No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

## APPELLANT'S OPPOSED MOTION FOR RELEASE PENDING APPEAL

Jeffrey B. Coopersmith
Aaron Brecher
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, WA 98101

Amy Walsh
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Stephen A. Cazares
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
355 South Grand Avenue,
Suite 2700
Los Angeles, CA 90071

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION .............................................................................. 1

PROCEEDINGS BELOW ................................................................... 2

ARGUMENT ...................................................................................... 4

I.    The District Court's Constructive Amendment Of The
Indictment Is A Substantial Question Likely To Lead To A
New Trial On All Counts ........................................................ 4

    A.    The district court's admission of evidence distinct from
the charges in the indictment presents a substantial
question ........................................................................... 4

    B.    The substantial question about the scope of the
indictment is likely to result in a new trial on all charges ....... 10

II.    The District Court's Admission Of Specialized Testimony By
Non-Experts Is A Substantial Question Likely To Lead To A
New Trial On All Counts ...................................................... 11

    A.    The district court's error in interpreting and applying
Rules 701 and 702 presents a substantial question ................. 11

    B.    The substantial question about Rules 701 and 702 is
likely to result in a new trial on all counts ........................... 15

III.    The Government's Failure To Correct False Testimony Is A
Substantial Question Likely To Lead To A New Trial On The
Investor Counts ..................................................................... 17

    A.    The government knowingly solicited and failed to correct
false testimony in violation of *Napue v. Illinois* ................... 17

    B.    The substantial question about the government's *Napue*
violation is likely to result in a new trial on all investor
counts ............................................................................. 21

IV.    The District Court Correctly Found That Mr. Balwani Satisfies
The Remaining Requirements For Release Pending Appeal ............. 24

CONCLUSION ................................................................................. 24

RULES AND STATUTORY PROVISIONS ........................................ 26

LIST OF EXHIBITS .......................................................................... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Borg,*
    951 F.2d 1011 (9th Cir. 1991) ................................................................22

*Dow v. Virga,*
    729 F.3d 1041 (9th Cir. 2013) ................................................20, 21, 23

*Elsayed Mukhtar v. Cal. State Univ.,*
    299 F.3d 1053 (9th Cir. 2002) ................................................................16

*Giglio v. United States,*
    405 U.S. 150 (1972) ................................................................................23

*Hayes v. Brown,*
    399 F.3d 972 (9th Cir. 2005) ..................................................17, 18, 22, 23

*Jackson v. Brown,*
    513 F.3d 1057 (9th Cir. 2008) ........................................................19, 21

*N. Mariana Islands v. Bowie,*
    243 F.3d 1109 (9th Cir. 2001) ................................................................20

*Napue v. Illinois,*
    360 U.S. 264 (1959) ................................................................1, 4, 17, 23

*Obrey v. Johnson,*
    400 F.3d 691 (9th Cir. 2005) ................................................................15

*Panah v. Chappell,*
    935 F.3d 657 (9th Cir. 2019) ................................................................18

*Standen v. Whitley,*
    994 F.2d 1417 (9th Cir. 1993) ................................................................16

*Stirone v. United States,*
    361 U.S. 212 (1960) ..................................................................................7

*United States v. Adamson,*
    291 F.3d 606 (9th Cir. 2002) ........................................................7, 8, 9, 10

ii

*United States v. Alli*,
344 F.3d 1002 (9th Cir. 2003) ............................................................21

*United States v. Antonakeas*,
255 F.3d 714 (9th Cir. 2001) ................................................................9

*United States v. Ausby*,
916 F.3d 1089 (D.C. Cir. 2019) ..........................................................18

*United States v. Bailey*,
696 F.3d 794 (9th Cir. 2012) ..............................................................15

*United States v. Carlson*,
616 F.2d 446 (9th Cir. 1980) ................................................................8

*United States v. Dipentino*,
242 F.3d 1090 (9th Cir. 2001) ..............................................................7

*United States v. Durham*,
464 F.3d 976 (9th Cir. 2006) ..............................................................12

*United States v. Figueroa-Lopez*,
125 F.3d 1241 (9th Cir. 1997) ............................................................14

*United States v. Garcia*,
340 F.3d 1013 (9th Cir. 2003) ..........................................................1, 4

*United States v. Handy*,
761 F.2d 1279 (9th Cir. 1985) ..........................................................1, 5

*United States v. Hartz*,
458 F.3d 1011 (9th Cir. 2006) ..............................................................8

*United States v. Haynes*,
729 F.3d 178 (2d Cir. 2013) ..............................................................14

*United States v. Kohring*,
637 F.3d 895 (9th Cir. 2011) ..............................................................24

*United States v. LaPage*,
231 F.3d 488 (9th Cir. 2000) ..............................................................20

*United States v. McDill*,
871 F.3d 628 (8th Cir. 2017) ...............................................................11

*United States v. Natal*,
849 F.3d 530 (2d Cir. 2017) ................................................................14

*United States v. Oaxaca*,
233 F.3d 1154 (9th Cir. 2000) ............................................................16

*United States v. Price*,
566 F.3d 900 (9th Cir. 2009) ..............................................................20

*United States v. Riddle*,
103 F.3d 423 (5th Cir. 1997) ..............................................................14

*United States v. Stein*,
846 F.3d 1135 (11th Cir. 2017) ..........................................................21

