Exhibit G

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS S. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFFREY B. SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Kelly.Volkar@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT RAMESH "SUNNY" BALWANI'S MOTION FOR RELEASE PENDING APPEAL |
| v. | |
| RAMESH "SUNNY" BALWANI, | Date:   February 17, 2023 |
| Defendant. | Time:  9:30 a.m. |
| | Court: Hon. Edward J. Davila |

# **TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................................1

BACKGROUND .......................................................................................................................1

LEGAL STANDARD ................................................................................................................2

ARGUMENT ............................................................................................................................4

    A.    Defendant Has Not Met His Burden of Showing by Clear and Convincing
Evidence That He Is Not a Flight Risk .......................................................................5

    B.    Defendant Has Not Met His Burden of Showing by Clear and Convincing
Evidence That He Is Not a Danger to the Community .................................................6

    C.    The Questions Defendant Has Presented Are Not Likely to Result in Reversal
or an Order for a New Trial on All Counts of Conviction ........................................10

    D.    Defendant Has Not Met His Burden of Showing That the Appeal Raises a
Substantial Question of Law or Fact.........................................................................14

        1.    The Evidence Admitted on Patient-Related Counts Did Not
Constructively Amend the Third Superseding Indictment .................................14

        2.    The Court Properly Admitted Testimony of Erika Cheung, Dr. Mark
Pandori, and Dr. Adam Rosendorff .................................................................16

        3.    There Was No Error in the Government Choosing Not to Seek
Admission of Recordings of Co-Defendant Holmes in Defendant
Balwani's Trial.................................................................................................18

        4.    The Court Did Not Err in Its Relevant Rulings Regarding the LIS
Database ..........................................................................................................19

        5.    The Court Did Not Err in Its Relevant Rulings Regarding Dr.
Rosendorff.......................................................................................................22

        6.    The Court Did Not Err in Admitting Certain Exhibits Related to the
Department of Defense ....................................................................................23

        7.    The Court Properly Calculated a Reasonable Estimate of Loss to
Victims .............................................................................................................24

CONCLUSION........................................................................................................................25

1

# **TABLE OF AUTHORITIES**

2

**CASES**

3
*Morison v. United States*,

4
    486 U.S. 1306 (1988) ..................................................................................................... 4

5
*Napue v. Illinois*,

6
    360 U.S. 264 (1959) ..................................................................................... 18, 19, 23

7
*United States v. Abel*,

    469 U.S. 45 (1984) ....................................................................................................... 22

8
*United States v. Anderson*,

9
    532 F.2d 1218 (9th Cir. 1976) ................................................................................... 15

10
*United States v. Bayko*,

11
    774 F.2d 516 (1st Cir. 1985) ................................................................................... 3, 4

12
*United States v. Bilanzich*,

13
    771 F.2d 292 (7th Cir. 1985) ......................................................................................... 4

14
*United States v. Cuong Cau Dang*, No. 13-CR-00486-EJD,

15
    2013 WL 4119426 (N.D. Cal. Aug. 9, 2013) ......................................................... 5

16
*United States v. Gerald N.*,

    900 F.2d 189 (9th Cir. 1990) (per curiam) .............................................................. 3

17
*United States v. Handy*,

18
    761 F.2d 1279 (9th Cir. 1985) ............................................................................ *passim*

19
*United States v. Hankey*,

20
    203 F.3d 1160 (9th Cir. 2000) ................................................................................... 22

21
*United States v. Kakkar*, No. 5:13-CR-00736-EJD,

22
    2017 WL 4163291 (N.D. Cal. Sept. 20, 2017) .................................................... 5, 6

23
*United States v. Khan*, No. 12-CR-00860-YGR,

    2014 WL 2930656 (N.D. Cal. June 27, 2014) ............................................... 3, 5, 6

24
*United States v. Laurienti*,

25
    611 F.3d 530 (9th Cir. 2010) ..................................................................................... 24

26
*United States v. Lindsey*,

27
    680 F. App'x 563 (9th Cir. 2017) .......................................................................... 6, 7

28

*United States v. Martin*,
   796 F.3d 1101 (9th Cir. 2015) ...................................................................................... 25

*United States v. McCahill*,
   765 F.2d 849 (9th Cir. 1985) ......................................................................................... 2

*United States v. Mett*,
   41 F.3d 1281 (9th Cir. 1994) ......................................................................................... 3

*United States v. Miller*,
   753 F.2d 19 (3d Cir. 1985) ................................................................................... 3, 4, 16

*United States v. Montoya*,
   908 F.2d 450 (9th Cir. 1990) ............................................................................... 3, 5, 14

*United States v. Motamedi*,
   767 F.2d 1403 (9th Cir. 1985) ....................................................................................... 5

*United States v. Reynolds*,
   956 F.2d 192 (9th Cir. 1992) ......................................................................................... 6

*United States v. Sivilla*,
   714 F.3d 1168 (9th Cir. 2013) ..................................................................................... 21

*United States v. Zolp*,
   479 F.3d 715 (9th Cir. 2007) ................................................................................. 24, 25

**STATUTES**

18 U.S.C. § 3142 ............................................................................................................ 10

18 U.S.C. § 3143 .......................................................................................................... 2, 3

**FEDERAL RULES**

Federal Rule of Criminal Procedure 29 .............................................................. 2, 12, 13

Federal Rule of Criminal Procedure 33 ......................................................................... 2

Federal Rule of Criminal Procedure 46 ......................................................................... 3

Federal Rule of Evidence 702 ....................................................................... 16, 17, 18

## INTRODUCTION

The government opposes Defendant Ramesh "Sunny" Balwani's Motion for Release Pending Appeal. *See* ECF No. 1711 ("Motion"). More than six months ago, Defendant was found guilty on twelve felony fraud-related counts associated with significant harm to patient-victims and a loss to investor-victims of at least $120 million. The Court imposed a sentence of 155 months of imprisonment along with other conditions on December 7, 2022, and set a self-surrender date of March 15, 2023. Defendant has maintained throughout this case that he is independently wealthy (in part to assert that he had no motive to defraud the victims of the two schemes to defraud). Defendant has not accepted responsibility and has shown no remorse to the victims of his crime. The criminal justice system presumes at this point that a criminal defendant would begin serving his or her custodial sentence, and Defendant cannot meet the stringent standard for release pending appeal mandated by Congress in order to overcome that presumption. There are not two systems of justice—one for the wealthy and one for the poor—there is one criminal justice system in this country. And under that system, the time has come for Ramesh "Sunny" Balwani to answer for his crimes committed nearly a decade ago, as found by a jury made up of a fair cross section of individuals from this community, and to begin serving the term of imprisonment imposed by this Court as sufficient but not greater than necessary to account for those crimes. The government respectfully requests the Court deny Defendant's Motion.

## BACKGROUND

On July 28, 2020, the government filed the Third Superseding Indictment ("TSI"), charging Defendant Ramesh "Sunny" Balwani and co-Defendant Elizabeth Holmes with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2). ECF No. 469. The Court severed the case in March 2020. ECF No. 362. Beginning on August 31, 2021, co-Defendant Holmes' trial spanned four months, during which hundreds of exhibits were admitted and dozens of witnesses testified. *See generally* ECF Nos. 1256–1306, 1324. On January 3, 2022, the jury found co-Defendant Holmes guilty of four counts with respect to investor-related counts. ECF No. 1235.

Beginning with jury selection on March 9, 2022, Defendant Balwani's trial similarly spanned four months on the same twelve counts alleged in the TSI. *See generally* ECF Nos. 1514–1559. Throughout the trial, over 500 exhibits were admitted and 26 witnesses testified. *See* ECF No. 1562.

On July 7, 2022, the jury found Defendant Balwani guilty of all twelve counts, including conspiracy to commit wire fraud against Theranos investors, six counts of wire fraud in connection with six specific investors, conspiracy to commit wire fraud against Theranos paying patients, and four counts of wire fraud in connection with patients. *See* ECF No. 1507. Defendant moved for acquittal under Federal Rule of Criminal Procedure 29 ("Rule 29"). On November 7, 2022, the Court denied Defendant's Rule 29 motion. ECF No. 1635. Defendant subsequently joined co-Defendant Holmes' motion for a new trial purportedly based on newly discovered evidence based on post-trial statements made by Dr. Adam Rosendorff, under Federal Rule of Criminal Procedure 33 ("Rule 33"). ECF No. 1594. The Court denied Defendant's Rule 33 motion. ECF No. 1599.

