Exhibit H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

     v.

BALWANI,

               Defendant.

Case No. 5:18-cr-00258-EJD-2

**ORDER ON SENTENCING**

On July 7, 2022, the jury returned a verdict of guilty as to Ramesh "Sunny" Balwani ("Defendant") on Counts 1–12 of the Third Superseding Indictment, including one count of conspiracy to commit wire fraud against Theranos investors, one count to commit conspiracy against Theranos paying patients, six counts of wire fraud against investors, and four counts of wire fraud against Theranos patients, in violation of 18 U.S.C. §§ 1343 and 1349. This Court sentenced Mr. Balwani to 155 months of imprisonment as to each Count 1–12 to be served concurrently, followed by 3 years of supervised release as to each count to be served concurrently.

In their respective sentencing memoranda, the government and Mr. Balwani dispute several findings and conclusions in the Presentence Investigation Report ("PSR"), including the probation officer's application of the U.S. Sentencing Guidelines ("U.S.S.G."). *See* Def. Ramesh "Sunny" Balwani's Sentencing Memorandum ("Def.'s Sent'g Mem."), ECF No. 1662; United States' Sentencing Memorandum ("Gov't Sent'g Mem."), ECF No. 1661. The Court addressed the parties' objections and disputes at Mr. Balwani's sentencing hearing on December 7, 2022. This Order memorializes the Court's reasoning in support of its determinations and sentence imposed at that hearing.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

United States District Court
Northern District of California

United States District Court
Northern District of California

For the reasons stated on the record at the December 7, 2022 hearing and in this order, the Court finds that (A) the loss in this case can be reasonably found to be $120,192,642; (B) the offense involved 10 or more victims; (C) the offense as to Defendant did not involve a conscious or reckless risk of death or serious bodily injury; and (D) the Defendant was not an organizer, leader, manager, or supervisor in the criminal activity. These findings yielded an offense level of 33 and an undisputed Criminal History Category I, resulting in a Guidelines range of 135 – 168 months.

## I. LEGAL STANDARD

"All sentencing proceedings begin with the district court's calculations of the applicable Guidelines range." *United States v. Prien-Pinto*, 917 F.3d 1155, 1157 (9th Cir. 2019); *see also United States v. Staten*, 466 F.3d 708, 710 (9th Cir. 2006) ("[A]lthough district courts are no longer required to follow the United States Sentencing Guidelines . . . 'the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals.'") (quoting *United States v. Booker*, 543 U.S. 220, 259 (2005)).

The government bears the burden of proving the facts necessary to enhance a defendant's offense level under the Guidelines. *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir. 1994); *accord United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (*en banc*) ("[W]hen the government seeks an upward adjustment, it bears the burden of proof." (citation omitted)). While "the district court may rely on undisputed statements in the PSR at sentencing," if the defendant objects to those statements "the district court is obligated to resolve the factual dispute, and the government bears the burden of proof to establish the factual predicate. . . . The court may not simply rely on the factual statements" in that report. *Ameline*, 409 F.3d at 1085–86; *see also* Fed. R. Crim. P. 32(i)(3)(B). In making factual determinations, "a sentencing judge is generally not restricted to evidence that would be admissible at trial. However, 'inadmissible evidence cannot be considered [at sentencing] if it lacks sufficient indicia of reliability to support its probable accuracy.'" *United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000) (citation omitted, alternation in original).

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

Case 5:18-cr-00258-EJD Document 1617-7 Filed 02/16/23 Page 3 of 23

## II.  GUIDELINES CALCULATION

### A.  Loss Enhancement, U.S.S.G. § 2B.1(b)(1)

The commentary to the U.S. Sentencing Guidelines provides that courts "need only make a reasonable estimate of the loss," which is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt 3(A), 3(C).  Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," whereas intended loss is "the pecuniary harm that the defendant purposely sought to inflict."  U.S.S.G. § 2B1.1 cmt 3(A)(i)-(ii).  The Ninth Circuit recognizes that the guidelines "do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  The district court's obligation is to "adopt a reasonable 'realistic, economic' projection of loss based on the evidence presented." *United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001).

Mr. Balwani had raised several objections to the PSR's calculation of the loss enhancement, which the Court resolved on the record at the sentencing hearing and arrived at a final loss amount.  Here, the Court provides the details of its loss calculation, which reflects the rulings on Mr. Balwani's objections.

#### 1.  Standard of Proof

The government and Mr. Balwani dispute the correct standard of proof the Court should apply in this case.  During sentencing and in its analysis below, the Court applied the "preponderance of the evidence" standard for facts underlying the loss calculation.

"As a general rule, factual findings underlying a sentencing enhancement need only be found by a preponderance of the evidence," particularly where the enhancements are based on convictions.  *United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022); *United States v. Hymas*, 780 F.3d 1285, 1289–90 (9th Cir. 2015).  However, in instances where the "enhancement has an [] extremely disproportionate impact on the sentence," the Ninth Circuit has held "that due process may require the government to demonstrate facts underlying disputed enhancements by clear and convincing evidence."  *Lonich*, 23 F.4th at 910 (internal quotation marks omitted).  When

determining "whether a disproportionate effect on sentencing may require the application of a heightened standard of proof," courts consider the "totality of the circumstances." *Hymas*, 780 F.3d at 1289; *United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019). The Ninth Circuit has focused on three primary factors in assessing disproportionality: (1) whether the increase in sentence is based on the extent of a conspiracy; (2) whether the increase in the number of offense levels is less than or equal to four; and (3) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range. *See Lonich*, 23 F.4th at 910–16.

Here, the jury convicted Mr. Balwani of conspiracy to commit wire fraud against Theranos investors, as well as three counts of wire fraud. Given that actual loss is measured by the "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt 3(A)(i), the Court's task begins by identifying which investments were "reasonably foreseeable" from Mr. Balwani's conspiracy. In other words, whether a particular investment should be included in the loss calculation is based on the extent of the conspiracy, and therefore need only be established by a "preponderance of the evidence." *Lonich*, 23 F.4th at 914. Several courts have "declined to apply the clear and convincing standard of proof when the enhancement at issue was based entirely on the extent of the conspiracy . . . regardless of whether the disputed sentencing enhancements resulted in an increase of the offense level by more than four points or whether it resulted in a Guidelines range that more than doubled." *Id.* (internal citations and quotation marks omitted). The Ninth Circuit has also repeatedly held that "where sentencing enhancements for financial loss are based on the extent of the fraud conspiracy . . . facts underlying the disputed enhancements need only be found by a preponderance of the evidence." *United States v. Berger*, 587 F.3d 1038, 1048 (9th Cir. 2009) (collecting cases); *see also United States v. Laurienti*, 611 F.3d 530, 556 (9th Cir. 2010) ("Because each Defendant was convicted of conspiracy, and because the losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard applies."); *United States v. Riley*, 335 F.3d 919, 926 (9th Cir. 2003) ("[T]his enhancement is based on the extent of the conduct to which [defendant] pled guilty (the amount of loss intended by the

1    conspiracy's fraud).");  *Hymas*, 780 F.3d at 1289 ("District courts generally use the 'preponderance

2    of the evidence standard of proof when finding facts at sentencing, such as the amount of loss

3    caused by a fraud.'") (quoting *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010),

4    overruled on other grounds by *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020)).  Because

5    the loss calculation in this case is based on the extent of the investor fraud conspiracy (*i.e.*, which

6    Series C investments and corresponding losses were incurred because of the conspiracy), the

7    correct standard of proof is "preponderance of the evidence."

