Exhibit M

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

6      UNITED STATES OF AMERICA,        )
                                        )   CR-18-00258-EJD
7                    PLAINTIFF,         )
                                        )   SAN JOSE, CALIFORNIA
8              VS.                      )
                                        )   MARCH 22, 2022
9      RAMESH "SUNNY" BALWANI,          )
                                        )   VOLUME 8
10                   DEFENDANT.         )
       _____ )   PAGES 985 - 1154

11

12                   TRANSCRIPT OF TRIAL PROCEEDINGS
                  BEFORE THE HONORABLE EDWARD J. DAVILA
13                   UNITED STATES DISTRICT JUDGE

14     A P P E A R A N C E S:

15     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                              BY:   JOHN C. BOSTIC
16                                  JEFFREY B. SCHENK
                              150 ALMADEN BOULEVARD, SUITE 900
17                            SAN JOSE, CALIFORNIA 95113

18                            BY:   ROBERT S. LEACH
                                    KELLY VOLKAR
19                            1301 CLAY STREET, SUITE 340S
                              OAKLAND, CALIFORNIA 94612

20
            (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
       OFFICIAL COURT REPORTER:
22                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                              CERTIFICATE NUMBER 8074
23

24           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED WITH COMPUTER
25

01:59PM  1    SAMPLE ON THE EDISON?

01:59PM  2    A.   SO THE TECAN WOULD BASICALLY TAKE A LITTLE BIT OF THE

01:59PM  3    BLOOD THAT WE HAD FROM THE COLLECTION UNIT, IT WOULD PUT IT IN

01:59PM  4    THE WELL, AND THEN IT WOULD DILUTE IT, AND THAT WAS SORT OF THE

01:59PM  5    SAMPLE PREP FOR THE EDISON CARTRIDGE.

01:59PM  6    Q.   DID YOU HAVE AN UNDERSTANDING AS TO WHY THE SAMPLE NEEDED

01:59PM  7    TO BE DILUTED BY THE TECAN BEFORE IT COULD BE RUN ON THE

01:59PM  8    EDISON?

01:59PM  9            MR. COOPERSMITH:  OBJECTION.  702, YOUR HONOR.

01:59PM  10           THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR HER

01:59PM  11   KNOWLEDGE OF THAT.

01:59PM  12           MR. BOSTIC:  I THINK THE QUESTION I ASKED WAS A YES

02:00PM  13   OR NO QUESTION, BUT JUST TO CLARIFY.

02:00PM  14   Q.   I'M ASKING BASED ON YOUR WORK AT THE COMPANY, DID YOU HAVE

02:00PM  15   AN UNDERSTANDING AS TO WHY THAT STEP WAS NECESSARY, THE

02:00PM  16   DILUTION STEP --

02:00PM  17   A.   YES.

02:00PM  18   Q.   -- BEFORE A SAMPLE COULD BE RUN?

02:00PM  19   A.   YES.

02:00PM  20   Q.   AND HOW DID YOU GAIN THAT UNDERSTANDING?

02:00PM  21   A.   FROM THE SOP'S THAT WERE PROVIDED TO US FROM THERANOS.

02:00PM  22   Q.   SO THE COMPANY DOCUMENTS THAT GOVERNED THIS PROCESS

02:00PM  23   EXPLAINED THAT REASON?

02:00PM  24   A.   YES.

02:00PM  25   Q.   SO WHAT WAS THAT REASON?  WHY WAS THAT DILUTION STEP

02:00PM 1    NECESSARY BEFORE THE SAMPLE COULD BE RUN ON THE EDISON?

02:00PM 2              MR. COOPERSMITH:  SAME OBJECTION, YOUR HONOR.  BEST

02:00PM 3    EVIDENCE AS WELL.

02:00PM 4              THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

02:00PM 5              THE WITNESS:  SO PART OF IT WAS BECAUSE WE HAD SMALL

02:00PM 6    SAMPLE SIZES, SO WE DID A DILUTION STEP IN ORDER TO ACCOMMODATE

02:00PM 7    FOR THE SMALL SAMPLE SIZES, AND THEN IT'S ALSO A PART OF THE

02:00PM 8    TEST.

02:00PM 9    BY MR. BOSTIC:

02:00PM 10   Q.   DID THE DILUTION STEP EFFECTIVELY INCREASE THE VOLUME OF

02:00PM 11   THE SAMPLE, MAKE IT BIGGER?

02:01PM 12   A.   IT DID.

02:01PM 13   Q.   THE PROCESS THAT YOU JUST OUTLINED, THOSE STEPS, WOULD

02:01PM 14   THAT PROCESS BE USED TO YIELD RESULTS FOR MULTIPLE ASSAYS AT A

02:01PM 15   TIME OR WOULD IT NEED TO BE RUN EACH TIME FOR EACH ASSAY THAT

02:01PM 16   NEEDED TO BE PERFORMED?

02:01PM 17   A.   IT WOULD NEED TO BE RUN FOR EACH TEST THAT WE DID EACH

02:01PM 18   TEST OR ASSAY.

02:01PM 19        SO ONLY ONE PATIENT FOR ONE TEST WOULD GO THROUGH THAT

02:01PM 20   WHOLE PROCESS.

02:01PM 21   Q.   SO IF A PATIENT CAME IN, FOR EXAMPLE, AND NEEDED, LET'S

02:01PM 22   SAY, JUST THREE ASSAYS RUN ON A SINGLE SAMPLE, HOW WOULD THAT

02:01PM 23   BE HANDLED?

02:01PM 24   A.   SO IF IT WAS THREE ELISA TESTS OR THREE IMMUNOASSAYS, WE

02:01PM 25   WOULD HAVE TO GO THROUGH THAT WHOLE PROCESS THREE TIMES.

02:03PM   1    Q.   DURING YOUR TIME AT THERANOS, WAS THE COMPANY USING THE

02:03PM   2    3.0 OR THE 3.5 FOR ACTUAL PATIENT TESTING?

02:03PM   3    A.   YES.

02:03PM   4    Q.   ONE OR BOTH OF THOSE?

02:03PM   5    A.   MOSTLY THE 3.5'S.

02:03PM   6    Q.   AND HOW ABOUT THE 4.0 DEVICE THAT YOU JUST MENTIONED,

02:03PM   7    DURING YOUR TIME AT THE COMPANY DID THERANOS EVER USE THE 4.0

02:03PM   8    DEVICE FOR ACTUAL PATIENT TESTING?

02:03PM   9    A.   NO.

02:03PM   10   Q.   DID YOU HAVE AN UNDERSTANDING WHEN YOU WERE AT THE COMPANY

02:03PM   11   AS TO WHY THERANOS WAS NOT USING THE 4.0 DEVICE FOR PATIENT

02:03PM   12   TESTING?

02:03PM   13   A.   THE 4.0'S DIDN'T HAVE THE CAPACITY TO RUN ANY TEST THAT WE

02:03PM   14   OFFERED THAT WERE LIVE, AND THEY JUST WEREN'T READY.  THEY

02:03PM   15   HADN'T BEEN DEVELOPED YET.

02:03PM   16        MR. COOPERSMITH:  YOUR HONOR, MOVE TO STRIKE UNDER

02:03PM   17   702.  IT WASN'T RESPONSIVE TO THE QUESTION, AND IT'S ALSO A

02:04PM   18   VIOLATION OF RULE 702.

02:04PM   19        THE COURT:  OVERRULED.  THE ANSWER IS -- THE

02:04PM   20   QUESTION WAS BASED ON HER UNDERSTANDING AS AN EMPLOYEE.  SO THE

02:04PM   21   OBJECTION IS OVERRULED.  THE ANSWER CAN REMAIN.

02:04PM   22   BY MR. BOSTIC:

02:04PM   23   Q.   AND, MS. CHEUNG, JUST TO CLARIFY, DURING YOUR TIME AT THE

02:04PM   24   COMPANY, WERE YOU GENERALLY AWARE OF WHAT ASSAYS WERE MOVING

02:04PM   25   THROUGH RESEARCH AND DEVELOPMENT AND WHICH WERE ACTUALLY IN

02:04PM  1        PATIENT TESTING USE?

02:04PM  2        A.   YES.

02:04PM  3        Q.   AND DURING YOUR TIME AT THE COMPANY, DID ANY TEST AT ALL

02:04PM  4        ON THE 4.0 DEVICE MOVE THROUGH THE R&D PROCESS AND ACTUALLY GET

02:04PM  5        TO THE PATIENT TESTING STAGE?

02:04PM  6        A.   NO.

02:04PM  7        Q.   THE PATIENT TESTS THAT THERANOS WAS RUNNING IN THE

02:05PM  8        CLINICAL LAB, WERE ALL OF THOSE TESTS RUN ON THE EDISON, THE

02:05PM  9        THERANOS-BUILT ANALYZERS?

02:05PM  10       A.   CAN YOU REPEAT THE QUESTION?

02:05PM  11       Q.   SURE.

02:05PM  12            THE PATIENT TESTING THAT THERANOS WAS DOING, WAS THAT ALL

02:05PM  13       BEING DONE ON THE EDISON, THE THERANOS-BUILT DEVICE?

02:05PM  14       A.   NO.  ONLY A SMALL SUBSET OF THE THERANOS TESTS WERE BEING

02:05PM  15       RUN ON THE EDISON DEVICES.

02:05PM  16       Q.   AND WHY WAS THAT?  WHY WAS ONLY A SMALL SUBSET BEING RUN

02:05PM  17       ON THE THERANOS DEVICES?

02:05PM  18            MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  602.

02:05PM  19            THE COURT:  WELL, THIS GOES TO HER KNOWLEDGE AS AN

02:05PM  20       EMPLOYEE THERE?

02:05PM  21            MR. BOSTIC:  CORRECT, YOUR HONOR.

02:05PM  22            THE COURT:  IF YOU CAN ANSWER IN THE SCOPE OF YOUR

02:05PM  23       EMPLOYMENT.

02:05PM  24            THE WITNESS:  SO IN THE SCOPE?  OKAY.

02:05PM  25            THE EDISON DEVICES ONLY HAD THE CAPACITY TO RUN ELISA

CHEUNG DIRECT BY MR. BOSTIC                                          1137

02:05PM   1        TEST, WHICH IS ONLY -- IS ONE SPECIFIC TYPE OF CHEMISTRY.  IT

02:05PM   2        DIDN'T HAVE THE CAPABILITIES TO RUN GENERAL CHEMISTRY,

02:06PM   3        MICROBIOLOGY, CYTOMETRY TESTS.

02:06PM   4            SO THE REASON WHY THERANOS ONLY RAN THAT SMALL SUBSET IS

02:06PM   5        BECAUSE THAT'S ALL THEY HAD THE CAPACITY TO RUN WAS BASICALLY

02:06PM   6        ELISA TYPE TESTS.

02:06PM   7                MR. COOPERSMITH:  YOUR HONOR, I'M GOING TO OBJECT

02:06PM   8        AGAIN UNDER 702.  THIS WITNESS DOESN'T HAVE THAT KNOWLEDGE TO

02:06PM   9        OPINE ABOUT WHAT THE DEVICE WAS CAPABLE OF OR WHAT ITS CAPACITY

02:06PM  10        WAS.

02:06PM  11                MR. BOSTIC:  YOUR HONOR, SHE OPERATED THESE DEVICES

02:06PM  12        ON A DAILY BASIS.  I THINK --

02:06PM  13                THE COURT:  THE OBJECTION 702 IS OVERRULED.

02:06PM  14                MR. COOPERSMITH:  YOUR HONOR, SHE CAN CERTAINLY SAY

02:06PM  15        WHAT SHE DID BUT TO GO FURTHER AND OPINE AS TO WHAT THE DEVICE

02:06PM  16        WAS CAPABLE OF AND WHAT ITS CAPACITY WAS I THINK IS BEYOND THIS

02:06PM  17        WITNESS'S EXPERTISE.

02:06PM  18                THE COURT:  WELL, THE ANSWER, AS I UNDERSTAND IT --

02:06PM  19        AND, MR. BOSTIC, YOU COULD LAY A FOUNDATION IF YOU WOULD LIKE

02:06PM  20        TO -- IS BASED ON HER TRAINING AND EXPERIENCE AT THE COMPANY.

02:06PM  21            PERHAPS IF YOU WANT TO ASK HER IF THAT'S WHAT SHE WAS

02:06PM  22        INSTRUCTED OR TRAINED.

02:06PM  23        BY MR. BOSTIC:

02:06PM  24        Q.   MS. CHEUNG, FROM YOUR TRAINING AND EXPERIENCE AT THE

02:07PM  25        COMPANY, DID YOU HAVE AN UNDERSTANDING AS TO WHAT THE EDISON 3

02:07PM  1    SERIES COULD DO AND WHAT IT COULD NOT DO?

02:07PM  2    A.   YES.

02:07PM  3    Q.   AND BASED ON YOUR TRAINING AND EXPERIENCE AT THE COMPANY,

02:07PM  4    WHERE WAS THAT LINE?  WHAT COULD THE EDISON 3 SERIES DO AND

02:07PM  5    WHAT COULD IT NOT DO?

02:07PM  6              MR. COOPERSMITH:  YOUR HONOR, SAME OBJECTION.  702.

02:07PM  7              THE COURT:  OVERRULED.

02:07PM  8              THE WITNESS:  CAN YOU REPEAT THE QUESTION?

02:07PM  9              MR. BOSTIC:  SURE.

02:07PM 10    Q.   WHAT COULD THE EDISON 3 SERIES DO AND WHAT COULD IT NOT DO

02:07PM 11    BASED ON YOUR TRAINING AND EXPERIENCE?

02:07PM 12              MR. COOPERSMITH:  SAME OBJECTION, YOUR HONOR.

02:07PM 13              THE COURT:  OVERRULED.

02:07PM 14              THE WITNESS:  THE EDISON 3.0 SERIES COULD DO ELISA'S

02:07PM 15    AND THAT WAS THE ONLY CAPACITY IT COULD DO WAS THAT TYPE OF

02:07PM 16    CHEMISTRY AND METHODOLOGY, AND THAT WAS WHAT MY UNDERSTANDING

02:07PM 17    OF THE TECHNOLOGY BASED ON WORKING FOR THE COMPANY.

02:08PM 18    BY MR. BOSTIC:

02:08PM 19    Q.   COULD I ASK YOU TO TURN TO EXHIBIT 3741 IN THE BINDER IN

02:08PM 20    FRONT OF YOU.

02:08PM 21         DO YOU SEE EXHIBIT 3741?

02:08PM 22    A.   YES.

02:08PM 23    Q.   AND WHAT IS THAT DOCUMENT IF YOU RECOGNIZE IT?

02:08PM 24    A.   THIS IS THE TESTING MENU AT THERANOS.

02:08PM 25    Q.   HAD YOU PREVIOUSLY HAD THE OPPORTUNITY TO REVIEW THE FIRST

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,           )
6                                         )   CR-18-00258-EJD
                         PLAINTIFF,       )
7                                         )   SAN JOSE, CALIFORNIA
               VS.                        )
8                                         )   MARCH 23, 2022
      RAMESH "SUNNY" BALWANI,             )
9                                         )   VOLUME 9
                         DEFENDANT.       )
10    _____        )   PAGES 1155 - 1381

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                            150 ALMADEN BOULEVARD, SUITE 900
17                          SAN JOSE, CALIFORNIA 95113

18                          BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                          1301 CLAY STREET, SUITE 340S
                            OAKLAND, CALIFORNIA 94612
20
             (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
      OFFICIAL COURT REPORTER:
22                               IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
23

24           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED WITH COMPUTER
25

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1202

10:05AM  1    A.   BECAUSE OUR SYSTEM WASN'T WORKING.  WE WEREN'T ABLE TO GET

10:05AM  2    THE QUALITY CONTROLS TO PASS, THIS IS, AGAIN, SOMETHING THAT WE

10:06AM  3    KNOW THE CONCENTRATION OF, SO THEY SHOULD BE PASSING.

10:06AM  4         AND BASED ON THE PROMISES THAT WE MADE TO OUR PATIENTS,

10:06AM  5    AND THE COMMITMENTS THAT WE HAD IN TERMS OF DELIVERING RESULTS

10:06AM  6    IN A CERTAIN AMOUNT OF TIME, AND IF IT WASN'T GETTING OUT, WE

10:06AM  7    WEREN'T ABLE TO GET THE PATIENT RESULT OUT IN THE TIMEFRAME

10:06AM  8    THAT WE PROMISED TO THEM.

10:06AM  9    Q.   DID THE QC FAILURES HAVE ANY IMPACT ON THE ACCURACY OR

10:06AM  10   RELIABILITY OF THE PATIENT TESTS THAT WERE GOING TO BE

10:06AM  11   PERFORMED ON THIS DAY?

10:06AM  12             MR. COOPERSMITH:  YOUR HONOR, OBJECTION.  RULE 702.

10:06AM  13             THE COURT:  CAN YOU LAY A FOUNDATION.

10:06AM  14             MR. BOSTIC:  SURE.  LET ME REPHRASE.

10:06AM  15   Q.   MS. CHEUNG, YOU MENTIONED THAT THESE PROBLEMS CREATED

10:06AM  16   ISSUES WITH THERANOS PERFORMING TESTS QUICKLY ENOUGH; IS THAT

10:07AM  17   RIGHT?

10:07AM  18   A.   THAT IS CORRECT.

10:07AM  19   Q.   AT THERANOS DID YOU UNDERSTAND WHETHER QC FAILURES ALSO

10:07AM  20   RELATED NOT JUST TO THE SPEED WITH WHICH TESTS COULD BE

10:07AM  21   CONDUCTED, BUT ALSO TO THE ACCURACY OF THE RESULTS?

10:07AM  22   A.   YES.

10:07AM  23   Q.   AND WHAT IS THE RELATIONSHIP, AS YOU UNDERSTOOD IT AT THE

10:07AM  24   TIME, BETWEEN QUALITY CONTROL TESTING AND TEST ACCURACY?

10:07AM  25             MR. COOPERSMITH:  YOUR HONOR, IT'S RULE 702.  EVEN

10:07AM 1    IF SHE HAS AN UNDERSTANDING, SHE CAN'T TESTIFY AS AN EXPERT

10:07AM 2    WITNESS.  SO RULE 702.

10:07AM 3            THE COURT:  I'M SORRY.  DID WE TALK ABOUT THIS AT

10:07AM 4    PRETRIAL?  WE PROBABLY DIDN'T ABOUT SPEAKING OBJECTIONS, AND I

10:07AM 5    APOLOGIZE WE DIDN'T COVER THAT.

10:07AM 6        BUT IF YOU WANT TO, MR. BOSTIC, IF YOUR QUESTIONS ABOUT

10:07AM 7    WHAT THIS WITNESS KNOWS AND OTHER WITNESSES KNOW THE BASIS OF

10:07AM 8    THE KNOWLEDGE, IF SHE WAS TRAINED OR AS TO CERTAIN THINGS OR

10:08AM 9    WHETHER OR NOT THIS MOVES INTO 702 TERRITORY, IT'S SOMETHING

10:08AM 10   THAT WE TALKED ABOUT YESTERDAY IN REGARDS TO THE WITNESS'S

10:08AM 11   BREADTH OF KNOWLEDGE AND THE BASIS FOR IT.

10:08AM 12           MR. BOSTIC:  UNDERSTOOD, YOUR HONOR.

10:08AM 13   Q.   LET ME ASK A PREFATORY QUESTION.

10:08AM 14       MS. CHEUNG, WHEN YOU WERE AT THERANOS, DID YOU RECEIVE

10:08AM 15   TRAINING AS TO THE PURPOSE FOR QUALITY CONTROL TESTING?

10:08AM 16   A.   YES.

10:08AM 17   Q.   AND WHAT WERE YOU TOLD AT THERANOS ABOUT WHY QUALITY

10:08AM 18   CONTROL TESTING WAS NEEDED?

10:08AM 19   A.   SO --

10:08AM 20           MR. COOPERSMITH:  OBJECTION.  HEARSAY, YOUR HONOR.

10:08AM 21           THE COURT:  OVERRULED.

10:08AM 22           THE WITNESS:  SO FOR THE QUALITY CONTROL TRAINING

10:08AM 23   THAT WE RECEIVED, ESSENTIALLY IT WAS, AGAIN, A WAY IN WHICH WE

10:08AM 24   COULD MEASURE THE PERFORMANCE -- THE QUALITY CONTROL SYSTEM WAS

10:08AM 25   ESSENTIALLY TO GIVE US AN INDICATION OF HOW WELL OUR SYSTEM WAS

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1204

10:08AM  1    RUNNING AND IF IT WAS RUNNING TO THE CALIBER IN WHICH WE

10:08AM  2    ARTICULATED IT WOULD RUN.

10:09AM  3        SO IF YOU HAVE, AGAIN, A KNOWN CONCENTRATION OF A SAMPLE

10:09AM  4    WHICH THAT IS GIVEN TO US THAT IT IS 10 NANOGRAMS PER MIL, AND

10:09AM  5    THE FACT THAT WE RUN IT ON OUR SYSTEM AND IT'S COMING OUT 52,

10:09AM  6    WE KNOW THAT THERE IS SOMETHING WRONG WITH THE ACCURACY.

10:09AM  7        AND WE WERE ALSO UNDERSTOOD AND TOLD THAT THAT DEVIATION

10:09AM  8    OF 10 NOT EQUALLING 52 COULD BE FOR A VARIETY OF DIFFERENT

10:09AM  9    REASONS, BUT AT THE END OF THE DAY WE KNOW THE ACCURACY IS NOT

10:09AM  10   CORRECT BECAUSE IT'S ALREADY ARTICULATED TO US AT THE BEGINNING

10:09AM  11   THAT 10 -- THE CORRECT VALUE FOR VITAMIN D IS 10.

10:09AM  12       SO IT WAS AN INDICATION THAT THERE WAS SOME ISSUE IN THE

10:09AM  13   ACCURACY OF THE ACTUAL DEVICE, BECAUSE, AGAIN, YOU KNOW IT

10:09AM  14   EQUALS 10 OR IN SOME ACCEPTABLE RANGE OF 10.

10:09AM  15   BY MR. BOSTIC:

10:09AM  16   Q.   THANK YOU.

10:09AM  17       GOING BACK TO THIS PARTICULAR DAY AND THIS QC FAILURE, DO

10:10AM  18   YOU SEE ON THE SCREEN A MESSAGE FROM MS. HOLMES ON

10:10AM  19   NOVEMBER 30TH SUGGESTING A POSSIBLE SOLUTION?

10:10AM  20   A.   YES.

10:10AM  21   Q.   AND WHAT IS MS. HOLMES SUGGESTING IN THAT EMAIL?

10:10AM  22   A.   SHE IS SUGGESTING THAT WE TRY AND RUN IT ON THE

10:10AM  23   TRADITIONAL METHODS.

10:10AM  24   Q.   AND WHAT DID TRADITIONAL METHODS MEAN IN TERMS OF WHAT

10:10AM  25   DEVICE WOULD BE USED?

11:06AM  1    A.   WE RARELY HAD QC FAILURES FOR THE COMMERCIALLY VIABLE

11:06AM  2    TESTS, OR COMMERCIALLY VIABLE -- THE TESTS THAT WE RAN ON THE

11:06AM  3    COMMERCIALLY VIABLE MACHINES.  SORRY.

11:06AM  4    Q.   THE NON-THERANOS DEVICES PERFORMED BETTER IN QC?

11:06AM  5    A.   THAT IS CORRECT.

11:06AM  6    Q.   THIS IS DATA FROM MARCH OF 2014; IS THAT RIGHT?

11:06AM  7    A.   YES.

11:06AM  8    Q.   AND BASED ON YOUR MEMORY, WAS MARCH AN ESPECIALLY BAD

11:06AM  9    MONTH FOR EDISON PERFORMANCE AT THERANOS, OR WAS THIS TYPICAL

11:06AM 10    OF WHAT YOU WOULD SEE?

11:06AM 11    A.   THIS WAS VERY TYPICAL OF WHAT WE WOULD SEE.

11:06AM 12    Q.   YOU MENTIONED THAT THIS CAUSED CONCERNS IN YOUR MIND, BUT

11:07AM 13    YOU TESTIFIED EARLIER THAT IF A DEVICE FAILED QUALITY CONTROL,

11:07AM 14    THEN IT WOULDN'T BE USED FOR PATIENT TESTING; IS THAT RIGHT?

11:07AM 15    A.   THAT IS CORRECT.

11:07AM 16    Q.   AND WHY DID THAT NOT REMOVE YOUR CONCERNS ABOUT PATIENT

11:07AM 17    TESTING AT THERANOS?

11:07AM 18         MR. COOPERSMITH:  YOUR HONOR, OBJECTION.  I THINK

11:07AM 19    THIS IS GOING TO CALL FOR A 702 ANSWER.

11:07AM 20         THE COURT:  DO YOU WANT TO LAY A LITTLE MORE

11:07AM 21    FOUNDATION ABOUT HER BREADTH OF KNOWLEDGE?

11:07AM 22         MR. BOSTIC:  SURE.

11:07AM 23    Q.   SO, MS. CHEUNG, I'M JUST ASKING YOU TO RECONCILE TWO

11:07AM 24    THINGS THAT YOU SAID?

11:07AM 25    A.   OKAY.

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1246

11:07AM  1    Q.   ON THE ONE HAND DO YOU REMEMBER TESTIFYING THAT WHEN A

11:07AM  2    DEVICE FAILED QUALITY CONTROL, IT WAS NOT USED FOR PATIENT

11:07AM  3    TESTING UNTIL IT WOULD PASS?

11:07AM  4    A.   RIGHT.

11:07AM  5    Q.   AND IS THAT HOW THINGS ACTUALLY WORKED AT THERANOS?

11:07AM  6    A.   CAN YOU REPEAT THE QUESTION ONE MORE TIME.

11:07AM  7    Q.   SURE.

11:07AM  8         WAS THAT RULE FOLLOWED AT THERANOS?

11:07AM  9    A.   YES.

11:07AM  10   Q.   AND YOU ALSO JUST TESTIFIED THAT THESE HIGH QC FAILURE

11:08AM  11   RATES WERE CONCERNING TO YOU?

11:08AM  12   A.   YES.

11:08AM  13   Q.   AND MY QUESTION TO YOU IS WHY WERE THEY CONCERNING IF YOU

11:08AM  14   KNEW DEVICES WEREN'T USED IF THEY FAILED QC?

11:08AM  15   A.   I THINK BECAUSE --

11:08AM  16        MR. COOPERSMITH:  YOUR HONOR, PARDON ME.  RULE 702.

11:08AM  17   THIS IS EXACTLY THE SAME QUESTION.  THERE HAS NOT BEEN ANY

11:08AM  18   ADDITIONAL FOUNDATION LAID AS FAR AS I CAN HEAR.

11:08AM  19        THE COURT:  I THINK THE POINT IS WELL TAKEN, THERE

11:08AM  20   WASN'T ANY FOUNDATION AS TO THE REASONS FOR HER CONCERN OR HER

11:08AM  21   BREADTH OF KNOWLEDGE AS TO WHY.

11:08AM  22        IS THAT SOMETHING THAT YOU CAN DO?

11:08AM  23        MR. BOSTIC:  OKAY, YOUR HONOR.

11:08AM  24   Q.   MS. CHEUNG, AS PART OF YOUR TRAINING AT THERANOS, WERE YOU

11:08AM  25   PROVIDED AN EXPLANATION AS TO WHY QC HAD TO BE PERFORMED BEFORE

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1247

11:08AM  1    PATIENT TESTING COULD PROCEED?

11:08AM  2    A.   SO QC TESTING IS REALLY TO CHECK THE PERFORMANCE OF YOUR

11:09AM  3    SYSTEM.

11:09AM  4         SO IF YOU HAVE A HIGH PERCENTAGE OF FAILURES WITHIN THE

11:09AM  5    SYSTEM, YOU CAN KIND OF FORECAST OUT THAT THAT PERCENTAGE OF

11:09AM  6    FAILURES COULD LIKELY OCCUR FOR PATIENT TESTING.

11:09AM  7         SO IF WE HAVE A SAMPLE SIZE OF 300, AND WE'RE GETTING

11:09AM  8    ONE-FORTH OF THAT FAILURES, LET'S SAY IT'S 400, IT MEANS THAT

11:09AM  9    100 ARE ESSENTIALLY IN THE TERRITORY OF NOT BEING ACCURATE.

11:09AM  10        SO THE REASON THAT IT'S CONCERNING IS THE FACT THAT IT IS

11:09AM  11   HAPPENING ACROSS TESTS AND ACROSS MACHINES DESPITE US

11:09AM  12   CONSISTENTLY CHANGING ALL OF THESE DIFFERENT VARIABLES THAT WE

11:09AM  13   CAN ANTICIPATE THAT IT'S PROBABLY --

11:09AM  14            MR. COOPERSMITH:  YOUR HONOR, IF I COULD JUST

11:09AM  15   INTERRUPT.

11:09AM  16        SHE'S NOW GIVING THE VERY ANSWER THAT WAS OBJECTIONABLE --

11:09AM  17   SHE'S GIVING THE SAME ANSWER THAT WAS OBJECTIONABLE, AND IT WAS

11:09AM  18   NOT REALLY RESPONSIVE TO THE QUESTION, SO I WOULD MOVE TO

11:10AM  19   STRIKE THE ANSWER THAT SHE JUST GAVE AND RENEW THAT OBJECTION.

11:10AM  20            THE COURT:  THE ANSWER SHE GAVE I THINK WAS

11:10AM  21   APPROPRIATE.  YOU OBJECTED TO A POINT.

11:10AM  22        DID YOU WANT TO ASK ADDITIONAL QUESTIONS AT THIS POINT?

11:10AM  23   BY MR. BOSTIC:

11:10AM  24   Q.   MS. CHEUNG, IF I COULD JUST INTERPOSE A QUICK QUESTION.

11:10AM  25        THE ANSWER THAT YOU'RE GIVING, IS THAT BASED ON THE

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1248

11:10AM  1    TRAINING THAT YOU GOT AT THERANOS?

11:10AM  2    A.   YES.

11:10AM  3              MR. BOSTIC:  I WOULD JUST ASK THAT THE WITNESS BE

11:10AM  4    ALLOWED TO COMPLETE HER ANSWER.

11:10AM  5              THE WITNESS:  OKAY.

11:10AM  6              THE COURT:  AND YOU MAY.  THE OBJECTION IS OVERRULED

11:10AM  7    AS TO THAT.

11:10AM  8              THE WITNESS:  OKAY.  SO THAT'S, THAT'S WHY IT WAS

11:10AM  9    CONCERNING.  IT WAS CONCERNING BECAUSE IF YOU JUST EXTRAPOLATE

11:10AM  10   OUT ESSENTIALLY THE PERCENTAGE OF FAILURES THAT ARE HAPPENING

11:10AM  11   ACROSS THE SYSTEM, EVEN IF WE CHANGE THE DEVICE, THERE'S

11:10AM  12   SOMETHING STILL GOING ON THAT IS CAUSING ONE OUT OF FOUR

11:10AM  13   FAILURES OF EVERY SINGLE TEST THAT WE DO ON THIS EDISON SYSTEM,

11:10AM  14   RIGHT?

11:10AM  15      EVEN IF YOU CHANGE THE DEVICE, IT SEEMS LIKELY THAT MAYBE

11:10AM  16   THERE'S SOME ISSUE WITH THE CHEMISTRY, MAYBE -- WHATEVER THE

11:10AM  17   ISSUE MIGHT BE, IT'S STILL THE FACT THAT I KNOW WHEN I RUN FOUR

11:11AM  18   TESTS, THAT ONE OF THEM IS LIKELY NOT TO WORK BASED ON THE

11:11AM  19   CUMULATIVE DATA THAT WE'RE RUNNING FOR THE QC ANALYSIS AND

11:11AM  20   BASICALLY GETTING AN UNDERSTANDING OF HOW MANY FAILURES WE'RE

11:11AM  21   HAVING FOR QC, AND THIS IS JUST ONE MONTH.

11:11AM  22   BY MR. BOSTIC:

11:11AM  23   Q.   UNDERSTOOD.  THANK YOU.

11:11AM  24      YOUR HONOR, THIS MIGHT BE A GOOD TIME FOR A BREAK?

11:11AM  25              THE COURT:  LET'S DO THAT, LADIES AND GENTLEMEN.

1

2                    UNITED STATES DISTRICT COURT

3               NORTHERN DISTRICT OF CALIFORNIA

4                    SAN JOSE DIVISION

5

6    UNITED STATES OF AMERICA,     )
                               )  CR-18-00258-EJD

7              PLAINTIFF,     )
                               )  SAN JOSE, CALIFORNIA

8           VS.               )
                               )  MARCH 30, 2022

9    RAMESH "SUNNY" BALWANI,     )
                               )  VOLUME 11

10           DEFENDANT.     )
    _____   )  PAGES 1444 - 1682

11

12              TRANSCRIPT OF TRIAL PROCEEDINGS
           BEFORE THE HONORABLE EDWARD J. DAVILA

13              UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S :

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                          BY:  JOHN C. BOSTIC

16                             JEFFREY B. SCHENK
                          150 ALMADEN BOULEVARD, SUITE 900

17                          SAN JOSE, CALIFORNIA 95113

18                       BY:  ROBERT S. LEACH
                             KELLY VOLKAR

19                          1301 CLAY STREET, SUITE 340S
                          OAKLAND, CALIFORNIA 94612

20

21       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22   OFFICIAL COURT REPORTER:
                         IRENE L. RODRIGUEZ, CSR, RMR, CRR

23                         CERTIFICATE NUMBER 8074

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

25

CHEUNG REDIRECT BY MR. BOSTIC                                          1552

11:32AM  1    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

11:32AM  2    A.   I DO.

11:32AM  3    Q.   AND DO YOU REMEMBER MR. COOPERSMITH ASKED YOU TO LOOK AT

11:33AM  4    PAGE 14 OF THAT DOCUMENT?

11:33AM  5    A.   YES.

11:33AM  6    Q.   HE IDENTIFIED IT AS THE CAP PROFICIENCY TESTING MANUAL; IS

11:33AM  7    THAT CORRECT?

11:33AM  8    A.   THAT IS CORRECT.

11:33AM  9    Q.   AND HE REFERRED YOU TO A SECTION ON THAT PAGE THAT

11:33AM  10   MENTIONS OUTLIERS; IS THAT CORRECT?

11:33AM  11   A.   THAT IS CORRECT.

11:33AM  12   Q.   I'LL ASK YOU TO TAKE A MINUTE TO REVIEW THAT PARAGRAPH.

11:33AM  13   AND THEN MY QUESTION FOR YOU IS DOES THAT DESCRIBE THE PROCESS

11:33AM  14   THAT THERANOS USED?

11:33AM  15   A.   THIS --

11:33AM  16        MR. COOPERSMITH:  HOLD ON A SECOND.  OBJECTION.

11:33AM  17   RULE 702.

11:33AM  18        THE COURT:  ARE YOU ASKING THIS WITNESS, ARE YOU

11:33AM  19   ASKING THIS WITNESS THE PRACTICE THAT SHE ENGAGED IN AS AN

11:33AM  20   EMPLOYEE AT HER JOB?

11:33AM  21        MR. BOSTIC:  EXACTLY, YOUR HONOR.

11:33AM  22   I'M ASKING HER WHETHER WHAT SHE OBSERVED HAPPENING AT

11:33AM  23   THERANOS IS THE SAME THAT WAS DESCRIBED IN THE DOCUMENT THAT

11:33AM  24   THE DEFENSE DISCUSSED.

11:33AM  25        MR. COOPERSMITH:  YOUR HONOR, SHE TESTIFIED THAT SHE

11:34AM  1   HAD NO AWARENESS OF THE COLLEGE OF AMERICAN PATHOLOGISTS OR

11:34AM  2   THEIR DOCUMENT AND HAS NO AWARENESS OF THIS PROCESS.

11:34AM  3       SO WE'RE JUST, I THINK, MAKING THIS UP AS WE GO ALONG.

11:34AM  4   SHE'S NEVER SEEN THIS BEFORE.  SHE'S NOT -- IT'S A 702 ISSUE.

11:34AM  5           THE COURT:  WELL, SHE'S NOT BEING CALLED TO TESTIFY

11:34AM  6   AS AN EXPERT ON THIS?

11:34AM  7           MR. BOSTIC:  CORRECT.

11:34AM  8           THE COURT:  RIGHT.

11:34AM  9           MR. BOSTIC:  I'M JUST ASKING HER TO READ THE WORDS.

11:34AM  10          THE COURT:  RIGHT.  OBJECTION IS OVERRULED.

11:34AM  11      SO YOU'RE NOT TO READ WHAT -- OUT LOUD, BUT JUST READ THIS

11:34AM  12  TO YOURSELF, AND THEN MR. BOSTIC WILL ASK YOU ANOTHER QUESTION.

11:34AM  13          THE WITNESS:  OKAY.

11:34AM  14          MR. COOPERSMITH:  YOUR HONOR, IF SHE'S GOING TO READ

11:34AM  15  THE DOCUMENT AND ANSWER QUESTIONS ABOUT THE TEXT, I THINK WE

11:34AM  16  OUGHT TO JUST ADMIT THE DOCUMENT AT THAT POINT.

11:34AM  17          THE COURT:  ARE YOU SEEKING ADMISSION OF THE

11:34AM  18  DOCUMENT?

11:34AM  19          MR. BOSTIC:  I AM NOT AT THIS TIME, YOUR HONOR.

11:34AM  20          THE COURT:  OKAY.

11:34AM  21          THE WITNESS:  CAN YOU REPEAT THE QUESTION ONE MORE

11:34AM  22  TIME?

11:34AM  23  BY MR. BOSTIC:

11:34AM  24  Q.   YES.  THE QUESTION WAS IS THE -- DOES THE DESCRIPTION IN

11:34AM  25  THE MANUAL REGARDING OUTLIER DETECTION, DOES THAT MATCH WHAT

CHEUNG REDIRECT BY MR. BOSTIC                                    1554

11:35AM  1    YOU OBSERVED HAPPENING AT THERANOS?

11:35AM  2    A.   NO, NO, IT DOESN'T MATCH.

11:35AM  3    Q.   DO YOU RECALL A DISCUSSION WITH MR. COOPERSMITH ABOUT THE

11:35AM  4    PROFICIENCY TESTING EXPERIMENT THAT WAS RUN IN FEBRUARY OF

11:35AM  5    2014?

11:35AM  6    A.   CORRECT.

11:35AM  7    Q.   AND DO YOU RECALL LOOKING AT EMAILS WITH HIM THAT MENTION

11:35AM  8    AN SOP OR SOP'S THAT WEREN'T FOLLOWED IN CONNECTION WITH THAT

11:35AM  9    PROFICIENCY TESTING EXPERIMENT?

