Exhibit S

ADAM A. REEVES (NYBN 2363877)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5589
    FAX: (408) 535-5066
    john.bostic@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) **CASE NO. 18-CR-00258 EJD** |
| Plaintiff, | ) |
| | ) **UNITED STATES' OPPOSITION TO** |
| v. | ) **DEFENDANTS' MOTION TO DISMISS** |
| | ) **COUNTS TWO AND NINE THROUGH** |
| | ) **ELEVEN OF SUPERSEDING INDICTMENT** |
| ELIZABETH HOLMES and RAMESH | ) **(ECF NO. 206)** |
| "SUNNY" BALWANI, | ) |
| | ) Date: February 10, 2020 |
| Defendants. | ) Time: 10:00 a.m. |
| | ) Court: Hon Edward J. Davila |

GOVT. OPP TO MOT TO DISMISS PATIENT COUNTS
18-CR-00258 EJD

**TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................................1

II. BACKGROUND ...................................................................................................................2

    A.    Defendants' Scheme to Defraud Doctors and Patients........................................................2

    B.    Harm Suffered by Patients as a Result of Defendants' Fraud ............................................3

III. ARGUMENT .........................................................................................................................4

    A.    The Law Does Not Support Dismissal ...............................................................................4

    B.    The Indictment Alleges Defendants' Intent to Defraud Patient Victims ...........................5

    C.    The Indictment Alleges Defendants' Intent to Obtain Money from the Victims of the Fraud........................................................................................................................9

IV. CONCLUSION ....................................................................................................................13

# TABLE OF AUTHORITIES

Page(s)

Cases

*Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Employees & Rest. Employees Union, AFL-CIO*,
   215 F.3d 923 (9th Cir. 2000) .................................................................................................. 12
*Neder v. United States*,
   527 U.S. 1 (1999) ..................................................................................................................... 8
*Russell v. United States*,
   369 U.S. 749 (1962) .............................................................................................................. 4, 5
*United States v. Cleveland*,
   531 U.S. 12 (2000) .................................................................................................................. 10
*United States v. Ali*,
   620 F.3d 1062 (9th Cir. 2010) ....................................................................................... 6, 7, 10
*United States v. Bonallo*,
   858 F.2d 1427 (9th Cir. 1988) .......................................................................................... 5, 11
*United States v. Bruchhausen*,
   977 F.2d 464 (9th Cir. 1992) ................................................................................................ 12
*United States v. Buckley*,
   689 F.2d 893 (9th Cir. 1982) .................................................................................................. 4
*United States v. Cecil*,
   608 F.2d 1294 (9th Cir. 1979) ................................................................................................ 4
*United States v. Ciccone*,
   219 F.3d 1078 (9th Cir. 2000) .............................................................................................. 12
*United States v. Crawford*,
   239 F.3d 1086 (9th Cir. 2001) .............................................................................................. 11
*United States v. Curtis*,
   506 F.2d 985 (10th Cir. 1974) ................................................................................................ 5
*United States v. Dowie*,
   411 Fed. Appx. 21 (9th Cir. Dec. 2, 2010) ........................................................................... 10
*United States v. Giese*,
   597 F.2d 1170 (9th Cir. 1979) .............................................................................................. 4, 5
*United States v. Greenberg*,
   835 F.3d 295 (2d Cir. 2016) ............................................................................................. 8, 11
*United States v. Harkonen*,
   510 Fed. Appx. 633 (9th Cir. Mar. 4, 2013) ...................................................................... 7, 12
*United States v. Jinian*,
   725 F.3d 954 (9th Cir. 2013) .................................................................................................. 5
*United States v. Keith*,
   605 F.2d 462 (9th Cir. 1979) .................................................................................................. 4
*United States v. Keuylian*,
   23 F. Supp. 3d 1126 (C.D. Cal. 2014) .................................................................................... 5
*United States v. Lew*,
   875 F.2d 219 (9th Cir. 1989) ..................................................................................... 9, 10, 11
*United States v. Lothian*,
   976 F.2d 1257 (9th Cir. 1992) ................................................................................................ 6
*United States v. McNally*,
   483 U.S. 350 (1987) ............................................................................................................... 10
*United States v. Mitchell*,
   867 F.2d 1232 (9th Cir. 1989) .............................................................................................. 12
*United States v. Pheaster*,
   544 F.2d 353 (9th Cir. 1976) .................................................................................................. 4

