Exhibit V

MARK S. DAVIES (Admitted Pro Hac Vice)
JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

Email: mark.davies@orrick.com; jcoopersmith@orrick.com;
awalsh@orrick.com; scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**DEFENDANT RAMESH "SUNNY" BALWANI'S REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL**<br><br>**Date: February 17, 2023**<br>**Time: 9:30 a.m.**<br>**CTRM.: 4, 5th Floor**<br><br>**Hon. Edward J. Davila** |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................. 1

II. ARGUMENT ...................................................................................................... 2

   A. Mr. Balwani Is Not Likely To Flee Or Pose Any Danger. .................................. 2

   B. Mr. Balwani's Appeal Presents Eight Substantial Questions Warranting A
     New Trial Or A Substantially Reduced Sentence. ................................................ 3

     1. The Constructive Amendment Of The Indictment Is A Substantial
       Question. ...................................................................................................... 3

     2. The Admissibility Of Specialized Testimony By Non-Experts Is A
       Substantial Question. .................................................................................. 6

     3. The Use Of False Testimony Is A Substantial Question. ............................ 8

     4. The Denial Of The Motion To Suppress And An Instruction On Missing
       Evidence Is A Substantial Question. ......................................................... 12

     5. The Admissibility Of Evidence On Dr. Rosendorff's Bias Is A
       Substantial Question. ................................................................................ 13

     6. The Denial Of A New Trial Or Evidentiary Hearing Based On
       Dr. Rosendorff's Post-Trial Conduct Is A Substantial Question. .............. 14

     7. The Admissibility Of Evidence On Alleged Misrepresentations To The
       Department Of Defense Is A Substantial Question. ................................... 14

     8. The Standard Of Proof For Proving Loss At Sentencing, And Whether
       The Government Met That Burden, Is A Substantial Question. .................. 15

   C. Any One Of The Substantial Questions Would Result In Dismissal, A New
     Trial, Or A Substantially Reduced Substance. .................................................... 15

III. CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Youngblood*,
488 U.S. 51 (1988) ................................................................................................12

*Brown v. Borg*,
951 F.2d 1011 (9th Cir. 1991) .............................................................................10

*Dow v. Virga*,
729 F.3d 1041 (9th Cir. 2013) ...............................................................................9

*Hayes v. Brown*,
399 F.3d 972 (9th Cir. 2005) ..........................................................................10, 11

*Napue v. Illinois*,
360 U.S. 264 (1959) ...................................................................................9, 10, 11

*Panah v. Chappell*,
935 F.3d 657 (9th Cir. 2019) .................................................................................9

*United States v. Adamson*,
291 F.3d 606 (9th Cir. 2002) .............................................................................4, 6

*United States v. Alli*,
344 F.3d 1002 (9th Cir. 2003) ...............................................................................8

*United States v. Chen*,
No. 17-cr-00603, 2021 WL 2662116 (N.D. Cal. June 29, 2021) ......................7, 8

*United States v. Cuong Cau Dang*,
No. 13-cr-486-EJD, 2013 WL 4119426 (N.D. Cal. Aug. 9, 2013) ..........................2

*United States v. Figueroa-Lopez*,
125 F.3d 1241 (9th Cir. 1997) ...............................................................................7

*United States v. Garcia*,
340 F.3d 1013 (9th Cir. 2003) ...............................................................................3

*United States v. Job*,
871 F.3d 852 (9th Cir. 2017) ...............................................................................15

*United States v. Kakkar*,
No. 5:13-cr-00736, 2017 WL 4163291 (N.D. Cal. Sept. 20, 2017) ....................1, 2

*United States v. Kearns*,
5 F.3d 1251 (9th Cir. 1993) .................................................................................12

*United States v. Kohring*,
637 F.3d 895 (9th Cir. 2011) ...................................................................................5

*United States v. Kojayan*,
8 F.3d 1315 (9th Cir. 1993) ...................................................................................12

*United States v. Lonich*,
23 F.4th 881 (9th Cir. 2022) ...................................................................................15

*United States v. McDill*,
871 F.3d 628 (8th Cir. 2017) ...................................................................................5

*United States v. Mendez*,
619 F. App'x 644 (9th Cir. 2015) ...........................................................................14

*United States v. Oaxaca*,
233 F.3d 1154 (9th Cir. 2000) ...........................................................................3, 15

*United States v. Pablo Varela-Rivera*,
279 F.3d 1174 (9th Cir. 2002) .................................................................................4

*United States v. Robertson*,
895 F.3d 1206 (9th Cir. 2018) ...............................................................................12

*United States v. Schoneberg*,
396 F.3d 1036 (9th Cir. 2004) ...............................................................................14

*United States v. Shipsey*,
190 F.3d 1081 (9th Cir. 1999) .................................................................................5

*United States v. Sivilla*,
714 F.3d 1168 (9th Cir. 2013) ...............................................................................12

*United States v. Vizcarra-Martinez*,
66 F.3d 1006 (9th Cir. 1995) .................................................................................14

*United States v. Yates*,
16 F.4th 256 (9th Cir. 2021) ...................................................................................5

*United v. Handy*,
761 F.2d 1279 (9th Cir. 1985) .................................................................................1

**Statutes**

18 U.S.C. § 3143(b) .................................................................................................1

18 U.S.C. § 3143(b)(1) ...........................................................................................15

**Constitutional Provisions**

Sixth Amendment ...................................................................................................3, 14

**Rules and Regulations**

Fed. R. Civ. Proc. 29 ...........................................................................................1, 3, 15

Fed. R. Evid. 401 ..........................................................................................................4

Fed. R. Evid. 403 ..........................................................................................................4

Fed. R. Evid. 404(a) ....................................................................................................13

Fed. R. Evid. 404(b) ....................................................................................................14

Fed. R. Evid. 701 ..................................................................................................1, 6, 7

Fed. R. Evid. 701(a) ......................................................................................................6

Fed. R. Evid. 701(c) ......................................................................................................6

Fed. R. Evid. 702 ..............................................................................................1, 6, 7, 8

1

## I.  INTRODUCTION

2      The government has filed a brief that should be offensive to every American. Its claim

3   that Mr. Balwani is a flight risk rests on nothing more than his being a naturalized rather than a

4   native-born U.S. citizen. Under the government's discriminatory logic, immigrants to our

5   country, even those like Mr. Balwani who are exclusively U.S. citizens, would be ineligible for

6   release pending appeal, because they typically have some family abroad. The government's

7   attempt to tether its reasoning to the Court's ruling in *United States v. Kakkar*, No. 5:13-cr-00736,

8   2017 WL 4163291 (N.D. Cal. Sept. 20, 2017), is meritless. There is no risk of flight or danger, as

9   Probation concluded and as evidenced by Mr. Balwani's perfect track record on supervision.[1]

10      As for whether Mr. Balwani has shown a substantial question of law or fact, the

11   government conveniently ignores the applicable standard under § 3143(b), which asks whether

12   reasonable judges could have ruled differently—not whether this Court correctly decided each

13   issue on the merits. And it sidesteps the standard for harmless error, instead emphasizing the

14   supposed sufficiency of the evidence, as if this were a Rule 29 motion. The government's

15   responses to the eight legal and factual errors shown by Mr. Balwani simply confirm that each

16   presents a substantial question.

17      As Mr. Balwani's motion also explained, the government's constructive amendment of the

18   indictment invalidates all counts because whether Theranos' testing was reliable and accurate was

19   at the heart of all counts as argued to the jury. So too, the violation of Rules 701 and 702 allowed

20   improper expert testimony that the jury should not have relied on to convict on all counts. And

21   the government's failure to correct false testimony likewise warrants reversal across the board.

22   The remaining issues likewise go to either all counts or all the investor counts (which were the

23   primary drivers of his sentence through loss enhancement). In any event, Mr. Balwani need not

24   prove that each error reaches all of the counts so long as a combination of those questions would

25   likely result in reversal, a new trial, or a substantially reduced sentence.

26      Because Mr. Balwani has satisfied all the § 3143(b) factors, the Court should grant him

27   release. *See United v. Handy*, 761 F.2d 1279 (9th Cir. 1985) (granting release pending appeal).

28   _____

[1] The government does not argue that Mr. Balwani is pursuing an appeal for purposes of delay.

1    **II.    ARGUMENT**

2         **A.    Mr. Balwani Is Not Likely To Flee Or Pose Any Danger.**

3         The government preaches that "[t]here are not two systems of justice." Dkt. 1725 at 1. But

4    in labeling Mr. Balwani a flight-risk, the government advocates for precisely that: one system of

5    justice for American-born U.S. citizens and one for defendants born abroad (regardless of

6    citizenship). As evidence that this U.S. citizen will flee, the government asserts that Mr. Balwani

7    was "born in Pakistan" and "appears to maintain close ties" with his family in India. *Id.* at 6. His

8    siblings, nieces, and nephews "are very important to him." *Id.* And he has performed "community

9    service work" "in India and Pakistan." *Id.* at 6. The Court is told that these facts "[w]eigh[]

10   against" release, *id.*, but what they really do is paint a picture of an immigrant who cares about his

11   family and his community. And Mr. Balwani does so both at home and abroad—as the

12   government concedes, describing his "close ties within the United States." *Id.* These facts make

13   Mr. Balwani a typical American. They do not "weigh against" his release. It is disturbing that

14   representatives of the United States would invoke these facts to support their position.

15        The government's xenophobic approach to the flight analysis finds no support in this

16   Court's decision in *United States v. Kakkar*, 2017 WL 4163291. This Court denied Mr. Kakkar's

17   motion not because that defendant was an immigrant, but because Kakkar: (1) was a non-citizen

18   who faced immigration proceedings as a result of his conviction; (2) failed to "provide specific

19   examples" of his community ties; (3) "transferred assets and placed them out of the reach of

20   potential creditors"; and (4) according to the government continued to engage in fraud while on

21   release. *Id.* at *2. Mr. Balwani's case shares none of these characteristics. The Court should reject

22   the government's attempt to use *Kakkar* as a bludgeon to be wielded indiscriminately against

23   immigrants who, like Mr. Balwani, are citizens with perfect supervision records.[2]

24        As for danger to the community, the government's argument is a rehashing of the

25   purported facts of this case, meant to establish that Mr. Balwani caused harm to patients and

26   ─────────────────

27   [2] The government ignores *Cuong Cau Dang*, in which this Court concluded that a defendant has domestic ties that "clearly run deep" even while at the same time "perform[ing] charitable work" abroad. No. 13-cr-486-EJD, 2013 WL 4119426, at *4 (N.D. Cal. Aug. 9, 2013), *cited at*

28   Dkt. 1711 at 3 n.1. Mr. Balwani's life reflects this immigrant experience—including ties to communities domestic and abroad—while nevertheless being "tethered to the United States." *Id.*

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

investors from 2013 to 2016. Dkt. 1725 at 6-10. But nowhere does the government address the risk of any danger from Mr. Balwani *now*, in 2023. That's because there is no evidence that any such risks exist. The government's additional arguments about lack of acceptance of responsibility (Dkt. 1725 at 7), and using assets to mount a defense (Dkt. 1725 at 6), also cannot be taken seriously. Under those theories, all defendants who go to trial and appeal are dangerous and ineligible for release because they have not accepted responsibility. Under the government's logic, any defendant who uses his resources to retain counsel of his choice to defend himself is ineligible for release. These remarkable arguments treat the Sixth Amendment as meaningless, and they seek to disadvantage Mr. Balwani merely for exercising his constitutional rights.

**B.**     **Mr. Balwani's Appeal Presents Eight Substantial Questions Warranting A New Trial Or A Substantially Reduced Sentence.**

The government rehashes its arguments on the merits, but ignores the applicable standard for release pending appeal and the underlying standard for prejudicial error. Mr. Balwani need not now win his appeal on the merits, months in advance, in order to warrant release. He needs to show only "a non-frivolous issue" that reasonable judges could fairly debate. Dkt. 1711 at 5 (citing *United States v. Garcia*, 340 F.3d 1013, 1020 n.5 (9th Cir. 2003)). At the very most, the government establishes a fair debate on each of these issues—exactly what is required for this Court to grant this motion. In addition, by attempting to defend the convictions by arguing the sufficiency of the evidence, the government relies on the wrong standard for reversal. *E.g.*, Dkt. 1725 at 28 (citing Rule 29 context). "[T]he harmlessness of an error is distinct from evaluating whether there is substantial evidence to support a verdict," *United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000), and as explained below, certain of the errors are subject to even lower standards favoring reversal. The centrality of the errors here and the hotly contested nature of the remaining evidence reinforce the substantial questions warranting a new trial.

**1.**     **The Constructive Amendment Of The Indictment Is A Substantial Question.**

The government's opposition, like its evidence at trial, overlooks the Grand Jury's vital role. The Third Superseding Indictment ("TSI," Dkt. 469) alleges 9 categories of misrepresentations to investors and one type of misrepresentation to patients, none of which

1   involve showing systemic flaws in commercial technology. Allowing the government to

2   introduce a complex of facts outside the TSI's allegations constructively amended the indictment

3   without the Grand Jury's blessing. There is at least a substantial question whether this error

4   tainted all counts of conviction. The government's arguments miss the mark in several ways.

5   First, it is *the government's* cramped reading of the TSI that is hypertechnical. The TSI

6   refers expressly to Theranos' proprietary technology over and over. *See, e.g.*, TSI ¶¶ 5-10, 12(A),

7   12(A), 12(C), 12(F), 12(H). In quoting Paragraph 16, the government again omits the critical

8   language confirming that Mr. Balwani's alleged knowledge of systemic problems was a subset of

9   the allegation that *Theranos' technology* could not deliver consistently accurate results. *Compare*

10  TSI ¶ 16, *with* Dkt. 1725 at 19; *see also* Dkt. 1193 at 6. The government plucks stray phrases

11  from the TSI to contort its common-sense meaning, shared by all parties and the Court until the

12  government's opposition to Mr. Balwani's evidentiary motion—a point to which the government

13  still has never responded. *Compare* Dkt. 1181 at 4-5, *with* Dkt. 1155 at 26-27; Dkt. 668 at 6;

14  Dkt. 664 at 4; Dkt. 330 at 3-4, 22-23. Nor does the TSI's inclusion of HIV affect the analysis: the

15  government's filings make plain that it believed that HIV was tested on proprietary technology,

16  despite the government's pretending otherwise once it realized its mistake.[3] *See, e.g.*, Dkt. 267

17  at 6; Dkt. 265 at 7; 2/4/22 Hr'g Tr. 47. If the interpretation of the TSI were resolved in

18  Mr. Balwani's favor, the government nowhere disputes that the "complex of facts" surrounding

19  the CMS evidence, Bingham testimony, and Tompkins testimony would constitute a constructive

20  amendment. *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002).

21  Mr. Balwani preserved this error. When "the substance of an objection has been

22  thoroughly explored and the trial court's ruling was explicit and definitive, the issue is preserved

23  for appeal." *United States v. Pablo Varela-Rivera*, 279 F.3d 1174, 1177 (9th Cir. 2002).

24  Mr. Balwani sought to exclude evidence of inaccurate commercial technology precisely because

25  the TSI's "allegations about accuracy and reliability relate solely to 'Theranos's technology.'"

26  Dkt. 1156 at 12. While the *in limine* motion sought exclusion under Rules 401 and 403, the metric

27

28

---

[3] The government's gripe that the defendants somehow complicated their efforts to determine which technology was used to test Brent Bingham's blood has no legal basis and would not be an issue if the government had secured the LIS data.

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

1   for relevance Mr. Balwani argued turned entirely on the TSI's meaning. Mr. Balwani expressly

2   noted that denying the motion based on the amended Bill of Particulars would impermissibly

3   amend the indictment. *Id.* at 19-20. As Mr. Balwani explained in seeking the exclusion,

4   "[e]vidence to suggest that non-Theranos technology was inaccurate and unreliable as a basis to

5   substantiate wire-fraud charges against Mr. Balwani was not put before a grand jury, and as a

6   result cannot be put before this petit jury." *Id.* at 20. In the opposition and reply, both parties

7   focused almost exclusively on the meaning of the TSI and whether the challenged evidence

8   tracked the grand jury's charges. *See* Dkt. 1181 at 4-11; Dkt. 1193 at 5-14. So too with the

9   lengthy oral argument and the Court's Order, which discussed whether the TSI's language put

10  Mr. Balwani on notice of accuracy issues connected to third-party devices. *See* Dkt. 1326 at 7-8;

11  2/4/22 Tr. at 30-69. Whether the indictment alleged inaccuracies in commercial technology was

12  extensively explored and definitively ruled on.[4]

13        The government is also wrong that this error affected just two counts. Dkt. 1725 at 16. To

14  the contrary, whether Theranos' testing was accurate and reliable was at the heart of all counts.

15  Mr. Balwani's motion pointed to repeated statements in the government's closing tying the

16  evidence on CMS's findings to the investor counts. *See* Tr. 7670, 7681-84. Indeed, each time the

17  government returned to its core theme that Theranos' testing was inaccurate, it exacerbated the

18  risk of confusing the jury on what was at issue. Because there was a general verdict here, an

19  appellate court would conclude that this affected all counts. *See United States v. McDill*, 871 F.3d

20  628, 633 (8th Cir. 2017) (holding that defendant subjected to a constructive amendment required

21  vacatur of all counts, since general verdict prevented court from knowing whether verdict rested

22  on an invalid constitutional ground). *Cf. United States v. Yates*, 16 F.4th 256, 269 (9th Cir. 2021)

23  (holding government must prove harmlessness beyond a reasonable doubt in the face of

24  constitutional error when jury returns general verdict that "may rest on a legally invalid theory");

25  *United States v. Kohring*, 637 F.3d 895, 902 n.2 (9th Cir. 2011). Reversal would then be

26

---

27  [4] In any event, there would still be a substantial question whether a constructive amendment that prejudiced the convictions is plain error. *See United States v. Shipsey*, 190 F.3d 1081, 1087-88 (9th Cir. 1999) (vacating theft and money laundering convictions because constructive amendment constituted plain error).

28

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

automatic, *Adamson*, 291 F.3d at 615—a principle the government does not dispute, *see* Dkt. 1725 at 14-16. Given the centrality of accuracy and reliability to the government's case, whether the government constructively amended the TSI is a substantial question on all counts.

**2. The Admissibility Of Specialized Testimony By Non-Experts Is A Substantial Question.**

Mr. Balwani's motion reviewed in detail his objections to the improper specialized testimony of Erika Cheung, Mark Pandori, and Adam Rosendorff. The government's response commits two basic errors. First, the government defends the wrong testimony. Take Ms. Cheung for example: Mr. Balwani challenged the admission of specialized testimony at the following pages: Tr. 1132-33, 1135-38, 1202-03, 1245-48, 1552-54, and 1557-58, *cited at* Dkt. 1711 at 11-12. The government defends Ms. Cheung by pointing to *different portions* of her testimony: Tr. 1117, 1201, 1251, *cited at* Dkt. 1725 at 17. There is not a single page of overlap.

No one disputes that Ms. Cheung gave some admissible testimony. No one disputes that she could testify as a lay witness about the details of her job at Theranos, the events she witnessed, and the things she said or did. But this is not an all-or-nothing proposition: Just because some testimony was admissible does not establish that all of it was. The government cannot launder six instances of inadmissible testimony by pointing to three *other*, admissible excerpts and then argue that all the testimony was therefore proper. By failing to address it, the government effectively concedes the error as to the testimony Mr. Balwani actually challenged.

Second, the government conflates the distinct requirements of Rules 701 and 702. As relevant here, Rule 701 imposes two requirements on lay testimony: It must be "rationally based on the witness's perception." Fed. R. Evid. 701(a). *And* it must "not [be] based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). The counterpart to that requirement in Rule 701(c) is in Rule 702, which applies the expert-witness rules to testimony that is "scientific, technical, or other[wise] specialized."

Each of these two Rule 701 requirements is a necessary condition for lay testimony, but neither on its own is sufficient. The government attempts to collapse these two requirements into a single "percipience" rule, arguing that if a witness perceived the matter in question, the

witness's testimony on that matter is lay testimony—no matter how specialized. Dkt. 1725 at 18 ("Such statements are squarely within the bounds of percipient testimony despite the fact that it relates to a technical topic."). Of course, the government does not cite a single Ninth Circuit case for that proposition—or, for that matter, anywhere else in this section of its opposition.

That's because the government has made this exact argument to the Ninth Circuit before and it lost in spectacular fashion, spurring a canonical (and binding) decision that was later codified as Rule 701(c). In *Figueroa-Lopez*, the government articulated the same theory as here: namely, that the rules are satisfied by the "percipience of a witness to the facts on which he wishes to tender an opinion." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997). The Ninth Circuit squarely condemned the government's theory: "[M]ere percipience … does not trump Rule 702." *Id.* "The Government's argument," the Court explained, "simply blurs the distinction between Federal Rules of Evidence 701 and 702." *Id.* Based on rational perception, a lay observer could testify about watching an autopsy and about "the removal of a bullet from a heart"—but not about "the cause of the decedent's death." *Id.* That last conclusion would require expertise. Similarly, Ms. Cheung could testify in her lay capacity about loading a cartridge into a blood analyzer, about running a blood test, and about what result she obtained— but not about whether that result bore on the accuracy and reliability of the underlying technology.[5] Whether or not based on her rational perceptions, that last conclusion requires specialized knowledge that Ms. Cheung plainly lacks.

The government's tendency to blur Rules 701 and 702 also explains its misplaced reliance on *United States v. Chen*, No. 17-cr-00603, 2021 WL 2662116 (N.D. Cal. June 29, 2021). *Chen* stands for the unremarkable proposition that lay witnesses may properly testify "based on their personal knowledge and positions in the day-to-day affairs" of a company. *Id.* at *9. But nothing about the testimony in *Chen* was scientific, technical, or specialized. The witnesses were to be

---

[5] *E.g.*, Tr. 1204 ("[T]he correct value for vitamin D is 10. So it was an indication that there was some issue in the accuracy of the actual device, because, again, you know it equals 10 or in some acceptable range of 10."); Tr. 1248 ("It was concerning because if you just extrapolate out essentially the percentage of failures that are happening across the system, even if we change the device, there's something still going on that is causing one out of four failures of every single test that we do on this Edison system, right? Even if you change the device, it seems likely that maybe there's some issue with the chemistry….").

1    examined merely about whether they kept certain information secret at work. *Id.* at \*9-10.

2        The testimony challenged here went far beyond the who, what, when, and where of the

3    witnesses' day jobs. It required them to apply specialized knowledge, to describe scientific

4    concepts to the jury, and to opine on the accuracy and reliability of novel medical technology.

5    Whether or not there was a nugget of percipience at the core of that testimony is irrelevant,

6    because "mere percipience … does not trump Rule 702."

7        The government admits that the alleged misrepresentations about accuracy and reliability

8    are the ones that "mattered" to the patient counts. Dkt. 1725 at 11 (citing Tr. 7060). In other

9    words, the asserted error prejudiced those counts. But it infected the investor counts, too. The

10   government points to other alleged misrepresentations to investors, *id.* at 11-12, but given the

11   centrality of accuracy and reliability to the government's case—even as to investors—and the

12   hotly disputed evidence as to those other allegations, they do not negate prejudice. Indeed, the

13   government's closing asked the jury to render a verdict of "guilty on *all counts*" by looking to the

14   testimony of three witnesses: "Erika Cheung, or Rosendorff[,] or Pandori." Tr. 7086 (emphasis

15   added). The admission of their specialized testimony raises a substantial question as to all counts.

16              **3.    The Use Of False Testimony Is A Substantial Question.**

17       The government mistakenly contends that Mr. Balwani argues for reversal "because the

18   government did not seek to admit as exhibits in [his] trial tape recordings of [Ms. Holmes] on a

19   call with investors … and instead have" Bryan Tolbert "testify to what he was told …." Dkt. 1725

20   at 18; *see also id.* at 19 (claiming Mr. Balwani asserts prosecutorial misconduct based on "not

21   call[ing] every witness the government had called" in Ms. Holmes' trial).[6] That is plainly not Mr.

22   Balwani's argument. Mr. Balwani's motion is based on the government's decision to "elicit …

---

[6] In support of this misguided characterization, the government argues that "[i]f [Mr. Balwani]
believed the tapes [made by Tolbert] were so critical," he should have "s[ought] to admit" them.
Dkt. 1725 at 19. But as to the *Napue* error Mr. Balwani actually argues in his motion, it is the
government's "independent obligation," not Mr. Balwani's, to "immediately … take steps to
correct known misstatements of its witnesses." *United States v. Alli*, 344 F.3d 1002, 1007 (9th
Cir. 2003). In any event, the government forgets that as soon as the defense learned that the
government would not admit the tape on Tolbert's direct examination, Tr. 4248, it offered the
tape to cross-examine Tolbert on "the actual words [Holmes] said" that "influenced his decision"
so that the jury could hear the true facts and "not just [Tolbert's] recollection of what she said."
Tr. 4249. The government vigorously opposed this request, *see, e.g.*, Tr. 4248-61, 4389-96, and
the Court ruled it "would not permit [admission]," Tr. 4396.

inaccurate testimony from Mr. Tolbert" despite that it "knew all too well from its experience at the Holmes trial that Mr. Tolbert's testimony did not match the truth" of what Ms. Holmes said on the December 2013 investor call. Dkt. 1711 at 15. While "no rule … says the government is required to try the case in the exact same manner in severed trials," Dkt. 1725 at 19, longstanding Supreme Court precedent (that the government's brief fails to address) forbids the government from changing its strategy by "'soliciting false evidence'" or "'allow[ing] it to go uncorrected when it appears,'" as the government did here. *Dow v. Virga*, 729 F.3d 1041, 1042-43 (9th Cir. 2013) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

The government's decision to rely on false evidence requires reversal if "(1) the testimony was actually false" or misleading, "(2) the prosecutor knew it was false, and (3) the false testimony was material (i.e., there is a reasonable likelihood that the false testimony could have affected the judgment)." *Id.* at 1048; *see also Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019); Dkt. 1711 at 14. Thus in *Dow*, the Ninth Circuit reversed denial of habeas where the prosecutor—dissatisfied with a mistrial in the first trial—failed to correct false evidence more favorable to it in the second trial. 729 F.3d at 1044-46. The court held that this violated Dow's due process rights under *Napue* and required reversal because "the jury rendered a guilty verdict after hearing the false testimony while the first jury, which did not hear that testimony, failed to do so." *Id.* at 1050. Here, the disparate outcomes between Ms. Holmes' trial—where the jury learned and focused on what she *actually* stated during the December 2013 investor call, Dkt. 1711 at 15—and Mr. Balwani's trial—where the government presented a false version of the call—well clears the minimal materiality standard necessary for reversal under *Napue*.

The government makes no attempt to explain why the specific Tolbert testimony quoted in Mr. Balwani's motion, Dkt. 1711 at 15, was not false or misleading. It therefore forfeits any argument that these statements do not present at least a substantial question as to whether the government's failure to correct Tolbert meets the first two prongs of *Napue*. To the extent the government's brief could be read to suggest that, as a general principle, a discrepancy between facts it knows to be true—the recording—and a witness's "memory" of those facts cannot form the basis of a *Napue* error, Dkt. 1725 at 19, that is not the law. "The fact that [a] witness is not

complicit in the falsehood is what gives the false testimony the ring of truth, and makes it all the more likely to affect the judgment of the jury. That the witness is unaware of the falsehood of his testimony makes it more dangerous, not less so." *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005). Tolbert mistakenly recalled Ms. Holmes to have claimed "that Theranos devices *were employed* on the medevac helicopters" and "*being used* to kind of improve survival rates of military personnel who had been injured in combat," Tr. 4435 (emphasis added)—a mistaken recollection that Chris Lucas also shared, Tr. 5631. The government knew they were wrong: It knew from Tolbert's tape recording that Ms. Holmes only ever used aspirational language on the call, stating that "the ability to take a technology like this and put it in flight, specifically on a medevac, has the *potential* to change survival rates." Holmes Tr. 4504 (emphasis added). This issue therefore presents a substantial question on *Napue*'s first two prongs. And this was not a mistake in the heat of the moment—the government knew from Ms. Holmes' trial, as well as from the Holmes jury's request to replay the Tolbert tape, that the words on the tape were contrary to Tolbert's and Lucas' testimony elicited by the government.

As to the third prong (materiality), the government's assertion that Tolbert's false testimony "could not possibly affect *all counts* of conviction," Dkt. 1725 at 19, is belied by its own closing argument. The government made Ms. Holmes' statements about the military—and Tolbert's recitation of those statements in particular—a "centerpiece" of its closing argument as to all investor counts, *Hayes*, 399 F.3d at 985, "enhanc[ing] immeasurably the impact [on all counts] of [the] false … evidence," *Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991); *see also* Dkt. 1711 at 15 (explaining that government made this testimony "central to … its case"). It argued to the jury that "Holmes's role in the investor conspiracy was to recruit investors" and that "[s]he communicated false statements directly to investors like Tolbert." Tr. 6970. It told the jury, "You *heard* the Tolbert phone call when Holmes brags about DOD or military work that Theranos did." *Id.* (emphasis added). "That's Holmes fulfilling her role in the conspiracy." *Id.* Yet the government had not allowed the jury to "hear" that call directly—only Tolbert and Lucas' inaccurate rendition of it. Furthermore, it asserted that the jury could trust the recitations of *all* investors regarding Holmes' military statements because they "all heard one form—one version

or another of this story that Theranos technology was deployed actually treating soldiers in the battlefield, sometimes on medevac helicopters." Tr. 7028 (emphasis added). The problem, of course, was that as the government knew, in investor conversations critical to this argument Ms. Holmes never told investors that the devices were being used in this way. By manufacturing consistency between its witnesses with Tolbert and Lucas' false testimony, "the [government] achieved the desired effect of artificially bolstering [its witnesses' collective] credibility"—as to misrepresentations allegedly made almost a decade earlier—through an "unconstitutional step." *Hayes*, 399 F.3d at 987. Indeed, the government elicited the same "consistent" testimony from Brian Grossman of PFM and Lisa Peterson of RDV, knowing that there was a recording of Ms. Holmes' actual words that did not match that testimony.

Illustrating this precise point, the government relies on Patrick Mendenhall, a witness relevant to Count 1, Dkt. 1725 at 19 (citing Tr. 4283-4302 & TX 4059), whose testimony was premised in part on his "independent memory" of a conversation with Mr. Balwani in December 2013, Tr. 4290. The government argued to the jury that it could believe "all" investors' testimony because of alignment with Tolbert's. Tr. 7028. It follows that "[i]f the jury had been informed" that at least two of these investors were wrong about what Ms. Holmes had said during the December 2013 time period, Mendenhall and other investors' "credibility would have been affected." *Id.* The jury "might well have concluded" that the demonstrably false accounts of investors who swore they had heard the same statements as other investors created reasonable doubt as to whether any investor's account should be credited. *Napue*, 360 U.S. at 270.

Under Ninth Circuit precedent, (1) the different outcomes on Counts 4 and 5 across Ms. Holmes' and Mr. Balwani's trials, and (2) the government's decision to knowingly make false testimony a "centerpiece" of its closing argument for all investor counts, both strongly support the conclusion that the false testimony was material to all investor counts. At a minimum, a court must reverse all counts affected by *Napue* error, but the flagrant nature of the prosecutorial misconduct here—where the government not only failed to correct false testimony but resisted the defense's attempts to reveal its deception to the jury—would also warrant reversal on all counts under the courts' "supervisory power to make it clear that the misconduct was

1    serious, … and that steps must be taken to avoid a recurrence of this chain of events." *United*

2    *States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir. 1993); *see also United States v. Kearns*, 5

3    F.3d 1251, 1254 (9th Cir. 1993) (suggesting that sanctions such as "dismissal of an indictment"

4    may be "appropriate" for "intentional deception"); Dkt. 1711 at 15. This error therefore presents a

5    substantial question likely to result in outright dismissal of—or, at the very least, a new trial on—

6    all counts, including patient and investor.

7         **4.    The Denial Of The Motion To Suppress And An Instruction On Missing Evidence Is A Substantial Question.**

8

9         Unrebutted expert testimony shows that the government could have secured the

10   comprehensive patient data from LIS long after Theranos disassembled the system. *See* Tr. 6807-

11   08, 6821. The government has never had a good-faith basis for its insinuation that Mr. Balwani

12   was somehow to blame for the data's unavailability—incorporated into its opposition despite the

     government's eleventh-hour concession that Mr. Balwani was not responsible. *See* Tr. 6872.

13

14        As for the rejected missing evidence instruction, no case holds that missing evidence must

15   have been in the government's custody to warrant the instruction. The Ninth Circuit has described

16   that issue as one of many factors—none dispositive. *See United States v. Robertson*, 895

17   F.3d 1206, 1213 (9th Cir. 2018). Other factors, including the government's negligence or

18   recklessness in ignoring an option that would have secured this data and the personal involvement

     of the prosecuting attorneys who tried this case, point squarely the other way. *See id.*; TX 5943.

19   Government negligence, even when the exculpatory value of the missing evidence is unknown,

20   can justify reversing a conviction when the district court fails to give the requested instruction.

21   *See United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013). It is fairly debatable whether it

22   was error to deny the instruction. A jury so charged would likely have rejected the core allegation

23   underpinning *all* counts of conviction—that Theranos' clinical testing was inaccurate.

24        Turning to the denial of the suppression motion itself, it is fairly debatable whether the

25   Court misapplied *Arizona v. Youngblood*, 488 U.S. 51 (1988). Any absence of bad faith on the

26   government's part is of no moment when the missing evidence at issue is exculpatory. Here,

27   when the Court has heard from three clinicians (Drs. Burnes, Wooten, and Zachman) who ordered

28

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

many hundreds of Theranos tests with concerns about the accuracy of testing for just two patients, the comprehensive testing data in LIS would likely have been exculpatory. Had the motion been granted and anecdotal evidence suppressed, the government's overwhelmingly anecdotal case would not have led to a conviction on any count.

### 5. The Admissibility Of Evidence On Dr. Rosendorff's Bias Is A Substantial Question.

The government and Mr. Balwani agree on a lot when it comes to Dr. Rosendorff's bias. They agree the question of bias revolves around whether Rosendorff had a "special motive to lie" based on an "interest in the outcome of the trial or personal animosity or favoritism" toward the prosecution. Dkt. 1725 at 22. And they agree that at least some of the government investigations into Dr. Rosendorff's workplaces "concerned time periods" when Rosendorff worked at the relevant companies and were related to "his role in the company." *Id.* (arguing only that "[s]*ome* of that scrutiny" was outside those parameters (emphasis added)).

Those basic facts, which were withheld from the jury, would have devastated Dr. Rosendorff's credibility. It would not have done so, as the government argues, by proving anything impermissible about Rosendorff's character. *See* Fed. R. Evid. 404(a). It might have incidentally demonstrated that Rosendorff was an error-prone lab director, for example, but that was not the purpose for which Mr. Balwani offered the evidence nor the argument he would have made based on it. Evidence of the government investigations of labs where Dr. Rosendorff worked after he left Theranos would have demonstrated that Rosendorff was motivated to blame others for the decisions he made at Theranos, in order to avoid questions (including questions from government investigators and prosecutors) about whether his own conduct was the reason so many labs where he worked were under government scrutiny. That's why Mr. Balwani sought to offer evidence of *the investigations*, not whether there were in fact laboratory fraud or errors.

The government constructs a straw man, positing that Mr. Balwani "cannot show—that subsequent investigations … give[] rise to a motive for Dr. Rosendorff to lie or slant his testimony." But all Mr. Balwani had to do was offer evidence of bias; he did not have to prove bias to the Court in order to present evidence of it to the jury. He had a robust Sixth Amendment

1  right to do so. *E.g.*, *United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2004).

2       Nor does it matter that Rosendorff gave prior statements consistent with his trial

3  testimony. *See* Dkt. 1725 at 22-23. All that shows is that he was consistent in his bias—

4  consistently motivated to cater to the government and avoid its scrutiny.

5       There is at least a substantial question whether the jury should have heard this evidence of

6  bias from a key witness. And for the reasons described above, Dr. Rosendorff's testimony was an

7  essential component of the convictions on "all counts." *Supra* at 8 (citing Tr. 7086).

8          **6.**     **The Denial Of A New Trial Or Evidentiary Hearing Based On**

9                   **Dr. Rosendorff's Post-Trial Conduct Is A Substantial Question.**

10       The government tries to brush off as harmless the erroneous *denial* of an evidentiary

  hearing on Dr. Rosendorff's post-trial conduct by pointing to what Rosendorff said at the hearing

11  that was *granted* to Ms. Holmes. As explained in Mr. Balwani's motion (at 17-18), there was no

12  basis for distinguishing between the defendants in this regard, and the government musters none.

13       Second, the government asks Mr. Balwani and the Court to be content with the answers

14  Rosendorff gave in response to questioning from the government and Ms. Holmes. But neither of

15  those parties had an interest in probing Rosendorff's testimony at Mr. Balwani's trial. The

16  arbitrary, erroneous denial of Mr. Balwani's request for a hearing raises a substantial question

17  warranting release pending appeal. Dkt. 1711 at 18 (citing *United States v. Mendez*, 619 F. App'x

18  644, 646 (9th Cir. 2015)). For the reasons stated just above, an error affecting Rosendorff's

19  testimony affects all counts of conviction.

20          **7.**     **The Admissibility Of Evidence On Alleged Misrepresentations To The**

21                   **Department Of Defense Is A Substantial Question.**

22       The government claims that evidence of misrepresentations *to* the military was "important

23  to show Defendant's intent and knowledge that the statements Defendant made to investor

24  victims about Theranos' work with the Department of Defense were, in fact, false." Dkt. 1725

25  at 28. Federal Rule of Evidence 404(b) governs the introduction of other acts to show "intent" and

26  "knowledge," but the government ignores its own failure to provide notice under Rule 404(b).

27  Nor does the government even attempt to show that this evidence satisfies the test for admission

28  as "inextricably intertwined" with the charged offenses. *United States v. Vizcarra-Martinez*, 66

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

1    F.3d 1006, 1012 (9th Cir. 1995). By not bothering to address the relevant legal standard, the

2    government impliedly concedes the substantial question.

3         As for the likely effect of the error, the government fails to even recite the appropriate

4    standard. The government points to the Court's Order on *Ms. Holmes*' Rule 29 motion, *see*

5    Dkt. 1725 at 28 (citing Dkt. 1575 at 4 n.1), in which evidence is viewed in the light most

6    favorable to the government. But when assessing whether an evidentiary error is harmless, courts

7    look to both the other evidence in the record and to "the most perceptive reflections as to the

8    probabilities of the effect of error on a reasonable trier of fact." *United States v. Job*, 871 F.3d

9    852, 865 (9th Cir. 2017); *see also Oaxaca*, 233 F.3d at 1158. As discussed above, the government

10   made representations about the military a core theme of its opening and closing, and its conflating

11   representations to the military with those to investors casts doubt on all investor counts.

12        **8.    The Standard Of Proof For Proving Loss At Sentencing, And Whether
              The Government Met That Burden, Is A Substantial Question.**

13        The government fails to cite—much less address—the Ninth Circuit's latest word on the

14   standard that governs loss in this case: *United States v. Lonich*, 23 F.4th 881, 915 (9th Cir. 2022).

15        **C.    Any One Of The Substantial Questions Would Result In Dismissal, A New
              Trial, Or A Substantially Reduced Substance.**

16

17        For the reasons described above and in the motion, each of the errors undermined all of

18   the counts for which imprisonment was imposed or else are likely to result in a substantially

19   reduced sentence. *Supra* §§ III.C.1-8. These errors, individually or in combination, therefore

20   satisfy the fourth prong of § 3143(b)(1).

21   **III.    CONCLUSION**

22        Mr. Balwani respectfully requests that the Court grant his motion.

23   DATED: February 10, 2023                    Respectfully submitted,

24                                               ORRICK, HERRINGTON & SUTCLIFFE LLP

25

26                                               By:  */s/ Mark S. Davies*
                                                      Mark S. Davies

27                                               Attorney for Defendant
                                                 RAMESH "SUNNY" BALWANI
28

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD