No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant.*

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

## OPENING BRIEF OF
## APPELLANT RAMESH "SUNNY" BALWANI

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................ 3

BAIL AND DETENTION STATUS .......................................................... 3

STATEMENT OF THE ISSUES ............................................................... 3

STATUTES AND RULES ........................................................................ 4

STATEMENT OF THE CASE .................................................................. 5

    Theranos invents proprietary blood-testing technology ......................... 5

    Theranos starts work with the U.S. military ........................................ 6

    In partnership with Walgreens, Theranos offers blood-testing
        services to the public ................................................................. 7

    CMS finds "immediate jeopardy" based on laboratory practices
        unrelated to Theranos' proprietary technology ......................... 11

    Mr. Balwani departs Theranos.......................................................... 13

PROCEEDINGS BELOW ....................................................................... 13

    A grand jury indicts Holmes and Balwani for alleged fraud
        concerning Theranos' proprietary blood-testing technology ...... 13

    After the trials are severed, Holmes is convicted ............................... 14

    Mr. Balwani moves to exclude evidence addressing the accuracy
        and reliability of conventional blood-testing technology............ 14

    The district court admits extensive evidence of deficiencies in
        conventional blood-testing technology ..................................... 15

    The district court admits specialized testimony from non-experts
        about whether Theranos' proprietary testing worked ............... 16

    The government knowingly elicits false testimony about Holmes'
        representations concerning the military.................................... 20

The government's closing argument emphasizes inaccurate and unreliable conventional tests, specialized testimony from non-experts, and false testimony about Holmes' military statements ................................................................. 21

The jury convicts Mr. Balwani ......................................................... 23

SUMMARY OF ARGUMENT ................................................................. 24

STANDARD OF REVIEW ....................................................................... 25

ARGUMENT ............................................................................................. 26

I. The District Court Violated the Fifth Amendment by Constructively Amending the Charges Against Mr. Balwani Without Approval from a Grand Jury ...................................... 26

   A. The indictment charges fraud related to the accuracy and reliability of Theranos' proprietary blood-testing technology .................................................................... 27

   B. The government's evidence at trial addressed the accuracy and reliability of conventional technology ......... 30

   C. The evidence constituted a constructive amendment of the indictment ................................................................. 32

   D. The error requires vacating all counts ............................. 34

II. The District Court Violated Rules 701 and 702 by Admitting Specialized Testimony from Non-Experts ................................. 35

   A. Cheung, Rosendorff, and Pandori each gave scientific and technical testimony about the accuracy and reliability of Theranos' blood-testing services ................. 37

   B. The Cheung, Rosendorff, and Pandori testimony was "specialized" under Rules 701 and 702 .......................... 40

   C. The district court violated Rules 701 and 702 by allowing Cheung, Rosendorff, and Pandori to give specialized testimony without first finding them qualified experts ......................................................... 42

   D. The district court's error requires vacating all counts ....... 49

III.   The Government's Failure to Correct False Investor
       Testimony About Holmes' Statements Regarding Theranos'
       Military Relationships Violated Due Process ........................... 53

       A.   Tolbert and Lucas testified falsely ................................... 54

       B.   The prosecutors knew the testimony was false and
            failed to correct it ........................................................... 56

       C.   The false testimony was material to all investor counts
            and warrants a new trial on each .................................... 59

IV.    The District Court Applied the Wrong Standard for Proving
       Loss at Sentencing ................................................................. 66

CONCLUSION ........................................................................................... 69

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arnold v. Runnels*,
421 F.3d 859 (9th Cir. 2005) ................................................................ 61

*Brown v. Borg*,
951 F.2d 1011 (9th Cir. 1991) .............................................................. 61

*Caliendo v. Warden of Cal. Men's Colony*,
365 F.3d 691 (9th Cir. 2004) ................................................................ 65

*Dow v. Virga*,
729 F.3d 1041 (9th Cir. 2013) .......................................... 26, 53, 54, 59, 65

*Elsayed Mukhtar v. Cal. State Univ.*,
299 F.3d 1053 (9th Cir. 2002) .............................................................. 51

*Giglio v. United States*,
405 U.S. 150 (1972) ............................................................................. 63

*Hayes v. Brown*,
399 F.3d 972 (9th Cir. 2005) ............................ 53, 59, 60, 62, 63, 64, 65, 66

*Jackson v. Brown*,
513 F.3d 1057 (9th Cir. 2008) .......................................... 26, 56, 58, 59, 66

*Jerden v. Amstutz*,
430 F.3d 1231 (9th Cir. 2005) .............................................................. 46

*Kennedy v. Lockyer*,
379 F.3d 1041 (9th Cir. 2004) .............................................................. 65

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ............................................................................. 45

*N. Mariana Islands v. Bowie*,
243 F.3d 1109 (9th Cir. 2001) .............................................................. 59

*Napue v. Illinois,*
    360 U.S. 264 (1959) ................................................4, 53, 56, 64

*Obrey v. Johnson,*
    400 F.3d 691 (9th Cir. 2005) ................................................ 49

*Panah v. Chappell,*
    935 F.3d 657 (9th Cir. 2019) ................................................ 54

*Rodriguez v. Gen. Dynamics Armament & Tech. Prods.,*
    510 F. App'x 675 (9th Cir. 2013) .......................................... 45

*Russell v. United States,*
    369 U.S. 749 (1962) ............................................................ 26

*Stirone v. United States,*
    361 U.S. 212 (1960) ................................................ 27, 32, 33

*Tribble v. Evangelides,*
    670 F.3d 753 (7th Cir. 2012) ................................................ 40

*United States v. Adamson,*
    291 F.3d 606 (9th Cir. 2002) .................................26, 27, 32, 34

*United States v. Alli,*
    344 F.3d 1002 (9th Cir. 2003) ..........................................57, 60

*United States v. Ausby,*
    916 F.3d 1089 (D.C. Cir. 2019) ............................................ 54

*United States v. Bailey,*
    696 F.3d 794 (9th Cir. 2012) ................................................ 49

*United States v. Berger,*
    587 F.3d 1038 (9th Cir. 2009) .............................................. 26

*United States v. Bhagat,*
    436 F.3d 1140 (9th Cir. 2006) .............................................. 25

*United States v. Blinder,*
    10 F.3d 1468 (9th Cir. 1993) ................................................ 27

*United States v. Butler*,
    567 F.2d 885 (9th Cir. 1978) ................................................................. 59

*United States v. Carlson*,
    616 F.2d 446 (9th Cir. 1980) ................................................................. 33

*United States v. Chen*,
    No. 17-cr-00603, 2021 WL 2662116 (N.D. Cal. June 29, 2021) .......... 41, 42

*United States v. Conn*,
    297 F.3d 548 (7th Cir. 2002) ................................................................. 40, 44

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013) ................................................................. 66

*United States v. Crocker*,
    568 F.2d 1049 (3d Cir. 1977) ................................................................. 33

*United States v. Figueroa-Lopez*,
    125 F.3d 1241 (9th Cir. 1997) ........................................... 36, 44, 45, 46, 52

*United States v. Finley*,
    301 F.3d 1000 (9th Cir. 2002) ................................................................. 40

*United States v. Frederick*,
    78 F.3d 1370 (9th Cir. 1996) ................................................................. 68

*United States v. Hartz*,
    458 F.3d 1011 (9th Cir. 2006) ................................................................. 33

*United States v. Haynes*,
    729 F.3d 178 (2d Cir. 2013) ................................................................. 41

*United States v. Hymas*,
    780 F.3d 1285 (9th Cir. 2015) ................................................................. 68

*United States v. Kirk*,
    844 F.2d 660 (9th Cir. 1988) ................................................................. 57

*United States v. Kohring*,
    637 F.3d 895 (9th Cir. 2011) ................................................................. 65, 66

vi

*United States v. LaPage,*
    231 F.3d 488 (9th Cir. 2000) ...................................................54, 56, 59, 65

*United States v. Lloyd,*
    807 F.3d 1128 (9th Cir. 2015)................................................................ 45

*United States v. Lonich,*
    23 F.4th 881 (9th Cir. 2022) .................................................................. 67

*United States v. McDill,*
    871 F.3d 628 (8th Cir. 2017) ................................................................. 34

*United States v. Miller,*
    471 U.S. 130 (1985) .............................................................................. 26

*United States v. Miller,*
    738 F.3d 361 (D.C. Cir. 2013)............................................................... 45

*United States v. Morales,*
    108 F.3d 1031 (9th Cir. 1997)................................................................ 49

*United States v. Natal,*
    849 F.3d 530 (2d Cir. 2017)................................................................... 48

*United States v. Oaxaca,*
    233 F.3d 1154 (9th Cir. 2000)................................................................ 52

*United States v. Peoples,*
    250 F.3d 630 (8th Cir. 2001) ................................................................. 40

*United States v. Price,*
    566 F.3d 900 (9th Cir. 2009) ................................................................. 58

*United States v. Riddle,*
    103 F.3d 423 (5th Cir. 1997) ................................................................. 41

*United States v. Shipsey,*
    190 F.3d 1081 (9th Cir. 1999)................................................................ 32

*United States v. Stein,*
    846 F.3d 1135 (11th Cir. 2017).............................................................. 60

*United States v. Valencia-Lopez,*
   971 F.3d 891 (9th Cir. 2020) ................................................... 51

*United States v. Wells,*
   879 F.3d 900 (9th Cir. 2018) ................................................... 25

*United States v. Wilson,*
   605 F.3d 985 (D.C. Cir. 2010) ................................................. 40

**Constitutional Provisions**

U.S. Const. amend. V ..................................................... 26, 27, 33

**Statutes**

18 U.S.C. § 1343 ........................................................................ 67

18 U.S.C. § 1349 ........................................................................ 67

18 U.S.C. § 3231 .......................................................................... 3

28 U.S.C. § 1291 .......................................................................... 3

U.S.S.G. § 2B1.1 ................................................................... 67, 68

U.S.S.G. Ch. 5 Pt. A (Sentencing Table) .................................... 67

**Rules**

Fed. R. App. P. 4 .......................................................................... 3

Fed. R. App. P. 28 ...................................................................... 67

Fed. R. Crim. P. 16 (2021) .......................................................... 36

Fed. R. Evid. 602 ........................................................................ 46

Fed. R. Evid. 701 .............................. 3, 24, 35, 36, 37, 40, 42, 43, 46, 48, 49, 52

Fed. R. Evid. 702 ............ 3, 24, 35, 36, 37, 40, 42, 43, 44, 45, 46, 47, 49, 50, 52

Fed. R. Evid. 801 .................................................................. 57, 58

# INTRODUCTION

This is an appeal about prosecutorial overreach to secure a conviction in a high-profile case. The media frenzy surrounding Theranos—books, podcasts, an HBO documentary, a Hulu series on the eve of trial, and pervasive television and print reporting all proclaiming Sunny Balwani guilty—created enormous public expectations for a government win.

In this high-pressure atmosphere, the government violated Mr. Balwani's rights and the rules of evidence through lawless efforts that permeated the trial. The district court approved these efforts by:

- allowing the government to present extensive evidence that permitted the jury to convict Mr. Balwani for conduct on which the grand jury did not indict;

- allowing the government to present specialized testimony from lay witnesses on the technical question whether Theranos' proprietary technology was accurate and reliable; and

- allowing the government to present testimony from investors that co-defendant Elizabeth Holmes made certain misrepresentations about Theranos' military work, when the government knew from a recording of Holmes (which it successfully fought to exclude) that the testimony was false.

In short, the government pursued grave due process and evidentiary violations that undermined Mr. Balwani's right to a fair trial. The district court, which should have safeguarded Mr. Balwani against these errors, instead enabled them, clearing the way for an unfair verdict.

In a disturbing last chapter, the court allowed the government to inflate the Sentencing Guidelines range by applying the wrong standard of proof, which the court used to impose an unjust sentence of 155 months.

Mr. Balwani, a successful entrepreneur, joined Theranos nearly six years after its founding, when it already had an impressive Board of Directors and relationships with top pharmaceutical companies. He invested and lost millions in the company, and he relied on the opinions of third-party experts and Theranos scientists to believe in Theranos' capabilities and in the promise of its partnership with Walgreens. But because of the errors below, Mr. Balwani is now serving a 13-year sentence.

The Court should vacate the judgment and sentence.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. It imposed sentence on December 7, 2022. 1-ER-38-39. Mr. Balwani timely filed his notice of appeal on December 20, 2022. 26-ER-6946-47; Fed. R. App. P. 4(b)(1)(A)(i), (b)(2). The district court entered final judgment on February 16, 2023. 1-ER-2-9. This Court has jurisdiction under 28 U.S.C. § 1291.

## BAIL AND DETENTION STATUS

The district court and this Court denied Mr. Balwani's requests for bail pending appeal. 3-ER-377-93; Dkt. 14. Mr. Balwani reported to the Bureau of Prisons on April 20, 2023.

## STATEMENT OF THE ISSUES

1. Whether the district court constructively amended the indictment by admitting extensive evidence about the accuracy and reliability of Theranos' blood-testing using *conventional* technology, when the indictment related to the accuracy of Theranos' *proprietary* technology only.

2. Whether the district court misconstrued and violated Rules 701 and 702 by allowing the government to present specialized opinion testimony from three lay witnesses concerning the central issue whether Theranos' technology worked.

3.   Whether the government violated due process under *Napue v. Illinois*, 360 U.S. 264 (1959), by failing to correct material false testimony that Holmes misrepresented Theranos' military work to investors, when the government knew that testimony was disproved by a recording in its possession.

4.   Whether the district court applied an incorrect preponderance standard for proving fraud loss instead of the clear-and-convincing standard this Court requires, leading to a loss amount that dramatically increased the Sentencing Guidelines range.

## STATUTES AND RULES

Relevant constitutional provisions, statutes, rules, and Sentencing Guidelines are in the Addendum.

## STATEMENT OF THE CASE

**Theranos invents proprietary blood-testing technology.**

Elizabeth Holmes founded Theranos to develop innovative methods for testing blood.  The conventional method was to draw large amounts of blood by puncturing patients' veins.  *See* PSR ¶ 9 (filed under seal under Ninth Circuit Rule 27-13(d)).  In its early years, Theranos developed proprietary technology to run clinical tests using only small drops of blood collected from the finger.  PSR ¶ 12.  Theranos' innovations spanned every component of the blood-testing process: It invented collection tubes for fingerstick samples, generations of the devices for testing those samples, the chemistries to operate inside those devices, and the software to run it all.  *See* 3-ER-583-86; 4-ER-769-73; 8-ER-1832-38; 22-ER-5929.  Theranos secured revenue-generating relationships with major pharmaceutical companies, including AstraZeneca, Celgene, Glaxo-Smith Kline, Novartis, Pfizer, and Schering-Plough.  PSR ¶ 19.

Mr. Balwani learned of Theranos through his romantic relationship with Holmes.  *See* PSR ¶ 10.  After six years of operation, Theranos' Board—including Silicon Valley legend Don Lucas and Stanford engineering professor Channing Robertson—chose Mr. Balwani as the Board's Vice Chair and, a year later, appointed him President and Chief Operating Officer.  *See* 22-ER-

5974; 22-ER-5986-87; 12-ER-3249; 12-ER-3277; 18-ER-4823. Mr. Balwani asked for a salary of $1 per year until the company was profitable, but the Board disagreed; he was paid $99,000 annually. PSR ¶ 119.[1] Previously, Mr. Balwani had worked for Microsoft and later started and sold a company called CommerceBid. PSR ¶¶ 117-18.

Within months of Mr. Balwani's joining the company, Theranos' chief scientist reported that Theranos' proprietary technology had "demonstrated capabilities fully equivalent" to conventional laboratory methods. PSR ¶ 12. Theranos' research-and-development teams went on to develop hundreds of blood tests using micro-samples of blood, generating dozens of reports demonstrating the efficacy of particular tests—or "assays"—for clinical use with Theranos' proprietary technology. *See id.*

**Theranos starts work with the U.S. military.**

Theranos worked with the U.S. military toward the goal of deploying devices on the battlefield. *E.g.*, 8-ER-1945-89; 19-ER-5340-47; 22-ER-5894-923; 22-ER-5950. Military personnel tested the devices' ability to travel on helicopters and function in extreme conditions. 8-ER-1962-71. For example,

---

[1] Demonstrating his belief in the company, Mr. Balwani guaranteed a $12 million loan to Theranos and invested $4.7 million. *See* PSR ¶¶ 19, 121. Mr. Balwani never tried to sell any Theranos stock, thus losing millions when the company failed. *See* PSR ¶ 121.

Theranos sent one of its next-generation devices to Africa, where it traveled on a military helicopter to assess how it fared in harsh weather. 22-ER-5892-93; 22-ER-5931-46. The device "travelled well and functioned well" on these trips. 22-ER-5892. Theranos' military work was ultimately interrupted by government sequestration in 2013 and Theranos' launch of retail projects. 8-ER-1983-89.

**In partnership with Walgreens, Theranos offers blood-testing services to the public.**

Theranos partnered with Walgreens to use Theranos' proprietary device in Walgreens' retail pharmacies to make quick and convenient blood testing available to consumers. *See* PSR ¶ 23. Before formalizing the relationship, Walgreens had a team of experts at Johns Hopkins Medicine evaluate Theranos' technology. That evaluation concluded that the technology was "novel and sound," that its special strengths included "[a]ccuracy," and that the experts had identified "[n]o major weaknesses." 22-ER-6060-61. Theranos sent several of its proprietary devices to Walgreens, which Walgreens used internally to run tests for years before any testing was offered to the public. *See* PSR ¶ 17.

Theranos' strategy with Walgreens evolved over time, and regulatory requirements led the companies to adopt a two-phased approach. PSR ¶ 23. In the first phase, patient blood samples collected at Walgreens would be

shipped to a Theranos lab for analysis.  *Id.*  The second phase, to start after

Theranos secured required regulatory approvals, would place Theranos devices

in Walgreens stores.  *Id.*; 19-ER-5351.

To accommodate the volume and range of tests anticipated due to the

public launch, Theranos supplemented its proprietary devices with high-

volume conventional devices manufactured by companies like Siemens; these

were approved by the FDA to test standard volumes of blood collected through

a traditional arm draw.  *See* 3-ER-599-600.  Theranos' scientists sometimes

modified these conventional devices so they could analyze large numbers of

small blood samples collected via fingerstick.  *See* PSR ¶ 23.  Thus, when it was

testing patient samples in its clinical lab, Theranos used proprietary devices

that it built from scratch, unmodified conventional devices, and conventional

devices with proprietary modifications.

Holmes and Balwani informed Walgreens that blood samples taken from

the arm would be tested on conventional technology.  3-ER-434-35.  They

informed investors and patients, too: A press release disclosed that blood

samples may be taken through "traditional methods."  19-ER-5385-88.

Likewise, Theranos' website advised that arm draws would sometimes be

used.  11-ER-2970-71.  And Theranos informed the Centers for Medicare and

Medicaid Services ("CMS") and the FDA that its testing relied in part on

conventional technology. *See* 21-ER-5805-16. An investor knew that samples might be tested through "traditional methods," 16-ER-4238-39, and others said they did not remember, 11-ER-2979-80; 17-ER-4792.

Tests run on proprietary technology—whether Theranos' own devices or Theranos-modified conventional devices—underwent a rigorous validation process before being used to test patients. *See* 4-ER-788; 10-ER-2556-57. A qualified lab director—"responsible for absolutely everything"—had to attest to the accuracy and reliability of *all* clinical testing, including testing using proprietary technology. 10-ER-2517; *accord* 5-ER-1112-13; 10-ER-2501. Dr. Adam Rosendorff directed Theranos' clinical lab at the time of the public launch with Walgreens. He never released a single patient result he believed inaccurate, 10-ER-2576-77; 11-ER-2788, and he personally approved validation reports prepared by teams of scientists for all proprietary tests before they were offered to the public, *see* 10-ER-2550-51; 10-ER-2556-59.

After the public launch with Walgreens and amid the need to continue developing new proprietary tests and expand the clinical lab, Theranos raised investments. *See, e.g.*, 16-ER-4280-81. In December 2013, Holmes spoke to shareholders by phone. Bryan Tolbert, Chris Lucas, and other investors listened in on that call, which Tolbert recorded. 12-ER-3237-39; 16-ER-4259-60. Holmes spoke aspirationally about how portable blood-testing had "the

ability" to take place on a military medevac helicopter, with the "potential to change survival rates" for soldiers in the battlefield. 23-ER-6247; *see also* 19-ER-5345 (scope of work provided to military outlining the same).[2]  But she explained that the company "had to pause a large number of [its] ongoing pharmaceutical and military programs so that [it] could focus" on retail opportunities. 23-ER-6247-48.

Throughout 2014, Theranos and Walgreens worked toward a national rollout of Theranos services in Walgreens stores, including thousands of new stores in 2015. 19-ER-5389-94; 9-ER-2305-06; 14-ER-3619-20.  A Walgreens executive told Mr. Balwani that "[w]e are going to touch 2000 stores in 2015." 20-ER-5451.  In December 2014, Walgreens leadership remained committed to a rollout, and in March 2015, Walgreens' internal correspondence discussed financial metrics associated with offering Theranos services in 2500 stores. 22-ER-5970; 20-ER-5452-55.

Walgreens' planned expansion supported Theranos' optimistic revenue forecasts and drove investments throughout 2014. *See, e.g.*, 11-ER-2990-91; 14-ER-3917; 15-ER-3919; 17-ER-4711.  But as with any investment, there was risk: Investors understood that, if the rollout slowed, Theranos would not

---

[2] Transcript excerpts in ER volumes 23-25 are from Holmes' trial.

realize the projected revenues.  *E.g.*, 11-ER-2951.  Investor Brian Grossman received a spreadsheet from Mr. Balwani disclosing the assumptions underlying Theranos' revenue model.  *See* 17-ER-4800-02.  Investor Lisa Peterson recalled that Mr. Balwani offered a lengthy presentation explaining those forecasts; she did not remember the details of the presentation.  11-ER-2870; 12-ER-3028-30.

Theranos ultimately obtained hundreds of patents on its technology and guarded its technologies as trade secrets in the interim.  *See* 21-ER-5716-70; 22-ER-5947-48.  It also obtained FDA approval for one of its blood tests and for the next-generation device running that test.  *See* 22-ER-5930; 22-ER-5951-69; 22-ER-6062-68.

**CMS finds "immediate jeopardy" based on laboratory practices unrelated to Theranos' proprietary technology.**

In fall 2015, Sarah Bennett from CMS, the agency "responsible for the oversight of laboratories," 12-ER-3289, inspected Theranos' clinical lab.  The resulting report's cover letter proclaims: "CONDITION LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY."  20-ER-5458.  CMS "determined that the deficient practices of the laboratory pose immediate jeopardy to patient health and safety."  *Id.*  "Immediate jeopardy" is "a situation in which immediate corrective action is necessary because the

laboratory's non-compliance … has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death." *Id.*

The immediate jeopardy finding was based on a category of testing—hematology—that Theranos was conducting with conventional technology. 20-ER-5458 (immediate jeopardy "based on the Condition-level requirement … Hematology"); 20-ER-5464-65 (identifying CBC, WBC, and PT/INR as hematology tests); 20-ER-5489-97, 20-ER-5506, 20-ER-5531 (showing CBC, WBC, and PT/INR were being tested with conventional technology: "Drew 3 instruments," "Advia 2120i," and "Cellavision"); 14-ER-3706-07 (Bennett confirming that PT/INR was run on "an FDA approved commercial device"). CMS's findings overwhelmingly focused on conventional technology and lab management.[3]

---

[3] None of the most serious deficiencies—the condition-level ones—related to the performance of Theranos' proprietary technology. 20-ER-5464-65 (CBC, WBC, and PT/INR on conventional devices); 20-ER-5469-70 (identifying analytic systems deficiencies—none based on the performance of Theranos' proprietary technology); 20-ER-5533-34 (lab director failure to supervise); 20-ER-5551 (technical supervisor's training and performance deficiencies); 20-ER-5577 (personnel qualification deficiencies). Indeed, Bennett did not inspect the part of Theranos' lab running proprietary technology. 14-ER-3693-94; 14-ER-3727-28; 14-ER-3745.

**Mr. Balwani departs Theranos.**

Mr. Balwani left Theranos in summer 2016—over two years before Theranos shuttered. The company had $351 million in cash. 6-ER-1506-08. The company also held a valuable portfolio of over 300 patents, which a contemporaneous valuation estimated could have yielded as much as $745 million in licensing opportunities. 3-ER-440; 3-ER-483.

## PROCEEDINGS BELOW

**A grand jury indicts Holmes and Balwani for alleged fraud concerning Theranos' proprietary blood-testing technology.**

A grand jury indicted Holmes and Balwani, alleging conspiracies to defraud investors (Count 1) and patients (Count 2) and individual counts of wire fraud corresponding to both alleged schemes (Counts 3-8 related to investors, and Counts 9-12 related to patients). 25-ER-6886-900. According to the indictment, Holmes and Balwani defrauded Theranos' investors because they "knew that Theranos's proprietary analyzer had accuracy and reliability problems …." 25-ER-6890. The indictment also accused Holmes and Balwani of claiming that "Theranos's technology had deployed to the battlefield." 25-ER-6891.[4] The indictment further alleged a scheme to defraud Theranos

---

[4] The indictment alleged other misrepresentations to investors about an expanding partnership with Walgreens, financial projections, and the use of conventional technology to perform some services. 25-ER-6890-92.

patients despite knowing that "Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results." 25-ER-6892-93.

**After the trials are severed, Holmes is convicted.**

The district court severed Holmes' trial from Mr. Balwani's, ordering that Holmes be tried first. 25-ER-6901-02. Holmes was convicted of conspiring to defraud investors and several counts of wire fraud against individual investors. *See* 22-ER-6132-34.

**Mr. Balwani moves to exclude evidence addressing the accuracy and reliability of conventional blood-testing technology.**

Before trial, Mr. Balwani moved to exclude evidence about the accuracy and reliability of blood tests run on conventional technology. 22-ER-6151-61. The challenged evidence encompassed large portions of CMS's inspection report (20-ER-5458-582), including its finding that Theranos' laboratory practices posed an "immediate jeopardy." Mr. Balwani similarly sought to exclude testimony from two patients whose tests were not run on Theranos' proprietary technology. 22-ER-6151-52.

In the government's parallel motion to exclude evidence that Mr. Balwani trusted Theranos with his own mother's blood work, it argued that the accuracy of tests not "run on [a] Theranos proprietary blood analyzer

14

[but rather on] a regular FDA-approved machine" lacked "relevance to the charged conduct." 22-ER-6167.[5]

In a hearing on the parties' motions, the district court concluded that the charges did not relate to the accuracy of conventional technology:

> I understand that he's not—*your client is not charged with doing anything with commercial machines*. He's certainly not charged with that. And if that is the only evidence and you asked the Court to grant a directed verdict, I would probably grant that if they didn't put anything in about *the company's machines like they said in the indictment*.

22-ER-6082 (emphases added).

But in its written order following the hearing, the district court reversed course and denied Mr. Balwani's motion without acknowledging its prior conclusion or the government's position that the accuracy of testing on non-Theranos technology lacked "relevance to the charged conduct." 22-ER-6167; 2-ER-372-73.

**The district court admits extensive evidence of deficiencies in conventional blood-testing technology.**

Based on its ruling, the district court permitted Bennett to testify at length about CMS's findings and admitted the 100-page report containing those findings, including CMS's "immediate jeopardy" determination even

---

[5] In the Holmes trial, the government likewise argued that evidence was irrelevant unless related to "the actual Theranos technology." 22-ER-6170-73.

15

though, as discussed above, that finding relied on problems with tests Theranos was running only on conventional technology. *Supra* at 11-12.

Similarly, the testimony of two patients—about allegedly incorrect test results they received—was about conventional technology. Erin Tompkins testified about a false-positive HIV screener result she received, even though Theranos never conducted HIV testing on its own technology. 10-ER-2497-98; 16-ER-4515-17; 17-ER-4519-30. And Brent Bingham testified about a false platelet test, even though the government could not establish that it was conducted on proprietary technology. *See* 16-ER-4491-94; 20-ER-5472; 20-ER-5489-90; 20-ER-5495.

**The district court admits specialized testimony from non-experts about whether Theranos' proprietary technology worked.**

The government offered no expert witness on the central question of the accuracy and reliability of Theranos' proprietary technology, and it failed to secure Theranos' comprehensive clinical database. Instead, the government's presentation at trial relied on anecdotes about allegedly erroneous test results and the opinions of non-experts on specialized topics.

Theranos maintained a database with comprehensive patient-testing data. That database revealed how patient results compared with the results of prior tests, quality-control information, and other measurements recording Theranos' patient testing. 10-ER-2620-23. Theranos' scientific team used the

database as a key tool for determining whether a test result was valid.  *See* 10-ER-2624.  But the government recklessly failed to obtain that database—akin to charging an accounting-fraud case without obtaining accounting records and auditor files.[6]

As the government's witnesses acknowledged, every lab generates erroneous results.  *E.g.*, 4-ER-786; 10-ER-2681.  The government never established that the rate of errors at Theranos differed from the rate at other labs.  Indeed, Rosendorff's correspondence as lab director confirmed that the rate of physician inquiries about Theranos test results was "not higher than in [his] previous job" at a University of Pittsburgh lab.  21-ER-5820.

With no expert on the systemic accuracy of Theranos' technology, and without the comprehensive database, the government resorted to anecdotal evidence about alleged errors and testimony from lay witnesses about the accuracy and reliability of Theranos' proprietary testing.  For instance, the jury heard from only four patients, even though Theranos issued millions of patient test results.  *Compare* 16-ER-4406; 16-ER-4470; 16-ER-4478; 16-ER-4515

---

[6] Theranos shut down this database years after Mr. Balwani left the company.  At trial, unrebutted expert testimony showed that the government could have obtained the data had it taken actions recommended by the government's own IT specialist—and that the prosecution team decided not to pursue that recommendation.  18-ER-5062-64.

(patients testifying about Theranos blood work), *with* 14-ER-3668 (noting 890,000 tests per year for Theranos' California lab alone).  Three physicians testified about specific patients who had used Theranos.  Among their hundreds of Theranos patients, they identified just two whose tests prompted concerns.  *See* 16-ER-4380-81; 16-ER-4389-91, 16-ER-4450-53; 18-ER-4905.

The district court allowed the government to plug the glaring holes in its case through specialized testimony from three lay witnesses—none offered as experts.

First, Erika Cheung, the government's opening witness at trial, was an entry-level lab associate at Theranos for six months in her "first job out of college."  3-ER-572.  She was "at the bottom of the … organizational structure."  3-ER-581.  Despite lacking any technical credentials, she opined on: (1) why dilution is necessary in blood testing, 3-ER-587-88; (2) the capacities of Theranos devices, 3-ER-590-93; (3) the purpose of and concerns arising from Theranos' quality-control testing, 3-ER-654-56; 4-ER-698-701; (4) comparisons between Theranos' data-analysis procedures and an industry-standards manual she had never seen before, 4-ER-940-42; and (5) the nature of government regulations governing blood testing, 4-ER-945-46.  The district court also allowed her to testify that purportedly poor quality-control

performance in the clinical lab suggested "that there was some issue in the accuracy of the actual [Theranos] device."  3-ER-656.

Second, Rosendorff gave his opinions about: (1) the effects of laboratory bias, dilution, and hemolysis on the accuracy and reliability of Theranos technology, 9-ER-2345-47; 11-ER-2733-35; (2) concerns arising from Theranos' use of testing reference ranges specific to its fingerstick technology, 9-ER-2347-48; and (3) whether purported errors in individual patients' results could indicate systemic accuracy problems, 9-ER-2349-50.[7]  In its closing, the government described Rosendorff's testimony as "technical [and] specialized," citing his credentials.  19-ER-5246.

Third, Mark Pandori, Ph.D., offered opinions on: (1) whether Theranos technology was groundbreaking given the state of the art and industry knowledge, 5-ER-997-98; 5-ER-1090; (2) concerns arising from quality-control and proficiency testing, 5-ER-1023; 7-ER-1600-01; and (3) whether "Theranos testing was more accurate" than competitors', 5-ER-1091.  Pandori relied on his experience with the "literature," 5-ER-999, and explained that "[y]ou

---

[7] After leaving Theranos, Rosendorff served as lab director at three companies that were investigated over testing errors or healthcare fraud, including one subject to a CMS finding of immediate jeopardy.  *See* 3-ER-527-28; 3-ER-533-34; 3-ER-536-37; 3-ER-543; 3-ER-546; 3-ER-551-68.  The district court prohibited inquiry into Rosendorff's bias arising from those investigations.

would need to be, you know, an expert to appreciate" some of the matters on which he testified, 5-ER-1038.

**The government knowingly elicits false testimony about Holmes' representations concerning the military.**

Among the government's most serious allegations was that the defendants falsely claimed that Theranos had deployed its technology to the battlefield to save U.S. soldiers. 25-ER-6891. Aside from witnesses' memories of events almost a decade earlier, the only evidence of what Theranos told investors on this topic comes from Tolbert's recording of the December 2013 investor call. *Supra* at 9-10.

During Holmes' trial, the government had played portions of Tolbert's recording. Regarding Theranos' military relationship, the tape proved that Holmes spoke in aspirational terms about portable blood-testing's "*potential* to change survival rates" through use on medevacs, but she did not represent that Theranos devices were *already* being used on the battlefield. 23-ER-6247 (emphasis added). Holmes also communicated that Theranos "had to pause" its military work to focus on retail opportunities. *Id.* The parties played portions of the tape discussing the military four times. 23-ER-6246-47; 23-ER-6279-80; 24-ER-6549; 24-ER-6553. The jury returned a mixed verdict on the investor counts after Holmes' counsel encouraged them to consider "the contemporaneous record [of] what was told about medevacs," 25-ER-6731,

and after the jury asked to listen to the tape again during deliberations, 22-ER-6135. *See* 22-ER-6132-34.

In Mr. Balwani's trial, by contrast, the government did not introduce the tape and successfully opposed the defense's efforts to play it. 2-ER-326-39; 2-ER-352-59; *see also* 2-ER-359. Instead of letting the jury hear Holmes' words, the government elicited testimony from Tolbert and Lucas directly conflicting with the tape. They falsely testified that Holmes claimed (1) that "Theranos devices were employed on the medevac helicopters and being used to … improve survival rates of military personnel who had been injured in combat"; and (2) that Theranos was "broadening" its military pursuits. 12-ER-3239; 12-ER-3242; *see also* 12-ER-3241-42; 15-ER-4205 (Lucas testifying Holmes said that the technology "was being used" already); 16-ER-4259-60. The government knew this testimony was false because it had the recording and fought hard to keep it from the jury, but it did not correct the testimony.

**The government's closing argument emphasizes inaccurate and unreliable conventional tests, specialized testimony from non-experts, and false testimony about Holmes' military statements.**

Throughout its closing, the government referred to the accuracy of blood testing—without distinguishing between proprietary and conventional testing. *See*, *e.g.*, 19-ER-5199 ("investors thought they were investing in a company that could test accurately" and "[p]atients thought they were getting their blood

21

tested in a company that could test accurately"); 19-ER-5175 ("Just like an article in the media would talk about Theranos's accuracy, and that would be useful for an investor to hear, a patient would read in the media that Theranos's testing was accurate and also make a decision to use Theranos as a lab or blood testing service …."); 19-ER-5176 (similar).

When discussing "the accuracy and reliability of [Theranos] blood testing," the government relied extensively on the opinions of the three former Theranos lab employees—the lay witnesses described above.  18-ER-5076; *see also* 19-ER-5192-93; 19-ER-5222-24.  "The simplest evidence" on this issue, the government argued, "was testimony from at least three individuals who worked within Theranos working in the lab.  That was, of course, Erika Cheung and then Drs. Mark Pandori and Adam Rosendorff."  19-ER-5230.  Indeed, the government's closing referred to Rosendorff—its star witness—by name more than 100 times.  18-ER-5075-117; 19-ER-5119-224; 19-ER-5230-339.[8]

---

[8] After both trials, Rosendorff visited Holmes' home—uninvited—to convey alarming misgivings about his testimony.  According to the only witness, Rosendorff explained that he wanted to talk to Holmes, because it would be "healing": He said he "fe[lt] guilty" because the government used his testimony to "make everybody look bad" and "ma[k]e things sound worse than they were"—to such a degree that he "was having trouble sleeping."  3-ER-519.  He thought, in short, that in testifying he "had done something

The government's closing also emphasized Holmes' purported statements about the military—and Tolbert's memory of those statements. It argued that "Holmes's role in the investor conspiracy was to recruit investors" and that "[s]he communicated false statements directly to investors like Tolbert." 18-ER-5107. Although the government did not play the tape of the December 2013 call for the jury, and resisted the defense's efforts to introduce it, the government astonishingly told the jury, "You heard the Tolbert phone call when Holmes brags about DOD or military work that Theranos did." *Id.* "That's Holmes fulfilling her role in the conspiracy." *Id.* It argued that the jury could trust investor-witnesses' recollections because they "all heard … that Theranos technology was deployed actually treating soldiers in the battlefield, sometimes on medevac helicopters." 19-ER-5166. The government's closing arguments highlighted the alleged military representations at least ten times. 18-ER-5071-117; 19-ER-5119-224; 19-ER-5228-339.

**The jury convicts Mr. Balwani.**

The jury convicted Mr. Balwani on all counts. 3-ER-521-24. The district court imposed a Guidelines sentence of 155 months. 1-ER-188.

---

wrong." *Id.* The district court barred Mr. Balwani from participating in the hearing it ordered to probe Rosendorff's statements, although it afforded Holmes that opportunity. 3-ER-496-97.

## SUMMARY OF ARGUMENT

*First*, the indictment, properly construed, relates to the accuracy and reliability of only Theranos' proprietary technology. Evidence related to the accuracy and reliability of Theranos testing using conventional technology is irrelevant to the indictment. By admitting inflammatory evidence of problems with conventional testing, the district court constructively amended the indictment. This violated Mr. Balwani's Fifth Amendment right to an indictment approved by a grand jury. Because the admission of this evidence created a substantial likelihood that the petit jury could have convicted on all counts based on the constructively amended charges, this Court should vacate the convictions.

*Second*, the district court misconstrued and violated Federal Rules of Evidence 701 and 702 by allowing lay witnesses—never qualified as experts— to offer extensive specialized testimony about technical subjects, including whether Theranos' technology provided accurate results. This error, which went to issues at the heart of the government's case, requires vacating all counts of conviction.

*Third*, the government violated Mr. Balwani's due process rights by knowingly using false testimony. Two government witnesses gave false testimony about representations they had purportedly heard that drove their

24

decision to invest in Theranos. The government knew the testimony was false because it had a recording of the call (which it successfully fought to keep from the jury) in which those alleged misrepresentations were made. The government then repeatedly capitalized on this false testimony in closing—at least ten times—and used it to unconstitutionally bolster its witnesses' credibility. These due process violations were material to the entire investor case; they require a new trial on all investor-related counts.

*Fourth*, the district court applied the wrong standard of proof in calculating loss at sentencing. This Court requires clear and convincing evidence to prove disputed sentencing enhancements that disproportionately affect the sentence. By applying a preponderance standard, the district court erred.

The district court's errors, individually or cumulatively, require vacating the judgment and sentence.

## STANDARD OF REVIEW

This Court reviews de novo the issues presented: (1) whether the district court constructively amended the indictment, *United States v. Bhagat*, 436 F.3d 1140, 1145 (9th Cir. 2006); (2) whether the district court properly "'construct[ed] or interpret[ed] … the Federal Rules of Evidence, including whether particular evidence falls within the scope of a given rule,'" *United*

*States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018); (3) whether the government improperly solicited or failed to correct false testimony, *Dow v. Virga*, 729 F.3d 1041, 1049 (9th Cir. 2013); and (4) "[w]hether the district court violated due process by using an improper standard of proof" at sentencing, *United States v. Berger*, 587 F.3d 1038, 1042 (9th Cir. 2009). Any underlying factual findings are reviewed for clear error. *Jackson v. Brown*, 513 F.3d 1057, 1069 (9th Cir. 2008).

## ARGUMENT

**I.      The District Court Violated the Fifth Amendment by Constructively Amending the Charges Against Mr. Balwani Without Approval from a Grand Jury.**

The Fifth Amendment guarantees that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury …." The government may therefore prosecute only those felony charges endorsed by a grand jury, *United States v. Miller*, 471 U.S. 130, 136 (1985), and neither the government nor a court may broaden an indictment's charges, *Russell v. United States*, 369 U.S. 749, 770 (1962). A constructive amendment "'occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them.'" *United States v. Adamson*, 291

26

F.3d 606, 614 (9th Cir. 2002), *abrogated on other grounds by United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) (en banc).

The district court erred in permitting the government to present a "'complex of facts'" that is "'distinctly different from those set forth'" in the indictment. *Adamson*, 291 F.3d at 615. The indictment alleges misrepresentations about the accuracy and reliability of *proprietary* technology. § I.A. At trial, however, the district court admitted extensive evidence about the accuracy and reliability of *conventional* technology. § I.B. Under *Stirone v. United States*, 361 U.S. 212 (1960), the district court violated the Fifth Amendment by constructively amending the indictment. § I.C. The error requires vacating all counts. § I.D.

## A. The indictment charged fraud related to the accuracy and reliability of Theranos' proprietary blood-testing technology only.

**1.** An indictment should be "'(1) read as a whole; (2) read to include facts which are necessarily implied; and (3) construed according to common sense.'" *United States v. Blinder*, 10 F.3d 1468, 1471 (9th Cir. 1993). Under that standard, the indictment's allegations about accuracy and reliability relate only to Theranos' proprietary technology.

The indictment accuses Holmes and Balwani of misleading investors with statements concealing that "Theranos's proprietary analyzer had accuracy and reliability problems." 25-ER-6890. And it charges them with deceiving

27

patients through "omissions concerning the limits of and problems with Theranos's technologies" despite knowing that "Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results." 25-ER-6892; *see also* 25-ER-6894 (accusing the defendants of conspiring to defraud patients under the "fraudulent pretense that Theranos technology produced reliable and accurate blood test results").

Other language is also about proprietary technology. For instance, Paragraph 16 of the indictment refers to the capabilities of "Theranos" as an example ("in particular") of the problem described in the prior sentence, which was limited to "Theranos's technology." 25-ER-6892-93. And the first phrase of Paragraph 17 limits the allegations to the "accuracy and reliability problems" charged earlier in the indictment, i.e., of proprietary technology. 25-ER-6893.

**2.** The government and the district court initially interpreted the indictment as Mr. Balwani does. But after Mr. Balwani sought to exclude evidence central to the government's case based on this correct interpretation, the government reversed course. The district court also departed from its prior conclusion, ruling that the indictment reaches the accuracy of conventional technology. *Supra* at 14-15.

28

The government argued, and the district court agreed, that the indictment's reference to HIV testing proves its broader scope, because Theranos always tested for HIV on conventional technology. *See* 22-ER-6143-44; 2-ER-373. But including HIV shows the opposite: At the time of the indictment, the government incorrectly *thought* that HIV was tested using proprietary technology.[9] Consistent with that misunderstanding, the government instructed a potential expert to analyze *proprietary* "fingerstick" testing, incorrectly including the HIV test. 22-ER-6138-39. And it showed the grand jury evidence about problems with a proprietary HIV test Theranos was developing. 3-ER-427-28; 20-ER-5456-57. (That proprietary test was never used clinically.)[10]

In other words, the HIV allegation cements that the government, and by extension the grand jury, believed that only proprietary technology was at issue

---

[9] The government's filings below confirm this unequivocally. *See* 25-ER-6908; 25-ER-6926.

[10] The government made other, similar mistakes. For example, it failed to respond to the defense's argument that the bill of particulars lists gonorrhea—a urine & pelvic swab test—as an example of a problematic blood test. *See* 22-ER-6096-97; *see also, e.g.*, 23-ER-6320 (acknowledging that "there may have been some confusion on the government's side about whether the PT assay, which is listed in the indictment and bill of particulars, was the same thing as the platelet assay" at issue in Count 9).

in the indictment.  The district court's interpretation of the indictment cannot stand on that thin basis.

### B. The government's evidence at trial addressed the accuracy and reliability of conventional technology.

The government took full advantage of the district court's deviation from the indictment, prejudicing Mr. Balwani with evidence that should have been excluded.

First, the testimony of CMS official Bennett wildly exceeded the indictment's bounds.  The government repeatedly highlighted CMS's "immediate jeopardy" finding with Bennett.  13-ER-3345-49.  Bennett explained that "immediate jeopardy" was "a situation where the lab practices have the potential to cause harm, or have caused harm, or could cause death to patients."  13-ER-3345.  The government also underscored the potential danger of inaccurate coagulation testing even though that test, PT/INR, was run on conventional technology.  14-ER-3707; 14-ER-3755 ("PT INR is … related to clotting and whether a person's blood clots appropriately … and [if it is not in a certain range] the patient's health can be affected.").  Thus, while the government at times asked Bennett about proprietary technology, at

bottom, her observations and the "immediate jeopardy" finding were based on conventional technology and ordinary lab mismanagement.[11]

Two out of the four patients who testified at trial also offered evidence unconnected to the accuracy of proprietary technology. Tompkins testified about a false-positive HIV screener result, even though that test was run on conventional technology. 17-ER-4523-30. And Bingham testified about an allegedly false platelet count test, despite the government's failure to show that this test was run on Theranos' proprietary technology. *See, e.g.*, 16-ER-4491-94.

The government's closing arguments highlight the centrality of this conventional-testing evidence to all counts. The government stressed Theranos' purportedly inaccurate testing without distinguishing between proprietary and conventional testing, and in connection with both investor and patient charges. *See, e.g.*, 19-ER-5199 (arguing to the jury that "investors thought they were investing in a company that could test accurately" and "patients thought they were getting their blood tested in a company that could test accurately"); 19-ER-5175-76 (similar).

---

[11] In fact, Bennett often declined to answer questions about Theranos' proprietary technology because she did not inspect that part of Theranos' lab. *See* 14-ER-3693-94; 14-ER-3727-28; 14-ER-3745.

This evidence—emphasized throughout the government's closing—could have caused the jury to convict based on inaccuracy of conventional testing and ordinary lab mismanagement, even though no grand jury indicted Mr. Balwani on those charges.

### C. The evidence constituted a constructive amendment of the indictment.

The evidence above constitutes precisely the "'complex of facts … distinctly different from those'" in the indictment that effects a constructive amendment. *Adamson*, 291 F.3d at 615.

*Stirone*, the "seminal case on constructive amendments," *United States v. Shipsey*, 190 F.3d 1081, 1086 (9th Cir. 1999), involved defendants charged with violating the Hobbs Act by interfering with the import of *sand into* Pennsylvania. *Stirone*, 361 U.S. at 213. But the district court admitted evidence showing interference with the export of *steel from* Pennsylvania. *Id.* at 214. The Supreme Court declared this a constructive amendment: The "indictment here cannot fairly be read as charging interference with movements of steel from Pennsylvania to other States." *Id.* at 217. As *Stirone* explained, no court "can know that the grand jury would have been willing to charge" on the export theory, but that was the (improper) basis for admitting the export-related evidence. *Id.* With that evidence of uncharged conduct, the

defendant could have faced conviction "on a charge the grand jury never made against him," so the error was "fatal." *Id.* at 219.

Since *Stirone*, courts have repeatedly vacated convictions when the jury may have convicted based on a charge the grand jury never made. *See, e.g.*, *United States v. Crocker*, 568 F.2d 1049, 1060 (3d Cir. 1977) (holding that indictment alleging perjury was constructively amended when government was allowed to prove testimony untruthful "in an entirely different manner"), *abrogated on other grounds as recognized in United States v. Miller*, 527 F.3d 54 (3d Cir. 2008); *see also United States v. Carlson*, 616 F.2d 446, 447-48 (9th Cir. 1980) (finding constructive amendment when defendant was charged with misapplying bank funds by causing loan to be made for personal use, but evidence and instructions permitted conviction for causing loan to be made without adequate security).

Here, the divergence between the charges and the evidence allowed Mr. Balwani to face conviction based on "'*different behavior*'"—failures in conventional blood-testing and lab mismanagement—"'than that alleged in the original indictment.'" *United States v. Hartz*, 458 F.3d 1011, 1021 (9th Cir. 2006) (distinguishing constructive amendment from variance). Because Mr. Balwani faced conviction on charges the grand jury never made, the Fifth Amendment was violated.

33

### D. The error requires vacating all counts.

Constructive amendment "always requires reversal." *Adamson*, 291 F.3d at 615. Here, that means vacating all counts.

The government stated post-trial that "misrepresentations about the accuracy and reliability of Theranos' testing would be sufficient to support a verdict on all counts alleged in the [indictment] and is the key overlapping misrepresentation between the two fraud schemes." 3-ER-408.

When there is a constitutionally invalid basis that could have supported all counts, and the jury makes no special findings, vacating all counts is required. In *United States v. McDill*, 871 F.3d 628, 630-31 (8th Cir. 2017), the defendant was convicted of two violations of threatening, intimidating, or interfering with a Forest Officer. The citations, however, charged interfering, a violation, and harassing, which was not a violation. *Id.* So "the verdict was permissible only if it rested on the theory that McDill intentionally interfered" with the officers. *Id.* at 632. The improperly admitted harassment evidence created "at least a substantial likelihood that McDill was convicted of an offense for which he was not charged." *Id.* at 633. The court could not determine whether the verdict rested on the valid ground or the invalid ground, and both counts had to be vacated. *Id.*

As in *McDill*, the general verdict here makes it impossible to know whether Mr. Balwani was convicted on all counts based on an impermissible theory about the accuracy of conventional testing. Thus, the Court must vacate the convictions on all counts.

## II.    The District Court Violated Rules 701 and 702 by Admitting Specialized Testimony from Non-Experts.

The government offered no expert testimony on the systemic accuracy of Theranos' technology, and as described above (at 16-17), it recklessly failed to obtain Theranos' database, which would have permitted expert analysis (by the government and the defense) of test results and quality-control data. No expert science and no data—despite the complex scientific and technical nature of this case about advanced medical diagnostics.

Instead, the government relied on three former Theranos employees called as lay witnesses to give the jury the scientific and technical context, facts, and conclusions. Erika Cheung, Adam Rosendorff, and Mark Pandori each offered highly specialized testimony, and each opined that Theranos' blood-testing services were not accurate and not reliable. By offering specialized evidence through these non-expert witnesses under Federal Rule of Evidence 701, the government avoided subjecting them and their testimony to the scrutiny of Rule 702. *See* Add. 2-3 (text of these Rules).

The government's dodge of Rule 702 is a familiar move. It is so common that the Rules of Evidence were amended to bar this practice explicitly: "If a witness is not testifying as an expert, testimony in the form of an opinion" cannot be "based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). Otherwise, "the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." *Id.* advisory committee's notes to 2000 amendment (citing *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)). That provision was added to codify this Court's landmark *Figueroa-Lopez* decision, which rejected the government's position on this very issue. 125 F.3d at 1246. The two rules work together: Rule 701(c) sets an outer boundary for lay testimony, and Rule 702 imposes requirements on "specialized" testimony that traverses that boundary.[12]

The three former employees gave specialized testimony in "lay witness clothing." § II.A. Because the testimony was specialized, the district court

---

[12] These Rules are buttressed by the dual requirements that the experts reliably base their opinions on sufficient data, Fed. R. Evid. 702(b)-(c), and that the government disclose "a written summary" including "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications," Fed. R. Crim. P. 16(a)(1)(G) (2021). By offering expert testimony in lay clothing, the government evaded these twin obligations. *See* Br. Nat'l Ass'n Criminal Def. Lawyers in Support of Holmes 8-9, 15-17.

should have applied Rules 701(c) and 702 to prevent these unqualified witnesses from providing specialized testimony. §II.B. The challenged testimony about accuracy and reliability was essential to the government's case, this Court should vacate the convictions on all counts. §II.C. This Court's review is de novo. *Supra* at 25-26.

### A. Cheung, Rosendorff, and Pandori each gave scientific and technical testimony about the accuracy and reliability of Theranos' blood-testing services.

**1.** Cheung, the government's first witness, was an entry-level lab associate at Theranos for six months. 3-ER-571-73; *supra* at 18. Cheung's job was to process samples through the blood-testing devices, not to conduct scientific analysis: She would scan barcodes, load samples into cartridges and machines, and then "hit start." 3-ER-586. She had no relevant expertise.

Nevertheless, Cheung testified about a wide range of specialized propositions and opinions concerning blood-testing technology and regulation. *Supra* at 18-19. That included scientific background, the capabilities of Theranos devices, statistical assessments, regulatory comparisons, and conclusions about the accuracy and reliability of Theranos' technology. *Id.* As just one example of the many described above, the government asked her whether the quality-control performance of Theranos' proprietary devices "ha[d] any impact on the accuracy or reliability of the patient tests." 3-ER-

37

654. Cheung then opined that purportedly poor quality-control performance indicated "some issue in the accuracy of the actual [Theranos] device." 3-ER-656. Lacking any statistical training, Cheung opined that she "just extrapolate[d] out essentially the percentage of [quality-control] failures" to conclude that "it seems likely that maybe there's some issue with the chemistry" running inside Theranos' devices. 4-ER-701.

But even Cheung conceded that these were complex scientific conclusions: The "in house research studies" at Theranos "made it very complicated to really understand what was going on"—which makes sense because, unlike the scientists conducting those studies (many of whom had advanced degrees and years of experience), Cheung had no basis in education or experience to reach such an understanding. 3-ER-664; 4-ER-699-701*; see also* 3-ER-663; 3-ER-672; 4-ER-677; 4-ER-800.

**2.** Rosendorff was the director of Theranos' clinical lab. *Supra* at 9; 9-ER-2317. His testimony covered laboratory procedures and statistics, concerns about the use of reference ranges, and conclusions about the accuracy and reliability of Theranos' technology. *Supra* at 19.

Take hemolysis as an example of those described above: Rosendorff explained that hemolysis occurs "when you collect the blood" and "you damage the red blood cells and they pop." 11-ER-2735. As a result,

"whatever is inside of the red blood cells gets into the sample, and it can really interfere with the detection of a lot of different things" in the blood. *Id.* The government then elicited Rosendorff's opinion whether hemolysis had "any effect on the accuracy and reliability of certain tests." *Id.* As Rosendorff proceeded to explain (over Mr. Balwani's objection), there is "a large amount of hemoglobin in red blood cells, and when that spills out into the sample it turns it pink[,] and that interferes with the ability of the readers to read what is in the sample." *Id.* Rosendorff opined that this problem occurred "[w]ay, way more frequently" with samples taken by Theranos' proprietary fingerstick method, affecting the "accuracy and reliability of certain [Theranos] tests." 11-ER-2735-36.

**3.** Pandori was a supervisor in the Theranos lab alongside Rosendorff for six months. 5-ER-979-80. He testified about whether Theranos' technology was groundbreaking given the state of the art and industry knowledge, the nature and consequences of quality-control and proficiency testing, and conclusions about the accuracy and reliability of Theranos' technology. *Supra* at 19-20.

Pandori's testimony relied on his experience with the "literature," 5-ER-999, and he explained that "[y]ou would need to be, you know, an expert to appreciate" some of the matters on which he testified, 5-ER-1038. For

39

example, Pandori explained that he "did not find [the Theranos devices]
groundbreaking" based on his "general knowledge" of the industry. 5-ER-998.
He reached that conclusion in part by comparing the purported "failure rate"
of the Theranos devices with that of conventional equipment. 5-ER-999. And
he could make that comparison because he "had familiarity" with the scientific
"literature" and had prior work experience "direct[ly] us[ing]" and
"superv[ising]" the use of conventional equipment. *Id.*; *see also* 5-ER-997; 5-
ER-1091.

### B. The Cheung, Rosendorff, and Pandori testimony was "specialized" under Rules 701 and 702.

The Courts of Appeals have offered a straightforward formulation of
when testimony is barred by Rule 701(c) and must instead comply with
Rule 702: Is it "beyond the understanding of an average juror"? *United States v.
Wilson*, 605 F.3d 985, 1026 (D.C. Cir. 2010) (per curiam). Was it beyond the
understanding of an "untrained layman"? *United States v. Peoples*, 250 F.3d
630, 641 (8th Cir. 2001).[13] Another key indicator of expert testimony is asking
a witness to "*summarize* her experiences … and *draw conclusions*." *Tribble*, 670
F.3d at 758.

---

[13] *See also Tribble v. Evangelides*, 670 F.3d 753, 758 (7th Cir. 2012); *United States
v. Finley*, 301 F.3d 1000, 1013 (9th Cir. 2002) ("the common knowledge of the
average layperson"); *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002).

The testimony of Cheung, Rosendorff, and Pandori conveys and summarizes specialized knowledge derived from their training and experience, and it draws conclusions from that knowledge. It is plainly beyond the understanding of the average juror. For example, when Rosendorff's testimony got especially complex, the government would ask him to translate it for the jury from technobabble into what the government called "plain English"—because, of course, the matters he addressed were beyond a lay juror's understanding. 11-ER-2734; *see also* 9-ER-2346-47; 9-ER-2349-50; 11-ER-2733-35. And compared to the testimony in other cases, the testimony challenged here is squarely on the specialized side of the line. *See, e.g.*, *United States v. Haynes*, 729 F.3d 178, 194 (2d Cir. 2013) (finding error in admitting lay testimony "about how [a] fuel tank functions"); *United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997) (finding error in admitting lay testimony including "an overview of banking regulations and practices").

The government has never identified precedent that supports its view that the challenged testimony was non-expert. Instead, it has consistently cited a district-court decision—*United States v. Chen*—that just reinforces the fact that there was error here. *See* No. 17-cr-00603, 2021 WL 2662116 (N.D. Cal. June 29, 2021) (unpublished). There, the district court concluded that non-expert witnesses could testify about the purely factual question whether a

41

company's trade secrets were in fact kept secret.  *Id.* at *9-10.  Were the files stored "secure[ly] [and] confidential[ly]"?  Were they "treated as confidential" by employees?  *Id.* at *9.  Those questions did not require the witnesses to opine on specialized matters.

Contrast that with the questions here, which elicited complex scientific opinions, rather than straightforward historical facts: What was the purpose of quality-control and proficiency testing?  Did it comply with industry guidance and government regulations, and did it indicate systemic errors?  What is the meaning of hemolysis for red blood cells, and does it affect accuracy and reliability?  Those questions are superficially related to the witnesses' employment, but they go far beyond the who, what, when, and where.  They address the scientific *how* and *why*.  They are the kinds of questions for which the government might have—but did not—call an expert.  It was error to allow the government to close that critical evidentiary gap, concerning the central issue whether Theranos' technology worked, with unqualified non-expert opinion testimony.

### C. The district court violated Rules 701 and 702 by allowing Cheung, Rosendorff, and Pandori to give specialized testimony without first finding them qualified experts.

The district court offered two reasons to excuse these witnesses from Rule 702 and admit their testimony under Rule 701.  Each is meritless.

**1.** The district court observed that the witnesses testified "based on [their] training and experience" at Theranos. 2-ER-203. By taking that approach, the district court courted the error.

Of course, it was permissible for these witnesses to testify about the details of their employment, events at Theranos, and the like; that is routine lay testimony. It is purely "based on the witness's perception" *and* "not based on … specialized knowledge." Fed. R. Evid. 701(a), (c). But to cross the line into specialized testimony requires qualification and the scrutiny imposed by Rule 702.

Whenever Mr. Balwani objected to expert testimony from these lay witnesses, the district court's routine response was to ask the government to "lay a foundation." *E.g.*, 2-ER-301. In this context, that meant rephrasing the question by couching it in the witness's training and work experience. *E.g.*, 2-ER-203 ("Well, the answer, as I understand it … is based on her training and

experience at the company.  Perhaps if you want to ask her if that's what she was instructed or trained.").[14]

For example, the government laid a "foundation" by asking Cheung whether she had "receive[d] training as to the purpose for quality control testing."  2-ER-213.  She had, so the government asked her to repeat what she was "told at Theranos about why quality control testing was needed."  *Id.*

But questions framed "based upon your training and experience" are a hallmark of expert testimony that trigger application of Rule 702.  *Figueroa-Lopez*, 125 F.3d at 1246; *see also Conn*, 297 F.3d at 554 ("[T]he Government asked Agent McCart to base his answer on his 'training and experience' as an ATF agent.").

That principle tracks the plain text of Rule 702, which applies whenever a witness is testifying based on "knowledge, skill, experience, training, or education."  Indeed, testimony derived from on-the-job training and experience *is* expert testimony; there is no loophole for job-related expertise.

---

[14] *Accord* 2-ER-201 ("The question was based on her understanding as an employee.  So the objection is overruled."); 2-ER-202 ("Well, this goes to her knowledge as an employee there?  …  If you can answer in the scope of your employment."); 2-ER-213 ("[I]f your questions about what this witness knows … if she was trained … it's something that we talked about yesterday in regards to the witness's breadth of knowledge and the basis for it."); 2-ER-235 ("Well, are you asking is this what she was trained?"); 2-ER-243 ("Do you want to lay a little foundation, his background[?]").

*E.g.*, *Rodriguez v. Gen. Dynamics Armament & Tech. Prods.*, 510 F. App'x 675, 676 (9th Cir. 2013) (unpublished) (citing *Figueroa-Lopez*, 125 F.3d at 1246) (explaining that Rule 702 applies "even when the expertise involved is specialized knowledge gained as part of a witness's job"); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999) (describing an expert witness "whose expertise is based purely on experience, say, a perfume tester"); *United States v. Miller*, 738 F.3d 361, 372 (D.C. Cir. 2013) (finding plain error in admitting testimony based on knowledge developed "as a criminal investigator").[15]

Taking its cue from the district court, the government capitalized on the suspension of Rule 702. Indeed, in closing, the government asked the jury to reject arguments from Mr. Balwani's counsel about Theranos' quality-control performance—because the issue was too technical for a lawyer to explain: "[B]ut I'd urge you to be cautious when a lawyer asks you to accept his judgment on a *technical specialized issue* and to accept that judgment over the testimony of a witness [Rosendorff] who does this for a living[,] who is a

---

[15] Besides eliciting Rule 702 errors, the district court's approach made matters even worse by eliciting hearsay. By asking questions about a witness's on-the-job training—what a witness was "told"—the government brought out expert testimony *and* hearsay. *See United States v. Lloyd*, 807 F.3d 1128, 1155-56 (9th Cir. 2015).

medical doctor, who is a clinical pathologist and a lab director." 19-ER-5246 (emphasis added). If an issue is too technical and specialized for a lawyer to explain, it is beyond the understanding of the untrained layman and, therefore, an issue for experts.

**2.** The district court also allowed expert testimony from these non-expert witnesses by crediting the fact that it was (at least sometimes) based on their rational perceptions—e.g., "the witness can testify based on their experience[,] this is what I saw, this is what I observed." 5-ER-1068.

It is true that a non-expert's testimony must be based on "personal knowledge of the matter," Fed. R. Evid. 602, and must be "rationally based on the witness's perception," Fed. R. Evid. 701(a). But those are necessary conditions for admissibility—not sufficient ones. They operate independently from Rules 701(c) and 702's requirements.

If testimony is specialized, it is expert testimony—no matter whether it is based on personal knowledge and perception. "The mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702." *Figueroa-Lopez*, 125 F.3d at 1246. As this Court has explained, "[o]therwise, a layperson witnessing the removal of a bullet from a heart during an autopsy could opine as to the cause of the decedent's death." *Id.*; *accord Jerden v. Amstutz*, 430 F.3d 1231, 1239-40 (9th Cir. 2005) (reversing

46

admission of lay testimony "contain[ing] detailed and scientific observations about the [MRI] report and the conclusions" about "signs of a brain tumor" because specialized—even though based on witness's observations).

Just the same here. Without employing specialized knowledge, a lay witness who worked in a blood-testing lab could not describe why dilution was scientifically necessary, *see* 2-ER-198-99 (Cheung); opine on the state of the art and whether particular technology was novel, *see* 2-ER-243; 2-ER-283 (Pandori); or offer bottom-line opinions about whether Theranos' technology was accurate and reliable, *see* 2-ER-219-22 (Cheung); 5-ER-1023; 2-ER-284; 2-ER-292-93 (Pandori); 2-ER-301-05; 3-ER-313-15 (Rosendorff). An untrained layman could not have rendered those opinions. So absent Rule 702's scrutiny, the government's witnesses should not have been permitted to do so either.

To support its rational-perception basis for admitting this testimony, the district court relied on an analogy to toasters. It explained that a lay witness could testify, based on her own rational perception of a toaster, whether you could "toast[] rye bread," whether you could "toast wheat bread," and whether you could "poach an egg" or "make spaghetti" in the toaster. 2-ER-252. That is correct so far as it goes: Lay witnesses can testify based on observations

"'result[ing] from a process of reasoning familiar in everyday life.'" Fed. R. Evid. 701 advisory committee's note to 2000 amendment.

But applied to the testimony challenged here, that analogy fails twice over. First, the testimony here went far beyond what a lay witness could reason based on familiar, everyday observations. Based on routine operation of the devices, perhaps Cheung could testify about inserting a cartridge into an analyzer—just like a toaster user could describe inserting a slice of bread. But without employing specialized knowledge, a lay toaster user could not describe how a toaster's knob electrically connects to its heating element, how and why a toaster might short-circuit, or whether burnt toast was the result of user error or miscalibration during the manufacturer's quality control. That is the stuff of experts.

Second, blood analyzers are complex scientific instruments—not simple kitchen appliances. Beyond sophisticated hardware and software, each device contained an extraordinarily complex set of chemical reagents and ingredients necessary to perform a wide range of blood tests. Each device was, in effect, a miniaturized chemistry laboratory. Unlike a toaster, essentially nothing about a blood analyzer results from a process of reasoning familiar in everyday life. *See, e.g.*, *United States v. Natal*, 849 F.3d 530, 536 (2d Cir. 2017) (per curiam)

48

(finding error in admission of lay testimony about "how cell phone towers operate").

In short, the government achieved exactly what the rules are intended to avoid. It evaded Rule 702's strictures by offering what it described as "technical specialized" testimony from non-expert witnesses never qualified to give it and, in doing so, avoided subjecting that testimony to the gatekeeping imposed by Rule 702's qualification and reliability requirements. In admitting the challenged testimony, the district court erred in construing Rules 701 and 702 and determining their scope.

**D. The district court's error requires vacating all counts.**

The Court's review of this evidentiary error "begins with 'a presumption of prejudice,'" and the government bears the "burden to show the harmlessness of the error." *United States v. Bailey*, 696 F.3d 794, 803 (9th Cir. 2012) (quoting *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005)). The Court "must reverse unless … it is more probable than not that the error did not materially affect the verdict." *Id.* (quoting *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc)).

The government cannot carry its burden to rebut the presumption of prejudice, because its reliance on these three witnesses materially affected the verdict. Its closing demonstrates this prejudice: The government made

Rosendorff a centerpiece of its closing, referring to him more than 100 times and emphasizing his qualifications. *Supra* at 22, 45-46. And it was precisely these three witnesses the government named when arguing to the jury about "the accuracy and reliability of blood testing." 18-ER-5076; *accord* 19-ER-5192-93; 19-ER-5222-24. As the government told the jury, "The simplest evidence on [accuracy and reliability] was testimony from at least three individuals who worked within Theranos working in the lab. That was, of course, Erika Cheung and then Drs. Mark Pandori and Adam Rosendorff." 19-ER-5230.[16] The government thus directly argued that these three lay witnesses were the authorities on the accuracy and reliability of complex scientific blood-testing technology. As the government correctly pointed out, these witnesses were asked to opine on an ultimate issue in the case—namely, the accuracy and reliability of Theranos' technology.

Without this extensive testimony going to the heart of the government's case, a jury could have—and likely would have—harbored significant doubts about the government's allegations of testing inaccuracy and unreliability. As this Court has explained, when a district court fails properly to apply Rule 702's prerequisites to specialized testimony, and when the witness

---

[16] Similarly, the district court relied on these three witnesses to deny Mr. Balwani's motion for acquittal. *See* 3-ER-489-91.

"addresse[s] the central issue of [the] case," "it is hard for us to see how [that] testimony … was harmless." *Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1068 (9th Cir. 2002), *overruled in part on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc); *accord United States v. Valencia-Lopez*, 971 F.3d 891, 902 (9th Cir. 2020) ("went 'to the heart' of the most important issue in the case"; "government emphasized … in its closing").

Accuracy and reliability were, indeed, the "central issue" in this case, because—at the most fundamental level—the case is about whether Theranos' technology worked. The improper expert testimony went to the core of this issue, which cuts across all counts of the indictment. The government has conceded that representations about accuracy and reliability were the ones that "mattered" to the patient counts. 3-ER-408 (quoting 19-ER-5198). And it has conceded that accuracy and reliability were "the key overlapping misrepresentation between the two fraud schemes," both the patient *and* investor counts. 3-ER-408. Indeed, the government repeatedly had its investor-witnesses confirm that accuracy and reliability were "very important" to their decision-making. 15-ER-4178 (Lucas); *see also* 12-ER-3080 (Mendenhall) ("very impactful"); 12-ER-3228-29 (Tolbert) ("significant"). The government may point to other alleged misrepresentations that, in its view, could have sufficed to convict on the investor counts. But the prejudice

question is not one of sufficiency; an evidentiary error can materially affect the verdict even if a jury could possibly have convicted based on other evidence. *See United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000).

This error was especially prejudicial given the remaining evidence on accuracy and reliability, which was anecdotal. Theranos issued millions of test results, and at trial the government showed *at most* that a tiny fraction of a percent of those results were erroneous. But stray errors are taken for granted in every laboratory setting. *See supra* at 17 (citing 10-ER-2681). The testimony of these three witnesses was essential to the government's effort to show that the purported errors at Theranos surpassed what every laboratory expects. *See, e.g.*, 5-ER-999.

\* \* \*

When the government "blurs the distinction between Federal Rules of Evidence 701 and 702," the system of checks and balances established by those rules breaks down. *Figueroa-Lopez*, 125 F.3d at 1246. That is precisely what happened here. The government presented what it described as "technical specialized" testimony. But it did so without subjecting that testimony to Rule 702's strictures, which expressly apply to "specialized" testimony. As a result, Mr. Balwani was convicted based on testimony that should never have come in. This Court should vacate the convictions on all counts.

52

**III.   The Government's Failure to Correct False Investor Testimony About Holmes' Statements Regarding Theranos' Military Relationships Violated Due Process.**

The Supreme Court has "long emphasized 'the special role played by the American prosecutor in the search for truth in criminal trials.'" *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc).  "Deliberate deception" of a jury is "'inconsistent with the rudimentary demands of justice.'" *Id.*  Under *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the government's use of false testimony violates due process and requires reversal where "(1) the testimony was actually false" or misleading; "(2) the prosecutor knew it was false"; and "(3) the false testimony was material (*i.e.*, there is a reasonable likelihood that the false testimony could have affected the judgment)." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).

Investors Bryan Tolbert and Chris Lucas testified falsely about Holmes' statements on a December 2013 investor call, inaccurately describing representations she made about Theranos' military relationships that were central to the government's case.  § III.A.  The prosecutors knew the testimony was false because they had a recording of the call, which they had played at Holmes' trial.  Having heard Holmes' actual words, her jury returned a mixed verdict.  At Mr. Balwani's trial, the government instead relied on Tolbert and Lucas' more inculpatory testimony despite knowing it was false, and it also

actively prevented the jury from hearing the truth.  § III.B.  The government then capitalized on its witnesses' false assertions to bolster its case for all investor counts.  At a minimum, there is a reasonable likelihood the false testimony *could* have affected the verdict, and so this Court should vacate all investor counts.  § III.C.

**A. Tolbert and Lucas testified falsely.**

*Napue*'s first prong requires testimony that is "actually false," *Dow*, 729 F.3d at 1048, or is misleading or creates a "false impression," *United States v. LaPage*, 231 F.3d 488, 490 (9th Cir. 2000); *accord Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019); *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019).

What Holmes told investors on the tape-recorded December 2013 call is beyond dispute.  23-ER-6220-54 (transcription of recording).  Tolbert and Lucas' accounts differed from what she said in two key respects.  *Supra* at 9-10, 20-21.

First, concerning the deployment of Theranos equipment on military helicopters, Tolbert testified that Holmes stated that the "devices *were employed* on the medevac helicopters and *being used* to kind of improve survival rates of military personnel who had been injured in combat."  12-ER-3239 (emphases added).  Lucas testified that Holmes said "the technology *was being used* in the

Middle East and in particular in the—on the battlefield." 15-ER-4205 (emphasis added); *see also* 16-ER-4259-60 (linking to December 2013 call). In fact, as the tape confirms, Holmes had spoken in a strictly forward-looking sense: "[T]he ability to take a technology like this and put it in flight, specifically on a medevac, has the *potential* to change survival rates." 23-ER-6247 (emphasis added). This was no different than what Theranos stated in the undeniably prospective scope of work it prepared for the military explaining proposed "applications": "Medevac: the ability to test and triage wounded soldiers at the time of impact and during evacuation (e.g., in a helicopter), and avoid delayed care due to unavailable medical information while the soldier is in transit." 19-ER-5345.

Second, concerning the state of Theranos' military relationships, when the government asked about "statements [that] matter[ed] in [the] decision to invest," Tolbert testified Holmes had claimed that Theranos' military work would advance, in a "*broadening* of the[] [company's] business opportunities." 12-ER-3241-42 (emphasis added). But Holmes in fact stated that the company "had to *pause* a large number of [its] ongoing pharmaceutical and military programs so that [it] could focus" more narrowly on retail opportunities. 23-ER-6247-48 (emphasis added).

55

These false recollections supported the government's assertions that Mr. Balwani and Holmes misrepresented the company's business relationships and current capabilities. *See, e.g.*, 25-ER-6891. But they were false.

**B. The prosecutors knew the testimony was false and failed to correct it.**

As to *Napue*'s second prong, the government "'knew or should have known'" that Tolbert and Lucas' testimony was false, *Jackson*, 513 F.3d at 1071, but "allow[ed] it to go uncorrected," *Napue*, 360 U.S. at 269 (holding that the failure to correct even unsolicited false testimony violates due process); *see also* 12-ER-3239; 12-ER-3241-42; 15-ER-4205; 16-ER-4259-60. This is as clear a case of knowledge as it gets: The government had the tape. The government had played the tape at Holmes' trial just months earlier in the same courtroom; got burned by it when the jury scrutinized Holmes' actual words; and then fought tooth and nail to keep it from Mr. Balwani's jury. *See LaPage*, 231 F.3d at 490 (finding knowledge where "the matter was important and the same prosecutor tried the case both times"); *supra* at 20-21.

That the government knew this testimony was false and failed to correct it satisfies this prong of *Napue*. Still, the government's conduct here fell so far short of satisfying its due-process obligations that it bears emphasizing: Not only did the government fail to correct the record—it invited the error.

56

More focused on conviction than truth, and despite the existence of a recording, the government decided to present Holmes' statements solely through inaccurate witness recollections. This was a telling move, as the government typically wants the jury to hear the actual words that constituted an allegedly fraudulent statement. It then convinced the district court it would be "hearsay" for Mr. Balwani to introduce the recording so the jury could hear "the actual words [Holmes] said" and not just witnesses' false "recollection[s] of what she said." 2-ER-327-29; *see also* 2-ER-326-39; 2-ER-352-59.[17] That argument was meritless, *see* Fed. R. Evid. 801(c); *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir. 1988)—and notably, the government was comfortable with Mr. Balwani eliciting the same out-of-court statements as long as he did so through the filter of witnesses' imperfect memories rather than the tape, 2-ER-328.[18] Thus, the government was keenly aware of how unhelpful Holmes'

---

[17] Mr. Balwani's request to introduce the tape preserved his *Napue* challenge. *Contra* Dkt. 11-1 at 18. The issue was discussed extensively, 2-ER-326-39; 2-ER-352-59, and the court ruled it "would not permit" Mr. Balwani to admit the tape to undermine the witnesses' accounts, 2-ER-359. In any event, the government's failure to uphold its "independent obligation [to] immediately … take steps to correct known misstatements of its witnesses" would establish plain error. *United States v. Alli*, 344 F.3d 1002, 1007 (9th Cir. 2003) (concluding such circumstances met prongs one, two, and four of plain-error review); *see also infra* at 60 n. 19 (third prong also satisfied here).

[18] The prosecutor "agree[d]" Ms. Holmes' statements were admissible "for the purpose of establishing what mattered to Tolbert" and that the defense could

57

recorded statements were to its case, and it sought a better outcome through more damning but fictional witness accounts.

Even if there were any doubt as to knowledge, the government still "should have known" the testimony was false. *Jackson*, 513 F.3d at 1071. Tolbert himself alerted the government that it should "suspect" inaccuracy in his testimony. *United States v. Price*, 566 F.3d 900, 910 n.11 (9th Cir. 2009). Early in his direct examination, Tolbert admitted uncertainty about what Holmes said without "look[ing] back at the transcript of the call." 12-ER-3238. This triggered the government's duty to "'investigate' further." *Price*, 566 F.3d at 910 n.11.

Instead, the government addressed Tolbert's reference to the existence of a helpful transcript by simply having him confirm that at least "some" of his testimony was "based upon having reviewed th[e] transcript at some point since 2013"—a nine-year span. 12-ER-3239. This "attempt[] to finesse the problem by pressing ahead" did not discharge the government's duties, which require it "to act when put on notice of the real possibility of false testimony."

---

offer them "through questioning." 2-ER-328. In other words, according to the government, Holmes' statements were not hearsay if they came in through Tolbert's faulty recollection (its preferred vehicle), but they *were* hearsay if they came in through the accurate recording. But the hearsay rules are agnostic about how an out-of-court statement is presented. Fed. R. Evid. 801(a), (c).

*N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001). "A prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts." *Id.*; *cf. United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978) (holding that even negligent nondisclosure violates due process).

Having affirmatively blocked the defense from allowing the jury to hear the truth, "[t]he prosecutor [then] did nothing to correct the false impression of the facts left with the jury." *LaPage*, 231 F.3d at 490. These actions violated due process under *Napue*'s first and second prongs.

### C. The false testimony was material to all investor counts and warrants a new trial on each.

Under *Napue*'s third prong, Mr. Balwani's convictions must be vacated if there is "any reasonable likelihood that the presentation of the false testimony or failure to correct the record once the false evidence was presented 'could have affected the judgment of the jury.'" *Hayes*, 399 F.3d at 988. This materiality standard is far "less demanding" than ordinary harmless-error review. *Dow*, 729 F.3d at 1048 (footnote omitted). Indeed, this Court "ha[s] gone so far as to say that 'if it is established that the government knowingly permitted the introduction of false testimony,'" then "'reversal is virtually automatic.'" *Jackson*, 513 F.3d at 1076.

Vacatur is necessary because there is a reasonable likelihood that the false testimony *could* have affected the verdict. The government repeatedly and "affirmatively capitalize[d]" on the false testimony in urging the jury to convict on the investor counts. *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017); *see also Alli*, 344 F.3d at 1008.[19] Holmes' statements about the military—and Tolbert's recitation of those statements—were a "centerpiece" of the government's closing on the alleged investor fraud. *Hayes*, 399 F.3d at 985. It argued that "Holmes's role in the investor conspiracy was to recruit investors" and that "[s]he communicated false statements directly to investors like Tolbert." 18-ER-5107. It told the jury, falsely and brazenly, "You *heard* the Tolbert phone call when Holmes brags about DOD or military work that Theranos did." *Id.* (emphasis added). "That's Holmes fulfilling her role in the conspiracy." *Id.* Of course, at the government's urging, the jury had *not*

---

[19] While plain-error review need not apply here, *see supra* at 57 n.17, vacatur would be warranted even under that standard. The government's decision to "capitalize on the false testimony" distinguishes its misconduct from *Alli*'s "relatively rare case" where the *Napue* error did not affect the defendant's substantial rights. 344 F.3d at 1008. Indeed, this case is worse than *Alli* at every turn: The government solicited Tolbert and Lucas' false testimony; that testimony went to the essential element of whether Mr. Balwani's alleged co-conspirator made fraudulent misrepresentations; and the government both successfully opposed Mr. Balwani's efforts to introduce the true facts and then repeatedly leveraged its witnesses' false testimony to hide investors' "dubious reliability." *Id.*; *see also id.* at 1007-08.

"heard" that call. The government again highlighted the alleged military misrepresentations in its rebuttal, arguing that investors "were told that the Theranos devices were being used clinically by the military, and you know that's not the case." 19-ER-5261.

In all, the government emphasized the military representations at least *ten times* between closing and rebuttal, "enhanc[ing] immeasurably" the false testimony's impact on all investor counts. *Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991); *see* 18-ER-5071; 18-ER-5087; 18-ER-5107; 19-ER-5125-31; 19-ER-5164-66; 19-ER-5228; 19-ER-5257-71; 19-ER-5335. "Where the prosecutor['s] [argument] specifically emphasizes" the erroneously admitted words of the defendant (or a co-conspirator), reversal has been compelled even under more stringent harmless-error standards. *Arnold v. Runnels*, 421 F.3d 859, 869 (9th Cir. 2005).

The military issue was a powerful one for the government to highlight. It was able to argue that Mr. Balwani and Holmes tapped into investors' sense of patriotism by purportedly claiming that Theranos devices were currently saving servicemembers' lives. As Tolbert put it: "[T]he thought that these service men and women who get hurt can be helped was certainly something that we felt, you know, wholehearted support for." 12-ER-3242. The government made a similar emotional appeal to the jury, that Mr. Balwani and

Holmes had misused the military's name and reputation: "[T]hey told investors that the technology was saving lives, that it was deployed on medevac helicopters and on the battlefield." 19-ER-5165.

The problem, of course, was that the government knew that Holmes never said Theranos' devices were being used in this way on the December 2013 call. Had the jury learned Holmes' true statements, it could have "compare[d] [them] to what was actually going on with Theranos's military programs," as Holmes' defense counsel was able to direct her jury to do, 25-ER-6720—a comparison that undermined the government's allegations of fraud.

The government's deception went even further. It also used the false testimony to "artificially bolster[]" the collective credibility of all investor witnesses—not just Tolbert and Lucas. *Hayes*, 399 F.3d at 987. Witness credibility was key to the government's allegations, many of which—including the purported medevac misrepresentation—were never supported with documentary evidence, just stale memories of conversations almost a decade earlier. For example, investor Alan Eisenman (Count 3) had no notes of his December 2013 call with Mr. Balwani just before his investment. 15-ER-4108-09. He admitted he had no "specific recollection" of what Mr. Balwani told him about Theranos technology or business activities, 15-ER-4113, just that

such information "came" to him before he invested, 15-ER-4112-13. Lisa
Peterson (Count 7) testified that she "d[id]n't remember" all the financial
information Mr. Balwani presented to her, 12-ER-3029, or "all of the specifics"
about Theranos' military relationships, 11-ER-2874.

The government asserted that the jury could trust investor witnesses'
recollections about Holmes' military statements because they "all heard one
form—one version or another of this story that Theranos technology was
deployed actually treating soldiers in the battlefield, sometimes on medevac
helicopters." 19-ER-5166. It returned to this credibility point in its rebuttal,
arguing that "because they all say consistently the same thing, you can have
confidence that you're hearing from them what they heard from the
defendant." 19-ER-5265; *see also* 19-ER-5261-65.

Thus, in the government's own telling, Tolbert and Lucas' false
testimony—reporting "this story" they never heard—was pivotal to assessing
Holmes' statements to other investors, including by buttressing those investors'
faulty memories. By manufacturing consistency across investor witnesses'
testimony—a consistency that eluded it in the Holmes trial—"the
[government] achieved the desired effect of artificially bolstering" witnesses'
credibility through an "unconstitutional step." *Hayes*, 399 F.3d at 987; *see also*
*Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (holding that where

"credibility" of a witness is "an important issue in the case," deception by the prosecutor on that issue violates due process under *Napue*). The false testimony—aided by the government's distortion of hearsay principles to keep Holmes' actual words from the jury (*supra* at 57 & n.18)—meant "[t]he jury was not permitted to assess" for themselves the inconsistencies between (1) the recording of Holmes' statements, (2) the false description of those statements at trial, and (3) the dubious descriptions by other investor-witnesses of Holmes' statements on similar topics. *Hayes*, 399 F.3d at 987. Without the government's misconduct, the jury "might well have concluded" that Tolbert and Lucas gave demonstrably false accounts of her statements, and that, in turn, might well have bred reasonable doubt as to other investors' accounts of long-ago events. *Napue*, 360 U.S. at 270.

In short, the false testimony was material because the government proactively and emphatically made it material. Moreover, the *Napue* materiality analysis requires considering not just the potential effect of the false evidence but also the potential effect of the government's "failure to correct the record once the false evidence was presented." *Hayes*, 399 F.3d at 988. This inquiry includes what could have happened if the government was forced to disclose to the jury that it had solicited false testimony. *Id.* If Mr. Balwani's jury "had been informed" of this, it "would have had a devastating effect on

64

the credibility of the entire prosecution case." *Id.* at 987-88. Indeed, because the tape was played at her trial, Holmes' counsel was able to undermine the investors' credibility and show the jury that "the contemporaneous record [of] what was told about medevacs" was different than "the evolution of memory" on the subject. 25-ER-6731.[20]

Mr. Balwani has satisfied his burden to show the false testimony "undermine[s] … confidence" in the verdict. *Hayes*, 399 F.3d at 988. Although the government alleged other misrepresentations as potential grounds for the charged investor fraud, "there is no way to determine whether the jury based [its multiple] convictions on" the alleged military misrepresentations or those other grounds. *United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011). Because the jury "might have relied" on the false testimony in reaching its verdict, that testimony is material, even if the

---

[20] After listening to the tape multiple times, the Holmes jury hung on counts expressly premised on Tolbert and Lucas' investments. 22-ER-6132-34. When the government injected false testimony into Mr. Balwani's trial, his jury convicted on all counts. *See supra* at 20-21. In other cases with multiple trials, this Court has held that a different outcome in the second trial helps show the *Napue* violation "undoubtedly [*did*] ha[ve] an effect on the jury's decision." *Dow*, 729 F.3d at 1049-50 (emphasis added); *cf. LaPage*, 231 F.3d at 491 (reversal where previous trial ended in mistrial); *Kennedy v. Lockyer*, 379 F.3d 1041, 1056 & n.18 (9th Cir. 2004) (same for different constitutional error); *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 699 (9th Cir. 2004) (same for different constitutional error). All Mr. Balwani needs to show is that the *Napue* violation *could* have affected his jury's decision. *Dow*, 729 F.3d at 1048.

jury could have relied on other alleged misrepresentations. *Id.* (holding that such circumstances satisfy *Brady*'s more difficult materiality standard); *see also Jackson*, 513 F.3d at 1071 ("A 'reasonable probability'" may be found "even where the remaining evidence would have been sufficient to convict the defendant," and "without [the court] finding that the outcome would more likely than not have been different.").

In sum, "there is little doubt" that Tolbert and Lucas were "key witness[es]" for the government's entire investor case. *Hayes*, 399 F.3d at 985. Because their "testimony and credibility" regarding the December 2013 call "were crucial to the [government]'s case," *id.* at 986, the false testimony undermines confidence in the verdict. Mr. Balwani has satisfied *Napue*'s materiality prong for a new trial on all investor counts.

## IV. The District Court Applied the Wrong Standard for Proving Loss at Sentencing.

The extreme effects of the Sentencing Guidelines loss table on sentencing—often divorced from the seriousness of the offense—make the "loss guideline fundamentally flawed, especially as loss amounts climb." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring). So too here. The district court's 26-level increase to Mr. Balwani's Guidelines range due to loss was error. Instead of requiring the government to show loss by clear and convincing evidence, as this Court

mandates, the district court applied a preponderance standard. 1-ER-12. As a

result, Mr. Balwani's range skyrocketed from 4-10 months to 135-168 months.

*See* U.S.S.G. §§ 2B1.1(a)(1), 2B1.1(b)(1), 2B1.1(b)(2)(A), Ch. 5 Pt. A; 1-ER-

131-32.[21]

When a sentencing enhancement has an "extremely disproportionate

impact on the sentence," "due process may require the government to

demonstrate facts underlying disputed enhancements by clear and convincing

evidence." *United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022). The

analysis depends on six factors, three of which arise here: (1) whether the

sentencing increase is based on the extent of a conspiracy; (2) whether the

increase in the number of offense levels is four or fewer; and (3) whether the

enhanced sentence more than doubles the length of the sentence authorized by

the initial Guidelines range. *See id.* at 910-16. The second two factors

indisputably favor Mr. Balwani.

So does the first factor. Thus, the clear-and-convincing standard applies.

*Lonich* instructs that the preponderance standard does not apply when "[t]he

jury's guilty verdicts [in a conspiracy case] do not compel the conclusion" that

the defendant caused the losses. *Id.* at 915. Nothing in the elements of the

---

[21] Mr. Balwani adopts all the sentencing arguments made in this case by co-
defendant Holmes. *See* Fed. R. App. P. 28(i); Holmes Op. Br. 77-90.

offenses or the jury's general verdict here suggests that investors' losses "resulted from" the offenses.  U.S.S.G. § 2B1.1 n.3(A)(i); 18 U.S.C. §§ 1343, 1349.  Indeed, several investors whose losses the district court tabulated never testified at trial.  *See* 1-ER-15-16 (Kovacevich, Peer Ventures Group, Murdoch).  As for those who did, the government moved to preclude Mr. Balwani from arguing that "victims did not in fact rely" on his statements.  22-ER-6162-63.  And the government's closing argument stressed that the jury need not find "actual reliance by an investor."  19-ER-5149.  So the verdicts do not reveal the cause of investor losses, and the clear-and-convincing standard governs.

When the trial court applies the wrong standard at sentencing, this Court does not engage in "guesswork" about what the district court might have found under the correct standard.  *United States v. Hymas*, 780 F.3d 1285, 1292 (9th Cir. 2015).  The error requires resentencing.

*     *     *

Considered separately, the errors in Mr. Balwani's trial each justify vacating the judgment.  Taken together, they certainly undermine the basis for all counts, both as to patients and investors.  *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).

## CONCLUSION

Mr. Balwani asks this Court to vacate the judgment and sentence and remand.

May 4, 2023                                        Respectfully submitted,

                                                   /s/ Mark S. Davies

Jeffrey B. Coopersmith                             Mark S. Davies
Amy Walsh                                          James Anglin Flynn
Stephen A. Cazares                                 ORRICK, HERRINGTON &
Aaron P. Brecher                                       SUTCLIFFE LLP
Sachi Schuricht                                    1152 15th Street, NW
Amari L. Hammonds                                  Washington, DC  20005
ORRICK, HERRINGTON &                               (202) 339-8400
    SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

                          *Counsel for Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** 22-10338

The undersigned attorney or self-represented party states the following:

[  ] I am unaware of any related cases currently pending in this court.

[  ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[X] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*United States of America v. Elizabeth Holmes*, No. 22-10312

**Signature** s/Mark S. Davies          **Date** May 4, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Form 17                                                    *New 12/01/18*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 22-10338

I am the attorney or self-represented party.

**This brief contains <u>14000</u> words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Mark S. Davies      **Date** May 4, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*

# ADDENDUM

**Page**

U.S. Const. amend. V ................................................................Add. 2

18 U.S.C. § 1343 ......................................................................Add. 2

18 U.S.C. § 1349 ......................................................................Add. 2

Fed. R. Evid. 701 .....................................................................Add. 2

Fed. R. Evid. 702 .....................................................................Add. 3

U.S.S.G. § 2B1.1.......................................................................Add. 3

U.S.S.G. Ch. 5, Pt. 2 (Sentencing Table)..............................Add. 10

**U.S. Const. amend. V.**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**18 U.S.C. § 1343. Fraud by wire, radio, or television**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**18 U.S.C. § 1349. Attempt and conspiracy**

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those

prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

**Fed. R. Evid. 701. Opinion Testimony by Lay Witnesses**

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a)     rationally based on the witness's perception;

Add. 2

(b)    helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c)    not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

## Fed. R. Evid. 702. Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

## U.S.S.G. § 2B1.1. Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States

(a)    Base Offense Level:

(1)    7, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or

(2)    6, otherwise.

(b)    Specific Offense Characteristics

(1)    If the loss exceeded $6,500, increase the offense level as follows:

**Loss (apply the greatest)** ..................... **Increase in Level**

(A) $6,500 or less ................................................. no increase

(B) More than $6,500 ...................................................add 2

(C) More than $15,000 ..................................................add 4

(D) More than $40,000...................................................add 6

(E) More than $95,000 ...................................................add 8

(F) More than $150,000 .............................................add 10

(G) More than $250,000................................................add 12

(H) More than $550,000...............................................add 14

(I) More than $1,500,000............................................add 16

(J) More than $3,500,000 ...........................................add 18

(K) More than $9,500,000 .........................................add 20

(L) More than $25,000,000........................................add 22

(M) More than $65,000,000......................................add 24

(N) More than $150,000,000 ....................................add 26

(O) More than $250,000,000 ....................................add 28

(P) More than $550,000,000 ....................................add 30.

(2)    (Apply the greatest) If the offense—

(A)(i) involved 10 or more victims; (ii) was committed through mass-marketing; or (iii) resulted in substantial financial hardship to one or more victims, increase by 2 levels;

(B)    resulted in substantial financial hardship to five or more victims, increase by 4 levels; or

(C)    resulted in substantial financial hardship to 25 or more victims, increase by 6 levels.

(3)    If the offense involved a theft from the person of another, increase by 2 levels.

(4)    If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by 2 levels.

(5)    If the offense involved theft of, damage to, destruction of, or trafficking in, property from a national cemetery or veterans' memorial, increase by 2 levels.

(6)    If (A) the defendant was convicted of an offense under 18 U.S.C. § 1037; and (B) the offense involved obtaining electronic mail addresses through improper means, increase by 2 levels.

(7)    If (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was (i) more than $1,000,000, increase by 2 levels; (ii) more than $7,000,000, increase by 3 levels; or (iii) more than $20,000,000, increase by 4 levels.

(8)    (Apply the greater) If—

(A)    the offense involved conduct described in 18 U.S.C. § 670, increase by 2 levels; or

(B)    the offense involved conduct described in 18 U.S.C. § 670, and the defendant was employed by, or was an agent of, an organization in the supply chain for the pre-retail medical product, increase by 4 levels.

(9)    If the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency; (B) a

Add. 5

misrepresentation or other fraudulent action during the course of a bankruptcy proceeding; (C) a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines; or (D) a misrepresentation to a consumer in connection with obtaining, providing, or furnishing financial assistance for an institution of higher education, increase by 2 levels. If the resulting offense level is less than level 10, increase to level 10.

(10)   If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

(11)   If the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

(12)   If the offense involved conduct described in 18 U.S.C. § 1040, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

(13)   If the defendant was convicted under 42 U.S.C. 408(a), 1011(a), or 1383a(a) and the statutory maximum term of ten years' imprisonment applies, increase by 4 levels. If the resulting offense level is less than 12, increase to level 12.

(14)   (Apply the greater) If the offense involved misappropriation of a trade secret and the defendant knew or intended—

Add. 6

(A) that the trade secret would be transported or transmitted out of the United States, increase by 2 levels; or

(B) that the offense would benefit a foreign government, foreign instrumentality, or foreign agent, increase by 4 levels.

If subparagraph (B) applies and the resulting offense level is less than level 14, increase to level 14.

(15)   If the offense involved an organized scheme to steal or to receive stolen (A) vehicles or vehicle parts; or (B) goods or chattels that are part of a cargo shipment, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

(16)   If the offense involved (A) the conscious or reckless risk of death or serious bodily injury; or (B) possession of a dangerous weapon (including a firearm) in connection with the offense, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

(17)   (Apply the greater) If—

(A)    the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by 2 levels; or

(B)    the offense (i) substantially jeopardized the safety and soundness of a financial institution; or (ii) substantially endangered the solvency or financial security of an organization that, at any time during the offense, (I) was a publicly traded company; or (II) had 1,000 or more employees, increase by 4 levels.

(C)    The cumulative adjustments from application of both subsections (b)(2) and (b)(17)(B) shall not exceed 8 levels, except as provided in subdivision (D).

(D)    If the resulting offense level determined under subdivision (A) or (B) is less than level 24, increase to level 24.

(18)   If (A) the defendant was convicted of an offense under 18 U.S.C. § 1030, and the offense involved an intent to obtain personal information, or (B) the offense involved the unauthorized public dissemination of personal information, increase by 2 levels.

(19)(A)        (Apply the greatest) If the defendant was convicted of an offense under:

>    (i)        18 U.S.C. § 1030, and the offense involved a computer system used to maintain or operate a critical infrastructure, or used by or for a government entity in furtherance of the administration of justice, national defense, or national security, increase by 2 levels.

>    (ii)        18 U.S.C. § 1030(a)(5)(A), increase by 4 levels.

>    (iii)        18 U.S.C. § 1030, and the offense caused a substantial disruption of a critical infrastructure, increase by 6 levels.

(B) If subdivision (A)(iii) applies, and the offense level is less than level 24, increase to level 24.

(20) If the offense involved—

>    (A)    a violation of securities law and, at the time of the offense, the defendant was (i) an officer or a director of a publicly traded company; (ii) a registered broker or dealer, or a person associated with a broker or dealer; or (iii) an investment adviser, or a person associated with an investment adviser; or

>    (B)    a violation of commodities law and, at the time of the offense, the defendant was (i) an officer or a director of a futures commission merchant or an introducing broker; (ii) a commodities trading advisor; or (iii) a commodity pool operator, increase by 4 levels.

(c)    Cross References

(1)     If (A) a firearm, destructive device, explosive material, or controlled substance was taken, or the taking of any such item was an object of the offense; or (B) the stolen property received, transported, transferred, transmitted, or possessed was a firearm, destructive device, explosive material, or controlled substance, apply § 2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy), § 2D2.1 (Unlawful Possession; Attempt or Conspiracy), § 2K1.3 (Unlawful Receipt, Possession, or Transportation of Explosive Materials; Prohibited Transactions Involving Explosive Materials), or § 2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition), as appropriate.

(2)     If the offense involved arson, or property damage by use of explosives, apply § 2K1.4 (Arson; Property Damage by Use of Explosives), if the resulting offense level is greater than that determined above.

(3)     If (A) neither subdivision (1) nor (2) of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (e.g., 18 U.S.C. § 1001, § 1341, § 1342, or § 1343); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

(4)     If the offense involved a cultural heritage resource or a paleontological resource, apply § 2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources), if the resulting offense level is greater than that determined above.

## U.S.S.G. Ch. 5, Pt. 2 (Sentencing Table)

### SENTENCING TABLE
#### (in months of imprisonment)

| Offense Level | Criminal History Category (Criminal History Points) | | | | | |
|---|---|---|---|---|---|---|
| | I (0 or 1) | II (2 or 3) | III (4, 5, 6) | IV (7, 8, 9) | V (10, 11, 12) | VI (13 or more) |
| **Zone A** 1 | 0–6 | 0–6 | 0–6 | 0–6 | 0–6 | 0–6 |
| 2 | 0–6 | 0–6 | 0–6 | 0–6 | 0–6 | 1–7 |
| 3 | 0–6 | 0–6 | 0–6 | 0–6 | 2–8 | 3–9 |
| 4 | 0–6 | 0–6 | 0–6 | 2–8 | 4–10 | 6–12 |
| 5 | 0–6 | 0–6 | 1–7 | 4–10 | 6–12 | 9–15 |
| 6 | 0–6 | 1–7 | 2–8 | 6–12 | 9–15 | 12–18 |
| 7 | 0–6 | 2–8 | 4–10 | 8–14 | 12–18 | 15–21 |
| 8 | 0–6 | 4–10 | 6–12 | 10–16 | 15–21 | 18–24 |
| **Zone B** 9 | 4–10 | 6–12 | 8–14 | 12–18 | 18–24 | 21–27 |
| 10 | 6–12 | 8–14 | 10–16 | 15–21 | 21–27 | 24–30 |
| 11 | 8–14 | 10–16 | 12–18 | 18–24 | 24–30 | 27–33 |
| **Zone C** 12 | 10–16 | 12–18 | 15–21 | 21–27 | 27–33 | 30–37 |
| 13 | 12–18 | 15–21 | 18–24 | 24–30 | 30–37 | 33–41 |
| 14 | 15–21 | 18–24 | 21–27 | 27–33 | 33–41 | 37–46 |
| 15 | 18–24 | 21–27 | 24–30 | 30–37 | 37–46 | 41–51 |
| 16 | 21–27 | 24–30 | 27–33 | 33–41 | 41–51 | 46–57 |
| 17 | 24–30 | 27–33 | 30–37 | 37–46 | 46–57 | 51–63 |
| 18 | 27–33 | 30–37 | 33–41 | 41–51 | 51–63 | 57–71 |
| 19 | 30–37 | 33–41 | 37–46 | 46–57 | 57–71 | 63–78 |
| 20 | 33–41 | 37–46 | 41–51 | 51–63 | 63–78 | 70–87 |
| 21 | 37–46 | 41–51 | 46–57 | 57–71 | 70–87 | 77–96 |
| 22 | 41–51 | 46–57 | 51–63 | 63–78 | 77–96 | 84–105 |
| 23 | 46–57 | 51–63 | 57–71 | 70–87 | 84–105 | 92–115 |
| 24 | 51–63 | 57–71 | 63–78 | 77–96 | 92–115 | 100–125 |
| 25 | 57–71 | 63–78 | 70–87 | 84–105 | 100–125 | 110–137 |
| 26 | 63–78 | 70–87 | 78–97 | 92–115 | 110–137 | 120–150 |
| 27 | 70–87 | 78–97 | 87–108 | 100–125 | 120–150 | 130–162 |
| **Zone D** 28 | 78–97 | 87–108 | 97–121 | 110–137 | 130–162 | 140–175 |
| 29 | 87–108 | 97–121 | 108–135 | 121–151 | 140–175 | 151–188 |
| 30 | 97–121 | 108–135 | 121–151 | 135–168 | 151–188 | 168–210 |
| 31 | 108–135 | 121–151 | 135–168 | 151–188 | 168–210 | 188–235 |
| 32 | 121–151 | 135–168 | 151–188 | 168–210 | 188–235 | 210–262 |
| 33 | 135–168 | 151–188 | 168–210 | 188–235 | 210–262 | 235–293 |
| 34 | 151–188 | 168–210 | 188–235 | 210–262 | 235–293 | 262–327 |
| 35 | 168–210 | 188–235 | 210–262 | 235–293 | 262–327 | 292–365 |
| 36 | 188–235 | 210–262 | 235–293 | 262–327 | 292–365 | 324–405 |
| 37 | 210–262 | 235–293 | 262–327 | 292–365 | 324–405 | 360–life |
| 38 | 235–293 | 262–327 | 292–365 | 324–405 | 360–life | 360–life |
| 39 | 262–327 | 292–365 | 324–405 | 360–life | 360–life | 360–life |
| 40 | 292–365 | 324–405 | 360–life | 360–life | 360–life | 360–life |
| 41 | 324–405 | 360–life | 360–life | 360–life | 360–life | 360–life |
| 42 | 360–life | 360–life | 360–life | 360–life | 360–life | 360–life |
| 43 | life | life | life | life | life | life |