No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

---

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

---

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 1 OF 26 (PAGES ER-1 – ER-192)

---

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

# UNITED STATES DISTRICT COURT
## Northern District of California

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| Ramesh Balwani | ) |
| | ) USDC Case Number: CR-18-00258-002 EJD |
| | ) BOP Case Number: DCAN518CR00258-002 |
| | ) USM Number: 24966-111 |
| | ) Defendant's Attorney: Jeffrey Bruce Coopersmith (Retained) |

**THE DEFENDANT:**

☐ pleaded guilty to count(s): _____

☐ pleaded nolo contendere to count(s): _____ which was accepted by the court.

☑ was found guilty on count(s): <u>1, 2, 3-8, 9-12</u> after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud Against Theranos Investors | 2015 | 1 |
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud Against Theranos Paying Patients | 2016 | 2 |
| 18 U.S.C. § 1349 | Wire Fraud Against Theranos Investors | 10/31/2014 | 3-8 |
| 18 U.S.C. § 1349 | Wire Fraud Against Theranos Paying Patients | 08/03/2015 | 9-12 |

The defendant is sentenced as provided in pages 2 through <u>8</u> of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s): _____

☐ Count(s) _____ is/are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/7/2022
_____
Date of Imposition of Judgment

_____
Signature of Judge

The Honorable Edward J. Davila
United States District Judge
_____
Name & Title of Judge

February 16, 2023
_____
Date

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

DEFENDANT: Ramesh Balwani                                                    Judgment - Page 2 of 8
CASE NUMBER: CR-18-00258-002 EJD

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
    155 months. This term consists of 155 months on each of Counts 1-12, all counts to be served concurrently.

The appearance bond is hereby exonerated, or upon surrender of the defendant as noted below.  Any cash bail plus interest shall be returned to the owner(s) listed on the Affidavit of Owner of Cash Security form on file in the Clerk's Office.

☑    The Court makes the following recommendations to the Bureau of Prisons:
     The defendant shall be placed at the minimum-security satellite camp at Lompoc, as he has no history of violence, no gang history, no criminal history, and no substance abuse history.
☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐    at _____ am/pm on _____ (no later than 2:00 pm).

    ☐    as notified by the United States Marshal.

☑    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑    on 3/15/2023 (no later than 2:00 pm).

    ☐    as notified by the United States Marshal.

    ☐    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at
_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

ER-3

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

DEFENDANT: Ramesh Balwani                                                    Judgment - Page 3 of 8
CASE NUMBER: CR-18-00258-002 EJD

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:  Three (3) years. This term consists of three years on Counts 1-12, all counts to be served concurrently.

## MANDATORY CONDITIONS OF SUPERVISION

1) You must not commit another federal, state or local crime.

2) You must not unlawfully possess a controlled substance.

3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4) ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5) ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

ER-4

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Ramesh Balwani | Judgment - Page 4 of 8 |
| CASE NUMBER: CR-18-00258-002 EJD | |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court, and bring about improvements in your conduct and condition.

1)      You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of RELEASE, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2)      After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3)      You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4)      You must follow the instructions of the probation officer related to the conditions of supervision.
5)      You must answer truthfully the questions asked by your probation officer.
6)      You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with, for example), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
7)      You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by these and the special conditions of your supervision that he or she observes in plain view.
8)      You must work at least part-time (defined as 20 hours per week) at a lawful type of employment unless excused from doing so by the probation officer for schooling, training, community service or other acceptable activities. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
9)      You must not communicate or interact with someone you know is engaged in criminal activity. You must not associate, communicate, or interact with any person you know has been convicted of a felony, unless granted permission to do so by the probation officer.
10)      If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
11)      You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12)      You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

☐      If the probation officer determines that you pose a risk to a third party, the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk. *(check if applicable)*

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions.  I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision upon a finding of a violation of probation or supervised release.

(Signed) _____      _____
           Defendant                                                   Date

           _____      _____
           U.S. Probation Officer/Designated Witness             Date

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Ramesh Balwani | Judgment - Page 5 of 8 |
| CASE NUMBER: CR-18-00258-002 EJD | |

## SPECIAL CONDITIONS OF SUPERVISION

1. You must pay any restitution, fine and special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

2. You must have no contact with the investor victims, unless otherwise directed by the probation officer.

3. You must not maintain a position of fiduciary capacity without the prior permission of the probation officer.

4. You must provide the probation officer with access to any financial information, including tax returns, and must authorize the probation officer to conduct credit checks and obtain copies of income tax returns.

5. You must not open any new lines of credit and/or incur new debt without the prior permission of the probation officer.

6. You must submit your person, residence, office, vehicle, or any property under your control, including any computers, cell phones, and other electronic devices, to a search. Such a search must be conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation. You must warn any residents that the premises may be subject to searches.

7. You must cooperate in the collection of DNA as directed by the probation officer.

ER-6

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

DEFENDANT: Ramesh Balwani                                                    Judgment - Page 6 of 8
CASE NUMBER: CR-18-00258-002 EJD

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

|  | **Assessment** | **Fine** | **Restitution** | **AVAA Assessment\*** | **JVTA Assessment\*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $ 1,200 | $ 25,000 | To Be Determined | N/A | N/A |

☑ The determination of restitution is deferred until <u>a date TBD</u>. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss\*\* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTALS** | $ 0.00 | $ 0.00 |  |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the fine/restitution.

    ☐ the interest requirement is waived for the fine/restitution is modified as follows:

    _____

---

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

| | |
|---|---|
| DEFENDANT: Ramesh Balwani | Judgment - Page 7 of 8 |
| CASE NUMBER: CR-18-00258-002 EJD | |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows*:

**A** ☐ Lump sum payment of _____ due immediately, balance due

     ☐ not later than _____ , or

     ☐ in accordance with   ☐ C,   ☐ D, or   ☐ E, and/or   ☐ F below); or

**B** ☐ Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
It is further ordered that the defendant shall pay to the United States a special assessment of $1,200 and a fine in the amount of $25,000. During imprisonment, payment of the fine is due at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program. Once the defendant is on supervised release, the fine must be paid in monthly payments of not less than $1,000 or at least 10 percent of earnings, whichever is greater, to commence no later than 60 days after placement on supervision. Notwithstanding any payment schedule set by the court, the United States Attorney's Office may pursue collection through all available means in accordance with 18 U.S.C. §§ 3613 and 3644(m). Fine payments shall be made to the Clerk of U.S. District Court, Attention: Financial Unit, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s): _____

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

---

* Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

DEFENDANT: Ramesh Balwani                                         Judgment - Page 8 of 8
CASE NUMBER: CR-18-00258-002 EJD

☐     The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future, **but such future orders do not affect the defendant's responsibility for the full amount of the restitution ordered.**

ER-9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,

    v.

BALWANI,

           Defendant.

Case No.  5:18-cr-00258-EJD-2

**ORDER ON SENTENCING**

On July 7, 2022, the jury returned a verdict of guilty as to Ramesh "Sunny" Balwani ("Defendant") on Counts 1–12 of the Third Superseding Indictment, including one count of conspiracy to commit wire fraud against Theranos investors, one count to commit conspiracy against Theranos paying patients, six counts of wire fraud against investors, and four counts of wire fraud against Theranos patients, in violation of 18 U.S.C. §§ 1343 and 1349.  This Court sentenced Mr. Balwani to 155 months of imprisonment as to each Count 1–12 to be served concurrently, followed by 3 years of supervised release as to each count to be served concurrently.

In their respective sentencing memoranda, the government and Mr. Balwani dispute several findings and conclusions in the Presentence Investigation Report ("PSR"), including the probation officer's application of the U.S. Sentencing Guidelines ("U.S.S.G.").  *See* Def. Ramesh "Sunny" Balwani's Sentencing Memorandum ("Def.'s Sent'g Mem."), ECF No. 1662; United States' Sentencing Memorandum ("Gov't Sent'g Mem."), ECF No. 1661.  The Court addressed the parties' objections and disputes at Mr. Balwani's sentencing hearing on December 7, 2022.  This Order memorializes the Court's reasoning in support of its determinations and sentence imposed at that hearing.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

1

For the reasons stated on the record at the December 7, 2022 hearing and in this order, the Court finds that (A) the loss in this case can be reasonably found to be $120,192,642; (B) the offense involved 10 or more victims; (C) the offense as to Defendant did not involve a conscious or reckless risk of death or serious bodily injury; and (D) the Defendant was not an organizer, leader, manager, or supervisor in the criminal activity. These findings yielded an offense level of 33 and an undisputed Criminal History Category I, resulting in a Guidelines range of 135 – 168 months.

## I.    LEGAL STANDARD

"All sentencing proceedings begin with the district court's calculations of the applicable Guidelines range." *United States v. Prien-Pinto*, 917 F.3d 1155, 1157 (9th Cir. 2019); *see also United States v. Staten*, 466 F.3d 708, 710 (9th Cir. 2006) ("[A]lthough district courts are no longer required to follow the United States Sentencing Guidelines . . . 'the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals.'") (quoting *United States v. Booker*, 543 U.S. 220, 259 (2005)).

The government bears the burden of proving the facts necessary to enhance a defendant's offense level under the Guidelines. *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir. 1994); *accord United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (*en banc*) ("[W]hen the government seeks an upward adjustment, it bears the burden of proof." (citation omitted)). While "the district court may rely on undisputed statements in the PSR at sentencing," if the defendant objects to those statements "the district court is obligated to resolve the factual dispute, and the government bears the burden of proof to establish the factual predicate. . . . The court may not simply rely on the factual statements" in that report. *Ameline*, 409 F.3d at 1085–86; *see also* Fed. R. Crim. P. 32(i)(3)(B). In making factual determinations, "a sentencing judge is generally not restricted to evidence that would be admissible at trial. However, 'inadmissible evidence cannot be considered [at sentencing] if it lacks sufficient indicia of reliability to support its probable accuracy.'" *United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000) (citation omitted, alternation in original).

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

## II.    GUIDELINES CALCULATION

### A.    Loss Enhancement, U.S.S.G. § 2B.1(b)(1)

The commentary to the U.S. Sentencing Guidelines provides that courts "need only make a reasonable estimate of the loss," which is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt 3(A), 3(C).  Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," whereas intended loss is "the pecuniary harm that the defendant purposely sought to inflict."  U.S.S.G. § 2B1.1 cmt 3(A)(i)-(ii).  The Ninth Circuit recognizes that the guidelines "do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  The district court's obligation is to "adopt a reasonable 'realistic, economic' projection of loss based on the evidence presented." *United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001).

Mr. Balwani had raised several objections to the PSR's calculation of the loss enhancement, which the Court resolved on the record at the sentencing hearing and arrived at a final loss amount.  Here, the Court provides the details of its loss calculation, which reflects the rulings on Mr. Balwani's objections.

#### 1.    Standard of Proof

The government and Mr. Balwani dispute the correct standard of proof the Court should apply in this case.  During sentencing and in its analysis below, the Court applied the "preponderance of the evidence" standard for facts underlying the loss calculation.

"As a general rule, factual findings underlying a sentencing enhancement need only be found by a preponderance of the evidence," particularly where the enhancements are based on convictions.  *United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022); *United States v. Hymas*, 780 F.3d 1285, 1289–90 (9th Cir. 2015).  However, in instances where the "enhancement has an [] extremely disproportionate impact on the sentence," the Ninth Circuit has held "that due process may require the government to demonstrate facts underlying disputed enhancements by clear and convincing evidence."  *Lonich*, 23 F.4th at 910 (internal quotation marks omitted).  When

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

United States District Court
Northern District of California

1    determining "whether a disproportionate effect on sentencing may require the application of a

2    heightened standard of proof," courts consider the "totality of the circumstances." *Hymas*, 780

3    F.3d at 1289; *United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019). The Ninth Circuit has

4    focused on three primary factors in assessing disproportionality: (1) whether the increase in

5    sentence is based on the extent of a conspiracy; (2) whether the increase in the number of offense

6    levels is less than or equal to four; and (3) whether the length of the enhanced sentence more than

7    doubles the length of the sentence authorized by the initial sentencing guideline range. *See*

8    *Lonich*, 23 F.4th at 910–16.

9        Here, the jury convicted Mr. Balwani of conspiracy to commit wire fraud against Theranos

10   investors, as well as three counts of wire fraud. Given that actual loss is measured by the

11   "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt

12   3(A)(i), the Court's task begins by identifying which investments were "reasonably foreseeable"

13   from Mr. Balwani's conspiracy. In other words, whether a particular investment should be

14   included in the loss calculation is based on the extent of the conspiracy, and therefore need only be

15   established by a "preponderance of the evidence." *Lonich*, 23 F.4th at 914. Several courts have

16   "declined to apply the clear and convincing standard of proof when the enhancement at issue was

17   based entirely on the extent of the conspiracy . . . regardless of whether the disputed sentencing

18   enhancements resulted in an increase of the offense level by more than four points or whether it

19   resulted in a Guidelines range that more than doubled." *Id.* (internal citations and quotation marks

20   omitted). The Ninth Circuit has also repeatedly held that "where sentencing enhancements for

21   financial loss are based on the extent of the fraud conspiracy . . . facts underlying the disputed

22   enhancements need only be found by a preponderance of the evidence." *United States v. Berger*,

23   587 F.3d 1038, 1048 (9th Cir. 2009) (collecting cases); *see also United States v. Laurienti*, 611

24   F.3d 530, 556 (9th Cir. 2010) ("Because each Defendant was convicted of conspiracy, and because

25   the losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard

26   applies."); *United States v. Riley*, 335 F.3d 919, 926 (9th Cir. 2003) ("[T]his enhancement is based

27   on the extent of the conduct to which [defendant] pled guilty (the amount of loss intended by the

28   Case No.: 5:18-cr-00258-EJD-2
     ORDER ON SENTENCING

1    conspiracy's fraud).”); *Hymas*, 780 F.3d at 1289 (“District courts generally use the ‘preponderance

2    of the evidence standard of proof when finding facts at sentencing, such as the amount of loss

3    caused by a fraud.’”) (quoting *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010),

4    overruled on other grounds by *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020)).  Because

5    the loss calculation in this case is based on the extent of the investor fraud conspiracy (*i.e.*, which

6    Series C investments and corresponding losses were incurred because of the conspiracy), the

7    correct standard of proof is “preponderance of the evidence.”

8    　　　Mr. Balwani nonetheless contended that the Court should apply the clear and convincing

9    standard of proof, relying in part on *Lonich*.  Def.’s Sent’g Mem. 22–23.  However, the facts here

10   are distinguishable from those in *Lonich*, where the government sought to incorporate losses

11   associated with a bank’s total collapse into the loss calculation of a loan fraud conspiracy

12   conviction.  23 F.4th at 915.  In holding that the clear and convincing standard applied in *Lonich*,

13   the Ninth Circuit emphasized that the reasons for the bank’s failure included a “substantial amount

14   of uncharged and acquitted conduct” and was too attenuated from the convicted conspiratorial

15   conduct.  *Id.* at 915.  By contrast, there is no such intervening causal factor here, where the

16   evidence at Mr. Balwani’s trial and in various victim impact statements indicated that the

17   investments were a result of the convicted conduct, *i.e.*, misrepresentations of Theranos

18   technology.  *See infra* Section II(B).  Indeed, even the *Lonich* opinion acknowledges that “[t]he

19   preponderance of the evidence standard might have been appropriate if, for example, the loss

20   enhancements were based on the value of [the] defaulted [] loans,” 23 F.4th at 915, an approach

21   that is analogous to the Court’s loss calculation here based on the value of certain Series C

22   investments.  *See infra* at Section II(A)(2).

23   　　　On these facts, this case more closely resembles the investor fraud in *Laurienti*, where the

24   Ninth Circuit held that it was “reasonable to infer that *all clients of Defendants who purchased the*

25   [] *stocks* were duped by the conspiracy.”  611 F.3d at 556–57 (emphasis added).  Mr. Balwani’s

26   attempt to distinguish *Laurienti* based on the type and sufficiency of the proof presented at

27   sentencing (Def.’s Sent’g Mem. 22) does not bear upon the Ninth Circuit’s analysis on the

28   Case No.: 5:18-cr-00258-EJD-2
     ORDER ON SENTENCING

United States District Court
Northern District of California

ER-14

1    *standard* of proof, a determination that turned on the defendant's conspiracy conviction.

2    *Laurienti*, 611 F.3d at 556.

3    Because this sentencing enhancement is based on the extent of Mr. Balwani's convicted

4    conspiracy, the Court applied the preponderance standard to any facts supporting the loss

5    calculation for U.S.S.G. § 2B.1(b)(1).

6    **2.    Investment Calculation**

7    Probation in the PSR calculated the total loss sustained by the Series C investors to be

8    $730,840,209 across 29 separate investors.  PSR ¶ 73.  Mr. Balwani objected to this calculation,

9    and the government bears the burden of proof to establish the total loss amount by a

10   preponderance of the evidence.  *See Ameline*, 409 F.3d at 1086; *see supra* Section II(A)(1).

11   The Ninth Circuit applies a general loss causation principle at sentencing, "permitting a

12   district court to impose sentencing enhancements only for losses that 'resulted from' the

13   defendant's fraud."  *United States v. Berger*, 587 F.3d 1038, 1043 (9th Cir. 2009) (citing *United*

14   *States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000)).

15   After reviewing the evidence presented by the government, the Court found by a

16   preponderance of the evidence that Mr. Balwani's fraudulent representations resulted in at least

17   twelve (12) victims investing a total of $381,347,268.  The table below sets forth this list of

18   investors, the relevant individual who testified to the investment, and an accounting and totaling of

19   their investment amounts:

| Investor (Testifying Individual) | Shares | Share Price | Investment Amount |
|---|---|---|---|
| Alan Eisenman (Self) | 6,666 | $15.00 | $99,990 |
| Sherrie Eisenman (Alan Eisenman) | 3,333 | $15.00 | $49,995 |
| Hall Group (Bryan Tolbert) | 325,000 | $15.00 | $4,875,000 |
| Richard Kovacevich (Self) | 276,666 | $15.00 | $4,149,990 |
| Lucas Venture Group (Donald A. Lucas) | 504,667 | $15.00 | $7,570,005 |
| Mendenhall TF Partners (Pat Mendenhall) | 87,500 | $15.00 | $1,312,500 |
| Black Diamond Ventures (Chris Lucas) | 356,660 | $15.00 | $5,349,900 |
| Peer Ventures Group (Mark Campbell) | 1,169,995 | $15.00 | $17,549,925 |

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

United States District Court
Northern District of California

| | | | |
|---|---|---|---|
| **Peer Ventures Group** (Mark Campbell) | 779,411 | $17.00 | **$13,249,987** |
| **PFM Funds** (Brian Grossman) | 5,655,294 | $17.00 | **$96,139,998** |
| **Mosley Family Holdings** (Daniel Mosley) | 352,941 | $17.00 | **$5,999,997** |
| **RDV Corporation** (Lisa Peterson) | 5,882,352 | $17.00 | **$99,999,984** |
| **Keith Rupert Murdoch** (Natalie Ravitz) | 7,352,941 | $17.00 | **$124,999,997** |
| **TOTAL INVESTMENT AMOUNT** | | | **$381,347,268** |

In reaching this count and figure, the Court only included those investors who indicated they had relied on or reviewed the Theranos misrepresentations propagated by the conspiracy to defraud Theranos investors, instead of counting every Series C investor as the PSR does.[1] *See infra* Section II(B); *see also* Leach Decl., Ex. B, ECF No. 1644-1. Moreover, each one of these investments was made prior to Mr. Balwani's departure from Theranos in May 2016. ECF No. 1644-1. This total investment amount, however, was not the end of the Court's loss calculation analysis.

### 3. Share Value Offset

In addition to calculating loss as either actual or intended loss, the Sentencing Guidelines also require that a victim's loss be offset by the victim's benefits received when calculating loss. U.S.S.G. § 2B1.1 cmt 3(E)(i); *see also W. Coast Aluminum Heat Treating Co.*, 265 F.3d at 992. In the context of fraud cases involving induced stock purchases of an otherwise legitimate company, this principle has been interpreted to mean that district courts "may not assume that the loss inflicted equals the full pre-disclosure value of the stock." *Zolp*, 479 F.3d at 719. Rather, courts must "disentangle the underlying value of the stock" and identify "inflation of that value due to the fraud." *Id.*

The Court found that, at the time the investor victims purchased their shares, Theranos stock was not "practically worthless" and retained some intrinsic value separate from the

---

[1] Though the Court did not adopt it, the PSR's approach nonetheless appear to have some support in the Ninth Circuit. Given the extent of Defendant's misrepresentations in widespread marketing materials and to the media for publication, it may be "reasonable to infer that all [Series C investors] were duped by the conspiracy." *Laurienti*, 611 F.3d at 557. The Court, however, declined to make such an inference in this case.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

United States District Court
Northern District of California

ER-16

1    fraudulent representations.  *See Laurienti*, 611 F.3d at 558 (citing *Zolp*, 479 F.3d at 719).

2    Therefore, to "reasonably estimate" the loss amounts attributable to Mr. Balwani's offenses, the

3    Court reduced the total investment amount identified in the preceding section by the "underlying

4    value" of the Theranos shares had no fraud occurred.  *See, e.g.*, *Berger*, 587 F.3d at 1046–47

5    (instructing the district court to apply a loss calculation method that "attempt[s] to gauge the

6    difference between [the] share price—as inflated through fraudulent representation—and what that

7    price would have been absent the misrepresentation"); *United States v. Geringer*, 672 F. App'x

8    651, 653 (9th Cir. 2016) (finding district court erred by failing to "determine the actual value, if

9    any, of the fund, and to deduct that value from the amount of loss"); *United States v. Evans*, 744

10   F.3d 1192, 1196 (10th Cir. 2014) (finding district court erred by not "inquir[ing] into what loss, if

11   any, the investors would have suffered if [defendant] had come clean regarding the status of the

12   securities"); *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008) (finding "district court erred

13   in not deducting from the purchase price the actual value of . . . illiquid securities").

14       The government sought to distinguish *Zolp* on two grounds: (1) *Zolp* involved a public

15   company with liquid and market-responsive share prices that readily lent themselves to an investor

16   impact analysis; and (2) the Theranos investors never received *any* value in return because the

17   shares ultimately became worthless without any liquidation opportunity.  With respect to the first

18   point, the Court acknowledges that valuing illiquid securities without a public market is certainly

19   more difficult than valuing publicly traded securities.  However, the language in *Zolp* does not

20   provide such a basis to distinguish the loss calculations for public securities from those involving

21   private securities.  The Court also cannot avoid its obligation to conduct a "reasonable estimate"

22   simply because a particular metric is not immediately available, a point that other courts have

23   acknowledged in the private company context.  *See Leonard*, 529 F.3d at 93 ("We are mindful that

24   illiquid securities for which there is no public market can be extremely difficult to value. . . . [W]e

25   can only call on the district court to make a 'reasonable estimate' of the loss amount.").

26       As to the government's second point, the Court is persuaded by the Ninth Circuit's

27   reasoning in *Lonich* where it held that the district court erred by attributing losses associated with

28   Case No.: 5:18-cr-00258-EJD-2
     ORDER ON SENTENCING

8

a bank's ultimate collapse to the defendant's loan fraud. 23 F.4th at 918–19. Analogously, the government here had not established—by either a preponderance or clear and convincing standard—that Theranos' ultimate collapse was the result of Mr. Balwani's conspiratorial conduct and should therefore be reflected in his loss calculation. The fact that the investors did not have—and never will have—an opportunity to liquidate their shares is undoubtedly unfortunate, but illiquidity and resale difficulty does not deprive Mr. Balwani of credit for the inherent value of Theranos shares. *See Leonard*, 529 F.3d at 93; *United States v. Crandall*, 525 F.3d 907, 913 (9th Cir. 2008) (finding district court erred by failing to credit the value of fraudulent condominiums, "even though the units may have been difficult or impossible to resell").

Accordingly, the Court concluded that the total investment amount was subject to a reduction based on the inherent value of Theranos stock absent Mr. Balwani's fraud.

### 4. Net Loss Calculation

The final determination in the Court's loss calculation analysis involved reasonably estimating Theranos' inherent value and deducting that value from the total investment amount to arrive at the actual loss that is attributable to Mr. Balwani's fraud.

Determining what the Theranos share price would have been if there had been no fraud is admittedly a difficult task, made all the more difficult by Theranos' status as a private company. The Court, however, is not "obligated to search for the perfect theoretical or statistical fit" but need only adopt a reasonable, realistic, economic, projection of loss based on evidence presented. *W. Coast Aluminum*, 265 F.3d at 991. To that end, the Court found that the government's expert, Mr. Carl Saba, provided a reasonable valuation of Theranos' shares that contains several indicia of reliability and incorporates multiple assumptions favorable to Mr. Balwani and Theranos. ECF No. 1645 ("Saba Report"); ECF No. 1674, Ex. 1 ("Saba Suppl. Report"). The Court here first summarizes the Saba Report's methodologies and Mr. Balwani's objections, before addressing the figures it adopted from the Report.

### a. Methodology and Data

The Saba Report provides valuations of 100% Theranos equity on three dates (February 7,

Case No.: 5:18-cr-00258-EJD
ORDER ON SENTENCING

United States District Court
Northern District of California

2014; December 31, 2014; and October 15, 2015) and then, from those valuations, extrapolates estimates of what the share price would have been on each date. For each date, the Saba Report provides two valuations using different methods, each reflecting different company metrics that are generally recognized in the appraisal profession. Saba Report ¶¶ 59, 65. The first valuation is a combination of the "discounted cash flow" method and the "guideline public company" method (collectively, the "Income Method"), which reflects Theranos' earnings, cash flow, and standing in relation to similar public companies. *Id.* ¶¶ 61-62; 65. The Saba Report's second valuation uses the "adjusted net asset value" method ("Asset Method"), which values Theranos based on its then-present assets and liabilities. *Id.* ¶ 77. Generally, the Income Method yielded a higher Theranos valuation—and therefore a lower loss proportion and amount—than the Asset Method. Once these two valuations were calculated, the Saba Report allocated those valuations to Theranos' shares using a methodology called "option pricing equity allocation" model. *Id.* ¶ 111. This method models the possible exit values for Theranos shares on a bell curve distribution, resulting in a projection of what the share price would have been on a selected date. *Id.* ¶¶ 111-15.

Additionally, the Saba Report's valuation figures reflect several assumptions drawn in Theranos' favor. For instance, the Saba Report assumes that Theranos would continue to operate as a going concern, *i.e.*, it was not in distress or facing near-term dissolution; Theranos' significant technology challenges would be successfully resolved; Theranos would realize high revenue growth in the near term; and it would earn significantly above industry margins. *Id.* ¶¶ 7, 16.

Most critically, the Saba Report does not rely on Theranos forecasts provided to investors, which were "associated with misrepresentations made to investors, and reflect extremely optimistic assumptions." *Id.* ¶ 84. Instead, the Report relies on certain IRC 409A forecasts prepared by an external professional services firm "for purposes of determining the fair market value of Theranos stock, and as a basis for federal tax reporting." *Id.* ¶ 86. Mr. Balwani does not object to the Saba Report's reliance on these 409(A) forecasts. *See* Def.'s Sent'g Mem. 38-39. Because the 409A forecasts were prepared for internal management use, were not provided to investors, and are "optimistic" but "orders of magnitude lower than those in the investor forecasts"

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

10

(Saba Report ¶ 86), the Court was satisfied that the Saba Report's reliance on the 409A forecasts was consistent with a reasonable, realistic, and economic estimate of Theranos' inherent valuation with minimal influence from Mr. Balwani's fraudulent representations.

### b. Defendant's Objections

Mr. Balwani made multiple objections to the Saba Report's analysis and submitted two expert reports—Scott Weingust and Tobin Reiff—in support of his position.

First, Mr. Balwani objected that the Saba Report provides an "$80 million dollar range [that] cannot constitute a reasonable estimate of loss." Def.'s Sent'g Mem. 28–29. As it did in Ms. Holmes's sentencing, the Court also rejected Mr. Balwani's characterization of the Saba Report's loss range as $80 million, which was the delta between the upper limit of the Saba Report's *primary* loss estimate and the lower limit of the Report's *alternative* loss estimate. *See* Saba Report ¶ 15. When viewed in their respective contexts, the Saba Report's estimated loss ranges are closer to $36–38 million. *Id.*

Second, Mr. Balwani challenged the Saba Report's selection of a 45% "cost of equity" rate, instead claiming that a more appropriate rate would have been 28% to 33%. Def.'s Sent'g Mem. 29, Ex. 46 ("Weingust Report"). This degree of granularity may be appropriate for a civil court determining the quantum of civil damages. However, as the Court noted at the hearing, a judge calculating loss in a criminal proceeding need not arrive at a loss amount with the pinpoint precision that Mr. Balwani proposes; the sentencing court "need only make a reasonable estimate of the loss" and is not "obligated to search for the perfect theoretical or statistical fit." U.S.S.G. § 2B1.1 cmt 3(C); *W. Coast Aluminum*, 265 F.3d at 991. Here, the gist of Mr. Balwani's equity rate objections is that the Saba Report did not incorporate the exact inputs that he wanted, *e.g.*, that the loss calculation ought to employ a 28% or 33% rate instead of a 45% rate, or that the Saba Report should have relied exclusively on data published by Pepperdine University instead of a broader survey. Weingust Report ¶¶ 16, 19–21. Such quarrels are especially incongruous where the valuations' only role is to ascribe some reasonable value to Theranos' shares in determining what portion of the actual share price can be attributable to the fraud conspiracy. On this front, the

Case No.: 5:18-cr-00258-EJD
ORDER ON SENTENCING

11

United States District Court
Northern District of California

Court found the type of criticisms advanced in the Weingust Report to be too specific to affect the Court's reasonable estimation of the Theranos' share value.

Although a sentencing court need not delve deep into this quantum debate to arrive at a reasonable estimate, the Court nonetheless identified some dubious bases underlying the Weingust Report's criticisms. For instance, the Weingust Report's proposed rate of equity relies entirely on data from one source—the Pepperdine University's studies—whereas the Saba Report's equity rate is estimated using data from five different sources, *including* the Pepperdine University studies. *See* Saba Report, Ex. F.4 n.2–n.5. Although the Weingust Report attempts to justify its reliance on a single source by criticizing the other sources for reflecting outdated data, Weingust Report ¶¶ 15, 20, this position conflicts not only with Saba's conclusion but also the view espoused by the American Institute of Certified Public Accountants ("AICPA") as published in its 2019 AICPA valuation practice aid. *See* Saba Suppl. Report ¶ 9 (noting that the 2019 AICPA practice aid indicated "despite their age, these academic studies are still regarded as providing reasonable indications of the target range of returns by stage of development"). These concerns further deterred the Court from relying on the Weingust Report's subsequent conclusions and criticisms. Accordingly, the Court adopted the Saba Report's use of a 45% cost of equity rate.

Third, to the extent that Mr. Balwani relies on the Reiff Report to challenge Mr. Saba's use of the option pricing model ("OPM"), this criticism also did not affect the Court's reasonable estimate of the loss. *See* Def.'s Sent'g Mem. 30–31, Ex. 47 ("Reiff Report"). The Reiff Report drew the Court's attention to the fact that the Saba Report's OPM analysis necessarily called for certain inputs that must be subjectively supplied by an appraiser instead by historical values. Reiff Report ¶¶ 5–7. However, the Reiff Report does not offer an opinion that Mr. Saba's OPM assumptions (four-year holding period with 55% equity volatility) were unreasonable. To the extent that the Saba Report's OPM equity allocation necessarily contained some values that were reasonably estimated, such estimation is entirely consonant with the Court's own reasonable estimate of loss.

Finally, regarding Mr. Balwani's objection as to Mr. Saba's "asset approach" analysis

(Def.'s Sent'g Mem. 29–30), the Court did not adopt the Saba Report's Asset Method and instead used the Income Method valuation in its loss calculation. As discussed further below, the selected Income Method yielded a higher Theranos valuation, a lower proportion attributable to the fraud, and was generally more favorable to Mr. Balwani.

Based on the foregoing reasons, the Court found that Mr. Balwani's expert reports—though helpful in providing further context and subjecting the Saba Report to rigorous and critical review—did not meaningfully undermine the reliability of the data and methodology employed by the Saba Report. Accordingly, the Court relied on the calculations and analyses in the Saba Report in reasonably estimating the loss.

### c. Final Calculation

Having outlined the Saba Report's methods and addressed Mr. Balwani's objections to the Saba Report, the Court proceeded to its own assessment of the various methods and dates that the Saba Report's present as potential valuations. As noted in the sentencing hearing, the Court adopted the Income Method calculation to estimate Theranos actual share price absent fraud. These valuations and metrics are more appropriate for valuing ongoing—as opposed to non-operating—businesses and yield a higher company valuation and a higher offset to Mr. Balwani's loss calculation. *Id.* ¶ 64. In identifying the proper valuation date, the Court selected the date closest in time to the last of the Series C investments, which is December 31, 2014. This date also resulted in a higher company valuation than the February 2014 date, which again is more favorable to Mr. Balwani. The Court declined to use the October 2015 Valuation Date (*i.e.*, when the fraud was exposed), because the Sentencing Guidelines only contemplate crediting value that was provided to the victim *before* the offense was detected. U.S.S.G. § 2B1.1, cmt. 3(E)(i). In sum, the Court considered the Asset Method and December 31, 20214 valuation date to be the most appropriate—and the most Defendant-favorable—foundation for its reasonable estimate of the loss resulting from Mr. Balwani's offense.

Using the Saba Report's estimate of Theranos' share prices on December 31, 2014, the Court found that the $15 Series C-1 price would have been $10.36 absent the fraud ($4.64 net loss

United States District Court
Northern District of California

per share); and the $17 Series C-2 price would have been $11.63 ($5.37 net loss per share). When multiplied by the total number of the identifiable victims' shares—2,730,487 Series C-1 shares and 20,022,939 Series C-2 shares, *see supra* Section II(A)(2)—the total loss in share value attributable to the fraud conspiracy is approximately **$120,192,642**. This figure is 31.5% of the total investment value—in other words, Theranos stock would have been approximately 31.5% less expensive if there had been no fraud.

Based on the foregoing analysis and calculation, the Court reasonably estimated the loss resulting from Mr. Balwani's offenses to be $120,192,642. Because this amount is more than $65 million and less than $150 million, the loss amount falls under row M of U.S.S.G. § 2B1.1(b)(1), and the Court accordingly increased Mr. Balwani's offense level by 24 levels.

### B. Victim Number Enhancement, U.S.S.G. § 2B1.1(b)(2)(A)(i)

The government has sufficiently shown by a preponderance of the evidence that at least ten or more victims suffered a financial loss as a result of the conspiracy to commit wire fraud.

Section 2B1.1(b)(2)(A)(i) of the Sentencing Guidelines supports a 2-level enhancement if the offense "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). The guidelines define a "victim" as a person, including a corporation, "who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1(b)(1), cmt. 1. Similar to estimating losses, a district court need only "make a reasonable estimate . . . based on the available information" in counting victims. *United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 605 (2020) (quoting *Zolp*, 479 F.3d at 719).

The PSR included a 2-level enhancement based on the number of victims. PSR ¶ 74. The government alleges that there are 29 victims who suffered a financial loss in the Series C round of investments, summarized in the spreadsheet attached as Exhibit B to its supporting declaration.[2]

---

[2] The government refers to the investor spreadsheet filed in Co-Defendant Elizabeth Holmes' docket (5:18-cr-00258-EJD-1, ECF No. 1644-1, Ex. B) that includes 37 entries, which the PSR interprets as 29 victim investors, stating "[t]here are a total of 37 investors in the C-1 and C-2 groups; some of those are grouped (i.e., Lucas Venture Funds and PFM). As such, the number of 29 ensures none of the grouped investors are counted twice." PSR ¶ 64.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

United States District Court
Northern District of California

Gov't Sent'g Mem. at 21.  The government relies on the Court's prior finding of 10 or more victims in Ms. Holmes's sentencing and contends that this Court should make this same finding as to Mr. Balwani.[3]  *Id.*  In reviewing the record, the Court finds that the government has met its burden of showing at least ten investors relied on Mr. Balwani's misrepresentations and fraudulent statements in making their decision to invest.  The evidence supports a finding that the following investors satisfy the definition of "victim" under the Sentencing Guidelines: (1) Partner Investments L.P., PFM Healthcare Master Fund, L.P., and PFM Healthcare Principals Fund, L.P. (collectively, "PFM"); (2) Mosley Family Holdings LLC; (3) RDV Corporation (Dynasty Financial II, LLC); (4) Keith Rupert Murdoch; (5) Richard Kovacevich; (6) Peer Venture Partners (Peer Ventures Group IV, L.P., or "PVP"); (7) Lucas Venture Group (Lucas Venture Group IV LP and Lucas Venture Group XI); (8) Mendenhall TF Partners; (9) Hall Group (Hall Black Diamond II, LLC); (10) Black Diamond Venture (Black Diamond Ventures XII-B, LLC); (11) Alan Eisenman; and (12) Sherrie Eisenman.  Accordingly, each of these victims' losses are reflected in the loss calculation.  *Supra* II.A.2.

Mr. Balwani does not dispute that these investments were made.  However, he argues that the government must show that his misrepresentations caused the loss.  He asserts that "[t]he jury did not find that any investors actually relied on misrepresentations in deciding to invest, and heard nothing at all about the bulk of the investments making up the PSR's and the government's asserted losses."  Def.'s Sent'g Mem. 21–23.  However, the record contains sufficient evidence that both Ms. Holmes and Mr. Balwani provided misrepresentations or false information about Theranos and the capabilities of its technology prior to the investments.  The preponderance of the

---

[3] In making this finding at Holmes' sentencing, the Court relied on testimony at trial as well as U.S. Securities Exchange Commission ("SEC") depositions (and memoranda summarizing deposition testimony), Federal Bureau of Investigation ("FBI") investigative reports, and victim impact statements provided by the government.  5:18-cr-00258-EJD-1, ECF Nos. 1643 at 3–8, 20–21; 1644, Exs. C–L.  "In making factual determinations, a sentencing judge is generally not restricted to evidence that would be admissible at trial," so long as the evidence contains "sufficient indicia of reliability to support its probable accuracy."  *United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000).  The Court here is satisfied and finds that the SEC and FBI interview memoranda and sworn deposition testimony submitted by the government bear such hallmarks and indicia of reliability.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

1    evidence supports a finding that additional investors qualify as victims for sentencing purposes.

2            Investors PFM, Mosley Family Holdings LLC, RDV Corporation, Black Diamond

3    Venture, Hall Group, and Alan Eisenman undoubtedly qualify as victims, as Mr. Balwani was

4    convicted of wire fraud against all six investors beyond a reasonable doubt.  *See* ECF Nos. 1507 at

5    2, 469 at 9, 1644-1.  During trial, investors from PFM, Mosley Family Holdings LLC, and RDV

6    Corporation specifically described meeting with both Ms. Holmes and Mr. Balwani in Palo Alto

7    prior to making their investments, during which time both Defendants made misrepresentations

8    that were important considerations in deciding to invest.  *See* Grossman (PFM) 5/18/22 Hr'g Tr.

9    6041:16–6042:9, 6043:3–6045:3, 6046:4–6050:12, 6056:3–6063, 6056:15–22:11, 6068:4–

10   6069:18; Mosley 5/10/22 Hr'g Tr. 5144:4–6; 5155:2–5157:1, 5163:3–5175:14, 5175:20–5176:7,

11   5202:4–5207:13;[4] Peterson (RDV) 4/26/22 Hr'g Tr. 3862:3–3864:8, 3864:16–3871:1; Eisenman

12   5/11/22 Hr'g Tr. 5388:15–5395:24, 5513:14–5514:4.[5]

13           While other investors did not directly interact with Mr. Balwani, they testified at trial about

14   their conversations with Ms. Holmes and their receipt of materials containing misrepresentations

15   about the technology—whether through investment binders or publicly available articles

16   containing statements by Ms. Holmes about Theranos' proprietary devices.  *See* PSR ¶ 18.  For

17   example, Mr. Holmes falsely stated during her interview published in the 2013 Wall Street Journal

18   ("WSJ") article that Theranos' proprietary device could "automate and miniaturize more than

19   1,000 laboratory tests" and stated "Theranos's processes are faster, cheaper, and more accurate

20

21   [4] Because it is not as immediately clear from the cited excerpts of Mr. Mosley's testimony, his
     testimony confirms his reliance on the Pfeizer Report and other information provided in the binder
22   in deciding to invest.  While Ms. Holmes provided the binder to Mr. Mosley, the record is clear
     that Mr. Balwani was aware that Ms. Holmes provided this information to Mr. Mosley.  Mr.
23   Mosley's testimony further suggests that the false or misleading information contained within the
     binder were reiterated—or, at the very least, they were not corrected—during his meeting with
24   both Ms. Holmes and Mr. Balwani in Palo Alto leading up to his investment.
     [5] Although Sherrie Eisenman did not testify at trial, Alan Eisenman testified that he and his wife
25   assess potential deals together and decide whether to invest, and he spoke on behalf of himself and
     his wife in email exchanges with Theranos, referring to he and his wife as "partner[s] in this
26   investment" in an email to Ms. Holmes.  5/11/2022 Hr'g Tr. 5430:10–25, 5457:21–22, 5458:16–
     17.  His victim impact statement also reflects both his and Sherrie's 2013 investments.  It is
27   therefore reasonable to infer that Sherrie Eisenman's investment was based upon the same false or
     misleading information in the same way that her husband's was.
28   Case No.: 5:18-cr-00258-EJD-2
     ORDER ON SENTENCING

than the conventional methods"—statements that had been reviewed and approved by Mr. Balwani. Gov't Sent'g Mem. 3. This article was provided in the binders or otherwise read by Theranos investors, such as Christopher Lucas and Pat Mendenhall.[6] PSR ¶¶ 27, 37, 42. As participants in the same conspiracy to commit wire fraud against Theranos investors, Ms. Holmes' statements and provision of certain materials to investors in furtherance of the conspiracy is attributable to her co-conspirator Mr. Balwani, regardless of whether he directly interacted with each investor.

Similarly, the Court heard testimony at trial from representatives of Hall Group, Black Diamond Venture, and Mendenhall TF Partners as to the companies' reliance on statements arising from the fraud conspiracy in their conversations with Ms. Holmes and the 2013 WSJ promotion in reaching their decision to invest in the company. Bryan Tolbert, the Vice President of Finance at Hall Group who was responsible for overseeing the company's investment portfolio during the relevant years, testified that Ms. Holmes' misrepresentations during his December 20, 2013 phone call with her were influential considerations in his company's decision to invest in Theranos. Tolbert 4/29/22 Hr'g Tr. 4429:21–4430:21, 4430:2–5, 4430:10–21, 4434:4–4435:24, 4436:18–4438:22, 4440:3–17, 4446:2–5. Chris Lucas of Black Diamond Venture and Pat Mendenhall of Mendenhall TF Partners also testified at trial that statements made by Ms. Holmes and the 2013 WSJ article were significant in making their investment decisions. Lucas 5/13/22 5595:5–20, 5601:20–25, 5602:11–5605:1, 5625:4-5626:17; Mendenhall 4/29/22 Hr'g Tr. 4275:3–4278:4.

Testimony before the SEC also reveals reliance by PVP, Lucas Venture Group, and Rupert Murdoch on Defendants' misrepresentations made in furtherance of the conspiracy to defraud investors. For example, Natalie Ravitz, the Chief of Staff to Rupert Murdoch in 2014–2015 and the advisor and manager of his personal investments, testified before the SEC that she and Mr.

---

[6] Mr. Lucas and Mr. Mendenhall of Mendenhall TF Partners testified at Holmes' and Balwani's trials respectively that Ms. Holmes' 2013 WSJ article was significant in making their investment decisions. 5:18-cr-00258-EJD-1, Lucas 11/4/21 Hr'g Tr. 5407:1–5410:18; Mendenhall 4/29/22 Hr'g Tr. 4275:3–4278:4.

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING
17

Murdoch met with both Defendants in Palo Alto, and that Ms. Holmes personally provided binders containing financial and visionary materials about Theranos (including information containing misrepresentations) to Mr. Murdoch. ECF No. 1644-9 at 10:11–13:1, 16:21–20:24, 31:17 33:2–34:21; *see also* 5:18-cr-00258-EJD-1, 10/19/21 Hr'g Tr. 3996:16–4001:21 (trial testimony of Daniel Edlin regarding binders created for Mr. Murdoch). Ms. Ravitz further stated that, based on their conversations with Ms. Holmes and Mr. Balwani, she and Mr. Murdoch believed that the blood testing was performed on Theranos' proprietary devices, not third-party devices. ECF No. 1644-9 at 76:8–78:17, 85:4–13. Ms. Ravitz also testified that the knowledge that blood tests were not actually being performed on Theranos devices "would have changed how we thought about certainly the financial aspects of it, if there wasn't an actual piece of technology that they had developed." *Id.* at 78:18–25; *see also id.* at 78:25–79:10.

Similarly, based on SEC interview memoranda, representatives of PVP and Lucas Venture Group testified that Ms. Holmes misrepresented Theranos proprietary devices were being used in combat and medevac helicopters in furtherance of the fraud conspiracy, and both investors indicated in their SEC testimony that they were not aware that testing was being done on non-proprietary devices despite meeting with her. *See* ECF Nos. 1644-6; 1644-7. In fact, Mark Campbell of PVP was surprised to learn through the subsequent 2015 WSJ article that Theranos was not using their proprietary device to run tests, which Theranos had never discussed. ECF No. 1644-7 at 5. Mr. Campbell further noted that Theranos provided letters from Celgene and GlaxoSmithKline validating its technology. *Id.* at 2. During Ms. Holmes' trial, however, the government presented evidence that Celgene had *not* comprehensively validated Theranos' technology. 5:18-cr-00258-EJD-1, 9/29/21 Hr'g Tr. 2296:14–2297:10, 2316:9–2318:7. Similarly, the late Donald A. Lucas testified during his SEC interview that during his meeting with Ms. Holmes prior to investing he was told "Theranos could run 50-75 simultaneous tests from one drop of blood," despite the fact that its proprietary devices could only run twelve fingerstick assays, and he was not told that testing was done on third-party devices. ECF No. 1644-6 at 1–3. He believed that the blood collected from one finger prick went into the Theranos device for

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING
18

1   analysis and that results were returned in 60 minutes.  *Id.* at 3.  Ms. Holmes also falsely told him

2   that Theranos' devices were being used on modified Humvees in Afghanistan and medevac

3   helicopters.  *Id.* at 1–2.

4       Finally, the government produced an FBI memorandum summarizing its interview with

5   Richard Kovacevich during its investigation.  ECF No. 1644-5.  In the memorandum, Mr.

6   Kovacevich describes misrepresentations or omissions made by Ms. Holmes and the company in

7   furtherance of the conspiracy to secure investments.  The memorandum indicated that, before

8   investing, Mr. Kovacevich was told that Theranos' proprietary devices were being used in military

9   operations and that these devices were cheaper, better, and faster than any other devices on the

10  market.  *Id.* at 2.  It also states that in 2013, neither Mr. Kovacevich nor any board member knew

11  that the proprietary device could only run twelve tests, and he did not recall Ms. Holmes ever

12  providing this information.  *Id.*  Mr. Kovacevich indicated that it mattered to him that Theranos

13  was able to run all the tests on its own proprietary devices, and that he did not learn that the

14  devices could not do so until the 2015 WSJ article.  *Id.* at 2, 3.  The FBI memorandum also noted

15  that Mr. Kovacevich received an email from Ms. Holmes containing materials about Theranos,

16  including valuation reports done by an "outside company."  *Id.* at 1.  He indicated during his

17  interview that outside valuation was also important to him, and, in fact, was so significant that Mr.

18  Kovacevich resigned from the board after third-party valuation never materialized.  *Id.* at 3.

19      Although the Court counted more than ten victims, the reality may be that Mr. Balwani's

20  fraud affected many more qualifying investor victims.  Beginning in 2014 and 2015, binders were

21  provided to investors containing false information about Theranos.  Gov't Sent'g Mem. 2.[7]  Daniel

22  Edlin, a Theranos project manager who reported to Ms. Holmes, testified that he prepared these

23  binders based on an approved checklist and stated that the binders were reviewed by Ms. Holmes

24  before they were provided to investors.  Edlin 4/13/22 Hr'g Tr. 2527:12–2528:8.  Mr. Edlin also

25  testified that Mr. Balwani contributed financial materials to these binders, and the binders were

---

[7] *See also* 5:18-cr-00258-EJD-1, Edlin 10/19/21 Hr'g Tr. 3993:15–14, 3995:7–23; 3996:18–4001:25.

1  used during his and Ms. Holmes' meetings with investors in Palo Alto. 4/13/22 Hr'g Tr. 2528:9–

2  21. It would not be an unreasonable inference to conclude that all potential C-1 and C-2 investors

3  received fraudulent information via Edlin's binders or were exposed to one of the multiple

4  publications containing misrepresentations. Gov't Sent'g Mem. 3, 21; *see George*, 949 F.3d at

5  1186 (noting that "the sentencing court reasonably [was allowed] to infer a pattern" in identifying

6  the number of victims of defendant's bank fraud scheme) (quoting *United States v. Pham*, 545

7  F.3d 712, 720 n.3 (9th Cir. 2008)); *Laurienti*, 611 F.3d at 557 (noting that "it is reasonable to infer

8  that all clients of Defendants who purchased the house stocks were duped by the conspiracy"

9  where defendants were convicted of criminal conspiracy to defraud clients). However, because

10  the Court has already identified at least ten victims whose losses do not require such an inference,

11  the Court need not—and declined to expand—the scope of victims to all investors who had

12  received an investor binder or read any of the misleading press releases.

13      In sum, the Court finds that the preponderance of the evidence supports the conclusion

14  that the aforementioned twelve investors invested significant sums in reliance on both Defendants'

15  misrepresentations and half-truths.[8] At sentencing, it is reasonable to infer that investors who

16  were told or received information containing misrepresentations before investing—including

17  misrepresentations about the financial projections of Theranos, the capabilities of its proprietary

18  technology, the use of Theranos' technology by the military, the company's reliance on third-party

19  machines, and valuations of the technology's performance—had relied on such information in

20  assessing their investment risk, which in turn affected whether they *would* invest and the *amount*

21  they chose to invest.

22      Accordingly, the Court is satisfied that the preponderance of the evidence supports a

23  finding that at least ten or more investors qualify as a victim under the Guidelines in support of a

24  2-level enhancement to Ms. Holmes' sentence under U.S.S.G. § 2B1.1(b)(2)(A)(i).

25  _____

26  [8] The government includes the three patients (Tompkins, Ellsworth, and Bingham) that Mr.
   Balwani was convicted of defrauding in its victim count. Gov't Sent'g Mem. at 21. Since the

27  government has already identified at least 10 investor-victims by a preponderance of the evidence,
   the Court need not include patient victims.

28  Case No.: 5:18-cr-00258-EJD-2
   ORDER ON SENTENCING

United States District Court
Northern District of California

**C.    Risk of Death or Serious Bodily Injury Enhancement, U.S.S.G. §**
**2B1.(b)(16)(A)**

The Guidelines permit a 2-level increase in offense level where "an offense involved [] the conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(16)(A). To establish that a defendant's conduct warrants the application of § 2B1.1(b)(16)(A), the government "need not show actual injury to any particular victim" and must instead focus on a defendant's "disregard of risk." *United States v. Henderson*, 893 F.3d 1338, 1351–52 (11th Cir. 2018). Ignorance of the risk is not a defense to the application of this enhancement. *United States v. Johansson*, 249 F.3d 848, 859 (9th Cir. 2001) ("[A] defendant does not have to subjectively know that his conduct created the risk.").

The PSR does not apply this enhancement, but the government argues that such an enhancement is warranted because Mr. Balwani's conduct created a significant risk of death or bodily injury to Theranos patients as a result of misdiagnosis due to inaccurate and/or unreliable test results. Gov't Sent'g Mem. 12–24. Mr. Balwani objects to this enhancement on the basis that there is insufficient evidence to support this finding. Def. Sent'g Mem. 33–38. The Court is inclined to agree. At the sentencing hearing, the Court voiced its concerns but ultimately agreed with Mr. Balwani's position. In reviewing the record, the Court did not find that both Defendants' fraudulent scheme involved a risk of serious bodily injury warranting the application of this enhancement.

Mr. Balwani was convicted of multiple wire fraud charges and conspiracy to commit wire fraud as to both Theranos investors and patients. The convictions as to the patient counts arise from Theranos' use of interstate electronic wires to purchase advertisements intended to induce individuals to purchase Theranos blood tests at Walgreens in California and Arizona, falsely representing in the process that these tests were more accurate and cheaper than blood tests from conventional laboratories. PSR ¶ 61. The evidence produced at trial soundly supports a finding that Mr. Balwani was aware of the shortcomings of Theranos' proprietary devices brought to his attention on multiple occasions—from reliability issues with its proficiency testing to failed quality control tests—and the fact that the devices were not nearly as accurate, fast, or reliable as

United States District Court
Northern District of California

ER-30

Defendants had touted. And because Theranos' proprietary devices were not performing as promised, Defendants resorted to modifying FDA-approved third-party commercial devices and increasing venipuncture (rather than fingerstick) testing which were run on non-Theranos devices. PSR ¶¶ 23–26, 40. This ruse—convincing investors that Theranos had developed a market-ready, reliable blood testing proprietary device more accurate and inexpensive than anything else on the market, and one which required only a few drops of capillary blood to run all the same tests as a traditional laboratory—was maintained through false appearances: a façade that Theranos was exclusively (or mostly) using its proprietary devices, which it was not.

Instead, the record suggests that the vast majority of blood tests purportedly performed on Theranos' proprietary devices were, in fact, performed on FDA approved third-party machines. PSR ¶ 26. Theranos opened its laboratory in Palo Alto in 2011 and only used FDA approved blood tests and FDA-approved third-party devices at the time. *Id.* ¶ 24. Ms. Holmes admitted at trial that during 2011–2013, the proficiency testing data provided to investors related to the FDA approved devices, not Theranos' proprietary technology. *Id.* Mr. Balwani testified that, once Theranos began its "soft launch" of its miniature blood analyzers in 2013, a qualified lab director signed off on validation reports for patient testing performed on Theranos' technology for clinical purposes. *Id.* ¶ 25. Later, the "expanded launch" was approved by then-lab director Dr. Adam Rosendorff. *Id.* At this time, Theranos modified third-party devices to enable them to run blood tests from small blood samples. *Id.* ¶ 36. No evidence was offered that these FDA-approved third-party machines—modified or not—had produced inaccurate or unreliable results. Accordingly, with respect to this vast majority of blood tests that Theranos performed, the Court found insufficient evidence that those tests exhibited an inordinate risk of inaccuracy, much less that Mr. Balwani consciously disregarded such a risk.

The evidence also indicated that the majority of fingerstick and venipuncture testing performed through the Walgreens contract were not performed using Theranos' proprietary devices. The Walgreens deal was set to occur in phases; during the initial phase, blood samples would be shipped to a Theranos central lab for analysis until its devices received FDA approval

United States District Court
Northern District of California

and could be used in Walgreens stores.  PSR ¶ 23.  Theranos never advanced the second stage, however, because its proprietary device never received FDA approval.  *Id.*  And while Walgreens was aware that venipuncture testing was not performed on Theranos' proprietary technology, the company was not aware that third-party machines were used for the vast majority of testing.  PSR ¶¶ 23, 39.  For example, Walgreen's representative Nimesh Jhaveri testified at trial that testing was never performed in Walgreens, and that Walgreens tracked the number of venous draws and the percentage hovered around 40%—a percentage so high that Mr. Jhaveri suggested it threatened future Walgreens' expansion if the venous draw metrics remained in this range.  *Id.* ¶¶ 23, 52; Jhaveri 4/19/22 Hr'g Tr. 2900:23–1; 2906:23–2907:3.

Notwithstanding the vast majority of tests performed on third-party machines, some tests were performed on Theranos' proprietary devices.  Multiple patients and/or doctors testified at trial that they received inaccurate blood tests results from Theranos.  For example, Dr Mark Burnes testified regarding PSA test results for his patient, Mehrl Ellsworth.  PSR ¶ 58.  After receiving PSA results that were "significantly elevated," Dr. Burnes ordered a second test from Theranos, which produced more consistent results.  *Id.*  He later ordered a third test which, again, showed elevated results.  *Id.*  Afterwards, he learned that the first and third tests were performed on Theranos' proprietary device and the second test was performed at the Phoenix lab.  *Id.*  Dr. Burnes also testified, however, that he did not observe any other inaccurate test results conducted by Theranos and noted that trial lab errors do occasionally occur.  *Id.*  Additionally, Dr. Burnes's reaction to the initial inaccurate blood test—which was to order further confirmatory testing— would suggest that the risk of misdiagnosis is somewhat attenuated from inaccurate testing issues, such that the Court may not be able to conclude that there is an inherent risk of death or serious bodily injury from inaccuracy alone.  Even if the inaccuracy issues may support a finding that patients did not receive the standard of accuracy as advertised, there is less evidence that the same inaccuracy issues rising to such a degree above the inaccuracies expected from standard blood tests that patients were at risk of death or serious bodily injury.

Furthermore, even with respect to testing performed on Theranos' proprietary devices, the

Case No.: 5:18-cr-00258-EJD-2
ORDER ON SENTENCING

United States District Court
Northern District of California

23

ER-32

1   evidence does not favor a finding that Mr. Balwani disregarded a risk of death or serious bodily

2   injury arising from these tests.  Dr. Adam Rosendorff, the former Theranos lab director from

3   2013–2014, testified that Theranos never used its miniature blood analyzer device in its clinical

4   lab for more than twelve assays, and by 2015, it was not using it in the clinical lab at all.  PSR ¶

5   31.  Dr. Rosendorff further testified that he approved the assay validation reports that he signed

6   and that he never knowingly released an inaccurate patient result.  Def. Sent'g Mem. 35;

7   Rosendorff 4/22/22 Hr'g Tr. 3537:1–3538:23; 3555:3–3556:25.  Certainly, Mr. Balwani's cavalier

8   attitude towards his duties overseeing the Theranos laboratory and his inexperience in the field of

9   biomedical technology supports a finding that he was ill-suited for this role.  However, the record

10  also reflects actions that are inconsistent with a reckless risk of death or serious bodily injury.  On

11  multiple instances, Mr. Balwani deferred to the judgment of Theranos scientists, for instance,

12  when they suggested moving assays to a commercial platform due to physician "lack of

13  confidence" in the results.  ECF No. 1665-7, Ex. 34.  Regarding hCG assay inaccuracy issues,

14  while Mr. Balwani learned that there were issues with hCG testing, he relied on Dr. Rosendorff's

15  signed hCG validation report and Dr. Rosendorff's signoff on continued use of hCG testing once

16  the team resolved the issues with the test.  PSR ¶ 54.  Though this evidence may be consistent with

17  a finding that Mr. Balwani was aware of inaccuracies and intended to deprive patients of "the

18  benefit of their bargain," Gov't Sent'g Mem. 22, reliance on other scientists is not necessarily

19  consistent with a finding that he consciously disregarded the risk of death or serious bodily injury

20  to those patients.

21      Although this was a close question, the evidence before the Court on balance does not

22  weigh in favor of imposing an enhancement to Mr. Balwani's sentence for consciously

23  disregarding the risk of death or serious bodily injury to Theranos patients.  Accordingly, the

24  Court declined to apply a 2-level enhancement under § 2B1.1(b)(16)(A).

25      **D.    Aggravating Role Adjustment, U.S.S.G. § 3B1.1(a)**

26      The PSR included a 4-level upward adjustment based on Mr. Balwani's aggravating role as

27  an "organizer or leader of a criminal activity" pursuant to U.S.S.G. § 3B1.1(a).  PSR ¶ 76.  Mr.

28  Case No.: 5:18-cr-00258-EJD-2
    ORDER ON SENTENCING

United States District Court
Northern District of California

Balwani objected to this enhancement, and the Court sustained the objection.

The "organizer" enhancement is applied if Mr. Balwani "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B.1(a). To impose the enhancement, the government must show that "the defendant had control over other participants or organized other participants for the purpose of carrying out" the charged crimes." *United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018) (alteration and internal quotation marks omitted). "Participants" are defined as individuals who are "criminally responsible for the commission of the offense," meaning, a person who is not criminally responsible is not a "participant." U.S.S.G. § 3B.1 cmt. 1. "Mere facilitation of criminal activity is not sufficient to support the enhancement. Nor is it sufficient for a defendant to have organized property or activities—the defendant must have organized participants." *Holden*, 908 F.3d at 402 (internal citation omitted).

At Mr. Balwani's sentencing hearing, the Court found that, although Mr. Balwani was certainly an organizer or leader at Theranos, there was insufficient evidence to conclude that he was an "organizer or leader" of the *criminal activity*, *i.e.*, fraud and conspiracy to commit fraud against Theranos investors. *See* PSR ¶ 108; Gov't Sent'g Mem. 26–27. The PSR and the government's sentencing memorandum focus on Mr. Balwani's deep involvement in Theranos' operations, but the evidence indicated that Theranos was a "real company," not a criminal enterprise. 9/8/21 Hr'g Tr. 553:7-8. To qualify for this enhancement, Mr. Balwani must have "organized other *participants for the purpose of carrying out the crime*." *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012) (emphasis added) (quoting *United States v. Ingham*, 486 F.3d 1068, 1074 (9th Cir. 2007)). Indeed, the Sentencing Guidelines accounts for circumstances involving a defendant's control over unwitting *non-participant* individuals, which is reflected in the "otherwise extensive" element but not the "organizer or leader" element. *See* U.S.S.G. § 3B1.1 cmt. 3 ("[A] fraud that involved only three participants but used the unknowing services of many outsiders could be considered *extensive*.") (emphasis added). Accordingly, Mr. Balwani's control and organization of other employees at Theranos do not satisfy the "organizer or

United States District Court
Northern District of California

1   leader" requirement; he must control or organize other participants in the criminal activity.

2       The only other participant in the criminal activity that the government had identified was

3   Ms. Holmes. Although the government frequently mention both Defendants together when

4   referencing the scheme to defraud investors, the evidence presented by the government did not

5   support a finding that Mr. Balwani exercised control over or otherwise organized Ms. Holmes,

6   only that they acted as co-equals. *See*, *e.g.*, PSR ¶¶ 76; Gov't Sent'g Mem. 13, 25 ("Balwani's

7   authority as President and COO was second only to Holmes"). The Ninth Circuit has expressly

8   held that "co-equal" conspirators who are not "in charge" of each other do not exhibit sufficient

9   control to qualify for even the 2-level aggravated role enhancement. *Holden*, 908 F.3d at 402–03.

10  Here, the government presented evidence that Mr. Balwani was the President and COO of

11  Theranos, directed product managers who maintained the Walgreens relationship, and ran the

12  CLIA lab. Gov't Sent'g Memo. 25–26. Absent from the government's showing, however, was

13  any evidence that Mr. Balwani controlled or organized Ms. Holmes' activities to perpetuate the

14  fraud. To the contrary, Ms. Holmes had the power to terminate anyone at Theranos, including Mr.

15  Balwani. 11/30/21 Hr'g Tr. 8093:9–8094:1. The evidence presented by the government did not

16  support a finding that Mr. Balwani exercised control over Ms. Holmes, such that the Court can

17  "apportion relative responsibility" to Mr. Balwani. *Holden*, 908 F.3d at 403.

18      Accordingly, the Court held that Mr. Balwani did not qualify for an aggravated role

19  enhancement under any sub-section of U.S.S.G. § 3B1.1.

20      **E.    Final Guidelines Calculation**

21      Based on the foregoing reasoning, the Court made the following findings at Mr. Balwani's

22  sentencing hearing:

23          1.  The base offense level for violations of 18 U.S.C. § 1343 is 7 (U.S.S.G. §

24              2B1.1(a)(1));

25          2.  The total loss to identified investor victims is $120,192,642, which increases the

26              offense level by 24 levels (§ 2B1.1(b)(1)(M));

27          3.  There are ten or more victims, which increases the offense level by 2 levels (§

28  Case No.: 5:18-cr-00258-EJD-2
    ORDER ON SENTENCING

1    2B1.1(b)(2)(A)(i)); and

2    4. There is insufficient evidence to support sentencing adjustments for risk of death or

3    serious bodily injury and aggravating role as an organizer or leader (§§

4    2B1.1(b)(16); 3B1.1(a)).

5    Accordingly, the Sentencing Guidelines calculation resulted in an offense level of 33.

6    Combined with Mr. Balwani's Category I Criminal History, this yielded a Guideline sentencing

7    range of 135 – 168 months.

8    **III.    INDIVIDUALIZED § 3553(A) ANALYSIS**

9    Once it arrived at the appropriate Sentencing Guidelines range at Mr. Balwani's sentencing

10   hearing, the Court proceeded to impose a sentence that is "sufficient, but not greater than

11   necessary to comply with the purposes" of sentencing.  18 U.S.C.S. § 3553.  In doing so, the Court

12   recognized that the Sentencing Guidelines' range is advisory, and it did not presume that the

13   Guidelines' sentence was reasonable.  *See Gall v. United States*, 552 U.S. 38, 46, 49–50 (2007).

14   Instead, the Court conducted "an individualized assessment based on the facts" of the case,

15   keeping in mind the factors listed at § 3553(a).

16   In determining the sentence, the Court considered the arguments and points presented in

17   both parties' memoranda.  The Court considered Mr. Balwani's history and characteristics, which

18   included his commendable and generous philanthropic contributions, not just to his own family

19   but also for the welfare of communities local and abroad.  The Court also considered the nature

20   and circumstances of the offense, recognizing that Mr. Balwani's sentence must reflect the

21   seriousness of the offense, promote respect for the law, provide just punishment for the offense,

22   and afford adequate deterrence in criminal conduct.  And particularly in this case, the Court

23   considered the need to avoid sentence disparities among defendants with similar records who have

24   been found guilty of similar conduct; specifically, the fact that Mr. Balwani was found guilty of all

25   twelve counts in the Third Superseding Indictment whereas his Co-Defendant Ms. Holmes was

26   convicted only on four counts of the same indictment.

27

28   Case No.: 5:18-cr-00258-EJD-2
     ORDER ON SENTENCING

United States District Court
Northern District of California

## IV.    SENTENCE

Having considered the § 3553 factors, the Court imposed a sentence of 155 months' imprisonment, 3 years' supervised release with conditions adopted from the PSR's recommendations for supervised release, a fine of $25,000, and a special assessment of $1,200 ($100 per Count).  Mr. Balwani's surrender date was set for March 15, 2023.  The parties were ordered to meet and confer to determine a date for the restitution hearing.

**IT IS SO ORDERED.**

Dated: February 16, 2023

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES**

**Date:** December 7, 2022          **Time:** 10:09 AM -12:19 PM;          **Judge:** Edward J. Davila
                                                    12:50-2:40 PM
                                **Total Time:** 4 hours

**Case No.:** 5:18-CR-00258-2 EJD    **Case Name:** *United States v. Ramesh Balwani* (P) (NC)

**Attorney for Plaintiff:**      Robert Leach, John Bostic, Jeffrey Schenk
        Also Present:      Maddi Wachs

**Attorney for Defendant**      Jeffrey Coopersmith, Amy Walsh, Cazares, Aaron Brecher, Amanda
                        McDowell, Shawn Estrada, Sachi Schuricht, Reese Onate, and Serena
                        Nichols

**Deputy Clerk:** Cheré Robinson          **Court Reporter:** Irene Rodriguez

                                    **Probation Officer:** Jessica Goldsberry

**PROCEEDINGS - SENTENCING**

Defendant present and not in custody. Hearing held.

The Court addresses objections to the Presentence Investigation Report. Arguments of Counsel heard.

The Court rules on objections; separate Order to issue.

The Court sentences Defendant as follows:

> Defendant is sentenced to 155 months as to Counts One, Two, Three through Eight, and Nine through Twelve of the Third Superseding Indictment (ECF No. 469, filed July 28, 2020), to be served concurrently. Defendant committed to the Bureau of Prisons to be imprisoned for said term.

> Upon release from imprisonment, the Defendant shall serve a term of 3 years supervised release as to Counts One, Two, Three through Eight, and Nine through Twelve of the Third Superseding Indictment to be served concurrently. The Court adopts the Probation Officer's recommendations as to the standard and special conditions of supervised release.

> A special assessment fee of $1,200 is imposed. The Court imposes a fine of $25,000, concurrent as to each Count.

Defendant shall self-surrender on March 15, 2023, at 2:00 PM to the designated facility; if a facility has not been designated, Defendant shall self-surrender to the U.S. Marshal's office. All present conditions of release remain in effect until such surrender.

The Court makes the following recommendation: This is a non-violent offense and, Defendant has no history of violence or other convictions. The Court recommends the Defendant be designated to the Lompoc minimum security satellite camp in Santa Barbara County, California. The Court finds that family visitation enhances rehabilitation.

**Cheré Robinson**
**Courtroom Deputy**
**Original: Efiled**
**CC:**

ER-38

The Court requests Counsel meet and confer on a schedule for a restitution hearing. The Court also requests Counsel confer with Co-Defendant Counsel regarding whether a joint restitution hearing should be held, and to provide the information and proposed dates and schedule to the Courtroom Deputy.

**P/NP: Present, Not Present**
**C/NC: Custody, Not in Custody**
**I: Interpreter**

2

**Cheré Robinson**
**Courtroom Deputy**
**Original: Efiled**
**CC:**

ER-39

```
 1

 2                    UNITED STATES DISTRICT COURT

 3                   NORTHERN DISTRICT OF CALIFORNIA

 4                        SAN JOSE DIVISION

 5

 6     UNITED STATES OF AMERICA,        )
                                        )  CR-18-00258-EJD
 7                   PLAINTIFF,         )
                                        )  SAN JOSE, CALIFORNIA
 8              VS.                      )
                                        )  DECEMBER 7, 2022
 9     RAMESH "SUNNY" BALWANI,          )
                                        )  PAGES 1 - 152
10                   DEFENDANT.         )
       _____ )  SENTENCING

11

12                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14     A P P E A R A N C E S:

15     FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                                JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:  ROBERT S. LEACH
                             1301 CLAY STREET, SUITE 340S
19                           OAKLAND, CALIFORNIA 94612

20
                      (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
       OFFICIAL COURT REPORTER:
22                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                               CERTIFICATE NUMBER 8074
23

24         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
25
```

```
1    A P P E A R A N C E S: (CONT'D)

2

     FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
3                            BY:  SHAWN ESTRADA
                                  REESE ONATE
4                                 SERENA NICHOLS
                            THE ORRICK BUILDING
5                            405 HOWARD STREET
                            SAN FRANCISCO, CALIFORNIA 94105
6
                            BY:  JEFFREY COOPERSMITH
7                                 AARON BRECHER
                                  AMANDA MCDOWELL
8                            701 FIFTH AVENUE, SUITE 5600
                            SEATTLE, WASHINGTON 98104
9
                            BY:  STEPHEN CAZARES
10                           77 SOUTH FIGUEROA STREET, SUITE 3200
                            LOS ANGELES, CALIFORNIA 90017
11
                            BY:  AMY WALSH
12                           51 W 52ND STREET
                            NEW YORK, NEW YORK 10019
13
     FOR U.S. PROBATION:     JESSICA GOLDSBERRY
14

15   ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                            BY:  MADDI WACHS, PARALEGAL
16
                            UNITED STATES POSTAL INSPECTION SERVICE
17                           BY:  CHRISTOPHER MCCOLLOW

18                           FEDERAL BUREAU OF INVESTIGATION
                            BY:  MARIO C. SCUSSEL
19
                            UNITED STATES FOOD & DRUG
20                           ADMINISTRATION
                            BY:  GEORGE SCAVDIS
21

22

23

24

25
```

```
 1      SAN JOSE, CALIFORNIA                    DECEMBER 7, 2022
 2                     P R O C E E D I N G S
 3          (COURT CONVENED AT 10:09 A.M.)
 4              THE COURT:  LET'S CALL OUR MORNING MATTER.
 5          THIS IS 18-258, UNITED STATES VERSUS
 6      RAMESH "SUNNY" BALWANI.
 7          LET ME FIRST CAPTURE THE APPEARANCES OF THE PARTIES.
 8          WHO APPEARS FOR THE GOVERNMENT?
 9              MR. LEACH:  GOOD MORNING, YOUR HONOR.
10          ROBERT LEACH ON BEHALF OF THE UNITED STATES.
11          I'M JOINED BY JOHN BOSTIC AND JEFF SCHENK
12              THE COURT:  THANK YOU.  GOOD MORNING.
13          AND FOR THE DEFENDANT?
14              MR. COOPERSMITH:  GOOD MORNING, YOUR HONOR.
15          JEFF COOPERSMITH FOR MR. BALWANI.
16          MR. BALWANI IS PRESENT.
17          I'M JOINED BY MY COLLEAGUES, AMY WALSH, STEPHEN CAZARES,
18      AND MOST OF OUR TEAM, AMANDA, SHAWN ESTRADA, REESE ONATE,
19      AARON BRECHER, SERENA NICHOLS, AND MOST OF MR. BALWANI'S FAMILY
20      IS SEATED BEHIND THAT ROW.
21              THE COURT:  THANK YOU.  GOOD MORNING.  IT'S NICE TO
22      SEE EVERYONE.
23              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.
24              THE COURT:  WE ARE HERE THIS MORNING FOR THE
25      SENTENCING IN THIS MATTER HAVING HEARD THE JURY'S VERDICT THAT
```

10:10AM 1 WAS RETURNED AND SUBSEQUENT TO THE TRIAL IN THIS MATTER.

10:10AM 2  LET ME INDICATE AND ASK FIRST, ARE ALL PARTIES READY TO

10:10AM 3 PROCEED?

10:10AM 4  MR. LEACH:  YES, YOUR HONOR.

10:10AM 5  MR. COOPERSMITH:  YES, YOUR HONOR.

10:10AM 6  THE COURT:  ALL RIGHT.  THANK YOU.

10:10AM 7 AND WHO APPEARS FOR PROBATION?

10:10AM 8  PROBATION OFFICER:  GOOD MORNING, YOUR HONOR.

10:10AM 9 JESSICA GOLDSBERRY FOR U.S. PROBATION.

10:10AM 10  THE COURT:  THANK YOU.  GOOD MORNING.

10:10AM 11 LET ME INDICATE THE DOCKETS THAT I HAVE REVIEWED IN THIS

10:10AM 12 MATTER IN ANTICIPATION OF PREPARATION OF THE SENTENCING.

10:10AM 13 FIRST OF ALL, I HAVE REVIEWED THE PSR, WHICH IS DOCKET

10:10AM 14 1647; I'VE REVIEWED THE GOVERNMENT'S SENTENCING MEMORANDUM,

10:10AM 15 1661; THE DEFENSE MEMORANDUM, 1662, I BELIEVE IT IS.  THERE WAS

10:11AM 16 A DEFENDANT'S APPENDIX A THAT WAS -- LET'S SEE.  THAT WAS FILED

10:11AM 17 ON NOVEMBER 30TH, YES.

10:11AM 18 AND 1665 WERE DEFENDANT'S EXHIBITS; 1671 WAS THE DEFENSE

10:11AM 19 RESPONSE TO THE GOVERNMENT'S MEMO WITH EXHIBITS; 1674 WAS THE

10:11AM 20 GOVERNMENT'S RESPONSE TO DEFENDANT'S MEMO; AND THEN AS RECENTLY

10:11AM 21 AS YESTERDAY AT 1:34 P.M., 1677 I BELIEVE IT WAS 100 PAGE

10:11AM 22 DOCUMENT, SUPPLEMENTAL EXPERT REPORT THAT WAS FILED BY THE

10:11AM 23 DEFENSE.

10:11AM 24 DID THE GOVERNMENT GET THAT SUPPLEMENTAL REPORT?

10:11AM 25  MR. LEACH:  WE DID, YOUR HONOR.  THANK YOU.

| | | |
|---|---|---|
| 10:11AM | 1 | THE COURT: ALL RIGHT. THANK YOU. |
| 10:11AM | 2 | THOSE ARE THE DOCUMENTS THAT THE COURT RECEIVED AND |
| 10:11AM | 3 | CONSIDERED, INCLUDING THE EXHIBITS. |
| 10:11AM | 4 | LET ME INDICATE THAT THERE WERE MANY, MANY LETTERS OF |
| 10:11AM | 5 | SUPPORT OF MR. BALWANI THAT WERE ALSO CONTAINED IN THOSE |
| 10:12AM | 6 | EXHIBITS, AND THE COURT HAS READ AND REVIEWED THOSE AS WELL. |
| 10:12AM | 7 | ARE THERE ANY OTHER DOCUMENTS THAT THE PARTIES WANT TO |
| 10:12AM | 8 | BRING TO MY ATTENTION? |
| 10:12AM | 9 | MR. LEACH: NO, YOUR HONOR. |
| 10:12AM | 10 | MR. COOPERSMITH: NO, YOUR HONOR. YOU'VE COVERED |
| 10:12AM | 11 | IT. THANK YOU. |
| 10:12AM | 12 | THE COURT: THANK YOU. |
| 10:12AM | 13 | LET ME ASK PROBATION THEN AS TO THE PSR, ARE THERE ANY |
| 10:12AM | 14 | CHANGES, ADDITIONS, DELETIONS TO THE PRESENTENCE REPORT? |
| 10:12AM | 15 | MR. COOPERSMITH: NO, YOUR HONOR. |
| 10:12AM | 16 | THE COURT: ALL RIGHT. THANK YOU. |
| 10:12AM | 17 | AND THE PARTIES DID RECEIVE THAT IN A TIMELY MATTER. |
| 10:12AM | 18 | WHAT I'D LIKE TO DO INITIALLY IS TO REVIEW THE OBJECTIONS. |
| 10:12AM | 19 | THERE WERE OBJECTIONS MADE TO THE PSR. |
| 10:12AM | 20 | WHAT I THOUGHT I WOULD DO, I BELIEVE THERE WERE A TOTAL OF |
| 10:12AM | 21 | 39 OBJECTIONS FILED BY THE DEFENSE AS TO THE PSR, INCLUDING |
| 10:12AM | 22 | OBJECTIONS IN THE APPENDIX A THAT WAS ATTACHED TO THE DEFENSE |
| 10:12AM | 23 | SENTENCING MEMORANDUM. |
| 10:13AM | 24 | AND GIVEN THE QUANTITY OF THOSE OBJECTIONS, I HAVE DIVIDED |
| 10:13AM | 25 | THOSE INTO TWO CATEGORIES THAT I TITLED CONTEXTUAL AND |

| | |
|---|---|
| 10:13AM 1 | SUBSTANTIVE. |
| 10:13AM 2 | THE SUBSTANTIVE OBJECTIONS, LET ME PARSE THOSE OUT FIRST, |
| 10:13AM 3 | THOSE ARE -- AND I'VE IDENTIFIED THOSE AS OBJECTIONS, AND THESE |
| 10:13AM 4 | ARE DEFENSE OBJECTIONS THIRTEEN, TWENTY-TWO, TWENTY-THREE, AND |
| 10:13AM 5 | TWENTY-FOUR, AND I'LL TALK ABOUT THOSE SEPARATELY. |
| 10:13AM 6 | THE BALANCE I'VE LABELLED CONTEXTUAL. AND WHAT I WOULD |
| 10:13AM 7 | LIKE TO DO IS GO THROUGH THOSE INITIALLY, AND THEN WE'LL GO |
| 10:13AM 8 | THROUGH THE SUBSTANTIVE. |
| 10:13AM 9 | IN THIS ANALYSIS, I THINK YOU'LL FIND THAT THE SUBSTANTIVE |
| 10:13AM 10 | OBJECTIONS REALLY RELATE TO LOSS AND GUIDELINE CALCULATIONS, |
| 10:13AM 11 | WHICH ARE OF INTEREST TO THE PARTIES. |
| 10:13AM 12 | I NOTE THAT THE GOVERNMENT ALSO FILED AN OBJECTION, AND I |
| 10:14AM 13 | HAVE THAT HERE. |
| 10:14AM 14 | LET ME ASK, IS THERE ANYTHING ELSE THAT YOU WOULD LIKE ME |
| 10:14AM 15 | TO KNOW, MR. LEACH, IN REGARDS TO THE GOVERNMENT'S OBJECTION? |
| 10:14AM 16 | MR. LEACH: NO, YOUR HONOR. |
| 10:14AM 17 | I THINK AS WE RELAY IN THE BRIEF THAT IN PREPARING THE |
| 10:14AM 18 | PSR, IT APPEARED THAT PROBATION RESOLVED SOME OBJECTIONS BY |
| 10:14AM 19 | PUTTING IN ARGUMENT WHERE -- WE'VE HIGHLIGHTED TWO OF THOSE |
| 10:14AM 20 | PARAGRAPHS FOR THE COURT. |
| 10:14AM 21 | WE DON'T THINK IT'S NECESSARY TO PARSE THE PSR IN QUITE |
| 10:14AM 22 | THAT WAY. |
| 10:14AM 23 | I THINK THE COURT SAT THROUGH TWO TRIALS WITH A LENGTHY |
| 10:14AM 24 | RECORD, AND WE WANTED TO HIGHLIGHT THOSE TO THE COURT BECAUSE |
| 10:14AM 25 | THERE WERE ELEMENTS THAT WE DISAGREED WITH, BUT AS WE SAY IN |

10:14AM  1    OUR PAPERS, I DON'T THINK IT'S NECESSARY FOR THE COURT TO

10:14AM  2    RESOLVE THOSE OBJECTIONS FOR PURPOSES OF SENTENCING.  AND I

10:14AM  3    WOULD IMAGINE THEY FALL INTO THE CATEGORY OUTSIDE OF THIRTEEN,

10:14AM  4    TWENTY-TWO, TWENTY-THREE, AND TWENTY-FOUR THAT YOUR HONOR JUST

10:15AM  5    DESCRIBED.

10:15AM  6             THE COURT:  OKAY.  THANK YOU.

10:15AM  7         MR. COOPERSMITH, YOU'RE AT THE LECTERN.

10:15AM  8             MR. COOPERSMITH:  OH, I JUST THOUGHT IT WOULD BE

10:15AM  9    ABOUT THAT TIME TO APPROACH, BUT I HAVE NOTHING TO ADD AT THIS

10:15AM  10    PARTICULAR MOMENT.

10:15AM  11             THE COURT:  WELL, THANK YOU.

10:15AM  12         THE GOVERNMENT'S OBJECTIONS WERE, AS YOU STATED,

10:15AM  13    MR. LEACH, TO -- I THINK YOUR OPINION IS THAT THE DEFENSE

10:15AM  14    SEEMED TO -- AND THEIR INTENT AND REQUEST WAS TO ADD CERTAIN

10:15AM  15    LANGUAGE TO VARIOUS PARAGRAPHS.  AND I'VE LOOKED AT THOSE,

10:15AM  16    INCLUDING THE EXAMPLES 17, 23 AND OTHERS THAT YOU SUGGEST.

10:15AM  17         AND LET ME JUST INDICATE THAT YOU ARE RIGHT, AND YOU HAVE

10:15AM  18    A GOOD MEMORY, I DID SIT THROUGH BOTH TRIALS, AND I WAS ABLE TO

10:15AM  19    HEAR THE EVIDENCE IN THAT.

10:15AM  20         THE STATEMENTS THAT YOU'VE RAISED THERE, I'M GOING TO

10:15AM  21    INVOKE FEDERAL RULE OF CRIMINAL PROCEDURE 32(I)(3)(B) AND

10:15AM  22    INDICATE THAT THE COURT NEED NOT RULE ON THOSE OBJECTIONS

10:15AM  23    BECAUSE THE COURT IS NOT GOING TO CONSIDER THAT TYPE OF

10:15AM  24    INFORMATION AS YOU'VE INDICATED.  AND I THINK PART OF THIS --

10:16AM  25    IN ITS SENTENCING DECISION.

10:16AM 1     AND PART OF THIS WILL COME OUT IN OUR DISCUSSION ABOUT THE

10:16AM 2     BALANCE OF THE OBJECTIONS.  SO THANK YOU FOR THAT.

10:16AM 3     ANYTHING FURTHER ON THAT?

10:16AM 4     MR. LEACH:  NO, YOUR HONOR.

10:16AM 5     MR. COOPERSMITH:  NO, YOUR HONOR.

10:16AM 6     THE COURT:  GREAT.  THANK YOU.

10:16AM 7     WELL, LET'S GO THROUGH WHAT I'VE IDENTIFIED AS CONTEXTUAL

10:16AM 8     OBJECTIONS.  AND THESE ARE CONTAINED, FIRST OF ALL, IN THE PSR

10:16AM 9     ITSELF BEGINNING IN THE ADDENDUM TO THE PRESENTENCE REPORT AND

10:16AM 10    THEN IN APPENDIX A SENTENCING MEMORANDUM THAT CONTAINED 24

10:16AM 11    THROUGH 39 I THINK THE BALANCE OF THE OBJECTIONS.

10:16AM 12    LET ME FIRST SAY THAT I HAVE READ AND REVIEWED THE

10:16AM 13    OBJECTIONS THAT ARE CONTAINED IN THE PSR.  THOSE ARE 1 THROUGH

10:17AM 14    24, I BELIEVE.

10:17AM 15    LET ME ASK, MS. GOLDSBERRY, IS THERE ANYTHING ELSE YOU

10:17AM 16    WOULD LIKE TO ADD TO ANY OF PROBATION'S RESPONSES TO THOSE

10:17AM 17    OBJECTIONS?

10:17AM 18    PROBATION OFFICER:  NO, YOUR HONOR.

10:17AM 19    THE COURT:  ALL RIGHT.  THANK YOU.

10:17AM 20    ANYTHING FURTHER YOU WOULD LIKE TO ADD TO THE OBJECTIONS,

10:17AM 21    MR. COOPERSMITH?

10:17AM 22    MR. COOPERSMITH:  NOT ON THOSE, YOUR HONOR.  WE PUT

10:17AM 23    THAT IN THE RECORD, AND WE THINK THE COURT IS FAMILIAR WITH THE

10:17AM 24    CASE OBVIOUSLY.  WE STAND BY THOSE, BUT WE DON'T THINK IT'S

10:17AM 25    NECESSARY TO ARGUE THOSE ONE BY ONE.

| | | |
|---|---|---|
| 10:17AM | 1 | THE COURT: OKAY. ANYTHING FURTHER -- |
| 10:17AM | 2 | MR. LEACH: NO, YOUR HONOR. |
| 10:17AM | 3 | THE COURT: -- ON THOSE OBJECTIONS? |
| 10:17AM | 4 | MR. LEACH: NO, YOUR HONOR. |
| 10:17AM | 5 | THE COURT: ALL RIGHT. THANK YOU. |
| 10:17AM | 6 | WHAT I INTEND TO DO IS JUST TO GO THROUGH AND INFORM YOU |
| 10:17AM | 7 | OF THE COURT'S DECISION AS TO THOSE OBJECTIONS. |
| 10:17AM | 8 | OBJECTION NUMBER ONE IS THE OBJECTION TO PARAGRAPH NUMBER |
| 10:17AM | 9 | 18 OF THE PSR, AND THAT OBJECTION IS OVERRULED. THE COURT |
| 10:18AM | 10 | FINDS THAT THIS SUMMARY IS SUBSTANTIVELY THE SAME AS THE SCHEME |
| 10:18AM | 11 | TO DEFRAUD IN THE THIRD SUPERSEDING INDICTMENT, AND I'LL ALLOW |
| 10:18AM | 12 | THAT TO REMAIN. |
| 10:18AM | 13 | OBJECTION NUMBER TWO GOES TOWARDS THE PARAGRAPH 19, AND |
| 10:18AM | 14 | THE COURT FINDS THAT THE OBJECTION OR THE RULING ON THIS IS |
| 10:18AM | 15 | UNNECESSARY, AGAIN, CITING FEDERAL RULE OF CRIMINAL PROCEDURE |
| 10:18AM | 16 | 32(I)(3)(B), AND THE COURT WILL NOT CONSIDER PRE-2010 |
| 10:18AM | 17 | PRE-CONSPIRACY SAFEWAY RELATIONSHIP IN THE DEFENDANT'S |
| 10:18AM | 18 | SENTENCING. |
| 10:18AM | 19 | MR. COOPERSMITH: YOUR HONOR, JUST TO CLARIFY. |
| 10:18AM | 20 | OBJECTION NUMBER TWO I BELIEVE RELATES TO FINAL PSR PARAGRAPH |
| 10:18AM | 21 | 20? |
| 10:18AM | 22 | THE COURT: 20, YES. |
| 10:18AM | 23 | MR. COOPERSMITH: YES, YOUR HONOR. |
| 10:18AM | 24 | THE COURT: YES. IF I SAID 19, I MEANT 20, YES. |
| 10:18AM | 25 | MR. COOPERSMITH: YES. |

| | | |
|---|---|---|
| 10:18AM | 1 | THE COURT: IT'S 20 IN THE FINAL PARAGRAPH. IT'S 19 |
| 10:18AM | 2 | IN THE DRAFT. |
| 10:18AM | 3 | MR. COOPERSMITH: YES, YOUR HONOR. THANK YOU. |
| 10:19AM | 4 | THE COURT: OBJECTION THREE RELATES TO PARAGRAPH 21, |
| 10:19AM | 5 | AND I'M GOING TO SUSTAIN IN PART THIS OBJECTION. |
| 10:19AM | 6 | AND I WILL -- THE THIRD BOLD REFERENCE IN THIS PARAGRAPH |
| 10:19AM | 7 | THAT REFERENCES BALWANI, THE NAME BALWANI, WE'LL STRIKE THAT. |
| 10:19AM | 8 | AND THE FOLLOWING SENTENCE, I THINK IT'S FIVE LINES DOWN, |
| 10:19AM | 9 | MS. GOLDSBERRY, THE WORD, THE FOURTH WORD IN THAT IS "THEY," |
| 10:19AM | 10 | THAT SHOULD BE CHANGED TO "WAS." |
| 10:19AM | 11 | PROBATION OFFICER: COULD THE COURT TELL ME THE |
| 10:19AM | 12 | WHOLE SENTENCE? |
| 10:19AM | 13 | THE COURT: "IF YOU SEE." LET ME SAY, THERE ARE |
| 10:20AM | 14 | SOME CHANGES HERE WE'RE GOING TO HAVE TO DO. THE PSR, AS YOU |
| 10:20AM | 15 | KNOW, IS CONFIDENTIAL. |
| 10:20AM | 16 | MR. COOPERSMITH: YES. |
| 10:20AM | 17 | THE COURT: SO I'M RETICENT TO READ WHOLESALE |
| 10:20AM | 18 | INFORMATION. |
| 10:20AM | 19 | PROBATION OFFICER: I UNDERSTAND. |
| 10:20AM | 20 | THE COURT: BUT I'M TRYING TO GIVE YOU GUIDANCE ON |
| 10:20AM | 21 | WHERE IT IS, AND, OF COURSE, I'LL HAVE TO READ SOME WORDS IN. |
| 10:20AM | 22 | BUT IF YOU'LL GO DOWN ONE, TWO, THREE, FOUR -- FIVE LINES |
| 10:20AM | 23 | DOWN, THAT SENTENCE BEGINS WITH THE WORD "THERANOS." |
| 10:20AM | 24 | PROBATION OFFICER: YES. |
| 10:20AM | 25 | THE COURT: AND THE WORD "THEY" IN THAT SENTENCE |

10:20AM 1    WILL BE CHANGED TO "WAS."

10:20AM 2              PROBATION OFFICER:  "WAS."

10:20AM 3              THE COURT:  AND IN THE PRECEDING SENTENCE FOLLOWING

10:20AM 4    THE WORD "HOLMES," THE NEXT TWO WORDS WILL BE STRICKEN,

10:20AM 5    INCLUDING MR. BALWANI'S NAME IN BOLD.

10:20AM 6              PROBATION OFFICER:  THE SENTENCE BEFORE?

10:20AM 7              THE COURT:  CORRECT.

10:20AM 8              PROBATION OFFICER:  OKAY.

10:20AM 9              THE COURT:  SO THE WORDS "AND BALWANI," FOLLOWING

10:20AM 10   THE WORD "HOLMES," WILL BE DELETED.

10:21AM 11             PROBATION OFFICER:  OKAY.  GOT IT.

10:21AM 12             THE COURT:  OBJECTION FOUR IS OVERRULED.  THIS IS AN

10:21AM 13   ACCURATE DESCRIPTION, AND IT DOES PROVIDE CONTEXT.

10:21AM 14        OBJECTION FIVE IS OVERRULED.  THIS RELATES TO PARAGRAPH

10:21AM 15   26.  THE COURT FINDS THAT THIS PARAGRAPH CORRECTLY STATES THE

10:21AM 16   EVIDENCE THAT WAS INTRODUCED AT TRIAL.

10:21AM 17        OBJECTION SIX IS OVERRULED.  I'LL NOTE THAT AT THE -- THIS

10:21AM 18   IS ONE OF THOSE PARAGRAPHS WHERE AT THE DEFENSE REQUEST I

10:21AM 19   BELIEVE PROBATION ACTUALLY INCLUDED SENTENCES THAT THE

10:21AM 20   DEFENDANT REQUESTED TO PROVIDE CONTEXT.  SO I'LL OVERRULE THE

10:21AM 21   OBJECTION TO THAT MATERIAL.

10:21AM 22        OBJECTION SEVEN, THIS RELATES TO PARAGRAPHS 36 AND 37,

10:21AM 23   THAT IS OVERRULED.  THE COURT FINDS THIS PARAGRAPH ACCURATE,

10:22AM 24   AND AGAIN, IT PROVIDES HELPFUL CONTEXT FOR THE OVERALL COMPANY

10:22AM 25   HISTORY AND SPECIFICALLY ITS RELATIONSHIP WITH PFIZER.

10:22AM 1    I'LL ALSO NOTE THAT PROBATION DID ADD LANGUAGE AT THE

10:22AM 2    DEFENSE REQUEST REGARDING HIS KNOWLEDGE OF THE PFIZER REPORT.

10:22AM 3    OBJECTION EIGHT AS TO PARAGRAPH 39 IS OVERRULED.  THIS

10:22AM 4    PARAGRAPH DOES PROVIDE CONTEXT AND PROBATION DID, AS I

10:22AM 5    UNDERSTAND IT, REMOVE A SENTENCE AT THE DEFENSE REQUEST.

10:22AM 6    OBJECTION NINE AS TO PARAGRAPH 40 IS SUSTAINED IN PART,

10:22AM 7    AND THE COURT WILL STRIKE THE INTRODUCTORY CLAUSE IN THE

10:22AM 8    SENTENCE.

10:22AM 9    AND LET ME GET THAT FOR YOU, MS. GOLDSBERRY.

10:22AM 10   IT'S PROBABLY EASIER TO TELL YOU THAT THE SECOND SENTENCE

10:22AM 11   UP FROM THE BOTTOM THAT BEGINS WITH THE WORD "DESPITE."

10:23AM 12   PROBATION OFFICER:  YES.

10:23AM 13   THE COURT:  THAT WILL BE STRICKEN, THE WORD

10:23AM 14   "DESPITE" WILL BE STRICKEN AS WILL THE NEXT FOUR WORDS,

10:23AM 15   INCLUDING THE COMMA.

10:23AM 16   PROBATION OFFICER:  OKAY.  SO EVERYTHING UP UNTIL

10:23AM 17   THE COMMA?

10:23AM 18   THE COURT:  INCLUDING THE COMMA.  AND THE SENTENCE

10:23AM 19   WILL BEGIN WITH "HOLMES."

10:23AM 20   PROBATION OFFICER:  GOT IT.

10:23AM 21   THE COURT:  OBJECTION TEN, THIS OBJECTION IS

10:23AM 22   OVERRULED.  THIS DESCRIPTION IS ACCURATE.  IT DOES PROVIDE

10:23AM 23   RELEVANT TESTIMONY FROM A FORMER EMPLOYEE.

10:23AM 24   AND I'LL NOTE AGAIN AT THE DEFENSE REQUEST, THE PROBATION

10:23AM 25   INCLUDED SENTENCES IN REGARDS TO THE DEFENDANT'S, PARDON ME,

10:23AM 1    RELIANCE ON OPINIONS.

10:23AM 2         OBJECTION ELEVEN IS OVERRULED.  THE COURT FINDS THAT THIS

10:24AM 3    PARAGRAPH IS ACCURATE AS WRITTEN, AND IT SEEMS THAT THE

10:24AM 4    DEFENDANT SEEKS TO ADD INFORMATION THAT ENCOMPASSES THE SPIRIT

10:24AM 5    OF PERHAPS A CLOSING ARGUMENT HERE, BUT THAT'S PART OF THE

10:24AM 6    RECORD, AND THE JURY HEARD THAT AND CONSIDERED ALL OF THAT.  SO

10:24AM 7    THE OBJECTION IS OVERRULED.

10:24AM 8         TWELVE IS AN OBJECTION TO PSR PARAGRAPHS 25, 26, 35, 36,

10:24AM 9    37, 38, 39, 40, 41, 42, AND 44, AND THIS OBJECTION AS TO THOSE

10:24AM 10   PARAGRAPHS IS OVERRULED.  I WILL NOTE THAT MANY OF THE

10:24AM 11   PARAGRAPHS ALSO CONTAIN STATEMENTS THAT WERE ADDED BY PROBATION

10:24AM 12   AT DEFENSE REQUEST INDICATING THAT MR. BALWANI'S POSITION AS TO

10:25AM 13   THOSE PARAGRAPHS AS WELL AS HIS DISAGREEMENT WITH THOSE

10:25AM 14   PARAGRAPHS WERE NOTED.  SO THE COURT WILL OVERRULE THAT

10:25AM 15   OBJECTION.

10:25AM 16        LET'S SEE.  I BELIEVE OBJECTION FOURTEEN, AND I'M AT

10:25AM 17   PARAGRAPH 47, IS OVERRULED.  AND THIS DETAILS INVESTOR

10:25AM 18   MENDENHALL.

10:25AM 19        I'M NOT CERTAIN -- I WAS NOT ABLE TO DETERMINE WHAT THAT

10:25AM 20   OBJECTION REALLY ENTAILED, SO I'M GOING TO LEAVE IT AS IS.

10:26AM 21        MR. COOPERSMITH, I NOTE THE OBJECTION.  I DON'T SEE HOW

10:26AM 22   IT'S INCOMPLETE OR MISLEADING, SO I'M GOING TO OVERRULE THE

10:26AM 23   OBJECTION AND LEAVE IT AS IT IS.

10:26AM 24        OBJECTION FIFTEEN RELATES TO PARAGRAPH 49, AND THE COURT

10:26AM 25   AGREES WITH THE PROBATION OFFICER'S RESPONSE TO THIS PARAGRAPH.

10:26AM 1    IT DOES NOT PURPORT TO TALLY THE NUMBER OF PATIENT VICTIMS.  IT

10:26AM 2    ONLY STATES WITH ACCURACY THAT HUNDREDS OF PATIENTS PAID FOR

10:26AM 3    THE BLOOD TEST, IRRESPECTIVE OF WHETHER THEY PAID OUT OF POCKET

10:26AM 4    OR THROUGH AN INSURED.  IT'S JUST A STATEMENT OF A FACT THAT

10:26AM 5    THE COURT WILL NOT DISTURB, AND THAT OBJECTION IS OVERRULED.

10:26AM 6        OBJECTION SIXTEEN RELATES TO PARAGRAPH 49 AND 50.  AND THE

10:26AM 7    COURT OVERRULES THIS.  THE COURT FINDS THAT THE EVIDENCE AT

10:26AM 8    TRIAL REVEALED MR. BALWANI'S KNOWLEDGE OF THE FACTS AS

10:27AM 9    INDICATED AND ADOPTS PROBATION'S EXPLANATION.

10:27AM 10       OBJECTION SEVENTEEN RELATED TO PARAGRAPH 52 IS OVERRULED.

10:27AM 11   THIS PARAGRAPH IS AN ACCURATE DESCRIPTION OF THE FACTS IN THE

10:27AM 12   CASE, AND THE COURT WILL OVERRULE THAT OBJECTION.

10:27AM 13       OBJECTION EIGHTEEN RELATES TO PARAGRAPH 53, PARDON ME,

10:27AM 14   THROUGH 58.  THE COURT WILL OVERRULE THIS IN PART.  PARAGRAPHS

10:27AM 15   53, 54, AND 58 REFLECT THE EXPERIENCE OF PATIENTS WHO DID

10:27AM 16   TESTIFY AT TRIAL, AND THEREFORE, THE OBJECTIONS TO THOSE

10:27AM 17   PATIENTS ARE OVERRULED.

10:27AM 18       NOW, AS TO THE REMAINING PATIENTS THAT ARE LISTED IN

10:28AM 19   THOSE -- IN THAT PARAGRAPH, THE COURT AGAIN WILL INVOKE FEDERAL

10:28AM 20   RULE OF CRIMINAL PROCEDURE 32(I)(3)(B) BECAUSE THE COURT WILL

10:28AM 21   NOT CONSIDER THOSE PATIENTS IN THE DEFENDANT'S SENTENCING.

10:28AM 22       OBJECTION NINETEEN RELATES TO PARAGRAPH 60.  THE COURT

10:28AM 23   FINDS THAT THIS INFORMATION IS RELEVANT, IT PROVIDES CONTEXT,

10:28AM 24   AND THE COURT WILL OVERRULE THAT OBJECTION.

10:28AM 25       OBJECTION TWENTY RELATES TO PARAGRAPH 66 AND 67, AND

| | | |
|---|---|---|
| 10:28AM | 1 | THOSE -- THAT OBJECTION IS OVERRULED. THE STATEMENTS, THE |
| 10:28AM | 2 | COURT CONSIDERS THEM APPROPRIATE AS VICTIM IMPACT STATEMENTS. |
| 10:28AM | 3 | THE COURT, OF COURSE THE PARTIES ARE AWARE, MAY CONSIDER THE |
| 10:29AM | 4 | CONSPIRATORIAL CONDUCT WITHIN THE SCOPE OF THE CONSPIRACY, EVEN |
| 10:29AM | 5 | IF THERE WASN'T PERSONAL OR INTERACTION WITH SPECIFIC INVESTORS |
| 10:29AM | 6 | BY THE DEFENDANT. |
| 10:29AM | 7 | OBJECTION TWENTY-ONE RELATES TO PARAGRAPH 61, AND THAT'S |
| 10:29AM | 8 | OVERRULED. THE COURT FINDS THAT THE PROBATION OFFICER'S |
| 10:29AM | 9 | EXPLANATION TO THIS OBJECTION IS APPROPRIATE. |
| 10:29AM | 10 | OBJECTION TWENTY-FIVE IS OVERRULED. THIS RELATES TO |
| 10:29AM | 11 | PARAGRAPH 14, AND THIS PARAGRAPH IS ACCURATE AND IS SUPPORTED |
| 10:29AM | 12 | BY THE RECORD IN THE MATTER. |
| 10:29AM | 13 | OBJECTION TWENTY-SIX RELATES TO PARAGRAPH 19, AND THIS IS |
| 10:29AM | 14 | SUSTAINED IN PART. THE COURT WILL SUSTAIN IN PART THIS |
| 10:29AM | 15 | OBJECTION. |
| 10:30AM | 16 | THIS IS ON PAGE 8, MS. GOLDSBERRY, AND IT'S IN THE LAST |
| 10:30AM | 17 | THREE SENTENCES OF THIS PARAGRAPH. |
| 10:30AM | 18 | AND THE THIRD SENTENCE UP FROM THE BOTTOM AT THE END OF |
| 10:30AM | 19 | THAT SENTENCE FOLLOWING THE WORD -- THE COURT WILL STRIKE THE |
| 10:30AM | 20 | WORDS "REVIEW AND APPROVAL," AND IN PLACE OF THAT WILL INSERT |
| 10:30AM | 21 | THE WORD "KNOWLEDGE." |
| 10:31AM | 22 | DID YOU GET THAT? |
| 10:31AM | 23 | PROBATION OFFICER: GOT IT. |
| 10:31AM | 24 | THE COURT: OKAY. THANK YOU. |
| 10:31AM | 25 | OBJECTION TWENTY-SEVEN IS OVERRULED. THIS LANGUAGE |

10:31AM 1    ADEQUATELY REFLECTS DR. ROSENDORFF'S TESTIMONY AND THE

10:31AM 2    PARAGRAPH NOTES THAT THE DEFENSE DISAGREEMENT WITH THE

10:31AM 3    CHARACTERIZATION OF KNOWLEDGE.  SO IT DOES CAPTURE THE DEFENSE

10:31AM 4    OPINIONS, SO I'LL OVERRULE THE OBJECTION.

10:31AM 5        OBJECTION TWENTY-EIGHT REFERS TO PARAGRAPH 37, AND THAT IS

10:31AM 6    OVERRULED.  THE COURT FINDS THAT THIS PARAGRAPH, INCLUDING THE

10:31AM 7    LAST SENTENCE, IS ACCURATE AND DOES PROVIDE CONTEXT.

10:31AM 8        OBJECTION TWENTY-NINE IS -- RELATES TO PARAGRAPH 44, AND

10:31AM 9    THIS IS OVERRULED.  THE COURT NOTES THAT THESE OBJECTIONS TO

10:31AM 10   THIS PARAGRAPH FOR THE SAME REASONS HE OBJECTS TO PARAGRAPH 40,

10:32AM 11   WHICH WAS OBJECTION NINE.  THIS PARAGRAPH ACCURATELY SUMMARIZES

10:32AM 12   MS. PETERSON'S TESTIMONY AT TRIAL AND THE CONVICTIONS OF

10:32AM 13   MR. BALWANI REGARDING THE WIRE FRAUD AGAINST RDV CORPORATION,

10:32AM 14   WHICH WAS COUNT SEVEN.  SO I'LL OVERRULE THAT OBJECTION.

10:32AM 15       OBJECTION THIRTY RELATES TO PARAGRAPH 50.  THAT OBJECTION

10:32AM 16   IS OVERRULED.  THIS PARAGRAPH IS SUPPORTED BY THE JURY'S

10:32AM 17   FINDINGS.  THE COURT FINDS THAT IT IS ACCURATE.

10:32AM 18       OBJECTIONS THIRTY-ONE THROUGH THIRTY-TWO RELATE TO

10:32AM 19   PARAGRAPHS 55 AND 56, AND THE COURT WILL REFER, AS TO THESE

10:32AM 20   OBJECTIONS, REFER TO ITS DECISION IN OBJECTION EIGHTEEN, AND IT

10:32AM 21   IS VERY SIMILAR, AND THE COURT'S FINDING IN OBJECTION EIGHTEEN

10:32AM 22   WILL ALSO RELATE TO THESE OBJECTIONS.

10:33AM 23       OBJECTION THIRTY-THREE RELATES TO PARAGRAPH 57 OF THE PSR.

10:33AM 24   AND THE COURT WILL, AGAIN, CITE FEDERAL RULE OF CRIMINAL

10:33AM 25   PROCEDURE 32(I)(3)(B).  THE COURT WILL NOT CONSIDER THIS

10:33AM 1    INFORMATION AND THIS PARAGRAPH IN RELATION TO THE DEFENDANT'S

10:33AM 2    SENTENCING.

10:33AM 3        OBJECTION THIRTY-FOUR RELATES TO PARAGRAPH 59, AND THIS

10:33AM 4    INFORMATION THAT IS IN THIS PARAGRAPH IS ACCURATE, AND THE

10:33AM 5    LANGUAGE IN THIS PARAGRAPH INDICATES THAT THE DEFENDANT'S

10:33AM 6    CONCERNS WERE ADDRESSED BY PROBATION.  THAT OBJECTION IS

10:33AM 7    OVERRULED.

10:33AM 8        OBJECTION THIRTY-FIVE RELATES TO PARAGRAPH 62, AND THE

10:33AM 9    COURT WILL PERHAPS SUSTAIN THIS IN PART.  I BELIEVE THE DEFENSE

10:34AM 10   OBJECTS TO PARAGRAPH 62.

10:34AM 11       BUT, MR. COOPERSMITH, MY SENSE IS THAT YOU'RE -- YOU

10:34AM 12   INTEND TO INSERT THIS PROPOSED LANGUAGE PERHAPS AT THE END OF

10:34AM 13   PARAGRAPH 60, IN PARAGRAPH 60 BUT AT THE END.

10:34AM 14       WOULD THAT BE A BETTER PLACEMENT FOR THIS?

10:34AM 15           MR. COOPERSMITH:  YOU MEAN IN PARAGRAPH 60 RATHER

10:34AM 16   THAN PARAGRAPH 62, YOUR HONOR?

10:34AM 17           THE COURT:  YES.

10:34AM 18       YOUR SENTENCE BEGINS WITH "FOR COMPARISON," AND IT ENDS

10:34AM 19   WITH "TEST RESULTS," AND THAT LANGUAGE, I LOOKED AT THAT AND

10:34AM 20   THOUGHT IF THAT IS GOING TO BE APPROPRIATE, IT MIGHT BE MORE

10:34AM 21   APPROPRIATE TO ADD IT AT THE TAIL END OF 60.  IT'S CONTEXTUAL

10:34AM 22   AND RELATES TO THAT SENTENCE.

10:34AM 23           MR. COOPERSMITH:  YOUR HONOR, I GUESS I DON'T HAVE

10:34AM 24   VERY STRONG FEELINGS ABOUT IT, AS LONG AS IT'S IN.

10:34AM 25       BUT IT RELATES MORE TO PARAGRAPH 62 BECAUSE PARAGRAPH 60

10:34AM 1    RELATES TO THIS ARIZONA MATTER SEEMS LIKE A DIFFERENT ISSUE.

10:35AM 2    BUT EITHER WAY, AGAIN, YOUR HONOR, IT'S -- THE POINT WOULD

10:35AM 3    STILL BE IN THE PSR EITHER WAY.

10:35AM 4         THE COURT:  WELL, I SUPPOSE THAT WAS THE CONFUSION

10:35AM 5    AS TO WHERE IT SHOULD GO.

10:35AM 6       LET'S ADD IT IN 60.  IT SEEMS TO ME 60 IS ONLY TWO

10:35AM 7    SENTENCES NOW, AND IF YOU WOULD LIKE THIS TO HAVE SOME

10:35AM 8    RECOGNITION, PERHAPS IT'S BETTER PLACED THERE AND IT WON'T GET

10:35AM 9    LOST IN ALL OF THE LANGUAGE OF 62.

10:35AM 10        MR. COOPERSMITH:  THAT'S FINE, YOUR HONOR.

10:35AM 11        THE COURT:  SO THAT WILL BE INSERTED AT THE END, THE

10:35AM 12   END OF PARAGRAPH 60.

10:35AM 13        PROBATION OFFICER:  AND THAT SENTENCE IS IN THE

10:35AM 14   APPENDIX, OBJECTION NUMBER THIRTY-FIVE DID THE COURT SAY?

10:35AM 15        THE COURT:  LET'S SEE.  I THINK THAT'S WHERE IT IS.

10:35AM 16        PROBATION OFFICER:  OKAY.

10:35AM 17      (PAUSE IN PROCEEDINGS.)

10:36AM 18        THE COURT:  THE FIRST SENTENCE IS WHAT I WAS

10:36AM 19   FOCUSSED ON, NOT THE SECOND SENTENCE.

10:36AM 20      SO THAT FIRST SENTENCE THAT ENDS IN "RESULTS"?

10:36AM 21        PROBATION OFFICER:  YES.

10:36AM 22        THE COURT:  THAT WILL BE PLACED IN 60.  THE SECOND

10:36AM 23   SENTENCE IS NOT NECESSARY.

10:36AM 24        PROBATION OFFICER:  GOT IT.

10:36AM 25        THE COURT:  AND OBJECTIONS THIRTY-SIX THROUGH

10:36AM 1     THIRTY-NINE ARE OVERRULED TO SAY THAT THE COURT WILL DISCUSS

10:36AM 2     THESE -- THIS IS PART OF OUR GUIDELINE DISCUSSION, SO I SUPPOSE

10:36AM 3     I COULD DEFER THOSE OBJECTIONS.  THEY WILL BE, THEY WILL BE

10:37AM 4     TAKEN UP IN OUR CONVERSATION ABOUT GUIDELINE CALCULATIONS.

10:37AM 5          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

10:37AM 6          THE COURT:  ALL RIGHT.  ANY QUESTIONS?

10:37AM 7     MS. GOLDSBERRY, DID YOU GET EVERYTHING?

10:37AM 8          PROBATION OFFICER:  I DID, YOUR HONOR.

10:37AM 9          THE COURT:  ALL RIGHT.  THANK YOU.

10:37AM 10     ALSO.  LET ME MOVE NOW, IF I MAY, TO WHAT I'VE CALLED AND

10:37AM 11    CATEGORIZED THE SUBSTANTIVE OBJECTIONS.

10:37AM 12     LET'S START WITH OBJECTION THIRTEEN, WHICH IS THE INVESTOR

10:37AM 13    VICTIM COUNT.  I BELIEVE IT'S PARAGRAPH 48 THAT THE DEFENSE

10:37AM 14    OBJECTS TO.  IT RELATES TO THE INVESTOR COUNT.

10:37AM 15     I JUST WANTED TO SAY AS TO THIS PARAGRAPH, THE COURT WOULD

10:38AM 16    SUSTAIN THE OBJECTION IF THE OBJECTION IS INDICATING THAT THE

10:38AM 17    COURT SHOULD NOT ESTIMATE THE VICTIMS, AND I THINK THAT'S THE

10:38AM 18    IMPORT OF WHAT THIS OBJECTION IS.

10:38AM 19     THE DEFENDANT ASSERTS THAT THE COURT CANNOT ESTIMATE THE

10:38AM 20    NUMBER OF VICTIMS, AND THE COURT WILL NOT ESTIMATE THE NUMBER

10:38AM 21    OF VICTIMS, USING THE ENTIRE BODY OF THE C INVESTORS, NOR WILL

10:38AM 22    IT ANALYZE C1, C2 INVESTORS IN THE AGGREGATE.

10:38AM 23     THE COURT WILL CONSIDER THE EVIDENCE THAT IS PRESENTED AND

10:38AM 24    AVAILABLE FOR EACH INVESTOR VICTIM AND IDENTIFY THE VICTIMS AND

10:38AM 25    THOSE LOSS CALCULATIONS THAT FLOW FROM.

| | | |
|---|---|---|
| 10:38AM | 1 | SO PERHAPS I'M TAKING TOO FINE A NOTE OF IT, BUT IF THE |
| 10:38AM | 2 | OBJECTION WAS, JUDGE, YOU CAN'T ESTIMATE, I AGREE WITH THAT, |
| 10:38AM | 3 | AND THE COURT DOESN'T INTEND TO ESTIMATE. |
| 10:38AM | 4 | OBJECTION TWENTY-TWO IS THE LOSS CALCULATION AND |
| 10:39AM | 5 | CAUSATION.  EXCUSE ME.  SO LET'S TALK ABOUT THAT. |
| 10:39AM | 6 | THERE'S A NUMBER OF OBJECTIONS, DIFFERENT LEVEL OF |
| 10:39AM | 7 | OBJECTIONS, I THINK, THAT THE DEFENSE IMPOSED HERE. |
| 10:39AM | 8 | MR. COOPERSMITH:  YES, YOUR HONOR. |
| 10:39AM | 9 | AND MY COLLEAGUE, AMY WALSH, WILL SPEAK ON THE LOSS AMOUNT |
| 10:39AM | 10 | ISSUES. |
| 10:39AM | 11 | THE COURT:  OKAY.  WELL, THEN IT'S TIME FOR A |
| 10:39AM | 12 | PITCHING CHANGE. |
| 10:39AM | 13 | MR. COOPERSMITH:  YES, YOUR HONOR. |
| 10:39AM | 14 | THE COURT:  GOOD MORNING, MS. WALSH. |
| 10:39AM | 15 | MS. WALSH:  GOOD MORNING, YOUR HONOR.  NICE TO SEE |
| 10:39AM | 16 | YOU AGAIN. |
| 10:39AM | 17 | THE COURT:  THANK YOU.  LIKEWISE. |
| 10:39AM | 18 | SO AS TO THE LOSS CALCULATION HERE, I NOTE THAT THE |
| 10:39AM | 19 | DEFENDANT OBJECTS TO LISTING ANY VICTIM OR ANY LOSS ASSERTING |
| 10:39AM | 20 | THAT NO VICTIM SUSTAINED ANY LOSS. |
| 10:40AM | 21 | LET ME ASK YOU, DO YOU WANT TO MAKE A -- DO YOU WANT TO |
| 10:40AM | 22 | PUT ANYTHING ON THE RECORD BEFORE I GO FORWARD HERE?  WOULD YOU |
| 10:40AM | 23 | LIKE ME TO HEAR SOMETHING? |
| 10:40AM | 24 | MS. WALSH:  YES, YES, PLEASE. |
| 10:40AM | 25 | THE COURT:  GO RIGHT AHEAD.  PLEASE. |

10:40AM 1      MS. WALSH:  SO, YOUR HONOR, WHAT I HAD PLANNED TO

10:40AM 2   ADDRESS THE COURT ON TODAY WERE ALL OF THE ISSUES CONNECTED TO

10:40AM 3   OUR OBJECTIONS REGARDING LOSS, INCLUDING THE BURDEN OF PROOF,

10:40AM 4   THE NUMBER OF VICTIMS, CAUSATION, ET CETERA.

10:40AM 5      THE COURT:  OKAY.

10:40AM 6      MS. WALSH:  AND THE SABA REPORT.

10:40AM 7      THE COURT:  SURE.

10:40AM 8      MS. WALSH:  AND I'LL JUST RUN THROUGH THAT, AND

10:40AM 9   OBVIOUSLY IF THE COURT HAS QUESTIONS, I'LL ANSWER THAT.

10:40AM 10      THE COURT:  SURE.  OF COURSE.

10:40AM 11      MS. WALSH:  SO LET'S START WITH THE BURDEN OF PROOF.

10:40AM 12   OBVIOUSLY THE COURT APPLIED IN MS. HOLMES'S SENTENCING THE

10:40AM 13   PREPONDERANCE BURDEN OR STANDARD OF PROOF, AND WE RESPECT THAT

10:40AM 14   RULING.  WE DO DISAGREE WITH IT.

10:40AM 15      WE DO BELIEVE THAT THE CLEAR AND CONVINCING STANDARD

10:40AM 16   SHOULD APPLY HERE.  WE THINK UNITED STATES VERSUS LONICH IS THE

10:41AM 17   OPERATIVE CASE THAT SHOULD APPLY TO THESE CIRCUMSTANCES.

10:41AM 18      AND THE ISSUE, OF COURSE, IS WHAT STANDARD OF PROOF SHOULD

10:41AM 19   APPLY TO THE GOVERNMENT WHO HAS THE BURDEN OF PROVING LOSS IN A

10:41AM 20   FRAUD CASE.

10:41AM 21      THE TWO FACTORS THAT REALLY ANIMATED THE COURT'S OPINION

10:41AM 22   IN LONICH, WHICH WAS A 2822 CASE, AS YOU KNOW, WERE, FIRST,

10:41AM 23   WHETHER THE DISPUTED ENHANCEMENTS DRAMATICALLY INCREASED THE

10:41AM 24   LOSS AMOUNT OR THE LEVELS, THE OFFENSE LEVEL THAT APPLIED.

10:41AM 25      AND THE COURT IN LONICH APPLIED THE VALENCIA FACTORS FIVE

10:41AM 1  AND SIX AND THAT IS IF THE ENHANCEMENT WAS 4 OR MORE LEVELS

10:41AM 2  ABOVE WHAT IT OTHERWISE WOULD BE, AND THE OFFENSE LEVEL

10:41AM 3  PROVIDED FOR A DOUBLING OF THE SENTENCING RANGE, THEN THAT WAS

10:42AM 4  ONE -- TWO FACTORS THAT WEIGHED HEAVILY IN FAVOR OF APPLYING

10:42AM 5  THE CLEAR AND CONVINCING STANDARD OF PROOF.

10:42AM 6       THERE'S NO DISPUTE HERE THAT THOSE TWO FACTORS ARE MET.

10:42AM 7       WHAT THE GOVERNMENT PROPOSES IN ITS LOSS CALCULATION

10:42AM 8  DRAMATICALLY INCREASES THE OFFENSE LEVEL.

10:42AM 9       WHAT THE PSR ALSO RECOMMENDS DOES THE SAME.  AND EVEN IF

10:42AM 10  YOU TAKE THE COURT'S FINDINGS IN THE HOLMES CASE, IT STILL

10:42AM 11  DRAMATICALLY INCREASES THE OFFENSE LEVELS BY THE LEVELS OF

10:42AM 12  LOSS.

10:42AM 13       THE GOVERNMENT WOULD BE 30 LEVELS.  THE COURT'S

10:42AM 14  APPLICATION WAS 24 LEVELS.  AND IF YOU TAKE MR. SABA'S PROPOSED

10:42AM 15  LOSS, THAT'S AN ADJUSTMENT OF 26 OR 28 LEVELS.

10:43AM 16       SO I DON'T THINK THERE'S ANY QUESTION THAT ANY PROPOSED

10:43AM 17  LOSS CALCULATION, AT LEAST WHAT WE HAVE HEARD SO FAR IN THE

10:43AM 18  HOLMES CASE AND IN OUR CASE, DRAMATICALLY INCREASES THE

10:43AM 19  DISCLOSURE.

10:43AM 20       THE SECOND FACTOR THAT THE LONICH COURT FOCUSSED ON WAS

10:43AM 21  WHETHER THE INCREASE WAS BASED ON THE EXTENT OF THE CONSPIRACY.

10:43AM 22  AND, OF COURSE, THIS IS AN EXTREMELY -- IT CAN BE A DIFFICULT

10:43AM 23  FACT TO ASCERTAIN.

10:43AM 24       THE LONICH COURT ITSELF RECOGNIZED THAT IN CONSPIRACY

10:43AM 25  CASES, THERE CAN BE THESE BORDERLINE CASES WHERE THE LOSS

10:43AM 1    AMOUNT DOES NOT FALL WITHIN THE CONSPIRACY.

10:43AM 2         AND WHAT WAS IMPORTANT TO THE COURT AND REALLY DROVE THE

10:43AM 3    COURT'S OPINION WAS WHETHER THE DEFENDANT HAD THE OPPORTUNITY

10:43AM 4    TO CHALLENGE THE LOSS AMOUNT THAT WAS BEING APPLIED AND

10:43AM 5    CHALLENGE THE EVIDENCE SUPPORTING THAT LOSS AMOUNT, AND THE

10:43AM 6    COURT REALLY FOCUSSED ON THE DUE PROCESS CONCERNS THAT WERE AT

10:44AM 7    PLAY IN LONICH, YOU KNOW, THE FAILURE OF THE BANK WAS BEING

10:44AM 8    PEGGED AS THE LOSS AMOUNT AND WHAT THE GOVERNMENT WAS

10:44AM 9    PROPOSING, AND THERE WERE REAL DUE PROCESS CONCERNS BECAUSE THE

10:44AM 10   DEFENDANTS NEVER REALLY GOT TO CHALLENGE THAT AMOUNT.

10:44AM 11        AND SO HERE WE HAVE A SIMILAR SITUATION.

10:44AM 12        THOSE DUE PROCESS CONCERNS THAT WERE AT PLAY IN LONICH

10:44AM 13   APPLY HERE AND REQUIRE A HIGHER BURDEN OF PROOF.

10:44AM 14        NONE OF THE FACTS UNDERLINE THE LOSS AMOUNT HERE AND

10:44AM 15   REALLY CAUSATION OF THE LOSS WERE PRESENTED TO THE JURY.

10:44AM 16        THE JURY WAS NOT INSTRUCTED ON RELIANCE.  THERE WERE TIMES

10:44AM 17   WHEN TO THE EXTENT THAT THE DEFENSE WANTED TO ASK QUESTIONS

10:44AM 18   ABOUT RELIANCE OR GET INTO RELIANCE, THE GOVERNMENT OBJECTED TO

10:44AM 19   THOSE QUESTIONS, UNDERSTANDABLY BECAUSE RELIANCE IS NOT AN

10:44AM 20   ELEMENT, BUT NEVERTHELESS THE JURY DID NOT HEAR THAT EVIDENCE.

10:45AM 21        THE JURY CAME BACK WITH A GENERAL VERDICT, MAKING NO

10:45AM 22   FINDINGS WHATSOEVER ON CAUSATION OR RELIANCE OR LOSS.

10:45AM 23        AND IN THE CIRCUMSTANCES OF THIS CASE, I RECOGNIZE THAT

10:45AM 24   THERE ARE SOME CASES WHERE, GIVEN THE NATURE OF THE CONSPIRACY,

10:45AM 25   IT'S EASY TO FIGURE OUT WHETHER THE CONDUCT FALLS WITHIN THE

10:45AM 1    SCOPE OF THE CONSPIRACY AND THE LOSS CAN JUST BE CALCULATED.

10:45AM 2        IN THIS CASE IT'S JUST NOT SO.  IT'S A VERY COMPLICATED

10:45AM 3    CAUSATION AND LOSS METHODOLOGY THAT NEEDS TO BE APPLIED OR THAT

10:45AM 4    HAS BEEN APPLIED BY VARIOUS EXPERTS.  IT'S NOT -- IT WAS NOT A

10:45AM 5    SHAM COMPANY.  THERANOS WAS A REAL COMPANY.  IT WASN'T A PONZI

10:45AM 6    SCHEME, WHICH MAY MAKE IT EASIER TO FIGURE OUT LOSS.

10:45AM 7        IT REALLY -- WHAT THESE INVESTORS AND OTHER INVESTORS THAT

10:45AM 8    THE GOVERNMENT WANTS TO INCLUDE RELIED ON IN MAKING THEIR

10:46AM 9    DECISIONS TO INVEST IS A SERIOUS QUESTION, AND IT'S A QUESTION

10:46AM 10   THAT YIELDS MANY, MANY YEARS OF EXPOSURE AND POTENTIALLY TIME

10:46AM 11   IN JAIL AND BECAUSE OF THAT, WE BELIEVE THAT THE CLEAR AND

10:46AM 12   CONVINCING STANDARD SHOULD APPLY.

10:46AM 13       SO, YOUR HONOR, I WAS GOING TO MOVE ON TO THE GOVERNMENT'S

10:46AM 14   LOSS AMOUNT.

10:46AM 15           THE COURT:  YES.

10:46AM 16           MS. WALSH:  SO THE GOVERNMENT IS ADVOCATING FOR AN

10:46AM 17   $800 MILLION LOSS AMOUNT ROUGHLY, AND IT HAS NOT PROVEN

10:46AM 18   CAUSATION FOR THAT AMOUNT.

10:46AM 19       IT DOES NOT PROVE CAUSATION FOR THE LONG LIST OF VICTIMS

10:46AM 20   THAT IT PROVIDED TO THE COURT.  IT DOES NOT -- IT HAS NOT

10:46AM 21   PROVEN, EITHER BY CLEAR AND CONVINCING EVIDENCE OR BY A

10:47AM 22   PREPONDERANCE THAT EACH ONE OF THOSE VICTIMS INDIVIDUALLY

10:47AM 23   RELIED ON THE REPRESENTATIONS THAT WERE BEFORE THE JURY IN THIS

10:47AM 24   CASE IN MAKING THEIR DECISIONS ABOUT WHETHER TO INVEST, AND I'M

10:47AM 25   GOING TO COME BACK TO THAT IN A SECOND.

10:47AM 1    BUT ANOTHER REASON THAT THE GOVERNMENT'S PROPOSED LOSS

10:47AM 2 AMOUNT FAILS IS THAT WE HAVE A SERIES OF EVENTS THAT ARE

10:47AM 3 INTERVENING CAUSES THAT BREAK THE CAUSAL CHAIN AFTER

10:47AM 4 MR. BALWANI LEAVES THERANOS.

10:47AM 5    AND I'M GOING TO ADDRESS THAT SEPARATELY, BUT THAT IS THE

10:47AM 6 SECOND REASON.  MR. BALWANI IS IN A VERY DIFFERENT SITUATION

10:47AM 7 FROM MS. HOLMES.  HE LEFT THERANOS IN MAY OF 2016.  SO I WILL

10:47AM 8 COME BACK TO THAT LATER.

10:47AM 9    BUT THE FINAL REASON THAT THE GOVERNMENT'S LOSS AMOUNT

10:47AM 10 FAILS IS THAT THE GOVERNMENT DOES NOT DISENTANGLE AS THE COURT

10:47AM 11 POINTED OUT IN MS. HOLMES'S SENTENCING.  THE GOVERNMENT DOES

10:48AM 12 NOT DISENTANGLE THE VALUE OF THERANOS FROM THE PRICE THAT

10:48AM 13 INVESTORS PAID FOR STOCK IN THERANOS, AND THEY HAVE TO DO THAT

10:48AM 14 UNDER ZOLP.

10:48AM 15    THE GOVERNMENT TRIED TO DO IT WITH THE SABA REPORT, BUT AS

10:48AM 16 I'M GOING TO GO THROUGH, THAT REPORT, AND AS EVIDENCED BY THE

10:48AM 17 EXPERT REPORTS THAT WE SUBMITTED, HAS SERIOUS ERRORS THAT CALL

10:48AM 18 INTO QUESTION THE RELIABILITY OF MR. SABA'S ANALYSIS, SO I WANT

10:48AM 19 TO GO THROUGH EACH ONE OF THOSE.

10:48AM 20    THE COURT:  OKAY.

10:48AM 21    MS. WALSH:  SO ON THE RELIANCE ISSUE, THE GOVERNMENT

10:48AM 22 HAS NOT PROVEN THAT EACH OF THE PROPOSED VICTIMS RELIED ON THE

10:48AM 23 STATEMENTS THAT WERE THE SUBJECT OF THE TRIAL.

10:48AM 24    THERANOS HAD MANY, MANY INVESTORS.  THOSE INVESTORS

10:48AM 25 INVESTED IN THERANOS FOR MANY DIFFERENT REASONS, VARIOUS

| | |
|---|---|
| 10:48AM | 1 |
| 10:49AM | 2 |
| 10:49AM | 3 |
| 10:49AM | 4 |
| 10:49AM | 5 |

1   REASONS.  SOME MAY HAVE INVESTED BECAUSE THEY THOUGHT

2   ELIZABETH HOLMES WAS BRILLIANT AND WAS A DYNAMIC LEADER AND

3   BELIEVED IN HER MISSION.  OTHERS MAY HAVE INVESTED BECAUSE

4   EVERYONE ELSE WAS INVESTING AND THEY HAD THIS FEAR OF MISSING

5   OUT ON A GREAT OPPORTUNITY.

6   AND, IN FACT, YOUR HONOR CITED A SIMILAR TYPE OF INVESTOR

7   IN MS. HOLMES'S SENTENCING, AND I THINK IT WAS MS. FADIL WHO

8   INVESTED BECAUSE SHE NOTICED SOME BIG NAMES INVESTING.  AND THE

9   COURT RIGHTLY POINTED OUT THAT THERE HAS TO BE SOME RELIANCE BY

10  A PARTICULAR INVESTOR ON THE STATEMENTS THAT WERE AT ISSUE IN

11  THE TRIAL.

12  THE VERDICT ALONE, SINCE IT WAS A GENERAL VERDICT, CANNOT

13  ESTABLISH THAT RELIANCE AND NEITHER THE GOVERNMENT NOR THE PSR

14  PROVIDES SUFFICIENT EVIDENCE FROM WHICH THE COURT CAN

15  REASONABLY CONCLUDE THAT EACH ONE OF THESE DIFFERENT VICTIMS

16  RELIED ON THE MISREPRESENTATIONS, AND, THEREFORE, THEIR LOSSES

17  WERE CAUSED BY THEM.

18  AND I WANT TO TALK ABOUT ONE VERY GLARING EXAMPLE, AND

19  THIS IS ONE OF THE INVESTORS THAT YOUR HONOR INCLUDED IN THE

20  TEN THAT APPLIED DURING MS. HOLMES'S SENTENCING, AND THAT

21  INVESTOR IS RUPERT MURDOCH.

22  SO MR. MURDOCH INVESTED $125 MILLION IN FEBRUARY 2015.

23  THE GOVERNMENT NEVER INTERVIEWED MR. MURDOCH ABOUT WHAT HE

24  RELIED ON, AND HE DID NOT SUBMIT A VICTIM IMPACT STATEMENT.  SO

25  WE DON'T KNOW WHY HE INVESTED IN THERANOS.

10:50AM 1     HE MAY HAVE BEEN LIKE MS. FADIL AND INVESTED IN THERANOS

10:50AM 2   BECAUSE EVERYONE ELSE WAS, WE JUST DON'T KNOW.

10:50AM 3     WHAT WE DO KNOW IS FROM HIS CHIEF OF STAFF,

10:51AM 4   NATALIE RAVITZ, WHO TESTIFIED IN FRONT OF THE S.E.C., AND WHAT

10:51AM 5   SHE SAID UNDER OATH IN FRONT OF THE S.E.C. IS THAT SHE

10:51AM 6   UNDERSTOOD THAT THERANOS'S HISTORICAL REVENUES WERE LOW. SHE

10:51AM 7   WAS SKEPTICAL ABOUT THE INVESTMENT FOR THAT REASON. SHE

10:51AM 8   DESCRIBED HOW MS. HOLMES TOLD HER THAT THE DEVICE, THE THERANOS

10:51AM 9   DEVICE COULD BE USED IN MILITARY FIELD OPERATIONS AND ON

10:51AM 10   MEDEVAC HELICOPTERS, BUT SHE DIDN'T SAY THEY WERE ON THE

10:51AM 11   HELICOPTERS OR THEY WERE IN THE FIELD, JUST THAT THEY COULD BE.

10:51AM 12     AND IMPORTANTLY, MS. RAVITZ TESTIFIED IN THE S.E.C. THAT

10:51AM 13   SHE ACTUALLY DIDN'T DO THE WORK THAT SHE WOULD NORMALLY DO, THE

10:51AM 14   DUE DILIGENCE OR EXAMINING THE BINDER THAT WAS RECEIVED FROM

10:51AM 15   THERANOS BECAUSE MR. MURDOCH HAD ALREADY AGREED TO INVEST IN

10:52AM 16   THERANOS BEFORE SHE GOT A CHANCE TO DO IT. HE ALREADY HAD AN

10:52AM 17   ORAL AGREEMENT WITH MS. HOLMES TO INVEST.

10:52AM 18     SO THIS IS THE CLEAREST EXAMPLE OF WE HAVE NO IDEA WHY

10:52AM 19   RUPERT MURDOCH INVESTED IN THERANOS, AND BECAUSE OF THAT THE

10:52AM 20   GOVERNMENT HAS NOT MET ITS BURDEN OF PROOF ON CAUSATION.

10:52AM 21     ANOTHER INVESTOR THAT FALLS INTO THAT SAME CATEGORY IS

10:52AM 22   PEER VENTURES. PEER VENTURES -- THE REPRESENTATIVES OF

10:52AM 23   PEER VENTURES WERE INTERVIEWED, THEY GAVE STATEMENTS ABOUT WHAT

10:52AM 24   STATEMENTS WERE MADE TO THEM ABOUT THERANOS, BUT THERE'S

10:52AM 25   NOTHING ABOUT WHAT THEY ACTUALLY RELIED ON AND WHY THEY

10:52AM 1    INVESTED, AND THAT ABSENCE OF EVIDENCE MEANS THAT WE CANNOT PUT

10:52AM 2    THEM IN THE CATEGORY OF A VICTIM WHOSE LOSSES WERE CAUSED BY

10:52AM 3    THE MISREPRESENTATIONS.

10:52AM 4         OKAY.  WHAT THE GOVERNMENT ALSO OFFERS TO THE COURT, AND

10:53AM 5    THE COURT USED THIS DURING MS. HOLMES'S TESTIMONY, IS AN EXPERT

10:53AM 6    REPORT THAT WOULD ESTABLISH LOSS UNDER ZOLP BY ESTABLISHING

10:53AM 7    ALSO THE VALUE OF THERANOS AT VARIOUS DIFFERENT DATES.  AND THE

10:53AM 8    COURT, I KNOW, RELIED ON THAT REPORT DURING THE HOLMES'S

10:53AM 9    SENTENCING, BUT AS EVIDENCED BY THE EXPERT REPORTS THAT WE

10:53AM 10   SUBMITTED, THE SABA REPORT IS NOT RELIABLE, AND IT'S NOT

10:53AM 11   RELIABLE FOR SEVERAL DIFFERENT REASONS.

10:53AM 12        ONE, IS ON ITS OWN IT PROVIDES A RANGE OF INVESTOR LOSSES,

10:53AM 13   AND THAT RANGE IS 237 MILLION TO 316 MILLION, WHICH IS AN

10:54AM 14   $80 MILLION RANGE.  THAT RANGE IS FAR TOO BROAD FOR THE COURT

10:54AM 15   TO BE ABLE TO RELY ON IT AS CONSTITUTING A REASONABLE ESTIMATE

10:54AM 16   OF LOSS.

10:54AM 17        AND I THINK THE COURT RECOGNIZED THAT IN THE HOLMES

10:54AM 18   SENTENCING, SO WE WOULD JUST REITERATE THAT ARGUMENT HERE.  THE

10:54AM 19   SAME THING APPLIES HERE.  IT'S TOO BROAD A RANGE, AND THE COURT

10:54AM 20   CANNOT USE IT.

10:54AM 21        THE SECOND ISSUE IS THAT EACH OF THE TWO APPROACHES USED

10:54AM 22   BY MR. SABA CONTAINS SERIOUS FLAWS, BOTH THE INCOME APPROACH

10:54AM 23   AND THE ASSET APPROACH.

10:54AM 24        SINCE THE COURT RELIED ON THE INCOME APPROACH, I WANT TO

10:54AM 25   ADDRESS THAT FIRST.

10:54AM 1       SO THE FLAW IN MR. SABA'S INCOME APPROACH RELATES TO THE

10:54AM 2    DISCOUNT RATE THAT HE APPLIED TO ASCERTAIN THE PRESENT VALUE OF

10:55AM 3    THE CASH FLOWS.  AND THIS IS ALL LAID OUT IN MR. WEINGUST'S

10:55AM 4    DECLARATION.  AND THE DISCOUNT RATE MATTERS BECAUSE IT'S WHAT

10:55AM 5    IS USED TO REDUCE FUTURE CASH FLOWS TO PRESENT VALUE.

10:55AM 6       USING A HIGHER DISCOUNT RATE MEANS THE PRESENT VALUE WILL

10:55AM 7    BE LOWER.  AND WHAT MR. WEINGUST POINTS OUT IS THAT MR. SABA'S

10:55AM 8    RATE IS INAPPROPRIATELY HIGH.  SO WHY IS THAT?

10:55AM 9       ACCORDING TO MR. WEINGUST, MR. SABA RELIED ON OLD DATA IN

10:55AM 10   REACHING THAT 44 PERCENT DISCOUNT RATE, AND WHAT HE SHOULD HAVE

10:55AM 11   DONE IS USED THE DATA THAT EXISTED CLOSER IN TIME TO THE

10:55AM 12   VALUATION DATE, WHICH WAS DECEMBER 31ST, 2014, THE DATE THAT

10:55AM 13   THE COURT CHOSE.

10:55AM 14      NOW, WHEN YOU USE THAT DISCOUNT RATE, WHEN YOU USE THE

10:56AM 15   DATA THAT IS CLOSER IN TIME, YOU COME UP WITH YOUR DISCOUNT

10:56AM 16   RATE, IT GOES DOWN TO 27 PERCENT, AND THIS IS ALL LAID OUT IN

10:56AM 17   THE WEINGUST DECLARATION.

10:56AM 18        THE COURT:  DID HE TALK ABOUT THE -- HIS CRITICISM,

10:56AM 19   I THINK, WAS ABOUT THE USE OF THE PEPPERDINE STUDY.  HE TALKED

10:56AM 20   ABOUT THE PEPPERDINE STUDY.

10:56AM 21        MS. WALSH:  HE DID.

10:56AM 22        THE COURT:  AND I THINK HE WAS CRITICAL SAYING THAT

10:56AM 23   MR. SABA DID NOT PROPERLY USE THAT PEPPERDINE STUDY IN THE

10:56AM 24   SENSE THAT -- I THINK -- DIDN'T HE SAY THAT THE INFORMATION IN

10:56AM 25   THAT STUDY WAS SOMEHOW DATED AND HE SHOULD HAVE DONE MORE?

| | | |
|---|---|---|
| 10:56AM | 1 | MS. WALSH:  RIGHT.  SO PEPPERDINE CREATES THE STUDY |
| 10:56AM | 2 | EVERY YEAR AND INSTEAD OF USING THE YEAR THAT WAS CLOSE IN TIME |
| 10:56AM | 3 | TO THE VALUATION DATE, MR. SABA INCLUDED MANY, MANY YEARS GOING |
| 10:56AM | 4 | BACK PRETTY FAR IN TIME, AND MR. WEINGUST SAYS THAT'S NOT AN |
| 10:56AM | 5 | APPROPRIATE WAY TO CALCULATE THE DISCOUNT RATE.  YOU SHOULD USE |
| 10:57AM | 6 | THE DATA THAT EXISTS AS CLOSE IN TIME AS POSSIBLE TO THE |
| 10:57AM | 7 | VALUATION DATE. |
| 10:57AM | 8 | THE COURT:  AND THERE WAS ALSO SOME DISCUSSION IN |
| 10:57AM | 9 | BOTH OF THE REPORTS ABOUT THE VARIABILITY OF VC CONDUCT.  VC'S |
| 10:57AM | 10 | INVEST IN VERY STRANGE WAYS.  IT'S NOT A 3 PERCENT GUARANTEED |
| 10:57AM | 11 | RETURN, IT'S NOT A TREASURY BILL. |
| 10:57AM | 12 | MS. WALSH:  NO. |
| 10:57AM | 13 | THE COURT:  IT'S A CREATURE OF THEIR OWN DESIGN AND |
| 10:57AM | 14 | ACTIONS, AND, THEREFORE, I THINK THEY BOTH OBSERVED THAT VC |
| 10:57AM | 15 | INVESTMENTS ARE DIFFICULT TO TRACK. |
| 10:57AM | 16 | MS. WALSH:  THEY ARE DIFFICULT -- WELL, PEPPERDINE |
| 10:57AM | 17 | IS A STUDY THAT TRACKS THEM EVERY YEAR.  SO THAT IS THE DATA |
| 10:57AM | 18 | THAT EXISTS. |
| 10:57AM | 19 | THE COURT:  COLLECTS THOSE INVESTMENTS AND OFFERS |
| 10:57AM | 20 | THAT HISTORY? |
| 10:57AM | 21 | MS. WALSH:  RIGHT.  BUT JUST SINCE YOU RAISED IT, |
| 10:57AM | 22 | YOUR HONOR, VC INVESTMENTS OR I GUESS PROJECTIONS OR RATES OF |
| 10:58AM | 23 | RETURN THAT APPEAR THERE, THEY ACCOUNT FOR THE RISK THAT THEY |
| 10:58AM | 24 | KNOW THEY'RE GETTING INTO.  AND THERE ARE PARTS, AND I THINK |
| 10:58AM | 25 | MR. WEINGUST POINTED THIS OUT, THERE ARE PARTS OF MR. SABA'S -- |

10:58AM 1    I THINK IT'S MORE IN THE SUPPLEMENTAL DECLARATION WHERE

10:58AM 2    MR. SABA SAYS, YOU KNOW, THESE RATES ARE TOO OPTIMISTIC, AND

10:58AM 3    THEY DON'T ACCOUNT FOR THE RISK THAT EXISTED AT THERANOS.

10:58AM 4        WELL, THESE ARE VENTURE CAPITAL FIRMS.  THEY ACCOUNT FOR

10:58AM 5    RISK.  THIS IS A MARKET FULL OF RISK.  SO THAT IS ANOTHER ONE

10:58AM 6    OF MR. WEINGUST'S POINTS THAT MR. SABA IS KIND OF AFTER THE

10:58AM 7    FACT SAYING THAT THESE RATES ARE TOO OPTIMISTIC BECAUSE THEY

10:58AM 8    HAVEN'T ACCOUNTED FOR RISK, BUT THEY HAVE.  THAT'S WHAT THEY

10:58AM 9    DO.

10:58AM 10            THE COURT:  THANK YOU.  YOU KNOW, WHAT WAS

10:58AM 11   INTERESTING, AS I LOOKED AT THESE REPORTS AND THINGS, I DIDN'T

10:58AM 12   LOOK AT AN APPENDIX OF THE PEPPERDINE REPORT OR ANY OF THESE

10:59AM 13   OTHER REPORTS, AND WHEN THEY TALK ABOUT RISK, AND THAT'S WHAT

10:59AM 14   WE'RE TALKING ABOUT FOR THIS ANALYSIS, WAS THERE ANY SPECIFIC

10:59AM 15   FACTOR THAT WAS IDENTIFIED IN THE RISK TAKING FOR THE RISK OF

10:59AM 16   FRAUD IN AN INVESTMENT?

10:59AM 17       IT DIDN'T SEEM THAT THAT'S A COLUMN THAT IS CHECKED OFF,

10:59AM 18   TICKED BY A PEPPERDINE STUDY OR SOMEONE ELSE.  IT SAYS RISK,

10:59AM 19   AND I SUPPOSE FROM AN INVESTOR STANDPOINT, I DON'T KNOW, BUT

10:59AM 20   DOES THAT MEAN, WELL, YOU KNOW, COMPANIES FAIL.  SOMEONE

10:59AM 21   INVENTS A NEW MOUSETRAP AND IT MIGHT WORK, BUT IT MIGHT NOT AS

10:59AM 22   OPPOSED TO IS THERE A RISK THAT THIS IS A FRAUDULENT ENDEAVOR?

10:59AM 23           MS. WALSH:  SO WHEN WE'RE TALKING ABOUT ECONOMIC

10:59AM 24   RISK AND VALUATION, FIRST, VALUATION IS DONE ONLY BASED ON WHAT

10:59AM 25   IS KNOWN OR KNOWABLE, RIGHT?

10:59AM 1    SO TYPICALLY IF THERE IS A FRAUD, IT'S NOT KNOWN

11:00AM 2    TYPICALLY.

11:00AM 3         THE COURT:  NO ONE WOULD INVEST IN THAT, WOULD THEY?

11:00AM 4         MS. WALSH:  RIGHT.  BUT THIS IS ALSO AN ECONOMIC

11:00AM 5    ANALYSIS, AND WHETHER -- IT'S ABOUT LOSING YOUR MONEY.  SO

11:00AM 6    WHETHER YOU LOSE YOUR MONEY BECAUSE THE COMPANY FAILED OR

11:00AM 7    BECAUSE IT -- FRAUD IS AFOOT, AND THE FRAUD COMES OUT AND YOU

11:00AM 8    LOSE YOUR INVESTMENT, FROM AN ECONOMIC STANDPOINT, THOSE TWO

11:00AM 9    THINGS ARE NOT GOING TO BE DIFFERENT.  YOU'RE GOING TO LOSE

11:00AM 10   YOUR MONEY.

11:00AM 11        SO TO ANSWER YOUR QUESTION, I DON'T THINK THOSE -- THE

11:00AM 12   PEPPERDINE STUDY ACCOUNTED FOR FRAUD, BUT I'M NOT SURE IT

11:00AM 13   MATTERS.

11:00AM 14        THE ISSUE IS WHAT IS THE RISK THAT YOU ARE GOING TO LOSE

11:00AM 15   YOUR INVESTMENT.

11:00AM 16        OKAY.  SO MR. WEINGUST, WHEN HE APPLIES THE DATA THAT HE

11:00AM 17   THINKS IS APPROPRIATE, COMES UP WITH A MUCH LOWER DISCOUNT

11:01AM 18   RATE, AND IT'S A 27 PERCENT DISCOUNT RATE.  AND HE LAYS THAT

11:01AM 19   OUT IN HIS TABLE 2 TO HIS DECLARATION.

11:01AM 20        AND MR. WEINGUST IS NOT JUST PICKING THIS OUT OF THIN AIR.

11:01AM 21   HE BASES IT ON DATA THAT EXISTS AT THE TIME OF THE VALUATION

11:01AM 22   DATE, BUT IT'S ALSO CORROBORATED BY OTHER EVIDENCE IN THE CASE.

11:01AM 23        FOR EXAMPLE, ARANCA USED A DISCOUNT RATE ON DECEMBER 31ST,

11:01AM 24   2014 THAT WAS 20 PERCENT, MUCH CLOSER TO MR. WEINGUST AND MUCH,

11:01AM 25   MUCH LOWER THAN MR. SOLACE.  AND THE LONG FILING THAT YOU

11:01AM 1    REFERENCED THIS MORNING, YOUR HONOR, I THINK IT WAS SO LONG

11:01AM 2    BECAUSE MR. WEINGUST ATTACHED THAT ARANCA REPORT.

11:01AM 3         THE COURT:  I THINK HIS SUMMARY, WAS IT 14 PAGES OR

11:01AM 4    SOMETHING LIKE THAT?

11:01AM 5         MS. WALSH:  YEAH, RIGHT.

11:01AM 6         THE COURT:  RIGHT.  BUT OF COURSE HE WANTED ME TO

11:02AM 7    READ THOSE 14 PAGES TO GET CONTEXT OF HIS 14 PAGES I THINK.

11:02AM 8         MS. WALSH:  WELL, I THINK HE JUST WANTED TO GIVE YOU

11:02AM 9    THE BASIS FOR WHAT HE WAS SAYING.

11:02AM 10   SO THAT ARANCA REPORT DOES CONTAIN THE DISCOUNT RATE AND

11:02AM 11   ITS DISCOUNT RATE IS 20 PERCENT.

11:02AM 12   ANOTHER CORROBORATING FACT IS FORTRESS IN 2017, LATE IN

11:02AM 13   2017 WHEN "THE WALL STREET JOURNAL" HAS WRITTEN ALL OF ITS

11:02AM 14   ARTICLES ABOUT THERANOS AND THE FRAUD IS POTENTIALLY OUT IN THE

11:02AM 15   MARKETPLACE, VERY RISKY INVESTMENT FOR ARANCA -- I'M SORRY, FOR

11:02AM 16   FORTRESS, AND FORTRESS ASSIGNED A DISCOUNT RATE OF 25 PERCENT,

11:02AM 17   A RATE OF RETURN OF 25 PERCENT, ALSO MUCH CLOSER TO

11:02AM 18   MR. WEINGUST AND MUCH LOWER THAN MR. SABA.

11:02AM 19   FINALLY, RDV IN ONE OF ITS EXHIBITS THAT IS A TRIAL

11:02AM 20   EXHIBIT, AND THIS IS TRIAL EXHIBIT 2192, ASSIGNED A RATE OF

11:03AM 21   RETURN FOR THERANOS OF 30 PERCENT.

11:03AM 22   SO MR. WEINGUST'S AFTER-THE-FACT ANALYSIS IS ACTUALLY

11:03AM 23   CORROBORATED BY SEVERAL PIECES OF EVIDENCE IN THE CASE.  AND

11:03AM 24   WHAT IT SHOWS IS MR. SABA'S DISCOUNT RATE IS TOO HIGH AND

11:03AM 25   CORRECTING IT MAKES A HUGE DIFFERENCE IN THE AMOUNT OF VALUE

11:03AM 1    THAT EXISTED IN THERANOS ON THAT VALUATION DATE, A HUGE

11:03AM 2    DIFFERENCE, AND THOSE DIFFERENCES ARE LAID OUT IN

11:03AM 3    MR. WEINGUST'S TABLE 2.

11:03AM 4        MR. WEINGUST ALSO FOUND THAT MR. SABA'S ASSET APPROACH WAS

11:03AM 5    FLAWED.

11:03AM 6        AND SINCE THE COURT DIDN'T APPLY THE ASSET APPROACH, I'D

11:03AM 7    LIKE TO GO THROUGH IT, BUT I RECOGNIZE THAT IT WASN'T APPLIED

11:03AM 8    TO MS. HOLMES.

11:04AM 9        BUT JUST QUICKLY, MR. WEINGUST NOTICED THAT MR. SABA DID

11:04AM 10   NOT APPLY AN OPPORTUNITY COST, WHICH IS A STANDARD FACTOR THAT

11:04AM 11   IS APPLIED IN ASSESSING VALUE USING THIS ASSET APPROACH.  AND

11:04AM 12   MR. SABA APPEARS TO HAVE IGNORED THAT FACTOR.  I DON'T KNOW IF

11:04AM 13   HE FORGOT TO APPLY IT OR WHY HE DIDN'T MENTION IT.

11:04AM 14       HE SAYS IN HIS SUPPLEMENTAL DECLARATION THAT HE DID

11:04AM 15   CONSIDER IT, BUT HE DECIDED NOT TO APPLY IT.

11:04AM 16       I THINK -- I'M NOT QUITE SURE THAT IS CREDIBLE BECAUSE

11:04AM 17   THERE WERE OTHER THINGS IN HIS ORIGINAL REPORT THAT HE

11:04AM 18   CONSIDERED AND DECIDED NOT TO APPLY, AND HE GOES THROUGH THEM

11:04AM 19   VERY CAREFULLY.  SO IT SEEMS HE WOULD DO THE SAME THING WITH

11:04AM 20   OPPORTUNITY CAUSED IF HE HAD REALLY CONSIDERED IT.  BUT IN ANY

11:04AM 21   EVENT, IT SHOULD BE APPLIED ACCORDING TO MR. WEINGUST, AND THAT

11:04AM 22   ALSO GREATLY AFFECTS THE VALUE OF THERANOS.

11:05AM 23       FINALLY, THE ALLOCATION METHOD THAT MR. SABA USES, SO THIS

11:05AM 24   IS WHEN HE HAS THE ENTIRE VALUE AND HE NEEDS TO ALLOCATE IT TO

11:05AM 25   THE DIFFERENT SHAREHOLDERS BASED ON THEIR LEVELS WITHIN THE

11:05AM 1     COMPANY, HE USED AN ALLOCATION METHOD THAT IS ACCEPTED IN THE

11:05AM 2     INDUSTRY, BUT IT'S THE OPC METHOD, BUT THERE ARE TWO INPUTS

11:05AM 3     THAT GO INTO THAT METHOD THAT ARE EXTREMELY SPECULATIVE.

11:05AM 4         THE TWO INPUTS ARE VOLATILITY AND THE OCCURRENCE OF A

11:05AM 5     HYPOTHETICAL LIQUIDITY EVENT.

11:05AM 6         AND WITH A PUBLIC COMPANY, THAT'S EASILY ASCERTAINABLE.

11:05AM 7     AND WITH A PRIVATE COMPANY AND LIMITED SHAREHOLDERS, IT IS

11:05AM 8     REALLY GUESSWORK TO ASCERTAIN THE LIQUIDITY OF PRIVATE STOCK OR

11:06AM 9     WHAT THE TIME PERIOD SHOULD BE BEFORE A LIQUIDITY EVENT HAPPENS

11:06AM 10     IN THE FUTURE.

11:06AM 11         THERE ARE UNKNOWNS, AND THEY REALLY INVOLVE A LOT OF

11:06AM 12     GUESSWORK.  THAT WOULD BE -- MAYBE THAT WOULD BE OKAY.  THE

11:06AM 13     PROBLEM IS IF YOU CHANGE EITHER ONE OF THESE INPUTS, IT GREATLY

11:06AM 14     IMPACTS THE VALUE THAT YOU END UP WITH PER SHAREHOLDER, AND

11:06AM 15     THESE HUGE SWINGS ARE JUST NOT APPROPRIATE FOR THE COURT TO USE

11:06AM 16     WHEN WE'RE TALKING ABOUT A CRIMINAL CASE AND SENTENCING AN

11:06AM 17     INDIVIDUAL TO WHAT COULD BE A LONG PERIOD OF TIME IN JAIL TO

11:06AM 18     RELY ON A METHOD WHERE IF YOU TWEAK ONE THING, IT SWINGS BY

11:06AM 19     HUNDREDS OF MILLIONS OF DOLLARS.  IT JUST DOESN'T SEEM

11:06AM 20     REASONABLE TO RELY ON THAT METHODOLOGY.

11:07AM 21         SO WHERE DOES THAT LEAVE US WITH MR. SABA?

11:07AM 22         AS I'VE SAID, HIS METHODOLOGY, IT MAY BE FINE IN A CIVIL

11:07AM 23     CASE, BUT IT'S NOT RELIABLE ENOUGH TO MAKE A REASONABLE

11:07AM 24     ESTIMATE IN THESE CIRCUMSTANCES IN SENTENCING.

11:07AM 25         MR. SABA IS ALSO INCONSISTENT WITH HOW HE USES

|  |  |
|---|---|
| 11:07AM | 1 |
| 11:07AM | 2 |
| 11:07AM | 3 |
| 11:07AM | 4 |
| 11:07AM | 5 |

INFORMATION.  FOR EXAMPLE, HE USES THE TIME PERIOD UNTIL A
LIQUIDITY EVENT.  HE BASES THAT ON THE ARANCA REPORT, BUT HE
REJECTS THE ARANCA'S RATE OF RETURN.  AND THERE'S NO REASON WHY
HE'S PICKING AND CHOOSING CERTAIN THINGS TO USE FROM ARANCA AND
NOT WITHOUT ANY EXPLANATION.

SO NO MATTER WHAT APPROACH MR. SABA USES, THE PROBLEM IS,
AS I JUST SAID, THE VALUE THAT HE LANDS ON IF YOU TWEAK ONE
THING ABOUT HIS APPROACH, WHICH MR. WEINGUST BELIEVES SHOULD BE
DONE TO BE ACCURATE, THE VALUE OF THERANOS GOES UP BY HUNDREDS
OF MILLIONS OF DOLLARS AND THE LOSS GOES DOWN BY HUNDREDS OF
MILLIONS OF DOLLARS.

SO WHAT IT SHOWS IS THAT IT'S NOT A RELIABLE METHODOLOGY
TO USE WHEN ASSESSING LOSS.

SO WE DON'T THINK THE GOVERNMENT HAS PROVEN EVEN BY A
PREPONDERANCE LOSS IN THIS CASE.  EVEN WITH THE BENEFIT OF
MR. SABA'S REPORT, IT'S TOO SPECULATIVE.  AND WHEN YOU LOOK AT
THE ECONOMIC REALITY OF WHAT HAPPENED HERE, IT'S A TOTALLY
DIFFERENT PICTURE.

WHAT HAPPENED IS MR. BALWANI LEFT THERANOS IN MAY 2016.
WHEN HE LEFT THERANOS, THERE WAS $350,000 IN THE BANK, THERE
WAS IP THAT THERANOS OWNED WORTH HUNDREDS OF MILLIONS OF
DOLLARS, AND THAT'S EVIDENCED BY FORTRESS'S LOAN OF
$100 MILLION THAT IT EXTENDED TO THERANOS.  AS A PRACTICE, THE
VALUE OF THE COLLATERAL IS GOING TO BE WORTH MULTIPLES OF THE
FACE AMOUNT OF THE LOAN.  THE PERKINS COIE REPORT VALUED

11:09AM 1    THERANOS'S IP AS POTENTIALLY GENERATING HUNDREDS OF MILLIONS OF

11:09AM 2    DOLLARS.  AND AFTER MR. BALWANI LEFT THERANOS -- I THINK I JUST

11:09AM 3    MISSPOKE.  I SAID 350,000 IN THE BANK.  IT'S 350 MILLION.

11:09AM 4    APOLOGIES.  A BIG DIFFERENCE.

11:09AM 5        SO THERE'S A HUGE AMOUNT OF CASH IN THE BANK AND A HUGE

11:09AM 6    VALUE OF IP THAT THE COMPANY OWNS.

11:09AM 7        AND WHEN MR. BALWANI LEAVES THERANOS, THERANOS HAS TO

11:10AM 8    DECIDE WHAT TO DO WITH THOSE ASSETS.  IS IT GOING TO CONTINUE

11:10AM 9    ITS BUSINESS OF TESTING BLOOD?  IS IT GOING TO PUT A PAUSE ON

11:10AM 10   ITS BUSINESS AND SHUT DOWN AND REPAY ALL OF ITS INVESTORS?  IS

11:10AM 11   IT GOING TO LICENSE ITS IP AND TRY TO GENERATE REVENUE THAT WAY

11:10AM 12   TO GIVE ITS INVESTORS A RETURN ON THEIR INVESTMENTS?  ALL OF

11:10AM 13   THOSE ARE DECISIONS THAT HAD TO BE ANALYZED AND MADE.

11:10AM 14       MR. BALWANI WAS NO PART OF THAT.  HE WAS GONE FROM THE

11:10AM 15   COMPANY.  HE HAD NO CONTROL OVER THOSE DECISIONS.  THOSE

11:10AM 16   DECISIONS WERE BEING MADE BY ELIZABETH HOLMES, THE BOARD OF

11:10AM 17   DIRECTORS, AND INVESTORS WHO WERE COMMUNICATING WITH THEM AT

11:10AM 18   THE TIME.

11:10AM 19       SO THE GOVERNMENT'S PROPOSITION THAT, WELL, THE INVESTORS

11:10AM 20   LOST EVERYTHING AND MR. BALWANI SHOULD BE ON THE HOOK FOR THAT

11:10AM 21   LOSS IS -- IT CANNOT BE SUSTAINED BECAUSE MR. BALWANI LEFT

11:11AM 22   THERANOS BEFORE THE INVESTORS LOST THEIR MONEY.  THERE WERE SO

11:11AM 23   MANY INTERVENING FACTORS THAT BREAK THE CHAIN OF CAUSATION

11:11AM 24   BETWEEN THE INVESTORS BUYING THERANOS STOCK AND THEN AT THE END

11:11AM 25   OF THE DAY LOSING THEIR MONEY WHEN THERANOS SHUT ITS DOORS.

11:11AM 1     AND ONE OF THOSE INVESTORS WAS MR. BALWANI.  HE LOST THE

11:11AM 2     MILLIONS OF DOLLARS THAT HE USED TO BUY THERANOS STOCK.  AND HE

11:11AM 3     HAD NO CONTROL OVER THAT.

11:11AM 4     SO, YOUR HONOR, JUST TO SUM UP ON LOSS, THE GOVERNMENT HAS

11:11AM 5     NOT MET ITS BURDEN BY CLEAR AND CONVINCING EVIDENCE OR BY A

11:11AM 6     PREPONDERANCE TO SHOW THAT THE LOSSES THAT THE INVESTORS

11:11AM 7     SUSTAINED WERE CAUSED BY MR. BALWANI'S CONDUCT.

11:12AM 8     THE WAY THEY APPROACH LOSS USING THE SABA REPORT IS SO

11:12AM 9     SPECULATIVE AND UNRELIABLE THAT THE COURT SHOULD NOT USE IT.

11:12AM 10    IT CANNOT YIELD A REASONABLE ESTIMATE OF LOSS.  IT'S WAY TOO

11:12AM 11    COMPLICATED.

11:12AM 12    AND, IN FACT, I WOULD JUST NOTE THAT THE GOVERNMENT

11:12AM 13    DOESN'T CITE ANY NINTH CIRCUIT CASE WHERE THE COURT USES A

11:12AM 14    METHODOLOGY TO ASSESS SHARE PRICE OR VALUE FOR A PRIVATE

11:12AM 15    COMPANY.

11:12AM 16    THEY CITE TO THE LEONARD CASE IN THE SECOND CIRCUIT AND

11:12AM 17    OTHER SECOND CIRCUIT CASES.  AND THE LEONARD CASE, I MEAN THE

11:12AM 18    LEONARD CASE ACTUALLY REVERSED THE DISTRICT COURT FOR DOING

11:12AM 19    EXACTLY WHAT THE GOVERNMENT IS RECOMMENDING TO THIS COURT.

11:12AM 20    THE LEONARD DISTRICT COURT SAID THE WHOLE LOSS -- THAT THE

11:12AM 21    DEFENDANT IS RESPONSIBLE FOR THE ENTIRE LOSS, AND THE SECOND

11:12AM 22    CIRCUIT REVERSED ON THAT.

11:12AM 23    AND ALL THE SECOND CIRCUIT SAID IS DISTRICT COURT, COME UP

11:13AM 24    WITH A METHODOLOGY THAT IS REASONABLE.  THAT'S WHAT WE LEARNED

11:13AM 25    FROM THAT CASE.

11:13AM 1    WE HAVE NO CASE LAW TO ESTABLISH WHAT A REASONABLE

11:13AM 2    METHODOLOGY IS.  AND THIS CASE IN THIS COMPANY, AND BASED ON

11:13AM 3    ALL OF THESE INVESTORS WHO WERE INVESTING FOR DIFFERENT

11:13AM 4    REASONS, IT'S WAY TOO COMPLICATED AND SPECULATIVE TO ASCERTAIN

11:13AM 5    A REASONABLE AMOUNT OF LOSS.

11:13AM 6        THE GUIDELINES TELL US WHAT TO DO IN THOSE CIRCUMSTANCES.

11:13AM 7    WE LOOK TO WHAT THE DEFENDANT GAINED, AND WE ALL KNOW THAT

11:13AM 8    MR. BALWANI GAINED NOTHING FROM HIS TIME AT THERANOS.  IN FACT,

11:13AM 9    HE LOST MONEY.

11:13AM 10        SO FOR THAT REASON, WE THINK THE LOSS ENHANCEMENT SHOULD

11:13AM 11    BE ZERO.

11:13AM 12            THE COURT:  SO LET ME JUST CAPTURE THAT.

11:13AM 13        THE JURY HEARD THE EVIDENCE IN THE TRIAL, THEY CONVICTED

11:13AM 14    MR. BALWANI OF EVERY ONE OF THE CHARGES THAT WAS PRESENTED TO

11:13AM 15    THEM, INCLUDING THE WIRE FRAUD COUNTS, AND YOU BELIEVE THAT

11:14AM 16    THERE'S NO LOSS, THAT THE COURT SHOULD FIND NO LOSS?  IS THAT

11:14AM 17    WHAT I'M HEARING YOU SAY?

11:14AM 18            MS. WALSH:  THAT THERE SHOULD BE NO ADJUSTMENT FOR

11:14AM 19    LOSS, THAT'S RIGHT.

11:14AM 20            THE COURT:  WHAT SHOULD THE LOSS AMOUNT BE IN YOUR

11:14AM 21    OPINION?

11:14AM 22            MS. WALSH:  FOR MR. BALWANI, IT'S ZERO.

11:14AM 23            THE COURT:  OKAY.  OKAY.

11:14AM 24            MS. WALSH:  YEAH.

11:14AM 25            THE COURT:  OKAY.  THANK YOU.

11:14AM 1    MR. LEACH.

11:14AM 2         MR. LEACH:  THANK YOU, YOUR HONOR.

11:14AM 3    I'D LIKE TO ADDRESS EACH OF MS. WALSH'S POINT IF I COULD,

11:14AM 4    BUT I WOULD START BY SAYING THAT WE ARE NOT STARTING FROM A

11:14AM 5    BLANK SLATE HERE.

11:14AM 6         MOST, IF NOT ALL, OF THESE ARGUMENTS WERE MADE IN THE

11:14AM 7    HOLMES SENTENCING WHERE THE COURT MADE FINDINGS BASED ON THE

11:14AM 8    SABA REPORT, BASED ON MS. RAVITZ'S TESTIMONY.  I THINK THE ONLY

11:14AM 9    NEW INFORMATION HERE THAT WE'RE DEALING WITH IS EXPERT

11:14AM 10   DECLARATIONS TENDERED BY MR. BALWANI.  I'LL GET TO THOSE, BUT

11:14AM 11   MOST IF NOT EVERYTHING THAT HAS BEEN RAISED HERE WAS RAISED AND

11:14AM 12   CONSIDERED IN THE HOLMES SENTENCING UNDER IDENTICAL

11:15AM 13   CIRCUMSTANCES, AND THERE'S SIMPLY NOTHING NEW BESIDES THE

11:15AM 14   EXPERT DECLARATIONS THAT SHOULD ALTER THE COURT'S FINDINGS THAT

11:15AM 15   IT MADE IN THE HOLMES SENTENCING.

11:15AM 16        NOW, WE'VE ARGUED THAT THE LOSS IS THE FULL AMOUNT OF THE

11:15AM 17   C1 AND C2 INVESTMENTS.  WE RECOGNIZE THE COURT DISAGREED WITH

11:15AM 18   THAT IN THE HOLMES SENTENCING.

11:15AM 19        WE PRESERVE OUR ARGUMENT ON THAT POINT, BUT I'M GOING TO

11:15AM 20   FOCUS ON THE LOSS BASED ON THE COURT'S FINDINGS IN THE HOLMES

11:15AM 21   SENTENCING BASED ON THE SABA REPORT, WHICH WE CONTINUE TO

11:15AM 22   BELIEVE PROVIDE A SOUND AND RELIABLE BASIS TO CALCULATE THE

11:15AM 23   LOSS IN THIS CASE.

11:15AM 24        AND IT'S IMPORTANT TO REMEMBER, YOUR HONOR, THE COURT'S

11:15AM 25   JOB HERE, THE COURT'S OBLIGATION IS TO HAVE A REASONABLE

11:15AM 1    ESTIMATE OF LOSS, NOT AN EXACT CALCULATION, AN ESTIMATE OF

11:15AM 2    LOSS.  THAT'S WHAT THE GUIDELINES CALL FOR.

11:15AM 3        AND THE GUIDELINES SAY THAT THIS IS A TASK BEST SUITED FOR

11:15AM 4    THE DISTRICT JUDGE WHO OVERSAW THE TRIAL AND THAT THERE'S NOT A

11:16AM 5    ONE-SIZE-FITS-ALL APPROACH.  THERE'S A NUMBER OF FACTORS THAT

11:16AM 6    THE COURT IS SUPPOSED TO CONSIDER, AND THE GUIDELINES RECOGNIZE

11:16AM 7    THAT THERE'S NOT ONLY ONE WAY TO CALCULATE THE LOSS.  THE

11:16AM 8    JUDGE'S JOB IS TO FIND A REASONABLE ESTIMATE.  THIS IS NOT AN

11:16AM 9    EXACT SCIENCE.

11:16AM 10       WE KNOW HERE THAT THE INVESTORS IN THIS CASE LOST

11:16AM 11   EVERYTHING, EACH OF THE COUNTS OF CONVICTION, ALL OF THE

11:16AM 12   INVESTORS THAT WE SUBMITTED IN MY DECLARATION IN THE HOLMES

11:16AM 13   CASE.  THIS ISN'T A CASE WHERE, YOU KNOW, THEY -- IF YOU VALUE

11:16AM 14   IT ON ONE DAY YOU HAVE X, IF THE STOCK KEEPS TRADING, THEY HAVE

11:16AM 15   Y.  THEY LOST ALL OF THEIR MONEY.

11:16AM 16       AND THE POINT OF THE SABA EXERCISE IS TO TRY TO AFFIX A

11:16AM 17   RESIDUAL VALUE TO THE STOCK ON A PARTICULAR DATE.  THE DATE

11:16AM 18   THAT THE COURT SELECTED IN THE HOLMES CASE WAS DECEMBER 31ST,

11:16AM 19   2014.

11:16AM 20       IT'S ALSO IMPORTANT TO REMEMBER IN TERMS OF THE BURDEN OF

11:16AM 21   PROOF, I DIDN'T HEAR ANYTHING NEW FROM MS. WALSH IN TERMS OF

11:17AM 22   THE CASES.  THE LONICH CASE WAS CITED BY MS. HOLMES AND RELIED

11:17AM 23   ON.

11:17AM 24       AND THE NINTH CIRCUIT IS CLEAR THROUGH THE LAURIENTI CASE

11:17AM 25   AND THE BERGER CASE THAT WHEN YOU'RE TALKING ABOUT COUNTS WHERE

11:17AM 1    YOU HAVE A CONVICTION, HERE WIRE FRAUD, HERE A CONSPIRACY TO

11:17AM 2    DEFRAUD INVESTORS, THE APPROPRIATE STANDARD IS PREPONDERANCE OF

11:17AM 3    EVIDENCE, AND THAT'S THE STANDARD THAT THE COURT APPLIED IN THE

11:17AM 4    HOLMES SENTENCING.  THERE'S NO NEW CASE LAW ON THIS, THERE'S NO

11:17AM 5    NUANCE FOR MR. BALWANI THAT MAKES IT DIFFERENT, AND THE COURT

11:17AM 6    SHOULD CONTINUE TO APPLY THAT PREPONDERANCE STANDARD.

11:17AM 7        I WOULD SUBMIT THAT WE MEET ANY STANDARD, YOUR HONOR, BUT

11:17AM 8    PREPONDERANCE IS WHAT CONTROLS HERE.

11:17AM 9        IN TERMS OF THE NEW FACTS THAT MS. WALSH POINTED OUT, SHE

11:17AM 10   RAISED A COUPLE RELIANCE ISSUES WITH RESPECT TO PARTICULAR

11:17AM 11   INVESTORS.  SHE MENTIONED MR. MURDOCH.  THAT WAS AN INVESTOR

11:18AM 12   WHERE THE COURT MADE FINDINGS IN THE HOLMES CASE.

11:18AM 13       THERE'S NO NEW FACTS IN THE RECORD BASED ON THAT.  THE

11:18AM 14   COURT HAS MS. RAVITZ'S SWORN TESTIMONY ON THIS POINT.  AND

11:18AM 15   SHE'S VERY MUCH IN THE SAME POSITION AS LISA PETERSON WAS FOR

11:18AM 16   RDV, WHO THE COURT ALSO HEARD IN TWO TRIALS AND FOUND WAS A

11:18AM 17   COMPETENT WITNESS TO TESTIFY OR PROVIDE INFORMATION ABOUT

11:18AM 18   RELIANCE IN THIS PARTICULAR SETTING.

11:18AM 19       SHE WAS THE CHIEF OF STAFF FOR MR. MURDOCH.  SHE SAT

11:18AM 20   THROUGH TWO MEETINGS WITH MS. HOLMES AND MR. BALWANI.  SHE

11:18AM 21   RECEIVED THE TWO BINDERS OF DUE DILIGENCE MATERIALS.  THE COURT

11:18AM 22   IS, BY NOW, VERY FAMILIAR WITH THE BINDERS THAT WERE PROVIDED

11:18AM 23   TO INVESTORS THAT WERE COMPILED BY MR. EDLIN.  SHE HAD THOSE,

11:18AM 24   AND SHE REVIEWED THOSE ALONG WITH MR. MURDOCH.  SHE HAD THE

11:18AM 25   SAME REVENUE PROJECTIONS THAT WENT TO INVESTORS, AND THOSE WERE

| | | |
|---|---|---|
| 11:18AM | 1 | IN PART OF THE CALCULUS BEHIND THE INVESTMENTS. |
| 11:18AM | 2 | SHE SAID THAT SHE AND MR. MURDOCH WERE TOLD AND THEY |
| 11:19AM | 3 | THOUGHT THE WAG DEAL WAS GROWING AND GENERATING MILLIONS OF |
| 11:19AM | 4 | DOLLARS IN REVENUE.  THIS IS IMPORTANT BECAUSE IT'S IN DECEMBER |
| 11:19AM | 5 | OF 2014, AND THIS IS A TIME PERIOD WHERE MR. BALWANI KNOWS FROM |
| 11:19AM | 6 | MR. JHAVERI AND OTHERS AT WALGREENS THAT THEY'RE NOT GOING TO |
| 11:19AM | 7 | EXPAND BEYOND THE 40 STORES BECAUSE THEY CAN'T GET THE RATIO OF |
| 11:19AM | 8 | THE FINGERSTICK TESTING DOWN.  THEY KNOW ALL OF THAT BY |
| 11:19AM | 9 | DECEMBER 14TH, 2014 AND NONE OF THAT IS DISCLOSED TO MS. RAVITZ |
| 11:19AM | 10 | OR TO MR. MURDOCH. |
| 11:19AM | 11 | SHE WAS THERE WHEN MS. HOLMES AND MR. BALWANI SHOWED THEM |
| 11:19AM | 12 | THE BOX THAT PURPORTEDLY WAS DOING ALL OF THE TESTING.  SHE WAS |
| 11:19AM | 13 | TOLD THAT THERE WERE USES IN THE MILITARY SITUATION. |
| 11:19AM | 14 | CRITICALLY, SHE TESTIFIED TO QUESTIONS THAT MR. MURDOCH |
| 11:19AM | 15 | WAS ASKED IN THESE MEETINGS.  ONE OF THEM WAS DIRECTED RIGHT TO |
| 11:19AM | 16 | MR. BALWANI, WHICH WAS HOW RELIABLE ARE THESE REVENUE |
| 11:19AM | 17 | PROJECTIONS?  AND MR. BALWANI SAID A MAXIMUM DOWNSIDE RISK OF |
| 11:20AM | 18 | THESE HUNDRED MILLION DOLLAR PROJECTIONS IS 30 PERCENT. |
| 11:20AM | 19 | THE COURT KNOWS FROM MS. RAVITZ'S TESTIMONY EXACTLY WHAT |
| 11:20AM | 20 | WAS TOLD TO MR. MURDOCH.  IT CAN DRAW INFERENCES BASED ON |
| 11:20AM | 21 | TESTIMONY ABOUT WHAT WAS RELEVANT.  THEY HAVEN'T CITED A SINGLE |
| 11:20AM | 22 | CASE FOR THE PROPOSITION THAT IN SENTENCING WHERE CALCULATING |
| 11:20AM | 23 | THE LOSS, YOU NEED TO CALL EACH AND EVERY INVESTOR IN THE |
| 11:20AM | 24 | COMPANY, PUT THEM ON THE STAND, ASK THEM QUESTIONS AS YOU WOULD |
| 11:20AM | 25 | IN A TRIAL IN ORDER TO DRAW THE REASONABLE ESTIMATE OF LOSS |

11:20AM 1     THAT THE COURT MUST ASSESS IN SENTENCING.

11:20AM 2          WE HAVE MORE THAN MET OUR BURDEN ON THAT POINT.

11:20AM 3          THERE WAS ALSO SOME REFERENCE IN THE BRIEFING TO

11:20AM 4     MS. PETERSON, LIKE MS. HOLMES, THEY MAKE THIS ARGUMENT THAT

11:20AM 5     BECAUSE MS. PETERSON WAS NOT THE FINAL DECISION-MAKER AT RDV,

11:20AM 6     SHE'S INCOMPETENT TO TESTIFY TO RDV'S RELIANCE.  THERE'S NO

11:20AM 7     CASE THAT SUPPORTS THAT.

11:20AM 8          AND MS. PETERSON'S TESTIMONY THROUGHOUT BOTH TRIALS IS

11:21AM 9     REPLETE WITH EVIDENCE SUPPORTING HER KNOWLEDGE OF WHAT WAS SAID

11:21AM 10    AND HER KNOWLEDGE OF WHAT WAS IMPORTANT TO RDV.  AND I WOULD

11:21AM 11    DIRECT THE COURT TO IN THE HOLMES TRIAL, TRIAL TRANSCRIPT 4759

11:21AM 12    SHE TESTIFIED WE WERE RELYING ON WHAT WE WERE TOLD.  SHE SAID

11:21AM 13    WE WERE RELYING ON WHAT WE WERE TOLD BY THEM ON THE ACCURACY OF

11:21AM 14    THE ANALYZER.  SHE SAID THE PFIZER DOCUMENT WAS VERY IMPORTANT

11:21AM 15    TO THEM.  SHE SAID SHE WAS NOT JUST RELYING ON WHAT WAS IN

11:21AM 16    WRITING, SHE WAS RELYING ON WHAT WE WERE TOLD.

11:21AM 17         AND SHE WAS ALSO THE ONE WHO PREPARED THE APPROVAL

11:21AM 18    DOCUMENT FOR RDV MEMORIALIZING FOR THEIR RECORDS, YOU KNOW,

11:21AM 19    WHAT THEY WERE TOLD, WHAT WAS IMPORTANT FOR THEM, AND WHAT THEY

11:21AM 20    RELIED ON.

11:21AM 21         SO THE NOTION THAT YOU NEED TO HAVE SWORN TESTIMONY IN A

11:21AM 22    SENTENCING PROCEEDING WITH EACH AND EVERY INVESTOR SAYING "I

11:21AM 23    RELIED ON THIS" IS JUST NOT SUPPORTED BY THE CASES, AND THE

11:21AM 24    COURT HAS AMPLE FACTUAL INFORMATION IN THE RECORD TO SUPPORT

11:22AM 25    THE FINDINGS THAT IT MADE IN THE HOLMES SENTENCING WHICH SHOULD

11:22AM 1    APPLY EQUALLY HERE.

11:22AM 2            THE COURT:  LET ME ASK YOU -- PARDON ME, MR. LEACH.

11:22AM 3    ARE THERE ANY VICTIMS PRESENT THAT WISH TO BE HEARD?

11:22AM 4            MR. LEACH:  NOT TO MY KNOWLEDGE, YOUR HONOR.

11:22AM 5            THE COURT:  ALL RIGHT.  THANK YOU.

11:22AM 6            MR. LEACH:  LET ME TURN TO MR. SABA BECAUSE I THINK

11:22AM 7    THE ONLY REAL NEW FACTUAL INFORMATION THAT THE COURT HAS IS TWO

11:22AM 8    EXPERT DECLARATIONS OR TWO FOR MR. WEINGUST AND ANOTHER ONE

11:22AM 9    FROM MR. REIFF.

11:22AM 10       I WANT TO START BY SAYING THAT THERE IS SOME DISPARITY IN

11:22AM 11   THE QUALIFICATIONS OF THE EXPERTS THAT MIGHT NOT BE OBVIOUS

11:22AM 12   FROM SOME OF THE MATERIALS, BUT I THINK ARE SIGNIFICANT IN

11:22AM 13   EVALUATING PARTICULARLY MR. WEINGUST.

11:22AM 14       MR. SABA IS AN ACCREDITED SENIOR APPRAISER WITH THE

11:22AM 15   AMERICAN SOCIETY OF APPRAISERS.  HE'S ALSO ACCREDITED IN

11:23AM 16   BUSINESS VALUATIONS BY THE AICPA, THE PROFESSIONAL ACCOUNTING

11:23AM 17   ASSOCIATION.

11:23AM 18       AND WHAT THAT -- AND MR. WEINGUST HAS NEITHER OF THOSE

11:23AM 19   CERTIFICATIONS.

11:23AM 20       MR. WEINGUST IS A MEMBER OF ANOTHER ORGANIZATION CALLED A

11:23AM 21   NATIONAL ASSOCIATION OF CERTIFIED EVALUATORS AND ANALYSTS, BUT

11:23AM 22   HE'S NOT CERTIFIED BY THAT ORGANIZATION.  MR. SABA IS.

11:23AM 23       AND WHY ARE THESE CERTIFICATIONS IMPORTANT?  IT'S BECAUSE

11:23AM 24   IN DOING HIS REPORT, MR. SABA WAS REQUIRED TO COMPLY WITH THE

11:23AM 25   STANDARDS THAT APPLY TO THOSE EVALUATORS, AND YOU CAN SEE THIS

11:23AM 1    AT THE TAIL END OF MR. SABA'S INITIAL REPORT, HE SAYS, "I

11:23AM 2    CERTIFY TO ALL OF THE FOLLOWING."  THAT MEANS HE FOLLOWED THE

11:23AM 3    STANDARDS OF THE AICPA IN PREPARING HIS REPORT, THAT MEANS HE

11:23AM 4    FOLLOWED THE STANDARDS OF AMERICAN SOCIETY OF APPRAISERS IN

11:23AM 5    PREPARING HIS REPORT, AND I THINK THAT CAN GIVE THE COURT ADDED

11:23AM 6    ASSURANCE THAT BECAUSE MR. SABA IS COMPLYING WITH THE

11:24AM 7    STANDARDS, DOING WHAT ACCOUNTANTS AND APPRAISERS DO EVERY DAY

11:24AM 8    IN TRYING TO DO SOMETHING THAT IS VERY HARD, WHICH IS TO VALUE

11:24AM 9    A COMPANY, AND PARTICULARLY HARD WHEN YOU'RE TRYING TO VALUE A

11:24AM 10   COMPANY AND DISENTANGLE A RISK THAT I THINK THE COURT IS RIGHT

11:24AM 11   IS NOT ACCOUNTED FOR BY INVESTORS OR BY -- AT LEAST THEY

11:24AM 12   SHOULDN'T HAVE TO ACCOUNT FOR IT, AND THAT'S THE RISK OF FRAUD.

11:24AM 13       SO THERE'S A VERY MEANINGFUL DIFFERENCE BETWEEN THE TWO

11:24AM 14   EXPERTS THAT THE COURT HAS.  WEINGUST IS A LAWYER, AND I'M NOT

11:24AM 15   CASTING ANY ASPERSIONS ON HIS QUALIFICATIONS, BUT HE DIDN'T

11:24AM 16   LOOK AT ANY DOCUMENTS, AS FAR AS I CAN TELL, OTHER THAN THE

11:24AM 17   ARANCA REPORT THAT HE PROVIDED TO YOU.  HE DIDN'T REVIEW THE

11:24AM 18   VOLUME OF MATERIAL THAT MR. SABA ATTACHED TO HIS REPORT TO

11:24AM 19   REALLY DIG INTO THE FORECAST, DIG INTO THE TESTIMONY TO TRY TO

11:24AM 20   FIGURE OUT WHAT WAS THE VALUE OF THIS COMPANY ON THIS

11:24AM 21   PARTICULAR DAY APPLYING THE STANDARDS.

11:24AM 22       AND I HAVE TO TAKE ISSUE WITH SOMETHING MS. WALSH SAID

11:24AM 23   EARLIER.  I DON'T SEE ANYTHING IN MR. WEINGUST'S DECLARATIONS

11:25AM 24   THAT SAY THIS IS THE RIGHT DISCOUNT RATE TO APPLY, YOU SHOULD

11:25AM 25   APPLY THIS DISCOUNT RATE, AND THIS GENERATES A PARTICULAR

11:25AM  1    VALUE.

11:25AM  2         HE'S CRITICAL OF WHAT MR. SABA DOES, BUT IF YOU PARSE THE

11:25AM  3    DECLARATION, AND WE'VE LOOKED AT IT VERY CAREFULLY, YOUR HONOR,

11:25AM  4    HE'S SAYING I THINK 45 PERCENT IS TOO HIGH.  IF YOU WERE TO

11:25AM  5    TAKE THIS 28 PERCENT NUMBER FROM THE SINGLE PEPPERDINE STUDY,

11:25AM  6    THIS IS WHAT HAPPENS.  AND IF YOU TAKE THE 20 PERCENT NUMBER

11:25AM  7    IMPLIED BY ARANCA, THIS IS WHAT HAPPENS.

11:25AM  8         BUT MR. WEINGUST DOESN'T LOOK AT A SINGLE DOCUMENT OTHER

11:25AM  9    THAN THE ARANCA REPORT, HE DOESN'T REVIEW ANY OF THE TESTIMONY,

11:25AM 10    HE DOESN'T REVIEW ANYTHING ABOUT THE UNDERLYING TECHNOLOGY.  HE

11:25AM 11    JUST SAYS, I HAVE A DIFFERENT -- YOU KNOW, I DISAGREED WITH

11:25AM 12    MR. SABA'S JUDGMENT ON THE 45 PERCENT, I'M NOT GOING TO TELL

11:25AM 13    YOU WHAT IT SHOULD BE, BUT IF YOU TAKE THESE OTHER TWO NUMBERS,

11:25AM 14    THIS IS WHAT YOU GET.

11:25AM 15         SO THIS ISN'T A SITUATION WHERE YOU HAVE AN EXPERT SAYING

11:26AM 16    X AND ANOTHER ONE SAYING Y.  IT'S REALLY THE Y BEING CRITICAL

11:26AM 17    OF THE X, AND THE X HAS GONE THROUGH A VERY, VERY THOROUGH

11:26AM 18    PROCESS, COMPLYING WITH THE APPROPRIATE STANDARDS.

11:26AM 19         THE 45 PERCENT IS A MATTER OF JUDGMENT, BUT HERE IT'S A

11:26AM 20    MATTER OF JUDGMENT BASED ON VERY, VERY REASONABLE

11:26AM 21    CIRCUMSTANCES.  LET ME EXPLAIN A LITTLE BIT WHY WE THINK THAT

11:26AM 22    IS SO AND WHY WE THINK THE COURT WAS RIGHT TO INCLUDE THAT IN

11:26AM 23    THE FIRST INSTANCE AND WHY MR. WEINGUST DOESN'T RAISE ANYTHING

11:26AM 24    TO MEANINGFULLY COUNTERACT THAT.

11:26AM 25         THE FIRST CRITIQUE I HEARD WAS HE'S USING THIS OLD DATA.

| | | |
|---|---|---|
| 11:26AM | 1 | THIS SO-CALLED "OLD DATA" IS FROM A 2019 REPORT BY THE AICPA, |
| 11:26AM | 2 | WHICH MR. WEINGUST IS NOT A MEMBER OF, IS NOT CERTIFIED BY, AND |
| 11:26AM | 3 | THIS IS A TOOL ACCORDING TO MR. SABA THAT IS USED ROUTINELY IN |
| 11:26AM | 4 | VALUATIONS OF COMPANIES, BOTH PRIVATE AND PUBLIC, AND THIS IS |
| 11:27AM | 5 | DATA THAT IS IN AS AUTHORITATIVE LITERATURE AS YOU CAN GET IN |
| 11:27AM | 6 | THIS AREA. |
| 11:27AM | 7 | SO WE APPRECIATE THAT MR. SABA THINKS IT'S OLD.  IT'S HARD |
| 11:27AM | 8 | TO GET DATA ON PRIVATE VENTURE CAPITAL COMPANIES. |
| 11:27AM | 9 | MR. WEINGUST WOULD HAVE YOU RELY ON ONE SINGLE REPORT FROM |
| 11:27AM | 10 | PEPPERDINE. |
| 11:27AM | 11 | MR. SABA IS TAKING A MORE HOLISTIC APPROACH BASED ON DATA |
| 11:27AM | 12 | THAT ISN'T OLD BUT IS DATA AUTHORITATIVELY RELIED UPON BY THE |
| 11:27AM | 13 | AICPA. |
| 11:27AM | 14 | THERE'S ALSO CRITICISM ON JUST USING THAT PEPPERDINE |
| 11:27AM | 15 | NUMBER.  THE COURT COMMENTED ON, WELL, DID HE USE THE 2021 |
| 11:27AM | 16 | NUMBERS OR THE 2015 NUMBERS?  I HOPE WE MADE THIS CLEAR IN OUR |
| 11:27AM | 17 | REPLY BRIEF, WHEN IT COMES TO THE PEPPERDINE STUDY, MR. SABA |
| 11:27AM | 18 | WAS USING THE 25 -- THE 2015 NUMBERS. |
| 11:27AM | 19 | IF YOU LOOK AT SOME OF THE SUPPORTING SCHEDULES AND YOU |
| 11:27AM | 20 | COMPARE THEM TO MR. WEINGUST'S DECLARATION, YOU'LL SEE THAT |
| 11:27AM | 21 | IT'S 2015 NUMBERS.  THEY'RE APPLES TO APPLES.  THERE IS A TYPO |
| 11:28AM | 22 | IN MR. SABA'S REPORT THAT SAYS 2021 MANUAL, BUT THE TYPO IS THE |
| 11:28AM | 23 | REFERENCE TO THE MANUAL, NOT THE USE OF THE PEPPERDINE STUDY. |
| 11:28AM | 24 | SO I HEARD MS. WALSH SAYING SOMETHING SLIGHTLY DIFFERENT, |
| 11:28AM | 25 | AND I JUST WANT TO MAKE SURE THAT WE'RE CLEAR ON THAT POINT. |

11:28AM 1      WHY IS IT WRONG TO USE THE ARANCA NUMBERS, THE 20 PERCENT?

11:28AM 2  WELL, WE KNOW THAT ARANCA WAS LIED TO, YOUR HONOR.  WE KNOW

11:28AM 3  THAT ARANCA IS A VALUATION COMPANY BASED IN INDIA.  I THINK THE

11:28AM 4  CROSS-EXAMINATION OF MS. SPIVEY IN THE BALWANI TRIAL WAS ARANCA

11:28AM 5  IS NOT REALLY THAT -- THE COST FOR AN ARANCA REPORT IS NOT THE

11:28AM 6  SAME AS GETTING A VALUATION REPORT FROM DUFF & PHELPS, BUT NOW

11:28AM 7  MR. WEINGUST IS SAYING OR SUGGESTING THAT'S SOMETHING THAT THE

11:28AM 8  COURT SHOULD LOOK TO.

11:28AM 9      BUT IF YOU LOOK AT THE VALUATION REPORT FROM 2014, ARANCA

11:29AM 10 IS ASSUMING, BASED ON WHAT THEY'RE TOLD BY MS. HOLMES AND

11:29AM 11 MR. BALWANI, THAT THERANOS IS GOING TO GO FROM $150,000 IN

11:29AM 12 REVENUE IN DECEMBER OF 2014 TO $113 MILLION IN REVENUE THE

11:29AM 13 FOLLOWING YEAR.

11:29AM 14      NOT ONLY DO WE KNOW THAT DIDN'T HAPPEN, WE KNEW AT

11:29AM 15 DECEMBER 2014 THERE WAS NO WAY THAT WAS GOING TO HAPPEN BECAUSE

11:29AM 16 WALGREENS WAS SAYING WE'RE NOT GOING TO EXPAND PAST 40 STORES

11:29AM 17 UNTIL YOU CAN GET YOUR TECHNOLOGY TO DO THE FINGERSTICKS MORE

11:29AM 18 APPROPRIATELY.  YOU DON'T SEE ANYTHING LIKE THAT IN THE ARANCA

11:29AM 19 REPORT.

11:29AM 20      MR. WEINGUST SAYS ARANCA DID ALL OF THIS DUE DILIGENCE.

11:29AM 21 THERE'S ZERO EVIDENCE IN THE RECORD ABOUT THE DILIGENCE THAT

11:29AM 22 ARANCA DID.

11:29AM 23      AND IF YOU LOOK CLOSELY AT THE FORECASTS THAT WERE

11:29AM 24 PROVIDED TO ARANCA, THESE ARE PIE IN THE SKY SUCCESS SCENARIO

11:29AM 25 PROJECTIONS UNDER THE BEST CASE, BASED ON EVERYTHING THAT WE

11:30AM 1  KNOW FROM THIS TRIAL, AND THAT'S NOTHING THAT MR. WEINGUST

11:30AM 2  READ, CONSIDERED, THOUGHT ABOUT.  YOU JUST CAN'T LOOK AT THE

11:30AM 3  ARANCA REPORTS BASED ON WHAT WE KNOW AND BASED UPON WHAT WE

11:30AM 4  HEARD IN THIS TRIAL AND THINK THAT THEY'RE ANYWHERE NEAR THE

11:30AM 5  RIGHT NUMBERS THAT SHOULD GO INTO CALCULATING THE DISCOUNT

11:30AM 6  RATE.

11:30AM 7       SO THE 45 PERCENT IS CONSIDERING THE PEPPERDINE REPORT,

11:30AM 8  ANOTHER BATCH OF COMPANIES FROM A WIDER PERIOD OF TIMEFRAME,

11:30AM 9  AND THE ACTUAL IMPLIED RATE OF RETURN THAT THE INVESTORS IN

11:30AM 10  THIS CASE THROUGH THEIR MODELING APPLIED.

11:30AM 11       I KNOW MR. WEINGUST IN HIS SUPPLEMENTAL DECLARATION

11:30AM 12  CRITIQUES THAT, BUT IT'S ACTUALLY IN THE SABA REPORT AND IN

11:30AM 13  WHAT HE DESCRIBED AS THE BUILD MODEL, LIKE YOU CAN SEE HIM

11:30AM 14  TAKING THE PROJECTIONS THAT WERE PROVIDED TO INVESTORS, TAKING

11:30AM 15  THE PRICE THAT THEY BOUGHT AT, AND USING THAT TO CALCULATE WHAT

11:30AM 16  WAS THEIR IMPLIED RATE OF RETURN, AND THAT'S PART OF THE MIX OF

11:31AM 17  INFORMATION THAT GOES INTO MR. SABA'S JUDGMENT, GIVING THE

11:31AM 18  DEFENDANTS EVERY BENEFIT OF THE DOUBT IN TERMS OF SOLVING ALL

11:31AM 19  OF THEIR TECHNOLOGY PROBLEMS, MEETING THESE PIE IN THE SKY

11:31AM 20  REVENUE PROJECTIONS, GETTING FDA APPROVAL, GETTING ALL OF THE

11:31AM 21  PROBLEMS FIXED IN THE LAB, GIVING ALL OF THOSE BENEFITS OF THE

11:31AM 22  DOUBT TO THE DEFENDANT, THAT'S HOW MR. SABA LANDS ON THIS

11:31AM 23  45 PERCENT, WHICH IS A MATTER OF JUDGMENT, BUT THERE IS

11:31AM 24  JUDGMENT IN THIS.  THERE'S NO DOUBT ABOUT THAT, YOUR HONOR.

11:31AM 25  BUT IT'S A JUDGMENT WELL GROUNDED IN THE TRIAL RECORD AND IN

11:31AM 1    THE FACTS THAT THE COURT HEARD, AND IT'S COMPLETELY APPROPRIATE

11:31AM 2    TO RELY ON.

11:31AM 3         MY COLLEAGUE ALSO BROUGHT UP THE FORTRESS TRANSACTION, AND

11:31AM 4    I DO THINK THAT THAT IS AN IMPORTANT DATA POINT FOR THE COURT

11:31AM 5    TO CONSIDER IN TERMS OF IS 121 MILLION SOMEHOW, YOU KNOW, JUST

11:32AM 6    NOT POSSIBLY THE LOSS IN THIS CASE.  AND I THINK IT'S IMPORTANT

11:32AM 7    TO UNDERSTAND EXACTLY WHAT THE FORTRESS TRANSACTION WAS.

11:32AM 8         THIS WAS IN DECEMBER OF 2017.  FORTRESS LENT $60 MILLION

11:32AM 9    TO THERANOS SECURED BY ALL OF THE IP, ALL OF THE PATENTS THAT

11:32AM 10   THE COURT HEARD ABOUT, ALL OF THE PATENTS THAT MR. WEINGUST

11:32AM 11   TALKS ABOUT, A $60 MILLION LOAN SECURED BY THE PATENTS, THE

11:32AM 12   INTELLECTUAL PROPERTY.

11:32AM 13        AND IF THERANOS COULD MEET PARTICULAR MILESTONES, IT MIGHT

11:32AM 14   GET AN ADDITIONAL 40 MILLION.  THAT'S WHERE THE $100 MILLION

11:32AM 15   COMES IN.

11:32AM 16        AT THE END OF THE DAY, THERANOS DEFAULTED ON THAT LOAN,

11:32AM 17   FORTRESS TOOK ALL OF THE IP, AND I THINK THAT'S THE ONLY REAL

11:32AM 18   TRANSACTION THAT WE HAVE TO ASSESS, WELL, WHAT WAS THAT IP

11:32AM 19   WORTH?  WHAT -- STRIP AWAY THE CASH, WHAT WAS THE IP WORTH?

11:32AM 20        THE MOST FORTRESS WOULD LEND WAS $60 MILLION.

11:33AM 21        NOW, LET'S SAY THAT THEY WERE DOUBLY COLLATERALIZED;

11:33AM 22   THAT'S $120 MILLION.  LET'S SAY THEY WERE TRIPLE

11:33AM 23   COLLATERALIZED; $180 MILLION.  FOUR TIMES COLLATERALIZED THAT

11:33AM 24   FORTRESS IS TAKING, YOU'RE AT 240 MILLION.  ALL OF THESE

11:33AM 25   NUMBERS ARE SIGNIFICANTLY LESS THAN MR. SABA'S VALUATION,

11:33AM 1    GIVING THE DEFENDANTS ALL OF THE BENEFIT OF THE DOUBT.

11:33AM 2        THE FORTRESS TRANSACTION IS REMARKABLY HELPFUL IN TERMS OF

11:33AM 3    ASSESSING WHETHER OR NOT THESE ARE LOSS ESTIMATES THAT ARE

11:33AM 4    REALLY JUST SPECULATION OR ARE REALLY SOMETHING THAT ARE JUST

11:33AM 5    GIVING THE BENEFIT OF THE DOUBT TO THE DEFENDANTS.  IT'S

11:33AM 6    MAGNITUDES OF VALUE LOWER.

11:33AM 7        MY COLLEAGUE ALSO TALKED ABOUT VOLATILITY AND HYPOTHETICAL

11:33AM 8    EXIT USING THE OPM MODEL.  MR. SABA ATTEMPTED TO ADDRESS THAT

11:34AM 9    IN HIS SUPPLEMENTAL REPORT.  YES, THIS IS HARD WORK.  THERE ARE

11:34AM 10   ASSUMPTIONS THAT HAVE TO GO INTO THIS.  WE'RE TRYING TO CREATE

11:34AM 11   A SCENARIO WHERE THERE WAS NO FRAUD, WHERE THERE WAS FULL

11:34AM 12   TRANSPARENT INFORMATION.  THAT IS A HARD EXERCISE.  WE

11:34AM 13   RECOGNIZE THAT.

11:34AM 14       BUT THE LEONARD CASE IN PARTICULAR SAYS THAT DOESN'T MEAN

11:34AM 15   WE THROW UP OUR HANDS AND DON'T ESTIMATE WHAT THE LOSS IS.  THE

11:34AM 16   LEONARD CASE SAYS WE RECOGNIZE THIS IS A HARD JOB FOR DISTRICT

11:34AM 17   COURTS, BUT THERE ARE TOOLS AVAILABLE.  THERE ARE A NUMBER OF

11:34AM 18   FACTORS TO GO THROUGH.  AND I THINK THE COURT'S THOUGHTFUL

11:34AM 19   ASSESSMENT OF THE INCOME APPROACH IN THE HOLMES SENTENCING WAS

11:34AM 20   APPROPRIATE THEN AND IT'S APPROPRIATE NOW.

11:34AM 21       UNLESS THE COURT HAS FURTHER QUESTIONS, THE GOVERNMENT

11:34AM 22   SUBMITS ON THE LOSS POINT.

11:34AM 23               THE COURT:  THANK YOU.

11:34AM 24               MS. WALSH:  JUST A COUPLE OF POINTS, YOUR HONOR.

11:34AM 25       SO I THINK IT'S WELL-KNOWN, AND MR. WEINGUST AND I THINK

11:35AM 1     MR. SABA WOULD AGREE WITH THIS, THAT VENTURE CAPITAL FIRMS BAKE

11:35AM 2     A FAILURE SCENARIO INTO THEIR MODELS FOR COMING UP WITH RATES

11:35AM 3     OF RETURN.  SO TO SAY, WELL, I HAVE THIS RATE OF RETURN THAT

11:35AM 4     VENTURE CAPITAL FIRMS WERE INVESTING IN DURING THIS TIME

11:35AM 5     PERIOD, BUT I NEED TO MAKE ADJUSTMENTS BECAUSE THEY DIDN'T KNOW

11:35AM 6     ABOUT ALL OF THESE BAD THINGS ABOUT THERANOS, YOU'RE DOUBLE

11:35AM 7     COUNTING RISK.

11:35AM 8         THEY'VE ALREADY TAKEN INTO ACCOUNT THE RISK OF THE

11:35AM 9     BUSINESS FAILING.  WHETHER IT FAILS FOR BAD MANAGEMENT,

11:35AM 10     MISTAKES OR FRAUD, IT'S AN ECONOMIC ANALYSIS, FAILURE IS

11:35AM 11     FAILURE, AND THEY HAVE TAKEN THAT INTO ACCOUNT.

11:35AM 12         THE COURT:  THEY DO?  IS THAT YOUR UNDERSTANDING IS

11:35AM 13     WHEN RISK ANALYSIS IS TAKEN, THEY ALSO LOOK AT WHAT IS THE

11:35AM 14     POSSIBILITY OF INTERIOR CRIMINAL CONDUCT THAT COULD RESULT IN A

11:35AM 15     FAILURE AND A DEBACLE OF THIS COMPANY?  IS THAT SOMETHING THAT

11:36AM 16     THEY DO?

11:36AM 17         MS. WALSH:  NO.

11:36AM 18         THE COURT:  OH.

11:36AM 19         MS. WALSH:  MY UNDERSTANDING IS THAT IT WOULD BE THE

11:36AM 20     OPPOSITE.  THEY LOOK AT RISK OF FAILURE.  THEY DON'T SAY WHY IS

11:36AM 21     THE BUSINESS FAILING.

11:36AM 22         THE COURT:  IT'S JUST FAILURE.

11:36AM 23         MS. WALSH:  IT'S ECONOMIC FAILURE.

11:36AM 24         THE COURT:  I SEE.  OKAY.

11:36AM 25         MS. WALSH:  JUST TO RESPOND TO A POINT THAT

54

11:36AM 1    MR. LEACH MADE ABOUT ARANCA. HE SAYS, WELL, ARANCA WAS LIED

11:36AM 2    TO, AND, THEREFORE, WE CAN'T RELY ON THAT DISCOUNT RATE OR THAT

11:36AM 3    RATE OF RETURN THAT IS IN THAT REPORT.

11:36AM 4        WELL, IF ARANCA WAS LIED TO AND IT'S NOT RELIABLE TO RELY

11:36AM 5    ON THAT INFORMATION, THEN WHY IS MR. SABA RELYING ON ARANCA TO

11:36AM 6    ESTABLISH THE TIME PERIOD UNTIL A LIQUIDITY EVENT? HE'S

11:36AM 7    PICKING AND CHOOSING WHAT WITHIN THE ARANCA REPORT HE'S RELYING

11:36AM 8    ON, AND THAT'S NOT AN APPROPRIATE WAY TO METHODICALLY AND

11:36AM 9    NEUTRALLY COME UP WITH A VALUE.

11:36AM 10        THE COURT: SO WHAT SHOULD WE DO IF WE COMPLETELY

11:36AM 11   ELIMINATED THE ARANCA, SHOULD THERE BE EVEN ANOTHER ANALYSIS

11:36AM 12   THAT WE ELIMINATE ARANCA AND SAY CAN YOU MAKE A DECISION NOT

11:37AM 13   RELYING ON THAT, OR IS IT BETTER PRACTICE TO ANALYZE EVERYTHING

11:37AM 14   THAT IS ON THE TABLE AND THEN MAKE AT LEAST A BEST ESTIMATE?

11:37AM 15        MS. WALSH: SURE. I THINK IT IS BETTER TO ANALYZE

11:37AM 16   EVERYTHING ON THE TABLE, BUT YOU CAN'T SAY ARANCA IS ON THE

11:37AM 17   TABLE AND I'M GOING TO CHOOSE THE TIME PERIOD FOR A LIQUIDITY

11:37AM 18   EVENT, THAT'S GOOD, THAT'S VALID, BUT, OH, NO, I'M GOING TO

11:37AM 19   REJECT THE RATE OF RETURN BECAUSE ARANCA WAS LIED TO. YOU

11:37AM 20   CAN'T HAVE IT BOTH WAYS.

11:37AM 21        THE COURT: OKAY.

11:37AM 22        MS. WALSH: OKAY. AND THEN JUST A COUPLE OF POINTS

11:37AM 23   ON MR. MURDOCH.

11:37AM 24        SO I DON'T THINK THAT NATALIE RAVITZ IS ANALOGOUS TO

11:37AM 25   LISA PETERSON AT ALL.

11:37AM 1      MS. RAVITZ EXPRESSED IN HER S.E.C. TESTIMONY THAT SHE

11:37AM 2   THOUGHT THAT THE HISTORICAL REVENUE WAS LOW, AND SHE DIDN'T

11:38AM 3   NECESSARILY THINK IT WAS A GOOD INVESTMENT TO MAKE.

11:38AM 4      IT WAS MR. MURDOCH WHO PULLED THE TRIGGER ON THE

11:38AM 5   INVESTMENT.  HE WAS THE DECISION-MAKER.  AND WE HAVE NOTHING IN

11:38AM 6   THE RECORD, ZERO FROM HIM IN THE FORM OF TESTIMONY OR IN THE

11:38AM 7   FORM OF A VICTIM IMPACT STATEMENT SAYING WHAT HE RELIED ON IN

11:38AM 8   MAKING THAT DECISION.  FOR THAT REASON, I THINK THE COURT HAS

11:38AM 9   TO REJECT HIM AS AN INVESTOR TO BE INCLUDED IN THE GROUP.

11:38AM 10           THE COURT:  OKAY.  THANK YOU.

11:38AM 11           MS. WALSH:  AND THEN FINALLY, THERE WAS SOMETHING

11:38AM 12   THAT MR. LEACH SAID THAT WAS INTERESTING ABOUT, WELL,

11:38AM 13   MR. WEINGUST IS NOT PROVIDING THE COURT WITH HIS OWN VALUATION.

11:38AM 14   HE'S NOT SAYING, HEY, THIS IS WHAT IT SHOULD BE.  THAT'S TRUE.

11:38AM 15      IT'S THE GOVERNMENT'S BURDEN TO PROVE LOSS.  IT'S NOT THE

11:38AM 16   DEFENSE'S BURDEN, AND MR. WEINGUST HASN'T PROVIDED THE COURT

11:38AM 17   WITH WHAT RATE OF RETURN OR ANYTHING ELSE OF VALUE, YOU KNOW, A

11:39AM 18   FULSOME VALUATION.  HE DIDN'T LOOK AT AS MANY DOCUMENTS PERHAPS

11:39AM 19   AS MR. SABA, BUT THE BURDEN IS NOT ON US TO ESTABLISH LOSS.

11:39AM 20      WHAT HE DID DO, AND I THINK THIS IS THE WHOLE POINT OF

11:39AM 21   THIS EXERCISE, HE LOOKED AT MR. SABA'S REPORT AS AN EXPERT, AND

11:39AM 22   HE NOTICED THAT THERE WERE SOME VERY SERIOUS ERRORS IN EACH

11:39AM 23   APPROACH, AND THE INCOME APPROACH AND THE ASSET APPROACH.

11:39AM 24   WE'VE GONE OVER THOSE TODAY.

11:39AM 25      THE MAGNITUDE IN TERMS OF VALUING THERANOS AND THEN

11:39AM 1    ASCERTAINING LOSS, THE MAGNITUDE OF THOSE ERRORS ARE SO GREAT

11:39AM 2    AND THEY RESULT IN SUCH SWINGS IN VALUE AND LOSS, THAT THE

11:39AM 3    COURT SHOULD NOT RELY ON THE REPORT IN FASHIONING A REASONABLE

11:39AM 4    LOSS AMOUNT.

11:39AM 5            THE COURT:  OKAY.  THANK YOU.

11:39AM 6        AND I THINK YOU'RE RIGHT, HIS REPORTS ARE CRITICAL,

11:39AM 7    THEY'RE CRITICISMS.  THEY'RE LOOKING AT THE SABA REPORT,

11:40AM 8    CRITICIZING SPECIFIC FINDINGS, PROTOCOLS THAT WERE ENGAGED AS

11:40AM 9    MR. REIFF -- IS IT MR. REIFF?

11:40AM 10           MS. WALSH:  REIFF.

11:40AM 11           THE COURT:  REIFF.  HE DID THE SAME THING.  BUT

11:40AM 12   NEITHER OF THEM COME UP WITH ANY FACTOR.

11:40AM 13       I THINK MR. REIFF ACTUALLY SAYS, WELL, HE TALKS ABOUT THE

11:40AM 14   SABA REPORT AND SUGGESTS, WELL, IT'S REASONABLE, BUT HE DOES

11:40AM 15   CRITICIZE IT NONETHELESS.

11:40AM 16           MS. WALSH:  YEAH.  AND I THINK WHAT HE SAYS IS THE

11:40AM 17   OCP METHOD OF ALLOCATION IS A COMMONLY USED METHOD, FINE, BUT

11:40AM 18   IN THESE CIRCUMSTANCES THERE ARE TWO FACTORS THAT ARE

11:40AM 19   INCREDIBLY SPECULATIVE.

11:40AM 20           THE COURT:  AND IT WAS HELPFUL -- THANK YOU.  AND I

11:40AM 21   WANT TO ASK MR. LEACH ABOUT ANYTHING HE WANTS TO SAY,

11:40AM 22   PARTICULARLY ABOUT THE ARANCA ISSUE.

11:40AM 23       BUT I DID LOOK AT THE RESUMES, THE CV'S OF THE EXPERTS

11:40AM 24   HERE AND MANY OF THEM, IT SEEMED, THAT HAD TESTIFIED IN

11:40AM 25   BUSINESS DISPUTES AND FAMILY LAW MATTERS.  THERE WERE MANY OF

11:41AM 1    THEM -- I THINK YOUR EXPERTS TESTIFIED IN FAMILY LAW CASES

11:41AM 2    WHERE THERE WAS A DISSOLUTION OF THE COMMUNITY, I SUPPOSE, AND

11:41AM 3    THERE'S A DISAGREEMENT ABOUT THOSE ASSETS AND THINGS.

11:41AM 4         THERE WEREN'T TOO MANY SPECIFIC CRIMINAL CASES THAT WERE

11:41AM 5    NOTED IN THE CV'S OF THE PARTIES.  I JUST NOTE THAT.

11:41AM 6         MR. LEACH.

11:41AM 7              MR. LEACH:  JUST BRIEFLY ON THE ARANCA POINT.

11:41AM 8    YOUR HONOR, THIS EXIT DATE ONLY COMES INTO PLAY IN THE ASSET

11:41AM 9    APPROACH, WHICH I KNOW THE COURT DID NOT ADOPT.

11:41AM 10        AND I THINK THE POINT HERE IS, NOT TO BE CRITICAL OF

11:41AM 11   ARANCA, BUT TO TAKE A HARD LOOK AT WHAT INFORMATION ARANCA

11:41AM 12   ACTUALLY HAS AND WHETHER JUDGMENTS IT'S MAKING IN TERMS OF THE

11:41AM 13   FOUR YEAR HORIZON ARE REASONABLE OR NOT, NOT JUST WHOLLY

11:42AM 14   DISCOUNT IT, BUT TO BRING A CRITICAL EYE TO IT.

11:42AM 15        AND IT'S NOT SO MUCH THE ARANCA REPORT AS IT IS THE

11:42AM 16   FINANCIAL FORECAST THAT WERE THE SUBJECT OF MULTIPLE DAYS OF

11:42AM 17   TESTIMONY IN THIS CASE, AND WHETHER THOSE ARE REASONABLE OR

11:42AM 18   NOT, AND I THINK ANYBODY LOOKING AT THEM, PARTICULARLY WITH

11:42AM 19   INFORMATION NOW, HAS TO SEE THAT THESE ARE PIE IN THE SKY

11:42AM 20   PROJECTIONS THAT NEED SOME FORM OF DISCOUNT, WHATEVER ARANCA

11:42AM 21   THOUGHT OR WAS TOLD.

11:42AM 22              THE COURT:  ANYTHING FURTHER?

11:42AM 23              MR. LEACH:  NO, YOUR HONOR.  THANK YOU.

11:42AM 24              MS. WALSH:  JUST ONE POINT BASED ON WHAT MR. LEACH

11:42AM 25   SAID.

11:42AM  1          THE COURT:  SURE.

11:42AM  2          MS. WALSH:  I BELIEVE THE HOLDING PERIOD BEFORE THE

11:42AM  3  LIQUIDITY EVENT IS SOMETHING THAT MR. SABA ASCERTAINED IN

11:42AM  4  CONNECTION WITH THE ALLOCATION OF VALUE, NOT WITH THE ASSET

11:42AM  5  APPROACH.

11:42AM  6      SO YOU HAVE THE PAPERS AND YOU'LL SEE, BUT THAT'S MY

11:42AM  7  UNDERSTANDING.  SO IT IS IMPORTANT BECAUSE EVEN IN THE INCOME

11:42AM  8  APPROACH YOU'RE GOING TO APPLY THE ALLOCATION METHOD TO THAT

11:42AM  9  APPROACH TO FIGURE OUT WHAT THE NUMBERS ARE FOR EACH INVESTOR.

11:42AM  10          THE COURT:  OKAY.  ANYTHING FURTHER ON LOSS

11:43AM  11  CALCULATION FROM EITHER SIDE?

11:43AM  12          MS. WALSH:  NO, YOUR HONOR.

11:43AM  13          THE COURT:  MR. LEACH?

11:43AM  14          MR. LEACH:  NO, YOUR HONOR.  THANK YOU.

11:43AM  15          THE COURT:  WERE YOU ALSO SPEAKING FOR THAT VICTIM

11:43AM  16  COUNT, WERE YOU DOING THAT, MS. WALSH?

11:43AM  17          MS. WALSH:  YES, YOUR HONOR.  I THOUGHT I ADDRESSED

11:43AM  18  IT IN TERMS OF LOSS CAUSATION AND MURDOCH IS ONE OF THE

11:43AM  19  EXAMPLES.

11:43AM  20          THE COURT:  ANYTHING FURTHER YOU WANT TO SAY ABOUT

11:43AM  21  THAT AS FAR AS THE GUIDELINE CALCULATION?

11:43AM  22          MS. WALSH:  WE REST ON OUR PAPERS.

11:43AM  23          THE COURT:  ALL RIGHT.  OKAY.

11:43AM  24      ANYTHING FURTHER ABOUT THAT?

11:43AM  25          MR. LEACH:  THE ONLY POINT I WOULD MAKE THERE,

11:43AM 1    YOUR HONOR, IS THAT THERE WERE SEVEN INVESTORS WHO ACTUALLY

11:43AM 2    TESTIFIED IN MR. BALWANI'S TRIAL.  IN ADDITION, THERE ARE THE

11:43AM 3    INVESTORS WHO WE PROFFERED INFORMATION ABOUT, SUCH AS

11:43AM 4    MR. MURDOCH, PEER VENTURES, SOME OF THE ONES THAT THE COURT

11:43AM 5    FOUND IN THE HOLMES SENTENCING.

11:43AM 6         IN ADDITION TO THAT, YOU KNOW, THERE ARE PATIENT VICTIMS

11:44AM 7    HERE.  THREE OF THEM TESTIFIED IN THE TRIAL.  SO I'M NOT SURE

11:44AM 8    HOW THERE CAN BE A SCENARIO WHERE THERE WERE FEWER THAN TEN

11:44AM 9    VICTIMS MET.  THAT IS SOMETHING THAT BECAUSE THE COURT DID NOT

11:44AM 10   CONSIDER ACQUITTED CONDUCT IN THE HOLMES SENTENCING IS

11:44AM 11   SOMETHING DIFFERENT HERE.  I JUST WANTED TO MAKE SURE THAT WE

11:44AM 12   ADDRESSED THAT POINT.

11:44AM 13            THE COURT:  THANK YOU.  WELL, LET ME TALK ABOUT THE

11:44AM 14   OTHER GUIDELINE ENHANCEMENTS, IF YOU WILL NOW.

11:44AM 15            MR. LEACH:  SURE, YOUR HONOR.

11:44AM 16            MS. WALSH:  AND MR. COOPERSMITH IS GOING TO ADDRESS

11:44AM 17   THOSE.

11:44AM 18            THE COURT:  SURE.

11:44AM 19            MS. WALSH:  WE'LL DO ANOTHER SWITCH.

11:44AM 20            THE COURT:  SURE.  OKAY.  AND I THINK WHAT WE'LL DO

11:44AM 21   IS GO THROUGH THESE OTHER TWO ENHANCEMENTS, WE'LL TAKE A BREAK,

11:44AM 22   AND THEN WE'LL COME BACK AND FINISH UP OUR GUIDELINE

11:44AM 23   CALCULATION AND THEN MOVE ON.

11:44AM 24            MR. LEACH:  THANK YOU, YOUR HONOR.

11:44AM 25            THE COURT:  I'M NOW AT OBJECTION TWENTY-FOUR, WHICH

60

| | | |
|---|---|---|
| 11:44AM | 1 | IS THE AGGRAVATING ROLE, AND THIS IS THE 4 POINT ENHANCEMENT |
| 11:45AM | 2 | FOR ORGANIZER OR LEADER UNDER 3B1.1(A), AND EVERYBODY KNOWS I |
| 11:45AM | 3 | DID NOT FIND THAT IN THE COMPANION CASE. |
| 11:45AM | 4 | MR. COOPERSMITH, DID YOU WANT TO BE HEARD ON THIS? |
| 11:45AM | 5 | MR. COOPERSMITH:  YOUR HONOR, I'M HAPPY TO BE HEARD. |
| 11:45AM | 6 | TO TRY TO MAKE THIS AS EFFICIENT AS POSSIBLE, IF THE COURT IS |
| 11:45AM | 7 | INCLINED TO APPLY THAT IN THE CASE OF MR. BALWANI, I CERTAINLY |
| 11:45AM | 8 | WOULD HAVE A LOT TO SAY.  IF THE COURT IS NOT INCLINED, I WILL |
| 11:45AM | 9 | HAVE A LOT LESS TO SAY. |
| 11:45AM | 10 | BUT I'LL SAY THIS IN BRIEF IS THAT AS I UNDERSTAND THE |
| 11:45AM | 11 | COURT'S RULING IN ELIZABETH HOLMES'S CASE, THE COURT DID NOT |
| 11:45AM | 12 | APPLY IT BECAUSE UNDER THE HOLDEN CASE IN THE NINTH CIRCUIT, IN |
| 11:45AM | 13 | ORDER TO BE AN ORGANIZER OR LEADER, TO GET ANY OF THE |
| 11:45AM | 14 | ADJUSTMENTS, WHETHER IT'S 2 POINTS OR 4 POINTS UNDER 3B1.1, YOU |
| 11:45AM | 15 | WOULD HAVE TO BE DIRECTING, ORGANIZING, LEADING ANOTHER |
| 11:45AM | 16 | CRIMINAL PARTICIPANT. |
| 11:46AM | 17 | AND AS THE COURT NOTED IN THE HOLMES SENTENCING, THE ONLY |
| 11:46AM | 18 | CRIMINAL PARTICIPANTS AT ISSUE HERE ALLEGEDLY ARE MR. BALWANI |
| 11:46AM | 19 | AND MS. HOLMES. |
| 11:46AM | 20 | THE COURT:  WELL, THE JURY FOUND THAT. |
| 11:46AM | 21 | MR. COOPERSMITH:  YES, I UNDERSTAND THAT.  AND FOR |
| 11:46AM | 22 | PURPOSES OF THE SENTENCING, WE OBVIOUSLY ARE RESPECTING THE |
| 11:46AM | 23 | VERDICT AND THAT'S WHY WE'RE HERE. |
| 11:46AM | 24 | BUT WITH REGARD TO THE CRIMINAL PARTICIPANTS, WE HAVE |
| 11:46AM | 25 | MS. HOLMES AND MR. BALWANI. |

ER-99

11:46AM 1    THE COURT DID NOT BELIEVE THAT MS. HOLMES WAS LEADING

11:46AM 2    MR. BALWANI, ALTHOUGH THERE ARE INDICATIONS IN THIS CASE THAT

11:46AM 3    THAT IS THE CASE, SHE WAS THE CEO, AND SHE HAD THE ABILITY TO

11:46AM 4    FIRE HIM AND SO FORTH.

11:46AM 5    THE COURT:  RIGHT.  BUT THE JURY FOUND WHAT THEY DID

11:46AM 6    AND WE'RE HERE TO DETERMINE WHETHER OR NOT THIS COURT IN ITS

11:46AM 7    SENTENCING DECISION SHOULD APPLY A LEADERSHIP ROLE TO YOUR

11:46AM 8    CLIENT.

11:46AM 9    I DIDN'T IN THE HOLMES CASE.  AND MAYBE WE SHOULD -- I

11:46AM 10   DON'T MEAN TO INTERRUPT YOU, BUT MAYBE I'LL TAKE YOUR

11:46AM 11   INVITATION TO SAY, WELL, IF YOU'RE NOT GOING TO GIVE IT, I

11:46AM 12   DON'T HAVE ANYTHING TO SAY, JUDGE.

11:46AM 13   SO LET'S TURN TO MR. LEACH.

11:46AM 14   MR. LEACH, SHOULD I GIVE THIS?  SHOULD THIS APPLY?

11:47AM 15   MR. LEACH:  I WAS HERE WHEN YOUR HONOR ELECTED NOT

11:47AM 16   TO GIVE IT.  SO I RESPECT THE COURT'S RULING, AND I DON'T WANT

11:47AM 17   TO REPEAT OURSELF, AND WE'RE NOT WRITING ON A BLANK SLATE HERE.

11:47AM 18   THE COURT:  SURE.

11:47AM 19   MR. LEACH:  THE ONLY POINT I WOULD MAKE -- AND WE DO

11:47AM 20   WANT TO PRESERVE OUR ARGUMENTS ON THIS.

11:47AM 21   THE COURT:  YES, OF COURSE.

11:47AM 22   MR. LEACH:  THE ONLY NUANCE I WOULD POINT OUT IS

11:47AM 23   THERE'S A COMPLICATED RELATIONSHIP BETWEEN ELIZABETH HOLMES AND

11:47AM 24   SUNNY BALWANI, AND I THINK THE TEXTS REVEAL AND THE EVIDENCE

11:47AM 25   REVEALS THAT THERE WERE TIMES PARTICULARLY WHEN YOU LOOK AT IT

| | | |
|---|---|---|
| 11:47AM | 1 | COUNT BY COUNT WHERE MR. BALWANI WAS LEADING AND WHERE |
| 11:47AM | 2 | MS. HOLMES WAS LEADING. |
| 11:47AM | 3 | TAKE, FOR EXAMPLE, PFM, MR. GROSSMAN, THERE WAS AN INITIAL |
| 11:47AM | 4 | MEETING BETWEEN MS. HOLMES AND MR. BALWANI AND THEN MUCH, IF |
| 11:47AM | 5 | NOT ALL, OF THE REMAINING ENGAGEMENT WAS BETWEEN MR. BALWANI |
| 11:47AM | 6 | AND MR. GROSSMAN. AND I THINK THERE'S A WAY TO LOOK AT THOSE |
| 11:47AM | 7 | FACTS AND SAY AT LEAST ON THAT COUNT, MR. BALWANI IS LEADING IN |
| 11:47AM | 8 | THAT SITUATION. |
| 11:47AM | 9 | NOW, THAT'S NOT TO SAY THAT THEY DON'T HAVE |
| 11:47AM | 10 | RESPONSIBILITY, THAT'S NOT TO SAY ONE IS CONTROLLING THE OTHER, |
| 11:48AM | 11 | BUT IF YOU LOOK AT IT IN PARTICULAR SITUATIONS, THERE ARE TIMES |
| 11:48AM | 12 | WHEN MS. HOLMES DEFERS TO HIM AND THERE ARE TIMES WHEN HE |
| 11:48AM | 13 | DEFERS TO HER. |
| 11:48AM | 14 | AND THERE'S JUST SOMETHING ODD ABOUT THIS CASE WHERE YOU |
| 11:48AM | 15 | HAVE THE CEO OF A COMPANY AND THE COO OF A COMPANY AND NEITHER |
| 11:48AM | 16 | ONE OF THEM IS THE LEADER. |
| 11:48AM | 17 | BUT BEYOND THAT, I THINK THE COURT UNDERSTANDS THOSE |
| 11:48AM | 18 | ISSUES. IT WAS A COMPLICATED RELATIONSHIP. WE MADE THE |
| 11:48AM | 19 | ARGUMENT THAT IT WAS OTHERWISE EXTENSIVE. THE COURT WENT THE |
| 11:48AM | 20 | OTHER WAY ON THAT POINT, AND WE UNDERSTAND THAT. |
| 11:48AM | 21 | SO THOSE ARE THE ONLY NUANCES THAT I WANTED TO POINT OUT |
| 11:48AM | 22 | AND WITH THAT I'LL SUBMIT. |
| 11:48AM | 23 | THE COURT: THANK YOU. AND THEY'RE APPROPRIATE. I |
| 11:48AM | 24 | THINK ALL OF US AGREE THE CASE WAS COMPLICATED AND NUANCED IN |
| 11:48AM | 25 | MANY WAYS, AND WE ALSO ARE GUIDED BY THE CASES THAT SAY THAT |

11:48AM 1    THERE CAN BE CO-LEADERS, AND IF THERE'S CO-LEADERS,

11:48AM 2    CO-CAPTAINS, THERE ISN'T A CAPTAIN DESIGNATED PER SE.

11:49AM 3         ANYTHING ELSE YOU WANT TO SAY ABOUT THIS, MR. COOPERSMITH?

11:49AM 4              MR. COOPERSMITH:  JUST BRIEFLY, YOUR HONOR.

11:49AM 5         WE UNDERSTAND UNDER THE HOLDEN CASE AND IF THEY ARE IN

11:49AM 6    FACT CO-LEADERS, THAT THE ADJUSTMENT WOULD NOT BE APPLIED TO

11:49AM 7    MR. BALWANI JUST LIKE IT WAS NOT APPLIED TO MS. HOLMES.

11:49AM 8         BUT I WILL SAY, AND THIS MAY BE COMING UP IN REMARKS

11:49AM 9    RELEVANT TO OTHER PORTIONS OF THE SENTENCING, YOUR HONOR, WE

11:49AM 10   REJECT THE IDEA THAT THEY WERE CO-LEADERS.

11:49AM 11        THE GOVERNMENT SAID OVER AND OVER AGAIN IN VARIOUS

11:49AM 12   CONTEXTS, INCLUDING THE SENTENCING MEMO IN MS. HOLMES'S CASE,

11:49AM 13   THAT MS. HOLMES WAS ULTIMATELY RESPONSIBLE.  SHE WAS THE CEO,

11:49AM 14   SHE WAS THE FACE OF THERANOS, SHE HAD THE ABILITY TO FIRE

11:49AM 15   MR. BALWANI.

11:49AM 16        SO WE DON'T AGREE WITH THAT.

11:49AM 17             THE COURT:  WELL, ALL OF THAT WAS TRUE.

11:49AM 18             MR. COOPERSMITH:  ALL OF THAT WAS TRUE, YEAH.

11:49AM 19             THE COURT:  RIGHT.

11:49AM 20             MR. COOPERSMITH:  BUT FOR PURPOSES OF THIS GUIDELINE

11:49AM 21   ENHANCEMENT, IF THEY ARE CO-LEADERS, EVEN IF THAT WERE THE

11:49AM 22   CASE, THESE GUIDELINE ADJUSTMENTS WOULD NOT BE APPLIED.  AND,

11:49AM 23   OF COURSE, IT CERTAINLY WOULDN'T BE APPLIED IF WHAT WE SAY IS

11:49AM 24   RIGHT, IT WAS ACTUALLY MS. HOLMES WHO WAS THE LEADER OF THIS

11:49AM 25   COMPANY AND OF MR. BALWANI.

| | | |
|---|---|---|
| 11:49AM | 1 | SO I THINK I'LL STOP THERE UNLESS THE COURT HAS MORE |
| 11:50AM | 2 | QUESTIONS.  WE DON'T THINK THE GUIDELINE ADJUSTMENT SHOULD BE |
| 11:50AM | 3 | APPLIED. |
| 11:50AM | 4 | THE COURT:  OKAY.  THANK YOU. |
| 11:50AM | 5 | THANK YOU.  LET'S TURN TO THE 2B1.1(B)(16), WHICH IS THE |
| 11:50AM | 6 | SERIOUS BODILY INJURY ENHANCEMENT.  THE GOVERNMENT IS URGING |
| 11:50AM | 7 | THIS OR SUGGESTS THAT THE COURT SHOULD APPLY THIS. |
| 11:50AM | 8 | I DONT THINK PROBATION -- DID YOU RECOMMEND THIS, |
| 11:50AM | 9 | MS. GOLDSBERRY? |
| 11:50AM | 10 | PROBATION OFFICER:  NOT IN THE FINAL REPORT, |
| 11:50AM | 11 | YOUR HONOR. |
| 11:50AM | 12 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:50AM | 13 | SO, MR. LEACH, WHAT SHOULD I KNOW ABOUT THIS? |
| 11:50AM | 14 | MR. LEACH:  THERE'S A SIGNIFICANT DIFFERENCE BETWEEN |
| 11:50AM | 15 | MS. HOLMES AND MR. BALWANI ON THIS POINT, YOUR HONOR, AND THAT |
| 11:50AM | 16 | IS MR. BALWANI WAS CONVICTED OF A CONSPIRACY TO DEFRAUD |
| 11:50AM | 17 | PATIENTS ABOUT THEIR BLOOD TESTS AND FOR FOUR INDIVIDUAL COUNTS |
| 11:50AM | 18 | OF WIRE FRAUD WITH RESPECT TO THREE PATIENTS WHO TESTIFIED IN |
| 11:50AM | 19 | AN AD TO THE MEDIA. |
| 11:50AM | 20 | SO WE HAVE A FINDING BY THE JURY THAT MR. BALWANI ENGAGED |
| 11:50AM | 21 | IN A CONSPIRACY TO PROVIDE FALSE AND MISLEADING INFORMATION TO |
| 11:51AM | 22 | PAYING PATIENTS WHO ARE GOING TO RELY ON THESE BLOOD TESTS. |
| 11:51AM | 23 | AND THERE'S A CASE THAT I KNOW THE COURT IS -- AND WE THINK |
| 11:51AM | 24 | THIS FACTUAL SCENARIO FOUND BY THE JURY FALLS SQUARELY WITHIN |
| 11:51AM | 25 | NINTH CIRCUIT CASE LAW. |

11:51AM 1      I THINK THE JOHANSSON CASE, WHICH WE CITE --

11:51AM 2          THE COURT:  249 FED. 3D?

11:51AM 3          MR. LEACH:  YES, YOUR HONOR.  YOU'RE FASTER THAN I

11:51AM 4      AM.

11:51AM 5      I THINK THAT'S VERY INSTRUCTIVE.  I MEAN, THAT'S WHERE

11:51AM 6      THERE WAS FALSIFICATION OF REPORTS ABOUT DRIVERS MEETING OR NOT

11:51AM 7      MEETING THE LIMIT, THE SLEEPING LIMIT BEFORE THEY HAD TO BE

11:51AM 8      TAKEN OFF THE ROAD, AND THOSE DOCUMENTS WERE FALSIFIED.  AND

11:51AM 9      THE NINTH CIRCUIT THERE FOUND THAT THERE WERE SUFFICIENT FACTS

11:51AM 10     TO SAY THAT THAT SCENARIO IS AN OFFENSE WITH A CONSCIOUS OR

11:51AM 11     RECKLESS DISREGARD OF SERIOUS BODILY INJURY.

11:51AM 12     I FAIL TO SEE THE DISTINCTION BETWEEN OUR TWO SITUATIONS

11:51AM 13     HERE.  THERE WAS AMPLE EVIDENCE IN THE RECORD THAT THERANOS WAS

11:51AM 14     PROVIDING FALSE AND MISLEADING BLOOD TESTS AND THAT MR. BALWANI

11:52AM 15     WAS CONSPIRING TO DO THAT TO PATIENTS.

11:52AM 16     THE JURY FOUND THAT HE ACTED WILLFULLY WITH RESPECT TO

11:52AM 17     THAT AND WITH INTENT TO DEFRAUD.

11:52AM 18     THE RESPONSE I HEAR FROM MR. COOPERSMITH IS, WELL,

11:52AM 19     MR. BALWANI WAS TRYING TO FIX PROBLEMS AS THEY AROSE, AND IF HE

11:52AM 20     WOULD SEE THIS, HE REACTED TO THAT.

11:52AM 21     THAT MIGHT BE TRUE OR THAT MIGHT NOT BE TRUE ACCORDING TO

11:52AM 22     THE EVIDENCE, BUT IT DOESN'T SEEM TO US THAT THAT'S SOMETHING

11:52AM 23     THAT YOU CAN SAY IN LIGHT OF THE VERDICT, AND I THINK IT'S

11:52AM 24     IMPORTANT THAT COUNT TWELVE GOES TO THE TIME PERIOD AUGUST OF

11:52AM 25     2015 LATE INTO THE CONSPIRACY.

11:52AM 1      SO WHAT MR. BALWANI WAS OR WAS NOT DOING I'M NOT SURE IS

11:52AM 2 PARTICULARLY RELEVANT, AND OUR BRIEF LAYS FORTH SOME OF THE

11:52AM 3 FACTS IN TERMS OF THE CONCERNS THAT ERIKA CHEUNG WAS RAISING,

11:52AM 4 THE CONCERNS THAT TYLER SHULTZ WAS RAISING, THE CONCERNS THAT

11:53AM 5 DR. PANDORI WAS RAISING WHEN HE WAS TOLD BY MR. BALWANI WHEN HE

11:53AM 6 SAYS WE SHOULD STOP DOING THE EDISON, WE'RE NOT GOING THAT.

11:53AM 7 THERE'S AMPLE EVIDENCE IN THE RECORD WHERE MR. BALWANI IS

11:53AM 8 ADVISED OF PROBLEMS AND YET THE TESTS CONTINUE TO BE ISSUED.

11:53AM 9      AND I THINK ONE POINT WE MENTION IN OUR BRIEF IS THERE IS

11:53AM 10 AN INSTANCE WHERE DANIEL YOUNG IS RAISING SOME CONCERNS HE HAS

11:53AM 11 WITH TESTS, AND THE DEFENSE RAISED A LOT ABOUT DR. YOUNG AND

11:53AM 12 HIM NOT BEING CALLED IN THIS CASE, BUT THERE'S AN EMAIL FROM

11:53AM 13 HIM THAT SAID -- WHERE DR. YOUNG IS RAISING SOME OF THESE

11:53AM 14 CONCERNS, EVEN THE INDIVIDUALS THAT THE DEFENSE WAS POINTING TO

11:53AM 15 AS THEIR GO-TO PERSON FOR THEIR PROBLEMS.  AND MR. BALWANI'S

11:53AM 16 RESPONSE TO THAT IS TELLING.  HE'S TOLD BY DR. YOUNG THAT THERE

11:53AM 17 ARE PROBLEMS IN THE FALL OF 2014, AND HE FORWARDS THAT TO

11:53AM 18 MS. HOLMES AND HE SAYS, "ALWAYS ANOTHER STUDY AFTER THE FACT."

11:53AM 19      WHAT DOES THAT MEAN?  THAT MEANS THAT HE KNOWS, TIME AND

11:53AM 20 TIME AGAIN, THERANOS IS GOING TO MARKET WITH SOMETHING BASED ON

11:54AM 21 A VALIDATION PROCESS THAT TURNS OUT NOT TO BE WORKING, ANOTHER

11:54AM 22 STUDY AFTER THE FACT.

11:54AM 23      DR. YOUNG IS PROPOSING, WELL, WE ALREADY WENT TO MARKET

11:54AM 24 WITH THIS PROBLEM, IT'S NOT WORKING.  LET'S GO DO ANOTHER STUDY

11:54AM 25 TO TRY TO FIGURE OUT WHAT THE ISSUE IS.  AND THAT'S NOT

11:54AM 1    HAPPENING WITH ONE ASSAY IN AUGUST OF 2014, THAT'S HAPPENING IN

11:54AM 2    MULTIPLE ASSAYS, AND MR. BALWANI KNOWS THIS.  AND ALL OF THIS

11:54AM 3    IS BEFORE THE SITUATION WHERE DR. ROSENDORFF LEAVES AFTER

11:54AM 4    TELLING MS. HOLMES IN A COMMUNICATION THAT GOES TO MR. BALWANI

11:54AM 5    THAT HE'S BEING ASKED TO VOUCH FOR TESTS THAT HE'S NOT

11:54AM 6    COMFORTABLE WITH, WHERE MR. BALWANI GOES TO THE LAB AND SAYS

11:54AM 7    IT'S AN F'ING DISASTER.

11:54AM 8         SO THERE IS BEYOND A REASONABLE DOUBT EVIDENCE THAT

11:54AM 9    MR. BALWANI CONSPIRED TO DEFRAUD PATIENTS TO GIVE THEM FALSE

11:54AM 10   AND UNRELIABLE INFORMATION, AND THAT FACT COMPELS THE

11:54AM 11   FINDING -- A FINDING UNDER THIS GUIDELINE THAT THE OFFENSE

11:55AM 12   INVOLVED A CONSCIOUS OR A KNOWING RISK OF SERIOUS BODILY

11:55AM 13   INJURY.

11:55AM 14        I JUST DON'T THINK WHATEVER HE IS DOING, YOU KNOW, IN

11:55AM 15   RESPONSE TO INDIVIDUAL ASSAYS MATTERS AT THE END OF THE DAY IN

11:55AM 16   LIGHT OF THE JURY FINDING.

11:55AM 17        SO FOR THOSE REASONS WE THINK THIS ENHANCEMENT IS

11:55AM 18   APPROPRIATELY APPLIED.

11:55AM 19             THE COURT:  THANK YOU.

11:55AM 20             MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:55AM 21        THIS IS ONE THAT THE PROBATION OFFICE GOT RIGHT BY NOT

11:55AM 22   RECOMMENDING THIS ADJUSTMENT, AND IT'S ALSO ONE THAT THE COURT

11:55AM 23   GOT RIGHT IN MS. HOLMES'S CASE.  LET ME ADDRESS MR. LEACH'S

11:55AM 24   ARGUMENTS AND SAY A FEW OTHER THINGS.

11:55AM 25        FIRST OF ALL, WE'RE TALKING ABOUT GUIDELINE ADJUSTMENT FOR

11:55AM 1    CONSCIOUS RISK OF CREATING -- CONSCIOUS CREATION OF A RISK OF

11:55AM 2    SERIOUS BODILY INJURY OR DEATH.

11:55AM 3        THE LAW ON THAT, JUST TO START WITH THAT, IS IT HAS TO BE

11:55AM 4    EITHER KNOWING OR RECKLESS, WHICH UNDER THE NINTH CIRCUIT

11:55AM 5    STANDARD, AND THIS IS ON PAGE 33 AND 34 OF OUR SENTENCING

11:56AM 6    MEMORANDUM, IT HAS TO BE RECKLESS.  IT IS SO OUTSIDE OF THE

11:56AM 7    PALE THAT THE DEFENDANT MUST ACTUALLY KNOW.  IT'S AS CLOSE AN

11:56AM 8    ANALOGY THAT YOU COULD POSSIBLY GET.

11:56AM 9        SO IN THIS CASE WE'VE GOT A JURY VERDICT, AS MR. LEACH

11:56AM 10   SAID, AND THE VERDICT WAS FINDING MR. BALWANI GUILTY OF PATIENT

11:56AM 11   COUNTS AND OF CONSPIRACY.  THAT IS TRUE, AND WE'RE NOT ARGUING

11:56AM 12   THAT AGAIN TODAY, OF COURSE.

11:56AM 13       BUT THE JURY VERDICT IS A GENERAL VERDICT.  AND AS WE

11:56AM 14   POINTED OUT IN OUR PAPERS, WE DON'T KNOW WHY THE JURY DECIDED

11:56AM 15   TO CONVICT MR. BALWANI ON THAT COUNT, BUT BY THAT SAME TOKEN,

11:56AM 16   WE DON'T KNOW WHY THE JURY DECIDED NOT TO CONVICT MS. HOLMES ON

11:56AM 17   THOSE SAME COUNTS, EVEN THOUGH THE GOVERNMENT'S PRESENTATION

11:56AM 18   WAS VIRTUALLY IDENTICAL IN BOTH CASES.

11:56AM 19       AND THE GOVERNMENT ARGUED IN MOTION PRACTICE AND IN

11:56AM 20   CLOSING ARGUMENT THAT ONE OF THE THEORIES OF WHY MR. BALWANI

11:56AM 21   WAS GUILTY OF THESE PATIENT COUNTS AND CONSPIRACY WAS THAT

11:57AM 22   PATIENTS HAD BEEN TOLD THERANOS LABORATORY RESULTS ARE MORE

11:57AM 23   ACCURATE, THEY'RE BETTER THAN OTHER COMPETITORS, YOU SHOULD GO

11:57AM 24   TO THERANOS.  THEY ARGUED THAT.  AND FOR ALL WE KNOW BASED ON

11:57AM 25   THE GENERAL VERDICT, THE JURY WOULD HAVE LATCHED ON TO THAT AND

11:57AM 1    SAID, OKAY, THAT'S A MISREPRESENTATION THAT WE'RE GOING TO FIND

11:57AM 2    GUILT ON.

11:57AM 3        SO THE VERDICT DOESN'T HELP US HERE IN TERMS OF WHETHER

11:57AM 4    THIS GUIDELINE ADJUSTMENT SHOULD BE APPLIED.

11:57AM 5        AND WHEN WE TALK ABOUT SENTENCING IS THE PROVINCE OF THE

11:57AM 6    COURT, NOT THE JURY, AND YOUR HONOR HAS TO DECIDE THESE

11:57AM 7    DIFFICULT QUESTIONS.

11:57AM 8        I WENT BACK TO THIS COURT'S RULING ON OUR RULE 29 MOTION,

11:57AM 9    AND THAT'S DOCKET 1625, AND WHEN YOU LOOK AT THAT, ESPECIALLY

11:57AM 10   PAGE 9 AND 10, THERE'S A LOT OF POINTS THAT THIS COURT MADE

11:57AM 11   ABOUT WHY MS. HOLMES KNEW FULL WELL, ACCORDING TO THE COURT'S

11:58AM 12   OPINION, THAT THE LABORATORY HAD ALL OF THESE ISSUES.

11:58AM 13       SO THE SAME EVIDENCE APPLIED TO MS. HOLMES.  FOR EXAMPLE,

11:58AM 14   IF THIS IS REALLY THE CASE, MR. LEACH POINTS OUT THAT

11:58AM 15   MR. BALWANI WROTE AN EMAIL TO MS. HOLMES AND SAID "ALWAYS

11:58AM 16   ANOTHER STUDY AFTER THE FACT."

11:58AM 17       WELL, MS. HOLMES GOT THAT EMAIL.  SO SHE HAS THE SAME

11:58AM 18   KNOWLEDGE AS MR. BALWANI IF THAT IS AN ISSUE.

11:58AM 19       WE DON'T THINK THAT'S WHAT IT MEANT.  BUT GIVEN

11:58AM 20   MR. LEACH'S ARGUMENT, WE DON'T UNDERSTAND HOW IT COULD BE

11:58AM 21   APPLIED TO MR. BALWANI AND NOT MS. HOLMES.  AND THE COURT, OF

11:58AM 22   COURSE, MADE THAT RULING IN MS. HOLMES'S CASE.

11:58AM 23       BY THE SAME TOKEN, IF THE TEXT MESSAGE "NORMANDY IS AN

11:58AM 24   F'ING DISASTER" IS WHAT MR. LEACH THINKS IT IS, SHE HAD THAT

11:58AM 25   SAME TEXT MESSAGE.  THE SAME EVIDENCE APPLIED TO HER AS IT WAS

11:58AM  1    TO MR. BALWANI, AND SHE WASN'T GIVEN THE ADJUSTMENT.  SO OUT OF

11:58AM  2    BASIC FAIRNESS, IT SHOULDN'T APPLY TO MR. BALWANI.

11:58AM  3        AGAIN, WE DON'T NEED TO DEBATE THIS NOW, BUT WE DON'T

11:59AM  4    BELIEVE THAT TEXT MESSAGE MEANT WHAT THE GOVERNMENT SAID, BUT I

11:59AM  5    DON'T NEED TO GO INTO THAT FOR THIS PURPOSE.

11:59AM  6        SO WHY SHOULDN'T THE GUIDELINE ADJUSTMENT BE APPLIED?  AND

11:59AM  7    THERE ARE A LOT OF REASONS.

11:59AM  8        FIRST OF ALL -- AND I WANT TO JUST HAND UP SOMETHING TO

11:59AM  9    THE COURT IF I CAN WITH YOUR PERMISSION, YOUR HONOR, AND I'LL

11:59AM  10   GIVE IT TO THE GOVERNMENT, TOO.  BUT THIS HAD TO DO WITH THE

11:59AM  11   BLOOD TESTING THAT MR. BALWANI ARRANGED FOR HIS MOTHER TO

11:59AM  12   HAVE --

11:59AM  13            THE COURT:  YOU DON'T HAVE TO PASS THAT UP.  I'VE

11:59AM  14   SEEN IT.

11:59AM  15            MR. COOPERSMITH:  I DON'T THINK YOU'VE SEEN IT.

11:59AM  16            THE COURT:  YOU PUT SOMETHING IN THE RECORD OR AT

11:59AM  17   LEAST ONE OF THE SUBMISSIONS WERE RELATIVE'S TESTS, BLOOD

11:59AM  18   TESTS.

11:59AM  19            MR. COOPERSMITH:  YES, YOUR HONOR.

11:59AM  20            THE COURT:  AND IF YOU'RE OFFERING THIS FOR AN

11:59AM  21   ARGUMENT TO SAY WOULD HE DO THIS TO A RELATIVE?  WOULD HE ALLOW

11:59AM  22   A RELATIVE TO TAKE A TEST IF HE HAD CONSCIOUS KNOWLEDGE?  IS

11:59AM  23   THAT WHAT THE PURPOSE OF THIS IS?

11:59AM  24            MR. COOPERSMITH:  YES, YOUR HONOR.

11:59AM  25            THE COURT:  I UNDERSTAND THAT.

| | |
|---|---|
| 11:59AM | 1 |

11:59AM    1        MR. COOPERSMITH: WHAT I'LL SAY -- AND I WON'T HAND

11:59AM    2    IT UP. BUT WHAT I WILL TELL THE COURT IS THAT WE LOOKED AT THE

11:59AM    3    BLOOD TESTS THAT MR. BALWANI'S MOTHER ACTUALLY HAD BASED ON THE

12:00PM    4    REPORT THAT WE HAVE IN EXHIBIT 20, I BELIEVE, AND TO MY

12:00PM    5    DECLARATION IN THE SENTENCING MEMORANDUM, WE LOOKED AT THE

12:00PM    6    ACTUAL BLOOD TEST SHE TOOK BECAUSE MR. LEACH SAID, WELL, WE

12:00PM    7    DON'T KNOW IF IT'S ACTUALLY FINGERSTICK, RIGHT?

12:00PM    8        SO WE LOOKED AT ALL OF THE TESTS THAT SHE HAD, AND WE

12:00PM    9    DETERMINED, AND THAT'S WHAT OUR HANDOUT SAYS, THAT EVERY SINGLE

12:00PM   10    ONE OF THOSE TESTS THAT HIS MOTHER HAD IN MARCH OF 2015 WERE

12:00PM   11    AVAILABLE AT THERANOS ON FINGERSTICK.

12:00PM   12        IN ADDITION, MR. BALWANI'S SISTER WHO SENT A LETTER TO THE

12:00PM   13    COURT, RUPA PAWANI, SAID SHE WAS THERE WHEN MR. BALWANI'S

12:00PM   14    MOTHER HAD FINGERSTICK.

12:00PM   15        AND THEN THE OTHER THING I'LL SAY ABOUT THAT, YOUR HONOR,

12:00PM   16    IS THAT OF COURSE THERE'S NO EVIDENCE HERE THAT -- WE KNOW HIS

12:00PM   17    MOTHER DID HAVE THE BLOOD TEST. THE REPORT IS IN THE RECORD.

12:00PM   18        THERE'S NO EVIDENCE HERE THAT MR. BALWANI SOMEHOW TOLD THE

12:00PM   19    LAB, OH, YOU KNOW, WHATEVER YOU DO, DON'T DO FINGERSTICK. HIS

12:00PM   20    MOTHER HAD A BLOOD TEST, A SERIES OF BLOOD TESTS. THOSE WERE

12:01PM   21    DUTIFULLY DONE BY THE LAB, AND THE RESULTS WERE REPORTED.

12:01PM   22        AND THAT FACT ALONE, I THINK, NEGATES ANY SUGGESTION THAT

12:01PM   23    MR. BALWANI IS PUTTING PATIENTS CONSCIOUSLY OR RECKLESSLY IN

12:01PM   24    DANGER AS THE GOVERNMENT ARGUES BECAUSE HE'S NOT GOING TO DO

12:01PM   25    THAT TO HIS OWN MOTHER AND OBVIOUSLY THAT POINT THE COURT

| | | |
|---|---|---|
| 12:01PM | 1 | UNDERSTANDS. |
| 12:01PM | 2 | SO IN ADDITION, THOUGH, THERE'S A LOT MORE, YOUR HONOR, |
| 12:01PM | 3 | AND THAT IS WHAT ACTUALLY HAPPENED HERE.  WHEN YOU LOOK AT THE |
| 12:01PM | 4 | WHOLE HISTORY OF THE THERANOS LABORATORY THAT WAS IN OPERATION |
| 12:01PM | 5 | BETWEEN 2013 TO 2015, IN HINDSIGHT YOU CAN LOOK AT THINGS LIKE |
| 12:01PM | 6 | THE CMS REPORT AND, YOU KNOW, SOME OF THE THINGS THAT DR. DAS |
| 12:01PM | 7 | SAID IN MS. HOLMES'S CASE AND SAY, WELL, MAYBE THEY SHOULD HAVE |
| 12:01PM | 8 | DONE THINGS A LITTLE DIFFERENTLY.  BUT IN REAL TIME, THOSE |
| 12:01PM | 9 | AFTER-THE-FACT REPORTS DON'T BEAR ON WHAT MR. BALWANI WAS |
| 12:01PM | 10 | TRYING TO DO OR NOT DO AS FAR AS PATIENT RISK AT THE TIME. |
| 12:01PM | 11 | WHEN YOU LOOK AT IT IN REAL TIME, EVERY SINGLE TIME THAT |
| 12:02PM | 12 | AN ISSUE WAS RAISED, MR. BALWANI DIDN'T SAY, WELL, SO WHAT, YOU |
| 12:02PM | 13 | KNOW, WE DON'T CARE.  IT WAS, LET'S GET TO THE BOTTOM OF THIS. |
| 12:02PM | 14 | WHEN THERE WERE EMAILS AFTER EMAILS WHERE LET'S FIGURE |
| 12:02PM | 15 | OUT WHAT IS GOING ON HERE, LET'S STOP TESTING UNTIL WE FIGURE |
| 12:02PM | 16 | OUT WHAT THE PROBLEM IS, LET'S DO STUDIES. |
| 12:02PM | 17 | AND THERE ARE SOME EXAMPLES THAT I THINK REALLY JUMP OUT, |
| 12:02PM | 18 | AT LEAST FOR ME.  FOR EXAMPLE, ON MAY 30TH, 2014, THE COURT |
| 12:02PM | 19 | PROBABLY REMEMBERS THIS, DR. ROSENDORFF SENT AN EMAIL THAT SAID |
| 12:02PM | 20 | STOP HCG TESTING ON THE THERANOS EDISON DEVICE, AND THAT'S THE |
| 12:02PM | 21 | PREGNANCY RELATED TEST THAT YOU'VE HEARD ABOUT. |
| 12:02PM | 22 | WELL, WHAT HAPPENED?  THEY DID STOP.  AND THEY STOPPED |
| 12:02PM | 23 | UNTIL THE SCIENTIFIC TEAM AND THE LAB COULD LOOK AT WHAT WAS |
| 12:02PM | 24 | GOING ON, AND WITHIN A FEW DAYS, THEY HAD DONE SOME STUDIES, |
| 12:02PM | 25 | AND THE LABORATORY TEAM SENT EMAILS TO DR. ROSENDORFF, NOT |

12:02PM 1    MR. BALWANI, AND SAID OKAY, WE'RE RELEASING THE RESULTS, WE

12:03PM 2    THINK WE'VE GOT THIS, AND DR. ROSENDORFF DIDN'T DO ANYTHING.

12:03PM 3    SO OKAY.  RIGHT.  SO THAT'S WHAT IS GOING ON HERE.

12:03PM 4        SO TO BLAME THIS ON MR. BALWANI WHERE HE'S CREATING A

12:03PM 5    CONSCIOUS RISK, THAT'S THE LAST THING THAT ANYONE WOULD WANT TO

12:03PM 6    DO RUNNING A COMPANY LIKE THIS.  HE RELIED ON THE SCIENTIFIC

12:03PM 7    TEAM.  DR. ROSENDORFF TESTIFIED THAT HE STOOD BY HIS VALIDATION

12:03PM 8    REPORTS.  DR. ROSENDORFF SAID HE NEVER RELEASED, KNOWINGLY

12:03PM 9    RELEASED A RESULT THAT HE THOUGHT WAS INACCURATE.

12:03PM 10       MR. BALWANI HAD A LOT OF DATA THAT WAS PRESENTED TO HIM,

12:03PM 11   INCLUDING THE AAP REPORTS THAT YOU SAW AT TRIAL AND A LOT OF

12:03PM 12   OTHER MATERIALS THAT ASSURED HIM THAT THE LAB WAS NOT RELEASING

12:03PM 13   INACCURATE RESULTS TO PATIENTS.

12:03PM 14       AND THEN THE QC ISSUE WHICH THE GOVERNMENT MENTIONED IN

12:03PM 15   THEIR PAPERS, OF COURSE QC, QUALITY CONTROL, IS SOMETHING THAT

12:03PM 16   YOU DO.  AND AS THE TESTIMONY AT TRIAL SHOWED, YOU DON'T

12:03PM 17   RELEASE THE RESULT UNTIL -- UNLESS THE QUALITY CONTROL PASSES.

12:04PM 18   SO THERE WAS NO EVIDENCE IN THIS CASE THAT MR. BALWANI DECIDED

12:04PM 19   LET'S RELEASE RESULTS ANYWAY EVEN IF THE QUALITY CONTROL FAILS.

12:04PM 20   THAT JUST NEVER HAPPENED.

12:04PM 21       SO I THINK FOR ALL OF THESE REASONS, INCLUDING THAT THERE

12:04PM 22   WERE MILLIONS OF TESTS HERE AND THE GOVERNMENT PRESENTED A

12:04PM 23   RELATIVELY SMALL HANDFUL, WE DON'T THINK THIS GUIDELINE

12:04PM 24   ADJUSTMENT SHOULD BE APPLIED TO MR. BALWANI ANY MORE THAN IT

12:04PM 25   COULD HAVE BEEN APPLIED TO MS. HOLMES, AND WE THINK THAT'S THE

12:04PM  1    RIGHT ACTION IN THIS CASE.

12:04PM  2              THE COURT:  OKAY.  ANYTHING FURTHER, MR. LEACH?

12:04PM  3              MR. LEACH:  TWO BRIEF POINTS, YOUR HONOR.

12:04PM  4         THE FIRST IS AT LEAST IN THE CONTEXT OF SENTENCING FOR

12:04PM  5    THIS GUIDELINE, THE COURT DOES NOT NEED TO FIND A MILLION TESTS

12:04PM  6    WERE WRONG.  THE COURT DOES NOT NEED A MILLION TESTS WERE

12:04PM  7    WRONG.  THE COURT NEEDS TO FIND THAT WITH RESPECT TO A PATIENT.

12:04PM  8    WE HAVE MULTIPLE PATIENTS TESTIFY IN THE TRIAL.

12:04PM  9    BRITTANY GOULD, THE COURT MAY RECALL, TESTIFIED ABOUT HER FALSE

12:05PM  10   HCG TEST WHICH HAPPENED AFTER THE PROBLEMS WERE PURPORTEDLY

12:05PM  11   FIXED THAT MR. COOPERSMITH DESCRIBE.  SO TO SAY THAT THERE

12:05PM  12   MIGHT HAVE BEEN SOME GOOD TESTS OUT THERE, DOES NOT RESPOND TO

12:05PM  13   WHETHER THE GUIDELINE APPLIES OR DOESN'T APPLY.

12:05PM  14        THE OTHER POINT I WOULD MAKE IS WE KNOW FROM THE CMS

12:05PM  15   REPORT AND FROM DR. DAS THAT THERANOS ITSELF CONCLUDED AT THE

12:05PM  16   END OF THE DAY THERE WAS A POSSIBLE PATIENT IMPACT FOR EVERY

12:05PM  17   ONE OF THE APPROXIMATELY 800,000 TESTS THAT WERE DONE ON THE

12:05PM  18   EDISON BETWEEN SEPTEMBER 2013 AND JUNE OF 2015.  ALL OF THOSE

12:05PM  19   WERE VOIDED, AND THERANOS ITSELF SAID THERE'S A POSSIBLE

12:05PM  20   PATIENT IMPACT.

12:05PM  21        SO WE HAVE FALSE DOCUMENTS GOING TO THE PATIENTS, WE HAVE

12:05PM  22   A POSSIBLE PATIENT IMPACT ON ALL OF THEM, WE HAVE A DEFENDANT

12:05PM  23   WHO IS CONVICTED OF WILLFULLY JOINING THE CONSPIRACY AND ACTING

12:05PM  24   WITH AN INTENT TO DEFRAUD THOSE PATIENTS, AND EVERYTHING THAT

12:05PM  25   MR. COOPERSMITH SAID IS A DISAGREEMENT WITH THE JURY'S FINDING

| | | |
|---|---|---|
| 12:05PM | 1 | THERE, AND I JUST DON'T SEE ANYTHING HE SAID THAT CAN |
| 12:06PM | 2 | CONTRAVENE WHAT THE JURY HAS FOUND IN THIS CASE. |
| 12:06PM | 3 | MR. COOPERSMITH: REALLY BRIEFLY, YOUR HONOR. |
| 12:06PM | 4 | WE'RE NOT ARGUING THE JURY'S FINDING AT THIS MOMENT. |
| 12:06PM | 5 | WHAT WE'RE SAYING IS THAT THE VERDICT DOESN'T GOVERN THIS |
| 12:06PM | 6 | BECAUSE WE DON'T KNOW WHY THEY CONVICTED GIVEN THE GOVERNMENT'S |
| 12:06PM | 7 | ARGUMENTS THAT THEY WERE TOLD THAT THERANOS WAS MORE ACCURATE. |
| 12:06PM | 8 | AND IF IT WAS JUST AS ACCURATE AS EVERY OTHER LAB IN THE |
| 12:06PM | 9 | COUNTRY, THAT WOULD NOT BE A REASON TO APPLY THIS FACTOR |
| 12:06PM | 10 | OBVIOUSLY. |
| 12:06PM | 11 | BUT JUST LET ME BRIEFLY MENTION BRITTANY GOULD SINCE |
| 12:06PM | 12 | MR. LEACH MENTIONED IT, AND ALSO DR. DAS. |
| 12:06PM | 13 | SO, FIRST OF ALL, ON BRITTANY GOULD, THE EMAILS THAT WERE |
| 12:06PM | 14 | INTRODUCED AT TRIAL SHOWED THAT THE PROBLEMS WERE RAISED TO |
| 12:06PM | 15 | MR. BALWANI'S LEVEL WHERE THERE WAS A PROBLEM WITH |
| 12:06PM | 16 | BRITTANY GOULD'S TEST AND MR. BALWANI WAS TOLD THAT THERE WAS A |
| 12:06PM | 17 | DECIMAL POINT ERROR IN THE RESULTS THAT WERE REPORTED TO HER |
| 12:06PM | 18 | AND HER POSITION. SO THAT'S NOT A REASON WHY MR. BALWANI WAS |
| 12:06PM | 19 | PUTTING SOMEONE AT RISK. |
| 12:06PM | 20 | AND AS I SAID BEFORE, THAT WAS AN HCG TEST WHICH OCCURRED |
| 12:07PM | 21 | SEVERAL MONTHS AFTER THAT INCIDENT THAT I JUST DESCRIBED WHERE |
| 12:07PM | 22 | DR. ROSENDORFF STOPPED THE TESTING, THERE WAS A STUDY DONE, AND |
| 12:07PM | 23 | THEN DR. ROSENDORFF ALLOWED IT TO GO BACK ON EDISON. |
| 12:07PM | 24 | SO MONTHS -- A FEW MONTHS LATER, BRITTANY GOULD GOT THE |
| 12:07PM | 25 | RESULT, THAT'S VERY UNFORTUNATE, BUT THAT'S NOT BECAUSE |

12:07PM 1    MR. BALWANI WAS TRYING TO CREATE A RISK OR KNEW HE WAS CREATING

12:07PM 2    A RISK TO SOMEONE LIKE MS. GOULD OR SOMEONE SIMILARLY SITUATED.

12:07PM 3        ON THE ISSUE OF DR. DAS, DR. DAS DIDN'T TESTIFY IN

12:07PM 4    MR. BALWANI'S CASE OBVIOUSLY, BUT MR. BALWANI WAS INVOLVED IN

12:07PM 5    HIRING DR. DAS ALONG WITH MS. HOLMES.  MR. BALWANI WAS STILL

12:07PM 6    THERE AT THE COMPANY IN THE LATTER PART OF 2015, AND THE FIRST

12:07PM 7    FEW MONTHS OF 2016 DR. DAS WAS HIRED.  SO THIS WAS MR. BALWANI

12:07PM 8    WORKING WITH MS. HOLMES TO TRY TO UNDERSTAND THE ISSUES THAT

12:07PM 9    HAD BEEN RAISED BY CMS.

12:07PM 10       BUT IN ANY EVENT, THIS IS AFTER THE FACT, AND THAT DR. DAS

12:07PM 11   COMES ALONG AND HAS A CERTAIN VIEW OF THE WORLD, MR. BALWANI IS

12:07PM 12   WORKING WITH HIM, AND THAT DOESN'T SAY THAT BACK IN REAL TIME

12:08PM 13   IN 2013 AND '14 OR EARLIER IN '15 THAT MR. BALWANI KNEW THAT HE

12:08PM 14   WAS CREATING SOME KIND OF RISK TO PATIENTS.

12:08PM 15       IN FACT, WE SEE IN THE RECORD THAT DEVICES CAME OFFLINE.

12:08PM 16   THE GOVERNMENT ITSELF PRESENTED AN EXHIBIT WHERE EARLY IN 2015,

12:08PM 17   OR EVEN LATE IN '14, CERTAIN TESTS ON THE EDISON WAS STOPPED.

12:08PM 18       SO THIS WAS NOT A COMPANY THAT, AS MR. BALWANI WAS IN THE

12:08PM 19   MANAGEMENT TEAM OF, WAS TRYING TO PROVIDE INACCURATE RESULTS TO

12:08PM 20   PATIENTS.  WE DON'T THINK THAT THE RECORD SUPPORTS THAT.  THE

12:08PM 21   COURT'S COMMENT IN MS. HOLMES'S CASE IS THE EVIDENCE DOESN'T

12:08PM 22   SUPPORT THAT.  WE THINK THAT'S A CORRECT OBSERVATION AND THIS

12:08PM 23   GUIDELINE ADJUSTMENT SHOULD NOT BE APPLIED.

12:08PM 24           THE COURT:  ALL RIGHT.  THANK YOU.

12:08PM 25       I THINK THE CONNECTION HERE IS A LITTLE BIT GREATER.  THE

12:08PM 1   EVIDENCE HERE AS TO YOUR CLIENT, MR. BALWANI'S INTIMACY WITH

12:08PM 2   THE LAB IS SOMETHING THAT IT SEEMED TO ME THAT HE HAD PURVIEW

12:08PM 3   OVER THE LAB.  YOU INDICATE THAT HE HIRED OR HAD PART OF HIRING

12:09PM 4   DR. DAS.

12:09PM 5      HE ALSO HIRED HIS DERMATOLOGIST AFTER DR. ROSENDORFF LEFT,

12:09PM 6   WHICH SUGGESTS THAT HE HAD MORE CONTROL.  I THINK THAT WAS THE

12:09PM 7   GENERAL PRESENTATION AT THE TRIAL, AT THE TRIALS, THAT THE LAB

12:09PM 8   WAS KIND OF HIS BABY IF YOU WILL.

12:09PM 9      HE HIRED MS. SAWYER CONCURRENT OR SHORTLY AFTER HE HIRED

12:09PM 10   HIS DERMATOLOGIST TO BE THE LAB DIRECTORS IN THAT CASE.  HE WAS

12:09PM 11   THE ONE WHO HAD GREATER RESPONSIBILITY IT SEEMED FOR THE LAB.

12:09PM 12   IF THERE WAS A DIVISION OF LABOR, THE LAB SEEMED TO BE HIS.

12:09PM 13   AND HE HAD -- THERE WERE EMAILS.  THERE WAS MS. CHEUNG, WHEN

12:09PM 14   SHE HAD ISSUES WITH THE LAB, SHE WENT TO MR. BALWANI TO TALK TO

12:09PM 15   HIM ABOUT IT, AND WE KNOW ABOUT THAT CONVERSATION AND HIS

12:10PM 16   RESPONSE TO HER CONCERNS AND OTHERS.

12:10PM 17      SO I THINK THAT'S THE DISTINCTION THAT HIS INTIMACY IS A

12:10PM 18   LITTLE BIT CLOSER TO THE LAB THAN PERHAPS MS. HOLMES AND

12:10PM 19   PERHAPS THAT GIVES HIM A GREATER VISION OF RESPONSIBILITY FOR

12:10PM 20   THE OUTPUT FROM THAT LAB, AND I THINK THAT'S THE BASIS OF

12:10PM 21   WHAT -- ONE OF THE BASIS OF ARGUING WHY THIS SHOULD APPLY TO

12:10PM 22   MR. BALWANI.

12:10PM 23       MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

12:10PM 24      I UNDERSTAND THE POINT.  IT IS TRUE THAT MR. BALWANI HAD

12:10PM 25   MORE DIRECT PURVIEW OF THE LAB, BUT IT'S ALSO TRUE THAT EACH OF

12:10PM 1    THESE IMPORTANT ISSUES THAT THE GOVERNMENT SAID ARE PROBLEMS,

12:10PM 2    THAT MR. BALWANI SHOULD HAVE FIXED OR TAKEN INTO ACCOUNT TO

12:10PM 3    STOP TESTING, MS. HOLMES ALSO KNEW ABOUT.

12:10PM 4        AND I'LL JUST READ FROM THE GOVERNMENT'S SENTENCING MEMO

12:10PM 5    BRIEFLY.  THEY SAY MS. HOLMES HAD ULTIMATE AUTHORITY OVER THE

12:10PM 6    LAB OPERATIONS JUST LIKE SHE DID EVERY OTHER ASPECT OF THE

12:10PM 7    COMPANY'S ACTIVITY.  AN ORG CHART PRESENTED TO CMS BY THERANOS

12:11PM 8    DISPLAYED MS. HOLMES AT THE TOP OF THE CLIA OPERATION

12:11PM 9    OVERSEEING A GROUP COMPRISED OF MORE THAN 60 THERANOS EMPLOYEES

12:11PM 10   INCLUDING --

12:11PM 11           THE COURT:  YOU'VE GOT TO SLOW DOWN.

12:11PM 12           MR. COOPERSMITH:  YEAH.  -- OVERSEEING A GROUP

12:11PM 13   COMPRISED OF MORE THAN 60 THERANOS EMPLOYEES, INCLUDING HER

12:11PM 14   COCONSPIRATOR, RAMESH BALWANI.

12:11PM 15       AND EVEN MORE IMPORTANTLY, YOUR HONOR, GOING TO THE ISSUE

12:11PM 16   OF HIRING DR. DHAWAN.  SO HE WAS MR. BALWANI'S DERMATOLOGIST,

12:11PM 17   BUT I THINK THAT'S SELLING HIM A LITTLE SHORT.  HE ALSO WAS THE

12:11PM 18   DIRECTOR OF THE CLINICAL LAB, AND HE WAS FULLY QUALIFIED.  NO

12:11PM 19   ONE HAS EVER DISPUTED THAT.

12:11PM 20           THE COURT:  HIS OWN LAB.

12:11PM 21           MR. COOPERSMITH:  HE WAS.  AND HE WAS ALSO LICENSED

12:11PM 22   AND HE SERVED AS THE LAB DIRECTOR.

12:11PM 23       BUT IN ADDITION -- AND WE PUT THESE DOCUMENTS INTO OUR

12:11PM 24   SENTENCING BRIEF.  THE RECORD HERE SHOWS THAT MR. BALWANI,

12:11PM 25   RIGHT AFTER DR. ROSENDORFF LEFT IN NOVEMBER OF 2014, HE DIDN'T

| | | |
|---|---|---|
| 12:11PM | 1 | JUST SAY, OH, LET'S GET MY DERMATOLOGIST IN HERE. HE WAS |
| 12:11PM | 2 | INVOLVED IN AN ACTIVE SEARCH, A VERY ACTIVE SEARCH FOR A |
| 12:12PM | 3 | FULL-TIME LAB DIRECTOR. HE PUT FORWARD DR. SAKSENA FOR THAT |
| 12:12PM | 4 | PURPOSE. HE HAD MADE SURE THAT DR. SAKSENA HAD TIME TO STUDY |
| 12:12PM | 5 | FOR THE TESTING HE HAD TO TAKE. THEY PUSHED THAT ISSUE WITH |
| 12:12PM | 6 | THE REGULATORS, THE CALIFORNIA REGULATORS TO MAKE SURE HE WOULD |
| 12:12PM | 7 | BE QUALIFIED. SO MR. BALWANI WAS NOT TRYING TO IGNORE THE |
| 12:12PM | 8 | PROBLEM. |
| 12:12PM | 9 | OF COURSE EVEN WHILE THEY WERE DOING THIS VERY ACTIVE LAB |
| 12:12PM | 10 | DIRECTOR SEARCH AND DR. DHAWAN AND DR. SAWYER WERE FILLING IN |
| 12:12PM | 11 | AS TEMPORARY LAB DIRECTORS, ALL OF THE SCIENTIFIC TEAM, PH.D. |
| 12:12PM | 12 | LEVEL PEOPLE WERE STILL IN THE LAB. MR. BALWANI WAS NOT MAKING |
| 12:12PM | 13 | DECISIONS, AND THERE'S NO EVIDENCE OF THIS OF WHICH PATIENT |
| 12:12PM | 14 | RESULTS TO RELEASE AND WHICH PATIENT RESULTS NOT TO RELEASE. |
| 12:12PM | 15 | SO WE THINK THAT IS A DISTINCTION THE COURT NOTED, BUT WE |
| 12:12PM | 16 | DON'T THINK THAT MAKES A DIFFERENCE IN THIS CASE GIVEN THE SUM |
| 12:12PM | 17 | TOTAL. |
| 12:12PM | 18 | AGAIN, I WOULD JUST COME BACK TO WHAT I WOULD THINK WOULD |
| 12:12PM | 19 | BE VERY UNFAIR TO APPLY THIS RESULT TO MR. BALWANI, THIS |
| 12:12PM | 20 | ADJUSTMENT WHEN IT WASN'T APPLIED TO MS. HOLMES WHERE SHE HAD |
| 12:13PM | 21 | THE SAME KNOWLEDGE AS THE COURT POINTED OUT IN DOCKET 1635. |
| 12:13PM | 22 | AGAIN, THE JURY VERDICT DOESN'T CONTROL HERE. IT'S THE |
| 12:13PM | 23 | PROVINCE OF THIS COURT TO MAKE THAT DECISION. |
| 12:13PM | 24 | IF IT WAS SOMETHING IN THE VERDICT THAT WAS A SPECIAL |
| 12:13PM | 25 | VERDICT, WE WOULD JUST BE IN A DIFFERENT POSITION, BUT WE JUST |

12:13PM  1    DON'T HAVE THAT.

12:13PM  2         THE COURT:  RIGHT.  AND I THINK YOU WERE TALKING

12:13PM  3    ABOUT THE HISTORY OF WHEN PROBLEMS WOULD ARISE AND YOUR

12:13PM  4    CLIENT'S ATTENTION TO THEM, AND WE KNOW THAT AT THIS TIME THIS

12:13PM  5    WAS A CRITICAL STAGE, THERE WAS ROLLOUT HAPPENING.  THIS WAS A

12:13PM  6    CRITICAL PART OF THE COMPANY'S EXISTENCE.

12:13PM  7         AND ANOTHER WAY OF LOOKING AT THE EVIDENCE, AND I DON'T

12:13PM  8    KNOW WHAT THE JURY THOUGHT ABOUT, BUT ONE WAY OF LOOKING AT IT

12:13PM  9    IS YOU LOSE YOUR LAB DIRECTOR, YOU'RE GOING TO LOSE CLIA, AND

12:13PM  10   EVERYTHING IS GOING TO COLLAPSE.  THE COMPANY WOULD CEASE TO

12:13PM  11   EXIST.

12:13PM  12        SO, OF COURSE, THOSE RESPONSIBLE IN THE COMPANY, THE

12:13PM  13   LEADERSHIP WOULD DO WHATEVER THEY COULD TO KEEP, TO KEEP THE

12:13PM  14   COMPANY GOING.  AND I THINK THIS IS WHAT YOUR POINT IS, HE

12:14PM  15   REACHED OUT TO A LAB DIRECTOR THAT HE KNEW THAT HE COULD HIRE

12:14PM  16   AS AN INTERIM PERHAPS TO KEEP THE COMPANY GOING.

12:14PM  17        AND WE ALL OBSERVED THE TESTIMONY OF THE DOCTOR AND WHEN

12:14PM  18   HE TESTIFIED ABOUT HIS WORK AND THE TIMES THAT HE SPENT ON SITE

12:14PM  19   AND THE NUMBER OF SIGNATURES THAT -- THE TRANCHES OF DOCUMENTS

12:14PM  20   THAT WERE PROVIDED TO HIM FOR HIS SIGNATURE AS LAB DIRECTOR

12:14PM  21   HAD TO SIGN OFF ON PROTOCOLS AND THINGS.  HE TALKED ABOUT WHAT

12:14PM  22   HE DID, AND WE ALL RECALL THE DEMEANOR AND NATURE AND QUALITY

12:14PM  23   OF HIS TESTIMONY AS HE WAS EXAMINED ABOUT HIS WORK THERE.  SO I

12:14PM  24   RECALL THAT.

12:14PM  25        I JUST SAY, THIS IS ANOTHER WAY OF LOOKING AT IT.

| | | |
|---|---|---|
| 12:14PM | 1 | MR. LEACH MIGHT ARGUE THEY WERE DESPERATE AT THAT TIME TO |
| 12:14PM | 2 | KEEP THE CONCERN GOING, AND THEY RECOGNIZED THAT PERHAPS THE |
| 12:15PM | 3 | EFFECTS OR THE INABILITY OF THE MACHINES WERE ABOUT TO BE |
| 12:15PM | 4 | REVEALED AND THEY WANTED TO KEEP THAT GOING.  MAYBE THAT'S WHAT |
| 12:15PM | 5 | THE GOVERNMENT'S POINT WAS.  I DON'T KNOW.  THEY DIDN'T ARGUE |
| 12:15PM | 6 | THAT SPECIFICALLY. |
| 12:15PM | 7 | BUT FOR PURPOSES OF THIS ALLOCATION OF THIS ENHANCEMENT, I |
| 12:15PM | 8 | THINK I TAKE YOUR POINT, I UNDERSTAND -- I DON'T THINK YOU |
| 12:15PM | 9 | WOULD QUARREL WITH THE FACT THAT THE DIVISION OF LABOR WAS SUCH |
| 12:15PM | 10 | THAT YOUR CLIENT HAD GREATER CONTROL, INTIMACY OR PROVINCE OVER |
| 12:15PM | 11 | THE LAB. |
| 12:15PM | 12 | MR. COOPERSMITH:  I DO QUARREL WITH THE TERM |
| 12:15PM | 13 | "CONTROL," YOUR HONOR.  AND JUST TO TAKE THE POINT THE COURT |
| 12:15PM | 14 | JUST MADE -- |
| 12:15PM | 15 | THE COURT:  WELL, HE HIRED HIS DERMATOLOGIST FOR THE |
| 12:15PM | 16 | LAB DIRECTOR, MS. HOLMES DIDN'T. |
| 12:15PM | 17 | MR. COOPERSMITH:  WELL, MS. HOLMES WAS THE CEO OF |
| 12:15PM | 18 | THE COMPANY.  SHE KNEW FULL WELL WHO WAS BEING HIRED AS THE LAB |
| 12:15PM | 19 | DIRECTOR. |
| 12:15PM | 20 | THE COURT:  HIS DERMATOLOGIST. |
| 12:15PM | 21 | MR. COOPERSMITH:  ABSOLUTELY.  SHE KNOWS ALL OF |
| 12:15PM | 22 | THESE THINGS.  AGAIN, THE ADJUSTMENT WASN'T APPLIED TO HER. |
| 12:15PM | 23 | THE COURT'S POINT THAT WE DON'T AGREE WITH THIS, BUT |
| 12:16PM | 24 | JUST TO PLAY IT OUT, THAT, WELL, AT THIS TIME THEY NEEDED A LAB |
| 12:16PM | 25 | DIRECTOR AND SO TO KEEP THE COMPANY GOING THEY HAD TO GET THE |

| | | |
|---|---|---|
| 12:16PM | 1 | LAB DIRECTOR IN PLACE AND KEEP THE CLINICAL LAB GOING.  IF |
| 12:16PM | 2 | THAT'S WHAT HAPPENED, THAT'S EQUALLY ON MS. HOLMES AS THE CEO. |
| 12:16PM | 3 | SO I DON'T UNDERSTAND WHY THAT WOULD BE MEANINGFUL HERE. |
| 12:16PM | 4 | THE COURT:  NO. |
| 12:16PM | 5 | MR. COOPERSMITH:  AND THE OTHER THING I'LL SAY IS |
| 12:16PM | 6 | THAT, OF COURSE, IN EARLY 2015 THE COMPANY OPENED AN ARIZONA |
| 12:16PM | 7 | LAB WITH DANIEL YOUNG AS THE LAB DIRECTOR WHO WAS QUALIFIED |
| 12:16PM | 8 | UNDER ARIZONA REQUIREMENTS, AND THAT LAB WAS DOING ALL FDA |
| 12:16PM | 9 | APPROVED COMMERCIAL TESTING. |
| 12:16PM | 10 | AND IN THAT TIMEFRAME EVEN WHILE, AS THE COURT POINTED |
| 12:16PM | 11 | OUT, DR. DHAWAN AND DR. SAWYER WERE IN PLACE OF LAB DIRECTORS |
| 12:16PM | 12 | UP IN NEWARK, MORE AND MORE TESTING WAS BEING SHIFTED TO THE |
| 12:16PM | 13 | COMMERCIAL MACHINES. |
| 12:16PM | 14 | AND I UNDERSTAND THE GOVERNMENT HAS OTHER ISSUES WITH THAT |
| 12:16PM | 15 | ON THE INVESTMENT SIDE, BUT FOR THIS PURPOSE, THAT'S THE |
| 12:16PM | 16 | OPPOSITE OF TRYING TO CREATE A RISK TO PATIENTS WHEN THEY'RE |
| 12:16PM | 17 | ACTIVELY SPENDING MONEY AND TIME OPENING AN ARIZONA LAB AND IS |
| 12:17PM | 18 | GOING TO TEST PATIENTS, AND THERE REALLY IS NO EVIDENCE IN THE |
| 12:17PM | 19 | CASE OF COMMERCIAL TESTING IS SOMEHOW FLAWED AT LEAST AS FAR AS |
| 12:17PM | 20 | HOW MR. BALWANI SAW IT. |
| 12:17PM | 21 | THE COURT:  HOW SHOULD I INTERPRET THE CONDUCT OR |
| 12:17PM | 22 | THE ACTION THAT -- I THINK IT IS DR. DAS WHEN HE WAS ON BOARD |
| 12:17PM | 23 | AND HE SAID, YOU KNOW, THE ONLY THING THAT WE CAN DO IS TO |
| 12:17PM | 24 | INVALIDATE ALL OF THOSE TESTS?  WHAT MR. LEACH SUGGESTS IS THAT |
| 12:17PM | 25 | THAT IS PER SE EVIDENCE. |

83

| | | |
|---|---|---|
| 12:17PM | 1 | MR. COOPERSMITH: WELL, FIRST OF ALL, OF COURSE THE |
| 12:17PM | 2 | ACTUAL LANGUAGE THAT DR. DAS USED WE POINT OUT AS AN ABUNDANCE |
| 12:17PM | 3 | OF CAUTION. |
| 12:17PM | 4 | BUT EVEN IF YOU TAKE THIS AS GOSPEL THAT DR. DAS REALLY |
| 12:17PM | 5 | BELIEVED THAT THIS HAD TO BE DONE AND THAT'S HIS DECISION, IT'S |
| 12:17PM | 6 | AFTER THE FACT, YOUR HONOR. AND SO MR. BALWANI, AS I SAID, IS |
| 12:17PM | 7 | INVOLVED WITH MS. HOLMES TO HIRE DR. DAS, A LAB DIRECTOR FROM |
| 12:17PM | 8 | UCLA, A HIGHLY QUALIFIED GUY, COMES IN AND HE LOOKS AT THE |
| 12:17PM | 9 | WHOLE ISSUE, AND THEY ALLOW HIM TO DO THAT. NO ONE WAS TELLING |
| 12:18PM | 10 | HIM DON'T LOOK AT THIS OR DON'T LOOK UNDER THIS ROCK. |
| 12:18PM | 11 | HE LOOKS AT THE LAB AND THE DOCUMENTATION, AND HE COMES UP |
| 12:18PM | 12 | WITH WHATEVER VIEW HE COMES UP WITH. BUT THE FACT THAT HE DID |
| 12:18PM | 13 | THAT LATER WHEN THERE WAS NO MORE FINGERSTICK TESTING GOING ON. |
| 12:18PM | 14 | AS OF SEPTEMBER 2015 WHEN CMS CAME IN, THE EDISON HAD BEEN |
| 12:18PM | 15 | STOPPED FOR MONTHS AND EVEN THE MODIFIED PREDICATE MACHINES |
| 12:18PM | 16 | WHICH ALSO DID FINGERSTICK WERE STOPPED AT THAT POINT. |
| 12:18PM | 17 | SO BY THE TIME THAT DR. DAS CAME IN, IT WAS ALL NOT BEING |
| 12:18PM | 18 | CONDUCTED ANYMORE. IT WAS ALL COMMERCIAL TESTING. |
| 12:18PM | 19 | AND SO IT'S LIKE THE SAME AS IF YOU BRING IN AN EXPERT FOR |
| 12:18PM | 20 | ANY BUSINESS OR LABORATORY AFTER THE FACT AND HE MAKES SOME |
| 12:18PM | 21 | CONCLUSIONS ABOUT PROBLEMS, IT DOESN'T GO TO WHAT MR. BALWANI |
| 12:18PM | 22 | KNEW AT THE TIME THAT THE LAB WAS OPERATING WITH FINGERSTICK, |
| 12:18PM | 23 | AND IT JUST DOESN'T AFFECT THAT. |
| 12:18PM | 24 | SO IT'S AFTER-THE-FACT INFORMATION. |
| 12:18PM | 25 | WHAT WE HAVE TO DETERMINE FOR PURPOSES OF THIS GUIDELINE |

ER-122

12:19PM  1    ADJUSTMENT IS WHETHER AT THE TIME THESE RESULTS WERE GOING OUT

12:19PM  2    MR. BALWANI WAS CREATING CONSCIOUSLY OR RECKLESSLY A RISK OF

12:19PM  3    THIS PATIENT HARM, AND THE EVIDENCE HERE IS THAT HE WAS NOT

12:19PM  4    DOING THAT.

12:19PM  5         EVEN IF THE COURT THOUGHT, WELL, MAYBE IN SOME CASES

12:19PM  6    THAT'S WHAT HAPPENED, THAT WOULD NOT SHOW THAT MR. BALWANI WAS

12:19PM  7    DOING THAT CONSCIOUSLY OR RECKLESSLY.  HE WAS TRYING TO DO WHAT

12:19PM  8    HE COULD, EVEN IF THE COURT THINKS IT'S INADEQUATE, DO WHAT HE

12:19PM  9    COULD TO FIX THE PROBLEMS AND MAKE SURE THAT THE SCIENTIFIC

12:19PM  10   TEAM WAS ON TOP OF THESE ISSUES SO THAT PATIENT RESULTS WERE AS

12:19PM  11   GOOD AS THEY COULD GET.

12:19PM  12            THE COURT:  THAT'S YOUR INTERPRETATION?

12:19PM  13            MR. COOPERSMITH:  YES, YOUR HONOR, I THINK THAT'S

12:19PM  14   FAIR FROM THE CASE IN THE CASE.

12:19PM  15            THE COURT:  OKAY.  THANK YOU.

12:19PM  16       LET'S TAKE ABOUT 20 MINUTES, AND THEN WE'LL COME BACK AND

12:19PM  17   WE WILL INCLUDE THE CALCULATIONS.  THANK YOU.

12:19PM  18            MR. LEACH:  THANK YOU, YOUR HONOR.

12:19PM  19       (RECESS FROM 12:19 P.M. UNTIL 12:50 P.M.)

12:50PM  20            THE COURT:  WE'RE BACK ON THE RECORD IN THE BALWANI

12:50PM  21   MATTER.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

12:50PM  22       I'D LIKE TO CONTINUE OUR CONVERSATION.  WE MENTIONED THE

12:50PM  23   SUBMISSION BY THE DEFENSE YESTERDAY OF A DOCUMENT, AND I DON'T

12:50PM  24   THINK IT'S BEEN FORMALLY -- I THINK IT WAS SUBMITTED WITH YOUR

12:50PM  25   REQUEST, I THINK, TO BE --

| | | |
|---|---|---|
| 12:50PM | 1 | MR. COOPERSMITH:  IT WAS AN ADMINISTRATIVE MOTION |
| 12:50PM | 2 | FOR LEAVE TO FILE IT. |
| 12:50PM | 3 | THE COURT:  THAT'S RIGHT.  IT HASN'T BEEN ACTED ON. |
| 12:50PM | 4 | I'VE TALKED ABOUT IT.  IT'S DOCUMENT 1677. |
| 12:50PM | 5 | THANK YOU, MS. ROBINSON. |
| 12:50PM | 6 | I'LL ADMIT THAT NOW JUST FOR THE RECORD. |
| 12:51PM | 7 | ALL RIGHT.  THANK YOU. |
| 12:51PM | 8 | ANY OTHER COMMENT FROM COUNSEL ABOUT ANY OF THE LOSS |
| 12:51PM | 9 | CALCULATIONS THAT WE HAVE TALKED ABOUT BEFORE THE BREAK, |
| 12:51PM | 10 | MR. LEACH? |
| 12:51PM | 11 | MR. LEACH:  NO, YOUR HONOR.  THANK YOU. |
| 12:51PM | 12 | MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU. |
| 12:51PM | 13 | THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH. |
| 12:51PM | 14 | ALL RIGHT.  THANK YOU. |
| 12:51PM | 15 | WHAT I WOULD LIKE TO DO IS TO GIVE YOU THE COURT'S |
| 12:51PM | 16 | DECISIONS ON THESE MATTERS SUCH THAT WE CAN PROCEED WITH THE |
| 12:51PM | 17 | GUIDELINE CALCULATIONS AND GOING FORWARD. |
| 12:51PM | 18 | FIRST OF ALL, AS TO THE LOSS CALCULATION MATTER AND THE |
| 12:52PM | 19 | FIRST ISSUE IS WHAT IS THE STANDARD THAT THE COURT SHOULD APPLY |
| 12:52PM | 20 | THAT IS PREPONDERANCE OR CLEAR AND CONVINCING? |
| 12:52PM | 21 | THE COURT IS GOING TO FIND THAT IN THIS MATTER THE |
| 12:52PM | 22 | PREPONDERANCE OF THE EVIDENCE LEVEL IS APPROPRIATE IN THIS |
| 12:52PM | 23 | CASE, AND THE COURT WILL APPLY THAT STANDARD CITING LAURIENTI, |
| 12:52PM | 24 | 611 FED. 3D, AND THE BERGER CASE AT 587 FED 3D. |
| 12:52PM | 25 | I KNOW WE'VE TALKED ABOUT THE LONICH CASE.  I DO THINK |

| | | |
|---|---|---|
| 12:52PM | 1 | LONICH IS DISTINGUISHABLE FROM OUR CASE HERE.  OF COURSE, |
| 12:52PM | 2 | LONICH INVOLVED -- AND I THINK, MS. WALSH, YOU'VE MENTIONED |
| 12:52PM | 3 | THIS -- THERE'S AN ISSUE ABOUT THE TOTAL BANK FAILURE VIS-À-VIS |
| 12:52PM | 4 | THE FRAUD ON THE INVESTORS AND THE STRUGGLE THAT THE COURT HAD |
| 12:52PM | 5 | AND THE PARTIES HAD WITH TRYING TO MATCH THOSE TWO LOSSES. |
| 12:52PM | 6 | THIS IS A VERY DIFFERENT FACT PATTERN, ALBEIT COMPLICATED |
| 12:52PM | 7 | NONETHELESS, BUT IT'S DIFFERENT FROM LONICH.  SO I DO FIND THAT |
| 12:53PM | 8 | THE PREPONDERANCE OF THE EVIDENCE IS THE APPROPRIATE STANDARD |
| 12:53PM | 9 | TO USE, AND THE COURT WILL USE THAT. |
| 12:53PM | 10 | THERE WAS ANOTHER OBJECTION I WANTED TO MENTION THAT |
| 12:53PM | 11 | MR. BALWANI SUGGESTED THAT -- REGARDING -- I THINK MS. WALSH |
| 12:53PM | 12 | TALKED ABOUT INTERVENING CAUSES AND DISRUPTION OF A CAUSAL |
| 12:53PM | 13 | CHAIN.  I DO WANT TO INDICATE THAT THE COURT IS GOING TO -- ANY |
| 12:53PM | 14 | ACTIONS THAT THERANOS TOOK AFTER MAY 2016 ARE NOT ATTRIBUTABLE, |
| 12:53PM | 15 | AND THE COURT WON'T CONSIDER THOSE AS ATTRIBUTABLE AS TO |
| 12:53PM | 16 | MR. BALWANI. |
| 12:53PM | 17 | IN THE COURT'S LOSS CALCULATION, THE OFFSET OF TOTAL |
| 12:54PM | 18 | INVESTOR LOSS AMOUNT IS THE VALUE OF THERANOS AT A POINT IN |
| 12:54PM | 19 | TIME PRIOR TO THE DEFENDANT'S DEPARTURE.  SO THAT SPECIFIC |
| 12:54PM | 20 | OBJECTION IS REALLY NOT NECESSARY, AGAIN, UNDER FEDERAL RULE OF |
| 12:54PM | 21 | CRIMINAL PROCEDURE 32(I)(3)(B) BECAUSE THE COURT IS NOT GOING |
| 12:54PM | 22 | TO USE ANY POST 2016 CONDUCT AS ITS DETERMINATION OF THE |
| 12:54PM | 23 | DEFENDANT'S SENTENCING. |
| 12:54PM | 24 | TURNING TO THE SABA REPORT, AND I'LL JUST CALL IT THAT. |
| 12:54PM | 25 | WE'VE HAD SOME ROBUST CONVERSATION ABOUT THAT. |

12:54PM 1    WE KNOW, AS MR. LEACH POINTS OUT, AND I DON'T THINK THE

12:54PM 2    DEFENSE PARTS COMPANY WITH, THAT THE COURT'S OBLIGATION IN THE

12:54PM 3    LOSS CALCULATION IN THE SEARCH FOR A LOSS CALCULATION IS A

12:54PM 4    REASONABLE, REALISTIC, AND ECONOMIC PROJECTION OF LOSS BASED ON

12:54PM 5    THE EVIDENCE AND WEST COAST ALUMINUM TEACHES THAT AT

12:55PM 6    265 FED. 3D.

12:55PM 7    WE HAD SOME DISCUSSION ABOUT MR. SABA'S REPORT AND THE

12:55PM 8    ANALYSIS THAT HE TOOK.  THE SABA REPORT'S ESTIMATION OF

12:55PM 9    VALUATION PROVIDES THREE DIFFERENT DATES REGARDING THE ANALYSIS

12:55PM 10   AND FOR THE PURPOSES OF ITS LOSS CALCULATION THE COURT SELECTS

12:55PM 11   THE DATE CLOSEST IN TIME AGAIN TO THE C INVESTMENTS, WHICH IS

12:55PM 12   DECEMBER 31, 2014.

12:55PM 13   LET ME INDICATE, AS I DID IN THE COMPANION CASE, I AM

12:55PM 14   GOING TO TELL YOU THE COURT'S DECISIONS NOW FOR PURPOSES OF

12:55PM 15   INFORMATION FOR TODAY'S SENTENCING.  I WILL ISSUE SHORTLY A

12:55PM 16   FORMAL ORDER THAT MEMORIALIZES THE COURT'S FINDINGS AND THE

12:55PM 17   REASONS AND BASIS FOR IT FOR YOUR BENEFIT AND FOR THE RECORD.

12:55PM 18   SO YOU'LL HAVE A MORE FULSOME ORDER THAT CAPTURES THE COURT'S

12:56PM 19   DECISION HERE AFTER TODAY.

12:56PM 20   AND THE COURT WILL ALSO SELECT THE INCOME METHOD.  IT

12:56PM 21   FINDS THAT IT IS THE MOST APPROPRIATE FOR ONGOING COMPANIES AND

12:56PM 22   IT DOES PROVIDE -- ACTUALLY IN THE COURT'S ANALYSIS HERE, IT

12:56PM 23   DOES PROVIDE A HIGHER COMPANY VALUATION AGAIN AND AGAIN, NOTING

12:56PM 24   THAT THAT IS ACTUALLY MORE FAVORABLE TO THE DEFENSE.

12:56PM 25   THERE WAS AN ARGUMENT ABOUT THE SABA REPORT'S LOSS RANGE

| | | |
|---|---|---|
| 12:56PM | 1 | BEING TOO BROAD.  I THINK MS. WALSH POINTS US TO THAT AND |
| 12:56PM | 2 | SUGGESTS THAT THE LOSS CALCULATIONS WERE INCORRECT PROVIDING |
| 12:56PM | 3 | INFORMATION FROM WEINGUST, DR. WEINGUST, MR. WEINGUST AND |
| 12:56PM | 4 | OTHERS, MR. REIFF AS WELL. |
| 12:56PM | 5 | AND I -- MR. SABA USED -- I THINK THE ALLEGATION WAS THAT |
| 12:56PM | 6 | SABA'S 45 PERCENT RATE WAS EXCESSIVE AND SHOULD HAVE USED |
| 12:57PM | 7 | PEPPERDINE STUDIES, AND I TALKED ABOUT WHAT THE COURT WAS DOING |
| 12:57PM | 8 | YESTERDAY AFTERNOON AFTER IT RECEIVED THE FILING AND THE EXPERT |
| 12:57PM | 9 | REPORTS AND THOSE THINGS. |
| 12:57PM | 10 | AND WHILE I DON'T WANT TO SAY I'M TROUBLED BY THE BATTLE |
| 12:57PM | 11 | OF QUANTUM EXPERTS, I APPRECIATE THAT THERE'S ROBUST ARGUMENT |
| 12:57PM | 12 | FOR THIS.  IT'S A VERY CRITICAL POINT FOR BOTH SIDES.  I |
| 12:57PM | 13 | APPRECIATE THAT, THAT ARGUMENT. |
| 12:57PM | 14 | BUT AS I POINTED OUT, THE -- THIS IS A CRIMINAL CASE, NOT |
| 12:57PM | 15 | A CIVIL CASE.  MS. WALSH TELLS US THAT, TOO.  IT HAS GREATER -- |
| 12:57PM | 16 | OBVIOUSLY THERE'S LIBERTY INTERESTS HERE THAT OUTWEIGH ANY |
| 12:57PM | 17 | CIVIL INTEREST, BUT, AGAIN, THE COURT'S TASK HERE, AIDED BY |
| 12:57PM | 18 | YOUR REPORTS, YOUR COMMENTS AND YOUR ASSISTANCE, IS TO FIND A |
| 12:57PM | 19 | REASONABLE -- IS TO USE REASONABLENESS TO FIND A REASONABLE |
| 12:58PM | 20 | AMOUNT HERE. |
| 12:58PM | 21 | WE'RE NOT IN A BUSINESS CONTEXT, AS MANY OF YOU ARE |
| 12:58PM | 22 | FAMILIAR WITH, OR AS I POINTED OUT, SOME OF THE EXPERT'S WORK |
| 12:58PM | 23 | IN THE PAST HAS BEEN TO PROVIDE SOME EQUITY AND DIVISION OF |
| 12:58PM | 24 | COMMUNITY PROPERTY IN A DISSOLUTION PROCEEDING.  THAT'S NOT THE |
| 12:58PM | 25 | FUNCTION HERE.  THAT PRECISENESS, AND I THINK YOU BOTH |

12:58PM 1  RECOGNIZE, BOTH SIDES RECOGNIZE, IT'S NOT ALWAYS ASCERTAINABLE,

12:58PM 2  AND THAT'S WHY THE CASES TELL US THAT THE SEARCH IS REALLY

12:58PM 3  BASED ON REASONABLENESS, RECOGNIZING THE COMPLEXITY OF THESE

12:58PM 4  CASES THAT COME BEFORE COURTS.

12:58PM 5  THE COURT DOES FIND THAT MR. SABA DID CONSIDER A BROADER

12:58PM 6  RANGE OF STUDIES AND DATA IN SELECTING THE 45 PERCENT NUMBER

12:58PM 7  THAT HE DID REACH.  HE LOOKED AT THE DATA FROM THE PEPPERDINE

12:59PM 8  STUDIES, HE LOOKED AT ARANCA WITH ALL OF ITS CRITICISMS, HE

12:59PM 9  USED THE INFORMATION THAT WAS, AS I MENTIONED TO MS. WALSH, ON

12:59PM 10  THE TABLE, AND THE COURT FINDS THAT HIS REPORT, NOTWITHSTANDING

12:59PM 11  THE CRITICISM OF THE OTHER EXPERTS, THAT ARE HELPFUL IN

12:59PM 12  PROVIDING CONTEXT AND SUBJECTING THE SABA REPORT TO MORE

12:59PM 13  CRITICAL REVIEW, THOSE REPORTS AND THOSE CRITICISMS DID NOT

12:59PM 14  DISTURB THE COURT'S FINDING THAT THE SABA REPORT IS REASONABLE

12:59PM 15  AND FOUNDED ON RELIABLE DATA AND ANALYSIS.

12:59PM 16  THE COURT FINDS THAT, AGAIN, THAT THE SABA PROTOCOL IS

12:59PM 17  RELIABLE AND REASONABLY ESTIMATING THE RESULT FROM THIS FRAUD

12:59PM 18  CONSPIRACY.

12:59PM 19  THERE WAS ANOTHER OBJECTION BY -- AND THE COURT WILL

12:59PM 20  ACCEPT THE SABA REPORT AND USE THE SABA REPORT IN ITS ANALYSIS

01:00PM 21  FOR ITS FINDINGS.

01:00PM 22  THERE WAS ANOTHER OBJECTION BY THE DEFENDANT ABOUT LOSS

01:00PM 23  SUSTAINED BY PATIENT VICTIMS.  LET ME INDICATE THAT THE COURT

01:00PM 24  IS GOING TO FIND AGAIN UNDER 32(I)(3)(B) THAT THIS IS

01:00PM 25  UNNECESSARY.  THE COURT IS NOT GOING TO CONSIDER PATIENT LOSSES

| | | |
|---|---|---|
| 01:00PM | 1 | IN REGARDS TO THE TOTAL LOSS AMOUNTS FOR 2B1.1(B)(1). |
| 01:00PM | 2 | MOVING TO THE VICTIM COUNT ENHANCEMENT.  THIS IS |
| 01:00PM | 3 | 2B1.1(B)(2)(A)(I).  THIS IS THE 2 POINT ENHANCEMENT FOR 10 OR |
| 01:00PM | 4 | MORE VICTIMS.  THE COURT FINDS THAT, AGAIN, UNDER A |
| 01:01PM | 5 | PREPONDERANCE OF EVIDENCE STANDARD THAT THE EVIDENCE DOES |
| 01:01PM | 6 | SUPPORT A FINDING OF AT LEAST 12 VICTIMS, INVESTOR VICTIMS WHO |
| 01:01PM | 7 | MEET THE DEFINITION OF VICTIMS AND UNDER THE GUIDELINES.  AND |
| 01:01PM | 8 | THE COURT WILL IDENTIFY THOSE 12: |
| 01:01PM | 9 | THE FIRST ONE IS PFM; |
| 01:01PM | 10 | TWO IS MOSLEY FAMILY HOLDINGS; |
| 01:01PM | 11 | THREE IS RDV CORPORATION; |
| 01:01PM | 12 | FOURTH IS KEITH RUPERT MURDOCH; |
| 01:01PM | 13 | FIVE IS RICHARD KOVACEVICH; |
| 01:01PM | 14 | SIX IS PEER VENTURE GROUP; |
| 01:01PM | 15 | SEVEN IS LUCAS VENTURE GROUP; |
| 01:01PM | 16 | EIGHT IS MENDENHALL; |
| 01:01PM | 17 | NINE IS HALL BLACK DIAMOND; |
| 01:02PM | 18 | TEN IS BLACK DIAMOND VENTURE; |
| 01:02PM | 19 | ELEVEN IS ALAN EISENMAN; AND, |
| 01:02PM | 20 | TWELVE IS SHERRIE EISENMAN. |
| 01:02PM | 21 | INVESTMENTS MADE BY EACH OF THESE VICTIMS ARE INCLUDED IN |
| 01:02PM | 22 | THE LOSS CALCULATION, AND ACCORDINGLY THE COURT FINDS THAT A 2 |
| 01:02PM | 23 | LEVEL ENHANCEMENT IS APPROPRIATE UNDER 2B1.1(B)(2)(A)(I). |
| 01:02PM | 24 | OBJECTION TWENTY-FOUR RELATES TO THE AGGRAVATING ROLE, AND |
| 01:02PM | 25 | I'VE TALKED WITH COUNSEL ABOUT THIS.  AND I THINK THE NINTH |

01:02PM 1    CIRCUIT HOLDEN CASE, 908 FED. 3D CONTROLS HERE, AND THE COURT

01:02PM 2    RECOGNIZING THAT IN OUR DISCUSSION THIS MORNING ABOUT

01:02PM 3    CO-LEADERS AS A POSSIBILITY, THE COURT IS GOING TO NOT FIND

01:02PM 4    THAT THIS ENHANCEMENT SHOULD BE GIVEN.  SO IF THAT MEANS THAT I

01:02PM 5    SUSTAIN THE DEFENSE OBJECTION, THAT'S WHAT I'VE DONE, AND I

01:03PM 6    WON'T FIND THAT ENHANCEMENT APPLIES HERE.

01:03PM 7        UNDER 2B1.1(B)(16)(A), THIS IS THE SERIOUS BODILY INJURY

01:03PM 8    ENHANCEMENT.  WE HAD SOME ROBUST -- THIS IS VERY CLOSE, I

01:03PM 9    THINK, VERY CLOSE INDEED.  WE HAD CONVERSATION ABOUT

01:03PM 10   MR. BALWANI'S WHAT I CALL INTIMACY WITH THE LAB, AND THE

01:03PM 11   EVIDENCE SHOWED TO THE COURT THAT HE HAD CONTROL AND

01:03PM 12   RESPONSIBILITY OVER THE LAB, AND THERE WERE ISSUES WITH THE

01:03PM 13   TESTING ACCURACY AND RELIABILITY OF THE PROPRIETARY DEVICE AND

01:03PM 14   THE TESTIMONY AT TRIAL SUGGESTED THAT.  IT SUGGESTED THAT

01:03PM 15   MR. BALWANI WAS THE CONTACT PERSON.

01:03PM 16       IT APPEARED THAT HE WAS THE LEAD CONTACT PERSON, AT LEAST

01:03PM 17   IN THE ADMINISTRATIVE CHAIN OUTSIDE OF THE LABS AND LAB

01:03PM 18   DIRECTORS, AND HE HAD CONTROL OVER THAT.  EMAILS WERE SENT TO

01:04PM 19   HIM REGARDING CONDUCT OF THE LAB, THE LAB'S ABILITY, THE

01:04PM 20   MACHINES, ISSUES WITH THE MACHINES.  WE ALSO KNOW THE EVIDENCE

01:04PM 21   SHOWS THAT THERE WAS AT LEAST SOME INTEREST BY MR. BALWANI AND

01:04PM 22   PERHAPS HIS CODEFENDANT IN TRYING TO FIND OUT WHO WAS

01:04PM 23   RESPONSIBLE FOR LEAKING INFORMATION FROM THE LAB AND THAT ALSO

01:04PM 24   FELL UNDER HIS PURVIEW AND HE HAD GREAT CONCERNS ABOUT THAT,

01:04PM 25   WHICH DO SUGGEST THAT HE HAD GREATER OVERSIGHT AND CONTROL OVER

01:04PM 1    THE LAB SITUATION.  AND MR. LEACH'S ARGUMENT SUGGESTS THAT THE

01:04PM 2    FACT THAT THERE WAS DR. DAS INVALIDATED AND CANCELLED ALL OF

01:04PM 3    THOSE TEST RESULTS IS PER SE EVIDENCE THAT THE COURT SHOULD USE

01:04PM 4    IN IMPOSING AND OTHERWISE ALLOWING THIS ENHANCEMENT AS AGAINST

01:05PM 5    MR. BALWANI.

01:05PM 6        AND, AGAIN, THIS IS A VERY CLOSE CALL.  THE COURT HAS

01:05PM 7    CONSIDERED VERY CAREFULLY THOSE ARGUMENTS AS WELL AS ITS

01:05PM 8    OBSERVANCE OF THE EVIDENCE AT TRIAL, THE WAY THE EVIDENCE CAME

01:05PM 9    IN AT TRIAL, AND THE COURT IS, HOWEVER, NOT GOING TO IMPOSE

01:05PM 10   THIS.  THE COURT IS GOING TO FIND THAT THERE'S INSUFFICIENT

01:05PM 11   EVIDENCE THAT REALLY DOES SHOW FACTUALLY THAT THERE WAS A

01:05PM 12   DISREGARDING OF THE RISK OR ACTUALLY A KNOWLEDGE OF THE RISK TO

01:05PM 13   PATIENTS OR AN ABILITY OR ACKNOWLEDGEMENT OF PROCEEDING WITH

01:05PM 14   THE TESTS NOTWITHSTANDING THAT.

01:05PM 15       IT'S VERY CLOSE, THOUGH, AND I THINK THE EVIDENCE COULD

01:05PM 16   VERY WELL -- AN ARGUMENT COULD BE MADE THAT MIGHT SUPPORT IT.

01:05PM 17   I'M NOT GOING TO FIND IT IN THIS CASE, AND I WILL DECLINE TO

01:05PM 18   APPLY THE 2 LEVEL ENHANCEMENT UNDER 2B1.1(B)(16)(A).

01:06PM 19       LET ME GO THROUGH THEN THE GUIDELINE CALCULATIONS FOR

01:06PM 20   COUNSEL AND PROBATION.  THESE ARE FOUND ON PAGE 22 OF

01:06PM 21   MS. GOLDSBERRY'S REPORT.

01:06PM 22       THERE'S A GROUPING OF THE COUNTS FROM ONE TO TWELVE, AND

01:06PM 23   PURSUANT TO 2B1.1(A)(1), AND THE COURT IS GOING TO FIND THAT

01:06PM 24   THE BASE OFFENSE LEVEL IS 7.

01:06PM 25       THE COURT IS GOING TO FIND THAT AFTER LOOKING AT THE SABA

01:07PM 1    REPORT AND THAT ANALYSIS, THE COURT IS GOING TO FIND THE TOTAL

01:07PM 2    LOSS TO INVESTOR VICTIMS IS $120 MILLION AND UNDER 2B1.1(M),

01:07PM 3    THIS IS A 24 LEVEL INCREASE.

01:07PM 4         THE COURT WILL FIND UNDER 2B1.(B)(2)(A)(I) THE NUMBER OF

01:07PM 5    VICTIMS IS A 2 LEVEL INCREASE.

01:07PM 6         AS I'VE SAID, THE COURT IS NOT GOING TO FIND IN

01:07PM 7    PARAGRAPH 76 THE ROLE ADJUSTMENT FOR LEADERSHIP.  THE ADJUSTED

01:07PM 8    OFFENSE LEVEL THEREFORE IS 33.

01:08PM 9         THE CRIMINAL HISTORY CATEGORY IS I.

01:08PM 10        AND THAT THEN YIELDS A GUIDELINE RANGE OF 135 TO

01:08PM 11   168 MONTHS.

01:08PM 12        MS. GOLDSBERRY?

01:08PM 13            PROBATION OFFICER:  YES, YOUR HONOR.

01:08PM 14            THE COURT:  AND THAT'S THE COURTS'S FINDING FOR

01:08PM 15   GUIDELINE CALCULATION.

01:08PM 16        AGAIN, THE COURT IS GOING TO PROVIDE COUNSEL WITH AN ORDER

01:08PM 17   THAT PROVIDES THE COURT'S MORE FULSOME DETAILS OF THE COURT'S

01:08PM 18   FINDINGS FOR THE RECORD, BUT I WANTED TO STATE AN OVERVIEW THE

01:08PM 19   REASON FOR THE COURT'S GUIDELINE CALCULATIONS.

01:08PM 20        ANY QUESTIONS?  MR. LEACH?

01:08PM 21            MR. LEACH:  NO, YOUR HONOR.

01:08PM 22            MR. COOPERSMITH:  WE UNDERSTAND THE COURT'S RULING.

01:08PM 23            THE COURT:  ALL RIGHT.  THANK YOU.

01:08PM 24        ANYTHING FURTHER BEFORE I ASK IF THE PARTIES WISH TO BE

01:08PM 25   HEARD AS TO SENTENCING?

01:08PM 1          MR. LEACH:  NO, YOUR HONOR.

01:08PM 2          THE COURT:  ALL RIGHT.

01:08PM 3          MR. COOPERSMITH:  NO, YOUR HONOR.

01:08PM 4          THE COURT:  ALL RIGHT.  THANK YOU.

01:09PM 5      DOES THE GOVERNMENT WISH TO BE HEARD?

01:09PM 6          MR. SCHENK:  GOOD MORNING, YES.  THANK YOU,

01:09PM 7   YOUR HONOR.

01:09PM 8      IF I COULD START WITH WHAT THE COURT HAD CALLED

01:09PM 9   SUBSTANTIVE PSR OBJECTIONS, AND I JUST WANTED TO FOR THE RECORD

01:09PM 10  CONFIRM THAT I THINK THERE WERE TWO THAT I THINK THE COURT HAS

01:09PM 11  NOT RULED ON YET, TWENTY-TWO AND TWENTY-THREE.

01:09PM 12     BASED ON WHAT THE COURT JUST SAID, THOUGH, IT SOUNDS LIKE

01:09PM 13  IT IS DENYING THE OBJECTIONS OR OVERRULING THE OBJECTIONS.

01:09PM 14  THEY BOTH HAD SOMETHING TO DO WITH THE ENHANCEMENTS FOR THE

01:09PM 15  NUMBER OF VICTIMS OR LOSS RELATED TO VICTIMS.

01:09PM 16         THE COURT:  THAT'S RIGHT.  I HOPE I MADE THAT CLEAR

01:09PM 17  WHEN I SAID I WOULD GET TO THOSE EARLIER IN OUR GUIDELINE

01:09PM 18  CALCULATIONS, BUT THAT'S THE SPIRIT OF THE COURT'S FINDINGS,

01:09PM 19  YES.  THANK YOU.

01:09PM 20         MR. SCHENK:  THANK YOU.

01:09PM 21     YOUR HONOR, I INTEND TO ADDRESS THE 3553(A) FACTORS AND

01:09PM 22  WHY THE COURT SHOULD IMPOSE A SENTENCE OF 180 MONTHS IN CUSTODY

01:10PM 23  IN THIS CASE.  THE COURT JUST NOTED ITS GUIDELINE RANGE AND THE

01:10PM 24  RANGE HERE AS THE COURT STATED IS 135 TO 168.

01:10PM 25     THE GOVERNMENT'S RECOMMENDATION IS ABOVE THE GUIDELINES

01:10PM 1    THAT THE COURT JUST DETERMINED, AND WE STAND BY THAT

01:10PM 2    RECOMMENDATION AND BELIEVE THAT AN APPROPRIATE SENTENCE IN THIS

01:10PM 3    CASE COMES FROM THE STATUTE, COMES FROM 3553(A), AND WHEN WE

01:10PM 4    ANALYZE THE FACTORS, WE SEE THAT A SENTENCE OF 15 YEARS IS

01:10PM 5    APPROPRIATE.

01:10PM 6        THE COURT SHOULD KEEP IN MIND TWO SORT OF OVERARCHING

01:10PM 7    THEMES THAT ARE RELEVANT WHEN SENTENCING MR. BALWANI.  THE

01:10PM 8    FIRST IS THE SIGNIFICANT ROLE HE PLAYED IN DEFRAUDING

01:10PM 9    INVESTORS, AND I'LL GO THROUGH THAT A LITTLE BIT MORE, BUT IT

01:10PM 10   IS NOT ACCURATE TO SAY THAT MS. HOLMES DEFRAUDED INVESTORS AND

01:10PM 11   SUNNY BALWANI RAN THE LAB.  THAT IS AN OVERSIMPLIFICATION AND

01:10PM 12   MORE SO JUST ISN'T TRUE.

01:11PM 13       MR. BALWANI PLAYED A SIGNIFICANT ROLE IN THE INVESTOR

01:11PM 14   FRAUD.  MR. BALWANI CREATED THE FINANCIAL STATEMENTS THAT THE

01:11PM 15   COURT WILL RECALL WERE OFF BY ONE BILLION DOLLARS.  THOSE

01:11PM 16   FINANCIAL STATEMENTS WERE PROVIDED TO INVESTORS, AND

01:11PM 17   MR. BALWANI KNEW THAT THOSE FINANCIAL STATEMENTS WERE PROVIDED

01:11PM 18   TO INVESTORS.

01:11PM 19       SO NOT ONLY DID HE DO WORK ON THE FINANCIAL SIDE, HE ALSO

01:11PM 20   PLAYED A ROLE IN THE WALGREENS ROLLOUT.  THE RELATIONSHIP WITH

01:11PM 21   WALGREENS WAS RELEVANT TO THE PATIENT FRAUD BECAUSE THAT WAS

01:11PM 22   THE LOCATION THAT THE PATIENTS WENT TO, TO RECEIVE THE BLOOD

01:11PM 23   TESTS, BUT IT ALSO WAS RELEVANT ON THE INVESTOR SIDE.

01:11PM 24       INVESTORS WERE TOLD THAT THERANOS HAD THIS HEALTHY AND

01:11PM 25   EXPANDING RELATIONSHIP WITH WALGREENS AND BECAUSE OF THAT HAD

01:11PM 1    MORE CONFIDENCE IN THE TECHNOLOGY, IN THE STABILITY OF THE

01:11PM 2    COMPANY, AND THOSE FACTS WERE COMMUNICATED TO INVESTORS.

01:11PM 3        MR. BALWANI PLAYED A ROLE IN THAT AND IN THE WALGREENS

01:12PM 4    RELATIONSHIP AND IN THE COMMUNICATION OF WALGREENS INFORMATION

01:12PM 5    TO INVESTORS.

01:12PM 6        FINALLY, THERE ARE CERTAIN INVESTORS THAT MR. BALWANI

01:12PM 7    PLAYED A SIGNIFICANT ROLE IN COMMUNICATING DIRECTLY WITH,

01:12PM 8    INDIVIDUALS LIKE BRIAN GROSSMAN AT PFM; INDIVIDUALS LIKE

01:12PM 9    ALAN EISENMAN WE'LL GET TO A LITTLE BIT LATER.  MR. BALWANI

01:12PM 10    ALSO COMMUNICATED DIRECTLY WITH INVESTORS.  SO HE PLAYED A

01:12PM 11    SIGNIFICANT ROLE IN THE INVESTOR SIDE.

01:12PM 12        ON THE PATIENT SIDE, AS THE COURT NOTED EARLIER THIS

01:12PM 13    MORNING, MR. BALWANI WAS INTIMATELY FAMILIAR WITH THE EVENTS IN

01:12PM 14    THE LAB.  MR. BALWANI HIRED AND FIRED INDIVIDUALS IN THE LAB.

01:12PM 15    AND WHILE HE HAS ARGUED TO THE COURT THAT HE WAS UNDER

01:12PM 16    MS. HOLMES, MR. BALWANI HAD SIGNIFICANT AUTONOMY IN RUNNING THE

01:12PM 17    LAB.  HE MADE DECISIONS THAT DIRECTLY IMPACTED THE INFORMATION

01:12PM 18    THAT WAS COMMUNICATED TO PATIENTS, AND IT IS IN THE LAB THAT

01:12PM 19    SOME OF THE GREATEST HARM OCCURRED, AND MR. BALWANI PLAYED A

01:13PM 20    SIGNIFICANT ROLE IN OVERSEEING THE CLINICAL LAB.

01:13PM 21        SO IT IS BOTH HIS ROLE IN THE PATIENT FRAUD AND HIS ROLE

01:13PM 22    IN THE INVESTOR FRAUD THAT SHOULD LEAVE THIS COURT TO DECIDE A

01:13PM 23    SIGNIFICANT CUSTODIAL SENTENCE SHOULD BE IMPOSED, AND THE

01:13PM 24    GOVERNMENT BELIEVES THAT THAT SENTENCE SHOULD BE 15 YEARS.

01:13PM 25        IN ORDER TO IMPOSE THAT SIGNIFICANT SENTENCE, THIS COURT

| | |
|---|---|
| 01:13PM | 1 |
| 01:13PM | 2 |
| 01:13PM | 3 |
| 01:13PM | 4 |
| 01:13PM | 5 |
| 01:13PM | 6 |
| 01:13PM | 7 |
| 01:13PM | 8 |
| 01:13PM | 9 |
| 01:13PM | 10 |
| 01:13PM | 11 |
| 01:14PM | 12 |
| 01:14PM | 13 |
| 01:14PM | 14 |
| 01:14PM | 15 |
| 01:14PM | 16 |
| 01:14PM | 17 |
| 01:14PM | 18 |
| 01:14PM | 19 |
| 01:14PM | 20 |
| 01:14PM | 21 |
| 01:14PM | 22 |
| 01:14PM | 23 |
| 01:14PM | 24 |
| 01:14PM | 25 |

DOES NOT HAVE TO FIND THAT MR. BALWANI FOUNDED THERANOS.  THE
DEFENSE ARGUES THAT HE DID NOT PLAY THAT ROLE, AND, THEREFORE,
HE SHOULD RECEIVE A SIGNIFICANT VARIANCE OR A PROBATIONARY
SENTENCE.

IN ORDER TO SENTENCE MR. BALWANI TO A SIGNIFICANT
CUSTODIAL SENTENCE, THE COURT NEED NOT CONCLUDE THAT THAT IS
RESERVED FOR FACTORS.  MR. BALWANI PLAYED A SIGNIFICANT ROLE IN
THE TWO FRAUDS ONCE HE ARRIVED AT THERANOS.

THE COURT ALSO, IN ORDER TO IMPOSE A SIGNIFICANT SENTENCE,
DOES NOT NEED TO CONCLUDE THAT MR. BALWANI INTENDED TO DEFRAUD
EITHER INVESTORS OR PATIENTS WHEN HE ARRIVED AT THERANOS AROUND
THE 2009 TIMEFRAME, JUST LIKE THE EVIDENCE AT TRIAL DID NOT
PROVE THAT ELIZABETH HOLMES STARTED THERANOS WITH THE INTENT TO
DEFRAUD, THE GOVERNMENT DID NOT PRESENT EVIDENCE AND IS NOT
ARGUING TO THE COURT THAT IT MUST CONCLUDE THAT HIS INITIAL
INTENT IN JOINING THERANOS WAS TO DEFRAUD.

INSTEAD WHAT HAPPENED HERE WAS BOTH HOLMES AND BALWANI
MADE A CHOICE TO DEFRAUD INVESTORS AND PATIENTS WHEN THEY SAW
THE RUNWAY, THE AMOUNT OF TIME THAT THERANOS HAD LEFT
DWINDLING.  THEY COULD HAVE ALLOWED THERANOS TO FAIL.  INSTEAD
THEY CHOSE TO COMMIT FRAUD BOTH TO INVESTORS AND PATIENTS, AND
THAT CHOICE WASN'T MADE WHEN MR. BALWANI JOINED THERANOS OR
WHEN MS. HOLMES FOUNDED THERANOS.

SO MY POINT HERE IS THERE ARE ARGUMENTS THAT THE DEFENSE
IS MAKING TO THE COURT IN ADVANCING THEIR SENTENCING

01:14PM  1    RECOMMENDATION, AND THEY ARE RED HERRINGS.  THE COURT NEED NOT

01:15PM  2    REACH THESE CONCLUSIONS, THAT HE FOUNDED THERANOS OR THAT HE

01:15PM  3    INITIALLY INTENDED TO DEFRAUD IN ORDER TO SENTENCE HIM TO A

01:15PM  4    SIGNIFICANT CUSTODIAL TIME.

01:15PM  5         HIS ACTIONS DURING THE CONSPIRACY PERIODS, 2010 OR SO,

01:15PM  6    WERE SUFFICIENTLY BAD TO JUSTIFY THIS SIGNIFICANT CUSTODIAL

01:15PM  7    SENTENCE.  WE NEED NOT LOOK FURTHER OR EARLIER IN TIME TO FIND

01:15PM  8    ADDITIONAL HARM IN ORDER TO JUSTIFY A SIGNIFICANT CUSTODIAL

01:15PM  9    SENTENCE.

01:15PM 10         THE 3553(A) FACTOR THAT THE COURT IS SUPPOSED TO CONSIDER

01:15PM 11    ARE THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.  THIS IS A

01:15PM 12    VERY AGGRAVATING FACTOR HERE FOR THE COURT TO CONSIDER AND

01:15PM 13    WEIGH.

01:15PM 14         WHAT HAPPENED HERE IS NOT A DISCRETE BAD DECISION ON AN

01:15PM 15    INDIVIDUAL DAY.  INSTEAD, MR. BALWANI CAME TO WORK DAY AFTER

01:15PM 16    DAY AND MADE MISREPRESENTATIONS TO INVESTORS.  HE CREATED

01:15PM 17    DOCUMENTS LIKE THE FINANCIAL STATEMENTS, AND HE ENGAGED WITH

01:16PM 18    WALGREENS, AND BOTH WERE DONE DECEPTIVELY.

01:16PM 19         BUT THE DECEPTION DIDN'T END THERE.  BOTH WERE THEN, THE

01:16PM 20    FINANCIAL STATEMENTS AND THE HEALTH OF THE WALGREENS

01:16PM 21    RELATIONSHIP, WERE USED AS TOOLS TO DEFRAUD INVESTORS.  THEY

01:16PM 22    WERE BOTH COMMUNICATED TO INVESTORS SO THAT INVESTORS BELIEVED

01:16PM 23    THAT THEY WERE INVESTING IN A DIFFERENT COMPANY BASED ON

01:16PM 24    REPRESENTATIONS THAT INVESTORS RECEIVED FROM MR. BALWANI.

01:16PM 25    INVESTORS BELIEVED THAT THEY WERE INVESTING IN A COMPANY THAT

01:16PM 1    WAS GOING TO ACHIEVE SIGNIFICANT REVENUE, SIGNIFICANT INCOME IN

01:16PM 2    THE VERY NEAR TERM, A BILLION DOLLARS IN 2015 IS WHAT INVESTORS

01:16PM 3    WERE TOLD SHORTLY BEFORE 2015.

01:16PM 4        INVESTORS WERE TOLD BASED ON REPRESENTATIONS DIRECTLY FROM

01:16PM 5    MR. BALWANI THAT THEY WERE INVESTING IN A COMPANY THAT HAD A

01:16PM 6    HEALTHY AND EXPANDING RELATIONSHIP WITH WALGREENS.  THAT'S NOT

01:16PM 7    WHAT MR. BALWANI WAS TOLD.

01:16PM 8        MR. BALWANI WAS TOLD BY MR. JHAVERI, WHO THE COURT HEARD

01:17PM 9    FROM DURING TRIAL, THAT WALGREENS WAS CONCERNED ABOUT THE

01:17PM 10   FINGERSTICK DRAW PERCENTAGE AND WOULD NOT EXPAND BEYOND ARIZONA

01:17PM 11   UNTIL THAT NUMBER CAME -- INCREASED, THE NUMBER OF FINGERSTICK

01:17PM 12   DRAWS INCREASED.

01:17PM 13       THAT'S WHAT MR. BALWANI HEARD FROM WALGREENS.  THAT IS NOT

01:17PM 14   WHAT INVESTORS HEARD FROM MR. BALWANI.

01:17PM 15       WHAT INVESTORS HEARD WAS THAT THERANOS WAS IN A HEALTHY

01:17PM 16   AND EXPANDING RELATIONSHIP WITH WALGREENS AND IT IS SO HEALTHY,

01:17PM 17   LOOK AT OUR FINANCIAL PROJECTIONS IN THE VERY NEAR TERM, 2014

01:17PM 18   AND 2015, THAT ARE BASED ON A GREATLY INCREASED NUMBER OF

01:17PM 19   STORES THAT THERANOS CLAIMS THAT IT WOULD BE PRESENT WITHIN

01:17PM 20   WALGREENS STORES GOING NATIONWIDE IN A VERY SHORT PERIOD OF

01:17PM 21   TIME.

01:17PM 22       AGAIN, THAT'S NOT WHAT MR. BALWANI KNEW FROM WALGREENS,

01:17PM 23   BUT INSTEAD THAT'S WHAT MR. BALWANI KNEW THAT HE HAD TO

01:17PM 24   COMMUNICATE TO INVESTORS IN ORDER TO ENCOURAGE THEM TO INVEST.

01:17PM 25       MR. BALWANI DIDN'T ONLY MISLEAD THE INVESTORS BEFORE THEY

01:18PM 1    INVESTED, BUT THERE'S A GOOD EXAMPLE.  THE COURT WILL REMEMBER

01:18PM 2    TRIAL EXHIBIT 2057 IN THE BALWANI TRIAL IN -- AT THAT TIME

01:18PM 3    ALAN EISENMAN FOUND A REPORT BY A CONSULTANT AT UBS.  AND IN

01:18PM 4    THAT REPORT THE CONSULTANT REACHES SOME CONCLUSIONS ABOUT

01:18PM 5    THERANOS, AND ALAN EISENMAN FOUND THOSE CONCLUSIONS

01:18PM 6    INTERESTING.  I'LL COME BACK TO THIS IN A MOMENT AND IDENTIFY

01:18PM 7    FOR THE COURT PRECISELY THESE CONCLUSIONS.

01:18PM 8        BUT THESE CONCLUSIONS IN A PUBLICALLY AVAILABLE SOURCE

01:18PM 9    DOCUMENT WERE COMMUNICATED TO MR. BALWANI, THEY WERE SURPRISING

01:18PM 10   TO ALAN EISENMAN, AND WHEN CONFRONTED WITH THESE FACTS,

01:18PM 11   MR. BALWANI TOLD ALAN EISENMAN THAT IT SOUNDS LIKE THIS IS FROM

01:18PM 12   AN UNINFORMED CONSULTANT.

01:18PM 13       MR. BALWANI KNEW AND NOT ONLY THAT INVESTORS NEEDED TO BE

01:18PM 14   DECEIVED ON THE FRONT IN ORDER FOR THEM TO INVEST, BUT ALSO THE

01:19PM 15   DECEPTION MUST CONTINUE.  THE TRUTH OF WHAT WAS HAPPENING AT

01:19PM 16   THERANOS COULD NOT GET OUT, OTHERWISE THE HOUSE OF CARDS WOULD

01:19PM 17   COLLAPSE.

01:19PM 18       SO THERE'S INSTANCES BOTH OF MR. BALWANI MISLEADING

01:19PM 19   INVESTORS BEFORE THEY INVEST, BUT ALSO PERPETUATING THE FRAUD

01:19PM 20   EVEN POST INVESTMENT LIKE THIS EXAMPLE.  MR. BALWANI ALSO, TO

01:19PM 21   CONTINUE THIS NATURE AND CIRCUMSTANCES OF THE OFFENSE ARGUMENT,

01:19PM 22   PLAYED A SIGNIFICANT ROLE IN THE CLINICAL LAB BY REMOVING

01:19PM 23   DISSENT.

01:19PM 24       WHEN ERIKA CHEUNG GOES TO MR. BALWANI AND SAID THAT SHE

01:19PM 25   WAS CONCERNED ABOUT THE TEST RESULTS, SOME OF THE QC DATA, WHAT

01:19PM 1    ERIKA CHEUNG TOLD THIS JURY WAS THAT MR. BALWANI TOLD HER THAT

01:19PM 2    WASN'T HER JOB.  HER JOB WAS TO PROCESS PATIENT SAMPLES AND NOT

01:19PM 3    ASK QUESTIONS.

01:19PM 4        AND WHEN INDIVIDUALS LIKE ERIKA CHEUNG OR TYLER SHULTZ OR

01:20PM 5    DR. ROSENDORFF RAISED CONCERNS, WHEN THEY WERE UNCOMFORTABLE

01:20PM 6    WITH WHAT THEY WERE BEING ASKED TO DO AT THERANOS, THERE WAS

01:20PM 7    ONLY ONE PLACE FOR THEM, AND THAT WAS THE EXIT.  THEY, BECAUSE

01:20PM 8    THEY WORKED UNDER SUNNY BALWANI, KNEW THEY COULDN'T STAY AT

01:20PM 9    THERANOS, AND THEY WERE ALL GIVEN THE OPTION:  PROCESS PATIENT

01:20PM 10   SAMPLES OR LEAVE.

01:20PM 11       AND WHEN SOMEONE LIKE DR. ROSENDORFF LEFT, YOU CAN SEE

01:20PM 12   WHAT MR. BALWANI DESIRED THROUGH WHO HE HIRES TO REPLACE HIM.

01:20PM 13   WE HAD A DISCUSSION ABOUT THIS EARLIER THIS MORNING.

01:20PM 14       MR. BALWANI HIRES DHAWAN AND SAWYER, TWO LARGELY ABSENTEE

01:20PM 15   LAB DIRECTORS, BECAUSE SOMEONE WHO WAS PRESENT WOULD HAVE ASKED

01:20PM 16   TOO MANY QUESTIONS AT THAT POINT.  THERE WASN'T A WAY TO KEEP

01:20PM 17   THERANOS GOING AND HAVE AN ENGAGED ADAM ROSENDORFF-LIKE LAB

01:20PM 18   DIRECTOR.  SO INSTEAD HE TURNED TO INDIVIDUALS THAT HE KNEW HE

01:20PM 19   COULD KEEP IN THE DARK, AND MR. BALWANI WOULD ACT AS THE

01:20PM 20   DE FACTO LAB DIRECTOR.

01:20PM 21       YOU HEARD TESTIMONY IN TRIAL FROM SAWYER AND DHAWAN ABOUT

01:21PM 22   NOT JUST THE NUMBER OF HOURS OR THE LACK OF HOURS THAT THEY

01:21PM 23   SPENT AT THE LAB, BUT THEIR LACK OF KNOWLEDGE REGARDING EVEN

01:21PM 24   THE TESTING PLATFORMS AT THERANOS.  THEY DIDN'T KNOW THAT

01:21PM 25   THERANOS WAS USING THERANOS DEVICES TO RUN TESTS.

01:21PM 1    MR. BALWANI WOULD HAVE YOU BELIEVE THAT THAT WAS A

01:21PM 2    TEMPORARY FIX, THAT HIS HOPE WAS THAT AN EMPLOYEE AT THERANOS

01:21PM 3    WOULD EVENTUALLY BECOME QUALIFIED TO BECOME THE LAB DIRECTOR,

01:21PM 4    THAT SHOULD GIVE THIS COURT NO COMFORT.

01:21PM 5    DURING THAT PERIOD OF TIME, THEY WERE TESTING PATIENT'S

01:21PM 6    BLOOD JUST LIKE THEY WERE WHEN ADAM ROSENDORFF WAS THERE, JUST

01:21PM 7    LIKE THEY WERE AFTER DHAWAN AND SAWYER LEFT.

01:21PM 8    TO SAY THIS WAS A TEMPORARY FIX ONLY MATTERS IF THEY

01:21PM 9    STOPPED TESTING DURING THAT PERIOD OF TIME.  BUT THERE WAS NO

01:21PM 10   ADJUSTMENT TO THE WAY THEY TREATED INDIVIDUAL PATIENTS WHO

01:21PM 11   TRUSTED THERANOS TO ASSIST THEM IN MAKING MEDICAL DECISIONS.

01:21PM 12   MR. BALWANI HAD A CHOICE IN THAT MOMENT, TO CONTINUE TO

01:21PM 13   HAVE ENGAGED LAB DIRECTORS LIKE DR. ROSENDORFF, OR NOT.  AND HE

01:22PM 14   KNEW WHAT WOULD HAPPEN IF HE CONTINUED TO HAVE ENGAGED LAB

01:22PM 15   DIRECTORS, AND HE MADE A DIFFERENT CHOICE.  AND IT IS THAT

01:22PM 16   CHOICE AND HIS MANY OTHER CHOICES THAT SHOULD LEAD THIS COURT

01:22PM 17   TO CONCLUDE THAT THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

01:22PM 18   ARE A SIGNIFICANTLY AGGRAVATING FACTOR AND SHOULD LEAD THE

01:22PM 19   COURT TO IMPOSE A SIGNIFICANT CUSTODIAL SENTENCE.

01:22PM 20   ON THE SAME POINT, THE DEFENSE HAS ARGUED TO THE COURT

01:22PM 21   THAT MR. BALWANI RECEIVED NO FINANCIAL BENEFIT FROM THE FRAUD

01:22PM 22   AND FOR THAT REASON THIS SHOULD BE A MITIGATING FACTOR.  I WANT

01:22PM 23   TO BE CLEAR ABOUT THIS.  IF THE COURT CONCLUDED THE WAY THAT

01:22PM 24   THE GOVERNMENT ADVOCATED THE GUIDELINES, THAT IS, THE

01:22PM 25   GOVERNMENT'S VIEW OF THE GUIDELINES ARE MR. BALWANI UNDER THE

01:22PM 1    GUIDELINES SHOULD GET A LIFE SENTENCE, THAT HE'S AN ADJUSTED

01:22PM 2    OFFENSE LEVEL 43, CRIMINAL HISTORY CATEGORY I, THEREFORE, THE

01:22PM 3    COURT SHOULD IMPOSE LIFE ACCORDING TO THE GUIDELINES.  THE

01:22PM 4    GOVERNMENT BELIEVES THAT THE LACK OF A FINANCIAL MOTIVE IS A

01:22PM 5    BASIS TO VARY AND NOT JUST THE FINANCIAL MOTIVE, BUT TO BE MORE

01:23PM 6    SPECIFIC, THE DELTA BETWEEN MR. BALWANI'S GAIN AND INVESTOR

01:23PM 7    LOSSES WOULD BE A BASIS TO VARY FROM A GUIDELINE OF LIFE.  THAT

01:23PM 8    IS NOT WHERE THE COURT HAS COME DOWN, THOUGH.

01:23PM 9        SO WHEN THE COURT USES ITS GUIDELINE RANGE 135 TO 168,

01:23PM 10   THIS FACTOR IS NO LONGER A FACTOR THAT THE COURT NEEDS TO BASE

01:23PM 11   A VARIANCE UPON BECAUSE THIS NEW GUIDELINE RANGE, 135 TO 168,

01:23PM 12   IS LOWER THAN WHAT 3553(A) SUGGESTS THE COURT SHOULD IMPOSE.

01:23PM 13       3553(A) SUGGESTS THAT THE COURT SHOULD IMPOSE A 15 YEAR

01:23PM 14   SENTENCE, SO AS A RESULT IT IS NO LONGER NECESSARY TO VARY

01:23PM 15   BASED ON THE LACK OF FINANCIAL GAIN TO MR. BALWANI.

01:23PM 16       THE NEXT 3553(A) FACTOR THE COURT IS ASKED TO CONSIDER ARE

01:23PM 17   THE HISTORY AND CHARACTERISTICS OF MR. BALWANI.  IN MANY

01:23PM 18   INSTANCES, IN MANY CASES THIS WOULD BE A BASIS TO VARY OR A

01:23PM 19   FACTOR IN MITIGATION.  IT ISN'T TRUE HERE, AND IT ISN'T TRUE

01:24PM 20   FOR A COUPLE OF REASONS.

01:24PM 21       FIRST, THE MOST SIGNIFICANT FACTOR IN MR. BALWANI'S FAVOR,

01:24PM 22   THE LACK OF CRIMINAL HISTORY IS COVERED BY THE GUIDELINES.

01:24PM 23   THERE'S SOME INSTANCES IN WHICH THE ADJUSTED OFFENSE LEVEL IS

01:24PM 24   SO HIGH HE GETS NO BENEFIT, IF HE'S IN CRIMINAL HISTORY

01:24PM 25   CATEGORY I OR II, FOR INSTANCE, THE GUIDELINE ADVOCATED BY THE

01:24PM 1    GOVERNMENT, THERE'S NO BENEFIT IF HE'S IN CATEGORY I OR II FOR

01:24PM 2    CRIMINAL HISTORY, SO THE COURT MIGHT THEN THINK IT IS NECESSARY

01:24PM 3    TO INTERVENE AND CREATE A VARIANCE BECAUSE OF THIS MITIGATING

01:24PM 4    FACTOR.  THAT ISN'T THE CASE ANY LONGER.

01:24PM 5        THE COURT'S GUIDELINE AT ADJUSTED OFFENSE LEVEL 33 HAS

01:24PM 6    DISTINCTIONS BETWEEN CRIMINAL HISTORY CATEGORIES, SO

01:24PM 7    MR. BALWANI'S NATURE AND HISTORY, HIS PERSONAL CIRCUMSTANCES

01:24PM 8    ACTUALLY CAN BE ACCOUNTED FOR NOW IN THE GUIDELINES.

01:24PM 9        THERE'S ANOTHER REASON, THOUGH, THE COURT SHOULD NOT FIND

01:24PM 10   AS A MITIGATING FACTOR, AND THAT IS THAT MR. BALWANI'S LETTERS

01:24PM 11   OF SUPPORT DEMONSTRATE THE EXISTENCE OF A SUPPORT NETWORK.

01:25PM 12   THAT SUPPORT NETWORK EXISTED DURING THE FRAUD.

01:25PM 13       THE SUPPORT NETWORKS GENERALLY HELP REDUCE RECIDIVISM.  WE

01:25PM 14   THINK THAT INDIVIDUALS WHO HAVE THE SUPPORT OF FAMILY OR THEIR

01:25PM 15   LOCAL COMMUNITY WILL BE LESS LIKELY TO TURN TO CRIME POST

01:25PM 16   RELEASE.  THAT ISN'T THE CASE HERE, THOUGH.  THAT SUPPORT

01:25PM 17   NETWORK EXISTED WHILE MR. BALWANI WAS ENGAGED IN THIS MULTIYEAR

01:25PM 18   FRAUD.  AS A RESULT THE COURT SHOULD NOT FIND THAT HIS NATURE

01:25PM 19   AND CIRCUMSTANCES ARE A MITIGATING FACTOR AND CERTAINLY NOT ONE

01:25PM 20   THAT REQUIRES THE COURT TO VARY FROM THE GUIDELINE RANGE THAT

01:25PM 21   IT FOUND.

01:25PM 22       IF WE CONTINUE IN 3553(A) NOW (A)(2), WE'RE ASKED TO LOOK

01:25PM 23   AT THE NEED FOR THE SENTENCE IMPOSED, NOT SOME COLLATERAL

01:25PM 24   CONSEQUENCES OF THIS CASE BUT RATHER THE NEED FOR THE SENTENCE

01:25PM 25   IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE AND IT IS

01:26PM 1    FROM THIS PART OF THE STATUTE THAT WE BEGIN OUR DISCUSSION OF

01:26PM 2    GENERAL DETERRENCE.

01:26PM 3        IN THIS CASE THERE HAS BEEN SIGNIFICANT MEDIA ATTENTION

01:26PM 4    AND AS THE CASES SUGGEST, WHITE COLLAR CRIME IS ALSO A

01:26PM 5    PARTICULAR TYPE OF CRIME THAT CAN BE DETERRED THROUGH GENERAL

01:26PM 6    DETERRENCE, THIS IS AN AREA IN WHICH THE COURT SHOULD GIVE

01:26PM 7    PARTICULAR WEIGHT OR EMPHASIS TO GENERAL DETERRENCE BECAUSE A

01:26PM 8    CALCULATION IS MADE BY THOSE WHO ARE CONTEMPLATING COMMITTING

01:26PM 9    FRAUD AND TO SOME EXTENT IT'S A ROUGH MATHEMATICAL CALCULATION,

01:26PM 10   THE RISK OF BEING CAUGHT AND THE POTENTIAL PUNISHMENT VERSUS

01:26PM 11   THE FINANCIAL GAIN OR THE BENEFIT OF COMMITTING THE CRIME.

01:26PM 12       THE MEDIA ATTENTION MAGNIFIES THE BENEFITS OF GENERAL

01:26PM 13   DETERRENCE AND IN SOME INSTANCES THE COURT MAY BE UNCOMFORTABLE

01:26PM 14   WITH IMPOSING A SIGNIFICANT CUSTODIAL SENTENCE ON AN INDIVIDUAL

01:26PM 15   IN A CASE WITH MEDIA ATTENTION BECAUSE IT'S HARD FOR THEM TO

01:26PM 16   CONTROL THE MEDIA ATTENTION.  THEY RECEIVE A SIGNIFICANT

01:27PM 17   SENTENCE IN A CASE FOR A REASON THAT THEY DIDN'T HAVE MUCH

01:27PM 18   CONTROL OVER.

01:27PM 19       AS THE COURT KNOWS, THOUGH, THAT ISN'T THE CASE HERE.  IN

01:27PM 20   THIS INSTANCE BOTH MS. HOLMES AND MR. BALWANI USED THE MEDIA TO

01:27PM 21   PERPETRATE THEIR FRAUD.  "THE WALL STREET JOURNAL" ARTICLE IN

01:27PM 22   2013 THAT THE COURT HEARD ABOUT IN MR. BALWANI'S TRIAL WAS SENT

01:27PM 23   TO MS. HOLMES AND MR. BALWANI BEFORE IT WAS PUBLISHED, AND IT

01:27PM 24   WAS REVIEWED, APPROVED, PUBLISHED, CONTAINED FALSE STATEMENTS,

01:27PM 25   AND THEN WERE SENT, THOSE COPIES OF THE ARTICLE WERE SENT TO

01:27PM  1    INDIVIDUAL INVESTORS.

01:27PM  2         MS. HOLMES AND MR. BALWANI USED THE MEDIA AS PART OF THE

01:27PM  3    FRAUD TO PROVIDE A MEASURE OF LEGITIMACY OR OF CORROBORATION TO

01:27PM  4    STATEMENTS THAT THEY HAD MADE TO INVESTORS AND AS A RESULT HE

01:27PM  5    SHOULDN'T HAVE IT BOTH WAYS.  HE SHOULDN'T GET THE BENEFIT FROM

01:27PM  6    HIS USE OF THE MEDIA DURING THE FRAUD BUT NOW AVOID THE

01:27PM  7    OPPORTUNITY THAT IS AVAILABLE TO THE COURT THROUGH GENERAL

01:28PM  8    DETERRENCE AND THE IMPOSITION OF A SIGNIFICANT CUSTODIAL

01:28PM  9    SENTENCE.

01:28PM 10         HIS USE OF THE MEDIA, THOUGH, DOESN'T END THERE.  I

01:28PM 11    MENTIONED A MOMENT AGO TRIAL EXHIBIT 2057, THAT'S THE UBS EMAIL

01:28PM 12    THAT ALAN EISENMAN SENT TO MR. BALWANI.  AND HERE I WANT TO

01:28PM 13    NOTE JUST SOME OF THE THINGS THAT WERE IN THE UBS CONSULTANT

01:28PM 14    STATEMENTS THAT MR. BALWANI CLAIMED WERE FROM AN UNINFORMED

01:28PM 15    CONSULTANT.

01:28PM 16         ALAN EISENMAN IN HIS UBS REPORT LEARNED THAT BLOOD SAMPLES

01:28PM 17    HAD TO BE SENT TO PALO ALTO.  THAT'S TRUE.  MR. BALWANI TELLS

01:28PM 18    ALAN EISENMAN THAT THAT SOUNDS LIKE IT'S COMING FROM AN

01:28PM 19    UNINFORMED CONSULTANT.

01:28PM 20         MR. EISENMAN ALSO LEARNED THAT THERANOS TESTING WAS LESS

01:28PM 21    RELIABLE THAN TRADITIONAL TESTING, THAT THAT WAS IN THE UBS

01:28PM 22    REPORT.  AGAIN, MR. BALWANI SAYS THAT'S FROM AN UNINFORMED

01:28PM 23    CONSULTANT, EVEN THOUGH WE NOW KNOW THAT TO BE TRUE.

01:28PM 24         AND FINALLY, THE TURN-AROUND TIME WAS OVER 24 HOURS.  THE

01:28PM 25    UBS CONSULTANT WRITES THAT.  ALAN EISENMAN IS SURPRISED BY THAT

01:29PM 1    BECAUSE THAT'S DIFFERENT THAN WHAT HE UNDERSTOOD WHEN HE WAS

01:29PM 2    MAKING THE DECISION TO INVEST.

01:29PM 3         AND MR. BALWANI, WHEN HE'S CONFRONTED WITH THAT AGAIN,

01:29PM 4    INFORMS MR. EISENMAN THAT THAT ALSO MUST BE FROM AN UNINFORMED

01:29PM 5    CONSULTANT.

01:29PM 6         MR. BALWANI'S USE OF THE MEDIA DOESN'T END THERE.  IN HIS

01:29PM 7    ENGAGEMENTS WITH WALGREENS HE SENDS INFORMATION THAT HE FINDS

01:29PM 8    PUBLICALLY AVAILABLE.  IT'S TRIAL EXHIBIT 1254.  THAT WAS AN

01:29PM 9    ARTICLE THAT APPEARED IN NOVEMBER OF 2013, RIGHT AT THE TIME

01:29PM 10   THAT THERANOS AND WALGREENS ARE GOING LIVE.  AND IN THIS

01:29PM 11   PUBLISHED STORY MR. BALWANI READS QUOTE, "NO BOTCHED STICKS, NO

01:29PM 12   PHLEBOTOMISTS, ONLY MACHINES IN THERANOS LABS."  MR. BALWANI

01:29PM 13   TAKES THIS ARTICLE AND SENDS IT TO WALGREENS.

01:29PM 14        SO THE USE OF THE MEDIA, THE MANIPULATION OF THE MEDIA TO

01:29PM 15   PERPETUATE THE FRAUD WAS NOT THE EXCLUSIVE PROVINCE OF

01:29PM 16   ELIZABETH HOLMES.  MR. BALWANI DID IT ALSO AND DID IT TO GREAT

01:30PM 17   EFFECT.  BECAUSE OF THAT THE COURT SHOULD FEEL COMFORTABLE

01:30PM 18   BELIEVING THAT A SENTENCE, A SIGNIFICANT CUSTODIAL SENTENCE

01:30PM 19   HERE WILL SATISFY THE AIMS OF GENERAL DETERRENCE, AND THOSE

01:30PM 20   AIMS WILL BE MAGNIFIED THROUGH THE ADDITIONAL COVERAGE.

01:30PM 21        WE'RE ALSO ASKED UNDER THIS PART OF 3553(A) TO CONSIDER

01:30PM 22   SPECIFIC DETERRENCE.  THE DEFENSE IN THEIR FILING ESSENTIALLY

01:30PM 23   GIVES THIS THE BACK OF THE HAND AND SAYS THAT MR. BALWANI,

01:30PM 24   THERE'S NO RISK OF FUTURE FRAUD, AND THAT THE COURT SHOULD PUT

01:30PM 25   NO WEIGHT ON SPECIFIC DETERRENCE.  THAT'S WRONG FOR THREE

01:30PM 1    REASONS.

01:30PM 2          FIRST, MR. BALWANI HAS NOT ACKNOWLEDGED HIS ROLE IN THE

01:30PM 3    FRAUD, AND THAT SHOULD PROVIDE SOME MEASURE OF CONCERN TO THE

01:30PM 4    COURT.  I'M NOT SAYING THAT THE COURT PUNISHES AN INDIVIDUAL

01:30PM 5    FOR GOING TO TRIAL.  IT'S A DIFFERENT ARGUMENT.  THE ARGUMENT

01:30PM 6    HERE IS THAT WHEN THE COURT IS DECIDING WHETHER THIS INDIVIDUAL

01:30PM 7    IS LIKELY TO COMMIT FUTURE CRIMES, THE COURT USES THE

01:31PM 8    INFORMATION THAT IS AVAILABLE TO IT TO REACH THAT CONCLUSION.

01:31PM 9    AND SOME OF THE INFORMATION THAT IS AVAILABLE TO THIS COURT IS

01:31PM 10   THAT THIS IS A DEFENDANT WHO HAS NOT ACKNOWLEDGED NOT JUST THAT

01:31PM 11   HE DIDN'T HAVE A ROLE IN A FRAUD, BUT HE'S GOING FURTHER.

01:31PM 12         AND THIS IS MY SECOND POINT.  IN THE DEFENSE'S SENTENCING

01:31PM 13   MEMO, THIS IS AT PAGES 25 AND 28, AND AGAIN THIS MORNING

01:31PM 14   THEY'VE REPEATED THIS ARGUMENT.  AND IT GOES LIKE THIS,

01:31PM 15   MR. BALWANI LEFT THERANOS AT A TIME WHEN IT HAD X DOLLARS,

01:31PM 16   $300 MILLION IN THE BANK, AND HE ISN'T RESPONSIBLE FOR WHAT

01:31PM 17   HAPPENED TO THAT MONEY.  IN FACT, MS. HOLMES, THE BOARD OF

01:31PM 18   DIRECTORS, AND THE INVESTORS ARE THE ONES WHO DECIDED HOW TO

01:31PM 19   SPEND THAT MONEY, AND IT IS THEIR FAULT THAT MORE OF THE LOSSES

01:31PM 20   WEREN'T RECOUPED, THAT THE LOSSES TO THE INVESTORS ARE THE

01:31PM 21   RESULT OF THE ACTIONS OF THE INDIVIDUALS WHO REMAINED AT

01:31PM 22   THERANOS AFTER MR. BALWANI LEFT.

01:32PM 23         MR. BALWANI ISN'T EVEN ACKNOWLEDGING TO THE COURT THAT HE

01:32PM 24   WAS PRESENT AT THE SCENE OF A CRIME.  IT'S A DIFFERENT THING TO

01:32PM 25   SAY I HAD A ROLE IN THE FRAUD, AND HE CERTAINLY ISN'T SAYING

01:32PM 1   THAT, BUT HE'S NOW GONE ONE FURTHER AND IS TELLING THIS COURT

01:32PM 2   THERANOS WAS NOT THE SCENE OF THE CRIME UNTIL I LEFT.  UNTIL I

01:32PM 3   LEFT, THERE WAS $300 MILLION LEFT IN THE BANK, AND THAT COULD

01:32PM 4   HAVE BEEN USED TO PAY BACK THE INVESTORS SO THERE WOULD HAVE

01:32PM 5   BEEN NO LOSS HERE.

01:32PM 6       WHEN HE GOES FURTHER AND MAKES THIS ARGUMENT TO THE COURT,

01:32PM 7   THE COURT SHOULD BE ADDITIONALLY CONCERNED ABOUT WHETHER A

01:32PM 8   SPECIFIC DETERRENCE IS NECESSARY, BECAUSE HE WON'T ACKNOWLEDGE

01:32PM 9   THAT THE MONEY IN THE BANK WAS THE RESULT OF FRAUD.  HE CAN

01:32PM 10  STILL MAINTAIN HIS POSITION THAT HE DIDN'T COMMIT FRAUD OR THAT

01:32PM 11  HE DIDN'T HAVE A ROLE IN IT AND THAT WAS ALL MS. HOLMES OR SOME

01:32PM 12  OTHER VERSION, BUT HE'S ACTUALLY GONE FURTHER NOW AND IS

01:32PM 13  TELLING THE COURT THAT MONEY IN THE BANK WAS MONEY THAT

01:32PM 14  THERANOS WAS ENTITLED TO HAVE AND SHOULD HAVE BEEN OR COULD

01:32PM 15  HAVE BEEN DISBURSED TO INVESTORS, AND AMONG THESE INDIVIDUALS,

01:33PM 16  AMONG THE GROUPS THAT HE BLAMES FOR NOT DOING THE RIGHT THING

01:33PM 17  WITH THAT MONEY IS THE INVESTORS THEMSELVES.  AND THE COURT

01:33PM 18  SHOULD BE CONCERNED ABOUT THAT KIND OF ARGUMENT WHEN IT'S

01:33PM 19  THINKING ABOUT WHETHER SPECIFIC DETERRENCE IS RELEVANT, IS A

01:33PM 20  FACTOR THAT IT SHOULD USE TO EITHER AGGRAVATE OR MITIGATE A

01:33PM 21  SENTENCE OUTSIDE OR WITHIN THE GUIDELINES.

01:33PM 22      THE THIRD REASON WHY A SPECIFIC DETERRENCE MATTERS IS A

01:33PM 23  REASON -- AN ARGUMENT I MADE A MOMENT AGO, SO I'LL TOUCH IT

01:33PM 24  BRIEFLY, AND THAT IS THE EXTENSIVE SUPPORT NETWORK THAT EXISTED

01:33PM 25  DURING THE TIME OF THE FRAUD HAS RELEVANCE TO SPECIFIC

01:33PM  1    DETERRENCE.  THE EXTENSIVE NETWORK EXISTED DURING THE FRAUD,

01:33PM  2    DID NOT DETER THE FRAUD, AND AS A RESULT, ONE OF THE CHECKS

01:33PM  3    THAT THE COURT MAY HAVE TO FEEL COMFORTABLE THAT SPECIFIC

01:33PM  4    DETERRENCE ISN'T NECESSARY IN SOME CASES IS ABSENT HERE, THE

01:33PM  5    NETWORK EXISTED AND DID NOT PREVENT THE FRAUD.

01:34PM  6         I WANT TO MOVE ON TO THE NEXT FACTOR WHICH IS PROMOTING

01:34PM  7    RESPECT FOR THE LAW AND PROVIDING JUST PUNISHMENT FOR THE

01:34PM  8    OFFENSE.  AND FOR THIS ONE I WANT TO REMIND THE COURT OF THE

01:34PM  9    REAL HARMS THAT OCCURRED HERE.  FOR THE INVESTOR SIDE, THE

01:34PM 10    INVESTORS LOST MILLIONS OF DOLLARS.  THAT IS ITSELF A

01:34PM 11    SIGNIFICANT HARM DESERVING OF A SIGNIFICANT CUSTODIAL SENTENCE,

01:34PM 12    BUT IT ALSO HAS A ROLE BECAUSE THE MONEY THAT WAS INVESTED HERE

01:34PM 13    HAD SIGNIFICANT OPPORTUNITY COST.  MUCH OF THE MONEY THAT WAS

01:34PM 14    INVESTED IN THERANOS, IF IT DIDN'T GO TO THERANOS, IT COULD

01:34PM 15    HAVE GONE TO OTHER LEGITIMATE TECHNOLOGICAL INNOVATIONS WITH

01:34PM 16    COMPANIES, ESPECIALLY COMPANIES HERE IN SILICON VALLEY, THAT

01:34PM 17    HAD REAL COMPANIES, THAT COULD DO REAL GOOD IN THE WORLD.

01:34PM 18         THE INVESTORS THOUGHT THAT WHAT THEY WERE INVESTING IN WAS

01:34PM 19    ONE OF THOSE COMPANIES.  AND THE REASONS THEY THOUGHT THAT IS

01:34PM 20    BECAUSE SOME OF THE STATEMENTS THAT MR. BALWANI HIMSELF MADE TO

01:34PM 21    INVESTORS WERE CREATED, WERE BIRTHED WITH THAT IDEA IN MIND TO

01:34PM 22    MAKE INVESTORS THINK THAT WHAT THEY WERE INVESTING IN WAS A

01:34PM 23    COMPANY WITH REAL TECHNOLOGY THAT COULD AFFECT THE FUTURE OF

01:35PM 24    HEALTH CARE.  INSTEAD INVESTORS INVESTED IN A FRAUD.  THEIR

01:35PM 25    MONEY COULD HAVE GONE TO A REAL COMPANY THAT COULD HAVE

01:35PM 1    AFFECTED HEALTH CARE IN THE FUTURE.

01:35PM 2        THERE'S ALSO REAL HARM ON THE PATIENT SIDE.  THE COURT

01:35PM 3    HEARD FROM PATIENTS DURING MR. BALWANI'S TRIAL WHO TESTIFIED

01:35PM 4    ABOUT THEIR EXPERIENCES.  I WON'T REPEAT ALL OF THEM, BUT THE

01:35PM 5    COURT KNOWS THAT INDIVIDUALS WHO RECEIVED BLOOD TEST RESULTS

01:35PM 6    FROM THERANOS MADE MEDICAL DECISIONS BASED ON THOSE BLOOD TEST

01:35PM 7    RESULTS.

01:35PM 8        IT IS NOT AN INTELLECTUAL LEAP TO SEE THE HARM.  IT IS THE

01:35PM 9    DIRECT RESULT.  ONE CAUSE OR IMPLIED THE OTHER IN THIS CASE.

01:35PM 10   AND INDIVIDUALS RECEIVED TEST RESULTS THAT WERE INCORRECT AND

01:35PM 11   MADE MEDICAL DECISIONS BASED UPON THAT INCORRECT INFORMATION.

01:35PM 12   THAT, TOO, IS A SIGNIFICANT REAL HARM THAT THIS COURT MUST

01:35PM 13   ADDRESS THROUGH ITS SIGNIFICANT CUSTODIAL SENTENCE.

01:36PM 14       THE LAST FACTOR I WANT TO TURN TO IS (A)(6), 3553(A)(6).

01:36PM 15   AND THE REASON I WANT TO TOUCH ON THIS ONE IS BECAUSE WE NOW

01:36PM 16   HAVE THE SENTENCE IMPOSED IN MS. HOLMES'S CASE.  AND THIS

01:36PM 17   FACTOR INFORMS US THAT WE SHOULD AVOID UNWARRANTED SENTENCE

01:36PM 18   DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN

01:36PM 19   FOUND GUILTY OF SIMILAR CONDUCT.

01:36PM 20       UNWARRANTED IS THE IMPORTANT WORD HERE.  MS. HOLMES

01:36PM 21   RECEIVED A SENTENCE OF 135 MONTHS.  THE GOVERNMENT IS ASKING

01:36PM 22   THE COURT TO SENTENCE MR. BALWANI HIGHER THAN THAT, TO A

01:36PM 23   SENTENCE OF 180 MONTHS, AND THAT IS A DISPARITY.  THOSE NUMBERS

01:36PM 24   ARE DIFFERENT, IT IS NOT UNWARRANTED, AND IT IS NOT UNWARRANTED

01:36PM 25   FOR SEVERAL REASONS.

01:36PM 1    FIRST, MR. BALWANI PLAYED A SIGNIFICANT ROLE IN BOTH THE

01:36PM 2 PATIENT FRAUD AND ALSO THE INVESTOR FRAUD.  I'VE IDENTIFIED

01:36PM 3 SPECIFIC PLACES OR SPECIFIC ROLES THAT MR. BALWANI PLAYED, SO

01:37PM 4 I'M NOT GOING TO REPEAT THOSE NOW, BUT IT IS RELEVANT AS THE

01:37PM 5 COURT ANALYZES WHETHER THERE'S A WARRANTED OR AN UNWARRANTED

01:37PM 6 DISPARITY BETWEEN MS. HOLMES AND MR. BALWANI SHOULD THE COURT

01:37PM 7 IMPOSE A SENTENCE LIKE THE ONE THAT THE GOVERNMENT IS

01:37PM 8 ADVOCATING FOR.

01:37PM 9    THE REASON THAT IT WOULD NOT BE UNWARRANTED IS BECAUSE

01:37PM 10 WHEN THE COURT SENTENCED MS. HOLMES, EVEN THOUGH IT COULD

01:37PM 11 CONSIDER AS RELEVANT CONDUCT ACQUITTED CONDUCT, THE COURT CHOSE

01:37PM 12 NOT TO.  THE COURT CHOSE TO SENTENCE MS. HOLMES BASED UPON THE

01:37PM 13 CONVICTED CONDUCT THAT WAS LIMITED TO THE INVESTOR FRAUD.

01:37PM 14    MR. BALWANI, AS THE COURT KNOWS, WAS CONVICTED OF ALL

01:37PM 15 COUNTS IN THE INDICTMENT.  THAT INCLUDED THE PATIENT FRAUD.

01:37PM 16 AND IT IS NOT JUST THE COUNTS OF CONVICTION THAT MATTERED, BUT

01:37PM 17 THE COURT SAW THE EVIDENCE IN THE CASE.  THE COURT SAW THE ROLE

01:37PM 18 THAT MR. BALWANI PLAYED IN THE LAB.

01:37PM 19    MR. BALWANI FIRED INDIVIDUALS WHO EXPRESSED DISSENT, HE

01:37PM 20 TOLD INDIVIDUALS WHO EXPRESSED DISSENT THAT THEIR JOB WAS

01:38PM 21 SIMPLY TO PROCESS PATIENT SAMPLES, HE REPLACED ENGAGED LAB

01:38PM 22 DIRECTORS WITH UNENGAGED LAB DIRECTORS, AND IT'S ALL OF THOSE

01:38PM 23 REASONS WHY THE COURT SHOULD FEEL COMFORTABLE THAT MR. BALWANI

01:38PM 24 SHOULD RECEIVE A MORE SIGNIFICANT SENTENCE THAN MS. HOLMES AND

01:38PM 25 THAT DISPARITY WOULD NOT BE UNWARRANTED.

01:38PM 1    MR. BALWANI ALSO PLAYED, AND I WANT TO HIGHLIGHT THIS, A

01:38PM 2    ROLE IN THE WALGREENS ROLLOUT THAT THE COURT HEARD SIGNIFICANT

01:38PM 3    EVIDENCE IN HIS TRIAL ABOUT.

01:38PM 4        MR. BALWANI WAS THE POINT PERSON AT THERANOS, AND

01:38PM 5    MR. JHAVERI WAS THE POINT PERSON AT WALGREENS, AND THE TWO OF

01:38PM 6    THEM WORKED TO OPERATIONALIZE THE ROLLOUT.  THAT ROLLOUT PLAYED

01:38PM 7    A SIGNIFICANT ROLE IN BOTH FRAUDS.

01:38PM 8        I TOUCHED ON THIS EARLIER THAT INVESTORS INVESTED BECAUSE

01:38PM 9    THEY SAW AND HEARD THAT THE ROLLOUT WITH WALGREENS WAS GOING

01:38PM 10   WELL, AND THEY WERE TOLD THAT THE ROLLOUT WITH WALGREENS WAS

01:39PM 11   EXPANDING.

01:39PM 12       THEY ALSO -- THE WALGREENS ROLLOUT ALSO CREATED THE

01:39PM 13   OPPORTUNITY FOR THE PATIENTS TO BE DEFRAUDED, TO GET THE

01:39PM 14   INACCURATE BLOOD TEST RESULTS.

01:39PM 15       MR. BALWANI'S ROLE, THE INTEGRAL ROLE THAT HE PLAYED IN

01:39PM 16   THE WALGREENS ROLLOUT AFFECTED BOTH FRAUDS, THE PATIENT FRAUD

01:39PM 17   AND THE INVESTOR FRAUD AND BECAUSE THAT PLAYED SUCH A

01:39PM 18   SIGNIFICANT ROLE IN BOTH FRAUDS, THE COURT SHOULD FEEL

01:39PM 19   COMFORTABLE IMPOSING A MORE SIGNIFICANT CUSTODIAL SENTENCE ON

01:39PM 20   MR. BALWANI THAN IT DID ON MS. HOLMES, AND THAT THAT DIFFERENCE

01:39PM 21   WOULD NOT BE AN UNWARRANTED SENTENCE DISPARITY.

01:39PM 22       THE LAST ISSUE I'LL TOUCH ON IS MR. BALWANI ADDRESSES

01:39PM 23   BASES FOR VARIANCE IN HIS MEMO, AND HE ESSENTIALLY SAYS THAT HE

01:39PM 24   INVESTED HIS OWN MONEY, THE MILLIONS OF DOLLARS, AND HE NEVER

01:39PM 25   SOUGHT FAME OR RECOGNITION, AND THAT HE HAS A LONG HISTORY OF

01:39PM 1    CHARITABLE GIVING.  IT IS THESE THREE PILLARS UPON WHICH THE

01:39PM 2    DEFENSE'S VARIANCE REQUEST IS BASED.

01:40PM 3        THE COURT SHOULD REJECT THEM AND DETERMINE THAT A SENTENCE

01:40PM 4    WITHIN THE GUIDELINE, WITHIN THE GUIDELINES THAT THE GOVERNMENT

01:40PM 5    RECOMMENDED WOULD BE LIFE.  THE GUIDELINES THAT THE COURT FOUND

01:40PM 6    135 TO 168 ARE MORE APPROPRIATE THAN ONE LIKE THE DEFENSE IS

01:40PM 7    ASKING FOR, WHICH IS A SENTENCE OF PROBATION.  NOT ONLY WOULD A

01:40PM 8    SENTENCE OF PROBATION IGNORE ALL OF THE PRIOR 3553(A) FACTORS

01:40PM 9    THAT I JUST COVERED WITH THE COURT, BUT IT ALSO ASSUMES THAT

01:40PM 10   THESE ARE PROPER BASES FOR VARIANCE, THAT MR. BALWANI'S

01:40PM 11   INVESTMENT OF HIS OWN MONEY, HE ARGUES, UNLIKE

01:40PM 12   ELIZABETH HOLMES, MR. BALWANI INVESTED HIS OWN MONEY.

01:40PM 13       THE COURT KNOWS FROM INFORMATION THAT IT RECEIVED DURING

01:40PM 14   THE COURSE OF THE TRIAL, MR. BALWANI HAD THE ABILITY TO INVEST

01:40PM 15   HIS OWN MONEY.  IT SHOULD NOT REWARD HIM FOR THAT.  IT, IN

01:40PM 16   FACT, SHOULD CAUSE THE COURT TO QUESTION HOW MR. BALWANI COULD

01:40PM 17   HAVE MADE THESE CHOICES.  WHY IT IS THAT MR. BALWANI, WHEN

01:40PM 18   FACED WITH THERANOS POTENTIALLY RUNNING OUT OF ITS RUNWAY, WHY

01:41PM 19   HE CHOSE TO DEFRAUD INVESTORS, WHY HE CHOSE TO DEFRAUD

01:41PM 20   PATIENTS?  THERE SIMPLY IS NO ANSWER TO THAT QUESTION.

01:41PM 21       THAT HE DID NOT SEEK FAME OR RECOGNITION IS NOT SOMETHING

01:41PM 22   THAT AT THIS STAGE HE SHOULD GET CREDIT FOR.

01:41PM 23       MR. BALWANI HELD ON TO HIS SHARES BECAUSE WHEN HE HAD --

01:41PM 24   BECAUSE WHEN HE POSSESSED THEM DURING THE FRAUD, THEY WERE

01:41PM 25   WORTH HUNDREDS OF MILLIONS OF DOLLARS, AND MR. BALWANI WANTED

01:41PM 1    BILLIONS OF DOLLARS.  HE HELD ON TO THEM BECAUSE HE ASSUMED, HE

01:41PM 2    THOUGHT THAT THERANOS WOULD OUTLIVE THE FRAUD, THAT EVENTUALLY

01:41PM 3    THERANOS COULD BECOME WHAT HE WAS TELLING INDIVIDUALS THERANOS

01:41PM 4    WAS, AND IF HE WAS SUCCESSFUL, HE WAS TAKING A RISK AND HE WAS

01:41PM 5    PLAYING THE GAME THAT EVENTUALLY WE WILL BE WHAT WE CLAIM TO BE

01:41PM 6    AND I WILL HAVE SHARES THAT ARE WORTH BILLIONS OF DOLLARS

01:41PM 7    INSTEAD OF MILLIONS.

01:41PM 8        SO THAT HE DID NOT SEEK FAME OR SOUGHT TO RECEIVE SOME

01:41PM 9    MEASURE OF RECOGNITION FOR IT IS NOT A BASIS FOR THE COURT NOW

01:42PM 10   TO DETERMINE HE DESERVES A VARIANCE AND CERTAINLY NOT ONE TO

01:42PM 11   PROBATION, WHICH IS WHAT THE DEFENSE IS ASKING FOR.

01:42PM 12       HIS HISTORY OF CHARITABLE GIVING IS CERTAINLY LAUDABLE.  I

01:42PM 13   DON'T HAVE ANY ADDITIONAL WORDS TO SAY ON THAT OTHER THAN IT IS

01:42PM 14   NOT A BASIS TO VARY OUTSIDE OF THE GUIDELINES THAT THE COURT

01:42PM 15   HAS FOUND, IT IS NOT A BASIS TO VARY BEYOND THE 180 MONTHS THAT

01:42PM 16   THE GOVERNMENT IS ASKING THE COURT TO IMPOSE, AND IT IS

01:42PM 17   CERTAINLY NOT A BASIS TO VARY DOWN TO PROBATION AS THE DEFENSE

01:42PM 18   IS ASKING FOR.

01:42PM 19       BEYOND THAT, I'LL SUBMIT AND ENCOURAGE THE COURT TO IMPOSE

01:42PM 20   A SIGNIFICANT CUSTODIAL SENTENCE REQUESTED BY THE GOVERNMENT.

01:42PM 21   THANK YOU.

01:42PM 22           THE COURT:  THANK YOU.

01:42PM 23       DOES DEFENSE WISH TO BE HEARD?

01:42PM 24           MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

01:43PM 25       SO THANK YOU FOR THE OPPORTUNITY, YOUR HONOR.  AND AFTER

| | |
|---|---|
| 01:43PM | 1 |
ALL OF THIS TIME, WE'VE FINALLY REACHED THIS POINT.  THIS IS

OBVIOUSLY A DECISION THAT AFFECTS A REAL HUMAN BEING,

MR. BALWANI.  THIS IS, AT THIS TIME, NOT A MATTER OF

CALCULATING DECIMAL POINTS AND NUMBERS.  IT'S ABOUT WHO

MR. BALWANI IS AND WHAT SENTENCE HE SHOULD RECEIVE.

THE REASON I SAY THAT IN PART, YOUR HONOR, IS BECAUSE IN

LISTENING TO MR. SCHENK, I FEEL LIKE WE'RE BACK IN THE

PRE-BOOKER WORLD WHERE SOMEHOW THE GUIDELINES ARE PRESUMED

REASONABLE AND THEY'RE OVERRIDINGLY THE MOST IMPORTANT THING,

AND THEN WE HAVE TO JUSTIFY VARIANCES.

I UNDERSTAND THE GUIDELINES UNDER THE PRECEDENT THAT EXIST

ARE A STARTING POINT.  FOR THE RECORD, WE DON'T EVEN AGREE WITH

THAT, THAT THEY SHOULD BE.  BUT WE UNDERSTAND THAT'S WHERE THE

COURT STARTS.

BUT THEY ARE A STARTING POINT.  THERE'S NO PRESUMPTION

THAT THEY'RE REASONABLE.  THEY'RE JUST ONE FACTOR AMONG ALL OF

THE 3553(A) FACTORS.

SO WHEN MR. SCHENK SAYS, WELL, HE THINKS THE GUIDELINES

ARE LIFE AND HE'S DOING US A FAVOR BY RECOMMENDING 15 YEARS,

THAT'S JUST OVERLY RELATED TO THE GUIDELINES AND NOT

APPROPRIATE IN TODAY'S SENTENCING WORLD.

THE OTHER THING THAT I WANT TO JUST OBSERVE IN GENERAL IS

THAT THE GOVERNMENT SAID A LOT OF THINGS AT TRIAL.  AND AS THE

COURT REMEMBERED, THERE WERE A LOT OF THINGS THAT THE

GOVERNMENT DID, AND THEY ARE ENTITLED TO MAKE A STRATEGIC

117

01:44PM 1    CHOICE WHERE THEY DECIDED TO PRESENT EVIDENCE AND NOT PRESENT

01:44PM 2    THE OTHER SIDE.  THEY DIDN'T, IN OTHER WORDS, FRONT THINGS AS

01:44PM 3    SOMETIMES LAWYERS DO.

01:44PM 4        AND THEY ARE NOW ASSUMING BECAUSE OF THE JURY VERDICT,

01:44PM 5    WHICH IS AGAIN A GENERAL VERDICT, THAT EVERY SINGLE FACT THAT

01:44PM 6    THEY PUT INTO PLAY AT TRIAL IS SOMEHOW FOUND BEYOND A

01:44PM 7    REASONABLE DOUBT.  THAT IS NOT THE CASE.

01:44PM 8        AND THEY'RE DOING THAT TODAY, AND THEY'VE DONE THAT

01:44PM 9    REPEATEDLY.

01:44PM 10        SO, FOR EXAMPLE, WHEN THE GOVERNMENT SAYS THAT MR. BALWANI

01:45PM 11   DIDN'T HAVE ANY BASIS TO THINK THAT THE WALGREENS RELATIONSHIP

01:45PM 12   WOULD CONTINUE TO GROW AFTER -- GIVEN HIS DEALINGS WITH

01:45PM 13   MR. JHAVERI AT WALGREENS, IN FACT, MR. JHAVERI SENT MR. BALWANI

01:45PM 14   AN EMAIL THAT SAID IN AUGUST OF 2014, SAID WE ARE GOING TO

01:45PM 15   TOUCH 2500 STORES IN 2015.  AND MR. JHAVERI DID THAT WITH FULL

01:45PM 16   KNOWLEDGE OF WHAT THE FINGERSTICK PERCENTAGES WERE AND SOME OF

01:45PM 17   THE DIFFICULTIES IN GETTING THAT FINGERSTICK PERCENTAGE DOWN TO

01:45PM 18   WHERE BOTH SIDES WANTED TO TARGET IT, WHICH BY THE WAY IN THE

01:45PM 19   EVIDENCE OF THE CASE WAS NOT REQUIRED BY WALGREENS UNTIL AUGUST

01:45PM 20   OF 2015.  SO THERE WAS PLENTY OF TIME.

01:45PM 21        BUT I ONLY RAISE THAT ONE THING, YOUR HONOR, AS AN

01:45PM 22   ILLUSTRATION THAT NOT EVERYTHING THAT THE GOVERNMENT PRESENTED

01:45PM 23   AT TRIAL IS TRUE.  THERE WAS DEFENSE EVIDENCE AND THE

01:45PM 24   GOVERNMENT IS TRYING TO IGNORE.  SO THERE'S A MUCH MORE NUANCED

01:45PM 25   BALANCED LOOK AT THIS THAT IS REQUIRED THAN WHAT THE GOVERNMENT

01:46PM 1    SAYS.

01:46PM 2        LET ME JUST SORT OF GO BACK TO FIRST PRINCIPLES.  SO THE

01:46PM 3    NATURE AND CIRCUMSTANCES OF THE OFFENSE.  MR. BALWANI, AS

01:46PM 4    MR. SCHENK HAS TO CONCEDE, DID NOT JOIN THERANOS BECAUSE HE WAS

01:46PM 5    TRYING TO DEFRAUD ANYONE.  IN FACT, BY THE TIME THAT

01:46PM 6    MR. BALWANI JOINED THERANOS, HE HAD ACCOMPLISHED EDUCATIONAL

01:46PM 7    ACHIEVEMENTS, HE HAD ACCOMPLISHED BUSINESS ACHIEVEMENTS, HE HAD

01:46PM 8    OBTAINED DEGREES.  HIS STORY IS REALLY A CLASSIC AMERICAN

01:46PM 9    SUCCESS STORY OF A MAN WHO CAME HERE AS A YOUNG PERSON TO GO TO

01:46PM 10   COLLEGE HERE IN THE UNITED STATES AND STUDIED HARD AND WORKED

01:46PM 11   HARD AND MOVED HERE TO SILICON VALLEY AND STARTED A COMPANY AND

01:46PM 12   WAS SUCCESSFUL.

01:46PM 13       AS MR. SCHENK SAID, HE LATER JOINED THERANOS IN 2009 NOT

01:46PM 14   TO DEFRAUD ANYONE, SO RIGHT AWAY HE DOESN'T HAVE ANY KIND OF

01:46PM 15   BACKGROUND IN THIS.  MS. HOLMES OBVIOUSLY FOUNDED THE COMPANY

01:47PM 16   MUCH EARLIER.

01:47PM 17       SO HE JOINS THERANOS.  SO WHAT DOES HE DO?  HE DOES SOME

01:47PM 18   DUE DILIGENCE AS WE'VE POINTED OUT.  HE DOES A LOT OF DUE

01:47PM 19   DILIGENCE.  HE ASKS A LOT OF QUESTIONS.  HE MEETS WITH A LOT OF

01:47PM 20   THE LEADING PEOPLE AT THERANOS.  HE MEETS WITH

01:47PM 21   CHANNING ROBERTSON, AN ENGINEER PROFESSOR AT STANFORD WHO TELLS

01:47PM 22   HIM THINGS ARE GREAT, AND HE DECIDES TO JOIN.

01:47PM 23       ALL OF THE EVIDENCE HERE POINTS TO THE FACT THAT

01:47PM 24   MR. BALWANI JOINED THIS COMPANY BECAUSE HE BELIEVED IN THE

01:47PM 25   MISSION OF THERANOS, HE HAD SOME FAMILY HISTORY, HIS FATHER

01:47PM 1    DIED AT A RELATIVELY YOUNG AGE, AND HE HAD SOME FAMILY HISTORY

01:47PM 2    THAT WANTED HIM TO CONTRIBUTE.

01:47PM 3        AND THIS WAS NOT UNUSUAL FOR MR. BALWANI.  HE HAD BEEN

01:47PM 4    CONTRIBUTING HIS WHOLE LIFE.  AS THE COURT HAS SEEN FROM THE

01:47PM 5    LETTERS THAT WE HAVE SUBMITTED, MR. BALWANI HAS A LONG HISTORY

01:47PM 6    OF GIVING.

01:47PM 7        MR. SCHENK SAYS, WELL, THAT'S NOT A FACTOR THAT THE COURT

01:47PM 8    SHOULD CONSIDER.  IT'S LAUDABLE, BUT, YOU KNOW, IT'S ABOUT WHO

01:47PM 9    MR. BALWANI IS.  SO IT IS A VERY IMPORTANT FACTOR TO LOOK AT

01:47PM 10   THE WHOLE PERSON HERE.

01:47PM 11       AND WHAT MR. BALWANI DID WITH HIS CHARITABLE GIVING LONG

01:48PM 12   BEFORE THERANOS, AND INCLUDING WHILE HE WAS INVOLVED WITH

01:48PM 13   THERANOS AND EVEN AFTER THAT, WAS HE TRIED TO -- YOU CAN SEE,

01:48PM 14   IT'S HELPING AN ORGANIZATION BUILD A COMMUNITY KITCHEN TO FEED

01:48PM 15   PEOPLE WHO NEEDED HELP, IT'S HELPING A VILLAGE GET A WATER PUMP

01:48PM 16   SO IT CAN SUPPLY WATER TO ITS INHABITANTS, IT'S CONTRIBUTING

01:48PM 17   MONEY SO THAT WHEELCHAIRS CAN BE PROVIDED TO PEOPLE WHO NEED TO

01:48PM 18   USE WHEELCHAIRS, AND IT'S VOLUNTEERING IN A CHARITABLE KITCHEN

01:48PM 19   TO ACTUALLY HELP HANDS ON FEED HOMELESS PEOPLE.  HE DID ALL OF

01:48PM 20   THAT WITHOUT ANY REQUEST FOR RECOGNITION.  HE DIDN'T WANT HIS

01:48PM 21   NAME ON A BUILDING.  NOTHING.  HE JUST WANTED TO HELP, AND

01:48PM 22   THAT'S WHY HE JOINED THERANOS BECAUSE HE WANTED TO HELP.  HE

01:48PM 23   WANTED TO CONTRIBUTE.

01:48PM 24       NOW, HE NOT ONLY CONTRIBUTED BY JOINING AND WORKING AND

01:48PM 25   ROLLING UP HIS SLEEVES AND TRY TO MAKE THIS COMPANY AS GOOD AS

01:48PM 1  COULD BE, HE ALSO INVESTED A LOT OF MONEY.  SO HE NOT ONLY

01:49PM 2  TALKED THE TALK, HE WALKED THE WALK.  HE PUT IN, AS THE COURT

01:49PM 3  SAW, WELL OVER $4 AND A HALF MILLION.  HE ALSO GUARANTEED A

01:49PM 4  LOAN WHICH SOHAN SPIVEY TESTIFIED AT TRIAL WAS THE SAME

01:49PM 5  ECONOMICALLY AS MR. BALWANI LOANING MONEY TO THE COMPANY.

01:49PM 6      SO HE LOANS MONEY.  HE'S ON THE HOOK FOR $12 MILLION AND

01:49PM 7  THAT HE COULD HAVE LOST AND FORTUNATELY HE DIDN'T LOSE THAT

01:49PM 8  MONEY.  HE DID LOSE THE 4 AND A HALF MILLION, MORE THAN THAT

01:49PM 9  THAT, HE INVESTED, PLUS THE MONEY THAT HE GAVE MS. HOLMES SO

01:49PM 10  SHE COULD BUY COMPANY STOCK.  SO MR. BALWANI ACTUALLY INVESTED

01:49PM 11  THAT MONEY.

01:49PM 12      MR. SCHENK SAYS, WELL, IT IS TRUE THAT HE NEVER SOLD A

01:49PM 13  SHARE, THAT IS TRUE, BUT SOMEHOW MR. SCHENK TURNS THAT AROUND

01:49PM 14  INTO AN AGGRAVATING FACTOR BECAUSE HE WAS SOMEHOW GREEDY WHERE

01:49PM 15  HE WANTED EVEN MORE BILLIONS SO HE WASN'T EVEN WILLING TO PART

01:49PM 16  WITH A SINGLE SHARE.  THERE'S NO EVIDENCE OF THAT.  IT'S POOR

01:49PM 17  SPECULATION.

01:49PM 18      NOTHING IN MR. BALWANI'S HISTORY FROM THE FACT THAT HE

01:50PM 19  GAVE OVER AND OVER AGAIN FOR A LONG PERIOD OF TIME WITH

01:50PM 20  CHARITABLE GIVING WITHOUT ASKING FOR ANYTHING.  HE INVESTED IN

01:50PM 21  THERANOS, HE ASKED FOR A SALARY OF ONE DOLLAR WHEN HE JOINED

01:50PM 22  THERANOS.  NOTHING IN THIS RECORD SUPPORTS THE IDEA THAT

01:50PM 23  MR. BALWANI IS GREEDY, AND THE REASON HE DIDN'T SELL SHARES IS

01:50PM 24  BECAUSE HE WANTED TO MAKE MORE BILLIONS.  AND IT'S NOT ALL OR

01:50PM 25  NOTHING BY THE WAY, YOUR HONOR.

01:50PM 1      MR. SCHENK AND THE GOVERNMENT POINT TO, WELL,

01:50PM 2  MR. BALWANI'S INVESTMENT IN THERANOS WAS RELATIVELY EARLY, IN

01:50PM 3  2009 AND 2010, AND SO WHAT ABOUT 2013, 2014, 2015?  MR. BALWANI

01:50PM 4  HAD ALL OF THESE SHARES WORTH HALF A BILLION DOLLARS, AND IF

01:50PM 5  YOU'RE TRYING TO DEFRAUD PEOPLE, COULD YOU HAVE SOLD ONE SHARE?

01:50PM 6  TEN SHARES?  A HUNDRED SHARES?  FIVE THOUSAND SHARES?  IT WOULD

01:50PM 7  BE A BASIC.  NO ONE WOULD BAT AN EYELASH IF SOMEONE WHO OWNED

01:50PM 8  THAT MANY SHARES IN A COMPANY THAT'S A HOT COMPANY AT THE TIME

01:50PM 9  WANTED TO DIVERSIFY THEIR PORTFOLIO A BIT YOU HAD TO SELL EVERY

01:50PM 10  SINGLE SHARE.

01:51PM 11      THIS IDEA THAT HE HELD ON TO THE SHARES BECAUSE HE WANTED

01:51PM 12  TO MAKE EVEN MORE BILLIONS, MR. SCHENK SAID THAT'S AN

01:51PM 13  AGGRAVATING FACTOR, THERE'S NO EVIDENCE OF THAT.  IT'S

01:51PM 14  BASICALLY MADE UP.

01:51PM 15      WHAT WE'VE GOT HERE AND THE REASON I'M TELLING YOU THIS,

01:51PM 16  YOUR HONOR, AND THE COURT KNOWS THIS FROM TRIAL IS THAT WE HAVE

01:51PM 17  A CASE THAT IS VERY UNUSUAL HERE.  IT'S OUTSIDE OF THE

01:51PM 18  HEARTLAND.  IT'S ATYPICAL OF THE FRAUD CASES THAT THIS COURT

01:51PM 19  AND COURTS ALL OVER THIS COUNTRY SEE EVERY SINGLE DAY, AND THAT

01:51PM 20  IS THE PRIMARY DRIVING MOTIVE OF FRAUD IS GREED, IS TO PUT

01:51PM 21  YOURSELF FIRST, IS TO MAKE MONEY BEFORE OTHERS.

01:51PM 22      THERE ARE MANY DEFENDANTS THAT I'M SURE THIS COURT HAS

01:51PM 23  SEEN AND CERTAINLY I HAVE SEEN AS AN ATTORNEY WHERE IF YOU GET

01:51PM 24  THE VICTIM'S MONEY, IT'S A WIN.  AND IF YOU ARE ABLE TO BUY A

01:51PM 25  HOUSE OR A BOAT OR TAKE A GREAT VACATION, THAT'S A WIN.

01:51PM 1    THERE IS NOTHING IN THIS RECORD THAT SUPPORTS IN ANY WAY

01:51PM 2    THAT MR. BALWANI WAS MOTIVATED BY THOSE THINGS.  HE DIDN'T DO

01:51PM 3    THOSE THINGS.  HE DIDN'T MAKE ANYTHING AT THERANOS.  IN FACT,

01:52PM 4    HE WAS AN INVESTOR IN THERANOS WHO LOST A LOT OF MONEY, AND

01:52PM 5    OBVIOUSLY HE WORKED FOR THE COMPANY AS WELL, AND WE CAN TALK

01:52PM 6    ABOUT THAT.

01:52PM 7    BUT THERE'S NO GREED FACTOR HERE.  THERE IS NO FINANCIAL

01:52PM 8    BENEFIT.  AND MR. SCHENK SAYS, WELL, MAYBE THAT'S A REASON TO

01:52PM 9    DEPART FROM LIFE.  AGAIN, THAT'S PUTTING THE GUIDELINES INTO AN

01:52PM 10   EXALTED PLACE THAT THEY ARE NOT DESERVING OF UNDER THE LAW, BUT

01:52PM 11   THEY ARE A REASON FOR A SIGNIFICANTLY LOWER SENTENCE HERE NOT

01:52PM 12   ONLY COMPARED TO THE GUIDELINE RANGE THAT THE COURT CALCULATED,

01:52PM 13   BUT ALSO COMPARED TO MS. HOLMES WHO DID NOT DO THAT.  SHE DID

01:52PM 14   NOT INVEST HER OWN MONEY.

01:52PM 15   THE OTHER THING I'LL SAY ABOUT THAT IN TERMS OF DISPARITY,

01:52PM 16   AND I'M JUMPING AROUND BUT I HOPE IT FLOWS LOGICALLY,

01:52PM 17   YOUR HONOR, MS. HOLMES RECEIVED A VERY HARSH SENTENCE, 11 YEARS

01:52PM 18   AND 3 MONTHS.  I THINK IT WAS 135 MONTHS.

01:52PM 19   AND WHAT THE GOVERNMENT ARGUED IN MS. HOLMES'S CASE, AMONG

01:52PM 20   OTHER THINGS, IS THAT YOU SHOULD SEND A MESSAGE TO THE

01:52PM 21   COMMUNITY THROUGH THE VEHICLE THAT YOU HAVE HERE, BECAUSE YOU

01:53PM 22   HAVE THE PRESS GATHERED WHO HAVE BEEN REPORTING ON THIS CASE

01:53PM 23   EXTENSIVELY FOR MANY YEARS NOW, AND YOU HAVE THIS BASIC

01:53PM 24   MOUTHPIECE TO GET THE WORD OUT IN THE COMMUNITY THAT IF YOU'RE

01:53PM 25   GOING TO COMMIT FRAUD, YOU'RE GOING TO GET A VERY HARSH

01:53PM 1    SENTENCE.

01:53PM 2        AND WHAT THE GOVERNMENT SAID IN THE CASE OF MS. HOLMES IS

01:53PM 3    THAT ORDINARILY YOU MIGHT THINK THAT IS NOT FAIR BECAUSE THE

01:53PM 4    DEFENDANT REALLY HAS NO CONTROL OVER THAT, BUT HERE THE

01:53PM 5    GOVERNMENT SAID MS. HOLMES ACTUALLY COURTED THE PRESS, AND,

01:53PM 6    THEREFORE, IT'S FAIR IN THIS CASE TO USE THAT MOUTHPIECE, IF

01:53PM 7    YOU WILL, TO GET THE WORD OUT, THE GENERAL DETERRENCE WORD.

01:53PM 8        AND THEN THEY TRIED TO PUT THIS ROUND PEG OF MR. BALWANI

01:53PM 9    INTO A ROUND HOLE OF THIS MEDIA ISSUE WHICH DOESN'T EXIST FOR

01:53PM 10   MR. BALWANI.

01:53PM 11       EVEN IF YOU THINK THAT MS. HOLMES WAS ICARUS AND FLEW TOO

01:53PM 12   CLOSE TO THE SUN, MR. BALWANI DID NOT SEEK THE SUN.  HE WAS NOT

01:53PM 13   ON THE COVER OF MAGAZINES, HE DID NOT GIVE INTERVIEWS, AND HE

01:54PM 14   DID NOT GO AROUND THE COUNTRY ACCEPTING AWARDS, AND HE DID NOT

01:54PM 15   SERVE ON THE BOARD OF PRESTIGIOUS INSTITUTIONS LIKE

01:54PM 16   HARVARD UNIVERSITY.  HE DIDN'T ASK FOR ANY OF THAT.  ALL HE

01:54PM 17   ASKED FOR WAS A DOLLAR AND A CHANCE TO WORK HARD, AND HE IS

01:54PM 18   VERY DIFFERENT FROM MS. HOLMES.

01:54PM 19       SOME OF THE EVIDENCE THAT THE JURY FOUND WAS THE MOST

01:54PM 20   SIGNIFICANT EVIDENCE IN MS. HOLMES'S CASE, THE EVIDENCE THAT

01:54PM 21   MS. HOLMES FALSIFIED PHARMACEUTICAL REPORTS, AND SHE SAID THIS

01:54PM 22   ON THE STAND, THERE WAS REALLY NO DISPUTE ABOUT THAT, SHE SAID

01:54PM 23   THAT SHE DIDN'T THINK SHE WAS DOING ANYTHING WRONG.

01:54PM 24       BUT MR. BALWANI KNEW NOTHING ABOUT MS. HOLMES PUTTING

01:54PM 25   LOGOS ON PHARMA REPORTS THAT SHOULDN'T HAVE BEEN ON THERE OR

01:54PM  1    CHANGING WORDING IN THE REPORTS.  MR. BALWANI DIDN'T DO THAT.

01:54PM  2         SO EVEN IF YOU THINK -- AND THE JURY APPARENTLY MAY HAVE

01:54PM  3    THOUGHT IN MS. HOLMES'S CASE THAT THAT'S AN ISSUE FOR

01:54PM  4    MS. HOLMES.  THAT'S NOT WHAT MR. BALWANI DID.  HE DIDN'T SEEK

01:54PM  5    THE MEDIA.

01:54PM  6         AND I WANT TO POINT OUT A FEW THINGS THAT MR. SCHENK

01:54PM  7    OMITTED.  SO THERE'S AN ARTICLE THAT THE COURT IS VERY FAMILIAR

01:55PM  8    WITH NOW HAVING SAT THROUGH TWO TRIALS AND THAT'S THE "FORTUNE"

01:55PM  9    MAGAZINE ARTICLE AUTHORED BY ROGER PARLOFF.  AND MS. HOLMES IS

01:55PM  10   ON THE COVER OF THAT "FORTUNE" ISSUE, YOU MIGHT RECALL.

01:55PM  11        THE GOVERNMENT PLAYED TAPES OF MS. HOLMES TALKING TO

01:55PM  12   ROGER PARLOFF AND MADE A CASE THAT THERE WERE FRAUDULENT

01:55PM  13   REPRESENTATIONS IN THERE.

01:55PM  14        WHAT THE GOVERNMENT DIDN'T TELL YOU IS THAT MR. BALWANI

01:55PM  15   ALSO SAT FOR A MUCH BRIEFER INTERVIEW WITH MR. PARLOFF, AND THE

01:55PM  16   GOVERNMENT DIDN'T PLAY THAT TAPE AT TRIAL.  AND THE REASON IS

01:55PM  17   BECAUSE THERE'S NOTHING IN THERE WHERE MR. BALWANI MAKES ANY

01:55PM  18   MISREPRESENTATIONS TO MR. PARLOFF.

01:55PM  19        SO EVEN WHEN MR. BALWANI HAD THE OPPORTUNITY, WHICH WAS

01:55PM  20   RARE, BY THE WAY, I CAN'T EVEN THINK OF ANOTHER TIME WHEN HE

01:55PM  21   GAVE AN INTERVIEW, EVEN WHEN HE HAD THE OPPORTUNITY TO HAVE A

01:55PM  22   DIRECT VEHICLE WITH MR. PARLOFF TO SAY WHATEVER HE WANTED TO

01:55PM  23   SAY THAT THE GOVERNMENT CLAIMS HE'S GOING TO SAY FRAUDULENT

01:55PM  24   THINGS, HE DIDN'T DO IT.  HE DIDN'T SAY ANYTHING FRAUDULENT,

01:56PM  25   AND THE GOVERNMENT DIDN'T PLAY THE TAPE.

01:56PM 1    SO FOR THE GOVERNMENT TO SAY THAT SOMEHOW THE MEDIA ISSUES

01:56PM 2    ARE EQUIVALENT BETWEEN THESE TWO DEFENDANTS AND THEY USE THAT

01:56PM 3    AS A REASON TO GIVE MS. HOLMES A HARSHER SENTENCE, THAT IS

01:56PM 4    ABSOLUTELY NOT APPLICABLE TO MR. BALWANI AND FOR THE SAME

01:56PM 5    REASON THAT THE GOVERNMENT ARGUED IT'S AN AGGRAVATING FACTOR IN

01:56PM 6    MS. HOLMES'S CASE, IT IS A MITIGATING FACTOR IN THIS CASE.

01:56PM 7    LET'S MOVE ON TO SOME OTHER THINGS.  STILL ON THE NATURE

01:56PM 8    AND CIRCUMSTANCES OF THE OFFENSE, YOUR HONOR.

01:56PM 9    SO MR. BALWANI, THERE'S NO DISPUTE, WANTED THIS COMPANY TO

01:56PM 10   SUCCEED.  MR. BOSTIC SAID THAT DURING CLOSING ARGUMENT THAT HE

01:56PM 11   WANTED THEM TO SUCCEED.  AGAIN, IT'S SOMETHING THAT TAKES US

01:56PM 12   OUT OF THE HEARTLAND.  THERE'S LOTS OF CASES WHERE THERE IS NO

01:56PM 13   INVESTMENT, IT'S A SCAM.  THIS WAS A COMPANY THAT MR. BALWANI

01:56PM 14   WAS TRYING TO BUILD.

01:56PM 15   AND IN ORDER TO BUILD IT, HE HAD A LOT OF DATA POINTS,

01:57PM 16   RIGHT?  HE KNEW THAT THE SCIENTIFIC TEAM HAD DONE HOURS AND

01:57PM 17   HOURS OF WORK TO SUBMIT AN FDA APPLICATION TO GET THEIR 4.0

01:57PM 18   DEVICE APPROVED.  AND, YOU KNOW, IF YOU'RE GOING TO COMMIT A

01:57PM 19   FRAUD, WHY GO THROUGH THE EFFORTS?  I MEAN, THIS WAS -- HE WAS

01:57PM 20   GETTING THE DATA AND THE COMPANY WAS WORKING ON THESE THINGS,

01:57PM 21   AND THAT THE SCIENCE WAS REAL, AND THAT IT IS GOING TO BE

01:57PM 22   SUCCESSFUL.

01:57PM 23   AND IN ORDER TO TRY TO MAKE IT AS SUCCESSFUL AS HE COULD,

01:57PM 24   HE TOOK RISKS.  HE WENT TO THAILAND AND MEXICO DURING THE

01:57PM 25   HEIGHT OF THE H1N1 FLU SCARE, THAT WAS A VERY DANGEROUS DISEASE

01:57PM 1     AT THE TIME, AND HE WENT THERE SO HE COULD TRY TO GET THE

01:57PM 2     DEVICE TESTED IN HOSPITALS IN THOSE PLACES.  AND EVEN LATER HE

01:57PM 3     WENT TO COLUMBIA WHERE AT THAT POINT WAS THE HOTBED OF THE ZIKA

01:57PM 4     DISEASE PANIC.  HE WENT TO COLUMBIA, AND AGAIN, TRYING TO GET

01:57PM 5     THE DEVICE TESTED SO IT COULD EVENTUALLY BE USED FOR ZIKA

01:58PM 6     TESTING.  HE WENT TO THOSE HOTBED AREAS BECAUSE HE WANTED THE

01:58PM 7     COMPANY TO SUCCEED.  THAT'S AT PERSONAL RISK, RIGHT?  AND HE

01:58PM 8     LOST A LOT HERE, YOUR HONOR, AND IT'S NOT JUST THE MONEY.

01:58PM 9         SO MR. BALWANI WAS THE SECOND IN COMMAND.  I KNOW THE

01:58PM 10    COURT HAS SAID THAT, WELL, MAYBE THEY WERE COEQUALS HERE.  IN

01:58PM 11    SOME WAYS THEY WERE, BUT THERE IS NO DOUBT THAT IT WAS

01:58PM 12    MS. HOLMES WHO WAS IN CHARGE, THAT SHE WAS THE CEO, THAT SHE

01:58PM 13    HAD THE POWER TO FIRE MR. BALWANI, THAT IF SHE DIDN'T LIKE WHAT

01:58PM 14    HE WAS DOING, SHE COULD HAVE FIRED HIM, SHE COULD HAVE TOLD HIM

01:58PM 15    TO DO SOMETHING DIFFERENT, SHE COULD HAVE DEMOTED HIM, ANY OF

01:58PM 16    THOSE THINGS.

01:58PM 17        AND THE GOVERNMENT HAS ARGUED REPEATEDLY JUST THAT POINT,

01:58PM 18    THAT MS. HOLMES IS THE FACE OF THE COMPANY, SHE'S THE CEO, THE

01:58PM 19    BUCK STOPPED THERE, AND THAT SHE HAD THE POWER TO FIRE

01:58PM 20    MR. BALWANI.  SO NOW THAT HER SENTENCING IS OVER, THEY'RE

01:59PM 21    PERHAPS TAKING A DIFFERENT VIEW OF THE WORLD.

01:59PM 22        LET ME GO OVER A FEW POINTS THAT MR. SCHENK MADE THAT I

01:59PM 23    THINK ARE IMPORTANT TO ADDRESS, YOUR HONOR.

01:59PM 24        WE HAVE TALKED ABOUT IN OUR SENTENCING MEMO THE NATURE OF

01:59PM 25    THE SENTENCING GUIDELINES.  AND AS I SAID BEFORE, I THINK THE

01:59PM 1    GOVERNMENT IS FAR TOO WEDDED, MORE THAN THE LAW ALLOWS, WEDDED

01:59PM 2    TO THE SENTENCING GUIDELINES IN THIS CASE.  THE FRAUD LOSS

01:59PM 3    AMOUNT, AS WE SAID IN OUR PAPERS, THEY DON'T DISTINGUISH

01:59PM 4    BETWEEN A DEFENDANT LIKE MR. BALWANI AND A DEFENDANT WHO IS

01:59PM 5    JUST RUNNING A FICTITIOUS COMPANY THAT HAS NOTHING, NEVER HAD

01:59PM 6    ANYTHING, AND IT'S JUST A COMPLETE SCAM.  THERE'S NO

01:59PM 7    DISTINGUISHING BETWEEN THOSE TYPES OF DEFENDANTS.

01:59PM 8        AND SO WHAT THE LOSS AMOUNT TABLE DOES IS ASSIGNS A

02:00PM 9    CERTAIN NUMBER TO A CERTAIN LOSS AMOUNT, AND I UNDERSTAND THE

02:00PM 10   COURT HAS MADE THOSE FINDINGS THIS MORNING OR THIS AFTERNOON.

02:00PM 11       SO EVEN THOUGH THAT'S WHAT THE GUIDELINES REQUIRE, THERE

02:00PM 12   IS SO MUCH OF A DISPARITY BETWEEN DIFFERENT DEFENDANTS IN

02:00PM 13   DIFFERENT CASES, AND I THINK THE COURT HAS TO LOOK AT THE FIRST

02:00PM 14   PERSON AS AN INDIVIDUAL AND WHAT REALLY HAPPENED, AND NOT ONLY

02:00PM 15   WHAT HAPPENED IN THE OFFENSE CONDUCT, BUT ALSO THE ENTIRE

02:00PM 16   HEALTH CARE, THE ENTIRE PERSONA, THE ENTIRE HISTORY AND MAKE A

02:00PM 17   DECISION BASED ON THAT AND NOT JUST ON THE GUIDELINES.

02:00PM 18       THE POINT I'M MAKING, YOUR HONOR, THE GUIDELINES, WE HAVE

02:00PM 19   POINTED OUT MANY SCHOLARS HAVE COMMENTED, ESPECIALLY IN A CASE

02:00PM 20   LIKE THIS, THEY CAN YIELD ABSURD RESULTS, AND WE THINK THAT

02:00PM 21   WOULD BE THE CASE HERE FOR MR. BALWANI.

02:00PM 22       THE GOVERNMENT SAYS THAT IT'S AN AGGRAVATING FACTOR THAT

02:00PM 23   MR. BALWANI HAS A SUPPORT NETWORK.  I THINK THAT'S THE FIRST

02:00PM 24   TIME THAT I HAVE HEARD THAT KIND OF ARGUMENT.  USUALLY THE

02:01PM 25   PRESENCE OF A SUPPORT NETWORK IS A REASON WHY THE DEFENDANT

02:01PM 1    WON'T BE A DANGER IN THE FUTURE.  AND THERE REALLY ISN'T ANY

02:01PM 2    EVIDENCE THAT HE WOULD BE.

02:01PM 3         FIRST OF ALL, HE'S ALREADY IN HIS LATE 50S, AND ALL OF THE

02:01PM 4    STUDIES ARE THAT PEOPLE IN THAT AGE RANGE ARE NOT LIKELY TO

02:01PM 5    REPEAT OFFENSES.  AND ALSO, WHEN YOU LOOK AT THE UNIQUE

02:01PM 6    CIRCUMSTANCES OF THIS CASE, THERE'S NO CHANCE THAT MR. BALWANI

02:01PM 7    WILL HAVE ANOTHER CRACK AT A COMPANY LIKE THERANOS.  YOU KNOW,

02:01PM 8    HE'S BASICALLY AND VERY UNFORTUNATELY RADIOACTIVE AS A RESULT

02:01PM 9    OF THIS WHOLE AFFAIR.

02:01PM 10        BUT THE SUPPORT NETWORK, YOU KNOW, THE REASON HE HAS A

02:01PM 11   SUPPORT NETWORK IS BECAUSE HE'S BEEN SO GIVING OVER THE YEARS.

02:01PM 12   I MEAN, HE HAS A DEVOTED FAMILY WHO ARE HERE IN COURT TODAY,

02:01PM 13   FIVE PEOPLE.  NOT EVERYONE COULD MAKE IT.  SOME OF THE FAMILY

02:01PM 14   MEMBERS ARE IN INDIA, SOME ARE ON THE EAST COAST AS THE COURT

02:02PM 15   HAS HEARD BEFORE.

02:02PM 16        BUT THE REASON THAT HE HAS A LOVING FAMILY SUPPORTING HIM

02:02PM 17   AND ALL OF THESE PEOPLE WRITING LETTERS -- THE PEOPLE WHO WROTE

02:02PM 18   LETTERS ARE NOT TRYING TO EXCUSE THE CONDUCT THAT THE JURY

02:02PM 19   FOUND.  THEY'RE JUST TRYING TO PRESENT TO THE COURT THE FULL

02:02PM 20   PICTURE OF MR. BALWANI AND ABOUT WHO HE IS.

02:02PM 21        AND THE REASON HE HAS THAT SUPPORT NETWORK IS BECAUSE OF

02:02PM 22   HOW CHARITABLE AND HOW SELFLESS HE'S BEEN FOR HIS ENTIRE LIFE.

02:02PM 23   AND FOR MR. SCHENK AND THE GOVERNMENT TO SAY THAT'S SOMEHOW AN

02:02PM 24   AGGRAVATING FACTOR, WELL, THAT'S JUST PUZZLING, YOUR HONOR.  I

02:02PM 25   DON'T GET THAT.  AND I THINK THAT'S A REASON TO LOOK AT

02:02PM 1    MR. BALWANI AS A CANDIDATE FOR LENIENCY AND NOT THE OTHER WAY

02:02PM 2    AROUND.

02:02PM 3        I WANT TO ADDRESS ONE REALLY IMPORTANT THING, YOUR HONOR,

02:02PM 4    AND THAT IS MR. SCHENK'S ARGUMENT THAT SOMEHOW MR. BALWANI HAS

02:02PM 5    NOT ACCEPTED RESPONSIBILITY AND THAT'S ANOTHER AGGRAVATING

02:02PM 6    FACTOR HE CLAIMS.

02:02PM 7        SO THERE IS A GUIDELINE ADJUSTMENT.  WE HAVE NOT ARGUED

02:02PM 8    FOR THAT ADJUSTMENT.  THE COURT IS NOT APPLYING THE 3 POINT

02:03PM 9    REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY.  WE HAVE NOT ASKED

02:03PM 10   FOR THAT.

02:03PM 11       MR. BALWANI EXERCISED HIS FIFTH AMENDMENT RIGHT NOT TO

02:03PM 12   TESTIFY AT TRIAL.  AND FOR MR. SCHENK TO SAY THAT SOMEHOW THE

02:03PM 13   FACT THAT HE HASN'T ACCEPTED RESPONSIBILITY IN A CASE THAT HE

02:03PM 14   WENT TO TRIAL AND EXERCISED THAT FIFTH AMENDMENT RIGHT, I

02:03PM 15   BELIEVE MR. SCHENK'S POINT IS AN IMPROPER COMMENT ON

02:03PM 16   MR. BALWANI'S FIFTH AMENDMENT RIGHT BECAUSE HE HAS NO

02:03PM 17   OPPORTUNITY TO ACCEPT RESPONSIBILITY UNLESS HE WAIVES THAT

02:03PM 18   RIGHT.

02:03PM 19       THE OTHER THING THAT MR. SCHENK SAYS ABOUT THAT IS SOMEHOW

02:03PM 20   OUR ARGUMENT THAT MR. BALWANI IS BLAMING INVESTORS FOR WHAT

02:03PM 21   HAPPENED AFTER HE LEFT THE COMPANY IS A REASON WHY HE'S NOT

02:03PM 22   ACCEPTING RESPONSIBILITY.  I WANT TO JUST CLARIFY THE RECORD ON

02:03PM 23   THAT BECAUSE I THINK THAT IS A TWISTED WAY TO LOOK AT THIS.

02:03PM 24       WHAT OUR ARGUMENT IS, IS NOT THAT INVESTORS ARE TO BLAME

02:03PM 25   SOMEHOW.  WHAT WE HAVE SAID ABOUT THAT HAD TO DO WITH THE LOSS

02:04PM 1    CALCULATION. I DON'T WANT TO REPEAT THOSE ARGUMENTS, BUT IT'S

02:04PM 2    IMPORTANT BECAUSE MR. SCHENK MENTIONED THIS, IS THAT WHEN

02:04PM 3    MR. BALWANI LEFT THE COMPANY, THE COMPANY HAD $350 MILLION IN

02:04PM 4    THE BANK. THAT'S NOT DISPUTED. HE ALSO HAD IP, WHICH THE

02:04PM 5    THINGS WE PUT IN THE RECORD SHOW WE BELIEVE WERE WORTH MANY,

02:04PM 6    MANY HUNDREDS OF MILLIONS OF DOLLARS, AND THE GOVERNMENT HAS A

02:04PM 7    DIFFERENT VIEW OF THAT. BUT WHATEVER YOU THINK ABOUT THAT,

02:04PM 8    MR. BALWANI AND HIS DEFENSE TEAM HAS NEVER ARGUED THAT THERANOS

02:04PM 9    WAS ENTITLED TO $350 MILLION AND SOMEHOW YOU WOULD BE DOING

02:04PM 10   PEOPLE A FAVOR IF THEY RETURN IT TO INVESTORS. NO.

02:04PM 11       THE POINT WAS THAT WHEN MR. BALWANI LEFT THE COMPANY, THE

02:04PM 12   COMPANY DID HAVE $350 MILLION AND HAD THE IP, AND INSTEAD OF

02:04PM 13   TRYING TO OPERATE FOR ANOTHER TWO YEARS AND MAKE A GO OF IT AS

02:04PM 14   A COMPANY, THEY COULD HAVE CLOSED THEIR DOORS RIGHT THEN AND

02:04PM 15   DISTRIBUTED WHATEVER THEY COULD DISTRIBUTE, INCLUDING THE CASH

02:04PM 16   THAT CAME FROM THE INVESTORS IN THE FIRST PLACE, DISTRIBUTED

02:04PM 17   THAT BACK TO INVESTORS, ALONG WITH WHATEVER THEY COULD GET FROM

02:05PM 18   THE IP. AND THAT ARGUMENT HAS NOTHING TO DO WITH WHETHER

02:05PM 19   MR. BALWANI ACCEPTED RESPONSIBILITY. WE HAVE NOT ASKED FOR THE

02:05PM 20   GUIDELINE ADJUSTMENT, AS I'VE SAID.

02:05PM 21       BUT FOR MR. SCHENK TO SAY WE SHOULD GIVE HIM A HARSHER

02:05PM 22   SENTENCE BECAUSE HE DIDN'T ACCEPT RESPONSIBILITY WHEN YOU PUT

02:05PM 23   ASIDE WHAT I CONSIDER UNFOUNDED ARGUMENT ABOUT THE 350 MILLION

02:05PM 24   AND THE TIME AFTER MR. BALWANI LEFT, WHEN YOU PUT THAT ASIDE,

02:05PM 25   WHICH YOU SHOULD, YOU END UP WITH WHAT I THINK IS AN IMPROPER

02:05PM 1    COMMENT ON HIS FIFTH AMENDMENT RIGHTS.

02:05PM 2              THE COURT:  WELL, PARDON ME FOR INTERRUPTING AND LET

02:05PM 3    ME DO SO NOW TO TELL YOU THAT THIS COURT IS NOT GOING TO IN ITS

02:05PM 4    SENTENCE -- AND I AM GOING TO SENTENCE YOUR CLIENT.  YOU KNOW

02:05PM 5    THAT.  THAT'S WHY WE'RE HERE.  BUT I AM NOT GOING TO SENTENCE

02:05PM 6    HIM IN ANY WAY CONSIDERING THE FACT THAT HE CHOSE TO EXERCISE

02:05PM 7    HIS UNITED STATES CONSTITUTIONAL RIGHT TO NOT TESTIFY AND

02:05PM 8    REMAIN SILENT.  THAT'S A CHERISHED RIGHT THAT WE ALL ENJOY, AND

02:05PM 9    HE EXERCISED THAT RIGHT.  THERE'S NO PUNITIVE ACTION ON

02:06PM 10   EXERCISING A CONSTITUTIONAL RIGHT.  I DON'T TAKE MR. SCHENK'S

02:06PM 11   COMMENT THAT WAY THAT HE WAS SUGGESTING THAT.

02:06PM 12        I UNDERSTAND HOW IT COULD BE INTERPRETED THAT WAY.  IT'S

02:06PM 13   NOT HOW THE COURT RECEIVED IT, AND IT'S CERTAINLY NOT HOW THE

02:06PM 14   COURT IS GOING TO EVALUATE THE APPROPRIATE SENTENCE IN THIS

02:06PM 15   CASE.  YOUR CLIENT HAS THE ABSOLUTE RIGHT NOT TO TESTIFY.  HE

02:06PM 16   WILL NOT BE PUNISHED FOR THE EXERCISE OF THAT.

02:06PM 17        YOU'RE COMPLETELY CORRECT THE GUIDELINES DO PROVIDE UNDER

02:06PM 18   3E1(A) AND (B) THE OPPORTUNITY, SHOULD A DEFENDANT CHOOSE TO

02:06PM 19   EXERCISE THAT OPPORTUNITY, TO RECEIVE A 3 LEVEL REDUCTION

02:06PM 20   SHOULD THEY WISH TO DO SO AND IF THEY OTHERWISE QUALIFY, AND HE

02:06PM 21   CHOSE NOT TO DO THAT.

02:06PM 22        SO TO YOUR POINT, HE IS NOT ENTITLED TO THE GUIDELINE

02:06PM 23   REDUCTION.  BUT I AM NOT GOING TO EVEN CONSIDER THE FACT THAT

02:06PM 24   HE DID NOT TESTIFY NOR THAT HE -- I THINK IT WAS IN -- I CAN'T

02:07PM 25   REMEMBER WHAT PARAGRAPH IT WAS IN THE PSR, BUT MS. GOLDSBERRY

02:07PM 1    NOTES THAT HE DID NOT MAKE ANY STATEMENT AS FAR AS ACCEPTANCE

02:07PM 2    OF RESPONSIBILITY, AND FOR PURPOSES OF HER REPORT CALCULATING

02:07PM 3    THE GUIDELINE CALCULATIONS THAT WAS AN IMPORTANT INQUIRY, BUT

02:07PM 4    FOR THAT REASON ONLY.

02:07PM 5           MR. COOPERSMITH:  YOUR HONOR, I REALLY APPRECIATE

02:07PM 6    THE COURT'S COMMENTS, AND I'M, OF COURSE, NOT SURPRISED, BUT

02:07PM 7    ALSO GLAD TO HEAR IT.

02:07PM 8        AND THE POINT I'M MAKING IS NOT THAT I THOUGHT THE COURT

02:07PM 9    WOULD PUNISH MR. BALWANI FOR THAT, AND, OF COURSE, THE COURT

02:07PM 10   WOULDN'T DO THAT AND SHOULDN'T.  IT'S JUST THAT MR. SCHENK'S

02:07PM 11   ARGUMENT NEEDS TO BE THROWN OUT BECAUSE THE IDEA THAT HE'S NOT

02:07PM 12   ACCEPTING RESPONSIBILITY, THAT'S A REASON TO IMPOSE MORE PRISON

02:07PM 13   TIME, THAT JUST I DON'T THINK FLIES.

02:07PM 14       BUT LET ME MOVE ON, YOUR HONOR.

02:07PM 15       MR. SCHENK MENTIONED, YOU KNOW, CERTAIN HARMS THAT WERE

02:07PM 16   CAUSED, RIGHT?  SO ONE THING HE COMMENTED ON WAS THE INVESTOR

02:08PM 17   HARM.  AND IF YOU BELIEVE THERE IS INVESTOR LOSS, AND I

02:08PM 18   UNDERSTAND THE COURT SO FOUND, THEN THAT IS A HARM IN THE CASE.

02:08PM 19       BUT BASICALLY THIS IS A DOUBLE COUNTING OR MAYBE IT'S

02:08PM 20   QUADRUPLE COUNTING OR QUINTUPLE COUNTING.  THE IDEA IS THAT THE

02:08PM 21   GUIDELINE MR. SCHENK IS TRYING TO TAKE ADVANTAGE OF ALREADY

02:08PM 22   ACCOUNT FOR A VERY LENGTHY SENTENCE JUST FROM THAT ONE FACTOR

02:08PM 23   UNDER 3553(A) FACTORS OF THE GUIDELINES WOULD DICTATE A CERTAIN

02:08PM 24   GUIDELINE RANGE, WHICH IS OBVIOUSLY ADVISORY.

02:08PM 25       BUT MR. SCHENK WANTS TO THEN DOUBLE COUNT THAT ARGUMENT

02:08PM 1    AGAIN IN ARGUING FOR A SENTENCE EVEN ABOVE THE GUIDELINE RANGE

02:08PM 2    THE COURT CALCULATED.

02:08PM 3        AND THEN PATIENT HARM.  THE COURT ALREADY, AND WE

02:08PM 4    APPRECIATE, DID NOT FIND THE FACTOR OF MR. BALWANI CONSCIOUSLY

02:08PM 5    OR RECKLESSLY CAUSING PATIENT HARM.  ALL OF US MAKE ERRORS

02:09PM 6    OBVIOUSLY.  WE POINTED TO THE EXAMPLE IN THE BRIEF, THE

02:09PM 7    CLEVELAND CLINIC EXAMPLE.  THIS IS ALL PUBLIC, THAT THE

02:09PM 8    CLEVELAND CLINIC WAS FOUND TO BE IN IMMEDIATE JEOPARDY BY THE

02:09PM 9    CMS LABORATORY REGULATORS ON MANY SCORES, AND IN FACT SOME OF

02:09PM 10   THE SAME THINGS THAT THERANOS WAS FOUND FOR, AND THEY HAD TO

02:09PM 11   CORRECT THE PROBLEMS, AND NO ONE WAS PROSECUTED.

02:09PM 12       BUT I BRING THAT UP BECAUSE WE'RE NOT IN THAT CASE, BUT

02:09PM 13   ALL LABS MAKE ERRORS.  IN FACT, DR. BURNS ON THE STAND SAID,

02:09PM 14   WELL, HE HAD SOME PROBLEMS WITH OTHERS LABS.

02:09PM 15       SO THAT'S WHAT HAPPENED.  SO BY DEFINITION ANY LABORATORY

02:09PM 16   CASE, WHETHER IT'S CRIMINAL OR CIVIL OR REGULATORY, IS GOING TO

02:09PM 17   INVOLVE SOME ERROR THAT A LAB MADE, AND, OF COURSE, THERE'S

02:09PM 18   ALWAYS THAT HARM.

02:09PM 19       SO MR. BALWANI NEVER WANTED THAT.  THERE'S NO EVIDENCE, AS

02:09PM 20   WE'VE SAID BEFORE AND I WON'T REPEAT THOSE ARGUMENTS, BUT NEVER

02:09PM 21   WANTED ANYONE TO BE HARMED.  HE WOULDN'T HARM A FLY.

02:09PM 22       INSTEAD, WHAT MR. BALWANI HAS DEMONSTRATED HIS ENTIRE LIFE

02:10PM 23   WAS THAT HE WANTS TO GIVE.  HE'S GRATEFUL TO BE HERE, HE'S

02:10PM 24   GRATEFUL TO BE A UNITED STATES CITIZEN, HE'S GRATEFUL TO HAVE

02:10PM 25   HAD THE OPPORTUNITY TO GIVE TO HIS COMMUNITY.  HE'S DONE THAT

02:10PM 1    OVER AND OVER AGAIN.  HE'S DEMONSTRATED HIS CHARACTER.

02:10PM 2        OBVIOUSLY HE WAS CONVICTED BY A JURY OF FRAUD AND THE

02:10PM 3    COURT HAS TO SENTENCE HIM OF COURSE, AND THAT'S WHY WE'RE HERE,

02:10PM 4    BUT HE IS DESERVING OF A LENIENT SENTENCE.  HE'S NOT

02:10PM 5    MS. HOLMES.  HE DID NOT PURSUE THE SAME PATH AS SHE DID.  HE

02:10PM 6    DID NOT PURSUE FAME AND FORTUNE AND RECOGNITION AND GLORY.  HE

02:10PM 7    DID NOT SELL A SINGLE SHARE.  HE DID NOT TRY TO PROFIT.  HE DID

02:10PM 8    NOT TRY TO HARM ANYBODY, AND, YES, THE COURT HAS TO SENTENCE

02:10PM 9    HIM, BUT NOT TO THE RANGE THAT THE GOVERNMENT IS RECOMMENDING

02:10PM 10   OR PROBATION IS RECOMMENDING, OR MS. HOLMES RECEIVED BY THIS

02:10PM 11   COURT.

02:10PM 12       NOT ALL DEFENDANTS ARE THE SAME.  IT'S AN INDIVIDUALIZED

02:10PM 13   DETERMINATION.

02:10PM 14       AND WITH THAT, YOUR HONOR, THANK YOU.

02:10PM 15           THE COURT:  THANK YOU.

02:10PM 16       AND I INTERRUPTED YOUR PRESENTATION WITH MY COMMENTS, AND

02:10PM 17   I DIDN'T MEAN TO SUGGEST IN ANY WAY THAT YOU SHOULD IN ANY WAY

02:11PM 18   RETREAT FROM ANY COMMENTS.  SO IF YOU HAVE ANYTHING YOU DIDN'T

02:11PM 19   GET A CHANCE TO SAY BECAUSE OF MY INTERRUPTION, YOU CERTAINLY

02:11PM 20   SHOULD GO FORWARD NOW.  I WANT YOU TO GIVE YOUR FULSOME

02:11PM 21   RESPONSE TO BOTH THE GOVERNMENT'S AND YOUR FULSOME POSITION.

02:11PM 22   SO I RARELY INTERRUPT SOMEONE DURING THEIR PRESENTATION.  I DID

02:11PM 23   SO BECAUSE I WANTED YOU TO KNOW THE COURT'S FEELINGS ABOUT YOUR

02:11PM 24   CLIENT'S EXERCISE OF HIS RIGHTS, BUT I DIDN'T MEAN TO INTERRUPT

02:11PM 25   YOU.

02:11PM 1        SO IF YOU HAD SOMETHING ELSE YOU WANTED TO SAY, REVIEW

02:11PM 2    YOUR NOTES AND LET ME KNOW, PLEASE.

02:11PM 3        MR. COOPERSMITH:  YEAH, I MIGHT TAKE A MOMENT TO

02:11PM 4    CONFER WITH MY TEAM, YOUR HONOR.

02:11PM 5        THE COURT:  SURE.  GO RIGHT AHEAD.

02:11PM 6        MR. COOPERSMITH:  AND I MIGHT AS WELL BE THOROUGH

02:11PM 7    WHILE WE'RE HERE.

02:11PM 8        THE COURT:  ABSOLUTELY.

02:12PM 9     (DISCUSSION OFF THE RECORD.)

02:12PM 10       MR. COOPERSMITH:  THANK YOU FOR THE COURT'S

02:12PM 11   INDULGENCE.  I APPRECIATE IT.

02:12PM 12       THE COURT:  OF COURSE.

02:12PM 13       MR. COOPERSMITH:  A FEW OTHER THINGS I'M REMINDED I

02:12PM 14   SHOULD SAY FOR COMPLETENESS, AND I THINK THESE THINGS ARE

02:12PM 15   IMPORTANT.

02:12PM 16    FIRST OF ALL, ONE THING THE GOVERNMENT SAID, I WROTE IN MY

02:12PM 17   NOTES AND I THINK IT IS WORTH RESPONDING TO, AND THAT IS THEY

02:12PM 18   SAY MR. BALWANI WAS THE QUOTE, "DE FACTO LAB DIRECTOR" AFTER

02:12PM 19   DR. ROSENDORFF LEFT.  I DON'T THINK THERE'S ANY BASIS FOR THAT.

02:12PM 20   MR. BALWANI WAS NOT THE DE FACTO LAB DIRECTOR.

02:12PM 21    THERE WERE, FIRST OF ALL, AS I SAID BEFORE, AN ENTIRE

02:12PM 22   SCIENTIFIC TEAM AT THERANOS, INCLUDING DR. SAKSENA WHO WERE

02:12PM 23   INVOLVED IN THE LAB.  EVEN IF DR. DHAWAN AND DR. SAWYER WERE

02:13PM 24   NOT AS INVOLVED AS YOU MIGHT LIKE, THERE WAS A WHOLE TEAM OF

02:13PM 25   SCIENTISTS WHO WERE THERE, AND THEY WERE THERE TO MAKE SURE THE

02:13PM 1     LAB RESULTS WERE AS GOOD AS THEY COULD BE AND THEY WERE RUNNING

02:13PM 2     SMOOTHLY.

02:13PM 3          AT THE SAME TIME, AS I SAID BEFORE, THE COMPANY WAS

02:13PM 4     PHASING OUT THE EDISON DEVICES AND USING MORE COMMERCIAL

02:13PM 5     DEVICES.  IN FACT, THEY OPENED UP THIS LAB IN ARIZONA, AND

02:13PM 6     DR. YOUNG WAS PUT IN CHARGE OF THE LAB, NOT MR. BALWANI, AND

02:13PM 7     DR. YOUNG WAS QUALIFIED AS A LAB DIRECTOR.

02:13PM 8          THE IDEA THAT HE WAS ALL OF THE SUDDEN TAKING IT UPON

02:13PM 9     HIMSELF TO OVERSEE WHAT RESULTS WERE BEING RELEASED TO

02:13PM 10    PATIENTS, THAT'S JUST NOT THE CASE.  THERE IS NOT A SINGLE TIME

02:13PM 11    THAT MR. BALWANI SIGNED OFF ON RELEASING A RESULT TO A PATIENT.

02:13PM 12    THAT JUST DIDN'T HAPPEN, AND HE'S NOT THE DE FACTO LAB

02:13PM 13    DIRECTOR.  HE WAS OPERATIONALLY INVOLVED IN THE LAB AS THE

02:13PM 14    COURT KNOWS.

02:13PM 15         IN ADDITION, JUST A WORD ABOUT STIFLING DISSENT I THINK IS

02:14PM 16    HOW THE GOVERNMENT PUT IT.  AND, YOU KNOW, THE COURT HEARD FROM

02:14PM 17    ERIKA CHEUNG, AND SHE GOT TO THERANOS AS A YOUNG GRADUATE OF

02:14PM 18    THE UNIVERSITY OF CALIFORNIA AND WAS EXCITED TO WORK THERE, AND

02:14PM 19    THEN SHE RAISED SOME ISSUES.

02:14PM 20         WELL, MR. BALWANI, THE GOVERNMENT WOULD HAVE YOU BELIEVE,

02:14PM 21    YOUR HONOR, THAT SHE RAISED ISSUES AND MR. BALWANI TOLD HER, I

02:14PM 22    DON'T WANT TO HEAR IT, JUST DO YOUR JOB, RUN THE SAMPLES, DON'T

02:14PM 23    TALK TO ME.

02:14PM 24         THAT IS NOT AT ALL WHAT HAPPENED.  WHEN IT GOT TO THE

02:14PM 25    POINT OF MR. BALWANI, ACCORDING TO MS. CHEUNG, SAYING YOUR JOB

02:14PM 1   IS TO RUN SAMPLES, BY THAT TIME THERE HAD BEEN SCIENTIST AFTER

02:14PM 2   SCIENTIST, ESPECIALLY DR. YOUNG, WHO LOOKED AT HER CLAIMS AND

02:14PM 3   LOOKED AT WHAT SHE SAID ABOUT QC AND LOOKED AT WHAT SHE SAID

02:14PM 4   ABOUT PROFICIENCY TESTS.

02:14PM 5       THE COURT MIGHT REMEMBER THERE WAS AN EXHIBIT, AND I DON'T

02:15PM 6   HAVE THE NUMBER, BUT THE COURT PROBABLY REMEMBERS IT WAS A

02:15PM 7   TABLE OF NUMBERS SHOWING A COMPARISON BETWEEN THERANOS DEVICES

02:15PM 8   AND MODIFIED PREDICATE -- I'M SORRY, ACTUAL PREDICATE MACHINES,

02:15PM 9   FDA MACHINES, AND SOME OF THE NUMBERS ACCORDING TO THE

02:15PM 10  GOVERNMENT WERE A LITTLE OFF.

02:15PM 11      DR. ROSENDORFF TESTIFIED THAT THAT WAS NOT A PROPER

02:15PM 12  EXPERIMENT, IT DIDN'T SHOW A FAILURE.  DR. PANDORI PUT TOGETHER

02:15PM 13  A WHOLE POWERPOINT ABOUT HOW THIS ALTERNATIVE ASSESSMENT

02:15PM 14  PROCEDURE WAS THE RIGHT WAY TO GO AND THAT WAS NOT THE CORRECT

02:15PM 15  WAY TO ANALYZE THINGS.

02:15PM 16      SO BY THE TIME THAT MR. BALWANI ALLEGEDLY HAD A

02:15PM 17  CONVERSATION WITH MS. CHEUNG WHERE SHE CLAIMED HE SAID JUST DO

02:15PM 18  YOUR JOB, AND HE ALREADY HAD SCIENTISTS LOOK AT THIS, INCLUDING

02:15PM 19  DR. YOUNG, ON EVERY SINGLE CLAIM.  SO THIS WAS THE OPPOSITE OF

02:15PM 20  A MANAGER NOT WANTING TO HEAR FROM MS. CHEUNG.  HE SPENT A LOT

02:15PM 21  OF TIME, A LOT OF COMPANY TIME, A LOT OF HIS EMPLOYEE'S TIME

02:15PM 22  TRYING TO UNDERSTAND WHERE SHE WAS COMING FROM AND TO ADDRESS

02:15PM 23  THE CONCERNS AS BEST AS HE COULD.

02:15PM 24      SO THAT IDEA OF SHUTTING PEOPLE DOWN I THINK IS -- THERE'S

02:16PM 25  A SORT OF MYTH THAT'S DEVELOPED ABOUT MR. BALWANI.  I THINK IF

02:16PM 1    YOU READ THE MEDIA, HE'S SOME KIND OF ENFORCER.  IF YOU READ

02:16PM 2    THE LETTERS FROM EMPLOYEES, THAT'S NOT HOW HE WAS PERCEIVED, AT

02:16PM 3    LEAST NOT BY EVERYBODY.  AND THIS IDEA THAT HE'S SHUTTING

02:16PM 4    MS. CHEUNG DOWN IS JUST NOT CONSISTENT WITH THE FACTS.

02:16PM 5         THE OTHER THING I WANTED TO SAY, AND WE PUT THIS IN OUR

02:16PM 6    SENTENCING PAPERS AND I MENTIONED THIS BEFORE, HE DID IN FACT

02:16PM 7    HAVE HIS FAMILY TESTED AT THERANOS.  AND IT WAS NOT JUST HIS

02:16PM 8    MOM, IT WAS HIS SIBLINGS AND OTHERS.  WHY WOULD YOU DO THAT IF

02:16PM 9    YOU THOUGHT THAT THE LAB WAS SO BAD?  I'M NOT SAYING THAT TO

02:16PM 10   ARGUE IT AGAINST THE JURY'S VERDICT, BECAUSE WE'RE HERE BECAUSE

02:16PM 11   OF A JURY VERDICT.  BUT IT SHOWS YOU THAT NOT EVERYTHING THAT

02:16PM 12   THE GOVERNMENT SAYS ABOUT MR. BALWANI AND NOT EVERYTHING THEY

02:16PM 13   SHOWED AT TRIAL IS NECESSARILY TRUE.  AND THERE'S NO BETTER

02:16PM 14   TIME TO THINK ABOUT IT OF HOW MR. BALWANI WANTED THE COMPANY TO

02:16PM 15   BE AND WHY HE HAD CONFIDENCE IN THE LAB.  HE WAS NOT TRYING TO

02:17PM 16   CREATE PATIENT HARM.  THERE'S NO BETTER EVIDENCE HERE REALLY

02:17PM 17   THAN THE FACT THAT HE HAS HIS OWN FAMILY TESTED THERE.  NOBODY

02:17PM 18   WOULD DO THAT.  HE'S BELOVED BY HIS FAMILY, AND HE LOVES THEM,

02:17PM 19   AND IT JUST DOESN'T WORK THAT WAY.

02:17PM 20        SO, AGAIN, I'M NOT TRYING TO SAY THAT WE SHOULD IGNORE THE

02:17PM 21   VERDICT.  WE CAN'T DO THAT.  BUT I THINK IT IS A MITIGATING

02:17PM 22   FACTOR THAT THE COURT SHOULD CONSIDER.

02:17PM 23        SO THANK YOU FOR THE EXTRA TIME, YOUR HONOR.  I APPRECIATE

02:17PM 24   IT.

02:17PM 25             THE COURT:  OF COURSE.

02:17PM 1    MR. COOPERSMITH:  I'M SURE WITH A COMPLICATED CASE

02:17PM 2    LIKE THIS I COULD GO ON FOR HOURS OR DAYS AS I DID DURING

02:17PM 3    CLOSING ARGUMENT, BUT I DO WANT THE COURT TO TAKE THESE THINGS

02:17PM 4    INTO CONSIDERATION.  OBVIOUSLY, WE'VE SUBMITTED A LOT OF

02:17PM 5    MATERIAL THAT THE COURT HAS READ, AND WE DO THINK THAT

02:17PM 6    MR. BALWANI IS DESERVING OF LENIENCY, AND THAT'S WHAT WE ASK

02:17PM 7    THE COURT TO DO.

02:17PM 8        THE COURT:  THANK YOU.

02:17PM 9      ANYTHING FURTHER FROM THE GOVERNMENT?

02:17PM 10       MR. SCHENK:  NO.  THANK YOU, YOUR HONOR.

02:17PM 11       THE COURT:  PROBATION, ANYTHING FURTHER?

02:17PM 12       PROBATION OFFICER:  NO, YOUR HONOR.

02:17PM 13       THE COURT:  ALL RIGHT.  THANK YOU.

02:17PM 14    IN JUST A MOMENT I'M GOING TO CALL UPON MR. BALWANI TO ASK

02:18PM 15    IF HE WISHES TO BE HEARD, BUT I'LL TAKE A MOMENT OF PERSONAL

02:18PM 16    PRIVILEGE, IF I MAY, AND I SHOULD HAVE DONE THIS AT THE OUTSET

02:18PM 17    TO THANK ALL COUNSEL, THANK YOU.  WE WERE TOGETHER FOR A LONG

02:18PM 18    TIME IN THIS TRIAL.  IT WAS HARD FOUGHT ON BOTH SIDES.  IT WAS

02:18PM 19    MY GREAT PRIVILEGE TO WORK WITH ALL OF YOU, AND I APPRECIATE

02:18PM 20    THAT.

02:18PM 21    AS MR. COOPERSMITH POINTS OUT, THE JURY HAS SPOKEN.  THE

02:18PM 22    REASON WE'RE HERE TODAY IS FOR THE SENTENCING.  YOU ALL KNOW

02:18PM 23    THAT SENTENCING IS THE MOST DIFFICULT THING THAT YOU DO AS

02:18PM 24    LITIGATORS.  IT'S CERTAINLY THE MOST DIFFICULT THING THAT A

02:18PM 25    JUDGE DOES WHEN SHE IMPOSES A SENTENCE ON AN INDIVIDUAL.

02:18PM 1    BUT, AGAIN, I JUST WANTED TO THANK YOU ALL FOR YOUR

02:18PM 2  COURTESY THROUGHOUT THE TRIAL.

02:18PM 3    MR. BALWANI, SIR, YOU HAVE THE RIGHT TO BE HEARD AT YOUR

02:18PM 4  SENTENCING.

02:18PM 5    IS THERE ANYTHING YOU WOULD LIKE TO SAY OR ANYTHING YOU

02:18PM 6  WOULD LIKE ME TO KNOW BEFORE I IMPOSE SENTENCE?

02:18PM 7    MR. COOPERSMITH:  YOUR HONOR, I WOULD JUST TELL THE

02:18PM 8  COURT THAT MR. BALWANI APPRECIATES THE INVITATION TO SPEAK, AND

02:19PM 9  WE KNOW HE HAS THAT RIGHT.  HE ALSO HAS THE RIGHT NOT TO SPEAK,

02:19PM 10 AND HE CHOOSES TO EXERCISE HIS RIGHT NOT TO SPEAK.

02:19PM 11    THE COURT:  OKAY.  IS THAT CORRECT, MR. BALWANI?

02:19PM 12    THE DEFENDANT:  YES, YOUR HONOR.

02:19PM 13    THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH, SIR.

02:19PM 14 THANK YOU.

02:19PM 15    ALL RIGHT.  ANYTHING FURTHER FROM EITHER SIDE?

02:19PM 16    MR. SCHENK:  NO, YOUR HONOR.

02:19PM 17    MR. COOPERSMITH:  NO, YOUR HONOR.

02:19PM 18    PROBATION OFFICER:  NO, YOUR HONOR.

02:19PM 19    THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  AND

02:19PM 20 THANK YOU, COUNSEL, FOR THE TIME SPENT THIS MORNING.  THIS WAS

02:19PM 21 HELPFUL TO THE COURT.

02:19PM 22    WE SPENT A LOT OF TIME GOING THROUGH THE NUANCES ABOUT THE

02:19PM 23 PRELIMINARY INFORMATION THAT MUST BE RESOLVED PRIOR TO THE

02:19PM 24 IMPOSITION OF A SENTENCE, AND AS I SAID, WE ALL KNOW WHY WE'RE

02:19PM 25 HERE.  I'VE READ THE PSR.  LET ME SAY I HAVE READ THE LETTERS

02:19PM 1    AND THE DOCUMENTS THAT HAVE BEEN SUPPLIED TO THE COURT, THE

02:19PM 2    INFORMATION BOTH FROM THE GOVERNMENT AND THEIR EXPERTS, THEIR

02:19PM 3    SENTENCING MEMORANDUM, AS WELL AS THE SENTENCING MEMORANDUM

02:19PM 4    FROM THE DEFENDANT.

02:19PM 5         I'VE READ THE LETTERS THAT WERE PRESENTED TO THE COURT

02:20PM 6    THAT SPEAK IN SUPPORT OF MR. BALWANI AND SPEAK TO HIS

02:20PM 7    BACKGROUND.  THEY SPEAK TO THE NATURE OF THEIR RELATIONSHIP

02:20PM 8    WITH HIM, THEIR KNOWLEDGE OF HIM.

02:20PM 9         THERE WERE PHOTOGRAPHS, WEREN'T THERE, THAT SHOW MANY PUSH

02:20PM 10   CARTS FROM PAKISTAN, I BELIEVE, AND INDIA THAT SHOW THE WORK OF

02:20PM 11   THE CONTRIBUTIONS THAT MR. BALWANI HAS MADE AND THE EFFORTS

02:20PM 12   THAT INDIVIDUALS WHO HAVE CHANGED THEIR LIVES, THEY'VE BEEN

02:20PM 13   ABLE TO ESTABLISH BUSINESSES WITH PUSH CARTS, SELLING FRUITS,

02:20PM 14   SELLING BEVERAGES, AND OTHER MATTERS TO IMPROVE THEIR LIVES.

02:20PM 15        SO TO MR. COOPERSMITH'S POINT, THESE ARE THINGS THAT AN

02:20PM 16   INDIVIDUAL LOOKS AT, AND THEY HAVE A GREAT IMPRESSION, POSITIVE

02:20PM 17   IMPRESSION ON THE COURT AS DO THE FAMILY SUPPORT, THE MANY

02:21PM 18   LETTERS THAT SPOKE ABOUT THEIR RELATIONSHIP WITH MR. BALWANI

02:21PM 19   AND THEIR SPECIAL CONNECTION WITH HIM, NOT JUST A BLOOD

02:21PM 20   RELATIONSHIP BUT MORE.

02:21PM 21        I BELIEVE HIS BROTHERS ARE IN COURT, AND THEY ARE GRATEFUL

02:21PM 22   TO HIM BECAUSE HE PAID FOR THEIR COLLEGE TUITION, HE PAID FOR

02:21PM 23   THE TUITION THAT ALLOWED THEM TO GO TO COLLEGE, AND PERHAPS

02:21PM 24   WHAT I HAVE LEARNED FROM HIM IN THE PSR WAS THAT HE WAS THE SON

02:21PM 25   WHO WAS SENT FORWARD TO ACCOMPLISH MUCH AND TO RETURN MUCH TO

02:21PM 1     HIS FAMILY.  HE DID THAT WITH HIS FAMILY.  HE CONSISTENTLY

02:21PM 2     SUPPORTED HIS FAMILY.

02:21PM 3          WE'RE TOLD ABOUT THE CHARITABLE GIFTS THAT HE MADE AND

02:21PM 4     SOME OF THOSE WERE BEFORE HIS INVOLVEMENT WITH THE COMPANY.

02:21PM 5     MANY OF THEM WERE AFTER HIS INVOLVEMENT WITH THE COMPANY AND

02:21PM 6     CONTINUED INTO THE 2020, I THINK, WAS ONE DATE THAT I NOTED

02:22PM 7     WHERE HE CONTINUED TO SUPPORT BOTH HIS -- THE TEMPLE THAT HE

02:22PM 8     WORSHIPS AT.  I THINK THAT'S WHERE THE -- I BELIEVE THAT'S

02:22PM 9     WHERE THE WELL WAS IN MILPITAS, CALIFORNIA, TO ASSIST THE

02:22PM 10    TEMPLE THERE IF I'M NOT MISTAKEN AND THAT'S MY RECOLLECTION.

02:22PM 11         BUT THAT SHOWS ANOTHER SIDE OF HIM, AND I THINK THAT WAS

02:22PM 12    YOUR POINT, MR. COOPERSMITH.

02:22PM 13         AND TO YOUR POINT, MR. COOPERSMITH, SENTENCING IS ALWAYS

02:22PM 14    INDIVIDUALIZED.

02:22PM 15         THE COURT NEEDS TO LOOK AT -- WE'VE TALKED ABOUT

02:22PM 16    MS. HOLMES.  SHE'S PART OF THIS CASE, BUT SHE'S NOT PART OF

02:22PM 17    THIS SENTENCE.  THE SENTENCE THAT THE COURT MUST CONSIDER IN

02:22PM 18    THIS CASE IS INDIVIDUALIZED TO MR. BALWANI, AND THAT'S WHAT THE

02:22PM 19    COURT INTENDS TO DO AND TALKING A LITTLE BIT ABOUT THE THINGS

02:22PM 20    THAT I'VE LEARNED ABOUT HIM FROM THE PSR AND THAT HE SHARED

02:22PM 21    WITH THE PROBATION OFFICER.

02:22PM 22         BUT WE KNOW THAT THE JURY SAT THROUGH THIS TRIAL FOR

02:23PM 23    MONTHS, THEY HEARD THE VARIOUS WITNESSES, THEY HEARD THE

02:23PM 24    ARGUMENTS OF COUNSEL, THEY HEARD THE CLOSING ARGUMENTS, THEY

02:23PM 25    HEARD THE EVIDENCE, AND THEY LOOKED AT THE EVIDENCE VERY

02:23PM 1    CAREFULLY.  THERE WERE MANY, MANY EXHIBITS THAT WERE PRESENTED.

02:23PM 2        AS I'VE SAID PREVIOUSLY, A JURY THAT WAS SELECTED BY BOTH

02:23PM 3    SIDES IS A REPRESENTATIVE OF THE COMMUNITY, AND WE ASKED THIS

02:23PM 4    JURY TO COME IN AS THE COMMUNITY TO HEAR AND JUDGE AND TEST THE

02:23PM 5    EVIDENCE THAT THE GOVERNMENT PUTS FORWARD THROUGH AN INDICTMENT

02:23PM 6    AND IN THAT WAY TO RENDER THE COMMUNITY'S DECISION AS TO

02:23PM 7    WHETHER OR NOT THERE HAVE BEEN VIOLATIONS THAT THE GOVERNMENT

02:23PM 8    HAS PROVED BY PROOF BEYOND A REASONABLE DOUBT.

02:23PM 9        IN THIS CASE THIS JURY DID RETURN VERDICTS OF GUILT AS TO

02:23PM 10   EACH OF THE COUNTS THAT WERE ALLEGED IN THE INDICTMENT, AND

02:24PM 11   THAT BRINGS US TO THIS DATE TODAY.

02:24PM 12       THE OTHER THINGS THAT I LEARNED ABOUT MR. BALWANI WERE HIS

02:24PM 13   GREAT SUCCESS IN EDUCATION AND THEN FOLLOWING HIS EDUCATION

02:24PM 14   WHAT HE DID WITH THAT EDUCATION, HE WENT FORWARD.  HE WAS A

02:24PM 15   SUCCESS IN BUSINESS.  HE WORKED AT MICROSOFT FOR A WHILE, BUT

02:24PM 16   THEN HE LEFT AND HE STARTED HIS OWN BUSINESS, AND AS WE KNOW IN

02:24PM 17   SILICON VALLEY HERE, IT IS NOT UNUSUAL, IT'S QUITE THE NORM FOR

02:24PM 18   SOMEONE TO START A BUSINESS, A STARTUP.  THAT'S A PHRASE THAT

02:24PM 19   WE ALL KNOW ABOUT.  AND WE KNOW WHAT HAPPENS WITH THOSE

02:24PM 20   STARTUPS.  OFTENTIMES THE PEOPLE WHO BEGIN THOSE COMPANIES,

02:24PM 21   THEY LOOK FORWARD TO BEING ACQUIRED AND THE ACQUISITION IS

02:24PM 22   SOMETHING THAT PEOPLE SEEK, AND THAT'S CERTAINLY WHAT HAPPENED

02:24PM 23   WITH MR. BALWANI.

02:24PM 24       THE INVESTIGATION IN THE PROBATION REPORT REFLECTS THAT HE

02:25PM 25   HAD STARTED A BUSINESS, AND THAT HE SOLD THE BUSINESS AT GREAT

02:25PM 1    PROFIT TO HIMSELF.  THAT'S SOMETHING THAT IS VERY COMMON IN

02:25PM 2    THIS VALLEY.  AND I WAS GOING TO SAY IT'S INTERESTING, OR

02:25PM 3    PERHAPS TRAGIC IS A BETTER WORD, TO LOOK AT THE PATH OF THIS

02:25PM 4    CASE AND TO REALIZE THAT THAT PATH HAS COME FULL CIRCLE.

02:25PM 5    INSTEAD OF IN A LARGE BUILDING, AN OFFICE BUILDING, A CAMPUS

02:25PM 6    WITH R&D AND LABS AND THINGS AND ENGINEERS, WHAT HAS HAPPENED

02:25PM 7    NOW IS ALL OF THAT HAS COME BACK TO A COURTROOM BECAUSE OF THE

02:25PM 8    JURY'S FINDINGS, BECAUSE OF THE INDICTMENT THAT THE COMMUNITY,

02:25PM 9    AT THE GUIDANCE OF THE GOVERNMENT, THE COMMUNITY ALSO WAS

02:25PM 10   RESPONSIBLE FOR THE INDICTMENT AND THE COMMUNITY HEARD THE

02:26PM 11   TRIAL, AND WE COME BACK TO THIS.

02:26PM 12        IS THAT WHAT WAS HAPPENING HERE?

02:26PM 13        MR. COOPERSMITH, YOU SUGGEST THAT THIS WAS A GREAT IDEA,

02:26PM 14   AND YOUR CLIENT WAS ALL IN ON IT.  THIS WAS TECHNOLOGY THAT

02:26PM 15   COULD CHANGE THE WORLD, IT COULD CHANGE THE WAY THAT HEALTH

02:26PM 16   CARE IS DISTRIBUTED AND ADMINISTERED, AND YOUR CLIENT HAS SAID

02:26PM 17   HE WAS ALL IN.  HE TRAVELLED.  THAT WASN'T BEFORE THE JURY.  I

02:26PM 18   THINK THIS IS SOMETHING THAT THE PROBATION DEPARTMENT GLEANED

02:26PM 19   FROM HIM.  THE JURY CERTAINLY DIDN'T HEAR ANY OF THAT, BUT HIS

02:26PM 20   TRAVEL WAS TO PERHAPS MARKET THE DEVICE AND PROVIDE THAT DEVICE

02:26PM 21   FOR OTHER COUNTRIES, POOR COUNTRIES.

02:26PM 22        BUT, AGAIN, WE COME FULL CIRCLE.  HOW DID THAT HAPPEN?

02:26PM 23   WHAT WAS THE DISRUPTION BETWEEN THIS GENIUS IDEA AND WHAT WAS

02:26PM 24   IT THAT DISRUPTED THAT MACHINE, THAT TECHNOLOGY, THAT BENEFIT

02:27PM 25   TO SO MANY COUNTRIES?  AND WHAT THE JURY FOUND WAS THAT IT WAS

02:27PM 1    FRAUD, IT WAS WIRE FRAUD.  AND FOR SOME REASON THAT HAPPENED.

02:27PM 2    WE DON'T KNOW WHAT IT WAS.  THE JURY HEARD THE EVIDENCE.  I

02:27PM 3    SUPPOSE THE JURY HEARD THE EVIDENCE, AND THEY FOUND THAT THE

02:27PM 4    CONDUCT WAS FRAUDULENT.

02:27PM 5        WHAT I'M SUGGESTING IS WHY DID THAT HAVE TO HAPPEN?  AND

02:27PM 6    THIS WAS A SUCCESSFUL BUSINESS.  THE IDEA WAS STRONG.  THERE

02:27PM 7    WERE MANY INVESTORS GOING, AND THEN THERE WERE PROBLEMS, AS

02:27PM 8    THERE ARE IN EVERYTHING IN LIFE.

02:27PM 9        AND IN THIS NEW VENTURE PROBLEMS STARTED TO ARISE.  THERE

02:28PM 10   WAS A LOT OF, I THINK IT WAS CALLED -- WHAT WAS IT CALLED?  IT

02:28PM 11   WAS GHOST OPERATION FOR TEN YEARS AND UNTIL THE MACHINE AND

02:28PM 12   EVERYTHING DEVELOPED.  MR. BALWANI CAME INTO THE COMPANY IN

02:28PM 13   2009 AND THEN THINGS STARTED TO GO FORWARD, BUT THEN THERE WERE

02:28PM 14   PROBLEMS.

02:28PM 15       AND NOTWITHSTANDING THOSE PROBLEMS, THE DEFENDANTS CHOSE

02:28PM 16   TO GO FORWARD AND CONTINUE WITH DECEPTION I'LL CALL IT,

02:28PM 17   MISLEADING INFORMATION, ACTIVE, MISLEADING AND CONTINUING TO

02:28PM 18   PERPETUATE THE FRAUD EVEN WHEN THEY KNEW THAT THE EVIDENCE

02:28PM 19   INTERNALLY INFORMED THEM THAT THEY COULD NOT PRODUCE WHAT THEY

02:28PM 20   SAID THEY WERE GOING TO PRODUCE TO THEIR INVESTORS.  AND THAT'S

02:28PM 21   THE WIRE FRAUD, ISN'T IT?  THAT'S THE FRAUD ON THE INVESTORS.

02:28PM 22       THEY KNEW THERE WERE ISSUES.  THEY CONCEALED, THEY MISLED

02:29PM 23   INVESTORS, THEY MISLED PATIENTS.  THEY CHOSE TO, FOR SOME

02:29PM 24   REASON, TO IGNORE ALL OF THAT EVIDENCE AND TO GO FORWARD WITH

02:29PM 25   THE INVESTMENTS.  THAT'S THE DISRUPTION.  THAT'S THE

02:29PM 1    SUPERSEDING INTERVENING ACTS THAT PREVENTED THERANOS FROM GOING

02:29PM 2    FORWARD WITH THIS TECHNOLOGY THAT HAD SUCH GREAT PROMISE.

02:29PM 3         WE WONDER WHY, WHY DID THAT HAPPEN?  WHAT WAS IT?  WAS IT

02:29PM 4    GREED?  MR. COOPERSMITH SUGGESTS IT WASN'T BECAUSE HE,

02:29PM 5    MR. BALWANI, WAS A SHAREHOLDER, AND HE LOST MILLIONS OF DOLLARS

02:29PM 6    IN THIS EVENT.

02:29PM 7         AND MR. SCHENK SAYS, WELL, IT'S A LITTLE DIFFERENT BECAUSE

02:29PM 8    HE'S A STAKEHOLDER, AND THERE WAS SOME HOPE THAT THE COMPANY

02:29PM 9    WOULD, NOTWITHSTANDING THE FRAUD, COME TO FRUITION AND HE WOULD

02:29PM 10   BE QUITE WEALTHY.

02:30PM 11        SOMEONE SAID, I THINK ONE OF THE LETTERS AND SOMEBODY SAID

02:30PM 12   THAT, WELL, INVESTORS SHOULD ONLY INVEST WHAT THEY EXPECT TO

02:30PM 13   LOSE.  IS THAT WHAT HE DID?  IS THAT MONEY THAT HE DID NOT HAVE

02:30PM 14   WORRIES ABOUT OR WAS NOT CONCERNED ABOUT PARTING COMPANY WITH?

02:30PM 15   WE DON'T KNOW.  I DON'T KNOW, AND I'M NOT SUGGESTING THAT THERE

02:30PM 16   WAS ANYTHING ON HIS PART, HIS CHOOSING NOT TO TESTIFY THAT

02:30PM 17   SHOULD SUGGEST ANYTHING OTHERWISE, AND I'M NOT SUGGESTING IN

02:30PM 18   ANY WAY THAT THERE'S A DEARTH OF EVIDENCE BECAUSE OF THAT AT

02:30PM 19   ALL.

02:30PM 20        BUT I THINK IT'S JUST THAT ENDURING QUESTION ABOUT WHY DID

02:30PM 21   SUCH A PROMISING COMPANY COME TO THIS END AND WHY DID

02:30PM 22   MR. BALWANI FIND HIMSELF IN THIS?

02:30PM 23        AND THE EVIDENCE SHOWED THAT HE KNEW ABOUT THE FRAUD.

02:30PM 24   THERE WERE TEXT MESSAGES BETWEEN HE AND HIS CODEFENDANT, THERE

02:30PM 25   WERE CONDUCT THAT WAS ENGAGED IN DIRECTLY BY MR. BALWANI WITH

02:31PM 1    INVESTORS WHEN HE MET WITH THEM, HE PROVIDED FINANCIAL

02:31PM 2    PROJECTIONS THAT WERE NOT JUST UNREALISTIC, THEY WERE LIES,

02:31PM 3    THEY WERE FRAUD.

02:31PM 4         AND WAS IT THE NECESSITY TO KEEP THE FINANCES GOING, TO

02:31PM 5    KEEP THE COMPANY GOING JUST ONE MORE, JUST ONE MORE BLOCK, JUST

02:31PM 6    ONE MORE BLOCK, WE'RE ALMOST THERE?  IS THAT WHAT IT WAS?

02:31PM 7         WERE THOSE ACTS OF DESPERATION OR ACTS OF MANIPULATION?

02:31PM 8    THAT CONDUCT IS CONCURRENT WITH THE FRAUD ON THE INVESTORS, AND

02:31PM 9    REGRETTABLY WHAT THE JURY IN THIS CASE FOUND AND WHAT THEY SAW

02:31PM 10   WAS MANIPULATION AND A TRUE FLIGHT FROM HONEST BUSINESS

02:31PM 11   PRACTICES.

02:31PM 12        AND, OF COURSE, IN HINDSIGHT WHAT WE WOULD RECOGNIZE IS

02:31PM 13   THE SOLUTION SHOULD HAVE BEEN AN INITIATION OF AN ACQUAINTANCE

02:32PM 14   WITH AND A FULSOME RELATIONSHIP WITH HONESTY, TRUTH, AND

02:32PM 15   CANDOR.  FOR SOME REASON THAT WAS NOT ENGAGED HERE, AND PERHAPS

02:32PM 16   THAT'S WHY WE ARE AT THIS REGRETTABLE STATE TODAY WHERE

02:32PM 17   MR. BALWANI STANDS BEFORE THE COURT HAVING BEEN CONVICTED OF

02:32PM 18   ALL OF THE COUNTS, INCLUDING THE PATIENT COUNTS IN THIS MATTER,

02:32PM 19   AND THAT IS TROUBLING.

02:32PM 20        I CERTAINLY RESPECT AND I DO NOTE ALL OF THE GOOD WORKS

02:32PM 21   THAT MR. BALWANI HAS DONE IN HIS LIFE WITH HIS FAMILY AND

02:32PM 22   OTHERS.

02:32PM 23        THE COURT IS NOT GOING TO IGNORE THOSE FACTORS, AND

02:32PM 24   THEY'RE IMPORTANT FACTORS THAT THE COURT CONSIDERS IN ITS 3553

02:32PM 25   ANALYSIS AS THE COURT MUST DO.

```
02:32PM   1          IN THIS MATTER, AGAIN, RECOGNIZING THAT THE INDIVIDUAL
02:32PM   2    BEFORE THE COURT AND HIS HISTORY, THE CHARACTERISTICS,
02:33PM   3    INCLUDING HIS CHARITY AND RECOGNIZING ALL OF THE GOOD THINGS
02:33PM   4    THAT HE HAS DONE, THE COURT IS GOING TO IMPOSE A SENTENCE IN
02:33PM   5    THIS MATTER.  THE COURT, FIRST OF ALL, WILL ORDER A SPECIAL
02:33PM   6    ASSESSMENT OF $1200.  THAT'S $100 PER COUNT IN THIS MATTER.
02:33PM   7          AS TO RESTITUTION, COUNSEL, I AM NOT GOING TO ORDER
02:33PM   8    RESTITUTION TODAY.  I'M GOING TO DEFER THAT FOR ANOTHER DATE,
02:33PM   9    AND I'LL ASK COUNSEL TO MEET AND CONFER ABOUT A SCHEDULE FOR A
02:33PM  10    RESTITUTION HEARING.
02:33PM  11          I'D ALSO INVITE YOU TO CONFER WITH THE CODEFENDANT'S
02:33PM  12    COUNSEL HERE, TOO, TO SEE IF THAT IS A HEARING THAT YOU WOULD
02:33PM  13    LIKE TO ENGAGE IN JOINTLY.
02:33PM  14          AS YOU MIGHT KNOW, I CONTINUED -- I DID NOT MAKE A
02:33PM  15    RESTITUTION FINDING IN MS. HOLMES'S CASES.  I ASKED COUNSEL TO
02:33PM  16    MEET AND CONFER ABOUT A SCHEDULE FOR THAT.  I WOULD INVITE YOU
02:34PM  17    ALL TO TALK ABOUT WHETHER OR NOT IT MAKES SENSE TO HAVE ONE
02:34PM  18    RESTITUTION HEARING OR IF YOU WOULD LIKE TO HAVE TWO SEPARATE
02:34PM  19    RESTITUTION HEARINGS OR JUST THE PROTOCOLS FOR THAT, AND THEN
02:34PM  20    YOU CAN CONTACT MS. ROBINSON ABOUT THAT.
02:34PM  21          SO I AM DEFERRING RESTITUTION AT THIS TIME,
02:34PM  22    MS. GOLDSBERRY.
02:34PM  23          IN THIS MATTER THE COURT WILL IMPOSE A FINE OF $25,000 AS
02:34PM  24    TO COUNTS ONE THROUGH TWELVE.  THAT'S CONCURRENT AS TO EACH
02:34PM  25    COUNT, MS. GOLDSBERRY.
```

02:34PM 1      I AM NOT GOING TO IMPOSE A SENTENCE OF PROBATION IN THIS

02:34PM 2   MATTER.  THE COURT IS GOING TO FIND THAT THERE'S A SUPERVISED

02:34PM 3   RELEASE TERM OF THREE YEARS AS TO EACH COUNT, AND THOSE SHALL

02:34PM 4   RUN CONCURRENT, CONCURRENT TO ONE ANOTHER.

02:34PM 5      IN THIS MATTER, RECOGNIZING THAT MR. BALWANI WAS CONVICTED

02:34PM 6   OF ALL OF THE COUNTS IN THIS MATTER, AND AGAIN, CONSIDERING THE

02:35PM 7   HISTORY AND CHARACTERISTICS, INCLUDING HIS CHARITY AND GOOD

02:35PM 8   WORKS AND RECOGNIZING ALL OF THAT, THE COURT IS GOING TO IMPOSE

02:35PM 9   A SENTENCE, A GUIDELINE SENTENCE, AND THE COURT FINDS IT'S

02:35PM 10  APPROPRIATE TO IMPOSE A GUIDELINE SENTENCE.  THE COURT WILL

02:35PM 11  IMPOSE A GUIDELINE SENTENCE OF 155 MONTHS, AND IN IMPOSING THIS

02:35PM 12  SENTENCE THE COURT FINDS THAT IT IS SUFFICIENT BUT NOT GREATER

02:35PM 13  THAN NECESSARY TO COMPLY WITH THE PURPOSES OF 18 UNITED STATES

02:35PM 14  CODE SECTION 3553.

02:35PM 15     THE COURT HAS CONSIDERED THE HISTORY AND THE

02:35PM 16  CHARACTERISTICS OF THE DEFENDANT, THE NATURE AND CIRCUMSTANCES

02:35PM 17  OF THE OFFENSE, INCLUDING THE NEED FOR THE SENTENCE IMPOSED TO

02:35PM 18  REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR

02:35PM 19  THE LAW, TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE, TO AFFORD

02:35PM 20  ADEQUATE DETERRENCE IN CRIMINAL CONDUCT AND ALSO TO AVOID

02:35PM 21  DISPARITY IN SENTENCES OF CO-DEFENDANTS.

02:36PM 22     THE COURT IMPOSES THIS SENTENCE AFTER CONSULTING THE

02:36PM 23  UNITED STATES SENTENCING GUIDELINES AND IN LIGHT OF THE

02:36PM 24  STATUTORY CONCERNS EXPRESSED IN 18 UNITED STATES CODE 3553(A).

02:36PM 25     MR. BALWANI, SIR, YOU HAVE THE RIGHT TO FILE AN APPEAL.

02:36PM 1    ANY APPEAL MUST BE FILED WITHIN 14 DAYS.

02:36PM 2         DO YOU UNDERSTAND THAT, SIR?

02:36PM 3              THE DEFENDANT:  I DO, YOUR HONOR.

02:36PM 4              THE COURT:  THANK YOU.

02:36PM 5         AS TO A SURRENDER DATE.  MR. COOPERSMITH, I WAS GOING TO

02:36PM 6    SUGGEST A SURRENDER DATE SOME TIME IN MARCH, AND I WAS GOING TO

02:36PM 7    IDENTIFY MARCH, EITHER -- LET'S SEE, THE 15TH, NO LATER THAN

02:36PM 8    2:00 P.M., MARCH 15TH, 2023, NO LATER THAN 2:00 P.M.  I DIDN'T

02:36PM 9    ASK THE GOVERNMENT IF THEY WANTED TO BE HEARD ON THE SURRENDER

02:36PM 10   DATE.  PARDON ME.

02:36PM 11             MR. SCHENK:  NOTHING FURTHER.  THANK YOU.

02:36PM 12             THE COURT:  ALL RIGHT.  THANK YOU.

02:36PM 13        DID YOU HAVE A DESIRE TO ASK THE COURT TO MAKE A

02:37PM 14   RECOMMENDATION TO THE BUREAU OF PRISON AS TO A LOCATION?

02:37PM 15             MR. COOPERSMITH:  YES, YOUR HONOR.  WE'VE DONE THE

02:37PM 16   LOOKING AT THE VARIOUS FACTORS.  WE WOULD ASK THE COURT TO

02:37PM 17   RECOMMEND THE MINIMUM SECURITY SATELLITE CAMP AT LOMPOC.

02:37PM 18             THE COURT:  ALL RIGHT.

02:37PM 19             MR. COOPERSMITH:  AND WE HAVE PARTICULAR LANGUAGE WE

02:37PM 20   WOULD LIKE THE COURT TO CONSIDER USING IN THE JUDGMENT, AND I

02:37PM 21   CAN CITE THAT NOW.

02:37PM 22             THE COURT:  LET ME SAY THAT I WAS GOING TO RECOGNIZE

02:37PM 23   THAT THIS WAS A NONVIOLENT OFFENSE, AND THAT MR. BALWANI

02:37PM 24   PRESENTS NO HISTORY OF VIOLENCE.  HE HAS NO RECORD, CRIMINAL

02:37PM 25   RECORD.  HE'S NOT -- THERE'S NO RECORD OF ANY SUBSTANCE ABUSE

02:37PM 1    NOR IS THERE ANY RECORD OF VIOLENCE IN HIS BACKGROUND SUCH THAT

02:37PM 2    A RECOMMENDATION TO A MINIMUM SECURITY CAMP LIKE FACILITY WOULD

02:38PM 3    BE APPROPRIATE, AND THE COURT WOULD RECOMMEND TO THE BUREAU OF

02:38PM 4    PRISONS THAT IT LOCATE HIM AT A FACILITY SUCH AS THAT THAT IS

02:38PM 5    CLOSEST AS POSSIBLE TO ALAMEDA COUNTY OR THE SOUTHERN PART OF

02:38PM 6    SANTA CLARA COUNTY TO AFFORD FOR FAMILY VISITATION BECAUSE THE

02:38PM 7    COURT FINDS THAT FAMILY VISITATION ENHANCES REHABILITATION.

02:38PM 8    THAT'S WHAT I WAS GOING TO STATE.

02:38PM 9         DO YOU WANT TO AUGMENT THAT?

02:38PM 10            MR. COOPERSMITH:  YES, YOUR HONOR.

02:38PM 11       AND THE CAMP FACILITY THAT WE'RE AWARE OF THAT WOULD FIT

02:38PM 12   THE DESCRIPTION THE COURT JUST GAVE WOULD BE THE SATELLITE CAMP

02:38PM 13   AT ATWATER, BUT WE ARE ASKING THE COURT TO RECOMMEND ASSIGNMENT

02:38PM 14   OF MR. BALWANI TO THE MINIMUM SECURITY CAMP AT LOMPOC, AND THE

02:38PM 15   REASON IS THAT IT IS A LITTLE FURTHER AWAY.  I THINK IT'S A

02:38PM 16   FOUR HOUR DRIVE INSTEAD OF A TWO HOUR DRIVE FROM HIS CURRENT

02:38PM 17   RESIDENCE, BUT NONETHELESS, IT'S A FACILITY THAT HAS MUCH MORE

02:38PM 18   PROGRAMMING AND I THINK IS MORE SUITABLE FOR MR. BALWANI, AND

02:39PM 19   HOPEFULLY HE CAN BE PRODUCTIVE IF THAT'S WHERE HE ENDS UP.

02:39PM 20            THE COURT:  OKAY.

02:39PM 21            MR. COOPERSMITH:  SO WE WOULD LIKE THE COURT TO

02:39PM 22   RECOMMEND THE MINIMUM SECURITY CAMP AT LOMPOC, AND THE COURT

02:39PM 23   HAS ALREADY MADE THE FINDING THAT HIS SECURITY NEEDS DON'T

02:39PM 24   REFLECT THE NEED TO BE CONFINED ABOVE THE CAMP LEVEL, AND I

02:39PM 25   UNDERSTAND THAT'S WHAT THE COURT HAS SAID; IS THAT CORRECT?

152

```
02:39PM   1              THE COURT:  YES, YES.  THE ONE THING I DIDN'T,
02:39PM   2    THERE'S ALSO NO EVIDENCE OF ANY GANG ACTIVITY THAT THE BUREAU
02:39PM   3    OF PRISONS NEEDS TO BE CONCERNED ABOUT.
02:39PM   4              MR. COOPERSMITH:  OKAY.  SO THAT'S OUR
02:39PM   5    RECOMMENDATION, YOUR HONOR.
02:39PM   6              THE COURT:  OKAY.  THANK YOU.  I WOULD RECOMMEND IF
02:39PM   7    THE LOMPOC CAMP IS AVAILABLE, AFTER THEY EVALUATE MR. BALWANI,
02:39PM   8    I HAVE NO OBJECTION TO THAT BEING HIS SITE.
02:39PM   9              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.
02:39PM  10         IN PARTICULAR, IT'S THE SATELLITE CAMP BECAUSE THERE'S
02:39PM  11    ACTUALLY ANOTHER HIGHER SECURITY LEVEL PRISON THERE AS WELL.
02:39PM  12    SO IT'S THE SATELLITE CAMP.
02:40PM  13              THE COURT:  IT'S THE MINIMUM SECURITY SATELLITE
02:40PM  14    CAMP.
02:40PM  15              MR. COOPERSMITH:  CORRECT, YOUR HONOR.
02:40PM  16              THE COURT:  RIGHT.  OKAY.  ANYTHING FURTHER?
02:40PM  17              MR. SCHENK:  NO, YOUR HONOR.  THANK YOU.
02:40PM  18              THE COURT:  MR. COOPERSMITH, ANYTHING FURTHER?
02:40PM  19              MR. COOPERSMITH:  I'M JUST LOOKING AT MY NOTES.
02:40PM  20         NO, YOUR HONOR, NOTHING FURTHER.
02:40PM  21              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK
02:40PM  22    YOU.
02:40PM  23         THANK YOU, COUNSEL.
02:40PM  24         (COURT CONCLUDED AT 2:40 P.M.)
         25
```

ER-191

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10  HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16       IRENE RODRIGUEZ, CSR, RMR, CRR
         CERTIFICATE NUMBER 8074

17

18       DATED:  DECEMBER 12, 2022

19

20

21

22

23

24

25