No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 2 OF 26 (PAGES ER-193 – ER-375)

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

*Counsel for Appellant*

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,          )
6                                       )  CR-18-00258-EJD
                    PLAINTIFF,          )
7                                       )  SAN JOSE, CALIFORNIA
              VS.                       )
8                                       )  MARCH 22, 2022
     RAMESH "SUNNY" BALWANI,            )
9                                       )  VOLUME 8
                    DEFENDANT.          )
10   _____   )  PAGES 985 - 1154

11

12                TRANSCRIPT OF TRIAL PROCEEDINGS
               BEFORE THE HONORABLE EDWARD J. DAVILA
13                UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                            150 ALMADEN BOULEVARD, SUITE 900
17                          SAN JOSE, CALIFORNIA 95113

18                          BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                          1301 CLAY STREET, SUITE 340S
                            OAKLAND, CALIFORNIA 94612
20

          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTER:
22                               IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
23

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
25

01:55PM   1          MR. COOPERSMITH, YOU HAVE THIS BINDER?

01:55PM   2               MR. COOPERSMITH:  I DO.

01:55PM   3               MR. BOSTIC:  AND THE COURT HAS A COPY.

01:55PM   4               THE COURT:  I DO.

01:55PM   5     BY MR. BOSTIC:

01:55PM   6     Q.   MS. CHEUNG, IF I COULD ASK YOU TO TURN IN THIS BINDER TO

01:56PM   7     TAB 5388.

01:56PM   8          LET ME KNOW ONCE YOU'RE THERE.

01:56PM   9     A.   I'M HERE.

01:56PM  10     Q.   AND AT TAB 5388, DO YOU SEE AN IMAGE OF A DEVICE?

01:56PM  11     A.   YES.

01:56PM  12     Q.   AND CAN YOU IDENTIFY THAT DEVICE FOR US?

01:56PM  13     A.   THAT IS THE EDISON DEVICE.

01:56PM  14     Q.   AND IS THIS A FAIR AND ACCURATE DEPICTION OF THE DEVICE

01:56PM  15     MADE BY THERANOS?

01:56PM  16     A.   YES.

01:56PM  17               MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

01:56PM  18     EXHIBIT 3588 INTO EVIDENCE.

01:56PM  19               MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

01:56PM  20               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:56PM  21          (GOVERNMENT'S EXHIBIT 5388 WAS RECEIVED IN EVIDENCE.)

01:56PM  22     BY MR. BOSTIC:

01:56PM  23     Q.   SO, MS. CHEUNG, ARE WE LOOKING ON THE SCREEN NOW AT A

01:56PM  24     PICTURE OF THE EDISON BLOOD ANALYZERS?

01:56PM  25     A.   YES.

01:56PM 1   Q.   AND WE CAN SEE WHAT IT LOOKS LIKE FROM THIS PICTURE, BUT

01:56PM 2   CAN YOU DESCRIBE IT FOR US IN TERMS OF ITS DIMENSIONS?  HOW BIG

01:56PM 3   WAS IT?

01:56PM 4   A.   SO THIS IS ABOUT THE SIZE OF A -- LIKE THE PC COMPUTERS

01:56PM 5   ROUGHLY.  SO IT WOULD BE MAYBE ABOUT THE SIZE OF A PRINTER.

01:57PM 6   Q.   SO IF YOU HAD TO ESTIMATE THE HEIGHT OF THIS DEVICE, COULD

01:57PM 7   YOU GIVE US YOUR BEST ESTIMATE?

01:57PM 8   A.   MY BEST ESTIMATE WOULD BE IT'S PROBABLY LIKE 1.5 FEET TO

01:57PM 9   2 FEET, YEAH.

01:57PM 10  Q.   AND YOUR JOB -- YOUR ROLE IN R&D AND THE CLINICAL LAB, DID

01:57PM 11  IT REQUIRE YOU TO OPERATE THE EDISON DEVICE?

01:57PM 12  A.   YES.

01:57PM 13  Q.   AND DID YOU RUN THE SAMPLES ON THE EDISON DEVICE?

01:57PM 14  A.   YES.

01:57PM 15  Q.   AND CAN YOU DESCRIBE FOR US WHAT THAT ENTAILED?  WHAT THE

01:57PM 16  STEPS WERE TO ACTUALLY GETTING A SAMPLE AND RUNNING A TEST ON

01:57PM 17  THIS DEVICE?

01:57PM 18  A.   YEAH.  SO TYPICALLY WE WOULD HAVE -- SHOULD I DO -- SHOULD

01:57PM 19  I DO A PATIENT SAMPLE?

01:57PM 20  Q.   PLEASE.

01:57PM 21  A.   SO SAY IF WE RECEIVED A PATIENT SAMPLE, ESSENTIALLY WE

01:57PM 22  WOULD GET A CALL AND ORDER AND SAY A PATIENT WANTS A VITAMIN D

01:57PM 23  SAMPLE.

01:57PM 24       SO THE PHLEBOTOMIST OR THE SHIPPING CONTAINERS WOULD COME

01:57PM 25  IN WITH THIS TINY NANOTAINER BLOOD SAMPLE.  WE WOULD TAKE THAT,

01:58PM  1     SCAN IT, SEE ALL OF THE TESTS THAT WE NEEDED TO DO.

01:58PM  2          WE WOULD SOMETIMES HAVE TO GIVE IT OVER TO OTHER TEAMS AS

01:58PM  3     WELL TO TAKE FROM THIS TINY BLOOD SAMPLE.

01:58PM  4          AND THEN WE WOULD TAKE THAT, PUT IT ON THIS MACHINE CALLED

01:58PM  5     A TECAN, WHICH WAS A LIQUID HANDLING ROBOT THAT WOULD TAKE

01:58PM  6     SMALL SAMPLES FROM THIS TINY CONTAINER INTO THIS CARTRIDGE.

01:58PM  7          AND SO WE WOULD HAVE THESE CARTRIDGES, AND FILL WITH THE

01:58PM  8     TINY BLOOD SAMPLE.  WE WOULD TAKE THAT CARTRIDGE, BRING IT TO

01:58PM  9     THE MACHINE, AND USE THE TOUCHSCREEN, AND YOU WOULD OPEN THE

01:58PM 10     MACHINE, AND YOU WOULD SCAB THE BAR CODE ONTO THE CARTRIDGE,

01:58PM 11     AND THEN YOU PUT THE CARTRIDGE IN.  YOU CONFIRM THAT THE RIGHT

01:58PM 12     TEST WAS THERE, AND THEN YOU WOULD HIT START.

01:58PM 13          AND THEN ONCE IT WOULD RUN, THEN WE WOULD PULL THE DATA

01:58PM 14     BASICALLY FROM THIS OTHER PLATFORM CALLED ALCHEMIST TO PROCESS

01:59PM 15     ALL OF THE DATA, AT LEAST IN THE BEGINNING OF WORKING THERE.

01:59PM 16     Q.   AND I WANT TO ASK A COUPLE OF FOLLOW-UP QUESTIONS.

01:59PM 17     A.   UH-HUH.

01:59PM 18     Q.   YOU MENTIONED A DEVICE CALLED TECAN; IS THAT RIGHT?

01:59PM 19     A.   YES.

01:59PM 20     Q.   AND IS THAT -- FIRST OF ALL, WAS THE TECAN THERANOS

01:59PM 21     MANUFACTURED OR INVENTED DEVICE?

01:59PM 22     A.   NO.

01:59PM 23     Q.   IT WAS A THIRD PARTY DEVICE?

01:59PM 24     A.   YES.

01:59PM 25     Q.   AND WHAT DID THE TECAN DO IN THE CONTEXT OF RUNNING A

01:59PM  1    SAMPLE ON THE EDISON?

01:59PM  2    A.   SO THE TECAN WOULD BASICALLY TAKE A LITTLE BIT OF THE

01:59PM  3    BLOOD THAT WE HAD FROM THE COLLECTION UNIT, IT WOULD PUT IT IN

01:59PM  4    THE WELL, AND THEN IT WOULD DILUTE IT, AND THAT WAS SORT OF THE

01:59PM  5    SAMPLE PREP FOR THE EDISON CARTRIDGE.

01:59PM  6    Q.   DID YOU HAVE AN UNDERSTANDING AS TO WHY THE SAMPLE NEEDED

01:59PM  7    TO BE DILUTED BY THE TECAN BEFORE IT COULD BE RUN ON THE

01:59PM  8    EDISON?

01:59PM  9              MR. COOPERSMITH:  OBJECTION.  702, YOUR HONOR.

01:59PM  10             THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR HER

01:59PM  11   KNOWLEDGE OF THAT.

01:59PM  12             MR. BOSTIC:  I THINK THE QUESTION I ASKED WAS A YES

02:00PM  13   OR NO QUESTION, BUT JUST TO CLARIFY.

02:00PM  14   Q.   I'M ASKING BASED ON YOUR WORK AT THE COMPANY, DID YOU HAVE

02:00PM  15   AN UNDERSTANDING AS TO WHY THAT STEP WAS NECESSARY, THE

02:00PM  16   DILUTION STEP --

02:00PM  17   A.   YES.

02:00PM  18   Q.   -- BEFORE A SAMPLE COULD BE RUN?

02:00PM  19   A.   YES.

02:00PM  20   Q.   AND HOW DID YOU GAIN THAT UNDERSTANDING?

02:00PM  21   A.   FROM THE SOP'S THAT WERE PROVIDED TO US FROM THERANOS.

02:00PM  22   Q.   SO THE COMPANY DOCUMENTS THAT GOVERNED THIS PROCESS

02:00PM  23   EXPLAINED THAT REASON?

02:00PM  24   A.   YES.

02:00PM  25   Q.   SO WHAT WAS THAT REASON?  WHY WAS THAT DILUTION STEP

02:00PM  1    NECESSARY BEFORE THE SAMPLE COULD BE RUN ON THE EDISON?

02:00PM  2              MR. COOPERSMITH:  SAME OBJECTION, YOUR HONOR.  BEST

02:00PM  3    EVIDENCE AS WELL.

02:00PM  4              THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

02:00PM  5              THE WITNESS:  SO PART OF IT WAS BECAUSE WE HAD SMALL

02:00PM  6    SAMPLE SIZES, SO WE DID A DILUTION STEP IN ORDER TO ACCOMMODATE

02:00PM  7    FOR THE SMALL SAMPLE SIZES, AND THEN IT'S ALSO A PART OF THE

02:00PM  8    TEST.

02:00PM  9    BY MR. BOSTIC:

02:00PM  10   Q.   DID THE DILUTION STEP EFFECTIVELY INCREASE THE VOLUME OF

02:00PM  11   THE SAMPLE, MAKE IT BIGGER?

02:01PM  12   A.   IT DID.

02:01PM  13   Q.   THE PROCESS THAT YOU JUST OUTLINED, THOSE STEPS, WOULD

02:01PM  14   THAT PROCESS BE USED TO YIELD RESULTS FOR MULTIPLE ASSAYS AT A

02:01PM  15   TIME OR WOULD IT NEED TO BE RUN EACH TIME FOR EACH ASSAY THAT

02:01PM  16   NEEDED TO BE PERFORMED?

02:01PM  17   A.   IT WOULD NEED TO BE RUN FOR EACH TEST THAT WE DID EACH

02:01PM  18   TEST OR ASSAY.

02:01PM  19      SO ONLY ONE PATIENT FOR ONE TEST WOULD GO THROUGH THAT

02:01PM  20   WHOLE PROCESS.

02:01PM  21   Q.   SO IF A PATIENT CAME IN, FOR EXAMPLE, AND NEEDED, LET'S

02:01PM  22   SAY, JUST THREE ASSAYS RUN ON A SINGLE SAMPLE, HOW WOULD THAT

02:01PM  23   BE HANDLED?

02:01PM  24   A.   SO IF IT WAS THREE ELISA TESTS OR THREE IMMUNOASSAYS, WE

02:01PM  25   WOULD HAVE TO GO THROUGH THAT WHOLE PROCESS THREE TIMES.

CHEUNG DIRECT BY MR. BOSTIC                                    1134

02:01PM 1    Q.   AND DOES THAT MEAN THAT THE SAMPLE WOULD NEED TO BE

02:02PM 2    SUBDIVIDED AT LEAST THREE TIMES?

02:02PM 3    A.   YES.

02:02PM 4    Q.   AND I THINK YOU ANSWERED THIS AS WELL, BUT COULD SAMPLES

02:02PM 5    FROM MULTIPLE PATIENTS BE RUN THROUGH THE EDISON

02:02PM 6    SIMULTANEOUSLY?

02:02PM 7    A.   NO.

02:02PM 8    Q.   YOU MENTIONED THE EDISON 3.0 AND THE 3.5.

02:02PM 9        DID YOU ALSO HEAR ABOUT DEVICES CALLED THE 4.0 OR MINILAB

02:02PM 10   OR OTHER DEVICES WHILE YOU WERE AT THERANOS?

02:02PM 11   A.   YES.

02:02PM 12   Q.   AND WHAT WERE THE OTHER DEVICES THAT YOU RECALL?

02:02PM 13   A.   SO THE 4.0 WERE THE NEXT ITERATION OF THE EDISON DEVICE.

02:02PM 14   SO INSTEAD OF JUST DOING ELISA'S, THEY WOULD BE ABLE TO DO

02:02PM 15   NUMEROUS TYPES OF CHEMISTRIES ON THERE.

02:02PM 16       SO THEY WOULD BE ABLE TO DO ELISA, THERE WAS GENERAL

02:02PM 17   CHEMISTRY, THERE WERE OTHER DEPARTMENTS AT THERANOS THAT RAN

02:02PM 18   OTHER TYPES OF TESTS, AND IT WAS SEEN AS THE NEXT GENERATION OF

02:02PM 19   THE EDISON DEVICES.

02:02PM 20   Q.   YOU SAID EARLIER THAT ELISA WAS ANOTHER TERM FOR

02:02PM 21   IMMUNOASSAY; IS THAT CORRECT?

02:03PM 22   A.   THAT'S CORRECT.

02:03PM 23   Q.   AND THE 4.0 COULD DO OTHER TYPES OF TESTS BESIDES THE

02:03PM 24   IMMUNOASSAY?

02:03PM 25   A.   YES.

CHEUNG DIRECT BY MR. BOSTIC                                    1135

02:03PM  1    Q.   DURING YOUR TIME AT THERANOS, WAS THE COMPANY USING THE

02:03PM  2    3.0 OR THE 3.5 FOR ACTUAL PATIENT TESTING?

02:03PM  3    A.   YES.

02:03PM  4    Q.   ONE OR BOTH OF THOSE?

02:03PM  5    A.   MOSTLY THE 3.5'S.

02:03PM  6    Q.   AND HOW ABOUT THE 4.0 DEVICE THAT YOU JUST MENTIONED,

02:03PM  7    DURING YOUR TIME AT THE COMPANY DID THERANOS EVER USE THE 4.0

02:03PM  8    DEVICE FOR ACTUAL PATIENT TESTING?

02:03PM  9    A.   NO.

02:03PM  10   Q.   DID YOU HAVE AN UNDERSTANDING WHEN YOU WERE AT THE COMPANY

02:03PM  11   AS TO WHY THERANOS WAS NOT USING THE 4.0 DEVICE FOR PATIENT

02:03PM  12   TESTING?

02:03PM  13   A.   THE 4.0'S DIDN'T HAVE THE CAPACITY TO RUN ANY TEST THAT WE

02:03PM  14   OFFERED THAT WERE LIVE, AND THEY JUST WEREN'T READY.  THEY

02:03PM  15   HADN'T BEEN DEVELOPED YET.

02:03PM  16           MR. COOPERSMITH:  YOUR HONOR, MOVE TO STRIKE UNDER

02:03PM  17   702.  IT WASN'T RESPONSIVE TO THE QUESTION, AND IT'S ALSO A

02:04PM  18   VIOLATION OF RULE 702.

02:04PM  19           THE COURT:  OVERRULED.  THE ANSWER IS -- THE

02:04PM  20   QUESTION WAS BASED ON HER UNDERSTANDING AS AN EMPLOYEE.  SO THE

02:04PM  21   OBJECTION IS OVERRULED.  THE ANSWER CAN REMAIN.

02:04PM  22   BY MR. BOSTIC:

02:04PM  23   Q.   AND, MS. CHEUNG, JUST TO CLARIFY, DURING YOUR TIME AT THE

02:04PM  24   COMPANY, WERE YOU GENERALLY AWARE OF WHAT ASSAYS WERE MOVING

02:04PM  25   THROUGH RESEARCH AND DEVELOPMENT AND WHICH WERE ACTUALLY IN

02:04PM  1      PATIENT TESTING USE?

02:04PM  2      A.   YES.

02:04PM  3      Q.   AND DURING YOUR TIME AT THE COMPANY, DID ANY TEST AT ALL

02:04PM  4      ON THE 4.0 DEVICE MOVE THROUGH THE R&D PROCESS AND ACTUALLY GET

02:04PM  5      TO THE PATIENT TESTING STAGE?

02:04PM  6      A.   NO.

02:04PM  7      Q.   THE PATIENT TESTS THAT THERANOS WAS RUNNING IN THE

02:05PM  8      CLINICAL LAB, WERE ALL OF THOSE TESTS RUN ON THE EDISON, THE

02:05PM  9      THERANOS-BUILT ANALYZERS?

02:05PM 10      A.   CAN YOU REPEAT THE QUESTION?

02:05PM 11      Q.   SURE.

02:05PM 12          THE PATIENT TESTING THAT THERANOS WAS DOING, WAS THAT ALL

02:05PM 13      BEING DONE ON THE EDISON, THE THERANOS-BUILT DEVICE?

02:05PM 14      A.   NO.  ONLY A SMALL SUBSET OF THE THERANOS TESTS WERE BEING

02:05PM 15      RUN ON THE EDISON DEVICES.

02:05PM 16      Q.   AND WHY WAS THAT?  WHY WAS ONLY A SMALL SUBSET BEING RUN

02:05PM 17      ON THE THERANOS DEVICES?

02:05PM 18              MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  602.

02:05PM 19              THE COURT:  WELL, THIS GOES TO HER KNOWLEDGE AS AN

02:05PM 20      EMPLOYEE THERE?

02:05PM 21              MR. BOSTIC:  CORRECT, YOUR HONOR.

02:05PM 22              THE COURT:  IF YOU CAN ANSWER IN THE SCOPE OF YOUR

02:05PM 23      EMPLOYMENT.

02:05PM 24              THE WITNESS:  SO IN THE SCOPE?  OKAY.

02:05PM 25          THE EDISON DEVICES ONLY HAD THE CAPACITY TO RUN ELISA

02:05PM 1    TEST, WHICH IS ONLY -- IS ONE SPECIFIC TYPE OF CHEMISTRY.  IT

02:05PM 2    DIDN'T HAVE THE CAPABILITIES TO RUN GENERAL CHEMISTRY,

02:06PM 3    MICROBIOLOGY, CYTOMETRY TESTS.

02:06PM 4         SO THE REASON WHY THERANOS ONLY RAN THAT SMALL SUBSET IS

02:06PM 5    BECAUSE THAT'S ALL THEY HAD THE CAPACITY TO RUN WAS BASICALLY

02:06PM 6    ELISA TYPE TESTS.

02:06PM 7              MR. COOPERSMITH:  YOUR HONOR, I'M GOING TO OBJECT

02:06PM 8    AGAIN UNDER 702.  THIS WITNESS DOESN'T HAVE THAT KNOWLEDGE TO

02:06PM 9    OPINE ABOUT WHAT THE DEVICE WAS CAPABLE OF OR WHAT ITS CAPACITY

02:06PM 10   WAS.

02:06PM 11             MR. BOSTIC:  YOUR HONOR, SHE OPERATED THESE DEVICES

02:06PM 12   ON A DAILY BASIS.  I THINK --

02:06PM 13             THE COURT:  THE OBJECTION 702 IS OVERRULED.

02:06PM 14             MR. COOPERSMITH:  YOUR HONOR, SHE CAN CERTAINLY SAY

02:06PM 15   WHAT SHE DID BUT TO GO FURTHER AND OPINE AS TO WHAT THE DEVICE

02:06PM 16   WAS CAPABLE OF AND WHAT ITS CAPACITY WAS I THINK IS BEYOND THIS

02:06PM 17   WITNESS'S EXPERTISE.

02:06PM 18             THE COURT:  WELL, THE ANSWER, AS I UNDERSTAND IT --

02:06PM 19   AND, MR. BOSTIC, YOU COULD LAY A FOUNDATION IF YOU WOULD LIKE

02:06PM 20   TO -- IS BASED ON HER TRAINING AND EXPERIENCE AT THE COMPANY.

02:06PM 21        PERHAPS IF YOU WANT TO ASK HER IF THAT'S WHAT SHE WAS

02:06PM 22   INSTRUCTED OR TRAINED.

02:06PM 23   BY MR. BOSTIC:

02:06PM 24   Q.   MS. CHEUNG, FROM YOUR TRAINING AND EXPERIENCE AT THE

02:07PM 25   COMPANY, DID YOU HAVE AN UNDERSTANDING AS TO WHAT THE EDISON 3

02:07PM 1    SERIES COULD DO AND WHAT IT COULD NOT DO?

02:07PM 2    A.   YES.

02:07PM 3    Q.   AND BASED ON YOUR TRAINING AND EXPERIENCE AT THE COMPANY,

02:07PM 4    WHERE WAS THAT LINE?  WHAT COULD THE EDISON 3 SERIES DO AND

02:07PM 5    WHAT COULD IT NOT DO?

02:07PM 6              MR. COOPERSMITH:  YOUR HONOR, SAME OBJECTION.  702.

02:07PM 7              THE COURT:  OVERRULED.

02:07PM 8              THE WITNESS:  CAN YOU REPEAT THE QUESTION?

02:07PM 9              MR. BOSTIC:  SURE.

02:07PM 10   Q.   WHAT COULD THE EDISON 3 SERIES DO AND WHAT COULD IT NOT DO

02:07PM 11   BASED ON YOUR TRAINING AND EXPERIENCE?

02:07PM 12             MR. COOPERSMITH:  SAME OBJECTION, YOUR HONOR.

02:07PM 13             THE COURT:  OVERRULED.

02:07PM 14             THE WITNESS:  THE EDISON 3.0 SERIES COULD DO ELISA'S

02:07PM 15   AND THAT WAS THE ONLY CAPACITY IT COULD DO WAS THAT TYPE OF

02:07PM 16   CHEMISTRY AND METHODOLOGY, AND THAT WAS WHAT MY UNDERSTANDING

02:07PM 17   OF THE TECHNOLOGY BASED ON WORKING FOR THE COMPANY.

02:08PM 18   BY MR. BOSTIC:

02:08PM 19   Q.   COULD I ASK YOU TO TURN TO EXHIBIT 3741 IN THE BINDER IN

02:08PM 20   FRONT OF YOU.

02:08PM 21        DO YOU SEE EXHIBIT 3741?

02:08PM 22   A.   YES.

02:08PM 23   Q.   AND WHAT IS THAT DOCUMENT IF YOU RECOGNIZE IT?

02:08PM 24   A.   THIS IS THE TESTING MENU AT THERANOS.

02:08PM 25   Q.   HAD YOU PREVIOUSLY HAD THE OPPORTUNITY TO REVIEW THE FIRST

02:08PM   1    FEW PAGES AT LEAST OF THIS EXHIBIT?

02:08PM   2    A.   YES.

02:08PM   3    Q.   AND LET'S FOCUS ON PAGES 1 THROUGH 7.  AND I'LL ASK DO

02:08PM   4    PAGES 1 THROUGH 7 CONSTITUTE A FAIR APPROXIMATION OR A

02:08PM   5    REPRESENTATIVE EXAMPLE OF THE TEST MENU AT THERANOS?

02:08PM   6    A.   YES.

02:09PM   7         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS THE

02:09PM   8    FIRST SEVEN PAGES OF 3741, AND WE'LL MARK IT AS 3741A.

02:09PM   9         MR. COOPERSMITH:  ONE MOMENT, YOUR HONOR.

02:09PM  10    YOUR HONOR, NO OBJECTION TO THE FIRST SEVEN PAGES OF THIS

02:09PM  11    EXHIBIT.

02:09PM  12         THE COURT:  IT'S ADMITTED, THE FIRST SEVEN PAGES

02:09PM  13    THAT IS MARKED AS 3741A, AND THAT MAY BE PUBLISHED.

02:09PM  14    (GOVERNMENT'S EXHIBIT 3741A WAS RECEIVED IN EVIDENCE.)

02:09PM  15         MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:09PM  16    AND, MS. WACHS, IF WE CAN GO TO PAGE 6, PLEASE, AND ZOOM

02:09PM  17    IN ON THE BOTTOM TWO-THIRDS.

02:09PM  18    Q.   MS. CHEUNG, ARE WE LOOKING AT A PORTION OF TEST MENUS

02:09PM  19    SHOWING SOME TESTS THAT THERANOS OFFERED DURING YOUR TIME AT

02:09PM  20    THE COMPANY?

02:09PM  21    A.   YES.

02:09PM  22    Q.   AND I'LL ASK YOU TO TAKE A LOOK AT THESE AND IF YOU COULD,

02:10PM  23    TO THE EXTENT THAT YOU RECALL, IDENTIFY SOME EXAMPLES OF TESTS

02:10PM  24    THAT THE EDISON COULD DO AND SOME EXAMPLES OF TESTS THAT THE

02:10PM  25    EDISON COULD NOT DO.

02:10PM   1           SO LET'S START WITH THE TESTS THAT THE EDISON COULD DO.

02:10PM   2      A.   SO THE EDISON COULD DO ON THIS ORDER PANEL ONE, TWO --

02:10PM   3      Q.   AND JUST TO CLARIFY, I DON'T MEAN TO TEST YOUR MEMORY, BUT

02:10PM   4      IF YOU COULD JUST IDENTIFY SOME EXAMPLES.

02:10PM   5      A.   SO IN THE THYROID SECTION THERANOS COULD DO T4, TOTAL T3,

02:10PM   6      AND THAT WAS IT.

02:10PM   7           AND THEN THIS IS FOR THE EDISON DEVICES.

02:11PM   8           AND IT COULD DO ONE OTHER, SO HCG IN THE REPRODUCTIVE

02:11PM   9      HEALTH.

02:11PM  10           AND AT THE TIME THAT I WORKED THERE ALSO TOTAL PSA, WHICH

02:11PM  11      IS IN THE ALPHABETICAL TEST I THROUGH Z AND VITAMIN D.  SO

02:11PM  12      ABOUT FIVE TESTS.

02:11PM  13           VITAMIN D, WHICH IS ALSO IN THE ALPHABETICAL TEST.

02:11PM  14      Q.   SO YOU'VE IDENTIFIED APPROXIMATELY FIVE TESTS ON THIS

02:11PM  15      PANEL THAT YOU CAN SEE?

02:11PM  16      A.   YEAH.  IT WAS MORE LIKE FOUR WHEN I WAS THERE.

02:11PM  17      Q.   FAIR TO SAY, THEN, THAT THE VAST MAJORITY OF THE TESTS ON

02:11PM  18      DISPLAY COULD NOT BE DONE ON THE EDISON BASED ON YOUR

02:11PM  19      UNDERSTANDING?

02:11PM  20              MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  LEADING.

02:11PM  21              THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

02:11PM  22              THE WITNESS:  THAT IS CORRECT.

02:11PM  23      BY MR. BOSTIC:

02:11PM  24      Q.   LET ME ASK YOU ABOUT A COUPLE OF THOSE.  FOR EXAMPLE, DO

02:11PM  25      YOU SEE A HEADING IN THE UPPER LEFT OF THE SCREEN LABELLED

02:11PM   1      COMMON PANELS?

02:12PM   2      A.   YES.

02:12PM   3      Q.   AND UNDER COMMON PANELS THERE'S ONE LABELLED CBC, NO DIFF.

02:12PM   4           AND THEN ANOTHER LABELLED CBC WITH/AUTO DIFF.

02:12PM   5           DO YOU HAVE AN UNDERSTANDING DURING YOUR TIME AT THE

02:12PM   6      COMPANY WHAT THE CBC TEST WAS?

02:12PM   7      A.   CBC STANDS FOR COMPLETE BLOOD COUNT, AND IT WAS A PANEL

02:12PM   8      TEST.  SO UNDERNEATH CBC YOU COULD RUN AND CHECK FOR WHOLE

02:12PM   9      BLOOD CELLS, WHITE BLOOD CELLS, AND IT HAD SEVERAL DIFFERENT

02:12PM   10     MARKERS THAT IT WOULD LOOK FOR.

02:12PM   11     Q.   AND I SEE THAT IT'S LISTED UNDER COMMON PANELS, BUT BASED

02:12PM   12     ON YOUR EXPERIENCE AT THE COMPANY, HOW COMMON WAS THAT CBC

02:12PM   13     ASSAY?

02:12PM   14     A.   HOW COMMON WAS THAT?

02:12PM   15     Q.   UH-HUH.

02:12PM   16     A.   IT WAS ORDERED QUITE FREQUENTLY.

02:12PM   17     Q.   AND COULD THE THERANOS EDISON DEVICE RUN A CBC PANEL OR

02:12PM   18     ANY PART OF IT?

02:12PM   19     A.   NO.

02:12PM   20     Q.   AND WAS THAT TRUE DURING YOUR ENTIRE TIME AT THE COMPANY?

02:13PM   21     A.   YES.

02:13PM   22     Q.   HOW ABOUT CMP.  DO YOU SEE THAT LISTED UNDER COMMON

02:13PM   23     PANELS?

02:13PM   24     A.   YES.

02:13PM   25     Q.   AND DID YOU HAVE AN UNDERSTANDING FROM YOUR TIME AT THE

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

         UNITED STATES OF AMERICA,           )
6                                            )  CR-18-00258-EJD
                      PLAINTIFF,             )
7                                            )  SAN JOSE, CALIFORNIA
                  VS.                        )
8                                            )  MARCH 23, 2022
         RAMESH "SUNNY" BALWANI,             )
9                                            )  VOLUME 9
                      DEFENDANT.             )
10       _____     )  PAGES 1155 - 1381

11

12                   TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                   UNITED STATES DISTRICT JUDGE

14       A P P E A R A N C E S:

15       FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                                 BY:  JOHN C. BOSTIC
16                                    JEFFREY B. SCHENK
                                 150 ALMADEN BOULEVARD, SUITE 900
17                               SAN JOSE, CALIFORNIA 95113

18                               BY:  ROBERT S. LEACH
                                      KELLY VOLKAR
19                               1301 CLAY STREET, SUITE 340S
                                 OAKLAND, CALIFORNIA 94612
20
                 (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
         OFFICIAL COURT REPORTER:
22                               IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
23

24           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED WITH COMPUTER
25

10:01AM 1    GROUP THAT WAS ESSENTIALLY A HELP LINE.  IF YOU HAD SEEN ISSUES

10:01AM 2    IN THE LAB AND NEEDED THEM TO GET RESOLVED QUICKLY, YOU WOULD

10:02AM 3    CC OR SEND IT OVER TO NORMANDY 911 TO HELP RESOLVE ANY PRESSING

10:02AM 4    ISSUES RELATING TO PATIENT TESTING.

10:02AM 5    Q.   AND YOU MENTIONED THAT THE LAB WAS DIVIDED INTO TWO

10:02AM 6    SECTIONS; IS THAT RIGHT?

10:02AM 7    A.   THAT'S CORRECT.

10:02AM 8    Q.   WAS THE NORMANDY SECTION THE ONE WITH THE

10:02AM 9    THERANOS-SPECIFIC EQUIPMENT OR THE COMMERCIAL EQUIPMENT?

10:02AM 10   A.   IT WAS WITH THE THERANOS-SPECIFIC EQUIPMENT, SO THE EDISON

10:02AM 11   DEVICES, AND THEN ALSO THE COMMERCIALLY VIABLE ONES THAT WERE

10:02AM 12   MODIFIED.

10:02AM 13   Q.   FOR THE PORTION OF THE LAB THAT HAD THE NON-THERANOS

10:02AM 14   REGULAR DEVICES, DO YOU KNOW WHETHER THERE WAS A SIMILAR 911

10:02AM 15   EMAIL ADDRESS?

10:02AM 16   A.   NO.

10:02AM 17   Q.   AND DO YOU NOT KNOW OR DO YOU HAVE A MEMORY?

10:02AM 18   A.   I THINK WE JUST SENT THEM TO THE CLIA LAB.  WE DIDN'T HAVE

10:02AM 19   A 911.

10:02AM 20   Q.   GOING BACK TO THIS EXHIBIT, LET ME ASK YOU TO --

10:03AM 21       MS. WACHS, IF WE CAN ZOOM IN ON THE NEXT MESSAGE UP, STILL

10:03AM 22   ON PAGE 2 BUT RIGHT IN THE MIDDLE OF THE PAGE.

10:03AM 23       MS. CHEUNG, HERE'S ANOTHER EMAIL FROM A FEW HOURS LATER;

10:03AM 24   IS THAT CORRECT?

10:03AM 25   A.   YES.

10:03AM   1    Q.   AND YOU'RE PROVIDING AN UPDATE TO THAT SAME GROUP OF

10:03AM   2    INDIVIDUALS?

10:03AM   3    A.   YES.

10:03AM   4    Q.   AND WHAT HAS HAPPENED HERE?  WHAT HAS CHANGED?

10:03AM   5    A.   CAN I TAKE A MOMENT TO READ IT?

10:03AM   6    Q.   OF COURSE.  PLEASE.

10:03AM   7         (PAUSE IN PROCEEDINGS.)

10:03AM   8              THE WITNESS:  SO ESSENTIALLY WHAT HAPPENED HERE, AS

10:03AM   9    I WAS SAYING, WHEN THE QC'S FAIL, YOU TRY TO FIND WHAT THE

10:03AM  10    ISSUE IS AND IMPLEMENT A CORRECTIVE ACTION.

10:03AM  11         SO HERE I WAS TRYING TO SEE IF IT WAS THE CHEMICALS THAT

10:03AM  12    WE USED TO RUN THE TEST THAT WAS HAVING A PARTICULAR ISSUE.

10:03AM  13         I CHANGED THE CHEMICALS.  IT WAS STILL FAILING.

10:03AM  14         I CHANGED TO A WHOLE NEW SET OF MACHINES.  IT WAS FAILING

10:04AM  15    AGAIN.

10:04AM  16         AND IT'S BASICALLY ME TRYING TO GET TO A RESOLUTION FOR

10:04AM  17    THE ISSUE AND ISOLATE WHAT VARIABLE COULD POSSIBLY BE GOING

10:04AM  18    WRONG TO GET THE QC'S TO PASS TO THEN RUN THE PATIENT SAMPLE.

10:04AM  19         AND THEN I'M ALSO ALERTING THAT I'M GOING TO HAVE ANOTHER

10:04AM  20    TECHNICIAN COME IN TO HELP ME RESOLVE WHAT IT MIGHT BE.

10:04AM  21    BY MR. BOSTIC:

10:04AM  22    Q.   YOU MENTION IN THIS EMAIL USING A DIFFERENT BOTTLE OF

10:04AM  23    SUBSTRATE FOR THOSE ADDITIONAL TESTS?

10:04AM  24    A.   YES.

10:04AM  25    Q.   AND WHAT DID THAT MEAN AND WHY DID YOU DO THAT?

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1201

10:04AM  1    A.   SO THE SUBSTRATE IS ESSENTIALLY A TYPE OF CHEMICAL THAT

10:04AM  2    HELPS THE ASSAY FLUORESCE AND EMIT LIGHT, AND THAT'S HOW YOU

10:04AM  3    GET THE READING OF WHAT THE CONCENTRATION OF VITAMIN D IS.  SO

10:04AM  4    IT'S A PART OF THE ASSAY.

10:04AM  5         AND BASICALLY I WAS JUST GETTING A NEW BOTTLE OF THAT

10:04AM  6    SUBSTRATE TO SEE IS THERE CONTAMINATION, WAS THERE SOME SORT OF

10:04AM  7    PROBLEM WITH THE REAGENTS THAT WE WERE USING.  SO I GOT AN

10:05AM  8    UNOPENED BOTTLE TO SEE IF THAT WOULD MAKE THE QC'S PASS.

10:05AM  9    Q.   AND DID THAT RESOLVE THE PROBLEM?

10:05AM 10    A.   NO.

10:05AM 11    Q.   THOSE ADDITIONAL CHECKS THAT YOU WERE DOING, WERE THEY

10:05AM 12    STILL ON THE SAME GROUP OF EDISONS THAT YOU HAD BEEN TRYING TO

10:05AM 13    MAKE WORK THE FIRST TIME?

10:05AM 14    A.   YES.

10:05AM 15    Q.   LET'S LOOK AT PAGE 1 OF THIS DOCUMENT, PLEASE, AND LET'S

10:05AM 16    ZOOM IN ON THE BOTTOM OF THE PAGE.

10:05AM 17         AND, MS. CHEUNG, DO YOU SEE AN EMAIL IN THE BOTTOM OF THAT

10:05AM 18    SELECTION FROM NOVEMBER 30TH AT 7:10 A.M.  AND MR. BALWANI SAYS

10:05AM 19    "THIS IS BEYOND UNACCEPTABLE PERFORMANCE."

10:05AM 20         DO YOU SEE THAT?

10:05AM 21    A.   YES.

10:05AM 22    Q.   AND AT THE TIME DID YOU AGREE WITH MR. BALWANI THAT THIS

10:05AM 23    WAS NOT ACCEPTABLE PERFORMANCE?

10:05AM 24    A.   YES.

10:05AM 25    Q.   AND WHY WAS THAT?

10:05AM  1    A.   BECAUSE OUR SYSTEM WASN'T WORKING.  WE WEREN'T ABLE TO GET

10:05AM  2    THE QUALITY CONTROLS TO PASS, THIS IS, AGAIN, SOMETHING THAT WE

10:06AM  3    KNOW THE CONCENTRATION OF, SO THEY SHOULD BE PASSING.

10:06AM  4         AND BASED ON THE PROMISES THAT WE MADE TO OUR PATIENTS,

10:06AM  5    AND THE COMMITMENTS THAT WE HAD IN TERMS OF DELIVERING RESULTS

10:06AM  6    IN A CERTAIN AMOUNT OF TIME, AND IF IT WASN'T GETTING OUT, WE

10:06AM  7    WEREN'T ABLE TO GET THE PATIENT RESULT OUT IN THE TIMEFRAME

10:06AM  8    THAT WE PROMISED TO THEM.

10:06AM  9    Q.   DID THE QC FAILURES HAVE ANY IMPACT ON THE ACCURACY OR

10:06AM  10   RELIABILITY OF THE PATIENT TESTS THAT WERE GOING TO BE

10:06AM  11   PERFORMED ON THIS DAY?

10:06AM  12             MR. COOPERSMITH:  YOUR HONOR, OBJECTION.  RULE 702.

10:06AM  13             THE COURT:  CAN YOU LAY A FOUNDATION.

10:06AM  14             MR. BOSTIC:  SURE.  LET ME REPHRASE.

10:06AM  15   Q.   MS. CHEUNG, YOU MENTIONED THAT THESE PROBLEMS CREATED

10:06AM  16   ISSUES WITH THERANOS PERFORMING TESTS QUICKLY ENOUGH; IS THAT

10:07AM  17   RIGHT?

10:07AM  18   A.   THAT IS CORRECT.

10:07AM  19   Q.   AT THERANOS DID YOU UNDERSTAND WHETHER QC FAILURES ALSO

10:07AM  20   RELATED NOT JUST TO THE SPEED WITH WHICH TESTS COULD BE

10:07AM  21   CONDUCTED, BUT ALSO TO THE ACCURACY OF THE RESULTS?

10:07AM  22   A.   YES.

10:07AM  23   Q.   AND WHAT IS THE RELATIONSHIP, AS YOU UNDERSTOOD IT AT THE

10:07AM  24   TIME, BETWEEN QUALITY CONTROL TESTING AND TEST ACCURACY?

10:07AM  25             MR. COOPERSMITH:  YOUR HONOR, IT'S RULE 702.  EVEN

10:07AM   1      IF SHE HAS AN UNDERSTANDING, SHE CAN'T TESTIFY AS AN EXPERT

10:07AM   2      WITNESS.  SO RULE 702.

10:07AM   3              THE COURT:  I'M SORRY.  DID WE TALK ABOUT THIS AT

10:07AM   4      PRETRIAL?  WE PROBABLY DIDN'T ABOUT SPEAKING OBJECTIONS, AND I

10:07AM   5      APOLOGIZE WE DIDN'T COVER THAT.

10:07AM   6          BUT IF YOU WANT TO, MR. BOSTIC, IF YOUR QUESTIONS ABOUT

10:07AM   7      WHAT THIS WITNESS KNOWS AND OTHER WITNESSES KNOW THE BASIS OF

10:07AM   8      THE KNOWLEDGE, IF SHE WAS TRAINED OR AS TO CERTAIN THINGS OR

10:08AM   9      WHETHER OR NOT THIS MOVES INTO 702 TERRITORY, IT'S SOMETHING

10:08AM  10      THAT WE TALKED ABOUT YESTERDAY IN REGARDS TO THE WITNESS'S

10:08AM  11      BREADTH OF KNOWLEDGE AND THE BASIS FOR IT.

10:08AM  12              MR. BOSTIC:  UNDERSTOOD, YOUR HONOR.

10:08AM  13      Q.   LET ME ASK A PREFATORY QUESTION.

10:08AM  14          MS. CHEUNG, WHEN YOU WERE AT THERANOS, DID YOU RECEIVE

10:08AM  15      TRAINING AS TO THE PURPOSE FOR QUALITY CONTROL TESTING?

10:08AM  16      A.   YES.

10:08AM  17      Q.   AND WHAT WERE YOU TOLD AT THERANOS ABOUT WHY QUALITY

10:08AM  18      CONTROL TESTING WAS NEEDED?

10:08AM  19      A.   SO --

10:08AM  20              MR. COOPERSMITH:  OBJECTION.  HEARSAY, YOUR HONOR.

10:08AM  21              THE COURT:  OVERRULED.

10:08AM  22              THE WITNESS:  SO FOR THE QUALITY CONTROL TRAINING

10:08AM  23      THAT WE RECEIVED, ESSENTIALLY IT WAS, AGAIN, A WAY IN WHICH WE

10:08AM  24      COULD MEASURE THE PERFORMANCE -- THE QUALITY CONTROL SYSTEM WAS

10:08AM  25      ESSENTIALLY TO GIVE US AN INDICATION OF HOW WELL OUR SYSTEM WAS

CHEUNG DIRECT BY MR. BOSTIC (RES.)                                    1204

10:08AM 1    RUNNING AND IF IT WAS RUNNING TO THE CALIBER IN WHICH WE

10:08AM 2    ARTICULATED IT WOULD RUN.

10:09AM 3        SO IF YOU HAVE, AGAIN, A KNOWN CONCENTRATION OF A SAMPLE

10:09AM 4    WHICH THAT IS GIVEN TO US THAT IT IS 10 NANOGRAMS PER MIL, AND

10:09AM 5    THE FACT THAT WE RUN IT ON OUR SYSTEM AND IT'S COMING OUT 52,

10:09AM 6    WE KNOW THAT THERE IS SOMETHING WRONG WITH THE ACCURACY.

10:09AM 7        AND WE WERE ALSO UNDERSTOOD AND TOLD THAT THAT DEVIATION

10:09AM 8    OF 10 NOT EQUALLING 52 COULD BE FOR A VARIETY OF DIFFERENT

10:09AM 9    REASONS, BUT AT THE END OF THE DAY WE KNOW THE ACCURACY IS NOT

10:09AM 10   CORRECT BECAUSE IT'S ALREADY ARTICULATED TO US AT THE BEGINNING

10:09AM 11   THAT 10 -- THE CORRECT VALUE FOR VITAMIN D IS 10.

10:09AM 12       SO IT WAS AN INDICATION THAT THERE WAS SOME ISSUE IN THE

10:09AM 13   ACCURACY OF THE ACTUAL DEVICE, BECAUSE, AGAIN, YOU KNOW IT

10:09AM 14   EQUALS 10 OR IN SOME ACCEPTABLE RANGE OF 10.

10:09AM 15   BY MR. BOSTIC:

10:09AM 16   Q.   THANK YOU.

10:09AM 17       GOING BACK TO THIS PARTICULAR DAY AND THIS QC FAILURE, DO

10:10AM 18   YOU SEE ON THE SCREEN A MESSAGE FROM MS. HOLMES ON

10:10AM 19   NOVEMBER 30TH SUGGESTING A POSSIBLE SOLUTION?

10:10AM 20   A.   YES.

10:10AM 21   Q.   AND WHAT IS MS. HOLMES SUGGESTING IN THAT EMAIL?

10:10AM 22   A.   SHE IS SUGGESTING THAT WE TRY AND RUN IT ON THE

10:10AM 23   TRADITIONAL METHODS.

10:10AM 24   Q.   AND WHAT DID TRADITIONAL METHODS MEAN IN TERMS OF WHAT

10:10AM 25   DEVICE WOULD BE USED?

10:10AM  1    A.   SO IT WOULD BE IN THIS CASE THE SIEMENS IMMULITE -- OH,

10:10AM  2    NO, NO, NO, THIS IS VITAMIN D.  SO THIS WOULD BE THE DIASORIN,

10:10AM  3    WHICH IS AN FDA APPROVED OFF-THE-SHELF MACHINE THAT YOU CAN USE

10:10AM  4    TO RUN VITAMIN D SAMPLES.

10:10AM  5    Q.   AND WAS THAT A THERANOS DEVICE OR A NON-THERANOS DEVICE?

10:10AM  6    A.   THAT WAS A NON-THERANOS DEVICE.

10:10AM  7    Q.   AND YOU MENTIONED FDA APPROVED.

10:10AM  8         WERE THE THERANOS-SPECIFIC DEVICES FDA APPROVED SPECIFIC

10:10AM  9    FOR THIS TIME?

10:10AM  10   A.   CAN YOU REPEAT THE QUESTION.

10:10AM  11   Q.   SURE.

10:10AM  12        THE QUESTION WAS WERE THE THERANOS-SPECIFIC DEVICES FDA

10:10AM  13   APPROVED FOR TESTING AT THIS TIME?

10:10AM  14   A.   NO.

10:10AM  15   Q.   LET'S ZOOM OUT, MS. WACHS, AND THEN ZOOM BACK IN ON KIND

10:11AM  16   OF THE MIDDLE AND TOP PORTION OF THE PAGE.

10:11AM  17        AT THE BOTTOM OF THE SELECTION, MS. CHEUNG, DO YOU SEE THE

10:11AM  18   RESPONSE TO MS. HOLMES'S SUGGESTION TO RUN THE SAMPLE OR

10:11AM  19   TRADITIONAL METHODS?

10:11AM  20   A.   YES.

10:11AM  21   Q.   AND DID THAT END UP BEING A VIABLE SOLUTION?

10:11AM  22   A.   NO.

10:11AM  23   Q.   AND WHY NOT?

10:11AM  24   A.   BECAUSE WE DIDN'T HAVE ENOUGH BLOOD IN ORDER TO RUN A

10:11AM  25   SAMPLE ON THE DIASORIN, AND ALSO IT'S FINGERSTICK BLOOD, IT'S

11:02AM  1    THERANOS RELATING TO QC FAILURE RATES?

11:02AM  2    A.   YES.

11:02AM  3          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1633.

11:02AM  4          MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

11:02AM  5          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

11:02AM  6       (GOVERNMENT'S EXHIBIT 1633 WAS RECEIVED IN EVIDENCE.)

11:02AM  7          MR. BOSTIC:  LET'S START, MS. WACHS, IF WE COULD

11:02AM  8    WITH THE EMAIL AT THE BOTTOM OF PAGE 1.

11:02AM  9    Q.   MS. CHEUNG, HERE'S AN EMAIL FROM SOMEONE NAMED LANGLY GEE

11:02AM  10   TO YOU AND OTHERS AT THERANOS REGARDING THE NUMBER OF FAILED

11:02AM  11   QUALITY CONTROL RUNS; IS THAT RIGHT?

11:03AM  12   A.   THAT'S CORRECT.

11:03AM  13   Q.   AND REMIND US, THE TERM "ELISA," WHAT DOES THAT REFER TO?

11:03AM  14   A.   ELISA IS THE TYPE OF METHODOLOGY THAT YOU USE ON THE

11:03AM  15   EDISON DEVICE.  SO IT'S THE TYPE OF TEST THAT YOU RUN OR THE

11:03AM  16   METHODOLOGY OF TESTS THAT YOU RUN.

11:03AM  17   Q.   SO THESE ARE QC FAILURE RATES FOR THE EDISON ANALYZER?

11:03AM  18   A.   THAT IS CORRECT.

11:03AM  19   Q.   AND IT SAYS, "FOR MARCH, 26 PERCENT RUNS FAILED."

11:03AM  20        IS THAT RIGHT?

11:03AM  21   A.   THAT IS CORRECT.

11:03AM  22   Q.   AND LET'S LOOK AT THE FOLLOWING PAGE AND SEE THAT DATA.

11:03AM  23        CAN YOU EXPLAIN JUST AT A HIGH LEVEL WHAT WE'RE LOOKING AT

11:03AM  24   HERE?

11:03AM  25   A.   SO WE'RE LOOKING AT ALL OF THE QUALITY CONTROL INFORMATION

11:03AM 1      FOR THE DIFFERENT TYPES OF TESTS.

11:03AM 2          SO WHERE IT SAYS ASSAY AND VITAMIN D, TT4, TT3, THOSE ARE

11:03AM 3      ALL OF THE DIFFERENT TYPES OF TESTS THAT WE WOULD RUN.

11:03AM 4          AND THEN WHERE IT SAYS LOW LEVEL AND HIGH LEVEL, THOSE ARE

11:03AM 5      THE QC SAMPLES.  SO, AGAIN, WE KNOW A LOW LEVEL CONCENTRATION

11:04AM 6      FOR QC, AND HIGH LEVEL SAMPLE FOR THE QC.

11:04AM 7          THE TOTAL RUNS IS THE TOTAL NUMBER OF RUNS, THE TOTAL

11:04AM 8      NUMBER OF TIMES THAT WE RAN QC'S FOR THAT MONTH.

11:04AM 9          AND THEN THE PERCENTAGE FAILURES IS HOW MANY FAILED.

11:04AM 10     Q.   AND AT THE BOTTOM RIGHT CORNER OF THAT CHART THERE'S A

11:04AM 11     TOTAL PERCENTAGE FAILURE RATE FOR QUALITY CONTROL FOR THESE

11:04AM 12     ASSAYS; IS THAT RIGHT?

11:04AM 13     A.   THAT IS CORRECT.

11:04AM 14     Q.   AND IT'S 25.6 PERCENT?

11:04AM 15     A.   THAT IS CORRECT.

11:04AM 16     Q.   LOOKING AT SOME OF THE INDIVIDUAL ASSAYS, FOR EXAMPLE,

11:04AM 17     TT3, WHAT WAS THE TT3 ASSAYS?

11:04AM 18     A.   THAT'S A THYROID MARKER.

11:04AM 19     Q.   AND HOW FREQUENTLY DID THE EDISON FAIL QUALITY CONTROL FOR

11:04AM 20     THE TT3 ASSAYS DURING THIS TIME PERIOD?

11:04AM 21     A.   SO DURING THIS TIME PERIOD IT FAILED 50 PERCENT OF THE

11:04AM 22     TIME.  SO WHAT THAT WOULD MEAN, SINCE WE HAVE TOTAL RUNS, LIKE

11:04AM 23     IF THAT WAS A PATIENT SAMPLE, WE HAD 40 RUNS, THAT MEANS 20

11:05AM 24     PEOPLE WOULD HAVE -- THERE WOULD HAVE BEEN FAILURES SO THAT

11:05AM 25     WOULD HAVE BEEN AN INACCURATE RESULT.

11:05AM  1    Q.   AND WERE RATES LIKE THESE CONCERNING -- LET ME ACTUALLY

11:05AM  2    JUST POINT OUT ONE MORE.

11:05AM  3         TST AT THE BOTTOM?

11:05AM  4    A.   YES.

11:05AM  5    Q.   AND WHAT DID TST REFER TO?

11:05AM  6    A.   THAT WAS FOR TOTAL TESTOSTERONE.

11:05AM  7    Q.   AND THE FAILURE RATE THERE IS NEARLY 50 PERCENT AT 45.2?

11:05AM  8    A.   THAT IS CORRECT.

11:05AM  9    Q.   AND WERE RATES CONCERNING TO YOU AT THE TIME AS SOMEONE

11:05AM 10    RUNNING PATIENT TESTS?

11:05AM 11    A.   YEAH, IT'S VERY CONCERNING BECAUSE AT THAT POINT YOU HAVE

11:05AM 12    A 50/50 CHANCE WHETHER IT'S AN ACCURATE RESULT OR IT'S NOT.

11:05AM 13    Q.   AND FROM YOUR WORK AT THERANOS, DID YOU ALSO HAVE SOME

11:05AM 14    FAMILIARITY WITH THE QC PERFORMANCE OF THE NON-THERANOS

11:05AM 15    ANALYZERS?

11:05AM 16    A.   YES.

11:05AM 17    Q.   AND HOW DID YOU DEVELOP THAT FAMILIARITY?

11:05AM 18    A.   I WOULD RUN PATIENT SAMPLES ON THE COMMERCIALLY VIABLE

11:05AM 19    MACHINES AND THE SORT OF FDA APPROVED MACHINES IN THE DINOSAUR

11:05AM 20    LAB FROM TIME TO TIME.

11:05AM 21    Q.   AND SO THINKING BACK TO THOSE TWO GROUPS, THE THERANOS

11:06AM 22    ANALYZER, AND WE'RE LOOKING AT THE QC FAILURE RATES FOR THAT?

11:06AM 23    A.   YEAH.

11:06AM 24    Q.   HOW DID QC PERFORMANCE FOR THE THERANOS DEVICES COMPARE TO

11:06AM 25    THE COMMERCIAL NON-THERANOS DEVICES?

11:06AM  1    A.   WE RARELY HAD QC FAILURES FOR THE COMMERCIALLY VIABLE

11:06AM  2    TESTS, OR COMMERCIALLY VIABLE -- THE TESTS THAT WE RAN ON THE

11:06AM  3    COMMERCIALLY VIABLE MACHINES.  SORRY.

11:06AM  4    Q.   THE NON-THERANOS DEVICES PERFORMED BETTER IN QC?

11:06AM  5    A.   THAT IS CORRECT.

11:06AM  6    Q.   THIS IS DATA FROM MARCH OF 2014; IS THAT RIGHT?

11:06AM  7    A.   YES.

11:06AM  8    Q.   AND BASED ON YOUR MEMORY, WAS MARCH AN ESPECIALLY BAD

11:06AM  9    MONTH FOR EDISON PERFORMANCE AT THERANOS, OR WAS THIS TYPICAL

11:06AM 10    OF WHAT YOU WOULD SEE?

11:06AM 11    A.   THIS WAS VERY TYPICAL OF WHAT WE WOULD SEE.

11:06AM 12    Q.   YOU MENTIONED THAT THIS CAUSED CONCERNS IN YOUR MIND, BUT

11:07AM 13    YOU TESTIFIED EARLIER THAT IF A DEVICE FAILED QUALITY CONTROL,

11:07AM 14    THEN IT WOULDN'T BE USED FOR PATIENT TESTING; IS THAT RIGHT?

11:07AM 15    A.   THAT IS CORRECT.

11:07AM 16    Q.   AND WHY DID THAT NOT REMOVE YOUR CONCERNS ABOUT PATIENT

11:07AM 17    TESTING AT THERANOS?

11:07AM 18         MR. COOPERSMITH:  YOUR HONOR, OBJECTION.  I THINK

11:07AM 19    THIS IS GOING TO CALL FOR A 702 ANSWER.

11:07AM 20         THE COURT:  DO YOU WANT TO LAY A LITTLE MORE

11:07AM 21    FOUNDATION ABOUT HER BREADTH OF KNOWLEDGE?

11:07AM 22         MR. BOSTIC:  SURE.

11:07AM 23    Q.   SO, MS. CHEUNG, I'M JUST ASKING YOU TO RECONCILE TWO

11:07AM 24    THINGS THAT YOU SAID?

11:07AM 25    A.   OKAY.

| | | |
|---|---|---|
| 11:07AM | 1 | Q.   ON THE ONE HAND DO YOU REMEMBER TESTIFYING THAT WHEN A |
| 11:07AM | 2 | DEVICE FAILED QUALITY CONTROL, IT WAS NOT USED FOR PATIENT |
| 11:07AM | 3 | TESTING UNTIL IT WOULD PASS? |
| 11:07AM | 4 | A.   RIGHT. |
| 11:07AM | 5 | Q.   AND IS THAT HOW THINGS ACTUALLY WORKED AT THERANOS? |
| 11:07AM | 6 | A.   CAN YOU REPEAT THE QUESTION ONE MORE TIME. |
| 11:07AM | 7 | Q.   SURE. |
| 11:07AM | 8 | WAS THAT RULE FOLLOWED AT THERANOS? |
| 11:07AM | 9 | A.   YES. |
| 11:07AM | 10 | Q.   AND YOU ALSO JUST TESTIFIED THAT THESE HIGH QC FAILURE |
| 11:08AM | 11 | RATES WERE CONCERNING TO YOU? |
| 11:08AM | 12 | A.   YES. |
| 11:08AM | 13 | Q.   AND MY QUESTION TO YOU IS WHY WERE THEY CONCERNING IF YOU |
| 11:08AM | 14 | KNEW DEVICES WEREN'T USED IF THEY FAILED QC? |
| 11:08AM | 15 | A.   I THINK BECAUSE -- |
| 11:08AM | 16 | MR. COOPERSMITH:  YOUR HONOR, PARDON ME.  RULE 702. |
| 11:08AM | 17 | THIS IS EXACTLY THE SAME QUESTION.  THERE HAS NOT BEEN ANY |
| 11:08AM | 18 | ADDITIONAL FOUNDATION LAID AS FAR AS I CAN HEAR. |
| 11:08AM | 19 | THE COURT:  I THINK THE POINT IS WELL TAKEN, THERE |
| 11:08AM | 20 | WASN'T ANY FOUNDATION AS TO THE REASONS FOR HER CONCERN OR HER |
| 11:08AM | 21 | BREADTH OF KNOWLEDGE AS TO WHY. |
| 11:08AM | 22 | IS THAT SOMETHING THAT YOU CAN DO? |
| 11:08AM | 23 | MR. BOSTIC:  OKAY, YOUR HONOR. |
| 11:08AM | 24 | Q.   MS. CHEUNG, AS PART OF YOUR TRAINING AT THERANOS, WERE YOU |
| 11:08AM | 25 | PROVIDED AN EXPLANATION AS TO WHY QC HAD TO BE PERFORMED BEFORE |

11:08AM  1    PATIENT TESTING COULD PROCEED?

11:08AM  2    A.   SO QC TESTING IS REALLY TO CHECK THE PERFORMANCE OF YOUR

11:09AM  3    SYSTEM.

11:09AM  4         SO IF YOU HAVE A HIGH PERCENTAGE OF FAILURES WITHIN THE

11:09AM  5    SYSTEM, YOU CAN KIND OF FORECAST OUT THAT THAT PERCENTAGE OF

11:09AM  6    FAILURES COULD LIKELY OCCUR FOR PATIENT TESTING.

11:09AM  7         SO IF WE HAVE A SAMPLE SIZE OF 300, AND WE'RE GETTING

11:09AM  8    ONE-FORTH OF THAT FAILURES, LET'S SAY IT'S 400, IT MEANS THAT

11:09AM  9    100 ARE ESSENTIALLY IN THE TERRITORY OF NOT BEING ACCURATE.

11:09AM  10        SO THE REASON THAT IT'S CONCERNING IS THE FACT THAT IT IS

11:09AM  11   HAPPENING ACROSS TESTS AND ACROSS MACHINES DESPITE US

11:09AM  12   CONSISTENTLY CHANGING ALL OF THESE DIFFERENT VARIABLES THAT WE

11:09AM  13   CAN ANTICIPATE THAT IT'S PROBABLY --

11:09AM  14             MR. COOPERSMITH:  YOUR HONOR, IF I COULD JUST

11:09AM  15   INTERRUPT.

11:09AM  16        SHE'S NOW GIVING THE VERY ANSWER THAT WAS OBJECTIONABLE --

11:09AM  17   SHE'S GIVING THE SAME ANSWER THAT WAS OBJECTIONABLE, AND IT WAS

11:09AM  18   NOT REALLY RESPONSIVE TO THE QUESTION, SO I WOULD MOVE TO

11:10AM  19   STRIKE THE ANSWER THAT SHE JUST GAVE AND RENEW THAT OBJECTION.

11:10AM  20             THE COURT:  THE ANSWER SHE GAVE I THINK WAS

11:10AM  21   APPROPRIATE.  YOU OBJECTED TO A POINT.

11:10AM  22        DID YOU WANT TO ASK ADDITIONAL QUESTIONS AT THIS POINT?

11:10AM  23   BY MR. BOSTIC:

11:10AM  24   Q.   MS. CHEUNG, IF I COULD JUST INTERPOSE A QUICK QUESTION.

11:10AM  25        THE ANSWER THAT YOU'RE GIVING, IS THAT BASED ON THE

11:10AM   1    TRAINING THAT YOU GOT AT THERANOS?

11:10AM   2    A.   YES.

11:10AM   3         MR. BOSTIC:  I WOULD JUST ASK THAT THE WITNESS BE

11:10AM   4    ALLOWED TO COMPLETE HER ANSWER.

11:10AM   5         THE WITNESS:  OKAY.

11:10AM   6         THE COURT:  AND YOU MAY.  THE OBJECTION IS OVERRULED

11:10AM   7    AS TO THAT.

11:10AM   8         THE WITNESS:  OKAY.  SO THAT'S, THAT'S WHY IT WAS

11:10AM   9    CONCERNING.  IT WAS CONCERNING BECAUSE IF YOU JUST EXTRAPOLATE

11:10AM  10    OUT ESSENTIALLY THE PERCENTAGE OF FAILURES THAT ARE HAPPENING

11:10AM  11    ACROSS THE SYSTEM, EVEN IF WE CHANGE THE DEVICE, THERE'S

11:10AM  12    SOMETHING STILL GOING ON THAT IS CAUSING ONE OUT OF FOUR

11:10AM  13    FAILURES OF EVERY SINGLE TEST THAT WE DO ON THIS EDISON SYSTEM,

11:10AM  14    RIGHT?

11:10AM  15         EVEN IF YOU CHANGE THE DEVICE, IT SEEMS LIKELY THAT MAYBE

11:10AM  16    THERE'S SOME ISSUE WITH THE CHEMISTRY, MAYBE -- WHATEVER THE

11:10AM  17    ISSUE MIGHT BE, IT'S STILL THE FACT THAT I KNOW WHEN I RUN FOUR

11:11AM  18    TESTS, THAT ONE OF THEM IS LIKELY NOT TO WORK BASED ON THE

11:11AM  19    CUMULATIVE DATA THAT WE'RE RUNNING FOR THE QC ANALYSIS AND

11:11AM  20    BASICALLY GETTING AN UNDERSTANDING OF HOW MANY FAILURES WE'RE

11:11AM  21    HAVING FOR QC, AND THIS IS JUST ONE MONTH.

11:11AM  22    BY MR. BOSTIC:

11:11AM  23    Q.   UNDERSTOOD.  THANK YOU.

11:11AM  24         YOUR HONOR, THIS MIGHT BE A GOOD TIME FOR A BREAK?

11:11AM  25         THE COURT:  LET'S DO THAT, LADIES AND GENTLEMEN.

11:11AM  1      LET'S TAKE 30 MINUTES, PLEASE, 30 MINUTES.

11:11AM  2          LET ME REMIND YOU OF OUR SCHEDULE WHILE I HAVE YOUR

11:11AM  3      ATTENTION.

11:11AM  4          WE WILL NOT BE IN SESSION TOMORROW, NOR WILL WE BE IN

11:11AM  5      SESSION NEXT MONDAY OR TUESDAY.

11:11AM  6          OUR NEXT TIME TOGETHER WILL BEGIN WEDNESDAY, THE 30TH.

11:11AM  7          IS THAT CORRECT, COUNSEL?  IS THAT YOUR --

11:11AM  8              MR. COOPERSMITH:  YES, YOUR HONOR, THAT IS MY

11:11AM  9      UNDERSTANDING.

11:11AM  10             MR. BOSTIC:  YES, YOUR HONOR.

11:11AM  11             THE COURT:  ALL RIGHT.  I JUST WANT TO REMIND YOU OF

11:11AM  12     THAT, PLEASE.

11:11AM  13         SO LET'S TAKE OUR BREAK.  WE'LL TAKE 30 MINUTES,

11:11AM  14     30 MINUTES, PLEASE.

11:12AM  15         (JURY OUT AT 11:12 A.M.)

11:12AM  16             THE COURT:  PLEASE BE SEATED.  THANK YOU.  THE

11:12AM  17     RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR OUR MORNING

11:12AM  18     BREAK.

11:12AM  19         MS. CHEUNG HAS LEFT THE COURTROOM.

11:12AM  20         COUNSEL, ANYTHING BEFORE WE TAKE OUR BREAK?

11:12AM  21             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT HAS TWO

11:12AM  22     ISSUES THAT WE WANT TO RAISE, BUT NEITHER ARE URGENT, AND I

11:12AM  23     DON'T KNOW THAT WE NEED TO CUT INTO OUR BREAK TO DO IT.  SO

11:12AM  24     MAYBE WE CAN TAKE IT UP AT THE END OF THE DAY SO WE'RE NOT

11:13AM  25     INTERRUPTING OUR BREAK.

11:13AM   1              THE COURT:  SURE.  THAT'S FINE.

11:13AM   2          MR. COOPERSMITH.

11:13AM   3              MR. COOPERSMITH:  NOTHING, YOUR HONOR.

11:13AM   4              THE COURT:  ALL RIGHT.  LET'S TAKE OUR BREAK.  THANK

11:13AM   5      YOU.

11:13AM   6          (RECESS FROM 11:13 A.M. UNTIL 11:48 A.M.)

11:48AM   7          (JURY IN AT 11:48 A.M.)

11:48AM   8              THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

11:48AM   9          THE PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:48AM  10          THE JURORS AND ALTERNATES ARE PRESENT.

11:48AM  11          MS. CHEUNG IS ON THE STAND.

11:48AM  12          MR. BOSTIC.

11:48AM  13              MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:48AM  14      Q.   WELCOME BACK.  BEFORE THE BREAK WE WERE TALKING ABOUT

11:48AM  15      QUALITY CONTROL.

11:48AM  16          DO YOU RECALL THAT DISCUSSION?

11:48AM  17      A.   YES.

11:48AM  18      Q.   AND CAN YOU REMIND US, PLEASE, HOW THE QUALITY CONTROL

11:49AM  19      PERFORMANCE OF THE THERANOS EDISON COMPARED IN YOUR EXPERIENCE

11:49AM  20      TO THE QC PERFORMANCE OF THE UNMODIFIED THIRD PARTY DEVICES

11:49AM  21      USED AT THERANOS?

11:49AM  22      A.   THERE WERE FAR MORE FAILURES ON THE EDISON DEVICES WHEN IT

11:49AM  23      CAME TO QC THAN THERE WERE ON THE COMMERCIALLY AVAILABLE

11:49AM  24      DEVICES.

11:49AM  25      Q.   HOW ABOUT THE MODIFIED THIRD PARTY DEVICES THAT WERE ALSO

11:49AM  1    USED AT THERANOS, DID YOU BECOME FAMILIAR WITH THE QUALITY

11:49AM  2    CONTROL PERFORMANCE OF THE THERANOS MODIFIED COMMERCIAL

11:49AM  3    DEVICES?

11:49AM  4    A.   THE ONLY ONE I WAS FAMILIAR WITH WAS THE SIEMENS ADVIA,

11:49AM  5    THE MODIFIED SIEMENS ADVIA.

11:49AM  6    Q.   AND FROM YOUR EXPERIENCE WITH THAT DEVICE, DID YOU HAVE A

11:49AM  7    SENSE OF WHETHER THE THERANOS MODIFIED VERSION PERFORMED BETTER

11:49AM  8    OR WORSE IN TERMS OF QC?

11:49AM  9    A.   IT PERFORMED WORSE.

11:49AM  10   Q.   THAT'S WHAT YOU OBSERVED WHEN YOU WERE WORKING WITH THAT

11:49AM  11   DEVICE AT THERANOS?

11:49AM  12   A.   YES.

11:49AM  13   Q.   IN MARCH AND APRIL OF 2014, BASED ON THE ISSUES YOU WERE

11:50AM  14   SEEING, HOW WERE YOU FEELING ABOUT YOUR EMPLOYMENT AT THE

11:50AM  15   COMPANY?

11:50AM  16   A.   I WAS REALLY CONCERNED ABOUT THE FACT THAT AT THIS POINT

11:50AM  17   THERE WAS A LOT OF EVIDENCE TO SUGGEST THAT THE THERANOS SYSTEM

11:50AM  18   AND THE EDISON DEVICES WEREN'T WORKING PROPERLY, BUT WE WERE

11:50AM  19   STILL ACTIVELY TESTING ON PATIENTS, AND I WAS GETTING

11:50AM  20   PROGRESSIVELY MORE AND MORE UNCOMFORTABLE WITH WORKING THERE

11:50AM  21   AND TESTING ON PATIENTS.

11:50AM  22        SO AT THAT TIME I WAS JUST INCREDIBLY UNCOMFORTABLE, AND

11:50AM  23   YEAH.

11:50AM  24   Q.   AND DID YOU DISCUSS YOUR CONCERNS AROUND THAT TIME WITH

11:50AM  25   ANYONE ELSE AT THE COMPANY?

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,        )
6                                     )   CR-18-00258-EJD
                    PLAINTIFF,        )
7                                     )   SAN JOSE, CALIFORNIA
              VS.                     )
8                                     )   MARCH 30, 2022
     RAMESH "SUNNY" BALWANI,          )
9                                     )   VOLUME 11
                    DEFENDANT.        )
10   _____)   PAGES 1444 - 1682

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
               BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTER:
22                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                               CERTIFICATE NUMBER 8074
23

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
25

11:28AM  1    PROPERLY, SO YOU WERE CONSTANTLY TRYING TO FIX THEM AS YOU HAD

11:28AM  2    ALREADY SHIPPED THEM.

11:28AM  3         SO THE PURPOSE OF DOING THAT CONTINUING R&D WORK WAS TO

11:28AM  4    FIX THE PROBLEMS THAT WE HAD SEEN WITH THIS ALREADY OPERATIONAL

11:28AM  5    DEVICE IN ADDITION TO PUTTING UP INFRASTRUCTURE FOR THAT SET OF

11:28AM  6    12 ASSAYS THAT WE TALKED ABOUT TO ACTUALLY START RUNNING MORE

11:28AM  7    PATIENT SAMPLES ON THEM.

11:28AM  8    Q.   AND DURING YOUR TIME AT THE COMPANY, DID YOU EVER SEE THAT

11:29AM  9    CONTINUING WORK PRODUCED A SATISFYING PERMANENT SOLUTION TO THE

11:29AM  10   PROBLEMS THAT YOU WERE SEEING?

11:29AM  11            MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  602.

11:29AM  12            THE COURT:  THIS GOES TO HER PERSONAL KNOWLEDGE?

11:29AM  13            MR. BOSTIC:  YES, YOUR HONOR.

11:29AM  14            THE COURT:  IN YOUR PERSONAL KNOWLEDGE.  YOU CAN

11:29AM  15   ANSWER THE QUESTION.

11:29AM  16            THE WITNESS:  CAN YOU REPEAT THE QUESTION SO I'M

11:29AM  17   CLEAR.

11:29AM  18   BY MR. BOSTIC:

11:29AM  19   Q.   THE QUESTION WAS DURING YOUR TIME AT THE COMPANY, DID YOU

11:29AM  20   EVER SEE THAT CONTINUING R&D WORK PRODUCE A SATISFYING

11:29AM  21   PERMANENT SOLUTION AS YOU UNDERSTOOD IT FOR THE PROBLEMS THAT

11:29AM  22   YOU WERE SEEING?

11:29AM  23   A.   FOR THE PROBLEMS THAT I WAS SEEING, IT WAS ALMOST ALWAYS

11:29AM  24   THAT WE WERE CONTINUOUSLY MITIGATING OR FIXING THE PROBLEMS

11:29AM  25   ONGOING, AND THERE WAS NO PERMANENT SOLUTION.

11:29AM  1        THERE WAS JUST A CHRONIC STATE OF PROBLEMS THAT WE HAD

11:29AM  2   EXPERIENCED WITH THE EDISON 3.5 DEVICES, WHICH WERE

11:29AM  3   OPERATIONAL.

11:29AM  4   Q.   MS. WACHS, CAN WE PROJECT EXHIBIT 1431.

11:30AM  5        MS. CHEUNG, DO YOU RECALL SOME DISCUSSION WITH

11:30AM  6   MR. COOPERSMITH ABOUT THERANOS'S TREATMENT OF OUTLIERS?

11:30AM  7   A.   CORRECT.

11:30AM  8   Q.   IN THIS EMAIL CHAIN --

11:30AM  9        LET'S SEE.  MS. WACHS, LET'S LOOK AT PAGE 2, AND LET'S

11:30AM 10   ZOOM IN ON THE MIDDLE OF THE PAGE.

11:30AM 11        MS. CHEUNG, DO YOU REMEMBER THIS MENTION OF A BELIEF THAT

11:30AM 12   AN ALGORITHM FOR OUTLIER REMOVAL HAS BEEN INCORPORATED INTO

11:30AM 13   NORMANDY SOFTWARE?

11:30AM 14   A.   YES.

11:30AM 15   Q.   AND LET'S COMPARE THAT TO PAGE 1, PLEASE.  AGAIN, ZOOM IN

11:31AM 16   ON THE MIDDLE OF THE PAGE.

11:31AM 17        THIS MESSAGE SAYS, "AT THIS TIME OUR OUTLIER REMOVAL

11:31AM 18   PROCEDURE IS MANUAL."

11:31AM 19        DO YOU SEE THAT?

11:31AM 20   A.   YES.

11:31AM 21   Q.   AND DURING YOUR TIME AT THE COMPANY, WHICH OF THESE TWO

11:31AM 22   DID YOU PERSONALLY OBSERVE?  DID YOU SEE OUTLIERS BEING HANDLED

11:31AM 23   AUTOMATICALLY AS PART OF AN ALGORITHM OR DID YOU SEE THEM BEING

11:31AM 24   HANDLED MANUALLY?

11:31AM 25   A.   THE MAJORITY OF THE TIME I WAS THERE IT WAS MANUAL, AND AT

11:31AM 1      THE TAIL END IT WAS AUTOMATED AT ONE POINT.

11:31AM 2      Q.   AND WHEN YOU SAY THEY WERE HANDLED MANUALLY, CAN YOU

11:31AM 3      DESCRIBE WHAT THAT MEANS?

11:31AM 4      A.   SO IN TERMS OF OUTLIER REMOVAL PROCESS -- SO SOMETIMES

11:31AM 5      OUTLIER REMOVAL IS A NORMAL PROCESS, AND AS WE HAD SHOWN THERE,

11:31AM 6      IT'S LIKE IF SOMEONE TRIPS, YOU KNOW, SOMETIMES YOU'LL TAKE OUT

11:31AM 7      THAT DATA.

11:31AM 8          BUT THERE ARE OTHER OCCURRENCES IN THE CASE OF THERANOS

11:31AM 9      WHERE IT WAS SORT OF LEFT AT THE DISCRETION OF ANYONE WHO WAS

11:31AM 10     WORKING WITH THE DATA TO JUST REMOVE WHATEVER DATA POINTS COULD

11:32AM 11     GIVE US THE BEST RESULTS IF THE QC'S -- TO GET THE QC'S TO PASS

11:32AM 12     IN MOST CASES.

11:32AM 13         SO IT COULD BE A CLA, A CLINICAL LAB ASSOCIATE, IT WOULD

11:32AM 14     BE ONE OF THE R&D PEOPLE.  THERE WASN'T REALLY A CLEAR

11:32AM 15     STRUCTURE OR A CLEAR UNDERSTANDING OF WHAT WAS CONSIDERED AN

11:32AM 16     OUTLIER VERSUS WHAT WAS CONSIDERED JUST A NORMAL DATA POINT.

11:32AM 17         SO IT WAS REALLY LEFT AT THE DISCRETION OF WHOEVER

11:32AM 18     HAPPENED TO BE HANDLING THE DATA.

11:32AM 19     Q.   SPEAKING OF THESE OUTLIER PROCESSES AGAIN, DO YOU RECALL

11:32AM 20     LOOKING AT AN EXHIBIT TITLED OR NUMBERED 20451 WITH

11:32AM 21     MR. COOPERSMITH?  IT WAS WHEN HE HANDED UP A PACKET ON ITS OWN,

11:32AM 22     NOT IN ONE OF THE BINDERS.

11:32AM 23     A.   CAN YOU REPEAT THE NUMBER.

11:32AM 24     Q.   YES.  20451?

11:32AM 25     A.   YES.

11:32AM  1    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

11:32AM  2    A.   I DO.

11:32AM  3    Q.   AND DO YOU REMEMBER MR. COOPERSMITH ASKED YOU TO LOOK AT

11:33AM  4    PAGE 14 OF THAT DOCUMENT?

11:33AM  5    A.   YES.

11:33AM  6    Q.   HE IDENTIFIED IT AS THE CAP PROFICIENCY TESTING MANUAL; IS

11:33AM  7    THAT CORRECT?

11:33AM  8    A.   THAT IS CORRECT.

11:33AM  9    Q.   AND HE REFERRED YOU TO A SECTION ON THAT PAGE THAT

11:33AM  10   MENTIONS OUTLIERS; IS THAT CORRECT?

11:33AM  11   A.   THAT IS CORRECT.

11:33AM  12   Q.   I'LL ASK YOU TO TAKE A MINUTE TO REVIEW THAT PARAGRAPH.

11:33AM  13   AND THEN MY QUESTION FOR YOU IS DOES THAT DESCRIBE THE PROCESS

11:33AM  14   THAT THERANOS USED?

11:33AM  15   A.   THIS --

11:33AM  16        MR. COOPERSMITH:  HOLD ON A SECOND.  OBJECTION.

11:33AM  17   RULE 702.

11:33AM  18        THE COURT:  ARE YOU ASKING THIS WITNESS, ARE YOU

11:33AM  19   ASKING THIS WITNESS THE PRACTICE THAT SHE ENGAGED IN AS AN

11:33AM  20   EMPLOYEE AT HER JOB?

11:33AM  21        MR. BOSTIC:  EXACTLY, YOUR HONOR.

11:33AM  22   I'M ASKING HER WHETHER WHAT SHE OBSERVED HAPPENING AT

11:33AM  23   THERANOS IS THE SAME THAT WAS DESCRIBED IN THE DOCUMENT THAT

11:33AM  24   THE DEFENSE DISCUSSED.

11:33AM  25        MR. COOPERSMITH:  YOUR HONOR, SHE TESTIFIED THAT SHE

11:34AM   1    HAD NO AWARENESS OF THE COLLEGE OF AMERICAN PATHOLOGISTS OR

11:34AM   2    THEIR DOCUMENT AND HAS NO AWARENESS OF THIS PROCESS.

11:34AM   3        SO WE'RE JUST, I THINK, MAKING THIS UP AS WE GO ALONG.

11:34AM   4    SHE'S NEVER SEEN THIS BEFORE.  SHE'S NOT -- IT'S A 702 ISSUE.

11:34AM   5            THE COURT:  WELL, SHE'S NOT BEING CALLED TO TESTIFY

11:34AM   6    AS AN EXPERT ON THIS?

11:34AM   7            MR. BOSTIC:  CORRECT.

11:34AM   8            THE COURT:  RIGHT.

11:34AM   9            MR. BOSTIC:  I'M JUST ASKING HER TO READ THE WORDS.

11:34AM  10            THE COURT:  RIGHT.  OBJECTION IS OVERRULED.

11:34AM  11        SO YOU'RE NOT TO READ WHAT -- OUT LOUD, BUT JUST READ THIS

11:34AM  12    TO YOURSELF, AND THEN MR. BOSTIC WILL ASK YOU ANOTHER QUESTION.

11:34AM  13            THE WITNESS:  OKAY.

11:34AM  14            MR. COOPERSMITH:  YOUR HONOR, IF SHE'S GOING TO READ

11:34AM  15    THE DOCUMENT AND ANSWER QUESTIONS ABOUT THE TEXT, I THINK WE

11:34AM  16    OUGHT TO JUST ADMIT THE DOCUMENT AT THAT POINT.

11:34AM  17            THE COURT:  ARE YOU SEEKING ADMISSION OF THE

11:34AM  18    DOCUMENT?

11:34AM  19            MR. BOSTIC:  I AM NOT AT THIS TIME, YOUR HONOR.

11:34AM  20            THE COURT:  OKAY.

11:34AM  21            THE WITNESS:  CAN YOU REPEAT THE QUESTION ONE MORE

11:34AM  22    TIME?

11:34AM  23    BY MR. BOSTIC:

11:34AM  24    Q.   YES.  THE QUESTION WAS IS THE -- DOES THE DESCRIPTION IN

11:34AM  25    THE MANUAL REGARDING OUTLIER DETECTION, DOES THAT MATCH WHAT

11:35AM 1    YOU OBSERVED HAPPENING AT THERANOS?

11:35AM 2    A.   NO, NO, IT DOESN'T MATCH.

11:35AM 3    Q.   DO YOU RECALL A DISCUSSION WITH MR. COOPERSMITH ABOUT THE

11:35AM 4    PROFICIENCY TESTING EXPERIMENT THAT WAS RUN IN FEBRUARY OF

11:35AM 5    2014?

11:35AM 6    A.   CORRECT.

11:35AM 7    Q.   AND DO YOU RECALL LOOKING AT EMAILS WITH HIM THAT MENTION

11:35AM 8    AN SOP OR SOP'S THAT WEREN'T FOLLOWED IN CONNECTION WITH THAT

11:35AM 9    PROFICIENCY TESTING EXPERIMENT?

11:35AM 10   A.   THAT IS CORRECT.

11:35AM 11   Q.   CAN YOU REMIND US HOW LONG YOU HAD BEEN AT THE COMPANY

11:35AM 12   WHEN THAT PROFICIENCY TESTING TOOK PLACE?

11:35AM 13   A.   I HAD BEEN AT THE COMPANY -- WHEN THE PROFICIENCY TESTING

11:35AM 14   WITH NEW YORK OR THE INTERNAL PROFICIENCY TESTING?

11:35AM 15   Q.   THE NEW YORK SAMPLES IN FEBRUARY OF 2014.

11:35AM 16   A.   IN FEBRUARY?  FIVE MONTHS.

11:36AM 17   Q.   AND IN ORDER TO DO YOUR JOB AT THE COMPANY, DID YOU NEED

11:36AM 18   TO BE FAMILIAR WITH THE REGULATIONS AND ALL OF THE INTERNAL

11:36AM 19   SOP'S THAT GOVERNED, FOR EXAMPLE, ALTERNATIVE ASSESSMENT

11:36AM 20   PROFICIENCY?

11:36AM 21   A.   NO, THAT WASN'T MY ROLE.

11:36AM 22   Q.   DID YOUR SUPERIORS HAVE TO BE FAMILIAR WITH THOSE

11:36AM 23   REGULATIONS AND PROCEDURES?

11:36AM 24   A.   YES.

11:36AM 25   Q.   FOCUSSING SPECIFICALLY ON THAT FEBRUARY 2014 TEST, AND

11:36AM  1    THAT'S THE TEST WHERE WE LOOKED AT THE DATA; CORRECT?

11:36AM  2    A.   CORRECT.

11:36AM  3    Q.   AND FOCUSSING SPECIFICALLY ON THAT TEST, DID YOUR

11:36AM  4    SUPERIORS IN THE LAB SUPPORT THAT TEST BEING RUN AT THERANOS?

11:36AM  5         MR. COOPERSMITH:  OBJECTION.  HEARSAY.

11:36AM  6         THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION

11:36AM  7    UNLESS YOU REPHRASE THE QUESTION.

11:36AM  8    BY MR. BOSTIC:

11:36AM  9    Q.   MS. CHEUNG, LET ME ASK IT THIS WAY, THE TEST THAT WE'RE

11:36AM  10   TALKING ABOUT RUN IN FEBRUARY OF 2014, WAS IT YOUR IDEA TO

11:37AM  11   PERFORM THAT EXPERIMENT AT THERANOS?

11:37AM  12   A.   NO.

11:37AM  13   Q.   WHO DIRECTED -- WELL, WERE YOU INVOLVED IN PERFORMING THAT

11:37AM  14   EXPERIMENT?

11:37AM  15   A.   YES.

11:37AM  16   Q.   WHO DIRECTED YOU TO PERFORM THAT EXPERIMENT AT THERANOS?

11:37AM  17   A.   THE -- IT WAS THE LAB DIRECTOR, AND THE MEDICAL DIRECTOR,

11:37AM  18   AND THE EXECUTIVE STAFF.

11:37AM  19   Q.   AND SO WHO ARE WE TALKING ABOUT SPECIFICALLY?

11:37AM  20   A.   MARK PANDORI AND ADAM ROSENDORFF.

11:37AM  21   Q.   THEY ARE THE ONES WHO WERE REQUESTING THAT YOU PERFORM

11:37AM  22   THAT EXPERIMENT?

11:37AM  23   A.   YES.

11:37AM  24        MR. COOPERSMITH:  YOUR HONOR, THAT LAST ANSWER I'M

11:37AM  25   MOVING TO STRIKE ON A HEARSAY BASIS.

11:37AM 1                    THE COURT:  OVERRULED.

11:37AM 2     BY MR. BOSTIC:

11:37AM 3     Q.   WHEN THIS HAPPENED, THIS WAS NOT AT THE END OF YOUR TIME

11:37AM 4     AT THE COMPANY; IS THAT CORRECT?

11:37AM 5     A.   THAT IS CORRECT.

11:37AM 6     Q.   AND THROUGHOUT YOUR ADDITIONAL TIME AT THE COMPANY, DID

11:37AM 7     YOU EVER BECOME MORE COMFORTABLE WITH THERANOS'S DELETION OF

11:38AM 8     OUTLIERS FROM THE TESTING DATA?

11:38AM 9     A.   NO.

11:38AM 10    Q.   I'D LIKE TO TALK ABOUT PROFICIENCY TESTING A LITTLE BIT.

11:38AM 11         DO YOU RECALL DISCUSSING THAT TOPIC WITH MR. COOPERSMITH?

11:38AM 12    A.   YES.

11:38AM 13    Q.   AND HE ASKED YOU TO LOOK AT EXHIBIT 7603BB.

11:38AM 14         DO YOU RECALL THAT?

11:38AM 15    A.   YES.  IS THAT IN THE --

11:38AM 16    Q.   I'LL GIVE YOU A SECOND TO TURN TO IT.

11:38AM 17    A.   IS IT 7603DD?

11:38AM 18    Q.   BB AS IN BOY.

11:38AM 19    A.   OKAY.

11:38AM 20    Q.   MS. WACHS, CAN WE PUT UP EXHIBIT 1548, PLEASE, AND THE

11:38AM 21    EXCEL CHART THAT IS ALREADY ADMITTED.

11:39AM 22         MS. CHEUNG, DO YOU SEE ON THE SCREEN IN FRONT OF YOU THE

11:39AM 23    DATA FROM THE PROFICIENCY TESTING EXPERIMENT AT THERANOS?

11:39AM 24    A.   YES.

11:39AM 25    Q.   AND THEN LOOKING AT DEFENSE EXHIBIT 7603BB, DO YOU RECALL

11:39AM  1    DISCUSSING WITH MR. COOPERSMITH SOME GUIDELINES OR MARGINS THAT

11:39AM  2    THE REGULATION PROVIDES FOR DIFFERENT KINDS OF TESTS?

11:39AM  3    A.   YES.

11:39AM  4    Q.   AND YOU TESTIFIED ON CROSS THAT THE SPECIFIC TESTS IN THE

11:39AM  5    REGULATION ARE GENERAL CHEMISTRY AS OPPOSED TO IMMUNOASSAYS; IS

11:39AM  6    THAT RIGHT?

11:39AM  7    A.   THAT IS CORRECT.

11:39AM  8    Q.   CAN YOU EXPLAIN WHY THAT MATTERS?

11:39AM  9    A.   THAT MATTERS BECAUSE THESE RANGES ARE GENERATED FOR A

11:39AM  10   DIFFERENT SUBSET OF TESTS, SO THEY HAVE NO RELATION TO THE

11:39AM  11   DIFFERENT TYPE OF PROFICIENCY TESTING THAT WE'RE RUNNING HERE

11:39AM  12   FOR THE IMMUNOASSAYS.

11:39AM  13        MR. COOPERSMITH:  YOUR HONOR, MOVE TO STRIKE UNDER

11:39AM  14   702.

11:39AM  15        THE COURT:  IS THIS RELATED TO HER -- MAYBE YOU CAN

11:39AM  16   LAY A FOUNDATION FOR THAT, PLEASE.

11:39AM  17        MR. BOSTIC:  SURE.

11:40AM  18   Q.   MS. CHEUNG, ARE YOU AWARE THAT -- WELL, LET ME ASK, THE

11:40AM  19   MARGINS, THE ALLOWABLE MARGINS SET BY THE REGULATIONS, ARE THEY

11:40AM  20   SPECIFIC TO EACH INDIVIDUAL ASSAY LISTED?

11:40AM  21        MR. COOPERSMITH:  YOUR HONOR, OBJECTION.  602, 702.

11:40AM  22        THE COURT:  WELL, ARE YOU ASKING IS THIS WHAT SHE

11:40AM  23   WAS TRAINED?

11:40AM  24        MR. BOSTIC:  I THINK IT'S APPARENT FROM THE

11:40AM  25   DOCUMENT, YOUR HONOR.

| | | |
|---|---|---|
| 11:40AM | 1 | THE COURT: RIGHT. RIGHT. WHY DON'T YOU LAY THAT |
| 11:40AM | 2 | FOUNDATION. |
| 11:40AM | 3 | BY MR. BOSTIC: |
| 11:40AM | 4 | Q. MS. CHEUNG, AT THERANOS, DID YOU GAIN AN UNDERSTANDING AS |
| 11:40AM | 5 | TO WHETHER THE REGULATIONS IMPOSED SPECIFIC MARGINS OF |
| 11:40AM | 6 | ALLOWABLE ERROR FOR EACH SPECIFIC TEST? |
| 11:40AM | 7 | A. YES. |
| 11:40AM | 8 | Q. AND WHAT DID YOU COME TO UNDERSTAND FROM YOUR WORK AT |
| 11:40AM | 9 | THERANOS? |
| 11:40AM | 10 | MR. COOPERSMITH: OBJECTION, YOUR HONOR. HEARSAY. |
| 11:40AM | 11 | THE COURT: OVERRULED. |
| 11:40AM | 12 | THE WITNESS: THAT -- CAN YOU REPEAT THAT QUESTION? |
| 11:40AM | 13 | BY MR. BOSTIC: |
| 11:40AM | 14 | Q. SURE. |
| 11:40AM | 15 | THE QUESTION WAS WHAT DID YOU LEARN AT THERANOS ABOUT |
| 11:40AM | 16 | WHETHER THE REGULATIONS IMPOSED SPECIFIC MARGINS FOR SPECIFIC |
| 11:41AM | 17 | TESTS? |
| 11:41AM | 18 | A. SO FOR SPECIFIC TESTS, THERE WAS A MARGIN THAT WE HAD TO |
| 11:41AM | 19 | BE IN OR A STANDARD DEVIATION OF THE ACTUAL AMOUNT FOR SPECIFIC |
| 11:41AM | 20 | TYPES OF TESTS. |
| 11:41AM | 21 | Q. AND IF WE'RE LOOKING AT THE FOUR TESTS THAT WERE INVOLVED |
| 11:41AM | 22 | IN THE FEBRUARY 2014 EXPERIMENT -- |
| 11:41AM | 23 | A. YES. |
| 11:41AM | 24 | Q. -- ARE ANY OF THOSE FOUR TESTS COVERED BY THE REGULATION |
| 11:41AM | 25 | THAT MR. COOPERSMITH DISCUSSED WITH YOU? |

CHEUNG REDIRECT BY MR. BOSTIC                                    1559

```
11:41AM   1     A.   NO.

11:41AM   2     Q.   EVEN SO, LOOKING AT THE MARGINS OF ALLOWABLE ERROR IN THAT

11:41AM   3     REGULATION, DO YOU RECALL DISCUSSING WITH MR. COOPERSMITH THAT

11:41AM   4     SOME OF THEM ALLOWED FOR DISCREPANCIES, EXCUSE ME, OF UP TO

11:41AM   5     30 PERCENT?

11:41AM   6     A.   CORRECT.

11:41AM   7     Q.   I'LL ASK YOU AGAIN TO LOOK AT THE RESULTS FROM THE TESTS

11:41AM   8     OF THE THERANOS TECHNOLOGY IN FEBRUARY OF 2014.

11:41AM   9          AND MY QUESTION IS, ARE YOU SEEING DISCREPANCY

11:42AM  10     SIGNIFICANTLY GREATER THAN 30 PERCENT IN THOSE RESULTS?

11:42AM  11     A.   YES, YES.

11:42AM  12     Q.   ALL RIGHT.  CAN YOU HIGHLIGHT SOME OF THOSE FOR US.

11:42AM  13     A.   SOME OF THEM ARE HIGHLIGHTED IN LIKE NY E09 ON F, THE

11:42AM  14     MAJORITY OF THE VITAMIN D SAMPLES.

11:42AM  15          ANOTHER EXAMPLE IS NY TM269 ON COLUMN H.

11:42AM  16     Q.   SO IF WE LOOK AT, FOR EXAMPLE, THE VITAMIN D RESULTS, AND

11:42AM  17     WE SEE IN F4 THERE'S A RECOVERY THERE OF 373 PERCENT.

11:42AM  18          DO YOU SEE THAT?

11:42AM  19     A.   YES.

11:42AM  20     Q.   IN ANYWHERE IN THE REGULATION THAT MR. COOPERSMITH SHOWED

11:42AM  21     YOU, IS THERE AN ASSAY WHERE YOU CAN STILL PASS PROFICIENCY

11:42AM  22     TESTING WHILE STILL BEING 2- OR 300 PERCENT OFF OF THE TARGET?

11:43AM  23     A.   NO.

11:43AM  24     Q.   YOU MENTIONED ALSO IN YOUR CONVERSATION WITH

11:43AM  25     MR. COOPERSMITH THAT THERE WAS A LATER INTERNAL PROFICIENCY
```

11:43AM  1    TESTING ROUND AT THERANOS; IS THAT RIGHT?

11:43AM  2    A.   THAT IS CORRECT.

11:43AM  3    Q.   AND YOU TESTIFIED THAT AS A RESULT OF THAT ROUND, TWO OF

11:43AM  4    THE ASSAYS INVOLVED FAILED AND HAD TO BE TAKEN OUT OF USE; IS

11:43AM  5    THAT RIGHT?

11:43AM  6    A.   THAT IS CORRECT.

11:43AM  7    Q.   DO YOU RECALL WHICH TWO ASSAYS THOSE WERE?

11:43AM  8    A.   I -- ONE WAS FT4 AND THE OTHER I DON'T REMEMBER AT THIS

11:43AM  9    TIME.

11:43AM  10   Q.   DO YOU RECALL LEARNING OF THAT RESULT DURING YOUR TIME AT

11:43AM  11   THERANOS?

11:43AM  12   A.   YES.

11:43AM  13   Q.   AND WERE YOU SURPRISED BY THOSE FAILURES OF THE PT

11:43AM  14   TESTING?

11:43AM  15   A.   NO.

11:43AM  16   Q.   WHY NOT?

11:43AM  17   A.   BECAUSE --

11:43AM  18        MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  RELEVANCE.

11:44AM  19   401.

11:44AM  20        THE COURT:  THIS IS BASED ON HER WORK AGAIN?

11:44AM  21        MR. BOSTIC:  YES, YOUR HONOR.

11:44AM  22        THE COURT:  YOU CAN ANSWER THE QUESTION BASED ON

11:44AM  23   YOUR WORK.

11:44AM  24        THE WITNESS:  SO BASED ON MY WORK AT THERANOS, I

11:44AM  25   WASN'T SURPRISED BY THE RESULTS BECAUSE IT WAS FAIRLY

11:44AM 1    CONSISTENT WITH WHAT WE WERE SEEING IN TERMS OF THE FAILURES OF

11:44AM 2    THE QUALITY CONTROLS, A LOT OF THE EXPERIMENTAL STUDIES THAT WE

11:44AM 3    WERE DOING, THAT IN ACTION WHEN WE WERE RUNNING THESE SAMPLES

11:44AM 4    AND THESE TESTS THAT WE FREQUENTLY SAW THAT THERE WERE GREAT

11:44AM 5    DEVIATIONS BETWEEN WHAT WAS EXPECTED AND WHAT WAS ACTUALLY

11:44AM 6    GENERATED.

11:44AM 7         SO IT DIDN'T SURPRISE ME THAT WHEN WE HAD DONE THE

11:44AM 8    PROFICIENCY TESTING BASED ON THE ALTERNATIVE ASSESSMENT, OR THE

11:44AM 9    SOP THAT WE JUST WENT THROUGH WITH MR. COOPERSMITH, THAT THESE

11:44AM 10   WERE NOT FUNCTIONING TO THE STANDARD IN WHICH THERANOS SET FOR

11:44AM 11   ITSELF.

11:44AM 12   BY MR. BOSTIC:

11:44AM 13   Q.   MR. COOPERSMITH ASKED YOU A QUESTION ABOUT THE ACCURACY OF

11:44AM 14   PATIENT RESULTS.

11:44AM 15        DO YOU RECALL THAT QUESTION?

11:44AM 16   A.   YES.

11:44AM 17   Q.   HE ASKED YOU SOMETHING LIKE ARE YOU AWARE OF ANY RESULTS

11:45AM 18   THAT ACTUALLY WENT OUT TO PATIENTS THAT ARE INACCURATE?

11:45AM 19   A.   CORRECT.

11:45AM 20   Q.   AND I THINK YOU TESTIFIED THAT YOU WERE NOT AWARE OF ANY

11:45AM 21   SPECIFIC RESULTS THAT WERE INACCURATE; IS THAT RIGHT?

11:45AM 22   A.   OH.  YES.

11:45AM 23   Q.   AND I JUST WANT TO MAKE IT CLEAR, IS THAT YOUR TESTIMONY

11:45AM 24   TODAY?

11:45AM 25   A.   YES.

PANDORI DIRECT BY MR. BOSTIC                                    1605

01:14PM  1    A.   YEAH, I WOULD PREFER TO BREAK THOSE UP.

01:15PM  2    Q.   SURE.

01:15PM  3         AND, MS. WACHS, IF WE CAN GO BACK TO PAGE 1 SO WE CAN HAVE

01:15PM  4    THAT LANGUAGE IN FRONT OF US.

01:15PM  5    A.   YEAH.

01:15PM  6    Q.   SO I'LL DRAW YOUR ATTENTION BACK TO THAT SECOND SENTENCE.

01:15PM  7    LET'S START WITH FASTER.

01:15PM  8         IN YOUR EXPERIENCE WERE THERANOS'S PROCESSES FASTER?

01:15PM  9    A.   NO.

01:15PM 10    Q.   HOW ABOUT MORE ACCURATE?

01:15PM 11         BASED ON YOUR EXPERIENCE AS LAB DIRECTOR AT THERANOS, WERE

01:15PM 12    THERANOS'S TESTS MORE ACCURATE THAN THE CONVENTIONAL METHODS?

01:15PM 13    A.   THEY WERE NOT.

01:15PM 14    Q.   AND LET'S GO THEN BACK TO PAGE 2 AND BACK TO THAT MIDDLE

01:15PM 15    PARAGRAPH.

01:15PM 16         IN YOUR EXPERIENCE WORKING AT THE COMPANY, DID THERANOS'S

01:16PM 17    TECHNOLOGY ELIMINATE MULTIPLE LAB TRIPS BECAUSE IT COULD RUN

01:16PM 18    ANY COMBINATION OF TESTS, INCLUDING FOLLOW-ON TESTS, ALL FROM A

01:16PM 19    SINGLE MICRO SAMPLE?

01:16PM 20    A.   NO.

01:16PM 21    Q.   YOU SAID YOU STARTED --

01:16PM 22         THANK YOU, MS. WACHS.  WE CAN TAKE THAT DOWN.

01:16PM 23         YOU SAID, DR. PANDORI, THAT YOU STARTED WORKING AT THE

01:16PM 24    COMPANY IN DECEMBER OF 2013; IS THAT RIGHT?

01:16PM 25    A.   CORRECT.

PANDORI DIRECT BY MR. BOSTIC                                          1606

01:16PM  1    Q.   DID YOU LEARN MORE ABOUT THE COMPANY'S TESTING OPERATIONS

01:16PM  2    AND TECHNOLOGY AFTER YOU JOINED THE COMPANY?

01:16PM  3    A.   YES.

01:16PM  4    Q.   WHEN YOU FIRST JOINED, WHAT DEVICES WAS THERANOS USING TO

01:16PM  5    CONDUCT ITS PATIENT TESTS?

01:16PM  6    A.   THERE WERE MANY.  THEY WERE USING FDA CLEARED EQUIPMENT

01:16PM  7    THAT ANY LAB MIGHT USE, LIKE AN IMMULITE OR A SIEMENS PIECE OF

01:16PM  8    EQUIPMENT FOR CHEMICAL ANALYSIS.  SO THESE WERE THE FDA CLEARED

01:17PM  9    EQUIPMENT THAT ANY LABORATORY, ANY PARTICULAR CLINICAL

01:17PM  10   LABORATORY MIGHT PURCHASE AND USE.

01:17PM  11       THEY WERE THEN USING A VERSION OF A SIEMENS ANALYZER THAT

01:17PM  12   HAD BEEN MODIFIED TO RUN DILUTED SAMPLES.

01:17PM  13       AND THEN THEY WERE USING SOMETHING CALLED EDISONS, WHICH

01:17PM  14   WERE MACHINES THAT RAN A DIFFERENT CLASS OF BLOOD TEST WHICH WE

01:17PM  15   REFER TO AS IMMUNOASSAY, AND THOSE WERE BUILT -- THEY WERE

01:17PM  16   CREATED BY THERANOS.

01:17PM  17   Q.   AND SO OF THOSE CATEGORY OF DEVICES THAT YOU JUST LISTED,

01:17PM  18   WHICH OF THOSE WERE ACTUALLY DESIGNED AND MANUFACTURED BY

01:17PM  19   THERANOS ITSELF?

01:17PM  20   A.   THE EDISONS, TO MY KNOWLEDGE, WERE DESIGNED AND BUILT BY

01:17PM  21   THERANOS.

01:17PM  22       THE MACHINES -- THEN THERE WAS A VERSION OF THE FDA

01:17PM  23   CLEARED MACHINE, AND THAT SOME PEOPLE AT THE COMPANY CALLED IT

01:17PM  24   HACKED, H-A-C-K-E-D, THAT WAS THEIR LANGUAGE, TO RUN -- TO

01:18PM  25   HANDLE THE LOWER VOLUMES.

01:18PM 1          AND THEN, AS I SAID, THERE WAS REGULAR LAB EQUIPMENT IN

01:18PM 2    THERE FROM FDA CLEARED LAB EQUIPMENT THAT LABS TYPICALLY BUY.

01:18PM 3    Q.   AND THOSE DEVICES WERE NOT CREATED OR MADE BY THERANOS?

01:18PM 4    A.   THAT'S CORRECT.

01:18PM 5    Q.   FOCUSSING SPECIFICALLY ON THE EDISON, IN YOUR JOB AS LAB

01:18PM 6    DIRECTOR, DID YOU COME TO HAVE AN UNDERSTANDING OF WHAT THE

01:18PM 7    DEVICE COULD DO AND WHAT IT COULDN'T DO IN TERMS OF DIFFERENT

01:18PM 8    TEST TYPES?

01:18PM 9    A.   I DID, YES.

01:18PM 10   Q.   CAN YOU DESCRIBE THAT FOR US AT A HIGH LEVEL?

01:18PM 11   A.   AT A -- DO YOU WANT TO KNOW WHICH PARTICULAR TEST IT COULD

01:18PM 12   RUN?

01:18PM 13   Q.   I WON'T, I WON'T TEST YOUR MEMORY THAT WAY UNLESS YOU HAVE

01:18PM 14   THOSE AT HAND.

01:18PM 15        I'M ASKING IF THERE WERE CATEGORIES OF TESTS THAT COULD BE

01:18PM 16   DONE AND COULDN'T BE DONE BY THE EDISON?

01:19PM 17   A.   EDISONS RAN A CATEGORY OF TESTS WHICH WE CALL

01:19PM 18   IMMUNOASSAYS.  SO THEY WOULD DETECT LARGER BIOMOLECULES, AND

01:19PM 19   THEY DID SO USING ANTIBODY INTERMEDIARIES, SO THEY DETECTED AND

01:19PM 20   COUNTERED THINGS.

01:19PM 21        WHAT YOU WOULDN'T RUN IS SOMETHING LIKE POTASSIUM OR

01:19PM 22   SODIUM, IF YOU NEEDED TO KNOW THAT.

01:19PM 23        BUT LARGER MOLECULES, IF YOU COULD DETECT WITH ANTIBODIES,

01:19PM 24   YOU WOULD USE AN EDISON.

01:19PM 25   Q.   YOU MENTIONED SOME CHEMISTRY TESTS THAT COULD NOT BE DONE

01:19PM   1    ON THE EDISON; IS THAT RIGHT?

01:19PM   2    A.   THAT'S CORRECT.

01:19PM   3    Q.   AND HOW ABOUT CYTOMETRY TESTS LIKE A COMPLETE BLOOD COUNT,

01:19PM   4    COULD THE EDISON DO THOSE?

01:19PM   5    A.   NO.

01:19PM   6    Q.   AND HOW ABOUT GENETIC ANALYSES, COULD THE EDISON DO THOSE

01:19PM   7    TESTS?

01:19PM   8    A.   NO, THE EDISON DIDN'T DO GENETIC TESTING.

01:19PM   9    Q.   DO YOU KNOW APPROXIMATELY HOW MANY ASSAYS THE EDISON DID

01:19PM   10   DURING YOUR TIME THERE?

01:19PM   11   A.   THE TOTAL NUMBER OF TESTS RUN ON THE EDISONS.

01:19PM   12   Q.   APPROXIMATELY HOW MANY DIFFERENT ASSAYS COULD THE EDISON

01:19PM   13   DO, IF YOU REMEMBER?

01:19PM   14   A.   I REMEMBER IT WAS AT LEAST FIVE, OR APPROXIMATELY THAT.

01:20PM   15   Q.   AS YOU CAME TO UNDERSTOOD -- SORRY.

01:20PM   16        AS YOU CAME TO UNDERSTAND THE CAPABILITIES AND LIMITATIONS

01:20PM   17   OF THE EDISON, DID YOU VIEW IT AS A GROUNDBREAKING TECHNOLOGY

01:20PM   18   IN 2013?

01:20PM   19   A.   NO, I DID NOT.

01:20PM   20   Q.   WHY NOT?

01:20PM   21   A.   WELL --

01:20PM   22        MR. CAZARES:  OBJECTION.  702.

01:20PM   23        THE COURT:  DO YOU WANT TO LAY A LITTLE FOUNDATION,

01:20PM   24   HIS BACKGROUND.

01:20PM   25   BY MR. BOSTIC:

PANDORI DIRECT BY MR. BOSTIC                                    1609

01:20PM 1    Q.   IN YOUR PRE-THERANOS EXPERIENCE WORKING AT CLINICAL LABS,

01:20PM 2    DID YOU COME TO HAVE A GENERAL KNOWLEDGE OF WHAT KINDS OF

01:20PM 3    TECHNOLOGY WAS OUT THERE AND AVAILABLE FOR RUNNING BLOOD TESTS?

01:20PM 4    A.   YEAH.   THAT WAS A MAJOR PART OF MY JOB.

01:20PM 5    Q.   AND WAS IT PART OF YOUR JOB TO KEEP UP WITH THE STATE OF

01:20PM 6    THE ART IN TERMS OF WHAT BLOOD ANALYZERS COULD DO?

01:20PM 7    A.   I CONSIDERED IT A SERIOUS PART OF MY JOB.

01:20PM 8    Q.   SO BASED ON THAT FOUNDATION, BASED ON YOUR KNOWLEDGE OF

01:21PM 9    THE INDUSTRY AT THE TIME AND WHAT YOU OBSERVED, WAS THE EDISON

01:21PM 10   GROUNDBREAKING IN 2013?

01:21PM 11           MR. CAZARES:  SAME OBJECTION.

01:21PM 12           THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

01:21PM 13           THE WITNESS:  NO, I DID NOT FIND IT GROUNDBREAKING.

01:21PM 14   BY MR. BOSTIC:

01:21PM 15   Q.   IN WHAT WAY WAS IT NOT GROUNDBREAKING?

01:21PM 16   A.   THERE WERE AT LEAST TWO REASONS, IF NOT MORE.

01:21PM 17        THE FIRST REASON WAS THAT THE AMOUNT OF SAMPLE THAT WAS

01:21PM 18   PUT IN THERE WAS NOT REALLY VERY DIFFERENT SUBSTANTIALLY THAN

01:21PM 19   WHAT WOULD BE PUT INTO SOME OF THE OTHER IMMUNOASSAY TESTS THAT

01:21PM 20   ARE COMMERCIALLY AVAILABLE.  SO THERE WAS NO DIFFERENCE IN

01:21PM 21   VALUE THAT WAS REQUIRED TO RUN THE TESTS.

01:21PM 22        THE EDISON COULD ONLY RUN, AS I RECALL, ONE SPECIMEN AT A

01:21PM 23   TIME IN EACH MACHINE AT THAT POINT.

01:21PM 24        AND THE IMMUNOASSAY TECHNOLOGIES WITH WHICH I HAVE

01:21PM 25   FAMILIARITY CAN RUN UPWARDS OF 90 OR MORE SPECIMENS

01:21PM 1    SIMULTANEOUSLY.

01:21PM 2        AND THEN THE FAILURE RATE OF THE CONTROLS ON THE EDISONS

01:22PM 3    WAS NOTABLY HIGHER THAN WHAT I WOULD SEE ON THE ASSAY EQUIPMENT

01:22PM 4    WITH WHICH I HAD FAMILIARITY, EITHER LITERATURE OR DIRECT USE

01:22PM 5    OR SUPERVISORIAL ROLE OVER.

01:22PM 6    Q.   LET ME ASK, AS YOU CAME TO UNDERSTAND THESE THINGS ABOUT

01:22PM 7    THE EDISON DEVICE, WAS THAT CONSISTENT OR INCONSISTENT WITH

01:22PM 8    WHAT YOU HAD READ IN PUBLICLY AVAILABLE INFORMATION AT

01:22PM 9    THERANOS?

01:22PM 10   A.   AT THAT TIME IT WAS INCONSISTENT.

01:22PM 11   Q.   LET ME TALK A LITTLE BIT MORE ABOUT YOUR ROLE AT THERANOS

01:22PM 12   SPECIFICALLY.  I'M SORRY IF YOU SAID ALREADY, BUT WHAT WAS YOUR

01:22PM 13   TITLE THERE?

01:22PM 14   A.   LABORATORY DIRECTOR.

01:22PM 15   Q.   AND WHAT DID THAT MEAN FOR YOU AT THERANOS?  WHAT WAS

01:22PM 16   INCLUDED IN YOUR RESPONSIBILITY?

01:22PM 17   A.   FOR ME IT INCLUDED OVERSIGHT OF WHAT WAS CALLED CLIA

01:22PM 18   LABORATORY, AND IT WAS LARGELY AN OPERATIONAL AND LOGISTICS

01:22PM 19   ROLE TO MAKE SURE THAT THINGS WERE BEING TESTED IN A RAPID

01:22PM 20   MANNER, IN A PROPER MANNER, AND THAT I WAS MANAGING THE

01:23PM 21   LABORATORY SCIENTISTS TO MAKE SURE THAT THEY WERE GETTING THEIR

01:23PM 22   JOBS DONE, AND I WAS TO CONSULT WITH ADAM ROSENDORFF WHO WAS

01:23PM 23   ALSO A LABORATORY DIRECTOR.

01:23PM 24   Q.   AND YOU MENTIONED DR. ROSENDORFF.  CAN YOU TELL US MORE

01:23PM 25   ABOUT HOW YOU FIT INTO THE -- EXCUSE ME -- THE ORGANIZATIONAL

01:23PM   1    STRUCTURE AT THE COMPANY?

01:23PM   2    A.   I -- ORGANIZATIONAL STRUCTURE, MAY I ASK DO YOU MEAN TO

01:23PM   3    WHOM I REPORTED?

01:23PM   4    Q.   LET'S START WITH THAT, SURE.

01:23PM   5    A.   I REPORTED TO SUNNY BALWANI.

01:23PM   6    Q.   AND HOW DID YOU COME TO UNDERSTAND THAT YOU REPORTED TO

01:23PM   7    MR. BALWANI?

01:23PM   8    A.   I DON'T RECALL.

01:23PM   9    Q.   YOU MENTIONED WORKING WITH DR. ROSENDORFF.

01:23PM  10         WHAT WERE YOUR POSITIONS RELATIVE TO EACH OTHER?

01:23PM  11    A.   WE CONSIDERED ONE ANOTHER PEERS, ALTHOUGH HIS NAME WAS ON

01:24PM  12    THE LICENSE, I CONSULTED HIM ON MATTERS OF QUALITY CONTROL AND

01:24PM  13    LOGISTICS IN THE LABORATORY, AND HE AND I WOULD DISCUSS

01:24PM  14    FINDINGS IN THE LABORATORY AND WOULD WORK TOGETHER IN WHAT IS

01:24PM  15    THE ISSUES AND THE PROBLEM SOLVING PROCESSES, WHICH ARE NORMAL

01:24PM  16    IN CLIA LABORATORIES.

01:24PM  17    Q.   YOU MENTIONED IN YOUR PREVIOUS LAB DIRECTOR ROLE YOU

01:24PM  18    REPORTED TO MEDICAL DOCTORS SPECIFICALLY; IS THAT RIGHT?

01:24PM  19    A.   WHEN I WAS THE LABORATORY DIRECTOR FOR THE CITY AND COUNTY

01:24PM  20    OF SAN FRANCISCO'S PUBLIC HEALTH LABORATORY, I REPORTED TO A

01:24PM  21    PERSON WHO WAS A MEDICAL DOCTOR.  AND, YEAH, ON BOTH OCCASIONS,

01:24PM  22    YES, I REPORTED TO A MEDICAL DOCTOR.

01:24PM  23    Q.   AND WAS THIS THE FIRST TIME IN YOUR CAREER WHEN YOU JOINED

01:25PM  24    THERANOS THAT YOU HAD REPORTED AS LAB DIRECTOR TO SOMEONE WHO

01:25PM  25    DIDN'T HAVE MEDICAL OR SCIENTIFIC TRAINING?

PANDORI DIRECT BY MR. BOSTIC                                    1612

01:25PM  1    A.   YES.

01:25PM  2    Q.   DID YOU HAVE A REACTION TO THAT STRUCTURE AT THE TIME?

01:25PM  3    A.   AT WHAT TIME?

01:25PM  4    Q.   WHEN YOU FIRST JOINED THE COMPANY, DID YOU HAVE A REACTION

01:25PM  5    TO THE FACT THAT YOU WERE REPORTING TO SOMEONE WHO WASN'T AN

01:25PM  6    M.D.?

01:25PM  7    A.   AT THE MOMENT THAT I JOINED THE COMPANY AND EARLY ON, I

01:25PM  8    DID NOT HAVE A REACTION.

01:25PM  9    Q.   DID YOU LATER COME TO HAVE AN OPINION ABOUT WHETHER THAT

01:25PM  10   WAS A GOOD OR BAD THING?

01:25PM  11   A.   I LATER CAME TO HAVE AN OPINION THAT IT WAS A BAD THING.

01:25PM  12   Q.   CAN YOU TELL ME MORE ABOUT MR. BALWANI'S ROLE IN

01:25PM  13   CONNECTION WITH THE CLINICAL LAB?  YOU SAID YOU REPORTED TO

01:25PM  14   HIM, BUT HOW WAS HE INVOLVED IN LABORATORY OPERATIONS?

01:25PM  15   A.   SUNNY WANTED ALL OF THE INFORMATION IN EVERY ASPECT OF THE

01:25PM  16   OPERATION TO BE KNOWN TO HIM, AND, IF NECESSARY, HE WOULD STEP

01:26PM  17   IN TO ASSIST IN SOLVING PROBLEMS AND DISCUSS THEM AND TO ASSIGN

01:26PM  18   DIFFERENT PEOPLE TO SOLVE DIFFERENT PROBLEMS.

01:26PM  19   Q.   YOU SAID THAT YOUR IMPRESSION WAS THAT HE WANTED TO KNOW

01:26PM  20   WHAT WAS HAPPENING.

01:26PM  21        HOW DID HE CONVEY THAT OR HOW DID HE ACHIEVE THAT AT

01:26PM  22   THERANOS?

01:26PM  23   A.   SUNNY WAS VERY COMMUNICATIVE, AND HE SPOKE TO AS MANY

01:26PM  24   PEOPLE AS HE COULD AS OFTEN AS HE COULD, AND SOUGHT TO HAVE AS

01:26PM  25   MUCH INTELLIGENCE ABOUT WHAT WAS GOING ON IN THE COMPANY AS HE

ER-247

PANDORI DIRECT BY MR. BOSTIC                                    1613

01:26PM   1    COULD AT ALL TIMES.

01:26PM   2         AND THAT WAS EITHER VOCALLY OR BY EMAIL.  AND, YOU KNOW,

01:26PM   3    VOCALLY WOULD BE LIKE MEETINGS OR INDIVIDUAL CONVERSATIONS.

01:26PM   4    Q.   AND IN YOUR PERSONAL EXPERIENCE, HOW FREQUENTLY WERE YOU

01:26PM   5    IN CONTACT WITH MR. BALWANI ABOUT EVENTS IN THE LAB DURING YOUR

01:26PM   6    TIME AT THERANOS?

01:26PM   7    A.   I BELIEVE EVERY DAY THAT I COULD THAT HE WAS THERE.

01:27PM   8    Q.   BESIDES YOUR ROLE IN THE CLINICAL LAB WHERE PATIENT

01:27PM   9    TESTING WAS DONE, DID YOU ALSO HAVE ANY INVOLVEMENT IN THE

01:27PM  10    RESEARCH AND DEVELOPMENT SIDE?

01:27PM  11    A.   I DID.

01:27PM  12    Q.   CAN YOU DESCRIBE WHAT THAT WAS?

01:27PM  13    A.   I WAS ASKED TO ASSIST IN REVIEWING VALIDATION REPORTS FOR

01:27PM  14    ANOTHER PART OF THE COMPANY THAT WAS DEVELOPING A GENETIC STYLE

01:27PM  15    TEST TO DETECT INFECTIOUS ORGANISMS, AND I WAS ASKED TO REVIEW

01:27PM  16    THE VALIDATION STUDIES THAT WERE DONE IN FURTHERANCE OF MOVING

01:27PM  17    THOSE TESTS FORWARD.

01:27PM  18    Q.   AND IN CONNECTION WITH THAT -- WELL, LET ME ASK, THAT

01:27PM  19    TESTING, WAS IT GOING TO BE PERFORMED ON THE EDISON 3.0 OR THE

01:27PM  20    3.5 DEVICE?

01:27PM  21    A.   NO, IT WAS NOT.

01:27PM  22    Q.   WAS THERE A PARTICULAR DEVICE THAT IT WOULD BE PERFORMED

01:28PM  23    ON?

01:28PM  24    A.   NOT TO MY KNOWLEDGE.

01:28PM  25    Q.   IN THAT ROLE, WORKING WITH R&D, DID YOU ALSO REPORT TO

ER-248

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                       SAN JOSE DIVISION

5

   UNITED STATES OF AMERICA,          )
6                                      )  CR-18-00258-EJD
                     PLAINTIFF,        )
7                                      )  SAN JOSE, CALIFORNIA
            VS.                        )
8                                      )  APRIL 1, 2022
   RAMESH "SUNNY" BALWANI,             )
9                                      )  VOLUME 12
                     DEFENDANT.        )
10   _____   )  PAGES 1683 - 1905

11

12              TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE EDWARD J. DAVILA
13              UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
            (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTER:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23

24       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER
25

```
 1    SAN JOSE, CALIFORNIA                    APRIL 1, 2022

 2                   P R O C E E D I N G S

 3         (COURT CONVENED AT 8:33 A.M.)

 4         (JURY OUT AT 8:33 A.M.)

 5              THE COURT:  WE ARE ON THE RECORD.  ALL COUNSEL ARE

 6    PRESENT.  MR. BALWANI IS PRESENT.

 7         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

 8         LET'S SEE.  LAST NIGHT AT ABOUT 4:30 P.M. DOCUMENT 1384

 9    WAS FILED, MOTION TO STRIKE IMPROPER EXPERT TESTIMONY, AND

10    OTHER PROHIBITED TESTIMONY BY THE DEFENSE.

11         I CHECKED THE ECF DOCKET THIS MORNING.  I DON'T THINK THE

12    GOVERNMENT HAS FILED ANYTHING.

13         MR. BOSTIC?

14              MR. BOSTIC:  NO, YOUR HONOR.  BUT WE'RE PREPARED TO

15    ADDRESS IT ORALLY.

16              THE COURT:  WELL, I'VE READ THIS.

17         DOES THE GOVERNMENT HAVE A RESPONSE TO THIS?

18              MR. BOSTIC:  YES, YOUR HONOR.

19              THE COURT:  ALL RIGHT.  THANK YOU.

20              MR. BOSTIC:  SO, YOUR HONOR, THE GOVERNMENT OPPOSES

21    THE DEFENSE MOTION TO STRIKE PORTIONS OF THE TESTIMONY OF

22    DR. PANDORI AND MS. CHEUNG.

23         THE SECTIONS OF TESTIMONY IDENTIFIED BY THE DEFENSE ARE

24    NOT EXPERT TESTIMONY.  THEY ARE THE TESTIMONY OF PERCIPIENT

25    WITNESSES WHO WORKED AT THERANOS.  THEY ADDRESS THE
```

The time stamps in the left margin read: 08:33AM (lines 3–15), 08:34AM (lines 16–25).

08:34AM  1    OBSERVATIONS OF THOSE WITNESSES IN TERMS OF HOW THE THERANOS

08:34AM  2    TECHNOLOGY WORKED AND MORE PARTICULARLY WHETHER THE THERANOS

08:34AM  3    TECHNOLOGY WORKED, AND IN THAT VEIN THESE WITNESSES HAVE

08:34AM  4    FIRSTHAND PERCIPIENT EXPERIENCE WHICH THEY ARE ABLE TO RELATE

08:34AM  5    TO THE JURY WITHOUT VEERING INTO THE REALM OF EXPERT TESTIMONY.

08:34AM  6         WHEN A WITNESS WHO WORKED WITH THESE DEVICES TESTIFIES

08:35AM  7    THAT THERE WERE RELIABILITY PROBLEMS, THAT THERE WERE ACCURACY

08:35AM  8    CONCERNS, THEY WERE REPORTING WHAT THEY SAW, WHEN THEY DESCRIBE

08:35AM  9    THEIR OWN CONCERNS AND WHY THEY WERE WORRIED ABOUT THE ACCURACY

08:35AM  10   OF THESE DEVICES, THAT'S RELEVANT NOT ONLY TO PUT THEIR

08:35AM  11   OBSERVATIONS IN CONTEXT, BUT ALSO BECAUSE IT'S THOSE CONCERNS

08:35AM  12   THAT MOTIVATED THEM TO ULTIMATELY RAISE THESE ISSUES WITH

08:35AM  13   OTHERS AT THE COMPANY, INCLUDING THE DEFENDANT HIMSELF, AND

08:35AM  14   THEN ULTIMATELY TO LEAVE THEIR EMPLOYMENT WITH THE COMPANY.

08:35AM  15        SO I'M HAPPY TO ADDRESS SPECIFIC INSTANCES THAT THE COURT

08:35AM  16   MIGHT HAVE QUESTIONS ON OR RESPOND TO ANY QUESTIONS THAT THE

08:35AM  17   COURT MIGHT HAVE, BUT OUR OVERALL POSITION IS THAT THESE

08:35AM  18   WITNESSES STAYED WITHIN THE BOUNDS OF LAY TESTIMONY AND ADHERED

08:35AM  19   TO THE GUIDANCE PREVIOUSLY ISSUED BY THE COURT IN CONNECTION

08:35AM  20   WITH PRETRIAL BRIEFING.

08:35AM  21        THE COURT:  ALL RIGHT.  WELL, THANK YOU.

08:35AM  22        I WONDER IF YOU COULD COMMENT ON PAGE 3 OF THE MOTION,

08:36AM  23   ECF PAGE 5 AT ABOUT LINE 13, I THINK, IT LOOKS LIKE IT, 13, IT

08:36AM  24   CITES THE TRANSCRIPT 1137 TO 1138.  THERE WAS AN OBJECTION

08:36AM  25   THERE.  I THINK IT WAS BASED ON 602 BY MR. COOPERSMITH.

08:36AM 1 AND THE COURT THEN ALLOWED THE TESTIMONY TO OCCUR, AND

08:36AM 2 THEN THERE WAS A 702 OBJECTION AS I RECALL.

08:36AM 3 SO THE 602 OBJECTION WAS OBVIOUSLY BASED ON KNOWLEDGE,

08:36AM 4 PERSONAL KNOWLEDGE.  MY SENSE IS THAT THAT IS WHAT THAT

08:36AM 5 COLLOQUY WAS REFERENCING, THE KNOWLEDGE, THE OBSERVATIONS AS

08:36AM 6 YOU JUST MENTIONED.

08:36AM 7 AND I BELIEVE THAT COLLOQUY WAS REGARDING WHAT THOSE

08:36AM 8 MACHINES COULD DO, WHAT THE ELISA, WAS IT THE ELISA MACHINES OR

08:36AM 9 THE EDISON MACHINES, WHAT THEY COULD RUN.

08:37AM 10 AND WHEN I LOOK AT THAT TESTIMONY AND RECALLING THE

08:37AM 11 COLLOQUY, THAT REALLY WAS A QUESTION ABOUT, AND YOU'LL PARDON

08:37AM 12 ME FOR PUTTING IT IN A DIFFERENT VISUAL VEIN, BUT I HOPE IT

08:37AM 13 CAPTURES THE SENTIMENT OF THAT EXAMINATION.

08:37AM 14 IT SEEMED TO ME THE QUESTIONS WERE:  THIS IS A TOASTER,

08:37AM 15 AND CAN YOU TOASTER RYE BREAD IN THIS TOASTER?  CAN YOU TOAST

08:37AM 16 WHEAT BREAD THEN TOASTER?  CAN YOU TOAST FRENCH BREAD IN THIS

08:37AM 17 TOASTER?

08:37AM 18 AND THEN THE NEXT QUESTION WOULD BE CAN YOU POACH AN EGG

08:37AM 19 IN THIS TOASTER?  CAN YOU MAKE SPAGHETTI IN THIS TOASTER?

08:37AM 20 AND IT SEEMED TO ME THAT THAT'S WHAT THAT QUESTIONING WAS

08:37AM 21 OF MS. CHEUNG, WHAT CAN YOU DO IN THESE MACHINES?  AND THAT, IT

08:37AM 22 SEEMED TO ME, DIDN'T REQUIRE EXPERTISE TO TALK ABOUT WHAT COULD

08:38AM 23 BE RUN IN THAT PARTICULAR MACHINE.  THAT'S WHAT SHE WAS TRAINED

08:38AM 24 TO DO.

08:38AM 25 THAT'S JUST ONE EXAMPLE.

08:38AM 1      ON THE SAME PAGE THERE WAS OBJECTIONS ABOUT WAS THIS

08:38AM 2      GROUNDBREAKING TECHNOLOGY, AND I THINK THERE WAS AN OBJECTION

08:38AM 3      TO THAT AT LEAST RAISED IN THE PLEADINGS.

08:38AM 4      AND THE QUESTION WAS NOT BASED NECESSARILY ON EXPERTISE,

08:38AM 5      BUT I BELIEVE DR. PANDORI TESTIFIED GROUND BREAKING IN THE

08:38AM 6      CONTEXT OF THE LITERATURE THAT WAS PUBLIC THROUGH THE COMPANY,

08:38AM 7      THE COMPANY REPRESENTATIONS, OR AT LEAST LITERATURE THAT HE,

08:38AM 8      DR. PANDORI, HAD READ REGARDING REPRESENTATIONS. AND IN THAT

08:38AM 9      VEIN THE TECHNOLOGY WAS NOT GROUND BREAKING TO HIM. I DON'T

08:38AM 10      BELIEVE THAT REQUIRED EXPERTISE.

08:38AM 11      LATER ON IN THAT SAME PAGE AT LINE 24, 25, THERE WERE

08:39AM 12      NOTES OF -- TESTIMONY OF 1610 REGARDING FAMILIARITY WITH THE

08:39AM 13      LITERATURE, ET CETERA. THERE WAS NO OBJECTION ACTUALLY TO ANY

08:39AM 14      OF THAT TESTIMONY.

08:39AM 15      THERE WAS CONVERSATIONS AT 1657 REGARDING RAW DATA, AND

08:39AM 16      THE CONTEXT OF THAT CONVERSATION WAS REALLY IN RESPONSE TO AN

08:39AM 17      EMAIL, AS I RECALL THE TESTIMONY, FROM MR. BALWANI ASKING FOR

08:39AM 18      THE RAW DATA. I THINK THE EMAIL SAID I WANT TO SEE THE RAW

08:39AM 19      DATA.

08:39AM 20      AND I BELIEVE YOUR QUESTIONS WERE REGARDING WHAT WOULD --

08:39AM 21      IN ESSENCE, WHAT WOULD SOMEONE NEED TO HAVE KNOWLEDGE OF TO DO

08:39AM 22      SOMETHING WITH THE RAW DATA. AND THE WITNESS TESTIFIED, WELL,

08:39AM 23      YOU WOULD HAVE TO HAVE SOME MEDICAL BACKGROUND OR SOMETHING.

08:39AM 24      AND THEN ULTIMATELY THE WITNESS SAID, WELL, YOU KNOW,

08:40AM 25      PERHAPS HE WAS GOING TO HAVE SOMEBODY LOOK AT IT SO THERE'S A

08:40AM 1    COMPLETELY INNOCENT REASON FOR HIS REQUEST.  I WANT IT.  MAYBE

08:40AM 2    HE PERSONALLY COULDN'T DO IT BECAUSE HE DIDN'T HAVE THE

08:40AM 3    BACKGROUND NECESSARY.  I THINK IT'S -- IN THE TESTIMONY HE HAS

08:40AM 4    A SOFTWARE BACKGROUND, OR AT LEAST IN THE OPENING STATEMENTS.

08:40AM 5         BUT, AGAIN, THAT FOLLOW-UP QUESTION AND ANSWER RATHER,

08:40AM 6    MAYBE HE WAS GOING TO HAVE SOMEONE ELSE LOOK AT IT.

08:40AM 7         OKAY.  I GUESS WHAT I'M POINTING OUT IS -- AND ACTUALLY,

08:40AM 8    THERE WAS NO OBJECTION TO THAT LINE OF QUESTIONING EITHER.

08:40AM 9         THE COMMENTS POINTED OUT ON PAGE 4 AT LINE 6, THERE'S

08:40AM 10   ANOTHER COLLOQUY THAT IS HIGHLIGHTED REGARDING SCOPE OF

08:40AM 11   EMPLOYMENT AND JOB DESCRIPTIONS.

08:40AM 12        AGAIN, AT PAGE 1663, THE ANSWER WAS, YEAH, I AGREE WITH, I

08:40AM 13   AGREE WITH -- THE QUESTION WAS, DO YOU AGREE WITH MR. BALWANI'S

08:41AM 14   ASSESSMENT?  I THINK HE WAS TALKING ABOUT -- MR. BALWANI WAS

08:41AM 15   TALKING ABOUT HIS OBSERVATIONS.  AND THE QUESTION WAS DO YOU

08:41AM 16   AGREE WITH HIM?  AND THE WITNESS ANSWERED, AND THERE WAS NO

08:41AM 17   OBJECTION TO THAT ANSWER, WHICH POTENTIALLY COULD HAVE CALLED

08:41AM 18   UPON EXPERT TESTIMONY IF WE FOLLOW THAT SAME, THAT SAME

08:41AM 19   THOUGHT.

08:41AM 20        THERE WERE MANY QUESTIONS EVEN AT PAGE 1508 ON

08:41AM 21   CROSS-EXAMINE TALKING TO MS. CHEUNG ABOUT THE MATRIX AND WHAT'S

08:41AM 22   THE MATRIX, AND TELL US ABOUT WHAT THE MATRIX DID?

08:41AM 23        PAGE 1146 DESCRIBING THE PROCESS, RUNNING SAMPLES ON THE

08:41AM 24   SIEMENS ADVIA; PAGE 1147, THE NEED FOR CENTRIFUGING; PAGE 1149,

08:41AM 25   VALIDATION.  SHE KNEW WHAT IT MEANT.  NO OBJECTION.

08:41AM 1    NOW, THERE WAS A PAGE, I BELIEVE THE MOTION INDICATES AT

08:42AM 2    1246 AND 1245, THERE WAS AN OBJECTION TO RECONCILING THE TWO

08:42AM 3    STATEMENTS.  AT PAGE 1246 THERE WAS AN OBJECTION, AND I THINK

08:42AM 4    THE COURT SAID WELL TAKEN, POINT WELL TAKEN.  I SUSTAINED THE

08:42AM 5    OBJECTION.

08:42AM 6    AND THEN MR. BOSTIC LAID A FOUNDATION, I THINK, FOR THAT

08:42AM 7    CONTINUING OVER TO PAGE 1248.

08:42AM 8    PAGE 1224 THERE WERE QUESTIONS, DID NOT FEEL THAT THE

08:42AM 9    MACHINES HAD THE INFRASTRUCTURE TO RUN HEP C.  NO OBJECTION.

08:42AM 10   HER OBJECTION REGARDING STABILITY IN HEP C WAS AT 1223.

08:42AM 11   NO OBJECTIONS.

08:42AM 12   THERE WERE THINGS IN THE PLEADINGS ALSO THAT TALK ABOUT

08:42AM 13   THE HACKING AND THE TESTIMONY REGARDING THE HACKING AT

08:42AM 14   PAGE 1665.  NO OBJECTION TO THAT.

08:42AM 15   ALTHOUGH IT'S NOTED IN THE PLEADINGS TO STRIKE NOW -- NOW

08:42AM 16   YOU'RE ASKING TO STRIKE THAT.  THERE WAS NO OBJECTION WHEN THAT

08:42AM 17   CAME IN.

08:42AM 18   THERE WAS REFERENCE TO THE PRIOR, THE PRIOR RULING IN THE

08:43AM 19   HOLMES CASE, AND THAT THIS TOPIC WAS RAISED AT THAT TIME IN AN

08:43AM 20   IN LIMINE MOTION.  AND THE WORD "HACKING" WASN'T REFERENCED IN

08:43AM 21   THAT MOTION.  THE WORD "TAMPERED" WAS USED.  PERHAPS IT'S THE

08:43AM 22   SAME THING.  BUT "TAMPERED," I BELIEVE, WAS THE WORD THAT WE

08:43AM 23   WERE DISCUSSING IN THE PRIOR MOTION, THE MOTION IN LIMINES IN

08:43AM 24   THE OTHER CASE.

08:43AM 25   BUT I TAKE THE POINT, YOU KNOW, TAMPERING, I UNDERSTAND

08:43AM 1    THAT COULD BE SEEN AS A PEJORATIVE TERM THAT MIGHT SUGGEST TO

08:43AM 2    THE JURY SOME NEFARIOUS ACTIVITY WAS DONE TO THESE MACHINES

08:43AM 3    THAT SHOULD CALL THEM TO QUESTION THAT.

08:43AM 4        THOSE ARE THE TYPES OF THINGS, OF COURSE, AS I SAID,

08:43AM 5    THERE'S NO OBJECTION TO THAT HACKING EITHER.  LET ME JUST TAKE

08:43AM 6    A MOMENT.

08:43AM 7        DO YOU AGREE WITH THAT, COUNSEL?

08:43AM 8            MR. BRECHER:  WITH WHICH POINT, YOUR HONOR?

08:43AM 9            THE COURT:  THAT THERE WAS NO OBJECTION TO THE

08:43AM 10   HACKING?

08:43AM 11           MR. BRECHER:  ON THAT PARTICULAR, THAT'S CORRECT,

08:44AM 12   YOUR HONOR.

08:44AM 13           THE COURT:  AND THAT PERHAPS WAS STRATEGIC, PERHAPS

08:44AM 14   SOME OF THESE OTHER ITEMS THAT I MENTIONED THAT WERE NOT

08:44AM 15   OBJECTED TO WERE STRATEGIC IN SOME MANNER.  I DON'T KNOW.  I'M

08:44AM 16   NOT ASKING ANY QUESTION ABOUT THAT.

08:44AM 17       THE POINT IS, THE POINT IS THAT BECAUSE -- JUST BECAUSE

08:44AM 18   IT'S SCIENCE DOESN'T MEAN IT REQUIRES EXPERTISE.  I APPRECIATE

08:44AM 19   DRAWING ATTENTION TO THIS.  SOMETIMES IT'S NOT AS SHARP AN EDGE

08:44AM 20   AS WE WOULD LIKE IT TO BE.  THERE ARE GREY AREAS IN THIS.

08:44AM 21       AND I BELIEVE THAT BOTH SIDES HAVE, IN THEIR EXAMINATION,

08:44AM 22   AND I UNDERSTAND CROSS-EXAMINATION IS RESPONSIVE TO DIRECT AND

08:44AM 23   SO SOMETIMES THERE'S, I'LL JUST CALL IT, CLEANUP.  SOMETIMES

08:44AM 24   YOU WANT TO CLEAN UP SOME OF THE THINGS THAT WERE RAISED ON

08:44AM 25   DIRECT SO YOUR EXAMINATION HAS TO BE GUIDED AS SUCH.

08:44AM 1      BUT THE TESTIMONY ABOUT THESE MACHINES HAS NOT, HAS NOT

08:45AM 2   BEEN SUCH, AND THE COURT'S RULINGS, I HAVE NOT SEEN IT SUCH

08:45AM 3   THAT IT REQUIRES A 702.

08:45AM 4      NOW, THERE COULD HAVE BEEN OBJECTIONS FROM THE GOVERNMENT

08:45AM 5   TO QUESTIONS THAT THE DEFENSE ASKED, AGAIN, REGARDING -- I

08:45AM 6   THINK I TALKED A LITTLE BIT ABOUT IT, THE CENTRIFUGE, THE

08:45AM 7   VALIDATION, AND ALL OF THOSE THINGS, THAT ARGUABLY THOSE MIGHT

08:45AM 8   REQUIRE 702, SOMEONE TO TALK ABOUT, WHAT IS A CENTRIFUGE?

08:45AM 9   ISN'T THAT HOW THEY MAKE NUCLEAR WEAPONS?  ISN'T THAT WHAT THEY

08:45AM 10  DO?  AND WHAT IS THE DIFFERENCE BETWEEN THAT AND THE EDISON

08:45AM 11  MACHINE?  SO DOES THAT REQUIRE AN EXPERTISE?  PERHAPS.

08:45AM 12     BUT THERE WAS NO OBJECTION TO ANY OF THAT FROM THE

08:45AM 13  GOVERNMENT.  I THINK THAT QUESTIONING CAME ON YOUR SIDE, WHICH

08:45AM 14  IS TO SAY THAT THERE IS SOME LATITUDE WHEN WE'RE TALKING ABOUT

08:45AM 15  THESE MACHINES.

08:45AM 16     IF IT GOES INTO, I THINK, SOMETHING LIKE WHAT DOES A

08:46AM 17  CENTRIFUGE DO?  AND WHAT DOES IT ACTUALLY DO TO MOLECULES WHEN

08:46AM 18  THEY'RE SPUN AT 15 MILLION RPM'S?  WHAT DOES THAT DO TO A

08:46AM 19  MOLECULE, OR HOW DOES THAT WORK?  THEN, OF COURSE, WE GET INTO

08:46AM 20  EXPERTISE AND THOSE TYPES OF THINGS.

08:46AM 21     I STILL THINK WE'RE AT A HIGH LEVEL IN THE CONVERSATIONS

08:46AM 22  THAT BOTH SIDES HAVE DONE.

08:46AM 23     IS THAT A SUBSTANTIALLY HIGH LEVEL THAT IT'S NOT REQUIRING

08:46AM 24  EXPERTISE?

08:46AM 25     SOMETIMES IT GETS CLOSE, AND I'LL GRANT YOU THAT.  I CAN

08:46AM  1    UNDERSTAND WHY THERE WOULD BE OBJECTIONS TO THAT, BUT, EXCUSE

08:46AM  2    ME, BUT AS I READ THROUGH THE PLEADINGS, I SEE A DISTINCTION

08:46AM  3    BETWEEN WHAT HAS BEEN ASKED AND WHAT HAS BEEN RECEIVED IN

08:46AM  4    EVIDENCE, THAT IS, NOTWITHSTANDING RAISING THE FIGUEROA-LOPEZ

08:46AM  5    CASE, AND WE KNOW WHAT HAPPENED IN THAT CASE AND THE OFFICERS

08:47AM  6    WERE -- THE AGENTS WERE ALLOWED TO TESTIFY AND GIVE THEIR

08:47AM  7    OPINIONS AS TO WHAT I THINK WAS A DRUG COURIER, THESE ARE ALL

08:47AM  8    ATTRIBUTES OF A DRUG COURIER.  OF COURSE, IT WAS HARMLESS ERROR

08:47AM  9    IN THAT BECAUSE OF OTHER EVIDENCE IN THE CASE, OF COURSE.

08:47AM  10         BUT IT DOESN'T APPEAR TO ME THAT THIS -- WHAT HAS BEEN

08:47AM  11   ELICITED SO FAR HAS BEEN REQUIRED OF AN EXPERT BACKGROUND OR

08:47AM  12   ANY EXPERTISE.  THESE -- MS. CHEUNG, DR. PANDORI WERE EMPLOYEES

08:47AM  13   THERE.  DR. PANDORI WAS TESTIFYING ABOUT HE'S A LAB DIRECTOR.

08:47AM  14   HE WAS ASKED QUESTIONS ABOUT WHAT DOES A LAB DIRECTOR DO?  YOU

08:47AM  15   CAME INTO THIS -- I KNOW THERE WERE QUESTIONS ABOUT REGULATORY

08:47AM  16   THINGS, AND HE WAS TALKING ABOUT THAT'S MY JOB DESCRIPTION.

08:47AM  17   THAT'S WHAT I'M SUPPOSED TO DO.  I'M SUPPOSED TO KNOW ABOUT THE

08:47AM  18   REGULATIONS, AND THAT'S HOW I OPERATE AND HAVE OVERSIGHT OVER

08:48AM  19   THE LAB.

08:48AM  20         WHAT DOES A LAWYER DO?  A LAWYER ADVOCATES.

08:48AM  21         BUT WE'RE NOT GOING TO ASK YOU TO REVIEW YOUR LAW REVIEW

08:48AM  22   ARTICLES, COUNSEL.

08:48AM  23              MR. BRECHER:  I'M HAPPY TO DO SO, YOUR HONOR.

08:48AM  24   THEY'RE NOT GREAT.

08:48AM  25              THE COURT:  WE'LL CALL YOUR PARENTS IN WHEN YOU DO

08:48AM 1    THAT, AND THEY'LL BE HAPPY TO JOIN US IN HEARING THOSE.  I'M

08:48AM 2    SURE THEY'RE PROUD OF YOU.

08:48AM 3              MR. BRECHER:  THAT'S THE SOLE LEADERSHIP,

08:48AM 4    YOUR HONOR.

08:48AM 5              THE COURT:  WELL, MY POINT IS, MY POINT IS -- AGAIN,

08:48AM 6    PARDON ME.  I DON'T MEAN TO BE INDELICATE ABOUT IT.  BUT USING

08:48AM 7    THE TOASTER ANALOGY, THAT'S REALLY WHAT I SEE THIS AS AND THAT

08:48AM 8    IS WITH THIS EDISON MACHINE.

08:48AM 9        SHE WAS TALKING ABOUT THIS IS WHAT COULD BE RUN.  YOU

08:48AM 10   NEEDED THE T-CUPS, YOU NEEDED THIS, AND THAT MACHINE COULDN'T

08:48AM 11   BE RUN WITHOUT THESE THINGS.  I DON'T BELIEVE THAT REQUIRED

08:48AM 12   EXPERTISE.

08:48AM 13       NOW, I DO HAVE SOME CONCERN, AND I THINK THE DEFENSE

08:48AM 14   RAISED THIS, THIS WAS A CONCERN, IT WAS RAISED IN THE MOTIONS

08:48AM 15   IN LIMINE PREVIOUSLY IN THE OTHER CASE, AND WE TALKED ABOUT IT

08:49AM 16   IN THIS CASE, AND THAT IS THE DANGER OF USING REGULATIONS, THAT

08:49AM 17   IS, CIVIL REGULATIONS TO GIVE THE JURY AN INFERENCE THAT IF

08:49AM 18   THERE'S A VIOLATION OF A CIVIL REGULATION, THEY SHOULD USE OR

08:49AM 19   CONSIDER IN ANY WAY, USE THAT IN THEIR THOUGHT PROCESS AS TO A

08:49AM 20   VIOLATION OF A CRIMINAL STATUTE.

08:49AM 21       AND THAT OVERRIDES, I THINK, THIS CASE, AND THAT'S A

08:49AM 22   CONCERN THAT I HAVE, AND I LOOK AT THE GOVERNMENT WHEN I SAY

08:49AM 23   THAT.

08:49AM 24       I THINK THERE WERE SOME OBJECTIONS, AT LEAST ONE OBJECTION

08:49AM 25   FROM THE DEFENSE ABOUT THAT, AND I DO HAVE CONCERN ABOUT THAT,

| | | |
|---|---|---|
| 08:49AM | 1 | AND WE'LL USE THIS TIME FOR ME TO EXPRESS THAT TO THE |
| 08:49AM | 2 | GOVERNMENT.  I WANT TO BE CAREFUL THAT THE JURY DOES NOT, IS |
| 08:49AM | 3 | NOT SOMEHOW INFORMED INTENTIONALLY OR ACCIDENTALLY THAT A |
| 08:49AM | 4 | VIOLATION OF A CIVIL REGULATION IS GOING TO BE INFERENCE OR IN |
| 08:49AM | 5 | SOME WAY CAUSE THEM TO THINK THAT THERE'S BEEN A VIOLATION OF A |
| 08:50AM | 6 | CRIMINAL SECTION, AND THAT'S IMPROPER. |
| 08:50AM | 7 | MR. BOSTIC:  IF I COULD RESPOND TO THAT, YOUR HONOR? |
| 08:50AM | 8 | THE COURT:  YES. |
| 08:50AM | 9 | MR. BOSTIC:  SO THE COURT'S POINT, OF COURSE, ARE |
| 08:50AM | 10 | WELL TAKEN. |
| 08:50AM | 11 | IT CERTAINLY IS NOT THE GOVERNMENT'S INTENT TO IMPLY TO |
| 08:50AM | 12 | THE JURY THAT THEY SHOULD CONVICT BECAUSE OF A VIOLATION OF A |
| 08:50AM | 13 | REGULATORY REQUIREMENT, AND I THINK THAT COMES THROUGH IN THE |
| 08:50AM | 14 | QUESTIONS AND ANSWERS. |
| 08:50AM | 15 | IN THE INSTANCES WHERE THOSE REGULATIONS WERE DISCUSSED, |
| 08:50AM | 16 | AND I'M THINKING PRIMARILY OF THE REGULATIONS CONCERNING |
| 08:50AM | 17 | PROFICIENCY TESTING, THE FOCUS -- WE ATTEMPTED TO KEEP THE |
| 08:50AM | 18 | FOCUS ON THE ISSUE OF TESTING ACCURACY.  AND THOSE TWO ISSUES |
| 08:50AM | 19 | ARE REALLY INTERTWINED. |
| 08:50AM | 20 | AND SO THE POINT OF THAT TESTIMONY IS THAT PROFICIENCY |
| 08:50AM | 21 | TESTING IS A REQUIREMENT, AND THE FOCUS IS NOT ON THE FACT THAT |
| 08:50AM | 22 | IT IS A REGULATION AND WHAT THE PENALTIES ARE FOR VIOLATING IT. |
| 08:51AM | 23 | WE DIDN'T INTRODUCE THE REGULATION AS, YOU KNOW, AN EXHIBIT. |
| 08:51AM | 24 | WE DIDN'T ASK ABOUT, YOU KNOW, WHAT CONSEQUENCES THERE MIGHT BE |
| 08:51AM | 25 | IF A LAB VIOLATES THOSE REGULATIONS, WE DIDN'T HIGHLIGHT THAT. |

08:51AM 1    INSTEAD, THE FOCUS WAS ON THE FUNCTION THAT THAT

08:51AM 2  REQUIREMENT SERVES, WHICH IS TO PROVIDE A WAY TO CONFIRM THAT

08:51AM 3  LABORATORY TESTING IS ACTUALLY DELIVERING RELIABLE RESULTS, AND

08:51AM 4  THAT'S A CHIEF ISSUE THAT IS RELEVANT TO THIS CASE.

08:51AM 5    SO THE FACT THAT THERE WAS DISCUSSION ABOUT THOSE

08:51AM 6  REGULATIONS, IT REALLY IS ANCILLARY TO THE CENTRAL ISSUE HERE,

08:51AM 7  WHICH IS THE TREATMENT OF PROFICIENCY TESTING AT THERANOS, AT

08:51AM 8  DEFENDANT'S COMPANY, AND WHETHER THE COMPANY'S USE OR NON-USE

08:51AM 9  OF PROFICIENCY TESTING HAD AN EFFECT ON THE RELIABILITY AND

08:51AM 10  ACCURACY OF THE RESULTS THAT WERE GOING OUT TO PATIENTS.

08:52AM 11    THE COURT:  OKAY.  THANK YOU.

08:52AM 12  COUNSEL.

08:52AM 13    MR. BRECHER:  THANK YOU, YOUR HONOR.

08:52AM 14    I APPRECIATE THE COURT TAKING THIS TIME.  I KNOW THE COURT

08:52AM 15  OFFERED A HOST OF COMMENTS THIS MORNING, BUT I KNOW -- I AM

08:52AM 16  SENSITIVE THAT MR. BOSTIC DIDN'T HAVE AN OPPORTUNITY TO RESPOND

08:52AM 17  IN WRITING, SO I WANTED TO MAKE SURE THAT THE GOVERNMENT HAS

08:52AM 18  COMPLETED ITS RESPONSE TO THE OTHER ISSUES THAT THE COURT

08:52AM 19  RAISED IF IT HAD ANY.

08:52AM 20    MR. BOSTIC:  THE ONLY ISSUE THAT I DIDN'T ADDRESS

08:52AM 21  YET IS THE USE OF THE TERM "HACKED."

08:52AM 22    ON THAT ISSUE, I'LL JUST POINT OUT BRIEFLY THAT I

08:52AM 23  UNDERSTOOD THE COURT'S ORDER TO BE PREVENTING THE RISK OF A

08:52AM 24  WITNESS USING A PEJORATIVE TERM TO GIVE THEIR OWN OPINION

08:52AM 25  CRITICIZING OR PASSING JUDGMENT ON THERANOS'S MODIFICATION OF

1699

08:52AM 1    THIRD PARTY DEVICES.  THAT'S NOT WHAT HAPPENED YESTERDAY OR THE

08:52AM 2    DAY BEFORE YESTERDAY.

08:52AM 3        WHEN DR. PANDORI USED THAT TERM "HACKED," HE WAS USING A

08:52AM 4    TERM THAT HE HAD HEARD AT THERANOS.  THAT WAS THE COMPANY'S OWN

08:52AM 5    INTERNAL TERM APPARENTLY FOR THEIR PRACTICE OF MODIFYING THESE

08:53AM 6    DEVICES.

08:53AM 7        SO I CERTAINLY DON'T THINK IT'S UNFAIR FOR HIM TO USE, TO

08:53AM 8    SIMPLY REPEAT THE TERM THAT HE HAD HEARD AT THE COMPANY.  HE

08:53AM 9    WAS NOT BEING PEJORATIVE OR PASSING ANY JUDGMENT ON THAT

08:53AM 10   PRACTICE.

08:53AM 11        THE COURT:  AND I DON'T BELIEVE, I DON'T BELIEVE THE

08:53AM 12   GOVERNMENT FOLLOWED UP ON THAT AND ASKED ANY QUESTIONS ABOUT

08:53AM 13   THAT.

08:53AM 14        I'M SURE THE DEFENSE WILL, OR IF YOU CHOOSE TO, THAT'S

08:53AM 15   SOMETHING THAT YOU WOULD DO TO GET CLARITY ON THAT TERM, WHERE

08:53AM 16   THAT CAME FROM.

08:53AM 17        MR. BRECHER:  POSSIBLY, YOUR HONOR.

08:53AM 18        AND I VERY MUCH APPRECIATE THE COURT'S COMMENTS, AND I

08:53AM 19   THINK I AGREE WITH MOST OF THEM.

08:53AM 20        I WANT TO MAKE SURE THAT OUR POSITION ON WHAT CONSTITUTES

08:53AM 21   EXPERT TESTIMONY IS CLEAR, AND IF AT THE END OF THE DAY I

08:53AM 22   ACCOMPLISH THAT AND THERE REMAINS DAYLIGHT BETWEEN MY

08:53AM 23   UNDERSTANDING AND THE COURT'S UNDERSTANDING, I'M UNDER NO

08:53AM 24   ILLUSIONS AS TO WHOSE PERSPECTIVE IS GOING TO GOVERN THE TRIAL

08:53AM 25   AND WE WILL HAVE MADE OUR RECORD CLEAR.

ER-262

08:53AM 1     BUT I THINK IT'S IMPORTANT TO POINT OUT THAT THE

08:53AM 2 OBJECTIONS AS WE RAISED THEM IN THE BRIEF AND IN SOME OF OUR

08:54AM 3 PAST BRIEFING ARE NOT CENTERED ON TECHNICAL SUBJECTS.  INDEED,

08:54AM 4 EVEN THE COURT'S EXAMPLE ABOUT MOLECULES AND WHAT GOES INTO

08:54AM 5 THEM, THAT DOESN'T GIVE ME A LOT OF HEARTBURN, YOUR HONOR.  THE

08:54AM 6 DEFINITION GAME, I DON'T WORRY ABOUT THAT TOO MUCH.

08:54AM 7     AS MR. BOSTIC POINTED OUT AT THE END OF THE DAY YESTERDAY,

08:54AM 8 THIS IS A TECHNICAL CASE.  IT DEALS WITH LAB TESTING.  THE JURY

08:54AM 9 IS GOING TO HEAR TERMS THAT THEY NEED TO UNDERSTAND FROM THESE

08:54AM 10 LAY WITNESSES, AND MOST OF THE WITNESSES ON THE GOVERNMENT'S

08:54AM 11 LIST ARE LAY WITNESSES, HOW THOSE TERMS WERE USED AT THERANOS.

08:54AM 12     OUR OBJECTION IS A LITTLE BIT DIFFERENT.  702, AS I

08:54AM 13 UNDERSTAND IT, AND I THINK NOT ONLY FIGUEROA-LOPEZ BUT EVERY

08:54AM 14 OTHER NINTH CIRCUIT OPINION TO ADDRESS THIS NARROW ISSUE THAT

08:54AM 15 I'M AWARE OF SAYS THE SAME THING, IT'S THE REASONING THAT

08:54AM 16 REQUIRES GOING FROM WHAT YOU OBSERVE IN YOUR PERCIPIENT

08:54AM 17 EXPERIENCE TO WHAT CONCLUSIONS AND OPINIONS YOU ACTUALLY DRAW.

08:54AM 18 THAT'S WHERE IMPERMISSIBLE EXPERTISE CAN BE IMPLICATED, AND THE

08:54AM 19 CENTRAL HALLMARK OF EXPERT TESTIMONY IS CAUSE AND EFFECT.

08:55AM 20     MS. CHEUNG IS WELCOME TO TESTIFY, AND WE WOULDN'T HAVE

08:55AM 21 OBJECTING TO HER TESTIFYING, THAT MACHINES FAILED QUALITY

08:55AM 22 CONTROL TESTS BASED ON THE STANDARDS THAT THERANOS SET.

08:55AM 23     WHAT HAPPENED TO THOSE MACHINES?  WHAT DID THEY DO WITH

08:55AM 24 THOSE MACHINES?  THAT'S FINE.

08:55AM 25     SHE'S ALSO WELCOME TO TESTIFY ABOUT WHAT DID SHE, OR IF

08:55AM 1    SHE HAS PERSONAL KNOWLEDGE, OTHERS COMMUNICATE TO MR. BALWANI

08:55AM 2    OR POTENTIALLY MS. HOLMES AND OTHERS AT THERANOS ABOUT THEIR

08:55AM 3    CONCERNS.  ALL ABOVE BOARD.

08:55AM 4        BUT WHEN YOU MOVE FROM THERE WAS A PROBLEM WITH THE

08:55AM 5    QUALITY CONTROLS, I SAW THAT THEY WERE FAILING, AND I'M TURNING

08:55AM 6    TO YOU, JURORS, AND I'M TELLING YOU I'M CONCERNED BECAUSE TO ME

08:55AM 7    WHAT THAT INDICATES IS THAT THERE IS SOME FUNDAMENTAL ACCURACY

08:55AM 8    PROBLEM, IF YOU LOOK AT THE ADVISORY COMMITTEE NOTES TO 702,

08:55AM 9    WHICH I THINK IS A VERY TELLING EXAMPLE BECAUSE IT GOES FROM

08:55AM 10   SAYING A DOCTOR -- A PHYSICIAN, AND, OF COURSE, MS. CHEUNG WAS

08:55AM 11   A JUNIOR LAB ASSOCIATE FRESH OUT OF COLLEGE, A PHYSICIAN CAN'T

08:55AM 12   SAY UNLESS NOTICE AS AN EXPERT, THAT BRUISING INDICATES TRAUMA.

08:56AM 13       I DON'T KNOW HOW A JUNIOR LAB ASSOCIATE OR EVEN SOMEONE

08:56AM 14   LIKE DR. PANDORI CAN, CONSISTENT WITH THOSE ADVISORY COMMITTEE

08:56AM 15   NOTES, CONSISTENT WITH FIGUEROA-LOPEZ, SAY WE SAW THESE

08:56AM 16   PHENOMENA, THERE WERE INTERNAL POLICIES AND PRACTICES AROUND

08:56AM 17   THESE PHENOMENA, WE RAISED CONCERNS ABOUT THESE PHENOMENA,

08:56AM 18   MAYBE THEY WERE IGNORED, AND NOW I'M CONCLUDING FROM THAT THAT

08:56AM 19   THERE IS SOME DEEP UNDERLYING PROBLEM.

08:56AM 20       THE COURT:  WELL, I APPRECIATE THAT.

08:56AM 21       BUT SOME OF THE COLLOQUY TALKED ABOUT THE SOP'S, AND THERE

08:56AM 22   WERE, THERE WERE -- THIS WAS CONTRARY TO THE SOP'S.  WHY DID

08:56AM 23   THAT CREATE CONCERN?  WELL, IT WASN'T -- IT DIDN'T FOLLOW THE

08:56AM 24   SOP'S.

08:56AM 25       YOUR COLLEAGUE, MR. COOPERSMITH, ON HIS CROSS-EXAMINATION

08:56AM 1      OF MS. CHEUNG INVITED HER TO LOOK AT AN SOP, AND THEN I BELIEVE

08:56AM 2      SHE CONCEDED THAT HER METHODOLOGY DID NOT FOLLOW THE SOP.

08:56AM 3          SO THERE WAS -- IF YOU SEE, THERE'S SOME THREAD ABOUT

08:56AM 4      THIS.  IT'S NOT -- IT ISN'T LEFT ON.  THERE IS SOME -- THERE'S

08:57AM 5      TESTIMONY ABOUT THE SOP'S, THERE'S TESTIMONY ABOUT WHAT THE

08:57AM 6      MACHINES COULD DO AND NOT DO, AND I THINK BOTH SIDES HAVE

08:57AM 7      FLIRTED WITH THAT AND THOSE CONCEPTS.  IT'S IMPORTANT TO YOUR

08:57AM 8      CASES, I SUPPOSE.  BUT IT DOES NOT -- IN THE COURT'S VIEW, THE

08:57AM 9      WAY THAT THE QUESTIONS HAVE BEEN ASKED, AND IT HASN'T RISEN TO

08:57AM 10     THAT LEVEL, THE FIGUEROA-LOPEZ TYPE OF TESTIMONY.  I JUST HAVE

08:57AM 11     NOT SEEN IT THAT WAY.  YOU HAVE MADE YOUR RECORD THERE, AND I

08:57AM 12     APPRECIATE THAT.

08:57AM 13         AND WE'LL BE MINDFUL GOING FORWARD ALSO, AND I APPRECIATE

08:57AM 14     YOU BRINGING THIS TO THE COURT'S ATTENTION.

08:57AM 15             MR. BRECHER:  OH, I'M SORRY, YOUR HONOR.

08:57AM 16             THE COURT:  NO, NO.  IT'S IMPORTANT TO HAVE THIS

08:57AM 17     DISCUSSION.  WE TALKED A LITTLE BIT ABOUT -- I'VE SHARED WITH

08:57AM 18     YOU MY CONCERNS ALSO ABOUT THIS CROSSOVER OF A CIVIL REGULATION

08:57AM 19     AND PENALTIES THAT MIGHT IN SOME WAY INFECT A JURY'S OPINION

08:58AM 20     ABOUT A CRIMINAL STATUTE, AND I HAVE CONCERNS ABOUT THE TENSION

08:58AM 21     BETWEEN THOSE TWO THINGS.

08:58AM 22             MR. BRECHER:  YES, YOUR HONOR.

08:58AM 23         IF I COULD SPEAK TO THAT FOR A MOMENT, ALTHOUGH I SUPPOSE

08:58AM 24     I SHOULD FIRST PAUSE ON THIS HACKED POINT?

08:58AM 25         FIRST, JUST TO MAKE SURE THE RECORD IS CLEAR, THAT RULING

08:58AM 1    IS NOT SOLELY IN 798.  IT WASN'T JUST CONFINED TO THE HOLMES

08:58AM 2    TRIAL.  IT WAS INCORPORATED BY REFERENCE IN 1326 IN THE RULING

08:58AM 3    IN THIS TRIAL ON PAGE 29.

08:58AM 4        AND WHILE THE WORD THERE THAT WAS USED WAS "TAMPERING,"

08:58AM 5    THE LANGUAGE THAT THE COURT USED IN EITHER ORDER DID NOT

08:58AM 6    CONTAIN THE PERSONAL OPINION RESTRICTION THAT MR. BOSTIC

08:58AM 7    OFFERED.  CERTAINLY I DON'T READ IT THAT WAY, AND I DON'T THINK

08:58AM 8    THERE'S ANY TEXT IN THAT ORDER THAT COULD BE READ THAT WAY.

08:58AM 9        WHAT THE COURT PROHIBITED, AS I UNDERSTAND THE RULING, IS

08:58AM 10   THE USE OF LANGUAGE THAT WOULD IMPLY TO THE JURY, REGARDLESS OF

08:58AM 11   WHETHER IT'S THE WITNESS'S OPINION OR ANYTHING ELSE, THAT

08:58AM 12   SOMETHING IMPROPER OR UNTOWARD HAD BEEN DONE.

08:58AM 13            THE COURT:  RIGHT.

08:58AM 14            MR. BRECHER:  AND I THINK IT'S APPROPRIATE TO

08:59AM 15   INSTRUCT THE JURY THAT THERE'S BEEN NO FOUNDATION LAID FOR

08:59AM 16   THAT.  IT WAS ALSO THE FACT THAT --

08:59AM 17            THE COURT:  DO I DO THAT ABSENT AN OBJECTION?  HOW

08:59AM 18   DO I DO THAT NOW?

08:59AM 19            MR. BRECHER:  IT'S A GREAT QUESTION, YOUR HONOR.

08:59AM 20            THE COURT:  THANK YOU.

08:59AM 21            MR. BRECHER:  SO I DO KNOW THAT THERE ARE SOME

08:59AM 22   POINTS IN WHICH THERE WERE OBJECTIONS RAISED IN THESE COMMENTS

08:59AM 23   AND SOME IN WHICH THEY WERE NOT.

08:59AM 24        AND IF THE COURT IS GOING TO REST PART OF ITS RULING ON A

08:59AM 25   SORT OF TARGET GONE BY WAIVER, I UNDERSTAND THAT, I DO.

08:59AM 1      BUT I WOULD SAY A COUPLE OF THINGS.  FIRST, OBVIOUSLY

08:59AM 2  YOUR HONOR HAS THE DISCRETION TO EXCUSE SUCH A WAIVER, AND HERE

08:59AM 3  WE -- YOU KNOW, MR. COOPERSMITH RAISED THE OBJECTION AT THE END

08:59AM 4  OF THE DAY, WE TEED IT UP IN A BRIEF THE FOLLOWING DAY.

08:59AM 5      BUT THE SECOND POINT I WOULD SAY IS THAT YOUR HONOR HAS A

08:59AM 6  BROADER RANGE OF REMEDIES.  EVEN IF THE COURT IS NOT INCLINED

08:59AM 7  TO STRIKE TESTIMONY, IF YOU AGREE WITH ME NOW, AND BASED ON

08:59AM 8  YOUR COMMENTS I DON'T TAKE FOR GRANTED THAT YOUR HONOR DOES,

08:59AM 9  BUT IF ON SOME OF THESE ISSUES YOUR HONOR AGREES WITH ME, THE

08:59AM 10  COURT HAS THE OPTION OF INSTRUCTING THE GOVERNMENT THAT THEY

08:59AM 11  CAN'T REFER TO THE IMPERMISSIBLE TESTIMONY IN CLOSING ARGUMENT,

09:00AM 12  FOR EXAMPLE.

09:00AM 13      THE COURT ALSO HAS THE OPTION TO TURN BACK TO THE POINT

09:00AM 14  ABOUT LEGAL CONCLUSIONS, AND I KNOW THAT'S AN ISSUE THAT

09:00AM 15  YOUR HONOR AND I HAVE HAD A CHANCE TO DISCUSS IN THE PAST.

09:00AM 16      THE COURT COULD INSTRUCT THE JURY THIS MORNING, JUST A

09:00AM 17  BRIEF CURATIVE INSTRUCTION, A REMINDER THAT MR. BALWANI IS NOT

09:00AM 18  ON TRIAL FOR THE VIOLATION OF CIVIL REGULATIONS, BECAUSE I DO

09:00AM 19  THINK THAT THERE WAS SOME VERY TROUBLING TESTIMONY THERE,

09:00AM 20  INCLUDING ABOUT WHAT THE FEDERAL GOVERNMENT AND ALL STATES

09:00AM 21  REQUIRE.  AND IT IS PERFECTLY CONSISTENT WITH 1326 FOR THE

09:00AM 22  GOVERNMENT TO DO, AS MR. BOSTIC ORIGINALLY DID IN HIS

09:00AM 23  TESTIMONY, WHICH IS, DID YOU RAISE THESE CONCERNS WITH

09:00AM 24  MR. BALWANI?  WHAT WAS HIS REACTION?  THAT'S PRECISELY WHAT THE

09:00AM 25  COURT SAID WAS OKAY.

09:00AM 1      BUT THE FOLLOWUP IS PRECISELY WHAT THE COURT SAID IS NOT

09:00AM 2  OKAY, AND THAT WAS THE QUESTION, WERE YOU GUESSING?  WAS THIS A

09:00AM 3  GUESS ABOUT WHAT THE REGULATIONS MEAN?  THAT IS AN INVITATION

09:00AM 4  FOR THE WITNESS TO TURN TO THE JURY, AND I THINK YOUR HONOR SAW

09:01AM 5  EVEN FROM A LATERAL PERSPECTIVE THAT DR. PANDORI GAVE A NUMBER

09:01AM 6  OF PROFESSORIAL ASIDES IN HIS TESTIMONY YESTERDAY, IN HIS

09:01AM 7  TESTIMONY ON WEDNESDAY.  THAT IS AN INVITATION TO TURN TO THE

09:01AM 8  JURY AND TELL THEM WHAT THE LAW IS, AND THAT'S NOT PERMISSIBLE.

09:01AM 9  AND I THINK THE COURT COULD CURE THAT THIS MORNING.

09:01AM 10      I THINK THAT THAT'S EVERYTHING THAT I HAVE, YOUR HONOR,

09:01AM 11  EXCEPT FOR ONE MINOR POINT, AND THAT'S BACK ON THE EXPERT

09:01AM 12  TESTIMONY ISSUE.

09:01AM 13      AS I SAID, AS WE UNDERSTAND THE CASE LAW, AND IT SEEMS TO

09:01AM 14  ME THAT WE UNDERSTAND IT DIFFERENTLY THAN YOUR HONOR, AND

09:01AM 15  THAT'S OKAY.  AS YOU POINT OUT, WE'VE MADE OUR RECORD.

09:01AM 16      THERE'S NO CURE FROM GROUNDING SPECIALIZED REASONING AND

09:01AM 17  EXPERTISE IN WHAT YOU LEARNED ON THE JOB.  I THINK THAT'S WHAT

09:01AM 18  FIGUEROA-LOPEZ STANDS FOR.

09:01AM 19      BUT EVEN IF WE'RE TOTALLY OFF THE RESERVATION ON THAT

09:01AM 20  POINT, AND YOUR HONOR IS CORRECT, AND OBVIOUSLY YOU'RE THE

09:01AM 21  JUDGE SO IT'S GOING TO WORK OUT THAT WAY, I HAVE TO DRAW

09:01AM 22  ATTENTION TO WHAT WE QUOTED IN OUR BRIEF, THIS PASSAGE ON

09:02AM 23  PAGE 1663 TO 64 OF THE TRANSCRIPT WHERE DR. PANDORI IS OFFERED

09:02AM 24  THAT LIFELINE BY MR. BOSTIC, AND HE PUSHES IT AWAY.

09:02AM 25      HE SAYS, WAS THIS BASED ON THE SCOPE OF YOUR EMPLOYMENT,

09:02AM 1    YOUR COMFORT RAISING THESE CONCERNS ABOUT PT?  AND DR. PANDORI

09:02AM 2    SAYS, I DON'T KNOW.  I DIDN'T REALLY KNOW WHAT THE SCOPE OF MY

09:02AM 3    EMPLOYMENT WAS, BUT I FELT COMFORTABLE DOING IT, QUOTE,

09:02AM 4    "BECAUSE I HAVE A LOT OF EXPERIENCE IN DIRECTING LABORATORY

09:02AM 5    ACTIVITIES AND LOOKING AT PT'S, AND I'M BOARD CERTIFIED AS A

09:02AM 6    HIGH COMPLEXITY LAB DIRECTOR, I FELT THAT I COULD CONTRIBUTE."

09:02AM 7         IN OTHER WORDS, WHAT HE SAID TO THE JURY, IN ESSENCE,

09:02AM 8    YOUR HONOR, WAS, NO, I'M NOT SURE THAT IT WAS WITHIN THE SCOPE

09:02AM 9    OF MY EMPLOYMENT, BUT I'M AN EXPERT, RIGHT?  I DON'T KNOW ANY

09:02AM 10   UNIVERSE IN WHICH THAT SORT OF TESTIMONY IS PERMISSIBLE EVEN

09:02AM 11   UNDER THE STANDARD THAT THE COURT SAYS.

09:02AM 12          THE COURT:  WHAT WAS THE QUESTION?  WHAT WAS THE

09:02AM 13   QUESTION?

09:02AM 14          MR. BRECHER:  THE QUESTION WAS WHETHER, IF I RECALL

09:02AM 15   CORRECTLY, IT WAS WHETHER DR. PANDORI FELT CONFIDENT IN

09:03AM 16   OFFERING HIS OPINIONS ON PROFICIENCY TESTING ON THOSE

09:03AM 17   REGULATIONS AND WHAT THEY REQUIRE, WHICH, AGAIN, NOT ONLY

09:03AM 18   RAISES 702 ISSUES, BUT ALSO -- AND MR. CAZARES RAISED THIS

09:03AM 19   OBJECTION IN THE MOMENT -- ALSO CALLS UPON DR. PANDORI TO OFFER

09:03AM 20   ANOTHER LEGAL CONCLUSION, THE SAME ISSUE THAT YOUR HONOR

09:03AM 21   SUGGESTED WAS SOMEWHAT TROUBLING.

09:03AM 22          THE COURT:  I RECALL THAT QUESTION ABOUT HIS DUTIES,

09:03AM 23   AND I'LL HAVE TO LOOK AT THE TRANSCRIPT AGAIN.

09:03AM 24       BUT, MR. BOSTIC, DO YOU HAVE THAT AT YOUR FINGERTIPS?

09:03AM 25          MR. BOSTIC:  YOUR HONOR, IF I REMEMBER THAT

09:03AM 1    CORRECTLY, THAT QUESTIONING WAS ABOUT ESSENTIALLY WHY

09:03AM 2    DR. PANDORI WAS PART OF THAT CONVERSATION WITH MR. BALWANI AND

09:03AM 3    OTHERS AT THERANOS.

09:03AM 4        SO THE QUESTION TO HIM WAS REALLY -- AND I'M SORRY, I

09:03AM 5    DON'T HAVE THE EXACT WORDING, BUT THE GIST OF THE QUESTION WAS,

09:03AM 6    WHY WERE YOU EXPRESSING YOUR VIEWS HERE?  WAS IT PART OF YOUR

09:03AM 7    JOB TO WEIGH IN ON THIS?  WHY WERE YOU PROVIDING YOUR OPINIONS

09:03AM 8    TO THE DEFENDANT ON THIS TOPIC.

09:04AM 9        AND SO THAT WAS HIS OPPORTUNITY TO EXPLAIN WHY HE DID WHAT

09:04AM 10   HE DID, WHY HE WAS OFFERING THAT INPUT TO MR. BALWANI AND

09:04AM 11   OTHERS AT THE COMPANY AT THE TIME.

09:04AM 12       I DISAGREE THAT THAT VEERS INTO EXPERT TESTIMONY OR THAT

09:04AM 13   THAT'S HIM BOLSTERING HIS EXPERT OPINIONS.

09:04AM 14           THE COURT:  MY RECOLLECTION OF THE QUESTION -- I'M

09:04AM 15   SORRY, I DON'T HAVE THE TRANSCRIPT IN FRONT OF ME NOW, BUT IT

09:04AM 16   WAS SOMETHING TO THAT VEIN DESCRIBING HIS JOB AND DID YOUR JOB

09:04AM 17   ENCOMPASS THE ABILITY TO OPINE AS TO MR. BALWANI'S

09:04AM 18   OBSERVATIONS, OR WHATEVER IT WAS.

09:04AM 19           MR. BRECHER:  YOUR HONOR, I HAPPEN TO HAVE THE

09:04AM 20   TESTIMONY IN FRONT OF ME.  IT'S DOCKET 1384-3 AT PAGE 1663.

09:04AM 21       AND MY OBJECTION IS NOT NECESSARILY TO THE QUESTION, IT'S

09:04AM 22   TO THE ANSWER THAT WAS GIVEN.

09:04AM 23       AND, IN FACT, ON THE HACKING POINT I'LL NOTE, IN FAIRNESS

09:04AM 24   TO MR. BOSTIC, I DON'T UNDERSTAND THE GOVERNMENT TO HAVE

09:04AM 25   ELICITED THAT DELIBERATELY.

09:04AM 1        THE COURT:  RIGHT.

09:04AM 2        MR. BRECHER:  BUT AS WE POINT OUT, THERE IS SOME

09:05AM 3   OBLIGATION TO INSTRUCT YOUR WITNESSES ABOUT THE COURT'S

09:05AM 4   RULINGS.

09:05AM 5        I APOLOGIZE, I THOUGHT YOU HAD A QUESTION.

09:05AM 6        ON PAGE 1663 THE QUESTION IS, FIRST OF ALL, AND I'M

09:05AM 7   LOOKING AT LINE 19, YOUR HONOR, FIRST OF ALL, AS LABORATORY

09:05AM 8   DIRECTOR AT THE TIME, DID YOU FEEL QUALIFIED TO GIVE YOUR INPUT

09:05AM 9   ON WHAT PROFICIENCY TESTING SHOULD LOOK LIKE AT THE LAB?

09:05AM 10       THE QUESTION DOES COUCH ITSELF IN TERMS OF HIS JOB

09:05AM 11  RESPONSIBILITIES, BUT IT ALSO ASKS WHETHER HE FEELS QUALIFIED.

09:05AM 12       BUT REGARDLESS, YOUR HONOR, ON WHETHER THE QUESTION ITSELF

09:05AM 13  WAS PERMISSIBLE, DR. PANDORI REJECTS THE PREMISE THAT IT WAS

09:05AM 14  HIS EMPLOYMENT THAT QUALIFIES HIM.

09:05AM 15       WHAT HE SAYS IS THAT IT'S MY BACKGROUND, IT'S THE OTHER

09:05AM 16  LABS THAT I'VE WORKED AT, IT'S MY EDUCATION, IT'S MY BOARD

09:05AM 17  CERTIFICATION.  THAT IS EXPERT TESTIMONY ON ANY DEFINITION OF

09:05AM 18  THE TERM.

09:05AM 19       I'LL JUST FLAG ON THAT ONE THERE WERE OBJECTIONS, SEVERAL

09:05AM 20  ACTUALLY, ON THAT PASSAGE.

09:05AM 21       BUT, AGAIN, EVEN IF THE COURT IS INCLINED NOT TO STRIKE

09:06AM 22  THE TESTIMONY FOR REASONS, WHETHER YOU DISAGREE SUBSTANTIVELY,

09:06AM 23  YOU DISAGREE PROCEDURALLY, OR YOU JUST THINK IT WOULD CREATE

09:06AM 24  CONFUSION, THERE ARE OTHER REMEDIES FOR THE COURT TO CONSIDER.

09:06AM 25       THE COURT:  THANK YOU.

09:06AM  1          MR. BRECHER:  THANK YOU, YOUR HONOR.

09:06AM  2          MR. BOSTIC:  YOUR HONOR, IF I COULD JUST BRIEFLY

09:06AM  3    RESPOND TO A COUPLE OF POINTS?

09:06AM  4          FIRST OF ALL, ON THE USE OF THE TERM "HACKED," I DISAGREE

09:06AM  5    THAT ANY CURATIVE INSTRUCTION IS NECESSARY, ESPECIALLY AT THIS

09:06AM  6    POINT.

09:06AM  7          THERE IS AN OPPORTUNITY ON CROSS-EXAMINATION FOR THE

09:06AM  8    DEFENSE TO CLARIFY WITH THIS WITNESS WHETHER THIS WITNESS IS

09:06AM  9    PASSING JUDGMENT ON OR CRITICIZING THERANOS'S USE OF MODIFIED

09:06AM  10   DEVICES.

09:06AM  11         I EXPECT THAT THE WITNESS WOULD SAY THAT HIS ONLY CONCERN

09:06AM  12   WAS WITH THE ACCURACY PROBLEMS THAT HE SAW AFTER THE FACT.

09:06AM  13         I DON'T UNDERSTAND THIS WITNESS TO BE SAYING THAT THERE

09:06AM  14   WAS SOMETHING WRONG PER SE WITH THE PRACTICE OF MAKING CHANGES

09:06AM  15   TO THOSE THIRD PARTY DEVICES.

09:06AM  16         I UNDERSTAND THE DEFENSE HAS PROVIDED THE COURT WITH A

09:06AM  17   DICTIONARY DEFINITION WITH THE TERM "HACKED."  I'LL POINT OUT

09:06AM  18   THAT IF A TERM LIKE "TAMPERED" IS FORBIDDEN AND THEN ALL

09:07AM  19   SYNONYMS OF THAT TERM ARE FORBIDDEN, IT BECOMES DIFFICULT TO

09:07AM  20   CONVEY THE IDEA IN THE FIRST PLACE.

09:07AM  21         I'M SURE I COULD FIND A THESAURUS WHERE TERMS LIKE

09:07AM  22   "ALTERED" AND "MODIFIED" ARE IN SIMILAR LISTS OF SYNONYMS FOR

09:07AM  23   TERMS LIKE "TAMPERED."

09:07AM  24         "HACKED" IS NOT NECESSARILY A PEJORATIVE TERM.  IN FACT,

09:07AM  25   MY UNDERSTANDING IS THAT IN THE TECHNICAL FIELD IT SOMETIMES IS

09:07AM  1    USED AS A COMPLIMENT.  IT'S A WAY TO FIND A CREATIVE SOLUTION

09:07AM  2    TO A PROBLEM.

09:07AM  3         SO I DON'T THINK THERE'S A SERIOUS CONCERN THAT THIS

09:07AM  4    WITNESS HAS BEEN SEEN TO CRITICIZE THAT PRACTICE EXCEPT FOR THE

09:07AM  5    ACCURACY PROBLEMS THAT IT PRODUCED, AND I THINK TO THE EXTENT

09:07AM  6    THAT THERE IS ANY LACK OF CLARITY, THAT CAN BE CLEARED UP ON

09:07AM  7    CROSS WITHOUT AN INSTRUCTION.

09:07AM  8         I THINK THE COURT IS RIGHT ON, ON THE ABILITY OF THESE

09:07AM  9    WITNESSES TO TESTIFY ABOUT WHAT THEY SAW AS OPERATORS OF THESE

09:07AM 10    DEVICES.

09:08AM 11         WHEN MS. CHEUNG, FOR EXAMPLE, TESTIFIED ABOUT HER CONCERNS

09:08AM 12    THAT SHE HAD AFTER SEEING QC PERFORMANCE, TO TAKE THE COURT'S

09:08AM 13    TOASTER ANALOGY, IF SOMEONE SAID EVERY TIME I PLUG IN MY

09:08AM 14    TOASTER IT SPARKS AND BURSTS INTO FLAMES, THAT MAKES ME WORRIED

09:08AM 15    THAT I AM NOT GOING TO BE ABLE TO MAKE TOAST FOR MY BREAKFAST

09:08AM 16    TOMORROW MORNING.

09:08AM 17         THAT'S THE SAME THING MS. CHEUNG WAS SAYING, WHENEVER THE

09:08AM 18    DEVICE WAS CHECKED IN THE QC STEP, SHE SAW PROBLEMS, THAT

09:08AM 19    RAISED CONCERNS FOR HER THAT THE DEVICE WAS NOT UP TO THE TASK

09:08AM 20    THAT IT WAS CREATED TO DO, WHICH WAS PROVIDE ACCURATE RESULTS

09:08AM 21    FOR PATIENT TESTING.

09:08AM 22         YOU DON'T NEED THE PERSON WHO DESIGNED THE MACHINE OR AN

09:08AM 23    EXPERT TO TESTIFY ABOUT THAT IN THE SAME WAY THAT YOU WOULDN'T

09:08AM 24    NEED SOMEONE TO TESTIFY ABOUT PROBLEMS WITH THE TOASTER.

09:08AM 25         FINALLY, WHEN WITNESSES LIKE THESE COUCH THEIR TESTIMONY

09:08AM 1    IN TERMS OF WHAT THEY LEARNED ON THE JOB, WHAT THEY SAW ON THE

09:08AM 2    JOB, THAT DOES ADDRESS THE DEFENSE'S CONCERNS, OR IT SHOULD,

09:08AM 3    BECAUSE THIS IS ALL ABOUT THE DEFENDANT'S STATE OF MIND AND HIS

09:09AM 4    INTENT, HIS KNOWLEDGE, AND SO THE PRACTICES AT THERANOS, THE

09:09AM 5    WAY TERMS WERE USED AT THERANOS, THE THINGS SEEN AT THERANOS,

09:09AM 6    ALL AT THE DEFENDANT'S COMPANY, ARE ALL RELEVANT TO WHAT HE WAS

09:09AM 7    AWARE OF, WHAT HE UNDERSTOOD, AND THEN WHAT HE INTENDED IN THE

09:09AM 8    DECISIONS THAT HE MADE.  SO THAT INFORMATION IS CERTAINLY

09:09AM 9    RELEVANT.

09:09AM 10       DEPRIVING THE JURY OF THAT WOULD HAVE THESE WITNESSES

09:09AM 11   SIMPLY SAY, I WORKED AT THERANOS FOR A TIME, AND THEN I SUPPOSE

09:09AM 12   THEY WOULD NEED TO SKIP TO I RAISED CONCERNS TO MANAGEMENT AND

09:09AM 13   THEN I LEFT.  THEY WOULDN'T BE ABLE TO EXPLAIN THAT CRITICAL

09:09AM 14   INTERVENING STEP THAT CAUSED THEM TO TAKE THOSE LATER STEPS AND

09:09AM 15   GIVE NOTICE TO THE DEFENDANT AND OTHERS.

09:09AM 16       SO FOR THOSE REASONS, THE GOVERNMENT OPPOSES THE MOTION.

09:09AM 17           THE COURT:  THANK YOU.

09:09AM 18           MR. BRECHER:  THANK YOU, YOUR HONOR.

09:09AM 19       JUST BRIEFLY.

09:09AM 20       FIRST OF ALL, I DO THINK THERE'S A MEANINGFUL DIFFERENCE

09:09AM 21   BETWEEN THE WORD "HACKED" AND THE WORD "MODIFIED," AND I WOULD

09:09AM 22   URGE THE COURT TO LOOK AT AGAIN 1326 AND THE PORTIONS OF 798

09:10AM 23   THAT IT ADOPTS BECAUSE WHAT DR. PANDORI SUBJECTIVELY MEANT OR

09:10AM 24   DIDN'T MEAN IS NOT WHAT THAT ORDER TURNS ON, AT LEAST AS I

09:10AM 25   UNDERSTAND IT.

09:10AM 1        BUT SECOND, AS TO THE PARADE OF HORRIBLES THAT MR. BOSTIC

09:10AM 2    OFFERED UP AT THE END ABOUT WHAT WITNESSES WOULDN'T BE ALLOWED

09:10AM 3    TO SAY, ALL I CAN DO IS I ASK THE COURT TO REVIEW THE

09:10AM 4    TRANSCRIPT OF THIS ARGUMENT AND THE PLEADINGS AND ASK IF I'VE

09:10AM 5    EVER HINTED AT ANYTHING LIKE THAT SORT OF WATERED DOWN

09:10AM 6    TESTIMONY.

09:10AM 7        THEY CAN TALK ABOUT PROBLEMS.  THEY CAN TALK ABOUT THINGS

09:10AM 8    NOT WORKING THE WAY THEY WERE SUPPOSED TO.

09:10AM 9        IT'S MAKING THAT INFERENTIAL LEAP FROM I DREW A

09:10AM 10   CONCLUSION, AND THIS IS MY CONCLUSION.  THAT'S VERY, VERY

09:10AM 11   DIFFICULT WHEN THAT LEAP REQUIRES DEMONSTRABLE EXPERTISE, AND

09:10AM 12   WE THINK IN THE INSTANCES THAT WE'VE FLAGGED THAT IT DOES.

09:10AM 13           THE COURT:  ALL RIGHT.  WELL, THANK YOU.  THANK YOU

09:10AM 14   VERY MUCH.

09:10AM 15       ANYTHING FURTHER?

09:10AM 16           MR. BOSTIC:  SUBMIT IT, YOUR HONOR.

09:10AM 17           MR. BRECHER:  THANK YOU, YOUR HONOR.  NOTHING

09:10AM 18   FURTHER.

09:10AM 19           THE COURT:  THANK YOU.

09:10AM 20       THE MOTION TO STRIKE, I'M NOT GOING TO STRIKE THE

09:11AM 21   TESTIMONY THAT YOU DESCRIBED.  I RESPECTFULLY DECLINE YOUR

09:11AM 22   INVITATION TO DO SO FOR THE REASONS STATED ON THE RECORD.  I

09:11AM 23   DON'T BELIEVE THAT IT HAS RISEN TO A 702 TYPE OF TESTIMONY THAT

09:11AM 24   REQUIRES THAT.

09:11AM 25       AS TO WHETHER OR NOT THE COURT SHOULD ADVISE THE JURY OF

09:11AM 1    ANY SPECIAL INSTRUCTION REGARDING THE CIVIL REGULATIONS AND

09:11AM 2    THAT, I'M NOT GOING TO DO THAT NOW.

09:11AM 3        I EXPECT THAT THERE WILL BE A FINAL INSTRUCTION THAT -- IN

09:11AM 4    THE FINAL INSTRUCTIONS THAT WILL TOUCH ON THAT, BUT I'M GOING

09:11AM 5    TO RESERVE THAT AND INDICATE THAT SHOULD THAT ISSUE COME UP, I

09:11AM 6    MAY VERY WELL USE THAT AS A REMEDY TO INFORM THE JURY ABOUT

09:11AM 7    WHAT THEY SHOULD DO AND HOW THEY SHOULD TREAT THAT TYPE OF

09:11AM 8    TESTIMONY.  SO I SUPPOSE THERE'S A RESERVATION ON THAT, AND

09:11AM 9    WE'LL JUST SEE WHERE THAT DEVELOPS.

09:12AM 10       AS TO THIS TERM "HACKED" MY SENSE IS THAT YOUR COLLEAGUES,

09:12AM 11   OR YOU, IF YOU CROSS-EXAMINE, WILL HAVE THE OPPORTUNITY TO

09:12AM 12   CLEAR THAT UP AND ASK QUESTIONS IF YOU WISH.  MAYBE YOU DON'T.

09:12AM 13   BUT THAT'S WHAT CROSS-EXAMINATION IS FOR.

09:12AM 14       THE OTHER THING I NOTED IN THESE TYPES OF CASES, SOMETIMES

09:12AM 15   RAISING THE ISSUE AGAIN UNNECESSARILY RAISES IT AND DRAWS

09:12AM 16   ATTENTION TO IT FOR THE JURY, PARTICULARLY IN SCIENTIFIC CASES

09:12AM 17   WHERE SOME OF THIS HAS BEEN, AND I'M NOT OFFERING ANY CRITIQUE

09:12AM 18   OR OBSERVATION OF THE PERFORMANCE OF THE ATTORNEYS, BUT RATHER

09:12AM 19   JUST THE MATERIAL, IT CAN BE DRY.  AND FOR LAY JURORS, THE

09:12AM 20   TESTIMONY IS SOMETIMES -- THE INFORMATION RATHER IS SOMETIMES

09:12AM 21   DRY AND DOESN'T HAVE THE SAME MEANING.  AND IF YOU WANT TO BEAT

09:12AM 22   THE DRUM AND CALL THEIR ATTENTION TO IT AGAIN, YOU CAN DO THAT.

09:12AM 23   THAT'S WHAT CLOSING ARGUMENTS ARE FOR I SUPPOSE.

09:13AM 24       SO I'M NOT GOING TO TAKE ANY REMEDIAL ACTION AT THIS

09:13AM 25   POINT.  I'M GOING TO RESERVE THE OPPORTUNITY TO DO THAT.  I'LL

09:13AM 1     SEE WHAT CROSS-EXAMINATION DOES AS WE GO FORWARD.

09:13AM 2          ALL RIGHT.  IT'S ABOUT A QUARTER AFTER THE HOUR NOW.

09:13AM 3          PLEASE RECALL THAT REGRETTABLY WE HAVE TO TAKE A BREAK AT

09:13AM 4     10:30 TODAY, AND IT WILL PROBABLY BE ABOUT AN HOUR, AN HOUR

09:13AM 5     BREAK, AND WE'LL COME BACK AS CLOSE TO 11:30 AS WE CAN, AND

09:13AM 6     THEN WE'LL FINISH, FINISH THE DAY AT 3:00.  I THINK I TOLD THEM

09:13AM 7     3:00 TODAY.

09:13AM 8          I BELIEVE WE ONLY HAVE TWO DAYS NEXT WEEK IF I'M NOT

09:13AM 9     MISTAKEN, TWO DAYS OF TESTIMONY NEXT WEEK, AND THEN THE

09:13AM 10    FOLLOWING WEEK WE'LL START A REAL TRIAL SCHEDULE HOPEFULLY.  SO

09:13AM 11    THANK YOU FOR YOUR PATIENCE.

09:13AM 12              MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:13AM 13              MR. BRECHER:  THANK YOU, YOUR HONOR.

09:13AM 14         (RECESS FROM 9:13 A.M. UNTIL 9:21 A.M.)

09:21AM 15         (JURY IN AT 9:21 A.M.)

09:21AM 16              THE COURT:  THANK YOU.  GOOD MORNING.

09:21AM 17         WE'RE BACK ON THE RECORD.  OUR JURY IS PRESENT.

09:21AM 18         ALL COUNSEL IS PRESENT, AND THE DEFENDANT IS PRESENT.

09:21AM 19         LADIES AND GENTLEMEN, IT'S NICE TO SEE YOU.  I HAD TO

09:21AM 20    SPEND SOME TIME WITH THESE LAWYERS TO GET THEIR HELP ON

09:21AM 21    SOMETHING THIS MORNING, SO I APOLOGIZE FOR THE DELAY.

09:21AM 22         BEFORE WE BEGIN, THOUGH, LET ME ASK YOU THAT QUESTION.

09:21AM 23    DURING OUR BREAK HAVE ANY OF YOU -- DID ANY OF YOU HAVE CAUSE

09:21AM 24    TO READ, DISCUSS, OR LEARN ANYTHING ABOUT THIS CASE OUTSIDE OF

09:21AM 25    THIS COURTROOM?

09:21AM 1        IF SO, WOULD YOU PLEASE RAISE YOUR HAND NOW.

09:21AM 2        I SEE NO HANDS.  THANK YOU.

09:21AM 3        LADIES AND GENTLEMEN, I DO WANT TO TELL YOU ONE OTHER

09:21AM 4  THING BEFORE WE START TODAY.  THIS MORNING I'VE DISCUSSED

09:21AM 5  THINGS WITH THE LAWYERS, AND WE ALL AGREE THAT WE WILL BE IN

09:21AM 6  SESSION ON SATURDAY AND SUNDAY, SO I JUST WANT YOU TO KNOW

09:22AM 7  THAT.

09:22AM 8        (LAUGHTER.)

09:22AM 9        THE COURT:  OKAY.  EVERYBODY KNOWS IT'S APRIL 1ST,

09:22AM 10  DON'T THEY?  OKAY.  THANK YOU VERY MUCH.

09:22AM 11        ALL RIGHT.  WE'RE NOT GOING TO BE IN SESSION SATURDAY AND

09:22AM 12  SUNDAY.

09:22AM 13        (LAUGHTER.)

09:22AM 14        THE COURT:  WE'LL BE IN SESSION TODAY.  I JUST WANT

09:22AM 15  TO REMIND YOU OF OUR SCHEDULE.  WE WILL HAVE TO BREAK AT 10:30,

09:22AM 16  AND WE'LL BREAK FOR ABOUT AN HOUR, I THINK, AND THEN WE'LL

09:22AM 17  CONTINUE THROUGH THE AFTERNOON, AND HOPEFULLY WE CAN BREAK

09:22AM 18  AROUND 3:00 O'CLOCK.

09:22AM 19        NEXT WEEK I BELIEVE WE'RE ONLY IN SESSION TWO DAYS.

09:22AM 20        IS THAT RIGHT, COUNSEL?  I THINK IT'S TWO DAYS NEXT WEEK.

09:22AM 21        MR. SCHENK:  YES, YOUR HONOR.

09:22AM 22        THE COURT:  RIGHT.  AND THEN THE WEEK FOLLOWING,

09:22AM 23  HOPEFULLY WE CAN START ON A MORE NORMAL THREE DAY SCHEDULE.

09:22AM 24        I'VE ASKED YOU TO LOOK AT YOUR SCHEDULES AND TO SEE IF WE

09:22AM 25  MIGHT EXTEND UNTIL 4:00 O'CLOCK SO WE CAN TRY TO CAPTURE AS

PANDORI DIRECT BY MR. BOSTIC (RES.)                1716

09:22AM   1       MUCH TIME AS WE CAN.  WE'LL TALK ABOUT THAT NEXT WEEK.

09:22AM   2            ALL RIGHT.  THANK YOU VERY MUCH.

09:22AM   3            DO WE HAVE THE WITNESS BACK?

09:22AM   4                 MR. BOSTIC:  YES, YOUR HONOR.

09:22AM   5                 THE COURT:  OKAY.  THANK YOU.

09:22AM   6       IF WE CAN CALL DR. PANDORI.

09:23AM   7            GOOD MORNING, SIR.  GO AHEAD AND TAKE THE STAND AGAIN IF

09:23AM   8       YOU WOULD, SIR.  MAKE YOURSELF COMFORTABLE AGAIN.

09:23AM   9            WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:23AM  10       AGAIN, PLEASE.

09:23AM  11                 THE WITNESS:  MARK PANDORI.

09:23AM  12                 THE COURT:  THANK YOU.  COUNSEL.

09:23AM  13            **(GOVERNMENT'S WITNESS, MARK PANDORI, WAS PREVIOUSLY**

09:23AM  14       **SWORN.)**

09:23AM  15                      **DIRECT EXAMINATION (RESUMED)**

09:23AM  16       BY MR. BOSTIC:

09:23AM  17       Q.   GOOD MORNING, DR. PANDORI.

09:23AM  18       A.   GOOD MORNING.

09:23AM  19       Q.   YESTERDAY WE SPENT A LITTLE TIME DISCUSSING A MEETING THAT

09:23AM  20       YOU HAD WITH MR. BALWANI ABOUT WHETHER THE EDISON SHOULD

09:23AM  21       CONTINUE TO BE USED AT THERANOS.

09:23AM  22            DO YOU RECALL THAT?

09:23AM  23       A.   YES.

09:23AM  24       Q.   CAN YOU HELP US PLACE THAT MEETING IN TIME?  APPROXIMATELY

09:23AM  25       WHEN WAS THAT IF YOU REMEMBER?

09:41AM  1    GOING TO SUSTAIN THE OBJECTION.

09:41AM  2    BY MR. BOSTIC:

09:41AM  3    Q.   DR. PANDORI, YOU TESTIFIED THAT THERE WERE STATEMENTS IN

09:41AM  4    THE ARTICLE THAT YOU FOUND NOT TO BE CORRECT; IS THAT RIGHT?

09:41AM  5    A.   THAT'S RIGHT.

09:41AM  6    Q.   CAN YOU TELL US, GENERALLY SPEAKING, WHAT WERE THE TOPIC

09:41AM  7    OF THOSE STATEMENTS?  WHAT WERE THEY ABOUT?

09:41AM  8            MR. CAZARES: OBJECTION.  HEARSAY.  FOUNDATION.

09:41AM  9            THE COURT:  OVERRULED.

09:41AM  10           THE WITNESS:  IN GENERAL, THEY WERE STATEMENTS ABOUT

09:41AM  11   THE CAPABILITY OF THE THERANOS LAB TESTING OPERATION.

09:41AM  12   BY MR. BOSTIC:

09:41AM  13   Q.   AND WERE THEY ABOUT, FOR EXAMPLE, WHAT THE TECHNOLOGY

09:42AM  14   COULD DO?

09:42AM  15   A.   RIGHT.  YEAH.

09:42AM  16       SO THINGS ABOUT TURN-AROUND TIME OR WHAT TESTS MIGHT OR

09:42AM  17   MIGHT NOT BE AVAILABLE OR THEIR ACCURACY.

09:42AM  18   Q.   LET'S BREAK THOSE UP IF WE COULD.

09:42AM  19       ON TURN-AROUND TIME, IF YOU SAW A DISCREPANCY THERE

09:42AM  20   BETWEEN WHAT THE ARTICLE SAID AND YOUR EXPERIENCE, WHAT WAS THE

09:42AM  21   DIFFERENCE?

09:42AM  22   A.   THE DIFFERENCE WAS THAT --

09:42AM  23           MR. CAZARES: OBJECTION.  HEARSAY.  RELEVANCE.  THE

09:42AM  24   WITNESS IS ALSO LOOKING AT THE ARTICLE WHILE THE QUESTION IS

09:42AM  25   BEING ASKED.

ER-280

PANDORI DIRECT BY MR. BOSTIC (RES.)                    1731

09:42AM   1              THE COURT:  THANK YOU.  OVERRULED.

09:42AM   2          YOU CAN ANSWER THE QUESTION.

09:42AM   3      BY MR. BOSTIC:

09:42AM   4      Q.  WOULD YOU LIKE THE QUESTION AGAIN, DR. PANDORI?

09:42AM   5      A.  NO.

09:42AM   6          THE AMOUNT OF TIME THAT WAS REPRESENTED IN THE ARTICLE

09:42AM   7      THAT INDICATED HOW LONG IT WOULD TAKE FOR US TO GENERATE A LAB

09:42AM   8      TEST RESULT WAS SHORTER THAN WHAT IT WAS ACTUALLY TAKING IN THE

09:42AM   9      LAB.

09:42AM  10      Q.  SO, IN OTHER WORDS, THE ARTICLE EXAGGERATED THE SPEED OF

09:43AM  11      THE THERANOS TEST?

09:43AM  12              MR. CAZARES:  OBJECTION.  LEADING.

09:43AM  13              THE COURT:  SUSTAINED.

09:43AM  14      BY MR. BOSTIC:

09:43AM  15      Q.  WERE THERE OTHER ISSUES OR OTHER TOPICS BESIDES

09:43AM  16      TURN-AROUND TIME WHERE YOU THOUGHT THAT THERE WERE FALSE OR

09:43AM  17      MISLEADING STATEMENTS IN THE ARTICLE?

09:43AM  18              MR. CAZARES:  OBJECTION.  HEARSAY.

09:43AM  19              THE COURT:  OVERRULED.

09:43AM  20              THE WITNESS:  YES.

09:43AM  21      BY MR. BOSTIC:

09:43AM  22      Q.  WHAT WERE THOSE OTHER TOPICS?

09:43AM  23      A.  AM I ALLOWED TO LOOK AT THIS TO REFRESH MY MEMORY?

09:43AM  24      Q.  WOULD LOOKING AT THE ARTICLE REFRESH YOUR RECOLLECTION?

09:43AM  25      A.  IT WOULD, BUT THERE ARE A COUPLE OF ISSUES THAT I REMEMBER

PANDORI DIRECT BY MR. BOSTIC (RES.)                    1732

09:43AM 1    OFF THE TOP OF MY HEAD.

09:43AM 2    Q.   WHAT I'LL ASK YOU TO DO IS TAKE A MOMENT TO LOOK AT THE

09:43AM 3    ARTICLE, AND LET ME KNOW WHEN YOU'RE DONE, AND I'LL RE-ASK THE

09:43AM 4    QUESTION.

09:43AM 5    A.   OKAY.

09:44AM 6         (PAUSE IN PROCEEDINGS.)

09:44AM 7              THE WITNESS:  OKAY.

09:44AM 8    BY MR. BOSTIC:

09:44AM 9    Q.   DID REVIEWING THE ARTICLE REFRESH YOUR MEMORY ABOUT SOME

09:44AM 10   OF THE OTHER TOPICS WHERE WHAT YOU SAW THAT YOU VIEWED AS FALSE

09:44AM 11   OR MISLEADING STATEMENTS?

09:44AM 12   A.   YEAH, READING THIS REMINDED ME HOW I FELT WHEN I READ IT.

09:44AM 13   Q.   SO WE TALKED ABOUT TURN-AROUND TIME ALREADY.

09:44AM 14        WHAT OTHER ISSUES DID YOU SEE WITH THIS ARTICLE?

09:44AM 15   A.   WELL, ONE THING THAT STUCK OUT WAS THE MENTION OF THE

09:44AM 16   FERTILITY PANEL.  AT THAT TIME WE DIDN'T OFFER THAT.  AT LEAST

09:44AM 17   FROM THE CLIA PERSPECTIVE, WE DIDN'T HAVE QUALITY DATA THAT I

09:44AM 18   THINK LED US TO THINK THAT THAT IS SOMETHING THAT WE COULD

09:44AM 19   OFFER.

09:44AM 20        BUT THERE WERE STATEMENTS HERE ABOUT NOT CULTURING

09:45AM 21   BACTERIA OR VIRUSES AND USING GENETIC METHODOLOGIES, WHICH WAS

09:45AM 22   POSED AS A NOVEL MEANS OF PROTECTING PATHOGENS, BUT THAT'S AN

09:45AM 23   INCORRECT STATEMENT AS WELL.

09:45AM 24        THAT WAS -- THERE WAS NOTHING NOVEL BEING DONE IN THAT

09:45AM 25   REGARD AT THERANOS WITH REGARD TO DETECTING PATHOGENS THAT WAY.

09:45AM   1          THE USE OF DNA TO DETECT PATHOGENS --

09:45AM   2                  MR. CAZARES: OBJECTION.  702.

09:45AM   3                  THE COURT:  WHY DON'T YOU ASK A QUESTION.

09:45AM   4                  MR. BOSTIC:  SURE.

09:45AM   5      Q.  DR. PANDORI, WHAT WAS YOUR -- WHAT HAD YOU OBSERVED THAT

09:45AM   6      MADE YOU UNDERSTAND THAT THAT WAS NOT A NOVEL THING THAT

09:45AM   7      THERANOS WAS DOING?

09:45AM   8                  MR. CAZARES: SAME OBJECTION.  702.

09:45AM   9                  THE COURT:  OVERRULED.

09:45AM  10                  THE WITNESS:  WELL, THAT STATEMENT, IF YOU GO TO A

09:45AM  11      PEER REVIEWED LITERATURE AND THE BODY OF KNOWLEDGE THAT WE HAVE

09:45AM  12      WITH REGARD TO DIAGNOSTIC TESTING, FOR EXAMPLE, PCR, WHICH IS A

09:45AM  13      WAY TO USE -- TO DO A DNA BASED DIAGNOSTIC, INSTEAD OF CULTURE,

09:46AM  14      WHICH WAS INVENTED IN 1985, AND SHORTLY THEREAFTER WAS ADOPTED

09:46AM  15      TO DETECT PATHOGENS.

09:46AM  16          IN THE LABORATORY THAT I WORKED PRIOR TO THIS AND OTHER

09:46AM  17      LABORATORIES I WORKED, WE USED DNA METHODOLOGIES TO DETECT

09:46AM  18      VIRUSES AND BACTERIA.  WE WOULD DO OVER 100,000 TIMES A YEAR.

09:46AM  19                  MR. CAZARES: OBJECTION.  INSPECTOR.

09:46AM  20                  THE COURT:  SUSTAINED.  YOU CAN ASK ANOTHER

09:46AM  21      QUESTION.

09:46AM  22      BY MR. BOSTIC:

09:46AM  23      Q.  SO, DR. PANDORI, SO FAR WE HAVE TALKED ABOUT TURN-AROUND

09:46AM  24      TIME AND THE STATUS OF THE FERTILITY PANEL AT THERANOS AND

09:46AM  25      WHETHER THERANOS'S DNA METHODS WERE NOVEL AT THE TIME.

PANDORI DIRECT BY MR. BOSTIC (RES.)                        1734

09:46AM   1           IS THAT CORRECT SO FAR?

09:46AM   2      A.   SO FAR THAT WAS A SUMMARY OF WHAT WE DISCUSSED.

09:46AM   3      Q.   WERE THERE OTHER TOPICS IN THE ARTICLE THAT YOU FELT WERE

09:46AM   4      ADDRESSED INADEQUATELY OR MISLEADING?

09:46AM   5      A.   THE -- THERE'S AN IMPLICATION HERE THAT TESTS WERE

09:47AM   6      ACCURATE OR MORE ACCURATE, AND THAT WAS A PROBLEM BECAUSE THAT

09:47AM   7      WASN'T AN OBSERVATION THAT WAS BEING MADE EMPIRICALLY IN THE

09:47AM   8      LABORATORY.

09:47AM   9           MR. CAZARES:  OBJECTION.  702.  MOVE TO STRIKE.

09:47AM  10           THE COURT:  DO YOU WANT TO LAY A FOUNDATION?

09:47AM  11           MR. BOSTIC:  SURE.

09:47AM  12      Q.   SO YOU SAID THAT THE ARTICLE IMPLIED OR SAID THAT THE

09:47AM  13      THERANOS TESTING WAS MORE ACCURATE; IS THAT CORRECT?

09:47AM  14      A.   CORRECT.

09:47AM  15      Q.   AND BASED ON YOUR OBSERVATIONS WHEN YOU WERE AT THE

09:47AM  16      COMPANY, AND LIMITED TO ONLY WHAT YOU SAW WHILE YOU WERE THERE,

09:47AM  17      WAS THAT TRUE OR NOT?

09:47AM  18           MR. CAZARES:  OBJECTION.  702.

09:47AM  19           THE COURT:  BASED ONLY ON HIS OBSERVATIONS?

09:47AM  20           MR. BOSTIC:  YES, YOUR HONOR.

09:47AM  21           THE COURT:  YOU CAN ANSWER THE QUESTION BASED ON

09:47AM  22      YOUR OBSERVATIONS.

09:47AM  23           THE WITNESS:  BASED SOLELY ON MY OBSERVATIONS,

09:47AM  24      THERE'S NO REASON AT ALL TO BELIEVE THAT THESE TESTS WERE MORE

09:47AM  25      ACCURATE THAN TESTS THAT ALREADY EXISTED.

09:47AM  1    BY MR. BOSTIC:

09:47AM  2    Q.   WERE THERE STATEMENTS IN THE ARTICLE ABOUT HOW MANY TESTS

09:47AM  3    THERANOS COULD PERFORM FROM A DROP OF BLOOD?

09:48AM  4             MR. CAZARES:  OBJECTION.  LEADING AND HEARSAY AGAIN.

09:48AM  5             THE COURT:  I'LL SUSTAIN THE LEADING QUESTION.

09:48AM  6    BY MR. BOSTIC:

09:48AM  7    Q.   DR. PANDORI, DO YOU RECALL ANY OTHER INSTANCES IN THE

09:48AM  8    ARTICLE WHERE YOU THOUGHT THAT THE ABILITIES OF THE THERANOS

09:48AM  9    TECHNOLOGY WERE MISREPRESENTED?

09:48AM  10            MR. CAZARES:  OBJECTION.  LEADING.

09:48AM  11            THE COURT:  OVERRULED.

09:48AM  12            THE WITNESS:  WELL, THE USE OF THE WORD "PANEL" IS

09:48AM  13   AN IMPLICATION WHEN SOMEBODY GOES AND GETS A PANEL, AS MANY

09:48AM  14   PEOPLE MAY KNOW, THAT WOULD BE ASKING FOR A NUMBER OF

09:48AM  15   LABORATORY TESTS SIMULTANEOUSLY, AND IT WASN'T OUR CURRENT

09:48AM  16   CAPABILITY TO BE ABLE TO RUN MANY, MANY -- SEVERAL LAB TESTS ON

09:48AM  17   ONE SPECIMEN ON THERANOS TECHNOLOGY AT THAT TIME.

09:48AM  18   BY MR. BOSTIC:

09:48AM  19   Q.   AND WHAT DID THE -- WHAT DO YOU RECALL THE ARTICLE SAYING

09:48AM  20   THAT WAS CONSISTENT OR INCONSISTENT WITH THAT?

09:48AM  21            MR. CAZARES:  OBJECTION.  HEARSAY AND LEADING.

09:48AM  22            MR. BOSTIC:  YOUR HONOR, THIS MIGHT BENEFIT FROM A

09:49AM  23   BRIEF SIDE-BAR DISCUSSION.  THE GOVERNMENT IS NOT OFFERING ANY

09:49AM  24   OF THIS CONTENT FOR THE TRUTH.

09:49AM  25            THE COURT:  UNDERSTOOD.  THE OBJECTION IS OVERRULED.

09:49AM  1          YOU CAN ANSWER THE QUESTION.

09:49AM  2              THE WITNESS:  CAN YOU RE-ASK THE QUESTION?

09:49AM  3      BY MR. BOSTIC:

09:49AM  4      Q.   YES.  SO LET ME GO BACK ONE QUESTION.

09:49AM  5          YOU WERE TELLING US ABOUT ANOTHER INSTANCE WHERE THE

09:49AM  6      ABILITIES OF THE THERANOS TECHNOLOGY YOU THOUGHT WERE

09:49AM  7      MISREPRESENTED IN THE ARTICLE.

09:49AM  8          CAN YOU SUMMARIZE THAT AGAIN FOR US?

09:49AM  9              MR. CAZARES:  OBJECTION.  IT CALLS FOR A NARRATIVE.

09:49AM 10      ASKED AND ANSWERED.

09:49AM 11              THE COURT:  OVERRULED.

09:49AM 12              THE WITNESS:  YOU WANT ME TO SUMMARIZE MY TROUBLE

09:49AM 13      WITH THE ARTICLE?  WOULD YOU LIKE ME TO BREAK THEM DOWN

09:49AM 14      INDIVIDUALLY, OR JUST GIVE YOU A GENERAL ASSESSMENT OF IT?

09:49AM 15      BY MR. BOSTIC:

09:49AM 16      Q.   I THINK JUST THE LAST TOPIC YOU WERE DISCUSSING ABOUT THE

09:49AM 17      BREADTH OF TESTS OR THE NUMBER OF TESTS THAT COULD BE

09:49AM 18      CONDUCTED?

09:49AM 19      A.   WELL, THE IMPLICATION OF THE ARTICLE IS THAT PEOPLE WILL

09:49AM 20      BE ABLE TO GET A PANEL OF TESTS PERFORMED ON A SINGLE

09:49AM 21      FINGERSTICK, BUT THAT WAS NOT THE CASE IN MY TIME THERE.

09:49AM 22      Q.   INSTEAD, WHAT WERE THE CAPABILITIES OF THE TECHNOLOGY AS

09:50AM 23      FAR AS HOW MANY TESTS COULD BE DONE ON A SINGLE SAMPLE?

09:50AM 24      A.   WE HAD A LOT OF DIFFICULT EVEN RUNNING ONE TEST ON ONE

09:50AM 25      SAMPLE.

PANDORI DIRECT BY MR. BOSTIC (RES.)                                    1737

09:50AM   1    Q.   ON THAT SAME TOPIC, IN YOUR EXPERIENCE WAS THE THERANOS

09:50AM   2    TECHNOLOGY CAPABLE OF RUNNING FOLLOW-ON TESTS ON BLOOD SAMPLES?

09:50AM   3    A.   NOT IN THE TIME THAT I WAS THERE.

09:50AM   4    Q.   AND CAN YOU EXPLAIN WHAT THAT MEANS?  WHAT IS A FOLLOW-ON

09:50AM   5    TEST?

09:50AM   6    A.   WELL, YOU TAKE A SAMPLE FROM A HUMAN BEING, IT COMES TO

09:50AM   7    THE LAB, YOU GET A TEST RESULT, THAT TEST RESULT WOULD CAUSE

09:50AM   8    YOU TO WANT TO RUN ANOTHER IN REFLUX TO THAT.

09:50AM   9    Q.   AND WAS THAT TOPIC ADDRESSED IN THE "WIRED" ARTICLE?

09:50AM  10    A.   I DON'T RECALL.

09:51AM  11            MR. CAZARES:  MOVE TO STRIKE THE PRIOR STATEMENTS

09:51AM  12    REGARDING THE IMPRESSION OF THE WITNESS ABOUT THE ARTICLE ON

09:51AM  13    THAT TOPIC.

09:51AM  14            MR. BOSTIC:  YOUR HONOR, IF I COULD BE ALLOWED TO

09:51AM  15    REFRESH THE WITNESS ON THAT?

09:51AM  16            THE COURT:  YES.

09:51AM  17    BY MR. BOSTIC:

09:51AM  18    Q.   DR. PANDORI, CAN I DIRECT YOU TO PAGE 2 OF EXHIBIT 1599?

09:51AM  19    A.   YES.

09:51AM  20    Q.   AND ABOUT TWO-THIRDS OF THE WAY DOWN THE PAGE, IF YOU

09:51AM  21    COULD REVIEW THAT AND THEN LET ME KNOW WHEN YOU'RE FINISHED?

09:51AM  22    A.   YEAH, I SEE THAT STATEMENT.

09:51AM  23    Q.   AND DO YOU SEE A STATEMENT THAT RELATES TO THERANOS'S

09:51AM  24    ABILITY, OR NOT --

09:51AM  25            THE COURT:  WE JUST HAVE TO GO ONE AT A TIME,

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


UNITED STATES OF AMERICA,           )
                                    )   CR-18-00258-EJD
                 PLAINTIFF,         )
                                    )   SAN JOSE, CALIFORNIA
        VS.                         )
                                    )   APRIL 6, 2022
RAMESH "SUNNY" BALWANI,             )
                                    )   VOLUME 14
                 DEFENDANT.         )
_____       )   PAGES 2177 - 2443



TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:   JOHN C. BOSTIC
                             JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:   ROBERT S. LEACH
                             KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
                             LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER

PANDORI REDIRECT BY MR. BOSTIC                                    2271

10:51AM   1    ROLE AND JOB DESCRIPTION.

10:51AM   2    Q.   THERE WAS ALSO SOME DISCUSSION WITH MR. CAZARES ABOUT

10:51AM   3    WHERE THE TEST MATERIAL FOR THAT FEBRUARY TEST CAME FROM.

10:51AM   4        DO YOU RECALL THAT?

10:51AM   5    A.   YES.

10:51AM   6    Q.   AND MR. CAZARES ASKED YOU ABOUT THE FACT THAT THOSE

10:51AM   7    SAMPLES HAD BEEN PREVIOUSLY RECEIVED AND USED FOR A ROUND OF

10:51AM   8    TESTING; IS THAT CORRECT?

10:51AM   9    A.   CORRECT.

10:51AM  10    Q.   DOES THAT FACT GIVE YOU ANY REASON TO DOUBT THE VALIDITY

10:51AM  11    OF THE FEBRUARY 2014 TESTS THAT WE'VE DISCUSSED?

10:51AM  12    A.   NOT AT THIS TIME.

10:51AM  13    Q.   THE FACT THAT THOSE SAMPLES HAD BEEN USED IN A PREVIOUS

10:51AM  14    ROUND, DOES THAT DEGRADE OR ERASE THE ABILITY OF THOSE SAMPLES

10:51AM  15    TO BE USED FOR THIS KIND OF TESTING?

10:52AM  16             MR. CAZARES:  OBJECTION.  702.

10:52AM  17             THE COURT:  OVERRULED.  OVERRULED.

10:52AM  18        YOU CAN ANSWER THE QUESTION.

10:52AM  19             THE WITNESS:  I'M NOT FAMILIAR WITH FOR THOSE

10:52AM  20    PARTICULAR TESTS EXACTLY, BUT IT WOULD BE COMMON, FROM A

10:52AM  21    STABILITY POINT OF VIEW OR --

10:52AM  22             MR. CAZARES:  OBJECTION.  FOUNDATION.

10:52AM  23             THE COURT:  SUSTAINED.

10:52AM  24        YOU CAN ASK ANOTHER QUESTION.

10:52AM  25             MR. BOSTIC:  MAY I LAY A FOUNDATION, YOUR HONOR?

10:52AM   1          THE COURT:  YES.

10:52AM   2    BY MR. BOSTIC:

10:52AM   3    Q.   DR. PANDORI, FROM YOUR WORK AT THERANOS, DO YOU HAVE AN

10:52AM   4    UNDERSTANDING AS TO THE GENERAL STABILITY OF SAMPLES LIKE WE'RE

10:52AM   5    TALKING ABOUT?

10:52AM   6    A.   FROM MY WORK AT THERANOS?

10:52AM   7    Q.   YES.

10:52AM   8    A.   I HAVE A GENERAL UNDERSTANDING OF THE STABILITY OF SUCH

10:52AM   9    SPECIMENS BASED ON THE ENTIRETY OF MY EXPERIENCE.

10:52AM  10    Q.   LET ME ASK YOU A MORE GENERAL QUESTION THEN.

10:52AM  11          YOU TESTIFIED EARLIER THAT IT WAS YOUR DECISION TO RUN

10:53AM  12    EDISON TESTING ON THESE SAMPLES IN FEBRUARY OF 2014; IS THAT

10:53AM  13    CORRECT?

10:53AM  14    A.   YES.

10:53AM  15    Q.   AND WHEN YOU DIRECTED THAT THAT TESTING HAPPEN, WHAT WAS

10:53AM  16    YOUR VIEW AS TO WHETHER THAT TESTING WAS GOING TO PROVIDE VALID

10:53AM  17    OR INVALID DATA?

10:53AM  18    A.   MY VIEW WAS THAT IT WOULD PROVIDE VALID DATA.

10:53AM  19    Q.   AND SITTING HERE TODAY, DO YOU HAVE ANY REASON TO DOUBT

10:53AM  20    THAT THAT DATA WAS VALID?

10:53AM  21    A.   I HAVE NONE.

10:53AM  22    Q.   MS. WACHS, CAN WE DISPLAY EXHIBIT 1548, AND SPECIFICALLY

10:53AM  23    THE ATTACHMENT.

10:53AM  24          DR. PANDORI, WHEN YOU WERE DISCUSSING THIS SPECIFIC TEST,

10:53AM  25    OR THIS TESTING WITH MR. CAZARES, THERE WAS ALSO SOME

PANDORI REDIRECT BY MR. BOSTIC                          2273

10:53AM   1    DISCUSSION ABOUT AAP.

10:53AM   2         DO YOU RECALL THAT?

10:53AM   3    A.   YES.

10:53AM   4    Q.   AND THAT DISCUSSION CONCERNED, FOR EXAMPLE, WHETHER

10:54AM   5    THERANOS HAD A PEER GROUP SUCH THAT IT COULD DO PROFICIENCY

10:54AM   6    TESTING IN THE STANDARD, IN THE INDUSTRY STANDARD WAY; CORRECT?

10:54AM   7    A.   CORRECT.

10:54AM   8    Q.   AND YOU TESTIFIED THAT YOU RECOGNIZED THAT THERANOS DID

10:54AM   9    NOT HAVE A PEER GROUP SUCH THAT IT COULD DO STANDARD

10:54AM  10    PROFICIENCY TESTING; CORRECT?

10:54AM  11    A.   CORRECT.

10:54AM  12    Q.   AND WAS THAT YOUR UNDERSTANDING IN FEBRUARY OF 2014?

10:54AM  13    A.   NO.

10:54AM  14    Q.   WHEN YOU ORDERED THAT THIS TESTING TAKE PLACE IN FEBRUARY

10:54AM  15    OF 2014, HOW DID YOU ACCOUNT FOR THE FACT THAT THIS WAS NOT AAP

10:54AM  16    BUT WAS STANDARD PROFICIENCY TESTING?

10:54AM  17    A.   WELL, AT THIS MOMENT IN TIME I WASN'T AWARE OF AN AAP

10:54AM  18    PROTOCOL AT THERANOS.

10:54AM  19         MY PRIMARY DRIVE AND CONCERN IN THAT ACTIVITY WAS THAT WE

10:54AM  20    HAD NOT DONE PT PROPERLY, WHICH IS TO SAY THAT WE HAD NOT DONE

10:55AM  21    PROFICIENCY TESTING IN A MANNER CONSISTENT WITH HOW PATIENT

10:55AM  22    SPECIMENS ARE TREATED.

10:55AM  23         SO MY PRIMARY GOAL WAS TO -- THERE WERE TWO GOALS.  ONE

10:55AM  24    WAS TO GET THAT DONE; AND SECONDARILY, TO THEN SEE FOR MYSELF,

10:55AM  25    BECAUSE I WAS RELATIVELY NEW AT THAT COMPANY, HOW THE

10:55AM  1    PERFORMANCE WOULD GO.

10:55AM  2    Q.    IN RETROSPECT -- WELL, LET ME ASK A DIFFERENT QUESTION.

10:55AM  3          SUBSEQUENTLY DID YOU COME TO HAVE A BETTER UNDERSTANDING

10:55AM  4    OF AAP PROTOCOLS OR REQUIREMENTS AS IT RELATED TO THERANOS?

10:55AM  5    A.    I DID.

10:55AM  6    Q.    INCORPORATING THAT UNDERSTANDING IN RETROSPECT, DO YOU NOW

10:55AM  7    VIEW THE DATA THAT WE'RE LOOKING AT ON THE SCREEN AS INVALID OR

10:55AM  8    NOT USEFUL IN TERMS OF MEASURING THE PERFORMANCE OF THERANOS

10:55AM  9    TESTS?

10:55AM  10   A.    WELL, I WAS NOT ABLE TO ASCERTAIN THE ANSWER TO THAT

10:55AM  11   QUESTION.

10:55AM  12         YOU KNOW, I WASN'T THERE LONG ENOUGH FOR ANYBODY TO SHOW

10:56AM  13   ME ANY DATA THAT INDICATED THAT THERE WAS A MATRIX ISSUE.

10:56AM  14   ALTHOUGH THE CONSTRUCTION OF AAP'S PRIOR TO MY ARRIVAL AT

10:56AM  15   THERANOS WOULD IMPLY THAT SUCH STUDIES HAD BEEN DONE, I WAS

10:56AM  16   NEVER MADE AWARE OF THE RESULTS OF SUCH STUDIES.

10:56AM  17   Q.    LET ME ASK IT MAYBE A SIMPLER WAY.

10:56AM  18         WE REVIEWED THIS DATA DURING YOUR DIRECT EXAMINATION;

10:56AM  19   CORRECT?

10:56AM  20   A.    CORRECT.

10:56AM  21   Q.    AND THIS TEST IN FEBRUARY OF 2014, IN YOUR VIEW, DID IT

10:56AM  22   REVEAL ANY PROBLEMS OR RAISE ANY CONCERNS ABOUT THE ACCURACY OF

10:56AM  23   THERANOS'S TESTING?

10:56AM  24              MR. CAZARES:  OBJECTION.  702.

10:56AM  25              THE COURT:  OVERRULED.

10:56AM  1          THE WITNESS:  YES, IT DID.

10:56AM  2     BY MR. BOSTIC:

10:56AM  3     Q.   AND SUBSEQUENT TO THAT, DID YOUR ADDITIONAL DISCUSSIONS

10:56AM  4     ABOUT AAP, OR ANY OTHER TOPIC, REMOVE THOSE CONCERNS THAT THIS

10:56AM  5     DATA HAD RAISED ABOUT POSSIBLE INACCURACY WITH THERANOS TESTS?

10:56AM  6     A.   NO, THEY HAD NOT ALL BY THEMSELVES REMOVED THAT.

10:57AM  7     Q.   AND WHEN YOU LEFT THE COMPANY, DID YOU STILL HAVE CONCERNS

10:57AM  8     ABOUT THE ACCURACY OF THERANOS'S TESTING?

10:57AM  9     A.   YES.

10:57AM  10    Q.   LOOKING AT THIS DATA SPECIFICALLY, I'LL DRAW YOUR

10:57AM  11    ATTENTION TO THE PSA RESULTS IN COLUMNS D, E, F, AND G.

10:57AM  12         DO YOU SEE THAT DATA?

10:57AM  13    A.   I DO.

10:57AM  14    Q.   AND THERE WAS SOME DISCUSSION WITH MR. CAZARES ABOUT TWO

10:57AM  15    SAMPLES THAT WERE RERUN.

10:57AM  16         DO YOU RECALL THAT DISCUSSION?

10:57AM  17    A.   I DO.

10:57AM  18    Q.   AND MR. CAZARES SUGGESTED TO YOU THAT A RERUN MIGHT BE

10:57AM  19    NECESSARY IN CASES WHERE THERE WAS AN EQUIPMENT MALFUNCTION.

10:57AM  20         DO YOU RECALL THAT?

10:57AM  21    A.   YES.

10:57AM  22    Q.   DO YOU KNOW ONE WAY OR ANOTHER WHETHER THERE WAS AN

10:57AM  23    EQUIPMENT MALFUNCTION DURING THIS FEBRUARY 2014 TESTING?

10:57AM  24    A.   I DO NOT KNOW ONE WAY OR THE OTHER.

10:57AM  25    Q.   THE FACT THAT THOSE TWO SAMPLES WERE RERUN, DO THEY ALLOW

10:57AM  1    YOU TO DRAW ANY CONCLUSIONS OR REVEAL ANYTHING ABOUT THE

10:58AM  2    PRECISION OF THE TWO TESTING METHODS THAT ARE BEING USED?

10:58AM  3    A.    YEAH.   TAKEN AT FACE VALUE, THESE DATA DEMONSTRATED,

10:58AM  4    ALBEIT WITH TWO SAMPLES RUN, THAT THE PREDICATE METHOD HAD HIGH

10:58AM  5    PRECISION LIKELY, AND THAT THE THERANOS METHOD HAD LESS

10:58AM  6    PRECISION.

10:58AM  7    Q.    AND WOULD TESTING PRECISION BE ONE POSSIBLE REASON WHY YOU

10:58AM  8    MIGHT WANT TO RERUN SAMPLES IN A TEST LIKE THIS?

10:58AM  9    A.    WOULD PRECISION BE A REASON TO RERUN THEM?

10:58AM 10    Q.    WOULD A DESIRE TO TEST PRECISION BE A REASON WHY YOU MIGHT

10:58AM 11    WANT TO RERUN SAMPLES IN A TEST LIKE THIS?

10:58AM 12    A.    NOT IN A PROFICIENCY TEST.

10:58AM 13         BUT IN A VERIFICATION OR VALIDATION STUDY, YOU WOULD

10:58AM 14    REALLY WANT TO DEFINITELY RERUN SPECIMENS TO ASCERTAIN

10:58AM 15    PRECISION.

10:58AM 16              MR. CAZARES:  OBJECTION.  NONRESPONSIVE.

10:59AM 17              THE COURT:  OVERRULED.

10:59AM 18    BY MR. BOSTIC:

10:59AM 19    Q.    AND WAS THIS A FORMAL PROFICIENCY TEST?

10:59AM 20    A.    WAS WHAT A FORMAL PROFICIENCY TEST?

10:59AM 21    Q.    WHAT WE'RE LOOKING AT FROM FEBRUARY 2014.

10:59AM 22    A.    THEY WERE RUN ON FORMAL PROFICIENCY TESTING SPECIMENS.

10:59AM 23    Q.    BUT WHEN IT COMES TO -- AS FAR AS THE PROCEDURE AND THE

10:59AM 24    PROTOCOLS, WAS THIS A FORMAL PROFICIENCY TESTING PROCESS?

10:59AM 25    A.    UM, I'M SORRY THAT I'M STUCK ON THE WORD "FORMAL."  I

PANDORI REDIRECT BY MR. BOSTIC                                    2277

10:59AM   1    DON'T UNDERSTAND IT.

10:59AM   2        SOMEBODY NEEDED TO RUN PT REGULARLY AND ACCORDING TO

10:59AM   3    REGULATIONS, AND WE WERE TRYING TO ACHIEVE THAT.  SO IF THAT

10:59AM   4    MEETS THE DEFINITION OF "FORMAL," THEN, YES, IT WAS FORMAL.

10:59AM   5    Q.   UNDERSTOOD.

10:59AM   6        MS. WACHS, COULD WE CALL UP EXHIBIT 5545.  THIS WAS

10:59AM   7    PREVIOUSLY ADMITTED.  LET'S USE THE HARD COPY.

11:00AM   8        MS. ROBINSON, CAN WE USE THE ELMO FOR THAT?

11:00AM   9        EXHIBIT 5545 WAS PREVIOUSLY ADMITTED.  MAY I PUBLISH,

11:00AM  10    YOUR HONOR?

11:00AM  11            THE COURT:  YES.

11:00AM  12    BY MR. BOSTIC:

11:00AM  13    Q.   DR. PANDORI, DO YOU SEE ON THE SCREEN TRIAL EXHIBIT 5545?

11:00AM  14    A.   I SEE SOMETHING ON THE SCREEN, BUT I DON'T SEE THAT

11:00AM  15    NUMBER.  I'M SORRY.

11:00AM  16    Q.   THAT'S ALL RIGHT.

11:01AM  17        DO YOU SEE NOW AT THE BOTTOM THE EXHIBIT NUMBER?

11:01AM  18    A.   YES, I SEE THAT EXHIBIT NUMBER.

11:01AM  19    Q.   OKAY.  DO YOU RECALL DISCUSSING THIS DOCUMENT WITH

11:01AM  20    MR. CAZARES?

11:01AM  21    A.   WOULD YOU PLEASE MOVE THE DOCUMENT UPWARD?

11:01AM  22        YES.

11:01AM  23    Q.   YES.  AND THIS IS ALSO IN VOLUME 1 IN CASE YOU WOULD LIKE

11:01AM  24    TO FLIP THROUGH IT AT THE SAME TIME, BUT THAT'S UP TO YOU.

11:01AM  25    A.   IT'S CLEARLY VISIBLE ON THE SCREEN NOW.

11:01AM  1    Q.   I'LL DRAW YOUR ATTENTION TO PAGE 3 OF THIS DOCUMENT.

11:01AM  2    A.   YES.

11:01AM  3    Q.   AND DO YOU SEE THERE AN EMAIL FROM LANGLY GEE TO YOU AND

11:01AM  4    OTHERS AT THERANOS WITH THE SUBJECT LINE UPDATED PT/AUDIT

11:01AM  5    RENEWALS SINCE 3/18?

11:01AM  6    A.   I SEE IT.

11:01AM  7    Q.   AND IT SAYS, "HERE ARE SURVEYS PERFORMED AND SCORES AND

11:01AM  8    UPDATE TO LICENSURES SINCE 3/18."

11:01AM  9         DO YOU SEE THAT?

11:01AM  10   A.   YES.

11:02AM  11   Q.   AND I'D LIKE TO ASK YOU ABOUT THE ACTUAL TESTING THAT IS

11:02AM  12   LISTED HERE.

11:02AM  13        DO YOU SEE A LIST BELOW OF DATES AND SURVEYS AND SCORES?

11:02AM  14   A.   I DO.

11:02AM  15   Q.   AND DO YOU UNDERSTAND THESE TO BE PROFICIENCY TESTING

11:02AM  16   RESULTS?

11:02AM  17   A.   I DO.

11:02AM  18   Q.   ARE THESE REFLECTING PROFICIENCY TESTING RESULTS FOR

11:02AM  19   TESTING PERFORMED ON THE THERANOS EDISON?

11:02AM  20   A.   FOR SOME OF THESE THERE'S NO WAY THAT COULD HAVE BEEN THE

11:02AM  21   CASE.

11:02AM  22   Q.   WHY DO YOU SAY THAT?

11:02AM  23   A.   BECAUSE FOR A LOT OF THESE THERE WERE NO, AT THAT TIME,

11:02AM  24   EDISON TESTS THAT RAN THOSE TESTS.

11:02AM  25   Q.   FOR EXAMPLE, WERE YOU -- WHERE IT SAYS API HEMATOLOGY, WAS

```
 1

 2                        UNITED STATES DISTRICT COURT

 3                      NORTHERN DISTRICT OF CALIFORNIA

 4                            SAN JOSE DIVISION

 5

 6     UNITED STATES OF AMERICA,        )
                                        )  CR-18-00258-EJD
 7                  PLAINTIFF,          )
                                        )  SAN JOSE, CALIFORNIA
 8          VS.                         )
                                        )  APRIL 20, 2022
 9     RAMESH "SUNNY" BALWANI,          )
                                        )  VOLUME 20
10                  DEFENDANT.          )
       _____ )  PAGES 3163 - 3450
11                                         SEALED PAGES 3222 - 3233

12

13                    TRANSCRIPT OF TRIAL PROCEEDINGS
                   BEFORE THE HONORABLE EDWARD J. DAVILA
14                     UNITED STATES DISTRICT JUDGE

15     A P P E A R A N C E S:

16     FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
17                                JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
18                           SAN JOSE, CALIFORNIA 95113

19                           BY:  ROBERT S. LEACH
                             1301 CLAY STREET, SUITE 340S
20                           OAKLAND, CALIFORNIA 94612

21          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22     OFFICIAL COURT REPORTERS:
                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                           CERTIFICATE NUMBER 8074
                             LEE-ANNE SHORTRIDGE, CSR, CRR
24                           CERTIFICATE NUMBER 9595

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED WITH COMPUTER
```

ROSENDORFF DIRECT BY MR. BOSTIC                              3262

11:05AM   1    LABORATORY DIRECTOR?

11:05AM   2    A.   NO, IT WAS NOT.

11:05AM   3    Q.   WHO SET THE LAUNCH DATE AT THERANOS, IF YOU KNOW?

11:05AM   4    A.   ELIZABETH AND SUNNY.

11:05AM   5    Q.   IF YOU HAD SET THAT TIMETABLE AND THE LAUNCH DATE, WOULD

11:05AM   6    YOU HAVE ALLOWED ADDITIONAL TIME FOR ASSAY VALIDATION?

11:05AM   7    A.   ABSOLUTELY.

11:05AM   8    Q.   GENERALLY SPEAKING, HOW WERE YOU FEELING ABOUT THE

11:05AM   9    COMPANY'S READINESS FOR A COMMERCIAL LAUNCH IN SEPTEMBER OF

11:05AM  10    2013?

11:05AM  11    A.   I WAS UNEASY.

11:05AM  12    Q.   AND WHAT WAS MAKING YOU UNEASY AT THAT TIME?

11:05AM  13    A.   I FELT LIKE R&D WAS BEING PRESSURED TO PRODUCE DATA THAT

11:05AM  14    INDICATED A CERTAIN RESULT.

11:05AM  15         I WASN'T ENTIRELY SURE IF I SHOULD TRUST WHAT I WAS

11:06AM  16    LOOKING AT, BUT I DECIDED TO TRUST.

11:06AM  17         NONE OF THE TESTING REALLY TOOK INTO ACCOUNT THE

11:06AM  18    PREANALYTIC FACTORS THAT I MENTIONED EARLIER IN MY TESTIMONY,

11:06AM  19    THINGS THAT COULD HAPPEN DURING COLLECTION OR WHEN SAMPLES SAT

11:06AM  20    OUT FOR A LONG TIME, SO I DIDN'T FEEL LIKE THE VALIDATION

11:06AM  21    NECESSARILY REFLECTED THE LIFE OF A SAMPLE.

11:06AM  22         AND I ALSO HAD SOME CONCERNS ABOUT USING VENOUS BLOOD FOR

11:06AM  23    THE PRECISION COMPONENT OF THE VALIDATIONS.

11:06AM  24    Q.   AND ON THAT LAST POINT, WHY DID THAT CONCERN YOU?

11:06AM  25    A.   BECAUSE WE WOULD BE COLLECTING BLOOD BY FINGERSTICK, WHICH

11:06AM   1      PROBABLY WAS MORE VARIABLE IN TERMS OF ITS COLLECTION.

11:06AM   2         AND THERE WAS A PRACTICAL PROBLEM THERE, WHICH WAS YOU

11:06AM   3      COULDN'T REALLY DO PRECISION FINGERSTICK.  YOU WOULD HAVE TO

11:07AM   4      STICK ALL OF THE FINGERS AND TOES OF A VOLUNTEER TO DO

11:07AM   5      PRECISION.

11:07AM   6      Q.   YOU TALKED ABOUT PRESSURE TO ACHIEVE CERTAIN RESULTS IN

11:07AM   7      THE VALIDATION WORK.

11:07AM   8         DO YOU RECALL THAT?

11:07AM   9      A.   YES.

11:07AM  10      Q.   AND WHERE WAS THAT PRESSURE COMING FROM AS YOU PERCEIVED

11:07AM  11      IT?

11:07AM  12      A.   FROM SUNNY AND ELIZABETH.

11:07AM  13      Q.   CAN I ASK YOU TO LOOK AT TAB 1049 IN YOUR BINDER, PLEASE.

11:07AM  14      A.   I HAVE.

11:07AM  15      Q.   AND IS 1049 AN EMAIL CHAIN INCLUDING YOU AND MR. BALWANI

11:07AM  16      RELATING TO THE COMPANY'S READINESS FOR LAUNCH?

11:07AM  17      A.   SO THE TOP ONE IS FROM SUNNY TO ELIZABETH.  IT SAYS, "RE:

11:07AM  18      CONCERNS ABOUT THE LAUNCH."

11:07AM  19      Q.   AND EARLIER IN THAT CHAIN, DO YOU SEE THAT IT BEGINS WITH

11:08AM  20      A MESSAGE FROM YOU TO MS. HOLMES AND DANIEL YOUNG?

11:08AM  21      A.   YES.

11:08AM  22               MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1049.

11:08AM  23               MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

11:08AM  24               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:08AM  25         (GOVERNMENT'S EXHIBIT 1049 WAS RECEIVED IN EVIDENCE.)

ROSENDORFF DIRECT BY MR. BOSTIC                    3264

BY MR. BOSTIC:

11:08AM 1

11:08AM 2    Q.   LET'S START AT THE BOTTOM OF PAGE 1 AND LOOK AT YOUR

11:08AM 3    EMAIL.

11:08AM 4         SO AGAIN, WE'RE AT AUGUST 29TH, 2013, AND LESS THAN

11:08AM 5    TWO WEEKS TO THE COMMERCIAL LAUNCH; RIGHT?

11:08AM 6    A.   YES.

11:08AM 7    Q.   AND YOU SAY, "HI ELIZABETH,

11:08AM 8         "I HAVE SOME MEDICAL AND OPERATIONAL CONCERNS ABOUT OUR

11:08AM 9    READINESS FOR 9/9."

11:08AM 10   A.   YES.

11:08AM 11   Q.   AND WHAT PROMPTED YOU TO SEND THIS EMAIL TO MS. HOLMES?

11:08AM 12   A.   I DIDN'T FEEL THAT RAISING THESE ISSUES TO MR. BALWANI

11:08AM 13   WOULD HAVE HAD ANY TRACTION, OR I THOUGHT THAT RAISING THESE

11:08AM 14   ISSUES PERHAPS WOULD BE MET WITH HOSTILITY.

11:08AM 15        AND I ALSO FELT THAT ELIZABETH, AS THE CEO OF THE COMPANY,

11:08AM 16   REALLY NEEDED TO KNOW ABOUT THESE ISSUES.

11:09AM 17   Q.   LET'S LOOK AT THE ISSUES THAT YOU RAISED.

11:09AM 18        SO AT THE BOTTOM OF THIS PAGE UNDER GLUCOSE, YOU WRITE,

11:09AM 19   "SIGNIFICANT NEGATIVE BIAS EXISTS FOR GLUCOSE."

11:09AM 20        WHAT DID YOU MEAN BY THAT?

11:09AM 21   A.   IT MEANS THAT THE READINGS WE ARE GETTING ON THE

11:09AM 22   FINGERSTICK ARE SYSTEMATICALLY LOWER THAN YOU WOULD GET ON

11:09AM 23   VENOUS BLOOD THAT RISES TO A LEVEL OF CLINICAL SIGNIFICANCE.

11:09AM 24   Q.   AND WHY WERE YOU CONCERNED ABOUT THAT?  WHY WAS THAT A

11:09AM 25   PROBLEM?

ER-300

ROSENDORFF DIRECT BY MR. BOSTIC                                    3265

11:09AM 1    A.   IT'S A PROBLEM BECAUSE, FOR INSTANCE, FASTING BLOOD

11:09AM 2    GLUCOSE IS USED TO DIAGNOSE DIABETES.  THERE'S A THRESHOLD OF

11:09AM 3    126 ABOVE WHICH YOU'RE DIAGNOSED WITH DIABETES SO --

11:10AM 4            MR. COOPERSMITH:  YOUR HONOR, I'M GOING TO OBJECT

11:10AM 5    AND MOVE TO STRIKE UNDER 702.

11:10AM 6            THE COURT:  I'LL -- THE LAST PORTION OF THIS

11:10AM 7    TESTIMONY, LADIES AND GENTLEMEN, REGARDING THOSE MEASUREMENTS

11:10AM 8    IS STRICKEN.

11:10AM 9        YOU CAN LAY A FOUNDATION, IF YOU CAN.

11:10AM 10           MR. BOSTIC:  UNDERSTOOD, YOUR HONOR.  THANK YOU.

11:10AM 11   Q.   DR. ROSENDORFF, GENERALLY SPEAKING, WHAT IS A BIAS IN THE

11:10AM 12   CONTEXT OF LABORATORY TESTING?

11:10AM 13   A.   A BIAS IS -- A BIAS IS A MEASURE OF HOW FAR A LABORATORY

11:10AM 14   TEST DEVIATES FROM THE CORRECT VALUE, FROM THE TRUE VALUE.

11:10AM 15   Q.   SO DOES THE EXISTENCE OF A BIAS IN A LABORATORY TEST HAVE

11:10AM 16   ANY EFFECT ON THE ACCURACY OR RELIABILITY OF THAT TEST?

11:10AM 17           MR. COOPERSMITH:  OBJECTION.  702.

11:10AM 18           THE COURT:  CAN YOU LAY A FOUNDATION?

11:10AM 19           MR. BOSTIC:  SURE.

11:11AM 20   Q.   DR. ROSENDORFF, IN YOUR ROLE AS LABORATORY DIRECTOR AT

11:11AM 21   THERANOS, WAS BIAS SOMETHING THAT MATTERED TO YOU?

11:11AM 22   A.   YES.

11:11AM 23   Q.   AND WHY DID BIAS MATTER TO YOU AS THERANOS LABORATORY

11:11AM 24   DIRECTOR?

11:11AM 25   A.   BIAS --

ER-301

11:11AM 1        MR. COOPERSMITH:  YOUR HONOR, SAME OBJECTION.

11:11AM 2        THE COURT:  OVERRULED.

11:11AM 3     YOU CAN ANSWER THE QUESTION.

11:11AM 4        THE WITNESS:  SO AS I MENTIONED, TOTAL ALLOWABLE

11:11AM 5   ERROR IS THE SUM OF BIAS AND PRECISION.

11:11AM 6     BIAS IS ANOTHER TERM FOR ACCURACY ESSENTIALLY.  IF THERE'S

11:11AM 7   SIGNIFICANT BIAS, THERE'S PROBLEMS WITH ACCURACY.

11:11AM 8   BY MR. BOSTIC:

11:11AM 9   Q.  ALL RIGHT.  LET'S LOOK AT PAGE 2 IN YOUR EMAIL.  ZOOM IN

11:11AM 10  ON THE TOP PARAGRAPH.

11:11AM 11    AND THERE YOU NOTE A DIFFERENCE IN REFERENCE RANGE FOR THE

11:11AM 12  THERANOS CHEMISTRIES VERSUS WHAT YOU WERE SEEING ON THE SIEMENS

11:12AM 13  CHEMISTRIES.

11:12AM 14    DO YOU SEE THAT?

11:12AM 15  A.  YES.

11:12AM 16  Q.  AND CAN YOU EXPLAIN FOR US WHY THAT WAS A CAUSE FOR

11:12AM 17  CONCERN FOR YOU AT THAT TIME?

11:12AM 18       MR. COOPERSMITH:  OBJECTION.  702.

11:12AM 19       THE COURT:  OVERRULED.

11:12AM 20    YOU CAN ANSWER THE QUESTION, SIR.

11:12AM 21  BY MR. BOSTIC:

11:12AM 22  Q.  WOULD YOU LIKE THE QUESTION AGAIN, DR. ROSENDORFF?

11:12AM 23  A.  YES, PLEASE.

11:12AM 24  Q.  THE QUESTION IS, THE DIFFERENCE BETWEEN THE RANGES ON THE

11:12AM 25  THERANOS CHEMISTRIES VERSUS THE SIEMENS CHEMISTRIES, WHY DID

ROSENDORFF DIRECT BY MR. BOSTIC                                3267

11:12AM 1    THAT MATTER TO YOU AS LABORATORY DIRECTOR?  WHY WERE YOU

11:12AM 2    RAISING IT TO THE CEO?

11:12AM 3    A.   REFERENCE RANGES FOR GLUCOSE ARE EXTREMELY WELL, WELL

11:12AM 4    ESTABLISHED.  SO WHATEVER METHOD IS BEING USED, THOSE REFERENCE

11:12AM 5    RANGES SHOULD CLOSELY MATCH THE PUBLISHED GLUCOSE REFERENCE

11:12AM 6    RANGES.

11:12AM 7        IF THEY ARE SIGNIFICANTLY BELOW IT, AS IS THE CASE HERE,

11:12AM 8    THAT INDICATES A PROBLEM WITH THE ASSAY.

11:13AM 9    Q.   YOU GO ON TO DISCUSS THE RECOMMENDED MAXIMUM BIAS AND THE

11:13AM 10   CB THAT YOU WERE OBSERVING AT THERANOS.

11:13AM 11       DO YOU SEE THAT?

11:13AM 12   A.   YES.

11:13AM 13   Q.   AND YOU SAY, "THE TOTAL ALLOWABLE ERROR (PRECISION PLUS

11:13AM 14   BIAS) IS 10 PERCENT, WHICH MEANS THAT OUR ENTIRE ERROR BUDGET

11:13AM 15   HAS ALREADY BEEN SPENT JUST ON PRECISION."

11:13AM 16       CAN YOU EXPLAIN WHAT YOU MEANT BY THAT?

11:13AM 17   A.   SO TOTAL ALLOWABLE ERROR IS THE SUM OF PRECISION AND BIAS.

11:13AM 18       THE PRECISION IS ALREADY 8 PERCENT, WHICH IS PRETTY CLOSE

11:13AM 19   TO 10 PERCENT.  IT'S NOT THE ENTIRE ERROR BUDGET, BUT IT'S

11:13AM 20   PRETTY CLOSE TO IT.

11:13AM 21       SO WE WOULD HAVE FAILED TOTAL ALLOWABLE ERROR JUST BASED

11:13AM 22   ON PRECISION ALONE.

11:13AM 23   Q.   AT THE END OF THAT PARAGRAPH, YOU ASK A QUESTION OF THE

11:13AM 24   CEO.

11:13AM 25       YOU SAY, "MAYBE WE NEED TO WORK ON OUR CALIBRATORS OR

ER-303

ROSENDORFF DIRECT BY MR. BOSTIC                                    3268

11:14AM  1    CHEMISTRY?"

11:14AM  2         DO YOU SEE THAT?

11:14AM  3    A.   YES, I DO.

11:14AM  4    Q.   WHAT WERE YOU SUGGESTING THERE?

11:14AM  5    A.   A BASIC PROBLEM WITH THE CHEMISTRY OF THERANOS METHODS.

11:14AM  6    Q.   IN OTHER WORDS, THIS WOULD BE GOING BACK TO THE DRAWING

11:14AM  7    BOARD IN A SENSE?

11:14AM  8    A.   EXACTLY.

11:14AM  9    Q.   LET'S LOOK FURTHER DOWN THE SAME PAGE UNDER SODIUM.

11:14AM 10         YOU WRITE, "I NOTICED FOR ONE OF THE DEMOS A FEW PATIENTS

11:14AM 11    HAD SODIUM VALUES IN THE 120'S, WHEREAS 99 PERCENT OF HEALTHY

11:14AM 12    PATIENTS SHOULD HAVE HAD SODIUMS BETWEEN 135-145?"

11:14AM 13         DO YOU SEE THAT?

11:14AM 14    A.   YES.

11:14AM 15    Q.   AND CAN YOU EXPLAIN WHAT THIS MEANS AND WHY YOU FELT THIS

11:14AM 16    WAS WORTH RAISING TO MS. HOLMES?

11:14AM 17    A.   IF A PATIENT TRULY HAS SODIUM IN THE 120'S, IT WOULD

11:14AM 18    RESULT IN THEIR BRAIN SWELLING, DELIRIUM.  THAT'S A LIFE

11:14AM 19    THREATENING SITUATION.

11:14AM 20    Q.   YOU SEEM TO BE REFERENCING A RELATIVELY SMALL NUMBER OF

11:15AM 21    RESULTS THAT YOU HAD SEEN IN THE COMPANY; IS THAT CORRECT?

11:15AM 22    A.   OH, YOU'RE REFERRING TO A FEW PATIENTS IN THE DEMOS.

11:15AM 23    Q.   YES.

11:15AM 24    A.   YES.

11:15AM 25    Q.   AS LABORATORY DIRECTOR, CAN INDIVIDUAL PROBLEMATIC RESULTS

ER-304

11:15AM 1     ALERT YOU TO PROBLEMS ABOUT THE ACCURACY OF A BLOOD ASSAY?

11:15AM 2     A.   YES.

11:15AM 3              MR. COOPERSMITH:  OBJECTION.  702.  MOVE TO STRIKE.

11:15AM 4              THE COURT:  OVERRULED.  THE ANSWER WILL REMAIN.

11:15AM 5     BY MR. BOSTIC:

11:15AM 6     Q.   LET'S LOOK AT HOW YOU END THIS MESSAGE.

11:15AM 7          IN THE BOTTOM PARAGRAPH YOU WRITE, "I WOULD LIKE US TO BE

11:15AM 8     THE BEST THAT WE CAN BE.  A FEW MORE WEEKS TO SORT THROUGH

11:15AM 9     THESE MEDICAL AND LOGISTICAL ISSUES, AND GETTING THE PROPER

11:15AM 10    LEVEL OF TRAINING AND STAFFING WOULD HELP US TREMENDOUSLY."

11:15AM 11         WHAT WERE YOU ASKING FOR HERE?

11:15AM 12    A.   I WAS ASKING FOR MORE TIME TO MAKE SURE THAT THE ASSAYS

11:15AM 13    WERE MEDICALLY -- OF MEDICAL VALUE, AND THAT THERE WAS THE

11:16AM 14    RIGHT LEVEL OF TRAINING AND STAFFING IN THE LABORATORY TO RUN

11:16AM 15    THOSE TESTS.

11:16AM 16    Q.   IN OTHER WORDS, WERE YOU ASKING TO DELAY THE COMMERCIAL

11:16AM 17    LAUNCH OF THE COMPANY'S TESTING?

11:16AM 18    A.   CORRECT.

11:16AM 19    Q.   WAS THAT A REQUEST THAT YOU MADE LIGHTLY?

11:16AM 20    A.   NO, NOT AT ALL.

11:16AM 21    Q.   WHY DID YOU THINK IT WAS NECESSARY TO MAKE THAT REQUEST?

11:16AM 22    A.   IN THE INTEREST OF NOT HARMING PATIENTS.

11:16AM 23    Q.   BETWEEN MS. HOLMES AND MR. BALWANI, DURING YOUR TIME AT

11:16AM 24    THE COMPANY, WHO WAS MOST INVOLVED IN THE RUNNING AND

11:16AM 25    OPERATIONS OF THE CLINICAL LAB?

11:16AM   1        A.    MR. BALWANI.

11:16AM   2        Q.    YOU SENT THIS EMAIL -- WELL, LET'S GO BACK TO PAGE 1 OF

11:16AM   3        THIS EMAIL AND ZOOM IN ON THE HEADER OF YOUR MESSAGE.

11:16AM   4              YOU SENT THIS TO MS. HOLMES AND DANIEL YOUNG.

11:16AM   5              DO YOU SEE THAT?

11:16AM   6        A.    YES, I DID.

11:16AM   7        Q.    WHY DID YOU NOT INCLUDE MR. BALWANI ON THIS EMAIL ABOUT

11:17AM   8        YOUR CONCERNS?

11:17AM   9        A.    WHEN I RAISED CONCERNS TO MR. BALWANI, HE WOULD -- THERE

11:17AM  10        WOULD BE ONE OF TWO RESPONSES.  HE WOULD EITHER CHALLENGE ME

11:17AM  11        THAT THERE WEREN'T REAL CONCERNS, OR HE WOULD DEFLECT TO

11:17AM  12        MR. YOUNG.

11:17AM  13              THERE WAS A THIRD OPTION WHERE HE WOULD SAY THAT HE WOULD

11:17AM  14        ADDRESS THEM, HE WOULD LOOK INTO THEM AND ADDRESS IT.

11:17AM  15        Q.    AND HAD THAT BEEN YOUR EXPERIENCE WITH MR. BALWANI WHEN

11:17AM  16        YOU HAD RAISED CONCERNS PRIOR TO SENDING THIS EMAIL IN LATE

11:17AM  17        AUGUST 2013?

11:17AM  18        A.    YES.

11:17AM  19        Q.    LET'S LOOK AT THE TOP HALF OF THIS PAGE.  A LITTLE FURTHER

11:17AM  20        DOWN, PLEASE.  LET'S JUST INCLUDE THE WHOLE TOP HALF.

11:17AM  21              PERFECT.

11:17AM  22              DR. ROSENDORFF, DO YOU SEE THAT MS. HOLMES THEN FORWARDED

11:17AM  23        YOUR EMAIL TO MR. BALWANI ON THAT SAME DAY?

11:17AM  24        A.    YES.

11:17AM  25        Q.    AND DO YOU SEE THEN MR. BALWANI'S RESPONSE?  HE SAYS, "WE

11:18AM  1     WILL TALK TO HIM."

11:18AM  2     A.   YES.

11:18AM  3     Q.   DO YOU REMEMBER A CONVERSATION WITH MR. BALWANI ABOUT YOUR

11:18AM  4     CONCERNS LEADING UP TO THE LAUNCH?

11:18AM  5     A.   I DO NOT.

11:18AM  6     Q.   MR. BALWANI SAYS, "I ASSUME WE CAN USE SIEMENS CHEMISTRY

11:18AM  7     FOR GLUCOSE AND SODIUM?  IF YES THEN WE SHOULD."

11:18AM  8          DO YOU SEE THAT?

11:18AM  9     A.   YES.

11:18AM  10    Q.   AND DOES THAT MEAN NOT USING THERANOS SPECIFIC TECHNOLOGY?

11:18AM  11    A.   YES.

11:18AM  12    Q.   OKAY.  WE CAN PUT THAT ASIDE.

11:18AM  13         LET ME ASK YOU ABOUT -- WELL, LET ME ASK YOU A SIMPLER

11:18AM  14    QUESTION.

11:18AM  15         WERE YOUR CONCERNS ABOUT THE COMPANY'S READINESS FOR

11:18AM  16    LAUNCH ADDRESSED AND RESOLVED PRIOR TO THE LAUNCH OF TESTING

11:18AM  17    SERVICES AT THERANOS?

11:18AM  18    A.   TO SOME EXTENT, YES.

11:18AM  19    Q.   WERE THEY RESOLVED COMPLETELY?

11:18AM  20    A.   NO.

11:18AM  21    Q.   DID YOU LATER DEVELOP ADDITIONAL CONCERNS ABOUT THE

11:18AM  22    TESTING?

11:18AM  23    A.   YES.

11:18AM  24    Q.   WE SAW A MENTION OF SOME SODIUM RESULTS FROM DEMOS

11:19AM  25    CONDUCTED AT THE COMPANY.

ROSENDORFF DIRECT BY MR. BOSTIC                    3272

11:19AM  1        DO YOU RECALL THAT?

11:19AM  2    A.   YES.

11:19AM  3    Q.   GENERALLY, DID YOU HAVE A ROLE IN THE TECHNOLOGY

11:19AM  4    DEMONSTRATIONS THAT WERE DONE AT THERANOS?

11:19AM  5    A.   MY ROLE WAS TO REVIEW THE RESULTS WITH DANIEL AFTER THE

11:19AM  6    DEMOS WERE COMPLETED.

11:19AM  7    Q.   AND FOR THESE VIP DEMOS, WERE YOU EVER PRESENT AT

11:19AM  8    PRESENTATIONS THAT MR. BALWANI OR MS. HOLMES MADE TO VIP'S

11:19AM  9    WHERE THEY WERE EXPLAINING WHAT THE THERANOS TECHNOLOGY WAS?

11:19AM  10   A.   I WAS NOT.

11:19AM  11   Q.   OKAY.  CAN I ASK YOU TO TURN TO TAB 1491 IN YOUR BINDER,

11:19AM  12   PLEASE.

11:19AM  13   A.   I'M THERE.

11:19AM  14   Q.   OKAY.  AND IS EXHIBIT 1491 AN EMAIL CHAIN THAT INCLUDES

11:20AM  15   YOU AND OTHERS AT THERANOS RELATING TO ONE OF THESE

11:20AM  16   DEMONSTRATIONS?

11:20AM  17   A.   YES.

11:20AM  18        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1491.

11:20AM  19        MR. COOPERSMITH:  802, YOUR HONOR.  OBJECTION.

11:20AM  20        MR. BOSTIC:  I BELIEVE THE BUSINESS RECORD

11:20AM  21   FOUNDATION HAS BEEN LAID THROUGH A PREVIOUS WITNESS, BUT I CAN

11:20AM  22   DO IT AGAIN IF NECESSARY.

11:20AM  23        THE COURT:  YOU'RE SEEKING TO ADMIT THIS AS A

11:20AM  24   BUSINESS RECORD?

11:20AM  25        MR. BOSTIC:  YES, YOUR HONOR.

ER-308

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,        )
6                                    )  CR-18-00258-EJD
                    PLAINTIFF,       )
7                                    )  SAN JOSE, CALIFORNIA
              VS.                    )
8                                    )  APRIL 26, 2022
    RAMESH "SUNNY" BALWANI,          )
9                                    )  VOLUME 22
                    DEFENDANT.       )
10   _____)  PAGES 3697 - 3959

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

09:55AM   1    A DOUBLING OF THE NUMBER OF UNITS IS NECESSARY, IN MY OPINION."

09:55AM   2         DO YOU SEE THAT?

09:55AM   3    A.   YES, I DO.

09:55AM   4              MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

09:55AM   5              THE COURT:  NO FURTHER QUESTIONS?

09:55AM   6              MR. COOPERSMITH:  ON CROSS, NO, YOUR HONOR.

09:56AM   7              THE COURT:  THERE'S REDIRECT.

09:56AM   8              THE WITNESS:  OKAY, EXCELLENT.  THANK YOU.

09:56AM   9         THANK YOU, MR. COOPERSMITH.

09:56AM  10              MR. COOPERSMITH:  YOU'RE WELCOME.

09:56AM  11              MR. BOSTIC:  IF I COULD JUST HAVE A MOMENT TO GET

09:56AM  12    SET UP, YOUR HONOR?

09:56AM  13              THE COURT:  YES.

09:56AM  14         (PAUSE IN PROCEEDINGS.)

09:56AM  15                      **REDIRECT EXAMINATION**

09:56AM  16    BY MR. BOSTIC:

09:56AM  17    Q.   GOOD MORNING, DR. ROSENDORFF.

09:56AM  18    A.   GOOD MORNING, MR. BOSTIC.

09:56AM  19    Q.   I'D LIKE TO ASK YOU JUST A FEW QUESTIONS ABOUT SOME TOPICS

09:56AM  20    THAT YOU DISCUSSED WITH MR. COOPERSMITH, AND IF WE COULD START

09:57AM  21    WITH THE LAUNCH IN SEPTEMBER 2013.

09:57AM  22         DO YOU HAVE THAT TIME PERIOD IN MIND?

09:57AM  23    A.   YES.

09:57AM  24    Q.   THERE'S BEEN SOME DISCUSSION ABOUT WHETHER THAT WAS A

09:57AM  25    LAUNCH TO THE PUBLIC AT LARGE OR TO THERANOS FRIENDS AND

ROSENDORFF REDIRECT BY MR. BOSTIC                                    3727

09:57AM  1    FAMILY.

09:57AM  2         DO YOU REMEMBER THAT DISCUSSION?

09:57AM  3    A.   YES, I DO.

09:57AM  4    Q.   MY QUESTION IS, FROM THE PERSPECTIVE OF A LABORATORY

09:57AM  5    DIRECTOR, IS THERE A SIGNIFICANT DIFFERENCE BETWEEN THOSE TWO?

09:57AM  6    A.   NO DIFFERENCE WHATSOEVER.

09:57AM  7    Q.   CAN YOU EXPLAIN WHY A LAB DIRECTOR VIEWS THOSE TWO

09:57AM  8    SCENARIOS THE SAME?

09:57AM  9    A.   IN BOTH THE SOFT AND A PUBLIC LAUNCH, THOSE TESTS ARE

09:57AM 10    PRESCRIBED AT THE DIRECTION OF A PHYSICIAN.

09:57AM 11         IN ADDITION, THOSE TESTS ARE -- THE RESULTS OF THOSE TESTS

09:57AM 12    ARE BEING USED TO MAKE HEALTH CARE DECISIONS, SOMETIMES VERY

09:57AM 13    IMPORTANT, CRITICAL HEALTH CONDITIONS.

09:57AM 14         AND THIRDLY, THOSE PEOPLE ARE STILL HUMAN BEINGS THAT

09:58AM 15    REQUIRE THE SAME DEGREE OF CARE AS WOULD THE PUBLIC.

09:58AM 16    Q.   SO IN TERMS OF THE ACCURACY AND RELIABILITY OF CLINICAL

09:58AM 17    TESTING, ARE YOUR STANDARDS FOR ACCURACY AND RELIABILITY

09:58AM 18    RELAXED AT ALL IN A FRIENDS AND FAMILY LAUNCH SCENARIO?

09:58AM 19    A.   NOT AT ALL.  BUT THERE'S NO BETA TESTING IN HEALTH CARE.

09:58AM 20    Q.   YOU ALSO DISCUSSED WITH DOCTOR -- OR MR. COOPERSMITH --

09:58AM 21    SORRY -- CONTINUOUS QUALITY CONTROL.

09:58AM 22         DO YOU REMEMBER THAT?

09:58AM 23    A.   YES, I DID.

09:58AM 24    Q.   CAN YOU EXPLAIN JUST BRIEFLY WHAT THE DIFFERENCE IS

09:58AM 25    BETWEEN DAILY QUALITY CONTROL AND CONTINUOUS QUALITY CONTROL?

09:58AM  1    A.    SO NOT TO BE NITPICKY, BUT I THINK THE PHRASE IS

09:58AM  2    CONTINUOUS QUALITY IMPROVEMENT.  IT'S A PRINCIPLE THAT ALMOST

09:58AM  3    ALL GOOD LABORATORIES FOLLOW WHERE YOU'RE JUST NOT LOOKING TO

09:58AM  4    FOLLOW THE LAW, YOU'RE LOOKING TO IMPROVE QUALITY AND PROCESSES

09:58AM  5    THROUGHOUT THE LIFE THE LAB.

09:59AM  6    Q.    AND DO YOU RECALL A DISCUSSION WITH MR. COOPERSMITH ABOUT

09:59AM  7    SOMETHING CALLED LEVEY-JENNINGS AND THE WESTGARD RULES?

09:59AM  8    A.    YES, I DO.

09:59AM  9    Q.    AND IS THAT SOMETHING THAT TAKES PLACE OVER A PERIOD OF

09:59AM 10    TIME AS OPPOSED TO DAILY QUALITY CONTROL TESTING?

09:59AM 11    A.    YES, IT DOES.

09:59AM 12    Q.    ON DIRECT WE TALKED ABOUT SOME PROBLEMS THAT YOU OBSERVED

09:59AM 13    WITH THERANOS'S PERFORMANCE IN DAILY QUALITY CONTROL.

09:59AM 14          DO YOU RECALL THAT?

09:59AM 15    A.    YES.

09:59AM 16    Q.    WHEN IT COMES TO THIS KIND OF OVER TIME TRACKING OF

09:59AM 17    QUALITY CONTROL PERFORMANCE, I'M WONDERING WHETHER PERFORMANCE

09:59AM 18    OVER TIME CAN MAKE UP FOR BAD PERFORMANCE ON DAILY QUALITY

09:59AM 19    CONTROL.

09:59AM 20          DO YOU UNDERSTAND THAT QUESTION?

09:59AM 21    A.    CAN I ASK YOU TO DIG INTO THAT A LITTLE BIT MORE?

09:59AM 22    Q.    YES.

09:59AM 23          SO WE TALKED ABOUT PROBLEMS WITH DAILY QUALITY CONTROL

09:59AM 24    PROBLEMS AT THERANOS; RIGHT?

09:59AM 25    A.    YES.

09:59AM   1      Q.   IS THERE ANY WAY THAT LOOKING AT THE DATA OVER TIME COULD

10:00AM   2      REDEEM THAT PERFORMANCE?

10:00AM   3          IN OTHER WORDS --

10:00AM   4              MR. COOPERSMITH:  OBJECTION.  LEADING.

10:00AM   5              THE COURT:  WHY DON'T YOU REASK THE QUESTION?

10:00AM   6      BY MR. BOSTIC:

10:00AM   7      Q.   IN OTHER WORDS, DR. ROSENDORFF, IS THERE ANY SCENARIO

10:00AM   8      WHERE THE PROBLEMS IDENTIFIED WITH DAILY QUALITY CONTROL GO

10:00AM   9      AWAY WHEN YOU LOOK AT THINGS LIKE WESTGARD RULES AND

10:00AM  10      LEVEY-JENNINGS?

10:00AM  11              MR. COOPERSMITH:  OBJECTION.  LEADING.

10:00AM  12              THE COURT:  OVERRULED.

10:00AM  13              THE WITNESS:  NO.  IN MY OPINION -- IT'S JUST AN

10:00AM  14      OPINION, IT'S NOT EXPERT TESTIMONY -- DAILY QC IS THE MOST

10:00AM  15      IMPORTANT QC.  IN FACT, IT'S ALSO PART OF WESTGARD RULES.  SO

10:00AM  16      IT'S WRAPPED UP INTO WESTGARD RULES, DAILY QC.

10:00AM  17      BY MR. BOSTIC:

10:00AM  18      Q.   THERE'S ALSO BEEN SOME DISCUSSION DURING DIRECT AND CROSS

10:00AM  19      ABOUT THERANOS'S METHOD OF DILUTING BLOOD SAMPLES BEFORE

10:00AM  20      TESTING.

10:00AM  21          DO YOU RECALL THAT?

10:00AM  22      A.   YES.

10:00AM  23      Q.   DURING YOUR TIME AT THERANOS, DID YOU OBSERVE ANY PROBLEMS

10:01AM  24      CREATED IN TERMS OF ACCURACY OR SENSITIVITY AS A RESULT OF

10:01AM  25      THERANOS'S PRACTICE OF DILUTING SAMPLES?

10:01AM   1              MR. COOPERSMITH:  OBJECTION.  702.

10:01AM   2              THE COURT:  OVERRULED.

10:01AM   3              THE WITNESS:  DURING VALIDATION, THERE WERE ATTEMPTS

10:01AM   4     TO MATCH THE MANUFACTURER SENSITIVITY FOR THE TEST.

10:01AM   5          THOSE, THOSE -- THAT SENSITIVITY IS SPELLED OUT IN THE

10:01AM   6     PACKAGE INSERT OF THE TEST.

10:01AM   7          BECAUSE OF THE DILUTION, IN MULTIPLE INSTANCES WE WERE NOT

10:01AM   8     ABLE TO MATCH THE SENSITIVITY OF THE PREDICATE TESTS.

10:01AM   9     BY MR. BOSTIC:

10:01AM  10     Q.   AND WHAT DOES THAT MEAN IN PLAIN ENGLISH IF THE THERANOS

10:01AM  11     TESTS COULD NOT MATCH THE SENSITIVITY OF THE CONVENTIONAL

10:01AM  12     TESTS?

10:01AM  13     A.   IT MEANS THAT THE LABORATORY WOULD NOT BE ABLE TO REPORT

10:01AM  14     BELOW A CERTAIN NUMBER.

10:01AM  15          THAT NUMBER WOULD BE HIGHER FOR THE THERANOS TESTS.

10:01AM  16          SO, FOR INSTANCE, IF -- TO DETECT MILD LIVER DAMAGE, YOU

10:02AM  17     NEED TO GO DOWN TO 20 UNITS OF AST.  THERANOS WOULD ONLY BE

10:02AM  18     ABLE TO GO UP TO MAYBE 50 OR 60 -- GO DOWN TO 50 OR 60, I'M

10:02AM  19     SORRY.

10:02AM  20          SO IN MANY CLINICAL SCENARIOS, THE THERANOS TESTS JUST

10:02AM  21     DIDN'T HAVE THE SENSITIVITY.

10:02AM  22     Q.   THERE WAS ALSO SOME DISCUSSION ABOUT YOUR OBSERVATIONS

10:02AM  23     WHEN IT CAME TO SOMETHING CALLED HEMOLYSIS.

10:02AM  24          DO YOU REMEMBER THAT?

10:02AM  25     A.   YES.

10:02AM  1    Q.   AND CAN YOU REMIND US WHAT HEMOLYSIS MEANS?

10:02AM  2    A.   YEAH, SURE.  HEMOLYSIS IS WHEN YOU COLLECT THE BLOOD,

10:02AM  3    PARTICULARLY WHEN YOU DO A FINGER PRICK AND YOU SQUEEZE THE

10:02AM  4    FINGER, WHAT HAPPENS IS THAT YOU DAMAGE THE RED BLOOD CELLS AND

10:02AM  5    THEY POP.

10:02AM  6         AND SO WHATEVER IS INSIDE OF THE RED BLOOD CELLS GETS INTO

10:02AM  7    THE SAMPLE, AND IT CAN REALLY INTERFERE WITH THE DETECTION OF A

10:02AM  8    LOT OF DIFFERENT THINGS.

10:02AM  9    Q.   IN YOUR EXPERIENCE AT THERANOS, DID HEMOLYSIS HAVE ANY

10:03AM 10    EFFECT ON THE ACCURACY AND RELIABILITY OF CERTAIN TESTS?

10:03AM 11              MR. COOPERSMITH:  OBJECTION.  702.

10:03AM 12              MR. BOSTIC:  I'M JUST ASKING ABOUT HIS OBSERVATIONS,

10:03AM 13    YOUR HONOR.

10:03AM 14              THE COURT:  OVERRULED.

10:03AM 15         YOU CAN ANSWER THE QUESTION.

10:03AM 16              THE WITNESS:  YES.  THERE'S A LARGE AMOUNT OF

10:03AM 17    HEMOGLOBIN IN RED BLOOD CELLS, AND WHEN THAT SPILLS OUT INTO

10:03AM 18    THE SAMPLE IT TURNS IT PINK AND THAT INTERFERES WITH THE

10:03AM 19    ABILITY OF THE READERS TO READ WHAT IS IN THE SAMPLE.

10:03AM 20    BY MR. BOSTIC:

10:03AM 21    Q.   AND IS THAT SOMETHING THAT YOU SAW HAPPEN AT THERANOS?

10:03AM 22    A.   YES.

10:03AM 23    Q.   AND WAS IT A FREQUENT OR INFREQUENT THING THAT YOU

10:03AM 24    OBSERVED?

10:03AM 25    A.   FREQUENT.

10:03AM  1    Q.   AND WHEN IT CAME TO HEMOLYSIS, THINKING OF THE THERANOS

10:03AM  2    FINGERSTICK METHOD VERSUS THE CONVENTIONAL VEIN DRAW, DID YOU

10:03AM  3    OBSERVE HEMOLYSIS HAPPEN MORE IN ONE THAN THE OTHER?

10:03AM  4    A.   WAY, WAY MORE FREQUENTLY WITH FINGERSTICK.  I CAN'T -- I

10:03AM  5    COULD VENTURE THE PERCENTAGE, BUT I'LL JUST LEAVE IT AT THAT,

10:04AM  6    THAT IT WAS WAY MORE FREQUENT WITH FINGERSTICK.

10:04AM  7    Q.   OKAY.  YOU WERE ALSO ASKED SOME QUESTIONS DURING

10:04AM  8    CROSS-EXAMINATION ABOUT THERANOS'S LABORATORY INFORMATION

10:04AM  9    SYSTEM.

10:04AM  10        DO YOU REMEMBER THAT?

10:04AM  11   A.   YES.

10:04AM  12   Q.   CAN YOU -- LET'S SEE.

10:04AM  13        LET ME ASK, IF YOU WERE LOOKING AT THE LAB RESULT AND

10:04AM  14   TRYING TO DETERMINE WHETHER IT WAS ACCURATE OR INACCURATE AFTER

10:04AM  15   THE FACT --

10:04AM  16   A.   YES.

10:04AM  17   Q.   -- WHAT KINDS OF DATA WOULD YOU BE LOOKING AT?

10:04AM  18   A.   I WOULD GO BACK AND REVIEW THE QUALITY CONTROL RECORDS FOR

10:04AM  19   THAT DAY.

10:04AM  20   Q.   WHEN IT CAME TO IDENTIFYING A PARTICULAR LAB RESULT AS

10:04AM  21   INACCURATE, WOULD YOU EVER CONSIDER PATIENT FACTORS, LIKE HOW A

10:04AM  22   PATIENT WAS PRESENTING?

10:04AM  23   A.   YES.  CLINICALLY IF A PATIENT'S HYPERTHYROID, FOR

10:04AM  24   INSTANCE, HAS AN OVERACTIVE THYROID GLAND, I WOULD FULLY EXPECT

10:05AM  25   THE TSH TO BE VERY, VERY LOW.

10:05AM  1          IF WE -- IN TALKING TO THE DOCTORS WHO ARE ORDERING THE

10:05AM  2     TESTS, IF THE THERANOS TEST WASN'T SHOWING THAT, THAT WOULD

10:05AM  3     RAISE ALARM BELLS FOR ME.

10:05AM  4     Q.   SO LET'S TAKE AN EXAMPLE LIKE THAT.

10:05AM  5          INFORMATION FROM A PATIENT'S DOCTOR ABOUT CONDITIONS THAT

10:05AM  6     THE PATIENT MIGHT HAVE OR HOW THEY WERE PRESENTING, WOULD THAT

10:05AM  7     INFORMATION BE STORED IN THERANOS'S LABORATORY INFORMATION

10:05AM  8     SYSTEM?

10:05AM  9     A.   NO, IT WOULD NOT.

10:05AM  10    Q.   WHEN IDENTIFYING SPECIFIC LAB RESULTS AS INACCURATE, WOULD

10:05AM  11    YOU EVER CONSIDER CONTEMPORANEOUS RESULTS FROM OTHER LABS

10:05AM  12    BESIDES THERANOS?

10:05AM  13    A.   YES, OF COURSE.  ON FREQUENT OCCASIONS I WOULD GET EMAILS

10:05AM  14    FROM DOCTORS SAYING THAT THE PATIENT HAD BEEN TESTED AT THE

10:05AM  15    SAME TIME AT QUEST OR A DAY LATER AT QUEST, FOR INSTANCE, AND

10:05AM  16    HAD VERY DIFFERENT RESULTS.

10:05AM  17    Q.   AND SAME QUESTION FOR THAT.

10:05AM  18         WAS -- WERE RESULTS FROM CONVENTIONAL LABS, NON-THERANOS

10:06AM  19    LABS, STORED IN THE THERANOS LABORATORY INFORMATION SYSTEM?

10:06AM  20    A.   NO.

10:06AM  21    Q.   LOOKING AT THE LABORATORY INFORMATION SYSTEM -- FIRST OF

10:06AM  22    ALL, LET ME ASK, DID YOU EVER ACTUALLY ACCESS THE LIS?  DID YOU

10:06AM  23    LOG IN AND VIEW THE DATA?

10:06AM  24    A.   I DID.

10:06AM  25    Q.   LOOKING AT THAT DATA, WAS IT POSSIBLE TO LOOK AT THE

10:06AM   1     INDIVIDUAL RESULTS AND IDENTIFY THEM INDIVIDUALLY AS ACCURATE

10:06AM   2     OR INACCURATE?

10:06AM   3     A.   NO.

10:06AM   4     Q.   I'D LIKE TO ASK YOU SOME QUESTIONS ABOUT THE HCG TEST.

10:06AM   5          CAN YOU REMIND US WHAT THAT TEST WAS USED FOR?

10:06AM   6     A.   THE COURT REPORTER IS PROBABLY USED TO THIS LONG WORD BY

10:06AM   7     NOW, BUT IT'S HUMAN CHORIONIC GONADOTROPIN, AND THAT'S A

10:06AM   8     PREGNANCY HORMONE.

10:06AM   9               MR. BOSTIC:  THANK YOU.

10:06AM  10          YOUR HONOR, 4147 IS ALREADY ADMITTED.

10:06AM  11          MAY WE PUBLISH?

10:07AM  12               THE COURT:  YES.

10:07AM  13     BY MR. BOSTIC:

10:07AM  14     Q.   DR. ROSENDORFF, WE SEE HERE AN EMAIL THAT WE REVIEWED

10:07AM  15     BEFORE FROM MAY 30TH, 2014, --

10:07AM  16               MR. COOPERSMITH:  I'M SORRY TO INTERRUPT,

10:07AM  17     YOUR HONOR.  BUT MY SCREEN IS SOMEHOW NOT -- YOU HAVE TO TURN

10:07AM  18     IT ON APPARENTLY.

10:07AM  19          (LAUGHTER.)

10:07AM  20     BY MR. BOSTIC:

10:07AM  21     Q.   DR. ROSENDORFF, YOUR SCREEN IS ON; CORRECT?

10:07AM  22     A.   YES, SIR.

10:07AM  23     Q.   DO YOU SEE YOUR EMAIL FROM MAY 30TH, 2014, WHERE YOU RELAY

10:07AM  24     YOUR DECISION TO STOP HCG TESTING ON THE EDISON?

10:07AM  25          DO YOU SEE THAT?

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

        UNITED STATES OF AMERICA,          )
6                                          )  CR-18-00258-EJD
                        PLAINTIFF,         )
7                                          )  SAN JOSE, CALIFORNIA
                  VS.                      )
8                                          )  APRIL 29, 2022
        RAMESH "SUNNY" BALWANI,            )
9                                          )  VOLUME 24
                        DEFENDANT.         )
10      _____    )  PAGES 4227 - 4480

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14      A P P E A R A N C E S:

15      FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                              BY:  JOHN C. BOSTIC
16                                 JEFFREY B. SCHENK
                              150 ALMADEN BOULEVARD, SUITE 900
17                            SAN JOSE, CALIFORNIA 95113

18                            BY:  ROBERT S. LEACH
                                   KELLY VOLKAR
19                            1301 CLAY STREET, SUITE 340S
                              OAKLAND, CALIFORNIA 94612
20
                 (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
        OFFICIAL COURT REPORTERS:
22                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                              CERTIFICATE NUMBER 8074
23                            LEE-ANNE SHORTRIDGE, CSR, CRR
                              CERTIFICATE NUMBER 9595
24
             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

08:51AM 1    LIMITING INSTRUCTION ON THE PURPOSE FOR THE 2006 TESTIMONY.

08:51AM 2        BUT I DON'T THINK, AS WE'RE HAVING THE DISCUSSION NOW, IT

08:51AM 3    SO OBVIOUSLY RISES TO THAT LEVEL.  AND THE REASON I THINK THAT

08:51AM 4    IS BECAUSE OF THE 403 ARGUMENTS I MADE TO THE COURT A MOMENT

08:51AM 5    AGO.

08:51AM 6        THE RISK OF PREJUDICE FROM THESE STATEMENTS IS ALMOST

08:51AM 7    ZERO.

08:51AM 8            THE COURT:  WELL, IF, IF -- AND I TAKE YOU AT YOUR

08:51AM 9    WORD THAT YOU'RE NOT GOING TO ARGUE IN ANY WAY THAT THE JURY

08:51AM 10   SHOULD FIND MR. BALWANI GUILTY FOR STATEMENTS MADE IN 2006.

08:52AM 11   THE COURT WOULDN'T PERMIT YOU TO DO THAT AND YOU WOULDN'T

08:52AM 12   ADVANCE THAT.

08:52AM 13           MR. SCHENK:  YES, YOUR HONOR.

08:52AM 14           THE COURT:  BUT I THINK THAT'S THE DANGER HERE IS,

08:52AM 15   CAN THEY SOMEHOW GET THERE?

08:52AM 16       WILL WE HAVE TO AND WILL WE NEED AN INSTRUCTION, A FINAL

08:52AM 17   INSTRUCTION THAT LIMITS THE SCOPE?  I DON'T KNOW.  THAT'S

08:52AM 18   ANOTHER POTENTIAL REMEDY.  I DON'T WANT TO GET THERE YET,

08:52AM 19   BECAUSE AS YOU SAY, WE DON'T KNOW WHAT THE TESTIMONY IS.  WE'RE

08:52AM 20   TRYING TO FRAME THAT.

08:52AM 21           MS. MCDOWELL:  YES.  THANK YOU, YOUR HONOR.

08:52AM 22       I DID HEAR FROM THE GOVERNMENT -- WHAT I'M HEARING FROM

08:52AM 23   MR. SCHENK IS THAT THEY ARE NOT GOING TO ELICIT TESTIMONY FROM

08:52AM 24   MR. TOLBERT ABOUT PURPORTED, SPECIFIC PURPORTED

08:52AM 25   MISREPRESENTATIONS MS. HOLMES MADE IN 2006.

08:52AM 1    SO IF THAT'S THE CASE, I THINK WE MAY BE ON THE SAME PAGE.

08:52AM 2    BUT I DO THINK THAT A LIMITING INSTRUCTION BEFORE

08:52AM 3    MR. TOLBERT TESTIFIES WOULD BE APPROPRIATE HERE, AND WE

08:53AM 4    ACTUALLY HAVE ONE THAT WE HAVE DRAFTED HERE IF I COULD PASS IT

08:53AM 5    UP.

08:53AM 6        THE COURT:  IMAGINE THAT.

08:53AM 7        MS. MCDOWELL:  YEAH (HANDING.)

08:53AM 8        THE COURT:  YES.  I DON'T KNOW ABOUT A LIMITING

08:53AM 9    INSTRUCTION BEFORE THE WITNESS TESTIFIES.

08:53AM 10    YOU HAVE THIS, MR. SCHENK?

08:53AM 11        MR. SCHENK:  I DO.

08:53AM 12        MS. MCDOWELL:  AND SO WHAT WE'RE PROPOSING HERE IS

08:53AM 13    IF THERE'S A SIGNIFICANT FOCUS ON THE 2006 EVENTS AND

08:53AM 14    STATEMENTS, THAT THE JURY IS INSTRUCTED THAT HIS TESTIMONY

08:53AM 15    RELATED TO EVENTS IN 2006 OR STATEMENTS MADE BY MS. HOLMES OR

08:53AM 16    MATERIALS HE REVIEWED IN 2006 CANNOT BE USED TO INFER ANYTHING

08:53AM 17    ABOUT MR. BALWANI'S KNOWLEDGE OR INTENT IN THIS CASE, AND I

08:53AM 18    WOULD HOPE THAT THE GOVERNMENT WOULD FIND THIS NOT TO BE

08:53AM 19    CONTROVERSIAL.

08:53AM 20    THIS IS -- YOU KNOW, OBVIOUSLY UNDER BLACK LETTER

08:53AM 21    CONSPIRACY LAW, YOU CAN'T IMPUTE MS. HOLMES'S CRIMINAL INTENT

08:54AM 22    OUTSIDE OF ANY CONCEIVABLE CONSPIRACY TO MR. BALWANI, SO I

08:54AM 23    THINK THAT THIS SORT OF LIMITING INSTRUCTION WOULD HELP

08:54AM 24    MITIGATE THE RISK THAT FAR.

08:54AM 25        THE COURT:  OKAY.

08:54AM 1     MR. SCHENK.

08:54AM 2         MR. SCHENK:  TWO POINTS.

08:54AM 3     I JUST WANT TO BE CLEAR, IT SOUNDED LIKE MS. MCDOWELL WAS

08:54AM 4     SAYING THAT HER UNDERSTANDING IS THAT THE GOVERNMENT DOES NOT

08:54AM 5     INTEND TO ELICIT SPECIFIC FALSE MISREPRESENTATIONS THAT

08:54AM 6     MS. HOLMES MADE TO MR. TOLBERT IN 2006.

08:54AM 7     WE DO INTEND TO ELICIT MISREPRESENTATIONS THAT MS. HOLMES

08:54AM 8     MADE TO MR. TOLBERT IN 2006.

08:54AM 9     THE QUESTION OF FALSITY COMES THROUGH PIECES OF EVIDENCE

08:54AM 10    COMPARING WHAT MS. HOLMES SAID AND THE REALITY.  THE GOVERNMENT

08:54AM 11    DOES NOT INTEND TO DO THAT.

08:54AM 12        THE COURT:  THAT'S WHAT I HEARD YOU SAY.

08:54AM 13        MR. SCHENK:  YES.  BUT I DON'T WANT THERE TO BE

08:54AM 14    CONFUSION ABOUT REPRESENTATIONS THAT TOLBERT HEARD IN 2006.

08:54AM 15    I DO INTEND TO ASK HIM, WHEN YOU WENT TO PALO ALTO IN

08:54AM 16    2006, WHAT DID YOU HEAR AND WHAT DID YOU LEARN?

08:55AM 17        THE COURT:  AND THAT'S HOW I UNDERSTOOD IT,

08:55AM 18    MS. MCDOWELL, BECAUSE THAT DOES INFORM THEN A 2013, A 2013

08:55AM 19    INVESTMENT DECISION LOOKING BACK ON IT.

08:55AM 20    SO I -- MY SENSE IS NOW THAT THAT WOULD BE PERMITTED.

08:55AM 21        MS. MCDOWELL:  UNDERSTOOD, YOUR HONOR.

08:55AM 22    SO IN THAT CASE, WE DO THINK THAT, YOU KNOW, A LIMITING

08:55AM 23    INSTRUCTION JUST TO GIVE THE JURY SOME GUIDANCE ON THIS ISSUE,

08:55AM 24    EITHER BEFORE MR. TOLBERT TESTIFIES OR AS THIS TESTIMONY COMES

08:55AM 25    IN, WE THINK THAT WOULD BE APPROPRIATE TO GUIDE THE JURY AS TO

4245

08:55AM 1    HOW THEY SHOULD BE CONSIDERING THAT SORT OF TESTIMONY.

08:55AM 2        AND JUST TO BRIEFLY PREVIEW THE ARGUMENT THAT MY

08:55AM 3    COLLEAGUE, MR. CAZARES, THE OTHER MATTER THAT WE'RE GOING TO

08:55AM 4    TAKE UP THIS MORNING HERE IS THAT IT'S TROUBLING THAT THE

08:55AM 5    GOVERNMENT PLANS TO OBJECT TO ANY PLAYING OF THE TAPE IN 2013

08:55AM 6    THAT MS. HOLMES -- THE MS. HOLMES CONFERENCE CALL WHERE

08:56AM 7    MR. TOLBERT WAS ON.

08:56AM 8        AND THAT TAPE IS WHAT SHE ACTUALLY SAID DURING THE CHARGED

08:56AM 9    CONSPIRACY, BUT THEN THEY'RE FOCUSSED ON WANTING TO INTRODUCE

08:56AM 10   REPRESENTATIONS THAT MS. HOLMES MADE OUTSIDE OF ANY CONCEIVABLE

08:56AM 11   CONSPIRACY.

08:56AM 12       SO THAT'S TROUBLING TO US, AND WE THINK THAT AT THE VERY

08:56AM 13   LEAST A LIMITING INSTRUCTION WOULD HELP MITIGATE THE RISK TO

08:56AM 14   MR. BALWANI HERE.

08:56AM 15           THE COURT:  OKAY.

08:56AM 16           MR. SCHENK:  I'M NOT SURE I GET THE CONNECTION

08:56AM 17   BETWEEN THE RECORDINGS AND THIS ISSUE.

08:56AM 18       I WOULD LIKE THE COURT TO DEFER ON THE LIMITING

08:56AM 19   INSTRUCTION AND ALLOW THE GOVERNMENT SOME TIME TO REVIEW IT,

08:56AM 20   AND LET'S SEE HOW THE TESTIMONY COMES IN.  BUT -- SORRY.

08:56AM 21           THE COURT:  AS I SAID, I'M NOT INCLINED TO GIVE A

08:56AM 22   LIMITING INSTRUCTION BEFORE ANY EVIDENCE COMES IN UNLESS I KNOW

08:56AM 23   WHAT IT IS.

08:56AM 24       IF THERE'S A TRANSCRIPT, AN AGREED UPON TRANSCRIPT THAT IS

08:56AM 25   GOING TO BE SUBMITTED TO THE JURY, THAT'S THE APPROPRIATE TIME

08:56AM 1    TO GIVE A LIMITING INSTRUCTION, BUT HERE IT'S KIND OF FLUID.

08:56AM 2         SO I APPRECIATE THIS.  WE'LL HOLD ON TO THIS AND HOLD ON

08:57AM 3    TO OUR SEATS AND SEE WHERE THE EVIDENCE TAKES US.

08:57AM 4         BUT AT LEAST, JUST FOR CLARITY'S SAKE HERE, THE GOVERNMENT

08:57AM 5    HAS SAID THAT THEY'RE NOT GOING TO INTRODUCE THE 37, 90, AND

08:57AM 6    4871 --

08:57AM 7              MS. MCDOWELL:  CORRECT.

08:57AM 8              THE COURT:  -- AS EXHIBITS.  THAT WON'T COME IN.

08:57AM 9         TESTIMONY WILL COME IN AND THE COURT WILL PERMIT INQUIRY

08:57AM 10   OF MR. TOLBERT REGARDING, REGARDING STATEMENTS MADE BY

08:57AM 11   MS. HOLMES, I GUESS IT IS, ABOUT WHAT HE HEARD AND HOW THAT --

08:57AM 12   AND THE BASIS FOR THAT IS THE COURT FINDS IT IS RELEVANT FOR

08:57AM 13   HIS -- AND HE WILL TESTIFY, I ASSUME, ABOUT A 2013 INVESTMENT.

08:57AM 14   AND TO MATCH THOSE TWO TOGETHER, IT IS RELEVANT, THE COURT

08:57AM 15   FINDS, FOR HIM TO TESTIFY ABOUT THE 2013 DECISION.

08:57AM 16        AND I THINK WE KNOW HIS INITIAL INVESTMENT WAS $2 MILLION,

08:57AM 17   AND THAT WAS NOT AN INVESTMENT THAT WAS MADE DIRECTLY.  IT WAS

08:58AM 18   MADE THROUGH A THIRD PARTY AS I UNDERSTAND IT.

08:58AM 19        IT SEEMS TO BE RELEVANT AS TO WHY THAT INVESTMENT WAS

08:58AM 20   INCREASED TO $5 MILLION AND CHANGED FROM A THIRD PARTY CONDUIT

08:58AM 21   TO A DIRECT INVESTMENT, AND I THINK THE JURY IS ENTITLED TO

08:58AM 22   HEAR ANY RELEVANCE ABOUT THAT, WHY THAT DISTINCTION CAME UP OR

08:58AM 23   WHAT THAT WAS ABOUT.

08:58AM 24        SO I'LL PERMIT INQUIRY IN THAT REGARD.

08:58AM 25              MS. MCDOWELL:  THANK YOU.

4247

08:58AM 1        UNDERSTOOD, YOUR HONOR.

08:58AM 2        I THINK THAT WHAT WE WOULD -- WHAT WE WERE FOCUSSING ON

08:58AM 3  WAS SPECIFICALLY THE FINANCIAL PROJECTIONS, DETAILS ABOUT THE

08:58AM 4  PHARMACEUTICAL COMPANIES, SO I GUESS WE'LL HAVE TO SEE HOW THE

08:58AM 5  TESTIMONY COMES IN, BUT WE WOULD SAY THAT WOULDN'T BE RELEVANT

08:58AM 6  TO INFORM THE 2013 INVESTMENT.  THAT WAS RELEVANT TO INFORM THE

08:58AM 7  2006 INVESTMENT.

08:58AM 8           THE COURT:  OKAY.

08:58AM 9           MS. MCDOWELL:  YES.

08:58AM 10          THE COURT:  ALL RIGHT.  THANK YOU.

08:58AM 11    ANYTHING FURTHER --

08:58AM 12          MS. MCDOWELL:  NO.

08:58AM 13          THE COURT:  -- ON THIS?

08:58AM 14          MS. MCDOWELL:  MY COLLEAGUE, MR. CAZARES, HAS

08:59AM 15  ANOTHER ISSUE TO TAKE UP.

08:59AM 16          THE COURT:  OKAY.  THERE'S SOMETHING ABOUT A TAPE?

08:59AM 17          MR. SCHENK:  YES, YOUR HONOR.

08:59AM 18          MR. CAZARES:  YES, YOUR HONOR.  GOOD MORNING,

08:59AM 19  YOUR HONOR.

08:59AM 20    STEPHEN CAZARES FOR MR. BALWANI.

08:59AM 21          THE COURT:  GOOD MORNING.

08:59AM 22          MR. CAZARES:  SO WE WANTED TO ADDRESS AN ISSUE WITH

08:59AM 23  THE COURT RELATING TO MR. TOLBERT'S TESTIMONY RELATING TO THE

08:59AM 24  DECEMBER 2013 CONFERENCE CALL THAT I KNOW THE COURT RECALLS

08:59AM 25  FROM THE PRIOR TRIAL.

ER-325

08:59AM 1    SO WHAT HAPPENED IN MS. HOLMES'S TRIAL WAS THE GOVERNMENT

08:59AM 2    IN ITS DIRECT EXAMINATION INTRODUCED EXCERPTS FROM THAT

08:59AM 3    12-20-2013 RECORDING OF MS. HOLMES SPEAKING TO INVESTORS.

08:59AM 4        THE DEFENSE INTRODUCED SOME SUPPLEMENTAL 106 PIECES ON THE

08:59AM 5    CROSS.

08:59AM 6        AND THEN THE PARTIES ARGUED IT OUT IN THE END.

08:59AM 7        WHAT I'M LEARNING FROM THE GOVERNMENT NOW IS THE

08:59AM 8    GOVERNMENT INTENDS, ON DIRECT EXAMINATION WITH MR. TOLBERT, TO

08:59AM 9    QUERY HIM ABOUT THAT CONFERENCE CALL, HIS RECOLLECTION OF A

08:59AM 10   CALL THAT TOOK PLACE ALMOST TEN YEARS AGO, USED SOME NOTES,

08:59AM 11   NON-VERBATIM NOTES THAT HE TOOK DURING THE CONFERENCE CALL AS

09:00AM 12   AN ANCHOR I GUESS AT SOME LEVEL FOR HIS RECOLLECTION.

09:00AM 13       BUT THEY DON'T INTEND TO INTRODUCE THE RECORDINGS

09:00AM 14   THEMSELVES OF WHAT MS. HOLMES ACTUALLY SAID, THE WORDS THAT THE

09:00AM 15   COURT KIND OF LEANED ON SOMEWHAT JUST NOW IN TALKING ABOUT THE

09:00AM 16   RELEVANCE OF THE 2006 STATEMENTS BY MS. HOLMES TO THE 2013

09:00AM 17   CONFERENCE CALL THAT LED TO MR. TOLBERT AND MR. HALL'S

09:00AM 18   INVESTMENT.

09:00AM 19       SO GIVEN THAT, THEY CAN TRY THEIR CASE HOW THEY WANT.  I

09:00AM 20   MEAN, IT'S A LITTLE SHOCKING TO ME THAT THE GOVERNMENT WOULD

09:00AM 21   NOT INTRODUCE A RECORDING IN A FRAUD CASE OF A DEFENDANT OR A

09:00AM 22   CODEFENDANT OF WHAT THE DEFENDANT ACTUALLY SAID TO AN INVESTOR.

09:00AM 23       AGAIN, IT'S THEIR CHOICE.

09:00AM 24       BUT I'M TOLD THE GOVERNMENT IS NOW GOING TO OBJECT TO THE

09:00AM 25   DEFENSE USING THE RECORDING IN CROSS-EXAMINATION WITH

09:00AM 1   MR. TOLBERT.

09:00AM 2        WE THINK THE RECORDING IS RELEVANT.

09:00AM 3            THE COURT:  TELL ME -- PARDON ME FOR INTERRUPTING

09:00AM 4   YOU.  TELL ME, WHAT DO YOU WISH TO DO THEN ON

09:01AM 5   CROSS-EXAMINATION?

09:01AM 6            MR. CAZARES:  TO PLAY THE RECORDING AND ASK HIM

09:01AM 7   QUESTIONS ABOUT WHAT MS. HOLMES SAID, WHAT HE THOUGHT ABOUT

09:01AM 8   THAT.

09:01AM 9        BECAUSE HE HAS ALREADY TESTIFIED, AND I'M ASSUMING HE'S

09:01AM 10  GOING TO TESTIFY AGAIN, THAT THIS RECORDING, THIS CONFERENCE

09:01AM 11  CALL, INFLUENCED HIS DECISION TO INVEST, WHICH IS A NONHEARSAY

09:01AM 12  PURPOSE.

09:01AM 13       THAT'S THE GOVERNMENT'S OWN THEORY FOR ELICITING THE

09:01AM 14  TESTIMONY FROM MR. TOLBERT REGARDING THE INVESTMENT, THAT IT

09:01AM 15  CAUSED HIM TO INVEST.

09:01AM 16           THE COURT:  SO, SO --

09:01AM 17           MR. CAZARES:  WE WANT TO RESPOND, CROSS-EXAMINE,

09:01AM 18  RELATING TO THE ACTUAL WORDS SHE SAID, NOT JUST HIS

09:01AM 19  RECOLLECTION OF WHAT SHE SAID.

09:01AM 20           THE COURT:  SO YOU WANT TO PLAY THE ENTIRETY OF THE

09:01AM 21  TAPE?

09:01AM 22           MR. CAZARES:  EXCERPTS, YOUR HONOR.  EXCERPTS, MUCH

09:01AM 23  LIKE WHAT HAPPENED IN THE HOLMES TRIAL.

09:01AM 24           THE COURT:  OKAY.  AND DO YOU HAVE THOSE IDENTIFIED?

09:01AM 25           MR. CAZARES:  THEY ARE MOSTLY ACTUALLY THE EXCERPTS

09:01AM 1    THAT THE GOVERNMENT USED THEMSELVES IN THE PRIOR TRIAL, ALONG

09:01AM 2    WITH ONE SUPPLEMENTAL THAT WE HAVE SHARED WITH THE GOVERNMENT.

09:01AM 3              THE COURT:  OKAY.

09:01AM 4              MR. SCHENK:  A FEW THOUGHTS.

09:01AM 5         IN THE HOLMES TRIAL, MS. HOLMES'S STATEMENTS ARE

09:02AM 6    ADMISSIONS.  THE GOVERNMENT HAS AN EXCEPTION TO THE HEARSAY

09:02AM 7    RULE TO ADMIT THEM, AND IT WAS ON THAT BASIS THAT MS. HOLMES'S

09:02AM 8    STATEMENTS ARE ADMISSIBLE.

09:02AM 9         IN THIS TRIAL, I DON'T BELIEVE THERE'S AN EXCEPTION FOR

09:02AM 10   THE DEFENSE TO PLAY MS. HOLMES'S STATEMENTS AND THEN ARGUE THAT

09:02AM 11   THE STATEMENTS WERE TRUE.

09:02AM 12        I DON'T THINK THE DEFENSE IS GOING TO ARGUE THAT THE

09:02AM 13   STATEMENTS THAT MS. HOLMES MADE WERE FALSE.

09:02AM 14        THE POINT OF PLAYING THEM, AND I CAN POINT TO EVEN

09:02AM 15   PARTICULAR EXCERPTS THAT THE DEFENSE HAS SUGGESTED TO THE

09:02AM 16   GOVERNMENT THAT THEY INTEND TO PLAY, LIKE THE ONE ABOUT THE

09:02AM 17   WORK THAT THERANOS DID TO PREPARE FOR A NATIONAL ROLLOUT.

09:02AM 18        THE DEFENSE WILL ARGUE THAT THAT'S TRUE.  THAT'S AN END

09:02AM 19   RUN AROUND THE HEARSAY RULES.

09:02AM 20        AND THEY ARE ADMITTING MS. HOLMES'S OUT-OF-COURT

09:02AM 21   STATEMENTS TO ESTABLISH THE TRUTH, BOTH THAT IT WAS RELEVANT --

09:02AM 22   I AGREE THAT THEY WILL ADMIT IT FOR THE PURPOSE OF ESTABLISHING

09:02AM 23   WHAT MATTERED TO TOLBERT.  THEY CAN DO THAT THROUGH

09:02AM 24   QUESTIONING.

09:02AM 25        TO ADMIT MS. HOLMES'S STATEMENTS IS A VIOLATION OF THE

09:02AM 1    HEARSAY RULES.

09:02AM 2        WE -- THE GOVERNMENT DID NOT INTEND TO OFFER THE

09:03AM 3    RECORDINGS CASE-IN-CHIEF AND INTENDED RATHER TO ASK MR. TOLBERT

09:03AM 4    HIS RECOLLECTION OF THE RECORDINGS AND WHAT -- I'M SORRY, HIS

09:03AM 5    RECOLLECTION OF THE CALL AND THE INFLUENCE THAT THOSE

09:03AM 6    STATEMENTS HAD ON HIM.

09:03AM 7        BUT I ALSO WANT TO BE CLEAR, IF MY UNDERSTANDING OF THE

09:03AM 8    HEARSAY RULES IS INCORRECT AND, IN FACT, THE DEFENSE IS ALLOWED

09:03AM 9    TO OFFER THESE, I'LL PLAY THEM IN DIRECT.

09:03AM 10        MR. CAZARES:  YOUR HONOR, FIRST OF ALL, THE

09:03AM 11    NONHEARSAY PURPOSE IS FOR WHAT MS. HOLMES ACTUALLY SAID, THE

09:03AM 12    ACT OF WHAT SHE SAID.

09:03AM 13        WE'RE NOT GOING TO ARGUE THAT WHAT SHE SAID WAS TRUE.

09:03AM 14        WHAT WE WANT TO PRESENT TO THE JURY SO THEY KNOW, WHAT DID

09:03AM 15    MS. HOLMES ACTUALLY SAY THAT LED TO MR. TOLBERT'S INVESTMENT?

09:03AM 16        NOT HIS VAGUE RECOLLECTION OF HIS UNDERSTANDING OF WHAT IT

09:03AM 17    MEANT, INTERPRETATIONS THAT HE'S PROBABLY GOING TO TESTIFY TO.

09:03AM 18        WHAT DID SHE ACTUALLY SAY, THE FACT OF WHAT SHE SAID?

09:03AM 19    THAT'S WHAT WE'RE TRUE INTRODUCING IT FOR.

09:03AM 20        WE'RE NOT GOING TO SIT HERE AND ARGUE THAT X, Y, AND Z WAS

09:04AM 21    TRUE IN THAT RECORDING.  SIMPLY, THAT'S WHAT SHE SAID.  IF YOU

09:04AM 22    UNDERSTOOD SOMETHING ELSE, MAYBE THAT'S ON YOU.

09:04AM 23        MAYBE THERE WAS SOME OTHER INFLUENCE ON MR. TOLBERT THAT

09:04AM 24    CAUSED HIM TO HAVE THAT UNDERSTANDING, BUT HER WORDS WERE IN

09:04AM 25    THE TAPE.  THAT'S WHAT HE WAS TOLD.

09:04AM 1       THE OTHER NONHEARSAY PURPOSES IS OBVIOUSLY A ROUTINE

09:04AM 2   NONHEARSAY PURPOSE, EFFECT ON THE LISTENER, YOUR HONOR.

09:04AM 3   WHETHER IT IS A DEFENDANT OR NOT IS IRRELEVANT TO THAT RULE.

09:04AM 4   IT'S A COMMONLY HEARD HEARSAY EXCEPTION.  THE EFFECT ON THE

09:04AM 5   LISTENER.

09:04AM 6       MR. TOLBERT HAS ALREADY SAID IN THIS COURT, UNDER OATH, I

09:04AM 7   LISTENED TO THE CONFERENCE CALL, IT WAS INFLUENTIAL, WE

09:04AM 8   INVESTED.

09:04AM 9       THAT'S A NONHEARSAY PURPOSE.

09:04AM 10      IN ADDITION, WHEN THE DEFENSE -- I'M SORRY.  WHEN THE

09:04AM 11  GOVERNMENT INTRODUCES ITS TESTIMONY, AGAIN, BASED ON

09:04AM 12  RECOLLECTION OF THE CALL TEN YEARS AGO, AND NOTES, AGAIN, IT'S

09:04AM 13  AN IMPERFECT RECITATION OF WHAT MS. HOLMES SAID WHEN THE

09:04AM 14  GOVERNMENT ALREADY HAS THE TAPES.

09:04AM 15      THE RULE OF COMPLETENESS ALSO PERMITS THIS COURT TO

09:05AM 16  INTRODUCE -- TO ALLOW THE DEFENSE TO INTRODUCE THE RECORDING,

09:05AM 17  AGAIN, TO COMPLETE THE PICTURE OF WHAT SHE ACTUALLY SAID.

09:05AM 18      NOT HIS NOTES, WHICH ACTUALLY AREN'T EVEN THE ACTUAL

09:05AM 19  NOTES.  THEY'RE A TRANSCRIPT OR A RECITATION THAT HE TYPED UP

09:05AM 20  FROM THE NOTES THAT HE THEN THREW AWAY.  SO THERE ARE A COUPLE

09:05AM 21  OF LAYERS OF HEARSAY THERE AS WELL.

09:05AM 22      BUT THE POINT IS THAT HE'S GOING TO TESTIFY TO WHAT HE

09:05AM 23  THINKS SHE SAID, THE TAPES SHOW WHAT SHE ACTUALLY SAID, AND

09:05AM 24  THAT'S PERMITTED UNDER THE RULE OF COMPLETENESS AS WELL.

09:05AM 25          THE COURT:  I'M NOT SURE IT'S A RULE OF COMPLETENESS

| | | |
|---|---|---|
| 09:05AM | 1 | ISSUE. THAT'S MORE FOR WRITINGS AND -- |
| 09:05AM | 2 | MR. CAZARES: NO, NO. THERE'S NINTH CIRCUIT LAW, |
| 09:05AM | 3 | U.S. VERSUS LOPEZ -- |
| 09:05AM | 4 | THE COURT: IF YOU'LL LET ME FINISH MY THOUGHTS. |
| 09:05AM | 5 | MR. CAZARES: I APOLOGIZE. |
| 09:05AM | 6 | THE COURT: THAT'S ALL RIGHT. THAT'S OKAY. |
| 09:05AM | 7 | I UNDERSTAND LOPEZ AND I UNDERSTAND WHAT LOPEZ SAYS, BUT |
| 09:05AM | 8 | I'M NOT CERTAIN THAT THAT'S THE STRONGEST ARGUMENT HERE FOR |
| 09:05AM | 9 | ADMITTING THIS. |
| 09:05AM | 10 | YOU SAY EFFECT ON THE LISTENER, AND THAT IS THE EFFECT -- |
| 09:06AM | 11 | THE INVESTMENT DECISION IN 2013, THAT EFFECT? |
| 09:06AM | 12 | MR. CAZARES: YES. |
| 09:06AM | 13 | THE COURT: AND THE DELTA BETWEEN THE 2006, AS WE'VE |
| 09:06AM | 14 | BEEN TALKING ABOUT THIS MORNING, THE DELTA BETWEEN THAT AND THE |
| 09:06AM | 15 | 2013 INVESTMENT. |
| 09:06AM | 16 | MR. CAZARES: YES, YOUR HONOR. |
| 09:06AM | 17 | BECAUSE THE COURT WAS READING THE TRANSCRIPT THAT THE |
| 09:06AM | 18 | GOVERNMENT PRESENTED TO YOU IN ITS RESPONSE TO OUR MOTION, AND |
| 09:06AM | 19 | THE DETAILS -- |
| 09:06AM | 20 | THE COURT: I READ IT LAST NIGHT BEFORE I GOT THEIR |
| 09:06AM | 21 | RESPONSE. |
| 09:06AM | 22 | MR. CAZARES: THE DETAILS THAT THE COURT WAS READING |
| 09:06AM | 23 | IS THE RECORDING. |
| 09:06AM | 24 | THOSE DETAILS ARE NOT NECESSARILY REFLECTED IN HIS NOTES. |
| 09:06AM | 25 | MAYBE HE'LL RECALL SOME OF THAT DETAIL, MAYBE HE WON'T. |

09:06AM 1       BUT THE POINT IS THAT WHAT SHE ACTUALLY SAID AND WHAT

09:06AM 2    APPARENTLY HAD SOME RELEVANCE TO WHAT SHE, MS. HOLMES, TOLD

09:06AM 3    MR. TOLBERT IN 2013, ARE NUANCES THAT AREN'T REFLECTED IN THE

09:06AM 4    NOTES.  HE MAY HAVE A RECOLLECTION OF IT, BUT THE RECORDING IS

09:06AM 5    THE BEST EVIDENCE OF WHAT SHE SAID.

09:06AM 6            THE COURT:  OKAY.  AND IT'S NOT OFFERED FOR THE

09:06AM 7    TRUTH OF --

09:06AM 8            MR. CAZARES:  ABSOLUTELY NOT.

09:07AM 9            THE COURT:  -- ANYTHING THAT MS. HOLMES SAID?

09:07AM 10           MR. CAZARES:  JUST WHAT SHE SAID, NOT THE

09:07AM 11   TRUTHFULNESS OR FALSITY OF WHAT SHE SAID.

09:07AM 12           THE COURT:  AND WHAT SHE SAID AND WHAT HE DID BASED

09:07AM 13   ON WHAT HE HEARD.

09:07AM 14           MR. CAZARES:  YES.

09:07AM 15           THE COURT:  AND HE CAN TESTIFY TO THAT WITHOUT THE

09:07AM 16   TAPE, CAN'T HE?

09:07AM 17           MR. CAZARES:  WELL, HE IS GOING TO TESTIFY IN DIRECT

09:07AM 18   BASED ON RECOLLECTION AND SOME NOTES.

09:07AM 19           THE COURT:  BUT, I MEAN, HE CAN TESTIFY ABOUT THAT

09:07AM 20   WITHOUT THE TAPE; RIGHT?

09:07AM 21           MR. CAZARES:  YES, HE CAN.

09:07AM 22           THE COURT:  SURE.

09:07AM 23           MR. CAZARES:  AND OUR RESPONSE IS THAT THE REST OF

09:07AM 24   THE RECORDING, WHAT HER ACTUAL WORDS, ARE ACTUALLY WHAT CAUSED

09:07AM 25   HIM TO INVEST, AND THE JURY SHOULD HEAR THAT OUT OF FUNDAMENTAL

09:07AM 1    FAIRNESS, YOUR HONOR.

09:07AM 2         THIS IS AN INVESTMENT FRAUD CASE.

09:07AM 3              THE COURT:  OKAY.

09:07AM 4              MR. CAZARES:  THE INVESTOR IS GOING TO COME HERE AND

09:07AM 5    TALK ABOUT WHAT CAUSED HIM TO INVEST.  SHOULDN'T THE JURY BE

09:07AM 6    PERMITTED TO HEAR THE WORDS THAT ACTUALLY CAUSED HIM TO INVEST?

09:07AM 7              THE COURT:  OKAY.  THANK YOU.

09:07AM 8              MR. SCHENK:  THANK YOU, YOUR HONOR.  A FEW THOUGHTS.

09:07AM 9         TOWARDS THE BEGINNING OF MR. CAZARES'S LAST INTERACTION

09:07AM 10   WITH THE COURT, HE TOLD THE COURT, AND WE MIGHT WANT TO GET

09:08AM 11   THIS TRANSCRIPT, THEY DO NOT INTEND TO ARGUE THE TRUTH OF THE

09:08AM 12   STATEMENTS THAT MS. HOLMES MADE ON THAT RECORDING.

09:08AM 13        ONE OF THE CLIPS THAT THEY TOLD THE GOVERNMENT THEY INTEND

09:08AM 14   TO PLAY IS 1348-4, AND IN DASH 4 MS. HOLMES SAYS, "OUR RETAIL

09:08AM 15   PARTNERS HAVE INVESTED HUNDREDS OF MILLIONS OF DOLLARS IN

09:08AM 16   BUILDING OUT THIS FRAMEWORK, AND WE, TOO, HAVE BEEN PREPARING

09:08AM 17   FOR THIS FOR MANY YEARS, AND THE GOAL IS TO BE ABLE TO BE

09:08AM 18   NATIONAL VERY, VERY, VERY, VERY QUICKLY."

09:08AM 19        IF THE DEFENSE IS ACTUALLY NOW TELLING THE COURT THEY DO

09:08AM 20   NOT INTEND IN CLOSING TO ARGUE THE TRUTH OF THAT AND OTHER

09:08AM 21   STATEMENTS THAT MS. HOLMES MADE, THAT IS NOT SOMETHING THAT I

09:08AM 22   THINK THEY'RE GOING TO WANT THE COURT TO HOLD THEM TO LATER ON

09:08AM 23   IN THE TRIAL.

09:08AM 24        AND THEY MIGHT WANT AN OPPORTUNITY TO REVISIT THAT

09:08AM 25   STATEMENT, BECAUSE I THINK THEY WILL ARGUE THE TRUTH OF THE

4256

09:08AM 1      STATEMENTS THAT MS. HOLMES MADE.

09:08AM 2          THAT'S WHY THEY WANT TO PLAY THEM, BECAUSE THEY WANT TO

09:08AM 3      ARGUE THAT THINGS THAT MS. HOLMES SAID TO MR. TOLBERT WERE, IN

09:09AM 4      FACT, TRUE.

09:09AM 5          AND IF THE ADMISSION OF THIS TAPE WILL LEAD TO PREVENTING

09:09AM 6      OR BARRING THEM FROM ARGUING THE TRUTH, IT'S GOING TO

09:09AM 7      SIGNIFICANTLY AFFECT THE KIND OF ARGUMENTS THAT THEY PREVIEWED

09:09AM 8      IN OPENING AND I ANTICIPATE THEY'LL BE MAKING IN CLOSING.

09:09AM 9          MR. CAZARES:  I CAN ADDRESS THAT, YOUR HONOR.

09:09AM 10         THE EVIDENCE -- OR EVIDENCE THAT WE BELIEVE THE DEFENSE

09:09AM 11     WILL BE ABLE TO USE TO ARGUE THAT RESOURCES AND PREPARATIONS

09:09AM 12     AND INTENT REGARDING A NATIONAL ROLLOUT ALL SUPPORTED

09:09AM 13     MR. BALWANI'S GOOD FAITH AND INTENT, THAT'S OUTSIDE OF THE

09:09AM 14     RECORDING.  WE DON'T NEED TO POINT TO THE RECORDING TO SAY,

09:09AM 15     LOOK, WHAT SHE SAID IS TRUE.

09:09AM 16         WE HAVE OTHER EVIDENCE THAT SUGGESTS MR. BALWANI'S GOOD

09:09AM 17     INTENT WITH RESPECT TO THE ROLLOUT AND THE RESOURCES SPENT AND

09:09AM 18     INTENT TO DO THE NATIONAL ROLLOUT.

09:09AM 19         WHETHER OR NOT MS. HOLMES SAID THAT IN THE RECORDING IS

09:09AM 20     IRRELEVANT.

09:09AM 21         OUR POINT IS MR. TOLBERT HAS THOUGHTS IN HIS HEAD --

09:09AM 22         THE COURT:  I UNDERSTAND YOUR ARGUMENT ABOUT

09:09AM 23     MR. TOLBERT, BUT I JUST WANT TO -- MR. SCHENK RAISES A POINT,

09:10AM 24     PERHAPS OF CAUTION DOWN THE ROAD, AND YOU'VE HEARD ME SAY

09:10AM 25     BEFORE, EVERYBODY PROCEEDS AT THEIR OWN PERIL.

ER-334

09:10AM   1    IF I ALLOW THE TAPES TO BE PLAYED AND EXAMINATION TO BE

09:10AM   2    HAD ON THAT, AND BASED ON WHAT YOU SAID, YOU'RE NOT GOING TO

09:10AM   3    ARGUE THE TRUTH OF ANY OF THIS, THAT CUTS A BROAD PATH, AND IF

09:10AM   4    THAT'S WHAT YOU WOULD LIKE TO DO, SO BE IT.

09:10AM   5         MR. CAZARES:  WELL, IT'S NOT THE TRUTH -- POINTING

09:10AM   6    TO HER WORDS IN THE RECORDING THAT WHAT SHE'S TOLD MR. TOLBERT

09:10AM   7    WAS TRUE.

09:10AM   8    WE HAVE OTHER EVIDENCE TO SHOW MR. BALWANI'S GOOD INTENT

09:10AM   9    BECAUSE MR. BALWANI WAS NOT ON THE RECORDING.

09:10AM  10         THE COURT:  NO, I UNDERSTAND THAT.

09:10AM  11         MR. CAZARES:  HE WASN'T THERE, HE DIDN'T LISTEN, AND

09:10AM  12    HE WASN'T ASKED QUESTIONS.

09:10AM  13         THE COURT:  I UNDERSTAND.  I FEAR WE GET DOWN TO A

09:10AM  14    POINT WHERE THERE ARE INSTRUCTIONS OR ARGUMENT AND THIS ISSUE

09:10AM  15    COMES UP AT A FUTURE TIME THAT WE'RE ALL REMINDED OF THE

09:10AM  16    LIMITATIONS OF WHAT YOU'RE ASKING.

09:10AM  17         MR. CAZARES:  YOUR HONOR, YOUR HONOR, IT'S A FAIR

09:10AM  18    POINT.

09:10AM  19    BUT NONHEARSAY PURPOSE FOR HEARSAY INTRODUCED IN THIS

09:11AM  20    TRIAL ALREADY, AND I'M ASSUMING GOING FORWARD, IT'S BEEN PRETTY

09:11AM  21    ROUTINE, AND I THINK BOTH PARTIES ARE EXPERIENCED AND KNOW HOW

09:11AM  22    THEY CAN ARGUE THESE ISSUES AND THE GUARDRAILS, IF YOU WILL.

09:11AM  23    AND I KNOW THE COURT IS AWARE OF THAT IS AND IS GOING TO

09:11AM  24    HOLD US TO IT AND WE UNDERSTAND THAT.

09:11AM  25         MR. SCHENK:  YOUR HONOR, JUST A COUPLE MORE POINTS.

4258

09:11AM 1       FIRST, THE DEFENSE SEEMS TO BE SAYING, WE'RE GOING TO PLAY

09:11AM 2   TAPES AND NOT ARGUE THAT THEY'RE TRUE, AND THEN IN CLOSING

09:11AM 3   ARGUE THAT MS. HOLMES'S STATEMENTS WERE TRUE.

09:11AM 4       THAT'S AN END RUN AROUND THE HEARSAY RULES.

09:11AM 5       SECOND, THE RULE OF COMPLETENESS DOES NOT APPLY HERE.  IF

09:11AM 6   I PLAY PORTIONS OF THE TAPES, THE DEFENSE GETS TO GO TO THE

09:11AM 7   COURT, OR TO THE GOVERNMENT, AND SAY, WE REQUEST, IF YOU PLAY

09:11AM 8   THIS PORTION AT THIS TIME, THAT IT IS APPROPRIATE AND FAIR FOR

09:11AM 9   YOU TO PLAY ANOTHER PORTION.

09:11AM 10      BUT TO SUGGEST THAT MY ASKING QUESTIONS OF TOLBERT ABOUT A

09:11AM 11  CALL REQUIRES, UNDER THE RULE OF COMPLETENESS, THAT THE CALL

09:12AM 12  THEN BE PLAYED IS NOT ACCURATE, AND THE GOVERNMENT WOULD NOT

09:12AM 13  OPEN THE DOOR TO THE PLAYING OF THE TAPE BY ASKING QUESTIONS

09:12AM 14  ABOUT A CALL ON DECEMBER 20TH.

09:12AM 15          MR. CAZARES:  AND ON THAT POINT, YOUR HONOR, THE

09:12AM 16  PROBLEM IS THAT RULE 611 KIND OF INTERRELATES WITH THE RULE OF

09:12AM 17  COMPLETENESS.

09:12AM 18      WHILE THE RULE OF COMPLETENESS MAY BE LIMITED AT SOME

09:12AM 19  LEVEL, RULE 611 IS NOT AND PERMITS THIS COURT TO MAKE

09:12AM 20  REASONABLE CONTROL OVER THE MODE AND ORDER OF INTERROGATING

09:12AM 21  WITNESSES AND PRESENTING EVIDENCE TO MAKE, AGAIN, THE

09:12AM 22  INTERROGATION AND PRESENTATION EFFECTIVE AND COMPLETE.

09:12AM 23      TO THE EXTENT THAT THEY'RE INTRODUCING EVIDENCE OF A

09:12AM 24  CONVERSATION AND A DISCUSSION AND A CONFERENCE CALL THAT IS

09:12AM 25  ALREADY RECORDED, THEY'RE ENTITLED TO DO IT.

09:12AM 1       BUT RULE 611 CERTAINLY PERMITS THE COURT TO ALLOW THE

09:12AM 2   DEFENSE TO CLOSE THAT LOOP AND LET THE JURY HEAR THE REST OF

09:12AM 3   THE CONVERSATION THAT TOOK PLACE, THE WHOLE CONVERSATION, NOT

09:12AM 4   JUST SOMEONE'S RECOLLECTION.

09:12AM 5       THE COURT:  OKAY.  I UNDERSTAND THAT.

09:12AM 6       I'M RETURNING BACK TO THIS, AND I THINK MR. SCHENK RAISES

09:13AM 7   A GOOD POINT REGARDING MS. HOLMES'S TESTIMONY HERE AND WHAT YOU

09:13AM 8   MAY SEEK TO ARGUE.

09:13AM 9       AND I JUST WANT TO SAY, IT MAY BE THAT I WON'T LET YOU

09:13AM 10  ARGUE SOMETHING, SO I JUST WANT TO MAKE SURE THAT YOU'VE BEEN

09:13AM 11  ABLE TO CONSULT YOUR TEAM AND YOUR CLIENT TO UNDERSTAND THAT.

09:13AM 12      MR. CAZARES:  WELL, YOUR HONOR, WE UNDERSTAND THE

09:13AM 13  ISSUES, I GUESS, TO THE EXTENT THAT THE GOVERNMENT HAS ISSUES

09:13AM 14  WITH ARGUMENT ABOUT TRUTHFULNESS, IT RELATES TO THE ROLLOUT,

09:13AM 15  AND I GUESS IT'S GOING TO BE MIDDLE EAST WORK BY THERANOS, OR

09:13AM 16  INTENT TO HAVE ITS DEVICE SOMEHOW USED BY THE MILITARY IN THE

09:13AM 17  MIDDLE EAST.

09:13AM 18      THERE'S OTHER EVIDENCE OF THAT WHICH WE CAN POINT TO WHICH

09:13AM 19  IS NOT CONNECTED TO THE ACTUAL CONVERSATION THAT MS. HOLMES

09:13AM 20  MADE.

09:13AM 21      THAT EVIDENCE WE CERTAINLY CAN POINT TO, AND THERE'S NO

09:13AM 22  REASON WHY WE SHOULD BE LIMITED ON IT BECAUSE THE RECORDING IS

09:13AM 23  COMING IN FOR A NONHEARSAY PURPOSE.

09:13AM 24      AND AGAIN, YOUR HONOR, THERE'S ALSO -- THE CATCH-ALL

09:14AM 25  EXCEPTION TO THE HEARSAY RULE ALSO SHOULD PERMIT THE RECORDING

4260

09:14AM 1    HERE AND THE JURY SHOULD BE PERMITTED TO HEAR WHAT MS. HOLMES

09:14AM 2    ACTUALLY SAID, PARTICULARLY GIVEN, AGAIN, THE GOVERNMENT IS

09:14AM 3    GOING TO INTRODUCE STATEMENTS BY HER IN 2006 TO ATTEMPT IN SOME

09:14AM 4    WAYS, IF NOT ARGUE MR. BALWANI IS RESPONSIBLE FOR THAT, THAT

09:14AM 5    MS. HOLMES ARGUABLY MAKES OR HAS A PATTERN OF MAKING STATEMENTS

09:14AM 6    THAT MAY OR MAY NOT BE ENTIRELY ACCURATE TO INVESTORS, AND

09:14AM 7    GIVEN THAT, THE JURY SHOULD HAVE THE ACTUAL WORDS, YOUR HONOR,

09:14AM 8    NOT JUST THIS INVESTOR'S RECOLLECTION.

09:14AM 9        THE COURT:  YOUR LAST STATEMENT GETS ME BACK TO SOME

09:14AM 10   CAUTION ABOUT WHAT ARE YOU GOING TO DO WITH THIS IF IT COMES

09:14AM 11   IN?  AND ARE YOU GOING TO ARGUE ITS TRUTH?

09:14AM 12       AND IF SO, THERE'S SOME CAUTIONS THAT COME WITH THAT EVEN

09:14AM 13   IF IT -- EVEN IF YOU HAVE THIS OTHER EVIDENCE.  I'M JUST SAYING

09:14AM 14   IT'S SOMETHING THAT WE HAVE TO LOOK AT VERY CAREFULLY, AND

09:14AM 15   THAT'S WHY I WAS PAUSING HERE TO MAYBE HAVE YOU -- IF YOU DON'T

09:15AM 16   NEED TO RETHINK THIS, THAT'S FINE.  IF YOU'VE MADE YOUR

09:15AM 17   DECISION, THAT'S FINE.

09:15AM 18       MR. SCHENK.

09:15AM 19       MR. SCHENK:  JUST TWO BRIEF THINGS.

09:15AM 20       THE LAST STATEMENT THAT MR. CAZARES MADE CERTAINLY SOUNDS

09:15AM 21   LIKE THE KIND OF ARGUMENT THAT THE GOVERNMENT WOULD MAKE BEFORE

09:15AM 22   IT WOULD ASK THE COURT TO ADMIT IT UNDER 801(D)(2)(E).

09:15AM 23   MS. HOLMES HAS A WAY OF SAYING THINGS THAT ARE FALSE, JUDGE,

09:15AM 24   YOU SHOULD ADMIT THIS BECAUSE IT'S A COCONSPIRATOR'S STATEMENT.

09:15AM 25       I WOULD BE VERY SURPRISED IF THE BASIS THAT THE DEFENSE IS

ER-338

09:15AM 1    SEEKING IS 801(D)(2)(E).  I THINK THERE ARE CASES THAT SAY THAT

09:15AM 2    THAT BASIS IS NOT AVAILABLE TO THE DEFENSE, 801(D)(2)(E).

09:15AM 3        SECOND, BY READING THAT ONE PORTION ABOUT THE ROLLOUT, I

09:15AM 4    WAS NOT LIMITING WHAT THE GOVERNMENT WILL SAY THE DEFENSE IS

09:15AM 5    PROHIBITED FROM ARGUING FOR THE TRUTH IN THE FUTURE.  I WAS

09:15AM 6    ONLY GIVING ONE EXAMPLE.

09:15AM 7        IF THE DEFENSE TRIES TO ADMIT THE TAPE, AND IF THE COURT

09:15AM 8    OVERRULES A HEARSAY OBJECTION AND ALLOWS IT TO BE PLAYED, I

09:16AM 9    WILL LISTEN VERY CAREFULLY TO WHAT THE DEFENSE PLAYS, AND THEN

09:16AM 10   I'LL EVALUATE WHETHER I'M GOING TO ARGUE TO THE COURT THAT EACH

09:16AM 11   OF THE DIFFERENT CATEGORIES OF STATEMENTS THAT THE JURY HEARD

09:16AM 12   CANNOT BE ARGUED FOR THE TRUTH BY THE DEFENSE, NOT JUST THE

09:16AM 13   ROLLOUT.

09:16AM 14       MR. CAZARES:  YOUR HONOR, LOOK, WE WOULD LIKE TO

09:16AM 15   THINK ABOUT IT.  I UNDERSTAND THE COURT'S CONCERNS.

09:16AM 16       I UNDERSTAND MR. TOLBERT IS COMING UP SECOND, SO MAYBE WE

09:16AM 17   CAN REVISIT THIS BEFORE HE ACTUALLY TAKES THE STAND.

09:16AM 18       THE COURT:  OKAY.  WELL, I THINK THAT'S A MEASURED

09:16AM 19   APPROACH.

09:16AM 20       THANK YOU FOR THE CONVERSATION THIS MORNING.  IT'S AN

09:16AM 21   IMPORTANT DECISION FOR THE COURT.

09:16AM 22       I THINK IT'S MORE IMPORTANT FOR THE PARTIES TO DECIDE HOW

09:16AM 23   THEY WANT THEIR CASE PRESENTED, AND THAT'S SOMETHING THAT I

09:16AM 24   THINK DESERVES SOME THOUGHT, SO THANK YOU FOR THAT.

09:16AM 25       SO WE'LL RESERVE DISCUSSION ON THIS UNTIL LATER.  THANK

| | | |
|---|---|---|
| 09:16AM | 1 | YOU FOR TELLING ME THE TIMING OF THAT. |
| 09:16AM | 2 | SO MOVING TO SCHEDULING. THE FIRST WITNESS TODAY WILL BE? |
| 09:16AM | 3 | MR. SCHENK: MR. MENDENHALL. |
| 09:16AM | 4 | THE COURT: AND WHAT IS OUR TIMING WITH THAT? |
| 09:17AM | 5 | MR. BOSTIC? |
| 09:17AM | 6 | MR. BOSTIC: YOUR HONOR, I THINK THE DIRECT FOR |
| 09:17AM | 7 | MR. MENDENHALL WILL BE ABOUT AN HOUR. |
| 09:17AM | 8 | THE COURT: AND IS HE YOUR WITNESS? |
| 09:17AM | 9 | MR. CAZARES: HE IS. PROBABLY SIMILAR IF NOT THAT |
| 09:17AM | 10 | MUCH LONGER. SO MAYBE UNTIL OUR FIRST BREAK, MAYBE A LITTLE |
| 09:17AM | 11 | AFTER THE FIRST BREAK, BUT -- |
| 09:17AM | 12 | THE COURT: OKAY. AND THEN THE NEXT WITNESS WILL BE |
| 09:17AM | 13 | MR. TOLBERT. AND IS IT EXPECTED THAT WE WILL FINISH |
| 09:17AM | 14 | MR. TOLBERT TODAY? |
| 09:17AM | 15 | MR. SCHENK: WE WOULD CERTAINLY FINISH THE DIRECT |
| 09:17AM | 16 | TODAY IF WE'RE STARTING AROUND 11:30 OR SO. |
| 09:17AM | 17 | THE COURT: RIGHT, RIGHT. |
| 09:17AM | 18 | MR. SCHENK: THE DIRECT WOULD CERTAINLY FINISH, AND |
| 09:17AM | 19 | FINISH I WOULD SAY WITH HOURS LEFT IN THE AFTERNOON. |
| 09:17AM | 20 | THE TAPE ISSUE ASIDE -- |
| 09:17AM | 21 | THE COURT: RIGHT. |
| 09:17AM | 22 | MR. SCHENK: OBVIOUSLY IT TAKES A LITTLE LONGER IF I |
| 09:17AM | 23 | PLAY THE TAPES. |
| 09:17AM | 24 | MR. CAZARES: PROBABLY A GOOD CHANCE WE CAN FINISH |
| 09:17AM | 25 | HIM, OR WE WILL MAKE OUR EFFORTS. |

| | | |
|---|---|---|
| 09:17AM | 1 | THE COURT: YOU DO WHAT -- EACH SIDE DOES WHAT YOU |
| 09:17AM | 2 | NEED TO DO. THERE'S NO TIME RESTRICTIONS. I'M JUST TRYING TO |
| 09:17AM | 3 | SCHEDULE FOR OUR SCHEDULING PURPOSES. |
| 09:17AM | 4 | REMIND ME AGAIN HOW LONG THE TAPE WAS. I JUST DON'T |
| 09:17AM | 5 | RECALL WHAT THAT WAS OFF THE TOP OF MY HEAD, JUST IN TOTAL WHAT |
| 09:18AM | 6 | THAT TOOK. |
| 09:18AM | 7 | IS THAT ABOUT A 20 MINUTE CONVERSATION? |
| 09:18AM | 8 | MR. CAZARES: THERE WERE SEVEN EXCERPTS. AN |
| 09:18AM | 9 | ESTIMATE OF THOSE SEVEN IS PROBABLY 30, 35 MINUTES, AND THEN I |
| 09:18AM | 10 | THINK THE DEFENSE HAS AN ADDED EXCERPT. SO MAYBE 35 MINUTES |
| 09:18AM | 11 | TOTAL, 40 MINUTES. THE ENTIRE RECORDING IS MUCH LONGER, BUT |
| 09:18AM | 12 | THE TOTAL EXCERPTS I THINK FALL SOMEWHERE IN THAT RANGE. |
| 09:18AM | 13 | THE COURT: RIGHT. |
| 09:18AM | 14 | MR. SCHENK: WE STARTED THE TAPE AT 1:30 WITH |
| 09:18AM | 15 | MR. TOLBERT AND WE FINISHED AT 3:00, BUT WE TOOK A HALF AN HOUR |
| 09:18AM | 16 | BREAK. |
| 09:18AM | 17 | THE COURT: RIGHT. AND THERE WERE MULTIPLE SEGMENTS |
| 09:18AM | 18 | PLAYED AND QUESTIONS, ET CETERA. |
| 09:18AM | 19 | MR. SCHENK: THERE WERE, I THINK, A TOTAL OF EIGHT |
| 09:18AM | 20 | CLIPS PLAYED ON THE DIRECT, AND THEN I THINK MR. DOWNEY PLAYED |
| 09:18AM | 21 | TWO CLIPS IN CROSS. |
| 09:18AM | 22 | THE COURT: ALL RIGHT. GREAT. THANK YOU. |
| 09:18AM | 23 | ALL RIGHT. I'LL STEP DOWN. WE'LL GET READY AND WE'LL |
| 09:18AM | 24 | BRING OUR JURY IN. |
| 09:19AM | 25 | MR. CAZARES: THANK YOU. |

09:19AM 1        MR. SCHENK:  THANK YOU.

09:19AM 2        (RECESS FROM 9:19 A.M. UNTIL 9:27 A.M.)

09:27AM 3        (JURY IN AT 9:27 A.M.)

09:27AM 4        THE COURT:  THANK YOU AGAIN FOR YOUR COURTESY.

09:27AM 5    WE ARE BACK ON THE RECORD.

09:28AM 6    ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

09:28AM 7    OUR JURY AND ALTERNATES ARE PRESENT.

09:28AM 8        GOOD MORNING, LADIES AND GENTLEMEN.  I HAD TO GET SOME

09:28AM 9    HELP FROM THE LAWYERS ON SOME MATTERS THIS MORNING, AND THAT'S

09:28AM 10   WHY WE WERE DELAYED THIS MORNING.  I APOLOGIZE FOR THAT.

09:28AM 11       BEFORE WE START, LET ME ASK YOU THAT QUESTION AGAIN.

09:28AM 12   DURING OUR BREAK, HAVE ANY OF YOU HAD CAUSE TO LEARN, LISTEN,

09:28AM 13   READ, OR DISCUSS ANYTHING ABOUT THIS CASE IN ANY WAY?

09:28AM 14       IF SO, COULD I JUST SEE YOUR HAND?

09:28AM 15       I SEE NO HANDS.  THANK YOU VERY MUCH.

09:28AM 16       DOES THE GOVERNMENT HAVE A WITNESS TO CALL?

09:28AM 17           MR. BOSTIC:  YES, YOUR HONOR.

09:28AM 18   THE UNITED STATES CALLED PATRICK MENDENHALL.

09:28AM 19           THE COURT:  THANK YOU.

09:28AM 20       SIR, IF YOU WOULD COME FORWARD, PLEASE.  LET ME INVITE YOU

09:28AM 21   TO STAND OVER HERE BY THE WITNESS STAND.

09:28AM 22       IF YOU WOULD RAISE YOUR RIGHT HAND WHILE YOU FACE OUR

09:29AM 23   COURTROOM DEPUTY, SHE HAS A QUESTION FOR YOU.

09:29AM 24       **(GOVERNMENT'S WITNESS, PATRICK MENDENHALL, WAS SWORN.)**

09:29AM 25           THE WITNESS:  YES, I DO.

09:29AM   1          THE COURT:  PLEASE HAVE A SEAT UP HERE, SIR.

09:29AM   2          I'LL INVITE YOU TO MAKE YOURSELF COMFORTABLE.

09:29AM   3          FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

09:29AM   4   NEED, AND YOU CAN BEND THAT DOWN.

09:29AM   5          WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:29AM   6   AND THEN SPELL IT PLEASE.

09:29AM   7          THE WITNESS:  MY NAME IS PATRICK MENDENHALL, THAT'S

09:29AM   8   P-A-T-R-I-C-K, M-E-N-D-E-N-H-A-L-L.

09:29AM   9          THE COURT:  THANK YOU.  COUNSEL.

09:29AM  10          MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:29AM  11                        **DIRECT EXAMINATION**

09:29AM  12   BY MR. BOSTIC:

09:29AM  13   Q.   GOOD MORNING, MR. MENDENHALL.

09:29AM  14   A.   GOOD MORNING.

09:29AM  15   Q.   IF YOU ARE FULLY VACCINATED, THE COURT WILL ALLOW YOU TO

09:29AM  16   TESTIFY WITHOUT A MASK.

09:29AM  17   A.   I AM, THANK YOU.

09:29AM  18   Q.   MR. MENDENHALL, WHAT IS YOUR PROFESSION?

09:29AM  19   A.   I AM THE MANAGING PARTNER, CEO OF U.S. CAPITAL ADVISORS,

09:29AM  20   WHICH IS A WEALTH MANAGEMENT FIRM AND AN INVESTMENT BANKING

09:30AM  21   FIRM.

09:30AM  22   Q.   AND WAS THERE A TIME WHEN YOU WERE AN INVESTOR IN A

09:30AM  23   COMPANY CALLED THERANOS?

09:30AM  24   A.   YES.

09:30AM  25   Q.   WAS ONE OF THOSE INVESTMENTS IN LATE 2013, EARLY 2014?

09:30AM  1     A.   YES.

09:30AM  2     Q.   HAD THERE BEEN AN EARLIER INVESTMENT IN THE COMPANY?

09:30AM  3     A.   YES.

09:30AM  4     Q.   AND WHAT WAS THE APPROXIMATE TIMING OF THAT INVESTMENT?

09:30AM  5     A.   I BELIEVE THAT WAS IN 2005, 2006 RANGE.

09:30AM  6     Q.   FOR THE 2013, 2014 INVESTMENT, WHO WAS YOUR PRIMARY

09:30AM  7     CONTACT AT THERANOS?

09:30AM  8     A.   SUNNY BALWANI.

09:30AM  9     Q.   I WANT TO TALK WITH YOU A LITTLE LATER ABOUT WHAT LED YOU

09:30AM 10     TO INVEST, BUT FIRST LET ME ASK YOU SOME QUESTIONS ABOUT YOUR

09:30AM 11     BACKGROUND.

09:30AM 12          CAN YOU SUMMARIZE FOR US YOUR EDUCATION, PLEASE?

09:30AM 13     A.   YES.  I HAVE AN UNDERGRADUATE DEGREE FROM OREGON STATE

09:30AM 14     UNIVERSITY IN GENERAL BUSINESS.

09:30AM 15     Q.   AND CAN YOU GIVE US AN OVERVIEW OF YOUR WORK HISTORY

09:31AM 16     FOLLOWING OBTAINING YOUR DEGREE?

09:31AM 17     A.   YES.  I GRADUATED FROM OREGON STATE IN 1981.

09:31AM 18          IN 1982 I WAS HIRED BY MERRILL LYNCH IN HOUSTON, TEXAS.  I

09:31AM 19     SPENT A LITTLE -- AROUND A YEAR, A LITTLE OVER A YEAR THERE.

09:31AM 20          I WENT TO A FIRM CALLED LEHMAN BROTHERS; IT WAS BOUGHT OUT

09:31AM 21     BY SHEARSON; WENT TO DREXEL; IT WAS BOUGHT OUT BY SMITH BARNEY;

09:31AM 22     AND THEN I SPENT 20 YEARS AT PAINE WEBBER AND UBS AT WHICH I

09:31AM 23     WAS A MANAGING DIRECTOR, AND I RAN THEIR THIRD LARGEST WEALTH

09:31AM 24     MANAGEMENT IN THE COMPANY.

09:31AM 25          AND ALL OF THIS WAS BASED IN HOUSTON, TEXAS.

MENDENHALL DIRECT BY MR. BOSTIC                               4267

09:31AM   1    Q.   AND ARE YOU CURRENTLY BASED IN HOUSTON, TEXAS?

09:31AM   2    A.   YES.  WE ARE HEADQUARTERED -- U.S. CAPITAL ADVISORS, WHICH

09:31AM   3    I FOUNDED IN 2010 AFTER LEAVING UBS, IS BASED IN HOUSTON, TEXAS

09:31AM   4    WITH OFFICES IN AUSTIN AND DALLAS, TEXAS.

09:31AM   5    Q.   SO YOU WERE IN THAT ROLE AT U.S. CAPITAL ADVISORS IN THE

09:31AM   6    2013, 2014 TIME PERIOD?

09:32AM   7    A.   YES.

09:32AM   8    Q.   YOU MENTIONED THAT YOU FIRST INVESTED IN THERANOS IN

09:32AM   9    APPROXIMATELY 2005, 2006; IS THAT RIGHT?

09:32AM  10    A.   YES.

09:32AM  11    Q.   HOW DID YOU FIRST HEAR ABOUT THE COMPANY?

09:32AM  12    A.   I HAD ONE OF MY FINANCIAL ADVISORS WHO HAD KNOWN

09:32AM  13    ELIZABETH HOLMES'S FAMILY, AND THEY HAD BEEN COMMUNICATING AND

09:32AM  14    HE BROUGHT IT -- I HAD TO APPROVE IT AS A SUPERVISOR, AND THERE

09:32AM  15    WERE SEVERAL OF MY ADVISORS THAT WERE INVESTING IN THE EARLY

09:32AM  16    STAGE OF THERANOS.

09:32AM  17         AND WHEN IT CAME ACROSS MY DESK, I JUST THOUGHT THESE GUYS

09:32AM  18    WERE SMART GUYS, SO I WENT AND INVESTED A LITTLE BIT WITH THEM.

09:32AM  19    Q.   AND WHAT WAS THE APPROXIMATE AMOUNT OF YOUR FIRST

09:32AM  20    INVESTMENT BACK THEN?

09:32AM  21    A.   I BELIEVE IT WAS $54,000 OR $56,000, SOMETHING IN THAT

09:32AM  22    RANGE.  RIGHT AROUND $50,000, YEAH.

09:32AM  23    Q.   I'M SORRY FOR TALKING OVER YOU.

09:32AM  24         YOU MENTIONED THAT THERE WAS AN ADVISOR.  WAS THAT SOMEONE

09:32AM  25    WHO WORKED WITH YOU AT U.S. CAPITAL ADVISORS?

12:05PM  1              IS THAT WHAT YOUR QUESTION IS?

12:05PM  2                  MR. CAZARES:  YES, YOUR HONOR, BETTER SAID.

12:05PM  3                  THE WITNESS:  I WOULD ASSUME SO.

12:05PM  4      BY MR. CAZARES:

12:05PM  5      Q.   OKAY.  AND DID YOU BECOME AWARE OF THE FACT, IN 2014,

12:05PM  6      THERANOS OPENED ANOTHER LAB IN ARIZONA TO HANDLE THE INCREASED

12:05PM  7      VOLUME?

12:05PM  8      A.   I BELIEVE I KNEW THAT, YES.

12:05PM  9      Q.   AND THAT WOULD HAVE TAKEN MONEY AS WELL; RIGHT?

12:05PM 10      A.   YES.

12:05PM 11      Q.   AND THAT WOULD HAVE BEEN CONSISTENT WITH YOUR

12:05PM 12      UNDERSTANDING OF HOW YOUR MONEY WAS BEING USED?

12:05PM 13      A.   CERTAINLY.  PARTIALLY, YES.

12:06PM 14      Q.   NOW, YOU WERE ASKED SOME QUESTIONS ABOUT THERANOS'S TESTS,

12:06PM 15      AND I THINK YOU WERE ASKED A QUESTION, DID YOU KNOW THAT

12:06PM 16      THERANOS'S TECHNOLOGY COULD ONLY DO 12 TESTS.

12:06PM 17          DO YOU REMEMBER THAT?

12:06PM 18      A.   YES.

12:06PM 19      Q.   AND YOU SAID THAT YOU WERE UNAWARE OF THAT FACT; CORRECT?

12:06PM 20      A.   YES.

12:06PM 21      Q.   NOW, WERE YOU AWARE OF THE FACT, WHETHER IT WAS FROM

12:06PM 22      MR. BALWANI OR ANYONE ELSE, THAT THERANOS'S SCIENTISTS HAD

12:06PM 23      DEVELOPED HUNDREDS OF TESTS THAT RAN ON ITS PROPRIETARY

12:06PM 24      TECHNOLOGY?

12:06PM 25      A.   I WAS UNAWARE.

12:06PM 1    Q.   OKAY.  BUT YOU WERE AWARE THAT THE FINGERSTICK TESTING WAS

12:06PM 2    REALLY THERANOS'S PRIMARY BUSINESS; CORRECT?

12:06PM 3    A.   YES.

12:06PM 4    Q.   THAT WAS THE GOAL OVER THE FUTURE, TO EXPAND THAT

12:06PM 5    OPERATION AND THE USE OF THEIR PROPRIETARY FINGERSTICK

12:06PM 6    TECHNOLOGY; CORRECT?

12:06PM 7    A.   YES.

12:06PM 8    Q.   WERE YOU AWARE IN THIS 2013, 2014 TIME PERIOD WHEN YOU

12:07PM 9    INVESTED THAT THERANOS SCIENTISTS HAD FIGURED OUT A WAY TO

12:07PM 10   MODIFY A COMMERCIAL DEVICE, LIKE A SIEMENS DEVICE, TO RUN

12:07PM 11   FINGERSTICK SAMPLES JUST LIKE ITS OWN EDISON?  WERE YOU AWARE

12:07PM 12   OF THAT?

12:07PM 13   A.   NO.

12:07PM 14   Q.   SETTING THAT ASIDE, WERE YOU AWARE OF THE FACT THAT

12:07PM 15   COMMERCIAL LAB EQUIPMENT, LIKE A SIEMENS DEVICE, HAD THE

12:07PM 16   CAPABILITY OF DOING KIND OF HIGH VOLUME TESTING IN ORDER TO

12:07PM 17   FILL KIND OF DEMAND?

12:07PM 18       DID YOU UNDERSTAND THAT?

12:07PM 19   A.   I DON'T HAVE A LOT OF KNOWLEDGE ON THE SYSTEMS AND THE

12:07PM 20   PROCESSES OF TESTING BLOOD.

12:07PM 21   Q.   OKAY.  PERIODICALLY, THOUGH, YOU WOULD KIND OF DO INTERNET

12:07PM 22   SEARCHES TO SEE WHAT YOU COULD LEARN ABOUT THERANOS'S BUSINESS

12:07PM 23   DURING THE TIME BEFORE AND AFTER WHEN YOU INVESTED; RIGHT?

12:07PM 24   A.   YES.

12:07PM 25   Q.   OKAY.  AND YOU WERE AWARE OF THE FACT THAT THERANOS

MENDENHALL RECROSS BY MR. CAZARES                    4385

12:07PM  1    OBTAINED PATENTS FOR ITS TECHNOLOGY; RIGHT?  YOU KNEW THAT?

12:07PM  2    A.   I KNEW THEY HAD SOME PATENTS, YES.

12:07PM  3    Q.   DID YOU EVER READ THE PATENTS?

12:07PM  4    A.   NEVER READ A PATENT.

12:08PM  5    Q.   OKAY.  THEY'RE KIND OF TECHNICAL IN NATURE; RIGHT?

12:08PM  6    A.   YES.  I WENT TO OREGON STATE UNIVERSITY.

12:08PM  7    Q.   FINE SCHOOL, A GREAT BASKETBALL SCHOOL.

12:08PM  8         BUT YOU UNDERSTOOD THAT PATENT APPLICATIONS AND ACTUAL

12:08PM  9    PATENTS, THOSE ARE AVAILABLE ON THE INTERNET; RIGHT?

12:08PM 10    A.   I ASSUME SO.

12:08PM 11    Q.   YEAH, THE U.S. PTO, YOU CAN KIND OF GO AND DO A SEARCH AND

12:08PM 12    FIND PATENTS THERE?

12:08PM 13    A.   I'LL BELIEVE YOU.

12:08PM 14    Q.   OKAY.  BUT YOU UNDERSTAND THAT'S GENERALLY AVAILABLE;

12:08PM 15    RIGHT?

12:08PM 16    A.   SURE.  YEAH.

12:08PM 17    Q.   AND DID YOU KNOW THAT THERANOS HAD ACTUALLY SUBMITTED AND

12:08PM 18    FILED AND OBTAINED PATENT PROTECTION FOR ITS COMMERCIAL

12:08PM 19    MODIFICATION DEVICES TO RUN FINGERSTICK SAMPLES JUST LIKE THE

12:08PM 20    EDISON?

12:08PM 21    A.   I UNDERSTOOD THAT THEY HAD PATENTS, YES.

12:08PM 22    Q.   OKAY.  BUT YOU DIDN'T KNOW ABOUT THE FACT THAT THEY

12:08PM 23    PATENTED THIS ADDITIONAL TECHNIQUE THAT THEY DEVELOPED TO RUN

12:08PM 24    FINGERSTICK SAMPLES ON A COMMERCIAL DEVICE?

12:08PM 25    A.   NO, I WAS NOT AWARE.

12:08PM  1    Q.   BUT IF THEY DID SPEND TIME AND RESOURCES, INVESTOR MONEY

12:08PM  2    TO DEVELOP THAT SORT OF TECHNOLOGY AND SCIENCE TO RUN

12:09PM  3    FINGERSTICK SAMPLES ON A COMMERCIAL DEVICE, YOU WOULD HAVE

12:09PM  4    EXPECTED THERANOS TO TAKE STEPS TO PROTECT THAT TECHNOLOGY AS

12:09PM  5    WELL; RIGHT?

12:09PM  6    A.   SURE.

12:09PM  7    Q.   BECAUSE ULTIMATELY ANYTHING THAT IS THERANOS DEVELOPED

12:09PM  8    TECHNOLOGICALLY COULD BE IN FURTHERANCE OF THE COMPANY'S GROWTH

12:09PM  9    AND PROFITS IN THE FUTURE; RIGHT?

12:09PM  10   A.   YES.

12:09PM  11   Q.   AND YOU WOULD EXPECT THEM TO PURSUE ANY AVENUE THAT COULD

12:09PM  12   GROW THE BUSINESS; RIGHT?

12:09PM  13   A.   YES.

12:09PM  14        MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

12:09PM  15        THE COURT:  MR. BOSTIC, ANY QUESTIONS?

12:09PM  16        MR. BOSTIC:  TWO QUESTIONS, YOUR HONOR.

12:09PM  17              **FURTHER REDIRECT EXAMINATION**

12:09PM  18   BY MR. BOSTIC:

12:09PM  19   Q.   MR. MENDENHALL, IN YOUR DISCUSSION WITH MR. BALWANI, DID

12:09PM  20   HE TELL YOU ABOUT ANY PART OF THERANOS'S TECHNOLOGY BESIDES THE

12:09PM  21   SMALL ANALYZER, THE EDISON?

12:09PM  22   A.   HE JUST TOLD ME THAT THE TECHNOLOGY WAS DONE AND THERE WAS

12:09PM  23   NO NEW SCIENCE NEEDED AND NO NEW TECHNOLOGY NEEDED.

12:09PM  24        SO I WASN'T -- I DIDN'T KNOW WHAT THAT APPLIED TO.  THAT'S

12:10PM  25   WHAT I KNEW WAS DONE, AND IT HAD THE CAPABILITIES OF RUNNING

12:10PM  1    SMALL SAMPLES SUCCESSFULLY ON WHATEVER THE TECHNOLOGY WAS,

12:10PM  2    YEAH.

12:10PM  3    Q.   AND BASED ON YOUR CONVERSATION WITH MR. BALWANI, DID YOU

12:10PM  4    HAVE AN UNDERSTANDING AS TO WHETHER THE THERANOS ANALYZER, THE

12:10PM  5    EDISON, WAS UP TO THE TASK OF HANDLING THE TESTING THAT

12:10PM  6    THERANOS WAS OFFERING TO THE PUBLIC?

12:10PM  7    A.   THAT WAS MY ASSUMPTION.

12:10PM  8    Q.   THAT WHAT?

12:10PM  9    A.   THAT THE THERANOS ANALYZER WAS RUNNING THE TEST.

12:10PM  10   Q.   THANK YOU.

12:10PM  11        NO FURTHER QUESTIONS.

12:10PM  12            THE COURT:  ANYTHING FURTHER?

12:10PM  13            MR. CAZARES:  VERY QUICKLY, YOUR HONOR.

12:10PM  14        (LAUGHTER.)

12:10PM  15            MR. CAZARES:  I PROMISE IT'S QUICK.

12:10PM  16            **FURTHER RECROSS-EXAMINATION**

12:10PM  17   BY MR. CAZARES:

12:10PM  18   Q.   IF WE CAN PUT UP ON THE SCREEN EXHIBIT 4059, WHICH ARE THE

12:11PM  19   NOTES.

12:11PM  20        THE SCREEN IS NOT WORKING?  THERE IT GOES.

12:11PM  21        DO YOU HAVE THE EXHIBIT ON YOUR SCREEN, SIR?

12:11PM  22   A.   YES.

12:11PM  23   Q.   AND AGAIN, YOU WROTE, "NO NEW SCIENCE IS NEEDED"; CORRECT?

12:11PM  24   A.   YES.

12:11PM  25   Q.   AND THEN "THE 'SCIENCE' BEHIND THERANOS IS COMPLETE";

12:11PM 1    CORRECT?

12:11PM 2    A.   YES.

12:11PM 3    Q.   AND YOU UNDERSTOOD THAT MEANS THEIR PROPRIETARY

12:11PM 4    TECHNOLOGY; CORRECT?

12:11PM 5    A.   THAT'S WHAT I FELT, YES.

12:11PM 6    Q.   BUT YOUR NOTES DON'T SAY, LIKE, "THE EDISON"; CORRECT?

12:11PM 7    A.   CORRECT.

12:11PM 8    Q.   AND WHATEVER THEIR PROPRIETARY FINGERSTICK TECHNOLOGY WAS,

12:11PM 9    THAT'S WHAT YOU WERE BEING TOLD?

12:11PM 10   A.   YES.

12:11PM 11              MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

12:11PM 12              MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

12:11PM 13              THE COURT:  MAY THIS WITNESS BE EXCUSED?

12:11PM 14              MR. CAZARES:  YES, YOUR HONOR.

12:11PM 15              MR. BOSTIC:  YES, YOUR HONOR.

12:11PM 16              THE COURT:  SIR, YOU'RE EXCUSED.

12:11PM 17              THE WITNESS:  THANK YOU.

12:11PM 18              THE COURT:  YOU'RE WELCOME.

12:11PM 19        LADIES AND GENTLEMEN, THIS SEEMS LIKE A GOOD TIME TO TAKE

12:11PM 20   OUR BREAK, SO LET'S TAKE 30 MINUTES, 30 MINUTES PLEASE, AND

12:12PM 21   WE'LL SEE YOU BACK THEN.  THANK YOU.

12:12PM 22        (RECESS FROM 12:12 P.M. UNTIL 12:46 P.M.)

12:46PM 23        (JURY OUT AT 12:46 P.M.)

24

25

| | | |
|---|---|---|
| 12:46PM | 1 | **AFTERNOON SESSION** |
| 12:46PM | 2 | THE COURT:  LET'S GO ON THE RECORD. |
| 12:46PM | 3 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  ALL COUNSEL |
| 12:46PM | 4 | ARE PRESENT.  MR. BALWANI IS PRESENT. |
| 12:46PM | 5 | SHOULD WE RETURN TO OUR CONVERSATION FROM THIS MORNING? |
| 12:46PM | 6 | ARE THE MIKES ON? |
| 12:46PM | 7 | THE CLERK:  SORRY. |
| 12:46PM | 8 | MR. SCHENK:  YES, YOUR HONOR. |
| 12:46PM | 9 | MR. CAZARES:  YES, YOUR HONOR. |
| 12:46PM | 10 | THE COURT:  WHERE ARE WE? |
| 12:46PM | 11 | MR. CAZARES:  WELL, YOUR HONOR, SO WHERE WE LEFT OFF |
| 12:46PM | 12 | IS THIS QUESTION ABOUT WHETHER OR NOT, RAISED BY THE |
| 12:46PM | 13 | GOVERNMENT, ABOUT WHETHER THE DEFENSE WOULD BE LIMITED IN ITS |
| 12:46PM | 14 | CLOSING ARGUMENTS RELATING TO THE WALGREENS LAUNCH, THE |
| 12:46PM | 15 | AFGHANISTAN ISSUE, MAYBE OTHER ISSUES, THROUGH INTRODUCTION OF |
| 12:46PM | 16 | THE RECORDINGS FOR -- YOU KNOW, NOT FOR THE TRUTH, FOR SOME |
| 12:47PM | 17 | EXCEPTION AND NOT FOR THE TRUTH. |
| 12:47PM | 18 | BUT I THINK THE PLACE TO REALLY START IS WE BELIEVE THAT |
| 12:47PM | 19 | THERE ARE EXCEPTIONS TO THE HEARSAY RULE THAT WOULD ADMIT THE |
| 12:47PM | 20 | TAPES FOR THE TRUTH, AND I DON'T THINK THAT'S INCONSISTENT WITH |
| 12:47PM | 21 | THE PRACTICE THAT HAS TAKEN PLACE IN THIS COURT UP UNTIL NOW, |
| 12:47PM | 22 | BECAUSE WHAT IS GOING TO HAPPEN IS THAT THE RECORDINGS, WE KNOW |
| 12:47PM | 23 | THEY'RE AUTHENTIC.  WE KNOW THAT MR. TOLBERT HAS TESTIFIED |
| 12:47PM | 24 | ABOUT THEM BEFORE, SO THEY'RE CREDIBLE. |
| 12:47PM | 25 | THE GOVERNMENT IS GOING TO INTRODUCE HIS RECOLLECTION |

ER-352

12:47PM 1    ABOUT THE VERY CONFERENCE CALL, AND, YOU KNOW, UNDER RULE 102,

12:47PM 2    UNDER THE BEST EVIDENCE RULE, THE TAPE IS THE ACTUAL BEST

12:47PM 3    EVIDENCE OF WHAT SHE SAID, THE TRUTH OF WHAT SHE SAID, NOT HIS

12:47PM 4    RECOLLECTION.

12:47PM 5        I DON'T THINK THAT'S A CONTROVERSIAL FACT, AND THAT ALONE

12:47PM 6    SHOULD ADMIT THE TAPES.

12:47PM 7        BUT IN ADDITION TO THAT, YOU KNOW, JUST, YOU KNOW, UNDER

12:47PM 8    THE RULE OF COMPLETENESS AND JUST FAIRNESS -- AND I'M NOT

12:47PM 9    SUGGESTING IN ANY WAY THAT THE COURT IS TRYING TO BE UNFAIR --

12:48PM 10   I THINK IT'S IMPORTANT FOR THE JURY TO BE ABLE TO HEAR THE

12:48PM 11   ACTUAL WORDS IF THAT'S WHAT THE GOVERNMENT IS GOING TO ASSERT

12:48PM 12   WERE MISLEADING AND FALSE RATHER THAN RECOLLECTION FROM AN

12:48PM 13   INDIVIDUAL CONVERSATION, YOU KNOW, 12 YEARS AGO OR 10 YEARS AGO

12:48PM 14   ALMOST.

12:48PM 15       SO THAT'S OUR POSITION, THEY SHOULD COME IN FOR THE TRUTH.

12:48PM 16           THE COURT:  FOR THE TRUTH?

12:48PM 17           MR. CAZARES:  FOR THE TRUTH.

12:48PM 18           THE COURT:  OKAY.  ALL RIGHT.

12:48PM 19           MR. SCHENK:  YOUR HONOR, THIS IS THE SECOND OR THIRD

12:48PM 20   TIME THE DEFENSE HAS CITED THE BEST EVIDENCE RULE TO THE COURT,

12:48PM 21   AND THE SECOND OR THIRD TIME THAT THEY HAVE CITED IT

12:48PM 22   INCORRECTLY.

12:48PM 23       THERE'S A CASE CALLED DIAZ-LOPEZ IN THE NINTH CIRCUIT THAT

12:48PM 24   DISCUSSES SOME OF THE HISTORY OF THE BEST EVIDENCE RULE, AND IT

12:48PM 25   MAKES CLEAR THAT THE BEST EVIDENCE RULE DOES NOT COMPARE TWO

12:48PM 1    DIFFERENT TYPES OF EVIDENCE, TOLBERT'S RECOLLECTION OF THE TAPE

12:48PM 2    WITH THE TAPE, AND THEN INSTRUCTS THE COURT THAT THE TAPE IS

12:48PM 3    THE BETTER OF THE TWO EVIDENCE, IT SHOULD ADMIT THAT ONE.

12:49PM 4    THAT'S NOT HOW THE BEST EVIDENCE RULE WORKS.

12:49PM 5        WHAT THE BEST EVIDENCE RULE IS IS PERMISSION TO ADMIT THE

12:49PM 6    ORIGINAL OF A DOCUMENT WHEN THERE'S A QUESTION ABOUT A COPY OF

12:49PM 7    THAT DOCUMENT.

12:49PM 8        IT DOES NOT COMPARE TWO DIFFERENT TYPES OF EVIDENCE AND

12:49PM 9    TELL THE COURT THAT IT MUST ADMIT THE TAPE BECAUSE THAT'S

12:49PM 10   BETTER THAN MR. TOLBERT'S RECOLLECTION OF IT.

12:49PM 11       SO ONE OF THE BASES THAT YOU JUST HEARD TO ADMIT THE

12:49PM 12   TOLBERT TAPES FOR THE TRUTH IS THE BEST EVIDENCE RULE, AND IT'S

12:49PM 13   DIAZ-LOPEZ, 625 F. 3D 1198, A NINTH CIRCUIT CASE FROM 2010.

12:49PM 14   BUT THIS CASE ALSO COLLECTS SOME OTHER NINTH CIRCUIT CASES THAT

12:49PM 15   CITE THE BEST EVIDENCE RULE FOR THIS SAME CONCEPT.

12:49PM 16       THE COURT, I THINK, ALSO HEARD THE RULE OF COMPLETENESS.

12:49PM 17   WE'VE DISCUSSED THIS MORNING IF THE GOVERNMENT OFFERED, FOR

12:49PM 18   INSTANCE, 1348-1 AND THE DEFENSE FELT THAT 1348-2 WAS NECESSARY

12:50PM 19   IN ORDER TO PROVIDE COMPLETE CONTEXT TO THE JURY, THE COURT

12:50PM 20   COULD ADMIT 1348-2 UNDER THE RULE OF COMPLETENESS.

12:50PM 21       IT DOES NOT SUGGEST THAT IF THE GOVERNMENT ASKS

12:50PM 22   MR. TOLBERT HIS RECOLLECTION OF THE TAPE, THE COURT MUST THEN,

12:50PM 23   FOR COMPLETENESS PURPOSES, ADMIT THE TAPE.

12:50PM 24       THE COURT HAS NOT HEARD A BASIS TO THE HEARSAY RULES THAT

12:50PM 25   ALLOW THE DEFENSE TO OFFER A CODEFENDANT'S STATEMENTS OUT OF

12:50PM 1    COURT FOR THE TRUTH.

12:50PM 2        AND WHAT WE ORIGINALLY CAME TO YOUR HONOR TO DISCUSS THIS

12:50PM 3    MORNING WAS A HEARSAY OBJECTION TO THE DEFENSE PLAYING THE

12:50PM 4    TAPES, AND I STILL HAVEN'T HEARD AN EXCEPTION TO THE HEARSAY

12:50PM 5    RULE THAT PERMITS THE DEFENSE TO PLAY THE TOLBERT TAPES.

12:50PM 6        MR. CAZARES:  I MEAN -- I APPRECIATE THE

12:50PM 7    GOVERNMENT'S POSITION, BUT IT'S STILL KIND OF DODGING THE

12:50PM 8    ISSUE, WHICH IS WHY THIS JURY SHOULDN'T BE HEARING THE ACTUAL

12:50PM 9    WORDS OF MS. HOLMES AS OPPOSED TO MR. TOLBERT'S RECOLLECTION

12:51PM 10   BASED ON SOME NOTES OF THE SAME CONVERSATION, BECAUSE THE

12:51PM 11   INFORMATION THAT THE GOVERNMENT WANTS TO CONVEY TO THE JURY IS

12:51PM 12   PURPORTEDLY WHAT MS. HOLMES SAID, NOT HIS INTERPRETATION.

12:51PM 13       MAYBE THEY CAN ASK THAT QUESTION AFTERWARDS.  THAT'S

12:51PM 14   ALWAYS A FAIR FOLLOW-UP QUESTION.

12:51PM 15       BUT THE GOVERNMENT WANTS THIS JURY TO TAKE INFERENCES FROM

12:51PM 16   THE WORDS THAT MS. HOLMES MADE IN THAT CONFERENCE CALL AND THAT

12:51PM 17   INFLUENCED MR. TOLBERT AND HIS BOSS TO INVEST, BUT THE

12:51PM 18   GOVERNMENT DOESN'T WANT THE JURY TO HEAR THE ACTUAL WORDS,

12:51PM 19   YOUR HONOR.

12:51PM 20       AND THE RULE OF COMPLETENESS DOES APPLY, NOT ON ITS OWN,

12:51PM 21   BUT IN COMBINATION WITH, YOU KNOW, COMMON LAW 611(A)(1).

12:51PM 22       YOU KNOW, THE COURT IS NOT REQUIRED.  OF COURSE NOT.  THE

12:51PM 23   COURT ALWAYS HAS DISCRETION ON EVIDENTIARY MATTERS, YOUR HONOR.

12:51PM 24       BUT IT SEEMS IN A SITUATION LIKE THIS WHERE THE GOVERNMENT

12:51PM 25   KNOWS THE TAPES ARE AUTHENTIC, THE GOVERNMENT THEMSELVES EVEN

12:52PM 1    INTRODUCED THEM, OBVIOUSLY NOT BOUND, IN THE PRIOR TRIAL.

12:52PM 2        THE GOVERNMENT NOW WANTS TO LIMIT OR PREVENT THE JURY FROM

12:52PM 3    HEARING THE COMMUNICATION AND THE CONTEXT OF THE COMMUNICATION

12:52PM 4    AND THE DETAILS.  THEY WANT TO GIVE THE JURY SNIPPETS, AND THE

12:52PM 5    RULE OF COMPLETENESS AND RULE 611 PERMIT THIS COURT TO ALLOW

12:52PM 6    THE JURY TO SEE AND HEAR THE WHOLE PICTURE AND NOT JUST THE

12:52PM 7    SNIPPETS.

12:52PM 8        AND THAT'S WHAT WE THINK SHOULD HAPPEN HERE, AND THAT'S A

12:52PM 9    RULE THAT WOULD PERMIT THE FACTS TO COME IN FOR THEIR TRUTH.

12:52PM 10       THE GOVERNMENT CAN CONTINUE TO MAKE THEIR ARGUMENTS THAT

12:52PM 11   THEY'RE MISLEADING, AND WE CAN CONTINUE TO MAKE OUR ARGUMENTS

12:52PM 12   THAT WE THINK THERE IS OTHER EVIDENCE THAT SHOWS THOSE

12:52PM 13   STATEMENTS WERE ACCURATE AND CONSISTENT WITH OTHER EVIDENCE IN

12:52PM 14   THE CASE.

12:52PM 15       THE COURT:  OKAY.  MR. SCHENK, ARE YOU -- YOUR

12:52PM 16   EXAMINATION OF MR. TOLBERT, ARE YOU INTENDING TO INTRODUCE THE

12:52PM 17   TAPES IN YOUR CASE?

12:52PM 18       MR. SCHENK:  NOT IN DIRECT, YOUR HONOR.

12:52PM 19       THE COURT:  OKAY.

12:53PM 20       AND THEN WHAT IS THE -- YOU'RE SEEKING TO INTRODUCE THE

12:53PM 21   TAPES.  YOU WOULD LIKE TO GET THE TAPES IN IN YOUR

12:53PM 22   CROSS-EXAMINATION, WHICH IS YOUR CASE, AND I'M NOT CERTAIN I'VE

12:53PM 23   HEARD YOU TELL ME THE EXCEPTION TO THE HEARSAY RULE, WHY THOSE

12:53PM 24   TAPES SHOULD BE ADMITTED FOR THEIR TRUTH, PARTICULARLY IF

12:53PM 25   THEY'RE THE STATEMENT OF A CODEFENDANT IN THIS PARTICULAR CASE.

| | | |
|---|---|---|
| 12:53PM | 1 | MR. CAZARES: WELL, I JUST THINK I SAID THE RULE OF |
| 12:53PM | 2 | COMPLETENESS AND FAIRNESS, YOUR HONOR. |
| 12:53PM | 3 | THE RULE OF COMPLETENESS REBUTS THE HEARSAY RULE AND ISN'T |
| 12:53PM | 4 | UNDERMINED BY THE HEARSAY RULE, IT ACTUALLY COMPLEMENTS IT, AND |
| 12:53PM | 5 | ALLOWS THE JURY TO ACTUALLY HEAR THE WHOLE PICTURE, WHERE THE |
| 12:53PM | 6 | INITIAL INTRODUCTION OF FACTS OR EVIDENCE DOESN'T NECESSARILY |
| 12:53PM | 7 | TELL THE WHOLE PICTURE. |
| 12:53PM | 8 | AND PARTICULARLY WHEN IT'S A FACT OF IMPORTANCE HERE, LIKE |
| 12:54PM | 9 | MS. HOLMES'S WORDS THAT THE GOVERNMENT HAS CHARGED IN |
| 12:54PM | 10 | EXECUTION, ONE OF THE COUNTS IS THE TOLBERT-HALL INVESTMENT, |
| 12:54PM | 11 | THEY'RE POINTING TO HER WORDS BUT SAYING, NO, THE JURY |
| 12:54PM | 12 | SHOULDN'T HEAR THOSE WORDS BECAUSE IT MIGHT BE HEARSAY AND |
| 12:54PM | 13 | IGNORE THESE OTHER BASES THAT WOULD PERMIT THE JURY TO HEAR |
| 12:54PM | 14 | THOSE FACTS. |
| 12:54PM | 15 | WE JUST THINK THAT THAT'S NOT CONSISTENT WITH COMMON LAW |
| 12:54PM | 16 | AND THE RULE OF COMPLETENESS. |
| 12:54PM | 17 | YOU KNOW, THERE ARE HEARSAY EXCEPTIONS THAT WOULD NOT BE |
| 12:54PM | 18 | FOR THE TRUTH. WE DON'T THINK THOSE ARE APPROPRIATE, BUT TO BE |
| 12:54PM | 19 | FRANK, YOUR HONOR, WE HAVE SOME CONCERNS THAT WE'RE SOMEHOW |
| 12:54PM | 20 | GOING TO BE LIMITED IN OUR CLOSING ARGUMENT, WHICH WE DON'T |
| 12:54PM | 21 | THINK WOULD BE APPROPRIATE, THAT KIND OF TIES OUR HANDS, |
| 12:54PM | 22 | YOUR HONOR. |
| 12:54PM | 23 | THE COURT: WELL, I HAVEN'T SAID TODAY THAT I WOULD |
| 12:54PM | 24 | LIMIT YOU IN ANY WAY. I HAVE NOT SAID THAT. |
| 12:54PM | 25 | BUT WHAT I SAID BEFORE WE STARTED THIS MORNING WAS, I |

4395

12:54PM  1      THINK ALL PARTIES SHOULD LOOK AND TAKE A MEASURED VIEW AS TO

12:55PM  2      WHAT IT IS THE PARTIES SEEK TO INTRODUCE AND WHAT IMPACT, IF

12:55PM  3      ANY, THAT MIGHT HAVE.

12:55PM  4          I'M NOT SUGGESTING THE COURT HAS MADE ANY DECISION ON

12:55PM  5      ANYTHING IN THAT REGARD.  I'M JUST TRYING TO LET EVERYBODY

12:55PM  6      KNOW, CHECK YOURSELVES, CHECK YOUR CASES, MAKE SURE WHEN YOU

12:55PM  7      ASK FOR SOMETHING, YOU KNOW, IT'S WHAT YOU WANT AND YOU'VE

12:55PM  8      FULLY CONSIDERED IT.

12:55PM  9          I'M NOT LOOKING YOU AT AND THE DEFENSE.  I'M TALKING ABOUT

12:55PM  10     BOTH SIDES.

12:55PM  11              MR. CAZARES:  I UNDERSTAND, YOUR HONOR.

12:55PM  12              THE COURT:  RIGHT.

12:55PM  13         BOTH SIDES, WHEN YOU TAKE ACTIONS THERE ARE CONSEQUENCES

12:55PM  14     FOR THAT.

12:55PM  15         I JUST WANTED TO MAKE SURE EVERYBODY HAD A MEASURED

12:55PM  16     APPROACH AND HAD AN OPPORTUNITY TO REVIEW THAT.

12:55PM  17         I WAS NOT SAYING, IF YOU DO THIS, I'M GOING TO LIMIT YOU.

12:55PM  18         THE DISCUSSION WAS, WELL, IF THIS COMES IN AND IF IT COMES

12:55PM  19     IN IN THIS WAY, WE MIGHT BE ASKING THIS.  AND THAT -- FROM THE

12:55PM  20     GOVERNMENT'S PERSPECTIVE.  AND THAT MIGHT CAUSE SOME

12:55PM  21     LIMITATIONS.

12:55PM  22         MY POINT THIS MORNING WAS, LET'S ALL STEP BACK AND THINK

12:55PM  23     ABOUT WHERE WE ARE BEFORE WE CALL THE WITNESS IN TO MAKE SURE

12:55PM  24     THAT WE UNDERSTAND THE FULL, THE FULL RAMIFICATIONS OF WHAT WE

12:55PM  25     DO.

ER-358

12:55PM 1          I'M GLAD YOU'VE DONE THAT.  THANKS FOR THAT.

12:56PM 2          ANYTHING FURTHER ON THIS?

12:56PM 3             MR. SCHENK:  SUBMIT IT.

12:56PM 4             MR. CAZARES:  SUBMIT IT.

12:56PM 5             THE COURT:  OKAY.  THANK YOU.

12:56PM 6        IF THERE'S -- IF THE GOVERNMENT IS NOT GOING TO PUT THESE

12:56PM 7  IN, I DON'T SEE GROUNDS TO ALLOW THE DEFENSE AT THIS TIME TO

12:56PM 8  PUT THESE IN.  SO I DON'T KNOW IF THAT WAS A REQUEST TO ADMIT

12:56PM 9  AT THIS STAGE OR NOT.

12:56PM 10       BUT I WOULD INDICATE, AS THE RECORD IS RIGHT NOW, I WOULD

12:56PM 11  NOT PERMIT IT.  LET ME JUST INDICATE THAT.

12:56PM 12            MR. CAZARES:  UNDERSTOOD, YOUR HONOR.  OKAY.

12:56PM 13            THE COURT:  OKAY.  SO WE'RE READY FOR MR. TOLBERT I

12:56PM 14  TAKE IT.

12:56PM 15            MR. SCHENK:  YES.

12:56PM 16            THE COURT:  OKAY.

12:56PM 17            MR. COOPERSMITH:  YOUR HONOR, I HAVE ONE THING, ONE

12:56PM 18  MINOR THING TO RAISE IF I CAN.

12:56PM 19            THE COURT:  SURE.

12:56PM 20            MR. COOPERSMITH:  THANK YOU, YOUR HONOR.  I

12:56PM 21  APPRECIATE IT.

12:56PM 22       I WILL JUST SAY ONE THING.  I HAVE NEVER SEEN BEFORE IN A

12:56PM 23  FRAUD CASE --

12:56PM 24            THE COURT:  YOU'RE GOING TO TALK ABOUT MY DECISION

12:56PM 25  THAT I JUST MADE?

| | | |
|---|---|---|
| 12:56PM | 1 | MR. COOPERSMITH:  WELL, NO, YOUR HONOR.  I'LL HOLD |
| 12:57PM | 2 | MY TONGUE ON THAT. |
| 12:57PM | 3 | THE COURT:  OKAY.  YOU HAD ONE OTHER THING. |
| 12:57PM | 4 | MR. COOPERSMITH:  YES, YOUR HONOR. |
| 12:57PM | 5 | THE ONE OTHER THING IS THAT WE HAVE A CONCERN ABOUT SOME |
| 12:57PM | 6 | OF THE QUESTIONING WE SAW WITH MR. MENDENHALL, AND WE'VE SEEN |
| 12:57PM | 7 | IT WITH OTHER WITNESSES, AND I THINK IT'S IMPORTANT TO RAISE. |
| 12:57PM | 8 | AND THE CONCERN WE HAVE IS THAT THE QUESTION TO |
| 12:57PM | 9 | MR. MENDENHALL -- AND AGAIN, WITH OTHER WITNESSES, WE EXPECT |
| 12:57PM | 10 | THERE WILL BE OTHER INVESTORS WHO TESTIFY, SO THE SAME ISSUE |
| 12:57PM | 11 | MAY ARISE AGAIN -- IS THAT MR. BOSTIC ASKED THE WITNESS, DID |
| 12:57PM | 12 | YOU KNOW THAT THE EDISON DEVICE COULD ONLY DO 12 TESTS? |
| 12:57PM | 13 | AND IF MR. BOSTIC WANTS TO ASK, DID YOU KNOW IT WAS |
| 12:57PM | 14 | ACTUALLY DOING 12 TESTS, THAT'S FAIR GAME, OKAY, BECAUSE THAT |
| 12:57PM | 15 | IS TRUE.  THE EVIDENCE ESTABLISHES THAT THERANOS WAS RUNNING |
| 12:57PM | 16 | THE EDISON FOR ABOUT 12 TESTS AT THE PEAK OF IT. |
| 12:57PM | 17 | BUT IF THE QUESTION IS, COULD IT DO OR IS IT CAPABLE, |
| 12:57PM | 18 | THERE IS NO QUESTION THAT THE EDISON -- I'M SORRY.  THERE IS NO |
| 12:58PM | 19 | EVIDENCE THAT THE EDISON WAS NOT CAPABLE OF RUNNING ADDITIONAL |
| 12:58PM | 20 | IMMUNOASSAYS. |
| 12:58PM | 21 | IN FACT, THE EVIDENCE IS THAT IT COULD RUN IMMUNOASSAYS, |
| 12:58PM | 22 | AND THERE'S FAR MORE IMMUNOASSAYS THAN JUST THE 12, AND THAT |
| 12:58PM | 23 | CAME IN WITH MS. CHEUNG. |
| 12:58PM | 24 | SO I THINK THE PROPER QUESTION THAT MR. BOSTIC COULD |
| 12:58PM | 25 | ASK -- AGAIN, PUTTING ASIDE THE ISSUE OF OMISSIONS, WHICH IS |

4398

12:58PM 1    ANOTHER ISSUE IN THE CASE -- BUT IN TERMS OF THE FAIR QUESTION

12:58PM 2    WITH A GOOD FAITH BASIS, IT'S, DID YOU KNOW THAT THE EDISON WAS

12:58PM 3    ONLY RUNNING 12 TESTS IN THE LAB?  NOT, DID YOU KNOW IT COULD

12:58PM 4    ONLY RUN?

12:58PM 5         I DON'T THINK THAT'S ESTABLISHED BY THE EVIDENCE, AND IT'S

12:58PM 6    NOT, IN OUR VIEW, A GOOD FAITH QUESTION, SO I WANTED TO RAISE

12:58PM 7    THAT.

12:58PM 8              THE COURT:  WAS THERE AN OBJECTION OF --

12:58PM 9              MR. COOPERSMITH:  THERE WAS.  A FOUNDATION

12:58PM 10   OBJECTION, YOUR HONOR.

12:58PM 11             THE COURT:  -- ASSUMING FACTS NOT IN EVIDENCE?

12:58PM 12             MR. COOPERSMITH:  I THINK IT WAS FOUNDATION, WHICH I

12:58PM 13   THINK AMOUNTS TO THE SAME THING.

12:58PM 14             MR. BOSTIC:  SO, YOUR HONOR, I DISAGREE WITH THE

12:58PM 15   DEFENSE'S INTERPRETATION OF THE QUESTION.

12:58PM 16        FIRST OF ALL, IT MAY BE THAT I ASKED THE QUESTION IN THE

12:59PM 17   WAY THAT MR. COOPERSMITH IS RECITING.

12:59PM 18        BUT I THINK, IN CASE IT MATTERS, IS THAT WHAT I ACTUALLY

12:59PM 19   ASKED IS, WERE YOU TOLD?

12:59PM 20        SO MY QUESTION ACTUALLY IS NOT, STRICTLY SPEAKING,

12:59PM 21   ASSUMING FACTS.  IT'S ASKING WHETHER MR. BALWANI MADE CERTAIN

12:59PM 22   REPRESENTATIONS TO HIM.

12:59PM 23        TO THE CENTRAL ISSUE, THOUGH, IT SOUNDS LIKE THIS COMES

12:59PM 24   DOWN TO A DEFINITION OF THE WORD "COULD," WHICH MIGHT BE A

12:59PM 25   LITTLE TOO SEMANTIC FOR PURPOSES OF SETTING UP GUARDRAILS FOR

12:59PM 1     HOW QUESTIONS COULD BE FORMULATED.

12:59PM 2        THE FACT IS THAT, AND I THINK THE EVIDENCE SHOWS THIS,

12:59PM 3     THAT THERANOS WANTED TO RUN MORE TESTS ON THE EDISON, IT WORKED

12:59PM 4     TO PUT MORE TESTS ON ITS EDISON DEVICE, IT ONLY EVER GOT TO 12.

12:59PM 5        MY UNDERSTANDING IS THAT ONLY 12 TESTS WERE VALIDATED FOR

12:59PM 6     USE IN THE CLIA LAB.

12:59PM 7        WHETHER THE DEVICE COULD HAVE BEEN USED TO RUN ADDITIONAL

12:59PM 8     TESTS, WHETHER THERANOS MIGHT HAVE BEEN SUCCESSFUL HAD IT TRIED

01:00PM 9     HARDER TO VALIDATE ADDITIONAL TESTS I THINK IS A HYPOTHETICAL

01:00PM 10     THAT DOESN'T MAKE THAT QUESTION IMPROPER.

01:00PM 11        I THINK THE COMPANY WANTED TO USE ITS TECHNOLOGY, ITS

01:00PM 12     DEVICE FOR AS MUCH AS POSSIBLE, AND 12 WAS THE MAXIMUM THAT IT

01:00PM 13     ACHIEVED DURING THE RELEVANT TIME PERIOD.

01:00PM 14          THE COURT:  OKAY.  ALL RIGHT.

01:00PM 15          MR. COOPERSMITH:  YOUR HONOR, I'M SORRY.  I DON'T

01:00PM 16     THINK THERE'S ANY EVIDENCE THAT THE EVIDENCE COULD ONLY DO.

01:00PM 17        AT THE END OF THE DAY, OUR TOOL AS LAWYERS AND JUDGES IS

01:00PM 18     WORDS.  SO IT MAY WELL COME DOWN TO A DEFINITION OF THE WORD

01:00PM 19     "COULD," AND THAT'S IMPORTANT.

01:00PM 20        BUT THERE'S NO EVIDENCE, AGAIN, THAT THE EDISON COULD ONLY

01:00PM 21     DO 12 TESTS, MEANING IT WAS ONLY CAPABLE OF DOING 12 TESTS, AND

01:00PM 22     I JUST DON'T THINK THERE'S A GOOD FAITH BASIS FOR THAT

01:00PM 23     QUESTION, AND THAT'S OUR CONCERN AND WE WOULD ASK THE COURT TO

01:00PM 24     TELL THE GOVERNMENT NOT TO DO THAT.

01:00PM 25          MR. BOSTIC:  I'M HAPPY TO ANSWER ANY CONCERNS OR

| 01:00PM | 1 | QUESTIONS THAT THE COURT MIGHT HAVE, BUT I DISAGREE WITH THE |
| 01:00PM | 2 | DEFENSE'S POSITION. |
| 01:00PM | 3 | THE COURT: OKAY. LET'S SEE WHERE QUESTIONS GO, AND |
| 01:00PM | 4 | IF THE OBJECTION IS MADE, THE COURT WILL RULE ON IT. |
| 01:01PM | 5 | OKAY. THANK YOU. |
| 01:01PM | 6 | MR. COOPERSMITH: THANK YOU, YOUR HONOR. |
| 01:01PM | 7 | MR. BOSTIC: THANK YOU, YOUR HONOR. |
| 01:01PM | 8 | (RECESS FROM 1:01 P.M. UNTIL 1:04 P.M.) |
| 01:04PM | 9 | (JURY IN AT 1:04 P.M.) |
| 01:04PM | 10 | THE COURT: WE'RE BACK ON THE RECORD. |
| 01:04PM | 11 | ALL OF THE PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE |
| 01:04PM | 12 | AGAIN. |
| 01:04PM | 13 | DOES THE GOVERNMENT HAVE A WITNESS TO CALL? |
| 01:05PM | 14 | MR. SCHENK: YES, YOUR HONOR. |
| 01:05PM | 15 | THE GOVERNMENT CALLS BRYAN TOLBERT. |
| 01:05PM | 16 | THE COURT: GOOD AFTERNOON, SIR. |
| 01:05PM | 17 | IF YOU WOULD COME FORWARD, PLEASE. JUST STAND RIGHT OVER |
| 01:05PM | 18 | HERE BY THE WITNESS STAND. |
| 01:05PM | 19 | IF YOU COULD FACE OUR COURTROOM DEPUTY WHILE YOU RAISE |
| 01:05PM | 20 | YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 01:05PM | 21 | **(GOVERNMENT'S WITNESS, JOHN BRYAN TOLBERT, WAS SWORN.)** |
| 01:05PM | 22 | THE WITNESS: YES, MA'AM. |
| 01:05PM | 23 | THE COURT: PLEASE HAVE A SEAT HERE, SIR. |
| 01:05PM | 24 | I'LL INVITE YOU TO MAKE YOURSELF COMFORTABLE. |
| 01:05PM | 25 | FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU |

01:05PM 1       NEED.

01:05PM 2           WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

01:05PM 3       AND THEN SPELL IT, PLEASE.

01:05PM 4               THE WITNESS:  JOHN BRYAN TOLBERT.  J-O-H-N,

01:05PM 5       B-R-Y-A-N, T-O-L-B-E-R-T.

01:05PM 6               THE COURT:  THANK YOU.  COUNSEL.

01:05PM 7               MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR.

01:05PM 8                       **DIRECT EXAMINATION**

01:05PM 9       BY MR. SCHENK:

01:05PM 10      Q.   GOOD AFTERNOON, MR. TOLBERT.  IF YOU ARE FULLY VACCINATED,

01:05PM 11      I UNDERSTAND THE COURT WILL PERMIT YOU TO TESTIFY WITHOUT A

01:06PM 12      MASK ON.

01:06PM 13      A.   I AM FULLY VACCINATED.

01:06PM 14               THE COURT:  YES.  THANK YOU.

01:06PM 15               MR. SCHENK:  THANK YOU, YOUR HONOR.

01:06PM 16      Q.   MR. TOLBERT, DO YOU WORK FOR A COMPANY CALLED HALL GROUP?

01:06PM 17      A.   YES, SIR.

01:06PM 18      Q.   AND WHILE WORKING AT HALL, DID YOU BECOME FAMILIAR WITH A

01:06PM 19      COMPANY CALLED THERANOS?

01:06PM 20      A.   I DID.

01:06PM 21      Q.   DO YOU REMEMBER WHEN YOU INITIALLY BECAME FAMILIAR WITH

01:06PM 22      THERANOS?

01:06PM 23      A.   IN THE FALL OF 2006.

01:06PM 24      Q.   IN AROUND THAT TIME, DID THE HALL GROUP MAKE AN INVESTMENT

01:06PM 25      IN THERANOS?

01:06PM 1     A.   WE DID.

01:06PM 2     Q.   AND WAS THAT THE ONLY INVESTMENT THAT HALL MADE IN

01:06PM 3     THERANOS?

01:06PM 4     A.   IN 2006 IT WAS.  WE HAD INVESTED ABOUT $2 MILLION.

01:06PM 5          WE HAD A SUBSEQUENT INVESTMENT IN DECEMBER OF 2013.

01:06PM 6          THOSE WERE THE TWO INVESTMENTS THAT WE MADE.

01:06PM 7     Q.   SO HALL MADE TWO SEPARATE INVESTMENTS, ONE IN 2006 AND THE

01:06PM 8     OTHER IN DECEMBER OF 2013?

01:06PM 9     A.   CORRECT.

01:06PM 10    Q.   WOULD YOU DESCRIBE TO THE JURY FIRST WHAT WORK, OR WHAT

01:07PM 11    LINE OF WORK THE HALL GROUP IS INVOLVED IN?

01:07PM 12    A.   THE HALL GROUP IS A PRIVATE INVESTMENT COMPANY, SO WE DO A

01:07PM 13    LOT OF WORK AROUND REAL ESTATE, INVESTING IN REAL ESTATE

01:07PM 14    INVESTMENT.  WE HAVE WINE OPERATIONS IN NAPA VALLEY.

01:07PM 15         AND WE DO PRIVATE INVESTING IN COMPANIES, YOU KNOW, OF ALL

01:07PM 16    DIFFERENT KIND OF SHAPES AND SIZES.

01:07PM 17    Q.   WHERE IS HALL LOCATED?

01:07PM 18    A.   OUR HEADQUARTERS ARE IN DALLAS, TEXAS.

01:07PM 19    Q.   AND THEN HOW ABOUT YOUR JOB AT THE HALL GROUP?  WHAT DO

01:07PM 20    YOU DO THERE?

01:07PM 21    A.   SO MY JOB IS RELATED TO FINANCE.  SO I DO CORPORATE

01:07PM 22    FINANCE KIND OF WORK, BUDGETS AND CASH FLOWS.

01:07PM 23         I ALSO OVERSEE OUR VENTURE INVESTING, SO INVESTMENTS THAT

01:07PM 24    WE MAKE IN PUBLIC AND PRIVATE COMPANIES.

01:07PM 25    Q.   AND WHAT IS YOUR JOB TITLE?

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

RAMESH "SUNNY" BALWANI,

                Defendant.

Case No. 5:18-cr-00258-EJD-1

**ORDER RE: MOTIONS IN LIMINE**

Re: Dkt. Nos. 1155, 1156

      On July 28, 2020, a federal grand jury returned a Third Superseding Indictment, charging Defendants Elizabeth Holmes and Ramesh "Sunny" Balwani with ten counts of wire fraud (Counts 3 through 12) in violation of 18 U.S.C. § 1343, and two counts of conspiracy to commit wire fraud (Counts 1 through 2) in violation of 18 U.S.C. § 1349. Third Superseding Indictment ("TSI"), Dkt. No. 469. The Defendants were charged with making deceptive representations about their company, Theranos, and its technology.

      In anticipation of trial, Balwani and the Government each filed motions in limine ("MIL") and supporting declarations. *See* United States' Mots. in Limine ("Govt. Mot."), Dkt. No. 1155; Decl. of Kelly I. Volkar in Supp. of United States' Mots. in Limine ("Volkar Decl."), Dkt. No. 1155-1; Def. Ramesh "Sunny" Balwani's Omnibus Mots. in Limine ("Balwani Mot."), Dkt. No. 1156; Decl. of Jeffrey B. Coopersmith in Supp. of Def. Ramesh Balwani's Mots. in Limine ("Coopersmith Decl."), Dkt. Nos. 1156-1, 1157; Decl. of Richard L. Sonnier III ("Sonnier Decl."), Dkt. No. 1158. Both parties submitted timely responses and replies in support of their respective motions. *See* Def. Ramesh "Sunny" Balwani's Responses to the Govt.'s Mots. in Limine

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

1

United States District Court
Northern District of California

("Balwani Resp."), Dkt. No. 1179; Decl. of Jeffrey B. Coopersmith in Supp. of Mr. Balwani's Resp. to Govt.'s Mots. in Limine ("Coopersmith Resp. Decl."), Dkt. No. 1179-1, 1179-2; United States' Resp. to Def. Ramesh "Sunny" Balwani's Mots. in Limine ("Govt. Resp."), Dkt. No. 1181; Decl. of Kelly I. Volkar in Supp. of United States' Resp. to Def. Balwani's Mots. in Limine ("Volkar Resp. Decl."), Dkt. No. 1183; Def. Ramesh "Sunny" Balwani's Replies in Supp. of His Mots. in Limine ("Balwani Reply"), Dkt. No. 1193; Decl. of Jeffrey B. Coopersmith Re: Mr. Balwani's Replies in Supp. of His Mots. in Limine ("Coopersmith Reply Decl."), Dkt. No. 1193-1; and United States' Reply to Def. Ramesh "Sunny" Balwani's Resp. to United States' Mots. in Limine ("Govt. Reply"), Dkt. No. 1195. The Court heard oral argument on February 4 and 8, 2022. Dkt. Nos. 1318, 1319. Having considered the parties' arguments, the relevant law, and the record in this case, the Court orders as follows.

## I. BACKGROUND

### A. The Indictment

Holmes founded Theranos, a health care and life sciences company, in 2003. TSI ¶ 1. Holmes served as the company's Chief Executive Officer. *Id*. Balwani was a board member, President, and Chief Operating Officer of Theranos. *Id*. ¶ 2.

Theranos' stated mission was to revolutionize medical laboratory testing through its allegedly innovative methods of drawing and testing blood and diagnosing patients. *Id*. ¶ 4. During the company's first ten years, its scientists worked toward developing proprietary technology that could run clinical tests using only tiny drops of blood. *Id*. ¶ 5. Theranos also worked toward developing a method for drawing a few drops of capillary blood from a patient's finger using a small lancet. *Id*. The blood was then stored in a "nanotainer." *Id*. Theranos sought to develop a second device called the Theranos Sample Processing Unit ("the TSPU," "Edison," or "miniLab") that could quickly and accurately analyze blood samples stored in the nanotainer. *Id*. The Government contends that the promises of these devices were never realized; the devices "consistently" produced inaccurate and unreliable results. *Id*. ¶ 16. Despite this, Defendants began a publicity campaign to promote the company and its devices. *Id.* ¶¶ 6-9. In September

Case No.: 5:18-cr-00258-EJD
ORDER RE: MOTIONS IN LIMINE

2

United States District Court
Northern District of California

1    2013, Theranos offered blood testing at Walgreens "Wellness Centers" in California and Arizona.

2    *Id.* ¶ 10.

3         The Government argues that Defendants conspired to commit and committed fraud

4    through two fraudulent schemes: one to defraud investors and another to defraud doctors and

5    patients.  The Court outlines these schemes below.

6         **Scheme to Defraud Investors.**  Defendants allegedly made materially false and

7    misleading statements and failed to disclose material facts to investors.  Based on the false

8    statements, investors invested money in Theranos.  Specifically, from 2013 to 2015, Defendants

9    allegedly made misstatements regarding:

10        1. Theranos' proprietary analyzer: Defendants allegedly made misstatements about

11   Theranos' proprietary analyzer—the TSPU, Edison, or miniLab—when they claimed the analyzer

12   was presently capable of accomplishing certain tasks, with more precision than other blood tests,

13   and at a faster rate, when they knew these statements were false.  *Id.* ¶ 12(A).

14        2. Theranos' financial health: Defendants allegedly misrepresented Theranos' financial

15   well-being when they told investors the company was financially strong and stable and would

16   make huge profits in 2014 and 2015 when, in fact, they knew Theranos would only generate

17   modest revenue.  *Id.* ¶ 12(B).

18        3. Technology demonstrations: Defendants allegedly deceived investors through

19   misleading technology demonstrations intended to cause potential investors to believe blood tests

20   were being conducted on Theranos' proprietary analyzer when Defendants knew the analyzer was

21   operating in "null protocol."  *Id.* ¶ 12(C).

22        4. Walgreens partnership: Defendants allegedly misled investors when they told them

23   Theranos had an expanding partnership with Walgreens when the Walgreens rollout had stalled

24   due to concerns with Theranos' performance.  *Id.* ¶ 12(D).

25        5. United States Department of Defense ("DOD") relationship: Defendants allegedly told

26   investors the company had a profitable and revenue-generating business relationship with the

27   DOD and that Theranos technology was deployed on the battlefield.  Defendants allegedly knew

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER RE: MOTIONS IN LIMINE

3

that Theranos had limited revenue from military contracts and that its technology was not used in the battlefield.  *Id*. ¶ 12(E).

6. Food and Drug Administration ("FDA") approval: Defendants allegedly misled investors when they told them that Theranos did not need the FDA to approve its proprietary analyzer and tests when Defendants knew this to be false.  *Id*. ¶ 12(F).

7. Patient testing: Defendants allegedly told investors that patient tests were conducted using Theranos-manufactured analyzers.  Defendants allegedly knew that Theranos used third-party, commercially available analyzers.  *Id*. ¶ 12(G).

8. Peer review: Defendants allegedly falsely told investors that several national or multinational pharmaceutical companies and research institutions had examined, used, and validated Theranos technology.  *Id*. ¶ 12(H).

9. Media representations: Defendants allegedly made the false and misleading statements described above to reporters and then shared the resulting articles directly with potential investors and via Theranos' website.  *Id*. ¶ 12(I).

**Scheme to Defraud Doctors and Patients.**  The Government alleges that from 2013 to 2016, Defendants advertised and marketed Theranos technology to doctors and patients, and falsely claimed that the tests were accurate and reliable.  *Id*. ¶¶ 14-15.  Their claims about Theranos technology were implicit and explicit.  *Id*. ¶ 15.  Despite knowing that Theranos' technology suffered from recurring accuracy and reliability problems, Defendants allegedly advertised the tests as accurate and reliable.  *Id*. ¶¶ 16-17.  Specifically, Defendants used materially false and misleading marketing materials and advertisements, and transmitted Theranos blood results that Defendants knew contained, or likely contained, inaccurate information.  *Id*. ¶¶ 16-18.  For instance, Theranos' public website touted its lab's ability to perform tests "quickly and accurately on samples as small as a single drop."  *Id*. ¶ 9.  Defendants also allegedly provided patients with reports that contained or were likely to contain: (1) inaccurate and unreliable results; (2) improperly adjusted reference ranges defining a normal or healthy result for a given test; (3) improperly removed "critical" results, i.e., results suggesting a patient needed medical attention;

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

4

1    and (4) results generated from improperly validated assays, further decreasing the reliability of

2    those tests.  *Id*. ¶ 17(C).

3         **B.    Procedural History**

4         The Court ordered separate trials for Holmes and Balwani.  Dkt. No. 977.  In anticipation

5    of trial, Holmes and the Government each filed motions in limine.  Dkt. Nos. 560, 561, 562, 563,

6    564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 577,578, 588.  The Court

7    addressed each motion in its May 22, 2021 Order Re: Motions in Limine ("Holmes MIL Order").

8    Dkt. No. 798.

9         Holmes' jury trial concluded on January 3, 2022.  The jury found Holmes guilty on Counts

10   1, 6, 7 and 8; not guilty on Counts 2, 10, 11 and 12; and did not reach a verdict on Counts 3, 4 and

11   5.[1]  Dkt. No. 1235.  Balwani's jury trial is scheduled to begin March 9, 2022.

12   **II.    LEGAL STANDARDS**

13        Motions in limine are a "procedural mechanism to limit in advance testimony or evidence

14   in a particular area."  *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009).  Like other

15   pretrial motions, motions in limine are "useful tools to resolve issues which would otherwise

16   clutter up the trial."  *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017).

17   Accordingly, "a ruling on a motion in limine is essentially a preliminary opinion that falls entirely

18   within the discretion of the district court."  *Id*.; *see Luce v. United States*, 469 U.S. 38, 41 n.4

19   (1984) (explaining that a court may rule in limine "pursuant to the district court's inherent

20   authority to manage the course of trials").

21        In many instances, however, rulings "should be deferred until trial, so that questions of

22   foundation, relevancy, and potential prejudice may be resolved in proper context."  *United States

23   v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016).  For example, in order to

24   exclude evidence on a motion in limine, "the evidence must be inadmissible on all potential

25   grounds."  *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1167 (D. Nev. 2014).

26   _____

27   [1] The Government dismissed Count 9.  Dkt. No. 1152.

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER RE: MOTIONS IN LIMINE

*United States District Court*
*Northern District of California*

1   Thus, denial of a motion in limine to exclude certain evidence does not mean that all evidence

2   contemplated by the motion will be admitted, only that the court is unable to make a

3   comprehensive ruling in advance of trial. *Id.* at 1168. Moreover, even if a district court does rule

4   in limine, the court may "change its ruling at trial because testimony may bring facts to the district

5   court's attention that it did not anticipate at the time of its initial ruling." *City of Pomona*, 866

6   F.3d at 1070; *see also Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) ("[I]n limine rulings

7   are not binding on the trial judge, and the judge may always change his mind during the course of

8   a trial.").

9       **C.     Federal Rule of Evidence 401**

10          Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if "it has any

11  tendency to make a fact more or less probable than it would be without the evidence . . . and the

12  fact is of consequence in determining the action." Fed. R. Evid. 401(a)-(b). "Relevancy simply

13  requires that the evidence logically advance a material aspect of the party's case." *United States v.*

14  *Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotations omitted).

15      **D.     Federal Rule of Evidence 403**

16          Even if evidence is relevant, it must be excluded if its "probative value is substantially

17  outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue

18  delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence

19  is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis,

20  commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172,

21  180 (1997). "Unfair prejudice can result from evidence that makes it more likely for a juror 'to

22  defer to findings and determinations relevant to credibility made by an authoritative, professional

23  factfinder rather than determine those issues for themselves.'" *United States v. Sine*, 493 F.3d

24  1021 (9th Cir. 1992).

25      **E.     Federal Rule of Evidence 802**

26          Hearsay evidence is inadmissible unless otherwise provided for under a federal statute, the

27  Federal Rules of Evidence, or "other rules prescribed by the Supreme Court." Fed. R. Evid. 802.

1    Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing"

2    and which "a party offers in evidence to prove the truth of the matter asserted in the statement."

3    Fed. R. Evid. 801. "Hearsay within hearsay" is only admissible "if each part of the combined

4    statements conforms with an exception to the rule." Fed. R. Evid. 805.

5    **III.    BALWANI'S MOTIONS IN LIMINE AND RELATED GOVERNMENT MOTIONS**

6         **A.    Balwani's MIL No. 1 to Exclude Evidence of Accuracy and Reliability of Tests
             Run on Unmodified Commercial Devices**

7

8         The TSI charges two fraudulent schemes—a scheme to defraud investors and a scheme to

9    defraud patients. Balwani argues that under the TSI, the alleged scheme to defraud patients turns

10   on allegations that Theranos' proprietary technology was not capable of producing accurate and

11   reliable results. Balwani Mot. at 1–2. Balwani contends that because the TSI does not include

12   allegations regarding the accuracy and reliability of non-Theranos technology—i.e., unmodified,

13   commercially available blood analyzers used by Theranos in its clinical laboratories—or about the

14   general practices of the Theranos clinical laboratories, evidence regarding the accuracy or

15   reliability of blood tests is only relevant if the test was run on a Theranos-manufactured or

16   Theranos-modified device. *Id.* at 1. On this ground, Balwani moves to exclude testimony from

17   patients E.T. and B.B. and to exclude portions of the Centers for Medicare and Medicaid Services

18   ("CMS") January 25, 2016, letter to Theranos' former lab director, Dr. Sunil Dhawan, and the

19   attached Form CMS-2567, Statement of Deficiencies, for the Theranos Newark clinical laboratory

20   (collectively, "the CMS Report").

21        "[A]n indictment is not to be read in a technical manner, but is to be construed according to

22   common sense and with an appreciation of existing realities." *United States v. Anderson*, 532 F.2d

23   1218, 1222 (9th Cir. 1976) (citing *United States v. Pleasant*, 469 F.2d 1121 (8th Cir. 1972);

24   *McKinney v. United States*, 172 F.2d 781 (9th Cir. 1949)). The indictment must be read to include

25   facts which are "necessarily implied by the allegations made therein." *Id.* Further, even if an

26   essential averment in an indictment is "faulty in form, if it may by fair construction be found

27   within the text, it is sufficient." *Id.* This is because the purpose of an indictment is to furnish the

28   Case No.: 5:18-cr-00258-EJD
     ORDER RE: MOTIONS IN LIMINE

     United States District Court
     Northern District of California

1    defendant with a sufficient description of the charges against him to enable him to prepare his

2    defense, to enable him to plead double jeopardy against a second prosecution, and to inform the

3    court of the facts alleged so that it can determine the sufficiency of the charge. *Russell v. United*

4    *States*, 369 U.S. 749, 763–64 (1962); *Williamson v. United States*, 310 F.2d 192, 195–96 (9th Cir.

5    1962).

6          The TSI meets this burden. Fairly read, the scheme to defraud patients includes Theranos'

7    use of unmodified, commercially available blood analyzers. The language of the TSI makes this

8    clear by going beyond statements about the abilities of "Theranos's technology" and including

9    allegations about Theranos' abilities generally. *See* TSI ¶¶ 14–18. First, the TSI alleges that

10   Holmes and Balwani engaged in a scheme to defraud patients who came to Theranos for blood

11   testing services by representing to those patients that "*Theranos* could provide accurate, fast,

12   reliable, and cheap blood tests and test results" despite their knowledge that "*Theranos* was not

13   capable of consistently producing accurate and reliable results for certain blood tests." *Id.* ¶¶ 16–

14   17 (emphases added). Second, while the TSI does at times focus exclusively on "Theranos

15   technology," the TSI also makes clear that the alleged scheme to defraud patients includes all

16   blood tests run by Theranos. *See id.* ¶ 18 ("Knowing that the accuracy and reliability of *Theranos*

17   *test results* was questionable and suspect, Holmes and Balwani oversaw the electronic wiring of

18   test results to patients, including . . . B.B. [and] E.T." (emphasis added)). Indeed, the TSI's

19   inclusion of assays (like HIV, the test that E.T. received) not run on Theranos-specific devices

20   confirms this. *See id.* at ¶ 16. Finally, even accepting Balwani's argument, evidence that patients

21   received inaccurate tests from unmodified conventional analyzers is relevant evidence that Holmes

22   and Balwani falsely promised patients that *Theranos* could deliver test results with superior

23   accuracy. The TSI puts Balwani on notice that the scheme to defraud patients includes Theranos'

24   use of unmodified conventional analyzers. Accordingly, the Court **DENIES** Balwani's motion to

25   exclude evidence about the accuracy and reliability of tests run on unmodified commercial

26   devices**.**

27

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER RE: MOTIONS IN LIMINE

United States District Court
Northern District of California

1  conspiracies ended.  Balwani Mot. at 30.

2  In opposition, the Government notes that during the Holmes trial, most exhibits were

3  admissible as business records or statements of agents, or for other non-hearsay purposes.  Govt.

4  Resp. at 19.  Indeed, it appears that the Court did not admit any exhibit or portion of testimony

5  based solely on Rule 801(d)(2)(E) during the Holmes trial.  Based on this, the Government

6  informed Balwani that it did not anticipate offering exhibits based solely on the coconspirator

7  exception because such exhibits or testimony would be admissible under other hearsay exceptions

8  (or for a non-hearsay purpose).  Govt. Resp. at 19.  The Government also does not plan to use

9  Holmes' pre-2009 statements for the truth of the matter asserted and agrees with Balwani that

10  post-July 2016 statements are likely irrelevant.  *Id.*

11  Considering the Government's response, the Court **DEFERS** ruling on this motion unless

12  and until the Government attempts to use Rule 801(d)(2)(E) to admit pre-2009 statements or post-

13  July 2016 statements.

### E.  Balwani's MIL No. 5 to Exclude Expert Testimony Offered by Law Witnesses

15  Balwani moves for an order precluding improper expert opinion from lay witnesses.

16  Balwani Mot. at 36.  The motion focuses primarily on the trial testimony of Erica Cheung, a

17  former Theranos employee who worked in the company's clinical laboratory for several months.

18  In the Holmes trial, Ms. Cheung testified about her understanding of the significance of certain

19  tests and events based on her experience working in the Theranos lab.  She testified about her

20  experiences running quality control checks and about the overall reliability and performance of

21  Theranos technology.  This testimony was proper percipient witness testimony.  *See United States*

22  *v. Chen*, No. 17-cr-00603-BLF-1, 2021 WL 2662116, at *9–10 (N.D. Cal. June 29, 2021) (finding

23  that proffered witnesses appeared to be lay witnesses, based on "their personal knowledge and

24  positions in the day-to-day affairs of [the Company]").  The testimony that the Government seeks

25  to elicit is permissible factual testimony based on Ms. Cheung's personal knowledge.  The defense

26  may object to statements during trial that it believes cross into expert testimony.  Accordingly, the

27  Court **DEFERS** ruling on this motion unless and until a lay witness attempts to offer expert

28  Case No.: 5:18-cr-00258-EJD
ORDER RE: MOTIONS IN LIMINE

13

United States District Court
Northern District of California

testimony.[4]

### F. Balwani's MIL No. 6 to Exclude Irrelevant and Inflammatory Text Messages

The Court considers this motion concurrently with the Government's Motion in Limine No. 8 to admit text messages between Holmes and Balwani offered by the Government. *See infra* Section IV.H.3.

### G. Balwani's MIL No. 7 to Exclude Evidence of Balwani's License Plate

The Government does not intend to offer evidence of Balwani's automobile license plate and does not oppose this motion. Govt. Resp. at 24–25. Accordingly, the Court **GRANTS** the motion to exclude evidence of Balwani's automobile license plate.

### H. Balwani's MIL No. 8 Adopting Certain Motions Previously Filed by Elizabeth Holmes

Balwani asks the Court to adopt pretrial rulings from the Holmes case as to seven motions in limine. Balwani Mot. at 48. The Government requests the Court remain open to reconsidering those pretrial rulings with respect to Balwani subject to how the evidence is introduced at his trial. Govt. Resp. at 26. The Government incorporates by reference its prior oppositions and arguments on the associated topics. *Id.*

#### 1. Balwani's Request to Extend Certain Pretrial Rulings from Holmes' Trial to His Trial

##### a. Balwani Adopts Holmes' MIL to Exclude Evidence Concerning Wealth, Spending, And Lifestyle (Dkt. No. 567)

Balwani adopts Holmes' Motion to Exclude Evidence Concerning Wealth, Spending, and Lifestyle Under Rules 401–403 (Dkt. No. 567), and asks the Court to apply its ruling on Holmes' motion to his trial. Balwani Mot. at 50-51. The Court previously ruled as follows:

---

[4] Balwani also argues that physician witnesses should not be able to attribute inaccurate Theranos test results to "laboratory error." Balwani Mot. at 39. In opposition, the Government states that it does not plan to elicit such testimony, but instead, as in the Holmes trial, will elicit testimony that certain Theranos results were incorrect. Balwani does not respond to this in his reply brief. The Court concludes that physician witnesses should be permitted to discuss conclusions they reached regarding the accuracy of relevant Theranos test results.

Case No.: 5:18-cr-00258-EJD
ORDER RE: MOTIONS IN LIMINE

14

United States District Court
Northern District of California