No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 3 OF 26 (PAGES ER-376 – ER-675)

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

*Counsel for Appellant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 5:18-cr-00258-2 EJD |
| Plaintiff, | |
| | **ORDER DENYING MOTION FOR RELEASE PENDING APPEAL** |
| v. | |
| RAMESH "SUNNY" BALWANI, | Re: ECF No. 1711 |
| Defendant. | |

Following a three-month trial, a jury returned a verdict of guilty as to Ramesh "Sunny" Balwani on all twelve counts of the Third Superseding Indictment. The Court subsequently sentenced Mr. Balwani to 155 months of imprisonment with a surrender date of March 15, 2023. Now before the Court is Mr. Balwani's Motion for Release Pending Appeal, which has been fully briefed and heard. ECF Nos. 1711, 1725, 1729. Having considered the record, the submitted briefing, and oral arguments, the Court DENIES the Motion.

## I. PROCEDURAL BACKGROUND

On July 7, 2022, a jury convicted Ramesh "Sunny" Balwani on twelve counts, consisting of one (1) count of conspiracy to commit wire fraud and six (6) counts of wire fraud against Theranos investors and one (1) count to conspiracy to commit wire fraud and four (4) counts of wire fraud against Theranos paying patients, in violation of 18 U.S.C. §§ 1343 and 1349.

On December 7, 2022, the Court sentenced Mr. Balwani to 155 months of imprisonment to be served concurrently, followed by 3 years of supervised release to be served concurrently. The Court also set a self-surrender date for Mr. Balwani at 2:00 p.m. on March 15, 2023. Mr. Balwani filed his Notice of Appeal on December 20, 2022, and this Motion for Release Pending Appeal

United States District Court
Northern District of California

("Motion") followed shortly thereafter on January 9, 2023. On February 17, 2023, the Court heard oral arguments on Mr. Balwani's Motion.

## II.     LEGAL STANDARD

Per 18 U.S.C. § 3143(b), a defendant who has been found guilty and sentenced to a term of imprisonment must be detained, even if an appeal has been filed. However, a court may allow the defendant to be released pending appeal if it makes the following four findings:

1. The defendant has demonstrated by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person in the community if released;

2. The appeal is not for purpose of delay;

3. The appeal raises a substantial question of law or fact; and

4. If that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

*United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985). On a motion for release pending appeal, the burden of proof shifts from the government to the defendant to demonstrate entitlement to release. *Id.*

## III.    FLIGHT RISK AND DANGER TO COMMUNITY

As to the first element, the Court considers whether Mr. Balwani is likely to flee or pose a danger to the safety of the community. The government does not affirmatively introduce any new evidence in support of this factor (nor are they required to); rather, it argues that Mr. Balwani has failed to satisfy this required showing by clear and convincing evidence.[1] Opp. 5–10.

The Court is satisfied that Mr. Balwani has presented clear and convincing evidence that he is not likely to flee or pose a danger. Mr. Balwani has been a naturalized U.S. citizen for over 23 years and maintains strong ties with his two brothers, also U.S. residents, who attended every day of his trial. Mr. Balwani has also demonstrated a history of compliance with the terms of his release, including seeking and obtaining court approval to release his passport in anticipation of international travel to India. ECF No. 401. When COVID-19 travel restrictions ultimately

---

[1] The government does not argue that the instant Motion is brought for the purpose of delay.

rendered those travel plans infeasible, Mr. Balwani returned his then-renewed passport to the government on request. ECF No. 557. The Court is also not aware of any indication that Mr. Balwani was a flight risk during the five months when he was in possession of his valid passport.

Additionally, Mr. Balwani has demonstrated that he is not likely to pose a danger to the safety of any person in the community if released. Mr. Balwani was convicted of non-violent—though nonetheless serious—crimes that occurred by virtue of his influence and position at Theranos. Today, Mr. Balwani is in no position to inflict similar harms of fraud on the community, and the Court is unaware of any evidence that he is likely to commit acts of deception or fraud in his everyday life. The government's recitation of the events giving rise to Mr. Balwani's investor and patient fraud convictions provides limited insight into the risk he poses today to the community, removed from the artifices that enabled his criminal activity.

The Court, accordingly, finds that Mr. Balwani has provided clear and convincing evidence that he is neither a flight risk nor a danger to the community.

## IV. "SUBSTANTIAL QUESTION" AND "LIKELIHOOD OF REVERSAL"

The Court next considers in tandem whether Mr. Balwani's "appeal raises a substantial question of law or fact" and whether a favorable determination on that question would be "likely to result in reversal or an order for new trial." *Handy*, 761 F.2d at 1283.

The "substantial question" requirement defines the level of merit required of the question presented. *Handy*, 761 F.2d at 1280. The Ninth Circuit has held that a "substantial question" is one that may be "fairly debatable" or "fairly doubtful." *Id.* at 1283. It must present "something more than the absence of frivolity" or issues "debatable among jurists of reason." *Id.* at 1281–82 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). The question, however, need not be a "close" one. *Handy*, 761 F.2d at 1282 n.2.

On the other hand, the "likelihood of reversal or new trial" requirement defines the "*type* of question that must be presented" for appeal. *Handy*, 761 F.2d at 1281 (emphasis added). This analysis, therefore, "does not involve assessing the likelihood that a reversal will occur in the particular case." *United States v. Garcia*, 340 F.3d 1013, 1020 n.5 (9th Cir. 2003). Rather, the Court must find the question presented to be "so integral to the merits of the conviction on which

Case No.: 5:18-cr-00258-2 EJD
ORDER DENYING MOTION FOR
RELEASE PENDING APPEAL

3

defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985). Put differently, the question cannot be one that would be considered harmless, would have no prejudicial effect, or was insufficiently preserved. *Id.*

In sum, the Court must assess whether Mr. Balwani has presented the correct *type* of question that has met the necessary *level of merit*. Because the "likelihood of reversal" inquiry is a more straightforward and largely binary determination, the Court will first review each question Mr. Balwani presented for satisfaction of this categorical requirement. If the question for appeal passes this inquiry, the Court will then proceed to consider whether that question is a substantial one, *i.e.*, fairly debatable or fairly doubtful.

### A. Constructive Amendment

Mr. Balwani first argues that, by admitting evidence concerning the accuracy and reliability of traditional commercial blood-testing technology used at Theranos, the Court permitted the Third Superseding Indictment ("TSI") to be constructively amended because the indictment can only be construed to allege fraud pertaining to Theranos's proprietary technology, not commercial blood-testing technology. Mot. 6–11. Specifically, Mr. Balwani challenges the denial of his motion to exclude the testimony from the Centers for Medicare and Medicaid Services ("CMS") regarding Theranos's lab conditions. Mot. 6–11; *see also* ECF No. 1326, at 7–8, Feb. 28, 2022. In its prior order, the Court had rejected Mr. Balwani's interpretation, finding that the TSI's language is broad enough to encompass *all* facets of Theranos's blood testing services, both proprietary and commercial. ECF No. 1326, at 8.

### 1. Likelihood of Reversal

The U.S. Supreme Court has declared that "[a]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215–16 (1960). However, minor differences between an indictment and the proof offered at trial could be dismissed as "nothing more than a variance." *United States v. Hartz*, 458 F.3d 1011, 1020 (9th Cir. 2006) (quoting *Stirone*, 361 U.S. at 217). "[A]

constructive amendment requires reversal, while a variance does not, unless it prejudices the defendant's substantial rights." *Hartz*, 458 F.3d at 1020.

The Court finds that, assuming the Ninth Circuit were to agree with Mr. Balwani's constructive amendment theory and its application to all twelve convictions, it would likely result in the reversal of all counts on which imprisonment has been imposed. As noted above, constructive amendment is a *per se* violation of the Fifth Amendment's Grand Jury Clause that would always require reversal if established. *See, e.g.*, *Hartz*, 458 F.3d at 1020. At the Motion hearing, Mr. Balwani also clarified that the question he raises is one of constructive amendment and rejected the suggestion that there may instead be a variance. *See* 2/17/23 Hr'g Tr. 47:4–13.

The government argues that, even if an appellate court were to accept his constructive amendment argument, Mr. Balwani's convictions are amply supported by other evidence and misrepresentations to investors. Opp. 10-12. However, the issue raised here on a constructive amendment challenge is not necessarily one of the evidence's sufficiency but rather one of kind, *i.e.*, whether "the proof offered at trial matche[s] the charges made in the indictment." *Hartz*, 458 F.3d at 1021. Therefore, the fact that there were other misrepresentations on which the jury could have permissibly convicted Mr. Balwani does not preclude the possibility that it *may* have convicted him on an impermissible set of facts. *See United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002) (listing constructive amendment cases where jury instructions "permitted" jury to convict on a divergent complex of facts).

Accepting the merits and scope of Mr. Balwani's proposed argument, the Court finds that the constructive amendment argument would be the "type of question that must be presented" for Mr. Balwani to prevail on his Motion, *i.e.*, it is likely to result in reversal or a new trial if determined favorably to him on appeal. *Handy*, 761 F.2d at 1281. The Court proceeds to consider whether this question is indeed a sufficiently substantial one that can be fairly debated.

### 2.    Substantial Question

Mr. Balwani argues the TSI only alleges that defendants made misrepresentations, *inter alia*, about the accuracy of proprietary Theranos technology, yet the jury heard evidence and was permitted to convict him based on misrepresentations about the accuracy of non-proprietary

commercial testing. Mot. 6–7. The government responds that the TSI can be fairly read to allege—and provided notice to Mr. Balwani of—a scheme involving misrepresentations as to both proprietary and commercial blood testing. Opp. 14–16.

The Court first provides a preliminary clarification. Although the parties have primarily focused their briefs on how the TSI should be interpreted, the proper construction of the TSI is *not* a question that is likely (on its own) to result in reversal or new trial. As the Court discussed above, the question presented that satisfies the "likelihood of reversal" requirement is whether the TSI has been constructively amended. *See supra* Section III(B)(1)(a); *Handy*, 761 F.2d at 1283. When considering constructive amendments, the Ninth Circuit does not focus solely on how an indictment may be interpreted but instead has often compared the "complex of facts" charged in the indictment with the "complex of facts" presented at trial and permitted by the jury instructions. *See Adamson*, 291 F.3d at 615 (defining constructive amendment as a "complex of facts presented at trial *distinctly different* from those set forth in the charging instrument") (emphasis added) (brackets omitted); *Hartz*, 458 F.3d at 1021 (noting that constructive amendment cases typically involve a "difference between the indictment and the jury instructions [that] allowed the defendant to be convicted on the basis of *different behavior* than that alleged in the original indictment") (emphasis in original). In so comparing, the Ninth Circuit often distinguishes constructive amendment from a variance, which "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984); *see also Adamson*, 291 F.3d at 615 (compiling constructive amendment and variance cases); *Hartz*, 458 F.3d at 1021 (holding that convictions permitted "despite variance so long as the variance does not alter the behavior for which the defendant can be convicted") (brackets and ellipses omitted).

From this body of Ninth Circuit constructive amendment cases, the Court has distilled at least three relevant inquiries for evaluating Mr. Balwani's question of whether the TSI has been constructively amended: (1) fairly read, what facts and behavior are charged in the TSI's allegations; (2) what facts and behavior were permitted as bases for the jury's convictions; and (3) if there is a divergence between the facts in the indictment and the facts permitted as bases for the

jury's convictions, does that divergence more closely resemble an amendment or a variance?  The Court considers Mr. Balwani's arguments as to each, recognizing that he must present a fairly debatable "substantial question" as to constructive amendment overall and not just any one facet.

### a.    TSI Interpretation

As to the first inquiry, the Court agrees with Mr. Balwani that the TSI's language—including what specific Theranos blood tests are encompassed by its allegations of misrepresentations and falsity—is open to fair debate, at least as to Mr. Balwani's interpretation regarding Theranos's commercial blood testing.  Although it had previously rejected Mr. Balwani's interpretation in favor of the government's—and remains doubtful of this interpretation—the Court recognizes that "it is not enough that [the Court is] unimpressed." *Herzog v. United States*, 75 S. Ct. 349, 351 (1955).

Here, the TSI's language is not so clear and unassailable that it would preclude any fair debate as to alternative interpretations.  For instance, the TSI does not directly allege that Theranos's commercial tests were not, in fact, "accurate, fast, reliable, and cheap" as advertised. TSI ¶ 15.  By contrast, the TSI *does* directly allege that Theranos's proprietary blood tests "w[ere], in fact, not capable of consistently producing accurate and reliable results."  TSI ¶ 16.  Taken together, the direct allegations regarding the *proprietary* tests' inaccuracies, combined with the absence of similar allegations regarding the *commercial* tests' inaccuracies, could support an interpretation that the TSI's alleged falsity only extended to Theranos's *proprietary* blood tests. At the very least, the Court is satisfied that the proper common-sense interpretation of what specific facts and behavior are alleged in the TSI can be a "debatable [question] among jurists of reason."  *Handy*, 761 F.2d at 1282.

### b.    Evidence at Trial and Jury Instructions

As to the second inquiry, even if it accepts Mr. Balwani's interpretation of the TSI, the Court is unable to identify a "fairly debatable" question that the jury may have convicted Mr. Balwani on the disputed factual bases, *i.e.*, for misrepresentations regarding Theranos's non-proprietary and commercial testing.  Here, the jury instructions provided affirmative guardrails to

United States District Court
Northern District of California

Case No.: 5:18-cr-00258-2 EJD
ORDER DENYING MOTION FOR
RELEASE PENDING APPEAL

7

ER-383

United States District Court
Northern District of California

protect against the possibility of conviction on those bases, specifically to avoid finding liability

based on regulatory deficiencies of Theranos's laboratory testing or medical devices.

The two relevant jury instructions here are Jury Instruction Nos. 15 and 28, which state:

<u>Instruction No. 15, Activities Not Charged</u>: You are here only to determine whether Mr. Balwani is guilty or not guilty of the charges in the indictment. *Mr. Balwani is not on trial for any conduct or offense not charged in the indictment*.

<u>Instruction No. 28, Alleged Violations of Regulations and Industry Standards</u>: You have heard evidence regarding alleged violations of regulations and industry standards. You may consider such evidence, along with other evidence, limited to any purposes for which such evidence was admitted, in assessing whether the government has proved each of the counts charged in the indictment. However, *you may not find Mr. Balwani liable for any of the offenses alleged in the indictment merely because he or Theranos may have violated federal or state regulations or because Mr. Balwani or Theranos may have engaged in negligent practices or violated industry standards related to laboratory testing or medical devices*.

ECF No. 1630 (emphasis added).

Though couched in somewhat general terms, Instruction No. 15 nonetheless cautioned the

jury against finding guilt as to "conduct or offense not charged in the indictment," an instruction

that the Ninth Circuit recently had found relevant in rejecting a constructive amendment challenge.

*See United States v. Heredia*, 2022 WL 2301993, at *2 (9th Cir. June 27, 2022) (quoting nearly

identical jury instruction). Additionally, Instruction No. 28 quite clearly instructs the jury *against*

convicting Mr. Balwani merely because "Theranos may have engaged in negligent practices or

violated industry standards related to laboratory testing or medical devices." Although this

language does not directly call out Theranos's commercial testing, the resulting proscribed set of

facts overlaps almost entirely with the evidence Mr. Balwani had moved to exclude, ECF No.

1326, at 7, as well as the "complex of facts" he now claims the jury may have impermissibly

convicted him on. *See* Mot. 7, 9–10 (objecting to evidence regarding "regulatory deficiencies

related to Theranos' use of ordinary commercial devices" and "alleged regulatory violations

(including an immediate jeopardy finding) corresponding mainly to non-Theranos devices").

At oral arguments, Mr. Balwani argued that these jury instructions were "quite precise"

and would not have any impact on the asserted constructive amendment error, which he claimed

was a "structural error." *See* Hr'g Tr. 46:22–47:2, Feb. 17, 2023. This assertion, however, runs

counter to the significant body of Ninth Circuit authority that have considered jury instructions at

length to determine whether an indictment has been constructively amended. *See, e.g.*, *United States v. Ward*, 747 F.3d 1184, 1191 (9th Cir. 2014) ("[T]he determination of whether a constructive amendment has been effected requires sensitivity to both the jury instructions as a reflection of the indictment, and to the nature of the proof offered at trial."); *United States v. Arreola*, 467 F.3d 1153, 1162 (9th Cir. 2006) (rejecting constructive amendment argument after "considering the jury verdict form in light of the court's instructions and the trial as a whole").

Furthermore, contrary to Mr. Balwani's suggestion that a general verdict prevents the Court from determining the basis for the verdict, the Ninth Circuit has expressly acknowledged that jury instructions can provide assurances that the jury convicted the defendant based solely on certain conduct instead of other impermissible conduct. *See Ward*, 747 F.3d at 1191 ("Typically, that assurance will be provided by jury instructions requiring the jury to find the conduct charged in the indictment before it may convict."). Likewise, here, Jury Instructions Nos. 15 and 28 were prophylactic measures informing the jury that they *could not* convict Mr. Balwani based solely on the evidence he sought to exclude—*i.e.*, the CMS testimony and regulatory finding regarding Theranos's commercial devices—thereby undermining a finding that the indictment had been constructively amended to permit conviction on that "complex of facts."

Mr. Balwani's cited excerpts from the government's closing argument also do not evidence an improper invitation for the jury to convict based on "problems related to ordinary commercial technology." Mot. 10. The government's references to Theranos's inability to run accurate blood tests does not misstate the indictment; in fact, they track it. *See, e.g.*, TSI ¶¶ 15 ("Theranos's ability to provide accurate . . blood tests and test results"); 17(A) ("materially false and misleading information concerning the accuracy and reliability of Theranos's blood testing services"). Similarly, the government's references to the CMS findings and inspection also do not, *ipso facto*, invite convictions based improperly on the inaccuracies of Theranos's commercial testing. Mot. 10. Although the CMS findings mostly addressed regulatory deficiencies with Theranos's commercial devices, certain deficiencies were nonetheless directed at Theranos's proprietary device. And if there were any ambiguities regarding how the CMS findings fit into the case, the jury was instructed against improperly relying on those findings by Jury Instruction No. 28.

Considering the evidence presented and instructions provided to the jury, the Court cannot find that it is "fairly debatable" that the jury may have convicted Mr. Balwani based solely on the accuracy and reliability issues relating to Theranos's commercial non-proprietary blood testing.

### c.    Amendment vs. Variance

Finally, assuming *arguendo* that there are differences between the allegations asserted in the TSI and the evidence presented at trial, the Court finds that any such divergence would more closely resemble a variance than a constructive amendment.  As presented by Mr. Balwani, the two divergent complexes of fact are (1) misrepresentations regarding the accuracy of Theranos's proprietary tests as alleged in the TSI; and (2) misrepresentations regarding the accuracy of commercial tests conducted by Theranos as presented at trial for the jury.  Mot. 6–7.

Even accepting this juxtaposition, there is no "fairly debatable" question that this divergence constitutes a variance because "here, there is but one set of facts with a single divergence, namely, the content of the misrepresentation." *Adamson*, 291 F.3d at 615–16.  In *Adamson*, the Ninth Circuit held that, where the indictment had alleged misrepresentations of the fact that servers had been upgraded but the jury was permitted to convict based on misrepresentations of *how* the servers were upgraded, there was no constructive amendment, though it did ultimately find the variance to be prejudicial. *Id.*  Similarly, Mr. Balwani's constructive amendment challenge amounts to a single divergence as to the content of his misrepresentations (*i.e.*, whether the misrepresentations related to the accuracy and reliability of all Theranos blood tests or only Theranos proprietary blood tests).  Mot. 6–7.

Mr. Balwani's response at oral argument—that the divergence here is "too fundamental" simply because it touched upon the accuracy and reliability of Theranos's tests—also fails to raise a "fairly debatable" question.  Hr'g Tr. 47:4–13.  Here, the elements of wire fraud as set forth in Jury Instruction No. 20 required a finding that Mr. Balwani participated in "a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  ECF No. 1630.  Whether the jury found the requisite fraudulent representations to be those pertaining to Theranos's proprietary technology or those regarding Theranos's non-proprietary blood tests does not present two "distinctly different"

United States District Court
Northern District of California

United States District Court
Northern District of California

complexes of fact, nor does it indicate that Mr. Balwani was convicted for "different behavior" than what was alleged in the TSI. *Adamson*, 291 F.3d at 615; *Hartz*, 458 F.3d at 1021. The mere fact that those misrepresentations involved the "fundamental" topic of accuracy does not widen or transform that limited difference.

The divergence in this case is also consistent with those in other circuit decisions that have rejected a finding of constructive amendment in favor of finding a variance instead. *See, e.g.*, *Hartz*, 458 F.3d at 1019 (finding variance where indictment alleged crimes involving two specific firearms but jury convicted based on a different weapon); *Von Stoll*, 726 F.2d at 586 (finding variance where "[t]he only inconsistency is that the indictment specified that [defendant] took the money from one partner, while the proof showed he got it from the other"); *United States v. Olson*, 925 F.2d 1170, 1175 (9th Cir. 1991) ("What matters on this mail fraud indictment is that [defendant] fraudulently obtained the use of others' money. Whether he intended that the effects of his fraud be permanent or temporary has no legal relevance."); *see also United States v. Dupre*, 462 F.3d 131, 141 (2d Cir. 2006) (finding no constructive amendment where "the particular wire transfer identified in the indictment was not proven at trial"). The considerable weight of this case law leaves little to no room for fair debate on whether the alleged divergence here could constitute constructive amendment.[2]

\* \* \*

Although Mr. Balwani has raised a fairly debatable question as to whether the TSI could be interpreted in his favor, he has not demonstrated that there can be fair debate as to the overall question of whether the TSI has been constructively amended throughout the course of trial. The jury instructions provided clear and precise boundaries to ensure the jury did not convict on conduct not charged in the TSI. Furthermore, even if the Court were to accept the two divergent

---

[2] The Court recognizes that variances may nonetheless warrant reversal if they prejudiced defendants' substantial rights. Here, however, Mr. Balwani has expressly dispelled any notion that he is arguing for a variance and has not made a showing that the variance prejudiced his substantial rights. *See* 2/17/23 Hr'g Tr. 47:4–13. Accordingly, the Court does not analyze whether Mr. Balwani would have been able to present a "substantial question" on a reversible variance theory as opposed to his constructive amendment theory.

"complexes of fact" as suggested by Mr. Balwani, the degree and nature of this divergence would only amount to a variance instead of a constructive amendment.

Accordingly, the Court finds that Mr. Balwani has failed to establish a "substantial question" as to whether the TSI has been constructively amended.

### B. Improper Lay Testimony

Mr. Balwani also argues that certain testimony provided by Erika Cheung, Mark Pandori, and Adam Rosendorff were improperly admitted without being qualified as experts. Mot. 11–12.

On appeal, the erroneous admission of expert testimony is subject to harmless error review, which means reversal is required only if the error is prejudicial. *United States v. Wells*, 879 F.3d 900, 923 (9th Cir. 2018). If it is more probable than not that the jury would have reached the same verdict had the evidence not been admitted, then there is no prejudice. *See Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1159 (9th Cir. 2010).[3]

Mr. Balwani argues that certain testimony from Ms. Cheung, Dr. Pandori, and Dr. Rosendorff was expert testimony erroneously admitted without expert qualification. Mot. 11–13. Notably, a favorable decision to Mr. Balwani would not have operated to exclude the entirety of these witnesses' testimony because certain portions of their testimony are indisputably admissible, such as the details of their jobs at Theranos, the events they witnessed, and the things they said or did. *See* Reply 6. The only portions Mr. Balwani challenges are those relating to testimony regarding Theranos device accuracy that involved scientific, technical, or other specialized knowledge. Mot. 13.

Although accuracy and reliability were certainly salient points of the government's case, it is not true that *all* of Mr. Balwani's convictions called for a determination of Theranos's testing accuracy. For instance, multiple investors had expressed shock upon learning that Theranos was using third-party machines instead of its own proprietary devices to conduct blood tests, evidencing a misrepresentation relevant to investors that does not turn on the accuracy of

---

[3] The Court notes at the outset that this standard alone distinguishes the "likelihood of reversal" analysis from the analogous analysis on the constructive amendment question, where reversal was *required* if the appellate court found a constructive amendment. *See supra* Section III(B)(1)(a).

United States District Court
Northern District of California

Theranos's technology.  *See* Opp. 10–11 (citing trial transcripts).  In other words, even if the Ninth Circuit were to agree with Mr. Balwani that lay testimony regarding the accuracy of Theranos technology was improperly admitted, there would nonetheless remain some bases for Mr. Balwani's convictions that would undermine a likelihood of reversal or new trial on all counts on which imprisonment was imposed.

Because the admission or exclusion of the relevant witnesses' testimony is not "so integral to the merits" of (at least) the investor fraud convictions, the Court cannot find that a favorable appellate determination on this question would be likely to result in reversal or a new trial.  *Miller*, 753 F.2d at 23.  The Court accordingly does not consider whether this question has reached the requisite level of merit or substantiality to justify release pending appeal.

### C.    Tolbert Testimony

Mr. Balwani asserts that the government committed *Napue* misconduct by soliciting testimony from Bryan Tolbert, the vice president of one of the investor victims, allegedly containing discrepancies with the recording of a December 2013 investor call.  Mot. 14–15.

"*Napue* does not create a 'per se rule of reversal.'"  *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (quoting *Sivak v. Hardison*, 658 F.3d 898, 912 (9th Cir. 2011)).  The testimony or evidence in question must be material to result in reversal.  *Id.*

The alleged government misconduct here is the solicitation of Mr. Tolbert's recollections about an investor call without admitting the actual recording of the call, which Mr. Balwani claims reflected a different characterization than Mr. Tolbert's recollections.   However, even if this argument prevails, it is limited to Count 5, *i.e.*, the investor fraud conviction that involved Mr. Tolbert.  Mr. Balwani also has not established how the corresponding discrepancies between the recording and Mr. Tolbert's testimony would be material to—and therefore require reversal of— the conviction on the transaction and investor fraud alleged in Count 5.  And even assuming the error is prejudicial and does somehow necessitate reversal of Count 5, Mr. Balwani has not shown that this error requires reversal of *all* investor fraud counts on which Mr. Balwani was convicted and sentenced to imprisonment.

The Court finds that the question of whether the government engaged in misconduct by introducing Mr. Tolbert's testimony without the accompanying recording is not the type that is likely to result in reversal or a new trial of all counts.

### D. LIS Evidence

Mr. Balwani challenges the Court's previous denial of his motion to suppress evidence of customer complaints, testing results, and the CMS report findings, as well as its denial of his request for a "missing evidence" instruction. ECF No. 1326, at 30–31. "Just like all other evidentiary errors," the admission of the above evidence is subject to harmless error review, meaning reversal is required only if there is a finding of prejudice. *Wells*, 879 F.3d at 923.

Mr. Balwani claims that the suppression of such evidence would have resulted in an acquittal on all counts because they related to a common underlying allegation: the accuracy and reliability of Theranos' clinical testing. Mot. 16–17; Reply 12. However, the TSI did not solely claim that Mr. Balwani's fraud on Theranos investors consisted of representations about the accuracy of Theranos's clinical testing—it also alleged that Mr. Balwani made misrepresentations regarding the company's financial status, reliance on third-party and commercially available devices, and validation by pharmaceutical companies. TSI ¶ 12. These misrepresentations to Theranos investors—and the evidence in support thereof—do not turn on whether Theranos's clinical tests were inaccurate and, therefore, those convictions would not be reversed by the requested suppression and missing evidence instruction.

### E. Dr. Rosendorff's Bias and Post-Trial Conduct

Mr. Balwani also claims that the admission of testimony regarding Dr. Rosendorff's post-Theranos employment would have resulted in reversal of all counts because it would demonstrate the bias in Dr. Rosendorff's testimony. Mot. 17; Reply 13–14. Furthermore, Mr. Balwani claims that he should have been entitled to a new trial or evidentiary hearing based on Dr. Rosendorff's post-trial conduct at Ms. Holmes' residence. Mot. 17–18.

Mr. Balwani's reliance on Dr. Rosendorff's testimony is misplaced. Dr. Rosendorff's testimony arose from his tenure as Theranos' lab director and, per Mr. Balwani, "was crucial to determining the accuracy of Theranos' technology, Mr. Balwani's knowledge of alleged

1    deficiencies in that technology, and his attitude toward regulatory compliance." Mot. 17. Despite

2    conclusory assertions that these issues were "core to all counts," Dr. Rosendorff's testimony is

3    primarily focused on Theranos's lab operations and bear little, if any, weight as to the fraudulent

4    representations made to investors. *See supra* Section III.B.4. Any question focusing on Dr.

5    Rosendorff's bias, therefore, would not be the type likely to result in reversal or new trial on all

6    convicted counts, especially where Dr. Rosendorff was subjected to extensive cross-examination

7    over three days of trial. Nor would reversal or a new trial be likely based on an evidentiary

8    hearing into Dr. Rosendorff's opinion of the government's presentation of evidence at Ms.

9    Holmes' trial. *See generally* ECF No. 1636, at 3–8 (outlining reasons for denying new trial based

10   on Dr. Rosendorff's post-trial conduct).

11       Even if the Court admitted evidence of Dr. Rosendorff's post-Theranos employment and

12   permitted Mr. Balwani to ask Dr. Rosendorff about his post-trial conduct, these questions are not

13   so integral to the merits of all convictions such that a favorable appellate decision would likely

14   result in reversal or a new trial.

15       **F.    Department of Defense Representations**

16       Mr. Balwani takes issue with the admission of evidence regarding misrepresentations in

17   materials Theranos provided to the military and argues that such evidence constituted inadmissible

18   character evidence under Federal Rule of Evidence 404(b). He claims that, had such evidence

19   instead been suppressed, he would have been acquitted of the investor counts. Mot. 18.

20       Here, Mr. Balwani's convictions for investor fraud involved many different

21   misrepresentations made to investors, regarding Theranos's testing capabilities, validation by

22   pharmaceutical companies, Theranos's relationship with Walgreens and the Department of

23   Defense, and the company's financial projections. *See* ECF No. 1645, at 7–8. The representations

24   regarding the Department of Defense, therefore, constitute only one facet of the larger body of

25   misrepresentations made to investors. Even if the Ninth Circuit were to agree with Mr. Balwani

26   that the evidence of Theranos's representations to the Department of Defense should have been

27   suppressed, the Court cannot find that this evidence on its own was "so integral to the merits of the

28

United States District Court
Northern District of California

[investor fraud] conviction . . . that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Miller*, 753 F.2d at 23.

The Court accordingly finds that the question of whether evidence regarding Theranos's misrepresentation to the Department of Defense should have been admitted is not one that is likely to result in reversal or a new trial.

### G. Standard of Proof at Sentencing

Finally, Mr. Balwani asserts that, had the Court applied the "clear and convincing" standard in sentencing him, he would have received either probation or a sentence shorter than the time for appeal. Mot. 19. In doing so, Mr. Balwani presumes that a favorable appellate decision on this question would result in a loss amount of zero. *Id.* ("And without the loss amount, the resulting Guidelines range would have been 4-10 months.").

Mr. Balwani's perfunctory suggestion is not supported by the jury's finding that he was guilty beyond a reasonable doubt of defrauding six different investors of amounts surpassing $150 million. In addition to the jury's convictions, the Court's Order on Sentencing recounted the evidence supporting its decisions to include certain specified investors in the loss calculation analysis. ECF No. 1730, at 14–20. The Court cannot say that this body of evidence would be likely to fail the "clear and convincing" standard (*i.e.*, that the Court lacks "an abiding conviction that the truth of the factual contentions at issue is highly probable") as to so many investors that Mr. Balwani would only be subject to imprisonment for a few years. *United States v. Lonich*, 23 F.4th 881, 916 (9th Cir. 2022) (internal brackets and quotation marks omitted). The question of whether the Court applied the correct standard of proof at sentencing, therefore, is not one that is likely to result in reversal or a new trial on the related investor counts.

## V. CONCLUSION

Although the Court finds that Mr. Balwani is not a flight risk or a danger to the safety of the community, it is unable to find that he has raised a "substantial question of law or fact" that if "determined favorably to [him]on appeal, [would be] likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed." *Handy*, 761 F.2d at 1283; 18 U.S.C. § 3143(b).

Based on the foregoing, the Court DENIES Mr. Balwani's Motion for Release Pending Appeal.

**IT IS SO ORDERED.**

Dated: March 9, 2023

_____
EDWARD J. DAVILA
United States District Judge

1   STEPHANIE M. HINDS (CABN 154284)
    United States Attorney
2
    THOMAS S. COLTHURST (CABN 99493)
3   Chief, Criminal Division

4   JEFFREY B. SCHENK (CABN 234355)
    JOHN C. BOSTIC (CABN 264367)
5   ROBERT S. LEACH (CABN 196191)
    KELLY I. VOLKAR (CABN 301377)
6   Assistant United States Attorneys

7       150 Almaden Boulevard, Suite 900
        San Jose, California 95113
8       Telephone: (408) 535-5061
        Fax: (408) 535-5066
9       Kelly.Volkar@usdoj.gov

10  Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                  SAN JOSE DIVISION

14  UNITED STATES OF AMERICA,            )   Case No. 18-CR-00258 EJD
                                         )
15          Plaintiff,                   )   UNITED STATES' OPPOSITION TO
                                         )   DEFENDANT RAMESH "SUNNY" BALWANI'S
16      v.                               )   MOTION FOR RELEASE PENDING APPEAL
                                         )
17  RAMESH "SUNNY" BALWANI,              )
                                         )   Date:   February 17, 2023
18          Defendant.                   )   Time:   9:30 a.m.
                                         )   Court:  Hon. Edward J. Davila
19                                       )
                                         )
20  _____)

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

BACKGROUND ..............................................................................................................1

LEGAL STANDARD ........................................................................................................2

ARGUMENT ....................................................................................................................4

    A.    Defendant Has Not Met His Burden of Showing by Clear and Convincing Evidence That He Is Not a Flight Risk ...........................................5

    B.    Defendant Has Not Met His Burden of Showing by Clear and Convincing Evidence That He Is Not a Danger to the Community ..........................6

    C.    The Questions Defendant Has Presented Are Not Likely to Result in Reversal or an Order for a New Trial on All Counts of Conviction .................................10

    D.    Defendant Has Not Met His Burden of Showing That the Appeal Raises a Substantial Question of Law or Fact ...................................................14

        1.    The Evidence Admitted on Patient-Related Counts Did Not Constructively Amend the Third Superseding Indictment .....................14

        2.    The Court Properly Admitted Testimony of Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff ...............................................16

        3.    There Was No Error in the Government Choosing Not to Seek Admission of Recordings of Co-Defendant Holmes in Defendant Balwani's Trial ...............................................................18

        4.    The Court Did Not Err in Its Relevant Rulings Regarding the LIS Database ...............................................................19

        5.    The Court Did Not Err in Its Relevant Rulings Regarding Dr. Rosendorff ...............................................................22

        6.    The Court Did Not Err in Admitting Certain Exhibits Related to the Department of Defense ...............................................................23

        7.    The Court Properly Calculated a Reasonable Estimate of Loss to Victims ...............................................................24

CONCLUSION...............................................................................................................25

**<u>TABLE OF AUTHORITIES</u>**

**CASES**

*Morison v. United States*,
    486 U.S. 1306 (1988) ................................................................................................ 4

*Napue v. Illinois*,
    360 U.S. 264 (1959) ...................................................................................... 18, 19, 23

*United States v. Abel*,
    469 U.S. 45 (1984) ................................................................................................ 22

*United States v. Anderson*,
    532 F.2d 1218 (9th Cir. 1976) ............................................................................ 15

*United States v. Bayko*,
    774 F.2d 516 (1st Cir. 1985) ............................................................................ 3, 4

*United States v. Bilanzich*,
    771 F.2d 292 (7th Cir. 1985) ................................................................................ 4

*United States v. Cuong Cau Dang*, No. 13-CR-00486-EJD,
    2013 WL 4119426 (N.D. Cal. Aug. 9, 2013) .................................................... 5

*United States v. Gerald N.*,
    900 F.2d 189 (9th Cir. 1990) (per curiam) ........................................................ 3

*United States v. Handy*,
    761 F.2d 1279 (9th Cir. 1985) .................................................................... *passim*

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) ............................................................................ 22

*United States v. Kakkar*, No. 5:13-CR-00736-EJD,
    2017 WL 4163291 (N.D. Cal. Sept. 20, 2017) ............................................ 5, 6

*United States v. Khan*, No. 12-CR-00860-YGR,
    2014 WL 2930656 (N.D. Cal. June 27, 2014) ........................................ 3, 5, 6

*United States v. Laurienti*,
    611 F.3d 530 (9th Cir. 2010) ............................................................................ 24

*United States v. Lindsey*,
    680 F. App'x 563 (9th Cir. 2017) .................................................................... 6, 7

*United States v. Martin*,
   796 F.3d 1101 (9th Cir. 2015) ............................................................................... 25

*United States v. McCahill*,
   765 F.2d 849 (9th Cir. 1985) ................................................................................... 2

*United States v. Mett*,
   41 F.3d 1281 (9th Cir. 1994) ................................................................................... 3

*United States v. Miller*,
   753 F.2d 19 (3d Cir. 1985) ........................................................................... 3, 4, 16

*United States v. Montoya*,
   908 F.2d 450 (9th Cir. 1990) ....................................................................... 3, 5, 14

*United States v. Motamedi*,
   767 F.2d 1403 (9th Cir. 1985) ................................................................................ 5

*United States v. Reynolds*,
   956 F.2d 192 (9th Cir. 1992) ................................................................................... 6

*United States v. Sivilla*,
   714 F.3d 1168 (9th Cir. 2013) ............................................................................... 21

*United States v. Zolp*,
   479 F.3d 715 (9th Cir. 2007) ........................................................................... 24, 25

**STATUTES**

18 U.S.C. § 3142 .......................................................................................................... 10

18 U.S.C. § 3143 .......................................................................................................... 2, 3

**FEDERAL RULES**

Federal Rule of Criminal Procedure 29 ........................................................... 2, 12, 13

Federal Rule of Criminal Procedure 33 ....................................................................... 2

Federal Rule of Criminal Procedure 46 ....................................................................... 3

Federal Rule of Evidence 702 ...................................................................... 16, 17, 18

## INTRODUCTION

The government opposes Defendant Ramesh "Sunny" Balwani's Motion for Release Pending Appeal. *See* ECF No. 1711 ("Motion"). More than six months ago, Defendant was found guilty on twelve felony fraud-related counts associated with significant harm to patient-victims and a loss to investor-victims of at least $120 million. The Court imposed a sentence of 155 months of imprisonment along with other conditions on December 7, 2022, and set a self-surrender date of March 15, 2023. Defendant has maintained throughout this case that he is independently wealthy (in part to assert that he had no motive to defraud the victims of the two schemes to defraud). Defendant has not accepted responsibility and has shown no remorse to the victims of his crime. The criminal justice system presumes at this point that a criminal defendant would begin serving his or her custodial sentence, and Defendant cannot meet the stringent standard for release pending appeal mandated by Congress in order to overcome that presumption. There are not two systems of justice—one for the wealthy and one for the poor—there is one criminal justice system in this country. And under that system, the time has come for Ramesh "Sunny" Balwani to answer for his crimes committed nearly a decade ago, as found by a jury made up of a fair cross section of individuals from this community, and to begin serving the term of imprisonment imposed by this Court as sufficient but not greater than necessary to account for those crimes. The government respectfully requests the Court deny Defendant's Motion.

## BACKGROUND

On July 28, 2020, the government filed the Third Superseding Indictment ("TSI"), charging Defendant Ramesh "Sunny" Balwani and co-Defendant Elizabeth Holmes with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2). ECF No. 469. The Court severed the case in March 2020. ECF No. 362. Beginning on August 31, 2021, co-Defendant Holmes' trial spanned four months, during which hundreds of exhibits were admitted and dozens of witnesses testified. *See generally* ECF Nos. 1256–1306, 1324. On January 3, 2022, the jury found co-Defendant Holmes guilty of four counts with respect to investor-related counts. ECF No. 1235.

Beginning with jury selection on March 9, 2022, Defendant Balwani's trial similarly spanned four months on the same twelve counts alleged in the TSI. *See generally* ECF Nos. 1514–1559. Throughout the trial, over 500 exhibits were admitted and 26 witnesses testified. *See* ECF No. 1562.

On July 7, 2022, the jury found Defendant Balwani guilty of all twelve counts, including conspiracy to commit wire fraud against Theranos investors, six counts of wire fraud in connection with six specific investors, conspiracy to commit wire fraud against Theranos paying patients, and four counts of wire fraud in connection with patients. *See* ECF No. 1507. Defendant moved for acquittal under Federal Rule of Criminal Procedure 29 ("Rule 29"). On November 7, 2022, the Court denied Defendant's Rule 29 motion. ECF No. 1635. Defendant subsequently joined co-Defendant Holmes' motion for a new trial purportedly based on newly discovered evidence based on post-trial statements made by Dr. Adam Rosendorff, under Federal Rule of Criminal Procedure 33 ("Rule 33"). ECF No. 1594. The Court denied Defendant's Rule 33 motion. ECF No. 1599.

On December 7, 2022, the Court calculated the applicable U.S. Sentencing Guidelines range to be 135 to 168 months of imprisonment, in part based upon a finding that a reasonable estimate of the loss to investor-victims was more than $120 million, and sentenced Defendant to a Guidelines sentence of 155 months' imprisonment on each count to run concurrently. ECF No. 1682; 12/07/22 Tr. at 92–93, 148–49. Over the government's objection, the Court did not consider patient-related conduct in its Guidelines calculation. 12/07/22 Tr. at 91–92. The Court set Defendant's self-surrender date on March 15, 2023. *Id.* at 150. The Court had previously made similar findings for the Guidelines calculation with respect to co-Defendant Holmes on November 18, 2022, and sentenced her to 135 months of imprisonment, among other conditions. ECF No. 1712; 11/18/22 Tr. at 87–88, 132–33.

## LEGAL STANDARD

Detention is the mandatory, routine norm for any defendant following conviction and the imposition of a custodial sentence. 18 U.S.C. § 3143(b)(1); *see also* ECF No. 1721 (providing full legal standard). The Bail Reform Act of 1984 ("the Act") provides that after conviction and imposition of sentence, detention is mandatory absent clear and convincing evidence that a defendant is not a flight risk or danger to the community. Congress enacted the Act to "toughen the law with respect to bail pending appeal" and to "make[ ] it considerably more difficult for a defendant to be released on bail pending appeal." *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985); *see also United States v. McCahill*, 765 F.2d 849, 850 (9th Cir. 1985) (Kennedy, J.). "Once a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit

1    it in the absence of exceptional circumstances." *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985)

2    (internal quotation omitted). Otherwise, "release of a criminal defendant into the community, even after

3    conviction," runs the risk of "destroy[ing] whatever deterrent effect remains in the criminal law." *Id.*

4    (internal quotation omitted).

5         Unlike in the pretrial-detention context, every defendant seeking bail pending appeal after his

6    conviction and sentencing is presumed to be a danger and a flight risk—and it is the defendant's burden

7    to overcome that presumption. *See United States v. Khan*, No. 12-CR-0860-YGR, 2014 WL 2930656,

8    at *2 (N.D. Cal. June 27, 2014) ("Through this statute Congress created a presumption of detention and

9    shifted the burden of proof to the defendant to show otherwise." (citing *Handy*, 761 F.2d at 1283)); *see*

10    *also Miller*, 753 F.2d at 22 ("The Bail Reform Act of 1984 was enacted because Congress wished to

11    reverse the presumption in favor of bail" for defendants seeking release pending appeal). As a result,

12    "under the Bail Reform Act of 1984 it is no easy matter to obtain bail pending appeal." *United States v.*

13    *Gerald N.*, 900 F.2d 189, 191 (9th Cir. 1990) (per curiam).

14         To overcome this legislative mandate, a defendant must prove: (1) by clear and convincing

15    evidence that he is not a flight risk or a danger to the community; and (2) that his appeal is not for the

16    purpose of delay and (3) raises a substantial question of law or fact that is (4) likely to result in

17    (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or

18    (iv) a reduced sentence to less than time served. 18 U.S.C. § 3143(b)(1); *see also United States v. Mett*,

19    41 F.3d 1281, 1282 n.3 (9th Cir. 1994) (listing requirements). Where a defendant fails to satisfy his

20    burden in every respect, a request for bail pending appeal must be denied. *See United States v. Montoya*,

21    908 F.2d 450, 451 (9th Cir. 1990); Fed. R. Crim. P. 46(c).

22         A "substantial question" refers to a legal issue that is "fairly debatable" or "fairly doubtful" and

23    "is one of more substance than would be necessary to a finding that it was not frivolous." *Handy*, 761

24    F.2d at 1283 (adopting the interpretation set forth in *Miller* and *Giancola*). "Fairly debatable" questions

25    are those that are novel or not readily answerable, or that pose issues "debatable among jurists of

26    reason." *Id.* at 1281–82 (internal quotations and citations omitted). "'[L]ikely to result in reversal'

27    defines the type of question that must be presented." *Id.* at 1281. This requirement "has generally been

28    read to mean that if error is found, it must not be harmless or unprejudicial error." *United States v.*

1   *Bayko*, 774 F.2d 516, 522 (1st Cir. 1985); *see also United States v. Bilanzich*, 771 F.2d 292, 299

2   (7th Cir. 1985) ("For example, harmless errors, errors that have no prejudicial effect, or errors that have

3   been insufficiently preserved would not justify a court's granting bail."). Thus, a "substantial" question

4   "may, nonetheless, in the circumstances of a particular case, be considered harmless, to have no

5   prejudicial effect, or to have been insufficiently preserved" such that the question would not be likely to

6   result in reversal. *Miller*, 753 F.2d at 23; *see Handy*, 761 F.2d at 1280, 1283 (adopting interpretation of

7   the standard set forth in *Miller*). Put differently, "[a] court may find that reversal or a new trial is

8   'likely' only if it concludes that the question is so integral to the merits of the conviction on which

9   defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the

10  conviction or a new trial." *Miller*, 753 F.2d at 23.

11      Furthermore, a defendant must prove that his appeal is likely to result in reversal or an order for

12  a new trial on *all counts* for which imprisonment has been imposed. *See*, *e.g.*, *Morison v. United States*,

13  486 U.S. 1306, 1306–07 (1988) (Rehnquist, C.J., in chambers, denying defendant's application for bail

14  pending resolution of certiorari petition because even if he raised a "substantial question" with respect to

15  certain counts of conviction, he had not done so with respect to *all counts* of conviction); *Handy*, 761

16  F.2d at 1283 (listing fourth requirement for granting bail pending appeal as "if that substantial question

17  is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for

18  a new trial of *all counts* on which imprisonment has been imposed" (emphasis added)).

19                                         **ARGUMENT**

20      Because the burden has shifted at this stage post-conviction and post-sentencing, Defendant's

21  cursory arguments that he is not a flight risk or economic danger to the community do not suffice to

22  meet the clear and convincing standard he faces. Furthermore, none of the arguments he has raised pose

23  a substantial question, as described further below. Regardless of whether any of the topics he has

24  asserted do raise a substantial question, Defendant cannot meet the final requirement because each of the

25  topics relate to harmless or non-prejudicial errors that do not affect *all* counts of conviction. *See Bayko*,

26  774 F.2d at 522; *Bilanzich*, 771 F.2d at 299; *Miller*, 753 F.2d at 23. Therefore, the Court should deny

27  Defendant's Motion for bail pending appeal.

28

### A. Defendant Has Not Met His Burden of Showing by Clear and Convincing Evidence That He Is Not a Flight Risk

Defendant asserts in cursory fashion that he is not a flight risk by relying on an overview of his pretrial record and citing two pretrial detention decisions. Mot. at 8–9 & nn.1 & 2 (*citing United States v. Cuong Cau Dang*, No. 13-CR-486-EJD (PSG), 2013 WL 4119426 (N.D. Cal. Aug. 9, 2013), *and United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985)). However, that the parties had previously agreed upon—and the Court approved—conditions of release pre-trial and pre-sentencing does not alone meet the heightened burden Defendant now faces post-sentencing. As described above, after conviction and imposition of sentence, the burden of proof shifts from the government to the Defendant to demonstrate by clear and convincing evidence that he is not a flight risk. *See Handy*, 761 F.2d at 1283; *see also Khan*, 2014 WL 2930656, at *2 ("Through this statute Congress created a presumption of detention and shifted the burden of proof to the defendant to show otherwise." (citing *Handy*, 761 F.2d at 1283)). The Ninth Circuit has held that this change, along with "[e]ach of the changes contained in the Bail Reform Act of 1984[,] makes it considerably more difficult for a defendant to be released on bail pending appeal." *Id.* The Ninth Circuit has also rejected cursory motions on contested issues given it is the defendant's burden to establish each requirement. *See*, *e.g.*, *Montoya*, 908 F.2d at 451.

This Court, too, has rejected similar arguments from a defendant convicted of wire fraud given, among other factors, the "undeniably compelling motivation to flee given the convictions[ and] the length of the sentence imposed[.]" *United States v. Kakkar*, No. 5:13-CR-00736-EJD, 2017 WL 4163291, at *2 (N.D. Cal. Sept. 20, 2017). Specifically, the defendant in *Kakkar* was not a citizen of the United States, but pointed to the fact that he was a permanent resident, had surrendered his passport, had lived in the country for 28 years with strong family and business ties to California, had his immediate family all living within the United States, and had complied with all pretrial release conditions. *Id.* Like Defendant here, that defendant emphasized his pretrial release record and the fact that he appeared at all court dates and hearings and complied with all pretrial requirements. *Id.* Nevertheless, the Court found that four years of incarceration was compelling motivation to flee and attempt to "avoid[ ] the gravity of the legal process he faces[.]" *Id.* Moreover, the Court found that, "given the fraudulent conduct underlying the convictions and the fact he transferred assets and placed them out of the reach of

1  potential creditors, the court does not believe that any existing business or community ties are strong

2  enough to prevent Defendant from seeking to evade the consequences of his actions." *Id.*

3    The Court's rationale in *Kakkar* applies with equal force here. Although Defendant is a U.S.

4  citizen, he was born in Pakistan and appears to maintain close ties with his family members living here

5  in the United States and those living abroad. *See* PSR ¶¶ 90, 95–96. Defendant has shared with the

6  Court that he has no children of his own, so his siblings and their families are very important to him.

7  11/07/22 Tr. at 11; *see also* PSR ¶ 97. He has also asserted that he is close with his three older sisters

8  who live in India. PSR ¶ 95. And while Defendant's Motion highlights the support he has provided to

9  local religious communities—the PSR emphasizes similar community service work also supporting

10  communities in India and Pakistan. PSR ¶ 101. Weighing against the strength of Defendant's close ties

11  within the United States are those close ties he has abroad and "the length of the sentence imposed"—

12  nearly 13 years—which, as the Court previously noted, is "an undeniably compelling motivation to

13  flee[.]" *Kakkar*, 2017 WL 4163291, at *2. Furthermore, Defendant has the means to flee. Defendant

14  provided information to the Probation Office demonstrating that he has millions of dollars in assets and,

15  shortly before his trial began, he sold a property for over $15 million, which helped pay for his legal

16  fees. PSR ¶¶ 122, 124. Defendant chose to pay his lawyers rather than his victims.

17    In sum, as another court in this District found, this Court should find that Defendant "has both

18  the means and the motive to flee." *Khan*, 2014 WL 2930656, at *4; *see also Kakkar*, 2017 WL

19  4163291, at *2. Defendant's cursory review of his record on pretrial release does not meet his

20  heightened burden now that he has been convicted and sentenced to a term of imprisonment.

21    **B. Defendant Has Not Met His Burden of Showing by Clear and Convincing Evidence**
22      **That He Is Not a Danger to the Community**

23    Similarly, Defendant's disingenuous assertion that he poses no danger to the community merely

24  because his criminal offense was "a nonviolent offense," 12/07/22 Tr. at 150, glosses over the staggering

25  financial harm caused by his conduct. *Cf.* Mot. at 9. It is well-settled that danger to the community is

26  not limited to physical violence but rather can encompass pecuniary or economic harm, as well. *See,*

27  *e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192–93 (9th Cir. 1992); *Kakkar*, 2017 WL 4163291, at *2

28  (citing *Reynolds*); *see also United States v. Lindsey*, 680 F. App'x 563, 567–68 (9th Cir. 2017)

(upholding denial of bail pending appeal where defendant's "elaborate mortgage fraud scheme" caused the loss of millions of dollars and "targeted vulnerable and impoverished individuals"). Despite its breadth, Defendant has not acknowledged the fraudulent nature of his conduct nor accepted responsibility, rendering it more likely that he will repeat it in the future. *See* 12/07/22 Tr. at 132. The government has described Defendants' conduct in detail elsewhere (*see, e.g.*, ECF Nos. 1395, 1486, 1661, 1721)—and the Court is familiar with the facts of this case having sat through two trials spanning nearly a year. The government incorporates by reference its brief summary of Defendant's elaborate scheme to defraud investors about the capabilities of Theranos' blood-testing device from its recently filed opposition to co-Defendant Holmes' motion for bail pending appeal. *See* ECF No. 1721 at 12.

In furtherance of their multi-year scheme to defraud patients, Defendants touted Theranos as a company that would revolutionize blood testing, making health information more reliable and more accessible. Beginning in late 2013, Theranos actually offered clinical blood testing services to the public, first in the Bay Area, then in Arizona. To jumpstart the process of making its tests available to the public, and to reach as many patients as it could, Theranos partnered with retail pharmacy chain Walgreens—a company with a nationwide footprint that could make Theranos' product accessible to most of the country's population. Defendant took the lead in managing Theranos' relationship with Walgreens, which was critical to both schemes to defraud because Theranos benefitted from the goodwill and credibility associated with the Walgreens name. *See* 04/19/22 Tr. at 2894, 2903 (Nimesh Jhaveri identifying Balwani as his day-to-day contact at Theranos); 05/18/22 Tr. at 5932 (Dr. Ellsworth testifying that he expected Theranos tests would be accurate based partly on their association with Walgreens). Throughout that partnership, Theranos pushed for wider and faster expansion, with Walgreens holding back and expressing concerns over Theranos' inability to conduct much of its testing using its vaunted fingerstick method, among other things. Despite Walgreens' hesitations about expanding the Theranos partnership more rapidly, many thousands of patients ended up receiving blood test services from Theranos between 2013 and 2016.

Defendants used a variety of methods to attract patients to Theranos, including Theranos' website and brochures that Theranos asked Walgreens to place in its stores to be read by customers. The brochures informed potential patients that Theranos was "the first and only CLIA-certified laboratory

capable of running all its tests on micro-samples," and that it could perform the "full range" of tests. TX 5084. Theranos' written materials targeting patients also promised "better answers" when it came to their health, claiming that the company's advanced automation gave its tests "the highest levels of accuracy." *Id.* Theranos' website similarly boasted that the lab "can precisely analyze tiny samples," and repeatedly promised tests with "the highest level of accuracy and precision." TX 5805. Defendants approved this website language despite receiving warnings from lawyers that such language was potentially problematic. *See* TX 3965, 3981. Meanwhile, the press echoed Defendants' claims about Theranos' scientific advances and improved accuracy. TX 1090 (email to Defendants with draft of *Wall Street Journal* article highlighting "improved accuracy"). The key claims in Theranos' promotional materials were intended to mislead patients and induce them to pay for subpar testing services.

In truth, Defendants worked hard to hide from Theranos patients that the company's proprietary testing analyzer was not reliable—forcing Defendants to use third-party predicate machines to fill the gaps without telling patients that meant receiving a vein draw rather than a fingerstick as advertised. Theranos' homegrown "TSPU" device—used for several important tests including HCG (to assess the presence and stage of a pregnancy), PSA (to check for potentially lethal prostate cancer), and TSH (a measure of thyroid health) (TX 4533)—was plagued by issues. It broke down frequently and, when it did return results, it suffered from serious accuracy problems. *See* TX 1587, 1633. When Theranos employees—from Erika Cheung at her entry-level position to Dr. Mark Pandori and Dr. Adam Rosendorff occupying the highest positions in the clinical lab—repeatedly raised the same concerns with inaccurate and unreliable results to Defendant, Defendant Balwani dismissed them. *See*, *e.g.*, 03/23/22 Tr. at 1255–56 (Cheung testified that Balwani said to her: "What makes you think that you're qualified to make these assessments about what is occurring within the clinical lab" and that he was "tired of the fact that people were trying to raise doubts about the Edison devices"); 03/30/22 Tr. at 1671–72 (Dr. Pandori testified that he recommended that Theranos stop using the Edison device and Balwani became upset and said "that wouldn't happen"); 04/20/22 Tr. at 3249, 3309, 3389–91 (Dr. Rosendorff testified that he raised concerns to Balwani and ultimately resigned because he was being asked to vouch for patient results he was not confident in).

Patients were harmed along the way:  Dr. Mark Burnes testified at trial about one of his patients named Dr. Mehrl Ellsworth, who received multiple incorrect PSA (prostate specific antigen) test results that, if believed, would indicate that Dr. Ellsworth had late-stage prostate cancer.  05/18/22 Tr. at 5888–906.  Patient Brent Bingham testified at trial about his own chronic medical condition that causes his body to produce too many platelets and requires him to obtain frequent blood tests to monitor his condition.  05/18/22 Tr. at 5941–62.  After seeing information in the media about Theranos, including claims of superior accuracy, he sought blood testing services from Defendants' company.  To his dismay he could not rely on the results as he had hoped.  Before making a drastic change to his treatment plan for his condition as Theranos' results would have suggested, he obtained comparison results from a conventional lab that showed the Theranos results to be inaccurate.  *Id.*  Additional patients who did not testify at trial were impacted by Theranos' PT/INR test (relating to blood clotting) and described their harrowing experiences with trying out Theranos' blood testing.  *See* PSR ¶¶ 56–57.

Brittany Gould testified at trial about her erroneous HCG test results from Theranos, which told her that she was having a miscarriage when her physical symptoms did not match that result.  05/13/22 Tr. at 5826–35.  Gould, who had suffered multiple miscarriages in the past, obtained a series of HCG values from Theranos and a traditional lab over the course of a week to confirm the status of her pregnancy—the Theranos results indicated she was having another miscarriage while the traditional lab indicated a viable pregnancy (and Gould would eventually deliver a healthy baby).  *Id.*  Theranos' repeated failure to return accurate test results across multiple assays after multiple attempts— particularly when using its proprietary equipment—speaks volumes about the reliability of Theranos technology.  It is impossible to know exactly how many times frightening scenarios like these played out in the lives of patients who trusted their blood testing to Theranos—since Theranos did not maintain a centralized log of patient complaints or reports of inaccurate tests, and only seemed to compile them post-hoc as needed.  *See* TX 4520 (complaint log selections).

In sum, Defendant committed an elaborate fraud scheme that resulted in more than a hundred million dollars of loss to investor-victims, with no consideration of the patient-victims he endangered and with no expressed remorse to this day toward his victims.  Given the nature and magnitude of the

crime, Defendant cannot meet his burden of demonstrating by clear and convincing evidence that he does not present a danger to the community under the relevant factors of 18 U.S.C. § 3142(g).

### C. The Questions Defendant Has Presented Are Not Likely to Result in Reversal or an Order for a New Trial on All Counts of Conviction

Even if Defendant had presented a substantial question—which he has not for reasons stated below—he could not meet his burden of proving the final requirement for bail pending appeal because he cannot demonstrate that favorable resolution on any of the questions he has presented would be likely to result in reversal of, or a new trial on, all counts of conviction, or otherwise alter the sentence in a manner that would not include a term of imprisonment. *Cf.* Mot. at 10–24. Given that each question presented addresses at most certain counts of conviction or one subpart of Defendant's schemes to defraud, even if the Ninth Circuit were to find error, such error would be harmless or non-prejudicial in light of the overwhelming amount of evidence regarding Defendant's multi-faceted misrepresentations.

Fundamentally, five of the eight issues Defendant has presented correspond almost entirely to the patient-related counts—not the investor-related counts—and thus a resolution favorable to Defendant would not materially affect *all* counts of conviction. *See* ECF No. 1507. Specifically:

- Defendant challenges the admission of CMS's January 2016 findings, in particular that there was immediate jeopardy to patient health after a review of Theranos' clinical lab, and the testimony of CMS inspector Sarah Bennett and certain patient-victims. *See* Mot. at 11–16.

- Defendant challenges the characterization of testimony by Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff, who testified as percipient witnesses about their daily tasks at Theranos in the clinical laboratory overseeing the testing of patients' blood. *See* Mot. at 16–18.

- Defendant challenges the testimony of Dr. Adam Rosendorff, who was Theranos' laboratory director from 2013–2014 within the investor fraud period, but who did not interact with investors. *See* Mot. at 22–23. *But see* ECF No. 1636 at 8.

- Finally, Defendant renews once again his LIS-related challenges. *See* Mot. at 21–22. *But see* ECF No. 1636 at 12–15 (holding co-Defendant was not prejudiced on this topic).

One straightforward way of identifying the harmlessness of the above asserted errors related to the patient convictions, is that, for the investor-related convictions, investors repeatedly testified at trial that they would have been shocked to learn Theranos was using third-party machines—not its own proprietary device as pitched—to run patient blood samples. *See, e.g.*, 04/26/22 Tr. at 3912–13;

04/29/22 Tr. at 4294–96, 4313, 4318, 4384.  As a result, investors testified that the negative October

2015 *Wall Street Journal* article exposed the fraud and spurred questions from investors to Defendants

about whether Theranos was using third party machines.  *See*, *e.g.*, 04/29/22 Tr. at 4318; 05/18/22 Tr. at

6131–34.  Even if the Ninth Circuit were to find the errors that Defendant asserts above, none of them

would impact the misrepresentation about using third-party devices.  And while testimony from

Theranos employees demonstrated the falsity of claims Defendants made to investors (and patients)

about the capabilities of Theranos' proprietary analyzer, they were not the only insiders to testify.  For

example, Daniel Edlin also testified that Theranos used third-party machines and that that information

was not freely shared or public before 2016.  *See* 04/06/22 Tr. at 2370–72, 2413–14.

Defendant asserts that the questions he has raised relate to "an ultimate issue: the accuracy and

reliability of Theranos technology."  Mot. at 11, 13, 18, 21–22.  But Defendant's argument asks the

Court to rely on a logical fallacy confusing a sufficient condition with a necessary one.  While the

government has always argued that Defendant's misrepresentations about the accuracy and reliability of

Theranos' testing would be sufficient to support a verdict on all counts alleged in the TSI and is the key

overlapping misrepresentation between the two fraud schemes, it is far from a necessary finding,

particularly on the investor fraud counts.  *Cf.* Mot. at 18.  The government argued in closing that

Defendant "defraud[ed] investors with a wide variety of false statements . . . . and those categories go

well beyond the accuracy of Theranos's blood testing[.]"  06/21/22 Tr. at 7079; *see also id.* at 6987–89,

6999–7002, 7013–18 (describing various categories of false statements and which investors relied on

which categories when deciding whether to invest—accuracy is not included in every list).  By contrast,

the government acknowledged in closing that, for the patient counts, "the specific representations that

mattered to the patient, as it's probably not a surprise, are the ones that relate to accuracy."  06/21/22 Tr.

at 7060; *see also id.* at 7047–55 (describing Cheung, Dr. Pandori, and Dr. Rosendorff highlighting

accuracy problems).  Indeed, the government recently argued at co-Defendant Holmes' sentencing that

the patient-related conduct gave a sense of legitimacy to the product that aided in defrauding investors

(ECF No. 1649 at 28–30), but the Court rejected that connection as "too attenuated."  *See* ECF No. 1712

at 18.  The Court should apply that same reasoning here.

TSI ¶ 12(A) alleges at least four deficiencies with the capabilities of Theranos' proprietary

analyzer about which Defendant misled investor-victims—and the accuracy and reliability problems are only one deficiency. ECF No. 469 ¶ 12(A). Critically, ¶ 12(A) alleges that Defendants made false statements to investor-victims that Theranos' analyzer "was presently capable of accomplishing certain tasks, such as performing the full range of clinical tests" when, in fact, Defendants knew the analyzer "performed a limited number of tests[.]" *Id.* The paragraph also references the speed of returning test results and the method of testing patients' blood, all in addition to Defendants' claim that Theranos' analyzer was "more accurate and reliable than those yielded by conventional methods[.]" *Id.* And, of course, Defendant's lies to investors regarding the capabilities of Theranos' proprietary device are themselves only one category among several misrepresentations he made. *See, e.g.*, *id.* ¶ 12(A)–(H); ECF No. 1635 at 4–8 (referencing other misrepresentations to investor-victims in denying Defendant's Rule 29 motion). As described further below, these other misrepresentations mattered to investors and cannot be discounted, which in turn prevents Defendant from being able to undermine *all* convictions. The link Defendant asserts between, in particular, the investor-related counts he was convicted on and one subpart within a subpart of categories of false misrepresentations he made to investors is far too attenuated to meet his burden of showing likely reversal or a new trial on those relevant counts.

The three other questions that Defendant has presented do not fare any better when stacked up against the overwhelming trial evidence and would present harmless or non-prejudicial errors at best:

- Defendant challenges the government's decision *not* to seek admission of certain exhibits at his trial that the government had admitted at co-Defendant Holmes' trial—specifically secretly recorded tapes of co-Defendant Holmes speaking to investors during a call in December 2013, when it is unclear if Defendant Balwani was on the call or present. *See* Mot. at 19–20.

- Defendant challenges admission of certain exhibits showing that Defendant made statements to Department of Defense representatives that were similarly made to investors. *See* Mot. at 23.

- Defendant challenges the Court's loss calculation and boldly claims he would be entitled to a 4-10 month sentence if the Court had properly thrown loss to victims out the window altogether. *See* Mot. at 24. In doing so, Defendant ignores the total loss to all investor-victims during the conspiracy period totaling more than $800 million—which is literally off the chart provided by the U.S. Sentencing Guideline—loss to the victims represented in substantive counts of conviction of more than $212 million, and ultimately the Court's modest approach of assuming, favorably to Defendant, that there was some value to Theranos when stocks were purchased even though none of the money invested was restored prior to the fraud being discovered, resulting in a loss of more than $120 million. *See* ECF No. 1661. It is not likely that Defendant would receive probation or a shorter sentence even if he were to prevail on this issue.

1    However, even if Defendant were to prevail on the substance of these claims (which is unlikely

2    as described in the next section below), any errors would be deemed harmless or non-prejudicial in the

3    context of the entire trial and thus unlikely to result in reversal, a new trial, a shorter sentence, or any

4    other alternative outcome.  None of the errors Defendant has asserted would alter the admission of the

5    text messages between Defendants, which is strong evidence supporting Defendant's conviction on the

6    conspiracy to defraud investor and conspiracy to defraud patient counts.  *See* ECF Nos. 1395 at 7–9,

7    1635 at 3–6.  Furthermore, a review of the false statements relevant to the investor-related counts of

8    conviction demonstrates that entire categories of false statements Defendant made to investors would

9    not be affected *at all*, even if the Ninth Circuit resolved every question Defendant has posed favorably to

10   him.  For example, as this Court found in denying Defendant's Rule 29 motion, at the same time

11   Defendant was told by Walgreens executives that Walgreens would never expand their relationship with

12   Theranos beyond a few dozen stores if the percentage of venous draws remained around 40%,

13   Defendant falsely represented to investors that it was reasonable to estimate that Theranos would be in

14   900 Walgreens locations by 2015.  ECF No. 1635 at 4.  As another example, Defendant "Balwani made

15   false representations directly to investors Pat Mendenhall and Brian Grossman[,]" such that they thought

16   "Theranos was not using third party devices" and Grossman "was shocked when he learned that

17   Theranos was not using its own devices to test blood." *Id.* at 3.  Defendant spoke directly with

18   investor Mendenhall, who wrote detailed notes from their phone call and who testified that Balwani told

19   him "that the science behind Theranos was complete; that no new invention was needed; and that

20   Theranos was completely vertically integrated"—none of which was true.  *Id.* at 8.  Defendant also

21   provided unattainable financial projections to investors, when he knew Theranos was barely generating

22   any revenue, and shared falsified reports portrayed as if written by large pharmaceutical companies. *Id.*

23   at 3–4.  And Defendant created "what was called the 'null protocol' to shield device failure from

24   investors" during demonstrations of the technology's purported capabilities. *Id.* at 7.

25   Tellingly, even if every issue Defendant has raised in his Motion for bail pending appeal was

26   resolved favorably to him, it would not impact any of the material misrepresentations listed above,

27   which are themselves only a small sampling of false statements that Defendant made to investors

28   connected to seven of the twelve counts on which Defendant was convicted.  Importantly, Defendant

1    also made multiple false statements to patient-victims (*see* ECF No. 1635 at 5–6, 9–10), although the

2    accuracy and reliability of Theranos' blood testing services was likely paramount to that set of victims.

3    In sum, Defendant cannot meet his burden of demonstrating that reversal, a new trial, or a

4    different sentence on *all counts* of conviction would result from the questions he has posed, and the

5    Court should deny his Motion on that basis.

6    ### D.   Defendant Has Not Met His Burden of Showing That the Appeal Raises a Substantial Question of Law or Fact

7

8    Defendant presents eight issues that he might raise on appeal that he asserts raise substantial

9    questions. *Cf.* Mot. at 11–24. But what counts as a substantial question is not measured by the number

10   of possible arguments. For reasons stated in the government's prior briefing on these topics and the

11   Court's ruling on them, these eight issues do not present substantial questions. Furthermore, to the

12   extent Defendant references other vague issues that might constitute substantial questions (*id.* at 6),

13   the Ninth Circuit has explicitly held that "cursory motion[s]" with "vague presentations" of issues are

14   insufficient to meet the substantial question standard and are thus barred. *See Montoya*, 908 F.2d at 451.

15   ### 1.   The Evidence Admitted on Patient-Related Counts Did Not Constructively Amend the Third Superseding Indictment

16

17   Defendant's first issue does not raise a substantial question because there was no constructive

18   amendment of the Third Superseding Indictment and, regardless, he did not properly preserve this claim.

19   *Cf.* Mot. at 11–16. Rather, Defendant's reading relies on an overly technical and improper reading of

20   the operative Indictment as it has alleged Defendants' conspiracy to defraud paying Theranos patients.

21   *See* ECF No. 1326 at 7–8. The TSI alleges that Defendant Balwani and co-Defendant Holmes devised a

22   scheme to defraud patients between approximately 2013—when Theranos began providing lab testing

23   services to patients through certain Walgreens stores in Palo Alto and Arizona—and 2016—when

24   Theranos elected to shutter its lab following interactions with CMS. ECF No. 469 (TSI) ¶¶ 14–18.

25   Specifically, the TSI alleges that from 2013 to 2016, the entire time Theranos was providing testing

26   services to patients, Theranos represented to doctors and patients that Theranos could provide accurate,

27   fast, reliable, and cheap blood tests and test results at the same time that Defendants knew that Theranos

28   was not, in fact, capable of consistently producing accurate and reliable results. *Id.* Based on an order

from the Court, the government provided a Bill of Particulars and ultimately incorporated 25 assays into the TSI for the patient-related counts. *Id.* ¶ 16. The government later amended its Bill of Particulars to add CBC and its component assays. *See* ECF No. 1157 at 83 (Exh. 16).

Defendant's attempt to limit the patient-related counts of conviction to "Theranos's technology" is undercut by the language of the TSI itself. The TSI references assays in the Bill of Particulars that were run on non-Theranos technology, such as HIV and CBC/PLT. *See* ECF No. 469 ¶¶ 14–18. Specifically, for those patients, the TSI alleges Defendants promised those patients that "*Theranos* could provide accurate, fast, reliable, and cheap blood tests and test results" despite their knowledge that "*Theranos* was not capable of consistently producing accurate and reliable results for certain blood tests including . . . HIV." *Id.* ¶¶ 16–17 (emphasis added). Defendant's reading of the TSI places too much weight on the phrase "Theranos's technology" and attempts improperly to import that language into other allegations in the Indictment. Adopting that interpretation would be contrary to Ninth Circuit guidance that "an indictment is not to be read in a technical manner, but is to be construed according to common sense with an appreciation of existing realities." *United States v. Anderson*, 532 F.2d 1218, 1222 (9th Cir.), *cert. denied*, 429 U.S. 839 (1976); *see also* ECF No. 1326 at 7–8.

Moreover, reading the TSI in the manner Defendant advocates cannot support a constructive amendment claim because (1) it requires ignoring more specific counts charged in favor of broad statements made in the introductory paragraphs describing the scheme to defraud as a whole and (2) the grand jury transcript that Defendant cites actually shows a match between the evidence the government presented to the grand jury and the evidence presented to the petit jury at trial. *Cf.* Mot. at 15; ECF No. 1711-3 at 135–39 (describing documents and expected testimony of Brent Bingham and Erin Tompkins that matches what was presented at trial). The evidence at trial demonstrated that Defendants made sweeping statements about the accuracy and reliability of Theranos' tests as a whole. Indeed, Defendants hid from the public (as well as investors) which tests were and were not performed on Theranos' technology, making it impossible for patients purchasing Theranos' services to know on what device their test would be performed. *See* ECF No. 1181 at 7–8 (detailing the difficulty in determining which machine Brent Bingham's test was run on even internally at Theranos). Moreover, they did not merely claim that Theranos' tests were accurate, they caused investors and patients to believe that

Theranos' tests were *more* accurate than the conventional tests previously available through competing labs. *See* TX 1106 (September 2013 *Wall Street Journal* article). Because Defendants falsely promised patients that Theranos could deliver test results with superior accuracy in an effort to lure patient customers, inaccurate test results derived from conventional analyzers are evidence that patients did not receive the benefit of the bargain. The TSI put Defendant on sufficient notice that these specific tests would be at issue in the trial, particularly for TSI Counts 9 (Brent Bingham) and 10 (Erin Tompkins).

In any event, Defendant has never previously alleged a constructive amendment on this point— not in his pretrial filings (which objected on irrelevance grounds), not in the moment when the evidence was admitted, nor in any post-trial motions—and thus has not properly preserved his core argument in this respect. *Miller*, 753 F.2d at 23 ("insufficiently preserved" questions are not likely to result in reversal), *adopted by Handy*, 761 F.2d at 1280, 1283. Thus, given Defendant did not properly preserve this claim and, even if he had, it would affect at most two counts of conviction—rather than *all* counts of conviction—the Court should deny his request for bail pending appeal on this ground.

### 2. The Court Properly Admitted Testimony of Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff

The Court properly fulfilled its gatekeeping role in deciding objections as Defendant made them respectively to the testimony of Theranos insiders Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff. *See* 04/01/22 Tr. at 1688–97, 1712–14. The Court noted that several portions of testimony challenged in Defendant's subsequent motion to strike were admitted during trial without objection; and in yet other instances, the Court sustained some of Defendant's Rule 702 objections. *Id.* The Court did not abuse its discretion in admitting the evidence it did as percipient witness testimony. The government incorporates by reference its prior briefing and argument on this topic and the Court's corresponding rulings. *See, e.g., id.* at 1687–88, 1697–99, 1709–11; ECF Nos. 660, 666, 798 at 70–72, 75–78, 1181, 1326. Fundamentally, these three witnesses testified as percipient witnesses—describing what their roles and responsibilities were at Theranos, how their respective interactions with Theranos' proprietary technology led each of them to question its ability to consistently provide accurate and reliable results to patients, and their ultimate resignations when Defendant dismissed their concerns or berated them for raising them. The Court properly rejected Defendant's request to strike this testimony

1   because it "didn't require expertise to talk about what could be run in that particular machine" in part

2   because "that's what [the witness] was trained to do" and "just because it's science doesn't mean it

3   requires expertise." 04/01/22 Tr. at 1689, 1693. Otherwise, under Defendant's approach, every witness

4   who worked in a technical or specialized field would be required to be designated an expert under

5   Federal Rule of Evidence 702 simply to testify to what he or she observed. That is not what Rule 702

6   requires. *See*, *e.g.*, *United States v. Chen*, No. 17-CR-00603-BLF-1, 2021 WL 2662116, at *9–10 (N.D.

7   Cal. June 29, 2021) (rejecting similar contention by defendant that engineers employed by company in

8   trade secret case should be deemed experts rather than permitted to testify as lay witnesses).

9       For example, Erika Cheung testified as a percipient witness who worked directly with Theranos

10  machines in the Theranos clinical lab, stating that she resigned from Theranos because she "was

11  uncomfortable with the fact that [they] were testing on patients . . . with technology that [she] felt wasn't

12  producing reliable results for those patients." 03/22/22 Tr. at 1117; *see also* 03/22/22 Tr. at 1201

13  (witness expressing her agreement with Defendant who characterized a quality control failure event as

14  "beyond unacceptable performance"). Cheung further explained that, as time went on at Theranos,

15  "there was a lot of evidence to suggest that the Theranos system and the Edison devices weren't working

16  properly," increasing her concerns about active testing on patients. 03/23/22 Tr. at 1251. Dr. Pandori

17  and Dr. Rosendorff both agreed that there were serious problems with Theranos' testing, explaining at

18  the trial that they resigned from their jobs as Theranos co-laboratory directors—at different times—

19  partly because "the frequency and severity of complaints that I was getting from clinicians really

20  reached a crescendo," causing Dr. Rosendorff in particular to feel like staying onboard would be risking

21  his integrity as a doctor. 04/20/22 Tr. at 3273; *see also* 03/30/22 Tr. at 1590–91, 1633, 1639.

22      Dr. Mark Pandori and Dr. Adam Rosendorff similarly testified to their percipient observations as

23  co-laboratory directors at Theranos during the charged patient conspiracy—beginning in late 2013. For

24  example, Dr. Mark Pandori testified about what he knew about Theranos before he became employed by

25  the company and how, after he began his employment, he was surprised to learn that Theranos used

26  "'third party devices,' [meaning] FDA cleared equipment that was run by other companies" because he

27  did not know that before he became an insider. 03/30/22 Tr. at 1614. The Court reviewed Dr. Pandori's

28  testimony about whether Theranos had "groundbreaking" technology and properly held that "the

1   question was not based necessarily on expertise, but I believe Dr. Pandori testified groundbreaking in

2   the context of the literature that was public through the company, the company representations[ that] Dr.

3   Pandori had read" which was percipient testimony.  04/01/22 Tr. at 1690.  And, again, the Court

4   sustained or partially sustained Defendant's Rule 702 objections at times, including clarifying whether

5   the witness was only testifying based on his own observations.  *See id.* at 1734.  Such statements are

6   squarely within the bounds of percipient testimony despite the fact that it relates to a technical subject.

7          Moreover, testimony regarding industry-standards and government regulations was not the focus

8   of the government's direct examination, and the portions cited in Defendant's Motion were in response

9   to questions asked during *cross-examination* and corresponding re-direct, rather than anything the

10  government elicited directly.  *See*, *e.g.*, 03/30/22 Tr. at 1552–58 (referring back to questions asked on

11  cross-examination about these topics); *cf.* Mot. at 17.  In denying Defendant's motion to strike similar

12  testimony based on this same reason, the Court also noted that Defendant's cross-examination strayed

13  more into technical concepts than did the government's direct examination.  *See* 04/01/22 Tr. at 1694.

14         In sum, there is no substantial question regarding whether the Court abused its discretion in

15  admitting and precluding certain testimony from Erika Cheung, Dr. Mark Pandori, and Dr. Adam

16  Rosendorff pursuant to Rule 702.

17        **3.**     **There Was No Error in the Government Choosing Not to Seek Admission of**

18                     **Recordings of Co-Defendant Holmes in Defendant Balwani's Trial**

19         Defendant has not presented a substantial question on this topic because the Ninth Circuit has

20  specifically held that a substantial question must be more than simply "not frivolous"—and this is a

21  frivolous issue.  *See Handy*, 761 F.2d at 1283.  Defendant asserts that it is "prosecutorial misconduct"

22  and "[d]eliberate deception" under *Napue v. Illinois*, 360 U.S. 264 (1959), because the government did

23  not seek to admit as exhibits in Defendant's trial tape recordings of co-Defendant on a call with

24  investors (on which it is unclear if Defendant even participated) and instead have the investor-victim,

25  Bryan Tolbert, testify to what he was told as well as the fact that he had never once spoken with

26  Defendant Balwani nor even seen him before testifying in court.  *See* 04/29/22 Tr. at 4406–53.  This is

27  frivolous.  There is no rule that says the government is required to try the case in the exact same manner

28  in severed trials against co-defendants—particularly when Defendant is the one who successfully sought

1    severance.  Otherwise, Defendant could claim "prosecutorial misconduct" because the government

2    called witnesses to testify in his trial who had more direct dealing with him and did not call every

3    witness the government had called in co-Defendant Holmes' trial who had more direct dealings with her.

4    That is nonsensical.  Further, there is no rule or requirement that the government must present a written

5    document or oral recording as an exhibit over and above a witness' direct testimony to events of which

6    the witness has personal knowledge.  The government presented the case *as relevant to Defendant*

7    *Balwani* during his trial—and did the same with respect to co-Defendant Holmes during her trial.  If

8    Defendant believed the tapes were so critical, he could have moved *in limine* to seek to admit them or

9    attempt to find an applicable hearsay exception.  Instead, he now claims a *Napue* violation without

10   pointing to a single false statement (only alleged discrepancies between the recording and Tolbert's

11   testimony from memory) and he cannot demonstrate it was material in light of Patrick Mendenhall's

12   testimony of a *direct call with Defendant Balwani* in the same relevant time period.  *See id.* at 4283–

13   302; TX 4059.  Moreover, this claim could not possibly affect *all counts* of conviction where only C1

14   investors participated on the call.  The Court should reject this claim outright.  *Cf.* Mot. at 19–20.

15              **4.      The Court Did Not Err in Its Relevant Rulings Regarding the LIS Database**

16            The Court has heard the facts surrounding the nature and destruction of Theranos' LIS on

17   numerous occasions, and the government incorporates by reference its prior filings and arguments on

18   this subject.  *See, e.g.*, ECF Nos. 682, 846, 1181, 1426, 1440, 1454, 1586; 05/04/21 Tr. at 45–68, 79–85;

19   07/07/21 Tr.; 11/10/21 Tr. at 5877–5889; 11/19/21 Tr. at 7100–7104; 02/08/22 Tr.; 02/08/22 Tr.;

20   05/11/22 Tr. at 5291–5329; 05/23/22 Tr.  Neither Defendant's motion to suppress on this basis nor

21   missing instruction request based on the LIS database raises a substantial question, particularly where

22   this Court has been given multiple opportunities to revisit the same topic and reach the same reasoned

23   results.  *Cf.* Mot. at 21–22.

24            The Court did not err in denying Defendant's motion to suppress several categories of evidence

25   regarding the patient-related counts based on the absence of the LIS database because Defendant cannot

26   demonstrate the exculpatory value of data within the LIS database and, in any event, the government did

27   not act in bad faith.  *See* ECF Nos. 887, 1326 at 20–21, 30–37.  The Court denied Defendant's motion to

28   suppress in part because the Court found that the government did not act in bad faith and "[t]he LIS

1    database information alone would not provide a conclusive determination of whether the Theranos blood

2    tests were accurate, and *it could just as likely contain incriminating evidence to the contrary*.  Any

3    exculpatory value is therefore speculative in nature."  ECF No. 887 at 10 (emphasis added); *see also*

4    1326 at 20–21, 30–37.  The evidence supports this conclusion.

5         First and foremost, it is highly speculative whether the LIS database would have been

6    exculpatory for Defendant and the evidence has shown it was far from a "complete" set of data.  The

7    government has repeatedly argued that the LIS database would have been a "powerful tool" to identify

8    additional patient-victims and quality-control data, but it would not have allowed the parties to sort

9    accurate from inaccurate patient results or determine an overall failure rate for Theranos' blood tests.

10   *See*, *e.g.*, ECF Nos. 846 at 7–8, 1440 at 5–7; 03/30/22 Tr. at 1471–73, 1565–66, 1575–76 (Erika Cheung

11   testified it would not "have been possible for the LIS to indicate for each patient result whether it was

12   accurate or inaccurate"); 04/26/22 Tr. at 3732–34 (Dr. Adam Rosendorff testified that he accessed and

13   used the LIS to view data and it was not "possible to look at the individual results [in LIS] and identify

14   them individually as accurate or inaccurate").  Indeed, Brent Bingham's testimony provides another

15   example of how raw data in LIS would be insufficient to answer the core question of whether the result

16   was accurate or inaccurate—because Bingham's health condition causes his normal health base line to

17   fall well above the reference range for platelets—but in LIS looking at just the result number without the

18   relevant reference range would not identify which of Bingham's Theranos test results were inaccurate.

19   05/18/21 Tr. at 5940–63.  Rather, as Defendant admits, "an LIS test result might need to be compared

20   with other data or with the patient's records and testimony" (ECF No. 1448 at 9), which is why

21   Dr. Rosendorff explained LIS was "at least *one of the tools*" used to investigate whether a result was

22   inaccurate but it was impossible to identify an individual result as accurate or inaccurate solely from

23   LIS.  *See* ECF No. 1440 at 5; ECF No. 1448 at 4 (emphasis added).  In addition, the evidence at

24   Defendant's trial suggested that the LIS was missing large swaths of data.  *See* ECF No. 1440 at 6

25   (detailing relevant testimony).

26        Furthermore, Defendant knew of, had better access to, and also failed to obtain a functioning

27   copy of the LIS when it was destroyed.  Although Theranos discontinued patient testing in summer

28   2016, employees at Theranos had access to the LIS throughout the first half of 2018 and were able to run

queries throughout Theranos' testing data and generate reports from that data. On August 28, 2018, three days before Theranos was set to vacate the facility where it maintained the LIS database hardware, Theranos executives and attorneys convened a call to discuss the upcoming shutdown of the LIS system. *See* ECF No. 681-37. Theranos—but not the government—was aware that, once the LIS was put into storage, it might become "very difficult to resuscitate." *Id.* This conference call included two Theranos employees, Michael Chung and Eric Caddenhead, and Vinaswathan "Shekar" Chandrasekaran, the principal of an outside technology firm hired by Defendant Balwani to create and maintain the LIS database. *See id.*; ECF No. 1423 at 2. Defendant's counsel has represented that Mr. Chandrasekaran was on the August 28, 2018, call because he was attempting to secure a copy of LIS for Defendant, but he was ultimately unsuccessful in doing so. *See* 02/08/22 Tr. at 12–14, 21–26.

After the Court permitted Defendant's Microsoft SQL expert to testify in a limited fashion with respect to what *could* have been done to reconstruct the LIS database after Theranos destroyed it (*see* ECF No. 1464), Defendant sought a so-called "missing evidence" instruction. The Court did not err in declining to give the requested instruction where the Ninth Circuit model instruction, itself, requires that the government *intentionally* destroyed or failed to preserve evidence for the trial (*see* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit § 3.19), and negligence might suffice to trigger such an instruction when *the government* destroys evidence within its possession, *see United States v. Sivilla*, 714 F.3d 1168, 1171–74 (9th Cir. 2013). The facts of this case could not be further from those presented to the Court in *Sivilla*. Here, after multiple subpoenas from the government over many months seeking a functioning copy of the LIS database, Theranos ultimately provided a non-functioning copy and then destroyed the only working copy. While Defendant's expert opined it was theoretically possible to reconstruct the LIS database, he also testified that he, himself, was unable to do so. *See* 06/09/22 Tr. at 6759–6760; *see also id.* at 6844–6888 (Court declining to provide instruction).

Regardless, as the government argued in closing, "LIS is limited to the patient counts" and "LIS is not related to the investor counts." 06/21/22 Tr. at 7079. Thus, as noted above, even if Defendant raised a debatable question—which he has not—he is unlikely to obtain the relief he seeks with respect to *all counts* of conviction. For reasons stated here and in prior arguments on this topic, Defendant does not raise a substantial question with respect to the LIS database that Theranos destroyed.

### 5.   The Court Did Not Err in Its Relevant Rulings Regarding Dr. Rosendorff

Defendant does not present a substantial question regarding the extent of his cross-examination of Dr. Adam Rosendorff or his post-trial statements at co-Defendant Holmes' residence.  *Cf.* Mot. at 22–23.  Dr. Adam Rosendorff worked as the CLIA laboratory director at Theranos from April 2013 until he resigned in November 2014.  Since then, he has worked at a number of other large companies, some of which have faced scrutiny from government entities.  *See* ECF No. 1405.  Some of that scrutiny concerned time periods when Dr. Rosendorff did not work for the relevant company or arose from conduct wholly unrelated to his role in the company.  *See id.*  Nevertheless, Defendant sought to use the simple fact of investigations at companies where he once worked to impugn Dr. Rosendorff's competence and his motives for testifying.  The Court permitted co-Defendant to make limited inquiry about a then-ongoing investigation of the lab Dr. Rosendorff had been working at during her trial where one possible outcome was a sanction that could have involved Dr. Rosendorff's professional license.  10/05/21 Tr. at 2567–68, 2717–20.  Subsequently, that investigation resolved without any sanctions imposed whatsoever.  *See* ECF Nos. 1405, 1405-2, 1405-3.  Thus, during Defendant's separate and subsequent trial, the Court denied Defendant's request to inquire into this area, as the threat of bias had evaporated and was too "speculative and attenuated."  04/20/22 Tr. at 3216–17.

The evidence about Dr. Rosendorff's post-Theranos employment did not constitute evidence of bias.  "The point of a bias inquiry is to expose to the jury the witness' special motive to lie by revealing facts such as interest in the outcome of the trial or personal animosity or favoritism toward the defendant" or prosecution.  *United States v. Hankey*, 203 F.3d 1160, 1171 (9th Cir. 2000) (internal citations omitted) (citing *United States v. Abel*, 469 U.S. 45 (1984)).  For example, in *Abel*, the Supreme Court held that evidence showing defendant and a defense witness were both members in a gang and one of the gang's tenets required its members to lie to protect each other was admissible as bias evidence against that witness.  469 U.S. at 52–53.  By contrast, here, Defendant has not shown—and cannot show—that subsequent investigations of companies where Dr. Rosendorff worked at certain times after he resigned from Theranos gives rise to a motive for Dr. Rosendorff to lie or slant his testimony.  Furthermore, each of the investigations Defendant references began in 2021 *after* Dr. Rosendorff had already given prior consistent statements regarding his percipient observations while working at

1    Theranos in civil depositions and multiple interviews with the FBI related to this case—negating

2    Defendant's claim that questioning regarding these three companies would show Dr. Rosendorff's

3    motive to slant his testimony favorably for the prosecution.  *Compare* ECF No. 1401-3 at 92, 105

4    (Invitae subpoena announced November 2021), 273 (uBiome indictment announced March 2021), 279

5    (CMS sends findings to CDPH Branch Lab in February 2021), *with*, *e.g.*, 09/28/21 Tr. at 1976:4–13

6    (describing civil deposition in February 2019).  There is no substantial question that the Court properly

7    held that the relevance of these topics was too "speculative and attenuated."  04/20/22 Tr. at 3216–17.

8           Similarly, there is no substantial question regarding Dr. Rosendorff's post-trial statements to co-

9    Defendant Holmes' partner, at her residence, without Defendant Balwani present, given that the Court

10   held an evidentiary hearing on this topic in co-Defendant's case and Dr. Rosendorff clarified under oath

11   what he meant.  *See* 10/17/22 Tr.; ECF No. 1636 at 3–8.  Specifically, Dr. Rosendorff repeatedly

12   "testified that he did *not* believe the government was making things sound worse than they were at trial"

13   and clarified that his statements about employees working hard to do something good at Theranos "did

14   not intend to include Ms. Holmes and Mr. Balwani[.]"  ECF No. 1636 at 3–8.  The Court found that

15   Dr. Rosendorff's post-trial statements were "too vague and general to imply any specific [prior]

16   testimony was actually false or misleading" and thus failed under *Napue*.  *Id.* at 6–8.  The Court further

17   held that the statements were immaterial and unlikely to affect the counts of conviction given that

18   "Dr. Rosendorff's post-trial statements only pertained to the *internal* operations at Theranos and,

19   therefore, are unlikely to affect the Defendant's convictions for investor fraud that featured Defendant's

20   representations of Theranos's *external* partnerships."  *Id.* at 8.  Defendant cannot show that he would

21   have fared better if he were granted a similar hearing.  Thus, any error—of which there was none—

22   would be harmless with respect to the investor counts and could not undermine *all counts* of conviction.

23
                    **6.    The Court Did Not Err in Admitting Certain Exhibits Related to the
24                          Department of Defense**

25          Defendant's two remaining issues do not raise substantial questions, either.  *Cf.* Mot. at 23–24.

26   The false statements that Defendants made to the Department of Defense were inextricably intertwined

27   with the investor-related fraud counts for at least two reasons.  First, Theranos had to get the Defense

28

1   Department interested in its product so that Defendants could exaggerate their involvement with the

2   military to investors later. Second, and even more importantly, this evidence was important to show

3   Defendant's intent and knowledge that the statements Defendants made to investor-victims about

4   Theranos' work with the Department of Defense were, in fact, false. *See* 04/13/22 Tr. at 2483–89.

5   Regardless, even if Defendant's claim on this point were fairly debatable, any error would be harmless

6   and non-prejudicial to all counts of conviction. *See* ECF No. 1575 at 4 n.1 (noting there is sufficient

7   evidence to uphold Defendant's conviction even setting aside false statements about Theranos' work

8   with the Department of Defense). Defendant distanced himself from the misrepresentations regarding

9   work with the military at trial by emphasizing that co-Defendant Holmes largely managed those

10  relationships, with very little involvement by Defendant. *See* 04/13/22 Tr. at 2586–89. Defendant

11  cannot show in a case involving lies on multiple topics to investors and patients that somehow lies to the

12  Department of Defense tipped the balance, particularly when he, himself, consistently asserted he was

13  less involved in that aspect of Theranos' work.

14              **7.    The Court Properly Calculated a Reasonable Estimate of Loss to Victims**

15          There is no substantial question about whether the Court employed the proper burden of proof by

16  which the government must prove loss and—given that the government could have shown loss in the

17  hundreds of millions of dollars under either standard—it is unlikely that Defendant would obtain

18  probation or a sentence of 4-10 months as he claims. *Cf.* Mot. at 24. "The guidelines do not present a

19  single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and

20  individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). The

21  Court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1(b) note 3(C). Because the

22  Court is in a "unique position to assess the evidence and estimate the loss," its determination is entitled

23  "to appropriate deference." *Id.* "Because [Balwani] was convicted of conspiracy, and because the

24  losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard applies."

25  *See United States v. Laurienti*, 611 F.3d 530, 556–57 (9th Cir. 2010).

26          If the Court had used solely the loss to the substantive counts associated with investor-victims

27  who testified, or had a representative testify, at trial—the loss would be more than $212 million. *See*

28  ECF No. 1661 at 23–24. Since Balwani also was convicted of conspiracy to commit wire fraud against

Theranos investors during the period 2010 to 2015 (ECF No. 1507)—the total invested in that time period is over $800 million. *See* ECF No. 1661 at 24. The Court concluded at sentencing that it is necessary to ascribe *some value* to Theranos stock purchased at or near the time victims invested, and made detailed findings based upon a report by Carl Saba, a partner with the Forensic Consulting Group at Hemming Morse, LLP, and a Certified Valuation Analyst and Accredited Senior Appraiser with decades of experience in the valuation of businesses. 12/07/22 Tr. at 85–93. The Court found Saba's report to be generous and quite favorable to Theranos—and based upon it made a reasonable estimate of the loss to Theranos investors based on Defendant's conduct of more than $120 million. *Id.* This approach aligns with the Ninth Circuit's instruction that "district courts should 'take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.'" *United States v. Martin*, 796 F.3d 1101, 1110 (9th Cir. 2015) (quotation omitted). Defendant identifies no clear error in the court's factual findings. *See Zolp*, 479 F.3d at 718.

In sum, there was no error, and this is an issue where the Court is in a "unique position" and entitled to "appropriate discretion." Defendant Balwani cannot show a substantial question on the Court's loss calculation.

## CONCLUSION

For the reasons stated above, the government respectfully requests that the Court deny Defendant Balwani's Motion for release pending appeal.


DATED: January 30, 2023

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


   */s/ Kelly I. Volkar*
JEFFREY B. SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
KELLY I. VOLKAR
Assistant United States Attorneys

# Exhibit 1

```
 1                    GRAND JURY 20-1

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                                      ORIGINAL
 4

 5   GJ INVESTIGATION NO. 2016R00024

 6

 7

 8

 9

10        REPORTER'S TRANSCRIPT OF PROCEEDINGS

11        TESTIMONY OF CHRISTOPHER McCOLLOW

12            AT 450 GOLDEN GATE AVENUE

13         SAN FRANCISCO, CALIFORNIA 94102

14              TUESDAY, JULY 14, 2020

15

16

17

18

19   FOR THE GOVERNMENT:

20   DAVID L. ANDERSON,

21   UNITED STATES ATTORNEY

22   BY:  ROBERT LEACH, AUSA

23   UNITED STATES DEPARTMENT OF JUSTICE

24   450 GOLDEN GATE AVENUE

25   SAN FRANCISCO, CALIFORNIA 94102
```

1    Q.   And did Ms. Gould tell the government that

2  she received a Theranos test indicating that she

3  was aborting her baby when in fact she was still

4  pregnant?

5    A.   That she had lost the baby, yes.

6    Q.   I draw your attention to the second part

7  of this email exchange where Mr. Holmes writes:

8  "We also have a capacity issue right now with

9  edisons at full capacity and venous samples in a

10  serious queue not being run.  Went down there and

11  it's a complete mess."  Do you see that language?

12    A.   I do.

13    Q.   Okay.  The "edison."  What, again, is the

14  Edison?

15    A.   The Edison is the Theranos proprietary

16  device that they used to... in the CLIA lab to test

17  certain types of samples.

18    Q.   Let me go forward in time to June 25th,

19  2014.  I draw your attention to the next slide,

20  which relates to excerpts of Grand Jury Exhibit

21  122.  Do you see down at the bottom Christian

22  Holmes writing:  "Questions about

23  Potassium/Calcium/Sodium/Chloride represent the

24  vast majority of 'issues' docs have with us

25  currently when I have my calls"?

```
 1      A.    Yes, I do.
 2            (The document referred to was pre-marked
 3   as Grand Jury Exhibit No. 122 for identification
 4   and is attached hereto.)
 5      Q.    And did he summarize additional facts
 6   relating to the calcium and potassium tests in the,
 7   in the next email?
 8      A.    He did.
 9      Q.    And what did Mr. Balwani write in response
10   to receiving this?
11      A.    Mr. Balwani wrote on June 25th, 2014:
12   "Can you please make this the top priority.  This
13   is causing us a lot of pain."
14      Q.    Let me draw your attention to the next
15   slide relating to Grand Jury Exhibit 123.  Does
16   this appear to contain excerpts of an email dated
17   August 16th, 2014 where Chinmay Pangarkar is
18   reporting the status on different assays that the
19   company is developing for use?
20      A.    Yes.
21            (The document referred to was pre-marked
22   as Grand Jury Exhibit No. 123 for identification
23   and is attached hereto.)
24      Q.    And among the tests that he talks about is
25   the hCG, TSH, free T3, and the HIV test?
```

99

ER-426

```
 1        A.    Yes.
 2        Q.    And is he saying things like:  "The
 3   current assays which are live are also taking quite
 4   a lot of time"?
 5        A.    He says that, yes.
 6        Q.    Okay.  Does he say there's a high
 7   frequency of patients who have very high TST?
 8        A.    Yes.
 9        Q.    Does he say for "Progesterone":  "We do
10   not have sufficient sensitivity at the low end, as
11   compared to the immulite"?
12        A.    Yes.
13        Q.    Immulite, that's a third-party device like
14   the ADVIA made by Siemens?
15        A.    It is.  Yes.
16        Q.    Okay.  And does he also say "HIV 1
17   continues to be an issue"?
18        A.    He does.  Yes.
19        Q.    Let me draw your attention to the next
20   slide relating to Grand Jury Exhibit 124.  Are
21   these portions of an email dated August 25th, 2014
22   relating to PT/INR?
23        A.    Yes.
24              (The document referred to was pre-marked
25   as Grand Jury Exhibit No. 124 for identification
```

BEHMKE REPORTING and VIDEO SERVICES, INC.
(415) 597-5600

1   and is attached hereto.)

2       Q.   And have we excerpted here portions of a

3   complaint that one of Theranos' phlebotomists is,

4   is sending to others within the company?

5       A.   Yes, it is.

6       Q.   And is the phlebotomist saying that she's

7   been taking anticoagulants or, or blood thinners

8   for 14 years and she's been within the recommended

9   range for about 13 years?

10      A.   She said that.  Yes.

11      Q.   Okay.  And did she say her standing order

12  was changed to Theranos and when the results came

13  back, they were out of range, too low?

14      A.   Yes.

15      Q.   And did the doctor increase, according to

16  this, her dosage of Coumadin as a result of that

17  test?

18      A.   Correct.

19      Q.   And is she reporting that after the change

20  in medication, she wasn't feeling right since the

21  one increased dose and also experienced skin

22  bruising on her legs and arms?

23      A.   It's cut off for the grand jurors, but,

24  yes, that's what it says.

25      Q.   Okay.  I'll just read this.  "This was

1  last week.  I have not felt 'right' since the one

2  increased dose and also experienced various skin

3  bruising on my legs and arms almost immediately

4  after the one dose."  Is that consistent with your

5  understanding of this complaint?

6      A.    Yes.

7      Q.    What did Dr. Young have to say about this

8  to Mr. Balwani?

9      A.    He states in an email that:  "As I

10  mentioned, I had some concerns a few weeks back

11  about sample stability for PT/INR only when

12  patients are under Coumadin treatment."

13      Q.    And what was Mr. Balwani's...  Did

14  Mr. Balwani forward this to Ms. Holmes?

15      A.    He did.

16      Q.    What did he tell Ms. Holmes?

17      A.    So just quickly, Dr. Young also said to

18  Mr. Balwani that we need to create a study plan to

19  evaluate this and are working on recruiting

20  patients for the study, and then Mr. Balwani

21  forwarded that email to Ms. Holmes, who said

22  "Always another study after the fact."

23      Q.    That day did Mr. Balwani also ask

24  Dr. Young about what other assays you have concerns

25  with and, if so, send me a list so I can prioritize

1  those over other work?

2      A.   Yes.  He did.

3      Q.   And is that email reflected, portions of

4  it, on the next slide; Grand Jury Exhibit 125,

5  August 25th, 2014?

6      A.   Yes.  It is.

7           (The document referred to was pre-marked

8  as Grand Jury Exhibit No. 125 for identification

9  and is attached hereto.)

10     Q.   And did those other assays that Dr. Young

11 escalate include hCG, testosterone, vitamin $B_{12}$,

12 TSH, $CO_2$, glucose, potassium, and $CO_2$?

13     A.   Correct.  Yes.

14     Q.   Let me draw your attention to Grand Jury

15 Exhibit 30.  Does this relate to an email relating

16 to $CO_2$ testing?

17     A.   It does.

18     Q.   And down at the bottom is this excerpts of

19 Dr. Rosendorff's testimony about $CO_2$?

20     A.   Yes, it is.

21     Q.   And he said what happens is that the

22 samples are collected in Phoenix, or in other parts

23 of Arizona.  The $CO_2$, the gas, leaves the tiny test

24 tubes, the microtainers, and your $CO_2$ drops, so you

25 get falsely depressed $CO_2$ values.  Is that a fair

103

1    summary of his testimony?

2        A.    It is.

3        Q.    And did Dr. Rosendorff want to start

4    reporting...  You can see this in the underlying

5    language of the email.  ...$CO_2$ voided by lab due to

6    stability issues?  Is that what Dr. Rosendorff

7    wanted to do?

8        A.    It is.  Yes.

9        Q.    Is that ultimately what Theranos did?

10       A.    I'm sorry.  Can you go back to that,

11   please?

12       Q.    Yes.

13       A.    The proposed alternative messaging was

14   "$CO_2$ results are not available due to temporary

15   unavailability of the test.  We apologize for the

16   inconvenience."

17       Q.    Okay.  Let me draw your attention to the

18   next slide.  Do you see at the top where it says

19   "8/27/2014 (CO2)"?

20       A.    Yes.

21       Q.    And is this a further dialogue between

22   Ms. Holmes and Mr. Balwani about voided $CO_2$

23   results?

24       A.    It is.

25       Q.    I draw your attention to the middle

# EXHIBIT 10

Confidential

1    IN THE UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF ARIZONA

3  IN RE:       )

4           ) Civil Action No.

5  THERANOS INC.,    ) No. 2:16-cv-2138-HRH

6  LITIGATION,     )

7

8

9     *** CONFIDENTIAL ***

10

11   VIDEOTAPED DEPOSITION OF WADE MIQUELON

12      August 9, 2019

13      Chicago, Illinois

14

15

16

17

18

19

20

21

22

23 REPORTED BY:
   Sheri E. Liss,
24 CSR, RPR, CRR, CLR

25 JOB NO. 10057960

ER-433

Wade Miquelon                                    In re Arizona Theranos, Inc. Litigation

1   Foundation.

2   BY THE WITNESS:

3        A.    I don't recall.

4   BY MS. HOWARD:

5        Q.    **Did you have any understanding of how**

6   **Theranos when it was partnering with Walgreens was**

7   **addressing throughput issues as you were rolling out**

8   **more and more testing locations?**

9              MR. LEVINE:  Objection.  Foundation.

10  BY THE WITNESS:

11       A.    I was not involved in that.

12  BY MS. HOWARD:

13       Q.    **Did you have any understanding as to**

14  **whether Theranos was using commercial testing**

15  **equipment?**

16       A.    I had a limited understanding.

17       Q.    **And what was your understanding?**

18       A.    My understanding was that two things,

19  one is that they had some commercial equipment which

20  was used to be able to do, again, I don't know if

21  calibration is the right word, but this back and

22  forth checking of traditional equipment versus

23  Theranos equipment.  And I also recall that Sunny

24  and Elizabeth saying that when we started up that

25  there might always be some tests that require venous

1  puncture by their very nature but over time this

2  should be very, very small.

3      **Q.    And what was your understanding about**

4  **how those tests that required venous puncture would**

5  **be analyzed?**

6      A.    My understanding is the ones that

7  required venous puncture would be done on a

8  traditional lab test machine or perhaps outsourced

9  to a lab.  They would not be run on the Edison.

10      MS. HOWARD:  I don't have any further

11  questions.  Thank you.

12      MR. LEVINE:  None here.

13      MS. SEEGER:  We'll reserve signature.

14      MS. GARDNER:  Plaintiffs object to three

15  exhibits that don't have Bates numbers for this

16  litigation, and request that Balwani's counsel

17  substitute and produce copies or meet an confer

18  about the issue.

19      MS. HOWARD:  For clarity, those are

20  Exhibit Nos. 285, 286 and 289; is that correct?

21      MS. GARDNER:  Yes, that is correct.

22      THE VIDEOGRAPHER:  This concludes the

23  deposition.  The time is 4:38.  Off the record.

24      (Whereupon, the proceedings

25      were concluded.)

Case 5:21-cv-03258-EJD Document 107-16 Filed 12/02/22 Page 62 of 82

```
 1            I further certify that I am not counsel

 2   for nor in any way related to any of the parties to

 3   this suit, nor am I in any way interested in the

 4   outcome thereof.

 5            I further certify that this certificate

 6   applies to the original signed and certified

 7   transcripts only.  I assume no responsibility for

 8   the accuracy of any reproduced copies not made under

 9   my control or direction.

10            IN TESTIMONY WHEREOF I have hereunto set

11   my hand this 19th day of August, 2019.

12

14

15

16

17

18

19            Sheri E. Liss, CSR, RPR, CRR, CLR

20

21

22

23

24

25
```

**Page 240**

# EXHIBIT 27

ER-437

PC0000001

# PERKINSCOIE

COUNSEL TO GREAT COMPANIES

- August 17, 2017

## Overview of Theranos' IP Assets and Near-Term Licensing Opportunities

Perkins Coie LLP

PC0000002

# Introduction to Theranos' Patent Portfolio

PERKINSCOIE

Theranos Has a Robust and Young Patent Portfolio

- Worldwide: Approximately 1,144 total assets
  - 318 granted patents

- United States: Approximately 316 total assets
  - 107 granted patents
  - 209 pending applications

PERKINSCOIE

PC0000003

ER-440

# Distribution of Theranos' Portfolio Worldwide



| | US | AU | EP | CN | KR | CA | JP | SG | IL | MX | HK | IN | NZ | WO | Other* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grant | 107 | 22 | 8 | 11 | 24 | 2 | 16 | 0 | 0 | 7 | 31 | 2 | 0 | 0 | 16 |
| Application | 131 | 42 | 53 | 49 | 34 | 54 | 38 | 44 | 44 | 35 | 0 | 25 | 22 | 8 | 17 |

Source: Innography, independent analysis. Includes active assets (grants and published applications) (Patent data provided as of August 16, 2017).
*Other consists of the following additional jurisdictions: RU, TW, ES, BR, DK, AR, AT, PT.

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 4

PC0000004

ER-441

PC0000005

# Theranos Portfolio Expiration Histogram (U.S. Patents)



Source: Innography, independent analysis. Includes active US grants (Patent data provided as of August 16, 2017).

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 5

ER-442

# Theranos Portfolio Innography Strength Ranges



Source: Innography, independent analysis. Includes active grants (Patent data provided as of August 16, 2017).
Strength Ranges are based on Innography's proprietary algorithm designed to identify (objectively) the strength of a patent.

# Top 20 Assignees for Theranos' Top 10 Class Codes

| Rank | Ultimate Parent | Asset Count |
|------|-----------------|-------------|
| 1 | Theranos Inc. | 328 |
| 2 | Siemens AG | 231 |
| 3 | Unassigned | 202 |
| 4 | Olympus Corporation | 112 |
| 5 | Roche Holding Ltd. | 105 |
| 6 | Sony Corporation | 103 |
| 7 | Sysmex Corporation | 95 |
| 8 | Proteus Digital Health, Inc. | 90 |
| 9 | Johnson & Johnson | 80 |
| 10 | Hitachi, Ltd. | 79 |
| 11 (tie) | Heartflow Inc | 78 |
| 11 (tie) | Nokia Corporation | 78 |
| 13 | Samsung Electronics Co., Ltd. | 75 |
| 14 | Medtronic plc | 71 |
| 15 | Koninklijke Philips NV | 66 |
| 16 | Huawei Technologies Co., Ltd. | 65 |
| 17 | Fujitsu Limited | 64 |
| 18 | Meso Scale Technologies LLC | 54 |
| 19 | International Business Machines Corp. | 52 |
| 20 | Canon Inc. | 51 |

Top 10 CPC codes are based on WW active assets (i.e., grants and published applications). Unassigned are assets without recorded assignments at the national PTOs. Source: Innography (Patent data provided as of August 16, 2017).

PC0000007

## Theranos' Patents Are Quite Valuable

- High (90+) Innography Ratings

- Strong claims, as assessed by Perkins Coie

- Coverage over technology that the market uses, and likely to be infringed by competitors

- Technology that Theranos views as central to POC / Diagnostic devices

- Many years until patent terms expire

  - You should perform your own analysis to assess the strength of these patents

PERKINSCOIE

# Example: U.S. Patent No. 8,283,155

**Title:** Point-of-Care Fluidic System and Uses Thereof

**Priority Date:** May 9, 2005

**Expiration Date:** July 4, 2026



# Example: U.S. Patent No. 8,679,407

**Title:** Systems and Methods for Improving Medical Treatments

**Priority Date:** May 9, 2005

**Expiration Date:** April 26, 2027



# Example: U.S. Patent No. 8,841,076

**Title:** Systems and Methods for Conducting Animal Studies

**Priority Date:** March 24, 2006

**Expiration Date:** June 21, 2029



**PERKINSCOIE**

PC0000011

# Example: U.S. Patent No. 8,741,230

**Title:** Systems and Methods of Sample Processing and Fluid Control in a Fluidic System

**Priority Date:** March 24, 2006

**Expiration Date:** June 21, 2029

PC0000012

---

(12) **United States Patent**
Holmes et al.

(10) Patent No.: **US 8,741,230 B2**
(45) Date of Patent: *Jun. 3, 2014

(54) SYSTEMS AND METHODS OF SAMPLE PROCESSING AND FLUID CONTROL IN A FLUIDIC SYSTEM

(75) Inventors: Elizabeth A. Holmes, Palo Alto, CA (US); Shaunak Roy, San Mateo, CA (US); Ian Gibbons, Portola Valley, CA (US); Shize Daniel Qi, Arcadia, CA (US); Edmund Ku, Sunnyvale, CA (US); Chin Yieh Siew, San Jose, CA (US); Melissa Takahashi, Mountain View, CA (US); Bruce Johnson, Cupertino, CA (US); Jeff Jensen, San Jose, CA (US); Keith Maverick, Palo Alto, CA (US); Don Springhorn, Alameda, CA (US); Anthony Delaurae, Fremont, CA (US)

(73) Assignee: Theranos, Inc., Palo Alto, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1185 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 11/554,509

(22) Filed: Oct. 30, 2006

(65) **Prior Publication Data**
US 2007/0224084 A1    Sep. 27, 2007

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/388,410, filed on Mar. 24, 2006, now abandoned, and a continuation-in-part of application No. 11/388,415, filed on Mar. 24, 2006, and a continuation-in-part of application No. 11/388,823, filed on Mar. 24, 2006, and a continuation-in-part of application No. 11/388,824, filed on Mar. 24, 2006, and a continuation-in-part of application No. 11/388,723,

filed on Mar. 24, 2006, and a continuation-in-part of application No. 11/389,409, filed on Mar. 24, 2006, now Pat. No. 7,635,594.

(51) **Int. Cl.**
G01N 33/48  (2006.01)
G01N 33/00  (2006.01)
C12Q 1/68  (2006.01)
C12Q 1/00  (2006.01)

(52) **U.S. Cl.**
USPC ................. 422/68.1; 422/64.1; 422/50

(58) **Field of Classification Search**
USPC .................................. 422/50, 68.1, 50, 90
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,003,379 A   1/1977 Ellinwood
4,146,029 A   3/1979 Ellinwood
(Continued)

FOREIGN PATENT DOCUMENTS

CN          2158960   7/2003
EP          0810005 A1   1/2005
(Continued)

OTHER PUBLICATIONS

Beaucab, et al. The quantum-mechanics of larger semiconductor clusters. Annu. Rev. Phys. Chem. 1990; 41:477-496.
(Continued)

Primary Examiner — Christine T Mui

(57) **ABSTRACT**

This invention is in the field of medical devices. Specifically, the present invention provides portable medical devices that allow real-time detection of analytes from a biological fluid. The methods and devices are particularly useful for providing point-of-care testing for a variety of medical applications.

53 Claims, 46 Drawing Sheets

# Example: U.S. Patent No. 8,470,524

**Title:** Reducing Optical Interference in a Fluidic Device

**Priority Date:** October 13, 2006

**Expiration Date:** October 13, 2026

---

(12) **United States Patent**
Gibbons et al.

(10) Patent No.: **US 8,470,524 B2**
(45) Date of Patent: *Jun. 25, 2013

(54) REDUCING OPTICAL INTERFERENCE IN A FLUIDIC DEVICE

(75) Inventors: Ian Gibbons, Portola Valley, CA (US); Michael O'Connell, San Jose, CA (US)

(73) Assignee: Theranos, Inc., Palo Alto, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.
This patent is subject to a terminal disclaimer.

(21) Appl. No.: 13/188,288

(22) Filed: Jul. 21, 2011

(65) Prior Publication Data
US 2012/0021453 A1 Jan. 26, 2012

Related U.S. Application Data

(63) Continuation of application No. 11/949,558, filed on Oct. 13, 2006, now Pat. No. 8,012,744.

(51) Int. Cl. C12Q 1/68 (2006.01)

(52) U.S. Cl. USPC ... 435/4; 435/287.1; 435/288.5; 435/288.7; 435/7.1; 427/2.13

(58) Field of Classification Search None
See application file for complete search history.

(56) References Cited

U.S. PATENT DOCUMENTS

4,986 Bhana et al.
8,1995 Coleman et al.
4,1997 Paroczay et al.

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 2005/ | 11/2005 |
| WO | WO 2007/ | 08/2007 |
| WO | WO 2006/ | 4/2006 |
| WO | WO 2007/ | 5/2009 |

OTHER PUBLICATIONS

European search report dated May 25, 2010 for Application No. ...
International search report date Sep. 6, 2006 for PCT Application No. ...
Sambrook, et al. Molecular Cloning. A Laboratory Manual 3rd Edition, Cold Spring Harbor Laboratory Press, New York, 2001. (Cover pages and table of contents only)

Primary Examiner — N C Yang
(74) Attorney, Agent, or Firm — Wilson Sonsini Goodrich & Rosati

(57) ABSTRACT

This invention is in the field of medical devices. Specifically, the present invention provides portable medical devices that allow real-time detection of analytes from a biological fluid. The methods and devices are particularly useful for providing point-of-care testing for a variety of medical applications. In particular, the medical device reduces interference with an optical signal which is indicative of the presence of an analyte in a bodily sample.

31 Claims, 6 Drawing Sheets

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 13

PC0000013

# Example: U.S. Patent No. 8,012,744

**Title:** Reducing Optical Interference in a Fluidic Device

**Priority Date:** October 13, 2006

**Expiration Date:** July 15, 2028

# Example: U.S. Patent No. 8,883,518

**Title:** Systems and methods of fluidic sample processing

**Priority Date:** August 6, 2007

**Expiration Date:** August 6, 2028



PERKINSCOIE

PC0000015

ER-452

## Identified Potential Infringement Claims

| Product | 8,283,155 | 8,841,076 | 8,679,407 | 8,470,524 | 8,012,744 | 8,883,518 | 8,741,230 |
|---|---|---|---|---|---|---|---|
| | ● | | | | | | ● |
| | | | ● | | | | |
| | ● | ● | ● | | | | |
| | | ● | | | | | |
| | ● | ● | | ● | ● | | |
| | | | | ● | ● | | |
| | | | | ● | ● | | |
| | ● | | | | | | |
| | ● | | | | | ● | |

Based on Presently-Available Information & Analysis; Subject to Change; Not a Guarantee of Infringement or Successful Litigation Result

**PERKINSCOIE**

PC0000016

ER-453



PERKINScoie

Perkins Coie LLP | Confidential | 17

PC0000017

# Example of a Target Infringement Read:

Overview of product



PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 18

PERKINSCOIE

ER-455

# Example of Target: (cont'd)



PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 19

**PERKINS**COIE

PC0000019

Example of Target: (cont'd)

PERKINSCOIE

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 20

PC0000020

## Example of Target: (cont'd)

PERKINSCOIE

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 21

PC0000021

Example of Target: (cont'd)

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 22

PERKINSCOIE

PC0000022

Example of Target: (cont'd)

## Example of Target: (cont'd)

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 24

PC0000024

PERKINSCOIE

Example of Target: (cont'd)



PERKINS**COIE**

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 25

PC0000025

PC0000026

# Potential Revenue Opportunities from Theranos' Patent Portfolio

PERKINSCOie

# Disclaimers / Understanding The Assumptions At Work

- This slide deck provides an estimate of revenue opportunities, which is intended for Theranos' internal assessment of its IP

  - Analysis is based on limited available information and assumptions based on licensing trends and historical experiences

  - The quality of public information—and therefore the quality of estimates—varies between target companies

  - Neither Theranos nor Perkins Coie represents that these revenue figures or projections are accurate

- The figures and analysis herein are being presented for discussion purposes only

  - You should not rely on the figures or analysis contained herein, or any statements made by Perkins Coie or Theranos related thereto

  - Rather, you should conduct your own analysis of the revenue opportunities and perform your own research regarding revenues

  - Later discussions are presumed to be at arms' length

PERKINSCoie

PC0000027

ER-464

# Disclaimers / Understanding The Assumptions At Work (Cont'd)

- This analysis is based on potential infringement claims identified to date

  - We are continuing to assess infringement reads against other companies, and related licensing opportunities

  - Accordingly, this analysis may understate the full revenue opportunity presented by Theranos' portfolio

  - We continue to monitor the market and search for relevant information regarding product revenues; we reserve the right to supplement or modify the revenue figures provided herein

  - We have excluded, for purposes of this analysis, the potential for lost profits, damages enhancements and recovery of attorneys' fees

**PERKINSCOIE**

PC0000028

ER-465

Third-party Analyses Project Strong Growth in POC Market

- MarketsandMarkets: Point-of-Care Diagnostics Market to reach $36.9 Billion by 2021, at **CAGR of 9.8%** from 2016 to 2021

- Allied Market Research: Global point of care diagnostics market valued at $23.0 Billion in 2015 and expected to reach $43.3 Billion by 2022, with **CAGR of 9.4%** from 2016 to 2022

- Zion Market Research: Global POC market valued at $23.5 Billion in 2016 and expected to reach $40.5B by 2022, with **CAGR of around 10%** between 2017 and 2022

- Kalorama: point-of-care technologies market up from $15.4B in 2015 to 18.4B in 2016 [equates to a **CAGR of 19.5%**]

PERKINSCOIE

PC0000029

ER-466

# Molecular POC Market CAGR Data (2015-2020)

- Molecular POC Market for Respiratory Tract Infections = 69.3%

- Molecular POC Market for Women's Health and Sexual Health = 65.7%

- Molecular POC Market for High-Burden Diseases (HIV, TB, Hepatitis, etc.) = 193%

- Molecular POC Market or GI Pathogens, HAIs and Bloodstream Infections = 42.4%

- Molecular POC Market for Non-Infections Diseases = 40.3%

*Source= Kalorama Information, Molecular Point of Care Diagnostics (March 2016)*

PERKINSCOIE

PC0000030

ER-467

# Estimated CAGR for Select Companies / Products

| Company | Years | CAGR |
|---------|-------|------|
|         |       |      |

PERKINSCOIE

PC0000031

ER-468

Recent Activity in the POC / Diagnostic Market Shows Value in Theranos' Patent Portfolio



PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 32

PERKINSCOIE

PC0000032

ER-469

Recent Activity in the POC / Diagnostic Market (Cont'd)

PC0000033

ER-470

PERKINSCOIE

Case Study:

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 34

PC0000034

PERKINSCOIE

Case Study: **[REDACTED]** (cont'd)

Foreign patent coverage for **[REDACTED]**:



'155 Patent Family

**Pending Applications**

- Europe
- Canada
- Israel
- India
- Mexico
- New Zealand

**Granted Patents**

- China
- Korea
- Australia
- Mexico

PERKINSCOIE

PC0000035

ER-472

Case Study:

PERKINSCOIE

Foreign Revenues Also Show Value Beyond the U.S. Borders

- In light of issues with foreign jurisdictions, we assumed that each target's foreign revenue potential equals 75% of US revenue potential

PERKINSCOIE

PC0000037

ER-474

Potential Revenue Opportunity:

PC0000038

PERKINSCOIe

ER-475

## Potential Revenue Opportunity:

PERKINSCOIE

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 39

## Potential Revenue Opportunity:

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 40

PerkinsCoie

PC0000040

Potential Revenue Opportunity:

PC0000041

PERKINSCOIE

ER-478

Potential Revenue Opportunity:

PerkinsCoie

PC0000042

ER-479

## Potential Revenue Opportunity:

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 43

PC0000043

**PERKINS**COIE

ER-480

Potential Revenue Opportunity:

PerkinsCoie.com | Privileged/Attorney Work Product | Confidential 44

PC0000044

PERKINSCOIE

ER-481

Potential Revenue Opportunity:

PERKINSCOIE

PC0000045

# Total Potential Revenue Opportunity

Estimated Past US Revenue Base = $453.6MM

Estimated Future US Revenue Base = $3,094MM

Total Estimated US Revenue Base = $3,548MM

Estimated Licensing and Revenue Opportunity (US):

    6% Royalty = $213MM

    8% Royalty = $286MM

    10% Royalty = $355MM

    12% Royalty = $426MM

Estimated Licensing and Revenue Opportunity (Foreign):

    6% Royalty = $160MM

    8% Royalty = $213MM

    10% Royalty = $266MM

    12% Royalty = $319MM

Estimated Licensing and Revenue Opportunity (US + Foreign):

    6% Royalty = $373MM

    8% Royalty = $499MM

    10% Royalty = $621MM

    12% Royalty = $745MM

PERKINSCOIE

PC0000046

ER-483

# Numerous Entrants In Point-of-Care Diagnostics

**Currently On The Market**

**Have Not Yet Entered The Market**



PC0000047

PERKINSCOIe

ER-484

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>RAMESH "SUNNY" BALWANI,<br>Defendant. | Case No. 5:18-cr-00258-EJD-1<br><br>**ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL** |

Defendant Ramesh "Sunny" Balwani was indicted on ten counts of wire fraud (Counts 3 through 12), in violation of 18 U.S.C. § 1343, and two counts of conspiracy to commit wire fraud (Counts 1 through 2), in violation of 18 U.S.C. § 1349. *See* Third Superseding Indictment ("TSI"), Dkt. No. 469. Pending before the Court is Mr. Balwani's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. For the reasons stated below, Mr. Balwani's motion is denied.

## I.     BACKGROUND

Jury selection began on March 9, 2022. Dkt. No. 1349. At the close of the Government's case-in-chief, Mr. Balwani made an oral motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. *See* 5/20/2022 Tr., Dkt. No. 1545, at 6331:24-25. Mr. Balwani simply asserted that "the government's case has failed to present sufficient evidence on every element of every count." *Id*. at 6332:1-3. Mr. Balwani stated, "[w]e are happy to address this in more detail when it's convenient for the court at a later time, but we do want to make that motion now under Rule 29." *Id*. at 6332:4-6. The Government opposed the motion, asserting that it "ha[d] submitted sufficient evidence to support each of the elements of each of the counts, and the court is within its

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
1

United States District Court
Northern District of California

1    prerogative to decide the motion or reserve until a later date." *Id*. at 6332:10-13. The Court

2    reserved decision on the motion pursuant to Federal Rule of Criminal Procedure 29(b).

3         At the close of all evidence, Mr. Balwani renewed his Rule 29 motion orally. *See* 6/9/2022

4    Tr., Dkt. No. 1549, at 6843:14-16. As before, the Court reserved judgment on the motion. *Id*. at

5    6844:2-3. Jury deliberations began on June 24, 2022. 6/24/2022 Tr., Dkt. No. 1554, at 7711. On

6    July 7, 2022, the jury reached a verdict. Dkt. No. 1507. The jury unanimously found Mr. Balwani

7    guilty on all counts.

8         After the verdict, the Court asked Mr. Balwani whether he intended to file any briefing in

9    support of his Rule 29 motion. He indicated that he would not be filing any briefing. The

10   Government likewise indicated that it would not be filing any briefing in opposition to Mr.

11   Balwani's motion. Neither party has requested oral argument on the motion. Accordingly, the

12   matter is ripe for decision.

13        Having considered the evidence and the relevant case law, the Court denies Mr. Balwani's

14   motion for judgment of acquittal.

15   **II.    STANDARDS**

16        Federal Rule of Criminal Procedure 29 permits a court to set aside a jury's guilty verdict

17   and enter a judgment of acquittal only if "the evidence is insufficient to sustain a conviction."

18   Fed. R. Crim. Proc. 29. Under this standard, "the relevant question is whether, after viewing the

19   evidence in the light most favorable to the prosecution, any rational trier of fact could have found

20   the essential elements of the crime beyond a reasonable doubt." *United States v. Riggins*, 40 F.3d

21   1055, 1057 (9th Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Courts

22   accord great deference to a jury's determination. *See Jackson*, 443 U.S. at 318–19. "The hurdle to

23   overturn a jury's conviction based on a sufficiency of the evidence challenge is high." *United*

24   *States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010). To overturn a jury's conviction, the

25   reviewing court must conclude that, viewing the facts in the light most favorable to the

26   government, "the government's proof was insufficient as a matter of law.'" *Id*.; *see also United*

27   *States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
                                        2

United States District Court
Northern District of California

# III. DISCUSSION

The Court concludes that there is sufficient evidence to convict Mr. Balwani on all counts.

## A. COUNTS 1 and 2—Conspiracy to Defraud

To prove a conspiracy to commit wire fraud under § 1349, the government had to prove (1) that Mr. Balwani and co-defendant Elizabeth Holmes agreed to commit wire fraud and (2) that Mr. Balwani became a member of the alleged conspiracy knowing one of its objects and intending to help accomplish it. Final Jury Instructions, Dkt. No. 1630, No. 16.

### 1. Conspiracy to Defraud Investors

The evidence showed, and a reasonable jury could find, that Mr. Balwani and Ms. Holmes agreed to defraud investors to gain money. Ms. Holmes led several investor meetings, which Mr. Balwani attended, where she made false representations to investors. Investors also received investment binders that were prepared with Mr. Balwani's approval and knowledge. These investment binders included false representations. Mr. Mosley testified that the investment binder contained what he thought was a Pfizer report validating Theranos's technology. Dr. Weber testified that Pfizer did not prepare the report. The investor materials included another document with the Schering-Plough logo, which suggested to investors that Shering-Plough had validated Theranos's technology when it had not. Dr. Cullen testified that Schering-Plough did not give Theranos permission to use the Schering-Plough logo. Mr. Balwani's attendance at investor meetings, as well as his review and approval of the investor binders, support an inference of a conspiracy.

There was also evidence that Mr. Balwani made false representations directly to investors Pat Mendenhall and Brian Grossman. Mr. Balwani gave Mr. Grossman the investor binder. Based on information from the co-defendants, both Mr. Mendenhall and Mr. Grossman thought Theranos was not using third party devices. Investor Chris Lucas was also under the false impression that Theranos used only its own devices for blood testing. Mr. Grossman testified he was shocked when he learned that Theranos was not using its own devices to test blood.

The evidence showed that Mr. Balwani also participated in the conspiracy by providing

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL

3

false financial projections to investors. Ms. Yam, the controller at Theranos, testified that Theranos was not generating much revenue. Mr. Balwani and Ms. Holmes told Lisa Peterson and other investors from RDV that Theranos expected to have $140 million in revenue by the end of 2014 and nearly $1 billion in revenue by the end of 2015. Theranos never realized revenue that approached either of the projections.

The evidence showed that Mr. Balwani also played a key role in the conspiracy as the head of the CLIA lab. Theranos employees Dan Edlin and Dr. Rosendorff, CMS surveyor Ms. Bennett, and others confirmed that Mr. Balwani controlled the lab, even though he did not have the title of "lab director." Mr. Balwani hired his dermatologist, Dr. Dhawan, as lab director after Dr. Rosendorff left the company, but Dr. Dhawan spent only a few hours total working on Theranos work signing documents sent to him and visited the lab only once or twice. Lynette Sawyer, another "lab director," never set foot in the Theranos lab. A rational trier of fact could conclude that Mr. Balwani managed Dr. Dhawan and Ms. Sawyer such that they would not uncover problems at the lab and Theranos could maintain the appearance of a licensed CLIA lab to increase investors' confidence to invest.

The evidence showed that Mr. Balwani also played a key role in the conspiracy through his involvement with the Theranos-Walgreens relationship. Nimesh Jhaveri testified that a national rollout of Theranos lab testing in Walgreens stores was never guaranteed. He testified that Walgreens tracked certain metrics, such as the percentage of venous draws, and that percentage was never satisfactory to Walgreens. Mr. Jhaveri told Mr. Balwani he was concerned about the percentage of venous draws and whether Theranos would ever expand beyond Arizona if the percentage of venous draws remained around 40%. Mr. Balwani falsely represented to investors that it was reasonable to estimate that there would be 900 Walgreens locations by 2015.

The numerous text messages and emails between Mr. Balwani and Ms. Holmes also support the jury's conclusion that the co-defendants conspired to commit wire fraud. For example, in July 2015, Mr. Balwani told Ms. Holmes, " I am responsible for everything at Theranos. All have been my decisions too." *See* 6/21/22 Tr. (Closing Argument), Dkt. No. 551,

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
4

at 6974:3-6. In another text message, Mr. Balwani told Ms. Holmes, "we have to work together" on revenue. *Id.* at 6974:18-19. Mr. Balwani also told Ms. Holmes: "You are the company. We need revenue." *Id.* at 6974:23-24. Several witnesses, including but not limited to Mr. Edlin, Dr. Pandori, Lisa Peterson, and Brian Grossman testified about Mr. Balwani's and Ms. Holmes's cohesive working relationship and collaboration.

There is evidence to establish the second element of the investor conspiracy charge, that Mr. Balwani became a member of the alleged conspiracy knowing one of its objects and intending to help accomplish it. The evidence supports the jury finding that Mr. Balwani's and Ms. Holmes' objective was to secure investor money to support the company through fraud. Ms. Yam testified about the financial condition of Theranos. Text messages confirm that the co-defendants knew Theranos needed money. A rational trier of fact could conclude that the co-defendants intentionally made false statements to investors about the state of Theranos, its technology, and its future prospects because the company desperately needed funding.

### 2. Conspiracy to Defraud Patients

The evidence showed, and a reasonable jury could find, that Mr. Balwani and Ms. Holmes agreed to defraud patients to gain money. The evidence showed that the co-defendants were responsible for false statements on Theranos's website, in patient brochures, and in the press. For example, the evidence showed that Mr. Balwani and Ms. Holmes were the only individuals at Theranos with authority to approve the Chiat/Day marketing materials. Theranos's marketing materials included representations such as "highest levels of accuracy," or "highest quality," and the "full range of tests." Theranos also used the phrase "one tiny drop" to suggest to patients that Theranos had a full range of tests that could be run on blood drawn by fingerstick. There was evidence that the co-defendants knew the marketing representations were false, including evidence that Theranos disregarded professional advice to replace the phrases, including replacing the phrase "highest quality" with "high quality."

There is evidence that Mr. Balwani played another role in the conspiracy: controlling the CLIA lab. A rational trier of fact could conclude that Mr. Balwani stifled the concerns that Dr.

United States District Court
Northern District of California

ER-489

United States District Court
Northern District of California

Rosendorff, Erika Cheung and others raised about blood testing and unreliable test results. Former lab director Dr. Pandori also raised his concerns about the Edison with Mr. Balwani, and they were not well received. A rational trier of fact could conclude that Mr. Balwani later hired absentee lab directors Dr. Dhawan and Lynette Sawyer to avoid serious scrutiny of known problems in the lab, including the inaccuracy and unreliability of test results.

There is evidence to establish the second element of the patient conspiracy charge, namely that Mr. Balwani became a member of the alleged conspiracy knowing one of its objects and intending to help accomplish it. Mr. Balwani's and Ms. Holmes' objective was to secure investment money through fraud. As discussed previously, the co-defendants knew Theranos needed money. A rational trier of fact could conclude that the co-defendants intentionally made false statements to patients because the company needed revenue.

### B. COUNTS 3 through 12—Wire Fraud.

The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme, and (3) specific intent to defraud. *United States v. Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017). A scheme to defraud is a deceptive scheme or plan to "obtain money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (internal quotations omitted). *See also* Final Jury Instructions, Dkt. No. 1630, No. 20.

The evidence showed, and a rational trier of fact could find, that Mr. Balwani committed wire fraud.

#### 1. Investor Counts

There is evidence that Mr. Balwani and Ms. Holmes engaged in a scheme to defraud investors from 2010 to 2015. The co-defendants made several misrepresentations to investors to persuade them to invest and thus provide funding that Theranos desperately needed. Theranos disseminated the false statements to investors through its website, emails, media publications, as well as other means. Investors testified that the misrepresentations were important to their investment decisions. A non-exhaustive list of material misrepresentations is set forth below.

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
6

United States District Court
Northern District of California

First, Mr. Balwani misrepresented or was responsible for misrepresentations regarding the capabilities of Theranos's devices. Among other things, Theranos ran demos of the Theranos device using what was called the "null protocol" to shield device failure from investors. Mr. Jhaveri was present at one of the demos. He thought his blood was being tested on the Edison when it truth it was tested on a commercial device called the Advia. Investors were not told that Theranos was using third party devices. Rather, the co-defendants led investors to believe Theranos developed and manufactured its own technology for blood testing. The co-defendants also misrepresented to investors that Theranos's technology ran a full range of tests from just a fingerstick.

The co-defendants were responsible for false statements about the accuracy and reliability of Theranos's testing. Mr. Balwani knew these representations were false. As stated previously, Dr. Rosendorff, Ms. Cheung and others told Mr. Balwani they had concerns about the testing and unreliable test results. Former lab director Dr. Pandori also raised his concerns about the Edison with Mr. Balwani. There is also evidence that Mr. Balwani and Ms. Holmes agreed to remove "outlier" test results and to average out the rest of the results so that the Edison device would pass quality control.

Second, the co-defendants misrepresented to investors that GlaxoSmithKline, Pfizer, and Schering-Plough had completed their own technical validation of Theranos technology.

Third, the co-defendants misrepresented to investors that Theranos's relationship with Walgreens was going well and that Theranos were going to expand. They also failed to disclose to investors that Walgreens was not going to expand until Theranos reduced the number of venous draws.

Fourth, the co-defendants made false claims about work with the Department of Defense. Investors, including Lisa Peterson, Chris Lucas, Bryan Tolbert, and Brian Grossman, received false representations that Theranos's technology had been deployed by the Department of Defense on the battlefield, was saving lives, was in Afghanistan, and on medevac helicopters.

Fifth, the co-defendants gave investors false financial information. They misled investors

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
7

into believing Theranos was financially stable and generating revenue. Lisa Peterson, for example, thought Theranos was generating revenue in 2014. There is also evidence from which to infer that Mr. Balwani knew the financial projections were unattainable. Mr. Balwani knew the Walgreens 900 store rollout was not going to proceed unless Theranos reduced venous draws, and he knew Theranos did not have the technology to do so.

Specific intent to defraud can be inferred from much of the evidence already described above. As stated previously, Mr. Balwani regularly communicated with Ms. Yam and knew in 2013 that Theranos was down to $7 million in operating account. Yet Mr. Balwani represented to Mr. Mendenhall that Theranos could fund growth through current operations and was raising money only to accelerate business. The evidence showed and a rational trier of fact could conclude that Mr. Balwani knew these representations were false and were intended to deceive Mr. Mendenhall into investing. Intent to defraud can also be inferred from Mr. Balwani's review, approval, and distribution of the investor binders, and in particular, the financial information in the binders.

Intent to defraud can also be inferred from Mr. Balwani's representations to Mr. Mendenhall regarding Theranos's technology. Mr. Balwani misrepresented to him, among other things, that the science behind Theranos was complete; that no new invention was needed; and that Theranos was completely vertically integrated. Mr. Balwani also told Mr. Mendenhall that Theranos can run sixty to seventy tests with just three drops of blood. The evidence showed and a rational trier of fact could find that Mr. Balwani knew these representations were false and that he intended to defraud Mr. Mendenhall and other investors.

Additional evidence of intent to defraud includes, but is not limited to: Mr. Balwani's involvement in demos and the null protocol; his email describing a plan to distract Walgreens customers so they would not notice missing tests; and Walgreens's reaction to the negative October 16, 2015 Wall Street Journal article and complaint about Theranos's lack of transparency.

There is also evidence to satisfy the electronic wire element of the wire fraud counts. The parties stipulated that certain electronic funds transfers occurred and crossed state lines. All six of

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL

1    the investors created a wire transfer that crossed state lines.

2                    **2.    Patient Counts**

3          There is evidence of a scheme to defraud patients from 2013 through 2016.  As discussed

4    previously, the evidence shows and a rational trier of fact could conclude that Mr. Balwani

5    exercised full control over the CLIA lab.  He made hiring and firing decisions.  He decided which

6    devices to use.  He was the main point of contact for the CMS survey.

7          Lab directors and other lab employees told Mr. Balwani and Ms. Holmes about the

8    numerous problems in the CLIA lab, including quality control issues, inaccurate and unreliable

9    test results, and device failures.  There is evidence of problems with a number of assays, including

10   but not limited to Vitamin B12, HCG, testosterone, and $CO_2$.  Mr. Balwani and Ms. Holmes

11   communicated via text message about problems with tests.  Mr. Balwani also received customer

12   complaint logs.

13         Theranos's marketing represented to patients that its lab had the "highest levels of

14   accuracy," or "highest quality," and the "full range of tests."  Theranos also used the phrase "one

15   tiny drop" to convey to patients that Theranos could run tests on just a fingerstick of blood.

16   Theranos hired Chiat/Day to create the marketing materials.  Mr. Balwani and Ms. Holmes were

17   the only two people at Theranos who had authority to approve the marketing materials.

18   Theranos's false representations about testing also appeared in its website, patient brochures,

19   media articles, and advertising purchased from Horizon Media.  There are several emails showing

20   Mr. Balwani and Ms. Holmes strategizing about advertising and its effect on potential patients.

21         The evidence showed that the advertising misrepresentations were material to patients.

22   Brittany Gould testified she saw statements about accuracy and expected her tests to be accurate.

23   Dr. Ellsworth, Ms. Tompkins, and Mr. Bingham also saw statements about accuracy and expected

24   accurate test results.  Dr. Zachman testified about her patient's inaccurate Theranos HCG test.  Dr.

25   Burnes testified about his patient's inaccurate Theranos PSA tests.  Mr. Bingham testified about

26   his inaccurate Theranos platelet score.  Ms. Tompkins testified about the inaccurate HIV test result

27   she received from Theranos.

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
                                          9

United States District Court
Northern District of California

Intent to defraud can be inferred from much of the evidence already discussed above. For example, there was evidence that the co-defendants disregarded advice to replace phrases appearing on Theranos's website, including "one tiny drop of blood," "highest levels of accuracy," and "full range of tests." Intent to defraud can also be inferred from Mr. Balwani's and Ms. Holmes's text messages discussing building their business and running circles around others and the FDA by "manipulating their game." There is also evidence that Mr. Balwani and Ms. Holmes pressured Dr. Rosendorff to explain away inaccurate test results. Intent to defraud can also be inferred from the discussion between Mr. Balwani and Ms. Holmes regarding the strategy to engage to limit inspectors observing only limited and discrete parts of Theranos's facility.

Lastly, the evidence showed use of the wires to further the scheme to defraud investors: (1) a phone call across state lines to Mr. Bingham; (2) test results sent via facsimile over state lines to Mr. Ellsworth's doctor; (3) test results sent via facsimile over state lines to Ms. Tomkins's doctor; and (4) Theranos's wire transfer to Horizon Media to pay for advertisements for Theranos's Wellness Centers.

### 3. Aiding and Abetting

To prove aiding and abetting, the government had to establish the following elements. First, someone else committed the conduct charged in Counts Three through Twelve of the indictment. Second, Mr. Balwani aided, counseled, commanded, induced, or procured that person with respect to at least one element of wire fraud as charged in Counts Three through Twelve of the indictment. Third, Mr. Balwani acted with the intent to facilitate wire fraud as charged in Counts Three through Twelve of the indictment. Fourth, Mr. Balwani acted before the crime was completed. Final Jury Instructions, Dkt. No. 1630, No. 24.

Based on the evidence already discussed above, a rational trier of fact could find the first three elements of aiding and abetting. As to the fourth element, the evidence showed and a rational trier of fact could conclude that Mr. Balwani aided Ms. Holmes before the crime was completed. Specifically, there is evidence that on December 22, 2013, Mr. Balwani spoke with Mr. Mendenhall over the telephone and made misrepresentations about Theranos, its technology,

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
10

1    and finances.

2         In sum, viewing all of the evidence in the light most favorable to the government, a

3    rational trier of fact could find the essential elements of each of the charged offenses beyond a

4    reasonable doubt.

5    **IV.    CONCLUSION**

6         For the reasons discussed above, Mr. Balwani's motion for judgment of acquittal is

7    DENIED.

8         **IT IS SO ORDERED.**

9    Dated: November 7, 2022

11   _____
     EDWARD J. DAVILA
12   United States District Judge

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 5:18-cr-00258-EJD-1 |
| Plaintiff, | |
| v. | **ORDER DENYING "MOTION FOR NEW TRIAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 33 AND FOR LEAVE TO PARTICIPATE AT EVIDENTIARY HEARING"** |
| RAMESH "SUNNY" BALWANI, | |
| Defendant. | Re: Dkt. No. 1594 |

Defendant Ramesh "Sunny" Balwani has filed a "Motion For New Trial Under Federal Rule of Criminal Procedure 33 and for Leave to Participate at Evidentiary Hearing." Dkt. No. 1594. Mr. Balwani seeks leave to examine Dr. Rosendorff at the evidentiary hearing scheduled for October 17, 2022 in Ms. Holmes' case, and to submit post-hearing briefing on the same schedule set for Ms. Holmes' related Motion for a New Trial, Dkt. No. 1574. The motion is DENIED.

The purpose of the October 17, 2022 evidentiary hearing is to explore the meaning of Dr. Rosendorff's statements to Ms. Holmes' partner, William Evans, and whether any government misconduct occurred in regards to Dr. Rosendorff's testimony. Holmes' Mot. at 11. Dr. Rosendorff's statements to Mr. Evans related exclusively to his testimony during Ms. Holmes' trial, not Mr. Balwani's trial. Dr. Rosendorff allegedly told Mr. Evans, among other things: "(1) he tried to answer the questions honestly at Ms. Holmes' trial, but the government tried to make everyone look bad; (2) the government made things seem worse than they were; (3) everyone at Theranos was working hard to do something good and meaningful; (4) he felt that he had done

ER-496

something wrong, apparently in connection with Ms. Holmes' trial; (5) he wanted to talk to Ms.

Holmes; (6) he thought a conversation with Ms. Holmes would be healing for both of them; (7)

both she and he were young at the time of the events; and (8) these concerns were weighing on

him to the point where he had difficulty sleeping." Holmes' Mot. at 1.

The government later submitted a declaration from Dr. Rosendorff where he stated in

pertinent part:

> 3. During my testimony at . . . Mr. Balwani's trial[], I answered every question put to me completely, accurately, and truthfully to the best of my ability. Nothing I have learned since giving my testimony has changed by recollection of the events I witnessed during my time at Theranos. I stand by my testimony at . . . Mr. Balwani's trial[] in every respect.
>
> 4. The only instruction the government has given me in connection with this case is to tell the truth about the events I witnessed. I have no reason to believe that the government misrepresented or otherwise created a misimpression about . . . Mr. Balwani's conduct at Theranos.

Dkt. No. 1587-1.

There is no basis for Mr. Balwani to examine Dr. Rosendorff at the scheduled evidentiary

hearing because (1) none of Dr. Rosendorff's statements to Mr. Evans pertained to Mr. Balwani's

trial; (2) Dr. Rosendorff affirmed the completeness, accuracy and truthfulness of his testimony at

Mr. Balwani's trial; (3) Dr. Rosendorff unequivocally stands by his testimony at Mr. Balwani's

trial; (4) the only instruction the government gave him was to tell the truth about the events he

witnessed; and (5) Dr. Rosendorff has no reason to believe that the government misrepresented or

otherwise created a misimpression about Mr. Balwani's conduct at Theranos.

Mr. Balwani's motion is accordingly DENIED.

**IT IS SO ORDERED.**

Dated: October 11, 2022

_____
EDWARD J. DAVILA
United States District Judge

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOTION FOR NEW TRIAL AND LEAVE TO PARTICIPATE AT
EVIDENTIARY HEARING

2

United States District Court
Northern District of California

1   JOHN D. CLINE (CA State Bar No. 237759)
2   600 Stewart Street, Suite 400
    Seattle, WA 98101
3   Telephone: (360) 320-6435
    Email: cline@johndclinelaw.com

4
5   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
6   AMY MASON SAHARIA (Admitted Pro Hac Vice)
    KATHERINE TREFZ (CA State Bar No. 262770)
7   WILLIAMS & CONNOLLY LLP
    680 Maine Avenue, S.W.
8   Washington, DC 20024
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
9   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

10  Attorneys for Defendant ELIZABETH A. HOLMES

11
12
13              UNITED STATES DISTRICT COURT
14              NORTHERN DISTRICT OF CALIFORNIA
15              SAN JOSE DIVISION
16

17  UNITED STATES OF AMERICA,        )   Case No. CR-18-00258-EJD
                                     )
18          Plaintiff,               )   **MS. HOLMES' MOTION FOR A NEW TRIAL**
                                     )   **BASED ON NEWLY DISCOVERED EVIDENCE**
19      v.                           )   **REGARDING ADAM ROSENDORFF OR IN**
                                     )   **THE ALTERNATIVE AN EVIDENTIARY**
20  ELIZABETH HOLMES and             )   **HEARING**
    RAMESH "SUNNY" BALWANI,          )
21                                   )
            Defendants.              )   Date:       October 3, 2022
22                                   )   Time:       1:30 PM
                                     )   CTRM:       4, 5th Floor
23                                   )
                                     )   Hon. Edward J. Davila
24  _____)

25
26
27
28  MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
    REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
    CR-18-00258 EJD

1
2

## MOTION FOR A NEW TRIAL OR IN THE ALTERNATIVE

## AN EVIDENTIARY HEARING

3       PLEASE TAKE NOTICE that on October 3, 2022 at 1:30 pm or on such other date and time as

4   the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose, CA

5   95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does

6   respectfully move the Court for a new trial or, alternatively, an evidentiary hearing based on newly

7   discovered evidence.  Ms. Holmes makes this motion pursuant to Federal Rule of Criminal Procedure

8   33.  The Motion is based on the below Memorandum of Points and Authorities, the record in this case,

9   and any other matters that the Court deems appropriate.

10

11   DATED: September 6, 2022

12

13                                                           /s/ Amy Mason Saharia
                                                             KEVIN DOWNEY
14                                                           LANCE WADE
                                                             AMY MASON SAHARIA
15                                                           KATHERINE TREFZ
                                                             Attorneys for Elizabeth Holmes
16

17

18

19

20

21

22

23

24

25

26

27

28
MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

# TABLE OF CONTENTS

Page

BACKGROUND ...............................................................................................................1

    A.    Dr. Rosendorff's Trial Testimony................................................................1

    B.    Dr. Rosendorff's Encounter at Ms. Holmes' Home ....................................4

LEGAL STANDARD..........................................................................................................5

ARGUMENT ......................................................................................................................6

I.    The Newly Discovered Evidence Warrants a New Trial..................................................6

II.    At a Minimum, the Court Should Order an Evidentiary Hearing...................................11

CONCLUSION...................................................................................................................12

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

i

ER-500

## **TABLE OF AUTHORITIES**

Page(s)

### **CASES**

*Balestreri v. United States*, 224 F.2d 915 (9th Cir. 1955) ............................................................ 10

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) ..................................................................................... 2

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................................................... 8

*Napue v. Illinois*, 360 U.S. 264 (1959) ................................................................................................ 2

*United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206 (9th Cir. 1992) ..................... 5

*United States v. Butler*, 567 F.2d 885 (9th Cir. 1978) .................................................................. 8

*United States v. Davis*, 960 F.2d 820 (9th Cir. 1992) ................................................................... 10

*United States v. Fulcher*, 250 F.3d 244 (4th Cir. 2001) .......................................................... 7, 11

*United States v. Harrington*, 410 F.3d 598 (9th Cir. 2005) .................................................... 5, 10

*United States v. Hernandez-Rodriguez*, 443 F.3d 138 (1st Cir. 2006) .................................. 11

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000) ................................................................. 8

*United States v. Krasny*, 607 F.2d 840 (9th Cir. 1979) ................................................................ 10

*United States v. McKinney*, 952 F.2d 333 (9th Cir. 1991) ............................................................ 6

*United States v. Mendez*, 619 F. App'x 644 (9th Cir. 2015) ................................................... 6, 10

*United States v. Navarro-Garcia*, 926 F.2d 818 (9th Cir. 1991) ......................................... 11, 12

*United States v. Vozzella*, 124 F.3d 389 (2d Cir. 1997) ................................................................ 7

*United States v. Walgren*, 885 F.2d 1417 (9th Cir. 1989) ........................................................ 6, 10

*United States v. Walker*, 546 F. Supp. 805 (D. Haw. 1982) ........................................................ 7

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) ............................................................... 10

### **RULES**

Cal. R. Prof'l Conduct 4.2(a) ................................................................................................................. 5

Fed. R. Crim. P. 33 .................................................................................................................... 1, 5, 11

### **OTHER AUTHORITIES**

1 Weinstein's Evidence ¶ 401[07] (1985) ........................................................................................ 9

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

## MEMORANDUM OF POINTS AND AUTHORITIES

On August 8, 2022, at 4:51pm PT, Dr. Adam Rosendorff left a voicemail for Ms. Holmes' counsel asking if he could set up a meeting between Ms. Holmes and Dr. Rosendorff. An hour and 15 minutes later, without hearing back, Dr. Rosendorff appeared at Ms. Holmes' residence. Ms. Holmes' partner, William Evans, answered the door. In the course of two short conversations described in more detail below, Dr. Rosendorff stated, among other things: (1) he tried to answer the questions honestly at Ms. Holmes' trial, but the government tried to make everyone look bad; (2) the government made things seem worse than they were; (3) everyone at Theranos was working hard to do something good and meaningful; (4) he felt that he had done something wrong, apparently in connection with Ms. Holmes' trial; (5) he wanted to talk to Ms. Holmes; (6) he thought a conversation with Ms. Holmes would be healing for both of them; (7) both she and he were young at the time of the events; and (8) these concerns were weighing on him to the point where he had difficulty sleeping.

As the Court knows, Dr. Rosendorff was an important witness; indeed, the government viewed him as a star witness. The government mentioned him more than any other government witness in both opening and closing statements, and Dr. Rosendorff testified longer than any other government witness.

Due to the ethical restrictions on lawyers' communications with represented parties, Ms. Holmes' counsel are unable to return Dr. Rosendorff's call to probe the precise meaning of his statements. Under any interpretation of his statements, the statements warrant a new trial under Rule 33. But, at a minimum, and to the extent the Court has any doubt about whether a new trial is required, the Court should order an evidentiary hearing and permit Ms. Holmes to subpoena Dr. Rosendorff to testify about his concerns.

## BACKGROUND

### A. Dr. Rosendorff's Trial Testimony

The Court is familiar with Dr. Rosendorff. He was Theranos' laboratory director from April 2013 to November 2014. Holmes 9/24/21 Tr. 1702:19-1703:1. Even before Ms. Holmes' trial commenced, Dr. Rosendorff was a major focus of the government's case. The government met with Dr.

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

1

Rosendorff at least eight times, and noticed him as an expert as early as March 2020. Holmes 9/28/21 Tr. 1963:20-1967:16; Dkt. 580-3 at 7-8 (Gov't 3/6/2020 Notice of Expert Disclosure).

During trial, the government featured Dr. Rosendorff repeatedly in its opening statement as a witness who would testify as to issues related to technology, the state of the clinical laboratory, and intent. Holmes 9/8/21 Tr. 547-556. The government mentioned Dr. Rosendorff more than any other government witness during its opening statement.

After deciding not to produce its retained hematology expert for a *Daubert* hearing, and lacking any statistically significant evidence concerning the accuracy and reliability of Theranos technology, the government was forced to rely heavily on Dr. Rosendorff's testimony during Ms. Holmes' trial. The government's examination of Dr. Rosendorff led to a host of misleading statements that Ms. Holmes' counsel was forced to correct on cross-examination. *See, e.g.*, Holmes 9/28/21 Tr. 1974:15-1975:25, 1977:9-25 (Dr. Rosendorff's reasons for leaving the company); 2011:16-2014:16 (date and nature of Theranos' launch); 1981:25-1983:8 (Dr. Rosendorff confirming that the government failed to show him any policy documents or validation reports); 2256:18-2257:22 (correcting the government's implication that proficiency testing was not performed); 2476:17-2477:7 (establishing that all of Dr. Rosendorff's concerns regarding proficiency testing were addressed). Indeed, Ms. Holmes counsel alerted the Court that "the breadth of the [cross-]examination" was driven in part by "substantial concerns about what was [elicited] in direct under *Napue* [*v. Illinois*]" and its progeny, which compelled Ms. Holmes to "clarify the record." Holmes 10/5/21 Tr. 2714:3-8[1] (citing *Napue v. Illinois*, 360 U.S. 264 (1959)).[2] Due to the misleading nature of the government's presentation, throughout the cross-examination Ms. Holmes'

---

[1] Ms. Holmes later informed the Court that the government's questioning of Dr. Rosendorff also improperly implied facts not in the record concerning the propriety of Theranos' scientific data. Holmes 10/15/21 Tr. 3838:4-3839:2.

[2] In *Napue*, the Supreme Court held "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. at 269. "[I]f it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005).

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

2

ER-503

counsel asked Dr. Rosendorff to confirm that he was being truthful in his testimony. *See, e.g.*, Holmes 9/28/21 Tr. 1973:8-1974:7.

Significant issues also arose concerning Dr. Rosendorff's bias. Holmes 10/5/21 Tr. 2548:22-2576:17, 2705:5-2720:25. Ms. Holmes informed the Court of the serious potential for Dr. Rosendorff to provide biased testimony in favor of the government due to the pending government investigations into the three positions that he held post-Theranos—Perkin Elmer, Invitae, and uBiome. *Id.* The post-employment issues concerned Dr. Rosendorff's competence as a lab director, as well as his motivation to shift the blame for any Theranos issues to others including Ms. Holmes.

The Court permitted limited questioning about Dr. Rosendorff's employment at PerkinElmer on the ground that it was relevant "to potential issue[s] of bias." Holmes 10/5/21 Tr. 2709:14-2710:19, 2717:5-2720:25. The Court forbade questioning regarding "the nature of any investigation, the quality of the investigation, [or] [Dr. Rosendorff's] specific role in it." *Id.* at 2710:11-22. The Court excluded examination about Invitae as "inappropriate character evidence" under Rule 404(a)(1). *Id.* at 2709:5-13. And it excluded examination about uBiome under Rule 403 because the Court understood that a federal investigation into that lab "did not have anything to do with the operation of the lab per se." *Id.* at 2708:2-2709:4. Soon after the Court's ruling, the government opened the door by asking Dr. Rosendorff to compare his experience at Theranos with his experience at other laboratories. *Id.* at 2866:8-23. Ms. Holmes again requested to question Dr. Rosendorff about his post-employment issues as well as his bias. *See id.* at 2867:15-2888:11. The Court declined and, recognizing that the government opened the door to the issue, instructed the jury to disregard the government's questions and Dr. Rosendorff's answer. *Id.* at 2889:23-2890:10.

The government featured Dr. Rosendorff repeatedly in its closing arguments, again mentioning Dr. Rosendorff more than any other witness. *See* Holmes 12/16/21 and 12/17/22 Tr. (collectively referencing Dr. Rosendorff *over 50 times*). Recently, in the government's Opposition to Ms. Holmes' Rule 29 motion, the government repeatedly emphasized Dr. Rosendorff's interactions with Ms. Holmes.

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

3

1   Dkt. 1395 at 11. During the hearing on that motion, the government cited to Dr. Rosendorff's testimony

2   in support of its argument. 9/1/22 Hr'g Tr. 24:8-25:3.

3       **B.    Dr. Rosendorff's Encounter at Ms. Holmes' Home**

4           On August 8, 2022, at approximately 6:05pm, Dr. Rosendorff arrived at Ms. Holmes' home.

5   Declaration of William B. Evans ("Evans Decl.") ¶ 1; *see also* Evans Decl., Ex. A.  As Dr. Rosendorff

6   approached the home, her partner, William Evans, noticed Dr. Rosendorff walking towards the front

7   door and went to answer it.  Evans Decl. ¶ 2.  Mr. Evans did not immediately recognize Dr. Rosendorff,

8   but did so after Dr. Rosendorff introduced himself.  *Id.* ¶ 3.  Dr. Rosendorff seemed to be in distress and

9   his voice was trembling.  Ex. A at 1.  His cellphone was open to his camera, although it did not appear

10  that he was recording.  *Id.*  During this brief interaction outside the front door, Dr. Rosendorff repeatedly

11  stated that he needed to talk to Ms. Holmes.  *Id.*  Mr. Evans explained that Ms. Holmes could not talk to

12  anyone and that Dr. Rosendorff needed to leave.  *Id.*

13          Dr. Rosendorff attempted to leave the property but was driving the wrong way.  *Id.*  Mr. Evans

14  approached Dr. Rosendorff in his vehicle at the top of the driveway in order to direct Dr. Rosendorff in

15  the right direction.  *Id.*  A second conversation then occurred at the top of the driveway, with Mr. Evans

16  outside the car at the window and Dr. Rosendorff in the driver's seat.  Evans Decl. ¶ 4   Dr. Rosendorff

17  explained that he wanted to speak to Ms. Holmes because it would be "healing for both himself and

18  Elizabeth to talk."  Ex. A at 1.  He stated that "when he was called as a witness he tried to answer the

19  questions honestly but that the prosecutors tried to make everyone look bad" and that "the government

20  made things sound worse than they were when he was up on the stand during his testimony."  *Id.*  Dr.

21  Rosendorff stated that "Theranos was early in his and [Ms. Holmes'] career," that "everyone was just

22  doing the best they could," and "everyone was working so hard to do something good and meaningful."

23  *Id.*  He stated that "he fe[lt] guilty" and that he "felt like he had done something wrong," apparently in

24  connection with his testimony in Ms. Holmes' case.  *Id.*  He stated that these issues were "weighing on

25  him" and that "he was having trouble sleeping."  *Id.*

26

27

28  MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
    REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
    CR-18-00258 EJD

                                              4

Shortly before Dr. Rosendorff went to Ms. Holmes' home, he left a voicemail for Ms. Holmes' counsel Lance Wade.  Decl. of Lance A. Wade ("Wade Decl.") ¶ 1 & Ex. 1.  Mr. Wade received that voicemail at 7:51pm ET (4:51pm PT), and it lasted approximately thirty seconds.  Wade Decl., Ex. 1.  In the voicemail, Dr. Rosendorff identified himself and explained that he was calling because "he want[s] to try to visit Elizabeth at [her residence]; [he would] like to see her again" and that he thought "it would be quite healing for her and for [him]."  Wade Decl. ¶ 5.  Dr. Rosendorff asked if it was possible for Mr. Wade to arrange a visit between Dr. Rosendorff and Ms. Holmes at her residence.  *Id.*  Mr. Wade did not respond directly to Dr. Rosendorff given the ethical restrictions on communicating with represented parties.  *See* Cal. R. Prof'l Conduct 4.2(a) ("a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer").  The next day, Mr. Wade instead contacted the attorney who had appeared at Ms. Holmes' trial with Dr. Rosendorff.  Wade Decl., Ex. 2.  The attorney responded that there was no need for Mr. Wade to return the call.  *Id.*

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33, "[u]pon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal."  *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992).  Ordinarily, a new trial should be ordered under Rule 33 on the basis of newly discovered evidence where a defendant shows the following: (1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence indicates the defendant would probably be acquitted in a new trial.  *See United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005).

However, "when the motion implicates governmental misconduct," a defendant is not required to demonstrate that the newly discovered evidence would have probably resulted in an acquittal in a new trial, but needs to show only that there was a reasonable probability that the result would have been

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

1  different if the evidence was available to the defense.  *United States v. Walgren*, 885 F.2d 1417, 1427-28

2  (9th Cir. 1989).

**ARGUMENT**

Dr. Rosendorff's statements reflecting his concerns with the government's presentation of his

trial testimony, along with his comments that bear on Ms. Holmes' intent, put the integrity of the jury

verdict against Ms. Holmes in grave doubt.  The Court should grant a new trial or, at the very least,

order an evidentiary hearing.

**I.    The Newly Discovered Evidence Warrants a New Trial**

Dr. Rosendorff's statements satisfy each requirement for a new trial:

***Newly Discovered.***  Dr. Rosendorff's statements on August 8, 2022 occurred seven months after

the conclusion of Ms. Holmes' trial.  The information he revealed—including his belief that everyone at

Theranos was "working so hard to do something good and meaningful" and his concern about how the

government presented his testimony—is newly discovered evidence.  *United States v. Mendez*, 619 F.

App'x 644, 646 (9th Cir. 2015) (reversing and remanding after district court erroneously denied Rule 33

motion and stating that police report was newly discovered when the defendant and his attorneys "did

not have access to [the evidence] prior to trial"); *see also United States v. McKinney*, 952 F.2d 333, 335

(9th Cir. 1991) (evidence is newly discovered under Rule 33 when discovered after the verdict was

received).

***Diligence in Discovery.***  Similarly, Ms. Holmes' lack of access to this evidence was not the

result of a failure to act with diligence.  To the contrary, Ms. Holmes' counsel tried to elicit this

evidence when asking Dr. Rosendorff at trial whether he testified truthfully.  Holmes 9/28/21

Tr. 1973:8-1974:7.   Despite this questioning, Dr. Rosendorff did not indicate while on the stand that "he

tried to answer questions honestly" but that the government "made things sound worse than they were

when he was up on the stand during his testimony."  *Compare* Evans Decl., Ex. A., *with* Holmes 9/28/21

Tr. 1973:8-1974:7. Because this information was not revealed to Ms. Holmes despite her efforts at trial

to probe what she viewed as the misleading nature of the government's presentation, the due diligence

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

prong is satisfied. *See United States v. Fulcher*, 250 F.3d 244, 250 (4th Cir. 2001) (diligence prong is satisfied when "there is simply no indication from the record that a more probing cross-examination would have elicited any of the facts that came to light following the trial"); *United States v. Walker*, 546 F. Supp. 805, 811 (D. Haw. 1982) ("Due diligence means ordinary, rather than extraordinary, diligence.").

**Material to Issues at Trial.** Dr. Rosendorff's statements are material. To be sure, the exact meaning of Dr. Rosendorff's statements is unclear. Potential meanings include the following:

1. He "*tried* to answer the questions honestly," Evans Decl., Ex. A at 1 (emphasis added), but his attempt to be honest was not always successful, meaning that he provided untruthful testimony to the jury. This interpretation would explain why he said he "felt like he had done something wrong." *Id.*

2. He answered the government's questions honestly, but nonetheless the resulting presentation of evidence was misleading, raising potential concerns under *Napue*, discussed above. *See, e.g.*, *United States v. Vozzella*, 124 F.3d 389, 390 (2d Cir. 1997) (recognizing that *Napue* applied to "the use of evidence that was in part false and otherwise so misleading as to amount to falsity").

3. He answered the government's inculpatory questions honestly, but the government did not ask him about exculpatory information he had provided to the government (that the government did not disclose to the defense).

4. He answered the questions honestly, but the government's cherry-picked questioning and exhibits and his resulting testimony presented an incomplete picture to the jury and made things seem "worse than they were"—for example, by failing to present to the jury a complete, accurate picture of his time at Theranos, his many positive interactions with Ms. Holmes, and his view that "everyone was just doing the best they could" and was "working so hard to do something good and meaningful." Evans Decl., Ex. A at 1.

Under any interpretation of Dr. Rosendorff's statements, the statements are material to the case.

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

7

1   Even assuming he meant version 4, which is the most conservative interpretation of his statements, that

2   statement would have fundamentally changed the jury's perception of the case.

3       For starters, testimony from a government star witness that the government cherry-picked

4   evidence and/or testimony to make things seem worse than they were would have gravely damaged the

5   reliability of the government's investigation and presentation of evidence and bolstered Ms. Holmes'

6   defense. Evidence undermining the reliability of the government's investigation is necessarily material.

7   *See Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (evidence was material because it could have been used

8   to attack the reliability of the government's investigation); *United States v. Howell*, 231 F.3d 615, 625

9   (9th Cir. 2000) ("[I]nformation which might 'have raised opportunities to attack . . . the thoroughness

10  and even good faith of the investigation . . .' constitutes exculpatory, material evidence."). And this

11  testimony almost certainly would have diminished the weight the jury would have ascribed to Dr.

12  Rosendorff's testimony, which the government used to support key elements of its case. *See United*

13  *States v. Butler*, 567 F.2d 885, 890–91 (9th Cir. 1978) ("Both by casting doubt on the prosecution case

14  and by increasing the scope of the closing defense arguments, disclosure of the exact nature of the

15  prosecution's dealings with its key witness would certainly have affected the weight given his testimony

16  by the jury.").

17      Ms. Holmes specifically argued to the jury that the government's cherry-picked evidence

18  "obscured the full picture" and that the government was incorrectly viewing the evidence through a

19  "dirty lens." *See* Holmes 12/16/21 Tr. 9031:19-9041:10. Notably, Ms. Holmes attempted to

20  demonstrate the government's cherry-picking of evidence through Dr. Rosendorff's cross-examination.

21  *See* Holmes 9/29/21 Tr. 2139:15-2146:22 (showing government did not introduce on direct examination

22  full email chain related to inspection of CLIA lab that showed transparency in dealing with inspectors);

23  Holmes 10/5/21 Tr. at 2651:5-2657:25 (showing government raised issues with bicarbonate assay on

24  direct examination, but did not introduce emails that showed the issue was investigated and addressed

25  within 24 hours). This argument was central to Ms. Holmes' defense: it was the very first argument

26  that defense counsel made in closing argument. Dr. Rosendorff's statements would have powerfully

27

28  MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
    REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
    CR-18-00258 EJD

corroborated this defense.

Dr. Rosendorff's statements also are material to Ms. Holmes' alleged intent to defraud. To secure a conviction on the investor counts the government had to show, *inter alia*, that Ms. Holmes knowingly made material misrepresentations with intent to deceive. The government relied on Dr. Rosendorff in its closing argument when discussing the requisite knowledge and falsity elements of wire fraud. *See, e.g.*, Holmes 12/16/21 Tr. 8975:6-10 ("Dr. Rosendorff said that in the middle of 2014 he had conversations with Ms. Holmes about QC control . . . again, more knowledge evidence."). Dr. Rosendorff's statements that "everyone at Theranos" was doing their "best" and "working so hard to do something good and meaningful" would have directly undermined the government's intent arguments. No doubt exists that Ms. Holmes would have featured these statements prominently in her closing. Especially coming from a star government witness, these statements would have been material to intent.

***Not Cumulative or Merely Impeaching.*** The evidence is not cumulative. "Evidence is cumulative if repetitive, *and* if the small increment of probability it adds may not warrant the time spent in introducing it." 1 Weinstein's Evidence ¶ 401[07] (1985). Dr. Rosendorff did not testify at trial that the government's questioning obscured an accurate depiction of his tenure at Theranos, despite Ms. Holmes' counsel's repeated questioning about the government's tactics.

Nor is this evidence merely impeaching. Dr. Rosendorff's statement that everyone at Theranos "was just doing the best they could" that "everyone was working so hard to do something good and meaningful" is affirmative evidence of Ms. Holmes' intent. Evans Decl., Ex. A. And his statement that the government's presentation was an attempt "to make everybody look bad" and that the government "made things sound worse than they were" is affirmative evidence negating the quality of the government's investigation and trial presentation. *Id.*

Even if the evidence could be considered impeachment in part, that fact does not defeat the motion. Although "[o]rdinarily, evidence impeaching a witness will not be material . . . [i]n some situations, however, the newly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness's testimony totally incredible." *United States*

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

9

*v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992); *see also United States v. Wallach*, 935 F.2d 445, 458 (2d Cir. 1991) (concluding that new evidence impeaching the government's central witness was sufficiently powerful to require a new trial); *Balestreri v. United States*, 224 F.2d 915, 917 (9th Cir. 1955) ("To deny in every case a motion for a new trial on the ground of newly discovered evidence for the sole reason that the evidence was 'merely impeachment' might often lead to injustice."). Dr. Rosendorff was an important witness and his new statements materially undermine his testimony.

*Likelihood of Acquittal.* The final element overlaps considerably with the materiality element discussed above. *See United States v. Krasny*, 607 F.2d 840, 845 n.3 (9th Cir. 1979) (citing favorably the reasoning that "two of the traditional prerequisites for prevailing on a motion for a new trial based upon newly discovered evidence, *i.e.*, that the newly discovered evidence be material and that it probably would produce an acquittal on retrial, are really two means of measuring the same thing").

As an initial matter, Dr. Rosendorff's statements raise the possibility that the government may have engaged in misconduct. Dr. Rosendorff's statements to Mr. Evans are not sufficiently precise for Ms. Holmes to accuse the government of misconduct at this time. But if misconduct occurred, Ms. Holmes need not demonstrate that evidence would probably lead to an acquittal. *Walgren*, 885 F.2d at 1428. Rather, the applicable standard would be whether there is a reasonable probability that the result would have been different if the evidence had been available at trial. *Id.* At a minimum, the Court should order an evidentiary hearing to determine whether misconduct occurred.

Even under the more stringent standard, the last factor is met because the new evidence indicates that "a new trial would probably result in acquittal." *Harrington*, 410 F.3d at 601. For all the reasons already stated, and even ascribing the most conservative meaning to Dr. Rosendorff's statements, if the jury had heard from Dr. Rosendorff that the government cherry-picked evidence to make things seem worse than they were and that everyone was doing their best and working hard to do something good and meaningful, the jury would have viewed this case very differently. Dr. Rosendorff's statements would have "significantly bolstered [Ms. Holmes'] defense and directly rebutted the government's primary response." *Mendez*, 619 F. App'x at 646 (reversing denial of new trial motion after holding that

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

1    "[a] new trial, with the benefit of [newly discovered records], would probably result in acquittal"); *see*

2    *also Fulcher*, 250 F.3d at 251, 255 (affirming district court findings that new evidence "would paint a

3    'significantly more persuasive picture than the one presented to the jury at trial,'" and would "certainly

4    create a record more favorable for [the defendants]"); *United States v. Hernandez-Rodriguez*, 443 F.3d

5    138, 146 (1st Cir. 2006) (reversing denial of new trial motion where "district judge failed to consider the

6    full import of the defendant's new evidence"). Even without this new testimony, this was a close case,

7    as evidenced by the split verdict. Had Dr. Rosendorff provided these statements to the jury, Ms. Holmes

8    probably would have been acquitted.

9    **II.    At a Minimum, the Court Should Order an Evidentiary Hearing**

10            At a minimum, the Court should hold an evidentiary hearing both to determine the meaning of

11   Dr. Rosendorff's statements and to determine whether any government misconduct occurred. As

12   discussed above, Ms. Holmes' counsel are unable to return Dr. Rosendorff's phone call to ascertain the

13   meaning of his statements. If the Court has any doubts about whether Dr. Rosendorff's statements

14   warrant a new trial, an evidentiary hearing will provide the Court the facts necessary to decide the

15   motion.

16            An evidentiary hearing must be held on a motion for a new trial "[u]less the court is able to

17   determine without a hearing that the allegations are without credibility or that the allegations if true

18   would not warrant a new trial." *United States v. Navarro-Garcia*, 926 F.2d 818, 822 (9th Cir. 1991). In

19   determining whether to grant a hearing, "the district court must be guided 'by the content of the

20   allegations, including the seriousness of the alleged misconduct or bias, and the credibility of the

21   source.'" *Id.*

22            The "content of the allegations" here weighs in favor of a granting a hearing. Dr. Rosendorff's

23   statements suggest that the government's presentation of evidence may have misled the jury, whether

24   intentionally or not. His statements suggest that there is strong reason to doubt the credibility of a key

25   government witness. And his statements at least raise the possibility of government misconduct. As

26   already discussed, if government misconduct occurred, that would alter the applicable standard for

27

28   MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
     REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
     CR-18-00258 EJD

1  obtaining a new trial.  Thus, to the extent the Court has any doubt that a new trial is required under the

2  normal Rule 33 standard, at a minimum, it should conduct a hearing to determine whether misconduct

3  occurred.

4       Second, there is no reason to doubt the credibility of Dr. Rosendorff's statements or that Mr.

5  Evans has accurately conveyed those statements.  Dr. Rosendorff's recorded voicemail for Ms. Holmes'

6  counsel is consistent with Mr. Evans' account of his interactions with Dr. Rosendorff and Dr.

7  Rosendorff's statements.  *Compare* Evans Decl., Ex. A at 1; *with* Wade Decl. ¶ 5.  Nothing in the

8  current record refutes Dr. Rosendorff's recent statements.  *See Navarro-Garcia*, 926 F.2d at 823 ("The

9  district court made no finding that the affidavit lacked credibility.  Moreover, there is nothing in the

10  record that would support such a conclusion.").

11       The Court should hear directly from Dr. Rosendorff at an evidentiary hearing.

12  **CONCLUSION**

13       For the foregoing reasons, the Court should grant Ms. Holmes' motion for a new trial or, at a

14  minimum, order an evidentiary hearing.

15

16  DATED: September 6, 2022

17                                /s/ Amy Mason Saharia

18                                KEVIN DOWNEY
                              LANCE WADE

19                                AMY MASON SAHARIA
                              KATHERINE TREFZ

20                                Attorneys for Elizabeth Holmes

21

22

23

24

25

26

27

28

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

12

1

## **CERTIFICATE OF SERVICE**

2

     I hereby certify that on September 6, 2022 a copy of this filing was delivered via ECF on all

3

counsel of record.

4

5
                             /s/ Amy Mason Saharia

6
                             AMY MASON SAHARIA
                             Attorney for Elizabeth Holmes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE, REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

JOHN D. CLINE (CA State Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **DECLARATION OF WILLIAM B. EVANS** |
| v. | Hon. Edward J. Davila |
| ELIZABETH HOLMES, | |
| Defendant. | |

## DECLARATION OF WILLIAM B. EVANS

I, William B. Evans, declare as follows:

1.     I am the partner of Elizabeth Holmes.  I rent a home on a property in ███████ California, where I reside with Elizabeth and our son.  The property has a private driveway with several roads that provide access to seven homes on the same property, including the one I rent.

2.     On Monday August 8, 2022, at approximately 6:05pm, I was in the living room of the home, with a view of the front door, which is surrounded on both sides by large windows. Elizabeth and a friend were in another part of the home bathing our son.  I noticed a man approaching our door and went to answer it.

3.     The visitor identified himself as Adam Rosendorff.  Although I did not immediately recognize him, I recognized him after he introduced himself to me because I was in the courtroom during his trial testimony.  As described in Exhibit A, Dr. Rosendorff asked to speak with Elizabeth and made various other statements.  I asked him to leave.  When I noticed him attempting to leave the property in the wrong direction, I stopped him to correct his course.

4.     I had two conversations with Dr. Rosendorff.  The first was outside my front door when Dr. Rosendorff first approached.  The second was when I stopped him to point him in the direction of the exit.  That second conversation took place at the top of my driveway, with Dr. Rosendorff in his car and me outside of the car on the driver's side.  The substance of both conversations is captured to the best of my recollection in Exhibit A.

5.     My main focus during both conversations was to ensure Dr. Rosendorff quickly and safely left the property without interacting with Elizabeth and to do so in a courteous and respectful manner.    For this reason, I did not follow up on many of Dr. Rosendorff's statements.

6.     Shortly after he left, I memorialized the conversations I had with Dr. Rosendorff in an email that I sent to Elizabeth's counsel around 8:08pm.  A true and correct copy of that email is attached as Exhibit A to this declaration.

7.     Exhibit A contains my recollections of what Dr. Rosendorff told me but is not a word-for-word description of my encounter with Dr. Rosendorff.  For example, Dr. Rosendorff repeated many

DECLARATION OF WILLIAM B. EVANS
CR-18-00258 EJD

1

ER-516

of the statements in Exhibit A throughout both conversations, but I did not separately memorialize each instance of the statements in my email.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this ____ day of August, 2022 in ████ CA.

_____
WILLIAM B. EVANS

DECLARATION OF WILLIAM B. EVANS
CR-18-00258 EJD

2

ER-517

# EXHIBIT A

| From: | William Evans |
| --- | --- |
| To: | Downey, Kevin; Trefz, Katherine; John Cline |
| Subject: | My interaction with Adam Rosendorff |
| Date: | Monday, August 8, 2022 11:08:27 PM |

Today around 6pm Adam Rosendorff knocked on our door asking to speak to Elizabeth. We had a brief conversation after asking him to please leave. I have recorded that interaction to the best of my ability. You are of course welcome to call me any time if you have any specific questions about the interaction. ████████████

Adam Rosendorff showed up at my home around 6:05 pm tonight. He came to the front door and rang the doorbell. I did not recognize him. He is a big guy and my first thought was he was lost, he looked disheveled. His shirt was untucked, his hair was messy, his voice slightly trembled. His phone was open to his camera, but his video was not on. At first I thought he was trying to record an interaction but then I saw how disheveled he was and it looked like he had just pressed the camera button on his phone by accident. I don't believe it was recording anything and I did not see him taking any pictures.

He said he needs to talk to Elizabeth. I told him that he could not be here and that he needed to leave. He kept saying he needed to talk to her. I told him he knows Elizabeth can't talk to anyone and told him he needs to go. He turned to leave.

He got in his car and started going into the cul-de-sac by our home so I told him he needed to go the other way.

He said he thought it would be healing for both himself and Elizabeth to talk. He said it has been 10 years since he talked to her. He said he feels guilty, it seemed like he was hurting. He said when he was called as a witness he tried to answer the questions honestly but that the prosecutors tried to make everybody look bad (in the company). He said that the government made things sound worse than they were when he was up on the stand during his testimony. He said he felt like he had done something wrong. And that this was weighing on him, He said he was having trouble sleeping. He felt desperate to talk to Elizabeth.

He said he wants to help her. He said he is hurting. He said Theranos was early in his and her career, that he had just finished residency, and that everyone was working so hard to do something good and meaningful. He said that everyone was just doing the best they could. He talked about being with Elizabeth and talking with her at her thirtieth birthday party and about company holiday parties, including the Halloween party. He talked about how they were friends. He said Elizabeth was kind to him. He said that everyone has made so much money off of her and this story they created but that she didn't make any money. and neither did he or anyone who worked at the business, but that everyone else has off of the story of it. I remarked that it is easier to break things than to build them. He said that breaking things is the nature of America. He said that is what they did to Michael Jackson. They build things up

only to tear them down.

He asked how I was and how our child is (referred to as she).  I said we are blessed to have a happy and healthy son who just turned 1 year old. He said he has a five year old and he asked about W█. He said he would be in San Diego next week for a conference and was going to stay at one of the hotels my family owns. The hotel was the Hotel Del Coronado and I told him that we do not own that hotel and that we are just a small family business.

It appears he does not live here but has been thinking about this for a long time and wants to find Elizabeth. (The car seemed like a rental.) I told him I am sorry that he is hurting and having such a hard time. I told him that truth will prevail. I wished him good luck and said goodbye, he said the same.

--

**William B. Evans**

██████████ █ ███████

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION
**Honorable Edward J. Davila**
Courtroom 4 - 5th Floor

## TITLE:  *UNITED STATES v. RAMESH SUNNY BALWANI*
## CASE NUMBER:  5:18-CR-00258-2 EJD

## <u>Minute Order</u>

Date:   July 7, 2022
Time in Court:  (11:47-12:02 PM; 12:24-12:36 PM)
**TOTAL Time: 27 min**

Courtroom Deputy Clerk: Cheré Robinson
Court Reporter:  Irene Rodriguez

---

**APPEARANCES:**
Plaintiff Attorney(s) present:     Jeffrey Schenk, John Bostic, Robert Leach
Also present:   Paralegal – Maddi Wachs

Defendant Attorney(s) present:  Jeffrey Coopersmith, Amy Walsh, Stephen Cazares,
                                                    Aaron Brecher, Shawn Estrada

Also present:   Ramesh Sunny Balwani (out-of-custody)

---

**PROCEEDINGS:**

**Jury Trial (Day 46)**

11:47 am  Further Jury Trial held.  Jury deliberations resumed.  Jury Verdict rendered.

11:57 am  Jury Verdict:  Guilty on Counts 1-12 of the Third Superseding Indictment.

12:24 pm  Court in Session with Counsel out of presence of Jury.

12:27 pm   The Court refers the matter to the Probation Department for preparation of a Pre-Sentencing Report and sets Sentencing for November 15, 2022, at 10:00 AM.  Court will increase bond to $750,000, and bond package due by July 14, 2022.

Defendant to remain on current pretrial conditions.

Counsel to meet and confer and present the Court with a proposed briefing schedule on Rule 29 Motion.

12:36 pm  Court adjourns.  Jury trial completed.

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 18-CR-00258 EJD |
| Plaintiff, | ) |
| | ) **VERDICT FORM** |
| v. | ) |
| | ) |
| RAMESH "SUNNY" BALWANI, | ) |
| | ) |
| Defendant. | ) |
| | ) |

We, the members of the Jury in the above-entitled case, unanimously find the defendant, Ramesh "Sunny" Balwani:

1. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Conspiracy to Commit Wire Fraud against Theranos investors in violation of 18 U.S.C. § 1349, as charged in Count One of the indictment.

2. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Conspiracy to Commit Wire Fraud against Theranos paying patients in violation of 18 U.S.C. § 1349, as charged in Count Two of the indictment.

3. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $99,990 on or about December 30, 2013, as charged in Count Three of the indictment.

4. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire

ER-522

transfer of $5,349,900 on or about December 31, 2013, as charged in Count Four of the indictment.

5. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $4,875,000 on or about December 31, 2013, as charged in Count Five of the indictment.

6. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $38,336,632 on or about February 6, 2014, as charged in Count Six of the indictment.

7. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $99,999,984 on or about October 31, 2014, as charged in Count Seven of the indictment.

8. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $5,999,997 on or about October 31, 2014, as charged in Count Eight of the indictment.

9. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos paying patients, in violation of 18 U.S.C. § 1343, in connection with a telephone call from Patient B.B. to Theranos regarding B.B.'s laboratory blood test results on or about October 12, 2015, as charged in Count Nine of the indictment.

10. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos paying patients, in violation of 18 U.S.C. § 1343, in connection with a wire transmission of Patient E.T.'s laboratory blood test results on or about May 11, 2015, as charged in Count Ten of the indictment.

11. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos paying patients, in violation of 18 U.S.C. § 1343, in connection with a

ER-523

1  wire transmission of Patient M.E.'s laboratory blood test results on or about May 16, 2015, as

2  charged in Count Eleven of the indictment.

3  12. _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire

4  Fraud against Theranos paying patients, in violation of 18 U.S.C. § 1343, in connection with a

5  wire transfer of $1,126,661 on or about August 3, 2015, as charged in Count Twelve of the

6  indictment.

7

8  DATED: 7/7/2022                    * REDACTED *     ▮▮▮▮▮▮▮▮▮

9                                     JURY FOREPERSON

1  JEFFREY B. COOPERSMITH (SBN 252819)
   AMY WALSH (Admitted Pro Hac Vice)
2  STEPHEN A. CAZARES (SBN 201864)
   ORRICK, HERRINGTON & SUTCLIFFE LLP
3  The Orrick Building
   405 Howard Street
4  San Francisco, CA  94105-2669
   Telephone:   (415) 773-5700
5  Facsimile:   (415) 773-5759

6  Email: jcoopersmith@orrick.com; awalsh@orrick.com;
   scazares@orrick.com
7
   Attorneys for Defendant
8  RAMESH "SUNNY" BALWANI

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                  SAN JOSE DIVISION

13

14  UNITED STATES OF AMERICA,            Case No. CR-18-00258-EJD

15            Plaintiff,                 **RAMESH "SUNNY" BALWANI'S
                                         MOTION TO ALLOW
16       v.                              CROSS-EXAMINATION RELATING
                                         TO DR. ADAM ROSENDORFF'S
17  RAMESH "SUNNY" BALWANI,              POST-THERANOS EMPLOYMENT**

18            Defendant.                 **Date:  April 19, 2022
                                         Time: 8:30 a.m.
19                                       CTRM.: 4, 5th Floor**

20                                       **Hon. Edward J. Davila**

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION TO ALLOW CROSS-EXAMINATION RELATING TO DR. ADAM ROSENDORFF'S POST-THERANOS EMPLOYMENT**

PLEASE TAKE NOTICE that on April 19, 2022, at 8:30 a.m., or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, located at 280 South First Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Ramesh "Sunny" Balwani will and hereby does move the Court to allow cross-examination relating to Dr. Adam Rosendorff's post-Theranos employment. The Motion is based on the below Memorandum of Points and Authorities, the concurrently filed Declaration of Jeffrey B. Coopersmith and attached exhibits, the record in this case, and any other matters that the Court deems appropriate.

DATED: April 12, 2022

Respectfully submitted,

ORRICK HERRINGTON & SUTCLIFFE LLP

By: _/s/ Jeffrey B. Coopersmith_
Jeffrey B. Coopersmith

Attorney for Defendant
RAMESH "SUNNY" BALWANI

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The stakes are high here for Dr. Adam Rosendorff: Since his employment at Theranos, he has served as laboratory director for three other facilities—Invitae, uBiome, and PerkinElmer—and *at all three companies* federal investigations have ensued during or soon after his employment. At Invitae, 50,000 patients were told they may have received a false negative result on a genetic screening for cancer. And now, under the microscope of the very same government agents who investigated Theranos, Dr. Rosendorff's reputation—and, at times, his professional license—have been on the line.

The jury is entitled to know all this as they evaluate Dr. Rosendorff's testimony—including whether that testimony is biased due to looming government investigations and penalties. The Court should accordingly allow the defense to cross examine Dr. Rosendorff about his employment at Invitae, uBiome, and PerkinElmer, as well as the ensuing federal investigations.

## II.    BACKGROUND

*Invitae.* After he left Theranos in late 2014, Dr. Rosendorff worked as laboratory director for Invitae from early 2015 until August 28, 2017. *See* 9/24/21 Holmes Trial Tr. at 1702–03; Declaration of Jeffrey B. Coopersmith, Exs. 1 (Trial Exhibit ("TX") 20447) & 2 (TX 20346). Just two weeks after Dr. Rosendorff left Invitae, the company announced that it would retest 50,000 patients "after discovering an error in one of its tests that generated false negatives for a rare genetic mutation linked to hereditary colon cancer."[1] Then, in November 2021, Invitae disclosed that it had been served with a Department of Justice subpoena arising from an ongoing "investigation" into its "sponsored testing programs." *Id.*, Ex. 3 at 68 (Invitae Corp., Quarterly

---

[1] Catherine Ho, "After Error, SF Genetic Testing Firm Is Retesting 50,0000 Saliva Samples," *S.F. Chronicle* (Sept. 12, 2017), https://www.sfchronicle.com/business/article/After-error-SF-genetic-testing-firm-is-retesting-12192601.php.

1  Report (Form 10-Q) (Nov. 9, 2021)).[2]

2  **uBiome.**  Dr. Rosendorff served as laboratory director for uBiome, Inc. *See* 10/5/21

3  Holmes Trial Tr. at 2552, 2565, 2570.[3] In 2021, uBiome's cofounders were indicted in the

4  Northern District of California for federal securities and health-care fraud involving, among other

5  allegations, "tests that were not validated and not medically necessary," as well as allegedly

6  falsified patient testing records. *Id.,* Ex. 5 (TX 20420) at 2.

7  **PerkinElmer.**  Since January 2021, Dr. Rosendorff has served as laboratory and medical

8  director for PerkinElmer, Inc., operating a lab that processes covid tests, among others. In that

9  capacity, Dr. Rosendorff himself was served notices of "immediate jeopardy" by the California

10 Department of Public Health and the Centers for Medicare & Medicaid Services ("CMS") on

11 February 19, April 23, and May 6 of 2021. *See id.*, Exs. 6–8 (TX 20347, 20348 & 20349). Just

12 weeks after the third of these notices, Dr. Rosendorff submitted (and then later withdrew) his

13 resignation from PerkinElmer. *Id.*, Ex. 9 (TX 20446). The CMS agents who issued the

14 "immediate jeopardy" notice for PerkinElmer include the same agents who surveyed Theranos

15 and found condition-level deficiencies there. *See* 10/05/21 Holmes Trial Tr. at 2718–20.

16 Dr. Rosendorff has conceded that, at least at times, his laboratory-director license has hung in the

17 balance. *Id.* at 2720.

18 **Holmes trial.**  At the Holmes trial, the Court permitted questioning about

19 Dr. Rosendorff's employment at (and the CMS findings for) PerkinElmer on the ground that it

20 was relevant "to potential issue[s] of bias." *See id.* at 2709–10, 2717–21. But the Court excluded

21 examination about Invitae as "inappropriate character evidence" under Rule 404(a)(1). *Id.* at

22 2709. And it excluded examination about uBiome because "based on what [the parties] told [the

23 Court]," that indictment "did not have anything to do with the operation of the lab per se" and did

24

---

25 [2] The government has refused to produce a copy of the Invitae subpoena, and it has not denied that the subpoena's scope may overlap with the period of Dr. Rosendorff's employment. Instead,

26 the government has maintained only that it currently "has no documents from the time period of Dr. Rosendorff's employment at Invitae." Coopersmith Decl., Ex. 4 (March 31, 2022 Leach

27 email).

[3] *See also* Heather Somerville, "Former Theranos Lab Director Questioned About Faulty Lab

28 Tests at Current Employer," WALL ST. J. (Oct. 5, 2021), https://www.wsj.com/livecoverage/elizabeth-holmes-trial-theranos/card/RdfQbdiEbAPIAIdy5mBZ.

MOTION TO ALLOW CROSS-EXAMINATION
CASE NO. CR-18-00258-EJD

ER-528

1  not "alleg[e] any fraud involving the laboratory or anything about the lab." *Id.* at 2708.

2

3  **III.  ARGUMENT**

4      "Extensive cross-examination of a Government witness designed to reveal any biases or

5  prejudices of the witness is compelled by the confrontation clause." *United States v. Alvarez-*

6  *Lopez*, 559 F.2d 1155, 1160 (9th Cir. 1977). As the Court explained in the Holmes trial, "bias is

7  always relevant," and "it's appropriate to allow the defense to probe any issues of bias that may

8  exist." 10/05/21 Holmes Trial Tr. at 2710. At that time, the Court ruled that the defense would be

9  permitted to probe Dr. Rosendorff's "personal interest" and "bias" that may have arisen from

10 being subject to inspection and "immediate jeopardy" findings in connection with his

11 employment at PerkinElmer. *Id.* The Court should permit the same probing of bias in

12 Mr. Balwani's trial. *See id.*; *see also* 10/06/21 Holmes Trial Tr. at 2871 (observing that Holmes'

13 counsel did not exhaust the allowable scope of questioning about PerkinElmer).

14      The Court did not then allow similar questioning about Dr. Rosendorff's employment at

15 Invitae and uBiome, but it should do so now, including because the facts have changed. As for

16 Invitae, when this issue arose during the Holmes trial in October 2021, only the government—not

17 the Court or Ms. Holmes—could have known that Invitae was the target of a federal

18 investigation. (Invitae publicly disclosed a subpoena the following month. *See* Coopersmith

19 Decl., Ex. 3.) As for uBiome, respectfully, the Court was not provided all the relevant facts when

20 it ruled that there was no alleged "fraud involving the laboratory or anything about the lab."

21 10/05/21 Holmes Trial Tr. at 2708. On the contrary, allegations in that case touch directly on the

22 fraudulent use of unvalidated and medically unnecessary tests within Dr. Rosendorff's purview.

23 *See* Coopersmith Decl., Ex. 5 at 2–3.

24      Given the federal investigations involving *all three* of Dr. Rosendorff's post-Theranos

25 workplaces, he has compelling reasons to render biased testimony in this case, including to blame

26 Mr. Balwani for any lab issues at Theranos to avoid the conclusion that Dr. Rosendorff is a lab

27 industry "Typhoid Mary." Just as with the PerkinElmer inspection, the jury should be permitted

28 to hear about Invitae and uBiome as potential sources of bias.

1        The Court should allow Mr. Balwani to raise all three federal investigations on cross-

2    examination of Dr. Rosendorff. Each investigation, and especially all three taken together, tends

3    to show that Dr. Rosendorff's testimony may be biased. Mr. Balwani should be permitted to ask

4    not only whether a witness is biased, but also to "make a record from which to argue *why* [the

5    witness] might have been biased." *United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th

6    Cir. 2004) (second alteration in original) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)).

7    The Ninth Circuit has found it impossible to "overemphasize the importance of allowing full and

8    fair cross-examination of government witnesses" when their bias is at issue, and "[f]ull disclosure

9    of all relevant information concerning their past record and activities through cross-examination

10   … is indisputably in the interests of justice." *United States v. Brooke*, 4 F.3d 1480, 1489 (9th

11   Cir. 1993). Courts "should not be reluctant to invest the minimal judicial resources necessary to

12   ensure that the jury receives as much relevant information as possible," nor "should unwarranted

13   fear of juror confusion present any impediment." *Id.* This is because the "rules of evidence do not

14   (and could not) curtail this right" of the defendant to inquire about sources of bias. *Id.* at 1489

15   n.11. Although Mr. Balwani proposes a broader scope of questioning than was pursued at the

16   Holmes trial—to cover not one but three labs—his counsel understands the need to keep that

17   questioning limited to the purpose at hand: to elicit Dr. Rosendorff's post-Theranos jobs, the

18   investigations at each workplace, the personal and professional risks to Dr. Rosendorff, and the

19   likelihood that his testimony is biased by those facts.

20        Nothing supports curtailing an examination of bias on the ground that only the

21   PerkinElmer inspection (and not Invitae and uBiome) involved the same government agents as

22   those who surveyed Theranos. Bias can arise from any prospect of federal investigation or

23   penalty—not just from the same agents or agencies. *See, e.g.*, *United States v. Wilson*, 605

24   F.3d 985, 1006–07 (D.C. Cir. 2010) (per curiam) (discussing bias arising from investigation of

25   witness by police internal-affairs department, even if not by the U.S. Attorney prosecuting the

26   defendant); *United States v. Atherton*, 936 F.2d 728, 733 (2d Cir. 1991) ("In a limited sense, *any*

27   illegal conduct of a government witness can be considered probative of bias, on the theory that

28   the witness is likely to curry the favor of government attorneys in order to avoid prosecution. The

MOTION TO ALLOW CROSS-EXAMINATION
CASE NO. CR-18-00258-EJD

probative value of such evidence, however, depends in large measure on some showing that the government was contemplating prosecution, or at least was aware, of the illegality.").

## IV.     CONCLUSION

The Court should grant Mr. Balwani's motion and allow cross-examination of Dr. Rosendorff about his post-Theranos employment and the related federal regulatory and criminal inquiries.


DATED: April 12, 2022                    Respectfully submitted,

                                          ORRICK HERRINGTON & SUTCLIFFE LLP


                                          By:   */s/ Jeffrey B. Coopersmith*
                                                Jeffrey B. Coopersmith

                                          Attorney for Defendant
                                          RAMESH "SUNNY" BALWANI

# Exhibit No. 1

# INVITAE CORPORATION
## AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT

As a condition of my employment (with the term "**employment**" or any derivation such as "**employ**," as used herein, to include any consulting or independent contractor relationship) with Invitae, Inc., its subsidiaries, affiliates, successors or assigns (together, the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this Invitae Corporation At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement (this "**Agreement**"):

## 1. AT-WILL EMPLOYMENT

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF INVITAE, INC. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

## 2. CONFIDENTIALITY

A. *Definition of Confidential Information.* I understand that "**Company Confidential Information**" means information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or

Page 1 of 13

ER-533

B.   *Assignability*.  This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns.  There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated.  Notwithstanding anything to the contrary herein, Invitae, Inc. may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Invitae, Inc.'s relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C.   *Entire Agreement*.  This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations.  I represent and warrant that I am not relying on any statement or representation not contained in this Agreement.  Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

D.   *Headings*. Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.   *Severability*.  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.   *Modification, Waiver*.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of Invitae, Inc. and me.  Waiver by Invitae, Inc. of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.   *Survivorship*.  The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date: 1/22/2015

Signature
Adam Rosendorff, MD
Name of Employee (typed or printed)

Witness:
Signature
 Jami Breen
Name (typed or printed)

# Exhibit No. 2

August 28, 2017

Adam Rosendorff

█████████████

San Francisco, CA 94131

Dear Adam:

This letter sets forth the substance of the separation agreement (the "Agreement") that Invitae Corporation (the "Company") is offering to you to aid in your employment transition.

     **1.**     **Separation**.  Your last day of work with the Company and your employment termination date will be Monday, September 11, 2017 (the "Separation Date").

     **2.**     **Accrued Salary**.  On the Separation Date, the Company will pay you all accrued salary earned through the Separation Date, subject to standard payroll deductions and withholdings.  You are entitled to these payments by law.

     **3.**     **Severance Payment.**  Although the Company has no obligation to do so, if you sign this Agreement, allow it to become effective, and comply with your obligations under this Agreement, then the Company will pay you, as severance, the equivalent of 26 weeks of your base salary in effect as of the Separation Date, subject to standard payroll deductions and withholdings.  This amount will be paid in a lump sum within ten (10) days after the Effective Date (as defined in Section 14).

     **4.**     **Health Insurance.**  To the extent provided by the federal COBRA law or, if applicable, state insurance laws, and by the Company's current group health insurance policies, you will be eligible to continue your group health insurance benefits at your own expense following the Separation Date.  Later, you may be able to convert to an individual policy through the provider of the Company's health insurance, if you wish.  You will be provided with a separate notice describing your rights and obligations under COBRA.

     **5.**     **Stock Options.**  Under the terms of your stock option agreement and the applicable plan documents, vesting of your stock options will cease as of the Separation Date. Your right to exercise any vested shares, and all other rights and obligations with respect to your stock options(s), will be as set forth in your stock option agreement, grant notice and applicable plan documents.

     **6.**     **Other Compensation or Benefits.**  You acknowledge that, except as expressly provided in this Agreement, you have not earned and will not receive from the Company any additional compensation (including base salary, bonus, incentive compensation, or equity), severance, or benefits before or after the Separation Date, with the exception of any vested right you may have under the express terms of a written ERISA-qualified benefit plan (e.g., 401(k) account) or any vested options.

41109002 v1

INV000055

Page 5

We wish you the best in your future endeavors.

Sincerely,

By: _____

**Sylvia Arifin**
**Talent Operations**

**I HAVE READ, UNDERSTAND AND AGREE FULLY TO THE FOREGOING AGREEMENT:**

_____

**Adam Rosendorff**

August 29th, 2017
_____
Date

INV000059

# Exhibit No. 3

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**

---

## Form 10-Q

---

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2021**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File No. 001-36847**

INVITAE

# Invitae Corporation

**(Exact name of the registrant as specified in its charter)**

| Delaware | 27-1701898 |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**1400 16th Street, San Francisco, California 94103**

**(Address of principal executive offices, Zip Code)**

**(415) 374-7782**

**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of exchange on which registered |
|---|---|---|
| Common Stock, $0.0001 par value per share | NVTA | New York Stock Exchange |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b 2 of the Exchange Act.

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐    Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The number of shares of the registrant's common stock outstanding as of October 29, 2021 was 226,370,843.

**TABLE OF CONTENTS**

|  |  | Page No. |
|---|---|---|
| **PART I: Financial Information** | | |
| Item 1. | Condensed Consolidated Financial Statements | |
| | Condensed Consolidated Balance Sheets | 1 |
| | Condensed Consolidated Statements of Operations | 2 |
| | Condensed Consolidated Statements of Comprehensive Loss | 3 |
| | Condensed Consolidated Statements of Stockholders' Equity | 4 |
| | Condensed Consolidated Statements of Cash Flows | 5 |
| | Notes to Condensed Consolidated Financial Statements | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 29 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 4. | Controls and Procedures | 45 |
| **PART II: Other Information** | | |
| Item 1. | Legal Proceedings | 47 |
| Item 1A. | Risk Factors | 47 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 79 |
| Item 6. | Exhibits | 80 |
| **SIGNATURES** | | 81 |

PART I - Financial Information

**ITEM 1. Condensed Consolidated Financial Statements.**

INVITAE CORPORATION

**Condensed Consolidated Balance Sheets**

**(in thousands)**
**(unaudited)**

| | September 30, 2021 | December 31, 2020 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 921,634 | $ 124,794 |
| Marketable securities | 320,465 | 229,186 |
| Accounts receivable | 58,431 | 47,722 |
| Inventory | 30,633 | 32,030 |
| Prepaid expenses and other current assets | 34,401 | 20,200 |
| Total current assets | 1,365,564 | 453,932 |
| Property and equipment, net | 101,000 | 66,102 |
| Operating lease assets | 119,194 | 45,109 |
| Restricted cash | 10,275 | 6,686 |
| Intangible assets, net | 1,168,157 | 981,845 |
| Goodwill | 2,283,059 | 1,863,623 |
| Other assets | 23,790 | 13,188 |
| Total assets | $ 5,071,039 | $ 3,430,485 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 35,404 | $ 25,203 |
| Accrued liabilities | 104,308 | 86,058 |
| Operating lease obligations | 12,636 | 8,789 |
| Finance lease obligations | 3,825 | 1,695 |
| Total current liabilities | 156,173 | 121,745 |
| Operating lease obligations, net of current portion | 120,467 | 48,357 |
| Finance lease obligations, net of current portion | 6,467 | 3,123 |
| Debt | 111,156 | 104,449 |
| Convertible senior notes, net | 1,462,499 | 283,724 |
| Deferred tax liability | 51,378 | 51,538 |
| Other long-term liabilities | 56,182 | 841,256 |
| Total liabilities | 1,964,322 | 1,454,192 |
| Commitments and contingencies (Note 8) | | |
| Stockholders' equity: | | |
| Common stock | 23 | 19 |
| Accumulated other comprehensive income | 21 | 1 |
| Additional paid-in capital | 4,624,397 | 3,337,120 |
| Accumulated deficit | (1,517,724) | (1,360,847) |
| Total stockholders' equity | 3,106,717 | 1,976,293 |
| Total liabilities and stockholders' equity | $ 5,071,039 | $ 3,430,485 |

See accompanying notes to unaudited condensed consolidated financial statements.

1

ER-541

**INVITAE CORPORATION**

**Condensed Consolidated Statements of Operations**

**(in thousands, except per share amounts)**
**(unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| Revenue: | | | | |
| Test revenue | $ 111,676 | $ 67,326 | $ 322,448 | $ 175,503 |
| Other revenue | 2,719 | 1,402 | 11,880 | 3,664 |
| Total revenue | 114,395 | 68,728 | 334,328 | 179,167 |
| Cost of revenue | 87,741 | 46,643 | 252,563 | 130,017 |
| Research and development | 97,511 | 37,802 | 284,323 | 168,433 |
| Selling and marketing | 55,501 | 37,800 | 163,705 | 119,440 |
| General and administrative | 86,820 | 27,810 | 197,640 | 77,638 |
| Change in fair value of contingent consideration | (19,866) | (504) | (386,836) | 4,328 |
| Loss from operations | (193,312) | (80,823) | (177,067) | (320,689) |
| Other income (expense), net | 3,357 | (15,771) | 9,846 | (32,499) |
| Interest expense | (14,069) | (6,308) | (35,869) | (17,244) |
| Net loss before taxes | (204,024) | (102,902) | (203,090) | (370,432) |
| Income tax benefit | (5,848) | - | (29,208) | (2,600) |
| Net loss | $ (198,176) | $ (102,902) | $ (173,882) | $ (367,832) |
| Net loss per share, basic and diluted | $ (0.91) | $ (0.78) | $ (0.85) | $ (3.08) |
| Shares used in computing net loss per share, basic and diluted | 218,384 | 132,484 | 205,587 | 119,386 |

See accompanying notes to unaudited condensed consolidated financial statements.

2

We have adopted policies and procedures designed to comply with these laws and regulations. In the ordinary course of our business, we conduct internal reviews of our compliance with these laws. Our compliance may also be subject to governmental review. The growth of our business and our expansion outside of the United States may increase the potential of violating these laws or our internal policies and procedures. The risk of our being found in violation of these or other laws and regulations is further increased by the fact that many have not been fully interpreted by the regulatory authorities or the courts, and their provisions are open to a variety of interpretations. We recently received a subpoena from the U.S. Attorney's Office for the District of Massachusetts requesting that we produce certain documents regarding our sponsored testing programs. We are in the process of responding to the subpoena and are cooperating fully with the investigation. Although we remain committed to compliance with all applicable laws and regulations, we cannot predict the outcome of this investigation or any other requests or investigations that may arise in the future regarding these or other subject matters. Any action brought against us for violation of the above-referenced or other laws or regulations, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. If our operations are found to be in violation of any of these laws and regulations, we may be subject to any applicable penalty associated with the violation, including significant administrative, civil and criminal penalties, damages, fines, imprisonment, exclusion from participation in Federal healthcare programs, refunding of payments received by us, and curtailment or cessation of our operations. Any of the foregoing consequences could seriously harm our business and our financial results.

***Healthcare policy changes, including legislation reforming the U.S. healthcare system, may have a material adverse effect on our financial condition, results of operations and cash flows.***

In March 2010, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act, collectively referred to as the Affordable Care Act, was enacted in the United States, which made a number of substantial changes in the way healthcare is financed by both governmental and private insurers. Policy changes or implementation of new health care legislation could result in significant changes to health care systems. In the United States, this could include potential modification or repeal of all or parts of the Affordable Care Act.

In April 2014, Congress passed the Protecting Access to Medicare Act of 2014, or PAMA, which included substantial changes to the way in which clinical laboratory services are paid under Medicare. Under PAMA (as amended by the Further Consolidated Appropriations Act, 2020 and the Coronavirus Aid, Relief, and Economic Security Act, respectively) and its implementing regulations, clinical laboratories must report to CMS private payer rates beginning in 2017, and then in 2022 and every three years thereafter for clinical diagnostic laboratory tests that are not advanced diagnostic laboratory tests and every year for advanced diagnostic laboratory tests.

We do not believe that our tests meet the definition of advanced diagnostic laboratory tests, but in the event that we seek designation for one or more of our tests as an advanced diagnostic laboratory test and the tests are determined by CMS to meet these criteria or new criteria developed by CMS, we would be required to report private payer data for those tests annually. Otherwise, we will be required to report private payer rates for our tests on an every three years basis starting in 2022. Laboratories that fail to timely report the required payment information may be subject to substantial civil money penalties.

As set forth in the PAMA final rule, for tests furnished on or after January 1, 2018, Medicare payments for clinical diagnostic laboratory tests are paid based upon these reported private payer rates. For clinical diagnostic laboratory tests that are assigned a new or substantially revised code, initial payment rates for clinical diagnostic laboratory tests that are not advanced diagnostic laboratory tests will be assigned by the cross-walk or gap-fill methodology. Initial payment rates for new advanced diagnostic laboratory tests will be based on the actual list charge for the laboratory test. The payment rates calculated under PAMA went into effect starting January 1, 2018. Where applicable, reductions to payment rates resulting from the new methodology are limited to 10% per test per year in each of the years 2018 through 2020. Rates will be held at 2020 levels during 2021, and then, where applicable based upon median private payer rates reported in 2017 or 2022, reduced by up to 15% per test per year in each of 2022 through 2024 (with a second round of private payer rate reporting in 2022 to establish rates for 2023 through 2025).

PAMA also authorized the adoption of new, temporary billing codes and/or unique test identifiers for FDA-cleared or approved tests as well as advanced diagnostic laboratory tests. The CPT® Editorial Panel approved a proposal to create a new section of billing codes to facilitate implementation of this section of PAMA, but these codes would apply to our tests only if we apply for such codes.

68

# Exhibit No. 5

United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

# NORTHERN DISTRICT *of* CALIFORNIA

U.S. Attorneys » Northern District of California » News

**Department of Justice**

U.S. Attorney's Office

Northern District of California

FOR IMMEDIATE RELEASE                                   Thursday, March 18, 2021

# uBiome Co-Founders Charged With Federal Securities, Health Care Fraud Conspiracies

### Indictment Alleges Former Co-CEOs Defrauded Health Insurance Providers and Investors In Schemes Related to Clinical Gut and Vaginal Microbiome Tests and Capital Fundraises

SAN FRANCISCO – A federal grand jury handed down a 33-page indictment today charging Zachary Schulz Apte and Jessica Sunshine Richman with multiple federal crimes including conspiracy to commit securities fraud, conspiracy to commit health care fraud, money laundering, and related offenses in connection with alleged schemes to defraud health insurance providers and investors raise to capital for now-bankrupt microbiome testing company uBiome.

The announcement was made by Acting U.S. Attorney Stephanie M. Hinds, Federal Bureau of Investigation Special Agent in Charge Craig D. Fair, U.S. Postal Inspection Service (USPIS) Inspector in Charge Rafael Nuñez; U.S. Department of Health and Human Services Office of the Inspector General (HHS-OIG) Special Agent in Charge Steven J. Ryan; Defense Criminal Investigative Service (DCIS) Western Field Office Special Agent in Charge Bryan D. Denny; U.S. Department of Veterans Affairs, Office of Inspector General (VA OIG) Special Agent in Charge is Jason P. Root; Amtrak Office of the Inspector General Special Agent In Charge, Western Field Office, Thomas M. Hopkins; Office of Personnel Management Office of Inspector General (OPM-OIG) Deputy Inspector General Performing the Duties of the Inspector General Norbert E. Vint.

According to the indictment, Apte, 36, and Richman, 46, both of whom resided in San Francisco at relevant times, co-founded uBiome in October 2012.  Initially, uBiome offered a direct-to-consumer service, called "Gut Explorer," which allowed an individual to submit a fecal sample that uBiome would analyze in its laboratory and produce a report comparing the customer's microbiome to the microbiomes of others who had submitted fecal samples to uBiome, all for less than $100.  The indictment describes how the defendants eventually expanded uBiome's business model to include development and marketing of "clinical" tests regarding the gut and vaginal microbiomes, which tests would ostensibly be used by medical professionals to make medical decisions and as to which uBiome would seek reimbursement from health insurance providers in amounts up to nearly $3,000.  The indictment alleges that Apte's and Richman's efforts to have uBiome develop clinical tests that could be billed to insurance companies were intended to

Trial Exh. 20420 Page 001                                                  ER-545

attract large-scale venture capital investment.  By late 2015, shortly before it raised millions of dollars in its "Series B" fundraising round, uBiome began to market a "clinical" version of a test.  Thereafter, the indictment alleges that Apte and Richman caused uBiome to employ various methods to secure health care provider orders for its clinical gut test and clinical vaginal test, including by having its Chief Medical Officer review test requests from customers and endeavoring to build a network of health care providers external to uBiome.

"The innovation that emerges from our Bay Area companies is unparalleled," said Acting U.S. Attorney Hinds, "but all innovation must exist within the boundaries of the law. Today's indictment alleges that in their efforts to move fast to drive business and investment capital to their microbiome start up, defendants turned a blind eye to compliance and pursued at all costs a path designed to bring the greatest investment in their company. The indictment alleges defendants bilked insurance providers with fraudulent reimbursement requests, a practice that inevitably would result in higher premiums for us all.  Further, defendants cashed out on the investment that flowed into the company to benefit themselves. Today's indictment is a cautionary tale about the importance of robust compliance programs rather than lip service, and the importance of honesty with investors."

"This was the result of a very complex investigation conducted by the FBI and our federal and state partners," said FBI Special Agent in Charge Fair. "This indictment illustrates that the heavily regulated healthcare industry does not lend itself to a 'move fast and break things' approach, but rather to an approach of compliance and accountability."

"The United States Postal Inspection Service has a long history of successfully investigating complex fraud cases," said USPIS Inspector in Charge Nuñez. "Anyone who engages in deceptive practices should know they will not go undetected and will be held accountable.  The collaborative investigative work on this case conducted by Postal Inspectors, our law enforcement partners, and the United States Attorney's Office illustrates our efforts to protect American consumers and businesses."

"The announced indictment is a crucial step forward in holding accountable those who, among other things, allegedly engaged in fraudulent schemes against TRICARE, the Department of Defense's healthcare system for military members and their families," said DCIS Special Agent in Charge Denny. "DCIS will continue to work with its law enforcement partners to see this matter through in order to protect the best interests of the Department of Defense and the American public."

"This indictment demonstrates the VA OIG's unwavering commitment to safeguard the integrity of the programs that support our nation's veterans and their families" said VA OIG Special Agent in Charge Root.

"We are very proud of this well-coordinated, joint effort—a true partnership between the U.S. Attorney's Office and multiple investigative agencies like Amtrak's Office of Inspector General," said Amtrak OIG Special Agent in Charge Hopkins. "Because of this joint effort and efforts like it, we continue to achieve success across the country in bringing justice to those who target Amtrak's health care plan, its employees and their dependents."

"The OPM OIG is committed to investigating unscrupulous providers that take advantage of the system and defraud the American taxpayer," said OPM OIG Deputy Inspector General Vint.

The indictment describes how the defendants ultimately adopted several fraudulent practices with respect to its clinical tests.  Specifically, according to the indictment, the defendants developed, implemented, and oversaw practices designed to deceive approving health care providers and reimbursing insurance providers regarding tests that were not validated and not medically necessary.  Further, the indictment alleges the defendants falsified documents and lied about and concealed material facts when insurance providers asked questions to which truthful answers would reveal the fraudulent nature of uBiome's billing model.  The

Trial Exh. 20420 Page 002

ER-546

3/19/22, 2:00 PM
Case 5:21-cr-00402-RMR Document 170-15 Filed 04/22/22 Page 172 of 300
uBiome Co-Founders Charged in Federal Securities, Health Care Fraud Conspiracies | USAO-NDCA | Department of Justice

indictment alleges such practices included (1) fraudulently submitting reimbursement claims for re-tests or re-sequencings of archived samples (referred to internally at uBiome as "upgrades"); (2) utilizing a captive network of doctors and other health care providers who fraudulently were given partial and misleading information about the test requests they were reviewing; (3) fraudulently submitting reimbursement claims with respect to tests that had not been validated under applicable federal standards and/or for which patient test results had not yet been released; (4) manipulating dates of service to conceal uBiome's actual testing and marketing practices from insurance providers, and to maximize billings; (5) fraudulently not charging patients for patient responsibility required by insurers, and instead, in some cases, incentivizing them with gift cards, and then making false or misleading statements about, or concealing, those practices from insurance providers; and (6) falsifying documents, using the identity of doctors and other health care providers without their knowledge or authorization, and lying to insurance providers in response to requests for information, overpayment notifications, requests for recoupment of billings, denials of reimbursement requests, or audits investigating uBiome's billing practices.  The indictment alleges that, between 2015 and 2019, uBiome submitted more than $300 million in reimbursement claims to private and public health insurers.  Of these reimbursement claims, uBiome was paid more than $35 million.

The indictment also includes allegations that defendants oversaw an effort to deceive and mislead investors about various aspects of uBiome's business during its Series B and Series C fundraising rounds, which occurred primarily in 2016 and 2018, respectively.  Specifically, the indictment alleges defendant misled investors about (1) the success of uBiome's business model in terms of revenues and reimbursement rates; (2) the threats to future revenues represented by uBiome's failure to collect patient responsibility, marketing of upgrades, and reliance a captive group of health care providers to generate orders; and (3) the lack of clinical utility and acceptance in the medical community of uBiome's tests.  The indictment alleges that the defendants failed to disclose to investors, and otherwise concealed from investors, that "not only were insurance providers' questions about and responses to uBiome's billing practices calling uBiome's entire business model into question, but [defendants] had had to falsify documents and lie to insurance providers in order to attempt to keep them at bay."  The indictment alleges that Apte and Richman induced investors to invest more than $64 million in uBiome stock during the Series B and Series C fundraising rounds and, furthermore, that Apte and Richman together sold investors more than $12 million of their personal uBiome during those rounds.

In addition to these charges, the indictment contains allegations that defendants engaged in aggravated identity theft and engaging in transactions with the proceeds of the specified unlawful activities of wire fraud and securities fraud (i.e., money laundering).  With respect to the identity theft charges, the indictment provides examples of how defendants used the names and personal information of various health care providers to create documents for submission to health insurance companies  with respect to certain uBiome customers during and in relation to the conspiracy and scheme to defraud those insurers.  With respect to money laundering, the indictment alleges Apte used more than $10,000 of proceeds of the scheme to defraud investors to make a $2,250,000 payment ostensibly to a law firm for a retainer and to deposit $500,000 into a bank account.  Also with respect to money laundering, the indictment alleges Richman used more than $10,000 of proceeds of the scheme to defraud investors to make payments related to real property in Washington State and Florida, to purchase an annuity from a life insurance company, to pay a law firm $2,000,000 ostensibly for a legal retainer, and to transfer funds in the amount of $900,000 intended as partial payment for the purchase of a residence in south Florida.

In sum, the defendants are charged with the following crimes and face the following maximum penalties:

| Offense | Statute | Maximum Statutory Penalty (per count) |
|---|---|---|

| Offense | Statute | Maximum Statutory Penalty (per count) |
|---|---|---|
| Conspiracy to Commit Health Care Fraud<br><br>(one count, each defendant) | 18 U.S.C. § 1349 | 20 years |
| Health Care Fraud<br><br>(14 counts, each defendant) | 18 U.S.C. § 1347 | 20 years |
| Aggravated Identity Theft and Aiding and Abetting<br><br>(six counts, each defendant) | 18 U.S.C. § 1028A & 2 | Two years, consecutive to underlying sentence |
| Conspiracy to Commit Wire Fraud and Securities Fraud<br><br>(one count, each defendant) | 18 U.S.C. § 371 | 5 years |
| Wire Fraud and Aiding and Abetting<br><br>(10 counts, each defendant) | 18 U.S.C. § 1343 & 2 | 20 years |
| Fraud in Connection with the Purchase and Sale of Securities<br><br>(nine counts, each defendant) | 15 U.S.C. §§ 78j(b), 78ff;<br><br>17 C.F.R. § 240.10b-5;<br><br>18 U.S.C. § 2 | 20 years |
| Engaging in Monetary Transactions with Proceeds of Specified Unlawful Activity<br><br>(Apte, two counts; Richman, four counts) | 18 U.S.C. § 1957 | 10 years |

The court may order additional terms of supervised release, as well as additional monetary penalties and restitution.  However, any sentence following conviction would be imposed by the court only after consideration of the U.S. Sentencing Guidelines and the federal statute governing the imposition of a sentence, 18 U.S.C. § 3553.

An indictment merely alleges that crimes have been committed, and defendants are presumed innocent until proven guilty beyond a reasonable doubt.

The defendants' initial federal court appearances have not yet been scheduled.

The case is being prosecuted by the Special Prosecutions Section of the U.S. Attorney's Office for the Northern District of California.  The prosecution is the result of an investigation by the FBI, USPIS, HHS-OIG, DCIS, VA-OIG, Amtrak-OIG; OPM-OIG; and the U.S. Department of Labor, Employee Benefits Security Administration, with assistance from the California Department of Justice Division of Medi-Cal Fraud & Elder Abuse and the California Department of Insurance.  The U.S. Attorney's Office and all the federal law enforcement agencies also thank the San Francisco Regional Office of the Securities and Exchange Commission (SEC).  The SEC conducted a parallel investigation that was also announced today.

---

**Attachment(s):**
Download uBiome indictment

**Component(s):**
USAO - California, Northern

Updated March 18, 2021

Trial Exh. 20420 Page 005

ER-549

# Exhibit No. 6



State of California—Health and Human Services Agency
# California Department of Public Health



**TOMÁS J. ARAGÓN, M.D., Dr.P.H**
*Director and State Public Health Officer*

**GAVIN NEWSOM**
*Governor*

## IMPORTANT NOTICE – ACTION NECESSARY

*(Confirmation of successful transmission by email constitutes proof of receipt of this letter)*

February 19, 2021

Adam Rosendorff, MD
CLIA Laboratory Director
CDPH Branch Laboratory
28454 Livingston Ave
Valencia, CA 91355

Timothy Bow
Emergency Procurement Officer, Owner Representative
California Department of Public Health
850 Marina Bay Parkway, Bldg. P
Richmond, CA 94804

STATE: CPH889339
CLIA: 05D2197416

### PUBLIC HEALTH LABORATORY STATE INSPECTION-CONDITION LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY

Dear Laboratory Director/Owner(s):

An inspection of your laboratory was conducted on December 8, 2020, and December 9, 2020, and on December 16, 2020, by Elsa Eleco, Examiner III , Elaine Flores, Examiner II, Catherine Tolentino, Examiner II, and Jinong Feng, Examiner I, representatives of the California Department of Public Health (the Department), Laboratory Field Services. This routine inspection concluded on February 17, 2021.

As a result of that inspection, Department examiners determined that your laboratory is **not** in compliance with the requirements specified in the Health and Safety Code (HSC) section 101160 and/or California Code of Regulations (CCR), title 17, sections 1078 and 1083.

---

Laboratory Field Services ● 320 West 4th Street, Suite 890 ● Los Angeles, CA 90013
(213) 620-6160 ● (213) 620-6565 FAX
LFS Website (www.cdph.ca.gov/LFS)



CMS-CDPH-BL-000607

ER-551

CDPH Branch Laboratory
February 19, 2021
Page 2

In order for a public health laboratory to perform testing under the Health and Safety
Code subsections 101160 (a) – (b), it must comply with all federal CLIA requirements.
These requirements are found in section 353 of the Public Health Service Act (42
U.S.C. 263a) and 42 Code of Federal Regulations, Part 493 (42 CFR 493). Compliance
with these regulations is a condition of certification for the State Public Health
Laboratory Certification program.

As a result of that inspection, Department examiners determined that your laboratory is
**not** in compliance with all of the Conditions required for certification in the State Public
Health Laboratory Certification program. In addition, the examiners determined that the
deficient practices of your laboratory pose immediate jeopardy to patient health and
safety. (Immediate jeopardy is defined in the California Code of Regulations (CCR) as a
situation in which immediate corrective action is necessary because the laboratory's
non-compliance with one or more Condition-level requirements has already caused, is
causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals
served by the laboratory or to the health and safety of the general public.) Specifically,
the laboratory did not meet the following Conditions:

>    D3000 - 42 CFR 493.1100  Condition: Facility administration
>    D5300 - 42 CFR 493.1240  Condition: Preanalytic systems
>    D5400 - 42 CFR 493.1250  Condition: Analytic systems
>    D5800 - 42 CFR 493.1290  Condition: Postanalytic systems
>    D6076 - 42 CFR 493.1441  Condition: Laboratories performing high complexity
>      testing; laboratory director

In addition, other standards were also found to be not met. Enclosed is Form 2567,
Statement of Deficiencies, listing all the deficiencies found during the survey.

Because of the seriousness of these deficiencies, your laboratory no longer meets the
requirements to perform testing under the Health and Safety Code. Based on the finding
of immediate jeopardy, this office has contacted the Centers for Medicare & Medicaid
Services (CMS), and has notified them of our determination of non-compliance.

When a laboratory's deficiencies pose immediate jeopardy, the Department requires the
laboratory to take immediate action to remove the jeopardy and come into Condition-
level compliance.

Failure to meet Condition-level requirements and/or failure to return the allegation of
compliance and accompanying evidence within the stated time period may result in
sanctions against the public health laboratory's certificate, laboratory director, and
owners, suspension from the Medi-Cal and/or Medicaid program in addition to civil
money penalties, and recovery of costs associated with the investigation:

1.  Civil money penalties for each day of noncompliance or per violation for a
    condition level deficiency that poses immediate jeopardy, to the extent permitted
    by law.

CMS-CDPH-BL-000608

ER-552

CDPH Branch Laboratory
February 19, 2021
Page 3

   2. Exclusion from Ownership or Operation (Title 17 CCR § 1065.5)

   3. Revocation and/or suspension of the public health certificate (Title 17 CCR § 1065.5)

Please be advised that sanctions and/or enforcement actions can be rescinded only when compliance is verified. Please also be advised that due to the potential significant hazard to the public health and safety posed by the deficiencies identified, sanctions may become effective 21 calendar days from the date of this letter.

You have 10 CALENDAR DAYS from the date of this notice to provide this office (at the address shown at the end of this notice), with a credible allegation of compliance and acceptable evidence documenting that the immediate jeopardy has been removed and that action has been taken to correct all of the Condition-level deficiencies in question.

You are directed to document your allegation of compliance using the enclosed State Form 2567, Statement of Deficiencies, in the columns labeled "Provider Plan of Correction" and "Completion Date" located on the right side of the form, keying your responses to the deficiencies on the left. The laboratory director must sign, date, and return the completed State Form 2567 documented with a credible allegation of compliance to our office WITHIN 10 CALENDAR DAYS from the date of this notice. You must also submit documented evidence that verifies that the corrections were made.

For your information, a credible allegation of compliance is a statement or documentation that is:

   1. Made by a representative of a laboratory with a history of having maintained a commitment to compliance and taking corrective action when required;

   2. Realistic in terms of the possibility of the corrective action being accomplished between the date of the survey and the date of the allegation; and

   3. Indicates resolution of the problems.

In addition, acceptable evidence of correction must include:

   1. Documentation showing what corrective action(s) have been taken for patients found to have been affected by the deficient practice;

   2. How the laboratory has identified other patients having the potential to be affected by the same deficient practice and what corrective action(s) has been taken;

   3. What measure has been put into place or what systemic changes you have made to ensure that the deficient practice does not recur; and

   4. How the corrective action(s) are being monitored to ensure the deficient practice does not recur.

CDPH Branch Laboratory
February 19, 2021
Page 4

If you submit a credible allegation of compliance and acceptable evidence that your laboratory has removed jeopardy and come into Condition-level compliance, postmarked by March 1, 2021, and we are able to verify compliance with all CLIA requirements through a follow-up survey, sanctions will not be imposed. If your laboratory does not submit a credible allegation of compliance and acceptable evidence of correction, we will not conduct a follow-up survey. (Your allegation of compliance will be included in the public record of the inspection.) Electronic submission is acceptable.

Please send all correspondence to the following address:

   CDPH-Laboratory Field Services
   320 West 4th Street, Suite 890
   Los Angeles, CA 90013
   Attention: Catherine Tolentino, Examiner II

If you have any questions regarding this letter, you may contact me at 213-422-5703 or via email at Catherine.Tolentino@cdph.ca.gov.

Sincerely,

*Robert J. Thomas for*
*Catherine Tolentino*

Catherine Tolentino
Examiner II

Enclosure

cc:   Robert J. Thomas
      Branch Chief

      Elsa Eleco
      Section Chief, On-Site Licensing Inspections

CMS-CDPH-BL-000610

ER-554



Case 5:18-cr-00258-EJD   Document 1401-3   Filed 04/12/22   Page 283 of 296

# Exhibit No. 7

State of California—Health and Human Services Agency
# California Department of Public Health

**TOMAS J. ARAGÓN, M.D., Dr.P.H**
*Director and State Public Health Officer*



**GAVIN NEWSOM**
*Governor*

## IMPORTANT NOTICE – ACTION NECESSARY

*(Confirmation of successful transmission by email constitute proof of receipt of this letter)*

April 23, 2021

Adam Rosendorff, MD
CLIA Laboratory Director
CDPH Branch Laboratory
28454 Livingston Ave
Valencia, CA 91355

Timothy Bow
Emergency Procurement Officer, Owner Representative
California Department of Public Health
850 Marina Bay Parkway, Bldg P
Richmond, CA 94804

STATE: CPH889339
CLIA: 05D2197416

### PUBLIC HEALTH LABORATORY STATE INSPECTION - CONDITION LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY

Dear Laboratory Director/Owner(s):

In order for a public health laboratory to perform testing under the Health and Safety Code subsections 101160 (a) - (b), it must comply with all federal CLIA requirements. These requirements are found in section 353 of the Public Health Service Act (42 U.S.C. 263a) and 42 Code of Federal Regulations, Part 493 (42 CFR 493). Compliance with these regulations is a condition of certification for the State Public Health Laboratory Certification program.

An inspection of your laboratory was conducted on February 7, 2021, by Elsa Eleco, Examiner III, and Catherine Tolentino, Examiner II, representatives of the California Department of Public Health (the Department), Laboratory Field Services. This complaint inspection concluded on April 22, 2021.

---

CMS-CDPH-BL-000027

ER-556

CDPH Branch Laboratory
April 23, 2021
Page 2

As a result of that inspection, Department examiners determined that your laboratory is not in compliance with the requirements specified in the Health and Safety Code (HSC) section 101160 and/or California Code of Regulations (CCR), title 17, sections 1078 and 1083.

Department examiners also determined that your laboratory is not in compliance with all of the Conditions required for certification in the State Public Health Laboratory Certification program. In addition, the examiners determined that the deficient practices of your laboratory pose immediate jeopardy to patient health and safety. (Immediate jeopardy is defined in the California Code of Regulations (CCR) as a situation in which immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public.) Specifically, the laboratory did not meet the following Conditions:

> D5200 - 42 CFR 493.1230 Condition: General Laboratory Systems
> D5400 - 42 CFR 493.1250 Condition: Analytic systems
> D5800 - 42 CFR 493.1290 Condition: Postanalytic systems
> D6076 - 42 CFR 493.1441 Condition: Laboratories performing high complexity testing; laboratory director

In addition, other standards were also found to be not met. Enclosed is Form 2567, Statement of Deficiencies, listing all the deficiencies found during the survey.

Because of the seriousness of these deficiencies, your laboratory no longer meets the requirements to perform testing under the Health and Safety Code. Based on the finding of immediate jeopardy, this office has contacted the Centers for Medicare & Medicaid Services (CMS), and has notified them of our determination of non-compliance.

When a laboratory's deficiencies pose immediate jeopardy, the Department requires the laboratory to take immediate action to remove the jeopardy and come into Condition-level compliance.

Failure to meet Condition-level requirements and/or failure to return the allegation of compliance and accompanying evidence within the stated time period may result in sanctions against the public health laboratory's certificate, laboratory director, and owners, suspension from the Medi-Cal and/or Medicaid program in addition to civil money penalties, and recovery of costs associated with the investigation:

1. Civil money penalties for each day of noncompliance or per violation for a condition level deficiency that poses immediate jeopardy, to the extent permitted by law.

2. Exclusion from ownership or operation (Title 17 CCR § 1065.5)

CMS-CDPH-BL-000028

CDPH Branch Laboratory
April 23, 2021
Page 3

3. Revocation and/or suspension of the public health certificate (Title 17 CCR § 1065.5)

Please be advised that sanctions and/or enforcement actions can be rescinded only when compliance is verified. Please also be advised that due to the potential significant hazard to the public health and safety posed by the deficiencies identified, sanctions may become effective 21 calendar days from the date of this letter.

You have 10 CALENDAR DAYS from the date of this notice to provide this office with a credible allegation of compliance and acceptable evidence documenting that the immediate jeopardy has been removed and that action has been taken to correct all of the Condition-level deficiencies in question.

You are directed to document your allegation of compliance using the enclosed State Form 2567, Statement of Deficiencies, in the columns labeled "Provider Plan of Correction" and "Completion Date" located on the right side of the form, keying your responses to the deficiencies on the left. The laboratory director must sign, date, and return the completed State Form 2567 documented with a credible allegation of compliance to our office, at the address shown at the end of this notice, WITHIN 10 CALENDAR DAYS from the date of this notice. Electronic submission is acceptable. You must also submit documented evidence that verifies that the corrections were made.

For your information, a credible allegation of compliance is a statement or documentation that is:

1. Made by a representative of a laboratory with a history of having maintained a commitment to compliance and taking corrective action when required;

2. Realistic in terms of the possibility of the corrective action being accomplished between the date of the survey and the date of the allegation; and

3. Indicates resolution of the problems.

In addition, acceptable evidence of correction must include:

1. Documentation showing what corrective action(s) the laboratory has taken for patients found to have been affected by the deficient practice;

2. How the laboratory has identified other patients having the potential to be affected by the same deficient practice and what corrective action(s) the laboratory has taken;

CMS-CDPH-BL-000029

ER-558

CDPH Branch Laboratory
April 23, 2021
Page 4

3. What measure the laboratory has put into place or what systemic changes the laboratory has made to ensure that the deficient practice does not recur; and

4. How the laboratory is monitoring corrective action(s) to ensure the deficient practice does not recur.

If you submit a credible allegation of compliance and acceptable evidence that your laboratory has removed jeopardy and come into Condition-level compliance, postmarked by May 3, 2021, and we are able to verify compliance with all CLIA requirements through a follow-up survey, we will not impose sanctions. If your laboratory does not submit a credible allegation of compliance and acceptable evidence of correction, we will not conduct a follow-up survey. (Your allegation of compliance will be included in the public record of the inspection.)

Please send all correspondence to the following address:

CDPH-Laboratory Field Services
320 West 4th Street, Suite 890
Los Angeles, CA 90013
Attention: Catherine Tolentino, Examiner II

If you have any questions regarding this letter, you may contact me at 213-422-5703 or via email at Catherine.Tolentino@cdph.ca.gov.

Sincerely,

Catherine Tolentino
Examiner II

Enclosure

cc:   Robert J. Thomas
      Branch Chief

      Elsa Eleco
      Section Chief, On-Site Licensing

CMS-CDPH-BL-000030

# Exhibit No. 8

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Division of Clinical Laboratory Improvement & Quality (DCLIQ)
Western and Central Operations Branch - San Francisco Location
(Denver, Kansas City, San Francisco, and Seattle)
90 7th Street, Suite 5-300 (5W)
San Francisco, CA  94103-6707



Refer to: DCLIQ - GKY

## IMPORTANT NOTICE – PLEASE READ CAREFULLY

Sent via facsimile to (661) 402-6485 and first class mail.
*(Confirmation of successful facsimile transmission or e-mail constitutes proof of receipt.)*

May 6, 2021

Adam Rosendorff, M.D., Director
CDPH Branch Laboratory
28454 Livingston Avenue
Valencia, CA  91355

CLIA Number: 05D2197416

**RE:   NOTICE OF CONDITION-LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY**

**REQUEST FOR ALLEGATION OF COMPLIANCE AND EVIDENCE OF CORRECTION**

Dear Dr. Rosendorff:

In order for a laboratory to perform testing under the Clinical Laboratory Improvement Amendments of 1988 (CLIA), Public Law 100-578, it must comply with all CLIA requirements.  These requirements are found in section 353 of the Public Health Service Act (42 U.S.C. § 263a) and Title 42 of the Code of Federal Regulations, Part 493 (42 C.F.R. § 493). Laboratories are required to be in compliance with the applicable regulations. Compliance with these regulations is a condition of certification for the CLIA program.

Representatives from the Centers for Medicare & Medicaid Services (CMS) San Francisco Location conducted an initial certification and complaint survey of your laboratory that was completed on May 6, 2021. As a result of the survey, it was determined that your facility is not in compliance with all of the Conditions required for certification in the CLIA program. In addition, based on the Condition-level requirements at 42 C.F.R. § 493.1250, Analytic Systems and 42 C.F.R. § 493.1441, Laboratories Performing High Complexity Testing; Laboratory Director, it was determined that the deficient practices of the laboratory pose immediate jeopardy to patient health and safety. (Immediate jeopardy is defined by the CLIA regulations as a situation in which immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public.) Specifically, the following Conditions were not met:

CMS-CDPH-BL-000664

D5400 - 42 C.F.R. § 493.1250 Condition: Analytic Systems; and,
D6076 - 42 C.F.R. § 493.1441 Condition: Laboratories performing high complexity
testing; laboratory director

In addition, the laboratory was not in compliance with various CLIA Standards. Enclosed is Form CMS-2567, Statement of Deficiencies, listing all the deficiencies found during the survey.

When a laboratory's deficiencies pose immediate jeopardy, CMS requires the laboratory to take immediate action to remove the jeopardy and come into Condition-level compliance. Laboratories that do not meet the Condition-level requirements of CLIA may not be certified to perform laboratory testing under the CLIA program. You must take steps to bring any unmet Conditions and associated Standards into compliance immediately.

Please be advised that sanctions and/or enforcement actions can be rescinded only when compliance is verified.

You are required to respond WITHIN 10 CALENDAR DAYS OF RECEIPT of this notice. You are directed to document your credible allegation of compliance using the enclosed Form CMS-2567, Statement of Deficiencies, or in a separate document attachment. If using the Form CMS-2567 for each finding, complete the columns labeled "Provider Plan of Correction" and "Completion Date" located on the right side of the form, keying your responses to the deficiencies on the left. The laboratory director must sign, date and return the completed Form CMS-2567 or separate document containing your documentation of a credible allegation of compliance to our office WITHIN 10 CALENDAR DAYS from the date of this notice. You must also submit documented evidence verifying the laboratory has made all corrections noted in the credible allegation of compliance. Your allegation of compliance will be included in the public record of the inspection. We may conduct a follow-up, onsite survey to verify the corrections.

A credible allegation of compliance is a statement or documentation that is:

1)  Made by a representative of a laboratory with a history of having maintained a commitment to compliance and taking corrective action when required;

2)  Realistic in terms of the possibility of the corrective action being accomplished between the date of the survey and the date of the allegation; and,

3)  Indicates resolution of the problems.

For your information, acceptable evidence of correction must include:

1)  Documentation showing what corrective action(s) have been taken for patients found to have been affected by the deficient practice;

2)  How the laboratory has identified other patients having the potential to be affected by the same deficient practice and what corrective action(s) has been taken;

3)  What measure has been put into place or what systemic changes you have made to ensure that the deficient practice does not recur; and,

4)  How the corrective action(s) are being monitored to ensure the deficient practice does not recur.

Page **2** of **3**

CMS-CDPH-BL-000665

If you do not submit a credible allegation of compliance and acceptable evidence of correction, or if you submit an allegation of compliance that is determined to be credible and are found to be out of compliance with any CLIA Condition-level requirements at the time of the follow-up visit, we may impose sanctions. These may include alternative sanctions (Civil Money Penalty per 42 C.F.R. § 493.1834, Directed Plan of Correction per 42 C.F.R. § 493.1832, State Onsite Monitoring per 42 C.F.R. § 493.1836) and principal sanctions (suspension, limitation and/or revocation of your laboratory's CLIA certificate per 42 C.F.R. § 493.1840, and cancellation of your laboratory's approval for Medicare payments per 42 C.F.R. § 493.1814).

Please note that surveys take an overview of the laboratory, often through random sampling. By its nature, a survey may not find every violation that the laboratory may have committed. It remains the responsibility of the laboratory and its director to ensure that the laboratory is at all times following all CLIA requirements, to identify any problems in the laboratory and take corrective action specific to the problems, and to institute appropriate quality assessment measures to ensure that the deficient practices do not recur.

In addition to the routine CLIA certification surveys, announced or unannounced investigations/surveys may be conducted by CMS or its agent at any time to address complaints or other non-compliance issues. These investigations/surveys may well identify violations that may not have surfaced during a routine survey using random sampling, but for which the laboratory and its director will still be held responsible.

All responses as well as any future correspondence pertaining to this survey should be sent to:

> Karen Fuller, Manager
> Division of Clinical Laboratory Improvement & Quality (DCLIQ)
> Western and Central Operations Branch – San Francisco Office
> Centers for Medicare & Medicaid Services
> 90 7th Street, Suite S-300 (5W)
> San Francisco, CA  94103-6707

Please contact Gary Yamamoto by telephone at (415) ██████ or by e-mail at ████████@cms.hhs.gov, or Josh Cohen by telephone at (415) ████████ or by e-mail at ███████@cms.hhs.gov with any questions concerning this letter.

Sincerely,

Karen M. Fuller -S  Digitally signed by Karen M.
Fuller -S
Date: 2021.05.06 12:24:45 -07'00'

Karen Fuller, Manager
Division of Clinical Laboratory Improvement & Quality (DCLIQ)
Western and Central Operations Branch
(Denver, Kansas City, San Francisco, and Seattle)

Enclosure:   CMS-2567, Statement of Deficiencies

cc:   California Department of Public Health, Laboratory Field Services

CMS-CDPH-BL-000666

ER-563

Date/Time IJ Template provided to entity: _____ **May 6, 2021 12:00PM** _____

| IJ Component | Yes/No | Preliminary fact analysis which demonstrates when key component exists. |
|---|---|---|
| **Noncompliance:** Has the entity failed to meet one or more federal health, safety, and/or quality regulations?<br><br>If yes, in the blank space, identify the tag and briefly summarize the issues that lead to the determination that the entity is in noncompliance with the identified requirement. This includes the action(s), error(s), or lack of action, and the extent of the noncompliance (for example, number of cases). Use one IJ template for each tag being considered at IJ level. | Yes | D6076 – Laboratory Director, High Complexity Testing<br><br>The Laboratory Director failed to ensure that:<br>- Testing systems developed for its SARS-CoV-2 test provided quality laboratory results for all aspects of the testing performed;<br>- Quality Assessment (QA) programs are maintained;<br>- Test systems are functioning properly; and,<br>- Personnel received appropriate training prior to results reporting. |
| | | **AND** |
| **Serious injury, serious harm, serious impairment or death:** Is there evidence that a serious adverse outcome occurred, or a serious adverse outcome is likely as a result of the identified noncompliance?<br><br>If Yes, in the blank space, briefly summarize the serious adverse outcome, or likely serious adverse outcome to the recipient. | Yes | A serious adverse outcome could occur if inaccurate and unreliable patient test results are reported as a result of non-compliance with 42 C.F.R. § 493.1441 Laboratories Performing High Complexity Testing; Laboratory Director (deficiency tag: D6076). |
| | | **AND** |
| **Need for Immediate Action:** Does the entity need to take immediate action to correct noncompliance that has caused or is likely to cause serious injury, serious harm, serious impairment, or death?<br><br>If yes, in the blank space, briefly explain why. | Yes | The laboratory must immediately:<br>- Establish test performance specifications for its SARS-CoV-2 test system;<br>- Maintain QA protocols;<br>- Follow maintenance protocols;<br>- Maintain an accurate test records system; and,<br>- Ensure employee training and competency. |

**Disclaimer: The findings on this IJ Template are preliminary and do not represent an official finding against a Medicare provider or supplier. Form CMS-2567 is the only form that contains official survey finding.**

CMS-CDPH-BL-000667

Date/Time IJ Template provided to entity:    __May 6, 2021 12:00PM__

| IJ Component | Yes/No | Preliminary fact analysis which demonstrates when key component exists. |
|---|---|---|
| **Noncompliance:** Has the entity failed to meet one or more federal health, safety, and/or quality regulations?<br><br>If yes, in the blank space, identify the tag and briefly summarize the issues that lead to the determination that the entity is in noncompliance with the identified requirement. This includes the action(s), error(s), or lack of action, and the extent of the noncompliance (for example, number of cases). Use one IJ template for each tag being considered at IJ level. | Yes | D5400 ANALYTIC SYSTEMS<br>The laboratory failed to:<br>- Establish test performance specifications for its SARS-CoV-2 test system;<br>- Ensure quality control materials meet laboratory criteria for acceptability before reporting a patient SARS-CoV-2 test result;<br>- Ensure employee training and competency;<br>- Follow maintenance protocols;<br>- Maintain an accurate test records system; and,<br>- Maintain Quality Assurance (QA) protocols. |
| **Serious injury, serious harm, serious impairment or death:** Is there evidence that a serious adverse outcome occurred, or a serious adverse outcome is likely as a result of the identified noncompliance?<br><br>If Yes, in the blank space, briefly summarize the serious adverse outcome, or likely serious adverse outcome to the recipient. | Yes | A serious adverse outcome could occur if inaccurate and unreliable patient test results are reported as a result of non-compliance with 42 C.F.R. § 493.1250 Condition: Analytic Systems (deficiency tag: D5400). |
| **Need for Immediate Action:** Does the entity need to take immediate action to correct noncompliance that has caused or is likely to cause serious injury, serious harm, serious impairment, or death?<br><br>If yes, in the blank space, briefly explain why. | Yes | The laboratory must immediately:<br>- Establish test performance specifications for its SARS-CoV-2 test system;<br>- Ensure quality control materials meet laboratory criteria for acceptability before reporting a patient SARS-CoV-2 test result;<br>- Ensure employee training and competency;<br>- Follow maintenance protocols;<br>- Maintain an accurate test records system; and,<br>- Maintain QA protocols. |

**Disclaimer: The findings on this IJ Template are preliminary and do not represent an official finding against a Medicare provider or supplier. Form CMS-2567 is the only form that contains official survey finding.**

CMS-CDPH-BL-000668



Case 5:18-cr-00258-EJD   Document 1401-3   Filed 04/12/22   Page 294 of 296

# Exhibit No. 9



**From:** Rosendorff, Adam <████████@PERKINELMER.COM>
**Sent:** Tuesday, June 1, 2021 12:14 PM
**To:** Flores, Elaine@CDPH <████████@cdph.ca.gov>; Tolentino, Catherine@CDPH
<████████@cdph.ca.gov>; Eleco, Elsa@CDPH <████████@cdph.ca.gov>
**Subject:** Re: Resigning from PerkinElmer and CDPH Branch Laboratory, Valencia

Hello

Please disregard this email.

Adam


Adam Rosendorff, MD
Laboratory Director, CDPH Branch Laboratory, Valencia
Medical Director, PerkinElmer Genomics
Mobile: 617-784-8929
E-mail: adam.rosendorff@perkinelmer.com



**From:** "Rosendorff, Adam" <████████@PERKINELMER.COM>
**Date:** Wednesday, May 26, 2021 at 10:17 AM
**To:** "Flores, Elaine@CDPH" <████████@cdph.ca.gov>, "Tolentino, Catherine@CDPH"
<████████@cdph.ca.gov>, "Eleco, Elsa@CDPH" ████████@cdph.ca.gov>
**Subject:** FW: Resigning from PerkinElmer and CDPH Branch Laboratory, Valencia


Good morning

Please see the email below.

US-MISC-001143

Thank you,

Adam

---

**From:** "Rosendorff, Adam" <█████████@PERKINELMER.COM>
**Date:** Wednesday, May 26, 2021 at 10:05 AM
**To:** "Hegde, Madhuri" <█████████@PERKINELMER.COM>, "Dennewitz, LeeAnn" <█████████@perkinelmer.com>
**Subject:** Resigning from PerkinElmer

Hello

I would like to submit my resignation as laboratory director of CDPH Branch Laboratory, Valencia, and as an employee of PerkinElmer, effective two weeks from today.

I have decided to take a job in Northern California to be closer to my daughter.

I will be in shortly to discuss further if needed.

Sincerely,

Adam


Adam Rosendorff, MD
Laboratory Director
CDPH Branch Laboratory, Valencia
(cell) █████████

```
 1

 2                    UNITED STATES DISTRICT COURT

 3                   NORTHERN DISTRICT OF CALIFORNIA

 4                        SAN JOSE DIVISION

 5

     UNITED STATES OF AMERICA,       )
 6                                    )   CR-18-00258-EJD
                   PLAINTIFF,         )
 7                                    )   SAN JOSE, CALIFORNIA
              VS.                     )
 8                                    )   MARCH 22, 2022
     RAMESH "SUNNY" BALWANI,          )
 9                                    )   VOLUME 8
                   DEFENDANT.         )
10   _____ )   PAGES 985 - 1154

11

12               TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
             (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTER:
22                              IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074
23

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER
25
```

| | | |
|---|---|---|
| 01:00PM | 1 | **AFTERNOON SESSION** |
| 01:36PM | 2 | (JURY IN AT 1:36 P.M.) |
| 01:36PM | 3 | THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL |
| 01:37PM | 4 | ARE PRESENT.  MR. BALWANI IS PRESENT. |
| 01:37PM | 5 | THE JURY AND ALTERNATES ARE PRESENT. |
| 01:37PM | 6 | DOES THE GOVERNMENT HAVE A WITNESS TO CALL? |
| 01:37PM | 7 | MR. BOSTIC:  YES, YOUR HONOR. |
| 01:37PM | 8 | THE UNITED STATES CALLED ERIKA CHEUNG. |
| 01:37PM | 9 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 01:37PM | 10 | GOOD AFTERNOON. |
| 01:37PM | 11 | THE WITNESS:  GOOD AFTERNOON. |
| 01:37PM | 12 | THE COURT:  IF YOU WOULD STAND BY OUR COURTROOM |
| 01:37PM | 13 | DEPUTY AND RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 01:37PM | 14 | THE CLERK:  RAISE YOUR RIGHT HAND. |
| 01:38PM | 15 | **(GOVERNMENT'S WITNESS, ERIKA CHEUNG, WAS SWORN.)** |
| 01:38PM | 16 | THE WITNESS:  YES. |
| 01:38PM | 17 | THE COURT:  PLEASE HAVE A SEAT.  MAKE YOURSELF |
| 01:38PM | 18 | COMFORTABLE.  FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS |
| 01:38PM | 19 | YOU NEED. |
| 01:38PM | 20 | I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 01:38PM | 21 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 01:38PM | 22 | AND THEN SPELL IT, PLEASE. |
| 01:38PM | 23 | THE WITNESS:  OKAY.  MY NAME IS ERIKA CHEUNG, AND |
| 01:38PM | 24 | THAT'S SPELLED E-R-I-K-A, CHEUNG, C-H-E-U-N-G. |
| 01:38PM | 25 | THE COURT:  THANK YOU. |

01:38PM  1         COUNSEL.

01:38PM  2                    **DIRECT EXAMINATION**

01:38PM  3    BY MR. BOSTIC:

01:38PM  4    Q.   GOOD AFTERNOON, MS. CHEUNG.

01:38PM  5    A.   GOOD AFTERNOON.

01:38PM  6    Q.   IF YOU ARE FULLY VACCINATED, I UNDERSTAND THAT THE COURT

01:38PM  7    WILL ALLOW YOU TO TESTIFY WITHOUT A MASK?

01:38PM  8    A.   OKAY.  I'M FULLY VACCINATED.

01:38PM  9              THE COURT:  YES.  PLEASE.

01:38PM  10   BY MR. BOSTIC:

01:38PM  11   Q.   MS. CHEUNG, WAS THERE A TIME WHEN YOU WORKED FOR A COMPANY

01:38PM  12   CALLED THERANOS?

01:38PM  13   A.   YES.

01:38PM  14   Q.   AND WHEN YOU WERE AT THERANOS, WHAT WAS YOUR JOB TITLE AND

01:38PM  15   WHAT DID YOU DO THERE?

01:38PM  16   A.   MY JOB TITLE WAS LAB ASSOCIATE, AND I STARTED IN THE

01:38PM  17   COMPANY WORKING IN THE RESEARCH AND DEVELOPMENT LAB.

01:38PM  18        AND THEN I WAS TRANSITIONED TO TAKING THE PRODUCTS THAT WE

01:38PM  19   DEVELOPED IN RESEARCH AND DEVELOPMENT INTO THE CLINICAL LAB.

01:39PM  20        AND THE TITLE WAS THE SAME FOR BOTH POSITIONS.

01:39PM  21   Q.   THANK YOU.

01:39PM  22        DO YOU REMEMBER WHAT YOUR APPROXIMATE DATES OF EMPLOYMENT

01:39PM  23   WERE AT THE COMPANY?

01:39PM  24   A.   I WORKED AT THERANOS OCTOBER OF 2013 TO APRIL OF 2014.

01:39PM  25   Q.   AND HOW DID YOUR EMPLOYMENT END?  WERE YOU TERMINATED OR

01:39PM  1    LAID OFF?  DID YOU RESIGN?

01:39PM  2    A.   I RESIGNED.

01:39PM  3    Q.   AND WHY DID YOU RESIGN FROM YOUR JOB IN APRIL OF 2014?

01:39PM  4    A.   I RESIGNED FROM THERANOS BECAUSE I WAS UNCOMFORTABLE WITH

01:39PM  5    THE FACT THAT WE WERE TESTING ON PATIENTS WITHOUT -- WITH

01:39PM  6    TECHNOLOGY THAT I FELT WASN'T PRODUCING RELIABLE RESULTS FOR

01:39PM  7    THOSE PATIENTS.

01:39PM  8    Q.   I'D LIKE TO ASK YOU SOME MORE ABOUT THAT, BUT FIRST IF I

01:39PM  9    COULD ASK YOU A COUPLE OF QUESTIONS ABOUT YOUR BACKGROUND.

01:39PM  10        CAN YOU SUMMARIZE YOUR EDUCATION FOR US, PLEASE?

01:39PM  11   A.   I -- AT THE TIME AT THERANOS I HAD RECENTLY RECEIVED MY

01:39PM  12   UNDERGRADUATE DEGREE FROM THE UNIVERSITY OF CALIFORNIA BERKELEY

01:40PM  13   IN MOLECULAR AND CELL BIOLOGY AND LINGUISTICS.

01:40PM  14   Q.   AND HAD YOU HAD ANY EMPLOYMENT HISTORY IN BETWEEN

01:40PM  15   OBTAINING YOUR DEGREE AND WORKING AT THERANOS?

01:40PM  16   A.   BETWEEN OBTAINING -- NO.  THIS WAS MY FIRST JOB OUT OF

01:40PM  17   COLLEGE.

01:40PM  18   Q.   CAN YOU TELL US HOW YOU FIRST HEARD ABOUT THERANOS AND HOW

01:40PM  19   YOU BECAME AWARE OF THE JOB AT THE COMPANY?

01:40PM  20   A.   I FIRST LEARNED ABOUT THERANOS AT A JOB CAREER FAIR THAT

01:40PM  21   WAS ON THE UNIVERSITY'S CAMPUS.

01:40PM  22        AND ESSENTIALLY WHEN I HAD ARRIVED THERE, THERE WASN'T A

01:40PM  23   LOT OF COMPANIES THAT WERE IN BIOTECHNOLOGY, EXCEPT FOR

01:40PM  24   THERANOS, AND THEY HAD A LINE OUT THE DOOR OF PEOPLE REALLY

01:40PM  25   WANTING TO WORK FOR THEM.

CHEUNG DIRECT BY MR. BOSTIC                                          1118

01:40PM   1         AND SO I WAITED IN LINE TO TALK TO THE RECRUITER, AND THEY

01:40PM   2    BASICALLY TOLD ME THAT THEY WERE LOOKING FOR ENTRY LEVEL

01:40PM   3    SCIENTISTS AND ASSOCIATES.

01:40PM   4    Q.   SO IT SOUNDS LIKE THERE WAS SOME EXCITEMENT ABOUT THE

01:40PM   5    COMPANY IN GENERAL?

01:40PM   6    A.   THERE WAS A LOT OF EXCITEMENT ABOUT THE COMPANY.  I THINK

01:41PM   7    AT THAT TIME, ASIDE FROM WHAT PEOPLE WERE TALKING ABOUT

01:41PM   8    SPECIFICALLY IN THE VALLEY, THERE WASN'T A TON KNOWN EXCEPT FOR

01:41PM   9    THEIR WEBSITE AND MAYBE ABOUT TWO ARTICLES, ONE FROM "THE

01:41PM  10    WALL STREET JOURNAL" AND ANOTHER ABOUT WHAT THE COMPANY WAS

01:41PM  11    DOING AND A COUPLE YOUTUBE VIDEOS.

01:41PM  12    Q.   WERE YOU PERSONALLY EXCITED ABOUT THE PROSPECT OF THE

01:41PM  13    COMPANY AT THAT TIME?

01:41PM  14    A.   I WAS VERY EXCITED TO BE APART OF THE COMPANY.

01:41PM  15    Q.   AND YOU SAID NOT MUCH WAS KNOWN.

01:41PM  16         WHAT DID YOU KNOW ABOUT THE COMPANY AT THE TIME THAT MADE

01:41PM  17    YOU EXCITED ABOUT IT?

01:41PM  18    A.   THERE WAS A NUMBER OF THINGS.  I THINK A BIG ONE WAS

01:41PM  19    THERANOS WAS CREATING THIS SORT OF INNOVATIVE TECHNOLOGY WHERE

01:41PM  20    INSTEAD OF GETTING ALL OF YOUR BLOOD DIAGNOSTICS BY VENOUS DRAW

01:41PM  21    YOU CAN DO IT BY FINGERSTICK.  SO THAT WAS REALLY EXCITING TO

01:41PM  22    SEE WHAT THEY WERE WORKING ON, AND THE SCIENCE SEEMED VERY

01:41PM  23    COMPELLING TO START OFF AS A -- START OFF MY CAREER.

01:41PM  24         I WAS REALLY ATTRACTED TO THE FOUNDER OF THE COMPANY WHO

01:41PM  25    HAD DROPPED OUT OF STANFORD AT AGE 19 TO START THIS COMPANY,

ER-573

01:42PM 1     AND SHE SEEMED TO HAVE A LOT OF CHARISMA ABOUT HER, AND IT JUST

01:42PM 2     SEEMED LIKE AN INTERESTING PERSON TO WORK WITH.

01:42PM 3         THE BLOOD TESTS WERE ALSO AFFORDABLE, AND THEY HAD PRICE

01:42PM 4     TRANSPARENCY AROUND THEM, SO IT SEEMED LIKE A GOOD OPPORTUNITY

01:42PM 5     TO HELP SUPPORT IN MAKING HEALTH CARE MORE ACCESSIBLE FOR

01:42PM 6     PEOPLE, WHICH WAS A BIG PERSONAL MISSION OF MINE.

01:42PM 7         AND IT WAS JUST -- IT SEEMED LIKE AN UP AND COMING

01:42PM 8     COMPANY, AND SO I WAS JUST REALLY HAPPY THAT I COULD

01:42PM 9     POTENTIALLY HAVE AN OPPORTUNITY TO WORK THERE STRAIGHT OUT OF

01:42PM 10    COLLEGE.

01:42PM 11    Q.   YOU MENTIONED THE FOUNDER OF THE COMPANY.

01:42PM 12         ARE YOU REFERRING TO ELIZABETH HOLMES?

01:42PM 13    A.   YES.

01:42PM 14    Q.   DID THAT INTEREST CAUSE YOU TO PURSUE A JOB AT THERANOS?

01:42PM 15    A.   YES.

01:42PM 16    Q.   AND WHAT WERE THE STEPS IN PURSUING THAT JOB?

01:42PM 17    A.   SO PURSUING THAT JOB, THE FIRST STEP IS THAT I GAVE AT

01:42PM 18    THAT CAREER FAIR MY RESUME TO ONE OF THE RECRUITERS.

01:42PM 19         THE RECRUITERS BASICALLY CALLED ME BACK AND SAID, HEY, WE

01:42PM 20    HAVE JOB OPPORTUNITIES.  I DIDN'T REALLY KNOW WHAT JOB I WAS

01:43PM 21    INTERVIEWING FOR.

01:43PM 22         BUT AFTER THAT I MET ON THE PHONE WITH ONE OF THE HR

01:43PM 23    MANAGERS, AND THEN THE PRODUCT MANAGER, AND THEN WENT IN FOR AN

01:43PM 24    INTERVIEW WITH TWO SCIENTISTS, AND THEN I HAD A FINAL INTERVIEW

01:43PM 25    WITH SUNNY BALWANI AND ELIZABETH HOLMES.

CHEUNG DIRECT BY MR. BOSTIC                                    1120

01:43PM  1    Q.   WHEN YOU INTERVIEWED WITH MR. BALWANI AND MS. HOLMES, WERE

01:43PM  2    THOSE INTERVIEWS TOGETHER OR DID YOU SPEAK TO THEM

01:43PM  3    INDIVIDUALLY?

01:43PM  4    A.   I SPOKE TO THEM INDIVIDUALLY, AND THEY WERE BACK TO BACK.

01:43PM  5    Q.   AND WHAT DO YOU REMEMBER ABOUT THOSE CONVERSATIONS?

01:43PM  6         FIRST LET'S START WITH YOUR CONVERSATION WITH MS. HOLMES,

01:43PM  7    IF YOU REMEMBER ANY.

01:43PM  8    A.   SO MY CONVERSATION WITH MS. HOLMES, I REMEMBER BASICALLY

01:43PM  9    GOING IN THERE, AND SHE WAS MY LAST INTERVIEW BEFORE I GOT THE

01:43PM  10   JOB.

01:43PM  11        WE TALKED A LITTLE BIT ABOUT WHAT WOULD BE ENTAILED

01:43PM  12   BECAUSE I STILL WASN'T VERY SURE WHAT JOB I WAS APPLYING FOR,

01:43PM  13   SO SHE SUGGESTED INSTEAD OF PUTTING ME IN THE CLINICAL SETTING,

01:44PM  14   PUTTING ME IN THE RESEARCH LAB.

01:44PM  15        I TRIED TO ASK HER A COUPLE OF QUESTIONS ABOUT THE

01:44PM  16   TECHNOLOGY, BUT, THEY'RE LIKE, YOU'LL FIND OUT ONCE YOU WORK

01:44PM  17   FOR THE COMPANY.

01:44PM  18        AND I THINK THERE WAS -- AT THAT TIME THERE WAS A BIT OF

01:44PM  19   STAR STRUCKNESS AND WAS, LIKE, OH, I GET AN OPPORTUNITY TO MEET

01:44PM  20   WITH THE FOUNDER OF THE COMPANY EVEN THOUGH I'M JUST APPLYING

01:44PM  21   FOR AN ENTRY LEVEL POSITION.

01:44PM  22        SO I WAS A BIT SURPRISED THAT SHE WAS WILLING TO PUT IN

01:44PM  23   THAT TIME AND ENERGY TO INTERVIEW ME.

01:44PM  24   Q.   AND THEN SAME QUESTION FOR YOUR CONVERSATION WITH

01:44PM  25   MR. BALWANI.

CHEUNG DIRECT BY MR. BOSTIC                                    1121

01:44PM   1         ACTUALLY LET ME ASK, WHAT WAS YOUR UNDERSTANDING AT THE

01:44PM   2    TIME OF MR. BALWANI'S POSITION AT THE COMPANY?

01:44PM   3    A.    MR. BALWANI WAS THE COO OF THE COMPANY.

01:44PM   4    Q.    AND DID YOU HAVE AN UNDERSTANDING AS TO WHERE THAT PUT HIM

01:44PM   5    IN THE ORG CHART RELATIVE TO MS. HOLMES, FOR EXAMPLE?

01:44PM   6    A.    I WAS UNDER THE IMPRESSION THAT THEY WERE KIND OF WORKING

01:44PM   7    SIDE BY SIDE, THAT THEY WERE BOTH AT THE TOP TIER OF THE

01:44PM   8    COMPANY.

01:44PM   9    Q.    AND WHAT DO YOU REMEMBER FROM YOUR INTERVIEW WITH

01:45PM  10    MR. BALWANI WHEN YOU WERE APPLYING FOR THE JOB?

01:45PM  11    A.    I REMEMBER IT WAS INITIALLY A LITTLE TOUGH, AND HE ASKED

01:45PM  12    ME A LOT OF QUESTIONS ABOUT MY PRIOR EXPERIENCE.

01:45PM  13         I WORKED AT A LAB AT UCSF.  HE WAS REALLY CURIOUS AS TO

01:45PM  14    WHY I DOUBLE MAJORED IN LINGUISTICS AND THAT SEEMED KIND OF

01:45PM  15    ODD.  AND I TOLD HIM THAT WAS A HOBBY OF MINE.

01:45PM  16         AND HE SEEMED TO BE SORT OF, YEAH, JUST ASKING ME LOTS OF

01:45PM  17    QUESTIONS BUT SOFTENED WHEN I TALKED ABOUT THE FACT THAT I WAS

01:45PM  18    REALLY INTERESTED WITH ELIZABETH HOLMES AND WAS REALLY

01:45PM  19    IMPRESSED WITH WHAT THE COMPANY WAS DOING, AND EVEN THERE WAS

01:45PM  20    NOT A LOT KNOWN BY THEM, BUT THERE SEEMED AT LEAST AS AN

01:45PM  21    OUTSIDER THERE WAS LOTS OF INTERESTING THINGS.

01:45PM  22         AND AFTER THAT MOMENT THEN HE SAID, OKAY, WAIT HERE, AND

01:45PM  23    WE'LL HAVE ELIZABETH CONDUCT THE FINAL INTERVIEW.

01:45PM  24    Q.    AFTER THOSE TWO FINAL INTERVIEWS, DID YOU RECEIVE AN OFFER

01:45PM  25    OF EMPLOYMENT FROM THERANOS?

01:45PM  1    A.   YES.

01:45PM  2    Q.   AND DID YOU ACCEPT?

01:45PM  3    A.   YES.

01:45PM  4    Q.   WHEN YOU STARTED AT THE COMPANY, DID YOU SIGN AN NDA, A

01:46PM  5    NONDISCLOSURE AGREEMENT?

01:46PM  6    A.   YES.

01:46PM  7    Q.   AND WHAT DO YOU REMEMBER GENERALLY, IF ANYTHING, ABOUT HOW

01:46PM  8    CONFIDENTIAL INFORMATION OR SECRET INFORMATION WAS HANDLED AT

01:46PM  9    THERANOS?

01:46PM 10    A.   WE WERE -- SO BEFORE I EVEN JOINED THE COMPANY EVEN WHILE

01:46PM 11    INTERVIEWING, THEY HAD ME SIGN AN NDA.

01:46PM 12         WHEN WE FIRST JOINED THE COMPANY, THEY ALSO HAD US SIGN AN

01:46PM 13    NDA.

01:46PM 14         AND THEN WE HAD AN INTRODUCTORY INTERVIEW WITH

01:46PM 15    CHRISTIAN HOLMES, WHO WAS ONE OF THE LEAD PRODUCT MANAGERS OF

01:46PM 16    THE COMPANY.  AND HE ESSENTIALLY TOLD US THAT CONFIDENTIALITY

01:46PM 17    WAS VERY IMPORTANT FOR THE COMPANY, THAT THEY DIDN'T WANT

01:46PM 18    COMPETITORS TO KNOW ABOUT TRADE SECRETS, ABOUT THE TECHNOLOGY

01:46PM 19    THAT WE WERE WORKING ON.

01:46PM 20         AND EVEN TO THE EXTENT THAT WE WERE NOT ALLOWED TO PUT ON

01:46PM 21    OUR LINKEDIN THAT WE WORKED FOR THE COMPANY, AND WE HAD TO BE

01:46PM 22    QUITE VAGUE ABOUT WHAT OUR ROLES AND RESPONSIBILITIES AND

01:46PM 23    DUTIES WERE TO ENSURE THAT NO COMPETITORS WOULD FIND OUT WHAT

01:47PM 24    WE WERE WORKING ON OR ANY EXTERNAL ORGANIZATIONS KNEW EXACTLY

01:47PM 25    WHAT WAS HAPPENING INTERNALLY.

01:47PM 1   Q.   AND YOU MENTIONED THE NAME CHRISTIAN HOLMES.

01:47PM 2        IS THAT PERSON RELATED TO ELIZABETH HOLMES?

01:47PM 3   A.   THAT'S HER BROTHER.

01:47PM 4   Q.   WHEN YOU FIRST STARTED AT THE COMPANY, WHAT WAS YOUR

01:47PM 5   UNDERSTANDING OF WHAT BUSINESS THE COMPANY WAS IN?  WHAT WAS IT

01:47PM 6   DOING?

01:47PM 7   A.   SO MY UNDERSTANDING WAS THAT THE BUSINESS WAS ESSENTIALLY

01:47PM 8   CREATING THESE MEDICAL DEVICES AND THESE BLOOD TESTING MACHINES

01:47PM 9   WHERE, AGAIN, WE WOULD BE ABLE TO TAKE A FINGERSTICK OF BLOOD

01:47PM 10  AND PROCESS ALL OF THE DIFFERENT BLOOD SAMPLES THAT A PATIENT

01:47PM 11  WOULD NORMALLY ORDER WHEN THEY WOULD GO SEE A DOCTOR.

01:47PM 12       SO IT WAS A COMBINATION BETWEEN THIS MEDICAL DEVICE

01:47PM 13  COMPANY IN ADDITION TO PATIENT SERVICES.  SO WE WERE ALSO EN

01:47PM 14  ROUTE -- ALREADY IN THE PROGRESS WHEN I STARTED WORKING FOR THE

01:48PM 15  COMPANY OF ACTIVELY TESTING PATIENTS.

01:48PM 16  Q.   SO LET'S TAKE THOSE TWO AREAS ONE AT A TIME.

01:48PM 17  A.   OKAY.

01:48PM 18  Q.   FIRST, YOU MENTIONED DEVELOPING MEDICAL DEVICES TO TEST

01:48PM 19  BLOOD; IS THAT CORRECT?

01:48PM 20  A.   YES.

01:48PM 21  Q.   AND DID THERANOS HAVE ANY COMPETITORS IN THAT FIELD?

01:48PM 22  A.   YES.  SO THE TWO MAJOR COMPETITORS THAT WE TALKED ABOUT IN

01:48PM 23  THE COMPANY WERE LABCORP AND QUEST DIAGNOSTICS.

01:48PM 24  Q.   AND LET'S BREAK APART, IF WE CAN, THE FIELD OF CREATING

01:48PM 25  MEDICAL DEVICES AND THE FIELD OF TESTING BLOOD.

01:48PM  1    A.   YES.

01:48PM  2    Q.   SO THE BUSINESS OF LABCORP AND QUEST, WHICH BUCKET DID

01:48PM  3    THEY FALL INTO?  WERE THEY MEDICAL DEVICE COMPANIES OR BLOOD

01:48PM  4    TESTING LABS?

01:48PM  5    A.   THEY WERE BLOOD TESTING LABS.

01:48PM  6    Q.   OH, SO THEY WERE COMPETITORS TO THERANOS IN THAT AREA?

01:48PM  7    A.   YES.

01:48PM  8    Q.   AND HOW ABOUT IN THE DEVELOPING AND MANUFACTURING MEDICAL

01:48PM  9    DEVICES FIELD, DID THERANOS HAVE COMPETITORS IN THAT ACTIVITY?

01:49PM  10   A.   YES.

01:49PM  11   Q.   AND AS YOU UNDERSTOOD IT AT THE TIME, WHO WERE THE

01:49PM  12   COMPETITORS THERE?

01:49PM  13   A.   SO IN TERMS OF THE COMPETITORS, IN TERMS OF JUST BLOOD

01:49PM  14   DIAGNOSTIC DEVICES, THOSE ARE PEOPLE LIKE SIEMENS, DIASORIN,

01:49PM  15   BASICALLY ANYONE WHO DEVELOPED MEDICAL DEVICES THAT TEST BLOOD.

01:49PM  16       I MEAN, THERE WERE A COUPLE THAT DID FINGERSTICK

01:49PM  17   TECHNOLOGY, TOO.  YOU HAVE COMPANIES THAT DO BLOOD GLUCOSE

01:49PM  18   MONITORING OR I0STAT FINGERSTICK COLLECTION FOR EMERGENCY

01:49PM  19   VEHICLES, BUT THAT'S GENERALLY ANY COMPANY THAT DEVELOPS

01:49PM  20   MEDICAL DEVICES THAT YOU'RE ABLE TO TEST BLOOD IS THERANOS'S

01:49PM  21   COMPETITOR.

01:49PM  22   Q.   YOU MENTIONED SOME COMPANIES THAT DID FINGERSTICK TESTING.

01:49PM  23       WERE YOU AWARE IN 2013 OF THESE OTHER COMPANIES THAT WERE

01:49PM  24   ALSO DOING BLOOD TESTING BY FINGERSTICK?

01:49PM  25   A.   YES.

01:49PM  1    Q.   WHEN YOU STARTED AT THE COMPANY, CAN YOU TELL US ABOUT

01:50PM  2    YOUR INITIAL JOB TITLE AND YOUR ROLE AT THE COMPANY WHEN YOU

01:50PM  3    FIRST STARTED WORKING THERE?

01:50PM  4    A.   WHEN I FIRST STARTED WORKING FOR THE COMPANY, I WAS A LAB

01:50PM  5    ASSOCIATE FOR THE RESEARCH AND DEVELOPMENT LAB, SPECIFICALLY

01:50PM  6    FOCUSSED ON IMMUNOASSAYS, AND THAT TEAM WAS CALLED ELISA.

01:50PM  7    Q.   AND GENERALLY SPEAKING, WHAT DID THE RESEARCH AND

01:50PM  8    DEVELOPMENT LAB DO AT THERANOS?

01:50PM  9    A.   SO THE RESEARCH AND DEVELOPMENT LAB WAS ESSENTIALLY

01:50PM  10   CREATING A LOT OF THESE TESTS THAT COULD BE RUN ON FINGERSTICK

01:50PM  11   ON THE PROPRIETARY DEVICE THAT THERANOS CREATED CALLED THE

01:50PM  12   EDISON.

01:50PM  13        SO THEY WERE IN CHARGE OF CREATING THE TEST AND VALIDATING

01:50PM  14   THEM AND MAKING SURE THAT DID THEY HIT THE STANDARDS NECESSARY

01:50PM  15   TO ACTUALLY TAKE THEM TO MARKET.  SO ARE THEY ACCURATE?  DO

01:50PM  16   THEY SHOW CONSISTENT RESULTS?

01:50PM  17        AND ONCE WE HAD DONE THAT VALIDATION, YOU WOULD SORT OF

01:50PM  18   CARRY OFF THE TEST TO THE CLINICAL SETTING WHERE THE PATIENT

01:50PM  19   PROCESSING HAPPENED.

01:51PM  20   Q.   IS IT CORRECT THEN THAT FOR A GIVEN TEST OR ASSAY, THE R&D

01:51PM  21   WORK GENERALLY HAPPENS BEFORE THE TEST IS MOVED INTO THE

01:51PM  22   CLINICAL LAB?

01:51PM  23   A.   YES.

01:51PM  24   Q.   DOES THAT MEAN THAT THE R&D WORK IS COMPLETE BEFORE THE

01:51PM  25   TEST IS USED ON ACTUAL PATIENTS?

01:51PM 1    A.   YES.

01:51PM 2    Q.   WHEN YOU WERE WORKING IN THE R&D LAB, WHAT WAS THE

01:51PM 3    STRUCTURE OF THAT DEPARTMENT AT THE TIME?  HOW DID YOU FIT INTO

01:51PM 4    THE ORG CHART?

01:51PM 5    A.   TO THE ORG CHART?

01:51PM 6         SO THE WAY THAT THE IMMUNOASSAY TEAM OR THE ELISA TEAM WAS

01:51PM 7    STRUCTURED AT THE TIME THAT I ENTERED THERE, YOU HAD THE CORE

01:51PM 8    ELISA TEAM WHICH AT THE TOP YOU HAD SHARADA WHO WAS A HEAD

01:51PM 9    SCIENTIST, AND THEN BELOW HER WERE TEAM LEADS, AND BELOW THAT

01:51PM 10   WERE SORT OF LIKE RESEARCH SCIENTISTS OR ASSOCIATES, AND THEN

01:51PM 11   BELOW THAT WERE LAB ASSOCIATES.

01:52PM 12        SO I WAS AT THE BOTTOM OF THE SORT OF ORGANIZATIONAL

01:52PM 13   STRUCTURE.

01:52PM 14   Q.   AND DID YOU SAY THAT SHARADA WAS IN CHARGE OF THAT GROUP?

01:52PM 15   A.   YES.

01:52PM 16   Q.   AND DID YOU KNOW AT THE TIME TO WHOM SHARADA REPORTED TO?

01:52PM 17   A.   SHARADA REPORTED TO SUNNY AND ELIZABETH.

01:52PM 18   Q.   YOU TESTIFIED THAT GENERALLY RESEARCH AND DEVELOPMENT WORK

01:52PM 19   FOR A TEST OCCURRED BEFORE A TEST WAS USED ON PATIENTS; IS THAT

01:52PM 20   RIGHT?

01:52PM 21   A.   GENERALLY, YES.

01:52PM 22   Q.   AND WHEN YOU STARTED WORKING AT THE COMPANY IN OCTOBER OF

01:52PM 23   2013, WAS THERANOS ALREADY OFFERING BLOOD TESTS TO PATIENTS?

01:52PM 24   A.   YES.

01:52PM 25   Q.   AND DOES THAT MEAN THAT THE COMPANY WASN'T DOING ANY R&D

01:52PM 1    WORK AT THE TIME?

01:52PM 2    A.   NO.

01:52PM 3    Q.   WHAT R&D WORK WAS THE COMPANY DOING STILL?

01:52PM 4    A.   SO THE COMPANY WAS STILL DOING VALIDATION STUDIES FOR

01:52PM 5    THESE TESTS THAT WE WERE TESTING ON PATIENTS.

01:52PM 6         SO THERE WAS STILL RESIDUAL RESEARCH AND DEVELOPMENT WORK

01:53PM 7    AND VALIDATION WORK THAT HAD TO OCCUR BEFORE WE WERE TESTING

01:53PM 8    THEM LIVE WITH PATIENTS, AND THERE WERE A LOT OF STUDIES EVEN

01:53PM 9    FOR THE TESTS THAT WERE LIVE FOR PATIENTS THAT WERE STILL

01:53PM 10   ONGOING.

01:53PM 11   Q.   AND SO THERE WAS CONTINUING RESEARCH AND DEVELOPMENT WORK

01:53PM 12   EVEN FOR TESTS THAT WERE ALREADY USED ON PATIENTS?

01:53PM 13   A.   YES.

01:53PM 14        MR. COOPERSMITH:  OBJECTION.  LEADING, YOUR HONOR.

01:53PM 15        THE COURT:  OVERRULED.  THE ANSWER MAY REMAIN.

01:53PM 16   YOU CAN ASK ANOTHER QUESTION.

01:53PM 17   BY MR. BOSTIC:

01:53PM 18   Q.   WHEN YOU WORKED IN -- LET ME, JUST TO CLARIFY, YOU

01:53PM 19   MENTIONED A TERM ELISA.  YOU WERE PART OF THE ELISA GROUP IN

01:53PM 20   R&D; IS THAT RIGHT?

01:53PM 21   A.   YES.

01:53PM 22   Q.   AND WHAT DOES THAT TERM "ELISA" REFER TO?

01:53PM 23   A.   ELISA IS IN REFERENCE TO A SPECIFIC TESTING METHODOLOGY

01:53PM 24   THAT WE USE.  SO IT'S A TYPE OF ASSAY OR A TYPE OF TEST.  SO

01:53PM 25   IT'S A SPECIFIC TYPE OF CHEMISTRY THAT YOU USE IN ORDER TO BE

01:54PM 1    ABLE TO DETERMINE WHAT SOMEONE'S HEALTH RESULTS ARE FOR A

01:54PM 2    CERTAIN SUBSET OF TESTS.

01:54PM 3    Q.    FROM YOUR WORK IN RESEARCH AND DEVELOPMENT, DID YOU BECOME

01:54PM 4    GENERALLY FAMILIAR WITH THE DEVICES THAT THERANOS WAS USING FOR

01:54PM 5    DEVELOPING ITS BLOOD TESTS AT THE TIME?

01:54PM 6    A.    YES.

01:54PM 7    Q.    AND HOW ABOUT WHEN YOU WORKED LATER IN THE CLINICAL LAB,

01:54PM 8    DID YOU ALSO BECOME FAMILIAR WITH THE DEVICES THAT THERANOS WAS

01:54PM 9    USING TO ACTUALLY RUN PATIENT SAMPLE TESTS?

01:54PM 10   A.    YES.

01:54PM 11   Q.    DID THERANOS -- LET ME ASK, DID YOU BECOME FAMILIAR WITH

01:54PM 12   THE TYPES OF TESTS, GENERALLY SPEAKING, THAT WERE RUN ON THOSE

01:54PM 13   KINDS OF DEVICES?

01:54PM 14   A.    YES.

01:54PM 15   Q.    AND DID THERANOS MANUFACTURE ITS OWN BLOOD ANALYZERS?

01:55PM 16   A.    IT DID.

01:55PM 17   Q.    AND WHICH OF THOSE IN-HOUSE MANUFACTURED ANALYZERS DID YOU

01:55PM 18   BECOME FAMILIAR WITH WHEN YOU WERE AT THE COMPANY?

01:55PM 19   A.    I BECAME FAMILIAR WITH THE EDISON DEVICE.

01:55PM 20   Q.    AND WERE THERE MULTIPLE VERSIONS OF THE EDISON DEVICE THAT

01:55PM 21   YOU KNEW ABOUT?

01:55PM 22   A.    YEAH.  SO THERE WAS THE EDISON 3.0, AND THE EDISON 3.5.

01:55PM 23   Q.    CAN I ASK YOU TO TURN --

01:55PM 24        ACTUALLY, MAY I APPROACH, YOUR HONOR?

01:55PM 25            THE COURT:  YES.

01:55PM  1          MR. COOPERSMITH, YOU HAVE THIS BINDER?

01:55PM  2                MR. COOPERSMITH:  I DO.

01:55PM  3                MR. BOSTIC:  AND THE COURT HAS A COPY.

01:55PM  4                THE COURT:  I DO.

01:55PM  5     BY MR. BOSTIC:

01:55PM  6     Q.   MS. CHEUNG, IF I COULD ASK YOU TO TURN IN THIS BINDER TO

01:56PM  7     TAB 5388.

01:56PM  8          LET ME KNOW ONCE YOU'RE THERE.

01:56PM  9     A.   I'M HERE.

01:56PM  10    Q.   AND AT TAB 5388, DO YOU SEE AN IMAGE OF A DEVICE?

01:56PM  11    A.   YES.

01:56PM  12    Q.   AND CAN YOU IDENTIFY THAT DEVICE FOR US?

01:56PM  13    A.   THAT IS THE EDISON DEVICE.

01:56PM  14    Q.   AND IS THIS A FAIR AND ACCURATE DEPICTION OF THE DEVICE

01:56PM  15    MADE BY THERANOS?

01:56PM  16    A.   YES.

01:56PM  17                MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

01:56PM  18    EXHIBIT 3588 INTO EVIDENCE.

01:56PM  19                MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

01:56PM  20                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:56PM  21        (GOVERNMENT'S EXHIBIT 5388 WAS RECEIVED IN EVIDENCE.)

01:56PM  22    BY MR. BOSTIC:

01:56PM  23    Q.   SO, MS. CHEUNG, ARE WE LOOKING ON THE SCREEN NOW AT A

01:56PM  24    PICTURE OF THE EDISON BLOOD ANALYZERS?

01:56PM  25    A.   YES.

CHEUNG DIRECT BY MR. BOSTIC                    1130

01:56PM   1      Q.   AND WE CAN SEE WHAT IT LOOKS LIKE FROM THIS PICTURE, BUT

01:56PM   2      CAN YOU DESCRIBE IT FOR US IN TERMS OF ITS DIMENSIONS?  HOW BIG

01:56PM   3      WAS IT?

01:56PM   4      A.   SO THIS IS ABOUT THE SIZE OF A -- LIKE THE PC COMPUTERS

01:56PM   5      ROUGHLY.  SO IT WOULD BE MAYBE ABOUT THE SIZE OF A PRINTER.

01:57PM   6      Q.   SO IF YOU HAD TO ESTIMATE THE HEIGHT OF THIS DEVICE, COULD

01:57PM   7      YOU GIVE US YOUR BEST ESTIMATE?

01:57PM   8      A.   MY BEST ESTIMATE WOULD BE IT'S PROBABLY LIKE 1.5 FEET TO

01:57PM   9      2 FEET, YEAH.

01:57PM   10     Q.   AND YOUR JOB -- YOUR ROLE IN R&D AND THE CLINICAL LAB, DID

01:57PM   11     IT REQUIRE YOU TO OPERATE THE EDISON DEVICE?

01:57PM   12     A.   YES.

01:57PM   13     Q.   AND DID YOU RUN THE SAMPLES ON THE EDISON DEVICE?

01:57PM   14     A.   YES.

01:57PM   15     Q.   AND CAN YOU DESCRIBE FOR US WHAT THAT ENTAILED?  WHAT THE

01:57PM   16     STEPS WERE TO ACTUALLY GETTING A SAMPLE AND RUNNING A TEST ON

01:57PM   17     THIS DEVICE?

01:57PM   18     A.   YEAH.  SO TYPICALLY WE WOULD HAVE -- SHOULD I DO -- SHOULD

01:57PM   19     I DO A PATIENT SAMPLE?

01:57PM   20     Q.   PLEASE.

01:57PM   21     A.   SO SAY IF WE RECEIVED A PATIENT SAMPLE, ESSENTIALLY WE

01:57PM   22     WOULD GET A CALL AND ORDER AND SAY A PATIENT WANTS A VITAMIN D

01:57PM   23     SAMPLE.

01:57PM   24          SO THE PHLEBOTOMIST OR THE SHIPPING CONTAINERS WOULD COME

01:57PM   25     IN WITH THIS TINY NANOTAINER BLOOD SAMPLE.  WE WOULD TAKE THAT,

01:58PM   1    SCAN IT, SEE ALL OF THE TESTS THAT WE NEEDED TO DO.

01:58PM   2         WE WOULD SOMETIMES HAVE TO GIVE IT OVER TO OTHER TEAMS AS

01:58PM   3    WELL TO TAKE FROM THIS TINY BLOOD SAMPLE.

01:58PM   4         AND THEN WE WOULD TAKE THAT, PUT IT ON THIS MACHINE CALLED

01:58PM   5    A TECAN, WHICH WAS A LIQUID HANDLING ROBOT THAT WOULD TAKE

01:58PM   6    SMALL SAMPLES FROM THIS TINY CONTAINER INTO THIS CARTRIDGE.

01:58PM   7         AND SO WE WOULD HAVE THESE CARTRIDGES, AND FILL WITH THE

01:58PM   8    TINY BLOOD SAMPLE.  WE WOULD TAKE THAT CARTRIDGE, BRING IT TO

01:58PM   9    THE MACHINE, AND USE THE TOUCHSCREEN, AND YOU WOULD OPEN THE

01:58PM  10    MACHINE, AND YOU WOULD SCAB THE BAR CODE ONTO THE CARTRIDGE,

01:58PM  11    AND THEN YOU PUT THE CARTRIDGE IN.  YOU CONFIRM THAT THE RIGHT

01:58PM  12    TEST WAS THERE, AND THEN YOU WOULD HIT START.

01:58PM  13         AND THEN ONCE IT WOULD RUN, THEN WE WOULD PULL THE DATA

01:58PM  14    BASICALLY FROM THIS OTHER PLATFORM CALLED ALCHEMIST TO PROCESS

01:59PM  15    ALL OF THE DATA, AT LEAST IN THE BEGINNING OF WORKING THERE.

01:59PM  16    Q.   AND I WANT TO ASK A COUPLE OF FOLLOW-UP QUESTIONS.

01:59PM  17    A.   UH-HUH.

01:59PM  18    Q.   YOU MENTIONED A DEVICE CALLED TECAN; IS THAT RIGHT?

01:59PM  19    A.   YES.

01:59PM  20    Q.   AND IS THAT -- FIRST OF ALL, WAS THE TECAN THERANOS

01:59PM  21    MANUFACTURED OR INVENTED DEVICE?

01:59PM  22    A.   NO.

01:59PM  23    Q.   IT WAS A THIRD PARTY DEVICE?

01:59PM  24    A.   YES.

01:59PM  25    Q.   AND WHAT DID THE TECAN DO IN THE CONTEXT OF RUNNING A

01:59PM  1    SAMPLE ON THE EDISON?

01:59PM  2    A.   SO THE TECAN WOULD BASICALLY TAKE A LITTLE BIT OF THE

01:59PM  3    BLOOD THAT WE HAD FROM THE COLLECTION UNIT, IT WOULD PUT IT IN

01:59PM  4    THE WELL, AND THEN IT WOULD DILUTE IT, AND THAT WAS SORT OF THE

01:59PM  5    SAMPLE PREP FOR THE EDISON CARTRIDGE.

01:59PM  6    Q.   DID YOU HAVE AN UNDERSTANDING AS TO WHY THE SAMPLE NEEDED

01:59PM  7    TO BE DILUTED BY THE TECAN BEFORE IT COULD BE RUN ON THE

01:59PM  8    EDISON?

01:59PM  9              MR. COOPERSMITH:  OBJECTION.  702, YOUR HONOR.

01:59PM  10             THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR HER

01:59PM  11   KNOWLEDGE OF THAT.

01:59PM  12             MR. BOSTIC:  I THINK THE QUESTION I ASKED WAS A YES

02:00PM  13   OR NO QUESTION, BUT JUST TO CLARIFY.

02:00PM  14   Q.   I'M ASKING BASED ON YOUR WORK AT THE COMPANY, DID YOU HAVE

02:00PM  15   AN UNDERSTANDING AS TO WHY THAT STEP WAS NECESSARY, THE

02:00PM  16   DILUTION STEP --

02:00PM  17   A.   YES.

02:00PM  18   Q.   -- BEFORE A SAMPLE COULD BE RUN?

02:00PM  19   A.   YES.

02:00PM  20   Q.   AND HOW DID YOU GAIN THAT UNDERSTANDING?

02:00PM  21   A.   FROM THE SOP'S THAT WERE PROVIDED TO US FROM THERANOS.

02:00PM  22   Q.   SO THE COMPANY DOCUMENTS THAT GOVERNED THIS PROCESS

02:00PM  23   EXPLAINED THAT REASON?

02:00PM  24   A.   YES.

02:00PM  25   Q.   SO WHAT WAS THAT REASON?  WHY WAS THAT DILUTION STEP

02:00PM 1    NECESSARY BEFORE THE SAMPLE COULD BE RUN ON THE EDISON?

02:00PM 2              MR. COOPERSMITH:  SAME OBJECTION, YOUR HONOR.  BEST

02:00PM 3    EVIDENCE AS WELL.

02:00PM 4              THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

02:00PM 5              THE WITNESS:  SO PART OF IT WAS BECAUSE WE HAD SMALL

02:00PM 6    SAMPLE SIZES, SO WE DID A DILUTION STEP IN ORDER TO ACCOMMODATE

02:00PM 7    FOR THE SMALL SAMPLE SIZES, AND THEN IT'S ALSO A PART OF THE

02:00PM 8    TEST.

02:00PM 9    BY MR. BOSTIC:

02:00PM 10   Q.  DID THE DILUTION STEP EFFECTIVELY INCREASE THE VOLUME OF

02:00PM 11   THE SAMPLE, MAKE IT BIGGER?

02:01PM 12   A.  IT DID.

02:01PM 13   Q.  THE PROCESS THAT YOU JUST OUTLINED, THOSE STEPS, WOULD

02:01PM 14   THAT PROCESS BE USED TO YIELD RESULTS FOR MULTIPLE ASSAYS AT A

02:01PM 15   TIME OR WOULD IT NEED TO BE RUN EACH TIME FOR EACH ASSAY THAT

02:01PM 16   NEEDED TO BE PERFORMED?

02:01PM 17   A.  IT WOULD NEED TO BE RUN FOR EACH TEST THAT WE DID EACH

02:01PM 18   TEST OR ASSAY.

02:01PM 19        SO ONLY ONE PATIENT FOR ONE TEST WOULD GO THROUGH THAT

02:01PM 20   WHOLE PROCESS.

02:01PM 21   Q.  SO IF A PATIENT CAME IN, FOR EXAMPLE, AND NEEDED, LET'S

02:01PM 22   SAY, JUST THREE ASSAYS RUN ON A SINGLE SAMPLE, HOW WOULD THAT

02:01PM 23   BE HANDLED?

02:01PM 24   A.  SO IF IT WAS THREE ELISA TESTS OR THREE IMMUNOASSAYS, WE

02:01PM 25   WOULD HAVE TO GO THROUGH THAT WHOLE PROCESS THREE TIMES.

02:01PM  1    Q.   AND DOES THAT MEAN THAT THE SAMPLE WOULD NEED TO BE

02:02PM  2    SUBDIVIDED AT LEAST THREE TIMES?

02:02PM  3    A.   YES.

02:02PM  4    Q.   AND I THINK YOU ANSWERED THIS AS WELL, BUT COULD SAMPLES

02:02PM  5    FROM MULTIPLE PATIENTS BE RUN THROUGH THE EDISON

02:02PM  6    SIMULTANEOUSLY?

02:02PM  7    A.   NO.

02:02PM  8    Q.   YOU MENTIONED THE EDISON 3.0 AND THE 3.5.

02:02PM  9         DID YOU ALSO HEAR ABOUT DEVICES CALLED THE 4.0 OR MINILAB

02:02PM 10    OR OTHER DEVICES WHILE YOU WERE AT THERANOS?

02:02PM 11    A.   YES.

02:02PM 12    Q.   AND WHAT WERE THE OTHER DEVICES THAT YOU RECALL?

02:02PM 13    A.   SO THE 4.0 WERE THE NEXT ITERATION OF THE EDISON DEVICE.

02:02PM 14    SO INSTEAD OF JUST DOING ELISA'S, THEY WOULD BE ABLE TO DO

02:02PM 15    NUMEROUS TYPES OF CHEMISTRIES ON THERE.

02:02PM 16         SO THEY WOULD BE ABLE TO DO ELISA, THERE WAS GENERAL

02:02PM 17    CHEMISTRY, THERE WERE OTHER DEPARTMENTS AT THERANOS THAT RAN

02:02PM 18    OTHER TYPES OF TESTS, AND IT WAS SEEN AS THE NEXT GENERATION OF

02:02PM 19    THE EDISON DEVICES.

02:02PM 20    Q.   YOU SAID EARLIER THAT ELISA WAS ANOTHER TERM FOR

02:02PM 21    IMMUNOASSAY; IS THAT CORRECT?

02:03PM 22    A.   THAT'S CORRECT.

02:03PM 23    Q.   AND THE 4.0 COULD DO OTHER TYPES OF TESTS BESIDES THE

02:03PM 24    IMMUNOASSAY?

02:03PM 25    A.   YES.

02:03PM  1    Q.   DURING YOUR TIME AT THERANOS, WAS THE COMPANY USING THE

02:03PM  2    3.0 OR THE 3.5 FOR ACTUAL PATIENT TESTING?

02:03PM  3    A.   YES.

02:03PM  4    Q.   ONE OR BOTH OF THOSE?

02:03PM  5    A.   MOSTLY THE 3.5'S.

02:03PM  6    Q.   AND HOW ABOUT THE 4.0 DEVICE THAT YOU JUST MENTIONED,

02:03PM  7    DURING YOUR TIME AT THE COMPANY DID THERANOS EVER USE THE 4.0

02:03PM  8    DEVICE FOR ACTUAL PATIENT TESTING?

02:03PM  9    A.   NO.

02:03PM 10    Q.   DID YOU HAVE AN UNDERSTANDING WHEN YOU WERE AT THE COMPANY

02:03PM 11    AS TO WHY THERANOS WAS NOT USING THE 4.0 DEVICE FOR PATIENT

02:03PM 12    TESTING?

02:03PM 13    A.   THE 4.0'S DIDN'T HAVE THE CAPACITY TO RUN ANY TEST THAT WE

02:03PM 14    OFFERED THAT WERE LIVE, AND THEY JUST WEREN'T READY.  THEY

02:03PM 15    HADN'T BEEN DEVELOPED YET.

02:03PM 16         MR. COOPERSMITH:  YOUR HONOR, MOVE TO STRIKE UNDER

02:03PM 17    702.  IT WASN'T RESPONSIVE TO THE QUESTION, AND IT'S ALSO A

02:04PM 18    VIOLATION OF RULE 702.

02:04PM 19         THE COURT:  OVERRULED.  THE ANSWER IS -- THE

02:04PM 20    QUESTION WAS BASED ON HER UNDERSTANDING AS AN EMPLOYEE.  SO THE

02:04PM 21    OBJECTION IS OVERRULED.  THE ANSWER CAN REMAIN.

02:04PM 22    BY MR. BOSTIC:

02:04PM 23    Q.   AND, MS. CHEUNG, JUST TO CLARIFY, DURING YOUR TIME AT THE

02:04PM 24    COMPANY, WERE YOU GENERALLY AWARE OF WHAT ASSAYS WERE MOVING

02:04PM 25    THROUGH RESEARCH AND DEVELOPMENT AND WHICH WERE ACTUALLY IN

ER-590

CHEUNG DIRECT BY MR. BOSTIC 1136

02:04PM 1    PATIENT TESTING USE?

02:04PM 2    A.   YES.

02:04PM 3    Q.   AND DURING YOUR TIME AT THE COMPANY, DID ANY TEST AT ALL

02:04PM 4    ON THE 4.0 DEVICE MOVE THROUGH THE R&D PROCESS AND ACTUALLY GET

02:04PM 5    TO THE PATIENT TESTING STAGE?

02:04PM 6    A.   NO.

02:04PM 7    Q.   THE PATIENT TESTS THAT THERANOS WAS RUNNING IN THE

02:05PM 8    CLINICAL LAB, WERE ALL OF THOSE TESTS RUN ON THE EDISON, THE

02:05PM 9    THERANOS-BUILT ANALYZERS?

02:05PM 10   A.   CAN YOU REPEAT THE QUESTION?

02:05PM 11   Q.   SURE.

02:05PM 12        THE PATIENT TESTING THAT THERANOS WAS DOING, WAS THAT ALL

02:05PM 13   BEING DONE ON THE EDISON, THE THERANOS-BUILT DEVICE?

02:05PM 14   A.   NO.  ONLY A SMALL SUBSET OF THE THERANOS TESTS WERE BEING

02:05PM 15   RUN ON THE EDISON DEVICES.

02:05PM 16   Q.   AND WHY WAS THAT?  WHY WAS ONLY A SMALL SUBSET BEING RUN

02:05PM 17   ON THE THERANOS DEVICES?

02:05PM 18            MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  602.

02:05PM 19            THE COURT:  WELL, THIS GOES TO HER KNOWLEDGE AS AN

02:05PM 20   EMPLOYEE THERE?

02:05PM 21            MR. BOSTIC:  CORRECT, YOUR HONOR.

02:05PM 22            THE COURT:  IF YOU CAN ANSWER IN THE SCOPE OF YOUR

02:05PM 23   EMPLOYMENT.

02:05PM 24            THE WITNESS:  SO IN THE SCOPE?  OKAY.

02:05PM 25        THE EDISON DEVICES ONLY HAD THE CAPACITY TO RUN ELISA

02:05PM 1      TEST, WHICH IS ONLY -- IS ONE SPECIFIC TYPE OF CHEMISTRY.  IT

02:05PM 2      DIDN'T HAVE THE CAPABILITIES TO RUN GENERAL CHEMISTRY,

02:06PM 3      MICROBIOLOGY, CYTOMETRY TESTS.

02:06PM 4          SO THE REASON WHY THERANOS ONLY RAN THAT SMALL SUBSET IS

02:06PM 5      BECAUSE THAT'S ALL THEY HAD THE CAPACITY TO RUN WAS BASICALLY

02:06PM 6      ELISA TYPE TESTS.

02:06PM 7              MR. COOPERSMITH:  YOUR HONOR, I'M GOING TO OBJECT

02:06PM 8      AGAIN UNDER 702.  THIS WITNESS DOESN'T HAVE THAT KNOWLEDGE TO

02:06PM 9      OPINE ABOUT WHAT THE DEVICE WAS CAPABLE OF OR WHAT ITS CAPACITY

02:06PM 10     WAS.

02:06PM 11             MR. BOSTIC:  YOUR HONOR, SHE OPERATED THESE DEVICES

02:06PM 12     ON A DAILY BASIS.  I THINK --

02:06PM 13             THE COURT:  THE OBJECTION 702 IS OVERRULED.

02:06PM 14             MR. COOPERSMITH:  YOUR HONOR, SHE CAN CERTAINLY SAY

02:06PM 15     WHAT SHE DID BUT TO GO FURTHER AND OPINE AS TO WHAT THE DEVICE

02:06PM 16     WAS CAPABLE OF AND WHAT ITS CAPACITY WAS I THINK IS BEYOND THIS

02:06PM 17     WITNESS'S EXPERTISE.

02:06PM 18             THE COURT:  WELL, THE ANSWER, AS I UNDERSTAND IT --

02:06PM 19     AND, MR. BOSTIC, YOU COULD LAY A FOUNDATION IF YOU WOULD LIKE

02:06PM 20     TO -- IS BASED ON HER TRAINING AND EXPERIENCE AT THE COMPANY.

02:06PM 21         PERHAPS IF YOU WANT TO ASK HER IF THAT'S WHAT SHE WAS

02:06PM 22     INSTRUCTED OR TRAINED.

02:06PM 23     BY MR. BOSTIC:

02:06PM 24     Q.   MS. CHEUNG, FROM YOUR TRAINING AND EXPERIENCE AT THE

02:07PM 25     COMPANY, DID YOU HAVE AN UNDERSTANDING AS TO WHAT THE EDISON 3

02:07PM 1    SERIES COULD DO AND WHAT IT COULD NOT DO?

02:07PM 2    A.   YES.

02:07PM 3    Q.   AND BASED ON YOUR TRAINING AND EXPERIENCE AT THE COMPANY,

02:07PM 4    WHERE WAS THAT LINE?  WHAT COULD THE EDISON 3 SERIES DO AND

02:07PM 5    WHAT COULD IT NOT DO?

02:07PM 6            MR. COOPERSMITH:  YOUR HONOR, SAME OBJECTION.  702.

02:07PM 7            THE COURT:  OVERRULED.

02:07PM 8            THE WITNESS:  CAN YOU REPEAT THE QUESTION?

02:07PM 9            MR. BOSTIC:  SURE.

02:07PM 10   Q.   WHAT COULD THE EDISON 3 SERIES DO AND WHAT COULD IT NOT DO

02:07PM 11   BASED ON YOUR TRAINING AND EXPERIENCE?

02:07PM 12           MR. COOPERSMITH:  SAME OBJECTION, YOUR HONOR.

02:07PM 13           THE COURT:  OVERRULED.

02:07PM 14           THE WITNESS:  THE EDISON 3.0 SERIES COULD DO ELISA'S

02:07PM 15   AND THAT WAS THE ONLY CAPACITY IT COULD DO WAS THAT TYPE OF

02:07PM 16   CHEMISTRY AND METHODOLOGY, AND THAT WAS WHAT MY UNDERSTANDING

02:07PM 17   OF THE TECHNOLOGY BASED ON WORKING FOR THE COMPANY.

02:08PM 18   BY MR. BOSTIC:

02:08PM 19   Q.   COULD I ASK YOU TO TURN TO EXHIBIT 3741 IN THE BINDER IN

02:08PM 20   FRONT OF YOU.

02:08PM 21       DO YOU SEE EXHIBIT 3741?

02:08PM 22   A.   YES.

02:08PM 23   Q.   AND WHAT IS THAT DOCUMENT IF YOU RECOGNIZE IT?

02:08PM 24   A.   THIS IS THE TESTING MENU AT THERANOS.

02:08PM 25   Q.   HAD YOU PREVIOUSLY HAD THE OPPORTUNITY TO REVIEW THE FIRST

02:08PM 1     FEW PAGES AT LEAST OF THIS EXHIBIT?

02:08PM 2     A.   YES.

02:08PM 3     Q.   AND LET'S FOCUS ON PAGES 1 THROUGH 7.  AND I'LL ASK DO

02:08PM 4     PAGES 1 THROUGH 7 CONSTITUTE A FAIR APPROXIMATION OR A

02:08PM 5     REPRESENTATIVE EXAMPLE OF THE TEST MENU AT THERANOS?

02:08PM 6     A.   YES.

02:09PM 7          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS THE

02:09PM 8     FIRST SEVEN PAGES OF 3741, AND WE'LL MARK IT AS 3741A.

02:09PM 9          MR. COOPERSMITH:  ONE MOMENT, YOUR HONOR.

02:09PM 10    YOUR HONOR, NO OBJECTION TO THE FIRST SEVEN PAGES OF THIS

02:09PM 11    EXHIBIT.

02:09PM 12         THE COURT:  IT'S ADMITTED, THE FIRST SEVEN PAGES

02:09PM 13    THAT IS MARKED AS 3741A, AND THAT MAY BE PUBLISHED.

02:09PM 14    (GOVERNMENT'S EXHIBIT 3741A WAS RECEIVED IN EVIDENCE.)

02:09PM 15         MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:09PM 16    AND, MS. WACHS, IF WE CAN GO TO PAGE 6, PLEASE, AND ZOOM

02:09PM 17    IN ON THE BOTTOM TWO-THIRDS.

02:09PM 18    Q.   MS. CHEUNG, ARE WE LOOKING AT A PORTION OF TEST MENUS

02:09PM 19    SHOWING SOME TESTS THAT THERANOS OFFERED DURING YOUR TIME AT

02:09PM 20    THE COMPANY?

02:09PM 21    A.   YES.

02:09PM 22    Q.   AND I'LL ASK YOU TO TAKE A LOOK AT THESE AND IF YOU COULD,

02:10PM 23    TO THE EXTENT THAT YOU RECALL, IDENTIFY SOME EXAMPLES OF TESTS

02:10PM 24    THAT THE EDISON COULD DO AND SOME EXAMPLES OF TESTS THAT THE

02:10PM 25    EDISON COULD NOT DO.

CHEUNG DIRECT BY MR. BOSTIC                                    1140

02:10PM   1              SO LET'S START WITH THE TESTS THAT THE EDISON COULD DO.

02:10PM   2      A.   SO THE EDISON COULD DO ON THIS ORDER PANEL ONE, TWO --

02:10PM   3      Q.   AND JUST TO CLARIFY, I DON'T MEAN TO TEST YOUR MEMORY, BUT

02:10PM   4      IF YOU COULD JUST IDENTIFY SOME EXAMPLES.

02:10PM   5      A.   SO IN THE THYROID SECTION THERANOS COULD DO T4, TOTAL T3,

02:10PM   6      AND THAT WAS IT.

02:10PM   7              AND THEN THIS IS FOR THE EDISON DEVICES.

02:11PM   8              AND IT COULD DO ONE OTHER, SO HCG IN THE REPRODUCTIVE

02:11PM   9      HEALTH.

02:11PM  10              AND AT THE TIME THAT I WORKED THERE ALSO TOTAL PSA, WHICH

02:11PM  11      IS IN THE ALPHABETICAL TEST I THROUGH Z AND VITAMIN D.  SO

02:11PM  12      ABOUT FIVE TESTS.

02:11PM  13              VITAMIN D, WHICH IS ALSO IN THE ALPHABETICAL TEST.

02:11PM  14      Q.   SO YOU'VE IDENTIFIED APPROXIMATELY FIVE TESTS ON THIS

02:11PM  15      PANEL THAT YOU CAN SEE?

02:11PM  16      A.   YEAH.  IT WAS MORE LIKE FOUR WHEN I WAS THERE.

02:11PM  17      Q.   FAIR TO SAY, THEN, THAT THE VAST MAJORITY OF THE TESTS ON

02:11PM  18      DISPLAY COULD NOT BE DONE ON THE EDISON BASED ON YOUR

02:11PM  19      UNDERSTANDING?

02:11PM  20              MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  LEADING.

02:11PM  21              THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

02:11PM  22              THE WITNESS:  THAT IS CORRECT.

02:11PM  23      BY MR. BOSTIC:

02:11PM  24      Q.   LET ME ASK YOU ABOUT A COUPLE OF THOSE.  FOR EXAMPLE, DO

02:11PM  25      YOU SEE A HEADING IN THE UPPER LEFT OF THE SCREEN LABELLED

02:11PM   1    COMMON PANELS?

02:12PM   2    A.   YES.

02:12PM   3    Q.   AND UNDER COMMON PANELS THERE'S ONE LABELLED CBC, NO DIFF.

02:12PM   4         AND THEN ANOTHER LABELLED CBC WITH/AUTO DIFF.

02:12PM   5         DO YOU HAVE AN UNDERSTANDING DURING YOUR TIME AT THE

02:12PM   6    COMPANY WHAT THE CBC TEST WAS?

02:12PM   7    A.   CBC STANDS FOR COMPLETE BLOOD COUNT, AND IT WAS A PANEL

02:12PM   8    TEST.  SO UNDERNEATH CBC YOU COULD RUN AND CHECK FOR WHOLE

02:12PM   9    BLOOD CELLS, WHITE BLOOD CELLS, AND IT HAD SEVERAL DIFFERENT

02:12PM  10    MARKERS THAT IT WOULD LOOK FOR.

02:12PM  11    Q.   AND I SEE THAT IT'S LISTED UNDER COMMON PANELS, BUT BASED

02:12PM  12    ON YOUR EXPERIENCE AT THE COMPANY, HOW COMMON WAS THAT CBC

02:12PM  13    ASSAY?

02:12PM  14    A.   HOW COMMON WAS THAT?

02:12PM  15    Q.   UH-HUH.

02:12PM  16    A.   IT WAS ORDERED QUITE FREQUENTLY.

02:12PM  17    Q.   AND COULD THE THERANOS EDISON DEVICE RUN A CBC PANEL OR

02:12PM  18    ANY PART OF IT?

02:12PM  19    A.   NO.

02:12PM  20    Q.   AND WAS THAT TRUE DURING YOUR ENTIRE TIME AT THE COMPANY?

02:13PM  21    A.   YES.

02:13PM  22    Q.   HOW ABOUT CMP.  DO YOU SEE THAT LISTED UNDER COMMON

02:13PM  23    PANELS?

02:13PM  24    A.   YES.

02:13PM  25    Q.   AND DID YOU HAVE AN UNDERSTANDING FROM YOUR TIME AT THE

02:13PM   1    COMPANY AS TO WHAT CMP REFERRED TO?

02:13PM   2    A.   YEAH.  IT WAS COMPREHENSIVE METABOLIC PANEL.

02:13PM   3    Q.   AND HOW COMMON OR HOW FREQUENTLY ORDERED WAS THAT TEST

02:13PM   4    WHEN YOU WERE AT THERANOS?

02:13PM   5    A.   IT WAS FAIRLY COMMONLY ORDERED.

02:13PM   6    Q.   AND COULD THE EDISON DEVICE RUN A CMP PANEL?

02:13PM   7    A.   NO.

02:13PM   8    Q.   SO IF THE EDISON COULDN'T DO MANY OF THESE TESTS, WHAT WAS

02:13PM   9    THERANOS USING TO RUN THESE ASSAYS WHEN THE ORDERS CAME IN?

02:13PM  10    A.   THERANOS WAS USING A COUPLE DIFFERENT METHODS.  SO FOR CBC

02:14PM  11    AND FOR THE COMPREHENSIVE METABOLIC PANEL THEY WERE USING FDA

02:14PM  12    APPROVED MACHINES THAT HAD BEEN MODIFIED IN ORDER TO BE ABLE TO

02:14PM  13    ACCOMMODATE THE SMALL SAMPLE SIZE THAT WE USED AT THERANOS.

02:14PM  14    Q.   AND YOU MENTIONED THAT THERE WERE MODIFICATIONS TO THOSE

02:14PM  15    DEVICES.

02:14PM  16         WHO PERFORMED THOSE MODIFICATIONS, IF YOU KNOW?

02:14PM  17    A.   THERANOS PROVIDED THOSE MODIFICATIONS.

02:14PM  18    Q.   I'LL ASK YOU TO TURN TO TAB 5389 IN THE BINDER, PLEASE.

02:14PM  19    YOU CAN SEE A PICTURE ONCE YOU GET THERE?

02:14PM  20    A.   YES.

02:14PM  21    Q.   AND DO YOU RECOGNIZE THE OBJECT DEPICTED IN 5389?

02:14PM  22    A.   YES.

02:14PM  23    Q.   AND WHAT IS IT?

02:14PM  24    A.   THIS IS A SIEMENS ADVIA.

02:14PM  25    Q.   AND IS THIS A FAIR AND ACCURATE DEPICTION OF THE SIEMENS

02:14PM  1    ADVIA DEVICE?

02:14PM  2    A.   YES.

02:14PM  3         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5389.

02:14PM  4         MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

02:14PM  5         THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:15PM  6    (GOVERNMENT'S EXHIBIT 5389 WAS RECEIVED IN EVIDENCE.)

02:15PM  7    BY MR. BOSTIC:

02:15PM  8    Q.   MS. CHEUNG, A FEW MOMENTS AGO WE LOOKED AT THE PICTURE OF

02:15PM  9    THE THERANOS EDISON DEVICE.  NOW WE'RE LOOKING AT A SIEMENS

02:15PM  10   ADVIA; IS THAT CORRECT?

02:15PM  11   A.   YES.

02:15PM  12   Q.   AND AS YOU DID BEFORE, COULD YOU DESCRIBE WHAT IT LOOKED

02:15PM  13   LIKE IN PERSON AND HOW BIG IT WAS?

02:15PM  14   A.   SO THIS DEVICE WAS REALLY LARGE.  YOU COULD THINK OF IT

02:15PM  15   ALMOST LIKE A -- WHAT WOULD BE A COMPARABLE?  LIKE A FREEZER.

02:15PM  16   SO ONE OF THOSE BIG FREEZERS THAT YOU FILL WITH A BUNCH OF

02:15PM  17   FOOD.  IT'S ABOUT THAT SIZE.  AND YOU CAN STAND ABOUT TWO TO

02:15PM  18   THREE PEOPLE IN FRONT OF IT.

02:15PM  19   Q.   AND IF YOU HAD TO ESTIMATE HOW WIDE IT WAS ACROSS FROM

02:15PM  20   LEFT TO RIGHT?

02:15PM  21   A.   I DON'T KNOW IF I COULD DO THAT ESTIMATION.  MAYBE ABOUT

02:15PM  22   FIVE FEET.

02:15PM  23   Q.   AND DURING YOUR TIME AT THERANOS, DID YOU BECOME FAMILIAR

02:15PM  24   WITH THIS DEVICE, THE SIEMENS ADVIA?

02:15PM  25   A.   YES.

02:15PM 1     Q.   AND HOW DID YOU BECOME FAMILIAR WITH IT AT THERANOS?

02:15PM 2     A.   I BECAME FAMILIAR WITH THE SIEMENS ADVIA BOTH WITH RUNNING

02:16PM 3     THEM USING THE THERANOS METHODS AND ALSO USING THEM IN THE

02:16PM 4     OTHER LAB, THE NORMAL FDA APPROVED METHODS AS WELL.

02:16PM 5     Q.   SO JUST SO WE'RE CLEAR, WE'RE TALKING ABOUT A COUPLE OF

02:16PM 6     DIFFERENT APPROACHES THAT THERANOS TOOK TO RUNNING PATIENT

02:16PM 7     SAMPLES; IS THAT RIGHT?

02:16PM 8     A.   THAT IS CORRECT.

02:16PM 9     Q.   ONE METHOD WE TALKED ABOUT WAS RUNNING SMALL SAMPLES ON

02:16PM 10    THE THERANOS BUILT EDISON DEVICE; CORRECT?

02:16PM 11    A.   CORRECT.

02:16PM 12    Q.   AND WE'VE ALSO TALKED ABOUT RUNNING SAMPLES ON A MODIFIED

02:16PM 13    SIEMENS ADVIA OR OTHER THIRD PARTY DEVICE; IS THAT CORRECT?

02:16PM 14    A.   THAT IS CORRECT.

02:16PM 15    Q.   AND BETWEEN THOSE TWO METHODS, SO THE THERANOS MADE DEVICE

02:16PM 16    OR THE THERANOS MODIFIED DEVICE, COULD THERANOS RUN ALL OF THE

02:16PM 17    TESTS ON ITS TEST MENU?

02:16PM 18    A.   NO.

02:16PM 19    Q.   SO IT NEEDED AN ADDITIONAL APPROACH TO COVER ADDITIONAL

02:16PM 20    TESTS?

02:16PM 21    A.   THAT IS CORRECT.

02:16PM 22    Q.   AND WHAT WAS THE ADDITIONAL APPROACH?

02:17PM 23    A.   SO THE ADDITIONAL APPROACH -- AT THERANOS WE HAD THE

02:17PM 24    FINGERSTICK COLLECTIONS, SO ESSENTIALLY COLLECTING BLOOD FROM

02:17PM 25    THE FINGERSTICK SAMPLE.

02:17PM  1          AND THEN IF WE WERE NOT ABLE TO PROCESS THE PATIENT

02:17PM  2   SAMPLES USING THE FINGERSTICK METHOD, SOMETIMES IT WOULD ALSO

02:17PM  3   COLLECT A VENOUS DRAW, SO FROM THE VEIN, AND THEY WOULD RUN A

02:17PM  4   CERTAIN SUBSET ON THE VENOUS DRAW USING BASICALLY UNMODIFIED

02:17PM  5   FDA APPROVED MACHINES THAT YOU COULD BUY.

02:17PM  6          AND THEN ADDITIONALLY, IF WE DIDN'T HAVE THE CAPACITY TO

02:17PM  7   RUN THOSE, WE WOULD ALSO CONTACT ANOTHER AGENCY CALLED ARUP,

02:17PM  8   AND WE WOULD RUN THOSE SAMPLES OUT, A-R-U-P, TO BE ABLE TO RUN

02:17PM  9   THOSE TYPES OF TESTS THAT WE DIDN'T HAVE CAPACITY TO DO

02:17PM  10  INHOUSE.

02:17PM  11  Q.   SO, IN OTHER WORDS, ARE YOU SAYING THAT THERE WERE SOME

02:17PM  12  TESTS, SOME KINDS OF ASSAYS THAT THERANOS COULDN'T DO INHOUSE

02:17PM  13  WITH ANY OF THE THREE APPROACHES THAT WE'VE BEEN TALKING ABOUT?

02:18PM  14  A.   THAT IS CORRECT.

02:18PM  15  Q.   FOR THE MODIFIED AND UNMODIFIED THIRD PARTY NON-THERANOS

02:18PM  16  DEVICES, DID YOU HAVE EXPERIENCE OPERATING BOTH OF THOSE

02:18PM  17  METHODS DURING YOUR TIME AT THE COMPANY?

02:18PM  18  A.   YES.

02:18PM  19  Q.   AND YOU WALKED US THROUGH THE STEPS THAT WERE INVOLVED IN

02:18PM  20  PROCESSING A PATIENT SAMPLE THROUGH THE EDISON.  CAN YOU DO IT

02:18PM  21  FOR THE OTHER TWO METHODS?

02:18PM  22          LET'S START WITH THE MODIFIED SIEMENS ADVIA, FOR EXAMPLE?

02:18PM  23  CAN YOU TELL US ROUGHLY WHAT THE STEPS WERE IN RUNNING A SAMPLE

02:18PM  24  THERE?

02:18PM  25  A.   YEAH.  SO FOR THE MODIFIED SIEMENS ADVIA, TYPICALLY IT

CHEUNG DIRECT BY MR. BOSTIC                                          1146

```
02:18PM   1    WOULD BE THE SAME THING, YOU WOULD GET THE NANOTAINERS, THE

02:18PM   2    LITTLE BLOOD CONTAINERS, AND WE WOULD PUT THEM THROUGH THE

02:18PM   3    SAMPLE AND IT WOULD TELL US WHO GETS IT FIRST.  SO IS IT

02:18PM   4    GENERAL CHEMISTRY?  IS IT ELISA?  WHO GETS IT.

02:18PM   5        THEY TELL US HOW TO PREP THE BLOOD.  DO WE CENTRIFUGE IT?

02:18PM   6    WHAT DO WE DO?  DO WE COLLECT WHOLE BLOOD?

02:18PM   7        AND THEN ONCE WE GET THE TYPE OF, BASICALLY BLOOD TYPE

02:18PM   8    THAT WE GET, WE WOULD GO PRINT THE BAR CODES, AND WE WOULD --

02:19PM   9    IN THE CASE OF THE SIEMENS ADVIA MODIFIED, WE WOULD COLLECT ALL

02:19PM  10    OF THESE LITTLE THINGS CALLED T-CUPS WHICH WERE THERANOS

02:19PM  11    MANUFACTURED CUPS THAT WE WOULD PLACE IN THE SIEMENS ADVIA, AND

02:19PM  12    WE WOULD STACK THEM UP.

02:19PM  13        AND THEN THEY WOULD UTILIZE THE TECAN TO BASICALLY DOSE

02:19PM  14    OUT THE BLOOD INTO THESE T-CUPS AND THEN DILUTE THE SAMPLES.

02:19PM  15        AND THEN WE WOULD TAKE THAT TRAY, AND WE WOULD RUN IT OVER

02:19PM  16    TO THE SIEMENS ADVIA, MAKE SURE ALL OF THE BAR CODES WERE PUT

02:19PM  17    ON THEM, AND THEN WE WOULD LOAD UP THIS MACHINE.

02:19PM  18        AND THEN FROM THERE, MAKE SURE AND CHECK THAT IT RAN ALL

02:19PM  19    OF THE BAR CODES CORRECTLY AND START THE PROCESS SO IT COULD

02:19PM  20    PROCESS ALL OF THE DIFFERENT RESULTS.

02:19PM  21        AND THEN FROM THERE WE WOULD BE ABLE TO GENERATE WHAT THE

02:19PM  22    PATIENT RESULTS WERE.

02:19PM  23        SO THAT WAS THE THERANOS MODIFIED FOR THE SIEMENS ADVIA.

02:20PM  24    Q.  YOU MENTIONED THE TECAN DEVICE AGAIN?

02:20PM  25    A.  YES.
```

02:20PM  1    Q.   WAS THAT ALSO NECESSARY TO USE THE THERANOS MODIFIED THIRD

02:20PM  2    PARTY DEVICES?

02:20PM  3    A.   YES, IT WAS.

02:20PM  4    Q.   AND I MAY HAVE FORGOT TO ASK YOU BEFORE, WHAT DOES THE

02:20PM  5    TECAN DEVICE LOOK LIKE AND HOW BIG WAS IT?

02:20PM  6    A.   IT WAS REALLY BIG.  SO THE TECAN DEVICE, IT'S ALMOST LIKE

02:20PM  7    A HARDWARE WORK BENCH.  SO IT IS A LIQUID HANDLING ROBOT.  IT

02:20PM  8    HAS THIS BIG TABLETOP TO IT WHERE YOU CAN SET UP DIFFERENT

02:20PM  9    STRUCTURES TO TELL THE ROBOTIC ARM WHERE IT SHOULD MOVE.

02:20PM  10       YOU COULD FIT MAYBE, AGAIN, LIKE THREE PEOPLE, FOUR PEOPLE

02:20PM  11   IN FRONT OF IT.

02:20PM  12   Q.   AND THAT LARGE DEVICE AS WELL AS THE LARGE MODIFIED

02:20PM  13   SIEMENS ADVIA WOULD BE BOTH REQUIRED FOR RUNNING A SAMPLE UNDER

02:20PM  14   THIS METHOD?

02:20PM  15   A.   YES.

02:20PM  16   Q.   AND YOU ALSO TALKED ABOUT HOW SOME SAMPLES NEEDED TO BE

02:20PM  17   CENTRIFUGED; IS THAT CORRECT?

02:20PM  18   A.   THAT IS CORRECT.

02:20PM  19   Q.   AND WOULD THAT REQUIRE YET ANOTHER PIECE OF EQUIPMENT?

02:21PM  20   A.   YES.

02:21PM  21   Q.   HOW ABOUT THE THIRD METHOD WE TALKED ABOUT USING THE

02:21PM  22   EDISON, AND WE TALKED ABOUT USING THE THIRD PARTY DEVICES.  HOW

02:21PM  23   ABOUT AN UNMODIFIED THIRD PARTY DEVICE?  WHAT WAS THE PROCESS

02:21PM  24   LIKE FOR THAT AND HOW DID IT COMPARE?

02:21PM  25   A.   YEAH.  SO FOR THE SIEMENS ADVIA, IF YOU ARE REALLY GOING

CHEUNG DIRECT BY MR. BOSTIC                                    1148

02:21PM 1      TO RUN IT IN THE UNMODIFIED, I TYPICALLY HAVE A VENOUS DRAW FOR

02:21PM 2      THE TWO, IT WOULD HAVE A BAR CODE ON IT.  I WOULD JUST TAKE THE

02:21PM 3      BLOOD SAMPLE OVER THE CAP, PUT IT IN THE MACHINE, AND CHECK

02:21PM 4      THAT IT'S RUNNING ALL THE RIGHT PATIENTS AND ALL OF THE RIGHT

02:21PM 5      TESTS, AND THEN I WOULD HIT START, AND THEN IT WOULD RUN ALL OF

02:21PM 6      THE TEST SAMPLES THAT I NEEDED TO RUN.

02:21PM 7      Q.   WAS THAT FEWER STEPS THAN WERE REQUIRED FOR THE THERANOS

02:21PM 8      SPECIFIC METHOD?

02:21PM 9      A.   IT WAS CONSIDERED WAY FEWER STEPS AND IT WAS WAY MORE

02:21PM 10     AUTOMATED.  YOU BASICALLY JUST OPENED THE TWO, YOU MAKE SURE

02:21PM 11     THE RIGHT BAR CODE IS ON IT -- SORRY.

02:22PM 12         YOU OPEN THE TWO, YOU PUT IT IN THE MACHINE, AND YOU JUST

02:22PM 13     LET THE SIEMENS ADVIA BASICALLY SCAN ALL OF THE BAR CODES AND

02:22PM 14     RUN ALL OF THE TESTS, AND YOU DON'T TOUCH IT PAST THAT POINT.

02:22PM 15     Q.   AND I ASKED YOU BEFORE ABOUT THE EDISON DEVICE AND WHETHER

02:22PM 16     IT COULD RUN MULTIPLE ASSAYS AT A TIME OR MULTIPLE SAMPLES AT A

02:22PM 17     TIME.

02:22PM 18         WAS THE ANSWER NO?  IS THAT CORRECT?

02:22PM 19     A.   YES.

02:22PM 20     Q.   HOW ABOUT THE SIEMENS ADVIA?  COULD IT RUN MULTIPLE ASSAYS

02:22PM 21     ON A SINGLE PATIENT SAMPLE?

02:22PM 22     A.   YES.

02:22PM 23     Q.   AND HOW ABOUT MULTIPLE PATIENT SAMPLES, COULD IT RUN

02:22PM 24     SEVERAL PATIENT SAMPLES AT THE SAME TIME?

02:22PM 25     A.   YES.

CHEUNG DIRECT BY MR. BOSTIC                                    1149

02:22PM   1      Q.   LET'S TALK A LITTLE BIT ABOUT YOUR WORK IN R&D.

02:23PM   2           ARE YOU FAMILIAR WITH THE TERM "VALIDATION" IN THE CONTEXT

02:23PM   3      OF BLOOD TESTING?

02:23PM   4      A.   YES.

02:23PM   5      Q.   AND WHAT DID THAT MEAN DURING YOUR TIME AT THERANOS?

02:23PM   6      A.   SO VALIDATION AT THERANOS MEANT THAT WE HAD TO CREATE

02:23PM   7      ESSENTIALLY THESE VALIDATION REPORTS, AND WE HAD TO RUN A

02:23PM   8      SERIES OF DIFFERENT STUDIES TO CHECK AND SEE WAS THE TEST

02:23PM   9      SUFFICIENT ENOUGH AND OF QUALITY ENOUGH TO START RUNNING ON

02:23PM  10      PATIENT SAMPLES.

02:23PM  11           SO VALIDATION STUDIES WOULD INCLUDE THINGS LIKE PRECISION.

02:23PM  12      ARE THE TESTS PERFORMING IN A WAY THAT IT'S CONSISTENT OVER

02:23PM  13      TIME?  ARE THEY ACCURATE?  ARE WE BASICALLY BEING ABLE TO

02:23PM  14      GENERATE THE ACCURATE RESULT BASED ON A NO CONCENTRATION SAMPLE

02:23PM  15      THAT WE HAVE?

02:23PM  16           OR ALSO, BECAUSE THERANOS WAS PERFORMING A DIFFERENT TYPE

02:23PM  17      OF COLLECTION, WE WERE DOING FINGERSTICK, WE NEEDED TO CONDUCT

02:23PM  18      STUDIES TO COMPARE HOW DOES THE FINGERSTICK COMPARE TO THE

02:23PM  19      VENOUS DRAW.

02:23PM  20           SO IT WAS A WHOLE RANGE OF DIFFERENT EXPERIMENTS THAT WE

02:24PM  21      HAD TO CONDUCT IN ORDER TO GET THEM APPROVED TO MOVE ON TO THE

02:24PM  22      CLINICAL SETTING.

02:24PM  23      Q.   WE TALKED BEFORE ABOUT RESEARCH AND DEVELOPMENT GENERALLY,

02:24PM  24      BUT FOR VALIDATION SPECIFICALLY, IS THAT SOMETHING THAT HAPPENS

02:24PM  25      BEFORE, DURING, OR AFTER A TEST IS USED ON ACTUAL PATIENTS?

ER-604

CHEUNG DIRECT BY MR. BOSTIC                                    1150

02:24PM  1     A.   TYPICALLY IT HAPPENS BEFORE.

02:24PM  2     Q.   AND WHEN YOU JOINED THERANOS IN 2013, THE COMPANY WAS

02:24PM  3     ALREADY CONDUCTING PATIENT TESTING; IS THAT RIGHT?

02:24PM  4     A.   THAT IS CORRECT.

02:24PM  5     Q.   AND WAS THERE ONGOING VALIDATION WORK HAPPENING AT THE

02:24PM  6     COMPANY DURING YOUR TIME THERE OR WAS IT ALREADY COMPLETE?

02:24PM  7     A.   THERE WAS ONGOING VALIDATION WORK DURING MY TIME THERE.

02:24PM  8     Q.   AND WAS THAT TRUE FOR THROUGHOUT YOUR TIME AT THE COMPANY?

02:24PM  9     A.   YES.

02:24PM  10    Q.   AND WHEN YOU LEFT THE COMPANY IN APRIL OF 2014, WAS ALL OF

02:24PM  11    THE VALIDATION WORK COMPLETE OR WAS IT STILL ON GOING?

02:24PM  12    A.   IT WAS STILL ONGOING.

02:24PM  13    Q.   FOR THE VALIDATION WORK, WERE ACTUAL HUMAN SAMPLES

02:25PM  14    REQUIRED?

02:25PM  15    A.   CAN YOU REPEAT THAT QUESTION.

02:25PM  16    Q.   SURE.  TO VALIDATE A TEST AT THERANOS, WERE HUMAN SAMPLES

02:25PM  17    REQUIRED?

02:25PM  18    A.   YES.

02:25PM  19    Q.   AND WHERE DID THOSE SAMPLES COME FROM FOR THE THERANOS

02:25PM  20    VALIDATION WORK?

02:25PM  21    A.   SO SOMETIMES PEOPLE WOULD GIVE US SAMPLES OR WE WOULD BUY

02:25PM  22    THEM, AND ALSO THEY COLLECTED SAMPLES INHOUSE.  SO WE, AS

02:25PM  23    EMPLOYEES OF THE COMPANY, COULD DONATE OUR BLOOD IN ORDER TO BE

02:25PM  24    PROCESSED AND USED FOR RESEARCH.

02:25PM  25    Q.   AND DID YOU PERSONALLY DONATE BLOOD WHEN YOU WERE AN

ER-605

02:25PM 1    EMPLOYEE AT THERANOS TO BE USED IN THE VALIDATION PROCESS?

02:25PM 2    A.   YES.

02:25PM 3    Q.   CAN YOU DESCRIBE MR. BALWANI'S INVOLVEMENT, IF ANY, IN THE

02:25PM 4    RESEARCH AND DEVELOPMENT WORK WHILE YOU WERE AT THERANOS?

02:25PM 5    A.   YEAH.  SO SUNNY'S INVOLVEMENT IN THE RESEARCH AND

02:25PM 6    DEVELOPMENT PROCESS, ESPECIALLY WHEN WE WOULD CONDUCT

02:26PM 7    VALIDATION, ESSENTIALLY SUNNY WOULD TELL US WHAT OUR PRIORITIES

02:26PM 8    WERE IN TERMS OF THE ASSAYS THAT WE NEEDED TO VALIDATE.

02:26PM 9        AND ONCE WE HAD CONDUCTED ALL OF THE VALIDATION STUDIES

02:26PM 10   AND WE REVIEWED THEM, WE WOULD GIVE THEM TO SHARADA, AND

02:26PM 11   SHARADA WOULD TALK TO SUNNY AND ELIZABETH ABOUT THE PROGRESS

02:26PM 12   THAT WE WERE MAKING ON THE VALIDATION.

02:26PM 13       EVERY ONCE IN A WHILE HE WOULD COME IN THE LABORATORY,

02:26PM 14   TOO, AND SEE WHAT WE WERE WORKING ON AND TO JUST CHECK IN

02:26PM 15   SOMETIMES TO SEE WHAT WAS HAPPENING IN THE R&D LAB.

02:26PM 16   Q.   HOW FREQUENTLY DID YOU SEE MR. BALWANI IN THE OFFICE AT

02:26PM 17   THERANOS?

02:26PM 18   A.   IN THE OFFICE OR IN THE LABORATORY?

02:26PM 19   Q.   IN THE OFFICE GENERALLY?

02:26PM 20   A.   HE WAS THERE QUITE FREQUENTLY.

02:26PM 21   Q.   AND YOU SAID THAT HE WOULD OCCASIONALLY STOP BY THE R&D

02:26PM 22   LAB SPECIFICALLY?

02:26PM 23   A.   YEAH.  SO WE WOULD -- YOU COULD SEE HIM BECAUSE THEY HAVE

02:26PM 24   GLASS DOORS TO THE OFFICES, SO EVERY TIME YOU WALKED IN AND

02:26PM 25   ENTERED THE BUILDING YOU COULD TYPICALLY SEE THEM IN THE OFFICE

CHEUNG DIRECT BY MR. BOSTIC                                    1152

```
02:26PM  1    AND EVERY ONCE IN A WHILE HE WOULD COME DOWN TO THE LAB AS

02:26PM  2    WELL.

02:26PM  3    Q.   MS. CHEUNG, DO YOU SEE MR. BALWANI IN THE COURTROOM TODAY?

02:27PM  4    A.   YES.

02:27PM  5    Q.   AND COULD YOU IDENTIFY HIM FOR US, PLEASE?

02:27PM  6    A.   HE'S SITTING THERE WEARING THE BLUE MASK AND THE CHECKERED

02:27PM  7    TIE.

02:27PM  8             MR. BOSTIC:  THE RECORD SHOULD SHOW THAT THE WITNESS

02:27PM  9    HAS IDENTIFIED THE DEFENDANT.

02:27PM 10             THE COURT:  YES.

02:27PM 11             MR. BOSTIC:  YOUR HONOR, I'M ABOUT TO MOVE INTO A

02:27PM 12    DIFFERENT SUBJECT.  THIS MIGHT BE A GOOD STOPPING POINT FOR THE

02:27PM 13    DAY.

02:27PM 14             THE COURT:  LET'S DO THAT THEN.  WE'RE GOING TO TAKE

02:27PM 15    OUR BREAK FOR THE DAY.  LET'S RESUME AT 9:00 O'CLOCK.  IF YOU

02:27PM 16    COULD RESUME AT 9:00 O'CLOCK, PLEASE.

02:27PM 17        LADIES AND GENTLEMEN OF THE JURY, I JUST WANT TO READ YOU

02:27PM 18    AN ADMONISHMENT ONCE AGAIN, PLEASE.

02:27PM 19        AS I INDICATED BEFORE THIS TRIAL STARTED, YOU AS JURORS

02:27PM 20    WILL DECIDE THE CASE BASED SOLELY ON THE EVIDENCE THAT IS

02:27PM 21    PRESENTED IN THIS COURTROOM.

02:27PM 22        THIS MEANS THAT AFTER YOU LEAVE HERE FOR THE NIGHT, YOU

02:27PM 23    MUST NOT CONDUCT ANY INDEPENDENT RESEARCH ABOUT THIS CASE, THE

02:27PM 24    MATTERS IN THE CASE, THE LEGAL ISSUES IN THE CASE, OR THE

02:27PM 25    INDIVIDUALS OR OTHER ENTITIES INVOLVED IN THE CASE.
```

ER-607

02:28PM 1   THIS IS IMPORTANT FOR THE SAME REASONS THAT JURORS HAVE

02:28PM 2   LONG BEEN INSTRUCTED TO LIMIT THEIR EXPOSURE TO TRADITIONAL

02:28PM 3   FORMS OF MEDIA INFORMATION SUCH AS TELEVISION AND NEWSPAPERS.

02:28PM 4   YOU MUST ALSO NOT COMMUNICATE WITH ANYONE IN ANY WAY ABOUT

02:28PM 5   THIS CASE, AND YOU MUST IGNORE ANY INFORMATION ABOUT THE CASE

02:28PM 6   THAT YOU MIGHT SEE WHILE BROWSING THE INTERNET OR YOUR SOCIAL

02:28PM 7   MEDIA FEEDS.

02:28PM 8   IN ESSENCE, LADIES AND GENTLEMEN, ONCE AGAIN, PLEASE, YOU

02:28PM 9   MUST NOT AND YOU MAY NOT DO ANY INDEPENDENT RESEARCH OR IN ANY

02:28PM 10  WAY TRY TO DISCOVER OR HAVE DISCUSSIONS ABOUT THIS CASE OR

02:28PM 11  ANYTHING TO DO WITH IT.

02:28PM 12  WE'LL RECESS THIS EVENING.  IF YOU COULD COLLECT

02:28PM 13  YOURSELVES SUCH THAT WE CAN BEGIN AT 9:00 O'CLOCK TOMORROW, I'D

02:28PM 14  BE GRATEFUL.  I THINK WE HAVE BREAKFAST AGAIN.

02:28PM 15  MS. ROBINSON, DO WE?  GREAT.  OKAY.  THAT AWAITS YOU.

02:28PM 16  HAVE A GOOD EVENING, FOLKS.  WE'LL SEE YOU TOMORROW.

02:29PM 17  THANK YOU.  YOU CAN STAND DOWN.  WE'LL SEE YOU TOMORROW

02:29PM 18  MORNING.

02:29PM 19  (JURY OUT AT 2:29 P.M.)

02:29PM 20  THE COURT:  HAVE A SEAT.  THE RECORD SHOULD REFLECT

02:29PM 21  THAT THE JURY HAS LEFT THE COURTROOM FOR THE EVENING.

02:29PM 22  MS. CHEUNG HAS LEFT THE COURTROOM.

02:30PM 23  ALL COUNSEL AND MR. BALWANI REMAIN.

02:30PM 24  ANYTHING FURTHER BEFORE WE RECESS FOR THE DAY, COUNSEL?

02:30PM 25  MR. BOSTIC:  NOTHING FROM THE GOVERNMENT,

1154

02:30PM 1    YOUR HONOR.

02:30PM 2         THE COURT:  MR. COOPERSMITH.

02:30PM 3         MR. COOPERSMITH:  NO, YOUR HONOR.

02:30PM 4         THE COURT:  ALL RIGHT.  JUST TO RECALL -- AND THANK

02:30PM 5    YOU FOR YOUR PATIENCE TODAY.  WE GOT OUR FIRST DAY UNDERWAY.

02:30PM 6    THANK YOU FOR THAT.

02:30PM 7         PLEASE RECALL THAT THE COURT IS AVAILABLE AT 8:30.  SHOULD

02:30PM 8    ANY PARTY WISH TO BRING ANYTHING UP FOR DISCUSSION OUTSIDE OF

02:30PM 9    THE PRESENCE OF THE JURY, I'M ALWAYS HERE TO DO THAT SHOULD

02:30PM 10   THAT BECOME NECESSARY AT ANY TIME.

02:30PM 11        WE'LL HAVE TOMORROW, AND THEN WE'LL HAVE A LONG BREAK

02:30PM 12   UNTIL NEXT WEEK.

02:30PM 13        I THINK I'VE INDICATED TO A VERY GENEROUS PERSON HAS

02:30PM 14   OFFERED THE SCHEDULE SUCH THAT WE CAN BE IN SESSION THE LAST

02:30PM 15   WEEK IN MAY, WHICH IS THAT MEMORIAL DAY WEEK.  WE WILL HAVE

02:30PM 16   THOSE DAYS AVAILABLE TO US OWING TO THE GENEROSITY OF A CERTAIN

02:30PM 17   COURT EMPLOYEE.  SO WE'RE VERY GRATEFUL FOR THAT PERSON, AND

02:30PM 18   WE'LL HAVE THAT AVAILABLE TO US.

02:31PM 19        I DON'T THINK I'VE MENTIONED THAT TO THE JURY.  I'LL TELL

02:31PM 20   THEM THAT TOMORROW, TOMORROW MORNING.

02:31PM 21        ALL RIGHT.  HAVE A GOOD EVENING.  THANK YOU.

02:31PM 22        MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:31PM 23        MR. COOPERSMITH:  THANK YOU.

02:31PM 24        (COURT ADJOURNED AT 2:31 P.M.)

25

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,           )
6                                        )  CR-18-00258-EJD
                        PLAINTIFF,       )
7                                        )  SAN JOSE, CALIFORNIA
              VS.                        )
8                                        )  MARCH 23, 2022
     RAMESH "SUNNY" BALWANI,             )
9                                        )  VOLUME 9
                        DEFENDANT.       )
10   _____     )  PAGES 1155 - 1381

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S :

15   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                            150 ALMADEN BOULEVARD, SUITE 900
17                          SAN JOSE, CALIFORNIA 95113

18                          BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                          1301 CLAY STREET, SUITE 340S
                            OAKLAND, CALIFORNIA 94612
20
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTER:
22                               IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
23

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
25

ER-610

```
 1    SAN JOSE, CALIFORNIA                      MARCH 23, 2022

 2                        P R O C E E D I N G S

 3        (COURT CONVENED AT 9:05 A.M.)

 4        (JURY IN AT 9:05 A.M.)

 5            THE COURT:  THANK YOU.  PLEASE BE SEATED.

 6        WE ARE BACK ON THE RECORD IN THE BALWANI MATTER.  ALL

 7    COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

 8        OUR JURY AND ALTERNATES ARE PRESENT.  GOOD MORNING, LADIES

 9    AND GENTLEMEN.

10        BEFORE WE BEGIN AGAIN, LET ME ASK YOU THAT QUESTION AGAIN,

11    PLEASE.

12        DURING THE RECESS LAST NIGHT AND THIS MORNING, HAVE ANY OF

13    YOU HAD CAUSE OR OCCASION TO DO ANY RESEARCH TO LEARN ANYTHING

14    ABOUT THIS CASE OR HAVE ANYONE TALK TO YOU ABOUT ANYTHING TO DO

15    WITH THIS CASE?

16        IF SO, WOULD YOU PLEASE RAISE YOUR HAND.

17        THANK YOU.  I SEE NO HANDS.  THANK YOU FOR YOUR CONTINUED

18    FIDELITY TO THE COURT'S ADMONITION.

19        I JUST WANT TO TELL YOU ABOUT OUR SCHEDULE THIS MORNING.

20    MY THOUGHT IS WE GO UNTIL 11:00, TAKE A 30 MINUTE BREAK, AND

21    RECONVENE AFTER THAT AND GO UNTIL 1:00 AND TAKE A 30 MINUTE

22    BREAK.

23        WE'RE GOING TO END AT 3:00 O'CLOCK TODAY, COUNSEL, IF THAT

24    SUITS YOU.

25        GREAT.  MR. BOSTIC, YOU'D LIKE TO CONTINUE WITH YOUR
```

09:06AM 1    DIRECT EXAMINATION?

09:06AM 2              MR. BOSTIC:  YES.  THANK YOU, YOUR HONOR.

09:06AM 3              THE COURT:  SURE.

09:06AM 4         GOOD MORNING, MS. CHEUNG.  IF YOU WOULD RESUME THE STAND,

09:06AM 5    PLEASE, AND MAKE YOURSELF COMFORTABLE AGAIN.  YOU MAY REMOVE

09:06AM 6    YOUR MASK IF YOU WISH.

09:06AM 7         WHEN YOU ARE COMFORTABLE, WOULD YOU JUST STATE YOUR NAME

09:06AM 8    AGAIN, PLEASE.

09:06AM 9              THE WITNESS:  MY NAME IS ERIKA CHEUNG.

09:06AM 10             **(GOVERNMENT'S WITNESS, ERIKA CHEUNG, WAS PREVIOUSLY**

09:06AM 11   **SWORN.)**

09:06AM 12             THE COURT:  THANK YOU.

09:06AM 13        MR. BOSTIC.

09:06AM 14             MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:06AM 15                  **DIRECT EXAMINATION (RESUMED)**

09:06AM 16   BY MR. BOSTIC:

09:06AM 17   Q.   GOOD MORNING, MS. CHEUNG.

09:06AM 18   A.   GOOD MORNING.

09:06AM 19   Q.   I'D LIKE TO TALK TO YOU ABOUT -- SHIFTING TOPICS REGARDING

09:07AM 20   YOUR TIME AT THERANOS AND ASK YOU ABOUT DEMONSTRATIONS OF

09:07AM 21   THERANOS TECHNOLOGY?

09:07AM 22   A.   OKAY.

09:07AM 23   Q.   WHEN YOU WORKED AT THE COMPANY, WERE YOU INVOLVED IN ANY

09:07AM 24   WAY IN DEMONSTRATIONS OF THE THERANOS TECHNOLOGY DONE FOR

09:07AM 25   VIP'S?

09:07AM  1     A.   YES.

09:07AM  2     Q.   WHAT WAS YOUR INVOLVEMENT IN THOSE DEMONSTRATIONS?

09:07AM  3     A.   SO MY INVOLVEMENT IN THOSE DEMONSTRATIONS IS WHEN WE WOULD

09:07AM  4     GET AN ORDER FOR A VIP SAMPLE, I WOULD RUN THE TEST FOR -- THE

09:07AM  5     ELISA TEST, SO THINGS LIKE VITAMIN D, TSH, TPSA, AND FT4.

09:07AM  6     Q.   AND WHAT WAS YOUR UNDERSTANDING AT THE TIME WHO THOSE

09:07AM  7     VIP'S WERE, GENERALLY SPEAKING?

09:07AM  8     A.   THE VIP'S WERE TYPICALLY INVESTORS OR SPECIAL GUESTS THAT

09:07AM  9     WE HAD COMING INTO THE COMPANY AND KIND OF MORE THAN PATIENTS.

09:07AM  10    Q.   AND HOW FREQUENTLY DID THIS HAPPEN?  HOW OFTEN DID YOU

09:07AM  11    WORK ON A DEMO FOR A VIP GUEST?

09:08AM  12    A.   THE DEMO'S FOR THE VIP'S PROBABLY HAPPENED SEVERAL TIMES A

09:08AM  13    MONTH.

09:08AM  14    Q.   AND WERE THE DEMOS RUN IN THE CLINICAL LAB WHERE PATIENT

09:08AM  15    TESTING WAS DONE OR WERE THEY RUN BY THE R&D DEPARTMENT OR SOME

09:08AM  16    OTHER GROUP?

09:08AM  17    A.   SO IT DEPENDED ON THE TIME.

09:08AM  18         SO INITIALLY WHEN I STARTED WORKING FOR THE COMPANY, THEY

09:08AM  19    WERE RUN BY THE RESEARCH AND DEVELOPMENT TEAM, AND THEN IT WAS

09:08AM  20    A MIXTURE, AND THEN IT WAS EVENTUALLY RUN BY THE CLINICAL LAB.

09:08AM  21    Q.   DO YOU STILL HAVE A BINDER OF DOCUMENTS IN FRONT OF YOU?

09:08AM  22    A.   YES.

09:08AM  23    Q.   CAN I ASK YOU TO TURN TO TAB 1227, PLEASE.

09:08AM  24         DO YOU HAVE 1227 IN FRONT OF YOU?

09:08AM  25    A.   YES.

09:08AM  1    Q.   AND IS THAT AN EMAIL CHAIN INCLUDING YOU AND OTHER

09:08AM  2    INDIVIDUALS AT THERANOS FROM NOVEMBER OF 2013?

09:08AM  3    A.   YES.

09:08AM  4    Q.   DOES THIS EMAIL CHAIN RELATE TO ONE OF THE DEMOS OR ONE OR

09:09AM  5    MORE OF THE DEMOS THAT WE HAVE BEEN DISCUSSING?

09:09AM  6    A.   YES.

09:09AM  7            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1227.

09:09AM  8            MR. COOPERSMITH:  JUST A MOMENT, YOUR HONOR.

09:09AM  9        (PAUSE IN PROCEEDINGS.)

09:09AM  10           MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

09:09AM  11           THE COURT:  THANK YOU.  THIS EXHIBIT IS ADMITTED,

09:09AM  12   AND IT MAY BE PUBLISHED.

09:09AM  13       (GOVERNMENT'S EXHIBIT 1227 WAS RECEIVED IN EVIDENCE.)

09:09AM  14   BY MR. BOSTIC:

09:09AM  15   Q.   AND, MS. CHEUNG, DID EMPLOYEES AT THERANOS USE EMAILS TO

09:09AM  16   COORDINATE THE COLLECTION AND PROCESSING OF THESE DEMO SAMPLES?

09:09AM  17   A.   YES.

09:09AM  18   Q.   AND LET'S LOOK AT PAGE 6 OF THIS EMAIL, PLEASE, MS. WACHS.

09:10AM  19        AND DO YOU SEE ON THE SCREEN, MS. CHEUNG, AN EMAIL FROM

09:10AM  20   SOMEONE NAMED DANIEL EDLIN?

09:10AM  21   A.   YES.

09:10AM  22   Q.   TO SEVERAL EMPLOYEES AT THERANOS?

09:10AM  23   A.   YES.

09:10AM  24   Q.   AND WHO WAS DANIEL EDLIN AT THE COMPANY?

09:10AM  25   A.   DANIEL EDLIN WAS ONE OF THE PROJECT MANAGERS.

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1163

09:10AM   1      Q.   AND DID HE HAVE A SPECIFIC ROLE IN CONNECTION WITH DEMOS

09:10AM   2      LIKE THIS ONE?

09:10AM   3      A.   HE WAS THE PRODUCT LEADER AND HANDLED BASICALLY ALL OF THE

09:10AM   4      DEMO SAMPLES, SO WE WOULD REPORT BACK ALL OF OUR RESULTS TO

09:10AM   5      DANIEL.  HE WOULD LET US KNOW WHEN THERE WAS A PARTICULAR DEMO

09:10AM   6      SAMPLE THAT WE HAD TO RUN.

09:10AM   7      Q.   IN THIS EMAIL ON OCTOBER 22ND, 2013, THREE PARAGRAPHS DOWN

09:10AM   8      IN HIS EMAIL HE SAYS, "THE DEFAULT TEST LIST FOR THIS GROUP OF

09:10AM   9      DEMOS IS," AND THEN HE LISTS SEVERAL DIFFERENT TESTS.

09:10AM  10           DO YOU SEE THAT?

09:10AM  11      A.   YES.

09:10AM  12      Q.   AND THE TESTS LISTED ARE CHEM 14, LIPIDS, CBC, AND

09:11AM  13      VITAMIN D/TSH/PSA; IS THAT CORRECT?

09:11AM  14      A.   THAT IS CORRECT.

09:11AM  15      Q.   FROM YOUR MEMORY AT YOUR TIME AT THE COMPANY, CAN YOU TELL

09:11AM  16      US WHICH OF THESE COULD BE RUN ON THE EDISON DEVICE AND WHICH

09:11AM  17      COULD NOT?

09:11AM  18      A.   THE ONLY TEST THAT COULD BE RUN ON THE EDISON DEVICE WERE

09:11AM  19      VITAMIN D, TSH, AND PSA.

09:11AM  20           AND CHEM 14, LIPIDS, CBC COULD NOT BE RUN ON THE EDISON

09:11AM  21      DEVICE.

09:11AM  22      Q.   AND CHEM 14, LIPIDS, AND CBC, WERE THOSE EACH INDIVIDUAL

09:11AM  23      TESTS OR WERE THEY PANELS OF TESTS?

09:11AM  24      A.   THOSE WERE PANELS OF TESTS.

09:11AM  25      Q.   SO DOES THAT MEAN LOOKING AT THIS AS A LIST OF TESTS, THE

ER-615

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1164

09:11AM   1    MAJORITY OF THESE TESTS COULD NOT BE RUN ON THE THERANOS-BUILT

09:11AM   2    ANALYZER?

09:11AM   3    A.   THAT'S CORRECT.

09:11AM   4    Q.   LET'S LOOK AT PAGE 4 OF THE SAME EXHIBIT.  LET'S ZOOM IN

09:12AM   5    ON THE MIDDLE MESSAGE FROM SOMEBODY NAMED MAX FOSQUE.

09:12AM   6         AND WHO WAS MAX FOSQUE AT THERANOS?

09:12AM   7    A.   MAX FOSQUE WAS ALSO A PRODUCT MANAGER AS WELL.

09:12AM   8    Q.   AND DID HE HAVE A SIMILAR ROLE IN CONNECTION WITH THESE

09:12AM   9    DEMONSTRATIONS AS MR. EDLIN?

09:12AM  10    A.   YES.

09:12AM  11    Q.   AND MR. FOSQUE'S EMAIL ON OCTOBER 28TH, HE TALKS ABOUT A

09:12AM  12    DEMO THAT IS SCHEDULED FOR THE FOLLOWING DAY; IS THAT RIGHT?

09:12AM  13    A.   THAT IS CORRECT.

09:12AM  14    Q.   AND HE PROVIDES A BULLET POINT LIST WITH SOME DIRECTIONS.

09:12AM  15         DO YOU SEE THAT?

09:12AM  16    A.   YES.

09:12AM  17    Q.   AND THERE'S A TEST LIST FOR THIS DEMO WHICH INCLUDES CBC

09:12AM  18    AND CHEM 14, AND THEN HE SAYS WITH VITAMIN D ADDED IF

09:12AM  19    EVERYTHING IS GOING SMOOTHLY.

09:12AM  20         DO YOU SEE THAT?

09:12AM  21    A.   YES.

09:12AM  22    Q.   AND WHAT WAS YOUR UNDERSTANDING AT THE TIME OF WHAT THAT

09:12AM  23    MEANT?  WHY WOULD AN ASSAY NEED TO BE INCLUDED ONLY IF

09:12AM  24    SOMETHING WAS GOING SMOOTHLY?

09:12AM  25    A.   SO TYPICALLY WE HAD REQUIREMENTS IN HOW LONG IT WOULD TAKE

ER-616

CHEUNG DIRECT BY MR. BOSTIC (RES.)                  1165

09:13AM   1    TO GIVE A PATIENT A RESULT, SO THINGS HAD TO BE IN AN HOUR OR

09:13AM   2    TWO.

09:13AM   3         AND IF, SAY, QUALITY CONTROLS DIDN'T PASS OR MAYBE THERE

09:13AM   4    WAS SOME SORT OF PROCESSING ERROR, THERE WOULDN'T BE ENOUGH

09:13AM   5    TIME IN ORDER TO CONDUCT THAT FOLLOW-ON TEST.

09:13AM   6         AND ALSO IN TERMS OF THE EDISON DEVICES AND THE EDISON

09:13AM   7    TESTS, SOMETIMES WE WOULDN'T HAVE THE SYSTEM PREPARED BECAUSE

09:13AM   8    OF QUALITY CONTROL FAILURES USUALLY IN ORDER TO RUN VITAMIN D.

09:13AM   9         SO THAT'S PROBABLY IN REFERENCE TO THE FACT THAT IT

09:13AM  10    WOULDN'T HIT THE MARKER OF TIME OR THERE WAS SOME SORT OF OTHER

09:13AM  11    OPERATIONAL ISSUE THAT WOULD PREVENT US FROM BEING ABLE TO RUN

09:13AM  12    IT.

09:13AM  13    Q.   AND DO I UNDERSTAND CORRECTLY FROM YOUR TESTIMONY THAT

09:13AM  14    ACCORDING TO THIS EMAIL, THE NON-THERANOS EDISON TESTS WOULD BE

09:13AM  15    PERFORMED AND THE EDISON TESTS WOULD ONLY BE PERFORMED IF

09:13AM  16    THINGS WERE RUNNING SMOOTHLY?

09:13AM  17              MR. COOPERSMITH:  OBJECTION.  LEADING.

09:13AM  18              THE COURT:  COUNSEL, DO YOU WANT TO REPHRASE YOUR

09:13AM  19    QUESTION?

09:14AM  20    BY MR. BOSTIC:

09:14AM  21    Q.   MS. CHEUNG, IN THIS EMAIL IT SAYS THAT CBC AND CHEM 14

09:14AM  22    WOULD BE PERFORMED AND VITAMIN D ADDED ONLY IF EVERYTHING WAS

09:14AM  23    GOING SMOOTHLY.

09:14AM  24         WHAT WAS THE DIFFERENCE BETWEEN CBC AND CHEM 14 ON THE ONE

09:14AM  25    HAND AND VITAMIN D ON THE OTHER HAND AS FAR AS WHICH DEVICES

09:14AM   1    WERE USED TO RUN THOSE TESTS?

09:14AM   2    A.   SO CBC AND CHEM 14 USED OTHER OFF-THE SHELF ANALYZERS THAT

09:14AM   3    WERE MODIFIED USING THERANOS METHODS VERSUS VITAMIN D WAS USING

09:14AM   4    THE THERANOS-CREATED DEVICE, THE EDISON, IN ORDER TO RUN IT.

09:14AM   5        SO AT LEAST WITH THE OFF-THE-SHELF THEY WERE A LITTLE MORE

09:14AM   6    PREDICTABLE IF THEY WERE READY TO GO IF THE QC'S PASSED AND HOW

09:14AM   7    LONG IT WOULD TAKE.

09:14AM   8    Q.   AND YOU ARE USING THE TERM QC THAT I'D LIKE TO TALK TO YOU

09:14AM   9    IN A MINUTE, BUT WE'LL SAVE THAT FOR ONE MOMENT IF THAT'S OKAY.

09:14AM  10    A.   ALL RIGHT.

09:14AM  11    Q.   THIS REFERENCE TO THINGS GOING SMOOTHLY, IN YOUR

09:15AM  12    EXPERIENCE IN WORKING ON THESE DEMOS, DID THINGS USUALLY GO

09:15AM  13    SMOOTHLY OR WERE THERE PROBLEMS ENCOUNTERED?

09:15AM  14    A.   THERE WERE MANY PROBLEMS THAT WERE ENCOUNTERED.

09:15AM  15    Q.   LET'S LOOK AT PAGE 3 OF THE SAME EXHIBIT, AND LET'S ZOOM

09:15AM  16    IN ON THE TOP PORTION OF THE PAGE.

09:15AM  17        AND DO YOU SEE AN EMAIL FROM OCTOBER 30TH TO MANY PEOPLE

09:15AM  18    IN THIS SAME GROUP FROM SOMEONE NAMED KATHRYN ROMMEL?

09:15AM  19    A.   YES.

09:15AM  20    Q.   AND WHO WAS KATHRYN ROMMEL AT THERANOS?

09:15AM  21    A.   KATHRYN ROMMEL WAS ONE OF THE SCIENTISTS IN THE GENERAL

09:15AM  22    CHEMISTRY DEPARTMENT.

09:15AM  23    Q.   SHE ASKED A QUESTION IN CONNECTION WITH THE DEMO FOR THAT

09:15AM  24    DAY.  AND THE QUESTION IS "DOES THE ISE SAMPLE NEED TO BE RUN

09:15AM  25    WITH THE SIEMENS PROTOCOL AGAIN?"

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1167

09:15AM  1         DO YOU SEE THAT QUESTION?

09:15AM  2    A.    YES.

09:15AM  3    Q.    WHAT DID ISE MEAN AT THERANOS?

09:15AM  4    A.    THE ISE, I BELIEVE, IS THE ELECTROLYTES FOR THE SAMPLE,

09:16AM  5    BUT I CAN'T BE CERTAIN.

09:16AM  6    Q.    IS IT A PARTICULAR KIND OF TEST?

09:16AM  7    A.    IT'S A PARTICULAR TYPE OF TEST.

09:16AM  8    Q.    AND WHAT IS THIS EMAIL REFERENCING WHEN MS. ROMMEL ASKS IF

09:16AM  9    THE ISE SAMPLE NEEDS TO BE RUN WITH THE SIEMENS PROTOCOL?

09:16AM 10    A.    SO IN THIS CONTEXT THE ISE SAMPLE THAT THEY'RE TALKING

09:16AM 11    ABOUT IS IF IT NEEDS TO BE RUN ON THE SIEMENS ADVIA.

09:16AM 12    Q.    AND WAS THE SIEMENS ADVIA A THERANOS-DESIGNED OR BUILT

09:16AM 13    DEVICE?

09:16AM 14    A.    NO.

09:16AM 15    Q.    IT WAS A THIRD PARTY DEVICE?

09:16AM 16    A.    YES.

09:16AM 17    Q.    SO YOU SAID THAT YOU WERE INVOLVED IN PROCESSING THE

09:16AM 18    SAMPLES FOR THESE DEMOS; IS THAT CORRECT?

09:16AM 19    A.    THAT IS CORRECT.

09:16AM 20    Q.    CAN YOU TELL US ABOUT THE WORKFLOW FOR ACTUALLY PROCESSING

09:16AM 21    ONE OF THESE SAMPLES?

09:16AM 22         AND LET'S GO BACK TO PAGE 6 OF THIS EXHIBIT AND LOOK AT

09:16AM 23    THIS LIST OF ASSAYS IF WE CAN.

09:17AM 24         SO WE SEE THIS LIST OF ASSAYS, CHEM 14, LIPIDS, AND CBC

09:17AM 25    PANELS AND VITAMIN D/TSH, AND PSA; IS THAT RIGHT?

CHEUNG DIRECT BY MR. BOSTIC (RES.)                                    1168

```
09:17AM   1    A.    THAT IS CORRECT.

09:17AM   2    Q.    AND CAN YOU WALK US THROUGH THE PROCESS AT THERANOS FOR

09:17AM   3    ACTUALLY RUNNING THE TESTS ON A PATIENT SAMPLE FOR ONE OF THESE

09:17AM   4    DEMOS THAT INCLUDED THESE TESTS?

09:17AM   5              MR. COOPERSMITH:  YOUR HONOR, LACKS FOUNDATION.

09:17AM   6         SHE TESTIFIED SHE ONLY RAN THE ELISA SAMPLES.

09:17AM   7              THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR

09:17AM   8    THIS?

09:17AM   9    BY MR. BOSTIC:

09:17AM  10    Q.    MS. CHEUNG, DURING YOUR TIME AT THERANOS, DID YOU BECOME

09:17AM  11    FAMILIAR WITH HOW EACH OF THESE CATEGORIES OF ASSAYS WAS RUN AT

09:17AM  12    THE COMPANY?

09:17AM  13    A.    YES.

09:17AM  14    Q.    AND DID THAT FAMILIARITY COME FROM THE TIME YOU SPENT IN

09:17AM  15    R&D AS WELL AS IN CLIA?

09:17AM  16    A.    YES.

09:17AM  17    Q.    SO CAN YOU WALK US THROUGH, FOR A SAMPLE THAT CAME IN

09:18AM  18    AROUND THIS TIME PERIOD, WHAT WOULD BE THE PROCESS AT THERANOS

09:18AM  19    FOR CONDUCTING THESE TESTS ON A PATIENT SAMPLE?

09:18AM  20    A.    SO TYPICALLY WHAT WOULD HAPPEN IS A PHLEBOTOMIST WOULD

09:18AM  21    COME BACK INTO THE BACK LABORATORY AND GIVE US AGAIN THAT BLOOD

09:18AM  22    SAMPLE IN THE SMALL NANOTAINER.

09:18AM  23         AND THEN FROM THERE WE WOULD HAVE TO SCAN IT TO SEE OR WE

09:18AM  24    WOULD KNOW FROM THE EMAIL WHAT TEST WE WOULD HAVE TO RUN.

09:18AM  25         SO THEN EACH TEAM WOULD NEED A SAMPLE SIZE OF THAT BLOOD
```

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1169

09:18AM 1    SAMPLE.

09:18AM 2         SO, FOR EXAMPLE, IF IT HAD A CBC BECAUSE IT'S WHOLE BLOOD,

09:18AM 3    WE WOULD HAVE TO GIVE IT TO THE CYTOMETRY SEEM.  THEY WOULD GO

09:18AM 4    AND COLLECT THEIR BLOOD SAMPLE, THEY WOULD GIVE IT BACK TO THE

09:18AM 5    GENERAL CHEMISTRY TEAM, THEY WOULD SPIN IT IN A CENTRIFUGE,

09:18AM 6    THEY WOULD TAKE THEIR BLOOD.

09:18AM 7         AND THEN SAY, AND LET US KNOW ON THE EDISON TEAM, OKAY,

09:18AM 8    IT'S AVAILABLE FOR YOU TO TAKE COLLECTION.

09:18AM 9         SO THEN WE WOULD TAKE COLLECTION.  WE WOULD TAKE THE SMALL

09:18AM 10   SAMPLE.  WE WOULD AGAIN PUT IT -- SCAN IT AND SEE WHAT TESTS WE

09:18AM 11   HAD TO RUN, GO AND LABEL OUR CARTRIDGES, GRAB OUR CARTRIDGES,

09:19AM 12   TAKE IT OVER TO THE TECAN, HAVE THE TECAN DISPENSE THE BLOOD

09:19AM 13   INTO THE CARTRIDGE.

09:19AM 14        ONCE THAT WAS DONE, WE WOULD MAKE SURE THAT THE BAR CODE

09:19AM 15   WAS ON THERE PROPERLY.  WE WOULD TAKE IT OVER TO THE EDISON

09:19AM 16   DEVICE.  WE WOULD RUN IT IN THE EDISON DEVICE MAKING SURE THAT

09:19AM 17   WE CHECKED ON THE TOUCHSCREEN THAT IT WAS THE ACCURATE TEST, WE

09:19AM 18   WOULD HIT START, AND THEN IT WOULD RUN FROM ANYWHERE FROM ONE

09:19AM 19   TO TWO HOURS DEPENDING ON WHAT TEST.

09:19AM 20        AND SAY IF IT WAS THE CASE THAT WE DID VITAMIN D, TSH,

09:19AM 21   PSA, WE HAD TO DO THIS IF IT WERE THREE TESTS THREE TIMES.  SO

09:19AM 22   FOR ONE TEST FOR ONE PATIENT, THAT WHOLE CYCLE IS WHAT WE WOULD

09:19AM 23   DO.

09:19AM 24        BUT IF IT WAS THREE TESTS FOR ONE PATIENT, WE WOULD DO

09:19AM 25   THAT CYCLE THREE TIMES.

ER-621

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1170

09:19AM  1      Q.   AND WHAT DIFFERENT KINDS OF ANALYZERS WOULD BE REQUIRED TO

09:19AM  2      RUN THIS GROUP, SAY, OF ASSAYS ON A SINGLE PATIENT SAMPLE?

09:20AM  3      A.   FOR CHEM 14, LIPIDS, CBC, AND THE VITAMIN D, TSH?

09:20AM  4      Q.   YES.

09:20AM  5      A.   SO THE CHEM 14 AND LIPIDS WOULD REQUIRE A TECAN IN A

09:20AM  6      SIEMENS ADVIA --

09:20AM  7      Q.   START WITH THE TYPE OF TEST.

09:20AM  8      A.   SO FOR THE CHEM 14 AND THE LIPIDS, IT WOULD REQUIRE A

09:20AM  9      TECAN IN THE SIEMENS ADVIA MACHINE.

09:20AM 10          AND THEN FOR CBC IT WOULD REQUIRE THE TECAN IN ADDITION TO

09:20AM 11      A FLOW CYTOMETER CALLED THE BD FORTESSA.

09:20AM 12          AND THEN FOR VITAMIN D, TSH, AND PSA IT WOULD REQUIRE THE

09:20AM 13      TECAN AND THE EDISON DEVICES.

09:20AM 14      Q.   SO FOR THIS GROUP OF TESTS, HOW MANY TIMES WOULD A SAMPLE

09:21AM 15      NEED TO BE SUBDIVIDED?

09:21AM 16      A.   FOR -- SAY IF WE DID ALL OF THESE?

09:21AM 17      Q.   UH-HUH.

09:21AM 18      A.   IT WOULD NEED TO BE SUBDIVIDED SIX TIMES.

09:21AM 19      Q.   SO YOU WOULD NEED TO TAKE A SMALL SAMPLE THAT CAME IN AND

09:21AM 20      BREAK IT UP INTO THE SIX EVEN SMALLER SAMPLES?

09:21AM 21      A.   YES.

09:21AM 22      Q.   AND THE DEVICES USED TO RUN THE CBC PANEL AND THE CHEM 14

09:21AM 23      AND LIPIDS PANELS, WERE THOSE THERANOS DESIGNED OR MANUFACTURED

09:21AM 24      DEVICES?

09:21AM 25      A.   NO.

CHEUNG DIRECT BY MR. BOSTIC (RES.)                                    1171

09:21AM  1     Q.   AND HOW MANY PEOPLE AT THERANOS, IF YOU CAN ESTIMATE,

09:21AM  2     WOULD BE REQUIRED TO RUN THIS MANY TESTS ON A SINGLE PATIENT

09:21AM  3     SAMPLE IN THIS CONTEXT?

09:21AM  4     A.   AT A MINIMUM THERE WOULD NEED TO BE ABOUT FOUR PEOPLE.

09:22AM  5     Q.   I'D LIKE TO ASK ABOUT THE CLINICAL LAB AT THERANOS.  DID

09:22AM  6     YOU ALSO WORK IN THE CLINICAL LAB?

09:22AM  7     A.   YES.

09:22AM  8     Q.   AND WAS THERE A TIME WHEN YOU TRANSITIONED FROM WORKING IN

09:22AM  9     R&D TO CLINICAL?

09:22AM  10    A.   YES.

09:22AM  11    Q.   AND WHEN DID THAT HAPPEN APPROXIMATELY?

09:22AM  12    A.   SO APPROXIMATELY THAT HAPPENED -- THERE WAS A BIT OF

09:22AM  13    OVERLAP.  SO I WAS KIND OF IN BOTH.  BUT IT HAPPENED AROUND

09:22AM  14    DECEMBER OR JANUARY AND THEN THE FULL CONVERSION MAYBE IN

09:22AM  15    FEBRUARY.

09:22AM  16    Q.   AND WE'RE STILL IN 2014?

09:22AM  17    A.   WE'RE STILL IN -- YEAH, DECEMBER OF 2013 TO FEBRUARY OF

09:22AM  18    2014.

09:22AM  19    Q.   WHERE WAS THE CLINICAL LAB; LOCATED IN THE THERANOS

09:22AM  20    BUILDING?

09:22AM  21    A.   SO THERE WERE TWO CLINICAL LABS.  SO THERE WAS AN UPSTAIRS

09:22AM  22    CLINICAL LAB THAT HAD ALL OF THE FDA APPROVED MACHINES, AND

09:22AM  23    THAT WAS CALLED THE DINOSAUR LAB, AND THEN WE ADDITIONALLY HAD

09:22AM  24    A SECONDARY CLINICAL LAB IN THE DOWNSTAIRS LIKE BASEMENT AREA

09:23AM  25    THAT WAS CALLED NORMANDY.  AND THAT'S WHERE ALL OF THE THERANOS

09:23AM 1    DEVICES, THE EDISON DEVICES, IN ADDITION TO THE

09:23AM 2    THERANOS-MODIFIED DEVICES WERE LOCATED.

09:23AM 3    Q.   WHO CALLED THE UPSTAIRS LAB THE DINOSAUR LAB AT THERANOS?

09:23AM 4    A.   THAT WAS JUST THE NAME IT WAS GIVEN.

09:23AM 5    Q.   AND WHAT WAS YOUR UNDERSTANDING AS TO WHY IT WAS CALLED

09:23AM 6    THE DINOSAUR LAB?

09:23AM 7    A.   IT WAS CALLED THE DINOSAUR LAB BECAUSE IT WAS ALL THE OLD

09:23AM 8    WHAT WE CALL PREDICATE MACHINES OF THE TYPE OF BLOOD

09:23AM 9    DIAGNOSTICS THAT YOU WOULD HAVE SEEN IN THE PAST VERSUS WHAT WE

09:23AM 10   WERE TRYING TO BUILD IN THE FUTURE WHICH WAS LEVERAGING

09:23AM 11   FINGERSTICK TECHNOLOGY IN ORDER TO PROCESS BLOOD SAMPLES.

09:23AM 12   Q.   AND THOSE THERANOS-SPECIFIC DEVICES WERE IN THE DOWNSTAIRS

09:23AM 13   PORTION OF THE LAB?

09:23AM 14   A.   THAT'S CORRECT.

09:23AM 15   Q.   WHEN YOU WORKED IN THE CLINICAL LAB, CAN YOU DESCRIBE HOW

09:23AM 16   YOU FIT INTO THE ORGANIZATION?  WHO DID YOU REPORT TO AND WHO

09:23AM 17   DID YOU WORK AROUND?

09:23AM 18   A.   YEAH.  SO IN THE CLINICAL LAB THERE WAS SUNNY AND

09:23AM 19   ELIZABETH AT THE TOP;

09:24AM 20       AND THEN WHO REPORTED TO SUNNY AND ELIZABETH WERE THE LAB

09:24AM 21   DIRECTOR AND THE MEDICAL DIRECTOR;

09:24AM 22       AND THEN UNDERNEATH THE LAB DIRECTOR AND THE MEDICAL

09:24AM 23   DIRECTOR THERE WAS A QC SPECIALIST AND QC MANAGER.  THERE WERE

09:24AM 24   OTHER TYPES OF CLINICAL LAB MANAGERS I WOULD SAY.

09:24AM 25       AND THEN UNDERNEATH THEM WERE CLINICAL LAB SCIENTISTS;

CHEUNG DIRECT BY MR. BOSTIC (RES.)                        1173

09:24AM  1        AND THEN UNDERNEATH THEM WERE THE LAB ASSOCIATES AND THE

09:24AM  2   CUSTOMER SERVICE REPRESENTATIVES.

09:24AM  3        AND I WAS AT THE BOTTOM OF THAT CHAIN AT THE LAB ASSOCIATE

09:24AM  4   LEVEL.

09:24AM  5   Q.   SO WHAT WAS YOUR ROLE THEN?  WHAT WAS THE WORK THAT YOU

09:24AM  6   WERE DOING IN THE CLINICAL LAB ON A DAY-TO-DAY BASIS?

09:24AM  7   A.   SO THE ROLE AND THE DUTIES I HAD ON A DAILY BASIS WERE

09:24AM  8   ESSENTIALLY PREPARING THE LABORATORY IN ORDER TO GET READY TO

09:24AM  9   PROCESS PATIENT SAMPLES.

09:24AM 10        I WAS IN CHARGE OF RUNNING QUALITY CONTROLS, AND THAT'S

09:24AM 11   ESSENTIALLY A CHECK THAT YOU HAVE TO DO BEFORE YOU RUN THE

09:25AM 12   PATIENT SAMPLES.

09:25AM 13        AND THEN I WOULD ACTIVELY PROCESS THE PATIENT SAMPLES.

09:25AM 14        AND THEN I WOULD SAY IF RESEARCH AND DEVELOPMENT NEEDED TO

09:25AM 15   CONVERT THINGS OVER TO THE CLINICAL LAB, I WAS ALSO TASKED WITH

09:25AM 16   CONVERTING NEW ASSAYS OVER THERE, MAKING SURE WE HAD THE PROPER

09:25AM 17   INFRASTRUCTURE, LIKE DO WE HAVE THE CHEMICALS THAT WE NEED, DO

09:25AM 18   WE HAVE THE CORRECT SOP'S THAT WE NEED, ARE PEOPLE AWARE OF THE

09:25AM 19   NEW TYPES OF PATIENT TESTS THAT WE MIGHT BE RECEIVING.

09:25AM 20   Q.   YOU MENTIONED THE STRUCTURE OF PART OF THE COMPANY.  I'D

09:25AM 21   LIKE TO ASK YOU A LITTLE BIT MORE ABOUT MR. BALWANI'S

09:25AM 22   INVOLVEMENT.

09:25AM 23        HOW FREQUENTLY DID YOU SEE HIM, LET'S SAY, IN THE OFFICE

09:25AM 24   DURING YOUR TIME WORKING IN THE CLINICAL LAB?

09:25AM 25   A.   IN THE OFFICE?  HE WAS THERE QUITE FREQUENTLY IN HIS

09:25AM 1   OFFICE.

09:25AM 2   Q.   AND HOW ABOUT IN THE CLINICAL LAB SECTION ITSELF?  WAS HE

09:25AM 3   EVER THERE?

09:25AM 4   A.   HE WAS IN THE CLINICAL LAB SECTION EVERY ONCE IN A WHILE,

09:25AM 5   SO YOU WOULD SEE HIM PROBABLY ON A MONTHLY BASIS.

09:25AM 6   Q.   AND DID YOU HAVE DIRECT CONTACT WITH MR. BALWANI IN

09:26AM 7   CONNECTION WITH YOUR WORK AT THE CLINICAL LAB?

09:26AM 8   A.   NOT ALWAYS, NOT ALWAYS.

09:26AM 9        EVERY ONCE IN A WHILE HE WOULD DO WALKTHROUGHS AND ASK

09:26AM 10  QUESTIONS ABOUT WHAT WE WERE WORKING ON.

09:26AM 11  Q.   THERE WERE A FEW LAYERS OF REPORTING IN BETWEEN YOU AND

09:26AM 12  MR. BALWANI; IS THAT RIGHT?

09:26AM 13  A.   THAT IS CORRECT.

09:26AM 14  Q.   DURING YOUR TIME WORKING IN THE CLINICAL LAB, DID YOU

09:26AM 15  CONTINUE TO DO ANY R&D WORK AT THERANOS?

09:26AM 16  A.   CAN YOU REPEAT THAT QUESTION.

09:26AM 17  Q.   DURING YOUR TIME IN THE CLINICAL LAB AFTER YOU HAD

09:26AM 18  TRANSITIONED OVER TO THAT PART --

09:26AM 19  A.   YES.

09:26AM 20  Q.   -- DID YOU CONTINUE TO DO ANY RESEARCH AND DEVELOPMENT

09:26AM 21  WORK?

09:26AM 22  A.   YES.

09:26AM 23  Q.   AND WHAT KIND OF WORK WERE YOU STILL DOING FOR RESEARCH

09:26AM 24  AND DEVELOPMENT?

09:26AM 25  A.   SO ANY TIME THAT THEY HAD CERTAIN VALIDATION STUDIES AND

09:26AM   1    THEY NEEDED SOMEONE TO RUN CARTRIDGES, I WOULD RUN THEM FOR

09:26AM   2    THEM.

09:26AM   3        WE WERE CONVERTING CONSTANTLY OVER TO NEW TYPES OF

09:26AM   4    SYSTEMS.  SO, FOR EXAMPLE, WE USED TO HAND FILL THE CARTRIDGES

09:26AM   5    WITH ALL OF THE REAGENTS, BUT THEN WE HAD THIS SYSTEM CALLED

09:27AM   6    CAPSYS, AND THAT'S SPELLED C-A-P-S-Y-S.  SO WE HAD TO TEST, YOU

09:27AM   7    KNOW, WHAT ARE THE STABILITY OF THOSE CARTRIDGES OVER OTHERS.

09:27AM   8        ALSO, ANYTHING THAT MAY HAVE COME UP.  SOMETIMES THEY

09:27AM   9    WOULD HAVE US RUN EXTRA VALIDATION STUDIES TO SEE WHAT WAS

09:27AM  10    GOING ON.  YEAH.

09:27AM  11    Q.   AND WHEN YOU REFER TO EXTRA VALIDATION STUDIES TO SEE WHAT

09:27AM  12    WAS GOING ON, WHAT KINDS OF REASONS WOULD PROMPT THOSE EXTRA

09:27AM  13    STUDIES?

09:27AM  14    A.   TYPICALLY IT WAS BECAUSE WE WERE SEEING A LOT OF FAILURES

09:27AM  15    WITH QUALITY CONTROL DATA, OR WE WERE JUST HAVING A LOT OF

09:27AM  16    ISSUES WITH THE PERFORMANCE OF THE TEST, AND SO WE NEEDED TO

09:27AM  17    JUST HAVE CERTAIN CHECKS TO SEE, OKAY, WHAT IS CAUSING THESE

09:27AM  18    ISSUES?  HOW DO WE RESOLVE THE FACT THAT WE'RE HAVING PROBLEMS

09:27AM  19    ON A FREQUENT BASIS TO MAKE SURE THAT THE SYSTEM IS WORKING

09:27AM  20    PROPERLY TO ACTUALLY TEST THE PATIENTS IN ADDITION TO NOT MAKE

09:28AM  21    IT SO CUMBERSOME FOR OUR WORKFLOW, THE FACT THAT WE'RE

09:28AM  22    CONSTANTLY HAVING TO DO CRISIS MANAGEMENT BECAUSE THERE WERE SO

09:28AM  23    MANY ISSUES AND STAY UP LATE AND NOT BE ABLE TO BASICALLY DO

09:28AM  24    OUR WORK IN A TIMELY MANNER.

09:28AM  25    Q.   SO IN EARLY 2014 AT THERANOS, YOU'RE WORKING ON BOTH

09:28AM  1    SIDES?  YOU'RE WORKING ON THE CLINICAL SIDE SEEING THESE ISSUES

09:28AM  2    WITH PATIENT TESTING AND ALSO ON THE RESEARCH AND DEVELOPMENT

09:28AM  3    SIDE TRYING TO ADDRESS THOSE ISSUES?

09:28AM  4    A.   CORRECT.

09:28AM  5    Q.   I'D LIKE TO TALK TO YOU ABOUT QC WHAT YOU MENTIONED.  CAN

09:28AM  6    YOU EXPLAIN FOR US WHAT QC REFERS TO?

09:28AM  7    A.   SO QUALITY CONTROL IS ESSENTIALLY SORT OF LIKE A TESTING

09:28AM  8    SYSTEM THAT YOU HAVE BEFORE YOU RUN A PATIENT SAMPLE.

09:28AM  9         SO IN QC YOU HAVE A KNOWN CONCENTRATION OF A PARTICULAR

09:28AM 10    TEST.  SO, FOR EXAMPLE, FOR VITAMIN D WHEN I HAVE THE QC

09:28AM 11    SAMPLE, I KNOW THAT IT'S, YOU KNOW, TEN NANOTAINERS PER MILL.

09:29AM 12         AND SO BEFORE I RUN MY PATIENT SAMPLE, I BASICALLY THROW

09:29AM 13    THAT INTO THE MACHINE, IT GIVES ME AN ANSWER, AND IT SHOULD

09:29AM 14    IDEALLY BE TEN NANOGRAMS PER MILL OR IN SOME ACCEPTABLE RANGE

09:29AM 15    FOR THAT.  YOU WILL HAVE A HIGH VALUE, A LOW VALUE, SOMETIMES

09:29AM 16    YOU'LL HAVE THREE, YOU'LL HAVE A MIDDLE ONE.

09:29AM 17         AND BASICALLY THAT GIVES YOU SOME LEVEL OF CONFIDENCE THAT

09:29AM 18    ALL OF THE PARTS AND PIECES OF THE SYSTEM ARE WORKING PROPERLY

09:29AM 19    BECAUSE IN DIAGNOSTICS YOU HAVE TO CHECK THINGS LIKE THE

09:29AM 20    CHEMICALS YOU'RE USING, IS SOMEONE TRAINED OR NOT, YOU KNOW,

09:29AM 21    IS -- I DON'T KNOW -- IS THE SYSTEM LIKE THE DEVICE ITSELF TOO

09:29AM 22    HOT OR DOES IT HAVE SOME ISSUE, HARDWARE ISSUE?

09:29AM 23         SO THAT'S EFFECTIVELY WHAT QUALITY CONTROL IS, ARE THESE

09:29AM 24    KNOWN CONCENTRATIONS, YOU RUN THEM, AND SEE IF THEY PASS OR

09:29AM 25    FAIL, AND THAT GIVES YOU THE GO AHEAD TO BE ABLE TO RUN YOUR

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1177

09:29AM  1    PATIENT SAMPLE.

09:30AM  2    Q.   AND THE QUALITY CONTROL CHECKS, WERE THEY TEST SPECIFIC?

09:30AM  3    IN OTHER WORDS, DID YOU HAVE TO RUN A SPECIFIC QUALITY CONTROL

09:30AM  4    CHECK FOR, SAY, A VITAMIN D TEST BEFORE YOU COULD RUN A

09:30AM  5    VITAMIN D TEST?

09:30AM  6    A.   THAT IS CORRECT.

09:30AM  7    Q.   AND HOW FREQUENTLY DID THOSE QUALITY CONTROL CHECKS HAVE

09:30AM  8    TO BE DONE IN THE CLINICAL LAB?

09:30AM  9    A.   THEY HAD TO BE DONE EVERY DAY.

09:30AM  10   Q.   EVERY DAY FOR EACH MACHINE?

09:30AM  11   A.   YES.

09:30AM  12   Q.   AND FOR EACH ASSAY THAT THAT MACHINE WAS GOING TO BE RUN

09:30AM  13   IN?

09:30AM  14   A.   YES.

09:30AM  15   Q.   AND WHAT HAPPENED AT THERANOS OR WHAT WAS SUPPOSED TO

09:30AM  16   HAPPEN IF A MACHINE DIDN'T PASS THAT QUALITY CONTROL CHECK FOR

09:30AM  17   A CERTAIN TEST ON A CERTAIN DAY?

09:30AM  18   A.   SO IF A QUALITY CONTROL FAILED, ESSENTIALLY WE WOULD HAVE

09:30AM  19   TO CONDUCT AN INVESTIGATION TO SEE WHAT THE ISSUE WAS.

09:30AM  20        SO WAS IT THE CASE THAT THERE'S AN ISSUE OR SOME SORT OF

09:30AM  21   FAILURE WITH THE SYSTEM?  WAS IT SORT OF A FLUKE INCIDENT?

09:31AM  22        AND FROM THERE WE WOULD, YOU KNOW, TRY AND RESOLVE WHAT

09:31AM  23   WAS THE ISSUE.

09:31AM  24        TYPICALLY IF IT DID FAIL, WE WOULD TRY TO RUN QUALITY

09:31AM  25   CONTROLS ON ANOTHER SET OF MACHINES TO SEE IF WE COULD STILL

09:31AM   1      RUN A PATIENT SAMPLE.

09:31AM   2          AND THEN ALTERNATIVELY IF WE WERE NOT ABLE TO FIGURE OUT

09:31AM   3      WHAT THE ACTUAL ISSUE IS, WE WOULD HAVE TO RECALIBRATE THE

09:31AM   4      WHOLE SYSTEM, WHICH IS ABOUT A 20 TO AN 80 HOUR PROCESS.

09:31AM   5      Q.   AND WHY DID THAT HAVE TO BE DONE?  WHY COULDN'T THE

09:31AM   6      MACHINE BE USED FOR TESTING AFTER IT FAILED QUALITY CONTROL?

09:31AM   7      A.   IT WAS PART OF OUR PROTOCOLS IN THE SOP'S AT THERANOS, AND

09:31AM   8      IN ADDITION TO THE FACT THAT IT'S A GOOD INDICATION THAT

09:31AM   9      THERE'S SOMETHING WRONG WITH YOUR SYSTEM, SO IT'S PROBABLY NOT

09:31AM  10      GOING TO GIVE YOU RELIABLE RESULTS FOR THE PATIENT SAMPLES IF

09:31AM  11      IT'S NOT WORKING FOR THIS SAMPLE THAT YOU KNOW THE

09:31AM  12      CONCENTRATION OF.

09:31AM  13      Q.   CAN YOU TURN IN YOUR BINDER TO TAB 1289, PLEASE.

09:32AM  14          AND IS 1289 AN EMAIL CHAIN INCLUDING YOU AND OTHER

09:32AM  15      EMPLOYEES AT THERANOS FROM NOVEMBER 2013?

09:32AM  16      A.   YES.

09:32AM  17      Q.   AND DOES IT RELATE TO QUALITY CONTROL AS WE'VE BEEN

09:32AM  18      DISCUSSING?

09:32AM  19      A.   YES.

09:32AM  20              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1289.

09:32AM  21              MR. COOPERSMITH:  YOUR HONOR, I HAVE AN OBJECTION

09:32AM  22      UNDER RULE 106.  IT'S AN INCOMPLETE EMAIL STRING.

09:32AM  23          AND I WOULD REFER THE COURT TO EXHIBIT 1288.

09:32AM  24              THE COURT:  IS 1288 IN YOUR SUBMISSION IN YOUR

09:32AM  25      BINDER?

09:32AM  1          MR. BOSTIC:  IT IS NOT, YOUR HONOR.  IT IS NOT IN

09:32AM  2     THE COLLECTION OF DOCUMENTS THAT WE PULLED.

09:32AM  3          THIS IS THE COMPLETE VERSION OF THIS DOCUMENT.

09:33AM  4          MR. COOPERSMITH:  IT JUST DOESN'T CONTAIN THE ENTIRE

09:33AM  5     STRING.  IT'S INCOMPLETE.

09:33AM  6          THE OTHER DOCUMENT, 1288, HAS THE REST OF THE STRING THAT

09:33AM  7     WOULD BE RELEVANT TO THE SAME ISSUE.

09:33AM  8          THE COURT:  DO YOU HAVE 1288?

09:33AM  9          MR. BOSTIC:  ONE MOMENT, YOUR HONOR.

09:33AM 10     1287 IS A MORE COMPLETE VERSION OF THIS CHAIN.  IT MIGHT

09:33AM 11     INCLUDE THE ADDITIONAL CONTENT THAT DEFENSE COUNSEL WOULD LIKE

09:33AM 12     TO SEE.

09:33AM 13          THE COURT:  MR. COOPERSMITH, COULD YOU DRAW YOUR

09:33AM 14     ATTENTION TO THAT.

09:33AM 15          MR. COOPERSMITH:  YES, YOUR HONOR, I HAVE

09:33AM 16     EXHIBIT 1287 AS WELL.  THAT'S SORT OF A DIFFERENT BRANCH OF THE

09:33AM 17     STRING, BUT IT DOES NOT CONTAIN ALL OF THE INFORMATION THAT

09:33AM 18     1288 DOES.

09:33AM 19          MR. BOSTIC:  YOUR HONOR, I WOULD PROPOSE ADMITTING

09:33AM 20     1289 AT THIS TIME.  IF THE DEFENSE WOULD LIKE TO SUBMIT INTO

09:33AM 21     EVIDENCE A MORE COMPLETE COPY, I THINK THE GOVERNMENT WON'T

09:34AM 22     OBJECT.

09:34AM 23          MR. COOPERSMITH:  YOUR HONOR, I THINK RULE 106 SAYS

09:34AM 24     THAT WE ARE PERMITTED TO HAVE IT DONE AT THIS TIME.  THAT IS

09:34AM 25     WHAT THE RULES SAYS.

```
09:34AM   1                THE COURT:  IS THAT WHAT YOU WOULD LIKE,

09:34AM   2    MR. COOPERSMITH?

09:34AM   3                MR. COOPERSMITH:  YES.

09:34AM   4                THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, WE'LL

09:34AM   5    TAKE A BRIEF RECESS WHILE I LOOK AT THIS DOCUMENT.  WE'LL TAKE

09:34AM   6    A BRIEF RECESS, PARDON ME, AND WE'LL RECONVENE IN JUST A

09:34AM   7    MOMENT.

09:34AM   8          AND IF SOMEONE COULD HAND ME 1288, PLEASE.

09:34AM   9          (JURY OUT AT 9:34 A.M.)

09:34AM  10                THE COURT:  THANK YOU, MS. CHEUNG.

09:34AM  11    IF YOU COULD LEAVE PLEASE FOR JUST A MOMENT.

09:35AM  12          THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE

09:35AM  13    COURTROOM.

09:35AM  14          PLEASE BE SEATED.  THANK YOU.

09:35AM  15                MR. COOPERSMITH:  WE ARE LOOKING FOR A COPY,

09:35AM  16    YOUR HONOR.

09:35AM  17                THE COURT:  AND MS. CHEUNG HAS LEFT THE COURTROOM AS

09:35AM  18    WELL.  THANK YOU.

09:35AM  19                MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:35AM  20          (PAUSE IN PROCEEDINGS.)

09:35AM  21                MR. COOPERSMITH:  YOUR HONOR, I HAVE A COPY OF

09:35AM  22    EXHIBIT 1288.

09:35AM  23          I THINK THE GOVERNMENT HAS ONE; IS THAT RIGHT?

09:35AM  24                MR. BOSTIC:  I DON'T HAVE A COPY OF 1288 WITH ME.

09:35AM  25                MR. COOPERSMITH:  OKAY.
```

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1181

09:35AM  1          THE COURT:  WOULD YOU LIKE US TO MAKE COPIES OF

09:35AM  2   YOURS OR DO YOU HAVE A COPY MACHINE IN YOUR ROOM?

09:36AM  3          MR. BOSTIC:  I CAN ALSO TAKE A BRIEF LOOK,

09:36AM  4   YOUR HONOR, BEFORE THE COPY IS HANDED UP TO THE COURT.

09:36AM  5          THE COURT:  WELL, HE SHOULD SHARE.

09:36AM  6          MR. COOPERSMITH:  I FOUND TWO COPIES, YOUR HONOR.

09:36AM  7          THE COURT:  WHY DON'T YOU SHARE ONE WITH MR. BOSTIC,

09:36AM  8   PLEASE.

09:37AM  9      (PAUSE IN PROCEEDINGS.)

09:37AM 10          THE COURT:  MR. BOSTIC, HAVE YOU HAD OCCASION TO

09:37AM 11   LOOK AT 1288?

09:37AM 12          MR. BOSTIC:  YES.  THANK YOU, YOUR HONOR.

09:37AM 13      THE GOVERNMENT OPPOSES ADMITTING THIS VERSION INSTEAD OF

09:37AM 14   THE VERSION PROVIDED BY THE GOVERNMENT.

09:37AM 15      FOR ONE THING, RULE 106 DOES NOT AUTOMATICALLY REQUIRE

09:37AM 16   THAT THE LONGEST VERSION OF ANY GIVEN EMAIL CHAIN BE ADMITTED.

09:37AM 17   IT'S A RULE THAT REQUIRES THAT COMPLETE VERSIONS OF EXHIBITS BE

09:37AM 18   ADMITTED WHERE FAIRNESS SO REQUIRES.

09:37AM 19      I DON'T THINK IT'S UNFAIR TO ADMIT 1289 OR 1287 INSTEAD OF

09:37AM 20   1288.

09:37AM 21      AND CERTAINLY IT WOULD BE AN ACCEPTABLE SOLUTION IF IT

09:37AM 22   WERE UNFAIR TO SIMPLY ADMIT 1288 IN ADDITION.

09:37AM 23      BUT LOOKING AT THE CONTENT OF 1288, I SEE SOME HEARSAY

09:37AM 24   PROBLEMS WITH THE PORTIONS THAT ARE UNIQUE TO THIS VERSION OF

09:38AM 25   THE EMAIL CHAIN.

CHEUNG DIRECT BY MR. BOSTIC (RES.)                                        1182

09:38AM   1        SO THE GOVERNMENT WOULD OPPOSE THE ADMISSION OF 1288 IN

09:38AM   2   ANY CASE.

09:38AM   3               THE COURT:  MR. COOPERSMITH.

09:38AM   4               MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:38AM   5        SO AS THE COURT KNOWS, RULE 106 REQUIRES OTHER DOCUMENTS

09:38AM   6   TO BE CONSIDERED AND IN FAIRNESS THEY OUGHT TO BE CONSIDERED AT

09:38AM   7   THE SAME TIME.

09:38AM   8        IF YOU LOOK AT EXHIBIT 1289 THAT THE GOVERNMENT OFFERED,

09:38AM   9   MS. CHEUNG SAYS THAT CERTAIN QC FAILED, AND THEN THERE'S SOME

09:38AM  10   MORE DISCUSSION.

09:38AM  11        AND THE VERY TOP EMAIL IS FROM MR. BALWANI WHERE HE SAYS

09:38AM  12   THAT THIS IS BEYOND UNACCEPTABLE PERFORMANCE; RIGHT?

09:38AM  13        IF YOU GO TO EXHIBIT 1288, YOU CAN SEE AT THE BOTTOM OF

09:38AM  14   THE PAGE, NEAR THE BOTTOM OF THE PAGE.

09:38AM  15               THE COURT:  WHICH PAGE?

09:38AM  16               MR. COOPERSMITH:  I'M SORRY, ON EXHIBIT 1288 THE

09:38AM  17   BOTTOM OF THE FIRST PAGE YOU CAN SEE THE SAME EMAIL FROM

09:39AM  18   MR. BALWANI, "THIS IS BEYOND UNACCEPTABLE PERFORMANCE."

09:39AM  19        BUT THEN IT GOES ON.  AND THERE'S AN EMAIL FROM DR. DOSHI,

09:39AM  20   THERE'S AN EMAIL FROM MS. HOLMES, AND THERE'S AN EMAIL FROM

09:39AM  21   DR. YOUNG THAT SAYS THAT "THIS HAS BEEN RESOLVED."

09:39AM  22        THERE'S ANOTHER EMAIL THAT SAYS -- THERE'S ANOTHER EMAIL

09:39AM  23   FROM DANIEL YOUNG ON NOVEMBER 30TH, 2013, ON THE TOP THAT SAYS,

09:39AM  24   "ONE OF THE QC RUNS PASSED AFTER THE SOP WAS FOLLOWED

09:39AM  25   APPROPRIATELY."

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1183

```
09:39AM   1          AND THEN THERE'S AN EMAIL FROM MS. HOLMES, "WE NEED TO

09:39AM   2   RETRAIN."

09:39AM   3          SO THAT IS THE PART OF IT.

09:39AM   4          WHAT THE GOVERNMENT IS TRYING TO DO, IT APPEARS, IS LEAVE

09:39AM   5   THE IMPRESSION THAT WITH THIS EXHIBIT THERE WAS A QC FAILURE

09:39AM   6   AND THEN NOTHING ELSE HAPPENED.

09:39AM   7          BUT IN FAIRNESS, I THINK THE ENTIRE EPISODE HERE IS THAT,

09:39AM   8   YES, MS. CHEUNG REPORTED THAT, BUT APPARENTLY DR. YOUNG FELT

09:39AM   9   THAT SHE DIDN'T FOLLOW THE SOP PROPERLY.  SO WE THINK THAT

09:40AM  10   OUGHT TO BE CONSIDERED AT THE SAME TIME IF THE GOVERNMENT IS

09:40AM  11   GOING TO OFFER THIS EXHIBIT.

09:40AM  12          MR. BOSTIC:  SO, YOUR HONOR, I THINK THAT PART OF

09:40AM  13   THE DEFENSE'S OBJECTION MIGHT HAVE BEEN SOLVED WITH MY NEXT

09:40AM  14   EXHIBIT BECAUSE I WAS GOING TO GO TO 1287 NEXT.

09:40AM  15          BUT MR. COOPERSMITH DOESN'T HAVE THE BENEFIT OF A COPY OF

09:40AM  16   MY OUTLINE, OF COURSE.

09:40AM  17          1287 INCLUDES FOLLOW-ON DISCUSSION AFTER THE EMAIL FROM

09:40AM  18   MR. BALWANI WHERE HE SAYS, "THIS IS BEYOND UNACCEPTABLE

09:40AM  19   PERFORMANCE," SO IT AVOIDS LEAVING THE JURY WITH THE IMPRESSION

09:40AM  20   THAT THERE WAS NO FURTHER DISCUSSION.

09:40AM  21          AND, IN FACT, EXHIBIT 1287, IF I'M READING IT CORRECTLY,

09:40AM  22   IS A MORE COMPLETE VERSION AND EXPLANATION OF WHAT HAPPENED

09:40AM  23   HERE.  IT SPECIFICALLY INCLUDES A REQUEST FROM MS. HOLMES TO

09:40AM  24   EXPLAIN WHAT THE RESOLUTION WAS, AND SURAJ SAKSENA RESPONDS

09:40AM  25   AGAIN IN EXHIBIT 1287 EXPLAINING THAT TWO OUTLIERS HAD TO BE
```

ER-635

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1184

09:40AM   1      MANUALLY REMOVED TO PASS QC.

09:41AM   2           SO THAT WAS THE FORM OF THAT RESOLUTION.

09:41AM   3           I THINK THAT ADMITTING EXHIBIT 1287 PROVIDES THE FULL

09:41AM   4      PICTURE HERE AND AVOIDS ANY 106 CONCERNS AND OBVIATES THE NEED

09:41AM   5      FOR 1288.

09:41AM   6           MR. COOPERSMITH:  YOUR HONOR, I DON'T THINK THAT'S

09:41AM   7      CORRECT.

09:41AM   8           BY THE WAY, WE WILL TAKE A COPY OF MR. BOSTIC'S OUTLINE IF

09:41AM   9      HE WOULD LIKE TO SHARE THAT.

09:41AM  10           (LAUGHTER.)

09:41AM  11           MR. COOPERSMITH:  BUT REGARDING 1287, THAT I'M NOT

09:41AM  12      GOING TO HAVE AN OBJECTION TO WHEN AND IF MR. BOSTIC OFFERS IT,

09:41AM  13      BUT IT STILL IS NOT GOING TO SOLVE THE PROBLEM.

09:41AM  14           AND THE REASON IS THAT ALTHOUGH IT DOES STILL HAVE SOME

09:41AM  15      ADDITIONAL INFORMATION ON EXHIBIT 1287, BEYOND WHAT IS ON 1289,

09:41AM  16      IT STILL DOES NOT HAVE THE INFORMATION ON 1288, WHICH IS THAT

09:41AM  17      "ONE OF THE QC RUNS PASSED AFTER THE SOP WAS FOLLOWED

09:41AM  18      APPROPRIATELY," AND THAT'S THAT TOP EMAIL ON NOVEMBER 30TH FROM

09:41AM  19      DR. YOUNG, AS WELL AS THE "WE NEED TO RETRAIN" EMAIL.

09:41AM  20           SO I THINK THE COMPLETE SET WOULD BE 1287, 1288, AND 1289

09:42AM  21      AND THE OMISSION OF GOVERNMENT'S EXHIBIT 1288 IS WHERE THE 106

09:42AM  22      PROBLEM LIES.

09:42AM  23           THE COURT:  THE EMAIL YOU REFERENCED TO

09:42AM  24      DANIEL YOUNG, IT'S AT THE TOP OF PAGE 1 OF 1288, IS THIS WHAT

09:42AM  25      YOU'RE SEEKING TO -- THIS IS WHAT YOU WOULD LIKE TO GET IN?

```
09:42AM   1              THIS IS AN EMAIL TO DANIEL YOUNG CC'D INDIVIDUALS,

09:42AM   2       INCLUDING YOUR CLIENT, AND THIS IS FROM ELIZABETH HOLMES

09:42AM   3       NOVEMBER 30TH, 2013, AT 7:34 P.M., IS THAT WHAT YOU WANT IN?

09:42AM   4              MR. COOPERSMITH:  THAT'S ONE OF THE EMAILS,

09:42AM   5       YOUR HONOR.

09:42AM   6              AND THEN IN ADDITION, YOUR HONOR, BELOW THAT ON

09:42AM   7       EXHIBIT 1288 YOU CAN SEE THAT NOVEMBER 30TH EMAIL AT 11:27 A.M.

09:42AM   8       FROM DANIEL YOUNG, AND THAT'S THE ONE THAT SAYS, "ONE OF THE QC

09:43AM   9       RUNS PASSED AFTER THE SOP WAS FOLLOWED."

09:43AM  10              THE COURT:  11:27 A.M.?  I'M SORRY.

09:43AM  11              MR. COOPERSMITH:  YES, YOUR HONOR, 11:27 A.M.  IT'S

09:43AM  12       NEAR THE TOP OF PAGE 1 OF EXHIBIT 1288.

09:43AM  13              THE COURT:  I SEE.

09:43AM  14              MR. COOPERSMITH:  FINALLY BELOW THAT THERE'S AN

09:43AM  15       EMAIL THAT SAYS, "THIS HAS BEEN RESOLVED," THAT'S THE

09:43AM  16       11:25 A.M. EMAIL THAT IS BELOW THAT.

09:43AM  17              THAT PARTICULAR ONE ALSO APPEARS ON 1287.  SO THAT WOULD

09:43AM  18       BE SOLVED, AS MR. BOSTIC SAID, BY ADMITTING 1287, BUT IT'S

09:43AM  19       THOSE TWO TOP EMAILS ON 1288 THAT WOULD STILL NEED TO BE PUT

09:43AM  20       INTO THE RECORD UNDER 106.

09:43AM  21              MR. BOSTIC:  SO I THINK THE QUESTION FOR THE COURT,

09:43AM  22       YOUR HONOR, IS WHETHER THOSE TWO REMARKS ARE ADMISSIBLE OR

09:43AM  23       WHETHER THEY'RE -- THE FIRST IS WHETHER THEY'RE REQUIRED UNDER

09:43AM  24       106, WHICH I THINK THEY ARE NOT, AND SECOND, MAYBE MORE

09:43AM  25       IMPORTANTLY, WHETHER THEY'RE EVEN ADMISSIBLE AS HEARSAY.
```

09:43AM  1       I CAN SEE WHY THE DEFENSE WANTS TO KNOW ABOUT THOSE TWO

09:44AM  2   REMARKS.  DANIEL YOUNG EXPRESSING THE OPINION THAT THE SOP

09:44AM  3   WASN'T BEING FOLLOWED APPROPRIATELY BEFORE AND MS. HOLMES'S

09:44AM  4   OPINION THAT RETRAINING WAS NECESSARY.

09:44AM  5       BUT THOSE REMARKS, THOSE OPINIONS BY NONTESTIFYING

09:44AM  6   INDIVIDUALS, THESE OUT-OF-COURT STATEMENTS, AREN'T ADMISSIBLE.

09:44AM  7             MR. COOPERSMITH:  YOUR HONOR, TWO THINGS ABOUT THAT

09:44AM  8   HEARSAY ISSUE.

09:44AM  9       FIRST OF ALL, MR. BOSTIC DID A NICE JOB OF LAYING THE

09:44AM  10  EMAIL BUSINESS RECORDS PREDICATE WITH MS. HOLMES, AND I THINK

09:44AM  11  THE SAYING WHAT IS GOOD FOR THE GOOSE IS GOOD FOR THE GANDER AS

09:44AM  12  THEY SAY, AND I THINK THOSE ARE ALL BUSINESS RECORDS, AND I

09:44AM  13  DON'T THINK THAT'S A PROBLEM.

09:44AM  14      SECOND, YOUR HONOR, THIS IS A THERANOS DOCUMENT, AND I

09:44AM  15  BELIEVE WE HAVE A WRITTEN STIPULATION THAT THESE ARE AUTHENTIC,

09:44AM  16  SO THAT WOULD, OF COURSE, SOLVE THE AUTHENTICITY PROBLEM.

09:44AM  17      AND FINALLY, YOUR HONOR, I DON'T BELIEVE THAT WHEN THERE'S

09:44AM  18  A NEED FOR FAIRNESS UNDER 106, THAT THAT IS -- THE HEARSAY RULE

09:44AM  19  PREVENTS ADMISSION OF IT EVEN IF IT WERE HEARSAY.

09:45AM  20      THE REASON IS, 106 IS ABOUT WHETHER IN FAIRNESS THE

09:45AM  21  DOCUMENT OUGHT TO BE PRESENTED, AND IT'S NOT A MATTER OF

09:45AM  22  HEARSAY.  THE CASE I WOULD CITE TO THE COURT ON THAT IS

09:45AM  23  UNITED STATES VERSUS LOPEZ, 4 F.4TH 706, NINTH CIRCUIT 2021, SO

09:45AM  24  A FAIRLY RECENT CASE.  SO IT'S A MATTER OF WHAT IS FAIR AS

09:45AM  25  OPPOSED TO WHAT'S HEARSAY.

CHEUNG DIRECT BY MR. BOSTIC (RES.)                                      1187

09:45AM    1         SO FOR THAT REASON --

09:45AM    2              THE COURT:  THE COURT STILL HAS TO CONSIDER THE

09:45AM    3    ADMISSIBILITY UNDER THE HEARSAY RULE THOUGH.

09:45AM    4              MR. COOPERSMITH:  I THINK THE COURT HAS TO CONSIDER

09:45AM    5    THE ADMISSIBILITY, BUT THAT IS NOT A BARRIER TO ADMITTING THE

09:45AM    6    DOCUMENT.

09:45AM    7         BUT AS I ALSO SAID, YOUR HONOR, IT'S NOT, IT'S NOT HEARSAY

09:45AM    8    BECAUSE OF THE BUSINESS RECORDS ISSUE, AND IT JUST SEEMS LIKE

09:45AM    9    THIS IS SOMETHING THAT NEEDS TO BE ADMITTED IN FAIRNESS AS

09:45AM   10    RULE 106 SAYS.

09:45AM   11              MR. BOSTIC:  I DISAGREE ON THE BUSINESS RECORDS

09:45AM   12    POINT, YOUR HONOR.

09:45AM   13         THE COMMUNICATIONS THAT HAVE BEEN ADMITTED SO FAR ARE

09:45AM   14    BUSINESS RECORDS BECAUSE THEY COMPRISE THE WAY THAT EMPLOYEES

09:46AM   15    COORDINATED THE ONGOING BUSINESS AND OPERATIONS OF THERANOS.

09:46AM   16         THESE TWO REMARKS ARE OUTSIDE OF THAT PROCESS.  THEY'RE

09:46AM   17    NOT NECESSARY TO THE PROCESSING OF THE SAMPLE.  THEY DON'T

09:46AM   18    DOCUMENT WHAT HAPPENED WITH THE SAMPLE.

09:46AM   19         INSTEAD, THEY EXPRESS THE VIEWS OF TWO INDIVIDUALS WHO

09:46AM   20    AREN'T TESTIFYING, WHO AREN'T UNDER OATH, ABOUT THE APPROPRIATE

09:46AM   21    WAY TO DO THINGS AND WHAT NEEDED TO BE DONE NEXT TO SOLVE THE

09:46AM   22    ISSUE, AND THAT'S WHAT MAKES THEM INADMISSIBLE HEARSAY.

09:46AM   23              MR. COOPERSMITH:  YOUR HONOR, ONE MORE THING ABOUT

09:46AM   24    THAT.

09:46AM   25         EVEN IF THE COURT WERE TO VIEW THIS AS HEARSAY, AS I JUST

09:46AM  1    SAID IS NOT THE CASE OR SHOULD NOT BE THE CASE, IT WOULD STILL

09:46AM  2    BE ADMISSIBLE FOR MR. BALWANI'S STATE OF MIND, AND IT'S A

09:46AM  3    NONHEARSAY PURPOSE.

09:46AM  4         BECAUSE AS YOU CAN SEE, HE IS ON THE EMAIL STRINGS.  HE'S

09:46AM  5    BOTH ON -- HE'S ON ALL OF THE EMAIL STRINGS THAT I'M SUBMITTING

09:46AM  6    TO THE COURT SHOULD BE ADMITTED ALONG WITH THE OTHER EXHIBITS,

09:46AM  7    AND IT WOULD BE ADMISSIBLE FOR THAT NONHEARSAY PURPOSE AS WELL.

09:46AM  8         THE COURT:  STATE OF MIND AS TO WHAT?

09:47AM  9         MR. COOPERSMITH:  AND MR. BALWANI'S STATE OF MIND AS

09:47AM 10    TO UNDERSTANDING THAT MS. CHEUNG, THE WITNESS, HAS SAID IN THE

09:47AM 11    EMAIL THAT IN HER VIEW THERE WAS A QC RUN PROBLEM, AND CLEARLY

09:47AM 12    THE REASON THAT THE GOVERNMENT LIKES THAT IS BECAUSE THEY WANT

09:47AM 13    TO SHOW QUALITY CONTROL FAILURE.

09:47AM 14         THE COURT:  IS IT STATE OF MIND AS TO HIS NOTICE OF

09:47AM 15    THESE ISSUES?

09:47AM 16         MR. COOPERSMITH:  YEAH, THAT HE UNDERSTANDS THAT

09:47AM 17    THERE WAS A QC ISSUE THAT MS. CHEUNG RAISED, AND THEN HIS

09:47AM 18    SCIENTIFIC TEAM CONCLUDED THAT THE PROBLEM HAD BEEN RESOLVED,

09:47AM 19    AND IT WAS A PROBLEM WITH WHETHER MS. CHEUNG FOLLOWED THE SOP.

09:47AM 20         AND THAT'S NOTICE TO MR. BALWANI OF WHAT HAPPENED HERE,

09:47AM 21    WHICH IS DIFFERENT THAN THE HEARSAY RULE.

09:47AM 22         AND AS I SAID, IT SHOULDN'T BE HEARSAY IN ANY EVENT.

09:47AM 23         THE COURT:  WELL, I THINK IT IS HEARSAY.  WE AGREE

09:47AM 24    IT'S HEARSAY.

09:47AM 25         THE QUESTION IS WHETHER OR NOT IT'S ADMISSIBLE

09:47AM   1    NOTWITHSTANDING.  WOULD YOU AGREE WITH THAT?

09:47AM   2              MR. COOPERSMITH:  IT WOULD BE ADMISSIBLE UNDER A

09:47AM   3    HEARSAY EXCEPTION.

09:47AM   4         AND FOR THAT MATTER, YOUR HONOR, MUCH OF THESE DOCUMENTS

09:47AM   5    THAT WE HAVE SEEN SO FAR THIS MORNING THAT MR. BOSTIC IS TRYING

09:48AM   6    TO ADMIT ARE HEARSAY, BUT THEY'RE AT TIMES ADMISSIBLE UNDER THE

09:48AM   7    HEARSAY EXCEPTION, IN PARTICULAR 803(6).

09:48AM   8              THE COURT:  RIGHT.  I DON'T WANT TO GET INTO

09:48AM   9    LINGUISTICS, BUT IT'S HEARSAY.

09:48AM  10         THE QUESTION IS, IS THERE AN EXCEPTION?

09:48AM  11              MR. COOPERSMITH:  IS THERE --

09:48AM  12              THE COURT:  YOU'RE NOT ADVOCATING THAT IT'S NOT

09:48AM  13    HEARSAY SO IT SHOULD COME IN AS NONHEARSAY.

09:48AM  14              MR. COOPERSMITH:  THAT'S TRUE, YOUR HONOR.

09:48AM  15         WELL, RIGHT.  IT'S HEARSAY AND THERE WOULD EITHER BE AN

09:48AM  16    EXCEPTION, WHICH WOULD BE THE BUSINESS RECORDS EXCEPTION, OR

09:48AM  17    THERE'S A NONHEARSAY PURPOSE, THAT'S ANOTHER REASON IT COULD

09:48AM  18    COME IN, AND THEN THERE'S, OF COURSE, THE OVERLAY OF RULE 106.

09:48AM  19              THE COURT:  SO LET ME ASK, WHAT ABOUT THE BUSINESS

09:48AM  20    RECORDS EXCEPTION?  YOU TOLD ME ABOUT A STIPULATION.

09:48AM  21         HAVE THE PARTIES STIPULATED TO ANY TYPE OF A BUSINESS

09:48AM  22    RECORD?  THERE HASN'T BEEN A FOUNDATION LAID AS TO THAT.

09:48AM  23              MR. COOPERSMITH:  RIGHT.  BUT TO BE CLEAR,

09:48AM  24    YOUR HONOR, WHAT THE PARTIES STIPULATED TO IS AUTHENTICITY,

09:48AM  25    OKAY?  THERE'S STILL ROOM FOR EITHER MR. BOSTIC OR OUR TEAM TO

09:48AM 1      ARGUE THAT SOMETHING IS HEARSAY, YOU KNOW, BUT THE ISSUE IS

09:48AM 2      AUTHENTICITY.

09:48AM 3          SO I JUST WANTED TO MAKE SURE THAT THAT WASN'T AN ISSUE

09:48AM 4      BECAUSE WE HAVE A STIPULATION THAT THIS TYPE OF DOCUMENT WITH A

09:49AM 5      CERTAIN BATES NUMBER IS AUTHENTIC, SO WE KNOW IT'S AN ACTUAL

09:49AM 6      GOVERNMENT'S EMAIL.

09:49AM 7          I'M NOT SAYING THAT IT SOLVES ALL OF THE EVIDENTIARY

09:49AM 8      PROBLEMS, BUT IT GOES SOME OF THE WAY BECAUSE WE DON'T HAVE

09:49AM 9      THAT.  WE KNOW IT'S AN EMAIL DULY RETRIEVED FROM THE THERANOS

09:49AM 10     SERVER THAT WAS ACTUALLY, AS MR. BOSTIC POINTED OUT WITH THE

09:49AM 11     WITNESS, IT'S SOMETHING THAT THEY DO IN THE REGULAR COURSE OF

09:49AM 12     BUSINESS, THEY KEEP EMAILS.

09:49AM 13             THE COURT:  WELL, HE DIDN'T DO THAT, DID HE?  HE

09:49AM 14     HASN'T DONE THAT.

09:49AM 15             MR. COOPERSMITH:  CLOSE.

09:49AM 16             THE COURT:  MR. BOSTIC.

09:49AM 17             MR. BOSTIC:  THERE'S NO OBJECTION FROM THE

09:49AM 18     GOVERNMENT ON THE BASIS OF AUTHENTICITY, YOUR HONOR.

09:49AM 19         WHERE THE PARTIES PART WAYS IS WHETHER 106 REQUIRES 1288

09:49AM 20     TO COME IN AT ALL, AND CERTAINLY WHETHER IT REQUIRES THE

09:49AM 21     GOVERNMENT TO ADMIT 1288, AND SEPARATELY, WHETHER THESE TWO

09:49AM 22     REMARKS, WHICH ARE DIFFERENT FROM THE KINDS OF COMMUNICATIONS

09:49AM 23     WE TYPICALLY VIEW AS BUSINESS RECORDS, WHETHER THEY'RE

09:49AM 24     ADMISSIBLE.

09:49AM 25             THE COURT:  RIGHT.  OKAY.

09:49AM   1              ANYTHING FURTHER?

09:49AM   2                   MR. COOPERSMITH:  NO, YOUR HONOR.  I THINK THE COURT

09:49AM   3     HAS OUR POSITION.

09:49AM   4                   THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

09:50AM   5          WELL, I'M NOT GOING TO, I'M NOT GOING TO FORCE MR. BOSTIC

09:50AM   6     TO INTRODUCE 1288 IF HE DOESN'T WANT TO DO SO.

09:50AM   7          I'LL ALLOW -- I'LL TAKE YOUR MOTION.  IT SOUNDS LIKE YOU

09:50AM   8     WOULD LIKE TO ADMIT 1288 AT SOME POINT IN TIME SHOULD YOU

09:50AM   9     DESIRE TO CROSS-EXAMINE THIS WITNESS.

09:50AM  10                   MR. COOPERSMITH:  YES, YOUR HONOR.

09:50AM  11                   THE COURT:  RIGHT.  SO THANK YOU FOR THE HEADS UP ON

09:50AM  12     THAT.  AND I'VE GOT THIS.

09:50AM  13          SO I'M NOT GOING TO FORCE MR. BOSTIC TO INTRODUCE THIS IF

09:50AM  14     HE DOESN'T WANT TO, INCLUDING FOR THE 106 PURPOSES.

09:50AM  15          BUT IF YOU WANT TO CROSS-EXAMINE THIS IF YOU FEEL IT'S

09:50AM  16     APPROPRIATE, LET'S TAKE IT UP THEN.

09:50AM  17                   MR. COOPERSMITH:  OKAY.  OUR POSITION IS OBVIOUSLY

09:50AM  18     WE CAN, AND WE'LL TAKE IT UP AT THE TIME.

09:50AM  19                   THE COURT:  RIGHT.  WELL, YOU CAN'T NOW BECAUSE

09:50AM  20     YOU'RE NOT EXAMINING.

09:50AM  21                   MR. COOPERSMITH:  THAT'S TRUE, YOUR HONOR.

09:50AM  22                   THE COURT:  SO WE'LL SEE WHAT HAPPENS.

09:50AM  23          IS THAT CLEAR?

09:50AM  24                   MR. COOPERSMITH:  I UNDERSTAND THE COURT'S RULING.

09:50AM  25                   THE COURT:  ALL RIGHT.

09:50AM  1          CAN WE BRING THE JURY IN THEN?

09:51AM  2              MR. BOSTIC:  YES, YOUR HONOR.

09:51AM  3              THE COURT:  ALL RIGHT.

09:52AM  4          (JURY IN AT 9:52 A.M.)

09:52AM  5              THE COURT:  ALL RIGHT.  THANK YOU.

09:52AM  6          PLEASE BE SEATED.  WE'RE BACK ON THE RECORD.

09:52AM  7          OUR JURORS AND ALTERNATES ARE PRESENT.

09:53AM  8          MS. CHEUNG IS BACK ON THE STAND.

09:53AM  9          THANK YOU, LADIES AND GENTLEMEN.

09:53AM 10          MR. BOSTIC.

09:53AM 11              MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:53AM 12     Q.   MS. CHEUNG, CAN I ASK YOU TO LOOK AT EXHIBIT 1287 IN YOUR

09:53AM 13     BINDER?

09:53AM 14              THE COURT:  I'M SORRY TO INTERRUPT YOU.  DID YOU

09:53AM 15     INTRODUCE 1289?  I JUST WANT TO MAKE SURE --

09:53AM 16              MR. BOSTIC:  I HAVE NOT, YOUR HONOR.  THANK YOU.

09:53AM 17     I'M ACTUALLY GOING TO USE 1287 AS A SUBSTITUTE.

09:53AM 18              THE COURT:  OKAY.  THANK YOU.

09:53AM 19     BY MR. BOSTIC:

09:53AM 20     Q.   MS. CHEUNG, DO YOU SEE EXHIBIT 1287 IN FRONT OF YOU?

09:53AM 21     A.   YES.

09:53AM 22     Q.   AND IS THAT AN EMAIL FROM NOVEMBER 30TH, 2013, RELATING TO

09:53AM 23     A QUALITY CONTROL ISSUE AT THERANOS?

09:53AM 24     A.   YES.

09:53AM 25              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

09:53AM   1      EXHIBIT 1287.

09:53AM   2               MR. COOPERSMITH:  YOUR HONOR, TWO OBJECTIONS.

09:53AM   3          ONE IS THE SAME 106 OBJECTION FOR THE RECORD.

09:53AM   4          THE OTHER IS THAT IT APPEARS THAT THE TOP EMAIL, THAT TOP

09:54AM   5      EMAIL DON'T HAVE THE WITNESS AS ONE OF THE RECIPIENTS, AND FOR

09:54AM   6      THAT REASON OUR OBJECTION IS HEARSAY.

09:54AM   7               THE COURT:  MR. BOSTIC.

09:54AM   8               MR. BOSTIC:  YOUR HONOR, IF I COULD ATTEMPT TO LAY A

09:54AM   9      FOUNDATION FOR THOSE TOP TWO EMAILS AS A BUSINESS RECORD.

09:54AM  10               THE COURT:  OKAY.

09:54AM  11      BY MR. BOSTIC:

09:54AM  12      Q.   MS. CHEUNG, LET ME ASK YOU ABOUT A FEW PEOPLE WHO APPEAR

09:54AM  13      ON THIS EMAIL IF I COULD?

09:54AM  14      A.   OKAY.

09:54AM  15      Q.   FIRST, THE EMAIL CHAIN BEGINS WITH AN EMAIL FROM YOU ON

09:54AM  16      NOVEMBER 29TH, 2013.

09:54AM  17          DO YOU SEE THAT ON PAGE 2?

09:54AM  18      A.   YES.

09:54AM  19      Q.   AND CAN YOU IDENTIFY FOR US, PLEASE, THE PEOPLE IN THE

09:54AM  20      CC LINE?  WHO DID YOU SEND THIS EMAIL TO?

09:54AM  21      A.   SO I SENT THIS EMAIL TO SHARADA SIVARAMAN, WHO IS THE HEAD

09:55AM  22      OF THE ELISA DEPARTMENT; RAN HU, H-U, WHO IS A TEAM LEAD IN THE

09:55AM  23      ELISA DEPARTMENT; SAMARTHA ANEKAL, WHO IS A HEAD OF THE

09:55AM  24      HARDWARE TEAM, IT WAS LIKE THE SYSTEMS INTEGRATED TEAM; AND

09:55AM  25      THEN NISHIT DOSHI, WHO WAS PART OF THE CYTOMETRY TEAM;

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1194

09:55AM   1    SURAJ SAKSENA, WHO AT THAT TIME WAS WORKING IN THE ELISA TEAM

09:55AM   2    AS WELL BUT WAS PART OF BINDERS AND A PRODUCTION TEAM; AND THEN

09:55AM   3    CLIA LAB, WHICH IS ESSENTIALLY ALL OF THE CLINICAL LABORATORY

09:55AM   4    PERSONNEL.

09:55AM   5    Q.   AND DID YOU REGULARLY USE EMAIL TO COMMUNICATE WITH THOSE

09:55AM   6    INDIVIDUALS ABOUT ISSUES IN THE THERANOS LAB?

09:55AM   7    A.   YES.

09:55AM   8         AND THERE'S ONE OTHER PERSON THAT I SENT THIS TO AND THE

09:56AM   9    MAIN PERSON IS NORMANDY 911.

09:56AM  10    Q.   I'D LIKE TO ASK YOU ABOUT THAT AS WELL, BUT LET'S HOLD OFF

09:56AM  11    ON THAT FOR A MOMENT.

09:56AM  12    A.   OKAY.

09:56AM  13    Q.   YOUR EMAILS WITH THESE INDIVIDUALS, WHAT KINDS OF ISSUES

09:56AM  14    AT THERANOS WOULD REQUIRE DISCUSSION BY EMAIL WITH THIS SET OF

09:56AM  15    PEOPLE?

09:56AM  16    A.   IF THERE WERE QUALITY CONTROL FAILURES, IF THERE WAS AN

09:56AM  17    ISSUE IN PATIENT TESTING OR PROCESSING OR SOME SORT OF LAB

09:56AM  18    FAILURE.

09:56AM  19    Q.   AND DID THIS GROUP OF PEOPLE ROUTINELY COMMUNICATE BY

09:56AM  20    EMAIL ABOUT ISSUES LIKE QUALITY CONTROL FAILURES?

09:56AM  21    A.   YES.

09:56AM  22    Q.   AND WERE THOSE FOR THE PURPOSE OF DOCUMENTING THOSE

09:56AM  23    FAILURES AND ADDRESSING THEM?

09:56AM  24    A.   YES.

09:56AM  25    Q.   AND WAS IT IMPORTANT FOR THE PEOPLE IN THAT GROUP WHO SENT

ER-646

09:56AM  1    THOSE EMAILS TO BE ACCURATE IN THE DETAILS THAT THEY CONVEYED

09:56AM  2    BY EMAIL?

09:56AM  3    A.   YES.

09:56AM  4    Q.   AND WERE EMAILS BETWEEN MEMBERS OF THIS GROUP ABOUT

09:56AM  5    QUALITY CONTROL FAILURES PRESERVED AT THERANOS SO THAT THEY

09:56AM  6    COULD BE REFERRED BACK TO LATER IF NEEDED?

09:57AM  7    A.   YES.

09:57AM  8            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

09:57AM  9    EXHIBIT 1287.

09:57AM 10            MR. COOPERSMITH:  SAME OBJECTION AS TO THE EMAILS

09:57AM 11    THAT DO NOT INCLUDE THE WITNESS AS ONE OF THE RECIPIENTS OR

09:57AM 12    AUTHORS, WHICH THE COURT CAN SEE THE EXHIBIT, IT'S THE FIRST --

09:57AM 13    IT'S REALLY THE FIRST PAGE GOING TO THE TOP OF THE SECOND PAGE

09:57AM 14    OF EXHIBIT 1287 THERE THAT SAME PROBLEM ARISES.

09:57AM 15        SO OUR OBJECTION IS HEARSAY.

09:57AM 16            MR. BOSTIC:  I THINK WE'RE TALKING ABOUT THE SAME

09:57AM 17    GROUP OF INDIVIDUALS, YOUR HONOR.  I THINK THE FOUNDATION HAS

09:57AM 18    BEEN LAID.

09:57AM 19            THE COURT:  CAN YOU JUST IDENTIFY FOR THE RECORD,

09:57AM 20    PERHAPS IF THIS WITNESS CAN, THE RECIPIENTS OF THESE EMAILS AND

09:57AM 21    WHETHER OR NOT THEY'RE SIMILAR.

09:57AM 22            MR. BOSTIC:  YES, YOUR HONOR.

09:57AM 23    Q.   MS. CHEUNG, IF I COULD DIRECT YOUR ATTENTION TO THE TOP

09:57AM 24    TWO EMAILS IN THIS CHAIN?

09:57AM 25    A.   ON PAGE 2?

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1196

09:57AM   1    Q.   ON PAGE 1, PLEASE.

09:57AM   2    A.   ON PAGE 1.

09:58AM   3    Q.   AND LOOKING AT THE TOP TWO EMAILS AND THE PEOPLE INCLUDED

09:58AM   4    ON THOSE EMAILS, ARE THOSE THE SAME INDIVIDUALS THAT YOU WERE

09:58AM   5    REFERRING TO WHO REGULARLY COMMUNICATED BY EMAIL ABOUT ISSUES

09:58AM   6    LIKE QC FAILURES AT THERANOS?

09:58AM   7    A.   YES.

09:58AM   8    Q.   AND LOOKING AT THE CONTENT OF THOSE TOP TWO EMAILS, DOES

09:58AM   9    THAT CONTENT DOCUMENT THE RESOLUTION OF A QC FAILURE AT

09:58AM  10    THERANOS?

09:58AM  11    A.   YES.

09:58AM  12         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS THIS

09:58AM  13    DOCUMENT.

09:58AM  14         THE COURT:  ALL RIGHT.  THANK YOU.

09:58AM  15         MR. COOPERSMITH:  YOUR HONOR, SAME OBJECTION.

09:58AM  16    HEARSAY.

09:58AM  17    BUT I WILL ALSO NOTE THAT IF MR. BOSTIC LAID A FOUNDATION

09:58AM  18    FOR EXHIBIT 1287, THEN I'D LIKE TO RENEW MY 106 OBJECTION TO

09:58AM  19    NOT ADMITTING 1288 BECAUSE IT'S THE SAME FOUNDATION THAT

09:58AM  20    MR. BOSTIC JUST LAID.

09:58AM  21         MR. BOSTIC:  I DISAGREE, YOUR HONOR, BUT I THINK WE

09:58AM  22    CAN RESOLVE THAT IF AND WHEN THAT DOCUMENT IS OFFERED.

09:58AM  23         THE COURT:  LET'S WAIT.  I THINK I TOLD YOU A MOMENT

09:59AM  24    AGO WHAT WE WOULD DO WITH THAT, MR. COOPERSMITH.

09:59AM  25         MR. COOPERSMITH:  OKAY.  YES, YOUR HONOR, WE WILL

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1197

09:59AM   1    WAIT.

09:59AM   2              THE COURT:  RIGHT.  SO I'LL OVERRULE THE OBJECTION.

09:59AM   3    THIS IS ADMITTED, 803(6), THE FOUNDATION HAS BEEN LAID, AND IT

09:59AM   4    MAY BE PUBLISHED.

09:59AM   5         (GOVERNMENT'S EXHIBIT 1287 WAS RECEIVED IN EVIDENCE.)

09:59AM   6              MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:59AM   7         MS. WACHS, IF WE CAN PUT THAT ON THE SCREEN.

09:59AM   8         AND LET'S START WITH PAGE 2, PLEASE, AND ZOOM IN ON THE

09:59AM   9    BOTTOM OF THE DOCUMENT.

09:59AM  10    Q.   MS. CHEUNG, DO YOU SEE NOW AN EMAIL FROM YOU TO A GROUP OF

09:59AM  11    INDIVIDUALS AT THERANOS IN LATE NOVEMBER OF 2013?

09:59AM  12    A.   YES.

09:59AM  13    Q.   AND THE SUBJECT LINE FOR THIS EMAIL IS "BOTH QC CONTROLS

09:59AM  14    FOR VITAMIN D DIDN'T PASS."

10:00AM  15         DO YOU SEE THAT?

10:00AM  16    A.   YES.

10:00AM  17    Q.   CAN YOU DESCRIBE WHAT WAS HAPPENING HERE AND WHAT PROMPTED

10:00AM  18    YOU TO SEND THIS EMAIL?

10:00AM  19    A.   SO WE HAD RECEIVED A PATIENT SAMPLE, I BELIEVE THIS WAS

10:00AM  20    RIGHT AROUND THANKSGIVING, AND ESSENTIALLY PRIOR TO PROVIDING

10:00AM  21    THE VITAMIN D SAMPLE FOR THIS PATIENT I HAD TO RUN QUALITY

10:00AM  22    CONTROLS, WHICH WE HAD TWO QUALITY CONTROL MEASURES FOR THIS, A

10:00AM  23    SORT OF HIGH VALUE AND A LOW VALUE.

10:00AM  24         AND WHEN I HAD RUN THOSE QUALITY CONTROLS BEFORE RECEIVING

10:00AM  25    THE PATIENT SAMPLE, THEY FAILED.  AND I TRIED TO RESOLVE THE

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1198

10:00AM   1    ISSUE TO SEE IF THERE WAS SOME SORT OF OBVIOUS MISTAKE THAT WAS

10:00AM   2    MADE, BUT I COULDN'T FIGURE OUT WHAT IT WAS.

10:00AM   3         SO I CONTACTED ESSENTIALLY THIS HELP LINE WHEN WE RAN INTO

10:00AM   4    THESE TYPES OF ISSUES AND NOTIFIED UPPER LEVEL MANAGEMENT TO

10:00AM   5    NOTIFY THEM TO HELP ME KIND OF RESOLVE WHAT THE ISSUE WAS AND

10:00AM   6    WHAT WAS THE NEXT COURSE OF ACTION.

10:00AM   7    Q.   AND WHAT KIND OF ANALYZER WAS USED AT THERANOS AT THIS

10:01AM   8    TIME TO RUN THE VITAMIN D TEST?

10:01AM   9    A.   SO THESE WERE EDISON DEVICES.

10:01AM  10    Q.   SO BEFORE RUNNING THIS TEST YOU PERFORMED ONE OF THOSE QC

10:01AM  11    CHECKS THAT WE WERE JUST DISCUSSING ON THIS PARTICULAR EDISON?

10:01AM  12    A.   THAT'S CORRECT.

10:01AM  13    Q.   AND WAS THAT EDISON ABLE TO RETURN THE CORRECT ANSWER FOR

10:01AM  14    THE QC TEST?

10:01AM  15    A.   NO.  AND THIS IS A COLLECTION OF EDISONS FOR -- IT'S A SET

10:01AM  16    OF MACHINES.

10:01AM  17    Q.   UNDERSTOOD.

10:01AM  18    A.   YEAH.

10:01AM  19    Q.   AND YOU SENT THIS EMAIL TO THE INDIVIDUALS THAT WE TALKED

10:01AM  20    ABOUT BEFORE, AS WELL AS IN THE TO LINE THERE'S AN ADDRESS THAT

10:01AM  21    SAYS NORMANDY 911.

10:01AM  22         DO YOU SEE THAT?

10:01AM  23    A.   YES.

10:01AM  24    Q.   AND WHAT WAS THE NORMANDY 911 EMAIL ADDRESS?

10:01AM  25    A.   SO NORMANDY 911 WAS A KIND OF LIKE A LIST OR A BIG EMAIL

10:01AM  1    GROUP THAT WAS ESSENTIALLY A HELP LINE.  IF YOU HAD SEEN ISSUES

10:01AM  2    IN THE LAB AND NEEDED THEM TO GET RESOLVED QUICKLY, YOU WOULD

10:02AM  3    CC OR SEND IT OVER TO NORMANDY 911 TO HELP RESOLVE ANY PRESSING

10:02AM  4    ISSUES RELATING TO PATIENT TESTING.

10:02AM  5    Q.   AND YOU MENTIONED THAT THE LAB WAS DIVIDED INTO TWO

10:02AM  6    SECTIONS; IS THAT RIGHT?

10:02AM  7    A.   THAT'S CORRECT.

10:02AM  8    Q.   WAS THE NORMANDY SECTION THE ONE WITH THE

10:02AM  9    THERANOS-SPECIFIC EQUIPMENT OR THE COMMERCIAL EQUIPMENT?

10:02AM 10    A.   IT WAS WITH THE THERANOS-SPECIFIC EQUIPMENT, SO THE EDISON

10:02AM 11    DEVICES, AND THEN ALSO THE COMMERCIALLY VIABLE ONES THAT WERE

10:02AM 12    MODIFIED.

10:02AM 13    Q.   FOR THE PORTION OF THE LAB THAT HAD THE NON-THERANOS

10:02AM 14    REGULAR DEVICES, DO YOU KNOW WHETHER THERE WAS A SIMILAR 911

10:02AM 15    EMAIL ADDRESS?

10:02AM 16    A.   NO.

10:02AM 17    Q.   AND DO YOU NOT KNOW OR DO YOU HAVE A MEMORY?

10:02AM 18    A.   I THINK WE JUST SENT THEM TO THE CLIA LAB.  WE DIDN'T HAVE

10:02AM 19    A 911.

10:02AM 20    Q.   GOING BACK TO THIS EXHIBIT, LET ME ASK YOU TO --

10:03AM 21        MS. WACHS, IF WE CAN ZOOM IN ON THE NEXT MESSAGE UP, STILL

10:03AM 22    ON PAGE 2 BUT RIGHT IN THE MIDDLE OF THE PAGE.

10:03AM 23        MS. CHEUNG, HERE'S ANOTHER EMAIL FROM A FEW HOURS LATER;

10:03AM 24    IS THAT CORRECT?

10:03AM 25    A.   YES.

10:03AM   1    Q.   AND YOU'RE PROVIDING AN UPDATE TO THAT SAME GROUP OF

10:03AM   2    INDIVIDUALS?

10:03AM   3    A.   YES.

10:03AM   4    Q.   AND WHAT HAS HAPPENED HERE?  WHAT HAS CHANGED?

10:03AM   5    A.   CAN I TAKE A MOMENT TO READ IT?

10:03AM   6    Q.   OF COURSE.  PLEASE.

10:03AM   7         (PAUSE IN PROCEEDINGS.)

10:03AM   8             THE WITNESS:  SO ESSENTIALLY WHAT HAPPENED HERE, AS

10:03AM   9    I WAS SAYING, WHEN THE QC'S FAIL, YOU TRY TO FIND WHAT THE

10:03AM  10    ISSUE IS AND IMPLEMENT A CORRECTIVE ACTION.

10:03AM  11         SO HERE I WAS TRYING TO SEE IF IT WAS THE CHEMICALS THAT

10:03AM  12    WE USED TO RUN THE TEST THAT WAS HAVING A PARTICULAR ISSUE.

10:03AM  13         I CHANGED THE CHEMICALS.  IT WAS STILL FAILING.

10:03AM  14         I CHANGED TO A WHOLE NEW SET OF MACHINES.  IT WAS FAILING

10:04AM  15    AGAIN.

10:04AM  16         AND IT'S BASICALLY ME TRYING TO GET TO A RESOLUTION FOR

10:04AM  17    THE ISSUE AND ISOLATE WHAT VARIABLE COULD POSSIBLY BE GOING

10:04AM  18    WRONG TO GET THE QC'S TO PASS TO THEN RUN THE PATIENT SAMPLE.

10:04AM  19         AND THEN I'M ALSO ALERTING THAT I'M GOING TO HAVE ANOTHER

10:04AM  20    TECHNICIAN COME IN TO HELP ME RESOLVE WHAT IT MIGHT BE.

10:04AM  21    BY MR. BOSTIC:

10:04AM  22    Q.   YOU MENTION IN THIS EMAIL USING A DIFFERENT BOTTLE OF

10:04AM  23    SUBSTRATE FOR THOSE ADDITIONAL TESTS?

10:04AM  24    A.   YES.

10:04AM  25    Q.   AND WHAT DID THAT MEAN AND WHY DID YOU DO THAT?

CHEUNG DIRECT BY MR. BOSTIC (RES.)                          1201

10:04AM   1    A.   SO THE SUBSTRATE IS ESSENTIALLY A TYPE OF CHEMICAL THAT

10:04AM   2    HELPS THE ASSAY FLUORESCE AND EMIT LIGHT, AND THAT'S HOW YOU

10:04AM   3    GET THE READING OF WHAT THE CONCENTRATION OF VITAMIN D IS.  SO

10:04AM   4    IT'S A PART OF THE ASSAY.

10:04AM   5         AND BASICALLY I WAS JUST GETTING A NEW BOTTLE OF THAT

10:04AM   6    SUBSTRATE TO SEE IS THERE CONTAMINATION, WAS THERE SOME SORT OF

10:04AM   7    PROBLEM WITH THE REAGENTS THAT WE WERE USING.  SO I GOT AN

10:05AM   8    UNOPENED BOTTLE TO SEE IF THAT WOULD MAKE THE QC'S PASS.

10:05AM   9    Q.   AND DID THAT RESOLVE THE PROBLEM?

10:05AM  10    A.   NO.

10:05AM  11    Q.   THOSE ADDITIONAL CHECKS THAT YOU WERE DOING, WERE THEY

10:05AM  12    STILL ON THE SAME GROUP OF EDISONS THAT YOU HAD BEEN TRYING TO

10:05AM  13    MAKE WORK THE FIRST TIME?

10:05AM  14    A.   YES.

10:05AM  15    Q.   LET'S LOOK AT PAGE 1 OF THIS DOCUMENT, PLEASE, AND LET'S

10:05AM  16    ZOOM IN ON THE BOTTOM OF THE PAGE.

10:05AM  17         AND, MS. CHEUNG, DO YOU SEE AN EMAIL IN THE BOTTOM OF THAT

10:05AM  18    SELECTION FROM NOVEMBER 30TH AT 7:10 A.M.  AND MR. BALWANI SAYS

10:05AM  19    "THIS IS BEYOND UNACCEPTABLE PERFORMANCE."

10:05AM  20         DO YOU SEE THAT?

10:05AM  21    A.   YES.

10:05AM  22    Q.   AND AT THE TIME DID YOU AGREE WITH MR. BALWANI THAT THIS

10:05AM  23    WAS NOT ACCEPTABLE PERFORMANCE?

10:05AM  24    A.   YES.

10:05AM  25    Q.   AND WHY WAS THAT?

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1202

10:05AM  1   A.   BECAUSE OUR SYSTEM WASN'T WORKING.  WE WEREN'T ABLE TO GET

10:05AM  2   THE QUALITY CONTROLS TO PASS, THIS IS, AGAIN, SOMETHING THAT WE

10:06AM  3   KNOW THE CONCENTRATION OF, SO THEY SHOULD BE PASSING.

10:06AM  4        AND BASED ON THE PROMISES THAT WE MADE TO OUR PATIENTS,

10:06AM  5   AND THE COMMITMENTS THAT WE HAD IN TERMS OF DELIVERING RESULTS

10:06AM  6   IN A CERTAIN AMOUNT OF TIME, AND IF IT WASN'T GETTING OUT, WE

10:06AM  7   WEREN'T ABLE TO GET THE PATIENT RESULT OUT IN THE TIMEFRAME

10:06AM  8   THAT WE PROMISED TO THEM.

10:06AM  9   Q.   DID THE QC FAILURES HAVE ANY IMPACT ON THE ACCURACY OR

10:06AM  10  RELIABILITY OF THE PATIENT TESTS THAT WERE GOING TO BE

10:06AM  11  PERFORMED ON THIS DAY?

10:06AM  12            MR. COOPERSMITH:  YOUR HONOR, OBJECTION.  RULE 702.

10:06AM  13            THE COURT:  CAN YOU LAY A FOUNDATION.

10:06AM  14            MR. BOSTIC:  SURE.  LET ME REPHRASE.

10:06AM  15  Q.   MS. CHEUNG, YOU MENTIONED THAT THESE PROBLEMS CREATED

10:06AM  16  ISSUES WITH THERANOS PERFORMING TESTS QUICKLY ENOUGH; IS THAT

10:07AM  17  RIGHT?

10:07AM  18  A.   THAT IS CORRECT.

10:07AM  19  Q.   AT THERANOS DID YOU UNDERSTAND WHETHER QC FAILURES ALSO

10:07AM  20  RELATED NOT JUST TO THE SPEED WITH WHICH TESTS COULD BE

10:07AM  21  CONDUCTED, BUT ALSO TO THE ACCURACY OF THE RESULTS?

10:07AM  22  A.   YES.

10:07AM  23  Q.   AND WHAT IS THE RELATIONSHIP, AS YOU UNDERSTOOD IT AT THE

10:07AM  24  TIME, BETWEEN QUALITY CONTROL TESTING AND TEST ACCURACY?

10:07AM  25            MR. COOPERSMITH:  YOUR HONOR, IT'S RULE 702.  EVEN

10:07AM 1    IF SHE HAS AN UNDERSTANDING, SHE CAN'T TESTIFY AS AN EXPERT

10:07AM 2    WITNESS.  SO RULE 702.

10:07AM 3            THE COURT:  I'M SORRY.  DID WE TALK ABOUT THIS AT

10:07AM 4    PRETRIAL?  WE PROBABLY DIDN'T ABOUT SPEAKING OBJECTIONS, AND I

10:07AM 5    APOLOGIZE WE DIDN'T COVER THAT.

10:07AM 6       BUT IF YOU WANT TO, MR. BOSTIC, IF YOUR QUESTIONS ABOUT

10:07AM 7    WHAT THIS WITNESS KNOWS AND OTHER WITNESSES KNOW THE BASIS OF

10:07AM 8    THE KNOWLEDGE, IF SHE WAS TRAINED OR AS TO CERTAIN THINGS OR

10:08AM 9    WHETHER OR NOT THIS MOVES INTO 702 TERRITORY, IT'S SOMETHING

10:08AM 10   THAT WE TALKED ABOUT YESTERDAY IN REGARDS TO THE WITNESS'S

10:08AM 11   BREADTH OF KNOWLEDGE AND THE BASIS FOR IT.

10:08AM 12           MR. BOSTIC:  UNDERSTOOD, YOUR HONOR.

10:08AM 13   Q.   LET ME ASK A PREFATORY QUESTION.

10:08AM 14       MS. CHEUNG, WHEN YOU WERE AT THERANOS, DID YOU RECEIVE

10:08AM 15   TRAINING AS TO THE PURPOSE FOR QUALITY CONTROL TESTING?

10:08AM 16   A.   YES.

10:08AM 17   Q.   AND WHAT WERE YOU TOLD AT THERANOS ABOUT WHY QUALITY

10:08AM 18   CONTROL TESTING WAS NEEDED?

10:08AM 19   A.   SO --

10:08AM 20           MR. COOPERSMITH:  OBJECTION.  HEARSAY, YOUR HONOR.

10:08AM 21           THE COURT:  OVERRULED.

10:08AM 22           THE WITNESS:  SO FOR THE QUALITY CONTROL TRAINING

10:08AM 23   THAT WE RECEIVED, ESSENTIALLY IT WAS, AGAIN, A WAY IN WHICH WE

10:08AM 24   COULD MEASURE THE PERFORMANCE -- THE QUALITY CONTROL SYSTEM WAS

10:08AM 25   ESSENTIALLY TO GIVE US AN INDICATION OF HOW WELL OUR SYSTEM WAS

CHEUNG DIRECT BY MR. BOSTIC (RES.)                          1204

10:08AM  1    RUNNING AND IF IT WAS RUNNING TO THE CALIBER IN WHICH WE

10:08AM  2    ARTICULATED IT WOULD RUN.

10:09AM  3         SO IF YOU HAVE, AGAIN, A KNOWN CONCENTRATION OF A SAMPLE

10:09AM  4    WHICH THAT IS GIVEN TO US THAT IT IS 10 NANOGRAMS PER MIL, AND

10:09AM  5    THE FACT THAT WE RUN IT ON OUR SYSTEM AND IT'S COMING OUT 52,

10:09AM  6    WE KNOW THAT THERE IS SOMETHING WRONG WITH THE ACCURACY.

10:09AM  7         AND WE WERE ALSO UNDERSTOOD AND TOLD THAT THAT DEVIATION

10:09AM  8    OF 10 NOT EQUALLING 52 COULD BE FOR A VARIETY OF DIFFERENT

10:09AM  9    REASONS, BUT AT THE END OF THE DAY WE KNOW THE ACCURACY IS NOT

10:09AM 10    CORRECT BECAUSE IT'S ALREADY ARTICULATED TO US AT THE BEGINNING

10:09AM 11    THAT 10 -- THE CORRECT VALUE FOR VITAMIN D IS 10.

10:09AM 12         SO IT WAS AN INDICATION THAT THERE WAS SOME ISSUE IN THE

10:09AM 13    ACCURACY OF THE ACTUAL DEVICE, BECAUSE, AGAIN, YOU KNOW IT

10:09AM 14    EQUALS 10 OR IN SOME ACCEPTABLE RANGE OF 10.

10:09AM 15    BY MR. BOSTIC:

10:09AM 16    Q.   THANK YOU.

10:09AM 17         GOING BACK TO THIS PARTICULAR DAY AND THIS QC FAILURE, DO

10:10AM 18    YOU SEE ON THE SCREEN A MESSAGE FROM MS. HOLMES ON

10:10AM 19    NOVEMBER 30TH SUGGESTING A POSSIBLE SOLUTION?

10:10AM 20    A.   YES.

10:10AM 21    Q.   AND WHAT IS MS. HOLMES SUGGESTING IN THAT EMAIL?

10:10AM 22    A.   SHE IS SUGGESTING THAT WE TRY AND RUN IT ON THE

10:10AM 23    TRADITIONAL METHODS.

10:10AM 24    Q.   AND WHAT DID TRADITIONAL METHODS MEAN IN TERMS OF WHAT

10:10AM 25    DEVICE WOULD BE USED?

10:10AM 1    A.   SO IT WOULD BE IN THIS CASE THE SIEMENS IMMULITE -- OH,

10:10AM 2    NO, NO, NO, THIS IS VITAMIN D.  SO THIS WOULD BE THE DIASORIN,

10:10AM 3    WHICH IS AN FDA APPROVED OFF-THE-SHELF MACHINE THAT YOU CAN USE

10:10AM 4    TO RUN VITAMIN D SAMPLES.

10:10AM 5    Q.   AND WAS THAT A THERANOS DEVICE OR A NON-THERANOS DEVICE?

10:10AM 6    A.   THAT WAS A NON-THERANOS DEVICE.

10:10AM 7    Q.   AND YOU MENTIONED FDA APPROVED.

10:10AM 8        WERE THE THERANOS-SPECIFIC DEVICES FDA APPROVED SPECIFIC

10:10AM 9    FOR THIS TIME?

10:10AM 10   A.   CAN YOU REPEAT THE QUESTION.

10:10AM 11   Q.   SURE.

10:10AM 12       THE QUESTION WAS WERE THE THERANOS-SPECIFIC DEVICES FDA

10:10AM 13   APPROVED FOR TESTING AT THIS TIME?

10:10AM 14   A.   NO.

10:10AM 15   Q.   LET'S ZOOM OUT, MS. WACHS, AND THEN ZOOM BACK IN ON KIND

10:11AM 16   OF THE MIDDLE AND TOP PORTION OF THE PAGE.

10:11AM 17       AT THE BOTTOM OF THE SELECTION, MS. CHEUNG, DO YOU SEE THE

10:11AM 18   RESPONSE TO MS. HOLMES'S SUGGESTION TO RUN THE SAMPLE OR

10:11AM 19   TRADITIONAL METHODS?

10:11AM 20   A.   YES.

10:11AM 21   Q.   AND DID THAT END UP BEING A VIABLE SOLUTION?

10:11AM 22   A.   NO.

10:11AM 23   Q.   AND WHY NOT?

10:11AM 24   A.   BECAUSE WE DIDN'T HAVE ENOUGH BLOOD IN ORDER TO RUN A

10:11AM 25   SAMPLE ON THE DIASORIN, AND ALSO IT'S FINGERSTICK BLOOD, IT'S

CHEUNG DIRECT BY MR. BOSTIC (RES.)                         1206

10:11AM  1    NOT VENOUS BLOOD.

10:11AM  2    Q.   ABOVE THAT THERE'S A MESSAGE FROM DANIEL YOUNG THAT SAYS

10:11AM  3    THAT "THIS HAS BEEN RESOLVED.  SAMPLE IS BEING RUN ON EDISON."

10:11AM  4         DO YOU SEE THAT?

10:11AM  5    A.   YES.

10:11AM  6    Q.   AND WHO WAS DANIEL YOUNG AT THE COMPANY?

10:11AM  7    A.   DANIEL YOUNG WAS THE VICE PRESIDENT OF THE COMPANY.

10:11AM  8    Q.   AND TO WHOM DID HE REPORT, IF YOU KNOW?

10:11AM  9    A.   HE REPORTED TO SUNNY AND ELIZABETH.

10:11AM  10   Q.   AND ABOVE THAT MESSAGE MS. HOLMES ASKS, "WHAT IS THE

10:11AM  11   RESOLUTION."

10:11AM  12        DO YOU SEE THAT QUESTION?

10:12AM  13   A.   YES.

10:12AM  14   Q.   AND AT THE TOP OF THE PAGE SURAJ SAKSENA WRITES AND

10:12AM  15   PROVIDES THAT INFORMATION.

10:12AM  16        DO YOU SEE THAT?

10:12AM  17   A.   YES.

10:12AM  18   Q.   AND CAN YOU REMIND US WHO SURAJ SAKSENA?

10:12AM  19   A.   SURAJ SAKSENA IS -- HE HAD SEVERAL ROLES WITHIN THE

10:12AM  20   COMPANY, BUT AT THAT TIME HE WAS APART OF A TEAM CALLED BINDERS

10:12AM  21   AND ALSO WAS WORKING IN THE ELISA TEAM AND THE PRODUCTION TEAM.

10:12AM  22   SO HE WAS A SCIENTIST.

10:12AM  23   Q.   SURAJ SAYS IN HIS EMAIL, "2 OUTLIERS HAD TO BE MANUALLY

10:12AM  24   REMOVED TO PASS QC."

10:12AM  25        DO YOU SEE THAT?

10:12AM  1      A.    YES.

10:12AM  2      Q.    AND WHAT IS THAT REFERRING TO?

10:12AM  3      A.    SO AT THERANOS THEY WOULD FREQUENTLY, THEY WOULD

10:12AM  4      FREQUENTLY DELETE OUTLIERS OF A DATA SET IN ORDER TO GET VALUES

10:12AM  5      TO IN THIS CASE WHEN QC'S PASS.

10:12AM  6           SO WHEN WE RAN A SPECIFIC SAMPLE, WE DIDN'T JUST RUN A

10:12AM  7      SAMPLE ON ONE DEVICE, WE AT THIS TIME RAN IT ACROSS THREE

10:13AM  8      DEVICES.

10:13AM  9           SO YOU COULD -- WHAT THEY'RE REFERRING TO IS THAT THEY

10:13AM 10      WOULD DELETE DATA POINTS IN THAT SUBSET OF SIX IN ORDER TO GET

10:13AM 11      THE QC'S TO PASS, SO THEY WOULD MOVE DATA POINTS ESSENTIALLY.

10:13AM 12      Q.    YOU MENTIONED USING MULTIPLE DEVICES.  WOULD THAT ALL BE

10:13AM 13      FOR THE SAME TEST ON THE SAME PATIENT SAMPLE?

10:13AM 14      A.    YES.

10:13AM 15      Q.    AND SO WOULD THAT MEAN THAT THE MULTIPLE RESULTS WOULD BE

10:13AM 16      GENERATED FOR EACH TEST ON A PATIENT SAMPLE?

10:13AM 17      A.    YES.

10:13AM 18      Q.    AND THEN WHAT WOULD BE DONE WITH THAT COLLECTION OF

10:13AM 19      DIFFERENT RESULTS ACCORDING TO THIS METHOD?

10:13AM 20      A.    SO THEY WOULD BE COMBINED AND AGGREGATED.

10:13AM 21      Q.    AND WOULD ALL OF THEM BE COMBINED OR WOULD SOME BE

10:13AM 22      IGNORED?

10:13AM 23      A.    SO SOME OF THEM WOULD -- IF IT WAS THE CASE THAT THEY HAD

10:13AM 24      FOUND DATA TO BE OUTLIERS, THEY WOULD REMOVE TWO POINTS IN SOME

10:13AM 25      INSTANCES IN CASES LIKE WE'RE SEEING HERE FOR THE QC OR

10:13AM   1    ESSENTIALLY WHERE THEY HAD MOVED TWO DATA POINTS IN ORDER TO

10:14AM   2    GET THE QC'S TO PASS.

10:14AM   3    Q.   AND IN SOME CASES LIKE THIS, DISCARDING THAT DATA,

10:14AM   4    IGNORING SOME OF THAT DATA COULD BE THE DIFFERENCE BETWEEN

10:14AM   5    QUALITY CONTROL PASSING OR NOT?

10:14AM   6    A.   YES.

10:14AM   7    Q.   LET ME ASK YOU TO TURN IN YOUR BINDER, PLEASE, TO TAB

10:14AM   8    1323.

10:14AM   9         AND DO YOU HAVE THAT IN FRONT OF YOU?

10:14AM  10    A.   YES.

10:14AM  11    Q.   AND IS THIS ANOTHER EMAIL CHAIN INCLUDING YOU AND OTHERS

10:14AM  12    RELATING TO QC ISSUES?

10:14AM  13    A.   YES.

10:14AM  14         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1323.

10:14AM  15         MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:14AM  16         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:14AM  17    (GOVERNMENT'S EXHIBIT 1323 WAS RECEIVED IN EVIDENCE.)

10:15AM  18         MR. BOSTIC:  AND, MS. WACHS, IF WE CAN ZOOM IN ON

10:15AM  19    THE BOTTOM HALF OF THE PAGE.

10:15AM  20    Q.   SO, MS. CHEUNG, WE'RE NOW IN THE FOLLOWING MONTH OF

10:15AM  21    DECEMBER OF 2013; IS THAT RIGHT?

10:15AM  22    A.   THAT'S CORRECT.

10:15AM  23    Q.   COULD YOU EXPLAIN WHAT IS HAPPENING IN THIS EMAIL AND WHAT

10:15AM  24    PROMPTED YOU TO SEND IT?

10:15AM  25    A.   SO WE WERE HAVING MORE QC FAILURES IN DECEMBER, AND I WAS

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1209

```
10:15AM   1    CONTACTING ONE OF THE TEAM LEAD SCIENTISTS AND THE HEAD OF THE

10:15AM   2    ELISA TEAM TO ESSENTIALLY LET THEM KNOW THAT WITH THE NEW

10:15AM   3    RANGES THAT WE RECEIVED, WE WERE STILL GETTING QC FAILURES.

10:15AM   4    Q.   AND WAS THIS QC FAILURE HAPPENING IN THE R&D SIDE OF THE

10:15AM   5    HOUSE OR IN THE CLINICAL SIDE IN THE HOUSE WHERE PATIENT

10:15AM   6    TESTING HAPPENED?  CAN YOU TELL?

10:15AM   7    A.   THIS IS KIND OF IN THAT MIDDLE ZONE, SO THIS IS RELATED TO

10:15AM   8    R&D AT THIS POINT.

10:15AM   9         BUT, YEAH, THIS IS ACTUALLY RESEARCH AND DEVELOPMENT.

10:16AM  10    Q.   DID YOU SAY BEFORE THAT YOU BELIEVED THAT THE CLINICAL

10:16AM  11    SIDE NEEDED TO KNOW ABOUT THIS?

10:16AM  12    A.   YES.

10:16AM  13    Q.   AND WHY WAS THAT?

10:16AM  14    A.   BECAUSE THE QC'S ARE RELEVANT TO TESTING PATIENTS, AND SO

10:16AM  15    ALL OF THE PATIENT TESTING SHOULD OCCUR WITHIN THE CLINICAL LAB

10:16AM  16    BECAUSE THEY HAVE THE RIGHT SORT OF STAFF IN ORDER TO APPROVE

10:16AM  17    OR DENY WHETHER THE PATIENT RESULTS CAN GO OUT TO PATIENTS.

10:16AM  18    Q.   DURING YOUR TIME AT THERANOS, DID INFORMATION FLOW FREELY

10:16AM  19    BETWEEN THE R&D SIDE OF THE HOUSE AND THE CLINICAL PATIENT

10:16AM  20    TESTING SIDE?

10:16AM  21    A.   INITIALLY, YES.

10:16AM  22    Q.   DID THAT CHANGE OVER TIME?

10:16AM  23    A.   YES.

10:16AM  24    Q.   HOW SO?

10:16AM  25    A.   SO INITIALLY THERE WAS MORE FREE FORM COMMUNICATION
```

ER-661

10:16AM  1    BETWEEN RESEARCH AND DEVELOPMENT IN THE CLINICAL LAB TO THE

10:16AM  2    POINT THAT WE HAD DRIVES AND THE ABILITY TO WALK OVER TO

10:16AM  3    DIFFERENT DEPARTMENTS AND TALK TO THEM ABOUT DIFFERENT ISSUES.

10:17AM  4         BUT OVER TIME IT WAS TOLD TO US THAT WE COULDN'T

10:17AM  5    COMMUNICATE WITH PEOPLE WHEN WE WERE IN CLIA, OF PEOPLE OF

10:17AM  6    OTHER DEPARTMENTS, ABOUT WHAT WAS OCCURRING IN THE CLINICAL

10:17AM  7    LAB.

10:17AM  8         AND THEN A LOT OF PEOPLE BASICALLY GOT RESTRICTED -- LIKE

10:17AM  9    THEIR ACCESS GOT CUT OFF TO OTHER DRIVES THAT WERE SHARED BY,

10:17AM  10   SAY, THE RESEARCH DEPARTMENT.

10:17AM  11        AND THEN ALSO THERE WERE PHYSICAL BARRIERS THAT WERE PUT

10:17AM  12   UP TO SORT OF DEMARCATE WHO COULD HAVE ACCESS TO CERTAIN PARTS

10:17AM  13   OF THE LABORATORY OVER OTHERS.

10:17AM  14   Q.   THAT DIRECTION AND THOSE DECISIONS RESTRICTING INFORMATION

10:17AM  15   FLOW, WHERE DID THEY COME FROM, IF YOU KNOW?

10:17AM  16   A.   SO WHEN WE HAD THE COMMUNICATION SPECIFICALLY ABOUT CLIA

10:17AM  17   NOT COMMUNICATING WITH OTHER DEPARTMENTS, THAT CAME FROM SUNNY.

10:17AM  18   Q.   AND REGARDING THE R&D SIDE AND THE CLINICAL LAB SIDE, WAS

10:18AM  19   MR. BALWANI OVER BOTH OF THOSE SECTIONS WITHIN THERANOS?

10:18AM  20   A.   YES.

10:18AM  21   Q.   WERE THERE OTHER EMPLOYEES OR SUPERVISORS AT THERANOS WHO

10:18AM  22   OVERSAW BOTH OF THOSE DEPARTMENTS IN A DUAL ROLE IN THE SAME

10:18AM  23   WAY?

10:18AM  24   A.   ELIZABETH HOLMES.

10:18AM  25   Q.   SO WE HAVE MR. BALWANI, MS. HOLMES.

CHEUNG DIRECT BY MR. BOSTIC (RES.)                                    1211

10:18AM  1        ANYONE ELSE AT THERANOS WHO IN YOUR UNDERSTANDING WAS OVER

10:18AM  2   BOTH SIDES?

10:18AM  3   A.   DANIEL YOUNG.

10:18AM  4   Q.   OKAY.  AND ANYONE ELSE?

10:18AM  5   A.   WHO OVERSAW BOTH OF THOSE DEPARTMENTS IN A KIND OF

10:18AM  6   DECISION MAKING CAPACITY OR --

10:18AM  7   Q.   CORRECT.

10:18AM  8   A.   AT THIS TIME I DON'T REMEMBER.

10:18AM  9   Q.   THE QUALITY CONTROL FAILURES THAT WE'VE SEEN THAT WE'VE

10:18AM  10  LOOKED AT TOGETHER, WERE THOSE ISOLATED INCIDENTS OR WERE THERE

10:18AM  11  OTHER SIMILAR ISSUES THAT YOU SAW DURING YOUR TIME AT THERANOS?

10:18AM  12  A.   THESE WERE CONSISTENT ISSUES.

10:19AM  13  Q.   IN LATE 2013 AND EARLY 2014, WHAT WAS YOUR EXPERIENCE

10:19AM  14  GENERALLY WITH THE RELIABILITY OF THE THERANOS ANALYZERS THAT

10:19AM  15  YOU WERE OPERATING?

10:19AM  16  A.   THEY WERE HIGHLY UNRELIABLE.

10:19AM  17  Q.   AND WHAT MAKES YOU SAY THAT?

10:19AM  18  A.   THE QC'S WERE FAILING PROBABLY ON, LIKE, EVERY TWO DAYS,

10:19AM  19  EVERY THREE DAYS, WHICH WOULD SUGGEST THAT THERE WAS SOMETHING

10:19AM  20  WRONG WITH OUR SYSTEM, AND THIS WASN'T WITH ONE SPECIFIC ASSAY

10:19AM  21  OR ONE SPECIFIC TEST, BUT IT WAS ACROSS TESTS.

10:19AM  22       SO WE SAW ISSUES WITH VITAMIN D, WE SAW THE TSH, TPSA.

10:19AM  23  BASICALLY WITH ALL OF THE EDISON TESTS AT SOME POINT IN TIME WE

10:19AM  24  WERE HAVING QC FAILURES, OR JUST REALLY KIND OF UNRELIABLE

10:19AM  25  RESULTS, NOT ONLY THE QC'S BUT ALSO OTHER TYPE OF VALIDATION

CHEUNG DIRECT BY MR. BOSTIC (RES.)                          1212

10:19AM   1    STUDIES OR IN HOUSE RESEARCH STUDIES THAT WE WERE DOING THAT

10:19AM   2    MADE IT VERY COMPLICATED TO REALLY UNDERSTAND WHAT WAS GOING

10:20AM   3    ON.

10:20AM   4    Q.   IN LATE 2013, EARLY 2014, DID YOU RAISE THESE CONCERNS

10:20AM   5    WITH ANY OF THE PEOPLE THAT WE'VE BEEN TALKING ABOUT, EITHER

10:20AM   6    MS. HOLMES, MR. BALWANI, OR DAN YOUNG?

10:20AM   7    A.   WITH DANIEL YOUNG, YES.

10:20AM   8    Q.   AND TELL US ABOUT THAT?  HOW DID THAT CONVERSATION GET

10:20AM   9    STARTED?

10:20AM  10    A.   YEAH.  SO I HAD CALLED A MEETING WITH DANIEL YOUNG AND

10:20AM  11    SURAJ SAKSENA BECAUSE THE QC FAILURES WERE HAPPENING SO

10:20AM  12    FREQUENTLY THAT WE WERE TRYING TO PROBLEM SOLVE ON WHAT IS THE

10:20AM  13    ISSUE AT HAND.

10:20AM  14         AND WE, WE SAT DOWN AND WE HAD A MEETING TO SORT OF FIGURE

10:20AM  15    THAT OUT.  AND THE RESOLUTION OF THAT MEETING WAS ESSENTIALLY

10:20AM  16    POTENTIALLY IT WAS THE SAMPLES THAT WE WERE GETTING TO RUN THE

10:20AM  17    QC'S, SO MAYBE WE SHOULD TRY AND DEVELOP THEM IN HOUSE VERSUS

10:20AM  18    PURCHASE THEM THROUGH OTHER PARTIES TO SEE IF THAT MAKES A

10:20AM  19    DIFFERENCE.

10:20AM  20         AND -- YEAH, THAT WAS ESSENTIALLY THE RESOLUTION OF THAT

10:21AM  21    MEETING WAS, OKAY, MAYBE WE JUST NEED TO DEVELOP OUR QUALITY

10:21AM  22    CONTROL SUBSTANCES IN HOUSE.

10:21AM  23    Q.   AND DID THAT MEETING ADDRESS THE CONCERNS THAT YOU WERE

10:21AM  24    HAVING AT THAT TIME ABOUT THE RELIABILITY OF THE SYSTEM?

10:21AM  25    A.   NO.  IT FREQUENTLY FELT WHEN WE HAD THESE MEETINGS THAT IT

10:21AM  1    WAS ALWAYS KIND OF LIKE A GOOSE CHASE FOR SPECIFIC ISSUES

10:21AM  2    VERSUS THE SORT OF LIKE OVERARCHING PROBLEMS OF LIKE THE

10:21AM  3    EDISONS JUST DON'T SEEM TO BE WORKING VERY WELL, AND THEIR

10:21AM  4    PERFORMANCE IS SO UNRELIABLE.  WHETHER THAT'S ON THE HARDWARE

10:21AM  5    SIDE, WHETHER THAT'S ON THE ASSAY SIDE, WHETHER THAT'S ON THE

10:21AM  6    REAGENTS SIDE OR WHETHER THAT'S ON THE FAILURES OF THE TRAINING

10:21AM  7    SIDE, IT'S JUST THAT THERE ARE SO MANY ISSUES WITH THE WHOLE

10:21AM  8    SYSTEM IN ITSELF THAT WE NEED TO REALLY KIND OF TAKE IT BACK TO

10:21AM  9    THE DRAWING BOARD BECAUSE THEY'RE JUST NOT WORKING VERY WELL.

10:21AM  10   Q.   AND YOU MENTIONED THAT MEETING WAS WITH DR. YOUNG.  AND

10:21AM  11   SURAJ SAKSENA WAS ALSO PRESENT?

10:21AM  12   A.   YES.

10:21AM  13   Q.   AND ANYONE ELSE PRESENT FOR THAT MEETING?

10:21AM  14   A.   NOT AT THAT MEETING.

10:21AM  15   Q.   AND WHO DID DR. YOUNG REPORT TO AT THERANOS?

10:22AM  16   A.   SUNNY BALWANI AND ELIZABETH HOLMES.

10:22AM  17   Q.   CAN YOU PLEASE TURN TO TAB 1431 IN YOUR BINDER.

10:22AM  18        DO YOU SEE IN FRONT OF YOU AN EMAIL CHAIN BETWEEN YOU AND

10:22AM  19   OTHERS AT THERANOS RELATING TO QUALITY CONTROL ISSUES AT

10:22AM  20   THERANOS?

10:22AM  21   A.   YES.

10:22AM  22        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1431.

10:22AM  23        MR. COOPERSMITH:  YOUR HONOR, WE OBJECT TO THE TOP

10:22AM  24   EMAIL ON 1431, AND IT'S HEARSAY.

10:22AM  25        I'M SORRY.  I WITHDRAW THAT.  NO OBJECTION, YOUR HONOR.

CHEUNG DIRECT BY MR. BOSTIC (RES.)                                     1214

10:22AM   1              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:22AM   2              (GOVERNMENT'S EXHIBIT 1431 WAS RECEIVED IN EVIDENCE.)

10:22AM   3              MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:22AM   4         MS. WACHS, LET'S START WITH PAGE 6 OF THIS DOCUMENT.

10:22AM   5         Q.  MS. CHEUNG, DO YOU SEE IN THE MIDDLE OF THE PAGE THERE'S

10:23AM   6    AN EMAIL FROM ADAM ROSENDORFF TO YOU?

10:23AM   7    A.  YES.

10:23AM   8    Q.  AND WHO WAS ADAM ROSENDORFF AT THERANOS?

10:23AM   9    A.  ADAM ROSENDORFF WAS A MEDICAL DIRECTOR AT THERANOS.

10:23AM  10    Q.  AND IN THAT ROLE WHAT WAS HIS INVOLVEMENT WITH THE

10:23AM  11    CLINICAL TESTING DONE AT THE COMPANY?

10:23AM  12    A.  HE WAS KIND OF OVERSEEING ALL OF THE CLINICAL TESTING, SO

10:23AM  13    HE WOULD LET US KNOW WHEN WE HAD NEW ASSAYS THAT WE NEEDED TO

10:23AM  14    ONBOARD; AND IF WE HAD ANY ISSUES IN THE CLINICAL LAB, HE AND

10:23AM  15    THE LAB DIRECTOR WERE THE POINT PERSON THAT WE WOULD TALK TO.

10:23AM  16    HE WAS THE HEAD OF THAT DEPARTMENT.

10:23AM  17    Q.  AND THIS EMAIL ON JANUARY 15TH, 2014, RELATES TO QUALITY

10:23AM  18    CONTROL FOR EDISONS ACCORDING TO THE SUBJECT LINE; IS THAT

10:23AM  19    RIGHT?

10:23AM  20    A.  THAT IS CORRECT.

10:23AM  21    Q.  AND DR. ROSENDORFF IS ASKING YOU ABOUT VITAMIN D IN

10:23AM  22    PARTICULAR; IS THAT CORRECT?

10:23AM  23    A.  THAT IS CORRECT.

10:23AM  24    Q.  LET'S GO TO PRECEDING PAGE, SO FORWARD IN TIME, TO PAGE 5

10:24AM  25    OF THIS EXHIBIT, AND LET'S ZOOM IN ON THE BOTTOM MESSAGE.

10:24AM   1          AND DO YOU SEE HERE AN EMAIL FROM DR. ROSENDORFF TO YOU

10:24AM   2     SAYING THAT THE CV PERCENTAGE IS WAY TOO HIGH?

10:24AM   3          DO YOU SEE THAT?

10:24AM   4     A.   YES.

10:24AM   5     Q.   AND CAN YOU EXPLAIN WHAT MEANT?  FOR EXAMPLE, WHAT IS CV?

10:24AM   6     A.   SO CV STANDS FOR COEFFICIENT OF VARIANT.  AND ESSENTIALLY

10:24AM   7     WHAT THIS IS SAYING IS THAT BECAUSE WE HAD AGGREGATED SIX DATA

10:24AM   8     POINTS IN ORDER TO GENERATE A RESULT, THAT THE VALUES FOR THEM

10:24AM   9     WERE TOO DISPARATE FROM ONE ANOTHER.

10:24AM  10          AND HE'S BASICALLY TELLING US THAT BASED ON THE VALIDATION

10:24AM  11     WORK THAT WE CONDUCTED IT SHOULD BE 20 PERCENT, BUT WHAT WE'RE

10:24AM  12     SEEING IS A MUCH HIGHER VALUE.  SO YOU'RE SAYING MORE VARIANTS

10:25AM  13     AT 33 PERCENT.

10:25AM  14     Q.   AND GENERALLY SPEAKING, AT THERANOS WAS A HIGH CV

10:25AM  15     DESIRABLE OR WAS A LOW CV DESIRABLE?

10:25AM  16     A.   A LOW CV DESIRABLE.

10:25AM  17     Q.   AND WHY WAS A LOW CV DESIRABLE IN TERMS OF YOUR WORK AT

10:25AM  18     THERANOS?

10:25AM  19     A.   A LOW CV IS MORE DESIRABLE BECAUSE IT MEANS YOU HAVE LESS

10:25AM  20     VARIANTS.

10:25AM  21     Q.   IS THAT ANOTHER WAY OF SAYING THAT THE RESULTS WERE MORE

10:25AM  22     CONSISTENT?

10:25AM  23     A.   YES.

10:25AM  24     Q.   AND WERE HIGH CV'S A REPEATED PROBLEM THAT YOU SAW

10:25AM  25     MULTIPLE TIMES AT THERANOS?

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1216

10:25AM   1      A.   YES.

10:25AM   2      Q.   LET'S GO TO, IN THE SAME EXHIBIT, PAGE 3, PLEASE.  AND

10:25AM   3      LET'S ZOOM IN ON THE BOTTOM PORTION.

10:26AM   4           MS. CHEUNG, DO YOU SEE HERE A MESSAGE FROM

10:26AM   5      SHARADA SIVARAMAN NOTING THAT THE CV'S ARE HIGH BETWEEN

10:26AM   6      DEVICES?

10:26AM   7      A.   YES.

10:26AM   8      Q.   AND THERE'S THEN A STATEMENT BELOW THAT.  IT SAYS, "SINCE

10:26AM   9      WE ARE ALLOWED TO REMOVE 2 DATA POINTS FROM 6 (1 CARTRIDGE OUT

10:26AM  10      OF 3) I HAVE ATTEMPTED TO DO THAT."

10:26AM  11           DO YOU SEE THAT?

10:26AM  12      A.   YES.

10:26AM  13      Q.   AND WHAT IS THAT REFERRING TO?  WHERE DID THESE SIX DATA

10:26AM  14      POINTS COME FROM?

10:26AM  15      A.   SO, AGAIN, AT THIS TIME WHEN WOULD RUN SAMPLE, WHETHER IT

10:26AM  16      WAS A QC OR A PATIENT SAMPLE FOR ONE SPECIFIC TEST, WE WOULD

10:26AM  17      RUN THAT ON THREE SEPARATE EDISONS, AND THEN WE WOULD COMBINE

10:26AM  18      THE DATA POINTS FROM THOSE THREE SEPARATE EDISONS INTO ONE

10:26AM  19      AGGREGATED RESULT.

10:26AM  20           SO WHAT SHE'S SAYING IS THAT EACH OF THESE CARTRIDGES HAVE

10:26AM  21      TWO REACTION TIPS ON IT, AND SO ONE EDISON, TWO REACTION

10:27AM  22      EDISON, THE SECOND EDISON, AND THEN TWO FOR THE THIRD.

10:27AM  23           SO SHE'S BASICALLY SAYING THAT YOU CAN REMOVE TWO OF THOSE

10:27AM  24      DATA POINTS OF THOSE TWO REACTION TIPS OF THE SIX RESULTS THAT

10:27AM  25      ARE GENERATED.

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1217

10:27AM  1    Q.   SO YOU MENTIONED THREE DEVICES BEING USED TOGETHER; IS

10:27AM  2    THAT RIGHT?

10:27AM  3    A.   THAT IS CORRECT.

10:27AM  4    Q.   ARE WE TALKING ABOUT TO PERFORM ONE TEST FOR ONE PATIENT

10:27AM  5    SAMPLE, THREE EDISONS WOULD BE REQUIRED?

10:27AM  6    A.   YES.

10:27AM  7    Q.   AND SO GOING BACK TO -- DO YOU RECALL SOME DISCUSSION

10:27AM  8    ABOUT A DEMO WHERE THREE EDISON TESTS MIGHT HAVE BEEN REQUIRED?

10:27AM  9    A.   YES.

10:27AM  10   Q.   IF ONE PATIENT NEEDED TO HAVE THREE DIFFERENT TESTS

10:27AM  11   PERFORMED, HOW MANY EDISON DEVICES WOULD BE REQUIRED UNDER THIS

10:27AM  12   PROCESS?

10:27AM  13   A.   NINE -- OR, NO.   YEAH, NINE.

10:27AM  14   Q.   NINE SEPARATE EDISON DEVICES?

10:27AM  15   A.   YES.

10:27AM  16   Q.   AND IN GROUPS OF THREE, EACH ONE WOULD RUN THE SAME TEST

10:28AM  17   TWO TIMES?

10:28AM  18   A.   YES.

10:28AM  19   Q.   AND THEN ACCORDING TO THIS EMAIL, A CERTAIN PORTION OF

10:28AM  20   THAT DATA COULD BE DISREGARDED OR IGNORED?

10:28AM  21   A.   YES.

10:28AM  22   Q.   THIS PROCESS OF USING MULTIPLE DEVICES, RUNNING EACH TEST

10:28AM  23   MULTIPLE TIMES AND THEN DISCARDING SOME OF THE DATA.

10:28AM  24        WAS THAT USED AT THERANOS WITH THE NON-THERANOS DEVICES?

10:28AM  25   A.   NO.

CHEUNG DIRECT BY MR. BOSTIC (RES.)                                    1218

10:28AM   1    Q.   WITH THE NON-THERANOS DEVICES LIKE THE SIEMENS ADVIA, WERE

10:28AM   2    THEY REQUIRED TO BE RUN IN GROUPS?  DID THEY NEED TO TEAM UP TO

10:28AM   3    RUN A SINGLE PATIENT SAMPLE?

10:28AM   4    A.   CAN YOU REPEAT THAT QUESTION.

10:28AM   5    Q.   SURE.

10:28AM   6         AT THERANOS WAS THE SIEMENS ADVIA ABLE TO RUN A PATIENT

10:28AM   7    TEST ON ITS OWN IN A SINGLE DEVICE, OR DID IT NEED TO BE

10:28AM   8    GROUPED INTO GROUPS OF MULTIPLE DEVICES THE WAY THAT THE EDISON

10:28AM   9    DID?

10:28AM  10    A.   NO.  OKAY.

10:28AM  11         FOR THE SIEMENS ADVIA, YOU JUST PUT THE SAMPLE IN THERE

10:29AM  12    AND IT WOULD JUST RUN ALL OF THE TESTS AND IN ALL OF THE

10:29AM  13    PATIENTS AT ONCE.  YOU DIDN'T HAVE TO GROUP MULTIPLE

10:29AM  14    SIEMENS ADVIAS TOGETHER TO PRODUCE A PATIENT RESULT.

10:29AM  15    Q.   AND THERE WERE OTHER THIRD PARTY DEVICES AT THERANOS

10:29AM  16    BESIDES THE SIEMENS ADVIA; IS THAT RIGHT?

10:29AM  17    A.   YES.

10:29AM  18    Q.   FOR ANY OF THOSE THIRD PARTY DEVICES, DID THEY NEED TO

10:29AM  19    WORK IN GROUPS THIS WAY?

10:29AM  20    A.   NO.

10:29AM  21    Q.   LET'S LOOK AT PAGE 2, PLEASE.  ACTUALLY, LET'S GO TO

10:29AM  22    PAGE 1 AND ZOOM IN ON THE MIDDLE OF THE PAGE.

10:29AM  23         PERFECT.  THANK YOU.

10:29AM  24         DO YOU SEE HERE A MESSAGE FROM SHARADA SIVARAMAN FOLLOWING

10:29AM  25    UP ON THE SAME TOPIC?

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1219

10:29AM   1      A.   YES.

10:29AM   2      Q.   AND IN THE SECOND PARAGRAPH OF THIS EMAIL IT SAYS, "AT

10:30AM   3      THIS TIME OUR OUTLIER REMOVAL PROCEDURE IS MANUAL."

10:30AM   4           DO YOU SEE THAT?

10:30AM   5      A.   YES.

10:30AM   6      Q.   AND DURING YOUR TIME AT THERANOS, DID YOU EVER WITNESS

10:30AM   7      OUTLIERS BEING REMOVED FROM THESE DATA SETS?

10:30AM   8      A.   YES.

10:30AM   9      Q.   AND TELL US WHAT YOU SAW?  HOW DID THAT WORK?

10:30AM  10      A.   SO WHEN THEY WOULD DELETE OUTLIERS -- THERE WERE DIFFERENT

10:30AM  11      CONTEXTS THAT THAT WAS USED.

10:30AM  12           SO, FOR EXAMPLE, IN THE RESEARCH AND DEVELOPMENT CONTEXT,

10:30AM  13      WHAT WOULD HAPPEN IS THAT WE WOULD DISPLAY ALL OF THE DATA ON A

10:30AM  14      PRESENTATION AND SAY WE NEEDED TO GET A PARTICULAR ACCURACY IN

10:30AM  15      ORDER TO PASS VALIDATION.

10:30AM  16           SO ONCE THEY HAD ALL OF THE DATA ON THERE, AND SAY WE

10:30AM  17      DIDN'T HIT THE MARKER FOR ACCURACY, THEY WOULD START TO REMOVE

10:30AM  18      THESE DATA POINTS AND DEEM THEM AS OUTLIERS TO GET THE ACCURACY

10:30AM  19      RATE CLOSER TO WHAT THE EXPECTED RESULT WAS.

10:30AM  20           AND THIS WAS ALSO HAPPENING, AS WE SAW BEFORE, IN THE

10:30AM  21      CONTEXT OF QC'S.  IF THE QC'S FAILED, WAS IT THE CASE THAT WE

10:31AM  22      WERE ABLE TO DELETE SOME OF THESE DATA POINTS IN ORDER TO GET

10:31AM  23      THEM FROM FAILING TO PASSING.

10:31AM  24           BUT THERE WASN'T NECESSARILY A STANDARD PROTOCOL THAT

10:31AM  25      PEOPLE USED FOR THIS, AND IT WAS BASICALLY AT THE DISCRETION OF

10:31AM 1    WHOEVER WAS THE PERSON HANDLING THE DATA.

10:31AM 2    Q.    AND YOU SAW THIS HAPPEN PERSONALLY AT THERANOS?

10:31AM 3    A.    YES.

10:31AM 4    Q.    AND WHAT WAS YOUR REACTION TO THIS PROCESS, THIS PROCESS

10:31AM 5    OF TAKING MULTIPLE RESULTS FOR THE SAME TEST AND THEN

10:31AM 6    DISCARDING CERTAIN OF THEM TO MAKE QUALITY CONTROL PASS?

10:31AM 7    A.    IT WAS REALLY CONCERNING BECAUSE YOU DON'T REALLY

10:31AM 8    UNDERSTAND -- NUMBER ONE, THERE WASN'T REALLY CLEAR PROTOCOLS

10:31AM 9    OF WHAT WAS CONSTITUTED AS AN OUTLIER.

10:31AM 10        SO HOW DO YOU KNOW WHAT TO REMOVE IS NOT CLEARLY DEFINED.

10:31AM 11        AND THEN NOT ONLY THAT, BUT IT GIVES YOU SORT OF AN -- IT

10:31AM 12   DOES -- IT GIVES YOU A FALSE SENSE OF WHAT IS ACTUALLY GOING ON

10:32AM 13   WITH THE SYSTEM BECAUSE ESSENTIALLY YOU'RE JUST MANIPULATING

10:32AM 14   THE DATA AT THAT POINT TO MAKE IT SEEM LIKE THE QC'S ARE

10:32AM 15   PASSING, BUT THAT MIGHT NOT ACTUALLY BE THE REALITY OF THE

10:32AM 16   SYSTEM.

10:32AM 17        SO IT WAS CONCERNING BECAUSE WE DIDN'T HAVE VERY SET

10:32AM 18   PROTOCOLS IN TERMS OF HOW THIS OUTLIER DELETION WAS HAPPENING,

10:32AM 19   AND NOT ONLY THAT, BUT THERE WAS LIKE A VARIABLE UNDERSTANDING

10:32AM 20   OF HOW THAT WAS DONE.  SO YOU HAVE -- HOW SHARADA WOULD DO IT

10:32AM 21   WOULD BE DIFFERENT THAN A LAB TECHNICIAN UYEN OR SURAJ WOULD DO

10:32AM 22   IT.

10:32AM 23        SO IT BECAME VERY CONFUSING TO KNOW, WELL, WHAT IS AN

10:32AM 24   OUTLIER?  WHAT IS CONSTITUTED AS AN OUTLIER?  AND WHEN IS IT

10:32AM 25   APPROPRIATE TO UTILIZE AN OUTLIER DILUTION VERSUS NOT?

CHEUNG DIRECT BY MR. BOSTIC (RES.)                                1221

10:32AM  1        AND IT WAS SOMETHING THAT CREATED A LOT OF TENSION BECAUSE

10:32AM  2   IT JUST SEEMED LIKE WE WERE REMOVING DATA POINTS TO JUST MAKE

10:32AM  3   IT APPEAR THAT THINGS WERE WORKING.

10:32AM  4   Q.   AND THESE QC PRACTICES AND PERFORMANCE ISSUES, DID THEY

10:33AM  5   HAVE AN EFFECT ON HOW YOU VIEWED YOUR JOB RUNNING PATIENT

10:33AM  6   SAMPLES AT THERANOS?

10:33AM  7   A.   YES, BECAUSE -- FOR EXAMPLE, WITH THE QC'S, AGAIN, I KNOW

10:33AM  8   WHAT THE SAMPLE CONCENTRATION IS, BUT FOR A PATIENT RESULT, I

10:33AM  9   DON'T KNOW WHAT THE SAMPLE CONCENTRATION IS.  SO HOW AM I

10:33AM 10   SUPPOSED TO UNDERSTAND WHAT DATA POINTS DO I REMOVE OR NOT IN

10:33AM 11   ORDER TO GET AN ACCURATE RESULT?

10:33AM 12        THE EXPECTATION IS THAT YOUR SYSTEM AND WHY YOU RUN THE

10:33AM 13   QC'S PERFORM WELL ENOUGH, THAT ONCE I RUN A PATIENT SAMPLE, I

10:33AM 14   HAVE SOME DEGREE OF CONFIDENCE THAT IT IS GOING TO PRODUCE AN

10:33AM 15   ACCURATE RESULT; THAT I DON'T HAVE TO GUESS, BASICALLY, ABOUT

10:33AM 16   WHAT INFORMATION TO REMOVE TO GIVE ME THE CORRECT -- YOU KNOW,

10:33AM 17   AN ACCURATE PATIENT RESULT AT THAT POINT.

10:33AM 18   Q.   CAN I ASK YOU TO PLEASE LOOK AT TAB 1512 IN THE BINDER.

10:34AM 19        IS TAB 1512 AN EMAIL FROM YOU AND OTHER INDIVIDUALS AT

10:34AM 20   THERANOS RELATING TO THE PROCESSING OF TESTS AND QUALITY

10:34AM 21   CONTROL PROCEDURES?

10:34AM 22   A.   YES.

10:34AM 23           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1512.

10:34AM 24           MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:34AM 25           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

CHEUNG DIRECT BY MR. BOSTIC (RES.)                    1222

10:34AM   1            (GOVERNMENT'S EXHIBIT 1512 WAS RECEIVED IN EVIDENCE.)

10:34AM   2                 MR. BOSTIC:  AND, MS. WACHS, IF WE CAN START WITH

10:34AM   3      THE BOTTOM OF PAGE 2, PLEASE.

10:34AM   4      Q.   MS. CHEUNG, DO YOU SEE AN EMAIL TO DR. ROSENDORFF AND TO

10:34AM   5      YOU AND OTHERS AT THERANOS RELATING TO FOUR DIFFERENT ASSAYS

10:34AM   6      RUN ON THE EDISON?

10:34AM   7      A.   YES.

10:34AM   8      Q.   AND WHAT WERE THOSE FOUR ASSAYS?

10:34AM   9      A.   SO THESE FOUR ASSAYS ARE TOTAL T4, TOTAL T3, TT4, TT3,

10:35AM  10      TESTOSTERONE, THE ACRONYM TST, AND FSH.

10:35AM  11      Q.   AND WHAT GROUP OF INDIVIDUALS IS DR. ROSENDORFF EMAILING

10:35AM  12      HERE THAT YOU'RE APART OF?

10:35AM  13      A.   THESE ARE ALL THE CLINICAL LAB ASSOCIATES THAT

10:35AM  14      SPECIFICALLY WORK WITH THE EDISON DEVICES.

10:35AM  15      Q.   LET'S GO TO PAGE 1 OF THIS DOCUMENT, PLEASE, AND LET'S

10:35AM  16      ZOOM IN ON THE BOTTOM HALF OF THE PAGE.

10:35AM  17            THERE'S AN EMAIL AT THE BOTTOM HERE FROM SURAJ SAKSENA

10:35AM  18      REPORTING A CONCERN REGARDING STABILITY.  IT SAYS, "SINCE WE DO

10:35AM  19      NOT HAVE STABILITY DATA ON THE HCV CAPSYS CARTRIDGES."

10:35AM  20            DO YOU SEE THAT?

10:35AM  21      A.   YES.

10:35AM  22      Q.   AND THERE'S A MENTION BELOW, "IF THIS QC FAILS, WE WILL

10:35AM  23      NOT RUN THE PATIENT SAMPLE.  WE WILL HAVE TO RECALIBRATE WITH

10:36AM  24      FRESH REAGENTS."

10:36AM  25            DO YOU SEE THAT?

ER-674

10:36AM  1    A.   YES.

10:36AM  2    Q.   AND CAN YOU EXPLAIN HERE WHAT THAT IS SAYING AND WHAT THAT

10:36AM  3    REFERS TO?

10:36AM  4    A.   SO ESSENTIALLY I WAS TOLD THAT I WOULD HAVE TO RUN A

10:36AM  5    HEPATITIS C SAMPLE, WHICH AT THAT TIME WE HAD NEVER DONE

10:36AM  6    BEFORE.  AND THE REAGENTS IN THE CARTRIDGES THAT WE HAD BUILT

10:36AM  7    FOR HEPATITIS C, I DIDN'T HAVE CONFIDENCE THAT THEY HAD ENOUGH

10:36AM  8    STABILITY, THAT THEY MAY HAVE BEEN EXPIRED.

10:36AM  9         SO ESSENTIALLY SURAJ IS TELLING ADAM AND THE TEAM THAT,

10:36AM  10   YOU KNOW, WE'RE GOING TO TRY AND SEE IF THE QC'S PASS UTILIZING

10:36AM  11   THESE REAGENTS THAT HAVE -- THAT ARE MAY BE GOOD, OR MAYBE NOT

10:36AM  12   GOOD, AND THEN FROM THERE WE'LL DETERMINE WHETHER WE NEED TO

10:36AM  13   RECALIBRATE THE SYSTEM OR WHETHER WE POTENTIALLY RUN THE

10:36AM  14   PATIENT SAMPLE BASED ON THOSE RESULTS.

10:36AM  15   Q.   I'LL DRAW YOUR ATTENTION TO AN EMAIL THAT SAYS IT'S FROM

10:37AM  16   ROMINA RIENER.

10:37AM  17        DO YOU SEE THAT ON THE SCREEN?

10:37AM  18   A.   YES.

10:37AM  19   Q.   AND THE EMAIL IS SIGNED ERIKA THOUGH.

10:37AM  20        DO YOU SEE THAT?

10:37AM  21   A.   YES.

10:37AM  22   Q.   AND CAN YOU EXPLAIN THAT DISCREPANCY?

10:37AM  23   A.   SO ALL OF US HAD THE SAME COMPUTERS AT THE LAB BENCHES,

10:37AM  24   AND I ACCIDENTALLY SENT AN EMAIL FROM ROMINA'S COMPUTER INSTEAD

10:37AM  25   OF MY COMPUTER.