No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 7 OF 26 (PAGES ER-1523 – ER-1822)**

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

       UNITED STATES OF AMERICA,          )
6                                         )  CR-18-00258-EJD
                        PLAINTIFF,        )
7                                         )  SAN JOSE, CALIFORNIA
                  VS.                     )
8                                         )  APRIL 6, 2022
       RAMESH "SUNNY" BALWANI,            )
9                                         )  VOLUME 14
                        DEFENDANT.        )
10     _____   )  PAGES 2177 - 2443

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14     A P P E A R A N C E S:

15     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                              BY:   JOHN C. BOSTIC
16                                  JEFFREY B. SCHENK
                              150 ALMADEN BOULEVARD, SUITE 900
17                            SAN JOSE, CALIFORNIA 95113

18                            BY:   ROBERT S. LEACH
                                    KELLY VOLKAR
19                            1301 CLAY STREET, SUITE 340S
                              OAKLAND, CALIFORNIA 94612
20
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
       OFFICIAL COURT REPORTERS:
22                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                               CERTIFICATE NUMBER 8074
23                             LEE-ANNE SHORTRIDGE, CSR, CRR
                               CERTIFICATE NUMBER 9595
24
              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                  TRANSCRIPT PRODUCED WITH COMPUTER

| | | |
|---|---|---|
| 09:12AM | 1 | THE COURT:  ALL RIGHT.  WE'LL TAKE A BREAK AND BRING |
| 09:12AM | 2 | DR. PANDORI ON AND COMPLETE HIS TESTIMONY THIS MORNING. |
| 09:12AM | 3 | WHAT DO WE HAVE LEFT WITH HIM DO YOU THINK?  ANY IDEA? |
| 09:12AM | 4 | MR. CAZARES:  1 TO 1.5. |
| 09:12AM | 5 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 09:12AM | 6 | MR. BRECHER:  THANK YOU, YOUR HONOR. |
| 09:12AM | 7 | (RECESS FROM 9:12 A.M. UNTIL 9:23 A.M.) |
| 09:23AM | 8 | (JURY IN AT 9:23 A.M.) |
| 09:23AM | 9 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 09:23AM | 10 | WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT. |
| 09:23AM | 11 | MR. BALWANI IS PRESENT. |
| 09:23AM | 12 | OUR JURY AND ALTERNATES ARE PRESENT. |
| 09:23AM | 13 | GOOD MORNING, LADIES AND GENTLEMEN. |
| 09:23AM | 14 | BEFORE WE BEGIN, LET ME ASK YOU THAT QUESTION AGAIN. |
| 09:23AM | 15 | DURING THE BREAK DID ANY OF YOU HAVE CAUSE TO DO ANY |
| 09:23AM | 16 | INVESTIGATION, DISCUSS OR COME UPON ANY INFORMATION REGARDING |
| 09:24AM | 17 | THIS CASE? |
| 09:24AM | 18 | IF SO, IF YOU WOULD PLEASE RAISE YOUR HAND. |
| 09:24AM | 19 | I SEE NO HANDS.  THANK YOU. |
| 09:24AM | 20 | WE ARE GOING TO RESUME, I BELIEVE, WITH DR. PANDORI, |
| 09:24AM | 21 | MR. BOSTIC? |
| 09:24AM | 22 | MR. BOSTIC:  YES, YOUR HONOR, THE WITNESS IS |
| 09:24AM | 23 | AVAILABLE. |
| 09:24AM | 24 | THE COURT:  GREAT.  LET'S CALL HIM, RECALL HIM. |
| 09:24AM | 25 | SIR, IF YOU WOULD JUST RETURN TO THE STAND, PLEASE. |

09:24AM  1    AGAIN, MAKE YOURSELF COMFORTABLE.

09:24AM  2         **(GOVERNMENT'S WITNESS, MARK PANDORI, WAS RESWORN.)**

09:24AM  3              THE COURT:  AND WHEN YOU ARE COMFORTABLE -- YES, YOU

09:24AM  4    CAN REMOVE YOUR MASK.

09:24AM  5         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE JUST STATE YOUR

09:25AM  6    NAME AGAIN, PLEASE.

09:25AM  7              THE WITNESS:  MARK PANDORI.

09:25AM  8              THE COURT:  THANK YOU.

09:25AM  9         COUNSEL.

09:25AM 10              MR. CAZARES:  AND, YOUR HONOR, MAY I HAND UP A

09:25AM 11    BINDER TO THE COURT?

09:25AM 12              THE COURT:  YES.

09:25AM 13              MR. CAZARES:  THE DEFENSE ALREADY HAS A COPY,

09:25AM 14    YOUR HONOR.

09:25AM 15              THE COURT:  GREAT.

09:25AM 16              MR. CAZARES:  (HANDING.)

09:25AM 17         AND MAY I REMOVE MY MASK, YOUR HONOR?

09:25AM 18              THE COURT:  YES.

09:25AM 19                   **CROSS-EXAMINATION (RESUMED)**

09:25AM 20    BY MR. CAZARES:

09:25AM 21    Q.   GOOD MORNING, DR. PANDORI.

09:25AM 22    A.   GOOD MORNING.

09:25AM 23    Q.   I WANT TO PICK UP WHERE WE LEFT OFF ON FRIDAY.  AND WITHIN

09:25AM 24    THE BENCH THERE YOU HAVE SOME BINDERS, AND I BELIEVE IN YOUR

09:25AM 25    VOLUME 2 YOU SHOULD HAVE AN EXHIBIT MARKED NUMBER 20279.

| | | |
|---|---|---|
| 09:25AM | 1 | 20279. |
| 09:25AM | 2 | A.   YES. |
| 09:25AM | 3 | Q.   DO YOU HAVE 20279 IN FRONT OF YOU? |
| 09:25AM | 4 | A.   YES. |
| 09:25AM | 5 | Q.   OKAY.  AND DO YOU RECALL THAT WE WERE DISCUSSING THIS |
| 09:25AM | 6 | EXHIBIT?  IT'S AN EMAIL DATED MAY 30, 2014. |
| 09:26AM | 7 | DO YOU SEE THAT? |
| 09:26AM | 8 | A.   YES. |
| 09:26AM | 9 | Q.   AND THE COVER SHEET APPEARS TO BE ADDRESSED TO |
| 09:26AM | 10 | DR. ADAM ROSENDORFF; CORRECT? |
| 09:26AM | 11 | A.   YES. |
| 09:26AM | 12 | Q.   AND ITS SUBJECT LINE IS TRANSITION REPORT. |
| 09:26AM | 13 | DO YOU SEE THAT AS WELL? |
| 09:26AM | 14 | A.   YES. |
| 09:26AM | 15 | Q.   AND I ASKED YOU ON FRIDAY TO TAKE A LOOK AT THE |
| 09:26AM | 16 | ATTACHMENT. |
| 09:26AM | 17 | CAN YOU DO THAT AGAIN? |
| 09:26AM | 18 | DO YOU SEE THERE IS A MULTI-PAGE MEMO ATTACHED TO THE |
| 09:26AM | 19 | EMAIL? |
| 09:26AM | 20 | DO YOU SEE THAT? |
| 09:26AM | 21 | A.   YES. |
| 09:26AM | 22 | Q.   AND AT THE TOP OF THE MEMO IT HAS A TYPE STAMPED 52930? |
| 09:26AM | 23 | A.   IT HAS THE NUMBERS 5, 29, AND 30 ON THERE. |
| 09:26AM | 24 | Q.   AND THE INITIALS M.W. PANDORI. |
| 09:26AM | 25 | DO YOU SEE THAT? |

09:26AM  1     A.   YES.

09:26AM  2     Q.   AND THOSE ARE YOUR INITIALS?

09:26AM  3     A.   THOSE ARE MY INITIALS, AND MY LAST NAME.

09:26AM  4     Q.   OKAY.  AND WHEN I ASKED YOU ABOUT THE EMAIL AND THE MEMO,

09:26AM  5     THE TRANSITION REPORT REFLECTED IN 20279 ON FRIDAY, YOU

09:26AM  6     TESTIFIED THAT YOU HAD NEVER SEEN THE ATTACHED REPORT BEFORE;

09:27AM  7     CORRECT?

09:27AM  8     A.   NO.  I TESTIFIED THAT IT WAS UNFAMILIAR TO ME.

09:27AM  9     Q.   BUT YOU FIRST SAID THAT YOU HAD NEVER SEEN THE ATTACHED

09:27AM 10     REPORT BEFORE; CORRECT?

09:27AM 11     A.   I DON'T RECALL MY EXACT WORDS, BUT I RECALL NOT

09:27AM 12     RECOGNIZING THE DOCUMENT.

09:27AM 13     Q.   THERE SHOULD BE A BINDER THERE ON YOUR DESK WITH SOME

09:27AM 14     PRIOR STATEMENTS.  I'M LOOKING FOR EXHIBIT 28456, 28456.

09:27AM 15          DO YOU HAVE THAT?

09:27AM 16     A.   YES.

09:27AM 17     Q.   AT 28456, IT'S A TRANSCRIPT FROM FRIDAY.

09:27AM 18          DO YOU SEE THAT?

09:27AM 19     A.   YES.

09:27AM 20     Q.   APRIL 1, '22?

09:27AM 21     A.   YES.

09:27AM 22     Q.   AND IF YOU COULD TURN TO PAGE 1865.  ARE YOU AT 1865?

09:27AM 23     A.   NO.

09:27AM 24     Q.   OKAY.  SO LET ME KNOW WHEN YOU'RE THERE.

09:28AM 25     A.   I AM.

PANDORI CROSS BY MR. CAZARES (RES.)                              2203

09:28AM  1      Q.   AND LOOK AT LINES 1 TO 3.  READ THAT TO YOURSELF.

09:28AM  2      A.   YES, I SEE THAT.

09:28AM  3      Q.   AND YOU TESTIFIED ON FRIDAY THAT YOU NEVER SAW THE REPORT

09:28AM  4      BEFORE; CORRECT?

09:28AM  5      A.   THAT'S WHAT IT SAYS.

09:28AM  6      Q.   OKAY.  WHEN I SHOWED YOU EXHIBIT 20279 ON FRIDAY, YOU ALSO

09:28AM  7      SAID THAT YOU DID NOT SEND THE EMAIL AND ATTACHED REPORT TO

09:28AM  8      DR. ROSENDORFF; CORRECT?

09:28AM  9      A.   WELL, NO.  I SAID THE EMAIL DOES NOT HAVE A FROM LINE, SO

09:28AM  10     I CAN'T TELL WHO SENT THAT EMAIL.

09:28AM  11     Q.   WITHIN THAT SAME EXHIBIT, 28456, THE TRANSCRIPT FROM

09:28AM  12     FRIDAY, PAGE 1863.

09:28AM  13     A.   YES, I'M THERE.

09:28AM  14     Q.   LINE 16 TO 17, READ THAT TO YOURSELF?

09:29AM  15     A.   YES.

09:29AM  16     Q.   YOU TESTIFIED ON FRIDAY THAT YOU DID NOT SEND THE EMAIL

09:29AM  17     AND REPORT TO DR. ROSENDORFF; CORRECT?

09:29AM  18     A.   THAT'S WHAT IT SAYS HERE.

09:29AM  19     Q.   OKAY.  AND THAT'S THE TRANSCRIPT FROM FRIDAY?

09:29AM  20     A.   I'D HAVE TO GO TO THE FRONT OF THE DOCUMENT TO CONFIRM

09:29AM  21     THAT.

09:29AM  22     Q.   BUT THE DOCUMENT THAT YOU'RE LOOKING AT, EXHIBIT 28456,

09:29AM  23     SAYS THAT YOU TOLD THIS JURY THAT YOU DID NOT SEND THIS EMAIL

09:29AM  24     AND REPORT TO DR. ROSENDORFF; CORRECT?

09:29AM  25          MR. BOSTIC:  OBJECTION.

| | | |
|---|---|---|
| 09:29AM | 1 | THE COURT:  SUSTAINED. |
| 09:29AM | 2 | BY MR. CAZARES: |
| 09:29AM | 3 | Q.   WITH RESPECT TO EXHIBIT 20279, DR. PANDORI, UPON ALSO |
| 09:29AM | 4 | SEEING THAT, YOU DID NOT RECALL AUTHORING THE REPORT; CORRECT? |
| 09:29AM | 5 | A.   I DO NOT RECALL AUTHORING IT. |
| 09:29AM | 6 | MR. CAZARES:  YOUR HONOR, PURSUANT TO THE FOUNDATION |
| 09:29AM | 7 | WE LAID ON FRIDAY, MOVE TO ADMIT EXHIBIT 20279 AND THE |
| 09:29AM | 8 | ATTACHMENT. |
| 09:29AM | 9 | MR. BOSTIC:  NO OBJECTION. |
| 09:29AM | 10 | THE COURT:  IT'S ADMITTED. |
| 09:29AM | 11 | (DEFENDANT'S EXHIBIT 20279 WAS RECEIVED IN EVIDENCE.) |
| 09:29AM | 12 | MR. CAZARES:  MAY WE PUT THE FIRST PAGE UP ON THE |
| 09:30AM | 13 | SCREEN? |
| 09:30AM | 14 | THE COURT:  IT MAY BE PUBLISHED. |
| 09:30AM | 15 | BY MR. CAZARES: |
| 09:30AM | 16 | Q.   AND YOU CAN LOOK AT THE HARD COPY DOCUMENT OR THE SCREEN, |
| 09:30AM | 17 | DR. PANDORI, WHEN THAT COMES UP. |
| 09:30AM | 18 | DO YOU SEE IT UP ON THE SCREEN, DR. PANDORI, |
| 09:30AM | 19 | EXHIBIT 20279? |
| 09:30AM | 20 | A.   YES. |
| 09:30AM | 21 | Q.   OKAY.  AND AT THE TOP OF THE MESSAGE, IT APPEARS TO BE A |
| 09:30AM | 22 | TRUNCATED EMAIL, IT SAYS TO ADAM_ROSENDORFF@THERANOS.COM. |
| 09:30AM | 23 | DO YOU SEE THAT? |
| 09:30AM | 24 | A.   YES, I SEE WHAT YOU'VE HIGHLIGHTED. |
| 09:30AM | 25 | Q.   OKAY.  AND THE SUBJECT IS TRANSITION REPORT? |

09:30AM  1      A.   YES.

09:30AM  2      Q.   5/30/2014, THAT'S MAY 30TH, 2014.

09:30AM  3           DO YOU SEE THAT?

09:30AM  4      A.   I SEE THAT.

09:30AM  5      Q.   AND THERE'S A REFERENCE DOCUMENT ATTACHED, IT SAYS

09:30AM  6      TRANSITION MWP 05 2014.DOCX.

09:31AM  7           DO YOU SEE THAT?

09:31AM  8      A.   YES.

09:31AM  9      Q.   AND THE EMAIL SAYS "ATTACHED.

09:31AM 10           "A TRANSITION REPORT.

09:31AM 11           "HOPE THIS HELPS.

09:31AM 12           MARK."

09:31AM 13           DO YOU SEE THAT?

09:31AM 14      A.   I SEE WHAT YOU'VE HIGHLIGHTED, YES.

09:31AM 15      Q.   THOSE ARE YOUR WORDS; CORRECT?

09:31AM 16      A.   THERE'S NO FROM LINE ON THE EMAIL.  I DON'T KNOW IF I --

09:31AM 17      Q.   I'M NOT ASKING YOU THAT.  THOSE ARE YOUR WORDS --

09:31AM 18              THE COURT:  LET HIM FINISH HIS ANSWER, PLEASE.

09:31AM 19           GO AHEAD.

09:31AM 20              THE WITNESS:  NORMALLY IF I'M ASKED THAT QUESTION

09:31AM 21      ABOUT AN EMAIL, I WOULD WANT TO SEE THE FROM LINE.

09:31AM 22      BY MR. CAZARES:

09:31AM 23      Q.   WE CAN GET THERE.  BUT I'M ASKING YOU, ARE THE TYPEWRITTEN

09:31AM 24      WORDS IN EXHIBIT 20279 UP ON THE SCREEN YOUR TYPEWRITTEN WORDS

09:31AM 25      TO DR. ROSENDORFF?

09:31AM  1      A.   I DON'T KNOW.

09:31AM  2      Q.   IF YOU CAN TURN TO THE NEXT PAGE, WE CAN PUT IT UP THE

09:31AM  3   SCREEN, THE ATTACHMENT REFERENCED IN THE EMAIL, AND YOU SEE AT

09:31AM  4   THE TOP THAT WE MENTIONED BEFORE, THERE'S THE NUMBER 5/29/30.

09:31AM  5        DO YOU SEE THAT?

09:31AM  6      A.   YES.

09:31AM  7      Q.   AND ON 5-29 OF 2014, MAY 29TH OF 2014, YOU WERE STILL

09:32AM  8   WORKING AT THERANOS; CORRECT?

09:32AM  9      A.   I DON'T KNOW.

09:32AM  10     Q.   IT'S A YES OR NO.

09:32AM  11     A.   I DON'T KNOW WHAT DATE.  DO YOU HAVE ANY DOCUMENTS THAT I

09:32AM  12  CAN REFRESH MY MEMORY ON WHAT DAY I LEFT?

09:32AM  13     Q.   SO IT'S YOUR TESTIMONY THAT YOU DON'T RECALL WHEN YOU LEFT

09:32AM  14  THERANOS PRECISELY?

09:32AM  15     A.   I DON'T REMEMBER THE EXACT DATE.  I TRIED TO DOUBLE-CHECK

09:32AM  16  MY MEMORY IN THAT REGARD WITH SOME DOCUMENTATION.  IT LOOKS

09:32AM  17  LIKE --

09:32AM  18     Q.   DR. PANDORI, THERE'S NO FURTHER QUESTION PENDING.

09:32AM  19          MR. BOSTIC:  I ASK THAT THE WITNESS BE ALLOWED TO

09:32AM  20  COMPLETE HIS ANSWER.

09:32AM  21       ALSO, OBJECTION.  ARGUMENTATIVE.

09:32AM  22          THE COURT:  LET ME LET YOU WAIT FOR HIS NEXT

09:32AM  23  QUESTION AND THEN YOU CAN ANSWER.

09:32AM  24  BY MR. CAZARES:

09:32AM  25     Q.   DR. PANDORI, THE ATTACHMENT TO EXHIBIT 20279, CONTINUING

09:32AM 1    ON THAT FIRST PAGE, THERE'S A HEADER AND YOU WILL SEE IT SAYS

09:32AM 2    TRANSITION INDEX.

09:32AM 3        DO YOU SEE THAT?

09:32AM 4    A.   YES.

09:32AM 5    Q.   AND THEN THERE ARE FOUR CATEGORIES:  SUBJECT A, HIV/HCV

09:32AM 6    SMALLER VOLUME PROJECT.

09:32AM 7        DO YOU SEE THAT?

09:32AM 8    A.   YES.

09:32AM 9    Q.   AND HIV AND HCV ARE INFECTIOUS DISEASE MATTERS THAT YOU

09:33AM 10   WORKED ON AT THERANOS; CORRECT?

09:33AM 11   A.   CORRECT.  HCV I RECALL.  HIV LESS SO.

09:33AM 12   Q.   AND THEN SUBJECT MATTER B, EMC/BUGS.

09:33AM 13       BUGS RELATES TO THE INFECTIOUS DISEASE LAB AT THERANOS;

09:33AM 14   CORRECT?

09:33AM 15   A.   THAT WAS MY UNDERSTANDING.

09:33AM 16   Q.   AND YOU DID SOME WORK IN RELATION TO THE INFECTIOUS

09:33AM 17   DISEASE LAB AT THERANOS; CORRECT?

09:33AM 18   A.   YES.

09:33AM 19   Q.   AND SUBJECT MATTER C SAYS, DAILY CLIA ADMIN ISSUES.

09:33AM 20       DO YOU SEE THAT?

09:33AM 21   A.   YES.

09:33AM 22   Q.   AND YOU DID SOME ADMINISTRATION ISSUES, MANAGERIAL MATTERS

09:33AM 23   THAT YOU HANDLED WITHIN THE CLIA LAB AT THERANOS; CORRECT?

09:33AM 24   A.   CORRECT.

09:33AM 25   Q.   AND THEN UNDER SUBJECT MATTER D, THERE'S AN OTHER, OTHER

09:33AM  1    NOTES.

09:33AM  2        DO YOU SEE THAT?

09:33AM  3    A.   YES.

09:33AM  4    Q.   AND YOU STILL DON'T RECALL AUTHORING THIS DOCUMENT?  IS

09:33AM  5    THAT YOUR TESTIMONY?

09:33AM  6    A.   I DON'T RECALL.

09:33AM  7    Q.   IF WE COULD TURN TO PAGE 006 OF THE DOCUMENT IN THE LOWER

09:33AM  8    QUARTILE, AND PUT THAT ON THE SCREEN?

09:33AM  9    A.   YES.

09:33AM  10   Q.   AND UNDER THE SUBJECT MATTER D, THE FOURTH OF THE ISSUES

09:34AM  11   IDENTIFIED ON THE FIRST PAGE, YOU SEE HERE IT SAYS, OTHER

09:34AM  12   NOTES.

09:34AM  13       DO YOU SEE THAT?

09:34AM  14   A.   YES.

09:34AM  15   Q.   AND THEN THE PARAGRAPH BEGINS, "EDISONS" COLON.

09:34AM  16       DO YOU SEE THAT?

09:34AM  17   A.   YES.

09:34AM  18   Q.   AND THOSE ARE YOUR WORDS; CORRECT?  THIS PARAGRAPH WAS

09:34AM  19   WRITTEN BY YOU?

09:34AM  20   A.   I DON'T RECALL.

09:34AM  21   Q.   THE PARAGRAPHS CONTINUES, "THE PRIMARY CONCERN IN THIS

09:34AM  22   SECTION IS THE AVAILABLE NUMBER OF DEVICES."

09:34AM  23       DO YOU SEE THAT?

09:34AM  24   A.   YES.

09:34AM  25   Q.   AND THAT'S EDISON DEVICES IS THE PRIMARY CONCERN REFLECTED

PANDORI CROSS BY MR. CAZARES (RES.)                                    2209

09:34AM  1      IN THIS DOCUMENT; CORRECT?

09:34AM  2      A.   I BELIEVE THAT WOULD BE THE ANTECEDENT, YEP.

09:34AM  3      Q.   THE NUMBER OF DEVICES RELATED -- THAT THIS IS RELATING TO

09:34AM  4      IS EDISONS; CORRECT?

09:34AM  5      A.   YES.

09:34AM  6      Q.   AND THEN THE PARAGRAPH CONTINUES, "FOR FT4, VIT D, AND

09:34AM  7      TSH," LET'S STOP THERE.

09:34AM  8          FT4 IS A TEST THAT WAS RUN ON THE EDISON DEVICE AT THAT

09:34AM  9      TIME; CORRECT?

09:34AM 10      A.   YES.

09:34AM 11      Q.   AND VIT D, VITAMIN D WAS ALSO A TEST RUN ON THE EDISON AT

09:35AM 12      THAT TIME; CORRECT?

09:35AM 13      A.   CORRECT.

09:35AM 14      Q.   AND THEN TSH WAS ALSO RUN ON EDISON?

09:35AM 15      A.   YES.

09:35AM 16      Q.   AND THAT WAS USED FOR PATIENT TESTING AT THE TIME;

09:35AM 17      CORRECT?

09:35AM 18      A.   CORRECT.

09:35AM 19      Q.   AND THEN THE PARAGRAPH CONTINUES.

09:35AM 20          "AT LEAST A DOUBLING OF THE NUMBER OF UNITS IS NECESSARY,

09:35AM 21      IN MY OPINION."

09:35AM 22          DO YOU SEE THAT?

09:35AM 23      A.   I SEE THAT.

09:35AM 24      Q.   AND THOSE ARE YOUR WORDS, CORRECT, "AT LEAST A DOUBLING OF

09:35AM 25      THE NUMBER OF UNITS," MEANING EDISONS, "IS NECESSARY IN MY

09:35AM  1    OPINION."

09:35AM  2         CORRECT?  THOSE ARE YOUR WORDS?

09:35AM  3    A.   I DON'T REMEMBER EVER WRITING THAT.

09:35AM  4    Q.   THIS IS MAY 30, 2014, AN EMAIL TO DR. ROSENDORFF THAT YOU

09:35AM  5    SENT; IS THAT RIGHT?

09:35AM  6              MR. BOSTIC:  OBJECTION.  ASKED AND ANSWERED.

09:35AM  7              THE COURT:  SUSTAINED.

09:35AM  8    BY MR. CAZARES:

09:35AM  9    Q.   MAY 30, 2014 IS MORE THAN A WEEK AFTER THE MAY 19TH, 2014,

09:35AM 10    CONVERSATION THAT YOU SAY YOU HAD WITH MS. HOLMES AND

09:35AM 11    MR. BALWANI THAT LED TO YOUR RESIGNATION; CORRECT?

09:35AM 12    A.   CAN YOU REPEAT THE QUESTION?

09:35AM 13    Q.   MAY 19TH, 2014, IS THE DATE THAT YOU TOLD THIS JURY THAT

09:35AM 14    YOU HAD A CONVERSATION WITH ELIZABETH HOLMES AND SUNNY BALWANI

09:36AM 15    THAT LED TO YOUR RESIGNATION?

09:36AM 16    A.   I THINK IT WAS ON OR AROUND THAT DATE.

09:36AM 17    Q.   YOU SAID WITHIN A DAY OR SO; CORRECT?

09:36AM 18    A.   RIGHT.

09:36AM 19    Q.   BECAUSE MAY 19TH IS YOUR BIRTHDAY AND THAT'S WHY YOU

09:36AM 20    REMEMBER IT; CORRECT?

09:36AM 21    A.   RIGHT.  BUT I STILL DON'T KNOW EXACTLY WHAT DAY I LEFT.

09:36AM 22    IF YOU HAVE A DOCUMENT WHICH CAN HELP ASSIST MY MEMORY IN THAT

09:36AM 23    REGARD, THAT WOULD BE VERY HELPFUL.

09:36AM 24    Q.   YOU'RE HAVING A TOUGH TIME REMEMBERING THINGS, YEAH?

09:36AM 25    A.   WHEN I LEFT, THE DATE THAT I LEFT THE COMPANY, WHICH

PANDORI CROSS BY MR. CAZARES (RES.)                    2211

09:36AM  1      HAPPENED EIGHT YEARS AGO, YES.

09:36AM  2      Q.   THE DATE OF EXHIBIT 20279, WHICH IS MAY 30, 2014, IS

09:36AM  3      SUBSEQUENT TO YOUR BIRTHDAY; CORRECT?

09:36AM  4      A.   YES.

09:36AM  5      Q.   OKAY.  BACK TO PAGE 6 OF THE EXHIBIT.  THE DOCUMENT

09:36AM  6      CONTINUES, "THIS IS ONE OF THE SECTIONS WHERE MORE STAFF (LAB

09:36AM  7      TECHS) WOULD BENEFIT THE MOST."

09:36AM  8           DO YOU SEE THAT?

09:36AM  9      A.   TO WHERE ARE YOU REFERRING?

09:36AM 10      Q.   AGAIN UNDER OTHER NOTES?

09:36AM 11      A.   YES.

09:37AM 12      Q.   "EDISONS:  THE PRIMARY CONCERN IN THIS SECTION IS THE

09:37AM 13      AVAILABLE NUMBER OF DEVICES."

09:37AM 14           YOU SEE THAT?

09:37AM 15      A.   I DO.

09:37AM 16      Q.   AND THEN "FOR FT4, VIT D AND TSH, AT LEAST A DOUBLING OF

09:37AM 17      THE NUMBER OF UNITS IS NECESSARY, IN MY OPINION."

09:37AM 18           DO YOU SEE THAT?

09:37AM 19      A.   I DO.

09:37AM 20      Q.   AND THEN IT FOLLOWS, "THIS IS ONE OF THE SECTIONS WHERE

09:37AM 21      MORE STAFF (LAB TECHS) WOULD BENEFIT THE MOST."

09:37AM 22           DO YOU SEE THAT?

09:37AM 23      A.   YES.

09:37AM 24      Q.   AND AT THE TIME THERANOS WAS HIRING MORE STAFF IN THE LAB;

09:37AM 25      CORRECT?

09:37AM 1    A.   YES.

09:37AM 2    Q.   AND THEN THE MEMO CONTINUES.

09:37AM 3         "I HAVE BEEN INFORMED THAT THE UNITS REQUIRE SERVICE WITH

09:37AM 4    HIGH FREQUENCY, SO A CONTINUOUS MONITORING OF THIS SECTION IS

09:37AM 5    WARRANTED."

09:37AM 6         DO YOU SEE THAT?

09:37AM 7    A.   YES.

09:37AM 8    Q.   YOU WROTE THAT; CORRECT?

09:37AM 9    A.   I DON'T RECALL.

09:37AM 10   Q.   NOW, YOU HAD TESTIFIED BEFORE TO THIS JURY ON FRIDAY THAT

09:37AM 11   YOU TOLD DR. ROSENDORFF ON MANY OCCASIONS TO STOP USING THE

09:37AM 12   EDISONS.

09:37AM 13        THAT'S WHAT YOU TOLD THIS JURY; CORRECT?

09:37AM 14   A.   YES.

09:37AM 15   Q.   THE MEMO REFLECTED HERE AT 20279 SAYS TO DOUBLE THE NUMBER

09:38AM 16   OF EDISONS ON MAY 30, 2014; CORRECT?

09:38AM 17   A.   CORRECT.

09:38AM 18   Q.   IT DOESN'T SAY STOP USING THEM IN THIS MEMO, DOES IT?

09:38AM 19   A.   CORRECT.

09:38AM 20   Q.   DR. PANDORI, IF YOU COULD TAKE A LOOK WITHIN THE DOCUMENTS

09:38AM 21   THAT YOU HAVE FOR EXHIBIT 20498, 20498.  THAT WOULD BE IN THE

09:38AM 22   SMALL BINDER IN FRONT OF YOU THAT SAYS PANDORI, MARK PANDORI ON

09:39AM 23   THE FRONT.

09:39AM 24        20498.

09:39AM 25   A.   I'VE LOCATED IT.

ER-1538

PANDORI CROSS BY MR. CAZARES (RES.)                        2213

09:39AM   1    Q.   OKAY.  20498 IS ANOTHER EMAIL DATED MAY 30, 2014.

09:39AM   2         DO YOU SEE THAT?

09:39AM   3    A.   YES.

09:39AM   4    Q.   AND THAT EMAIL APPEARS TO BE FROM YOURSELF.

09:39AM   5         DO YOU SEE THAT?

09:39AM   6    A.   YES.

09:39AM   7    Q.   TO MONA RAMAMURTHY, THE HEAD OF HR; CORRECT?

09:39AM   8    A.   YES.

09:39AM   9    Q.   AND TO MR. BALWANI AT THEIR THERANOS EMAIL ADDRESSES?

09:39AM  10    A.   YES.

09:39AM  11    Q.   AND THE SUBJECT LINE, TRANSITION REPORT.

09:39AM  12         DO YOU SEE THAT AS WELL?

09:39AM  13    A.   YES.

09:39AM  14         MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT

09:39AM  15    EXHIBIT 20498.  THIS IS ALSO THE SUBJECT TO THE EMAIL

09:39AM  16    STIPULATION.

09:39AM  17         MR. BOSTIC:  NO OBJECTION.

09:39AM  18         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:39AM  19    (DEFENDANT'S EXHIBIT 20498 WAS RECEIVED IN EVIDENCE.)

09:39AM  20    BY MR. CAZARES:

09:39AM  21    Q.   SO YOU SEE, DR. PANDORI, UP ON THE SCREEN THE EMAIL

09:40AM  22    APPEARS TO BE FROM YOURSELF.

09:40AM  23         DO YOU SEE THAT?

09:40AM  24    A.   YES.

09:40AM  25    Q.   AND THEN TO MS. RAMAMURTHY AND MR. BALWANI.

PANDORI CROSS BY MR. CAZARES (RES.)                2214

09:40AM   1           DO YOU SEE THAT?

09:40AM   2     A.    YES.

09:40AM   3     Q.    AND SO YOU SENT THIS EMAIL; CORRECT?

09:40AM   4     A.    I DON'T RECALL.  ACCORDING TO THE HEADER, YES.

09:40AM   5     Q.    MAY 30, 2014.  SO YOU WERE STILL WORKING THAT DAY AT

09:40AM   6     THERANOS; CORRECT?

09:40AM   7     A.    I DON'T RECALL WHAT DAY I LEFT THERANOS.

09:40AM   8     Q.    AND THE ATTACHMENT TO THIS DOCUMENT, IT SAYS TRANSITION

09:40AM   9     MWP 05 2014.DOCX.

09:40AM  10           DO YOU SEE THAT?

09:40AM  11     A.    I DO.

09:40AM  12     Q.    AND THAT'S THE SAME DOCUMENT REFERENCED IN 20279 THAT WE

09:40AM  13     JUST LOOKED AT; CORRECT?

09:40AM  14     A.    I BELIEVE SO, YES.

09:40AM  15     Q.    AND AGAIN, THE SUBJECT LINE OF THIS EMAIL IS TRANSITION

09:40AM  16     REPORT.

09:40AM  17           DO YOU SEE THAT?

09:40AM  18     A.    YES.

09:40AM  19     Q.    AND THE EMAIL FROM YOURSELF READS, "ATTACHED.

09:40AM  20           "A DOCUMENT DETAILING THE STATE OF VARIOUS PROJECTS OR

09:40AM  21     WORKS IN THE CLIA/BUGS LABORATORIES.  IT CONTAINS ADDITIONAL

09:40AM  22     TRANSITIONAL INFORMATION DETAILING THE ADMINISTRATIVE FUNCTIONS

09:40AM  23     WHICH I HAVE BEEN PERFORMING AS NEW EMPLOYEES ARRIVE AND ON A

09:41AM  24     DAILY BASIS.

09:41AM  25           "I WAS GOING TO SHARE THIS WITH ADAM WITH YOUR PERMISSION.

PANDORI CROSS BY MR. CAZARES (RES.)                    2215

09:41AM   1           MARK PANDORI."

09:41AM   2           DO YOU SEE THAT?

09:41AM   3      A.   I DO SEE THAT.

09:41AM   4      Q.   AND YOU SENT THAT?

09:41AM   5      A.   ACCORDING TO THE HEADER.

09:41AM   6      Q.   AND YOU SENT THE MEMO REFLECTED AND ATTACHED IN

09:41AM   7      EXHIBIT 20498 TO DR. ROSENDORFF AS WE'VE ALREADY SEEN; CORRECT?

09:41AM   8      A.   WELL, THAT EMAIL DOESN'T HAVE A FROM LINE ON IT, SO I

09:41AM   9      DON'T RECALL.

09:41AM  10      Q.   SO YOU DON'T -- YOU'RE TELLING THIS JURY YOU DID NOT SEND

09:41AM  11      THE TRANSITION REPORT TO DR. ROSENDORFF?

09:41AM  12           IS THAT WHAT YOU'RE SAYING?

09:41AM  13               MR. BOSTIC:  ASKED AND ANSWERED.

09:41AM  14               THE COURT:  SUSTAINED.

09:41AM  15      BY MR. CAZARES:

09:41AM  16      Q.   IF WE CAN TURN TO THE FRONT PAGE OF THE ATTACHMENT ON

09:41AM  17      20498?

09:41AM  18      A.   I'M THERE.

09:41AM  19      Q.   AND WE'LL PUT IT UP ON THE SCREEN FOR THE JURY.

09:42AM  20           AND YOU SEE IT APPEARS TO BE THE SAME MEMO THAT WAS

09:42AM  21      REFLECTED IN EXHIBIT 20279; CORRECT?

09:42AM  22      A.   IT DOES.

09:42AM  23      Q.   AND IF WE COULD FLIP BACK TO SUBJECT MATTER D ON PAGE 6,

09:42AM  24      THIS MEMO TO MR. BALWANI AND MS. RAMAMURTHY ALSO INCLUDES A

09:42AM  25      PASSAGE ABOUT THE EDISONS.

PANDORI CROSS BY MR. CAZARES (RES.)                    2216

09:42AM 1          DO YOU SEE THAT?

09:42AM 2     A.   YES.

09:42AM 3     Q.   AND THIS SAME MEMO TO MS. RAMAMURTHY AND MR. BALWANI ALSO

09:42AM 4     READS, "THE PRIMARY CONCERN IN THIS SECTION IS THE AVAILABLE

09:42AM 5     NUMBER OF DEVICES."

09:42AM 6          DO YOU SEE THAT?

09:42AM 7     A.   YES, I DO.

09:42AM 8     Q.   AND THIS MEMO TO MR. BALWANI ALSO READS, "FOR FT4, VIT D,

09:42AM 9     AND TSH, AT LEAST A DOUBLING OF THE NUMBER OF UNITS IS

09:42AM 10    NECESSARY, IN MY OPINION."

09:42AM 11         DO YOU SEE THAT?

09:42AM 12    A.   YES.

09:42AM 13    Q.   AND THIS IS A DOCUMENT ATTACHED TO AN EMAIL FROM YOU TO

09:42AM 14    MR. BALWANI; CORRECT?

09:42AM 15    A.   TO MR. BALWANI, YES.

09:42AM 16    Q.   OKAY.  AND THIS IS MAY 30, 2014; CORRECT?

09:42AM 17    A.   THAT'S WHAT IS DATED ON THE EMAIL.

09:42AM 18    Q.   THIS WOULD HAVE BEEN AFTER YOUR DISCUSSION WITH MS. HOLMES

09:42AM 19    AND MR. BALWANI ON OR ABOUT YOUR BIRTHDAY, MAY 19TH, 2014;

09:43AM 20    CORRECT?

09:43AM 21    A.   I DON'T HAVE THE DATE STRAIGHT.  I NEED TO KNOW WHAT DAY

09:43AM 22    THAT HAPPENED.  IF YOU HAVE ANY DOCUMENTS, THAT MIGHT HELP ME.

09:43AM 23    Q.   YOU TOLD THIS JURY THAT YOU HAD THE DISCUSSION WITH

09:43AM 24    MR. BALWANI AND MS. HOLMES, TRIGGERED BY THE "WIRED" ARTICLE

09:43AM 25    THAT LED TO YOUR RESIGNATION WITHIN FIVE MINUTES, ON YOUR

PANDORI CROSS BY MR. CAZARES (RES.)                    2217

09:43AM   1       BIRTHDAY, MAY 19TH, 2014, GIVE OR TAKE A DAY; CORRECT?

09:43AM   2       A.   CORRECT.

09:43AM   3       Q.   AND THIS MEMO THAT YOU'RE SENDING TO MR. BALWANI ON

09:43AM   4       MAY 30, 2014, IS SUBSEQUENT TO THAT DISCUSSION?

09:43AM   5       A.   IT IS, YES.

09:43AM   6       Q.   AND YOU ALSO TESTIFIED TO THIS JURY THAT YOU HAD TWO

09:43AM   7       DISCUSSIONS WITH MR. BALWANI ABOUT THE USE OF EDISONS; CORRECT?

09:43AM   8       A.   I DON'T REMEMBER IF I SAID TWO, BUT THERE WERE

09:43AM   9       DISCUSSIONS.

09:43AM  10       Q.   YOU SAID YOU HAD TWO DISCUSSIONS, ONE WITH MR. BALWANI

09:43AM  11       WHILE THE TWO OF YOU WERE MOVING DEVICES OR EQUIPMENT IN WHICH

09:43AM  12       YOU TOLD HIM THAT THE LAB SHOULD STOP USING THE EDISONS;

09:43AM  13       CORRECT?

09:43AM  14       A.   I DID LET HIM KNOW THAT.

09:43AM  15       Q.   AND THEN YOU SAID YOU HAD ANOTHER DISCUSSION WITH

09:44AM  16       MR. BALWANI ABOUT THE USE OF EDISONS WHERE YOU TOLD HIM TO STOP

09:44AM  17       USING THE EDISONS IN YOUR OFFICE WHERE MR. BALWANI WAS

09:44AM  18       ACCOMPANIED BY TWO PROJECT MANAGERS; CORRECT?

09:44AM  19       A.   WELL, AT THAT TIME I DIDN'T TELL HIM THAT.  I THINK THAT

09:44AM  20       WAS PART OF THE DISCUSSION.

09:44AM  21       Q.   AND YOU TESTIFIED ON FRIDAY THAT BOTH OF THOSE DISCUSSIONS

09:44AM  22       WITH MR. BALWANI ABOUT THE USE OF THE EDISONS TOOK PLACE IN

09:44AM  23       MARCH OR APRIL OF 2014; CORRECT?

09:44AM  24           THAT'S WHAT YOU TESTIFIED TO?

09:44AM  25       A.   CORRECT.

ER-1543

PANDORI CROSS BY MR. CAZARES (RES.)                    2218

09:44AM  1    Q.   SO THIS EMAIL WITH THE ATTACHMENT AND THE REPORT TO

09:44AM  2    MR. BALWANI ON MAY 30, 2014, IS SUBSEQUENT TO THOSE DISCUSSIONS

09:44AM  3    YOU SAY YOU HAD WITH MR. BALWANI ABOUT THE USE OF EDISONS;

09:44AM  4    CORRECT?

09:44AM  5    A.   THEY'RE SUBSEQUENT.

09:44AM  6    Q.   OKAY.  AND HERE IN LOOKING AT 20498, THE MEMO THAT YOU

09:44AM  7    SENT TO MR. BALWANI, UNDER OTHER NOTES, EDISONS, YOU DID NOT

09:44AM  8    INCLUDE ANY LANGUAGE THERE ABOUT A CONCERN THAT YOU HAD WITH

09:44AM  9    THE ACCURACY OF EDISONS, DID YOU?

09:44AM  10   A.   NO.

09:44AM  11   Q.   IN 20498, IN THE MEMO TO MR. BALWANI, YOU DID NOT WRITE

09:45AM  12   THAT YOU HAD CONCERN ABOUT PATIENT HARM RELATING TO THE

09:45AM  13   ACCURACY OF EDISONS, DID YOU?

09:45AM  14   A.   NO, I DID NOT.

09:45AM  15   Q.   YOU CAN SET THAT ASIDE.

09:45AM  16        IN THE DOCUMENT BINDERS THAT YOU HAVE, IF YOU COULD PLEASE

09:45AM  17   LOOK FOR 20277.  20277.  IT SHOULD BE IN VOLUME 2.

09:46AM  18   A.   I'M THERE.

09:46AM  19   Q.   OKAY.  AND 20277 APPEARS TO BE AN EMAIL DATED MAY 21ST OF

09:46AM  20   2014.

09:46AM  21        DO YOU SEE THAT?

09:46AM  22   A.   YES.

09:46AM  23            MR. CAZARES:  I APOLOGIZE, YOUR HONOR.

09:46AM  24   Q.   AND THE EMAIL APPEARS TO BE A MESSAGE FROM YOURSELF TO

09:46AM  25   DR. ROSENDORFF?

09:46AM    1        A.   YES.

09:46AM    2        Q.   AND THE EMAIL REFERENCES MEETINGS BETWEEN YOURSELF AND

09:46AM    3   DR. ROSENDORFF AND THE CLIA STAFF?

09:47AM    4        A.   YES.

09:47AM    5        Q.   AND YOU'RE ESSENTIALLY WRITING A DRAFT MESSAGE TO

09:47AM    6   DR. ROSENDORFF BEFORE SENDING IT TO THE CLIA STAFF; CORRECT?

09:47AM    7        A.   CORRECT.

09:47AM    8        Q.   AND IT WAS YOUR REGULAR PRACTICE TO USE EMAIL TO

09:47AM    9   COMMUNICATE WITH DR. ROSENDORFF REGARDING CLIA MATTERS AT THAT

09:47AM   10   TIME; CORRECT?

09:47AM   11        A.   CORRECT.

09:47AM   12        Q.   AND YOU RECALL HAVING THOSE MEETINGS WITH THE CLIA STAFF

09:47AM   13   THAT ARE REFERENCED IN THE EMAIL?

09:47AM   14        A.   NOT AT THIS POINT I DON'T, BUT THEY ARE REFERRED TO HERE.

09:47AM   15        Q.   BUT YOU DID HAVE MEETINGS WITH CLIA STAFF ABOUT ISSUES

09:47AM   16   RELATING TO THE CLINICAL LAB REGULARLY, DIDN'T YOU?

09:47AM   17        A.   YES.

09:47AM   18        Q.   INCLUDING BEFORE YOU LEFT THERANOS IN MAY OF 2014;

09:47AM   19   CORRECT?

09:47AM   20        A.   CORRECT.

09:47AM   21        Q.   AND IT WAS YOUR UNDERSTANDING THAT THOSE EMAILS AND

09:47AM   22   COMMUNICATIONS THAT YOU HAD WITH DR. ROSENDORFF WERE MAINTAINED

09:47AM   23   AT THERANOS DURING THE REGULAR COURSE OF BUSINESS; CORRECT?

09:47AM   24        A.   I WOULD ASSUME SO.

09:47AM   25             MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT 20277.

PANDORI CROSS BY MR. CAZARES (RES.)                          2220

09:48AM   1            MR. BOSTIC:  NO OBJECTION.

09:48AM   2            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:48AM   3        (DEFENDANT'S EXHIBIT 20277 WAS RECEIVED IN EVIDENCE.)

09:48AM   4            MR. CAZARES:  IF WE CAN PUT THAT UP ON THE SCREEN

09:48AM   5    AND JUST HIGHLIGHT THE TOP PORTION FIRST, THOUGH.

09:48AM   6    Q.  AND THE LATTER OF THE MESSAGES IN THE EXHIBIT 20277

09:48AM   7    APPEARS TO BE FROM DR. ROSENDORFF TO YOURSELF.

09:48AM   8        DO YOU SEE THAT?

09:48AM   9    A.  YES.

09:48AM  10    Q.  OKAY.  AND IT'S MAY 21, 2014.

09:48AM  11        DO YOU SEE THAT AS WELL?

09:48AM  12    A.  I DO.

09:48AM  13    Q.  AND MAY 21, 2014, THAT'S TWO DAYS AFTER YOUR BIRTHDAY THAT

09:48AM  14    YEAR; CORRECT?

09:48AM  15    A.  YES.

09:48AM  16    Q.  SO AFTER OR AROUND THE TIME OF THE PURPORTED CONVERSATIONS

09:48AM  17    THAT YOU HAD WITH MR. BALWANI AND MS. HOLMES THAT LED TO YOUR

09:48AM  18    RESIGNATION; CORRECT?

09:48AM  19    A.  WELL, AGAIN, I DON'T REMEMBER WHAT DATE THAT WAS EXACTLY.

09:48AM  20    Q.  AND IN THE MESSAGE AT 20277, DR. ROSENDORFF WRITES TO

09:48AM  21    YOURSELF, "MARK.

09:48AM  22        "I THINK THAT LOOKS JUST FINE.

09:48AM  23        "THANKS.

09:48AM  24        "ADAM."

09:49AM  25        DO YOU SEE THAT?

09:49AM   1     A.   YES.

09:49AM   2     Q.   AND IF WE CAN SCROLL DOWN TO THE LOWER PORTION OF THE

09:49AM   3     EMAIL.

09:49AM   4          AND THIS APPEARS TO BE A MESSAGE FROM YOURSELF TO

09:49AM   5     DR. ROSENDORFF, MAY 21, 2014.

09:49AM   6          DO YOU SEE THAT?

09:49AM   7     A.   CORRECT.

09:49AM   8     Q.   AND YOU SAY, "IS THIS OK," QUESTION MARK?

09:49AM   9     A.   THAT'S RIGHT.

09:49AM   10    Q.   AND IT APPEARS THAT YOU'RE ASKING FOR DR. ROSENDORFF'S

09:49AM   11    APPROVAL OF THE MESSAGE.

09:49AM   12         DO YOU SEE THAT?

09:49AM   13    A.   YES.

09:49AM   14    Q.   AND IN THE MESSAGE YOU WROTE IN THE DRAFT, "DEAR CLIA

09:49AM   15    LABORATORY MEMBERS,

09:49AM   16         "ADAM AND I WERE ABLE TO DISCUSS WITH ONE ANOTHER THE

09:49AM   17    RESULTS OF OUR ONE ON ONE CONVERSATIONS WITH EACH OF YOU, AND

09:49AM   18    ONE OF EVERYONE'S PRIMARY CONCERNS IS WORK HOURS."

09:49AM   19         DO YOU SEE THAT?

09:49AM   20    A.   YES.

09:49AM   21    Q.   AND THAT'S A REFERENCE TO CONCERNS OF THE CLIA STAFF THAT

09:49AM   22    YOU'RE REPORTING TO DR. ROSENDORFF; CORRECT?

09:49AM   23    A.   YES.

09:49AM   24    Q.   AND AS FAR AS CONCERNS BY THE CLIA STAFF, THERE IS NO

09:49AM   25    MENTION HERE IN THIS EMAIL ABOUT ACCURACY AND RELIABILITY OF

09:49AM  1    THE EDISON; CORRECT?

09:50AM  2    A.   THAT'S NOT DISCUSSED IN THIS EMAIL AS FAR AS I CAN TELL.

09:50AM  3    Q.   THE PRIMARY CONCERN HERE IS WORK HOURS; CORRECT?

09:50AM  4    A.   CORRECT.

09:50AM  5    Q.   AND AT THE BOTTOM OF THE MESSAGE YOU FINISH, "THANKS FOR

09:50AM  6    ALL OF THE CANDOR AND SUGGESTIONS YOU EACH PROVIDED IN THE

09:50AM  7    COURSE OF YOUR INDIVIDUAL MEETINGS.  STEP BY STEP, WE CAN

09:50AM  8    ADDRESS THESE ISSUES IN OUR AIM TO IMPROVE THE CLIA LABORATORY.

09:50AM  9        "SINCERELY,

09:50AM  10       "MARK PANDORI."

09:50AM  11       DO YOU SEE THAT?

09:50AM  12   A.   I DO.

09:50AM  13   Q.   AND YOU RECALL THE MEETINGS WITH THE CLIA STAFF?

09:50AM  14   A.   I REMEMBER MEETING WITH THEM IN GROUPS, AND OCCASIONALLY

09:50AM  15   SOME OF THEM INDIVIDUALLY.  BUT I DON'T REMEMBER MEETING WITH

09:50AM  16   THEM INDIVIDUALLY IN A SERIES LIKE THIS.

09:50AM  17   Q.   YOU CAN SET THAT ASIDE.  YOU CAN SET THAT EXHIBIT ASIDE.

09:50AM  18       AND IF YOU COULD TAKE A LOOK AT EXHIBIT 20496.  20496.

09:51AM  19   AND THAT SHOULD BE IN THE SMALLER BINDER THAT SAYS MARK PANDORI

09:51AM  20   ON THE FRONT.

09:51AM  21   A.   I'M THERE.

09:51AM  22   Q.   AND 20496, THE MESSAGE AT THE TOP APPEARS TO BE FROM

09:51AM  23   MS. RAMAMURTHY TO YOURSELF AT YOUR THERANOS ADDRESS.

09:51AM  24       DO YOU SEE THAT?

09:51AM  25   A.   YES.

09:51AM  1      Q.   AND DATED 5/27/2014.

09:51AM  2           DO YOU SEE THAT?

09:51AM  3      A.   I DO.

09:51AM  4      Q.   AND THE SUBJECT LINE IS TRANSITION.

09:51AM  5           DO YOU SEE THAT?

09:51AM  6      A.   YES.

09:51AM  7      Q.   AND MS. RAMAMURTHY WAS THE HEAD OF HR?

09:51AM  8      A.   THAT'S MY UNDERSTANDING.

09:51AM  9      Q.   AND YOU COMMUNICATED WITH HER RELATING TO YOUR EXIT

09:51AM 10      PROCESS FROM THERANOS; CORRECT?

09:51AM 11      A.   CORRECT.

09:51AM 12      Q.   AND THIS APPEARS TO BE A PART OF THAT PROCESS; CORRECT?

09:51AM 13      A.   I HAVE TO READ THE EMAIL.

09:51AM 14      Q.   WHY DON'T YOU TAKE A LOOK AT IT AND REFRESH YOUR

09:51AM 15      RECOLLECTION.

09:52AM 16      A.   I'VE READ THE EMAIL.

09:52AM 17      Q.   AND YOU SAID THAT YOU HAD COMMUNICATIONS WITH

09:52AM 18      MS. RAMAMURTHY RELATING TO YOUR EXIT PROCESS FROM THERANOS;

09:52AM 19      CORRECT?

09:52AM 20      A.   I DID.

09:52AM 21      Q.   AND THIS MESSAGE AT 20496 APPEARS TO BE A PART OF THAT

09:52AM 22      PROCESS; CORRECT?

09:52AM 23      A.   THE WORD "TRANSITION" IMPLIES IT.

09:52AM 24              MR. CAZARES:  MOVE TO ADMIT 20496, YOUR HONOR.

09:52AM 25              MR. BOSTIC:  NO OBJECTION.

PANDORI CROSS BY MR. CAZARES (RES.)                    2224

09:52AM  1            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:52AM  2         (DEFENDANT'S EXHIBIT 20496 WAS RECEIVED IN EVIDENCE.)

09:52AM  3     BY MR. CAZARES:

09:52AM  4     Q.  AND JUST LOOKING AT THE HEADER OF THE MESSAGE, IT STARTS

09:52AM  5     WITH -- AGAIN, IT APPEARS TO BE FROM YOURSELF -- FROM

09:52AM  6     MS. RAMAMURTHY, I'M SORRY, TO YOURSELF, MAY 27, 2014.

09:52AM  7         DO YOU SEE THAT?

09:52AM  8     A.  I DO.

09:52AM  9     Q.  AND THE SUBJECT MATTER IS TRANSITION.

09:52AM  10        DO YOU SEE THAT?

09:52AM  11    A.  YES.

09:52AM  12    Q.  AND IN THE MESSAGE FROM MS. RAMAMURTHY SHE WRITES, "HI

09:52AM  13    MARK,

09:52AM  14        "SUNNY IS OUT TODAY SO HE WANTED ME TO CONNECT WITH YOU ON

09:52AM  15    TRANSITION.  HE SAID THAT YOU CAN WORK FROM HOME TOMORROW AND

09:53AM  16    THURSDAY TO FOCUS ON DOCUMENTING THE FOLLOWING:"

09:53AM  17        AND THE FIRST BULLET IS "HIV AND HCV MICRO VOLUME

09:53AM  18    PROJECT."

09:53AM  19        DO YOU SEE THAT?

09:53AM  20    A.  YES.

09:53AM  21    Q.  AND THE SECOND BULLET IS, "PROCESS YOU WERE GOING TO SET

09:53AM  22    UP IN EMC FOR THE BUGS LAB."

09:53AM  23        DO YOU SEE THAT?

09:53AM  24    A.  YES.

09:53AM  25    Q.  AND THEN THAT BULLET CONTINUES, "PLEASE INCLUDE ALL

PANDORI CROSS BY MR. CAZARES (RES.)                    2225

09:53AM  1    CULTURE EQUIPMENT THAT YOU BOUGHT AND DETAILS ABOUT WHAT YOU

09:53AM  2    PLANNED ON DOING THERE. "

09:53AM  3        DO YOU SEE THAT?

09:53AM  4    A.   I DO, YES.

09:53AM  5    Q.   AND THERE'S A THIRD BULLET IN THE MESSAGE FROM

09:53AM  6    MS. RAMAMURTHY TO YOURSELF THAT SAYS, "ANYTHING ELSE THAT YOU

09:53AM  7    BELIEVE NEEDS TO BE DOCUMENTED FOR EFFECTIVE TRANSITION

09:53AM  8    PURPOSES."

09:53AM  9        DO YOU SEE THAT?

09:53AM  10   A.   I DO SEE THAT.

09:53AM  11   Q.   SO YOU WERE INVITED TO INCLUDE ANYTHING ELSE THAT YOU

09:53AM  12   BELIEVED NEEDED TO BE COMMUNICATED TO DR. ROSENDORFF IN THE

09:53AM  13   TRANSITION MEMO THAT WE HAVE ALREADY TAKEN A LOOK AT; CORRECT?

09:53AM  14   A.   IT APPEARS THAT I WAS INVITED TO SHARE INFORMATION WITH

09:53AM  15   THEM.

09:53AM  16   Q.   AND YOU DID SO; CORRECT?

09:53AM  17   A.   WE'VE SEEN THAT IN EMAILS TODAY.

09:53AM  18   Q.   AND THOSE WERE YOUR WORDS IN THE TRANSITION MEMO TO

09:54AM  19   DR. ROSENDORFF AND TO MR. BALWANI; CORRECT?

09:54AM  20   A.   WELL, THE TRANSITION MEMO I DON'T RECALL SENDING

09:54AM  21   DR. ROSENDORFF.  BUT OTHERWISE THE ONE SENT TO MR. BALWANI AND

09:54AM  22   MS. RAMAMURTHY, WE DID LOOK AT.

09:54AM  23   Q.   YOU DON'T DENY SENDING THE TRANSITION MEMO TO

09:54AM  24   DR. ROSENDORFF, DO YOU?

09:54AM  25   A.   I SAID I DON'T RECALL.

ER-1551

PANDORI CROSS BY MR. CAZARES (RES.)                    2226

09:54AM  1    Q.   YOU CAN SAID THAT ASIDE.

09:54AM  2         IF YOU COULD TAKE A LOOK AT EXHIBIT 20501.  20501.

09:54AM  3         THAT SHOULD ALSO BE IN THAT SMALL BINDER.

09:54AM  4    A.   YES.

09:54AM  5    Q.   DO YOU HAVE 20501?

09:54AM  6    A.   YES.

09:54AM  7    Q.   NOW, 20501 APPEARS TO BE A MESSAGE FROM YOURSELF TO

09:54AM  8    MR. BALWANI DATED MAY 30, 2014.

09:54AM  9         DO YOU SEE THAT?

09:54AM  10   A.   YES.

09:54AM  11   Q.   AND THE SUBJECT MATTER IS HCV SMALL VOLUME THOUGHTS.

09:55AM  12        DO YOU SEE THAT?

09:55AM  13   A.   YES, I DO.

09:55AM  14   Q.   AND HCV WAS ONE OF THE ISSUES ADDRESSED IN THAT TRANSITION

09:55AM  15   MEMO; CORRECT?

09:55AM  16   A.   IT WAS IN THAT DOCUMENT.

09:55AM  17   Q.   BECAUSE HCV WAS AN INFECTIOUS DISEASE ISSUE THAT YOU DID

09:55AM  18   SOME WORK ON AT THERANOS; CORRECT?

09:55AM  19   A.   YES.

09:55AM  20        MR. CAZARES:  MOVE TO ADMIT 20501, YOUR HONOR.

09:55AM  21        MR. BOSTIC:  YOUR HONOR, HEARSAY.  ALSO

09:55AM  22   AUTHENTICATION.

09:55AM  23        I'LL NOTE THAT THE DOCUMENT DOESN'T HAVE A BATES NUMBER.

09:55AM  24        THE COURT:  DO YOU WANT TO LAY A FOUNDATION?

09:55AM  25        MR. CAZARES:  YES, YOUR HONOR.

09:55AM 1    Q.   DR. PANDORI, IN YOUR TIME AT THERANOS, YOU USED EMAIL TO

09:55AM 2    COMMUNICATE WITH BOTH THE CLIA LAB AS WELL AS MANAGEMENT;

09:55AM 3    CORRECT?

09:55AM 4    A.   CORRECT.

09:55AM 5    Q.   INCLUDING MR. BALWANI?

09:55AM 6    A.   OH, YEAH.

09:55AM 7    Q.   AND IN THOSE MESSAGES, YOU DID YOUR BEST TO TRY TO

09:55AM 8    COMMUNICATE MATTERS RELATING TO THE LAB ACCURATELY IN ORDER TO

09:55AM 9    PERFORM YOUR BUSINESS; CORRECT?

09:56AM 10   A.   YES.

09:56AM 11   Q.   AND IT'S YOUR UNDERSTANDING THAT THOSE MESSAGES WERE

09:56AM 12   MAINTAINED BY THERANOS IN THE REGULAR COURSE OF BUSINESS;

09:56AM 13   CORRECT?

09:56AM 14   A.   IT'S MY UNDERSTANDING.

09:56AM 15   Q.   AND THIS HCV PROJECT -- OR HCV WAS AN INFECTIOUS DISEASE

09:56AM 16   AND AN ISSUE THAT YOU DID SOME WORK ON DURING YOUR TIME AT

09:56AM 17   THERANOS; CORRECT?

09:56AM 18   A.   CORRECT.

09:56AM 19   Q.   AND AS WE SAW IN THE TRANSITION MEMO, YOU COMMUNICATED

09:56AM 20   UPDATES TO MR. BALWANI AND MS. RAMAMURTHY RELATED TO YOUR WORK

09:56AM 21   ON THE HCV PROJECT AS REFLECTED IN EXHIBIT 20501; CORRECT?

09:56AM 22   A.   HCV WAS A TOPIC IN THAT DOCUMENT.

09:56AM 23   Q.   AND THAT'S AN ISSUE THAT YOU WORKED ON; CORRECT?

09:56AM 24   A.   YES.

09:56AM 25         MR. CAZARES:  MOVE TO ADMIT 20501, YOUR HONOR.

ER-1553

09:56AM  1          MR. BOSTIC:  THE DEFENDANT'S STATEMENT IS STILL

09:56AM  2    HEARSAY, AND ALSO AUTHENTICATION.

09:57AM  3          MR. CAZARES:  THE ISSUE RELATES TO, YOUR HONOR,

09:57AM  4    PRIOR INCONSISTENT STATEMENTS ABOUT THE TIME OR TRANSITION, AS

09:57AM  5    WELL AS STATE OF MIND OF MR. BALWANI RELATING TO DR. PANDORI'S

09:57AM  6    EXIT.

09:57AM  7          THE COURT:  IS THAT AN ISSUE?

09:57AM  8          MR. CAZARES:  YEAH.

09:57AM  9          THE COURT:  YOUR CLIENT'S STATE OF MIND AS TO THE

09:57AM 10    EXIT?

09:57AM 11          MR. CAZARES:  THE BASIS, THE REASONS FOR THE EXIT.

09:57AM 12          THE COURT:  ALL RIGHT.  I'LL ADMIT THIS UNDER

09:57AM 13    803(6).

09:57AM 14      (DEFENDANT'S EXHIBIT 20501 WAS RECEIVED IN EVIDENCE.)

09:57AM 15          THE COURT:  AND IT MAY BE PUBLISHED.

09:57AM 16    BY MR. CAZARES:

09:57AM 17    Q.  WE HAVE 20501 UP ON THE SCREEN.

09:57AM 18        DO YOU SEE THAT, DR. PANDORI?

09:57AM 19    A.  YES.

09:57AM 20    Q.  AND AGAIN, THE LATTER OF THE MESSAGES IN THE CHAIN APPEARS

09:57AM 21    TO BE FROM YOURSELF TO MR. BALWANI?

09:57AM 22    A.  IT DOES.

09:57AM 23    Q.  MAY 30, 2014.  SUBJECT MATTER HCV SMALL VOLUME THOUGHTS.

09:58AM 24        DO YOU SEE THAT?

09:58AM 25    A.  I DO SEE IT.

PANDORI CROSS BY MR. CAZARES (RES.)                    2229

09:58AM  1    Q.   AND FURTHER DOWN IN THE CHAIN, GOING TO THE BOTTOM OF THE

09:58AM  2    FIRST PAGE, IT APPEARS TO BE A MESSAGE FROM YOURSELF TO

09:58AM  3    MR. BALWANI, MAY 30, 2014, WHERE YOU WROTE, "SUNNY,

09:58AM  4        "WANTED TO MAKE SURE I GAVE YOU MY HCV THOUGHTS YOU ASKED

09:58AM  5    FOR, IN CASE THEY HELP."

09:58AM  6        DO YOU SEE THAT?

09:58AM  7    A.   I DO.

09:58AM  8    Q.   AND YOU WROTE THIS MESSAGE TO MR. BALWANI; CORRECT?

09:58AM  9    A.   YEAH, I DON'T RECALL, BUT IT'S INDICATED IN THE HEADER

09:58AM  10   THAT I DID.

09:58AM  11   Q.   NOW, ON FRIDAY YOU TESTIFIED IN RELATION TO THAT

09:58AM  12   CONVERSATION WITH MS. HOLMES AND MR. BALWANI ON OR ABOUT YOUR

09:58AM  13   BIRTHDAY, MAY 19TH, 2014, THAT AFTER THAT CONVERSATION, WITHIN

09:58AM  14   FIVE MINUTES YOU RESIGNED; CORRECT?

09:58AM  15   A.   YES.

09:58AM  16   Q.   AND YOU HAD NO FURTHER COMMUNICATIONS WITH MR. BALWANI

09:58AM  17   AFTER THAT MEETING.

09:58AM  18       THAT'S WHAT YOU TESTIFIED; CORRECT?

09:58AM  19   A.   YEAH, I DON'T REMEMBER TALKING WITH MR. BALWANI AFTER

09:58AM  20   THAT.

09:58AM  21   Q.   BUT YOU DID COMMUNICATE WITH HIM BY EMAIL APPARENTLY;

09:58AM  22   CORRECT?

09:58AM  23   A.   WELL, WE WOULD HAVE TO GET THE DATES STRAIGHTENED OUT FOR

09:59AM  24   ME TO ANSWER THAT WITH CONFIDENCE.

09:59AM  25   Q.   MAY 30, 2014, IS REFLECTED IN 20501; CORRECT?

ER-1555

09:59AM    1        A.   YES.

09:59AM    2        Q.   AND THAT'S AFTER YOUR BIRTHDAY, MAY 19TH, 2014; CORRECT?

09:59AM    3        A.   CORRECT.

09:59AM    4        Q.   IN THE MESSAGE YOU WRITE, AFTER YOU SAID YOU WANTED TO

09:59AM    5        GIVE MY HCV THOUGHTS YOU ASKED FOR IN CASE THEY HELP, YOU

09:59AM    6        PROVIDED SOME INFORMATION RELATING TO THE HCV SMALL VOLUME

09:59AM    7        PROJECT AT THE LAB; CORRECT?

09:59AM    8        A.   IT SAYS THAT THERE, YEP.

09:59AM    9        Q.   AND THEN MR. BALWANI RESPONDED BACK TO YOU, "THANKS FOR

09:59AM   10        THE SUMMARY.

09:59AM   11            "I AGREE.  THIS IS PRECISELY WHAT WE WERE EXPECTING AND

09:59AM   12        PLANNING TO DO SO THIS IS IN LINE WITH OUR ESTIMATES."

09:59AM   13            DO YOU SEE THAT?

09:59AM   14        A.   YES.

09:59AM   15        Q.   AND "AS YOU KNOW, THIS IS THERANOS'S TRADE SECRET AND

09:59AM   16        SOMETHING WE INTEND TO OFFER SOON."

09:59AM   17            DO YOU SEE THIS?

09:59AM   18        A.   YES.

09:59AM   19        Q.   AND THIS HCV SMALL PROJECT VOLUME RELATED TO TESTS OR A

10:00AM   20        TEST RUN ON THE EDISON DEVICE; CORRECT?

10:00AM   21        A.   NO, THAT'S NOT CORRECT.

10:00AM   22        Q.   IT WAS RELATING TO THERANOS'S FINGERSTICK SMALL SAMPLE

10:00AM   23        TESTING; CORRECT?

10:00AM   24        A.   WELL, THERE WERE TWO HCV TESTS THAT WERE DISCUSSED IN MY

10:00AM   25        TIME AT THERANOS.  ONE OF THEM IS WHAT IS KNOWN AS A VIRAL LOAD

10:00AM  1    TEST WHERE YOU'RE MEASURING AND COUNTING PARTICLES GENERALLY

10:00AM  2    USING THE VIRUS'S NUCLEIC ACID TO MAKE THAT COUNTING PROCESS

10:00AM  3    OCCUR.

10:00AM  4        THE OTHER IS AN ANTIBODY TEST WHICH MEASURES WHETHER OR

10:00AM  5    NOT SOMEBODY HAD BEEN EXPOSED TO HCV, AND THAT WOULD BE WHAT WE

10:00AM  6    CALL AN ANTIBODY TEST.

10:00AM  7        EDISONS ONLY RAN ANTIBODY TESTS.  THIS PRECISELY DESCRIBES

10:00AM  8    GENOTYPE AND LOAD IF YOU LOOK FURTHER DOWN ON THE EMAIL.

10:00AM  9        SO, NO, IT DOES NOT REFER TO EDISONS.

10:00AM 10    Q.   AND YOU SEE MR. BALWANI'S EMAIL TO YOU, HE VIEWED THE

10:00AM 11    TECHNOLOGY THAT YOU WERE DESCRIBING AND WORKING ON AT THERANOS

10:00AM 12    AS THERANOS TRADE SECRET; CORRECT?

10:00AM 13            MR. BOSTIC:  OBJECTION.  CALLS FOR SPECULATION.

10:01AM 14    LACKS FOUNDATION.

10:01AM 15            THE COURT:  YOU'RE ASKING JUST WHAT THIS SAYS?

10:01AM 16            MR. CAZARES:  YES.

10:01AM 17            THE WITNESS:  CAN YOU REPEAT THE QUESTION, PLEASE?

10:01AM 18    BY MR. CAZARES:

10:01AM 19    Q.   IN RESPONSE TO YOUR MESSAGE ON MAY 30, 2014, MR. BALWANI

10:01AM 20    WROTE TO YOU THAT "THIS HCV SMALL VOLUME PROJECT IS THERANOS

10:01AM 21    TRADE SECRET."

10:01AM 22        DO YOU SEE THAT?

10:01AM 23    A.   I SEE THAT.

10:01AM 24    Q.   SO WHATEVER THE PROJECT WAS YOU WERE WORKING ON,

10:01AM 25    MR. BALWANI VIEWED IT AS A THERANOS TRADE SECRET; CORRECT?

PANDORI CROSS BY MR. CAZARES (RES.)                    2232

10:01AM   1                MR. BOSTIC:  SAME OBJECTION.

10:01AM   2                THE COURT:  SUSTAINED.

10:01AM   3      BY MR. CAZARES:

10:01AM   4      Q.   YOU CAN SET THAT ASIDE.

10:01AM   5           DR. PANDORI, ON FRIDAY THERE WAS SOME DISCUSSION IN YOUR

10:01AM   6      DIRECT EXAM RELATING TO THE VIP DEMOS AND THE HANDLING OF

10:01AM   7      SAMPLES FROM DEMOS.

10:02AM   8           DO YOU RECALL THAT?

10:02AM   9      A.   IT WAS FRIDAY?  I RECALL THE CONVERSATION.

10:02AM  10      Q.   AND YOU TESTIFIED RELATING TO THE HANDLING OF SAMPLES FROM

10:02AM  11      VIP DEMOS; CORRECT?

10:02AM  12      A.   CORRECT.

10:02AM  13      Q.   AND YOU TESTIFIED THAT MANAGEMENT, INCLUDING MR. BALWANI,

10:02AM  14      HAD INSTRUCTED THAT VIP SAMPLES WERE TO BE HANDLED QUICKLY;

10:02AM  15      CORRECT?

10:02AM  16      A.   CORRECT.

10:02AM  17      Q.   AND YOU TESTIFIED THAT THE PRACTICE RAISED SPIRITUAL

10:02AM  18      PROBLEMS FOR YOU BECAUSE TO EFFECT THAT, THE VIP SAMPLES WERE

10:02AM  19      KIND OF DROPPED TO THE FRONT OF THE LINE IN FRONT OF OTHER

10:02AM  20      PATIENT SAMPLES; CORRECT?

10:02AM  21      A.   YES.

10:02AM  22      Q.   IF YOU COULD TAKE A LOOK AT EXHIBIT 20255.  20555.  I'M

10:02AM  23      SORRY, 20255.  20255.  THAT'S IN VOLUME 1, THE ORIGINAL LARGE

10:02AM  24      VOLUME BINDER.

10:03AM  25      A.   OKAY.  I'VE FOUND IT.

| | | |
|---|---|---|
| 10:03AM | 1 | Q.   20255 APPEARS TO BE A MESSAGE FROM MR. BALWANI TO YOURSELF |
| 10:03AM | 2 | AND TWO OTHER INDIVIDUALS? |
| 10:03AM | 3 | A.   YES. |
| 10:03AM | 4 | Q.   AND THOSE INDIVIDUALS ARE KIND OF THE PRODUCT MANAGERS, IF |
| 10:03AM | 5 | YOU WILL, AT THERANOS; CORRECT? |
| 10:03AM | 6 | A.   YES. |
| 10:03AM | 7 | Q.   AND THAT'S JANUARY 30, 2014? |
| 10:03AM | 8 | A.   IT IS JANUARY 30TH, 2014. |
| 10:03AM | 9 | Q.   AND THE SUBJECT LINE OF THE MESSAGE SAYS VIP SAMPLES. |
| 10:03AM | 10 | DO YOU SEE THAT? |
| 10:03AM | 11 | A.   YES. |
| 10:03AM | 12 | Q.   AND THIS APPEARS TO BE RELATING TO THIS HANDLING OF |
| 10:03AM | 13 | SAMPLES FROM VIP DEMOS THAT YOU DISCUSSED IN YOUR TESTIMONY; |
| 10:03AM | 14 | CORRECT? |
| 10:03AM | 15 | A.   IT'S REFERRING TO VIP SAMPLES, CORRECT. |
| 10:03AM | 16 | Q.   OKAY. |
| 10:03AM | 17 | YOUR HONOR, MOVE TO ADMIT 20255 SUBJECT TO THE PARTIES' |
| 10:03AM | 18 | EMAIL STIPULATION. |
| 10:03AM | 19 | MR. BOSTIC:  NO OBJECTION. |
| 10:03AM | 20 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:04AM | 21 | (DEFENDANT'S EXHIBIT 20255 WAS RECEIVED IN EVIDENCE.) |
| 10:04AM | 22 | BY MR. CAZARES: |
| 10:04AM | 23 | Q.   AS YOU CAN SEE UP ON THE SCREEN, DR. PANDORI, THE MESSAGE |
| 10:04AM | 24 | IS FROM MR. BALWANI TO YOURSELF, MAX FOSQUE, AND |
| 10:04AM | 25 | NICHOLAS MENCHEL. |

| | | |
|---|---|---|
| 10:04AM | 1 | DO YOU SEE THAT? |
| 10:04AM | 2 | A.   I DO. |
| 10:04AM | 3 | Q.   AND SUBJECT LINE IS VIP SAMPLES. |
| 10:04AM | 4 | DO YOU SEE THAT? |
| 10:04AM | 5 | A.   YES. |
| 10:04AM | 6 | Q.   AND IN THE MESSAGE TO YOU, MR. BALWANI WROTE, "PLEASE KNOW |
| 10:04AM | 7 | THAT THERE IS A VERY HIGH LIKELIHOOD THAT WE HAD MORE VIP'S |
| 10:04AM | 8 | YESTERDAY AND TODAY AND ALL WEEKEND AND MONDAY THAT WILL VISIT |
| 10:04AM | 9 | OUR WAG PSC'S." |
| 10:04AM | 10 | DO YOU SEE THAT? |
| 10:04AM | 11 | A.   YES. |
| 10:04AM | 12 | Q.   AND WAG PSC'S, THOSE ARE THE PATIENT SERVICE CENTERS WHERE |
| 10:04AM | 13 | SAMPLES WERE COLLECTED; CORRECT? |
| 10:04AM | 14 | A.   I THINK SO. |
| 10:04AM | 15 | Q.   AND THEN THOSE SAMPLES WOULD BE TRANSPORTED OR SHIPPED TO |
| 10:04AM | 16 | THE LAB IF NECESSARY; CORRECT? |
| 10:04AM | 17 | A.   CORRECT. |
| 10:04AM | 18 | Q.   AND MR. BALWANI WROTE IN THE MESSAGE TO YOURSELF, "THOUGH |
| 10:04AM | 19 | ALL SAMPLES SHD RECEIVE SAME TREATMENT, GIVEN INCIDENTS OVER |
| 10:05AM | 20 | LAST 2 DAYS, I WOULD LIKE EVERYONE PAYING SPECIAL ATTENTION FOR |
| 10:05AM | 21 | NEXT WEEK UNTIL OUR PROCESS IS PERFECT." |
| 10:05AM | 22 | DO YOU SEE THAT? |
| 10:05AM | 23 | A.   YES. |
| 10:05AM | 24 | Q.   SO MR. BALWANI IS TELLING YOU TO TREAT THE VIP SAMPLES THE |
| 10:05AM | 25 | SAME AS OTHER SAMPLES; CORRECT? |

PANDORI CROSS BY MR. CAZARES (RES.)                    2235

10:05AM  1    A.   CORRECT.

10:05AM  2    Q.   BUT HE'S NOT ASKING FOR PREFERENTIAL TREATMENT IN THIS

10:05AM  3    MESSAGE FOR THE VIP'S; CORRECT?

10:05AM  4    A.   WELL, HE'S SAYING THAT ALL OF THE VIP SAMPLES SHOULD

10:05AM  5    RECEIVE THE SAME TREATMENT, SO THAT ALL OF THE -- WHAT IT SAYS

10:05AM  6    IS THAT ALL OF THE VIP SAMPLES, ASSUMING SHD MEANS SHOULD, ALL

10:05AM  7    SAMPLES SHOULD RECEIVE THE SAME TREATMENT.

10:05AM  8    Q.   THE WALGREENS PATIENT SERVICE CENTERS ARE WHERE ALL

10:05AM  9    PATIENT SAMPLES WERE COLLECTED; CORRECT?

10:05AM  10   A.   YES.

10:05AM  11   Q.   YOU CAN SET THAT ASIDE.

10:06AM  12        IN YOUR TESTIMONY IN RESPONSE TO QUESTIONS FROM THE

10:06AM  13   GOVERNMENT, YOU DISCUSSED AND MENTIONED THE FACT THAT YOU WERE

10:06AM  14   ASKED TO REVIEW VALIDATION REPORTS FOR OTHER TESTING DONE IN

10:06AM  15   THE RESEARCH AND DEVELOPMENT PORTION OF THERANOS; CORRECT?

10:06AM  16   A.   CORRECT.

10:06AM  17   Q.   AND THAT RELATED TO THIS NUCLEIC ACID AMPLIFICATION

10:06AM  18   DEVELOPMENT; CORRECT?

10:06AM  19   A.   CORRECT.

10:06AM  20   Q.   AND AS A PART OF THAT YOU HAD REGULAR COMMUNICATIONS, OR

10:06AM  21   COMMUNICATIONS WITH DR. PRANAV PATEL WHO WAS THE HEAD OF THE

10:06AM  22   NUCLEIC ACID AMPLIFICATION TEAM?

10:06AM  23   A.   I DID.

10:06AM  24   Q.   AND AS A PART OF THOSE DISCUSSION, DR. PATEL SHARED WITH

10:06AM  25   YOU VALIDATION REPORTS, OR DRAFT VALIDATION REPORTS; CORRECT?

PANDORI CROSS BY MR. CAZARES (RES.)                    2236

10:06AM  1    A.   CORRECT.

10:06AM  2    Q.   AND IN ADDITION TO DR. PATEL, THERE WERE OTHER TEAMS AT

10:06AM  3    THERANOS DEVELOPING NEW TESTS; CORRECT?

10:06AM  4    A.   I BELIEVE SO.

10:06AM  5    Q.   YOU'RE FAMILIAR WITH AN INDIVIDUAL NAMED DR. PAUL PATEL?

10:06AM  6    A.   YES.

10:06AM  7    Q.   AND DR. PAUL PATEL, AGAIN, HEADED ANOTHER ONE OF THESE

10:07AM  8    TEAMS DEVELOPING TESTS WITHIN THE RESEARCH AND DEVELOPMENT

10:07AM  9    PORTION OF THE COMPANY; CORRECT?

10:07AM  10   A.   MY RECOLLECTION IS THAT PAUL PATEL WORKED IN A SECTION

10:07AM  11   CALLED CHEMISTRY.  I DON'T KNOW IF HE WAS DEVELOPING NEW TESTS

10:07AM  12   OR MANAGING EXISTING ONES.

10:07AM  13   Q.   GENERAL CHEMISTRY WAS HIS DEPARTMENT; CORRECT?

10:07AM  14   A.   I JUST CALLED IT CHEMISTRY.

10:07AM  15   Q.   AND YOU'RE FAMILIAR WITH ANOTHER INDIVIDUAL NAMED

10:07AM  16   DR. CHINMAY PANGARKAR AS WELL; CORRECT?

10:07AM  17   A.   I RECOGNIZE THE FIRST NAME.

10:07AM  18   Q.   AND THERE WAS A TEAM AT THERANOS DEVELOPING ASSAYS

10:07AM  19   RELATING TO CYTOMETRY TESTING; CORRECT?

10:07AM  20   A.   CORRECT.

10:07AM  21   Q.   AND YOU'RE FAMILIAR WITH DR. SHARADA SIVARAMAN; CORRECT?

10:07AM  22   A.   NO.

10:07AM  23   Q.   AND YOU'RE FAMILIAR WITH A TEAM IN THERANOS'S RESEARCH AND

10:07AM  24   DEVELOPMENT LAB THAT WERE DEVELOPING ADDITIONAL TESTS RELATING

10:07AM  25   TO THE IMMUNOASSAYS FOR THE EDISON AND OTHER DEVICES; CORRECT?

10:07AM   1    A.   I HAD A SENSE THAT WAS GOING ON, BUT I CAN'T RECALL

10:07AM   2    ANYONE'S NAME THAT PARTICIPATED IN THAT.

10:07AM   3    Q.   DR. PANDORI, IF YOU CAN TAKE A LOOK AT EXHIBIT 20461,

10:08AM   4    20461.  THAT SHOULD BE IN VOLUME 2.

10:08AM   5    A.   OKAY.  I'M THERE.

10:08AM   6    Q.   20461 APPEARS TO BE AN EMAIL DATED DECEMBER 11TH, 2013.

10:08AM   7         DO YOU SEE THAT?

10:08AM   8    A.   YES.

10:08AM   9    Q.   FROM DR. PATEL, PRANAV PATEL?

10:08AM   10   A.   YES.

10:08AM   11   Q.   TO YOURSELF?

10:08AM   12   A.   YES.

10:08AM   13   Q.   WITH A SUBJECT MATTER TNAA LDT VALIDATION REPORT.

10:08AM   14        DO YOU SEE THAT?

10:08AM   15   A.   YES.

10:08AM   16   Q.   AND THEN THERE ARE SOME ATTACHMENTS TO THE DOCUMENT?

10:09AM   17   A.   I'M LOOKING AT IT.

10:09AM   18   Q.   OKAY.  DRAFT VALIDATION REPORTS?

10:09AM   19   A.   THAT'S WHAT THE TITLE IS, YES.

10:09AM   20   Q.   AND YOU HAD COMMUNICATIONS WITH DR. PATEL RELATING TO YOUR

10:09AM   21   REVIEW OF DRAFT VALIDATION REPORTS; CORRECT?

10:09AM   22   A.   CORRECT.

10:09AM   23        MR. CAZARES:  MOVE TO ADMIT 20461.

10:09AM   24        MR. BOSTIC:  401.

10:09AM   25        THE COURT:  YOU'RE ASKING THAT THE ENTIRETY OF THE

10:09AM  1    EXHIBIT COME IN?

10:09AM  2            MR. CAZARES:  IT'S NOT MY INTENT TO REVIEW THE

10:09AM  3    ENTIRETY OF THE ATTACHMENTS, YOUR HONOR, BUT TO ASK A FEW

10:09AM  4    QUESTIONS.

10:09AM  5            THE COURT:  BUT YOU WANT THE JURY TO RECEIVE THIS

10:10AM  6    STACK?

10:10AM  7            MR. CAZARES:  YES, YOUR HONOR.

10:10AM  8            THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

10:10AM  9        (DEFENDANT'S EXHIBIT 20461 WAS RECEIVED IN EVIDENCE.)

10:10AM 10    BY MR. CAZARES:

10:10AM 11    Q.   REFERRING TO THE FIRST PAGE, IT'S EXHIBIT 20461, AND IT'S

10:10AM 12    AN EMAIL ON DECEMBER 11TH, 2013?

10:10AM 13        DO YOU SEE THAT?

10:10AM 14    A.   I DO.

10:10AM 15    Q.   AND AGAIN, THIS IS FROM DR. PATEL TO YOU?

10:10AM 16    A.   YES.

10:10AM 17    Q.   AND SUBJECT LINE IS TNAA LDT VALIDATION REPORTS.

10:10AM 18        DO YOU SEE THAT?

10:10AM 19    A.   I DO.

10:10AM 20    Q.   AND TNAA, FOR THE JURY, MEANS THERANOS'S NUCLEIC ACID

10:10AM 21    AMPLIFICATION TEST; CORRECT?

10:10AM 22    A.   I THINK SO.

10:10AM 23    Q.   AND LDT REFERS TO LAB DEVELOPED TESTS, MEANING THERANOS'S

10:10AM 24    PROPRIETARY TESTING; CORRECT?

10:10AM 25    A.   LDT IS A TERMINOLOGY MEANING LABORATORY DEVELOPED TESTS,

10:10AM 1      AND WHAT IT REFERS TO IS A SITUATION WHERE A LAB BUILDS THEIR

10:11AM 2      OWN LABORATORY TESTS BECAUSE OF A NEED EITHER BECAUSE THERE'S

10:11AM 3      NO FDA CLEARED OPTION OR THERE'S A VERY SPECIFIC REASON WHY

10:11AM 4      THEY CANNOT RUN A FDA CLEARED OPTION.

10:11AM 5          SO THE LAB DEVELOPS A TEST AND IT'S CALLED AN LDT.

10:11AM 6          BEFORE AN LDT CAN BE UTILIZED DIAGNOSTICALLY OR

10:11AM 7      MEDICALLY --

10:11AM 8              MR. CAZARES:  YOUR HONOR, MOVE TO STRIKE.  THERE'S

10:11AM 9      NO QUESTION PENDING AND I HAVEN'T ASKED ALL OF THIS

10:11AM 10     INFORMATION.

10:11AM 11             THE COURT:  I'M NOT GOING TO STRIKE IT.  BUT YOU CAN

10:11AM 12     ASK ANOTHER QUESTION NOW.

10:11AM 13             MR. CAZARES:  UNDERSTOOD, YOUR HONOR.

10:11AM 14     Q.   DR. PANDORI, IF YOU CAN TURN TO PAGE 3 OF THE EXHIBIT.

10:11AM 15     A.   PAGE 3, YES.

10:11AM 16     Q.   AND PAGE 3 APPEARS TO BE A DRAFT VALIDATION REPORT DATED

10:11AM 17     NOVEMBER 27, 2013.

10:11AM 18         DO YOU SEE THAT?

10:11AM 19     A.   YES.

10:11AM 20     Q.   AND THIS TEST IS TITLED BORDETELLA PARAPERTUSSIS TNAA

10:11AM 21     VALIDATION REPORT.

10:11AM 22         DO YOU SEE THAT?

10:11AM 23     A.   YES.

10:11AM 24     Q.   AND THIS IS AMONG THE DRAFT VALIDATION REPORTS THAT YOU

10:12AM 25     REVIEWED DURING YOUR TIME AT THERANOS?

10:12AM    1     A.   TO BE FRANK, I DON'T RECALL THIS ONE IN PARTICULAR, BUT

10:12AM    2     THERE WERE A FEW OF THEM, IF NOT MANY.

10:12AM    3     Q.   SO YOU DO RECALL DRAFTING VALIDATION REPORTS, YOU'RE NOT

10:12AM    4     JUST SURE IF THIS WAS ONE OF THEM?

10:12AM    5     A.   NO, I DIDN'T DRAFT THEM.  I REVIEWED THOSE THAT WERE

10:12AM    6     DRAFTED BY OTHERS.

10:12AM    7     Q.   AND YOU PROVIDED COMMENTS TO THE DRAFTERS?

10:12AM    8     A.   YES.

10:12AM    9     Q.   AND YOU VIEWED THE DRAFT VALIDATION REPORTS POSITIVELY;

10:12AM   10     CORRECT?

10:12AM   11     A.   I DON'T RECALL THE INDIVIDUAL REVIEW OF EVERY REPORT.

10:12AM   12     Q.   BUT YOU HAD POSITIVE THOUGHTS ABOUT MANY OF THEM; CORRECT?

10:12AM   13     A.   I RECALL THAT THERE WERE -- THAT IT LOOKED LIKE IT WAS ON

10:12AM   14     THE RIGHT TRACK AND IT WAS AN EXCITING LINE OF POSSIBLE

10:12AM   15     TECHNOLOGY.

10:12AM   16     Q.   AND THIS WAS POSSIBLE USE OF THERANOS'S TECHNOLOGY IN THE

10:12AM   17     FUTURE; CORRECT?

10:12AM   18     A.   CORRECT, IT WAS POSSIBLE.

10:12AM   19     Q.   IT WASN'T BEING USED IN THE CLINICAL LAB AT THE TIME?

10:12AM   20     A.   CORRECT.

10:12AM   21     Q.   YOU CAN SET THAT ASIDE.

10:12AM   22          IF YOU COULD TAKE A LOOK AT 20444.  IT SHOULD ALSO BE IN

10:13AM   23     THAT SMALLER BINDER AGAIN.

10:13AM   24     A.   I'M SORRY.  WHAT WAS THE NUMBER AGAIN?

10:13AM   25     Q.   20444.

10:13AM   1    A.   OH, YEAH, IT'S IN VOLUME 2.

10:13AM   2         ALL RIGHT.  I'M THERE.

10:13AM   3    Q.   20444 APPEARS TO BE AN EMAIL DATED 12/13/2013.

10:13AM   4         DO YOU SEE THAT?

10:13AM   5    A.   YES.

10:13AM   6    Q.   FROM YOURSELF TO DR. PATEL?

10:13AM   7    A.   YES.

10:13AM   8    Q.   AND THE SUBJECT LINE SAYS NAAT VALIDATION.

10:13AM   9         DO YOU SEE THAT?

10:13AM  10    A.   YES.

10:13AM  11            MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT 20444

10:13AM  12    PURSUANT TO THE PARTIES' STIPULATIONS REGARDING EMAILS.

10:14AM  13            MR. BOSTIC:  NO OBJECTION.

10:14AM  14            THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:14AM  15        (DEFENDANT'S EXHIBIT 20444 WAS RECEIVED IN EVIDENCE.)

10:14AM  16    BY MR. CAZARES:

10:14AM  17    Q.   AGAIN TO ORIENT THE JURY, WE'RE LOOKING AT A

10:14AM  18    DECEMBER 13TH, 2013, EMAIL FROM YOURSELF TO DR. PATEL?

10:14AM  19    A.   IT IS.

10:14AM  20    Q.   AND THIS IS RELATING TO NAAT VALIDATIONS.

10:14AM  21         DO YOU SEE THAT?

10:14AM  22    A.   YES.

10:14AM  23    Q.   AND THAT'S THIS NUCLEIC ACID AMPLIFICATION VALIDATION

10:14AM  24    TESTS; CORRECT?

10:14AM  25    A.   VERY LIKELY.

PANDORI CROSS BY MR. CAZARES (RES.)                                    2242

10:14AM  1    Q.   AND CONTINUING WITH THE MESSAGE YOU START TO DR. PATEL,

10:14AM  2    "PRANAV, ADAM," BECAUSE DR. ROSENDORFF IS ALSO COPIED ON THE

10:14AM  3    MESSAGE, "I BELIEVE THAT WITH REGARD TO THE IDEA OF USING A

10:14AM  4    COMPARATOR METHOD, ONLY CERTAIN TESTS WILL REQUIRE THIS."

10:14AM  5         DO YOU SEE THAT?

10:14AM  6    A.   YES.

10:14AM  7    Q.   "FOR MANY OF THE ANALYTES, WE CAN ARGUE VERY WELL THAT

10:14AM  8    THERE IS NO FDA APPROVED MOLECULAR COMPARATOR METHOD."

10:14AM  9         DO YOU SEE THAT?

10:14AM  10   A.   YES.

10:14AM  11   Q.   AND THAT'S WHAT YOU WROTE?

10:15AM  12   A.   CORRECT.

10:15AM  13   Q.   AND THEN YOU FOLLOW, "AN INSPECTOR COULD ARGUE THAT WE

10:15AM  14   COULD HAVE USED CULTURE AS THE GOLD STANDARD.  HOWEVER, I

10:15AM  15   BELIEVE THAT STRONG ARGUMENTS COULD BE MADE THAT WHAT YOU DID

10:15AM  16   WITH PCR WAS A BETTER COMPARATOR FOR THE TEST, SINCE IT IS WELL

10:15AM  17   ESTABLISHED THAT PCR IS MORE SENSITIVE THAN CULTURE FOR THE

10:15AM  18   VAST MAJORITY OF CASES."

10:15AM  19        CORRECT?

10:15AM  20   A.   CORRECT.

10:15AM  21   Q.   SO ESSENTIALLY IN THIS MESSAGE YOU'RE PROVIDING COMMENTS

10:15AM  22   TO DR. PATEL RELATING TO THESE TNAA VALIDATION REPORTS;

10:15AM  23   CORRECT?

10:15AM  24   A.   CORRECT.

10:15AM  25   Q.   AND SO BY THIS TIME YOU HAD ALREADY REVIEWED AT LEAST SOME

PANDORI CROSS BY MR. CAZARES (RES.)                    2243

10:15AM  1    REPORTS; CORRECT?

10:15AM  2    A.   CORRECT.

10:15AM  3    Q.   IF WE CAN TURN TO THE SECOND PAGE, ITEM NUMBER 8, IT

10:15AM  4    APPEARS THAT YOU WROTE, "IN TWO OCCASIONS, AT LEAST, WHERE I

10:15AM  5    HAVE BEEN INSPECTED BY CLIA AND VALIDATIONS WERE REVIEWED, THE

10:15AM  6    INSPECTORS ASKED US TO HAVE A CONCLUDING STATEMENT THAT

10:16AM  7    INDICATED THAT THE LABORATORY HAS DETERMINED THAT BASED UPON

10:16AM  8    THE DATA, THAT THE TEST IS SAFE AND EFFECTIVE FOR USE WITH

10:16AM  9    HUMAN BEINGS/PATIENTS."

10:16AM  10       DO YOU SEE THAT?

10:16AM  11   A.   I DO SEE IT.

10:16AM  12   Q.   AND THEN YOU CONTINUED, "THESE VALIDATIONS ARE EXCELLENT,

10:16AM  13   BUT THEY ARE MISSING THIS ELEMENT."

10:16AM  14       THOSE ARE YOUR WORDS; CORRECT?

10:16AM  15   A.   CORRECT.

10:16AM  16   Q.   AND YOU DESCRIBED THE REPORTS AS EXCELLENT BUT MISSING

10:16AM  17   THIS PIECE; CORRECT?

10:16AM  18   A.   CORRECT.

10:16AM  19   Q.   AND "THE INTRO SHOULD STATE THAT THE GOAL WAS TO DETERMINE

10:16AM  20   IF THE TEST WAS SAFE FOR USE ON PEOPLE, AND THE CONCLUSION

10:16AM  21   SHOULD STATE THAT THE TEST IS SAFE FOR PEOPLE."

10:16AM  22       THOSE ARE YOUR WORDS?

10:16AM  23   A.   YES, THOSE ARE MY WORDS.

10:16AM  24   Q.   AND THAT'S AFTER REVIEWING THERANOS'S DRAFT VALIDATION

10:16AM  25   REPORTS FOR SOME OF THESE TNAA ASSAYS; CORRECT?

ER-1569

10:16AM  1    A.    CORRECT.

10:16AM  2    Q.    YOU CAN SET THAT ASIDE.

10:17AM  3          AND IF YOU CAN TAKE A LOOK AT 20460.

10:17AM  4    A.    OKAY, I'M THERE.

10:17AM  5    Q.    20460 AT THE TOP OF THE PAGE, THE LATTER OF THE MESSAGES

10:17AM  6    IN THE CHAIN APPEARS TO BE DATED DECEMBER 14TH, 2013.

10:17AM  7          DO YOU SEE THAT?

10:17AM  8    A.    YES.

10:17AM  9    Q.    AND FROM DR. PATEL TO YOURSELF?

10:17AM  10   A.    YES.

10:17AM  11   Q.    WITH A COPY TO DANIEL YOUNG?

10:17AM  12   A.    I SEE IT.

10:17AM  13   Q.    AND THE SUBJECT LINE SAYS, RE B. PARAPERTUSSI VALID.SUGG?

10:17AM  14   A.    I SEE IT.

10:17AM  15   Q.    AND THEN THIS APPEARS TO BE AN EMAIL CHAIN BACK AND FORTH

10:17AM  16   RESPONSES BETWEEN YOURSELF AND DR. PATEL.

10:17AM  17         DO YOU SEE THAT?

10:17AM  18   A.    YES.

10:17AM  19   Q.    AND THIS RELATES AGAIN TO YOUR REVIEW OF THESE VALIDATION

10:17AM  20   REPORTS RELATING TO THERANOS'S NUCLEIC ACID AMPLIFICATION

10:18AM  21   TESTS; CORRECT?

10:18AM  22   A.    THEY'RE REFERRING TO ONE SPECIFIC ASSAY, NOT ALL TNAA.

10:18AM  23            MR. CAZARES:  MOVE TO ADMIT 20460, YOUR HONOR.

10:18AM  24            MR. BOSTIC:  NO OBJECTION.

10:18AM  25            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

PANDORI CROSS BY MR. CAZARES (RES.)                                    2245

10:18AM   1              (DEFENDANT'S EXHIBIT 20460 WAS RECEIVED IN EVIDENCE.)

10:18AM   2       BY MR. CAZARES:

10:18AM   3       Q.   AND FOCUSSING OUR ATTENTION TO BE PAGE 2 OF THE EXHIBIT.

10:18AM   4       ON PAGE 2 AT THE TOP, THERE APPEARS TO BE A MESSAGE FROM

10:18AM   5       YOURSELF TO DR. PATEL COPIED TO DR. YOUNG.

10:18AM   6            DO YOU SEE THAT?

10:18AM   7       A.   I DO.

10:18AM   8       Q.   DECEMBER 14TH, 2013.

10:18AM   9            DO YOU SEE THAT?

10:18AM  10       A.   OH, YEAH, IT WAS RIGHT AFTER I STARTED.

10:18AM  11       Q.   IN YOUR MESSAGE YOU WROTE, "PRANAV,

10:18AM  12            "I'VE GONE THROUGH WHAT YOU SENT ME BACK.  I WILL GO

10:18AM  13       THROUGH EVERY VALIDATION IN DETAIL, LIKE THIS, IF THE COMPANY

10:18AM  14       DEEMS THIS TO BE OF USE.  I REALLY THINK THESE ARE SOLID."

10:18AM  15            THOSE ARE YOUR WORDS; CORRECT?

10:18AM  16       A.   YES.

10:18AM  17       Q.   "BUT WITH SOME TWEAKING, THEY WOULD BECOME WELL REFERENCED

10:19AM  18       DOCUMENTS, AIR-TIGHT AGAINST INSPECTION."

10:19AM  19            THOSE ARE YOUR WORDS; CORRECT?

10:19AM  20       A.   CORRECT.

10:19AM  21       Q.   "ALSO, I'D LOVE TO LEARN THE TNAA, AND EVEN RUN IT AT SOME

10:19AM  22       POINT -- I WOULD LIKE TO HELP WITH THESE VALIDATIONS AT ALL

10:19AM  23       LEVELS."

10:19AM  24            THOSE ARE YOUR WORDS?

10:19AM  25       A.   YES.

ER-1571

10:19AM   1    Q.   AND YOU HAD REVIEWED AT LEAST SOME OF THE VALIDATION

10:19AM   2    REPORTS BY DECEMBER 2013; CORRECT?

10:19AM   3    A.   I DON'T KNOW HOW MANY.

10:19AM   4    Q.   BUT YOU DID REVIEW SOME?

10:19AM   5    A.   I BELIEVE SO, YES.

10:19AM   6    Q.   AND THAT'S WHAT IS REFLECTED IN THE MESSAGE; CORRECT?

10:19AM   7    A.   CORRECT.

10:19AM   8    Q.   IF YOU COULD TAKE A LOOK AT EXHIBIT 20456.

10:19AM   9    A.   OKAY.

10:19AM  10    Q.   20456 APPEARS TO BE A MESSAGE FROM -- OR DATED JANUARY 11,

10:20AM  11    2014.

10:20AM  12         DO YOU SEE THAT?

10:20AM  13    A.   YES.

10:20AM  14    Q.   FROM YOURSELF TO MR. BALWANI?

10:20AM  15    A.   YES.

10:20AM  16    Q.   THE SUBJECT LINE EDISONS, ET AL.

10:20AM  17         DO YOU SEE THAT?

10:20AM  18    A.   YES.

10:20AM  19    Q.   AND TAKE A LOOK AT THE MESSAGE AND SEE IF IT REFRESHES

10:20AM  20    YOUR RECOLLECTION ABOUT THE DISCUSSION.

10:20AM  21    A.   YES, IT APPEARS TO BE A REVIEW OF THINGS THAT I HAD BEEN

10:20AM  22    DOING UP UNTIL JANUARY 11TH.

10:20AM  23    Q.   AND IT WAS YOUR REGULAR PRACTICE TO COMMUNICATE WITH EMAIL

10:20AM  24    BOTH WITH MR. BALWANI AS WELL AS OTHERS AT THERANOS?

10:20AM  25    A.   CORRECT.

PANDORI CROSS BY MR. CAZARES (RES.) 2247

10:20AM 1    Q.   AND YOU DID YOUR BEST TO COMMUNICATE ACCURATELY THE ISSUES

10:20AM 2    AND EVENTS THAT YOU WERE DEALING WITH IN THE LAB?

10:20AM 3    A.   YEAH, I WAS EAGER TO MAKE CLEAR THAT I WAS DOING MY JOB.

10:21AM 4            MR. CAZARES:  OKAY.  MOVE TO ADMIT 20456,

10:21AM 5    YOUR HONOR.

10:21AM 6            MR. BOSTIC:  IS THIS COMING IN AS A BUSINESS RECORD?

10:21AM 7            THE COURT:  I WOULD THINK THAT'S THE BASIS FOR THE

10:21AM 8    ADMISSION.

10:21AM 9            MR. CAZARES:  YES, YOUR HONOR.

10:21AM 10           MR. BOSTIC:  NO OBJECTION.

10:21AM 11           THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:21AM 12        (DEFENDANT'S EXHIBIT 20456 WAS RECEIVED IN EVIDENCE.)

10:21AM 13   BY MR. CAZARES:

10:21AM 14   Q.   AND STARTING AT THE TOP OF THE MESSAGE, AGAIN, DATED

10:21AM 15   JANUARY 11TH, 2014, FROM YOURSELF TO MR. BALWANI.

10:21AM 16       DO YOU SEE THAT?

10:21AM 17   A.   YES.

10:21AM 18   Q.   AND THE SUBJECT LINE IS EDISONS ET AL.

10:21AM 19   A.   YES.

10:21AM 20   Q.   AND YOU WROTE, "SUNNY,

10:21AM 21       "I MET WITH SURAJ AND WE DISCUSSED THE 'GO LIVE' AND

10:21AM 22   VALIDATION ASSOCIATED TOPICS FOR THE EDISON IMMUNOASSAYS."

10:21AM 23       DO YOU SEE THAT?

10:21AM 24   A.   YES.

10:21AM 25   Q.   AND YOU WROTE, "I WILL WORK WITH HIM, IN MUCH THE SAME

PANDORI CROSS BY MR. CAZARES (RES.)                    2248

10:21AM   1    CAPACITY AS I AM WORKING WITH PRANAV, TO GET THESE CLIA READY.

10:21AM   2    I HAVE TO SAY, THAT ONE OF THE THINGS I AM REALLY ENJOYING

10:21AM   3    ABOUT BEING HERE IS THE CALIBER OF INDIVIDUALS THAT ARE WORKING

10:21AM   4    HERE."

10:22AM   5         DO YOU SEE THAT?

10:22AM   6    A.   YES.

10:22AM   7    Q.   AND THOSE WERE YOUR THOUGHTS AT THE TIME; CORRECT?

10:22AM   8    A.   CORRECT.

10:22AM   9    Q.   "YOU TOLD ME A WHILE BACK, 'WE WILL NOT FAIL,' AND I HAVE

10:22AM  10    TO SAY, WITH PEOPLE LIKE THIS, I HAVE NO DOUBT."

10:22AM  11         THOSE WERE YOUR WORDS; CORRECT?

10:22AM  12    A.   CORRECT.

10:22AM  13    Q.   THE MESSAGE CONTINUES FURTHER DOWN NEAR THE BOTTOM.  YOU

10:22AM  14    WROTE, "SOUNDS CORNY, BUT I ALREADY THINK WE'RE MAKING IN-ROADS

10:22AM  15    TOWARDS STAFF MORALE AND CULTURE IN CLIA; DON'T WANT TO

10:22AM  16    OVERPROMISE ANYTHING; BUT.. THIS IS AN EXCELLENT GROUP POISED

10:22AM  17    TO DO GREAT WORK, AND I'M LETTING THEM KNOW THIS."

10:22AM  18         CORRECT?

10:22AM  19    A.   YES.

10:22AM  20    Q.   AND THOSE ARE YOUR WORDS TO MR. BALWANI; CORRECT?

10:22AM  21    A.   YES.

10:22AM  22    Q.   YOU CAN SET THAT ASIDE.

10:23AM  23         THE COURT:  FOLKS, WHY DON'T YOU TAKE A STANDING

10:23AM  24    BREAK HERE AND STRETCH FOR A MINUTE WHILE THE NEXT EXHIBIT IS

10:23AM  25    BEING SOUGHT.

10:23AM   1            (STRETCHING.)

10:23AM   2                 THE COURT:  THANK YOU.

10:23AM   3            COUNSEL.

10:23AM   4                 MR. CAZARES:  THANK YOU.

10:23AM   5       Q.   DR. PANDORI, IF YOU CAN TAKE A LOOK AT EXHIBIT 20265.

10:23AM   6       20265.

10:23AM   7       A.   I'M THERE.

10:23AM   8       Q.   AND 20265 APPEARS TO BE AN EMAIL BETWEEN YOURSELF AND

10:24AM   9       MR. BALWANI.

10:24AM  10            DO YOU SEE THAT?

10:24AM  11       A.   YES.

10:24AM  12       Q.   DATED MARCH 17TH, 2014?

10:24AM  13       A.   MARCH 18TH.

10:24AM  14       Q.   18TH.  I APOLOGIZE.  2014?  2014?

10:24AM  15       A.   OH, YES.

10:24AM  16                 MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT PURSUANT TO

10:24AM  17       THE PARTIES' STIP REGARDING EMAILS.

10:24AM  18                 MR. BOSTIC:  NO OBJECTION.

10:24AM  19                 THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:24AM  20            (DEFENDANT'S EXHIBIT 20265 WAS RECEIVED IN EVIDENCE.)

10:24AM  21       BY MR. CAZARES:

10:24AM  22       Q.   AND YOU CAN ALSO SEE THE MESSAGE UP ON TOP OF THE SCREEN,

10:24AM  23       DR. PANDORI, IF IT'S EASIER.

10:24AM  24       A.   EITHER WAY.

10:24AM  25       Q.   LOOKING AT THE TOP OF THE CHAIN, AGAIN, THE LATTER OF THE

PANDORI CROSS BY MR. CAZARES (RES.)                    2250

10:24AM   1    MESSAGES APPEAR TO BE FROM MR. BALWANI TO YOURSELF COPYING

10:24AM   2    DANIEL YOUNG.

10:24AM   3        DO YOU SEE THAT?

10:24AM   4    A.   YES.

10:24AM   5    Q.   AND IT'S DATED MARCH 18TH, AS YOU SAID, 2014; CORRECT?

10:24AM   6    A.   CORRECT.

10:24AM   7    Q.   AND THE SUBJECT LINE SAYS RE: PA.

10:25AM   8        DO YOU SEE THAT?

10:25AM   9    A.   YES.

10:25AM  10    Q.   AND THEN IF WE SCROLL DOWN TO THE EARLIER OF THE MESSAGES

10:25AM  11    IN THE CHAIN --

10:25AM  12    A.   HOW FAR DOWN WOULD YOU LIKE ME TO GO?

10:25AM  13    Q.   START FROM THE BOTTOM.

10:25AM  14        THE FIRST MESSAGE IN THE CHAIN APPEARS TO BE FROM

10:25AM  15    MR. BALWANI TO YOURSELF MARCH 17TH, 2014; CORRECT?

10:25AM  16    A.   YES.

10:25AM  17    Q.   AND IN THE SUBJECT AGAIN IT'S PA.

10:25AM  18        AND MR. BALWANI ASKS YOU, "ARE YOU QUALIFIED TO BE LAB

10:25AM  19    DIRECTOR IN PENNSYLVANIA?"

10:25AM  20        DO YOU SEE THAT?

10:25AM  21    A.   YES.

10:25AM  22    Q.   AND THIS IS MARCH 17TH OF 2014.  YOU RECEIVED -- YOU

10:25AM  23    TESTIFIED ON FRIDAY THAT THE "WIRED" ARTICLE THAT REFLECTED AN

10:25AM  24    INTERVIEW BY MS. HOLMES WAS A CATALYST UPON YOUR LEAVING

10:25AM  25    THERANOS; CORRECT?

10:25AM  1    A.   CORRECT.

10:25AM  2    Q.   BECAUSE OF REPRESENTATIONS IN THE ARTICLE.

10:26AM  3         THAT'S WHAT YOU TESTIFIED TO; CORRECT?

10:26AM  4    A.   CORRECT.

10:26AM  5    Q.   AND YOU RECEIVED THAT ARTICLE IN FEBRUARY OF 2014;

10:26AM  6    CORRECT?

10:26AM  7    A.   YEAH.

10:26AM  8         I DON'T REMEMBER THE DATE EXACTLY.

10:26AM  9    Q.   YOU RECEIVED THE ARTICLE BEFORE MR. BALWANI WAS RAISING

10:26AM  10   THE ISSUE TO YOU ON MARCH 17TH, 2014, ABOUT BECOMING A LAB

10:26AM  11   DIRECTOR IN PENNSYLVANIA FOR THERANOS; CORRECT?

10:26AM  12   A.   WELL, I DON'T KNOW WHAT YOU MEAN BY "RECEIVED THE

10:26AM  13   ARTICLE."

10:26AM  14   Q.   YOU RECEIVED THE ARTICLE IN FEBRUARY OF 2014; CORRECT?

10:26AM  15        MR. BOSTIC:  ASKED AND ANSWERED.

10:26AM  16        THE COURT:  SUSTAINED.

10:26AM  17   BY MR. CAZARES:

10:26AM  18   Q.   LET'S CONTINUE WITH THE EXHIBIT.

10:26AM  19        YOU RESPONDED TO MR. BALWANI ON MARCH 17TH, 2014, "SUNNY,

10:26AM  20        "FROM WHAT I HAVE FOUND, YES, I AM QUALIFIED.  THEY MAY

10:26AM  21   ASK ME TO TAKE AN EXAM, BUT ACCORDING TO THIS, I QUALIFY."

10:26AM  22        AND THEN IT LOOKS LIKE YOU REFERENCED A WEBSITE OF SOME

10:26AM  23   SORT; CORRECT?

10:26AM  24   A.   CORRECT.

10:26AM  25   Q.   AND YOU DIDN'T SAY TO MR. BALWANI, NO, I HAVE NO INTEREST

10:27AM 1    IN BEING A LAB DIRECTOR FOR THERANOS; CORRECT?

10:27AM 2    A.   CORRECT.

10:27AM 3    Q.   AND IF WE CONTINUE WITH THE EXHIBIT, MR. BALWANI RESPONDED

10:27AM 4    TO YOU, AGAIN MARCH 17TH, 2014, "OK.  WE MAY NEED TO OPEN A LAB

10:27AM 5    THERE -- SIMILAR TO WHAT WE HAVE HERE AT 1601 (CLUNKERS AND

10:27AM 6    NORMANDY) OR INITIALLY ALL CLUNKERS AND THEN NORMANDY.  FYI."

10:27AM 7        DO YOU SEE THAT?

10:27AM 8    A.   YES.

10:27AM 9    Q.   AND IN THAT WHEN MR. BALWANI IS REFERENCING CLUNKERS, HE'S

10:27AM 10   TALKING ABOUT FDA APPROVED DEVICES; CORRECT?

10:27AM 11   A.   THAT'S MY MEMORY, YEAH.

10:27AM 12   Q.   AND NORMANDY RELATES TO THE LDT FOR FINGERSTICK TESTING;

10:27AM 13   CORRECT?

10:27AM 14   A.   CORRECT.

10:27AM 15   Q.   AND THEN MR. BALWANI CONTINUES, "CAN YOU INVENTORY WHAT WE

10:27AM 16   NEED TO BUILD A CLUNKERS LAB AND WHAT PERCENTAGE VOLUME WILL IT

10:27AM 17   COVER."

10:27AM 18       DO YOU SEE THAT?

10:27AM 19   A.   YES.

10:27AM 20   Q.   AND SO HE'S ASKING YOU TO ADVISE MR. BALWANI WHAT WILL BE

10:28AM 21   NEEDED FOR A NEW LAB; CORRECT?

10:28AM 22   A.   CORRECT.

10:28AM 23   Q.   AND THEN CONTINUING WITH THE EXHIBIT, MARCH 18TH OF 2014,

10:28AM 24   IT LOOKS LIKE YOU RESPONDED TO MR. BALWANI'S REQUEST; CORRECT?

10:28AM 25   A.   IT DOES, YES.

10:28AM 1    Q.   AND YOU WROTE, "SUNNY,

10:28AM 2         "LET ME KNOW IF YOU WOULD LIKE MORE INFORMATION OR DETAIL.

10:28AM 3    HERE IS A SUMMARY."

10:28AM 4         AND THEN YOU REFERENCED EQUIPMENT THAT WOULD BE NEEDED FOR

10:28AM 5    A NEW LABORATORY; CORRECT?

10:28AM 6    A.   CORRECT.

10:28AM 7    Q.   AND WHEN MR. BALWANI ASKED YOU ABOUT BECOMING A NEW LAB

10:28AM 8    DIRECTOR IN PENNSYLVANIA, YOU DID NOT ASK HIM -- WELL, SCRATCH

10:28AM 9    THAT.  SET THAT ASIDE.  YOU CAN PUT THAT ASIDE.

10:29AM 10        IF YOU CAN TAKE A LOOK AT EXHIBIT 20458.

10:29AM 11   A.   OKAY.

10:29AM 12   Q.   NOW, AS YOU SIT HERE TODAY, YOU DON'T RECALL WHAT DAY YOU

10:29AM 13   RECEIVED A COPY OF THE "WIRED" ARTICLE THAT YOU SAY LED TO YOUR

10:29AM 14   RESIGNATION?

10:29AM 15   A.   I DIDN'T REMEMBER THE EXACT DATE.

10:29AM 16   Q.   OKAY.  TAKE A LOOK AT EXHIBIT 20458.  20458.

10:29AM 17        ARE YOU LOOKING AT IT?

10:29AM 18   A.   YES.

10:29AM 19   Q.   AND IT APPEARS TO BE AN EMAIL?

10:29AM 20   A.   THERE IS A -- IT'S AN EMAIL, YES.

10:29AM 21   Q.   THE LATER OF WHICH APPEARS TO BE FROM A SWAPNA JOSHI.

10:30AM 22        DO YOU SEE THAT?

10:30AM 23   A.   YES.

10:30AM 24   Q.   TO YOURSELF?

10:30AM 25   A.   AND ADAM.

10:30AM 1    Q.   AND DR. ROSENDORFF.

10:30AM 2         DATED 2/27/2014.

10:30AM 3         DO YOU SEE THAT?

10:30AM 4    A.   YES.

10:30AM 5    Q.   AND THERE'S A REFERENCE TO "WIRED" ARTICLE.

10:30AM 6         DO YOU SEE THAT?

10:30AM 7    A.   I DO.

10:30AM 8    Q.   AND THEN BELOW THAT THERE'S A MESSAGE INVOLVING DR. YOUNG

10:30AM 9    AND OTHERS WITHIN THE COMP BIO LAB.

10:30AM 10        DO YOU SEE THAT?

10:30AM 11   A.   OH, THE TO IS COMP.BIO.

10:30AM 12   Q.   EXACTLY.

10:30AM 13        AND YOU KNOW WHO DR. YOUNG IS?

10:30AM 14   A.   YES.

10:30AM 15   Q.   AND SWAPNA JOSHI WORKED WITH DR. YOUNG; CORRECT?

10:30AM 16   A.   I DON'T REMEMBER JOSHI SWAPNA.

10:30AM 17   Q.   AND THE MESSAGE REFLECTS YOU RECEIVED THE "WIRED" ARTICLE

10:31AM 18   ON FEBRUARY 27, 2014; CORRECT?

10:31AM 19   A.   THIS LINK WAS SENT TO ME ON THAT DAY.

10:31AM 20   Q.   SO THAT WAS MORE THAN THREE MONTHS BEFORE YOU LEFT

10:31AM 21   THERANOS; CORRECT?

10:31AM 22   A.   YES.

10:31AM 23             MR. CAZARES:  MOVE TO ADMIT 20458, YOUR HONOR.

10:31AM 24             MR. BOSTIC:  NO OBJECTION.

10:31AM 25             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

PANDORI CROSS BY MR. CAZARES (RES.)                    2255

10:31AM   1              (DEFENDANT'S EXHIBIT 20458 WAS RECEIVED IN EVIDENCE.)

10:31AM   2       BY MR. CAZARES:

10:31AM   3       Q.   AGAIN, TO ORIENT THE JURY, THE EARLIER OF THE TWO MESSAGES

10:31AM   4       IN THE CHAIN APPEARS TO BE FROM DR. YOUNG TO COMP.BIO.

10:31AM   5            DO YOU SEE THAT?

10:31AM   6       A.   I DO.

10:31AM   7       Q.   IS THAT A LIST SERVICE OF SOME SORT?

10:31AM   8       A.   I DON'T KNOW WHAT THAT IS.

10:31AM   9       Q.   AND THE DATE IS FEBRUARY 20TH, 2014.

10:31AM  10            DO YOU SEE THAT?

10:31AM  11       A.   YES.

10:31AM  12       Q.   AND THE SUBJECT LINE IS "WIRED" ARTICLE.

10:31AM  13            DO YOU SEE THAT?

10:31AM  14       A.   YES.

10:31AM  15       Q.   AND THEN THERE'S A LINK TO A "WIRED" ARTICLE THAT

10:31AM  16       REFERENCES ELIZABETH HOLMES AND THERANOS.

10:32AM  17            DO YOU SEE THAT?

10:32AM  18       A.   YES.

10:32AM  19       Q.   AND AGAIN, THE "WIRED" ARTICLE RELATING TO MS. HOLMES IS

10:32AM  20       WHAT YOU SAID WAS A CATALYST TO YOUR RESIGNATION FROM THERANOS;

10:32AM  21       CORRECT?

10:32AM  22       A.   A BIG PART, YEP.

10:32AM  23       Q.   AND THEN CONTINUING ON THE CHAIN, IT APPEARS THAT YOU

10:32AM  24       RECEIVED IT FROM MR. JOSHI, THE LINK TO THE ARTICLE, ON

10:32AM  25       FEBRUARY 27, 2014; CORRECT?

ER-1581

10:32AM    1    A.   CORRECT.

10:32AM    2    Q.   AND THIS IS ALSO BEFORE MR. BALWANI ASKED YOU ABOUT

10:32AM    3    BECOMING A LAB DIRECTOR IN PENNSYLVANIA FOR THERANOS; CORRECT?

10:32AM    4    A.   CORRECT.

10:32AM    5    Q.   AND THIS IS ALSO BEFORE THE MAY 2014 TRANSITION REPORTS

10:32AM    6    THAT YOU SENT TO DR. ROSENDORFF AND MR. BALWANI WHERE YOU

10:32AM    7    ADVISED THAT THEY NEEDED TO DOUBLE THE NUMBER OF EDISONS IN THE

10:32AM    8    CLINICAL LAB; CORRECT?

10:32AM    9    A.   IT WAS BEFORE THAT EMAIL, YEAH.

10:32AM   10    Q.   YOU CAN SET THAT ASIDE.

10:33AM   11         YOU CAN TAKE A LOOK AT EXHIBIT 20253.  20253.

10:33AM   12    A.   OKAY, I'M THERE.

10:33AM   13    Q.   ARE YOU LOOKING AT 20253?

10:33AM   14    A.   I HAVE 20253.

10:33AM   15    Q.   OKAY.  AND 20253 APPEARS TO BE AN EMAIL CHAIN DATED

10:34AM   16    MAY 12TH OF 2014.

10:34AM   17         DO YOU SEE THAT?

10:34AM   18    A.   ARE YOU REFERRING TO 20253?

10:34AM   19    Q.   YES.

10:34AM   20    A.   NO, I DON'T MATCH THOSE DATES.

10:34AM   21    Q.   YOU KNOW WHAT?  SET THAT ONE ASIDE.

10:34AM   22         YOU WANT TO LOOK AT 20490.

10:34AM   23    A.   20490?

10:34AM   24    Q.   YES.

10:35AM   25    A.   DO YOU KNOW WHAT VOLUME THAT IS IN?

10:35AM   1      Q.   20490 WOULD BE IN THE SMALLER BINDER THAT SAYS YOUR NAME

10:35AM   2      ON THE FRONT.

10:35AM   3      A.   OKAY.  I'M THERE.

10:35AM   4      Q.   20490 APPEARS TO BE AN EMAIL CHAIN, THE LATTER OF WHICH AT

10:35AM   5      THE TOP OF THE FIRST PAGE LOOKS TO BE DATED 5/22/2014.

10:35AM   6           DO YOU SEE THAT?

10:35AM   7      A.   YES.

10:35AM   8      Q.   A MESSAGE FROM YOURSELF TO SANI HADZIAHETOVIC?

10:35AM   9           DO YOU SEE THAT?

10:35AM  10      A.   I SEE IT.

10:35AM  11      Q.   AND THE SUBJECT MATTER IS EDISONS.

10:35AM  12           DO YOU SEE THAT?

10:35AM  13      A.   YES.

10:35AM  14           MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT PER THE

10:35AM  15      PARTIES' STIPULATION REGARDING EMAILS.

10:35AM  16           MR. BOSTIC:  IF AS A BUSINESS RECORD, NO OBJECTION,

10:35AM  17      YOUR HONOR.

10:35AM  18           MR. CAZARES:  THIS ONE IS PRIOR INCONSISTENT

10:35AM  19      STATEMENTS, IMPEACHMENT RELATING TO EDISONS.

10:36AM  20           THE COURT:  WELL, I'LL ADMIT IT.  IT'S ADMITTED

10:36AM  21      PURSUANT TO THE STIPULATION.

10:36AM  22      (DEFENDANT'S EXHIBIT 20490 WAS RECEIVED IN EVIDENCE.)

10:36AM  23      BY MR. CAZARES:

10:36AM  24      Q.   AND WE CAN START AT THE TOP OF FIRST PAGE, DR. PANDORI,

10:36AM  25      AGAIN A MAY 22ND, 2014, MESSAGE FROM YOURSELF TO

PANDORI CROSS BY MR. CAZARES (RES.) 2258

10:36AM  1    SANI HADZIAHETOVIC.

10:36AM  2    A.    YES.

10:36AM  3    Q.    AND YOU WROTE, "OK SANI,

10:36AM  4          "THANK YOU FOR YOUR ATTENTION AND WORK TO GET THIS GOING.

10:36AM  5    LET ME KNOW HOW I CAN ASSIST."

10:36AM  6          DO YOU SEE THAT?

10:36AM  7    A.    YES.

10:36AM  8    Q.    AND THIS RELATES TO EDISONS IN SOME WAY?

10:36AM  9    A.    THAT'S THE SUBJECT LINE.

10:36AM  10   Q.    WHY DON'T WE GO BACK ON PAGE 4, MIDDLE OF THE PAGE, THERE

10:37AM  11   APPEARS TO BE A MESSAGE FROM YOURSELF, MAY 20, 2014.

10:37AM  12         DO YOU SEE THAT?

10:37AM  13   A.    YES.

10:37AM  14   Q.    AND THEN THE MESSAGE IS TO A CHINMAY PANGARKAR.

10:37AM  15         DO YOU SEE THAT?

10:37AM  16   A.    YES.

10:37AM  17   Q.    ADAM ROSENDORFF.

10:37AM  18         DO YOU SEE THAT?

10:37AM  19   A.    YES.

10:37AM  20   Q.    NISHIT DOSHI.

10:37AM  21         DO YOU SEE THAT?

10:37AM  22   A.    YES.

10:37AM  23   Q.    AURELIE SOUPPE?

10:37AM  24   A.    YES.

10:37AM  25   Q.    ROMINA RIENER?

ER-1584

PANDORI CROSS BY MR. CAZARES (RES.)                    2259

10:37AM   1    A.    YES.

10:37AM   2    Q.    AS WELL AS HODA ALAMDAR; CORRECT?

10:37AM   3    A.    YES.

10:37AM   4    Q.    NOW, MS. SOUPPE, MS. RIENER, AND MS. ALAMDAR ALL WORKED

10:37AM   5    WITHIN THE CLINICAL LAB; CORRECT?

10:37AM   6    A.    YES.

10:37AM   7    Q.    BUT DR. PANGARKAR WAS NOT WITHIN THE CLINICAL LAB;

10:37AM   8    CORRECT?

10:37AM   9    A.    HE DIDN'T WORK AS A LAB TECH OR A CLS.  I BELIEVE HE

10:37AM  10    WORKED DEVELOPING CBC TESTS, BUT I'M NOT 100 PERCENT CLEAR ON

10:37AM  11    MY MEMORY ON THAT.

10:37AM  12    Q.    AND GETTING BACK TO THE MESSAGE FROM YOURSELF, YOU WROTE,

10:37AM  13    "HI, CHINMAY, NISHIT."

10:37AM  14          DO YOU SEE THAT?

10:37AM  15    A.    YES.

10:37AM  16    Q.    AND YOU WROTE, "THERE REMAINS AN ISSUE IN NORMANDY WITH

10:37AM  17    THE NUMBER OF EDISON READERS AVAILABLE FOR PATIENT TESTING.  WE

10:38AM  18    WILL SURELY NEED MORE READERS FOR THE FOLLOWING REASONS."

10:38AM  19          DO YOU SEE THAT?

10:38AM  20    A.    YES.

10:38AM  21    Q.    AND THOSE ARE YOUR WORDS; CORRECT?

10:38AM  22    A.    YES, THE FROM LINE IS ME.

10:38AM  23    Q.    AND THIS IS MAY 20, 2014.  THIS IS THE DAY AFTER YOUR

10:38AM  24    BIRTHDAY IN 2014; CORRECT?

10:38AM  25    A.    IT IS.

PANDORI CROSS BY MR. CAZARES (RES.)                    2260

10:38AM  1    Q.  WHICH MEANS THIS IS A DAY WITHIN A DAY OF THE CONVERSATION

10:38AM  2    THAT YOU SAY YOU HAD WITH MS. HOLMES AND MR. BALWANI THAT LED

10:38AM  3    TO YOUR RESIGNATION AROUND THE TIME OF YOUR BIRTHDAY, MAY 19TH,

10:38AM  4    2014; CORRECT?

10:38AM  5    A.  WELL, AS I'VE SAID, I'M NOT -- I DON'T RECALL PRECISELY

10:38AM  6    THE DAY THAT I HAD THAT CONVERSATION.

10:38AM  7    Q.  WE CAN CONTINUE BACK TO THE MESSAGE.  UNDER ITEM 1 YOU

10:38AM  8    WROTE, "THE NUMBER OF EDISON TESTS IS ALREADY CHALLENGING THE

10:38AM  9    NUMBER WE HAVE."

10:38AM  10        DO YOU SEE THAT?

10:38AM  11   A.  YES.

10:38AM  12   Q.  AND THEN YOU FOLLOW, "A NEW WORKFLOW PROCESS WILL REQUIRE

10:38AM  13   ALL VACUTAINERS WITH EDISON-CAPABLE TESTS TO BE ALIQUOTED INTO

10:38AM  14   CTN AND TESTED ON EDISONS."

10:39AM  15        DO YOU SEE THAT?

10:39AM  16   A.  YES.

10:39AM  17   Q.  AND THE MESSAGE CONTINUES.  "MORE STORES ARE OPENING THIS

10:39AM  18   WEEK (WE CANNOT ESTIMATE HOW MANY MORE SPECIMENS WILL BE COMING

10:39AM  19   IN AS A RESULT)."

10:39AM  20        DO YOU SEE THAT?

10:39AM  21   A.  YES.

10:39AM  22   Q.  NOW, IN THE MESSAGE, YOU WERE NOT TELLING DR. PANGARKAR TO

10:39AM  23   STOP USING EDISONS FOR PATIENT TESTING; CORRECT?

10:39AM  24   A.  CORRECT.

10:39AM  25   Q.  AND IN THE MESSAGE, MAY 20, 2014, YOU ARE NOT TELLING

10:39AM  1    DR. ROSENDORFF TO STOP USING EDISONS FOR PATIENT TESTING;

10:39AM  2    CORRECT?

10:39AM  3    A.   CORRECT.

10:39AM  4    Q.   YOU'RE NOT TELLING ANY OF THE PERSONS IN EXHIBIT 20490 TO

10:39AM  5    STOP USING EDISONS; CORRECT?

10:39AM  6    A.   I DON'T HAVE THAT AUTHORITY, AND I DID NOT AT THAT TIME.

10:39AM  7    Q.   AND YOU'RE NOT MAKING THAT RECOMMENDATION IN EXHIBIT 20490

10:39AM  8    EITHER, ARE YOU?

10:39AM  9    A.   I'M NOT MAKING THAT RECOMMENDATION HERE.

10:39AM  10   Q.   IF WE CAN CONTINUE TO PAGE 5 OF THE MESSAGE.

10:40AM  11        YOU QUOTE, "THERE ARE APPARENTLY 2 ADDITIONAL READERS FOR

10:40AM  12   TSH, HOWEVER THEY ARE NOT BEEN CHARACTERIZED PROPERLY FOR USE."

10:40AM  13        DO YOU SEE THAT?

10:40AM  14   A.   YES.

10:40AM  15   Q.   AND THEN YOU FOLLOWED, "FOR TSH ALONE, WE HAVE ABOUT 10

10:40AM  16   TEST-HOURS OF DEMAND, NOT COUNTING BOTH QC RUNS AND ANY RERUNS

10:40AM  17   THAT ARE NECESSARY.

10:40AM  18        DO YOU SEE THAT?

10:40AM  19   A.   YES.

10:40AM  20   Q.   "OF COURSE OTHER TESTS ARE DEMANDING THE ATTENTION OF THE

10:40AM  21   TECHNICIAN, SO THINGS ARE NOT RUNNING PERFECTLY END-TO-END AND

10:40AM  22   SO THE AMOUNT OF WORK IS PRETTY HIGH."

10:40AM  23        DO YOU SEE THAT?

10:40AM  24   A.   CORRECT.

10:40AM  25   Q.   AND AT THAT TIME PATIENT VOLUME WAS INCREASING AT THE

PANDORI CROSS BY MR. CAZARES (RES.)                2262

10:40AM  1    CLINICAL LAB; CORRECT?

10:40AM  2    A.   YEAH.  I DON'T SPECIFICALLY RECALL WHAT THE NUMBERS WERE

10:40AM  3    AT THAT POINT IN TIME.

10:40AM  4    Q.   THE MESSAGE CONTINUES, "CLIA LAB AIMS TO BRING MORE PEOPLE

10:40AM  5    INTO THIS SECTION TO TRAIN."

10:40AM  6         DO YOU SEE THAT?

10:40AM  7    A.   YES.

10:40AM  8    Q.   "HOWEVER, IN ORDER TO BE EFFECTIVE, EXTRA PEOPLE WILL NEED

10:40AM  9    MORE READERS."

10:40AM  10        DO YOU SEE THAT?

10:40AM  11   A.   YES.

10:40AM  12   Q.   THOSE ARE YOUR WORDS; CORRECT?

10:41AM  13   A.   CORRECT.

10:41AM  14   Q.   FOR THE LAB TECHNICIANS TO BE MORE EFFECTIVE, THEY WILL

10:41AM  15   NEED MORE READERS?

10:41AM  16   A.   CORRECT.

10:41AM  17   Q.   AND BY READERS YOU MEAN MORE EDISONS; CORRECT?

10:41AM  18   A.   CORRECT.

10:41AM  19   Q.   AND THEN YOU WROTE, "I'D LIKE TO DISCUSS A PLAN TO DOUBLE

10:41AM  20   THE NUMBER OF READERS FOR THE THREE MAIN TESTS."

10:41AM  21        DO YOU SEE THAT?

10:41AM  22   A.   CORRECT.

10:41AM  23   Q.   THOSE ARE YOUR WORDS; CORRECT?

10:41AM  24   A.   CORRECT.

10:41AM  25   Q.   AND BY "THREE MAIN TESTS," THAT'S THREE MAIN TESTS RUN ON

ER-1588

10:41AM   1    EDISON FOR PATIENT TESTING; CORRECT?

10:41AM   2    A.   CORRECT.

10:41AM   3    Q.   AND "THIS WILL BE NECESSARY AS MORE STORES WILL BE OPENING

10:41AM   4    IN JUNE AND WE STILL DON'T KNOW THE IMPACT OF THE OPENINGS IN

10:41AM   5    MAY."

10:41AM   6        DO YOU SEE THAT?

10:41AM   7    A.   CORRECT.

10:41AM   8    Q.   SO YOU WERE EXPECTING PATIENT VOLUME TO GO UP AT THE TIME,

10:41AM   9    WHICH IS WHY YOU WERE ASKING FOR MORE EDISONS AT THE TIME;

10:41AM  10    CORRECT?

10:41AM  11    A.   YEAH.  THEY FAILED SO FREQUENTLY THAT WE NEEDED MORE OF

10:41AM  12    THEM.

10:41AM  13    Q.   BUT YOU'RE NOT SAYING STOP USING THEM, ARE YOU?

10:41AM  14    A.   NOT IN THIS EMAIL.

10:42AM  15    Q.   YOU CAN SET THAT ASIDE.

10:42AM  16        IF YOU CAN TAKE A LOOK AT EXHIBIT 20521.

10:42AM  17    A.   OKAY.  I'M THERE.

10:42AM  18    Q.   20521 APPEARS TO BE A MESSAGE, A CHAIN OF EMAILS, THE

10:42AM  19    LATTER OF WHICH IS DATED MAY 22ND, 2014.

10:42AM  20        DO YOU SEE THAT?

10:42AM  21    A.   I SEE THE EMAILS.

10:42AM  22    Q.   AND THE MESSAGE AT THE TOP APPEARS TO BE FROM YOURSELF.

10:42AM  23        DO YOU SEE THAT?

10:42AM  24    A.   YES.

10:42AM  25    Q.   TO MAX FOSQUE.

PANDORI CROSS BY MR. CAZARES (RES.)                    2264

10:42AM   1          DO YOU SEE THAT?

10:42AM   2     A.   YES.

10:42AM   3     Q.   AND THE SUBJECT IS RE 35050 AND 23321.

10:43AM   4          DO YOU SEE THAT?

10:43AM   5     A.   YES.

10:43AM   6     Q.   AND MR. FOSQUE WAS ONE OF THOSE PROJECT MANAGERS AT

10:43AM   7     THERANOS; CORRECT?

10:43AM   8     A.   YES.

10:43AM   9     Q.   AND HE'S SOMEONE THAT YOU HAD OCCASION TO DEAL WITH IN

10:43AM  10     YOUR BUSINESS AT THERANOS; CORRECT?

10:43AM  11     A.   FREQUENT OCCASION.

10:43AM  12          MR. CAZARES:  MOVE TO ADMIT 20521, YOUR HONOR.

10:43AM  13          MR. BOSTIC:  NO OBJECTION.

10:43AM  14          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:43AM  15     (DEFENDANT'S EXHIBIT 20521 WAS RECEIVED IN EVIDENCE.)

10:43AM  16     BY MR. CAZARES:

10:43AM  17     Q.   NOW, STARTING AT THE TOP OF THE MESSAGE, THE LATTER OF THE

10:43AM  18     MESSAGES IN THE CHAIN, YOU WROTE TO MR. FOSQUE, "NO PROBLEM.

10:43AM  19          "I WHOLEHEARTEDLY EXPECTED IT TO PLAY OUT EXACTLY AS IT

10:43AM  20     PLAYED OUT.

10:43AM  21          "THANKS, MAX."

10:43AM  22          DO YOU SEE THAT?

10:43AM  23     A.   I SEE IT.

10:43AM  24     Q.   AND THEN IN RESPONSE -- THAT IS A RESPONSE TO A MESSAGE

10:44AM  25     FROM MR. FOSQUE WHERE HE WROTE, "THANKS... SHOULD I NOT HAVE

ER-1590

PANDORI CROSS BY MR. CAZARES (RES.)                2265

10:44AM  1    SENT THAT EMAIL, PERHAPS?

10:44AM  2         "WE WOULD HAVE LOOKED VERY FOOLISH IN FRONT OF A LARGE

10:44AM  3    DOCTOR'S GROUP IF WE HAD CALLED ONE OF THOSE PATIENTS FOR A

10:44AM  4    SECOND REDRAW..."

10:44AM  5         DO YOU SEE THAT?

10:44AM  6    A.   I SEE IT.

10:44AM  7    Q.   AND THE MESSAGE BELOW THAT APPEARS TO BE DATED MAY 21,

10:44AM  8    2014.

10:44AM  9         DO YOU SEE THAT?

10:44AM 10    A.   YES.

10:44AM 11    Q.   FROM YOURSELF; CORRECT?

10:44AM 12    A.   CORRECT.

10:44AM 13    Q.   TO MR. BALWANI?

10:44AM 14    A.   AMONG OTHERS.

10:44AM 15    Q.   MAX FOSQUE, DR. ROSENDORFF IS ALSO IN THE TO LINE.

10:44AM 16         DO YOU SEE THAT?

10:44AM 17    A.   I DO.

10:44AM 18    Q.   DANIEL YOUNG?

10:44AM 19    A.   YES.

10:44AM 20    Q.   NISHIT DOSHI.

10:44AM 21         DO YOU SEE THAT?

10:44AM 22    A.   YES.

10:44AM 23    Q.   AND TINA LIN?

10:44AM 24    A.   I SEE IT.

10:44AM 25    Q.   AND THEN THERE ARE OTHERS COPIED IN THE CC LINE?

ER-1591

PANDORI CROSS BY MR. CAZARES (RES.)                    2266

10:44AM   1     A.   YES.

10:44AM   2     Q.   AND IN THE MESSAGE YOU WROTE, "I HAD BEEN NOTIFIED OF THIS

10:45AM   3     SITUATION VERY RECENTLY, TODAY, THROUGH MARIA WHO IS TRYING TO

10:45AM   4     REVIEW AND RELEASE THESE."

10:45AM   5          DO YOU SEE THAT?

10:45AM   6     A.   YES.

10:45AM   7     Q.   AND BY "THESE" THAT'S RELATING TO PATIENT RESULTS;

10:45AM   8     CORRECT?

10:45AM   9     A.   I GUESS SO.  I MEAN, THAT WOULD MAKE SENSE IN THE CONTEXT

10:45AM  10     OF THE EMAIL, BUT I DON'T KNOW FOR SURE.

10:45AM  11     Q.   AND THEN YOU CONTINUED IN THE MESSAGE, "THE SAMPLES ARE

10:45AM  12     BOTH LOCATED AND ARE SCHEDULED TO BE RUN ASAP."

10:45AM  13          DO YOU SEE THAT?

10:45AM  14     A.   YES.

10:45AM  15     Q.   AND THEN YOUR MESSAGE CONTINUES, "THE EDISON OPERATORS

10:45AM  16     FAILED TO ENTER THESE TWO SPECIMENS INTO THE WORKFLOW."

10:45AM  17          DO YOU SEE THAT?

10:45AM  18     A.   YES.

10:45AM  19     Q.   AND THEN YOU CONTINUED, "IN A PURSUIT OF WHY, IT SEEMS

10:45AM  20     THAT AT LEAST PART OF THE ISSUE WAS THAT THEY WERE NOT USING

10:45AM  21     THE PENDING LISTS NOW BEING GENERATED EACH DAY, AND INSTEAD

10:45AM  22     RELYING ON THE BINDER DOWNSTAIRS WITH THE SPECIMEN PRINTOUTS."

10:45AM  23          DO YOU SEE THAT?

10:45AM  24     A.   YEAH.

10:45AM  25     Q.   "TOMORROW THERE IS A CLIA WIDE MEETING TO DISCUSS THE

ER-1592

10:45AM  1    UTILIZATION OF THE NOVEL PENDING LISTS, AND TO REVIEW THIS

10:46AM  2    ISSUE."

10:46AM  3        DO YOU SEE THAT?

10:46AM  4    A.   YES.

10:46AM  5    Q.   SO YOU ARE REPORTING TO THE RECIPIENTS OF THE MESSAGE THAT

10:46AM  6    THE OPERATORS FAILED TO IDENTIFY TWO SPECIMENS AS NEEDING TO BE

10:46AM  7    RUN; CORRECT?

10:46AM  8    A.   YES.

10:46AM  9    Q.   AND THEN YOU WERE IDENTIFYING A WAY THAT YOU WERE GOING TO

10:46AM  10   SOLVE THAT PROBLEM IN THE FUTURE; CORRECT?

10:46AM  11   A.   YES.

10:46AM  12   Q.   AND THEN THE MESSAGE CONTINUES.  YOU WROTE, "RELATEDLY, I

10:46AM  13   HAVE ON TWO OCCASIONS IN THE LAST 2 WEEKS REQUESTED MORE EDISON

10:46AM  14   READERS TO BE MADE AVAILABLE IN NORMANDY."

10:46AM  15       DO YOU SEE THAT?

10:46AM  16   A.   YES.

10:46AM  17   Q.   THOSE ARE YOUR WORDS; CORRECT?

10:46AM  18   A.   CORRECT.

10:46AM  19   Q.   "TESTING VOLUMES ARE GOING UP AND HAVING ONLY 2 TO 3

10:46AM  20   READERS PER TEST CAUSES SPECIMENS TO BACK UP AND FOR THE

10:46AM  21   WORKFLOW TO GAIN COMPLEXITY."

10:46AM  22       DO YOU SEE THAT?

10:46AM  23   A.   OH, YEAH.

10:46AM  24   Q.   AND THIS BACKUP ISSUE OR TURN-AROUND TIME, THAT WAS A

10:46AM  25   CONCERN YOU HAD AT THE TIME; CORRECT?

ER-1593

10:46AM   1    A.   AMONG SEVERAL CONCERNS, YES.

10:47AM   2    Q.   AND THEN YOU CONTINUED, "I AM TOLD THAT MORE READERS ARE

10:47AM   3    ON THEIR WAY, AT LEAST FOR THE MOST COMMON TESTS."

10:47AM   4         CORRECT?

10:47AM   5    A.   CORRECT.

10:47AM   6    Q.   AND IN THE MESSAGE, YOU'RE NOT TELLING THE RECIPIENTS OF

10:47AM   7    THIS MESSAGE TO STOP USING EDISONS FOR PATIENT TESTING;

10:47AM   8    CORRECT?

10:47AM   9    A.   CORRECT.

10:47AM  10    Q.   AND AMONG THE RECIPIENTS OF THIS MESSAGE IS MR. BALWANI;

10:47AM  11    CORRECT?

10:47AM  12    A.   CORRECT.

10:47AM  13              MR. CAZARES:  YOUR HONOR, MAY I HAVE A MOMENT?

10:47AM  14              THE COURT:  YES.

10:48AM  15         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:48AM  16              MR. CAZARES:  YOUR HONOR, NO FURTHER QUESTIONS AT

10:48AM  17    THIS TIME.

10:48AM  18              THE COURT:  REDIRECT?

10:48AM  19              MR. BOSTIC:  YES, YOUR HONOR.

10:48AM  20         YOUR HONOR, MAY I ASK WHEN THE COURT IS CONSIDERING TAKING

10:48AM  21    A MORNING BREAK?

10:48AM  22              THE COURT:  WELL, MAYBE AT THE BOTTOM OF THE HOUR.

10:48AM  23    ANOTHER 40 MINUTES.

10:48AM  24         I DON'T SEE AN OBJECTION, SO LET'S DO THAT.

10:48AM  25              MR. BOSTIC:  THANK YOU, YOUR HONOR.  WE'LL PLAN

10:48AM  1    ACCORDINGLY.

10:48AM  2                        **REDIRECT EXAMINATION**

10:48AM  3    BY MR. BOSTIC:

10:48AM  4    Q.   GOOD MORNING, DR. PANDORI.

10:48AM  5    A.   GOOD MORNING.

10:48AM  6    Q.   I WOULD LIKE TO ASK YOU A FEW QUESTIONS FOLLOWING UP ON

10:48AM  7    YOUR CONVERSATION WITH MR. CAZARES OVER THE LAST COUPLE OF

10:48AM  8    DAYS.

10:49AM  9         FIRST I'D LIKE TO START ON THE TOPIC OF PROFICIENCY

10:49AM 10    TESTING AT THERANOS.  DO YOU RECALL TALKING ABOUT THAT ON YOUR

10:49AM 11    DIRECT EXAM AND THEN ON CROSS?

10:49AM 12    A.   YES, I DO.

10:49AM 13    Q.   AND IN PARTICULAR, DO YOU RECALL DISCUSSIONS ABOUT A TEST

10:49AM 14    THAT WAS RUN AT THERANOS ON PROFICIENCY TESTING SAMPLES IN

10:49AM 15    FEBRUARY OF 2014?

10:49AM 16    A.   YES.

10:49AM 17    Q.   ON CROSS, MR. CAZARES ASKED YOU WHETHER YOU HAD PERSONALLY

10:49AM 18    OBSERVED THAT TESTING BEING PERFORMED.

10:49AM 19         DO YOU RECALL THAT QUESTIONING?

10:49AM 20    A.   YES, I RECALL THAT.

10:49AM 21    Q.   AND YOUR TESTIMONY WAS THAT YOU HAD NOT SEEN THAT TESTING

10:49AM 22    ACTUALLY HAPPEN; CORRECT?

10:49AM 23    A.   CORRECT.

10:49AM 24    Q.   DO YOU HAVE ANY REASON, SITTING HERE TODAY, TO DOUBT THAT

10:49AM 25    THAT TEST WAS PERFORMED PROPERLY?

10:49AM  1              MR. CAZARES:  OBJECTION.  CALLS FOR SPECULATION.

10:49AM  2              THE COURT:  OVERRULED.

10:49AM  3              THE WITNESS:  NO, I HAVE NO REASON TO BELIEVE THAT

10:50AM  4       IT WAS TESTED INCORRECTLY.

10:50AM  5          LABORATORIES OPERATE BY STANDARD OPERATING PROCEDURES THAT

10:50AM  6       ARE WRITTEN AND TRAINED AND COMPETENCY IS ASSESSED, AND THAT'S

10:50AM  7       UNLIKE OTHER STYLES OF WORKPLACES.

10:50AM  8       BY MR. BOSTIC:

10:50AM  9       Q.   AND I'D LIKE TO ASK YOU, ON THAT SAME TOPIC, ABOUT

10:50AM 10       ERIKA CHEUNG SPECIFICALLY.  ARE YOU FAMILIAR WITH MS. CHEUNG

10:50AM 11       AND HER POSITION AT THE COMPANY?

10:50AM 12       A.   I AM.

10:50AM 13       Q.   ARE YOU FAMILIAR WITH MS. CHEUNG'S ROLE IN THE CLINICAL

10:50AM 14       LAB AT THERANOS DURING YOUR TIME THERE?

10:50AM 15       A.   I AM FAMILIAR.

10:50AM 16       Q.   AS PART OF MS. CHEUNG'S ROLE AT THERANOS, DID SHE HAVE

10:50AM 17       EXPERIENCE WITH THE PROCEDURES FOR RUNNING PATIENT SAMPLES ON

10:50AM 18       EDISON DEVICES?

10:50AM 19       A.   IT WAS MY UNDERSTANDING THAT SHE DID, YES.

10:50AM 20       Q.   AND WHERE DID THAT EXPERIENCE COME FROM BASED ON YOUR

10:50AM 21       UNDERSTANDING?

10:50AM 22       A.   THERANOS.

10:50AM 23       Q.   AND WHAT WAS IT ABOUT HER ROLE THAT GAVE HER THAT

10:50AM 24       EXPERIENCE?

10:51AM 25       A.   HER ROLE WAS AS A LABORATORY ASSOCIATE, AND THAT WAS THEIR

PANDORI REDIRECT BY MR. BOSTIC                               2271

10:51AM  1    ROLE AND JOB DESCRIPTION.

10:51AM  2    Q.   THERE WAS ALSO SOME DISCUSSION WITH MR. CAZARES ABOUT

10:51AM  3    WHERE THE TEST MATERIAL FOR THAT FEBRUARY TEST CAME FROM.

10:51AM  4         DO YOU RECALL THAT?

10:51AM  5    A.   YES.

10:51AM  6    Q.   AND MR. CAZARES ASKED YOU ABOUT THE FACT THAT THOSE

10:51AM  7    SAMPLES HAD BEEN PREVIOUSLY RECEIVED AND USED FOR A ROUND OF

10:51AM  8    TESTING; IS THAT CORRECT?

10:51AM  9    A.   CORRECT.

10:51AM  10   Q.   DOES THAT FACT GIVE YOU ANY REASON TO DOUBT THE VALIDITY

10:51AM  11   OF THE FEBRUARY 2014 TESTS THAT WE'VE DISCUSSED?

10:51AM  12   A.   NOT AT THIS TIME.

10:51AM  13   Q.   THE FACT THAT THOSE SAMPLES HAD BEEN USED IN A PREVIOUS

10:51AM  14   ROUND, DOES THAT DEGRADE OR ERASE THE ABILITY OF THOSE SAMPLES

10:51AM  15   TO BE USED FOR THIS KIND OF TESTING?

10:52AM  16              MR. CAZARES:  OBJECTION.  702.

10:52AM  17              THE COURT:  OVERRULED.  OVERRULED.

10:52AM  18        YOU CAN ANSWER THE QUESTION.

10:52AM  19              THE WITNESS:  I'M NOT FAMILIAR WITH FOR THOSE

10:52AM  20   PARTICULAR TESTS EXACTLY, BUT IT WOULD BE COMMON, FROM A

10:52AM  21   STABILITY POINT OF VIEW OR --

10:52AM  22              MR. CAZARES:  OBJECTION.  FOUNDATION.

10:52AM  23              THE COURT:  SUSTAINED.

10:52AM  24        YOU CAN ASK ANOTHER QUESTION.

10:52AM  25              MR. BOSTIC:  MAY I LAY A FOUNDATION, YOUR HONOR?

ER-1597

10:52AM   1          THE COURT:  YES.

10:52AM   2     BY MR. BOSTIC:

10:52AM   3     Q.   DR. PANDORI, FROM YOUR WORK AT THERANOS, DO YOU HAVE AN

10:52AM   4     UNDERSTANDING AS TO THE GENERAL STABILITY OF SAMPLES LIKE WE'RE

10:52AM   5     TALKING ABOUT?

10:52AM   6     A.   FROM MY WORK AT THERANOS?

10:52AM   7     Q.   YES.

10:52AM   8     A.   I HAVE A GENERAL UNDERSTANDING OF THE STABILITY OF SUCH

10:52AM   9     SPECIMENS BASED ON THE ENTIRETY OF MY EXPERIENCE.

10:52AM  10     Q.   LET ME ASK YOU A MORE GENERAL QUESTION THEN.

10:52AM  11          YOU TESTIFIED EARLIER THAT IT WAS YOUR DECISION TO RUN

10:53AM  12     EDISON TESTING ON THESE SAMPLES IN FEBRUARY OF 2014; IS THAT

10:53AM  13     CORRECT?

10:53AM  14     A.   YES.

10:53AM  15     Q.   AND WHEN YOU DIRECTED THAT THAT TESTING HAPPEN, WHAT WAS

10:53AM  16     YOUR VIEW AS TO WHETHER THAT TESTING WAS GOING TO PROVIDE VALID

10:53AM  17     OR INVALID DATA?

10:53AM  18     A.   MY VIEW WAS THAT IT WOULD PROVIDE VALID DATA.

10:53AM  19     Q.   AND SITTING HERE TODAY, DO YOU HAVE ANY REASON TO DOUBT

10:53AM  20     THAT THAT DATA WAS VALID?

10:53AM  21     A.   I HAVE NONE.

10:53AM  22     Q.   MS. WACHS, CAN WE DISPLAY EXHIBIT 1548, AND SPECIFICALLY

10:53AM  23     THE ATTACHMENT.

10:53AM  24          DR. PANDORI, WHEN YOU WERE DISCUSSING THIS SPECIFIC TEST,

10:53AM  25     OR THIS TESTING WITH MR. CAZARES, THERE WAS ALSO SOME

PANDORI REDIRECT BY MR. BOSTIC 2273

10:53AM 1     DISCUSSION ABOUT AAP.

10:53AM 2         DO YOU RECALL THAT?

10:53AM 3     A.   YES.

10:53AM 4     Q.   AND THAT DISCUSSION CONCERNED, FOR EXAMPLE, WHETHER

10:54AM 5     THERANOS HAD A PEER GROUP SUCH THAT IT COULD DO PROFICIENCY

10:54AM 6     TESTING IN THE STANDARD, IN THE INDUSTRY STANDARD WAY; CORRECT?

10:54AM 7     A.   CORRECT.

10:54AM 8     Q.   AND YOU TESTIFIED THAT YOU RECOGNIZED THAT THERANOS DID

10:54AM 9     NOT HAVE A PEER GROUP SUCH THAT IT COULD DO STANDARD

10:54AM 10    PROFICIENCY TESTING; CORRECT?

10:54AM 11    A.   CORRECT.

10:54AM 12    Q.   AND WAS THAT YOUR UNDERSTANDING IN FEBRUARY OF 2014?

10:54AM 13    A.   NO.

10:54AM 14    Q.   WHEN YOU ORDERED THAT THIS TESTING TAKE PLACE IN FEBRUARY

10:54AM 15    OF 2014, HOW DID YOU ACCOUNT FOR THE FACT THAT THIS WAS NOT AAP

10:54AM 16    BUT WAS STANDARD PROFICIENCY TESTING?

10:54AM 17    A.   WELL, AT THIS MOMENT IN TIME I WASN'T AWARE OF AN AAP

10:54AM 18    PROTOCOL AT THERANOS.

10:54AM 19        MY PRIMARY DRIVE AND CONCERN IN THAT ACTIVITY WAS THAT WE

10:54AM 20    HAD NOT DONE PT PROPERLY, WHICH IS TO SAY THAT WE HAD NOT DONE

10:55AM 21    PROFICIENCY TESTING IN A MANNER CONSISTENT WITH HOW PATIENT

10:55AM 22    SPECIMENS ARE TREATED.

10:55AM 23        SO MY PRIMARY GOAL WAS TO -- THERE WERE TWO GOALS.  ONE

10:55AM 24    WAS TO GET THAT DONE; AND SECONDARILY, TO THEN SEE FOR MYSELF,

10:55AM 25    BECAUSE I WAS RELATIVELY NEW AT THAT COMPANY, HOW THE

PANDORI REDIRECT BY MR. BOSTIC                                    2274

10:55AM  1    PERFORMANCE WOULD GO.

10:55AM  2    Q.   IN RETROSPECT -- WELL, LET ME ASK A DIFFERENT QUESTION.

10:55AM  3         SUBSEQUENTLY DID YOU COME TO HAVE A BETTER UNDERSTANDING

10:55AM  4    OF AAP PROTOCOLS OR REQUIREMENTS AS IT RELATED TO THERANOS?

10:55AM  5    A.   I DID.

10:55AM  6    Q.   INCORPORATING THAT UNDERSTANDING IN RETROSPECT, DO YOU NOW

10:55AM  7    VIEW THE DATA THAT WE'RE LOOKING AT ON THE SCREEN AS INVALID OR

10:55AM  8    NOT USEFUL IN TERMS OF MEASURING THE PERFORMANCE OF THERANOS

10:55AM  9    TESTS?

10:55AM  10   A.   WELL, I WAS NOT ABLE TO ASCERTAIN THE ANSWER TO THAT

10:55AM  11   QUESTION.

10:55AM  12        YOU KNOW, I WASN'T THERE LONG ENOUGH FOR ANYBODY TO SHOW

10:56AM  13   ME ANY DATA THAT INDICATED THAT THERE WAS A MATRIX ISSUE.

10:56AM  14   ALTHOUGH THE CONSTRUCTION OF AAP'S PRIOR TO MY ARRIVAL AT

10:56AM  15   THERANOS WOULD IMPLY THAT SUCH STUDIES HAD BEEN DONE, I WAS

10:56AM  16   NEVER MADE AWARE OF THE RESULTS OF SUCH STUDIES.

10:56AM  17   Q.   LET ME ASK IT MAYBE A SIMPLER WAY.

10:56AM  18        WE REVIEWED THIS DATA DURING YOUR DIRECT EXAMINATION;

10:56AM  19   CORRECT?

10:56AM  20   A.   CORRECT.

10:56AM  21   Q.   AND THIS TEST IN FEBRUARY OF 2014, IN YOUR VIEW, DID IT

10:56AM  22   REVEAL ANY PROBLEMS OR RAISE ANY CONCERNS ABOUT THE ACCURACY OF

10:56AM  23   THERANOS'S TESTING?

10:56AM  24             MR. CAZARES:  OBJECTION.  702.

10:56AM  25             THE COURT:  OVERRULED.

ER-1600

10:56AM  1          THE WITNESS:  YES, IT DID.

10:56AM  2      BY MR. BOSTIC:

10:56AM  3      Q.   AND SUBSEQUENT TO THAT, DID YOUR ADDITIONAL DISCUSSIONS

10:56AM  4      ABOUT AAP, OR ANY OTHER TOPIC, REMOVE THOSE CONCERNS THAT THIS

10:56AM  5      DATA HAD RAISED ABOUT POSSIBLE INACCURACY WITH THERANOS TESTS?

10:56AM  6      A.   NO, THEY HAD NOT ALL BY THEMSELVES REMOVED THAT.

10:57AM  7      Q.   AND WHEN YOU LEFT THE COMPANY, DID YOU STILL HAVE CONCERNS

10:57AM  8      ABOUT THE ACCURACY OF THERANOS'S TESTING?

10:57AM  9      A.   YES.

10:57AM 10      Q.   LOOKING AT THIS DATA SPECIFICALLY, I'LL DRAW YOUR

10:57AM 11      ATTENTION TO THE PSA RESULTS IN COLUMNS D, E, F, AND G.

10:57AM 12          DO YOU SEE THAT DATA?

10:57AM 13      A.   I DO.

10:57AM 14      Q.   AND THERE WAS SOME DISCUSSION WITH MR. CAZARES ABOUT TWO

10:57AM 15      SAMPLES THAT WERE RERUN.

10:57AM 16          DO YOU RECALL THAT DISCUSSION?

10:57AM 17      A.   I DO.

10:57AM 18      Q.   AND MR. CAZARES SUGGESTED TO YOU THAT A RERUN MIGHT BE

10:57AM 19      NECESSARY IN CASES WHERE THERE WAS AN EQUIPMENT MALFUNCTION.

10:57AM 20          DO YOU RECALL THAT?

10:57AM 21      A.   YES.

10:57AM 22      Q.   DO YOU KNOW ONE WAY OR ANOTHER WHETHER THERE WAS AN

10:57AM 23      EQUIPMENT MALFUNCTION DURING THIS FEBRUARY 2014 TESTING?

10:57AM 24      A.   I DO NOT KNOW ONE WAY OR THE OTHER.

10:57AM 25      Q.   THE FACT THAT THOSE TWO SAMPLES WERE RERUN, DO THEY ALLOW

ER-1601

10:57AM 1    YOU TO DRAW ANY CONCLUSIONS OR REVEAL ANYTHING ABOUT THE

10:58AM 2    PRECISION OF THE TWO TESTING METHODS THAT ARE BEING USED?

10:58AM 3    A.    YEAH.   TAKEN AT FACE VALUE, THESE DATA DEMONSTRATED,

10:58AM 4    ALBEIT WITH TWO SAMPLES RUN, THAT THE PREDICATE METHOD HAD HIGH

10:58AM 5    PRECISION LIKELY, AND THAT THE THERANOS METHOD HAD LESS

10:58AM 6    PRECISION.

10:58AM 7    Q.    AND WOULD TESTING PRECISION BE ONE POSSIBLE REASON WHY YOU

10:58AM 8    MIGHT WANT TO RERUN SAMPLES IN A TEST LIKE THIS?

10:58AM 9    A.    WOULD PRECISION BE A REASON TO RERUN THEM?

10:58AM 10   Q.    WOULD A DESIRE TO TEST PRECISION BE A REASON WHY YOU MIGHT

10:58AM 11   WANT TO RERUN SAMPLES IN A TEST LIKE THIS?

10:58AM 12   A.    NOT IN A PROFICIENCY TEST.

10:58AM 13       BUT IN A VERIFICATION OR VALIDATION STUDY, YOU WOULD

10:58AM 14   REALLY WANT TO DEFINITELY RERUN SPECIMENS TO ASCERTAIN

10:58AM 15   PRECISION.

10:58AM 16           MR. CAZARES:  OBJECTION.  NONRESPONSIVE.

10:59AM 17           THE COURT:  OVERRULED.

10:59AM 18   BY MR. BOSTIC:

10:59AM 19   Q.    AND WAS THIS A FORMAL PROFICIENCY TEST?

10:59AM 20   A.    WAS WHAT A FORMAL PROFICIENCY TEST?

10:59AM 21   Q.    WHAT WE'RE LOOKING AT FROM FEBRUARY 2014.

10:59AM 22   A.    THEY WERE RUN ON FORMAL PROFICIENCY TESTING SPECIMENS.

10:59AM 23   Q.    BUT WHEN IT COMES TO -- AS FAR AS THE PROCEDURE AND THE

10:59AM 24   PROTOCOLS, WAS THIS A FORMAL PROFICIENCY TESTING PROCESS?

10:59AM 25   A.    UM, I'M SORRY THAT I'M STUCK ON THE WORD "FORMAL."  I

10:59AM  1    DON'T UNDERSTAND IT.

10:59AM  2         SOMEBODY NEEDED TO RUN PT REGULARLY AND ACCORDING TO

10:59AM  3    REGULATIONS, AND WE WERE TRYING TO ACHIEVE THAT.  SO IF THAT

10:59AM  4    MEETS THE DEFINITION OF "FORMAL," THEN, YES, IT WAS FORMAL.

10:59AM  5    Q.   UNDERSTOOD.

10:59AM  6         MS. WACHS, COULD WE CALL UP EXHIBIT 5545.  THIS WAS

10:59AM  7    PREVIOUSLY ADMITTED.  LET'S USE THE HARD COPY.

11:00AM  8         MS. ROBINSON, CAN WE USE THE ELMO FOR THAT?

11:00AM  9         EXHIBIT 5545 WAS PREVIOUSLY ADMITTED.  MAY I PUBLISH,

11:00AM 10    YOUR HONOR?

11:00AM 11              THE COURT:  YES.

11:00AM 12    BY MR. BOSTIC:

11:00AM 13    Q.   DR. PANDORI, DO YOU SEE ON THE SCREEN TRIAL EXHIBIT 5545?

11:00AM 14    A.   I SEE SOMETHING ON THE SCREEN, BUT I DON'T SEE THAT

11:00AM 15    NUMBER.  I'M SORRY.

11:00AM 16    Q.   THAT'S ALL RIGHT.

11:01AM 17         DO YOU SEE NOW AT THE BOTTOM THE EXHIBIT NUMBER?

11:01AM 18    A.   YES, I SEE THAT EXHIBIT NUMBER.

11:01AM 19    Q.   OKAY.  DO YOU RECALL DISCUSSING THIS DOCUMENT WITH

11:01AM 20    MR. CAZARES?

11:01AM 21    A.   WOULD YOU PLEASE MOVE THE DOCUMENT UPWARD?

11:01AM 22         YES.

11:01AM 23    Q.   YES.  AND THIS IS ALSO IN VOLUME 1 IN CASE YOU WOULD LIKE

11:01AM 24    TO FLIP THROUGH IT AT THE SAME TIME, BUT THAT'S UP TO YOU.

11:01AM 25    A.   IT'S CLEARLY VISIBLE ON THE SCREEN NOW.

11:01AM    1    Q.   I'LL DRAW YOUR ATTENTION TO PAGE 3 OF THIS DOCUMENT.

11:01AM    2    A.   YES.

11:01AM    3    Q.   AND DO YOU SEE THERE AN EMAIL FROM LANGLY GEE TO YOU AND

11:01AM    4    OTHERS AT THERANOS WITH THE SUBJECT LINE UPDATED PT/AUDIT

11:01AM    5    RENEWALS SINCE 3/18?

11:01AM    6    A.   I SEE IT.

11:01AM    7    Q.   AND IT SAYS, "HERE ARE SURVEYS PERFORMED AND SCORES AND

11:01AM    8    UPDATE TO LICENSURES SINCE 3/18."

11:01AM    9         DO YOU SEE THAT?

11:01AM   10    A.   YES.

11:02AM   11    Q.   AND I'D LIKE TO ASK YOU ABOUT THE ACTUAL TESTING THAT IS

11:02AM   12    LISTED HERE.

11:02AM   13         DO YOU SEE A LIST BELOW OF DATES AND SURVEYS AND SCORES?

11:02AM   14    A.   I DO.

11:02AM   15    Q.   AND DO YOU UNDERSTAND THESE TO BE PROFICIENCY TESTING

11:02AM   16    RESULTS?

11:02AM   17    A.   I DO.

11:02AM   18    Q.   ARE THESE REFLECTING PROFICIENCY TESTING RESULTS FOR

11:02AM   19    TESTING PERFORMED ON THE THERANOS EDISON?

11:02AM   20    A.   FOR SOME OF THESE THERE'S NO WAY THAT COULD HAVE BEEN THE

11:02AM   21    CASE.

11:02AM   22    Q.   WHY DO YOU SAY THAT?

11:02AM   23    A.   BECAUSE FOR A LOT OF THESE THERE WERE NO, AT THAT TIME,

11:02AM   24    EDISON TESTS THAT RAN THOSE TESTS.

11:02AM   25    Q.   FOR EXAMPLE, WERE YOU -- WHERE IT SAYS API HEMATOLOGY, WAS

11:02AM 1    THE EDISON CAPABLE OF RUNNING ANY HEMATOLOGY TESTS DURING YOUR

11:02AM 2    TIME AT THE COMPANY?

11:02AM 3    A.   NO.

11:02AM 4         THAT WOULD ALSO HAVE BEEN TRUE FOR CAP INFECTIOUS DISEASE

11:02AM 5    SEROLOGY.  I ONLY REMEMBER ONE.  THOSE ARE GOING TO BE PANELS.

11:02AM 6    SO WHEN THEY COME, YOU DON'T NECESSARILY KNOW.

11:03AM 7         THERE MIGHT BE SEVERAL INFECTIOUS DISEASES IN A PANEL LIKE

11:03AM 8    THAT, AND I ONLY REMEMBER ONE EVER BEING CONSIDERED ON THE

11:03AM 9    EDISON.

11:03AM 10   Q.   HOW ABOUT SOMETHING LIKE CLINICAL MICROSCOPY?  COULD THAT

11:03AM 11   HAVE RELATED TO THE EDISON?

11:03AM 12   A.   NO.

11:03AM 13   Q.   SITTING HERE TODAY, ARE YOU ABLE TO SEE WHETHER ANY OF

11:03AM 14   THIS PROFICIENCY TESTING ACTUALLY RELATED TO THE THERANOS

11:03AM 15   ANALYZER.

11:03AM 16   A.   NO, I CAN'T.

11:03AM 17   Q.   I'D LIKE TO SHOW YOU ANOTHER EXHIBIT THAT YOU DISCUSSED

11:03AM 18   WITH MR. CAZARES, AND THAT'S NUMBER 20444.  I THINK THAT'S IN

11:04AM 19   VOLUME 2.

11:04AM 20        THIS WAS PREVIOUSLY ADMITTED.

11:04AM 21        MAY I PUBLISH, YOUR HONOR?

11:04AM 22            THE COURT:  YES.

11:04AM 23   BY MR. BOSTIC:

11:04AM 24   Q.   AND, DR. PANDORI, DO YOU SEE TRIAL EXHIBIT 20444 ON THE

11:04AM 25   SCREEN?

11:04AM 1    A.   YES.

11:04AM 2    Q.   THE SCREEN FROZE.

11:04AM 3         THE CLERK:  SHE HAS IT UP.

11:04AM 4         MR. BOSTIC:  OH.  EVEN BETTER.

11:04AM 5    Q.   LET'S GO TO THE SECOND PAGE OF THIS DOCUMENT, PLEASE.

11:05AM 6    A.   I'M THERE.

11:05AM 7    Q.   AND LET'S ZOOM IN ON ITEM NUMBER 8.

11:05AM 8         AND DO YOU REMEMBER DISCUSSING THIS LANGUAGE WITH

11:05AM 9    MR. CAZARES?

11:05AM 10   A.   YES.

11:05AM 11   Q.   IT STATES HERE THAT YOU HAD REVIEWED VALIDATIONS THAT WERE

11:05AM 12   EXCELLENT, BUT THEY WERE MISSING AN ELEMENT, STATING THAT THE

11:05AM 13   TEST WAS SAFE FOR USE ON PEOPLE.

11:05AM 14        DO YOU SEE THAT?

11:05AM 15   A.   YES.

11:05AM 16   Q.   THE SUBJECT LINE TO THIS EMAIL IS NAAT VALIDATIONS; IS

11:05AM 17   THAT CORRECT?

11:05AM 18   A.   YES.

11:05AM 19   Q.   DOES THAT RELATE TO A CERTAIN KIND OF ASSAY?

11:05AM 20   A.   YES, IT DOES.

11:05AM 21   Q.   AND WAS THAT KIND OF TEST RUN ON THE EDISON DEVICE?

11:05AM 22   A.   NO, IT WAS NOT.

11:05AM 23   Q.   SO THE TEST THAT YOU'RE TALKING ABOUT IN THIS EMAIL WHERE

11:05AM 24   YOU SAY THAT THE VALIDATIONS WERE EXCELLENT, OR WHERE YOU SAY

11:05AM 25   THAT THE TEST IS SAFE FOR PEOPLE, DOES THAT ACTUALLY RELATE TO

PANDORI REDIRECT BY MR. BOSTIC                                2281

11:05AM   1    TESTING DONE ON THE THERANOS ANALYZER THAT YOU WORKED WITH IN

11:06AM   2    THE LAB?

11:06AM   3    A.   IT DOES NOT.

11:06AM   4    Q.   OKAY.  WE CAN SET THAT ASIDE.

11:06AM   5         I WON'T PUT IT UP RIGHT NOW, BUT DO YOU RECALL IN THE LAST

11:06AM   6    PORTION OF YOUR CONVERSATION WITH MR. CAZARES LOOKING AT AN

11:06AM   7    EMAIL FROM YOU TO MR. BALWANI WHERE YOU PRAISED THE CALIBER OF

11:06AM   8    THE PEOPLE AT THERANOS AND YOU EXPRESSED A POSITIVE ATTITUDE

11:06AM   9    ABOUT THE COMPANY?

11:06AM  10    A.   YEAH, I REMEMBER THAT.

11:06AM  11    Q.   AND DO YOU RECALL THAT THAT EMAIL WAS FROM RELATIVELY

11:06AM  12    EARLY ON IN YOUR TIME AT THE COMPANY?

11:06AM  13    A.   YES, I RECALL THAT.

11:06AM  14    Q.   AND DID THAT GENUINELY REFLECT YOUR ATTITUDE ABOUT

11:06AM  15    THERANOS AT THE TIME?

11:06AM  16    A.   IT DID AT THAT TIME.

11:06AM  17    Q.   DID THAT POSITIVE ATTITUDE ABOUT THE COMPANY CHANGE OVER

11:06AM  18    THE COURSE OF YOUR EMPLOYMENT AT THERANOS?

11:06AM  19    A.   CAN YOU RESTATE THE QUESTION, PLEASE?

11:06AM  20    Q.   SURE.  THE VIEWS THAT YOU EXPRESSED IN THAT EMAIL --

11:07AM  21    A.   YES.

11:07AM  22    Q.   -- WHERE YOU WERE POSITIVE AND HOPEFUL ABOUT THE COMPANY,

11:07AM  23    DID YOU KEEP FEELING THAT WAY THROUGHOUT YOUR TIME WORKING AT

11:07AM  24    THERANOS?

11:07AM  25    A.   WELL, THERE WERE TWO EXPRESSIONS THERE.  ONE WAS THE

ER-1607

11:07AM  1    CALIBER OF THE PEOPLE, BUT THE OVERALL FEELING OF THE COMPANY.

11:07AM  2         THERE WERE -- I LEFT THERE STILL FEELING THAT THERE WAS A

11:07AM  3    VERY HIGH CALIBER OF PERSONS THAT WERE WORKING THERE, BUT I

11:07AM  4    DIDN'T HAVE A HIGH OPINION OF THE COMPANY OVERALL.

11:07AM  5    Q.   IN THAT EMAIL YOU EXPRESSED OPTIMISM ABOUT THE COMPANY'S

11:07AM  6    CHANCE OF SUCCESS.

11:07AM  7         DO YOU RECALL THAT?

11:07AM  8    A.   EXCITEMENT.

11:07AM  9    Q.   AND DID THAT EXCITEMENT STAY WITH YOU THROUGHOUT YOUR TIME

11:07AM  10   AT THE COMPANY?

11:07AM  11   A.   IT DID NOT.

11:07AM  12   Q.   OKAY.  AND CAN YOU SUMMARIZE WHY NOT?

11:07AM  13   A.   WELL, FOR ONE, THE TESTS THAT WERE DEVELOPED AT THERANOS,

11:07AM  14   THE EDISONS DIDN'T WORK VERY WELL.

11:07AM  15        THEY -- IT REQUIRED THAT WE HAVE A LOT OF MACHINES, AND

11:07AM  16   MANY OF THE MACHINES WOULD FAIL REGULARLY, AND THAT'S WHY WE

11:07AM  17   NEEDED A LOT OF MACHINES.

11:08AM  18        THE CHEMISTRIES WERE RUN ON MODIFIED THIRD PARTY DEVICES,

11:08AM  19   THEY WEREN'T RUN ON THERANOS TECHNOLOGY, AND THEY FACED

11:08AM  20   CHALLENGES AS WELL.

11:08AM  21        THE -- WHEN WE, THAT WOULD BE LAB DIRECTORS OR CLIA

11:08AM  22   PERSONNEL, SOUGHT TO DO OUR JOBS AND TO TROUBLESHOOT OR TO

11:08AM  23   MAYBE PUT CERTAIN TESTING ASIDE WHILE WE WORKED ON THEM, WE MET

11:08AM  24   CHALLENGES WITH MANAGEMENT WHEN WE SOUGHT TO DO THAT.

11:08AM  25        AND SO IT DIDN'T FEEL LIKE A VERY GOOD PLACE TO ME.  I

11:08AM 1   WANTED THIS TO BE -- I THOUGHT THIS WAS SOMETHING MORE MATURE

11:08AM 2   IN ASSISTING THE PUBLIC'S HEALTH AND IT WAS FAR FROM THAT.

11:08AM 3   Q.   I WOULD LIKE TO TALK NOW ABOUT THE DAYS LEADING UP TO YOUR

11:08AM 4   DEPARTURE FROM THE COMPANY.

11:08AM 5        FIRST, JUST SO WE'RE CLEAR, DO YOU RECALL CONVERSATIONS

11:08AM 6   ABOUT A MEETING THAT YOU HAD WITH MR. BALWANI AND MS. HOLMES

11:08AM 7   WHERE YOU SUGGESTED MEETINGS SO THAT MS. HOLMES COULD MAKE

11:09AM 8   SURE, FOR EXAMPLE, THAT SHE WAS PROVIDING ACCURATE INFORMATION

11:09AM 9   ABOUT THE COMPANY?

11:09AM 10  A.   YES, I RECALL.

11:09AM 11  Q.   AND DO YOU KNOW EXACTLY WHEN THAT MEETING HAPPENED SITTING

11:09AM 12  HERE TODAY?

11:09AM 13  A.   NO.

11:09AM 14  Q.   YOU TESTIFIED EARLIER THAT IT WAS SOMETIME AROUND YOUR

11:09AM 15  BIRTHDAY.

11:09AM 16  A.   YES.

11:09AM 17  Q.   YOU TESTIFIED THAT YOU RESIGNED VERY SHORTLY AFTER THAT

11:09AM 18  MEETING.

11:09AM 19       IS THAT STILL YOUR TESTIMONY?

11:09AM 20  A.   YES.

11:09AM 21  Q.   AND WHEN YOU RESIGNED, DID YOU WALK OUT OF THE BUILDING

11:09AM 22  IMMEDIATELY THAT DAY, OR WAS THAT YOU GIVING YOUR TWO WEEK

11:09AM 23  NOTICE, OR SOMETHING ELSE?

11:09AM 24  A.   MY RECOLLECTION IS THAT I HAD A CONVERSATION WITH

11:09AM 25  MONA RAMAMURTHY WHEREUPON SHE -- WELL, I DON'T REMEMBER THE

PANDORI REDIRECT BY MR. BOSTIC                                    2284

11:09AM  1    EXACT NATURE OF THAT.

11:09AM  2        AND I REMEMBER GOING TO -- EXITING THROUGH THE SECURITY

11:09AM  3    OFFICE AND TALKING TO SOMEBODY NAMED EDGAR, AND THEN I REMEMBER

11:10AM  4    HE EITHER COMING OUTSIDE WITH ME OR WALKING ME ALL OF THE WAY,

11:10AM  5    I'M NOT SURE I REMEMBER, TO MY CAR.

11:10AM  6        AND HE SAID TO ME, SUNNY CALLED DOWN AND SAID I HAVE TO

11:10AM  7    SEARCH YOUR CAR.

11:10AM  8        AND I SAID, YOU DON'T HAVE TO SEARCH MY CAR, EDGAR.

11:10AM  9        AND HE SAID, YOU'RE RIGHT, I DON'T HAVE TO SEARCH YOUR

11:10AM 10    CARE.

11:10AM 11        AND I LEFT.

11:10AM 12    Q.   SO THAT MOMENT STANDS OUT IN YOUR MIND?

11:10AM 13    A.   YEAH.

11:10AM 14    Q.   AND DO YOU HAVE A MEMORY ONE WAY OR ANOTHER OF WHETHER

11:10AM 15    THAT HAPPENED ON THE SAME DAY AS YOUR MEETING WITH MR. BALWANI

11:10AM 16    AND MS. HOLMES, OR A WEEK LATER?  CAN YOU TELL US ONE WAY OR

11:10AM 17    ANOTHER?

11:10AM 18    A.   I RECALL IT HAPPENING THE SAME DAY.

11:10AM 19    Q.   THERE WAS DISCUSSION WITH MR. CAZARES ABOUT THE "WIRED"

11:10AM 20    ARTICLE AS WELL WHERE YOU SAW SOME INACCURATE OR MISLEADING

11:10AM 21    STATEMENTS.

11:10AM 22        DO YOU RECALL THAT?

11:10AM 23    A.   I RECALL.

11:10AM 24    Q.   AND MR. CAZARES ASKED YOU WHETHER YOU HAD IN FACT RECEIVED

11:10AM 25    THAT ARTICLE IN FEBRUARY OF 2014; IS THAT RIGHT?

11:10AM  1    A.   HE DID.

11:10AM  2    Q.   AND I'LL ASK YOU TO TURN TO -- OR ACTUALLY LET'S PROJECT

11:10AM  3    EXHIBIT 1599, WHICH IS THAT ARTICLE.  THIS WAS PREVIOUSLY

11:11AM  4    ADMITTED.

11:11AM  5         ACTUALLY, NO, LET'S TAKE THAT DOWN.  I'M SORRY?

11:11AM  6              MR. CAZARES:  THAT'S NOT IN EVIDENCE.

11:11AM  7              MR. BOSTIC:  IT'S NOT IN EVIDENCE.

11:11AM  8    Q.   DR. PANDORI, APOLOGIES.

11:11AM  9         IF I COULD ASK YOU TO TURN TO EXHIBIT 1599.  AND THAT'S

11:11AM 10    IN --

11:11AM 11    A.   DO YOU KNOW WHAT VOLUME THAT IS IN?

11:11AM 12    Q.   THAT'S IN THE WHITE BINDER, THE GOVERNMENT BINDER.

11:11AM 13    A.   OKAY.  I'M THERE.

11:11AM 14    Q.   AND WE WERE JUST TALKING ABOUT MR. CAZARES'S QUESTIONS TO

11:11AM 15    YOU ABOUT WHETHER YOU HAD RECEIVED THAT ARTICLE IN FEBRUARY OF

11:11AM 16    2014.

11:11AM 17         DO YOU REMEMBER THAT DISCUSSION?

11:11AM 18    A.   YES, I REMEMBER THAT DISCUSSION.

11:11AM 19    Q.   LOOKING AT EXHIBIT 1599, IS THERE A DATE INDICATED ON THAT

11:11AM 20    ARTICLE?

11:11AM 21    A.   YES.

11:11AM 22    Q.   AND WHAT IS THE DATE ON THE ARTICLE?

11:11AM 23    A.   MARCH 2014.

11:11AM 24    Q.   MR. CAZARES SHOWED YOU AN EMAIL WITH A LINK TO A "WIRED"

11:11AM 25    ARTICLE.

PANDORI REDIRECT BY MR. BOSTIC                    2286

11:11AM  1           DO YOU REMEMBER THAT?

11:11AM  2      A.   YES.

11:11AM  3      Q.   AND DO YOU KNOW WHETHER THAT LINK WAS TO THE ACTUAL

11:12AM  4      ARTICLE THAT WE HAVE BEEN TALKING ABOUT?

11:12AM  5      A.   NO, I DON'T KNOW THE ANSWER TO THAT QUESTION.

11:12AM  6      Q.   ASSUMING THAT IT WAS AND THE LINK WAS EMAILED TO YOU IN

11:12AM  7      FEBRUARY, DO YOU HAVE A MEMORY OF WHETHER YOU READ THE ARTICLE

11:12AM  8      ON THE DAY THAT YOU RECEIVED IT OR SOMETIME LATER?  DO YOU KNOW

11:12AM  9      THAT?

11:12AM  10     A.   NO, I DON'T KNOW THAT.

11:12AM  11     Q.   I'D LIKE TO TALK TO YOU ABOUT EXHIBIT 20277.

11:12AM  12          MS. WACHS, DO WE HAVE THAT ACCESSIBLE ELECTRONICALLY?

11:12AM  13          AND THIS WAS PREVIOUSLY ADMITTED.

11:12AM  14     A.   OKAY.

11:12AM  15     Q.   AND LET'S ZOOM IN ON THE TEXT OF YOUR EMAIL IN THE MIDDLE

11:12AM  16     OF THE PAGE, JUST THE FIRST FEW PARAGRAPHS.

11:12AM  17          DO YOU REMEMBER READING THIS WITH MR. CAZARES?

11:13AM  18     A.   YES.

11:13AM  19     Q.   AND YOU WRITE, "ADAM AND I WERE ABLE TO DISCUSS WITH ONE

11:13AM  20     ANOTHER THE RESULTS OF OUR ONE ON ONE CONVERSATIONS WITH EACH

11:13AM  21     OF YOU, AND ONE OF EVERYONE'S PRIMARY CONCERNS IS WORK HOURS."

11:13AM  22          DO YOU SEE THAT?

11:13AM  23     A.   YES.

11:13AM  24     Q.   MR. CAZARES POINTED OUT THAT THIS EMAIL DOES NOT MENTION

11:13AM  25     ANY CONCERNS ABOUT THE ACCURACY OR RELIABILITY OF THE DEVICES;

ER-1612

11:13AM  1    IS THAT RIGHT?

11:13AM  2    A.   CORRECT.

11:13AM  3    Q.   WHEN YOU WERE AT THERANOS, DID OTHER STAFF IN THE CLIA LAB

11:13AM  4    EXPRESS CONCERNS TO YOU ABOUT THE ACCURACY OR THE RELIABILITY

11:13AM  5    OF THE EDISON DEVICES?

11:13AM  6              MR. CAZARES:  OBJECTION.  HEARSAY.

11:13AM  7              MR. BOSTIC:  THE DEFENSE OPENED THE DOOR TO THIS,

11:13AM  8    YOUR HONOR.

11:13AM  9              MR. CAZARES:  IT'S STILL HEARSAY.

11:13AM  10             THE COURT:  IS THIS A YES OR NO ANSWER?

11:13AM  11             MR. BOSTIC:  YES, YOUR HONOR, FOR NOW.

11:13AM  12             THE COURT:  OVERRULED.

11:13AM  13        YOU CAN ANSWER YES OR NO.

11:13AM  14             THE WITNESS:  YES.

11:13AM  15    BY MR. BOSTIC:

11:13AM  16    Q.   AND WAS THAT SOMETHING THAT HAPPENED ON MULTIPLE

11:13AM  17    OCCASIONS?

11:13AM  18             MR. CAZARES:  SAME OBJECTION.

11:13AM  19             THE COURT:  OVERRULED.

11:14AM  20        YES OR NO?

11:14AM  21             THE WITNESS:  YES.

11:14AM  22    BY MR. BOSTIC:

11:14AM  23    Q.   IN THE EMAIL YOU WRITE, "ONE OF EVERYONE'S PRIMARY

11:14AM  24    CONCERNS IS WORK HOURS."

11:14AM  25         WHEN YOU WROTE THAT, DID YOU MEAN TO IMPLY THAT NO ONE HAD

11:14AM   1    ANY CONCERNS ABOUT ACCURACY OR RELIABILITY?

11:14AM   2    A.   NO, I DIDN'T MEAN TO IMPLY THAT.

11:14AM   3    Q.   OF THE INDIVIDUALS WHO EXPRESSED CONCERNS TO YOU ABOUT

11:14AM   4    ACCURACY AND RELIABILITY, WAS ERIKA CHEUNG ONE OF THEM?

11:14AM   5         MR. CAZARES:  OBJECTION.  IT CALLS FOR HEARSAY.

11:14AM   6         THE COURT:  SUSTAINED.

11:14AM   7    BY MR. BOSTIC:

11:14AM   8    Q.   LET'S TALK ABOUT THE TRANSITION MEMO THAT YOU REVIEWED

11:14AM   9    WITH MR. CAZARES.

11:14AM  10         WE CAN TAKE THIS EXHIBIT DOWN.

11:14AM  11         AND CAN WE PUT UP EXHIBIT 20279.

11:14AM  12         DR. PANDORI, DO YOU REMEMBER REVIEWING THIS EXHIBIT WITH

11:15AM  13    MR. CAZARES?

11:15AM  14    A.   I DO.

11:15AM  15    Q.   SITTING HERE TODAY, DO YOU HAVE A MEMORY OF WRITING THE

11:15AM  16    TRANSITION MEMO THAT WE'VE BEEN DISCUSSING?

11:15AM  17    A.   I DON'T HAVE A MEMORY OF IT.

11:15AM  18    Q.   YOU WERE ALSO SHOWN EXHIBIT 20498.

11:15AM  19         CAN WE PUT THAT ONE UP, MS. WACHS.

11:15AM  20         DR. PANDORI, YOU SEE THAT THIS IS AN EMAIL THAT ACTUALLY

11:15AM  21    HAS A FROM LINE THAT INDICATES THAT THE EMAIL IS FROM YOU.

11:15AM  22         DO YOU SEE THAT?

11:15AM  23    A.   YES.

11:15AM  24    Q.   THE PREVIOUS EXHIBIT THAT WE LOOKED AT, 20279, LACKED A

11:15AM  25    FROM LINE; IS THAT CORRECT?

11:15AM  1      A.   CORRECT.

11:15AM  2      Q.   DID MR. CAZARES SHOW YOU THIS EXHIBIT BEFORE HE ASKED YOU

11:15AM  3      ABOUT WHETHER YOU HAD WRITTEN THE TRANSITION MEMO?

11:15AM  4      A.   NO, THAT'S NOT THE ORDER OF THINGS.

11:16AM  5      Q.   WOULD IT HAVE BEEN HELPFUL TO YOUR RECOLLECTION OF THINGS

11:16AM  6      TO HAVE SEEN THIS EMAIL BEFORE YOU WERE ASKED ABOUT THAT FIRST

11:16AM  7      EMAIL WITH NO FROM LINE?

11:16AM  8      A.   TO SEE THIS EMAIL WITHOUT HAVING SEEN THE TRANSITION

11:16AM  9      DOCUMENT?

11:16AM 10      Q.   DO YOU SEE THAT THIS EMAIL ATTACHES AN ATTACHMENT

11:16AM 11      INDICATING THAT IT IS THE TRANSITION MEMO?

11:16AM 12      A.   YES.

11:16AM 13      Q.   AND WOULD HAVING SEEN THIS EXHIBIT FIRST HAVE BEEN HELPFUL

11:16AM 14      TO YOU?

11:16AM 15      A.   IF IT INCLUDE -- NO -- PERHAPS.

11:16AM 16      Q.   DOES SEEING THIS EXHIBIT HELP YOUR UNDERSTANDING AS FAR AS

11:16AM 17      WHETHER OR NOT YOU SENT THIS EMAIL?

11:16AM 18      A.   DOES IT -- IT HAS A FROM LINE, WHICH MAKES ME FEEL MORE

11:16AM 19      INCLINED THAT I DID.

11:16AM 20      Q.   AND IN THIS EXHIBIT IN PARTICULAR, YOU SEND THE TRANSITION

11:17AM 21      REPORT TO MONA RAMAMURTHY AND SUNNY BALWANI; IS THAT CORRECT?

11:17AM 22      A.   YES.

11:17AM 23      Q.   LET'S LOOK AT THE TEXT OF THAT MEMO ITSELF.  IF WE CAN

11:17AM 24      FLIP FORWARD THROUGH THE DOCUMENT.

11:17AM 25           LET'S GO TO -- KEEP GOING.  WE'RE LOOKING FOR THE SECTION

11:17AM  1     ON EDISONS, WHICH I THINK IS ON PAGE 6.  THERE WE GO.

11:17AM  2          OKAY.  DO YOU SEE UNDER OTHER NOTES THERE'S A SECTION ON

11:17AM  3     EDISONS?

11:17AM  4     A.  YES.

11:17AM  5     Q.  AND IT SAYS HERE, "THE PRIMARY CONCERN IN THIS SECTION IS

11:17AM  6     THE AVAILABLE NUMBER OF DEVICES."

11:17AM  7          DO YOU SEE THAT?

11:17AM  8     A.  YES.

11:17AM  9     Q.  ARE YOU GENERALLY FAMILIAR WITH THE CONCEPT OF A

11:17AM  10    TRANSITION MEMO?

11:17AM  11    A.  YES.

11:17AM  12    Q.  IN THIS CASE, WHAT WOULD THE GOAL HAVE BEEN IN WRITING

11:18AM  13    THIS MEMO DURING THE TIME THAT YOU WERE LEAVING THE COMPANY?

11:18AM  14          MR. CAZARES: OBJECTION.  FOUNDATION.  CALLS FOR

11:18AM  15    SPECULATION BASED ON THE WITNESS'S TESTIMONY ALREADY.

11:18AM  16          THE COURT:  REGARDING WHETHER HE WROTE IT OR NOT?  I

11:18AM  17    THINK THERE'S A FOUNDATION.

11:18AM  18          SUSTAINED.

11:18AM  19    BY MR. BOSTIC:

11:18AM  20    Q.  LET'S LOOK INSTEAD AT 20496.

11:18AM  21    DR. PANDORI, DO YOU REMEMBER DISCUSSING THIS EXHIBIT WITH

11:18AM  22    MR. CAZARES?

11:18AM  23    A.  YES.

11:18AM  24    Q.  AND IS THIS AN EMAIL FROM MS. RAMAMURTHY ASKING FOR A

11:18AM  25    TRANSITION MEMO?

PANDORI REDIRECT BY MR. BOSTIC                                    2291

11:18AM  1    A.   IT'S ASKING ME FOR SOME INFORMATION ABOUT THE LAB.

11:18AM  2    Q.   OKAY.  AND DID THE TRANSITION MEMO THAT WE LOOKED AT

11:18AM  3    SATISFY THIS REQUEST?

11:19AM  4    A.   YES.

11:19AM  5    Q.   AND MR. CAZARES POINTED OUT THAT THIS ASKS FOR ANYTHING

11:19AM  6    ELSE THAT YOU BELIEVE NEEDS TO BE DOCUMENTED FOR EFFECTIVE

11:19AM  7    TRANSITION PURPOSES.

11:19AM  8         DO YOU SEE THAT?

11:19AM  9    A.   I DO.

11:19AM  10   Q.   FOR EFFECTIVE TRANSITION PURPOSES IN THE SITUATION THAT

11:19AM  11   YOU WERE IN, WHY DID YOU DECIDE NOT TO DOCUMENT THE CONCERNS

11:19AM  12   THAT YOU HAD ABOUT THE ACCURACY AND RELIABILITY OF THERANOS

11:19AM  13   TESTING?

11:19AM  14            MR. CAZARES:  OBJECTION.  SPECULATION.  IT CALLS FOR

11:19AM  15   SPECULATION BASED ON THE WITNESS'S TESTIMONY ALREADY.

11:19AM  16            THE COURT:  OVERRULED.

11:19AM  17        YOU CAN ANSWER THE QUESTION.

11:19AM  18   BY MR. BOSTIC:

11:19AM  19   Q.   WOULD YOU LIKE THE QUESTION AGAIN, DOCTOR?

11:19AM  20   A.   NO.  I HAD ALREADY MADE MY CONCERNS KNOWN AT THAT TIME,

11:19AM  21   AND WHAT I WANTED TO HAVE DONE, NOBODY WAS GOING TO DO THAT, SO

11:19AM  22   WHAT POINT WAS THERE TO PUSH THIS FURTHER.

11:19AM  23        THERE WAS NO -- I DIDN'T HAVE THE AUTHORITY TO MAKE THAT

11:19AM  24   DECISION.  ASKING REPEATEDLY WOULD BE SOMEWHAT AKIN TO HITTING

11:19AM  25   YOUR HEAD AGAINST THE WALL.

ER-1617

11:19AM  1    Q.   AND WE SAW A FEW MINUTES AGO THAT THIS TRANSITION MEMO WAS

11:20AM  2    SENT TO MR. BALWANI; IS THAT CORRECT?

11:20AM  3    A.   IN ADDITION TO MS. MONA RAMAMURTHY, I BELIEVE.

11:20AM  4    Q.   AND YOU SAID THAT YOU HAD PREVIOUSLY RAISED YOUR CONCERNS.

11:20AM  5         HAD YOU SPECIFICALLY RAISED THOSE CONCERNS TO MR. BALWANI

11:20AM  6    HIMSELF?

11:20AM  7    A.   YES.

11:20AM  8    Q.   AND WE ALSO SAW AN INSTANCE WHERE THE TRANSITION MEMO WAS

11:20AM  9    SENT TO DR. ROSENDORFF; IS THAT CORRECT?

11:20AM  10   A.   CORRECT.

11:20AM  11   Q.   AND AT THAT POINT HAD YOU ALREADY RAISED YOUR CONCERNS TO

11:20AM  12   DR. ROSENDORFF?

11:20AM  13   A.   ON MANY OCCASIONS.

11:20AM  14   Q.   DESCRIBE THAT.  HOW FREQUENTLY DID YOU HAVE THESE

11:20AM  15   CONVERSATIONS AND HOW DID THAT TOPIC COME UP?

11:20AM  16   A.   MORE THAN ONCE PER WEEK, AND IT CAME UP BECAUSE IT WAS A

11:20AM  17   NORMAL COURSE OF CONVERSATION BETWEEN DR. ROSENDORFF AND

11:20AM  18   MYSELF.

11:20AM  19   Q.   AND WHEN WE'RE TALKING ABOUT THIS SUBJECT, WHAT DO YOU

11:20AM  20   MEAN SPECIFICALLY?  WHAT ISSUES WERE BEING DISCUSSED ON A

11:20AM  21   REGULAR OCCASION WITH DR. ROSENDORFF?

11:20AM  22   A.   THE QUALITY OF THE MACHINERY AND THE QUALITY OF LAB

11:21AM  23   TESTING AT NORMANDY.

11:21AM  24   Q.   SO FOR THIS TRANSITION MEMO, IF IT WAS FOR

11:21AM  25   DR. ROSENDORFF'S BENEFIT, WOULD THERE HAVE BEEN ANY NEED TO

11:21AM   1    INCLUDE THOSE CONCERNS IN THE TRANSITION MEMO?

11:21AM   2             MR. CAZARES:  OBJECTION.  CALLS FOR SPECULATION AND

11:21AM   3    FOUNDATION.

11:21AM   4             THE COURT:  ARE YOU ASKING IF HE SENT THIS TO

11:21AM   5    DR. ROSENDORFF?

11:21AM   6             MR. BOSTIC:  NO.  I'M ASKING HIM ABOUT HIS PREVIOUS

11:21AM   7    CONVERSATIONS AND WHETHER ADDITIONAL DETAIL WOULD HAVE BEEN

11:21AM   8    NECESSARY.

11:21AM   9             MR. CAZARES:  AGAIN, IT CALLS FOR FOUNDATION AND

11:21AM  10    SPECULATION BASED ON HIS TESTIMONY ABOUT THE MEMO.

11:21AM  11             THE COURT:  I'LL SUSTAIN THE OBJECTION TO THAT

11:21AM  12    QUESTION.

11:21AM  13    BY MR. BOSTIC:

11:22AM  14    Q.   LET'S GO BACK TO THAT MEMO ITSELF.

11:22AM  15         SO IF WE CAN LOOK AT 20279 AND GO BACK TO THE SECTION ON

11:22AM  16    EDISONS, WHICH I THINK IS PAGE 6.

11:22AM  17         AND, DR. PANDORI, IN THIS SECTION YOU MENTION A NEED FOR

11:22AM  18    MORE UNITS; IS THAT CORRECT?

11:22AM  19    A.   CORRECT.

11:22AM  20    Q.   AND WE SAW OTHER INSTANCES WHERE YOU RECOMMENDED THAT THE

11:22AM  21    LAB OBTAIN AND USE MORE EDISON ANALYZERS; IS THAT RIGHT?

11:22AM  22    A.   THAT'S CORRECT.

11:22AM  23    Q.   AND WHY WAS THAT YOUR RECOMMENDATION IF YOU HAD CONCERNS

11:22AM  24    ABOUT THE ACCURACY AND RELIABILITY OF THE EDISONS?

11:22AM  25    A.   WELL, WE DIDN'T FULLY UNDERSTAND THE NATURE OF THE TROUBLE

PANDORI REDIRECT BY MR. BOSTIC                                          2294

11:22AM   1    WITH THE INSTRUMENT.  THAT WAS STILL BEING ASCERTAINED.

11:22AM   2         BUT SOME OF THEM WOULD PASS QUALITY CONTROL, AND SO IF YOU

11:22AM   3    WANTED TO GET PATIENT SPECIMENS DONE, YOU COULD TEST A WIDER

11:23AM   4    NUMBER OF INSTRUMENTS AND SEE WHICH ONCE WERE FUNCTIONING

11:23AM   5    CORRECTLY.

11:23AM   6    Q.   WE TALKED EARLIER ABOUT HOW MANY EDISONS WERE REQUIRED TO

11:23AM   7    RUN A PATIENT SAMPLE.

11:23AM   8         DO YOU RECALL THAT?

11:23AM   9    A.   YES.

11:23AM  10    Q.   HOW MANY EDISONS WERE NEEDED IN A GROUP TO RUN A SINGLE

11:23AM  11    PATIENT ASSAY?

11:23AM  12    A.   WELL, IT DEPENDS IF I ANSWER ON AVERAGE.  BUT ONE EDISON,

11:23AM  13    IF IT WAS WORKING CORRECTLY, COULD TEST ONE PATIENT SAMPLE.

11:23AM  14    Q.   ARE YOU AWARE OF A PRACTICE AT THERANOS WHERE DEVICES WERE

11:23AM  15    USED IN GROUPS OF THREE AND THEN SAMPLES, SAMPLE RESULTS WERE

11:23AM  16    AVERAGED OUT?

11:23AM  17    A.   YES.

11:23AM  18    Q.   DID THAT NEED, THE NEED TO RUN SAMPLES IN GROUPS OF THREE,

11:23AM  19    INCREASE THE NEED FOR ADDITIONAL EDISONS?

11:23AM  20    A.   YES.

11:24AM  21    Q.   DO YOU REMEMBER BEING SHOWN AN EMAIL BY MR. CAZARES WHERE

11:24AM  22    MR. BALWANI TOLD YOU THAT INVOLVEMENT OF THE PRODUCT MANAGEMENT

11:24AM  23    TEAM SHOULD BE ON YOUR TERMS?

11:24AM  24    A.   YES.

11:24AM  25    Q.   AND WAS THAT HOW IT ENDED UP WORKING DURING YOUR TIME AT

ER-1620

11:24AM  1    THERANOS?

11:24AM  2    A.   NO.

11:24AM  3    Q.   AND HOW DID IT ACTUALLY WORK AT THERANOS?

11:24AM  4    A.   FOR THE ENTIRETY OF MY TIME AT THERANOS, PRODUCT

11:24AM  5    MANAGEMENT TEAM MEMBERS HAD A SIGNIFICANT INFLUENCE IN ALL

11:24AM  6    MATTERS THAT I ENGAGED IN.

11:24AM  7    Q.   INCLUDING CLINICAL MATTERS?

11:24AM  8    A.   YES.

11:24AM  9    Q.   AND WHO DID THE PRODUCT MANAGEMENT TEAM REPORT TO?

11:24AM  10   A.   I DON'T REMEMBER THEIR STRUCTURE EXACTLY.  I BELIEVED IT

11:24AM  11   WAS SUNNY BALWANI.

11:24AM  12   Q.   DO YOU RECALL TESTIFYING ABOUT A TIME WHERE MR. BALWANI

11:24AM  13   CAME TO YOUR OFFICE TO CONFRONT YOU ABOUT YOUR VIEWS ON THE

11:24AM  14   EDISON?

11:24AM  15   A.   YES.

11:24AM  16   Q.   AND CAN YOU REMIND US WHO ACCOMPANIED HIM WHEN HE CAME TO

11:24AM  17   YOUR OFFICE TO DISCUSS THAT?

11:25AM  18   A.   TWO PRODUCT MANAGERS.

11:25AM  19   Q.   DO YOU RECALL, DURING CROSS-EXAMINATION, TALKING WITH

11:25AM  20   MR. CAZARES ABOUT CLIA REGULATIONS AND WHAT THEY SAY ABOUT THE

11:25AM  21   ROLE OF LAB DIRECTOR?

11:25AM  22   A.   YES.

11:25AM  23   Q.   AND WOULD YOU AGREE THAT CLIA REGULATIONS IN GENERAL SAY

11:25AM  24   THAT THE LAB DIRECTOR HAS A LOT OF AUTHORITY?

11:25AM  25   A.   YES.

11:25AM  1    Q.   AND THAT THE LAB DIRECTOR IS RESPONSIBLE FOR A NUMBER OF

11:25AM  2    THINGS WITHIN THE LAB, INCLUDING THE QUALITY OF THE RESULTS?

11:25AM  3    A.   YES.

11:25AM  4    Q.   TO DO THAT JOB, DOES A LAB DIRECTOR NEED TO HAVE AUTONOMY

11:25AM  5    AND AUTHORITY?

11:25AM  6         MR. CAZARES:  OBJECTION.  CALLS FOR SPECULATION.

11:25AM  7    FOUNDATION.

11:25AM  8         MR. BOSTIC:  I'M ASKING HIM ABOUT HIS JOB,

11:25AM  9    YOUR HONOR.

11:25AM  10        THE COURT:  OVERRULED.

11:25AM  11        THE WITNESS:  YOU KNOW, A LAB DIRECTOR NEEDS TO HAVE

11:25AM  12   THE AUTHORITY TO MAKE A LOT OF DIFFERENT DECISIONS IN ORDER TO

11:25AM  13   PERFORM THAT JOB CORRECTLY.

11:25AM  14   BY MR. BOSTIC:

11:25AM  15   Q.   AND AS LAB DIRECTOR AT THERANOS, DID MR. BALWANI AND

11:25AM  16   MS. HOLMES GIVE YOU THE LEVEL OF AUTHORITY THAT YOU NEEDED TO

11:26AM  17   ACT EFFECTIVELY AS A LAB DIRECTOR?

11:26AM  18        MR. CAZARES:  OBJECTION.  THE LAB DIRECTOR?

11:26AM  19   FOUNDATION, SPECULATION, AND ACTUALLY 403.

11:26AM  20        THE COURT:  THIS IS RELATED TO HIS JOB?

11:26AM  21        MR. BOSTIC:  YES, YOUR HONOR.

11:26AM  22        THE COURT:  HIS OPINION OF HIS JOB?

11:26AM  23        MR. BOSTIC:  YES, YOUR HONOR.

11:26AM  24        THE COURT:  OVERRULED.

11:26AM  25   BY MR. BOSTIC:

11:26AM 1    Q.   I'LL ASK YOU THE QUESTION AGAIN, DR. PANDORI, AND THAT

11:26AM 2    QUESTION IS -- FIRST OF ALL, CAN YOU REMIND US, WHAT WAS YOUR

11:26AM 3    JOB TITLE AND ROLE AT THERANOS?

11:26AM 4    A.   THE JOB TITLE WAS LABORATORY DIRECTOR.

11:26AM 5         THE ROLE WAS MORE OF A LOGISTICAL ASSISTANT DIRECTOR.

11:26AM 6    Q.   AND WE TALKED ABOUT WHAT THE REGULATIONS SAY ON PAPER

11:26AM 7    ABOUT THE LAB DIRECTOR ROLE; CORRECT?

11:26AM 8    A.   WE TALKED ABOUT THAT.

11:26AM 9    Q.   AND MY QUESTION NOW IS, DID MR. BALWANI AND MS. HOLMES

11:26AM 10   GIVE YOU AND DR. ROSENDORFF THE AUTHORITY AND POWER YOU NEEDED

11:26AM 11   IN THE COMPANY TO DO THAT JOB CORRECTLY?

11:26AM 12             MR. CAZARES:  OBJECTION.  403, FOUNDATION, CALLS FOR

11:26AM 13   SPECULATION.

11:26AM 14             THE COURT:  OVERRULED.

11:26AM 15             THE WITNESS:  NOT IN MY OPINION.

11:27AM 16   BY MR. BOSTIC:

11:27AM 17   Q.   AND WHY DO YOU SAY THAT?

11:27AM 18   A.   BECAUSE CERTAIN THINGS THAT I FELT THAT WE NEEDED TO DO IN

11:27AM 19   FURTHERANCE OF PATIENT SAFETY AND QUALITY, I DIDN'T HAVE THE

11:27AM 20   AUTHORITY TO MAKE THOSE DECISIONS.

11:27AM 21   Q.   AND ARE THOSE THE THINGS THAT WE HAVE BEEN DISCUSSING

11:27AM 22   THROUGHOUT YOUR TESTIMONY?

11:27AM 23   A.   YES.

11:27AM 24             MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

11:27AM 25             THE COURT:  YES.

PANDORI REDIRECT BY MR. BOSTIC                                    2298

11:27AM   1              (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:27AM   2                    MR. BOSTIC:  NO FURTHER QUESTIONS.

11:27AM   3              THANK YOU, DR. PANDORI.

11:27AM   4              YOU CAN TAKE THAT DOWN.

11:27AM   5                    THE COURT:  DO YOU HAVE RECROSS?

11:27AM   6                    MR. CAZARES:  I DO, YOUR HONOR.

11:27AM   7                    THE COURT:  ALL RIGHT.  LET'S TAKE OUR BREAK, LADIES

11:27AM   8      AND GENTLEMEN, AND THEN WE'LL CONTINUE WITH DR. PANDORI.

11:27AM   9              THANK YOU.

11:27AM  10              (RECESS FROM 11:27 A.M. UNTIL 12:10 P.M.)

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

PANDORI RECROSS BY MR. CAZARES                                    2299

12:10PM   1                       **AFTERNOON SESSION**

12:10PM   2          (JURY IN AT 12:10 P.M.)

12:10PM   3             THE COURT:  ALL COUNSEL ARE PRESENT.

12:10PM   4       THE JURY AND ALTERNATES ARE PRESENT.

12:11PM   5       DR. PANDORI IS BACK ON THE STAND.

12:11PM   6       YOU HAVE RECROSS?

12:11PM   7            MR. CAZARES:  A LITTLE BIT, YOUR HONOR.  THANK YOU.

12:11PM   8            THE COURT:  ALL RIGHT.

12:11PM   9               **RECROSS-EXAMINATION**

12:11PM 10  BY MR. CAZARES:

12:11PM 11  Q.   DR. PANDORI, YOU WERE ASKED ON REDIRECT ABOUT THE EMAIL

12:11PM 12  THAT IS REFLECTED IN EXHIBIT 20548, WHICH IS IN EVIDENCE.

12:11PM 13      CAN WE PUT THAT UP ON THE SCREEN.

12:11PM 14  A.   I SEE IT.

12:11PM 15  Q.   OKAY.  AND YOU RECALL THE MESSAGE AT THE LOWER PORTION OF

12:11PM 16  THE EXHIBIT FROM DANIEL YOUNG, THAT'S DR. YOUNG, WHO YOU'RE

12:11PM 17  FAMILIAR WITH; CORRECT?

12:11PM 18  A.   CORRECT.

12:11PM 19  Q.   AND THAT'S FEBRUARY 20, 2014.

12:11PM 20      DO YOU SEE THE DATE?

12:11PM 21  A.   I SEE IT.

12:11PM 22  Q.   AND THEN THERE'S A LINK TO AN INTERNET "WIRED" ARTICLE AND

12:11PM 23  THE DOCUMENT REFLECTS ELIZABETH HOLMES - THERANOS.

12:12PM 24      DO YOU SEE THAT?

12:12PM 25  A.   I DO.

ER-1625

12:12PM   1      Q.   AND IT APPEARS SOMEONE FORWARDED THAT MESSAGE, A

12:12PM   2      SWAPNA JOSHI.

12:12PM   3           YOU KNOW WHO DR. JOSHI IS; CORRECT?

12:12PM   4      A.   NO, I DON'T.

12:12PM   5      Q.   SOMEONE THAT WORKED AT THERANOS?

12:12PM   6      A.   IT APPEARS SO.

12:12PM   7      Q.   AND THE MESSAGE WAS SENT TO YOU ON FEBRUARY 27TH, 2014.

12:12PM   8           DO YOU SEE THAT?

12:12PM   9      A.   YES.

12:12PM  10      Q.   AND EMBEDDED IN THAT MESSAGE IS THE LINK TO THE "WIRED"

12:12PM  11      ARTICLE.

12:12PM  12           DO YOU SEE THAT?

12:12PM  13      A.   YES.

12:12PM  14      Q.   AND YOU'RE AWARE OF THE FACT THAT "WIRED" ISSUES ITS

12:12PM  15      ARTICLES ONLINE BEFORE IT ACTUALLY MAKES AVAILABLE THE HARD

12:12PM  16      COPY MAGAZINES ON NEWS STANDS; CORRECT?

12:12PM  17      A.   I'M NOT AWARE OF THAT FACT.

12:12PM  18      Q.   YOU CAN TAKE THAT DOWN, MR. ALLEN.

12:12PM  19           YOU WERE ASKED SOME QUESTIONS BY MR. BOSTIC ON REDIRECT

12:12PM  20      RELATING TO, AGAIN, THE NEW YORK PROFICIENCY SAMPLE EXPERIMENT

12:13PM  21      THAT WAS DONE IN FEBRUARY OF 2014.

12:13PM  22           DO YOU RECALL THAT?

12:13PM  23      A.   WAS IT A SPREADSHEET?

12:13PM  24      Q.   THE SPREADSHEET AND THE EXPERIMENT UNDERLYING THE

12:13PM  25      EXPERIMENT.

12:13PM  1         DO YOU RECALL THAT?

12:13PM  2    A.   OH, I RECALL THAT.

12:13PM  3    Q.   AND THAT WAS IN FEBRUARY OF 2014; CORRECT?

12:13PM  4    A.   I THINK SO.  YOU'D HAVE TO SHOW ME THE DATE AGAIN.

12:13PM  5    Q.   AND YOU TESTIFIED THAT YOU WERE THE PERSON WHO CAME UP

12:13PM  6    WITH THE IDEA TO DO THAT EXPERIMENT; CORRECT?

12:13PM  7    A.   THAT'S MY UNDERSTANDING.

12:13PM  8    Q.   AND AT THE TIME THAT YOU CAME UP WITH THAT IDEA, YOU WERE

12:13PM  9    UNAWARE OF THE FACT THAT DR. ROSENDORFF HAD ALREADY

12:13PM  10   IMPLEMENTED, VALIDATED, SIGNED OFF ON A STANDARD OPERATING

12:13PM  11   PROCEDURE TO PERFORM AAP ON THERANOS EDISON DEVICES; CORRECT?

12:13PM  12            MR. BOSTIC:  OBJECTION.  VAGUE.  COMPOUND.

12:13PM  13            THE COURT:  DID YOU UNDERSTAND THE QUESTION?

12:13PM  14            THE WITNESS:  THERE WERE SEVERAL VERBS.

12:13PM  15            THE COURT:  WHY DON'T YOU REPHRASE?

12:13PM  16   BY MR. CAZARES:

12:13PM  17   Q.   AT THE TIME, AT THE TIME THAT YOU SUGGESTED THE EXPERIMENT

12:13PM  18   IN FEBRUARY OF 2014 WITH THE NEW YORK PROFICIENCY TESTING

12:13PM  19   SAMPLES, YOU WERE UNAWARE THAT DR. ROSENDORFF HAD ALREADY

12:13PM  20   SIGNED OFF AND APPROVED A STANDARD OPERATING PROCEDURE FOR AAP

12:14PM  21   ON EDISON DEVICES; CORRECT?

12:14PM  22   A.   CORRECT.

12:14PM  23   Q.   AND THAT EXPERIMENT THAT YOU PERFORMED WASN'T PERFORMED

12:14PM  24   CONSISTENT WITH THAT STANDARD OPERATING PROCEDURE THAT HAD

12:14PM  25   ALREADY BEEN AUTHORIZED AND APPROVED BY DR. ROSENDORFF;

PANDORI RECROSS BY MR. CAZARES                                    2302

12:14PM  1    CORRECT?

12:14PM  2    A.   CORRECT.

12:14PM  3    Q.   AND YOU ALSO AGREED, I THINK WITH MR. BOSTIC, DID YOU NOT,

12:14PM  4    THAT THE CLINICAL LABORATORY SHOULD BE OPERATED AND CONDUCTED

12:14PM  5    CONSISTENT WITH THE STANDARD OPERATING PROCEDURES THAT WERE

12:14PM  6    ALREADY AUTHORIZED AND SIGNED OFF ON BY THE CLINICAL LABORATORY

12:14PM  7    DIRECTOR; CORRECT?

12:14PM  8    A.   DID YOU JUST SAY THAT JOHN BOSTIC ASKED ME THAT QUESTION?

12:14PM  9    Q.   WHAT I'M ASKING YOU IS THAT YOU AGREE THAT THE LABORATORY

12:14PM  10   SHOULD BE OPERATED AND ITS EMPLOYEES SHOULD PERFORM TESTING

12:14PM  11   CONSISTENT WITH THE STANDARD OPERATING PROCEDURES THAT WERE

12:14PM  12   APPROVED BY THE CLIA LAB DIRECTOR; CORRECT?

12:15PM  13   A.   IN A DIAGNOSTIC LABORATORY, THAT WOULD BE AN APPROPRIATE

12:15PM  14   COURSE OF ACTION AS LONG AS THOSE SOP'S HAVE BEEN APPROVED BY

12:15PM  15   THE LABORATORY DIRECTOR.

12:15PM  16   Q.   AND ADAM ROSENDORFF WAS THE LABORATORY DIRECTOR DURING THE

12:15PM  17   TIME THAT YOU WORKED AT THERANOS; CORRECT?

12:15PM  18   A.   CORRECT.

12:15PM  19   Q.   IF WE COULD PLEASE PUBLISH EXHIBIT 7440.  IT'S ALREADY IN

12:15PM  20   EVIDENCE.

12:15PM  21        AND, DR. PANDORI, LOOKING ON THE SCREEN, DO YOU SEE 7440

12:15PM  22   IS AN EMAIL THAT WE DISCUSSED EARLIER FROM YOURSELF TO

12:15PM  23   MR. BALWANI AND DR. ROSENDORFF?

12:15PM  24        DO YOU SEE THAT?

12:15PM  25   A.   YES, I DO.

PANDORI RECROSS BY MR. CAZARES                                2303

12:15PM  1    Q.   AND THAT'S APRIL 17TH, 2014.

12:15PM  2         DO YOU SEE THAT?

12:15PM  3    A.   YES.

12:15PM  4    Q.   AND THIS IS SUBSEQUENT TO THAT EXPERIMENT USING THE

12:15PM  5    NEW YORK PROFICIENCY TESTING SAMPLES; CORRECT?

12:15PM  6    A.   YES.

12:15PM  7    Q.   AND IN THE MESSAGE YOU INDICATE, "ATTACHED, A SLIDE SHOW I

12:15PM  8    PUT TOGETHER GIVING AN OVERVIEW OF AAP AND HOW IT WORKS AND WHY

12:16PM  9    IT IS BETTER THAN PT."

12:16PM  10        DO YOU SEE THAT?

12:16PM  11   A.   YES.

12:16PM  12   Q.   AND THOSE ARE YOUR WORDS; CORRECT?

12:16PM  13   A.   CORRECT.

12:16PM  14   Q.   AND PT REFERS TO PROFICIENCY TESTING; CORRECT?

12:16PM  15   A.   YES, IT DOES.

12:16PM  16   Q.   AND IF WE CAN GO TO THE UNDERLYING POWERPOINT AT PAGE 6.

12:16PM  17        AND YOU PUT THE POWERPOINT TOGETHER; CORRECT?

12:16PM  18   A.   THAT'S MY -- YES.

12:16PM  19   Q.   AND INCLUDED IN THE POWERPOINT YOU PROVIDED TO MR. BALWANI

12:16PM  20   AND DR. ROSENDORFF, YOU WRITE, OR WROTE, IN THE PRESENTATION,

12:16PM  21   "THERANOS TESTS HAVE NO PEER GROUP."

12:16PM  22        CORRECT?

12:16PM  23   A.   YES.

12:16PM  24   Q.   AND YOU AGREED WITH THAT AT THE TIME; CORRECT?

12:16PM  25   A.   IN APRIL OF '17, IT WAS CLEAR -- ON APRIL 17TH I THINK IS

PANDORI RECROSS BY MR. CAZARES                                    2304

```
12:17PM   1    WHEN THAT WAS DATED, THERE WAS NO TECHNICAL PEER.

12:17PM   2    Q.   AND YOU ALSO WROTE IN THE PRESENTATION, "NORMAL PROCESS OF

12:17PM   3    PT IS THEREFORE NOT APPROPRIATE," EXCLAMATION POINT.

12:17PM   4         DO YOU SEE THAT?

12:17PM   5    A.   YES.

12:17PM   6    Q.   AND AGAIN, THIS IS YOUR PRESENTATION?

12:17PM   7    A.   CORRECT.

12:17PM   8    Q.   AND YOU AGREED WITH THAT AT THE TIME; CORRECT?

12:17PM   9    A.   CORRECT.

12:17PM  10            MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

12:17PM  11            THE COURT:  MR. BOSTIC?

12:17PM  12            MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

12:17PM  13            THE COURT:  MAY THIS WITNESS BE EXCUSED?

12:17PM  14            MR. CAZARES:  YES, YOUR HONOR.

12:17PM  15            MR. BOSTIC:  YES, YOUR HONOR.

12:17PM  16            THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU.

12:17PM  17         DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL?

12:17PM  18            MR. SCHENK:  YES, YOUR HONOR.

12:17PM  19         THE UNITED STATES CALLS CONSTANCE CULLEN.

12:18PM  20            THE COURT:  GOOD MORNING.  IF YOU WOULD JUST STAND

12:18PM  21    THERE AND RAISE YOUR RIGHT HAND WHILE YOU FACE OUR COURTROOM

12:18PM  22    DEPUTY, SHE HAS A QUESTION FOR YOU.

12:18PM  23         (GOVERNMENT'S WITNESS, CONSTANCE CULLEN, WAS SWORN.)

12:18PM  24            THE WITNESS:  YES.

12:18PM  25            THE COURT:  THANK YOU.
```

ER-1630

01:22PM 1    NO FURTHER QUESTIONS.

01:22PM 2            THE COURT:  MS. WALSH?

01:22PM 3            MS. WALSH:  NOTHING FURTHER.

01:22PM 4            THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:22PM 5            MR. SCHENK:  YES.

01:22PM 6            THE COURT:  MS. WALSH, MAY THIS WITNESS BE EXCUSED?

01:22PM 7            MS. WALSH:  YES.

01:22PM 8            THE COURT:  THANK YOU.  DOCTOR, YOU'RE EXCUSED.

01:22PM 9    THANK YOU.

01:22PM 10       DOES THE GOVERNMENT HAVE ADDITIONAL WITNESSES AVAILABLE

01:22PM 11   TODAY?

01:22PM 12           MR. BOSTIC:  YES, YOUR HONOR, WE DO.

01:22PM 13       THE UNITED STATES CALLED DANIEL EDLIN.

01:23PM 14           THE COURT:  FOLKS, IF YOU WANT TO STAND AND STRETCH

01:23PM 15   FOR A MOMENT WHILE THE WITNESS COMES IN.

01:23PM 16       SIR, IF YOU WOULD COME AND STAND AND RAISE YOUR RIGHT

01:23PM 17   HAND.

01:23PM 18       **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS SWORN.)**

01:23PM 19           THE WITNESS:  YES.

01:23PM 20           THE COURT:  PLEASE HAVE A SEAT HERE, SIR.

01:23PM 21       AND PLEASE BE SEATED EVERYONE.

01:23PM 22       THANK YOU.

01:23PM 23       MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST THAT

01:23PM 24   MICROPHONE AND THE CHAIR AS NEEDED FOR YOUR COMFORT.

01:23PM 25       WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

01:23PM 1    AND THEN SPELL IT, PLEASE.

01:23PM 2              THE WITNESS:  DANIEL EDLIN, D-A-N-I-E-L, E-D-L-I-N.

01:23PM 3              THE COURT:  THANK YOU.

01:23PM 4         MR. BOSTIC.

01:23PM 5              MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:23PM 6                    **DIRECT EXAMINATION**

01:23PM 7    BY MR. BOSTIC:

01:23PM 8    Q.   GOOD AFTERNOON, MR. EDLIN.

01:23PM 9    A.   GOOD AFTERNOON.

01:23PM 10   Q.   I UNDERSTAND FROM THE COURT THAT YOU ARE PERMITTED TO

01:24PM 11   TESTIFY WITHOUT A MASK IF YOU ARE FULLY VACCINATED; IS THAT

01:24PM 12   CORRECT?

01:24PM 13   A.   YES.

01:24PM 14   Q.   MR. EDLIN, WAS THERE A TIME WHEN YOU WORKED FOR A COMPANY

01:24PM 15   CALLED THERANOS?

01:24PM 16   A.   YES.

01:24PM 17   Q.   DO YOU REMEMBER YOUR APPROXIMATE DATES OF EMPLOYMENT WITH

01:24PM 18   THE COMPANY?

01:24PM 19   A.   I JOINED SEPTEMBER OF 2011 AND LEFT IN DECEMBER OF 2016.

01:24PM 20   Q.   AND WHAT JOB TITLES DID YOU HAVE WHILE YOU WERE AT

01:24PM 21   THERANOS?

01:24PM 22   A.   I WAS HIRED AS A SENIOR PROJECT MANAGER, AND I RECEIVED A

01:24PM 23   PROMOTION THREE YEARS LATER TO LEAD STRATEGIC OPERATIONS,

01:24PM 24   OFFICE OF THE CEO.

01:24PM 25   Q.   AND I WANT TO TALK MORE ABOUT YOUR JOB RESPONSIBILITIES,

ER-1632

01:24PM  1    BUT FOR NOW, CAN YOU SUMMARIZE IN A FEW SENTENCES WHAT THOSE

01:24PM  2    ROLES INVOLVED?

01:24PM  3    A.   AS SENIOR PRODUCT MANAGER, I SUPPORTED KEY BUSINESS

01:24PM  4    PARTNERSHIPS, INCLUDING THE WALGREENS PARTNERSHIP.

01:25PM  5         I ALSO SUPPORTED RELATIONSHIPS WITH COMPONENTS OF THE

01:25PM  6    DEPARTMENT OF DEFENSE AND SOME PHARMACEUTICAL COMPANIES.

01:25PM  7         I WORKED WITH OTHER SENIOR PRODUCT MANAGERS TO SUPPORT

01:25PM  8    WORK WITH MARKETING AND COMMUNICATIONS COMPANIES.

01:25PM  9         AND I ALSO COORDINATED TECHNOLOGY DEMONSTRATIONS.

01:25PM  10   Q.   WHEN YOU LEFT THE COMPANY, DID YOU SAY THAT WAS END OF THE

01:25PM  11   YEAR 2016?

01:25PM  12   A.   CORRECT.

01:25PM  13   Q.   WHAT WAS THE NATURE OF YOUR DEPARTURE FROM THE COMPANY?

01:25PM  14   WERE YOU LAID OFF?  WERE YOU FIRED?  DID YOU QUIT?

01:25PM  15             MS. WALSH:  OBJECTION.  TIME PERIOD.

01:25PM  16             THE COURT:  THE TIMING OF HIS -- WHEN HE LEFT?

01:25PM  17             MS. WALSH:  YES.

01:25PM  18             THE COURT:  DID YOU WANT TO MAYBE JUST ASK A

01:25PM  19   QUESTION ABOUT THAT, WHEN HE LEFT JUST TO CLEAR THE RECORD.

01:25PM  20             MR. BOSTIC:  SURE.

01:25PM  21         IS THE CONFUSION AS TO WHEN HE LEFT?

01:25PM  22             THE COURT:  I THINK SO.

01:25PM  23   BY MR. BOSTIC:

01:25PM  24   Q.   MR. EDLIN, WHEN DID YOU LEAVE THE COMPANY?

01:25PM  25   A.   DECEMBER 2016.

EDLIN DIRECT BY MR. BOSTIC                                          2355

01:26PM  1    Q.   AND WHY DID YOU LEAVE THE COMPANY IN DECEMBER OF 2016?

01:26PM  2              MS. WALSH:  OBJECTION.  RELEVANCE.

01:26PM  3              THE COURT:  OVERRULED.

01:26PM  4         YOU CAN ANSWER THE QUESTION.

01:26PM  5              THE WITNESS:  I LEFT THE COMPANY FOR TWO MAIN

01:26PM  6    REASONS:

01:26PM  7         ONE, I WANTED TO GO TO BUSINESS SCHOOL, WHICH I DID; AND

01:26PM  8    TWO, I NO LONGER BELIEVED, BASED ON WHAT I WAS SEEING, THAT THE

01:26PM  9    COMPANY WAS CAPABLE OF STANDING BEHIND THE CLAIMS IT HAD BEEN

01:26PM 10    MAKING ABOUT THE TECHNOLOGY.

01:26PM 11         THIS WAS ABOUT A YEAR AFTER THE FIRST

01:26PM 12    "WALL STREET JOURNAL" ARTICLE CAME OUT.  IN THAT PERIOD THE

01:26PM 13    COMPANY MADE SEVERAL ATTEMPTS TO PROVE ITS TECHNOLOGY, ALL OF

01:26PM 14    WHICH WERE UNSUCCESSFUL, AND I NO LONGER WANTED TO BE IN THAT

01:26PM 15    ENVIRONMENT.

01:26PM 16    BY MR. BOSTIC:

01:26PM 17    Q.   UNDERSTOOD.  I'LL WANT TO FOLLOW UP WITH YOU ON THAT

01:26PM 18    DECISION AND WHAT CAME BEHIND IT LATER.

01:26PM 19         BUT FOR NOW, CAN YOU GIVE US SOME INFORMATION ABOUT YOUR

01:26PM 20    BACKGROUND, STARTING WITH YOUR EDUCATION?

01:26PM 21    A.   FOR MY UNDERGRADUATE I ATTENDED DUKE UNIVERSITY AND

01:27PM 22    MAJORED IN PUBLIC POLICY AND RECEIVED A CERTIFICATE IN MARKETS

01:27PM 23    AND MANAGEMENT STUDIES.

01:27PM 24         I ALSO RECEIVED MY MASTER'S OF BUSINESS ADMINISTRATION

01:27PM 25    FROM THE UCLA ANDERSON SCHOOL OF MANAGEMENT.

ER-1634

01:27PM 1    Q.   AND IN BETWEEN OBTAINING THOSE DEGREES AND STARTING WORK

01:27PM 2    AT THERANOS, DID YOU HAVE ANY OTHER EMPLOYMENT?

01:27PM 3    A.   MY FIRST JOB OUT OF COLLEGE WAS AS AN EQUITY RESEARCH AND

01:27PM 4    SALES ASSISTANT AT TELSEY ADVISORY GROUP.

01:27PM 5    Q.   AND FOR HOW LONG WERE YOU THERE?

01:27PM 6    A.   ABOUT TWO YEARS.

01:27PM 7    Q.   SO LET'S TALK ABOUT HOW YOU CAME TO WORK AT THERANOS.

01:27PM 8        HOW DID YOU FIRST FIND OUT ABOUT THE COMPANY?

01:27PM 9    A.   I FIRST FOUND OUT ABOUT THE COMPANY THROUGH

01:27PM 10   ELIZABETH HOLMES'S BROTHER, CHRISTIAN.  HE AND I ATTENDED DUKE

01:27PM 11   TOGETHER, AND HE'S ONE OF MY CLOSEST FRIENDS, AND I KNEW THAT

01:27PM 12   HIS SISTER HAD DROPPED OUT OF STANFORD TO START HER OWN

01:27PM 13   COMPANY, WHICH IS THERANOS.

01:27PM 14   Q.   AND WHEN YOU FIRST HEARD ABOUT THERANOS, WAS IT IN

01:28PM 15   CONNECTION WITH THE JOB THAT YOU EVENTUALLY CAME TO HAVE, OR

01:28PM 16   DID YOU KNOW ABOUT IT BEFORE THEN?

01:28PM 17   A.   I KNEW ABOUT IT BEFORE THEN.

01:28PM 18   Q.   AND HOW DID YOU COME TO FIND OUT ABOUT THE POSSIBILITY

01:28PM 19   THAT YOU MIGHT WORK AT THERANOS?

01:28PM 20   A.   ABOUT TWO YEARS AFTER I GRADUATED FROM COLLEGE, CHRISTIAN

01:28PM 21   MOVED TO CALIFORNIA TO WORK AT THERANOS AND I KNEW THAT HE WAS

01:28PM 22   DOING THAT.

01:28PM 23       AND THEN A FEW MONTHS LATER, HE ACTUALLY GAVE ME A CALL TO

01:28PM 24   TELL ME THAT THERE MIGHT BE AN OPPORTUNITY FOR ME TO JOIN THE

01:28PM 25   COMPANY.

01:28PM  1    Q.   CAN YOU PLACE THAT IN TIME FOR US?  WHAT YEAR ARE WE

01:28PM  2    TALKING ABOUT NOW?

01:28PM  3    A.   THIS WAS AROUND JUNE OF 2011.

01:28PM  4    Q.   AND WERE YOU INTERESTED IN THAT OPPORTUNITY?

01:28PM  5    A.   I WAS.  IT SOUNDED LIKE A VERY EXCITING OPPORTUNITY WITH A

01:28PM  6    LOT OF POTENTIAL.  I DIDN'T RECEIVE A LOT OF INFORMATION ABOUT

01:28PM  7    IT AT THE TIME, BUT IT SOUNDED LIKE SOMETHING WORTH PURSUING.

01:29PM  8    Q.   AND DID YOU PURSUE THE JOB BASED ON THAT INTEREST?

01:29PM  9    A.   I DID.

01:29PM  10   Q.   CAN YOU SUMMARIZE THE APPLICATION INTERVIEW PROCESS?  WHAT

01:29PM  11   WERE THE STEPS INVOLVED?

01:29PM  12   A.   AFTER I HAD SOME INITIAL DISCUSSIONS WITH CHRISTIAN, I WAS

01:29PM  13   INVITED TO INTERVIEW AT THERANOS'S OFFICES.

01:29PM  14        CHRISTIAN ALSO EXTENDED THE SAME OFFER TO A FEW OF OUR

01:29PM  15   OTHER CLASSMATES FROM DUKE, AND A GROUP OF US WENT TO THE

01:29PM  16   THERANOS OFFICES IN PALO ALTO TO INTERVIEW WITH SUNNY AND

01:29PM  17   ELIZABETH, BOTH IN A GROUP SETTING AND ALSO ONE-ON-ONE.

01:29PM  18   Q.   AND APPROXIMATELY HOW MANY PEOPLE ARE WE TALKING ABOUT IN

01:29PM  19   THIS GROUP OF COLLEGE CLASSMATES WHO WERE INTERVIEWING FOR THIS

01:29PM  20   JOB AT THERANOS, OR THESE JOBS AT THERANOS?

01:29PM  21   A.   I THINK THERE WERE FOUR OTHER PEOPLE INITIALLY, AND THEN

01:29PM  22   ABOUT A YEAR LATER ANOTHER GENTLEMAN JOINED.

01:29PM  23   Q.   AS PART OF THAT INTERVIEW PROCESS, DID YOU HAVE

01:29PM  24   CONVERSATIONS WITH MR. BALWANI AND MS. HOLMES?

01:29PM  25   A.   YES.

01:29PM  1    Q.   AND DID YOU SPEAK TO THEM SEPARATELY OR TOGETHER, IF YOU

01:30PM  2    REMEMBER?

01:30PM  3    A.   I REMEMBER SPEAKING WITH THEM TOGETHER IN A GROUP SETTING

01:30PM  4    WITH THE OTHER PEOPLE WHO JOINED AS SENIOR PRODUCT MANAGERS,

01:30PM  5    AND THEN I HAD A TWO-ON-ONE DISCUSSION, SO I MET WITH ELIZABETH

01:30PM  6    AND SUNNY.

01:30PM  7    Q.   AND EVENTUALLY WERE YOU OFFERED A POSITION AT THERANOS?

01:30PM  8    A.   YES.

01:30PM  9    Q.   AND YOU ACCEPTED?

01:30PM  10   A.   CORRECT.

01:30PM  11   Q.   AT THE TIME THAT YOU FIRST STARTED AT THE COMPANY, WHAT

01:30PM  12   WAS YOUR UNDERSTANDING OF WHAT BUSINESS THE COMPANY WAS IN?

01:30PM  13   A.   I UNDERSTOOD THAT THE COMPANY WAS IN THE LABORATORY

01:30PM  14   TECHNOLOGY OR HEALTH CARE TECHNOLOGY BUSINESS, AND THAT THE

01:30PM  15   COMPANY'S MISSION WAS TO MAKE ACCESS TO LAB TESTING MORE

01:30PM  16   ACCESSIBLE TO PATIENTS, AND THAT THE PROPRIETARY UNDERLYING

01:30PM  17   TECHNOLOGY WAS CONNECTED TO BEING ABLE TO DO LABORATORY TESTING

01:30PM  18   ON A FINGERSTICK AND SMALL AMOUNT OF BLOOD.

01:30PM  19   Q.   WHEN YOU WERE FIRST HIRED AT THE COMPANY, YOUR JOB TITLE

01:31PM  20   WAS SENIOR PROJECT MANAGER YOU SAID?

01:31PM  21   A.   CORRECT.

01:31PM  22   Q.   CAN YOU DESCRIBE HOW THAT POSITION FITS INTO THE OVERALL

01:31PM  23   ORGANIZATION OF THE COMPANY?

01:31PM  24   A.   SO I JOINED A PRODUCT MANAGEMENT TEAM THAT ALREADY

01:31PM  25   EXISTED, AND WHEN I JOINED, I REPORTED DIRECTLY TO

EDLIN DIRECT BY MR. BOSTIC                                           2359

01:31PM   1     CHRISTIAN HOLMES, WHO WAS THE TEAM LEAD, AND THEN CHRISTIAN

01:31PM   2     REPORTED UP TO SUNNY.

01:31PM   3     Q.   AND FROM YOUR TIME AT THE COMPANY, DID YOU COME TO

01:31PM   4     UNDERSTAND HOW MR. BALWANI AND MS. HOLMES FIT INTO THE OVERALL

01:31PM   5     ORGANIZATION OF THE COMPANY?

01:31PM   6     A.   YES.

01:31PM   7     Q.   HOW WOULD YOU DESCRIBE THEIR ROLES?

01:31PM   8     A.   SO ELIZABETH WAS THE CEO, AND SUNNY WAS THE PRESIDENT AND

01:31PM   9     COO.

01:31PM  10     Q.   OKAY.  YOU MENTIONED THAT AT THE BEGINNING YOU WERE

01:32PM  11     REPORTING TO CHRISTIAN HOLMES.  IS THAT MS. HOLMES'S YOUNGER OR

01:32PM  12     OLDER BROTHER, IF YOU KNOW?

01:32PM  13     A.   YOUNGER BROTHER.

01:32PM  14     Q.   DID THERE COME A TIME WHEN YOUR REPORTING OBLIGATIONS

01:32PM  15     CHANGED?

01:32PM  16     A.   YES.

01:32PM  17     Q.   AND WHEN DID THAT HAPPEN AND HOW DID IT CHANGE?

01:32PM  18     A.   THAT HAPPENED WHEN I RECEIVED MY PROMOTION AT THE END OF

01:32PM  19     2014.  SO THAT BEGAN IN JANUARY OF 2015.

01:32PM  20          AND AT THAT TIME I REPORTED DIRECTLY TO ELIZABETH HOLMES.

01:32PM  21     Q.   AND HOW DID YOUR JOB RESPONSIBILITIES CHANGE WITH THAT

01:32PM  22     PROMOTION?  AND IF YOU CAN START BY GIVING US YOUR NEW TITLE

01:32PM  23     FOLLOWING THE PROMOTION?

01:32PM  24     A.   MY NEW TITLE FOLLOWING THE PROMOTION WAS LEAD OF STRATEGIC

01:32PM  25     OPERATIONS, OFFICE OF THE CEO.

ER-1638

01:32PM 1    THE MAJORITY OF MY JOB RESPONSIBILITIES REMAINED, ALTHOUGH

01:32PM 2    AT THAT POINT IN TIME THE WALGREENS PARTNERSHIP AND OPERATION

01:32PM 3    HAD REALLY GOTTEN OFF THE GROUND, SO I SPENT LESS OF MY TIME

01:33PM 4    WORKING ON THAT.

01:33PM 5    AND THERE WAS ALSO AN OPERATIONAL COMPONENT TO THE NEW

01:33PM 6    ROLE WHERE I WORKED WITH OTHER MEMBERS OF THE OFFICE OF THE CEO

01:33PM 7    TO MAKE SURE THAT ANY PROJECTS OR REQUESTS REQUIRED ELIZABETH'S

01:33PM 8    FEEDBACK OR ATTENTION WERE RESPONDED TO IN A TIMELY FASHION.

01:33PM 9    Q.   I'D LIKE TO ASK YOU ABOUT THAT ROLE AND HOW FREQUENTLY IT

01:33PM 10   REQUIRED YOU TO INTERACT WITH MS. HOLMES AND MR. BALWANI, SO

01:33PM 11   LET'S BREAK THOSE UP.

01:33PM 12   FIRST OF ALL, HOW FREQUENTLY WERE YOU IN CONTACT WITH

01:33PM 13   MS. HOLMES IN THAT ROLE AT THE COMPANY?

01:33PM 14   A.   THE SECOND ROLE?

01:33PM 15   Q.   YES.

01:33PM 16   A.   GENERALLY ON A DAILY BASIS.

01:33PM 17   Q.   AND WERE YOU REPORTING DIRECTLY TO HER AT THAT TIME?

01:33PM 18   A.   YES.

01:33PM 19   Q.   AND HOW ABOUT MR. BALWANI?  HOW FREQUENTLY WERE YOU IN

01:33PM 20   CONTACT WITH HIM DURING THAT TIME PERIOD?

01:33PM 21   AND I GUESS WE'RE TALKING ABOUT FROM 2015 ON.

01:33PM 22   A.   IT WAS NOT NEARLY AS FREQUENT.

01:34PM 23   Q.   AND IF YOU COULD TRY TO QUANTIFY IT FOR US, WAS IT WEEKLY?

01:34PM 24   MONTHLY?  SOMETHING ELSE?

01:34PM 25   A.   I THINK WEEKLY OR BIWEEKLY.

ER-1639

EDLIN DIRECT BY MR. BOSTIC                                    2361

01:34PM  1   Q.   HOW ABOUT FOR THE TIME PERIOD BEFORE YOUR PROMOTION?  SO

01:34PM  2   IF WE'RE TALKING ABOUT 2012 THROUGH 2014, HOW FREQUENTLY DID

01:34PM  3   YOU HAVE CONTACT WITH MR. BALWANI DURING THAT TIME PERIOD?

01:34PM  4   A.   I HAD CONTACT WITH MR. BALWANI MORE FREQUENTLY IN THAT

01:34PM  5   TIME PERIOD MAINLY AROUND THE WALGREENS PARTNERSHIP, WHEN THE

01:34PM  6   WALGREENS OPERATION BECAUSE SUNNY KIND OF OVERSAW THAT

01:34PM  7   RELATIONSHIP, AND AT THE TIME THAT'S WHERE I SPENT MOST OF MY

01:34PM  8   TIME.

01:34PM  9   Q.   CAN YOU TELL US MORE ABOUT THAT?  WHAT WAS YOUR ROLE IN

01:34PM 10   CONNECTION WITH THE WALGREENS PARTNERSHIP, AND WHY DID THAT

01:34PM 11   ENTAIL FREQUENT CONTACT WITH THE DEFENDANT, MR. BALWANI?

01:34PM 12   A.   IN MY ROLE I WORKED WITH THE OTHER SENIOR PRODUCT MANAGERS

01:35PM 13   TO OPERATIONALIZE AND PLAN WHAT THE WALGREENS OPERATION WOULD

01:35PM 14   LOOK LIKE, AND THAT INCLUDED MAINLY THE FRONT END CUSTOMER

01:35PM 15   EXPERIENCE PROCESS FOR PATIENTS AS THEY ENTERED A THERANOS

01:35PM 16   WELLNESS CENTER AND HAD THEIR SAMPLES COLLECTED IN THAT STORE.

01:35PM 17       THERE WERE ALSO A NUMBER OF OTHER ASPECTS, INCLUDING

01:35PM 18   SOFTWARE DEVELOPMENT AND APPLICATIONS THAT WERE USED BY

01:35PM 19   PHARMACISTS AND TECHNICIANS IN THE WALGREENS STORES IN THE

01:35PM 20   WELLNESS CENTERS TO CHECK PATIENTS IN, RUN THEIR INSURANCE,

01:35PM 21   EVALUATE THEIR LAB FORMS.

01:35PM 22       AND THEN THERE WAS ALSO ANOTHER SOFTWARE APPLICATION THAT

01:35PM 23   HELPED THE TECHNICIANS UNDERSTAND WHAT TUBES THEY NEEDED TO

01:35PM 24   COLLECT CERTAIN SAMPLES BASED ON THE PARTICULAR LAB ORDER.

01:35PM 25   Q.   DURING YOUR TIME AT THE COMPANY, DID YOU GET A SENSE FOR

01:36PM 1    HOW INFORMATION MOVED AROUND THE COMPANY?  AND IN PARTICULAR

01:36PM 2    I'M ASKING ABOUT WHETHER THE FLOW OF INFORMATION WAS RESTRICTED

01:36PM 3    WITHIN THERANOS?

01:36PM 4    A.   YES.

01:36PM 5    Q.   WHAT WAS YOUR SENSE THERE?

01:36PM 6    A.   THE FLOW OF INFORMATION WAS GENERALLY RESTRICTED, AND WHAT

01:36PM 7    I MEAN BY THAT IS CERTAIN INFORMATION WOULD NOT GET SHARED

01:36PM 8    OUTSIDE OF THE PARTICULAR TEAM TO WHICH THAT INFORMATION

01:36PM 9    APPLIED.

01:36PM 10   Q.   AND HOW DID YOU COME TO UNDERSTAND THAT THAT WAS THE WAY

01:36PM 11   OF THINGS AT THERANOS?

01:36PM 12   A.   THAT'S WHAT I WAS TOLD BY MY SUPERVISORS.

01:36PM 13   Q.   AND WHO ARE WE TALKING ABOUT, THE PEOPLE WHO TOLD YOU THAT

01:36PM 14   INFORMATION WAS TO BE RESTRICTED THAT WAY?

01:36PM 15   A.   THAT INCLUDED CHRISTIAN, ELIZABETH, AND SUNNY.

01:36PM 16   Q.   YOU HEARD DIRECTION LIKE THAT FROM ALL THREE OF THOSE

01:36PM 17   INDIVIDUALS?

01:36PM 18   A.   CORRECT.

01:36PM 19   Q.   SO FAR WE'VE BEEN TALKING ABOUT THE WAY THE INFORMATION

01:37PM 20   MOVED BETWEEN DIFFERENT EMPLOYEES WITHIN THE COMPANY; CORRECT?

01:37PM 21   A.   RIGHT.

01:37PM 22   Q.   AND HOW ABOUT THE FLOW OF INFORMATION FROM INSIDE OF THE

01:37PM 23   COMPANY TO OUTSIDE?  DID YOU GET DIRECTION ABOUT KEEPING

01:37PM 24   INFORMATION WITHIN THE COMPANY AND NOT PUBLICLY DISCLOSING IT?

01:37PM 25   A.   YES, THAT INFORMATION WAS ALSO RESTRICTED FROM BEING SENT

ER-1641

EDLIN DIRECT BY MR. BOSTIC                                    2363

01:37PM 1   OUTSIDE OF THE COMPANY.

01:37PM 2       MY UNDERSTANDING WAS THAT NO INFORMATION SHOULD BE SHARED

01:37PM 3   OUTSIDE OF THE COMPANY UNLESS IT WAS APPROVED, AND IN MY CASE

01:37PM 4   THAT WOULD HAVE BEEN APPROVED BY CHRISTIAN, ELIZABETH, OR

01:37PM 5   SUNNY.

01:37PM 6   Q.   WHEN WE ARE TALKING ABOUT RESTRICTIONS ON FLOW OF

01:37PM 7   INFORMATION WITHIN THE COMPANY, WAS THERE ANYONE AT THE COMPANY

01:37PM 8   TO WHOM THOSE RESTRICTIONS DID NOT APPLY?

01:37PM 9       IN OTHER WORDS, WERE THERE PEOPLE AT THE COMPANY WHO WERE

01:37PM 10  ALLOWED TO KNOW ANYTHING, WHO DIDN'T HAVE RESTRICTIONS ON WHAT

01:37PM 11  THEY COULD KNOW?

01:37PM 12  A.   YES.

01:37PM 13  Q.   AND WHO FELL INTO THAT CATEGORY?

01:38PM 14  A.   ELIZABETH AND SUNNY.

01:38PM 15  Q.   SO BASED ON YOUR TIME AT THE COMPANY, WAS THERE ANY

01:38PM 16  INFORMATION THAT YOU UNDERSTOOD COULD NOT BE SHARED WITH EITHER

01:38PM 17  MS. HOLMES OR WITH MR. BALWANI?

01:38PM 18  A.   THAT WAS NOT MY EXPERIENCE.

01:38PM 19  Q.   AND BASED ON YOUR UNDERSTANDING, WAS THERE ANYONE ELSE

01:38PM 20  WITHIN THAT CATEGORY, THE CATEGORY OF PEOPLE WHO WERE ALLOWED

01:38PM 21  TO KNOW EVERYTHING THAT WAS HAPPENING AT THE COMPANY?

01:38PM 22  A.   NO.

01:38PM 23      MR. BOSTIC:  YOUR HONOR, I WASN'T SURE IF THE COURT

01:38PM 24  WANTED TO TAKE A BREAK AT 2:00 P.M. OR SOONER.

01:38PM 25      THE COURT:  I THOUGHT WE WOULD TAKE A BREAK AT 2:00

ER-1642

01:38PM 1     P.M., LADIES AND GENTLEMEN.

01:38PM 2              MR. BOSTIC:  UNDERSTOOD.

01:38PM 3     Q.   MR. EDLIN, WHILE WORKING AT THE COMPANY, DID YOU HAVE

01:38PM 4     OPPORTUNITIES TO OBSERVE MS. HOLMES AND MR. BALWANI'S WORKING

01:38PM 5     RELATIONSHIP?

01:38PM 6     A.   YES.

01:38PM 7     Q.   LET ME ASK A FEW QUESTIONS ABOUT THAT.

01:38PM 8          FIRST OF ALL, WHEN IT CAME TO THEIR POSITIONS AT THE

01:39PM 9     COMPANY, WERE THEY COEQUALS?  WAS ONE ABOVE THE OTHER IN THE

01:39PM 10    ORGANIZATIONAL CHART?

01:39PM 11         WHAT WAS YOUR UNDERSTANDING THERE?

01:39PM 12    A.   ASIDE FROM THE TITLES, I DID NOT REALLY SEE A DISTINCTION.

01:39PM 13    Q.   DO YOU MEAN TO SAY THAT THEY OPERATED AS EQUALS?

01:39PM 14    A.   YES, I THINK THAT'S A FAIR CHARACTERIZATION.

01:39PM 15    Q.   TELL ME ABOUT THAT.  WHAT MAKES YOU SAY THAT?

01:39PM 16    A.   IN MY EXPERIENCE, I SAW THE TWO OF THEM WORK VERY CLOSELY

01:39PM 17    TOGETHER ON A DAILY BASIS.

01:39PM 18         THEY WERE ALWAYS IN EACH OTHER'S OFFICES EITHER HAVING

01:39PM 19    LUNCH OR HAVING OTHER CONVERSATIONS.

01:39PM 20         FROM MY VANTAGE POINT, I RECEIVED DIRECTION AND UNDERSTOOD

01:39PM 21    THAT THEY BOTH HAD AN UNDERSTANDING OF THE OVERALL STRATEGY FOR

01:39PM 22    THE COMPANY.

01:39PM 23    Q.   AND TELL ME ABOUT -- YOU MENTIONED YOUR VANTAGE POINT.

01:40PM 24         HOW DID YOU HAVE A CHANCE TO SEE THESE TWO WORKING

01:40PM 25    TOGETHER?

01:40PM  1    A.   VISUALLY THEIR OFFICES HAD GLASS WINDOWS AND DOORS, SO I

01:40PM  2    WOULD ALWAYS BE ABLE TO SEE INSIDE OF THEIR OFFICES, AS ANYONE

01:40PM  3    ELSE WOULD.

01:40PM  4    Q.   AND DOES THAT HAVE SOMETHING TO DO WITH WHERE YOUR WORK

01:40PM  5    STATION WAS IN RELATION TO THEIR OFFICES?

01:40PM  6    A.   YES.

01:40PM  7    Q.   AND WHERE WAS YOUR WORK STATION?

01:40PM  8    A.   I SAT IN A POD OF DESKS OUTSIDE OF THEIR OFFICES, OR CLOSE

01:40PM  9    TO THEIR OFFICES.

01:40PM  10   Q.   AND BESIDES SITTING NEAR THEIR OFFICES AND BEING ABLE TO

01:40PM  11   SEE THEM WORKING, DID YOUR WORK ALSO INVOLVE CONTACT WITH THE

01:40PM  12   TWO OF THEM?

01:40PM  13   A.   YES.

01:40PM  14   Q.   WHEN IT CAME TO THE RESPONSIBILITIES OF MS. HOLMES AND

01:40PM  15   MR. BALWANI, DID YOU OBSERVE THEM COLLABORATING REGULARLY AT

01:41PM  16   THE COMPANY OR DID THEY TEND TO WORK SEPARATELY?  WHAT DID YOU

01:41PM  17   SEE IN THAT REGARD?

01:41PM  18   A.   I THINK THERE WAS A MIX.  THERE WERE CERTAIN AREAS THAT

01:41PM  19   EACH OF THEM FOCUSSED ON, AND THERE WERE OTHER AREAS WHERE IT

01:41PM  20   SEEMED MORE COLLABORATIVE.

01:41PM  21   Q.   DID YOU EVER HAVE A CHANCE TO SEE AN INSTANCE WHERE THE

01:41PM  22   TWO OF THEM DISAGREED ABOUT SOMETHING THAT HAPPENED AT

01:41PM  23   THERANOS?

01:41PM  24   A.   THERE WERE A NUMBER OF TIMES WHERE THERE WOULD BE A LIVELY

01:41PM  25   DISCUSSION ABOUT A CERTAIN STRATEGY OR A CERTAIN APPROACH, AND

EDLIN DIRECT BY MR. BOSTIC                                           2366

01:41PM  1    I THINK AS PART OF A HEALTHY DISCUSSION THERE WAS SOME

01:41PM  2    DISAGREEMENT AT TIMES, YES.

01:41PM  3    Q.   AND DESPITE SEEING THAT AGREEMENT, IS IT STILL YOUR

01:41PM  4    TESTIMONY THAT THEY TENDED TO COLLABORATE AND AGREE ON THINGS?

01:41PM  5    A.   YES.

01:41PM  6    Q.   YOU TALKED ABOUT A ROLE THAT YOU HAD IN CONNECTION WITH

01:41PM  7    THE OPERATIONALIZATION OF THE TESTING AT WALGREENS; IS THAT

01:42PM  8    CORRECT?

01:42PM  9    A.   YES.

01:42PM  10   Q.   IN CONNECTION WITH THAT ROLE, DID YOU COME TO UNDERSTAND

01:42PM  11   GENERALLY WHAT KINDS OF DEVICES THE COMPANY WAS USING FOR BLOOD

01:42PM  12   TESTING?

01:42PM  13   A.   YES.

01:42PM  14   Q.   WHEN AND HOW DID YOU COME TO UNDERSTAND WHAT ANALYZERS THE

01:42PM  15   COMPANY WAS USING?

01:42PM  16   A.   I CAME TO UNDERSTAND THIS OVER A PERIOD OF TIME FROM WHEN

01:42PM  17   I JOINED THE COMPANY UP UNTIL THE LAST YEAR THAT I LEFT, AND

01:42PM  18   OVER THAT TIME I LEARNED MORE.

01:42PM  19        INITIALLY I WAS EXPOSED TO THE EDISON 3.0 VERSION OF THE

01:42PM  20   DEVICE MAINLY IN MY WORK SUPPORTING SOME OF THE PHARMACEUTICAL

01:42PM  21   AND MILITARY RELATIONSHIPS THAT THE COMPANY HAD.

01:42PM  22        AND THEN OVER TIME ADDITIONAL DEVICES WERE INCORPORATED

01:43PM  23   INTO THE TECHNOLOGY DEMONSTRATIONS, AND THAT'S HOW I LEARNED

01:43PM  24   ABOUT THOSE DEVICES.

01:43PM  25   Q.   OKAY.  I'D LIKE TO BREAK THAT OUT A LITTLE BIT.

ER-1645

01:43PM 1          YOU MENTIONED THE EDISON 3.0 DEVICE; IS THAT RIGHT?

01:43PM 2      A.   YES.

01:43PM 3      Q.   DID YOU HAVE AN UNDERSTANDING IN 2013 AND 2014 AS TO

01:43PM 4      GENERALLY WHAT THAT DEVICE COULD DO AND WHAT IT COULDN'T DO?

01:43PM 5      A.   I DON'T THINK SO.

01:43PM 6      Q.   SO, FOR EXAMPLE, DID YOU KNOW HOW MANY DIFFERENT KINDS OF

01:43PM 7      TESTS THE EDISON 3.0 COULD RUN?

01:43PM 8      A.   NO.

01:43PM 9      Q.   DID YOU KNOW WHETHER THERE WAS A SPECIFIC CATEGORY OF

01:43PM 10     TESTS THAT THE EDISON WAS LIMITED TO?

01:43PM 11     A.   I DON'T BELIEVE SO.

01:43PM 12     Q.   AND IS THAT BECAUSE YOUR JOB OR YOUR ROLE DIDN'T REQUIRE

01:43PM 13     YOU TO KNOW THAT INFORMATION?

01:43PM 14     A.   CORRECT.

01:43PM 15     Q.   AND YOU TESTIFIED THAT YOUR UNDERSTANDING OF WHAT DEVICES

01:43PM 16     THERANOS WAS USING CHANGED OVER TIME UP UNTIL THE END OF YOUR

01:44PM 17     TIME WITH THE COMPANY; IS THAT RIGHT?

01:44PM 18     A.   YES.

01:44PM 19     Q.   WHAT WERE SOME OF THE THINGS THAT YOU LEARNED ABOUT THE

01:44PM 20     COMPANY'S DEVICES TOWARDS THE END OF YOUR TIME WORKING AT

01:44PM 21     THERANOS?

01:44PM 22          MS. WALSH:  OBJECTION.  RELEVANCE.

01:44PM 23          THE COURT:  OVERRULED.

01:44PM 24     BY MR. BOSTIC:

01:44PM 25     Q.   WOULD YOU LIKE THE QUESTION AGAIN, MR. EDLIN?

EDLIN DIRECT BY MR. BOSTIC                                    2368

01:44PM  1    A.   YES, PLEASE.

01:44PM  2    Q.   THE QUESTION WAS, WHAT WERE SOME OF THE THINGS THAT YOU

01:44PM  3    LEARNED ABOUT THE DEVICES THAT THE COMPANY WAS USING TOWARDS

01:44PM  4    THE END OF YOUR TIME THERE?

01:44PM  5    A.   WELL, IN 2016 I LEARNED THAT THE COMPANY HAD BEEN USING

01:44PM  6    THIRD PARTY DEVICES TO RUN FINGERSTICK SAMPLES, AND I ALSO

01:44PM  7    LEARNED IN THAT TIME THAT ONLY ONE VERSION OF THE THERANOS

01:44PM  8    DEVICE HAD BEEN USED FOR CLINICAL PATIENT SAMPLES.

01:44PM  9    Q.   AND YOU HAVE A MEMORY OF LEARNING THAT IN 2016?

01:44PM  10   A.   WELL, I FIRST HEARD ABOUT IT AT THE END OF 2015 IN "THE

01:44PM  11   WALL STREET JOURNAL" ARTICLE, AND I ATTENDED MEETINGS WHERE

01:45PM  12   THAT MATERIAL WAS DISCUSSED IN 2016, AND THAT'S WHEN I WOULD

01:45PM  13   SAY I LEARNED IT.

01:45PM  14   Q.   SO IN 2013, AROUND THE TIME OF THE WALGREENS ROLLOUT, EVEN

01:45PM  15   IN YOUR ROLE IN CONNECTION WITH THAT ROLLOUT AND IN YOUR ROLE

01:45PM  16   AS A PRODUCT MANAGER, YOU WEREN'T AWARE OF THE COMPANY'S USE OF

01:45PM  17   THIRD PARTY DEVICES FOR TESTING?

01:45PM  18            MS. WALSH:   OBJECTION.   ASKED AND ANSWERED.

01:45PM  19            THE COURT:   OVERRULED.

01:45PM  20        DO YOU UNDERSTAND THE QUESTION?

01:45PM  21            THE WITNESS:   CAN YOU REPEAT THE QUESTION, PLEASE?

01:45PM  22            MR. BOSTIC:   SURE.

01:45PM  23   Q.   THE QUESTION WAS, EVEN IN THE ROLE THAT YOU HAD IN

01:45PM  24   CONNECTION WITH THE WALGREENS ROLLOUT AND YOUR ROLE AS A

01:45PM  25   PRODUCT MANAGER, YOU DIDN'T KNOW IN 2013 AND 2014 THAT THERANOS

ER-1647

01:45PM 1     WAS RELYING ON THIRD PARTY DEVICES?

01:45PM 2     A.   CORRECT.

01:45PM 3     Q.   YOU MENTIONED THE EDISON 3 SERIES.

01:45PM 4          DID YOU LATER COME TO BE FAMILIAR WITH ANOTHER GENERATION

01:45PM 5     OF THERANOS ANALYZERS?

01:45PM 6     A.   YES.

01:45PM 7     Q.   AND CAN YOU TELL US ABOUT WHAT THOSE WERE AND HOW YOU

01:46PM 8     FOUND OUT ABOUT THEM?

01:46PM 9     A.   SO THE EDISON DEVICES WERE CONSIDERED THE 3 SERIES; THE

01:46PM 10    NEXT GENERATION DEVICES WERE CONSIDERED THE 4 SERIES; AND THERE

01:46PM 11    WERE THREE VARIATIONS OF THESE DEVICES, AND MY UNDERSTANDING

01:46PM 12    WAS THAT THESE DEVICES HAD THE CAPABILITY TO RUN ANY LAB TEST.

01:46PM 13    Q.   AND HOW DID YOU COME TO KNOW ABOUT THESE DEVICES?

01:46PM 14    A.   I FIRST LEARNED ABOUT THESE DEVICES AS PART OF THE

01:46PM 15    PLANNING WORK WITH THE DEPARTMENT OF DEFENSE.

01:46PM 16    Q.   AND THE DEVICES WE'RE TALKING ABOUT, I THINK YOU MENTIONED

01:46PM 17    THERE WERE THREE DIFFERENT VERSIONS OF THAT GENERATION.

01:46PM 18         CAN YOU WALK US THROUGH WHAT THOSE WERE?

01:46PM 19    A.   YES.  SO THE FIRST VERSION WAS INITIALLY CALLED THE

01:46PM 20    MINILAB, AND THAT DEVICE WAS ABOUT FOUR OR FIVE FEET TALL AND

01:47PM 21    IT CONSISTED OF THE COMPONENTS OF FOUR OR FIVE DIFFERENT

01:47PM 22    DEVICES STACKED ON TOP OF ONE ANOTHER.

01:47PM 23         AND THE OTHER VERSIONS WERE -- ONE WAS REFERRED TO AS A

01:47PM 24    4.0 MONOBAY, AND THAT WAS INTENDED FOR ONE SAMPLE AT A TIME.

01:47PM 25         AND THEN THE 4S WAS A SMALLER VERSION OF THE MONOBAY.

01:47PM 1     Q.   THE DEVICES THAT WE'RE TALKING ABOUT NOW, WERE THEY EVER

01:47PM 2     USED FOR CLINICAL PATIENT TESTING AT THERANOS TO YOUR

01:47PM 3     KNOWLEDGE?

01:47PM 4     A.   NO.

01:47PM 5     Q.   IN CONTRAST, THE EDISON THAT WE TALKED ABOUT BEFORE, THE

01:47PM 6     EDISON 3.0, WAS THAT USED FOR ACTUAL CLINICAL PATIENT TESTING?

01:47PM 7     A.   YES.

01:47PM 8     Q.   AND I WANT TO BE CLEAR, WHEN WE'RE TALKING ABOUT THE --

01:47PM 9     THESE NEXT GENERATION DEVICES, THE 4 SERIES THAT YOU MENTIONED,

01:47PM 10    WERE THEY USED FOR CLINICAL PATIENT TESTING AT ANY POINT IN

01:48PM 11    YOUR TIME AT THE COMPANY, INCLUDING AS LATE AS 2015 AND 2016?

01:48PM 12    A.   NO.

01:48PM 13    Q.   WE TALKED A MINUTE AGO ABOUT RESTRICTIONS ON FLOW OF

01:48PM 14    INFORMATION WITHIN THE COMPANY, WITHIN THERANOS.

01:48PM 15         LET ME ASK YOU ABOUT THAT SPECIFICALLY IN TERMS OF THE USE

01:48PM 16    OF THIRD PARTY DEVICES.

01:48PM 17         TO YOUR KNOWLEDGE, WAS THE COMPANY'S USE OF THIRD PARTY

01:48PM 18    DEVICES PUBLIC IN 2013 AND 2014?

01:48PM 19    A.   I DON'T BELIEVE SO.

01:48PM 20    Q.   AND WE TALKED ABOUT CATEGORIES OF INFORMATION THAT WERE

01:48PM 21    RESTRICTED AT THERANOS.  DID YOU UNDERSTAND THAT THE USE OF

01:48PM 22    THIRD PARTY DEVICES FELL INTO THAT CATEGORY, A CATEGORY OF

01:49PM 23    INFORMATION THAT SHOULD NOT BE SHARED WITHIN OR OUTSIDE OF THE

01:49PM 24    COMPANY?

01:49PM 25              MS. WALSH:  OBJECTION.  LEADING.

01:49PM   1                    THE COURT:  SUSTAINED.

01:49PM   2          YOU CAN REPHRASE IT.

01:49PM   3     BY MR. BOSTIC:

01:49PM   4     Q.   LET ME ASK, DID YOU HAVE AN UNDERSTANDING AS TO WHETHER

01:49PM   5     THE USE OF THIRD PARTY DEVICES WAS A CONFIDENTIAL FACT AT

01:49PM   6     THERANOS OR WHETHER IT COULD BE SHARED FREELY OUTSIDE OF THE

01:49PM   7     COMPANY?

01:49PM   8     A.   I DON'T BELIEVE IT COULD HAVE BEEN SHARED FREELY.

01:49PM   9     Q.   WHEN YOU FOUND OUT ABOUT THE COMPANY'S USE OF THIRD PARTY

01:49PM  10     DEVICES, DID YOU BECOME AWARE OF THE COMPANY'S USE OF BOTH

01:49PM  11     MODIFIED THIRD PARTY DEVICES AND ALSO UNMODIFIED THIRD PARTY

01:49PM  12     DEVICES?

01:49PM  13     A.   I'M SORRY, CAN YOU REPEAT THE BEGINNING OF THAT QUESTION?

01:49PM  14     Q.   SURE.  WHEN YOU DID FIND OUT ABOUT THE COMPANY'S USE OF

01:49PM  15     THIRD PARTY DEVICES, DID YOU FIND OUT ABOUT THE USE OF MODIFIED

01:49PM  16     AND UNMODIFIED DEVICES?

01:49PM  17     A.   YES.

01:49PM  18     Q.   AND WHEN WE'RE TALKING ABOUT THE CONFIDENTIALITY REGARDING

01:50PM  19     THAT TOPIC AS YOU UNDERSTOOD IT, WAS THERE A DIFFERENCE THERE?

01:50PM  20     OR DID THOSE CONFIDENTIALITY OBLIGATIONS APPLY BOTH TO THE

01:50PM  21     MODIFIED DEVICES AND ALSO THE UNMODIFIED DEVICES?

01:50PM  22     A.   THERE WAS A POINT IN TIME AROUND JULY 2017 WHERE I BELIEVE

01:50PM  23     THAT ALL ASPECTS OF THE THERANOS TECHNOLOGY BECAME PUBLIC

01:50PM  24     INFORMATION, THIS WAS SHARED AT A CONFERENCE.

01:50PM  25          SO UP UNTIL THAT POINT, I DON'T BELIEVE THAT THAT WAS

EDLIN DIRECT BY MR. BOSTIC                                    2372

01:50PM  1    PUBLIC INFORMATION, BUT I THINK AFTERWARD IT WAS.

01:50PM  2    Q.   AND CAN YOU HELP US NAIL THAT DOWN IN TIME?  DID YOU

01:50PM  3    MENTION A MONTH OR A YEAR?

01:50PM  4    A.   I BELIEVE IT WAS JULY OF 2016.

01:50PM  5    Q.   SO BEFORE THAT YOUR UNDERSTANDING WOULD HAVE BEEN THAT ALL

01:50PM  6    OF THESE FACTS WOULD HAVE BEEN RESTRICTED AND SHOULD HAVE BEEN

01:50PM  7    KEPT WITHIN THERANOS?

01:50PM  8    A.   RIGHT.

01:50PM  9    Q.   AS PART OF YOUR JOB AT THE COMPANY, DID YOU HANDLE TOURS

01:51PM  10   OF THE THERANOS FACILITIES?

01:51PM  11   A.   SOMETIMES.

01:51PM  12   Q.   WHO ELSE DID THAT WORK?  WHO ELSE WAS INVOLVED IN

01:51PM  13   PROVIDING TOURS OF THE FACILITIES FOR VIP VISITORS, FOR

01:51PM  14   EXAMPLE?

01:51PM  15   A.   IN MY EXPERIENCE IT WAS MAINLY ELIZABETH.

01:51PM  16   Q.   WAS MR. BALWANI ALSO INVOLVED IN SOME OF THOSE TOURS?

01:51PM  17   A.   SOME OF THEM, YES.

01:51PM  18   Q.   AND WHEN IT CAME TO TOURS, WHICH PORTIONS OF THE

01:51PM  19   FACILITIES DID YOU GIVE TOURS TO VIP'S TO?

01:51PM  20   A.   THE GENERAL WORKING SPACE FOR DIFFERENT EMPLOYEES AND THE

01:51PM  21   R&D LABS.

01:51PM  22   Q.   WAS THE R&D LAB WHERE, FOR EXAMPLE, THE NEXT GENERATION

01:51PM  23   DEVICES THAT WE TALKED ABOUT WERE BEING WORKED ON?

01:51PM  24            MS. WALSH:  OBJECTION.  LEADING.

01:51PM  25            THE COURT:  OVERRULED.

01:51PM  1          THE WITNESS:  I DO RECALL SEEING THOSE DEVICES IN

01:52PM  2   THE R&D LAB.

01:52PM  3   BY MR. BOSTIC:

01:52PM  4   Q.   HOW ABOUT THE CLINICAL LAB WHERE THE PREVIOUS GENERATION

01:52PM  5   DEVICES WERE BEING USED FOR PATIENT TESTING?  DID YOU EVER GIVE

01:52PM  6   A TOUR OF THE CLINICAL LAB DURING YOUR TIME AT THE COMPANY?

01:52PM  7   A.   NO.

01:52PM  8   Q.   AND WHOSE DECISION WAS IT WHO GOT TO SEE WHAT AT THE

01:52PM  9   COMPANY?  WHO CONTROLLED WHERE THOSE TOURS WENT AND WHAT WAS

01:52PM  10  COVERED?

01:52PM  11  A.   ELIZABETH AND SUNNY.

01:52PM  12  Q.   DO YOU REMEMBER AN OCCASION DURING YOUR TIME AT THE

01:52PM  13  COMPANY WHERE REPRESENTATIVES FROM WALGREENS CAME TO TOUR THE

01:52PM  14  THERANOS FACILITIES?

01:52PM  15  A.   YES.

01:52PM  16  Q.   AND IN ADVANCE OF THAT VISIT, WERE YOU ASKED TO PREPARE

01:52PM  17  ANY AREAS FOR THEM TO SEE?

01:52PM  18  A.   YES.

01:52PM  19  Q.   WHAT DO YOU REMEMBER ABOUT THAT?

01:52PM  20  A.   I REMEMBER THAT THERE WAS A ROOM ADJACENT TO THE CLINICAL

01:52PM  21  LAB AND ELIZABETH ASKED THAT I WORK WITH DANIEL YOUNG, WHO WAS

01:53PM  22  A HEAD SCIENTIST AT THERANOS, TO SET UP SEVERAL MINILAB DEVICES

01:53PM  23  IN THAT ROOM.

01:53PM  24  Q.   CAN YOU HELP US PLACE THIS IN TIME, FIRST OF ALL?

01:53PM  25          DO YOU REMEMBER WHAT YEAR APPROXIMATELY THIS WOULD HAVE

01:53PM 1    BEEN?

01:53PM 2    A.   2013.

01:53PM 3    Q.   AND DURING THIS TIME PERIOD, WERE THOSE DEVICES BEING USED

01:53PM 4    AT ALL FOR PATIENT TESTING?

01:53PM 5    A.   NO.

01:53PM 6    Q.   BECAUSE WE'RE TALKING ABOUT THE MINILAB, THE NEXT

01:53PM 7    GENERATION DEVICE; IS THAT RIGHT?

01:53PM 8    A.   CORRECT.

01:53PM 9    Q.   WERE THERE ANY OTHER INSTRUCTIONS THAT YOU RECEIVED IN

01:53PM 10   CONNECTION WITH THOSE DEVICES, FOR EXAMPLE, WHETHER THEY WERE

01:53PM 11   GOING TO BE FUNCTIONAL OR NOT?

01:53PM 12   A.   THE DIRECTION THAT I WAS GIVEN WAS TO MAKE SURE THAT THE

01:53PM 13   DEVICES WERE POWERED ON, THAT THEY HAD THE GRAPHIC USER

01:53PM 14   INTERFACE SHOWING ON THE SCREEN, AND THAT ONE OF THE DEVICES

01:54PM 15   SHOULD BE ABLE TO ACCEPT A CARTRIDGE.

01:54PM 16   Q.   AND I'M SORRY IF YOU SAID ALREADY, BUT APPROXIMATELY HOW

01:54PM 17   MANY OF THESE MINILAB DEVICES ARE WE TALKING ABOUT BEING PUT IN

01:54PM 18   THAT ROOM?

01:54PM 19   A.   I THINK IT WAS BETWEEN 10 TO 15.

01:54PM 20   Q.   AND DID YOU, IN FACT, FOLLOW THOSE INSTRUCTIONS AND SET UP

01:54PM 21   THOSE DEVICES IN THAT ROOM IN ADVANCE OF THE TOUR?

01:54PM 22   A.   I DON'T THINK I PERSONALLY SET THEM UP, BUT I WORKED WITH

01:54PM 23   ENGINEERS.  I ASKED ENGINEERS TO SET THEM UP.

01:54PM 24   Q.   YOUR JOB WAS TO MAKE SURE THAT IT WAS DONE?

01:54PM 25   A.   RIGHT.

01:54PM  1    Q.   AND WERE YOU A PART OF THAT TOUR WHEN THE WALGREENS VIP'S

01:54PM  2    CAME TO VISIT WHEN THAT ROOM WAS SET UP?

01:54PM  3    A.   NO.

01:54PM  4    Q.   SO DO YOU HAVE ANY KNOWLEDGE ABOUT WHAT MIGHT HAVE BEEN

01:54PM  5    SAID ABOUT THE DEVICES THAT WERE IN THAT ROOM?

01:55PM  6    A.   NO.

01:55PM  7    Q.   WAS MS. HOLMES INVOLVED IN THAT TOUR?

01:55PM  8    A.   YES.

01:55PM  9    Q.   WAS MR. BALWANI INVOLVED IN THAT TOUR?

01:55PM 10    A.   YES.

01:55PM 11    Q.   AFTER THE TOUR TOOK PLACE, DID THAT ROOM WITH ALL OF THOSE

01:55PM 12    DEVICES, THE NEXT GENERATION DEVICES, REMAIN SET UP THE WAY IT

01:55PM 13    WAS?

01:55PM 14    A.   NO.  THE DEVICES WERE REMOVED ABOUT A DAY OR TWO

01:55PM 15    AFTERWARD.

01:55PM 16    Q.   AND HOW DID THAT COME TO TAKE PLACE?

01:55PM 17    A.   ELIZABETH ASKED -- WELL, I ASKED ELIZABETH IF THOSE

01:55PM 18    DEVICES SHOULD REMAIN THERE, AND SHE SAID NO, PLEASE REMOVE

01:55PM 19    THEM.

01:55PM 20         AND SO I ASKED THE ENGINEERS TO DO THAT.

01:55PM 21    Q.   SEPARATE FROM YOUR WORK ON THE TOURS, DID YOU HAVE ANY

01:55PM 22    INVOLVEMENT IN TECHNOLOGY DEMONSTRATIONS FOR VIP VISITORS?

01:55PM 23    A.   YES, I HELPED TO COORDINATE THOSE TECHNOLOGY

01:55PM 24    DEMONSTRATIONS.

01:55PM 25    Q.   CAN YOU SUMMARIZE WHAT YOUR ROLE WAS IN CONNECTION WITH

01:56PM 1    THOSE DEMOS?

01:56PM 2    A.   MY ROLE WAS MAINLY TO COORDINATE WITH A NUMBER OF

01:56PM 3    DIFFERENT PERSONNEL WITHIN THE COMPANY FOR THE DEMOS.

01:56PM 4        SO THERE WERE SOME HARDWARE ENGINEERS WHO WERE RESPONSIBLE

01:56PM 5    FOR ACTUALLY SETTING UP A DEVICE;

01:56PM 6        THERE WERE SOFTWARE ENGINEERS WHO ARE RESPONSIBLE FOR

01:56PM 7    MAKING SURE THAT CERTAIN APPLICATIONS WERE ON THE DEVICE;

01:56PM 8        AND THEN THERE WERE ALSO LAB PERSONNEL WHO WERE NOTIFIED

01:56PM 9    IN ORDER TO PROCESS AND VALIDATE THE SAMPLES AND TESTS.

01:56PM 10   Q.   CAN YOU WALK US THROUGH THE WORKFLOW FOR A TYPICAL

01:56PM 11   DEMONSTRATION STARTING WITH WHERE THE DEVICE WOULD BE FOR THE

01:56PM 12   DEMONSTRATION AND HOW IT WOULD GET THERE?

01:56PM 13   A.   SO FIRST I WOULD GET A NOTIFICATION FROM EITHER ELIZABETH

01:57PM 14   OR SUNNY THAT A CERTAIN GUEST, ALSO KNOWN AS VIP AT TIMES,

01:57PM 15   WOULD BE COMING TO THE OFFICES AND THAT A DEMO WAS NEEDED.

01:57PM 16       SO THERE WERE INTERVIEW OR CONFERENCE ROOMS THAT WERE SET

01:57PM 17   UP FOR THIS PARTICULAR REASON, AND ONCE I RECEIVED THAT

01:57PM 18   INFORMATION, I WOULD THEN NOTIFY THE GROUP OF PEOPLE THAT I

01:57PM 19   JUST MENTIONED THAT A DEMO WAS HAPPENING AND THAT CERTAIN

01:57PM 20   DEVICES WOULD BE NEEDED TO BE SET UP.

01:57PM 21       AND I WOULD ALSO LET THE LAB KNOW SO THAT THEY WOULD BE

01:57PM 22   READY TO EITHER VALIDATE OR PROCESS A SAMPLE AT A MOMENT'S

01:57PM 23   NOTICE SO THAT RESULTS COULD GET SENT BACK TO THAT GUEST AS

01:57PM 24   SOON AS POSSIBLE.

01:57PM 25   Q.   AND WHEN WE ARE TALKING ABOUT THE DEVICES THAT WERE IN THE

01:57PM 1    CONFERENCE ROOMS WHERE THE VIP'S WERE, WERE THEY ALWAYS THE

01:57PM 2    DEVICES THAT THE COMPANY WAS USING FOR CLINICAL PATIENT

01:58PM 3    TESTING, OR WERE THEY SOMETIMES THE NEXT GENERATION DEVICES

01:58PM 4    THAT WEREN'T BEING USED FOR PATIENT TESTING?

01:58PM 5    A.   IN MY EXPERIENCE THEY WERE ONLY THE THERANOS DEVICES, THE

01:58PM 6    THERANOS MANUFACTURED DEVICES.

01:58PM 7    Q.   AND BETWEEN THE DIFFERENT KINDS OF THERANOS MANUFACTURED

01:58PM 8    DEVICES, WERE THEY LIMITED TO, SAY, THE 3 SERIES THAT WAS

01:58PM 9    ACTUALLY BEING USED IN THE CLINICAL LAB, OR DID YOU SOMETIMES

01:58PM 10   PLACE IN THOSE CONFERENCE ROOMS THE NEXT GENERATION THERANOS

01:58PM 11   DEVICES THAT WEREN'T BEING USED FOR PATIENT TESTING?

01:58PM 12   A.   IN MY COORDINATION, OFTENTIMES OTHER PEOPLE WOULD OFTEN

01:58PM 13   PLACE THOSE DEVICES, BUT WHEN I FIRST JOINED THE COMPANY, ONLY

01:58PM 14   THE EDISON 3.0 VERSION WAS PLACED IN THOSE ROOMS; AND THEN OVER

01:58PM 15   TIME THE NEXT GENERATION OF DEVICES WERE ALSO PLACED IN THOSE

01:58PM 16   ROOMS.

01:58PM 17   Q.   WERE THERE INSTANCES WHERE A NEXT GENERATION DEVICE WAS

01:59PM 18   PLACED IN A ROOM, BUT OTHER DEVICES WERE NECESSARY TO RUN THE

01:59PM 19   SAMPLE, IF YOU RECALL?

01:59PM 20   A.   I DON'T RECALL KNOWING AT THAT TIME WHICH DEVICES WERE

01:59PM 21   USED TO TEST THE SAMPLES.

01:59PM 22   Q.   OKAY.  AND WE'LL LOOK AT SOME EMAILS IN A FEW MINUTES THAT

01:59PM 23   MIGHT REFRESH YOUR RECOLLECTION.

01:59PM 24       FOR NOW LET ME ASK, WERE YOU EVER ASKED TO PLACE A

01:59PM 25   NON-THERANOS ANALYZER IN ONE OF THESE CONFERENCE ROOMS FOR A

01:59PM   1      VIP VISIT?

01:59PM   2      A.   NO.

01:59PM   3      Q.   DID YOU EVER, FOR EXAMPLE, PUT ONE OF THE BIG

01:59PM   4      SIEMENS ADVIA'S IN A CONFERENCE ROOM FOR A DEMO?

01:59PM   5      A.   NO.

01:59PM   6      Q.   HOW ABOUT AN IMMULITE DEVICE?  DID YOU EVER PLACE AN

01:59PM   7      IMMULITE?

01:59PM   8      A.   NO.

01:59PM   9      Q.   HOW ABOUT A TECAN MACHINE?  WERE YOU EVER ASKED TO PLACE A

01:59PM  10      TECAN MACHINE IN A CONFERENCE ROOM FOR ONE OF THESE DEMOS?

01:59PM  11      A.   NO.

01:59PM  12           MR. BOSTIC:  YOUR HONOR, THIS MIGHT BE A GOOD TIME

01:59PM  13      FOR A BREAK.

01:59PM  14           THE COURT:  LET'S TAKE OUR BREAK, LADIES AND

01:59PM  15      GENTLEMEN.  WE'LL TAKE 30 MINUTES, LADIES AND GENTLEMEN,

02:00PM  16      30 MINUTES.

02:00PM  17           (RECESS FROM 2:00 P.M. UNTIL 2:34 P.M.)

02:34PM  18           THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

02:34PM  19           ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

02:34PM  20           THE JURY AND ALTERNATES ARE PRESENT.

02:34PM  21           MR. BOSTIC, WOULD YOU LIKE TO CONTINUE?

02:34PM  22           MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

02:34PM  23      Q.   WELCOME BACK, MR. EDLIN.

02:34PM  24      A.   THANK YOU.

02:34PM  25      Q.   WE WERE TALKING ABOUT HOW TECHNOLOGY DEMONSTRATIONS WORKED

02:34PM 1      AT THERANOS.

02:34PM 2           DO YOU HAVE THAT SUBJECT IN MIND?

02:34PM 3      A.   YES.

02:34PM 4           MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

02:34PM 5           THE COURT:  YES.

02:34PM 6           MR. BOSTIC:  (HANDING.)

02:34PM 7      I'VE JUST HANDED THE WITNESS A BINDER.  I BELIEVE THE

02:34PM 8  COURT ALREADY HAS A COPY AND SO DOES THE DEFENSE.

02:34PM 9           MS. WALSH:  YES, YOUR HONOR.

02:34PM 10  BY MR. BOSTIC:

02:34PM 11  Q.   MR. EDLIN, COULD I ASK YOU TO TURN TO TAB 959 IN THE

02:34PM 12  BINDER IN FRONT OF YOU.

02:35PM 13  A.   OKAY.

02:35PM 14  Q.   AND LET ME ASK, IN CONNECTION WITH THESE TECHNOLOGY

02:35PM 15  DEMONSTRATIONS AT THERANOS, YOU MENTIONED THAT YOU HAD A ROLE

02:35PM 16  IN COORDINATING THEM; IS THAT RIGHT?

02:35PM 17  A.   CORRECT.

02:35PM 18  Q.   DID YOU REGULARLY USE EMAIL IN ORDER TO COORDINATE WITH

02:35PM 19  THE VARIOUS PEOPLE WHO WERE INVOLVED IN THESE DEMONSTRATIONS?

02:35PM 20  A.   YES, AND SOMETIMES THERE WAS VERBAL COMMUNICATION AS WELL.

02:35PM 21  Q.   OKAY.  AND WHEN IT CAME TO THE EMAILS, WERE THOSE EMAILS

02:35PM 22  IN THOSE CASES THE MECHANISM BY WHICH THE DETAILS AND LOGISTICS

02:35PM 23  AND THE RESULTS OF THOSE DEMONSTRATIONS WERE COORDINATED AND

02:35PM 24  EXCHANGED WITHIN THERANOS?

02:35PM 25  A.   YES.

02:35PM 1    Q.   AND IN ORDER FOR THAT PART OF THE COMPANY'S BUSINESS TO

02:35PM 2    OPERATE, WAS IT IMPORTANT THAT THOSE EMAILS BE ACCURATE?

02:35PM 3    A.   YES.

02:35PM 4    Q.   AND AT THERANOS, WERE EMAILS LIKE THOSE PRESERVED SO THAT

02:36PM 5    THEY COULD BE REFERRED BACK TO LATER, IF NECESSARY?

02:36PM 6    A.   TO MY KNOWLEDGE, YES.

02:36PM 7    Q.   LOOKING AT TAB 959, DO YOU SEE AN EMAIL CHAIN INCLUDING

02:36PM 8    YOU AND OTHERS AT THERANOS RELATING TO COORDINATING ONE OF

02:36PM 9    THESE DEMOS?

02:36PM 10   A.   YES.

02:36PM 11          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 959.

02:36PM 12          MS. WALSH:  NO OBJECTION, YOUR HONOR.

02:36PM 13          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:36PM 14      (GOVERNMENT'S EXHIBIT 959 WAS RECEIVED IN EVIDENCE.)

02:36PM 15   BY MR. BOSTIC:

02:36PM 16   Q.   AND BEGINNING AT PAGE 2 OF THIS DOCUMENT, IF WE CAN ZOOM

02:36PM 17   IN ON THE TEXT OF YOUR EMAIL, MR. EDLIN, WE SEE AN EMAIL FROM

02:36PM 18   YOU DATED AUGUST 8TH, 2013; IS THAT CORRECT?

02:36PM 19   A.   CORRECT.

02:36PM 20   Q.   AND THE SUBJECT LINE IS DEMO ON AUGUST 13TH -- 4S AND

02:36PM 21   MINILAB.

02:36PM 22      DO YOU SEE THAT?

02:36PM 23   A.   YES.

02:36PM 24   Q.   TAKE A MOMENT TO REVIEW THIS IF YOU WOULD LIKE, BUT MY

02:36PM 25   QUESTION FOR YOU IS, WHAT WAS THE PURPOSE OF THIS EMAIL AND

EDLIN DIRECT BY MR. BOSTIC                                    2381

02:36PM  1    WHAT WAS HAPPENING HERE?

02:37PM  2    A.   THE PURPOSE OF THIS EMAIL WAS TO NOTIFY DIFFERENT

02:37PM  3    PERSONNEL WHO EACH HAD DIFFERENT SPECIALTIES ABOUT A DEMO THAT

02:37PM  4    WAS GOING TO HAPPEN.

02:37PM  5         IT WAS TYPICAL TO SEND -- IT WAS TYPICAL THAT I WOULD SEND

02:37PM  6    THESE TYPES OF EMAILS IF A DEMO WERE TO HAPPEN.

02:37PM  7    Q.   AND ARE WE TALKING HERE ABOUT A DEMO THAT WAS GOING TO

02:37PM  8    TAKE PLACE AT THE THERANOS FACILITY?

02:37PM  9    A.   YES, AT THE THERANOS OFFICE.

02:37PM  10   Q.   IN THIS EMAIL YOU MENTION "WILL NEED TO HAVE A 4S AND

02:37PM  11   MINILAB SET UP IN INTERVIEW ROOM NUMBER 1."

02:37PM  12        DO YOU SEE THAT AT THE TOP OF THE MESSAGE?

02:37PM  13   A.   YES.

02:37PM  14   Q.   DOES THAT REFER TO THE ACTUAL DEVICES THAT WERE GOING TO

02:38PM  15   BE PRESENT DURING THE VIP MEETING?

02:38PM  16   A.   YES.

02:38PM  17   Q.   AND THE 4S AND MINILAB, CAN YOU REMIND US WHETHER THOSE

02:38PM  18   WERE CURRENT GEN THERANOS DEVICES USED FOR PATIENT TESTING, OR

02:38PM  19   WERE THEY NEXT GEN DEVICES THAT WERE NEVER USED FOR CLINICAL

02:38PM  20   TESTING?

02:38PM  21   A.   THEY WERE NEXT GENERATION DEVICES.

02:38PM  22   Q.   BELOW THAT IN THE EMAIL, THERE'S A PLAN A AND A PLAN B,

02:38PM  23   AND IT SAYS "PLAN A IS TO HAVE BOTH ABLE TO RUN NULL

02:38PM  24   PROTOCOLS."

02:38PM  25        DO YOU SEE THAT?

ER-1660

02:38PM 1    A.   YES.

02:38PM 2    Q.   AND THEN THERE'S A QUESTION.  YOU ASK, "MICHAEL -- CAN YOU

02:38PM 3    PLEASE REFRESH MY MEMORY IF THE NORMANDY OR THE DEMO APP IS

02:38PM 4    MORE APPROPRIATE FOR THIS?"

02:38PM 5        DO YOU SEE THAT?

02:38PM 6    A.   YES.

02:38PM 7    Q.   AND YOU SAYS "PLAN B IS TO HAVE THE 4S ABLE TO RUN A CBC,

02:38PM 8    IF POSSIBLE."

02:38PM 9        DO YOU SEE THAT?

02:38PM 10   A.   YES.

02:38PM 11   Q.   AND WHY WAS IT NECESSARY TO HAVE A PLAN A AND A PLAN B IN

02:38PM 12   THIS CASE?

02:38PM 13   A.   IT WAS NECESSARY BECAUSE AT THE TIME OF WRITING THIS

02:39PM 14   EMAIL, I WAS UNSURE OF WHAT WOULD BE AVAILABLE AND WHAT

02:39PM 15   WOULD -- WHAT THE DEVICES WOULD BE CAPABLE OF DOING FOR THIS

02:39PM 16   MEETING.

02:39PM 17   Q.   THIS EMAIL IS SENT ON AUGUST 8TH, 2013?

02:39PM 18   A.   RIGHT.

02:39PM 19   Q.   AND IT'S IN ADVANCE OF A DEMONSTRATION THAT WAS GOING TO

02:39PM 20   HAPPEN ABOUT FIVE DAYS LATER?

02:39PM 21   A.   CORRECT.

02:39PM 22   Q.   AND WAS THERE STILL SOME UNCERTAINTY ABOUT WHETHER THERE

02:39PM 23   WAS GOING TO BE A 4S ABLE TO RUN A BLOOD COUNT FIVE DAYS AFTER

02:39PM 24   THIS?

02:39PM 25   A.   AT THE TIME OF WRITING, YES, THERE WAS UNCERTAINTY.

EDLIN DIRECT BY MR. BOSTIC                                    2383

02:39PM  1   Q.   WAS THAT A COMMON THING IN YOUR EXPERIENCE AT THERANOS FOR

02:39PM  2   THERE TO BE UNCERTAINTY ABOUT WHAT EQUIPMENT WOULD BE AVAILABLE

02:39PM  3   ON A CERTAIN DAY OR WHAT IT WOULD BE CAPABLE OF DOING?

02:39PM  4   A.   ONLY FOR A PERIOD OF TIME.

02:39PM  5        LATER ON THERE WAS MORE CERTAINTY AND A MORE RELIABLE

02:39PM  6   PROCESS FOR DEMOS.

02:40PM  7   Q.   THE PLAN A SECTION DISCUSSES THE POSSIBILITY OF HAVING

02:40PM  8   THESE TWO DEVICES, THE 4S AND THE MINILAB, BEING ABLE TO RUN

02:40PM  9   NULL PROTOCOLS.

02:40PM 10        DO YOU SEE THAT?

02:40PM 11   A.   YES.

02:40PM 12   Q.   AND CAN YOU EXPLAIN WHAT THE NULL PROTOCOL WAS IN THIS

02:40PM 13   CONTEXT?

02:40PM 14   A.   SO A PROTOCOL WAS ESSENTIALLY LOADED ONTO A DEVICE AND

02:40PM 15   ACCORDING TO A DIFFERENT PROTOCOL, IT PROGRAMMED WHAT THE

02:40PM 16   DEVICE WOULD ACTUALLY DO IF A CARTRIDGE WAS INSERTED INTO A

02:40PM 17   DEVICE OR IF OTHER FUNCTIONS WERE REQUESTED OR IF A USER

02:40PM 18   PRESSED A CERTAIN BUTTON ON THE DEVICE, FOR EXAMPLE.

02:40PM 19        A NULL PROTOCOL WAS ONE OF SEVERAL PROTOCOLS THAT WAS

02:40PM 20   AVAILABLE THROUGH THE DEMO APP, WHICH IS REFERRED TO HERE.

02:41PM 21        THE NULL PROTOCOL BASICALLY MEANS JUST AN EMPTY PROTOCOL.

02:41PM 22   SO THE NULL PROTOCOL WOULD NOT ATTEMPT TO RUN A BLOOD SAMPLE OR

02:41PM 23   RUN A SAMPLE.

02:41PM 24   Q.   SO LET'S IMAGINE THAT WE'RE IN THAT CONFERENCE ROOM, THE

02:41PM 25   DEVICE IS THERE, IT'S SET UP TO RUN THIS NULL PROTOCOL.

ER-1662

02:41PM  1          IF A SAMPLE IS PUT INTO THE MACHINE THEN, CAN YOU DESCRIBE

02:41PM  2   WHAT THE VISITOR WOULD SEE OR WHAT WOULD WE SEE IN THAT CASE?

02:41PM  3   A.   THE VISITOR WOULD SEE A GRAPHIC USER INTERFACE ON THE

02:41PM  4   DEVICE, AND THEN DEPENDING ON WHAT WAS DONE, THEY MIGHT SEE

02:41PM  5   DIFFERENT THINGS, BUT THERE COULD BE -- I THINK AT ONE POINT

02:41PM  6   THE DEVICE HAD LOADING OR INITIALIZING, SOMETHING LIKE THAT.

02:41PM  7   Q.   SO THE DEVICE RUNNING THE NULL PROTOCOL WOULD BE POWERED

02:41PM  8   ON AND THE SCREEN WOULD BE ON?

02:41PM  9   A.   CORRECT.

02:42PM 10   Q.   AND WHEN THE SAMPLE WAS LOADED, YOU SAID THE SCREEN MIGHT

02:42PM 11   SAY LOADING OR INITIALIZING?

02:42PM 12   A.   IF SOMETHING WAS LOADED.

02:42PM 13          BUT WHEN A USER FIRST SAW IT, THEY WOULD BASICALLY -- I

02:42PM 14   THINK THEY WOULD SEE A THERANOS LOGO, AND THEN A BUTTON THAT

02:42PM 15   WOULD INITIALIZE THE STEPS TO POTENTIALLY PROCESS A SAMPLE.

02:42PM 16   Q.   OKAY.  AND WHEN THE NULL PROTOCOL WAS RUNNING, WAS THE

02:42PM 17   DEVICE CAPABLE OF ACCEPTING A SAMPLE?  WOULD THE MACHINE OPEN

02:42PM 18   AND THEN TAKE IN THE SAMPLE?

02:42PM 19   A.   I THINK IT COULD BE CAPABLE.  BUT THE NULL PROTOCOL

02:42PM 20   ITSELF, YES, WOULD ACCEPT A CARTRIDGE AND THERE COULD BE A

02:42PM 21   NANOTAINER, OR NOT, ON THE CARTRIDGE, BUT THEN AFTERWARD

02:43PM 22   NOTHING WOULD HAPPEN.

02:43PM 23   Q.   SO THE SAMPLE WOULD GO INTO THE DEVICE, BUT THE DEVICE IS

02:43PM 24   NOT EVEN TRYING TO ACTUALLY RUN A TEST OR RETURN A RESULT; IS

02:43PM 25   THAT RIGHT?

02:43PM  1    A.   THAT IS MY UNDERSTANDING.

02:43PM  2    Q.   OKAY.  AND WAS THE NULL PROTOCOL AN ITEM OF SOFTWARE THAT

02:43PM  3    WAS SPECIFIC TO THE THERANOS EDISON?

02:43PM  4    A.   IN MY EXPERIENCE THE NULL PROTOCOL ONLY APPLIED TO THE

02:43PM  5    NEXT GENERATION VERSION OF THE DEVICES, SO THE 4S OR THE

02:43PM  6    MINILAB AS IS IN THIS EMAIL.

02:43PM  7    Q.   I SEE.

02:43PM  8         AND TO YOUR KNOWLEDGE, WAS THE NULL PROTOCOL SOMETHING

02:43PM  9    THAT WAS DEVELOPED IN HOUSE AT THERANOS?

02:43PM 10    A.   I BELIEVE SO.

02:43PM 11    Q.   WHO WOULD HAVE BEEN INVOLVED IN CREATING THE NULL

02:43PM 12    PROTOCOL?

02:43PM 13    A.   THE SOFTWARE DEVELOPERS.

02:43PM 14    Q.   AND THERE WAS A GROUP OF SOFTWARE DEVELOPERS AT THERANOS?

02:44PM 15    A.   YES.

02:44PM 16    Q.   AND TO WHOM DID THEY REPORT?

02:44PM 17    A.   TO SUNNY.

02:44PM 18    Q.   OKAY.  AND ARE YOU AWARE OF MR. BALWANI'S BACKGROUND?

02:44PM 19    A.   YES.

02:44PM 20    Q.   WHAT WAS HIS BACKGROUND OR SPECIALTY IN BEFORE HE CAME TO

02:44PM 21    THERANOS?

02:44PM 22    A.   I WOULD SAY BROADLY IN SOFTWARE.

02:44PM 23    Q.   YOU ASKED MICHAEL CRAIG WHETHER THE NORMANDY OR DEMO APP

02:44PM 24    IS MORE APPROPRIATE FOR THIS.

02:44PM 25         CAN YOU EXPLAIN FOR US WHAT THAT MEANS?  WHAT ARE THE APPS

02:44PM  1    AND WHAT IS THE DIFFERENCE BETWEEN THE NORMANDY AND THE DEMO

02:44PM  2    APP?

02:44PM  3    A.   A DEMO APP WAS USED FOR DEMOS.  THIS APP RESEMBLED WHAT I

02:44PM  4    THINK IS GENERALLY COMMON ON PHONE APPS IN TERMS OF A SIMPLE

02:44PM  5    DESIGN AND AN EASY USER EXPERIENCE.

02:44PM  6         I BELIEVE THAT THE NORMANDY APP WAS USED IN THE LAB AND

02:45PM  7    WAS NOT AS USER FRIENDLY TO, LET'S SAY, SOMEONE WHO WASN'T

02:45PM  8    FAMILIAR WITH THE DEVICE.

02:45PM  9    Q.   SO WHEN YOU'RE TALKING ABOUT USER FRIENDLINESS, ARE WE

02:45PM  10   TALKING ABOUT THINGS LIKE APPEARANCE AND HOW INTUITIVE IT IS?

02:45PM  11   A.   YES.

02:45PM  12   Q.   AND YOU'RE SAYING THAT THE VERSION OF THE INTERFACE THAT

02:45PM  13   WOULD SHOW UP DURING A DEMONSTRATION FOR A VIP WOULD BE

02:45PM  14   DIFFERENT FROM THE INTERFACE THAT WOULD ACTUALLY BE USED IN THE

02:45PM  15   LAB?

02:45PM  16             MS. WALSH:  OBJECTION.  LEADING.

02:45PM  17             THE COURT:  SUSTAINED.

02:45PM  18             MR. BOSTIC:  I CAN MOVE ON.

02:45PM  19   Q.   LET'S TURN TO THE FIRST PAGE OF THIS EXHIBIT AND LOOK AT

02:45PM  20   THE BOTTOM, AND I WANT TO ASK YOU ABOUT ANOTHER FEATURE OF THE

02:45PM  21   DEMO APP.

02:45PM  22        LET'S ZOOM IN ON THE BOTTOM COUPLE OF MESSAGES.  THERE.

02:45PM  23   THANKS.

02:45PM  24        DO YOU SEE ON THE BOTTOM THERE'S A RESPONSE TO YOUR

02:45PM  25   QUESTION TO MICHAEL CRAIG ON THE BOTTOM RELATING TO THE DEMO

EDLIN DIRECT BY MR. BOSTIC                                           2387

02:46PM   1     APP?

02:46PM   2     A.   YES.

02:46PM   3     Q.   AND MR. CRAIG SAYS, "I WOULD RECOMMEND THE DEMO APP,

02:46PM   4     ALTHOUGH EITHER WOULD WORK.   THE DEMO APP MERELY SHIELDS

02:46PM   5     PROTOCOL FAILURES FROM THE CLIENT."

02:46PM   6          DO YOU SEE THAT?

02:46PM   7     A.   YES.

02:46PM   8     Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHAT THAT MEANS?

02:46PM   9     A.   YES.

02:46PM  10     Q.   AND WHAT DOES THAT MEAN?

02:46PM  11     A.   THIS MEANS THAT IF THE DEMO APP WAS ON THE DEVICE, AND IF

02:46PM  12     A TEST WAS BEING RUN AND THERE WAS AN ERROR, THAT ERROR WOULD

02:46PM  13     NOT APPEAR ON THE SCREEN.

02:46PM  14     Q.   AND ARE WE TALKING ABOUT THE KIND OF ERROR THAT MIGHT

02:46PM  15     PREVENT A RESULT FROM BEING RETURNED ON A SAMPLE?

02:46PM  16     A.   YES, ALONG WITH, I THINK THERE WERE A NUMBER OF DIFFERENT

02:46PM  17     KINDS OF ERRORS.

02:46PM  18     Q.   WHAT WOULD HAPPEN INSTEAD IF A DEVICE DURING DEMONSTRATION

02:46PM  19     WAS RUNNING THE DEMO APP AND IT ENCOUNTERED THAT KIND OF ERROR

02:46PM  20     THAT WOULD PREVENT IT FROM RETURNING A RESULT?   AGAIN, PUTTING

02:46PM  21     US BACK IN THE ROOM, WHAT WOULD WE SEE ON THE SCREEN, IF

02:46PM  22     ANYTHING?

02:46PM  23     A.   I THINK THAT THE SCREEN WOULD STILL SAY PROCESSING.

02:47PM  24     Q.   AND IT WOULD JUST SAY THAT INDEFINITELY?

02:47PM  25     A.   I'M NOT SURE WHEN IT STOPPED IF IT DID.

ER-1666

02:47PM  1    Q.   HOW WOULD THAT COMPARE TO THE VERSION OF THE SOFTWARE THAT

02:47PM  2    WOULD ACTUALLY RUN IN THE LAB, IF YOU KNOW?

02:47PM  3    A.   I'M NOT AN EXPERT ON THE NORMANDY APP OR WHAT WAS RUN IN

02:47PM  4    THE LAB, BUT IT'S MY UNDERSTANDING THAT AS SOON AS AN ERROR

02:47PM  5    OCCURRED, IT WOULD SHOW AND NOTIFY THE USER.

02:47PM  6    Q.   OKAY.  YOU RESPOND TO MR. CRAIG AND HIS DESCRIPTION ABOUT

02:47PM  7    THE DEMO APP SHIELDING PROTOCOL FAILURES, YOU WRITE "NEVER A

02:47PM  8    BAD THING."

02:47PM  9         DO YOU SEE THAT?

02:47PM  10   A.   YES.

02:47PM  11   Q.   AT THIS TIME DID YOU BELIEVE THAT IT WAS A GOOD IDEA TO

02:47PM  12   HAVE THIS DEMO APP IN PLACE DURING VIP DEMOS LIKE THIS?

02:47PM  13            MS. WALSH:  OBJECTION.

02:48PM  14            THE COURT:  OVERRULED.

02:48PM  15        YOU CAN ANSWER THE QUESTION.

02:48PM  16            THE WITNESS:  I BASED MY RECOMMENDATION ON THE

02:48PM  17   INFORMATION THAT I WAS GIVEN, AND THE RECOMMENDATION FROM

02:48PM  18   PEOPLE THAT I CONSIDERED EXPERTS AT THE COMPANY.

02:48PM  19   BY MR. BOSTIC:

02:48PM  20   Q.   AND WHEN WE'RE TALKING ABOUT THESE MEETINGS WITH VIP'S,

02:48PM  21   WHO WAS TYPICALLY RUNNING THESE MEETINGS?  WAS IT YOU ACTUALLY

02:48PM  22   RUNNING THE MEETINGS IN THE CONFERENCE ROOMS?

02:48PM  23   A.   NO.

02:48PM  24   Q.   WHO WAS -- WHO WOULD RUN THOSE MEETINGS?

02:48PM  25   A.   IN MY EXPERIENCE MOST OF THE MEETINGS WERE RUN BY

02:48PM 1    ELIZABETH, AND THERE WERE OTHER MEETINGS THAT WERE ALSO RUN

02:48PM 2    WITH SUNNY.

02:48PM 3    Q.   LOOKING AT THE TOP OF THE SELECTION THAT IS ON THE SCREEN

02:48PM 4    IN FRONT OF YOU, THERE'S A MESSAGE ON AUGUST 10TH, TWO DAYS

02:48PM 5    LATER, FROM DANIEL YOUNG.

02:48PM 6         DO YOU SEE THAT?

02:48PM 7    A.   YES.

02:48PM 8    Q.   HE SAYS, "WE HAVE RE-ALLOCATED THE 4S DEVICES, SO THEY ARE

02:49PM 9    NOT AVAILABLE FOR PREPARING TO RUN CBC FOR THIS DEMO,

02:49PM 10   UNFORTUNATELY."

02:49PM 11        DO YOU SEE THAT?

02:49PM 12   A.   YES.

02:49PM 13   Q.   DOES THIS MEAN THAT PLAN B IN YOUR EMAIL, BEING ABLE TO

02:49PM 14   HAVE THE 4S RUN A CBC, WAS NOT GOING TO BE POSSIBLE?

02:49PM 15   A.   THAT'S CORRECT.

02:49PM 16   Q.   LET'S LOOK AT THE TOP HALF OF PAGE 1, PLEASE.

02:49PM 17        IN YOUR EMAIL IN RESPONSE YOU SAY, "OK, THAT'S FINE."

02:49PM 18        DO YOU SEE THAT?

02:49PM 19   A.   YES.

02:49PM 20   Q.   AND YOU ASK, "WHEN ARE THE 4S AND THE MINILAB SCHEDULED TO

02:49PM 21   BE MOVED TO INTERVIEW ROOM NUMBER 1?"

02:49PM 22        DO YOU SEE THAT?

02:49PM 23   A.   YES.

02:49PM 24   Q.   AND THEN YOU ALSO ASK ABOUT PUTTING ONE OF THE 3.5'S IN

02:50PM 25   THE DEMO ROOM.

EDLIN DIRECT BY MR. BOSTIC                                    2390

02:50PM 1          DO YOU SEE THAT?

02:50PM 2     A.   YES.

02:50PM 3     Q.   AND YOU ASK ABOUT THE COMFORT LEVEL WITH RUNNING A MALE

02:50PM 4     HEALTH/THYROID PANEL ON THE 3.5.

02:50PM 5          DO YOU SEE THAT?

02:50PM 6     A.   YES.

02:50PM 7     Q.   AND WHY WERE YOU ASKING ABOUT THE COMFORT LEVEL OF RUNNING

02:50PM 8     THAT ASSAY?

02:50PM 9     A.   I WAS INTERESTED IN UNDERSTANDING WHETHER THAT WOULD BE A

02:50PM 10    POTENTIAL OPTION FOR A DEMO MEETING, AND IF THAT TYPE OF TEST

02:50PM 11    COULD BE OFFERED TO THE GUESS.

02:50PM 12    Q.   IN OTHER WORDS, WHETHER THAT TEST WAS READY FOR USE IN

02:50PM 13    THIS KIND OF TEST?

02:50PM 14    A.   YES.

02:50PM 15    Q.   IN THE TOP EMAIL IN THIS CHAIN, SAMARTHA ANEKAL WRITES,

02:50PM 16    "DAN, THE ASSAY TEAMS ARE PLANNING ON USING THE 3.5 DEVICES

02:50PM 17    TOMORROW, BUT WE CAN MOVE ONE OF THE R&D UNITS IF IT'S JUST FOR

02:50PM 18    SHOW-AND-TELL?"

02:51PM 19         DO YOU SEE THAT?

02:51PM 20    A.   YES.

02:51PM 21    Q.   AND DO YOU RECALL WHEN THERANOS FIRST BEGAN OFFERING

02:51PM 22    CLINICAL BLOOD TESTS TO PATIENTS?

02:51PM 23    A.   YES.  IN SEPTEMBER OF 2013.

02:51PM 24    Q.   THE MONTH AFTER THIS TOOK PLACE?

02:51PM 25    A.   YES.

02:51PM   1    Q.   OKAY.  YOU CAN PUT THAT ASIDE.

02:51PM   2         I'LL ASK YOU TO TURN NEXT TO TAB 961 IN YOUR BINDER.

02:51PM   3    A.   OKAY.

02:51PM   4    Q.   AND AT 961, DO YOU SEE ANOTHER EMAIL CHAIN INCLUDING YOU,

02:51PM   5    MR. BALWANI, AND MS. HOLMES RELATING TO COORDINATION FOR A DEMO

02:51PM   6    THE FOLLOWING DAY?

02:51PM   7    A.   YES.

02:51PM   8         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 961.

02:51PM   9         MS. WALSH:  NO OBJECTION.

02:51PM  10         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:51PM  11         (GOVERNMENT'S EXHIBIT 961 WAS RECEIVED IN EVIDENCE.)

02:51PM  12    BY MR. BOSTIC:

02:51PM  13    Q.   SO, MR. EDLIN, STARTING WITH YOUR EMAIL, YOU WRITE TO

02:52PM  14    MS. HOLMES AND MR. BALWANI, "THE FOLLOWING DEVICES ARE PLANNED

02:52PM  15    TO BE IN THE DEMO/INTERVIEW ROOM."

02:52PM  16         DO YOU SEE THAT?

02:52PM  17    A.   YES.

02:52PM  18    Q.   AND WHY WERE YOU COORDINATING WITH MS. HOLMES AND

02:52PM  19    MR. BALWANI ON THE DETAILS FOR THIS DEMO FOR TOMORROW'S

02:52PM  20    MEETING?

02:52PM  21    A.   I WANTED TO MAKE SURE THAT THEY WERE AWARE OF WHICH

02:52PM  22    DEVICES WOULD BE IN THE ROOM AND WHAT THE CAPABILITIES WERE.

02:52PM  23         I BELIEVE IN THIS CASE THEY WERE BRINGING THE GUESTS TO

02:52PM  24    THE ROOM.

02:52PM  25    Q.   AND YOU MENTION AN ASSORTMENT OF DEVICES THAT WERE GOING

02:52PM  1   TO BE IN THE DEMO/INTERVIEW ROOM.  NUMBER ONE ON THAT LIST WAS

02:52PM  2   A 3.5 EDISON WITH A DEMO APP SET TO RUN THE NULL PROTOCOL.

02:52PM  3       DO YOU SEE THAT?

02:52PM  4   A.   YES.

02:52PM  5   Q.   AND THEN THERE'S A 4S WITH THE DEMO APP ALSO SET TO RUN

02:53PM  6   THE NULL PROTOCOL?

02:53PM  7   A.   YES.

02:53PM  8   Q.   AND THEN WE SEE TWO MINILABS, ONE THAT COULD RUN THE NULL

02:53PM  9   PROTOCOL AND ONE THAT COULD NOT; IS THAT RIGHT?

02:53PM 10   A.   YES.

02:53PM 11   Q.   AND THEN YOU ASK ABOUT WHETHER THEY WOULD ALSO LIKE TO

02:53PM 12   HAVE A 3.0 EDISON THAT COULD RUN THE H1N1 MILITARY DEMO; IS

02:53PM 13   THAT RIGHT?

02:53PM 14   A.   YES.

02:53PM 15   Q.   AND IF THAT 3.0 EDISON WAS NOT INCLUDED, WOULD ANY OF

02:53PM 16   THESE FOUR DEVICES THAT YOU LIST BE CAPABLE OF ACTUALLY RUNNING

02:53PM 17   A PATIENT SAMPLE IN THE ROOM?

02:53PM 18   A.   I'M NOT SURE.

02:53PM 19   Q.   THE FIRST THREE, IT MENTIONS THEY'RE SET TO RUN THE NULL

02:53PM 20   PROTOCOL; IS THAT CORRECT?

02:53PM 21   A.   YES.

02:53PM 22   Q.   DID THE NULL PROTOCOL INVOLVE ACTUALLY PROCESSING A

02:53PM 23   PATIENT SAMPLE AND RETURNING A RESULT?

02:54PM 24   A.   NO.

02:54PM 25   Q.   AND DEVICE NUMBER 4, YOU NOTE THAT IT WOULD NOT BE ABLE TO

02:54PM 1    RUN THE NULL PROTOCOL, DUE TO OLD PIPETTE NOZZLES THAT FAIL

02:54PM 2    ONCE THEY INITIALIZE IN THE PROTOCOL?

02:54PM 3    A.    RIGHT.

02:54PM 4    Q.    WOULD THAT DEVICE BE CAPABLE OF RUNNING A PATIENT SAMPLE

02:54PM 5    BASED ON THAT PROBLEM?

02:54PM 6    A.    I DON'T BELIEVE SO.

02:54PM 7    Q.    OKAY.  WE CAN PUT THAT ASIDE.  THANK YOU.

02:54PM 8          AND LET ME ASK YOU TO LOOK NEXT AT TAB 860, PLEASE.

02:55PM 9    A.    OKAY.

02:55PM 10   Q.    DO YOU SEE AT TAB 860 ANOTHER EMAIL CHAIN INCLUDING YOU

02:55PM 11   AND MS. HOLMES AND MR. BALWANI RELATING TO COORDINATION AND

02:55PM 12   RESULTS FROM ONE OF THESE DEMOS?

02:55PM 13   A.    YES.

02:55PM 14         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 860.

02:55PM 15         MS. WALSH:  NO OBJECTION.

02:55PM 16         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:55PM 17   (GOVERNMENT'S EXHIBIT 860 WAS RECEIVED IN EVIDENCE.)

02:55PM 18         MR. BOSTIC:  LET'S START ON PAGE 12.  THANK YOU,

02:55PM 19   MS. WACHS.  AND IF WE CAN ZOOM IN ON THE BOTTOM JUST TO HAVE

02:55PM 20   THAT HEADER INFORMATION FOR THAT EMAIL.

02:55PM 21   Q.    DO YOU SEE, MR. EDLIN, WE'RE ABOUT TO LOOK AT AN EMAIL

02:55PM 22   FROM YOU ON MAY 31ST, 2013?

02:55PM 23   A.    YES.

02:55PM 24   Q.    AND THE SUBJECT LINE IS SAMPLE RUNNING RIGHT NOW.

02:55PM 25         DO YOU SEE THAT?

EDLIN DIRECT BY MR. BOSTIC                                   2394

02:55PM  1    A.    YES.

02:55PM  2    Q.    LET'S LOOK AT PAGE 13.

02:55PM  3          AT THE TOP OF PAGE 13 YOU ASK, "WHAT IS THE STATUS?  IT'S

02:56PM  4    ALREADY BEEN RUNNING FOR 1 HOUR 15 MINUTES AND HAS BEEN STUCK

02:56PM  5    ON 99 PERCENT FOR ABOUT 8 MINUTES."

02:56PM  6          DO YOU RECALL WHAT YOU WERE REFERRING TO IN THIS EMAIL?

02:56PM  7    A.    YES.

02:56PM  8    Q.    AND CAN YOU EXPLAIN IT FOR US?

02:56PM  9    A.    THIS REFERS TO A DEMO THAT WAS BEING RUN AT A HOSPITAL IN

02:56PM 10    NEW YORK, AND A SAMPLE WAS RUNNING ON ONE OF THE DEVICES IN THE

02:56PM 11    ROOM, AND I WAS KEEPING TABS ON THE DEVICE TO MAKE SURE THAT IT

02:56PM 12    WAS RUNNING AND THAT IT WOULD BE COMPLETED IN TIME FOR THE END

02:56PM 13    OF THE MEETING, AND I NOTICED THAT THE PROCESS, HAVING

02:56PM 14    COMPLETED IT, WAS STUCK ON 99 PERCENT.

02:56PM 15          SO I SENT AN EMAIL TO ONE OF THE -- TO SANDHYA, WHO WAS A

02:56PM 16    SOFTWARE ENGINEER OR A DEVELOPER, TO ASK ABOUT WHY THAT WAS.

02:56PM 17    Q.    AND WHEN THIS DEMO WAS HAPPENING, WERE YOU PRESENT IN

02:57PM 18    NEW YORK WITH THE DEVICE?

02:57PM 19    A.    YES.

02:57PM 20    Q.    AND YOU WERE COORDINATING WITH THERANOS PERSONNEL BACK IN

02:57PM 21    CALIFORNIA?

02:57PM 22    A.    CORRECT.

02:57PM 23    Q.    AND WHY WAS THE DEVICE IN THAT HOSPITAL IN NEW YORK?  WAS

02:57PM 24    IT THERE BECAUSE THAT HOSPITAL WAS USING THE DEVICE FOR PATIENT

02:57PM 25    TESTING?

ER-1673

02:57PM   1    A.   NO.   THAT MEETING WAS CENTERED ON SHARING WHAT THERANOS AS

02:57PM   2    A COMPANY WAS DOING AND EXPLORING POTENTIAL OPPORTUNITIES TO

02:57PM   3    PARTNER WITH THE HOSPITAL.

02:57PM   4    Q.   SO YOU WERE THERE WITH THE DEVICE FOR PURPOSES OF THAT

02:57PM   5    DEMONSTRATION?

02:57PM   6    A.   CORRECT.   I WAS WITH A GROUP OF THERANOS EMPLOYEES.

02:57PM   7    Q.   AND LET'S LOOK AT PAGE 11 OF THE EMAIL.

02:57PM   8        IF WE ZOOM IN ON THE MIDDLE OF THE PAGE, WE SEE THERE'S

02:57PM   9    SOME DISCUSSION ABOUT WHAT THE RUN TIME OF THAT SHOULD HAVE

02:57PM  10    BEEN; CORRECT?

02:57PM  11    A.   CORRECT.

02:58PM  12    Q.   AND THEN LET'S LOOK AT THE TOP OF THIS PAGE.

02:58PM  13        OKAY.   AND DO YOU SEE IN THE BOTTOM OF YOUR EMAIL HERE, IT

02:58PM  14    SAYS, "NOTE THAT THE SAME DONOR GAVE BLOOD FOR THE 3.0 RUN AS

02:58PM  15    WELL AS THE RUN SCHEDULED FOR TONIGHT, AND WE WILL BE COMPARING

02:58PM  16    RESULTS."

02:58PM  17        DO YOU SEE THAT?

02:58PM  18    A.   YES.

02:58PM  19    Q.   OKAY.   LET'S GO TO PAGE 10.   WE'RE MOVING FORWARD IN TIME

02:58PM  20    NOW.   LET'S ZOOM IN ON THE TEXT OF THIS MIDDLE EMAIL.

02:58PM  21        IS THIS AN EMAIL FROM YOU TO DANIEL YOUNG?

02:58PM  22    A.   YES.

02:58PM  23    Q.   IT SAYS AT THE TOP, "GIVEN THAT THE SAMPLES ARE BEING RUN

02:58PM  24    AT THIS LATE HOUR, I JUST WANT TO TOUCH BASE WITH YOU TO ENSURE

02:58PM  25    THAT WE'RE COORDINATED FOR THESE REPORTS."

ER-1674

EDLIN DIRECT BY MR. BOSTIC                                    2396

02:58PM 1          DO YOU SEE THAT?

02:58PM 2     A.   YES.

02:58PM 3     Q.   WHAT ROLE DID DANIEL YOUNG HAVE IN CONNECTION WITH THE

02:58PM 4     RESULTS FROM THESE REPORTS, OR THESE DEMOS?

02:59PM 5     A.   DANIEL REVIEWED THE RESULTS AND THE TEST LOGS TO ENSURE

02:59PM 6     THAT THE TEST WAS VALID, AND HE INTERPRETED THE RESULTS, AND

02:59PM 7     THEN APPROVED THEM FOR DISTRIBUTION BACK TO THE GUEST.

02:59PM 8     Q.   AND WAS THAT HIS REGULAR ROLE IN CONNECTION WITH

02:59PM 9     DEMONSTRATIONS LIKE THIS?

02:59PM 10    A.   YES.

02:59PM 11    Q.   DID HE HAVE THAT SAME ROLE IN CONNECTION WITH CLINICAL

02:59PM 12    PATIENT TESTING AT THERANOS?

02:59PM 13    A.   I'M NOT EXACTLY SURE, BUT I KNOW THAT HE WAS A LAB

02:59PM 14    DIRECTOR.

02:59PM 15    Q.   YOU BELIEVE THAT DANIEL YOUNG WAS A LAB DIRECTOR OF THE

02:59PM 16    CLINICAL LAB AT THERANOS?

02:59PM 17    A.   I BELIEVE IT WAS IN THE ARIZONA LAB.

02:59PM 18    Q.   AT THE BOTTOM OF YOUR EMAIL, THE LAST SENTENCE SAYS, "I'LL

02:59PM 19    BASE MY SCHEDULE ON YOUR AVAILABILITY SO THAT WE CAN FINALIZE

03:00PM 20    THE REPORTS AND GET THEM TO EAH FOR APPROVAL AS SOON AS

03:00PM 21    POSSIBLE."

03:00PM 22         DO YOU SEE THAT?

03:00PM 23    A.   YES.

03:00PM 24    Q.   WAS EAH ELIZABETH HOLMES?

03:00PM 25    A.   YES.

03:00PM  1    Q.   AND WHAT WAS HER ROLE IN CONNECTION WITH THE RESULTS FROM

03:00PM  2    THESE DEMO TESTS?

03:00PM  3    A.   IN CONNECTION TO THIS PARTICULAR DEMO, I REMEMBER THAT

03:00PM  4    ELIZABETH WAS INTERESTED IN SEEING WHAT THE END RESULTS WOULD

03:00PM  5    BE.  BUT USUALLY SHE WAS NOT INVOLVED IN REVIEWING RESULTS FOR

03:00PM  6    DEMOS.

03:00PM  7    Q.   ALL RIGHT.  LET'S LOOK AT PAGE 8, AND THE BOTTOM OF THE

03:00PM  8    PAGE, AND JUST TO CAPTURE THAT HEADER INFORMATION FOR THAT

03:00PM  9    BOTTOM EMAIL.

03:00PM  10        WE'RE LOOKING AT AN EMAIL FROM YOU ON THAT SATURDAY,

03:00PM  11   JUNE 1ST, TO MS. HOLMES, MR. BALWANI, AND DANIEL YOUNG.

03:00PM  12        DO YOU SEE THAT?

03:00PM  13   A.   YES.

03:00PM  14   Q.   AND YOU'RE PROVIDING SOME INFORMATION ABOUT THE TEST.

03:01PM  15   LET'S LOOK, IN PARTICULAR, AT THE FOLLOWING PAGE, PAGE 9.

03:01PM  16        AND AT THE TOP OF THAT PAGE YOU SAY IN YOUR EMAIL, "IT

03:01PM  17   LOOKS LIKE THERE IS SOME DISCREPANCY BETWEEN THE TWO INFECTIOUS

03:01PM  18   PANEL RUNS -- ANY THOUGHTS ON WHY THIS IS THE CASE?"

03:01PM  19        DO YOU SEE THAT?

03:01PM  20   A.   YES.

03:01PM  21   Q.   AND DO YOU RECALL THAT EARLIER IN THE CHAIN WE SAW THAT

03:01PM  22   THIS SAME DONOR HAD DONATED FOR TWO DIFFERENT KINDS OF ANALYSIS

03:01PM  23   AND THE RESULTS WERE GOING TO BE COMPARED?

03:01PM  24   A.   YES.

03:01PM  25   Q.   AND YOU'RE HIGHLIGHTING A DISCREPANCY BETWEEN TWO RUNS OF

03:01PM  1    THE SAME PANEL; CORRECT?

03:01PM  2    A.   CORRECT.

03:01PM  3    Q.   BUT THESE SAMPLES WERE FROM THE SAME DONOR?

03:01PM  4    A.   CORRECT.

03:01PM  5    Q.   AND WHY DID YOU WANT TO ASK MS. HOLMES, MR. BALWANI, AND

03:02PM  6    DR. YOUNG ABOUT THIS?

03:02PM  7    A.   AS PART OF MY ROLE IN THIS DEMONSTRATION, MY ROLE WAS TO

03:02PM  8    SEND THE RESULTS BACK TO THE PATIENT, EMAIL THEM BACK AFTER

03:02PM  9    RECEIVING THEM FROM THE LAB, AND I NOTICED THAT THERE WAS A

03:02PM  10   DISCREPANCY, AND I WAS CURIOUS AS TO WHY THAT WAS, AND I WANTED

03:02PM  11   TO MAKE SURE THAT THE GROUP ON THIS EMAIL WAS AWARE OF IT.

03:02PM  12   Q.   LET'S LOOK AT PAGE 7 AND GET SOME MORE DETAILS ABOUT WHAT

03:02PM  13   WAS HAPPENING HERE.

03:02PM  14        I'M SORRY THAT THESE EMAILS ARE SO NARROW HERE.

03:02PM  15        LET'S LOOK AT YOUR MESSAGE, SO THE BOTTOM TWO-THIRDS.

03:02PM  16        DO YOU SEE YOU PROVIDE SOME ADDITIONAL CONTEXT ABOUT THIS

03:02PM  17   DISCREPANCY?  AND YOU SAY FOR TEST NUMBER 1 THE SAMPLE WAS

03:03PM  18   COLLECTED, DEPOSITED DIRECTLY INTO A CARTRIDGE, AND RUN ON

03:03PM  19   SITE.

03:03PM  20        THE CARTRIDGE HAD BEEN SHIPPED TO NYC IN STANDARD

03:03PM  21   PACKAGING.

03:03PM  22        DO YOU SEE THAT?

03:03PM  23   A.   YES.

03:03PM  24   Q.   AND LET'S TURN THE PAGE AND LOOK AT PAGE 8 WHERE AT THE

03:03PM  25   TOP YOU ADDRESS SAMPLE NUMBER 2, AND YOU SAY, "SAMPLE NUMBER 2

ER-1677

03:03PM 1      WAS ALIQUOTED FROM THE BCD 2.1 NANOTAINERS, PIPETTED DIRECTLY

03:03PM 2      INTO A CARTRIDGE, AND RUN AT THERANOS."

03:03PM 3           AND BELOW THAT YOU SAY, "BOTH CARTRIDGES WERE RUN ON THE

03:03PM 4      SAME READER."

03:03PM 5           DO YOU SEE THAT?

03:03PM 6      A.   YES.

03:03PM 7      Q.   AND SO IS THIS A SITUATION WHERE TWO SAMPLES FROM THE SAME

03:03PM 8      DONOR WERE RUN ON THE SAME THERANOS READER BUT PRODUCED TWO

03:03PM 9      DIFFERENT RESULTS?

03:03PM 10     A.   YES.

03:03PM 11     Q.   AND WHY IS THAT A PROBLEM?

03:03PM 12              MS. WALSH:  OBJECTION.

03:03PM 13              THE COURT:  IT MIGHT BE A FOUNDATIONAL ISSUE.  IF

03:04PM 14     YOU WANT TO LAY A FOUNDATION.

03:04PM 15     BY MR. BOSTIC:

03:04PM 16     Q.   LET ME ASK, WAS THAT VIEWED AS A PROBLEM AT THERANOS?

03:04PM 17     A.   YES.

03:04PM 18     Q.   LET'S LOOK AT THE TOP OF PAGE 7, AND ZOOM IN ON

03:04PM 19     MS. HOLMES'S EMAIL WHERE SHE WRITES TO YOU, DANIEL YOUNG, AND

03:04PM 20     SUNNY BALWANI, "THE DISCREPANCY WILL BE A PROBLEM."

03:04PM 21          DO YOU SEE THAT?

03:04PM 22     A.   YES.

03:04PM 23     Q.   AND WERE YOU A PART OF ANY DISCUSSIONS WITH MS. HOLMES OR

03:04PM 24     MR. BALWANI ABOUT THIS DISCREPANCY, THIS PROBLEM THAT YOU WERE

03:04PM 25     SEEING, BESIDES THIS EMAIL?

03:04PM   1    A.   NOT FOR THIS -- I DON'T BELIEVE, ASIDE FROM THIS EMAIL,

03:04PM   2    THERE WAS DISCUSSION ABOUT IT.

03:04PM   3    Q.   LET'S FAST FORWARD AND LOOK AT THE RESOLUTION HERE.  LET'S

03:04PM   4    GO TO PAGE 4 AND ZOOM IN ON THE TOP PART OF THE PAGE.

03:05PM   5         AND DO YOU SEE HERE AN EMAIL FROM MS. HOLMES ABOUT THIS

03:05PM   6    SAME TOPIC?

03:05PM   7    A.   YES.

03:05PM   8    Q.   AND AFTER GETTING SOME INFORMATION FROM DANIEL YOUNG, SHE

03:05PM   9    SAYS, "AGREE ON THE PA MEASLES RESULT."

03:05PM   10        DO YOU UNDERSTAND THAT TO REFER TO PALO ALTO?

03:05PM   11   A.   YES.

03:05PM   12   Q.   SHE SAYS, "AGREE ON THE PA MEASLES RESULT.  WE'LL ONLY

03:05PM   13   INCLUDE THAT ONE FROM PA.  I WOULD INTEGRATE THE PA ONLY

03:05PM   14   INFECTIOUS RESULTS WITH THE REST OF THE REPORT RESULTS AND THEN

03:05PM   15   ONLY CALL OUT AS INFECTIOUS THE ONES WE SHOW FOR BOTH PALO ALTO

03:05PM   16   AND NEW YORK."

03:05PM   17        DO YOU SEE THAT?

03:05PM   18   A.   YES.

03:05PM   19   Q.   LET'S GO TO PAGE 3 AND ZOOM IN ON THE TOP HALF OF THE

03:05PM   20   PAGE.

03:06PM   21        DO WE SEE HERE A MESSAGE FROM DANIEL YOUNG ON JUNE 1ST AT

03:06PM   22   5:11 P.M.?

03:06PM   23        DO YOU SEE THAT?

03:06PM   24   A.   YES.

03:06PM   25   Q.   AND BELOW THE BULLET POINTS IN HIS EMAIL, HE IS ADDRESSING

03:06PM  1      YOU, I BELIEVE, IS THAT RIGHT, WHERE HE SAYS DAN?

03:06PM  2      A.   YES.

03:06PM  3      Q.   HE SAYS, FOR BILIRUBIN, TOTAL, CAN YOU CHANGE THE

03:06PM  4      REFERENCE RANGE, AND HE PROVIDES A RANGE, AND REMOVE THE

03:06PM  5      L INDICATOR.

03:06PM  6           AND ON CALCIUM HE ALSO ASKS YOU TO CHANGE THE RANGE.  HE

03:06PM  7      SAYS IT DOESN'T CHANGE THE OUTCOME, BUT SHOWS THE RESULT TO BE

03:06PM  8      CLOSER TO THE REFERENCE RANGE.

03:06PM  9           DO YOU SEE THAT?

03:06PM  10     A.   YES.

03:06PM  11     Q.   AND CAN YOU EXPLAIN WHAT IS HAPPENING HERE?

03:06PM  12     A.   HERE THE REFERENCE RANGES FOR THE TESTS ARE BEING MODIFIED

03:06PM  13     AND THE RESULTING IMPACT IS THAT CERTAIN OF THE RESULTS COMPARE

03:07PM  14     DIFFERENTLY TO THAT RELATIVE RANGE.

03:07PM  15     Q.   FROM YOUR WORK AT THERANOS, DID YOU HAVE AN UNDERSTANDING

03:07PM  16     AS TO WHAT THE TERM "REFERENCE RANGE" MEANT?

03:07PM  17     A.   MY UNDERSTANDING IS THAT IF A RESULT FOR A CERTAIN TEST IS

03:07PM  18     WITHIN A REFERENCE RANGE, IT'S CONSIDERED A HEALTHY RESULT.

03:07PM  19     Q.   SO, FOR EXAMPLE, FOR THE BILIRUBIN TEST FOR THIS DEMO,

03:07PM  20     THIS EMAIL FROM DANIEL YOUNG SAYS THAT CHANGING THE REFERENCE

03:07PM  21     RANGE AS REQUESTED WOULD ALSO RESULT IN REMOVING THE

03:07PM  22     L INDICATOR.

03:07PM  23           DO YOU SEE THAT?

03:07PM  24     A.   YES.

03:07PM  25     Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHAT THE

03:07PM 1    L INDICATOR WOULD MEAN?

03:07PM 2    A.   THAT WOULD REFER TO LOW.

03:07PM 3         SO IF A TEST RESULT WAS NOT WITHIN THE REFERENCE RANGE, IT

03:07PM 4    WOULD HAVE AN INDICATION, IN THIS CASE L, BUT IT COULD ALSO

03:07PM 5    HAVE AN INDICATION H FOR HIGH.

03:08PM 6    Q.   SO IN THIS CASE CHANGING THE REFERENCE RANGE WOULD RESULT

03:08PM 7    IN THE RESULT NO LONGER BEING LOW; IS THAT CORRECT?

03:08PM 8    A.   CORRECT.

03:08PM 9    Q.   AND FOR CALCIUM, IS DANIEL YOUNG SAYING THAT THE CHANGE IN

03:08PM 10   REFERENCE RANGE WOULD MAKE THE RESULT CLOSER TO THE REFERENCE

03:08PM 11   RANGE?

03:08PM 12        DO YOU SEE THAT?

03:08PM 13            MS. WALSH:  OBJECTION.

03:08PM 14            THE COURT:  OVERRULED.

03:08PM 15        YOU CAN ANSWER.

03:08PM 16            THE WITNESS:  CAN YOU REPEAT THE QUESTION?

03:08PM 17   BY MR. BOSTIC:

03:08PM 18   Q.   SURE.  DO YOU SEE IN THE EMAIL DANIEL YOUNG SAYING THAT

03:08PM 19   CHANGING THE REFERENCE RANGE FOR CALCIUM WOULD MAKE THE RESULTS

03:08PM 20   FOR THIS DONOR CLOSER TO THE REFERENCE RANGE?

03:08PM 21   A.   YES.

03:08PM 22   Q.   SO, IN OTHER WORDS, CLOSER TO THE NORMAL RANGE?

03:08PM 23   A.   CORRECT.

03:08PM 24   Q.   AND WAS THIS SOMETHING THAT YOU SAW ON MULTIPLE OCCASIONS,

03:08PM 25   DANIEL YOUNG ALTERING RESULTS OR REFERENCES FOR DEMOS THAT TOOK

03:08PM  1      PLACE AT THERANOS?

03:08PM  2              MS. WALSH:  OBJECTION.  LEADING.

03:08PM  3              THE COURT:  WOULD YOU REPHRASE?

03:09PM  4      BY MR. BOSTIC:

03:09PM  5      Q.  WAS THIS THE ONLY TIME THAT YOU SAW DANIEL YOUNG DO

03:09PM  6      SOMETHING LIKE THIS AFTER THE FACT WITH DEMO RESULTS, EITHER

03:09PM  7      ADJUSTING THE RESULTS THEMSELVES OR THE REFERENCE RANGES?

03:09PM  8      A.  NO.

03:09PM  9      Q.  YOU SAW THAT ON OTHER OCCASIONS?

03:09PM 10      A.  YES.

03:09PM 11      Q.  OKAY.  LET'S LOOK AT 871 NEXT, PLEASE, IN YOUR BINDER.

03:09PM 12          AND ONCE YOU HAVE IT, LET ME KNOW IF YOU SEE AT 871

03:09PM 13      ANOTHER EMAIL CHAIN INCLUDING YOU AND MR. BALWANI RELATING TO

03:09PM 14      DEMO COORDINATION.

03:09PM 15      A.  YES.

03:09PM 16              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 871.

03:09PM 17              MS. WALSH:  NO OBJECTION.

03:09PM 18              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:09PM 19          (GOVERNMENT'S EXHIBIT 871 WAS RECEIVED IN EVIDENCE.)

03:09PM 20              MR. BOSTIC:  LET'S START AT THE BOTTOM OF THIS PAGE,

03:09PM 21      PAGE 2.

03:09PM 22      Q.  DO YOU SEE THAT THIS STARTS WITH AN EMAIL FROM

03:09PM 23      CHRISTIAN HOLMES TO YOU AND OTHERS AT THERANOS; IS THAT RIGHT?

03:10PM 24      A.  YES.

03:10PM 25      Q.  AND IT SAYS, "SUNNY MENTIONED THAT HE'D LIKE TO RUN A DEMO

03:10PM 1     DURING AN EXEC MEETING NEXT TUESDAY."

03:10PM 2         DO YOU SEE THAT?

03:10PM 3     A.   YES.

03:10PM 4     Q.   LET'S GO UP ON THIS PAGE, AND ZOOM IN ON THE MIDDLE FEW

03:10PM 5     MESSAGES.

03:10PM 6         DANIEL YOUNG RESPONDS AND ASKS WHETHER THERE'S ANY

03:10PM 7     PREFERENCE FOR DEVICE TYPE, MONOBAY, MINILAB, OR 4S.

03:10PM 8         DO YOU SEE THAT?

03:10PM 9     A.   YES.

03:10PM 10    Q.   ARE THOSE ALL NEXT GENERATION DEVICES NEVER USED FOR

03:10PM 11    PATIENT TESTING AT THERANOS?

03:10PM 12            MS. WALSH:  OBJECTION.  LEADING.

03:10PM 13            THE COURT:  OVERRULED.

03:10PM 14            THE WITNESS:  YES.

03:10PM 15    BY MR. BOSTIC:

03:10PM 16    Q.   LET'S ZOOM OUT AND CAPTURE THE TOP OF THIS PAGE.

03:10PM 17        AND YOU WRITE BACK, "JUST CAUGHT UP WITH SUNNY.  HE

03:10PM 18    DEFINITELY WANTS TO HAVE A MINILAB AND THEN EITHER A 4S OR

03:10PM 19    MONOBAY (WHICHEVER IS WORKING BETTER)."

03:10PM 20        DO YOU SEE THAT?

03:10PM 21    A.   YES.

03:11PM 22    Q.   AND THAT PHRASE, "WHICHEVER IS WORKING BETTER," WHAT WAS

03:11PM 23    THE SIGNIFICANCE OF THAT?

03:11PM 24    A.   I THINK THAT REFERS TO THE DEVICE CAPABILITIES AND ABILITY

03:11PM 25    TO PROCESS A TEST OR RUN A TEST.

EDLIN DIRECT BY MR. BOSTIC                                              2405

03:11PM  1    Q.   AND DURING YOUR TIME AT THERANOS, IS THAT SOMETHING THAT

03:11PM  2    KIND OF VARIED FROM DAY-TO-DAY WHETHER A CERTAIN DEVICE WAS

03:11PM  3    WORKING OR AVAILABLE FOR THIS KIND OF DEMO?

03:11PM  4    A.   I THINK I MENTIONED EARLIER THERE WAS A TIME PERIOD WHEN

03:11PM  5    THERE WAS A LITTLE UNCERTAINTY, AND THIS FALLS WITHIN THAT TIME

03:11PM  6    PERIOD.

03:11PM  7    Q.   LET'S GO TO PAGE 1, AND LET'S ZOOM IN ON THE BOTTOM HALF

03:11PM  8    OF THE PAGE.

03:11PM  9         THERE'S AN EMAIL FROM YOU AT THE BOTTOM WHERE YOU SAY,

03:11PM 10    FOR TOMORROW'S DEMO, WE'D LIKE TO HAVE A MINILAB AND EITHER A

03:11PM 11    4S OR MONOBAY, WITH THE NORMANDY SHELL UPLOADED.

03:11PM 12         DO YOU SEE THAT?

03:12PM 13    A.   YES.

03:12PM 14    Q.   AND THEN AT THE BOTTOM YOU SAY, "SAM INDICATED THAT THE

03:12PM 15    DEVICES ARE CAPABLE OF RUNNING A CBC."

03:12PM 16         DO YOU SEE THAT?

03:12PM 17    A.   YES.

03:12PM 18    Q.   AND YOU ASK THAT FIVE PRACTICE TESTS BE RUN ON EACH DEVICE

03:12PM 19    TO MAKE SURE THAT THEY'RE ABLE TO DO SO?

03:12PM 20    A.   YES.

03:12PM 21    Q.   AND WHY DID YOU THINK THAT THAT STEP WAS NECESSARY?

03:12PM 22    A.   I'M NOT SURE IF I THOUGHT THE STEP WAS NECESSARY, BUT I

03:12PM 23    BELIEVE THAT I WAS PASSING ALONG A REQUEST TO DO THOSE TESTS TO

03:12PM 24    ENSURE THAT THE DEVICES WERE FUNCTIONING IN AN ACCEPTABLE WAY.

03:12PM 25    Q.   LET'S ZOOM IN ON THE TOP HALF OF THIS PAGE.

03:12PM  1          DO YOU SEE AT THE BOTTOM OF THAT COLLECTION AN EMAIL FROM

03:12PM  2   MR. BALWANI TO YOU AND DANIEL YOUNG?

03:12PM  3   A.   YES.

03:12PM  4   Q.   HE SAYS, "GIVEN ML DOESN'T HAVE CYTO, WHAT ARE WE PLANNING

03:12PM  5   ON RUNNING ON ML?"

03:12PM  6          DO YOU SEE THAT?

03:12PM  7   A.   YES.

03:12PM  8   Q.   AND WHAT WAS ML REFERRING TO?

03:12PM  9   A.   THE MINILAB TOWER, I BELIEVE AT THIS TIME.

03:12PM  10  Q.   OKAY.  THANK YOU.

03:12PM  11         AND WHEN MR. BALWANI SAYS, "THE ML DOESN'T HAVE CYTO," DO

03:13PM  12  YOU HAVE A SENSE OR AN UNDERSTANDING OF WHAT "CYTO" MEANS

03:13PM  13  THERE?

03:13PM  14  A.   CYTOMETRY, WHICH WAS A CERTAIN TYPE OF TEST.

03:13PM  15  Q.   AND DOES THAT CATEGORY OF TESTS HAVE ANYTHING TO DO WITH

03:13PM  16  THE CBC, COMPLETE BLOOD COUNT, THAT WAS SUPPOSED TO BE RUN

03:13PM  17  HERE?

03:13PM  18             MS. WALSH:  OBJECTION.  LEADING.

03:13PM  19             THE COURT:  OVERRULED.

03:13PM  20             THE WITNESS:  YES.

03:13PM  21  BY MR. BOSTIC:

03:13PM  22  Q.   DANIEL YOUNG WRITES BACK TO MR. BALWANI.  HE SAYS, "RIGHT

03:13PM  23  NOW, WE ARE NOT PLANNING ON RUNNING ANYTHING ON THE ML,

03:13PM  24  UNFORTUNATELY.  THE GENERAL CHEMISTRY AND ELISA ASSAYS ARE NOT

03:13PM  25  PERFORMING ADEQUATELY FOR A DEMO AT THE MOMENT."

03:13PM 1       DO YOU SEE THAT?

03:13PM 2   A.   YES.

03:13PM 3   Q.   AND THEN ABOVE THAT, DO YOU SEE THAT MR. BALWANI FORWARDS

03:13PM 4   THIS TO MS. HOLMES WITH THE COMMENT, "VERY FRUSTRATING"?

03:13PM 5   A.   YES.

03:13PM 6   Q.   LET'S GO TO TAB 966 NEXT.

03:14PM 7       ONCE YOU'RE THERE, LET ME KNOW WHETHER YOU RECOGNIZE 966

03:14PM 8   AS ANOTHER EMAIL, INTERNAL AT THERANOS, INCLUDING YOU, RELATING

03:14PM 9   TO THE VIP DEMO.

03:14PM 10  A.   YES.

03:14PM 11          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 966,

03:14PM 12  AND I'M OFFERING THE EMAIL ONLY, NOT THE ATTACHMENTS.

03:14PM 13          THE WITNESS:  I'M SURE, I'M -- I'M NOT SURE IF YOU

03:14PM 14  ASKED WHETHER THE EMAIL WAS FROM ME.  I THINK IT'S FROM

03:14PM 15  DANIEL YOUNG HERE.

03:14PM 16          MR. BOSTIC:  THANK YOU.  I DIDN'T MEAN TO SAY

03:14PM 17  THAT --

03:14PM 18          THE WITNESS:  OKAY.

03:14PM 19  BY MR. BOSTIC:

03:14PM 20  Q.   -- IF I DID.  BUT DOES THIS EMAIL INCLUDE YOU?

03:14PM 21  A.   YES.

03:14PM 22          MS. WALSH:  NO OBJECTION.

03:14PM 23          THE COURT:  JUST THE EMAIL WILL BE ADMITTED, AND IT

03:14PM 24  MAY BE PUBLISHED.

03:14PM 25      (GOVERNMENT'S EXHIBIT 966, EMAIL ONLY, WAS RECEIVED IN

03:14PM  1      EVIDENCE.)

03:14PM  2              MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:15PM  3          LET'S ZOOM IN ON THE CONTENT OF THIS EMAIL, SO THE TOP

03:15PM  4      HALF OF PAGE 1.

03:15PM  5      Q.   AND DO YOU SEE AN EMAIL FROM DANIEL YOUNG TO YOU,

03:15PM  6      CHRISTIAN HOLMES, ELIZABETH HOLMES, AND SUNNY BALWANI AT

03:15PM  7      THERANOS?

03:15PM  8      A.   YES.

03:15PM  9      Q.   AND IT ATTACHES WHAT DANIEL YOUNG REFERS TO AS DEMO

03:15PM 10      RESULTS FOR THE SIX SUBJECTS.

03:15PM 11          DO YOU SEE THAT?

03:15PM 12      A.   YES.

03:15PM 13      Q.   DO YOU RECALL A TIME IN AUGUST OF 2013 WHERE MULTIPLE

03:15PM 14      INDIVIDUALS FROM WALGREENS VISITED THERANOS?

03:15PM 15      A.   YES.

03:15PM 16      Q.   AND DO YOU KNOW WHETHER AS PART OF THAT VISIT THEY

03:15PM 17      RECEIVED DEMO TESTS OR NOT?

03:15PM 18      A.   THEY DID.

03:15PM 19      Q.   DANIEL YOUNG WRITES IN HIS EMAIL, LOOKING AT THE SECOND

03:16PM 20      TOPIC THERE -- ACTUALLY, FIRST, LET ME ASK YOU ABOUT ONE

03:16PM 21      QUESTION.

03:16PM 22          IN YOUR BINDER YOU HAVE HARD COPIES OF THE ATTACHMENTS TO

03:16PM 23      THIS EMAIL.

03:16PM 24          DO YOU SEE THAT IN FRONT OF YOU?

03:16PM 25      A.   YES.

03:16PM 1    Q.  I'LL ASK YOU TO FLIP THROUGH AND SEE IF YOU CAN FIND A

03:16PM 2    NAME.  ACTUALLY LOOK AT PAGE 7 OF THE EXHIBIT.

03:16PM 3        AND DO YOU SEE THE NAME NIMESH JHAVERI APPEARING ON

03:16PM 4    PAGE 7?

03:16PM 5    A.  YES.

03:16PM 6    Q.  AND DO YOU RECOGNIZE THAT NAME?

03:16PM 7    A.  YES.

03:16PM 8    Q.  AND WHO WAS NIMESH JHAVERI?

03:16PM 9    A.  HE WORKED AT WALGREENS.

03:16PM 10   Q.  AND GOING BACK TO PAGE 1, OR LOOKING AT THE SCREEN, DO YOU

03:16PM 11   SEE THAT ONE OF THE ATTACHMENTS SAYS LAB REPORT 8-13-2013 NJ?

03:16PM 12   A.  YES.

03:16PM 13   Q.  IN DANIEL YOUNG'S EMAIL, THE SECOND PARAGRAPH, HE SAYS, "I

03:17PM 14   'CORRECTED' ASSAY RESULTS THAT I ATTRIBUTED TO BCD COLLECTION

03:17PM 15   PROBLEMS."

03:17PM 16       HE SAYS, "THE GC RESULTS LOOK GOOD AFTER SUCH CLEANUP."

03:17PM 17       DO YOU SEE THAT?

03:17PM 18   A.  YES.

03:17PM 19   Q.  THE QUESTION IS, DO YOU HAVE AN UNDERSTANDING AS TO HOW

03:17PM 20   DANIEL YOUNG WENT ABOUT, QUOTE, "CORRECTING" THE RESULTS FOR

03:17PM 21   DEMOS LIKE THIS?

03:17PM 22   A.  I DO NOT.

03:17PM 23   Q.  WERE YOU PART OF THAT PROCESS AT ALL?

03:17PM 24   A.  NO.

03:17PM 25   Q.  LOOKING AT THE FOURTH PARAGRAPH OF HIS EMAIL, HE SAYS,

03:17PM  1    "EACH SUBJECT HAD THE THYROID PANEL PERFORMED.  I REMOVED THE

03:17PM  2    THYROID RESULTS THAT I FELT WERE QUESTIONABLE."

03:17PM  3        DO YOU SEE THAT?

03:17PM  4    A.   YES.

03:17PM  5    Q.   AND HE SAYS, "THERE ARE A FEW OUT OF RANGE RESULTS LEFT IN

03:17PM  6    THE REPORT, BUT THEY ARE VERY CLOSE TO THE REFERENCE RANGE."

03:17PM  7        AND HE SAYS IN PARENTHESES, "(NOTE THAT I THINK THERE IS

03:18PM  8    SOMETHING WRONG WITH THE TT3 ASSAY/REAGENTS, AND AM FOLLOWING

03:18PM  9    UP WITH SHARADA.  I REMOVED ALL TT3 RESULTS.)"

03:18PM  10       DO YOU SEE THAT?

03:18PM  11   A.   YES.

03:18PM  12   Q.   AND THIS WAS IN MID-AUGUST 2013; IS THAT RIGHT?

03:18PM  13   A.   YES.

03:18PM  14   Q.   AND THAT IS ROUGHLY A MONTH BEFORE THERANOS BEGAN PATIENT

03:18PM  15   TESTING?

03:18PM  16   A.   YES.

03:18PM  17   Q.   OKAY.  WE CAN PUT THAT ASIDE.

03:18PM  18       IF I COULD ASK YOU TO TURN TO TAB 957, PLEASE.

03:18PM  19       LET ME ASK, ON THE EMAIL THAT WE WERE JUST LOOKING AT WITH

03:18PM  20   THE RESULTS FROM WALGREENS, WHAT IS YOUR UNDERSTANDING OF WHY

03:18PM  21   MR. BALWANI WAS INCLUDED ON THAT EMAIL?

03:18PM  22       LET ME ASK IT A DIFFERENT WAY.  WHAT WAS MR. BALWANI'S

03:18PM  23   ROLE IN CONNECTION WITH THE WALGREENS PARTNERSHIP AT THIS TIME?

03:18PM  24   A.   AT THIS TIME SUNNY OVERSAW THAT RELATIONSHIP WITH

03:19PM  25   WALGREENS.

03:19PM  1    Q.   IN THAT ROLE, WAS HE INVOLVED AT ALL WITH THE MEETINGS AND

03:19PM  2    VISITS FROM WALGREENS PERSONNEL?

03:19PM  3    A.   YES.

03:19PM  4    Q.   I WOULD JUST ASK YOU TO TURN TO TAB 957.

03:19PM  5         DO YOU HAVE THAT IN FRONT OF YOU?

03:19PM  6    A.   YES.

03:19PM  7    Q.   AND DO YOU SEE AT 957 ANOTHER EMAIL CHAIN AT THERANOS

03:19PM  8    RELATING TO DEMO WORKFLOW?

03:19PM  9    A.   YES.

03:19PM 10         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 957.

03:19PM 11         MS. WALSH:  OBJECTION.  HEARSAY.

03:19PM 12         THE COURT:  IS THIS FIVE PAGES, MR. BOSTIC?

03:19PM 13         MR. BOSTIC:  YES, YOUR HONOR.

03:19PM 14         THE COURT:  IS THIS SUBJECT TO A STIPULATION OR IS

03:20PM 15    THIS 803(6)?

03:20PM 16         MR. BOSTIC:  SO, YOUR HONOR, AS TO AUTHENTICITY,

03:20PM 17    THIS DOES FALL WITHIN THE PARTIES' STIPULATION AND I'M OFFERING

03:20PM 18    IT UNDER 803(6).  I BELIEVE THAT THIS WITNESS HAS PREVIOUSLY

03:20PM 19    LAID THE FOUNDATION.

03:20PM 20         THE COURT:  WHY DON'T YOU JUST LAY THE FOUNDATION

03:20PM 21    BRIEFLY, AND THEN WE'LL GO ON.

03:20PM 22    BY MR. BOSTIC:

03:20PM 23    Q.   MR. EDLIN, WE TALKED BEFORE ABOUT THE WAY THAT THE EMAIL

03:20PM 24    WAS USED IN ORDER TO COORDINATE AND COMMUNICATE ABOUT DEMOS; IS

03:20PM 25    THAT RIGHT?

03:20PM 1    A.   YES.

03:20PM 2    Q.   AND WAS THE USE OF THE EMAIL IN THAT WAY AN IMPORTANT PART

03:20PM 3    OF HOW THESE DEMOS WERE MONITORED AND ARRANGED AND ORGANIZED AT

03:20PM 4    THERANOS?

03:20PM 5    A.   YES.

03:20PM 6    Q.   AND TO FULFILL THAT PURPOSE, DID THE EMAILS HAVE TO BE

03:20PM 7    ACCURATE?

03:20PM 8    A.   YES.

03:20PM 9    Q.   AND WERE THE EMAILS RETAINED SO THAT THEY COULD BE

03:20PM 10   REFERENCED BACK LATER, IF NECESSARY?

03:20PM 11   A.   I BELIEVE THEY WERE.

03:20PM 12        MR. BOSTIC:  YOUR HONOR, I OFFER THIS EXHIBIT 957

03:20PM 13   UNDER 803(6).

03:20PM 14        MS. WALSH:  NO OBJECTION.

03:20PM 15        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:20PM 16   (GOVERNMENT'S EXHIBIT 957 WAS RECEIVED IN EVIDENCE.)

03:21PM 17   BY MR. BOSTIC:

03:21PM 18   Q.   AND LET'S START WITH PAGE 2 OF THIS EXHIBIT AND ZOOM IN ON

03:21PM 19   THE MIDDLE OF THE PAGE.

03:21PM 20   MR. EDLIN, DO YOU RECALL THAT WE WERE JUST LOOKING AT AN

03:21PM 21   EMAIL ATTACHING SIX LAB REPORTS FROM A DEMO IN MID-AUGUST 2013?

03:21PM 22   A.   YES.

03:21PM 23   Q.   AND YOU SEE HERE AN EMAIL FROM YOU MENTIONING, "WE WILL BE

03:21PM 24   COLLECTING FINGERSTICK SAMPLES VERY SOON.  PLEASE BE ON

03:21PM 25   STANDBY."

03:21PM 1    A.   I DO.

03:21PM 2    Q.   AND THEN YOU SAY, "WE HAVE SIX SAMPLES; PLEASE MEET IN THE

03:21PM 3    LAB FOR THE HANDOFF."

03:21PM 4    A.   YES.

03:21PM 5    Q.   DOES THIS MEAN THAT THE SAMPLES WERE NOT BEING PROCESSED

03:21PM 6    IN A CONFERENCE ROOM?

03:21PM 7    A.   YES.

03:21PM 8    Q.   CAN YOU EXPLAIN WHAT THAT MEANS THEN?  WHERE WERE THEY

03:21PM 9    PROCESSED?  WHERE WERE THE TESTS RUN?

03:21PM 10   A.   I'M NOT EXACTLY SURE WHERE THEY WERE RUN, BUT IN THIS

03:22PM 11   INSTANCE I MET THE LABORATORY PERSONNEL IN THE R&D LAB, HANDED

03:22PM 12   OFF THE SAMPLES TO THEM, AND THEN THAT WAS THE EXTENT OF MY

03:22PM 13   INVOLVEMENT.

03:22PM 14   Q.   LET'S GO TO PAGE 1 OF THIS EXHIBIT AND ZOOM IN ON THE

03:22PM 15   BOTTOM.

03:22PM 16       AND DO YOU SEE AT THE BOTTOM THERE THAT'S AN EMAIL FROM

03:22PM 17   NICHOLAS HAASE?

03:22PM 18   A.   YES.

03:22PM 19   Q.   AND WHAT WAS HIS POSITION AT THE COMPANY?

03:22PM 20   A.   I BELIEVE HE WAS A SCIENTIST.

03:22PM 21   Q.   HE SAYS, "UPDATE:  WE JUST STARTED THE ADVIA RUN OF ALL

03:22PM 22   SAMPLES."

03:22PM 23       DO YOU SEE THAT?

03:22PM 24   A.   I DO.

03:22PM 25   Q.   AND WHAT DOES ADVIA REFER TO THERE?

03:22PM 1      A.   A THIRD PARTY DEVICE.

03:22PM 2      Q.   OKAY.  SO THAT'S A BLOOD ANALYZER THAT WASN'T BUILT BY

03:22PM 3   THERANOS?

03:22PM 4      A.   CORRECT.

03:22PM 5      Q.   DO YOU KNOW WHETHER YOU WERE IN THIS MEETING IN MID-2013

03:23PM 6   WITH THE WALGREENS PERSONNEL?

03:23PM 7      A.   I DON'T RECALL WHETHER I WAS IN A PART OF THE MEETING.

03:23PM 8        I KNOW THAT I WAS NOT IN THE ENTIRE MEETING.

03:23PM 9      Q.   DO YOU KNOW ONE WAY OR THE OTHER WHETHER THE WALGREENS

03:23PM 10  VIP'S WERE TOLD THAT THEIR SAMPLES WERE BEING RUN NOT ON

03:23PM 11  THERANOS DEVICES, BUT ON THIRD PARTY ANALYZERS?

03:23PM 12          MS. WALSH:  OBJECTION.  FOUNDATION.

03:23PM 13          THE COURT:  OVERRULED.

03:23PM 14        YOU CAN ANSWER THE QUESTION IF YOU KNOW.

03:23PM 15  BY MR. BOSTIC:

03:23PM 16     Q.   CAN I REPEAT THAT QUESTION FOR YOU, MR. EDLIN?

03:23PM 17     A.   SURE.

03:23PM 18     Q.   THE QUESTION WAS, DO YOU KNOW ONE WAY OR THE OTHER WHETHER

03:23PM 19  THE WALGREENS VIP'S WERE TOLD THAT THEIR SAMPLES WERE BEING RUN

03:23PM 20  NOT ON THERANOS DEVICES, BUT ON THIRD PARTY ANALYZERS?

03:23PM 21     A.   I DON'T KNOW.

03:23PM 22     Q.   LET'S GO TO TAB 1014, PLEASE.

03:24PM 23        AND LOOKING AT TAB 1014, DO YOU SEE ANOTHER INTERNAL EMAIL

03:24PM 24  AT THERANOS RELATING TO A DEMONSTRATION IN AUGUST?

03:24PM 25     A.   YES.

03:24PM   1                    MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1014.

03:24PM   2                    MS. WALSH:  NO OBJECTION.

03:24PM   3                    THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:24PM   4           (GOVERNMENT'S EXHIBIT 1014 WAS RECEIVED IN EVIDENCE.)

03:24PM   5      BY MR. BOSTIC:

03:24PM   6      Q.   AND LET'S START ON PAGE 4.

03:24PM   7      A.   OKAY.

03:24PM   8      Q.   MR. EDLIN, DO YOU RECALL AROUND THIS TIME IN AUGUST 2013

03:24PM   9      WORKING ON A DEMONSTRATION FOR A WRITER WITH "THE

03:24PM  10      WALL STREET JOURNAL"?

03:24PM  11      A.   YES.

03:24PM  12      Q.   DO YOU RECALL THAT WRITER'S NAME?

03:24PM  13      A.   JOE RAGO.

03:24PM  14      Q.   IN AN EMAIL FROM YOU -- AND LET'S ZOOM IN ON YOUR EMAIL

03:24PM  15      FROM AUGUST 20TH AT 3:51.

03:25PM  16           YOU SAY, "THIS THURSDAY 8/22 WE WILL BE HOSTING A DEMO AT

03:25PM  17      OUR OFFICES.  THERE WILL BE ONE MALE PATIENT, ONE FINGERSTICK

03:25PM  18      DRAW, AND TIMING IS TBD."

03:25PM  19           DO YOU SEE THAT?

03:25PM  20      A.   YES.

03:25PM  21      Q.   YOU SAY, "PLANNED TESTS WILL CONSIST OF SOME COMBINATION

03:25PM  22      OF THE FOLLOWING:  CBC, CHEM 14, LIPIDS, THYROID PANEL OR MALE

03:25PM  23      HEALTH."

03:25PM  24           IS THAT RIGHT?

03:25PM  25      A.   YES.

03:25PM   1    Q.   AND THEN YOU SAY, "FOR THIS DEMO, WE WILL NEED TO TURN

03:25PM   2    AROUND RESULTS FASTER THAN EVER BEFORE -- IDEALLY IN 1 HOUR AND

03:25PM   3    NO LONGER THAN 2 HOURS.

03:25PM   4         DO YOU SEE THAT?

03:25PM   5    A.   YES.

03:25PM   6    Q.   AND DO YOU KNOW WHY THIS DEMO NEEDED TO BE COMPLETED,

03:25PM   7    QUOTE, "FASTER THAN EVER BEFORE"?

03:25PM   8    A.   WELL, TYPICALLY FOR DEMOS THE RESULT WOULD BE RETURNED BY

03:25PM   9    THE END OF THE BUSINESS DAY.

03:25PM  10         IN THIS SCENARIO, ELIZABETH WANTED THE RESULTS TO BE

03:26PM  11    RETURNED BEFORE THE END OF THE MEETING, AND FROM THE POINT OF

03:26PM  12    THIS DEMO, THE MEETING WOULD HAVE ENDED AFTER ONE OR TWO HOURS

03:26PM  13    AFTER THE SAMPLE IS TAKEN.

03:26PM  14    Q.   AND THIS KIND OF SPEED, THIS KIND OF TURN-AROUND TIME ON A

03:26PM  15    DEMO IS SOMETHING THAT THERANOS HADN'T DONE BEFORE; IS THAT

03:26PM  16    RIGHT?

03:26PM  17              MS. WALSH:  OBJECTION.  LEADING.

03:26PM  18              THE COURT:  SUSTAINED.

03:26PM  19    BY MR. BOSTIC:

03:26PM  20    Q.   LOOKING AT YOUR EMAIL WHERE YOU SAY, "WE WILL NEED TO TURN

03:26PM  21    AROUND RESULTS FASTER THAN EVER BEFORE," HAD THERANOS

03:26PM  22    PREVIOUSLY BEEN CAPABLE OF TURNING AROUND DEMO RESULTS IN THIS

03:26PM  23    KIND OF TIME PERIOD?

03:26PM  24    A.   I THINK THE COMPANY WAS CAPABLE OF IT, BUT IT HAD NOT DONE

03:26PM  25    THAT.

03:26PM   1     Q.   LOOKING AT YOUR EMAIL FURTHER DOWN, YOU SAY, "SAM AND

03:26PM   2     MICHAEL -- SIMILAR TO LAST WEEK, PLEASE SET UP TWO MINILABS,

03:27PM   3     ONE 4S, AND ONE 3.5 IN INTERVIEW ROOM NUMBER 1."

03:27PM   4          DO YOU SEE THAT?

03:27PM   5     A.   YES.

03:27PM   6     Q.   ARE ALL OF THOSE DEVICES THERANOS BUILT DEVICES?

03:27PM   7     A.   YES.

03:27PM   8     Q.   AND YOU SAY, "THE MINILABS, 4S, AND 3.5 SHOULD HAVE THE

03:27PM   9     DEMO APP THAT CAN RUN NULL PROTOCOLS."

03:27PM  10          DO YOU SEE THAT?

03:27PM  11     A.   YES.

03:27PM  12     Q.   LET'S GO TO PAGE 2.

03:27PM  13          DO YOU SEE AT THE BOTTOM OF PAGE 2 THAT YOU WERE HEADING

03:27PM  14     IN, ACCORDING TO YOUR EMAIL, TO COLLECT THE FINGERSTICK SAMPLE?

03:27PM  15     A.   YES.

03:27PM  16     Q.   LET'S LOOK AT THE TOP OF PAGE 2.

03:27PM  17          AND DO YOU SEE THERE AN EMAIL FROM YOU TO MR. BALWANI?

03:27PM  18     A.   YES.

03:27PM  19     Q.   AND YOU SAY, "UNFORTUNATELY BY THE LOOKS OF THE THYROID

03:28PM  20     PANEL RESULTS BELOW IT APPEARS TO HAVE HAD MAJOR ISSUES AGAIN."

03:28PM  21          DO YOU SEE THAT?

03:28PM  22     A.   YES.

03:28PM  23     Q.   A COUPLE OF QUESTIONS THERE.  FIRST OF ALL, YOU SAY "IT

03:28PM  24     APPEARS TO HAVE HAD MAJOR ISSUES AGAIN."

03:28PM  25          WAS THIS NOT THE FIRST TIME THAT YOU WERE AWARE OF THE

EDLIN DIRECT BY MR. BOSTIC                                    2418

03:28PM   1    THYROID PANEL HAVING PROBLEMS?

03:28PM   2    A.   THAT'S RIGHT.

03:28PM   3    Q.   WHAT DO YOU REMEMBER ABOUT PROBLEMS WITH THAT PARTICULAR

03:28PM   4    ASSAY?

03:28PM   5    A.   I REMEMBER THAT THE RESULTS FROM TESTS ON THAT ASSAY WERE

03:28PM   6    NOT VIABLE.

03:28PM   7    Q.   AND WAS THIS IN THE CONTEXT OF DEMO TESTING OR OTHER R&D

03:28PM   8    WORK?  WHERE DID THAT UNDERSTANDING COME FROM?

03:28PM   9    A.   I DON'T REMEMBER SPECIFICALLY, BUT I THINK IT WAS IN

03:28PM  10    CONNECTION WITH A DEMO, OTHERWISE -- AND I SAY THAT BECAUSE

03:28PM  11    THAT WAS MY INVOLVEMENT.  SO IT'S POSSIBLE THAT THERE WERE

03:29PM  12    PRACTICE TESTS DONE AT SOME EARLIER POINT.

03:29PM  13    Q.   IF YOU LOOK AT THE BOTTOM OF PAGE 1, YOU SEE THE HEADER

03:29PM  14    INFORMATION FOR THE EMAIL THAT WE'RE LOOKING AT.

03:29PM  15        AND YOU SEND THIS EMAIL JUST TO SUNNY BALWANI; IS THAT

03:29PM  16    RIGHT?

03:29PM  17    A.   YES.

03:29PM  18    Q.   WHY DID YOU SEND THIS EMAIL DIRECTLY TO MR. BALWANI?  WHY

03:29PM  19    HIM?

03:29PM  20    A.   I DON'T REMEMBER EXACTLY.

03:29PM  21    Q.   WHAT ROLE DID MR. BALWANI HAVE GENERALLY WHEN IT CAME TO

03:29PM  22    DEMOS LIKE THIS ONE?

03:29PM  23    A.   OFTEN SUNNY WAS KEPT IN THE LOOP IF A DEMO WAS FOR A GUEST

03:29PM  24    OR A GROUP OF PEOPLE THAT WOULD HAVE BEEN, YOU KNOW, RELEVANT

03:29PM  25    TO HIM OR THAT HE WAS INTERESTED IN KNOWING ABOUT.

03:30PM 1    Q.   OKAY.  GOING BACK TO YOUR EMAIL AT THE TOP OF PAGE 2.

03:30PM 2    A.   YES.

03:30PM 3    Q.   YOU SAY, "THE THYROID PANEL APPEARS TO HAVE HAD MAJOR

03:30PM 4    ISSUES AGAIN."

03:30PM 5         YOU GO ON TO SAY, "THIS IS AFTER CALIBRATION WAS RE-DONE

03:30PM 6    YESTERDAY, AFTER A CLINICAL CORRECTION WAS PUT IN PLACE FOR

03:30PM 7    TT3, AND AFTER DANIEL REVIEWED RECENT DATA AND SAID HE WAS

03:30PM 8    CONFIDENT THAT AT LEAST 5 OF THESE RESULTS WOULD WORK."

03:30PM 9         DO YOU SEE THAT?

03:30PM 10   A.   YES.

03:30PM 11   Q.   LET'S GO TO PAGE 1 AND LOOK AT MR. BALWANI'S REACTION.

03:30PM 12   A.   OKAY.

03:30PM 13   Q.   AND DO YOU SEE THE EMAIL FROM HIM WHERE HE SAYS, "TO SAY

03:30PM 14   THIS IS DEEPLY DISAPPOINTING WILL BE A GROSS UNDERSTATEMENT"?

03:30PM 15   A.   I DO.

03:30PM 16   Q.   HE SAYS, "WE HAVE BEEN ASKING TO GET THIS CARTRIDGE BUILT

03:30PM 17   AND QAED AND TESTED FOR MONTHS NOW AND EVERY SINGLE RUN WE HAVE

03:31PM 18   HAD ON THYROID PANEL HAS BEEN A DISASTER."

03:31PM 19        DO YOU SEE THAT?

03:31PM 20   A.   YES.

03:31PM 21   Q.   AND THIS IS ABOUT ONE WEEK BEFORE THE END OF AUGUST; IS

03:31PM 22   THAT RIGHT?

03:31PM 23   A.   YES.

03:31PM 24   Q.   AND ONE MONTH BEFORE THERANOS BEGAN PATIENT TESTING?

03:31PM 25   A.   YES.

03:31PM  1    Q.   LET'S LOOK AT THE EMAIL ABOVE THAT FROM

03:31PM  2    SUREKHA GANGADKHEDKAR.

03:31PM  3         DO YOU SEE HERE ANOTHER REPORT SENT DIRECTLY TO

03:31PM  4    MR. BALWANI, INCLUDING YOU AND DANIEL YOUNG, REGARDING THESE

03:31PM  5    RESULTS?

03:31PM  6    A.   YES.

03:31PM  7    Q.   AND SUREKHA GANGADKHEDKAR SAYS, "WITH THE PRESENT RUN,

03:31PM  8    HERE IS THE BREAK-UP OF THE RESULTS," AND THEN SHE PROVIDES A

03:31PM  9    NUMBERED LIST.

03:31PM 10    A.   YES.

03:31PM 11    Q.   SHE NOTES NUMBER 2, THERE'S AN ASSAY THAT WAS OORL DUE TO

03:31PM 12    SUBSTRATE EVAPORATION.

03:31PM 13         DO YOU KNOW WHAT OORL STOOD FOR AT THERANOS?

03:31PM 14    A.   OUT OF RANGE LOW.

03:31PM 15    Q.   UNDER NUMBER 4 FOR THE TT3 ASSAY, SHE NOTES THAT THAT WAS

03:32PM 16    ALSO WAS OUT OF RANGE LOW; IS THAT CORRECT?

03:32PM 17    A.   YES.

03:32PM 18    Q.   AND SHE SAYS AT THE BOTTOM THAT "THIS POINTS TO

03:32PM 19    CARRY-OVER/CONTAMINATION DURING THE RUN AND NOT RELATED TO

03:32PM 20    ASSAY ISSUES."

03:32PM 21         DO YOU SEE THAT?

03:32PM 22    A.   YES.

03:32PM 23    Q.   AND THEN FOR NUMBER 6 SHE SAYS "FT-4 -- RESULT REPORTED,

03:32PM 24    HIGH."

03:32PM 25         DO YOU SEE THAT?

03:32PM  1    A.   YES.

03:32PM  2    Q.   AND SHE SAYS, "SINCE WE DO NOT HAVE SAMPLE TO TEST ON THE

03:32PM  3    REFERENCE METHOD, NOT POSSIBLE TO MAKE A CONCLUSION ON THE HIGH

03:32PM  4    RESULTS."

03:32PM  5        DID I READ THAT CORRECTLY?

03:32PM  6    A.   YES.

03:32PM  7    Q.   AND FINALLY AT THE TOP OF THIS PAGE, DO YOU SEE THAT

03:32PM  8    MR. BALWANI TOOK THE STEP TO FORWARD THAT INFORMATION TO

03:32PM  9    MS. HOLMES?

03:32PM  10   A.   I DO.

03:32PM  11   Q.   LET'S LOOK AT 1157 NEXT.

03:33PM  12       AND AT 1157, DO YOU SEE AN EMAIL FROM YOU TO OTHERS AT

03:33PM  13   THERANOS RELATING TO A DEMO THE FOLLOWING DAY?

03:33PM  14   A.   YES.

03:33PM  15           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1157.

03:33PM  16           MS. WALSH:  IF IT'S 803(6), I HAVE NO OBJECTION,

03:33PM  17   YOUR HONOR.

03:33PM  18           MR. BOSTIC:  IT IS.

03:33PM  19           THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:33PM  20       (GOVERNMENT'S EXHIBIT 1157 WAS RECEIVED IN EVIDENCE.)

03:33PM  21   BY MR. BOSTIC:

03:33PM  22   Q.   AND LET'S ZOOM IN ON THE TOP HALF OF PAGE 1.

03:33PM  23       MR. EDLIN, DO YOU SEE THAT THIS RELATES TO A DEMO THAT WAS

03:33PM  24   GOING TO HAPPEN APPARENTLY ON SEPTEMBER 24TH, 2013?

03:33PM  25   A.   YES.

03:33PM 1    Q.   AT THIS POINT HAD THERANOS BEGUN PATIENT TESTING YET?

03:33PM 2    A.   YES.

03:33PM 3    Q.   IN THIS EMAIL, PAUL PATEL WRITES, "DANIEL,

03:33PM 4         "ARE WE EXPECTING TO RUN THIS SAMPLE ON ADVIA?"

03:34PM 5         DO YOU SEE THAT QUESTION?

03:34PM 6    A.   YES.

03:34PM 7    Q.   AND ON THE TOP WE SEE YOUR EMAIL RESPONSE.

03:34PM 8         YOU SAY, "PLEASE PLAN ON RUNNING THIS SAMPLE USING THE

03:34PM 9    SAME PROCESSES AS LAST WEEK, IE, THE CURRENT WORKFLOW IN

03:34PM 10   NORMANDY."

03:34PM 11        WHAT DOES THAT MEAN, "THE CURRENT WORKFLOW IN NORMANDY"?

03:34PM 12   A.   I THINK THAT REFERS TO HOW THE NORMANDY LAB OPERATED.

03:34PM 13   Q.   OKAY.  WAS THAT THE LAB RUNNING PATIENT TESTS?

03:34PM 14   A.   I'M NOT SURE.

03:34PM 15   Q.   YOU GO ON TO SAY IN THAT EMAIL, "TO ANSWER PAUL'S

03:34PM 16   QUESTION, I BELIEVE THAT ADVIA IS USED FOR THIS FOR GC ASSAYS."

03:34PM 17        DO YOU SEE THAT?

03:34PM 18   A.   I DO.

03:34PM 19   Q.   AND DID YOU TESTIFY EARLIER THAT ADVIA WAS A NON-THERANOS

03:34PM 20   THIRD PARTY DEVICE?

03:34PM 21   A.   YES, AND AT THIS POINT I WAS LIKELY PASSING INFORMATION

03:34PM 22   FROM DANIEL YOUNG TO PAUL.

03:35PM 23   Q.   LET'S GO BACK, JUST BRIEFLY, TO PAGE 2 AND ZOOM IN ON THE

03:35PM 24   BOTTOM HALF.

03:35PM 25        AND WE SEE HERE AN EMAIL FROM YOU, AGAIN, RELATING TO

03:35PM 1      COORDINATION OF THIS DEMO?

03:35PM 2      A.   YES.

03:35PM 3      Q.   AND AT THE BOTTOM YOU SAY, "SAM AND MICHAEL -- WE WILL

03:35PM 4      ALSO NEED TO SET UP MINILABS AND A 4S IN INTERVIEW ROOM NUMBER

03:35PM 5      1."

03:35PM 6           DO YOU SEE THAT?

03:35PM 7      A.   YES.

03:35PM 8      Q.   AND WAS EITHER THE MINILAB OR THE 4S PART OF THE WORKFLOW

03:35PM 9      IN THE THERANOS CLINICAL LAB?

03:35PM 10     A.   NOT TO MY KNOWLEDGE.

03:35PM 11     Q.   ALL RIGHT.  SO, IN OTHER WORDS, IS THIS A SITUATION WHERE

03:35PM 12     THE NEXT GENERATION DEVICES WERE SET UP IN A CONFERENCE ROOM

03:35PM 13     WHERE THE MEETING WAS HELD, BUT THOSE DEVICES WERE NEVER USED

03:35PM 14     FOR CLINICAL PATIENT TESTING?

03:36PM 15           MS. WALSH:  OBJECTION.  LEADING.

03:36PM 16           THE COURT:  IT WAS LEADING.  I'LL ALLOW IT.

03:36PM 17     YOU CAN ANSWER THE QUESTION.

03:36PM 18           THE WITNESS:  CAN YOU REPEAT THE QUESTION, PLEASE?

03:36PM 19           MR. BOSTIC:  SURE.

03:36PM 20     Q.   ARE WE LOOKING AT A SITUATION WHERE NEXT GENERATION

03:36PM 21     DEVICES, NOT USED FOR CLINICAL PATIENT TESTING, WERE SET UP IN

03:36PM 22     THE ACTUAL CONFERENCE ROOM?

03:36PM 23     A.   YES.

03:36PM 24     Q.   OKAY.  FINALLY, LET'S LOOK AT TAB 3070, 3070.

03:36PM 25           AND DO YOU SEE HERE AN EMAIL CHAIN INCLUDING YOU,

03:36PM 1     MS. HOLMES, AND MR. BALWANI RELATING TO A TEST FOR A VIP GUEST?

03:36PM 2     A.   YES.

03:36PM 3           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 3070,

03:37PM 4     AND WE'RE GOING TO REDACT THE PATIENT NAME.

03:37PM 5           MS. WALSH:  NO OBJECTION.

03:37PM 6           THE COURT:  IT'S ADMITTED.  SUBJECT TO REDACTION, IT

03:37PM 7     MAY BE PUBLISHED.

03:37PM 8         (GOVERNMENT'S EXHIBIT 3070 WAS RECEIVED IN EVIDENCE.)

03:37PM 9     BY MR. BOSTIC:

03:37PM 10    Q.   AND LET'S GO FIRST TO THE BOTTOM OF PAGE 1, AND WE SEE

03:37PM 11    THAT WE'RE ABOUT TO LOOK AT AN EMAIL FROM YOU, MR. EDLIN, ON

03:37PM 12    DECEMBER 27TH, 2015; IS THAT CORRECT?

03:37PM 13    A.   YES.

03:37PM 14    Q.   SO YEARS AFTER THERANOS HAD BEGUN PATIENT TESTING?

03:37PM 15    A.   OVER TWO YEARS, YES.

03:37PM 16    Q.   AND LET'S TURN THE PAGE.  THE SUBJECT LINE SAYS MESSAGING

03:37PM 17    FOR VIP GUESTS.

03:37PM 18        AND LOOKING AT THE CONTENT OF THE EMAIL, LET'S ZOOM IN ON

03:37PM 19    THE TOP.  IT SAYS -- YOU WRITE, "YESTERDAY WE SENT DR.," AND

03:37PM 20    WE'VE REDACTED THE NAME, "HIS RESULTS FROM THE STUDY IN WHICH

03:37PM 21    WE COMPARE FINGERSTICK CTN RESULTS TO VENOUS RESULTS RUN AT

03:37PM 22    THERANOS, ARUP, AND UCSF."

03:38PM 23        DO YOU SEE THAT?

03:38PM 24    A.   YES.

03:38PM 25    Q.   YOU THEN SAY, "WE WERE UNABLE TO RETURN 5 TEST RESULTS FOR

EDLIN DIRECT BY MR. BOSTIC                                          2425

03:38PM  1    THE CTN FOR THE FOLLOWING REASONS."

03:38PM  2         WHAT WAS THE CTN?

03:38PM  3    A.   IT STANDS FOR CAPILLARY TUBE AND NANOTAINER, AND IT WAS A

03:38PM  4    THERANOS MANUFACTURED DEVICE THAT COLLECTED A BLOOD SAMPLE FROM

03:38PM  5    A FINGERSTICK.

03:38PM  6    Q.   AND WAS THE CTN USED WITH THERANOS SPECIFIC TESTS OR WAS

03:38PM  7    IT ALSO USED WITH REGULAR COMMERCIALLY AVAILABLE TESTS, IF YOU

03:38PM  8    KNOW?

03:38PM  9    A.   I BELIEVE IT WAS RUN IN CONNECTION TO THERANOS SPECIFIC

03:38PM 10    TESTS.

03:38PM 11    Q.   OKAY.  SO YOU'RE WRITING THAT THE LAB WAS UNABLE TO RETURN

03:38PM 12    FIVE TEST RESULTS FOR THE THERANOS METHODS FOR THE FOLLOWING

03:38PM 13    REASONS.

03:38PM 14         UNDER NUMBER 1, POTASSIUM, CHLORIDE, AND SODIUM?

03:38PM 15    A.   YES.

03:38PM 16    Q.   YOU WRITE, "SAMPLE BECAME CONTAMINATED DURING

03:39PM 17    CENTRIFUGATION."

03:39PM 18         DO YOU SEE THAT?

03:39PM 19    A.   YES.

03:39PM 20    Q.   UNDER PART B THERE FOR THOSE SAME ASSAYS UNDER ROOT CAUSE,

03:39PM 21    YOU WRITE, "THE CONTAMINATION OF THE CTN IS NOT DUE TO ANY

03:39PM 22    HUMAN ERROR."

03:39PM 23         DO YOU SEE THAT?

03:39PM 24    A.   YES, AND IN THIS CASE I WAS RELAYING INFORMATION DIRECTLY

03:39PM 25    FROM TINA.

03:39PM 1    Q.   AND YOUR UNDERSTANDING AGAIN, APPARENTLY FROM TINA, WAS

03:39PM 2    THAT, QUOTE, "WE DON'T KNOW HOW OR WHY THIS HAPPENED"; IS THAT

03:39PM 3    RIGHT?

03:39PM 4    A.   YES.

03:39PM 5    Q.   AND THEN GOING DOWN TO ITEM 2 IN THE LIST FOR CALCIUM AND

03:39PM 6    TOTAL PROTEIN?

03:39PM 7    A.   YES.

03:39PM 8    Q.   YOU WRITE, "THESE TWO RESULTS WERE STATISTICALLY

03:39PM 9    SIGNIFICANTLY TOO HIGH RELATIVE TO THE VENOUS REPORT."

03:39PM 10       DO YOU SEE THAT?

03:39PM 11   A.   YES.

03:39PM 12   Q.   CAN YOU EXPLAIN WHAT THAT MEANS?  WHAT WAS BEING COMPARED

03:39PM 13   IN THIS CASE?

03:39PM 14   A.   IN THIS CASE RESULTS FROM A FINGERSTICK WERE BEING

03:39PM 15   COMPARED TO RESULTS FROM A VENIPUNCTURE.

03:40PM 16   Q.   OKAY.  AND UNDER B WHERE IT SAYS ROOT CAUSE, YOU WRITE,

03:40PM 17   "UNKNOWN."

03:40PM 18       DO YOU SEE THAT?

03:40PM 19   A.   YES.  AND, AGAIN, IN THIS CASE I WAS PASSING ALONG

03:40PM 20   INFORMATION FROM A SCIENTIST.

03:40PM 21   Q.   OKAY.  LET'S LOOK AT PAGE 1 TO GET SOME MORE DETAILS ABOUT

03:40PM 22   WHO THIS DONOR WAS, WHO THIS SUBJECT WAS.

03:40PM 23       ZOOM IN ON THE BOTTOM HALF OF THE PAGE.

03:40PM 24       AND DO YOU SEE AN EMAIL FROM CHRISTIAN HOLMES TO HIS

03:40PM 25   SISTER, ELIZABETH HOLMES, AND SUNNY BALWANI?

03:40PM 1    A.   YES.

03:40PM 2    Q.   AND HE SAYS, "FYI -- THIS IS THE DOC EAH MET AT FORBES

03:40PM 3    CONFERENCE AND INVITED TO DO COMPARISON."

03:40PM 4         DO YOU SEE THAT?

03:40PM 5    A.   YES.

03:40PM 6    Q.   AND CHRISTIAN HOLMES WRITES, "HE WAS VERY PLEASANT IN

03:40PM 7    PERSON BUT NOTED HE INTENDS TO WRITE ABOUT HIS EXPERIENCE AND

03:40PM 8    RESULTS."

03:40PM 9         DO YOU SEE THAT?

03:40PM 10   A.   YES.

03:40PM 11   Q.   LOOKING AT THAT EMAIL, YOU ARE NOT INCLUDED ON THAT

03:40PM 12   PARTICULAR EMAIL MESSAGE; IS THAT CORRECT?

03:40PM 13   A.   THAT'S CORRECT.

03:40PM 14   Q.   AND GOING UP TO THE MESSAGE ABOVE THAT, WE SEE A RESPONSE

03:41PM 15   FROM MS. HOLMES.

03:41PM 16   A.   YES.

03:41PM 17   Q.   AND THAT ONE DOES INCLUDE YOU; CORRECT?

03:41PM 18   A.   YES.

03:41PM 19   Q.   AND SHE WRITES, "YOU CAN SAY WE DO RUN THOSE ASSAYS, BUT

03:41PM 20   WERE NOT ABLE TO RUN THEM ON THIS SAMPLE, APPARENTLY DUE TO A

03:41PM 21   HUMAN ERROR IN SAMPLE HANDLING."

03:41PM 22        DO YOU SEE THAT?

03:41PM 23   A.   YES.

03:41PM 24   Q.   MS. HOLMES IS SAYING TO TELL THE DOCTOR THAT THE ASSAYS

03:41PM 25   COULD NOT BE RUN ON THE SAMPLE; IS THAT CORRECT?

03:41PM  1    A.   YES.

03:41PM  2    Q.   IN FACT, WEREN'T THE ASSAYS RUN ON THIS SAMPLE?

03:41PM  3    A.   YES.

03:41PM  4    Q.   SHE ALSO SAYS TO TELL THE DOCTOR THAT THE PROBLEM WAS,

03:41PM  5    QUOTE, "DUE TO A HUMAN ERROR IN SAMPLE HANDLING."

03:41PM  6         DO YOU SEE THAT?

03:41PM  7    A.   YES.

03:41PM  8    Q.   HADN'T YOU JUST REPORTED THAT YOUR UNDERSTANDING FROM TINA

03:41PM  9    WAS THAT THE CONTAMINATION WAS NOT DUE TO ANY HUMAN ERROR?

03:41PM 10    A.   THAT WAS HER UNDERSTANDING, YES.

03:42PM 11    Q.   AND WHEN YOU SAY "HER UNDERSTANDING," DO YOU MEAN TINA'S

03:42PM 12    UNDERSTANDING?

03:42PM 13    A.   I DO.

03:42PM 14    Q.   AT THE TIME, IN DECEMBER OF 2015, DID YOU NOTE THE

03:42PM 15    INCONSISTENCY BETWEEN WHAT MS. HOLMES WAS SAYING SHOULD BE

03:42PM 16    REPRESENTED AND WHAT WAS BEING DISCUSSED INTERNALLY?

03:42PM 17    A.   I'M NOT SURE WHAT YOU MEAN.

03:42PM 18    Q.   SITTING HERE TODAY, DO YOU SEE THE INCONSISTENCY BETWEEN

03:42PM 19    WHAT MS. HOLMES IS SAYING SHOULD BE SAID TO THE DOCTOR AND WHAT

03:42PM 20    ACTUALLY HAPPENED AT THERANOS?

03:42PM 21    A.   I DO.

03:42PM 22         MS. WALSH:  OBJECTION.  RELEVANCE.

03:42PM 23         THE COURT:  OVERRULED.

03:42PM 24         THE WITNESS:  I DO NOTE THE INCONSISTENCY, YES.

03:42PM 25    BY MR. BOSTIC:

03:42PM  1    Q.   SO MY QUESTION IS, AT THE TIME IN DECEMBER OF 2015, DID

03:42PM  2    YOU NOTICE THAT INCONSISTENCY?

03:42PM  3    A.   I'M NOT SURE WHETHER -- I DON'T REMEMBER.

03:43PM  4    Q.   OKAY.  WE CAN PUT THAT ASIDE.

03:43PM  5         I'D LIKE TO MOVE ON, IN OUR REMAINING TIME TODAY, TO A

03:43PM  6    DIFFERENT TOPIC AND TALK ABOUT YOUR INVOLVEMENT IN THE

03:43PM  7    MARKETING OF THERANOS AND SOME MEDIA RELATIONS INVOLVING THE

03:43PM  8    COMPANY.  OKAY?

03:43PM  9    A.   OKAY.

03:43PM  10   Q.   FIRST, LET'S START WITH THE THERANOS WEBSITE.

03:43PM  11        DO YOU RECALL A TIME WHEN THERANOS WAS PREPARING TO LAUNCH

03:43PM  12   A NEW VERSION OF ITS PUBLIC WEBSITE?

03:43PM  13   A.   YES.

03:43PM  14   Q.   AND WHEN DID THAT TAKE PLACE?

03:43PM  15   A.   IT TOOK PLACE IN 2013 LEADING UP TO THE LAUNCH WITH

03:43PM  16   WALGREENS.

03:43PM  17   Q.   DO YOU KNOW APPROXIMATELY WHAT MONTH THAT WOULD HAVE BEEN

03:43PM  18   THEN, OR MONTHS THAT WE WOULD BE TALKING ABOUT?

03:43PM  19   A.   IT WAS LIKELY IN THE SUMMER OF 2013.

03:43PM  20   Q.   AND AROUND THAT TIME, DID YOU HAVE A ROLE IN ASSISTING

03:43PM  21   WITH THE CONTENT OF THE THERANOS WEBSITE?

03:43PM  22   A.   YES.

03:43PM  23   Q.   AND WHAT WAS YOUR ROLE?

03:43PM  24   A.   MY ROLE WAS TO WORK DIRECTLY WITH THE ACCOUNT MANAGERS AND

03:44PM  25   ACCOUNT SUPERVISORS AT TBWACHIAT/DAY TO TRACK DELIVERABLES,

03:44PM  1    FACILITATE INFORMATION AND COMMUNICATION.

03:44PM  2    Q.   AND YOU MENTIONED TBWACHIAT/DAY?

03:44PM  3    A.   YES.

03:44PM  4    Q.   AND WHAT IS THAT?

03:44PM  5    A.   THAT'S A MARKETING AND ADVERTISING AGENCY.

03:44PM  6    Q.   AND WHAT WAS ITS RELATIONSHIP TO THERANOS BACK IN 2013?

03:44PM  7    A.   THEY WERE THE AGENCY OR VENDOR THAT THERANOS WAS

03:44PM  8    PARTNERING WITH TO DEVELOP A MARKETING COMMUNICATIONS -- A

03:44PM  9    MARKETING AND COMMUNICATIONS STRATEGY WHICH INCLUDED THE

03:44PM 10    WEBSITE REDESIGN.

03:44PM 11    Q.   AND WHEN IT CAME TO THE REDESIGN OF THE WEBSITE, WERE

03:44PM 12    MS. HOLMES AND MR. BALWANI INVOLVED AS CEO AND COO OF THE

03:44PM 13    COMPANY?

03:44PM 14    A.   YES.

03:44PM 15    Q.   AND IN WHAT WAY WERE THEY INVOLVED?

03:44PM 16    A.   THE COMPANY HAD SEVERAL MEETINGS WITH A NUMBER OF

03:45PM 17    DIFFERENT EMPLOYEES AT CHIAT/DAY, AND ELIZABETH AND SUNNY I

03:45PM 18    THINK SPOKE WITH THEM TO ESTABLISH THE TERMS OF THE

03:45PM 19    RELATIONSHIP AND THE SCOPE OF THAT RELATIONSHIP, AND ALSO TO

03:45PM 20    PROVIDE INFORMATION ABOUT THE DIRECTION OF THE COMPANY AND THE

03:45PM 21    STRATEGY AND WHAT THEY WERE HOPING TO ACHIEVE THROUGH A

03:45PM 22    MARKETING EFFORT.

03:45PM 23    Q.   I'LL ASK YOU TO LOOK IN YOUR BINDER AT TAB 3965, PLEASE.

03:45PM 24         AND DO YOU HAVE THAT IN FRONT OF YOU?

03:45PM 25    A.   I DO.

03:45PM  1    Q.   AT 3965, DO YOU SEE AN EMAIL INCLUDING YOU, MR. BALWANI,

03:45PM  2    AND MS. HOLMES RELATING TO WEBSITE CONTENT?

03:45PM  3    A.   YES.

03:45PM  4              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 3965.

03:45PM  5              MS. WALSH:  YOUR HONOR, WE OBJECT BASED ON HEARSAY.

03:46PM  6    THERE ARE MULTIPLE LAYERS OF HEARSAY IN THIS EMAIL.

03:46PM  7              THE COURT:  MR. BOSTIC, ARE YOU SEEKING TO INTRODUCE

03:46PM  8    THE ENTIRETY?  IT LOOKS LIKE THERE'S A BROCHURE OR SOMETHING.

03:46PM  9              MR. BOSTIC:  YES, YOUR HONOR, BUT NOT FOR ITS TRUTH.

03:46PM  10   THIS IS NOT FOR HEARSAY.  THIS IS TO SHOW WHAT WAS BEING

03:46PM  11   CONSIDERED AS CONTENT FOR THE WEBSITE AT THE TIME.

03:46PM  12   IT'S ALSO RELEVANT TO NOTICE TO MS. HOLMES AND MR. BALWANI

03:46PM  13   ABOUT THAT CONTENT AND ISSUES WITH THE CONTENT.

03:47PM  14   (PAUSE IN PROCEEDINGS.)

03:47PM  15             THE COURT:  ALL RIGHT.  THANK YOU.

03:47PM  16   I'LL ADMIT THIS ONLY FOR THE ISSUE OF NOTICE.

03:47PM  17   LADIES AND GENTLEMEN, THIS IS NOT OFFERED FOR THE TRUTH OF

03:47PM  18   THE MATTER ASSERTED.  IT'S NOT BEING ADMITTED FOR THE TRUTH OF

03:47PM  19   ANYTHING ASSERTED IN THESE DOCUMENTS AT ALL, BUT RATHER JUST

03:47PM  20   FOR THE NOTICE OF THE INFORMATION, BUT NOT FOR THE TRUTH.

03:47PM  21   AND IT CAN BE ADMITTED FOR THAT LIMITED PURPOSE AND

03:47PM  22   PUBLISHED.

03:47PM  23             MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:47PM  24   (GOVERNMENT'S EXHIBIT 3965 WAS RECEIVED IN EVIDENCE.)

03:47PM  25             MR. BOSTIC:  MS. WACHS, IF WE CAN ZOOM IN ON THE

03:47PM 1    HEADER INFORMATION FIRST.

03:47PM 2    Q.   AND DO YOU SEE HERE AN EMAIL FROM SOMEONE NAMED

03:47PM 3    JEFFREY BLICKMAN TO MS. HOLMES, CC'ING MR. BALWANI,

03:47PM 4    CHRISTIAN HOLMES, AND YOU?

03:47PM 5    A.   YES.

03:47PM 6    Q.   WHO WAS JEFF BLICKMAN AT THERANOS?

03:47PM 7    A.   JEFF BLICKMAN WAS A SENIOR PRODUCT MANAGER THAT I WORKED

03:47PM 8    WITH.

03:47PM 9    Q.   THE SUBJECT LINE HERE IS .COM PDF AND JIM FOX'S COMMENTS.

03:47PM 10       DO YOU SEE THAT?

03:48PM 11   A.   YES.

03:48PM 12   Q.   AND LET'S LOOK AT THE CONTENT OF THE EMAIL.  JUST ZOOM IN

03:48PM 13   ON THE TOP HALF OF THAT FOR NOW.

03:48PM 14       AND MR. BLICKMAN WRITES, "ELIZABETH -- HERE'S THE PDF

03:48PM 15   SCREENSHOTS OF THE LATEST .COM TO SEND TO COUNSEL."

03:48PM 16       WAS THIS CONTENT FOR THE WEBSITE?

03:48PM 17   A.   YES.

03:48PM 18   Q.   HE SAYS, "ALONG WITH JIM'S (ABRIDGED) FEEDBACK FROM TODAY,

03:48PM 19   REMOVED ANYTHING BASED ON PERSONAL OPINION."

03:48PM 20       DO YOU SEE THAT?

03:48PM 21   A.   YES.

03:48PM 22   Q.   AND I'D LIKE TO DRAW YOUR ATTENTION TO THE FIRST TWO ITEMS

03:48PM 23   ON THIS LIST.  THE FIRST ONE SAYS, "WHAT IS THE SOURCE/BACKUP

03:48PM 24   DATA FOR 'AT THERANOS WE CAN PERFORM ALL LAB TESTS ON A SAMPLE

03:48PM 25   1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW'?"

EDLIN DIRECT BY MR. BOSTIC                                    2433

03:48PM  1         DO YOU SEE THAT?

03:48PM  2     A.   YES.

03:48PM  3     Q.   AND THE ITEM 2 SAYS, "OUR REVOLUTION/OUR TECHNOLOGY -- 'A

03:49PM  4     TINY DROP IS ALL IT TAKES' -- WE OFTEN USE MORE THAN ONE DROP;

03:49PM  5     WE SHOULD SAY 'A FEW DROPS IS ALL IT TAKES,'" AND THEN OTHER

03:49PM  6     ALTERNATIVES ARE PROVIDED.

03:49PM  7         DO YOU SEE THAT?

03:49PM  8     A.   YES.

03:49PM  9     Q.   WHAT WAS YOUR UNDERSTANDING OF THE PURPOSE OF THESE

03:49PM 10     COMMENTS ON THE WEBSITE CONTENT?

03:49PM 11     A.   THE PURPOSE WAS TO CORRECT ANY -- WAS TO PROPOSE CHANGES

03:49PM 12     THAT WOULD CORRECT ANY INACCURACIES OR INCONSISTENCIES WITH THE

03:49PM 13     WEBSITE CONTENT.

03:49PM 14     Q.   OKAY.  IF I COULD ASK YOU TO LOOK AT PAGE 4 OF THIS

03:49PM 15     EXHIBIT.

03:49PM 16         MS. WACHS, ZOOM IN ON THE TOP PART OF THE PAGE.

03:49PM 17         AND IT'S A LITTLE FAINT, BUT DO YOU SEE THAT CONTENT THAT

03:49PM 18     IS BEING COMMENTED ON, THE LANGUAGE OF THE NANOTAINER AND THEN

03:49PM 19     THE TEXT "AT THERANOS WE CAN PERFORM ALL LAB TESTS ON A SAMPLE

03:50PM 20     1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW"?

03:50PM 21     A.   YES.

03:50PM 22     Q.   AT THIS TIME IN SEPTEMBER OF 2013, DID YOU KNOW WHETHER OR

03:50PM 23     NOT THAT STATEMENT WAS TRUE AS TO THE COMPANY'S TECHNOLOGY?

03:50PM 24     A.   I DON'T THINK I HAD A BASIS TO MAKE AN ASSESSMENT ONE WAY

03:50PM 25     OR THE OTHER.

03:50PM  1     Q.   OKAY.  BELOW THE TEXT THAT WE'RE LOOKING AT HERE, THERE'S

03:50PM  2     A LINE THAT SAYS, "A TINY DROP IS ALL IT TAKES."

03:50PM  3          IS THAT ADDITIONAL TEXT THAT WAS BEING COMMENTED ON IN THE

03:50PM  4     EMAIL THAT WE JUST LOOKED AT?

03:50PM  5     A.   YES.

03:50PM  6     Q.   LET'S GO DOWN A LITTLE BIT MORE ON THIS PAGE AND LOOK AT A

03:50PM  7     SECTION WHERE THERE'S A TITLE, "HIGHEST LEVELS OF ACCURACY."

03:50PM  8     A.   YES.

03:50PM  9     Q.   AND THAT'S VERY DIFFICULT TO READ.

03:50PM 10          BUT DO YOU SEE TEXT THERE THAT SAYS, "HIGHEST LEVELS OF

03:51PM 11     ACCURACY," AND REFERS TO SYSTEMATICALLY ELIMINATING -- WELL, I

03:51PM 12     WON'T TRY TO READ THAT.

03:51PM 13          (LAUGHTER.)

03:51PM 14             MR. BOSTIC:  I WON'T INTERPRET THAT.

03:51PM 15             THE COURT:  THANK YOU, MR. BOSTIC.

03:51PM 16     BY MR. BOSTIC:

03:51PM 17     Q.   LET'S KEEP IT TO THE TITLE.

03:51PM 18          DO YOU SEE THE QUOTE THERE, "HIGHEST LEVELS OF ACCURACY"?

03:51PM 19     A.   YES.

03:51PM 20     Q.   IN YOUR ROLE THERE WORKING AT THERANOS, DID YOU HAVE THE

03:51PM 21     OPPORTUNITY TO REVIEW THE ACTUAL PUBLIC WEBSITE OF THE COMPANY?

03:51PM 22     A.   YES.

03:51PM 23     Q.   AND SITTING HERE TODAY, DO YOU RECALL WHETHER THE WEBSITE

03:51PM 24     ENDED UP MAKING CLAIMS ABOUT THE HIGHEST LEVELS OF ACCURACY?

03:51PM 25     A.   I DON'T RECALL THE SPECIFIC WORDING.

03:51PM   1    Q.   OKAY.  I'LL ASK YOU TO TURN TO TAB 3981, PLEASE.

03:52PM   2         AND LOOKING AT 3981, DO YOU SEE ANOTHER EMAIL CHAIN

03:52PM   3    INCLUDING YOU AND MS. HOLMES AND RELATING TO WEBSITE CONTENT?

03:52PM   4    A.   YES.

03:52PM   5              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 3981.

03:52PM   6              MS. WALSH:  YOUR HONOR, THIS EXHIBIT HAS THE SAME

03:52PM   7    ISSUE AS THE LAST ONE.  THERE ARE MULTIPLE LAYERS OF HEARSAY.

03:52PM   8              MR. BOSTIC:  AND IT'S OFFERED FOR THE SAME PURPOSE,

03:52PM   9    YOUR HONOR.

03:52PM  10              THE COURT:  NOTICE.  NOTICE AS TO?

03:52PM  11              MR. BOSTIC:  NOTICE AS TO WEBSITE CONTENT AND

03:52PM  12    POTENTIAL ISSUES WITH THE WEBSITE CONTENT.

03:52PM  13              THE COURT:  ALL RIGHT.  THANK YOU.

03:52PM  14         LADIES AND GENTLEMEN, THIS WILL BE ADMITTED NOT FOR THE

03:52PM  15    TRUTH OF THE MATTER ASSERTED, BUT SOLELY FOR THE ISSUE OF

03:52PM  16    NOTICE AS TO WEBSITE CONTENT AND ANY ISSUES THERETO, SOLELY FOR

03:52PM  17    THAT PURPOSE.

03:52PM  18         AND IT MAY BE PUBLISHED.

03:52PM  19         (GOVERNMENT'S EXHIBIT 3981 WAS RECEIVED IN EVIDENCE.)

03:53PM  20              MR. BOSTIC:  AND LET'S START BY ZOOMING IN ON THE

03:53PM  21    BOTTOM HALF OF PAGE 1.

03:53PM  22    Q.   DO YOU SEE, MR. EDLIN, AN EMAIL FROM SOMEONE NAMED

03:53PM  23    JAIME WOLSZON?

03:53PM  24    A.   YES.

03:53PM  25    Q.   AND DO YOU REMEMBER WHO JAMIE WOLSZON WAS IN RELATION TO

03:53PM  1      THERANOS?

03:53PM  2      A.   I BELIEVE SHE'S AN OUTSIDE COUNSEL.

03:53PM  3      Q.   AND SHE'S SENDING AN EMAIL TO SOMEONE NAMED KATE BEARDSLEY

03:53PM  4      WHOSE EMAIL ADDRESS IS @BEARDSLEYLAWPLLC.

03:53PM  5           DO YOU SEE THAT?

03:53PM  6      A.   YES.

03:53PM  7      Q.   AND THE EMAIL SAYS, "PLEASE FIND BELOW MY COMMENTS TO THE

03:53PM  8      THERANOS WEBSITE."

03:53PM  9           DO YOU SEE THAT?

03:53PM  10     A.   YES.

03:53PM  11     Q.   AND SHE WRITES A COUPLE OF SENTENCES LATER, "AS DISCUSSED,

03:53PM  12     THEY FALL WITHIN THE CATEGORIES OF SUBSTANTIATION FOR

03:53PM  13     SUPERLATIVE OR COMPARATIVE PERFORMANCE CLAIMS."

03:53PM  14          DO YOU SEE THAT?

03:53PM  15     A.   YES.

03:53PM  16     Q.   AND BEFORE WE LEAVE THIS PAGE, IF WE CAN JUST ZOOM IN ON

03:54PM  17     THE TOP HALF, AND DO YOU SEE THAT THE COMMENTS THAT WE ARE

03:54PM  18     ABOUT TO REVIEW WERE FORWARDED ON SEPTEMBER 6TH FROM MS. HOLMES

03:54PM  19     TO HER BROTHER AND TO SUNNY BALWANI?

03:54PM  20     A.   YES.

03:54PM  21     Q.   OKAY.  LET'S LOOK AT WHAT THOSE COMMENTS ARE.

03:54PM  22          LET'S GO TO PAGE 2 OF THE EXHIBIT.  AND LET'S ZOOM IN ON

03:54PM  23     THE TOP FIRST.

03:54PM  24          WE SEE HERE A BULLET POINT LIST OF COMMENTS TO THE WEBSITE

03:54PM  25     CONTENT; CORRECT?

03:54PM  1    A.   YES.

03:54PM  2    Q.   AND THE FIRST BULLET POINT SAYS, "PLEASE REMOVE REFERENCES

03:54PM  3    TO 'ALL' TESTS AND REPLACE WITH STATEMENTS SUCH AS 'MULTIPLE'

03:54PM  4    OR 'SEVERAL.'  IT IS HIGHLY UNLIKELY THAT THE LABORATORY CAN

03:54PM  5    PERFORM EVERY CONCEIVABLE TEST, BOTH FROM A LOGISTICAL

03:54PM  6    STANDPOINT AND BECAUSE THE CLIA CERTIFICATION DESIGNATES

03:54PM  7    SPECIFIC SPECIALTIES OF TESTS THE LAB PERFORMS."

03:55PM  8         DO YOU SEE THAT?

03:55PM  9    A.   YES.

03:55PM  10   Q.   AND THE SECOND BULLET HAS A SIMILAR COMMENT.  IT SAYS,

03:55PM  11   "FOR A SIMILAR REASON, REPLACE 'FULL RANGE' WITH 'BROAD

03:55PM  12   RANGE.'"

03:55PM  13        DO YOU SEE THAT?

03:55PM  14   A.   YES.

03:55PM  15   Q.   AND SITTING HERE TODAY, DO YOU RECALL WHAT THE THERANOS

03:55PM  16   WEBSITE ENDED UP SAYING ABOUT THE RANGE OF TESTS THAT COULD BE

03:55PM  17   PERFORMED?

03:55PM  18   A.   I DON'T REMEMBER THE SPECIFIC WORDING.

03:55PM  19   Q.   OKAY.  WE CAN COME BACK TO THAT.

03:55PM  20        LET'S GO DOWN IN THE SAME BULLET POINT LIST.

03:55PM  21        AND THERE'S A LINE THAT SAYS "REPLACE 'FASTER AND

03:55PM  22   EASIER.'"

03:55PM  23   A.   RIGHT.

03:55PM  24   Q.   IT SAYS, "REPLACE 'FASTER AND EASIER' WITH 'FAST AND

03:55PM  25   EASY.'"

EDLIN DIRECT BY MR. BOSTIC                                    2438

03:55PM  1        IS THIS A COMMENT SEEKING TO CHANGE ONE OF THOSE

03:55PM  2    SUPERLATIVE CLAIMS REFERENCED ON THE PREVIOUS PAGE?

03:55PM  3    A.   YES.

03:55PM  4    Q.   THERE'S ANOTHER COMMENT THAT SAYS, "REPLACE 'HIGHEST

03:55PM  5    QUALITY' WITH 'HIGH QUALITY.'"

03:55PM  6        DO YOU SEE THAT?

03:55PM  7    A.   YES.

03:55PM  8    Q.   AND THEN THERE'S ONE THAT SAYS, "ENSURE SUBSTANTIATION FOR

03:55PM  9    '4 HOURS OR LESS.'"

03:56PM  10       DO YOU SEE THAT?

03:56PM  11   A.   YES.

03:56PM  12   Q.   SITTING HERE TODAY, DO YOU KNOW WHETHER THESE CHANGES WERE

03:56PM  13   IN FACT MADE?

03:56PM  14   A.   I'M NOT SURE EXACTLY.

03:56PM  15   Q.   LET'S GO TO THE BOTTOM OF PAGE 2 AND ZOOM IN ON THE LAST

03:56PM  16   FEW BULLET POINTS -- ACTUALLY START A LITTLE HIGHER.  ACTUALLY

03:56PM  17   THE BOTTOM FIVE OR SO.

03:56PM  18       DO YOU SEE SOMETHING, MR. EDLIN, SOMETHING REFERENCING CV

03:56PM  19   AT THE SECOND BULLET POINT THERE?

03:56PM  20   A.   YES.

03:56PM  21   Q.   IT SAYS "A CV OF LESS THAN 10 PERCENT COULD STILL BE TOO

03:56PM  22   HIGH -- IT DEPENDS ON THE TEST."

03:56PM  23       DO YOU SEE THAT?

03:56PM  24   A.   YES.

03:56PM  25   Q.   AND IT SAYS, "REPLACE 'HIGHEST LEVELS OF ACCURACY' WITH

03:57PM  1    'HIGH LEVELS OF ACCURACY.'"

03:57PM  2        DO YOU SEE THAT?

03:57PM  3    A.   YES.

03:57PM  4    Q.   LET'S GO TO PAGE 3 AND SEE A COUPLE MORE OF THESE

03:57PM  5    COMMENTS, AND LET'S ZOOM IN ON THE TOP.  AND THE ADVICE TO

03:57PM  6    MS. HOLMES FORWARDED TO MR. BALWANI WAS TO, QUOTE, "CHANGE

03:57PM  7    'MORE PRECISE' TO 'PRECISE.'"

03:57PM  8        DO YOU SEE THAT IN THE THIRD BULLET POINT?

03:57PM  9    A.   YES.

03:57PM  10   Q.   AND LET'S GO TO PAGE 4 AND ZOOM IN ON THE TOP.

03:57PM  11       DO YOU SEE THE SECOND BULLET POINT READS, "ENSURE

03:57PM  12   SUBSTANTIATION FOR 'UNPRECEDENTED SPEED AND ACCURACY.'"

03:57PM  13       DO YOU SEE THAT ADVICE?

03:57PM  14   A.   YES.

03:57PM  15   Q.   AND LET'S LOOK AT THE BOTTOM OF THIS LIST.

03:57PM  16       AND DO YOU SEE THE SECOND TO THE BOTTOM CONTAINS THE

03:58PM  17   ADVICE TO MS. HOLMES AND MR. BALWANI TO REMOVE THE, QUOTE,

03:58PM  18   "UNRIVALLED ACCURACY"?

03:58PM  19       DO YOU SEE THAT?

03:58PM  20   A.   YES.

03:58PM  21   Q.   AND DO YOU KNOW WHETHER ANY OF THESE CHANGES WERE MADE TO

03:58PM  22   THE WEBSITE CONTENT?

03:58PM  23   A.   I DON'T RECALL SPECIFICALLY.

03:58PM  24   Q.   DO YOU KNOW WHETHER, SUBSEQUENT TO THIS TIME, MS. HOLMES

03:58PM  25   OR MR. BALWANI USED LANGUAGE SIMILAR TO THIS IN DESCRIBING THE

03:58PM 1    COMPANY'S TECHNOLOGY TO INVESTORS OF THE COMPANY?

03:58PM 2    A.   YES.

03:58PM 3    Q.   WHAT DO YOU KNOW ABOUT THAT?

03:58PM 4    A.   I RECALL THAT SOME OF THIS SAME TERMINOLOGY WAS USED IN

03:58PM 5    MATERIALS THAT WERE INCLUDED IN INVESTMENT BINDERS THAT WERE

03:58PM 6    SENT TO INVESTORS OR POTENTIAL INVESTORS.

03:58PM 7    Q.   THIS SAME LANGUAGE THAT THE DEFENDANT WAS ADVISED SHOULD

03:58PM 8    NOT BE ON THE WEBSITE?

03:58PM 9    A.   I'M NOT SURE IF IT REFERS TO ALL OF THE INFORMATION WE

03:58PM 10   JUST REVIEWED, BUT I DO RECALL THAT THERE IS AT LEAST SOME OF

03:59PM 11   THIS INFORMATION.

03:59PM 12   Q.   OKAY.  I'D LIKE TO TAKE A LOOK AT SOME OF THAT WITH YOU.

03:59PM 13        BUT THIS MIGHT BE A GOOD TIME TO BREAK FOR THE DAY,

03:59PM 14   YOUR HONOR.

03:59PM 15        THE COURT:  ALL RIGHT.  LET'S DO THAT.

03:59PM 16        LET'S BREAK -- WE'LL TAKE OUR LONG WEEKEND RECESS, LADIES

03:59PM 17   AND GENTLEMEN.

03:59PM 18        PLEASE RECALL THAT WE WILL NOT BE IN SESSION TOMORROW, NOR

03:59PM 19   FRIDAY.

03:59PM 20        WE WILL NEXT BE TOGETHER ON APRIL 12TH, APRIL 12TH AT

03:59PM 21   9:00 A.M.

03:59PM 22        I ONCE AGAIN REMIND YOU OF THE ADMONISHMENT.  PLEASE DO

03:59PM 23   NOT DISCUSS THIS CASE, LEARN ANYTHING ABOUT THIS, OR IN ANY WAY

03:59PM 24   COME ACROSS ANY INFORMATION ABOUT THIS CASE.

03:59PM 25        I'LL ASK YOU THAT QUESTION WHETHER ANY OF THOSE THINGS

03:59PM 1   OCCURRED WHEN WE NEXT GET TOGETHER ON THE 12TH.

03:59PM 2       LET ME ALSO TELL YOU THAT MY SENSE IS THAT ON THE 12TH WE

03:59PM 3   MIGHT HAVE A SEATING CHANGE.  AND, OF COURSE, I HAVE NOT TOLD

03:59PM 4   MS. ROBINSON THAT WE WILL DO THAT, BUT WHAT WE EXPECT TO DO IS

04:00PM 5   TO ALLOW OUR DEAR FRIENDS IN THE PEWS OUT THERE, IN THE

04:00PM 6   COMFORTABLE WOOD SEATS, TO MOVE INTO THE FIRST CLASS, BUSINESS

04:00PM 7   CLASS SECTION HERE, AND WE'LL ROTATE FOLKS DOWN ACCORDINGLY.

04:00PM 8       (LAUGHTER.)

04:00PM 9       THE COURT:  SO WE'LL COORDINATE ALL OF THAT NEXT

04:00PM 10  WEEK FOR YOU, BUT WE'LL START THAT NEXT WEEK.

04:00PM 11      SO HAVE A GREAT LONG WEEKEND.  ENJOY, AND WE'LL SEE YOU

04:00PM 12  SOON.  THANK YOU.  SEE YOU TUESDAY.

04:00PM 13      AND, MR. EDLIN, IF YOU COULD RETURN ON THE 12TH AT

04:00PM 14  9:00 A.M., THAT WOULD BE GREAT.

04:00PM 15      THE WITNESS:  YES, YOUR HONOR.

04:00PM 16      (JURY OUT AT 4:00 P.M.)

04:00PM 17      THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

04:00PM 18  YOU.

04:00PM 19      THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

04:01PM 20  WEEKEND, AND MR. EDLIN HAS LEFT THE COURTROOM.

04:01PM 21      COUNSEL AND MR. BALWANI ARE PRESENT.

04:01PM 22      I JUST WANTED TO INDICATE ON THE RECORD, THE COURT DID

04:01PM 23  ALLOW 291 TO COME IN, 259 TO COME IN, OVER -- I DO WANT TO

04:01PM 24  MEMORIALIZE MS. WALSH'S OBJECTIONS, AS WELL AS MEMORIALIZING

04:01PM 25  THE CONVERSATIONS THAT WE HAD PREVIOUSLY WITH COUNSEL REGARDING

2442

04:01PM 1    1237, WHICH WAS THE MOTION TO EXCLUDE THIS EVIDENCE.

04:01PM 2         THE COURT ALLOWED, AS THE RECORD REFLECTS, THIS TO COME IN

04:01PM 3    FOR A VERY LIMITED PURPOSE, A LIMITED PURPOSE OF KNOWLEDGE

04:01PM 4    ONLY, AS MR. BALWANI WAS A RECIPIENT, AMONGST OTHERS, OF AN

04:01PM 5    EMAIL THAT CONTAINED THAT.

04:01PM 6         IT WAS NOT ADMITTED FOR ANY OTHER PURPOSE, AND ANY OTHER

04:02PM 7    ADDITIONAL USE OF THAT INFORMATION HAS YET TO BE DETERMINED.

04:02PM 8         SO IT WAS ADMITTED SOLELY FOR THAT LIMITED PURPOSE OF

04:02PM 9    KNOWLEDGE.

04:02PM 10        IN DOING SO, THE COURT ALSO -- THERE WAS A 403 OBJECTION

04:02PM 11   BY MS. WALSH.

04:02PM 12        THE COURT FOUND, AND DOES FIND, THAT THE PROBATIVE VALUE

04:02PM 13   AS TO THE KNOWLEDGE ISSUE, AGAIN, THAT LIMITED KNOWLEDGE ISSUE,

04:02PM 14   OUTWEIGHS ANY PREJUDICIAL IMPACT, UNFAIR PREJUDICIAL IMPACT

04:02PM 15   THAT ADMISSION OF THAT EVIDENCE FOR THAT LIMITED PURPOSE

04:02PM 16   CARRIES.

04:02PM 17        SO I JUST WANTED TO SUBSTANTIATE THE COURT'S RULING ON

04:02PM 18   THAT NOW THAT WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

04:02PM 19        SO HAVE A GOOD WEEKEND EVERYONE.  WE'LL SEE YOU NEXT WEEK.

04:02PM 20   I THINK IT'S GOING TO BE WARM THIS WEEK, SO ENJOY, AND WE'LL

04:02PM 21   SEE YOU SOON.

04:02PM 22        THANK YOU.

04:02PM 23             MR. BOSTIC:  THANK YOU.

04:02PM 24             MR. SCHENK:  THANK YOU.

04:02PM 25             MR. CAZARES:  THANK YOU, YOUR HONOR.

ER-1721

2443

04:02PM   1          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

04:02PM   2          (COURT ADJOURNED AT 4:02 P.M.)

       3

       4

       5

       6

       7

       8

       9

      10

      11

      12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

ER-1722

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

   UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                    )
                    PLAINTIFF,       )   SAN JOSE, CALIFORNIA
7                                    )
             VS.                     )   APRIL 13, 2022
8                                    )
   RAMESH "SUNNY" BALWANI,           )   VOLUME 17
9                                    )
                    DEFENDANT.       )   PAGES 2465 - 2724
10   _____  )
                                         **SEALED PAGES** 2718 - 2724
11
                   TRANSCRIPT OF TRIAL PROCEEDINGS
12             BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
13
   A P P E A R A N C E S:
14
   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                        BY:  JOHN C. BOSTIC
                               JEFFREY B. SCHENK
16                        150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113
17
                          BY:  ROBERT S. LEACH
18                             KELLY VOLKAR
                          1301 CLAY STREET, SUITE 340S
19                        OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21   OFFICIAL COURT REPORTER:
                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                        CERTIFICATE NUMBER 8074

23
             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
24               TRANSCRIPT PRODUCED WITH COMPUTER

25

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2505

09:37AM   1          THANK YOU VERY MUCH, FOLKS.  THANK YOU FOR THAT.

09:37AM   2          DO WE HAVE THE WITNESS, MR. EDLIN HERE?

09:37AM   3             MR. BOSTIC:  YES, YOUR HONOR.

09:37AM   4             THE COURT:  GREAT.

09:37AM   5          GOOD MORNING, SIR.  IF YOU WOULD RESUME YOUR SEAT.  MAKE

09:37AM   6   YOURSELF COMFORTABLE AGAIN.

09:37AM   7          YOU CAN REMOVE YOUR MASK WHILE YOU TESTIFY.

09:37AM   8          WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:38AM   9   AGAIN, PLEASE.

09:38AM  10             THE WITNESS:  DANIEL EDLIN.

09:38AM  11             THE COURT:  THANK YOU, SIR.  I'LL REMIND YOU THAT

09:38AM  12   YOU'RE STILL UNDER OATH.

09:38AM  13             THE WITNESS:  THANK YOU, YOUR HONOR.

09:38AM  14          **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS PREVIOUSLY**

09:38AM  15   **SWORN.)**

09:38AM  16                **DIRECT EXAMINATION (RESUMED)**

09:38AM  17   BY MR. BOSTIC:

09:38AM  18   Q.  GOOD MORNING, MR. EDLIN.

09:38AM  19   A.  GOOD MORNING.

09:38AM  20   Q.  DO YOU RECALL WHEN WE LEFT OFF LAST WEEK WE WERE LOOKING

09:38AM  21   AT SOME COMMUNICATIONS WHERE MS. HOLMES AND MR. BALWANI WERE

09:38AM  22   RECEIVING SOME ADVICE ABOUT CLAIMS ON THE THERANOS WEBSITE?

09:38AM  23   A.  I DO.

09:38AM  24   Q.  LET'S GO BACK TO THAT JUST BRIEFLY.  CAN WE LOOK AT

09:38AM  25   EXHIBIT 3981.

ER-1724

09:38AM 1      THIS IS ALREADY ADMITTED.  MAY I PUBLISH, YOUR HONOR?

09:38AM 2           THE COURT:  YES.

09:38AM 3           MR. BOSTIC:  MS. WACHS, LET'S ZOOM IN ON THE BOTTOM

09:39AM 4  HALF OF THIS PAGE.

09:39AM 5  Q.   MR. EDLIN, DO YOU REMEMBER THIS EMAIL FORWARDING TO

09:39AM 6  MS. HOLMES SOME COMMENTS FROM HYMAN PHELPS AND SOMEONE NAMED

09:39AM 7  JAIME WOLSZON?

09:39AM 8  A.   RIGHT.

09:39AM 9  Q.   AND IF WE CAN ZOOM OUT AND CAPTURE THE TOP HALF OF THE

09:39AM 10 PAGE.

09:39AM 11      DO YOU SEE THAT ON SEPTEMBER 6TH, 2013, MS. HOLMES

09:39AM 12 FORWARDED THIS TO CHRISTIAN HOLMES, HER BROTHER, AND TO

09:39AM 13 SUNNY BALWANI; CORRECT?

09:39AM 14 A.   CORRECT.

09:39AM 15 Q.   AND CAN YOU REMIND US APPROXIMATELY WHEN DID THERANOS HAVE

09:39AM 16 ITS PUBLIC LAUNCH WHEN IT STARTED OFFERING SERVICES TO THE

09:39AM 17 PUBLIC?

09:39AM 18 A.   ABOUT A WEEK AFTER THIS EMAIL.

09:39AM 19 Q.   LET'S GO TO PAGE 2 OF THIS EXHIBIT.  IF WE CAN ZOOM IN ON

09:39AM 20 THE TOP HALF.

09:39AM 21      MR. EDLIN, DO YOU RECALL SEEING ADVICE LIKE WHAT APPEARS

09:40AM 22 ABOUT TWO-THIRDS DOWN THIS SELECTION WHERE IT SAYS, "REPLACE

09:40AM 23 'HIGHEST QUALITY' WITH 'HIGH QUALITY'"?

09:40AM 24 A.   YES.

09:40AM 25 Q.   AND THE SECOND BULLET DOWN FROM THE TOP IT READS, "FOR A

09:40AM 1    SIMILAR REASON," AS MENTIONED ABOVE, "REPLACE 'FULL RANGE' WITH

09:40AM 2    'BROAD RANGE.'"

09:40AM 3        DO YOU SEE THAT?

09:40AM 4    A.   I DO.

09:40AM 5    Q.   AND LET'S LOOK AT THE BOTTOM HALF OF THIS PAGE.

09:40AM 6        AND DO YOU SEE THAT THE THIRD UP FROM THE BOTTOM INCLUDES

09:40AM 7    THE ADVICE, "REPLACE 'HIGHEST LEVELS OF ACCURACY' WITH 'HIGH

09:40AM 8    LEVELS OF ACCURACY'"?

09:40AM 9    A.   YES.

09:40AM 10   Q.   I'D LIKE YOU TO LOOK AT ANOTHER DOCUMENT.  AND I'LL BE

09:40AM 11   HANDING YOU SOME ADDITIONAL MATERIALS TODAY.

09:40AM 12       MAY I APPROACH, YOUR HONOR?

09:40AM 13           THE COURT:  YES.

09:40AM 14           MR. BOSTIC:  (HANDING.)

09:41AM 15   Q.   MR. EDLIN, I'VE HANDED YOU WHAT HAS BEEN MARKED AS 5805.

09:41AM 16       DO YOU HAVE THAT IN FRONT OF YOU?

09:41AM 17   A.   YES.

09:41AM 18   Q.   AND HAVE YOU REVIEWED THIS DOCUMENT BEFORE?

09:41AM 19   A.   YES.

09:41AM 20   Q.   AND DO YOU RECOGNIZE WHAT IT IS?

09:41AM 21   A.   I DO.

09:41AM 22   Q.   WHAT IS 5805?

09:41AM 23   A.   THIS IS CONSISTENT WITH MY RECOLLECTION OF THE THERANOS

09:41AM 24   WEBSITE.

09:41AM 25   Q.   OKAY.  AND CAN YOU TELL US APPROXIMATELY WHAT TIME

09:41AM   1     PERIOD -- WELL, LET ME ASK, IN YOUR ROLE AT THERANOS, DID YOU

09:41AM   2     HAVE OCCASION TO REVIEW THE THERANOS WEBSITE?

09:41AM   3     A.   YES.

09:41AM   4     Q.   AND FOR WHAT REASON DID YOU REVIEW THE THERANOS WEBSITE

09:42AM   5     WHEN YOU WERE WORKING AT THE COMPANY?

09:42AM   6     A.   WELL, IT WAS THE COMPANY'S WEBSITE, SO I OFTENTIMES

09:42AM   7     CHECKED IT.  SOMETIMES I WAS PART OF A TEAM THAT WAS INVOLVED

09:42AM   8     WITH MAKING UPDATES TO THE WEBSITE, AND IN THOSE INSTANCES I

09:42AM   9     CHECKED THE WEBSITE AS WELL.

09:42AM   10    Q.   AND IN THE COURSE OF THAT, DID YOU BECOME GENERALLY

09:42AM   11    FAMILIAR WITH THE CONTENT OF THE WEBSITE?

09:42AM   12    A.   YES.

09:42AM   13    Q.   AND DOES EXHIBIT 5805 REFLECT THAT CONTENT?  IS IT

09:42AM   14    CONSISTENT WITH YOUR RECOLLECTION?

09:42AM   15    A.   IT IS.

09:42AM   16          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5805.

09:42AM   17          MS. WALSH:  NO OBJECTION.

09:42AM   18          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:42AM   19      (GOVERNMENT'S EXHIBIT 5805 WAS RECEIVED IN EVIDENCE.)

09:42AM   20          MR. BOSTIC:  AND, YOUR HONOR, AS TO THIS DOCUMENT,

09:42AM   21    I'VE RUN THIS BY THE DEFENSE, WE WOULD LIKE TO PUBLISH A NATIVE

09:42AM   22    VERSION OF THIS PDF.  IT'S THE SAME CONTENT, BUT IT WILL BE

09:43AM   23    MORE LEGIBLE ON THE SCREEN.

09:43AM   24          THE COURT:  THAT'S FINE.

09:43AM   25    BY MR. BOSTIC:

09:43AM  1    Q.   MR. EDLIN, DO YOU SEE HERE THAT THIS IS A VERSION OF THE

09:43AM  2    THERANOS WEBSITE FROM THE WAYBACK MACHINE AS INDICATED AT THE

09:43AM  3    TOP OF THE PAGE?

09:43AM  4         DO YOU SEE THAT?

09:43AM  5    A.   YES.

09:43AM  6    Q.   AND AT THE UPPER RIGHT HAND OF THE PAGE THERE'S A DATE

09:43AM  7    INDICATED FEBRUARY 8TH, 2014.

09:43AM  8         DO YOU SEE THAT?

09:43AM  9    A.   I DO.

09:43AM  10   Q.   IS THERE ANYTHING ABOUT THE APPEARANCE OF THIS WEBSITE

09:43AM  11   THAT IS CONSISTENT WITH THAT DATE BASED ON YOUR RECOLLECTION?

09:43AM  12   A.   WELL, I CAN SEE THAT THE THERANOS LOGO IS A VERSION THAT I

09:43AM  13   BELIEVE WAS THE LOGO AT THE TIME.  I KNOW THAT IT WAS CHANGED

09:43AM  14   AT SOME POINT LATER ON.

09:43AM  15   Q.   AND THE VERSION OF THE LOGO THAT WE'RE LOOKING AT IS

09:43AM  16   CONSISTENT WITH THE EARLIER VERSION OF THE LOGO?

09:44AM  17   A.   THERE WAS A VERSION OF THE LOGO WHEN I FIRST JOINED THE

09:44AM  18   COMPANY IN 2011, AND THEN IT CHANGED TO THIS VERSION, AND THEN

09:44AM  19   THERE WAS A THIRD.

09:44AM  20   Q.   LET'S LOOK AT SOME OF THE CONTENT ON THE THERANOS WEBSITE

09:44AM  21   AT THIS TIME.

09:44AM  22        IF WE CAN ZOOM OUT TO CAPTURE MORE OF THIS PAGE, AND THEN

09:44AM  23   UNDER WHERE IT SAYS, "THE LAB TEST, REINVENTED," LET'S ZOOM IN

09:44AM  24   ON THAT LANGUAGE.

09:44AM  25        AND, MR. EDLIN, DO YOU SEE -- AND JUST BEAR WITH US.

ER-1728

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2510

09:44AM   1          DO YOU SEE AT THE LOWER LEFT-HAND CORNER OF THE PAGE IT

09:44AM   2   SAYS, "THE LAB TEST, REINVENTED"?

09:44AM   3          AND IT READS, "NO BIG NEEDLES.  NO ENDLESS WAITING.  WE'VE

09:44AM   4   BUILT A WHOLE NEW APPROACH TO GETTING YOU ANSWERS"?

09:44AM   5   A.   YES.

09:44AM   6   Q.   AND LET'S GO TO THE SECOND PAGE OF THIS WEBSITE.

09:45AM   7          LET'S SEE.  A LITTLE FURTHER DOWN.  THERE'S A SECTION WITH

09:45AM   8   A HEADING "ONE DROP.  A WORLD OF ANSWERS."

09:45AM   9          CAN WE MAKE THAT A LITTLE LARGER, MS. WACHS.

09:45AM  10          DO YOU SEE, MR. EDLIN, THERE'S TEXT THERE THAT SAYS, "OUR

09:45AM  11   LABORATORY CAN PRECISELY ANALYZE TINY SAMPLES.  A FEW DROPS ARE

09:45AM  12   ALL WE NEED TO PERFORM MOST TESTS.  SO NOW, YOU CAN HAVE YOUR

09:45AM  13   LABS -- FROM BLOOD, URINE, FLUIDS, AND MORE -- DONE QUICKLY,

09:45AM  14   EASILY, AND ACCURATELY."

09:45AM  15          DO YOU SEE THAT?

09:45AM  16   A.   YES.

09:45AM  17   Q.   LET'S GO A LITTLE FURTHER DOWN.  LET'S SEE.  UNDER A "A

09:45AM  18   FULL RANGE OF TESTS," DO YOU SEE THERE'S A SECTION THAT SAYS "A

09:45AM  19   FULL RANGE OF TESTS.  A FRACTION OF THE COST"?

09:45AM  20   A.   YES.

09:45AM  21   Q.   AND THEN THERE'S TEXT THAT SAYS, "WE OFFER A FULL RANGE OF

09:45AM  22   LABORATORY TESTS, FROM COMMON PANELS TO SPECIALIZED TESTS.  ALL

09:45AM  23   WITH SPEED AND THE HIGHEST LEVELS OF QUALITY."

09:46AM  24          DO YOU SEE THAT?

09:46AM  25   A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                    2511

09:46AM  1    Q.   AND I WANT TO ASK YOU ABOUT THAT PHRASE "HIGHEST LEVELS OF

09:46AM  2    QUALITY."

09:46AM  3         FIRST OF ALL, DO YOU RECALL SEEING THAT PHRASE IDENTIFIED

09:46AM  4    ON THE DOCUMENT WITH ADVICE THAT WE WERE JUST LOOKING AT

09:46AM  5    BEFORE?

09:46AM  6    A.   YES.

09:46AM  7    Q.   WE ALSO SAW ON THAT DOCUMENT MENTION OF THE PHRASE

09:46AM  8    "HIGHEST LEVELS OF ACCURACY."

09:46AM  9         DO YOU RECALL THAT?

09:46AM  10   A.   YES.

09:46AM  11   Q.   DO YOU RECALL ANY DISCUSSIONS WHEN YOU WERE AT THERANOS

09:46AM  12   ABOUT THE TERM "QUALITY" VERSUS THE TERM "ACCURACY"?

09:46AM  13   A.   VAGUELY.

09:46AM  14   Q.   WHAT DO YOU REMEMBER ABOUT THAT?

09:46AM  15   A.   I REMEMBER THERE WERE DISCUSSIONS ABOUT WHAT WORDING TO

09:46AM  16   USE TO DESCRIBE AFTER SEEING "QUALITY."

09:46AM  17   Q.   AND IN THOSE DISCUSSIONS WAS THERE A DIFFERENCE BETWEEN

09:46AM  18   HOW QUALITY WAS BEING USED AND HOW ACCURACY WAS BEING USED?

09:46AM  19   A.   I DON'T RECALL.

09:46AM  20   Q.   DURING YOUR TIME AT THERANOS AND IN THIS CONTEXT, WAS

09:46AM  21   THERE A MEANING FOR THE TERM "QUALITY" THAT MEANT SOMETHING

09:47AM  22   OTHER THAN ACCURACY AND RELIABILITY OF TESTS?

09:47AM  23            MS. WALSH:  OBJECTION.  LEADING.

09:47AM  24            THE COURT:  SUSTAINED.

09:47AM  25   BY MR. BOSTIC:

ER-1730

09:47AM 1    Q.   MR. EDLIN, DID THE TERM "QUALITY" AT THERANOS, IN YOUR

09:47AM 2    EXPERIENCE, HAVE A SPECIAL OR UNIQUE MEANING?

09:47AM 3    A.   NOT THAT I WAS AWARE OF.

09:47AM 4    Q.   AND AS IT WAS USED IN THIS CONTEXT, WAS IT EQUIVALENT TO

09:47AM 5    OR WAS IT DIFFERENT FROM ACCURACY AND RELIABILITY?

09:47AM 6    A.   I THINK IT WAS SIMILAR.

09:47AM 7    Q.   LET'S GO TO PAGE 3 OF THE EXHIBIT.  LET'S SEE.

09:47AM 8        THERE'S A HEADING THAT READS, "A FEW DROPS IS ALL IT

09:48AM 9    TAKES."

09:48AM 10       DO YOU SEE THAT?

09:48AM 11   A.   YES.

09:48AM 12   Q.   AND THERE THE WEBSITE READS, "THERANOS'S PATENTED

09:48AM 13   TECHNOLOGY CAN ANALYZE SAMPLES AS SMALL AS 1/1,000 THE SIZE OF

09:48AM 14   A TYPICAL BLOOD DRAW.  OUR TESTS ARE CERTIFIED IN OUR CLIA

09:48AM 15   LABORATORY AND COVER A FULL RANGE FROM BLOOD, URINE, AND OTHER

09:48AM 16   SAMPLES.  IT'S FAST, EASY, AND THE HIGHEST LEVEL OF QUALITY."

09:48AM 17       SO WE SEE AGAIN THAT "HIGHEST LEVEL OF QUALITY" LANGUAGE

09:48AM 18   APPEARING?

09:48AM 19   A.   RIGHT.

09:48AM 20   Q.   AND LET'S GO DOWN ON THE SAME PAGE.

09:48AM 21       I THINK THERE'S A SECTION THAT BEGINS "HIGH LEVELS OF

09:48AM 22   PRECISION."

09:48AM 23       DO YOU SEE THAT?

09:48AM 24   A.   YES.

09:48AM 25   Q.   AND THERE THE TEXT SAYS, "BY SYSTEMATICALLY CONTROLLING

EDLIN DIRECT BY MR. BOSTIC (RES.)                    2513

09:48AM  1    AND STANDARDIZING OUR MICRO-PROCESSES, WE OFFER TESTS WITH HIGH

09:48AM  2    LEVELS OF PRECISION."

09:48AM  3        DO YOU SEE THAT?

09:48AM  4    A.   YES.

09:48AM  5    Q.   AND THEN IT SAYS, "WE'VE ALSO AUTOMATED OUR PRE- AND

09:49AM  6    POST-ANALYTIC PROCESSES, MINIMIZING HUMAN PROCESSING -- THE

09:49AM  7    CAUSE OF THE MAJORITY OF LAB-TEST ERRORS."

09:49AM  8        DID I READ THAT CORRECTLY?

09:49AM  9    A.   YES.

09:49AM 10    Q.   AND WHEN YOU WERE AT THE COMPANY, DID YOU HAVE A BASIS TO

09:49AM 11    KNOW WHETHER CLAIMS LIKE THIS WERE TRUE OR FALSE?

09:49AM 12    A.   I HAD NO BASIS TO KNOW, BUT I HAD NO REASON TO DOUBT THAT

09:49AM 13    THE CLAIMS WERE ACCURATE.

09:49AM 14    Q.   LET'S GO TO PAGE 6 NEXT.

09:49AM 15        AND ACTUALLY, GOING BACK UP TO THAT FIRST BLOCK OF TEXTS

09:49AM 16    UNDER "INNOVATION MEETS ACCESSIBILITY."

09:49AM 17        DO YOU SEE HERE THE WEBSITE CLAIMS THAT "BECAUSE WE

09:49AM 18    BELIEVE EVERYONE DESERVES ACCESS TO THE BEST TECHNOLOGY, THE

09:49AM 19    BEST SCIENCE, AND THE BEST TOOLS TO HELP THEM AND THEIR DOCTOR

09:49AM 20    KNOW MORE ABOUT THEIR HEALTH"?

09:49AM 21    A.   I SEE THAT, YES.

09:50AM 22    Q.   LET'S GO TO PAGE 21 NEXT.

09:50AM 23        AND UNDER THAT SECTION THAT SAYS, "WELCOME TO THERANOS,"

09:50AM 24    DO YOU SEE THERE'S LANGUAGE THAT SAYS, "THERANOS'S LABORATORY

09:50AM 25    CAN ANALYZE SMALLER SAMPLES THAN PREVIOUSLY POSSIBLE, WITH

09:50AM   1      SPEED AND THE HIGHEST LEVELS OF ACCURACY"?

09:50AM   2          DO YOU SEE THAT?

09:50AM   3      A.   YES.

09:50AM   4      Q.   THAT LANGUAGE, "THE HIGHEST LEVELS OF ACCURACY," IS THAT

09:50AM   5      THE SAME LANGUAGE THAT WE SAW MS. HOLMES AND MR. BALWANI BEING

09:50AM   6      ADVISED AGAINST USING EARLIER?

09:50AM   7      A.   I BELIEVE SO.

09:50AM   8      Q.   AND AGAIN, IN THE BOTTOM OF THAT SECTION, DO YOU SEE

09:50AM   9      THERE'S ANOTHER REFERENCE TO "THE HIGHEST-QUALITY LAB TESTING"?

09:50AM  10      A.   YES.

09:50AM  11      Q.   OKAY.  FINALLY, LET'S GO TO PAGE 22.  IF WE CAN MOVE OVER

09:51AM  12      A LITTLE BIT.

09:51AM  13          SO UNDER THIS BLOCK OF TEXT THERE'S A HEADING "ONE TINY

09:51AM  14      DROP.  THOUSANDS OF ANSWERS."

09:51AM  15          DO YOU SEE THAT?

09:51AM  16      A.   YES.

09:51AM  17      Q.   AND THE LANGUAGE HERE SAYS, "THERANOS CAN PERFORM A FULL

09:51AM  18      RANGE OF TESTS ON SAMPLES AS SMALL AS A FEW TINY DROPS."

09:51AM  19          DO YOU SEE THAT?

09:51AM  20      A.   YES.

09:51AM  21      Q.   AND THEN SKIPPING DOWN A LITTLE BIT.  DO YOU SEE THERE'S

09:51AM  22      LANGUAGE THAT SAYS, "AND WE PROVIDE THE HIGHEST LEVEL OF

09:51AM  23      OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN BOTH OUR PRE- AND

09:51AM  24      POST-ANALYTIC PROCESSES, TO REALIZE THE HIGHEST LEVEL OF

09:51AM  25      ACCURACY AND PRECISION"?

09:51AM   1          DO YOU SEE THAT?

09:51AM   2     A.   YES.

09:51AM   3     Q.   OKAY.  YOU CAN PUT THAT EXHIBIT ASIDE.  THANK YOU.

09:51AM   4          BESIDES THE PUBLIC THERANOS WEBSITE, DID THE COMPANY ALSO

09:52AM   5     MARKET TO PATIENTS USING BROCHURES AND OTHER MARKETING

09:52AM   6     MATERIALS?

09:52AM   7     A.   YES.

09:52AM   8     Q.   AND DID YOU HAVE ANY ROLE IN CONNECTION WITH DEVELOPING

09:52AM   9     AND REVIEWING THE CONTENT FOR THOSE MATERIALS?

09:52AM  10     A.   I HAD A ROLE IN FACILITATING THE REVIEW AND APPROVAL AND

09:52AM  11     THE INVESTMENT OF THOSE MATERIALS.

09:52AM  12     Q.   DESCRIBE THAT.  WHAT DID YOUR ROLE ACTUALLY REQUIRE YOU TO

09:52AM  13     DO?

09:52AM  14     A.   IN MY ROLE I WORKED WITH TBWACHIAT/DAY.  IN PARTNERSHIP

09:52AM  15     WITH THEIR ACCOUNT MANAGERS CHIAT/DAY DEVELOPED CONTENT, AND I

09:52AM  16     MADE SURE THAT THAT CONTENT WAS REVIEWED AND APPROVED BY SUNNY

09:52AM  17     AND ELIZABETH IN A TIMELY FASHION, AND THEN SENT BACK TO

09:52AM  18     CHIAT/DAY.

09:52AM  19     Q.   DID YOU COME TO UNDERSTAND IN THAT ROLE WHAT KIND OF

09:52AM  20     APPROVAL WAS NECESSARY FOR THAT MARKETING CONTENT?

09:52AM  21     A.   ELIZABETH AND SUNNY'S APPROVAL.

09:53AM  22     Q.   DID YOU EVER OBSERVE SITUATIONS WHERE -- FIRST OF ALL, LET

09:53AM  23     ME ASK JUST SO IT'S CLEAR, WHAT WAS CHIAT/DAY?

09:53AM  24     A.   A MARKETING AND ADVERTISING AGENCY THAT THERANOS WORKED

09:53AM  25     WITH.

09:53AM  1     Q.   INDEPENDENT FROM THERANOS?

09:53AM  2     A.   YES.

09:53AM  3     Q.   DID YOU EVER OBSERVE AN INSTANCE WHERE CHIAT/DAY WAS ABLE

09:53AM  4     TO MAKE THE DECISION ON ITS OWN ABOUT WHO WOULD APPEAR IN ITS

09:53AM  5     MARKETING DOCUMENTATION?

09:53AM  6     A.   NO.  IT REQUIRES APPROVAL.

09:53AM  7     Q.   AND IN REQUIRING APPROVAL FROM THERANOS, WAS THERE ANYONE

09:53AM  8     AT THE COMPANY BESIDES MS. HOLMES AND MR. BALWANI WHO HAD THE

09:53AM  9     AUTHORITY TO PROVIDE THAT APPROVAL FOR THE MARKETING MATERIALS?

09:53AM 10     A.   NO.

09:53AM 11     Q.   HOW ABOUT YOU, WERE YOU EXERCISING YOUR JUDGMENT IN

09:53AM 12     DECIDING WHAT THESE DOCUMENTS WOULD SAY?

09:53AM 13     A.   NO.

09:53AM 14     Q.   IN DOING THAT WORK, DID YOU BECOME GENERALLY FAMILIAR WITH

09:54AM 15     THE CONTENT OF THE BROCHURES AND MARKETING MATERIALS?

09:54AM 16     A.   I DID.

09:54AM 17     Q.   OKAY.  I'D LIKE TO SHOW YOU ANOTHER DOCUMENT.

09:54AM 18          MAY I APPROACH, YOUR HONOR?

09:54AM 19               THE COURT:  YES.

09:54AM 20               MR. BOSTIC:  (HANDING.)

09:54AM 21     Q.   MR. EDLIN, DO YOU HAVE EXHIBIT 5804 IN FRONT OF YOU?

09:54AM 22     A.   YES.

09:54AM 23     Q.   AND IS 5804 A 2013 SEPTEMBER 9TH EMAIL FROM

09:54AM 24     CHRISTIAN HOLMES TO INDIVIDUALS AT WALGREENS?

09:55AM 25     A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                            2517

09:55AM   1    Q.   DO YOU RECOGNIZE THE NAMES OF THE INDIVIDUALS AT

09:55AM   2    WALGREENS?

09:55AM   3    A.   I RECOGNIZE ONE NAME.

09:55AM   4    Q.   AND IS THAT NAME A NAME OF SOMEONE THAT YOU HAD CONTACT

09:55AM   5    WITH IN THIS ROLE AT THERANOS WHEN YOU WORKED THERE?

09:55AM   6    A.   YES.

09:55AM   7    Q.   AND CAN YOU DESCRIBE, IN CONNECTION WITH THE BROCHURE AND

09:55AM   8    MARKETING MATERIALS THAT WE'RE TALKING ABOUT, WHAT WAS

09:55AM   9    CHRISTIAN HOLMES'S ROLE?

09:55AM   10   A.   CHRISTIAN WAS THE TEAM LEAD FOR THE PRODUCT MANAGEMENT

09:55AM   11   TEAM, AND HE WAS THE MAIN POINT OF CONTACT WHO INTERFACED WITH

09:55AM   12   WALGREENS.

09:55AM   13   Q.   AND I'LL ASK YOU TO LOOK AT PAGE 3 OF THE EXHIBIT, PLEASE.

09:56AM   14        TELL ME IF YOU RECOGNIZE THE DOCUMENT THAT STARTS AT

09:56AM   15   PAGE 3?

09:56AM   16   A.   I DO.

09:56AM   17   Q.   WHAT IS IT?

09:56AM   18   A.   IT IS A MECHANICAL FOR THE BROCHURE, PATIENT BROCHURE.

09:56AM   19   Q.   AND WHAT DOES THAT MEAN, "A MECHANICAL"?

09:56AM   20   A.   IT'S ESSENTIALLY A DRAFT OF THE BROCHURE BEFORE IT GETS

09:56AM   21   PRINTED.

09:56AM   22             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5804.

09:56AM   23             MS. WALSH:  OBJECTION, YOUR HONOR.  HEARSAY.

09:56AM   24        THIS WITNESS IS NOT ON THIS EMAIL, AND IT CONTAINS HEARSAY

09:56AM   25   WITHIN.

ER-1736

EDLIN DIRECT BY MR. BOSTIC (RES.)                    2518

09:56AM   1        MR. BOSTIC:  SO, YOUR HONOR, THE PARTIES'

09:56AM   2   STIPULATION COVERS THIS DOCUMENT AS TO AUTHENTICATION, AND I

09:56AM   3   BELIEVE THIS WITNESS HAS LAID A FOUNDATION FOR ITS ADMISSION.

09:56AM   4        THE COURT:  ALL RIGHT.  THANK YOU.  I'LL OVERRULE

09:56AM   5   THE OBJECTION.  THIS IS ADMITTED.

09:56AM   6     (GOVERNMENT'S EXHIBIT 5804 WAS RECEIVED IN EVIDENCE.)

09:57AM   7        MR. BOSTIC:  MAY WE PUBLISH, YOUR HONOR?

09:57AM   8        THE COURT:  YES.

09:57AM   9        MR. BOSTIC:  IF WE CAN DISPLAY 5804.

09:57AM  10     I THINK WE NEED TO RESET THE SYSTEM PERHAPS.

09:57AM  11        THE CLERK:  SURE.

09:57AM  12     (PAUSE IN PROCEEDINGS.)

09:58AM  13        MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

09:58AM  14        THE COURT:  YES.

09:58AM  15     (PAUSE IN PROCEEDINGS.)

09:58AM  16        MR. BOSTIC:  SO I THINK WE'RE DISPLAYING IT, BUT

09:58AM  17   IT'S NOT COMING UP ON THE SCREEN FOR SOME REASON.

09:58AM  18        THE CLERK:  DO YOU WANT TO USE THE ELMO?

09:58AM  19        MR. BOSTIC:  WE CAN.

09:58AM  20     SO, YOUR HONOR, I'LL TRY DISPLAYING THIS ON THE ELMO, AND

09:58AM  21   WE'LL SEE IF THE RESOLUTION IS GOOD ENOUGH.

09:58AM  22        THE COURT:  SURE.

09:58AM  23   BY MR. BOSTIC:

09:58AM  24   Q.  FIRST OF ALL, MR. EDLIN, DO YOU SEE THAT WE'RE LOOKING AT

09:58AM  25   AN EMAIL FROM CHRISTIAN HOLMES TO INDIVIDUALS AT WALGREENS?

ER-1737

09:58AM  1    A.   YES.

09:58AM  2    Q.   AND DO YOU SEE THAT THE TEXT OF HIS EMAIL SAYS, "ATTACHED

09:58AM  3    IS THE UPDATED BROCHURE MECHANICAL."

09:59AM  4         AND THEN IT SAYS, "PLEASE USE THIS VERSION FOR ADDITIONAL

09:59AM  5    ROUNDS OF BROCHURES TO BE DELIVERED TO STORES, AND HOPEFULLY IN

09:59AM  6    THE NEAR TERM."

09:59AM  7         IT SAYS, "WE WENT AHEAD AND PRINTED A FEW HUNDRED OF THESE

09:59AM  8    TO PUT IN THE STORES UNTIL THE NEW BATCH ARRIVES FROM YOUR

09:59AM  9    END."

09:59AM  10        DO YOU SEE THAT LANGUAGE?

09:59AM  11   A.   YES.

09:59AM  12   Q.   OKAY.  LET'S SEE IF WE CAN CAPTURE THE CONTENT.

09:59AM  13        DO YOU SEE WHAT IS DISPLAYED ON THE SCREEN NOW?

09:59AM  14   A.   YES.

09:59AM  15   Q.   AND IS THIS WHAT YOU IDENTIFIED BEFORE AS THE ACTUAL

09:59AM  16   BROCHURE ITSELF?

09:59AM  17   A.   I THINK I IDENTIFIED IT AS THE MECHANICAL FOR THE

09:59AM  18   BROCHURE.

09:59AM  19   Q.   AND DOES THE MECHANICAL FOR THE BROCHURE HAVE THE SAME

10:00AM  20   CONTENT?

10:00AM  21   A.   YES.

10:00AM  22   Q.   LET'S SEE.  I'LL DRAW YOUR ATTENTION TO ONE SECTION THAT

10:00AM  23   READS, "ONE TINY DROP CHANGES EVERYTHING."

10:00AM  24        DO YOU SEE THAT?

10:00AM  25   A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2520

10:00AM   1    Q.   AND THEN UNDERNEATH THERE'S LANGUAGE THAT SAYS, "AT

10:00AM   2    THERANOS, WE'RE CHANGING LAB TESTING FOREVER.  AS THE WORLD'S

10:00AM   3    FIRST AND ONLY CLIA-CERTIFIED LABORATORY CAPABLE OF RUNNING ALL

10:00AM   4    OF ITS TESTS ON MICRO-SAMPLES, WE CAN PERFORM OUR TESTS ON TINY

10:00AM   5    SAMPLE AMOUNTS."

10:00AM   6         DO YOU SEE THAT?

10:00AM   7    A.   YES.

10:00AM   8    Q.   LET'S SEE.  I'LL SHOW YOU ANOTHER SECTION.

10:00AM   9         DO YOU SEE HERE IT SAYS, "ONE DROP.  A WORLD OF ANSWERS"?

10:00AM  10    A.   YES.

10:00AM  11    Q.   AND UNDER THAT SECTION DO YOU SEE IT READS, "WITH

10:01AM  12    THERANOS, ALL WE NEED IS A TINY SAMPLE"?

10:01AM  13    A.   YES.

10:01AM  14    Q.   AND IT THEN SAYS, "AND FROM THAT SAMPLE, WE CAN PERFORM

10:01AM  15    THE FULL RANGE OF TESTS."

10:01AM  16         DO YOU SEE THAT?

10:01AM  17    A.   YES.

10:01AM  18    Q.   I'LL SHOW YOU THE NEXT PAGE OF THIS BROCHURE.

10:01AM  19         ARE WE LOOKING AT NOW AN ADDITIONAL PAGE OF CONTENT FOR

10:01AM  20    THIS PATIENT BROCHURE?

10:01AM  21    A.   YES.

10:01AM  22    Q.   BY THE WAY, DO YOU KNOW FROM YOUR WORK ON THE WALGREENS

10:01AM  23    ROLLOUT HOW THIS WAS DISTRIBUTED OR WHERE IT WAS PLACED?

10:01AM  24    A.    IT WAS PLACED IN THERANOS WELLNESS CENTERS WITHIN

10:01AM  25    WALGREENS STORES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                2521

10:01AM   1    Q.   AND WHO WAS THE INTENDED AUDIENCE FOR THIS BROCHURE?

10:01AM   2    A.   GUESTS OR PATIENTS WHO CAME IN TO GET LAB TESTING.

10:02AM   3    Q.   ON PAGE 4 OF THE EXHIBIT, SO THE SECOND PAGE OF THIS

10:02AM   4    BROCHURE, THERE'S A HEADING THAT SAYS, "BETTER ANSWERS,

10:02AM   5    FASTER."

10:02AM   6         DO YOU SEE THAT?

10:02AM   7    A.   YES.

10:02AM   8    Q.   AND THERE'S A CLAIM UNDERNEATH IT THAT SAYS, "BY

10:02AM   9    AUTOMATING OUR PRE- AND POST-ANALYTIC PROCESSES, WE DRASTICALLY

10:02AM  10    MINIMIZE HUMAN PROCESSING -- THE CAUSE OF THE MAJORITY OF LAB

10:02AM  11    TEST ERRORS.  BY STANDARDIZING OUR PROCESSES, WE OFFER TESTS

10:02AM  12    WITH THE HIGHEST LEVELS OF ACCURACY."

10:02AM  13         DO YOU SEE THAT?

10:02AM  14    A.   YES.

10:02AM  15    Q.   OKAY.  YOU CAN SET THAT ASIDE.  THANK YOU.

10:02AM  16         DO YOU RECALL DURING YOUR TIME AT THERANOS, AN ARTICLE

10:02AM  17    BEING WRITTEN BY SOMEONE NAMED JOSEPH RAGO AT "THE

10:03AM  18    WALL STREET JOURNAL"?

10:03AM  19    A.   YES.

10:03AM  20    Q.   AND CAN I ASK YOU TO LOOK AT THE BINDER IN FRONT OF YOU AT

10:03AM  21    TAB 1090.

10:03AM  22    A.   OKAY.

10:03AM  23    Q.   AND AT 1090, DO YOU SEE AN EMAIL FROM JEFFRY BLICKMAN TO

10:03AM  24    MR. BALWANI, MS. HOLMES, CHRISTIAN HOLMES, AND YOU AT THERANOS?

10:03AM  25    A.   YES.

10:03AM  1      Q.   AND IS THAT EMAIL DATED SEPTEMBER 2013 -- OR SORRY,

10:03AM  2      SEPTEMBER 6TH, 2013?

10:03AM  3      A.   YES.

10:03AM  4      Q.   AND DOES THIS RELATE TO THE CONTENT OF THAT ARTICLE?

10:03AM  5      A.   YES.

10:03AM  6               MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1090.

10:04AM  7               MS. WALSH:  OBJECTION.  HEARSAY WITHIN HEARSAY.

10:04AM  8               MR. BOSTIC:  SO, YOUR HONOR, THIS ARTICLE ITSELF IS

10:04AM  9      ALREADY ADMITTED AS EXHIBIT 1106.

10:04AM 10          THE PURPOSE OF THIS EXHIBIT IS TO SHOW MR. BALWANI'S

10:04AM 11      REVIEW OF THE CONTENT BEFORE IT WAS PUBLISHED.

10:04AM 12               THE COURT:  ALL RIGHT.  THANK YOU.

10:04AM 13          THE OBJECTION IS OVERRULED.  THIS IS ADMITTED, AND IT MAY

10:04AM 14      BE PUBLISHED.

10:04AM 15          (GOVERNMENT'S EXHIBIT 1106 WAS RECEIVED IN EVIDENCE.)

10:04AM 16               MR. BOSTIC:  LET'S ZOOM IN ON THE BOTTOM HALF OF

10:04AM 17      THIS PAGE, PLEASE.

10:04AM 18      Q.   MR. EDLIN, DO YOU SEE THAT THIS EMAIL STARTS WITH AN EMAIL

10:04AM 19      FROM JOE RAGO?

10:04AM 20      A.   YES.

10:04AM 21      Q.   AND WHO WAS JOE RAGO?

10:05AM 22      A.   HE WAS A REPORTER OR A WRITER FOR "THE

10:05AM 23      WALL STREET JOURNAL."

10:05AM 24      Q.   AND IN THIS EMAIL ON SEPTEMBER 6TH HE WRITES TO MS. HOLMES

10:05AM 25      AND JEFFRY BLICKMAN AT THERANOS.

EDLIN DIRECT BY MR. BOSTIC (RES.)                              2523

10:05AM  1          DO YOU SEE THAT?

10:05AM  2     A.   YES.

10:05AM  3     Q.   AND THE SUBJECT LINE IS READBACK.

10:05AM  4          HE SAYS, "DEEPLY SORRY FOR THE DELAY, COULDN'T BE HELPED

10:05AM  5     ON MY END, BUT PLEASE FIND BELOW ALL THE QUOTES WE PLAN TO USE

10:05AM  6     IN THE INTERVIEW, MY PARAPHRASES AND ALL FACTUAL STATEMENTS

10:05AM  7     ABOUT THERANOS."

10:05AM  8          DO YOU SEE THAT?

10:05AM  9     A.   YES.

10:05AM  10    Q.   LET'S GO UP TO -- SORRY.  LET ME JUST GO DOWN TO THE

10:05AM  11    SECOND PARAGRAPH IN THIS EMAIL.

10:05AM  12         IT SAYS, "IF ANY POINTS NEED TO BE CLARIFIED, IF I'VE

10:05AM  13    EXPLAINED SOMETHING INCOMPLETELY OR LEFT OUT SOMETHING

10:05AM  14    IMPORTANT, OR OF COURSE IF THERE'S AN OUT AND OUT ERROR PLEASE

10:05AM  15    LET ME KNOW AND WE'LL CORRECT."

10:05AM  16         DO YOU SEE THAT?

10:05AM  17    A.   YES.

10:05AM  18    Q.   AND LET'S ZOOM OUT AND ZOOM IN ON THE TOP HALF OF THIS

10:06AM  19    PAGE.

10:06AM  20         AND WE SEE HERE A MESSAGE FROM JEFF BLICKMAN TO MS. HOLMES

10:06AM  21    AND MR. BALWANI AND OTHERS AT THERANOS; CORRECT?

10:06AM  22    A.   JEFF SENDS IT TO ELIZABETH AND THEN COPIES THE OTHERS,

10:06AM  23    YES.

10:06AM  24    Q.   AND HE SAYS, "WENT THREW THIS AND HIGHLIGHTED A FEW THINGS

10:06AM  25    IN YELLOW DIRECTLY IN HIS EMAIL, AND SUMMARIZED BELOW."

EDLIN DIRECT BY MR. BOSTIC (RES.)                2524

10:06AM 1       DO YOU SEE THAT?

10:06AM 2   A.   YES.

10:06AM 3   Q.   AND AMONG THE ISSUES THAT HE NOTES, TOWARDS THE BOTTOM OF

10:06AM 4   THE SELECTION, THE THIRD HASHMARK FROM THE BOTTOM THERE'S A

10:06AM 5   LINE THAT SAYS, "HE CALLS OUT," QUOTE, "'IMPROVED ACCURACY'

10:06AM 6   WHEN TALKING ABOUT REDUCTION OF HUMAN ERROR THROUGH

10:06AM 7   AUTOMATION."

10:06AM 8       DO YOU SEE THAT?

10:06AM 9   A.   YES.

10:06AM 10  Q.   AND LET'S LOOK AT PAGE 2 OF THIS EXHIBIT.

10:07AM 11      AND ON PAGE 2, MR. EDLIN, DO YOU SEE THAT MR. RAGO

10:07AM 12  INCLUDES THE TEXT OF THE ARTICLE THAT WAS GOING TO BE PUBLISHED

10:07AM 13  ABOUT THERANOS?

10:07AM 14  A.   YES.

10:07AM 15  Q.   AND LET'S GO TO PAGE 3 AND ZOOM IN ON THE THIRD PARAGRAPH

10:07AM 16  FROM THE TOP OR THE SECOND FULL PARAGRAPH.

10:07AM 17      AND DO YOU SEE THERE HERE'S THE LANGUAGE ABOUT IMPROVED

10:07AM 18  ACCURACY THAT MR. BLICKMAN WAS REFERENCING IN HIS EMAIL?

10:07AM 19  A.   YES.

10:07AM 20  Q.   LET'S LOOK AT THE ACTUAL ARTICLE ITSELF.

10:07AM 21      YOUR HONOR, EXHIBIT 1106 IS ALREADY ADMITTED.  MAY WE

10:07AM 22  PUBLISH?

10:07AM 23          THE COURT:  YES.

10:07AM 24  BY MR. BOSTIC:

10:07AM 25  Q.   LET'S LOOK AT THE FIRST INDENTED PARAGRAPH ON PAGE 1.

10:08AM 1          MR. EDLIN, IN THE FINAL PUBLISHED VERSION OF THE ARTICLE,

10:08AM 2     DO YOU SEE THAT IT CLAIMS IN THE MIDDLE OF THIS PARAGRAPH THAT

10:08AM 3     "THERANOS'S PROCESSES ARE FASTER, CHEAPER AND MORE ACCURATE

10:08AM 4     THAN THE CONVENTIONAL METHODS"?

10:08AM 5     A.   I DO.

10:08AM 6     Q.   AND LET'S LOOK AT PAGE 2 OF THIS EXHIBIT.  ZOOM IN ON THE

10:08AM 7     THIRD PARAGRAPH FROM THE BOTTOM.

10:08AM 8          DO YOU SEE THERE THE ARTICLE READS, "ANOTHER THERANOS

10:08AM 9     ADVANCE IS ITS TESTING'S ACCURACY"?

10:08AM 10    A.   YES.

10:08AM 11    Q.   YOU CAN PUT THAT ASIDE.

10:08AM 12         I HAVE ANOTHER DOCUMENT FOR YOU TO REVIEW.

10:09AM 13         MAY I APPROACH, YOUR HONOR?

10:09AM 14              THE COURT:  YES.

10:09AM 15    BY MR. BOSTIC:

10:09AM 16    Q.   MR. EDLIN, DO YOU HAVE WHAT HAS BEEN MARKED AS

10:09AM 17    EXHIBIT 5801 IN FRONT OF YOU?

10:09AM 18    A.   YES.

10:09AM 19    Q.   AND IS 5801 AN EMAIL FROM MR. BLICKMAN TO THE SAME GROUP

10:09AM 20    OF PEOPLE THAT WE WERE JUST LOOKING AT, MS. HOLMES, CC'ING

10:09AM 21    MR. BALWANI, CHRISTIAN HOLMES, AND YOURSELF?

10:09AM 22    A.   YES.

10:09AM 23    Q.   AND DOES IT RELATE TO THE CONTENT OF ANOTHER NEWS ARTICLE

10:09AM 24    PUBLISHED ABOUT THERANOS?

10:09AM 25    A.   IT RELATES TO A MAGAZINE ARTICLE.

| 10:09AM | 1 | MR. BOSTIC: YOUR HONOR, THE GOVERNMENT OFFERS 5801. |

10:09AM  1    MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5801.

10:10AM  2    MS. WALSH:  YOUR HONOR, NO OBJECTION.

10:10AM  3    THE PARTIES HAVE STIPULATED THAT THE "WIRED" MAGAZINE WAS

10:10AM  4    PUBLISHED ONLINE ON FEBRUARY 18TH, 2014.

10:10AM  5    THE COURT:  ALL RIGHT.  THANK YOU.

10:10AM  6    IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:10AM  7    (GOVERNMENT'S EXHIBIT 5801 WAS RECEIVED IN EVIDENCE.)

10:10AM  8    BY MR. BOSTIC:

10:10AM  9    Q.  OKAY.  SO LET'S ZOOM IN FIRST ON THE EMAIL ITSELF.

10:10AM 10    MR. EDLIN, ARE WE LOOKING AT, AGAIN, AN EMAIL FROM

10:10AM 11    FEBRUARY 18TH, 2014, WITH THE SUBJECT "WIRED" ARTICLE?

10:10AM 12    A.  YES.

10:10AM 13    Q.  AND WAS THAT EMAIL SENT TO MR. BALWANI, AMONG OTHERS?

10:10AM 14    A.  YES.

10:10AM 15    Q.  LET'S GO TO PAGE 2 OF THIS EXHIBIT.  LET'S SEE IF WE CAN

10:10AM 16    ZOOM IN ON THAT TEXT.  WE MAY NEED TO SWITCH VERSIONS OR FIGURE

10:10AM 17    OUT SOMETHING ELSE, BUT LET'S SEE HOW READABLE IT IS.

10:11AM 18    MR. EDLIN, CAN YOU MAKE OUT THIS TEXT ON THE SCREEN?

10:11AM 19    A.  I THINK I CAN.

10:11AM 20    Q.  DO YOU SEE TOWARDS THE BOTTOM OF THE SELECTION THERE

10:11AM 21    THERE'S A LINE THAT SAYS, "INSTEAD OF VIALS OF BLOOD, ONE FOR

10:11AM 22    EVERY TEST NEEDED, THERANOS REQUIRES ONLY A PINPRICK AND A DROP

10:11AM 23    OF BLOOD."

10:11AM 24    DO YOU SEE THAT?

10:11AM 25    A.  YES.

ER-1745

10:11AM  1    Q.   IT THEN SAYS, "WITH THAT, THEY CAN PERFORM HUNDREDS OF

10:11AM  2    TESTS, FROM STANDARD CHOLESTEROL CHECKS TO SOPHISTICATED," AND

10:11AM  3    THEN LET'S TURN THE PAGE, AND ZOOM IN ON THE TOP LEFT, "TO

10:11AM  4    SOPHISTICATED GENETIC ANALYSES."

10:11AM  5         DO YOU SEE THAT?

10:11AM  6    A.   YES.

10:11AM  7    Q.   AND IT THEN SAYS, "THE RESULTS ARE FASTER, MORE ACCURATE,

10:11AM  8    AND FAR CHEAPER THAN CONVENTIONAL METHODS."

10:12AM  9         DO YOU SEE THAT?

10:12AM  10   A.   YES.

10:12AM  11   Q.   OKAY.  WE CAN SET THAT ASIDE.  THANK YOU.

10:12AM  12        DID YOUR WORK AT THERANOS INVOLVE ANY INVOLVEMENT IN

10:12AM  13   PREPARING MATERIALS OR PRESENTATIONS THAT WOULD GO TO POTENTIAL

10:12AM  14   INVESTORS IN THE COMPANY?

10:12AM  15   A.   MY WORK WAS MOSTLY RELATED TO COMPILING THOSE MATERIALS,

10:12AM  16   YES.

10:12AM  17   Q.   AND DESCRIBE WHAT WAS INVOLVED IN THAT?  WHAT DID YOU

10:12AM  18   ACTUALLY DO?

10:12AM  19   A.   WITH REGARD TO THAT PROCESS, ELIZABETH WOULD NOTIFY

10:12AM  20   SOMETIMES A GROUP OF PEOPLE, INCLUDING ME, THAT BINDERS SHOULD

10:12AM  21   BE PREPARED FOR CERTAIN INVESTORS.

10:12AM  22        AND I WORKED WITH A GROUP OF PEOPLE TO PRINT OUT SOME OF

10:12AM  23   THOSE DOCUMENTS, IN SOME INSTANCES UPDATE CERTAIN SECTIONS WITH

10:13AM  24   NEW NEWS OR RECENT DEVELOPMENTS WITH BUSINESS PARTNERS, PRINT

10:13AM  25   OUT THE MATERIALS, PHYSICALLY PUT THEM INTO A BINDER, AND THEN

10:13AM 1    MAIL THEM OUT.

10:13AM 2    Q.   AND WHEN IT CAME TO THE CONTENT OF THOSE MATERIALS THAT

10:13AM 3    WERE GOING TO INVESTORS, SAME QUESTION AS BEFORE, WERE YOU KIND

10:13AM 4    OF EXERCISING YOUR OWN JUDGMENT IN DECIDING WHAT SHOULD BE IN

10:13AM 5    THERE, WHAT IT SHOULD SAY?

10:13AM 6    A.   NO.  ALL OF THE MATERIALS WERE INCLUDED BASED ON THE

10:13AM 7    PRE-APPROVED CHECKLIST THAT WAS REVIEWED AND APPROVED BY

10:13AM 8    ELIZABETH.

10:13AM 9    Q.   AND WAS MR. BALWANI INVOLVED AT ALL IN REVIEWING OR

10:13AM 10   APPROVING THE CONTENT FOR THESE BINDERS?

10:13AM 11   A.   HIS ONLY INVOLVEMENT, I RECALL IN SOME INSTANCES WHERE

10:13AM 12   THERE WAS A FINANCIAL SECTION, ELIZABETH TOLD ME TO GO TO SUNNY

10:13AM 13   TO GET CERTAIN MATERIALS AND THEN PUT THEM INTO THE BINDER.

10:14AM 14   Q.   AND WERE THESE MATERIALS EVER IN CONNECTION WITH MEETINGS

10:14AM 15   THAT WOULD TAKE PLACE WITH THESE POTENTIAL INVESTORS IN THE

10:14AM 16   COMPANY?

10:14AM 17   A.   I DO RECALL SOME MEETINGS.

10:14AM 18   Q.   AND DID THOSE MEETINGS INCLUDE MS. HOLMES, MR. BALWANI, OR

10:14AM 19   BOTH, AS YOU RECALL?

10:14AM 20   A.   SOME MEETINGS INCLUDED BOTH.  SOME MEETINGS INCLUDED ONE

10:14AM 21   OR THE OTHER.

10:14AM 22   Q.   LET ME ASK YOU TO LOOK AT TAB 1940 IN THE BINDER IN FRONT

10:14AM 23   OF YOU, PLEASE.

10:15AM 24        AND DO YOU HAVE 1940?

10:15AM 25   A.   YES.

10:15AM  1    Q.   THIS IS AN EMAIL FROM YOU ON SEPTEMBER 16TH, 2014; IS THAT

10:15AM  2    RIGHT?

10:15AM  3    A.   YES.

10:15AM  4    Q.   AND DOES IT RELATE TO YOUR WORK WITH MS. HOLMES INVOLVING

10:15AM  5    THE CONTENT OF INVESTMENT MATERIALS BINDERS?

10:15AM  6    A.   YES.

10:15AM  7              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1940.

10:15AM  8              MS. WALSH:  NO OBJECTION.

10:15AM  9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:15AM  10        (GOVERNMENT'S EXHIBIT 1940 WAS RECEIVED IN EVIDENCE.)

10:15AM  11   BY MR. BOSTIC:

10:15AM  12   Q.   MR. EDLIN, DO YOU SEE THE EMAIL NOW ON THE SCREEN FROM

10:15AM  13   SEPTEMBER OF 2014?

10:15AM  14   A.   YES.

10:15AM  15   Q.   AND DO YOU RECALL THE APPROXIMATE TIMEFRAME DURING WHICH

10:15AM  16   YOU WERE WORKING ON BINDERS FOR THE COMPANY?  WAS IT THROUGHOUT

10:15AM  17   THE ENTIRE TIME OR A NARROWER TIME?

10:15AM  18   A.   IT WAS NOT THE ENTIRE TIME.  THERE WAS A NARROW TIME.

10:15AM  19   Q.   AND WAS 2014 PART OF THAT TIMEFRAME?

10:16AM  20   A.   YES.

10:16AM  21   Q.   CAN YOU DESCRIBE THE PURPOSE OF THE EMAIL THAT YOU SENT IN

10:16AM  22   SEPTEMBER OF 2014 THAT WE'RE LOOKING AT?

10:16AM  23   A.   THIS EMAIL IS IN RESPONSE TO AN EMAIL REQUEST FROM

10:16AM  24   ELIZABETH WHO ASKED TO SEE THE CONTENTS OF THE TWO BINDERS THAT

10:16AM  25   WERE BEING PREPARED COMPARED TO OTHER BINDERS THAT WERE SENT

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2530

10:16AM  1    PREVIOUSLY.

10:16AM  2    Q.   AND WHAT IS THE -- WHAT ARE YOU GENERALLY DESCRIBING IN

10:16AM  3    YOUR RESPONSE TO THAT EMAIL?

10:16AM  4    A.   IN THIS EMAIL I'M OUTLINING THE CONTENTS OF BOTH

10:17AM  5    INVESTMENT BINDERS.

10:17AM  6    Q.   AND DID THE BINDERS THAT YOU PREPARED FOR POTENTIAL

10:17AM  7    INVESTORS EVER INCLUDE SLIDE PRESENTATIONS ABOUT THERANOS?

10:17AM  8    A.   YES.

10:17AM  9    Q.   DID YOU PREPARE BINDERS WITH SLIDE PRESENTATIONS ON

10:17AM  10   MULTIPLE OCCASIONS?

10:17AM  11   A.   YES.

10:17AM  12   Q.   CAN I ASK YOU TO LOOK AT TAB 4869 IN YOUR BINDER.

10:17AM  13        LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU.

10:17AM  14   A.   I DO.

10:17AM  15   Q.   DO YOU RECALL A TIME WHEN SOMEONE NAMED RUPERT MURDOCH WAS

10:17AM  16   CONSIDERING AN INVESTMENT IN THERANOS?

10:17AM  17   A.   YES.

10:17AM  18   Q.   AND DO YOU REMEMBER APPROXIMATELY WHEN THAT WAS?

10:18AM  19   A.   I DON'T REMEMBER EXACTLY, BUT I BELIEVE IT WAS WITHIN THAT

10:18AM  20   NARROWER WINDOW THAT WE DISCUSSED.

10:18AM  21   Q.   DO YOU RECALL HAVING ANY ROLE IN CONNECTION WITH

10:18AM  22   MR. MURDOCH'S CONSIDERATION OF A POSSIBLE INVESTMENT?

10:18AM  23   A.   I RECALL -- CAN YOU REPEAT THE QUESTION?

10:18AM  24   Q.   SURE.

10:18AM  25        DID YOU HAVE ANY ROLE IN CONNECTION WITH HIS CONSIDERATION

ER-1749

10:18AM   1    OF AN INVESTMENT?  FOR EXAMPLE, WOULD YOU HAVE BEEN PREPARING

10:18AM   2    MATERIALS FOR HIS REVIEW AT THAT TIME?

10:18AM   3    A.   I BELIEVE I DID.

10:18AM   4    Q.   OKAY.  AT TAB 4869, DO YOU RECOGNIZE THE DOCUMENT THAT IS

10:18AM   5    INCLUDED THERE?

10:18AM   6    A.   YES.

10:18AM   7    Q.   AND WHAT IS THAT?

10:18AM   8    A.   THIS IS ONE OF THE SLIDE PRESENTATIONS THAT WAS INCLUDED

10:18AM   9    IN THE INVESTMENT BINDERS, AND THIS IS A GENERAL OVERVIEW OF

10:19AM  10    THE COMPANY.

10:19AM  11          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:19AM  12    5869 -- I'M SORRY, 4869.

10:19AM  13          MS. WALSH:  NO OBJECTION.

10:19AM  14          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:19AM  15    (GOVERNMENT'S EXHIBIT 4869 WAS RECEIVED IN EVIDENCE.)

10:19AM  16    BY MR. BOSTIC:

10:19AM  17    Q.   SO, MR. EDLIN, BEGINNING WITH PAGE 3 HERE -- ACTUALLY,

10:19AM  18    LET'S GO BACK TO -- LET'S GO TO PAGE 1 FOR A MOMENT TO THE

10:19AM  19    TITLE PAGE.

10:19AM  20          AND DO YOU SEE THAT THIS WAS PART OF A CONFIDENTIAL

10:19AM  21    INVESTMENT MATERIALS FOR RUPERT MURDOCH WITH THE THERANOS LOGO

10:19AM  22    AT THE TOP?

10:19AM  23    A.   YES.

10:19AM  24    Q.   AND LET'S GO TO THE NEXT PAGE, PLEASE.

10:19AM  25          AND DO YOU SEE THE TITLE HERE IS THERANOS CONFIDENTIAL

10:19AM  1    OVERVIEW?

10:19AM  2    A.   YES.

10:19AM  3    Q.   AND LOOKING AT THE SLIDES THAT COME AFTER THIS, WAS THIS

10:20AM  4    PRESENTATION SHARED JUST WITH MR. MURDOCH OR ARE YOU AWARE OF

10:20AM  5    IT BEING SENT TO OTHER INVESTORS?

10:20AM  6    A.   I'M NOT AWARE OF THIS PRESENTATION BEING SHARED WITH OTHER

10:20AM  7    INVESTORS.

10:20AM  8    Q.   HOW ABOUT SIMILAR SLIDE PRESENTATIONS WITH SOME OF THE

10:20AM  9    SAME CONTENT, ARE YOU AWARE OF THAT BEING SHARED WITH ANY OTHER

10:20AM  10   INVESTORS?

10:20AM  11   A.   YES.

10:20AM  12   Q.   LET'S GO TO PAGE 3, PLEASE.  LET'S ZOOM IN ON THAT TEXT.

10:20AM  13        AND DO YOU SEE HERE IN THIS PRESENTATION FOR AN INVESTOR

10:20AM  14   THERE'S LANGUAGE THAT SAYS, "THERANOS'S PROPRIETARY, PATENTED

10:20AM  15   TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK

10:20AM  16   AND TESTS FROM MICRO-SAMPLES OF OTHER MATRICES."

10:20AM  17        DO YOU SEE THAT?

10:20AM  18   A.   YES.

10:20AM  19   Q.   AND IT THEN SAYS, "AND GENERATES SIGNIFICANTLY HIGHER

10:20AM  20   INTEGRITY DATA THAN CURRENTLY POSSIBLE."

10:20AM  21        DO YOU SEE THAT?

10:20AM  22   A.   YES.

10:20AM  23   Q.   LET'S GO TO PAGE 15.  LET'S LOOK AT THE SECOND TO THE

10:21AM  24   BOTTOM BULLET POINT HERE.  THIS IS UNDER A TITLE THAT SAYS COST

10:21AM  25   SAVINGS.

10:21AM  1         DO YOU SEE THAT?

10:21AM  2    A.   YES.

10:21AM  3    Q.   AND AT THE SECOND TO THE BOTTOM BULLET POINT THE INVESTOR

10:21AM  4    PRESENTATION SAYS, "THE UNPRECEDENTED LACK OF VARIATION FROM

10:21AM  5    SYSTEM TO SYSTEM YIELDS HIGHER INTEGRITY DATA AND LONGITUDINAL

10:21AM  6    TRENDING."

10:21AM  7         DO YOU SEE THAT?

10:21AM  8    A.   YES.

10:21AM  9    Q.   WHEN YOU WERE WORKING AT THE COMPANY, DID YOU HAVE A BASIS

10:21AM 10    TO KNOW WHETHER THERANOS'S TESTS HAD AN ACTUALLY UNPRECEDENTED

10:21AM 11    LACK OF VARIATION?

10:21AM 12    A.   I DID NOT.

10:21AM 13    Q.   LET'S LOOK AT PAGE 28 NEXT.

10:22AM 14         DO YOU SEE HERE THERE'S A TITLE "SAME TESTS, A WHOLE NEW

10:22AM 15    APPROACH"?

10:22AM 16    A.   YES.

10:22AM 17    Q.   AND IT READS BELOW THAT, "THE ACTIONABLE INFORMATION YOU

10:22AM 18    NEED, 1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW."

10:22AM 19         DO YOU SEE THAT?

10:22AM 20    A.   YES.

10:22AM 21    Q.   AND THERE'S SOME IMAGES BENEATH THAT.

10:22AM 22         COULD YOU TELL US WHAT IS DEPICTED IN THOSE IMAGES?

10:22AM 23    A.   THOSE IMAGES ARE OF THE FINGERSTICK PROCESS, AND IT ALSO

10:22AM 24    SHOWS A NANOTAINER.

10:22AM 25    Q.   AND WHAT WAS THE NANOTAINER AT THERANOS?

10:22AM 1     A.   THE NANOTAINER WAS THE SMALL TUBE THAT THE COMPANY USED TO

10:22AM 2     COLLECT FINGERSTICK SAMPLES.

10:22AM 3     Q.   BELOW THOSE IMAGES IT SAYS, "THERANOS RUNS ANY TEST

10:22AM 4     AVAILABLE IN CENTRAL LABORATORIES, AND PROCESSES ALL SAMPLE

10:22AM 5     TYPES."

10:22AM 6          DO YOU SEE THAT?

10:22AM 7     A.   YES.

10:22AM 8     Q.   AND SKIPPING DOWN TO THE BOTTOM OF THAT SELECTION, DO YOU

10:23AM 9     SEE THERE'S LANGUAGE THAT SAYS, "THERANOS PROVIDES THE HIGHEST

10:23AM 10    LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR

10:23AM 11    PRE- AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS

10:23AM 12    OF ACCURACY AND PRECISION"?

10:23AM 13    A.   YES.

10:23AM 14    Q.   AND DO YOU RECALL BEFORE WHEN WE WERE LOOKING AT A

10:23AM 15    DISCUSSION ABOUT WHETHER THE WEBSITE SHOULD INCLUDE CLAIMS OF

10:23AM 16    HIGHEST LEVELS OF ACCURACY?

10:23AM 17    A.   YES.

10:23AM 18    Q.   IS THIS THE SAME LANGUAGE APPEARING IN AN INVESTOR

10:23AM 19    PRESENTATION?

10:23AM 20    A.   YES.

10:23AM 21    Q.   AND WE SEE ONE MORE EXAMPLE OF THAT IF WE GO TO PAGE 30.

10:23AM 22         AND HERE DO YOU SEE CONTENT WITH THE TITLE "A NEW STANDARD

10:23AM 23    IN QUALITY"?

10:23AM 24    A.   YES.

10:23AM 25    Q.   AND UNDERNEATH THAT THERE'S A SUBHEADING THAT READS, "THE

10:24AM   1    HIGHEST LEVELS OF ACCURACY."

10:24AM   2        DO YOU SEE THAT?

10:24AM   3    A.   YES.

10:24AM   4    Q.   AND AGAIN, THE INVESTOR PRESENTATION SAYS BELOW THE

10:24AM   5    GRAPHIC, "BY SYSTEMATICALLY CONTROLLING AND STANDARDIZING OUR

10:24AM   6    PROCESSES, THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF

10:24AM   7    ACCURACY."

10:24AM   8        DID I READ THAT CORRECTLY?

10:24AM   9    A.   YES.

10:24AM  10    Q.   OKAY.  WE CAN PUT THAT ASIDE.  THANK YOU.

10:24AM  11        MR. EDLIN, CAN YOU PLEASE LOOK AT -- ACTUALLY, LET ME HAND

10:24AM  12    YOU ANOTHER DOCUMENT.

10:24AM  13        MAY I APPROACH, YOUR HONOR?

10:24AM  14            THE COURT:  YES.

10:24AM  15        FOLKS, IF YOU WANT TO STAND UP AND STRETCH FOR A MOMENT,

10:24AM  16    PLEASE FEEL FREE.

10:25AM  17        (STRETCHING.)

10:25AM  18    BY MR. BOSTIC:

10:25AM  19    Q.   MR. EDLIN, DO YOU HAVE AN EXHIBIT IN FRONT OF YOU MARKED

10:25AM  20    1752?

10:25AM  21    A.   YES.

10:25AM  22    Q.   AND IS IT AN EMAIL FROM MS. HOLMES TO YOU ON JUNE 1ST,

10:25AM  23    2014?

10:25AM  24    A.   YES.

10:25AM  25    Q.   AND DO YOU SEE THAT THE SUBJECT LINE IS ROGER PARLOFF,

EDLIN DIRECT BY MR. BOSTIC (RES.)                          2536

10:25AM  1    AGGREGATED ACTION ITEMS?

10:25AM  2    A.   YES.

10:25AM  3    Q.   AND DO YOU RECOGNIZE THAT NAME, ROGER PARLOFF?

10:25AM  4    A.   YES.

10:25AM  5    Q.   AND WHO WAS THAT IN CONNECTION WITH THERANOS?

10:26AM  6    A.   HE WAS A JOURNALIST FOR "FORTUNE" MAGAZINE, AND HE WROTE A

10:26AM  7    PIECE ON THERANOS.

10:26AM  8    Q.   AND IN THIS EMAIL FROM MS. HOLMES TO YOU, CAN YOU DESCRIBE

10:26AM  9    THE PURPOSE OF THIS EMAIL?

10:26AM  10   A.   THE TOP EMAIL OR JUST GENERALLY?

10:26AM  11   Q.   GENERALLY THE CHAIN?

10:26AM  12   A.   YEAH.  THIS REFERS TO AN AGGREGATED LIST OF ACTION ITEMS

10:26AM  13   INCLUDING FOLLOW-UP MATERIALS THAT WERE IN CONNECTION TO THE

10:26AM  14   ARTICLE THAT MR. PARLOFF WAS WRITING, AND MY ROLE WAS TO

10:26AM  15   AGGREGATE ALL OF THE ACTION ITEMS AND ENSURE THAT THE

10:26AM  16   APPROPRIATE PERSONNEL WITHIN THE COMPANY WERE PROVIDING

10:26AM  17   INFORMATION RESPECTIVE TO THEIR ACTION ITEMS.

10:27AM  18   Q.   DID YOUR INVOLVEMENT WITH THAT PROCESS GIVE YOU AN

10:27AM  19   UNDERSTANDING AS TO WHO MR. PARLOFF INTERVIEWED IN CONNECTION

10:27AM  20   WITH THE ARTICLE?

10:27AM  21   A.   I RECALL THAT HE ONLY INTERVIEWED ELIZABETH.

10:27AM  22   Q.   AND THAT'S YOUR RECOLLECTION?

10:27AM  23   A.   YES.

10:27AM  24        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1752.

10:27AM  25        MS. WALSH:  NO OBJECTION.

10:27AM  1              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:27AM  2         (GOVERNMENT'S EXHIBIT 1752 WAS RECEIVED IN EVIDENCE.)

10:27AM  3    BY MR. BOSTIC:

10:27AM  4    Q.   LET'S LOOK AT THE BOTTOM OF PAGE 1, PLEASE.

10:27AM  5         HERE'S AN EMAIL FROM YOU TO MS. HOLMES CC'ING OTHERS WHERE

10:27AM  6    YOU SAY, "HI ELIZABETH,

10:27AM  7         "PLEASE SEE BELOW/ATTACHED FOR THE ROGER PARLOFF ACTION

10:27AM  8    ITEMS LIST."

10:27AM  9         DO YOU SEE THAT?

10:27AM 10    A.   YES.

10:27AM 11    Q.   AND CAN YOU DESCRIBE WHAT THIS LIST IS THAT WE'RE LOOKING

10:28AM 12    AT IN THE CHART AND WHAT ITS PURPOSE WAS?

10:28AM 13    A.   THIS IS THE LIST OF CATEGORIES OF INFORMATION THAT I

10:28AM 14    BELIEVE WERE REFERENCED IN ELIZABETH'S DISCUSSION WITH

10:28AM 15    MR. PARLOFF, AND THIS WAS INFORMATION THAT WAS REQUESTED.

10:28AM 16         SO THIS LIST INCLUDES THE TYPE OF INFORMATION AS WELL AS

10:28AM 17    THE RESOURCE WITHIN THE COMPANY WHO IS TASKED WITH PROVIDING

10:28AM 18    THAT INFORMATION.

10:28AM 19    Q.   LET'S ZOOM OUT AND LOOK AT THE TOP OF THIS PAGE.

10:28AM 20         AND THERE WE SEE A MESSAGE FROM MS. HOLMES JUST TO YOU ON

10:28AM 21    JUNE 1ST.

10:28AM 22         AND DO YOU SEE THAT THERE'S AN ATTACHMENT TITLED THERANOS

10:28AM 23    MULTIPLEXED PANEL VALIDATION REPORT SCHERING-PLOUGH?

10:28AM 24    A.   YES.

10:28AM 25    Q.   WHAT WAS YOUR UNDERSTANDING AT THE TIME AS TO WHY

10:29AM   1    MS. HOLMES WAS SENDING YOU THAT DOCUMENT?

10:29AM   2              MS. WALSH:  OBJECTION.

10:29AM   3              THE COURT:  SPECULATION.

10:29AM   4              THE WITNESS:  I --

10:29AM   5    BY MR. BOSTIC:

10:29AM   6    Q.   LET ME ASK YOU A FOUNDATIONAL QUESTION, MR. EDLIN.

10:29AM   7         DO YOU RECALL AROUND THIS TIME CONVERSATIONS WITH

10:29AM   8    MS. HOLMES ABOUT THIS TO DO LIST AND PROVIDING INFORMATION TO

10:29AM   9    MR. PARLOFF?

10:29AM   10   A.   YES.

10:29AM   11   Q.   DID THOSE DISCUSSIONS INCLUDE REPORTS RELATING TO

10:29AM   12   THERANOS'S WORK WITH PHARMACEUTICAL COMPANIES?

10:29AM   13   A.   YES.

10:29AM   14   Q.   DID MS. HOLMES GIVE YOU DIRECTION ABOUT WHAT YOU WERE

10:29AM   15   SUPPOSED TO DO WHEN YOU RECEIVED THE REPORT ATTACHED TO THIS

10:29AM   16   EMAIL?

10:29AM   17   A.   I DON'T RECALL WHAT THE DIRECTION WAS, BUT I DO RECALL

10:30AM   18   THAT THERE WAS A COLLECTION OF MATERIALS THAT WAS SENT TO

10:30AM   19   MR. PARLOFF AT ONE POINT.

10:30AM   20   Q.   LET'S LOOK AT PAGE 7 OF THIS EXHIBIT.

10:30AM   21        MR. EDLIN, ARE WE LOOKING NOW AT THE ATTACHMENT ITSELF,

10:30AM   22   THAT ATTACHMENT TITLED THERANOS MULTIPLEXED VALIDATION REPORT

10:30AM   23   SCHERING-PLOUGH?

10:30AM   24   A.   YES.

10:30AM   25   Q.   AND IF WE CAN ZOOM IN ON THE TOP OF THE PAGE.

10:30AM  1          DO YOU SEE THAT AT THE TOP OF THE PAGE THERE ARE TWO LOGOS

10:30AM  2    INCLUDED?

10:30AM  3    A.   YES.

10:30AM  4    Q.   AND ONE IS FOR SCHERING-PLOUGH; IS THAT CORRECT?

10:30AM  5    A.   YES.

10:30AM  6    Q.   AND THE OTHER IS FOR THERANOS; IS THAT RIGHT?

10:30AM  7    A.   YES.

10:30AM  8    Q.   DO YOU HAVE ANY KNOWLEDGE ABOUT HOW THE SCHERING-PLOUGH

10:30AM  9    LOGO CAME TO BE ON THIS PARTICULAR DOCUMENT?

10:30AM  10   A.   I DO NOT.

10:30AM  11   Q.   OKAY.  WE CAN SET THAT ASIDE.  THANK YOU.

10:31AM  12          MR. EDLIN, DO YOU HAVE A TAB IN YOUR BINDER MARKED 1776?

10:31AM  13   A.   I DO.

10:31AM  14   Q.   AND DO YOU RECOGNIZE WHAT IS AT 1776?

10:31AM  15   A.   YES.

10:31AM  16   Q.   AND WHAT IS IT?

10:31AM  17   A.   THIS LOOKS TO BE THE "FORTUNE" ARTICLE THAT MR. PARLOFF

10:31AM  18   WROTE.

10:31AM  19   Q.   AND IS THE DATE OF THAT ARTICLE JUNE 12TH, 2014?

10:31AM  20   A.   YES.

10:31AM  21          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1776.

10:31AM  22          MS. WALSH:  OBJECTION.

10:31AM  23          THE COURT:  I'LL SUSTAIN THE OBJECTION AT THIS POINT

10:31AM  24   WITHOUT FOUNDATION.

10:32AM  25   BY MR. BOSTIC:

EDLIN DIRECT BY MR. BOSTIC (RES.)                              2540

10:32AM  1    Q.   LET ME JUST ASK YOU A COUPLE OF OTHER FOUNDATIONAL

10:32AM  2    QUESTIONS, MR. EDLIN.

10:32AM  3    A.   UH-HUH.

10:32AM  4    Q.   WHEN THIS ARTICLE WAS PUBLISHED, DO YOU REMEMBER WHETHER

10:32AM  5    YOU REVIEWED THE ARTICLE?

10:32AM  6    A.   I REMEMBER READING THE ARTICLE.

10:32AM  7    Q.   AND IS WHAT IS AT 1776 A TRUE AND CORRECT COPY OF THE

10:32AM  8    ARTICLE ITSELF?

10:32AM  9    A.   IT APPEARS TO BE.

10:32AM  10   Q.   OKAY.  WE CAN SET THAT ASIDE FOR NOW.

10:32AM  11        I'D LIKE TO SHIFT GEARS AND TALK ABOUT WORK THAT YOU DID

10:32AM  12   AT THERANOS RELATING TO COMMUNICATIONS WITH THE MILITARY.

10:32AM  13        DO YOU RECALL THAT WORK?

10:32AM  14   A.   YES.

10:32AM  15   Q.   TELL US ABOUT YOUR ROLE THERE?  WHAT WAS YOUR JOB IN

10:32AM  16   CONNECTION WITH DEALINGS THAT THERANOS HAD WITH THE MILITARY?

10:32AM  17   A.   I SUPPORTED RELATIONSHIPS WITH VARIOUS DIVISIONS OF THE

10:32AM  18   DEPARTMENT OF DEFENSE, AND IN THAT ROLE I HELPED TO FACILITATE

10:33AM  19   COORDINATION AND INFORMATION SHARING RELATED TO A NUMBER OF

10:33AM  20   DIFFERENT PROGRAMS THAT WERE INTENDED TO EVALUATE THE THERANOS

10:33AM  21   TECHNOLOGY COMPARED TO LAB TESTING THAT WAS AVAILABLE TO THE

10:33AM  22   MILITARY AT THE TIME.

10:33AM  23   Q.   AND WHAT WAS THE POINT OF THOSE COMPARISONS AS YOU

10:33AM  24   UNDERSTOOD THEM?

10:33AM  25   A.   THE COMPARISON WAS TO EVALUATE HOW THERANOS LAB TESTING

ER-1759

10:33AM 1    COMPARED TO TESTING THAT THE MILITARY HAD WITH THE EVENTUAL

10:33AM 2    GOAL OF THE PROGRAM TO USE THERANOS TESTING FOR THE MILITARY.

10:33AM 3    Q.   AND IN THAT ROLE WERE YOU IN TOUCH WITH ONE COMPONENT OF

10:33AM 4    THE MILITARY OR MULTIPLE COMPONENTS?

10:33AM 5    A.   MULTIPLE COMPONENTS.

10:34AM 6    Q.   DO YOU REMEMBER WHAT SOME OF THEM WERE?

10:34AM 7    A.   YES.  THERE WAS U.S. CENTCOM, SOCOM, AFRICOM, AND THE

10:34AM 8    INSTITUTION OF SURGICAL RESEARCH.

10:34AM 9    Q.   AND YOU MENTIONED I THINK SOME ABBREVIATIONS.  IT'S OKAY

10:34AM 10   IF YOU CAN'T, BUT ARE YOU ABLE TO EXPAND AND EXPLAIN THOSE FOR

10:34AM 11   US STARTING WITH CENTCOM?  WHAT DOES THAT STAND FOR?

10:34AM 12   A.   U.S. CENTRAL COMMAND, SPECIAL OPERATIONS COMMAND, AFRICA

10:34AM 13   COMMAND.

10:34AM 14   Q.   AND IN THAT ROLE WERE YOU SPEAKING ON BEHALF OF THERANOS

10:34AM 15   OR WERE YOU ACTING AS A GO-BETWEEN FOR SOMEONE ELSE WHO WAS

10:34AM 16   MAKING DECISIONS FOR THE COMPANY?

10:34AM 17   A.   I'D SAY THE LATER.  ANY SUBSTANTIVE COMMUNICATION THAT I

10:35AM 18   HAD WITH ANY MEMBER, ANY DIVISION WITHIN THE MILITARY WAS BASED

10:35AM 19   ON INFORMATION THAT I HAD DISCUSSED WITH ELIZABETH AND GOT FROM

10:35AM 20   ELIZABETH, AND SOMETIMES THOSE DISCUSSIONS INFORMED EMAIL

10:35AM 21   DRAFTS THAT ARE THEN SENT TO ELIZABETH TO REVIEW AND APPROVE,

10:35AM 22   AND SHE WOULD DO THAT BEFORE I SENT OUT ANY COMMUNICATION BACK

10:35AM 23   TO THE MILITARY.

10:35AM 24   Q.   I WANT TO ASK YOU ABOUT SOME OF THOSE CONTACTS, BUT LET ME

10:35AM 25   SKIP TO THE END AND ASK YOU, IN YOUR EXPERIENCE AT THERANOS,

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2542

10:35AM  1    DID THE MILITARY EVER ACTUALLY USE A THERANOS DEVICE FOR THE

10:35AM  2    DIAGNOSIS OR TREATMENT OF SOLDIERS?

10:35AM  3    A.   NOT TO MY KNOWLEDGE.

10:35AM  4    Q.   CAN YOU TURN TO TAB 504 IN YOUR BINDER, PLEASE.

10:36AM  5         AND DO YOU RECOGNIZE WHAT IS AT 504?

10:36AM  6    A.   YES.

10:36AM  7    Q.   AND IS IT AN EMAIL FROM JANUARY 2012 FROM YOU TO A

10:36AM  8    REPRESENTATIVE OF THE U.S. MILITARY?

10:36AM  9    A.   YES.

10:36AM  10   Q.   AND DOES IT INCLUDE AN ATTACHMENT PRESENTING INFORMATION

10:36AM  11   ABOUT THERANOS?

10:36AM  12   A.   YES.

10:36AM  13            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 504.

10:36AM  14            MS. WALSH:  OTHER THAN OUR DISCUSSION THIS MORNING,

10:36AM  15   NO OBJECTION.

10:36AM  16            THE COURT:  THANK YOU.  IT'S ADMITTED, 504 IS

10:36AM  17   ADMITTED, AND IT MAY BE PUBLISHED.

10:36AM  18            MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:36AM  19        (GOVERNMENT'S EXHIBIT 504 WAS RECEIVED IN EVIDENCE.)

10:36AM  20            MR. BOSTIC:  LET'S START WITH PAGE 1.

10:36AM  21        LET'S ZOOM IN ON THE MIDDLE OF THE PAGE, FIRST, TO SEE

10:37AM  22   MAJOR COOK'S EMAIL.  ACTUALLY STARTING A LITTLE LOWER DOWN.

10:37AM  23        PERFECT.  THANK YOU.

10:37AM  24   Q.   MR. EDLIN, WHO WAS MAJOR STEPHEN COOK, IF YOU REMEMBER?

10:37AM  25   A.   MAJOR STEPHEN COOK WAS A PART OF SPECIAL OPERATIONS

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2543

10:37AM  1      COMMAND.

10:37AM  2      Q.   AND IN HIS EMAIL TO YOU, IN THAT SECOND SENTENCE HE SAYS,

10:37AM  3      "AS YOU KNOW, WE'RE LOOKING TO EVALUATE YOUR SYSTEM TO

10:37AM  4      DETERMINE ITS UTILITY ACROSS THE OPERATIONS AND ENVIRONMENTS IN

10:37AM  5      WHICH WE'D LIKE TO DEPLOY IT."

10:37AM  6           DO YOU SEE THAT?

10:37AM  7      A.   YES.

10:37AM  8      Q.   AND IT SAYS, "IN ORDER TO DO SO, WE'D LIKE TO CONDUCT AN

10:37AM  9      ASSESSMENT PERIOD AFTER WHICH WE'D LIKELY MOVE FORWARD WITH A

10:37AM  10     12-MONTH RENEWABLE SERVICE CONTRACT."

10:37AM  11          DO YOU SEE THAT?

10:37AM  12     A.   YES.

10:37AM  13     Q.   AND THEN SKIPPING TWO PARAGRAPHS DOWN HE PROPOSES THREE

10:38AM  14     DEVICES, GPS DISABLED.

10:38AM  15          DO YOU SEE THAT?

10:38AM  16     A.   YES.

10:38AM  17     Q.   AND ACTUALLY ONE ABOVE THAT.  IT SAYS, "RUNNING UP TO 400

10:38AM  18     ASSAYS EACH MONTH."

10:38AM  19          DO YOU SEE THAT?

10:38AM  20     A.   YES.

10:38AM  21     Q.   AND THOSE ASSAYS INCLUDE "COMPLETE BLOOD COUNT."

10:38AM  22          DO YOU SEE THAT?

10:38AM  23     A.   YES.

10:38AM  24     Q.   DO YOU KNOW WHETHER THE EDISON DEVICE USED IN THE CLINICAL

10:38AM  25     LAB WAS ABLE TO RUN A COMPLETE BLOOD COUNT OR NOT?

10:38AM    1    A.    I HAVE LEARNED THAT IT WAS NOT ABLE TO.

10:38AM    2                 MS. WALSH:  OBJECTION.

10:38AM    3                 THE COURT:  SUSTAINED.

10:38AM    4         THE LAST ANSWER IS STRICKEN, LADIES AND GENTLEMEN.

10:38AM    5    BY MR. BOSTIC:

10:38AM    6    Q.    MR. EDLIN, DID YOU KNOW DURING YOUR TIME AT THE COMPANY

10:38AM    7    WHETHER THE EDISON DEVICE WAS ABLE TO RUN A COMPLETE BLOOD

10:38AM    8    COUNT OR NOT?

10:38AM    9    A.    YES, THERE WAS A POINT IN TIME WHERE I LEARNED THAT.

10:39AM   10    Q.    AND HOW DID YOU COME TO LEARN THAT WHILE YOU WERE AT THE

10:39AM   11    COMPANY?

10:39AM   12    A.    I CAME TO LEARN THAT, I BELIEVE IN CONNECTION WITH ONE OF

10:39AM   13    THE PROGRAMS WITH THE MILITARY WHEN WE NEEDED TO -- WHEN A

10:39AM   14    DECISION WAS MADE ON WHICH DEVICES WERE GOING TO BE USED FOR

10:39AM   15    THE PROGRAM.

10:39AM   16    Q.    OKAY.  WE'LL CIRCLE BACK TO THAT IN A COUPLE MINUTES.

10:39AM   17    A.    OKAY.

10:39AM   18    Q.    FOR NOW LET ME ASK YOU, IN JANUARY OF 2012, DURING THE

10:39AM   19    TIME OF THIS EMAIL, DID YOU KNOW WHETHER THE THERANOS EDISON

10:39AM   20    COULD PERFORM A COMPLETE BLOOD COUNT?

10:39AM   21    A.    I DON'T BELIEVE SO.

10:39AM   22    Q.    OKAY.  LET'S LOOK AT THE ATTACHMENT TO THIS EMAIL, AND

10:39AM   23    THAT IS ON PAGE 5 OF THE EXHIBIT.

10:40AM   24         AND CAN YOU TELL US WHAT WE'RE LOOKING AT HERE BEGINNING

10:40AM   25    ON PAGE 5?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2545

10:40AM  1    A.    THIS LOOKS TO BE A BACKGROUND AND OVERVIEW DOCUMENT ABOUT

10:40AM  2    THERANOS.

10:40AM  3    Q.    AND WHERE DID THIS CONTENT COME FROM?

10:40AM  4    A.    I DON'T RECALL WHERE ALL OF THE CONTENT CAME FROM.

10:40AM  5          I RECALL THAT A DOCUMENT EXISTED, BUT I DON'T KNOW WHERE

10:40AM  6    THE INFORMATION CAME FROM.

10:40AM  7    Q.    DID THIS INFORMATION COME FROM WITHIN THERANOS, OR DID IT

10:40AM  8    COME FROM THE MILITARY, OR A THIRD SOURCE, IF YOU KNOW?

10:40AM  9    A.    THIS WAS A THERANOS-PRODUCED DOCUMENT.

10:40AM  10   Q.    MS. HOLMES IS CC'D ON YOUR EMAIL TO MAJOR COOK ATTACHING

10:40AM  11   THIS MEMO.

10:41AM  12         DO YOU REMEMBER WHETHER MS. HOLMES WOULD HAVE REVIEWED AND

10:41AM  13   APPROVED THIS MEMO BEFORE IT WAS SENT TO THE MILITARY?

10:41AM  14   A.    I RECALL THAT SHE DID.

10:41AM  15   Q.    LET'S LOOK AT SOME OF THE CONTENT HERE.  LET'S ZOOM IN ON

10:41AM  16   THE TOP THIRD OF THE PAGE.

10:41AM  17         DO YOU SEE UNDER BACKGROUND THERE'S A CLAIM THAT SAYS,

10:41AM  18   "THERANOS HAS CREATED A POINT-OF-SERVICE LABORATORY

10:41AM  19   INFRASTRUCTURE THAT GENERATES REAL-TIME DATA FROM A FINGERSTICK

10:41AM  20   OF BLOOD OR OTHER MICRO-VOLUMES OF DIFFERENT SAMPLE TYPES

10:41AM  21   DELIVERING HIGHER QUALITY DATA THAN PREVIOUSLY POSSIBLE."

10:41AM  22   A.    YES.

10:41AM  23   Q.    AND IT THEN SAYS, "THIS TECHNOLOGY IS AN INDUSTRY FIRST."

10:41AM  24         DO YOU SEE THAT?

10:41AM  25   A.    YES.

ER-1764

10:41AM  1    Q.   AND THE FIRST BULLET POINT UNDERNEATH SAYS, "EACH THERANOS

10:41AM  2    DEVICE CAN RUN EVERY TEST CURRENTLY AVAILABLE THROUGH THE

10:41AM  3    TRADITIONAL CENTRALIZED OR HOSPITAL LABORATORY INFRASTRUCTURE."

10:41AM  4         DO YOU SEE THAT?

10:41AM  5    A.   YES.

10:41AM  6    Q.   AND DID YOU KNOW AT THE TIME WHETHER THAT STATEMENT WAS

10:42AM  7    TRUE OR FALSE?

10:42AM  8    A.   I DIDN'T KNOW, BUT I HAD NO REASON TO DOUBT ITS ACCURACY.

10:42AM  9    Q.   LOOKING AT THE SECOND TO THE BOTTOM BULLET POINT IN THIS

10:42AM  10   COLLECTION, THERE'S A CLAIM THAT READS, "THERANOS MANUFACTURES

10:42AM  11   ALL OF ITS TECHNOLOGIES AND SYSTEMS WITHIN THE UNITED STATES."

10:42AM  12        DO YOU SEE THAT?

10:42AM  13   A.   YES.

10:42AM  14   Q.   CAN YOU REMIND US WHEN YOU BECAME AWARE OF THE COMPANY'S

10:42AM  15   RELIANCE ON THIRD PARTY DEVICES?

10:42AM  16   A.   CAN YOU SPECIFY THE PREVIOUS QUESTION.

10:42AM  17   Q.   SURE.

10:42AM  18        DO YOU RECALL YOUR PREVIOUS TESTIMONY THAT WHEN YOU

10:42AM  19   LEARNED THAT THE COMPANY WAS USING NON-THERANOS DEVICES FOR

10:43AM  20   SOME OF ITS TESTS?

10:43AM  21   A.   I LEARNED THAT THE COMPANY WAS USING THIRD PARTY DEVICES

10:43AM  22   FOR FINGERSTICK TESTS IN 2016.  I DON'T RECALL EXACTLY WHEN --

10:43AM  23   I DON'T RECALL EXACTLY.

10:43AM  24   Q.   OKAY.  AND THIS DOCUMENT ONLY MENTIONS FINGERSTICK TESTING

10:43AM  25   OF BLOOD; IS THAT CORRECT?

10:43AM 1    A.   YES.

10:43AM 2    Q.   LET ME ASK IT A DIFFERENT WAY.

10:43AM 3         DO YOU SEE ANY MENTION OF VEIN SAMPLES, OR VENIPUNCTURE,

10:43AM 4    IN THIS DOCUMENT?

10:43AM 5    A.   WELL, AT THE TOP IT SAYS FINGERSTICK OR OTHER

10:43AM 6    MICRO-VOLUMES OF DIFFERENT SAMPLE TYPES.

10:43AM 7    Q.   OKAY.

10:43AM 8    A.   SO I DON'T SEE A MENTION OF VENOUS HERE.

10:43AM 9    Q.   LET'S TURN THE PAGE, AND LET'S ZOOM IN UNDER MILITARY

10:44AM 10   APPLICATIONS UNDER PROJECT SCOPE.

10:44AM 11        DO YOU SEE UNDER MEDEVAC AT THE TOP, "THE ABILITY TO TEST

10:44AM 12   AND TRIAGE WOUNDED SOLDIERS AT THE TIME OF IMPACT AND DURING

10:44AM 13   EVALUATION (E.G. IN A HELICOPTER)."

10:44AM 14        DO YOU SEE THAT?

10:44AM 15   A.   YES.

10:44AM 16   Q.   AND TO YOUR KNOWLEDGE WAS ANY THERANOS DEVICE EVER USED IN

10:44AM 17   THIS WAY, IN OTHER WORDS, TO TEST SOLDIERS ON A MEDICAL

10:44AM 18   HELICOPTER?

10:44AM 19   A.   NO.

10:44AM 20   Q.   UNDER TELECOMMUNICATIONS THAT LAST SENTENCE SAYS,

10:44AM 21   "THERANOS FIELD SYSTEMS' RUGGED, MODULAR DESIGN WITH INTEGRATED

10:44AM 22   COMMUNICATIONS CAPABILITY AND GPS ENABLE FULL OPERABILITY IN

10:45AM 23   THE FIELD."

10:45AM 24        DO YOU SEE THAT?

10:45AM 25   A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                2548

10:45AM 1    Q.   IN YOUR EXPERIENCE WITH THERANOS DEVICES, DID YOU FIND

10:45AM 2    THEM TO BE RUGGED?

10:45AM 3    A.   NO.

10:45AM 4    Q.   WHAT MAKES YOU SAY THAT?

10:45AM 5    A.   IN MY EXPERIENCE, THE DEVICES HAD TO BE PLUGGED INTO A

10:45AM 6    POWER SOURCE AND KEPT IN A STATIONARY POSITION, AND THEY

10:45AM 7    COULDN'T BE MOVED WHEN THE DEVICE WAS OPERATING.

10:45AM 8    Q.   IN CONNECTION WITH YOUR WORK WITH THE MILITARY, DID YOU

10:45AM 9    EVER SHIP THERANOS DEVICES TO THE MILITARY?

10:45AM 10   A.   YES.

10:45AM 11   Q.   WHEN DO YOU RECALL DOING THAT?

10:45AM 12   A.   I RECALL THAT DEVICES WERE SHIPPED TO SOCOM, I BELIEVE IT

10:45AM 13   WAS 2014, AND DEVICES WERE ALSO SENT TO AFRICOM.

10:45AM 14   Q.   OKAY.  LET ME ASK YOU ABOUT SOCOM FIRST.

10:45AM 15        WE CAN TAKE THIS EXHIBIT DOWN.  THANK YOU, MS. WACHS.

10:46AM 16        WHEN IT CAME TO SHIPPING THE DEVICES TO SOCOM, WAS THAT

10:46AM 17   SOMEWHERE WITHIN THE U.S. OR SOMEWHERE OVERSEAS?

10:46AM 18   A.   IT WAS IN KENTUCKY.

10:46AM 19   Q.   AND WHAT WAS THE PURPOSE OF SHIPPING DEVICES TO SPECIAL

10:46AM 20   OPERATIONS COMMAND IN KENTUCKY?

10:46AM 21   A.   THEY WERE SHIPPED IN CONNECTION TO THE EVALUATIVE PROGRAMS

10:46AM 22   THAT WE WERE PLANNING WITH THEM.

10:46AM 23   Q.   AND WHEN YOU SAY, "EVALUATIVE PROGRAMS," WHAT DOES THAT

10:46AM 24   MEAN?

10:46AM 25   A.   THAT REFERS TO THE EVALUATION OF THERANOS DEVICES COMPARED

ER-1767

EDLIN DIRECT BY MR. BOSTIC (RES.)                           2549

10:46AM   1    TO THE TESTING AVAILABLE TO THE MILITARY.

10:46AM   2    Q.   AND DO YOU REMEMBER HOW MANY DEVICES APPROXIMATELY WERE

10:46AM   3    SHIPPED TO KENTUCKY AT THAT TIME?

10:46AM   4    A.   I BELIEVE IT WAS THREE.

10:46AM   5    Q.   AND DO YOU KNOW WHETHER SOCOM EVER ACTUALLY USED THOSE

10:46AM   6    DEVICES TO RUN ASSAYS AND EVALUATE PERFORMANCE?

10:46AM   7    A.   I DON'T BELIEVE THEY DID.

10:46AM   8    Q.   YOU MENTIONED EARLIER THE ARMY INSTITUTE OF SURGICAL

10:47AM   9    RESEARCH; IS THAT RIGHT?

10:47AM  10    A.   YES.

10:47AM  11    Q.   AND CAN YOU DESCRIBE THERANOS'S CONTACTS WITH THAT

10:47AM  12    COMPONENT?

10:47AM  13    A.   I RECALL HAVING TWO MAIN CONTACTS AND THAT PROGRAM WAS FOR

10:47AM  14    A BURN STUDY IN CONNECTION TO EVALUATING SEPSIS WITH BURN

10:47AM  15    PATIENTS.

10:47AM  16    Q.   AND DID THAT STUDY ACTUALLY TAKE PLACE?

10:47AM  17    A.   YES.

10:47AM  18    Q.   AND WAS THIS THE MILITARY CONNECTION INVOLVING THERANOS

10:47AM  19    THAT GOT THE FURTHEST ALONG?

10:47AM  20    A.   I THINK IT'S FAIR TO SAY THAT.

10:48AM  21    Q.   NONETHELESS, DID THAT STUDY INVOLVE THE ACTUAL USE OF THE

10:48AM  22    THERANOS DEVICE TO DIAGNOSE AND TREAT SOLDIERS TO YOUR

10:48AM  23    KNOWLEDGE?

10:48AM  24         MS. WALSH:  OBJECTION.  LEADING.

10:48AM  25         THE COURT:  OVERRULED.

ER-1768

10:48AM   1                    THE WITNESS:  TO MY KNOWLEDGE, NO.

10:48AM   2       BY MR. BOSTIC:

10:48AM   3       Q.   LET ME DIRECT YOUR ATTENTION TO TAB 588 IN THE BINDER IN

10:48AM   4       FRONT OF YOU.

10:48AM   5            AND DO YOU SEE AT 588 AN EMAIL CHAIN BETWEEN

10:48AM   6       COLONEL ERIN EDGAR AND ELIZABETH HOLMES?

10:48AM   7       A.   YES.

10:48AM   8                 MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:48AM   9       EXHIBIT 588.

10:48AM  10                 MS. WALSH:  NO OBJECTION.

10:48AM  11                 THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:48AM  12            (GOVERNMENT'S EXHIBIT 588 WAS RECEIVED IN EVIDENCE.)

10:48AM  13                 MR. BOSTIC:  AND LET'S ZOOM IN ON THE FIRST EMAIL,

10:49AM  14       THE BOTTOM EMAIL.

10:49AM  15       Q.   DURING YOUR TIME AT THERANOS, DID YOU HAVE CONTACT WITH

10:49AM  16       SOMEBODY NAMED COLONEL ERIN EDGAR?

10:49AM  17       A.   I DON'T BELIEVE I HAD MUCH CONTACT WITH HIM, BUT I BELIEVE

10:49AM  18       I'M AWARE THAT HE WAS INVOLVED IN OUR PROGRAM, IN THE THERANOS

10:49AM  19       PROGRAM WITH CENTCOM.

10:49AM  20       Q.   OKAY.  AND THAT WAS GOING TO BE MY NEXT QUESTION.

10:49AM  21            WHICH COMPONENT OF THE MILITARY WAS HE FAMILIAR WITH?  YOU

10:49AM  22       SAID CENTCOM?

10:49AM  23       A.   YES.

10:49AM  24       Q.   AROUND THIS TIME IN APRIL OF 2012, WHAT WAS CENTCOM TRYING

10:49AM  25       TO DO WITH RESPECT TO THE THERANOS DEVICE?

10:49AM   1    A.   CENTCOM WAS INTERESTED IN A SIMILAR TYPE OF EVALUATION OF

10:49AM   2    THE THERANOS TECHNOLOGY COMPARED TO THE TESTING THAT WAS

10:49AM   3    AVAILABLE.

10:49AM   4    Q.   AND THIS EMAIL HAS THE SUBJECT LINE THERANOS UPDATE TO

10:50AM   5    GENERAL MATTIS.

10:50AM   6         DO YOU SEE THAT?

10:50AM   7    A.   YES.

10:50AM   8    Q.   AND HOW WAS GENERAL MATTIS CONNECTED TO THESE

10:50AM   9    COMMUNICATIONS BETWEEN CENTCOM AND THERANOS?

10:50AM  10    A.   I'M NOT SURE BEYOND JUST WHAT IS WRITTEN IN THE EMAILS,

10:50AM  11    BUT YEAH.

10:50AM  12    Q.   OKAY.  THE MENTION IN THIS EMAIL TO THE EFFORT OF GETTING

10:50AM  13    THE ANALYZERS INTO THEATER.

10:50AM  14         DO YOU SEE THAT?

10:50AM  15    A.   YES.

10:50AM  16    Q.   AROUND THIS TIME, DID THAT RELATE TO USE ON THE

10:50AM  17    BATTLEFIELD TO TREAT SOLDIERS?

10:50AM  18    A.   AT THIS TIME, NO.  I THINK THAT WAS THE EVENTUAL GOAL IF

10:50AM  19    THE PROGRAM WAS SUCCESSFUL.

10:50AM  20    Q.   AND SO WHAT STAGES WERE THINGS AT WITH CENTCOM AT THIS

10:50AM  21    TIME IN APRIL OF 2012?

10:51AM  22    A.   AT THIS TIME I WOULD SAY THEY WERE IN THE PLANNING STAGE.

10:51AM  23    Q.   LET'S LOOK AT EXHIBIT 1027 TO GET SOME MORE DETAILS ON

10:51AM  24    THAT.

10:51AM  25         AND AT 1027, DO YOU SEE AN EMAIL FROM YOURSELF TO

10:51AM  1     MS. HOLMES WITH THE SUBJECT LINE THERANOS LIMITED OBJECTIVE

10:51AM  2     EXPERIMENT?

10:51AM  3     A.   YES.

10:51AM  4     Q.   AND DOES THIS RELATE TO CONTINUING EXPLORATION OF POSSIBLE

10:51AM  5     USE BY CENTCOM?

10:51AM  6     A.   YES.

10:51AM  7          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1027.

10:51AM  8          MS. WALSH:  NO OBJECTION.

10:51AM  9          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:51AM  10    (GOVERNMENT'S EXHIBIT 1027 WAS RECEIVED IN EVIDENCE.)

10:51AM  11         MR. BOSTIC:  LET'S START BY ZOOMING IN ON THE MIDDLE

10:52AM  12    OF THE PAGE TO CAPTURE THE EMAIL FROM MARTIN DRAKE.

10:52AM  13    Q.   SO, MR. EDLIN, THIS EMAIL IS FROM JULY 24TH, 2013; IS THAT

10:52AM  14    CORRECT?

10:52AM  15    A.   YES.

10:52AM  16    Q.   AND THE SUBJECT HEADING HERE IS THERANOS LIMITED OBJECTIVE

10:52AM  17    EXPERIMENT.

10:52AM  18         DO YOU RECALL WHAT THAT REFERRED TO?  WHAT WAS THE LIMITED

10:52AM  19    OBJECTIVE EXPERIMENT?

10:52AM  20    A.   THAT WAS THE NAME OF THE EVALUATION OF THAT PROGRAM.

10:52AM  21    Q.   IN THE -- LET'S SEE.

10:52AM  22         IN THIS EMAIL, MARTIN DRAKE SAYS, "I AM A SCIENCE ADVISOR

10:52AM  23    WITH U.S. CENTRAL COMMAND."

10:52AM  24         DO YOU SEE THAT?

10:52AM  25    A.   YES.

10:52AM  1    Q.   AND IT SAYS, "GENERAL MATTIS CHARGED OUR COMMAND SURGEON

10:52AM  2    AND ME TO CONDUCT AN INVESTIGATION INTO THE COMPARATIVE

10:52AM  3    BENEFITS OF YOUR TECHNOLOGY AND APPROACH OVER LEGACY METHODS

10:53AM  4    AND EQUIPMENT."

10:53AM  5         DO YOU SEE THAT?

10:53AM  6    A.   YES.

10:53AM  7    Q.   AND IT SAYS, "WE HAVE BEEN UNABLE TO PUSH YOUR EQUIPMENT

10:53AM  8    TO THEATER SO THAT WE COULD CONDUCT A PROPER EXPERIMENT."

10:53AM  9         DO YOU SEE THAT?

10:53AM  10   A.   YES.

10:53AM  11   Q.   SO THIS IS NOW SUMMER OF 2013.

10:53AM  12        AT THIS POINT HAD THE DEALINGS WITH CENTCOM GOTTEN TO THE

10:53AM  13   POINT WHERE THE MILITARY WAS READY TO USE THERANOS DEVICES TO

10:53AM  14   ACTUALLY TEST AND TREAT SOLDIERS?

10:53AM  15   A.   NO.

10:53AM  16   Q.   WHY NOT?  WHAT STILL NEEDED TO HAPPEN FIRST?

10:53AM  17   A.   AT THIS POINT, CENTCOM STILL HAD NOT HAD EXPERIENCE USING

10:53AM  18   THE THERANOS DEVICES AND RUNNING TESTS.

10:54AM  19   Q.   LET'S GO BACK TO PAGE 1 OF THIS EXHIBIT, AND LET'S ZOOM IN

10:54AM  20   ON MARTIN DRAKE'S EMAIL ON THIS PAGE.

10:54AM  21        HERE, DO YOU SEE AN EMAIL IN AUGUST OF 2013 THAT READS IN

10:54AM  22   THE SECOND PARAGRAPH, "IN ORDER FOR US TO REQUEST RESOURCES IN

10:54AM  23   FINANCIAL YEAR 2014 TO CONDUCT THIS LOE, WE WILL REQUIRE A FIRM

10:54AM  24   COMMITMENT FROM YOU WHEN THERANOS WILL BE AVAILABLE, IN

10:54AM  25   THEATER, AND READY FOR TEST.  PLEASE PICK A DATE IN CALENDAR

10:54AM   1    YEAR 2014 WHEN YOU KNOW BEYOND DOUBT YOU WILL BE READY TO

10:54AM   2    TEST."

10:54AM   3         DO YOU SEE THAT?

10:54AM   4    A.   YES.

10:54AM   5    Q.   AND AROUND THIS TIME WERE THERE ISSUES WITH THE COMPANY'S

10:54AM   6    READINESS FOR THE TESTS THAT THE MILITARY WANTED TO PERFORM?

10:54AM   7    A.   MY UNDERSTANDING AT THIS TIME WAS THAT THE COMPANY WAS

10:54AM   8    STILL IN THE PROCESS OF CUSTOMIZATION FOR THE PROGRAM.

10:54AM   9    Q.   AND WHERE DID THAT UNDERSTANDING COME FROM?

10:54AM  10    A.   THAT'S WHAT I WAS TOLD BY ELIZABETH AND OTHER SCIENTISTS.

10:55AM  11    Q.   LET'S LOOK AT THE TOP EMAIL ON THIS PAGE.

10:55AM  12         HERE'S YOUR RESPONSE TO MARTIN DRAKE'S REQUEST FOR A DATE

10:55AM  13    CERTAIN FOR WHEN THE COMPANY COULD DO THE TEST; CORRECT?

10:55AM  14    A.   YES.

10:55AM  15    Q.   AND YOU SAY IN THE THIRD PARAGRAPH DOWN, "LOOKING AHEAD TO

10:55AM  16    2014, WE WOULD BE ABLE TO DELIVER ALL OF OUR EQUIPMENT TO

10:55AM  17    THEATER AND BEGIN TESTING BY AUGUST 1ST."

10:55AM  18         DO YOU SEE THAT?

10:55AM  19    A.   YES.

10:55AM  20    Q.   AND SO IN OTHER WORDS, THE COMPANY NEEDED ANOTHER YEAR TO

10:55AM  21    COMPLETE ITS WORK AND BE READY FOR THAT TESTING?

10:55AM  22    A.   THAT'S WHAT I WAS TOLD.

10:55AM  23    Q.   WERE YOU STILL AT THE COMPANY IN AUGUST OF 2014?

10:55AM  24    A.   YES.

10:55AM  25    Q.   AND DID THIS LIMITED OBJECTIVE EXPERIMENT ACTUALLY BEGIN A

10:55AM  1    YEAR LATER, IN AUGUST OF 2014?

10:55AM  2    A.   NO.

10:55AM  3    Q.   DID THIS LIMITED OBJECTIVE EXPERIMENT EVER TAKE PLACE

10:55AM  4    DURING YOUR TIME AT THE COMPANY?

10:55AM  5    A.   NO.

10:55AM  6    Q.   OKAY.  WE CAN SET THAT EXHIBIT ASIDE.

10:56AM  7         DID YOU EVER TRAVEL TO MILITARY BASES IN CONNECTION WITH

10:56AM  8    YOUR WORK AT THERANOS?

10:56AM  9    A.   YES.

10:56AM  10   Q.   AND WHAT DO YOU RECALL ABOUT THAT?

10:56AM  11   A.   I RECALL TRAVELLING TO THE MACDILL AIRFORCE BASE IN TAMPA

10:56AM  12   FOR A SECURITY TEST ON THE THERANOS DEVICES.

10:56AM  13   Q.   AND WHAT DOES "SECURITY TEST" MEAN IN THE CONTEXT OF WHAT

10:56AM  14   THE MILITARY WAS TRYING TO DO WITH THE DEVICES?

10:56AM  15   A.   CENTCOM WAS INTERESTED IN PLUGGING IN ONE OF THE THERANOS

10:56AM  16   DEVICES TO ITS SERVER TO UNDERSTAND WHAT ITS VULNERABILITIES

10:56AM  17   WERE FROM A SECURITY PERSPECTIVE.

10:56AM  18   Q.   AND DID THAT TEST INVOLVE ANY EVALUATION OF THE ACTUAL

10:56AM  19   PERFORMANCE OF THE MACHINE IN CLINICAL TESTING?

10:56AM  20   A.   NO.

10:56AM  21   Q.   WE HAVEN'T SPOKEN ABOUT AFRICOM YET.

10:57AM  22        WHAT DO YOU RECALL ABOUT AFRICOM'S EXPLORATION OF POSSIBLE

10:57AM  23   USE OF THE THERANOS DEVICE?

10:57AM  24   A.   AFRICOM WAS INTERESTED IN THE VIABILITY OF THERANOS

10:57AM  25   DEVICES IN CERTAIN TEST DEVICES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                              2556

10:57AM   1          I RECALL THAT, I BELIEVE, THREE EDISON DEVICES WERE I

10:57AM   2   THINK FIRST SENT TO EUROPE AND THEN FLOWN TO AFRICA TO DO SOME

10:57AM   3   TESTING.

10:57AM   4   Q.   AND DO YOU RECALL WHETHER THAT TESTING INCLUDED ACTUAL

10:57AM   5   CLINICAL USE OF THE DEVICES?

10:57AM   6          IN OTHER WORDS, WERE THE DEVICES USED IN AFRICA TO RUN

10:57AM   7   REAL TESTS ON PATIENTS THAT MEDICAL DECISIONS WERE BASED ON?

10:57AM   8   A.   NO.  FOR THAT PROGRAM, THE POINT OF CONTACT THERE SENT

10:58AM   9   THERANOS PREDETERMINED RESULTS THAT THEY WERE INTERESTED IN

10:58AM  10   SEEING ON THE THERANOS SCREEN, BUT IT'S MY UNDERSTANDING THAT

10:58AM  11   NO CLINICAL TESTS WERE DONE.

10:58AM  12   Q.   SO IF THE POINT OF THE TEST WASN'T TO ACTUALLY EVALUATE

10:58AM  13   THE CLINICAL PERFORMANCE OF THE MACHINE, WHAT WAS THE POINT OF

10:58AM  14   THE TEST AS YOU UNDERSTOOD IT?

10:58AM  15   A.   I UNDERSTOOD THAT THE POINT OF THE PROGRAM WAS TO EVALUATE

10:58AM  16   HOW THE DEVICES PERFORMED, INCLUDING USABILITY, AND IF THE

10:58AM  17   DEVICES WOULD POWER ON IN CERTAIN TESTING ENVIRONMENTS.

10:58AM  18   Q.   SO THINKING ABOUT ALL OF THE CONTACT THAT YOU HAD WITH THE

10:59AM  19   MILITARY AND YOUR KNOWLEDGE OF THE COMPANY'S INVOLVEMENT THERE,

10:59AM  20   DURING YOUR TIME AT THE COMPANY, WERE THERANOS ANALYZERS EVER

10:59AM  21   USED BY THE MILITARY CLINICALLY IN THE TREATMENT OF DEPLOYED

10:59AM  22   SOLDIERS?

10:59AM  23   A.   NOT TO MY KNOWLEDGE.

10:59AM  24   Q.   DID THE MILITARY DEPLOY ANY THERANOS DEVICES TO A

10:59AM  25   BATTLEFIELD OR A WAR ZONE FOR CLINICAL USE?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2557

10:59AM  1    A.   NO.

10:59AM  2    Q.   TO YOUR KNOWLEDGE, DID THE MILITARY EVER SEND A SINGLE

10:59AM  3    THERANOS ANALYZER TO THE MIDDLE EAST?

10:59AM  4    A.   NO.

10:59AM  5    Q.   AND TO YOUR KNOWLEDGE, WAS A THERANOS ANALYZER EVER

10:59AM  6    INSTALLED ON A MEDEVAC OR ANOTHER MILITARY HELICOPTER?

10:59AM  7    A.   NO.

10:59AM  8    Q.   DID YOU EVER DISCUSS WITH MS. HOLMES THE REASON WHY THE

10:59AM  9    MILITARY PROJECTS DIDN'T MOVE FURTHER ALONG?

10:59AM  10   A.   YES.

10:59AM  11   Q.   AND WHAT DO YOU REMEMBER HER SAYING ABOUT THAT?

11:00AM  12            MS. WALSH:  OBJECTION.  HEARSAY.

11:00AM  13            MR. BOSTIC:  IT'S NOT FOR THE TRUTH, YOUR HONOR.

11:00AM  14            THE COURT:  FOR WHAT PURPOSE?

11:00AM  15            MR. BOSTIC:  SO I THINK THIS IS TO -- I THINK THE

11:00AM  16   RELEVANT COMPARISON IS BETWEEN WHAT MS. HOLMES SAID AND THE

11:00AM  17   ACTUAL STATE OF THE TECHNOLOGY AT THE COMPANY.

11:00AM  18            THE COURT:  AND THAT'S NOT FOR THE TRUTH?

11:00AM  19            MR. BOSTIC:  NO, YOUR HONOR.  IN FACT, I BELIEVE THE

11:00AM  20   EVIDENCE WOULD SHOW THAT IT'S A FALSE STATEMENT.

11:00AM  21            THE COURT:  ALL RIGHT.  THANK YOU.

11:00AM  22        LADIES AND GENTLEMEN, THIS WILL BE ADMITTED NOT FOR THE

11:00AM  23   TRUTH OF THE MATTER ASSERTED IN THIS STATEMENT BY MS. HOLMES,

11:00AM  24   BUT ONLY AS TO ANY ISSUE OF FALSITY.  IT'S NOT FOR THE TRUTH OF

11:00AM  25   THE MATTER ASSERTED.

ER-1776

11:00AM 1   BY MR. BOSTIC:

11:00AM 2   Q.   SO, MR. EDLIN, THE QUESTION WAS, WHAT REASON, IF ANY, DID

11:01AM 3   MS. HOLMES GIVE YOU FOR WHY THE MILITARY PROJECTS WERE MOVING

11:01AM 4   FURTHER ALONG?

11:01AM 5   A.   SHE TOLD ME THAT IT WAS A RESOURCE ISSUE AND THAT THE

11:01AM 6   COMPANY'S LIMITED RESOURCES HAD TO BE DIRECTED TOWARDS

11:01AM 7   PREPARING FOR THE COMMERCIAL RETAIL LAUNCH.

11:01AM 8   Q.   IN THAT CONVERSATION, OR ANY OTHER CONVERSATION, DID

11:01AM 9   MS. HOLMES EVER TALK ABOUT LIMITATIONS IN CAPABILITIES OF THE

11:01AM 10  THERANOS DEVICES AS BEING THE REASON WHY THOSE CONTACTS WITH

11:01AM 11  THE MILITARY DIDN'T MOVE FORWARD?

11:01AM 12  A.   SHE DID NOT.

11:01AM 13  Q.   IN ANY COMMUNICATIONS THAT YOU WERE INVOLVED IN WITH THE

11:01AM 14  MILITARY, WAS THE MILITARY EVER TOLD THAT DEVICE READINESS, OR

11:01AM 15  THE CAPABILITIES OF THE DEVICE WERE THE REASON WHY THESE

11:01AM 16  PROJECTS WEREN'T MOVING FORWARD?

11:01AM 17  A.   I RECALL THAT THE FACT THAT THERANOS WAS CUSTOMIZING ITS

11:02AM 18  DEVICES FOR A PROGRAM AND NEEDED TIME TO DO THAT WAS BEING

11:02AM 19  DISCUSSED.

11:02AM 20  Q.   YOU REMEMBER IT BEING DISCUSSED IN TERMS OF CUSTOMIZATION?

11:02AM 21  A.   YES.

11:02AM 22  Q.   AND DO YOU RECALL THE MILITARY EVER BEING TOLD THAT

11:02AM 23  THERANOS DIDN'T HAVE A SINGLE DEVICE THAT COULD RUN ALL OF THE

11:02AM 24  TESTS THAT THE MILITARY NEEDED?

11:02AM 25  A.   NO.

EDLIN DIRECT BY MR. BOSTIC (RES.)                    2559

11:02AM   1              MS. WALSH:  OBJECTION.  LEADING.

11:02AM   2              THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

11:02AM   3    BY MR. BOSTIC:

11:02AM   4    Q.   AND THE ANSWER WAS?

11:02AM   5    A.   NO.

11:02AM   6    Q.   I'D LIKE TO SHIFT GEARS AND TALK ABOUT THERANOS PATIENTS.

11:02AM   7         IN YOUR ROLE AT THERANOS, WERE YOU GENERALLY AWARE OF

11:02AM   8    CALLS THAT THE COMPANY WOULD GET FROM PATIENTS OR DOCTORS ABOUT

11:02AM   9    QUESTIONABLE OR INACCURATE TEST RESULTS?

11:02AM  10    A.   I WAS GENERALLY AWARE.

11:02AM  11    Q.   ALL RIGHT.  HOW DID YOU COME TO BE AWARE OF THAT

11:02AM  12    HAPPENING?

11:02AM  13    A.   ON A FEW INSTANCES I WAS COPIED ON EMAIL SERVICE.

11:03AM  14    Q.   FROM YOUR WORK AT THE COMPANY, DO YOU KNOW WHETHER THERE

11:03AM  15    WERE PEOPLE WHO WORKED THERE WHO WERE DESIGNATED TO RECEIVE

11:03AM  16    THOSE CALLS FROM CUSTOMERS OR PATIENTS?

11:03AM  17    A.   YES.

11:03AM  18    Q.   AND WHAT GROUP OF PEOPLE ARE WE TALKING ABOUT THERE?

11:03AM  19    A.   I BELIEVE THERE WAS A CUSTOMER SERVICES GROUP THAT

11:03AM  20    RECEIVED THOSE CALLS.

11:03AM  21    Q.   AND ARE YOU AWARE OF WHERE THAT CUSTOMER SERVICES GROUP

11:03AM  22    SAT, IN OTHER WORDS, AT WHAT FACILITY?

11:03AM  23    A.   SO WE WERE IN -- I WAS IN THREE DIFFERENT BUILDINGS WHEN I

11:03AM  24    WAS EMPLOYED BY THE COMPANY.  I DO RECALL THAT IN THE SECOND

11:03AM  25    BUILDING, THAT TEAM WAS AT THE THERANOS OFFICES IN PALO ALTO.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2560

11:03AM   1        I DON'T RECALL WHERE THAT GROUP WAS LOCATED IN MY -- IN

11:03AM   2   THE THIRD BUILDING THAT I WAS APART OF IT.

11:03AM   3   Q.   OKAY.  AND THESE ARE BUILDINGS THAT YOU MOVED TO

11:03AM   4   SEQUENTIALLY?

11:04AM   5   A.   CORRECT.

11:04AM   6   Q.   LET ME ASK YOU TO TURN TO TAB 5413 IN THE BINDER IN FRONT

11:04AM   7   OF YOU.

11:04AM   8        OKAY.  DO YOU HAVE 5413?

11:04AM   9   A.   YES.

11:04AM  10   Q.   AND IS THIS AN EMAIL, INCLUDING YOU ON THE CHAIN, RELATING

11:04AM  11   TO A QUESTION FROM A PATIENT OR PHYSICIAN ABOUT A THERANOS LAB

11:04AM  12   TEST RESULT?

11:04AM  13   A.   YES.

11:04AM  14           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5413.

11:04AM  15           MS. WALSH:  OBJECTION, YOUR HONOR.  THERE ARE

11:04AM  16   MULTIPLE LEVELS OF HEARSAY IN THIS EMAIL.

11:04AM  17           THE COURT:  MR. BOSTIC.

11:05AM  18   BY MR. BOSTIC:

11:05AM  19   Q.   MR. EDLIN, DURING YOUR TIME AT THERANOS, WAS EMAIL USED AS

11:05AM  20   A PRIMARY MEANS OF COMMUNICATION BETWEEN EMPLOYEES?

11:05AM  21   A.   YES.

11:05AM  22   Q.   AND WHEN IT CAME TO THE WORK OF THE LAB AND THE RESULTS

11:05AM  23   THAT WENT OUT, WAS EMAIL USED TO DOCUMENT AND DISCUSS ISSUES

11:05AM  24   ABOUT SOME OF THOSE RESULTS?

11:05AM  25   A.   I DON'T KNOW SPECIFICALLY ABOUT THE LAB COMMUNICATIONS,

11:05AM   1    BUT I BELIEVE IT WAS A COMBINATION OF EMAILS AND CONVERSATIONS.

11:05AM   2    Q.   AND WERE YOU SOMETIMES INCLUDED IN INSTANCES OF EMAIL

11:05AM   3    CHAINS DISCUSSING ISSUES AROUND PATIENT COMPLAINTS LIKE THE ONE

11:06AM   4    IN FRONT OF YOU?

11:06AM   5    A.   IT WAS INFREQUENT, BUT SOMETIMES, YES.

11:06AM   6    Q.   AND IN THOSE EMAILS, WAS IT IMPORTANT FOR THE PEOPLE

11:06AM   7    CONVEYING THE INFORMATION TO BE ACCURATE SO THAT THE ISSUES

11:06AM   8    COULD BE ADDRESSED?

11:06AM   9    A.   YES.

11:06AM   10   Q.   AND WERE EMAILS LIKE THIS PRESERVED AT THERANOS SO THAT

11:06AM   11   THEY COULD BE REFERRED BACK TO LATER IF NEEDED?

11:06AM   12   A.   I BELIEVE SO.

11:06AM   13          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5413

11:06AM   14   UNDER 803(6).

11:06AM   15          MS. WALSH:  YOUR HONOR, ON PAGES 2 THROUGH 3, I

11:06AM   16   BELIEVE THAT FOUNDATION TAKES CARE OF THE EMAIL TO MR. EDLIN.

11:06AM   17      BUT ON PAGES 2 THROUGH 3, THERE ARE FURTHER ASSERTIONS

11:06AM   18   THAT ARE HEARSAY WITHIN HEARSAY, AND I BELIEVE MR. BOSTIC IS

11:06AM   19   OFFERING THOSE FOR THE TRUTH.

11:06AM   20          MR. BOSTIC:  AT A MINIMUM, I BELIEVE THIS SHOULD

11:07AM   21   COME IN FOR NOTICE TO MR. BALWANI WHO IS ON THE SECOND TOP

11:07AM   22   EMAIL OF PAGE 1.

11:07AM   23          THE COURT:  ALL RIGHT.  THANK YOU.

11:07AM   24      ANYTHING FURTHER, MS. WALSH?

11:07AM   25          MS. WALSH:  NO, YOUR HONOR.

EDLIN DIRECT BY MR. BOSTIC (RES.)                    2562

11:07AM   1              THE COURT:  ALL RIGHT.  THANK YOU.

11:07AM   2          I'LL ADMIT THIS.

11:07AM   3          LADIES AND GENTLEMEN, THIS IS OFFERED NOT FOR THE EMAILS

11:07AM   4   AND THE CONTENT, THAT IS, THE CONTENT FROM THE SENDER OF THE

11:07AM   5   EMAIL REGARDING SERVICES, IT'S NOT OFFERED FOR THE TRUTH OF THE

11:07AM   6   MATTER ASSERTED, BUT ONLY AS TO THE ISSUE OF NOTICE TO THE

11:07AM   7   RECIPIENTS OF THE EMAIL OF WHICH MR. BALWANI WAS ONE.

11:07AM   8          SO IT'S FOR THAT LIMITED PURPOSE.

11:07AM   9          MR. BOSTIC.

11:07AM  10          AND IT MAY BE PUBLISHED.

11:07AM  11          (GOVERNMENT'S EXHIBIT 5413 WAS RECEIVED IN EVIDENCE.)

11:07AM  12              MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:07AM  13   Q.   SO LOOKING AT EXHIBIT 5413, LET'S START WITH PAGE 2 AND

11:08AM  14   THE BOTTOM OF THE PAGE.

11:08AM  15          MR. EDLIN, THIS IS AN EMAIL FROM JULY 29TH, 2014, FROM

11:08AM  16   SOMEONE NAMED AMELIA AGUIRRE TO CHRISTIAN HOLMES AND TO YOU.

11:08AM  17          DO YOU SEE THAT?

11:08AM  18   A.   YES.

11:08AM  19   Q.   AND THE SUBJECT IS PATIENT REQUESTING PHYSICIAN CALL

11:08AM  20   REGARDING LAB RESULTS.

11:08AM  21          AND THE TEXT SAYS, "I RECEIVED A CALL FROM PATIENT," AND

11:08AM  22   WE REDACTED THE NAME.  IT SAYS, "HE EXPRESSED THAT HE DOES NOT

11:08AM  23   BELIEVE OUR RESULTS WERE NOT ACCURATE," ALTHOUGH THAT MAY BE A

11:08AM  24   TYPO, "FROM HIS LAST VISIT AND HIS PHYSICIAN AGREES (NOT

11:08AM  25   CONSISTENT WITH HISTORY)."

ER-1781

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2563

11:08AM   1          DO YOU SEE THAT?

11:08AM   2     A.   YES.

11:08AM   3     Q.   AND LET'S GO TO PAGE 3.  AND ZOOM IN THE TOP TWO

11:08AM   4     PARAGRAPHS THERE.

11:08AM   5          THE REPORT SAYS, "HE CAME TO THERANOS MOST RECENTLY ON

11:08AM   6     JULY 22ND, AND THE RESULTS FOR INR WERE .9.  HIS PHYSICIAN SENT

11:09AM   7     HIM TO LABCORP 2 DAYS LATER BECAUSE HE BELIEVED THE LAB RESULTS

11:09AM   8     WERE LOW AND HIS RESULT AT LABCORP FOR INR WAS 3.1 (WHICH

11:09AM   9     PATIENT SAYS IS MORE CONSISTENT WITH HIS HISTORY WHICH IS

11:09AM  10     USUALLY BETWEEN 2.0 AND 3.0)."

11:09AM  11          DO YOU SEE THAT?

11:09AM  12     A.   YES.

11:09AM  13     Q.   AND IT SAYS, "HE CURRENTLY HAS A STANDING ORDER FOR PT/INR

11:09AM  14     FROM HIS DOCTOR, HOWEVER, HE DOES NOT WANT TO CONTINUE TO COME

11:09AM  15     TO THERANOS EVEN THOUGH HE HAS A STANDING ORDER UNTIL WE VERIFY

11:09AM  16     THAT OUR RESULTS ARE ACCURATE."

11:09AM  17          DO YOU SEE THAT?

11:09AM  18     A.   YES.

11:09AM  19     Q.   AND LET'S GO BACK TO PAGE 2, AND LET'S ZOOM IN ON THE

11:09AM  20     EMAIL FROM CHRISTIAN HOLMES TO YOU AND TO MAX FOSQUE.

11:09AM  21     A.   YES.

11:09AM  22     Q.   AND CHRISTIAN HOLMES SAYS TO MAX, "CAN YOU PULL THE

11:09AM  23     RESULTS HISTORY FOR THIS PATIENT ON THE INR HE'S ASKING ABOUT?

11:09AM  24     ELIZABETH WANTS TO REVIEW THEN HAVE SOMEONE CALL THE

11:09AM  25     PATIENT/DOC BACK."

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    2564

11:10AM   1        DO YOU SEE THAT?

11:10AM   2   A.   YES.

11:10AM   3   Q.   DURING YOUR TIME AT THE COMPANY, DID YOU HAVE AN

11:10AM   4   UNDERSTANDING OF WHAT ROLE ELIZABETH HOLMES HAD IN REVIEWING

11:10AM   5   PATIENT RESULTS IN SITUATIONS SUCH AS THIS?

11:10AM   6   A.   I BELIEVE ON SOME OCCASIONS SHE WORKED WITH WHOEVER WOULD

11:10AM   7   BE RESPONDING TO WORKING WITH THE PHYSICIAN ON CERTAIN

11:10AM   8   MESSAGING AND SCRIPTING.

11:10AM   9   Q.   IN FACT, LET'S GO TO PAGE 1 OF THIS EXHIBIT.  AND LOOK AT

11:10AM  10   THE TOP TWO MESSAGES OR THE TOP THREE MESSAGES.

11:10AM  11        WE SEE A MESSAGE AT THE BOTTOM FROM MS. HOLMES TO THIS

11:10AM  12   GROUP, INCLUDING MR. BALWANI.

11:10AM  13        DO YOU SEE THAT?

11:10AM  14   A.   YES.

11:10AM  15   Q.   SHE SAYS, "MAX -- NEED YOU TO TRIAGE THIS, THEN COME BRIEF

11:10AM  16   ME ON WHAT HAPPENED.  FROM THERE WE'LL DECIDE WHO WILL CALL."

11:10AM  17        DO YOU SEE THAT?

11:10AM  18   A.   YES.

11:10AM  19   Q.   MAX FOSQUE THEN ASKS, "WHAT DOES THIS MEAN?"

11:11AM  20        IS THAT EMAIL JUST TO YOU?

11:11AM  21   A.   I BELIEVE IT'S TO CHRISTIAN.

11:11AM  22   Q.   I SEE.

11:11AM  23        AND THEN CHRISTIAN HOLMES WRITES BACK, "WHAT SUNNY JUST

11:11AM  24   SAID -- HOPE THAT MAKES SENSE.  BASICALLY HAVE NISHIT LOOK AT

11:11AM  25   THE DATA AND SEE IF ANYTHING WENT WRONG (IDENTIFY THE ISSUE)

11:11AM  1    THEN WORK WITH ELIZABETH ON SCRIPTING WHILE SUNNY ADDRESSES

11:11AM  2    ROOT CAUSE OF ANY ISSUE INTERNALLY."

11:11AM  3        DO YOU SEE THAT?

11:11AM  4    A.   YES.

11:11AM  5    Q.   AND THAT REFERENCE TO ELIZABETH HOLMES WORKING ON

11:11AM  6    SCRIPTING, WHAT IS YOUR UNDERSTANDING OF WHAT SCRIPTING WOULD

11:11AM  7    HAVE MEANT IN THAT CONTEXT?

11:11AM  8    A.   I THINK IT REFERS TO MESSAGING THAT WOULD RELATE TO THE

11:11AM  9    SPECIFIC ISSUE.

11:11AM  10   Q.   MESSAGING TO WHOM?

11:11AM  11   A.   PHYSICIANS.

11:11AM  12   Q.   AND THEN IT SAYS, "WHILE SUNNY ADDRESSES ROOT CAUSE OF ANY

11:12AM  13   ISSUE INTERNALLY."

11:12AM  14       WHAT IS YOUR UNDERSTANDING OF WHAT WOULD BE INVOLVED IN

11:12AM  15   THAT?

11:12AM  16   A.   MY UNDERSTANDING IS THAT SUNNY WOULD WORK WITH THE

11:12AM  17   LABORATORY PERSONNEL TO UNDERSTAND WHAT CAUSED THE ISSUE.

11:12AM  18       SO INTERNALLY I BELIEVE IT WOULD REFER TO WITHIN THE

11:12AM  19   CLINICAL LAB OR WITH THERANOS SCIENTISTS.

11:12AM  20   Q.   OKAY.  WE CAN SET THAT ASIDE.

11:12AM  21       I'D LIKE TO ASK YOU A FEW QUESTIONS ABOUT THE RELATIONSHIP

11:12AM  22   BETWEEN MS. HOLMES AND MR. BALWANI.

11:12AM  23       WE TALKED EARLIER ABOUT THEIR WORKING RELATIONSHIP AND

11:12AM  24   WHAT YOU OBSERVED THERE.  I'D LIKE TO ASK YOU NOW ABOUT THEIR

11:12AM  25   PERSONAL RELATIONSHIP.

11:12AM 1    WHEN YOU WERE WORKING AT THE COMPANY, WERE YOU AWARE THAT

11:12AM 2    MS. HOLMES AND MR. BALWANI HAD A PERSONAL RELATIONSHIP?

11:12AM 3    A.   YES.

11:12AM 4    Q.   HOW DID YOU KNOW ABOUT THAT?

11:12AM 5    A.   WHEN I WAS FIRST INTRODUCED TO SUNNY IN -- WHEN I WAS

11:13AM 6    STILL IN COLLEGE, HE WAS INTRODUCED TO ME AS ELIZABETH'S

11:13AM 7    BOYFRIEND.

11:13AM 8    Q.   EVEN BEFORE YOU STARTED WORK AT THE COMPANY?

11:13AM 9    A.   YES.

11:13AM 10   Q.   AND WHEN YOU STARTED WORK AT THE COMPANY, WERE MS. HOLMES

11:13AM 11   AND MR. BALWANI STILL ROMANTICALLY INVOLVED?

11:13AM 12   A.   I BELIEVE SO -- I'M NOT SURE OF THE EXACT NATURE OF THEIR

11:13AM 13   RELATIONSHIP, BUT I BELIEVE THERE WAS STILL A RELATIONSHIP

11:13AM 14   OUTSIDE OF THE OFFICE.

11:13AM 15   Q.   DURING THE TIME THAT YOU WORKED AT THE COMPANY, WAS THAT

11:13AM 16   RELATIONSHIP PUBLIC KNOWLEDGE?

11:13AM 17        IN OTHER WORDS, WAS IT SOMETHING THAT WAS FREELY SHARED

11:13AM 18   WITH EMPLOYEES OF THE COMPANY?

11:13AM 19   A.   NO.

11:13AM 20   Q.   DURING THE TIME THAT YOU WERE AN EMPLOYEE AT THE COMPANY,

11:13AM 21   DID YOU HAVE ANY OPPORTUNITIES TO OBSERVE MS. HOLMES AND

11:13AM 22   MR. BALWANI OUTSIDE OF THE WORK CONTEXT IN THE PERSONAL

11:14AM 23   CONTEXT?

11:14AM 24   A.   YES.

11:14AM 25   Q.   AND HOW DID THOSE OPPORTUNITIES COME UP?

ER-1785

11:14AM 1    A.   THEY CAME UP WHEN CHRISTIAN WOULD USUALLY TELL MYSELF OR

11:14AM 2    OTHER MEMBERS OF THE PRODUCT MANAGEMENT TEAM, WE WOULD, YOU

11:14AM 3    KNOW, BE INVITED TO DINNER, EITHER TO GO OUT TO DINNER OR THERE

11:14AM 4    WERE OTHER TIMES THAT WE WENT TO SUNNY'S HOUSE FOR DINNER.

11:14AM 5    Q.   AND DURING THAT TIME, DID YOU OBSERVE MR. BALWANI AND

11:14AM 6    MS. HOLMES ACTING AS A COUPLE?

11:14AM 7    A.   YES.

11:14AM 8    Q.   AND DURING PART OF THAT TIME PERIOD, WERE MS. HOLMES AND

11:14AM 9    MR. BALWANI LIVING TOGETHER AT THE SAME ADDRESS?

11:14AM 10   A.   YES.

11:14AM 11   Q.   AND DO YOU REMEMBER WHAT DATE RANGE WE WOULD BE TALKING

11:14AM 12   ABOUT THERE APPROXIMATELY?

11:14AM 13   A.   I'M NOT SURE OF THE EXACT DATES, BUT I THINK IN THE 2013

11:15AM 14   TO '14 TO PART OF '15 RANGE.

11:15AM 15   Q.   DURING YOUR TIME AT THE COMPANY, WAS IT YOUR UNDERSTANDING

11:15AM 16   THAT MS. HOLMES AND MR. BALWANI WERE IN A ROMANTIC RELATIONSHIP

11:15AM 17   THE ENTIRE TIME, OR DID YOU COME TO UNDERSTAND AT SOME POINT

11:15AM 18   THAT THAT RELATIONSHIP ENDED?

11:15AM 19        WHAT DID YOU KNOW ABOUT THAT?

11:15AM 20   A.   I DIDN'T HAVE AN UNDERSTANDING OF THAT.

11:15AM 21   Q.   LET ME SHOW YOU ONE MORE DOCUMENT.

11:15AM 22        MAY I APPROACH, YOUR HONOR?

11:15AM 23           THE COURT:  YES.

11:16AM 24        MR. BOSTIC, BEFORE WE MOVE INTO THIS, I'M BEING REQUESTED

11:16AM 25   FOR A BREAK BY ONE OF THE JURORS.

| | | |
|---|---|---|
| 11:16AM | 1 | MR. BOSTIC:  NOW IS A GOOD TIME, YOUR HONOR. |
| 11:16AM | 2 | THE COURT:  LET'S TAKE OUR MORNING BREAK, LADIES AND |
| 11:16AM | 3 | GENTLEMEN.  THANK YOU. |
| 11:50AM | 4 | (RECESS FROM 11:17 A.M. UNTIL 11:50 A.M.) |
| 11:50AM | 5 | (JURY OUT AT 11:50 A.M.) |
| 11:50AM | 6 | THE COURT:  LET'S GO BACK ON THE RECORD. |
| 11:50AM | 7 | I JUST WANTED TO SAY, COUNSEL, AFTER WE BREAK TODAY, I'D |
| 11:50AM | 8 | LIKE TO KEEP ONE JUROR WHO HAS EXPRESSED SOME ISSUES REGARDING |
| 11:50AM | 9 | MEDICAL APPOINTMENTS THAT WE SHOULD DISCUSS.  I'M GOING TO KEEP |
| 11:51AM | 10 | THE JUROR, AND WE'LL TALK WITH HIM PRIVATELY OUTSIDE OF THE |
| 11:51AM | 11 | PRESENCE OF THE OTHER JURORS. |
| 11:51AM | 12 | I JUST WANTED TO LET YOU KNOW THAT. |
| 11:51AM | 13 | WE'LL BRING OUR JURY IN.  I THINK THEY'RE GOING TO |
| 11:51AM | 14 | RECONSTITUTE THEMSELVES IN THE BOX.  SO THIS WILL TAKE A |
| 11:51AM | 15 | MOMENT. |
| 11:51AM | 16 | (PAUSE IN PROCEEDINGS.) |
| 11:55AM | 17 | (JURY IN AT 11:55 A.M.) |
| 11:55AM | 18 | THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL |
| 11:55AM | 19 | ARE PRESENT. |
| 11:55AM | 20 | MR. EDLIN IS ON THE STAND. |
| 11:55AM | 21 | OUR JURY IS PRESENT RECONSTITUTED IN THE BOX. |
| 11:55AM | 22 | JUST ON OBSERVATION, FOLKS, IT LOOKS LIKE THIS WILL BE A |
| 11:55AM | 23 | FULL FLIGHT. |
| 11:55AM | 24 | (LAUGHTER.) |
| 11:55AM | 25 | THE COURT:  SO I'M GLAD.  YOU LOOK GOOD THERE. |

11:55AM  1    THANK YOU.  I APPRECIATE THAT.

11:55AM  2         IF ANY -- DURING THE PROCEEDINGS, IF ANYONE HAS ANY ISSUE

11:55AM  3    ABOUT ANYTHING, YOU SHOULD PLEASE LET ME KNOW, LET MS. ROBINSON

11:55AM  4    KNOW, RAISE YOUR HAND IF YOU NEED TO ADJUST ANY OF THESE

11:55AM  5    SCREENS.

11:55AM  6         YOU MIGHT WANT TO ADJUST THESE SCREENS NOW IN

11:55AM  7    ANTICIPATION, BUT IF ANY OTHER ISSUE COMES UP REGARDING YOUR

11:55AM  8    COMFORT IN THE SEATING, PLEASE LET ME KNOW AND WE'LL DO --

11:55AM  9    WE'LL MAKE EFFORTS TO ACCOMMODATE THINGS.

11:56AM  10        OTHERWISE, ENJOY THE FLIGHT.  YOU'RE VERY COMPACT.

11:56AM  11        I HAVE TO SAY WE HAVEN'T SEEN -- IT'S BEEN ABOUT TWO YEARS

11:56AM  12   SINCE WE ACTUALLY HAD A JURY FULLY CONSTITUTED IN THE BOX HERE.

11:56AM  13   SO IT'S REFRESHING FOR ME TO SEE A FULL BOX AS WE GET BACK TO

11:56AM  14   NORMALCY IN OUR COURTS.

11:56AM  15        SO THANK YOU VERY MUCH.

11:56AM  16             JURORS:  YAY.

11:56AM  17             THE COURT:  MR. BOSTIC.

11:56AM  18             MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:56AM  19   Q.  MR. EDLIN, BEFORE THE BREAK, I THINK I HANDED YOU A COPY

11:56AM  20   OF WHAT HAS BEEN MARKED AS EXHIBIT 5387I.

11:56AM  21        DO YOU HAVE THAT IN FRONT OF YOU?

11:56AM  22   A.  YES.

11:56AM  23   Q.  WHEN YOU WERE AN EMPLOYEE AT THERANOS, DID YOU EVER

11:56AM  24   COMMUNICATE WITH MS. HOLMES AND MR. BALWANI BY TEXT MESSAGE?

11:56AM  25   A.  SOMETIMES, YES.

11:56AM   1    Q.   DID YOU EVER HAVE OCCASION, THOUGH, TO SEE THEIR TEXT

11:56AM   2    CORRESPONDENCE BETWEEN EACH OTHER, JUST THE TWO OF THEM?

11:56AM   3    A.   NO.

11:56AM   4    Q.   I'D LIKE TO REVIEW SOME OF THOSE TEXT MESSAGES WITH YOU.

11:57AM   5         YOUR HONOR, THE GOVERNMENT OFFERS 5387I.

11:57AM   6              MS. WALSH:   NO OBJECTION, YOUR HONOR.

11:57AM   7              THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

11:57AM   8         (GOVERNMENT'S EXHIBIT 5387I WAS RECEIVED IN EVIDENCE.)

11:57AM   9    BY MR. BOSTIC:

11:57AM  10    Q.   FIRST, BEFORE WE ZOOM IN AND LOOK AT ANY OF THESE

11:57AM  11    MESSAGES, I ASKED YOU BEFORE WHETHER MS. HOLMES AND

11:57AM  12    MR. BALWANI'S RELATIONSHIP WAS SOMETHING THAT COULD BE FREELY

11:57AM  13    SHARED AND DISCUSSED AT THERANOS.

11:57AM  14         DO YOU REMEMBER THAT?

11:57AM  15    A.   YES.

11:57AM  16    Q.   AND DO YOU REMEMBER WHAT YOUR ANSWER WAS ON THAT?

11:57AM  17    A.   NO.

11:57AM  18    Q.   AND HOW DID YOU COME TO UNDERSTAND THAT THEIR RELATIONSHIP

11:57AM  19    WAS NOT SOMETHING THAT COULD BE OPENLY DISCUSSED AT THE

11:57AM  20    COMPANY?

11:57AM  21    A.   I DON'T REMEMBER A SPECIFIC CONVERSATION.   I DON'T

11:58AM  22    REMEMBER A SPECIFIC CONVERSATION.

11:58AM  23    Q.   YOU MENTIONED THAT THERE WAS A GROUP OF PRODUCT MANAGERS

11:58AM  24    WHO WOULD SOMETIMES BE INVITED TO THE HOUSE WHERE MS. HOLMES

11:58AM  25    AND MR. BALWANI LIVED; IS THAT RIGHT?

11:58AM 1      A.   YES.

11:58AM 2      Q.   WHAT WAS IT ABOUT THAT GROUP THAT, IN YOUR UNDERSTANDING,

11:58AM 3      MADE IT OKAY FOR THEM TO KNOW ABOUT THE EXISTENCE OF THE

11:58AM 4      RELATIONSHIP?

11:58AM 5      A.   WE HAD MET BEFORE I HAD STARTED WORKING THERE, AND

11:58AM 6      SIMILARLY OTHER -- WE MET BEFORE WE STARTED WORKING AT

11:58AM 7      THERANOS, AND WE WERE AWARE OF THAT RELATIONSHIP EXISTING.

11:58AM 8      Q.   AND ARE WE TALKING THEN ABOUT THE GROUP OF

11:58AM 9      CHRISTIAN HOLMES'S COLLEGE CLASSMATES?

11:58AM 10     A.   YES.

11:58AM 11     Q.   STARTING AT PAGE 1 OF THIS EXHIBIT, I'LL ASK YOU TO LOOK

11:59AM 12     AT THE TOP PORTION OF THESE TEXT MESSAGES.

11:59AM 13          DO YOU SEE THAT WE'RE LOOKING AT TEXTS FROM JUNE OF 2011?

11:59AM 14     A.   YES.

11:59AM 15     Q.   AND THIS BEGINS WITH A MESSAGE FROM MS. HOLMES TO

11:59AM 16     MR. BALWANI SAYING, "STEVE WANTS WARRANTS FOR HITTING 50 PER

11:59AM 17     DAY PER STORE."

11:59AM 18          DO YOU SEE THAT?

11:59AM 19     A.   YES.

11:59AM 20     Q.   ARE YOU AWARE -- WELL, LET ME ASK YOU, WERE YOU WORKING AT

11:59AM 21     THE COMPANY IN JUNE OF 2011?

11:59AM 22     A.   NO.

11:59AM 23     Q.   WHEN YOU STARTED AT THE COMPANY, WERE YOU AWARE OF

11:59AM 24     DEALINGS THAT THE COMPANY HAD HAD WITH SAFEWAY?

11:59AM 25     A.   YES.

11:59AM  1    Q.   AND WHAT WERE YOU AWARE OF IN THAT REGARD?

11:59AM  2    A.   I WAS AWARE THAT THE COMPANY WAS WORKING WITH SAFEWAY TO

11:59AM  3    PLAN A ROLLOUT SIMILAR TO THE WALGREENS ROLLOUT WHERE

11:59AM  4    THERANOS -- LAB TESTING WOULD BE AVAILABLE THROUGH SAFEWAY.

11:59AM  5    Q.   AND DO YOU RECOGNIZE THE NAME STEVE BURD FROM YOUR TIME AT

12:00PM  6    THERANOS?

12:00PM  7    A.   YES.  HE WAS THE CEO OF SAFEWAY AT THAT TIME.

12:00PM  8    Q.   MS. HOLMES TEXTS THAT "STEVE WANTS WARRANTS FOR HITTING 50

12:00PM  9    PER DAY PER STORE."

12:00PM  10       SHE THEN ASKED, "YOU THERE?"

12:00PM  11       THEN MR. BALWANI SAYS, "WE CANT DO THAT."

12:00PM  12       DO YOU SEE THAT?

12:00PM  13   A.   YES.

12:00PM  14   Q.   AND MR. BALWANI ASKS, "IN WHAT TIMEFRAME?"

12:00PM  15       AND MS. HOLMES SAYS, "DIDN'T SAY."

12:00PM  16       AND MR. BALWANI SAYS, "BESIDES.  WE DON'T KNOW IF DOCS

12:00PM  17   WILL LIKE SAFEWAY OVER OTHERS."

12:00PM  18       DO YOU SEE THAT?

12:00PM  19   A.   YES.

12:00PM  20   Q.   AND HE SAYS, "WHAT IF SAFEWAY BUNGLES UP."

12:00PM  21       DID I READ THAT CORRECTLY?

12:00PM  22   A.   YES.

12:00PM  23   Q.   AND LET'S ZOOM OUT AND ZOOM IN ON THE NEXT PORTION.

12:00PM  24       MR. BALWANI ASKS A CLARIFYING QUESTION "YOU MEAN 50

12:00PM  25   PATIENTS PER DAY PER STORE RIGHT?"

EDLIN DIRECT BY MR. BOSTIC (RES.)                                2573

12:00PM  1          AND MS. HOLMES SAYS, "YES"; RIGHT?

12:01PM  2     A.   YES.

12:01PM  3     Q.   AND MR. BALWANI GOES ON TO EXPLAIN WHY HE'S OPPOSED TO THE

12:01PM  4     IDEA.

12:01PM  5          DO YOU SEE THAT?

12:01PM  6     A.   YES.

12:01PM  7     Q.   AND MR. BALWANI THEN ASKS, "STILL ON PHONE WITH HIM?"

12:01PM  8          AND MS. HOLMES SAYS, "YES."

12:01PM  9          DO YOU SEE THAT?

12:01PM 10     A.   YES.

12:01PM 11     Q.   LET'S NOW GO TO THE NEXT PAGE OF THE EXHIBIT AND LET'S

12:01PM 12     ZOOM IN ON THE TOP HALF.

12:01PM 13          AGAIN, MORE COMMUNICATIONS ON JUNE 22ND, 2011.

12:01PM 14          MS. HOLMES SAYS, A THIRD FROM THE TOP, "MEETING WAS

12:01PM 15     PERFECT."

12:01PM 16          DO YOU SEE THAT?

12:01PM 17     A.   YES.

12:01PM 18     Q.   MR. BALWANI SAYS, "AWESOME.  U R ALWAYS PERFECT."

12:01PM 19          DO YOU SEE THAT?

12:01PM 20     A.   YES.

12:01PM 21     Q.   AND MS. HOLMES REPORTS ABOUT HALF WAY DOWN THAT SELECTION,

12:01PM 22     "THEY WANT IN, WANT TO INVEST, WANT TO BE MOST PREFERRED

12:01PM 23     PARTNER."

12:01PM 24          DO YOU SEE THAT?

12:01PM 25     A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                      2574

12:02PM   1    Q.   AND MR. BALWANI RESPONDS, "AGTG.  HMFR."

12:02PM   2         DO YOU SEE THAT?

12:02PM   3    A.   YES.

12:02PM   4    Q.   AND MS. HOLMES ASKS, "WHAT DOES AGTG MEAN?"

12:02PM   5         AND MR. BALWANI RESPONDS, "ALL GLORY TO GOD."

12:02PM   6         DO YOU SEE THAT?

12:02PM   7    A.   YES.

12:02PM   8    Q.   AND LET'S ZOOM IN ON THE BOTTOM OF THIS PAGE, THE BOTTOM

12:02PM   9    HALF.

12:02PM  10         AND DO YOU SEE SOME COMMUNICATIONS HERE RELATING TO

12:02PM  11    MR. BALWANI'S FLIGHT STATUS AND HIS FLIGHT BEING DELAYED?

12:02PM  12    A.   YES.

12:02PM  13    Q.   AND HE TALKS ABOUT WHETHER HE'S GOING TO WORK ON THE

12:02PM  14    PLANE.

12:02PM  15         DO YOU SEE THAT TOWARDS THE BOTTOM OF THE PAGE?

12:02PM  16    A.   YES.

12:02PM  17    Q.   LET'S GO TO PAGE 3 AND ZOOM IN ON THIS PORTION.

12:03PM  18         DO YOU SEE HERE MORE DISCUSSION ABOUT IMMEDIATE PLANS, AND

12:03PM  19    THEN ALSO A THIRD FROM THE BOTTOM A DISCUSSION ABOUT AN EMAIL

12:03PM  20    THAT MR. BALWANI SENT ABOUT LARRY SUMMER AND SQUARE.

12:03PM  21         HE SAYS, "GOOD TIME FOR US TO TALK WITH HANK NEXT MONTH

12:03PM  22    AFTER GLORY 2 (C2)."

12:03PM  23         DO YOU SEE THAT?

12:03PM  24    A.   YES.

12:03PM  25    Q.   AND THEN SOME ADDITIONAL INFORMATION ABOUT MS. HOLMES'S

EDLIN DIRECT BY MR. BOSTIC (RES.)                    2575

12:03PM  1    LANDING TIME; CORRECT?

12:03PM  2    A.   YES.

12:03PM  3    Q.   AND THEN MR. BALWANI SAYS, "BE SAFE.  TEXT ME WHEN U LAND

12:03PM  4    AND ARRIVE."

12:03PM  5         DO YOU SEE THAT?

12:03PM  6    A.   YES.

12:03PM  7    Q.   LET'S GO TO THE FOLLOWING PAGE.  LET'S ZOOM IN ON THAT TOP

12:03PM  8    PORTION.

12:03PM  9         DO YOU SEE SOME MESSAGES FROM MR. BALWANI AND MS. HOLMES

12:03PM  10   EXPRESSING AFFECTION FOR EACH OTHER?

12:03PM  11   A.   YES.

12:03PM  12   Q.   LET'S GO DOWN TO THE BOTTOM SECTION.

12:04PM  13        WE SEE SOME MORE DISCUSSION BETWEEN MR. BALWANI AND

12:04PM  14   MS. HOLMES ABOUT DINNER PLANS; CORRECT?

12:04PM  15   A.   YES.

12:04PM  16   Q.   LET'S GO TO THE FOLLOWING PAGE.  LET'S ZOOM IN ON THE

12:04PM  17   BOTTOM PORTION HERE, THE BOTTOM THIRD OR SO.

12:04PM  18        AND DO YOU SEE HERE THERE'S A MESSAGE FROM MR. BALWANI ON

12:04PM  19   JUNE 23RD, 2011, "THRU SKYPE WE R TOGETHER.  CAN'T BE APART

12:04PM  20   FROM U FOR EVEN FEW HOURS."

12:04PM  21        DO YOU SEE THAT?

12:04PM  22   A.   YES.

12:04PM  23   Q.   LET'S GO TO THE NEXT PAGE.  ZOOM IN ON THAT PORTION.

12:04PM  24        DO YOU SEE HERE SOME ADDITIONAL MESSAGES BETWEEN

12:05PM  25   MS. HOLMES AND MR. BALWANI EXPRESSING AFFECTION AND

ER-1794

12:05PM 1   APPRECIATION FOR THEIR RELATIONSHIP?

12:05PM 2   A.   YES.

12:05PM 3   Q.   LET'S GO TO THE FOLLOWING PAGE.  THAT'S PAGE 7 OF THE

12:05PM 4   EXHIBIT.  ZOOM IN ON THAT PORTION.

12:05PM 5        AND DO YOU SEE HERE A DISCUSSION ABOUT TOUCH SCREENS

12:05PM 6   STARTING WITH A TEXT MESSAGE FROM MR. BALWANI TO MS. HOLMES NOW

12:05PM 7   IN MAY OF 2012?

12:05PM 8   A.   YES.

12:05PM 9   Q.   AND DO YOU SEE THAT MR. BALWANI TALKS ABOUT A PREVIOUS

12:05PM 10  PURCHASE OR A PAYMENT FOR 200 12-INCH TOUCH SCREENS?

12:05PM 11  A.   YES.

12:05PM 12  Q.   AND MR. BALWANI THEN TELLS MS. HOLMES, "I DON'T THINK WE

12:05PM 13  WILL USE MORE THAN 20 OR 30 OF THESE THIS YEAR SO I AM TRYING

12:06PM 14  TO RETURN 170-180 OF THESE IF WE CAN."

12:06PM 15       DO YOU SEE THAT?

12:06PM 16  A.   YES.

12:06PM 17  Q.   AND MR. BALWANI THEN EXPLAINS THAT THE 20 TO 30 CAN BE

12:06PM 18  USED IN MONOS OR MINILABS THAT WE WILL SEND OUT FOR COOL DEMOS.

12:06PM 19       AND HE SAYS FOR ALL NORMANDY MACHINES, WE WILL USE THE

12:06PM 20  EXISTING 8.4 INCH SCREENS.

12:06PM 21       DO YOU SEE THAT?

12:06PM 22  A.   YES.

12:06PM 23  Q.   DURING YOUR TIME AT THE COMPANY, DO YOU RECALL DIFFERENT

12:06PM 24  VERSIONS OF DEVICES THAT WERE SENT OUT FOR DEMOS VERSUS

12:06PM 25  VERSIONS THAT WERE USED INTERNALLY FOR PATIENT TESTING?

12:06PM  1    A.    CAN YOU REPEAT THE QUESTION.

12:06PM  2    Q.    SURE.

12:06PM  3          DURING YOUR TIME AT THE COMPANY, DID YOU EVER WITNESS

12:06PM  4    DIFFERENT VERSIONS OF DEVICES BEING SENT OUT FOR DEMOS THAT

12:06PM  5    WERE DIFFERENT FROM THE VERSIONS THAT WERE USED IN HOUSE FOR

12:06PM  6    PATIENT TESTING?

12:06PM  7    A.    AND WHEN YOU SAY, "SENT OUT FOR DEMOS"?

12:06PM  8    Q.    WELL, I GUESS I'M REFERRING TO THE LANGUAGE OF

12:07PM  9    MR. BALWANI'S TEXT WHERE HE SAYS, "MONOS AND MINILABS THAT WE

12:07PM  10   SENT OUT FOR COOL DEMOS."

12:07PM  11         LET ME JUST ASK, DO YOU HAVE A MEMORY OF A PRACTICE THAT

12:07PM  12   IS CONSISTENT WITH THIS TEXT?

12:07PM  13   A.    NO.

12:07PM  14   Q.    YOU TESTIFIED EARLIER ABOUT MONOS AND MINILABS AND OTHER

12:07PM  15   NEXT GENERATION DEVICES.

12:07PM  16         DO YOU REMEMBER THAT TESTIMONY?

12:07PM  17   A.    YES.

12:07PM  18   Q.    WERE THOSE DEVICES USED FOR PATIENT TESTING AT THERANOS?

12:07PM  19   A.    NO.

12:07PM  20   Q.    DO YOU SEE FURTHER DOWN THE PAGE THERE'S SOME ADDITIONAL

12:07PM  21   DISCUSSION AND PLANNING BETWEEN MS. HOLMES AND MR. BALWANI

12:07PM  22   ABOUT DEVICE SPECIFICATIONS AND ALLOCATION?

12:08PM  23   A.    YES.

12:08PM  24   Q.    LET'S GO TO PAGE 10 OF THE EXHIBIT, AND LET'S ZOOM IN ON

12:08PM  25   THE TOP HALF OF THE PAGE.

EDLIN DIRECT BY MR. BOSTIC (RES.)                    2578

12:08PM   1              AND DO YOU SEE HERE THAT NOW WE'RE IN NOVEMBER 2013, SO

12:08PM   2    WE'VE MOVED FORWARD IN TIME?

12:08PM   3    A.   YES.

12:08PM   4    Q.   AND NOVEMBER 18TH, 2013, WE SEE MR. BALWANI TEXTS "HOME"

12:08PM   5    TO MS. HOLMES.

12:08PM   6         DO YOU SEE THAT?

12:08PM   7    A.   YES.

12:08PM   8    Q.   MS. HOLMES RESPONDS WITH A SMILEY FACE AND SAYS, "I AM

12:08PM   9    THERE IN SPIRIT."

12:08PM  10         SHE SAYS, "MAKE FIRE SO WE WILL BE CLOSE."

12:08PM  11         DO YOU SEE THAT?

12:08PM  12    A.   YES.

12:08PM  13    Q.   AND THEN THERE'S SOME MORE DISCUSSION EXPRESSING AFFECTION

12:08PM  14    AND THEN DISCUSSING SOME PLANS TO WORK.

12:08PM  15         DO YOU SEE THAT?

12:08PM  16    A.   YES.

12:08PM  17    Q.   LET'S GO TO PAGE 12.  LET'S ZOOM IN ON THE TOP TWO-THIRDS

12:09PM  18    OF THIS PORTION.

12:09PM  19         AND NOW WE'RE IN OCTOBER 2014.

12:09PM  20         DO YOU SEE THAT?

12:09PM  21    A.   YES.

12:09PM  22    Q.   AROUND THIS TIME, WAS IT YOUR UNDERSTANDING THAT

12:09PM  23    MS. HOLMES AND MR. BALWANI WERE STILL TOGETHER?

12:09PM  24    A.   YES.

12:09PM  25    Q.   MR. BALWANI TEXTS THAT HE MISSES MS. HOLMES WHEN THEY ARE

ER-1797

12:09PM   1    NOT TOGETHER.

12:09PM   2         DO YOU SEE THAT?

12:09PM   3    A.   YES.

12:09PM   4    Q.   AND THEN THERE'S SOME MORE DISCUSSION EXPRESSING AFFECTION

12:09PM   5    FOR EACH OTHER.

12:09PM   6         DO YOU SEE THAT?

12:09PM   7    A.   YES.

12:09PM   8    Q.   AND THEN THERE IS SOME PLANS -- I'M SORRY, SOME DISCUSSION

12:09PM   9    ABOUT PLANS FOR THE DAY.

12:09PM  10         AND AT THE BOTTOM THERE'S A REQUEST FROM MR. BALWANI TO

12:09PM  11    "PLEASE GET CVS DONE THIS A.M. HAVE SCOTT AND CHRISTIAN IN

12:09PM  12    TRICORDER ALL MORNING AND TELL THEM WHAT CHANGES U WANT."

12:10PM  13         DO YOU SEE THAT?

12:10PM  14    A.   YES.

12:10PM  15    Q.   AND WHAT WAS TRICORDER IF YOU REMEMBER?

12:10PM  16    A.   IT WAS THE NAME OF A CONFERENCE ROOM.

12:10PM  17    Q.   LET'S LOOK AT PAGE 13.

12:10PM  18         HERE WE'RE IN NOVEMBER 2014.  DO YOU SEE A TEXT FROM

12:10PM  19    MR. BALWANI TO MS. HOLMES MENTIONING A FULL MOON?

12:10PM  20    A.   YES.

12:10PM  21    Q.   AND MS. HOLMES WRITES WITH A SET OF GOALS OR A LIST OF

12:10PM  22    BULLET POINTS.

12:10PM  23         DO YOU SEE THAT?

12:10PM  24    A.   YES.

12:10PM  25    Q.   SHE SAYS, "TOTAL CONFIDENCE IN MYSELF BEST BUSINESS PERSON

ER-1798

12:10PM   1    OF THE YEAR.

12:10PM   2        "FOCUS.

12:10PM   3        "DETAILS EXCELLENT.

12:10PM   4        "DON'T GIVE WHAT ANYONE THINKS.

12:10PM   5        "ENGAGE EMPLOYEES IN MEETINGS BY STORIES AND MAKING IT

12:10PM   6    ABOUT THEM."

12:10PM   7        DO YOU SEE THAT?

12:10PM   8    A.   YES.

12:10PM   9    Q.   AND THEN AFTER SHE ASKS FOR A RESPONSE, MR. BALWANI

12:11PM   10   WRITES, "AWESOME.  U R LISTENING AND PAYING ATTENTION."

12:11PM   11       DO YOU SEE THAT?

12:11PM   12   A.   YES.

12:11PM   13   Q.   AND IN 2014, APPROXIMATELY HOW OLD WAS MS. HOLMES?

12:11PM   14           MS. WALSH:  OBJECTION.

12:11PM   15           THE COURT:  THIS IS AS TO PERSONAL KNOWLEDGE, IF HE

12:11PM   16   HAS PERSONAL KNOWLEDGE?

12:11PM   17           MR. BOSTIC:  YES.

12:11PM   18           THE COURT:  YOU CAN ANSWER THE QUESTION.

12:11PM   19           THE WITNESS:  APPROXIMATELY 30.

12:11PM   20   BY MR. BOSTIC:

12:11PM   21   Q.   AND APPROXIMATELY HOW OLD WAS MR. BALWANI AT THAT TIME?

12:11PM   22           MS. WALSH:  OBJECTION.  RELEVANCE.

12:11PM   23           THE COURT:  OVERRULED.

12:11PM   24           THE WITNESS:  I DON'T KNOW SPECIFICALLY.

12:11PM   25   BY MR. BOSTIC:

EDLIN DIRECT BY MR. BOSTIC (RES.)                                2581

12:11PM   1      Q.   WHAT IS YOUR BEST ESTIMATE?

12:11PM   2              MS. WALSH:  OBJECTION.  FOUNDATION.

12:11PM   3              THE COURT:  SUSTAINED AS TO THE FORM OF THE

12:11PM   4      QUESTION.

12:11PM   5      BY MR. BOSTIC:

12:11PM   6      Q.   HOW ABOUT WHEN IT CAME TO BUSINESS EXPERIENCE, WHAT WAS

12:11PM   7      YOUR UNDERSTANDING AS TO HOW MUCH BUSINESS EXPERIENCE

12:11PM   8      MS. HOLMES HAD WHEN SHE FOUNDED THERANOS?

12:12PM   9      A.   MY UNDERSTANDING WAS THAT THERANOS WAS THE EXTENT OF HER

12:12PM  10      BUSINESS EXPERIENCE.

12:12PM  11      Q.   AND FROM WORKING WITH MR. BALWANI, DO YOU HAVE AN

12:12PM  12      UNDERSTANDING OF THE EXTENT OF HIS BUSINESS EXPERIENCE BEFORE

12:12PM  13      HE CAME TO THERANOS?

12:12PM  14      A.   SUNNY HAD A VERY SUCCESSFUL CAREER.

12:12PM  15      Q.   FINALLY, LET'S LOOK AT PAGE 14 OF THE EXHIBIT.

12:12PM  16          SO NOW WE'RE MOVING FORWARD IN TIME.  YOU SEE NOW WE'RE IN

12:12PM  17      MAY OF 2015.

12:12PM  18          DO YOU SEE THAT?

12:12PM  19      A.   YES.

12:12PM  20      Q.   AND THERE ARE MORE TEXTS BETWEEN MS. HOLMES AND

12:12PM  21      MR. BALWANI DURING THIS TIME PERIOD EXPRESSING AFFECTION FOR

12:12PM  22      EACH OTHER.

12:12PM  23          DO YOU SEE THAT?

12:12PM  24      A.   YES.

12:12PM  25      Q.   AND THERE'S ALSO DISCUSSION OF THEIR WHEREABOUTS AND PLANS

ER-1800

12:13PM  1    FOR THE IMMEDIATE FUTURE.

12:13PM  2        DO YOU SEE THAT?

12:13PM  3    A.   YES.

12:13PM  4    Q.   OKAY.  WE CAN PUT THAT ASIDE.  I'D LIKE TO TALK ABOUT THE

12:13PM  5    CIRCUMSTANCES OF YOUR DEPARTURE FROM THE COMPANY AND THE

12:13PM  6    REASONS FOR IT.

12:13PM  7        DID YOU BECOME AWARE IN 2015 THAT THERE WAS GOING TO BE A

12:13PM  8    NEGATIVE ARTICLE PUBLISHED ABOUT THERANOS?

12:13PM  9    A.   I BECAME AWARE THAT "THE WALL STREET JOURNAL" WAS GOING TO

12:13PM  10   WRITE A PIECE THAT WOULD NOT BE FAVORABLE.

12:13PM  11   Q.   AND DID YOU FIND OUT ABOUT THAT BEFORE THE PIECE WAS

12:13PM  12   ACTUALLY PUBLISHED?

12:13PM  13   A.   I BELIEVE IT WAS CLOSE TO THE TIME IT WAS.

12:13PM  14   Q.   AND HOW DID YOU LEARN ABOUT THAT INCOMING ARTICLE, IF YOU

12:13PM  15   REMEMBER?

12:13PM  16   A.   I -- AS PART OF MY ROLES AND RESPONSIBILITIES, I WORKED

12:14PM  17   WITH MARKETING AND COMMUNICATIONS, AND I BASICALLY HEARD RUMORS

12:14PM  18   THAT THIS WAS HAPPENING.

12:14PM  19   Q.   SO OTHERS AT THE COMPANY KNEW AS WELL; IS THAT CORRECT?

12:14PM  20   A.   I BELIEVE SO, YES.

12:14PM  21   Q.   AT SOME POINT IN 2015, DID THE ARTICLE ACTUALLY COME OUT?

12:14PM  22   A.   YES.

12:14PM  23   Q.   DO YOU REMEMBER THE APPROXIMATE TIMING OF THE ARTICLE?

12:14PM  24   A.   OCTOBER 2015.

12:14PM  25   Q.   WHAT DO YOU REMEMBER, AND JUST AT A HIGH LEVEL, ABOUT THE

EDLIN DIRECT BY MR. BOSTIC (RES.)                    2583

12:14PM  1    COMPANY'S RESPONSE TO THAT ARTICLE IN THE WEEKS AND MONTHS

12:14PM  2    AFTER IT WAS PUBLISHED?

12:14PM  3    A.   I REMEMBER THAT THE COMPANY VEHEMENTLY DENIED THE CLAIMS

12:14PM  4    THAT WERE MADE IN "THE WALL STREET JOURNAL" ARTICLE ABOUT

12:14PM  5    THERANOS.

12:14PM  6    Q.   AND OTHER THAN DENYING THE CLAIMS, DID THE COMPANY DO ANY

12:15PM  7    WORK TO TRY TO DISPROVE THOSE CLAIMS?

12:15PM  8    A.   I RECALL THAT THE COMPANY CLAIMED THAT IT WOULD BE ABLE TO

12:15PM  9    PUT OUT DATA AND INFORMATION THAT WOULD PROVE ITS SCIENCE AND

12:15PM 10    TECHNOLOGY AND REFUTE THE CLAIMS FROM "THE WALL STREET JOURNAL"

12:15PM 11    ARTICLE.

12:15PM 12    Q.   DID THERE COME A POINT IN TIME WHERE YOU DECIDED TO END

12:15PM 13    YOUR TIME AT THERANOS?

12:15PM 14    A.   YES.

12:15PM 15    Q.   AND WHY DID YOU MAKE THAT DECISION AND WHEN?

12:15PM 16    A.   IN THE YEAR AFTER "THE WALL STREET JOURNAL" ARTICLES CAME

12:15PM 17    OUT AND THERANOS MADE THOSE CLAIMS THAT IT WOULD BE ABLE TO

12:15PM 18    REFUTE WHAT WAS SAID IN "THE WALL STREET JOURNAL" ARTICLES,

12:15PM 19    THERE WERE SEVERAL OPPORTUNITIES THAT THE COMPANY HAD TO DO

12:15PM 20    THAT, AND THEY WERE ALL UNSUCCESSFUL.

12:15PM 21        AND I ULTIMATELY REACHED THE CONCLUSION THAT THE REASON

12:15PM 22    THAT THOSE OPPORTUNITIES WERE UNSUCCESSFUL WAS BECAUSE THE

12:16PM 23    COMPANY COULD NOT PROVE ITS TECHNOLOGY AND WAS NOT CAPABLE OF

12:16PM 24    DOING IT AND WAS NEVER GOING TO BE ABLE TO DO THAT.

12:16PM 25        SO I LEFT THE COMPANY IN DECEMBER OF 2016.

| | | |
|---|---|---|
| 12:16PM | 1 | Q.   THANK YOU, MR. EDLIN. |
| 12:16PM | 2 | NO FURTHER QUESTIONS AT THIS TIME. |
| 12:16PM | 3 | THE COURT:  MS. WALSH, DO YOU HAVE |
| 12:16PM | 4 | CROSS-EXAMINATION? |
| 12:16PM | 5 | MS. WALSH:  I DO, YOUR HONOR. |
| 12:17PM | 6 | (PAUSE IN PROCEEDINGS.) |
| 12:17PM | 7 | MS. WALSH:  MAY I APPROACH THE BENCH, YOUR HONOR? |
| 12:17PM | 8 | THE COURT:  YES. |
| 12:17PM | 9 | MS. WALSH:  (HANDING.) |
| 12:17PM | 10 | MAY I APPROACH MR. EDLIN? |
| 12:17PM | 11 | THE COURT:  YES, PLEASE. |
| 12:18PM | 12 | MS. WALSH:  (HANDING.) |
| 12:18PM | 13 | **CROSS-EXAMINATION** |
| 12:18PM | 14 | BY MS. WALSH: |
| 12:18PM | 15 | Q.   GOOD AFTERNOON, MR. EDLIN. |
| 12:18PM | 16 | A.   GOOD AFTERNOON. |
| 12:18PM | 17 | Q.   MY NAME IS AMY WALSH, AND I REPRESENT MR. BALWANI. |
| 12:18PM | 18 | I'M GOING TO ASK YOU A FEW QUESTIONS ABOUT YOUR TESTIMONY |
| 12:18PM | 19 | LAST WEEK AND THIS MORNING.  OKAY? |
| 12:18PM | 20 | A.   OKAY. |
| 12:18PM | 21 | Q.   OKAY.  SO I FIRST WANT TO START WITH YOUR BACKGROUND. |
| 12:18PM | 22 | YOU WERE EMPLOYED BY THERANOS FROM SEPTEMBER 2011 TO |
| 12:18PM | 23 | DECEMBER 2016; IS THAT RIGHT? |
| 12:18PM | 24 | A.   CORRECT. |
| 12:18PM | 25 | Q.   OKAY.  AND BEFORE YOU WORKED AT THERANOS, YOU WORKED AT A |

EDLIN CROSS BY MS. WALSH                                    2585

12:18PM  1    FIRM CALLED TELSEY ADVISORY GROUP; IS THAT RIGHT?

12:18PM  2    A.   YES.

12:18PM  3    Q.   AND THAT WAS EQUITY ANALYST SHOP OR A FIRM; IS THAT

12:18PM  4    CORRECT?

12:18PM  5    A.   RIGHT, EQUITY RESEARCH.  I THINK I SAID EQUITY RESEARCH

12:18PM  6    FIRM.

12:18PM  7    Q.   THANK YOU.  I APOLOGIZE.

12:19PM  8         WHAT DID YOU DO FOR THAT FIRM?

12:19PM  9    A.   I SUPPORTED THEIR INSTITUTIONAL SALES DESK AND SOME OF THE

12:19PM 10    RESEARCH ANALYSTS.

12:19PM 11    Q.   OKAY.  AND YOU WORKED THERE FOR ABOUT A YEAR; IS THAT

12:19PM 12    RIGHT?

12:19PM 13    A.   IT WAS ABOUT TWO YEARS.

12:19PM 14    Q.   OKAY.  AND I TAKE IT THAT YOUR WORK AT THAT FIRM DIDN'T

12:19PM 15    HAVE ANYTHING TO DO WITH BLOOD TESTING; CORRECT?

12:19PM 16    A.   CORRECT.

12:19PM 17    Q.   AND IT WASN'T SCIENCE BASED; IS THAT RIGHT?

12:19PM 18    A.   THAT'S RIGHT.

12:19PM 19    Q.   OKAY.  AND BEFORE YOU WORKED AT THAT FIRM, YOU GRADUATED

12:19PM 20    FROM DUKE UNIVERSITY; RIGHT?

12:19PM 21    A.   CORRECT.

12:19PM 22    Q.   AND YOU WERE A PUBLIC POLICY MAJOR; RIGHT?

12:19PM 23    A.   YES.

12:19PM 24    Q.   AND I THINK YOU ALSO SAID THAT YOU GOT A CERTIFICATE IN

12:19PM 25    MARKETS AND MANAGEMENT; CORRECT?

| | | |
|---|---|---|
| 12:19PM | 1 | A.   CORRECT. |
| 12:19PM | 2 | Q.   AND YOU DID NOT GET ANY DEGREES IN SCIENCE OR MATH FROM |
| 12:19PM | 3 | DUKE; RIGHT? |
| 12:19PM | 4 | A.   CORRECT. |
| 12:19PM | 5 | Q.   AND YOU HAVE NO TRAINING IN HEMATOLOGY OR MICROBIOLOGY; |
| 12:20PM | 6 | CORRECT? |
| 12:20PM | 7 | A.   CORRECT. |
| 12:20PM | 8 | Q.   OKAY.  SO IS IT FAIR TO SAY THAT YOU WOULD NOT CONSIDER |
| 12:20PM | 9 | YOURSELF A SCIENTIST? |
| 12:20PM | 10 | A.   THAT'S FAIR TO SAY. |
| 12:20PM | 11 | Q.   AND THAT WAS TRUE WHILE YOU WORKED AT THERANOS; RIGHT? |
| 12:20PM | 12 | A.   YES. |
| 12:20PM | 13 | Q.   OKAY.  SO WHEN YOU WORKED AT THERANOS, YOU TOLD US THAT |
| 12:20PM | 14 | YOU MANAGED DIFFERENT RELATIONSHIPS AT THERANOS; CORRECT? |
| 12:20PM | 15 | A.   CORRECT. |
| 12:20PM | 16 | Q.   OKAY.  AND THOSE WERE WITH THE MILITARY; RIGHT? |
| 12:20PM | 17 | A.   RIGHT. |
| 12:20PM | 18 | Q.   PHARMACEUTICAL COMPANIES; CORRECT? |
| 12:20PM | 19 | A.   CORRECT. |
| 12:20PM | 20 | Q.   YOU SENT INFORMATION TO INVESTORS; RIGHT? |
| 12:20PM | 21 | A.   CORRECT. |
| 12:20PM | 22 | Q.   AND YOU TOLD US ABOUT FACILITATING THESE TECHNOLOGY |
| 12:20PM | 23 | DEMONSTRATIONS; RIGHT? |
| 12:20PM | 24 | A.   CORRECT. |
| 12:20PM | 25 | Q.   AND YOU ALSO -- YOU JUST TESTIFIED THIS MORNING ABOUT |

EDLIN CROSS BY MS. WALSH                                                2587

12:20PM   1    COORDINATING THERANOS'S WEBSITE AND MARKETING MATERIALS; IS

12:20PM   2    THAT RIGHT?

12:20PM   3    A.   I WAS LESS INVOLVED IN THE WEBSITE.

12:21PM   4         BUT, YES, AS PART OF THE WORK THAT WE DID WITH CHIAT/DAY,

12:21PM   5    THERE WERE -- I WORKED ON THAT RELATIONSHIP ALONG WITH TWO

12:21PM   6    OTHER PRODUCT MANAGERS.

12:21PM   7    Q.   OKAY.  AND CHIAT/DAY WAS THE MARKETING FIRM THAT THERANOS

12:21PM   8    WAS WORKING WITH AT THE TIME?

12:21PM   9    A.   CORRECT.

12:21PM  10    Q.   AND WE'RE GOING TO COME BACK TO CHIAT/DAY LATER.

12:21PM  11         BUT THAT'S WHO THEY WERE; RIGHT?

12:21PM  12    A.   RIGHT.

12:21PM  13    Q.   OKAY.  AND AS A PRODUCT MANAGER AT THERANOS, YOU WERE NOT,

12:21PM  14    OR YOU DIDN'T CONSIDER YOURSELF, AN EXPERT IN THERANOS'S

12:21PM  15    TECHNOLOGY AT THE TIME; RIGHT?

12:21PM  16    A.   RIGHT.

12:21PM  17    Q.   OKAY.  YOU WEREN'T AN EXPERT IN THE CHEMISTRY OF HOW THE

12:21PM  18    ASSAYS WORKED; RIGHT?

12:21PM  19    A.   RIGHT.

12:21PM  20    Q.   AND YOU WERE NOT AN EXPERT IN THE SOFTWARE THAT RAN THE

12:21PM  21    MACHINES; RIGHT?

12:21PM  22    A.   RIGHT.

12:21PM  23    Q.   OR THE SOFTWARE THAT SHOWED ON THE USER INTERFACE OF THE

12:21PM  24    MACHINES; CORRECT?

12:21PM  25    A.   CORRECT.

EDLIN CROSS BY MS. WALSH                                              2588

12:21PM   1   Q.   AND YOU ALSO WERE NOT AN EXPERT IN THE HARDWARE, THE

12:22PM   2   ROBOTICS INSIDE THE MACHINE THAT OPERATED THE TESTS; CORRECT?

12:22PM   3   A.   CORRECT.

12:22PM   4   Q.   OKAY.  OTHER TEAMS OF PEOPLE AT THERANOS WERE IN CHARGE OF

12:22PM   5   THOSE AREAS; RIGHT?

12:22PM   6   A.   RIGHT.

12:22PM   7   Q.   AND YOU -- AND WE'RE GOING TO TALK MORE ABOUT THIS, BUT

12:22PM   8   GENERALLY, YOU WENT TO THOSE TEAMS PERIODICALLY WHEN YOU NEEDED

12:22PM   9   INFORMATION RELATED TO THOSE SUBJECT AREAS; IS THAT FAIR?

12:22PM  10   A.   YES.

12:22PM  11   Q.   OKAY.  YOU'VE ALSO TALKED ABOUT YOUR WORK WITH MS. HOLMES

12:22PM  12   VERSUS MR. BALWANI.

12:22PM  13        DO YOU REMEMBER THAT?

12:22PM  14   A.   YES.

12:22PM  15   Q.   AND YOU WORKED WITH BOTH OF THEM; CORRECT?

12:22PM  16   A.   CORRECT.

12:22PM  17   Q.   BUT I THINK YOU TESTIFIED THAT YOU WORKED MORE -- MUCH

12:22PM  18   MORE CLOSELY WITH MS. HOLMES; RIGHT?

12:22PM  19   A.   RIGHT.

12:22PM  20   Q.   THAN YOU DID WITH MR. BALWANI; CORRECT?

12:22PM  21   A.   CORRECT.

12:22PM  22   Q.   AND I THINK YOU SAID THAT THEY THEMSELVES WORKED CLOSELY

12:22PM  23   TOGETHER; RIGHT?

12:22PM  24   A.   RIGHT.

12:22PM  25   Q.   AT LEAST AS FAR AS YOU OBSERVED; RIGHT?

ER-1807

EDLIN CROSS BY MS. WALSH                                    2589

12:23PM   1    A.   RIGHT.

12:23PM   2    Q.   BUT THEY ALSO HAD DIFFERENT ROLES AT THE COMPANY; IS THAT

12:23PM   3    RIGHT?

12:23PM   4    A.   THAT WAS MY UNDERSTANDING, YES.

12:23PM   5    Q.   OKAY.  AND MS. HOLMES'S ROLE RELATED TO THE SCIENCE OF THE

12:23PM   6    ASSAYS; IS THAT FAIR?

12:23PM   7    A.   YES.

12:23PM   8    Q.   AND SHE WAS MUCH MORE INVOLVED IN THE R&D LAB; CORRECT?

12:23PM   9    A.   CORRECT.

12:23PM  10    Q.   AND SHE'S THE ONE WHO HAD THE RELATIONSHIPS WITH THE

12:23PM  11    PHARMACEUTICAL COMPANIES; RIGHT?

12:23PM  12    A.   RIGHT.

12:23PM  13    Q.   AND SHE IS THE PERSON WHO HAD THE RELATIONSHIPS WITH THE

12:23PM  14    VARIOUS DIFFERENT MILITARY COMPONENTS; IS THAT RIGHT?

12:23PM  15    A.   THAT'S RIGHT.

12:23PM  16    Q.   AND, IN FACT, THE EMAILS, WE'LL LOOK AT THESE AGAIN, BUT

12:23PM  17    THE EMAILS THAT YOU HAD REGARDING THOSE MILITARY COMPONENTS

12:23PM  18    WERE PRIMARILY WITH HER; RIGHT?

12:23PM  19    A.   CORRECT.

12:23PM  20    Q.   OKAY.  SHE WAS ALSO THE ONE WHO WAS MORE ENGAGED IN THE

12:24PM  21    PUBLIC RELATIONS CAMPAIGN FOR THERANOS; IS THAT RIGHT?

12:24PM  22    A.   YES.

12:24PM  23    Q.   AND SHE IS THE ONE WHO WORKED ON THE BRANDING OF THERANOS

12:24PM  24    WITH CHIAT/DAY; RIGHT?

12:24PM  25    A.   YES.

ER-1808

EDLIN CROSS BY MS. WALSH                                          2590

12:24PM  1    Q.   AND SHE DID WORK ON DESIGNING THE LOGO OF THERANOS;

12:24PM  2    CORRECT?

12:24PM  3    A.   CORRECT.

12:24PM  4    Q.   AND YOU TALKED ABOUT THE LOGO CHANGING FROM PERIOD TO

12:24PM  5    PERIOD.

12:24PM  6         SHE WAS THE ONE WHO WORKED MOST CLOSELY ON THAT; RIGHT?

12:24PM  7    A.   RIGHT.

12:24PM  8    Q.   OKAY.  AND SHE WAS THE FACE OF THERANOS TO THE OUTSIDE

12:24PM  9    WORLD; IS THAT FAIR?

12:24PM 10    A.   YES.

12:24PM 11    Q.   SHE DID PRESS INTERVIEWS; CORRECT?

12:24PM 12    A.   CORRECT.

12:24PM 13    Q.   AND SHE APPEARED ON THE COVER OF MAGAZINES AND NEWSPAPERS;

12:24PM 14    RIGHT?

12:24PM 15    A.   CORRECT.

12:24PM 16    Q.   AND SHE DID A TED TALK; CORRECT?

12:24PM 17    A.   IT WAS TED MED, BUT YES.

12:24PM 18    Q.   TED MED.  OKAY.

12:24PM 19         AND I THINK YOU ALSO SAID LAST WEEK THAT SHE WAS THE

12:24PM 20    PRIMARY PERSON MEETING WITH THE SO-CALLED "VIP'S" THAT CAME

12:24PM 21    INTO THE COMPANY; RIGHT?

12:24PM 22    A.   RIGHT.

12:24PM 23    Q.   AND I THINK YOU ALSO SAID THAT SHE WAS THE ONE WHO RAN

12:25PM 24    MOST OF THE DEMO MEETINGS; RIGHT?

12:25PM 25    A.   RIGHT.

ER-1809

12:25PM  1    Q.   AND SHE WAS THE ONE WHO GAVE MOST OF THE TOURS OF THE

12:25PM  2    FACILITIES; CORRECT?

12:25PM  3    A.   RIGHT, RIGHT.

12:25PM  4    Q.   OKAY.  AND SO LET'S TURN TO MR. BALWANI'S AREA OF

12:25PM  5    CONCENTRATION.

12:25PM  6         HE WAS IN CHARGE OF OPERATIONS OF THE COMPANY; RIGHT?

12:25PM  7    A.   RIGHT.

12:25PM  8    Q.   AND HIS SPECIALTY WAS SOFTWARE, WASN'T IT?

12:25PM  9    A.   THAT WAS MY UNDERSTANDING.

12:25PM 10    Q.   HE WAS IN CHARGE OF SOFTWARE INVESTMENT; RIGHT?

12:25PM 11    A.   YES.

12:25PM 12    Q.   SOFTWARE DESIGN; CORRECT?

12:25PM 13    A.   YES.

12:25PM 14    Q.   THE LAB INFORMATION SYSTEM; RIGHT?

12:25PM 15    A.   RIGHT.

12:25PM 16    Q.   AND THAT'S WHERE ALL OF THE PATIENT DATA WAS KEPT;

12:25PM 17    CORRECT?

12:25PM 18    A.   I BELIEVE SO.

12:25PM 19    Q.   AND HE WAS INVOLVED IN DESIGNING, ALONG WITH A TEAM OF

12:25PM 20    OTHER PEOPLE, BUT DESIGNING THAT SYSTEM; RIGHT?

12:25PM 21    A.   RIGHT.

12:25PM 22    Q.   IN FACT, HE HAD A BACKGROUND IN SOFTWARE; RIGHT?

12:26PM 23    A.   RIGHT.

12:26PM 24    Q.   AND HE WORKED FOR MICROSOFT?

12:26PM 25    A.   YES.

ER-1810

EDLIN CROSS BY MS. WALSH                    2592

12:26PM  1    Q.   AND THEN HE HAD HIS OWN STARTUP COMPANY WHICH HE SOLD

12:26PM  2    BEFORE HE CAME TO THERANOS; RIGHT?

12:26PM  3    A.   RIGHT.

12:26PM  4    Q.   AND HE WAS ALSO IN CHARGE AT THERANOS OF THE MANUFACTURING

12:26PM  5    OF THE DEVICES; RIGHT?

12:26PM  6    A.   I DON'T KNOW EXACTLY.

12:26PM  7    Q.   OKAY.  BUT MR. BALWANI DID NOT HAVE A MEDICAL DEGREE;

12:26PM  8    RIGHT?

12:26PM  9    A.   AS FAR AS I'M CONCERNED.

12:26PM  10   Q.   AS FAR AS YOU KNOW; RIGHT?

12:26PM  11   A.   YES.

12:26PM  12   Q.   AND HE DIDN'T HAVE ANY TRAINING, AS FAR AS YOU'RE AWARE,

12:26PM  13   IN BIOSCIENCE; CORRECT?

12:26PM  14   A.   AS FAR AS I UNDERSTAND, YES.

12:26PM  15   Q.   AND AS FAR AS YOU'RE AWARE, HE DIDN'T PLAY A ROLE IN

12:26PM  16   DEVELOPING THOSE CHEMISTRIES THAT WENT INTO THE ACTUAL BLOOD

12:26PM  17   TESTS TO MAKE THEM WORK; RIGHT?

12:26PM  18   A.   RIGHT.

12:26PM  19   Q.   AND THAT WAS MS. HOLMES'S EXPERTISE, ALONG WITH OTHERS;

12:26PM  20   CORRECT?

12:26PM  21   A.   CORRECT.

12:27PM  22   Q.   SO YOU MENTIONED IN YOUR WORK AT THERANOS YOU RELIED ON

12:27PM  23   VARIOUS DIFFERENT SCIENTISTS IN THESE DIFFERENT GROUPS WITHIN

12:27PM  24   THE COMPANY; RIGHT?

12:27PM  25   A.   RIGHT.

ER-1811

EDLIN CROSS BY MS. WALSH                                        2593

12:27PM   1    Q.   AND SO WHEN YOU NEEDED INFORMATION, YOU CONSULTED WITH

12:27PM   2    THOSE PEOPLE FROM TIME TO TIME; IS THAT RIGHT?

12:27PM   3    A.   RIGHT.

12:27PM   4    Q.   AND WHEN THOSE SCIENTISTS GAVE YOU INFORMATION, YOU RELIED

12:27PM   5    ON IT; CORRECT?

12:27PM   6    A.   YES.

12:27PM   7    Q.   AND OFTEN YOU WOULD PASS THE INFORMATION FROM THEM TO

12:27PM   8    WHOEVER WAS ASKING FOR IT; CORRECT?

12:27PM   9    A.   YES.

12:27PM  10    Q.   OKAY.  AND ONE OF THOSE SCIENTISTS WAS DR. DANIEL YOUNG.

12:27PM  11         DO YOU REMEMBER HIM?

12:27PM  12    A.   YES.

12:27PM  13    Q.   AND HE WAS IN CHARGE OF THE THERANOS SYSTEMS AND

12:27PM  14    COMPUTATIONAL BIOSCIENCES.

12:27PM  15         DO YOU REMEMBER THAT?

12:27PM  16    A.   YES.

12:27PM  17    Q.   ALL RIGHT.  HE PLAYED A PROMINENT ROLE IN THE R&D LAB;

12:27PM  18    RIGHT?

12:27PM  19    A.   I BELIEVE SO.

12:27PM  20    Q.   AND HE WAS AN EXTREMELY KNOWLEDGEABLE PERSON, WAS HE NOT?

12:28PM  21    A.   HE WAS.

12:28PM  22    Q.   HE GRADUATED FROM M.I.T.; CORRECT?

12:28PM  23    A.   YES.

12:28PM  24    Q.   AND HE HAD VARIOUS DEGREES IN MECHANICAL ENGINEERING;

12:28PM  25    RIGHT?

EDLIN CROSS BY MS. WALSH                                                      2594

12:28PM   1        A.   YES.

12:28PM   2        Q.   HE ALSO HAD WORKED IN THE BIOSCIENCES FIELD BEFORE HE CAME

12:28PM   3    TO THERANOS; RIGHT?

12:28PM   4        A.   I DON'T KNOW THE SPECIFICS, BUT THAT WAS MY UNDERSTANDING.

12:28PM   5        Q.   OKAY.  AND YOU GENERALLY FOUND HIM, IN YOUR EXPERIENCE, TO

12:28PM   6    BE GENUINELY KNOWLEDGEABLE ABOUT THE THERANOS ASSAYS; CORRECT?

12:28PM   7        A.   CORRECT.

12:28PM   8        Q.   AND YOU HAD CONFIDENCE IN WHAT HE WAS TELLING YOU AT THE

12:28PM   9    TIME; RIGHT?

12:28PM  10        A.   YES.

12:28PM  11        Q.   OKAY.  SO WHEN A QUESTION WOULD COME UP ABOUT THE SCIENCE

12:28PM  12    OR THE RESULTS OF A PARTICULAR ASSAY, YOU DEFERRED GENERALLY TO

12:28PM  13    DR. YOUNG, DIDN'T YOU?

12:28PM  14        A.   I DID.

12:28PM  15        Q.   AND WE'RE GOING TO LOOK AT SOME EMAILS REGARDING THE

12:29PM  16    DEMOS.

12:29PM  17             IT WAS DR. YOUNG'S JOB TO ANALYZE THOSE TEST RESULTS;

12:29PM  18    RIGHT?

12:29PM  19        A.   YES.

12:29PM  20        Q.   AND HE WOULD LOOK AT THE DATA; RIGHT?

12:29PM  21        A.   RIGHT.

12:29PM  22        Q.   AND HE WOULD MAKE CERTAIN JUDGMENTS BASED ON THE SCIENCE;

12:29PM  23    CORRECT?

12:29PM  24        A.   CORRECT.

12:29PM  25        Q.   AND HE WOULD MAKE DECISIONS ABOUT WHAT SHOULD BE REPORTED

ER-1813

EDLIN CROSS BY MS. WALSH                                      2595

12:29PM  1    OUT TO THE VISITOR WHO GOT THE DEMONSTRATION; IS THAT RIGHT?

12:29PM  2    A.   THAT'S RIGHT.

12:29PM  3    Q.   AND YOU REFERRED TO HIM ENTIRELY IN THAT DECISION MAKING

12:29PM  4    PROCESS; CORRECT?

12:29PM  5    A.   YES.

12:29PM  6    Q.   OKAY.  NOW, YOU MENTIONED YOU INTERACTED WITH DIFFERENT

12:29PM  7    TEAMS AT THERANOS.  ONE OF THOSE TEAMS WAS THE ASSAY

12:29PM  8    DEVELOPMENT TEAM.

12:29PM  9        DO YOU REMEMBER THAT?

12:29PM 10    A.   YES.

12:29PM 11    Q.   AND THEN THERE WAS AN ASSAY --

12:29PM 12    A.   THERE WERE A COUPLE -- THERE WERE SEVERAL OF THEM, YES.

12:29PM 13    Q.   RIGHT.  THERE WERE SEVERAL OF THEM; CORRECT?

12:29PM 14    A.   YES.

12:29PM 15    Q.   AND THEY CORRESPONDED GENERALLY TO THE TYPE OF ASSAYS THAT

12:29PM 16    THEY WORKED ON; IS THAT FAIR?

12:30PM 17    A.   YES.

12:30PM 18    Q.   AND SO THERE WAS A SEPARATE ASSAY DEVELOPMENT TEAM FOR

12:30PM 19    IMMUNOASSAYS, FOR EXAMPLE?

12:30PM 20    A.   RIGHT.

12:30PM 21    Q.   FOR CYTOMETRY; RIGHT?

12:30PM 22    A.   RIGHT.

12:30PM 23    Q.   FOR GENERAL CHEMISTRY; CORRECT?

12:30PM 24    A.   CORRECT.

12:30PM 25    Q.   AND FOR THIS TEST CALLED NUCLEIC ACID AMPLIFICATION;

ER-1814

12:30PM  1    RIGHT?

12:30PM  2    A.   RIGHT.

12:30PM  3    Q.   AND YOU WERE AWARE AT THE TIME THAT MANY DIFFERENT ASSAYS

12:30PM  4    WERE BEING DEVELOPED WITHIN THERANOS; RIGHT?

12:30PM  5    A.   RIGHT.

12:30PM  6    Q.   AND, IN FACT, YOU SAW MANY OF THOSE ASSAY INVESTMENT

12:30PM  7    REPORTS DESCRIBING HOW THE ASSAYS WERE DEVELOPED; RIGHT?

12:30PM  8    A.   CORRECT.

12:30PM  9    Q.   AND THOSE REPORTS CONTAINED A LOT OF SCIENTIFIC AND

12:30PM  10   TECHNICAL DATA; RIGHT?

12:30PM  11   A.   RIGHT.

12:30PM  12   Q.   AND THEY WERE FAIRLY LONG?

12:30PM  13   A.   YES.

12:30PM  14   Q.   AND THERE WAS ONE FOR EACH INDIVIDUAL ASSAY THAT THERANOS

12:30PM  15   DEVELOPED; CORRECT?

12:30PM  16        MR. BOSTIC:  OBJECTION.  FOUNDATION.

12:30PM  17        THE COURT:  CAN YOU LAY A FOUNDATION FOR HIS

12:30PM  18   KNOWLEDGE OF THAT.

12:30PM  19        MS. WALSH:  SURE.

12:30PM  20   Q.   MR. EDLIN, YOU SAW MANY OF THOSE ASSAY DEVELOPMENT

12:31PM  21   REPORTS; RIGHT?

12:31PM  22   A.   YES.

12:31PM  23   Q.   AND GENERALLY, DID A REPORT RELATE TO ONE ASSAY OR MORE

12:31PM  24   THAN ONE ASSAY?

12:31PM  25   A.   I RECALL THAT EACH REPORT RELATED TO ONE ASSAY.

EDLIN CROSS BY MS. WALSH                                                2597

| | | |
|---|---|---|
| 12:31PM | 1 | Q. SO LET ME HAVE YOU TURN IN YOUR BINDER TO EXHIBIT 7239. |
| 12:31PM | 2 | A. YES. |
| 12:31PM | 3 | Q. DO YOU HAVE THAT IN FRONT OF YOU? |
| 12:31PM | 4 | A. YES. |
| 12:31PM | 5 | Q. OKAY. IS THAT AN EMAIL BETWEEN -- TO ELIZABETH HOLMES? |
| 12:32PM | 6 | DO YOU SEE THAT? |
| 12:32PM | 7 | A. YES. |
| 12:32PM | 8 | Q. AND IT'S FROM A FELLOW NAMED CHINMAY PANGARKAR? |
| 12:32PM | 9 | A. YES. |
| 12:32PM | 10 | Q. AND WHO WAS CHINMAY PANGARKAR? |
| 12:32PM | 11 | A. HE WAS THE LEAD OF THE CYTOMETRY ASSAY DEVELOPMENT TEAM. |
| 12:32PM | 12 | Q. OKAY. AND YOU'RE ON COPY; RIGHT? |
| 12:32PM | 13 | A. YES. |
| 12:32PM | 14 | Q. AND DR. YOUNG IS ON COPY; CORRECT? |
| 12:32PM | 15 | A. YES. |
| 12:32PM | 16 | Q. AND THE DATE OF THE EMAIL IS JUNE 21ST, 2012. |
| 12:32PM | 17 | DO YOU SEE THAT? |
| 12:32PM | 18 | A. YES. |
| 12:32PM | 19 | MS. WALSH: YOUR HONOR, THE GOVERNMENT -- I'M SORRY, |
| 12:32PM | 20 | THE DEFENSE OFFERS EXHIBIT 7329. |
| 12:32PM | 21 | MR. BOSTIC: HEARSAY. |
| 12:32PM | 22 | (PAUSE IN PROCEEDINGS.) |
| 12:32PM | 23 | MS. WALSH: I CAN LAY A FOUNDATION, YOUR HONOR. |
| 12:32PM | 24 | THE COURT: SURE. |
| 12:32PM | 25 | BY MS. WALSH: |

ER-1816

12:32PM  1    Q.   SO, MR. EDLIN, JUST LIKE MR. BOSTIC ASKED YOU ON DIRECT

12:32PM  2    EXAMINATION, DID YOU USE EMAIL IN THE REGULAR COURSE OF

12:32PM  3    THERANOS BUSINESS THAT YOU DID FOR THE COMPANY?

12:32PM  4    A.   YES.

12:32PM  5    Q.   AND WAS IT YOUR REGULAR PRACTICE TO USE EMAIL?

12:33PM  6    A.   YES.

12:33PM  7    Q.   AND DID IT HELP YOU CONDUCT OR DO YOUR JOB AT THERANOS TO

12:33PM  8    BE ABLE TO COMMUNICATE THROUGH EMAIL?

12:33PM  9    A.   YES.

12:33PM  10   Q.   AND DID OTHER EMPLOYEES THAT YOU INTERACTED WITH IN YOUR

12:33PM  11   JOB COMMUNICATE WITH YOU THROUGH EMAIL?

12:33PM  12   A.   YES.

12:33PM  13   Q.   AND TO DO YOUR JOB, WAS IT IMPORTANT FOR EVERYONE ON THE

12:33PM  14   EMAIL TO BE AS ACCURATE AS POSSIBLE IN COMMUNICATING THE

12:33PM  15   INFORMATION?

12:33PM  16   A.   YES.

12:33PM  17   Q.   AND WERE THERANOS EMAILS PRESERVED SO THAT LATER ON THEY

12:33PM  18   COULD BE USED AND CHECKED AND READ BY OTHERS?

12:33PM  19   A.   YES.

12:33PM  20        MS. WALSH:  YOUR HONOR, WE OFFER 7239.

12:33PM  21        MR. BOSTIC:  SAME OBJECTION AS TO THIS PARTICULAR

12:33PM  22   EMAIL.

12:33PM  23        THE COURT:  I'LL OVERRULE THE OBJECTION.  IT'S

12:33PM  24   ADMITTED.

12:33PM  25        (DEFENDANT'S EXHIBIT 7239 WAS RECEIVED IN EVIDENCE.)

ER-1817

EDLIN CROSS BY MS. WALSH                                     2599

12:33PM  1              THE COURT:  AND IT MAY BE PUBLISHED.

12:34PM  2      BY MS. WALSH:

12:34PM  3      Q.   OKAY.  SO LET'S TAKE A LOOK AT 7239.

12:34PM  4           YOU MENTIONED THAT CHINMAY PANGARKAR WAS A SENIOR

12:34PM  5      SCIENTIST IN THE COMPUTATIONAL BIOSCIENCES IN CHARGE OF THE

12:34PM  6      CYTOMETRY ASSAYS; RIGHT?

12:34PM  7      A.   RIGHT.

12:34PM  8      Q.   AND HE WAS A PH.D.; CORRECT?

12:34PM  9      A.   CORRECT.

12:34PM  10     Q.   AND HE'S IN THIS EMAIL SAYING "HI ELIZABETH:

12:34PM  11          "ASSAYS DEVELOPMENT AND CLINICAL STUDY SUMMARY REPORTS FOR

12:34PM  12     ALL CYTOMETRY ASSAYS ARE LOCATED AT THE FOLLOWING LOCATION."

12:34PM  13          AND THEN THERE'S A LINK TO THE REPORTS.

12:34PM  14          DO YOU SEE THAT?

12:34PM  15     A.   YES.

12:34PM  16     Q.   AND THEN DR. PANGARKAR SAYS TO YOU AND MS. HOLMES AND

12:34PM  17     DR. YOUNG, "SOME COMMENTS TO GO WITH THESE REPORTS:

12:34PM  18          "REPORTS HAVE BEEN WRITTEN TO DEMONSTRATE.

12:34PM  19          "THAT THERE IS SOUND SCIENCE AND METHOD DEVELOPMENT BEHIND

12:34PM  20     OUR ASSAYS.

12:34PM  21          "THAT OUR ASSAYS GIVE RESULTS THAT AGREE WITH PREDICATE

12:34PM  22     METHODS WITHIN CLIA PRESCRIBED LIMITS."

12:35PM  23          DO YOU SEE THAT?

12:35PM  24     A.   YES.

12:35PM  25     Q.   AND PREDICATE METHODS IS A TEST RUNNING ON COMMERCIAL

ER-1818

12:35PM   1    MACHINES.

12:35PM   2         IS THAT ANOTHER WAY OF SAYING THAT?

12:35PM   3    A.   I BELIEVE SO.

12:35PM   4    Q.   AND CLIA IS -- CORRESPONDS TO CLINICAL LAB REQUIREMENTS;

12:35PM   5    IS THAT RIGHT?

12:35PM   6    A.   I BELIEVE SO.

12:35PM   7    Q.   OKAY.  WE CAN TAKE THAT DOWN.

12:35PM   8         OKAY.  SO YOU INTERACTED WITH THE ASSAY DEVELOPMENT TEAMS

12:35PM   9    AND THE SOFTWARE TEAMS; IS THAT RIGHT?

12:35PM  10    A.   ON OCCASIONS.

12:35PM  11    Q.   AND ALSO THE HARDWARE TEAMS; CORRECT?

12:35PM  12    A.   YES.

12:35PM  13    Q.   OKAY.  AND YOU TESTIFIED LAST WEEK THAT THERE WERE --

12:35PM  14    THERE WAS A GENERAL PRACTICE OF RESTRICTING INFORMATION WITHIN

12:36PM  15    THERANOS.

12:36PM  16         DO YOU REMEMBER THAT?

12:36PM  17    A.   YES.

12:36PM  18    Q.   OKAY.  BUT YOU WERE ABLE TO DO YOUR JOB AND COMMUNICATE

12:36PM  19    WITH PEOPLE ACROSS DIFFERENT AREAS OF THE COMPANY, WEREN'T YOU?

12:36PM  20    A.   YES.

12:36PM  21    Q.   WHEN YOU NEEDED INFORMATION, YOU COULD GO TO THEM AND ASK

12:36PM  22    THEM A QUESTION; RIGHT?

12:36PM  23    A.   YES.

12:36PM  24    Q.   AND THEY WOULD GIVE YOU AN ANSWER; RIGHT?

12:36PM  25    A.   YES.

EDLIN CROSS BY MS. WALSH                                      2601

12:36PM  1    Q.   AND YOU FELT LIKE YOU COULD RELY ON THEIR ANSWERS;

12:36PM  2    CORRECT?

12:36PM  3    A.   CORRECT.

12:36PM  4    Q.   AND YOU UNDERSTOOD AT THE TIME THAT THERANOS WAS

12:36PM  5    DEVELOPING VALUABLE TECHNOLOGY; RIGHT?

12:36PM  6    A.   YES.

12:36PM  7    Q.   IT WAS A RELATIVELY NEW COMPANY AT THE TIME; RIGHT?

12:36PM  8    A.   RIGHT.

12:36PM  9    Q.   AND NEW IN THE BLOOD TESTING SPACE; CORRECT?

12:36PM  10   A.   CORRECT.

12:36PM  11   Q.   AND IT WAS DEVELOPING ITS OWN CHEMISTRIES TO TEST BLOOD;

12:36PM  12   RIGHT?

12:36PM  13   A.   I'M NOT SURE IF I HAD THAT UNDERSTANDING AT THE TIME, BUT

12:36PM  14   I DID KNOW THAT IT WAS DEVELOPING ITS OWN TECHNOLOGY.

12:37PM  15   Q.   OKAY.  AND IT WAS DEVELOPING ITS OWN SOFTWARE; RIGHT?

12:37PM  16   A.   RIGHT.

12:37PM  17   Q.   AND WRITING SOFTWARE FROM SCRATCH; CORRECT?

12:37PM  18   A.   RIGHT.

12:37PM  19   Q.   AND IT WAS ALSO BUILDING ITS OWN HARDWARE; RIGHT?

12:37PM  20   A.   RIGHT.

12:37PM  21   Q.   AND ALSO DEVELOPING PROCESSES TO RUN THE BLOOD TESTING

12:37PM  22   MACHINES.

12:37PM  23        IS THAT FAIR?

12:37PM  24   A.   YES.

12:37PM  25   Q.   AND WHEN I SAY "PROCESSES," I'M REFERRING TO PROTOCOLS.

EDLIN CROSS BY MS. WALSH                                    2602

12:37PM  1     THERE WERE CERTAIN PROTOCOLS FOR RUNNING DIFFERENT MACHINES; IS

12:37PM  2     THAT RIGHT?

12:37PM  3     A.   CAN YOU SPECIFY KIND OF WHICH MACHINES AND IN WHICH

12:37PM  4     CONTEXT THAT'S FOR?

12:37PM  5     Q.   SURE.

12:37PM  6          FOR THERANOS'S TECHNOLOGY THAT IT WAS DEVELOPING, IT WAS

12:37PM  7     DEVELOPING HARDWARE; RIGHT?

12:37PM  8     A.   RIGHT.

12:37PM  9     Q.   SOFTWARE; CORRECT?

12:37PM 10     A.   RIGHT.

12:37PM 11     Q.   THE ASSAY ITSELF; RIGHT?

12:37PM 12     A.   RIGHT.

12:37PM 13     Q.   AND THAT'S WHAT THE ASSAY DEVELOPMENT TEAMS WERE

12:38PM 14     DEVELOPING?

12:38PM 15     A.   RIGHT.

12:38PM 16     Q.   BUT ALSO THE PROCESSES TO PUT ALL OF THOSE THINGS

12:38PM 17     TOGETHER; RIGHT?

12:38PM 18     A.   RIGHT.

12:38PM 19     Q.   IN ORDER TO MAKE THE MACHINE WORK IN A UNIFIED WAY;

12:38PM 20     CORRECT?

12:38PM 21     A.   CORRECT.

12:38PM 22     Q.   OKAY.  AND THERANOS OBTAINED PATENTS ON MUCH OF ITS WORK;

12:38PM 23     RIGHT?

12:38PM 24     A.   THAT WAS MY UNDERSTANDING.

12:38PM 25     Q.   AND THE PATENTS PROTECTED THE INTELLECTUAL PROPERTY OF

ER-1821

EDLIN CROSS BY MS. WALSH                                    2603

12:38PM   1    THERANOS; RIGHT?

12:38PM   2    A.   I DON'T KNOW THE SPECIFICS, BUT THAT'S, OF COURSE, WHAT

12:38PM   3    PATENTS DO.

12:38PM   4    Q.   GENERALLY?

12:38PM   5    A.   RIGHT.

12:38PM   6    Q.   AND YOU'RE AWARE THAT THERANOS HELD MANY PATENTS; IS THAT

12:38PM   7    RIGHT?

12:38PM   8    A.   YES.

12:38PM   9    Q.   AND FOR IDEAS THAT IT WAS DEVELOPING THAT IT DIDN'T HAVE

12:38PM  10    PATENTS FOR, THERE WAS CONCERN WITHIN THE COMPANY THAT HAD TO

12:38PM  11    PROTECT THOSE IDEAS; RIGHT?

12:38PM  12         MR. BOSTIC:   OBJECTION.   CALLS FOR SPECULATION.

12:38PM  13    LACKS FOUNDATION.

12:38PM  14         THE COURT:   COULD YOU ASK THAT IN A DIFFERENT WAY?

12:38PM  15         MS. WALSH:   SURE.

12:39PM  16    Q.   WELL, MR. EDLIN, YOU TESTIFIED THAT THERE WAS SOME

12:39PM  17    RESTRICTION ON THE FLOW OF INFORMATION WITHIN THERANOS;

12:39PM  18    CORRECT?

12:39PM  19    A.   CORRECT.

12:39PM  20    Q.   AND ISN'T IT YOUR UNDERSTANDING THAT ONE OF THE REASONS

12:39PM  21    THERE WAS RESTRICTION ON THE FLOW OF INFORMATION IS BECAUSE THE

12:39PM  22    COMPANY WANTED TO PROTECT ITS IDEAS AND INTELLECTUAL PROPERTY?

12:39PM  23         MR. BOSTIC:   SAME OBJECTION.

12:39PM  24         THE COURT:   YOU'RE ASKING IF HE HAS PERSONAL

12:39PM  25    KNOWLEDGE OF THIS?

ER-1822