No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 8 OF 26 (PAGES ER-1823 – ER-2122)**

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

12:39PM 1          MS. WALSH:  JUST HIS UNDERSTANDING.

12:39PM 2          THE COURT:  YOU CAN ANSWER THE QUESTION, SIR, BASED

12:39PM 3     ON YOUR PERSONAL KNOWLEDGE.

12:39PM 4          THE WITNESS:  THAT WAS MY UNDERSTANDING.

12:39PM 5     BY MS. WALSH:

12:39PM 6     Q.   IT WAS?

12:39PM 7     A.   YES.

12:39PM 8     Q.   AND ONE OF THE REASONS THAT WAS THE CASE, WAS BECAUSE

12:39PM 9     THERANOS HAD COMPETITORS IN THE BLOOD TESTING MARKET; RIGHT?

12:39PM 10    A.   THAT WAS ONE OF THE REASONS.

12:39PM 11    Q.   RIGHT.  THERE WERE TWO VERY LARGE COMPANIES THAT WERE

12:39PM 12    THERANOS'S COMPETITORS; RIGHT?

12:39PM 13    A.   I'M NOT SURE AT THE TIME TO WHEN I LEARNED THAT, BUT, YES,

12:40PM 14    TWO INCUMBENTS IN THE -- I'M NOT SURE WHEN I -- I DON'T

12:40PM 15    REMEMBER.

12:40PM 16         THE COURT:  DID YOU SAY TWO INCUMBENTS IN THE LAB

12:40PM 17    INDUSTRY?

12:40PM 18         THE WITNESS:  YES.

12:40PM 19         MS. WALSH:  THANK YOU.

12:40PM 20    Q.   AND THE TWO INCUMBENTS WERE LABCORP AND QUEST; RIGHT?

12:40PM 21    A.   RIGHT.

12:40PM 22    Q.   AND THEY WERE TWO LARGE BLOOD TESTING COMPANIES; CORRECT?

12:40PM 23    A.   YES.

12:40PM 24    Q.   AND THEY OCCUPIED MOST OF THE MARKET IN BLOOD TESTING AT

12:40PM 25    THE TIME; IS THAT RIGHT?

12:40PM   1    A.   I DON'T KNOW THE SPECIFICS.

12:40PM   2    Q.   OKAY.  DID YOU HAVE AN UNDERSTANDING AT THE TIME WHEN YOU

12:40PM   3    WERE WORKING AT THERANOS, THAT THAT WAS THE CASE?

12:40PM   4    A.   I DON'T RECALL THE EXACT PERCENTAGE OF THE MARKET.

12:40PM   5    Q.   OKAY.  HOW ABOUT JUST GENERALLY, THEY OCCUPIED MOST OF THE

12:40PM   6    MARKET?

12:40PM   7    A.   I THINK MOST WOULD REQUIRE A MAJORITY, I JUST DON'T

12:41PM   8    REMEMBER THE EXACT PERCENTAGE.

12:41PM   9    Q.   OKAY.  ALL RIGHT.  SO I WANT TO SHIFT GEARS NOW TO

12:41PM  10    WALGREENS.

12:41PM  11         YOU HAD A ROLE IN INTERACTING WITH WALGREENS, DID YOU NOT,

12:41PM  12    WHILE YOU WERE AT THERANOS?

12:41PM  13    A.   I DID.

12:41PM  14    Q.   AND YOUR ROLE, I THINK YOU TESTIFIED THAT IT INVOLVED

12:41PM  15    OPERATIONALIZING THE ROLLOUT; RIGHT?

12:41PM  16    A.   RIGHT.

12:41PM  17    Q.   AND YOUR ROLE IN CONNECTION WITH WALGREENS RELATED TO THE

12:41PM  18    PATIENT EXPERIENCE AT WALGREENS; IS THAT FAIR?

12:41PM  19    A.   YES.

12:41PM  20    Q.   AND PART OF WHAT YOU DID, WAS YOU PROVIDED THE TRAINING

12:41PM  21    FOR PHLEBOTOMISTS IN WALGREENS; CORRECT?

12:42PM  22    A.   NOT ALL OF THE TRAINING, BUT I WAS INVOLVED WITH THE

12:42PM  23    TRAINING, YES.

12:42PM  24    Q.   WHAT WERE YOU INVOLVED WITH?

12:42PM  25    A.   I WORKED WITH THE REST OF MY TEAM AND ALSO WITH OTHER

EDLIN CROSS BY MS. WALSH                                                     2606

12:42PM 1      PERSONNEL WITHIN THERANOS TO DEVELOP A TRAINING PROGRAM THAT I,

12:42PM 2      ALONG WITH OTHER MEMBERS OF THE PRODUCT MANAGEMENT TEAM,

12:42PM 3      PRESENTED TO, IT WAS AT FIRST A GROUP OF WALGREENS TECHNICIANS,

12:42PM 4      AND WE DEVELOPED THE TRAINING MODEL WHERE WE WOULD TRAIN A

12:42PM 5      GROUP OF TECHNICIANS, AND THEN THEY THEMSELVES WOULD BE ABLE TO

12:42PM 6      TRAIN A GROUP OF TECHNICIANS.

12:42PM 7      Q.   OKAY.  AND SO YOU AND OTHERS DEVELOPED THAT TRAINING OF

12:42PM 8      TRAIN THE TRAINER; IS THAT RIGHT?

12:42PM 9      A.   RIGHT, IN CONSULTATION WITH OTHER EXPERTS WITHIN THE

12:42PM 10     COMPANY.

12:42PM 11     Q.   AND YOU ALSO TRAINED THE TECHNICIANS, OR THE PERSON WHO

12:43PM 12     TRAINED THE TECHNICIANS, ON THE SOFTWARE APPS THAT WERE

12:43PM 13     ASSOCIATED WITH THERANOS; IS THAT RIGHT?

12:43PM 14     A.   I PERSONALLY DON'T RECALL DELIVERING THAT TRAINING, BUT I

12:43PM 15     DO RECALL THAT THAT WAS PART OF THE TRAINING.

12:43PM 16     Q.   OKAY.  AND THAT SOFTWARE RELATED TO CHECKING THE PATIENT

12:43PM 17     IN AT WALGREENS; RIGHT?

12:43PM 18     A.   RIGHT.

12:43PM 19     Q.   CHECKING THEIR INSURANCE; CORRECT?

12:43PM 20     A.   CORRECT.

12:43PM 21     Q.   EVALUATING THEIR LAB FORMS AT THE TIME; RIGHT?

12:43PM 22     A.   RIGHT.

12:43PM 23     Q.   AND ALSO, I THINK YOU MENTIONED TRAINING THE TECHNICIANS

12:43PM 24     ON THE APPS TO HELP THEM UNDERSTAND WHICH TUBES THEY NEEDED TO

12:43PM 25     HELP COLLECT THE BLOOD; IS THAT RIGHT?

ER-1826

12:43PM 1     A.   RIGHT.

12:43PM 2     Q.   AND THERE WERE VARIOUS DIFFERENT TUBES THAT THEY COULD

12:43PM 3     USE; RIGHT?

12:43PM 4     A.   RIGHT.

12:43PM 5     Q.   SO THEY HAD TO KNOW WHICH ONES TO USE?

12:43PM 6     A.   CORRECT.

12:43PM 7     Q.   SO LET'S JUST TALK MORE BROADLY ABOUT THE

12:44PM 8     THERANOS-WALGREENS RELATIONSHIP.  ALL RIGHT?

12:44PM 9     A.   UH-HUH.

12:44PM 10    Q.   THERANOS PARTNERED WITH WALGREENS TO BRING ITS BLOOD

12:44PM 11    TESTING SERVICES INTO WALGREENS; CORRECT?

12:44PM 12    A.   YES.

12:44PM 13    Q.   AND THE GOVERNMENT ASKED YOU QUESTIONS ABOUT THE

12:44PM 14    WALGREENS-THERANOS RELATIONSHIP IN 2013.

12:44PM 15         DO YOU REMEMBER THAT?

12:44PM 16    A.   YES.

12:44PM 17    Q.   RIGHT BEFORE THE ROLLOUT; RIGHT?

12:44PM 18    A.   YES.

12:44PM 19    Q.   BUT, IN FACT, WALGREENS AND THERANOS HAD A RELATIONSHIP, A

12:44PM 20    PARTNERSHIP YEARS BEFORE THE ROLLOUT; RIGHT?

12:44PM 21    A.   YES.

12:44PM 22    Q.   AND DO YOU REMEMBER THAT THE LAUNCH, THE WALGREENS LAUNCH

12:44PM 23    WAS SCHEDULED FOR 2012 AND IT GOT POSTPONED?

12:44PM 24         DO YOU RECALL THAT?

12:44PM 25    A.   I RECALL THAT IT WAS POSTPONED.

EDLIN CROSS BY MS. WALSH                                    2608

12:44PM  1    Q.   OKAY.  AND THE ORIGINAL IDEA IN THE PARTNERSHIP BETWEEN

12:45PM  2    THERANOS AND WALGREENS WAS TO PUT THERANOS'S DEVICES IN

12:45PM  3    WALGREENS.

12:45PM  4         DO YOU REMEMBER THAT?

12:45PM  5    A.   YES.

12:45PM  6    Q.   AND THAT WAS GOING TO BE CALLED A POINT OF SERVICE MODEL;

12:45PM  7    RIGHT?

12:45PM  8    A.   I'M FAMILIAR WITH THE TERM, I'M JUST NOT FAMILIAR WITH HOW

12:45PM  9    IT WAS DESCRIBED AT THAT TIME.

12:45PM  10   Q.   OKAY.  BUT THE ORIGINAL IDEA WAS TO PUT THE DEVICES IN

12:45PM  11   WALGREENS; RIGHT?

12:45PM  12   A.   RIGHT.

12:45PM  13   Q.   OKAY.  AND AT A CERTAIN POINT IN TIME THAT CHANGED; RIGHT?

12:45PM  14   A.   RIGHT.

12:45PM  15   Q.   AND IT CHANGED FOR VARIOUS DIFFERENT REASONS, SOME RELATED

12:45PM  16   TO FDA APPROVAL THAT MIGHT BE REQUIRED ON THE DEVICE TO MOVE IT

12:45PM  17   FROM THERANOS INTO THE WALGREENS STORES; RIGHT?

12:45PM  18         MR. BOSTIC:  LACKS FOUNDATION.  CALLS FOR

12:45PM  19   SPECULATION.

12:45PM  20         THE COURT:  CAN YOU LAY A FOUNDATION FOR THAT

12:45PM  21   QUESTION?

12:45PM  22         MS. WALSH:  SURE.

12:46PM  23   Q.   SO THE MODEL CHANGED FROM PUTTING DEVICES IN THE STORES;

12:46PM  24   RIGHT?

12:46PM  25   A.   RIGHT.

ER-1828

12:46PM  1    Q.   AND IT CHANGED FOR A NUMBER OF DIFFERENT REASONS.

12:46PM  2         DO YOU REMEMBER ANY OF THE REASONS?

12:46PM  3              MR. BOSTIC:  CALLS FOR HEARSAY.

12:46PM  4              THE COURT:  CAN YOU ASK IF HE WAS INVOLVED WITH ANY

12:46PM  5    OF THOSE?

12:46PM  6              MS. WALSH:  SURE.

12:46PM  7    Q.   MR. EDLIN, WERE YOU INVOLVED IN THE EARLIER RELATIONSHIP

12:46PM  8    BETWEEN THERANOS AND WALGREENS?

12:46PM  9    A.   WHEN I JOINED THE COMPANY, THERE WAS AN EXISTING

12:46PM  10   RELATIONSHIP WITH WALGREENS AND THAT WAS -- THAT RELATIONSHIP

12:46PM  11   WAS MY PRIMARY, YOU KNOW, ROLES AND RESPONSIBILITIES AT THE

12:46PM  12   COMPANY.

12:47PM  13        SO I WAS INVOLVED WITH THAT RELATIONSHIP AS EARLY AS 2011

12:47PM  14   WHEN I JOINED THE COMPANY.

12:47PM  15   Q.   OKAY.  AND YOU'RE AWARE -- NOT TO BE REPETITIVE -- BUT THE

12:47PM  16   ORIGINAL IDEA WAS TO PUT THE DEVICES IN THE WALGREENS; RIGHT?

12:47PM  17   A.   RIGHT.

12:47PM  18   Q.   AND AT A CERTAIN POINT IN TIME THAT CHANGED; RIGHT?

12:47PM  19   A.   RIGHT.

12:47PM  20   Q.   AND THE PARTIES, WALGREENS AND THERANOS, AGREED THAT THEY

12:47PM  21   WERE GOING TO CHANGE HOW THIS ROLLOUT WAS GOING TO OCCUR;

12:47PM  22   RIGHT?

12:47PM  23   A.   THERE WAS A MUTUAL AGREEMENT GIVEN THAT THAT IS WHAT

12:47PM  24   HAPPENED, BUT I WAS NOT APART OF THOSE CONVERSATIONS.

12:47PM  25   Q.   UNDERSTOOD.

EDLIN CROSS BY MS. WALSH                                    2610

12:47PM  1            AND THE CHANGE THAT OCCURRED WAS THAT THERANOS WAS NOW,

12:47PM  2     INSTEAD OF PUTTING DEVICES IN WALGREENS, THERANOS WAS GOING TO

12:47PM  3     COLLECT BLOOD SAMPLES IN WALGREENS, SHIP THEM BACK TO THERANOS,

12:47PM  4     AND PROCESS THE TESTS IN THERANOS.

12:47PM  5            DO YOU REMEMBER THAT?

12:47PM  6     A.   YES.

12:47PM  7     Q.   AND THAT CHANGE AND THAT PHASE OF SHIPPING SAMPLES BACK TO

12:48PM  8     THERANOS, THAT WAS REFERRED TO AS PHASE I.

12:48PM  9            DO YOU REMEMBER THAT?

12:48PM 10     A.   YES.

12:48PM 11     Q.   OKAY.  AND PUTTING THE MACHINES IN THE STORES, THAT WAS

12:48PM 12     GOING TO BE PHASE II; RIGHT?

12:48PM 13     A.   I DON'T, I DON'T RECALL.

12:48PM 14     Q.   OKAY.  BUT THAT WAS THE NEXT PHASE; IS THAT FAIR?  WHETHER

12:48PM 15     IT'S CALLED PHASE II OR SOMETHING ELSE, THAT WAS THE NEXT

12:48PM 16     PHASE, PUTTING THE DEVICES IN THE STORES?

12:48PM 17     A.   I'M NOT SURE WHETHER THAT IDEA ENDURED OR IF THAT WAS --

12:48PM 18     CONTINUED TO ALWAYS BE THE PLAN.  I'M NOT SURE.

12:48PM 19     Q.   OKAY.  WELL, IT WAS THE GOAL, THOUGH, OF THERANOS TO

12:49PM 20     ULTIMATELY PUT DEVICES IN WALGREENS STORES; RIGHT?

12:49PM 21     A.   I THINK THAT WAS THE INITIAL GOAL.

12:49PM 22            I'M NOT SURE WHETHER, AFTER THERE WAS THE CHANGE, IF THAT

12:49PM 23     WAS STILL THE GOAL OR IF THAT CHANGED OR IF IT CHANGED

12:49PM 24     PERMANENTLY.

12:49PM 25     Q.   OKAY.  AND PART OF THE GOAL ALSO, PUTTING ASIDE WALGREENS,

EDLIN CROSS BY MS. WALSH                                    2611

12:49PM   1    WAS TO PUT DEVICES IN OTHER LOCATIONS OUTSIDE OF THERANOS.

12:49PM   2         DO YOU REMEMBER THAT?

12:49PM   3    A.   YES.

12:49PM   4    Q.   PLACES LIKE HOSPITALS; RIGHT?

12:49PM   5    A.   RIGHT.

12:49PM   6    Q.   DOCTOR OFFICES; CORRECT?

12:49PM   7    A.   RIGHT.

12:49PM   8    Q.   ULTIMATELY PUTTING DEVICES IN MILITARY HOSPITALS; RIGHT?

12:49PM   9    A.   RIGHT.

12:49PM  10    Q.   OKAY.  BUT THIS WALGREENS ROLLOUT THAT OCCURRED IN 2013,

12:49PM  11    THAT WAS LIMITED TO THIS PHASE I MODEL; CORRECT?

12:49PM  12    A.   THAT BECAME THE WHOLE MODEL.

12:49PM  13    Q.   SO IN YOUR EXPERIENCE, WHAT HAPPENED WAS THE WALGREENS --

12:50PM  14    THE TESTING THAT OCCURRED IN 2013 WITH THE SHIPMENTS COMING

12:50PM  15    INTO THERANOS --

12:50PM  16    A.   RIGHT.

12:50PM  17    Q.   -- THAT WAS THE MODEL; RIGHT?

12:50PM  18    A.   THAT BECAME THE MODEL.  AND, YOU KNOW, I DON'T RECALL

12:50PM  19    WORKING ON A DIFFERENT MODEL.

12:50PM  20         SO THAT BECAME THE MODEL, AND THAT ESSENTIALLY WAS HOW THE

12:50PM  21    WALGREENS OPERATION CONTINUED TO PROCEED.

12:50PM  22    Q.   AND SO YOU PERSONALLY DIDN'T WORK ON ANY PHASE II MODEL;

12:50PM  23    RIGHT?

12:50PM  24    A.   RIGHT.

12:50PM  25    Q.   OR PUTTING DEVICES IN STORES; RIGHT?

EDLIN CROSS BY MS. WALSH                                    2612

12:50PM   1      A.   RIGHT.

12:50PM   2           THE WALGREENS OPERATION, YOU KNOW, STOPPED AFTER I THINK

12:50PM   3      55 STORES WERE SET UP, WHICH WAS WITH RESPECT TO THE OVERALL,

12:51PM   4      THE OVERALL NUMBER OF WALGREENS STORES THAT TESTING WOULD

12:51PM   5      POTENTIALLY BE AVAILABLE AT, WHICH I THINK WAS OVER 8,000.

12:51PM   6      FIFTY-FIVE WAS EARLY ON IN THAT PROCESS.

12:51PM   7      Q.   UNDERSTOOD.

12:51PM   8           BUT THE GOAL WAS TO PUT -- TO OPEN THERANOS SERVICE

12:51PM   9      CENTERS IN WALGREENS ACROSS THE COUNTRY; RIGHT?

12:51PM  10      A.   RIGHT.

12:51PM  11      Q.   OKAY.  AND ARE YOU AWARE THAT FOR TESTING PATIENT SAMPLES,

12:51PM  12      WHEN WALGREENS OPENED IN SEPTEMBER OF 2013, THE SERIES 3

12:51PM  13      DEVICES WERE THE DEVICES THAT WERE USED FOR TESTING PATIENT

12:51PM  14      SAMPLES?

12:51PM  15      A.   I'M NOT SURE IF I KNEW IF THE DEVICES WERE USED TO TEST

12:51PM  16      PATIENT SAMPLES, BUT AT THAT TIME I RECALL THAT THOSE WERE THE

12:52PM  17      DEVICES THAT WERE PLANNED TO INITIALLY BE IN THE WALGREENS

12:52PM  18      STORES.

12:52PM  19      Q.   OKAY.  AND YOU TESTIFIED ABOUT NEXT GENERATION DEVICES AS

12:52PM  20      WELL; RIGHT?

12:52PM  21      A.   RIGHT.

12:52PM  22      Q.   AND THAT WAS THE 4 SERIES DEVICE; CORRECT?

12:52PM  23      A.   CORRECT.

12:52PM  24      Q.   AND YOU SAID THAT THERE WERE THREE VARIATIONS OF THE

12:52PM  25      4 SERIES; RIGHT?

EDLIN CROSS BY MS. WALSH                                    2613

12:52PM   1      A.   RIGHT.

12:52PM   2      Q.   THERE WAS THE 4.0 MONOBAY; CORRECT?

12:52PM   3      A.   CORRECT.

12:52PM   4      Q.   AND THE 4S; CORRECT?

12:52PM   5      A.   CORRECT.

12:52PM   6      Q.   AND THAT WAS A SMALLER VERSION OF THE MONOBAY; CORRECT?

12:52PM   7      A.   CORRECT.

12:52PM   8      Q.   AND THE MINILAB; RIGHT?

12:52PM   9      A.   RIGHT.

12:52PM  10      Q.   AND THE MINILAB WAS KIND OF NEXT GENERATION, WASN'T IT?

12:52PM  11      A.   I DON'T THINK I HAD THAT UNDERSTANDING AT THE TIME.

12:53PM  12           I THOUGHT MY UNDERSTANDING WAS THAT BOTH OF THE DEVICES

12:53PM  13      WERE THE NEXT GENERATION.

12:53PM  14           SO I DON'T THINK I WAS TOLD THAT -- WHAT THE SEQUENCE

12:53PM  15      WOULD BE IN TERMS OF WHEN THEY'RE AVAILABLE.

12:53PM  16      Q.   OKAY.  BUT THE MINILAB WAS SEVERAL DIFFERENT MONOBAYS ON

12:53PM  17      TOP OF EACH OTHER; RIGHT?

12:53PM  18      A.   THE MONOBAY BLADE, WHICH IS KIND OF THE SHELF OF

12:53PM  19      COMPONENTS, YES, ON TOP OF EACH OTHER.

12:53PM  20      Q.   RIGHT.  AND THE MINILAB WOULD BE ABLE TO RUN MANY

12:53PM  21      DIFFERENT TESTS ALL AT ONCE; RIGHT?

12:53PM  22      A.   THAT'S WHAT IT WAS DESIGNED TO DO.

12:53PM  23      Q.   RIGHT.

12:53PM  24      A.   RIGHT.

12:53PM  25      Q.   AND THE MONOBAY COULD NOT RUN AS MANY TESTS AT THE SAME

12:53PM  1      TIME; RIGHT?

12:53PM  2      A.   CORRECT.

12:53PM  3      Q.   OKAY.

12:53PM  4           SO LET'S PULL UP, IF WE COULD, YOUR HONOR, EXHIBIT 5388,

12:54PM  5      WHICH IS ALREADY IN EVIDENCE?

12:54PM  6              THE COURT:  YES.

12:54PM  7      BY MS. WALSH:

12:54PM  8      Q.   DO YOU SEE THAT, MR. EDLIN?

12:54PM  9      A.   YES.

12:54PM  10     Q.   AND THAT'S A PHOTO OF THE 3 SERIES EDISON; RIGHT?

12:54PM  11     A.   YES.

12:54PM  12     Q.   OKAY.  AND IF YOU CAN TURN IN YOUR BINDER TO 7747.

12:54PM  13          DO YOU SEE THAT?

12:54PM  14     A.   I DO.

12:54PM  15     Q.   AND WHAT DO YOU RECOGNIZE THAT TO BE?

12:54PM  16     A.   A 4S.

12:54PM  17     Q.   A 4S DEVICE, THERANOS'S 4S DEVICE?

12:54PM  18     A.   YES, I BELIEVE SO.

12:54PM  19              MS. WALSH:  OKAY.  YOUR HONOR, WE OFFER 7747.

12:55PM  20              MR. BOSTIC:  NO OBJECTION.

12:55PM  21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:55PM  22          (DEFENDANT'S EXHIBIT 7747 WAS RECEIVED IN EVIDENCE.)

12:55PM  23     BY MS. WALSH:

12:55PM  24     Q.   OKAY.  SO THAT'S THE 7747 DEVICE.

12:55PM  25              AND THAT WAS THE DEVICE THAT YOU USED IN YOUR WORK WITH

EDLIN CROSS BY MS. WALSH                                    2615

12:55PM  1    THE MILITARY; RIGHT?

12:55PM  2    A.   THERE WAS A SHIFT TO THAT DEVICE, AND THAT WAS THE

12:55PM  3    INTENDED DEVICE THAT WAS -- THAT WOULD BE INTENDED TO BE USED

12:55PM  4    WITH THE MILITARY.

12:55PM  5    Q.   RIGHT.

12:55PM  6         BUT IN YOUR INTERACTIONS WITH THE MILITARY, YOU SAID YOU

12:55PM  7    SHIPPED SOME DEVICES TO MACDILL AIRFORCE BASE; RIGHT?

12:55PM  8    A.   YES.

12:55PM  9    Q.   AND THEN THERE WAS SOME FEEDBACK FROM THE MILITARY THAT

12:55PM 10    THE DEVICE NEEDED TO BE SMALLER; RIGHT?

12:55PM 11         DO YOU REMEMBER THAT?

12:55PM 12    A.   YES, BUT THAT'S NOT EXACTLY THE SEQUENCE OF EVENTS.

12:55PM 13    Q.   OKAY.  SO IS THIS 4S DEVICE, THOUGH, THE SMALLER VERSION

12:56PM 14    OF THE 4 SERIES DEVICE?

12:56PM 15    A.   YES.

12:56PM 16    Q.   OKAY.  AND THAT WAS A PRODUCT OF YOUR INTERACTION AND WORK

12:56PM 17    WITH THE MILITARY; RIGHT?

12:56PM 18    A.   WHEN -- I DON'T KNOW.

12:56PM 19         WHEN I WORKED WITH THE MILITARY, THERE WAS A REQUEST FOR A

12:56PM 20    SMALLER, LIGHTER DEVICE, AND WHEN I CONVEYED THAT INFORMATION

12:56PM 21    TO ELIZABETH, IT SEEMED THAT SHE HAD -- WAS ALREADY AWARE OF A

12:56PM 22    VERSION OF -- AWARE OF A MODEL THAT WAS SIMILAR TO THE 4S.

12:56PM 23         SO I DON'T KNOW IF THAT SPECIFICALLY WAS THE CAUSE AND

12:56PM 24    EFFECT.  LIKE, IT SEEMED TO ME THAT THERE WAS ALREADY A

12:57PM 25    PROTOTYPE OR AN IDEA OF THIS BEFORE MY WORK WITH THE MILITARY.

12:57PM  1     Q.   OKAY.  BUT REGARDLESS OF WHEN THE IDEA CAME INTO BEING,

12:57PM  2     THIS WAS THE DEVICE THAT YOU USED IN CONNECTION WITH THE

12:57PM  3     MILITARY?  THIS IS WHAT YOU WERE WORKING ON; RIGHT?

12:57PM  4     A.   THIS IS WHAT THE SCIENTISTS AND THE ENGINEERING TEAMS WERE

12:57PM  5     WORKING ON, YES.

12:57PM  6     Q.   SURE.  AND YOU WORKED ON IT, TOO, JUST IN A DIFFERENT

12:57PM  7     ROLE; RIGHT?

12:57PM  8     A.   I DON'T KNOW IF I WOULD SAY I WORKED ON IT.

12:57PM  9     Q.   OKAY.  YOU HAD SOME INVOLVEMENT WITH THIS DEVICE, DID YOU

12:57PM  10    NOT?

12:57PM  11    A.   YES.

12:57PM  12    Q.   OKAY.  AND THAT INVOLVEMENT RELATED TO THERANOS'S

12:57PM  13    RELATIONSHIPS WITH THE MILITARY; IS THAT FAIR?

12:57PM  14    A.   YES.

12:57PM  15    Q.   OKAY.  CAN YOU TURN IN YOUR BINDER TO 20186.

12:58PM  16         DO YOU SEE THAT?

12:58PM  17    A.   YES.

12:58PM  18    Q.   AND DO YOU RECOGNIZE WHAT THAT IS?

12:58PM  19    A.   YES.

12:58PM  20    Q.   AND WHAT IS IT?

12:58PM  21    A.   4S AND ITS COMPONENTS.

12:58PM  22         MS. WALSH:  OKAY.  YOUR HONOR, WE OFFER 20186.

12:58PM  23         MR. BOSTIC:  NO OBJECTION.

12:59PM  24         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:59PM  25    (DEFENDANT'S EXHIBIT 20186 WAS RECEIVED IN EVIDENCE.)

12:59PM   1    BY MS. WALSH:

12:59PM   2    Q.   OKAY.  SO, MR. EDLIN, THIS IS A DIAGRAM; RIGHT?

12:59PM   3    A.   YES.

12:59PM   4    Q.   AND YOU SAID IT WAS OF THE 4S?

12:59PM   5    A.   YES.

12:59PM   6    Q.   OKAY.  ON THE TOP IT SAYS MINILAB.

12:59PM   7         IS THE MINILAB JUST A GROUPING OF THIS DEVICE STACKED UP

12:59PM   8    ONE ON TOP OF THE OTHER?

12:59PM   9    A.   NO, I DON'T BELIEVE SO.

12:59PM  10    Q.   OKAY.  AND HOW IS THIS DEVICE DIFFERENT FROM THE MINILAB?

12:59PM  11    A.   SO THIS IS -- THIS IS AN IMAGE OF A 4S.  IT WAS RENAMED

12:59PM  12    MINILAB FOR THE PURPOSE OF A PARTICULAR PRESENTATION IN 2015.

01:00PM  13         MY UNDERSTANDING AT THAT TIME WAS THAT THE DEVICE THAT WAS

01:00PM  14    PREVIOUSLY NAMED THE MINILAB WAS NO LONGER IN PRODUCTION.

01:00PM  15    Q.   OKAY.  BUT THIS WAS A NEXT GENERATION DEVICE; RIGHT?

01:00PM  16    A.   CORRECT.

01:00PM  17    Q.   OKAY.  AND YOU SEE ALL OF THE COMPONENTS ON THIS EXHIBIT?

01:00PM  18    A.   CORRECT.

01:00PM  19    Q.   AND IT HAD A MATERIAL HANDLING ROBOT.

01:00PM  20         DO YOU SEE THAT?

01:00PM  21    A.   YES.

01:00PM  22    Q.   A CENTRIFUGE ON THE RIGHT SIDE; RIGHT?

01:00PM  23    A.   RIGHT.

01:00PM  24    Q.   A CYTOMETER; RIGHT?

01:00PM  25    A.   RIGHT.

EDLIN CROSS BY MS. WALSH                                                          2618

01:00PM  1    Q.   THE CARTRIDGE IS ON THE BOTTOM WHERE THE BLOOD SAMPLE

01:00PM  2    WOULD GO; CORRECT?

01:00PM  3    A.   RIGHT.

01:00PM  4    Q.   AND SO ALL OF THESE COMPONENTS WERE BUILT AND PUT INTO

01:00PM  5    THIS MACHINE; CORRECT?

01:00PM  6    A.   I'M NOT SURE.  I DON'T KNOW IF EVERY SINGLE COMPONENT

01:01PM  7    COULD EXIST IN THE MACHINE AT THE SAME TIME.

01:01PM  8    Q.   OKAY.  BUT YOUR UNDERSTANDING WAS THIS MACHINE HAD

01:01PM  9    DIFFERENT COMPONENTS TO BE ABLE TO TEST DIFFERENT FAMILIES OF

01:01PM 10    ASSAYS, RIGHT, NOT JUST ONE FAMILY?

01:01PM 11    A.   RIGHT.

01:01PM 12    Q.   OKAY.  WE CAN TAKE THIS DOWN.

01:01PM 13         ALL RIGHT.  I WANT TO SHIFT GEARS NOW TO DEMOS.  YOU

01:01PM 14    TESTIFIED LAST WEEK QUITE A BIT ABOUT TECH DEMOS; RIGHT?

01:01PM 15    A.   RIGHT.

01:01PM 16    Q.   AND YOU SAID ESSENTIALLY THAT YOU WERE THE COORDINATOR FOR

01:01PM 17    THE LOGISTICS OF THE DEMOS; CORRECT?

01:01PM 18    A.   CORRECT.

01:01PM 19    Q.   YOU MADE SURE THE ROOM WAS SET UP WITH THE MACHINES THAT

01:01PM 20    WERE REQUESTED; RIGHT?

01:01PM 21    A.   RIGHT.

01:01PM 22    Q.   YOU MADE SURE THE ENGINEERS HAD BROUGHT THOSE MACHINES

01:01PM 23    INTO THE ROOM AT THE RIGHT TIME; RIGHT?

01:01PM 24    A.   RIGHT.

01:02PM 25    Q.   AND YOU WORKED WITH OTHER PEOPLE TO PREPARE FOR THE DEMO;

01:02PM  1    CORRECT?

01:02PM  2    A.   CORRECT.

01:02PM  3    Q.   YOU WORKED WITH THE ASSAY TEAM ON THE DEMOS; RIGHT?

01:02PM  4    A.   TO COORDINATE, YES.

01:02PM  5    Q.   TO COORDINATE, SURE.

01:02PM  6    A.   RIGHT.

01:02PM  7    Q.   THE ASSAY TEAMS HELPED YOU WHEN YOU NEEDED HELP FROM THEM;

01:02PM  8    RIGHT?

01:02PM  9    A.   YES.

01:02PM  10   Q.   OKAY.  AND SAME WITH THE HARDWARE TEAM; RIGHT?

01:02PM  11   A.   RIGHT.

01:02PM  12   Q.   AND ALSO THE SAME WITH THE SOFTWARE TEAM; RIGHT?

01:02PM  13   A.   CORRECT.

01:02PM  14   Q.   AND THERE WERE OTHER SCIENTISTS WHO, IF YOU NEEDED THEIR

01:02PM  15   HELP, THEY WOULD HELP PARTICIPATE AND SET UP THIS DEMO; RIGHT?

01:02PM  16   A.   RIGHT.

01:02PM  17   Q.   AND SOMETIMES THERE WERE, YOU KNOW, 10 TO 15 DIFFERENT

01:02PM  18   SCIENTISTS WORKING AND SETTING UP THE DEMOS; IS THAT FAIR?

01:02PM  19   A.   THAT'S FAIR.

01:02PM  20   Q.   AND COMING BACK TO DR. DANIEL YOUNG, HE ALSO WAS SOMEONE

01:02PM  21   WHO PARTICIPATED AND HELPED IN THE DEMO PROCESS; RIGHT?

01:02PM  22   A.   YES.

01:02PM  23   Q.   AND AS YOU TESTIFIED, HE ULTIMATELY REVIEWED AND APPROVED

01:03PM  24   ANY TEST RESULTS; RIGHT?

01:03PM  25   A.   RIGHT.

01:03PM  1    Q.   AND NOT ALL DEMONSTRATIONS WERE THE SAME; RIGHT?

01:03PM  2    A.   RIGHT.

01:03PM  3    Q.   AND SOME YOU UNDERSTOOD OCCURRED IN THERANOS WHICH YOU

01:03PM  4    TESTIFIED ABOUT; RIGHT?

01:03PM  5    A.   RIGHT.

01:03PM  6    Q.   AND SOME OCCURRED OUTSIDE OF THERANOS; RIGHT?

01:03PM  7    A.   RIGHT.

01:03PM  8    Q.   AND I THINK WE SAW ONE OF THOSE?

01:03PM  9    A.   RIGHT.

01:03PM  10   Q.   WE'LL SEE MORE.

01:03PM  11        AND IN THE ONES OUTSIDE OF THERANOS, MS. HOLMES MIGHT

01:03PM  12   TRAVEL TO THOSE DEMOS; RIGHT?

01:03PM  13   A.   RIGHT.

01:03PM  14   Q.   AND YOU SOMETIMES TRAVELLED TO THOSE; CORRECT?

01:03PM  15   A.   SOMETIMES, YES.

01:03PM  16   Q.   AND THE DEMOS ALSO COULD BE DIFFERENTIATED BECAUSE --

01:03PM  17   WITHDRAWN.

01:03PM  18        THE DEMOS ALSO HAD DIFFERENT PURPOSES; CORRECT?

01:03PM  19   A.   THAN?  OH, DIFFERENT DEMOS RESPECTIVE TO ONE ANOTHER?

01:03PM  20   Q.   LET ME MAKE IT MORE CLEAR.

01:04PM  21        SOMETIMES DEMOS WERE JUST SO PEOPLE COULD SEE THE SOFTWARE

01:04PM  22   AND THE TECHNOLOGY; RIGHT?

01:04PM  23   A.   CORRECT.

01:04PM  24   Q.   THEY DIDN'T WANT TO GET THEIR BLOOD DRAWN; RIGHT?

01:04PM  25   A.   RIGHT.

ER-1840

01:04PM 1    Q.   THEY DIDN'T WANT TO GET A FINGER PRICK; RIGHT?

01:04PM 2    A.   RIGHT, RIGHT.

01:04PM 3    Q.   AND OTHER DEMOS MIGHT BE TO SOMEONE WHO DID WANT TO

01:04PM 4    EXPERIENCE FINGERSTICK, THEY WONDERED WHAT IT FELT LIKE; RIGHT?

01:04PM 5    A.   RIGHT.

01:04PM 6    Q.   AND THEY WANTED TO SEE HOW THE PROCESS WORKED; RIGHT?

01:04PM 7    A.   RIGHT.

01:04PM 8    Q.   AND OTHER DEMOS WERE BOTH; CORRECT?

01:04PM 9    A.   CORRECT.

01:04PM 10   Q.   SO LET'S TURN -- ACTUALLY, IF YOU COULD TURN IN YOUR

01:04PM 11   BINDER TO 7243.

01:05PM 12   A.   OKAY.

01:05PM 13   Q.   SO IS THAT AN EMAIL FROM MS. HOLMES TO DR. YOUNG COPYING

01:05PM 14   YOU?

01:05PM 15   A.   YES.

01:05PM 16   Q.   AND THE DATE IS AUGUST 1ST, 2012; RIGHT?

01:05PM 17   A.   YES.

01:05PM 18   Q.   AND IT RELATES TO A DEMO; CORRECT?

01:05PM 19   A.   YES.

01:05PM 20        MS. WALSH:  YOUR HONOR, WE OFFER 7243.

01:05PM 21        MR. BOSTIC:  NO OBJECTION.

01:05PM 22        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:05PM 23      (DEFENDANT'S EXHIBIT 7243 WAS RECEIVED IN EVIDENCE.)

01:05PM 24   BY MS. WALSH:

01:05PM 25   Q.   OKAY.  SO LET'S GO TO THE BOTTOM EMAIL FIRST IN TIME.

EDLIN CROSS BY MS. WALSH                                                    2622

01:05PM  1          MS. HOLMES IS EMAILING DR. YOUNG, AND YOU'RE NOT COPIED ON

01:05PM  2     THIS, JULY 31ST, 2012.

01:05PM  3          AND SHE SAYS, "DO WE HAVE A COUPLE MINILABS THAT ARE FULLY

01:05PM  4     ASSEMBLED WITH FUNCTIONAL SCREENS/ELECTRONICS THAT ARE EASY TO

01:05PM  5     SHOW A CLIENT TOMORROW MID-DAY?"

01:05PM  6          DO YOU SEE THAT?

01:05PM  7     A.   YES.

01:05PM  8     Q.   AND SHE'S REFERRING TO NEXT GENERATION TECHNOLOGY; RIGHT?

01:06PM  9     A.   YES.

01:06PM 10     Q.   AND THIS IS 2012, SO IT'S REALLY NEXT GENERATION; RIGHT?

01:06PM 11     A.   RIGHT.

01:06PM 12     Q.   OKAY.  DR. YOUNG RESPONDS, "YES, WE HAVE FULLY FUNCTIONAL

01:06PM 13     MINILABS.  I WILL MAKE SURE THE DISPLAY IS READY AS WELL.  DO

01:06PM 14     YOU WANT THIS IN THE CONFERENCE ROOM?

01:06PM 15          "ALSO, DO YOU WANT ANY TESTS RUN IN THE MACHINE, OR JUST

01:06PM 16     TO HAVE IT POWERED UP WITH THE DISPLAY SHOWING SOMETHING

01:06PM 17     INTERESTING?"

01:06PM 18          AND SHE SAYS, "WE CAN PUT THEM IN AN INTERVIEW ROOM.

01:06PM 19     YES -- IF WE CAN EASILY HAVE THEM READY TO ACCEPT CARTRIDGES WE

01:06PM 20     SHOULD.  ALSO YES ON THE SCREEN... WE SHOULD NOT DO A LOT OF

01:06PM 21     EXTRA WORK FOR THIS THOUGH."

01:06PM 22          AND THEN DR. YOUNG RESPONDS, "OK, I'LL GET THIS PREPARED.

01:06PM 23          "RIGHT NOW, WE ARE NOT READY TO RUN WHOLE BLOOD SAMPLES IN

01:06PM 24     THIS DEVICE."

01:06PM 25          DO YOU SEE THAT?

EDLIN CROSS BY MS. WALSH                                                2623

01:06PM  1     A.   YES.

01:06PM  2     Q.   AND THEN MS. HOLMES'S RESPONSE IS "WE'RE NOT RUNNING

01:06PM  3     SAMPLES -- JUST DEMONSTRATING THE HARDWARE."

01:07PM  4          DO YOU SEE THAT?

01:07PM  5     A.   YES.

01:07PM  6     Q.   AND THIS IS AN EXAMPLE WHERE YOU'RE REALLY SHOWING THE

01:07PM  7     MACHINE, THE HARDWARE, AND HOW IT WORKS WITHOUT RUNNING A

01:07PM  8     SAMPLE; CORRECT?

01:07PM  9     A.   CORRECT.

01:07PM 10     Q.   OKAY.  OKAY.  LET'S TALK ABOUT THESE IN CONNECTION WITH

01:07PM 11     THE DEMO APP AND YOU TALKED ABOUT THIS LAST WEEK; CORRECT?

01:07PM 12     A.   RIGHT.

01:07PM 13     Q.   SO THERANOS HAD DEVELOPED A LOT OF SOFTWARE FOR THESE

01:07PM 14     MACHINES; CORRECT?

01:07PM 15     A.   CORRECT.

01:07PM 16     Q.   ESPECIALLY FOR THE NEXT GENERATION MACHINES; RIGHT?

01:07PM 17     A.   CORRECT.

01:07PM 18     Q.   AND THERANOS HAD DEVELOPED A LOT OF DIFFERENT APPS FOR

01:07PM 19     DIFFERENT SCENARIOS AND USES FOR THE MACHINE.

01:07PM 20          IS THAT FAIR?

01:07PM 21     A.   I WAS AWARE OF A FEW.  I'M NOT SURE HOW MANY ADDITIONAL

01:08PM 22     APPS WERE DEVELOPED.

01:08PM 23     Q.   OKAY.  BUT THERE WERE SOME; RIGHT?

01:08PM 24     A.   YES.

01:08PM 25     Q.   OKAY.  AND I THINK YOU TESTIFIED LAST WEEK THAT IT WAS

EDLIN CROSS BY MS. WALSH                                              2624

01:08PM   1    KIND OF LIKE AN IPHONE OR A SMART PHONE WHERE YOU COULD SEE

01:08PM   2    DIFFERENT APPS ON THE SCREEN; RIGHT?

01:08PM   3    A.   I THINK I REFERRED TO THE INTUITIVENESS AND SIMPLE SCREEN

01:08PM   4    OF AN IPHONE APP, BUT I DON'T RECALL BEING ABLE TO SEE MULTIPLE

01:08PM   5    APPS AS YOU CAN ON A PHONE SELECTING A DIFFERENT APP TO USE.

01:08PM   6    Q.   OKAY.  SO LET'S TURN THEN TO IN YOUR BINDER TO 20538.

01:09PM   7    A.   OKAY.

01:09PM   8    Q.   AND TAKE A LOOK AT THE EMAIL AND THE ATTACHED EXHIBIT.

01:09PM   9    A.   OKAY.

01:09PM   10   Q.   AND PARTICULARLY LOOK AT PAGE 30 ON THE EXHIBIT.

01:10PM   11   A.   OKAY.

01:10PM   12   Q.   IS THAT THE -- ONE OF THE SCREENS THAT WOULD APPEAR ON THE

01:10PM   13   DEVICE THAT SHOWED THE USER INTERFACE WITH THE DIFFERENT APPS?

01:10PM   14   A.   I DON'T HAVE A RECOLLECTION OF SEEING THIS ON A NEXT

01:10PM   15   GENERATION DEVICE.

01:10PM   16        I DO RECALL SEEING SOMETHING SIMILAR ON A 3.0 SERIES

01:10PM   17   EARLIER IN MY TIME AT THERANOS.

01:10PM   18   Q.   OKAY.  AND TAKE A LOOK AT THE PAGES 7 THROUGH 13.

01:11PM   19   A.   OKAY.

01:11PM   20   Q.   DO YOU RECOGNIZE THOSE AS THE SCREENS A USER MIGHT SEE IF

01:11PM   21   THEY PRESS THE USER DIARY ON THE SCREEN?

01:11PM   22   A.   I DON'T RECOGNIZE THIS.

01:11PM   23   Q.   OKAY.  SO IT WAS JUST PAGE 30, AND YOU RECOGNIZE PAGE 30

01:11PM   24   AS ON THE 3.0 SERIES; IS THAT RIGHT?

01:11PM   25   A.   RIGHT.

01:11PM   1    Q.   OKAY.

01:11PM   2         YOUR HONOR, WE OFFER PAGE 30 OF 20538?

01:11PM   3             MR. BOSTIC:  NO OBJECTION TO THAT PAGE, YOUR HONOR.

01:11PM   4             THE COURT:  PAGE 30 OF 20538 IS ADMITTED, AND IT MAY

01:11PM   5    BE PUBLISHED.

01:11PM   6         (DEFENDANT'S EXHIBIT 20538, PAGE 30 WAS RECEIVED IN

01:12PM   7    EVIDENCE.)

01:12PM   8    BY MS. WALSH:

01:12PM   9    Q.   OKAY.  MR. EDLIN, YOU SAID YOU RECOGNIZE THIS ON THE 3.0

01:12PM  10    SERIES; RIGHT?

01:12PM  11    A.   RIGHT.

01:12PM  12    Q.   AND THIS WAS THE HOME SCREEN OF THAT DEVICE; RIGHT?

01:12PM  13    A.   UM, THIS WAS NOT THE MOST COMMON HOME SCREEN THAT I SAW,

01:12PM  14    BUT I DO REMEMBER SEEING A HOME SCREEN THAT RESEMBLED THIS.

01:12PM  15    Q.   OKAY.  AND WHAT WAS THE MOST COMMON HOME SCREEN THAT YOU

01:12PM  16    SAW?

01:12PM  17    A.   I RECALL IT JUST SAID THERANOS ON IT.

01:12PM  18    Q.   OKAY.  ALL RIGHT.

01:12PM  19         BUT YOU DO RECALL SEEING THIS SCREEN AT SOME POINT; RIGHT?

01:12PM  20    A.   I DON'T KNOW ABOUT THIS SPECIFIC SCREEN, BUT IT DOES

01:12PM  21    RESEMBLE -- IT DOES RESEMBLE A SCREEN THAT I DO REMEMBER

01:12PM  22    SEEING.

01:12PM  23    Q.   OKAY.  AND THERE ARE VARIOUS DIFFERENT BUTTONS OR SQUARES

01:12PM  24    THAT YOU CAN PUSH ON THE SCREEN; RIGHT?

01:12PM  25    A.   RIGHT.

01:12PM 1    Q.   AND THE SCREEN WAS SUCH THAT YOU COULD TOUCH IT, IT WAS A

01:13PM 2    TOUCHSCREEN --

01:13PM 3    A.   YES.

01:13PM 4    Q.   -- AND IT WOULD BRING YOU TO A NEXT OR A NEW MENU; RIGHT?

01:13PM 5    A.   IT WOULD ADVANCE THE APP BASED ON WHAT YOU SELECTED.

01:13PM 6    Q.   OKAY.  AND SO IF YOU PRESSED FOOD DIARY, FOR EXAMPLE, IT

01:13PM 7    MIGHT BRING YOU TO ANOTHER SET OF -- ANOTHER SCREEN RELATED TO

01:13PM 8    THE FOOD DIARY; IS THAT RIGHT?

01:13PM 9    A.   I DON'T HAVE FAMILIARITY WITH ANYTHING BEYOND JUST THE

01:13PM 10   SCREEN.

01:13PM 11   Q.   OKAY.  AND I REALIZE, MR. EDLIN, IT'S BEEN ALMOST A DECADE

01:13PM 12   SINCE YOU'VE LOOKED AT THESE THINGS OR SINCE YOU WORKED AT

01:13PM 13   THERANOS?

01:13PM 14   A.   UH-HUH.

01:13PM 15   Q.   SO I UNDERSTAND THAT.  AND MEMORIES FADE; RIGHT?

01:13PM 16   A.   RIGHT.

01:13PM 17   Q.   SO LET'S TAKE THAT DOWN.

01:13PM 18        YOUR HONOR, WHAT I'D LIKE TO DO IS TO SHOW MR. EDLIN ONLY

01:13PM 19   A SHORT VIDEO, WITH NO AUDIO, ON HIS SCREEN, AND ASK HIM IF HE

01:14PM 20   RECOGNIZES THAT VIDEO.

01:14PM 21        THE COURT:  IS THAT POSSIBLE -- DO WE HAVE IT CUED

01:14PM 22   UP?

01:14PM 23        MS. WALSH:  WE DO HAVE IT CUED UP, AND IT'S

01:14PM 24   EXHIBIT 20537 FOR THE RECORD.

01:14PM 25   Q.   SO, MR. EDLIN, YOU'RE GOING TO SEE SOMETHING ON YOUR

01:14PM  1    SCREEN, AND I'LL ASK YOU IF YOU RECOGNIZE IT.

01:14PM  2    A.    OKAY.

01:14PM  3          (VIDEO PLAYING OFF THE RECORD.)

01:14PM  4              THE WITNESS:  I DO RECOGNIZE THIS.

01:14PM  5    BY MS. WALSH:

01:14PM  6    Q.    OKAY.  WHAT IS IT?

01:14PM  7    A.    THIS IS AN APP WITH INSTRUCTIONS ON HOW TO COLLECT AND

01:15PM  8    PROCESS A SAMPLE ON A THERANOS DEVICE.

01:15PM  9    Q.    AND DO YOU --

01:15PM  10         WELL, BEFORE I ASK YOU THAT, YOUR HONOR, WE OFFER 20537.

01:15PM  11             MR. BOSTIC:  NO OBJECTION.

01:15PM  12   BY MS. WALSH:

01:15PM  13   Q.    AND BEFORE WE PLAY IT, I JUST WANT TO ASK, THIS IS ON A

01:15PM  14   4 SERIES DEVICE, ISN'T IT?

01:15PM  15   A.    YES.

01:15PM  16   Q.    AND THAT'S NEXT GENERATION; RIGHT?

01:15PM  17   A.    RIGHT.

01:15PM  18   Q.    AND WHAT YOU SEE ON THE SCREEN IS INSTRUCTIONS ON HOW TO

01:15PM  19   COLLECT A BLOOD SAMPLE WITH THE MACHINE THERE; RIGHT?

01:15PM  20   A.    RIGHT.

01:15PM  21   Q.    OKAY.  AND SO WE'RE GOING TO PLAY IT.  AND IF YOU COULD,

01:15PM  22   MR. EDLIN, TELL US WHAT IS HAPPENING AS IT'S PLAYING?

01:15PM  23             THE COURT:  LET ME ADMIT THIS NOW, AND IF YOU'D LIKE

01:15PM  24   TO PLAY IT NOW, IF NOW IS A GOOD TIME TO PLAY IT, WE CAN PLAY

01:15PM  25   IT.

01:15PM  1          MS. WALSH:  OKAY.  THANK YOU.

01:16PM  2          (DEFENDANT'S EXHIBIT 20537 WAS RECEIVED IN EVIDENCE.)

01:16PM  3          (VIDEO PLAYING OFF THE RECORD.)

01:16PM  4     BY MS. WALSH:

01:16PM  5     Q.   SO PLEASE NARRATE FOR US WHAT IS HAPPENING.

01:16PM  6     A.   OKAY.  USER TAPS THE SCREEN TO BEGIN.

01:16PM  7          THIS IS GIVING INSTRUCTIONS ON HOW TO COLLECT A

01:16PM  8     FINGERSTICK SAMPLE.

01:16PM  9          THE FINGER IS WARM, AND THE FINGER GETS WIPED WITH THE

01:16PM 10     ALCOHOL SWIPE.

01:16PM 11          IT IS PAUSED TO SHOW THE FUNCTIONALITY.

01:16PM 12          THIS IS THE FINGERSTICK GRIP.

01:16PM 13          AND THEN A LANCET USING A CTN TO COLLECT THE BLOOD SAMPLE.

01:16PM 14          REMOVING THE NANOTAINER FROM THE CTN.

01:16PM 15          OPENING THE THERANOS DEVICE.

01:16PM 16          AND PUTTING A CARTRIDGE WITH THE NANOTAINER INTO THE

01:16PM 17     DEVICE.

01:16PM 18     Q.   OKAY.  AND AGAIN, THIS IS ON A 4 SERIES DEVICE; RIGHT?

01:16PM 19     A.   YES.

01:16PM 20     Q.   OKAY.  AND LET ME ASK YOU ABOUT A FEW TERMS THAT YOU

01:17PM 21     MENTIONED WHEN YOU WERE NARRATING THIS.

01:17PM 22          YOU MENTIONED A CTN?

01:17PM 23     A.   RIGHT.

01:17PM 24     Q.   AND WHAT IS A CTN?

01:17PM 25     A.   A CAPILLARY TUBE NANOTAINER.  IT WAS A THERANOS

EDLIN CROSS BY MS. WALSH                                        2629

01:17PM  1    MANUFACTURED DEVICE THAT COLLECTED THE BLOOD FROM A FINGERSTICK

01:17PM  2    AND THEN TRANSFERRED THAT BLOOD INTO A LITTLE NANOTAINER TUBE.

01:17PM  3    Q.   OKAY.  AND YOU SAID THE NANOTAINER, HOW DOES THE

01:17PM  4    NANOTAINER DIFFER FROM THE CTN?

01:17PM  5    A.   THE CTN HAS TWO PARTS, IT'S THE CAPILLARY TUBE, THE CT,

01:17PM  6    AND THEN THE NANOTAINER, WHICH IS THE N.  SO THE NANOTAINER

01:17PM  7    DETACHES FROM THE CTN.

01:17PM  8    Q.   OKAY.  AND WHAT HAPPENS TO THE NANOTAINER AFTER IT

01:17PM  9    DETACHES?

01:17PM  10   A.   THE NANOTAINER GETS ENTERED INTO A CARTRIDGE, AND THEN

01:17PM  11   THAT CARTRIDGE IS INSERTED INTO A DEVICE, AND THEN THAT BLOOD

01:18PM  12   SAMPLE IS PROCESSED IN THE DEVICE.

01:18PM  13   Q.   AND THEN THE CARTRIDGE WE SAW IN THE VIDEO KIND OF GOING

01:18PM  14   INTO A LITTLE HOLE IN THE DEVICE, IS THAT WHERE THE CARTRIDGE

01:18PM  15   WOULD BE PLACED?

01:18PM  16   A.   RIGHT.  THERE IS KIND OF A DOOR THAT OPENS UP AND THEN YOU

01:18PM  17   PUT THE CARTRIDGE IN, AND THEN IT -- THE DEVICE ACCEPTS AND

01:18PM  18   PULLS IN THE CARTRIDGE, AND THAT CARTRIDGE HAS ALL OF THE

01:18PM  19   DIFFERENT CHEMISTRIES THAT WOULD BE NEEDED FOR A TEST.

01:18PM  20   Q.   OKAY.  SO LET'S NOW TURN TO THE SUBJECT OF THE NULL

01:18PM  21   PROTOCOL.  OKAY?

01:18PM  22   A.   UH-HUH.

01:18PM  23   Q.   SO IN THE EARLY DAYS OF THE COMPANY, THE THERANOS MACHINES

01:18PM  24   WERE BUILT TO ANALYZE A BLOOD SAMPLE; RIGHT?

01:18PM  25   A.   HOW EARLY?

EDLIN CROSS BY MS. WALSH

2630

01:19PM 1    Q.   BEFORE THE DEMO APP AND THE NULL PROTOCOL WERE WRITTEN,

01:19PM 2    THE MACHINE NEEDED A BLOOD SAMPLE IN ORDER TO OPERATE PROPERLY;

01:19PM 3    IS THAT RIGHT?

01:19PM 4    A.   I DON'T KNOW THE VARIOUS USE CASES OF THE MACHINE.  THAT,

01:19PM 5    I WAS NOT DIRECTLY INVOLVED WITH.

01:19PM 6    Q.   OKAY.  BUT BEFORE THE NULL PROTOCOL WAS WRITTEN, IF YOU

01:19PM 7    PUT A CARTRIDGE IN THE MACHINE WITHOUT A BLOOD SAMPLE, IT WOULD

01:19PM 8    CAUSE THE MACHINE TO BE CONFUSED, WOULDN'T IT?

01:19PM 9    A.   THAT WAS MY EXPERIENCE.

01:19PM 10   Q.   RIGHT.  BECAUSE THE MACHINE WAS EXPECTING TO GET A BLOOD

01:19PM 11   SAMPLE; RIGHT?

01:19PM 12   A.   RIGHT.

01:19PM 13   Q.   AND IT DIDN'T HAVE A BLOOD SAMPLE; RIGHT?

01:19PM 14   A.   RIGHT.

01:19PM 15   Q.   AND SO IT EITHER WOULD SHUT DOWN OR KICK UP ERRORS, BUT IT

01:20PM 16   WOULD NOT OPERATE PROPERLY; RIGHT?

01:20PM 17   A.   RIGHT.

01:20PM 18   Q.   AND SO FOR DEMONSTRATIONS WHERE PEOPLE DID NOT WANT TO

01:20PM 19   GIVE BLOOD IN ORDER TO RUN THAT DEMONSTRATION BEFORE THE NULL

01:20PM 20   PROTOCOL, PEOPLE WOULD HAVE TO DONATE THEIR BLOOD; RIGHT?

01:20PM 21        THEY WOULD HAVE TO GET A FINGERSTICK TO GO INTO THAT

01:20PM 22   CARTRIDGE?

01:20PM 23   A.   DO YOU MEAN -- IN WHAT SETTING?

01:20PM 24   Q.   FOR A DEMO?

01:20PM 25   A.   I DID SEE THAT HAPPEN ON OCCASION.

ER-1850

01:20PM  1    Q.   OKAY.  SO IN ORDER TO PREVENT THAT FROM HAPPENING, WHEN

01:20PM  2    THERE WAS A DEMO WITH NO BLOOD SAMPLE, THE SOFTWARE TEAM WROTE

01:20PM  3    A PROTOCOL; RIGHT?

01:20PM  4    A.   RIGHT.

01:20PM  5    Q.   AND THAT PROTOCOL WAS THE NULL PROTOCOL; RIGHT?

01:20PM  6    A.   I BELIEVE SO.

01:21PM  7    Q.   AND IT TOLD THE MACHINE THAT THERE WAS NO BLOOD IN THE

01:21PM  8    CARTRIDGE; RIGHT?

01:21PM  9    A.   I DON'T KNOW THOSE DETAILS IN TERMS OF WHAT IT TOLD THE

01:21PM  10   MACHINE.

01:21PM  11       I JUST KNOW THAT A NULL PROTOCOL DID NOT ATTEMPT TO RUN A

01:21PM  12   BLOOD SAMPLE.

01:21PM  13   Q.   OKAY.  AND YOU SAID LAST WEEK THAT THE NULL PROTOCOL

01:21PM  14   BASICALLY MEANS AN EMPTY PROTOCOL; RIGHT?

01:21PM  15   A.   RIGHT.

01:21PM  16   Q.   IT MEANS NOTHING, THERE'S NOTHING THERE; RIGHT?

01:21PM  17   A.   RIGHT.

01:21PM  18   Q.   OKAY.  AND THE MACHINE WOULD NOT ATTEMPT TO RUN A BLOOD

01:21PM  19   TEST IF IT WAS PROGRAMMED IN, THAT THERE WAS NOTHING, THAT

01:21PM  20   THERE WAS NO BLOOD IN THAT CARTRIDGE; RIGHT?

01:21PM  21   A.   RIGHT.

01:21PM  22   Q.   AND THERE WERE NEVER ANY BLOOD SAMPLES PUT INTO THE

01:22PM  23   MACHINE WHEN YOU WERE RUNNING THE NULL PROTOCOL; RIGHT?

01:22PM  24   A.   RIGHT.

01:22PM  25            MR. BOSTIC:  OBJECTION.  CALLS FOR SPECULATION.

EDLIN CROSS BY MS. WALSH                                        2632

01:22PM  1            THE COURT:  I'LL ALLOW THE ANSWER TO REMAIN.  YOU

01:22PM  2    CAN ASK ANOTHER QUESTION.

01:22PM  3            MS. WALSH:  OKAY.

01:22PM  4    Q.  SO I JUST WANT TO BE REALLY CLEAR ABOUT THIS, WHEN A

01:22PM  5    MACHINE WAS PROGRAMMED -- AND LET ME ASK YOU SOME FOUNDATION.

01:22PM  6        YOU WERE FAMILIAR WITH RUNNING THESE DEMOS; RIGHT?

01:22PM  7    A.  YES.

01:22PM  8    Q.  WE SAW EMAILS LAST WEEK, WE'RE GOING TO LOOK AT SOME MORE,

01:22PM  9    BUT WE SAW EMAILS LAST WEEK RELATING TO THE NULL PROTOCOL;

01:22PM  10   RIGHT?

01:22PM  11   A.  RIGHT.

01:22PM  12   Q.  AND IN YOUR EXPERIENCE AT THE COMPANY, WAS THERE EVER A

01:22PM  13   TIME THAT YOU REMEMBERED THAT THE MACHINE WAS RUNNING A NULL

01:22PM  14   PROTOCOL AND A BLOOD SAMPLE WAS PUT INTO THE MACHINE?

01:22PM  15   A.  I DON'T HAVE A RECOLLECTION OF THAT HAPPENING.

01:22PM  16   Q.  OKAY.  AND THE GOVERNMENT ASKED YOU A HYPOTHETICAL LAST

01:22PM  17   WEEK, AND I JUST WANT TO MAKE SURE THAT IT'S REALLY, REALLY

01:23PM  18   CLEAR.

01:23PM  19       SO TURN IN YOUR VOLUME 2, YOUR VOLUME 2.

01:23PM  20   A.  OKAY.

01:23PM  21   Q.  AND IF YOU TURN TO EXHIBIT 28460.

01:23PM  22   A.  OKAY.

01:23PM  23   Q.  AND I'M LOOKING AT LINES -- SORRY.

01:23PM  24       28460, PAGE 2383?

01:24PM  25   A.  I'M SORRY, WHAT WAS THE PAGE?

01:24PM   1    Q.   2383.  AND IT CARRIES OVER TO 2384 WHEN YOU GET THERE.

01:24PM   2    A.   YOU SAID 28460 AND THEN THERE ARE ONLY THREE DIGITS FOR

01:24PM   3    THE PAGES.

01:24PM   4    Q.   OKAY.  HOLD ON.

01:24PM   5    A.   OH, I'M SORRY.  AT THE TOP.

01:24PM   6    Q.   YEAH.  OKAY.

01:24PM   7    A.   OKAY.

01:24PM   8    Q.   SO THE BOTTOM OF 2383 CARRYING OVER TO 2384, THE QUESTION,

01:24PM   9    "SO LET'S IMAGINE."

01:24PM  10         DO YOU SEE THAT?

01:24PM  11    A.   YES.

01:24PM  12    Q.   AND SO YOU WERE ASKED A HYPOTHETICAL LAST WEEK?

01:24PM  13    A.   YES.

01:24PM  14    Q.   AND THE HYPOTHETICAL PREMISED -- WAS PREMISED ON THE

01:24PM  15    DEVICE BEING IN THE ROOM; RIGHT?

01:24PM  16    A.   RIGHT.

01:24PM  17    Q.   DO YOU SEE THAT?

01:24PM  18    A.   YES.

01:24PM  19    Q.   AND IT WAS THAT THE DEVICE WAS SET UP TO RUN THE NULL

01:25PM  20    PROTOCOL.

01:25PM  21         DO YOU SEE THAT?

01:25PM  22    A.   YES.

01:25PM  23    Q.   AND ALSO THAT A SAMPLE WAS PUT INTO THE MACHINE.

01:25PM  24         DO YOU SEE THAT?

01:25PM  25    A.   YES, IF A SAMPLE WAS PUT INTO THE MACHINE.  YES.

01:25PM   1    Q.   RIGHT.  BUT IT'S NOT THE CASE THAT A SAMPLE WAS PUT INTO A

01:25PM   2    MACHINE RUNNING THE NULL PROTOCOL, IS IT?

01:25PM   3               MR. BOSTIC:  FOUNDATION.  CALLS FOR SPECULATION.  I

01:25PM   4    THINK THE QUESTION WAS AS TO HIS PERSONAL EXPERIENCE.

01:25PM   5               THE COURT:  THAT'S WHAT YOU WERE ASKING WHAT HIS

01:25PM   6    PERSONAL EXPERIENCE.

01:25PM   7               MS. WALSH:  THAT'S RIGHT.

01:25PM   8               THE COURT:  RIGHT.  DO YOU UNDERSTAND THE QUESTION?

01:25PM   9               THE WITNESS:  WOULD YOU MIND REPEATING IT?

01:25PM  10    BY MS. WALSH:

01:25PM  11    Q.   SURE.

01:25PM  12         IT WAS YOUR EXPERIENCE AT THERANOS, WASN'T IT, THAT IF THE

01:25PM  13    NULL PROTOCOL WAS RUNNING ON A MACHINE, A BLOOD SAMPLE WAS NOT

01:25PM  14    PUT IN THAT MACHINE; IS THAT CORRECT?

01:25PM  15    A.   THAT'S CORRECT.

01:25PM  16    Q.   LET'S TURN TO AN EXHIBIT THAT THE GOVERNMENT SHOWED YOU

01:25PM  17    LAST WEEK ABOUT THE NULL PROTOCOL, 959.

01:26PM  18         YOUR HONOR, THIS ONE IS IN EVIDENCE SO PERMISSION TO

01:26PM  19    PUBLISH?

01:26PM  20               THE COURT:  YES.

01:26PM  21    BY MS. WALSH:

01:26PM  22    Q.   OKAY.  IF YOU LOOK AT THE BOTTOM OF PAGE 1, MR. EDLIN, IT

01:26PM  23    TALKS ABOUT THE DEMO APP SHIELDING PROTOCOL FAILURES.

01:26PM  24         DO YOU SEE THAT?

01:26PM  25    A.   YES.

EDLIN CROSS BY MS. WALSH                                          2635

01:26PM   1    Q.   AND THE GOVERNMENT ASKED YOU ABOUT THE DEMO APP IN

01:26PM   2    CONNECTION WITH THE NULL PROTOCOL.

01:26PM   3         WE WERE TALKING ABOUT THAT LAST WEEK; RIGHT?

01:26PM   4    A.   YES.

01:26PM   5    Q.   AND THERE WAS NOTHING OR YOU DIDN'T BELIEVE YOU WERE DOING

01:26PM   6    ANYTHING NEFARIOUS IN RUNNING THESE DEMOS USING THE DEMO APP OR

01:26PM   7    THE NULL PROTOCOL, DID YOU?

01:26PM   8    A.   NO.

01:26PM   9    Q.   YOU WEREN'T TRYING TO TRICK ANYONE; RIGHT?

01:26PM  10    A.   RIGHT.

01:26PM  11    Q.   YOU WEREN'T TRYING TO PULL THE WOOL OVER ANYONE'S EYES;

01:26PM  12    CORRECT?

01:26PM  13    A.   CORRECT.

01:26PM  14    Q.   AND YOU HAD NO REASON TO BELIEVE AT THE TIME THAT ANYONE

01:27PM  15    ELSE AT THERANOS WAS DOING THAT; RIGHT?

01:27PM  16    A.   RIGHT.

01:27PM  17    Q.   YOU WERE SIMPLY RUNNING THE DEMOS TO TRY TO SHOW A VISITOR

01:27PM  18    HOW THE TECHNOLOGY WORKED; RIGHT?

01:27PM  19    A.   CORRECT.

01:27PM  20    Q.   AND MANY OF THE MACHINES THAT YOU WERE DOING THAT ON WERE

01:27PM  21    NEXT GENERATION MACHINES; RIGHT?

01:27PM  22    A.   AT A CERTAIN POINT, YES.

01:27PM  23    Q.   OKAY.  IF YOU COULD, MR. EDLIN, TURN IN YOUR BINDER TO

01:27PM  24    20486.

01:28PM  25    A.   OKAY.

EDLIN CROSS BY MS. WALSH                                              2636

01:28PM   1    Q.   OKAY.  JUST TAKE A LOOK AT THAT EMAIL AND TELL US WHETHER

01:28PM   2    THAT WAS EMAIL CORRESPONDENCE BETWEEN YOU, AND MR. BALWANI, AND

01:28PM   3    DR. YOUNG REGARDING THE DEPARTMENT OF DEFENSE APP?

01:28PM   4    A.   YES.

01:28PM   5    Q.   AND THAT EMAIL IS IN APRIL OF 2013.

01:28PM   6         DO YOU SEE THAT?

01:28PM   7    A.   YES.

01:28PM   8    Q.   OKAY.

01:28PM   9         YOUR HONOR, WE OFFER 20486.

01:28PM  10              MR. BOSTIC:  NO OBJECTION.

01:28PM  11              THE COURT:  IT'S ADMITTED.

01:28PM  12         (DEFENDANT'S EXHIBIT 20486 WAS RECEIVED IN EVIDENCE.)

01:28PM  13    BY MS. WALSH:

01:28PM  14    Q.   SO LET'S TURN TO PAGE 2 OF THAT EMAIL.  AND THIS PART OF

01:28PM  15    THE EMAIL IS FROM MR. BALWANI TO YOU ON APRIL 13TH?

01:28PM  16    A.   RIGHT.

01:28PM  17    Q.   AND WHAT THE EMAIL SAYS, "DAN,

01:28PM  18         "WE ARE GETTING COUPLE OF 4S DEVICES THIS WEEK AND NEXT.

01:28PM  19    AS PART OF STRESS TESTING THEM, I WANT YOU TO SPEND COUPLE OF

01:28PM  20    HOURS OR DESIGNATE SOMEONE FROM QA TO SPEND A DAY STRESS

01:29PM  21    TESTING THE DOD APP."

01:29PM  22         DO YOU SEE THAT?

01:29PM  23    A.   YES.

01:29PM  24    Q.   AND DO YOU REMEMBER WHAT THE DOD APP WAS?

01:29PM  25    A.   YES.  IT WAS AN APP THAT WAS INTENDED FOR THE PROGRAMS

01:29PM  1    WITH THE MILITARY THAT I DISCUSSED EARLIER TODAY.

01:29PM  2    Q.   OKAY.  AND HE CONTINUES.

01:29PM  3         "AND RUNNING A DUMMY CARTRIDGE AND VIEWING RESULTS FROM

01:29PM  4    THE CLOUD.  THE ENTIRE PROCESS IS NOW CODE COMPLETE AND

01:29PM  5    INTEGRATED SO EVEN IF YOU RUN A CONTROL CARTRIDGE THAT RUNS FOR

01:29PM  6    5 MINUTES, IT WILL GIVE YOU SOME RESULT.  SHEKAR IS CODE

01:29PM  7    COMPLETE WITH SERVER SIDE CODE."

01:29PM  8         DO YOU SEE THAT?

01:29PM  9    A.   YES.

01:29PM 10    Q.   AND WHO WAS SHEKAR?

01:29PM 11    A.   SHEKAR WAS A SOFTWARE DEVELOPER.  I'M SURE HE HAD A HIGHER

01:29PM 12    TITLE THAN THAT AT THERANOS.

01:29PM 13    Q.   OKAY.  AND THEN IF WE CONTINUE UP THE EMAIL, YOU RESPOND,

01:30PM 14    OR I GUESS YOU FORWARD THIS TO DR. YOUNG, AND YOU SAY, "HI

01:30PM 15    DANIEL."

01:30PM 16         AND THAT'S DANIEL YOUNG; RIGHT?

01:30PM 17    A.   RIGHT.

01:30PM 18    Q.   "SUNNY WOULD LIKE TO START STRESS TESTING THE DOD APP ON

01:30PM 19    THE 4S NEXT MONDAY -- WILL YOU BE ABLE TO PROVIDE A DUMMY

01:30PM 20    CARTRIDGE?"

01:30PM 21         DO YOU SEE THAT?

01:30PM 22    A.   YES.

01:30PM 23    Q.   AND THE 4S IS THE NEXT GENERATION DEVICE; RIGHT?

01:30PM 24    A.   RIGHT.

01:30PM 25    Q.   AND DR. YOUNG RESPONDS TO YOU, "WHAT DO YOU WANT TO RUN ON

EDLIN CROSS BY MS. WALSH                                    2638

01:30PM  1    THIS CARTRIDGE?"

01:30PM  2         RIGHT?

01:30PM  3    A.   RIGHT.

01:30PM  4    Q.   AND AGAIN, THE CARTRIDGE IS THE THING THAT YOU PUT IN THE

01:30PM  5    MACHINE THAT MAY OR MAY NOT HAVE BLOOD IN IT; RIGHT?

01:30PM  6    A.   RIGHT.

01:30PM  7    Q.   AND THEN YOU RESPOND TO DR. YOUNG AND SAY, "INITIALLY WE

01:30PM  8    ONLY HAVE TO RUN A NULL PROTOCOL, BUT LATER IN THE WEEK IF WE

01:30PM  9    COULD RUN CARTRIDGES SIMILAR TO THE ONES WE WILL BE DEPLOYING

01:30PM  10   THAT WOULD BE IDEAL -- WHATEVER WE CAN GET THAT WILL BE AS

01:30PM  11   CLOSE TO A REAL-LIFE SIMULATION AS POSSIBLE SO WE CAN TEST ALL

01:31PM  12   OF THE FACETS OF THE APP."

01:31PM  13        DO YOU SEE THAT?

01:31PM  14   A.   YES.

01:31PM  15   Q.   SO THIS IS NOT EVEN -- THIS IS AN INTERNAL THERANOS EMAIL;

01:31PM  16   RIGHT?

01:31PM  17   A.   YES.

01:31PM  18   Q.   AND THIS IS NOT AN INVESTOR DEMO; RIGHT?

01:31PM  19   A.   CORRECT.

01:31PM  20   Q.   YOU'RE JUST STRESS TESTING A DEVICE; CORRECT?

01:31PM  21   A.   CORRECT.

01:31PM  22   Q.   AND YOU ARE SAYING YOU MIGHT RUN THE NULL PROTOCOL IN THAT

01:31PM  23   STRESS TESTING; RIGHT?

01:31PM  24   A.   RIGHT.

01:31PM  25   Q.   SO AGAIN, THERE WAS NOTHING NEFARIOUS ABOUT RUNNING THE

| | | |
|---|---|---|
| 01:31PM | 1 | NULL PROTOCOL ON THESE MACHINES; CORRECT? |
| 01:31PM | 2 | A.   CORRECT. |
| 01:31PM | 3 | Q.   THIS IS NOT EVEN AN OUTWARD FACING EMAIL; RIGHT? |
| 01:31PM | 4 | A.   RIGHT. |
| 01:31PM | 5 | Q.   AND IT'S NOT ABOUT PRESENTING THERANOS TECHNOLOGY TO AN |
| 01:31PM | 6 | OUTSIDE PARTY FOR THE STRESS TESTING; RIGHT? |
| 01:31PM | 7 | A.   CORRECT. |
| 01:31PM | 8 | Q.   OKAY.  WE CAN TAKE THAT DOWN. |
| 01:32PM | 9 | LET'S TURN TO THE TECH DEMOS THAT DID INVOLVE TESTING. |
| 01:32PM | 10 | YOU TESTIFIED ABOUT SOME OF THOSE LAST WEEK; RIGHT? |
| 01:32PM | 11 | A.   RIGHT. |
| 01:32PM | 12 | Q.   AND YOU ALSO MENTIONED LAST WEEK AND TODAY THAT SOME OF |
| 01:32PM | 13 | THOSE DEMONSTRATIONS WERE RUN OUTSIDE OF THERANOS; RIGHT? |
| 01:32PM | 14 | A.   YES. |
| 01:32PM | 15 | Q.   OKAY.  SO LET'S TAKE A LOOK AT ONE OF THOSE. |
| 01:32PM | 16 | THIS IS ONE THAT THE GOVERNMENT DIDN'T SHOW YOU. |
| 01:32PM | 17 | TURN IN YOUR BINDER TO 7244. |
| 01:32PM | 18 | A.   OKAY. |
| 01:32PM | 19 | Q.   SO JUST READ THROUGH THAT EMAIL OR TAKE A LOOK AT IT. |
| 01:33PM | 20 | AND IF YOU LOOK AT THE BOTTOM EMAIL, THIS IS AN EMAIL FROM |
| 01:33PM | 21 | MR. BALWANI TO YOU AND OTHERS; RIGHT? |
| 01:33PM | 22 | A.   RIGHT. |
| 01:33PM | 23 | Q.   AND THE OTHERS ARE MOSTLY SCIENTISTS AT THERANOS; RIGHT? |
| 01:33PM | 24 | A.   YES. |
| 01:33PM | 25 | Q.   AND ON AUGUST 1ST, 2012; RIGHT? |

01:33PM  1    A.   RIGHT.

01:33PM  2    Q.   AND IT RELATES TO A DEMO THAT TOOK PLACE IN CHICAGO.

01:33PM  3         DO YOU SEE THAT?

01:33PM  4    A.   YES.

01:33PM  5    Q.   OKAY.

01:33PM  6         YOUR HONOR, WE OFFER 7244.

01:33PM  7              MR. BOSTIC:  TWO LAYERS OF HEARSAY HERE, YOUR HONOR.

01:33PM  8         (PAUSE IN PROCEEDINGS.)

01:33PM  9              THE COURT:  MS. WALSH.

01:33PM 10              MS. WALSH:  YES, YOUR HONOR.  THIS IS A BUSINESS

01:33PM 11    RECORD.  I'M HAPPY TO LAY A FOUNDATION WITH THE WAY WE DID WITH

01:33PM 12    THE OTHER DEMO EMAILS.

01:33PM 13              THE COURT:  MR. BOSTIC, ARE YOU -- YOU HAVE CONCERN

01:34PM 14    WITH THE FIRST PARAGRAPH?

01:34PM 15              MR. BOSTIC:  YES, YOUR HONOR, THE FIRST PARAGRAPH

01:34PM 16    TOWARDS THE BOTTOM OF THE PAGE.  ALSO, I'M NOT SURE THAT THIS

01:34PM 17    QUALIFIES AS A BUSINESS RECORD, THIS KIND OF ONE-OFF

01:34PM 18    COMMUNICATION.

01:34PM 19         (PAUSE IN PROCEEDINGS.)

01:34PM 20              MS. WALSH:  IT ALSO GOES TO MR. BALWANI'S STATE OF

01:34PM 21    MIND, YOUR HONOR.  HE'S ON THE EMAIL.

01:34PM 22              THE COURT:  ALL RIGHT.  THANK YOU.

01:34PM 23         I'LL ADMIT THIS, AND IT MAY BE PUBLISHED.

01:34PM 24         (DEFENDANT'S EXHIBIT 7244 WAS RECEIVED IN EVIDENCE.)

01:34PM 25    BY MS. WALSH:

EDLIN CROSS BY MS. WALSH                                    2641

01:34PM  1    Q.   OKAY.  LET'S TAKE A LOOK AT THIS BOTTOM EMAIL.

01:35PM  2         AS I SAID, THIS IS FROM MR. BALWANI TO YOU AND A NUMBER OF

01:35PM  3    DIFFERENT PEOPLE.  AND I JUST WANT TO TAKE YOU THROUGH SOME OF

01:35PM  4    THEM TO SEE IF YOU KNOW WHO THEY ARE.

01:35PM  5    A.   YES.

01:35PM  6    Q.   SO DANIEL YOUNG WE'VE TALKED ABOUT?

01:35PM  7    A.   RIGHT.

01:35PM  8    Q.   SUREKHA GANGADKHEDKAR.

01:35PM  9         DO YOU SEE THAT NAME?

01:35PM 10    A.   YES.

01:35PM 11    Q.   AND SHE WAS THE LEADER OF THE IMMUNOASSAYS IN THE R&D

01:35PM 12    SECTION; RIGHT?

01:35PM 13    A.   YES.

01:35PM 14    Q.   AND DR. PAUL PATEL.

01:35PM 15         DO YOU SEE THAT NAME?

01:35PM 16    A.   YES.

01:35PM 17    Q.   HE WAS THE LEADER OF THE GENERAL CHEMISTRY ASSAYS IN R&D;

01:35PM 18    RIGHT?

01:35PM 19    A.   RIGHT.

01:35PM 20    Q.   AND CHINMAY PANGARKAR.

01:35PM 21         DO YOU SEE THAT?

01:35PM 22    A.   YES.

01:35PM 23    Q.   HE WAS IN CHARGE OF ASSAY DEVELOPMENT FOR CYTOMETRY AND

01:35PM 24    IMMUNOASSAYS; RIGHT?

01:35PM 25    A.   RIGHT.

EDLIN CROSS BY MS. WALSH                                               2642

01:35PM   1    Q.   OKAY.  AND THERE ARE ALSO SOME PEOPLE ON HERE WHO WORKED

01:35PM   2    ON HARDWARE.

01:36PM   3         DO YOU SEE THE NAME SURAJ SAKSENA?

01:36PM   4    A.   YES.

01:36PM   5    Q.   HE WAS IN CHARGE OF CARTRIDGE MANUFACTURING, WAS HE NOT?

01:36PM   6    A.   I DON'T RECALL SPECIFICALLY.

01:36PM   7    Q.   OKAY.  AND HOW ABOUT IAN GIBBONS?

01:36PM   8         DO YOU RECOGNIZE THAT NAME?

01:36PM   9    A.   YES.

01:36PM  10    Q.   HE WAS ONE OF THE CHIEF SCIENTISTS AT THERANOS?

01:36PM  11    A.   YES.

01:36PM  12    Q.   AND ALL OF THOSE PEOPLE ARE PH.D.'S; RIGHT?

01:36PM  13    A.   I BELIEVE IAN WAS -- OH, ALL OF THESE PEOPLE.

01:36PM  14         I DON'T KNOW.  I REMEMBER CHINMAY AND IAN AS I RECALL, BUT

01:36PM  15    I WOULDN'T BE SURPRISED, IN FACT, IF THEY HAD PH.D.'S.

01:36PM  16    Q.   OKAY.  SO LET'S TAKE A LOOK AT WHAT MR. BALWANI SAYS TO

01:36PM  17    THIS GROUP.

01:36PM  18         HE SAYS, "I HEARD BACK FROM THE EXECUTIVE ON WHOM WE HAD

01:36PM  19    PERFORMED THE DEMO ON 7/16 IN CHICAGO."

01:36PM  20         DO YOU SEE THAT?

01:36PM  21    A.   YES.

01:36PM  22    Q.   AND DO YOU KNOW WHO OR -- YEAH, WHAT EXECUTIVE THAT WAS?

01:36PM  23    A.   I DON'T REMEMBER WHICH SPECIFIC EXECUTIVE.

01:37PM  24    Q.   AND HOW ABOUT, WHAT ABOUT THE COMPANY THAT THE EXECUTIVE

01:37PM  25    WAS EMPLOYED BY?

ER-1862

EDLIN CROSS BY MS. WALSH                                              2643

01:37PM  1    A.   I BELIEVE IT WAS WITH WALGREENS.

01:37PM  2    Q.   OKAY.  CONTINUING ON WITH WHAT MR. BALWANI SAYS.

01:37PM  3         "HE SAID HIS RESULTS FROM THE CENTRAL LAB THAT HE DID ON

01:37PM  4    HIS DOCTOR'S ORDER, WERE IDENTICAL TO THE RESULTS FROM OUR

01:37PM  5    SYSTEM DURING THE DEMO.  HE HAD GONE TO SEE HIS DOCTOR AFTER HE

01:37PM  6    GOT OUR RESULTS DURING THE DEMO."

01:37PM  7         AND THEN MR. BALWANI CONTINUES.  "I HOPE THIS GIVES AN

01:37PM  8    ADDITIONAL DOSE OF CONFIDENCE (NOT THAT YOU NEEDED MORE OF IT)

01:37PM  9    TO EVERYONE AS THESE WERE DIFFICULT ASSAYS -- INCLUDED

01:37PM 10    VITAMIN DIFFICULT.  WE ARE DOING GOOD WORK HERE AND WILL SAVE

01:37PM 11    MILLIONS OF LIVES AND WILL IMPROVE THE QUALITY OF CARE

01:37PM 12    DELIVERED TO HUNDREDS OF MILLIONS MORE BECAUSE OF OUR WORK.

01:37PM 13    THIS KNOWLEDGE AND CONVICTION SHOULD BE THE GREATEST SOURCE OF

01:38PM 14    OUR CONFIDENCE.  I THINK IT IS A UNIQUE OPPORTUNITY WHEN YOUR

01:38PM 15    CAREER AND WORK IS NOT JUST WORK THAT PAYS YOUR BILLS, BUT IS

01:38PM 16    ALSO IN SERVICE OF HUMANITY AND GOOD FOR THE GREATER GOOD.  I

01:38PM 17    HOPE YOU ALL SHARE THIS SENTIMENT."

01:38PM 18         DO YOU SEE THAT?

01:38PM 19    A.   YES.

01:38PM 20    Q.   AND ONE OF THERANOS'S GOALS WAS TO MAKE BLOOD TESTING MORE

01:38PM 21    ACCESSIBLE TO EVERYONE; RIGHT?

01:38PM 22    A.   RIGHT.

01:38PM 23    Q.   TO MAKE IT CHEAPER; RIGHT?

01:38PM 24    A.   RIGHT.

01:38PM 25    Q.   AND MORE CONVENIENT; RIGHT?

ER-1863

EDLIN CROSS BY MS. WALSH                                    2644

01:38PM   1     A.   CORRECT.

01:38PM   2     Q.   WE CAN TAKE THAT DOWN.

01:38PM   3          NOW, YOU TESTIFIED LAST WEEK ABOUT A DEMONSTRATION THAT

01:38PM   4     TOOK PLACE AT A NEW YORK CITY HOSPITAL.

01:38PM   5          DO YOU REMEMBER THAT?

01:38PM   6     A.   YES.

01:38PM   7     Q.   AND YOU SAID THAT THE PURPOSE OF THE MEETING WAS TO SHARE

01:38PM   8     WHAT THERANOS WAS WORKING ON; RIGHT?

01:38PM   9     A.   RIGHT.

01:38PM  10     Q.   AND TO EXPLORE POTENTIAL OPPORTUNITIES TO PARTNER WITH

01:38PM  11     THAT HOSPITAL; CORRECT?

01:38PM  12     A.   CORRECT.

01:38PM  13     Q.   AND PART OF THE MEETING, IN ADDITION TO THE DISCUSSION,

01:39PM  14     WAS TO RUN A DEMONSTRATION; RIGHT?

01:39PM  15     A.   RIGHT.

01:39PM  16     Q.   AND YOU HAD YOUR ROLE IN COORDINATING THAT DEMONSTRATION;

01:39PM  17     RIGHT?

01:39PM  18     A.   CORRECT.

01:39PM  19     Q.   AND THE DEVICE HAD TO BE SENT TO NEW YORK; RIGHT?

01:39PM  20     A.   RIGHT.

01:39PM  21     Q.   AND DANIEL YOUNG HAD HIS ROLE IN THE DEMONSTRATION; RIGHT?

01:39PM  22     A.   RIGHT.

01:39PM  23     Q.   AND HIS ROLE WAS TO REVIEW THE TEST RESULTS; RIGHT?

01:39PM  24     A.   RIGHT.

01:39PM  25     Q.   AND THE TEST LOGS; RIGHT?

ER-1864

01:39PM 1     A.   RIGHT.

01:39PM 2     Q.   AND TO ENSURE THE TEST WAS VALID.  I THINK YOU TESTIFIED

01:39PM 3     TO THAT LAST WEEK; RIGHT?

01:39PM 4     A.   RIGHT.

01:39PM 5     Q.   AND HE INTERPRETED THE RESULTS AND APPROVED THEM FOR

01:39PM 6     DISTRIBUTION BACK TO THE CLIENT; RIGHT?

01:39PM 7     A.   RIGHT.

01:39PM 8     Q.   OKAY.  SO LET'S TAKE A LOOK AT 860.

01:40PM 9          DO YOU HAVE THAT IN FRONT OF YOU?

01:40PM 10              THE COURT:  860?

01:40PM 11              MS. WALSH:  860.

01:40PM 12         YOUR HONOR, THIS IS IN EVIDENCE, SO I REQUEST THAT IT BE

01:40PM 13    PUBLISHED.

01:40PM 14              THE COURT:  YES.

01:40PM 15              MS. WALSH:  THANK YOU.

01:40PM 16    Q.   DO YOU HAVE IT, MR. EDLIN?  IT'S ON YOUR SCREEN.

01:40PM 17    A.   YEAH, SORRY.

01:40PM 18    Q.   OKAY.  SO LET'S GO TO PAGE 11 OF 860.

01:40PM 19         AND ON THE TOP OF PAGE 11 YOU ARE ASKING SUREKHA, CAN YOU

01:40PM 20    PLEASE SEND THE RESULTS TO DR. YOUNG; RIGHT?

01:40PM 21    A.   RIGHT.

01:40PM 22    Q.   AND YOU SAID THAT IS DANIEL, THAT'S DANIEL YOUNG; RIGHT?

01:40PM 23    A.   YES.

01:40PM 24    Q.   AND YOU SAY, "CAN YOU PLEASE REVIEW AND PROVIDE REFERENCE

01:40PM 25    RANGES AS WELL FOR THE LAB REPORT."

EDLIN CROSS BY MS. WALSH                                           2646

01:40PM   1          DO YOU SEE THAT?

01:40PM   2     A.   YES.

01:40PM   3     Q.   AND NOW LET'S FLIP TO PAGE 10 AND YOU SEE THERE'S A BOX,

01:40PM   4     KIND OF A CHART OF ASSAYS THERE FROM SUREKHA.

01:40PM   5          DO YOU SEE THAT?

01:40PM   6     A.   YES.

01:40PM   7     Q.   AND THERE ARE SIX DIFFERENT ASSAYS LISTED; RIGHT?

01:41PM   8     A.   RIGHT.

01:41PM   9     Q.   AND THAT'S FOR ONE CARTRIDGE; RIGHT?

01:41PM   10    A.   RIGHT.

01:41PM   11    Q.   AND SO THAT'S A NEXT GENERATION DEVICE, ISN'T IT, SIX

01:41PM   12    ASSAYS ON ONE CARTRIDGE?

01:41PM   13    A.   I DON'T KNOW.

01:41PM   14    Q.   OKAY.  YOU SEE ONE OF THE ASSAYS IS HSV 1.

01:41PM   15         DO YOU SEE THAT?

01:41PM   16    A.   YES.

01:41PM   17    Q.   AND YOU REMEMBER THAT THERANOS GOT FDA APPROVAL ON THE

01:41PM   18    HSV 1 ASSAY.

01:41PM   19         DO YOU REMEMBER THAT?

01:41PM   20    A.   YES.

01:41PM   21    Q.   THAT'S LATER IN TIME, BUT IT WAS ULTIMATELY APPROVED BY

01:41PM   22    THE FDA; CORRECT?

01:41PM   23    A.   CORRECT.

01:42PM   24    Q.   AND WITH REGARD TO THAT ASSAY, THAT MEANT THAT THERANOS

01:42PM   25    COULD PUT ITS MACHINE IN A PLACE EXTERNAL TO THERANOS AND RUN

01:42PM 1     THAT ASSAY; RIGHT?

01:42PM 2             MR. BOSTIC:  FOUNDATION.  CALLS FOR A LEGAL

01:42PM 3     CONCLUSION.

01:42PM 4             MS. WALSH:  I'LL WITHDRAW IT.

01:42PM 5             THE COURT:  THE QUESTION IS WITHDRAWN.

01:42PM 6     BY MS. WALSH:

01:42PM 7     Q.  OKAY.  LET'S LOOK UP AT THE EMAIL.

01:42PM 8         AND YOU ASK DANIEL IN THE THIRD PARAGRAPH THERE, "CAN YOU

01:42PM 9     PLEASE CONFIRM THE UNITS BELOW AND THE REFERENCE RANGES FOR

01:42PM 10    THESE ASSAYS?

01:42PM 11        "WILL ANY OF THE REFERENCE RANGES CHANGE FOR THE OTHER

01:42PM 12    ASSAYS GIVEN THAT THE SUBJECT TODAY WAS FEMALE?  FOR REFERENCE,

01:42PM 13    I HAVE ATTACHED A SPREADSHEET COMPARING THE REFERENCE RANGES

01:42PM 14    FOR LAST TWO DEMOS WE DID -- THE ONE FROM EARLIER THIS WEEK

01:42PM 15    (MALE SUBJECT), AND THE LAST TIME WE TOOK THE SAMPLE AND SENT

01:42PM 16    IT BACK FROM PHOENIX (FEMALE SUBJECT).  I HAVE HIGHLIGHTED THE

01:42PM 17    DIFFERENCES IN YELLOW."

01:42PM 18        DO YOU SEE THAT?

01:42PM 19    A.  YES.

01:42PM 20    Q.  OKAY.  AND THERE YOU'RE TALKING ABOUT DETERMINING A

01:43PM 21    REFERENCE RANGE FOR THE TEST; RIGHT?

01:43PM 22    A.  RIGHT.

01:43PM 23    Q.  AND REFERENCE RANGES CHANGED FROM TIME TO TIME, DIDN'T

01:43PM 24    THEY?

01:43PM 25    A.  CAN YOU BE MORE SPECIFIC?

EDLIN CROSS BY MS. WALSH                                              2648

01:43PM  1    Q.   SURE.

01:43PM  2         WELL, YOU'RE ATTACHING A SPREADSHEET SHOWING TWO DIFFERENT

01:43PM  3    REFERENCE RANGES; RIGHT?  THAT'S WHAT YOU SAY IN YOUR EMAIL?

01:43PM  4    A.   THIS INDICATES TO ME THAT THERE CAN BE DIFFERENT REFERENCE

01:43PM  5    RANGES FOR A MALE AND FOR A FEMALE.

01:43PM  6    Q.   RIGHT.  AND THAT WASN'T UNUSUAL, WAS IT?

01:43PM  7    A.   NO.

01:43PM  8    Q.   AND YOU WEREN'T IN CHARGE OF SETTING THE REFERENCE RANGES;

01:43PM  9    RIGHT?

01:43PM 10    A.   CORRECT.

01:43PM 11    Q.   DR. YOUNG, THAT WAS HIS JOB; RIGHT?

01:44PM 12    A.   CORRECT.

01:44PM 13    Q.   AND IN YOUR EXPERIENCE WITH DR. YOUNG, HE SET THE

01:44PM 14    REFERENCE RANGES BASED ON THE SCIENCE THAT HE WAS AWARE OF;

01:44PM 15    RIGHT?

01:44PM 16              MR. BOSTIC:  FOUNDATION.  CALLS FOR SPECULATION.

01:44PM 17              THE COURT:  SUSTAINED.

01:44PM 18              MS. WALSH:  OKAY.  WELL, LET'S LOOK FURTHER IN THE

01:44PM 19    EMAIL.

01:44PM 20    Q.   SO ON PAGE 9 YOU POINT OUT AT THE TOP THAT THERE'S A

01:44PM 21    DISCREPANCY BETWEEN THE TWO INFECTIOUS PANEL RUNS; RIGHT?

01:44PM 22    A.   RIGHT.

01:44PM 23    Q.   AND THEN IF YOU GO TO PAGE 7, THAT'S WHEN MS. HOLMES SAYS,

01:44PM 24    "THE DISCREPANCY WILL BE A PROBLEM."

01:44PM 25         DO YOU REMEMBER THAT?

01:44PM  1      A.   YES.

01:44PM  2      Q.   THE GOVERNMENT HIGHLIGHTED THAT FOR YOU?

01:44PM  3      A.   YES.

01:44PM  4      Q.   AND SO I'M GOING TO GO FURTHER UP THE EMAIL TO LOOK AT

01:44PM  5      PARTS OF THE EMAIL THAT WE DIDN'T SEE LAST WEEK DURING YOUR

01:44PM  6      TESTIMONY.

01:44PM  7           ON PAGE 5, THE TOP OF PAGE 5 MS. HOLMES ASKS, "DANIEL --

01:45PM  8      IS OUR READ THAT THE SECOND RUN IN PA," THAT'S PALO ALTO;

01:45PM  9      RIGHT?

01:45PM 10      A.   RIGHT.

01:45PM 11      Q.   "SECOND RUN IN PALO ALTO IS THE MOST ACCURATE FOR ALL

01:45PM 12      THREE DISCREPANCIES?"

01:45PM 13           DO YOU SEE THAT?

01:45PM 14      A.   YES, AND SHE'S ASKING DR. YOUNG.

01:45PM 15      Q.   I WAS JUST GOING TO ASK YOU THAT, RIGHT.

01:45PM 16           SO GENERALLY AT THERANOS, DANIEL YOUNG IS DANIEL; RIGHT?

01:45PM 17      A.   YES.

01:45PM 18      Q.   AND YOU WERE REFERRED TO AS DAN; IS THAT FAIR?

01:45PM 19      A.   YES.

01:45PM 20      Q.   AND SO SHE'S ASKING DR. YOUNG, "IS OUR READ THAT THE

01:45PM 21      SECOND RUN IN PALO ALTO IS THE MOST ACCURATE."

01:45PM 22           CORRECT?

01:45PM 23      A.   YES.

01:45PM 24      Q.   OKAY.

01:45PM 25      A.   YES.

01:45PM  1    Q.   AND IF WE FLIP TO PAGE 4, DR. YOUNG RESPONDS TO HER, AND

01:45PM  2    HE SAYS, "YES, I TRUST THE SECOND RUN IN PALO ALTO.  OVER

01:45PM  3    90 PERCENT OF PEOPLE APPROXIMATELY 50 YEARS OF AGE SHOULD TEST

01:45PM  4    POSITIVE FOR MUMPS IGG BASED ON PUBLISHED SEROPREVALENCE

01:46PM  5    STUDIES."

01:46PM  6         DO YOU SEE THAT?

01:46PM  7    A.   UH-HUH, YES.

01:46PM  8    Q.   AND SO HERE IS AN EXAMPLE OF DR. YOUNG CONSULTING

01:46PM  9    SCIENTIFIC PUBLICATIONS AND USING HIS SCIENTIFIC BACKGROUND TO

01:46PM 10    EXPRESS HIS OPINION AS TO WHICH TEST IS MORE ACCURATE; RIGHT?

01:46PM 11    A.   RIGHT.

01:46PM 12    Q.   LET'S NOW GO -- IF YOU COULD, ACTUALLY, MR. EDLIN, LOOK AT

01:46PM 13    PAGES 3 AND 2.

01:46PM 14         AND THERE'S KIND OF A DEBATE BETWEEN MS. HOLMES AND

01:46PM 15    DR. YOUNG ABOUT THE SCIENCE OF WHAT HE'S SAYING.

01:46PM 16         DO YOU SEE THAT?

01:46PM 17    A.   YES.

01:46PM 18    Q.   OKAY.  AND THEN ON PAGE 2 WE CAN HIGHLIGHT FROM

01:46PM 19    MS. HOLMES, AFTER THAT DEBATE SHE SAYS, "GO AHEAD AND PREPARE

01:46PM 20    FINAL REPORT AND I'LL REVIEW IN PARALLEL."

01:46PM 21         DO YOU SEE THAT?

01:46PM 22    A.   YES.

01:46PM 23    Q.   AND BY THE WAY, IN THE EMAIL PARTS OF THE CHAIN WHERE

01:47PM 24    MS. HOLMES AND DR. YOUNG ARE DEBATING THE SCIENCE RELATED TO

01:47PM 25    THIS TEST, MR. BALWANI IS NOT SAYING ANYTHING, IS HE?

ER-1870

01:47PM   1        A.    NO.

01:47PM   2        Q.    HE'S NOT COMMENTING ON IT; RIGHT?

01:47PM   3        A.    RIGHT.

01:47PM   4        Q.    OKAY.  SO NOW LET'S FLIP TO PAGE 1.  LET'S LOOK AT

01:47PM   5    DANIEL YOUNG'S EMAIL ON JUNE 1ST, 2013, 7:44 P.M.

01:47PM   6            HE'S COMMENTING ON THE FINAL VERSION OF THE REPORT; RIGHT?

01:47PM   7        A.    RIGHT.

01:47PM   8        Q.    AND HE'S SAYING, "TOTAL HB SHOULD HAVE AN 'L' NEXT TO IT";

01:47PM   9    CORRECT?

01:47PM  10        A.    RIGHT.

01:47PM  11        Q.    INDICATING TO THE CUSTOMER THAT IT'S LOW; RIGHT?

01:47PM  12        A.    YES.

01:47PM  13        Q.    OKAY.  AND MS. HOLMES RESPONDS, "OK LET'S SEND IT OUT

01:47PM  14    AFTER THESE CHANGES.  I ASSUME IT IS BEST PRACTICE TO LEAVE THE

01:47PM  15    H AND L RESPECTIVELY FOR THE ONES THAT ARE JUST ONE POINT OUT

01:47PM  16    OF RANGE -- I HAVE SEEN SOME REPORTS THAT DON'T FLAG IT."

01:47PM  17            DO YOU SEE THAT?

01:47PM  18        A.    YES.

01:47PM  19        Q.    SO SHE'S SAYING IT'S THE BEST PRACTICE TO LEAVE THOSE

01:48PM  20    INDICATIONS HIGH AND LOW, SO LET'S DO THAT; RIGHT?

01:48PM  21        A.    IT SOUNDS LIKE SHE'S CONFIRMING WHETHER THEY SHOULD BE

01:48PM  22    MARKED AS HIGH OR LOW IF THEY'RE JUST ONE POINT OUT OF RANGE.

01:48PM  23        Q.    RIGHT.  OKAY.

01:48PM  24            AND THEN THE NEXT EMAIL UP IS FROM MR. BALWANI.

01:48PM  25            DO YOU SEE THAT?

01:48PM 1    A.   YES.

01:48PM 2    Q.   AND HE SAYS, "WE SHOULD DO THAT BECAUSE THAT'S WHAT ALL

01:48PM 3    COMPUTERIZED LIS SYSTEMS WILL DO.  NO FUZZY LOGIC..."

01:48PM 4         DO YOU SEE THAT?

01:48PM 5    A.   YES.

01:48PM 6    Q.   AND THIS IS THE FIRST TIME THAT HE'S COMMENTING IN THIS 11

01:48PM 7    OR SO PAGE EMAIL CHAIN; RIGHT?

01:48PM 8    A.   YES.

01:48PM 9    Q.   AND WHAT HE'S SAYING IS EVEN IF IT'S ONE POINT OUT OF

01:48PM 10   RANGE, IF IT'S OUT OF RANGE, IT'S OUT OF RANGE, AND WE SHOULD

01:48PM 11   INDICATE THAT ON THE REPORT; RIGHT?

01:48PM 12   A.   RIGHT.

01:48PM 13   Q.   OKAY.  WE CAN TAKE THAT DOWN.

01:49PM 14         THE COURT:  FOLKS, WHY DON'T YOU TAKE A STANDING

01:49PM 15   BREAK, AND LET'S SEE HOW THAT WORKS IN YOUR SEATING ARRANGEMENT

01:49PM 16   NOW BEFORE WE MOVE TO THE NEXT DOCUMENT.

01:49PM 17        I THOUGHT WE WOULD BREAK, MS. WALSH, ABOUT A QUARTER PAST

01:49PM 18   THE HOUR AT 2:15.

01:49PM 19         MS. WALSH:  SURE.  THAT'S FINE.

01:49PM 20        (STRETCHING.)

01:50PM 21   BY MS. WALSH:

01:50PM 22   Q.   CAN YOU TURN TO PAGE 957 IN YOUR BINDER?

01:50PM 23   A.   VOLUME 1?

01:50PM 24   Q.   VOLUME 1, YEAH.

01:50PM 25         THE COURT:  IT MAY NOT BE.

01:50PM 1          MS. WALSH:  I'M SORRY.  THIS IS IN EVIDENCE.  I

01:50PM 2   APOLOGIZE.  SO WE'LL JUST PUBLISH IT ON YOUR SCREEN.  YEAH.

01:50PM 3   Q.   OKAY.  SO EXHIBIT 957.

01:50PM 4          SO BEFORE WE GET INTO THE EMAIL, MR. EDLIN, YOU TESTIFIED

01:50PM 5   ON DIRECT THAT THE FIRST TIME YOU LEARNED THAT THERANOS WAS

01:50PM 6   USING THIRD PARTY DEVICES TO RUN FINGERSTICK SAMPLES WAS IN

01:50PM 7   2005, AROUND THE TIME OF "THE WALL STREET JOURNAL"; IS THAT

01:50PM 8   RIGHT?

01:50PM 9   A.   THAT IS WHEN I HEARD THE CLAIM FOR THE FIRST TIME, 2015,

01:51PM 10  WITH THE ARTICLE, BUT I REMEMBER LEARNING IT IN MEETINGS IN

01:51PM 11  2016.

01:51PM 12  Q.   OKAY.  SO AGAIN, IT'S BEEN A LONG TIME SINCE YOU WORKED AT

01:51PM 13  THERANOS, SO LET'S TAKE A LOOK AT THIS EMAIL.  THIS IS ONE THAT

01:51PM 14  THE GOVERNMENT SHOWED YOU.

01:51PM 15         AND WHAT THE GOVERNMENT SHOWED YOU IS ON PAGE 1 OF THIS

01:51PM 16  EMAIL.  IT RELATES TO DEMO WORKFLOW.  THIS IS AUGUST 2013.  AND

01:51PM 17  THE EMAIL IS FROM NICHOLAS HAASE.

01:51PM 18         WHO WAS HE, AGAIN?

01:51PM 19  A.   A SCIENTIST.

01:51PM 20  Q.   OKAY.  AND IT'S TO YOU, DR. YOUNG, AND ALL OF THESE

01:51PM 21  SCIENTISTS THAT WE HAVE ALREADY GONE THROUGH, ALSO COPYING

01:51PM 22  JEFF BLICKMAN.

01:51PM 23         HE WAS ON THE PRODUCT MANAGEMENT TEAM AS WELL; RIGHT?

01:51PM 24  A.   YES.

01:51PM 25  Q.   OKAY.  AND MR. HAASE SAYS, "UPDATE:  WE JUST STARTED THE

EDLIN CROSS BY MS. WALSH                                          2654

01:51PM  1    ADVIA RUN OF ALL SAMPLES."

01:51PM  2        DO YOU SEE THAT?

01:51PM  3    A.   YES.

01:51PM  4    Q.   OKAY.  AND IF WE TURN NOW TO PAGE 2 OF THE EXHIBIT IN THE

01:51PM  5    MIDDLE AT 10:53 A.M. THERE'S AN EMAIL FROM YOU TO ALL OF THESE

01:52PM  6    PEOPLE AND IT SAYS, "HI ALL -- WE WILL BE COLLECTING

01:52PM  7    FINGERSTICK SAMPLES VERY SOON.  PLEASE BE ON STANDBY."

01:52PM  8        DO YOU SEE THAT?

01:52PM  9    A.   YES.

01:52PM  10   Q.   AND SO THIS IS AN INSTANCE WHEN FINGERSTICK SAMPLES ARE

01:52PM  11   BEING RUN ON THE ADVIA; RIGHT?

01:52PM  12   A.   ARE YOU ASKING ME IF THAT IS WHAT HAPPENED KNOWING WHAT I

01:52PM  13   KNOW NOW OR JUST BASED ON WHAT I KNEW AT THE TIME?

01:52PM  14   Q.   JUST BASED ON THIS EMAIL.

01:52PM  15   A.   RIGHT.

01:52PM  16   Q.   THIS IS AN EMAIL SHOWING -- AND YOU'RE ON THE EMAIL;

01:52PM  17   RIGHT?

01:52PM  18   A.   RIGHT.

01:52PM  19   Q.   AND AN EMAIL SHOWING THAT THE COMMERCIAL MACHINE WAS USED,

01:52PM  20   THE ADVIA; RIGHT?

01:52PM  21   A.   RIGHT.

01:52PM  22   Q.   AND -- BUT IT WAS USED TO RUN FINGERSTICK SAMPLES; RIGHT?

01:52PM  23   A.   RIGHT.

01:52PM  24   Q.   AND SO YOU'RE ON THIS EMAIL AT THE TIME.  THE EMAIL

01:52PM  25   INDICATES THAT YOU WERE AWARE OF THAT; RIGHT?

ER-1874

01:52PM  1    A.   I AM COPIED ON THE EMAIL.  I DON'T KNOW IF I WAS -- I

01:53PM  2    DON'T THINK I WAS AWARE OF THAT, THOUGH.

01:53PM  3    Q.   MEANING YOU WEREN'T KIND OF PUTTING THE TWO TOGETHER AND

01:53PM  4    DRAWING A CONCLUSION?

01:53PM  5    A.   CORRECT.

01:53PM  6    Q.   BUT -- SO IT'S CLEAR, BACK IN 2013 YOU WERE CLEARLY ON

01:53PM  7    THIS EMAIL WHERE THE ADVIA WAS BEING USED TO RUN FINGERSTICK

01:53PM  8    SAMPLES; RIGHT?

01:53PM  9    A.   YES.

01:53PM 10    Q.   AND MS. -- THE GOVERNMENT ASKED YOU ABOUT COMMERCIAL

01:53PM 11    MACHINES, ONE OF THEM BEING THE ADVIA; RIGHT?

01:53PM 12    A.   CORRECT.

01:53PM 13    Q.   BUT THERANOS MODIFIED THOSE MACHINES TO RUN FINGERSTICK

01:53PM 14    SAMPLES; CORRECT?

01:53PM 15    A.   YES.

01:53PM 16    Q.   AND WHAT THEY DID -- WHAT THERANOS DID, WAS IT CHANGED

01:53PM 17    SOME OF THE SOFTWARE IN CONNECTION WITH THE MACHINE; RIGHT?

01:53PM 18    A.   I DON'T KNOW THE SPECIFICS, BUT, YES.

01:54PM 19    Q.   OKAY.  AND IT MADE -- WHATEVER CHANGES IT MADE, THERANOS

01:54PM 20    CAME UP WITH THOSE CHANGES AND CHANGED THOSE COMMERCIAL

01:54PM 21    MACHINES; RIGHT?

01:54PM 22    A.   I DON'T KNOW HOW THE DECISIONS CAME ABOUT.

01:54PM 23    Q.   RIGHT.  BUT PUT ASIDE THE HOW.  THEY MODIFIED THE

01:54PM 24    MACHINES; CORRECT?

01:54PM 25    A.   CORRECT.

01:54PM  1    Q.   AND THE REASON FOR MODIFYING THOSE MACHINES, WAS SO THOSE

01:54PM  2    COMMERCIAL MACHINES COULD RUN FINGERSTICK SAMPLES; RIGHT?

01:54PM  3    A.   RIGHT.

01:54PM  4    Q.   THE MACHINES, IF YOU DON'T MODIFY THEM, WOULD HAVE RUN

01:54PM  5    VENOUS SAMPLES; CORRECT?

01:54PM  6    A.   I BELIEVE SO.

01:54PM  7    Q.   AND VENOUS SAMPLES ARE TAKEN FROM THE ARM; RIGHT?

01:54PM  8    A.   RIGHT.

01:54PM  9    Q.   AND THAT'S DIFFERENT FROM FINGERSTICK, TAKING FROM THE

01:54PM 10    FINGER; RIGHT?

01:54PM 11    A.   RIGHT.

01:54PM 12    Q.   OKAY.  OKAY.  WE CAN TAKE THAT DOWN.

01:55PM 13         LET'S LOOK AT ANOTHER EXAMPLE, 1157, WHICH IS IN EVIDENCE,

01:55PM 14    SO WE CAN PUBLISH THAT.

01:55PM 15         SO HERE'S ANOTHER EXAMPLE IN 2013.  IF WE LOOK AT PAGE 1,

01:55PM 16    MR. EDLIN, THIS IS GOING TO BE ON THE SCREEN.

01:55PM 17         PAUL PATEL IN THE MIDDLE EMAILS YOU, AND DR. YOUNG, AND

01:55PM 18    DR. PANGARKAR, AND DR. SIVARAMAN.

01:55PM 19         "DANIEL,

01:55PM 20         "ARE WE EXPECTING TO RUN THIS SAMPLE ON THE ADVIA?"

01:55PM 21         DO YOU SEE THAT?

01:55PM 22    A.   YES.

01:55PM 23    Q.   AND THE ADVIA IS THE COMMERCIAL MACHINE.  YOU TESTIFIED TO

01:55PM 24    THAT; RIGHT?

01:55PM 25    A.   YES.  AND PAUL IS ASKING DANIEL YOUNG HERE.  AS WE

01:55PM 1     ESTABLISHED, I WENT BY DAN AND HE WENT BY DANIEL.

01:56PM 2     Q.   CORRECT.  SO DANIEL IS DANIEL YOUNG, AND YOU'RE DAN.

01:56PM 3          SO HE'S ASKING DR. YOUNG; RIGHT?

01:56PM 4     A.   RIGHT.

01:56PM 5     Q.   AND THIS IS THE PART OF THE EMAIL THAT THE GOVERNMENT

01:56PM 6     SHOWED YOU; RIGHT?

01:56PM 7     A.   RIGHT.

01:56PM 8     Q.   AND THEN IF WE TURN TO PAGE 2, WHICH THE GOVERNMENT DIDN'T

01:56PM 9     SHOW YOU, THE EMAIL FROM YOU TO ALL OF THESE PEOPLE REGARDING

01:56PM 10    THE DEMO TOMORROW MORNING YOU SAY, "PLEASE NOTE THAT WE HAVE A

01:56PM 11    PATIENT COMING IN TOMORROW MORNING FOR A DEMO FROM 9:00 TO

01:56PM 12    10:00, AND THE FINGERSTICK COLLECTION WILL LIKELY BE AT 10:00

01:56PM 13    A.M."

01:56PM 14         DO YOU SEE THAT?

01:56PM 15    A.   YES.

01:56PM 16    Q.   AND SO THIS IS ANOTHER EXAMPLE OF FINGERSTICK BEING RUN ON

01:56PM 17    ADVIA MACHINES; RIGHT?

01:56PM 18    A.   UM, I THINK I'M WRITING IN REFERENCE TO -- CAN YOU REPEAT

01:57PM 19    THE QUESTION?

01:57PM 20    Q.   SURE.

01:57PM 21         THE EMAIL REFERS TO, ON THE FIRST PAGE, TO AN ADVIA;

01:57PM 22    RIGHT?  AN ADVIA MACHINE?

01:57PM 23    A.   RIGHT.

01:57PM 24    Q.   AND FOR THE SAME DEMO ON PAGE 2, YOU'RE SAYING THAT THE

01:57PM 25    SAMPLES ARE GOING TO BE FINGERSTICK COLLECTION.

EDLIN CROSS BY MS. WALSH                                    2658

01:57PM  1          DO YOU SEE THAT?

01:57PM  2     A.   YES.

01:57PM  3     Q.   AND SO THIS IS ANOTHER EMAIL SHOWING FINGERSTICK SAMPLES

01:57PM  4     BEING RUN ON THE ADVIA; RIGHT?

01:57PM  5     A.   WELL, THE ADVIA WAS REFERENCING THE FIRST SET OF SAMPLES

01:57PM  6     THAT WERE RUN, AND THEN THIS IS DESCRIBING A DIFFERENT DEMO

01:57PM  7     THAT IS BEING RUN IN THE FUTURE.

01:57PM  8          SO I DON'T THINK THERE'S ANY DISCUSSION ABOUT HOW THESE

01:57PM  9     SAMPLES ARE RUN.

01:57PM  10    Q.   OKAY.  SO AT 2:11 P.M. YOU SAY TO THIS GROUP OF PEOPLE,

01:58PM  11    "HELLO ALL,

01:58PM  12         "PLEASE NOTE THAT WE HAVE A PATIENT COMING IN."

01:58PM  13         AND IT'S GOING TO BE A FINGERSTICK COLLECTION; RIGHT?

01:58PM  14    A.   RIGHT.

01:58PM  15    Q.   AND THEN THERE'S A QUESTION FROM MATTHEW BLACK, "IF YOU

01:58PM  16    FIND OUT, PLEASE LET US KNOW WHAT FORMAT THIS WILL COME IN";

01:58PM  17    RIGHT?

01:58PM  18         DO YOU SEE THAT?

01:58PM  19    A.   YES.

01:58PM  20    Q.   OKAY.  AND THEN AN EMAIL FROM DR. PANGARKAR, "PLEASE

01:58PM  21    ADVISE"; RIGHT?

01:58PM  22         AT THE BOTTOM OF PAGE 1.

01:58PM  23    A.   YES.

01:58PM  24    Q.   AND THEN THE NEXT EMAIL UP YOU SAY, "DANIEL -- CAN YOU

01:58PM  25    PLEASE ADVISE IF WE NEED TO USE RAM SCIENTIFIC TUBES."

EDLIN CROSS BY MS. WALSH                                    2659

01:58PM   1          DO YOU SEE THAT?

01:58PM   2     A.   YES.

01:58PM   3     Q.   AND THEN DR. PATEL SAYS, "DANIEL,

01:59PM   4          "ARE WE EXPECTING TO RUN THIS SAMPLE ON THE ADVIA?"

01:59PM   5          DO YOU SEE THAT?

01:59PM   6     A.   YES.

01:59PM   7     Q.   AND MY ONLY QUESTION IS, THIS IS AN EMAIL CONTAINING A

01:59PM   8     DISCUSSION ABOUT RUNNING FINGERSTICK SAMPLES ON THE ADVIA;

01:59PM   9     RIGHT?

01:59PM  10     A.   RIGHT.

01:59PM  11     Q.   OKAY.  AND THIS IS ANOTHER EXAMPLE OF THE DISCUSSION AT

01:59PM  12     LEAST OF FINGERSTICK SAMPLES ON ADVIA'S; RIGHT?

01:59PM  13     A.   YES.

01:59PM  14     Q.   AND WHEN FINGERSTICK SAMPLES ARE BEING RUN ON ADVIA'S,

01:59PM  15     THEY'RE MODIFIED MACHINES; CORRECT?

01:59PM  16     A.   THAT'S MY UNDERSTANDING.

01:59PM  17     Q.   RIGHT.  AND YOUR UNDERSTANDING IS THAT THOSE MODIFICATIONS

01:59PM  18     WERE MADE BY THERANOS; RIGHT?

01:59PM  19     A.   RIGHT.

01:59PM  20     Q.   OKAY.  LET'S TAKE A LOOK AT 871 THAT IS ON THE SCREEN.

02:00PM  21          IT IS IN EVIDENCE, YOUR HONOR.

02:00PM  22               THE COURT:  ALL RIGHT.

02:00PM  23     BY MS. WALSH:

02:00PM  24     Q.   DO YOU SEE 871, MR. EDLIN?

02:00PM  25     A.   YES.

EDLIN CROSS BY MS. WALSH                                    2660

02:00PM  1    Q.   OKAY.  AND THIS IS AN EMAIL THAT THE GOVERNMENT SHOWED YOU

02:00PM  2    LAST WEEK.  THIS RELATES TO A DEMO.

02:00PM  3         DO YOU SEE THAT?

02:00PM  4    A.   YES.

02:00PM  5    Q.   AND WE CAN START -- LET'S START WITH THE EMAIL ON PAGE 2

02:00PM  6    FROM DANIEL YOUNG, SECOND FROM THE TOP.

02:00PM  7         DANIEL YOUNG IS ASKING, "ANY PREFERENCE FOR DEVICE TYPE

02:01PM  8    (MONOBAY, MINILAB, 4S)?"

02:01PM  9         DO YOU SEE THAT?

02:01PM  10   A.   YES.

02:01PM  11   Q.   AND THOSE ARE ALL NEXT GENERATION DEVICES; RIGHT?

02:01PM  12   A.   CORRECT.

02:01PM  13   Q.   AND CHRISTIAN HOLMES SAYS, "NO PREFERENCE -- WHATEVER YOU

02:01PM  14   THINK IS BEST FOR THE PANEL/TESTS THAT ARE CHOSEN."

02:01PM  15        DO YOU SEE THAT?

02:01PM  16   A.   YES.

02:01PM  17   Q.   AND THEN YOU SAY, "JUST CAUGHT UP WITH SUNNY.  HE

02:01PM  18   DEFINITELY WANTS TO HAVE A MINILAB, AND THEN EITHER A 4S OR

02:01PM  19   MONOBAY (WHICHEVER IS WORKING BETTER)"; RIGHT?

02:01PM  20   A.   YES.

02:01PM  21   Q.   AND AGAIN, THESE ARE NEXT GENERATION DEVICES; CORRECT?

02:01PM  22   A.   CORRECT.

02:01PM  23   Q.   AND THE ASSAYS PUT ON THEM, SOME OF THEM ARE STILL IN

02:01PM  24   DEVELOPMENT; RIGHT?

02:01PM  25   A.   RIGHT.

ER-1880

EDLIN CROSS BY MS. WALSH                                           2661

02:01PM   1    Q.   AND IT'S R&D; RIGHT?

02:01PM   2    A.   RIGHT.

02:01PM   3    Q.   OKAY.  LET'S GO TO PAGE 1, THE EMAIL FROM DANIEL YOUNG,

02:02PM   4    THE SECOND FROM THE TOP.

02:02PM   5         DANIEL YOUNG SAYS, "RIGHT NOW, WE ARE NOT PLANNING ON

02:02PM   6    RUNNING ANYTHING ON THE MINILAB, UNFORTUNATELY."

02:02PM   7         THIS IS ON THE MINILAB; RIGHT?

02:02PM   8    A.   YES.

02:02PM   9    Q.   "THE GENERAL CHEMISTRY AND ELISA ASSAYS ARE NOT PERFORMING

02:02PM   10   ADEQUATELY FOR A DEMO AT THE MOMENT"; RIGHT?

02:02PM   11   A.   RIGHT.

02:02PM   12   Q.   AND THEN MR. BALWANI SAYS, "THAT'S VERY FRUSTRATING";

02:02PM   13   RIGHT?

02:02PM   14   A.   RIGHT.

02:02PM   15   Q.   AND MR. BALWANI SPECIFICALLY ASKED FOR A MINILAB TO BE

02:02PM   16   SHOWN; RIGHT?

02:02PM   17        CORRECT?

02:02PM   18   A.   CAN YOU JUST -- LET ME SEE IT ONE MORE TIME.

02:02PM   19   Q.   I'M SORRY.  IT'S ON PAGE 2.

02:02PM   20   A.   YEAH.

02:02PM   21   Q.   YOU SAY JUST CAUGHT UP WITH SUNNY.  HE DEFINITELY WANTS A

02:02PM   22   MINILAB.

02:02PM   23        DO YOU SEE THAT?

02:02PM   24   A.   YES.

02:02PM   25   Q.   AND DANIEL YOUNG IS SAYING SORRY, BUT THE GENERAL

ER-1881

02:02PM    1    CHEMISTRY AND THE ELISA ASSAYS ARE NOT RUNNING ON THE MINILAB;

02:02PM    2    IS THAT RIGHT?

02:02PM    3    A.   RIGHT.

02:02PM    4    Q.   AND SO HE'S FRUSTRATED THAT THEY CAN'T RUN THOSE

02:02PM    5    PARTICULAR ASSAYS ON THE MINILAB AT THAT POINT IN TIME;

02:03PM    6    CORRECT?

02:03PM    7    A.   YES.

02:03PM    8    Q.   OKAY.  WE CAN TAKE THAT DOWN.

02:03PM    9         THERE'S ONE MORE, AND THEN WE CAN TAKE THE BREAK.

02:03PM   10         YOUR HONOR, IF WE CAN LOOK AT WHAT IS ON THE SCREEN 1014

02:03PM   11    WHICH IS IN EVIDENCE?

02:03PM   12              THE COURT:  1014?

02:03PM   13              MS. WALSH:  YES.

02:03PM   14              THE COURT:  ALL RIGHT.

02:04PM   15    BY MS. WALSH:

02:04PM   16    Q.   OKAY.  MR. EDLIN, IF YOU WOULD LOOK AT PAGE 2, THE TOP OF

02:04PM   17    PAGE 2, YOU'RE SAYING TO MR. BALWANI, "SUNNY,

02:04PM   18         "UNFORTUNATELY BY THE LOOKS OF THE THYROID PANEL RESULTS

02:04PM   19    BELOW IT APPEARS TO HAVE HAD MAJOR ISSUES AGAIN."

02:04PM   20         DO YOU SEE THAT?

02:04PM   21    A.   YES.

02:04PM   22    Q.   AND THEN MR. BALWANI SAYS THIS IS DEEPLY DISAPPOINTING.

02:04PM   23         DO YOU SEE THAT?

02:04PM   24    A.   YES.

02:04PM   25    Q.   AND THEN DR. GANGADKHEDKAR SAYS, "HI SUNNY,

02:04PM 1          "THIS CARTRIDGE WAS A RECENT BUILD."

02:04PM 2          DO YOU SEE THAT?

02:04PM 3          SHE'S TALKING ABOUT EVAPORATION OF REAGENTS.

02:04PM 4          DO YOU SEE THAT?

02:04PM 5     A.   YES.

02:04PM 6     Q.   AND SHE SAYS, "THE LAST TIME THIS LOT WAS USED WAS FOR THE

02:04PM 7     DEMO ON 8/13 WHERE ALL THE RUNS WENT WELL WITH NO FAILURES."

02:05PM 8          DO YOU SEE THAT?

02:05PM 9     A.   YES.

02:05PM 10    Q.   OKAY.  BUT THIS DEMONSTRATION, AGAIN, WAS A NEXT

02:05PM 11    GENERATION DEMONSTRATION, WASN'T IT?

02:05PM 12         AND IF YOU COULD, JUST TO ORIENT YOU, MR. EDLIN, LOOK AT

02:05PM 13    THE DEVICES THAT ARE PUT IN THE DEMO ARE TWO MINILABS, ONE 4S.

02:05PM 14         DO YOU SEE THAT?

02:05PM 15    A.   AND 1.35?

02:05PM 16    Q.   RIGHT.

02:05PM 17         SO NEXT GENERATION PLUS?

02:05PM 18    A.   OR CURRENT GENERATION AND NEXT GENERATION, RIGHT.

02:05PM 19    Q.   RIGHT.

02:05PM 20         BUT THERE ARE 4S'S AND WHAT YOU DESCRIBED AS THE NEXT

02:05PM 21    GENERATION DEVICES IN THE ROOM; RIGHT?

02:06PM 22    A.   YES.

02:06PM 23    Q.   OKAY.  OKAY.  WE CAN TAKE THAT DOWN.

02:06PM 24         YOUR HONOR, WOULD THIS BE A GOOD TIME TO BREAK?

02:06PM 25              THE COURT:  SURE.  LET'S DO THAT.

EDLIN CROSS BY MS. WALSH                                    2664

02:06PM  1           LET'S TAKE A BREAK, LADIES AND GENTLEMEN, NOW.

02:06PM  2           WE'LL BE BACK IN ABOUT 25 TO 30 MINUTES.

02:06PM  3           (RECESS FROM 2:06 P.M. UNTIL 2:40 P.M.)

02:40PM  4               THE COURT:  WE'RE BACK ON THE RECORD.

02:40PM  5           THE JURY IS PRESENT.

02:40PM  6           ALL COUNSEL ARE PRESENT.

02:40PM  7           MS. WALSH.

02:40PM  8               MS. WALSH:  YES.  THANK YOU.

02:40PM  9      Q.   OKAY.  WELCOME BACK, MR. EDLIN.

02:40PM 10      A.   THANK YOU.

02:40PM 11      Q.   ALL RIGHT.  SO I WANT TO TURN NOW TO SOME DEMOS THAT YOU

02:40PM 12      COORDINATED IN CONNECTION WITH WALGREENS EXECUTIVES COMING IN

02:41PM 13      TO THERANOS IN THE SUMMER OF 2013.  OKAY?

02:41PM 14      A.   OKAY.

02:41PM 15      Q.   BEFORE THOSE EXECUTIVES CAME IN -- I THINK IT WAS

02:41PM 16      AUGUST 2013; RIGHT?

02:41PM 17      A.   YES.

02:41PM 18      Q.   OKAY.  AND THAT WAS A MONTH BEFORE THE WALGREENS ROLLOUT;

02:41PM 19      RIGHT?

02:41PM 20      A.   YES.

02:41PM 21      Q.   APPROXIMATELY?

02:41PM 22      A.   YES.

02:41PM 23      Q.   OKAY.  BEFORE WALGREENS EXECUTIVES CAME IN FOR THOSE DEMOS

02:41PM 24      IN AUGUST 2013, WALGREENS WAS ALREADY IN POSSESSION OF A

02:41PM 25      THERANOS DEVICE, WASN'T IT?

ER-1884

02:41PM   1    A.   I RECALL THAT THEY DID HAVE A DEVICE AT ONE TIME, BUT I'M

02:41PM   2    NOT SURE ABOUT THE TIMING.

02:41PM   3    Q.   OKAY.  SO IF YOU COULD TURN IN YOUR BINDER TO 20550.

02:42PM   4    A.   OKAY.

02:42PM   5    Q.   OKAY.  AND THIS IS AN EMAIL CHAIN BETWEEN YOU AND

02:42PM   6    MR. BALWANI AND TIM KEMP.

02:42PM   7         DO YOU SEE THAT?

02:42PM   8    A.   YES.

02:42PM   9    Q.   AND WHO IS TIM KEMP?

02:42PM   10   A.   TIM KEMP, I BELIEVE HE WAS A FELLOW AT THERANOS.

02:43PM   11   Q.   OKAY.  AND TONY NUGENT WAS ON THIS CHAIN.

02:43PM   12        DO YOU SEE THAT?

02:43PM   13   A.   YES.

02:43PM   14   Q.   AND WHO WAS TONY NUGENT?

02:43PM   15   A.   HE WORKED ON THE DEVICE HARDWARE.

02:43PM   16   Q.   OKAY.  AND THERE'S A PERSON NAMED SUKHDEV BAINIWAL.

02:43PM   17        DO YOU SEE THAT?

02:43PM   18   A.   YES.

02:43PM   19   Q.   WHO WAS THAT PERSON?

02:43PM   20   A.   HE WORKED ON THE SOFTWARE TEAM.

02:43PM   21   Q.   OKAY.  AND WAS IT PART OF YOUR JOB TO ANSWER QUESTIONS

02:43PM   22   FROM DIFFERENT TEAMS REGARDING THERANOS DEVICES AND LOGISTICS

02:43PM   23   OF DEVICES, WAS THAT PART OF YOUR JOB TO ANSWER THOSE

02:43PM   24   QUESTIONS?

02:43PM   25   A.   TO ANSWER QUESTIONS FROM WHICH TEAMS?

EDLIN CROSS BY MS. WALSH                                    2666

02:43PM    1       Q.   THE HARDWARE TEAMS?

02:43PM    2       A.   I'M NOT SURE IF I WOULD CHARACTERIZE IT AS ANSWERING

02:43PM    3       QUESTIONS FROM THEM.

02:43PM    4       Q.   OKAY.  THIS EMAIL, THOUGH, IS ABOUT HARDWARE DEVICES;

02:44PM    5       RIGHT?

02:44PM    6       A.   I'M JUST TAKING A LOOK.

02:44PM    7       Q.   SURE.

02:44PM    8            (PAUSE IN PROCEEDINGS.)

02:44PM    9            THE WITNESS:  I THINK THIS REFERS TO THE LOCATIONS

02:44PM   10       OF DEVICES THAT WERE EITHER IN USE OR SENT OUTSIDE OF THE

02:44PM   11       COMPANY --

02:44PM   12       BY MS. WALSH:

02:44PM   13       Q.   OKAY.

02:44PM   14       A.   -- TO VARIOUS LOCATIONS.

02:44PM   15       Q.   AND CORRESPONDING IN THIS EMAIL CHAIN, WERE YOU TRYING TO

02:44PM   16       BE AS ACCURATE AS YOU COULD BE?

02:44PM   17       A.   YES.

02:44PM   18       Q.   AND, AGAIN, EMAILS LIKE THIS WERE USED DURING THE COURSE

02:44PM   19       OF THERANOS'S BUSINESS; CORRECT?

02:44PM   20       A.   YES.

02:44PM   21       Q.   AND THOSE EMAILS WERE PRESERVED; RIGHT?

02:44PM   22       A.   YES.

02:44PM   23            MS. WALSH:  YOUR HONOR, WE OFFER 20550.

02:45PM   24            MR. BOSTIC:  NO OBJECTION.

02:45PM   25            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:45PM   1            (DEFENDANT'S EXHIBIT 20550 WAS RECEIVED IN EVIDENCE.)

02:45PM   2   BY MS. WALSH:

02:45PM   3   Q.   OKAY.  LET'S TURN TO PAGE 4 ON THAT EXHIBIT AND THE BOTTOM

02:45PM   4   EMAIL FROM MR. NUGENT.

02:45PM   5        DO YOU SEE THAT?

02:45PM   6   A.   YES.

02:45PM   7   Q.   AND THAT'S TO MR. BALWANI; RIGHT?

02:45PM   8   A.   YES.

02:45PM   9   Q.   AND THE DATE IS JULY 10TH, 2013; RIGHT?

02:45PM  10   A.   YES.

02:45PM  11   Q.   AND THE SUBJECT IS SUMMARY OF HISTORICAL EDISON NUMBERS SO

02:45PM  12   WE HAVE A FIXED POINT OF REFERENCE ON NUMBERS GOING FORWARD.

02:45PM  13        DO YOU SEE THAT?

02:45PM  14   A.   YES.

02:45PM  15   Q.   AND THEN MR. NUGENT LISTS "NUMBERS OF 3.0/3.05 EDISONS."

02:45PM  16        DO YOU SEE THAT?

02:45PM  17   A.   YES.

02:45PM  18   Q.   AND THOSE VERSIONS OF THE DEVICE WERE OLDER VERSIONS, WERE

02:46PM  19   THEY NOT?

02:46PM  20   A.   THEY WERE.

02:46PM  21   Q.   AND THEN THE THIRD HEADING DOWN SAYS, "FROM PHYSICAL COUNT

02:46PM  22   NEWARK AND 1601, 9-JULY-2013 AND ESTIMATE OF UNITS OUTSIDE";

02:46PM  23   RIGHT?

02:46PM  24   A.   YES.

02:46PM  25   Q.   AND THEN THE BOTTOM SAYS, "ESTIMATED NUMBER OF 3.0/3.05

EDLIN CROSS BY MS. WALSH                                          2668

02:46PM   1    DEPLOYED EXTERNALLY."

02:46PM   2         DO YOU SEE THAT?

02:46PM   3    A.   YES.

02:46PM   4    Q.   AND THEN IN THE BOTTOM EMAIL MR. BALWANI ASKS TIM KEMP,

02:46PM   5    "TIM,

02:46PM   6         "CAN YOU LOOK AT THE LOG FILES AND ACCOUNT FOR THE

02:46PM   7    25 UNITS HIGHLIGHTED THAT WE THINK ARE EXTERNAL.  1 OF THESE IS

02:46PM   8    AT WALGREENS AND AM CC'ING CHRISTIAN HERE SO WE CAN BRING THAT

02:46PM   9    IN.  DAN MAY KNOW MORE IN FIELD AT ABA ET CETERA."

02:47PM  10         DO YOU SEE THAT?

02:47PM  11    A.   YES.

02:47PM  12    Q.   AND YOU WERE THE DAN IN THAT EMAIL; RIGHT?

02:47PM  13    A.   YES.

02:47PM  14    Q.   AND WHAT IS FOR THE ABA?

02:47PM  15    A.   IT'S FOR THE AMERICAN BURN ASSOCIATION, AND THERANOS HAD

02:47PM  16    PARTNERED WITH THEM ON THE BURN STUDY THAT I HAD REFERENCED

02:47PM  17    EARLIER IN MY TESTIMONY.

02:47PM  18    Q.   RIGHT.  AND WE'LL LOOK AT SOME EMAILS REGARDING THAT.

02:47PM  19         BUT THAT WAS A STUDY WHERE THERANOS DEVICES WERE SENT TO A

02:47PM  20    NUMBER OF DIFFERENT HOSPITALS AROUND THE COUNTRY; RIGHT?

02:47PM  21    A.   RIGHT.

02:47PM  22    Q.   AND THOSE DEVICES WERE USED IN THOSE HOSPITALS; CORRECT?

02:47PM  23    A.   YES.

02:47PM  24    Q.   FOR THE PURPOSES OF THE STUDY; RIGHT?

02:47PM  25    A.   YES.

ER-1888

EDLIN CROSS BY MS. WALSH                                                    2669

02:47PM  1    Q.   MOVING UP THE PAGE FROM PAGE 2 FROM TIM KEMP TO

02:47PM  2    MR. BALWANI COPYING YOU.

02:47PM  3         MR. KEMP SAYS ON THE FIRST LINE, "READER E000347 IS STILL

02:47PM  4    REGISTERED AS BEING AT WALGREENS."

02:48PM  5         DO YOU SEE THAT?

02:48PM  6    A.   YES.

02:48PM  7    Q.   OKAY.  AND THE READER IS ANOTHER WORD FOR THE DEVICE

02:48PM  8    ITSELF; RIGHT?

02:48PM  9    A.   YES.

02:48PM 10    Q.   SO THAT'S REFERRING TO THE EDISON; RIGHT?

02:48PM 11    A.   YES.

02:48PM 12    Q.   AND AS YOU JUST TESTIFIED TO, IT'S AN OLDER VERSION OF THE

02:48PM 13    EDISON; CORRECT?

02:48PM 14    A.   YES.

02:48PM 15    Q.   OKAY.  AND MR. KEMP IS SAYING IT'S STILL REGISTERED AS

02:48PM 16    BEING IN WALGREENS.

02:48PM 17         DO YOU SEE THAT?

02:48PM 18    A.   YES.

02:48PM 19    Q.   OKAY.  WE CAN TAKE THAT DOWN.

02:48PM 20         AND SO WALGREENS HAD A THERANOS DEVICE ALREADY IN ITS

02:48PM 21    POSSESSION BY AUGUST 2013; CORRECT?

02:48PM 22    A.   ACCORDING TO THAT LAST EMAIL THAT WE REVIEWED, YES.

02:48PM 23    Q.   RIGHT.

02:48PM 24    A.   YES.

02:48PM 25    Q.   RIGHT.  AND IT HAD AN OLDER VERSION OF THE DEVICE; RIGHT?

UNITED STATES COURT REPORTERS

ER-1889

02:48PM  1    A.   YES.

02:48PM  2    Q.   OKAY.  AND THEN IT COMES TIME THAT WALGREENS EXECUTIVES

02:49PM  3    COME INTO THERANOS IN 2013; RIGHT?

02:49PM  4    A.   YES.

02:49PM  5    Q.   AND THEY COME THERE FOR A DEMO; RIGHT?

02:49PM  6    A.   YES.

02:49PM  7    Q.   OKAY.  SO LET'S LOOK AT EXHIBIT 959, WHICH IS IN EVIDENCE.

02:49PM  8         THAT IS GOING TO COME UP ON YOUR SCREEN WHEN WE PUBLISH

02:49PM  9    IT, MR. EDLIN.

02:49PM  10   A.   OKAY.  I SEE IT.

02:49PM  11   Q.   OKAY.  AND IF WE TURN TO PAGE 2 AND LOOK AT THE SUBJECT

02:50PM  12   LINE, DEMO ON 8/13.

02:50PM  13        DO YOU SEE THAT?

02:50PM  14   A.   YES.

02:50PM  15   Q.   AND THAT'S THE WALGREENS DEMO; RIGHT?

02:50PM  16   A.   YES.

02:50PM  17   Q.   AND THE SUBJECT LINE SAYS 4S AND MINILAB.

02:50PM  18        DO YOU SEE THAT?

02:50PM  19   A.   YES.

02:50PM  20   Q.   AND SO THE WALGREENS DEMO INVOLVED NEXT GENERATION DEVICES

02:50PM  21   IN AUGUST OF 2013; RIGHT?

02:50PM  22   A.   YES.

02:50PM  23   Q.   THE 4S AND THE MINILAB WERE NEXT GENERATION; CORRECT?

02:50PM  24   A.   CORRECT.

02:50PM  25   Q.   OKAY.  AND AS FAR AS YOU'RE AWARE -- WE TALKED ABOUT THIS

EDLIN CROSS BY MS. WALSH                                              2671

02:50PM  1    CENTRAL LAB MODEL -- AS FAR AS YOU'RE AWARE, THE 4S AND THE

02:50PM  2    MINILAB, AT THIS POINT IN TIME IN AUGUST OF 2013, WERE NOT

02:50PM  3    GOING TO BE PLACED IN WALGREENS; RIGHT?

02:50PM  4    A.   CAN YOU JUST REPEAT THE FIRST PART OF THAT QUESTION?

02:50PM  5    Q.   SURE.

02:50PM  6         IN AUGUST OF 2013 WHEN WALGREENS IS COMING IN FOR THAT

02:50PM  7    DEMO --

02:50PM  8    A.   RIGHT.

02:50PM  9    Q.   -- AS FAR AS YOU'RE AWARE, THE NEXT GENERATION DEVICES,

02:51PM  10   THE 4S AND THE MINILAB, ARE NOT GOING TO BE PLACED INSIDE

02:51PM  11   WALGREENS; IS THAT CORRECT?

02:51PM  12   A.   ARE YOU ASKING ME IF THEY WERE GOING TO BE PLACED THERE AT

02:51PM  13   SOME POINT IN THE FUTURE, OR AT THAT PERIOD OF TIME?

02:51PM  14   Q.   AT THAT PERIOD OF TIME?

02:51PM  15   A.   NO.   THE COMPANY WAS PREPARING FOR THE CENTRALIZED LAB

02:51PM  16   MODEL.

02:51PM  17   Q.   OKAY.   IF YOU COULD TURN TO 966A IN YOUR BINDER.

02:52PM  18        DO YOU SEE THAT?

02:52PM  19   A.   YES.

02:52PM  20   Q.   966A IS AN EMAIL THAT WE HAVE ALREADY SEEN THAT IS IN

02:52PM  21   EVIDENCE AS 966, AND 966A HAS ONE OF THE LAB REPORTS ATTACHED,

02:52PM  22   WHICH HAS BEEN REDACTED FOR ALL OF THE PERSONAL INFORMATION.

02:52PM  23        DO YOU SEE THAT?

02:52PM  24   A.   YES.

02:52PM  25   Q.   OKAY.

02:52PM  1          YOUR HONOR, WE OFFER 966A?

02:52PM  2              MR. BOSTIC:  APOLOGIES.  I DON'T THINK I HAVE A COPY

02:52PM  3      OF THIS IN MY BINDER.

02:53PM  4          (DISCUSSION OFF THE RECORD.)

02:53PM  5              MR. BOSTIC:  NO OBJECTION, YOUR HONOR.

02:53PM  6              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:53PM  7          (GOVERNMENT'S EXHIBIT 966A, AND REDACTED ATTACHMENT, WAS

02:53PM  8      RECEIVED IN EVIDENCE.)

02:53PM  9      BY MS. WALSH:

02:53PM 10      Q.   OKAY.  AND LET'S JUST GO TO THE SECOND PAGE OF THAT

02:53PM 11      EXHIBIT.  IT'S PAGE 3 OF THE EXHIBIT.

02:53PM 12          AND THIS WAS THE LAB REPORT THAT WAS ATTACHED AS A RESULT

02:53PM 13      OF THE DEMO; CORRECT?

02:53PM 14      A.   CORRECT.

02:53PM 15      Q.   AND IF YOU LOOK AT THE TOP OF THAT REPORT, IT SAYS,

02:53PM 16      THERANOS TEST REPORT TECHNOLOGY DEMONSTRATION; RIGHT?

02:53PM 17      A.   YES.

02:53PM 18      Q.   AND THEN FURTHER DOWN IN THE FIRST BOX IT SAYS IN QUOTES

02:53PM 19      "TECHNOLOGY DEMONSTRATION"; RIGHT?

02:53PM 20      A.   YES.

02:53PM 21      Q.   AND IT SAYS THAT AGAIN IN THE SECOND BOX; RIGHT?

02:53PM 22      A.   YES.

02:53PM 23      Q.   AND THEN A THIRD TIME ALSO IN THE SECOND BOX?

02:53PM 24          DO YOU SEE THAT?

02:53PM 25      A.   YES.

EDLIN CROSS BY MS. WALSH                                           2673

02:53PM  1     Q.   OKAY.  WE CAN TAKE THAT DOWN.

02:54PM  2          AND SO THE GOVERNMENT SHOWED YOU 966, EXHIBIT 966 LAST

02:54PM  3     WEEK, AND THAT'S WHERE DR. YOUNG WAS MAKING DECISIONS ABOUT

02:54PM  4     WHAT TESTS TO INCLUDE, WHAT RESULTS TO INCLUDE, AND WHAT NOT TO

02:54PM  5     INCLUDE; IS THAT RIGHT?

02:54PM  6     A.   RIGHT.

02:54PM  7     Q.   OKAY.  AND AGAIN, YOU RELIED COMPLETELY ON HIM TO MAKE

02:54PM  8     THOSE DECISIONS; RIGHT?

02:54PM  9     A.   YES.

02:54PM 10     Q.   AND THAT WAS BASED ON HIS SCIENTIFIC EXPERTISE; RIGHT?

02:54PM 11     A.   YES.

02:54PM 12     Q.   AND ANY LITERATURE THAT HE MAY HAVE CONSULTED; RIGHT?

02:54PM 13     A.   YES.

02:54PM 14     Q.   AND WE SAW IN THE EXAMPLE OF THE NEW YORK HOSPITAL, HE DID

02:54PM 15     CONSULT WITH THE LITERATURE; RIGHT?

02:54PM 16     A.   YES.

02:54PM 17     Q.   OKAY.  OKAY.  MR. EDLIN, IF YOU CAN TURN IN YOUR BINDER TO

02:55PM 18     EXHIBIT 20536.

02:55PM 19     A.   OKAY.

02:55PM 20     Q.   DO YOU SEE THAT EMAIL?

02:55PM 21     A.   YES.

02:55PM 22     Q.   AND THAT'S AN EMAIL FROM YOU TO A GROUP OF PEOPLE WITHIN

02:55PM 23     THERANOS; RIGHT?

02:55PM 24     A.   YES.

02:55PM 25     Q.   MR. BALWANI IS ON THE EMAIL; CORRECT?

EDLIN CROSS BY MS. WALSH                                          2674

02:55PM  1    A.   YES.

02:55PM  2    Q.   AND THE DAY OF THE EMAIL IS NOVEMBER 14TH, 2013; RIGHT?

02:55PM  3    A.   YES.

02:55PM  4    Q.   AND THE SUBJECT LINE IS WAG SPECIMENS TONIGHT.

02:56PM  5         DO YOU SEE THAT?

02:56PM  6    A.   YES.

02:56PM  7    Q.   AND WAG REFERS TO WALGREENS; IS THAT CORRECT?

02:56PM  8    A.   CORRECT.

02:56PM  9    Q.   OKAY.  AND SO THIS IS AFTER THE RETAIL LAUNCH; RIGHT?

02:56PM  10   A.   RIGHT.

02:56PM  11   Q.   AND I THINK YOU TESTIFIED LAST WEEK THAT THE FIRST TIME

02:56PM  12   THAT YOU LEARNED THAT BLOOD SAMPLES WERE BEING RUN ON

02:56PM  13   COMMERCIAL DEVICES WAS MUCH LATER THAN 2013.

02:56PM  14        DO YOU REMEMBER THAT?

02:56PM  15   A.   THAT FINGERSTICK SAMPLES WERE, RIGHT.

02:56PM  16   Q.   OKAY.  AND YOU LEARNED THAT MUCH LATER?

02:56PM  17        THAT'S WHAT YOU TESTIFIED TO?

02:56PM  18   A.   RIGHT.

02:56PM  19   Q.   OKAY.  TAKE A LOOK AT THIS EMAIL.

02:56PM  20        AND AGAIN, MR. EDLIN, I REALIZE THAT IT'S BEEN ALMOST TEN

02:56PM  21   YEARS SINCE YOU WORKED AT THERANOS, BUT TAKE A LOOK AT THIS

02:56PM  22   EMAIL.

02:56PM  23        IS THIS EMAIL CORRESPONDENCE IN CONNECTION WITH SOME

02:56PM  24   WALGREENS SPECIMENS THAT WERE COMING INTO THERANOS?

02:56PM  25   A.   RIGHT.

ER-1894

02:56PM    1        Q.   OKAY.  AND IN THE MIDDLE PART OF THE EMAIL IT REFERS TO A

02:57PM    2    DEMO PATIENT.

02:57PM    3        DO YOU SEE THAT?

02:57PM    4        IT'S THE BOTTOM EMAIL, ONE, TWO -- THREE PARAGRAPHS DOWN.

02:57PM    5        DO YOU SEE THAT?

02:57PM    6        A.   YES.

02:57PM    7        Q.   OKAY.

02:57PM    8        YOUR HONOR, WE OFFER 20536.

02:57PM    9            MR. BOSTIC:  NO OBJECTION.

02:57PM   10            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:57PM   11        (DEFENDANT'S EXHIBIT 20536 WAS RECEIVED IN EVIDENCE.)

02:57PM   12    BY MS. WALSH:

02:57PM   13        Q.   SO IF WE TAKE A LOOK AT THE BOTTOM EMAIL, MR. EDLIN, THIS

02:57PM   14    IS FROM MAX FOSQUE.

02:57PM   15        DO YOU SEE THAT?

02:57PM   16        A.   YES.

02:57PM   17        Q.   AND WHO WAS MAX FOSQUE?

02:57PM   18        A.   HE WAS A PRODUCT MANAGER.

02:57PM   19        Q.   OKAY.  AND AS YOU SAID, THE DATE IS NOVEMBER 13TH, 2013;

02:57PM   20    RIGHT?

02:57PM   21        A.   YES.

02:57PM   22        Q.   AND IT'S ABOUT WALGREENS SPECIMENS COMING IN; RIGHT?

02:57PM   23        A.   YES.

02:57PM   24        Q.   AND THE OTHER PEOPLE ON THE EMAIL ARE DR. YOUNG; RIGHT?

02:57PM   25        A.   YES.

EDLIN CROSS BY MS. WALSH                                                2676

02:57PM  1     Q.   THE PRODUCT MANAGEMENT TEAM; CORRECT?

02:57PM  2     A.   YES.

02:57PM  3     Q.   MR. BALWANI; RIGHT?

02:58PM  4     A.   YES.

02:58PM  5     Q.   AND NORMANDY.

02:58PM  6          DO YOU SEE THAT?

02:58PM  7     A.   YES.

02:58PM  8     Q.   WHAT WAS THE NORMANDY EMAIL GROUP?

02:58PM  9     A.   NORMANDY REFERRED TO A LAB, BUT I'M NOT EXACTLY SURE WHO

02:58PM 10     WAS WITHIN THAT DISTRIBUTION LIST.

02:58PM 11     Q.   OKAY.  AND WHAT THE EMAIL SAYS IS, "THE FIRST SET OF LIVE

02:58PM 12     SPECIMENS FROM PHOENIX HAVE BEEN DROPPED AT THE AIRPORT AND

02:58PM 13     WILL BE ARRIVING AT 1601 AROUND 8:30 P.M.  THESE INCLUDE CTN'S

02:58PM 14     AND VACUTAINERS."

02:58PM 15          DO YOU SEE THAT?

02:58PM 16     A.   YES.

02:58PM 17     Q.   OKAY.  AND WERE YOU AWARE THAT WALGREENS DEMOS -- THERE

02:58PM 18     WAS A SET OF WALGREENS DEMOS THAT OCCURRED IN NOVEMBER OF 2013

02:58PM 19     IN PHOENIX.

02:58PM 20          DO YOU RECALL THAT?

02:58PM 21     A.   NO.

02:58PM 22     Q.   OKAY.  AND DIRECTING YOUR ATTENTION TO CTN'S AND

02:58PM 23     VACUTAINERS.

02:59PM 24          THE CTN'S WERE THE THINGS USED FOR FINGERSTICK TESTING;

02:59PM 25     RIGHT?

02:59PM  1     A.   RIGHT.

02:59PM  2     Q.   YOU EXPLAINED TO US HOW THAT WORKED; RIGHT?

02:59PM  3     A.   RIGHT.

02:59PM  4     Q.   AND VACUTAINER IS REFERRED TO VENOUS DRAWS; CORRECT?

02:59PM  5     A.   RIGHT.

02:59PM  6     Q.   OKAY.  THE EMAIL CONTINUES.  "ALL PATIENT AND PHYSICIAN

02:59PM  7     INFORMATION EXISTS IN LIS.  FOR PATIENTS THAT HAD CTN'S

02:59PM  8     COLLECTED, PLEASE ENTER ALL RESULTS IN LIS."

02:59PM  9          THAT'S THE LABORATORY INFORMATION SYSTEM; RIGHT?

02:59PM 10     A.   RIGHT.

02:59PM 11     Q.   "AND GENERATE THE REPORT FROM LIS.  FOR PATIENTS THAT HAD

02:59PM 12     VACUTAINERS COLLECTED, PLEASE PROCESS THESE ON CLUNKERS."

02:59PM 13          DO YOU SEE THAT?

02:59PM 14     A.   YES.

02:59PM 15     Q.   AND CLUNKERS REFERRED TO COMMERCIAL MACHINES; RIGHT?

02:59PM 16     A.   I DON'T KNOW SPECIFICALLY.

02:59PM 17     Q.   OKAY.  YOU KNOW, THOUGH, THAT VENOUS DRAWS WERE PROCESSED

02:59PM 18     ON COMMERCIAL MACHINES; CORRECT?

02:59PM 19     A.   CORRECT.

02:59PM 20     Q.   OKAY.  SO THIS EMAIL IS -- THIS EMAIL LAYS OUT SAMPLES

03:00PM 21     COMING IN FROM WALGREENS; RIGHT?

03:00PM 22     A.   RIGHT.

03:00PM 23     Q.   THEY'RE BOTH ON FINGERSTICK AND VENOUS DRAWS; RIGHT?

03:00PM 24     A.   RIGHT.

03:00PM 25     Q.   AND THEY'RE GOING TO BE PROCESSED ON WHAT ARE CALLED

03:00PM   1     CLUNKERS; RIGHT?

03:00PM   2     A.   THIS IS WHAT MAX IS ASKING ABOUT.  INDEPENDENT OF THIS

03:00PM   3     INSTRUCTION, I DIDN'T HAVE THE KNOWLEDGE OF HOW THE TESTS WERE

03:00PM   4     RUN.

03:00PM   5     Q.   SURE.  UNDERSTOOD.

03:00PM   6          BUT YOU ARE ON THIS EMAIL ABOUT VENOUS DRAWS BEING

03:00PM   7     PROCESSED IN THE LAB; CORRECT?

03:00PM   8     A.   YES.

03:00PM   9     Q.   AND IT WAS YOUR UNDERSTANDING THAT VENOUS DRAWS WERE

03:00PM   10    PROCESSED IN COMMERCIAL MACHINES; CORRECT?

03:00PM   11    A.   RIGHT.

03:00PM   12    Q.   OKAY.  WE CAN TAKE THAT DOWN.

03:00PM   13         OKAY.  MR. EDLIN, IF YOU COULD GO TO 20173 IN YOUR BINDER.

03:01PM   14         DO YOU SEE THAT?

03:01PM   15    A.   YES.

03:01PM   16    Q.   AND IS THAT AN EMAIL FROM MR. BALWANI TO YOU AND OTHERS

03:01PM   17    WHO WORKED ON DEMOS?

03:01PM   18    A.   YES.

03:01PM   19    Q.   AND THE DATE OF THIS EMAIL IS JANUARY 7TH, 2014?

03:01PM   20    A.   YES.

03:01PM   21    Q.   AND IT'S ABOUT A DEMO ON FRIDAY; IS THAT RIGHT?

03:01PM   22    A.   YES.

03:01PM   23              MS. WALSH:  YOUR HONOR, WE OFFER 20173.

03:01PM   24              MR. BOSTIC:  NO OBJECTION.

03:01PM   25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

ER-1898

03:02PM    1              (DEFENDANT'S EXHIBIT 20173 WAS RECEIVED IN EVIDENCE.)

03:02PM    2      BY MS. WALSH:

03:02PM    3      Q.   OKAY.  MR. EDLIN, WERE YOU AWARE OF -- READING THIS EMAIL,

03:02PM    4      WERE YOU AWARE OF AN INVESTOR COMING IN IN JANUARY 2014 FOR A

03:02PM    5      DEMO?

03:02PM    6      A.   I DON'T REMEMBER WHO THIS WAS ASSOCIATED WITH.

03:02PM    7      Q.   OKAY.  AND LET'S JUST HIGHLIGHT THE TEXT, THE FIRST

03:02PM    8      PARAGRAPH OF THIS EXHIBIT.

03:02PM    9              MR. BALWANI SAYS, "WE HAVE A VERY IMPORTANT DEMO THIS

03:02PM   10      FRIDAY BETWEEN 9:00 TO 1:00.  I WOULD LIKE TO DEMO ENTIRE END

03:02PM   11      TO END PROCESS FROM COLLECTING SAMPLE TO RUNNING IT ON DEVICES

03:02PM   12      AND SHOWING RESULTS ON .ME IPHONE AND ANDROID."

03:02PM   13              DO YOU SEE THAT?

03:02PM   14      A.   YES.

03:03PM   15      Q.   AND HE WANTS TO HAVE TWO PHONES READY FOR THE DEMO AS

03:03PM   16      WELL; RIGHT?

03:03PM   17      A.   YES.

03:03PM   18      Q.   AND WHAT IS THE .ME THAT IS BEING REFERRED TO THERE?

03:03PM   19      A.   I BELIEVE THAT REFERRED TO THE THERANOS APP FOR AN IPHONE

03:03PM   20      WHERE A PATIENT COULD SEE THE RESULTS.

03:03PM   21      Q.   OKAY.  AND ANY OTHER INFORMATION THAT COULD BE ACCESSED

03:03PM   22      THROUGH THAT APP?

03:03PM   23      A.   I RECALL THERE WAS CERTAIN BACKGROUND INFORMATION FOR EACH

03:03PM   24      TEST AND WHAT THE RESULT MEANT AND THE RESULT ALONG WITH THE

03:03PM   25      REFERENCE RANGE.  I BELIEVE YOU COULD FIND A WALGREENS

03:03PM    1    LOCATION, A WELLNESS CENTER LOCATION, AND THAT IS WHAT IS

03:03PM    2    COMING TO MIND RIGHT NOW.

03:03PM    3    Q.   OKAY.  AND IT WAS MR. BALWANI'S SOFTWARE TEAM WHO

03:03PM    4    DEVELOPED THAT SOFTWARE FOR THOSE APPS; CORRECT?

03:03PM    5    A.   CORRECT.

03:03PM    6    Q.   OKAY.  IF YOU COULD TURN TO 20175 IN YOUR BINDER,

03:04PM    7    MR. EDLIN.

03:04PM    8    A.   OKAY.

03:04PM    9    Q.   TAKE A LOOK AT THAT EMAIL, AND IT HAS AN ATTACHMENT.

03:04PM   10        DO YOU SEE THAT?

03:04PM   11    A.   YES.

03:04PM   12    Q.   OKAY.  AND IS THIS AN EMAIL CHAIN ABOUT A DEMO REPORT?

03:04PM   13    A.   YES.

03:04PM   14    Q.   OKAY.

03:04PM   15        WE OFFER 20175, INCLUDING THE ATTACHMENT WHICH SHOULD BE

03:04PM   16    REDACTED FOR THE PERSONAL INFORMATION.

03:04PM   17            MR. BOSTIC:  NO OBJECTION.

03:04PM   18    BY MS. WALSH:

03:04PM   19    Q.   OKAY.  SO LET'S PUBLISH --

03:04PM   20            THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:05PM   21        (DEFENDANT'S EXHIBIT 20175 WAS RECEIVED IN EVIDENCE.)

03:05PM   22    BY MS. WALSH:

03:05PM   23    Q.   LET'S LOOK AT THE EMAIL.

03:05PM   24        OKAY.  LET'S LOOK AT THE BOTTOM EMAIL, AND MAX FOSQUE IS

03:05PM   25    SAYING TO YOU AND DR. YOUNG, "DANIEL Y," MEANING DR. YOUNG, "IF

03:05PM 1    YOU WOULDN'T MIND QUICKLY REVIEWING THIS REPORT BEFORE ITS SENT

03:05PM 2    THAT WOULD BE GREAT."

03:05PM 3        DO YOU SEE THAT?

03:05PM 4    A.   YES.

03:05PM 5    Q.   AND THEN DR. YOUNG EMAILS BACK SAYING, "THE RESULTS LOOK

03:05PM 6    FINE."

03:05PM 7        DO YOU SEE THAT?

03:05PM 8    A.   YES.

03:05PM 9    Q.   AND THEN YOU ATTACH THE FINAL REPORT; RIGHT?

03:05PM 10   A.   YES.

03:05PM 11   Q.   OKAY.  AND THESE ARE THE RESULTS FROM THE DEMONSTRATION

03:05PM 12   THAT WE JUST SAW THAT YOU WERE SETTING UP FOR ON JANUARY 7TH;

03:05PM 13   RIGHT?

03:05PM 14   A.   CORRECT.

03:05PM 15   Q.   AND THAT IS EXHIBIT 20173; RIGHT?

03:06PM 16   A.   CORRECT.

03:06PM 17   Q.   AND THE NAME ON THE ATTACHMENT, THE NAME ON THE REPORT?

03:06PM 18       DO YOU SEE THAT NAME?

03:06PM 19   A.   YES.

03:06PM 20   Q.   DO YOU RECOGNIZE THAT NAME?

03:06PM 21   A.   I DON'T.

03:06PM 22   Q.   OKAY.  YOU DON'T ASSOCIATE VIVEK KHANNA WITH ANY

03:06PM 23   PARTICULAR GUEST THAT CAME IN?

03:06PM 24   A.   NOT AS I SIT HERE TODAY.

03:06PM 25   Q.   OKAY.  NOW WE'RE GOING TO SWITCH GEARS AND TALK ABOUT

EDLIN CROSS BY MS. WALSH                                    2682

03:06PM   1    THERANOS'S RELATIONSHIP WITH CHIAT/DAY.

03:06PM   2         DO YOU REMEMBER THAT?

03:06PM   3    A.   YES.

03:06PM   4    Q.   AND YOU TESTIFIED ABOUT THE RELATIONSHIP MOSTLY IN THE

03:06PM   5    PERIOD 2013.

03:06PM   6         DO YOU REMEMBER THAT?

03:06PM   7    A.   YOU'RE ASKING IF THE TESTIMONY REFERRED TO INFORMATION IN

03:07PM   8    2013.

03:07PM   9    Q.   THAT'S RIGHT.

03:07PM  10    A.   YES.

03:07PM  11    Q.   AND SO THE GOVERNMENT ASKED YOU QUESTIONS ABOUT THE

03:07PM  12    RELATIONSHIP IN 2013; IS THAT RIGHT?

03:07PM  13    A.   YES.

03:07PM  14    Q.   OKAY.  BUT THE RELATIONSHIP WITH CHIAT/DAY ACTUALLY BEGAN

03:07PM  15    IN 2012.

03:07PM  16         IS THAT YOUR RECOLLECTION?

03:07PM  17    A.   I DON'T REMEMBER THE SPECIFIC DATE, BUT THAT SOUNDS

03:07PM  18    REASONABLE.  THERE WAS A RELATIONSHIP, YOU KNOW, BEFORE THE

03:07PM  19    WALGREENS LAUNCH.

03:07PM  20    Q.   OKAY.  SO IF YOU COULD TURN TO 20547.

03:07PM  21         DO YOU SEE THAT?

03:07PM  22    A.   YES.

03:07PM  23    Q.   AND IS THAT AN EMAIL FROM SOMEONE FROM CHIAT/DAY TO YOU

03:07PM  24    AND MR. BALWANI AND OTHERS AT THERANOS AND CHIAT/DAY?

03:08PM  25    A.   YES.

ER-1902

EDLIN CROSS BY MS. WALSH                                              2683

03:08PM  1    Q.   OKAY.  AND THE DATE OF THAT EMAIL IS NOVEMBER 9TH, 2012.

03:08PM  2         DO YOU SEE THAT?

03:08PM  3    A.   YES.

03:08PM  4    Q.   OKAY.  AND IS THIS RELATED TO THE THERANOS CHIAT/DAY

03:08PM  5    RELATIONSHIP?

03:08PM  6    A.   I BELIEVE SO.

03:08PM  7              MS. WALSH:  YOUR HONOR, WE OFFER 20547.

03:08PM  8              MR. BOSTIC:  NO OBJECTION.

03:08PM  9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:08PM 10         (DEFENDANT'S EXHIBIT 20547 WAS RECEIVED IN EVIDENCE.)

03:08PM 11    BY MS. WALSH:

03:08PM 12    Q.   SO LET'S TAKE A LOOK AT THIS EMAIL.  THIS IS AN EMAIL FROM

03:08PM 13    SOMEONE NAMED KRISTEN LATTO WHO IS AN ACCOUNT DIRECTOR AT

03:08PM 14    CHIAT/DAY; RIGHT?

03:08PM 15    A.   YES.

03:08PM 16    Q.   AND THE ATTACHMENTS AND THE EMAIL INDICATES WHAT IS

03:08PM 17    ATTACHED ARE WHITE BOARD NOTES; RIGHT?

03:08PM 18    A.   YES.  RIGHT.

03:08PM 19    Q.   BRAND ARCHETYPES; CORRECT?

03:08PM 20    A.   YES.

03:08PM 21    Q.   AUDIENCE INSIGHT; RIGHT?

03:09PM 22    A.   RIGHT.

03:09PM 23    Q.   AND CONSUMER WORLD; RIGHT?

03:09PM 24    A.   RIGHT.

03:09PM 25    Q.   AND SO THIS IS IN NOVEMBER OF 2012; RIGHT?

EDLIN CROSS BY MS. WALSH                                          2684

03:09PM  1      A.   RIGHT.

03:09PM  2      Q.   AND WHAT THERANOS WAS DOING BACK IN 2012 WAS STARTING TO

03:09PM  3      DEVELOP ITS MARKETING MATERIALS; RIGHT?

03:09PM  4      A.   I BELIEVE SO.

03:09PM  5      Q.   AND THIS WAS ALMOST A YEAR BEFORE THE WALGREENS LAUNCH;

03:09PM  6      RIGHT?

03:09PM  7      A.   YES.

03:09PM  8      Q.   AND IN YOUR INTERACTION WITH CHIAT/DAY, CHIAT/DAY THE

03:09PM  9      MARKETING FIRM, DEVELOPED DIFFERENT SLIDE DECKS FOR DIFFERENT

03:09PM  10     AUDIENCES; IS THAT RIGHT?

03:10PM  11     A.   I DON'T RECALL THE SPECIFICS, BUT THAT SOUNDS FAMILIAR.

03:10PM  12     Q.   OKAY.  LET'S LOOK AT AN EMAIL, AND IT MAY REFRESH YOUR

03:10PM  13     RECOLLECTION.

03:10PM  14          WHY DON'T YOU TURN TO 20548.

03:10PM  15     A.   OKAY.

03:10PM  16     Q.   IS THIS ANOTHER EMAIL THAT YOU ARE ON WITH MR. BALWANI AND

03:10PM  17     OTHERS AT THERANOS AND CHIAT/DAY?

03:10PM  18     A.   YES.

03:10PM  19     Q.   AND WHAT IS ATTACHED IS JUST A SCHEDULE OF DELIVERABLES

03:10PM  20     AND DATES OF COMPLETION.

03:10PM  21          DO YOU SEE THAT?

03:10PM  22     A.   YES.

03:10PM  23               MS. WALSH:  YOUR HONOR, WE OFFER 20548.

03:10PM  24               MR. BOSTIC:  NO OBJECTION IF OFFERED AS A BUSINESS

03:10PM  25     RECORD.

EDLIN CROSS BY MS. WALSH                                    2685

03:10PM   1              MS. WALSH:  IT IS, YOUR HONOR.

03:10PM   2              THE COURT:  IT IS ADMITTED.  IT MAY BE PUBLISHED.

03:10PM   3         (DEFENDANT'S EXHIBIT 20548 WAS RECEIVED IN EVIDENCE.)

03:10PM   4    BY MS. WALSH:

03:10PM   5    Q.   OKAY.  SO LET'S LOOK AT THE BOTTOM EMAIL FROM

03:10PM   6    CHRISTIAN HOLMES.

03:10PM   7         HE SAYS, "STAN,

03:11PM   8         "HOPE YOU'RE DOING WELL.  ATTACHED IS A DASHBOARD OF OUR

03:11PM   9    KEY DELIVERABLES AND ASSOCIATED DATES OF COMPLETION."

03:11PM  10         DO YOU SEE THAT?

03:11PM  11    A.   YES.

03:11PM  12    Q.   AND THEN IF YOU FLIP THE ATTACHMENT, IT GOES THROUGH THE

03:11PM  13    ITEMS AND THE ITEMS CONSIST OF A SERIES OF DIFFERENT SLIDE

03:11PM  14    DECKS; RIGHT?

03:11PM  15    A.   YES.

03:11PM  16    Q.   AND THERE ARE SLIDE DECKS FOR HOSPITAL EXECUTIVES;

03:11PM  17    CORRECT?

03:11PM  18    A.   YES.

03:11PM  19    Q.   AND LARGE PROVIDERS; RIGHT?

03:11PM  20    A.   YES.

03:11PM  21    Q.   PHYSICIANS; RIGHT?

03:11PM  22    A.   YES.

03:11PM  23    Q.   AND THERE'S ONE RELATED TO THE THERANOS LAUNCH; RIGHT?

03:11PM  24    A.   YES.

03:11PM  25    Q.   AND LEAVE BEHIND FOR PATIENTS IN THE DOCTOR'S OFFICE;

ER-1905

03:11PM  1    RIGHT?

03:11PM  2    A.   YES.

03:11PM  3    Q.   BUT AT THE TIME THAT THESE DECKS WERE BEING DEVELOPED,

03:11PM  4    MR. EDLIN, THERANOS DID NOT HAVE RELATIONSHIPS WITH HOSPITAL

03:11PM  5    EXECUTIVES; RIGHT?

03:11PM  6    A.   I'M NOT SURE I AGREE WITH THAT.

03:12PM  7    Q.   OKAY.  THERANOS HAD NOT ENTERED INTO ANY PARTNERSHIP WITH

03:12PM  8    A HOSPITAL TO PUT THE THERANOS DEVICE IN A HOSPITAL TO RUN

03:12PM  9    BLOOD TESTS?

03:12PM  10   A.   I'M NOT SURE.

03:12PM  11   Q.   OKAY.  HOW ABOUT DOCTOR'S OFFICES?  THERANOS HAD NOT

03:12PM  12   ENTERED INTO PARTNERSHIPS WITH DOCTORS TO PUT THE THERANOS

03:12PM  13   DEVICE IN DOCTOR'S OFFICES YET, HAD IT?

03:12PM  14   A.   I DON'T RECALL THE EXACT DATES.  I HAD -- I RECALL THAT

03:13PM  15   THERE WERE RELATIONSHIPS WITH HOSPITAL SYSTEMS AT ONE POINT.  I

03:13PM  16   THINK THOSE RELATIONSHIPS TOOK A SIMILAR PHASED APPROACH AS I

03:13PM  17   REFERENCED WITH SOME OF THE MILITARY RELATIONSHIPS WHERE

03:13PM  18   THERE'S AN EVALUATION INITIALLY.

03:13PM  19        BUT I DON'T REMEMBER WHEN THOSE WERE SIGNED AND THE EXTENT

03:13PM  20   OF WHERE AT THIS POINT IN TIME THERANOS WAS IN THOSE

03:13PM  21   RELATIONSHIPS.

03:13PM  22   Q.   OKAY.  BUT IN MEETING WITH CHIAT/DAY IN 2012, IS IT FAIR

03:13PM  23   TO SAY THAT THE PURPOSE OF THOSE MEETINGS WAS TO DEVELOP

03:13PM  24   MATERIALS ABOUT WHAT THERANOS -- THE GOALS THAT THERANOS WAS

03:13PM  25   TRYING TO ACHIEVE?

03:13PM  1              IS THAT FAIR?

03:13PM  2     A.   YES.

03:13PM  3     Q.   AND CERTAIN PROGRAMS THAT IT MIGHT ENTER INTO IN THE

03:13PM  4     FUTURE BUT HAD NOT YET NECESSARILY SECURED YET; IS THAT RIGHT?

03:14PM  5     A.   YES.

03:14PM  6     Q.   IT WAS KIND OF WORKSHOPPING ALL OF THE POSSIBLE IDEAS

03:14PM  7     RELATED TO THERANOS'S MISSION; RIGHT?

03:14PM  8     A.   YES.

03:14PM  9     Q.   OKAY.  AND YOU ALSO TESTIFIED ABOUT SENDING SLIDE DECKS TO

03:14PM  10    INVESTORS AND OTHER OUTSIDE PARTIES; RIGHT?

03:14PM  11    A.   RIGHT.

03:14PM  12    Q.   AND SOME OF THE SLIDE DECKS WERE TAILORED TO ONE AUDIENCE,

03:14PM  13    ONE KIND OF AUDIENCE; RIGHT?

03:14PM  14    A.   RIGHT.

03:14PM  15    Q.   OTHERS WERE TAILORED TO OTHERS; RIGHT?

03:14PM  16    A.   RIGHT.

03:15PM  17    Q.   SOME WERE FOR BUSINESS PARTNERS; CORRECT?

03:15PM  18    A.   CORRECT.

03:15PM  19    Q.   OTHERS WERE FOR INVESTORS; RIGHT?

03:15PM  20    A.   CORRECT.

03:15PM  21    Q.   AND MANY, MANY OF THE SLIDES WERE ABOUT THE COMPANY'S

03:15PM  22    INVESTIGATION; IS THAT TRUE?

03:15PM  23              MR. BOSTIC:  OBJECTION.  VAGUE.

03:15PM  24              THE COURT:  DO YOU UNDERSTAND THE QUESTION?

03:15PM  25              THE WITNESS:  CAN YOU DEFINE "MANY"?

EDLIN CROSS BY MS. WALSH                                    2688

03:15PM  1    BY MS. WALSH:

03:15PM  2    Q.   WELL, LET ME PUT IT THIS WAY, THERE WERE SLIDES IN THOSE

03:15PM  3    SLIDE DECKS --

03:15PM  4    A.   RIGHT.

03:15PM  5    Q.   -- THAT RELATED TO THE COMPANY'S MISSION; RIGHT?

03:15PM  6    A.   YES.

03:15PM  7    Q.   AND THE COMPANY'S GOALS TO MAKE HEALTH -- BLOOD TESTING

03:15PM  8    ACCESSIBLE TO EVERYONE; RIGHT?

03:15PM  9    A.   RIGHT.

03:15PM  10   Q.   GOALS ABOUT PRICING; RIGHT?

03:15PM  11   A.   RIGHT.

03:15PM  12   Q.   GOALS ABOUT DIFFERENT USE CASES FOR THERANOS TECHNOLOGY;

03:15PM  13   RIGHT?

03:15PM  14   A.   YES.

03:15PM  15   Q.   OKAY.  AND WHEN IT CAME TO -- WE'RE GOING TO GO FORWARD IN

03:16PM  16   TIME TO AUGUST, SEPTEMBER 2013.  OKAY?

03:16PM  17        WHEN IT CAME TO DEVELOPING THE CONTENT FOR THE WEBSITE,

03:16PM  18   THESE CHIAT/DAY SLIDES SERVED AS THE BASIS FOR SOME OF THAT

03:16PM  19   CONTENT, DIDN'T IT?

03:16PM  20   A.   FOR THE WEBSITE CONTENT?

03:16PM  21   Q.   YEAH.

03:16PM  22   A.   I DON'T SPECIFICALLY RECALL THAT SEQUENCE, BUT I DO RECALL

03:16PM  23   THERE WAS SIMILAR CONTENT ON THE WEBSITE AND IN THESE OTHER

03:16PM  24   PRESENTATIONS.

03:16PM  25   Q.   OKAY.  BUT IT'S FAIR TO SAY THAT REVISING THERANOS'S

EDLIN CROSS BY MS. WALSH                                    2689

```
03:16PM   1    WEBSITE IN THE SUMMER OF 2013 WAS A HUGE PROJECT FOR THE

03:17PM   2    COMPANY?

03:17PM   3    A.   YES.

03:17PM   4    Q.   IT TOOK A LOT OF WORK; RIGHT?

03:17PM   5    A.   YES.

03:17PM   6    Q.   AND THERANOS HAD A PRETTY PRIMITIVE WEBSITE BEFORE THAT

03:17PM   7    TIME; RIGHT?

03:17PM   8    A.   CORRECT.

03:17PM   9    Q.   AND THERE WE ARE SEVERAL PRODUCT MANAGERS LIKE YOU WHO

03:17PM  10    WERE INVOLVED IN THE CREATION AND REVISION OF THAT WEBSITE

03:17PM  11    CONTENT; RIGHT?

03:17PM  12    A.   I WOULD SAY THAT THERE WERE PRODUCT MANAGERS WHO WERE --

03:17PM  13    WHO WORKED CLOSELY WITH CHIAT/DAY ON THE REVISION OF THE

03:17PM  14    WEBSITE, BUT IT WAS MOSTLY CHIAT THAT CREATED THE CONTENT AND

03:17PM  15    MATERIALS.

03:17PM  16    Q.   OKAY.  AND THEN THE PRODUCT MANAGERS WORKED ON REVISING

03:17PM  17    THOSE MATERIALS FOR THE WEBSITE; IS THAT FAIR?

03:17PM  18    A.   THE PRODUCT MANAGERS, I MEAN MY ROLE WAS NOT INVOLVED WITH

03:18PM  19    REVISING.

03:18PM  20         THE REVISING WAS DONE MORE BETWEEN CHIAT/DAY AND ELIZABETH

03:18PM  21    OR SUNNY WITH REGARD TO THE WORDING.

03:18PM  22         AND MY ROLE WAS TO FACILITATE THOSE COMMUNICATIONS, MAKE

03:18PM  23    SURE THAT THE PROJECT STAYED ON TASK AND ON TARGET.

03:18PM  24         WHEN IT CAME TO CONTENT GENERATION, I WOULDN'T SAY THAT I

03:18PM  25    WAS INVOLVED WITH THAT.
```

ER-1909

03:18PM 1     Q.   OKAY.  LET'S TAKE A LOOK IN YOUR BINDER, IF YOU CAN, AT

03:18PM 2     EXHIBIT 10467.

03:19PM 3          DO YOU SEE THAT?

03:19PM 4     A.   YES.

03:19PM 5     Q.   OKAY.  AND IS THIS AN EMAIL CHAIN BETWEEN YOU, AND

03:19PM 6     JEFF BLICKMAN, AND DANIEL YOUNG ABOUT QUESTIONS REGARDING THE

03:19PM 7     THERANOS WEBSITE?

03:19PM 8     A.   YES.

03:19PM 9     Q.   AND THE DATE OF THE EMAIL IS SEPTEMBER 22ND, 2013;

03:19PM 10    CORRECT?

03:19PM 11    A.   YES.

03:19PM 12         MS. WALSH:  YOUR HONOR, WE OFFER EXHIBIT 10467 AS A

03:19PM 13    BUSINESS RECORD.

03:19PM 14         MR. BOSTIC:  NO OBJECTION.

03:19PM 15         THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:19PM 16         (DEFENDANT'S EXHIBIT 10467 WAS RECEIVED IN EVIDENCE.)

03:19PM 17    BY MS. WALSH:

03:19PM 18    Q.   OKAY.  LET'S TURN TO PAGE 5 OF 6 OF THE EMAIL.  AND THAT'S

03:20PM 19    AN EMAIL FROM YOU TO DANIEL YOUNG ON AUGUST 9TH, 2013.

03:20PM 20         DO YOU SEE THAT?

03:20PM 21    A.   YES.

03:20PM 22    Q.   AND YOU SAY, "HI DANIEL,

03:20PM 23         "WE HAVE A FEW QUESTIONS RELATED TO INFO-GRAPHICS THAT

03:20PM 24    WE'RE PLANNING TO INCLUDE ON THE WEBSITE, AND WE WERE HOPING

03:20PM 25    THAT YOU COULD LEND YOUR EXPERTISE."

EDLIN CROSS BY MS. WALSH                                          2691

```
03:20PM   1            DO YOU SEE THAT?

03:20PM   2       A.   YES.

03:20PM   3       Q.   AND GOING DOWN ON THAT SAME EMAIL, YOU'RE POINTING OUT

03:20PM   4       "FAST AND MEANINGFUL TURN-AROUND TIMES"; RIGHT?

03:20PM   5            DO YOU SEE THAT?  ITEM 1?

03:20PM   6       A.   YES.

03:20PM   7       Q.   OKAY.  AND WHAT YOU SAY IS, "FOR THIS GRAPHIC," AND THE

03:20PM   8       GRAPHIC IS BELOW THE TEXT, "WE WANT TO INCLUDE AN ASSAY THAT

03:20PM   9       TYPICALLY TAKES A LONG TIME TO TEST BUT THAT WE HAVE THE

03:20PM  10       ABILITY TO PROCESS QUICKLY, AND BY PROVIDING ANSWERS FASTER IT

03:20PM  11       WOULD MAKE A MEANINGFUL IMPACT ON THE DIAGNOSIS.  CAN YOU THINK

03:20PM  12       OF A SPECIFIC ASSAY THAT MEETS THIS CRITERIA?  VITAMIN D

03:21PM  13       DOESN'T QUITE WORK BECAUSE IT'S NOT CRITICAL TO HAVE THESE

03:21PM  14       RESULTS FAST.  ELIZABETH SUGGESTED USING A BACTERIA ASSAY."

03:21PM  15            DO YOU SEE THAT?

03:21PM  16       A.   YES.

03:21PM  17       Q.   AND THEN DR. YOUNG RESPONDS TO YOUR QUESTION AND HE SAYS,

03:21PM  18       "FAST TURN-AROUND TIME," AND HE GIVES SOME EXAMPLES,

03:21PM  19       "STREPTOCOCCUS PNEUMONIAE IS ONE OF THE MOST COMMON CAUSES OF

03:21PM  20       COMMUNITY-ACQUIRED PNEUMONIA.  CURRENT CRITERIA OF DIAGNOSIS

03:21PM  21       ARE BASED ON SPUTUM CULTURES.  MANY PATIENTS OFTEN RECEIVE,"

03:21PM  22       AND HE GOES ON ABOUT THE TECHNICAL ASPECTS OF WHAT YOU ASKED

03:21PM  23       HIM.

03:21PM  24            DO YOU SEE THAT?

03:21PM  25       A.   YES.
```

ER-1911

EDLIN CROSS BY MS. WALSH                    2692

03:21PM   1    Q.   AND SO IN WORKING ON THE WEBSITE, YOU CONSULTED WITH THE

03:21PM   2    SCIENTIST, TOO, RIGHT?

03:21PM   3    A.   YES.

03:21PM   4    Q.   AND YOU WERE ASKING QUESTIONS ABOUT CONTENT; RIGHT?

03:21PM   5    A.   YES.

03:21PM   6    Q.   AND YOU WERE DOING THAT TO TRY TO MAKE THE WEBSITE

03:21PM   7    ACCURATE; RIGHT?

03:21PM   8    A.   YES.

03:21PM   9    Q.   YOU WANTED IT TO BE -- NOT HAVE ANY ERRORS; RIGHT?

03:22PM  10    A.   RIGHT.

03:22PM  11    Q.   AND TO BE PRECISE AND ACCURATE; RIGHT?

03:22PM  12    A.   CORRECT.

03:22PM  13    Q.   OKAY.  LET'S TURN NOW TO 10469 IN YOUR BINDER.

03:22PM  14    A.   OKAY.

03:22PM  15    Q.   OKAY.  IS THIS AN EMAIL FROM YOU TO MS. HOLMES COPYING

03:22PM  16    CHRISTIAN HOLMES AND JEFF BLICKMAN ABOUT THE DOT COM.

03:22PM  17         DO YOU SEE THAT?

03:22PM  18    A.   YES.

03:22PM  19    Q.   AND THE DATE IS AUGUST 30TH, 2013; RIGHT?

03:22PM  20    A.   YES.

03:22PM  21    Q.   AND THE DOT COM, I TAKE IT, WAS THE THERANOS WEBSITE?

03:23PM  22    A.   AUGUST 30TH, 2013.

03:23PM  23         THE COURT:  WE DIDN'T GET AN ANSWER.

03:23PM  24         MS. WALSH:  SORRY.

03:23PM  25    Q.   WAS THE DOT COM REFERRING TO THE THERANOS WEBSITE?

EDLIN CROSS BY MS. WALSH                                              2693

```
03:23PM   1      A.   YES.

03:23PM   2      Q.   AND IS THE DATE OF THE EMAIL AUGUST 30TH, 2013?

03:23PM   3      A.   YES.

03:23PM   4      Q.   OKAY.

03:23PM   5           YOUR HONOR, WE OFFER 10467 -- 10469.

03:23PM   6              MR. BOSTIC:  NO OBJECTION.

03:23PM   7              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:23PM   8         (DEFENDANT'S EXHIBIT 10469 WAS RECEIVED IN EVIDENCE.)

03:23PM   9      BY MS. WALSH:

03:23PM  10      Q.   OKAY.  SO IN THIS EMAIL YOU'RE REACHING OUT TO MS. HOLMES

03:23PM  11      ABOUT THE WEBSITE AND YOU SAY, "I'VE ATTACHED SOME OPTIONS FOR

03:23PM  12      A GRAPH TO ILLUSTRATE THE BETTER DATA FROM FRESHER SAMPLES

03:23PM  13      PIECE OF .COM."

03:23PM  14           DO YOU SEE THAT?

03:23PM  15      A.   YES.

03:23PM  16      Q.   AND THEN THE SECOND PARAGRAPH SAYS, "PLEASE LET US KNOW IF

03:23PM  17      YOU HAVE ANY COMMENTS ON THIS.  WE'LL NEED TO SEND FEEDBACK ON

03:23PM  18      THIS TO CHIAT TONIGHT."

03:24PM  19           DO YOU SEE THAT?

03:24PM  20      A.   YES.

03:24PM  21      Q.   AND IF WE COULD JUST TURN TO THE FIRST GRAPHIC.

03:24PM  22           AND THIS -- WHAT YOU'RE ASKING ABOUT IS THE DECAY OF

03:24PM  23      ANALYTES IN BLOOD AND SERUM.

03:24PM  24           DO YOU SEE THAT?

03:24PM  25      A.   YES.
```

03:24PM 1    Q.   AND THAT WAS A FAIRLY TECHNICAL TOPIC; CORRECT?

03:24PM 2    A.   CORRECT.

03:24PM 3    Q.   AND SO YOU'RE REACHING OUT TO ELIZABETH TO GET SOME

03:24PM 4    FEEDBACK FROM HER; RIGHT?

03:24PM 5    A.   CORRECT.

03:24PM 6    Q.   OKAY.  SO LET'S, IF YOU CAN, MR. EDLIN, TURN TO 10468.

03:24PM 7    A.   OKAY.

03:24PM 8    Q.   AND IF YOU LOOK AT THE BOTTOM EMAIL THAT IS DATED

03:24PM 9    AUGUST 29TH, 2013; RIGHT?

03:24PM 10   A.   RIGHT.

03:24PM 11   Q.   AND THAT'S THE SAME EMAIL THAT YOU SENT TO MS. HOLMES IN

03:24PM 12   THE LAST EXHIBIT THAT WE LOOKED AT; IS THAT RIGHT?

03:24PM 13   A.   YES.

03:25PM 14   Q.   OKAY.  AND SO IT'S PICKING UP ON THE CHAIN; RIGHT?

03:25PM 15   A.   RIGHT.

03:25PM 16   Q.   AND THEN IT CONTINUES ON IN THE CHAIN BETWEEN MS. HOLMES

03:25PM 17   AND DR. YOUNG AND OTHERS AT THERANOS.

03:25PM 18       DO YOU SEE THAT?

03:25PM 19   A.   YES.

03:25PM 20       MS. WALSH:  YOUR HONOR, WE OFFER 10468.

03:25PM 21       MR. BOSTIC:  NO OBJECTION.

03:25PM 22       THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:25PM 23   (DEFENDANT'S EXHIBIT 10468 WAS RECEIVED IN EVIDENCE.)

03:25PM 24   BY MS. WALSH:

03:25PM 25   Q.   OKAY.  SO GOING TO WHERE WE PICK UP ON THE CHAIN IS WHERE

EDLIN CROSS BY MS. WALSH                                          2695

03:25PM   1    MS. HOLMES GETS YOUR EMAIL AND THEN SHE FORWARDS IT OR SHE

03:25PM   2    LOOPS IN DANIEL YOUNG.

03:25PM   3        DO YOU SEE THAT?

03:25PM   4    A.   YES.

03:25PM   5    Q.   AND SHE SAYS, "DANIEL:  ARE YOU SAYING 2 HOURS FROM THE

03:25PM   6    TIME IT BECOMES SERUM IN THE BELOW GRAPH"; RIGHT?

03:25PM   7    A.   RIGHT.

03:25PM   8    Q.   AND SHE'S ASKING ABOUT THE RATE OF DECAY; RIGHT?

03:25PM   9    A.   RIGHT.

03:25PM  10    Q.   AND SO THE FIRST THING MS. HOLMES DOES IS TO LOOP IN

03:25PM  11    DANIEL YOUNG TO ANSWER THAT QUESTION; CORRECT?

03:25PM  12    A.   CORRECT.

03:25PM  13    Q.   AND THEN THERE IS SOME BACK AND FORTH BETWEEN MS. HOLMES

03:25PM  14    AND DR. YOUNG THAT IS A LITTLE BIT TECHNICAL.

03:26PM  15        BUT LET'S GO TO THE TOP EMAIL.  AND THIS IS FROM

03:26PM  16    MS. HOLMES, AND SHE SAYS, "IF THEY CURRENTLY DO REFRIGERATE

03:26PM  17    THEN WE SHOULD REFLECT THAT SO WE ARE MAKING AN ACCURATE

03:26PM  18    CLAIM."

03:26PM  19        DO YOU SEE THAT?

03:26PM  20    A.   YES.

03:26PM  21    Q.   AND SO THERE'S AN EXAMPLE OF MS. HOLMES TRYING TO MAKE THE

03:26PM  22    WEBSITE AS ACCURATE AS POSSIBLE; CORRECT?

03:26PM  23    A.   CORRECT.

03:26PM  24    Q.   OKAY.  OKAY.  SO YOU ALSO TESTIFIED IN CONNECTION WITH THE

03:26PM  25    WEBSITE THAT THERANOS GOT SOME FEEDBACK FROM ITS ATTORNEYS ON

03:26PM   1    THE CONTENT OF THE WEBSITE.

03:27PM   2         DO YOU REMEMBER THAT?

03:27PM   3    A.   YES.

03:27PM   4    Q.   AND ONE OF THEM WAS AN IN-HOUSE ATTORNEY, THAT WAS

03:27PM   5    JIM FOX, REMEMBER?

03:27PM   6    A.   YES.

03:27PM   7    Q.   AND THE OTHER ONE WAS AN OUTSIDE ATTORNEY, THAT WAS

03:27PM   8    KATE BEARDSLEY; CORRECT?

03:27PM   9    A.   CORRECT.

03:27PM  10    Q.   AND THEY PROPOSED CERTAIN CHANGES TO THE WEBSITE; RIGHT?

03:27PM  11    A.   YES.

03:27PM  12    Q.   AND TO TRY TO CORRECT ANY INCONSISTENCIES?

03:27PM  13         DO YOU REMEMBER?

03:27PM  14    A.   YES.

03:27PM  15    Q.   SO TURN TO 20166.

03:27PM  16    A.   OKAY.

03:27PM  17    Q.   AND JUST LOOK THROUGH THAT CHAIN.

03:28PM  18         IS THAT AN EMAIL CHAIN ON SEPTEMBER 6TH THROUGH

03:28PM  19    SEPTEMBER 11TH, 2013?

03:28PM  20    A.   YES.

03:28PM  21    Q.   AND THIS IS AN EMAIL CHAIN REGARDING UPDATES OR WORKING ON

03:28PM  22    THE WEBSITE; IS THAT RIGHT?

03:28PM  23    A.   JUST ONE MOMENT, PLEASE.

03:28PM  24         (PAUSE IN PROCEEDINGS.)

03:28PM  25              THE WITNESS:  YES.

ER-1916

EDLIN CROSS BY MS. WALSH                                              2697

03:29PM   1              MS. WALSH:  OKAY.  WE OFFER 20166.

03:29PM   2              MR. BOSTIC:  FOUNDATION AND AUTHENTICATION.  I DON'T

03:29PM   3   SEE THE WITNESS ON THIS EMAIL, AND IT LACKS A BATES NUMBER.

03:29PM   4              MS. WALSH:  OKAY, YOUR HONOR.  WE CAN PUT THIS

03:29PM   5   ASIDE, AND I CAN COME BACK TO IT, IF NECESSARY.

03:29PM   6   Q.   OKAY.  SO YOU TESTIFIED THIS MORNING ABOUT THE FEEDBACK

03:29PM   7   THERANOS GOT FROM ITS ATTORNEYS AND THE WHY WEBSITE PAGES IN

03:29PM   8   FEBRUARY OF 2014.

03:29PM   9        DO YOU REMEMBER THAT?

03:29PM   10  A.   YES.

03:29PM   11  Q.   AND THAT EXHIBIT WITH THE WEBSITE PAGES WAS 5805, AND WE

03:29PM   12  CAN SHOW IT TO YOU AGAIN.

03:29PM   13  A.   IF YOU DON'T MIND.

03:30PM   14  Q.   LET'S PULL UP 5805.

03:30PM   15       ARE THESE THE WEBSITE PAGES THAT WERE LIVE IN FEBRUARY OF

03:30PM   16  2014?

03:30PM   17  A.   YES, TO THE BEST OF MY RECOLLECTION.

03:30PM   18  Q.   OKAY.

03:30PM   19       YOUR HONOR, I HAVE A DEMONSTRATIVE THAT I WOULD LIKE TO

03:30PM   20  USE, AND I CAN HAND IT UP TO THE COURT, AND THE WITNESS, AND

03:30PM   21  COUNSEL.

03:30PM   22              THE COURT:  OKAY.  SURE.

03:30PM   23              MS. WALSH:  (HANDING.)

03:31PM   24  Q.   OKAY.  MR. EDLIN, YOU WERE SHOWN EXHIBIT 3965, WHICH IS IN

03:31PM   25  EVIDENCE.

EDLIN CROSS BY MS. WALSH                                    2698

03:31PM  1            AND WHAT I'D LIKE TO REQUEST, IS THAT WE PUBLISH PAGE 4 OF

03:31PM  2    THAT EXHIBIT.

03:31PM  3                 THE COURT:  YES.

03:31PM  4    BY MS. WALSH:

03:31PM  5    Q.   AND THE GOVERNMENT SHOWED YOU ONE OF THESE PAGES.  THIS IS

03:31PM  6    ONE OF THE DRAFT PAGES OF THE WEBSITE; RIGHT?

03:31PM  7    A.   YES.

03:31PM  8    Q.   OKAY.  AND IF YOU WANT TO GET EXHIBIT 3965 IN FRONT OF

03:31PM  9    YOU, THAT MIGHT HELP.

03:31PM  10   A.   OKAY.  JUST ONE SECOND.

03:32PM  11        OKAY.

03:32PM  12   Q.   AND YOU SEE THE FIRST -- THESE ARE THE DRAFT PAGES; RIGHT?

03:32PM  13   A.   YES.

03:32PM  14   Q.   OKAY.  AND YOU SEE THE FIRST ENTRY, "A TINY DROP IS ALL IT

03:32PM  15   TAKES."

03:32PM  16        DO YOU SEE THAT?

03:32PM  17        YOU CAN LOOK ON THE SCREEN FOR THAT.

03:32PM  18   A.   YES.

03:32PM  19   Q.   OKAY.  AND IF YOU COULD JUST TURN IN YOUR EXHIBIT TO 3965

03:32PM  20   JUST ON YOUR OWN.

03:32PM  21   A.   UH-HUH.

03:32PM  22   Q.   TO THE FIRST PAGE, WHICH IS THE EMAIL FROM THE ATTORNEY,

03:32PM  23   JIM FOX.

03:32PM  24        DO YOU HAVE THAT IN FRONT OF YOU?

03:32PM  25   A.   YES.

ER-1918

EDLIN CROSS BY MS. WALSH                                2699

03:32PM   1      Q.   AND YOU SEE HOW HE SAYS IN HIS ADVICE --

03:32PM   2      A.   RIGHT.

03:32PM   3      Q.   -- "A TINY DROP IS ALL IT TAKES.  WE OFTEN USE MORE THAN

03:33PM   4      ONE DROP.  WE SHOULD SAY A FEW DROPS IS ALL IT TAKES"?

03:33PM   5           DO YOU SEE THAT?

03:33PM   6      A.   YES.

03:33PM   7      Q.   OKAY.  NOW, LET'S TURN TO 5805 TO THAT SAME PAGE, WHICH IS

03:33PM   8      PAGE 3.

03:33PM   9           DO YOU SEE THAT ON THE SCREEN?

03:33PM  10      A.   I DO.

03:33PM  11      Q.   AND DO YOU SEE THAT "A TINY DROP" HAS BEEN CHANGED TO "A

03:33PM  12      FEW DROPS IS ALL IT TAKES."

03:33PM  13           DO YOU SEE THAT?

03:33PM  14      A.   YES.

03:33PM  15      Q.   OKAY.  SO LET'S TAKE THOSE DOWN AND PUT UP OUR

03:33PM  16      DEMONSTRATIVE.

03:33PM  17              MR. BOSTIC:  YOUR HONOR, APOLOGIES.  I DO HAVE

03:33PM  18      OBJECTIONS TO AT LEAST PORTIONS OF THE DEMONSTRATIVE.  IF IT'S

03:33PM  19      POSSIBLE TO DISPLAY ONLY THE FIRST ROW FOR NOW, I WOULDN'T HAVE

03:33PM  20      AN OBJECTION TO THAT.

03:33PM  21              MS. WALSH:  SURE, YOUR HONOR.

03:33PM  22              THE COURT:  ALL RIGHT.

03:33PM  23              MS. WALSH:  WE'LL DO THE FIRST ROW.

03:33PM  24              THE COURT:  AND, LADIES AND GENTLEMEN, EXCUSE ME.

03:34PM  25      THIS IS A, THIS IS A DEMONSTRATIVE.  IT IS NOT BEING INTRODUCED

03:34PM  1    INTO EVIDENCE AT THIS POINT, SO YOU WILL NOT HAVE THIS AS PART

03:34PM  2    OF YOUR EVIDENCE.

03:34PM  3        IT'S MERELY A TOOL USED TO DESCRIBE OTHER EVIDENCE THAT

03:34PM  4    MAY HAVE ALREADY BEEN ADMITTED.

03:34PM  5        SO IT'S BEING SHOWN TO YOU SOLELY FOR THAT PURPOSE.

03:34PM  6        COUNSEL.

03:34PM  7             MS. WALSH:  THANK YOU.

03:34PM  8    Q.   OKAY.  SO WE SEE ON THE LEFT COLUMN THE DRAFT WEBSITE

03:34PM  9    LANGUAGE THAT WAS IN 3965, "A TINY DROP IS ALL IT TAKES";

03:34PM 10    RIGHT?

03:34PM 11    A.   YES.

03:34PM 12    Q.   AND THEN THE DRAFT FROM THE ATTORNEYS IS "A FEW DROPS IS

03:34PM 13    ALL IT TAKES OR AS LITTLE AS ONE DROP IS ALL IT TAKES, OR SOME

03:34PM 14    PHRASE"; RIGHT?

03:34PM 15    A.   YES.

03:34PM 16    Q.   AND THEN SOME FINAL LANGUAGE THAT WENT LIVE IS CHANGED TO

03:34PM 17    "A FEW DROPS IS ALL IT TAKES"; RIGHT?

03:35PM 18    A.   CORRECT.

03:35PM 19    Q.   OKAY.  SO WE CAN TAKE THAT DOWN.

03:35PM 20        NOW LET'S GO BACK TO 3965, WHICH ARE THE DRAFT WEBSITE

03:35PM 21    PAGES.  ON PAGE 4 THE SECOND ENTRY IS, "FASTER RESULTS.  FASTER

03:35PM 22    ANSWERS."

03:35PM 23        DO YOU SEE THAT?

03:35PM 24    A.   YES.

03:35PM 25    Q.   AND THEN IF YOU TURN TO EXHIBIT 3981 IN YOUR BINDER.

03:35PM  1     A.    OKAY.

03:35PM  2     Q.    AND YOU SEE THIS IS THE ADVICE FROM THE OTHER LAWYER,

03:36PM  3     KATE BEARDSLEY?

03:36PM  4     A.    YES.

03:36PM  5     Q.    DO YOU REMEMBER THAT?

03:36PM  6     A.    YES.

03:36PM  7     Q.    AND ON PAGE 2 OF THE EXHIBIT SHE SAYS IN ONE OF THE MIDDLE

03:36PM  8     BULLETS, "REPLACE 'FASTER AND EASIER' WITH 'FAST AND EASY.'"

03:36PM  9           DO YOU SEE THAT?

03:36PM  10    A.    YES.

03:36PM  11    Q.    AND THEN IF WE CAN PUT UP THE FINAL WEB PAGES, WHICH IS

03:36PM  12    5805 ON PAGE 3, YOU SEE THAT THE CHANGE WAS MADE, "FAST

03:36PM  13    RESULTS.   FAST ANSWERS."

03:36PM  14          DO YOU SEE THAT?

03:36PM  15    A.    YES.

03:36PM  16    Q.    OKAY.   LET'S NEXT GO TO --

03:36PM  17    A.    ACTUALLY, I SEE ON THE BEARDSLEY GUIDANCE IT SAYS,

03:36PM  18    "REPLACE 'FASTER AND EASIER' WITH 'FAST AND EASY.'"

03:36PM  19    Q.    RIGHT?

03:36PM  20    A.    AND THIS HAS -- THIS IS WORDED JUST SLIGHTLY DIFFERENTLY,

03:36PM  21    BUT, YES, "FASTER" WAS CHANGED TO "FAST."

03:37PM  22    Q.    EXACTLY.

03:37PM  23          SO IT'S SLIGHTLY DIFFERENT BUT "FASTER" WAS CHANGED TO

03:37PM  24    "FAST"; CORRECT?

03:37PM  25    A.    CORRECT.

03:37PM 1    Q.   OKAY.  SO LET'S GO TO THE THIRD ONE ON THAT PAGE -- I'M

03:37PM 2    SORRY, THIRD ONE ON THE DRAFT PAGES IN 3965, "HIGHEST LEVELS OF

03:37PM 3    ACCURACY."

03:37PM 4         DO YOU SEE THAT?

03:37PM 5    A.   YES.

03:37PM 6    Q.   OKAY.  AND THEN IF YOU TURN TO MS. BEARDSLEY'S ADVICE ON

03:37PM 7    3981 IN YOUR BINDER --

03:37PM 8    A.   UH-HUH.

03:37PM 9    Q.   -- THIRD BULLET FROM THE BOTTOM --

03:37PM 10   A.   RIGHT.

03:37PM 11   Q.   -- "REPLACE 'HIGHEST LEVELS OF ACCURACY' WITH 'HIGHEST

03:37PM 12   LEVELS OF ACCURACY.'"

03:37PM 13        DO YOU SEE THAT?

03:37PM 14   A.   YES.

03:37PM 15   Q.   AND WHAT ENDS UP ON THE LIVE WEBSITE ON EXHIBIT 5805 IS

03:37PM 16   "HIGH LEVELS OF PRECISION."

03:37PM 17        DO YOU SEE THAT?

03:37PM 18   A.   I DO.

03:37PM 19   Q.   AND AGAIN, THIS IS AN EXAMPLE OF THE EXACT CHANGE WASN'T

03:38PM 20   MADE, BUT A CHANGE WAS MADE FROM "HIGHEST LEVELS OF ACCURACY,"

03:38PM 21   TO "HIGH LEVELS OF PRECISION"; CORRECT?

03:38PM 22   A.   CORRECT.

03:38PM 23   Q.   AND LET'S GO TO THE NEXT ONE ON 3965.  THE FOURTH ONE DOWN

03:38PM 24   IS "MORE PRECISE TRENDING."

03:38PM 25        THIS IS ON THE DRAFT WEB PAGES; RIGHT?

EDLIN CROSS BY MS. WALSH                                          2703

03:38PM   1    A.   YES.

03:38PM   2    Q.   AND THEN IF YOU GO TO MS. BEARDSLEY, HER ADVICE IN 3981 ON

03:38PM   3    PAGE 3 --

03:38PM   4    A.   YES.

03:38PM   5    Q.   -- THE THIRD BULLET DOWN.

03:38PM   6    A.   I SEE.

03:38PM   7    Q.   SHE SAYS, "CHANGE 'MORE PRECISE' TO 'PRECISE'"; RIGHT?

03:38PM   8    A.   YES.

03:38PM   9    Q.   AND WHAT ENDS UP BEING THE LIVE PAGES ON EXHIBIT 5805, THE

03:39PM  10    WORD IS CHANGED TO "PRECISE"; RIGHT?

03:39PM  11    A.   RIGHT.

03:39PM  12    Q.   "PRECISE TRENDING"; CORRECT?

03:39PM  13    A.   CORRECT.

03:39PM  14    Q.   AND THEN LET'S LOOK ON THE SAME PAGES OF THE DRAFT ON PAGE

03:39PM  15    3965 ABOVE, "A TINY DROP IS ALL IT TAKES."

03:39PM  16         IT'S A LITTLE HARD TO SEE?

03:39PM  17    A.   UH-HUH.

03:39PM  18    Q.   BUT THE TEXT, IT SAYS, "AT THERANOS, WE CAN PERFORM ALL

03:39PM  19    LAB TESTS ON A SAMPLE 1/1,000 THE SIZE OF A TYPICAL BLOOD

03:39PM  20    DRAW."

03:39PM  21         DO YOU SEE THAT?

03:39PM  22    A.   I DO.

03:39PM  23    Q.   OKAY.  AND THEN IF YOU GO TO MS. BEARDSLEY'S ADVICE,

03:39PM  24    EXHIBIT 3981 AT PAGE 2, SHE SAYS, "ENSURE SUBSTANTIATION FOR A

03:40PM  25    CLAIM 1/1,000 THE SIZE OF TYPICAL BLOOD DRAW."

ER-1923

EDLIN CROSS BY MS. WALSH                                          2704

03:40PM  1          DO YOU SEE THAT?

03:40PM  2    A.   YES.

03:40PM  3    Q.   AND THEN IF WE GO TO THE LIVE PAGES, A CHANGE IS MADE AND

03:40PM  4    WHAT THE CHANGE IS, "AT THERANOS, WE CAN PERFORM OUR LAB TESTS

03:40PM  5    ON SAMPLES AS SMALL AS 1/1,000 THE SIZE OF A TYPICAL BLOOD

03:40PM  6    DRAW."

03:40PM  7          DO YOU SEE THAT?

03:40PM  8    A.   YES.

03:40PM  9    Q.   SO "ALL" WAS CHANGED TO "OUR" AND TEXT WAS ADDED "AS SMALL

03:40PM 10    AS."

03:40PM 11          DO YOU SEE THAT?

03:40PM 12    A.   I DO.

03:41PM 13    Q.   OKAY.  LET'S GO TO PAGE 7 OF EXHIBIT 3965.

03:41PM 14          IN THE MIDDLE OF THE PAGE, THE DRAFT WEB PAGE IS "A

03:41PM 15    COMPLETE TEST MENU."

03:41PM 16          DO YOU SEE THAT?

03:41PM 17    A.   "A COMPLETE TEST MENU," YES.

03:41PM 18    Q.   "A COMPLETE TEST MENU," YES.

03:41PM 19          AND IF YOU GO TO MS. BEARDSLEY'S ADVICE ON PAGE 3, ONE,

03:41PM 20    TWO, THREE, FOUR, FIVE -- SIX BULLETS UP FROM THE TOP SHE SAYS,

03:41PM 21    "CHANGE 'COMPLETE' TO 'COMPREHENSIVE.'"

03:41PM 22          DO YOU SEE THAT?

03:41PM 23    A.   YES.

03:41PM 24    Q.   AND IF WE GO TO THE ACTUAL WEBSITE CAPTURES, ON PAGE 6, IT

03:42PM 25    SAYS, "A COMPREHENSIVE TEST MENU."

EDLIN CROSS BY MS. WALSH                                          2705

03:42PM  1          DO YOU SEE THAT?

03:42PM  2    A.   I DO.

03:42PM  3    Q.   SO "COMPLETE" WAS CHANGED TO "COMPREHENSIVE"; RIGHT?

03:42PM  4    A.   YES.

03:42PM  5    Q.   OKAY.  LET'S SET ALL OF THOSE ASIDE.

03:42PM  6          AND SO JUST TO ASK ONE MORE QUESTION ABOUT THE WEBSITE,

03:42PM  7    BASED ON WHAT YOU'VE SEEN AND THE EMAILS THAT YOU'VE SEEN

03:42PM  8    RELATED TO THIS, IN YOUR OWN EXPERIENCE, YOU AND YOUR

03:43PM  9    COLLEAGUES WERE DOING THE BEST YOU COULD TO TRY TO MAKE THAT

03:43PM 10    WEBSITE ACCURATE, WEREN'T YOU?

03:43PM 11          MR. BOSTIC:  OBJECTION.  FOUNDATION.  CALLS FOR

03:43PM 12    SPECULATION.

03:43PM 13          THE COURT:  COULD YOU LAY A FOUNDATION.

03:43PM 14          MS. WALSH:  SURE.

03:43PM 15    Q.   SO YOU WORKED ON PARTS OF THE WEBSITE; CORRECT?  WE SAW

03:43PM 16    THAT IN THE EMAILS; RIGHT?

03:43PM 17    A.   CORRECT.

03:43PM 18    Q.   AND CHRISTIAN HOLMES WORKED ON THE WEBSITE; CORRECT?

03:43PM 19    A.   YES.

03:43PM 20    Q.   AND YOU POSED QUESTIONS TO MS. HOLMES; RIGHT?

03:43PM 21    A.   YES.

03:43PM 22    Q.   AND LAWYERS WERE GIVING YOU FEEDBACK; CORRECT?

03:43PM 23    A.   CORRECT.

03:43PM 24    Q.   AND WE SAW SOME OF THAT FEEDBACK WAS IMPLEMENTED; RIGHT?

03:43PM 25    A.   RIGHT.

EDLIN CROSS BY MS. WALSH                                             2706

03:43PM   1    Q.   SO IS IT FAIR TO SAY THAT YOU WERE MAKING GREAT EFFORT TO

03:43PM   2    TRY TO MAKE THE WEBSITE ACCURATE?

03:43PM   3              MR. BOSTIC:  ARE WE ASKING ABOUT THIS WITNESS

03:43PM   4    INDIVIDUALLY?

03:43PM   5              MS. WALSH:  YES, YOUR HONOR, YES.

03:43PM   6              THE COURT:  IT'S ABOUT HIS EFFORTS.

03:43PM   7              MS. WALSH:  YES.

03:43PM   8              THE COURT:  DO YOU UNDERSTAND THAT, SIR?

03:43PM   9              THE WITNESS:  I DO.

03:43PM  10              THE COURT:  OKAY.  YOU CAN ANSWER THE QUESTION.

03:43PM  11              THE WITNESS:  THE ANSWER IS YES.

03:43PM  12              THE COURT:  OKAY.

03:43PM  13              MS. WALSH:  THANK YOU.

03:43PM  14    Q.   AND YOU DIDN'T HAVE REASON TO BELIEVE THAT ANYONE ELSE WHO

03:44PM  15    WAS WORKING ON THE WEBSITE WITH YOU WAS NOT TRYING TO MAKE IT

03:44PM  16    ACCURATE?

03:44PM  17              MR. BOSTIC:  SAME OBJECTIONS.  CALLS FOR

03:44PM  18    SPECULATION.

03:44PM  19              MS. WALSH:  JUST WHAT HE OBSERVED.

03:44PM  20              THE COURT:  I THINK YOU'LL NEED TO LAY A BETTER

03:44PM  21    FOUNDATION FOR THAT.

03:44PM  22              MS. WALSH:  OKAY.

03:44PM  23    Q.   SO WHAT WE'VE SEEN IN THE EMAILS IS LAWYERS GIVING

03:44PM  24    FEEDBACK; RIGHT?

03:44PM  25    A.   RIGHT.

ER-1926

03:44PM  1    Q.   AND THERANOS PERSONNEL IMPLEMENTING THE FEEDBACK; RIGHT?

03:44PM  2    A.   RIGHT.

03:44PM  3    Q.   AND PEOPLE CONSULTING WITH EACH OTHER ABOUT MAKING THE

03:44PM  4    WEBSITE ACCURATE; RIGHT?

03:44PM  5    A.   RIGHT.

03:44PM  6    Q.   AND I TAKE IT YOU DID NOT OBSERVE ANYTHING IN YOUR WORK AT

03:44PM  7    THERANOS, WORKING ON THIS WEBSITE, THAT MADE YOU CONCLUDE THAT

03:44PM  8    THE PEOPLE YOU WERE WORKING WITH WERE TRYING TO NOT MAKE THE

03:45PM  9    WEBSITE ACCURATE?

03:45PM  10              MR. BOSTIC:  SAME OBJECTIONS.  SAME QUESTION.

03:45PM  11              THE COURT:  SUSTAINED.

03:45PM  12   BY MS. WALSH:

03:45PM  13   Q.   ALL RIGHT.  LET'S MOVE ON TO THE WALGREENS BROCHURE.

03:45PM  14       MAY I JUST CHECK SOMETHING, YOUR HONOR?

03:45PM  15              THE COURT:  YES, OF COURSE.

03:45PM  16       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

03:46PM  17   BY MS. WALSH:

03:46PM  18   Q.   ALL RIGHT.  MR. EDLIN, PLEASE TURN IN YOUR BINDER TO

03:46PM  19   EXHIBIT 10558.

03:46PM  20   A.   OKAY.

03:46PM  21   Q.   SO THIS IS AN EMAIL THAT YOU'RE ON; RIGHT?

03:46PM  22   A.   YES.

03:46PM  23   Q.   AND MR. CHRISTIAN HOLMES IS ON THIS EMAIL; CORRECT?

03:46PM  24   A.   YES.

03:46PM  25   Q.   AND THE EMAIL IS WITH A PERSON NAMED MIKE YAGI; CORRECT?

03:46PM  1    A.   YES.

03:46PM  2    Q.   AND MR. YAGI IS WITH CHIAT/DAY; RIGHT?

03:46PM  3    A.   YES.

03:46PM  4    Q.   AND THE DATE OF THE EMAIL IS SEPTEMBER 5TH, 2013; RIGHT?

03:46PM  5    A.   RIGHT.

03:46PM  6    Q.   AND THE SUBJECT IS BROCHURE FEEDBACK; RIGHT?

03:46PM  7    A.   RIGHT.

03:46PM  8         MS. WALSH:  YOUR HONOR, WE OFFER 10558.

03:46PM  9         MR. BOSTIC:  NO OBJECTION.

03:46PM 10         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:46PM 11    (DEFENDANT'S EXHIBIT 10558 WAS RECEIVED IN EVIDENCE.)

03:47PM 12    BY MS. WALSH:

03:47PM 13    Q.   SO LET'S LOOK AT WHAT MR. HOLMES SAYS TO MIKE.

03:47PM 14         "MIKE,

03:47PM 15         "I HOPE YOU'RE DOING WELL.  I JUST CAUGHT UP WITH

03:47PM 16    ELIZABETH -- SHE HAD A CONVERSATION WITH OUR REGULATORY FOLKS

03:47PM 17    AND THEY WANT TO MAKE A FEW CHANGES ON THE BROCHURE FOR

03:47PM 18    WALGREENS.  THESE ARE RELATIVELY MINOR BUT WILL NEED TO

03:47PM 19    IMPLEMENT THEM AS SOON AS WE CAN FOR ADDITIONAL PRINTING OF THE

03:47PM 20    BROCHURE.  HERE IS THE FEEDBACK AND WE CAN DISCUSS -- I BELIEVE

03:47PM 21    ELIZABETH IS GOING TO JOIN ALL OF THE MEETINGS ON

03:47PM 22    FEEDBACK/CHANGES PER THIS NOTE."

03:47PM 23         AND THEN MR. HOLMES LISTS THE FEEDBACK; RIGHT?

03:47PM 24    A.   RIGHT.

03:47PM 25    Q.   AND ONE OF THEM "ON THE ONE 'TINY DROP CHANGES EVERYTHING'

03:47PM  1    PANEL I WOULD SAY 'TINY' RATHER THAN THE 'TINIEST'"; RIGHT?

03:47PM  2    A.   RIGHT.

03:47PM  3    Q.   AND "ON THE 'ONE DROP A WORLD OF ANSWERS PANEL, I WOULD

03:47PM  4    ASSUME THAT WE ARE NOT PROVIDING EVERY TEST THAT ANYONE WOULD

03:47PM  5    EVER WANT.  YOU MIGHT WANT TO STAY A FULL RANGE OF

03:47PM  6    STANDARD/COMMON/MOST FREQUENT TESTS"; RIGHT?

03:47PM  7    A.   RIGHT.

03:48PM  8    Q.   AND SO THIS IS AN EXAMPLE OF MR. HOLMES GETTING FEEDBACK

03:48PM  9    THROUGH MS. HOLMES ABOUT FEEDBACK FROM THE REGULATORY FOLKS AT

03:48PM  10   THERANOS; RIGHT?

03:48PM  11   A.   RIGHT.

03:48PM  12   Q.   AND THOSE REGULATORY FOLKS, THOSE ARE THE REGULATORY

03:48PM  13   LAWYERS WITHIN THERANOS; IS THAT CORRECT?

03:48PM  14   A.   YES.

03:48PM  15   Q.   AND HE'S COMMUNICATING -- MR. HOLMES IS COMMUNICATING THAT

03:48PM  16   FEEDBACK TO CHIAT/DAY; RIGHT?

03:48PM  17   A.   RIGHT.

03:48PM  18   Q.   SO THAT CHIAT/DAY CAN IMPLEMENT CHANGES TO THE MARKETING

03:48PM  19   MATERIALS; CORRECT?

03:48PM  20   A.   CORRECT.

03:48PM  21   Q.   OKAY.  LET'S TURN TO 20167.

03:49PM  22   A.   OKAY.

03:49PM  23   Q.   AND TAKE A LOOK AT THAT EMAIL.

03:50PM  24   A.   OKAY.  IT'S A LONG EMAIL.

03:50PM  25   Q.   I'M NOT GOING TO ASK YOU ABOUT EVERYTHING.

03:50PM  1    A.   OKAY.

03:50PM  2    Q.   GENERALLY SPEAKING, HAVING REVIEWED THE EMAIL, IS THIS AN

03:51PM  3    EMAIL THAT YOU'RE ON, MR. BALWANI IS ON, MS. HOLMES IS ON, AND

03:51PM  4    OTHERS ARE ON REGARDING A MEDIA INQUIRY FROM G2 INTELLIGENCE?

03:51PM  5    A.   YES.

03:51PM  6    Q.   AND IS THE DATE OF THE EMAIL SEPTEMBER 13TH, 2013?

03:51PM  7    A.   YES.  YES.

03:51PM  8         MS. WALSH:  YOUR HONOR, WE OFFER 20167.

03:51PM  9         MR. BOSTIC:  NO OBJECTION.

03:51PM 10         THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:51PM 11         (DEFENDANT'S EXHIBIT 20167 WAS RECEIVED IN EVIDENCE.)

03:51PM 12    BY MS. WALSH:

03:51PM 13    Q.   LET'S TURN TO PAGE 7 OF THE EMAIL JUST TO ORIENT US.

03:51PM 14         DO YOU SEE THAT?

03:51PM 15    A.   I DO.

03:51PM 16    Q.   AND THIS IS AN EMAIL FROM LAURA FOGELMAN FROM GROW

03:51PM 17    MARKETING.

03:51PM 18         DO YOU SEE THAT?

03:51PM 19    A.   YES.

03:51PM 20    Q.   AND THIS IS TO MS. HOLMES, MR. BALWANI, YOU AND OTHERS;

03:51PM 21    RIGHT?

03:51PM 22    A.   YES.

03:51PM 23    Q.   AND BY THE WAY, WHAT WAS GROW MARKETING?

03:51PM 24    A.   IT WAS A MARKETING AND COMMUNICATIONS COMPANY THAT

03:52PM 25    THERANOS CONSULTED WITH IN PREPARATION FOR THE WALGREENS

EDLIN CROSS BY MS. WALSH                                    2711

03:52PM   1      LAUNCH.

03:52PM   2      Q.   OKAY.  AND WHAT MS. FOGELMAN IS SAYING IS, "WE RECEIVED A

03:52PM   3      MEDIA INQUIRY TODAY FROM RON SHINKMAN OF G2 INTELLIGENCE, A

03:52PM   4      CREDIBLE LAB INDUSTRY PUBLICATION."

03:52PM   5           DO YOU SEE THAT?

03:52PM   6      A.   YES.

03:52PM   7      Q.   AND THEN IF YOU GO FORWARD TO PAGE 4, THIS IS AN EMAIL

03:52PM   8      FROM JEFF BLICKMAN TO YOU, AND MR. BALWANI, AND MS. HOLMES, AND

03:52PM   9      OTHERS; RIGHT?

03:52PM  10      A.   YES.

03:52PM  11      Q.   AND IT SETS FORTH A LIST OF QUESTIONS FROM

03:53PM  12      G2 INTELLIGENCE?

03:53PM  13      A.   RIGHT.

03:53PM  14      Q.   THAT G2 INTELLIGENCE WANTED ANSWERED FOR THE PUBLICATION;

03:53PM  15      RIGHT?

03:53PM  16      A.   CORRECT.

03:53PM  17      Q.   AND I WANT TO DIRECT YOUR ATTENTION TO QUESTION NUMBER 7.

03:53PM  18           DO YOU SEE THAT?

03:53PM  19      A.   YES.

03:53PM  20      Q.   AND QUESTION NUMBER 7 FROM THE PUBLICATION ASKS, "HOW MUCH

03:53PM  21      BLOOD IS REQUIRED (IN NANOLITERS OR MICROGRAMS)?  ALTHOUGH IT

03:53PM  22      IS MENTIONED IN THE RELEASE, HOW SPECIFICALLY WILL IT BE DRAWN?

03:53PM  23      THE BLOOD WILL BE DRAWN --" OH, I'M SORRY.

03:53PM  24           SO THAT'S THE QUESTION; RIGHT?

03:53PM  25      A.   YES.

EDLIN CROSS BY MS. WALSH                                    2712

03:53PM   1   Q.   AND THEN THE TEXT AFTER THAT IS MR. BLICKMAN ANSWERING THE

03:53PM   2   QUESTION; RIGHT?

03:53PM   3   A.   THAT'S RIGHT.

03:53PM   4   Q.   AND THEN MR. BLICKMAN SAYS THE BLOOD WILL BE DRAWN IN A

03:53PM   5   THREE STEP PROCESS -- PLACE FINGER WARMER ON PATIENT'S

03:53PM   6   FINGERTIP; CLEAN THE FINGER TIP; AND DEPRESS TINY LANCET ON

03:53PM   7   FINGER; TECHNICIAN COLLECTS BLOOD IN SMALL DISPOSABLE DEVICES

03:54PM   8   TO FILL OR NANOTAINER TUBES WITH A FEW DROPS OF SAMPLE.

03:54PM   9        DO YOU SEE THAT?

03:54PM  10   A.   YES.

03:54PM  11   Q.   AND SO THAT'S MR. BLICKMAN'S ANSWER TO QUESTION 7; RIGHT?

03:54PM  12   A.   YES.

03:54PM  13   Q.   AND THEN IF WE GO TO PAGE 2, MR. BALWANI RESPONDS.

03:54PM  14        DO YOU SEE THAT?

03:54PM  15   A.   YES.

03:54PM  16   Q.   AND HIS RESPONSE SPILLS OVER ON TO PAGE 3.

03:54PM  17        AND WHAT I WANT TO FOCUS ON IS WHAT HE ADDS TO QUESTION 7.

03:54PM  18        DO YOU SEE THAT?

03:54PM  19   A.   YES.

03:54PM  20   Q.   OKAY.  AND WHAT HE ADDS IN ALL CAPS IS, "FIX THIS TO ALSO

03:54PM  21   INCLUDE VENIPUNCTURE.  WE DON'T WANT TO BE CONFUSED WITH POINT

03:54PM  22   OF SERVICE FINGERSTICK TECHNOLOGY.  YOU CAN FOCUS ON SMALL

03:54PM  23   VOLUME.  BLOOD VOLUME REQUIREMENTS VARY BY TEST."

03:54PM  24        DO YOU SEE THAT?

03:54PM  25   A.   I DO.

03:54PM  1    Q.   AND SO MR. BALWANI IS COMMUNICATING THIS NEEDS TO BE

03:55PM  2    FIXED, WE NEED TO SAY VENIPUNCTURE; RIGHT?

03:55PM  3    A.   RIGHT.

03:55PM  4    Q.   AND THIS IS TO A JOURNALIST WHO IS GOING TO PUBLISH

03:55PM  5    SOMETHING FOR THE PUBLIC TO READ ABOUT THERANOS; CORRECT?

03:55PM  6    A.   CORRECT.

03:55PM  7    Q.   OKAY.  WE CAN TAKE THAT DOWN.

03:55PM  8         LET'S GO TO 10554 IN YOUR BINDER, MR. EDLIN.

03:55PM  9    A.   OKAY.

03:55PM  10   Q.   IS THIS AN EMAIL WITH YOU, MR. BALWANI, AND MS. HOLMES,

03:55PM  11   AND GROW MARKETING RELATING TO THE JOE RAGO INTERVIEW?

03:55PM  12   A.   YES.

03:55PM  13   Q.   AND IS THE DATE OF THE EMAIL AUGUST 20TH, 2013?

03:56PM  14   A.   YES.

03:56PM  15          MS. WALSH:  YOUR HONOR, WE OFFER 10554.

03:56PM  16          MR. BOSTIC:  NO OBJECTION.

03:56PM  17          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:56PM  18        (DEFENDANT'S EXHIBIT 10554 WAS RECEIVED IN EVIDENCE.)

03:56PM  19   BY MS. WALSH:

03:56PM  20   Q.   AND THIS IS JOE RAGO FROM "THE WALL STREET JOURNAL";

03:56PM  21   CORRECT?

03:56PM  22   A.   CORRECT.

03:56PM  23   Q.   AND SO MS. FOGELMAN ON -- JUST TO SHOW THE HEADER ON

03:56PM  24   PAGE 1, SHE'S EMAILING YOU, AND MR. BLICKMAN, AND MR. BALWANI,

03:56PM  25   AND OTHERS FOR THERANOS STATS/SOURCES FOR JOE RAGO INTERVIEW.

EDLIN CROSS BY MS. WALSH                                    2714

03:56PM   1        DO YOU SEE THAT?

03:56PM   2   A.   YES.

03:56PM   3   Q.   AND IF WE GO TO PAGE 2, ONE ITEM THAT SHE'S LOOKING FOR IS

03:56PM   4   THE FIFTH BULLET DOWN FROM THE TOP WHERE IT SAYS, "THE PRE- AND

03:57PM   5   POST-ANALYTICAL PHASES OF THE LAB TESTING PROCESS AMOUNT FOR

03:57PM   6   93 PERCENT OF ERRORS."

03:57PM   7        AND SHE ASKS, "IS THERE A MORE RECENT STATISTIC THAN THIS

03:57PM   8   1993 AACC ARTICLE?"

03:57PM   9        DO YOU SEE THAT?

03:57PM  10   A.   I DO.

03:57PM  11   Q.   AND THEN LET'S GO TO THE TOP EMAIL.  AND THIS IS

03:57PM  12   MR. HOLMES RESPONDING TO MS. FOGELMAN'S INQUIRY; RIGHT?

03:57PM  13   A.   RIGHT.

03:57PM  14   Q.   AND HE GOES THROUGH A NUMBER OF DIFFERENT ITEMS BUT WITH

03:57PM  15   REGARD TO WHAT HE JUST ASKED AND I JUST READ, MR. HOLMES SAYS,

03:57PM  16   "THE SOURCE OF THIS STAT CAME FROM A CLINICAL CHEMISTRY ARTICLE

03:57PM  17   IN 1993, AS WE SENT EARLIER, BUT THIS STATISTIC IS STILL OFTEN

03:57PM  18   MENTIONED IN MORE CONTEMPORARY ARTICLES.  FOR EXAMPLE, THE

03:57PM  19   IDENTIFICATION OF THE TYPES OF PREANALYTICAL ERRORS IN THE

03:57PM  20   CLINICAL CHEMISTRY LABORATORY PUBLISHED BY LABMEDICINE IN 2009

03:57PM  21   CITES THE ARTICLE/STAT IN 1993 IN ITS FIRST FOOTNOTE."

03:58PM  22        DO YOU SEE THAT?

03:58PM  23   A.   YES.

03:58PM  24   Q.   OKAY.  AND SO THIS IS CHRISTIAN HOLMES TRYING TO

03:58PM  25   SUBSTANTIATE THE DIFFERENT BULLETS THAT MS. FOGELMAN IS ASKING

03:58PM  1    ABOUT; RIGHT?

03:58PM  2    A.   RIGHT.

03:58PM  3    Q.   ALL IN PREPARATION FOR THE RAGO INTERVIEW OF MS. HOLMES;

03:58PM  4    CORRECT?

03:58PM  5    A.   YES.

03:58PM  6         MS. WALSH:  YOUR HONOR, I AM AT A BREAKING POINT, IF

03:58PM  7    THE COURT IS AT A CONVENIENT POINT TO BREAK FOR THE DAY.

03:58PM  8         THE COURT:  YOU'RE NOT GOING TO FINISH IN TWO

03:58PM  9    MINUTES?

03:58PM 10         MS. WALSH:  NO, I AM NOT.

03:58PM 11         THE COURT:  ALL RIGHT.  LET'S TAKE OUR BREAK, LADIES

03:58PM 12    AND GENTLEMEN.  WE'RE GOING TO RECESS NOW.  REMEMBER, WE'LL

03:58PM 13    RESUME ON FRIDAY, AND WE WILL RESUME ON FRIDAY, AND WE WILL END

03:58PM 14    OUR FRIDAY AT NOON.

03:58PM 15         SO LET ME REMIND YOU OF THE ADMONISHMENT.

03:59PM 16         PLEASE DO NOT DO ANY INVESTIGATION OR IN ANY WAY ATTEMPT

03:59PM 17    TO LEARN ANYTHING ABOUT THIS CASE, DO NOT DISCUSS THE CASE,

03:59PM 18    SEE, WATCH, READ OR VIEW ANYTHING TO DO WITH IT.

03:59PM 19         WITH THAT ADMONISHMENT, HAVE A GOOD EVENING.  WE'LL SEE

03:59PM 20    YOU ON FRIDAY.

03:59PM 21         I'M GOING TO ASK JUROR NUMBER 8, IF YOU COULD STAY JUST

03:59PM 22    FOR A MOMENT, PLEASE.  JUROR NUMBER 8, IF YOU COULD REMAIN.

03:59PM 23         BUT EVERYONE ELSE, HAVE A GOOD EVENING.  WE'LL SEE YOU

03:59PM 24    FRIDAY.

03:59PM 25         LIKEWISE, MR. EDLIN, WE'LL SEE YOU FRIDAY MORNING AT

EDLIN CROSS BY MS. WALSH                    2716

03:59PM   1      9:00 O'CLOCK.

03:59PM   2                  THE WITNESS:  YES, YOUR HONOR.

03:59PM   3                  THE COURT:  THANK YOU.

03:59PM   4           (JURY OUT AT 3:59 P.M.)

04:00PM   5           (JUROR NUMBER 8 PRESENT.)

04:00PM   6                  THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

04:00PM   7      SEATED.  THANK YOU.

04:00PM   8           ALL RIGHT.  THE RECORD SHOULD REFLECT THAT OUR JURY HAS

04:00PM   9      LEFT FOR THE DAY.

04:00PM  10           ALL COUNSEL ARE PRESENT.

04:00PM  11           JUROR NUMBER 8 IS PRESENT.

04:00PM  12           SIR, I WANTED TO TALK TO YOU ABOUT SOME INFORMATION THAT

04:00PM  13      WAS DELIVERED TO ME THROUGH OUR COURTROOM DEPUTY.

04:00PM  14           THIS DOES INVOLVE -- AND MY SENSE IS THAT IT IS GOING TO

04:00PM  15      INVOLVE SOME PERSONAL INFORMATION ABOUT YOU IN REGARDS TO YOUR

04:00PM  16      SERVICE HERE.  YOU'RE NOT IN TROUBLE, LET ME JUST SAY THAT.  IT

04:00PM  17      HAS NOTHING TO DO WITH THAT.  IT'S JUST REALLY ABOUT YOUR

04:00PM  18      SCHEDULING AND SCHEDULING FOR YOU, AND I THINK IT MAY TOUCH ON

04:01PM  19      SOME PERSONAL MATTERS.

04:01PM  20           SO TO THAT EXTENT, AND TO RESPECT YOUR PRIVACY, I AM GOING

04:01PM  21      TO INDICATE THAT THESE PROCEEDINGS SHOULD BE SEALED NOW AS WELL

04:01PM  22      AS THIS PORTION OF THE TRANSCRIPT.  SO ANYONE WHO IS NOT

04:01PM  23      ATTACHED TO THIS CASE, THAT IS, A MEMBER OF THE DEFENSE TEAM OR

04:01PM  24      PROSECUTION TEAM, I'M GOING TO ASK YOUR CONSIDERATION AND IF

04:01PM  25      YOU COULD LEAVE THE COURTROOM, PLEASE.

04:01PM    1              THANK YOU.

           2                  **(SEALED PROCEEDINGS PAGES 2718 – 2724.)**

           3

           4

           5

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

ER-1937

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

   UNITED STATES OF AMERICA,        )
5                                    )  CR-18-00258-EJD
                  PLAINTIFF,         )
6                                    )  SAN JOSE, CALIFORNIA
            VS.                      )
7                                    )  APRIL 15, 2022
   RAMESH "SUNNY" BALWANI,          )
8                                    )  VOLUME 18
                  DEFENDANT.         )
9  _____  )  PAGES 2725 - 2841

10

11          TRANSCRIPT OF TRIAL PROCEEDINGS
        BEFORE THE HONORABLE EDWARD J. DAVILA
12           UNITED STATES DISTRICT JUDGE

13  A P P E A R A N C E S:

14  FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                          BY:  JOHN C. BOSTIC
15                             JEFFREY B. SCHENK
                          150 ALMADEN BOULEVARD, SUITE 900
16                        SAN JOSE, CALIFORNIA 95113

17                        BY:  ROBERT S. LEACH
                               KELLY VOLKAR
18                        1301 CLAY STREET, SUITE 340S
                          OAKLAND, CALIFORNIA 94612

19
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
20

   OFFICIAL COURT REPORTER:
21                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074
22

23    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
         TRANSCRIPT PRODUCED WITH COMPUTER
24

25

ER-1938

09:24AM 1    OUR CALENDARS, AND WE HAVE IDENTIFIED SOME DATES THAT WE MAY BE

09:24AM 2    ABLE TO CAPTURE ADDITIONAL TIME.  AND WE'RE GOING TO GIVE YOU

09:24AM 3    THOSE CALENDARS FOR YOU TO LOOK AT AND STUDY, AND NEXT WEEK

09:24AM 4    WE'LL TALK.  I'LL ASK YOU SOME QUESTIONS ABOUT WHETHER OR NOT

09:24AM 5    YOU CAN MAKE YOURSELVES AVAILABLE AT SOME TIME.

09:24AM 6         ONE OF THE OTHER QUESTIONS, AND YOU'LL SEE ON THE SCHEDULE

09:24AM 7    WE GIVE YOU, IS WHETHER WE CAN START OUR PROCEEDINGS AT 8:30.

09:24AM 8    I KNOW THAT PRESENTS SOME ISSUES FOR SOME OF YOU, BUT I'D LIKE

09:24AM 9    TO DISCUSS THAT IF WE CAN.

09:24AM 10        SO WE'LL GIVE YOU THAT AT THE END OF THE DAY AND SOMETHING

09:24AM 11   THAT YOU CAN TAKE HOME WITH YOU.

09:24AM 12        ALL RIGHT.  THANK YOU VERY MUCH.

09:24AM 13        MR. EDLIN IS ON THE STAND.

09:24AM 14        SIR, IF YOU COULD JUST REPEAT YOUR NAME, PLEASE, STATE

09:25AM 15   YOUR NAME.

09:25AM 16             THE WITNESS:  DANIEL EDLIN.

09:25AM 17             THE COURT:  THANK YOU.

09:25AM 18        **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS PREVIOUSLY**

09:25AM 19   **SWORN.)**

09:25AM 20             THE COURT:  MS. WALSH.

09:25AM 21             MS. WALSH:  THANK YOU, YOUR HONOR.

09:25AM 22        MAY I REMOVE MY MASK, YOUR HONOR?

09:25AM 23             THE COURT:  YES, YES.  THANK YOU.

09:25AM 24   ///

09:25AM 25   ///

09:25AM 1                    **CROSS-EXAMINATION (RESUMED)**

09:25AM 2        BY MS. WALSH:

09:25AM 3        Q.   GOOD MORNING, MR. EDLIN.  WELCOME BACK.

09:25AM 4        A.   GOOD MORNING.  THANK YOU.

09:25AM 5        Q.   SO I WANT TO PICK UP THE TESTIMONY THIS MORNING WITH THE

09:25AM 6        INTERVIEW OF MS. HOLMES BY ROGER PARLOFF.

09:25AM 7              AND JUST TO ORIENT OURSELVES, MR. PARLOFF WAS A WRITER;

09:25AM 8        CORRECT?

09:25AM 9        A.   CORRECT.

09:25AM 10       Q.   AND HE WAS WRITING A PIECE FOR "FORTUNE" MAGAZINE; IS THAT

09:25AM 11       RIGHT.

09:25AM 12       A.   THAT'S RIGHT.

09:25AM 13       Q.   AND THAT WAS AN ARTICLE ON THERANOS; RIGHT?

09:25AM 14       A.   CORRECT.

09:25AM 15       Q.   AND YOU AND OTHERS AT THERANOS DID SOME WORK TO PREPARE

09:25AM 16       FOR THAT INTERVIEW; CORRECT?

09:25AM 17       A.   YES.

09:26AM 18       Q.   SO LET'S TAKE A LOOK AT EXHIBIT 1752, WHICH IS IN

09:26AM 19       EVIDENCE.

09:26AM 20            YOUR HONOR, MAY WE PUBLISH THAT?

09:26AM 21                 THE COURT:  YES.

09:26AM 22       BY MS. WALSH:

09:26AM 23       Q.   AND, MR. EDLIN, THIS IS AN EMAIL CHAIN AMONG YOU, AND

09:26AM 24       MS. HOLMES, AND MR. BLICKMAN, AND CHRISTIAN HOLMES REGARDING

09:26AM 25       SOME ITEMS TO BE PREPARED FOR THE PARLOFF INTERVIEW; IS THAT

EDLIN CROSS BY MS. WALSH (RES.)                                    2732

09:26AM   1        RIGHT?

09:26AM   2        A.   YES.

09:26AM   3        Q.   AND THE DATE OF THAT EMAIL IS JUNE 1ST, 2014; CORRECT?

09:26AM   4             WELL, THE TOP EMAIL IS JUNE 1ST, 2014; RIGHT?

09:26AM   5        A.   YES.

09:26AM   6        Q.   OKAY.  AND THE SUBJECT IS ROGER PARLOFF - AGGREGATED

09:26AM   7        ACTION ITEMS.

09:26AM   8             DO YOU SEE THAT?

09:26AM   9        A.   YES.

09:26AM  10        Q.   OKAY.  AND JUST TAKE A LOOK AT THE EMAIL CHAIN THROUGHOUT.

09:26AM  11        IT'S A FAIRLY LONG CHAIN.

09:26AM  12        A.   IS THIS IN ONE OF THE BINDERS?

09:27AM  13        Q.   NO.  IT'S ON THE SCREEN.

09:27AM  14        A.   OKAY.

09:27AM  15        Q.   YEAH.  IF WE COULD JUST SCROLL THROUGH THE CHAIN.

09:27AM  16             AND MY QUESTION IS, MR. BALWANI IS NOT ON THIS EMAIL

09:27AM  17        CHAIN; IS THAT RIGHT?

09:27AM  18        A.   RIGHT.

09:27AM  19        Q.   AND ATTACHED TO THE CHAIN -- WITHDRAWN.

09:27AM  20             AS PART OF THE CHAIN WITHIN THE EMAIL, THERE IS A

09:27AM  21        CHECKLIST.

09:27AM  22             DO YOU SEE THAT?

09:27AM  23        A.   YES.

09:27AM  24        Q.   AND IF WE GO TO PAGE 1, THE CHECKLIST HAS ACTION ITEMS;

09:27AM  25        RIGHT?

ER-1941

EDLIN CROSS BY MS. WALSH (RES.)                    2733

09:27AM  1    A.   YES.

09:27AM  2    Q.   AND THEN THERE'S A COLUMN TO THE RIGHT CALLED RESOURCE.

09:27AM  3         DO YOU SEE THAT?

09:27AM  4    A.   YES.

09:27AM  5    Q.   AND THERE ARE DIFFERENT PEOPLE ASSIGNED TO COLLECT

09:27AM  6    DIFFERENT PIECES OF INFORMATION; IS THAT FAIR?

09:27AM  7    A.   YES.

09:27AM  8    Q.   AND LET'S JUST GO THROUGH SOME OF THOSE.

09:27AM  9         SO ON PAGE 1 REGARDING THE LAB FORM REFLEX TESTING

09:28AM 10    CONFIGURATION, THAT WAS ASSIGNED TO DANIEL YOUNG; RIGHT?

09:28AM 11    A.   RIGHT.

09:28AM 12    Q.   THE SEPSIS PAPER THAT WILL BE PUBLISHED.

09:28AM 13         ALSO DR. YOUNG; RIGHT?

09:28AM 14    A.   RIGHT.

09:28AM 15    Q.   AND THAT SEPSIS PAPER RELATED TO YOUR WORK WITH THE BURN

09:28AM 16    STUDY IN CONNECTION WITH THE MILITARY; IS THAT CORRECT?

09:28AM 17    A.   I BELIEVE THERE WAS ANOTHER SEPSIS STUDY.

09:28AM 18    Q.   OKAY.  SO THE NEXT ITEM IS BACKGROUND ON THE FACT THAT WE

09:28AM 19    FIGURED OUT HOW TO FREEZE CAPILLARY BLOOD.

09:28AM 20         DO YOU SEE THAT?

09:28AM 21    A.   YES.

09:28AM 22    Q.   AND DR. YOUNG WAS IN CHARGE OF THAT; CORRECT?

09:28AM 23    A.   YES.

09:28AM 24    Q.   AND THEN DATA ON THE AMOUNT OF BLOOD REQUIRED TO DO

09:28AM 25    ADDITIONAL TESTS USING A TRADITIONAL SAMPLE THAT COULD DO ANY

EDLIN CROSS BY MS. WALSH (RES.)                    2734

09:28AM 1     POSSIBLE REFLEX TESTS VERSUS THERANOS.

09:28AM 2         ALSO DR. YOUNG; RIGHT?

09:28AM 3     A.   RIGHT.

09:28AM 4     Q.   AND THEN DATA ON PERFORMANCE OF POC INSTRUMENTS NOT BEING

09:28AM 5     ACCURATE, AS ACCURATE/GOOD.

09:28AM 6         ALSO DR. YOUNG; RIGHT?

09:29AM 7     A.   YES.

09:29AM 8     Q.   DATA ON ANY COMBINATION OF TESTS BEING ABLE TO BE DONE ON

09:29AM 9     OUR FRAMEWORK.

09:29AM 10        ALSO DR. YOUNG; CORRECT?

09:29AM 11    A.   CORRECT.

09:29AM 12    Q.   AND THEN IF WE FLIP OVER TO PAGE 2 -- AND I'M NOT GOING TO

09:29AM 13    GO THROUGH EVERY SINGLE ONE OF THESE BUT JUST A COUPLE.

09:29AM 14        LANGUAGE ON WHAT HE CAN SAY ABOUT OUR HAVING DEVICES, HOW

09:29AM 15    MANY DEVICES WE ARE USING IN EACH FACILITY.

09:29AM 16        THAT WAS ASSIGNED TO MS. HOLMES; RIGHT?

09:29AM 17    A.   RIGHT.

09:29AM 18    Q.   AND THEN NUMBER 17, LANGUAGE ON THE DEVICE COMPARISON AND

09:29AM 19    LAB COMPARISON BETWEEN THERANOS AND QUEST.

09:29AM 20        ALSO MS. HOLMES?

09:29AM 21    A.   YES.

09:29AM 22    Q.   AND IF WE GO DOWN TO NUMBER 40, POSSIBLE PT DATA.

09:29AM 23        PT IS PROFICIENCY TESTING; RIGHT?

09:29AM 24    A.   RIGHT.

09:29AM 25    Q.   AND VALIDATION REPORTS, PHARMA REPORTS, AND VALUATION.

ER-1943

EDLIN CROSS BY MS. WALSH (RES.)                                    2735

09:29AM   1              THAT WAS ALSO ASSIGNED TO MS. HOLMES; RIGHT?

09:29AM   2    A.   RIGHT.

09:29AM   3    Q.   AND THEN IF WE GO TO PAGE 3, THERE'S SOMETHING THAT SAYS

09:29AM   4    DONE - PER EAH.

09:30AM   5              DO YOU SEE THAT?

09:30AM   6    A.   YES.

09:30AM   7    Q.   AND THAT'S A REFERENCE TO MS. HOLMES; RIGHT?

09:30AM   8    A.   RIGHT.

09:30AM   9    Q.   AND NUMBER 2 IS DATA - SHOWING OUR PERFORMANCE VERSUS

09:30AM  10    HOSPITAL LABS OR OTHER LABS.

09:30AM  11              THAT WAS ASSIGNED TO DR. YOUNG; RIGHT?

09:30AM  12    A.   RIGHT.

09:30AM  13    Q.   AND THEN FOLLOW UP ON VITAMIN D CV AND NIST/CDC STANDARDS

09:30AM  14    BEING LESS THAN 5 PERCENT.

09:30AM  15              THAT WAS DR. YOUNG; CORRECT?

09:30AM  16    A.   CORRECT.

09:30AM  17    Q.   AND WHAT DOES CV STAND FOR?

09:30AM  18    A.   COEFFICIENT OF VARIATION.

09:30AM  19    Q.   OKAY.  AND ON THIS LIST OF TASKS, THERE WERE ABOUT 30 OR

09:30AM  20    MORE TASKS, MR. BALWANI DOES NOT APPEAR ANYWHERE ON THIS LIST,

09:30AM  21    DOES HE?

09:30AM  22    A.   IF YOU COULD JUST ZOOM BACK TO THE FULL LIST.

09:30AM  23              NO.

09:30AM  24    Q.   OKAY.  WE CAN TAKE THAT DOWN.

09:30AM  25              SO, MR. EDLIN, THE PARLOFF INTERVIEW, THAT WAS MS. HOLMES

ER-1944

EDLIN CROSS BY MS. WALSH (RES.)                                    2736

09:30AM   1      SITTING FOR THE INTERVIEW; CORRECT?

09:30AM   2      A.   YES.

09:31AM   3      Q.   WERE YOU PRESENT FOR THAT INTERVIEW?

09:31AM   4      A.   NO.

09:31AM   5      Q.   DO YOU KNOW IF MR. BALWANI WAS PRESENT?

09:31AM   6      A.   I DON'T.  I DON'T BELIEVE HE WAS.

09:31AM   7      Q.   ALL RIGHT.  NOW, I WANT TO TURN TO YOUR TESTIMONY ABOUT

09:31AM   8      YOUR RELATIONSHIPS WITH THE MILITARY.  OKAY?

09:31AM   9          GENERALLY SPEAKING, IS IT FAIR TO SAY THAT IT WAS

09:31AM   10     MS. HOLMES WHO HAD THE RELATIONSHIPS WITH THE DIFFERENT

09:31AM   11     COMPONENTS OF THE MILITARY?

09:31AM   12     A.   YES.

09:31AM   13     Q.   AND SHE WAS THE ONE LEADING THERANOS'S EFFORTS IN THOSE

09:31AM   14     RELATIONSHIPS; IS THAT CORRECT?

09:31AM   15     A.   CORRECT.

09:31AM   16     Q.   AND SO YOU WORKED CLOSELY WITH HER IN YOUR COMMUNICATIONS

09:31AM   17     WITH THE MILITARY; CORRECT?

09:31AM   18     A.   CORRECT.

09:31AM   19     Q.   SO THE FIRST COMPONENT I WANT TO ASK YOU ABOUT IS SOCOM.

09:31AM   20          DO YOU REMEMBER TESTIFYING ABOUT THAT?

09:31AM   21     A.   YES.

09:31AM   22     Q.   AND WHAT DOES SOCOM STAND FOR?

09:31AM   23     A.   SPECIAL OPERATIONS COMMAND.

09:32AM   24     Q.   OKAY.  THE GOVERNMENT SHOWED YOU EXHIBIT 504, WHICH IS IN

09:32AM   25     EVIDENCE.

EDLIN CROSS BY MS. WALSH (RES.)                           2737

09:32AM  1            AND, YOUR HONOR, CAN WE PUBLISH THAT?

09:32AM  2                    THE COURT:  YES.

09:32AM  3                    MS. WALSH:  IF WE CAN PULL THAT UP.

09:32AM  4       Q.  AND THIS WAS THE EMAIL TO MAJOR COOK; CORRECT?

09:32AM  5       A.  CORRECT.

09:32AM  6       Q.  AND THAT WAS WITH THE ATTACHMENT THAT DESCRIBED THERANOS.

09:32AM  7            DO YOU REMEMBER THAT?

09:32AM  8       A.  YES.

09:32AM  9       Q.  AND MR. BALWANI IS NOT ON EITHER ONE OF THESE EMAILS IN

09:32AM 10       THE CHAIN; IS THAT RIGHT?

09:32AM 11       A.  RIGHT.

09:32AM 12       Q.  IF WE CAN TURN TO THE ATTACHMENT ON PAGE 6, THE PROJECT

09:33AM 13       SCOPE.

09:33AM 14            YOU WERE ASKED ABOUT THAT; RIGHT?

09:33AM 15       A.  YES.

09:33AM 16       Q.  AND THE SCOPE OF THE PROJECT CONTEMPLATED MILITARY

09:33AM 17       INTERACTIONS; CORRECT?

09:33AM 18       A.  YES.

09:33AM 19       Q.  AND IT CONTEMPLATED THE ABILITY TO TEST AND TRIAGE WOUNDED

09:33AM 20       SOLDIERS AT THE TIME OF IMPACT AND DURING EVACUATION ON THE

09:33AM 21       MEDEVAC; RIGHT?

09:33AM 22       A.  RIGHT.

09:33AM 23       Q.  AND THAT WAS ONE OF THE GOALS OF THE RELATIONSHIP; RIGHT?

09:33AM 24       A.  CORRECT.

09:33AM 25       Q.  AND YOU ENDED UP SHIPPING THREE DEVICES TO SOCOM; RIGHT?

09:33AM 1     A.   RIGHT.

09:33AM 2     Q.   AND SO SOCOM HAD THE DEVICES IN THEIR POSSESSION; CORRECT?

09:33AM 3     A.   CORRECT.

09:33AM 4     Q.   THEY COULD HAVE DONE TESTING WHILE THE DEVICE WAS IN THEIR

09:33AM 5     POSSESSION; RIGHT?

09:33AM 6     A.   I BELIEVE THEY JUST HAD DEVICES AND NOT CARTRIDGES.

09:33AM 7     Q.   OKAY.  BUT THEY HAD THE DEVICES APART FROM THERANOS,

09:33AM 8     SEPARATE AND APART FROM THERANOS; RIGHT?

09:33AM 9     A.   RIGHT.

09:33AM 10    Q.   ALL RIGHT.  SO YOU ALSO TESTIFIED ABOUT THE U.S. ARMY BURN

09:34AM 11    STUDY.

09:34AM 12        DO YOU REMEMBER THAT?

09:34AM 13    A.   YES.

09:34AM 14    Q.   AND THAT WAS A STUDY THAT WAS CONDUCTED AS A PART OF

09:34AM 15    THERANOS PARTNERING WITH THE U.S. ARMY; RIGHT?

09:34AM 16    A.   I'M NOT SURE WHETHER THE OFFICIAL PARTNERSHIP WAS WITH THE

09:34AM 17    ARMY OR THE AMERICAN BURN ASSOCIATION, BUT IT WAS IN

09:34AM 18    CONSULTATION WITH THE ARMY.

09:34AM 19    Q.   OKAY.  IN CONSULTATION WITH.

09:34AM 20        AND THERE WERE MEMBERS OF THE MILITARY THAT YOU WORKED

09:34AM 21    WITH IN CONNECTION WITH THAT STUDY; IS THAT FAIR?

09:34AM 22    A.   YES.

09:34AM 23    Q.   AND THE STUDY HAD ALREADY BEGUN WHEN YOU HAD ARRIVED AT

09:34AM 24    THERANOS; RIGHT?

09:34AM 25    A.   CORRECT.

09:34AM   1    Q.   AND THE DOCTOR WHO WAS LEADING THE STUDY WAS

09:34AM   2    DR. KEVIN CHUNG; RIGHT?

09:34AM   3    A.   RIGHT.

09:34AM   4    Q.   AND HE WAS A MEMBER OF THE MILITARY; CORRECT?

09:34AM   5    A.   CORRECT.

09:34AM   6    Q.   AND THE STUDY WAS FUNDED, WAS IT NOT, BY THE U.S. ARMY

09:34AM   7    INSTITUTE OF SURGICAL RESEARCH?

09:34AM   8    A.   RIGHT.

09:34AM   9    Q.   AND THE STUDY WAS A CLINICAL TRIAL, WASN'T IT?

09:34AM  10    A.   I AM NOT SURE.

09:34AM  11    Q.   OKAY.  WELL, WE'LL LOOK AT A DOCUMENT AND THAT MAY HELP

09:35AM  12    YOU ANSWER THAT.

09:35AM  13    A.   OKAY.

09:35AM  14    Q.   BUT DURING THE COURSE OF THIS STUDY YOU SENT THERANOS

09:35AM  15    DEVICES TO VARIOUS DIFFERENT HOSPITALS AROUND THE COUNTRY;

09:35AM  16    RIGHT?

09:35AM  17    A.   RIGHT.

09:35AM  18    Q.   AND WE SAW THAT YESTERDAY IN THAT LIST OF DEVICES THAT

09:35AM  19    WERE SENT OUT TO DIFFERENT STATES AND DIFFERENT CITIES.

09:35AM  20         DO YOU REMEMBER THAT?

09:35AM  21    A.   YES.

09:35AM  22    Q.   OKAY.  AND THERE WERE ABOUT 40 EDISONS THAT WERE SENT TO

09:35AM  23    DIFFERENT HOSPITALS, GIVE OR TAKE?

09:35AM  24    A.   I THINK THAT'S ABOUT RIGHT.

09:35AM  25    Q.   AND THE HOSPITAL RECEIVED THE DEVICES AND WERE ABLE TO USE

ER-1948

EDLIN CROSS BY MS. WALSH (RES.) 2740

09:35AM 1 THOSE DEVICES ON THEIR OWN; RIGHT?

09:35AM 2 A. RIGHT.

09:35AM 3 Q. AND THAT WAS FOR THE PURPOSES OF THE STUDY; CORRECT?

09:35AM 4 A. CORRECT.

09:35AM 5 Q. AND THE DEVICES THAT WERE SENT WERE 3 SERIES DEVICES;

09:35AM 6 RIGHT?

09:35AM 7 A. CORRECT.

09:35AM 8 Q. OKAY. AND SO THE POINT OF THE STUDY WAS TO DO AN

09:35AM 9 EVALUATION OF SEPSIS IN CONNECTION WITH BURN VICTIMS.

09:35AM 10 DO YOU REMEMBER THAT?

09:35AM 11 A. YES.

09:35AM 12 Q. AND THE ARMY OR THE PEOPLE WHO WERE DOING THIS STUDY CAME

09:36AM 13 TO LEARN THAT BURN VICTIMS HAVE A PARTICULAR SUSCEPTIBILITY TO

09:36AM 14 SEPSIS; IS THAT RIGHT?

09:36AM 15 A. YES.

09:36AM 16 Q. OKAY. AND SEPSIS IS AN EXTREMELY SERIOUS CONDITION;

09:36AM 17 CORRECT?

09:36AM 18 A. CORRECT.

09:36AM 19 Q. IT CAN BE LIFE THREATENING; RIGHT?

09:36AM 20 A. RIGHT.

09:36AM 21 Q. AND SO THE POINT OF THE STUDY WAS TO TRY TO IMPROVE

09:36AM 22 TREATMENT FOR THOSE BURN VICTIMS TO PREVENT SEPSIS; CORRECT?

09:36AM 23 PREVENT OR TREAT SEPSIS?

09:36AM 24 A. I THINK THAT'S FAIR.

09:36AM 25 Q. OKAY. AND YOUR ROLE IN THE STUDY WAS ESSENTIALLY AS A

ER-1949

09:36AM  1      COORDINATOR; RIGHT?

09:36AM  2      A.   RIGHT.

09:36AM  3      Q.   SIMILAR TO YOUR ROLE IN OTHER ASPECTS OF THE COMPANY -- OF

09:36AM  4      THERANOS; RIGHT?

09:36AM  5      A.   RIGHT.

09:36AM  6      Q.   AND IN THAT ROLE, YOU COMMUNICATED WITH RESEARCH

09:36AM  7      COORDINATORS AT THE DIFFERENT HOSPITALS; RIGHT?

09:36AM  8      A.   RIGHT.

09:36AM  9      Q.   IF THEY HAD QUESTIONS, THEY WOULD CONTACT YOU?

09:36AM  10     A.   RIGHT.

09:36AM  11     Q.   AND YOU DID TRAINING AT THE HOSPITALS; CORRECT?

09:37AM  12     A.   CORRECT.

09:37AM  13     Q.   SOME OF THE HOSPITALS ALREADY HAD THE 3.0 DEVICES; RIGHT?

09:37AM  14     A.   CORRECT.

09:37AM  15     Q.   AND SOME DIDN'T; RIGHT?

09:37AM  16     A.   RIGHT.

09:37AM  17     Q.   AND FOR ONES WHO DIDN'T, YOU SENT THOSE DEVICES TO THE

09:37AM  18     HOSPITALS; CORRECT?

09:37AM  19     A.   YES.

09:37AM  20     Q.   OKAY.  AND WHEN YOU SENT THOSE DEVICES TO THOSE HOSPITALS,

09:37AM  21     YOU WORKED WITH THE SOFTWARE ENGINEERS AT THERANOS TO PREPARE

09:37AM  22     THE DEVICES; RIGHT?

09:37AM  23     A.   RIGHT.

09:37AM  24     Q.   BECAUSE THE DEVICES HAD TO BE PREPARED AND PACKAGED AND

09:37AM  25     SHIPPED OUT TO THE HOSPITALS.

09:37AM  1          IS THAT FAIR?

09:37AM  2     A.   YES.

09:37AM  3     Q.   OKAY.  SO TURN IN YOUR BINDER TO 10462.

09:37AM  4     A.   OKAY.  LET ME JUST GET THERE.

09:38AM  5     Q.   OKAY.  IS THIS AN EMAIL BETWEEN YOU AND A PERSON NAMED

09:38AM  6     ELSA COATES AND OTHERS?

09:38AM  7     A.   YES.

09:38AM  8     Q.   IT'S FROM ELSA COATES; CORRECT?

09:38AM  9     A.   CORRECT.

09:38AM 10     Q.   AND WHO WAS ELSA COATES?

09:38AM 11     A.   SHE WAS A CLINICAL RESEARCH COORDINATOR WITH THE ARMY.

09:38AM 12     Q.   OKAY.  AND THE DATE OF THE EMAIL IS NOVEMBER 9TH, 2012; IS

09:38AM 13     THAT RIGHT?

09:38AM 14     A.   YES.

09:38AM 15     Q.   AND WAS THIS EMAIL IN CONNECTION WITH YOUR WORK FOR THE

09:38AM 16     BURN STUDY?

09:38AM 17     A.   YES.

09:38AM 18          MS. WALSH:  YOUR HONOR, WE OFFER 10462.

09:38AM 19          MR. BOSTIC:  NO OBJECTION.

09:38AM 20          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:38AM 21     (DEFENDANT'S EXHIBIT 10462 WAS RECEIVED IN EVIDENCE.)

09:38AM 22     BY MS. WALSH:

09:38AM 23     Q.   OKAY.  LET'S TAKE A LOOK AT PAGE 1, THIS FIRST PAGE THAT

09:38AM 24     WE ARE ON.

09:38AM 25          THIS EMAIL WAS SENT FROM ELSA COATES TO YOU AND A WHOLE

09:38AM   1        GROUP OF OTHER PEOPLE.

09:38AM   2             DO YOU SEE THAT?

09:38AM   3        A.   YES.

09:38AM   4        Q.   AND GOING DOWN TO THE FOURTH PARAGRAPH, THE EMAIL GIVES

09:39AM   5        SOME DIRECTIONS ON WHERE YOU SHOULD BE DROPPED OFF.

09:39AM   6             DO YOU SEE THAT?

09:39AM   7        A.   YES.

09:39AM   8        Q.   AND IT'S THE SAN ANTONIO MILITARY MEDICAL CENTER; RIGHT?

09:39AM   9        A.   YES.

09:39AM  10        Q.   AND IT SAYS IT'S "FORMALLY KNOWN AS THE BROOKE ARMY

09:39AM  11        MEDICAL CENTER"; RIGHT?

09:39AM  12        A.   RIGHT.

09:39AM  13        Q.   IF WE CAN TURN TO PAGE 2, THERE WAS A LONG LIST OF PEOPLE

09:39AM  14        AT THE TOP OF PAGE 2 WHO WERE GOING TO THIS MEETING?

09:39AM  15        A.   RIGHT.

09:39AM  16        Q.   AND JUST SO IT'S CLEAR, THIS WAS ABOUT A MEETING THAT YOU

09:39AM  17        WERE GOING TO ATTEND WITH A BUNCH OF OTHER PEOPLE; RIGHT?

09:39AM  18        A.   CORRECT.

09:39AM  19        Q.   AND THESE PEOPLE ARE ON THE EMAIL?

09:39AM  20        A.   YES.

09:39AM  21        Q.   AND THIS LIST ARE SOME OF THE ATTENDEES AT THAT MEETING;

09:39AM  22        RIGHT?

09:39AM  23        A.   YES.

09:39AM  24        Q.   AND SOME OF THEM YOU CAN SEE ARE MEDICAL DOCTORS; RIGHT?

09:39AM  25        A.   CORRECT.

EDLIN CROSS BY MS. WALSH (RES.)                                    2744

09:39AM  1    Q.   AND THERE'S YOU AT THE BOTTOM; RIGHT?

09:40AM  2    A.   YES.

09:40AM  3    Q.   AND YOU'RE REPRESENTING THERANOS?

09:40AM  4    A.   RIGHT.

09:40AM  5    Q.   AND IF WE GO DOWN TO THE LAST EMAIL OR THE LAST ONE ON

09:40AM  6    PAGE 2, THIS IS FROM ELSA COATES?

09:40AM  7    A.   CORRECT.

09:40AM  8    Q.   AND SHE SAYS, "OUR OBJECTIVE IS TO PROVIDE EXTENSIVE

09:40AM  9    TRAINING ON THE PROTOCOL AND INTERVENTIONAL PROCEDURES,

09:40AM 10    THERANOS READERS, VELOS/PAPER, CRFS, REGULATORY DOCUMENTS, AND

09:40AM 11    THE DCC WEBSITE."

09:40AM 12        DO YOU SEE THAT?

09:40AM 13    A.   YES.

09:40AM 14    Q.   AND SO THIS WAS AN EMAIL IN FURTHERANCE OF YOUR PROVIDING

09:40AM 15    TRAINING ON THE THERANOS READERS; IS THAT RIGHT?

09:40AM 16    A.   THAT'S RIGHT.

09:40AM 17    Q.   AND THEN YOU WENT TO THE DIFFERENT HOSPITAL TO GIVE THAT

09:40AM 18    TRAINING; CORRECT?

09:40AM 19    A.   TO -- YES.  I WENT TO SOME OF THE HOSPITAL.  NOT ALL.

09:40AM 20    Q.   SOME?

09:40AM 21    A.   RIGHT.

09:40AM 22    Q.   AND HOW MANY DID YOU GO TO?  DO YOU REMEMBER?

09:40AM 23    A.   I DON'T REMEMBER EXACTLY.  IT COULD BE FIVE OR SIX.

09:41AM 24    Q.   OKAY.  AND THOSE WERE IN VARIOUS DIFFERENT PARTS OF THE

09:41AM 25    COUNTRY?

ER-1953

EDLIN CROSS BY MS. WALSH (RES.)                                   2745

09:41AM   1    A.   CORRECT.

09:41AM   2    Q.   OKAY.  AND SO WHEN YOU WENT TO THE HOSPITAL, AND EVEN WHEN

09:41AM   3    YOU WERE BACK AT THERANOS, YOU WOULD KEEP IN CONTACT WITH THE

09:41AM   4    PEOPLE AT THE HOSPITAL RUNNING THOSE MACHINES; IS THAT FAIR?

09:41AM   5    A.   YES.

09:41AM   6    Q.   AND IF THEY HAD QUESTIONS ABOUT THE MACHINE, THEY WOULD

09:41AM   7    CALL YOU; RIGHT?

09:41AM   8    A.   YES.

09:41AM   9    Q.   AND IF THEY HAD ANY ISSUES, LIKE CONNECTIVITY REGARDING

09:41AM  10    THE MACHINES, THEY WOULD CONTACT YOU; CORRECT?

09:41AM  11    A.   CORRECT.

09:41AM  12    Q.   OR SOMETIMES CARTRIDGES NEEDED TO BE REPLACED.  THAT WOULD

09:41AM  13    BE SOMETHING THAT YOU WOULD TALK TO THEM ABOUT; RIGHT?

09:41AM  14    A.   RIGHT.

09:41AM  15    Q.   OKAY.  AND YOU WERE THE ONE RESPONSIBLE FOR GETTING THEM

09:41AM  16    WHATEVER THEY NEEDED SO THAT THEY COULD RUN THE MACHINE IN THE

09:41AM  17    HOSPITAL; RIGHT?

09:41AM  18    A.   RIGHT.

09:41AM  19    Q.   AND SO ONCE THE STUDY BEGAN, DATA STARTED TO BE GENERATED;

09:42AM  20    RIGHT?

09:42AM  21    A.   RIGHT.

09:42AM  22    Q.   BLOOD SAMPLES WERE TAKEN FROM THE PATIENTS; RIGHT?

09:42AM  23    A.   RIGHT.

09:42AM  24    Q.   AND THE SAMPLES WERE ANALYZED ON THE THERANOS READERS;

09:42AM  25    RIGHT?

ER-1954

EDLIN CROSS BY MS. WALSH (RES.)                           2746

09:42AM  1    A.   RIGHT.

09:42AM  2    Q.   THEY WERE SENT BACK DIGITALLY TO THERANOS; CORRECT?

09:42AM  3    A.   THE DATA, YES.

09:42AM  4    Q.   THE DATA, YES.

09:42AM  5         AND THAT DATA WAS PROVIDED TO DR. CHUNG; RIGHT?

09:42AM  6    A.   YES.

09:42AM  7    Q.   HE WAS THE ONE WHO WAS IN CHARGE OF THE ENTIRE STUDY;

09:42AM  8    CORRECT?

09:42AM  9    A.   CORRECT.

09:42AM  10   Q.   AND THAT STUDY WENT ON FOR THREE OR FOUR YEARS, DIDN'T IT?

09:42AM  11   A.   IT DID.

09:42AM  12   Q.   AT THE END OF THE STUDY, A REPORT WAS PUBLISHED ON THE

09:42AM  13   FINDINGS.

09:42AM  14        DO YOU REMEMBER THAT?

09:42AM  15   A.   YES.

09:42AM  16   Q.   AND THAT WAS A CULMINATION OF ALL OF THE WORK THAT HAD

09:42AM  17   BEEN DONE OVER THE THREE OR FOUR YEARS FOR THAT STUDY; RIGHT?

09:42AM  18   A.   RIGHT.

09:42AM  19   Q.   AND IT INVOLVED A LOT OF WORK; RIGHT?

09:42AM  20   A.   YES.

09:42AM  21   Q.   IT INVOLVED OTHER SCIENTISTS AT THERANOS; CORRECT?

09:42AM  22   A.   CORRECT.

09:42AM  23   Q.   SOFTWARE ENGINEERS; RIGHT?

09:42AM  24   A.   RIGHT.

09:42AM  25   Q.   AND YOU PLAYED A COORDINATING ROLE IN THOSE EFFORTS;

ER-1955

09:42AM  1     CORRECT?

09:42AM  2     A.   YES.

09:42AM  3     Q.   OKAY.  IF YOU CAN TURN TO 7694.

09:43AM  4          DO YOU SEE THAT?

09:43AM  5     A.   YES.

09:43AM  6     Q.   AND IS THAT THE RESULT OF THE STUDY THAT WAS PUBLISHED ON

09:43AM  7     THE BURN STUDY?

09:43AM  8     A.   YES.

09:43AM  9               MS. WALSH:  YOUR HONOR WE OFFER 7694?

09:43AM  10              MR. BOSTIC:  NO OBJECTION.

09:43AM  11              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:43AM  12         (DEFENDANT'S EXHIBIT 7694 WAS RECEIVED IN EVIDENCE.)

09:43AM  13    BY MS. WALSH:

09:43AM  14    Q.   OKAY.  SO LET'S JUST TAKE A LOOK FIRST AT THE TITLE OF

09:43AM  15    THIS EXHIBIT.

09:43AM  16         THE TITLE IS HIGH-VOLUME HEMOFILTRATION IN ADULT BURN

09:43AM  17    PATIENTS WITH SEPTIC SHOCK AND ACUTE KIDNEY INJURY; A MULTI

09:43AM  18    CENTER RANDOMIZED CONTROLLED TRIAL."

09:43AM  19         DO YOU SEE THAT?

09:43AM  20    A.   YES.

09:43AM  21    Q.   AND BELOW THE TITLE IS KEVIN K. CHUNG.

09:43AM  22         THAT'S DR. CHUNG; RIGHT?

09:43AM  23    A.   YES.

09:43AM  24    Q.   AND THEN THERE'S ELSA COATES, WHO YOU WERE ALSO IN CONTACT

09:44AM  25    WITH; RIGHT?

09:44AM  1     A.   RIGHT.

09:44AM  2     Q.   AND THEN AT THE BOTTOM OF THIS PAGE, THIS REPORT WAS

09:44AM  3     PRESENTED ON MARCH 24TH, 2017.

09:44AM  4          IS THAT CORRECT?

09:44AM  5     A.   YES.

09:44AM  6     Q.   AND THAT WAS AFTER YOU LEFT THERANOS; RIGHT?

09:44AM  7     A.   YES.

09:44AM  8     Q.   OKAY.  AND IF WE GO TO PAGE 3 OF THE REPORT, THE TOP LEFT

09:44AM  9     PARAGRAPH, DO YOU SEE ALL SIX CYTOKINES, AND THEN THERE'S A

09:44AM 10     LIST OF THESE DIFFERENT ABBREVIATIONS?

09:44AM 11     A.   YES.

09:44AM 12     Q.   OKAY.  AND IT SAYS THEY WERE MEASURED BY A SANDWICH ELISA

09:44AM 13     METHOD ON THE THERANOS 3.0 DEVICE?

09:44AM 14     A.   YES.

09:44AM 15     Q.   AND THOSE ABBREVIATIONS, EACH ONE OF THOSE IS A DIFFERENT

09:44AM 16     ASSAY, IS IT NOT?

09:44AM 17     A.   THAT'S MY UNDERSTANDING.

09:44AM 18     Q.   SO THERE WERE SIX DIFFERENT ASSAYS THAT WERE USED IN

09:45AM 19     CONNECTION WITH THE STUDY; RIGHT?

09:45AM 20     A.   RIGHT.

09:45AM 21     Q.   ALL ON THE 3.0 DEVICE?

09:45AM 22     A.   RIGHT.

09:45AM 23     Q.   OKAY.  IF YOU CAN TURN TO PAGE 7 OF THE REPORT.

09:45AM 24          PAGE 7 HAS THE ACKNOWLEDGEMENTS FOR THE STUDY; RIGHT?

09:45AM 25     A.   RIGHT.

EDLIN CROSS BY MS. WALSH (RES.)

09:45AM 1    Q.   AND IN THE SECOND COLUMN, IT'S A LITTLE HARD TO FIND, BUT

09:45AM 2    IN THE TOP PARAGRAPH ABOVE THE WORD "FUNDING," ABOUT FIVE LINES

09:45AM 3    UP.

09:45AM 4        DO YOU SEE THAT?

09:45AM 5    A.   YES.

09:45AM 6    Q.   THERE'S AN ACKNOWLEDGEMENT FOR THERANOS; RIGHT?

09:45AM 7    A.   RIGHT.

09:45AM 8    Q.   AND ELIZABETH HOLMES; CORRECT?

09:45AM 9    A.   CORRECT.

09:45AM 10   Q.   AND DANIEL YOUNG; RIGHT?

09:45AM 11   A.   RIGHT.

09:45AM 12   Q.   AND YOU; RIGHT?

09:45AM 13   A.   RIGHT.

09:45AM 14   Q.   AND THEN BELOW THAT IT SAYS, "THE FUNDING - THIS WORK WAS

09:45AM 15   FUNDED BY THE UNITED STATES ARMY MEDICAL RESEARCH AND MATERIAL

09:45AM 16   COMMAND."

09:45AM 17       DO YOU SEE THAT?

09:45AM 18   A.   I DO.

09:46AM 19   Q.   OKAY.  YOU CAN TAKE THAT DOWN.

09:46AM 20       SO THIS STUDY WAS A SUCCESS.  IT RESULTED IN DATA BEING

09:46AM 21   GENERATED; RIGHT?

09:46AM 22           MR. BOSTIC:  OBJECTION COMPOUND.

09:46AM 23           THE COURT:  DO YOU WANT TO ASK BOTH THOSE

09:46AM 24   SEPARATELY.

09:46AM 25           MS. WALSH:  SURE.

09:46AM  1    Q.   MR. EDLIN, THIS STUDY RESULTED IN DATA BEING GENERATED;

09:46AM  2    RIGHT?

09:46AM  3    A.   RIGHT.

09:46AM  4    Q.   FROM THE THERANOS MACHINES; CORRECT?

09:46AM  5    A.   RIGHT.

09:46AM  6    Q.   AND THAT DATA WAS ANALYZED BY DR. CHUNG; RIGHT?

09:46AM  7    A.   RIGHT.

09:46AM  8    Q.   IT ENDED UP IN A REPORT; CORRECT?

09:46AM  9    A.   CORRECT.

09:46AM  10   Q.   AND THAT REPORT WAS PRESENTED TO A MEDICAL ASSOCIATION;

09:46AM  11   RIGHT?

09:46AM  12   A.   RIGHT.

09:46AM  13   Q.   AND IT WAS PUBLISHED; RIGHT?

09:46AM  14   A.   RIGHT.

09:46AM  15   Q.   AND SO THE STUDY WAS A SUCCESS; IS THAT FAIR?

09:46AM  16   A.   I BELIEVE I WOULD SAY THAT THE STUDY WAS COMPLETED.  I

09:46AM  17   THINK THE INVESTIGATORS WERE HOPING TO GET MORE PATIENTS

09:46AM  18   ENROLLED, BUT IT WAS COMPLETED.

09:47AM  19   Q.   OKAY.  BUT FOR THE PATIENTS WHO WERE, THESE WERE BURN

09:47AM  20   VICTIMS; RIGHT?

09:47AM  21   A.   RIGHT.

09:47AM  22   Q.   SO FOR THE PATIENTS WHO WERE ENROLLED --

09:47AM  23              MADAM COURT REPORTER:  EXCUSE ME.  ONE MOMENT,

09:47AM  24   COUNSEL.

09:47AM  25              THE COURT:  EXCUSE ME.  I HEAR SOME DEVICE GOING

EDLIN CROSS BY MS. WALSH (RES.)                    2751

09:47AM  1     OFF.  CAN EVERYONE PLEASE CHECK YOUR DEVICES.

09:47AM  2          IS IT YOUR MACHINE?

09:48AM  3               MADAM COURT REPORTER:  I DON'T KNOW.

09:48AM  4               THE COURT:  MS. WALSH.

09:48AM  5               MS. WALSH:  SHOULD WE PAUSE AGAIN?

09:48AM  6          (PAUSE IN PROCEEDINGS.)

09:49AM  7     BY MS. WALSH:

09:49AM  8     Q.   SO, MR. EDLIN, UNDERSTANDING THAT THERE WERE PERHAPS NOT

09:49AM  9     AS MANY PATIENTS AS EVERYONE WANTED IN THE STUDY, THE PATIENTS

09:49AM 10     WHO DID PARTICIPATE IN THE STUDY, DATA WAS GENERATED FROM THOSE

09:49AM 11     PATIENTS; RIGHT?

09:49AM 12     A.   CORRECT.

09:49AM 13     Q.   AND THE STUDY WAS COMPLETED; RIGHT?

09:49AM 14     A.   YES.

09:49AM 15     Q.   AND A REPORT WAS PUBLISHED AND DELIVERED AT A CONFERENCE;

09:49AM 16     CORRECT?

09:49AM 17     A.   YES.

09:49AM 18     Q.   OKAY.  LET'S NOW MOVE ON TO YOUR WORK IN CONNECTION WITH

09:50AM 19     THE AFRICAN COMMAND.  OKAY?

09:50AM 20     A.   YES.

09:50AM 21     Q.   AND THAT'S ABBREVIATED AS AFRICOM; RIGHT?

09:50AM 22     A.   YES.

09:50AM 23     Q.   AND WHAT AFRICOM IS, IS IT'S THE MILITARY COMMAND FOR ALL

09:50AM 24     OF -- ALL OF THE MILITARY WHO IS DOING WORK ON THE AFRICAN

09:50AM 25     CONTINENT; IS THAT RIGHT?

ER-1960

EDLIN CROSS BY MS. WALSH (RES.)                    2752

09:50AM   1      A.   RIGHT.

09:50AM   2      Q.   OKAY.  AND THE GOVERNMENT ASKED YOU YESTERDAY WHETHER ANY

09:50AM   3      CLINICAL TESTING WAS PERFORMED ON THE MACHINE, ON THE THERANOS

09:50AM   4      MACHINE THAT WAS GIVEN TO AFRICOM.

09:50AM   5           DO YOU REMEMBER THAT?

09:50AM   6      A.   YES.

09:50AM   7      Q.   AND THE ANSWER WAS NO, THERE WAS NO CLINICAL TESTING

09:50AM   8      PERFORMED; RIGHT?

09:50AM   9      A.   RIGHT.

09:50AM  10      Q.   BUT THE FIRST STEP OF THAT RELATIONSHIP, WAS JUST TO SEE

09:50AM  11      HOW THE DEVICE PERFORMED IN CONDITIONS IN AFRICA; IS THAT

09:50AM  12      RIGHT?

09:50AM  13      A.   RIGHT.

09:50AM  14      Q.   BECAUSE THERE WERE EXTREME TEMPERATURES IN AFRICA; RIGHT?

09:50AM  15      A.   RIGHT.

09:50AM  16      Q.   AND AFRICOM HAD TO MAKE SURE THAT THE DEVICE COULD

09:50AM  17      WITHSTAND THOSE CONDITIONS; RIGHT?

09:50AM  18      A.   CORRECT.

09:51AM  19      Q.   AND SO YOU WERE, AGAIN, A COORDINATOR FOR THE DISCUSSIONS

09:51AM  20      WITH AFRICOM; RIGHT?

09:51AM  21      A.   RIGHT.

09:51AM  22      Q.   LET'S TAKE A LOOK THEN, IN CONNECTION WITH YOUR WORK,

09:51AM  23      LET'S TAKE A LOOK AT 13993 IN YOUR BINDER.

09:51AM  24           DO YOU SEE THAT?

09:51AM  25      A.   I DO.

09:51AM 1   Q.   AND JUST TAKE A LOOK THROUGH THE CHAIN.  IT'S A LONG

09:51AM 2   EMAIL.

09:51AM 3   A.   I'M FAMILIAR WITH IT, YES.

09:51AM 4   Q.   OKAY.  IS THAT AN EMAIL CHAIN WITH LIEUTENANT COLONEL

09:52AM 5   GIVENS, MS. HOLMES, CHRISTIAN HOLMES, AND YOU ABOUT YOUR WORK

09:52AM 6   IN CONNECTION WITH AFRICOM?

09:52AM 7   A.   YES.

09:52AM 8          MS. WALSH:  YOUR HONOR, THE GOVERNMENT -- WE OFFER

09:52AM 9   13993.

09:52AM 10         MR. BOSTIC:  YOUR HONOR, I WOULD OBJECT TO THIS

09:52AM 11  COMING IN WITHOUT THE ATTACHMENT.

09:52AM 12         THE COURT:  IS THAT A?

09:52AM 13         MS. WALSH:  IT IS A.  THAT'S FINE.

09:52AM 14         THE COURT:  DO YOU SEEK TO ADMIT 993 AND 993A?

09:52AM 15         MS. WALSH:  I'M HAPPY TO DO THAT, YES.

09:52AM 16         MR. BOSTIC:  NO OBJECTION.

09:52AM 17         THE COURT:  BOTH OF THOSE ARE ADMITTED 13993 AND

09:52AM 18  13993A ARE ADMITTED.  THEY MAY BE PUBLISHED.

09:52AM 19      (DEFENDANT'S EXHIBITS 13993 AND 13993A WERE RECEIVED IN

09:52AM 20  EVIDENCE.)

09:52AM 21  BY MS. WALSH:

09:52AM 22  Q.   OKAY.  SO LET'S TURN TO PAGE 11 OF THE EMAIL CHAIN.

09:52AM 23       ARE YOU THERE?

09:52AM 24  A.   YES.

09:52AM 25  Q.   OKAY.  THIS IS AN EMAIL FROM MELISSA GIVENS TO YOU,

09:53AM   1    MS. HOLMES, AND MR. HOLMES.

09:53AM   2        DO YOU SEE THAT?

09:53AM   3    A.   YES.

09:53AM   4    Q.   AND BY THE WAY, MR. BALWANI IS NOT ON THIS EMAIL CHAIN;

09:53AM   5    RIGHT?

09:53AM   6    A.   RIGHT.

09:53AM   7    Q.   OKAY.  AND WHAT -- MELISSA GIVENS WAS A

09:53AM   8    LIEUTENANT COLONEL; CORRECT?

09:53AM   9    A.   CORRECT.

09:53AM  10    Q.   AND WHAT SHE SAYS IS THAT "IT HAS BEEN AN EXTREMELY BUSY

09:53AM  11    WEEK FOR ME, SO I HAVE NOT HAD MUCH TIME TO DEVOTE TO PROTOCOL

09:53AM  12    WRITING.

09:53AM  13        "I FIGURED I CAN SEND YOU A SHELL OF THE PROTOCOL AND LET

09:53AM  14    YOU WORK ON FILLING IN PERTINENT DETAILS WHILE I FLESH OUT THE

09:53AM  15    REMAINDER OF THE PROTOCOL."

09:53AM  16        DO YOU SEE THAT?

09:53AM  17    A.   YES.

09:53AM  18    Q.   AND SO LET'S GO FORWARD THEN IN TIME TO PAGE 9.

09:53AM  19        AT THE BOTTOM YOU EMAIL LIEUTENANT COLONEL GIVENS.  WE'RE

09:53AM  20    IN MAY 2012?

09:53AM  21    A.   YES.

09:53AM  22    Q.   AND YOU SAY, "LIEUTENANT COLONEL GIVENS,

09:53AM  23        "THANK YOU.  CAN YOU ALSO PLEASE CLARIFY HOW YOU ENVISION

09:53AM  24    THE SHIPPING PROCESS FOR THE DEVICE AND THE CARTRIDGES.  WILL

09:54AM  25    WE BE SENDING THEM SEPARATELY TO DIFFERENT LOCATIONS?  IF SO,

EDLIN CROSS BY MS. WALSH (RES.)                          2755

```
09:54AM   1    CAN YOU PLEASE LET US KNOW WHERE THEY WILL BE SHIPPED?  I
09:54AM   2    RECALL YOUR SAYING DURING OUR MEETING THAT YOU WOULD CARRY THE
09:54AM   3    DEVICE WITH YOU; DOES THIS MEAN THAT WE WOULD FIRST SHIP THE
09:54AM   4    READER TO YOU IN GERMANY, AND THEN SHIP THE CARTRIDGES
09:54AM   5    SEPARATELY TO THE LOCATION IN THEATER?  THIS INFORMATION WILL
09:54AM   6    HELP ENSURE THAT WE HAVE ALL OF THE CUSTOMS PERMITS FOR
09:54AM   7    SHIPPING."
09:54AM   8        DO YOU SEE THAT?
09:54AM   9    A.   YES.
09:54AM  10    Q.   AND THEN SHE RESPONDS TO YOU IN THE NEXT EMAIL UP AND SHE
09:54AM  11    SAYS, "DAN,
09:54AM  12        "PLEASE PLAN ON SHIPPING THE DEVICE AND CARTRIDGES TO ME
09:54AM  13    IN GERMANY."
09:54AM  14        AND THEN IF WE GO DOWN TO THE NEXT PARAGRAPH.
09:54AM  15        "I WILL HAND CARRYING EVERYTHING WITH ME TO CAMEROON FOR
09:54AM  16    THE FIRST TEST."
09:54AM  17        DO YOU SEE THAT?
09:54AM  18    A.   YES.
09:54AM  19    Q.   AND LET'S MOVE FORWARD IN TIME TO PAGE 2.
09:54AM  20        AND YOU HAVE MORE QUESTIONS FOR LIEUTENANT COLONEL; RIGHT?
09:54AM  21    A.   RIGHT.
09:54AM  22    Q.   AND YOUR EMAIL AT 8:42 A.M. TO HER ASKS IN THE LAST
09:55AM  23    PARAGRAPH, "CAN YOU ALSO PLEASE ADDRESS THE FOLLOWING QUESTIONS
09:55AM  24    AS WE WORK ON PREPARING THE MATERIALS:
09:55AM  25        "HOW WILL THE CARTRIDGES BE STORED IN THE FIELD?  WE WILL
```

ER-1964

EDLIN CROSS BY MS. WALSH (RES.)                                    2756

09:55AM  1    NEED TO PREPARE THE APPROPRIATE PACKAGING.

09:55AM  2         "HOW LONG WILL THE CARTRIDGES BE STORED IN THE FIELD?  YOU

09:55AM  3    MENTIONED THAT IT WOULD BE A LITTLE OVER A WEEK IN CAMEROON --

09:55AM  4    DO YOU HAVE ANY ADDITIONAL DETAILS?  HOW LONG WILL YOU BE IN

09:55AM  5    UGANDA?

09:55AM  6         "HOW WILL THE DEVICE BE TRANSPORTED IN THE FIELD?  I.E.,

09:55AM  7    DO YOU PLAN ON KEEPING THE DEVICE IN ITS PACKAGING IN BETWEEN

09:55AM  8    USE?  WHAT KIND OF CONDITIONS MIGHT BE ON THE MEDEVAC FROM

09:55AM  9    GERMANY TO UGANDA?"

09:55AM 10         AND THEN YOU ASK ABOUT THE POWER OUTLETS WHEN THE DEVICE

09:55AM 11    IS BEING USED.

09:55AM 12         DO YOU SEE THAT?

09:55AM 13    A.   YES.

09:55AM 14    Q.   OKAY.  AND THEN SHE RESPONDS ON PAGES 1 THROUGH 2 OF THIS

09:55AM 15    EMAIL, AND WHAT SHE SAYS IN HER SECOND PARAGRAPH IS, "THE

09:55AM 16    TRAINING SITE HAS OPEN AIR BUILDING WITH NO AC AND THE

09:56AM 17    TEMPERATURE WILL BE BETWEEN 100-110 DEGREES FAHRENHEIT"; RIGHT?

09:56AM 18    A.   RIGHT.

09:56AM 19    Q.   AND THOSE ARE HIGH TEMPERATURES CONSIDERING THAT THE

09:56AM 20    THERANOS DEVICES WERE NOT NECESSARILY BUILT FOR THOSE

09:56AM 21    TEMPERATURES; IS THAT RIGHT?

09:56AM 22    A.   THAT'S MY UNDERSTANDING.

09:56AM 23    Q.   AND THEN ON THE NEXT PAGE SHE SAYS, "WHEN WE FLY THE

09:56AM 24    EQUIPMENT FROM UGANDA, IT WILL BE ON A NON-PRESSURIZED AIRCRAFT

09:56AM 25    AT ALTITUDES LESS THAN 10,000 FEET.  TEMPERATURES WILL RANGE

ER-1965

EDLIN CROSS BY MS. WALSH (RES.)                         2757

09:56AM   1    FROM 100 DEGREES FAHRENHEIT WITH HIGH HUMIDITY WITH TO

09:56AM   2    60 DEGREES IN FLIGHT."

09:56AM   3         DO YOU SEE THAT?

09:56AM   4    A.   YES.

09:56AM   5    Q.   AND YOU'RE TALKING TO HER ABOUT THE TRANSPORT AND THE

09:56AM   6    VARIOUS DIFFERENT CONDITIONS ON THE FLIGHT; CORRECT?

09:56AM   7    A.   CORRECT.

09:56AM   8    Q.   AND THE TEMPERATURES ARE GOING TO BE PRETTY HIGH IN

09:56AM   9    AFRICA; IS THAT RIGHT?

09:56AM  10    A.   YES.

09:56AM  11    Q.   OKAY.  AND SO THERANOS THEN WORKED TO MAKE SURE THE DEVICE

09:57AM  12    THAT YOU WERE GOING TO SEND HER COULD WITHSTAND THOSE

09:57AM  13    TEMPERATURES; RIGHT?

09:57AM  14    A.   RIGHT.

09:57AM  15    Q.   DO YOU REMEMBER THAT?

09:57AM  16    A.   YES.

09:57AM  17    Q.   OKAY.  LET'S LOOK AT 13986.

09:57AM  18         DO YOU SEE THAT?

09:57AM  19    A.   YES.

09:57AM  20    Q.   AND IS THAT AN EMAIL FROM DANIEL YOUNG TO YOU, MS. HOLMES,

09:57AM  21    AND CHRISTIAN HOLMES?

09:57AM  22    A.   YES.

09:57AM  23    Q.   AND THAT'S IN CONNECTION WITH THE AFRICOM TRAINING AND

09:57AM  24    PROJECT; RIGHT?

09:57AM  25    A.   YES.

EDLIN CROSS BY MS. WALSH (RES.)                    2758

09:57AM  1              MS. WALSH:  YOUR HONOR, WE OFFER 13986.

09:57AM  2              MR. BOSTIC:  NO OBJECTION.

09:57AM  3              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:57AM  4         (DEFENDANT'S EXHIBIT 13986 WAS RECEIVED IN EVIDENCE.)

09:57AM  5    BY MS. WALSH:

09:57AM  6    Q.   SO THIS IS ON JUNE 1ST, 2012?

09:57AM  7    A.   RIGHT.

09:57AM  8    Q.   AND DANIEL YOUNG IS WRITING TO YOU AND CHRISTIAN HOLMES,

09:57AM  9    COPYING MS. HOLMES.

09:57AM 10         AND WHAT HE SAYS -- AND THE SUBJECT IS AFRICOM TRAINING.

09:57AM 11         AND WHAT HE SAYS IS, "48 HOURS OF CONTINUAL TESTING OF THE

09:58AM 12    READER AT 110 DEGREES FAHRENHEIT COMPLETED SUCCESSFULLY

09:58AM 13    TONIGHT.  WE RAN 100 PROTOCOLS SEQUENTIALLY -- SO I FEEL VERY

09:58AM 14    GOOD ABOUT RELIABILITY FOR THIS EMPLOYMENT.

09:58AM 15         "AFTER REMOVING THE DEVICE FROM THE THERMAL TESTING

09:58AM 16    CHAMBER, THE AFRICOM PROTOCOL WAS TESTED SUCCESSFULLY -- SO IT

09:58AM 17    IS GOOD TO GO FOR YOUR DEMO TOMORROW.

09:58AM 18         "READER IS #106 AND IS SITTING IN THE QA TEST AREA."

09:58AM 19         DO YOU SEE THAT?

09:58AM 20    A.   YES.

09:58AM 21    Q.   AND READER REFERS TO THE DEVICE ITSELF; RIGHT?

09:58AM 22    A.   CORRECT.

09:58AM 23    Q.   OKAY.  AND THE AFRICOM PROTOCOL, THAT WAS THE PROTOCOL

09:58AM 24    THAT LIEUTENANT COLONEL GIVENS GAVE TO THERANOS; RIGHT?

09:58AM 25    A.   RIGHT.

ER-1967

09:58AM   1      Q.   SHE DECIDED WHAT TESTS TO RUN; CORRECT?

09:58AM   2      A.   SHE DECIDED WHAT TEST RESULTS WOULD APPEAR ON THE SCREEN.

09:58AM   3      Q.   RIGHT.

09:58AM   4      A.   ON THE READER.

09:58AM   5      Q.   RIGHT.  AND SO IT WASN'T CLINICAL TESTING FOR PATIENTS;

09:58AM   6      RIGHT?

09:58AM   7      A.   RIGHT.

09:58AM   8      Q.   IT WAS JUST TO SEE IF THE DEVICE COULD WITHSTAND THESE

09:59AM   9      EXTREME CONDITIONS; CORRECT?

09:59AM  10      A.   CORRECT.

09:59AM  11      Q.   LET'S TURN TO 10446 IN YOUR BINDER.

09:59AM  12           DO YOU HAVE THAT?

09:59AM  13      A.   I DO.

09:59AM  14      Q.   OKAY.  IS THAT ANOTHER EMAIL BETWEEN YOU,

09:59AM  15      LIEUTENANT COLONEL GIVENS, MS. HOLMES, AND CHRISTIAN HOLMES?

09:59AM  16      A.   YES.

09:59AM  17      Q.   AND DID THAT RELATE AGAIN TO THE AFRICOM PROJECT?

09:59AM  18      A.   YES.

09:59AM  19              MS. WALSH:  YOUR HONOR, WE OFFER 10446.

09:59AM  20              MR. BOSTIC:  NO OBJECTION.

09:59AM  21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:59AM  22         (DEFENDANT'S EXHIBIT 10446 WAS RECEIVED IN EVIDENCE.)

09:59AM  23      BY MS. WALSH:

09:59AM  24      Q.   OKAY.  SO IF WE GO TO THE BOTTOM EMAIL FROM

10:00AM  25      LIEUTENANT COLONEL GIVENS.

ER-1968

EDLIN CROSS BY MS. WALSH (RES.)                                    2760

10:00AM   1              SHE WRITES, "THERANOS TEAM.

10:00AM   2              "I MADE IT BACK FROM 2 TRIPS TO AFRICA AND MANAGED TO WORK

10:00AM   3       THROUGH ALL OF THE CASES IN THE PROTOCOL.

10:00AM   4              "THE MACHINE TRAVELED WELL AND FUNCTIONED WELL.  MY ONLY

10:00AM   5       COMPLAINT IS THE TOUCHSCREEN -- VERY FRUSTRATING.

10:00AM   6              "I WILL BE PREPARING A FULL REPORT."

10:00AM   7              AND THEN SHE GOES ON.

10:00AM   8              A COUPLE OF PARAGRAPHS DOWN SHE SAYS, "BECAUSE THE MACHINE

10:00AM   9       SEEMED TO FUNCTION WELL IN THE ENVIRONMENT, I AM GOING TO WRITE

10:00AM  10       A PREPROPOSAL TO SUBMIT TO THE USSOCOM BISC IN HOPES OF GAINING

10:00AM  11       FUNDING FOR A FULL PROPOSAL THROUGH THE USSOCOM BAA FOR

10:00AM  12       EXTRAMURAL BIOMEDICAL RESEARCH AND DEVELOPMENT."

10:00AM  13              DO YOU SEE THAT?

10:00AM  14       A.   YES.

10:00AM  15       Q.   AND SHE GOES ON.

10:00AM  16              "MY GOAL WILL BE TO DEPLOY 3-5 MACHINES TO AFRICA TO USE

10:00AM  17       REALTIME AT LOCATIONS WHERE WE HAVE PERSISTENT PRESENCE AND

10:00AM  18       COLLECT REAL LABORATORY DATA AND COMPARE IT TO THE CURRENT

10:01AM  19       STANDARD OF CARE."

10:01AM  20              DO YOU SEE THAT?

10:01AM  21       A.   I DO.

10:01AM  22       Q.   SO SHE'S SAYING THAT THE DEVICE TRAVELLED WELL, IT

10:01AM  23       FUNCTIONED WELL; RIGHT?

10:01AM  24       A.   RIGHT.

10:01AM  25       Q.   AND SHE DIDN'T LIKE THE TOUCHSCREEN; RIGHT?

EDLIN CROSS BY MS. WALSH (RES.) 2761

10:01AM 1    A.   RIGHT.

10:01AM 2    Q.   BUT THE NEXT STEP WAS TO WRITE UP A REPORT AND A

10:01AM 3    PREPROPOSAL FOR IT TO BE USED FOR TESTING; RIGHT?

10:01AM 4    A.   RIGHT.

10:01AM 5    Q.   OKAY.  AND THEN LET'S LOOK AT THE TOP EMAIL.

10:01AM 6        YOU REPLIED TO HER, "LIEUTENANT COLONEL GIVENS,

10:01AM 7        "WE ARE VERY HAPPY TO HEAR THAT THE TRIP WENT WELL AND

10:01AM 8    THAT THERE WERE NO ISSUES WITH TRAVEL AND FUNCTION OF THE

10:01AM 9    DEVICE.  AS SOON AS WE RECEIVE THE DEVICE WE WILL WORK ON

10:01AM 10   COMPILING THE PERFORMANCE DATA FOR YOU.

10:01AM 11       "PLEASE NOTE THAT WE HAVE DEVELOPED A FAMILY OF NEXT

10:01AM 12   GENERATION SYSTEMS WHICH INCLUDE A MUCH MORE DYNAMIC AND

10:01AM 13   SENSITIVE TOUCHSCREEN."

10:01AM 14       DO YOU SEE THAT?

10:01AM 15   A.   YES.

10:01AM 16   Q.   AND SO LIEUTENANT COLONEL GIVENS GOT THE 3.0 DEVICE;

10:01AM 17   RIGHT?

10:01AM 18   A.   RIGHT.

10:01AM 19   Q.   AND THE NEXT GENERATION MACHINES WERE THE 4 SERIES; RIGHT?

10:02AM 20   A.   RIGHT.

10:02AM 21   Q.   AND WE SPOKE ABOUT THOSE YESTERDAY; CORRECT?

10:02AM 22   A.   RIGHT.

10:02AM 23   Q.   AND THOSE 4 SERIES MACHINES HAD BETTER USER INTERFACES;

10:02AM 24   RIGHT?

10:02AM 25   A.   RIGHT.

ER-1970

10:02AM   1    Q.   MORE SENSITIVE SCREENS; RIGHT?

10:02AM   2    A.   RIGHT.

10:02AM   3    Q.   BETTER GRAPHICS; CORRECT?

10:02AM   4    A.   RIGHT.

10:02AM   5    Q.   AND SO THAT'S WHAT YOU'RE TELLING HER IS THAT WE HAVE NEXT

10:02AM   6    GENERATION GRAPHICS THAT ARE GOING TO BE BETTER; CORRECT?

10:02AM   7    A.   THIS IS WHAT ELIZABETH TOLD ME TO SAY TO HER, BUT THAT'S

10:02AM   8    WHAT IS BEING SAID HERE.

10:02AM   9    Q.   OKAY.  SO MS. HOLMES REVIEWED THIS EMAIL BEFORE YOU SENT

10:02AM  10    IT?

10:02AM  11    A.   YES.

10:02AM  12    Q.   OKAY.  BUT THIS IS WHAT WAS SENT TO LIEUTENANT COLONEL

10:02AM  13    GIVENS; RIGHT?

10:02AM  14    A.   RIGHT.

10:02AM  15    Q.   AND IT'S TRUE, WASN'T IT, THAT THE SCREENS ON THE 4 SERIES

10:02AM  16    DEVICES WERE BETTER; RIGHT?

10:02AM  17    A.   YES.

10:02AM  18    Q.   OKAY.  ALL RIGHT.  LET'S TALK NOW ABOUT YOUR WORK WITH

10:03AM  19    U.S. CENTRAL COMMAND.

10:03AM  20        DO YOU REMEMBER THAT?

10:03AM  21    A.   YES.

10:03AM  22    Q.   AND SO U.S. CENTRAL COMMAND WAS ABBREVIATED CENTCOM;

10:03AM  23    RIGHT?

10:03AM  24    A.   RIGHT.

10:03AM  25    Q.   AND IT WAS ANOTHER DIVISION OF THE DEPARTMENT OF DEFENSE;

EDLIN CROSS BY MS. WALSH (RES.)                2763

10:03AM   1    CORRECT?

10:03AM   2    A.   CORRECT.

10:03AM   3    Q.   AND CENTCOM OVERSAW ALL OF THE MILITARY THAT WAS LOCATED

10:03AM   4    IN THE MIDDLE EAST; RIGHT?

10:03AM   5    A.   RIGHT.

10:03AM   6    Q.   AND YOU TESTIFIED THAT THAT RELATIONSHIP WITH CENTCOM

10:03AM   7    BEGAN IN ABOUT APRIL 2012.

10:03AM   8         DO YOU REMEMBER THAT?

10:03AM   9    A.   YES.

10:03AM  10    Q.   AND THE GOAL OF THE RELATIONSHIP WAS TO DEPLOY THERANOS

10:03AM  11    DEVICES TO AFGHANISTAN; RIGHT?

10:03AM  12    A.   YES.

10:03AM  13    Q.   WHERE THERE WAS A WAR GOING ON; CORRECT?

10:03AM  14    A.   RIGHT.

10:03AM  15    Q.   OKAY.  AND YOU ALSO TESTIFIED YESTERDAY THAT IN

10:04AM  16    APRIL 2012, THINGS WERE STILL IN THE PLANNING STAGES WITH

10:04AM  17    CENTCOM; RIGHT?

10:04AM  18    A.   RIGHT.

10:04AM  19    Q.   OKAY.  THEN IN SEPTEMBER 2012, YOU AND MR. HOLMES

10:04AM  20    TRAVELLED TO THE MACDILL AIR FORCE BASE IN TAMPA; RIGHT?

10:04AM  21    A.   I WOULD HAVE TO SEE THE EXACT DATE.

10:04AM  22    Q.   OKAY.  IF YOU LOOK IN YOUR BINDER AT 20205.

10:04AM  23    A.   OKAY.

10:04AM  24    Q.   JUST GLANCE THROUGH THAT.

10:05AM  25    A.   YES, I DO SEE THAT.

ER-1972

EDLIN CROSS BY MS. WALSH (RES.)                    2764

10:05AM  1    Q.  DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WENT TO THE

10:05AM  2    MACDILL AIRFORCE BASE IN SEPTEMBER OF 2012?

10:05AM  3    A.  IT DOES.

10:05AM  4    Q.  OKAY.  AND YOU WENT WITH MR. HOLMES; RIGHT?

10:05AM  5    A.  RIGHT.

10:05AM  6    Q.  THAT'S CHRISTIAN HOLMES; RIGHT?

10:05AM  7    A.  RIGHT.

10:05AM  8    Q.  AND YOU SENT THE DEVICE SEPARATELY; IS THAT RIGHT?

10:05AM  9    A.  RIGHT.

10:05AM 10    Q.  OKAY.  AND YOU SAID YESTERDAY THAT THE MILITARY DID A

10:05AM 11    SECURITY TEST ON THE DEVICE; RIGHT?

10:05AM 12    A.  RIGHT.

10:05AM 13    Q.  AND THAT WAS -- THAT INVOLVED PLUGGING THE DEVICE INTO A

10:05AM 14    SERVER; RIGHT?

10:05AM 15    A.  RIGHT.

10:05AM 16    Q.  AND SEEING WHERE THE VULNERABILITIES WERE IN THE DEVICE

10:05AM 17    WHEN IT WAS CONNECTED TO THE SERVER; RIGHT?

10:05AM 18    A.  RIGHT.

10:05AM 19    Q.  AND THOSE WERE I.T. VULNERABILITIES; RIGHT?

10:05AM 20    A.  YES.

10:05AM 21    Q.  OKAY.  AND THE MILITARY ALSO HAD A REACTION TO THE SIZE OF

10:05AM 22    THE DEVICE WHEN YOU WERE THERE; RIGHT?

10:05AM 23    A.  RIGHT.

10:06AM 24    Q.  MEMBERS OF THE MILITARY THOUGHT IT WAS TOO HEAVY; RIGHT?

10:06AM 25    A.  RIGHT.

ER-1973

EDLIN CROSS BY MS. WALSH (RES.)                                    2765

10:06AM  1     Q.   AND TOO BIG?

10:06AM  2     A.   RIGHT.

10:06AM  3     Q.   SO YOU TOOK THAT INFORMATION BACK TO THERANOS; CORRECT?

10:06AM  4     A.   CORRECT.

10:06AM  5     Q.   AND IN RESPONSE TO THAT INFORMATION, THERANOS STARTED

10:06AM  6     MODIFYING THAT DEVICE; RIGHT?

10:06AM  7     A.   CORRECT.

10:06AM  8     Q.   THERANOS ENGINEERS WORKED TO MAKE THAT DEVICE SMALLER;

10:06AM  9     CORRECT?

10:06AM  10    A.   CORRECT.

10:06AM  11    Q.   AND LIGHTER; RIGHT?

10:06AM  12    A.   RIGHT.

10:06AM  13    Q.   AND ENGINEERS ALSO WORKED ON ADDRESSING ANY I.T.

10:06AM  14    VULNERABILITIES IN THE DEVICE; RIGHT?

10:06AM  15    A.   AS FAR AS I WAS CONCERNED.

10:06AM  16    Q.   OKAY.  SO TURN IN YOUR BINDER TO 10457.

10:07AM  17    A.   OKAY.

10:07AM  18    Q.   IS THAT AN EMAIL BETWEEN YOU, AND MAJOR CHRISTINE MURPHY,

10:07AM  19    AND ELIZABETH HOLMES ABOUT THE PROTOCOL FOR CENTCOM?

10:07AM  20    A.   YES.

10:07AM  21             MS. WALSH:  WE OFFER 10457.

10:07AM  22             MR. BOSTIC:  NO OBJECTION.

10:07AM  23             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:07AM  24        (DEFENDANT'S EXHIBIT 10457 WAS RECEIVED IN EVIDENCE.)

10:07AM  25    BY MS. WALSH:

EDLIN CROSS BY MS. WALSH (RES.)                    2766

10:07AM  1     Q.   OKAY.  SO THE BOTTOM EMAIL IS FROM MAJOR MURPHY TO YOU.

10:07AM  2          AND IT SAYS, "SIR,

10:07AM  3          "FOR YOUR REFERENCE, PLEASE FIND ATTACHED THE APPROVED

10:07AM  4     VERSION OF THE PROTOCOL"; RIGHT?

10:07AM  5     A.   RIGHT.

10:07AM  6     Q.   AND YOU FORWARDED THAT TO MS. HOLMES?

10:07AM  7     A.   CORRECT.

10:07AM  8     Q.   AND YOU SAY, "ATTACHED IS THE CENTCOM LOE PROTOCOL FOR

10:08AM  9     YOUR RECORDS"; RIGHT?

10:08AM 10     A.   RIGHT.

10:08AM 11     Q.   AND YOU SAY NOTE THAT THIS IS BEING ADJUSTED TO INCLUDE

10:08AM 12     THESE DIFFERENT ASSAYS; RIGHT?

10:08AM 13     A.   RIGHT.

10:08AM 14     Q.   OKAY.  LET'S TAKE A LOOK AT THE PROTOCOL ITSELF.  IF WE GO

10:08AM 15     TO PAGE 1.

10:08AM 16          THE STUDY TITLE IS LIMIT THE OBJECTIVE EQUIPMENT ON THE

10:08AM 17     THERANOS POINT OF SERVICE LAB DEVICE.

10:08AM 18          DO YOU SEE THAT?

10:08AM 19     A.   YES.

10:08AM 20     Q.   AND THEN IF WE GO TO PAGE 2, ITEM 3 IS STUDY FACILITIES.

10:08AM 21          AND WHAT IT LISTS IS COMBINED JOINT THEATER HOSPITAL,

10:08AM 22     BAGRAM AIRFORCE BASE, AFGHANISTAN; CORRECT?

10:08AM 23     A.   CORRECT.

10:08AM 24     Q.   THAT'S WHERE THE DEVICES WERE GOING TO BE SENT; RIGHT?

10:08AM 25     A.   RIGHT.

EDLIN CROSS BY MS. WALSH (RES.)                    2767

10:08AM   1    Q.   AND THEN IF YOU TURN TO PAGE 6, LOOKING AT THE ABSTRACT,

10:09AM   2    THE ABSTRACT SAYS, "THIS LOE WILL DOCUMENT THE FUNCTIONALITY OF

10:09AM   3    THE THERANOS DEVICE IN A FIELD ENVIRONMENT AFTER DEPLOYMENT AND

10:09AM   4    TRANSPORT FROM THE UNITED STATES.  THE LOE WILL ALSO DETERMINE

10:09AM   5    THE INFORMATION TECHNOLOGY COMPATIBILITY OF THE THERANOS DEVICE

10:09AM   6    WITH PRE-EXISTING DOD NETWORK COMMUNICATIONS HARDWARE AND

10:09AM   7    NETWORK SECURITY CONFIGURATIONS."

10:09AM   8         RIGHT?

10:09AM   9    A.   RIGHT.

10:09AM  10    Q.   THE DEVICE HAD TO BE, HAD TO BE WORKED SO THAT IT WAS

10:09AM  11    COMPATIBLE WITH THE DOD SYSTEMS, THE I.T.; CORRECT?

10:09AM  12    A.   RIGHT.

10:09AM  13    Q.   CERTAIN THINGS HAD TO BE DONE TO MAKE SURE THAT THOSE TWO

10:09AM  14    SYSTEMS COMMUNICATED; RIGHT?

10:09AM  15    A.   RIGHT.

10:09AM  16    Q.   AND THAT THEY COMMUNICATED IN A SAFE AND SECURE WAY;

10:09AM  17    CORRECT?

10:09AM  18    A.   CORRECT.

10:09AM  19    Q.   AND LET'S LOOK AT NUMBER 3, THE RESEARCH HYPOTHESES AND

10:09AM  20    OBJECTIVES.

10:09AM  21         IT SAYS, "THE OBJECTIVE OF THE LOE IS TO DOCUMENT THE

10:10AM  22    FUNCTIONALITY OF THE THERANOS IN A DEPLOYED SETTING UNDER FIELD

10:10AM  23    CONDITIONS AND ITS OPERATIONS ON THE DOD NETWORK."

10:10AM  24         DO YOU SEE THAT?

10:10AM  25    A.   YES.

EDLIN CROSS BY MS. WALSH (RES.)                          2768

10:10AM   1    Q.   OKAY.  AND SO YOU RECEIVED THIS PROTOCOL, THE APPROVED

10:10AM   2    VERSION OF THE PROTOCOL, IN NOVEMBER OF 2012; RIGHT?

10:10AM   3    A.   RIGHT.

10:10AM   4    Q.   AND YOU FORWARDED IT TO MS. HOLMES A SHORT TIME LATER IN

10:10AM   5    EARLY DECEMBER 2012; CORRECT?

10:10AM   6    A.   YES.

10:10AM   7    Q.   OKAY.  SO TURN NOW IN YOUR BINDER TO 20160.

10:10AM   8    A.   OKAY.

10:10AM   9    Q.   OKAY.  TAKE A LOOK AT THAT.

10:10AM  10         AND IS THAT AN EMAIL BETWEEN YOU AND MEMBERS OF THE

10:11AM  11    MILITARY AND MR. BALWANI ABOUT THE NETWORK CONNECTION RELATED

10:11AM  12    TO THE CENTCOM PROJECT?

10:11AM  13    A.   YES.

10:11AM  14              MS. WALSH:  YOUR HONOR, WE OFFER 20160.

10:11AM  15              MR. BOSTIC:  NO OBJECTION.

10:11AM  16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:11AM  17         (DEFENDANT'S EXHIBIT 20160 WAS RECEIVED IN EVIDENCE.)

10:11AM  18    BY MS. WALSH:

10:11AM  19    Q.   OKAY.  TURNING TO PAGE 2 OF THAT EXHIBIT.

10:11AM  20         YOU EMAIL LIEUTENANT COMMANDER ROMERO.

10:11AM  21         DO YOU SEE THAT?

10:11AM  22    A.   YES.

10:11AM  23    Q.   AND WHAT YOU SAY IS, "WE ARE WORKING ON THE FINAL

10:11AM  24    CONFIGURATION STEPS FOR OUR SYSTEMS, AND WE WANT TO ENSURE THAT

10:11AM  25    WE CAN SUCCESSFULLY ESTABLISH CONNECTION ON THE NETWORK AT

10:11AM   1      CJTH."

10:11AM   2           DO YOU SEE THAT?

10:11AM   3      A.   YES.

10:11AM   4      Q.   AND CJTH WAS THE HOSPITAL IN BAGRAM; RIGHT?

10:11AM   5      A.   I BELIEVE SO.

10:11AM   6      Q.   AND THAT'S IN AFGHANISTAN?

10:11AM   7      A.   RIGHT.

10:11AM   8      Q.   AND THEN THE LAST SENTENCE SAYS, "WE HOPE TO BE ABLE TO

10:12AM   9      ADDRESS AS MANY I.T.-RELATED CONTINGENCIES AS POSSIBLE BEFORE

10:12AM  10      SHIPPING THE DEVICES TO THEATER"; RIGHT?

10:12AM  11      A.   RIGHT.

10:12AM  12      Q.   AND THEN HE WRITES BACK TO YOU, "MR. EDLIN, THERE IS NO

10:12AM  13      CELL PHONE CARRIER HERE THAT PROVIDES DATA CONNECTIVITY.  THE

10:12AM  14      LOCAL CELLPHONE PROVIDER IS ROSHAN."

10:12AM  15           AND THAT WAS A CARRIER IN AFGHANISTAN; RIGHT?

10:12AM  16      A.   I'M NOT SURE.

10:12AM  17      Q.   OKAY.  AND THEN LET'S GO UP THE CHAIN.

10:12AM  18           NEXT, YOU EMAIL MR. BALWANI; RIGHT?

10:12AM  19      A.   YES.

10:12AM  20      Q.   AND DO YOU SEE THAT?

10:12AM  21      A.   YES.

10:12AM  22      Q.   AND YOU SAY, "SUNNY,

10:12AM  23           "WOULD YOU MIND TAKING A QUICK LOOK AT THIS RESPONSE TO

10:12AM  24      THE LIEUTENANT COLONEL?  JUST WANT TO MAKE SURE THERE IS NO

10:12AM  25      CONFUSION ON THEIR END?"

10:12AM 1          AND YOU SEND HIM A DRAFT OF THE EMAIL; RIGHT?

10:12AM 2     A.   YES.

10:12AM 3     Q.   AND THIS IS THE FIRST TIME THAT WE HAVE SEEN MR. BALWANI'S

10:12AM 4     INVOLVEMENT IN ANY OF THESE MILITARY RELATIONSHIPS; RIGHT?

10:12AM 5     A.   RIGHT.

10:12AM 6     Q.   AND IT'S IN CONNECTION WITH WHATEVER I.T. REQUIREMENTS

10:13AM 7     WERE NEEDED FOR THE MILITARY; IS THAT RIGHT?

10:13AM 8     A.   YES.

10:13AM 9     Q.   AND HE WAS IN CHARGE OF A TEAM THAT DID THAT; CORRECT?

10:13AM 10    A.   CORRECT.

10:13AM 11    Q.   OKAY.  LET'S GO TO 20472.

10:13AM 12         DO YOU SEE THAT?

10:13AM 13    A.   YES.

10:13AM 14    Q.   AND IS THAT ANOTHER EMAIL WITH MR. BALWANI ABOUT THESE

10:13AM 15    NETWORK REQUIREMENTS FOR AFGHANISTAN?

10:13AM 16    A.   YES.

10:14AM 17              MS. WALSH:  YOUR HONOR, WE OFFER 20472.

10:14AM 18              MR. BOSTIC:  NO OBJECTION.

10:14AM 19              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:14AM 20         (DEFENDANT'S EXHIBIT 20472 WAS RECEIVED IN EVIDENCE.)

10:14AM 21    BY MS. WALSH:

10:14AM 22    Q.   OKAY.  LET'S GO TO PAGE 3 OF THE EMAIL.

10:14AM 23         AND THIS IS FROM MR. BALWANI TO MICHAEL CRAIG AND OTHERS,

10:14AM 24    COPYING YOU; RIGHT?

10:14AM 25    A.   RIGHT.

EDLIN CROSS BY MS. WALSH (RES.)                    2771

10:14AM    1    Q.   AND IT'S ON FEBRUARY 8TH, 2013; RIGHT?

10:14AM    2    A.   RIGHT.

10:14AM    3    Q.   AND IT RELATES TO NETWORKING UTILITY AND CONNECTIVITY IN

10:14AM    4    AFGHANISTAN.

10:14AM    5         DO YOU SEE THAT?

10:14AM    6    A.   YES.

10:14AM    7    Q.   AND MR. BALWANI SAYS, "WE WILL NEED TO DEPLOY 4S --"

10:14AM    8         THAT'S THE DEVICE; RIGHT?

10:14AM    9    A.   RIGHT.

10:14AM   10    Q.   "-- IN AFGHANISTAN AT THE END OF THE MONTH AND NEED TO

10:14AM   11    ABSOLUTE MAKE SURE THAT THE NETWORKING UTILITY IN THE DEVICE

10:14AM   12    WORKS FLAWLESSLY"; RIGHT?

10:14AM   13    A.   RIGHT.

10:14AM   14    Q.   AND THEN THE NEXT EMAIL, MR. BALWANI EMAILS AGAIN, YOU'RE

10:14AM   15    ON COPY, AND HE SAYS -- HE'S EMAILING MICHAEL CRAIG AND OTHERS?

10:15AM   16    A.   UH-HUH.

10:15AM   17    Q.   AND HE SAYS, "ANTTI,

10:15AM   18         "CAN YOU CREATE A SMALL NETWORK IN A SMALL ROOM DOWNSTAIRS

10:15AM   19    (LIKE AN I.T. LAB) WHERE WE HAVE A ROUTER THAT CREATES AN

10:15AM   20    ETHERNET WORK BUT BLOCKS ANY DEVICE FROM CONNECTING TO THE

10:15AM   21    INTERNET USING DIFFERENT NETWORKING POLICIES AND ONLY

10:15AM   22    LEGITIMATE DEVICE THAT CONNECT TO THE ETHERNET ARE ABLE TO

10:15AM   23    CONNECT TO THE INTERNET.  WE SHOULD KEEP THIS ROOM TO SIMULATE

10:15AM   24    ALL DIFFERENT CONNECTIVITY SCENARIOS WE WILL SEE IN

10:15AM   25    AFGHANISTAN."

EDLIN CROSS BY MS. WALSH (RES.)                          2772

10:15AM   1          DO YOU SEE THAT?

10:15AM   2     A.   YES.

10:15AM   3     Q.   AND SO HE'S WORKING WITH HIS TEAM TO TRY TO MAKE THIS

10:15AM   4     DEVICE SECURE TO SEND TO AFGHANISTAN; CORRECT?

10:15AM   5     A.   CORRECT.

10:15AM   6     Q.   OKAY.  IF YOU CAN TURN TO 20161 AND 20162.  AND THESE TWO

10:16AM   7     ARE VERY SHORT.  IF YOU COULD TAKE A LOOK AT EACH ONE.

10:16AM   8          SO TAKING A LOOK AT 20161, IS THAT ANOTHER EMAIL CHAIN

10:16AM   9     WITH MR. BALWANI ABOUT THE 4S DEPLOYMENT TO AFGHANISTAN AND THE

10:16AM  10     I.T. REQUIREMENTS?

10:16AM  11     A.   IT IS.

10:16AM  12     Q.   AND 20162 ALSO WITH MR. BALWANI REGARDING THE SAME?

10:16AM  13     A.   YES.

10:16AM  14     Q.   OKAY.

10:16AM  15          YOUR HONOR, WE OFFER 20161 AND 20162.

10:16AM  16          MR. BOSTIC:  NO OBJECTION.

10:16AM  17          THE COURT:  THEY'RE ADMITTED.  THEY MAY BE

10:16AM  18     PUBLISHED.

10:16AM  19          (DEFENDANT'S EXHIBITS 20161 AND 20162 WERE RECEIVED IN

10:16AM  20     EVIDENCE.)

10:16AM  21          MS. WALSH:  OKAY.  WE ACTUALLY DON'T NEED TO PUBLISH

10:16AM  22     THESE.  IT'S MORE OF THE SAME THAT WE JUST SAW.

10:16AM  23     Q.   BUT THOSE ARE ADDITIONAL EMAILS, ARE THEY NOT, WITH

10:17AM  24     MR. BALWANI ABOUT THIS I.T. ISSUE, IS IT NOT?

10:17AM  25     A.   YES.

EDLIN CROSS BY MS. WALSH (RES.)

10:17AM 1    Q.   OKAY.  SO THOSE TWO EMAILS WERE IN FEBRUARY 2013.

10:17AM 2        LET'S TURN NOW TO 10472.

10:17AM 3    A.   OKAY.

10:17AM 4    Q.   SO IS THIS AN EMAIL CHAIN WITH JIM -- JAMES SOMMER OF THE

10:17AM 5    ARMY, U.S. CENTCOM?

10:17AM 6    A.   YES.

10:17AM 7    Q.   AND MR. -- I GUESS DR. SOMMER WAS THE ARMY SCIENCE

10:17AM 8    ADVISOR; CORRECT?

10:17AM 9    A.   RIGHT.

10:17AM 10   Q.   AND WAS THIS ALSO IN CONNECTION WITH SHIPPING THERANOS'S

10:18AM 11   DEVICES TO CENTCOM?

10:18AM 12   A.   YES.

10:18AM 13   Q.   OKAY.

10:18AM 14       YOUR HONOR, WE OFFER EXHIBIT 10472.

10:18AM 15           MR. BOSTIC:  NO OBJECTION.

10:18AM 16           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:18AM 17       (DEFENDANT'S EXHIBIT 10472 WAS RECEIVED IN EVIDENCE.)

10:18AM 18   BY MS. WALSH:

10:18AM 19   Q.   IF WE GO TO THE BOTTOM EMAIL, THIS IS FROM DR. SOMMER TO

10:18AM 20   YOU, AND HE SAYS, "DAN,

10:18AM 21       "YOU HAD MENTIONED THAT THE DEVICE MIGHT BE SHIPPED AT THE

10:18AM 22   END OF THE MONTH.  HAVE YOU A FIRM DATE YET?"

10:18AM 23       AND YOU REPLY, "AT THIS POINT I WOULD ESTIMATE THAT AN

10:18AM 24   EARLY-MARCH TIMEFRAME IS MORE LIKELY THAN AN END-OF-FEBRUARY

10:18AM 25   SCENARIO"; RIGHT?

EDLIN CROSS BY MS. WALSH (RES.)                    2774

```
10:18AM   1    A.   YES.

10:18AM   2    Q.   AND YOU'RE STILL WORKING ON THE I.T. ISSUES ON THE DEVICE

10:18AM   3    AT THIS POINT IN TIME; RIGHT?

10:18AM   4    A.   OTHERS AT THERANOS WERE WORKING ON IT, BUT YES.

10:18AM   5    Q.   FAIR ENOUGH.

10:18AM   6         OTHERS AT THERANOS; RIGHT?

10:18AM   7    A.   YES.

10:18AM   8    Q.   AND SO YOU, DAN EDLIN, COULD NOT SHIP THAT DEVICE UNTIL IT

10:19AM   9    WAS FULLY FINALIZED FROM AN I.T. PERSPECTIVE; RIGHT?

10:19AM  10    A.   RIGHT.

10:19AM  11    Q.   AMONG OTHER THINGS, IF ANYTHING ELSE NEEDED TO BE DONE;

10:19AM  12    CORRECT?

10:19AM  13    A.   CORRECT.

10:19AM  14    Q.   SO LET'S GO TO PAGE 1.  THIS IS FROM DR. SOMMER TO YOU,

10:19AM  15    FEBRUARY 27TH, 2013.

10:19AM  16         AND DR. SOMMER SAYS, "DANIEL:

10:19AM  17         "THINGS AT DOD ARE REALLY GETTING MESSED UP WITH THE

10:19AM  18    UPCOMING SEQUESTRATION."

10:19AM  19         AND WHAT WAS YOUR UNDERSTANDING OF WHAT THE SEQUESTRATION

10:19AM  20    WAS?

10:19AM  21    A.   I DON'T RECALL.

10:19AM  22    Q.   SEQUESTRATION, IT WAS THE GOVERNMENT NOT HAVING MONEY AT

10:19AM  23    THE TIME TO DEVOTE TO PROJECTS.

10:19AM  24         IS THAT FAIR?

10:19AM  25    A.   YES.
```

EDLIN CROSS BY MS. WALSH (RES.) 2775

10:19AM 1  Q.   AND DO YOU RECALL THAT HAPPENING IN CONNECTION WITH THE

10:19AM 2  CENTCOM PROJECT?

10:19AM 3  A.   YES.

10:19AM 4  Q.   AND HE SAYS, "THIS WILL AFFECT HOW WE DO THE UPCOMING LOE.

10:20AM 5  IF THE DEVICE IS NOT SHIPPED SOON, THE GOVERNMENT FOLKS LIKE

10:20AM 6  MYSELF WILL NOT BE ABLE TO TRAVEL TO THEATER."

10:20AM 7      DO YOU SEE THAT?

10:20AM 8  A.   YES.

10:20AM 9  Q.   OKAY.  AND THEN YOU WRITE BACK TO HIM SAYING, "MR. SOMMER,

10:20AM 10     "ANY ADDITIONAL INFORMATION YOU MAY HAVE ON HOW THE

10:20AM 11 SEQUESTRATION WILL AFFECT THE LOE WILL BE VERY USEFUL,

10:20AM 12 PARTICULARLY IF THERE ARE ANY FIRM DATES BY WHICH YOU WOULD

10:20AM 13 NEED THE DEVICES SHIPPED IN ORDER FOR YOU AND OTHER GOVERNMENT

10:20AM 14 FOLKS TO BE ABLE TO TRAVEL TO THEATER.

10:20AM 15     "REGARDING THE STATUS OF OUR SHIPMENT, PLEASE SEE BELOW

10:20AM 16 FOR AN UPDATE.  THIS SHOULD PROVIDE SOME INSIGHT INTO WHAT IS

10:20AM 17 DRIVING OUR SHIPMENT TIMELINES AS WE WORK TOWARD FINALIZING AN

10:20AM 18 EXACT DATE."

10:20AM 19     AND THEN YOU SAY, "AS PER OUR PREVIOUS DISCUSSIONS, THE 4S

10:20AM 20 DEVICES THAT WE ARE SHIPPING HAVE BEEN SPECIALLY BUILT FOR THE

10:20AM 21 PURPOSES OF OUR LOE.  IN SO DOING, WE HAVE HAD TO REVALIDATE

10:21AM 22 AND RETEST EVERY ASPECT OF THE DEVICE CONFIGURATION TO ENSURE

10:21AM 23 THAT THESE SYSTEMS MEET OUR STANDARDS AND EXPECTATIONS."

10:21AM 24     DO YOU SEE THAT?

10:21AM 25 A.   YES.

10:21AM   1    Q.   AND THE DEVICE WAS REBUILT; RIGHT?  IT WAS MADE SMALLER;

10:21AM   2    CORRECT?

10:21AM   3    A.   CORRECT.

10:21AM   4    Q.   AND LIGHTER; RIGHT?

10:21AM   5    A.   RIGHT.

10:21AM   6    Q.   AND THE I.T. CONFIGURATIONS INSIDE OF THE DEVICE WERE

10:21AM   7    CHANGED; RIGHT?

10:21AM   8    A.   RIGHT.

10:21AM   9    Q.   AND OTHER ASPECTS OF THE DEVICE CHANGED; CORRECT?

10:21AM  10    A.   CORRECT.

10:21AM  11    Q.   NOW, IF YOU GO DOWN ALMOST TO THE BOTTOM OF THAT PARAGRAPH

10:21AM  12    YOU SAY, "THESE PROCESSES HAVE GUIDED OUR DELIVERY TIMELINES;

10:21AM  13    WE HAVE BEEN ALLOCATING ALL OF THE RESOURCES WE CAN TO THIS

10:21AM  14    PROJECT IN PARALLEL WITH OUR COMPANY'S COMMERCIAL LAUNCH."

10:21AM  15        THAT WAS THE WALGREENS LAUNCH; RIGHT?

10:21AM  16    A.   YES.

10:21AM  17    Q.   AND THAT WAS HAPPENING AT THE SAME TIME OR ABOUT TO

10:21AM  18    HAPPEN; RIGHT?

10:21AM  19    A.   LATER THAT YEAR.

10:21AM  20    Q.   RIGHT.  BUT YOU WERE PREPARING FOR IT AT THE TIME; RIGHT?

10:21AM  21    A.   YES.

10:21AM  22    Q.   AND IT WAS A LOT OF WORK; RIGHT?

10:21AM  23    A.   YES.

10:21AM  24    Q.   AND CONTINUING ON.

10:21AM  25        "AS A RAPIDLY GROWING COMPANY, WE ARE MANAGING THESE

ER-1985

10:21AM  1    TIMELINES AS BEST AS POSSIBLE WHILE MAKING SURE THAT THE

10:21AM  2    INTEGRITY OF OUR PRODUCTS AND PROGRAM GOALS ARE NOT

10:22AM  3    COMPROMISED."

10:22AM  4        OKAY.  WE CAN TAKE THAT DOWN.

10:22AM  5        IF WE CAN LOOK AT 1027 WHICH IS IN EVIDENCE AND THE

10:22AM  6    GOVERNMENT PUBLISHED.

10:22AM  7        AND IF WE CAN LOOK AT THAT, YOUR HONOR?

10:22AM  8            THE COURT:  YES.

10:22AM  9    BY MS. WALSH:

10:22AM 10    Q.  AND YOU CAN LOOK AT THAT ON YOUR SCREEN, MR. EDLIN.

10:22AM 11        OKAY.  IF WE GO TO THE EMAIL ON PAGE 5.  THIS WAS AN EMAIL

10:22AM 12    THAT THE GOVERNMENT SHOWED YOU.  IT WAS FROM MARTIN DRAKE, THE

10:22AM 13    CHIEF SCIENCE AND TECHNOLOGY COMMAND SCIENCE ADVISOR.

10:23AM 14        DO YOU SEE THAT?

10:23AM 15    A.  YES.

10:23AM 16    Q.  AND MR. DRAKE WAS SENDING AN EMAIL TO MS. HOLMES SAYING --

10:23AM 17    INTRODUCING HIMSELF.  AND THE LAST SENTENCE OF THAT FIRST

10:23AM 18    PARAGRAPH HE IS SAYING, "FUNDING IS EXPIRING AND PERSONNEL ARE

10:23AM 19    BEING RE-DIRECTED TO OTHER ONGOING PROJECTS."

10:23AM 20        DO YOU SEE THAT?

10:23AM 21    A.  YES.

10:23AM 22    Q.  AND THEN YOU WROTE BACK TO MR. DRAKE AND SAID, "THANK YOU

10:23AM 23    VERY MUCH FOR YOUR NOTE, AND WE APPRECIATE ALL OF THE WORK THAT

10:23AM 24    YOU AND YOUR TEAM HAVE BEEN DOING TO SUPPORT OUR TEST EFFORTS

10:23AM 25    WITH U.S. CENTCOM.  WE HAVE PUT A SIGNIFICANT AMOUNT OF

EDLIN CROSS BY MS. WALSH (RES.)                                    2778

10:23AM   1    RESOURCES AND INVESTED HEAVILY IN PREPARING FOR THIS

10:23AM   2    DEPLOYMENT, AND HAVE BEEN CUSTOMIZING BOTH OUR EQUIPMENT AND

10:23AM   3    TECHNOLOGY TO MEET THE SPECIFIC REQUIREMENTS OF OUR LOE AND THE

10:23AM   4    IRB WE HAVE IN PLACE FOR THIS.  WE REMAIN FOCUSSED ON BEING

10:23AM   5    ABLE TO PROVIDE YOU WITH AN INFRASTRUCTURE THAT CAN ADDRESS

10:23AM   6    MANY OF THE UNMET MEDICAL NEEDS FACED IN THEATER."

10:23AM   7         DO YOU SEE THAT?

10:23AM   8    A.   YES.

10:23AM   9    Q.   OKAY.  AND THEN IF WE CAN GO UP TO ANOTHER EMAIL THAT YOU

10:24AM  10    SEND ON PAGE 3 TO MR. DRAKE.  YOU SAY, "MR. DRAKE,

10:24AM  11         "THANK YOU FOR YOUR NOTE.  WE HAVE BEEN WORKING TO

10:24AM  12    DETERMINE A DATE IN LINE WITH YOUR QUESTION BELOW."

10:24AM  13         AND HIS QUESTION WAS PLEASE TELL ME WHEN YOU CAN SEND THE

10:24AM  14    DEVICE; RIGHT?

10:24AM  15    A.   RIGHT.

10:24AM  16    Q.   YEAH.  AND YOU SAY, "AS WE WANT TO MAKE SURE WE PROVIDE

10:24AM  17    YOU WITH TIMELINES THAT WE CAN DEFINITIVELY PLAN TOWARD IN THE

10:24AM  18    CONTEXT OF OBLIGATIONS WE HAVE PREVIOUSLY COMMITTED OURSELVES

10:24AM  19    TO AS A COMPANY."

10:24AM  20         DO YOU SEE THAT?

10:24AM  21    A.   YES.

10:24AM  22    Q.   AND THOSE OBLIGATIONS WERE THE CONTRACTS WITH WALGREENS;

10:24AM  23    RIGHT?

10:24AM  24    A.   RIGHT.

10:24AM  25    Q.   TO DO A RETAIL ROLLOUT; CORRECT?

ER-1987

EDLIN CROSS BY MS. WALSH (RES.)                2779

10:24AM   1     A.   CORRECT.

10:24AM   2     Q.   FOR CONSUMER PATIENT BLOOD TESTING IN WALGREENS; RIGHT?

10:24AM   3     A.   RIGHT.

10:24AM   4     Q.   OKAY.  WE CAN TAKE THAT DOWN IS.

10:25AM   5          OKAY.  SO JUST GENERALLY REGARDING THESE MILITARY

10:25AM   6     PROJECTS, YOU WORKED HARD ON THESE PROJECTS; RIGHT?

10:25AM   7     A.   RIGHT.

10:25AM   8     Q.   YOU WANTED TO SEE THEM GET ACCOMPLISHED; RIGHT?

10:25AM   9     A.   RIGHT.

10:25AM  10     Q.   YOU SENT DEVICES TO SOCOM; RIGHT?

10:25AM  11     A.   RIGHT.

10:25AM  12     Q.   YOU SENT A DEVICE TO AFRICOM; CORRECT?

10:25AM  13     A.   CORRECT.

10:25AM  14     Q.   YOU SENT DEVICES TO HOSPITALS IN CONNECTION WITH THE BURN

10:25AM  15     STUDY; RIGHT?

10:25AM  16     A.   RIGHT.

10:25AM  17     Q.   YOU WERE DOING EVERYTHING YOU COULD TO MAKE THESE PROJECTS

10:25AM  18     SUCCEED; CORRECT?

10:25AM  19     A.   YES.

10:25AM  20     Q.   BUT THERE WERE CERTAIN THINGS OUT OF YOUR CONTROL THAT

10:25AM  21     GOT -- THAT INTERRUPTED THAT PROGRESS; CORRECT?

10:25AM  22     A.   CORRECT.

10:25AM  23     Q.   THERE WAS THE SEQUESTRATION ON THE MILITARY END; RIGHT?

10:25AM  24     A.   RIGHT.

10:25AM  25     Q.   AND THERE WAS THE WALGREENS LAUNCH ON THERANOS'S END;

ER-1988

| | | |
|---|---|---|
| 10:25AM | 1 | RIGHT? |
| 10:25AM | 2 | A.   RIGHT. |
| 10:25AM | 3 | Q.   AND RESOURCES DID NEED TO BE ALLOCATED TO -- THERANOS |
| 10:26AM | 4 | COULDN'T DO EVERYTHING ALL AT ONCE; IS THAT FAIR? |
| 10:26AM | 5 | A.   YES. |
| 10:26AM | 6 | Q.   AND IT HAD A CONTRACT WITH WALGREENS; RIGHT? |
| 10:26AM | 7 | A.   RIGHT. |
| 10:26AM | 8 | Q.   AND IT HAD TO LIVE UP TO THAT CONTRACT; RIGHT? |
| 10:26AM | 9 | A.   RIGHT. |
| 10:26AM | 10 | Q.   AND THAT CONTRACT INVOLVED AN EXTENSIVE AND LABOR |
| 10:26AM | 11 | INTENSIVE RETAIL ROLLOUT; IS THAT FAIR? |
| 10:26AM | 12 | A.   YES. |
| 10:26AM | 13 | Q.   OKAY. |
| 10:26AM | 14 | SO I WANT TO NEXT TALK TO YOU ABOUT YOUR WORK IN |
| 10:26AM | 15 | CONNECTION WITH PHARMACEUTICAL COMPANIES.  OKAY? |
| 10:26AM | 16 | A.   OKAY. |
| 10:26AM | 17 | Q.   AND YOU TESTIFIED ON DIRECT THAT PART OF YOUR JOB WAS TO |
| 10:26AM | 18 | SUPPORT THERANOS'S RELATIONSHIP WITH PHARMA COMPANIES; RIGHT? |
| 10:26AM | 19 | A.   RIGHT. |
| 10:26AM | 20 | Q.   AND THERANOS HAD SOME OF THOSE RELATIONSHIPS BEFORE YOU |
| 10:26AM | 21 | BEGAN AT THERANOS; CORRECT? |
| 10:26AM | 22 | A.   I BELIEVE IT WAS ALL OF THEM. |
| 10:26AM | 23 | Q.   ALL OF THEM. |
| 10:26AM | 24 | A.   YES. |
| 10:26AM | 25 | Q.   OKAY.  SOME OF THEM CONTINUED AFTER THE WALGREENS LAUNCH; |

ER-1989

EDLIN CROSS BY MS. WALSH (RES.)                    2781

10:26AM  1    RIGHT?

10:26AM  2    A.   I'M NOT SURE.

10:27AM  3    Q.   OKAY.  WELL, WE'RE GOING TO LOOK AT SOME DOCUMENTS AND YOU

10:27AM  4    CAN LET US KNOW.

10:27AM  5    A.   OKAY.

10:27AM  6    Q.   BUT BEFORE WE DO THAT, THOSE RELATIONSHIPS BETWEEN THE

10:27AM  7    PHARMACEUTICAL COMPANIES AND THERANOS WERE LED BY

10:27AM  8    ELIZABETH HOLMES; CORRECT?

10:27AM  9    A.   CORRECT.

10:27AM 10    Q.   MR. BALWANI WAS NOT INVOLVED IN THOSE RELATIONSHIPS AS FAR

10:27AM 11    AS YOU KNOW; RIGHT?

10:27AM 12    A.   RIGHT.

10:27AM 13    Q.   AND SHE WAS THE POINT PERSON FOR THE PEOPLE WITHIN THOSE

10:27AM 14    PHARMA COMPANIES; RIGHT?

10:27AM 15    A.   RIGHT.

10:27AM 16    Q.   AND WHATEVER YOU DID IN CONNECTION WITH THAT, YOU WERE

10:27AM 17    SUPERVISED BY HER; CORRECT?

10:27AM 18    A.   CORRECT.

10:27AM 19    Q.   AND SHE REVIEWED WHAT YOU DID; RIGHT?

10:27AM 20    A.   RIGHT.

10:27AM 21    Q.   SHE APPROVED WHAT YOU DID; CORRECT?

10:27AM 22    A.   YES.

10:27AM 23    Q.   OKAY.  SO LET'S TAKE A LOOK AT 4018.

10:28AM 24         DO YOU SEE THAT DOCUMENT?

10:28AM 25    A.   YES.

UNITED STATES COURT REPORTERS

ER-1990

10:28AM  1    Q.   THAT'S A MEETING INVITE; RIGHT?

10:28AM  2    A.   YES.

10:28AM  3    Q.   AND IT'S IN OCTOBER OF 2013?

10:28AM  4    A.   YES.

10:28AM  5    Q.   DID -- AND DO YOU SEE YOUR NAME DOWN IN THE MIDDLE THERE?

10:28AM  6    A.   YES.

10:28AM  7    Q.   OKAY.  DOES THAT REFRESH YOUR RECOLLECTION AS TO THE

10:28AM  8    PHARMA RELATIONSHIPS CONTINUING PAST THE WALGREENS LAUNCH?

10:28AM  9    A.   I DON'T REMEMBER THIS PARTICULAR MEETING, BUT I DO SEE

10:28AM 10    THAT IT'S IN THE EMAIL.

10:28AM 11    Q.   OKAY.

10:28AM 12         YOUR HONOR, WE OFFER 4018.

10:28AM 13              MR. BOSTIC:  NO OBJECTION, YOUR HONOR.  BUT I THINK

10:28AM 14    THIS MAY BE BEYOND THE SCOPE OF DIRECT AND THE EVIDENCE IN THE

10:28AM 15    CASE-IN-CHIEF.

10:28AM 16              MS. WALSH:  YOUR HONOR, MR. EDLIN TESTIFIED THAT HE

10:29AM 17    COORDINATED WITH PHARMA COMPANIES, AND THIS IS JUST A MEETING

10:29AM 18    SHOWING THAT.

10:29AM 19              THE COURT:  I'LL OVERRULE THE OBJECTION.  THIS CAN

10:29AM 20    BE ADMITTED AND PUBLISHED.

10:29AM 21         (GOVERNMENT'S EXHIBIT 4018 WAS RECEIVED IN EVIDENCE.)

10:29AM 22    BY MS. WALSH:

10:29AM 23    Q.   AND SO THIS IS FROM SOMEONE FROM PFIZER, IS IT NOT,

10:29AM 24    MR. EDLIN?

10:29AM 25    A.   YES.

EDLIN CROSS BY MS. WALSH (RES.) 2783

10:29AM 1    Q.   AND A PERSON NAMED SALLY SKERRITT; RIGHT?

10:29AM 2    A.   YES.

10:29AM 3    Q.   AND THE SUBJECT IS THERANOS SITE VISIT?

10:29AM 4    A.   YES.

10:29AM 5    Q.   AND DO YOU SEE THE NAME CRAIGLIPSET@PFIZER.COM?

10:29AM 6    A.   YES.

10:29AM 7    Q.   AND DO YOU REMEMBER WHO THAT WAS?

10:29AM 8    A.   I DO NOT.

10:29AM 9    Q.   AND THE PEOPLE WHO WERE IN ATTENDANCE AT THIS MEETING FROM

10:29AM 10   THERANOS WERE MS. HOLMES; RIGHT?

10:29AM 11   A.   I SEE THE NAMES ON THE MEETING INVITE, BUT I JUST DON'T

10:29AM 12   REMEMBER THE MEETING ITSELF.

10:29AM 13   Q.   OKAY.  FAIR ENOUGH.

10:30AM 14       YOU DON'T REMEMBER THE MEETING, BUT YOU SEE THREE NAMES

10:30AM 15   HERE, RIGHT, ON THIS DOCUMENT?

10:30AM 16   A.   YES.

10:30AM 17   Q.   AND THOSE THREE NAMES ARE MS. HOLMES; RIGHT?

10:30AM 18   A.   RIGHT.

10:30AM 19   Q.   CHRISTIAN HOLMES; CORRECT?

10:30AM 20   A.   CORRECT.

10:30AM 21   Q.   AND YOU; RIGHT?

10:30AM 22   A.   RIGHT.

10:30AM 23   Q.   AND FROM PFIZER YOU SEE AT THE BOTTOM THE NAME

10:30AM 24   CRAIG LIPSET; RIGHT?

10:30AM 25   A.   YES.

ER-1992

EDLIN CROSS BY MS. WALSH (RES.)                          2784

10:30AM   1    Q.   AND IT SAYS SENIOR DIRECTOR OF CLINICAL INNOVATION.

10:30AM   2         DO YOU SEE THAT?

10:30AM   3    A.   YES.

10:30AM   4    Q.   AND THERE ARE SOME OTHER PEOPLE FROM PFIZER ON THIS

10:30AM   5    DOCUMENT; RIGHT?

10:30AM   6    A.   CORRECT.

10:30AM   7    Q.   WE CAN TAKE THAT DOWN.

10:30AM   8         OKAY.  TAKE A LOOK AT 20456.

10:31AM   9    A.   OKAY.

10:31AM  10    Q.   OKAY.  DO YOU SEE THAT THIS IS AN EMAIL BETWEEN

10:31AM  11    MS. HOLMES, MR. BALWANI, MR. HOLMES, AND SOMEONE FROM PFIZER

10:31AM  12    ABOUT MEETING IN NOVEMBER OF 2013?

10:31AM  13    A.   YES.

10:31AM  14    Q.   OKAY.

10:31AM  15         YOUR HONOR, WE WOULD OFFER 20456?

10:31AM  16         MR. BOSTIC:  NO OBJECTION.

10:31AM  17         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:31AM  18    (DEFENDANT'S EXHIBIT 20456 WAS RECEIVED IN EVIDENCE.)

10:31AM  19    BY MS. WALSH:

10:31AM  20    Q.   IF WE TAKE A LOOK AT THE MIDDLE EMAIL, THERE'S A PERSON

10:32AM  21    NAMED MORTEN SOGAARD.

10:32AM  22         DO YOU SEE THAT?

10:32AM  23    A.   YES.

10:32AM  24    Q.   AND HE HAS A PFIZER EMAIL ADDRESS?

10:32AM  25    A.   YES.

EDLIN CROSS BY MS. WALSH (RES.)                                    2785

10:32AM   1     Q.   AND DID YOU EVER DEAL WITH HIM?

10:32AM   2     A.   I DON'T BELIEVE SO.

10:32AM   3     Q.   OKAY.  AND MR. SOGAARD IS EMAILING CHRISTIAN HOLMES AND HE

10:32AM   4     SAYS, "MY SINCERE APOLOGIES, I SHOULD HAVE CHECKED ON OUR SIDE

10:32AM   5     FIRST.  I WILL FOLLOW UP TO MOVE THINGS ALONG ON OUR SIDE.

10:32AM   6     PLEASE TAKE MY MAIL AS AN EXPRESSION OF INTEREST AND EXCITEMENT

10:32AM   7     WITH YOUR TECHNOLOGY AND ASPIRATIONS THAT WE CAN MOVE FORWARD

10:32AM   8     WITH DISCUSSIONS AND HOPEFULLY A PARTNERSHIP.

10:32AM   9          "THANK YOU ALSO FOR CHECKING REGARDING THE PROPOSED

10:32AM  10     MEETING.  THAT COULD BE AN EXCELLENT OPPORTUNITY TO FURTHER

10:32AM  11     ENGAGE PFIZER SENIOR MANAGEMENT."

10:32AM  12          DO YOU SEE THAT?

10:32AM  13     A.   YES.

10:32AM  14     Q.   AND THEN MS. HOLMES WRITES BACK SAYING, "MORTEN:

10:32AM  15          "THANKS FOR THIS.  WE WOULD LOOK FORWARD TO MEETING WITH

10:32AM  16     YOUR PRESIDENT OF R&D AT JP MORGAN."

10:32AM  17          DO YOU SEE THAT?

10:33AM  18     A.   YES.

10:33AM  19     Q.   OKAY.  WERE YOU AWARE THAT PFIZER AND THERANOS SIGNED A

10:33AM  20     CONFIDENTIAL DISCLOSURE AGREEMENT IN DECEMBER OF 2013?

10:33AM  21     A.   I DON'T RECALL THAT.

10:33AM  22     Q.   OKAY.  TURN TO 20453.

10:33AM  23     A.   OKAY.

10:33AM  24     Q.   DO YOU SEE THAT DOCUMENT?

10:33AM  25     A.   YES.

EDLIN CROSS BY MS. WALSH (RES.)                              2786

10:33AM  1    Q.   DOES THAT REFRESH YOUR RECOLLECTION AS TO WHETHER A

10:33AM  2    CONFIDENTIAL DISCLOSURE AGREEMENT WAS SIGNED BY PFIZER AND

10:33AM  3    THERANOS IN DECEMBER OF 2013?

10:34AM  4    A.   I SEE THAT THIS WAS SIGNED AT THAT TIME, BUT I DON'T HAVE

10:34AM  5    A RECOLLECTION OF IT.

10:34AM  6    Q.   OKAY.

10:34AM  7    A.   I PERSONALLY DON'T HAVE A RECOLLECTION OF IT.

10:34AM  8    Q.   OKAY.   OKAY.   YOU CAN PUT THAT ASIDE.

10:34AM  9         OKAY.   JUST ONE MORE PFIZER DOCUMENT I WANT TO SHOW YOU,

10:34AM 10    AND THAT IS 20542.   TAKE A LOOK AT THAT.

10:35AM 11         DO YOU SEE THAT?

10:35AM 12    A.   YES.

10:35AM 13    Q.   AND THAT'S AN EMAIL CHAIN OF FEBRUARY 2015.

10:35AM 14         DO YOU SEE THAT?

10:35AM 15    A.   YES.

10:35AM 16    Q.   AND MR. BLICKMAN IS ON THAT EMAIL, IS THAT RIGHT, IN THE

10:35AM 17    MIDDLE EMAIL?

10:35AM 18    A.   YES.

10:35AM 19    Q.   OKAY.   AND WAS MR. BLICKMAN INVOLVED IN ALSO DOING SOME

10:35AM 20    COORDINATING WORK IN CONNECTION WITH THE PHARMA COMPANIES?

10:35AM 21    A.   I DON'T BELIEVE SO.

10:35AM 22    Q.   OKAY.   SO DOES THAT REFRESH YOUR RECOLLECTION AS TO

10:35AM 23    MEETINGS THAT THERANOS WAS HAVING WITH PFIZER IN CONNECTION

10:35AM 24    WITH WALGREENS?

10:35AM 25    A.   IT DOES NOT REFRESH MY PERSONAL RECOLLECTION.

10:36AM  1    Q.   OKAY.  DO YOU REMEMBER THAT THERE WAS A MOVE TO HAVE

10:36AM  2    PHARMACEUTICAL BLOOD TESTING FOR PEOPLE WHO WERE PARTICIPANTS

10:36AM  3    IN STUDIES IN WALGREENS?

10:36AM  4        DO YOU REMEMBER THAT?

10:36AM  5    A.   CAN YOU BE MORE SPECIFIC?

10:36AM  6    Q.   SURE.

10:36AM  7        SO THERANOS HAD PREVIOUSLY PARTNERED WITH PHARMA

10:36AM  8    COMPANIES; RIGHT?

10:36AM  9    A.   RIGHT.

10:36AM 10    Q.   AND IN THOSE PARTNERSHIPS, THERANOS PROVIDED BLOOD TESTING

10:36AM 11    FOR PATIENTS WHO PARTICIPATED IN PHARMA STUDIES; RIGHT?

10:36AM 12    A.   RIGHT.

10:36AM 13    Q.   AND THOSE PATIENTS MIGHT GET THEIR BLOOD TESTED AT THE

10:36AM 14    PHARMA COMPANY; RIGHT?

10:36AM 15    A.   RIGHT.

10:36AM 16    Q.   OR SOMETIMES IN THEIR HOMES; CORRECT?

10:36AM 17    A.   RIGHT.

10:36AM 18    Q.   AND THERE WAS AN IDEA THAT THERANOS WAS SPEAKING WITH

10:37AM 19    PHARMA COMPANIES ABOUT MOVING THAT BLOOD TESTING, THE LOCATION

10:37AM 20    OF THAT BLOOD TESTING TO WALGREENS; RIGHT?

10:37AM 21    A.   RIGHT.

10:37AM 22    Q.   AND PHARMA PATIENTS WHO WERE IN STUDIES COULD GO INTO THE

10:37AM 23    WALGREENS TO GET THEIR BLOOD TESTED THAT WOULD BE USED FOR THE

10:37AM 24    STUDY.

10:37AM 25        DO YOU REMEMBER THAT?

10:37AM   1        A.   YES.

10:37AM   2        Q.   OKAY.  AND NOW, WHEN YOU LOOK AT THIS EMAIL IN 2015, DOES

10:37AM   3    THAT REFRESH YOUR RECOLLECTION AS TO THAT BEING DISCUSSED

10:37AM   4    DURING THAT TIME PERIOD?

10:37AM   5        A.   YES.

10:37AM   6             MS. WALSH:  YOUR HONOR, WE OFFER 20542.

10:37AM   7             MR. BOSTIC:  HEARSAY AND FOUNDATION, YOUR HONOR.

10:37AM   8             THE COURT:  SUSTAINED.

10:38AM   9    BY MS. WALSH:

10:38AM  10        Q.   LET'S TAKE A LOOK AT 20544.

10:38AM  11             DO YOU SEE THAT DOCUMENT?

10:38AM  12        A.   YES.

10:38AM  13        Q.   AND THIS IS A DOCUMENT THAT YOU'RE ON; RIGHT?

10:38AM  14        A.   YES.

10:38AM  15        Q.   OKAY.  AND MR. BALWANI IS ON THIS ONE; RIGHT?

10:38AM  16        A.   YES.

10:38AM  17        Q.   AND MS. HOLMES; CORRECT?

10:38AM  18        A.   YES.

10:38AM  19        Q.   AND DR. YOUNG; RIGHT?

10:38AM  20        A.   YES.

10:38AM  21        Q.   AND THE BOTTOM EMAIL IS WITH SOMEONE FROM GSK.

10:38AM  22             DO YOU SEE THAT?

10:38AM  23        A.   YES.

10:38AM  24        Q.   AND THIS IS IN MARCH OF 2012.

10:38AM  25             DO YOU SEE THAT?

10:38AM   1    A.   YES.

10:38AM   2              MS. WALSH:  YOUR HONOR, WE OFFER 20544.

10:38AM   3              MR. BOSTIC:  NO OBJECTION.

10:38AM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:38AM   5         (DEFENDANT'S EXHIBIT 20544 WAS RECEIVED IN EVIDENCE.)

10:38AM   6    BY MS. WALSH:

10:38AM   7    Q.   OKAY.  IF WE LOOK AT THE BOTTOM EMAIL, THIS PERSON FROM

10:38AM   8    GSK YANNICK VERNAEVES-SCHOEN IS EMAILING YOU, AND HE SAID, "LET

10:38AM   9    ME INTRODUCE MYSELF AS THE CONTRACT MANAGER, IN CHARGE OF

10:39AM  10    SETTING UP ALL CONTRACT AGREEMENT FOR GSK -- GVCL PARTNERSHIP

10:39AM  11    ACTIVITIES.

10:39AM  12         "I HAVE BEEN REQUESTED TO ISSUE A MASTER LABORATORY

10:39AM  13    SERVICE AGREEMENT (MLSA) COVERING FUTURE ACTIVITIES BETWEEN GSK

10:39AM  14    AND YOUR LAB.

10:39AM  15         "CAN I PLEASE ASK YOU TO REVIEW ATTACHED DOCUMENTS AND

10:39AM  16    REVERT TO ME WITH ANY COMMENTS YOU MAY HAVE SO THAT WE CAN MOVE

10:39AM  17    FURTHER INTO CONTRACT DISCUSSION?"

10:39AM  18         DO YOU SEE THAT?

10:39AM  19    A.   YES.

10:39AM  20    Q.   AND THEN YOU EMAIL BACK AND YOU SAY, "HI ALL,

10:39AM  21         "I HAVE ATTACHED THE PROPOSED AGREEMENT FOR OUR UPCOMING

10:39AM  22    CLINICAL TRIAL WITH GSK STARTING JULY 1ST."

10:39AM  23         DO YOU SEE THAT?

10:39AM  24    A.   YES.

10:39AM  25    Q.   OKAY.  AND THIS IS MARCH 12TH, 2012; RIGHT?

EDLIN CROSS BY MS. WALSH (RES.)                2790

10:39AM   1    A.   YES.

10:39AM   2    Q.   SO LET'S NOW TURN TO 20545.

10:40AM   3    A.   OKAY.

10:40AM   4    Q.   OKAY.  AND IS THIS A MEETING INVITE FOR DISCUSSION BETWEEN

10:40AM   5    GSK AND THERANOS, INCLUDING YOU, REGARDING A CONFIDENTIALITY

10:40AM   6    AGREEMENT?

10:40AM   7    A.   YES.

10:40AM   8    Q.   AND THAT'S IN CONNECTION WITH THE GSK-THERANOS

10:40AM   9    RELATIONSHIP; IS THAT RIGHT?

10:40AM  10    A.   YES.

10:40AM  11         MS. WALSH:  YOUR HONOR, WE OFFER 20545.

10:40AM  12         MR. BOSTIC:  NO OBJECTION.

10:40AM  13         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:40AM  14    (DEFENDANT'S EXHIBIT 20545 WAS RECEIVED IN EVIDENCE.)

10:40AM  15    BY MS. WALSH:

10:40AM  16    Q.   OKAY.  LET'S TAKE A LOOK AT THE TEXT AT THE BOTTOM UNDER

10:40AM  17    ATTENDEES IT SAYS, "DEARS" -- AND THIS IS A TEXT FROM GSK;

10:40AM  18    CORRECT?

10:41AM  19    A.   YES.

10:41AM  20    Q.   "DEARS, WE HAVE BEEN ENGAGED LATELY IN EMAIL CHANGES TO

10:41AM  21    SET-UP A CDA BETWEEN OUR COMPANIES.  DUE TO TIGHT TIME

10:41AM  22    CONSTRAINTS, AND BECAUSE THE CDA IS THE LIMITING FACTOR FOR

10:41AM  23    FURTHER IMPORTANT DISCUSSIONS, WE WOULD LIKE TO HAVE THIS CDA

10:41AM  24    FINAL BY WEEK 14."

10:41AM  25         DO YOU SEE THAT?

EDLIN CROSS BY MS. WALSH (RES.)                      2791

10:41AM    1    A.   YES.

10:41AM    2    Q.   AND THE CDA IS THE CONFIDENTIALITY AGREEMENT; RIGHT?

10:41AM    3    A.   RIGHT.

10:41AM    4    Q.   AND SO THE TWO COMPANIES COULD TALK FREELY WITH ONE

10:41AM    5    ANOTHER?

10:41AM    6    A.   CORRECT.

10:41AM    7    Q.   AND THEN IT SAYS, "TO ACHIEVE THIS, A TC --" TELEPHONE

10:41AM    8    CALL; RIGHT?

10:41AM    9    A.   RIGHT.

10:41AM   10    Q.   "-- IS PRESUMABLY THE MOST EFFICIENT WAY FROM NOW TO

10:41AM   11    DISCUSS TOWARD A FINAL AGREEMENT."

10:41AM   12         DO YOU SEE THAT?

10:41AM   13    A.   YES.

10:41AM   14    Q.   OKAY.  AND THIS IS IN APRIL 2012; RIGHT?

10:41AM   15    A.   RIGHT.

10:41AM   16    Q.   OKAY.  YOU CAN TAKE THAT DOWN.

10:42AM   17         ALL RIGHT.  NEXT I WANT TO SHIFT GEARS TO THE FDA APPROVAL

10:42AM   18    THAT THERANOS GOT ON ITS HSV I ASSAY.

10:42AM   19         DO YOU REMEMBER THAT?

10:42AM   20    A.   YES.

10:42AM   21    Q.   AND THE FDA, JUST FOR SOME CONTEXT, THE FDA IS THE FEDERAL

10:42AM   22    REGULATOR FOR ALL MEDICAL DEVICES; RIGHT?

10:42AM   23    A.   I BELIEVE SO.

10:42AM   24    Q.   AND FDA CLEARANCE IS A BIG DEAL TO GET ON A MEDICAL

10:42AM   25    DEVICE; RIGHT?

ER-2000

EDLIN CROSS BY MS. WALSH (RES.)                                2792

```
10:42AM   1     A.   YES.

10:42AM   2     Q.   AND IT TAKES A LOT OF WORK TO GET IT; CORRECT?

10:42AM   3              MR. BOSTIC:  OBJECTION.  FOUNDATION.

10:42AM   4              THE COURT:  WOULD YOU LAY A FOUNDATION FOR HIS

10:42AM   5     KNOWLEDGE.

10:42AM   6              MS. WALSH:  SURE.

10:42AM   7     Q.   SO YOU WERE AT THE COMPANY IN 2013 THROUGH '15; RIGHT?

10:42AM   8     A.   YES.

10:42AM   9     Q.   AND YOU WERE AWARE THAT THE SCIENTISTS IN THE R&D LAB WERE

10:42AM  10     WORKING ON GETTING FDA APPROVAL FOR ASSAYS THEY WERE

10:43AM  11     DEVELOPING; RIGHT?

10:43AM  12     A.   IN WHAT TIME PERIOD?

10:43AM  13     Q.   2015.

10:43AM  14     A.   YES.

10:43AM  15     Q.   OKAY.  AND YOU OBSERVED -- YOU DIDN'T WORK SIDE BY SIDE

10:43AM  16     WITH THEM; RIGHT?

10:43AM  17     A.   CORRECT.

10:43AM  18     Q.   BUT DID YOU HAVE SOME AWARENESS OF HOW MUCH WORK THEY WERE

10:43AM  19     PUTTING IN TO APPLY FOR FDA APPROVAL?

10:43AM  20     A.   YES.

10:43AM  21     Q.   AND HOW MUCH WORK WAS THAT?

10:43AM  22     A.   A LOT OF WORK.

10:43AM  23     Q.   OKAY.

10:43AM  24     A.   THEY WERE WORKING VERY HARD.

10:43AM  25     Q.   AND THERANOS FINALLY GOT FDA APPROVAL FOR ONE OF ITS
```

ER-2001

10:43AM   1    ASSAYS; RIGHT?

10:43AM   2    A.   YES.

10:43AM   3    Q.   AND THAT WAS THE HSV I ASSAY; CORRECT?

10:43AM   4    A.   CORRECT.

10:43AM   5    Q.   AND THE APPROVAL WAS NOT JUST FOR THE ASSAY ITSELF, BUT IT

10:43AM   6    WAS ALSO ON THE DEVICE IT RAN ON; RIGHT?

10:43AM   7    A.   YES.

10:43AM   8    Q.   AND FOR THE NANOTAINER THAT COLLECTED THE BLOOD; RIGHT?

10:44AM   9    A.   YES.

10:44AM  10    Q.   AND SO TURN IN YOUR BINDER TO 13988.

10:44AM  11         DO YOU SEE THAT?

10:44AM  12    A.   YES.

10:44AM  13    Q.   OKAY.  IS THAT AN EMAIL FROM MS. HOLMES TO ALL THERANOS

10:44AM  14    EMPLOYEES?

10:44AM  15    A.   YES.

10:44AM  16    Q.   AND IT'S ON JULY 2ND, 2015; RIGHT?

10:44AM  17    A.   YES.

10:44AM  18    Q.   AND YOU WERE EMPLOYED AT THERANOS AT THE TIME; RIGHT?

10:44AM  19    A.   YES.

10:44AM  20    Q.   AS WAS MR. BALWANI; CORRECT?

10:44AM  21    A.   YES.

10:44AM  22         MS. WALSH:  WE OFFER 13988.

10:44AM  23         MR. BOSTIC:  NO OBJECTION.

10:44AM  24         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:44AM  25         (DEFENDANT'S EXHIBIT 13988 WAS RECEIVED IN EVIDENCE.)

| | | |
|---|---|---|
| 10:44AM | 1 | BY MS. WALSH: |
| 10:44AM | 2 | Q.   SO IT'S TO ALL THERANOS EMPLOYEES. |
| 10:45AM | 3 | AND MS. HOLMES SAYS, "IT IS WITH INCREDIBLE PRIDE THAT I |
| 10:45AM | 4 | OFFICIALLY LET YOU KNOW THAT WE HAVE RECEIVED OUR FIRST FDA |
| 10:45AM | 5 | CLEARANCE ON OUR SYSTEM, AND THE FIRST LABORATORY DEVELOPED |
| 10:45AM | 6 | TEST WE HAVE FILED:  HSV 1. |
| 10:45AM | 7 | "JOIN ME IN OUR MEETING THIS AFTERNOON TO DISCUSS AND |
| 10:45AM | 8 | CELEBRATE TOGETHER.  WE WILL BE LIVE STREAMING WITH ARIZONA, |
| 10:45AM | 9 | NEWARK, AND L.A." |
| 10:45AM | 10 | DO YOU SEE THAT? |
| 10:45AM | 11 | A.   YES. |
| 10:45AM | 12 | Q.   OKAY.  AND YOU REMEMBER, RIGHT, THAT THIS WAS AN |
| 10:45AM | 13 | INCREDIBLY HAPPY OCCASION AT THE COMPANY; RIGHT? |
| 10:45AM | 14 | A.   YES. |
| 10:45AM | 15 | Q.   THERE WAS A BIG PARTY; RIGHT? |
| 10:45AM | 16 | A.   RIGHT. |
| 10:45AM | 17 | Q.   WITH BALLOONS; CORRECT? |
| 10:45AM | 18 | A.   RIGHT. |
| 10:45AM | 19 | Q.   AND DANCING AND MUSIC; RIGHT? |
| 10:45AM | 20 | A.   RIGHT. |
| 10:45AM | 21 | Q.   AND THE ENTIRE -- ALL OF THE EMPLOYEES WERE IN ONE ROOM |
| 10:45AM | 22 | BEING ADDRESSED BY MS. HOLMES; RIGHT? |
| 10:46AM | 23 | A.   RIGHT. |
| 10:46AM | 24 | Q.   AND THAT ADDRESS WAS BEING LIVE STREAMED TO THE ARIZONA |
| 10:46AM | 25 | HEADQUARTERS OF THERANOS; RIGHT? |

ER-2003

10:46AM   1    A.   RIGHT.

10:46AM   2    Q.   AND DURING THAT MEETING, MS. HOLMES MADE A PRESENTATION

10:46AM   3    ABOUT THE FDA CLEARANCE; CORRECT?

10:46AM   4    A.   YES.

10:46AM   5    Q.   AND SHE KIND OF EXPLAINED HOW IT CAME ABOUT; RIGHT?

10:46AM   6    A.   YES.

10:46AM   7    Q.   AND WHAT IT MEANT FOR THE COMPANY; CORRECT?

10:46AM   8    A.   YES.

10:46AM   9    Q.   SO TAKE A LOOK AT 20183.

10:46AM   10   A.   OKAY.

10:46AM   11   Q.   OKAY.  AND YOU SEE THAT'S AN EMAIL FROM DANIEL YOUNG TO

10:46AM   12   YOU; RIGHT?

10:46AM   13   A.   YES.

10:47AM   14   Q.   AND IT ATTACHES A POWERPOINT PRESENTATION; RIGHT?

10:47AM   15   A.   YES.

10:47AM   16   Q.   AND THEN IF YOU LOOK AT THE PRESENTATION -- DO YOU SEE

10:47AM   17   THAT?  YOU CAN JUST FLIP THROUGH IT.

10:47AM   18   A.   YES.

10:47AM   19   Q.   WAS DR. YOUNG EMAILING YOU A PRESENTATION FOR A POWERPOINT

10:47AM   20   FOR THAT MEETING?

10:47AM   21   A.   YES.

10:47AM   22   Q.   THAT IS WHERE MS. HOLMES SPOKE; RIGHT?

10:47AM   23   A.   YES.

10:47AM   24        MS. WALSH:  OKAY.  WE OFFER 20183.

10:47AM   25        MR. BOSTIC:  HEARSAY, YOUR HONOR, ALSO BEYOND THE

10:47AM   1    SCOPE.

10:47AM   2              THE COURT:  THIS IS A LITTLE BEYOND THE SCOPE OF

10:47AM   3    DIRECT.

10:47AM   4              MS. WALSH:  RIGHT.  IF I COULD ADDRESS THAT?

10:47AM   5        THE SCOPE OF THE DIRECT INVOLVED TESTIMONY ABOUT

10:47AM   6    THERANOS'S TECHNOLOGY ALLEGEDLY NOT WORKING, ISSUES WITH

10:48AM   7    DEVICES, THINGS BREAKING, AND PEOPLE BEING DISSATISFIED,

10:48AM   8    INCLUDING CUSTOMERS THAT WE SAW IN VARIOUS EXHIBITS.

10:48AM   9        THIS IS FDA APPROVAL FOR THE THERANOS DEVICE ON AT LEAST

10:48AM  10    ONE TEST, SO I THINK IT IS WITHIN THE SCOPE OF THE DIRECT.

10:48AM  11              THE COURT:  WHAT DOES THE FDA APPROVAL HAVE TO DO

10:48AM  12    WITH THE DEVICES BEING BROKEN OR HAVING PROBLEMS WITH THEM?

10:48AM  13              MS. WALSH:  BECAUSE THE FDA REVIEWED THE DEVICE AND

10:48AM  14    THE DATA AND THE OPERATION OF THE DEVICE, AND IT APPROVED IT AS

10:48AM  15    RELIABLE AND PRODUCING ACCURATE TESTING INFORMATION.

10:48AM  16              THE COURT:  IS THAT WHAT AN FDA APPROVAL IS?

10:48AM  17              MR. BOSTIC:  I DON'T THINK THAT'S BEEN ESTABLISHED,

10:48AM  18    YOUR HONOR.  I THINK THAT'S ATTORNEY ARGUMENT.

10:48AM  19              THE COURT:  I THINK THAT'S CORRECT.  I DON'T THINK

10:48AM  20    THAT'S IN EVIDENCE YET.

10:48AM  21              MS. WALSH:  RIGHT.

10:48AM  22        SO AS FAR AS THE HEARSAY ISSUE, YOUR HONOR, MR. BALWANI

10:48AM  23    WAS AT THIS PRESENTATION.  SO IT GOES TO HIS STATE OF MIND AS

10:49AM  24    TO THE VIABILITY OF THE THERANOS TECHNOLOGY.

10:49AM  25              THE COURT:  WHY DON'T YOU LAY A FOUNDATION FOR THAT.

10:49AM  1        MS. WALSH:  SURE.

10:49AM  2   Q.  MR. EDLIN, I ASKED YOU ABOUT THIS CELEBRATION AND THE

10:49AM  3   MEETING WHERE MS. HOLMES SPOKE; RIGHT?

10:49AM  4   A.  RIGHT.

10:49AM  5   Q.  YOU WERE THERE; RIGHT?

10:49AM  6   A.  YES.

10:49AM  7   Q.  MANY OTHER EMPLOYEES; CORRECT?

10:49AM  8   A.  CORRECT.

10:49AM  9   Q.  AND MR. BALWANI WAS THERE DURING IT; RIGHT?

10:49AM 10   A.  I BELIEVE HE WAS, YES.

10:49AM 11   Q.  AND YOU WERE SITTING CLOSE BY TO HIM, WERE YOU NOT?

10:49AM 12   A.  YES.

10:49AM 13        THE COURT:  WAS THIS DISPLAYED --

10:49AM 14        MS. WALSH:  FAIR ENOUGH, YOUR HONOR.

10:49AM 15   Q.  AND A SLIDE DECK WAS DISPLAYED; RIGHT?

10:49AM 16   A.  RIGHT.

10:49AM 17   Q.  AND DID IT CONTAIN THE INFORMATION THAT IS IN THIS SLIDE

10:49AM 18   DECK?  IF YOU COULD TAKE A LOOK AT IT, YEAH.

10:49AM 19   A.  I BELIEVE IT DID.

10:49AM 20   Q.  OKAY.

10:49AM 21        THE COURT:  AND YOU'RE ASKING THAT THIS BE ADMITTED

10:49AM 22   ONLY FOR THE STATE OF MIND OF YOUR CLIENT THEN?

10:50AM 23        MS. WALSH:  THAT'S RIGHT, YOUR HONOR.

10:50AM 24        THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

10:50AM 25   WILL BE ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED IN

EDLIN CROSS BY MS. WALSH (RES.)                    2798

10:50AM 1    THE DOCUMENTS OR THE EMAILS, BUT SOLELY AS TO THE ISSUE OF THE

10:50AM 2    STATE OF MIND OF MR. BALWANI AS TO NOTICE OF THE INFORMATION

10:50AM 3    BUT NOT FOR ITS TRUTH.  AND IT CAN BE ADMITTED WITH THAT

10:50AM 4    LIMITATION AND PUBLISHED.

10:50AM 5        (DEFENDANT'S EXHIBIT 20183 WAS RECEIVED IN EVIDENCE.)

10:50AM 6    BY MS. WALSH:

10:50AM 7    Q.   OKAY.  IF WE CAN TURN IN THE SLIDE DECK TO PAGE 2.

10:50AM 8    A.   OKAY.

10:50AM 9    Q.   AND THIS SAYS, "THIS WAS A MAJOR MILESTONE FOR THERANOS

10:50AM 10   AND NATIONAL PREVENTATIVE HEALTH CARE LANDSCAPE."

10:50AM 11       DO YOU SEE THAT?

10:50AM 12   A.   YES.

10:50AM 13   Q.   AND IT HAS PART OF THE ANNOUNCEMENT, "THERANOS TODAY

10:51AM 14   ANNOUNCED THAT IT HAS RECEIVED THE U.S. FOOD AND DRUG

10:51AM 15   ADMINISTRATION CLEARANCE OF ITS TEST SYSTEM AND TEST FOR HERPES

10:51AM 16   SIMPLEX 1 VIRUS IGG."

10:51AM 17       DO YOU SEE THAT?

10:51AM 18   A.   YES.

10:51AM 19   Q.   AND THEN THE NEXT SLIDE SAYS, "THERANOS RECEIVES FDA

10:51AM 20   CLEARANCE AND REVIEW AND VALIDATION OF REVOLUTIONARY

10:51AM 21   FINGERSTICK TECHNOLOGY, TEST, AND ASSOCIATED TEST SYSTEM."

10:51AM 22       DO YOU SEE THAT?

10:51AM 23   A.   YES.

10:51AM 24   Q.   AND ON SLIDE 4, IT LISTS THE NUMBER OF CARTRIDGES RUN, THE

10:51AM 25   MINUTES OF PROTOCOL TIME, THE DEVICES USED; RIGHT?

ER-2007

EDLIN CROSS BY MS. WALSH (RES.)                                    2799

10:51AM   1      A.   RIGHT.

10:51AM   2      Q.   AND YOU SEE THIS APPROVAL WAS ON THE 4S DEVICE; RIGHT?

10:51AM   3      A.   YES.

10:51AM   4      Q.   AND THE 4S DEVICE IS THE DEVICE THAT WE TALKED ABOUT IN

10:51AM   5      CONNECTION WITH THE LATER MILITARY RELATIONSHIPS; RIGHT?

10:51AM   6      A.   RIGHT.

10:51AM   7      Q.   OKAY.  AND THEN WE CAN GO FORWARD TO PAGE 15.

10:52AM   8           AND THIS JUST SHOWS ALL OF THE DIFFERENT PARTS OF THE

10:52AM   9      COMPANY THAT WORKED ON THIS FDA CLEARANCE.

10:52AM  10           DO YOU SEE THAT?

10:52AM  11      A.   YES.

10:52AM  12      Q.   AND SO -- YOU CAN PUT THAT ASIDE AND YOU CAN TAKE THAT

10:52AM  13      DOWN.

10:52AM  14           AND SO THIS WAS ANOTHER MAJOR PROJECT THAT WAS GOING ON IN

10:52AM  15      THE -- AT LEAST IN 2015, IF NOT 2014, TIMEFRAME AT THERANOS;

10:52AM  16      RIGHT?

10:52AM  17      A.   RIGHT.

10:52AM  18      Q.   AND IN ADDITION TO THE MILITARY RELATIONSHIPS; RIGHT?

10:52AM  19      A.   IN AROUND -- I BELIEVE THEY -- IN 2015 THOSE HAD CEASED.

10:52AM  20      Q.   OKAY.  IT WAS IN ADDITION TO THE RETAIL LAUNCH; RIGHT?

10:52AM  21      A.   RIGHT.

10:52AM  22      Q.   WHICH WAS ONGOING; CORRECT?

10:52AM  23      A.   CORRECT.

10:52AM  24      Q.   AND IT WAS A LOT OF WORK THAT HAD TO BE DONE; CORRECT?

10:52AM  25      A.   YES.

ER-2008

10:52AM  1    Q.   OKAY.  IF YOU CAN LOOK AT 2604?

10:53AM  2            THE COURT:  IS THAT IN VOLUME 2?

10:53AM  3            MS. WALSH:  YES.

10:53AM  4            THE WITNESS:  2604?

10:54AM  5    BY MS. WALSH:

10:54AM  6    Q.   2604.  IT'S TUCKED IN THERE.

10:54AM  7    A.   YEP.  I HAVE THAT IN VOLUME 1.

10:54AM  8    Q.   YOU HAVE IT?

10:54AM  9    A.   I HAVE IT IN VOLUME 1, YES.

10:54AM 10            MS. WALSH:  THANK YOU, YOUR HONOR.

10:54AM 11    Q.   DO YOU SEE THAT?

10:54AM 12    A.   YES.

10:54AM 13    Q.   AND IS THAT THE FDA APPROVAL OF THE HSV 1 ASSAY?

10:54AM 14    A.   I'M NOT SURE.

10:54AM 15    Q.   OKAY.  AND YOU WERE AWARE, MR. EDLIN, THAT -- I'LL WAIT

10:54AM 16    FOR YOU.

10:54AM 17    A.   OKAY.

10:54AM 18    Q.   YOU WERE AWARE THAT IN ADDITION TO THE FDA APPROVAL FOR

10:55AM 19    THE DEVICE, THERANOS ALSO GOT WHAT IS CALLED A CLIA WAIVER.

10:55AM 20        WERE YOU AWARE OF THAT?

10:55AM 21    A.   IT SOUNDS FAMILIAR.

10:55AM 22    Q.   OKAY.  AND THE CLIA WAIVER ALLOWED THERANOS TO PUT THE

10:55AM 23    DEVICE INTO A STORE; RIGHT?

10:55AM 24    A.   RIGHT.

10:55AM 25    Q.   OR INTO AN AIRPORT; RIGHT?

EDLIN CROSS BY MS. WALSH (RES.)                          2801

10:55AM   1    A.   RIGHT.

10:55AM   2    Q.   DIFFERENT LOCATIONS OUTSIDE OF THERANOS; RIGHT?

10:55AM   3    A.   RIGHT.

10:55AM   4    Q.   AND CONDUCT BLOOD TESTING OUTSIDE OF THERANOS; CORRECT?

10:55AM   5           MR. BOSTIC:  OBJECTION.  FOUNDATION.  CALLS FOR A

10:55AM   6    LEGAL CONCLUSION.

10:55AM   7           THE COURT:  CAN YOU LAY A FOUNDATION.

10:55AM   8           MS. WALSH:  I CAN MOVE ON FROM THIS, YOUR HONOR.

10:55AM   9           THE COURT:  ALL RIGHT.

10:55AM  10           MS. WALSH:  YEAH.  OKAY.

10:55AM  11           THE COURT:  SHOULD WE TAKE OUR BREAK NOW?  DO YOU

10:55AM  12    HAVE MORE MATERIAL TO COVER?

10:55AM  13           MS. WALSH:  I DON'T.  I HAVE FIVE MINUTES.

10:55AM  14           THE COURT:  OKAY.  LET'S LET YOU FINISH THAT AND

10:55AM  15    THEN WE'LL TAKE OUR BREAK, LADIES AND GENTLEMEN.

10:55AM  16    BY MS. WALSH:

10:55AM  17    Q.   OKAY.  MR. EDLIN, SO WE WERE TALKING ABOUT

10:55AM  18    ELIZABETH HOLMES SPEAKING TO THE WHOLE COMPANY.

10:55AM  19         AND YOU TESTIFIED YESTERDAY ABOUT HER AGE; RIGHT?

10:56AM  20         THE GOVERNMENT ASKED YOU ABOUT HER AGE.  DO YOU REMEMBER

10:56AM  21    THAT?

10:56AM  22    A.   YES.  YES.

10:56AM  23    Q.   AND SHE WAS AN EXTREMELY -- IN YOUR OBSERVATIONS AND IN

10:56AM  24    YOUR INTERACTIONS WITH HER, SHE WAS AN EXTREMELY ENGAGING

10:56AM  25    SPEAKER, WAS SHE NOT?

EDLIN CROSS BY MS. WALSH (RES.) 2802

10:56AM 1     A.   YES.

10:56AM 2     Q.   SHE COULD REALLY HOLD THE ROOM WHEN SHE WAS SPEAKING TO A

10:56AM 3   CROWD; CORRECT?

10:56AM 4     A.   CORRECT.

10:56AM 5     Q.   EVERYONE WAS LISTENING TO ELIZABETH HOLMES; RIGHT?

10:56AM 6     A.   CORRECT.

10:56AM 7     Q.   AND SHE HAD A COMMANDING VOICE; RIGHT?

10:56AM 8     A.   YES.

10:56AM 9     Q.   AND SHE ALSO HAD A COMMAND OF THE DETAILS OF WHAT WENT ON

10:56AM 10   INSIDE OF THE COMPANY; RIGHT?

10:56AM 11     A.   YES.

10:56AM 12     Q.   SHE UNDERSTOOD THE CHEMISTRIES INVOLVED IN THE ASSAYS;

10:56AM 13   RIGHT?

10:56AM 14     A.   RIGHT.

10:56AM 15     Q.   SHE UNDERSTOOD HOW THE DEVICES WORKED; CORRECT?

10:56AM 16     A.   RIGHT.

10:56AM 17     Q.   SHE WAS LISTED AS AN INVENTOR ON MANY OF THOSE PATENTS;

10:56AM 18   CORRECT?

10:56AM 19     A.   CORRECT.

10:56AM 20     Q.   AND EVEN ONE ON ONE, NOT IN FRONT OF A BIG CROWD, BUT EVEN

10:56AM 21   ONE ON ONE, YOU INTERACTED WITH HER A LOT; RIGHT?

10:56AM 22     A.   RIGHT.

10:57AM 23     Q.   AND SHE WAS EXTREMELY ENGAGING; IS THAT FAIR?

10:57AM 24     A.   YES.

10:57AM 25     Q.   AND IN YOUR ENTIRE TIME AT THERANOS, IN CONNECTION WITH

EDLIN CROSS BY MS. WALSH (RES.)                                    2803

10:57AM    1    YOUR WORK WITH THE MILITARY, IN CONNECTION WITH YOUR WORK

10:57AM    2    REGARDING THE DEMOS, PUTTING TOGETHER INVESTOR PACKETS, TALKING

10:57AM    3    TO PEOPLE WHO WANTED TO KNOW ABOUT THERANOS, YOU NEVER THOUGHT

10:57AM    4    THAT YOU WERE DECEIVING OR PLAYING A TRICK ON ANYONE, DID YOU?

10:57AM    5    A.   I DID NOT.

10:57AM    6              MS. WALSH:  MAY I HAVE A MOMENT, YOUR HONOR?

10:57AM    7              THE COURT:  YES.

10:57AM    8         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:58AM    9              MS. WALSH:  I HAVE NOTHING FURTHER, YOUR HONOR.

10:58AM   10              THE COURT:  ALL RIGHT.  THANK YOU.

10:58AM   11         MR. BOSTIC, WILL YOU HAVE REDIRECT?

10:58AM   12              MR. BOSTIC:  I WILL, YOUR HONOR.

10:58AM   13              THE COURT:  ALL RIGHT.  LET'S TAKE OUR BREAK, LADIES

10:58AM   14    AND GENTLEMEN.  WE'LL TAKE ABOUT A 20, 20 MINUTE BREAK, AND

10:58AM   15    THEN WE'LL CONTINUE WITH THE TESTIMONY.

10:55AM   16         (RECESS FROM 10:48 A.M. UNTIL 11:10 A.M.)

11:10AM   17              THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

11:10AM   18    YOU.

11:10AM   19         WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

11:10AM   20    ARE PRESENT AGAIN.

11:10AM   21         MR. BOSTIC.

11:10AM   22              MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

11:10AM   23    ///

11:10AM   24    ///

11:10AM   25    ///

**REDIRECT EXAMINATION**

11:10AM  1

11:10AM  2     BY MR. BOSTIC:

11:10AM  3     Q.   GOOD MORNING, MR. EDLIN.

11:10AM  4     A.   GOOD MORNING.

11:10AM  5     Q.   I'D LIKE TO FOLLOW UP ON SOME OF THE TOPICS THAT YOU

11:10AM  6     DISCUSSED WITH MR. BALWANI'S LAWYERS.

11:10AM  7          LET ME ASK YOU FIRST ABOUT THE TOPIC OF THE FDA'S DECISION

11:10AM  8     REGARDING THE HSV TEST IN 2015.

11:10AM  9          DO YOU HAVE THAT TOPIC IN MIND?

11:10AM 10     A.   YES.

11:10AM 11     Q.   FIRST OF ALL, THAT HSV TEST, WHAT WAS THE HSV TEST?

11:10AM 12     A.   HERPES SIMPLEX.

11:10AM 13     Q.   DURING YOUR DISCUSSION WITH MS. WALSH, SHE USED THE TERM

11:11AM 14     "APPROVAL" TO DESCRIBE WHAT THE FDA DID IN THAT CASE.

11:11AM 15          DO YOU RECALL THAT THE EXHIBIT THAT YOU REVIEWED WITH HER

11:11AM 16     REFERRED INSTEAD TO A CLEARANCE?

11:11AM 17     A.   I'D HAVE TO SEE IT AGAIN.

11:11AM 18     Q.   LET ME JUST ASK YOU THIS, ARE YOU AWARE OF SIGNIFICANT

11:11AM 19     DIFFERENCES BETWEEN AN FDA APPROVAL VERSUS AN FDA CLEARANCE?

11:11AM 20     A.   I'M NOT SURE.

11:11AM 21     Q.   OKAY.  DID YOUR JOB AT THERANOS REQUIRE YOU TO UNDERSTAND

11:11AM 22     THE DIFFERENCES BETWEEN AN FDA APPROVAL AND AN FDA CLEARANCE?

11:11AM 23     A.   NO.

11:11AM 24     Q.   THE FDA CLEARANCE FOR THE HERPES ASSAY IN 2015, FIRST OF

11:11AM 25     ALL, WHAT MONTH IN 2015 DID THAT TAKE PLACE IF YOU RECALL?

EDLIN REDIRECT BY MR. BOSTIC                                    2805

11:11AM   1     A.   I BELIEVE JULY.

11:11AM   2     Q.   AND CAN YOU REMIND US WHEN THERANOS BEGAN OFFERING PATIENT

11:11AM   3     TESTING TO THE PUBLIC?

11:11AM   4     A.   SEPTEMBER OF 2013.

11:12AM   5     Q.   AND THE FDA CLEARANCE IN JULY 2015, ALMOST TWO YEARS AFTER

11:12AM   6     THERANOS BEGAN OFFERING PATIENT TESTING, WHAT DEVICE, WHAT

11:12AM   7     ANALYZER DID THAT RELATE TO?

11:12AM   8     A.   THE 4S.

11:12AM   9     Q.   AND WAS THE 4S ANALYZER EVER USED BY THERANOS FOR ACTUAL

11:12AM  10     PATIENT TESTING?

11:12AM  11     A.   NO.

11:12AM  12     Q.   THAT HERPES TEST, WAS THAT A TEST THAT THERANOS EVER RAN

11:12AM  13     ON THE EDISON THAT IT USED FOR PATIENT TESTING, IF YOU KNOW?

11:12AM  14     A.   I DON'T KNOW.

11:12AM  15     Q.   YOU MENTIONED DURING CROSS-EXAMINATION THAT THE MINILAB

11:12AM  16     DEVICE WAS NO LONGER IN PRODUCTION IN 2015; IS THAT CORRECT?

11:12AM  17     A.   I DON'T RECALL SEEING THAT DEVICE IN 2015.  I REMEMBER

11:13AM  18     JUST SEEING THE 4S.

11:13AM  19     Q.   WAS IT YOUR UNDERSTANDING THAT AT SOME POINT IN THAT YEAR,

11:13AM  20     THE MINILAB WAS NO LONGER BEING PURSUED BY THERANOS?

11:13AM  21     A.   YES.

11:13AM  22     Q.   DURING YOUR TIME AT THE COMPANY, DID THE MINILAB EVER

11:13AM  23     REACH THE POINT WHERE IT WAS A FINISHED PRODUCT USED FOR

11:13AM  24     PATIENT TESTING?

11:13AM  25     A.   NO.

ER-2014

EDLIN REDIRECT BY MR. BOSTIC                                    2806

11:13AM   1    Q.   AND THERE WAS A POINT IN 2015 WHEN THE MINILAB WAS, BASED

11:13AM   2    ON YOUR UNDERSTANDING, NO LONGER EVEN IN DEVELOPMENT TOWARDS

11:13AM   3    THAT GOAL?

11:13AM   4    A.   I DIDN'T HAVE THAT UNDERSTANDING OF WHAT WAS GOING ON, ON

11:13AM   5    THE DEVELOPMENT SIDE.

11:13AM   6    Q.   I'D LIKE TO TALK TO YOU A LITTLE BIT ABOUT THE

11:13AM   7    DEMONSTRATIONS THAT YOU'VE TESTIFIED ABOUT.

11:13AM   8        WE'VE BEEN TALKING ABOUT THE EDISON VERSIONS USED FOR

11:14AM   9    PATIENT TESTING VERSUS THE NEXT GENERATION DEVICES.

11:14AM  10        DO YOU RECALL THAT DISCUSSION?

11:14AM  11    A.   YES.

11:14AM  12    Q.   AND THE NEXT GENERATION DEVICES, THE MINILAB, THE

11:14AM  13    4 SERIES, THE 4S, WERE ANY OF THOSE EVER USED FOR ACTUAL

11:14AM  14    CLINICAL PATIENT TESTING AT THERANOS?

11:14AM  15    A.   NO.

11:14AM  16    Q.   WERE THERE OCCASIONS WHERE YOU WERE ASKED TO PUT THOSE

11:14AM  17    NEXT GENERATION DEVICES IN CONFERENCE ROOMS FOR VIP MEETINGS

11:14AM  18    AND DEMONSTRATIONS?

11:14AM  19    A.   YES.

11:14AM  20    Q.   YOU WERE ASKED ON CROSS-EXAMINATION WHETHER IN CONNECTION

11:14AM  21    WITH THOSE DEMONSTRATIONS YOU PERSONALLY INTENDED TO DECEIVE

11:14AM  22    ANYONE.

11:14AM  23        CAN YOU REMIND US WHAT YOUR ANSWER WAS?

11:14AM  24    A.   I DID NOT.

11:14AM  25    Q.   FOR THOSE MEETINGS WHERE THE VIP'S WOULD MEET IN

EDLIN REDIRECT BY MR. BOSTIC                                    2807

11:14AM  1    CONFERENCE ROOMS AT THERANOS, WHO WOULD BE PRESENT ON THE

11:14AM  2    THERANOS SIDE?

11:14AM  3    A.   USUALLY ELIZABETH AND SOMETIMES SUNNY.

11:14AM  4    Q.   AND WERE YOU PRESENT FOR THE ENTIRETY OF ANY OR MANY OF

11:15AM  5    THOSE MEETINGS?

11:15AM  6    A.   SOME OF THEM.

11:15AM  7    Q.   OKAY.  WERE THERE MULTIPLE MEETINGS WITH VIP'S IN THESE

11:15AM  8    THERANOS CONFERENCE ROOMS WHERE YOU WEREN'T PRESENT FOR

11:15AM  9    PORTIONS OR ALL OF THEM?

11:15AM 10    A.   YES.

11:15AM 11    Q.   SO IF WE WANTED TO KNOW WHAT WAS SAID TO A VIP DURING ONE

11:15AM 12    OF THOSE MEETINGS WHEN YOU WEREN'T PRESENT, WOULD YOU BE ABLE

11:15AM 13    TO PROVIDE THAT INFORMATION FOR US?

11:15AM 14    A.   NO.

11:15AM 15    Q.   WE WOULD NEED TO ASK SOMEONE ELSE?

11:15AM 16    A.   CORRECT.

11:15AM 17    Q.   WE DISCUSSED THE NULL PROTOCOL AND THE DEMO APP DURING

11:15AM 18    YOUR DIRECT EXAMINATION.

11:15AM 19        DO YOU RECALL THAT?

11:15AM 20    A.   YES.

11:15AM 21    Q.   AND YOU GOT SOME ADDITIONAL QUESTIONS ABOUT THAT ON CROSS;

11:15AM 22    CORRECT?

11:15AM 23    A.   CORRECT.

11:15AM 24    Q.   AND DID YOU PERSONALLY COME UP WITH THE IDEA FOR THE NULL

11:15AM 25    PROTOCOL AT THERANOS?

ER-2016

EDLIN REDIRECT BY MR. BOSTIC                                    2808

11:15AM   1    A.   NO.

11:15AM   2    Q.   AND HOW ABOUT THE DEMO APP, WAS THAT YOUR IDEA?

11:15AM   3    A.   NO.

11:15AM   4    Q.   WERE YOU INVOLVED IN ACTUALLY DEVELOPING EITHER OF THOSE

11:15AM   5    SOFTWARE ITEMS?

11:15AM   6    A.   NO.

11:15AM   7    Q.   AND WERE THOSE ITEMS DEVELOPED IN HOUSE AT THERANOS?

11:16AM   8    A.   YES.

11:16AM   9    Q.   AND WHO OR WHAT GROUP OF PEOPLE WOULD HAVE DEVELOPED THOSE

11:16AM  10    PIECES OF SOFTWARE?

11:16AM  11    A.   THE SOFTWARE DEVELOPMENT GROUP.

11:16AM  12    Q.   AND WHO DID THAT GROUP REPORT TO?

11:16AM  13    A.   SUNNY.

11:16AM  14    Q.   AND CAN YOU REMIND US WHAT WAS THE KEY FEATURE OF THE DEMO

11:16AM  15    APP AS IT RELATES TO VIP DEMONSTRATIONS THAT WE'VE BEEN TALKING

11:16AM  16    ABOUT, OR KEY FEATURES?

11:16AM  17    A.   ONE OF THE FEATURES WAS THAT IT SHIELDED ERRORS.  THE

11:16AM  18    OTHER FEATURE WAS THAT IT HAD A USER FRIENDLY TOUCHSCREEN.

11:16AM  19    Q.   AND WHEN YOU SAY, "IT SHIELDED ERRORS," WHAT DOES THAT

11:16AM  20    MEAN?  CAN YOU EXPLAIN?

11:16AM  21    A.   IF AN ERROR OCCURRED IN THE DEVICE, IT DID NOT APPEAR ON

11:16AM  22    THE SCREEN.

11:16AM  23    Q.   YOU WERE INVOLVED IN COORDINATING MANY ASPECTS OF THESE

11:16AM  24    DEMONSTRATIONS AT THERANOS; CORRECT?

11:17AM  25    A.   YES.

ER-2017

11:17AM  1    Q.   WERE YOU ALWAYS PRESENT FOR CONVERSATIONS THAT MS. HOLMES

11:17AM  2    OR MR. BALWANI HAD WITH THE VIP'S ABOUT THE DEMONSTRATIONS AND

11:17AM  3    WHAT THEY WERE GOING TO SEE, WHAT MIGHT BE HAPPENING BEHIND THE

11:17AM  4    SCENES?

11:17AM  5    A.   NO.

11:17AM  6    Q.   SO IF WE WANTED TO KNOW WHAT MR. BALWANI OR MS. HOLMES

11:17AM  7    SAID TO THE VIP'S ABOUT THAT, WE WOULD NEED TO ASK SOMEONE

11:17AM  8    ELSE?

11:17AM  9    A.   CORRECT.

11:17AM  10   Q.   AS THE PERSON COORDINATING THESE DEMONSTRATIONS, DID YOU

11:17AM  11   HAVE AN UNDERSTANDING ABOUT WHY THE DEMONSTRATIONS WERE TAKING

11:17AM  12   PLACE?

11:17AM  13   A.   IN SOME INSTANCES.

11:17AM  14   Q.   AS YOU UNDERSTOOD IT, WHAT WAS THE OVERALL POINT OF THESE

11:17AM  15   DEMONSTRATIONS?

11:17AM  16           MS. WALSH:  OBJECTION.  HEARSAY.

11:17AM  17           THE COURT:  OVERRULED.

11:17AM  18           THE WITNESS:  THE POINT WAS TO SHOW HOW THE THERANOS

11:17AM  19   TECHNOLOGY FUNCTIONED AND WHAT THE THERANOS TECHNOLOGY WAS.

11:17AM  20   BY MR. BOSTIC:

11:18AM  21   Q.   AND WAS IT TO SHOW HOW WELL THE THERANOS TECHNOLOGY

11:18AM  22   FUNCTIONED?

11:18AM  23   A.   I THINK IT WAS TO SHOW HOW WELL AND HOW THE TECHNOLOGY

11:18AM  24   FUNCTIONED.

11:18AM  25   Q.   AND THAT GOAL OF SHOWING WHAT THE TECHNOLOGY IS AND HOW

11:18AM   1    WELL IT FUNCTIONS, SITTING HERE TODAY, CAN YOU EXPLAIN HOW THAT

11:18AM   2    GOAL IS SERVED BY A PIECE OF SOFTWARE THAT HIDES ERRORS FROM A

11:18AM   3    VIP WHO IS WATCHING?

11:18AM   4             MS. WALSH:  OBJECTION.  ARGUMENT.

11:18AM   5             THE COURT:  COULD YOU REPHRASE THAT QUESTION.

11:18AM   6    BY MR. BOSTIC:

11:18AM   7    Q.   SITTING HERE TODAY, MR. EDLIN, DO YOU BELIEVE THAT THE

11:18AM   8    GOAL OF SHOWING HOW WELL THE THERANOS TECHNOLOGY WORKED WAS

11:18AM   9    SERVED BY A PIECE OF SOFTWARE THAT HID ERRORS FROM THE VIP

11:19AM   10   WATCHING?

11:19AM   11             MS. WALSH:  OBJECTION.  ARGUMENT.

11:19AM   12             THE COURT:  OVERRULED.

11:19AM   13   BY MR. BOSTIC:

11:19AM   14   Q.   IF YOU KNOW?

11:19AM   15   A.   CAN YOU REPEAT THE QUESTION?

11:19AM   16   Q.   SURE.

11:19AM   17        DO YOU BELIEVE THAT THE GOAL, THE GOAL THAT WE TALKED

11:19AM   18   ABOUT OF SHOWING HOW WELL THE THERANOS TECHNOLOGY WORKED WAS

11:19AM   19   SERVED BY USING SOFTWARE THAT HID ERRORS FROM THE VIP?

11:19AM   20   A.   I DON'T KNOW.

11:19AM   21   Q.   DO YOU RECALL DISCUSSION DURING YOUR DIRECT EXAMINATION OF

11:19AM   22   INSTANCES WHERE DANIEL YOUNG REMOVED OR CHANGED LABORATORY

11:19AM   23   RESULTS FOR THESE DEMOS?

11:19AM   24   A.   YES.

11:19AM   25   Q.   I'LL ASK YOU THE SAME QUESTION ABOUT THAT, WHICH IS, IF

11:19AM 1    THE GOAL WAS TO DEMONSTRATE TO VIP'S HOW WELL THE THERANOS

11:19AM 2    TECHNOLOGY WORKED, DO YOU BELIEVE THAT THAT GOAL WAS SERVED BY

11:20AM 3    REMOVING OR CHANGING PROBLEMATIC RESULTS?

11:20AM 4            MS. WALSH:  OBJECTION.  ARGUMENT.

11:20AM 5            THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

11:20AM 6            THE WITNESS:  CAN YOU REPEAT THE QUESTION?

11:20AM 7    BY MR. BOSTIC:

11:20AM 8    Q.  SURE.

11:20AM 9        THE GOAL OF SHOWING HOW WELL THE THERANOS TECHNOLOGY

11:20AM 10   WORKED -- AND LET ME ASK, WAS THE POINT OF THESE

11:20AM 11   DEMONSTRATIONS, TO PRESENT AN HONEST PICTURE OF HOW WELL THE

11:20AM 12   THERANOS TECHNOLOGY WORKED IN YOUR MIND?

11:20AM 13   A.  YES.

11:20AM 14   Q.  SO THAT GOAL THEN, THE GOAL OF SHOWING HOW WELL THE

11:20AM 15   THERANOS TECHNOLOGY WORKED, DO YOU BELIEVE THAT GOAL WAS SERVED

11:20AM 16   BY THE PRACTICE OF REMOVING OR CHANGING PROBLEMATIC RESULTS

11:20AM 17   AFTER THE FACT, IF YOU KNOW?

11:20AM 18   A.  I DON'T KNOW.

11:20AM 19   Q.  MS. WALSH ASKED YOU ABOUT CONTACT THAT YOU HAD HAD WITH

11:20AM 20   SCIENTISTS WHO WORKED AT THERANOS.

11:20AM 21       DO YOU RECALL THOSE DISCUSSIONS?

11:20AM 22   A.  YES.

11:20AM 23   Q.  AND SHE ASKED YOU WHETHER YOU CONSULTED WITH THOSE

11:21AM 24   SCIENTISTS, AND I BELIEVE YOU SAID YOU DID?

11:21AM 25   A.  YES.

EDLIN REDIRECT BY MR. BOSTIC                                              2812

11:21AM  1     Q.  AND SHE ASKED YOU WHETHER YOU RELIED ON THOSE SCIENTISTS,

11:21AM  2     AND I BELIEVE YOU SAID YES; IS THAT RIGHT?

11:21AM  3     A.  RIGHT.

11:21AM  4     Q.  AND I THINK SHE MAY HAVE ASKED YOU WHETHER YOU DEFERRED TO

11:21AM  5     THOSE SCIENTISTS.

11:21AM  6         DID YOU?

11:21AM  7     A.  I DID.

11:21AM  8     Q.  AND WHY DID YOU CONSULT WITH, RELY ON, AND DEFER TO THE

11:21AM  9     SCIENTISTS AT THERANOS?

11:21AM  10    A.  BECAUSE THEY WERE THE EXPERTS WITHIN THE COMPANY WHO HAD

11:21AM  11    THE INFORMATION THAT I WAS ASKED TO GET AT THE TIME.

11:21AM  12    Q.  IN YOUR ROLE AT THERANOS, WHEN YOU WERE INTERACTING WITH

11:21AM  13    THESE SCIENTISTS WHO WERE THE EXPERTS, DID YOU EVER ARGUE WITH

11:21AM  14    THEM ABOUT THE SCIENCE?

11:21AM  15    A.  NO.

11:21AM  16    Q.  DID YOU EVER DISAGREE WITH THEM ON SCIENTIFIC POINTS?

11:21AM  17    A.  NO.

11:21AM  18    Q.  DID YOU EVER IGNORE THE ADVICE THAT THEY GAVE YOU ON

11:21AM  19    SCIENTIFIC POINTS?

11:21AM  20    A.  NO.

11:21AM  21    Q.  DID YOU EVER OVERRULE DECISIONS THAT THEY MADE ON POINTS

11:21AM  22    RELATING TO SCIENCE?

11:22AM  23    A.  NO.

11:22AM  24    Q.  MS. WALSH ALSO ASKED YOU ABOUT MR. BALWANI'S ROLE IN THE

11:22AM  25    COMPANY AS IT RELATED TO MS. HOLMES'S ROLE.

ER-2021

11:22AM 1        DO YOU RECALL THAT DISCUSSION?

11:22AM 2    A.   YES.

11:22AM 3    Q.   AND SHE LISTED A NUMBER OF THINGS THAT MS. HOLMES WAS

11:22AM 4    RESPONSIBLE FOR IN THE COMPANY AND SOME THINGS THAT MR. BALWANI

11:22AM 5    WAS RESPONSIBLE FOR AS WELL.

11:22AM 6        DO YOU RECALL THAT?

11:22AM 7    A.   YES.

11:22AM 8    Q.   AND DID SHE ASK YOU -- LET ME ASK IT A DIFFERENT WAY.

11:22AM 9        DID YOUR DISCUSSION WITH HER INCLUDE ALL OF THE AREAS FOR

11:22AM 10   WHICH MR. BALWANI WAS PRIMARILY RESPONSIBLE IN THE COMPANY?

11:22AM 11   A.   I DON'T BELIEVE SO.

11:22AM 12   Q.   OKAY.  WHAT AREAS WERE LEFT OUT OF THAT CONVERSATION, IF

11:22AM 13   YOU RECALL?

11:22AM 14   A.   I DON'T RECALL.

11:22AM 15   Q.   LET ME ASK YOU SOME SPECIFIC QUESTIONS THEN.

11:22AM 16       DO YOU RECALL MS. WALSH ASKING YOU ABOUT WHETHER

11:22AM 17   MR. BALWANI WAS PRIMARILY RESPONSIBLE FOR SOFTWARE AT THE

11:23AM 18   COMPANY?

11:23AM 19   A.   YES.

11:23AM 20   Q.   AND WHAT WAS THE ANSWER TO THAT?

11:23AM 21   A.   YES.

11:23AM 22   Q.   WAS MR. BALWANI ALSO RESPONSIBLE FOR FINANCIAL MATTERS AT

11:23AM 23   THE COMPANY, IF YOU KNOW?

11:23AM 24   A.   I BELIEVE SO.

11:23AM 25   Q.   OKAY.  AND WHAT MAKES YOU SAY THAT?

11:23AM  1    A.   WHEN I WAS ASKED TO HELP COMPILE SOME INVESTMENT BINDERS,

11:23AM  2    I RECALL THAT ELIZABETH TOLD ME TO GET THE FINANCIAL SECTION OF

11:23AM  3    THE BINDER FROM SUNNY.

11:23AM  4    Q.   AND SPEAKING OF CONTACT WITH INVESTORS, ARE YOU AWARE OF

11:23AM  5    ANY MEETINGS WITH THERANOS INVESTORS WHERE MR. BALWANI WAS

11:23AM  6    PRESENT FOR THOSE MEETINGS?

11:23AM  7    A.   I'M AWARE THAT THOSE MEETINGS HAPPENED.  I'M NOT SURE OF

11:23AM  8    THE SPECIFICS, THOUGH.

11:23AM  9    Q.   I'M SORRY FOR TALKING OVER YOU.

11:23AM 10        HOW ABOUT WHEN IT CAME TO THERANOS'S RELATIONSHIP WITH

11:23AM 11    WALGREENS, DID MR. BALWANI HAVE A PRIMARY ROLE THERE?

11:24AM 12    A.   YES.

11:24AM 13    Q.   WHAT MAKES YOU SAY THAT?

11:24AM 14    A.   IN MY ROLE AS A SENIOR PRODUCT MANAGER WORKING ON THE

11:24AM 15    WALGREENS PARTNERSHIP, MY TEAM REPORTED UP TO SUNNY.  HE

11:24AM 16    OVERSAW THAT PARTNERSHIP.

11:24AM 17    Q.   WHEN MS. WALSH WAS LISTING AREAS OF RESPONSIBILITY AT THE

11:24AM 18    COMPANY, I DON'T THINK SHE ASKED YOU ABOUT RESPONSIBILITY FOR

11:24AM 19    THE CLINICAL LAB.

11:24AM 20        SO WE'RE TALKING ABOUT THE PORTION OF THE BUSINESS THAT

11:24AM 21    ACTUALLY RAN PATIENT TESTING FOR THE PUBLIC; CORRECT?

11:24AM 22    A.   CORRECT.

11:24AM 23    Q.   BETWEEN MS. HOLMES AND MR. BALWANI, WHICH OF THEM, IN YOUR

11:24AM 24    EXPERIENCE, WAS MORE INVOLVED WITH THE OPERATIONS OF THE

11:24AM 25    CLINICAL LAB WHERE PATIENT TESTING WAS DONE?

11:24AM  1    A.    SUNNY.

11:24AM  2    Q.    AND WHAT MAKES YOU SAY THAT?

11:24AM  3    A.    NUMBER ONE, HE WAS THE COO AND IN CHARGE OF OPERATIONS

11:24AM  4    WITHIN THE COMPANY, AND MY UNDERSTANDING WAS THAT THE CLINICAL

11:24AM  5    LAB FELL WITHIN OPERATIONS.

11:25AM  6         I'M ALSO AWARE THAT AT ONE POINT A LAB DIRECTOR LEFT THE

11:25AM  7    COMPANY AND HE ASSUMED CONTROL, OR HE OVERSAW THE CLINICAL LAB

11:25AM  8    OPERATIONS.

11:25AM  9    Q.    AND AT THAT POINT WHERE MR. BALWANI TOOK MORE CONTROL OVER

11:25AM  10   THE LAB AFTER A LAB DIRECTOR LEFT, CAN YOU PLACE THAT IN TIME

11:25AM  11   FOR US?

11:25AM  12        DO YOU HAVE A RECOLLECTION AS TO APPROXIMATELY WHEN THAT

11:25AM  13   WAS?

11:25AM  14   A.    I BELIEVE IN 2014.

11:25AM  15   Q.    DO YOU STILL HAVE THE WHITE BINDER IN FRONT OF YOU?

11:25AM  16   A.    YES.

11:25AM  17   Q.    THE GOVERNMENT BINDER.

11:25AM  18        CAN I ASK YOU TO TURN TO TAB 1776, PLEASE.

11:26AM  19   A.    OKAY.

11:26AM  20   Q.    OKAY.  YOU HAVE EXHIBIT 1776 IN FRONT OF YOU?

11:26AM  21   A.    YES.

11:26AM  22   Q.    CAN YOU IDENTIFY EXHIBIT 1776 FOR US?

11:26AM  23   A.    THIS WAS AN ARTICLE IN "FORTUNE" MAGAZINE WRITTEN ABOUT

11:26AM  24   THERANOS.

11:26AM  25   Q.    AND DO YOU RECALL DISCUSSING THIS ARTICLE AND MS. HOLMES'S

11:26AM 1    INTERVIEW WITH MS. WALSH A FEW MINUTES AGO?

11:26AM 2    A.   YES.

11:26AM 3    Q.   YOU TESTIFIED ON CROSS-EXAMINATION THAT, GENERALLY

11:26AM 4    SPEAKING, MS. HOLMES WAS THE FACE OF THE COMPANY; IS THAT

11:26AM 5    CORRECT?

11:26AM 6    A.   YES.

11:26AM 7    Q.   AND YOU WERE ALSO ASKED ABOUT WHETHER MR. BALWANI WAS

11:26AM 8    PRESENT FOR MS. HOLMES'S INTERVIEW FOR THIS ARTICLE.

11:27AM 9         DO YOU RECALL THAT?

11:27AM 10   A.   YES.

11:27AM 11   Q.   COULD I DIRECT YOUR ATTENTION TO PAGE 21 OF THAT ARTICLE,

11:27AM 12   THE TOP PARAGRAPH.  I'LL JUST ASK YOU TO LOOK IT OVER.  THE

11:27AM 13   PAGE NUMBERS ARE AT THE VERY BOTTOM.

11:27AM 14   A.   OKAY.  I SEE THAT.

11:27AM 15   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. BALWANI WAS

11:27AM 16   ALSO INTERVIEWED FOR THIS "FORTUNE" ARTICLE?

11:27AM 17   A.   YES.

11:27AM 18   Q.   OKAY.  YOU CAN PUT THAT ASIDE.  THANK YOU.

11:27AM 19        DO YOU RECALL DISCUSSING WITH MR. BALWANI'S COUNSEL THE

11:27AM 20   WALGREENS RELATIONSHIP AND THE FACT THAT WALGREENS APPARENTLY

11:27AM 21   HAD A THERANOS DEVICE IN ITS POSSESSION?

11:27AM 22   A.   YES.

11:27AM 23   Q.   DO YOU RECALL ANY OF THE DETAILS ABOUT WHEN THAT DEVICE

11:27AM 24   WAS PROVIDED TO WALGREENS OR FOR WHAT PURPOSE?

11:28AM 25   A.   I DON'T.

EDLIN REDIRECT BY MR. BOSTIC                                    2817

11:28AM  1    Q.  DO YOU KNOW, FOR EXAMPLE, WHETHER THAT DEVICE WAS CAPABLE

11:28AM  2    OF RUNNING ANY ASSAYS?

11:28AM  3    A.  NO.

11:28AM  4    Q.  DO YOU KNOW WHETHER THERANOS PROVIDED THE CARTRIDGES AND

11:28AM  5    REAGENTS THAT WOULD BE NECESSARY TO ACTUALLY USE THAT DEVICE AS

11:28AM  6    AN ANALYZER?

11:28AM  7    A.  I DON'T.

11:28AM  8    Q.  DO YOU KNOW WHETHER WALGREENS WAS PERMITTED TO EXAMINE THE

11:28AM  9    DEVICE, FOR EXAMPLE, TO OPEN IT UP AND LOOK AT THE COMPONENTS?

11:28AM  10   A.  I'M NOT AWARE OF THOSE SPECIFIC CONVERSATIONS, BUT I

11:28AM  11   ASSUME THAT THEY WOULD NOT BE ALLOWED TO DO THAT.

11:28AM  12   Q.  WHAT MAKES YOU ASSUME THAT THAT WOULDN'T BE PERMITTED?

11:28AM  13   A.  IN MY EXPERIENCE, NO ONE OUTSIDE OF THE COMPANY WAS

11:28AM  14   PERMITTED TO DO THAT.

11:28AM  15   Q.  SPEAKING OF THE COMPANY'S RELATIONSHIPS WITH OUTSIDE

11:29AM  16   PARTNERS, DO YOU RECALL DISCUSSING WITH MS. WALSH SOME OF THE

11:29AM  17   CONTACTS THAT THE COMPANY HAD WITH PHARMACEUTICAL COMPANIES?

11:29AM  18   A.  YES.

11:29AM  19   Q.  OKAY.  AND YOU WERE SHOWN SOME INSTANCES IN 2013 WHERE

11:29AM  20   THERE WERE EMAILS AND DISCUSSIONS ABOUT SOME POSSIBLE FUTURE

11:29AM  21   DEALINGS.

11:29AM  22       DO YOU RECALL THAT GENERALLY?

11:29AM  23   A.  YES.

11:29AM  24   Q.  SITTING HERE TODAY, DO YOU HAVE A RECOLLECTION OF ANY OF

11:29AM  25   THOSE CONTACTS ACTUALLY TURNING INTO REAL REVENUE GENERATING

ER-2026

11:29AM  1    WORK FOR THERANOS?

11:29AM  2    A.   NO.

11:29AM  3    Q.   MS. WACHS, CAN WE PUBLISH --

11:29AM  4         YOUR HONOR, ACTUALLY, WE WOULD LIKE TO PUBLISH

11:29AM  5    EXHIBIT 7753, AND ONE OF THE ATTACHMENTS.  I BELIEVE THIS IS

11:30AM  6    PRE-ADMITTED.

11:30AM  7              THE COURT:  IT MAY BE PUBLISHED, YES.

11:30AM  8    BY MR. BOSTIC:

11:30AM  9    Q.   LET'S GO TO TAB 2.

11:30AM  10        MR. EDLIN, WHAT I'M SHOWING YOU IS A PRE-ADMITTED EXHIBIT.

11:30AM  11        HAVE YOU SEEN THESE FINANCIAL RECORDS BEFORE?

11:30AM  12   A.   NO.

11:30AM  13   Q.   I'LL DIRECT YOUR ATTENTION TO THE LEFT MOST COLUMN, A,

11:30AM  14   WHERE SOME ENTITIES ARE LISTED.

11:30AM  15        DO YOU SEE THOSE ENTITIES?

11:30AM  16   A.   YES.

11:30AM  17   Q.   AND DO YOU SEE THAT THEY INCLUDE COMPANIES LIKE PFIZER,

11:30AM  18   MERCK, AND OTHER PHARMACEUTICAL COMPANIES?

11:30AM  19   A.   YES.

11:30AM  20   Q.   AND DO YOU SEE AT THE TOP THERE'S A LINE FOR AMERICAN BURN

11:30AM  21   ASSOCIATION?

11:30AM  22   A.   YES.

11:30AM  23   Q.   AND CAN YOU REMIND US WHAT WAS THE COMPANY' WORK WITH THE

11:30AM  24   AMERICAN BURN ASSOCIATION?

11:30AM  25   A.   THE WORK WAS ON A STUDY LOOKING AT SEPSIS IN CONNECTION

EDLIN REDIRECT BY MR. BOSTIC                                        2819

11:30AM   1   WITH BURN PATIENTS.

11:30AM   2   Q.   LET'S SCROLL TO THE RIGHT IN THIS CHART, SO MOVING FORWARD

11:31AM   3   IN TIME, AND LET'S LOOK AT THE TIME PERIOD 2012, 2013, AND ON.

11:31AM   4       SO, MR. EDLIN, LOOKING AT THIS CHART, FIRST OF ALL, FOR

11:31AM   5   THE PHARMACEUTICAL COMPANIES, DO YOU SEE ON THIS CHART ANY

11:31AM   6   REVENUE, LET'S SEE, OTHER THAN -- ACTUALLY, LET ME JUST ASK, DO

11:31AM   7   YOU SEE ANY REVENUE ON THIS CHART FROM PHARMACEUTICAL COMPANIES

11:31AM   8   IN 2012 OR ON?

11:31AM   9   A.   IF I'M LOOKING AT THIS CORRECTLY, IT'S -- THERE'S A GAP

11:31AM  10   BETWEEN 2011 AND 2014.

11:31AM  11   Q.   OKAY.  SO I GUESS MY QUESTION IS, DO YOU SEE ANY INDICATED

11:31AM  12   REVENUE FROM PHARMACEUTICAL COMPANIES ON THIS CHART FOR THOSE

11:31AM  13   YEARS, 2012, 2013, OR ON?

11:31AM  14   A.   JUST 2014.

11:31AM  15   Q.   OKAY.  AND FOR 2014, YOU SEE THERE IS INCOME UNDER THE ROW

11:32AM  16   FOR AMERICAN BURN ASSOCIATION; IS THAT CORRECT?

11:32AM  17   A.   YES.

11:32AM  18   Q.   AND THE GRAND TOTAL FOR THE AMERICAN BURN ASSOCIATION

11:32AM  19   ENTITY IS ON THE RIGHT COLUMN THERE, AND IT SAYS 288,000.

11:32AM  20       DO YOU SEE THAT?

11:32AM  21   A.   YES.

11:32AM  22   Q.   IS THAT CONSISTENT WITH YOUR RECOLLECTION ABOUT THE TOTAL

11:32AM  23   AMOUNT OF MONEY THAT THERANOS ACTUALLY MADE FROM THAT MULTI

11:32AM  24   YEAR STUDY WITH THE AMERICAN BURN ASSOCIATION?

11:32AM  25   A.   I DON'T RECALL.

11:32AM 1    Q.  DO YOU HAVE ANY RECOLLECTION OF THE AMOUNT BEING, EXCUSE

11:32AM 2    ME, DIFFERENT FROM THIS AMOUNT OF 288,000?

11:32AM 3    A.  I DON'T RECALL --

11:32AM 4    Q.  OKAY.

11:32AM 5    A.  -- WHAT THE NUMBER WAS.

11:32AM 6    Q.  OKAY.  WE CAN PUT THAT ASIDE.  THANK YOU.

11:32AM 7        SPEAKING OF THAT BURN STUDY AND CONTACTS WITH THE

11:32AM 8    MILITARY, I'D LIKE TO DISCUSS THAT WITH YOU BRIEFLY.

11:32AM 9    A.  OKAY.

11:32AM 10   Q.  AND LET'S START WITH THE BURN STUDY.

11:33AM 11       MS. WACHS, DO WE HAVE THE ABILITY TO PROJECT 7694?

11:33AM 12       YOUR HONOR, THIS WAS PRE-ADMITTED?

11:33AM 13           THE COURT:  IT WAS, YES.

11:33AM 14           MR. BOSTIC:  IF WE CAN ZOOM IN ON THE ABSTRACT

11:33AM 15   SECTION, JUST THAT WHOLE BOX.

11:33AM 16   Q.  SO, MR. EDLIN, UNDER RESULTS, I THINK YOU TESTIFIED ABOUT

11:33AM 17   THE REASON WHY THE STUDY WAS TERMINATED.

11:33AM 18       DO YOU RECALL THAT?

11:33AM 19   A.  I'M NOT SURE IF IT WAS IN THAT CONTEXT.

11:33AM 20   Q.  OKAY.  LET ME ASK IT A BETTER WAY.

11:33AM 21   A.  OKAY.

11:33AM 22   Q.  DO YOU SEE UNDER RESULTS THE SECOND SENTENCE BEGINS, "THE

11:33AM 23   STUDY WAS TERMINATED DUE TO"?

11:33AM 24   A.  YES.

11:33AM 25   Q.  IT SAYS, "THE STUDY WAS TERMINATED DUE TO SLOW

EDLIN REDIRECT BY MR. BOSTIC                                    2821

11:33AM   1    ENROLLMENT."

11:33AM   2        DO YOU RECALL THAT?  CAN YOU EXPLAIN WHAT THAT MEANS?

11:33AM   3    A.   THAT MEANS THAT THE STUDY DID NOT ENROLL OR MAKE A PART OF

11:34AM   4    THAT STUDY.  THAT GENERAL PROCESS WAS SLOW.

11:34AM   5        I THINK THE STUDY WAS THE INVESTIGATOR'S HOPE THAT MORE

11:34AM   6    PATIENTS WOULD BE APART OF THAT STUDY.

11:34AM   7    Q.   ABOVE THAT IT INDICATES THAT A FEW DOZEN PATIENTS WERE

11:34AM   8    INVOLVED.

11:34AM   9        IS THAT CONSISTENT WITH YOUR RECOLLECTION?

11:34AM  10    A.   YES.

11:34AM  11    Q.   UNDER BACKGROUND, IT TALKS ABOUT THE OBJECTIVE OF THE

11:34AM  12    STUDY.

11:34AM  13        DO YOU SEE THAT?

11:34AM  14    A.   YES.

11:34AM  15    Q.   AND IT TALKS ABOUT A TREATMENT ABBREVIATED HBHF, WHICH

11:34AM  16    STANDS FOR HIGH-VOLUME HEMOFILTRATION.

11:34AM  17        DO YOU SEE THAT?

11:34AM  18    A.   YES.

11:34AM  19    Q.   AND DID THIS STUDY RELATE TO EXPLORING WHETHER THAT

11:34AM  20    TREATMENT WOULD BE AN EFFECTIVE TREATMENT FOR BURN PATIENTS?

11:35AM  21    A.   YES.

11:35AM  22    Q.   AND DID THERANOS HAVE ANYTHING TO DO WITH THE DEVELOPMENT

11:35AM  23    OF THAT TREATMENT, THAT HIGH-VOLUME HEMOFILTRATION?

11:35AM  24    A.   I DON'T BELIEVE SO.

11:35AM  25    Q.   OKAY.  LET'S MOVE FORWARD IN THIS EXHIBIT.

ER-2030

EDLIN REDIRECT BY MR. BOSTIC                                    2822

11:35AM   1          LET'S GO TO THE SECOND TO THE LAST PAGE, PLEASE.  SO WE

11:35AM   2     CAN JUST KEEP SCROLLING FORWARD UNTIL WE GET THERE.  THERE IT

11:35AM   3     WAS.  JUST THE PREVIOUS PAGE.

11:35AM   4          LET'S ZOOM IN ON ACKNOWLEDGEMENTS SECTION IN THE LOWER

11:36AM   5     RIGHT CORNER.

11:36AM   6          MR. EDLIN, DO YOU SEE THAT THE ACKNOWLEDGEMENTS SECTION

11:36AM   7     LISTS A VARIETY OF PROFESSIONALS AND FACILITIES INVOLVED IN THE

11:36AM   8     STUDY?

11:36AM   9     A.   YES.

11:36AM  10     Q.   AND DO YOU SEE THAT THE FACILITIES INCLUDE MANY FACILITIES

11:36AM  11     THAT ARE NOT AFFILIATED WITH THE MILITARY?

11:36AM  12     A.   YES.

11:36AM  13     Q.   SO MY QUESTION IS, WAS THIS STUDY FOCUSSED ON THE

11:36AM  14     TREATMENT OF SOLDIERS AS SUBJECTS OR WAS IT BROADER THAN THAT?

11:36AM  15     A.   BROADER.

11:36AM  16     Q.   AND, AGAIN, JUST TO CLARIFY, BASED ON YOUR UNDERSTANDING

11:36AM  17     OF THE STUDY AND WORKING WITH IT, DID THIS STUDY INVOLVE THE

11:36AM  18     ACTUAL CLINICAL USE OF THE THERANOS ANALYZER?

11:36AM  19          IN OTHER WORDS, DID DOCTORS RELY ON THE RESULTS FROM THE

11:36AM  20     THERANOS TESTS TO MAKE ANY TREATMENT DECISIONS ABOUT PATIENTS?

11:37AM  21     A.   NO.

11:37AM  22     Q.   OKAY.  WE CAN PUT THAT ASIDE.  THANK YOU.

11:37AM  23          YOU WERE ALSO ASKED ABOUT THERANOS'S CONTACT WITH SPECIAL

11:37AM  24     OPERATIONS COMMAND.

11:37AM  25          DO YOU REMEMBER THAT?

ER-2031

EDLIN REDIRECT BY MR. BOSTIC                                         2823

11:37AM  1    A.   YES.

11:37AM  2    Q.   AND MS. WALSH ASKED YOU ABOUT AN INSTANCE WHERE DEVICES

11:37AM  3    WERE SENT TO SOCOM; IS THAT RIGHT?

11:37AM  4    A.   YES.

11:37AM  5    Q.   AND SHE ASKED YOU WHETHER SOCOM COULD RUN TESTS ON THOSE

11:37AM  6    DEVICES -- WELL, ACTUALLY, LET ME JUST ASK YOU THAT QUESTION.

11:37AM  7         TO YOUR RECOLLECTION, COULD SOCOM HAVE USED THOSE DEVICES

11:37AM  8    TO ACTUALLY RUN TESTS?

11:37AM  9    A.   I THINK I -- THEY WOULD HAVE NEEDED MORE MATERIAL, MORE

11:37AM  10   EQUIPMENT TO DO THAT.

11:37AM  11   Q.   YOU TESTIFIED ON CROSS THAT YOU DON'T BELIEVE THE

11:37AM  12   CARTRIDGES WERE INCLUDED WITH THOSE DEVICES?

11:37AM  13   A.   CORRECT.

11:37AM  14   Q.   EXPLAIN WHAT THAT MEANS.  WHAT WERE THE CARTRIDGES AND WHY

11:38AM  15   WERE THEY NECESSARY FOR USE WITH THE DEVICES?

11:38AM  16   A.   THE CARTRIDGES WERE A PIECE OF EQUIPMENT THAT SOMEONE

11:38AM  17   WOULD PUT A NANOTAINER OF BLOOD INTO.

11:38AM  18        CARTRIDGES ALSO HAD DIFFERENT CHEMISTRIES THAT WERE

11:38AM  19   REQUIRED TO DO TESTING.

11:38AM  20        SO A DEVICE ITSELF COULD NOT DO THE TESTING.  IT NEEDED

11:38AM  21   CARTRIDGES AND NANOTAINERS IN ORDER TO DO THE TESTING.

11:38AM  22   Q.   AND WOULD A LACK OF CARTRIDGES PREVENT SOCOM FROM USING

11:38AM  23   THE ANALYZER IN THE CLINICAL TREATMENT OF SOLDIERS?

11:38AM  24   A.   YES.

11:38AM  25   Q.   HOW ABOUT JUST TESTING THE DEVICE TO SEE IF IT PROVIDED

EDLIN REDIRECT BY MR. BOSTIC                                    2824

11:38AM  1    ACCURATE RESULTS, WOULD THE LACK OF CARTRIDGES PREVENT THEM

11:38AM  2    FROM EVEN TAKING THAT STEP?

11:38AM  3    A.   YES.

11:38AM  4    Q.   I'D LIKE TO ASK YOU ABOUT THERANOS'S DEALINGS WITH

11:39AM  5    CENTCOM.  THAT'S CENTRAL COMMAND; RIGHT?

11:39AM  6    A.   RIGHT.

11:39AM  7    Q.   YOU WERE ASKED ABOUT A TRIP TO MACDILL BASE IN 2012 FOR A

11:39AM  8    SECURITY TEST.

11:39AM  9         DO YOU REMEMBER THAT TRIP?

11:39AM  10   A.   YES.

11:39AM  11   Q.   AND CAN YOU EXPLAIN TO US WHAT THE DEVICE HAD TO DO ON

11:39AM  12   THAT TRIP?  FOR EXAMPLE, WAS IT RUNNING ANY ACTUAL PATIENT

11:39AM  13   SAMPLES AT THAT TIME?

11:39AM  14   A.   IT DID NOT HAVE TO RUN ANY TESTS AT THAT TIME.

11:39AM  15   Q.   WHAT WAS IT DOING INSTEAD?

11:39AM  16   A.   IT ESSENTIALLY HAD TO TURN ON AND CONNECT TO THE NETWORK

11:39AM  17   AND SERVER, AND THAT WAS IT.

11:39AM  18   Q.   YOU WERE ALSO SHOWN A PROTOCOL FOR A LIMITED OBJECTIVE

11:39AM  19   EXPERIMENT WITH CENTCOM.

11:39AM  20        DO YOU REMEMBER SEEING THAT?

11:39AM  21   A.   YES.

11:39AM  22   Q.   MS. WACHS, DO WE HAVE THAT EXHIBIT TO DISPLAY?  IT'S

11:39AM  23   10472.

11:39AM  24        ACTUALLY, SORRY.  IT'S 10457.

11:40AM  25        MR. -- SORRY.  YOUR HONOR, MAY WE PUBLISH?

ER-2033

11:40AM 1                    THE COURT:  YES.

11:40AM 2      BY MR. BOSTIC:

11:40AM 3      Q.   MR. EDLIN, DO YOU RECALL REVIEWING THIS EXHIBIT AND THE

11:40AM 4      ATTACHED PROTOCOL WITH MS. WALSH?

11:40AM 5      A.   YES.

11:40AM 6      Q.   AND LET'S LOOK AT THE ATTACHMENT, THE PROTOCOL ITSELF.

11:40AM 7           SO, FIRST OF ALL, CAN YOU EXPLAIN FOR US WHAT THE FUNCTION

11:40AM 8      OF THIS DOCUMENT WAS?  WHAT ARE WE ACTUALLY LOOKING AT?

11:40AM 9      A.   THIS DOCUMENT OUTLINES THE WORK THAT THERANOS WOULD DO

11:40AM 10     WITH CENTCOM TO EVALUATE THE TECHNOLOGY.

11:40AM 11     Q.   OKAY.  AND THIS WORK THAT WAS GOING TO TAKE PLACE, DID IT

11:40AM 12     ACTUALLY EVER HAPPEN?

11:40AM 13     A.   NO.

11:40AM 14     Q.   THE LIMITED OBJECTIVE EXPERIMENT WHERE A DEVICE WAS GOING

11:40AM 15     TO BE SHIPPED TO THE MIDDLE EAST AND EVALUATED BY THE MILITARY,

11:41AM 16     DID THAT ACTUALLY EVER TAKE PLACE?

11:41AM 17     A.   NO.

11:41AM 18     Q.   LET'S LOOK AT PAGE 12 OF THIS EXHIBIT.

11:41AM 19          LET'S KEEP GOING TO THE NEXT PAGE.

11:41AM 20          AND ONE MORE.  RIGHT THERE.

11:41AM 21          LET'S ZOOM IN ON THE TOP PORTION OF THIS PAGE.

11:41AM 22          MR. EDLIN, DO YOU SEE THAT NOW WE'RE LOOKING AT A PART OF

11:41AM 23     THAT DOCUMENT THAT HAS A LIST OF ASSAYS?

11:41AM 24     A.   YES.

11:41AM 25     Q.   AND I'LL DRAW YOUR ATTENTION TO JUST THE FIRST ONE ON THAT

EDLIN REDIRECT BY MR. BOSTIC                                    2826

11:41AM  1    LIST, WHICH IS CBC.

11:41AM  2        DO YOU HAVE AN UNDERSTANDING AS TO WHAT CBC IS OR WHAT IT

11:41AM  3    STANDS FOR?

11:42AM  4    A.    COMPLETE BLOOD COUNT.

11:42AM  5    Q.    AT THIS TIME, DO YOU KNOW WHETHER THERANOS HAD A HOME

11:42AM  6    BUILT ANALYZER THAT IT WAS USING FOR THE CBC ASSAY FOR PATIENT

11:42AM  7    TESTING?

11:42AM  8            MS. WALSH:  OBJECTION.  FOUNDATION.

11:42AM  9            THE COURT:  YOU'RE ASKING IF HE HAS PERSONAL

11:42AM 10    KNOWLEDGE OF THAT.  OVERRULED.

11:42AM 11        YOU CAN ANSWER THE QUESTION WHETHER YOU HAD PERSONAL

11:42AM 12    KNOWLEDGE.

11:42AM 13    BY MR. BOSTIC:

11:42AM 14    Q.    LET ME ASK IT AGAIN, MR. EDLIN.

11:42AM 15        THE QUESTION IS, AROUND THE TIME THAT THESE CONVERSATIONS

11:42AM 16    WERE HAPPENING WITH THE MILITARY, DO YOU KNOW WHETHER THERANOS

11:42AM 17    HAD A HOME BUILT ANALYZER THAT IT WAS ACTUALLY USING FOR CBC

11:42AM 18    ASSAYS FOR PATIENT TESTING?

11:42AM 19    A.    I DON'T BELIEVE IT DID.

11:42AM 20    Q.    LET'S LOOK AT EXHIBIT 10472, WHICH IS ANOTHER ONE THAT YOU

11:43AM 21    REVIEWED WITH MS. WALSH.

11:43AM 22        YOUR HONOR, MAY WE DISPLAY THIS?

11:43AM 23            THE COURT:  YES.

11:43AM 24    BY MR. BOSTIC:

11:43AM 25    Q.    MR. EDLIN, DO YOU RECALL REVIEWING THIS CORRESPONDENCE

EDLIN REDIRECT BY MR. BOSTIC                                2827

11:43AM   1    WHERE THERANOS WAS PREPARING TO SEND AN ANALYZER TO THE

11:43AM   2    MILITARY IN FEBRUARY OF 2013?

11:43AM   3    A.   YES.

11:43AM   4    Q.   YOU TESTIFIED THAT THERANOS LAUNCHED ITS TESTING SERVICES

11:43AM   5    TO THE PUBLIC IN SEPTEMBER 2013; IS THAT RIGHT?

11:43AM   6    A.   YES.

11:43AM   7    Q.   AND SO ABOUT SEVEN MONTHS AFTER THIS; IS THAT CORRECT?

11:43AM   8    A.   YES.

11:43AM   9    Q.   IN SEPTEMBER 2013, DID THERANOS HAVE A 4 SERIES DEVICE

11:43AM   10   THAT WAS AT THE POINT WHERE IT COULD BE USED FOR PATIENT

11:43AM   11   TESTING?

11:43AM   12   A.   I DON'T BELIEVE SO.

11:43AM   13   Q.   HOW ABOUT IN 2014, BASED ON YOUR UNDERSTANDING, WERE ANY

11:44AM   14   4 SERIES DEVICES READY TO BE USED FOR PATIENT TESTING AT

11:44AM   15   THERANOS IN 2014?

11:44AM   16   A.   I BELIEVE THEY WERE STILL UNDER DEVELOPMENT.

11:44AM   17   Q.   AND HOW ABOUT IN 2015, YEARS AFTER THIS EMAIL, DID

11:44AM   18   THERANOS HAVE A 4 SERIES DEVICE THAT IT COULD USE FOR PATIENT

11:44AM   19   TESTING?

11:44AM   20   A.   I KNOW THAT THE TESTS WERE NOT USED FOR PATIENT TESTING.

11:44AM   21   Q.   AND IS THAT TRUE FOR YOUR ENTIRE TIME AT THE COMPANY?

11:44AM   22   A.   YES.

11:44AM   23   Q.   LOOKING AT THIS EMAIL, I'LL DRAW YOUR ATTENTION TO THE

11:44AM   24   HIGHER -- I'M SORRY, THE ITALICIZED PARAGRAPH, WHICH IS THE

11:44AM   25   THIRD ONE DOWN.  LET'S DRAW YOUR ATTENTION TO THAT ONE.

EDLIN REDIRECT BY MR. BOSTIC                                    2828

11:45AM  1        DO YOU SEE THERE'S -- ON THE THIRD LINE THERE'S A SENTENCE

11:45AM  2    THAT BEGINS, "WE HAVE SIGNIFICANTLY ACCELERATED THERANOS'S

11:45AM  3    PREVIOUSLY PLANNED RELEASE OF 4S IN ORDER TO MEET OUR

11:45AM  4    OBJECTIVES FOR THIS PROGRAM."

11:45AM  5        DO YOU SEE THAT?

11:45AM  6    A.   YES.

11:45AM  7    Q.   AND THIS CLAIM OF SIGNIFICANTLY ACCELERATING THE RELEASE

11:45AM  8    OF 4S, LET ME JUST ASK, WAS THE 4S DEVICE EVER ACTUALLY

11:45AM  9    RELEASED DURING YOUR TIME AT THE COMPANY?

11:45AM 10    A.   COULD YOU DEFINE "RELEASED"?

11:45AM 11    Q.   SURE.

11:45AM 12        WAS IT EVER SOLD TO ANY THIRD PARTIES, TO YOUR KNOWLEDGE?

11:45AM 13    A.   NO.

11:45AM 14    Q.   WAS IT EVER USED FOR CLINICAL PATIENT TESTING, TO YOUR

11:45AM 15    KNOWLEDGE?

11:45AM 16    A.   NO.

11:45AM 17    Q.   DID IT EVER COMPLETE THE RESEARCH AND DEVELOPMENT PROCESS,

11:45AM 18    TO YOUR KNOWLEDGE?

11:45AM 19    A.   I UNDERSTAND THAT IT RECEIVED THAT FDA CLEARANCE OR

11:46AM 20    APPROVAL FOR THE ONE TEST.

11:46AM 21    Q.   AND DID YOU UNDERSTAND THAT TO BE THE END OF ALL RESEARCH

11:46AM 22    AND DEVELOPMENT SUCH THAT THE 4S WAS COMPLETE AND A RELEASED

11:46AM 23    PRODUCT?

11:46AM 24    A.   NO.

11:46AM 25    Q.   FINALLY -- OKAY.  WE CAN SET THAT ASIDE.

ER-2037

EDLIN REDIRECT BY MR. BOSTIC                                     2829

11:46AM   1        FINALLY, LET ME ASK YOU, ON THE MILITARY TOPIC, ABOUT

11:46AM   2   THERANOS'S DEALINGS WITH AFRICOM.  IF WE CAN BRIEFLY DISPLAY

11:46AM   3   13993.

11:46AM   4        YOUR HONOR, THIS IS PRE-ADMITTED.

11:46AM   5            THE COURT:  YES.

11:46AM   6   BY MR. BOSTIC:

11:46AM   7   Q.  AND LET'S LOOK AT PAGE 5, PLEASE.  LET'S LOOK AT THE

11:46AM   8   BOTTOM OF THIS PAGE.

11:46AM   9        MR. EDLIN, DO YOU SEE HERE THAT MELISSA GIVENS FROM THE

11:47AM  10   MILITARY IS SPECIFYING VALUES FOR THE PATIENTS THAT WOULD BE

11:47AM  11   TESTED?

11:47AM  12   A.  YES.

11:47AM  13   Q.  CAN YOU EXPLAIN WHAT THAT MEANS IN TERMS OF WHETHER THE

11:47AM  14   DEVICE WAS ACTUALLY BEING USED TO PROVIDE RESULTS FOR PATIENTS?

11:47AM  15   A.  LIEUTENANT COLONEL GIVENS SENT A LIST OF RESULTS FOR

11:47AM  16   DIFFERENT PATIENT NUMBERS THAT WOULD BE DISPLAYED ON THE DEVICE

11:47AM  17   SCREEN.  SO THESE WERE ESSENTIALLY ARTIFICIAL RESULTS THAT WERE

11:47AM  18   PRELOADED INTO THE THERANOS SOFTWARE AND THEN DISPLAYED ON THE

11:47AM  19   SCREEN WHEN A CERTAIN PATIENT WAS -- A CERTAIN PATIENT NUMBER

11:47AM  20   WAS INPUT INTO THE APPLICATION.

11:47AM  21   Q.  SO, IN OTHER WORDS, THE DEVICE WAS NOT ACTUALLY RUNNING

11:47AM  22   TESTS ON SAMPLES AND RECORDING THE RESULTS?

11:47AM  23   A.  CORRECT.

11:48AM  24   Q.  AND DO YOU RECALL REVIEWING WITH MS. WALSH EMAILS ABOUT

11:48AM  25   FUTURE TESTING THAT AFRICOM WAS PLANNING?

11:48AM   1      A.   YES.

11:48AM   2      Q.   AND DID THAT TESTING EVER ACTUALLY TAKE PLACE?

11:48AM   3      A.   NO.

11:48AM   4      Q.   OKAY.  WE CAN SET THAT ASIDE.

11:48AM   5           THE LAST TOPIC I WANT TO DISCUSS WITH YOU, MR. EDLIN, IS

11:48AM   6      THE ADVICE THAT THERANOS GOT AND THAT MR. BALWANI AND

11:48AM   7      MS. HOLMES RECEIVED ABOUT THE WEBSITE CONTENT.

11:48AM   8           DO YOU RECALL THAT?

11:48AM   9      A.   YES.

11:48AM  10           MR. BOSTIC:  YOUR HONOR, MAY WE PUBLISH 3981.  IT'S

11:48AM  11      BEEN PRE-ADMITTED.

11:48AM  12           THE COURT:  YES.

11:48AM  13      BY MR. BOSTIC:

11:48AM  14      Q.   MR. EDLIN, DO YOU RECALL DISCUSSING WITH MS. WALSH ABOUT

11:48AM  15      DIRECTION THAT THERANOS GOT ABOUT THE WEBSITE AND SHE HAD

11:48AM  16      SHOWED YOU SOME CHANGES THAT HAD BEEN MADE ON THE WEBSITE?

11:48AM  17      A.   YES.

11:48AM  18      Q.   AND LET'S LOOK AT THE BOTTOM OF THIS PAGE.

11:49AM  19           AND DO YOU SEE HERE THAT ABOUT HALF WAY DOWN THAT

11:49AM  20      PARAGRAPH IT MENTIONS THAT WHAT IS BEING CALLED OUT ARE

11:49AM  21      SITUATIONS WHERE THERE'S DISCUSSION ABOUT SUPERLATIVE OR

11:49AM  22      COMPARATIVE PERFORMANCE CLAIMS.

11:49AM  23           DO YOU SEE THAT?

11:49AM  24      A.   YES.

11:49AM  25      Q.   LET'S LOOK AT THE NEXT PAGE OF THIS EXHIBIT.

ER-2039

EDLIN REDIRECT BY MR. BOSTIC                                      2831

11:49AM   1          AND DO YOU SEE OR DO YOU RECALL IN THIS EXHIBIT THAT

11:49AM   2     MR. BALWANI AND MS. HOLMES WERE ADVISED NOT TO USE LANGUAGE

11:49AM   3     LIKE "HIGHEST QUALITY, HIGHEST LEVELS OF ACCURACY"?

11:49AM   4     A.   YES.

11:49AM   5     Q.   AND LET'S GO TO THE NEXT PAGE HERE.

11:49AM   6          AND DO YOU SEE THAT THEY WERE ADVISED NOT TO USE THE

11:49AM   7     PHRASE "MORE PRECISE" AND TO SAY "PRECISE" INSTEAD?

11:49AM   8     A.   YES.

11:49AM   9     Q.   AND LET'S LOOK NOW AT THE FINAL VERSION OF THE WEBSITE,

11:50AM  10     WHICH IS 5805.

11:50AM  11          AND LET'S LOOK AT PAGE 2.

11:50AM  12          AND UNDER A FULL RANGE OF TESTS, IF WE CAN ZOOM IN ON

11:50AM  13     THAT.

11:50AM  14          DO YOU SEE THAT THE FINAL VERSION OF THE WEBSITE STILL HAD

11:50AM  15     THE LANGUAGE CLAIMING "THE HIGHEST LEVELS OF QUALITY"?

11:50AM  16     A.   I DO.

11:50AM  17     Q.   LET'S GO TO PAGE 3 AND UNDER WHERE IT SAYS, "A FEW DROPS."

11:50AM  18          DO YOU RECALL THAT THE WEBSITE AGAIN REPEATED THE CLAIM

11:50AM  19     ABOUT HAVING "THE HIGHEST LEVEL OF QUALITY"?

11:50AM  20     A.   I DO.

11:50AM  21     Q.   AND LET'S GO TO PAGE 21.  LET'S ZOOM IN UNDER ONE TINY

11:51AM  22     DROP ON THIS PAGE.

11:51AM  23          LET'S ZOOM OUT.

11:51AM  24          LET'S LOOK UNDER WELCOME AT THE TOP OF THE PAGE.

11:51AM  25          DO YOU RECALL THAT AGAIN THE FINAL VERSION OF THE WEBSITE

11:51AM  1    STILL HAS THE CLAIM ABOUT SPEED AND QUOTE, "THE HIGHEST LEVELS

11:51AM  2    OF ACCURACY"?

11:51AM  3    A.   I DO.

11:51AM  4    Q.   AND FINALLY, LET'S LOOK AT PAGE 22 AND THERE UNDER "ONE

11:51AM  5    TINY DROP."

11:51AM  6         DO YOU SEE HERE AGAIN THAT LANGUAGE THAT MR. BALWANI AND

11:51AM  7    MS. HOLMES WERE ADVISED NOT TO USE ABOUT "THE HIGHEST LEVEL OF

11:51AM  8    ACCURACY AND PRECISION"?

11:51AM  9    A.   I DO.

11:51AM 10    Q.   AND DO YOU RECALL THAT ON DIRECT, YOU SAW THE BROCHURE

11:52AM 11    THAT THERANOS USED TO MARKET TO PATIENTS?

11:52AM 12    A.   YES.

11:52AM 13    Q.   AND DO YOU RECALL SIMILAR LANGUAGE BEING USED IN THAT

11:52AM 14    BROCHURE?

11:52AM 15    A.   YES.

11:52AM 16    Q.   AND DO YOU RECALL THAT WE ALSO LOOKED AT AN EXAMPLE OF AN

11:52AM 17    INVESTOR PRESENTATION SENT BY THERANOS TO AN INVESTOR?

11:52AM 18    A.   YES.

11:52AM 19    Q.   AND DO YOU RECALL THAT THAT ALSO HAD SIMILAR CLAIMS ABOUT

11:52AM 20    "THE HIGHEST LEVELS OF ACCURACY"?

11:52AM 21    A.   YES.

11:52AM 22         MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

11:52AM 23         THE COURT:  YES.

11:52AM 24    (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:52AM 25         MR. BOSTIC:  NO FURTHER QUESTIONS.

ER-2041

11:52AM  1          MS. WALSH:  THANK YOU, YOUR HONOR.

11:52AM  2          CAN WE LEAVE THAT EXHIBIT UP IF THAT'S POSSIBLE.

11:53AM  3                    **RECROSS-EXAMINATION**

11:53AM  4   BY MS. WALSH:

11:53AM  5   Q.   THANK YOU.  I JUST WANT TO TAKE A LOOK AT THAT SENTENCE,

11:53AM  6   MR. EDLIN, THAT CONTAINED THE PHRASE "HIGHEST LEVEL OF ACCURACY

11:53AM  7   AND PRECISION," THAT FULL SENTENCE.  IF WE CAN HIGHLIGHT FROM

11:53AM  8   "AND," THE SENTENCE, "AND WE PROVIDE THE HIGHEST LEVEL OF

11:53AM  9   OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN BOTH OUR PRE- AND

11:53AM  10  POST-ANALYTIC PROCESSES, TO REALIZE THE HIGHEST LEVEL OF

11:53AM  11  ACCURACY AND PRECISION."

11:53AM  12         DO YOU SEE THAT?

11:53AM  13  A.   YES.

11:53AM  14  Q.   AND SO IT'S TO REALIZE THOSE HIGHEST LEVELS THAT THE

11:53AM  15  COMPANY WAS TRYING TO ACHIEVE; CORRECT?

11:53AM  16  A.   CORRECT.

11:53AM  17  Q.   OKAY.  AND APART FROM THE EMAILS THAT WE SAW FROM THE

11:53AM  18  LAWYERS, DO YOU REMEMBER THOSE LAWYERS, MR. EDLIN, WITH THE

11:53AM  19  LAWYER'S ADVICE?

11:53AM  20  A.   YES.

11:54AM  21  Q.   AND THERE WERE OTHER COMMUNICATIONS WITH THE LAWYERS AT

11:54AM  22  THERANOS ABOUT THE WEBSITE; CORRECT?

11:54AM  23  A.   I DON'T RECALL SPECIFIC INSTANCES, BUT I WOULD NOT BE

11:54AM  24  SURPRISED IF THAT HAPPENED.

11:54AM  25  Q.   OKAY.  THERE WERE PHONE CALLS WITH LAWYERS; RIGHT?

EDLIN RECROSS BY MS. WALSH                                    2834

11:54AM  1      A.   I DON'T KNOW SPECIFICALLY.

11:54AM  2      Q.   ALL RIGHT.  ARE YOU AWARE THAT THERE WERE MEETINGS WITH

11:54AM  3      THE LAWYERS ABOUT THE MARKETING MATERIALS AND THE WEBSITE?

11:54AM  4      A.   I BELIEVE SO.

11:54AM  5      Q.   SO IS IT FAIR TO SAY THAT THOSE TWO EMAILS THAT WE SAW ARE

11:54AM  6      NOT THE ONLY COMMUNICATIONS WITH THE LAWYERS ABOUT THE WEBSITE?

11:54AM  7      A.   I DON'T KNOW SPECIFICALLY.

11:54AM  8      Q.   OKAY.  AND THE GOVERNMENT JUST ASKED YOU ABOUT THE FDA --

11:54AM  9      LET'S CALL IT FDA CLEARANCE TO BE PRECISE, THE FDA CLEARANCE

11:54AM  10     FOR THE HSV 1 ASSAY.

11:54AM  11          DO YOU REMEMBER THAT?

11:54AM  12     A.   YES.

11:54AM  13     Q.   AND THAT WAS IN 2015; RIGHT?

11:55AM  14     A.   RIGHT.

11:55AM  15     Q.   AND THE GOVERNMENT JUST POINTED OUT THAT PATIENT TESTING

11:55AM  16     WAS GOING ON SINCE 2013; RIGHT?

11:55AM  17     A.   RIGHT.

11:55AM  18     Q.   BUT THAT PATIENT TESTING WAS BASED ON THE CENTRAL LAB

11:55AM  19     MODEL; CORRECT?

11:55AM  20     A.   CORRECT.

11:55AM  21     Q.   WHERE THE SAMPLES WERE TAKEN AT WALGREENS; RIGHT?

11:55AM  22     A.   RIGHT.

11:55AM  23     Q.   AND THEY WERE SHIPPED TO THERANOS; CORRECT?

11:55AM  24     A.   CORRECT.

11:55AM  25     Q.   AND THEY WERE PROCESSED AT THERANOS; RIGHT?

EDLIN RECROSS BY MS. WALSH                                          2835

11:55AM   1    A.   RIGHT.

11:55AM   2    Q.   AND THEN RESULTS WERE ISSUED; CORRECT?

11:55AM   3    A.   RIGHT.

11:55AM   4    Q.   AND THERE WAS NOTHING THAT VIOLATED FDA RULES AS FAR AS

11:55AM   5    YOU KNEW WITH THAT MODEL; IS THAT RIGHT?

11:55AM   6              MR. BOSTIC:   OBJECTION.   702, FOUNDATION, CALLS FOR

11:55AM   7    A LEGAL CONCLUSION.

11:55AM   8              THE COURT:   YOU CAN LAY A FOUNDATION OF HIS

11:55AM   9    KNOWLEDGE.

11:55AM  10              MS. WALSH:   SURE.

11:55AM  11    Q.   MR. EDLIN, YOU -- WERE YOU AWARE THAT THE POINT OF THE FDA

11:55AM  12    CLEARANCE IS THAT -- IS SO THAT THERANOS COULD PUT ITS DEVICES

11:55AM  13    OUTSIDE OF THERANOS?

11:55AM  14    A.   YES.

11:55AM  15    Q.   AND BEFORE, AND BEFORE IT DID THAT, IT WOULD HAVE TO RUN

11:56AM  16    THE TEST IN HOUSE; IS THAT RIGHT?

11:56AM  17    A.   BEFORE THE CLEARANCE?

11:56AM  18    Q.   YES.

11:56AM  19    A.   YES.

11:56AM  20    Q.   OKAY.   THE GOVERNMENT ALSO ASKED YOU ABOUT THE TEST

11:56AM  21    RESULTS COMING OUT OF THE DEMONSTRATIONS.

11:56AM  22         DO YOU REMEMBER THAT?

11:56AM  23    A.   YES.

11:56AM  24    Q.   AND ONE OF THE QUESTIONS TO YOU WAS WHETHER THE GOAL OF

11:56AM  25    THOSE DEMONSTRATIONS WAS TO PRESENT AN HONEST PICTURE OF WHAT

ER-2044

EDLIN RECROSS BY MS. WALSH                                           2836

11:56AM   1    WAS GOING ON; RIGHT?

11:56AM   2    A.   YES.

11:56AM   3    Q.   AND THAT WAS THE GOAL; RIGHT?

11:56AM   4    A.   YES.

11:56AM   5    Q.   AND DID YOU BELIEVE THAT DANIEL YOUNG, IN DOING WHAT HE

11:56AM   6    WAS DOING, WAS BEING DISHONEST IN ANALYZING AND MAKING

11:56AM   7    DECISIONS ABOUT THOSE TEST RESULTS?

11:56AM   8    A.   NO.

11:56AM   9    Q.   YOU ALSO TESTIFIED THAT AT A CERTAIN POINT WHEN THE LAB

11:57AM  10    DIRECTORS AT THERANOS LEFT IN 2014 --

11:57AM  11         DO YOU REMEMBER THAT?

11:57AM  12    A.   YES.

11:57AM  13    Q.   -- AND AFTER THAT, MR. BALWANI OVERSAW THE LAB.

11:57AM  14         DO YOU REMEMBER THAT TESTIMONY?

11:57AM  15    A.   YES.

11:57AM  16    Q.   BUT MR. BALWANI WAS OVERSEEING THE LAB OPERATIONS;

11:57AM  17    CORRECT?

11:57AM  18    A.   I'M NOT SURE I UNDERSTAND THE DISTINCTION.

11:57AM  19    Q.   WELL, HE WASN'T QUALIFIED TO BE A LAB DIRECTOR, WAS HE?

11:57AM  20    A.   I DON'T BELIEVE SO.

11:57AM  21    Q.   AND HE WASN'T MAKING MEDICAL DECISIONS AS FAR AS YOU KNOW;

11:57AM  22    RIGHT?

11:57AM  23    A.   RIGHT.

11:57AM  24    Q.   HE DIDN'T HAVE A BIOSCIENCE BACKGROUND; RIGHT?

11:57AM  25    A.   RIGHT.

EDLIN RECROSS BY MS. WALSH                                      2837

11:57AM  1    Q.   AND SO TO THE EXTENT THAT HE WAS IN CHARGE OF THAT

11:57AM  2    CLINICAL LAB, IT WAS RELATED TO THE OPERATIONS; RIGHT?

11:57AM  3    A.   RIGHT.

11:57AM  4    Q.   THE GOVERNMENT ALSO ASKED YOU ABOUT THE DEVICE THAT WAS

11:57AM  5    SENT TO WALGREENS.

11:57AM  6         DO YOU REMEMBER THAT?

11:57AM  7    A.   YES.

11:57AM  8    Q.   AND WHETHER THE -- THAT DEVICE COULD RUN ASSAYS; RIGHT?

11:57AM  9    A.   RIGHT.

11:57AM  10   Q.   AND WHETHER WALGREENS HAD CARTRIDGES TO RUN THOSE ASSAYS;

11:57AM  11   RIGHT?

11:57AM  12   A.   RIGHT.

11:57AM  13   Q.   COULD WE PULL UP EXHIBIT 20550, WHICH IS IN EVIDENCE.

11:58AM  14        AND THIS IS AN EMAIL FROM YOU TO MR. BALWANI?

11:58AM  15   A.   RIGHT.

11:58AM  16   Q.   AND IN THE SECOND PARAGRAPH YOU SAY, "THERE ARE CURRENTLY

11:58AM  17   40 READERS IN THE FIELD FOR THE ABA TRIAL"; RIGHT?

11:58AM  18   A.   YES.

11:58AM  19   Q.   AND THIS IS THE EMAIL THAT CONTAINS THE STATEMENT ABOUT

11:58AM  20   WALGREENS HAVING ONE OF THOSE READERS; CORRECT?

11:58AM  21   A.   CORRECT.

11:58AM  22   Q.   AND A READER IS A DEVICE; RIGHT?

11:58AM  23   A.   RIGHT.

11:58AM  24   Q.   AND WITH REGARD TO THE 40 READERS IN THE FIELD FOR THE ABA

11:58AM  25   TRIAL, THEY ALL HAD CARTRIDGES; RIGHT?

2838

11:58AM 1    A.   RIGHT.

11:58AM 2    Q.   AND THEY WERE ALL RUNNING TESTS; RIGHT?

11:58AM 3    A.   RIGHT.

11:58AM 4    Q.   AND SO DO YOU HAVE ANY REASON TO BELIEVE THAT THE DEVICE

11:58AM 5    THAT WALGREENS HAD, DID NOT HAVE CARTRIDGES?

11:58AM 6    A.   I DON'T KNOW.

11:58AM 7    Q.   AND DO YOU HAVE ANY REASON TO BELIEVE THAT IT COULD NOT

11:58AM 8    RUN TESTS?

11:58AM 9    A.   NO.

11:58AM 10   Q.   OKAY.

11:59AM 11             MS. WALSH:  MAY I HAVE ONE MOMENT, YOUR HONOR?

11:59AM 12             THE COURT:  YES.

11:59AM 13        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

11:59AM 14             MS. WALSH:  NO FURTHER QUESTIONS.

11:59AM 15             THE COURT:  MR. BOSTIC?

11:59AM 16             MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

11:59AM 17             THE COURT:  MAY THIS WITNESS BE EXCUSED?

11:59AM 18             MR. BOSTIC:  YES, YOUR HONOR.

11:59AM 19             MS. WALSH:  YES, YOUR HONOR.

11:59AM 20             THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU VERY

11:59AM 21   MUCH.

11:59AM 22             THE WITNESS:  THANK YOU.

11:59AM 23             THE COURT:  YOU CAN JUST LEAVE THE BINDERS THERE.

11:59AM 24   THEY'LL BE COLLECTED.

11:59AM 25             LADIES AND GENTLEMEN, WE'LL TAKE OUR WEEKEND BREAK NOW.  I

ER-2047

| 11:59AM | 1 | WANT TO DO TWO THINGS.  I WANT TO REMIND YOU OF THE |
| 12:00PM | 2 | ADMONISHMENT. |
| 12:00PM | 3 | PLEASE, DURING THE WEEKEND, DO NOT READ, DISCUSS, OR IN |
| 12:00PM | 4 | ANY WAY LEARN ANYTHING ABOUT THIS CASE. |
| 12:00PM | 5 | ALSO, I WANT TO TELL YOU, WE WILL -- MS. ROBINSON WILL BE |
| 12:00PM | 6 | GIVING YOU A CALENDAR.  I THINK IT'S COLOR CODED.  AND SHE'LL |
| 12:00PM | 7 | GIVE YOU THOSE BEFORE YOU LEAVE. |
| 12:00PM | 8 | PLEASE LOOK AT THESE OVER THE WEEKEND. |
| 12:00PM | 9 | THE GREEN -- I THINK THE GREEN LEGEND DISPLAYS DAYS THAT |
| 12:00PM | 10 | WE WOULD LIKE TO CAPTURE SOME EXTRA TIME THAT I MENTIONED |
| 12:00PM | 11 | EARLIER THIS MORNING.  SO IF YOU COULD PLEASE STUDY THAT AND |
| 12:00PM | 12 | THEN COMPARE IT TO YOUR SCHEDULES, AND I'D LIKE TO TALK WITH |
| 12:00PM | 13 | YOU ABOUT IT NEXT WEEK WHEN WE MEET AGAIN AS TO WHETHER OR NOT |
| 12:00PM | 14 | WE CAN CAPTURE SOME ADDITIONAL TIME SUCH THAT WE CAN KEEP OUR |
| 12:00PM | 15 | TRIAL ON SCHEDULE. |
| 12:00PM | 16 | I APPRECIATE YOUR ACCOMMODATION IN THIS, AND WE'LL TALK |
| 12:00PM | 17 | ABOUT IT NEXT WEEK. |
| 12:00PM | 18 | YOU HAVE A GOOD WEEKEND AND ENJOY YOUR WEEKENDS, AND WE'LL |
| 12:00PM | 19 | SEE YOU, I THINK IT'S TUESDAY, TUESDAY AT 9:00 A.M. |
| 12:01PM | 20 | ALL RIGHT.  THANK YOU. |
| 12:01PM | 21 | (JURY OUT AT 12:01 P.M.) |
| 12:01PM | 22 | THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK |
| 12:01PM | 23 | YOU, COUNSEL. |
| 12:01PM | 24 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE |
| 12:01PM | 25 | WEEKEND. |

12:01PM 1          COUNSEL, ANYTHING BEFORE WE ADJOURN FOR THE WEEKEND.

12:01PM 2             MR. BOSTIC:  NOTHING, YOUR HONOR.

12:01PM 3             THE COURT:  MS. WALSH?  MR. COOPERSMITH?

12:01PM 4             MR. COOPERSMITH:  NO, YOUR HONOR.

12:01PM 5             THE COURT:  ALL RIGHT.  THANK YOU.  HAVE A GOOD

12:01PM 6  WEEKEND.  ARE WE GETTING TOGETHER AT 8:30 ON TUESDAY -- NO,

12:01PM 7  THAT'S WEDNESDAY, ISN'T IT?

12:02PM 8             MR. BOSTIC:  I THINK IT'S CURRENTLY SET FOR TUESDAY,

12:02PM 9  YOUR HONOR.

12:02PM 10           THE COURT:  THAT'S RIGHT.

12:02PM 11     LET ME JUST ASK, SCHEDULING WISE, THE WITNESS THAT THAT

12:02PM 12  MOTION PERTAINS TO, IS THAT OUR NEXT WITNESS?

12:02PM 13           MR. BOSTIC:  AS OF NOW, YOUR HONOR, I BELIEVE HE'S

12:02PM 14  NOT NEXT, HE'S THE ONE AFTER THAT.

12:02PM 15           THE COURT:  AND THE NEXT WITNESS IS -- WILL WE

12:02PM 16  JUST -- SCHEDULING, WILL WE COMPLETE THAT WITNESS, DO YOU

12:02PM 17  THINK, ON TUESDAY?

12:02PM 18           MR. SCHENK:  YOUR HONOR, I THINK THE GOVERNMENT WILL

12:02PM 19  FINISH THE DIRECT IN THE MORNING ON TUESDAY.

12:02PM 20           THE COURT:  I SEE.  OKAY.  ALL RIGHT.

12:02PM 21     ANY IDEA YOU WANT TO OFFER, MR. COOPERSMITH?

12:02PM 22           MR. COOPERSMITH:  I THINK HE'S A FAIRLY IMPORTANT

12:02PM 23  WITNESS, BUT THERE MIGHT BE, YOU KNOW, A FAIR AMOUNT OF CROSS.

12:02PM 24     I HAVEN'T SEEN THE DIRECT YET, SO IT'S HARD TO SAY

12:02PM 25  EXACTLY.

12:02PM 1          THE COURT:  OKAY.

12:02PM 2          MR. COOPERSMITH:  BUT I'M NOT SURE THAT HE WILL BE

12:02PM 3    FINISHED ON TUESDAY, ALTHOUGH IT'S POSSIBLE.

12:02PM 4          THE COURT:  ALL RIGHT.  FAIR ENOUGH.  THANK YOU.

12:02PM 5    THANKS VERY MUCH.  ALL RIGHT.

12:02PM 6        (COURT ADJOURNED AT 12:02 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ER-2050

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

6    UNITED STATES OF AMERICA,        )
                                      )   CR-18-00258-EJD
7                 PLAINTIFF,          )
                                      )   SAN JOSE, CALIFORNIA
8         VS.                         )
                                      )   APRIL 19, 2022
9    RAMESH "SUNNY" BALWANI,          )
                                      )   VOLUME 19
10               DEFENDANT.           )
     _____)   PAGES 2842 - 3162
11                                        **SEALED PAGES 3143 - 3148**

12

13                  TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
14                   UNITED STATES DISTRICT JUDGE

15   A P P E A R A N C E S :

16

17   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:   JOHN C. BOSTIC
18                               JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
19                         SAN JOSE, CALIFORNIA 95113

20

21           (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22   OFFICIAL COURT REPORTERS:
                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                         CERTIFICATE NUMBER 8074
                           LEE-ANNE SHORTRIDGE, CSR, CRR
24                         CERTIFICATE NUMBER 9595

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER

ER-2051

JHAVERI DIRECT BY MR. SCHENK                                    2880

09:20AM   1                    THE COURT:  MR. COOPERSMITH?

09:20AM   2                    MR. COOPERSMITH:  NO, YOUR HONOR.

09:20AM   3                    THE COURT:  ALL RIGHT.  THANK YOU.

09:20AM   4            DOES THE GOVERNMENT HAVE ANOTHER WITNESS?

09:20AM   5                    MR. SCHENK:  YES, YOUR HONOR.  THANK YOU.

09:20AM   6            THE GOVERNMENT CALLS NIMESH JHAVERI.

09:20AM   7                    THE COURT:  SIR, IF YOU WOULD COME FORWARD AND STAND

09:20AM   8       OVER HERE BY THE WITNESS STAND, PLEASE.

09:20AM   9            IF YOU WOULD RAISE YOUR RIGHT HAND, OUR COURTROOM DEPUTY

09:20AM  10       HAS A QUESTION FOR YOU.

09:20AM  11            **(GOVERNMENT'S WITNESS, NIMESH JHAVERI, WAS SWORN.)**

09:20AM  12                    THE WITNESS:  YES, I DO.

09:20AM  13                    THE COURT:  PLEASE HAVE A SEAT HERE, SIR, AND MAKE

09:20AM  14       YOURSELF COMFORTABLE.

09:20AM  15            PLEASE ADJUST THAT CHAIR AND MICROPHONE AS YOU NEED.

09:20AM  16            WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:21AM  17       AND THEN SPELL IT, PLEASE.

09:21AM  18                    THE WITNESS:  MY NAME IS NIMESH JHAVERI.  NIMESH,

09:21AM  19       N-I-M-E-S-H.  LAST NAME, JHAVERI, J-H-A-V-E-R-I.

09:21AM  20                    THE COURT:  THANK YOU.

09:21AM  21            COUNSEL.

09:21AM  22                              **DIRECT EXAMINATION**

09:21AM  23       BY MR. SCHENK:

09:21AM  24       Q.   GOOD MORNING, MR. JHAVERI.

09:21AM  25       A.   GOOD MORNING.

09:21AM  1      Q.   AND IF YOU ARE FULLY VACCINATED, AND WITH THE COURT'S

09:21AM  2      PERMISSION, I UNDERSTAND THAT YOU CAN TESTIFY WITHOUT A MASK

09:21AM  3      ON.

09:21AM  4      A.   GREAT.

09:21AM  5              THE COURT:   THAT'S FINE.   THANK YOU.

09:21AM  6              THE WITNESS:   THANK YOU.

09:21AM  7              MR. SCHENK:   AND I WILL ALSO REMOVE MINE.

09:21AM  8          THANK YOU, YOUR HONOR.

09:21AM  9      Q.   MR. JHAVERI, DID YOU WORK FOR A COMPANY CALLED WALGREENS?

09:21AM  10     A.   YES, I DID.

09:21AM  11     Q.   HOW LONG DID YOU WORK AT WALGREENS?

09:21AM  12     A.   TWENTY-NINE YEARS AND FIVE MONTHS.

09:21AM  13     Q.   AND WOULD YOU DESCRIBE FOR THE JURY YOUR RESPONSIBILITIES

09:21AM  14     WHILE YOU WORKED AT WALGREENS?

09:21AM  15     A.   SURE.  I HAD -- OVER THE 29 YEARS, I HAD VARIOUS POSITIONS

09:21AM  16     FROM STORE CLERK, FRONT STORE CASHIER, ALL OF THE WAY TO

09:21AM  17     PHARMACIST TO EXECUTIVE LEVEL POSITIONS BEFORE I LEFT.

09:22AM  18     Q.   AND AT THE END OF YOUR TIME THERE, WHAT WERE THE EXECUTIVE

09:22AM  19     LEVEL POSITIONS THAT YOU HELD?

09:22AM  20     A.   I WAS LEADING OUR HEALTH CARE SERVICES STRATEGY AND

09:22AM  21     DEVELOPMENT.

09:22AM  22     Q.   AND WHAT DOES THAT MEAN?

09:22AM  23     A.   SO WALGREENS WAS IN THE PROCESS OF MOVING FROM SIMPLY

09:22AM  24     RETAIL PHARMACY TO ALSO PROVIDING HEALTH CARE SERVICES, VARIOUS

09:22AM  25     SERVICES THAT ARE GOOD FOR THE PATIENT, FOR THE CUSTOMER, AND

JHAVERI DIRECT BY MR. SCHENK                                    2882

09:22AM   1     SO I WAS LEADING THE DEVELOPMENT OF THE STRATEGY FOR THAT, AS

09:22AM   2     WELL AS DETERMINING WHAT KIND OF SERVICES WE COULD INCORPORATE

09:22AM   3     INTO THE STORE.

09:22AM   4     Q.   AND WHEN DID YOU LEAVE WALGREENS?

09:22AM   5     A.   I LEFT IN OCTOBER OF 2018.

09:22AM   6     Q.   I'M SORRY.  OF?

09:22AM   7     A.   2018.

09:22AM   8     Q.   2018.

09:22AM   9          AND THE EXECUTIVE LEVEL POSITIONS THAT YOU'VE JUST

09:22AM  10     DESCRIBED, WAS THAT AT THE END OF YOUR TIME?

09:22AM  11     A.   IT WAS, SIR.

09:22AM  12     Q.   DO YOU KNOW ROUGHLY WHEN YOU STARTED AT THOSE EXECUTIVE

09:22AM  13     LEVEL POSITIONS?

09:22AM  14     A.   PROBABLY SOMETIME IN THE YEAR 2000 I WAS BROUGHT INTO THE

09:23AM  15     CORPORATE OFFICE TO LEAD OUR PHARMACY OPERATIONS FOR THE

09:23AM  16     EASTERN ONE-THIRD OF THE COMPANY.

09:23AM  17          AND THEN FROM THERE UNTIL OCTOBER OF 2018, I HELD SEVERAL

09:23AM  18     DIFFERENT ROLES FROM PHARMACY OPERATIONS TO HEALTH CARE

09:23AM  19     SERVICES DEVELOPMENT AND THINGS IN THE MIDDLE, HR.

09:23AM  20          SO ALL SORTS OF DIFFERENT ROLES THAT THEY PROVIDED

09:23AM  21     EXPERIENCE FOR US FOR.

09:23AM  22     Q.   WOULD YOU PLEASE BRIEFLY DESCRIBE YOUR EDUCATIONAL

09:23AM  23     BACKGROUND FOR THE JURY?

09:23AM  24     A.   SURE.

09:23AM  25          I HAVE MY PHARMACY DEGREE.  I WAS A LICENSED PHARMACIST IN

ER-2054

JHAVERI DIRECT BY MR. SCHENK                                    2883

09:23AM  1    TWO STATES, NEW JERSEY AND ILLINOIS.

09:23AM  2        I ALSO HAVE MY MBA FROM LAKE FORREST GRADUATE SCHOOL OF

09:23AM  3    MANAGEMENT IN ORGANIZATIONAL BEHAVIOR.

09:23AM  4    Q.   WHILE YOU WERE WORKING AT WALGREENS, DID YOU BECOME

09:23AM  5    FAMILIAR WITH A COMPANY CALLED THERANOS?

09:23AM  6    A.   I DID.

09:23AM  7    Q.   AND DO YOU REMEMBER WHEN YOU FIRST BECAME FAMILIAR WITH

09:23AM  8    THERANOS?

09:23AM  9    A.   SURE.  IT WAS PROBABLY SOMETIME IN THE 2010, 2011

09:23AM 10    TIMEFRAME.  I WAS LEADING AN INITIATIVE WHICH SUBSEQUENTLY WAS

09:24AM 11    NAMED WELL EXPERIENCE.  IT WAS THE REDESIGNING OF OUR

09:24AM 12    PHARMACIES IN OUR STORES, AND THAT'S WHEN I CAME ACROSS MEETING

09:24AM 13    WITH MS. HOLMES AND MR. BALWANI.

09:24AM 14    Q.   AND WOULD YOU TAKE A MOMENT AND DESCRIBE THE WELL

09:24AM 15    EXPERIENCE TO THE JURY.  WHAT IS THAT?

09:24AM 16    A.   SURE.  WHAT WE WERE DOING DURING THAT 2010, 2011

09:24AM 17    TIMEFRAME -- AND WHEN I SAY "WE," WALGREENS -- WAS TO REFRESH

09:24AM 18    OUR STORES, MAKE THE STORES MORE MODERN.

09:24AM 19        WE WERE ALSO REFRESHING OUR AREAS TO BRING THE PHARMACISTS

09:24AM 20    OUT FROM BEHIND THE COUNTERS SO THEY'RE MORE ACCESSIBLE FOR

09:24AM 21    PATIENTS, FOR CUSTOMERS.

09:24AM 22        MANY TIMES WHEN YOU GO INTO A DRUG STORE, THE PHARMACISTS

09:24AM 23    MAY NOT BE SEEN OR THEY'RE IN THE BACK DOING SOME WORK, AND

09:24AM 24    WHAT WE WERE TRYING TO DO IS TO SAY, HEY, THE RIGHT PLACE FOR

09:24AM 25    OUR PHARMACISTS AND THEIR STAFF IS IN FRONT OF THE PATIENTS, IN

JHAVERI DIRECT BY MR. SCHENK                                      2884

09:24AM   1    FRONT OF THE CUSTOMERS SO THEY CAN ASK QUESTIONS FREELY.

09:24AM   2        AND SO WE WERE REDESIGNING ALL OF THE STORES TO DO THAT

09:25AM   3    ONE AT A TIME.

09:25AM   4    Q.   AND WAS IT DURING THIS WORK THAT YOU WERE DOING THAT YOU

09:25AM   5    CALL THE WELL EXPERIENCE THAT YOU BECAME FAMILIAR WITH

09:25AM   6    MS. HOLMES AND MR. BALWANI?

09:25AM   7    A.   YES, SIR.

09:25AM   8    Q.   HOW SO?

09:25AM   9    A.   I ACTUALLY -- ACTUALLY, I KNEW THAT THE COMPANY,

09:25AM  10    WALGREENS, WAS SPEAKING TO A COMPANY CALLED THERANOS.

09:25AM  11        BUT WHEN I REALLY HAD MY FIRST INTERACTION WITH

09:25AM  12    MR. BALWANI AND MS. HOLMES, I RECEIVED A PHONE CALL FROM ONE OF

09:25AM  13    OUR EXECUTIVES THAT THEY WERE MEETING WITH THEM AT THE

09:25AM  14    WALGREENS CORPORATE OFFICE, AND THEY WOULD LOVE TO SEE THIS NEW

09:25AM  15    WELL EXPERIENCE STORE, THIS NEW REDESIGNED STORE THAT WAS NOT

09:25AM  16    TOO FAR FROM THE CORPORATE OFFICE.

09:25AM  17        SO I SAID I WAS MORE THAN HAPPY TO DO THAT.  IT WAS IN

09:25AM  18    WHEELING, ILLINOIS, NOT TOO FAR FROM THE CORPORATE

09:25AM  19    HEADQUARTERS, AND I MET MR. BALWANI AND MS. HOLMES AT THE

09:25AM  20    STORE, PROVIDED THEM WITH AN OVERVIEW, A TOUR OF THE STORE, THE

09:25AM  21    SPACE.

09:25AM  22        AND WE SPENT A LITTLE TIME SPEAKING ABOUT A SPACE CALLED

09:26AM  23    THE COMMUNITY ROOM, WHICH WAS A LARGE SPACE WHERE WE COULD

09:26AM  24    DELIVER HEALTH CARE SERVICES, TESTING FOR GLUCOSE, TESTING FOR

09:26AM  25    YOUR LIPIDS, OR WE CAN DO EDUCATIONAL SESSIONS THERE.  IT WAS

ER-2056

09:26AM  1    JUST AN OPEN SPACE.

09:26AM  2        SO WE SPOKE ABOUT THAT THE LONG-TERM PLAN WOULD BE TO USE

09:26AM  3    THIS SPACE TO PROVIDE OTHER HEALTH CARE SERVICES IN CONJUNCTION

09:26AM  4    WITH, OF COURSE, THE PHARMACY.

09:26AM  5        SO WE SPENT PROBABLY ABOUT 15, 20 MINUTES TOGETHER.  I HAD

09:26AM  6    AN OPPORTUNITY TO MEET THEM FOR THE FIRST TIME.

09:26AM  7        AND THAT WAS THE END OF THE VISIT.

09:26AM  8    Q.   A MOMENT AGO, DID YOU SAY THAT THE STORE WAS LOCATED IN

09:26AM  9    WHEELING, ILLINOIS?

09:26AM  10   A.   YES.

09:26AM  11   Q.   AND IS THAT W-H-E-E-L-I-N-G?

09:26AM  12   A.   THAT'S RIGHT.

09:26AM  13   Q.   AND YOU SAID THAT DURING THIS MEETING -- HOW LONG DID IT

09:26AM  14   LAST?

09:26AM  15   A.   IT WAS VERY SHORT, 15, 20 MINUTES AT MAX.

09:26AM  16   Q.   AND WAS THAT WALKING THROUGH THIS STORE IN WHEELING?

09:26AM  17   A.   YES.  SO THE BACK OF THE STORE TOWARDS WHERE MOST OF YOU

09:26AM  18   WOULD FIND A PHARMACY AREA, THAT'S WHERE WE REALLY SPENT MOST

09:27AM  19   OF OUR TIME TO PROVIDE THEM WITH AN OVERVIEW OF WHAT THE NEW

09:27AM  20   PHARMACY DEPARTMENT WOULD LOOK LIKE, AND THERE WAS A NEW

09:27AM  21   CONSULTATION ROOM OR A PRIVATE ROOM WHERE -- LET'S SAY YOU

09:27AM  22   WANTED TO GET YOUR VACCINES OR YOU WANTED TO SPEAK TO OUR

09:27AM  23   PHARMACIST.

09:27AM  24       I SHOWED THEM THAT ROOM AND THE WAITING AREA, AND THEN OF

09:27AM  25   COURSE THAT COMMUNITY SPACE THAT I SPOKE ABOUT.

09:27AM   1    Q.   WHEN YOU WERE IN THE WALGREENS STORE WITH MS. HOLMES AND

09:27AM   2    MR. BALWANI, AT THAT TIME DID YOU KNOW WHAT LINE OF BUSINESS

09:27AM   3    THERANOS WAS IN?

09:27AM   4    A.   I HAD, I HAD AN IDEA OF EXACTLY, YOU KNOW, WHAT -- THE

09:27AM   5    IDEA WAS A NEW TECHNOLOGY FOR LAB TESTING AND THINGS OF THAT

09:27AM   6    NATURE.

09:27AM   7    Q.   DID YOU HAVE CONVERSATIONS WITH MS. HOLMES OR MR. BALWANI

09:27AM   8    ON THIS PARTICULAR DAY ABOUT THEIR BUSINESS?

09:27AM   9    A.   I DON'T RECALL HAVING A CONVERSATION ABOUT THE BUSINESS.

09:27AM  10         THE PURPOSE OF THE VISIT WAS PRIMARILY FOR ME TO SHOW THEM

09:27AM  11    THE SPACE.

09:27AM  12    Q.   OKAY.  AFTER THIS DAY AT A WALGREENS STORE IN ILLINOIS,

09:28AM  13    WAS THAT YOUR LAST EXPOSURE TO THERANOS, OR DID YOU HAVE

09:28AM  14    FURTHER?

09:28AM  15    A.   I DID HAVE FURTHER EXPOSURE SEVERAL YEARS LATER WHEN

09:28AM  16    WALGREENS DID OPEN UP THE FIRST COUPLE OF STORES.  I THINK IT

09:28AM  17    WAS 2013 IF I'M NOT MISTAKEN.  I DID HAVE AN OPPORTUNITY TO

09:28AM  18    VISIT THE THERANOS HEADQUARTERS AND MEET WITH MS. HOLMES AND

09:28AM  19    MR. BALWANI AT THE CORPORATE HEADQUARTERS OF THERANOS WITH SOME

09:28AM  20    OTHER WALGREENS EXECUTIVES.

09:28AM  21    Q.   AND THIS MEETING THAT YOU'RE DESCRIBING TO THE JURY, WAS

09:28AM  22    THAT IN 2013?

09:28AM  23    A.   I BELIEVE SO.

09:28AM  24    Q.   AND WHAT WAS YOUR ROLE IN THE THERANOS-WALGREENS

09:28AM  25    RELATIONSHIP NOW IN 2013?

JHAVERI DIRECT BY MR. SCHENK                                    2887

09:28AM 1    A.   SO 2013 WE WERE CONTINUING THE WORK THAT WE WERE DOING

09:28AM 2    WITH WELL EXPERIENCE, WHICH WAS THE REDESIGNING OF OUR STORES.

09:28AM 3        AND KERMIT CRAWFORD, WHO WAS OUR PRESIDENT OF PHARMACY AND

09:28AM 4    HEALTH CARE AT THE TIME, ASKED ME TO GO SO I COULD BETTER

09:28AM 5    UNDERSTAND WHAT THE REQUIREMENTS WOULD BE IF WE PUT THIS TYPE

09:29AM 6    OF A SERVICE INSIDE OF A STORE.

09:29AM 7        AND SO MY JOB WAS PRIMARILY TO UNDERSTAND WHAT ARE THE

09:29AM 8    SPACE REQUIREMENTS THAT ARE REQUIRED.  ARE THERE ANY SPECIFIC

09:29AM 9    THINGS THAT I NEED TO BE BUILDING FOR?  YOU KNOW, WHAT KIND OF

09:29AM 10   TABLE, A CHAIR, OR A HEALTH CARE EQUIPMENT THAT I NEED TO

09:29AM 11   ACCOUNT FOR IN THAT DESIGN?  THAT'S REALLY WHAT THE PRIMARY

09:29AM 12   GOAL WAS FOR ME.

09:29AM 13       AS YOU CAN IMAGINE, REMODELING A STORE, A RETAIL STORE IS

09:29AM 14   NOT EASY, ESPECIALLY WHEN THE STORE IS OPEN.  WE WANT TO MAKE

09:29AM 15   SURE IT'S SAFE.  WE WANT TO MAKE SURE THAT THE TEAM MEMBERS ARE

09:29AM 16   ALSO SAFE, CUSTOMERS ARE SAFE.  WE WANT TO TRY TO MINIMIZE THE

09:29AM 17   TOUCHES ON A STORE; IN OTHER WORDS, MINIMIZE THE AMOUNT OF

09:29AM 18   CONSTRUCTION TIME.

09:29AM 19       SO IF WE CAN INCORPORATE ALL OF THE THINGS THAT

09:29AM 20   POTENTIALLY COULD BE COMING DOWN SORT OF THE PIPELINE, THEN WE

09:29AM 21   WOULD LIKE TO DO THAT.  IT'S BETTER FOR CUSTOMERS, IT'S BETTER

09:29AM 22   FOR TEAM MEMBERS, IT'S CERTAINLY BETTER FOR THE COMPANY

09:29AM 23   OVERALL.

09:29AM 24   Q.   IN 2013 WHEN YOU BEGAN THIS EFFORT THAT YOU'VE DESCRIBED

09:30AM 25   AS PART OF THE WELL EXPERIENCE, WHAT KINDS OF THINGS DID YOU DO

JHAVERI DIRECT BY MR. SCHENK                    2888

09:30AM  1    TO GET YOURSELF FAMILIAR WITH THERANOS OR WHAT THE RELATIONSHIP

09:30AM  2    BETWEEN THERANOS AND WALGREENS WOULD LOOK LIKE?

09:30AM  3    A.   YEAH.  IT WAS PRIMARILY DISCUSSIONS WITH SEVERAL OF THE

09:30AM  4    WALGREENS EXECUTIVES AT THE TIME THAT WERE INTIMATELY INVOLVED

09:30AM  5    WITH THAT PARTNERSHIP, UNDERSTANDING WHAT THE SERVICE OFFERING

09:30AM  6    WOULD BE, UNDERSTANDING HOW IT WOULD INCORPORATE INTO THE

09:30AM  7    WORKFLOW OF OUR PHARMACY, THINGS OF THAT NATURE.

09:30AM  8    Q.   WHEN YOU WERE CONSIDERING REDESIGNING WALGREENS STORES,

09:30AM  9    HOW MUCH SPACE DID YOU HAVE AT YOUR FINGERTIPS?  WHAT KIND OF

09:30AM  10   SPACE WERE YOU WORKING WITH?

09:30AM  11   A.   YEAH.  SO AS YOU KNOW, MOST WALGREENS DRUG STORES ARE

09:30AM  12   ABOUT 10,000 SQUARE FEET ON THE FRONT, YOU KNOW, THE FULL --

09:30AM  13   NOT INCLUDING STOCK IN THE BACK OF THE STORE.  THAT'S WHAT WE

09:30AM  14   CALL THE SELLING SPACE.

09:30AM  15       AND OF THAT SPACE, ABOUT 1500 SQUARE FEET IS WHAT WE WOULD

09:31AM  16   DEEM THE PHARMACY AREA, WHAT YOU WOULD GO IN THE BACK.

09:31AM  17       AND SO WHAT WE WERE DEALING WITH IS HOW DO WE INCORPORATE

09:31AM  18   A SERVICE LIKE THERANOS INTO THAT SPACE ALONG WITH OUR PHARMACY

09:31AM  19   DEPARTMENT.

09:31AM  20   Q.   AND AT THIS TIME, AGAIN, IN 2013, DID YOU HAVE ANY

09:31AM  21   KNOWLEDGE ABOUT THE SIZE OF THE EQUIPMENT THAT THERANOS USED TO

09:31AM  22   TEST BLOOD?

09:31AM  23   A.   NOT REALLY.  YOU KNOW, I KNEW THAT POTENTIALLY THERE MIGHT

09:31AM  24   BE, YOU KNOW, SOME EQUIPMENT THAT WOULD BE NECESSARY,

09:31AM  25   EVERYTHING FROM A CENTRIFUGE, TO A REFRIGERATOR, TO A POTENTIAL

ER-2060

09:31AM  1    TESTING MACHINE.  I DIDN'T KNOW THE SPECIFICS AT THE TIME.

09:31AM  2         THE IDEA FOR MY TEAM AND I WAS JUST TO UNDERSTAND OVERALL

09:31AM  3    SPACE COMMITMENTS, YOU KNOW, DOES IT HAVE TO BE 10 BY 10?  DOES

09:31AM  4    IT HAVE TO BE 8 BY 17?  OF COURSE IT HAS TO BE ADA COMPATIBLE.

09:31AM  5         YOU KNOW, DOES IT HAVE TO HAVE A DOOR?  NOT A DOOR?  WHAT

09:31AM  6    KIND OF LIGHTING?

09:31AM  7         IT WAS PRIMARILY AT THAT LEVEL.

09:32AM  8         AND THEN ONCE WE STARTED TO BUILD THE STORES AND WE

09:32AM  9    STARTED TO UNDERSTAND WHAT THE REQUIREMENTS WERE, WE TOOK IT

09:32AM 10    FROM THERE.

09:32AM 11    Q.   GREAT.  THANK YOU.

09:32AM 12         YOUR HONOR, MAY I APPROACH?

09:32AM 13              THE COURT:  YES.

09:32AM 14              MR. SCHENK:  (HANDING.)

09:32AM 15              THE COURT:  MR. COOPERSMITH, YOU HAVE A BINDER?

09:32AM 16              MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

09:32AM 17              MR. SCHENK:  AND I THINK THE COURT HAS ONE.

09:32AM 18    Q.   MR. JHAVERI, IF YOU WOULD TURN IN THE BINDER I HAVE NOW

09:32AM 19    HANDED YOU TO TAB 372.

09:32AM 20         YOUR HONOR, 372 HAS ALREADY BEEN ADMITTED.  PERMISSION TO

09:32AM 21    PUBLISH?

09:32AM 22              THE COURT:  YES.

09:32AM 23    BY MR. SCHENK:

09:32AM 24    Q.   MR. JHAVERI, I'M SHOWING YOU -- AND THERE'S A SCREEN IN

09:32AM 25    FRONT OF YOU, AND YOU ALSO HAVE A PAPER COPY.  USE WHICHEVER

JHAVERI DIRECT BY MR. SCHENK                           2890

09:32AM  1    YOU FEEL MORE COMFORTABLE WITH.

09:32AM  2         I'M SHOWING YOU A DOCUMENT THAT IS ENTITLED THERANOS

09:32AM  3    MASTER PURCHASE AGREEMENT.

09:32AM  4         DO YOU SEE THAT?

09:32AM  5    A.   I DO.

09:32AM  6    Q.   AND AT THE TOP OF THE DOCUMENT, IS IT DATED IN JULY OF

09:33AM  7    2010?

09:33AM  8    A.   THAT'S CORRECT.

09:33AM  9    Q.   WAS -- IN ADDITION TO SPEAKING WITH OTHER INDIVIDUALS AT

09:33AM 10    WALGREENS TO LEARN ABOUT THE THERANOS-WALGREENS RELATIONSHIP,

09:33AM 11    DID YOU ALSO REVIEW SOME DOCUMENTS TO HELP GET YOURSELF UP TO

09:33AM 12    SPEED ON THE WALGREENS-THERANOS RELATIONSHIP?

09:33AM 13    A.   YES.  ONCE I BECAME MORE INVOLVED WITH THE PROJECT ITSELF,

09:33AM 14    OF COURSE I REVIEWED ALL OF THE AGREEMENTS IN PLACE, DOCUMENTS

09:33AM 15    ON WHAT THE STATUS IS OF A PARTICULAR PROJECT, SPEAKING TO SOME

09:33AM 16    OF OUR TEAM MEMBERS THAT WERE ALREADY INVOLVED WITH THE

09:33AM 17    THERANOS TEAM.  THOSE WERE SOME OF THE THINGS THAT I DID TO

09:33AM 18    LEARN MORE.

09:33AM 19    Q.   AND WAS THIS PURCHASE AGREEMENT FROM 2010 ONE OF THE

09:33AM 20    DOCUMENTS THAT YOU REVIEWED TO HELP YOURSELF GET UP TO SPEED?

09:33AM 21    A.   YES, SIR.

09:33AM 22    Q.   WOULD YOU TURN NOW TO PAGE 4.  THE DOCUMENTS HAVE IN THE

09:33AM 23    FOOTER IN THE MIDDLE AT THE BOTTOM A TRIAL EXHIBIT NUMBER AND A

09:34AM 24    PAGE NUMBER.  SO AS I REFER TO EXHIBIT AND PAGE NUMBERS, THAT'S

09:34AM 25    WHERE I WILL BE LOOKING.

09:34AM 1      A.   RIGHT.

09:34AM 2      Q.   AND THERE'S ONE CALLED NUMBER 4 AND IT'S SCHEDULE A.

09:34AM 3           DO YOU SEE THAT?

09:34AM 4      A.   I DO.

09:34AM 5      Q.   OF THE SORT OF UNDER NUMBER 1 BACKGROUND, THE SECOND

09:34AM 6      PARAGRAPH UP FROM THE BOTTOM BEGINS, "THE ABILITY."

09:34AM 7           DO YOU SEE THAT?

09:34AM 8      A.   I DO.

09:34AM 9      Q.   IT READS, "THE ABILITY TO RUN BLOOD TESTS FROM A

09:34AM 10     FINGERSTICK IN LESS THAN AN HOUR AT WALGREENS' PHARMACIES

09:34AM 11     CREATES A NEW WORKFLOW AND A NEW DIAGNOSTIC PARADIGM FOR HEALTH

09:34AM 12     CARE."

09:34AM 13          MR. JHAVERI, WAS THAT SENTENCE AN ACCURATE DESCRIPTION OF

09:34AM 14     WHAT YOU UNDERSTOOD THE THERANOS TECHNOLOGY TO BE OFFERING

09:34AM 15     WALGREENS AT THE TIME?

09:34AM 16          MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  QUESTION

09:34AM 17     AS TO TIME.  THE QUESTION IS VAGUE.

09:34AM 18          THE COURT:  DO YOU WANT TO JUST TIME STAMP THE

09:34AM 19     QUESTION.

09:34AM 20          MR. SCHENK:  YES.

09:34AM 21     Q.   MR. JHAVERI, YOU DESCRIBED TO THE JURY EARLIER THAT YOU

09:34AM 22     TRANSITIONED AGAIN TO WORK ON THE THERANOS-WALGREENS

09:35AM 23     RELATIONSHIP IN 2013; IS THAT RIGHT?

09:35AM 24     A.   IT WAS TOWARDS THE LATTER OF 2013 AND THEN INTO 2014 IS

09:35AM 25     WHEN I STARTED TO REALLY BECOME MORE INVOLVED.

JHAVERI DIRECT BY MR. SCHENK                    2892

09:35AM  1    Q.   AND WE'LL GET TO THIS A LITTLE BIT LATER, BUT YOU

09:35AM  2    DESCRIBED THERE WAS AN INSTANCE WHEN YOU WENT TO THERANOS

09:35AM  3    HEADQUARTERS IN PALO ALTO.

09:35AM  4         DO YOU RECALL THAT?

09:35AM  5    A.   I DO.

09:35AM  6    Q.   AND WAS THAT IN 2013?

09:35AM  7    A.   I BELIEVE SO, YES.

09:35AM  8    Q.   AND SO IN 2013, WAS THIS SENTENCE THAT I READ TO YOU A

09:35AM  9    MOMENT AGO AN ACCURATE DESCRIPTION OF YOUR UNDERSTANDING OF

09:35AM  10   WHAT THE THERANOS TECHNOLOGY INSIDE OF A WALGREENS STORE WOULD

09:35AM  11   OFFER TO PATIENTS?

09:35AM  12   A.   YES.

09:35AM  13   Q.   I'M SORRY?

09:35AM  14   A.   YES.

09:35AM  15   Q.   IN IT, IT INCLUDES REFERENCES TO BLOOD TESTS FROM A

09:35AM  16   FINGERSTICK.

09:35AM  17        DID YOU UNDERSTAND THAT THERANOS WAS OFFERING TO COMPLETE

09:35AM  18   BLOOD TESTING ON PATIENTS FROM BLOOD DRAWS FROM A FINGER?

09:36AM  19   A.   THAT'S CORRECT.

09:36AM  20   Q.   AND DID YOU UNDERSTAND THAT THE TURN-AROUND TIME, THE

09:36AM  21   AMOUNT OF TIME IT WOULD TAKE FOR A BLOOD TEST TO GENERATE A

09:36AM  22   RESULT, WAS, AS IT SAYS HERE, IN LESS THAN AN HOUR AT WALGREENS

09:36AM  23   PHARMACIES, AGAIN IN 2013?

09:36AM  24   A.   YES.  I DIDN'T KNOW THE EXACT TIME, BUT I KNEW IT WAS

09:36AM  25   VERY, VERY EFFICIENT AND FAST, AND IN UNDER AN HOUR YOU WOULD

JHAVERI DIRECT BY MR. SCHENK                    2893

09:36AM   1    HAVE THE RESULTS.

09:36AM   2    Q.   UNDER NUMBER 2 ON THIS PAGE, THERE'S SOMETHING CALLED

09:36AM   3    PROGRAM OBJECTIVES, AND THEN A SUBPARAGRAPH A.

09:36AM   4         DO YOU SEE WHERE I AM?

09:36AM   5    A.   YES, SIR.

09:36AM   6    Q.   IT READS, "MAKE BLOOD TESTING FASTER, AND FAR MORE

09:36AM   7    ACCESSIBLE, EFFECTIVE, AND ACTIONABLE BY INTRODUCING A MORE

09:36AM   8    COST EFFECTIVE, REALTIME BLOOD TESTING SERVICE AT WALGREENS

09:36AM   9    STORES AND WALGREENS' OTHER CLINICAL OPERATIONS NATIONWIDE."

09:36AM  10         DO YOU SEE THAT?

09:36AM  11    A.   I DO.

09:36AM  12    Q.   AND WAS THIS ALSO ACCURATE AT THE TIME, THAT IS 2013,

09:36AM  13    REGARDING YOUR UNDERSTANDING OF WHAT THERANOS WAS OFFERING TO

09:37AM  14    WALGREENS PATIENTS?

09:37AM  15    A.   YES, SIR.

09:37AM  16    Q.   IF YOU'LL NOW PLEASE TURN TO PAGE 6.

09:37AM  17         ON PAGE 6 WE SEE SCHEDULE B, AND UNDER NUMBER 2 THERE'S

09:37AM  18    SOMETHING CALLED "BEST PRICE GUARANTEE?"

09:37AM  19         DO YOU SEE THAT?

09:37AM  20    A.   I DO.

09:37AM  21    Q.   AND IF WE CAN BLOW UP 2 AND DOWN THROUGH THE A, B, AND C,

09:37AM  22    PLEASE, MS. WACHS.

09:37AM  23         THANK YOU.

09:37AM  24         THE LAST SENTENCE OF THE PARAGRAPH UNDER NUMBER 2 READS,

09:37AM  25    "FOR PURPOSES OF THIS AGREEMENT, AVAILABLE CARTRIDGES INCLUDE

ER-2065

09:37AM  1      FIRST GENERATION CARTRIDGES OF THERANOS SYSTEMS VERSIONS 1, 2,

09:37AM  2      AND 3 AS DEFINED BELOW."

09:37AM  3          MR. JHAVERI, DO YOU HAVE AN UNDERSTANDING OF WHAT VERSIONS

09:37AM  4      1, 2, AND 3 REFERRED TO?

09:37AM  5      A.   YES.  WHEN I STARTED WORKING ON THE PROJECT, MR. BALWANI

09:37AM  6      AND I DISCUSSED WHAT THE TESTS WERE THAT WERE BEING OFFERED.

09:38AM  7      VERSION 1 TESTS WERE YOUR NORMAL ROUTINE TESTS THAT YOU WOULD

09:38AM  8      RECEIVE, LIKE A CBC AND THINGS OF THAT NATURE.

09:38AM  9          VERSION 2 WERE TESTS THAT THERANOS TEAMS WERE WORKING ON,

09:38AM  10     STD, THINGS OF THAT NATURE.

09:38AM  11         AND VERSION 3 TESTS WERE PLANNED TO BE THESE PREDICTIVE

09:38AM  12     TESTS THAT THEY COULD THEN DETERMINE IF YOU ARE PREDISPOSED TO

09:38AM  13     CANCER, THINGS OF THAT NATURE.

09:38AM  14         BUT THOSE WERE LONG-TERM.  THEY WERE NOT IN EXISTENCE

09:38AM  15     TODAY.

09:38AM  16     Q.   YOU STARTED THAT DESCRIPTION BY SAYING THAT YOU HAD

09:38AM  17     CONVERSATIONS WITH MR. BALWANI; IS THAT RIGHT?

09:38AM  18     A.   THAT'S RIGHT.

09:38AM  19     Q.   WHO WAS YOUR MAIN POINT OF CONTACT OVER THE YEARS WHEN YOU

09:38AM  20     WORKED ON THIS PROJECT AT THERANOS?

09:38AM  21     A.   YEAH.  ONCE I WAS FULLY INVOLVED IN THE PROJECT, IT WAS

09:38AM  22     MR. BALWANI THAT WAS MY DAY-TO-DAY INTERACTIONS, IF YOU WANT TO

09:38AM  23     CALL IT THAT.

09:38AM  24     Q.   YOU SAID THAT VERSION 3 WERE -- LET ME ASK YOU, WERE THEY

09:38AM  25     TESTS THAT THERANOS, AS YOU UNDERSTOOD IT, CURRENTLY HAD

JHAVERI DIRECT BY MR. SCHENK                           2895

09:38AM  1    AVAILABLE, OR THEY WERE FUTURE?

09:38AM  2    A.   THEY WERE FUTURE TESTS.

09:39AM  3    Q.   HOW ABOUT VERSION 1?  WHAT WAS YOUR UNDERSTANDING WITH

09:39AM  4    REGARD TO VERSION 1?

09:39AM  5    A.   VERSION 1 TESTS WERE WHAT THEY OFFERED TODAY AT THE TIME.

09:39AM  6    Q.   I'M SORRY?

09:39AM  7    A.   VERSION 1 TESTS WERE THE TESTS THAT THEY WERE OFFERING AT

09:39AM  8    THAT TIME.

09:39AM  9    Q.   AND DID SOMEONE AT THERANOS TELL YOU THAT?

09:39AM 10    A.   THAT WAS IN THE DISCUSSIONS THAT WE'D HAD AS TEAMS.

09:39AM 11    Q.   AND TO BE MORE SPECIFIC, DO YOU REMEMBER IF THERE WAS AN

09:39AM 12    INDIVIDUAL AT THERANOS WHO PROVIDED YOU WITH THAT INFORMATION,

09:39AM 13    THAT VERSION 1 WAS AVAILABLE TODAY?

09:39AM 14    A.   MR. BALWANI AND I HAD DISCUSSIONS ABOUT WHICH TESTS WERE

09:39AM 15    BEING OFFERED.

09:39AM 16         HE ALSO REFERRED ME TO THE WEBSITE, THE THERANOS WEBSITE

09:39AM 17    WHERE ALL OF THE TESTS WERE LISTED.  SO WE HAD A REAL GOOD IDEA

09:39AM 18    OF EXACTLY WHAT TESTS THEY WERE AND WHAT WAS BEING OFFERED AT

09:39AM 19    THE TIME.

09:39AM 20    Q.   AND IF YOU'LL NOW LOOK AT 2(A), VERSION 1, IT READS, "ALL

09:39AM 21    ROUTINE LABORATORY TESTS SPECIFIED ON SCHEDULE D."

09:39AM 22         DO YOU SEE THAT?

09:39AM 23    A.   I DO.

09:39AM 24    Q.   AND SO LET'S FOLLOW THAT THROUGH TO SEE HOW VERSION 1 IS

09:40AM 25    DEFINED.  IF YOU'LL NOW TURN TO PAGE 23 OF THIS DOCUMENT.

JHAVERI DIRECT BY MR. SCHENK                                    2896

09:40AM  1           DO YOU SEE AT THE TOP OF PAGE 23 THIS PAGE IS TITLED

09:40AM  2      SCHEDULE D?

09:40AM  3      A.   I DO.

09:40AM  4      Q.   AND IN THE MIDDLE THERE IS SOME BOLD LANGUAGE THAT READS

09:40AM  5      "ROUTINE LABORATORY TESTS (VERSION 1)."

09:40AM  6           DO YOU SEE THAT?

09:40AM  7      A.   YES, SIR.

09:40AM  8      Q.   AND UNDERNEATH IT SAYS, "LIST ATTACHED TO END OF

09:40AM  9      AGREEMENT."

09:40AM  10          AND NOW, MR. JHAVERI, IF YOU'LL TURN TO PAGE 37 OF THIS

09:40AM  11     DOCUMENT.

09:40AM  12          DO YOU SEE BEGINNING ON PAGE 37 SOMETHING CALLED THERANOS

09:40AM  13     BASE ASSAY LIBRARY?

09:40AM  14     A.   I DO.

09:40AM  15     Q.   AND WOULD YOU PLEASE COUNT FOR THE JURY HOW MANY PAGES

09:41AM  16     THIS PORTION GOES ON FOR, PAGES THAT LOOK LIKE THIS?

09:41AM  17          AND, MS. WACHS, IF WE COULD AT THE SAME TIME JUST SCROLL

09:41AM  18     FROM PAGE 37 THROUGH PAGE 44.

09:41AM  19     A.   DO YOU WANT ME TO COUNT EIGHT PAGES?

09:41AM  20     Q.   YES, SIR.

09:41AM  21     A.   ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN, EIGHT.

09:41AM  22          EIGHT TOTAL.

09:41AM  23     Q.   THANK YOU.

09:41AM  24          NOW, IF YOU'LL TURN TO PAGE 39.

09:41AM  25     A.   YES, SIR.

ER-2068

JHAVERI DIRECT BY MR. SCHENK                                    2897

09:41AM   1    Q.   THE EIGHT PAGES THAT YOU'VE JUST COUNTED, DO THEY ALL

09:41AM   2    ROUGHLY LOOK LIKE PAGE 39?

09:41AM   3    A.   YES.

09:41AM   4    Q.   DIFFERENT TESTS; IS THAT RIGHT?

09:41AM   5    A.   THAT'S CORRECT.

09:41AM   6    Q.   ON PAGE 39, ABOUT SIX TESTS DOWN FROM THE TOP, WHICH TEST

09:42AM   7    IS LISTED THERE?

09:42AM   8    A.   COMPLETE CBC.

09:42AM   9    Q.   OKAY.  AND THEN DOES IT GIVE A FURTHER DESCRIPTION OF A

09:42AM   10   COMPLETE BLOOD COUNT?

09:42AM   11   A.   YES, COMPLETE CBC AUTOMATED BLOOD COUNT, COMPLETE CBC

09:42AM   12   AUTOMATED HEMOGLOBIN, HEMATOCRIT, RED BLOOD CELLS, WHITE BLOOD

09:42AM   13   CELLS, AND PLATELET COUNT.

09:42AM   14   Q.   THANK YOU VERY MUCH.

09:42AM   15        WAS IT YOUR UNDERSTANDING THAT THE EIGHT PAGES THAT YOU

09:42AM   16   AND I JUST LOOKED AT WERE A LIST OF THE TESTS THAT THERANOS

09:42AM   17   TOLD WALGREENS IT COULD RUN?

09:42AM   18             MR. COOPERSMITH:  OBJECTION.  LEADING.

09:42AM   19             THE COURT:  SUSTAINED.

09:42AM   20   BY MR. SCHENK:

09:42AM   21   Q.   WHAT WAS THE POINT OF THE LIST THAT WE JUST LOOKED AT?

09:42AM   22   A.   IT WAS TO UNDERSTAND WHAT TESTS WERE BEING OFFERED.

09:42AM   23   Q.   BY WHOM?

09:42AM   24   A.   BY THERANOS.

09:42AM   25   Q.   IF YOU'LL NOW TURN TO PAGE 617.  I'M SORRY, EXHIBIT 617.

JHAVERI DIRECT BY MR. SCHENK                                2898

09:43AM 1        MR. JHAVERI, DO YOU RECOGNIZE THIS DOCUMENT?

09:43AM 2    A.   I DO.

09:43AM 3    Q.   AND IS THIS AN AMENDED MASTER SERVICES AGREEMENT DATED IN

09:43AM 4    JUNE OF 2012?

09:43AM 5    A.   YES, SIR.

09:43AM 6    Q.   WAS THIS ALSO ONE OF THE DOCUMENTS THAT YOU REVIEWED WHEN

09:43AM 7    YOU WERE GETTING YOURSELF UP TO SPEED IN 2013?

09:43AM 8    A.   YES, SIR.

09:43AM 9        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 617.

09:43AM 10       MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

09:43AM 11       THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:43AM 12   (GOVERNMENT'S EXHIBIT 617 WAS RECEIVED IN EVIDENCE.)

09:43AM 13   BY MR. SCHENK:

09:43AM 14   Q.   MR. JHAVERI, I'M SHOWING YOU NOW THE FIRST PAGE OF

09:43AM 15   EXHIBIT 617.  IS THIS ONE ENTITLED AMENDED AND RESTATED

09:43AM 16   THERANOS MASTER SERVICES AGREEMENT?

09:43AM 17   A.   IT IS.

09:43AM 18   Q.   AND IF YOU'LL NOW TURN TO PAGE 4 OF THIS VERSION.

09:44AM 19       UNDER 2, UNDER PROGRAM OBJECTIVES UNDER SUBPARAGRAPH A, IT

09:44AM 20   READS, "MAKE TESTING LESS INVASIVE, FASTER, AND FAR MORE

09:44AM 21   ACCESSIBLE, EFFECTIVE AND ACTIONABLE BY INTRODUCING A MORE COST

09:44AM 22   EFFECTIVE BLOOD TESTING SERVICE AT WALGREENS STORES AND

09:44AM 23   WALGREENS' OTHER CLINICAL OPERATIONS NATIONWIDE," AND THEN IT

09:44AM 24   CONTINUES.

09:44AM 25       MR. JHAVERI, AGAIN, IN 2013 WHEN YOU WERE GETTING UP TO

JHAVERI DIRECT BY MR. SCHENK                                    2899

09:44AM   1    SPEED ON THE PROJECT, IS THIS SUBPARAGRAPH CONSISTENT WITH YOUR

09:44AM   2    UNDERSTANDING OF WHAT THERANOS WAS OFFERING?

09:44AM   3    A.   YES, IT IS.

09:44AM   4    Q.   IN PARAGRAPH 3 THAT IS ENTITLED PHASED DISRUPTION, SORT OF

09:44AM   5    IN THE MIDDLE OF THE PARAGRAPH, DO YOU SEE WHERE IT BEGINS, "IT

09:44AM   6    IS THE PARTIES' INTENTION FOR WALGREENS TO ACT."

09:44AM   7         DO YOU SEE WHERE I AM?  SORT OF FOUR LINES DOWN IN THE

09:44AM   8    MIDDLE?

09:44AM   9    A.   YES, I DO.

09:44AM   10   Q.   "IT IS THE PARTIES' INTENTION FOR WALGREENS TO ACT AS A

09:45AM   11   PATIENT SERVICE CENTER AND COLLECT BLOOD SAMPLES VIA

09:45AM   12   FINGERSTICK TECHNOLOGY, SMALL SAMPLES OF URINE, SALIVA, FECES,

09:45AM   13   OR SWABS WITH LABORATORY TESTING TO BE PERFORMED BY THERANOS AT

09:45AM   14   A CLIA CERTIFIED OFFSITE LABORATORY (PSC PHASE)."

09:45AM   15        DO YOU SEE THAT?

09:45AM   16   A.   I DO.

09:45AM   17   Q.   AND FIRST OF ALL, WHAT DOES PSC STAND FOR?

09:45AM   18   A.   PATIENT SERVICE CENTER.

09:45AM   19   Q.   AND WHAT IS THIS DESCRIBING HERE?  WHAT IS THE PSC PHASE?

09:45AM   20   A.   SO WHAT WE WERE DOING AT THE WALGREENS STORES, A PHARMACY

09:45AM   21   TECHNICIAN OR A PHLEBOTOMIST WOULD EXTRACT YOUR BLOOD FOR THE

09:45AM   22   BLOOD TEST, AND THEN THAT BLOOD WOULD BE TRANSPORTED BY COURIER

09:45AM   23   SERVICE TO THE THERANOS LAB FOR THE TESTING OF THE BLOOD, AND

09:45AM   24   THEN SUBSEQUENTLY THE RESULTS BEING DETERMINED AND THEN SENT TO

09:46AM   25   THE PROVIDER.

ER-2071

JHAVERI DIRECT BY MR. SCHENK                                    2900

09:46AM  1        WHAT WE WERE TALKING ABOUT HERE IS -- THE PSC IS WHAT WE

09:46AM  2   WERE CREATING INSIDE OF EACH OF THE WALGREENS STORES, THE

09:46AM  3   PATIENT SERVICE CENTER SORT OF SAY OR THE WELLNESS CENTERS.

09:46AM  4        WE USED VARIOUS DIFFERENT NAMES THROUGHOUT THE PROJECT,

09:46AM  5   BUT THAT'S WHAT WE WERE TALKING ABOUT.

09:46AM  6   Q.   AND YOU DESCRIBED JUST A MOMENT AGO BOTH AN EMPLOYEE OF

09:46AM  7   WALGREENS, A TECHNICIAN, OR A PHLEBOTOMIST WOULD COLLECT THE

09:46AM  8   BLOOD.

09:46AM  9        WHAT DID YOU MEAN BY THAT?

09:46AM  10  A.   WELL, PART OF THE PROJECT, AS WE WERE STARTING IT, WAS TO

09:46AM  11  MAKE SURE THAT WE COULD TAKE CARE OF THE PATIENTS WHEN THEY

09:46AM  12  COME IN FOR THEIR ORDER THAT THEIR PHYSICIAN OR PROVIDER GAVE

09:46AM  13  THEM, AND SO WE TRAINED PHARMACY TECHNICIANS TO DO THE

09:46AM  14  FINGERSTICK, BECAUSE THEY CAN, AND THERE WAS NO REQUIREMENT

09:46AM  15  THAT THEY HAVE TO BE A LICENSED PHLEBOTOMIST, THINGS OF THAT

09:47AM  16  NATURE, TO DO A FINGERSTICK.

09:47AM  17       HOWEVER, IF THE BLOOD DRAW REQUIRED A VENOUS DRAW WHICH IS

09:47AM  18  YOUR TRADITIONAL -- IF YOU EVER GO TO A LAB AND HAVE A VENOUS

09:47AM  19  DRAW, THREE TEST TUBES OR TWO TEST TUBES OR WHATEVER THE CASE

09:47AM  20  IS, THAT DOES REQUIRE A LICENSED PHLEBOTOMIST.

09:47AM  21       SO IN THIS CASE WE HAD BOTH OF THOSE INDIVIDUALS AVAILABLE

09:47AM  22  DEPENDING ON WHAT WAS NEEDED FOR THE PATIENT.

09:47AM  23  Q.   SO DID YOU KNOW THAT THERANOS BLOOD TESTING WOULD REQUIRE

09:47AM  24  AT LEAST SOME VEIN DRAWS?

09:47AM  25  A.   AT THAT TIME, YES, WE DID KNOW THAT, YOU KNOW, ABOUT

ER-2072

09:47AM  1    40 PERCENT WAS THROUGH THE VEIN VERSUS THE FINGERSTICK.

09:47AM  2    Q.   AND DID YOU HAVE CONVERSATIONS WITH MR. BALWANI ABOUT THAT

09:47AM  3    FACT, THAT SOME OF THE BLOOD TESTING WOULD BE DONE BY

09:47AM  4    VENIPUNCTURE OR USING A PHLEBOTOMIST?

09:47AM  5    A.   YES, MR. BALWANI AND I DISCUSSED THAT.

09:47AM  6    Q.   AND DID YOU TALK TO MR. BALWANI ABOUT WHY THAT WOULD BE

09:47AM  7    NECESSARY?  WHY THERANOS WOULD NOT BE ABLE TO DO ALL TESTING

09:48AM  8    THROUGH FINGERSTICK?

09:48AM  9    A.   YES, IT WAS -- WHEN WE STARTED THE PROJECT, WE WANTED TO

09:48AM 10    MAKE SURE THAT WE DETERMINED THAT WE ARE HITTING ON ALL OF THE

09:48AM 11    METRICS THAT WE COCREATED, MEANING THERANOS AND WALGREENS TEAMS

09:48AM 12    DETERMINED WHICH METRICS WE WANTED TO GO AFTER THAT WOULD DEEM

09:48AM 13    IT TO BE SUCCESSFUL.

09:48AM 14         AND EVERYTHING FROM HOW LONG THE PATIENT WAITED, HOW LONG

09:48AM 15    IT TOOK FOR THE ENTIRE INTERACTION TO OCCUR, HOW LONG IT TOOK

09:48AM 16    FOR YOU TO GET CHECKED IN, YOU KNOW, TO THE NUMBER OF

09:48AM 17    TECHNICIANS THAT WERE BEING TRAINED, HOW LONG DID IT TAKE TO

09:48AM 18    TRAIN THEM?  HOW WAS THE BLOOD DRAWN FROM THE PATIENT?  WAS IT

09:48AM 19    BY FINGERSTICK OR BY THE VENOUS DRAW?

09:48AM 20         AND SO WE MEASURED ALL OF THIS AND THESE ARE METRICS THAT

09:48AM 21    WE MONITORED, AND MR. BALWANI AND I HAD DISCUSSIONS ON IT, AS

09:48AM 22    WELL AS THE TEAMS HAD DISCUSSIONS WHEN THEY MET ON A REGULAR

09:48AM 23    BASIS TO ENSURE THAT WE WERE HITTING ON THOSE METRICS.

09:49AM 24         AND IF WE WEREN'T, THEN LET'S MAKE SURE THAT WE UNDERSTAND

09:49AM 25    WHAT WE NEED TO DO TO FIX THEM OR CORRECT THEM.

ER-2073

JHAVERI DIRECT BY MR. SCHENK                                    2902

09:49AM   1    Q.   AND YOU DESCRIBED THE METHOD OF THE BLOOD DRAW AS ONE OF

09:49AM   2    THE METRICS; IS THAT RIGHT?

09:49AM   3    A.   YES, SIR.

09:49AM   4    Q.   AND SO THAT IS WHETHER IT'S A FINGERSTICK OR A VEIN DRAW?

09:49AM   5    A.   THAT'S RIGHT.

09:49AM   6    Q.   AND WHY WAS THAT A METRIC THAT WAS BEING MEASURED OR THAT

09:49AM   7    YOU AND YOUR TEAMS WERE PAYING ATTENTION TO?

09:49AM   8    A.   WELL, THE TECHNOLOGY THAT WE WERE PARTNERING WITH THERANOS

09:49AM   9    ON WAS THE FINGERSTICK TECHNOLOGY THAT ALLOWED A PATIENT TO GET

09:49AM  10    THEIR BLOOD TESTED WITH A SMALL AMOUNT OF BLOOD.  IT WASN'T

09:49AM  11    YOUR TRADITIONAL THREE TEST TUBES OR TWO -- WHATEVER THE NUMBER

09:49AM  12    IS.  SO THAT WAS THE PROPRIETARY TECHNOLOGY.  IT COULD BE DONE

09:49AM  13    IN A VERY SHORT PERIOD OF TIME.

09:49AM  14         SO WHAT WE WANTED TO MAKE SURE IS THAT THE EXPECTATION OF

09:49AM  15    THE PATIENT COMING IN OF GETTING A FINGERSTICK WAS BEING MET.

09:49AM  16         THE EXPECTATION OF A PROVIDER ORDERING THAT TEST THROUGH

09:50AM  17    FINGERSTICK ALSO NEEDED TO BE MET.

09:50AM  18         AND SO WE WANTED TO MEASURE THAT.  ARE WE DOING THAT OR

09:50AM  19    NOT?

09:50AM  20         AND SO THAT WAS A KEY METRIC THAT WE LOOKED AT EVERY

09:50AM  21    MONTH.

09:50AM  22    Q.   AND DID THE PERCENT OF FINGERSTICK DRAWS, OR THE PERCENT

09:50AM  23    OF VENOUS DRAWS, THAT IS, HOW OFTEN A PATIENT WAS GETTING ONE

09:50AM  24    OR THE OTHER, DID THAT MATTER TO WALGREENS?

09:50AM  25    A.   IT DID.

ER-2074

JHAVERI DIRECT BY MR. SCHENK                                    2903

09:50AM 1   Q.   DID YOU TALK ABOUT THAT FACT, THAT IS, THAT IT MATTERED TO

09:50AM 2   WALGREENS, WITH MR. BALWANI?

09:50AM 3   A.   YES.

09:50AM 4   Q.   DO YOU KNOW WHETHER MR. BALWANI KNEW THAT IT MATTERED TO

09:50AM 5   WALGREENS?

09:50AM 6   A.   MR. BALWANI KNEW THAT IT MATTERED TO WALGREENS AND TO

09:50AM 7   THERANOS.

09:50AM 8   Q.   AND HOW DO YOU KNOW THAT?  WHY DO YOU SAY THAT?

09:50AM 9   A.   WE HAD A VERY OPEN DIALOGUE.  MR. BALWANI AND I HAD

09:50AM 10  CONVERSATIONS.  WE DISCUSSED THE PROJECT, HOW IT WAS GOING, THE

09:50AM 11  PROGRESS, THE STATUS, WHAT THE FUTURE WAS, HOW DO WE PLAN FOR

09:50AM 12  WHERE WE WANT TO LAUNCH?

09:50AM 13       SO THESE WERE THINGS THAT WE DISCUSSED OPENLY.

09:50AM 14       YOU KNOW, REMEMBER, WALGREENS WAS NOT THE LAB.  I WAS NOT

09:51AM 15  THE LAB EXPERT.  THERANOS WAS THE LAB EXPERT.  WE WERE

09:51AM 16  PROVIDING THE SPACE, SOME OF THE EMPLOYEES, THE FLOW OF THE

09:51AM 17  PATIENTS COMING IN, AND BRINGING THAT TOGETHER IS THE

09:51AM 18  PARTNERSHIP.

09:51AM 19       SO ANY TYPE OF QUESTIONS THAT WE HAD IN REGARDS TO THE

09:51AM 20  ACTUAL LAB, CERTAINLY MR. BALWANI WAS ON POINT TO HELP US

09:51AM 21  UNDERSTAND.

09:51AM 22  Q.   DO YOU REMEMBER WHEN WALGREENS BEGAN OFFERING THERANOS

09:51AM 23  BLOOD TESTING SERVICES AT WALGREENS STORES?

09:51AM 24  A.   IT WAS -- I BELIEVE IN 2013 WE HAD OPENED OUR FIRST STORE

09:51AM 25  IN PALO ALTO, WHICH WAS NEAR THE THERANOS HEADQUARTERS, AND

ER-2075

JHAVERI DIRECT BY MR. SCHENK                                    2904

09:51AM  1    THEN WE OPENED A COUPLE MORE STORES IN PHOENIX, ARIZONA.

09:51AM  2    Q.   AND I CAN SHOW YOU A DOCUMENT IF IT WOULD HELP IN A

09:51AM  3    MOMENT, BUT DO YOU REMEMBER THE MONTH IN 2013?

09:51AM  4    A.   I BELIEVE IT WAS IN NOVEMBER.  IF I'M NOT MISTAKEN,

09:52AM  5    NOVEMBER OR DECEMBER.

09:52AM  6    Q.   OKAY.  AND YOU SAID AFTER THAT THERE WERE ADDITIONAL

09:52AM  7    STORES.  PALO ALTO WAS THE FIRST.

09:52AM  8         HOW MANY MORE STORES, THROUGHOUT THE ENTIRE RELATIONSHIP,

09:52AM  9    OPENED?

09:52AM 10    A.   WE OPENED 41 STORES TOTAL BY OCTOBER OF 2014.

09:52AM 11         AND 2013, I WAS STILL NOT FULLY INVOLVED WITH THE PROJECT

09:52AM 12    AS MY TEAM WASN'T INVOLVED IN THAT.

09:52AM 13         AROUND THE EARLY 2014, MY TEAM TOOK OVER THE INITIATIVE.

09:52AM 14    WE PARTNERED WITH THE THERANOS TEAM.

09:52AM 15         AND WHAT WE NEEDED TO DO WAS TO START TO EXPAND THE NUMBER

09:52AM 16    OF STORES SO WE CAN DETERMINE WHAT IS WORKING, WHAT IS NOT

09:52AM 17    WORKING.

09:52AM 18         ONE OF THE THINGS THAT WE TRY TO DO, AND MOST COMPANIES

09:52AM 19    TRY TO DO, IS THIS CONCEPT OF CRAWL, WALK, RUN, RIGHT?

09:52AM 20         YOU DON'T JUST BUILD A CAR AND PUT IT OUT ONTO THE ROAD.

09:52AM 21    YOU HAVE TO TEST IT.

09:52AM 22         SO WHAT WE WERE DOING IS WE HAD THREE STORES, WE WANTED TO

09:53AM 23    EXPAND FURTHER SO WE COULD TEST ALL OF THESE THINGS.  HOW IS

09:53AM 24    THE EXPERIENCE LOOKING?  YOU KNOW, WHAT DOES THE WAIT TIME LOOK

09:53AM 25    LIKE?  MAYBE WE NEEDED TO REDESIGN THE SPACE?

JHAVERI DIRECT BY MR. SCHENK                                          2905

09:53AM  1        ALL OF THOSE THINGS WERE PART OF THAT PROCESS OF

09:53AM  2   DETERMINING WHETHER WE WERE ACHIEVING SUCCESS, AND IF WE

09:53AM  3   WEREN'T, WELL, THEN WE WOULD PIVOT, SHIFT, IMPROVE, AND THEN

09:53AM  4   MOVE ON.

09:53AM  5   Q.   SO YOU SAID THAT THERE WERE A TOTAL OF 41 STORES; IS THAT

09:53AM  6   RIGHT?

09:53AM  7   A.   THAT'S CORRECT.

09:53AM  8   Q.   AND THERE WAS ONE, I THINK YOU SAID, IN PALO ALTO.  WHERE

09:53AM  9   WERE THE OTHER 40?

09:53AM  10  A.   THE OTHER 40 WERE IN THE PHOENIX, ARIZONA MARKET.

09:53AM  11  Q.   OKAY.  NOW, LET'S GO BACK TO THE TOPIC THAT WE WERE

09:53AM  12  DISCUSSING A MOMENT AGO, TRACKING VENOUS DRAW PERCENT OR

09:53AM  13  FINGERSTICK PERCENT.

09:53AM  14       DURING THE ENTIRE TIME THAT WALGREENS HAD THERANOS

09:53AM  15  SERVICES AVAILABLE IN ITS STORES, WAS THERE EVER A POINT WHEN

09:53AM  16  WALGREENS WAS SATISFIED, WAS HAPPY WITH THE VENOUS PERCENT?

09:53AM  17  A.   NO.

09:53AM  18  Q.   DID YOU COMMUNICATE THAT FACT TO MR. BALWANI?

09:54AM  19  A.   I DID.

09:54AM  20  Q.   DID MR. BALWANI EVER GIVE YOU REASONS OR AN EXPLANATION

09:54AM  21  FOR WHY THE VENOUS DRAW PERCENT WAS WHAT IT WAS, WAS AT THE

09:54AM  22  RATE THAT IT WAS?

09:54AM  23  A.   SURE.  WE DISCUSSED IT AND WE PRESENTED IT TO MY

09:54AM  24  LEADERSHIP AS WELL.  THERE WE ARE SEVERAL REASONS THAT HE

09:54AM  25  PROVIDED US.  ONE, THERE COULD BE -- THEY WERE STILL

09:54AM   1    DETERMINING ORDERING PATTERNS BY PHYSICIANS AND PROVIDERS TO

09:54AM   2    ENSURE THAT THEIR CARTRIDGES WERE READY.

09:54AM   3         HE ALSO LET ME KNOW THERE WERE INSTANCES WHERE PHYSICIANS

09:54AM   4    TOOK TESTS, THE ACCURACY OF THE TEST, A FINGERSTICK VERSUS A

09:54AM   5    VENOUS DRAW WOULD ACTUALLY ORDER TWO TESTS FOR THE PATIENT AND

09:54AM   6    SO THEY WERE SEEING THAT AS WELL.

09:54AM   7         THOSE WERE SOME OF THE REASONS THAT HE PROVIDED.

09:54AM   8         BUT HE ASSURED ME THAT OVER TIME THAT PERCENTAGE WOULD GO

09:54AM   9    DOWN.

09:54AM  10    Q.   LET'S TAKE THOSE TWO THAT YOU DESCRIBED.

09:54AM  11         THE FIRST I THINK YOU SAID WAS DEVELOPING CARTRIDGES AND

09:55AM  12    SORT OF GETTING A HANDLE ON THE ORDERING PATTERNS; IS THAT

09:55AM  13    RIGHT?

09:55AM  14    A.   THAT'S RIGHT.

09:55AM  15    Q.   WHAT DID THAT MEAN?

09:55AM  16    A.   MY UNDERSTANDING IS THAT AS TESTS WERE BEING ORDERED BY

09:55AM  17    PHYSICIANS, THAT THERANOS NEEDED TO UNDERSTAND WHAT TESTS WERE

09:55AM  18    BEING ORDERED SO THAT THEY CAN HAVE THE RIGHT CARTRIDGES IN THE

09:55AM  19    STORES.

09:55AM  20         AND IF THOSE CARTRIDGES WERE NOT THERE, THEN THEY WOULD

09:55AM  21    HAVE TO GO TO A VENOUS DRAW WHERE THEY REQUIRED A LITTLE BIT

09:55AM  22    MORE BLOOD.

09:55AM  23    Q.   WAS THE BLOOD TESTING BEING DONE IN THE STORES?

09:55AM  24    A.   NO, THE TESTING WAS NEVER DONE IN THE STORES.  IN THE

09:55AM  25    STORES WE WERE SIMPLY DOING THE BLOOD EXTRACTION.

09:55AM 1   Q.   I SEE.  SO THE BLOOD WAS EXTRACTED IN THE STORES.  WHERE

09:55AM 2   WAS THE TESTING BEING DONE?

09:55AM 3   A.   THE TESTING WAS DONE AT THERANOS'S LAB.

09:55AM 4   Q.   SO WHEN MR. BALWANI TOLD YOU THAT THERANOS NEEDED TO

09:55AM 5   DEVELOP THE RIGHT CARTRIDGES, WAS HE TALKING ABOUT THE RIGHT

09:55AM 6   CARTRIDGES INSIDE OF THE WALGREENS STORES, OR WAS HE TALKING

09:55AM 7   ABOUT DEVELOP THE CARTRIDGES BACK AT THE THERANOS LAB?

09:55AM 8   A.   YOU KNOW, I DON'T KNOW THE EXACT PLACE WHERE THOSE

09:55AM 9   CARTRIDGES.

09:56AM 10      WHAT I KNEW WAS THAT THERE WERE CARTRIDGES WHERE THE BLOOD

09:56AM 11  SAMPLE HAD TO GO.

09:56AM 12  Q.   OKAY.

09:56AM 13  A.   AND THOSE WERE WHAT NEEDED TO BE ACCURATE BASED ON THE

09:56AM 14  PATTERNS OF THE PROVIDERS IN THE AREA.

09:56AM 15  Q.   YOU ALSO SAID THAT MR. BALWANI TOLD YOU THAT THERE WERE

09:56AM 16  PHYSICIANS WHO WERE ORDERING TESTS TO CHECK THE ACCURACY.

09:56AM 17      WHAT DID YOU MEAN BY THAT?

09:56AM 18  A.   WELL, THIS WAS NEW TECHNOLOGY, AND IT WAS TECHNOLOGY THAT

09:56AM 19  COULD REVOLUTIONIZE THE HEALTH CARE INDUSTRY.

09:56AM 20      AND SO PHYSICIANS AND PROVIDERS WANTED TO MAKE SURE THAT

09:56AM 21  THE RESULTS THAT THEY WERE RECEIVING FROM A FINGERSTICK VERSUS

09:56AM 22  THE TRADITIONAL VENOUS DRAW WAS THE SAME.

09:56AM 23      THERE WERE STUDIES THAT HAVE SAID THAT 70 PERCENT OF ALL

09:56AM 24  MEDICAL DECISIONS ARE DONE BASED ON LABS, ON PATIENT'S LABS, SO

09:56AM 25  IT WAS VERY IMPORTANT THAT THE LABS ARE ACCURATE, THE RESULTS

JHAVERI DIRECT BY MR. SCHENK                                    2908

09:56AM  1    ARE ACCURATE.

09:56AM  2        SO PART OF THIS WAS PHYSICIANS ORDERING BOTH TESTS TO

09:57AM  3    ENSURE THAT THEY CAN SEE BOTH RESULTS.

09:57AM  4    Q.  AS A REASON OR EXPLANATION FOR WHY THE VENOUS DRAW PERCENT

09:57AM  5    WAS WHERE IT WAS, DID MR. BALWANI EVER TELL YOU THAT THERANOS

09:57AM  6    WAS HAVING TECHNOLOGICAL PROBLEMS DEVELOPING TESTS?

09:57AM  7            MR. COOPERSMITH:  OBJECTION.  LEADING.

09:57AM  8            THE COURT:  SUSTAINED.

09:57AM  9    BY MR. SCHENK:

09:57AM  10   Q.  AMONG THE REASONS THAT MR. BALWANI PROVIDED, DID HE EVER

09:57AM  11   TELL YOU ANYTHING ELSE ABOUT THERANOS'S TECHNOLOGY?

09:57AM  12   A.  NO.

09:57AM  13   Q.  DID HE EVER TELL YOU THAT THE THERANOS LAB WAS TERRIBLE?

09:57AM  14   A.  NO.

09:57AM  15   Q.  IF YOU'LL NOW TURN TO PAGE 6 OF THE DOCUMENT IN FRONT OF

09:57AM  16   US.

09:57AM  17       AT THE VERY BOTTOM OF PAGE 6 THERE'S SOMETHING CALLED

09:57AM  18   "INNOVATION FEE."

09:57AM  19       DO YOU SEE THAT?

09:58AM  20   A.  I DO.

09:58AM  21   Q.  AND THEN AT THE TOP OF 7 IT SAYS "WALGREENS AGREES TO PAY

09:58AM  22   TO THERANOS AN INNOVATION FEE FOR UP TO $100 MILLION."

09:58AM  23       AND THEN IT HAS ROMAN NUMERALS I, II, AND III BELOW THAT.

09:58AM  24       DO YOU SEE THAT?

09:58AM  25   A.  YES, SIR.

ER-2080

JHAVERI DIRECT BY MR. SCHENK                                    2909

09:58AM  1    Q.   AND NUMBER III SAYS, "UPON SUCCESSFUL PILOT COMPLETION AND

09:58AM  2    INITIATION OF PROGRAM LAUNCH, WALGREENS SHALL COMMIT TO A FINAL

09:58AM  3    DISTRIBUTION OF $50 MILLION."

09:58AM  4         DO YOU SEE THAT?

09:58AM  5    A.   YES.

09:58AM  6    Q.   AND WHAT DOES "UPON SUCCESSFUL PILOT COMPLETION MEAN"?

09:58AM  7         WHAT IS THE PILOT A REFERENCE TO?

09:58AM  8    A.   SO THE PILOT WAS REFERRING TO THE TESTS THAT I WAS

09:58AM  9    SPEAKING TO EARLIER TO GO FROM 3 TO 41 STORES AND TO ENSURE

09:58AM  10   THAT WE WERE HITTING -- THE ENTIRE WORKFLOW, THE ENTIRE

09:58AM  11   PROCESS, AND TO ENSURE THAT WE WERE HITTING THE METRICS THAT WE

09:59AM  12   HAD AGREED UPON TOGETHER, AND SO THAT WAS THE PILOT PHASE OF

09:59AM  13   IT.

09:59AM  14        AGAIN, AS I MENTIONED EARLIER, THE IDEA IS NOT TO GO FROM

09:59AM  15   0 TO 100.  THE IDEA WAS TO DO A CRAWL, WALK, RUN, SORT OF A

09:59AM  16   SLOW PROGRESSION SO WE UNDERSTAND WHAT WE'RE DOING, BOTH

09:59AM  17   THERANOS AND WALGREENS, TO HELP US GET BETTER, MAKE SURE THE

09:59AM  18   EXPERIENCE IS RIGHT, AND THAT'S WHAT WE WERE TRYING TO DO.

09:59AM  19   Q.   WHEN YOU WERE USING NUMBERS A MOMENT AGO, 0 TO 100, WHAT

09:59AM  20   WERE THOSE NUMBERS?

09:59AM  21   A.   WHAT I WAS REFERRING TO IS, YOU KNOW, YOU DON'T GO FROM 0

09:59AM  22   TO 100 MILES AN HOUR INSTANTLY.  YOU GRADUALLY INCREASE OVER

09:59AM  23   TIME.

09:59AM  24        IT WAS SIMPLY A DESCRIPTION TO SAY WHAT WE TRY TO DO WITH

09:59AM  25   ANY PROJECT IS TO DO IT IN PHASES, DO A PROOF OF CONCEPT, THEN

ER-2081

JHAVERI DIRECT BY MR. SCHENK                              2910

09:59AM  1    GO TO A PILOT, AND THEN FROM A PILOT, WE EXPAND THE PILOT.

10:00AM  2         WHEN WE BELIEVE WE'VE ACHIEVED THE SUCCESS WE'RE LOOKING

10:00AM  3    FOR, THEN WE START TO SCALE.

10:00AM  4         WE DO THAT NOT ONLY FOR A PARTNERSHIP WITH THERANOS, BUT

10:00AM  5    WE WOULD DO THAT FOR ANY PROJECT.

10:00AM  6    Q.   WHAT WOULD HAPPEN IF THE PILOT WAS NOT SUCCESSFUL?

10:00AM  7    A.   WELL, WE HAVE A COUPLE OF DIFFERENT CHOICES IF THE PILOT

10:00AM  8    IS NOT SUCCESSFUL.

10:00AM  9         ONE, IF THERE IS A DETERMINATION THAT WE CAN FIX IT AND

10:00AM 10    CORRECT IT AND COURSE CORRECT, THEN WE WOULD TAKE THOSE STEPS

10:00AM 11    AND THEN START TO MOVE FORWARD.

10:00AM 12         THERE ARE INSTANCES WHERE WE WOULD COMPLETELY STOP THE

10:00AM 13    PROJECT.  IF WE BELIEVE THAT WE CANNOT CORRECT THE ISSUES IN

10:00AM 14    THE PILOT OR IT'S NOT DRIVING THE VALUE TO PATIENTS, TO

10:00AM 15    CUSTOMERS, TO THE COMPANY, THEN WE WOULD STOP THE PROJECT.

10:00AM 16         SO THERE ARE A COUPLE OF DIFFERENT CHOICES THAT YOU CAN

10:00AM 17    MAKE WHEN IT COMES TO PILOTS.

10:00AM 18    Q.   IF THE PILOT WAS SUCCESSFUL, WHAT WOULD HAPPEN?

10:00AM 19    A.   WE WOULD CONTINUE TO EXPAND INTO MORE STORES, MORE

10:00AM 20    LOCATIONS, AND CONTINUE TO MONITOR IT OVER TIME.

10:01AM 21    Q.   DID YOU EVER DISCUSS THAT WITH MR. BALWANI -- AND BY

10:01AM 22    "THAT" I MEAN IF THE PILOT WAS NOT SUCCESSFUL -- THERE WAS ONE

10:01AM 23    FORK IN THE ROAD WITH CERTAIN OPTIONS SUCH AS NOT EXPANDING

10:01AM 24    FURTHER, AND IF THE PILOT WAS SUCCESSFUL, THERE WERE OTHER

10:01AM 25    OPTIONS, SUCH AS EXPANSION TO ADDITIONAL STORES?

JHAVERI DIRECT BY MR. SCHENK                                    2911

10:01AM   1     A.   WE DID DISCUSS THAT.  WE OPENLY DISCUSSED EXPANSION PLANS

10:01AM   2     AND WHAT THAT WOULD REQUIRE FOR US TO GO FURTHER.

10:01AM   3          AND IF THE PILOT WAS NOT SUCCESSFUL, I DID LET MR. BALWANI

10:01AM   4     KNOW IT WOULD BE DIFFICULT FOR ME OR FOR ANY OF THE WALGREENS

10:01AM   5     LEADERSHIP TO SAY LET'S KEEP GOING.

10:01AM   6          AND SO THAT WAS OPENLY DISCUSSED.

10:01AM   7     Q.   DID YOU EVER TELL MR. BALWANI THAT A NATIONWIDE ROLLOUT OF

10:01AM   8     THERANOS SERVICES WITHIN WALGREENS STORES WAS GUARANTEED?

10:01AM   9     A.   NO, I DID WOULD NOT SAY THAT IT WAS GUARANTEED.

10:02AM  10          BUT WE HAD HOPED THAT IT WOULD BE NATIONWIDE, AND SO WE

10:02AM  11     TRIED WHATEVER WE CAN DO TO MAKE THE PILOT SUCCESSFUL.

10:02AM  12          AND SO THAT WAS THE HOPE, THAT WE WOULD GO NATIONWIDE.

10:02AM  13          BUT AGAIN, WHAT WE EXPANDED TO, HOW MANY STORES WE

10:02AM  14     EXPANDED TO WAS ALL BASED ON THE SUCCESS OF THE PILOT.  IF THE

10:02AM  15     PILOT IS NOT WORKING, I DON'T KNOW HOW ANYONE COULD JUSTIFY

10:02AM  16     MOVING TO FURTHER STORES.

10:02AM  17     Q.   WERE YOU WORKING HARD TO TRY TO MAKE THE PILOT SUCCESSFUL?

10:02AM  18     A.   ABSOLUTELY.

10:02AM  19     Q.   DID YOU ASSUME THAT MR. BALWANI WAS WORKING HARD TO MAKE

10:02AM  20     THE PILOT SUCCESSFUL?

10:02AM  21     A.   ABSOLUTELY.

10:02AM  22     Q.   WOULD YOU NOW TURN TO PAGE 9 OF THIS DOCUMENT.

10:02AM  23          ON PAGE 9 UNDER B3 THERE'S A PARAGRAPH ENTITLED "CRITICAL

10:02AM  24     VALUES."

10:02AM  25          DO YOU SEE THAT?

ER-2083

JHAVERI DIRECT BY MR. SCHENK                                    2912

10:02AM   1    A.   I DO.

10:02AM   2    Q.   AND IN IT, IT READS, "IN THE EVENT A RESULT REFLECTS ONE

10:02AM   3    OR MORE VALUES AT SUCH VARIANCE WITH NORMAL AS TO BE

10:02AM   4    POTENTIALLY LIFE-THREATENING (CRITICAL VALUE), THERANOS WILL BE

10:03AM   5    SOLELY RESPONSIBLE FOR NOTIFYING THE APPROPRIATE PERSONNEL

10:03AM   6    ACCORDING TO ITS OBLIGATIONS AS A CLIA-CERTIFIED LAB UNDER,"

10:03AM   7    AND THEN IT CONTINUES.

10:03AM   8        DO YOU SEE THAT?

10:03AM   9    A.   I DO.

10:03AM  10    Q.   WHEN THE RESULTS FROM BLOOD TESTS WERE GENERATED, DID

10:03AM  11    WALGREENS HAVE THOSE RESULTS OR DID THERANOS HAVE THOSE

10:03AM  12    RESULTS?

10:03AM  13    A.   NO, WALGREENS DID NOT RECEIVE THE RESULTS.

10:03AM  14        THERANOS WOULD HAVE THE RESULTS.

10:03AM  15    Q.   SO WHOSE JOB WAS IT TO MAKE USE OF THE INFORMATION?  TO

10:03AM  16    MAKE USE OF THE LAB RESULT?

10:03AM  17    A.   YEAH.  SO WHEN THE THERANOS -- KEEP IN MIND THAT WALGREENS

10:03AM  18    WAS NOT THE LAB.  THERANOS WAS THE LAB.

10:03AM  19        AND SO WHEN THEY RECEIVED THE RESULTS, IT WAS THEIR

10:03AM  20    RESPONSIBILITY THEN TO SEND THOSE RESULTS TO THE APPROPRIATE

10:03AM  21    PROVIDER THAT ORDERED THE TEST.  THAT WAS THEIR RESPONSIBILITY,

10:03AM  22    NOT WALGREENS'S RESPONSIBILITY.

10:03AM  23    Q.   WOULD YOU NOW TURN TO PAGE 23 OF THIS DOCUMENT, PLEASE.

10:04AM  24    ON PAGE 23, NUMBER 9 IS "DEVICE."

10:04AM  25        DO YOU SEE THAT?

JHAVERI DIRECT BY MR. SCHENK                                    2913

10:04AM 1      A.   I DO.

10:04AM 2      Q.   "DEVICE MEANS THERANOS'S ANALYZER, THE THERANOS PATIENT

10:04AM 3      INTERFACE AND SAMPLE COLLECTION TOOLS."

10:04AM 4           IN 2013 WHEN, AS YOU DESCRIBED TO THE JURY, YOU WERE

10:04AM 5      REVIEWING DOCUMENTS TO GET YOURSELF UP TO SPEED, WAS THIS

10:04AM 6      SENTENCE CONSISTENT WITH YOUR UNDERSTANDING OF WHAT "DEVICE"

10:04AM 7      MEANT AND WHAT TECHNOLOGY THERANOS WAS USING?

10:04AM 8      A.   YES.  I HAD A HIGH LEVEL UNDERSTANDING THAT THERANOS WAS

10:04AM 9      USING THEIR OWN PROPRIETARY TECHNOLOGY TO DRAW THE BLOOD FROM

10:04AM 10     THE FINGERSTICK AND THEN PUT IT INTO WHAT THEY REFER TO AS A

10:04AM 11     NANOTAINER FOR COLLECTION.

10:04AM 12     Q.   WOULD YOU TURN TO PAGE 26.

10:04AM 13          AT THE VERY BOTTOM THERE'S SOMETHING CALLED "NATIONAL

10:05AM 14     ROLLOUT CRITERIA."

10:05AM 15          DO YOU SEE THAT?

10:05AM 16     A.   YES.

10:05AM 17     Q.   AND JUST -- I'M NOT GOING TO READ IT TO YOU.  TAKE A

10:05AM 18     MOMENT AND TELL ME IF IN THERE IT SAYS THAT A NATIONAL ROLLOUT

10:05AM 19     IS GUARANTEED.

10:05AM 20     A.   NO, IT DOESN'T SAY IT GUARANTEES IT.  IT IDENTIFIES SOME

10:05AM 21     OF THE CRITERIA THAT NEEDS TO BE MET, AND THEN A MUTUALLY

10:05AM 22     AGREED UPON EXPANSION FROM THERE.

10:05AM 23     Q.   AND THEN IF YOU TURN TO PAGE 27, IT CONTINUES WITH A

10:05AM 24     DISCUSSION OF A ROLLOUT.

10:05AM 25          SAME QUESTION.  IN THIS PARAGRAPH AT THE TOP, DOES IT SAY

JHAVERI DIRECT BY MR. SCHENK                                    2914

10:05AM   1    THAT A NATIONAL ROLLOUT OF THERANOS TESTING SERVICES INSIDE OF

10:05AM   2    WALGREENS STORES WAS GUARANTEED?

10:06AM   3    A.   NO, IT DOES NOT.

10:06AM   4    Q.   IF YOU'LL NOW TURN TO EXHIBIT 966.

10:06AM   5         YOUR HONOR, 966 HAS BEEN PREVIOUSLY ADMITTED, AT LEAST THE

10:06AM   6    EMAIL PORTION.

10:06AM   7         PERMISSION TO PUBLISH?

10:06AM   8             THE COURT:  YES.

10:06AM   9    BY MR. SCHENK:

10:06AM  10    Q.   MR. JHAVERI, IF YOU'LL LOOK AT EXHIBIT 966, AND ACTUALLY

10:06AM  11    I'D LIKE YOU TO LOOK AT PAGES 7 AND 8.  SO WHAT HAS BEEN

10:06AM  12    ADMITTED SO FAR IS PAGE 1, AND I'M ASKING YOU TO LOOK AT

10:06AM  13    EXHIBIT 966, PAGES 7 AND 8.

10:06AM  14         DO YOU SEE PAGES 7 AND 8?

10:06AM  15    A.   I DO.

10:06AM  16    Q.   AND DO YOU RECOGNIZE THOSE PAGES?

10:06AM  17    A.   I DO.

10:06AM  18    Q.   AND WHAT ARE PAGES 7 AND 8?

10:06AM  19    A.   PAGES 7 AND 8 ARE ACTUALLY MY THERANOS TEST REPORT.  I HAD

10:07AM  20    A TEST DONE WHEN I WAS AT THE CORPORATE HEADQUARTERS OF

10:07AM  21    THERANOS, AND SO THESE WERE THE RESULTS FROM THOSE TESTS.

10:07AM  22             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT MOVES 7 AND

10:07AM  23    8 FOR EXHIBIT 966 INTO EVIDENCE, AND I'LL NOTE THAT WE HAVE

10:07AM  24    REDACTED CERTAIN INFORMATION, TEST RESULTS VALUES.

10:07AM  25             MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

JHAVERI DIRECT BY MR. SCHENK                                    2915

10:07AM  1              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:07AM  2         (GOVERNMENT'S EXHIBIT 966 WAS RECEIVED IN EVIDENCE.)

10:07AM  3              MR. COOPERSMITH:  WILL THIS BE 966 WITH A LETTER

10:07AM  4    OR --

10:07AM  5              MR. SCHENK:  I'M HAPPY TO DO IT EITHER WAY.  I

10:07AM  6    INTENDED TO JUST LEAVE IT AS 966 NOW THAT WE'VE ADDED PAGES 7

10:07AM  7    AND 8 TO IT.

10:07AM  8              THE COURT:  SO THE RECORD COULD REFLECT THAT 966

10:07AM  9    INCLUDES PAGES 7 AND 8 AS ONE 966.

10:07AM 10         IS THAT ALL RIGHT WITH YOU?

10:07AM 11              MR. COOPERSMITH:  YES, YOUR HONOR.

10:07AM 12              THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

10:07AM 13    HAS BEEN ADMITTED, IT MAY BE PUBLISHED, AND YOU'LL SEE PATIENT

10:08AM 14    RESULTS, THERE'S BLANK SPACES THERE.  ANY RESULTS HAVE BEEN

10:08AM 15    DELETED AND REDACTED FROM THIS BECAUSE OF CONFIDENTIALITY.

10:08AM 16         BUT OTHERWISE THE DOCUMENT IS -- WELL, YOU CAN ASK THE

10:08AM 17    WITNESS ABOUT THE DOCUMENT.

10:08AM 18              MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR.

10:08AM 19    Q.   MR. JHAVERI, AT THE TOP SORT OF IN THE MIDDLE, DO YOU SEE

10:08AM 20    YOUR NAME ON PAGE 7 OF 966?

10:08AM 21    A.   YES, SIR.

10:08AM 22    Q.   AND DID YOU -- AT THE VERY TOP OF THE REPORT, IT SAYS

10:08AM 23    THERANOS TEST REPORT TECHNOLOGY DEMONSTRATION.

10:08AM 24         DO YOU SEE THAT?

10:08AM 25    A.   YES.

JHAVERI DIRECT BY MR. SCHENK                    2916

| | | |
|---|---|---|
| 10:08AM | 1 | Q.   AND DID YOU HAVE THIS TECHNOLOGY DEMONSTRATION PERFORMED |
| 10:08AM | 2 | AT THERANOS? |
| 10:08AM | 3 | A.   YES.  WE WERE ACTUALLY AT THERANOS HEADQUARTERS TO MEET |
| 10:08AM | 4 | WITH THEM IN 2013, I BELIEVE SOMETIME IN AUGUST, AROUND THAT |
| 10:08AM | 5 | TIMEFRAME, AND THIS WAS A DEMONSTRATION AFTER BOTH TEAMS MET, |
| 10:08AM | 6 | THE LEADERSHIP MET, AND THESE WERE THE RESULTS FROM THAT TEST. |
| 10:08AM | 7 | Q.   AND IF YOU LOOK AT THE RIGHT -- ON THE TOP RIGHT OF THE |
| 10:09AM | 8 | DOCUMENT THERE'S A DATE. |
| 10:09AM | 9 | DO YOU SEE IT? |
| 10:09AM | 10 | A.   YES. |
| 10:09AM | 11 | Q.   AND WHAT IS THE DATE? |
| 10:09AM | 12 | A.   AUGUST 13TH, 2013. |
| 10:09AM | 13 | Q.   AND WHERE WERE YOU ON AUGUST 13TH, 2013? |
| 10:09AM | 14 | A.   WELL, WE WERE AT THE THERANOS HEADQUARTERS IN PALO ALTO, |
| 10:09AM | 15 | AND THIS TEST WAS DONE IN A SMALL ROOM NEXT TO A CONFERENCE |
| 10:09AM | 16 | ROOM THAT WE WERE SITTING IN. |
| 10:09AM | 17 | Q.   YOU SAID "WE." |
| 10:09AM | 18 | WHO IS "WE"? |
| 10:09AM | 19 | A.   THERE WERE SEVERAL WALGREENS LEADERSHIP THAT WENT TO VISIT |
| 10:09AM | 20 | MR. BALWANI AND MS. HOLMES FOR DISCUSSION OF THE PARTNERSHIP, |
| 10:09AM | 21 | WHAT WE ENVISIONED THIS PARTNERSHIP WILL BECOME, JUST STRATEGIC |
| 10:09AM | 22 | DISCUSSIONS. |
| 10:09AM | 23 | AND SO TOWARDS THE END OF THE MEETING IT WAS SUGGESTED, I |
| 10:09AM | 24 | DON'T REMEMBER BY WHOM, THAT WOULD ANYONE LIKE TO TAKE THE TEST |
| 10:09AM | 25 | AND SEE WHAT A PATIENT WOULD GO THROUGH? |

JHAVERI DIRECT BY MR. SCHENK                                    2917

10:09AM   1        AND SO, OF COURSE, I DID VOLUNTEER, AND I DID HAVE MY

10:09AM   2   BLOOD DRAWN THROUGH A FINGERSTICK, AND THEN THE RESULTS WERE

10:10AM   3   SENT TO ME.  I THINK BY THE TIME I GOT BACK HOME TO CHICAGO

10:10AM   4   FROM CALIFORNIA THE RESULTS WERE IN MY EMAIL.

10:10AM   5   Q.   MR. JHAVERI, YOU SAID THAT MR. BALWANI AND MS. HOLMES WERE

10:10AM   6   PRESENT; IS THAT RIGHT?

10:10AM   7   A.   THAT'S RIGHT.

10:10AM   8   Q.   AND YOU SAID THAT YOU DON'T REMEMBER WHO, BUT SOMEONE

10:10AM   9   SUGGESTED TO YOU, DOES ANYBODY WANT TO TAKE A TEST?  IS THAT

10:10AM  10   CORRECT?

10:10AM  11   A.   YEAH.  IT WAS MORE OF, YOU KNOW, LET'S DEMONSTRATE, THE

10:10AM  12   DEMONSTRATION OF EXACTLY WHAT THE FINGERSTICK LOOKS LIKE.

10:10AM  13        WE WENT INTO A SEPARATE ROOM, AND THERE WERE ALSO A COUPLE

10:10AM  14   OF MACHINES THAT I ASSUMED TO BE THE THERANOS TECHNOLOGY

10:10AM  15   MACHINES THAT THEY WOULD TEST THOSE RESULTS ON.

10:10AM  16        THOSE MACHINES WEREN'T OPERATIONAL IN THE ROOM, BUT I

10:10AM  17   THINK IT WAS JUST SIMPLY TO SHOW US WHAT THESE MACHINES WOULD

10:10AM  18   LOOK LIKE.

10:10AM  19   Q.   AND I THINK YOU SAID A MOMENT AGO IT WAS TO SHOW WHAT THE

10:10AM  20   PATIENT EXPERIENCE WOULD BE LIKE; IS THAT RIGHT?

10:10AM  21   A.   THAT'S RIGHT.

10:10AM  22   Q.   AND WHAT DID YOU MEAN BY THAT?

10:10AM  23   A.   WHAT EXACTLY WOULD HAPPEN WHEN A PATIENT WOULD WALK INTO A

10:11AM  24   WALGREENS STORE WHERE THERANOS SERVICES WERE BEING OFFERED, YOU

10:11AM  25   KNOW, HOW WOULD THE BLOOD BE DRAWN, WHAT WOULD BE SOME OF THE

JHAVERI DIRECT BY MR. SCHENK                                    2918

10:11AM  1    TOOLS THAT THEY WOULD USE TO DRAW THE BLOOD, HOW FAST IT WOULD

10:11AM  2    BE, HOW LESS PAINFUL IT WOULD BE.

10:11AM  3        THOSE WERE SOME OF THE THINGS THAT WE WANTED TO SEE, AND

10:11AM  4    SO THIS WAS A DEMONSTRATION TO SHOW THAT.

10:11AM  5    Q.   YOU SAID THAT YOU DIDN'T KNOW WHO ASKED YOU IF YOU WERE

10:11AM  6    INTERESTED.  IS IT POSSIBLE IT WAS SOMEONE OTHER THAN

10:11AM  7    MS. HOLMES OR MR. BALWANI?

10:11AM  8             MR. COOPERSMITH:  OBJECTION.  IT CALLS FOR

10:11AM  9    SPECULATION.

10:11AM  10            THE WITNESS:  I COULDN'T TELL YOU.

10:11AM  11            THE COURT:  I'LL LEAVE THE ANSWER.  THE ANSWER WILL

10:11AM  12   REMAIN.

10:11AM  13            MR. SCHENK:  OKAY.

10:11AM  14   Q.   YOU SAID THAT IT WAS TO SHOW WHAT A PATIENT EXPERIENCE

10:11AM  15   WOULD BE LIKE.

10:11AM  16        CAN YOU BE MORE SPECIFIC?  WHAT PATIENT, OR WHOSE PATIENT?

10:11AM  17   A.   YEAH.  SO KEEP IN MIND WHAT WE WERE DOING WAS TO OFFER THE

10:11AM  18   THERANOS FINGERSTICK TECHNOLOGY, THE LAB SERVICES INSIDE OF A

10:12AM  19   WALGREENS STORE.

10:12AM  20        AND WHEN WE LAUNCHED THE SERVICE, THE PATIENT WOULD COME

10:12AM  21   IN WITH THEIR PHYSICIAN ORDER TO GET THEIR LAB TEST DONE.

10:12AM  22        AND SO WHAT WE WANTED TO SEE IS, WHAT DOES THAT

10:12AM  23   FINGERSTICK LOOK LIKE?  YOU KNOW, HOW LONG DOES IT TAKE?  HOW

10:12AM  24   ARE THEY EXTRACTING THE BLOOD?  HOW ARE THEY DRAWING THE BLOOD?

10:12AM  25   IS IT PAINFUL?

10:12AM   1          THINGS OF THAT NATURE THAT WOULD ACCOMPANY WHAT A PATIENT

10:12AM   2    OR A CUSTOMER WHO WALKED INTO A WALGREENS STORE WOULD

10:12AM   3    EXPERIENCE.

10:12AM   4    Q.   AND NOW IF YOU'LL TURN TO THE TAB RIGHT BEFORE THIS ONE,

10:12AM   5    IT'S TAB 957 IN YOUR BINDER.

10:12AM   6          YOUR HONOR, 957 HAS BEEN PREVIOUSLY ADMITTED.  PERMISSION

10:12AM   7    TO PUBLISH?

10:12AM   8              THE COURT:  YES.

10:12AM   9    BY MR. SCHENK:

10:12AM  10    Q.   MR. JHAVERI, I'M SHOWING YOU AN EMAIL WITHIN THERANOS --

10:12AM  11    YOU'RE NOT ON THIS DOCUMENT -- A CHAIN OF EMAILS ALSO FROM THIS

10:12AM  12    DATE AUGUST 13TH, 2013.

10:12AM  13          DO YOU SEE THAT?

10:12AM  14    A.   I DO.

10:13AM  15    Q.   AND THE SUBJECT LINE OF THE CHAIN IS DEMO WORKFLOW.

10:13AM  16          DO YOU SEE THAT?

10:13AM  17    A.   YES.

10:13AM  18    Q.   NOW, THE FIRST FULL EMAIL UP FROM THE BOTTOM THAT READS

10:13AM  19    UPDATE, DO YOU SEE WHERE I AM?  THE BOTTOM OF THE FIRST PAGE?

10:13AM  20    A.   YES.

10:13AM  21    Q.   "UPDATE:  WE JUST STARTED THE ADVIA RUN OF ALL SAMPLES."

10:13AM  22          DOES THE WORD "ADVIA" MEAN ANYTHING TO YOU?

10:13AM  23    A.   IT'S THE BRAND OF A LAB MACHINE.

10:13AM  24    Q.   IT'S THE BRAND OF A LAB MACHINE?

10:13AM  25    A.   YEAH.

JHAVERI DIRECT BY MR. SCHENK                                    2920

10:13AM   1    Q.   AND WHEN YOU WERE HAVING YOUR BLOOD TESTED AT THERANOS,

10:13AM   2    DID YOU KNOW WHETHER IT WOULD BE TESTED ON A THERANOS DEVICE OR

10:13AM   3    ON A BRAND OF ANOTHER MACHINE CALLED AN ADVIA?

10:13AM   4    A.   NO.   THE ASSUMPTION WAS THAT IT WAS BEING RUN ON THE

10:13AM   5    THERANOS PROPRIETARY TECHNOLOGY.

10:13AM   6    Q.   WOULD IT HAVE BEEN SURPRISING TO YOU TO KNOW THAT THE

10:13AM   7    BLOOD WAS TESTED ON AN ADVIA?

10:13AM   8    A.   YES, IT WOULD.

10:13AM   9    Q.   WHY?

10:13AM  10    A.   THAT'S NOT THE PARTNERSHIP THAT WE HAD SIGNED UP FOR.

10:13AM  11    THAT'S NOT WHAT WE HAD AGREED UPON.

10:13AM  12         THE OFFERING OF THE SERVICE WAS THERANOS'S OWN PROPRIETARY

10:14AM  13    TECHNOLOGY THROUGH FINGERSTICK TECHNOLOGY AT THE BLOOD DRAW,

10:14AM  14    AND THEN THE RESULTS BEING PROVIDED TO A PROVIDER OR A PATIENT

10:14AM  15    WITHIN A SHORT PERIOD OF TIME.   THAT WAS THE TECHNOLOGY.

10:14AM  16         SO IF IT WAS DONE ON A STANDARD LAB MACHINE, THAT WOULD

10:14AM  17    RAISE QUESTIONS.

10:14AM  18    Q.   AND I JUST WANT TO CONFIRM, DURING THIS DEMONSTRATION, WAS

10:14AM  19    MR. BALWANI PRESENT?

10:14AM  20    A.   YES, SIR.

10:14AM  21    Q.   WOULD YOU NOW TURN TO EXHIBIT 1113.

10:14AM  22         MR. JHAVERI, DO YOU SEE THE DOCUMENT AT 1113?

10:14AM  23    A.   YES.

10:14AM  24    Q.   DO YOU RECOGNIZE THIS DOCUMENT?

10:14AM  25    A.   I DO.

10:14AM  1    Q.   AND WHAT IS THIS?

10:14AM  2    A.   THIS WAS A PRESS RELEASE THAT WAS MADE BY BOTH THERANOS

10:14AM  3    AND WALGREENS AT THE TIME THAT WE LAUNCHED THE SERVICE.

10:15AM  4             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1113

10:15AM  5    IN EVIDENCE.

10:15AM  6             MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:15AM  7             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:15AM  8         (GOVERNMENT'S EXHIBIT 1113 WAS RECEIVED IN EVIDENCE.)

10:15AM  9    BY MR. SCHENK:

10:15AM  10   Q.   MR. JHAVERI, LET'S FIRST TIME STAMP THIS.  THE DEMO YOU

10:15AM  11   HAD WAS AUGUST 13TH, 2013; IS THAT RIGHT?

10:15AM  12   A.   THAT'S RIGHT.

10:15AM  13   Q.   AND SO THE PRESS RELEASE ANNOUNCING THE SERVICES ARE NOW

10:15AM  14   AVAILABLE TO THE PUBLIC WAS LESS THAN ONE MONTH LATER; IS THAT

10:15AM  15   RIGHT?

10:15AM  16   A.   THAT'S RIGHT.

10:15AM  17   Q.   AND SO YOU WERE IN PALO ALTO HAVING THE DEMONSTRATION JUST

10:15AM  18   WEEKS BEFORE THE SERVICE WENT LIVE?

10:15AM  19   A.   THAT'S CORRECT.

10:15AM  20   Q.   THE PRESS RELEASE BEGINS, "THERANOS SELECTS WALGREENS AS A

10:15AM  21   LONG-TERM PARTNER THROUGH WHICH TO OFFER ITS NEW CLINICAL

10:15AM  22   LABORATORY SERVICE."

10:15AM  23       DO YOU SEE THAT?

10:15AM  24   A.   I DO.

10:15AM  25   Q.   "WITH FIRST LOCATION LAUNCHING THIS MONTH IN

JHAVERI DIRECT BY MR. SCHENK 2922

10:16AM 1    SILICON VALLEY, CONSUMERS CAN NOW COMPLETE ANY

10:16AM 2    CLINICIAN-DIRECTED LAB TEST WITH AS LITTLE AS A FEW DROPS OF

10:16AM 3    BLOOD AND RESULTS AVAILABLE IN A MATTER OF HOURS."

10:16AM 4        DO YOU SEE THAT?

10:16AM 5    A.   YES.

10:16AM 6    Q.   SO THE FIRST LOCATION WAS LAUNCHING THIS MONTH IN

10:16AM 7    SILICON VALLEY.  IS THAT SEPTEMBER OF 2013?

10:16AM 8    A.   THAT'S RIGHT.

10:16AM 9    Q.   IS THAT THE PALO ALTO STORE THAT YOU WERE REFERRING TO

10:16AM 10   EARLIER IN YOUR TESTIMONY?

10:16AM 11   A.   YES, IT WAS.

10:16AM 12   Q.   AND THEN IN THIS FIRST PARAGRAPH IT TALKS ABOUT BRINGING

10:16AM 13   ACCESS TO THERANOS'S NEW LAB TESTING SERVICE, AND THEN A COUPLE

10:16AM 14   OF LINES DOWN IT USES THE PHRASE "ACCESS TO LESS INVASIVE."

10:16AM 15       DO YOU SEE THAT?

10:16AM 16       "AND MORE AFFORDABLE."

10:16AM 17       DO YOU SEE THAT ALSO?

10:16AM 18   A.   YES.

10:16AM 19   Q.   AND THEN THE LAST SENTENCE OF THAT PARAGRAPHS, "THE

10:16AM 20   SAMPLES ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A

10:16AM 21   MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS, ELIMINATING THE

10:17AM 22   NEED FOR LARGER NEEDLES AND NUMEROUS VIALS OF BLOOD REQUIRED

10:17AM 23   FOR MOST DIAGNOSTIC LAB TESTING."

10:17AM 24       IS THIS FIRST PARAGRAPH, WHAT I'VE JUST READ TO YOU,

10:17AM 25   CONSISTENT WITH WHAT YOUR UNDERSTANDING WAS OF THE THERANOS

ER-2094

JHAVERI DIRECT BY MR. SCHENK                                    2923

10:17AM    1    TECHNOLOGY AT THE TIME?

10:17AM    2    A.   YES, IT IS.

10:17AM    3    Q.   AND THEN TWO PARAGRAPH DOWN, THE ONE THAT BEGINS, "FOR THE

10:17AM    4    FIRST TIME."

10:17AM    5         DO YOU SEE THAT PARAGRAPH?

10:17AM    6    A.   YES, I DO.

10:17AM    7    Q.   "THERANOS IS INTRODUCING A CLIA-CERTIFIED LAB SERVICE WITH

10:17AM    8    THE ABILITY TO RUN ITS TESTS ON MICRO-SAMPLES."

10:17AM    9         IS THAT CONSISTENT WITH WHAT YOU UNDERSTOOD THE THERANOS

10:17AM   10    TECHNOLOGY TO BE AT THE TIME?

10:17AM   11    A.   YES.

10:17AM   12    Q.   "THERANOS'S PROPRIETARY LABORATORY INFRASTRUCTURE

10:17AM   13    MINIMIZES HUMAN ERROR THROUGH EXTENSIVE AUTOMATION TO PRODUCE

10:17AM   14    HIGH QUALITY RESULTS."

10:17AM   15         WAS THAT SENTENCE CONSISTENT WITH YOUR UNDERSTANDING OF

10:17AM   16    THE THERANOS TECHNOLOGY AT THE TIME?

10:17AM   17    A.   YES.

10:17AM   18    Q.   "THERANOS RESULTS ARE AVAILABLE TO PHYSICIANS IN A MATTER

10:18AM   19    OF HOURS."

10:18AM   20         IS THAT ALSO CONSISTENT WITH WHAT YOU UNDERSTOOD THE

10:18AM   21    THERANOS TECHNOLOGY TO OFFER AT THE TIME?

10:18AM   22    A.   YES.

10:18AM   23    Q.   MR. JHAVERI, WOULD YOU NOW TURN TO THE NEXT TAB.  IT'S

10:18AM   24    1254.

10:18AM   25         YOUR HONOR, THE GOVERNMENT OFFERS THE ONE EMAIL THAT I

ER-2095

10:18AM   1    BELIEVE IS SHOWING IN THE COURT'S BINDER.  IT'S AN EMAIL

10:18AM   2    FROM -- ACTUALLY, LET ME ASK A QUESTION.

10:18AM   3         MR. JHAVERI, DO YOU SEE THE EMAIL ON THE BOTTOM OF PAGE 1

10:18AM   4    OF EXHIBIT 1254?

10:18AM   5    A.   I DO.

10:18AM   6    Q.   AND IT'S AN EMAIL FROM MR. BALWANI TO THREE INDIVIDUALS.

10:18AM   7         DO YOU RECOGNIZE THOSE THREE INDIVIDUALS?

10:18AM   8    A.   I DO.

10:18AM   9    Q.   AND THE FIRST IS JAY ROSAN.

10:18AM  10         WHO IS JAY ROSAN?

10:18AM  11    A.   JAY ROSAN IS A PHYSICIAN AND HE WAS IN CHARGE OF HEALTH

10:19AM  12    CARE INNOVATION AT THE TIME.

10:19AM  13    Q.   THE NEXT NAME IS BRAD WASSON.

10:19AM  14         DO YOU RECOGNIZE THAT NAME?

10:19AM  15    A.   I DO.

10:19AM  16    Q.   AND WHO WAS BRAD WASSON?

10:19AM  17    A.   BRAD WASSON WAS ALSO A LEADER AT WALGREENS, AND AT THE

10:19AM  18    TIME I THINK HE WAS IN CHARGE OF SOME OF THE PRODUCT

10:19AM  19    DEVELOPMENT FOR PHARMACY SERVICES FOR WALGREENS.

10:19AM  20    Q.   AND FINALLY, RICHARD ASHWORTH.

10:19AM  21         DO YOU RECOGNIZE THAT NAME?

10:19AM  22    A.   I DO.

10:19AM  23    Q.   WHO IS THAT?

10:19AM  24    A.   RICHARD ASHWORTH WAS ONE OF OUR SENIOR VICE PRESIDENTS

10:19AM  25    THAT HAD PHARMACY OPERATIONS FOR THE WEST COAST OF THE COMPANY.

10:19AM  1    Q.   AND THE EMAIL IS FROM SUNNY BALWANI AND THE EMAIL ADDRESS

10:19AM  2    IS LISTED THERE.

10:19AM  3         DID YOU COMMUNICATE WITH MR. BALWANI OVER EMAIL?

10:19AM  4    A.   YES, DURING THE PROJECT WE DID.

10:19AM  5    Q.   AND WHEN YOU SENT HIM EMAILS, WAS THAT THE EMAIL ADDRESS

10:19AM  6    THAT YOU USED?

10:19AM  7    A.   YES.

10:19AM  8         MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS THE

10:19AM  9    EMAIL AND THE CONTENT OF THE BODY OF 1254.

10:20AM 10         MR. COOPERSMITH:  901, YOUR HONOR.  OBJECTION.

10:20AM 11         THE COURT:  OVERRULED.  IT'S ADMITTED, AND IT MAY BE

10:20AM 12    PUBLISHED.

10:20AM 13         (GOVERNMENT'S EXHIBIT 1254 WAS RECEIVED IN EVIDENCE.)

10:20AM 14         MR. SCHENK:  THANK YOU.

10:20AM 15    Q.   MR. JHAVERI, IT LOOKS LIKE MR. BALWANI IS SENDING A URL

10:20AM 16    LINK.

10:20AM 17         DO YOU SEE THAT?

10:20AM 18    A.   I DO.

10:20AM 19    Q.   AND THEN THE CONTENT OF AN ARTICLE.

10:20AM 20         DO YOU SEE THAT ALSO?

10:20AM 21    A.   I DO.

10:20AM 22    Q.   AND IT'S FROM SOMETHING CALLED "SINGULARITYHUB."

10:20AM 23         DO YOU SEE THAT?

10:20AM 24    A.   I DO.

10:20AM 25    Q.   NOW, IF WE CAN GO INTO THE BODY OF THE ARTICLE ON THE NEXT

10:20AM  1    PAGE, SO PAGE 2.  IT READS, THE FIRST PARAGRAPH, "A NUMBER OF

10:20AM  2    STARTUPS ARE SELLING PORTABLE DIAGNOSTIC LABORATORIES THAT

10:20AM  3    REQUIRE JUST A DROP OF THE PATIENT'S BLOOD, MADE POSSIBLE BY

10:21AM  4    ADVANCES IN THE FIELD OF MICROFLUIDICS.  BUT PERHAPS LAB TESTS

10:21AM  5    CAN BE MADE FASTER, EASIER, AND MORE ACCURATE WITH A

10:21AM  6    TURN-OF-THE-LAST CENTURY TECHNOLOGY:  AUTOMATION.  THAT'S THE

10:21AM  7    BET THAT SILICON VALLEY COMPANY THERANOS IS MAKING, AND THE

10:21AM  8    COMPANY RECENTLY SEALED A DEAL WITH WALGREENS'S PHARMACY TO

10:21AM  9    DELIVER ON-SITE LABORATORY SERVICES TO MANY OF ITS STORES."

10:21AM  10         MR. COOPERSMITH:  YOUR HONOR, I'M GOING TO ADD AN

10:21AM  11   802 OBJECTION TO READING THE ARTICLE.

10:21AM  12        MR. SCHENK:  TWO POINTS.  FIRST, IT'S IN EVIDENCE.

10:21AM  13    SECOND, IT'S NOT BEING OFFERED FOR THE TRUTH, BUT RATHER

10:21AM  14   IT'S RELEVANT TO SHOW MR. BALWANI'S KNOWLEDGE AND MR. BALWANI'S

10:21AM  15   INTENT TO SHARE THE CONTENT OF THIS ARTICLE WITH INDIVIDUALS

10:21AM  16   LIKE WALGREENS WHO WERE BOTH INVESTORS AND BUSINESS PARTNERS.

10:21AM  17        THE COURT:  ALL RIGHT.  SO IT'S NOT -- YOU'RE NOT

10:21AM  18   OFFERING IT FOR THE TRUTH OF THE MATTER ASSERTED IN THE

10:22AM  19   ARTICLE, BUT FOR THE REASONS THAT YOU STATED, THE INTENT,

10:22AM  20   NOTICE INTENT, AND TO SHOW THAT IT WAS DISTRIBUTED FROM

10:22AM  21   MR. BALWANI?

10:22AM  22        MR. SCHENK:  AND KNOWLEDGE.

10:22AM  23        THE COURT:  AND KNOWLEDGE.  THANK YOU.

10:22AM  24    ALL RIGHT.  I'LL OVERRULE THE OBJECTION.  IT'S ADMITTED

10:22AM  25   FOR THAT LIMITED PURPOSE ONLY, LADIES AND GENTLEMEN, NOT FOR

JHAVERI DIRECT BY MR. SCHENK                                    2927

10:22AM 1    THE TRUTH OF THE MATTER ASSERTED IN THE DOCUMENT AS READ BY --

10:22AM 2    AS WAS READ BY MR. SCHENK, BUT RATHER AS TO THE ISSUE OF

10:22AM 3    KNOWLEDGE AND INTENT AS TO MR. BALWANI.

10:22AM 4         YOU CAN CONTINUE.

10:22AM 5              MR. SCHENK:  THANK YOU, YOUR HONOR.

10:22AM 6    Q.   MR. JHAVERI, NOW, IF WE CAN LOOK AT THE NEXT PARAGRAPH,

10:22AM 7    THE ONE THAT BEGINS "HENRY FORD."

10:22AM 8         DO YOU SEE THAT ONE?

10:22AM 9    A.   YES, I DO.

10:22AM 10   Q.   "HENRY FORD WOULD RECOGNIZE THE PRINCIPLE THAT ALLOWS

10:22AM 11   THERANOS TO COMPLETE ACCURATE LAB TESTS WITHIN 4 HOURS:

10:22AM 12   CONSISTENCY AND AUTOMATION INCREASE SPEED AND BRING PRICE DOWN.

10:22AM 13   EVEN SO, THERANOS'S SELLING POINT IS MUCH SMALLER THAN A

10:23AM 14   MODEL T:  A CAPSULE-SIZED LAB VIAL, AND JUST ONE NEEDS TO BE

10:23AM 15   FILLED FOR THE COMPANY TO RUN NEARLY ANY STANDARD LAB TEST."

10:23AM 16        DO YOU SEE THAT?

10:23AM 17   A.   YES, I DO.

10:23AM 18   Q.   AND THAT LAST SENTENCE THAT I READ TO YOU, "A

10:23AM 19   CAPSULE-SIZED LAB VIAL, AND JUST ONE NEEDS TO BE FILLED FOR THE

10:23AM 20   COMPANY TO RUN NEARLY ANY STANDARD LAB TEST," WAS THAT ALSO

10:23AM 21   CONSISTENT WITH YOUR UNDERSTANDING OF THE TECHNOLOGY OFFERING,

10:23AM 22   THAT IS, WHAT WALGREENS WAS PARTNERING WITH THERANOS TO

10:23AM 23   ACCOMPLISH?

10:23AM 24   A.   YES.

10:23AM 25   Q.   IT CONTINUES NOW WITH A PARAGRAPH, "HERE'S HOW IT WORKS."

JHAVERI DIRECT BY MR. SCHENK                          2928

10:23AM  1        DO YOU SEE WHERE I AM?

10:23AM  2    A.  I DO.

10:23AM  3    Q.  "HERE'S HOW IT WORKS:  BLOOD IS DRAWN WITH A FINGERSTICK,

10:23AM  4    RATHER THAN A NEEDLE IN THE ARM.  (IT CAN ALSO RUN URINE TESTS

10:23AM  5    WITH JUST A DROP OF THAT.)  THERE ARE NO BOTCHED STICKS -- OF

10:24AM  6    COURSE, THERE ARE NO PHLEBOTOMISTS, ONLY MACHINES, IN THERANOS

10:24AM  7    LABS."

10:24AM  8        DO YOU SEE THAT?

10:24AM  9    A.  YES, I DO.

10:24AM 10    Q.  IT CONTINUES ON THE LAST PARAGRAPH OF THIS PAGE,

10:24AM 11    "'THERANOS HAS WORKED RELENTLESSLY" --

10:24AM 12        DO YOU SEE WHERE I AM?

10:24AM 13    A.  YES.

10:24AM 14    Q.  -- "TO REACH A POINT AT WHICH WE COULD HELP MAKE

10:24AM 15    ACTIONABLE INFORMATION ACCESSIBLE TO PHYSICIANS AND PATIENTS AT

10:24AM 16    THE TIME IT MATTERS MOST.  CLINICIANS CAN NOW SEE THEIR

10:24AM 17    PATIENTS HAVING RECEIVED LAB RESULTS FROM FRESH SAMPLES IN A

10:24AM 18    MATTER OF HOURS,' SHE SAID IN A STATEMENT."

10:24AM 19        AND WHAT I JUST READ TO YOU WAS IN QUOTES.

10:24AM 20        DO YOU SEE THAT?

10:24AM 21    A.  YES.

10:24AM 22    Q.  AND TWO PARAGRAPHS UP FROM THAT, DOES IT ATTRIBUTE THE

10:24AM 23    QUOTE TO CEO ELIZABETH HOLMES?

10:24AM 24    A.  YES.

10:25AM 25    Q.  AND IF YOU'LL TURN TO THE NEXT PAGE AND THE SECOND

ER-2100

JHAVERI DIRECT BY MR. SCHENK                              2929

10:25AM 1    PARAGRAPH, IT READS, "THE MACHINES METE OUT BITS OF THE

10:25AM 2    'MICRO-SAMPLE' FOR EACH TEST A DOCTOR HAS ORDERED.  IN

10:25AM 3    CONVENTIONAL TESTING, EACH TEST REQUIRES A DEDICATED VIAL,

10:25AM 4    WHICH ADDS DRAMATICALLY TO THE AMOUNT OF BLOOD REQUIRED.

10:25AM 5    THERANOS IS EVEN ABLE TO SAVE SOME OF THE TINY SAMPLE IN CASE

10:25AM 6    THE DOCTOR REQUESTS FURTHER TESTS AFTER SEEING THE INITIAL

10:25AM 7    RESULTS."

10:25AM 8        WAS "THAT" -- AND BY "THAT" I MEAN THE ABILITY TO SAVE

10:25AM 9    SOME SAMPLE AND RUN FURTHER TESTS -- WAS THAT CONSISTENT WITH

10:25AM 10   YOUR UNDERSTANDING OF THE THERANOS TECHNOLOGY AT THIS TIME?

10:25AM 11   A.   YES, IT WAS.

10:25AM 12   Q.   "ALL OF THE DIAGNOSTIC TECHNOLOGY," I'M NOW CONTINUING

10:26AM 13   WITH THE NEXT PARAGRAPH, "IS INTEGRATED, WHICH INCREASES

10:26AM 14   PRECISION.  EACH MACHINE IN A CONVENTIONAL LAB MAY CALIBRATE

10:26AM 15   DIFFERENTLY, AND THE MIX OF BRANDS AND AGES IN MEANS RESULTS

10:26AM 16   COME WITH AN IMPLIED 'OR SO' AT THE END.  PLOTTING RESULTS OVER

10:26AM 17   TIME IS THEREFORE MOSTLY USELESS."

10:26AM 18       IS THIS ALSO CONSISTENT WITH YOUR UNDERSTANDING OF THE

10:26AM 19   ADVANTAGES OF THE THERANOS TECHNOLOGY, THAT IS, UNLIKE

10:26AM 20   CONVENTIONAL MACHINES, THE THERANOS MACHINES DON'T CALIBRATE

10:26AM 21   DIFFERENTLY, BUT RATHER ARE CALIBRATED TOGETHER?

10:26AM 22   A.   YES.  MY UNDERSTANDING WAS AT THE TIME THAT YOUR

10:26AM 23   TRADITIONAL LABS CAN HAVE VARIATION FROM LAB TO LAB, AND WITH

10:26AM 24   THE THERANOS LAB, THAT VARIATION WOULD NOT OCCUR.

10:26AM 25   Q.   AND DO YOU RECALL WHERE YOU GOT THAT UNDERSTANDING?  DID

ER-2101

10:26AM 1    YOU TALK ABOUT THAT CONCEPT, FOR EXAMPLE, WITH MR. BALWANI?

10:26AM 2    A.   YES, SIR.

10:26AM 3    Q.   WOULD YOU NOW TURN TO EXHIBIT 1387.

10:27AM 4        MR. JHAVERI, IS 1387 ANOTHER AMENDED AGREEMENT BETWEEN

10:27AM 5    THERANOS AND WALGREENS?

10:27AM 6    A.   YES.

10:27AM 7    Q.   AND IS IT DATED THE END OF 2013, DECEMBER 31ST?

10:27AM 8    A.   THAT'S CORRECT.

10:27AM 9            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1387.

10:27AM 10           MR. COOPERSMITH:  NO OBJECTION.

10:27AM 11           THE COURT:  1387?

10:27AM 12           MR. SCHENK:  YES, YOUR HONOR.

10:27AM 13           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:27AM 14           MR. SCHENK:  THANK YOU.

10:27AM 15       (GOVERNMENT'S EXHIBIT 1387 WAS RECEIVED IN EVIDENCE.)

10:27AM 16   BY MR. SCHENK:

10:27AM 17   Q.   MR. JHAVERI, I'M GOING TO DIRECT YOUR ATTENTION TO A

10:27AM 18   SENTENCE IN THE SECOND MIDDLE OF THE PARAGRAPH.  IT SAYS

10:27AM 19   "ASSUMING APPROPRIATE COVERAGE."

10:27AM 20       DO YOU SEE THAT ABOUT FIVE OR SIX LINES DOWN?

10:28AM 21   A.   YES, I DO.

10:28AM 22   Q.   "ASSUMING APPROPRIATE COVERAGE, QUALITY, AND PERFORMANCE

10:28AM 23   BY WALGREENS, IT IS THE EXPECTATION THAT WALGREENS WILL BE

10:28AM 24   THERANOS'S EXCLUSIVE RETAIL PHARMACY AND CLINIC PARTNER.

10:28AM 25   ASSUMING THE ABILITY TO SCALE, ACCEPTABLE QUALITY AND

10:28AM 1    PERFORMANCE BY THERANOS, IT IS THE EXPECTATION THAT THERANOS

10:28AM 2    WILL BE WALGREENS' EXCLUSIVE PARTNER FOR THE SERVICES."

10:28AM 3         DO YOU SEE THAT?

10:28AM 4    A.   YES, I DO.

10:28AM 5    Q.   IN DECEMBER OF 2013 WHEN THIS AGREEMENT WAS AMENDED, DO

10:28AM 6    YOU REMEMBER WHAT WAS HAPPENING IN THE RELATIONSHIP, SORT OF

10:28AM 7    WHAT WAS YOUR ROLE AND WHAT WAS GOING ON IN THE

10:28AM 8    THERANOS-WALGREENS RELATIONSHIP?

10:28AM 9    A.   YEAH.  RIGHT ABOUT THIS TIME, WE HAD ABOUT THREE STORES

10:28AM 10   OPEN, WE HAD THREE STORES OPENED, AND I WAS PROBABLY A FEW

10:28AM 11   WEEKS AWAY FROM TAKING OVER THE INITIATIVE IN THE PARTNERSHIP.

10:28AM 12        AND SO THE TWO COMPANIES WERE ALSO IN THE PROCESS OF

10:29AM 13   REDOING THEIR AGREEMENT TO MAKE SURE THAT IT'S CURRENT, THAT IT

10:29AM 14   MEETS THE REQUIREMENTS THAT BOTH COMPANIES CAN AGREE UPON, AND

10:29AM 15   IT WAS LED BY OUR M & A DIVISION, OUR MERGERS AND ACQUISITION

10:29AM 16   DIVISION, LED BY A GENTLEMAN NAMED MARK VAINISI.

10:29AM 17   Q.   AND WHEN IT SAYS IN THE SENTENCE THAT I READ TO YOU,

10:29AM 18   "ASSUMING THE ABILITY TO SCALE ACCEPTABLE QUALITY AND

10:29AM 19   PERFORMANCE BY THERANOS, IT IS THE EXPECTATION THAT THERANOS

10:29AM 20   WILL BE WALGREENS EXCLUSIVE PARTNER," WHAT DID THAT MEAN?

10:29AM 21        AND BY "THAT" I MEAN THINGS LIKE ABILITY TO SCALE,

10:29AM 22   ACCEPTABLE QUALITY?

10:29AM 23   A.   WELL, THE REFERENCE HERE AGAIN IS THAT THERE ARE A LOT OF

10:29AM 24   THINGS THAT GO INTO THE ABILITY TO EXPAND THESE SERVICES

10:29AM 25   NATIONWIDE.  IT'S NOT SIMPLY DROPPING A MACHINE DOWN OR

JHAVERI DIRECT BY MR. SCHENK                    2932

10:29AM   1    CENTRIFUGE DOWN AND TRAINING A BUNCH OF PEOPLE.

10:30AM   2         IT REQUIRES QUITE A BIT OF TIME, COST, PLANNING.  AND SO

10:30AM   3    WHAT WE'RE REFERRING TO IS BOTH COMPANIES HAVE TO HAVE THE

10:30AM   4    ABILITY TO SCALE TO MORE STORES, NUMBER ONE.

10:30AM   5         THE SERVICE HAS TO BE HIGH QUALITY; AND THE PERFORMANCE,

10:30AM   6    IN THIS CASE, THE THERANOS PERFORMANCE BECAUSE THEY ARE THE

10:30AM   7    LAB, HAS TO BE MEETING THE AGREED UPON REQUIREMENTS.

10:30AM   8         AND IF SO, IF THAT HAPPENS, THEN WE WILL CONTINUE TO

10:30AM   9    EXPAND.  THAT'S REALLY WHAT THIS IS REFERRING TO.

10:30AM  10    Q.   YOU DESCRIBED A MOMENT AGO SOME OF THE THINGS THAT WERE

10:30AM  11    NECESSARY FOR FURTHER EXPANSION, LIKE ACCEPTABLE QUALITY; IS

10:30AM  12    THAT RIGHT?

10:30AM  13    A.   THAT'S CORRECT.

10:30AM  14    Q.   AND IN THE CONTEXT OF LAB TESTING, WHAT DOES THAT MEAN?

10:30AM  15    A.   WELL, A COUPLE OF THINGS.  WELL, THE MAIN THING IS

10:30AM  16    ACCURACY.

10:30AM  17              MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  702.

10:30AM  18              THE COURT:  WHY DON'T YOU ASK THAT QUESTION AGAIN,

10:30AM  19    IF YOU WOULD, PLEASE.

10:30AM  20              MR. SCHENK:  YES.

10:31AM  21    Q.   WHEN YOU WERE WORKING ON THE THERANOS PROJECT INITIALLY IN

10:31AM  22    THE PILOT AND ASSISTING -- DID YOU ASSIST IN THE DETERMINATION

10:31AM  23    OF WHETHER THERE WOULD BE FURTHER EXPANSION?

10:31AM  24    A.   CAN YOU ASK THAT QUESTION AGAIN, SIR?

10:31AM  25    Q.   YES.

ER-2104

JHAVERI DIRECT BY MR. SCHENK                          2933

10:31AM 1      DURING YOUR WORK ON THE PILOT PHASE, DID YOU HAVE A ROLE

10:31AM 2   IN EVALUATING WHETHER THE PILOT WAS SUCCESSFUL?

10:31AM 3   A.   YES.

10:31AM 4   Q.   AND IN YOUR EVALUATION OF WHETHER THE PILOT WAS

10:31AM 5   SUCCESSFUL, WHAT KIND OF FACTORS DID YOU CONSIDER?  WHAT DID

10:31AM 6   YOU PAY ATTENTION TO?

10:31AM 7   A.   WELL, WE PAID ATTENTION TO SEVERAL FACTORS, AND I REFERRED

10:31AM 8   TO METRICS THAT WE HAD DEFINED BETWEEN THE THERANOS TEAM AND

10:31AM 9   THE WALGREENS TEAM, AND THOSE METRICS WERE -- SOME WERE

10:31AM 10  OPERATIONAL IN NATURE, IN OTHER WORDS, WHAT DOES THE EXPERIENCE

10:31AM 11  LOOK LIKE, HOW LONG DOES THE PATIENT WAIT, HOW LONG DOES IT

10:31AM 12  TAKE TO CHECK IN A PATIENT, THINGS OF THAT NATURE.

10:31AM 13      THEN WE ALSO HAD METRICS THAT LOOKED AT HOW LONG IT TAKES

10:31AM 14  TO TRAIN TEAM MEMBERS.

10:31AM 15      KEEP IN MIND, WHEN WE TRAIN TEAM MEMBERS, WE HAVE TO PULL

10:32AM 16  THEM FROM THEIR NORMAL DAY-TO-DAY JOB, AND SO IT IMPACTS

10:32AM 17  SERVICE LEVELS IN OUR STORES, AND SO WE HAD TO MINIMIZE THAT

10:32AM 18  WHILE STILL TRAINING THEM APPROPRIATELY, SO WE MEASURED THAT.

10:32AM 19      THREE, WE MEASURED THE NUMBER OF TEAM MEMBERS THAT WE ALSO

10:32AM 20  TRAINED.  IF WE WERE GOING TO EXPAND, WE NEEDED TO HAVE THESE

10:32AM 21  FOLKS READY TO GO SO THEY COULD BE PUT INTO THESE STORES AND

10:32AM 22  START WORKING.

10:32AM 23      AND THEN WE HAD OTHER MEASURES THAT WE ALSO LOOKED AT ON

10:32AM 24  THE PERFORMANCE OF THE SERVICE ITSELF, AND ONE OF THOSE WAS THE

10:32AM 25  NUMBER OF PATIENTS THAT WERE RECEIVING A FINGERSTICK DRAW

ER-2105

JHAVERI DIRECT BY MR. SCHENK                    2934

10:32AM   1    VERSUS A VENOUS DRAW, AND WE MEASURED THAT AS WELL.

10:32AM   2        AND SO ALL OF THESE METRICS WENT INTO DETERMINING WHETHER

10:32AM   3    OR NOT THE PILOT WAS SUCCESSFUL, AND WE MEASURED AND WE

10:32AM   4    MONITORED THOSE NUMBERS ON A REGULAR BASIS.

10:32AM   5    Q.   DID YOU COMMUNICATE THESE METRICS TO MR. BALWANI?

10:32AM   6    A.   I DID.

10:32AM   7    Q.   AND DID YOU -- DO YOU KNOW WHETHER MR. BALWANI KNEW THAT

10:33AM   8    WALGREENS WAS PAYING ATTENTION TO THESE METRICS?

10:33AM   9    A.   WE DID.  ALL OF THE METRICS AND THE PLAN WAS DONE

10:33AM  10    COLLABORATIVELY WITH MR. BALWANI'S TEAM AND MY TEAM TOGETHER,

10:33AM  11    AND SO THERE WAS TRANSPARENCY IN WHAT WE WERE TRYING TO ACHIEVE

10:33AM  12    AND WHAT ARE THE NUMBERS THAT WE ARE TRYING TO HIT.

10:33AM  13    Q.   WAS -- ACTUALLY, LET'S MOVE TO EXHIBIT 3755 IN YOUR

10:33AM  14    BINDER.

10:33AM  15        THE COURT:  WHILE YOU'RE DOING THAT, MR. SCHENK, LET

10:33AM  16    ME INVITE THE JURY TO JUST STAND AND TAKE A STRETCHING BREAK

10:33AM  17    FOR JUST A MOMENT.

10:33AM  18    THE EXHIBIT AGAIN WAS?

10:33AM  19        MR. SCHENK:  3755.

10:33AM  20        THE COURT:  THANK YOU.

10:34AM  21    (STRETCHING.)

10:34AM  22        THE COURT:  ALL RIGHT.  THANK YOU, MR. SCHENK.

10:34AM  23        MR. SCHENK:  THANK YOU.

10:34AM  24    Q.   MR. JHAVERI, DO YOU RECOGNIZE THE DOCUMENT THAT IS LOCATED

10:34AM  25    AT EXHIBIT 3755?

JHAVERI DIRECT BY MR. SCHENK                                    2935

10:34AM   1       A.   I DO.

10:34AM   2       Q.   AND WHAT IS THIS DOCUMENT?

10:34AM   3       A.   WHAT THIS IS, IS A PROGRAM CHARTER, AND FOR A SIMPLE

10:34AM   4       DESCRIPTION, WHENEVER WE START A PROJECT, WE WRITE SORT OF A

10:34AM   5       SYNOPSIS OF WHAT WE WANT TO ACHIEVE, WHAT IS THE PROJECT, WHO

10:34AM   6       IS THE TEAM, WHAT ARE WE TRYING TO DO, WHAT ARE SOME OF THE

10:34AM   7       METRICS, WHAT DOES THE PILOT LOOK LIKE?

10:34AM   8            ALL OF THOSE THINGS WE TRY TO DOCUMENT AND TO MAKE SURE

10:34AM   9       THAT WE'RE STAYING TRUE TO WHAT WE'RE TRYING TO ACHIEVE.

10:35AM  10       Q.   AND IS THIS AN INTERNAL WALGREENS DOCUMENT?

10:35AM  11       A.   YES, SIR.

10:35AM  12                MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3755.

10:35AM  13                MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:35AM  14                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:35AM  15            (GOVERNMENT'S EXHIBIT 3755 WAS RECEIVED IN EVIDENCE.)

10:35AM  16       BY MR. SCHENK:

10:35AM  17       Q.   MR. JHAVERI, AT THE VERY TOP, THE PROGRAM NAME IS

10:35AM  18       DIAGNOSTIC TESTING.

10:35AM  19            DO YOU SEE THAT?

10:35AM  20       A.   YES, SIR.

10:35AM  21       Q.   AND UNDER BUSINESS OWNER ON THE RIGHT, I SEE YOUR NAME AND

10:35AM  22       SOMEONE NAMED BRAD WASSON; IS THAT RIGHT?

10:35AM  23       A.   YES, SIR.

10:35AM  24       Q.   AND WHAT DOES "BUSINESS OWNER" MEAN?

10:35AM  25       A.   OWNERSHIP OF THE EXECUTION OF THE PROJECT ITSELF.

ER-2107

JHAVERI DIRECT BY MR. SCHENK                                    2936

10:35AM  1    Q.    AND IS BRAD WASSON A NAME THAT WE SAW ON AN EMAIL AN

10:35AM  2    EXHIBIT OR TWO AGO?

10:35AM  3    A.    YES, BRAD WASSON WAS AT THE TIME MY BOSS.

10:35AM  4    Q.    OKAY.  IF YOU'LL NOW TURN TO PAGE 2 OF THIS DOCUMENT, ON

10:35AM  5    SORT OF THE SECOND SECTION UNDER EXECUTIVE SUMMARY, THE OVERALL

10:35AM  6    GOAL.

10:35AM  7         DO YOU SEE THAT?

10:35AM  8    A.    YES, I DO.

10:36AM  9    Q.    "THE OVERALL GOAL IS TO EXPAND TO 2500 STORES NATIONWIDE

10:36AM  10   BY THE END OF FISCAL YEAR '16.  THE PLAN FOR FISCAL YEAR '14 IS

10:36AM  11   TO ROLL OUT DIAGNOSTIC TESTING SERVICES TO 40 STORES BY

10:36AM  12   AUGUST 1, 2014."

10:36AM  13        DO YOU SEE THAT?

10:36AM  14   A.    YES, SIR.

10:36AM  15   Q.    WHAT DOES IT MEAN THAT THE GOAL WAS TO EXPAND TO 2500

10:36AM  16   STORES NATIONWIDE BY THE END OF FISCAL YEAR '16?

10:36AM  17   A.    YEAH.  SO IT'S EXACTLY HOW IT STATES.  SO THE PLAN WAS

10:36AM  18   THAT IF EVERYTHING GOES RIGHT, THAT WE WOULD GET TO 2500 STORES

10:36AM  19   AND BE NATIONWIDE AND OFFER THESE SERVICES BY THE END OF FISCAL

10:36AM  20   YEAR '16.

10:36AM  21        AND JUST TO BE SPECIFIC ON WHAT FISCAL YEAR MEANS, THE

10:36AM  22   WALGREENS FISCAL YEAR IS FROM SEPTEMBER 1ST TO AUGUST 31ST.  SO

10:36AM  23   IN THIS PARTICULAR CASE WE'RE TALKING ABOUT FISCAL YEAR '16, AT

10:37AM  24   THE END OF FISCAL YEAR '16 WOULD BE AUGUST 31ST, 2016.

10:37AM  25   Q.    AND YOU SAID EXPAND TO 2500 STORES.  IS THIS REGARDING

JHAVERI DIRECT BY MR. SCHENK                                    2937

10:37AM 1     THERANOS BLOOD TESTING SERVICES WITHIN A WALGREENS STORE?

10:37AM 2     A.   YES, SIR.

10:37AM 3     Q.   WHY THEN IN -- FIRST OF ALL, IF YOU COULD GO BACK TO THE

10:37AM 4     FIRST PAGE, LET'S CAPTURE THE DATE.

10:37AM 5          DO YOU SEE DOCUMENT VERSION CONTROL?

10:37AM 6     A.   I DO.

10:37AM 7     Q.   AND AT THE -- THERE'S A LIST OF ROWS, THE THIRD ROW, OR

10:37AM 8     VERSION 3.0, IS DATED IN MARCH OF 2014.

10:37AM 9          DO YOU SEE THAT?

10:37AM 10    A.   YES.

10:37AM 11    Q.   AND SO IS THAT THE DATE OF THE VERSION OF THE DOCUMENT

10:37AM 12    THAT WE ARE LOOKING AT?

10:37AM 13    A.   THAT'S CORRECT.

10:37AM 14    Q.   SO WHY IN MARCH OF 2014 IS WALGREENS TALKING ABOUT A GOAL

10:37AM 15    FOR THE END OF FISCAL YEAR '16?

10:37AM 16    A.   WELL, WITH ANY INITIATIVE, SPECIFICALLY FOR THERANOS, YOU

10:37AM 17    HAVE TO PLAN, AND WHAT THIS CHARTER SHOWS IS WHAT THE HOPE AND

10:38AM 18    THE PLAN IS WHAT WE WOULD GET TO.

10:38AM 19         AS I MENTIONED, A PROGRAM CHARTER IDENTIFIES AND CLEARLY

10:38AM 20    DOCUMENTS WHAT WE ARE TRYING TO ACHIEVE AND WHAT THE GOAL OF

10:38AM 21    THE PROJECT IS.

10:38AM 22         AND SO THE GOAL OF THE PROJECT WAS TO BE NATIONWIDE.  THAT

10:38AM 23    WAS THE HOPE, TO EXPAND THIS TO 2500 STORES.

10:38AM 24         BUT IN ORDER FOR US TO DO THAT, WE HAVE TO GO THROUGH THAT

10:38AM 25    PROCESS OF CRAWL, WALK, RUN, THAT PILOT PHASE TO MAKE SURE

JHAVERI DIRECT BY MR. SCHENK                                    2938

10:38AM 1    WE'RE HITTING THE SUCCESS MEASURES THAT WE'VE DEFINED.

10:38AM 2    Q.   THANK YOU.

10:38AM 3         IF YOU'LL NOW LOOK AT THE LAST SENTENCE OF THIS EXECUTIVE

10:38AM 4    SUMMARY, "THE SCOPE OF THIS PROGRAM CHARTER IS TARGETED AT THE

10:38AM 5    PILOT PHASE, WITH AN OVERVIEW FOR WHAT IS CURRENTLY KNOWN ABOUT

10:38AM 6    SCALE PLANS."

10:38AM 7         DO YOU SEE THAT?

10:38AM 8    A.   YES, SIR.

10:38AM 9    Q.   AND WHAT DOES IT MEAN THAT THE SCOPE OF THE PROGRAM

10:38AM 10   CHARTER, THIS DOCUMENT, IS THE PILOT PHASE?

10:39AM 11   A.   YEAH.  SO WHAT WE HAVE IN THIS PROGRAM CHARTER IS THE

10:39AM 12   DETAILS OF THE PHASE THAT WE CALL THE PILOT, WHICH IS THE 40,

10:39AM 13   41 STORES THAT WE WILL BE LAUNCHING.  WHAT WILL WE BE LOOKING

10:39AM 14   AT?  WHAT ARE THE SUCCESS MEASURES DURING THAT PILOT PHASE?

10:39AM 15        AND THEN, AS IT STATES, THE OVERVIEW IS WHERE WE HOPE TO

10:39AM 16   GO BASED ON THAT PILOT.  AND SO WE DON'T HAVE THE DETAILS IN

10:39AM 17   THIS PROGRAM CHARTER BECAUSE WE DON'T KNOW WHAT WE'RE GOING TO

10:39AM 18   LEARN IN THAT PILOT PHASE, SO THAT'S THE OVERVIEW.

10:39AM 19        BUT THE DETAILS ARE THE PILOT ITSELF.

10:39AM 20   Q.   WAS WALGREENS PLANNING TO USE WHAT IT LEARNED THROUGH THE

10:39AM 21   PILOT PHASE TO THEN FOCUS ON FURTHER EXPANSION?

10:39AM 22   A.   YES.  THE IDEA HERE IS TO MAKE SURE THAT THE SERVICES

10:39AM 23   WORKING AS DEFINED IN THE PROGRAM CHARTER AS AGREED UPON WITH

10:39AM 24   THERANOS AND WALGREENS, EXCUSE ME.

10:39AM 25        AND THEN DURING THAT PILOT PHASE, AS WE LEARN MORE, WE

10:40AM  1    SHIFTED, WE CHANGED, WE EVOLVED.

10:40AM  2         AND WHEN WE BELIEVE THAT WE HAVE ACHIEVED THAT SUCCESS,

10:40AM  3    THEN WE CAN EXPAND FURTHER.

10:40AM  4         BUT DURING THAT TIME, WE'RE STILL PLANNING BECAUSE, AGAIN,

10:40AM  5    YOU CAN'T JUST WAKE UP ONE DAY AND SAY, I'M GOING TO OPEN UP

10:40AM  6    2500 STORES.  IT TAKES A LOT OF TIME, A LOT OF EFFORT, A LOT OF

10:40AM  7    COST, A LOT OF TRAINING TO DO THAT.

10:40AM  8         AND SO WE'RE ALWAYS PLANNING FORWARD BASED ON WHAT WE'RE

10:40AM  9    SEEING, AND THAT CAN ALWAYS CHANGE BASED ON THE RESULTS THAT

10:40AM 10    WE'RE SEEING IN THE PILOT.

10:40AM 11    Q.   OKAY.  I'M GOING TO ASK YOU A QUESTION ABOUT PROPOSED

10:40AM 12    SOLUTION ON PAGE 3, BUT DO YOU NEED TO TAKE A MINUTE AND GRAB

10:40AM 13    WATER?  WOULD THAT HELP?

10:40AM 14    A.   YEAH.  THANK YOU.

10:40AM 15    Q.   SURE.

10:40AM 16         AT THE BOTTOM OF PAGE 3, DO YOU SEE THE SECTION ENTITLED

10:41AM 17    PROPOSED SOLUTION?

10:41AM 18    A.   YES, SIR.

10:41AM 19    Q.   AND IT READS, "WALGREENS PLANS TO OFFER LABORATORY

10:41AM 20    SERVICES THROUGH OUR RETAIL STORES.  WE PLAN ON PERFORMING THE

10:41AM 21    MAJORITY OF THE SAME TESTS (SEE THERANOS TEST MENU IN APPENDIX

10:41AM 22    C OF PROGRAM CHARTER APPENDIX) THAT THE INDUSTRY LEADERS DO

10:41AM 23    TODAY (LABCORP AND QUEST).  THE FUNDAMENTAL DIFFERENCE WILL BE

10:41AM 24    THAT WALGREENS, THROUGH OUR CONVENIENT LOCATIONS, WILL OFFER

10:41AM 25    GREATER EASE AND ACCESS THAN IS CURRENTLY FOUND IN THE INDUSTRY

ER-2111

JHAVERI DIRECT BY MR. SCHENK                    2940

10:41AM  1    TODAY.  WALGREENS WILL BE ENTERING THE LAB MARKET WITH A

10:41AM  2    DISRUPTIVE," AND THEN IT CONTINUES NOW ON TO THE TOP OF PAGE 4,

10:41AM  3    "TECHNOLOGY ADVANTAGE.  MOREOVER, WE HAVE FOUND AN IDEAL

10:41AM  4    PARTNER, THERANOS, WHICH CAN OFFER LESS INVASIVE, FASTER, AND

10:41AM  5    COST EFFECTIVE RESULTS TO THE PATIENTS.  THE THERANOS

10:41AM  6    TECHNOLOGY ONLY REQUIRES A SMALL SAMPLE IN ORDER TO

10:42AM  7    AUTOMATICALLY PROCESS MULTIPLE TESTS FROM A MENU OF 300 PLUS

10:42AM  8    TESTS IN LESS THAN 4 HOURS.  SAMPLES COLLECTED INCLUDE BLOOD,

10:42AM  9    URINE, FECES, AND SPUTUM.  APPROXIMATELY 120 MILLILITERS OF

10:42AM  10   BLOOD IS COLLECTED PER FINGERSTICK, WITH APPROXIMATELY 2 BLOOD

10:42AM  11   COLLECTIONS PER PATIENT.  A DROP OF BLOOD IS 5 MILLILITERS."

10:42AM  12       MR. JHAVERI, IS THE DESCRIPTION THAT I'VE READ TO YOU JUST

10:42AM  13   NOW CONSISTENT WITH YOUR UNDERSTANDING OF WHAT THE THERANOS

10:42AM  14   SERVICES OFFERED AT THIS TIME?

10:42AM  15   A.   YES.

10:42AM  16   Q.   SO DID YOU UNDERSTAND THAT THE THERANOS TECHNOLOGY WAS

10:42AM  17   LESS INVASIVE THAN, IN THIS PARAGRAPH IT COMPARES IT TO QUEST

10:42AM  18   AND LABCORP?

10:42AM  19   A.   YES.

10:42AM  20   Q.   THAT IT WAS FASTER THAN QUEST AND LABCORP?

10:42AM  21   A.   YES.

10:42AM  22   Q.   THAT IT WAS COST EFFECTIVE, IT PROVIDED COST EFFECTIVE

10:43AM  23   RESULTS TO PATIENTS?

10:43AM  24   A.   YES.

10:43AM  25   Q.   AND ALSO THAT THERANOS TECHNOLOGY ONLY REQUIRED A SMALL

ER-2112

JHAVERI DIRECT BY MR. SCHENK                                    2941

10:43AM   1    SAMPLE IN ORDER TO AUTOMATICALLY PROCESS MULTIPLE TESTS FROM A

10:43AM   2    MENU OF MORE THAN 300 TESTS IN LESS THAN FOUR HOURS.

10:43AM   3        IS THAT ALSO CONSISTENT WITH YOUR UNDERSTANDING?

10:43AM   4    A.   YES.

10:43AM   5    Q.   MR. JHAVERI, WOULD YOU NOW TURN TO EXHIBIT 1711 IN YOUR

10:43AM   6    BINDER.

10:43AM   7        DO YOU SEE THAT DOCUMENT?

10:43AM   8    A.   I DO.

10:43AM   9    Q.   AND, MR. JHAVERI, YOU'VE TOLD THE JURY THAT THERE WERE

10:43AM  10    MEETINGS WHERE YOU HAD THE OPPORTUNITY TO INTERACT WITH

10:44AM  11    INDIVIDUALS FROM THERANOS AND TALK ABOUT HOW THE PILOT WAS

10:44AM  12    GOING, THINGS THAT YOU CITED AS LEARNING; IS THAT RIGHT?

10:44AM  13    A.   THAT'S CORRECT.

10:44AM  14    Q.   HOW DID THOSE MEETINGS OCCUR?  DO YOU RECALL?

10:44AM  15    A.   SURE.

10:44AM  16        WE HAD WHAT WE CALLED PARTNERSHIP MEETINGS, AND SO AS WE

10:44AM  17    WERE GOING THROUGH THE PILOT AND LAUNCHING NEW STORES, ON A

10:44AM  18    REGULAR BASIS, USUALLY MONTHLY, BOTH TEAMS, THE THERANOS TEAM

10:44AM  19    AND THE WALGREENS TEAM, WOULD COME TOGETHER.

10:44AM  20        IN THIS PARTICULAR CASE, MS. HAWORTH, PATTY HAWORTH, WHO

10:44AM  21    THE EMAILS WERE FROM, WAS THE PROJECT MANAGER HELPING TO

10:44AM  22    COORDINATE AND ENSURE THAT THE PROJECT PLAN IS BEING MET AND

10:44AM  23    THAT ALL OF THE MINUTES WERE BEING DOCUMENTED, ALL OF THE

10:44AM  24    PLANNING WAS BEING DOCUMENTED.

10:44AM  25        AND SO WHAT THIS ALLOWED BOTH TEAMS TO DO IS TO STAY ON

10:44AM   1     ONE PAGE, TO DRIVE WITH ONE DIRECTION, AND ALSO TO ENSURE THAT

10:44AM   2     WE CAN DISCUSS SOME OF THE ISSUES THAT WE WERE EXPERIENCING,

10:45AM   3     SOME OF THE LEARNINGS THAT WE WERE SEEING, AND HOW DO WE

10:45AM   4     CORRECT THEM, HOW DO WE FIX THEM, WHAT DO WE NEED TO DO.

10:45AM   5          AND SO THAT IS THE PURPOSE OF THOSE MEETINGS.

10:45AM   6     Q.   WERE SLIDES SHOWN DURING SOME OF THESE MEETINGS,

10:45AM   7     POWERPOINT SLIDES?

10:45AM   8     A.   SOME MEETINGS, YES.

10:45AM   9     Q.   AND IS EXHIBIT 1711 AN EXAMPLE OF SLIDES FROM A MAY 2014

10:45AM   10    MEETING?

10:45AM   11    A.   YES, IT IS.

10:45AM   12    Q.   YOU MENTIONED A NAME A MOMENT AGO, PATTY HAWORTH.

10:45AM   13         WHO IS THAT?

10:45AM   14    A.   PATTY HAWORTH WAS A TEAM MANAGER AT WALGREENS.  SHE WAS

10:45AM   15    THE PROJECT MANAGER FOR THIS PARTICULAR PROJECT.

10:45AM   16    Q.   AND INCLUDED ON A LIST OF RECIPIENTS OF THIS EMAIL, DO YOU

10:45AM   17    SEE YOUR NAME?

10:45AM   18    A.   I DO.

10:45AM   19    Q.   DO YOU SEE MR. BALWANI'S NAME?

10:45AM   20    A.   YES, SIR.

10:46AM   21              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1711.

10:46AM   22              MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:46AM   23              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:46AM   24         (GOVERNMENT'S EXHIBIT 1711 WAS RECEIVED IN EVIDENCE.)

10:46AM   25    BY MR. SCHENK:

10:46AM   1      Q.   SO LET'S SHOW THE JURY NOW THE SUBJECT LINE OF THIS

10:46AM   2      MAY 6TH, 2014, EMAIL.

10:46AM   3           MR. JHAVERI, DO YOU SEE THAT IT'S CALLED A DIAGNOSTIC

10:46AM   4      TESTING EXECUTIVE STEERING COMMITTEE SLIDE DECK.

10:46AM   5           DO YOU SEE THAT?

10:46AM   6      A.   YES, I DO.

10:46AM   7      Q.   AND WHAT IS THE EXECUTIVE STEERING COMMITTEE?

10:46AM   8      A.   SO WE HAD A -- PART OF THE PROJECT IS TO CREATE NOT ONLY

10:46AM   9      THE TEAM MEMBERS THAT ARE ACTUALLY DOING THE PROJECT, BUT ALSO

10:46AM  10      OVERSIGHT, AND SO WE HAD A COMMITTEE THAT WAS CALLED THE

10:46AM  11      EXECUTIVE STEERING COMMITTEE THAT WE MET WITH ON A REGULAR

10:46AM  12      BASIS TO PROVIDE THEM WITH AN UPDATE, WHERE WE ARE, WHAT WE'RE

10:46AM  13      DOING, AND THEN WHAT CAN THEY DO TO HELP US IN ANY TYPE OF

10:46AM  14      ISSUES THAT MAY HAVE COME UP.

10:46AM  15      Q.   THANK YOU.

10:46AM  16           AND THEN THE BODY OF THE EMAIL, DO YOU SEE MS. HAWORTH

10:46AM  17      WRITES THAT THESE SLIDES ARE ATTACHED FOR OUR MEETING TODAY,

10:47AM  18      WHICH IS MAY 6TH, 2014?

10:47AM  19      A.   YES, SIR.

10:47AM  20      Q.   AND IF NOW YOU'LL TURN TO PAGE 7 OF THIS EXHIBIT, THE VERY

10:47AM  21      TOP BOX THAT IS A LITTLE BIT -- I'M SORRY, THE TOP BOX UNDER

10:47AM  22      THE MIDDLE OF THIS SLIDE.

10:47AM  23           DO YOU SEE A LIST OF EXECUTIVE STEERING COMMITTEE MEMBERS?

10:47AM  24      A.   YES, I DO.

10:47AM  25      Q.   ARE YOU A MEMBER OF THE COMMITTEE?

JHAVERI DIRECT BY MR. SCHENK                    2944

10:47AM  1    A.   I AM.

10:47AM  2    Q.   AND WHO IS THE LONE REPRESENTATIVE FROM THERANOS?

10:47AM  3    A.   MR. BALWANI.

10:47AM  4    Q.   IF YOU'LL NOW TURN TO PAGE 9 OF THIS EXHIBIT, THERE'S A

10:47AM  5    SLIDE THAT IS ENTITLED CURRENT OPERATIONS METRICS.

10:47AM  6         DO YOU SEE THAT?

10:47AM  7    A.   I DO.

10:47AM  8    Q.   YOU'VE TALKED TO THIS JURY THIS MORNING ABOUT METRICS.

10:47AM  9         IS THIS AN EXAMPLE OF SOME OF THE METRICS THAT YOU

10:47AM  10   DESCRIBED EARLIER?

10:47AM  11   A.   YES, THEY ARE.  YES, THEY ARE.

10:48AM  12   Q.   AND SO I'D LIKE TO GO THROUGH A FEW OF THEM WITH YOU, BUT

10:48AM  13   FIRST, WOULD YOU NOTE FOR THE JURY THE TWO COLUMNS ARE

10:48AM  14   DIFFERENT DATES.

10:48AM  15        WHAT INFORMATION IS BEING COMMUNICATED THERE?

10:48AM  16   A.   WELL, THE TWO DATES REPRESENT SORT OF A MOMENT IN TIME

10:48AM  17   WHEN THE FIRST THREE STORES OPENED UP, AND THEN AT THE TIME IN

10:48AM  18   MAY, WHERE DID WE STAND IN TERMS OF THE PROJECT ITSELF.

10:48AM  19        SO AS YOU CAN SEE, THE FIRST LINE WE HAVE MOVED IN

10:48AM  20   FEBRUARY OF 2014 FROM THREE STORES TO 11 STORES ON MAY 1ST OF

10:48AM  21   2014.

10:48AM  22   Q.   GREAT.  SO LET'S TAKE THAT FIRST, THAT FIRST ROW, THE

10:48AM  23   NUMBER OF STORES.

10:48AM  24        IN FEBRUARY OF '14, THE NUMBER IS THREE; IS THAT RIGHT?

10:48AM  25   A.   YES.

10:48AM  1    Q.   SO IS THAT ONE IN PALO ALTO AND TWO IN ARIZONA?

10:48AM  2    A.   YES.

10:48AM  3    Q.   AND NOW WE SEE IN MAY THE NUMBER INCREASED TO 11.  WHERE

10:48AM  4    ARE THESE ADDITIONAL STORES THAT HAVE NOW OPENED, WHERE ARE

10:49AM  5    THEY?

10:49AM  6    A.   ALL OF THE ADDITIONAL STORES WERE IN THE PHOENIX, ARIZONA

10:49AM  7    MARKET.

10:49AM  8    Q.   AND WHEN YOU SAY "ALL," DO YOU MEAN IN THE ENTIRE LIFE OF

10:49AM  9    THE THERANOS-WALGREENS RELATIONSHIP, EVERY ADDITIONAL STORE

10:49AM  10   OUTSIDE OF THE PALO ALTO LOCATION WAS ALWAYS IN ARIZONA?

10:49AM  11   A.   YES, SIR.

10:49AM  12   Q.   AND IF NOW YOU'LL LOOK AT THE SECOND ROW, AVERAGE PATIENTS

10:49AM  13   PER STORE PER DAY.

10:49AM  14        FIRST, WHAT IS THAT?  WHAT DOES THAT MEAN?

10:49AM  15   A.   SO WE MEASURED THE NUMBER OF PATIENTS PER STORE PER DAY

10:49AM  16   BECAUSE IT ALLOWED US TO SEE IF WE WERE GROWING, IF THE SERVICE

10:49AM  17   WAS BEING ACCEPTED, IF THE PHYSICIANS WERE ORDERING THE TESTS

10:49AM  18   FOR THEIR PATIENTS.

10:49AM  19        SO, OF COURSE, THIS WAS A VERY CRITICAL MEASURE FOR US IN

10:49AM  20   TERMS OF GROWTH.

10:49AM  21   Q.   NOW, IF YOU'LL LOOK AT THE NEXT ROW.

10:49AM  22        WELL, LET'S LOOK AT THOSE NUMBERS.  FIRST IT WAS .8, AND

10:49AM  23   THEN IT INCREASES TO 3.1.

10:49AM  24        IS THAT A POSITIVE TREND?  IS THAT TREND SOMETHING THAT

10:49AM  25   WALGREENS WAS HAPPY TO SEE?

JHAVERI DIRECT BY MR. SCHENK                    2946

10:49AM   1    A.   YES, THIS WAS A VERY POSITIVE TREND, IN TWO INSTANCES.

10:50AM   2    ONE, IT'S GROWING OVERALL PATIENTS; BUT IT'S ALSO GROWING WITH

10:50AM   3    THE NUMBER OF STORES GROWING.

10:50AM   4         SO IT IS VERY, VERY POSITIVE.

10:50AM   5    Q.   THE NEXT ROW IS AVERAGE CHECK IN, AND IT LOOKS LIKE IN

10:50AM   6    FEBRUARY IT WAS 10 TO 11 MINUTES, AND BY MAY IT WAS 8 MINUTES.

10:50AM   7         WOULD YOU BRIEFLY DESCRIBE TO THE JURY WHAT THAT IS?

10:50AM   8    A.   SURE.  AS I MENTIONED EARLIER, WE WANTED TO MEASURE ALL OF

10:50AM   9    THE INSTANCES THAT WHEN A CUSTOMER OR A PATIENT COMES INTO A

10:50AM  10    WALGREENS STORE AND THEY ARE RECEIVING THE THERANOS SERVICE,

10:50AM  11    HOW LONG DOES IT TAKE?  WE WANTED TO MAKE SURE THAT THE

10:50AM  12    EXPERIENCE WAS GOOD FOR THEM, THAT THEY WEREN'T WAITING A LONG

10:50AM  13    TIME.

10:50AM  14         AND SO THE CHECK-IN PROCESS IS WHEN YOU ACTUALLY APPROACH

10:50AM  15    THE COUNTER AND LET THE PHARMACY TECHNICIAN KNOW THAT YOU'RE

10:50AM  16    HERE FOR YOUR LABS, AND THE PROCESS OF ACTUALLY MAKING SURE

10:50AM  17    YOU'RE READY TO RECEIVE YOUR BLOOD DRAW, THAT PROCESS IS WHAT

10:50AM  18    WE MEASURED.

10:51AM  19         AND IN THIS INSTANCE FROM FEBRUARY TO MAY, THAT PROCESS

10:51AM  20    IMPROVED.  THE CUSTOMER WAITED LESS, AND SO WE WERE MOVING IN

10:51AM  21    THE RIGHT DIRECTION.

10:51AM  22    Q.   THANK YOU.

10:51AM  23         NOW, TWO ROWS DOWN THERE'S ONE THAT IS TITLED

10:51AM  24    VENOUS DRAWS, AND IT LOOKS LIKE THE PERCENT IN FEBRUARY WAS

10:51AM  25    43 PERCENT AND THE PERCENT IN MAY IS 39 PERCENT.

JHAVERI DIRECT BY MR. SCHENK                    2947

| | | |
|---|---|---|
| 10:51AM | 1 | WHAT IS THIS A REFERENCE TO? |
| 10:51AM | 2 | A.   THE VENOUS DRAWS IS IN REFERENCE TO WHAT I DESCRIBED |
| 10:51AM | 3 | EARLIER, THAT THERE ARE TWO METHODS BY WHICH YOUR BLOOD COULD |
| 10:51AM | 4 | BE DRAWN.  ONE WAS THROUGH THE FINGERSTICK, OR THE SECOND WAS |
| 10:51AM | 5 | THROUGH THE TRADITIONAL METHOD THROUGH YOUR VEINS. |
| 10:51AM | 6 | AND SO WHAT WE WERE MEASURING WAS WHAT PERCENTAGE OF THE |
| 10:51AM | 7 | DRAWS WAS THROUGH THE TRADITIONAL METHOD OF VEINS VERSUS THE |
| 10:51AM | 8 | FINGERSTICK. |
| 10:51AM | 9 | SO IN THIS PARTICULAR CASE, 39 PERCENT IN MAY OF THE DRAWS |
| 10:51AM | 10 | WERE NOT THE FINGERSTICK, THEY WERE THE VENOUS DRAWS. |
| 10:51AM | 11 | Q.   AND HOW DID YOU FEEL ABOUT THAT NUMBER?  YOU TOLD ME THAT |
| 10:52AM | 12 | THE NUMBER OF PATIENTS PER STORE WAS A GOOD THING, WAS POSITIVE |
| 10:52AM | 13 | OVER THE MONTHS. |
| 10:52AM | 14 | HOW DID YOU FEEL ABOUT THE VENOUS DRAW NUMBERS? |
| 10:52AM | 15 | A.   NOT GOOD.  THIS NUMBER WAS HIGH AND, AGAIN, WHAT WE WERE |
| 10:52AM | 16 | TRYING TO GET TO WAS ZERO, THAT EVERY PATIENT THAT CAME IN |
| 10:52AM | 17 | RECEIVED A FINGERSTICK. |
| 10:52AM | 18 | Q.   AND DID YOU TALK TO MR. BALWANI ABOUT THAT, THE FACT THAT |
| 10:52AM | 19 | THESE NUMBERS WERE TOO HIGH? |
| 10:52AM | 20 | A.   YES, SIR. |
| 10:52AM | 21 | Q.   IF YOU'LL NOW TURN TO THE NEXT PAGE, PAGE 10, THERE'S A |
| 10:52AM | 22 | SLIDE ENTITLED VENOUS DRAWS. |
| 10:52AM | 23 | DO YOU SEE THAT? |
| 10:52AM | 24 | A.   YES, SIR. |
| 10:52AM | 25 | Q.   AND I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THE CONTENT, |

ER-2119

JHAVERI DIRECT BY MR. SCHENK                    2948

10:52AM  1    BUT FIRST, WHERE DID THE INFORMATION THAT IS CONTAINED ON THIS

10:52AM  2    SLIDE COME FROM?

10:52AM  3    A.   THE INFORMATION ON THIS SLIDE IS FROM THE THERANOS TEAM.

10:52AM  4    AGAIN, MR. BALWANI AND I PARTNERED ON MAKING SURE THAT THE

10:52AM  5    INFORMATION THAT IS PROVIDED AT THE EXECUTIVE COMMITTEE, OR ANY

10:52AM  6    OTHER COMMITTEE, THAT CERTAIN PARTS WHERE THERANOS WAS

10:53AM  7    RESPONSIBLE FOR, THEY WOULD PROVIDE THAT INFORMATION; AND PARTS

10:53AM  8    THAT WALGREENS WAS RESPONSIBLE FOR, WE WOULD PROVIDE THE

10:53AM  9    INFORMATION.

10:53AM  10        SO IN THIS PARTICULAR CASE, THIS WAS PROVIDED BY

10:53AM  11   MR. BALWANI AND HIS TEAM.

10:53AM  12   Q.   SO YOU DESCRIBED DIFFERENT AREAS OF RESPONSIBILITY.

10:53AM  13        WAS VENOUS DRAWS AND THE REASONS FOR VENOUS DRAWS, DID

10:53AM  14   THAT FALL UNDER THE THERANOS AREA OF RESPONSIBILITY?

10:53AM  15   A.   YES, IT DID.

10:53AM  16   Q.   AND THE FIRST LINE OF THIS SLIDE SAYS, "ORIGINALLY

10:53AM  17   ESTIMATED THAT BY END OF FEBRUARY 2014 WOULD BE BELOW

10:53AM  18   20 PERCENT OF TOTAL DRAWS AND BELOW 10 PERCENT BY END OF

10:53AM  19   AUGUST."

10:53AM  20        SO I THINK WE SAW ON THE LAST SLIDE THAT IN FEBRUARY OF

10:53AM  21   2014, IT WAS ACTUALLY AROUND 40, 43 PERCENT; IS THAT RIGHT?

10:53AM  22   A.   YES, SIR.

10:53AM  23   Q.   AND NOW IF YOU'LL SPOIL IT FOR THE JURY, IN THE END OF

10:53AM  24   AUGUST, DID IT GET DOWN TO AROUND 10 PERCENT?

10:53AM  25   A.   NO, IT DID NOT.

ER-2120

JHAVERI DIRECT BY MR. SCHENK                                    2949

10:53AM   1    Q.   THE NEXT PART OF THE SLIDE SAYS, "CURRENT PROJECTIONS:

10:54AM   2         "BELOW 20 PERCENT BY END OF AUGUST (90 PERCENT CONFIDENCE

10:54AM   3    LEVEL.)"

10:54AM   4         WHAT DID "CONFIDENCE LEVEL" MEAN?

10:54AM   5    A.   WHAT THIS SHOWS IS HOW CONFIDENT THE THERANOS TEAM WAS TO

10:54AM   6    ACHIEVE THAT LEVEL.  SO A 90 PERCENT CONFIDENCE LEVEL IS VERY

10:54AM   7    HIGH.  THAT ASSURED US THAT THEY WERE GOING TO HIT THIS NUMBER.

10:54AM   8         AND SO THAT'S WHAT IS BEING REFLECTED HERE.

10:54AM   9    Q.   THE NEXT DASH SAYS, "BELOW 10 PERCENT BY END OF OCTOBER."

10:54AM  10         AND IS THIS NOW GREATER THAN 95 PERCENT CONFIDENCE LEVEL?

10:54AM  11    A.   YES, SIR.

10:54AM  12    Q.   AND DID THAT COME TO PASS?  WAS IT BELOW 10 PERCENT,

10:54AM  13    VENOUS DRAWS, BY THE END OF OCTOBER?

10:54AM  14    A.   NO.

10:54AM  15    Q.   AND THE NEXT DASH IS, "BELOW 5 PERCENT BY END OF 2014."

10:54AM  16         THAT IS, IT LOOKS LIKE 90 PERCENT CONFIDENCE LEVEL.

10:55AM  17         DO YOU SEE THAT?

10:55AM  18    A.   YES.

10:55AM  19    Q.   AND THEN HOW ABOUT THE TRUTH OF THAT COMING TO PASS?  BY

10:55AM  20    THE END OF 2014, WERE LESS THAN 5 PERCENT OF THE BLOOD DRAWS

10:55AM  21    FROM A VEIN?

10:55AM  22    A.   NO, IT WAS NOT.

10:55AM  23    Q.   AND THE BOTTOM PART OF THE SLIDE READS, "WHY HIGHER NUMBER

10:55AM  24    OF VENOUS DRAWS SO FAR:"

10:55AM  25         THE FIRST ONE, "LEARNING PROCESS AROUND ORDERING PATTERNS

JHAVERI DIRECT BY MR. SCHENK                                    2950

10:55AM  1    FOR ARIZONA."

10:55AM  2         WHAT DOES THAT MEAN?

10:55AM  3    A.   SO WHAT WE'RE DESCRIBING HERE ON THIS SLIDE ARE SOME OF

10:55AM  4    THE REASONS THAT WERE PROVIDED TO US FROM MR. BALWANI AND HIS

10:55AM  5    TEAM AS TO WHY THE VENOUS DRAWS WOULD BE HIGHER.

10:55AM  6         SO REMEMBER WE WERE MOVING AND EXPANDING INTO THE ARIZONA

10:55AM  7    MARKET, AND SO WHAT THIS IS REFERENCING TO IS THERANOS WAS

10:55AM  8    CONTINUING TO LEARN WHAT THE PHYSICIANS WERE ORDERING IN THE

10:55AM  9    MARKETPLACE, AND THAT'S IN REFERENCE TO THAT.

10:55AM  10   Q.   AND THEN THE NEXT DASH IS, "ORDERING PATTERNS ARE

10:56AM  11   DIFFERENT THAN ANTICIPATED AND THERANOS IS ADDING NEW

10:56AM  12   CARTRIDGES RAPIDLY TO ADDRESS THESE PATTERNS."

10:56AM  13        WAS THIS ALSO PROVIDED TO WALGREENS I THINK YOU SAID BY

10:56AM  14   MR. BALWANI AND HIS TEAM?

10:56AM  15   A.   YES.

10:56AM  16   Q.   WERE THESE THE TWO REASONS THAT WERE PROVIDED FOR WHY THE

10:56AM  17   VENOUS DRAW NUMBERS WERE AS HIGH AS THEY WERE?

10:56AM  18   A.   YES, THEY WERE.

10:56AM  19   Q.   IF YOU'LL NOW TURN TO PAGE 12 OF THIS SLIDE DECK.

10:56AM  20        AT THE BOTTOM BUBBLE ON THE RIGHT, THERE'S A SECTION

10:56AM  21   CALLED MARKETING.

10:56AM  22        DO YOU SEE THAT?

10:56AM  23   A.   I DO.

10:56AM  24   Q.   AND IT SAYS, "EXTERNAL ADVERTISING TO GENERATE AWARENESS

10:56AM  25   OF SERVICE AND PERCEPTION OF WALGREENS AS A HEALTH CARE