*United States v. Wells*,
879 F.3d 900 (9th Cir. 2018) ..............................................................12

*United States v. Wilson*,
605 F.3d 985 (D.C. Cir. 2010)............................................................14

**Statutes**

18 U.S.C. § 3143(b) .............................................................................24

18 U.S.C. § 3143(b)(1)............................................................................4

18 U.S.C. § 3145(c) ...........................................................................1, 4

**Rules and Regulations**

Fed. R. App. P. 9(b) ...............................................................................4

Fed. R. Evid. 701 .......................................................1, 4, 11, 12, 14, 15

Fed. R. Evid. 702 .................................................. 1, 4, 11, 12, 13, 14, 15

iv

# INTRODUCTION

Congress placed in this Court the life-altering role of assuring that motions for release pending appeal are properly resolved. 18 U.S.C. § 3145(c). The district court below has permitted the government to violate the Fifth Amendment, circumvent the Federal Rules of Evidence, and trample on Due Process. The substantial questions raised here warrant reversal or a new trial on all counts. The Court should grant Mr. Balwani's motion. *See United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985) (reversing denial of release pending appeal); *United States v. Zimny*, 857 F.3d 97 (1st Cir. 2017) (same).

"[A] 'substantial question' is one that is 'fairly debatable.'" *United States v. Handy*, 761 F.2d 1279, 1281 (9th Cir. 1985); *see also United States v. Garcia*, 340 F.3d 1013, 1020 n.5 (9th Cir. 2003) (requiring "only a non-frivolous issue").

There are three substantial questions presented:

(1) Whether the district court constructively amended the Grand Jury's indictment by admitting a complex of facts about the accuracy and reliability of *traditional* blood tests used by Theranos, when the indictment alleged fraud related only to the accuracy and reliability of Theranos' *proprietary* blood tests?

(2) Whether the district court erred in its interpretation of Federal Rules of Evidence 701 and 702 and therefore erroneously admitted specialized testimony on crucial questions from three lay witnesses never qualified as experts?

(3) Whether the government violated *Napue v. Illinois*, 360 U.S. 264, 269 (1959), by soliciting and failing to correct false testimony about statements made on an investor call, even though it knew the

testimony contradicted an audio tape of the call that the
government played in the co-defendant's earlier trial?

## PROCEEDINGS BELOW

The Grand Jury alleged that Theranos, Inc., led by its founder, Elizabeth
Holmes, and its President, Mr. Balwani, sought to develop "proprietary technology
that could run clinical tests using only tiny drops of blood instead of the vials of
blood typically drawn from an arm vein for traditional analysis." Ex. A at ¶ 5. The
indictment charged Ms. Holmes and Mr. Balwani with two schemes, to defraud
patient and to defraud investors, hinging on alleged misrepresentations about the
capabilities of this proprietary technology. Ex. A at ¶¶ 5-9, 12(A), 15-17, 19-26.

Ms. Holmes was tried first and convicted on certain investor counts. Ex. D.
The jury hung on other investor counts after asking to rehear an audio tape of a
December 2013 investor call that was played several times during her trial. *Id.*; *see
also* Ex. C (minute order noting jury request to hear tape during deliberations).

At Mr. Balwani's trial, the government highlighted evidence related to
accuracy and reliability problems with traditional blood-testing technology—that
is, technology manufactured commercially by well-known third-party
manufacturers (such as Siemens AG) and used in labs around the country and the
world, which Theranos used to run certain tests. *E.g.*, Ex. M at 4621, 4660-64,
4965-66, 5030-31, 5953-56, 5977-91, 7670, 7681-84. Among other things, the
district court permitted the government to introduce a lengthy report from the

federal laboratory regulator (Centers for Medicare & Medicaid Services, or "CMS") listing a plethora of violations related overwhelmingly to traditional blood-testing technology, including the inflammatory finding that testing using that technology presented an "immediate jeopardy" to patients. *See* Ex. M at 4660, 4664-66, 5030-31; Ex. Q at 15, 33, 35, 37, 40, 49, 74. The government also emphasized specialized scientific and technical testimony of three former Theranos employees who purported to explain how Theranos' proprietary devices and chemistries worked or failed to work. *E.g.*, Ex. M at 1203, 1245-48, 1634, 1734, 2274-75, 3265-69, 3729-31, 6939, 7054-55, 7084-86, 7576. And the government introduced witnesses' inaccurate recollections of the December 2013 investor call, while convincing the court to block Mr. Balwani from challenging that testimony with the tape of the call played at the previous trial. *E.g.*, Ex. M at 4435, 5631, 6970, 7028; *see also* Ex. M at 4396 (court excluding tape). The government emphasized this testimony at least ten times in closing argument. *See* Ex. M at 6934, 6950, 6970, 7026-28, 7574, 7603, 7607, 7609-11, 7617, 7681.

The jury convicted Mr. Balwani on all counts. Exs. E, F. The district court sentenced him to 155 months of incarceration. Ex. H at 28.

Mr. Balwani moved the district court for release pending appeal. Among other issues, Mr. Balwani argued that there is a substantial question whether the government violated his Fifth Amendment right to indictment by a Grand Jury,

3

violated Federal Rules of Evidence 701 and 702, and violated his due process rights by using false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). The court found that Mr. Balwani "has provided clear and convincing evidence that he is neither a flight risk nor a danger to the community." Ex. J at 3; 18 U.S.C. § 3143(b)(1). But the court denied release. Ex. J. Mr. Balwani remains on release with a scheduled report date of March 16, 2023. Ex. K.

Mr. Balwani moves this Court for release pending appeal. *See* Fed. R. App. P. 9(b); 18 U.S.C. § 3145(c).[1] Attached here are the judgment of conviction, Ex. I; a transcript of the district court's release proceedings, Ex. O; the district court's order denying release, Ex. J; and the court reporter's certificate, Ex. P.

## ARGUMENT

### I. The District Court's Constructive Amendment Of The Indictment Is A Substantial Question Likely To Lead To A New Trial On All Counts.

#### A. The district court's admission of evidence distinct from the charges in the indictment presents a substantial question.

As the district court correctly determined, there is at least a substantial question whether the allegations in the indictment turn on the accuracy and reliability of Theranos' proprietary technology rather than the accuracy and reliability of traditional blood-testing technology. Although it denied release on

---

[1] This Court owes no deference to the district court's legal determinations underlying its denial of release pending appeal. *United States v. Garcia*, 340 F.3d 1013, 1015 (9th Cir. 2003). It reviews factual findings for clear error. *Id.*

this ground, the district court recognized:

> [T]he direct allegations regarding the *proprietary* tests' inaccuracies, combined with the absence of similar allegations regarding the *commercial* tests' inaccuracies, could support an interpretation that the [indictment]'s alleged falsity only extended to Theranos's *proprietary* blood tests.

Ex. J at 7.[2] "At the very least … the proper common-sense interpretation of what specific facts and behavior are alleged in the [indictment] can be a 'debatable [question] among jurists of reason." *Id.* (citing *Handy*, 761 F.2d at 1282). Indeed, at a pretrial hearing the district court itself read the indictment exactly as Mr. Balwani does, before abruptly changing its mind on the eve of trial. *See* Ex. L at 32 (Court: "I understand that he's not … charged with doing anything with commercial machines. He's certainly not charged with that…."). The government likewise read the indictment as limited to the accuracy and reliability of Theranos' proprietary technology when it served its interests. *See* Ex. B at 20 (arguing that a test not "run on [a] Theranos proprietary blood analyzer" should be "precluded under Rules 401 and 403" because it lacks "relevance to the charged conduct").

---

[2] Other aspects of the indictment confirm this reading. The indictment accuses the defendants of misleading investors based on their knowledge that "Theranos's proprietary analyzer had accuracy and reliability problems …." Ex. A at ¶ 12(A). And it charges them with deceiving patients through "omissions concerning the limits of and problems with Theranos's technologies" and their alleged knowledge that "Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results." Ex. A at ¶¶ 15-16.

Although the indictment charged only offenses relating to the accuracy and reliability of Theranos' propriety technology, the district court permitted the government (over Mr. Balwani's objection) to introduce a complex of facts distinctly different from those in the indictment: evidence of unreliable testing on traditional technology.

First, CMS employee Sarah Bennett testified at length, with the aid of a detailed report, about CMS's findings of deficiencies during an inspection of Theranos' lab. For example, the district court admitted testimony and a 100-page exhibit reflecting CMS's conclusion that Theranos' lab practices posed "immediate jeopardy" to patient safety, which the evidence defined as "lab practices [that] have the potential to cause harm, or have caused harm, or could cause death to patients." *See* Ex. M at 4660, 4664. That finding relied on problems with hematology tests run at that time on traditional blood-testing technology. *See* Ex. M at 4964-66, 5030-31; Ex. Q at 15, 33, 35, 37, 40, 49, 74. The rest of the CMS report also related overwhelmingly to testing on traditional blood-testing technology rather than Theranos' proprietary technology. *See* Ex. Q; Ex. J at 9. Thus, the jury heard that Theranos posed an immediate risk to patient safety, even though that regulatory finding was based on traditional blood tests that were not the basis for the fraud charges in the indictment.

Second, Theranos patient Erin Tompkins testified about a false-positive HIV

screener result she received, even though Theranos' HIV testing was always performed on traditional blood-testing technology. *See* Ex. M at 3415-16, 5977-91.

Third, patient Brent Bingham testified about an allegedly inaccurate platelet count test he received, even though Theranos tested platelets on both proprietary and traditional technology, and the government did not show which was used. *See, e.g.*, Ex. M at 5953-56; Ex. Q at 32-33, 38.

This extensive evidence constructively amended the indictment. A constructive amendment "occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Adamson*, 291 F.3d 606, 614 (9th Cir. 2002) (quotation omitted), *modified on other grounds by United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007). In the seminal case on constructive amendment, *Stirone v. United States*, 361 U.S. 212, 213-14 (1960), the defendants were charged with violating the Hobbs Act by interfering with shipments of sand coming *into* Pennsylvania, but the district court admitted evidence showing interference with the export of steel *from* Pennsylvania. Because the defendant could have been convicted "on a charge the grand jury never made against him," the error was "fatal." *Id.* at 219. This Court has issued similar rulings.[3]

---

[3] *See, e.g.*, *United States v. Dipentino*, 242 F.3d 1090, 1094-95 (9th Cir. 2001) (indictment charged defendants with allowing asbestos-containing materials to dry

The district court here erred in concluding that any divergence between the charges and the evidence at trial constituted at most a variance rather than an amendment. *See* Ex. J at 6, 10-11. In reaching that conclusion, the district court relied on *Adamson*, which found a variance when the indictment alleged misrepresentations of the fact that servers had been upgraded but the jury was allowed to convict based on misrepresentations about *how* the servers were upgraded. Ex. J at 10 (citing *Adamson*, 291 F.3d at 615-16). But unlike *Adamson*, this case involves far more than a divergence between the charges and the evidence about the "content of the misrepresentation." *Id.* Mr. Balwani instead faced conviction based on "*different behavior* than that alleged in the original indictment." *United States v. Hartz*, 458 F.3d 1011, 1021 (9th Cir. 2006). A case about misrepresenting the abilities of innovative technology morphed into one about Theranos' failure as a lab generally, through evidence of mismanagement and failures in traditional blood testing. Based on that dramatically different picture, the jury could have convicted Mr. Balwani for fraud related to deficient lab practices and failures in Theranos' traditional blood testing—far from the actual

---

out on floor instead of placing materials into containers, but jury instruction permitted conviction for failing to deposit asbestos containing materials at waste disposal site); *United States v. Carlson*, 616 F.2d 446, 447-48 (9th Cir. 1980) (indictment charged defendant with misapplying bank funds by causing loan to be made for personal use, but evidence and instructions permitted conviction for doing so by causing loan to be made when it was inadequately secured).

charges about fraud related to Theranos' proprietary technology. That "different behavior" is a fundamentally distinct way of committing the alleged crime and tracks the fatal divergences in *Stirone*, *Dipentino*, and *Carlson*.[4] Finding a variance here would create an exception to the constructive amendment doctrine broad enough to swallow *Stirone* itself.

Nor did the jury instructions eliminate the effect of amending the indictment. The district court reasoned that any divergence between the evidence and the charges was cured by instructing the jury not to convict merely because "Theranos may have violated federal or state regulations or … engaged in negligent practices or violated industry standards …." Ex. J at 8. The district court's reasoning is insufficient for three reasons. First, the instruction said nothing about the prejudicial evidence from Ms. Tompkins and Mr. Bingham. Second, the instruction did not tell the jury to ignore the CMS evidence; it affirmatively told the jury to "consider [the] evidence ... [for] any purposes for which such evidence was admitted." *Id.* It confirmed only that negligent practices or regulatory violations were not enough *on their own* to support a fraud conviction—of course, as the jury

---

[4] Even when this Court has held that divergent facts constitute only a variance, it has acknowledged that the line between variance and amendment is "at times difficult to draw." *Adamson*, 291 F.3d at 615; *see also United States v. Antonakeas*, 255 F.3d 714, 722 (9th Cir. 2001) (noting that distinction between the two is "blurred"). Because Mr. Balwani need only show a substantial question, that difficulty supports granting relief.

was separately instructed, a fraud conviction also requires proving intent. Third, because some of the CMS evidence did concern "Theranos's proprietary device," *id.* at 9, the same instruction would have been needed no matter the district court's decision on whether to admit evidence on the accuracy of commercial technology.

So too with the instruction that "Mr. Balwani is not on trial for any conduct or offense not charged in the indictment." Ex. J at 8. That simply begs the question. The district court itself interpreted the indictment and, based on its misreading, admitted evidence pertaining to problems with traditional blood-testing technology. Instructing the jury that it could convict only on charges in the indictment did nothing to clarify the scope of those charges given the divergent evidence presented.

Thus, there is at least a substantial question whether the indictment was constructively amended.

## B. The substantial question about the scope of the indictment is likely to result in a new trial on all charges.

A constructive amendment "always requires reversal." *Adamson*, 291 F.3d at 615. The district court acknowledged that, if "the Ninth Circuit were to agree with Mr. Balwani's constructive amendment theory and its application to all twelve convictions, it would likely result in the reversal of all counts on which imprisonment has been imposed." Ex. J at 5.

On that point, the district court is correct. The government conceded that

"misrepresentations about the accuracy and reliability of Theranos' testing would be sufficient to support a verdict on all counts alleged in the [indictment] and is the key overlapping misrepresentation between the two fraud schemes …." Ex. G at 11. In other words, the district court's expansion of the indictment to allow conviction based on the inaccuracy of testing on traditional technology offered the jury an invalid basis to convict on all counts. Because the jury's general verdict made no special findings, this Court cannot say whether the jury convicted Mr. Balwani on the invalid basis or a valid one. *See United States v. McDill*, 871 F.3d 628, 633 (8th Cir. 2017) (constructive amendment required vacating all counts where general verdict meant court did not know whether verdict rested on constitutionally invalid ground). Thus, the substantial question, if resolved in Mr. Balwani's favor, is likely to lead to reversal or a new trial on all counts.

## II. The District Court's Admission Of Specialized Testimony By Non-Experts Is A Substantial Question Likely To Lead To A New Trial On All Counts.

### A. The district court's error in interpreting and applying Rules 701 and 702 presents a substantial question.

The government offered no expert testimony on the science behind blood-testing technology. Instead, it relied solely on specialized testimony from witnesses never qualified to give it. Those witnesses testified extensively about the accuracy and reliability of Theranos' proprietary devices, which conducted complex biochemistries with high-tech hardware and novel software. It was error to admit

that testimony from non-experts under Federal Rules of Evidence 701 and 702.[5]

The district court erred in applying Rules 701[6] and 702[7] to three key government witnesses: Erika Cheung, Mark Pandori, and Adam Rosendorff. Each of them repeatedly crossed the line between lay and specialized testimony:

**1.** Ms. Cheung testified about why dilution is necessary in blood testing, Ex. M at 1132-33; the capacities of Theranos devices, *id.* at 1135-38; the purpose of and concerns arising from Theranos' quality-control testing, *id.* at 1202-03, 1245-48; comparisons between Theranos' data-analysis procedures and an industry-standards manual she had never seen before, *id.* at 1552-54; and the purpose of government regulations governing blood testing, *id.* at 1557-58.

**2.** Dr. Pandori testified about whether Theranos' technology was

---

[5] Although evidentiary errors are often reviewed for abuse of discretion, the Court applies de novo review here to the "construction of interpretation of … the Federal Rules of Evidence, including whether particular evidence falls within the scope of a given rule." *United States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018) (alteration in original) (quoting *United States v. Durham*, 464 F.3d 976, 981 (9th Cir. 2006)).

[6] **Rule 701** provides that if "a witness is not testifying as an expert," "testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

[7] **Rule 702** permits witnesses to convey "scientific, technical, or other specialized knowledge" only if that witness "is qualified as an expert" and if the testimony otherwise conforms to that rule's four requirements (usefulness, factual basis, reliable methods, and reliable application).

groundbreaking given the state of the art and industry knowledge, *id.* at 1608, 1733; concerns with quality-control and proficiency testing, *id.* at 1634, 2274-75; and a critical issue: whether "Theranos testing was more accurate," *id.* at 1734.

**3.** Dr. Rosendorff testified about the effects of laboratory bias, dilution, and hemolysis on the accuracy and reliability of Theranos' technology, *id.* at 3265-66, 3729-31; concerns arising from Theranos' use of testing reference ranges specific to its fingerstick technology, *id.* at 3266-67; and whether purported errors in individual results could indicate systemic accuracy problems, *id.* at 3268-69.

To take just one example, Ms. Cheung—a former entry-level lab associate with no relevant expertise—opined on whether quality-control failures "ha[d] any impact on the accuracy or reliability of patient tests." *id.* at 1202. Yes, she testified, those failures were "an indication that there was some issue in the accuracy of the actual [Theranos] device." *id.* at 1204. Lacking any statistical training or reliable methodology, Ms. Cheung opined that she "just extrapolate[d] out essentially the percentage of [quality-control] failures" to conclude that "it seems likely that maybe there's some issue with the chemistry" on Theranos devices. *id.* at 1248.

The district court allowed this specialized testimony, notwithstanding Rule 702's unsatisfied safeguards, because the witnesses testified "based on [their] training and experience" at Theranos. *id.* at 1137. But questions framed "based upon your training and experience" are a hallmark of Rule 702 expert testimony.

*United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997).

Nor was it sufficient that the witnesses' testimony was purportedly based on their rational perceptions. In this Court's landmark decision in *Figueroa-Lopez*, the government articulated that very theory—that the Rules are satisfied by the "percipience of a witness to the facts on which he wishes to tender an opinion." 125 F.3d at 1246. This Court condemned that theory: "[M]ere percipience … does not trump Rule 702." *Id.* "Otherwise, a layperson witnessing the removal of a bullet … could opine as to the cause of the decedent's death." *Id.*[8]

The evidence described above far exceeded what other courts have found to be specialized. *E.g.*, *United States v. Natal*, 849 F.3d 530, 536 (2d Cir. 2017) (per curiam) ("how cell phone towers operate"); *United States v. Haynes*, 729 F.3d 178, 194 (2d Cir. 2013) ("how [a] fuel tank functions"); *United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997) ("overview of banking regulations and practices"). It was "beyond the understanding of an average juror" and, therefore, specialized. *United States v. Wilson*, 605 F.3d 985, 1026 (D.C. Cir. 2010) (per curiam).

In denying Mr. Balwani release pending appeal, the district court did not dispute the above analysis. Even the government argued in its closing argument

---

[8] Codifying *Figueroa-Lopez*, the advisory committee reinforced Rule 701 by adding subsection (c) in order "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee note to 2000 amendment (citing *Figueroa-Lopez*, 125 F.3d at 1246).

that its witnesses offered "technical specialized" testimony. Ex. M at 7592. It is, at least, fairly debatable whether that testimony conveyed "specialized knowledge" that should have been subjected to Rule 702, or else excluded under Rule 701.

**B.   The substantial question about Rules 701 and 702 is likely to result in a new trial on all counts.**

The district court's sole reason for denying release was that the error did not prejudice Mr. Balwani with respect to "*all*" counts because the investor counts did not turn exclusively "on the accuracy of Theranos's technology." Ex. J at 12-13.[9] But that ruling rested on both legal and factual errors.

At the threshold, the district court misapprehended the prejudice inquiry. It failed even to mention that the analysis "begins with 'a presumption of prejudice,'" and the government bears the "burden to show the harmlessness of the error." *United States v. Bailey*, 696 F.3d 794, 803 (9th Cir. 2012) (quoting *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005)). Instead, the district court mistakenly analyzed the question as if it were Mr. Balwani's burden.

The government cannot make the showing required to avoid this profound error. When testimony is admitted in violation of Rules 701 and 702, and when it

---

[9] There can be no dispute that accuracy and reliability were essential to the patient counts and, therefore, that the error undermined those convictions. *See* Ex. A at ¶¶ 17(A)-(C); Ex. G at 11 (conceding that accuracy and reliability were the representations that "mattered to the patient [counts]" (quoting Ex. M at 7060)).

"addresse[s] the central issue of [the] case," "it is hard for us to see how [that] testimony … was harmless." *Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1068 (9th Cir. 2002), *overruled in part on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc).

It wasn't. Here, again, the district court misunderstood the law. It evaluated whether, absent these non-expert witnesses' expert testimony on accuracy and reliability, there "remain[ed] some bases for Mr. Balwani's convictions." Ex. J at 13. And it concluded that the error was harmless because other alleged misrepresentations could have supported the jury's verdict. *Id.* at 12-13. In other words, the district court saw sufficient evidence to support the convictions.

But this Court has been clear: "Determining the harmlessness of an error is distinct from evaluating whether there is substantial evidence to support a verdict." *United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000). Indeed, "[t]here is a striking difference" between the two, and the harmlessness analysis requires inquiry into "the probabilities of the effect of error on a reasonable trier of fact." *Id.* (quoting *Standen v. Whitley*, 994 F.2d 1417, 1423 (9th Cir. 1993)). In other words, courts ask whether a jury likely *would* have convicted absent the error, not whether it *could* have—as the district court asked here.

The government has not disputed that this specialized testimony was necessary for it to prove the accuracy and reliability allegations—allegations that

16

were integral to all counts. *See, e.g.*, Ex. G at 11 (describing accuracy and reliability as "the key overlapping misrepresentation between the two fraud schemes"). Moreover, even assuming there was sufficient evidence to convict on the basis of other alleged misrepresentations, those allegations were hotly contested at trial, and there is no reason to think a jury would have convicted on those allegations alone. Therefore, no court could confidently say that the improperly admitted specialized testimony did not affect the verdict.

## III. The Government's Failure To Correct False Testimony Is A Substantial Question Likely To Lead To A New Trial On The Investor Counts.

Over two decades ago, this Court, sitting en banc, directed federal prosecutors to stop engaging in "schemes to place false or distorted evidence before a jury." *Hayes v. Brown*, 399 F.3d 972, 998 (9th Cir. 2005) (discussing *Napue*, 360 U.S. 264). "Our criminal justice system depends on the integrity of the attorneys who present their cases to the jury." *Id.* Despite *Hayes*, here is yet another case where a prosecutor obtained a conviction through "deceptive means," thereby "weaken[ing]" "the entire foundation of our system of justice." *Id.*

### A. The government knowingly solicited and failed to correct false testimony in violation of *Napue v. Illinois*.

The government's failure to uphold its "affirmative duty … to correct false testimony" that it knew to be false—indeed, the government's knowing and intentional conduct designed to put false testimony before the jury—is a substantial

question on appeal. *Hayes*, 399 F.3d at 981 (such conduct violates due process).

**1.** Two investor witnesses—Bryan Tolbert and Chris Lucas—gave "false or misleading" testimony regarding Ms. Holmes' statements to investors on a key December 2013 call. *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019); *see also Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019). What Ms. Holmes actually told investors on that call is not up for debate because Mr. Tolbert made an audio tape of the call. Ex. N at 4477-511. Mr. Tolbert and Mr. Lucas's accounts differed from what she said in important respects:

- Mr. Tolbert testified that Ms. Holmes bragged "that Theranos devices *were employed* on the medevac helicopters" and "*being used* to kind of improve survival rates of military personnel who had been injured in combat." Ex. M at 4435 (emphasis added). Lucas testified that Ms. Holmes said "the technology *was being used* in the Middle East and in particular in the—on the battlefield." Ex. M at 5631 (emphasis added); *see also* Ex. M at 5685 (testifying she made this statement on the December 2013 call).

- In fact, as the tape confirms, Ms. Holmes used aspirational language: "[T]he ability to take a technology like this and put it in flight, specifically on a medevac, has the *potential* to change survival rates." Ex. N at 4504 (emphasis added).

- When the government asked about material representations, Mr. Tolbert identified Ms. Holmes' suggestion that Theranos' military and pharmaceutical partnerships would advance, a "*broadening o*f the[] [company's] business opportunities." Ex. M at 4437-38 (emphasis added).

- In fact, as the tape confirms, Ms. Holmes stated that the company "had to *pause* a large number of [its] ongoing pharmaceutical and military programs so that [it] could focus"

on retail opportunities. Ex. N at 4504-05 (emphasis added).

Mr. Tolbert and Mr. Lucas's false and misleading testimony supported the government's assertions that Mr. Balwani and Ms. Holmes misrepresented the company's business relationships and current capabilities, but they did not reflect the truth of Ms. Holmes' statements.

**2.** The government "'kn[e]w or should have known'" that Mr. Tolbert and Mr. Lucas's testimony was false but did not correct it. *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008). This investor call was a major focus of Ms. Holmes' trial, where her words were played for the jury at least four times. *E.g.*, Ex. N at 4477-511 (Tolbert direct), 4536-37 & 4547-50 (Tolbert cross), 8929, 8963-67, 8982 (government closing); Ex. C (jury request to rehear tape during deliberations). There, the government introduced the tape of the call affirmatively and then had to confront on redirect examination how the tape in fact weakened its case. *See, e.g.*, Ex. N at 4566. And when the government focused on Ms. Holmes' alleged statements about Theranos devices on military medevacs during its closing argument, *e.g.*, Ex. N at 8910, 8922, 8968, Ms. Holmes' defense counsel was able to direct the jury to "compare [the tape] to what was actually going on with Theranos's military programs," *id.* at 9157—showing that Ms. Holmes did not tell investors that Theranos devices were being used on medevacs as "many of the witnesses" had suggested, *id.* at 9162; *see also id.* at 4504. After asking to rehear

19

Ms. Holmes' actual words, the jury returned a mixed verdict (*supra*, at 2)—which prompted the government to change strategy at Mr. Balwani's trial. Indeed, the government was so keenly aware of how unhelpful Ms. Holmes' actual statements were to its case that it successfully fought to keep Mr. Balwani from introducing the tape to undermine its witnesses' accounts. Ex. M at 4248-61, 4389-96.

Given the above, "it [is] plain that the [government] knew" its revised presentation of Ms. Holmes' statements (solely through witness recollection) was false because "the matter was important and the same prosecutor tried the case both times." *United States v. LaPage*, 231 F.3d 488, 490 (9th Cir. 2000). Mr. Tolbert himself alerted the government that it should "suspect" inaccuracy, *United States v. Price*, 566 F.3d 900, 910 n.11 (9th Cir. 2009): Early in his testimony, he admitted he was uncertain of what Ms. Holmes said without "look[ing] back at the transcript of the call." Ex. M at 4434. Yet the government not only refused "to act when put on notice of the real possibility of false testimony," *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001); it affirmatively blocked the defense from showing the testimony was untrue.

**3.** The district court did not deny that the government knowingly used false evidence. *See* Ex. J at 13-14. It is at least "fairly debatable" whether "knowingly elicit[ing] and then fail[ing] to correct false testimony" denied Mr. Balwani due process. *Dow v. Virga*, 729 F.3d 1041, 1042-43 (9th Cir. 2013).

### B.   The substantial question about the government's *Napue* violation is likely to result in a new trial on all investor counts.

The government's failure to correct false testimony requires a new trial if the testimony was "material," i.e., if "'there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury.'" *Dow*, 729 F.3d at 1048 (materiality requires "far lesser showing" than ordinary harmless error review). If "'it is established that the government knowingly permitted the introduction of false testimony,'" then "'reversal is virtually automatic.'" *Jackson*, 513 F.3d at 1076; *see also United States v. Alli*, 344 F.3d 1002, 1008 (9th Cir. 2003) (it is "rare" for "the government's failure to correct false testimony" to not "affect[] the defendant's substantial rights").

Here, the false testimony was material to all the investor counts for the simple reason that the government "affirmatively capitalize[d]" on it in urging the jury to convict on all those counts. *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017); *see also Alli*, 344 F.3d at 1008.[10] Ms. Holmes' statements about the military—and Mr. Tolbert's recitation of those statements—were a "centerpiece" of the government's closing on the alleged investor fraud. *Hayes*,

---

[10] These counts largely served as the basis for Mr. Balwani's imprisonment. Because the district court found investor loss amounts totaling $120,192,642 and at least ten investor victims, Ex. H at 14-15, it increased Mr. Balwani's offense level by 26 levels for a total offense level of 33, *id.* at 26-27. This yielded a sentencing guidelines range of 135-168 months. *Id.* at 27. He was sentenced to 155 months.

399 F.3d at 985. It argued that "Holmes's role in the investor conspiracy was to recruit investors" and that "[s]he communicated false statements directly to investors like Tolbert." Ex. M at 6970. It told the jury, "You *heard* the Tolbert phone call when Holmes brags about DOD or military work that Theranos did." *Id.* (emphasis added). "That's Holmes fulfilling her role in the conspiracy." *Id.* Yet the government had not let the jury "hear" that call directly—only Mr. Tolbert and Mr. Lucas's inaccurate rendition. And it returned to the military representations at least ten times between closing and rebuttal, "enhanc[ing] immeasurably" the false testimony's "impact" on all investor counts. *Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991); *see* Ex. M at 6934, 6950, 6970, 7026-28, 7574, 7603-17, 7681.

The government then used the false testimony to "artificially bolster[]" the collective credibility of the investor witnesses. *Hayes*, 399 F.3d at 987. It asserted that the jury could trust the recollections of those witnesses regarding Ms. Holmes' military statements because they "all heard one form—one version or another of this story that Theranos technology was deployed actually treating soldiers in the battlefield, sometimes on medevac helicopters." Ex. M at 7028. The government returned to this point in its rebuttal, arguing that "because they all say consistently the same thing, you can have confidence that you're hearing from them what they heard from the defendant." *Id.* at 7611; *see also id.* at 7607-11.

In its order below, the district court summarily concluded that "Mr. Balwani

ha[d] not shown that this error requires reversal of *all* investor fraud counts on which [he] was convicted." Ex. J at 13. But as just shown, in the government's own telling Mr. Tolbert and Mr. Lucas's testimony was pivotal to assessing Ms. Holmes' statements to all investors. And by manufacturing consistency between witnesses, "the [government] achieved the desired effect of artificially bolstering" witnesses' credibility through an "unconstitutional step." *Hayes*, 399 F.3d at 987; *see also Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (where "credibility" of a witness is "an important issue in the case," deception by the prosecutor that protects the witness's credibility violates due process under *Napue*). Without this government misconduct, the jury "might well have concluded" that the demonstrably false accounts of investors, who swore they had heard the same statements as other investors almost a decade ago, created reasonable doubt whether any investor should be believed. *Napue*, 360 U.S. at 270.[11] And "[i]f the jury had been informed" that the government had presented incorrect testimony, this "would have had a devastating effect on the credibility of the entire prosecution case." *Hayes*, 399 F.3d at 987-88.

---

[11] After listening to the audio tape of the December 2013 call, the Holmes jury hung on counts expressly based on Mr. Tolbert and Mr. Lucas's investments. Ex. D. As this Court has noted, where, as here, a different jury outcome is reached in a second trial after a *Napue* violation, the violation "undoubtedly [affected] the jury's decision." *Dow*, 729 F.3d at 1049-50—a standard far higher than what Mr. Balwani must show here, *id.* at 1048.

Although the government alleged other misrepresentations as potential bases for the charged investor fraud, "there is no way to determine whether the jury based [its multiple] convictions on" other grounds. *United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011). The false testimony is material "because it speaks" to "acts that the jury might have relied on in reaching its verdicts." *Id.*

At a minimum, such a disclosure *could* have affected the outcome of the entire investor case—all that *Napue* requires for a reversal or new trial on at least all investor counts.

## IV. The District Court Correctly Found That Mr. Balwani Satisfies The Remaining Requirements For Release Pending Appeal.

The district court correctly found that "Mr. Balwani has presented clear and convincing evidence that he is not likely to flee or pose a danger." Ex. J at 2-3 (citing 18 U.S.C. § 3143(b)). He is not a flight risk, as evidenced by his close family ties in the United States and his consistent history of compliance with terms of release. *Id.* Nor is he a danger to the community. *Id.* Mr. Balwani has never been arrested for any other crime, and, as the district court found, he is in no position to "commit acts of deception or fraud in his everyday life." *Id.* at 3. Finally, the district court correctly noted that this appeal is not taken for purposes of delay; indeed, the government does not dispute this requirement. *Id.* at 2 n.1.

## CONCLUSION

The Court should grant Mr. Balwani's motion for release pending appeal.

March 15, 2023

Jeffrey B. Coopersmith
Aaron Brecher
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, WA  98101

Amy Walsh
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019

Stephen A. Cazares
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 South Grand Avenue,
Suite 2700
Los Angeles, CA  90071

Respectfully submitted,

*/s/ Mark S. Davies*
Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

*Counsel for Appellant*

## RULES AND STATUTORY PROVISIONS

Federal Rule of Appellate Procedure 9(b) provides that a defendant may:

obtain review of a district court order regarding release after a judgment of conviction by filing a notice of appeal from that order in the district court or by filing a motion in the court of appeals if the party has already filed a notice of appeal from the judgment of conviction.

Federal Rule of Appellate Procedure Rule 9(c) provides that:

The court must make its decisions regarding release in accordance with the applicable provisions of 18 U.S.C. §§ 3142 [release pending trial], 3143 [release pending sentence or appeal], and 3145(c) [review of release or detention order].

Section 3143(b)(1) provides that:

[T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds-
    (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
    (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in-
    (i) reversal,
    (ii) an order for a new trial,
    (iii) a sentence that does not include a term of imprisonment, or
    (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.
    If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title.

Section 3145(c) provides that:

An appeal from … a decision denying revocation … shall be determined promptly. A person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is

clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

# LIST OF EXHIBITS

Exhibit A: Dkt. No. 469, Third Superseding Indictment, filed July 28, 2020

Exhibit B: Dkt. No. 1155, United States' Motions in Limine, filed November 19, 2021

Exhibit C: Dkt. No. 1218, Minute Order for December 23, 2021, filed December 23, 2021

Exhibit D: Dkt. No. 1235, Verdict Form for Elizabeth Holmes, filed January 3, 2022

Exhibit E: Dkt. No. 1507, Verdict Form for Ramesh "Sunny" Balwani, filed July 7, 2022

Exhibit F: Dkt. No. 1508, Minute Order for July 7, 2022, filed July 7, 2022

Exhibit G: Dkt. No. 1725, United States' Opposition to Defendant Ramesh "Sunny" Balwani's Motion for Release Pending Appeal, filed January 30, 2023

Exhibit H: Dkt. No. 1730, Order on Sentencing, filed February 16, 2023

Exhibit I: Dkt. No. 1731, Judgment in a Criminal Case, filed February 16, 2023

Exhibit J: Dkt. No. 1743, Order Denying Motion for Release Pending Appeal, filed March 9, 2023

Exhibit K: Dkt. No. 1744, Order Granting Defendant's Administration Motion and Extending Defendant's Reporting Date, filed March 9, 2023

Exhibit L: Excerpts from Transcript of February 4, 2022 Hearing

Exhibit M: Excerpts from Trial Transcript of Ramesh "Sunny" Balwani

Exhibit N: Excerpts from Trial Transcript of Elizabeth Holmes

Exhibit O: Transcript of February 17, 2023 Hearing

Exhibit P: Certificate of the Court Reporter

Exhibit Q: TX4621 - CMS letter titled "Condition Level Deficiencies - Immediate Jeopardy."