On December 7, 2022, the Court calculated the applicable U.S. Sentencing Guidelines range to be 135 to 168 months of imprisonment, in part based upon a finding that a reasonable estimate of the loss to investor-victims was more than $120 million, and sentenced Defendant to a Guidelines sentence of 155 months' imprisonment on each count to run concurrently. ECF No. 1682; 12/07/22 Tr. at 92–93, 148–49. Over the government's objection, the Court did not consider patient-related conduct in its Guidelines calculation. 12/07/22 Tr. at 91–92. The Court set Defendant's self-surrender date on March 15, 2023. *Id.* at 150. The Court had previously made similar findings for the Guidelines calculation with respect to co-Defendant Holmes on November 18, 2022, and sentenced her to 135 months of imprisonment, among other conditions. ECF No. 1712; 11/18/22 Tr. at 87–88, 132–33.

## LEGAL STANDARD

Detention is the mandatory, routine norm for any defendant following conviction and the imposition of a custodial sentence. 18 U.S.C. § 3143(b)(1); *see also* ECF No. 1721 (providing full legal standard). The Bail Reform Act of 1984 ("the Act") provides that after conviction and imposition of sentence, detention is mandatory absent clear and convincing evidence that a defendant is not a flight risk or danger to the community. Congress enacted the Act to "toughen the law with respect to bail pending appeal" and to "make[ ] it considerably more difficult for a defendant to be released on bail pending appeal." *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985); *see also United States v. McCahill*, 765 F.2d 849, 850 (9th Cir. 1985) (Kennedy, J.). "Once a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit

it in the absence of exceptional circumstances." *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (internal quotation omitted). Otherwise, "release of a criminal defendant into the community, even after conviction," runs the risk of "destroy[ing] whatever deterrent effect remains in the criminal law." *Id.* (internal quotation omitted).

Unlike in the pretrial-detention context, every defendant seeking bail pending appeal after his conviction and sentencing is presumed to be a danger and a flight risk—and it is the defendant's burden to overcome that presumption. *See United States v. Khan*, No. 12-CR-0860-YGR, 2014 WL 2930656, at *2 (N.D. Cal. June 27, 2014) ("Through this statute Congress created a presumption of detention and shifted the burden of proof to the defendant to show otherwise." (citing *Handy*, 761 F.2d at 1283)); *see also Miller*, 753 F.2d at 22 ("The Bail Reform Act of 1984 was enacted because Congress wished to reverse the presumption in favor of bail" for defendants seeking release pending appeal). As a result, "under the Bail Reform Act of 1984 it is no easy matter to obtain bail pending appeal." *United States v. Gerald N.*, 900 F.2d 189, 191 (9th Cir. 1990) (per curiam).

To overcome this legislative mandate, a defendant must prove: (1) by clear and convincing evidence that he is not a flight risk or a danger to the community; and (2) that his appeal is not for the purpose of delay and (3) raises a substantial question of law or fact that is (4) likely to result in (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to less than time served. 18 U.S.C. § 3143(b)(1); *see also United States v. Mett*, 41 F.3d 1281, 1282 n.3 (9th Cir. 1994) (listing requirements). Where a defendant fails to satisfy his burden in every respect, a request for bail pending appeal must be denied. *See United States v. Montoya*, 908 F.2d 450, 451 (9th Cir. 1990); Fed. R. Crim. P. 46(c).

A "substantial question" refers to a legal issue that is "fairly debatable" or "fairly doubtful" and "is one of more substance than would be necessary to a finding that it was not frivolous." *Handy*, 761 F.2d at 1283 (adopting the interpretation set forth in *Miller* and *Giancola*). "Fairly debatable" questions are those that are novel or not readily answerable, or that pose issues "debatable among jurists of reason." *Id.* at 1281–82 (internal quotations and citations omitted). "'[L]ikely to result in reversal' defines the type of question that must be presented." *Id.* at 1281. This requirement "has generally been read to mean that if error is found, it must not be harmless or unprejudicial error." *United States v.*

1    *Bayko*, 774 F.2d 516, 522 (1st Cir. 1985); *see also United States v. Bilanzich*, 771 F.2d 292, 299

2    (7th Cir. 1985) ("For example, harmless errors, errors that have no prejudicial effect, or errors that have

3    been insufficiently preserved would not justify a court's granting bail."). Thus, a "substantial" question

4    "may, nonetheless, in the circumstances of a particular case, be considered harmless, to have no

5    prejudicial effect, or to have been insufficiently preserved" such that the question would not be likely to

6    result in reversal. *Miller*, 753 F.2d at 23; *see Handy*, 761 F.2d at 1280, 1283 (adopting interpretation of

7    the standard set forth in *Miller*). Put differently, "[a] court may find that reversal or a new trial is

8    'likely' only if it concludes that the question is so integral to the merits of the conviction on which

9    defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the

10   conviction or a new trial." *Miller*, 753 F.2d at 23.

11          Furthermore, a defendant must prove that his appeal is likely to result in reversal or an order for

12   a new trial on *all counts* for which imprisonment has been imposed. *See, e.g.*, *Morison v. United States*,

13   486 U.S. 1306, 1306–07 (1988) (Rehnquist, C.J., in chambers, denying defendant's application for bail

14   pending resolution of certiorari petition because even if he raised a "substantial question" with respect to

15   certain counts of conviction, he had not done so with respect to *all counts* of conviction); *Handy*, 761

16   F.2d at 1283 (listing fourth requirement for granting bail pending appeal as "if that substantial question

17   is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for

18   a new trial of *all counts* on which imprisonment has been imposed" (emphasis added)).

19                                              **ARGUMENT**

20          Because the burden has shifted at this stage post-conviction and post-sentencing, Defendant's

21   cursory arguments that he is not a flight risk or economic danger to the community do not suffice to

22   meet the clear and convincing standard he faces. Furthermore, none of the arguments he has raised pose

23   a substantial question, as described further below. Regardless of whether any of the topics he has

24   asserted do raise a substantial question, Defendant cannot meet the final requirement because each of the

25   topics relate to harmless or non-prejudicial errors that do not affect *all* counts of conviction. *See Bayko*,

26   774 F.2d at 522; *Bilanzich*, 771 F.2d at 299; *Miller*, 753 F.2d at 23. Therefore, the Court should deny

27   Defendant's Motion for bail pending appeal.

28

## A.    Defendant Has Not Met His Burden of Showing by Clear and Convincing Evidence That He Is Not a Flight Risk

Defendant asserts in cursory fashion that he is not a flight risk by relying on an overview of his pretrial record and citing two pretrial detention decisions.  Mot. at 8–9 & nn.1 & 2 (*citing United States v. Cuong Cau Dang*, No. 13-CR-486-EJD (PSG), 2013 WL 4119426 (N.D. Cal. Aug. 9, 2013), *and United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985)).  However, that the parties had previously agreed upon—and the Court approved—conditions of release pre-trial and pre-sentencing does not alone meet the heightened burden Defendant now faces post-sentencing.  As described above, after conviction and imposition of sentence, the burden of proof shifts from the government to the Defendant to demonstrate by clear and convincing evidence that he is not a flight risk.  *See Handy*, 761 F.2d at 1283; *see also Khan*, 2014 WL 2930656, at *2 ("Through this statute Congress created a presumption of detention and shifted the burden of proof to the defendant to show otherwise." (citing *Handy*, 761 F.2d at 1283)).  The Ninth Circuit has held that this change, along with "[e]ach of the changes contained in the Bail Reform Act of 1984[,] makes it considerably more difficult for a defendant to be released on bail pending appeal."  *Id.*  The Ninth Circuit has also rejected cursory motions on contested issues given it is the defendant's burden to establish each requirement.  *See*, *e.g.*, *Montoya*, 908 F.2d at 451.

This Court, too, has rejected similar arguments from a defendant convicted of wire fraud given, among other factors, the "undeniably compelling motivation to flee given the convictions[ and] the length of the sentence imposed[.]"  *United States v. Kakkar*, No. 5:13-CR-00736-EJD, 2017 WL 4163291, at *2 (N.D. Cal. Sept. 20, 2017).  Specifically, the defendant in *Kakkar* was not a citizen of the United States, but pointed to the fact that he was a permanent resident, had surrendered his passport, had lived in the country for 28 years with strong family and business ties to California, had his immediate family all living within the United States, and had complied with all pretrial release conditions.  *Id.*  Like Defendant here, that defendant emphasized his pretrial release record and the fact that he appeared at all court dates and hearings and complied with all pretrial requirements.  *Id.*  Nevertheless, the Court found that four years of incarceration was compelling motivation to flee and attempt to "avoid[ ] the gravity of the legal process he faces[.]"  *Id.*  Moreover, the Court found that, "given the fraudulent conduct underlying the convictions and the fact he transferred assets and placed them out of the reach of

1  potential creditors, the court does not believe that any existing business or community ties are strong

2  enough to prevent Defendant from seeking to evade the consequences of his actions." *Id.*

3      The Court's rationale in *Kakkar* applies with equal force here.  Although Defendant is a U.S.

4  citizen, he was born in Pakistan and appears to maintain close ties with his family members living here

5  in the United States and those living abroad.  *See* PSR ¶¶ 90, 95–96.  Defendant has shared with the

6  Court that he has no children of his own, so his siblings and their families are very important to him.

7  11/07/22 Tr. at 11; *see also* PSR ¶ 97.  He has also asserted that he is close with his three older sisters

8  who live in India.  PSR ¶ 95.  And while Defendant's Motion highlights the support he has provided to

9  local religious communities—the PSR emphasizes similar community service work also supporting

10  communities in India and Pakistan.  PSR ¶ 101.  Weighing against the strength of Defendant's close ties

11  within the United States are those close ties he has abroad and "the length of the sentence imposed"—

12  nearly 13 years—which, as the Court previously noted, is "an undeniably compelling motivation to

13  flee[.]" *Kakkar*, 2017 WL 4163291, at *2.  Furthermore, Defendant has the means to flee.  Defendant

14  provided information to the Probation Office demonstrating that he has millions of dollars in assets and,

15  shortly before his trial began, he sold a property for over $15 million, which helped pay for his legal

16  fees.  PSR ¶¶ 122, 124.  Defendant chose to pay his lawyers rather than his victims.

17      In sum, as another court in this District found, this Court should find that Defendant "has both

18  the means and the motive to flee."  *Khan*, 2014 WL 2930656, at *4; *see also Kakkar*, 2017 WL

19  4163291, at *2.  Defendant's cursory review of his record on pretrial release does not meet his

20  heightened burden now that he has been convicted and sentenced to a term of imprisonment.

21      **B.**      **Defendant Has Not Met His Burden of Showing by Clear and Convincing Evidence**
            **That He Is Not a Danger to the Community**
22

23      Similarly, Defendant's disingenuous assertion that he poses no danger to the community merely

24  because his criminal offense was "a nonviolent offense," 12/07/22 Tr. at 150, glosses over the staggering

25  financial harm caused by his conduct.  *Cf.* Mot. at 9.  It is well-settled that danger to the community is

26  not limited to physical violence but rather can encompass pecuniary or economic harm, as well.  *See,*

27  *e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192–93 (9th Cir. 1992); *Kakkar*, 2017 WL 4163291, at *2

28  (citing *Reynolds*); *see also United States v. Lindsey*, 680 F. App'x 563, 567–68 (9th Cir. 2017)

(upholding denial of bail pending appeal where defendant's "elaborate mortgage fraud scheme" caused the loss of millions of dollars and "targeted vulnerable and impoverished individuals").  Despite its breadth, Defendant has not acknowledged the fraudulent nature of his conduct nor accepted responsibility, rendering it more likely that he will repeat it in the future.  *See* 12/07/22 Tr. at 132.  The government has described Defendants' conduct in detail elsewhere (*see*, *e.g.*, ECF Nos. 1395, 1486, 1661, 1721)—and the Court is familiar with the facts of this case having sat through two trials spanning nearly a year.  The government incorporates by reference its brief summary of Defendant's elaborate scheme to defraud investors about the capabilities of Theranos' blood-testing device from its recently filed opposition to co-Defendant Holmes' motion for bail pending appeal.  *See* ECF No. 1721 at 12.

In furtherance of their multi-year scheme to defraud patients, Defendants touted Theranos as a company that would revolutionize blood testing, making health information more reliable and more accessible.  Beginning in late 2013, Theranos actually offered clinical blood testing services to the public, first in the Bay Area, then in Arizona.  To jumpstart the process of making its tests available to the public, and to reach as many patients as it could, Theranos partnered with retail pharmacy chain Walgreens—a company with a nationwide footprint that could make Theranos' product accessible to most of the country's population.  Defendant took the lead in managing Theranos' relationship with Walgreens, which was critical to both schemes to defraud because Theranos benefitted from the goodwill and credibility associated with the Walgreens name.  *See* 04/19/22 Tr. at 2894, 2903 (Nimesh Jhaveri identifying Balwani as his day-to-day contact at Theranos); 05/18/22 Tr. at 5932 (Dr. Ellsworth testifying that he expected Theranos tests would be accurate based partly on their association with Walgreens).  Throughout that partnership, Theranos pushed for wider and faster expansion, with Walgreens holding back and expressing concerns over Theranos' inability to conduct much of its testing using its vaunted fingerstick method, among other things.  Despite Walgreens' hesitations about expanding the Theranos partnership more rapidly, many thousands of patients ended up receiving blood test services from Theranos between 2013 and 2016.

Defendants used a variety of methods to attract patients to Theranos, including Theranos' website and brochures that Theranos asked Walgreens to place in its stores to be read by customers.  The brochures informed potential patients that Theranos was "the first and only CLIA-certified laboratory

1  capable of running all its tests on micro-samples," and that it could perform the "full range" of tests.

2  TX 5084. Theranos' written materials targeting patients also promised "better answers" when it came to

3  their health, claiming that the company's advanced automation gave its tests "the highest levels of

4  accuracy." *Id.* Theranos' website similarly boasted that the lab "can precisely analyze tiny samples,"

5  and repeatedly promised tests with "the highest level of accuracy and precision." TX 5805. Defendants

6  approved this website language despite receiving warnings from lawyers that such language was

7  potentially problematic. *See* TX 3965, 3981. Meanwhile, the press echoed Defendants' claims about

8  Theranos' scientific advances and improved accuracy. TX 1090 (email to Defendants with draft of *Wall*

9  *Street Journal* article highlighting "improved accuracy"). The key claims in Theranos' promotional

10 materials were intended to mislead patients and induce them to pay for subpar testing services.

11      In truth, Defendants worked hard to hide from Theranos patients that the company's proprietary

12 testing analyzer was not reliable—forcing Defendants to use third-party predicate machines to fill the

13 gaps without telling patients that meant receiving a vein draw rather than a fingerstick as advertised.

14 Theranos' homegrown "TSPU" device—used for several important tests including HCG (to assess the

15 presence and stage of a pregnancy), PSA (to check for potentially lethal prostate cancer), and TSH (a

16 measure of thyroid health) (TX 4533)—was plagued by issues. It broke down frequently and, when it

17 did return results, it suffered from serious accuracy problems. *See* TX 1587, 1633. When Theranos

18 employees—from Erika Cheung at her entry-level position to Dr. Mark Pandori and Dr. Adam

19 Rosendorff occupying the highest positions in the clinical lab—repeatedly raised the same concerns with

20 inaccurate and unreliable results to Defendant, Defendant Balwani dismissed them. *See, e.g.*, 03/23/22

21 Tr. at 1255–56 (Cheung testified that Balwani said to her: "What makes you think that you're qualified

22 to make these assessments about what is occurring within the clinical lab" and that he was "tired of the

23 fact that people were trying to raise doubts about the Edison devices"); 03/30/22 Tr. at 1671–72

24 (Dr. Pandori testified that he recommended that Theranos stop using the Edison device and Balwani

25 became upset and said "that wouldn't happen"); 04/20/22 Tr. at 3249, 3309, 3389–91 (Dr. Rosendorff

26 testified that he raised concerns to Balwani and ultimately resigned because he was being asked to vouch

27 for patient results he was not confident in).

28

Patients were harmed along the way: Dr. Mark Burnes testified at trial about one of his patients named Dr. Mehrl Ellsworth, who received multiple incorrect PSA (prostate specific antigen) test results that, if believed, would indicate that Dr. Ellsworth had late-stage prostate cancer. 05/18/22 Tr. at 5888–906. Patient Brent Bingham testified at trial about his own chronic medical condition that causes his body to produce too many platelets and requires him to obtain frequent blood tests to monitor his condition. 05/18/22 Tr. at 5941–62. After seeing information in the media about Theranos, including claims of superior accuracy, he sought blood testing services from Defendants' company. To his dismay he could not rely on the results as he had hoped. Before making a drastic change to his treatment plan for his condition as Theranos' results would have suggested, he obtained comparison results from a conventional lab that showed the Theranos results to be inaccurate. *Id.* Additional patients who did not testify at trial were impacted by Theranos' PT/INR test (relating to blood clotting) and described their harrowing experiences with trying out Theranos' blood testing. *See* PSR ¶¶ 56–57.

Brittany Gould testified at trial about her erroneous HCG test results from Theranos, which told her that she was having a miscarriage when her physical symptoms did not match that result. 05/13/22 Tr. at 5826–35. Gould, who had suffered multiple miscarriages in the past, obtained a series of HCG values from Theranos and a traditional lab over the course of a week to confirm the status of her pregnancy—the Theranos results indicated she was having another miscarriage while the traditional lab indicated a viable pregnancy (and Gould would eventually deliver a healthy baby). *Id.* Theranos' repeated failure to return accurate test results across multiple assays after multiple attempts— particularly when using its proprietary equipment—speaks volumes about the reliability of Theranos technology. It is impossible to know exactly how many times frightening scenarios like these played out in the lives of patients who trusted their blood testing to Theranos—since Theranos did not maintain a centralized log of patient complaints or reports of inaccurate tests, and only seemed to compile them post-hoc as needed. *See* TX 4520 (complaint log selections).

In sum, Defendant committed an elaborate fraud scheme that resulted in more than a hundred million dollars of loss to investor-victims, with no consideration of the patient-victims he endangered and with no expressed remorse to this day toward his victims. Given the nature and magnitude of the

crime, Defendant cannot meet his burden of demonstrating by clear and convincing evidence that he does not present a danger to the community under the relevant factors of 18 U.S.C. § 3142(g).

### C.    The Questions Defendant Has Presented Are Not Likely to Result in Reversal or an Order for a New Trial on All Counts of Conviction

Even if Defendant had presented a substantial question—which he has not for reasons stated below—he could not meet his burden of proving the final requirement for bail pending appeal because he cannot demonstrate that favorable resolution on any of the questions he has presented would be likely to result in reversal of, or a new trial on, all counts of conviction, or otherwise alter the sentence in a manner that would not include a term of imprisonment. *Cf.* Mot. at 10–24. Given that each question presented addresses at most certain counts of conviction or one subpart of Defendant's schemes to defraud, even if the Ninth Circuit were to find error, such error would be harmless or non-prejudicial in light of the overwhelming amount of evidence regarding Defendant's multi-faceted misrepresentations.

Fundamentally, five of the eight issues Defendant has presented correspond almost entirely to the patient-related counts—not the investor-related counts—and thus a resolution favorable to Defendant would not materially affect *all* counts of conviction. *See* ECF No. 1507. Specifically:

- Defendant challenges the admission of CMS's January 2016 findings, in particular that there was immediate jeopardy to patient health after a review of Theranos' clinical lab, and the testimony of CMS inspector Sarah Bennett and certain patient-victims. *See* Mot. at 11–16.

- Defendant challenges the characterization of testimony by Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff, who testified as percipient witnesses about their daily tasks at Theranos in the clinical laboratory overseeing the testing of patients' blood. *See* Mot. at 16–18.

- Defendant challenges the testimony of Dr. Adam Rosendorff, who was Theranos' laboratory director from 2013–2014 within the investor fraud period, but who did not interact with investors. *See* Mot. at 22–23. *But see* ECF No. 1636 at 8.

- Finally, Defendant renews once again his LIS-related challenges. *See* Mot. at 21–22. *But see* ECF No. 1636 at 12–15 (holding co-Defendant was not prejudiced on this topic).

One straightforward way of identifying the harmlessness of the above asserted errors related to the patient convictions, is that, for the investor-related convictions, investors repeatedly testified at trial that they would have been shocked to learn Theranos was using third-party machines—not its own proprietary device as pitched—to run patient blood samples. *See, e.g.*, 04/26/22 Tr. at 3912–13;

04/29/22 Tr. at 4294–96, 4313, 4318, 4384.  As a result, investors testified that the negative October 2015 *Wall Street Journal* article exposed the fraud and spurred questions from investors to Defendants about whether Theranos was using third party machines.  *See*, *e.g.*, 04/29/22 Tr. at 4318; 05/18/22 Tr. at 6131–34.  Even if the Ninth Circuit were to find the errors that Defendant asserts above, none of them would impact the misrepresentation about using third-party devices.  And while testimony from Theranos employees demonstrated the falsity of claims Defendants made to investors (and patients) about the capabilities of Theranos' proprietary analyzer, they were not the only insiders to testify.  For example, Daniel Edlin also testified that Theranos used third-party machines and that that information was not freely shared or public before 2016.  *See* 04/06/22 Tr. at 2370–72, 2413–14.

Defendant asserts that the questions he has raised relate to "an ultimate issue: the accuracy and reliability of Theranos technology."  Mot. at 11, 13, 18, 21–22.  But Defendant's argument asks the Court to rely on a logical fallacy confusing a sufficient condition with a necessary one.  While the government has always argued that Defendant's misrepresentations about the accuracy and reliability of Theranos' testing would be sufficient to support a verdict on all counts alleged in the TSI and is the key overlapping misrepresentation between the two fraud schemes, it is far from a necessary finding, particularly on the investor fraud counts.  *Cf.* Mot. at 18.  The government argued in closing that Defendant "defraud[ed] investors with a wide variety of false statements . . . . and those categories go well beyond the accuracy of Theranos's blood testing[.]"  06/21/22 Tr. at 7079; *see also id.* at 6987–89, 6999–7002, 7013–18 (describing various categories of false statements and which investors relied on which categories when deciding whether to invest—accuracy is not included in every list).  By contrast, the government acknowledged in closing that, for the patient counts, "the specific representations that mattered to the patient, as it's probably not a surprise, are the ones that relate to accuracy."  06/21/22 Tr. at 7060; *see also id.* at 7047–55 (describing Cheung, Dr. Pandori, and Dr. Rosendorff highlighting accuracy problems).  Indeed, the government recently argued at co-Defendant Holmes' sentencing that the patient-related conduct gave a sense of legitimacy to the product that aided in defrauding investors (ECF No. 1649 at 28–30), but the Court rejected that connection as "too attenuated."  *See* ECF No. 1712 at 18.  The Court should apply that same reasoning here.

TSI ¶ 12(A) alleges at least four deficiencies with the capabilities of Theranos' proprietary

analyzer about which Defendant misled investor-victims—and the accuracy and reliability problems are only one deficiency. ECF No. 469 ¶ 12(A). Critically, ¶ 12(A) alleges that Defendants made false statements to investor-victims that Theranos' analyzer "was presently capable of accomplishing certain tasks, such as performing the full range of clinical tests" when, in fact, Defendants knew the analyzer "performed a limited number of tests[.]" *Id.* The paragraph also references the speed of returning test results and the method of testing patients' blood, all in addition to Defendants' claim that Theranos' analyzer was "more accurate and reliable than those yielded by conventional methods[.]" *Id.* And, of course, Defendant's lies to investors regarding the capabilities of Theranos' proprietary device are themselves only one category among several misrepresentations he made. *See, e.g., id.* ¶ 12(A)–(H); ECF No. 1635 at 4–8 (referencing other misrepresentations to investor-victims in denying Defendant's Rule 29 motion). As described further below, these other misrepresentations mattered to investors and cannot be discounted, which in turn prevents Defendant from being able to undermine *all* convictions. The link Defendant asserts between, in particular, the investor-related counts he was convicted on and one subpart within a subpart of categories of false misrepresentations he made to investors is far too attenuated to meet his burden of showing likely reversal or a new trial on those relevant counts.

The three other questions that Defendant has presented do not fare any better when stacked up against the overwhelming trial evidence and would present harmless or non-prejudicial errors at best:

- Defendant challenges the government's decision *not* to seek admission of certain exhibits at his trial that the government had admitted at co-Defendant Holmes' trial—specifically secretly recorded tapes of co-Defendant Holmes speaking to investors during a call in December 2013, when it is unclear if Defendant Balwani was on the call or present. *See* Mot. at 19–20.

- Defendant challenges admission of certain exhibits showing that Defendant made statements to Department of Defense representatives that were similarly made to investors. *See* Mot. at 23.

- Defendant challenges the Court's loss calculation and boldly claims he would be entitled to a 4-10 month sentence if the Court had properly thrown loss to victims out the window altogether. *See* Mot. at 24. In doing so, Defendant ignores the total loss to all investor-victims during the conspiracy period totaling more than $800 million—which is literally off the chart provided by the U.S. Sentencing Guideline—loss to the victims represented in substantive counts of conviction of more than $212 million, and ultimately the Court's modest approach of assuming, favorably to Defendant, that there was some value to Theranos when stocks were purchased even though none of the money invested was restored prior to the fraud being discovered, resulting in a loss of more than $120 million. *See* ECF No. 1661. It is not likely that Defendant would receive probation or a shorter sentence even if he were to prevail on this issue.

However, even if Defendant were to prevail on the substance of these claims (which is unlikely as described in the next section below), any errors would be deemed harmless or non-prejudicial in the context of the entire trial and thus unlikely to result in reversal, a new trial, a shorter sentence, or any other alternative outcome.  None of the errors Defendant has asserted would alter the admission of the text messages between Defendants, which is strong evidence supporting Defendant's conviction on the conspiracy to defraud investor and conspiracy to defraud patient counts.  *See* ECF Nos. 1395 at 7–9, 1635 at 3–6.  Furthermore, a review of the false statements relevant to the investor-related counts of conviction demonstrates that entire categories of false statements Defendant made to investors would not be affected *at all*, even if the Ninth Circuit resolved every question Defendant has posed favorably to him.  For example, as this Court found in denying Defendant's Rule 29 motion, at the same time Defendant was told by Walgreens executives that Walgreens would never expand their relationship with Theranos beyond a few dozen stores if the percentage of venous draws remained around 40%, Defendant falsely represented to investors that it was reasonable to estimate that Theranos would be in 900 Walgreens locations by 2015.  ECF No. 1635 at 4.  As another example, Defendant "Balwani made false representations directly to investors Pat Mendenhall and Brian Grossman[,]" such that they thought "Theranos was not using third party devices" and Grossman "was shocked when he learned that Theranos was not using its own devices to test blood." *Id.* at 3.  Defendant spoke directly with investor Mendenhall, who wrote detailed notes from their phone call and who testified that Balwani told him "that the science behind Theranos was complete; that no new invention was needed; and that Theranos was completely vertically integrated"—none of which was true.  *Id.* at 8.  Defendant also provided unattainable financial projections to investors, when he knew Theranos was barely generating any revenue, and shared falsified reports portrayed as if written by large pharmaceutical companies.  *Id.* at 3–4.  And Defendant created "what was called the 'null protocol' to shield device failure from investors" during demonstrations of the technology's purported capabilities.  *Id.* at 7.

Tellingly, even if every issue Defendant has raised in his Motion for bail pending appeal was resolved favorably to him, it would not impact any of the material misrepresentations listed above, which are themselves only a small sampling of false statements that Defendant made to investors connected to seven of the twelve counts on which Defendant was convicted.  Importantly, Defendant

also made multiple false statements to patient-victims (*see* ECF No. 1635 at 5–6, 9–10), although the accuracy and reliability of Theranos' blood testing services was likely paramount to that set of victims.

In sum, Defendant cannot meet his burden of demonstrating that reversal, a new trial, or a different sentence on *all counts* of conviction would result from the questions he has posed, and the Court should deny his Motion on that basis.

### D. Defendant Has Not Met His Burden of Showing That the Appeal Raises a Substantial Question of Law or Fact

Defendant presents eight issues that he might raise on appeal that he asserts raise substantial questions. *Cf.* Mot. at 11–24. But what counts as a substantial question is not measured by the number of possible arguments. For reasons stated in the government's prior briefing on these topics and the Court's ruling on them, these eight issues do not present substantial questions. Furthermore, to the extent Defendant references other vague issues that might constitute substantial questions (*id.* at 6), the Ninth Circuit has explicitly held that "cursory motion[s]" with "vague presentations" of issues are insufficient to meet the substantial question standard and are thus barred. *See Montoya*, 908 F.2d at 451.

### 1. The Evidence Admitted on Patient-Related Counts Did Not Constructively Amend the Third Superseding Indictment

Defendant's first issue does not raise a substantial question because there was no constructive amendment of the Third Superseding Indictment and, regardless, he did not properly preserve this claim. *Cf.* Mot. at 11–16. Rather, Defendant's reading relies on an overly technical and improper reading of the operative Indictment as it has alleged Defendants' conspiracy to defraud paying Theranos patients. *See* ECF No. 1326 at 7–8. The TSI alleges that Defendant Balwani and co-Defendant Holmes devised a scheme to defraud patients between approximately 2013—when Theranos began providing lab testing services to patients through certain Walgreens stores in Palo Alto and Arizona—and 2016—when Theranos elected to shutter its lab following interactions with CMS. ECF No. 469 (TSI) ¶¶ 14–18. Specifically, the TSI alleges that from 2013 to 2016, the entire time Theranos was providing testing services to patients, Theranos represented to doctors and patients that Theranos could provide accurate, fast, reliable, and cheap blood tests and test results at the same time that Defendants knew that Theranos was not, in fact, capable of consistently producing accurate and reliable results. *Id.* Based on an order

1  from the Court, the government provided a Bill of Particulars and ultimately incorporated 25 assays into

2  the TSI for the patient-related counts. *Id.* ¶ 16. The government later amended its Bill of Particulars to

3  add CBC and its component assays. *See* ECF No. 1157 at 83 (Exh. 16).

4  Defendant's attempt to limit the patient-related counts of conviction to "Theranos's technology"

5  is undercut by the language of the TSI itself. The TSI references assays in the Bill of Particulars that

6  were run on non-Theranos technology, such as HIV and CBC/PLT. *See* ECF No. 469 ¶¶ 14–18.

7  Specifically, for those patients, the TSI alleges Defendants promised those patients that "*Theranos* could

8  provide accurate, fast, reliable, and cheap blood tests and test results" despite their knowledge that

9  "*Theranos* was not capable of consistently producing accurate and reliable results for certain blood tests

10  including . . . HIV." *Id.* ¶¶ 16–17 (emphasis added). Defendant's reading of the TSI places too much

11  weight on the phrase "Theranos's technology" and attempts improperly to import that language into

12  other allegations in the Indictment. Adopting that interpretation would be contrary to Ninth Circuit

13  guidance that "an indictment is not to be read in a technical manner, but is to be construed according to

14  common sense with an appreciation of existing realities." *United States v. Anderson*, 532 F.2d 1218,

15  1222 (9th Cir.), *cert. denied*, 429 U.S. 839 (1976); *see also* ECF No. 1326 at 7–8.

16  Moreover, reading the TSI in the manner Defendant advocates cannot support a constructive

17  amendment claim because (1) it requires ignoring more specific counts charged in favor of broad

18  statements made in the introductory paragraphs describing the scheme to defraud as a whole and (2) the

19  grand jury transcript that Defendant cites actually shows a match between the evidence the government

20  presented to the grand jury and the evidence presented to the petit jury at trial. *Cf.* Mot. at 15; ECF No.

21  1711-3 at 135–39 (describing documents and expected testimony of Brent Bingham and Erin Tompkins

22  that matches what was presented at trial). The evidence at trial demonstrated that Defendants made

23  sweeping statements about the accuracy and reliability of Theranos' tests as a whole. Indeed,

24  Defendants hid from the public (as well as investors) which tests were and were not performed on

25  Theranos' technology, making it impossible for patients purchasing Theranos' services to know on what

26  device their test would be performed. *See* ECF No. 1181 at 7–8 (detailing the difficulty in determining

27  which machine Brent Bingham's test was run on even internally at Theranos). Moreover, they did not

28  merely claim that Theranos' tests were accurate, they caused investors and patients to believe that

Theranos' tests were *more* accurate than the conventional tests previously available through competing labs. *See* TX 1106 (September 2013 *Wall Street Journal* article). Because Defendants falsely promised patients that Theranos could deliver test results with superior accuracy in an effort to lure patient customers, inaccurate test results derived from conventional analyzers are evidence that patients did not receive the benefit of the bargain. The TSI put Defendant on sufficient notice that these specific tests would be at issue in the trial, particularly for TSI Counts 9 (Brent Bingham) and 10 (Erin Tompkins).

In any event, Defendant has never previously alleged a constructive amendment on this point—not in his pretrial filings (which objected on irrelevance grounds), not in the moment when the evidence was admitted, nor in any post-trial motions—and thus has not properly preserved his core argument in this respect. *Miller*, 753 F.2d at 23 ("insufficiently preserved" questions are not likely to result in reversal), *adopted by Handy*, 761 F.2d at 1280, 1283. Thus, given Defendant did not properly preserve this claim and, even if he had, it would affect at most two counts of conviction—rather than *all* counts of conviction—the Court should deny his request for bail pending appeal on this ground.

### 2. The Court Properly Admitted Testimony of Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff

The Court properly fulfilled its gatekeeping role in deciding objections as Defendant made them respectively to the testimony of Theranos insiders Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff. *See* 04/01/22 Tr. at 1688–97, 1712–14. The Court noted that several portions of testimony challenged in Defendant's subsequent motion to strike were admitted during trial without objection; and in yet other instances, the Court sustained some of Defendant's Rule 702 objections. *Id.* The Court did not abuse its discretion in admitting the evidence it did as percipient witness testimony. The government incorporates by reference its prior briefing and argument on this topic and the Court's corresponding rulings. *See, e.g., id.* at 1687–88, 1697–99, 1709–11; ECF Nos. 660, 666, 798 at 70–72, 75–78, 1181, 1326. Fundamentally, these three witnesses testified as percipient witnesses—describing what their roles and responsibilities were at Theranos, how their respective interactions with Theranos' proprietary technology led each of them to question its ability to consistently provide accurate and reliable results to patients, and their ultimate resignations when Defendant dismissed their concerns or berated them for raising them. The Court properly rejected Defendant's request to strike this testimony

because it "didn't require expertise to talk about what could be run in that particular machine" in part because "that's what [the witness] was trained to do" and "just because it's science doesn't mean it requires expertise." 04/01/22 Tr. at 1689, 1693. Otherwise, under Defendant's approach, every witness who worked in a technical or specialized field would be required to be designated an expert under Federal Rule of Evidence 702 simply to testify to what he or she observed. That is not what Rule 702 requires. *See*, *e.g.*, *United States v. Chen*, No. 17-CR-00603-BLF-1, 2021 WL 2662116, at *9–10 (N.D. Cal. June 29, 2021) (rejecting similar contention by defendant that engineers employed by company in trade secret case should be deemed experts rather than permitted to testify as lay witnesses).

For example, Erika Cheung testified as a percipient witness who worked directly with Theranos machines in the Theranos clinical lab, stating that she resigned from Theranos because she "was uncomfortable with the fact that [they] were testing on patients . . . with technology that [she] felt wasn't producing reliable results for those patients." 03/22/22 Tr. at 1117; *see also* 03/22/22 Tr. at 1201 (witness expressing her agreement with Defendant who characterized a quality control failure event as "beyond unacceptable performance"). Cheung further explained that, as time went on at Theranos, "there was a lot of evidence to suggest that the Theranos system and the Edison devices weren't working properly," increasing her concerns about active testing on patients. 03/23/22 Tr. at 1251. Dr. Pandori and Dr. Rosendorff both agreed that there were serious problems with Theranos' testing, explaining at the trial that they resigned from their jobs as Theranos co-laboratory directors—at different times— partly because "the frequency and severity of complaints that I was getting from clinicians really reached a crescendo," causing Dr. Rosendorff in particular to feel like staying onboard would be risking his integrity as a doctor. 04/20/22 Tr. at 3273; *see also* 03/30/22 Tr. at 1590–91, 1633, 1639.

Dr. Mark Pandori and Dr. Adam Rosendorff similarly testified to their percipient observations as co-laboratory directors at Theranos during the charged patient conspiracy—beginning in late 2013. For example, Dr. Mark Pandori testified about what he knew about Theranos before he became employed by the company and how, after he began his employment, he was surprised to learn that Theranos used "'third party devices,' [meaning] FDA cleared equipment that was run by other companies" because he did not know that before he became an insider. 03/30/22 Tr. at 1614. The Court reviewed Dr. Pandori's testimony about whether Theranos had "groundbreaking" technology and properly held that "the

question was not based necessarily on expertise, but I believe Dr. Pandori testified groundbreaking in the context of the literature that was public through the company, the company representations[ that] Dr. Pandori had read" which was percipient testimony.  04/01/22 Tr. at 1690.  And, again, the Court sustained or partially sustained Defendant's Rule 702 objections at times, including clarifying whether the witness was only testifying based on his own observations.  *See id.* at 1734.  Such statements are squarely within the bounds of percipient testimony despite the fact that it relates to a technical subject.

Moreover, testimony regarding industry-standards and government regulations was not the focus of the government's direct examination, and the portions cited in Defendant's Motion were in response to questions asked during *cross-examination* and corresponding re-direct, rather than anything the government elicited directly.  *See*, *e.g.*, 03/30/22 Tr. at 1552–58 (referring back to questions asked on cross-examination about these topics); *cf.* Mot. at 17.  In denying Defendant's motion to strike similar testimony based on this same reason, the Court also noted that Defendant's cross-examination strayed more into technical concepts than did the government's direct examination.  *See* 04/01/22 Tr. at 1694.

In sum, there is no substantial question regarding whether the Court abused its discretion in admitting and precluding certain testimony from Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff pursuant to Rule 702.

### 3. There Was No Error in the Government Choosing Not to Seek Admission of Recordings of Co-Defendant Holmes in Defendant Balwani's Trial

Defendant has not presented a substantial question on this topic because the Ninth Circuit has specifically held that a substantial question must be more than simply "not frivolous"—and this is a frivolous issue.  *See Handy*, 761 F.2d at 1283.  Defendant asserts that it is "prosecutorial misconduct" and "[d]eliberate deception" under *Napue v. Illinois*, 360 U.S. 264 (1959), because the government did not seek to admit as exhibits in Defendant's trial tape recordings of co-Defendant on a call with investors (on which it is unclear if Defendant even participated) and instead have the investor-victim, Bryan Tolbert, testify to what he was told as well as the fact that he had never once spoken with Defendant Balwani nor even seen him before testifying in court.  *See* 04/29/22 Tr. at 4406–53.  This is frivolous.  There is no rule that says the government is required to try the case in the exact same manner in severed trials against co-defendants—particularly when Defendant is the one who successfully sought

1    severance.  Otherwise, Defendant could claim "prosecutorial misconduct" because the government

2    called witnesses to testify in his trial who had more direct dealing with him and did not call every

3    witness the government had called in co-Defendant Holmes' trial who had more direct dealings with her.

4    That is nonsensical.  Further, there is no rule or requirement that the government must present a written

5    document or oral recording as an exhibit over and above a witness' direct testimony to events of which

6    the witness has personal knowledge.  The government presented the case *as relevant to Defendant*

7    *Balwani* during his trial—and did the same with respect to co-Defendant Holmes during her trial.  If

8    Defendant believed the tapes were so critical, he could have moved *in limine* to seek to admit them or

9    attempt to find an applicable hearsay exception.  Instead, he now claims a *Napue* violation without

10   pointing to a single false statement (only alleged discrepancies between the recording and Tolbert's

11   testimony from memory) and he cannot demonstrate it was material in light of Patrick Mendenhall's

12   testimony of a *direct call with Defendant Balwani* in the same relevant time period.  *See id.* at 4283–

13   302; TX 4059.  Moreover, this claim could not possibly affect *all counts* of conviction where only C1

14   investors participated on the call.  The Court should reject this claim outright.  *Cf.* Mot. at 19–20.

15         **4.    The Court Did Not Err in Its Relevant Rulings Regarding the LIS Database**

16         The Court has heard the facts surrounding the nature and destruction of Theranos' LIS on

17   numerous occasions, and the government incorporates by reference its prior filings and arguments on

18   this subject.  *See, e.g.*, ECF Nos. 682, 846, 1181, 1426, 1440, 1454, 1586; 05/04/21 Tr. at 45–68, 79–85;

19   07/07/21 Tr.; 11/10/21 Tr. at 5877–5889; 11/19/21 Tr. at 7100–7104; 02/08/22 Tr.; 02/08/22 Tr.;

20   05/11/22 Tr. at 5291–5329; 05/23/22 Tr.  Neither Defendant's motion to suppress on this basis nor

21   missing instruction request based on the LIS database raises a substantial question, particularly where

22   this Court has been given multiple opportunities to revisit the same topic and reach the same reasoned

23   results.  *Cf.* Mot. at 21–22.

24         The Court did not err in denying Defendant's motion to suppress several categories of evidence

25   regarding the patient-related counts based on the absence of the LIS database because Defendant cannot

26   demonstrate the exculpatory value of data within the LIS database and, in any event, the government did

27   not act in bad faith.  *See* ECF Nos. 887, 1326 at 20–21, 30–37.  The Court denied Defendant's motion to

28   suppress in part because the Court found that the government did not act in bad faith and "[t]he LIS

1  database information alone would not provide a conclusive determination of whether the Theranos blood

2  tests were accurate, and *it could just as likely contain incriminating evidence to the contrary*.  Any

3  exculpatory value is therefore speculative in nature."  ECF No. 887 at 10 (emphasis added); *see also*

4  1326 at 20–21, 30–37.  The evidence supports this conclusion.

5  First and foremost, it is highly speculative whether the LIS database would have been

6  exculpatory for Defendant and the evidence has shown it was far from a "complete" set of data.  The

7  government has repeatedly argued that the LIS database would have been a "powerful tool" to identify

8  additional patient-victims and quality-control data, but it would not have allowed the parties to sort

9  accurate from inaccurate patient results or determine an overall failure rate for Theranos' blood tests.

10  *See*, *e.g.*, ECF Nos. 846 at 7–8, 1440 at 5–7; 03/30/22 Tr. at 1471–73, 1565–66, 1575–76 (Erika Cheung

11  testified it would not "have been possible for the LIS to indicate for each patient result whether it was

12  accurate or inaccurate"); 04/26/22 Tr. at 3732–34 (Dr. Adam Rosendorff testified that he accessed and

13  used the LIS to view data and it was not "possible to look at the individual results [in LIS] and identify

14  them individually as accurate or inaccurate").  Indeed, Brent Bingham's testimony provides another

15  example of how raw data in LIS would be insufficient to answer the core question of whether the result

16  was accurate or inaccurate—because Bingham's health condition causes his normal health base line to

17  fall well above the reference range for platelets—but in LIS looking at just the result number without the

18  relevant reference range would not identify which of Bingham's Theranos test results were inaccurate.

19  05/18/21 Tr. at 5940–63.  Rather, as Defendant admits, "an LIS test result might need to be compared

20  with other data or with the patient's records and testimony" (ECF No. 1448 at 9), which is why

21  Dr. Rosendorff explained LIS was "at least *one of the tools*" used to investigate whether a result was

22  inaccurate but it was impossible to identify an individual result as accurate or inaccurate solely from

23  LIS.  *See* ECF No. 1440 at 5; ECF No. 1448 at 4 (emphasis added).  In addition, the evidence at

24  Defendant's trial suggested that the LIS was missing large swaths of data.  *See* ECF No. 1440 at 6

25  (detailing relevant testimony).

26  Furthermore, Defendant knew of, had better access to, and also failed to obtain a functioning

27  copy of the LIS when it was destroyed.  Although Theranos discontinued patient testing in summer

28  2016, employees at Theranos had access to the LIS throughout the first half of 2018 and were able to run

1  queries throughout Theranos' testing data and generate reports from that data. On August 28, 2018,

2  three days before Theranos was set to vacate the facility where it maintained the LIS database hardware,

3  Theranos executives and attorneys convened a call to discuss the upcoming shutdown of the LIS system.

4  *See* ECF No. 681-37. Theranos—but not the government—was aware that, once the LIS was put into

5  storage, it might become "very difficult to resuscitate." *Id.* This conference call included two Theranos

6  employees, Michael Chung and Eric Caddenhead, and Vinaswathan "Shekar" Chandrasekaran, the

7  principal of an outside technology firm hired by Defendant Balwani to create and maintain the LIS

8  database. *See id.*; ECF No. 1423 at 2. Defendant's counsel has represented that Mr. Chandrasekaran

9  was on the August 28, 2018, call because he was attempting to secure a copy of LIS for Defendant, but

10 he was ultimately unsuccessful in doing so. *See* 02/08/22 Tr. at 12–14, 21–26.

11      After the Court permitted Defendant's Microsoft SQL expert to testify in a limited fashion with

12 respect to what *could* have been done to reconstruct the LIS database after Theranos destroyed it (*see*

13 ECF No. 1464), Defendant sought a so-called "missing evidence" instruction. The Court did not err in

14 declining to give the requested instruction where the Ninth Circuit model instruction, itself, requires that

15 the government *intentionally* destroyed or failed to preserve evidence for the trial (*see* Manual of Model

16 Criminal Jury Instructions for the District Courts of the Ninth Circuit § 3.19), and negligence might

17 suffice to trigger such an instruction when *the government* destroys evidence within its possession, *see*

18 *United States v. Sivilla*, 714 F.3d 1168, 1171–74 (9th Cir. 2013). The facts of this case could not be

19 further from those presented to the Court in *Sivilla*. Here, after multiple subpoenas from the government

20 over many months seeking a functioning copy of the LIS database, Theranos ultimately provided a non-

21 functioning copy and then destroyed the only working copy. While Defendant's expert opined it was

22 theoretically possible to reconstruct the LIS database, he also testified that he, himself, was unable to do

23 so. *See* 06/09/22 Tr. at 6759–6760; *see also id.* at 6844–6888 (Court declining to provide instruction).

24      Regardless, as the government argued in closing, "LIS is limited to the patient counts" and "LIS

25 is not related to the investor counts." 06/21/22 Tr. at 7079. Thus, as noted above, even if Defendant

26 raised a debatable question—which he has not—he is unlikely to obtain the relief he seeks with respect

27 to *all counts* of conviction. For reasons stated here and in prior arguments on this topic, Defendant does

28 not raise a substantial question with respect to the LIS database that Theranos destroyed.

### 5. The Court Did Not Err in Its Relevant Rulings Regarding Dr. Rosendorff

Defendant does not present a substantial question regarding the extent of his cross-examination of Dr. Adam Rosendorff or his post-trial statements at co-Defendant Holmes' residence. *Cf.* Mot. at 22–23. Dr. Adam Rosendorff worked as the CLIA laboratory director at Theranos from April 2013 until he resigned in November 2014. Since then, he has worked at a number of other large companies, some of which have faced scrutiny from government entities. *See* ECF No. 1405. Some of that scrutiny concerned time periods when Dr. Rosendorff did not work for the relevant company or arose from conduct wholly unrelated to his role in the company. *See id.* Nevertheless, Defendant sought to use the simple fact of investigations at companies where he once worked to impugn Dr. Rosendorff's competence and his motives for testifying. The Court permitted co-Defendant to make limited inquiry about a then-ongoing investigation of the lab Dr. Rosendorff had been working at during her trial where one possible outcome was a sanction that could have involved Dr. Rosendorff's professional license. 10/05/21 Tr. at 2567–68, 2717–20. Subsequently, that investigation resolved without any sanctions imposed whatsoever. *See* ECF Nos. 1405, 1405-2, 1405-3. Thus, during Defendant's separate and subsequent trial, the Court denied Defendant's request to inquire into this area, as the threat of bias had evaporated and was too "speculative and attenuated." 04/20/22 Tr. at 3216–17.

The evidence about Dr. Rosendorff's post-Theranos employment did not constitute evidence of bias. "The point of a bias inquiry is to expose to the jury the witness' special motive to lie by revealing facts such as interest in the outcome of the trial or personal animosity or favoritism toward the defendant" or prosecution. *United States v. Hankey*, 203 F.3d 1160, 1171 (9th Cir. 2000) (internal citations omitted) (citing *United States v. Abel*, 469 U.S. 45 (1984)). For example, in *Abel*, the Supreme Court held that evidence showing defendant and a defense witness were both members in a gang and one of the gang's tenets required its members to lie to protect each other was admissible as bias evidence against that witness. 469 U.S. at 52–53. By contrast, here, Defendant has not shown—and cannot show—that subsequent investigations of companies where Dr. Rosendorff worked at certain times after he resigned from Theranos gives rise to a motive for Dr. Rosendorff to lie or slant his testimony. Furthermore, each of the investigations Defendant references began in 2021 *after* Dr. Rosendorff had already given prior consistent statements regarding his percipient observations while working at

Theranos in civil depositions and multiple interviews with the FBI related to this case—negating Defendant's claim that questioning regarding these three companies would show Dr. Rosendorff's motive to slant his testimony favorably for the prosecution. *Compare* ECF No. 1401-3 at 92, 105 (Invitae subpoena announced November 2021), 273 (uBiome indictment announced March 2021), 279 (CMS sends findings to CDPH Branch Lab in February 2021), *with*, *e.g.*, 09/28/21 Tr. at 1976:4–13 (describing civil deposition in February 2019). There is no substantial question that the Court properly held that the relevance of these topics was too "speculative and attenuated." 04/20/22 Tr. at 3216–17.

Similarly, there is no substantial question regarding Dr. Rosendorff's post-trial statements to co-Defendant Holmes' partner, at her residence, without Defendant Balwani present, given that the Court held an evidentiary hearing on this topic in co-Defendant's case and Dr. Rosendorff clarified under oath what he meant. *See* 10/17/22 Tr.; ECF No. 1636 at 3–8. Specifically, Dr. Rosendorff repeatedly "testified that he did *not* believe the government was making things sound worse than they were at trial" and clarified that his statements about employees working hard to do something good at Theranos "did not intend to include Ms. Holmes and Mr. Balwani[.]" ECF No. 1636 at 3–8. The Court found that Dr. Rosendorff's post-trial statements were "too vague and general to imply any specific [prior] testimony was actually false or misleading" and thus failed under *Napue*. *Id.* at 6–8. The Court further held that the statements were immaterial and unlikely to affect the counts of conviction given that "Dr. Rosendorff's post-trial statements only pertained to the *internal* operations at Theranos and, therefore, are unlikely to affect the Defendant's convictions for investor fraud that featured Defendant's representations of Theranos's *external* partnerships." *Id.* at 8. Defendant cannot show that he would have fared better if he were granted a similar hearing. Thus, any error—of which there was none— would be harmless with respect to the investor counts and could not undermine *all counts* of conviction.

### 6. The Court Did Not Err in Admitting Certain Exhibits Related to the Department of Defense

Defendant's two remaining issues do not raise substantial questions, either. *Cf.* Mot. at 23–24. The false statements that Defendants made to the Department of Defense were inextricably intertwined with the investor-related fraud counts for at least two reasons. First, Theranos had to get the Defense

1   Department interested in its product so that Defendants could exaggerate their involvement with the

2   military to investors later.  Second, and even more importantly, this evidence was important to show

3   Defendant's intent and knowledge that the statements Defendants made to investor-victims about

4   Theranos' work with the Department of Defense were, in fact, false.  *See* 04/13/22 Tr. at 2483–89.

5   Regardless, even if Defendant's claim on this point were fairly debatable, any error would be harmless

6   and non-prejudicial to all counts of conviction.  *See* ECF No. 1575 at 4 n.1 (noting there is sufficient

7   evidence to uphold Defendant's conviction even setting aside false statements about Theranos' work

8   with the Department of Defense).  Defendant distanced himself from the misrepresentations regarding

9   work with the military at trial by emphasizing that co-Defendant Holmes largely managed those

10  relationships, with very little involvement by Defendant.  *See* 04/13/22 Tr. at 2586–89.  Defendant

11  cannot show in a case involving lies on multiple topics to investors and patients that somehow lies to the

12  Department of Defense tipped the balance, particularly when he, himself, consistently asserted he was

13  less involved in that aspect of Theranos' work.

14              **7.      The Court Properly Calculated a Reasonable Estimate of Loss to Victims**

15              There is no substantial question about whether the Court employed the proper burden of proof by

16  which the government must prove loss and—given that the government could have shown loss in the

17  hundreds of millions of dollars under either standard—it is unlikely that Defendant would obtain

18  probation or a sentence of 4-10 months as he claims.  *Cf.* Mot. at 24.  "The guidelines do not present a

19  single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and

20  individualized nature of the inquiry."  *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  The

21  Court "need only make a reasonable estimate of the loss."  U.S.S.G. § 2B1.1(b) note 3(C).  Because the

22  Court is in a "unique position to assess the evidence and estimate the loss," its determination is entitled

23  "to appropriate deference."  *Id.*  "Because [Balwani] was convicted of conspiracy, and because the

24  losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard applies."

25  *See United States v. Laurienti*, 611 F.3d 530, 556–57 (9th Cir. 2010).

26              If the Court had used solely the loss to the substantive counts associated with investor-victims

27  who testified, or had a representative testify, at trial—the loss would be more than $212 million.  *See*

28  ECF No. 1661 at 23–24.  Since Balwani also was convicted of conspiracy to commit wire fraud against

Theranos investors during the period 2010 to 2015 (ECF No. 1507)—the total invested in that time period is over $800 million.  *See* ECF No. 1661 at 24.  The Court concluded at sentencing that it is necessary to ascribe *some value* to Theranos stock purchased at or near the time victims invested, and made detailed findings based upon a report by Carl Saba, a partner with the Forensic Consulting Group at Hemming Morse, LLP, and a Certified Valuation Analyst and Accredited Senior Appraiser with decades of experience in the valuation of businesses.  12/07/22 Tr. at 85–93.  The Court found Saba's report to be generous and quite favorable to Theranos—and based upon it made a reasonable estimate of the loss to Theranos investors based on Defendant's conduct of more than $120 million.  *Id.*  This approach aligns with the Ninth Circuit's instruction that "district courts should 'take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.'"  *United States v. Martin*, 796 F.3d 1101, 1110 (9th Cir. 2015) (quotation omitted).  Defendant identifies no clear error in the court's factual findings.  *See Zolp*, 479 F.3d at 718.

In sum, there was no error, and this is an issue where the Court is in a "unique position" and entitled to "appropriate discretion."  Defendant Balwani cannot show a substantial question on the Court's loss calculation.

## CONCLUSION

For the reasons stated above, the government respectfully requests that the Court deny Defendant Balwani's Motion for release pending appeal.


DATED:  January 30, 2023

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


 */s/ Kelly I. Volkar*
JEFFREY B. SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
KELLY I. VOLKAR
Assistant United States Attorneys