8        Mr. Balwani nonetheless contended that the Court should apply the clear and convincing

9    standard of proof, relying in part on *Lonich*.  Def.'s Sent'g Mem. 22–23.  However, the facts here

10   are distinguishable from those in *Lonich*, where the government sought to incorporate losses

11   associated with a bank's total collapse into the loss calculation of a loan fraud conspiracy

12   conviction.  23 F.4th at 915.  In holding that the clear and convincing standard applied in *Lonich*,

13   the Ninth Circuit emphasized that the reasons for the bank's failure included a "substantial amount

14   of uncharged and acquitted conduct" and was too attenuated from the convicted conspiratorial

15   conduct.  *Id.* at 915.  By contrast, there is no such intervening causal factor here, where the

16   evidence at Mr. Balwani's trial and in various victim impact statements indicated that the

17   investments were a result of the convicted conduct, *i.e.*, misrepresentations of Theranos

18   technology.  *See infra* Section II(B).  Indeed, even the *Lonich* opinion acknowledges that "[t]he

19   preponderance of the evidence standard might have been appropriate if, for example, the loss

20   enhancements were based on the value of [the] defaulted [] loans," 23 F.4th at 915, an approach

21   that is analogous to the Court's loss calculation here based on the value of certain Series C

22   investments.  *See infra* at Section II(A)(2).

23       On these facts, this case more closely resembles the investor fraud in *Laurienti*, where the

24   Ninth Circuit held that it was "reasonable to infer that *all clients of Defendants who purchased the*

25   [] *stocks* were duped by the conspiracy."  611 F.3d at 556–57 (emphasis added).  Mr. Balwani's

26   attempt to distinguish *Laurienti* based on the type and sufficiency of the proof presented at

27   sentencing (Def.'s Sent'g Mem. 22) does not bear upon the Ninth Circuit's analysis on the

28   Case No.: 5:18-cr-00258-EJD-2
     ORDER ON SENTENCING

United States District Court
Northern District of California

*standard* of proof, a determination that turned on the defendant's conspiracy conviction. *Laurienti*, 611 F.3d at 556.

Because this sentencing enhancement is based on the extent of Mr. Balwani's convicted conspiracy, the Court applied the preponderance standard to any facts supporting the loss calculation for U.S.S.G. § 2B.1(b)(1).

### 2. Investment Calculation

Probation in the PSR calculated the total loss sustained by the Series C investors to be $730,840,209 across 29 separate investors. PSR ¶ 73. Mr. Balwani objected to this calculation, and the government bears the burden of proof to establish the total loss amount by a preponderance of the evidence. *See Ameline*, 409 F.3d at 1086; *see supra* Section II(A)(1).

The Ninth Circuit applies a general loss causation principle at sentencing, "permitting a district court to impose sentencing enhancements only for losses that 'resulted from' the defendant's fraud." *United States v. Berger*, 587 F.3d 1038, 1043 (9th Cir. 2009) (citing *United States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000)).

After reviewing the evidence presented by the government, the Court found by a preponderance of the evidence that Mr. Balwani's fraudulent representations resulted in at least twelve (12) victims investing a total of $381,347,268. The table below sets forth this list of investors, the relevant individual who testified to the investment, and an accounting and totaling of their investment amounts:

| Investor (Testifying Individual) | Shares | Share Price | Investment Amount |
|---|---|---|---|
| **Alan Eisenman** (Self) | 6,666 | $15.00 | **$99,990** |
| **Sherrie Eisenman** (Alan Eisenman) | 3,333 | $15.00 | **$49,995** |
| **Hall Group** (Bryan Tolbert) | 325,000 | $15.00 | **$4,875,000** |
| **Richard Kovacevich** (Self) | 276,666 | $15.00 | **$4,149,990** |
| **Lucas Venture Group** (Donald A. Lucas) | 504,667 | $15.00 | **$7,570,005** |
| **Mendenhall TF Partners** (Pat Mendenhall) | 87,500 | $15.00 | **$1,312,500** |
| **Black Diamond Ventures** (Chris Lucas) | 356,660 | $15.00 | **$5,349,900** |
| **Peer Ventures Group** (Mark Campbell) | 1,169,995 | $15.00 | **$17,549,925** |

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

| | | | |
|---|---|---|---|
| **Peer Ventures Group** (Mark Campbell) | 779,411 | $17.00 | **$13,249,987** |
| **PFM Funds** (Brian Grossman) | 5,655,294 | $17.00 | **$96,139,998** |
| **Mosley Family Holdings** (Daniel Mosley) | 352,941 | $17.00 | **$5,999,997** |
| **RDV Corporation** (Lisa Peterson) | 5,882,352 | $17.00 | **$99,999,984** |
| **Keith Rupert Murdoch** (Natalie Ravitz) | 7,352,941 | $17.00 | **$124,999,997** |
| **TOTAL INVESTMENT AMOUNT** | | | **$381,347,268** |

In reaching this count and figure, the Court only included those investors who indicated they had relied on or reviewed the Theranos misrepresentations propagated by the conspiracy to defraud Theranos investors, instead of counting every Series C investor as the PSR does.[1] *See infra* Section II(B); *see also* Leach Decl., Ex. B, ECF No. 1644-1. Moreover, each one of these investments was made prior to Mr. Balwani's departure from Theranos in May 2016. ECF No. 1644-1. This total investment amount, however, was not the end of the Court's loss calculation analysis.

### 3. Share Value Offset

In addition to calculating loss as either actual or intended loss, the Sentencing Guidelines also require that a victim's loss be offset by the victim's benefits received when calculating loss. U.S.S.G. § 2B1.1 cmt 3(E)(i); *see also W. Coast Aluminum Heat Treating Co.*, 265 F.3d at 992. In the context of fraud cases involving induced stock purchases of an otherwise legitimate company, this principle has been interpreted to mean that district courts "may not assume that the loss inflicted equals the full pre-disclosure value of the stock." *Zolp*, 479 F.3d at 719. Rather, courts must "disentangle the underlying value of the stock" and identify "inflation of that value due to the fraud." *Id.*

The Court found that, at the time the investor victims purchased their shares, Theranos stock was not "practically worthless" and retained some intrinsic value separate from the

---

[1] Though the Court did not adopt it, the PSR's approach nonetheless appear to have some support in the Ninth Circuit. Given the extent of Defendant's misrepresentations in widespread marketing materials and to the media for publication, it may be "reasonable to infer that all [Series C investors] were duped by the conspiracy." *Laurienti*, 611 F.3d at 557. The Court, however, declined to make such an inference in this case.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

7

fraudulent representations. *See Laurienti*, 611 F.3d at 558 (citing *Zolp*, 479 F.3d at 719). Therefore, to "reasonably estimate" the loss amounts attributable to Mr. Balwani's offenses, the Court reduced the total investment amount identified in the preceding section by the "underlying value" of the Theranos shares had no fraud occurred. *See, e.g.*, *Berger*, 587 F.3d at 1046–47 (instructing the district court to apply a loss calculation method that "attempt[s] to gauge the difference between [the] share price—as inflated through fraudulent representation—and what that price would have been absent the misrepresentation"); *United States v. Geringer*, 672 F. App'x 651, 653 (9th Cir. 2016) (finding district court erred by failing to "determine the actual value, if any, of the fund, and to deduct that value from the amount of loss"); *United States v. Evans*, 744 F.3d 1192, 1196 (10th Cir. 2014) (finding district court erred by not "inquir[ing] into what loss, if any, the investors would have suffered if [defendant] had come clean regarding the status of the securities"); *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008) (finding "district court erred in not deducting from the purchase price the actual value of . . . illiquid securities").

The government sought to distinguish *Zolp* on two grounds: (1) *Zolp* involved a public company with liquid and market-responsive share prices that readily lent themselves to an investor impact analysis; and (2) the Theranos investors never received *any* value in return because the shares ultimately became worthless without any liquidation opportunity. With respect to the first point, the Court acknowledges that valuing illiquid securities without a public market is certainly more difficult than valuing publicly traded securities. However, the language in *Zolp* does not provide such a basis to distinguish the loss calculations for public securities from those involving private securities. The Court also cannot avoid its obligation to conduct a "reasonable estimate" simply because a particular metric is not immediately available, a point that other courts have acknowledged in the private company context. *See Leonard*, 529 F.3d at 93 ("We are mindful that illiquid securities for which there is no public market can be extremely difficult to value. . . . [W]e can only call on the district court to make a 'reasonable estimate' of the loss amount.").

As to the government's second point, the Court is persuaded by the Ninth Circuit's reasoning in *Lonich* where it held that the district court erred by attributing losses associated with

a bank's ultimate collapse to the defendant's loan fraud. 23 F.4th at 918–19. Analogously, the government here had not established—by either a preponderance or clear and convincing standard—that Theranos' ultimate collapse was the result of Mr. Balwani's conspiratorial conduct and should therefore be reflected in his loss calculation. The fact that the investors did not have—and never will have—an opportunity to liquidate their shares is undoubtedly unfortunate, but illiquidity and resale difficulty does not deprive Mr. Balwani of credit for the inherent value of Theranos shares. *See Leonard*, 529 F.3d at 93; *United States v. Crandall*, 525 F.3d 907, 913 (9th Cir. 2008) (finding district court erred by failing to credit the value of fraudulent condominiums, "even though the units may have been difficult or impossible to resell").

Accordingly, the Court concluded that the total investment amount was subject to a reduction based on the inherent value of Theranos stock absent Mr. Balwani's fraud.

### 4. Net Loss Calculation

The final determination in the Court's loss calculation analysis involved reasonably estimating Theranos' inherent value and deducting that value from the total investment amount to arrive at the actual loss that is attributable to Mr. Balwani's fraud.

Determining what the Theranos share price would have been if there had been no fraud is admittedly a difficult task, made all the more difficult by Theranos' status as a private company. The Court, however, is not "obligated to search for the perfect theoretical or statistical fit" but need only adopt a reasonable, realistic, economic, projection of loss based on evidence presented. *W. Coast Aluminum*, 265 F.3d at 991. To that end, the Court found that the government's expert, Mr. Carl Saba, provided a reasonable valuation of Theranos' shares that contains several indicia of reliability and incorporates multiple assumptions favorable to Mr. Balwani and Theranos. ECF No. 1645 ("Saba Report"); ECF No. 1674, Ex. 1 ("Saba Suppl. Report"). The Court here first summarizes the Saba Report's methodologies and Mr. Balwani's objections, before addressing the figures it adopted from the Report.

### a. Methodology and Data

The Saba Report provides valuations of 100% Theranos equity on three dates (February 7,

United States District Court
Northern District of California

2014; December 31, 2014; and October 15, 2015) and then, from those valuations, extrapolates estimates of what the share price would have been on each date. For each date, the Saba Report provides two valuations using different methods, each reflecting different company metrics that are generally recognized in the appraisal profession. Saba Report ¶¶ 59, 65. The first valuation is a combination of the "discounted cash flow" method and the "guideline public company" method (collectively, the "Income Method"), which reflects Theranos' earnings, cash flow, and standing in relation to similar public companies. *Id.* ¶¶ 61-62; 65. The Saba Report's second valuation uses the "adjusted net asset value" method ("Asset Method"), which values Theranos based on its then-present assets and liabilities. *Id.* ¶ 77. Generally, the Income Method yielded a higher Theranos valuation—and therefore a lower loss proportion and amount—than the Asset Method. Once these two valuations were calculated, the Saba Report allocated those valuations to Theranos' shares using a methodology called "option pricing equity allocation" model. *Id.* ¶ 111. This method models the possible exit values for Theranos shares on a bell curve distribution, resulting in a projection of what the share price would have been on a selected date. *Id.* ¶¶ 111-15.

Additionally, the Saba Report's valuation figures reflect several assumptions drawn in Theranos' favor. For instance, the Saba Report assumes that Theranos would continue to operate as a going concern, *i.e.*, it was not in distress or facing near-term dissolution; Theranos' significant technology challenges would be successfully resolved; Theranos would realize high revenue growth in the near term; and it would earn significantly above industry margins. *Id.* ¶¶ 7, 16.

Most critically, the Saba Report does not rely on Theranos forecasts provided to investors, which were "associated with misrepresentations made to investors, and reflect extremely optimistic assumptions." *Id.* ¶ 84. Instead, the Report relies on certain IRC 409A forecasts prepared by an external professional services firm "for purposes of determining the fair market value of Theranos stock, and as a basis for federal tax reporting." *Id.* ¶ 86. Mr. Balwani does not object to the Saba Report's reliance on these 409(A) forecasts. *See* Def.'s Sent'g Mem. 38-39. Because the 409A forecasts were prepared for internal management use, were not provided to investors, and are "optimistic" but "orders of magnitude lower than those in the investor forecasts"

Case No.: 5:18-cr-00258-EJD
ORDER ON SENTENCING

10

(Saba Report ¶ 86), the Court was satisfied that the Saba Report's reliance on the 409A forecasts was consistent with a reasonable, realistic, and economic estimate of Theranos' inherent valuation with minimal influence from Mr. Balwani's fraudulent representations.

### b. Defendant's Objections

Mr. Balwani made multiple objections to the Saba Report's analysis and submitted two expert reports—Scott Weingust and Tobin Reiff—in support of his position.

First, Mr. Balwani objected that the Saba Report provides an "$80 million dollar range [that] cannot constitute a reasonable estimate of loss." Def.'s Sent'g Mem. 28–29. As it did in Ms. Holmes's sentencing, the Court also rejected Mr. Balwani's characterization of the Saba Report's loss range as $80 million, which was the delta between the upper limit of the Saba Report's *primary* loss estimate and the lower limit of the Report's *alternative* loss estimate. *See* Saba Report ¶ 15. When viewed in their respective contexts, the Saba Report's estimated loss ranges are closer to $36–38 million. *Id.*

Second, Mr. Balwani challenged the Saba Report's selection of a 45% "cost of equity" rate, instead claiming that a more appropriate rate would have been 28% to 33%. Def.'s Sent'g Mem. 29, Ex. 46 ("Weingust Report"). This degree of granularity may be appropriate for a civil court determining the quantum of civil damages. However, as the Court noted at the hearing, a judge calculating loss in a criminal proceeding need not arrive at a loss amount with the pinpoint precision that Mr. Balwani proposes; the sentencing court "need only make a reasonable estimate of the loss" and is not "obligated to search for the perfect theoretical or statistical fit." U.S.S.G. § 2B1.1 cmt 3(C); *W. Coast Aluminum*, 265 F.3d at 991. Here, the gist of Mr. Balwani's equity rate objections is that the Saba Report did not incorporate the exact inputs that he wanted, *e.g.*, that the loss calculation ought to employ a 28% or 33% rate instead of a 45% rate, or that the Saba Report should have relied exclusively on data published by Pepperdine University instead of a broader survey. Weingust Report ¶¶ 16, 19–21. Such quarrels are especially incongruous where the valuations' only role is to ascribe some reasonable value to Theranos' shares in determining what portion of the actual share price can be attributable to the fraud conspiracy. On this front, the

United States District Court
Northern District of California

Court found the type of criticisms advanced in the Weingust Report to be too specific to affect the Court's reasonable estimation of the Theranos' share value.

Although a sentencing court need not delve deep into this quantum debate to arrive at a reasonable estimate, the Court nonetheless identified some dubious bases underlying the Weingust Report's criticisms. For instance, the Weingust Report's proposed rate of equity relies entirely on data from one source—the Pepperdine University's studies—whereas the Saba Report's equity rate is estimated using data from five different sources, *including* the Pepperdine University studies. *See* Saba Report, Ex. F.4 n.2–n.5. Although the Weingust Report attempts to justify its reliance on a single source by criticizing the other sources for reflecting outdated data, Weingust Report ¶¶ 15, 20, this position conflicts not only with Saba's conclusion but also the view espoused by the American Institute of Certified Public Accountants ("AICPA") as published in its 2019 AICPA valuation practice aid. *See* Saba Suppl. Report ¶ 9 (noting that the 2019 AICPA practice aid indicated "despite their age, these academic studies are still regarded as providing reasonable indications of the target range of returns by stage of development"). These concerns further deterred the Court from relying on the Weingust Report's subsequent conclusions and criticisms. Accordingly, the Court adopted the Saba Report's use of a 45% cost of equity rate.

Third, to the extent that Mr. Balwani relies on the Reiff Report to challenge Mr. Saba's use of the option pricing model ("OPM"), this criticism also did not affect the Court's reasonable estimate of the loss. *See* Def.'s Sent'g Mem. 30–31, Ex. 47 ("Reiff Report"). The Reiff Report drew the Court's attention to the fact that the Saba Report's OPM analysis necessarily called for certain inputs that must be subjectively supplied by an appraiser instead by historical values. Reiff Report ¶¶ 5–7. However, the Reiff Report does not offer an opinion that Mr. Saba's OPM assumptions (four-year holding period with 55% equity volatility) were unreasonable. To the extent that the Saba Report's OPM equity allocation necessarily contained some values that were reasonably estimated, such estimation is entirely consonant with the Court's own reasonable estimate of loss.

Finally, regarding Mr. Balwani's objection as to Mr. Saba's "asset approach" analysis

(Def.'s Sent'g Mem. 29–30), the Court did not adopt the Saba Report's Asset Method and instead used the Income Method valuation in its loss calculation. As discussed further below, the selected Income Method yielded a higher Theranos valuation, a lower proportion attributable to the fraud, and was generally more favorable to Mr. Balwani.

Based on the foregoing reasons, the Court found that Mr. Balwani's expert reports—though helpful in providing further context and subjecting the Saba Report to rigorous and critical review—did not meaningfully undermine the reliability of the data and methodology employed by the Saba Report. Accordingly, the Court relied on the calculations and analyses in the Saba Report in reasonably estimating the loss.

### c. Final Calculation

Having outlined the Saba Report's methods and addressed Mr. Balwani's objections to the Saba Report, the Court proceeded to its own assessment of the various methods and dates that the Saba Report's present as potential valuations. As noted in the sentencing hearing, the Court adopted the Income Method calculation to estimate Theranos actual share price absent fraud. These valuations and metrics are more appropriate for valuing ongoing—as opposed to non-operating—businesses and yield a higher company valuation and a higher offset to Mr. Balwani's loss calculation. *Id.* ¶ 64. In identifying the proper valuation date, the Court selected the date closest in time to the last of the Series C investments, which is December 31, 2014. This date also resulted in a higher company valuation than the February 2014 date, which again is more favorable to Mr. Balwani. The Court declined to use the October 2015 Valuation Date (*i.e.*, when the fraud was exposed), because the Sentencing Guidelines only contemplate crediting value that was provided to the victim *before* the offense was detected. U.S.S.G. § 2B1.1, cmt. 3(E)(i). In sum, the Court considered the Asset Method and December 31, 20214 valuation date to be the most appropriate—and the most Defendant-favorable—foundation for its reasonable estimate of the loss resulting from Mr. Balwani's offense.

Using the Saba Report's estimate of Theranos' share prices on December 31, 2014, the Court found that the $15 Series C-1 price would have been $10.36 absent the fraud ($4.64 net loss

per share); and the $17 Series C-2 price would have been $11.63 ($5.37 net loss per share). When multiplied by the total number of the identifiable victims' shares—2,730,487 Series C-1 shares and 20,022,939 Series C-2 shares, *see supra* Section II(A)(2)—the total loss in share value attributable to the fraud conspiracy is approximately **$120,192,642**. This figure is 31.5% of the total investment value—in other words, Theranos stock would have been approximately 31.5% less expensive if there had been no fraud.

Based on the foregoing analysis and calculation, the Court reasonably estimated the loss resulting from Mr. Balwani's offenses to be $120,192,642. Because this amount is more than $65 million and less than $150 million, the loss amount falls under row M of U.S.S.G. § 2B1.1(b)(1), and the Court accordingly increased Mr. Balwani's offense level by 24 levels.

### B. Victim Number Enhancement, U.S.S.G. § 2B1.1(b)(2)(A)(i)

The government has sufficiently shown by a preponderance of the evidence that at least ten or more victims suffered a financial loss as a result of the conspiracy to commit wire fraud.

Section 2B1.1(b)(2)(A)(i) of the Sentencing Guidelines supports a 2-level enhancement if the offense "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). The guidelines define a "victim" as a person, including a corporation, "who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1(b)(1), cmt. 1. Similar to estimating losses, a district court need only "make a reasonable estimate . . . based on the available information" in counting victims. *United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 605 (2020) (quoting *Zolp*, 479 F.3d at 719).

The PSR included a 2-level enhancement based on the number of victims. PSR ¶ 74. The government alleges that there are 29 victims who suffered a financial loss in the Series C round of investments, summarized in the spreadsheet attached as Exhibit B to its supporting declaration.[2]

---

[2] The government refers to the investor spreadsheet filed in Co-Defendant Elizabeth Holmes' docket (5:18-cr-00258-EJD-1, ECF No. 1644-1, Ex. B) that includes 37 entries, which the PSR interprets as 29 victim investors, stating "[t]here are a total of 37 investors in the C-1 and C-2 groups; some of those are grouped (i.e., Lucas Venture Funds and PFM). As such, the number of 29 ensures none of the grouped investors are counted twice." PSR ¶ 64.

Gov't Sent'g Mem. at 21. The government relies on the Court's prior finding of 10 or more victims in Ms. Holmes's sentencing and contends that this Court should make this same finding as to Mr. Balwani.[3] *Id.* In reviewing the record, the Court finds that the government has met its burden of showing at least ten investors relied on Mr. Balwani's misrepresentations and fraudulent statements in making their decision to invest. The evidence supports a finding that the following investors satisfy the definition of "victim" under the Sentencing Guidelines: (1) Partner Investments L.P., PFM Healthcare Master Fund, L.P., and PFM Healthcare Principals Fund, L.P. (collectively, "PFM"); (2) Mosley Family Holdings LLC; (3) RDV Corporation (Dynasty Financial II, LLC); (4) Keith Rupert Murdoch; (5) Richard Kovacevich; (6) Peer Venture Partners (Peer Ventures Group IV, L.P., or "PVP"); (7) Lucas Venture Group (Lucas Venture Group IV LP and Lucas Venture Group XI); (8) Mendenhall TF Partners; (9) Hall Group (Hall Black Diamond II, LLC); (10) Black Diamond Venture (Black Diamond Ventures XII-B, LLC); (11) Alan Eisenman; and (12) Sherrie Eisenman. Accordingly, each of these victims' losses are reflected in the loss calculation. *Supra* II.A.2.

Mr. Balwani does not dispute that these investments were made. However, he argues that the government must show that his misrepresentations caused the loss. He asserts that "[t]he jury did not find that any investors actually relied on misrepresentations in deciding to invest, and heard nothing at all about the bulk of the investments making up the PSR's and the government's asserted losses." Def.'s Sent'g Mem. 21–23. However, the record contains sufficient evidence that both Ms. Holmes and Mr. Balwani provided misrepresentations or false information about Theranos and the capabilities of its technology prior to the investments. The preponderance of the

---

[3] In making this finding at Holmes' sentencing, the Court relied on testimony at trial as well as U.S. Securities Exchange Commission ("SEC") depositions (and memoranda summarizing deposition testimony), Federal Bureau of Investigation ("FBI") investigative reports, and victim impact statements provided by the government. 5:18-cr-00258-EJD-1, ECF Nos. 1643 at 3–8, 20–21; 1644, Exs. C–L. "In making factual determinations, a sentencing judge is generally not restricted to evidence that would be admissible at trial," so long as the evidence contains "sufficient indicia of reliability to support its probable accuracy." *United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000). The Court here is satisfied and finds that the SEC and FBI interview memoranda and sworn deposition testimony submitted by the government bear such hallmarks and indicia of reliability.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

United States District Court
Northern District of California

evidence supports a finding that additional investors qualify as victims for sentencing purposes.

Investors PFM, Mosley Family Holdings LLC, RDV Corporation, Black Diamond Venture, Hall Group, and Alan Eisenman undoubtedly qualify as victims, as Mr. Balwani was convicted of wire fraud against all six investors beyond a reasonable doubt. *See* ECF Nos. 1507 at 2, 469 at 9, 1644-1. During trial, investors from PFM, Mosley Family Holdings LLC, and RDV Corporation specifically described meeting with both Ms. Holmes and Mr. Balwani in Palo Alto prior to making their investments, during which time both Defendants made misrepresentations that were important considerations in deciding to invest. *See* Grossman (PFM) 5/18/22 Hr'g Tr. 6041:16–6042:9, 6043:3–6045:3, 6046:4–6050:12, 6056:3–6063, 6056:15–22:11, 6068:4–6069:18; Mosley 5/10/22 Hr'g Tr. 5144:4–6; 5155:2–5157:1, 5163:3–5175:14, 5175:20–5176:7, 5202:4–5207:13;[4] Peterson (RDV) 4/26/22 Hr'g Tr. 3862:3–3864:8, 3864:16–3871:1; Eisenman 5/11/22 Hr'g Tr. 5388:15–5395:24, 5513:14–5514:4.[5]

While other investors did not directly interact with Mr. Balwani, they testified at trial about their conversations with Ms. Holmes and their receipt of materials containing misrepresentations about the technology—whether through investment binders or publicly available articles containing statements by Ms. Holmes about Theranos' proprietary devices. *See* PSR ¶ 18. For example, Mr. Holmes falsely stated during her interview published in the 2013 Wall Street Journal ("WSJ") article that Theranos' proprietary device could "automate and miniaturize more than 1,000 laboratory tests" and stated "Theranos's processes are faster, cheaper, and more accurate

---

[4] Because it is not as immediately clear from the cited excerpts of Mr. Mosley's testimony, his testimony confirms his reliance on the Pfizer Report and other information provided in the binder in deciding to invest. While Ms. Holmes provided the binder to Mr. Mosley, the record is clear that Mr. Balwani was aware that Ms. Holmes provided this information to Mr. Mosley. Mr. Mosley's testimony further suggests that the false or misleading information contained within the binder were reiterated—or, at the very least, they were not corrected—during his meeting with both Ms. Holmes and Mr. Balwani in Palo Alto leading up to his investment.

[5] Although Sherrie Eisenman did not testify at trial, Alan Eisenman testified that he and his wife assess potential deals together and decide whether to invest, and he spoke on behalf of himself and his wife in email exchanges with Theranos, referring to he and his wife as "partner[s] in this investment" in an email to Ms. Holmes. 5/11/2022 Hr'g Tr. 5430:10–25, 5457:21–22, 5458:16–17. His victim impact statement also reflects both his and Sherrie's 2013 investments. It is therefore reasonable to infer that Sherrie Eisenman's investment was based upon the same false or misleading information in the same way that her husband's was.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

than the conventional methods"—statements that had been reviewed and approved by Mr. Balwani. Gov't Sent'g Mem. 3. This article was provided in the binders or otherwise read by Theranos investors, such as Christopher Lucas and Pat Mendenhall.[6] PSR ¶¶ 27, 37, 42. As participants in the same conspiracy to commit wire fraud against Theranos investors, Ms. Holmes' statements and provision of certain materials to investors in furtherance of the conspiracy is attributable to her co-conspirator Mr. Balwani, regardless of whether he directly interacted with each investor.

Similarly, the Court heard testimony at trial from representatives of Hall Group, Black Diamond Venture, and Mendenhall TF Partners as to the companies' reliance on statements arising from the fraud conspiracy in their conversations with Ms. Holmes and the 2013 WSJ promotion in reaching their decision to invest in the company. Bryan Tolbert, the Vice President of Finance at Hall Group who was responsible for overseeing the company's investment portfolio during the relevant years, testified that Ms. Holmes' misrepresentations during his December 20, 2013 phone call with her were influential considerations in his company's decision to invest in Theranos. Tolbert 4/29/22 Hr'g Tr. 4429:21–4430:21, 4430:2–5, 4430:10–21, 4434:4–4435:24, 4436:18–4438:22, 4440:3–17, 4446:2–5. Chris Lucas of Black Diamond Venture and Pat Mendenhall of Mendenhall TF Partners also testified at trial that statements made by Ms. Holmes and the 2013 WSJ article were significant in making their investment decisions. Lucas 5/13/22 5595:5–20, 5601:20–25, 5602:11–5605:1, 5625:4-5626:17; Mendenhall 4/29/22 Hr'g Tr. 4275:3–4278:4.

Testimony before the SEC also reveals reliance by PVP, Lucas Venture Group, and Rupert Murdoch on Defendants' misrepresentations made in furtherance of the conspiracy to defraud investors. For example, Natalie Ravitz, the Chief of Staff to Rupert Murdoch in 2014–2015 and the advisor and manager of his personal investments, testified before the SEC that she and Mr.

---

[6] Mr. Lucas and Mr. Mendenhall of Mendenhall TF Partners testified at Holmes' and Balwani's trials respectively that Ms. Holmes' 2013 WSJ article was significant in making their investment decisions. 5:18-cr-00258-EJD-1, Lucas 11/4/21 Hr'g Tr. 5407:1–5410:18; Mendenhall 4/29/22 Hr'g Tr. 4275:3–4278:4.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

17

Murdoch met with both Defendants in Palo Alto, and that Ms. Holmes personally provided binders containing financial and visionary materials about Theranos (including information containing misrepresentations) to Mr. Murdoch. ECF No. 1644-9 at 10:11–13:1, 16:21–20:24, 31:17 33:2–34:21; *see also* 5:18-cr-00258-EJD-1, 10/19/21 Hr'g Tr. 3996:16–4001:21 (trial testimony of Daniel Edlin regarding binders created for Mr. Murdoch). Ms. Ravitz further stated that, based on their conversations with Ms. Holmes and Mr. Balwani, she and Mr. Murdoch believed that the blood testing was performed on Theranos' proprietary devices, not third-party devices. ECF No. 1644-9 at 76:8–78:17, 85:4–13. Ms. Ravitz also testified that the knowledge that blood tests were not actually being performed on Theranos devices "would have changed how we thought about certainly the financial aspects of it, if there wasn't an actual piece of technology that they had developed." *Id.* at 78:18–25; *see also id.* at 78:25–79:10.

Similarly, based on SEC interview memoranda, representatives of PVP and Lucas Venture Group testified that Ms. Holmes misrepresented Theranos proprietary devices were being used in combat and medevac helicopters in furtherance of the fraud conspiracy, and both investors indicated in their SEC testimony that they were not aware that testing was being done on non-proprietary devices despite meeting with her. *See* ECF Nos. 1644-6; 1644-7. In fact, Mark Campbell of PVP was surprised to learn through the subsequent 2015 WSJ article that Theranos was not using their proprietary device to run tests, which Theranos had never discussed. ECF No. 1644-7 at 5. Mr. Campbell further noted that Theranos provided letters from Celgene and GlaxoSmithKline validating its technology. *Id.* at 2. During Ms. Holmes' trial, however, the government presented evidence that Celgene had *not* comprehensively validated Theranos' technology. 5:18-cr-00258-EJD-1, 9/29/21 Hr'g Tr. 2296:14–2297:10, 2316:9–2318:7. Similarly, the late Donald A. Lucas testified during his SEC interview that during his meeting with Ms. Holmes prior to investing he was told "Theranos could run 50-75 simultaneous tests from one drop of blood," despite the fact that its proprietary devices could only run twelve fingerstick assays, and he was not told that testing was done on third-party devices. ECF No. 1644-6 at 1–3. He believed that the blood collected from one finger prick went into the Theranos device for

analysis and that results were returned in 60 minutes. *Id.* at 3. Ms. Holmes also falsely told him that Theranos' devices were being used on modified Humvees in Afghanistan and medevac helicopters. *Id.* at 1–2.

Finally, the government produced an FBI memorandum summarizing its interview with Richard Kovacevich during its investigation. ECF No. 1644-5. In the memorandum, Mr. Kovacevich describes misrepresentations or omissions made by Ms. Holmes and the company in furtherance of the conspiracy to secure investments. The memorandum indicated that, before investing, Mr. Kovacevich was told that Theranos' proprietary devices were being used in military operations and that these devices were cheaper, better, and faster than any other devices on the market. *Id.* at 2. It also states that in 2013, neither Mr. Kovacevich nor any board member knew that the proprietary device could only run twelve tests, and he did not recall Ms. Holmes ever providing this information. *Id.* Mr. Kovacevich indicated that it mattered to him that Theranos was able to run all the tests on its own proprietary devices, and that he did not learn that the devices could not do so until the 2015 WSJ article. *Id.* at 2, 3. The FBI memorandum also noted that Mr. Kovacevich received an email from Ms. Holmes containing materials about Theranos, including valuation reports done by an "outside company." *Id.* at 1. He indicated during his interview that outside valuation was also important to him, and, in fact, was so significant that Mr. Kovacevich resigned from the board after third-party valuation never materialized. *Id.* at 3.

Although the Court counted more than ten victims, the reality may be that Mr. Balwani's fraud affected many more qualifying investor victims. Beginning in 2014 and 2015, binders were provided to investors containing false information about Theranos. Gov't Sent'g Mem. 2.[7] Daniel Edlin, a Theranos project manager who reported to Ms. Holmes, testified that he prepared these binders based on an approved checklist and stated that the binders were reviewed by Ms. Holmes before they were provided to investors. Edlin 4/13/22 Hr'g Tr. 2527:12–2528:8. Mr. Edlin also testified that Mr. Balwani contributed financial materials to these binders, and the binders were

---

[7] *See also* 5:18-cr-00258-EJD-1, Edlin 10/19/21 Hr'g Tr. 3993:15–14, 3995:7–23; 3996:18–4001:25.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

19

used during his and Ms. Holmes' meetings with investors in Palo Alto. 4/13/22 Hr'g Tr. 2528:9–21. It would not be an unreasonable inference to conclude that all potential C-1 and C-2 investors received fraudulent information via Edlin's binders or were exposed to one of the multiple publications containing misrepresentations. Gov't Sent'g Mem. 3, 21; *see George*, 949 F.3d at 1186 (noting that "the sentencing court reasonably [was allowed] to infer a pattern" in identifying the number of victims of defendant's bank fraud scheme) (quoting *United States v. Pham*, 545 F.3d 712, 720 n.3 (9th Cir. 2008)); *Laurienti*, 611 F.3d at 557 (noting that "it is reasonable to infer that all clients of Defendants who purchased the house stocks were duped by the conspiracy" where defendants were convicted of criminal conspiracy to defraud clients). However, because the Court has already identified at least ten victims whose losses do not require such an inference, the Court need not—and declined to expand—the scope of victims to all investors who had received an investor binder or read any of the misleading press releases.

In sum, the Court finds that the preponderance of the evidence supports the conclusion that the aforementioned twelve investors invested significant sums in reliance on both Defendants' misrepresentations and half-truths.[8] At sentencing, it is reasonable to infer that investors who were told or received information containing misrepresentations before investing—including misrepresentations about the financial projections of Theranos, the capabilities of its proprietary technology, the use of Theranos' technology by the military, the company's reliance on third-party machines, and valuations of the technology's performance—had relied on such information in assessing their investment risk, which in turn affected whether they *would* invest and the *amount* they chose to invest.

Accordingly, the Court is satisfied that the preponderance of the evidence supports a finding that at least ten or more investors qualify as a victim under the Guidelines in support of a 2-level enhancement to Ms. Holmes' sentence under U.S.S.G. § 2B1.1(b)(2)(A)(i).

---

[8] The government includes the three patients (Tompkins, Ellsworth, and Bingham) that Mr. Balwani was convicted of defrauding in its victim count. Gov't Sent'g Mem. at 21. Since the government has already identified at least 10 investor-victims by a preponderance of the evidence, the Court need not include patient victims.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

United States District Court
Northern District of California

### C.     Risk of Death or Serious Bodily Injury Enhancement, U.S.S.G. § 2B.1(b)(16)(A)

The Guidelines permit a 2-level increase in offense level where "an offense involved [] the conscious or reckless risk of death or serious bodily injury."  U.S.S.G. § 2B.1(b)(16)(A). To establish that a defendant's conduct warrants the application of § 2B.1(b)(16)(A), the government "need not show actual injury to any particular victim" and must instead focus on a defendant's "disregard of risk."  *United States v. Henderson*, 893 F.3d 1338, 1351–52 (11th Cir. 2018). Ignorance of the risk is not a defense to the application of this enhancement.  *United States v. Johansson*, 249 F.3d 848, 859 (9th Cir. 2001) ("[A] defendant does not have to subjectively know that his conduct created the risk.").

The PSR does not apply this enhancement, but the government argues that such an enhancement is warranted because Mr. Balwani's conduct created a significant risk of death or bodily injury to Theranos patients as a result of misdiagnosis due to inaccurate and/or unreliable test results.  Gov't Sent'g Mem. 12–24.  Mr. Balwani objects to this enhancement on the basis that there is insufficient evidence to support this finding.  Def. Sent'g Mem. 33–38.  The Court is inclined to agree.  At the sentencing hearing, the Court voiced its concerns but ultimately agreed with Mr. Balwani's position.  In reviewing the record, the Court did not find that both Defendants' fraudulent scheme involved a risk of serious bodily injury warranting the application of this enhancement.

Mr. Balwani was convicted of multiple wire fraud charges and conspiracy to commit wire fraud as to both Theranos investors and patients.  The convictions as to the patient counts arise from Theranos' use of interstate electronic wires to purchase advertisements intended to induce individuals to purchase Theranos blood tests at Walgreens in California and Arizona, falsely representing in the process that these tests were more accurate and cheaper than blood tests from conventional laboratories.  PSR ¶ 61.  The evidence produced at trial soundly supports a finding that Mr. Balwani was aware of the shortcomings of Theranos' proprietary devices brought to his attention on multiple occasions—from reliability issues with its proficiency testing to failed quality control tests—and the fact that the devices were not nearly as accurate, fast, or reliable as

Case No.: 5:18-cr-00258-EJD
ORDER ON SENTENCING

United States District Court
Northern District of California

1    Defendants had touted.  And because Theranos' proprietary devices were not performing as

2    promised, Defendants resorted to modifying FDA-approved third-party commercial devices and

3    increasing venipuncture (rather than fingerstick) testing which were run on non-Theranos devices.

4    PSR ¶¶ 23–26, 40.  This ruse—convincing investors that Theranos had developed a market-ready,

5    reliable blood testing proprietary device more accurate and inexpensive than anything else on the

6    market, and one which required only a few drops of capillary blood to run all the same tests as a

7    traditional laboratory—was maintained through false appearances: a façade that Theranos was

8    exclusively (or mostly) using its proprietary devices, which it was not.

9            Instead, the record suggests that the vast majority of blood tests purportedly performed on

10   Theranos' proprietary devices were, in fact, performed on FDA approved third-party machines.

11   PSR ¶ 26.  Theranos opened its laboratory in Palo Alto in 2011 and only used FDA approved

12   blood tests and FDA-approved third-party devices at the time.  *Id.* ¶ 24.  Ms. Holmes admitted at

13   trial that during 2011–2013, the proficiency testing data provided to investors related to the FDA

14   approved devices, not Theranos' proprietary technology.  *Id.*  Mr. Balwani testified that, once

15   Theranos began its "soft launch" of its miniature blood analyzers in 2013, a qualified lab director

16   signed off on validation reports for patient testing performed on Theranos' technology for clinical

17   purposes.  *Id.* ¶ 25.  Later, the "expanded launch" was approved by then-lab director Dr. Adam

18   Rosendorff.  *Id.*  At this time, Theranos modified third-party devices to enable them to run blood

19   tests from small blood samples.  *Id.* ¶ 36.  No evidence was offered that these FDA-approved

20   third-party machines—modified or not—had produced inaccurate or unreliable results.

21   Accordingly, with respect to this vast majority of blood tests that Theranos performed, the Court

22   found insufficient evidence that those tests exhibited an inordinate risk of inaccuracy, much less

23   that Mr. Balwani consciously disregarded such a risk.

24           The evidence also indicated that the majority of fingerstick and venipuncture testing

25   performed through the Walgreens contract were not performed using Theranos' proprietary

26   devices.  The Walgreens deal was set to occur in phases; during the initial phase, blood samples

27   would be shipped to a Theranos central lab for analysis until its devices received FDA approval

28   Case No.: 5:18-cr-00258-EJD-2

United States District Court
Northern District of California

and could be used in Walgreens stores.  PSR ¶ 23.  Theranos never advanced the second stage, however, because its proprietary device never received FDA approval.  *Id.*  And while Walgreens was aware that venipuncture testing was not performed on Theranos' proprietary technology, the company was not aware that third-party machines were used for the vast majority of testing.  PSR ¶¶ 23, 39.  For example, Walgreen's representative Nimesh Jhaveri testified at trial that testing was never performed in Walgreens, and that Walgreens tracked the number of venous draws and the percentage hovered around 40%—a percentage so high that Mr. Jhaveri suggested it threatened future Walgreens' expansion if the venous draw metrics remained in this range.  *Id.* ¶¶ 23, 52; Jhaveri 4/19/22 Hr'g Tr. 2900:23–1; 2906:23–2907:3.

Notwithstanding the vast majority of tests performed on third-party machines, some tests were performed on Theranos' proprietary devices.  Multiple patients and/or doctors testified at trial that they received inaccurate blood tests results from Theranos.  For example, Dr Mark Burnes testified regarding PSA test results for his patient, Mehrl Ellsworth.  PSR ¶ 58.  After receiving PSA results that were "significantly elevated," Dr. Burnes ordered a second test from Theranos, which produced more consistent results.  *Id.*  He later ordered a third test which, again, showed elevated results.  *Id.*  Afterwards, he learned that the first and third tests were performed on Theranos' proprietary device and the second test was performed at the Phoenix lab.  *Id.*  Dr. Burnes also testified, however, that he did not observe any other inaccurate test results conducted by Theranos and noted that trial lab errors do occasionally occur.  *Id.*  Additionally, Dr. Burnes's reaction to the initial inaccurate blood test—which was to order further confirmatory testing—would suggest that the risk of misdiagnosis is somewhat attenuated from inaccurate testing issues, such that the Court may not be able to conclude that there is an inherent risk of death or serious bodily injury from inaccuracy alone.  Even if the inaccuracy issues may support a finding that patients did not receive the standard of accuracy as advertised, there is less evidence that the same inaccuracy issues rising to such a degree above the inaccuracies expected from standard blood tests that patients were at risk of death or serious bodily injury.

Furthermore, even with respect to testing performed on Theranos' proprietary devices, the

Case No.: 5:18-cr-00258-EJD
ORDER ON SENTENCING
23

evidence does not favor a finding that Mr. Balwani disregarded a risk of death or serious bodily injury arising from these tests. Dr. Adam Rosendorff, the former Theranos lab director from 2013–2014, testified that Theranos never used its miniature blood analyzer device in its clinical lab for more than twelve assays, and by 2015, it was not using it in the clinical lab at all. PSR ¶ 31. Dr. Rosendorff further testified that he approved the assay validation reports that he signed and that he never knowingly released an inaccurate patient result. Def. Sent'g Mem. 35; Rosendorff 4/22/22 Hr'g Tr. 3537:1–3538:23; 3555:3–3556:25. Certainly, Mr. Balwani's cavalier attitude towards his duties overseeing the Theranos laboratory and his inexperience in the field of biomedical technology supports a finding that he was ill-suited for this role. However, the record also reflects actions that are inconsistent with a reckless risk of death or serious bodily injury. On multiple instances, Mr. Balwani deferred to the judgment of Theranos scientists, for instance, when they suggested moving assays to a commercial platform due to physician "lack of confidence" in the results. ECF No. 1665-7, Ex. 34. Regarding hCG assay inaccuracy issues, while Mr. Balwani learned that there were issues with hCG testing, he relied on Dr. Rosendorff's signed hCG validation report and Dr. Rosendorff's signoff on continued use of hCG testing once the team resolved the issues with the test. PSR ¶ 54. Though this evidence may be consistent with a finding that Mr. Balwani was aware of inaccuracies and intended to deprive patients of "the benefit of their bargain," Gov't Sent'g Mem. 22, reliance on other scientists is not necessarily consistent with a finding that he consciously disregarded the risk of death or serious bodily injury to those patients.

Although this was a close question, the evidence before the Court on balance does not weigh in favor of imposing an enhancement to Mr. Balwani's sentence for consciously disregarding the risk of death or serious bodily injury to Theranos patients. Accordingly, the Court declined to apply a 2-level enhancement under § 2B1.1(b)(16)(A).

### D. Aggravating Role Adjustment, U.S.S.G. § 3B.1(a)

The PSR included a 4-level upward adjustment based on Mr. Balwani's aggravating role as an "organizer or leader of a criminal activity" pursuant to U.S.S.G. § 3B.1(a). PSR ¶ 76. Mr.

Balwani objected to this enhancement, and the Court sustained the objection.

The "organizer" enhancement is applied if Mr. Balwani "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). To impose the enhancement, the government must show that "the defendant had control over other participants or organized other participants for the purpose of carrying out" the charged crimes." *United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018) (alteration and internal quotation marks omitted). "Participants" are defined as individuals who are "criminally responsible for the commission of the offense," meaning, a person who is not criminally responsible is not a "participant." U.S.S.G. § 3B1.1 cmt. 1. "Mere facilitation of criminal activity is not sufficient to support the enhancement. Nor is it sufficient for a defendant to have organized property or activities—the defendant must have organized participants." *Holden*, 908 F.3d at 402 (internal citation omitted).

At Mr. Balwani's sentencing hearing, the Court found that, although Mr. Balwani was certainly an organizer or leader at Theranos, there was insufficient evidence to conclude that he was an "organizer or leader" of the *criminal activity*, *i.e.*, fraud and conspiracy to commit fraud against Theranos investors. *See* PSR ¶ 108; Gov't Sent'g Mem. 26–27. The PSR and the government's sentencing memorandum focus on Mr. Balwani's deep involvement in Theranos' operations, but the evidence indicated that Theranos was a "real company," not a criminal enterprise. 9/8/21 Hr'g Tr. 553:7-8. To qualify for this enhancement, Mr. Balwani must have "organized other *participants for the purpose of carrying out the crime*." *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012) (emphasis added) (quoting *United States v. Ingham*, 486 F.3d 1068, 1074 (9th Cir. 2007)). Indeed, the Sentencing Guidelines accounts for circumstances involving a defendant's control over unwitting *non-participant* individuals, which is reflected in the "otherwise extensive" element but not the "organizer or leader" element. *See* U.S.S.G. § 3B1.1 cmt. 3 ("[A] fraud that involved only three participants but used the unknowing services of many outsiders could be considered *extensive*.") (emphasis added). Accordingly, Mr. Balwani's control and organization of other employees at Theranos do not satisfy the "organizer or

United States District Court
Northern District of California

United States District Court
Northern District of California

leader" requirement; he must control or organize other participants in the criminal activity.

The only other participant in the criminal activity that the government had identified was Ms. Holmes. Although the government frequently mention both Defendants together when referencing the scheme to defraud investors, the evidence presented by the government did not support a finding that Mr. Balwani exercised control over or otherwise organized Ms. Holmes, only that they acted as co-equals. *See, e.g.*, PSR ¶¶ 76; Gov't Sent'g Mem. 13, 25 ("Balwani's authority as President and COO was second only to Holmes"). The Ninth Circuit has expressly held that "co-equal" conspirators who are not "in charge" of each other do not exhibit sufficient control to qualify for even the 2-level aggravated role enhancement. *Holden*, 908 F.3d at 402–03. Here, the government presented evidence that Mr. Balwani was the President and COO of Theranos, directed product managers who maintained the Walgreens relationship, and ran the CLIA lab. Gov't Sent'g Memo. 25–26. Absent from the government's showing, however, was any evidence that Mr. Balwani controlled or organized Ms. Holmes' activities to perpetuate the fraud. To the contrary, Ms. Holmes had the power to terminate anyone at Theranos, including Mr. Balwani. 11/30/21 Hr'g Tr. 8093:9–8094:1. The evidence presented by the government did not support a finding that Mr. Balwani exercised control over Ms. Holmes, such that the Court can "apportion relative responsibility" to Mr. Balwani. *Holden*, 908 F.3d at 403.

Accordingly, the Court held that Mr. Balwani did not qualify for an aggravated role enhancement under any sub-section of U.S.S.G. § 3B1.1.

### E. Final Guidelines Calculation

Based on the foregoing reasoning, the Court made the following findings at Mr. Balwani's sentencing hearing:

1. The base offense level for violations of 18 U.S.C. § 1343 is 7 (U.S.S.G. § 2B1.1(a)(1));

2. The total loss to identified investor victims is $120,192,642, which increases the offense level by 24 levels (§ 2B1.1(b)(1)(M));

3. There are ten or more victims, which increases the offense level by 2 levels (§

2B1.1(b)(2)(A)(i)); and

4. There is insufficient evidence to support sentencing adjustments for risk of death or serious bodily injury and aggravating role as an organizer or leader (§§ 2B1.1(b)(16); 3B1.1(a)).

Accordingly, the Sentencing Guidelines calculation resulted in an offense level of 33. Combined with Mr. Balwani's Category I Criminal History, this yielded a Guideline sentencing range of 135 – 168 months.

## III. INDIVIDUALIZED § 3553(A) ANALYSIS

Once it arrived at the appropriate Sentencing Guidelines range at Mr. Balwani's sentencing hearing, the Court proceeded to impose a sentence that is "sufficient, but not greater than necessary to comply with the purposes" of sentencing. 18 U.S.C.S. § 3553. In doing so, the Court recognized that the Sentencing Guidelines' range is advisory, and it did not presume that the Guidelines' sentence was reasonable. *See Gall v. United States*, 552 U.S. 38, 46, 49–50 (2007). Instead, the Court conducted "an individualized assessment based on the facts" of the case, keeping in mind the factors listed at § 3553(a).

In determining the sentence, the Court considered the arguments and points presented in both parties' memoranda. The Court considered Mr. Balwani's history and characteristics, which included his commendable and generous philanthropic contributions, not just to his own family but also for the welfare of communities local and abroad. The Court also considered the nature and circumstances of the offense, recognizing that Mr. Balwani's sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence in criminal conduct. And particularly in this case, the Court considered the need to avoid sentence disparities among defendants with similar records who have been found guilty of similar conduct; specifically, the fact that Mr. Balwani was found guilty of all twelve counts in the Third Superseding Indictment whereas his Co-Defendant Ms. Holmes was convicted only on four counts of the same indictment.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

## IV. SENTENCE

Having considered the § 3553 factors, the Court imposed a sentence of 155 months' imprisonment, 3 years' supervised release with conditions adopted from the PSR's recommendations for supervised release, a fine of $25,000, and a special assessment of $1,200 ($100 per Count). Mr. Balwani's surrender date was set for March 15, 2023. The parties were ordered to meet and confer to determine a date for the restitution hearing.

**IT IS SO ORDERED.**

Dated: February 16, 2023

EDWARD J. DAVILA
United States District Judge