11:35AM  10   A.   THAT IS CORRECT.

11:35AM  11   Q.   CAN YOU REMIND US HOW LONG YOU HAD BEEN AT THE COMPANY

11:35AM  12   WHEN THAT PROFICIENCY TESTING TOOK PLACE?

11:35AM  13   A.   I HAD BEEN AT THE COMPANY -- WHEN THE PROFICIENCY TESTING

11:35AM  14   WITH NEW YORK OR THE INTERNAL PROFICIENCY TESTING?

11:35AM  15   Q.   THE NEW YORK SAMPLES IN FEBRUARY OF 2014.

11:35AM  16   A.   IN FEBRUARY?  FIVE MONTHS.

11:36AM  17   Q.   AND IN ORDER TO DO YOUR JOB AT THE COMPANY, DID YOU NEED

11:36AM  18   TO BE FAMILIAR WITH THE REGULATIONS AND ALL OF THE INTERNAL

11:36AM  19   SOP'S THAT GOVERNED, FOR EXAMPLE, ALTERNATIVE ASSESSMENT

11:36AM  20   PROFICIENCY?

11:36AM  21   A.   NO, THAT WASN'T MY ROLE.

11:36AM  22   Q.   DID YOUR SUPERIORS HAVE TO BE FAMILIAR WITH THOSE

11:36AM  23   REGULATIONS AND PROCEDURES?

11:36AM  24   A.   YES.

11:36AM  25   Q.   FOCUSSING SPECIFICALLY ON THAT FEBRUARY 2014 TEST, AND

11:39AM  1    DISCUSSING WITH MR. COOPERSMITH SOME GUIDELINES OR MARGINS THAT

11:39AM  2    THE REGULATION PROVIDES FOR DIFFERENT KINDS OF TESTS?

11:39AM  3    A.   YES.

11:39AM  4    Q.   AND YOU TESTIFIED ON CROSS THAT THE SPECIFIC TESTS IN THE

11:39AM  5    REGULATION ARE GENERAL CHEMISTRY AS OPPOSED TO IMMUNOASSAYS; IS

11:39AM  6    THAT RIGHT?

11:39AM  7    A.   THAT IS CORRECT.

11:39AM  8    Q.   CAN YOU EXPLAIN WHY THAT MATTERS?

11:39AM  9    A.   THAT MATTERS BECAUSE THESE RANGES ARE GENERATED FOR A

11:39AM 10    DIFFERENT SUBSET OF TESTS, SO THEY HAVE NO RELATION TO THE

11:39AM 11    DIFFERENT TYPE OF PROFICIENCY TESTING THAT WE'RE RUNNING HERE

11:39AM 12    FOR THE IMMUNOASSAYS.

11:39AM 13          MR. COOPERSMITH:  YOUR HONOR, MOVE TO STRIKE UNDER

11:39AM 14    702.

11:39AM 15          THE COURT:  IS THIS RELATED TO HER -- MAYBE YOU CAN

11:39AM 16    LAY A FOUNDATION FOR THAT, PLEASE.

11:39AM 17          MR. BOSTIC:  SURE.

11:40AM 18    Q.   MS. CHEUNG, ARE YOU AWARE THAT -- WELL, LET ME ASK, THE

11:40AM 19    MARGINS, THE ALLOWABLE MARGINS SET BY THE REGULATIONS, ARE THEY

11:40AM 20    SPECIFIC TO EACH INDIVIDUAL ASSAY LISTED?

11:40AM 21          MR. COOPERSMITH:  YOUR HONOR, OBJECTION.  602, 702.

11:40AM 22          THE COURT:  WELL, ARE YOU ASKING IS THIS WHAT SHE

11:40AM 23    WAS TRAINED?

11:40AM 24          MR. BOSTIC:  I THINK IT'S APPARENT FROM THE

11:40AM 25    DOCUMENT, YOUR HONOR.

CHEUNG REDIRECT BY MR. BOSTIC                                    1558

11:40AM  1              THE COURT:  RIGHT.  RIGHT.  WHY DON'T YOU LAY THAT

11:40AM  2    FOUNDATION.

11:40AM  3    BY MR. BOSTIC:

11:40AM  4    Q.   MS. CHEUNG, AT THERANOS, DID YOU GAIN AN UNDERSTANDING AS

11:40AM  5    TO WHETHER THE REGULATIONS IMPOSED SPECIFIC MARGINS OF

11:40AM  6    ALLOWABLE ERROR FOR EACH SPECIFIC TEST?

11:40AM  7    A.   YES.

11:40AM  8    Q.   AND WHAT DID YOU COME TO UNDERSTAND FROM YOUR WORK AT

11:40AM  9    THERANOS?

11:40AM 10              MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  HEARSAY.

11:40AM 11              THE COURT:  OVERRULED.

11:40AM 12              THE WITNESS:  THAT -- CAN YOU REPEAT THAT QUESTION?

11:40AM 13    BY MR. BOSTIC:

11:40AM 14    Q.   SURE.

11:40AM 15         THE QUESTION WAS WHAT DID YOU LEARN AT THERANOS ABOUT

11:40AM 16    WHETHER THE REGULATIONS IMPOSED SPECIFIC MARGINS FOR SPECIFIC

11:41AM 17    TESTS?

11:41AM 18    A.   SO FOR SPECIFIC TESTS, THERE WAS A MARGIN THAT WE HAD TO

11:41AM 19    BE IN OR A STANDARD DEVIATION OF THE ACTUAL AMOUNT FOR SPECIFIC

11:41AM 20    TYPES OF TESTS.

11:41AM 21    Q.   AND IF WE'RE LOOKING AT THE FOUR TESTS THAT WERE INVOLVED

11:41AM 22    IN THE FEBRUARY 2014 EXPERIMENT --

11:41AM 23    A.   YES.

11:41AM 24    Q.   -- ARE ANY OF THOSE FOUR TESTS COVERED BY THE REGULATION

11:41AM 25    THAT MR. COOPERSMITH DISCUSSED WITH YOU?

01:19PM  1    ON THE EDISON; IS THAT RIGHT?

01:19PM  2    A.   THAT'S CORRECT.

01:19PM  3    Q.   AND HOW ABOUT CYTOMETRY TESTS LIKE A COMPLETE BLOOD COUNT,

01:19PM  4    COULD THE EDISON DO THOSE?

01:19PM  5    A.   NO.

01:19PM  6    Q.   AND HOW ABOUT GENETIC ANALYSES, COULD THE EDISON DO THOSE

01:19PM  7    TESTS?

01:19PM  8    A.   NO, THE EDISON DIDN'T DO GENETIC TESTING.

01:19PM  9    Q.   DO YOU KNOW APPROXIMATELY HOW MANY ASSAYS THE EDISON DID

01:19PM  10   DURING YOUR TIME THERE?

01:19PM  11   A.   THE TOTAL NUMBER OF TESTS RUN ON THE EDISONS.

01:19PM  12   Q.   APPROXIMATELY HOW MANY DIFFERENT ASSAYS COULD THE EDISON

01:19PM  13   DO, IF YOU REMEMBER?

01:19PM  14   A.   I REMEMBER IT WAS AT LEAST FIVE, OR APPROXIMATELY THAT.

01:20PM  15   Q.   AS YOU CAME TO UNDERSTOOD -- SORRY.

01:20PM  16        AS YOU CAME TO UNDERSTAND THE CAPABILITIES AND LIMITATIONS

01:20PM  17   OF THE EDISON, DID YOU VIEW IT AS A GROUNDBREAKING TECHNOLOGY

01:20PM  18   IN 2013?

01:20PM  19   A.   NO, I DID NOT.

01:20PM  20   Q.   WHY NOT?

01:20PM  21   A.   WELL --

01:20PM  22        MR. CAZARES:  OBJECTION.  702.

01:20PM  23        THE COURT:  DO YOU WANT TO LAY A LITTLE FOUNDATION,

01:20PM  24   HIS BACKGROUND.

01:20PM  25   BY MR. BOSTIC:

01:56PM  1    TESTIFIED THAT IT COULD NOT BE USED FOR PATIENT TESTING; IS

01:56PM  2    THAT RIGHT?

01:56PM  3    A.   CORRECT.

01:56PM  4    Q.   DESPITE THAT, DID THIS POOR QUALITY CONTROL PERFORMANCE

01:56PM  5    CAUSE YOU CONCERNS ABOUT THE ACCURACY OF RESULTS THAT WERE

01:56PM  6    GOING OUT TO PATIENTS?

01:57PM  7              MR. CAZARES:  OBJECTION.  702.  NOT NOTICED.

01:57PM  8              THE COURT:  OVERRULED.

01:57PM  9    BY MR. BOSTIC:

01:57PM  10   Q.   WOULD YOU LIKE THE QUESTION AGAIN, DOCTOR?

01:57PM  11   A.   NO, I HEARD THE QUESTION.

01:57PM  12        YOU ASKED ME IF IT LED TO MY CONCERN ABOUT THE ACCURACY OF

01:57PM  13   TEST RESULTS THAT WERE GOING OUT FROM THAT EQUIPMENT?

01:57PM  14        AND THE ANSWER IS, YES, IT DID RESULT IN A CONCERN ON MY

01:57PM  15   PART.

01:57PM  16        SO THE EQUIPMENT QUALITY CONTROLS ARE BEING RUN, AND

01:57PM  17   THEY'RE SHOWING RESULTS THAT ARE NUMERICALLY OFF BY ENOUGH THAT

01:57PM  18   IT'S NOT PASSING THE EQUIPMENT.

01:57PM  19        SO I DON'T WANT TO RUN A PATIENT SPECIMEN ON THAT.

01:57PM  20   Q.   AND FOLLOWING THIS EXAMPLE, THIS IS STILL EARLY

01:57PM  21   FEBRUARY 2014, DID YOU CONTINUE TO EXPERIENCE MORE QUALITY

01:57PM  22   CONTROL FAILURES OF THE THERANOS EQUIPMENT?

01:57PM  23   A.   YES.

01:57PM  24   Q.   LET'S LOOK AT ANOTHER EXAMPLE.  PLEASE TURN TO 1595 IN

01:57PM  25   YOUR BINDER.

1

2                      UNITED STATES DISTRICT COURT

3                     NORTHERN DISTRICT OF CALIFORNIA

4                            SAN JOSE DIVISION

5

         UNITED STATES OF AMERICA,          )
6                                           )  CR-18-00258-EJD
                          PLAINTIFF,        )
7                                           )  SAN JOSE, CALIFORNIA
                   VS.                      )
8                                           )  APRIL 1, 2022
         RAMESH "SUNNY" BALWANI,            )
9                                           )  VOLUME 12
                          DEFENDANT.        )
10       _____   )  PAGES 1683 - 1905

11

12                   TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                    UNITED STATES DISTRICT JUDGE

14       A P P E A R A N C E S:

15       FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                                BY:  JOHN C. BOSTIC
16                                   JEFFREY B. SCHENK
                                150 ALMADEN BOULEVARD, SUITE 900
17                              SAN JOSE, CALIFORNIA 95113

18                              BY:  ROBERT S. LEACH
                                     KELLY VOLKAR
19                              1301 CLAY STREET, SUITE 340S
                                OAKLAND, CALIFORNIA 94612
20
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
         OFFICIAL COURT REPORTER:
22                              IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074
23

24            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                   TRANSCRIPT PRODUCED WITH COMPUTER
25

PANDORI DIRECT BY MR. BOSTIC (RES.)                    1733

```
09:45AM  1         THE USE OF DNA TO DETECT PATHOGENS --

09:45AM  2              MR. CAZARES:  OBJECTION.  702.

09:45AM  3              THE COURT:  WHY DON'T YOU ASK A QUESTION.

09:45AM  4              MR. BOSTIC:  SURE.

09:45AM  5    Q.  DR. PANDORI, WHAT WAS YOUR -- WHAT HAD YOU OBSERVED THAT

09:45AM  6    MADE YOU UNDERSTAND THAT THAT WAS NOT A NOVEL THING THAT

09:45AM  7    THERANOS WAS DOING?

09:45AM  8              MR. CAZARES:  SAME OBJECTION.  702.

09:45AM  9              THE COURT:  OVERRULED.

09:45AM  10             THE WITNESS:  WELL, THAT STATEMENT, IF YOU GO TO A

09:45AM  11   PEER REVIEWED LITERATURE AND THE BODY OF KNOWLEDGE THAT WE HAVE

09:45AM  12   WITH REGARD TO DIAGNOSTIC TESTING, FOR EXAMPLE, PCR, WHICH IS A

09:45AM  13   WAY TO USE -- TO DO A DNA BASED DIAGNOSTIC, INSTEAD OF CULTURE,

09:46AM  14   WHICH WAS INVENTED IN 1985, AND SHORTLY THEREAFTER WAS ADOPTED

09:46AM  15   TO DETECT PATHOGENS.

09:46AM  16        IN THE LABORATORY THAT I WORKED PRIOR TO THIS AND OTHER

09:46AM  17   LABORATORIES I WORKED, WE USED DNA METHODOLOGIES TO DETECT

09:46AM  18   VIRUSES AND BACTERIA.  WE WOULD DO OVER 100,000 TIMES A YEAR.

09:46AM  19             MR. CAZARES:  OBJECTION.  INSPECTOR.

09:46AM  20             THE COURT:  SUSTAINED.  YOU CAN ASK ANOTHER

09:46AM  21   QUESTION.

09:46AM  22   BY MR. BOSTIC:

09:46AM  23   Q.  SO, DR. PANDORI, SO FAR WE HAVE TALKED ABOUT TURN-AROUND

09:46AM  24   TIME AND THE STATUS OF THE FERTILITY PANEL AT THERANOS AND

09:46AM  25   WHETHER THERANOS'S DNA METHODS WERE NOVEL AT THE TIME.
```

PANDORI DIRECT BY MR. BOSTIC (RES.)                                1734

09:46AM    1           IS THAT CORRECT SO FAR?

09:46AM    2      A.   SO FAR THAT WAS A SUMMARY OF WHAT WE DISCUSSED.

09:46AM    3      Q.   WERE THERE OTHER TOPICS IN THE ARTICLE THAT YOU FELT WERE

09:46AM    4      ADDRESSED INADEQUATELY OR MISLEADING?

09:46AM    5      A.   THE -- THERE'S AN IMPLICATION HERE THAT TESTS WERE

09:47AM    6      ACCURATE OR MORE ACCURATE, AND THAT WAS A PROBLEM BECAUSE THAT

09:47AM    7      WASN'T AN OBSERVATION THAT WAS BEING MADE EMPIRICALLY IN THE

09:47AM    8      LABORATORY.

09:47AM    9           MR. CAZARES:  OBJECTION.  702.  MOVE TO STRIKE.

09:47AM   10           THE COURT:  DO YOU WANT TO LAY A FOUNDATION?

09:47AM   11           MR. BOSTIC:  SURE.

09:47AM   12      Q.   SO YOU SAID THAT THE ARTICLE IMPLIED OR SAID THAT THE

09:47AM   13      THERANOS TESTING WAS MORE ACCURATE; IS THAT CORRECT?

09:47AM   14      A.   CORRECT.

09:47AM   15      Q.   AND BASED ON YOUR OBSERVATIONS WHEN YOU WERE AT THE

09:47AM   16      COMPANY, AND LIMITED TO ONLY WHAT YOU SAW WHILE YOU WERE THERE,

09:47AM   17      WAS THAT TRUE OR NOT?

09:47AM   18           MR. CAZARES:  OBJECTION.  702.

09:47AM   19           THE COURT:  BASED ONLY ON HIS OBSERVATIONS?

09:47AM   20           MR. BOSTIC:  YES, YOUR HONOR.

09:47AM   21           THE COURT:  YOU CAN ANSWER THE QUESTION BASED ON

09:47AM   22      YOUR OBSERVATIONS.

09:47AM   23           THE WITNESS:  BASED SOLELY ON MY OBSERVATIONS,

09:47AM   24      THERE'S NO REASON AT ALL TO BELIEVE THAT THESE TESTS WERE MORE

09:47AM   25      ACCURATE THAN TESTS THAT ALREADY EXISTED.

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,         )
6                                       )   CR-18-00258-EJD
                        PLAINTIFF,      )
7                                       )   SAN JOSE, CALIFORNIA
                  VS.                   )
8                                       )   APRIL 6, 2022
      RAMESH "SUNNY" BALWANI,           )
9                                       )   VOLUME 14
                        DEFENDANT.      )
10    _____  )   PAGES 2177 - 2443

11

12                   TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                   UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                                JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:  ROBERT S. LEACH
                                  KELLY VOLKAR
19                           1301 CLAY STREET, SUITE 340S
                             OAKLAND, CALIFORNIA 94612
20
           (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
      OFFICIAL COURT REPORTERS:
22                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
23                           LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

PANDORI REDIRECT BY MR. BOSTIC                                    2274

10:55AM   1      PERFORMANCE WOULD GO.

10:55AM   2      Q.   IN RETROSPECT -- WELL, LET ME ASK A DIFFERENT QUESTION.

10:55AM   3           SUBSEQUENTLY DID YOU COME TO HAVE A BETTER UNDERSTANDING

10:55AM   4      OF AAP PROTOCOLS OR REQUIREMENTS AS IT RELATED TO THERANOS?

10:55AM   5      A.   I DID.

10:55AM   6      Q.   INCORPORATING THAT UNDERSTANDING IN RETROSPECT, DO YOU NOW

10:55AM   7      VIEW THE DATA THAT WE'RE LOOKING AT ON THE SCREEN AS INVALID OR

10:55AM   8      NOT USEFUL IN TERMS OF MEASURING THE PERFORMANCE OF THERANOS

10:55AM   9      TESTS?

10:55AM  10      A.   WELL, I WAS NOT ABLE TO ASCERTAIN THE ANSWER TO THAT

10:55AM  11      QUESTION.

10:55AM  12           YOU KNOW, I WASN'T THERE LONG ENOUGH FOR ANYBODY TO SHOW

10:56AM  13      ME ANY DATA THAT INDICATED THAT THERE WAS A MATRIX ISSUE.

10:56AM  14      ALTHOUGH THE CONSTRUCTION OF AAP'S PRIOR TO MY ARRIVAL AT

10:56AM  15      THERANOS WOULD IMPLY THAT SUCH STUDIES HAD BEEN DONE, I WAS

10:56AM  16      NEVER MADE AWARE OF THE RESULTS OF SUCH STUDIES.

10:56AM  17      Q.   LET ME ASK IT MAYBE A SIMPLER WAY.

10:56AM  18           WE REVIEWED THIS DATA DURING YOUR DIRECT EXAMINATION;

10:56AM  19      CORRECT?

10:56AM  20      A.   CORRECT.

10:56AM  21      Q.   AND THIS TEST IN FEBRUARY OF 2014, IN YOUR VIEW, DID IT

10:56AM  22      REVEAL ANY PROBLEMS OR RAISE ANY CONCERNS ABOUT THE ACCURACY OF

10:56AM  23      THERANOS'S TESTING?

10:56AM  24                MR. CAZARES:  OBJECTION.  702.

10:56AM  25                THE COURT:  OVERRULED.

PANDORI REDIRECT BY MR. BOSTIC                                    2275

10:56AM  1              THE WITNESS:  YES, IT DID.

10:56AM  2    BY MR. BOSTIC:

10:56AM  3    Q.   AND SUBSEQUENT TO THAT, DID YOUR ADDITIONAL DISCUSSIONS

10:56AM  4    ABOUT AAP, OR ANY OTHER TOPIC, REMOVE THOSE CONCERNS THAT THIS

10:56AM  5    DATA HAD RAISED ABOUT POSSIBLE INACCURACY WITH THERANOS TESTS?

10:56AM  6    A.   NO, THEY HAD NOT ALL BY THEMSELVES REMOVED THAT.

10:57AM  7    Q.   AND WHEN YOU LEFT THE COMPANY, DID YOU STILL HAVE CONCERNS

10:57AM  8    ABOUT THE ACCURACY OF THERANOS'S TESTING?

10:57AM  9    A.   YES.

10:57AM  10   Q.   LOOKING AT THIS DATA SPECIFICALLY, I'LL DRAW YOUR

10:57AM  11   ATTENTION TO THE PSA RESULTS IN COLUMNS D, E, F, AND G.

10:57AM  12        DO YOU SEE THAT DATA?

10:57AM  13   A.   I DO.

10:57AM  14   Q.   AND THERE WAS SOME DISCUSSION WITH MR. CAZARES ABOUT TWO

10:57AM  15   SAMPLES THAT WERE RERUN.

10:57AM  16        DO YOU RECALL THAT DISCUSSION?

10:57AM  17   A.   I DO.

10:57AM  18   Q.   AND MR. CAZARES SUGGESTED TO YOU THAT A RERUN MIGHT BE

10:57AM  19   NECESSARY IN CASES WHERE THERE WAS AN EQUIPMENT MALFUNCTION.

10:57AM  20        DO YOU RECALL THAT?

10:57AM  21   A.   YES.

10:57AM  22   Q.   DO YOU KNOW ONE WAY OR ANOTHER WHETHER THERE WAS AN

10:57AM  23   EQUIPMENT MALFUNCTION DURING THIS FEBRUARY 2014 TESTING?

10:57AM  24   A.   I DO NOT KNOW ONE WAY OR THE OTHER.

10:57AM  25   Q.   THE FACT THAT THOSE TWO SAMPLES WERE RERUN, DO THEY ALLOW

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

6    UNITED STATES OF AMERICA,        )
                                      )  CR-18-00258-EJD
7              PLAINTIFF,             )
                                      )  SAN JOSE, CALIFORNIA
8         VS.                         )
                                      )  APRIL 20, 2022
9    RAMESH "SUNNY" BALWANI,          )
                                      )  VOLUME 20
10             DEFENDANT.             )
     _____ )  PAGES 3163 - 3450
                                         **SEALED PAGES 3222 - 3233**
11

12

13                 TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE EDWARD J. DAVILA
14                 UNITED STATES DISTRICT JUDGE

15   A P P E A R A N C E S:

16   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
17                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
18                         SAN JOSE, CALIFORNIA 95113

19                         BY:  ROBERT S. LEACH
                           1301 CLAY STREET, SUITE 340S
20                         OAKLAND, CALIFORNIA 94612

21        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22   OFFICIAL COURT REPORTERS:
                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                         CERTIFICATE NUMBER 8074
                           LEE-ANNE SHORTRIDGE, CSR, CRR
24                         CERTIFICATE NUMBER 9595

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

11:09AM   1    A.   IT'S A PROBLEM BECAUSE, FOR INSTANCE, FASTING BLOOD

11:09AM   2    GLUCOSE IS USED TO DIAGNOSE DIABETES.  THERE'S A THRESHOLD OF

11:09AM   3    126 ABOVE WHICH YOU'RE DIAGNOSED WITH DIABETES SO --

11:10AM   4              MR. COOPERSMITH:  YOUR HONOR, I'M GOING TO OBJECT

11:10AM   5    AND MOVE TO STRIKE UNDER 702.

11:10AM   6              THE COURT:  I'LL -- THE LAST PORTION OF THIS

11:10AM   7    TESTIMONY, LADIES AND GENTLEMEN, REGARDING THOSE MEASUREMENTS

11:10AM   8    IS STRICKEN.

11:10AM   9         YOU CAN LAY A FOUNDATION, IF YOU CAN.

11:10AM  10              MR. BOSTIC:  UNDERSTOOD, YOUR HONOR.  THANK YOU.

11:10AM  11    Q.   DR. ROSENDORFF, GENERALLY SPEAKING, WHAT IS A BIAS IN THE

11:10AM  12    CONTEXT OF LABORATORY TESTING?

11:10AM  13    A.   A BIAS IS -- A BIAS IS A MEASURE OF HOW FAR A LABORATORY

11:10AM  14    TEST DEVIATES FROM THE CORRECT VALUE, FROM THE TRUE VALUE.

11:10AM  15    Q.   SO DOES THE EXISTENCE OF A BIAS IN A LABORATORY TEST HAVE

11:10AM  16    ANY EFFECT ON THE ACCURACY OR RELIABILITY OF THAT TEST?

11:10AM  17              MR. COOPERSMITH:  OBJECTION.  702.

11:10AM  18              THE COURT:  CAN YOU LAY A FOUNDATION?

11:10AM  19              MR. BOSTIC:  SURE.

11:11AM  20    Q.   DR. ROSENDORFF, IN YOUR ROLE AS LABORATORY DIRECTOR AT

11:11AM  21    THERANOS, WAS BIAS SOMETHING THAT MATTERED TO YOU?

11:11AM  22    A.   YES.

11:11AM  23    Q.   AND WHY DID BIAS MATTER TO YOU AS THERANOS LABORATORY

11:11AM  24    DIRECTOR?

11:11AM  25    A.   BIAS --

11:11AM  1          MR. COOPERSMITH:  YOUR HONOR, SAME OBJECTION.

11:11AM  2          THE COURT:  OVERRULED.

11:11AM  3       YOU CAN ANSWER THE QUESTION.

11:11AM  4          THE WITNESS:  SO AS I MENTIONED, TOTAL ALLOWABLE

11:11AM  5   ERROR IS THE SUM OF BIAS AND PRECISION.

11:11AM  6       BIAS IS ANOTHER TERM FOR ACCURACY ESSENTIALLY.  IF THERE'S

11:11AM  7   SIGNIFICANT BIAS, THERE'S PROBLEMS WITH ACCURACY.

11:11AM  8   BY MR. BOSTIC:

11:11AM  9   Q.  ALL RIGHT.  LET'S LOOK AT PAGE 2 IN YOUR EMAIL.  ZOOM IN

11:11AM 10   ON THE TOP PARAGRAPH.

11:11AM 11       AND THERE YOU NOTE A DIFFERENCE IN REFERENCE RANGE FOR THE

11:11AM 12   THERANOS CHEMISTRIES VERSUS WHAT YOU WERE SEEING ON THE SIEMENS

11:12AM 13   CHEMISTRIES.

11:12AM 14       DO YOU SEE THAT?

11:12AM 15   A.  YES.

11:12AM 16   Q.  AND CAN YOU EXPLAIN FOR US WHY THAT WAS A CAUSE FOR

11:12AM 17   CONCERN FOR YOU AT THAT TIME?

11:12AM 18          MR. COOPERSMITH:  OBJECTION.  702.

11:12AM 19          THE COURT:  OVERRULED.

11:12AM 20       YOU CAN ANSWER THE QUESTION, SIR.

11:12AM 21   BY MR. BOSTIC:

11:12AM 22   Q.  WOULD YOU LIKE THE QUESTION AGAIN, DR. ROSENDORFF?

11:12AM 23   A.  YES, PLEASE.

11:12AM 24   Q.  THE QUESTION IS, THE DIFFERENCE BETWEEN THE RANGES ON THE

11:12AM 25   THERANOS CHEMISTRIES VERSUS THE SIEMENS CHEMISTRIES, WHY DID

ROSENDORFF DIRECT BY MR. BOSTIC                                      3267

11:12AM   1    THAT MATTER TO YOU AS LABORATORY DIRECTOR?  WHY WERE YOU

11:12AM   2    RAISING IT TO THE CEO?

11:12AM   3    A.   REFERENCE RANGES FOR GLUCOSE ARE EXTREMELY WELL, WELL

11:12AM   4    ESTABLISHED.  SO WHATEVER METHOD IS BEING USED, THOSE REFERENCE

11:12AM   5    RANGES SHOULD CLOSELY MATCH THE PUBLISHED GLUCOSE REFERENCE

11:12AM   6    RANGES.

11:12AM   7         IF THEY ARE SIGNIFICANTLY BELOW IT, AS IS THE CASE HERE,

11:12AM   8    THAT INDICATES A PROBLEM WITH THE ASSAY.

11:13AM   9    Q.   YOU GO ON TO DISCUSS THE RECOMMENDED MAXIMUM BIAS AND THE

11:13AM   10   CB THAT YOU WERE OBSERVING AT THERANOS.

11:13AM   11        DO YOU SEE THAT?

11:13AM   12   A.   YES.

11:13AM   13   Q.   AND YOU SAY, "THE TOTAL ALLOWABLE ERROR (PRECISION PLUS

11:13AM   14   BIAS) IS 10 PERCENT, WHICH MEANS THAT OUR ENTIRE ERROR BUDGET

11:13AM   15   HAS ALREADY BEEN SPENT JUST ON PRECISION."

11:13AM   16        CAN YOU EXPLAIN WHAT YOU MEANT BY THAT?

11:13AM   17   A.   SO TOTAL ALLOWABLE ERROR IS THE SUM OF PRECISION AND BIAS.

11:13AM   18        THE PRECISION IS ALREADY 8 PERCENT, WHICH IS PRETTY CLOSE

11:13AM   19   TO 10 PERCENT.  IT'S NOT THE ENTIRE ERROR BUDGET, BUT IT'S

11:13AM   20   PRETTY CLOSE TO IT.

11:13AM   21        SO WE WOULD HAVE FAILED TOTAL ALLOWABLE ERROR JUST BASED

11:13AM   22   ON PRECISION ALONE.

11:13AM   23   Q.   AT THE END OF THAT PARAGRAPH, YOU ASK A QUESTION OF THE

11:13AM   24   CEO.

11:13AM   25        YOU SAY, "MAYBE WE NEED TO WORK ON OUR CALIBRATORS OR

ROSENDORFF DIRECT BY MR. BOSTIC                                    3268

11:14AM  1    CHEMISTRY?"

11:14AM  2        DO YOU SEE THAT?

11:14AM  3    A.   YES, I DO.

11:14AM  4    Q.   WHAT WERE YOU SUGGESTING THERE?

11:14AM  5    A.   A BASIC PROBLEM WITH THE CHEMISTRY OF THERANOS METHODS.

11:14AM  6    Q.   IN OTHER WORDS, THIS WOULD BE GOING BACK TO THE DRAWING

11:14AM  7    BOARD IN A SENSE?

11:14AM  8    A.   EXACTLY.

11:14AM  9    Q.   LET'S LOOK FURTHER DOWN THE SAME PAGE UNDER SODIUM.

11:14AM 10        YOU WRITE, "I NOTICED FOR ONE OF THE DEMOS A FEW PATIENTS

11:14AM 11    HAD SODIUM VALUES IN THE 120'S, WHEREAS 99 PERCENT OF HEALTHY

11:14AM 12    PATIENTS SHOULD HAVE HAD SODIUMS BETWEEN 135-145?"

11:14AM 13        DO YOU SEE THAT?

11:14AM 14    A.   YES.

11:14AM 15    Q.   AND CAN YOU EXPLAIN WHAT THIS MEANS AND WHY YOU FELT THIS

11:14AM 16    WAS WORTH RAISING TO MS. HOLMES?

11:14AM 17    A.   IF A PATIENT TRULY HAS SODIUM IN THE 120'S, IT WOULD

11:14AM 18    RESULT IN THEIR BRAIN SWELLING, DELIRIUM.  THAT'S A LIFE

11:14AM 19    THREATENING SITUATION.

11:14AM 20    Q.   YOU SEEM TO BE REFERENCING A RELATIVELY SMALL NUMBER OF

11:15AM 21    RESULTS THAT YOU HAD SEEN IN THE COMPANY; IS THAT CORRECT?

11:15AM 22    A.   OH, YOU'RE REFERRING TO A FEW PATIENTS IN THE DEMOS.

11:15AM 23    Q.   YES.

11:15AM 24    A.   YES.

11:15AM 25    Q.   AS LABORATORY DIRECTOR, CAN INDIVIDUAL PROBLEMATIC RESULTS

| | | |
|---|---|---|
| 11:15AM | 1 | ALERT YOU TO PROBLEMS ABOUT THE ACCURACY OF A BLOOD ASSAY? |
| 11:15AM | 2 | A.   YES. |
| 11:15AM | 3 | MR. COOPERSMITH:  OBJECTION.  702.  MOVE TO STRIKE. |
| 11:15AM | 4 | THE COURT:  OVERRULED.  THE ANSWER WILL REMAIN. |
| 11:15AM | 5 | BY MR. BOSTIC: |
| 11:15AM | 6 | Q.   LET'S LOOK AT HOW YOU END THIS MESSAGE. |
| 11:15AM | 7 | IN THE BOTTOM PARAGRAPH YOU WRITE, "I WOULD LIKE US TO BE |
| 11:15AM | 8 | THE BEST THAT WE CAN BE.  A FEW MORE WEEKS TO SORT THROUGH |
| 11:15AM | 9 | THESE MEDICAL AND LOGISTICAL ISSUES, AND GETTING THE PROPER |
| 11:15AM | 10 | LEVEL OF TRAINING AND STAFFING WOULD HELP US TREMENDOUSLY." |
| 11:15AM | 11 | WHAT WERE YOU ASKING FOR HERE? |
| 11:15AM | 12 | A.   I WAS ASKING FOR MORE TIME TO MAKE SURE THAT THE ASSAYS |
| 11:15AM | 13 | WERE MEDICALLY -- OF MEDICAL VALUE, AND THAT THERE WAS THE |
| 11:16AM | 14 | RIGHT LEVEL OF TRAINING AND STAFFING IN THE LABORATORY TO RUN |
| 11:16AM | 15 | THOSE TESTS. |
| 11:16AM | 16 | Q.   IN OTHER WORDS, WERE YOU ASKING TO DELAY THE COMMERCIAL |
| 11:16AM | 17 | LAUNCH OF THE COMPANY'S TESTING? |
| 11:16AM | 18 | A.   CORRECT. |
| 11:16AM | 19 | Q.   WAS THAT A REQUEST THAT YOU MADE LIGHTLY? |
| 11:16AM | 20 | A.   NO, NOT AT ALL. |
| 11:16AM | 21 | Q.   WHY DID YOU THINK IT WAS NECESSARY TO MAKE THAT REQUEST? |
| 11:16AM | 22 | A.   IN THE INTEREST OF NOT HARMING PATIENTS. |
| 11:16AM | 23 | Q.   BETWEEN MS. HOLMES AND MR. BALWANI, DURING YOUR TIME AT |
| 11:16AM | 24 | THE COMPANY, WHO WAS MOST INVOLVED IN THE RUNNING AND |
| 11:16AM | 25 | OPERATIONS OF THE CLINICAL LAB? |

ROSENDORFF CROSS BY MR. COOPERSMITH                      3415

| | | |
|---|---|---|
| 03:41PM | 1 | Q.   OKAY.  AND ARE YOU AWARE THAT WITH WAIVED TESTING, THAT |
| 03:41PM | 2 | SOMETIMES THOSE DEVICES COULD BE PLACED IN THE FIELD? |
| 03:41PM | 3 | A.   I'M SORRY, WHAT DO YOU MEAN BY "IN THE FIELD"? |
| 03:41PM | 4 | Q.   LIKE IN A PHYSICIAN'S OFFICE OR A HOSPITAL OR -- |
| 03:41PM | 5 | A.   YES, YES. |
| 03:41PM | 6 | Q.   OKAY.  THANK YOU. |
| 03:41PM | 7 |      AND THEN IF YOU GO TO PAGE 5 OF THE DOCUMENT, YOU SEE |
| 03:41PM | 8 | THERE'S A LABORATORY TESTING DECLARATION THERE? |
| 03:41PM | 9 | A.   YES. |
| 03:41PM | 10 | Q.   AND THEN THERE'S HANDWRITING THAT FILLS IN A NUMBER OF THE |
| 03:42PM | 11 | INFORMATION FOR THE VARIOUS ASSAYS. |
| 03:42PM | 12 |      DO YOU SEE THAT? |
| 03:42PM | 13 | A.   YES. |
| 03:42PM | 14 | Q.   AND IS THAT YOUR HANDWRITING? |
| 03:42PM | 15 | A.   I BELIEVE SO, YES. |
| 03:42PM | 16 | Q.   OKAY.  THEN IF YOU GO TO THE NEXT PAGE, PAGE 6, DO YOU SEE |
| 03:42PM | 17 | THERE'S A SECTION CALLED HIV -- |
| 03:42PM | 18 | A.   THAT IS NOT -- I'M SORRY.  GO AHEAD. |
| 03:42PM | 19 | Q.   I'M SORRY.  I'LL FINISH MY QUESTION. |
| 03:42PM | 20 | A.   YEAH, PLEASE DO. |
| 03:42PM | 21 | Q.   THE SECTION IS CALLED "LIST ALL OTHER TESTS PERFORMED AND |
| 03:42PM | 22 | ANNUAL TEST VOLUME." |
| 03:42PM | 23 |      DO YOU SEE THAT? |
| 03:42PM | 24 | A.   YES. |
| 03:42PM | 25 | Q.   OKAY.  AND THEN THERE'S A -- THE FIRST ONE LISTED IS HIV |

03:42PM   1    RNA" I BELIEVE IT SAYS AVANT, "REALTIME PCR."

03:42PM   2        DO YOU SEE THAT?

03:42PM   3    A.   YES.

03:42PM   4    Q.   OKAY.  AND THAT'S A MOLECULAR TEST FOR HIV; IS THAT

03:42PM   5    CORRECT?

03:42PM   6    A.   YES.

03:42PM   7    Q.   AND THERANOS OFFERED THAT ON FDA PREDICATE MACHINES?

03:42PM   8    A.   CORRECT.

03:42PM   9    Q.   AT ALL TIMES THAT YOU WERE THERE; CORRECT?

03:43PM  10    A.   NO.  I THINK FOR A SHORT TIME HEPATITIS C WAS OFFERED ON

03:43PM  11    THE EDISON.

03:43PM  12    Q.   OKAY.  THANK YOU.

03:43PM  13        BUT JUST TALKING ABOUT HIV?

03:43PM  14    A.   YES, TO MY KNOWLEDGE.

03:43PM  15    Q.   AND ALL OF THE TIME YOU WERE AT THERANOS, THE HIV TEST WAS

03:43PM  16    OFFERED ON AN UNMODIFIED FDA APPROVED PREDICATE MACHINE;

03:43PM  17    CORRECT?

03:43PM  18    A.   YES.

03:43PM  19    Q.   OKAY.

03:43PM  20    A.   THAT'S NOT MY HANDWRITING, BY THE WAY.

03:43PM  21    Q.   OKAY.  IF YOU GO TO THE NEXT, PAGE 7?

03:43PM  22    A.   UH-HUH.

03:43PM  23    Q.   DO YOU SEE THERE'S SOMETHING CALLED DIRECTOR'S

03:43PM  24    ATTESTATION?

03:43PM  25    A.   YES.

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                          SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,        )
6                                      )  CR-18-00258-EJD
                     PLAINTIFF,        )
7                                      )  SAN JOSE, CALIFORNIA
              VS.                      )
8                                      )  APRIL 26, 2022
      RAMESH "SUNNY" BALWANI,          )
9                                      )  VOLUME 22
                     DEFENDANT.        )
10    _____  )  PAGES 3697 - 3959

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
                BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                           1301 CLAY STREET, SUITE 340S
                             OAKLAND, CALIFORNIA 94612
20
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
      OFFICIAL COURT REPORTERS:
22                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
23                           LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

09:59AM  1    Q.   IS THERE ANY WAY THAT LOOKING AT THE DATA OVER TIME COULD

10:00AM  2    REDEEM THAT PERFORMANCE?

10:00AM  3         IN OTHER WORDS --

10:00AM  4              MR. COOPERSMITH:  OBJECTION.  LEADING.

10:00AM  5              THE COURT:  WHY DON'T YOU REASK THE QUESTION?

10:00AM  6    BY MR. BOSTIC:

10:00AM  7    Q.   IN OTHER WORDS, DR. ROSENDORFF, IS THERE ANY SCENARIO

10:00AM  8    WHERE THE PROBLEMS IDENTIFIED WITH DAILY QUALITY CONTROL GO

10:00AM  9    AWAY WHEN YOU LOOK AT THINGS LIKE WESTGARD RULES AND

10:00AM  10   LEVEY-JENNINGS?

10:00AM  11             MR. COOPERSMITH:  OBJECTION.  LEADING.

10:00AM  12             THE COURT:  OVERRULED.

10:00AM  13             THE WITNESS:  NO.  IN MY OPINION -- IT'S JUST AN

10:00AM  14   OPINION, IT'S NOT EXPERT TESTIMONY -- DAILY QC IS THE MOST

10:00AM  15   IMPORTANT QC.  IN FACT, IT'S ALSO PART OF WESTGARD RULES.  SO

10:00AM  16   IT'S WRAPPED UP INTO WESTGARD RULES, DAILY QC.

10:00AM  17   BY MR. BOSTIC:

10:00AM  18   Q.   THERE'S ALSO BEEN SOME DISCUSSION DURING DIRECT AND CROSS

10:00AM  19   ABOUT THERANOS'S METHOD OF DILUTING BLOOD SAMPLES BEFORE

10:00AM  20   TESTING.

10:00AM  21        DO YOU RECALL THAT?

10:00AM  22   A.   YES.

10:00AM  23   Q.   DURING YOUR TIME AT THERANOS, DID YOU OBSERVE ANY PROBLEMS

10:01AM  24   CREATED IN TERMS OF ACCURACY OR SENSITIVITY AS A RESULT OF

10:01AM  25   THERANOS'S PRACTICE OF DILUTING SAMPLES?

| | | |
|---|---|---|
| 10:01AM | 1 | MR. COOPERSMITH: OBJECTION. 702. |
| 10:01AM | 2 | THE COURT: OVERRULED. |
| 10:01AM | 3 | THE WITNESS: DURING VALIDATION, THERE WERE ATTEMPTS |
| 10:01AM | 4 | TO MATCH THE MANUFACTURER SENSITIVITY FOR THE TEST. |
| 10:01AM | 5 | THOSE, THOSE -- THAT SENSITIVITY IS SPELLED OUT IN THE |
| 10:01AM | 6 | PACKAGE INSERT OF THE TEST. |
| 10:01AM | 7 | BECAUSE OF THE DILUTION, IN MULTIPLE INSTANCES WE WERE NOT |
| 10:01AM | 8 | ABLE TO MATCH THE SENSITIVITY OF THE PREDICATE TESTS. |
| 10:01AM | 9 | BY MR. BOSTIC: |
| 10:01AM | 10 | Q. AND WHAT DOES THAT MEAN IN PLAIN ENGLISH IF THE THERANOS |
| 10:01AM | 11 | TESTS COULD NOT MATCH THE SENSITIVITY OF THE CONVENTIONAL |
| 10:01AM | 12 | TESTS? |
| 10:01AM | 13 | A. IT MEANS THAT THE LABORATORY WOULD NOT BE ABLE TO REPORT |
| 10:01AM | 14 | BELOW A CERTAIN NUMBER. |
| 10:01AM | 15 | THAT NUMBER WOULD BE HIGHER FOR THE THERANOS TESTS. |
| 10:01AM | 16 | SO, FOR INSTANCE, IF -- TO DETECT MILD LIVER DAMAGE, YOU |
| 10:02AM | 17 | NEED TO GO DOWN TO 20 UNITS OF AST. THERANOS WOULD ONLY BE |
| 10:02AM | 18 | ABLE TO GO UP TO MAYBE 50 OR 60 -- GO DOWN TO 50 OR 60, I'M |
| 10:02AM | 19 | SORRY. |
| 10:02AM | 20 | SO IN MANY CLINICAL SCENARIOS, THE THERANOS TESTS JUST |
| 10:02AM | 21 | DIDN'T HAVE THE SENSITIVITY. |
| 10:02AM | 22 | Q. THERE WAS ALSO SOME DISCUSSION ABOUT YOUR OBSERVATIONS |
| 10:02AM | 23 | WHEN IT CAME TO SOMETHING CALLED HEMOLYSIS. |
| 10:02AM | 24 | DO YOU REMEMBER THAT? |
| 10:02AM | 25 | A. YES. |

ROSENDORFF REDIRECT BY MR. BOSTIC                          3731

10:02AM   1    Q.   AND CAN YOU REMIND US WHAT HEMOLYSIS MEANS?

10:02AM   2    A.   YEAH, SURE.  HEMOLYSIS IS WHEN YOU COLLECT THE BLOOD,

10:02AM   3    PARTICULARLY WHEN YOU DO A FINGER PRICK AND YOU SQUEEZE THE

10:02AM   4    FINGER, WHAT HAPPENS IS THAT YOU DAMAGE THE RED BLOOD CELLS AND

10:02AM   5    THEY POP.

10:02AM   6         AND SO WHATEVER IS INSIDE OF THE RED BLOOD CELLS GETS INTO

10:02AM   7    THE SAMPLE, AND IT CAN REALLY INTERFERE WITH THE DETECTION OF A

10:02AM   8    LOT OF DIFFERENT THINGS.

10:02AM   9    Q.   IN YOUR EXPERIENCE AT THERANOS, DID HEMOLYSIS HAVE ANY

10:03AM  10    EFFECT ON THE ACCURACY AND RELIABILITY OF CERTAIN TESTS?

10:03AM  11              MR. COOPERSMITH:  OBJECTION.  702.

10:03AM  12              MR. BOSTIC:  I'M JUST ASKING ABOUT HIS OBSERVATIONS,

10:03AM  13    YOUR HONOR.

10:03AM  14              THE COURT:  OVERRULED.

10:03AM  15         YOU CAN ANSWER THE QUESTION.

10:03AM  16              THE WITNESS:  YES.  THERE'S A LARGE AMOUNT OF

10:03AM  17    HEMOGLOBIN IN RED BLOOD CELLS, AND WHEN THAT SPILLS OUT INTO

10:03AM  18    THE SAMPLE IT TURNS IT PINK AND THAT INTERFERES WITH THE

10:03AM  19    ABILITY OF THE READERS TO READ WHAT IS IN THE SAMPLE.

10:03AM  20    BY MR. BOSTIC:

10:03AM  21    Q.   AND IS THAT SOMETHING THAT YOU SAW HAPPEN AT THERANOS?

10:03AM  22    A.   YES.

10:03AM  23    Q.   AND WAS IT A FREQUENT OR INFREQUENT THING THAT YOU

10:03AM  24    OBSERVED?

10:03AM  25    A.   FREQUENT.

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

       UNITED STATES OF AMERICA,          )
6                                          )   CR-18-00258-EJD
                      PLAINTIFF,           )
7                                          )   SAN JOSE, CALIFORNIA
             VS.                           )
8                                          )   APRIL 29, 2022
       RAMESH "SUNNY" BALWANI,             )
9                                          )   VOLUME 24
                      DEFENDANT.           )
10     _____        )   PAGES 4227 - 4480

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14     A P P E A R A N C E S:

15     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                              BY:  JOHN C. BOSTIC
16                                 JEFFREY B. SCHENK
                              150 ALMADEN BOULEVARD, SUITE 900
17                            SAN JOSE, CALIFORNIA 95113

18                            BY:  ROBERT S. LEACH
                                   KELLY VOLKAR
19                            1301 CLAY STREET, SUITE 340S
                              OAKLAND, CALIFORNIA 94612
20
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
       OFFICIAL COURT REPORTERS:
22                              IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074
23                              LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24
              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                 TRANSCRIPT PRODUCED WITH COMPUTER

4248

08:59AM 1     SO WHAT HAPPENED IN MS. HOLMES'S TRIAL WAS THE GOVERNMENT

08:59AM 2  IN ITS DIRECT EXAMINATION INTRODUCED EXCERPTS FROM THAT

08:59AM 3  12-20-2013 RECORDING OF MS. HOLMES SPEAKING TO INVESTORS.

08:59AM 4     THE DEFENSE INTRODUCED SOME SUPPLEMENTAL 106 PIECES ON THE

08:59AM 5  CROSS.

08:59AM 6     AND THEN THE PARTIES ARGUED IT OUT IN THE END.

08:59AM 7     WHAT I'M LEARNING FROM THE GOVERNMENT NOW IS THE

08:59AM 8  GOVERNMENT INTENDS, ON DIRECT EXAMINATION WITH MR. TOLBERT, TO

08:59AM 9  QUERY HIM ABOUT THAT CONFERENCE CALL, HIS RECOLLECTION OF A

08:59AM 10  CALL THAT TOOK PLACE ALMOST TEN YEARS AGO, USED SOME NOTES,

08:59AM 11  NON-VERBATIM NOTES THAT HE TOOK DURING THE CONFERENCE CALL AS

09:00AM 12  AN ANCHOR I GUESS AT SOME LEVEL FOR HIS RECOLLECTION.

09:00AM 13     BUT THEY DON'T INTEND TO INTRODUCE THE RECORDINGS

09:00AM 14  THEMSELVES OF WHAT MS. HOLMES ACTUALLY SAID, THE WORDS THAT THE

09:00AM 15  COURT KIND OF LEANED ON SOMEWHAT JUST NOW IN TALKING ABOUT THE

09:00AM 16  RELEVANCE OF THE 2006 STATEMENTS BY MS. HOLMES TO THE 2013

09:00AM 17  CONFERENCE CALL THAT LED TO MR. TOLBERT AND MR. HALL'S

09:00AM 18  INVESTMENT.

09:00AM 19     SO GIVEN THAT, THEY CAN TRY THEIR CASE HOW THEY WANT.  I

09:00AM 20  MEAN, IT'S A LITTLE SHOCKING TO ME THAT THE GOVERNMENT WOULD

09:00AM 21  NOT INTRODUCE A RECORDING IN A FRAUD CASE OF A DEFENDANT OR A

09:00AM 22  CODEFENDANT OF WHAT THE DEFENDANT ACTUALLY SAID TO AN INVESTOR.

09:00AM 23     AGAIN, IT'S THEIR CHOICE.

09:00AM 24     BUT I'M TOLD THE GOVERNMENT IS NOW GOING TO OBJECT TO THE

09:00AM 25  DEFENSE USING THE RECORDING IN CROSS-EXAMINATION WITH

4249

09:00AM 1    MR. TOLBERT.

09:00AM 2        WE THINK THE RECORDING IS RELEVANT.

09:00AM 3            THE COURT:  TELL ME -- PARDON ME FOR INTERRUPTING

09:00AM 4    YOU.  TELL ME, WHAT DO YOU WISH TO DO THEN ON

09:01AM 5    CROSS-EXAMINATION?

09:01AM 6            MR. CAZARES:  TO PLAY THE RECORDING AND ASK HIM

09:01AM 7    QUESTIONS ABOUT WHAT MS. HOLMES SAID, WHAT HE THOUGHT ABOUT

09:01AM 8    THAT.

09:01AM 9        BECAUSE HE HAS ALREADY TESTIFIED, AND I'M ASSUMING HE'S

09:01AM 10   GOING TO TESTIFY AGAIN, THAT THIS RECORDING, THIS CONFERENCE

09:01AM 11   CALL, INFLUENCED HIS DECISION TO INVEST, WHICH IS A NONHEARSAY

09:01AM 12   PURPOSE.

09:01AM 13       THAT'S THE GOVERNMENT'S OWN THEORY FOR ELICITING THE

09:01AM 14   TESTIMONY FROM MR. TOLBERT REGARDING THE INVESTMENT, THAT IT

09:01AM 15   CAUSED HIM TO INVEST.

09:01AM 16           THE COURT:  SO, SO --

09:01AM 17           MR. CAZARES:  WE WANT TO RESPOND, CROSS-EXAMINE,

09:01AM 18   RELATING TO THE ACTUAL WORDS SHE SAID, NOT JUST HIS

09:01AM 19   RECOLLECTION OF WHAT SHE SAID.

09:01AM 20           THE COURT:  SO YOU WANT TO PLAY THE ENTIRETY OF THE

09:01AM 21   TAPE?

09:01AM 22           MR. CAZARES:  EXCERPTS, YOUR HONOR.  EXCERPTS, MUCH

09:01AM 23   LIKE WHAT HAPPENED IN THE HOLMES TRIAL.

09:01AM 24           THE COURT:  OKAY.  AND DO YOU HAVE THOSE IDENTIFIED?

09:01AM 25           MR. CAZARES:  THEY ARE MOSTLY ACTUALLY THE EXCERPTS

4250

| | |
|---|---|
| 09:01AM | 1 | THAT THE GOVERNMENT USED THEMSELVES IN THE PRIOR TRIAL, ALONG |
| 09:01AM | 2 | WITH ONE SUPPLEMENTAL THAT WE HAVE SHARED WITH THE GOVERNMENT. |
| 09:01AM | 3 | THE COURT: OKAY. |
| 09:01AM | 4 | MR. SCHENK: A FEW THOUGHTS. |
| 09:01AM | 5 | IN THE HOLMES TRIAL, MS. HOLMES'S STATEMENTS ARE |
| 09:02AM | 6 | ADMISSIONS. THE GOVERNMENT HAS AN EXCEPTION TO THE HEARSAY |
| 09:02AM | 7 | RULE TO ADMIT THEM, AND IT WAS ON THAT BASIS THAT MS. HOLMES'S |
| 09:02AM | 8 | STATEMENTS ARE ADMISSIBLE. |
| 09:02AM | 9 | IN THIS TRIAL, I DON'T BELIEVE THERE'S AN EXCEPTION FOR |
| 09:02AM | 10 | THE DEFENSE TO PLAY MS. HOLMES'S STATEMENTS AND THEN ARGUE THAT |
| 09:02AM | 11 | THE STATEMENTS WERE TRUE. |
| 09:02AM | 12 | I DON'T THINK THE DEFENSE IS GOING TO ARGUE THAT THE |
| 09:02AM | 13 | STATEMENTS THAT MS. HOLMES MADE WERE FALSE. |
| 09:02AM | 14 | THE POINT OF PLAYING THEM, AND I CAN POINT TO EVEN |
| 09:02AM | 15 | PARTICULAR EXCERPTS THAT THE DEFENSE HAS SUGGESTED TO THE |
| 09:02AM | 16 | GOVERNMENT THAT THEY INTEND TO PLAY, LIKE THE ONE ABOUT THE |
| 09:02AM | 17 | WORK THAT THERANOS DID TO PREPARE FOR A NATIONAL ROLLOUT. |
| 09:02AM | 18 | THE DEFENSE WILL ARGUE THAT THAT'S TRUE. THAT'S AN END |
| 09:02AM | 19 | RUN AROUND THE HEARSAY RULES. |
| 09:02AM | 20 | AND THEY ARE ADMITTING MS. HOLMES'S OUT-OF-COURT |
| 09:02AM | 21 | STATEMENTS TO ESTABLISH THE TRUTH, BOTH THAT IT WAS RELEVANT -- |
| 09:02AM | 22 | I AGREE THAT THEY WILL ADMIT IT FOR THE PURPOSE OF ESTABLISHING |
| 09:02AM | 23 | WHAT MATTERED TO TOLBERT. THEY CAN DO THAT THROUGH |
| 09:02AM | 24 | QUESTIONING. |
| 09:02AM | 25 | TO ADMIT MS. HOLMES'S STATEMENTS IS A VIOLATION OF THE |

4251

| | | |
|---|---|---|
| 09:02AM | 1 | HEARSAY RULES. |
| 09:02AM | 2 | WE -- THE GOVERNMENT DID NOT INTEND TO OFFER THE |
| 09:03AM | 3 | RECORDINGS CASE-IN-CHIEF AND INTENDED RATHER TO ASK MR. TOLBERT |
| 09:03AM | 4 | HIS RECOLLECTION OF THE RECORDINGS AND WHAT -- I'M SORRY, HIS |
| 09:03AM | 5 | RECOLLECTION OF THE CALL AND THE INFLUENCE THAT THOSE |
| 09:03AM | 6 | STATEMENTS HAD ON HIM. |
| 09:03AM | 7 | BUT I ALSO WANT TO BE CLEAR, IF MY UNDERSTANDING OF THE |
| 09:03AM | 8 | HEARSAY RULES IS INCORRECT AND, IN FACT, THE DEFENSE IS ALLOWED |
| 09:03AM | 9 | TO OFFER THESE, I'LL PLAY THEM IN DIRECT. |
| 09:03AM | 10 | MR. CAZARES: YOUR HONOR, FIRST OF ALL, THE |
| 09:03AM | 11 | NONHEARSAY PURPOSE IS FOR WHAT MS. HOLMES ACTUALLY SAID, THE |
| 09:03AM | 12 | ACT OF WHAT SHE SAID. |
| 09:03AM | 13 | WE'RE NOT GOING TO ARGUE THAT WHAT SHE SAID WAS TRUE. |
| 09:03AM | 14 | WHAT WE WANT TO PRESENT TO THE JURY SO THEY KNOW, WHAT DID |
| 09:03AM | 15 | MS. HOLMES ACTUALLY SAY THAT LED TO MR. TOLBERT'S INVESTMENT? |
| 09:03AM | 16 | NOT HIS VAGUE RECOLLECTION OF HIS UNDERSTANDING OF WHAT IT |
| 09:03AM | 17 | MEANT, INTERPRETATIONS THAT HE'S PROBABLY GOING TO TESTIFY TO. |
| 09:03AM | 18 | WHAT DID SHE ACTUALLY SAY, THE FACT OF WHAT SHE SAID? |
| 09:03AM | 19 | THAT'S WHAT WE'RE TRUE INTRODUCING IT FOR. |
| 09:03AM | 20 | WE'RE NOT GOING TO SIT HERE AND ARGUE THAT X, Y, AND Z WAS |
| 09:04AM | 21 | TRUE IN THAT RECORDING. SIMPLY, THAT'S WHAT SHE SAID. IF YOU |
| 09:04AM | 22 | UNDERSTOOD SOMETHING ELSE, MAYBE THAT'S ON YOU. |
| 09:04AM | 23 | MAYBE THERE WAS SOME OTHER INFLUENCE ON MR. TOLBERT THAT |
| 09:04AM | 24 | CAUSED HIM TO HAVE THAT UNDERSTANDING, BUT HER WORDS WERE IN |
| 09:04AM | 25 | THE TAPE. THAT'S WHAT HE WAS TOLD. |

4252

09:04AM 1      THE OTHER NONHEARSAY PURPOSES IS OBVIOUSLY A ROUTINE

09:04AM 2  NONHEARSAY PURPOSE, EFFECT ON THE LISTENER, YOUR HONOR.

09:04AM 3  WHETHER IT IS A DEFENDANT OR NOT IS IRRELEVANT TO THAT RULE.

09:04AM 4  IT'S A COMMONLY HEARD HEARSAY EXCEPTION.  THE EFFECT ON THE

09:04AM 5  LISTENER.

09:04AM 6      MR. TOLBERT HAS ALREADY SAID IN THIS COURT, UNDER OATH, I

09:04AM 7  LISTENED TO THE CONFERENCE CALL, IT WAS INFLUENTIAL, WE

09:04AM 8  INVESTED.

09:04AM 9      THAT'S A NONHEARSAY PURPOSE.

09:04AM 10      IN ADDITION, WHEN THE DEFENSE -- I'M SORRY.  WHEN THE

09:04AM 11  GOVERNMENT INTRODUCES ITS TESTIMONY, AGAIN, BASED ON

09:04AM 12  RECOLLECTION OF THE CALL TEN YEARS AGO, AND NOTES, AGAIN, IT'S

09:04AM 13  AN IMPERFECT RECITATION OF WHAT MS. HOLMES SAID WHEN THE

09:04AM 14  GOVERNMENT ALREADY HAS THE TAPES.

09:04AM 15      THE RULE OF COMPLETENESS ALSO PERMITS THIS COURT TO

09:05AM 16  INTRODUCE -- TO ALLOW THE DEFENSE TO INTRODUCE THE RECORDING,

09:05AM 17  AGAIN, TO COMPLETE THE PICTURE OF WHAT SHE ACTUALLY SAID.

09:05AM 18      NOT HIS NOTES, WHICH ACTUALLY AREN'T EVEN THE ACTUAL

09:05AM 19  NOTES.  THEY'RE A TRANSCRIPT OR A RECITATION THAT HE TYPED UP

09:05AM 20  FROM THE NOTES THAT HE THEN THREW AWAY.  SO THERE ARE A COUPLE

09:05AM 21  OF LAYERS OF HEARSAY THERE AS WELL.

09:05AM 22      BUT THE POINT IS THAT HE'S GOING TO TESTIFY TO WHAT HE

09:05AM 23  THINKS SHE SAID, THE TAPES SHOW WHAT SHE ACTUALLY SAID, AND

09:05AM 24  THAT'S PERMITTED UNDER THE RULE OF COMPLETENESS AS WELL.

09:05AM 25          THE COURT:  I'M NOT SURE IT'S A RULE OF COMPLETENESS

4253

| | | |
|---|---|---|
| 09:05AM | 1 | ISSUE.  THAT'S MORE FOR WRITINGS AND -- |
| 09:05AM | 2 | MR. CAZARES:  NO, NO.  THERE'S NINTH CIRCUIT LAW, |
| 09:05AM | 3 | U.S. VERSUS LOPEZ -- |
| 09:05AM | 4 | THE COURT:  IF YOU'LL LET ME FINISH MY THOUGHTS. |
| 09:05AM | 5 | MR. CAZARES:  I APOLOGIZE. |
| 09:05AM | 6 | THE COURT:  THAT'S ALL RIGHT.  THAT'S OKAY. |
| 09:05AM | 7 | I UNDERSTAND LOPEZ AND I UNDERSTAND WHAT LOPEZ SAYS, BUT |
| 09:05AM | 8 | I'M NOT CERTAIN THAT THAT'S THE STRONGEST ARGUMENT HERE FOR |
| 09:05AM | 9 | ADMITTING THIS. |
| 09:05AM | 10 | YOU SAY EFFECT ON THE LISTENER, AND THAT IS THE EFFECT -- |
| 09:06AM | 11 | THE INVESTMENT DECISION IN 2013, THAT EFFECT? |
| 09:06AM | 12 | MR. CAZARES:  YES. |
| 09:06AM | 13 | THE COURT:  AND THE DELTA BETWEEN THE 2006, AS WE'VE |
| 09:06AM | 14 | BEEN TALKING ABOUT THIS MORNING, THE DELTA BETWEEN THAT AND THE |
| 09:06AM | 15 | 2013 INVESTMENT. |
| 09:06AM | 16 | MR. CAZARES:  YES, YOUR HONOR. |
| 09:06AM | 17 | BECAUSE THE COURT WAS READING THE TRANSCRIPT THAT THE |
| 09:06AM | 18 | GOVERNMENT PRESENTED TO YOU IN ITS RESPONSE TO OUR MOTION, AND |
| 09:06AM | 19 | THE DETAILS -- |
| 09:06AM | 20 | THE COURT:  I READ IT LAST NIGHT BEFORE I GOT THEIR |
| 09:06AM | 21 | RESPONSE. |
| 09:06AM | 22 | MR. CAZARES:  THE DETAILS THAT THE COURT WAS READING |
| 09:06AM | 23 | IS THE RECORDING. |
| 09:06AM | 24 | THOSE DETAILS ARE NOT NECESSARILY REFLECTED IN HIS NOTES. |
| 09:06AM | 25 | MAYBE HE'LL RECALL SOME OF THAT DETAIL, MAYBE HE WON'T. |

4254

09:06AM 1        BUT THE POINT IS THAT WHAT SHE ACTUALLY SAID AND WHAT

09:06AM 2    APPARENTLY HAD SOME RELEVANCE TO WHAT SHE, MS. HOLMES, TOLD

09:06AM 3    MR. TOLBERT IN 2013, ARE NUANCES THAT AREN'T REFLECTED IN THE

09:06AM 4    NOTES.  HE MAY HAVE A RECOLLECTION OF IT, BUT THE RECORDING IS

09:06AM 5    THE BEST EVIDENCE OF WHAT SHE SAID.

09:06AM 6        THE COURT:  OKAY.  AND IT'S NOT OFFERED FOR THE

09:06AM 7    TRUTH OF --

09:06AM 8        MR. CAZARES:  ABSOLUTELY NOT.

09:07AM 9        THE COURT:  -- ANYTHING THAT MS. HOLMES SAID?

09:07AM 10        MR. CAZARES:  JUST WHAT SHE SAID, NOT THE

09:07AM 11   TRUTHFULNESS OR FALSITY OF WHAT SHE SAID.

09:07AM 12        THE COURT:  AND WHAT SHE SAID AND WHAT HE DID BASED

09:07AM 13   ON WHAT HE HEARD.

09:07AM 14        MR. CAZARES:  YES.

09:07AM 15        THE COURT:  AND HE CAN TESTIFY TO THAT WITHOUT THE

09:07AM 16   TAPE, CAN'T HE?

09:07AM 17        MR. CAZARES:  WELL, HE IS GOING TO TESTIFY IN DIRECT

09:07AM 18   BASED ON RECOLLECTION AND SOME NOTES.

09:07AM 19        THE COURT:  BUT, I MEAN, HE CAN TESTIFY ABOUT THAT

09:07AM 20   WITHOUT THE TAPE; RIGHT?

09:07AM 21        MR. CAZARES:  YES, HE CAN.

09:07AM 22        THE COURT:  SURE.

09:07AM 23        MR. CAZARES:  AND OUR RESPONSE IS THAT THE REST OF

09:07AM 24   THE RECORDING, WHAT HER ACTUAL WORDS, ARE ACTUALLY WHAT CAUSED

09:07AM 25   HIM TO INVEST, AND THE JURY SHOULD HEAR THAT OUT OF FUNDAMENTAL

4255

09:07AM  1    FAIRNESS, YOUR HONOR.

09:07AM  2         THIS IS AN INVESTMENT FRAUD CASE.

09:07AM  3              THE COURT:  OKAY.

09:07AM  4              MR. CAZARES:  THE INVESTOR IS GOING TO COME HERE AND

09:07AM  5    TALK ABOUT WHAT CAUSED HIM TO INVEST.  SHOULDN'T THE JURY BE

09:07AM  6    PERMITTED TO HEAR THE WORDS THAT ACTUALLY CAUSED HIM TO INVEST?

09:07AM  7              THE COURT:  OKAY.  THANK YOU.

09:07AM  8              MR. SCHENK:  THANK YOU, YOUR HONOR.  A FEW THOUGHTS.

09:07AM  9         TOWARDS THE BEGINNING OF MR. CAZARES'S LAST INTERACTION

09:07AM 10    WITH THE COURT, HE TOLD THE COURT, AND WE MIGHT WANT TO GET

09:08AM 11    THIS TRANSCRIPT, THEY DO NOT INTEND TO ARGUE THE TRUTH OF THE

09:08AM 12    STATEMENTS THAT MS. HOLMES MADE ON THAT RECORDING.

09:08AM 13         ONE OF THE CLIPS THAT THEY TOLD THE GOVERNMENT THEY INTEND

09:08AM 14    TO PLAY IS 1348-4, AND IN DASH 4 MS. HOLMES SAYS, "OUR RETAIL

09:08AM 15    PARTNERS HAVE INVESTED HUNDREDS OF MILLIONS OF DOLLARS IN

09:08AM 16    BUILDING OUT THIS FRAMEWORK, AND WE, TOO, HAVE BEEN PREPARING

09:08AM 17    FOR THIS FOR MANY YEARS, AND THE GOAL IS TO BE ABLE TO BE

09:08AM 18    NATIONAL VERY, VERY, VERY, VERY QUICKLY."

09:08AM 19         IF THE DEFENSE IS ACTUALLY NOW TELLING THE COURT THEY DO

09:08AM 20    NOT INTEND IN CLOSING TO ARGUE THE TRUTH OF THAT AND OTHER

09:08AM 21    STATEMENTS THAT MS. HOLMES MADE, THAT IS NOT SOMETHING THAT I

09:08AM 22    THINK THEY'RE GOING TO WANT THE COURT TO HOLD THEM TO LATER ON

09:08AM 23    IN THE TRIAL.

09:08AM 24         AND THEY MIGHT WANT AN OPPORTUNITY TO REVISIT THAT

09:08AM 25    STATEMENT, BECAUSE I THINK THEY WILL ARGUE THE TRUTH OF THE

4256

| | | |
|---|---|---|
| 09:08AM | 1 | STATEMENTS THAT MS. HOLMES MADE. |
| 09:08AM | 2 | THAT'S WHY THEY WANT TO PLAY THEM, BECAUSE THEY WANT TO |
| 09:08AM | 3 | ARGUE THAT THINGS THAT MS. HOLMES SAID TO MR. TOLBERT WERE, IN |
| 09:09AM | 4 | FACT, TRUE. |
| 09:09AM | 5 | AND IF THE ADMISSION OF THIS TAPE WILL LEAD TO PREVENTING |
| 09:09AM | 6 | OR BARRING THEM FROM ARGUING THE TRUTH, IT'S GOING TO |
| 09:09AM | 7 | SIGNIFICANTLY AFFECT THE KIND OF ARGUMENTS THAT THEY PREVIEWED |
| 09:09AM | 8 | IN OPENING AND I ANTICIPATE THEY'LL BE MAKING IN CLOSING. |
| 09:09AM | 9 | MR. CAZARES:  I CAN ADDRESS THAT, YOUR HONOR. |
| 09:09AM | 10 | THE EVIDENCE -- OR EVIDENCE THAT WE BELIEVE THE DEFENSE |
| 09:09AM | 11 | WILL BE ABLE TO USE TO ARGUE THAT RESOURCES AND PREPARATIONS |
| 09:09AM | 12 | AND INTENT REGARDING A NATIONAL ROLLOUT ALL SUPPORTED |
| 09:09AM | 13 | MR. BALWANI'S GOOD FAITH AND INTENT, THAT'S OUTSIDE OF THE |
| 09:09AM | 14 | RECORDING.  WE DON'T NEED TO POINT TO THE RECORDING TO SAY, |
| 09:09AM | 15 | LOOK, WHAT SHE SAID IS TRUE. |
| 09:09AM | 16 | WE HAVE OTHER EVIDENCE THAT SUGGESTS MR. BALWANI'S GOOD |
| 09:09AM | 17 | INTENT WITH RESPECT TO THE ROLLOUT AND THE RESOURCES SPENT AND |
| 09:09AM | 18 | INTENT TO DO THE NATIONAL ROLLOUT. |
| 09:09AM | 19 | WHETHER OR NOT MS. HOLMES SAID THAT IN THE RECORDING IS |
| 09:09AM | 20 | IRRELEVANT. |
| 09:09AM | 21 | OUR POINT IS MR. TOLBERT HAS THOUGHTS IN HIS HEAD -- |
| 09:09AM | 22 | THE COURT:  I UNDERSTAND YOUR ARGUMENT ABOUT |
| 09:09AM | 23 | MR. TOLBERT, BUT I JUST WANT TO -- MR. SCHENK RAISES A POINT, |
| 09:10AM | 24 | PERHAPS OF CAUTION DOWN THE ROAD, AND YOU'VE HEARD ME SAY |
| 09:10AM | 25 | BEFORE, EVERYBODY PROCEEDS AT THEIR OWN PERIL. |

```
09:10AM   1        IF I ALLOW THE TAPES TO BE PLAYED AND EXAMINATION TO BE
09:10AM   2   HAD ON THAT, AND BASED ON WHAT YOU SAID, YOU'RE NOT GOING TO
09:10AM   3   ARGUE THE TRUTH OF ANY OF THIS, THAT CUTS A BROAD PATH, AND IF
09:10AM   4   THAT'S WHAT YOU WOULD LIKE TO DO, SO BE IT.
09:10AM   5        MR. CAZARES:  WELL, IT'S NOT THE TRUTH -- POINTING
09:10AM   6   TO HER WORDS IN THE RECORDING THAT WHAT SHE'S TOLD MR. TOLBERT
09:10AM   7   WAS TRUE.
09:10AM   8        WE HAVE OTHER EVIDENCE TO SHOW MR. BALWANI'S GOOD INTENT
09:10AM   9   BECAUSE MR. BALWANI WAS NOT ON THE RECORDING.
09:10AM  10        THE COURT:  NO, I UNDERSTAND THAT.
09:10AM  11        MR. CAZARES:  HE WASN'T THERE, HE DIDN'T LISTEN, AND
09:10AM  12   HE WASN'T ASKED QUESTIONS.
09:10AM  13        THE COURT:  I UNDERSTAND.  I FEAR WE GET DOWN TO A
09:10AM  14   POINT WHERE THERE ARE INSTRUCTIONS OR ARGUMENT AND THIS ISSUE
09:10AM  15   COMES UP AT A FUTURE TIME THAT WE'RE ALL REMINDED OF THE
09:10AM  16   LIMITATIONS OF WHAT YOU'RE ASKING.
09:10AM  17        MR. CAZARES:  YOUR HONOR, YOUR HONOR, IT'S A FAIR
09:10AM  18   POINT.
09:10AM  19        BUT NONHEARSAY PURPOSE FOR HEARSAY INTRODUCED IN THIS
09:11AM  20   TRIAL ALREADY, AND I'M ASSUMING GOING FORWARD, IT'S BEEN PRETTY
09:11AM  21   ROUTINE, AND I THINK BOTH PARTIES ARE EXPERIENCED AND KNOW HOW
09:11AM  22   THEY CAN ARGUE THESE ISSUES AND THE GUARDRAILS, IF YOU WILL.
09:11AM  23        AND I KNOW THE COURT IS AWARE OF THAT IS AND IS GOING TO
09:11AM  24   HOLD US TO IT AND WE UNDERSTAND THAT.
09:11AM  25        MR. SCHENK:  YOUR HONOR, JUST A COUPLE MORE POINTS.
```

4258

09:11AM  1      FIRST, THE DEFENSE SEEMS TO BE SAYING, WE'RE GOING TO PLAY

09:11AM  2  TAPES AND NOT ARGUE THAT THEY'RE TRUE, AND THEN IN CLOSING

09:11AM  3  ARGUE THAT MS. HOLMES'S STATEMENTS WERE TRUE.

09:11AM  4      THAT'S AN END RUN AROUND THE HEARSAY RULES.

09:11AM  5      SECOND, THE RULE OF COMPLETENESS DOES NOT APPLY HERE.  IF

09:11AM  6  I PLAY PORTIONS OF THE TAPES, THE DEFENSE GETS TO GO TO THE

09:11AM  7  COURT, OR TO THE GOVERNMENT, AND SAY, WE REQUEST, IF YOU PLAY

09:11AM  8  THIS PORTION AT THIS TIME, THAT IT IS APPROPRIATE AND FAIR FOR

09:11AM  9  YOU TO PLAY ANOTHER PORTION.

09:11AM 10      BUT TO SUGGEST THAT MY ASKING QUESTIONS OF TOLBERT ABOUT A

09:11AM 11  CALL REQUIRES, UNDER THE RULE OF COMPLETENESS, THAT THE CALL

09:12AM 12  THEN BE PLAYED IS NOT ACCURATE, AND THE GOVERNMENT WOULD NOT

09:12AM 13  OPEN THE DOOR TO THE PLAYING OF THE TAPE BY ASKING QUESTIONS

09:12AM 14  ABOUT A CALL ON DECEMBER 20TH.

09:12AM 15      MR. CAZARES:  AND ON THAT POINT, YOUR HONOR, THE

09:12AM 16  PROBLEM IS THAT RULE 611 KIND OF INTERRELATES WITH THE RULE OF

09:12AM 17  COMPLETENESS.

09:12AM 18      WHILE THE RULE OF COMPLETENESS MAY BE LIMITED AT SOME

09:12AM 19  LEVEL, RULE 611 IS NOT AND PERMITS THIS COURT TO MAKE

09:12AM 20  REASONABLE CONTROL OVER THE MODE AND ORDER OF INTERROGATING

09:12AM 21  WITNESSES AND PRESENTING EVIDENCE TO MAKE, AGAIN, THE

09:12AM 22  INTERROGATION AND PRESENTATION EFFECTIVE AND COMPLETE.

09:12AM 23      TO THE EXTENT THAT THEY'RE INTRODUCING EVIDENCE OF A

09:12AM 24  CONVERSATION AND A DISCUSSION AND A CONFERENCE CALL THAT IS

09:12AM 25  ALREADY RECORDED, THEY'RE ENTITLED TO DO IT.

4259

09:12AM 1        BUT RULE 611 CERTAINLY PERMITS THE COURT TO ALLOW THE

09:12AM 2   DEFENSE TO CLOSE THAT LOOP AND LET THE JURY HEAR THE REST OF

09:12AM 3   THE CONVERSATION THAT TOOK PLACE, THE WHOLE CONVERSATION, NOT

09:12AM 4   JUST SOMEONE'S RECOLLECTION.

09:12AM 5        THE COURT:  OKAY.  I UNDERSTAND THAT.

09:12AM 6      I'M RETURNING BACK TO THIS, AND I THINK MR. SCHENK RAISES

09:13AM 7   A GOOD POINT REGARDING MS. HOLMES'S TESTIMONY HERE AND WHAT YOU

09:13AM 8   MAY SEEK TO ARGUE.

09:13AM 9        AND I JUST WANT TO SAY, IT MAY BE THAT I WON'T LET YOU

09:13AM 10  ARGUE SOMETHING, SO I JUST WANT TO MAKE SURE THAT YOU'VE BEEN

09:13AM 11  ABLE TO CONSULT YOUR TEAM AND YOUR CLIENT TO UNDERSTAND THAT.

09:13AM 12       MR. CAZARES:  WELL, YOUR HONOR, WE UNDERSTAND THE

09:13AM 13  ISSUES, I GUESS, TO THE EXTENT THAT THE GOVERNMENT HAS ISSUES

09:13AM 14  WITH ARGUMENT ABOUT TRUTHFULNESS, IT RELATES TO THE ROLLOUT,

09:13AM 15  AND I GUESS IT'S GOING TO BE MIDDLE EAST WORK BY THERANOS, OR

09:13AM 16  INTENT TO HAVE ITS DEVICE SOMEHOW USED BY THE MILITARY IN THE

09:13AM 17  MIDDLE EAST.

09:13AM 18       THERE'S OTHER EVIDENCE OF THAT WHICH WE CAN POINT TO WHICH

09:13AM 19  IS NOT CONNECTED TO THE ACTUAL CONVERSATION THAT MS. HOLMES

09:13AM 20  MADE.

09:13AM 21       THAT EVIDENCE WE CERTAINLY CAN POINT TO, AND THERE'S NO

09:13AM 22  REASON WHY WE SHOULD BE LIMITED ON IT BECAUSE THE RECORDING IS

09:13AM 23  COMING IN FOR A NONHEARSAY PURPOSE.

09:13AM 24       AND AGAIN, YOUR HONOR, THERE'S ALSO -- THE CATCH-ALL

09:14AM 25  EXCEPTION TO THE HEARSAY RULE ALSO SHOULD PERMIT THE RECORDING

4260

09:14AM 1    HERE AND THE JURY SHOULD BE PERMITTED TO HEAR WHAT MS. HOLMES

09:14AM 2    ACTUALLY SAID, PARTICULARLY GIVEN, AGAIN, THE GOVERNMENT IS

09:14AM 3    GOING TO INTRODUCE STATEMENTS BY HER IN 2006 TO ATTEMPT IN SOME

09:14AM 4    WAYS, IF NOT ARGUE MR. BALWANI IS RESPONSIBLE FOR THAT, THAT

09:14AM 5    MS. HOLMES ARGUABLY MAKES OR HAS A PATTERN OF MAKING STATEMENTS

09:14AM 6    THAT MAY OR MAY NOT BE ENTIRELY ACCURATE TO INVESTORS, AND

09:14AM 7    GIVEN THAT, THE JURY SHOULD HAVE THE ACTUAL WORDS, YOUR HONOR,

09:14AM 8    NOT JUST THIS INVESTOR'S RECOLLECTION.

09:14AM 9         THE COURT:  YOUR LAST STATEMENT GETS ME BACK TO SOME

09:14AM 10   CAUTION ABOUT WHAT ARE YOU GOING TO DO WITH THIS IF IT COMES

09:14AM 11   IN?  AND ARE YOU GOING TO ARGUE ITS TRUTH?

09:14AM 12        AND IF SO, THERE'S SOME CAUTIONS THAT COME WITH THAT EVEN

09:14AM 13   IF IT -- EVEN IF YOU HAVE THIS OTHER EVIDENCE.  I'M JUST SAYING

09:14AM 14   IT'S SOMETHING THAT WE HAVE TO LOOK AT VERY CAREFULLY, AND

09:14AM 15   THAT'S WHY I WAS PAUSING HERE TO MAYBE HAVE YOU -- IF YOU DON'T

09:15AM 16   NEED TO RETHINK THIS, THAT'S FINE.  IF YOU'VE MADE YOUR

09:15AM 17   DECISION, THAT'S FINE.

09:15AM 18        MR. SCHENK.

09:15AM 19        MR. SCHENK:  JUST TWO BRIEF THINGS.

09:15AM 20        THE LAST STATEMENT THAT MR. CAZARES MADE CERTAINLY SOUNDS

09:15AM 21   LIKE THE KIND OF ARGUMENT THAT THE GOVERNMENT WOULD MAKE BEFORE

09:15AM 22   IT WOULD ASK THE COURT TO ADMIT IT UNDER 801(D)(2)(E).

09:15AM 23   MS. HOLMES HAS A WAY OF SAYING THINGS THAT ARE FALSE, JUDGE,

09:15AM 24   YOU SHOULD ADMIT THIS BECAUSE IT'S A COCONSPIRATOR'S STATEMENT.

09:15AM 25        I WOULD BE VERY SURPRISED IF THE BASIS THAT THE DEFENSE IS

4261

| | | |
|---|---|---|
| 09:15AM | 1 | SEEKING IS 801(D)(2)(E).  I THINK THERE ARE CASES THAT SAY THAT |
| 09:15AM | 2 | THAT BASIS IS NOT AVAILABLE TO THE DEFENSE, 801(D)(2)(E). |
| 09:15AM | 3 | SECOND, BY READING THAT ONE PORTION ABOUT THE ROLLOUT, I |
| 09:15AM | 4 | WAS NOT LIMITING WHAT THE GOVERNMENT WILL SAY THE DEFENSE IS |
| 09:15AM | 5 | PROHIBITED FROM ARGUING FOR THE TRUTH IN THE FUTURE.  I WAS |
| 09:15AM | 6 | ONLY GIVING ONE EXAMPLE. |
| 09:15AM | 7 | IF THE DEFENSE TRIES TO ADMIT THE TAPE, AND IF THE COURT |
| 09:15AM | 8 | OVERRULES A HEARSAY OBJECTION AND ALLOWS IT TO BE PLAYED, I |
| 09:16AM | 9 | WILL LISTEN VERY CAREFULLY TO WHAT THE DEFENSE PLAYS, AND THEN |
| 09:16AM | 10 | I'LL EVALUATE WHETHER I'M GOING TO ARGUE TO THE COURT THAT EACH |
| 09:16AM | 11 | OF THE DIFFERENT CATEGORIES OF STATEMENTS THAT THE JURY HEARD |
| 09:16AM | 12 | CANNOT BE ARGUED FOR THE TRUTH BY THE DEFENSE, NOT JUST THE |
| 09:16AM | 13 | ROLLOUT. |
| 09:16AM | 14 | MR. CAZARES:  YOUR HONOR, LOOK, WE WOULD LIKE TO |
| 09:16AM | 15 | THINK ABOUT IT.  I UNDERSTAND THE COURT'S CONCERNS. |
| 09:16AM | 16 | I UNDERSTAND MR. TOLBERT IS COMING UP SECOND, SO MAYBE WE |
| 09:16AM | 17 | CAN REVISIT THIS BEFORE HE ACTUALLY TAKES THE STAND. |
| 09:16AM | 18 | THE COURT:  OKAY.  WELL, I THINK THAT'S A MEASURED |
| 09:16AM | 19 | APPROACH. |
| 09:16AM | 20 | THANK YOU FOR THE CONVERSATION THIS MORNING.  IT'S AN |
| 09:16AM | 21 | IMPORTANT DECISION FOR THE COURT. |
| 09:16AM | 22 | I THINK IT'S MORE IMPORTANT FOR THE PARTIES TO DECIDE HOW |
| 09:16AM | 23 | THEY WANT THEIR CASE PRESENTED, AND THAT'S SOMETHING THAT I |
| 09:16AM | 24 | THINK DESERVES SOME THOUGHT, SO THANK YOU FOR THAT. |
| 09:16AM | 25 | SO WE'LL RESERVE DISCUSSION ON THIS UNTIL LATER.  THANK |

4389

|          |    |                                                                |
|----------|----|----------------------------------------------------------------|
| 12:46PM  | 1  | **AFTERNOON SESSION** |
| 12:46PM  | 2  | THE COURT:  LET'S GO ON THE RECORD. |
| 12:46PM  | 3  | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  ALL COUNSEL |
| 12:46PM  | 4  | ARE PRESENT.  MR. BALWANI IS PRESENT. |
| 12:46PM  | 5  | SHOULD WE RETURN TO OUR CONVERSATION FROM THIS MORNING? |
| 12:46PM  | 6  | ARE THE MIKES ON? |
| 12:46PM  | 7  | THE CLERK:  SORRY. |
| 12:46PM  | 8  | MR. SCHENK:  YES, YOUR HONOR. |
| 12:46PM  | 9  | MR. CAZARES:  YES, YOUR HONOR. |
| 12:46PM  | 10 | THE COURT:  WHERE ARE WE? |
| 12:46PM  | 11 | MR. CAZARES:  WELL, YOUR HONOR, SO WHERE WE LEFT OFF |
| 12:46PM  | 12 | IS THIS QUESTION ABOUT WHETHER OR NOT, RAISED BY THE |
| 12:46PM  | 13 | GOVERNMENT, ABOUT WHETHER THE DEFENSE WOULD BE LIMITED IN ITS |
| 12:46PM  | 14 | CLOSING ARGUMENTS RELATING TO THE WALGREENS LAUNCH, THE |
| 12:46PM  | 15 | AFGHANISTAN ISSUE, MAYBE OTHER ISSUES, THROUGH INTRODUCTION OF |
| 12:46PM  | 16 | THE RECORDINGS FOR -- YOU KNOW, NOT FOR THE TRUTH, FOR SOME |
| 12:47PM  | 17 | EXCEPTION AND NOT FOR THE TRUTH. |
| 12:47PM  | 18 | BUT I THINK THE PLACE TO REALLY START IS WE BELIEVE THAT |
| 12:47PM  | 19 | THERE ARE EXCEPTIONS TO THE HEARSAY RULE THAT WOULD ADMIT THE |
| 12:47PM  | 20 | TAPES FOR THE TRUTH, AND I DON'T THINK THAT'S INCONSISTENT WITH |
| 12:47PM  | 21 | THE PRACTICE THAT HAS TAKEN PLACE IN THIS COURT UP UNTIL NOW, |
| 12:47PM  | 22 | BECAUSE WHAT IS GOING TO HAPPEN IS THAT THE RECORDINGS, WE KNOW |
| 12:47PM  | 23 | THEY'RE AUTHENTIC.  WE KNOW THAT MR. TOLBERT HAS TESTIFIED |
| 12:47PM  | 24 | ABOUT THEM BEFORE, SO THEY'RE CREDIBLE. |
| 12:47PM  | 25 | THE GOVERNMENT IS GOING TO INTRODUCE HIS RECOLLECTION |

12:47PM 1    ABOUT THE VERY CONFERENCE CALL, AND, YOU KNOW, UNDER RULE 102,

12:47PM 2    UNDER THE BEST EVIDENCE RULE, THE TAPE IS THE ACTUAL BEST

12:47PM 3    EVIDENCE OF WHAT SHE SAID, THE TRUTH OF WHAT SHE SAID, NOT HIS

12:47PM 4    RECOLLECTION.

12:47PM 5         I DON'T THINK THAT'S A CONTROVERSIAL FACT, AND THAT ALONE

12:47PM 6    SHOULD ADMIT THE TAPES.

12:47PM 7         BUT IN ADDITION TO THAT, YOU KNOW, JUST, YOU KNOW, UNDER

12:47PM 8    THE RULE OF COMPLETENESS AND JUST FAIRNESS -- AND I'M NOT

12:47PM 9    SUGGESTING IN ANY WAY THAT THE COURT IS TRYING TO BE UNFAIR --

12:48PM 10   I THINK IT'S IMPORTANT FOR THE JURY TO BE ABLE TO HEAR THE

12:48PM 11   ACTUAL WORDS IF THAT'S WHAT THE GOVERNMENT IS GOING TO ASSERT

12:48PM 12   WERE MISLEADING AND FALSE RATHER THAN RECOLLECTION FROM AN

12:48PM 13   INDIVIDUAL CONVERSATION, YOU KNOW, 12 YEARS AGO OR 10 YEARS AGO

12:48PM 14   ALMOST.

12:48PM 15        SO THAT'S OUR POSITION, THEY SHOULD COME IN FOR THE TRUTH.

12:48PM 16             THE COURT:  FOR THE TRUTH?

12:48PM 17             MR. CAZARES:  FOR THE TRUTH.

12:48PM 18             THE COURT:  OKAY.  ALL RIGHT.

12:48PM 19             MR. SCHENK:  YOUR HONOR, THIS IS THE SECOND OR THIRD

12:48PM 20   TIME THE DEFENSE HAS CITED THE BEST EVIDENCE RULE TO THE COURT,

12:48PM 21   AND THE SECOND OR THIRD TIME THAT THEY HAVE CITED IT

12:48PM 22   INCORRECTLY.

12:48PM 23        THERE'S A CASE CALLED DIAZ-LOPEZ IN THE NINTH CIRCUIT THAT

12:48PM 24   DISCUSSES SOME OF THE HISTORY OF THE BEST EVIDENCE RULE, AND IT

12:48PM 25   MAKES CLEAR THAT THE BEST EVIDENCE RULE DOES NOT COMPARE TWO

12:48PM 1    DIFFERENT TYPES OF EVIDENCE, TOLBERT'S RECOLLECTION OF THE TAPE

12:48PM 2    WITH THE TAPE, AND THEN INSTRUCTS THE COURT THAT THE TAPE IS

12:48PM 3    THE BETTER OF THE TWO EVIDENCE, IT SHOULD ADMIT THAT ONE.

12:49PM 4    THAT'S NOT HOW THE BEST EVIDENCE RULE WORKS.

12:49PM 5        WHAT THE BEST EVIDENCE RULE IS IS PERMISSION TO ADMIT THE

12:49PM 6    ORIGINAL OF A DOCUMENT WHEN THERE'S A QUESTION ABOUT A COPY OF

12:49PM 7    THAT DOCUMENT.

12:49PM 8        IT DOES NOT COMPARE TWO DIFFERENT TYPES OF EVIDENCE AND

12:49PM 9    TELL THE COURT THAT IT MUST ADMIT THE TAPE BECAUSE THAT'S

12:49PM 10    BETTER THAN MR. TOLBERT'S RECOLLECTION OF IT.

12:49PM 11        SO ONE OF THE BASES THAT YOU JUST HEARD TO ADMIT THE

12:49PM 12    TOLBERT TAPES FOR THE TRUTH IS THE BEST EVIDENCE RULE, AND IT'S

12:49PM 13    DIAZ-LOPEZ, 625 F. 3D 1198, A NINTH CIRCUIT CASE FROM 2010.

12:49PM 14    BUT THIS CASE ALSO COLLECTS SOME OTHER NINTH CIRCUIT CASES THAT

12:49PM 15    CITE THE BEST EVIDENCE RULE FOR THIS SAME CONCEPT.

12:49PM 16        THE COURT, I THINK, ALSO HEARD THE RULE OF COMPLETENESS.

12:49PM 17    WE'VE DISCUSSED THIS MORNING IF THE GOVERNMENT OFFERED, FOR

12:49PM 18    INSTANCE, 1348-1 AND THE DEFENSE FELT THAT 1348-2 WAS NECESSARY

12:50PM 19    IN ORDER TO PROVIDE COMPLETE CONTEXT TO THE JURY, THE COURT

12:50PM 20    COULD ADMIT 1348-2 UNDER THE RULE OF COMPLETENESS.

12:50PM 21        IT DOES NOT SUGGEST THAT IF THE GOVERNMENT ASKS

12:50PM 22    MR. TOLBERT HIS RECOLLECTION OF THE TAPE, THE COURT MUST THEN,

12:50PM 23    FOR COMPLETENESS PURPOSES, ADMIT THE TAPE.

12:50PM 24        THE COURT HAS NOT HEARD A BASIS TO THE HEARSAY RULES THAT

12:50PM 25    ALLOW THE DEFENSE TO OFFER A CODEFENDANT'S STATEMENTS OUT OF

12:50PM 1 COURT FOR THE TRUTH.

12:50PM 2 AND WHAT WE ORIGINALLY CAME TO YOUR HONOR TO DISCUSS THIS

12:50PM 3 MORNING WAS A HEARSAY OBJECTION TO THE DEFENSE PLAYING THE

12:50PM 4 TAPES, AND I STILL HAVEN'T HEARD AN EXCEPTION TO THE HEARSAY

12:50PM 5 RULE THAT PERMITS THE DEFENSE TO PLAY THE TOLBERT TAPES.

12:50PM 6 MR. CAZARES: I MEAN -- I APPRECIATE THE

12:50PM 7 GOVERNMENT'S POSITION, BUT IT'S STILL KIND OF DODGING THE

12:50PM 8 ISSUE, WHICH IS WHY THIS JURY SHOULDN'T BE HEARING THE ACTUAL

12:50PM 9 WORDS OF MS. HOLMES AS OPPOSED TO MR. TOLBERT'S RECOLLECTION

12:51PM 10 BASED ON SOME NOTES OF THE SAME CONVERSATION, BECAUSE THE

12:51PM 11 INFORMATION THAT THE GOVERNMENT WANTS TO CONVEY TO THE JURY IS

12:51PM 12 PURPORTEDLY WHAT MS. HOLMES SAID, NOT HIS INTERPRETATION.

12:51PM 13 MAYBE THEY CAN ASK THAT QUESTION AFTERWARDS. THAT'S

12:51PM 14 ALWAYS A FAIR FOLLOW-UP QUESTION.

12:51PM 15 BUT THE GOVERNMENT WANTS THIS JURY TO TAKE INFERENCES FROM

12:51PM 16 THE WORDS THAT MS. HOLMES MADE IN THAT CONFERENCE CALL AND THAT

12:51PM 17 INFLUENCED MR. TOLBERT AND HIS BOSS TO INVEST, BUT THE

12:51PM 18 GOVERNMENT DOESN'T WANT THE JURY TO HEAR THE ACTUAL WORDS,

12:51PM 19 YOUR HONOR.

12:51PM 20 AND THE RULE OF COMPLETENESS DOES APPLY, NOT ON ITS OWN,

12:51PM 21 BUT IN COMBINATION WITH, YOU KNOW, COMMON LAW 611(A)(1).

12:51PM 22 YOU KNOW, THE COURT IS NOT REQUIRED. OF COURSE NOT. THE

12:51PM 23 COURT ALWAYS HAS DISCRETION ON EVIDENTIARY MATTERS, YOUR HONOR.

12:51PM 24 BUT IT SEEMS IN A SITUATION LIKE THIS WHERE THE GOVERNMENT

12:51PM 25 KNOWS THE TAPES ARE AUTHENTIC, THE GOVERNMENT THEMSELVES EVEN

12:52PM 1    INTRODUCED THEM, OBVIOUSLY NOT BOUND, IN THE PRIOR TRIAL.

12:52PM 2        THE GOVERNMENT NOW WANTS TO LIMIT OR PREVENT THE JURY FROM

12:52PM 3    HEARING THE COMMUNICATION AND THE CONTEXT OF THE COMMUNICATION

12:52PM 4    AND THE DETAILS.  THEY WANT TO GIVE THE JURY SNIPPETS, AND THE

12:52PM 5    RULE OF COMPLETENESS AND RULE 611 PERMIT THIS COURT TO ALLOW

12:52PM 6    THE JURY TO SEE AND HEAR THE WHOLE PICTURE AND NOT JUST THE

12:52PM 7    SNIPPETS.

12:52PM 8        AND THAT'S WHAT WE THINK SHOULD HAPPEN HERE, AND THAT'S A

12:52PM 9    RULE THAT WOULD PERMIT THE FACTS TO COME IN FOR THEIR TRUTH.

12:52PM 10        THE GOVERNMENT CAN CONTINUE TO MAKE THEIR ARGUMENTS THAT

12:52PM 11    THEY'RE MISLEADING, AND WE CAN CONTINUE TO MAKE OUR ARGUMENTS

12:52PM 12    THAT WE THINK THERE IS OTHER EVIDENCE THAT SHOWS THOSE

12:52PM 13    STATEMENTS WERE ACCURATE AND CONSISTENT WITH OTHER EVIDENCE IN

12:52PM 14    THE CASE.

12:52PM 15        THE COURT:  OKAY.  MR. SCHENK, ARE YOU -- YOUR

12:52PM 16    EXAMINATION OF MR. TOLBERT, ARE YOU INTENDING TO INTRODUCE THE

12:52PM 17    TAPES IN YOUR CASE?

12:52PM 18        MR. SCHENK:  NOT IN DIRECT, YOUR HONOR.

12:52PM 19        THE COURT:  OKAY.

12:53PM 20        AND THEN WHAT IS THE -- YOU'RE SEEKING TO INTRODUCE THE

12:53PM 21    TAPES.  YOU WOULD LIKE TO GET THE TAPES IN IN YOUR

12:53PM 22    CROSS-EXAMINATION, WHICH IS YOUR CASE, AND I'M NOT CERTAIN I'VE

12:53PM 23    HEARD YOU TELL ME THE EXCEPTION TO THE HEARSAY RULE, WHY THOSE

12:53PM 24    TAPES SHOULD BE ADMITTED FOR THEIR TRUTH, PARTICULARLY IF

12:53PM 25    THEY'RE THE STATEMENT OF A CODEFENDANT IN THIS PARTICULAR CASE.

4394

12:53PM 1         MR. CAZARES:  WELL, I JUST THINK I SAID THE RULE OF

12:53PM 2   COMPLETENESS AND FAIRNESS, YOUR HONOR.

12:53PM 3      THE RULE OF COMPLETENESS REBUTS THE HEARSAY RULE AND ISN'T

12:53PM 4   UNDERMINED BY THE HEARSAY RULE, IT ACTUALLY COMPLEMENTS IT, AND

12:53PM 5   ALLOWS THE JURY TO ACTUALLY HEAR THE WHOLE PICTURE, WHERE THE

12:53PM 6   INITIAL INTRODUCTION OF FACTS OR EVIDENCE DOESN'T NECESSARILY

12:53PM 7   TELL THE WHOLE PICTURE.

12:53PM 8      AND PARTICULARLY WHEN IT'S A FACT OF IMPORTANCE HERE, LIKE

12:54PM 9   MS. HOLMES'S WORDS THAT THE GOVERNMENT HAS CHARGED IN

12:54PM 10   EXECUTION, ONE OF THE COUNTS IS THE TOLBERT-HALL INVESTMENT,

12:54PM 11   THEY'RE POINTING TO HER WORDS BUT SAYING, NO, THE JURY

12:54PM 12   SHOULDN'T HEAR THOSE WORDS BECAUSE IT MIGHT BE HEARSAY AND

12:54PM 13   IGNORE THESE OTHER BASES THAT WOULD PERMIT THE JURY TO HEAR

12:54PM 14   THOSE FACTS.

12:54PM 15      WE JUST THINK THAT THAT'S NOT CONSISTENT WITH COMMON LAW

12:54PM 16   AND THE RULE OF COMPLETENESS.

12:54PM 17      YOU KNOW, THERE ARE HEARSAY EXCEPTIONS THAT WOULD NOT BE

12:54PM 18   FOR THE TRUTH.  WE DON'T THINK THOSE ARE APPROPRIATE, BUT TO BE

12:54PM 19   FRANK, YOUR HONOR, WE HAVE SOME CONCERNS THAT WE'RE SOMEHOW

12:54PM 20   GOING TO BE LIMITED IN OUR CLOSING ARGUMENT, WHICH WE DON'T

12:54PM 21   THINK WOULD BE APPROPRIATE, THAT KIND OF TIES OUR HANDS,

12:54PM 22   YOUR HONOR.

12:54PM 23        THE COURT:  WELL, I HAVEN'T SAID TODAY THAT I WOULD

12:54PM 24   LIMIT YOU IN ANY WAY.  I HAVE NOT SAID THAT.

12:54PM 25      BUT WHAT I SAID BEFORE WE STARTED THIS MORNING WAS, I

| | | |
|---|---|---|
| 12:54PM | 1 | THINK ALL PARTIES SHOULD LOOK AND TAKE A MEASURED VIEW AS TO |
| 12:55PM | 2 | WHAT IT IS THE PARTIES SEEK TO INTRODUCE AND WHAT IMPACT, IF |
| 12:55PM | 3 | ANY, THAT MIGHT HAVE. |
| 12:55PM | 4 | I'M NOT SUGGESTING THE COURT HAS MADE ANY DECISION ON |
| 12:55PM | 5 | ANYTHING IN THAT REGARD.  I'M JUST TRYING TO LET EVERYBODY |
| 12:55PM | 6 | KNOW, CHECK YOURSELVES, CHECK YOUR CASES, MAKE SURE WHEN YOU |
| 12:55PM | 7 | ASK FOR SOMETHING, YOU KNOW, IT'S WHAT YOU WANT AND YOU'VE |
| 12:55PM | 8 | FULLY CONSIDERED IT. |
| 12:55PM | 9 | I'M NOT LOOKING YOU AT AND THE DEFENSE.  I'M TALKING ABOUT |
| 12:55PM | 10 | BOTH SIDES. |
| 12:55PM | 11 | MR. CAZARES:  I UNDERSTAND, YOUR HONOR. |
| 12:55PM | 12 | THE COURT:  RIGHT. |
| 12:55PM | 13 | BOTH SIDES, WHEN YOU TAKE ACTIONS THERE ARE CONSEQUENCES |
| 12:55PM | 14 | FOR THAT. |
| 12:55PM | 15 | I JUST WANTED TO MAKE SURE EVERYBODY HAD A MEASURED |
| 12:55PM | 16 | APPROACH AND HAD AN OPPORTUNITY TO REVIEW THAT. |
| 12:55PM | 17 | I WAS NOT SAYING, IF YOU DO THIS, I'M GOING TO LIMIT YOU. |
| 12:55PM | 18 | THE DISCUSSION WAS, WELL, IF THIS COMES IN AND IF IT COMES |
| 12:55PM | 19 | IN IN THIS WAY, WE MIGHT BE ASKING THIS.  AND THAT -- FROM THE |
| 12:55PM | 20 | GOVERNMENT'S PERSPECTIVE.  AND THAT MIGHT CAUSE SOME |
| 12:55PM | 21 | LIMITATIONS. |
| 12:55PM | 22 | MY POINT THIS MORNING WAS, LET'S ALL STEP BACK AND THINK |
| 12:55PM | 23 | ABOUT WHERE WE ARE BEFORE WE CALL THE WITNESS IN TO MAKE SURE |
| 12:55PM | 24 | THAT WE UNDERSTAND THE FULL, THE FULL RAMIFICATIONS OF WHAT WE |
| 12:55PM | 25 | DO. |

4396

| | | |
|---|---|---|
| 12:55PM | 1 | I'M GLAD YOU'VE DONE THAT.  THANKS FOR THAT. |
| 12:56PM | 2 | ANYTHING FURTHER ON THIS? |
| 12:56PM | 3 | MR. SCHENK:  SUBMIT IT. |
| 12:56PM | 4 | MR. CAZARES:  SUBMIT IT. |
| 12:56PM | 5 | THE COURT:  OKAY.  THANK YOU. |
| 12:56PM | 6 | IF THERE'S -- IF THE GOVERNMENT IS NOT GOING TO PUT THESE |
| 12:56PM | 7 | IN, I DON'T SEE GROUNDS TO ALLOW THE DEFENSE AT THIS TIME TO |
| 12:56PM | 8 | PUT THESE IN.  SO I DON'T KNOW IF THAT WAS A REQUEST TO ADMIT |
| 12:56PM | 9 | AT THIS STAGE OR NOT. |
| 12:56PM | 10 | BUT I WOULD INDICATE, AS THE RECORD IS RIGHT NOW, I WOULD |
| 12:56PM | 11 | NOT PERMIT IT.  LET ME JUST INDICATE THAT. |
| 12:56PM | 12 | MR. CAZARES:  UNDERSTOOD, YOUR HONOR.  OKAY. |
| 12:56PM | 13 | THE COURT:  OKAY.  SO WE'RE READY FOR MR. TOLBERT I |
| 12:56PM | 14 | TAKE IT. |
| 12:56PM | 15 | MR. SCHENK:  YES. |
| 12:56PM | 16 | THE COURT:  OKAY. |
| 12:56PM | 17 | MR. COOPERSMITH:  YOUR HONOR, I HAVE ONE THING, ONE |
| 12:56PM | 18 | MINOR THING TO RAISE IF I CAN. |
| 12:56PM | 19 | THE COURT:  SURE. |
| 12:56PM | 20 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR.  I |
| 12:56PM | 21 | APPRECIATE IT. |
| 12:56PM | 22 | I WILL JUST SAY ONE THING.  I HAVE NEVER SEEN BEFORE IN A |
| 12:56PM | 23 | FRAUD CASE -- |
| 12:56PM | 24 | THE COURT:  YOU'RE GOING TO TALK ABOUT MY DECISION |
| 12:56PM | 25 | THAT I JUST MADE? |

TOLBERT DIRECT BY MR. SCHENK                                    4434

01:51PM  1    A.   I DO.

01:51PM  2    Q.   THE FIRST I'D LIKE TO TALK TO YOU ABOUT IS THE THERANOS

01:51PM  3    BLOOD TESTING TECHNOLOGY GENERALLY.

01:51PM  4         DURING THE CALL, DID MS. HOLMES TALK TO YOU ABOUT THE

01:51PM  5    THERANOS BLOOD TESTING TECHNOLOGY?

01:51PM  6    A.   SHE DID.

01:51PM  7    Q.   AND WHAT DO YOU REMEMBER HER SAYING?

01:51PM  8    A.   YOU KNOW, AS I REMEMBER THAT CALL, I REMEMBER HER SAYING,

01:51PM  9    YOU KNOW, THAT THE TECHNOLOGY WAS DEVELOPED TO A POINT WHERE

01:51PM  10   THERE COULD BE LOTS AND LOTS OF TESTS THAT WOULD BE RUN ON A

01:51PM  11   SMALL DROP OF BLOOD, AND THAT IT WAS ABLE TO BE, YOU KNOW, KIND

01:52PM  12   OF DONE FROM ANY LOCATION SO THAT, YOU KNOW, THERE WASN'T A BIG

01:52PM  13   CENTRAL LAB THAT THOSE TESTS HAD TO BE FILTERED THROUGH.

01:52PM  14        AND I REMEMBER HER SAYING THAT -- I BELIEVE THAT THE

01:52PM  15   ECONOMICS OF THOSE TESTS WERE SUCH THAT IT MADE IT VERY COST

01:52PM  16   EFFICIENT FOR THE COMPANY TO DO THAT, AS OPPOSED TO SOME OTHER

01:52PM  17   COMPETITORS AND WHAT THEY WOULD CHARGE.

01:52PM  18   Q.   THANK YOU.

01:52PM  19        DO YOU REMEMBER WHETHER MS. HOLMES TALKED ABOUT THE KIND

01:52PM  20   OF TUBES OF BLOOD THAT THERANOS USED VERSUS WHAT TRADITIONAL

01:52PM  21   LAB TESTING INVOLVED?

01:52PM  22   A.   YOU KNOW, I WOULD HAVE TO LOOK BACK AT THE TRANSCRIPT OF

01:52PM  23   THE CALL, BUT I THINK THERE WAS SOME DISCUSSION ABOUT THE, YOU

01:52PM  24   KNOW, ABOUT THE SMALL NANOTAINERS OR CONTAINERS OF BLOOD THAT

01:52PM  25   WOULD TAKE JUST A FEW DROPS.

TOLBERT DIRECT BY MR. SCHENK                                         4435

01:53PM  1     Q.   YOU REFERENCED A TRANSCRIPT OF THE CALL.

01:53PM  2          WHAT DO YOU MEAN?

01:53PM  3     A.   WELL, AT SOME POINT THAT PHONE CALL WAS RECORDED AND THERE

01:53PM  4     WAS A TRANSCRIPTION MADE OF IT.

01:53PM  5     Q.   I SEE.

01:53PM  6     A.   AND SO, YOU KNOW, I'VE -- SO I KNOW THERE'S A TRANSCRIPT

01:53PM  7     OF THAT CALL, AND I JUST HAVEN'T REVIEWED IT.

01:53PM  8     Q.   AND AS YOU'RE TESTIFYING TODAY, IS SOME OF YOUR MEMORY

01:53PM  9     BASED UPON HAVING REVIEWED THAT TRANSCRIPT AT SOME POINT SINCE

01:53PM 10     2013?

01:53PM 11     A.   CERTAINLY.

01:53PM 12          WHEN I SAY I HAVEN'T REVIEWED THE TRANSCRIPT, I HAVEN'T

01:53PM 13     REVIEWED IT ENOUGH TO MEMORIZE IT AND KNOW EXACTLY -- RECALL

01:53PM 14     EXACTLY WHAT WAS SAID.

01:53PM 15     Q.   I SEE.  BUT WHEN YOU'RE TESTIFYING TODAY ABOUT THE CALL,

01:53PM 16     YOU'RE SAYING THAT SOME OF THAT IS BASED ON HAVING REVIEWED THE

01:53PM 17     TRANSCRIPT SINCE THE CALL?

01:53PM 18     A.   CORRECT.

01:53PM 19     Q.   OKAY.  HOW ABOUT THE TOPIC OF THERANOS'S WORK WITH THE

01:53PM 20     MILITARY?  DID MS. HOLMES TALK ABOUT THAT?

01:53PM 21     A.   SHE DID TALK ABOUT MILITARY APPLICATIONS AND ABOUT, YOU

01:54PM 22     KNOW, THAT THERANOS DEVICES WERE EMPLOYED ON THE MEDEVAC

01:54PM 23     HELICOPTERS AND BEING USED TO KIND OF IMPROVE SURVIVAL RATES OF

01:54PM 24     MILITARY PERSONNEL WHO HAD BEEN INJURED IN COMBAT.

01:54PM 25     Q.   OKAY.  WE'LL COME BACK TO THAT IN A MOMENT.

TOLBERT DIRECT BY MR. SCHENK                                              4437

01:55PM  1    WHAT THE TECHNOLOGY COULD DO IS THAT -- YOU KNOW, EVEN AS I

01:55PM  2    REMEMBER, THERE WAS A LISTING POSTED ON THE WEBSITE AT SOME

01:55PM  3    POINT ON ALL OF THE TESTS THAT COULD BE DONE AND THE PRICES

01:55PM  4    THAT WOULD BE CHARGED FOR THOSE.

01:55PM  5         SO OUR UNDERSTANDING WAS THAT WITH THIS MULTITUDE OF

01:55PM  6    TESTS, YOU KNOW, ANYBODY COULD REALLY GO GET A TEST AND HAVE

01:55PM  7    SOME VALUE OR BENEFIT FROM THAT, AND SO I THINK THERE WAS SOME

01:56PM  8    REFERENCE TO THAT ON THE CALL.

01:56PM  9    Q.   AND HOW DID THAT COMPARE TO YOUR UNDERSTANDING IN 2006?

01:56PM 10    A.   WHEN WE INVESTED IN 2006, THERE WAS A LIMITED AMOUNT OF

01:56PM 11    TESTS THAT COULD BE DONE.  WE KNEW THAT, YOU KNOW, THERE WERE

01:56PM 12    SOME CAPABILITIES, BUT THAT OVER TIME THAT THAT WOULD INCREASE.

01:56PM 13         AND SO IT FELT LIKE, YOU KNOW, AT THIS POINT THE

01:56PM 14    TECHNOLOGY HAD PROGRESSED TO A PLACE THAT THOSE TESTS REALLY

01:56PM 15    COULD BE DONE.

01:56PM 16    Q.   AND HOW ABOUT THE STATEMENTS THAT YOU DESCRIBED WITH

01:56PM 17    REGARD TO THE MILITARY WORK?  DID THOSE STATEMENTS MATTER IN

01:56PM 18    YOUR DECISION TO INVEST?

01:56PM 19    A.   THEY DID.  YOU KNOW, WE HAD WATCHED WITH GREAT INTEREST --

01:56PM 20    HER BOARD OF DIRECTORS WAS UNVEILED IN JULY, AND WE HAD SEEN,

01:56PM 21    YOU KNOW, KIND OF THE MEMBERS OF THAT BOARD, AND IN

01:56PM 22    CONVERSATIONS THAT I HAD HAD WITH CHRIS LUCAS OVER THAT YEAR,

01:57PM 23    YOU KNOW, THERE WAS REFERENCE TO GOVERNMENTAL CONTRACTS AND,

01:57PM 24    YOU KNOW, KIND OF SEEING THE MEMBERS OF HER BOARD OF DIRECTORS

01:57PM 25    WHO WERE PARTICIPATING IN HELPING THOSE GOVERNMENT CONTRACTS

TOLBERT DIRECT BY MR. SCHENK                                    4438

01:57PM  1    ALONG THE WAY.

01:57PM  2        IT CERTAINLY FELT LIKE THAT REPRESENTED A GREAT

01:57PM  3    OPPORTUNITY FOR THE COMPANY AND ONE THAT WE WERE INTERESTED IN.

01:57PM  4    Q.  WAS THERE MENTION OF MILITARY WORK IN 2006?

01:57PM  5    A.  THERE WAS NOT.

01:57PM  6    Q.  SO HOW DOES THIS, THIS CONCEPT OR THIS AREA OF WORK

01:57PM  7    COMPARE WITH YOUR UNDERSTANDING OF WHAT THERANOS WAS DOING IN

01:57PM  8    2006?

01:57PM  9    A.  SO IT REPRESENTED A BROADENING OF THEIR BUSINESS

01:57PM 10    OPPORTUNITIES, ONE THAT WAS EXCITING, NOTWITHSTANDING THE FACT

01:57PM 11    THAT IT WAS HELPING PEOPLE THAT WERE INJURED, AND THAT'S NEVER

01:57PM 12    AN EXCITING THING.

01:57PM 13        BUT, YOU KNOW, I THINK IN A PERSONAL WAY, IT RESONATED.  I

01:57PM 14    HAVE A BROTHER WHO WAS IN THE MARINES AND WHO WAS IN

01:57PM 15    AFGHANISTAN FOR A PERIOD OF TIME, SO, YOU KNOW, THE THOUGHT

01:58PM 16    THAT THESE SERVICE MEN AND WOMEN WHO GET HURT CAN BE HELPED WAS

01:58PM 17    CERTAINLY SOMETHING THAT WE FELT, YOU KNOW, WHOLEHEARTED

01:58PM 18    SUPPORT FOR.

01:58PM 19    Q.  HOW ABOUT THE STATEMENTS THAT YOU HEARD ABOUT THE

01:58PM 20    FINANCIAL STATE OF THERANOS?  DID THOSE STATEMENTS MATTER IN

01:58PM 21    YOUR DECISION TO INVEST?

01:58PM 22    A.  THEY DID.

01:58PM 23        YOU KNOW, OUR UNDERSTANDING HAD BEEN ALONG THE WAY THAT

01:58PM 24    THERANOS WAS ABLE TO CAPTURE, YOU KNOW, SUBSTANTIAL REVENUE

01:58PM 25    FROM PHARMACEUTICAL CONTRACTS AND FROM OTHER SOURCES AND THAT,

TOLBERT DIRECT BY MR. SCHENK                                              4439

01:58PM  1    YOU KNOW, AT SOME POINT HAD BEEN ABLE TO BE CASH FLOW POSITIVE

01:58PM  2    OR SUSTAIN ITSELF FROM KIND OF REVENUES FROM OPERATIONS.

01:58PM  3         SO TO HEAR HER TALK ABOUT FINANCIAL KINDS OF THINGS IN A

01:58PM  4    POSITIVE WAY WAS, WAS EXTREMELY HELPFUL.

01:58PM  5    Q.   AND HOW DID THAT COMPARE TO YOUR UNDERSTANDING IN 2006?

01:58PM  6    A.   IN 2006, YOU KNOW, WHEN WE MADE THE INVESTMENT, OUR

01:58PM  7    UNDERSTANDING WAS THAT THERE WERE LOTS OF THOSE PHARMACEUTICAL

01:59PM  8    CONTRACTS IN PLACE, AND THEN THERE WAS CONTRACTS THAT WERE IN

01:59PM  9    PLACE AT THE TIME THAT WE INVESTED THAT HAD BEEN SIGNED WOULD,

01:59PM 10    YOU KNOW, BE A SUBSTANTIAL SOURCE OF REVENUE.

01:59PM 11         SO, YOU KNOW, THE OPPORTUNITY IN 2013 FELT A LOT BIGGER

01:59PM 12    THAN IT DID IN 2006, LIKE IT HAD MATURED AND THE COMPANY WAS

01:59PM 13    GOING TO BE ABLE TO ADDRESS IT.

01:59PM 14    Q.   THANK YOU.

01:59PM 15         AND FINALLY, THE STATEMENTS THAT MS. HOLMES MADE ABOUT THE

01:59PM 16    WALGREENS ROLLOUT, DID THOSE HAVE SIGNIFICANCE IN YOUR DECISION

01:59PM 17    TO INVEST?

01:59PM 18    A.   THEY DID.

01:59PM 19         LIKE I HAD REFERENCED BEFORE, YOU KNOW, MR. LUCAS AND I

01:59PM 20    HAD CONVERSATIONS ABOUT A RETAIL ROLLOUT AND ABOUT THE

01:59PM 21    COMPANY'S, YOU KNOW, FOCUS ON DEVELOPING THESE KIND OF LOCAL

01:59PM 22    PLACES WHERE THE TESTS COULD BE ADMINISTERED.

01:59PM 23         WE HAD HAD CONVERSATIONS ABOUT SAFEWAY, ABOUT WAL-MART,

01:59PM 24    ABOUT WALGREENS, AND SO THE FACT THAT ONE OF THOSE HAD ACTUALLY

02:00PM 25    MATURED TO A PLACE WHERE THE TECHNOLOGY WAS EMBRACED AND

```
 1
 2                    UNITED STATES DISTRICT COURT
 3                   NORTHERN DISTRICT OF CALIFORNIA
 4                          SAN JOSE DIVISION
 5
      UNITED STATES OF AMERICA,        )
 6                                     )   CR-18-00258-EJD
                       PLAINTIFF,      )
 7                                     )   SAN JOSE, CALIFORNIA
                 VS.                   )
 8                                     )   MAY 3, 2022
      RAMESH "SUNNY" BALWANI,          )
 9                                     )   VOLUME 25
                       DEFENDANT.      )
10     _____)  PAGES 4481 - 4747
11
12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                   UNITED STATES DISTRICT JUDGE
14     A P P E A R A N C E S:
15     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                              BY:  JOHN C. BOSTIC
16                                 JEFFREY B. SCHENK
                              150 ALMADEN BOULEVARD, SUITE 900
17                            SAN JOSE, CALIFORNIA 95113
18                            BY:  ROBERT S. LEACH
                              1301 CLAY STREET, SUITE 340S
19                            OAKLAND, CALIFORNIA 94612
20         (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21     OFFICIAL COURT REPORTERS:
                              IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                            CERTIFICATE NUMBER 8074
                              LEE-ANNE SHORTRIDGE, CSR, CRR
23                            CERTIFICATE NUMBER 9595
24         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED WITH COMPUTER
25
```

12:38PM 1    Q.   OKAY.  WITHOUT TALKING ABOUT THE SUBSTANCE OF THE

12:38PM 2    COMPLAINT, DID THAT INFORM SOME OF THE TOPIC AREAS THAT YOU

12:38PM 3    ELECTED TO FOCUS ON IN YOUR SURVEY?

12:38PM 4    A.   IT DID.

12:38PM 5    Q.   OKAY.  AND WHAT TOPIC AREAS WERE THOSE?

12:38PM 6    A.   IT WAS THAT THIS PARTICULAR COMPLAINT WAS RELATED TO --

12:38PM 7         MR. CAZARES:  OBJECTION.  HEARSAY AND 403.

12:38PM 8         THE COURT:  SUSTAINED.

12:38PM 9         IF YOU COULD JUST GET THE, I THINK, THE AREAS.

12:38PM 10   BY MR. LEACH:

12:38PM 11   Q.   OKAY.  AS A RESULT OF THE COMPLAINT, MS. BENNETT, DID YOU

12:38PM 12   MAKE A DECISION TO FOCUS ON PARTICULAR AREAS WITHIN THE CMS

12:38PM 13   SURVEY?

12:38PM 14   A.   YES.

12:38PM 15   Q.   AND WHAT AREAS DID YOU ELECT TO FOCUS ON?

12:38PM 16   A.   PROFICIENCY TESTING.

12:38PM 17   Q.   OKAY.  DID YOU ALSO ELECT TO FOCUS ON QUALITY CONTROL?

12:38PM 18   A.   WE DID.

12:38PM 19   Q.   OKAY.  WITHOUT DESCRIBING THE SUBSTANCE OF THE COMPLAINTS,

12:38PM 20   DID YOU HAVE AN UNDERSTANDING OF WHERE THE COMPLAINTS WERE

12:38PM 21   COMING FROM?

12:38PM 22   A.   WE, WE KNEW THAT THE COMPLAINTS HAD COME FROM INDIVIDUALS.

12:39PM 23   Q.   OKAY.  INDIVIDUALS OUTSIDE OF THE COMPANY OR INSIDE OF THE

12:39PM 24   COMPANY?

12:39PM 25   A.   ONE COMPLAINT WE KNEW WAS INSIDE OF THE COMPANY.  THE

BENNETT DIRECT BY MR. LEACH                                    4660

01:30PM   1    YET.

01:30PM   2        BUT WE WANTED TO MAKE SURE THAT THEY WERE AWARE THAT THAT

01:30PM   3    COULD HAPPEN.

01:30PM   4        AND THEN WHAT THEY WOULD NEED TO DO SPECIFICALLY TO

01:30PM   5    RESPOND TO THE DEFICIENCIES.

01:30PM   6    Q.   AND WHAT DO YOU MEAN BY "IMMEDIATE JEOPARDY"?

01:30PM   7    A.   IMMEDIATE JEOPARDY IS A SITUATION WHERE THE LAB PRACTICES

01:30PM   8    HAVE THE POTENTIAL TO CAUSE HARM, OR HAVE CAUSED HARM, OR COULD

01:30PM   9    CAUSE DEATH TO PATIENTS.

01:30PM  10    Q.   AND DID MS. HOLMES OR MR. BALWANI ATTEMPT TO DISSUADE YOU

01:30PM  11    FROM MAKING THAT FINDING?

01:30PM  12    A.   THEY DID.

01:30PM  13    Q.   AND TELL US WHAT WAS SAID.

01:30PM  14    A.   THEY WERE TRYING TO CONVINCE US THAT, YOU KNOW, PERHAPS WE

01:30PM  15    DIDN'T NEED TO CITE THIS, OR COULD WE DO THIS ANOTHER WAY SO

01:31PM  16    THAT IT DIDN'T LOOK QUITE SO BAD.  BUT WE CITE WHAT WE SEE THE

01:31PM  17    WAY WE SEE IT.

01:31PM  18    Q.   AND AT SOME POINT IN TIME, DID YOU DELIVER A 2567

01:31PM  19    STATEMENT OF DEFICIENCIES TO THERANOS SUMMARIZING THE RESULTS

01:31PM  20    OF YOUR SURVEY?

01:31PM  21    A.   WE DID.

01:31PM  22    Q.   LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

01:31PM  23    EXHIBIT 4621.

01:31PM  24        DO YOU RECOGNIZE THIS DOCUMENT?

01:31PM  25    A.   YES.

BENNETT DIRECT BY MR. LEACH                                    4661

01:31PM  1    Q.   THE FIRST FOUR PAGES OF EXHIBIT 4621 APPEAR TO BE A LETTER

01:31PM  2    DATED JANUARY 25TH, 2006.

01:31PM  3         DO YOU SEE THAT?

01:31PM  4    A.   I DO.

01:31PM  5    Q.   AND DID YOU HAVE A HAND IN DRAFTING THIS LETTER?

01:31PM  6    A.   I REVIEWED IT.

01:31PM  7    Q.   YOU REVIEWED IT.

01:32PM  8         AND BEGINNING ON PAGE 5 THERE IS A FORM WITH THE NUMBER

01:32PM  9    FORM 2567 DOWN IN THE BOTTOM LEFT.

01:32PM  10        DO YOU SEE THAT?

01:32PM  11   A.   I DO.

01:32PM  12   Q.   AND DO YOU SEE TO THE RIGHT THAT THIS IS 121 PAGES?

01:32PM  13   A.   YES.

01:32PM  14   Q.   WITH RESPECT TO THE FORM BEGINNING ON PAGE 5 AND

01:32PM  15   CONTINUING TO PAGE 125 OF THE TRIAL EXHIBIT, IS THIS SOMETHING

01:32PM  16   THAT YOU HAD A HAND IN PREPARING?

01:32PM  17   A.   YES.

01:32PM  18   Q.   AND WHAT WAS YOUR ROLE IN PREPARING THIS?

01:32PM  19   A.   MY ROLE WAS TO WRITE UP THE CITATIONS BASED ON THE AREAS

01:32PM  20   THAT I HAD LOOKED AT AND FOUND DEFICIENT PRACTICES.

01:32PM  21   Q.   OKAY.  AND IS THIS A REPORT OF MATTERS THAT YOU AND

01:32PM  22   MR. YAMAMOTO OBSERVED WHILE UNDER A LEGAL DUTY TO REPORT?

01:33PM  23   A.   YES.

01:33PM  24   Q.   DOES IT ACCURATELY DESCRIBE THE OBSERVATIONS YOU AND

01:33PM  25   MR. YAMAMOTO MADE DURING THE INSPECTION?

01:33PM 1     A.   YES, IT DOES.

01:33PM 2     Q.   WAS THIS PREPARED IN THE ORDINARY COURSE OF CMS'S

01:33PM 3     BUSINESS?

01:33PM 4     A.   YES.

01:33PM 5     Q.   OKAY.  AND WAS IT PREPARED AT OR AROUND THE TIME OF THE

01:33PM 6     MATTERS THAT YOU INSPECTED?

01:33PM 7     A.   YES.

01:33PM 8     Q.   AND WITH RESPECT TO THE LETTER, IS THE PURPOSE OF THIS

01:33PM 9     LETTER TO PROVIDE NOTICE TO THERANOS OF WHAT YOU HAVE FOUND?

01:33PM 10    A.   YES.

01:33PM 11    Q.   OKAY.

01:33PM 12         YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 4621.

01:33PM 13              MR. CAZARES:  OBJECTION, YOUR HONOR.  HEARSAY, 403,

01:33PM 14    702, AND I REFERENCE OUR MOTIONS IN LIMINE.

01:33PM 15              THE COURT:  ALL RIGHT.  THANK YOU.

01:33PM 16         ANYTHING FURTHER ON THIS, MR. LEACH?

01:33PM 17              MR. LEACH:  NO, YOUR HONOR.

01:33PM 18              THE COURT:  ALL RIGHT.  THANK YOU.

01:33PM 19         THE OBJECTION IS OVERRULED.  THIS WILL BE ADMITTED, AND IT

01:33PM 20    MAY BE PUBLISHED.

01:33PM 21         (GOVERNMENT'S EXHIBIT 4621 WAS RECEIVED IN EVIDENCE.)

01:34PM 22    BY MR. LEACH:

01:34PM 23    Q.   MR. BALWANI, I WANT TO DRAW YOUR ATTENTION TO THE TOP

01:34PM 24    PORTION OF THE LETTER.

01:34PM 25         DO YOU SEE THE DATE JANUARY 25TH, 2016?

BENNETT DIRECT BY MR. LEACH                                    4663

01:34PM  1    A.   YES.

01:34PM  2    Q.   AND THIS IS ADDRESSED TO SUNIL DHAWAN, M.D., DIRECTOR.

01:34PM  3         DO YOU SEE THAT?

01:34PM  4    A.   I DO.

01:34PM  5    Q.   WHY IS THIS ADDRESSED TO DR. DHAWAN?

01:34PM  6    A.   IT'S USUALLY -- THESE ENFORCEMENT LETTERS ARE USUALLY SENT

01:34PM  7    TO THE LABORATORY DIRECTOR.

01:34PM  8    Q.   THE SUBJECT LINE IS RE:  CONDITION LEVEL DEFICIENCIES --

01:34PM  9    IMMEDIATE JEOPARDY.

01:34PM  10        DO YOU SEE THAT?

01:34PM  11   A.   I DO.

01:34PM  12   Q.   AND IS THAT A REFERENCE TO THE TERMINOLOGY THAT YOU WERE

01:34PM  13   EXPRESSING TO MS. HOLMES AND MR. BALWANI IN THE EXIT INTERVIEW?

01:34PM  14   A.   YES.

01:34PM  15   Q.   LET'S LOOK AT THE FIRST PARAGRAPH.

01:34PM  16        THE LAST SENTENCE SAYS, "FEDERAL REGULATIONS REQUIRE

01:34PM  17   ONSITE SURVEYS TO DETERMINE WHETHER OR NOT A LABORATORY IS IN

01:34PM  18   COMPLIANCE WITH THE APPLICABLE REGULATIONS.  COMPLIANCE WITH

01:34PM  19   THESE REGULATIONS IS A CONDITION OF CERTIFICATION OF THE CLIA

01:34PM  20   PROGRAM."

01:34PM  21        DO YOU SEE THAT?

01:34PM  22   A.   I DO.

01:34PM  23   Q.   AND IS THAT A FAIR SUMMARY OF WHAT YOU DID IN YOUR WORK AS

01:35PM  24   A SURVEYOR?

01:35PM  25   A.   IT IS.

BENNETT DIRECT BY MR. LEACH                                          4664

01:35PM  1    Q.   OKAY.  THIS SAYS, "THE" -- IN THE NEXT PARAGRAPH IT SAYS,

01:35PM  2    "THE CENTERS FOR MEDICARE AND MEDICAID SERVICE (CMS) CONDUCTED

01:35PM  3    A CLIA RECERTIFICATION AND COMPLAINT SURVEY OF THE LABORATORY."

01:35PM  4         IS THAT ACCURATE?

01:35PM  5    A.   YES.

01:35PM  6    Q.   "THE ONSITE SURVEY WAS COMPLETED ON NOVEMBER 20TH, 2015."

01:35PM  7         IS THAT CORRECT?

01:35PM  8    A.   YES.

01:35PM  9    Q.   AND IT THEN SAYS, "AS A RESULT OF THE SURVEY, IT WAS

01:35PM 10    DETERMINED THAT YOUR FACILITY IS NOT IN COMPLIANCE WITH ALL OF

01:35PM 11    THE CONDITIONS REQUIRED FOR CERTIFICATION IN THE CLIA PROGRAM."

01:35PM 12         DO YOU SEE THAT?

01:35PM 13    A.   I DO.

01:35PM 14    Q.   AND CONDITIONS IS CAPITALIZED THERE.  IS THAT A TERM OF

01:35PM 15    ART?

01:35PM 16    A.   YES.

01:35PM 17    Q.   OKAY.  WHAT IS A CONDITION?

01:35PM 18    A.   CLIA REQUIREMENTS ARE DIVIDED INTO TWO LEVELS, STANDARD

01:35PM 19    LEVEL AND CONDITION LEVEL.

01:35PM 20         CONDITION LEVEL NONCOMPLIANCE IS MORE SERIOUS THAN A

01:36PM 21    DEFICIENCY FOUND AT THE STANDARD LEVEL.

01:36PM 22    Q.   OKAY.  AND THIS SAYS, "IN ADDITION, BASED ON THE

01:36PM 23    CONDITION-LEVEL REQUIREMENT, HEMATOLOGY, IT WAS DETERMINED THAT

01:36PM 24    THE DEFICIENT PRACTICES OF THE LABORATORY POSE IMMEDIATE

01:36PM 25    JEOPARDY TO PATIENT HEALTH AND SAFETY."

1

2               UNITED STATES DISTRICT COURT

3             NORTHERN DISTRICT OF CALIFORNIA

4                    SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,          )
6                                        )  CR-18-00258-EJD
                   PLAINTIFF,            )
7                                        )  SAN JOSE, CALIFORNIA
              VS.                        )
8                                        )  MAY 4, 2022
      RAMESH "SUNNY" BALWANI,            )
9                                        )  VOLUME 26
                   DEFENDANT.            )
10    _____   )  PAGES 4748 - 5022

11

12              TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE EDWARD J. DAVILA
13                UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                            150 ALMADEN BOULEVARD, SUITE 900
17                          SAN JOSE, CALIFORNIA 95113

18                          BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                          1301 CLAY STREET, SUITE 340S
                            OAKLAND, CALIFORNIA 94612
20
            (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
      OFFICIAL COURT REPORTERS:
22                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
23                          LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

BENNETT CROSS BY MR. CAZARES (RES.)                                    4964

02:21PM  1      MONTHS AFTER THE SURVEY BEGAN; CORRECT?

02:21PM  2      A.    THAT DETERMINATION WAS MADE WHEN THE SURVEY WAS COMPLETED,

02:21PM  3      BUT THE LABORATORY HAD BEEN NOTIFIED THAT WE WERE CONSIDERING

02:21PM  4      IT IN SEPTEMBER.

02:21PM  5      Q.    ARE YOU SURE ABOUT THAT?

02:21PM  6      A.    THAT'S MY RECOLLECTION.

02:21PM  7      Q.    OKAY.  LET MET GET YOU -- YOUR HONOR, I'M NOT SURE.  DID

02:21PM  8      THE COURT GET A TRANSCRIPT BINDER?  I'M NOT SURE WE HANDED

02:21PM  9      THOSE OUT.  NO?  LET ME GET IT.

02:22PM  10          (HANDING.)

02:22PM  11          AND WITHIN THE BINDER, THE TESTIMONY BINDER,

02:22PM  12     EXHIBIT 28009, YOUR HONOR, AT PAGE 25, LINES 7 TO 24.

02:23PM  13              THE COURT:  WOULD YOU LIKE THIS WITNESS TO READ THEM

02:23PM  14     TO HERSELF?

02:23PM  15              MR. CAZARES:  NO.  I HAVE A VIDEO, YOUR HONOR.

02:23PM  16              THE COURT:  MR. LEACH.

02:23PM  17              MR. LEACH:  OBJECTION.  THIS IS NOT PROPER 611, AND

02:23PM  18     IT'S HEARSAY.

02:23PM  19              MR. CAZARES:  PRIOR SWORN TESTIMONY.

02:23PM  20              THE COURT:  I'M NOT SURE WHAT THIS RELATES TO.

02:23PM  21          WHAT QUESTION DOES THIS RELATE TO?

02:24PM  22              MR. CAZARES:  RELATING TO THE TIMING OF

02:24PM  23     DETERMINATION OF IMMEDIATE JEOPARDY AND NOTICE TO THE LAB.

02:24PM  24              MR. LEACH:  THAT IS NOT HIS QUESTION, YOUR HONOR.

02:24PM  25          THE QUESTION WAS WHETHER SHE WAS CONSIDERING IT IN

02:24PM   1      SEPTEMBER --

02:24PM   2                  MR. CAZARES:  I DIDN'T SAY CONSIDER.

02:24PM   3                  THE COURT:  ONE AT A TIME, PLEASE.

02:24PM   4          THIS IS RELATED TO YOUR QUESTION, "THE DETERMINATION WAS

02:24PM   5      NOT MADE UNTIL MONTHS AFTER THE SURVEY BEGAN"?

02:24PM   6                  MR. CAZARES:  AND THE WITNESS JUST TESTIFIED THAT

02:24PM   7      THE LAB WAS NOTIFIED IN SEPTEMBER, AND IF YOU LOOK AT LINE 17

02:24PM   8      TO 21 IN PARTICULAR --

02:24PM   9                  THE COURT:  I'M SORRY, 17 TO?

02:24PM  10                  MR. CAZARES:  17 TO 21, AND YOU CAN EVEN CONTINUE

02:24PM  11      UNTIL 24.

02:25PM  12                  THE COURT:  THIS LOOKS A LITTLE DIFFERENT.

02:25PM  13                  MR. CAZARES:  I CAN RESET IT UP, YOUR HONOR.

02:25PM  14                  THE COURT:  LINE 18 REFERENCES COMPLIANCE ABOUT A

02:25PM  15      SPECIFIC ISSUE.

02:25PM  16                  MR. CAZARES:  THAT ISSUE IS THE SAME ISSUE.  IT'S A

02:25PM  17      DIFFERENT WORD.  COAGULATION, PT INR, IT'S THE SAME TEST.

02:25PM  18                  THE COURT:  WELL, I THINK IT -- YOU NEED TO LAY A

02:25PM  19      FOUNDATION.

02:25PM  20                  MR. CAZARES:  OKAY.

02:25PM  21      Q.   SO, MS. BENNETT, I THINK YOU ALREADY TESTIFIED THAT THE

02:25PM  22      PT INR TEST IS A COAGULATION TEST; CORRECT?

02:25PM  23      A.   YES, IT'S A TYPE OF COAGULATION TEST.

02:25PM  24      Q.   AND THE PT INR COAGULATION TEST IS THE TEST AT ISSUE IN

02:26PM  25      RELATION TO THE CONDITION LEVEL NONCOMPLIANCE THAT YOU FOUND;

BENNETT CROSS BY MR. CAZARES (RES.)                                    4966

02:26PM  1    CORRECT?

02:26PM  2    A.   THE PT INR WAS PART OF THE CONDITION LEVEL NONCOMPLIANCE,

02:26PM  3    YES.

02:26PM  4    Q.   AND ALSO PART OF THE ULTIMATE IMMEDIATE JEOPARDY ISSUE AS

02:26PM  5    WELL; CORRECT?

02:26PM  6    A.   YES.

02:26PM  7    Q.   OKAY.  AND YOU JUST TESTIFIED, I BELIEVE RIGHT NOW, THAT

02:26PM  8    IN SEPTEMBER OF 2015, YOU NOTIFIED THE LAB THAT YOU WERE

02:26PM  9    CONSIDERING IMMEDIATE JEOPARDY REGARDING PT INR; CORRECT?

02:26PM 10    A.   WE NOTIFIED THE LAB THAT WE WERE CONSIDERING IT, BUT THAT

02:26PM 11    A FINAL DETERMINATION HAD NOT BEEN MADE.

02:26PM 12    Q.   AND SO WAS THAT MADE CLEAR TO MR. BALWANI, THAT YOU HAD

02:26PM 13    NOT MADE A DETERMINATION OF IMMEDIATE JEOPARDY IN SEPTEMBER OF

02:26PM 14    2015?

02:26PM 15    A.   IT WAS MADE CLEAR.

02:26PM 16    Q.   OKAY.  AND THAT DETERMINATION REGARDING IMMEDIATE JEOPARDY

02:27PM 17    WAS NOT CONCLUDED AND DETERMINED FINALLY IN NOVEMBER OF 2015

02:27PM 18    EITHER; CORRECT?

02:27PM 19    A.   WE HAD NOT MADE A DECISION, A FINAL DECISION WHETHER WE

02:27PM 20    WERE GOING TO CALL I.J. BY THE END OF SEPTEMBER, IMMEDIATE

02:27PM 21    JEOPARDY.

02:27PM 22    Q.   UNTIL THE END --

02:27PM 23         THE COURT:  PULL THAT MICROPHONE CLOSER TO YOU.

02:27PM 24    BY MR. CAZARES:

02:27PM 25    Q.   JUST SO THE TRANSCRIPT IS CLEAR, THAT CONCLUSION REGARDING

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                          SAN JOSE DIVISION

5

        UNITED STATES OF AMERICA,            )
6                                            )  CR-18-00258-EJD
                        PLAINTIFF,           )
7                                            )  SAN JOSE, CALIFORNIA
                VS.                          )
8                                            )  MAY 10, 2022
        RAMESH "SUNNY" BALWANI,              )
9                                            )  VOLUME 27
                        DEFENDANT.           )
10      _____      )  PAGES 5023 - 5286

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                  BEFORE THE HONORABLE EDWARD J. DAVILA
13                    UNITED STATES DISTRICT JUDGE

14      A P P E A R A N C E S:

15      FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                              BY:   JOHN C. BOSTIC
16                                  JEFFREY B. SCHENK
                              150 ALMADEN BOULEVARD, SUITE 900
17                            SAN JOSE, CALIFORNIA 95113

18                            BY:   ROBERT S. LEACH
                                    KELLY VOLKAR
19                            1301 CLAY STREET, SUITE 340S
                              OAKLAND, CALIFORNIA 94612
20
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
        OFFICIAL COURT REPORTERS:
22                              IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074
23                              LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24
              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                  TRANSCRIPT PRODUCED WITH COMPUTER

BENNETT CROSS BY MR. CAZARES (RES.)                              5030

09:16AM   1   OFF LAST WEEK, AND WE TALKED ABOUT THIS DIVISION OF LABOR

09:16AM   2   BETWEEN YOURSELF AND MR. YAMAMOTO WITH RESECT TO THE SURVEY.

09:16AM   3       DO YOU RECALL THOSE DISCUSSIONS?

09:16AM   4   A.   YES.

09:16AM   5   Q.   OKAY.  AND I THINK YOU MENTIONED THAT, WITH RESPECT TO THE

09:16AM   6   WORK THAT YOU DID IN THE SURVEY AND REFLECTED IN THE SURVEY

09:16AM   7   REPORT, THAT YOU DID NOT SURVEY THE FINGERSTICK PART OF THE

09:16AM   8   LABORATORY; IS THAT CORRECT?

09:16AM   9   A.   I DID NOT.

09:16AM  10   Q.   AND THAT WOULD INCLUDE THEN THAT YOU DID NOT EXAMINE ANY

09:16AM  11   OF THE FINGERSTICK TESTING ON THE MODIFIED PREDICATE DEVICES;

09:16AM  12   IS THAT RIGHT?

09:16AM  13   A.   CORRECT.

09:16AM  14   Q.   OKAY.  NOW, YOU DID EXAMINE TESTING RELATING TO THE

09:17AM  15   PT INR, THE COAGULATION TEST; CORRECT?

09:17AM  16   A.   I DID.

09:17AM  17   Q.   BUT OTHER THAN THAT, YOU DIDN'T EXAMINE ANY OF THE

09:17AM  18   TRADITIONAL VENOUS BLOOD TESTING; CORRECT?

09:17AM  19   A.   I MAY HAVE, IF I REMEMBER CORRECTLY, REVIEWED SOME OF THE

09:17AM  20   QUALITY CONTROL DATA AND THE PERFORMANCE SPECIFICATIONS.

09:17AM  21   Q.   OKAY.  NOW, GETTING BACK TO THAT PT INR TEST, THAT WAS THE

09:17AM  22   TEST THAT WAS THE SUBJECT OF A CONDITION LEVEL NONCOMPLIANCE;

09:17AM  23   CORRECT?

09:17AM  24   A.   YES.

09:17AM  25   Q.   AND THE PT INR WAS ALSO THE SUBJECT OF THE IMMEDIATE

BENNETT CROSS BY MR. CAZARES (RES.)                    5031

09:17AM   1    JEOPARDY FINDING; CORRECT?

09:17AM   2    A.   IT WAS PART OF THE IMMEDIATE JEOPARDY, YES.

09:17AM   3    Q.   OKAY.  AND THAT PT INR TEST, THE ISSUES FOR THAT TEST WERE

09:17AM   4    THERE WAS A REAGENT STABILITY ISSUE; CORRECT?

09:17AM   5    A.   YES.

09:17AM   6    Q.   THERE WERE SOME QUALITY CONTROL ISSUES; CORRECT?

09:17AM   7    A.   YES.

09:17AM   8    Q.   AND THEN THERE WAS AN ISSUE RELATING TO THE CALCULATION OF

09:17AM   9    THE RESULTS; CORRECT?

09:17AM  10    A.   YES.

09:18AM  11    Q.   AND THAT PT INR TEST, THAT WAS RUN ON A SIEMENS MACHINE;

09:18AM  12    CORRECT?

09:18AM  13    A.   I BELIEVE IT WAS A SIEMENS, YES.

09:18AM  14    Q.   OKAY.  AND THAT'S AN FDA APPROVED COMMERCIAL DEVICE;

09:18AM  15    CORRECT?

09:18AM  16    A.   YES.

09:18AM  17    Q.   AND THEN THE REAGENT, THAT STABILITY ISSUE, THAT REAGENT

09:18AM  18    WAS MADE BY A COMPANY, NOT THERANOS; CORRECT?

09:18AM  19    A.   THAT IS CORRECT.

09:18AM  20    Q.   OKAY.  YOU SHOULD HAVE SOME BINDERS THERE IN FRONT OF YOU.

09:18AM  21         IF YOU COULD TAKE A LOOK AT THE GOVERNMENT'S BINDER, THE

09:18AM  22    WHITE BINDER, AT 4621.

09:18AM  23         WE CAN ALSO PUT IT UP ON THE SCREEN.  IF WE CAN LOOK AT

09:18AM  24    PAGE 16, UNDER D-TAG 5413.

09:18AM  25         AND YOU CAN LOOK ON THE BINDER OR ON THE SCREEN,

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,          )
6                                      )  CR-18-00258-EJD
                    PLAINTIFF,         )
7                                      )  SAN JOSE, CALIFORNIA
              VS.                      )
8                                      )  MAY 13, 2022
    RAMESH "SUNNY" BALWANI,            )
9                                      )  VOLUME 29
                    DEFENDANT.         )
10  _____        )  PAGES 5563 - 5837

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
               BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                                KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
         (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
    OFFICIAL COURT REPORTER:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23

24       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER
25

LUCAS DIRECT BY MR. BOSTIC                                         5631

10:33AM  1    COMPANY'S WORK WITH THE U.S. MILITARY OR DEPARTMENT OF DEFENSE?

10:34AM  2    A.   YES.

10:34AM  3    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THAT?

10:34AM  4    A.   THAT IT WAS VERY EXCITING, THAT THE TECHNOLOGY WAS BEING

10:34AM  5    USED IN THE MIDDLE EAST AND IN PARTICULAR IN THE -- ON THE

10:34AM  6    BATTLEFIELD.

10:34AM  7    Q.   AND YOU SAID THAT WAS EXCITING.  WHY WAS THAT EXCITING FOR

10:34AM  8    YOU AS AN INVESTOR?

10:34AM  9    A.   THAT, AGAIN, THE TECHNOLOGY WAS OPERATING, WORKING, AND

10:34AM  10   THAT THE MILITARY FOUND IT VERY HELPFUL FOR THEM.

10:34AM  11       AND SO OBVIOUSLY IF THEY THOUGHT IT WAS GOOD, POTENTIALLY

10:34AM  12   THEY WOULD ORDER -- PLACE A NICE ORDER FOR A LOT OF THE

10:34AM  13   TECHNOLOGY, AND ANALYZERS, AND SO FORTH.

10:34AM  14   Q.   THAT TOPIC, THAT BEING THE MILITARY'S USE OF THE THERANOS

10:34AM  15   ANALYZER, WAS THAT SOMETHING THAT YOU DISCUSSED WITH MS. HOLMES

10:34AM  16   ONCE OR MULTIPLE TIMES?

10:35AM  17   A.   MULTIPLE TIMES.

10:35AM  18   Q.   HOW ABOUT THE COMPANY'S FINANCIAL HEALTH?

10:35AM  19       BASED ON YOUR CONVERSATIONS WITH MS. HOLMES, AND THE

10:35AM  20   PUBLIC INFORMATION THAT YOU HAD READ, AND THE COMMUNICATIONS

10:35AM  21   FROM THERANOS, WHAT WAS YOUR UNDERSTANDING ABOUT HOW THE

10:35AM  22   COMPANY WAS DOING FINANCIALLY?

10:35AM  23   A.   AND AGAIN, THIS IS THE 2013 TIMEFRAME?

10:35AM  24   Q.   YES.

10:35AM  25   A.   CLEARLY THE COMPANY NEEDED TO RAISE MONEY TO SCALE UP AND

LUCAS CROSS BY MR. COOPERSMITH                                    5685

12:12PM   1    A.   YES.

12:12PM   2    Q.   AND ONE OF THE PEOPLE ON THAT CALL WAS CRAIG HALL?

12:12PM   3    A.   YES, HE WAS ALSO, YES.

12:12PM   4    Q.   OKAY.  ON DIRECT EXAMINATION, THE GOVERNMENT ASKED YOU

12:12PM   5    SOME QUESTIONS ABOUT INFORMATION THAT YOU HAD RECEIVED FROM

12:12PM   6    MS. HOLMES ABOUT MILITARY RELATIONSHIPS THAT THERANOS HAD?

12:12PM   7    A.   YES.

12:12PM   8    Q.   YOU DON'T REMEMBER THE EXACT WORDS THAT MS. HOLMES SAID AT

12:12PM   9    THIS POINT; CORRECT?

12:12PM   10   A.   OBVIOUSLY I DON'T REMEMBER THE EXACT WORDS, BUT I

12:13PM   11   CERTAINLY REMEMBER THE INTENT AND WHAT WAS SAID.

12:13PM   12   Q.   AND YOU TOOK AWAY FROM WHATEVER SHE SAID THAT THERE WAS A

12:13PM   13   RELATIONSHIP WITH THE MILITARY WHERE THERANOS WAS -- WHERE THE

12:13PM   14   MILITARY WAS USING THERANOS DEVICES IN THE FIELD?

12:13PM   15   A.   IN THE FIELD.

12:13PM   16   Q.   THAT'S WHAT YOU TOOK AWAY FROM WHATEVER WAS SAID?

12:13PM   17   A.   CORRECT.

12:13PM   18   Q.   BUT YOU DON'T REMEMBER THE EXACT WORDS?

12:13PM   19   A.   CORRECT.

12:13PM   20   Q.   OKAY.  MAYBE THIS IS OBVIOUS FROM THE QUESTIONS THAT WAS

12:13PM   21   ASKED OF YOU EARLIER, BUT MR. BALWANI WAS NOT ON THAT CALL ON

12:13PM   22   DECEMBER 20TH, 2013?

12:13PM   23   A.   NOT THAT I KNOW OF.

12:13PM   24   Q.   GOING WITH THE TOPIC OF THE 2013 INVESTMENT THAT YOU MADE,

12:13PM   25   YOU UNDERSTOOD THAT FOR THERANOS TO EMBARK ON THAT KIND OF

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,          )
6                                        )  CR-18-00258-EJD
                     PLAINTIFF,          )
7                                        )  SAN JOSE, CALIFORNIA
                  VS.                    )
8                                        )  MAY 18, 2022
      RAMESH "SUNNY" BALWANI,            )
9                                        )  VOLUME 31
                     DEFENDANT.          )
10    _____    )  PAGES 5872 - 6157

11

12                TRANSCRIPT OF TRIAL PROCEEDINGS
               BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                             BY:   JOHN C. BOSTIC
16                                 JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:   ROBERT S. LEACH
                                   KELLY VOLKAR
19                           1301 CLAY STREET, SUITE 340S
                             OAKLAND, CALIFORNIA 94612
20

21         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22    OFFICIAL COURT REPORTERS:
                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                           CERTIFICATE NUMBER 8074
                             LEE-ANNE SHORTRIDGE, CSR, CRR
23                           CERTIFICATE NUMBER 9595

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

10:47AM  1    BY MR. BOSTIC:

10:47AM  2    Q.   SO, MR. BINGHAM, CAN YOU TELL US WHAT WE'RE LOOKING AT

10:47AM  3    HERE?

10:47AM  4    A.   THIS IS A LAB THAT I COPIED SO I COULD SHOW IT TO MY

10:48AM  5    DOCTOR FROM THERANOS.

10:48AM  6    Q.   SO IS THAT WHY -- WELL, LET ME -- LET ME ASK, WAS THIS THE

10:48AM  7    LAB THAT YOU TOOK FROM THERANOS FOR THE PURPOSE OF COMPARING IT

10:48AM  8    WITH A CONVENTIONAL LAB RESULT?

10:48AM  9    A.   YES, IT IS.

10:48AM  10   Q.   AND DO YOU SEE AT THE TOP OF THIS SCREEN IT INDICATES THAT

10:48AM  11   THE VISIT DATE FOR THIS LAB WAS ON AUGUST 27TH, 2015?

10:48AM  12   A.   YES.

10:48AM  13   Q.   AND THE LOCATION OF THE DRAW SHOWS UP AS THERANOS SERVICE

10:48AM  14   CENTER ON 16TH STREET IN PHOENIX.

10:48AM  15        DO YOU SEE THAT?

10:48AM  16   A.   YES.

10:48AM  17   Q.   AND IS THAT WHERE YOU WENT TO GET YOUR BLOOD DRAWN?

10:48AM  18   A.   YES, IT IS.

10:48AM  19   Q.   MOVING DOWN THAT PAGE A LITTLE BIT.

10:48AM  20        DO YOU SEE THAT THERE'S A SECTION HIGHLIGHTED, SUMMARY OF

10:48AM  21   ABNORMAL RESULTS?

10:48AM  22   A.   YES, I DO.

10:48AM  23   Q.   AND ONE OF THE ENTRIES THERE READS PLT.

10:48AM  24        DO YOU SEE THAT?

10:48AM  25   A.   YES.

BINGHAM DIRECT BY MR. BOSTIC                                    5954

10:48AM  1     Q.   AND IS THAT THE ABBREVIATION FOR THE PLATELET RESULT?

10:48AM  2     A.   IT IS.

10:48AM  3     Q.   AND THE RESULT LISTED HERE IS 909.6.

10:49AM  4          DO YOU SEE THAT?

10:49AM  5     A.   THAT'S CORRECT.

10:49AM  6     Q.   AND IT'S FLAGGED AS HIGH; IS THAT RIGHT?

10:49AM  7     A.   YES.

10:49AM  8     Q.   WHAT WAS YOUR REACTION TO GETTING THIS RESULT OF 900-PLUS

10:49AM  9     ON THIS DAY IN AUGUST OF 2015?

10:49AM  10    A.   THAT IT WASN'T RIGHT.

10:49AM  11    Q.   AND WHAT MADE YOU THINK THAT?

10:49AM  12    A.   THE WAY I FELT, AND THEN -- BASICALLY THE WAY I FELT.  I

10:49AM  13    DIDN'T FEEL LIKE IT WAS IN THE 900'S.

10:49AM  14    Q.   AND CAN YOU JUST EXPLAIN IN DETAIL WHAT YOU MEAN BY THE

10:49AM  15    WAY YOU FELT?

10:49AM  16    A.   IF I WAS AT 900, I WOULD BE, LIKE, WANTING TO BE HOME IN

10:49AM  17    BED BASICALLY.

10:49AM  18    Q.   IT WOULD MANIFEST IN THAT LETHARGY THAT YOU WERE TALKING

10:49AM  19    ABOUT EARLIER?

10:49AM  20    A.   CORRECT.

10:49AM  21    Q.   IF I COULD ASK YOU TO TURN BACK IN YOUR BINDER ONE TAB TO

10:49AM  22    2729.

10:49AM  23         AND AT 2729, DO YOU SEE ANOTHER LAB REPORT FOR YOU FROM A

10:50AM  24    COLLECTION ON THAT SAME DAY, BUT THIS TIME FROM ACCESS MEDICAL

10:50AM  25    LABORATORIES?

BINGHAM DIRECT BY MR. BOSTIC                                    5955

10:50AM   1    A.   YES, I DO.

10:50AM   2              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 2729.

10:50AM   3              MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:50AM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:50AM   5         (GOVERNMENT'S EXHIBIT 2729 WAS RECEIVED IN EVIDENCE.)

10:50AM   6              MR. BOSTIC:

10:50AM   7    Q.   OKAY.  SO, MR. BINGHAM, IF WE ZOOM IN ON THE TOP PORTION,

10:50AM   8    DO WE SEE THAT THIS IS FROM ACCESS MEDICAL LABORATORIES?

10:50AM   9         IS THAT ANOTHER BLOOD TESTING LAB?

10:50AM  10    A.   YES.  IT'S THE ONE THAT MY PHYSICIAN USED.

10:50AM  11    Q.   AND DID YOUR PHYSICIAN SEND YOU TO THIS LAB ON THIS DATE?

10:50AM  12    A.   HE TOOK THE DRAW AND THEN SENT IT TO THEM.

10:50AM  13    Q.   OKAY.  AND THE COLLECTION DATE HERE IS AUGUST 27TH, 2015;

10:50AM  14    IS THAT RIGHT?

10:50AM  15    A.   CORRECT.

10:50AM  16    Q.   AND WAS THAT THE SAME DATE AS THE BLOOD DRAW FROM

10:50AM  17    THERANOS?

10:50AM  18    A.   YES, IT WAS.

10:50AM  19    Q.   DID YOU INTENTIONALLY VISIT BOTH LABS ON THE SAME DATE?

10:50AM  20    A.   YES, I DID.

10:50AM  21    Q.   AND WHY DID YOU CHOOSE TO DO IT THAT WAY?

10:51AM  22    A.   BECAUSE I FIGURED I SHOULD BE AS CLOSE AS POSSIBLE.

10:51AM  23    Q.   WAS THIS FOR A COMPARISON PURPOSE?

10:51AM  24    A.   FOR COMPARISON PURPOSES.

10:51AM  25    Q.   LET'S LOOK FURTHER DOWN ON THAT PAGE.

BINGHAM DIRECT BY MR. BOSTIC                                    5956

10:51AM   1        AND DO YOU SEE UNDER COMPLETE BLOOD COUNT THERE'S A LINE

10:51AM   2    FOR PLATELET COUNT?

10:51AM   3    A.   YES, I SEE IT.

10:51AM   4    Q.   AND DO YOU SEE INDICATED THERE IS THE NUMBER 756?

10:51AM   5    A.   YES, I DO.

10:51AM   6    Q.   AND COMPARING THOSE TWO RESULTS, THE 909 FROM THERANOS AND

10:51AM   7    THE 756 FROM THE CONVENTIONAL LAB, WAS THERE ONE OF THOSE THAT

10:51AM   8    LINED UP MORE WITH HOW YOUR SYMPTOMS WERE PRESENTING THAT DAY?

10:51AM   9    A.   YES, THIS LAB, THE ACCESS LAB.

10:51AM  10    Q.   OKAY.  WE CAN SET THAT ASIDE.

10:51AM  11        AFTER YOU RECEIVED THOSE AUGUST RESULTS AND YOU DID THE

10:51AM  12    COMPARISON, DID YOU TAKE ANY ACTION?

10:52AM  13    A.   YEAH.  SHORTLY THEREAFTER, AFTER COMMUNICATING WITH MY

10:52AM  14    DOCTOR, I ENDED UP CALLING.

10:52AM  15    Q.   AND YOU SAID THAT YOU CALLED.

10:52AM  16        WHO DID YOU CALL AT THAT TIME?

10:52AM  17    A.   THE NUMBER FOR THERANOS.

10:52AM  18    Q.   DO YOU REMEMBER THE DATE OF YOUR CALL TO THERANOS?

10:52AM  19    A.   NOT EXACTLY.  IT WAS EARLY IN SEPTEMBER.

10:52AM  20    Q.   OKAY.

10:52AM  21    A.   LIKE THE 10TH OR SOMETHING.  LIKE THE 10TH OR SOMEWHERE

10:52AM  22    AROUND THERE.

10:52AM  23    Q.   WOULD LOOKING AT A COMPLAINT LOG ENTRY FROM YOUR CALL ON

10:52AM  24    THAT DAY REFRESH YOUR MEMORY ABOUT WHEN IT WAS?

10:52AM  25    A.   YEAH, UH-HUH.

11:58AM   1                    THE COURT:  THANK YOU.

11:58AM   2          COUNSEL.

11:58AM   3                    MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:58AM   4                        **DIRECT EXAMINATION**

11:58AM   5     BY MR. BOSTIC:

11:58AM   6     Q.   GOOD MORNING, MS. TOMPKINS.

11:58AM   7     A.   GOOD MORNING.

11:58AM   8     Q.   IF YOU ARE FULLY VACCINATED AND COMFORTABLE DOING SO, I

11:58AM   9     UNDERSTAND THE COURT WILL ALLOW YOU TO TESTIFY WITHOUT A MASK.

11:58AM  10     A.   I AM FULLY VACCINATED, SO I'LL GO AHEAD AND TAKE THIS OFF.

11:58AM  11     Q.   LET ME START BY ASKING YOU, WAS THERE A TIME THAT YOU

11:58AM  12     RECEIVED BLOOD TESTING SERVICES FROM A COMPANY CALLED THERANOS?

11:58AM  13     A.   YES.

11:58AM  14     Q.   AND DO YOU REMEMBER APPROXIMATELY WHEN THAT WAS?

11:58AM  15     A.   I BELIEVE IT WAS MAY OF 2015.

11:58AM  16     Q.   I'D LIKE TO ASK YOU SOME QUESTIONS ABOUT YOUR EXPERIENCE

11:58AM  17     WITH THERANOS, BUT FIRST LET ME ASK YOU JUST A FEW BACKGROUND

11:58AM  18     QUESTIONS.

11:58AM  19          WHERE DO YOU LIVE CURRENTLY?

11:59AM  20     A.   I CURRENTLY LIVING IN PHOENIX, ARIZONA.

11:59AM  21     Q.   AND WERE YOU LIVING IN THE PHOENIX AREA IN 2015?

11:59AM  22     A.   YES, I WAS.

11:59AM  23     Q.   WERE YOU EMPLOYED AT THAT TIME?

11:59AM  24     A.   YES, I WAS.

11:59AM  25     Q.   WHERE DID YOU WORK?

| | |
|---|---|
| 11:59AM | 1 |
| 11:59AM | 2 |
| 11:59AM | 3 |
| 11:59AM | 4 |
| 11:59AM | 5 |
| 11:59AM | 6 |
| 11:59AM | 7 |
| 11:59AM | 8 |
| 11:59AM | 9 |
| 11:59AM | 10 |
| 11:59AM | 11 |
| 11:59AM | 12 |
| 11:59AM | 13 |
| 11:59AM | 14 |
| 12:00PM | 15 |
| 12:00PM | 16 |
| 12:00PM | 17 |
| 12:00PM | 18 |
| 12:00PM | 19 |
| 12:00PM | 20 |
| 12:00PM | 21 |
| 12:00PM | 22 |
| 12:00PM | 23 |
| 12:00PM | 24 |
| 12:00PM | 25 |

1   A.   I WAS A MUSIC DIRECTOR AT A SMALL METHODIST CONGREGATION;

2   I HAD PRIVATE VOICE STUDENTS; AND FOR HALF OF THE YEAR I WAS

3   A -- LIKE A TEACHING ARTIST FOR ARIZONA OPERA.

4   Q.   CAN YOU GIVE US A BRIEF SUMMARY OF YOUR EDUCATIONAL

5   BACKGROUND POST HIGH SCHOOL?

6   A.   YES.  I HAVE A BACHELOR'S IN MUSIC FROM SOUTHERN METHODIST

7   UNIVERSITY.

8   Q.   SO TURNING THEN TO YOUR CONTACT WITH THERANOS, HOW DID YOU

9   FIRST HEAR ABOUT THAT COMPANY?

10  A.   I BELIEVE THE FIRST TIME WAS SEEING THE MAGAZINE ON MY

11  FATHER'S COFFEE TABLE, "FORBES," WITH HER ON THE COVER.  I

12  THINK THAT WAS THE FIRST.  THERE MAY HAVE BEEN A TELEVISION

13  SPOT OR COMMERCIAL OR SOMETHING.

14       AND THEN AFTER THAT THERE WAS A RECOMMENDATION ON FACEBOOK

15  THAT I LOOKED INTO.

16  Q.   SO I'D LIKE TO TAKE THOSE KIND OF ONE AT A TIME.

17  A.   SURE.

18  Q.   FIRST YOU SAID YOU SAW A MAGAZINE AT A RELATIVE'S HOUSE

19  WITH SOMEONE ON THE COVER.  WHO DID YOU SEE?

20  A.   WITH ELIZABETH HOLMES ON THE COVER, YES.

21  Q.   THANK YOU.

22       AND JUST FOR THE COURT REPORTER'S SAKE, IF WE CAN MAKE

23  SURE NOT TO TALK OVER EACH OTHER?

24       AND THEN YOU ALSO MENTIONED THAT YOU MIGHT HAVE SEEN SOME

25  ADVERTISING FOR THE COMPANY?

12:00PM   1   A.   YES.  I BELIEVE AT SOME POINT THERE WAS A COMMERCIAL THAT

12:00PM   2   I SAW.  I'M NOT SURE WHERE.

12:00PM   3   Q.   AND THEN FINALLY YOU MENTIONED SOMETHING THAT YOU SAW ON

12:00PM   4   SOCIAL MEDIA.  WAS THAT THE THIRD SOURCE?

12:00PM   5   A.   YES.

12:00PM   6   Q.   AT THAT TIME, THAT IS, BEFORE YOU WENT TO THE COMPANY,

12:00PM   7   WHAT DID YOU KNOW ABOUT THERANOS AND ANYTHING THAT MADE IT

12:00PM   8   DIFFERENT FROM CONVENTIONAL LABS?

12:00PM   9   A.   I WAS FASCINATED BY THE PROPOSED, YOU KNOW, SINGLE DROP IN

12:00PM  10   A CAPSULE IDEA OF REVOLUTIONIZING BLOOD WORK FROM ANYTHING THAT

12:00PM  11   I HAD EVER HEARD OF BEFORE.

12:00PM  12        AND I WAS ALSO VERY ADMIRABLE OF THE YOUNG CEO.

12:01PM  13   Q.   TALKING ABOUT THE SMALL SAMPLE SIZE, WHY WAS THAT

12:01PM  14   APPEALING TO YOU AS SOMEONE CONSIDERING WHETHER TO GO THERE?

12:01PM  15   A.   WELL, I MEAN, IT'S JUST FASCINATING, FRANKLY.  AND THE --

12:01PM  16   IF WE CAN ACCOMPLISH THOSE SORTS OF THINGS WITHOUT TAKING MORE

12:01PM  17   BLOOD THAN IS ABSOLUTELY NECESSARY, THAT WAS -- THAT WAS

12:01PM  18   COMPELLING.

12:01PM  19   Q.   AT SOME POINT IN 2015, DID YOU DECIDE TO HAVE A BLOOD

12:01PM  20   TEST?

12:01PM  21   A.   YES.

12:01PM  22   Q.   AND DID YOU DECIDE TO GO TO THERANOS FOR THAT BLOOD TEST?

12:01PM  23   A.   YES.

12:01PM  24   Q.   AND WHAT MADE YOU CHOOSE THERANOS AT THAT TIME?

12:01PM  25   A.   AT THE TIME, TWO TOP PRIORITIES, OBVIOUSLY ACCURACY, BUT

TOMPKINS DIRECT BY MR. BOSTIC                                    5980

12:01PM  1    ALSO COST OF THE TEST WAS A BIG CONCERN.

12:01PM  2    Q.   LET'S TAKE THOSE IN REVERSE ORDER AND START WITH COST.

12:01PM  3    A.   OKAY.

12:01PM  4    Q.   AROUND THIS TIME, WERE YOU PLANNING TO PAY DIRECTLY FOR

12:01PM  5    THIS BLOOD TEST IN 2015?

12:02PM  6    A.   YES, BECAUSE I WAS UNINSURED.

12:02PM  7    Q.   AND IS THAT WHAT, IN FACT, ENDED UP HAPPENING?  DID YOU

12:02PM  8    GET A TEST FROM THERANOS THAT YOU PAID FOR OUT OF POCKET?

12:02PM  9    A.   YES.

12:02PM  10   Q.   AND WHAT WAS IT ABOUT THE COST CONCERNS THAT MADE THERANOS

12:02PM  11   ATTRACTIVE TO YOU?

12:02PM  12   A.   FROM EVERYTHING I HAD SEEN LOCALLY IN ARIZONA, THE

12:02PM  13   FEEDBACK WAS THAT IT WAS -- IF YOU'RE PAYING OUT OF POCKET, OR

12:02PM  14   IF MAYBE YOU'RE NOT, THAT IT WAS JUST MORE AFFORDABLE.

12:02PM  15   Q.   YOU MENTIONED ACCURACY IN ADDITION TO COST IS SOMETHING

12:02PM  16   THAT WAS IMPORTANT TO YOU; IS THAT RIGHT?

12:02PM  17   A.   YES.  WELL, OF COURSE, YES.

12:02PM  18   Q.   WHY DO YOU SAY "OF COURSE"?  WHY WAS ACCURACY IMPORTANT TO

12:02PM  19   YOU IN SEEKING OUT A PLACE TO GET A BLOOD TEST?

12:02PM  20   A.   I THINK IT'S FAIR, I THINK IT'S FAIR TO ASSUME MOST PEOPLE

12:02PM  21   WANTING BLOOD WORK DONE ARE HOPING FOR ACCURATE RESULTS.

12:02PM  22   Q.   AND FROM YOUR PERSPECTIVE, SPECIFICALLY WAS ACCURACY THE

12:02PM  23   MOST IMPORTANT FACTOR FOR YOU IN DECIDING WHERE TO GET A BLOOD

12:02PM  24   TEST?

12:02PM  25   A.   I THINK THAT'S A DIFFICULT QUESTION TO ANSWER ACTUALLY,

TOMPKINS DIRECT BY MR. BOSTIC                                          5981

12:03PM  1    BECAUSE IF I HAD GONE ANYWHERE ELSE, I WOULD HAVE EXPECTED

12:03PM  2    ACCURATE RESULTS.

12:03PM  3    Q.   LET ME ASK A DIFFERENT QUESTION THEN.

12:03PM  4         WE TALKED ABOUT PRICE AND THE BENEFITS OF TESTS BEING

12:03PM  5    AFFORDABLE.

12:03PM  6         FROM YOUR PERSPECTIVE AS A PATIENT, IS THERE ANY VALUE IN

12:03PM  7    BLOOD TESTS THAT ARE AFFORDABLE BUT ARE NOT SUFFICIENTLY

12:03PM  8    ACCURATE OR RELIABLE?

12:03PM  9    A.   NO.

12:03PM  10   Q.   DO YOU REMEMBER ANYTHING ABOUT YOUR EXPERIENCE OF GETTING

12:03PM  11   BLOOD DRAWN FROM THERANOS?

12:03PM  12   A.   I REMEMBER EXPECTING A PIN PRICK AND GETTING A VENOUS

12:03PM  13   DRAW.

12:03PM  14   Q.   AND DO YOU REMEMBER WHERE THAT HAPPENED?

12:03PM  15   A.   I BELIEVE IT WAS IN A WALGREENS.

12:03PM  16   Q.   OKAY.  DO YOU REMEMBER WHETHER YOU ASKED ANYONE AT

12:03PM  17   THERANOS QUESTIONS ABOUT WHY YOU WERE HAVING THAT DRAW METHOD

12:03PM  18   INSTEAD OF WHAT YOU EXPECTED?

12:03PM  19   A.   I DON'T REMEMBER.  I THINK I DIDN'T ASK ANY QUESTIONS.  I

12:03PM  20   JUST SORT OF WENT WITH IT.

12:04PM  21        MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

12:04PM  22        THE COURT:  YES.

12:04PM  23        MR. BOSTIC:  (HANDING.)

12:04PM  24   Q.   MS. TOMPKINS, I'VE JUST HANDED YOU A BINDER WITH A COUPLE

12:04PM  25   OF DOCUMENTS IN IT.

12:04PM  1      THE DEFENSE HAS A COPY, AND I BELIEVE THE COURT HAS ONE

12:04PM  2    ALSO.

12:04PM  3          THE COURT:  YES.

12:04PM  4    BY MR. BOSTIC:

12:04PM  5    Q.   MS. TOMPKINS, IF I COULD ASK YOU TO TURN TO TAB 5483 IN

12:04PM  6    THE BINDER IN FRONT OF YOU.

12:04PM  7    A.   UH-HUH.

12:04PM  8    Q.   AND DO YOU RECOGNIZE WHAT IS AT 5483?

12:04PM  9    A.   UH-HUH.

12:04PM 10    Q.   IS THIS --

12:04PM 11          THE COURT:  IS THAT YES?

12:04PM 12          THE WITNESS:  YES.  YES, IT IS.

12:04PM 13    BY MR. BOSTIC:

12:04PM 14    Q.   THANK YOU, MS. TOMPKINS.

12:04PM 15      AND IS THIS A LAB REPORT FROM THERANOS TO YOU FROM MAY OF

12:04PM 16    2015?

12:04PM 17    A.   YES.  IT WAS SENT TO MY GENERAL PRACTITIONER, BUT IT IS

12:04PM 18    FOR ME.

12:04PM 19          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5483.

12:04PM 20      I'LL NOTE THAT EXTRANEOUS LAB RESULTS HAVE BEEN REDACTED

12:04PM 21    IN THE COPY THAT WE'RE OFFERING.

12:05PM 22          MR. COOPERSMITH:  NO OBJECTION TO THIS EXHIBIT,

12:05PM 23    YOUR HONOR.

12:05PM 24          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:05PM 25      (GOVERNMENT'S EXHIBIT 5483 WAS RECEIVED IN EVIDENCE.)

| | | |
|---|---|---|
| 12:05PM | 1 | BY MR. BOSTIC: |
| 12:05PM | 2 | Q.   SO IF WE CAN ZOOM IN FIRST ON THE TOP OF THE PAGE. |
| 12:05PM | 3 |      SO, MS. TOMPKINS, DO YOU SEE YOUR NAME APPEARING AT THE |
| 12:05PM | 4 | TOP THERE? |
| 12:05PM | 5 | A.   YES. |
| 12:05PM | 6 | Q.   AND OVER TO THE RIGHT, YOU SEE UNDER PHYSICIAN THERE'S A |
| 12:05PM | 7 | NAME, GERALD ASIN. |
| 12:05PM | 8 |      DO YOU SEE THAT? |
| 12:05PM | 9 | A.   YES. |
| 12:05PM | 10 | Q.   AND DO YOU RECOGNIZE THAT NAME? |
| 12:05PM | 11 | A.   YES. |
| 12:05PM | 12 | Q.   WHO WAS DR. ASIN? |
| 12:05PM | 13 | A.   HE WAS MY GENERAL PRACTITIONER DOCTOR AT THE TIME. |
| 12:05PM | 14 | Q.   AND WAS THIS TEST IN MAY OF 2015 ORDERED THROUGH HIM? |
| 12:05PM | 15 | A.   YES, IT WAS. |
| 12:05PM | 16 | Q.   AND YOU MENTIONED THAT THE RESULTS WERE SENT BACK TO HIM; |
| 12:05PM | 17 | IS THAT CORRECT? |
| 12:05PM | 18 | A.   CORRECT. |
| 12:05PM | 19 | Q.   AT THE TOP OF THIS PAGE, DO YOU SEE THAT THERE'S A FAX |
| 12:05PM | 20 | STAMP, OR A FAX STAMP LEGEND ACROSS THE TOP? |
| 12:05PM | 21 | A.   YES. |
| 12:05PM | 22 | Q.   WITH A DATE? |
| 12:05PM | 23 | A.   YES, I DO. |
| 12:05PM | 24 | Q.   SORRY.  WITH THE DATE INDICATING THAT IT WAS SENT ON |
| 12:06PM | 25 | MAY 11TH, 2015? |

TOMPKINS DIRECT BY MR. BOSTIC                                    5984

12:06PM   1        A.   YES, I DO.

12:06PM   2        Q.   AND DO YOU SEE NEXT TO THAT IS WRITTEN THERANOS FAX

12:06PM   3   SERVER?

12:06PM   4        A.   YES.

12:06PM   5        Q.   AND DO YOU SEE A LITTLE FURTHER DOWN ON THE RIGHT-HAND

12:06PM   6   SIDE OF THE PAGE THERE'S SOME CONTACT INFORMATION FOR THERANOS

12:06PM   7   LISTING A FAX NUMBER?

12:06PM   8        A.   YES, I DO.

12:06PM   9        Q.   AND DO YOU SEE THAT THAT FAX NUMBER BEGINS WITH A 650 AREA

12:06PM  10   CODE?

12:06PM  11        A.   YES, I DO.

12:06PM  12        Q.   LET'S GO DOWN AND LOOK AT THE RESULTS THEMSELVES, AND

12:06PM  13   SPECIFICALLY AT A SECTION THAT IS LABELLED SUMMARY OF ABNORMAL

12:06PM  14   RESULTS.

12:06PM  15             DO YOU SEE THAT?

12:06PM  16        A.   I DO, YES.

12:06PM  17        Q.   AND LISTED THERE AT THE VERY TOP IS A TEST NAME LABELED

12:06PM  18   HIV-1 PLUS 2 AB.

12:06PM  19             DO YOU SEE THAT?

12:06PM  20        A.   YES.

12:06PM  21        Q.   AND THE RESULT FOR THAT TEST IS LISTED AS REACTIVE.

12:06PM  22             DO YOU SEE THAT?

12:06PM  23        A.   YES, I DO.

12:06PM  24        Q.   AND THAT RESULT IS FLAGGED BECAUSE OF THE REACTIVE RETURN.

12:06PM  25             DO YOU SEE THAT?

TOMPKINS DIRECT BY MR. BOSTIC                              5985

12:06PM  1     A.   YES.

12:06PM  2     Q.   DO YOU REMEMBER RECEIVING THIS RESULT IN MAY OF 2015?

12:07PM  3     A.   YES.

12:07PM  4     Q.   AND WHAT WAS YOUR REACTION TO SEEING THIS REACTIVE RESULT

12:07PM  5     AT THAT TIME?  DID IT SURPRISE YOU?

12:07PM  6     A.   IT SURPRISED AND TERRIFIED ME.

12:07PM  7     Q.   BASED ON YOUR MEDICAL HISTORY UP UNTIL THAT POINT -- LET

12:07PM  8     ME ASK, HAD YOU EVER BEEN DIAGNOSED WITH HIV OR AIDS?

12:07PM  9     A.   NO.

12:07PM  10    Q.   HAVE YOU EVER BEEN DIAGNOSED WITH HIV OR AIDS?

12:07PM  11    A.   NO.

12:07PM  12    Q.   HAVE YOU EVER EXPERIENCED ANY SYMPTOMS ATTRIBUTED TO HIV

12:07PM  13    OR AIDS?

12:07PM  14    A.   NO.

12:07PM  15    Q.   HAVE YOU EVER RECEIVED TREATMENT FOR HIV OR AIDS?

12:07PM  16    A.   NO.

12:07PM  17    Q.   LET'S LOOK AT A LITTLE FURTHER DOWN, IT MIGHT BE ON THE

12:07PM  18    NEXT PAGE OF THIS EXHIBIT, AND IN THE MIDDLE OF THE PAGE YOU

12:07PM  19    SEE THERE'S A BREAKDOWN FOR A SERIES OF HIV TESTS THAT WERE RUN

12:07PM  20    ON YOUR SAMPLE?

12:07PM  21    A.   YES, I SEE THAT.

12:08PM  22    Q.   AND DO YOU SEE THAT THE TEST FOR HIV-1 PLUS 2 ANTIBODIES

12:08PM  23    HAS THAT REACTIVE LABEL NEXT TO IT?

12:08PM  24    A.   YES, I SEE THAT.

12:08PM  25    Q.   DO YOU SEE THAT THE OTHER TESTS FOR HIV-1 ANTIBODIES,

12:08PM 1    HIV-2 ANTIBODIES, AND HIV-1 RNA ARE ALL LISTED AS NON-REACTIVE

12:08PM 2    OR NOT DETECTED?

12:08PM 3    A.   YES, I SEE THAT.

12:08PM 4    Q.   THEN LET'S GO DOWN TO THE BOTTOM UNDER NOTES, THIS MIGHT

12:08PM 5    BE ON THE FOLLOWING PAGE, AND THERE'S A BOX UNDER HIV-1 RNA,

12:08PM 6    AND THEN UNDER THAT BOX DO YOU SEE THERE'S A SECTION CALLED LAB

12:08PM 7    NOTES?

12:08PM 8    A.   YES.

12:08PM 9    Q.   AND IT READS THERE, "HIV ANTIBODIES WERE NOT CONFIRMED AND

12:08PM 10   HIV-1 RNA WAS NOT DETECTED.  NO LABORATORY EVIDENCE OF HIV-1

12:08PM 11   INFECTION.  FOLLOW-UP TESTING FOR HIV-2 SHOULD BE PERFORMED IF

12:08PM 12   CLINICALLY INDICATED."

12:08PM 13        DO YOU SEE THAT?

12:09PM 14   A.   YES, I DO.

12:09PM 15   Q.   LET'S GO BACK TO THE FIRST PAGE, AND GO BACK TO THAT

12:09PM 16   REACTIVE RESULT FOR HIV-1 PLUS 2 ANTIBODIES?

12:09PM 17   A.   YES.

12:09PM 18   Q.   OKAY.  DO YOU SEE THAT ON THE SCREEN IN FRONT OF YOU?

12:09PM 19   A.   YES, I DO.

12:09PM 20   Q.   BASED ON YOUR KNOWLEDGE OF YOUR MEDICAL HISTORY, ARE YOU

12:09PM 21   AWARE OF ANY REASON WHY HIV ANTIBODIES WOULD BE PRESENT IN YOUR

12:09PM 22   BLOOD, OR WOULD HAVE BEEN IN MAY OF 2015?

12:09PM 23   A.   NO, I AM NOT.  AND I KNOW THAT PROBABLY SEEMS LIKE A

12:09PM 24   STRANGE RESPONSE, BUT I AM NOT.  I HAVE NO REASON TO THINK THAT

12:09PM 25   THEY WOULD BE IN MY BLOODSTREAM.

12:09PM  1    Q.   FOLLOWING THE RECEIPT OF THIS RESULT, WHAT ACTION DID YOU

12:09PM  2    TAKE, IF ANY?

12:09PM  3    A.   I FOLLOWED UP WITH -- WELL, I SPOKE TO MY DOCTOR FOR

12:09PM  4    AWHILE, AND THEN I FOLLOWED UP WITH THERANOS DIRECTLY, AND --

12:09PM  5    UH-HUH.

12:09PM  6    Q.   I'M SORRY.  YOU CAN FINISH YOUR ANSWER.  I DIDN'T MEAN TO

12:09PM  7    TALK OVER YOU.

12:09PM  8    A.   I DIDN'T MEAN TO TALK OVER YOU EITHER.

12:10PM  9         AND I SPOKE TO A CUSTOMER SERVICE AGENT TRYING TO GET SOME

12:10PM  10   MORE INFORMATION.

12:10PM  11   Q.   THAT CALL TO THERANOS, WHY DID YOU DECIDE TO MAKE THAT

12:10PM  12   CALL?

12:10PM  13   A.   BECAUSE I WAS CONFUSED AND FRIGHTENED AND WANTED TO SEE IF

12:10PM  14   THERE WAS SOME INFORMATION I COULD GET THAT WOULD EXPLAIN WHY

12:10PM  15   THIS INFORMATION WAS GIVEN TO ME, WHY THESE -- LIKE, HOW COULD

12:10PM  16   THIS CONSULT BE POSSIBLE?

12:10PM  17   Q.   AND DURING THAT CALL WITH THERANOS, DO YOU RECALL SPEAKING

12:10PM  18   TO A MEDICAL PROFESSIONAL AT ANY POINT?

12:10PM  19   A.   INITIALLY I HAD NO MEMORY OF SPEAKING TO ANYONE BESIDES

12:10PM  20   THE CUSTOMER SERVICE AGENT.

12:10PM  21        IN THE TRIAL WITH MS. HOLMES, HOWEVER, I WAS PRESENTED

12:10PM  22   WITH AN EXCHANGE OF --

12:10PM  23             MR. COOPERSMITH:  YOUR HONOR, OBJECTION.  IF WE

12:10PM  24   COULD JUST LIMIT THIS ANSWER.

12:10PM  25             THE COURT:  WHY DON'T YOU ASK ANOTHER QUESTION?

TOMPKINS DIRECT BY MR. BOSTIC                                      5988

12:10PM  1                    MR. BOSTIC:  SURE.

12:10PM  2                    THE WITNESS:  OKAY.

12:10PM  3        BY MR. BOSTIC:

12:10PM  4        Q.   SO, MS. TOMPKINS, IF I COULD JUST ASK YOU TO TESTIFY BASED

12:11PM  5        ON YOUR MEMORY SITTING HERE TODAY --

12:11PM  6        A.   RIGHT.

12:11PM  7        Q.   -- DO YOU HAVE A RECOLLECTION OF SPEAKING TO A MEDICAL

12:11PM  8        PROFESSIONAL AT THERANOS?  AND I'M NOT ASKING HOW YOU LEARNED

12:11PM  9        OR HOW YOU WERE REFRESHED.

12:11PM  10       A.   RIGHT.  I HAVE A RECOLLECTION OF SPEAKING TO A SECOND

12:11PM  11       PERSON.  I DO NOT KNOW THAT THAT SECOND PERSON WAS A MEDICAL

12:11PM  12       PROFESSIONAL.

12:11PM  13       Q.   LET ME ASK A MORE GENERAL QUESTION.

12:11PM  14            IN THE CONVERSATIONS THAT YOU HAD WITH EITHER OF THE, IT

12:11PM  15       SOUNDS LIKE, TWO PEOPLE THAT YOU SPOKE TO AT THERANOS --

12:11PM  16       A.   UH-HUH.

12:11PM  17       Q.   -- DURING THOSE CONVERSATIONS, DID YOU RECEIVE AN

12:11PM  18       EXPLANATION FOR OR A CORRECTION FOR YOUR LAB RESULTS THAT YOU

12:11PM  19       FOUND SATISFYING?

12:11PM  20       A.   NO.

12:11PM  21       Q.   WHAT DO YOU REMEMBER ABOUT THOSE CONVERSATIONS?

12:11PM  22       A.   I WAS VERY EMOTIONAL AT THE TIME, AND I REMEMBER WHEN I

12:11PM  23       HAD THE FIRST CONVERSATION WITH THE CUSTOMER SERVICE AGENT

12:12PM  24       ASKING HER, ASKING HER THINGS THAT SHOULD HAVE BEEN ASKED OF A

12:12PM  25       MEDICAL PROFESSIONAL, AND HER SAYING, MA'AM, I'M JUST A

12:12PM  1    CUSTOMER SERVICE AGENT, LET ME REMIND YOU OF THAT.  LIKE, THESE

12:12PM  2    ARE NOT THINGS THAT I CAN ANSWER FOR YOU, WHICH I UNDERSTAND.

12:12PM  3         BUT THE LITTLE I REMEMBER ABOUT THE SECOND PERSON WAS THAT

12:12PM  4    THERE WAS MENTION OF THE ALGORITHM AT SOME POINT, BUT IT DIDN'T

12:12PM  5    MAKE MUCH SENSE TO ME.  IT DIDN'T ANSWER MY QUESTIONS, IF THAT

12:12PM  6    MAKES SENSE.

12:12PM  7    Q.   AFTER YOU GOT THESE RESULTS BACK AND SPOKE TO THERANOS,

12:12PM  8    DID YOU TAKE ANY ADDITIONAL ACTIONS TO TRY TO CONFIRM THAT TEST

12:12PM  9    RESULT?

12:12PM  10   A.   WITH THERANOS?

12:12PM  11   Q.   OR WITH ANOTHER --

12:12PM  12   A.   FOLLOWUP?  YES, I WAS ABLE TO GET AN EXAMINATION ABOUT

12:12PM  13   THREE MONTHS LATER AT A WOMEN'S CLINIC.

12:12PM  14   Q.   AND DID THAT EXAMINATION INCLUDE A TEST FOR HIV?

12:13PM  15   A.   YES.

12:13PM  16   Q.   AND DO YOU RECALL WHAT THE RESULT WAS?

12:13PM  17   A.   NEGATIVE.

12:13PM  18   Q.   AND DO YOU TODAY STILL HAVE A COPY OF THOSE RESULTS?

12:13PM  19   A.   NO.  I WAS NOT ABLE TO TRACK THOSE DOWN.

12:13PM  20   Q.   I'LL ASK YOU TO TURN TO TAB 5484 IN YOUR BINDER, PLEASE.

12:13PM  21   A.   OKAY.

12:13PM  22   Q.   AND AT 5484, DO YOU SEE A LAB REPORT FOR A TEST THAT YOU

12:13PM  23   HAD DONE AROUND AUGUST 10TH OF 2021?

12:13PM  24   A.   YES.

12:13PM  25        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5484.

12:13PM   1            MR. COOPERSMITH:  NOTHING BEYOND WHAT WAS PREVIOUSLY

12:13PM   2   DISCUSSED BEFORE, YOUR HONOR.

12:13PM   3            THE COURT:  ALL RIGHT.  THANK YOU.

12:13PM   4        THIS IS ADMITTED AND MAY BE PUBLISHED.

12:13PM   5        (GOVERNMENT'S EXHIBIT 5484 WAS RECEIVED IN EVIDENCE.)

12:13PM   6   BY MR. BOSTIC:

12:13PM   7   Q.   SO, MS. TOMPKINS, DO YOU SEE THAT IT INDICATES AT THE TOP

12:13PM   8   THIS IS FROM CONTRA COSTA HEALTH SERVICES?

12:13PM   9   A.   YES.

12:13PM  10   Q.   WERE YOU RESIDING OR STAYING IN THE CONTRA COSTA AREA IN

12:14PM  11   AUGUST OF 2021?

12:14PM  12   A.   YES, I WAS.

12:14PM  13   Q.   AND DO YOU SEE YOUR NAME THERE AT THE TOP?

12:14PM  14   A.   YES.

12:14PM  15   Q.   AND THIS IS LABELED "HUMAN IMMUNODEFICIENCY VIRUS (HIV)

12:14PM  16   ANTIGEN/ANTIBODY TEST RESULTS."

12:14PM  17        DO YOU SEE THAT?

12:14PM  18   A.   YES.

12:14PM  19   Q.   AND LET'S LOOK AT THE RESULTS.  LET'S GO DOWN A LITTLE

12:14PM  20   BIT.

12:14PM  21        DO YOU SEE FROM YOUR TEST IN AUGUST OF 2021, THE RESULT

12:14PM  22   REPORTED BACK WAS NEGATIVE.

12:14PM  23        DO YOU SEE THAT?

12:14PM  24   A.   YES, I DO.

12:14PM  25   Q.   I TAKE IT YOU WERE NOT SURPRISED BY THIS RESULT?

TOMPKINS CROSS BY MR. COOPERSMITH                    5991

12:14PM  1     A.   NO, I WAS NOT.

12:14PM  2     Q.   NEXT TO THAT NEGATIVE CHECK IT READS, "EVIDENCE OF HIV

12:14PM  3     ANTIGEN OR ANTIBODY WERE NOT DETECTED."

12:14PM  4          DO YOU SEE THAT?

12:14PM  5     A.   YES.

12:14PM  6     Q.   FOLLOWING YOUR EXPERIENCE WITH THERANOS, DID YOU CONTINUE

12:14PM  7     TO USE THAT LAB FOR TESTING AT ANY POINT?

12:14PM  8     A.   THERANOS?

12:14PM  9     Q.   YES.

12:14PM  10    A.   NO.

12:15PM  11         MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

12:15PM  12         THE COURT:  YES.

12:15PM  13         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:15PM  14         MR. BOSTIC:  NOTHING FURTHER.  THANK YOU.

12:15PM  15         THE COURT:  CROSS-EXAMINATION?

12:15PM  16              **CROSS-EXAMINATION**

12:15PM  17    BY MR. COOPERSMITH:

12:15PM  18    Q.   GOOD AFTERNOON, MS. TOMPKINS.

12:15PM  19    A.   GOOD AFTERNOON, SIR.

12:15PM  20    Q.   MY NAME IS JEFF COOPERSMITH, AND I REPRESENT MR. BALWANI

12:15PM  21    IN THIS CASE.

12:15PM  22         I'M GOING TO ASK YOU SOME QUESTIONS TO FOLLOW UP ON SOME

12:15PM  23    THINGS THAT MR. BOSTIC ASKED YOU ABOUT.  OKAY?

12:15PM  24    A.   UH-HUH, YES.

12:15PM  25    Q.   THANK YOU.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) CR-18-00258-EJD |
| PLAINTIFF, | ) |
| | ) SAN JOSE, CALIFORNIA |
| VS. | ) |
| | ) JUNE 21, 2022 |
| RAMESH "SUNNY" BALWANI, | ) |
| | ) VOLUME 38 |
| DEFENDANT. | ) |
| _____ | ) PAGES 6929 - 7156 |


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

              (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                       IRENE L. RODRIGUEZ, CSR, RMR, CRR
                       CERTIFICATE NUMBER 8074
                       LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595

          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER

CLOSING ARGUMENT BY MR. SCHENK                                    6934

09:16AM   1        MR. BALWANI AT THAT TIME KNEW THAT THERANOS WAS NOT

09:16AM   2   GENERATING AND WOULD NOT GENERATE ANY MEANINGFUL REVENUE BY

09:16AM   3   BEING HONEST WITH PEOPLE.  SO HE CHOSE A DIFFERENT PATH.

09:16AM   4        MR. BALWANI KNEW THAT THERE WERE TWO SOURCES OF POSSIBLE

09:16AM   5   REVENUE FOR THERANOS AND, TOGETHER WITH ELIZABETH HOLMES, THEY

09:17AM   6   CAME UP WITH TWO SCHEMES, TWO PLANS TO DEFRAUD THESE GROUPS OF

09:17AM   7   INDIVIDUALS.  THEY DECIDED TO DEFRAUD INVESTORS IN THERANOS,

09:17AM   8   AND THEY DECIDED TO DEFRAUD PATIENTS.

09:17AM   9        AND IT'S BECAUSE OF THOSE DECISIONS, IT'S BECAUSE OF THOSE

09:17AM  10   CHOICES THAT SUNNY BALWANI MADE THAT WE'VE BEEN TOGETHER SINCE

09:17AM  11   MARCH.

09:17AM  12        YOU KNOW, BECAUSE YOU'VE SEEN THE EVIDENCE, THAT THERANOS

09:17AM  13   WOULD NOT HAVE GENERATED REVENUE FROM EITHER OF THOSE GROUPS,

09:17AM  14   INVESTORS OR PATIENTS, IF IT WAS HONEST.

09:17AM  15        LET'S IMAGINE FOR A MOMENT WHAT HONEST PITCHES FROM

09:17AM  16   THERANOS, FROM MR. BALWANI, FIRST TO INVESTORS WOULD HAVE

09:17AM  17   SOUNDED LIKE.

09:17AM  18        IF MR. BALWANI WAS HONEST WITH INVESTORS, YOU KNOW THAT HE

09:18AM  19   WOULD HAVE TOLD THEM THAT THERANOS'S TECHNOLOGY WAS NOT

09:18AM  20   VALIDATED BY LARGE PHARMACEUTICAL COMPANIES; THAT THERANOS'S

09:18AM  21   TECHNOLOGY HAD NOT BEEN DEPLOYED BY THE MILITARY IN THE

09:18AM  22   BATTLEFIELD; THAT THERANOS DID NOT HAVE A HEALTHY AND EXPANDING

09:18AM  23   RELATIONSHIP WITH WALGREENS; THAT THERANOS DID NOT HAVE

09:18AM  24   MEANINGFUL REVENUE; THAT THERANOS'S TECHNOLOGY COULD NOT

09:18AM  25   GENERATE ACCURATE AND RELIABLE BLOOD TEST RESULTS.

CLOSING ARGUMENT BY MR. SCHENK                                    6939

09:24AM   1          DR. PANDORI TALKED TO YOU ABOUT HIS CONCERNS WHEN HE

09:24AM   2   WORKED AT THERANOS AND ABOUT RAISING THOSE CONCERNS REGARDING

09:24AM   3   THE ACCURACY AND RELIABILITY OF BLOOD TESTING.

09:24AM   4          YOU MAY RECALL THAT DR. PANDORI QUIT.  MANY THERANOS

09:24AM   5   EMPLOYEES QUIT.  ERIKA CHEUNG DID.  DR. PANDORI DID.

09:24AM   6   DR. ROSENDORFF DID.

09:24AM   7          AND WHEN DR. PANDORI QUIT, HE TOLD YOU HE PREPARED A

09:24AM   8   TRANSITION MEMO, A MEMO SO THAT THOSE WHO INHERITED HIS JOB

09:24AM   9   RESPONSIBILITIES COULD PICK UP ON THE WORK THAT HE HAD DONE,

09:24AM  10   AND THERE WAS AN ARGUMENT OR A DEBATE THROUGH WITNESS

09:24AM  11   QUESTIONING THAT OCCURRED HERE IN THE COURTROOM ABOUT THE

09:24AM  12   CONTENT OF THAT TRANSITION MEMO.

09:24AM  13          AND THROUGH QUESTIONING, THE DEFENSE WAS ELICITING THIS

09:24AM  14   POINT FROM DR. PANDORI, THAT IN HIS TRANSITION MEMO HE DIDN'T

09:25AM  15   WRITE HIS CONCERNS.  HE DIDN'T WRITE DOWN IN THE TRANSITION

09:25AM  16   MEMO THAT HE THOUGHT THAT THERE WERE PROBLEMS WITH THERANOS'S

09:25AM  17   TESTING DEVICE CALLED THE EDISON.

09:25AM  18          AND I WANT TO REMIND YOU WHAT DR. PANDORI SAID ABOUT THAT

09:25AM  19   POINT, WHY IT WAS MISSING FROM HIS TRANSITION MEMO.

09:25AM  20          WHAT HE TOLD YOU WAS THAT HE HAD RAISED THOSE CONCERNS.

09:25AM  21   HE RAISED THEM DIRECTLY TO MR. BALWANI.  THEY WERE NOT WELL

09:25AM  22   RECEIVED.  AND HE SAID TO PUT THOSE AGAIN IN THE TRANSITION

09:25AM  23   MEMO WAS AKIN TO HITTING YOUR HEAD AGAINST THE WALL.  THERE WAS

09:25AM  24   NO NEED TO WRITE SOMETHING IN THE MEMO SOMETHING THAT HE HAD

09:25AM  25   ALREADY RAISED DIRECTLY WITH THE PRESIDENT OF THE COMPANY AND

CLOSING ARGUMENT BY MR. SCHENK                                6950

09:41AM  1    THE CONTENT OF THESE STATEMENTS, LET ME JUST MAKE SURE I

09:41AM  2    UNDERSTAND YOUR WRITING STYLE VERSUS BALWANI'S SPEAKING STYLE

09:41AM  3    AND WHICH ONE IS BEING CAPTURED IN YOUR EMAIL, AND

09:42AM  4    MR. MENDENHALL CLARIFIED FOR YOU.

09:42AM  5         THE NEXT WITNESS WHO TESTIFIED WAS BRYAN TOLBERT.  YOU MAY

09:42AM  6    REMEMBER THAT MR. TOLBERT WORKED FOR THE HALL INVESTMENT GROUP,

09:42AM  7    ANOTHER INVESTOR.  AND MR. TOLBERT TOLD YOU THAT HE THINKS HE

09:42AM  8    MAY HAVE NEVER IN HIS LIFE SEEN MR. BALWANI.  HE DIDN'T SPEAK

09:42AM  9    TO HIM BEFORE INVESTING, HE DIDN'T COMMUNICATE WITH HIM BEFORE

09:42AM 10    INVESTING.  AND HE DID TALK TO ELIZABETH HOLMES ON THE PHONE

09:42AM 11    DURING A CONFERENCE CALL.  AND HE DESCRIBED TO YOU SOME OF WHAT

09:42AM 12    HE LEARNED ON THAT CALL, AND WHAT I'VE HIGHLIGHTED HERE FOR YOU

09:42AM 13    ARE STATEMENTS ABOUT MILITARY WORK.

09:42AM 14         ELIZABETH HOLMES TOLD BRYAN TOLBERT THAT THE THERANOS

09:42AM 15    DEVICE HAD BEEN DEPLOYED BY THE MILITARY AND WAS BEING USED IN

09:42AM 16    THE TREATMENT OF SOLDIERS.

09:42AM 17         LATER WE'LL COVER THIS IDEA HOW MR. BALWANI CAN BE

09:42AM 18    RESPONSIBLE FOR AN INVESTMENT BY SOMEONE HE NEVER SPOKE TO.  I

09:42AM 19    GET THAT THAT'S A QUESTION, AND WE'RE GOING TO COVER THAT

09:43AM 20    DIRECTLY.  BUT FOR NOW, I WANT TO REMIND YOU OF THIS MILITARY

09:43AM 21    TESTIMONY, INVESTORS LIKE MR. TOLBERT HEARD FALSE STATEMENTS

09:43AM 22    ABOUT WHAT THERANOS HAD DONE WITH THE DOD, AND MR. TOLBERT

09:43AM 23    HEARD THAT ON A PHONE CALL WITH ELIZABETH HOLMES.

09:43AM 24         THE NEXT WITNESS WHO TESTIFIED WAS DR. WEBER.  AS I

09:43AM 25    MENTIONED, DR. WEBER WORKED AT PFIZER.  SO DR. WEBER SORT OF

10:13AM 1    CONSPIRACY KNOWING OF AT LEAST ONE OF ITS OBJECTS AND INTENDING

10:13AM 2    TO HELP ACCOMPLISH IT.

10:13AM 3         SO LET'S BREAK THOSE OUT.  THE FIRST ELEMENT IS THAT THERE

10:14AM 4    WAS AN AGREEMENT.

10:14AM 5         FIRST, WHAT WAS THE AGREEMENT AS TO INVESTORS?  WELL, IT

10:14AM 6    WAS TO MAKE FALSE STATEMENTS TO INVESTORS IN ORDER TO GET

10:14AM 7    MONEY; IT'S THE AGREEMENT TO COMMIT WIRE FRAUD, IT'S NOT THE

10:14AM 8    ACTUAL COMMISSION OF WIRE FRAUD.  THE MONEY THAT COMES BACK

10:14AM 9    FROM INVESTORS IS THE SUBSTANTIVE WIRE FRAUD COUNTS WHEN HALL

10:14AM 10   WIRES MONEY TO THERANOS OR TOLBERT OR EISENMAN, THAT'S THE

10:14AM 11   SUBSTANTIVE WIRE FRAUD COUNTS.

10:14AM 12        THE CONSPIRACY IS THE AGREEMENT TO COMMIT A CRIME, WIRE

10:14AM 13   FRAUD, AND HOLMES AND BALWANI AGREED TO DEFRAUD INVESTORS BY

10:14AM 14   FALSE STATEMENTS, AND THEY EACH HAD DIFFERENT ROLES IN THE

10:14AM 15   CONSPIRACY.

10:14AM 16        MS. HOLMES'S ROLE IN THE INVESTOR CONSPIRACY WAS TO

10:14AM 17   RECRUIT INVESTORS.  SHE COMMUNICATED FALSE STATEMENTS DIRECTLY

10:14AM 18   TO INVESTORS LIKE TOLBERT.  YOU HEARD THE TOLBERT PHONE CALL

10:14AM 19   WHEN HOLMES BRAGS ABOUT DOD OR MILITARY WORK THAT THERANOS DID.

10:14AM 20   THAT'S HOLMES FULFILLING HER ROLE IN THE CONSPIRACY.

10:15AM 21        MR. BALWANI ALSO HAD A ROLE IN THE INVESTOR CONSPIRACY.

10:15AM 22   THE FIRST THING HE DID WAS RUN THE LAB, THE CLIA LAB, BECAUSE

10:15AM 23   HAVING A CLIA LAB WAS VERY USEFUL IN RECRUITING INVESTORS.

10:15AM 24        YOU HEARD THAT INVESTORS THOUGHT THAT WAS PROOF THAT THE

10:15AM 25   TECHNOLOGY WORKED.  SO WHEN THEY'RE INVESTING IN THERANOS, THEY

CLOSING ARGUMENT BY MR. SCHENK                                        7026

12:30PM  1        IF THIS WAS AN HONEST COMPANY, IF THIS WAS A COMPANY THAT

12:30PM  2   WASN'T DOING WHAT THE GOVERNMENT IS ALLEGING THAT THEY DO AND

12:30PM  3   THEY DID, THIS KIND OF EMAIL WOULDN'T HAVE BEEN SENT.  THERE

12:30PM  4   WOULD HAVE BEEN SUCH A LACK OF COMFORT IN SENDING THIS EMAIL TO

12:30PM  5   HOLMES, TO BALWANI IF SOMEONE LIKE CHRISTIAN HOLMES DIDN'T KNOW

12:30PM  6   IT WAS GOING TO BE WELL RECEIVED.

12:30PM  7        YOU KNOW, YOU WOULDN'T SEND THIS KIND OF EMAIL UNLESS YOU

12:30PM  8   KNEW MR. BALWANI WAS GOING TO BE OKAY WITH IT.

12:30PM  9        THE DEPARTMENT OF DEFENSE WAS ALSO A SOURCE OF FALSE

12:30PM  10  STATEMENTS.  YOU KNOW THAT INVESTORS THOUGHT THAT THERANOS WAS

12:31PM  11  TESTING, ITS TECHNOLOGY WAS BEING USED BY THE MILITARY ON

12:31PM  12  DEPLOYED SOLDIERS ON MEDEVAC HELICOPTERS IN THE TREATMENT OF

12:31PM  13  SOLDIERS IN THE BATTLEFIELD.  AND LOOK AT SOME OF THE

12:31PM  14  STATEMENTS THAT WERE COMMUNICATED TO THE DEPARTMENT OF DEFENSE

12:31PM  15  AS PART OF THAT RELATIONSHIP.

12:31PM  16       THIS ONE YOU HEARD WENT TO SPECIAL OPERATIONS COMMAND.

12:31PM  17       "THERANOS HAS CREATED A POINT-OF-SERVICE LABORATORY

12:31PM  18  INFRASTRUCTURE THAT GENERATES REAL-TIME DATA FROM A FINGERSTICK

12:31PM  19  OF BLOOD OR OTHER MICRO-VOLUMES OF DIFFERENT SAMPLE TYPES

12:31PM  20  DELIVERING HIGHER QUALITY DATA THAN PREVIOUSLY POSSIBLE."

12:31PM  21       SO THAT WAS COMMUNICATED TO THE DOD.

12:31PM  22       AND THE FIRST BULLET, "EACH THERANOS DEVICE CAN RUN EVERY

12:31PM  23  TEST CURRENTLY AVAILABLE THROUGH THE TRADITIONAL CENTRALIZED OR

12:31PM  24  HOSPITAL LABORATORY INFRASTRUCTURE IT."

12:31PM  25       YOU KNOW THAT BULLET IS A FALSE STATEMENT.  YOU KNOW THAT

CLOSING ARGUMENT BY MR. SCHENK                                    7027

12:31PM   1    EACH THERANOS DEVICE COULD NOT RUN EACH TEST, THAT'S WHY THEY

12:31PM   2    USED THIRD PARTY DEVICES AND MODIFIED THIRD PARTY DEVICES.

12:32PM   3         SO, AGAIN, THE KINDS OF FALSE STATEMENTS THAT THE

12:32PM   4    DEPARTMENT OF DEFENSE ARE THE SAME KINDS OF FALSE STATEMENTS

12:32PM   5    THAT INVESTORS HEARD.  IT'S NO ACCIDENT THAT THEY WERE ABLE TO

12:32PM   6    GET THE DEPARTMENT OF DEFENSE TO ENGAGE IN SOME RELATIONSHIPS.

12:32PM   7    YOU'VE HEARD ABOUT THE AMERICAN BURN ASSOCIATION, FOR INSTANCE,

12:32PM   8    TO ENGAGE IN SOME BUSINESS RELATIONSHIP WITH THERANOS, BUT THEN

12:32PM   9    WHEN THERANOS, WHEN HOLMES AND BALWANI COMMUNICATED WITH

12:32PM  10    INVESTORS ABOUT THAT BUSINESS RELATIONSHIP, THEY MADE FALSE

12:32PM  11    STATEMENTS ABOUT IT.

12:32PM  12         INSTEAD OF THE VERY LIMITED WORK THAT THEY DID WITH THE

12:32PM  13    DEPARTMENT OF DEFENSE, THEY TOLD INVESTORS THAT THE TECHNOLOGY

12:32PM  14    WAS SAVING LIVES, THAT IT WAS DEPLOYED ON MEDEVAC HELICOPTERS

12:32PM  15    AND ON THE BATTLEFIELD.

12:32PM  16         EDLIN TOLD YOU ABOUT THE REALITY OF THE RELATIONSHIP,

12:32PM  17    WHAT, IN FACT, THERANOS DID WITH THE MILITARY, AND HE EXPLAINED

12:32PM  18    HOW THE TECHNOLOGY WAS NOT BEING USED TO CLINICALLY TREAT

12:33PM  19    DEPLOYED SOLDIERS, HOW THE DEVICES WERE NOT IN A WAR ZONE FOR

12:33PM  20    CLINICAL USE OR ON THE BATTLEFIELD, HOW IT DIDN'T SEND DEVICES

12:33PM  21    INTO THE MIDDLE EAST, SOMETHING THAT INVESTORS HEARD, AND IT

12:33PM  22    WAS NEVER ON A MEDEVAC HELICOPTER OR DIFFERENT MILITARY

12:33PM  23    HELICOPTER.

12:33PM  24         SO EDLIN PROVIDED THE OTHER SIDE OF THE STORY.  YOU HEARD

12:33PM  25    FROM INVESTORS WHAT THEY HEARD, WHAT THEY UNDERSTOOD, BUT EDLIN

CLOSING ARGUMENT BY MR. SCHENK                                    7028

12:33PM   1    TOLD YOU WHAT THE REALITY WAS.

12:33PM   2         AND HERE ARE THE INVESTORS THAT HEARD FALSE STATEMENTS

12:33PM   3    ABOUT THE MILITARY:  TOLBERT, LUCAS, PETERSON, AND GROSSMAN ALL

12:33PM   4    HEARD ONE FORM -- ONE VERSION OR ANOTHER OF THIS STORY THAT

12:33PM   5    THERANOS TECHNOLOGY WAS DEPLOYED ACTUALLY TREATING SOLDIERS IN

12:33PM   6    THE BATTLEFIELD, SOMETIMES ON MEDEVAC HELICOPTERS.

12:33PM   7         YOU HEARD THE THERANOS-WALGREENS BUSINESS RELATIONSHIP.

12:33PM   8    WALGREENS WAS EXPECTING THAT THE TEST WOULD BE DONE RAPIDLY ON

12:33PM   9    A FINGERSTICK AND HOW WHAT WAS COMMUNICATED TO WALGREENS WAS

12:34PM  10    UNTRUE, AND, THEREFORE, MR. BALWANI DID NOT NEED TO WAIT FOR

12:34PM  11    WALGREENS TO DISCOVER THAT IT WAS A FRAUD TO KNOW THAT 900

12:34PM  12    STORES WAS UNREASONABLE, BECAUSE THESE STATEMENTS, WHAT WAS

12:34PM  13    COMMUNICATED TO WALGREENS WAS NOT TRUE.

12:34PM  14         SO WALGREENS WAS TOLD IN THE DOCUMENT ON THE LEFT THAT

12:34PM  15    THERANOS HAD THE ABILITY TO RUN BLOOD TESTS FROM A FINGERSTICK

12:34PM  16    IN LESS THAN AN HOUR AT WALGREENS PHARMACIES, AND JHAVERI TOLD

12:34PM  17    YOU IN 2013 WHEN HE WAS OPERATIONALIZING THE RELATIONSHIP, THAT

12:34PM  18    WAS CONSISTENT WITH HIS UNDERSTANDING, THAT'S WHAT HE THOUGHT

12:34PM  19    THERANOS COULD DO.

12:34PM  20         AND YOU SEE IN THE SERVICES AGREEMENT, THE DOCUMENT

12:34PM  21    ITSELF, THAT THE TWO COMPANIES SIGNED, THE PHRASE "DEVICE" WAS

12:34PM  22    DEFINED, AND JHAVERI TOLD YOU THIS ALSO WAS CONSISTENT WITH HIS

12:34PM  23    UNDERSTANDING OF WHAT THE THERANOS TECHNOLOGY WAS, THAT IT WAS

12:34PM  24    THE THERANOS ANALYZER, THE PATIENT INTERFACE AND SAMPLE

12:34PM  25    COLLECTION TOOLS, NOT SOME THIRD PARTY DEVICES AND NOT SOME

01:14PM  1    COMFORTABLE AFTER THERANOS HAD HALTED TESTING OF PSA ON THE

01:14PM  2    EDISON DEVICE.

01:15PM  3        ALL OF THIS, ALL OF THE BLOOD TESTING THAT THERANOS WAS

01:15PM  4    DOING FOR PATIENTS WAS WHILE HOLMES AND BALWANI WERE TEXTING

01:15PM  5    ABOUT SOMETHING DIFFERENT, ABOUT KNOWLEDGE THAT THERE WERE

01:15PM  6    PROBLEMS IN THE LAB, THAT THE NORMANDY LAB WAS A DISASTER, THAT

01:15PM  7    THEY NEED TO STOP FIGHTING FIRES BY NOT CREATING THEM IN THE

01:15PM  8    LAB, BY NEEDING NEW LAB DIRECTORS AND MANAGERS, BY IDENTIFYING

01:15PM  9    THE ROOT CAUSES OF THEIR PROBLEMS.

01:15PM 10        IN THEIR TEXT MESSAGES, THEY'RE TALKING ABOUT THE PROBLEMS

01:15PM 11    WITH BLOOD TESTING WHILE AT THE SAME TIME THEY'RE ALLOWING THE

01:15PM 12    BRITTANY GOULDS, THE DR. ELLSWORTHS, THE OTHER PATIENTS THAT

01:15PM 13    YOU HAVE HEARD FROM COME IN AND GET BLOOD TESTS AT THERANOS.

01:15PM 14        THEY ARE ALSO, AND IN THIS INSTANCE YOU SEE MR. BALWANI,

01:15PM 15    HE'S RECEIVING CUSTOMER COMPLAINT LOGS.  WHEN CUSTOMERS ARE

01:15PM 16    CALLING THERANOS TO COMPLAIN ABOUT ISSUES WITH TESTING, THEY

01:15PM 17    GET PUT INTO A DOCUMENT, AND YOU'VE SEEN THESE DOCUMENTS AND

01:16PM 18    EMAILS TO MR. BALWANI.  SO HE'S SEEING IN REAL TIME PROBLEMS

01:16PM 19    WITH PSA TESTING OR HCG TESTING, OTHER PROBLEMS.

01:16PM 20        BUT HE'S NOT JUST SEEING IT IN THE TEXT MESSAGES, HE'S NOT

01:16PM 21    JUST SEEING IT IN CUSTOMER COMPLAINT LOGS, HIS OWN EMPLOYEES

01:16PM 22    ARE GOING TO HIM LIKE ERIKA CHEUNG AND DR. PANDORI, AND THEY'RE

01:16PM 23    BOTH DIRECTLY CONFRONTING SUNNY BALWANI AND SAYING THAT THEY

01:16PM 24    HAVE CONCERNS ABOUT THE ACCURACY OF THERANOS'S BLOOD TESTING

01:16PM 25    TECHNOLOGY.

CLOSING ARGUMENT BY MR. SCHENK                                     7055

01:16PM   1          AND YOU SEE HERE ERIKA CHEUNG SAYING SHE DISCUSSED THESE

01:16PM   2    POOR QUALITY CONTROL RESULTS WITH MR. BALWANI, AND DR. PANDORI

01:16PM   3    IS SAYING THAT HE ALSO COMMUNICATED DIRECTLY WITH MR. BALWANI

01:16PM   4    ABOUT IN THIS INSTANCE STOPPING TO USE THE EDISON DEVICE.

01:16PM   5          MR. BALWANI TOLD HIM THAT WOULD NEVER HAPPEN.

01:16PM   6          THOSE WERE THE ONLY EMPLOYEES, THOUGH, THAT WARNED ABOUT

01:17PM   7    PROBLEMS IN THE LAB.  THIS EMPLOYEE YOUR HEARD SOME TESTIMONY

01:17PM   8    ABOUT TYLER SHULTZ ALSO SENT AN EMAIL, AND YOU SAW THAT EMAIL

01:17PM   9    GET FORWARDED TO SUNNY BALWANI.  SO IT ISN'T JUST THE WITNESSES

01:17PM   10   THAT YOU HAVE HEARD FROM.  YOU'VE SEEN OTHER EMAILS WHERE

01:17PM   11   MR. BALWANI IS TOLD THAT OTHER EMPLOYEES ALSO HAVE CONCERNS

01:17PM   12   ABOUT THERANOS'S BLOOD TESTING.

01:17PM   13         EVEN BEFORE THE LAUNCH, EVEN BEFORE SEPTEMBER OF 2013 WHEN

01:17PM   14   THERANOS BEGAN OFFERING TESTING IN WALGREENS STORES,

01:17PM   15   DR. ROSENDORFF WROTE AN EMAIL CALLED CONCERNS ABOUT THE LAUNCH.

01:17PM   16   DR. ROSENDORFF IN THE EMAIL IDENTIFIED SPECIFIC ASSAYS THAT HE

01:17PM   17   WAS WORRIED ABOUT.

01:17PM   18         SO EVEN BEFORE THEY LAUNCHED WITH WALGREENS, EVEN BEFORE

01:17PM   19   THEY BEGAN TESTING A PATIENT'S BLOOD, MR. BALWANI IS SENT THIS

01:17PM   20   EMAIL THAT DR. ROSENDORFF WROTE WARNING ABOUT PROBLEMS WITH THE

01:17PM   21   LAUNCH.  WHAT HAPPENED WITH PATIENTS WASN'T A SURPRISE.  IT WAS

01:17PM   22   EXPECTED.

01:17PM   23         THERE WERE -- THE WAY THERANOS SOLVED THE PROBLEMS WAS TO

01:18PM   24   CONDUCT THESE AFTER-THE-STUDY, AFTER-THE-FACT STUDIES.  SO

01:18PM   25   THERANOS WOULD TRY TO FIGURE OUT WHAT SOME OF ITS PROBLEMS

01:24PM 1   SOMETIMES THEY WRITE SEVERAL ASSAYS IN ONE EMAIL AND WARN

01:24PM 2   MR. BALWANI ABOUT THESE PROBLEMS.

01:24PM 3       THE SECOND ELEMENT FOR THE PATIENT COUNTS IS THIS SAME

01:24PM 4   CONCEPT OF MATERIALITY, THAT IS, THE FALSE STATEMENTS THAT THE

01:24PM 5   PATIENT HEARD NEEDED TO MATTER, NEEDED TO BE THE KIND OF FALSE

01:24PM 6   STATEMENTS THAT WOULD CAUSE A PATIENT TO SPEND MONEY ON THE

01:24PM 7   BLOOD TESTING, AND HERE EACH OF THE PATIENTS TOLD YOU BOTH THE

01:24PM 8   SOURCE WHERE THEY GOT STATEMENTS ABOUT THERANOS AND THEN WHAT

01:24PM 9   THOSE STATEMENTS WERE.

01:24PM 10      SO BRITTANY GOULD TOLD YOU SHE SAW PATIENT BROCHURES; AND

01:24PM 11  MR. BINGHAM TOLD YOU HE SAW STATEMENTS ON THE THERANOS WEBSITE;

01:24PM 12  MAGAZINE ARTICLES WERE REVIEWED BOTH BY TOMPKINS AND BINGHAM;

01:25PM 13  AND THEN TOMPKINS ALSO TOLD YOU SHE THOUGHT SHE REMEMBERS

01:25PM 14  SEEING OR HEARING A COMMERCIAL FOR THERANOS.

01:25PM 15      AND THE SPECIFIC REPRESENTATIONS THAT MATTERED TO THE

01:25PM 16  PATIENT, AS IT'S PROBABLY NOT A SURPRISE, ARE THE ONES THAT

01:25PM 17  RELATE TO ACCURACY.

01:25PM 18      SO BRITTANY GOULD TALKED ABOUT HOW SHE SAW AND EXPECTED --

01:25PM 19  SHE SAW STATEMENTS ABOUT ACCURACY, AND SHE EXPECTED HER BLOOD

01:25PM 20  TESTS TO BE ACCURATE.

01:25PM 21      SAME WITH DR. ELLSWORTH.  HE SAW STATEMENTS ABOUT ACCURACY

01:25PM 22  AND EXPECTED HIS BLOOD TESTS TO GENERATE ACCURATE RESULTS.

01:25PM 23      SAME FOR TOMPKINS, ACCURACY.  SHE TOLD YOU WHAT HER

01:25PM 24  EXPECTATIONS WERE.

01:25PM 25      SAME FOR BINGHAM.  HE ALSO SAW STATEMENTS ABOUT ACCURACY,

CLOSING ARGUMENT BY MR. SCHENK                                    7084

02:00PM  1    EXERCISED, SO HE LEFT MONEY ON THE TABLE, STOCK THAT HE NEVER

02:00PM  2    SOLD.

02:00PM  3         HE ALSO WANTS YOU TO THINK THAT HE WASN'T HIGH ENOUGH IN

02:00PM  4    THE ORG CHART TO HAVE MEANINGFUL COMMUNICATIONS WITH THIRD

02:00PM  5    PARTIES LIKE INVESTORS AND PATIENTS.  THAT WAS THE CEO.  THAT

02:00PM  6    WAS ELIZABETH HOLMES.

02:00PM  7         BUT HE WASN'T LOW ENOUGH IN THE ORG CHART TO KNOW WHAT WAS

02:00PM  8    HAPPENING INSIDE OF THE CLIA LAB.  THAT WAS THE LAB DIRECTOR'S

02:00PM  9    RESPONSIBILITY.  BUT YOU KNOW THE EVIDENCE.  YOU KNOW THAT

02:00PM 10    ISN'T TRUE.

02:00PM 11         YOU KNOW THAT PEOPLE LIKE ERIKA CHEUNG WHO WENT DIRECTLY

02:00PM 12    TO MR. BALWANI AND EXPRESSED CONCERNS ABOUT THERANOS'S BLOOD

02:00PM 13    TESTING WERE MET FROM STATEMENTS FROM MR. BALWANI THAT WERE

02:00PM 14    TOLD NOT FROM THE PERSPECTIVE OF SOMEONE WHO IS A VICTIM, NOT

02:00PM 15    FROM THE PERSPECTIVE OF SOMEONE WHO IS SURPRISED AT WHAT HE WAS

02:01PM 16    HEARING.

02:01PM 17         WHAT HE TELLS ERIKA CHEUNG IS THAT HE QUESTIONS HER

02:01PM 18    EXPERIENCE, AND HE'S SICK OF PEOPLE WHO DON'T HAVE ENOUGH

02:01PM 19    EXPERIENCE QUESTIONING THERANOS'S BLOOD TESTING.  AND HE TELLS

02:01PM 20    HER THAT SHE HAS ONE JOB AT THERANOS, AND THAT IS TO PROCESS

02:01PM 21    PATIENT SAMPLES AND NOT ASK ANY QUESTIONS.

02:01PM 22         IT'S NOT ONLY ERIKA CHEUNG, THOUGH.

02:01PM 23         DR. ROSENDORFF, WHEN DR. ROSENDORFF SEES PROBLEMS AT

02:01PM 24    THERANOS, HE BRINGS THEM DIRECTLY TO HOLMES AND BALWANI.  IN

02:01PM 25    THIS INSTANCE, WHEN HE'S SAYING WE'RE GOING TO MISS CRITICAL

02:01PM 1    VALUES FOR THIS GROUP OF ASSAYS CALLED ISE'S, WHEN WE'RE

02:01PM 2    MISSING CRITICAL VALUES, HE'S ASKING HOLMES AND BALWANI IF

02:01PM 3    THEY'RE COMFORTABLE WITH THAT.

02:01PM 4        AND WHAT DOES MR. BALWANI RESPOND?

02:01PM 5        "WE NEED TO RESPOND TO HIM NOW AND CUT HIM MONDAY."

02:01PM 6        MR. BALWANI IS NOT A VICTIM.  HE'S A PERPETRATOR OF THE

02:01PM 7    FRAUD BECAUSE MR. BALWANI KNOWS THAT THE BIGGEST THREAT TO

02:01PM 8    FRAUD IS THE TRUTH.

02:01PM 9        YOU'VE HEARD THIS DESCRIBED IN OTHER CONTEXTS AS THE

02:01PM 10   DISINFECTING POWER OF SUNLIGHT.  WHEN YOU HAVE INTERNAL

02:02PM 11   EMPLOYEES LIKE CHEUNG, LIKE ROSENDORFF WHO COME FORWARD AND

02:02PM 12   COMMUNICATE DIRECTLY WITH MR. BALWANI AND SAY OUR TESTING IS

02:02PM 13   INACCURATE AND WE'RE GOING TO MISS VALUES WE'RE SHARING WITH

02:02PM 14   PATIENTS, THEY DON'T GET CONFRONTED WITH SURPRISE.

02:02PM 15       MR. BALWANI ISN'T RECEIVING BREAKING NEWS FROM THEM.  HE'S

02:02PM 16   RECEIVING THREATS TO THE CONTINUATION OF THE FRAUD, AND THAT'S

02:02PM 17   WHY HE HAS TO SAY THINGS LIKE, "WE SHOULD CUT HIM MONDAY," WHEN

02:02PM 18   REFERRING TO ROSENDORFF.

02:02PM 19       AND FINALLY DR. PANDORI.  HE ALSO HAD CONCERNS WITH

02:02PM 20   TESTING AT THERANOS.  SO WHAT DID HE DO?  HE WENT DIRECTLY TO

02:02PM 21   BALWANI AND SAID THEY SHOULD STOP ALL TESTING ON THE EDISON

02:02PM 22   DEVICES.

02:02PM 23       IF THIS WAS NEWS TO MR. BALWANI, HOW DO YOU THINK HE WOULD

02:02PM 24   REACT?  AND COMPARE THAT TO HOW HE ACTUALLY DID REACT?

02:02PM 25       REMEMBER THIS STORY, DR. PANDORI TOLD YOU THAT WHEN HE

02:02PM   1    TOLD MR. BALWANI THAT THEY SHOULD STOP ALL TESTING ON THE

02:03PM   2    EDISON DEVICES, MR. BALWANI WENT AND GRABBED TWO COMPLETELY

02:03PM   3    UNRELATED INDIVIDUALS, TWO PROJECT MANAGERS, AND THEN WENT, THE

02:03PM   4    THREE OF THEM, TO DR. PANDORI'S OFFICE, AND IN DR. PANDORI'S

02:03PM   5    WORDS, "HE LET ME HAVE IT."

02:03PM   6         AGAIN, MR. BALWANI WASN'T SURPRISED BY THE INFORMATION

02:03PM   7    THAT HE WAS HEARING FROM ERIKA CHEUNG, OR ROSENDORFF OR

02:03PM   8    PANDORI.  HE KNEW ALL OF THESE THINGS.

02:03PM   9         WHAT HE WAS BOTHERED BY, WHAT HE DID WORRY ABOUT WAS THIS

02:03PM  10    KIND OF INFORMATION OR THIS TRUTH GETTING OUT WAS THE BIGGEST

02:03PM  11    THREAT TO THE FRAUD.

02:03PM  12         AND THE ONE THING MR. BALWANI DIDN'T EXPECT WAS THAT HE

02:03PM  13    WOULD BE BEFORE YOU, OR A JURY LIKE YOU, ONE DAY WHERE YOU

02:03PM  14    WOULD HAVE THE ABILITY TO SEE HIS EMAILS, TO READ HIS TEXT

02:03PM  15    MESSAGES, TO PUT THE FULL STORY TOGETHER.

02:03PM  16         AND BECAUSE YOU'VE SEEN THAT NOW, BECAUSE YOU KNOW THE

02:03PM  17    EVIDENCE, YOU KNOW THERE IS ONE AND ONLY VERDICT THAT IS

02:03PM  18    SUPPORTED BY THE EVIDENCE AND THAT IS GUILTY ON ALL COUNTS.

02:03PM  19         THANK YOU.

02:03PM  20         THANK YOU, YOUR HONOR.

02:03PM  21              THE COURT:  THANK YOU, MR. SCHENK.

02:04PM  22         WILL THE DEFENSE HAVE A CLOSING ARGUMENT?

02:04PM  23              MR. COOPERSMITH:  YES, YOUR HONOR.

02:04PM  24              THE COURT:  WHY DON'T WE TAKE 15 MINUTES.  WE'LL

02:04PM  25    TAKE A 15 MINUTE BREAK, LADIES AND GENTLEMEN, AND THEN WE'LL

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

         UNITED STATES OF AMERICA,           )
6                                            )  CR-18-00258-EJD
                        PLAINTIFF,           )
7                                            )  SAN JOSE, CALIFORNIA
                   VS.                       )
8                                            )  JUNE 24, 2022
         RAMESH "SUNNY" BALWANI,             )
9                                            )  VOLUME 41
                        DEFENDANT.           )
10       _____     )  PAGES 7557 - 7733

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                                JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:  ROBERT S. LEACH
                                  KELLY VOLKAR
19                           1301 CLAY STREET, SUITE 340S
                             OAKLAND, CALIFORNIA 94612
20
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
      OFFICIAL COURT REPORTER:
22                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                               CERTIFICATE NUMBER 8074
23

24         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER
25

09:24AM  1        IF YOU HAD BEEN LEARNING ABOUT THE COMPANY FROM THEM WHEN

09:24AM  2   THEY WERE RUNNING THE COMPANY, YOU WOULD HAVE HEARD A VERY

09:24AM  3   DIFFERENT PICTURE OF THINGS.

09:24AM  4        YOU WOULD HAVE HEARD THAT THIS WAS A COMPANY THAT HAD

09:24AM  5   DEVELOPED A TECHNOLOGY THAT COULD RUN THE FULL RANGE OF BLOOD

09:25AM  6   TESTS FROM A SINGLE DROP OF BLOOD FROM A FINGERTIP;

09:25AM  7        YOU WOULD HAVE HEARD THAT THE COMPANY'S TECHNOLOGY COULD

09:25AM  8   RUN MANY, MANY TESTS ALL AT ONCE FROM THAT TINY SINGLE SAMPLE;

09:25AM  9        THEY WOULD HAVE TOLD YOU THAT THE COMPANY'S ANALYZER WAS

09:25AM 10   FAR SMALLER THAN THE COMMERCIAL ANALYZERS THAT HAD PREVIOUSLY

09:25AM 11   USED, AND THAT IT COULD BE USED ALMOST ANYWHERE.

09:25AM 12        THEY WOULD HAVE TOLD YOU THAT THE SPEED AND ACCURACY OF

09:25AM 13   THEIR TECHNOLOGY WAS SUPERIOR TO WHAT ELSE WAS OUT THERE IN THE

09:25AM 14   INDUSTRY;

09:25AM 15        YOU WOULD HAVE HEARD FROM THEM THAT THE COMPANY'S

09:25AM 16   TECHNOLOGY HAD BEEN COMPREHENSIVELY VALIDATED BY MULTIPLE

09:25AM 17   PHARMACEUTICAL COMPANIES, INCLUDING GIANTS LIKE PFIZER AND

09:25AM 18   SCHERING-PLOUGH;

09:25AM 19        THEY WOULD HAVE TOLD YOU THAT THE WORLD'S MOST POWERFUL

09:25AM 20   AND WELL-EQUIPPED MILITARY HAD EVEN STARTED USING THE COMPANY'S

09:25AM 21   TECHNOLOGY, AND THAT THE TECHNOLOGY WAS BEING USED ON THE

09:25AM 22   BATTLEFIELD, AND THAT IT WAS ACTUALLY SAVING THE LIVES OF

09:25AM 23   SOLDIERS FIGHTING FOR THIS COUNTRY;

09:25AM 24        YOU WOULD HAVE HEARD THAT THE COMPANY GENERATED

09:25AM 25   SIGNIFICANT REVENUES EARLY ON, AND THAT IT WAS POISED TO GO

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7576

09:27AM  1        AND NOTICE IT SAYS, "IN REACHING YOUR VERDICT, YOU MAY

09:27AM  2   CONSIDER ONLY THE TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE.

09:27AM  3   THE FOLLOWING THINGS ARE NOT EVIDENCE."

09:27AM  4        NUMBER 1 IS "QUESTIONS, STATEMENTS, OBJECTIONS, AND

09:27AM  5   ARGUMENTS BY THE LAWYERS, THOSE ARE NOT EVIDENCE."

09:27AM  6        IT ALSO SAYS, "WHAT THE LAWYERS HAVE SAID IN THEIR OPENING

09:27AM  7   STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED

09:27AM  8   TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE."

09:27AM  9        SO THIS GOES FOR WHAT I SAY AS WELL.  IT CERTAINLY GOES

09:27AM 10   FOR WHAT YOU HEARD IN THE DEFENSE CLOSING.  THAT WAS NOT

09:27AM 11   EVIDENCE.  WHAT THE WITNESSES SAID WAS EVIDENCE.

09:27AM 12        THE LAWYER'S JOB HERE IS TO POINT OUT THE SIGNIFICANT

09:28AM 13   EVIDENCE TO YOU AND EXPLAIN HOW IT FITS INTO THE LARGER

09:28AM 14   PICTURE, NOT TO SUBSTITUTE THEIR VERSION OF THINGS FOR THE

09:28AM 15   WITNESSES WHO ARE ACTUALLY TESTIFYING BASED ON THEIR KNOWLEDGE.

09:28AM 16        SO WHAT DOES THE ACTUAL EVIDENCE SHOW IN THIS CASE?

09:28AM 17        WELL, ONE THING YOU SAW PLENTY OF, WAS EVIDENCE OF VERY

09:28AM 18   SERIOUS PROBLEMS WITH THE ACCURACY AND RELIABILITY OF

09:28AM 19   THERANOS'S TESTING.

09:28AM 20        THE SIMPLEST EVIDENCE ON THIS TOPIC WAS TESTIMONY FROM AT

09:28AM 21   LEAST THREE INDIVIDUALS WHO WORKED WITHIN THERANOS WORKING IN

09:28AM 22   THE LAB.  THAT WAS, OF COURSE, ERIKA CHEUNG AND THEN

09:28AM 23   DRS.  MARK PANDORI AND ADAM ROSENDORFF.  THROUGH THEIR ROLES,

09:28AM 24   THEY HAD FIRST HAND KNOWLEDGE AND FIRST HAND EXPERIENCE WITH

09:28AM 25   THE THERANOS TESTING, AND THEY SAW THE SERIOUS PROBLEMS THAT

09:51AM  1    THAT THERANOS DEVICES FAILED QUALITY CONTROL MORE THAN THREE

09:51AM  2    TIMES AS OFTEN AS THE UNMODIFIED COMMERCIAL DEVICES.

09:51AM  3         WHAT DOES THIS MEAN, THOUGH?  DO FAILURES IN QUALITY

09:51AM  4    CONTROL ACTUALLY TRANSLATE TO PROBLEMS WITH PATIENT TEST

09:52AM  5    ACCURACY?  AND THERE SEEMS TO BE SOME DISPUTE ON THIS POINT,

09:52AM  6    BUT NOT ACCORDING TO WHAT THE WITNESSES SAID, NOT ACCORDING TO

09:52AM  7    THE ACTUAL EVIDENCE.

09:52AM  8         DR. ROSENDORFF WAS ASKED WERE QUALITY CONTROL FAILURE

09:52AM  9    RATES LIKE THESE CONCERNING TO YOU?

09:52AM 10         HE SAID YES.

09:52AM 11         HE EXPLAINED IF QUALITY CONTROL IS FAILING HALF OF THE

09:52AM 12    TIME, OR 50 PERCENT OF THE TIME, IT INDICATES THAT THE PATIENT

09:52AM 13    RESULT WOULD BE INACCURATE HALF OF THE TIME.

09:52AM 14         DURING HIS CLOSING MR. COOPERSMITH CALLED THIS IDEA

09:52AM 15    "BIZARRE" I THINK WAS THE WORD THAT HE USED, AND HE SAID THERE

09:52AM 16    IS NO LOGIC TO IT.

09:52AM 17         AND I WILL REMIND YOU IT IS UP TO YOU TO WEIGH WITNESS

09:52AM 18    CREDIBILITY, BUT I'D URGE YOU TO BE CAUTIOUS WHEN A LAWYER ASKS

09:52AM 19    YOU TO ACCEPT HIS JUDGMENT ON A TECHNICAL SPECIALIZED ISSUE AND

09:52AM 20    TO ACCEPT THAT JUDGMENT OVER THE TESTIMONY OF A WITNESS WHO

09:52AM 21    DOES THIS FOR A LIVING WHO IS A MEDICAL DOCTOR, WHO IS A

09:52AM 22    CLINICAL PATHOLOGIST AND A LAB DIRECTOR.

09:53AM 23         I'LL ALSO REMIND YOU THAT DR. ROSENDORFF WAS NOT THE ONLY

09:53AM 24    ONE WHO SAID THIS.  LET'S LOOK AT ONE MORE QUOTE FROM HIM.

09:53AM 25         HE WAS ASKED ABOUT WHETHER THE PRACTICE OF NOT USING A

| | | |
|---|---|---|
| 10:09AM | 1 | HAPPENING, BECAUSE OF THE OTHER RELIABILITY ISSUES WITH THE |
| 10:09AM | 2 | PRODUCT. |
| 10:09AM | 3 | AND WHEN YOU THINK ABOUT THE INACCURATE RESULTS, THEY |
| 10:10AM | 4 | SERVE REALLY ONLY AS CONFIRMATION THAT BECAUSE THE INGREDIENTS |
| 10:10AM | 5 | GOING INTO THIS TESTING PROCESS WERE FLAWED, THAT WAS THE |
| 10:10AM | 6 | UNAVOIDABLE RESULT.  SO YOU SHOULD NOT BE SURPRISED THAT |
| 10:10AM | 7 | INACCURATE RESULTS RESULTED FROM THIS RECIPE BECAUSE WHAT WAS |
| 10:10AM | 8 | GOING IN WAS A SERIOUSLY FLAWED TESTING METHOD AND PLATFORM. |
| 10:10AM | 9 | THERE WERE OTHER PROBLEMS WITH THERANOS'S TECHNOLOGY |
| 10:10AM | 10 | BESIDES POOR ACCURACY.  AND THE EVIDENCE SHOWED THAT THAT |
| 10:10AM | 11 | RELATED TO THINGS LIKE THE LOW SPEED WITH WHICH THE DEVICE |
| 10:10AM | 12 | COULD ACTUALLY PROCESS A SAMPLE AND THE LOW THROUGHPUT, THE |
| 10:10AM | 13 | FACT THAT, IN ONE WITNESS'S WORDS, THE EDISON DEVICE COULD ONLY |
| 10:10AM | 14 | RUN ONE TEST PER HOUR IF YOU WERE LUCKY, WHEREAS A COMPETING |
| 10:10AM | 15 | DEVICE LIKE THE ADVIA 1800 COULD RUN A THOUSAND. |
| 10:11AM | 16 | YOU ALSO HEARD THAT USING THE THERANOS METHOD, INCLUDING |
| 10:11AM | 17 | ON THE EDISON, REQUIRED OTHER STEPS.  IT WASN'T A ONE STEP |
| 10:11AM | 18 | PROCESS.  FOR EXAMPLE, IT REQUIRES DILUTION OF THE SAMPLE ON A |
| 10:11AM | 19 | LARGE DEVICE CALLED A TECAN.  YOU SHOULD THINK ABOUT HOW THAT |
| 10:11AM | 20 | NEED AFFECTS THE TRUTH OF CLAIMS THAT THE MILITARY WAS GOING TO |
| 10:11AM | 21 | USE THIS ON THE BATTLEFIELD, OR THAT IT COULD BE USED IN A |
| 10:11AM | 22 | HELICOPTER. |
| 10:11AM | 23 | WHAT USE IS A SMALL PORTABLE DEVICE IF IT HAS TO BE USED |
| 10:11AM | 24 | IN GROUPS OF THREE, IF IT HAS TO BE USED ALONG WITH A MUCH |
| 10:11AM | 25 | LARGER DEVICE THAT DILUTES THE SAMPLE BEFOREHAND?  WAS THIS |

10:16AM 1    TO REMEMBER THAT THESE THINGS THAT WE'VE BEEN TALKING ABOUT,

10:16AM 2    THE THINGS THAT YOU NOW KNOW ABOUT THERANOS, WERE NEVER

10:16AM 3    DISCLOSED TO INVESTORS.  THE IMAGES, THE PICTURES THAT THEY HAD

10:16AM 4    IN THEIR MINDS ABOUT WHAT THE EDISON COULD DO DIFFERED GREATLY

10:16AM 5    FROM THE REALITY.

10:16AM 6        SO ALL OF THE LIMITATIONS ON THE DEVICE, THE THINGS THAT

10:16AM 7    IT COULD NOT DO, THAT INFORMATION WOULD HAVE BEEN SO VALUABLE

10:16AM 8    TO THOSE INVESTORS, WOULDN'T IT HAVE, IN MAKING THEIR DECISION

10:17AM 9    ON WHETHER TO WRITE LARGE CHECKS TO THE COMPANY?  SHOULDN'T

10:17AM 10   THEY HAVE KNOWN WHAT THE DEVICE COULD NOT DO CONTRARY TO THE

10:17AM 11   CLAIMS THAT MR. BALWANI WAS MAKING?

10:17AM 12       YOU'VE ALSO HEARD EVIDENCE THAT MR. BALWANI AND MS. HOLMES

10:17AM 13   MISREPRESENTED TO INVESTORS THE NATURE OF THERANOS'S DEALING

10:17AM 14   WITH THE MILITARY.  AND YOU HEARD THAT PEOPLE WERE LEFT WITH

10:17AM 15   THE IMPRESSION BECAUSE THEY WERE TOLD THAT THE THERANOS DEVICES

10:17AM 16   WERE BEING USED CLINICALLY BY THE MILITARY, AND YOU KNOW THAT'S

10:17AM 17   NOT THE CASE.

10:17AM 18       LET'S JUST GO QUICKLY THROUGH THE FOUR CONTACTS THAT

10:17AM 19   THERANOS HAD WITH THE MILITARY.  WHEN IT CAME TO THE BURN

10:17AM 20   STUDY, EXHIBIT 7694 WILL SHOW YOU A FEW THINGS.  FIRST, THAT

10:17AM 21   WAS NOT EXCLUSIVE TO THE MILITARY, THAT THE INDIVIDUALS BEING

10:17AM 22   TREATED WERE AT A VARIETY OF FACILITIES, INCLUDING MANY

10:17AM 23   CIVILIAN HOSPITALS; IT WILL SHOW YOU THAT ALL OF THE LOCATIONS

10:18AM 24   WERE IN THE U.S., SO NONE OF THIS WAS HAPPENING ON THE

10:18AM 25   BATTLEFIELD OR IN COMBAT LOCATIONS; YOU WILL SEE FROM THAT

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7608

10:18AM  1    EXHIBIT THAT THE TEST RESULTS WERE NOT USED TO ACTUALLY MAKE

10:18AM  2    TREATMENT DECISIONS FOR THE PEOPLE INVOLVED IN THE STUDY.  SO

10:18AM  3    THIS WASN'T CLINICAL USE OF THE THERANOS TESTING.  YOU WILL

10:18AM  4    ALSO SEE THAT THAT INCLUDED NO EVALUATION OF THE ACCURACY OF

10:18AM  5    THE THERANOS SYSTEM.  THAT WASN'T THE POINT OF THIS.

10:18AM  6         THE POINT OF THIS TEST WAS TO TEST AN EXPERIMENTAL

10:18AM  7    TREATMENT NOT DEVELOPED BY THERANOS, NOT TO SEE WHETHER OR NOT

10:18AM  8    THE THERANOS DEVICE COULD RETURN A RELIABLE RESULT.

10:18AM  9         WHEN IT CAME TO SPECIAL OPERATIONS, YOU HEARD FROM

10:18AM  10   MR. EDLIN THAT THREE DEVICES WERE SENT TO KENTUCKY, BUT THEY

10:18AM  11   WERE NOT USED FOR TESTING.  SO THAT NEVER WENT ANYWHERE.

10:18AM  12        WHEN IT CAME TO AFRICOM, YOU HEARD AGAIN FROM MR. EDLIN

10:18AM  13   THAT NO CLINICAL TESTING WAS DONE.  IN THIS CASE THE POINT WAS

10:18AM  14   TO SEE WHETHER THE DEVICE COULD SURVIVE A TRIP THROUGH HARSH

10:19AM  15   CONDITIONS, NOT WHETHER IT COULD ACTUALLY RUN TESTS AND RETURN

10:19AM  16   RELIABLE RESULTS.

10:19AM  17        SO YOU SAW IN THE EVIDENCE THAT THAT WOULD HAVE BEEN THE

10:19AM  18   NEXT STEP WHEN IT CAME TO AFRICOM'S WORK WITH THE DEVICE, BUT

10:19AM  19   THEY NEVER GOT THERE.

10:19AM  20        YOU SAW EMAILS TALKING ABOUT THE POSSIBILITY OF RUNNING

10:19AM  21   ACTUAL CLINICAL SAMPLES AND GETTING CLINICAL RESULTS AT SOME

10:19AM  22   POINT IN THE FUTURE.  THAT NEVER CAME TO BE.

10:19AM  23        THERE'S ALSO AN EMAIL IN CONNECTION WITH AFRICOM THAT

10:19AM  24   DISCUSSES THE DEVICE BEING TRANSPORTED ON WHAT THE MILITARY

10:19AM  25   CALLS AN UNPRESSURIZED AIRCRAFT.

REBUTTAL ARGUMENT BY MR. BOSTIC                                     7609

10:19AM  1          OVER THE COURSE OF THE DEFENSE'S CLOSING, THAT MORPHED

10:19AM  2  INTO THE DEVICE BEING TESTED ON AN AIRCRAFT.  THAT'S NOT WHAT

10:19AM  3  THE EVIDENCE SHOWS.  LET'S JUST BE CLEAR ABOUT THAT.

10:19AM  4          THE DEVICE TOOK A RIDE ON AN AIRPLANE.  AT NO POINT IS

10:19AM  5  THERE ANY EVIDENCE THAT IT WAS INSTALLED ON A HELICOPTER, USED

10:20AM  6  FOR TESTING ON A MEDEVAC HELICOPTER, OR ANYTHING LIKE WHAT THE

10:20AM  7  DEFENDANTS WERE TELLING INVESTORS WHAT WAS HAPPENING.

10:20AM  8          WHEN IT COMES TO CENTCOM OR CENTRAL COMMAND, THIS WOULD

10:20AM  9  HAVE BEEN THE COMPONENT OF THE MILITARY THAT COULD HAVE USED

10:20AM 10  THE DEVICE FOR TREATMENT OF SOLDIERS IN THE MIDDLE EAST WHERE

10:20AM 11  THERE WAS ACTIVE ENGAGEMENTS OCCURRING.

10:20AM 12          YOU KNOW, THOUGH, THAT WHAT WAS GOING TO HAPPEN HERE WAS A

10:20AM 13  LIMITED OBJECTIVE EXPERIMENT WHERE THE DEVICE WOULD BE

10:20AM 14  EVALUATED TO SEE IF POSSIBLY AT SOME POINT IN THE FUTURE IT

10:20AM 15  COULD BE USED TO TREAT SOLDIERS.

10:20AM 16          NOT ONLY DID THERANOS NEVER PASS THAT KIND OF EVALUATION,

10:20AM 17  THE EVALUATION NEVER EVEN HAPPENED.  NO DEVICE WAS EVER SENT

10:20AM 18  OVERSEAS, AND THIS LIMITED OBJECTIVE EXPERIMENT NEVER GOT OFF

10:20AM 19  THE GROUND.

10:20AM 20          SO MULTIPLE STEPS AWAY FROM BEING AT THE POINT WHERE THE

10:20AM 21  DEFENDANTS WERE SAYING IT WAS.

10:21AM 22          IN CONNECTION WITH THAT ENGAGEMENT OR THAT CONTACT WITH

10:21AM 23  THE MILITARY, YOU SAW EVIDENCE THAT MR. BALWANI WAS PERSONALLY

10:21AM 24  INVOLVED, THAT HE WAS WORKING SPECIFICALLY ON I.T. ISSUES.

10:21AM 25  THAT TELLS YOU SOMETHING.  IT TELLS YOU THAT HE WAS AWARE OF

```
10:21AM   1    WHERE THINGS STOOD WITH THESE MILITARY CONTRACTS.  SO YOU

10:21AM   2    SHOULDN'T HAVE ANY DOUBT THAT MR. BALWANI KNEW WHEN HE WAS IN

10:21AM   3    ROOMS WITH INVESTORS AND THEY WERE BEING TOLD THAT THE

10:21AM   4    COMPANY'S DEVICE WAS BEING USED ACTIVELY BY THE MILITARY.  HE

10:21AM   5    KNEW THAT WAS FALSE.  HE WAS UNDER NO FALSE IMPRESSION THAT

10:21AM   6    THIS PROGRAM WAS FURTHER ALONG THAN IT ACTUALLY WAS.

10:21AM   7         NOW, IN ITS CLOSING THE DEFENSE ARGUED THAT THESE

10:21AM   8    MISREPRESENTATIONS ABOUT THE MILITARY SHOULD BE CHALKED UP TO

10:21AM   9    SOME KIND OF MISUNDERSTANDING, AND MR. COOPERSMITH COMPARED

10:22AM  10    THIS TO A GAME OF TELEPHONE.  DO YOU REMEMBER THAT?

10:22AM  11         THIS IS NOTHING LIKE THAT.  IN THE GAME OF TELEPHONE, I'M

10:22AM  12    SURE YOU KNOW, ONE PERSON WHISPERS SOMETHING TO THE NEXT PERSON

10:22AM  13    WHO WILL THEN WHISPER IT TO THE NEXT, AND THEN A FEW LAYERS

10:22AM  14    LATER, YOU CHECK AND SEE WHETHER THE ORIGINAL MESSAGE WAS

10:22AM  15    PRESERVED, AND WHAT YOU END UP LEARNING IS THAT WHEN

10:22AM  16    INFORMATION IS PASSED THROUGH MULTIPLE PEOPLE, WHEN YOU GET

10:22AM  17    SOMETHING THIRD OR FOURTH HAND, YOU SOMETIMES CAN'T RELY ON

10:22AM  18    BELIEVING THAT THAT'S WHAT THE ORIGINAL PERSON ACTUALLY SAID.

10:22AM  19         HERE WE HAVE THE OPPOSITE SITUATION.  HERE WE HAVE

10:22AM  20    MULTIPLE PEOPLE WHO ALL HEARD THE SAME THING FROM THE SAME

10:22AM  21    SOURCE, THAT SOURCE BEING ELIZABETH HOLMES AND MR. BALWANI IN

10:22AM  22    MEETINGS THAT THEY HAD.

10:22AM  23         AND YOU'LL SEE HERE THAT AS EXAMPLES, THESE FOUR INVESTORS

10:22AM  24    ALL TESTIFIED ABOUT VERY SIMILAR THINGS THAT THEY HEARD FROM

10:22AM  25    THESE SAME DEFENDANTS.
```

10:22AM 1    SO INSTEAD OF BEING A SITUATION WHERE THE TRUTH GETS

10:22AM 2    DISTORTED BY PEOPLE ACTING IN GOOD FAITH BUT MAKING MISTAKES AS

10:23AM 3    INFORMATION IS PASSED ALONG, WE HAVE FOUR PEOPLE WHO ARE ALL

10:23AM 4    DELIBERATELY DECEIVED BY THE SAME PERSON AND BECAUSE THEY ALL

10:23AM 5    SAY CONSISTENTLY THE SAME THING, YOU CAN HAVE CONFIDENCE THAT

10:23AM 6    YOU'RE HEARING FROM THEM WHAT THEY HEARD FROM THE DEFENDANT.

10:23AM 7    ON OTHER TOPICS, YOU ALSO HEARD THAT THE COMPANY HAD NO

10:23AM 8    REVENUE FROM PHARMACEUTICAL COMPANIES AFTER 2011 DESPITE SOME

10:23AM 9    FRIENDLY EMAILS THAT PEOPLE AT THERANOS HAD WITH PEOPLE AT

10:23AM 10   THOSE PHARMACEUTICAL COMPANIES.  NOTHING ACTUALLY DEVELOPED OF

10:23AM 11   THAT.  AND YOU CAN CONFIRM THAT IN EXHIBIT 7753, WHICH ARE THE

10:23AM 12   THERANOS FINANCIAL RECORDS THAT SHOW A LACK OF ANY REVENUE FROM

10:23AM 13   PHARMA AFTER THE YEAR 2011.

10:23AM 14   SO THINK ABOUT THAT IN TERMS OF WHAT THE DEFENDANTS WERE

10:23AM 15   TELLING PEOPLE IN LATE 2013 ABOUT WHAT THEY WERE DOING WITH

10:23AM 16   PHARMA, WHAT WAS GOING TO HAPPEN WITH PHARMA, WHAT REVENUE THEY

10:24AM 17   WERE GOING TO GET.  WHEN THEY WERE SAYING THOSE THINGS, THEY

10:24AM 18   KNEW THAT THE COMPANY HAD NOT GENERATED ANY REVENUE FROM THAT

10:24AM 19   KIND OF BUSINESS FOR THE LAST COUPLE OF YEARS.

10:24AM 20   YOU KNOW THAT THE DEPARTMENT OF DEFENSE GAVE THEM NO

10:24AM 21   REVENUE EXCEPT FOR SOME MINIMAL MONEY FROM THE BURN STUDY.  AND

10:24AM 22   YOU KNOW THAT THE COMPANY HAD LIMITED REVENUE OVERALL AND WAS

10:24AM 23   IN DESPERATE NEED FOR CASH TO STAY AFLOAT IN 2013.

10:24AM 24   YOU ALSO KNOW THAT PFIZER AND SCHERING-PLOUGH DID NOT

10:24AM 25   ACTUALLY VALIDATE THE TECHNOLOGY AS THE DEFENDANTS CLAIM.

10:32AM   1    OUT SOON.  THIS WAS A LONG TERM PLAN.

10:32AM   2         AGAIN, IT WAS SUCCESSFUL FOR YEARS UNTIL IT WASN'T.

10:32AM   3         DURING THE TIME THAT MR. BALWANI WORKED AT THERANOS, YOU

10:32AM   4    SAW EVIDENCE THAT HE PUT EFFORT INTO ADDRESSING PROBLEMS AT THE

10:32AM   5    COMPANY.  SO HOW SHOULD YOU THINK ABOUT THAT?

10:32AM   6         WELL, THE GOVERNMENT IS NOT ASKING YOU TO BELIEVE THAT

10:32AM   7    MR. BALWANI DIDN'T WANT THE THERANOS TESTS TO WORK.  THAT'S

10:32AM   8    IMPORTANT TO UNDERSTAND.

10:33AM   9         HE AND MS. HOLMES WANTED THE TESTS TO WORK, AND MANY

10:33AM  10    PEOPLE AT THE COMPANY TRIED TO MAKE THAT HAPPEN.  AND OF COURSE

10:33AM  11    HE DID.

10:33AM  12         MR. BALWANI WOULD HAVE PREFERRED TO LIVE IN A WORLD WHERE

10:33AM  13    HE DIDN'T HAVE TO LIE ABOUT THE THINGS THAT HE WAS LYING ABOUT.

10:33AM  14    HE WOULD HAVE PREFERRED TO LIVE IN A WORLD WHERE THERANOS

10:33AM  15    TECHNOLOGY COULD DO WHAT HE SAID IT COULD DO.  THAT WORLD WOULD

10:33AM  16    HAVE BEEN BETTER.

10:33AM  17         IF THERANOS HAD ACTUALLY HAD THOSE CONTRACTS WITH THE

10:33AM  18    MILITARY, AND THE MILITARY WAS USING THE DEVICES THE WAY HE

10:33AM  19    SAID, THEN HE WOULDN'T HAVE HAD TO LIE ABOUT THAT.

10:33AM  20         IF THE COMPANY HAD BEEN GENERATING THE SIGNIFICANT

10:33AM  21    REVENUES THAT HE HAD CLAIMED, IF THE COMPANY WAS REALLY ON

10:33AM  22    TRACK TO GENERATE EVEN MORE, THAT WOULD HAVE BEEN A BETTER

10:33AM  23    WORLD FOR HIM.

10:33AM  24         SO OF COURSE ACTUAL SUCCESS WOULD HAVE BEEN BETTER THAN

10:33AM  25    FALSE SUCCESS, AND MR. BALWANI WAS PUTTING EFFORT INTO TRYING

12:33PM 1      INDIVIDUAL RESULTS IN THE LIS LABORATORY SYSTEM AND DETERMINE

12:33PM 2      WHETHER THEY'RE ACCURATE OR NOT.

12:33PM 3          SO FAR THE DEFENSE SAYS WE NEED THIS INFORMATION, AND THEY

12:33PM 4      TALK ABOUT THE ABILITY TO RUN SOME KIND OF STATISTICAL

12:33PM 5      ANALYSIS.  THEY SPEAK ABOUT THAT IN PRETTY VAGUE TERMS.  IT'S

12:33PM 6      UNCLEAR EXACTLY WHAT KIND OF ANALYSIS THEY THINK WOULD BE

12:33PM 7      POSSIBLE, BUT THIS IS ALL HYPOTHETICAL.  AND AGAIN, IT'S

12:33PM 8      CONTRARY TO TESTIMONY FROM THE ACTUAL EXPERTS WHO KNOW ABOUT

12:33PM 9      HOW TO EVALUATE THE ACCURACY OF THE LAB TEST RESULT.

12:33PM 10         SO THE LABORATORY INFORMATION SYSTEM IS CERTAINLY A

12:33PM 11     QUESTION MARK BECAUSE WE DON'T HAVE IT.  LIKELY, THOUGH, IT

12:34PM 12     WOULD STILL BE A QUESTION MARK IF WE DID, IS BECAUSE IT'S

12:34PM 13     UNCLEAR HOW, IF AT ALL, WE WOULD BE ABLE TO USE THAT AND

12:34PM 14     DETERMINE THE OVERALL ACCURACY OR INACCURACY RATE AT THERANOS.

12:34PM 15         TO THE EXTENT THAT THAT DATABASE WOULD SHED MORE LIGHT ON

12:34PM 16     THERANOS TEST ACCURACY, THOUGH, IS THERE ANY REASON FOR YOU TO

12:34PM 17     BELIEVE THAT IT WOULD MAKE THERANOS LOOK BETTER?

12:34PM 18         THINK ABOUT ALL OF THE PROBLEMS THAT YOU'VE SEEN IN

12:34PM 19     INTERNAL CORRESPONDENCE, RECORDS OF THE COMPANY, THINK ABOUT

12:34PM 20     THINGS THAT WITNESSES HAVE TOLD YOU, WITNESSES WHO ACTUALLY

12:34PM 21     WORKED WITH THIS TECHNOLOGY AND SAW THE RESULTS THAT IT

12:34PM 22     PRODUCED, THINK ABOUT THE CMS FINDINGS BASED ON A HOLISTIC LOOK

12:34PM 23     AT THE THERANOS LAB, THINK ABOUT HOW SARAH BENNETT CALLED THE

12:34PM 24     PROBLEMS THAT SHE SAW AT THE THERANOS LAB SYSTEMIC.

12:34PM 25         CMS ALSO NOTED THAT THERANOS ADMITTED FOLLOWING THE CMS

REBUTTAL ARGUMENT BY MR. BOSTIC                              7681

12:50PM   1    PAYMENT WAS GOING TO PAY FOR.  AND YOU'LL SEE AS RELEVANT TO

12:50PM   2    THE SCHEME TO DEFRAUD HERE THAT CONTENT EMPHASIZES THERANOS'S

12:50PM   3    FINGERSTICK BLOOD TESTING METHOD.

12:50PM   4         SO HOW DID THIS SCHEME WORK?  BECAUSE THESE TWO SCHEMES

12:50PM   5    WERE SUCCESSFUL FOR A NUMBER OF YEARS, THE SCHEMES TO DEFRAUD

12:50PM   6    PATIENTS AND INVESTORS.

12:50PM   7         WELL, YOU SAW THAT THEY INVOLVED STOLEN CREDIBILITY.  THE

12:50PM   8    DEFENDANTS STOLE THE CREDIBILITY OF OTHER ORGANIZATIONS LIKE

12:50PM   9    PHARMACEUTICAL COMPANIES THAT THEY CLAIMED HAD VALIDATED THEIR

12:50PM  10    TECHNOLOGY;

12:51PM  11         WALGREENS, WHO THEY WERE PARTNERING WITH;

12:51PM  12         THE MEMBERS OF THE BOARD;

12:51PM  13         THEY STOLE THE CREDIBILITY OF THE PRESS ALSO BY

12:51PM  14    ENGINEERING FALSE INFORMATION TO APPEAR IN PRESS ARTICLES AND

12:51PM  15    THEN SPREADING THAT INFORMATION TO VICTIMS;

12:51PM  16         THEY BORROWED THE CREDIBILITY OF THE U.S. MILITARY BY

12:51PM  17    CLAIMING THAT ORGANIZATION WAS RELYING ON THE COMPANY'S

12:51PM  18    TECHNOLOGY; AND,

12:51PM  19         THEY EXPLOITED HOW FALSE INFORMATION SPREADS TO MAKE THEIR

12:51PM  20    JOB OF DECEIVING ALL OF THOSE PEOPLE EASIER AND MORE EFFICIENT.

12:51PM  21         BUT DON'T LET THE FACT THAT THOSE LIES TOOK ON A LIFE OF

12:51PM  22    THEIR OWN DISTRACT YOU FROM THE FACT THAT THIS IS ALL ABOUT

12:51PM  23    MR. BALWANI'S ACTIONS AND HIS CHOICES.

12:51PM  24         SO YOU SHOULD ASK HOW WOULD MR. BALWANI'S ACTIONS AND

12:51PM  25    CHOICES HAVE BEEN DIFFERENT OVER THE YEARS IF HE WAS NOT A

12:51PM  1    PARTICIPANT IN THESE TWO SCHEMES TO DEFRAUD INVESTORS AND

12:51PM  2    PATIENTS?

12:51PM  3        HERE ARE SOME EXAMPLES:

12:51PM  4        MR. BALWANI WOULD HAVE TAKEN SERIOUSLY CONCERNS OF

12:52PM  5    SCIENTISTS AT THERANOS ABOUT PROBLEMS WITH TESTING.  YOU'LL

12:52PM  6    RECALL THAT DR. PANDORI SUGGESTED THAT THEY NOT USE THE EDISON

12:52PM  7    FOR TESTING ANYMORE.

12:52PM  8        AND WHEN THE LAB DIRECTOR, ADAM ROSENDORFF, SPECIFICALLY

12:52PM  9    SAID NOT TO USE THE EDISON ON HCG, MR. BALWANI, AS THE PERSON

12:52PM 10    OVERSEEING THE LAB, WOULD HAVE RESPONDED TO THAT WITH CONCERN

12:52PM 11    AND WOULD HAVE KEPT THAT DECISION IN PLACE UNTIL DR. ROSENDORFF

12:52PM 12    WAS COMFORTABLE RESUMING TESTING ON THAT PLATFORM.

12:52PM 13        IF MR. BALWANI HAD NOT BEEN A PARTICIPANT IN THESE SCHEMES

12:52PM 14    WHEN MULTIPLE SCIENTISTS, INCLUDING LAB DIRECTORS, QUIT

12:52PM 15    THERANOS OVER THE CONCERNS ABOUT THE RELIABILITY AND ACCURACY

12:52PM 16    OF THE TESTING, MR. BALWANI WOULD HAVE MOVED QUICKLY TO HIRE

12:52PM 17    AND ASSIGN ANOTHER QUALIFIED LAB DIRECTOR TO OVERSEE THE

12:52PM 18    OPERATION OF THIS LAB THAT HAD SO MANY PROBLEMS.

12:52PM 19        IF HE REALLY CARED ABOUT FIXING THE PROBLEMS AT THERANOS,

12:52PM 20    THAT'S WHAT HE WOULD HAVE DONE INSTEAD OF HIRING HIS

12:53PM 21    DERMATOLOGIST AND ANOTHER CO-LABORATORY DIRECTOR WHO MAY AS

12:53PM 22    WELL HAVE BEEN CARDBOARD CUTOUTS FOR ALL OF THE IMPACT THEY HAD

12:53PM 23    ON THE ACCURACY AND RELIABILITY OF TESTING AT THE COMPANY.

12:53PM 24        AND THAT'S NOT A CRITICISM OF THEM.  THE EVIDENCE SHOWS

12:53PM 25    THAT THEY FULFILLED THEIR MANDATE.  THEIR ASSIGNMENT AS GIVEN

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7683

12:53PM   1    TO THEM BY MR. BALWANI DID NOT INCLUDE MEANINGFUL PARTICIPATION

12:53PM   2    OF THE RUNNING OF THE LAB.

12:53PM   3         IF MR. BALWANI WEREN'T A PARTICIPATE IN THESE SCHEMES, HE

12:53PM   4    WOULD HAVE BEEN TROUBLED BY FALSE CLAIMS ABOUT THERANOS IN THE

12:53PM   5    MEDIA, CITING MS. HOLMES AND HIM AS A SOURCE; AND HE WOULDN'T

12:53PM   6    HAVE REJECTED DR. PANDORI'S IDEA THAT MS. HOLMES SHOULD CONSULT

12:53PM   7    WITH TECHNICAL PEOPLE AT THE COMPANY SO SHE COULD DO A BETTER

12:53PM   8    JOB OF BEING ACCURATE IN THOSE INTERVIEWS, HE WOULD HAVE BEEN

12:53PM   9    EVEN MORE TROUBLED BY MISLEADING STATEMENTS ON HIS COMPANY'S

12:53PM  10    OWN WEBSITES.

12:53PM  11         WHEN INVESTORS WANTED TO MEET THE LEADERS OF THERANOS, HE

12:53PM  12    WOULD HAVE GIVEN HONEST INFORMATION ABOUT THE COMPANY'S STATUS

12:53PM  13    AND ACHIEVEMENTS, INSTEAD OF WORKING WITH MS. HOLMES TO DECEIVE

12:54PM  14    PEOPLE OVER AND OVER AGAIN.

12:54PM  15         HE WOULD HAVE TOLD INVESTORS, WALGREENS REPRESENTATIVES

12:54PM  16    AND OTHER VIP VISITORS TO THERANOS, THAT THE DEVICES THAT THEY

12:54PM  17    WERE SHOWING THEM IN CONFERENCE ROOMS WERE NOT ACTUALLY THE

12:54PM  18    DEVICES THAT WERE GOING TO BE USED TO RUN THOSE VIP'S SAMPLES

12:54PM  19    WHEN THEY HAD DEMOS DONE AT THE COMPANY.

12:54PM  20         WHEN MR. MENDENHALL ASKED MR. BALWANI TO TELL HIM ABOUT

12:54PM  21    THE STATE OF THE COMPANY, HE WOULDN'T HAVE REPEATED THE SAME

12:54PM  22    FALSE STATEMENTS WHEN MS. HOLMES WASN'T THERE.

12:54PM  23         LATER, WHEN MR. MENDENHALL WANTED TO INVEST MORE BUT

12:54PM  24    NEEDED MORE CONCRETE INFORMATION ABOUT THE COMPANY, MR. BALWANI

12:54PM  25    WOULD HAVE PROVIDED IT BECAUSE HE WOULD HAVE HAD NOTHING TO

12:54PM  1     HIDE INSTEAD OF GOING SILENT ON THAT INVESTOR.

12:54PM  2          WHEN MR. EISENMAN ASKED ABOUT REPORTS DETAILING THE ACTUAL

12:54PM  3     LIMITS OF THE THERANOS TECHNOLOGY, MR. BALWANI WOULD HAVE

12:54PM  4     ADMITTED THE TRUTH TO THAT INVESTOR, HE WOULD HAVE COME CLEAN

12:54PM  5     INSTEAD OF SAYING THAT THE SOURCE DIDN'T KNOW WHAT THEY WERE

12:55PM  6     TALKING ABOUT.

12:55PM  7          WHEN THE CMS INSPECTION FOUND SERIOUS PROBLEMS IN THE

12:55PM  8     THERANOS LAB, MR. BALWANI WOULD HAVE FOCUSSED ON SOLUTIONS

12:55PM  9     RATHER THAN TRYING TO PERSUADE SARAH BENNETT NOT TO CALL IT

12:55PM 10     WHAT SHE SAW IT.

12:55PM 11          TOWARD THE BEGINNING OF THE DEFENSE CLOSING, MR. BALWANI'S

12:55PM 12     LAWYER SAID THERE WAS NO EVIDENCE HE ALONE, OR WORKING WITH

12:55PM 13     MS. HOLMES, TRIED TO DECEIVE OR CHEAT ANYONE.  IF THAT WERE AT

12:55PM 14     ALL TRUE, MR. BALWANI WOULD HAVE MADE THE OPPOSITE CHOICE IN

12:55PM 15     EACH AND EVERY ONE OF THE SITUATIONS I'VE JUST DESCRIBED, AND

12:55PM 16     THAT IS HOW YOU AS THE JURY ARE ABLE TO JUDGE THE INTENT AND

12:55PM 17     STATE OF MIND OF THE DEFENDANT, NOT BECAUSE YOU'RE A MIND

12:55PM 18     READER AND NOT BECAUSE YOU'RE ABLE TO RELY ON WHAT THE LAWYERS

12:55PM 19     SAY IN INTERPRETING MR. BALWANI'S ACTIONS OR STATEMENTS, BUT

12:55PM 20     BECAUSE YOU KNOW WHAT HE DID AND YOU KNOW ABOUT THE CHOICES HE

12:55PM 21     MADE HIMSELF.  YOU'VE SEEN THAT EVIDENCE.

12:56PM 22          SO WHEN YOU DELIBERATE AND MAKE YOUR DECISION, YOU SHOULD

12:56PM 23     RELY ON THAT EVIDENCE.  YOU SHOULD REVIEW ALL OF THE EVIDENCE,

12:56PM 24     ASSIGN IT THE WEIGHT THAT YOU THINK IS APPROPRIATE.  AND

12:56PM 25     INSTEAD OF RELYING ON THE DEFENSE COUNSEL'S CHARACTERIZATION OR