*United States v. Plache*,
   913 F.2d 1375 (9th Cir. 1990) ........................................................................................... 6
*United States v. Regent Office Supply Co.*,
   421 F.2d 1174 (2d Cir. 1970) ............................................................................................. 7
*United States v. Rogers*,
   321 F.3d 1226 (9th Cir. 2003) ........................................................................................... 6
*United States v. Sadler*,
   750 F.3d 585 (6th Cir. 2014) ............................................................................................. 7
*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007) ................................................................................................. 7
*United States v. Takhalov*,
   827 F.3d 1307 (11th Cir. 2016) ......................................................................................... 7
*United States v. Utz*,
   886 F.2d 1148 (9th Cir. 1989) .................................................................................... 8, 12
*United States v. Woods*,
   335 F.3d 993 (9th Cir. 2003) ............................................................................................. 6

Statutes

18 U.S.C. § 371 ............................................................................................................................. 5
18 U.S.C. § 1343 ........................................................................................................................... 5
18 U.S.C. § 1344 ......................................................................................................................... 11
28 U.S.C. § 515 ..................................................................................................................... 1, 13

## I. INTRODUCTION

This case involves two defendants who committed fraud in connection with Theranos, a blood-testing company that they built and operated. Defendants' fraud centered on misleading the public regarding the capabilities of Theranos's technology. Defendants represented that their technology produced accurate and reliable results. In reality, Defendants knew that their devices frequently yielded inaccurate results, rendering their tests unreliable. As a result of Defendants' misrepresentations on this topic and several others, investors lost hundreds of millions of dollars.

There is a second group of victims in this case, however, and it numbers into the thousands. When Defendants marketed their blood testing services to doctors and patients, they knew they were offering a product that was not what it appeared to be. Although they held out Theranos's tests as suitable for use in patient care, they were aware that the tests were not reliable enough for medical decision-making. As a result of this fraud, thousands of patients received unreliable blood tests, depriving them of money or property, placing their health at risk and, in many cases, causing actual harm. With the instant motion, Defendants ask the Court to ignore all of these victims and limit this case to the fraud targeting investors. That motion should be denied for at least three reasons.

First, the Indictment in this case meets constitutional standards in pleading the fraud against doctors and patients. Those standards do not require a charging document to allege every detail that will be presented at trial, but instead provide that indictments should be read as a whole, including implied facts, and with the benefit of common sense.

Second, the fraud alleged in the Indictment goes to the core of the bargain between Theranos and its customers. The medical tests offered by Theranos had essentially no value if they could not be relied upon, and Defendants' decision to market those unreliable tests is the definition of intent to defraud.

Third, the Indictment alleges that Defendants intended to deprive their victims of property—specifically, the money that Theranos's customers would pay for testing services. The fact that not every victim paid directly for a Theranos test does not affect the viability of this charge.

The Court should deny Defendants' motion to dismiss in its entirety.

//

## II. BACKGROUND

### A. Defendants' Scheme to Defraud Doctors and Patients

As alleged in the Indictment, Theranos operated in "stealth mode" for the first ten years of its existence. Beginning in approximately 2013, however, Defendants began to promote the company and its technology. One of Defendants' goals was to attract investment. The other key goal was to promote Theranos's services to the doctors and patients who made up the company's potential customers once it started offering blood testing in September of that year.

In order to attract those customers and induce them to pay for Theranos's services, Defendants explicitly and implicitly represented that their tests were accurate and reliable in addition to being faster and cheaper than the competition. (See Indictment, ECF No. 39, at ¶¶ 14-16). For instance, Theranos's public website touted the company's purported ability to conduct tests using tiny blood samples, and expressly stated that its lab could perform tests "quickly and accurately on samples as small as a single drop." (*Id.* at ¶ 9).

In truth, Defendants knew that Theranos's technology suffered from recurring problems, and was not capable of consistently producing accurate and reliable results—in particular for certain analytes including calcium, chloride, potassium, sodium, and bicarbonate (each of which is relevant to the diagnosis of a variety of medical conditions), as well as HIV (the life-threatening autoimmune disease), Hba1C (indicative of the presence and severity of diabetes), and hCG (a hormone associated with pregnancy). (*Id.* at ¶ 16). Holmes and Balwani knew that the medical reports they were providing to patients contained or were likely to contain: (1) inaccurate and unreliable results; (2) improperly adjusted reference ranges defining a normal or healthy result for a given test; (3) improperly removed "critical" results, i.e., results suggesting that a patient needed medical attention; and (4) results generated from improperly validated assays, further decreasing the reliability of those tests. (*Id.* at ¶ 17).

When Arizona's Attorney General filed a lawsuit against Theranos alleging that its advertisements misrepresented the accuracy and reliability of its blood testing, Theranos entered into a settlement under which it refunded tens of thousands of patients the money they had paid for the company's testing services.[1] By that time, the company had already voided years of results previously

---

[1] See Arizona Attorney General's Office Press Release (https://www.azag.gov/press-releases/ag-

provided to patients based on tests run on its proprietary analyzer.[2]

### B. Harm Suffered by Patients as a Result of Defendants' Fraud

The government is not required to plead or prove that every Theranos patient suffered harm in order to sustain a conviction, let alone survive a motion to dismiss the indictment. But when Defendants put their fraudulent scheme into action, they placed patients' health at risk, and the evidence showing that they ignored potential and actual patient harm will be integral proof of their intent to defraud. It goes without saying that, when a company provides unreliable medical testing services, severe patient harm is an inevitable result. Many of the patients interviewed by the government were affected in serious ways by the inaccurate and unreliable tests they received from Theranos.

For example, one patient received a lab report from Theranos stating that he was HIV positive. Experiencing shock and depression as a result of that life-changing diagnosis, he was planning to seek a confirmatory test from another lab when a Theranos representative called him and discouraged him from obtaining a second opinion, vouching for the reliability of the Theranos result. After living with this diagnosis for several days, that patient learned that the Theranos test had been inaccurate and that he was healthy after all.

Defendants were also aware that the company was having problems with the accuracy of its hCG (human chorionic gonadotrophin) test—used by doctors to determine whether a patient is pregnant. The government has interviewed multiple individuals who were traumatized or placed in medical danger as a result of inaccurate hCG tests from Theranos. One patient, who had been trying unsuccessfully to have a child for a long time, became pregnant only to receive a Theranos blood test during the early stages of her pregnancy indicating that she was miscarrying. After being forced to live through the heartbreak caused by that news, she obtained a test result from a conventional lab showing that, thankfully, her pregnancy was still viable. Another patient received a Theranos test result indicating that she was not pregnant. In reality, she was currently experiencing an ectopic pregnancy that would have threatened her life had a test from another lab not revealed its presence.

---

brnovich-obtains-465-million-arizonans-who-purchased-theranos-blood-tests).

[2] See "Theranos Has Thrown Out Two Years of Blood-Test Results," Fortune (May 19, 2016) (https://fortune.com/2016/05/19/theranos-void-edison-results/)

GOVT. OPP TO MOT TO DISMISS PATIENT COUNTS
18-CR-00258 EJD                                       3

1	The evidence at trial will show that these patients, along with many others, were intended targets
2	of Defendants' scheme to defraud. Their experiences with Theranos are evidence of the inaccuracy of
3	the tests and of Defendants' knowledge of their technology's lack of reliability. That does not mean,
4	though, that such evidence needs to be described in the charging document. The Indictment adequately
5	alleges the existence of Defendants' fraudulent scheme under the standards discussed below.

## III. ARGUMENT

### A. The Law Does Not Support Dismissal

The main purposes of an indictment are (1) to contain the elements of the offense intended to be charged and sufficiently apprise the defendant of what he or she must be prepared to meet; and (2) in case any similar charges are later filed against the defendant, to allow the defendant to argue double jeopardy. *Russell v. United States*, 369 U.S. 749, 763 (1962). Although an indictment should also be detailed enough to allow a court to determine its sufficiency, the Ninth Circuit considers this a "corollary purpose" of the document typically considered after trial, "when the theory on which the Government has obtained a conviction is clear." *United States v. Buckley*, 689 F.2d 893, 896 n.3 (9th Cir. 1982). At the pretrial stage, the indictment is usually deemed sufficient if it satisfies the two objectives above. *Id.* It is well established that "an indictment need not be drafted in the most precise form possible." *United States v. Pheaster*, 544 F.2d 353, 361 (9th Cir. 1976).

An indictment "is not to be read in a technical manner, but it is to be construed according to common sense with an appreciation of existing realities." *United States v. Giese*, 597 F.2d 1170, 1178 (9th Cir. 1979) (quotation omitted). Additionally, an indictment should be "read as a whole" and "read to include facts which are necessarily implied." *Buckley*, 689 F.2d at 899.

Courts applying these standards will not dismiss indictments or reverse convictions except in extreme cases. *See, e.g.*, *Russell*, 369 U.S. at 753-55 (reversing conviction under statute criminalizing refusal to answer question from congressional subcommittee where indictment failed to specify topic under inquiry in proceedings); *United States v. Keith*, 605 F.2d 462 (9th Cir. 1979) (indictment charging defendant with involuntary manslaughter failed to allege correct mental state required under that statute); *United States v. Cecil*, 608 F.2d 1294, 1296-97 (9th Cir. 1979) ("barren" indictment charged eleven defendants with drug conspiracy but only tracked statutory language and gave superficial details

about conspiracy, i.e., its location and objective); *United States v. Curtis*, 506 F.2d 985, 992 (10th Cir. 1974) (fraud indictment pleaded "little more than the statutory language without any fair indication of the nature or character of the scheme" or the misrepresentations that were part of it); *United States v. Keuylian*, 23 F. Supp. 3d 1126, 1128 (C.D. Cal. 2014) (dismissing indictment that adopted statutory fraud language but "fail[ed] to describe any act of deception committed by [the defendant]").

The Supreme Court considers it a beneficial development in criminal law that it has "upheld many convictions in the face of questions concerning the sufficiency of the charging papers" and that convictions are no longer reversed because of deficiencies that do not prejudice the accused. *Russell*, 369 U.S. at 763-64.

An indictment charging conspiracy satisfies the applicable standards above if it alleges the three elements which are the "gist of the offense." *Giese*, 597 F.2d at 1177.[3] Such an indictment need not "allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *Id.* at 1178.

The wire fraud statute criminalizes the use of the wires by an individual "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud. *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013). The Ninth Circuit recognizes that the fraud statute "reaches a wide range of fraudulent activity." *United States v. Bonallo*, 858 F.2d 1427, 1433 (9th Cir. 1988); *see also* Rakoff, *The Federal Mail Fraud Statute*, 18 Duquesne L.Rev. 772-73 (1980) (mail fraud statute has been characterized as the "'first line of defense' against virtually every new area of fraud to develop in the United States in the past century….").

### B. The Indictment Alleges Defendants' Intent to Defraud Patient Victims

The Indictment in this case clearly alleges that Holmes and Balwani, "through advertisements and solicitations, encouraged and induced doctors and patients to use Theranos's blood testing

---

[3] Addressing charge under 18 U.S.C. § 371.

laboratory services." (Indictment at ¶ 14). Defendants' scheme to defraud included "soliciting, encouraging, or otherwise inducing doctors to refer and patients to pay for and use its laboratory and blood testing services under the false and fraudulent pretense that Theranos technology produced reliable and accurate blood test results." (*Id.* at ¶ 22).

Defendants attempt to escape the allegations against them by misreading the Indictment and misinterpreting the applicable case law. Remarkably, Defendants' motion argues that the Indictment must be dismissed because there is no allegation that deceived patients "did not get what they paid for." (Mot. at 6). In other words, Defendants assert that their misrepresentations about the accuracy and reliability of Theranos's tests did not go to an essential element of the bargain between them and their customers. Defendants are incorrect.

The key question, as Defendants admit, is whether the charging document alleges their intent to defraud. "It is settled law that intent to defraud may be established by circumstantial evidence." *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003). That intent may be inferred from misrepresentations made by a defendant, *see United States v. Lothian*, 976 F.2d 1257, 1267-68 (9th Cir. 1992), and the scheme itself may be probative circumstantial evidence of an intent to defraud. *United States v. Plache*, 913 F.2d 1375, 1381 (9th Cir. 1990).

Defendants accuse the Indictment of failing to allege misrepresentations because it states that Defendants claimed their tests were accurate and reliable even though Theranos "was not capable of *consistently* producing accurate and reliable results." (Indictment at ¶¶ 15-16) (emphasis added). Defendants seem to argue that their alleged representations were not false because, even under the Indictment's allegations, *some* of Theranos's test results may have been accurate. But the existence of some accurate test results does not create a loophole in the charges. A scheme's fraudulent nature is measured by a "non-technical" standard under which representations are viewed as fraudulent if they are "misleading or deceptive" and need not be "literally false." *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003) (quotation omitted). Thus, Defendants cannot prevail based on an overly technical reading of the misrepresentations alleged in the Indictment. Indeed, the government is not required to prove that patients heard any particular misrepresentation, and the Ninth Circuit has upheld wire fraud convictions even where no false statements were made directly to victims. *See, e.g.*, *United States v. Ali*,

620 F.3d 1062 (9th Cir. 2010). It was no barrier to conviction in that case that the defendants may not have made false statements directly to Microsoft, the owner of the software defendants fraudulently obtained, because a specific false statement was not required under a scheme-to-defraud theory. *Id*. at 1070-71. As that court observed, "there are alternative routes to a mail fraud conviction, one being proof of a scheme or artifice to defraud." *Id.*

In this case, Defendants engaged in a scheme to defraud whereby they used explicit and implicit representations to convince doctors and patients that Theranos's tests was accurate and reliable, inducing customers to pay for Theranos's services. *See, e.g.*, *United States v. Harkonen*, 510 Fed. Appx. 633, 635-36 (9th Cir. Mar. 4, 2013) (defendant convicted for issuing a fraudulent medical press release regarding a pharmaceutical product targeted at potential customers). Because Theranos's reports to patients contained or were likely to contain inaccurate results, they were unreliable. The prevalence of inaccurate results in Theranos's tests rendered all Theranos results unreliable, as they could not be trusted to convey correct information. And unreliable medical test results are worthless because they cannot provide a sound basis for medical treatment decisions. Indeed, Theranos voided years of results from its proprietary analyzer and refunded test fees to tens of thousands of patients after its misrepresentations were exposed. But Holmes and Balwani knew of the flaws in Theranos's technology from the beginning. In misrepresenting the ability of their technology to produce accurate and reliable results—and by holding out their services for use in clinical settings—Defendants intended that patients would pay for testing that was not actually suitable for patients' medical needs because it could not be relied upon. This kind of deception goes straight to the heart of "the value of the bargain" struck between Theranos and its customers. *See United States v. Takhalov*, 827 F.3d 1307, 1312-14 (11th Cir. 2016). It strains logic to argue otherwise. In sum, the nature of Defendants' misrepresentations places their scheme to defraud squarely within the scope of the wire fraud statute.[4]

---

[4] Thus, these facts bear little relation to the cases cited by Defendants in which a party was tricked into engaging in what the defendant intended to be a fair transaction. *See, e.g.*, *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) (defendants' actions in tricking customers into entering bar could not form the basis of fraud conviction if transactions inside bar were fair); *United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) (defendant lied to pharmaceutical distributors and concealed her identity to obtain product, but paid full price and so did not defraud the distributors); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) (no evidence that company agents made any false representations regarding the quality or price of their merchandise); *United States v. Shellef*, 507 F.3d

Still, Defendants contend that the Indictment is deficient because it does not allege that any patient *actually received* an inaccurate result from a Theranos test. (Mot. at 1, 6). First, this assertion is simply incorrect. The Indictment alleges that tests performed on Theranos technology "contained or were likely to contain… inaccurate and unreliable results." (Indictment at ¶ 17(C)). A common-sense reading of this allegation unavoidably leads to the inference that, over the course of providing test results to thousands of people, Theranos gave many patients test results that were inaccurate. The government's investigation has confirmed that fact.

Second, and more important, Defendants' argument improperly shifts the inquiry away from the *nature of the scheme* to defraud and focuses instead on its actual effect. But while evidence of patient harm is undoubtedly relevant to proving Defendants' intent, the government is not required to plead or prove that the charged fraudulent scheme was ever completed. Instead, it is enough that the government charge "either that the victim was actually deprived of money or property *or* that the defendant intended to defraud the victim of the same." *United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989) (emphasis in original). "A scheme to defraud, whether successful or not, remains within the purview of section 1341." *Id.* Because the federal fraud statutes criminalize the "scheme to defraud," the common-law requirements of reliance and damages have no relevance to these offenses. *Neder v. United States*, 527 U.S. 1, 24-25 (1999). "The gravamen of the offense is the scheme to defraud." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quotation omitted). The government "need not prove that the victims of the fraud were *actually* injured," "only that defendants *contemplated* some actual harm or injury to their victims." *Id.* at 305-06 (quotation omitted) (emphasis in original).

In this case, the victims' potential and actual harm is critical evidence of Defendants' deceptive intent. But the fact that the government may use such evidence at trial does not alter the pleading requirements. Read as a whole with the benefit of common sense, the Indictment clearly alleges that Defendants intended to defraud Theranos's patients by obtaining their money in exchange for testing services that were not what Defendants represented them to be. The Indictment is therefore constitutionally sufficient, and Defendant's motion should be denied to the extent it argues failure to

---

82, 107-09 (2d Cir. 2007) (defendant deceived victim company into selling product it otherwise would not have sold, but company obtained fair value).

allege intent to defraud.

### C. The Indictment Alleges Defendants' Intent to Obtain Money from the Victims of the Fraud

The Indictment alleges that Holmes and Balwani "held Theranos's blood tests out to individuals as accurate and reliable," and made representations to individuals "to induce individuals to purchase Theranos's blood tests." (Indictment at ¶ 17). As a result of the scheme, "many hundreds of patients paid, or caused their medical insurance companies to pay, Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results." (*Id.* at ¶ 15). Nevertheless, Defendants argue that the Indictment fails to allege that Defendants intended to obtain money from the victims described in the Indictment. Specifically, Defendants contend that portions of the Indictment should be dismissed because some victims did not pay Theranos directly. Defendants rely on the proposition that a criminal fraud must involve the intent to obtain money or property from the one who is deceived. (Mot. at 3) (citing *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989)). Because the Indictment in this case alleges just such a scheme, the Court should deny Defendants' motion on this ground.

As an initial matter, Defendants do not actually follow through on their claim that the Indictment does not allege a scheme to obtain money from victims. At best, they argue that there was no scheme to defraud *some* of the victims referenced in the Indictment. Defendants apparently concede that this argument does not apply to any patients who paid directly for the testing services they obtained from Theranos. Accordingly, Defendant's motion cannot seek dismissal of any complete counts in the Indictment on these grounds. Their argument is limited to (1) doctors and (2) patients whose Theranos tests were covered by medical insurance. But even if some victims did not pay Theranos directly, the Indictment still properly alleges Defendants' scheme to defraud all of Theranos's customers.

The rule stated in *Lew*—that a fraud scheme must be directed at obtaining money from the victim who is deceived—is not as rigid as Defendants would hope, and that case is distinguishable on its facts. In *Lew*, an attorney was convicted of mail fraud after lying to the Department of Labor regarding the employment status of immigrants. *Lew*, 875 F.2d at 220. The defendant in that case, however, did not obtain money or property from the government who had been deceived—only from his clients, and there was no evidence that the defendant ever deceived them. *Id.* at 221. The Ninth Circuit concluded that

this was a problem in light of the holding in *United States v. McNally*, 483 U.S. 350, 356 (1987). In dicta, the Ninth Circuit interpreted *McNally* to hold that a fraudster's intent must be to obtain money or property from the one who is deceived. *Lew*, 875 F.2d at 221. In particular, the court in *Lew* took issue with a jury instruction in that case stating that the charged scheme was "to make false statements to the United States for the purpose of obtaining money from defendant's clients"—an instruction that "permitted conviction for conduct not within the reach" of the statute. *Id.* at 221-22; *see also United States v. Cleveland*, 531 U.S. 12, 15 (2000) (To qualify as property, "the thing obtained must be property in the hands of the victim."). Here, Defendants are charged with a scheme to deceive Theranos's customers in order to deprive those same individuals of money or property. There will be no need for a jury instruction inconsistent with the holding in *Lew*.

Additionally, the Supreme Court acknowledges that the phrase "scheme or artifice to defraud" should be "interpreted broadly insofar as property rights are concerned." *McNally*, 483 U.S. at 356. The Ninth Circuit has taken a flexible approach to assessing the connection between the target of a fraud and the property sought by the fraudster. In *Ali*, discussed above, the Ninth Circuit upheld a wire fraud conviction despite the fact that no false statements were made to the victim and the property obtained by the defendants did not come directly from the victim but rather through third party distributors. *United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010). As that court noted, the victim of the fraud was Microsoft even though the defendants acquired the property at issue—Microsoft's software—from third party distributors. *Id.* at 1067-68. And the defendants in that case need not have to make a misrepresentation directly to Microsoft to be guilty of wire fraud because the government was not required to prove any particular false statement under a scheme-to-defraud theory. *Id*. at 1070-71.

The Ninth Circuit similarly held in *Dowie* that the deprivation of money or property as a result of a fraud may be accomplished "indirectly." *United States v. Dowie*, 411 Fed. Appx. 21, 28 (9th Cir. Dec. 2, 2010). The defendant in that case, found guilty of defrauding the Los Angeles County Department of Water and Power, could not undo his conviction based on the fact that he actually received payment from the City of Los Angeles, "a separate entity from DWP, which was the deceived party." *Id.* at 27-28. Key to that decision was the lack of evidence that the defendant had sought to obtain money from the city rather than from the DWP. *Id*. at 28.

GOVT. OPP TO MOT TO DISMISS PATIENT COUNTS
18-CR-00258 EJD 10

In another case, a defendant was convicted after engaging in a scheme to defraud a bank[5] and challenged his conviction by arguing that the victims of the misrepresentation were actually the bank's customers whose accounts were falsely charged and not the bank itself. *United States v. Bonallo*, 858 F.2d 1427, 1434 n.9 (9th Cir. 1988). The Ninth Circuit rejected that argument because banks commonly reimburse the accounts of wrongly charged customers, so the defendant was ultimately harming the bank. *Id.* Thus, the Ninth Circuit concluded, the misrepresentation in that case was directed toward the bank, "and possibly toward the customers as well." *Id.* Notably, the Ninth Circuit in *Lew* confirmed that *Bonallo* remains a valid interpretation of the requirements for a fraud conviction. *See Lew*, 875 F.2d at 221-22 (despite the indirect nature of the monetary loss in *Bonallo*, the fraud in that case still included the intent to obtain money or property from the victim of the deceit).[6]

In fact, the Ninth Circuit has held that a fraud conviction does not even require the government to prove the identity of the fraud victim or the victim's ownership of the property obtained by the fraudster. *See United States v. Crawford*, 239 F.3d 1086, 1092-93 (9th Cir. 2001) (defendant who defrauded university in order to obtain a valuable piece of artwork could not obtain reversal because government failed to prove the victim owned the property as long as the defendant knew she was not entitled to it). Such a holding is incompatible with Defendants' theory that fraud has occurred only if the defendant has actually obtained property directly from the victim. Rather, it is the nature of the scheme to defraud and the defendant's intent that controls.

In this case, Defendants devised a scheme to defraud doctors and patients by misrepresenting the accuracy and reliability of Theranos's blood tests. Defendants' intent was to collect customers' money while providing them with blood testing services that were of little to no value due to their lack of accuracy and reliability. It does not matter that, after successfully attracting patients to use their services, some of those patients ended up having health insurance that paid for their blood tests.

---

[5] The statute at issue in that case, 18 U.S.C. § 1344, has the same structure as the wire fraud statute charged here.

[6] Other circuits have rejected outright the requirement that there be "convergence" between the the fraud and the property at issue. *See, e.g.*, *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) ("wire fraud does not require convergence between the parties intended to be deceived and those whose property is sought in a fraudulent scheme," and collecting cases from First, Fifth, Seventh, and Eighth Circuits holding same).

Defendants targeted their misrepresentations and false pretenses at patients because their intent was to separate those individuals from their money, and it is Defendants' intent that controls the analysis here. *See Utz*, 886 F.2d at 1151. Accordingly, Defendants cannot win dismissal based on the fact that Theranos received some money from medical insurance providers. Their argument on this point also ignores the fact that patients with health insurance are required to pay premiums for that coverage. That means that the money health insurance companies use to pay medical service providers is ultimately derived from, and indirectly reimbursed by, the covered patients. An indirect connection between the victims of the fraud and the funds obtained by the fraudster is acceptable under the case law discussed above.[7]

Defendants are similarly misguided in their attempt to dismiss portions of the Indictment based on the claim that Theranos never obtained property from any doctors. The Court should reject this conclusory factual argument, declining the defense's invitation to prejudge the evidence. Moreover, there is support in the case law for the proposition that doctors can be victims of this species of fraud. In *Harkonen*, the defendant was convicted of wire fraud after issuing a press release containing false information about a recent trial of a pharmaceutical product. *Harkonen*, 510 Fed. Appx. at 635-36. On appeal, the Ninth Circuit concluded that the jury found the press release fraudulent even if it was not "literally false," and further held that the press release was material because it was "capable of influencing the decision of *doctors to prescribe*, or *patients to seek*, prescriptions of [the product]." *Id*. at 636 (emphasis added).

Separately, misrepresentations to doctors are relevant to the scheme to the extent Defendants intended doctors to pass along fraudulent information to their patients in recommending Theranos. The case law makes it clear that a scheme to defraud can encompass more than misleading statements made by a defendant directly to a victim. *See, e.g.*, *United States v. Ciccone*, 219 F.3d 1078, 1084 (9th Cir.

---

[7] Because this case involves a scheme to obtain money from victims, it is nothing like the cases cited by Defendants where the item gained by the fraudster or lost by the victim did not qualify as actual property. *See, e.g.*, *United States v. Bruchhausen*, 977 F.2d 464, 467-68 (9th Cir. 1992) (manufacturers' interest in products not being shipped to Soviet Bloc was not property); *United States v. Mitchell*, 867 F.2d 1232, 1234 (9th Cir. 1989) (citizens' intangible right to "good government" was not property); *Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Employees & Rest. Employees Union, AFL-CIO*, 215 F.3d 923, 926 (9th Cir. 2000) (hotel's goodwill was not property defendant sought to obtain).

2000) (defendant's wire fraud conviction would stand even if he himself had not made the fraudulent calls to victims, as he devised the scheme and was the source of misleading information).

Accordingly, the Court should reject Defendants' arguments about the property interest at issue in this case.

**IV. CONCLUSION**

Defendants' motion to dismiss asks the Court to immunize them from a fraudulent scheme that targeted and impacted thousands of vulnerable victims. For the foregoing reasons, the Court should deny Defendants' motion in its entirety.

DATED: January 13, 2020

Respectfully submitted,

ADAM A. REEVES
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515

 */s/*
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys