No. 22-10338

## In The
## United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

**APPELLANT'S EXCERPTS OF RECORD**
**VOLUME 11 OF 26 (PAGES ER-2718 – ER-3017)**

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                      SAN JOSE DIVISION

5

       UNITED STATES OF AMERICA,          )
6                                         )  CR-18-00258-EJD
                     PLAINTIFF,           )
7                                         )  SAN JOSE, CALIFORNIA
                VS.                       )
8                                         )  APRIL 26, 2022
       RAMESH "SUNNY" BALWANI,            )
9                                         )  VOLUME 22
                     DEFENDANT.           )
10     _____      )  PAGES 3697 - 3959

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14     A P P E A R A N C E S :

15     FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                                JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:  ROBERT S. LEACH
                                  KELLY VOLKAR
19                           1301 CLAY STREET, SUITE 340S
                             OAKLAND, CALIFORNIA 94612
20
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
       OFFICIAL COURT REPORTERS:
22                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
23                           LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
24
              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                TRANSCRIPT PRODUCED WITH COMPUTER

| | | |
|---|---|---|
| 09:41AM | 1 | WE ARE BACK ON THE RECORD.  OUR JURY IS PRESENT. |
| 09:41AM | 2 | DR. ROSENDORFF IS PRESENT. |
| 09:41AM | 3 | SIR, I'LL REMIND YOU THAT YOU ARE STILL UNDER OATH. |
| 09:41AM | 4 | ALL COUNSEL ARE PRESENT. |
| 09:41AM | 5 | MR. BALWANI IS PRESENT. |
| 09:41AM | 6 | **(GOVERNMENT'S WITNESS, ADAM ROSENDORFF, PREVIOUSLY WAS** |
| 09:41AM | 7 | **SWORN.)** |
| 09:41AM | 8 | THE COURT:  LADIES AND GENTLEMEN, GOOD MORNING. |
| 09:41AM | 9 | I'M SEEING A DIFFERENT PERSPECTIVE OF OUR JURY.  WE'VE |
| 09:41AM | 10 | DONE THE LINE CHANGE.  SO WE'VE ADJUSTED SEATING.  I HOPE THAT |
| 09:42AM | 11 | WORKS FOR YOU. |
| 09:42AM | 12 | LET ME ASK THE JURY, MR. COOPERSMITH, BEFORE YOU BEGIN |
| 09:42AM | 13 | YOUR EXAMINATION, DURING THE BREAK, DID ANYONE HAVE CAUSE TO |
| 09:42AM | 14 | READ, LEARN, LISTEN, DISCUSS, OR SEE ANYTHING ABOUT THIS CASE? |
| 09:42AM | 15 | IF SO, PLEASE RAISE YOUR HAND. |
| 09:42AM | 16 | I SEE NO HANDS.  THANK YOU VERY MUCH. |
| 09:42AM | 17 | I APPRECIATE THAT. |
| 09:42AM | 18 | MR. COOPERSMITH, YOU'D LIKE TO CONTINUE WITH YOUR |
| 09:42AM | 19 | EXAMINATION? |
| 09:42AM | 20 | MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU. |
| 09:42AM | 21 | ONE MATTER, YOUR HONOR.  WE HAD DISCUSSED LAST FRIDAY |
| 09:42AM | 22 | EXHIBIT 9939, AND THAT WAS AN EXHIBIT CONDITIONALLY ADMITTED |
| 09:42AM | 23 | EARLIER IN THE TRIAL, AND WE WOULD MOVE FOR THE FULL ADMISSION |
| 09:42AM | 24 | OF THAT EXHIBIT. |
| 09:42AM | 25 | THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, YOU |

09:42AM 1      MAY RECALL THERE WAS AN EXHIBIT 9939 THAT THE COURT ADMITTED

09:42AM 2      CONDITIONALLY, AND THAT EXHIBIT I TOLD YOU WAS ADMITTED SUBJECT

09:42AM 3      TO A FOUNDATION BEING LAID.

09:43AM 4          I TOLD YOU THAT IF THE FOUNDATION WAS NOT LAID, THE COURT

09:43AM 5      WOULD STRIKE THE EXHIBIT AND ANY TESTIMONY ABOUT IT.

09:43AM 6          THERE HAS BEEN SUFFICIENT EVIDENCE RAISED, AND SO THAT

09:43AM 7      EXHIBIT IS ADMITTED WITHOUT ANY CONDITIONS.

09:43AM 8              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:43AM 9          (DEFENDANT'S EXHIBIT 9939 WAS RECEIVED IN EVIDENCE.)

09:43AM 10             THE COURT:  YOU'RE WELCOME.

09:43AM 11                    **CROSS-EXAMINATION (RESUMED)**

09:43AM 12     BY MR. COOPERSMITH:

09:43AM 13     Q.   AND GOOD MORNING, DR. ROSENDORFF.

09:43AM 14     A.   GOOD MORNING.

09:43AM 15     Q.   SO AS OF TODAY, YOU STILL WORK IN THE LAB INDUSTRY; IS

09:43AM 16     THAT CORRECT?

09:43AM 17     A.   CORRECT.

09:43AM 18     Q.   AND YOU'RE A LAB DIRECTOR?

09:43AM 19     A.   CORRECT.

09:43AM 20     Q.   OKAY.  DR. ROSENDORFF, DO YOU REMEMBER ON FRIDAY I ASKED

09:43AM 21     YOU SOME QUESTIONS ABOUT THE INITIAL LAUNCH OF THERANOS BLOOD

09:43AM 22     TESTING SERVICES AT WALGREENS?

09:43AM 23     A.   YES.

09:43AM 24     Q.   AND I ASKED YOU IN PARTICULAR ABOUT SOME QUESTIONS THAT

09:43AM 25     YOU HAD BEEN ASKED ON DIRECT EXAMINATION BY MR. BOSTIC ABOUT

09:43AM   1    THAT LAUNCH.

09:43AM   2        DO YOU REMEMBER THAT?

09:43AM   3    A.   YES.  I BELIEVE THERE WAS A DISTINCTION BEING MADE BETWEEN

09:44AM   4    A PUBLIC LAUNCH AND A FRIENDS AND FAMILY LAUNCH.

09:44AM   5    Q.   YES, YES.

09:44AM   6    A.   OKAY.

09:44AM   7    Q.   AND, IN FACT, YOU RECALL THAT ON WEDNESDAY LAST WEEK

09:44AM   8    DURING YOUR DIRECT EXAMINATION, MR. BOSTIC ASKED YOU ABOUT

09:44AM   9    WHETHER THERE WAS A LAUNCH TO THE GENERAL PUBLIC ON

09:44AM  10    SEPTEMBER 9TH OF 2013.

09:44AM  11        DO YOU RECALL THAT?

09:44AM  12    A.   YES.

09:44AM  13    Q.   AND THEN ON CROSS, WE TALKED ABOUT THE FRIENDS AND FAMILY

09:44AM  14    LAUNCH THAT OCCURRED ON SEPTEMBER 9TH.

09:44AM  15        DO YOU REMEMBER THAT?

09:44AM  16    A.   YES.

09:44AM  17    Q.   OKAY.  AND YOU TOLD THE GOVERNMENT ABOUT THE LAUNCH BEING

09:44AM  18    ONLY OPEN TO FRIENDS AND FAMILY AND NOT TO THE GENERAL PUBLIC

09:44AM  19    BACK IN 2018; CORRECT?

09:44AM  20    A.   I DON'T RECALL, SIR.

09:44AM  21    Q.   OKAY.  SO LET ME SEE IF I CAN REFRESH YOUR MEMORY.

09:44AM  22        COULD YOU TAKE A LOOK AT EXHIBIT 28408, WHICH IS IN ONE OF

09:44AM  23    THE TESTIMONY BINDERS THAT YOU SHOULD HAVE.  28408.

09:45AM  24    A.   SO I ONLY HAVE ONE TESTIMONY BINDER.  IT SAYS WITNESS

09:45AM  25    BINDER, I BELIEVE.

09:45AM  1          YOU'RE REFERRING TO THE U.S.A. VERSUS BALWANI BINDER.  I'M

09:45AM  2     SORRY.

09:45AM  3          28 --

09:45AM  4     Q.  YES.

09:45AM  5     A.  AND ANY IDEA WHICH ONE THAT SHOULD BE IN?

09:45AM  6     Q.  I THINK THERE SHOULD BE ONE LABELLED PRIOR TESTIMONY THAT

09:45AM  7     I'VE HANDED YOU.  I KNOW IT'S BEEN A FEW DAYS.

09:46AM  8     A.  NO.

09:46AM  9     Q.  OKAY.  YOU DON'T SEE IT?

09:46AM 10     A.  NO.

09:46AM 11     Q.  OKAY.

09:46AM 12          YOUR HONOR, MAY I SHOW THIS TO THE GOVERNMENT AND THEN

09:46AM 13     APPROACH THE WITNESS?

09:46AM 14             THE COURT:  YES, YES.

09:46AM 15             MR. COOPERSMITH:  (HANDING.)

09:46AM 16     Q.  OKAY.  DR. ROSENDORFF, I'VE HANDED YOU PAGES 82 AND 83 OF

09:46AM 17     SOME PRIOR TESTIMONY.

09:46AM 18          DO YOU SEE THAT?

09:46AM 19     A.  YES, YES.

09:46AM 20     Q.  AND YOU GAVE THAT TESTIMONY IN 2018?

09:46AM 21     A.  YES.

09:46AM 22     Q.  OKAY.  AND DOES THAT REFRESH YOUR MEMORY THAT YOU TOLD THE

09:46AM 23     GOVERNMENT IN 2018 THAT THERE WAS A SOFT LAUNCH NOT OPEN TO THE

09:47AM 24     GENERAL PUBLIC?

09:47AM 25     A.  YES.

09:47AM 1    Q.   OKAY.  THANK YOU.  I CAN TAKE THAT BACK.

09:47AM 2         MAY I APPROACH, YOUR HONOR?

09:47AM 3              THE COURT:  YES.

09:47AM 4              THE WITNESS:  (HANDING.)

09:47AM 5    BY MR. COOPERSMITH:

09:47AM 6    Q.   OKAY.  DR. ROSENDORFF, DO YOU RECALL, AND YOU MIGHT NOT

09:47AM 7    REMEMBER THE NUMBER, BUT DURING YOUR DIRECT EXAMINATION YOU

09:47AM 8    WERE SHOWN EXHIBIT 1772, WHICH IS ALREADY IN EVIDENCE.

09:47AM 9         SO I THINK WE CAN JUST PUT THAT ON THE SCREEN WITH YOUR

09:47AM 10   PERMISSION, YOUR HONOR?

09:47AM 11             THE COURT:  YES.

09:48AM 12   BY MR. COOPERSMITH:

09:48AM 13   Q.   AND DO YOU SEE EXHIBIT 1772, DR. ROSENDORFF, ON THE SCREEN

09:48AM 14   IN FRONT OF YOU?

09:48AM 15   A.   YES, I DO.

09:48AM 16   Q.   AND THIS WAS A DISCUSSION THAT YOU WERE HAVING WITH

09:48AM 17   MR. BALWANI ABOUT THE SUBJECT OF ALIQUOTING BLOOD FROM

09:48AM 18   VACUTAINERS TO SMALLER DEVICES FOR TESTING ON EDISON?

09:48AM 19   A.   YES.

09:48AM 20   Q.   AND LOOKING AT THE EMAIL THAT YOU SENT ON JUNE 11TH, 2014,

09:48AM 21   AT 5:25 P.M., I'D JUST LIKE TO LOOK AT THE LAST -- THE SECOND

09:48AM 22   TO THE LAST SENTENCE OF YOUR EMAIL.

09:48AM 23        DO YOU SEE YOU SAY, "I'D LIKE TO PERHAPS SUSPEND

09:48AM 24   VACUTAINER ALIQUOTING UNTIL WE CAN GO TO 2 SHIFTS."

09:48AM 25        RIGHT?

09:48AM  1      A.   YES.  PERHAPS.  I SAID PERHAPS, YES.

09:48AM  2      Q.   RIGHT.  AND WHAT YOU'RE COMMUNICATING THERE IS NOT TO STOP

09:48AM  3      ALIQUOTING ALTOGETHER, BUT TO SUSPEND IT UNTIL YOU CAN GET MORE

09:49AM  4      PERSONNEL TO WORK ON ADDITIONAL SHIFTS.

09:49AM  5           THAT'S WHAT YOU'RE SAYING IN THIS EMAIL; RIGHT?

09:49AM  6      A.   NOT IN OTHER EMAILS.

09:49AM  7      Q.   OKAY.  I'M JUST LOOKING AT THIS EMAIL, SIR.

09:49AM  8      A.   YES, THAT'S THE LITERAL MEANING OF THIS EMAIL.

09:49AM  9      Q.   RIGHT.  THAT WHEN OTHER PERSONNEL CAME TO MANAGE

09:49AM  10     ADDITIONAL SHIFTS, THEN IT COULD RESUME; RIGHT?

09:49AM  11     A.   YES.  IT WAS A SUGGESTION.

09:49AM  12     Q.   OKAY.  OKAY.  AND DO YOU SEE MR. BALWANI WROTE ABOVE, "WE

09:49AM  13     NEED THIS MESS RESOLVED ASAP.  I AM ASKING FOR MORE READERS FOR

09:49AM  14     OVER 2 WEEKS NOW AND WE HAVE A TOTAL OF 27

09:49AM  15     WORKING/READY/CALIBRATED EDISONS IN CLIA."

09:49AM  16          DO YOU SEE THAT?

09:49AM  17     A.   YES.

09:49AM  18     Q.   OKAY.  SO NOW I'D LIKE TO SHOW YOU ANOTHER EXHIBIT THAT IS

09:49AM  19     PART OF THE SAME EMAIL STRING, AND THAT'S EXHIBIT 13888, AND

09:49AM  20     YOU SHOULD BE ABLE TO SEE THAT ON YOUR SCREEN IN A MINUTE.

09:50AM  21          (PAUSE IN PROCEEDINGS.)

09:50AM  22              THE WITNESS:  DO YOU HAVE A QUESTION PENDING, SIR?

09:50AM  23              MR. COOPERSMITH:  I'M ABOUT TO.  SORRY FOR THE

09:50AM  24     DELAY.

09:50AM  25              THE WITNESS:  NO PROBLEM.

09:50AM  1    BY MR. COOPERSMITH:

09:50AM  2    Q.   DO YOU SEE ON EXHIBIT 13888 THERE'S THE SAME EMAIL THAT WE

09:50AM  3    JUST DISCUSSED ON THE BOTTOM EMAIL ON THE FIRST PAGE?

09:50AM  4    A.   YES.

09:50AM  5    Q.   AND THEN THERE'S A RESPONSE FROM MR. BALWANI TO THAT

09:50AM  6    EMAIL, WHICH IS DIFFERENT FROM THE RESPONSE THAT WE JUST SAW;

09:50AM  7    RIGHT?

09:50AM  8    A.   IT'S A CLARIFICATION OF A STRATEGY WHERE IF WE DID GO BACK

09:50AM  9    TO ALIQUOTING, HOW WE WOULD GO ABOUT DOING THAT.

09:51AM  10   Q.   RIGHT.  SO ACTUALLY THE SAME EMAIL THAT YOU WROTE THAT WE

09:51AM  11   JUST DISCUSSED, MR. BALWANI RESPONDED TWICE, AND THEN ONE OF

09:51AM  12   THEM, AS YOU JUST SAID, WAS A CLARIFICATION.

09:51AM  13        IS THAT FAIR?

09:51AM  14   A.   YEAH.  I BELIEVE IN OTHER EMAILS I MORE STRONGLY SUGGESTED

09:51AM  15   THAT WE SHOULD DISCONTINUE THIS PRACTICE.

09:51AM  16   Q.   OKAY.  BUT I'M ASKING ABOUT THESE EMAILS, SIR.

09:51AM  17   A.   YES.

09:51AM  18   Q.   AND YOU SEE THERE'S TWO DIFFERENT RESPONSES MR. BALWANI

09:51AM  19   MADE TO THE SAME EMAIL; RIGHT?

09:51AM  20   A.   I'M SORRY.  I MISUNDERSTOOD.

09:51AM  21        THIS -- AT THE TOP IS MR. BALWANI'S INSTRUCTIONS ABOUT HOW

09:51AM  22   THIS WOULD HAPPEN.

09:51AM  23   Q.   OKAY.

09:51AM  24   A.   NOT A SUGGESTION FROM ME.

09:51AM  25   Q.   OKAY.  WHY DON'T WE JUST LOOK AT IT.

09:51AM   1          YOUR HONOR, WE OFFER EXHIBIT 13888.

09:51AM   2              MR. BOSTIC:  NO OBJECTION.

09:51AM   3              THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

09:51AM   4          (DEFENDANT'S EXHIBIT 13888 WAS RECEIVED IN EVIDENCE.)

09:51AM   5     BY MR. COOPERSMITH:

09:51AM   6     Q.   OKAY.  DR. ROSENDORFF, DO YOU SEE ON THE BOTTOM OF THE

09:51AM   7     FIRST PAGE THERE'S THE SAME EMAIL THAT WE WERE LOOKING AT WHEN

09:52AM   8     WE WERE DISCUSSING 1772?

09:52AM   9     A.   YES.

09:52AM  10     Q.   AND THAT'S YOUR EMAIL, AND IT TALKS ABOUT THE "SUSPEND

09:52AM  11     VACUTAINER ALIQUOTING UNTIL WE CAN GO TO 2 SHIFTS."

09:52AM  12          DO YOU SEE THAT?

09:52AM  13     A.   YES.

09:52AM  14     Q.   AND THEN LET'S GO TO MR. BALWANI'S ADDITIONAL RESPONSE.

09:52AM  15          SO HE SAYS, "ADAM.  WE WON'T ALIQUOT THE HIGH VOLUME TESTS

09:52AM  16     LIKE TSH FOR NOW AS YOU SUGGESTED AND RUN THEM UPSTAIRS.  WE

09:52AM  17     WILL TWEAK THE SOFTWARE TO ALLOW US TO DO THAT.  IN THE

09:52AM  18     MEANTIME WE WILL PUSH MORE DEVICES TO DONE.  THE DRIVING FACTOR

09:52AM  19     WILL BE NO BACKLOG OR DELAY IN PATIENT SAMPLES TAT."

09:52AM  20          DO YOU SEE THAT?

09:52AM  21     A.   YES.

09:52AM  22     Q.   AND SO THAT'S MR. BALWANI'S CLARIFICATION AS YOU PUT IT?

09:52AM  23     A.   YES.

09:52AM  24     Q.   ALL RIGHT.  SO WHEN YOU WERE ON DIRECT EXAMINATION, YOU

09:52AM  25     REMEMBER MR. BOSTIC ASKED YOU IF MR. BALWANI'S SOLUTION TO WHAT

09:53AM  1    YOU EXPRESSED IN THIS EMAIL WAS TO MANUFACTURE OR PUT MORE

09:53AM  2    EDISONS ONLINE.

09:53AM  3         DO YOU REMEMBER THAT?

09:53AM  4    A.   ARE YOU ASKING ME ABOUT WHAT ACTUALLY HAPPENED VERSUS HIS

09:53AM  5    STATED SOLUTION?

09:53AM  6    Q.   I'M ASKING A DIFFERENT QUESTION.  LET ME START AGAIN.

09:53AM  7    A.   OKAY.

09:53AM  8    Q.   SO ON DIRECT EXAMINATION, DO YOU RECALL THAT MR. BOSTIC

09:53AM  9    ASKED YOU ABOUT THIS PARTICULAR EMAIL, WHETHER MR. BALWANI'S

09:53AM 10    SOLUTION TO THE ISSUE THAT YOU RAISED WAS TO PUT MORE EDISONS

09:53AM 11    ONLINE.

09:53AM 12         DO YOU RECALL THAT?

09:53AM 13    A.   YES.

09:53AM 14    Q.   AND YOU SAID YES?

09:53AM 15    A.   YES.

09:53AM 16    Q.   OKAY.  I'D LIKE TO SHOW YOU EXHIBIT 20279, WHICH IS

09:53AM 17    ALREADY IN EVIDENCE.

09:53AM 18         OKAY.  DO YOU SEE ON THE FIRST PAGE THERE'S AN EMAIL

09:54AM 19    FROM -- WELL, IT'S AN EMAIL TO YOU.

09:54AM 20         DO YOU SEE THAT?

09:54AM 21    A.   YES.

09:54AM 22    Q.   AND IT'S ON MAY 30TH, 2014?

09:54AM 23    A.   YES.

09:54AM 24    Q.   AND IT'S A TRANSITION REPORT FROM DR. PANDORI?

09:54AM 25    A.   YES.

09:54AM  1    Q.   OKAY.

09:54AM  2    A.   DO YOU KNOW IF THE TIMES MENTIONED ARE PACIFIC STANDARD

09:54AM  3    TIME OR GENERAL MEANTIME -- OR DO YOU KNOW WHAT THE TIME IS

09:54AM  4    REFERRED TO BY ANY CHANCE?

09:54AM  5    Q.   I KNOW THAT -- WELL, YOU KNOW THAT SOMETIMES EMAILS ARE IN

09:54AM  6    THE -- IN PACIFIC TIME; RIGHT?

09:54AM  7    A.   SURE.

09:54AM  8    Q.   AND SOMETIMES THEY'RE IN WHAT IS CALLED UTC TIME; RIGHT?

09:54AM  9    A.   THE -- IN MY EXPERIENCE, INTERNAL EMAILS IN COMPANIES I'VE

09:54AM 10    WORKED FOR IN CALIFORNIA ARE ALL ANNOTATED WITH PST.

09:54AM 11    Q.   RIGHT.  BUT YOU'VE CERTAINLY SEEN OCCASIONS IN YOUR

09:54AM 12    CAREER, AND INCLUDING AT THERANOS, WHERE EMAILS COME OUT IN UTC

09:54AM 13    TIME FOR VARIOUS REASONS; RIGHT?

09:55AM 14    A.   I, I -- THAT'S NOT MY RECOLLECTION, THOUGH.

09:55AM 15    Q.   OKAY.  BUT IN ANY EVENT, THIS IS AN EMAIL THAT YOU

09:55AM 16    RECEIVED FROM DR. PANDORI; CORRECT?

09:55AM 17    A.   IT APPEARS TO BE.

09:55AM 18    Q.   OKAY.  AND LET'S GO TO PAGE 6.

09:55AM 19         DO YOU SEE THERE'S A SECTION CALLED OTHER NOTES?

09:55AM 20    A.   YES.

09:55AM 21    Q.   AND DR. PANDORI WROTE THERE, "EDISONS:  THE PRIMARY

09:55AM 22    CONCERN IN THIS SECTION IS THE AVAILABLE NUMBER OF DEVICES."

09:55AM 23         DO YOU SEE THAT?

09:55AM 24    A.   YES.

09:55AM 25    Q.   AND THEN HE WROTE, "FOR FT4, VITAMIN D, AND TSH, AT LEAST

09:55AM  1     A DOUBLING OF THE NUMBER OF UNITS IS NECESSARY, IN MY OPINION."

09:55AM  2          DO YOU SEE THAT?

09:55AM  3     A.   YES, I DO.

09:55AM  4               MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

09:55AM  5               THE COURT:  NO FURTHER QUESTIONS?

09:55AM  6               MR. COOPERSMITH:  ON CROSS, NO, YOUR HONOR.

09:56AM  7               THE COURT:  THERE'S REDIRECT.

09:56AM  8               THE WITNESS:  OKAY, EXCELLENT.  THANK YOU.

09:56AM  9          THANK YOU, MR. COOPERSMITH.

09:56AM 10               MR. COOPERSMITH:  YOU'RE WELCOME.

09:56AM 11               MR. BOSTIC:  IF I COULD JUST HAVE A MOMENT TO GET

09:56AM 12     SET UP, YOUR HONOR?

09:56AM 13               THE COURT:  YES.

09:56AM 14          (PAUSE IN PROCEEDINGS.)

09:56AM 15                         **REDIRECT EXAMINATION**

09:56AM 16     BY MR. BOSTIC:

09:56AM 17     Q.   GOOD MORNING, DR. ROSENDORFF.

09:56AM 18     A.   GOOD MORNING, MR. BOSTIC.

09:56AM 19     Q.   I'D LIKE TO ASK YOU JUST A FEW QUESTIONS ABOUT SOME TOPICS

09:56AM 20     THAT YOU DISCUSSED WITH MR. COOPERSMITH, AND IF WE COULD START

09:57AM 21     WITH THE LAUNCH IN SEPTEMBER 2013.

09:57AM 22          DO YOU HAVE THAT TIME PERIOD IN MIND?

09:57AM 23     A.   YES.

09:57AM 24     Q.   THERE'S BEEN SOME DISCUSSION ABOUT WHETHER THAT WAS A

09:57AM 25     LAUNCH TO THE PUBLIC AT LARGE OR TO THERANOS FRIENDS AND

09:57AM  1     FAMILY.

09:57AM  2          DO YOU REMEMBER THAT DISCUSSION?

09:57AM  3     A.   YES, I DO.

09:57AM  4     Q.   MY QUESTION IS, FROM THE PERSPECTIVE OF A LABORATORY

09:57AM  5     DIRECTOR, IS THERE A SIGNIFICANT DIFFERENCE BETWEEN THOSE TWO?

09:57AM  6     A.   NO DIFFERENCE WHATSOEVER.

09:57AM  7     Q.   CAN YOU EXPLAIN WHY A LAB DIRECTOR VIEWS THOSE TWO

09:57AM  8     SCENARIOS THE SAME?

09:57AM  9     A.   IN BOTH THE SOFT AND A PUBLIC LAUNCH, THOSE TESTS ARE

09:57AM  10    PRESCRIBED AT THE DIRECTION OF A PHYSICIAN.

09:57AM  11         IN ADDITION, THOSE TESTS ARE -- THE RESULTS OF THOSE TESTS

09:57AM  12    ARE BEING USED TO MAKE HEALTH CARE DECISIONS, SOMETIMES VERY

09:57AM  13    IMPORTANT, CRITICAL HEALTH CONDITIONS.

09:57AM  14         AND THIRDLY, THOSE PEOPLE ARE STILL HUMAN BEINGS THAT

09:58AM  15    REQUIRE THE SAME DEGREE OF CARE AS WOULD THE PUBLIC.

09:58AM  16    Q.   SO IN TERMS OF THE ACCURACY AND RELIABILITY OF CLINICAL

09:58AM  17    TESTING, ARE YOUR STANDARDS FOR ACCURACY AND RELIABILITY

09:58AM  18    RELAXED AT ALL IN A FRIENDS AND FAMILY LAUNCH SCENARIO?

09:58AM  19    A.   NOT AT ALL.  BUT THERE'S NO BETA TESTING IN HEALTH CARE.

09:58AM  20    Q.   YOU ALSO DISCUSSED WITH DOCTOR -- OR MR. COOPERSMITH --

09:58AM  21    SORRY -- CONTINUOUS QUALITY CONTROL.

09:58AM  22         DO YOU REMEMBER THAT?

09:58AM  23    A.   YES, I DID.

09:58AM  24    Q.   CAN YOU EXPLAIN JUST BRIEFLY WHAT THE DIFFERENCE IS

09:58AM  25    BETWEEN DAILY QUALITY CONTROL AND CONTINUOUS QUALITY CONTROL?

09:58AM 1    A.  SO NOT TO BE NITPICKY, BUT I THINK THE PHRASE IS

09:58AM 2    CONTINUOUS QUALITY IMPROVEMENT.  IT'S A PRINCIPLE THAT ALMOST

09:58AM 3    ALL GOOD LABORATORIES FOLLOW WHERE YOU'RE JUST NOT LOOKING TO

09:58AM 4    FOLLOW THE LAW, YOU'RE LOOKING TO IMPROVE QUALITY AND PROCESSES

09:58AM 5    THROUGHOUT THE LIFE THE LAB.

09:59AM 6    Q.  AND DO YOU RECALL A DISCUSSION WITH MR. COOPERSMITH ABOUT

09:59AM 7    SOMETHING CALLED LEVEY-JENNINGS AND THE WESTGARD RULES?

09:59AM 8    A.  YES, I DO.

09:59AM 9    Q.  AND IS THAT SOMETHING THAT TAKES PLACE OVER A PERIOD OF

09:59AM 10   TIME AS OPPOSED TO DAILY QUALITY CONTROL TESTING?

09:59AM 11   A.  YES, IT DOES.

09:59AM 12   Q.  ON DIRECT WE TALKED ABOUT SOME PROBLEMS THAT YOU OBSERVED

09:59AM 13   WITH THERANOS'S PERFORMANCE IN DAILY QUALITY CONTROL.

09:59AM 14       DO YOU RECALL THAT?

09:59AM 15   A.  YES.

09:59AM 16   Q.  WHEN IT COMES TO THIS KIND OF OVER TIME TRACKING OF

09:59AM 17   QUALITY CONTROL PERFORMANCE, I'M WONDERING WHETHER PERFORMANCE

09:59AM 18   OVER TIME CAN MAKE UP FOR BAD PERFORMANCE ON DAILY QUALITY

09:59AM 19   CONTROL.

09:59AM 20       DO YOU UNDERSTAND THAT QUESTION?

09:59AM 21   A.  CAN I ASK YOU TO DIG INTO THAT A LITTLE BIT MORE?

09:59AM 22   Q.  YES.

09:59AM 23       SO WE TALKED ABOUT PROBLEMS WITH DAILY QUALITY CONTROL

09:59AM 24   PROBLEMS AT THERANOS; RIGHT?

09:59AM 25   A.  YES.

09:59AM  1    Q.   IS THERE ANY WAY THAT LOOKING AT THE DATA OVER TIME COULD

10:00AM  2    REDEEM THAT PERFORMANCE?

10:00AM  3         IN OTHER WORDS --

10:00AM  4              MR. COOPERSMITH:  OBJECTION.  LEADING.

10:00AM  5              THE COURT:  WHY DON'T YOU REASK THE QUESTION?

10:00AM  6    BY MR. BOSTIC:

10:00AM  7    Q.   IN OTHER WORDS, DR. ROSENDORFF, IS THERE ANY SCENARIO

10:00AM  8    WHERE THE PROBLEMS IDENTIFIED WITH DAILY QUALITY CONTROL GO

10:00AM  9    AWAY WHEN YOU LOOK AT THINGS LIKE WESTGARD RULES AND

10:00AM 10    LEVEY-JENNINGS?

10:00AM 11              MR. COOPERSMITH:  OBJECTION.  LEADING.

10:00AM 12              THE COURT:  OVERRULED.

10:00AM 13              THE WITNESS:  NO.  IN MY OPINION -- IT'S JUST AN

10:00AM 14    OPINION, IT'S NOT EXPERT TESTIMONY -- DAILY QC IS THE MOST

10:00AM 15    IMPORTANT QC.  IN FACT, IT'S ALSO PART OF WESTGARD RULES.  SO

10:00AM 16    IT'S WRAPPED UP INTO WESTGARD RULES, DAILY QC.

10:00AM 17    BY MR. BOSTIC:

10:00AM 18    Q.   THERE'S ALSO BEEN SOME DISCUSSION DURING DIRECT AND CROSS

10:00AM 19    ABOUT THERANOS'S METHOD OF DILUTING BLOOD SAMPLES BEFORE

10:00AM 20    TESTING.

10:00AM 21         DO YOU RECALL THAT?

10:00AM 22    A.   YES.

10:00AM 23    Q.   DURING YOUR TIME AT THERANOS, DID YOU OBSERVE ANY PROBLEMS

10:01AM 24    CREATED IN TERMS OF ACCURACY OR SENSITIVITY AS A RESULT OF

10:01AM 25    THERANOS'S PRACTICE OF DILUTING SAMPLES?

| | | |
|---|---|---|
| 10:01AM | 1 | MR. COOPERSMITH: OBJECTION. 702. |
| 10:01AM | 2 | THE COURT: OVERRULED. |
| 10:01AM | 3 | THE WITNESS: DURING VALIDATION, THERE WERE ATTEMPTS |
| 10:01AM | 4 | TO MATCH THE MANUFACTURER SENSITIVITY FOR THE TEST. |
| 10:01AM | 5 | THOSE, THOSE -- THAT SENSITIVITY IS SPELLED OUT IN THE |
| 10:01AM | 6 | PACKAGE INSERT OF THE TEST. |
| 10:01AM | 7 | BECAUSE OF THE DILUTION, IN MULTIPLE INSTANCES WE WERE NOT |
| 10:01AM | 8 | ABLE TO MATCH THE SENSITIVITY OF THE PREDICATE TESTS. |
| 10:01AM | 9 | BY MR. BOSTIC: |
| 10:01AM | 10 | Q. AND WHAT DOES THAT MEAN IN PLAIN ENGLISH IF THE THERANOS |
| 10:01AM | 11 | TESTS COULD NOT MATCH THE SENSITIVITY OF THE CONVENTIONAL |
| 10:01AM | 12 | TESTS? |
| 10:01AM | 13 | A. IT MEANS THAT THE LABORATORY WOULD NOT BE ABLE TO REPORT |
| 10:01AM | 14 | BELOW A CERTAIN NUMBER. |
| 10:01AM | 15 | THAT NUMBER WOULD BE HIGHER FOR THE THERANOS TESTS. |
| 10:01AM | 16 | SO, FOR INSTANCE, IF -- TO DETECT MILD LIVER DAMAGE, YOU |
| 10:02AM | 17 | NEED TO GO DOWN TO 20 UNITS OF AST. THERANOS WOULD ONLY BE |
| 10:02AM | 18 | ABLE TO GO UP TO MAYBE 50 OR 60 -- GO DOWN TO 50 OR 60, I'M |
| 10:02AM | 19 | SORRY. |
| 10:02AM | 20 | SO IN MANY CLINICAL SCENARIOS, THE THERANOS TESTS JUST |
| 10:02AM | 21 | DIDN'T HAVE THE SENSITIVITY. |
| 10:02AM | 22 | Q. THERE WAS ALSO SOME DISCUSSION ABOUT YOUR OBSERVATIONS |
| 10:02AM | 23 | WHEN IT CAME TO SOMETHING CALLED HEMOLYSIS. |
| 10:02AM | 24 | DO YOU REMEMBER THAT? |
| 10:02AM | 25 | A. YES. |

10:02AM  1    Q.   AND CAN YOU REMIND US WHAT HEMOLYSIS MEANS?

10:02AM  2    A.   YEAH, SURE.  HEMOLYSIS IS WHEN YOU COLLECT THE BLOOD,

10:02AM  3    PARTICULARLY WHEN YOU DO A FINGER PRICK AND YOU SQUEEZE THE

10:02AM  4    FINGER, WHAT HAPPENS IS THAT YOU DAMAGE THE RED BLOOD CELLS AND

10:02AM  5    THEY POP.

10:02AM  6         AND SO WHATEVER IS INSIDE OF THE RED BLOOD CELLS GETS INTO

10:02AM  7    THE SAMPLE, AND IT CAN REALLY INTERFERE WITH THE DETECTION OF A

10:02AM  8    LOT OF DIFFERENT THINGS.

10:02AM  9    Q.   IN YOUR EXPERIENCE AT THERANOS, DID HEMOLYSIS HAVE ANY

10:03AM 10    EFFECT ON THE ACCURACY AND RELIABILITY OF CERTAIN TESTS?

10:03AM 11              MR. COOPERSMITH:  OBJECTION.  702.

10:03AM 12              MR. BOSTIC:  I'M JUST ASKING ABOUT HIS OBSERVATIONS,

10:03AM 13    YOUR HONOR.

10:03AM 14              THE COURT:  OVERRULED.

10:03AM 15         YOU CAN ANSWER THE QUESTION.

10:03AM 16              THE WITNESS:  YES.  THERE'S A LARGE AMOUNT OF

10:03AM 17    HEMOGLOBIN IN RED BLOOD CELLS, AND WHEN THAT SPILLS OUT INTO

10:03AM 18    THE SAMPLE IT TURNS IT PINK AND THAT INTERFERES WITH THE

10:03AM 19    ABILITY OF THE READERS TO READ WHAT IS IN THE SAMPLE.

10:03AM 20    BY MR. BOSTIC:

10:03AM 21    Q.   AND IS THAT SOMETHING THAT YOU SAW HAPPEN AT THERANOS?

10:03AM 22    A.   YES.

10:03AM 23    Q.   AND WAS IT A FREQUENT OR INFREQUENT THING THAT YOU

10:03AM 24    OBSERVED?

10:03AM 25    A.   FREQUENT.

10:03AM 1    Q.   AND WHEN IT CAME TO HEMOLYSIS, THINKING OF THE THERANOS

10:03AM 2    FINGERSTICK METHOD VERSUS THE CONVENTIONAL VEIN DRAW, DID YOU

10:03AM 3    OBSERVE HEMOLYSIS HAPPEN MORE IN ONE THAN THE OTHER?

10:03AM 4    A.   WAY, WAY MORE FREQUENTLY WITH FINGERSTICK.  I CAN'T -- I

10:03AM 5    COULD VENTURE THE PERCENTAGE, BUT I'LL JUST LEAVE IT AT THAT,

10:04AM 6    THAT IT WAS WAY MORE FREQUENT WITH FINGERSTICK.

10:04AM 7    Q.   OKAY.  YOU WERE ALSO ASKED SOME QUESTIONS DURING

10:04AM 8    CROSS-EXAMINATION ABOUT THERANOS'S LABORATORY INFORMATION

10:04AM 9    SYSTEM.

10:04AM 10        DO YOU REMEMBER THAT?

10:04AM 11   A.   YES.

10:04AM 12   Q.   CAN YOU -- LET'S SEE.

10:04AM 13        LET ME ASK, IF YOU WERE LOOKING AT THE LAB RESULT AND

10:04AM 14   TRYING TO DETERMINE WHETHER IT WAS ACCURATE OR INACCURATE AFTER

10:04AM 15   THE FACT --

10:04AM 16   A.   YES.

10:04AM 17   Q.   -- WHAT KINDS OF DATA WOULD YOU BE LOOKING AT?

10:04AM 18   A.   I WOULD GO BACK AND REVIEW THE QUALITY CONTROL RECORDS FOR

10:04AM 19   THAT DAY.

10:04AM 20   Q.   WHEN IT CAME TO IDENTIFYING A PARTICULAR LAB RESULT AS

10:04AM 21   INACCURATE, WOULD YOU EVER CONSIDER PATIENT FACTORS, LIKE HOW A

10:04AM 22   PATIENT WAS PRESENTING?

10:04AM 23   A.   YES.  CLINICALLY IF A PATIENT'S HYPERTHYROID, FOR

10:04AM 24   INSTANCE, HAS AN OVERACTIVE THYROID GLAND, I WOULD FULLY EXPECT

10:05AM 25   THE TSH TO BE VERY, VERY LOW.

10:05AM  1        IF WE -- IN TALKING TO THE DOCTORS WHO ARE ORDERING THE

10:05AM  2   TESTS, IF THE THERANOS TEST WASN'T SHOWING THAT, THAT WOULD

10:05AM  3   RAISE ALARM BELLS FOR ME.

10:05AM  4   Q.   SO LET'S TAKE AN EXAMPLE LIKE THAT.

10:05AM  5        INFORMATION FROM A PATIENT'S DOCTOR ABOUT CONDITIONS THAT

10:05AM  6   THE PATIENT MIGHT HAVE OR HOW THEY WERE PRESENTING, WOULD THAT

10:05AM  7   INFORMATION BE STORED IN THERANOS'S LABORATORY INFORMATION

10:05AM  8   SYSTEM?

10:05AM  9   A.   NO, IT WOULD NOT.

10:05AM 10   Q.   WHEN IDENTIFYING SPECIFIC LAB RESULTS AS INACCURATE, WOULD

10:05AM 11   YOU EVER CONSIDER CONTEMPORANEOUS RESULTS FROM OTHER LABS

10:05AM 12   BESIDES THERANOS?

10:05AM 13   A.   YES, OF COURSE.  ON FREQUENT OCCASIONS I WOULD GET EMAILS

10:05AM 14   FROM DOCTORS SAYING THAT THE PATIENT HAD BEEN TESTED AT THE

10:05AM 15   SAME TIME AT QUEST OR A DAY LATER AT QUEST, FOR INSTANCE, AND

10:05AM 16   HAD VERY DIFFERENT RESULTS.

10:05AM 17   Q.   AND SAME QUESTION FOR THAT.

10:05AM 18        WAS -- WERE RESULTS FROM CONVENTIONAL LABS, NON-THERANOS

10:06AM 19   LABS, STORED IN THE THERANOS LABORATORY INFORMATION SYSTEM?

10:06AM 20   A.   NO.

10:06AM 21   Q.   LOOKING AT THE LABORATORY INFORMATION SYSTEM -- FIRST OF

10:06AM 22   ALL, LET ME ASK, DID YOU EVER ACTUALLY ACCESS THE LIS?  DID YOU

10:06AM 23   LOG IN AND VIEW THE DATA?

10:06AM 24   A.   I DID.

10:06AM 25   Q.   LOOKING AT THAT DATA, WAS IT POSSIBLE TO LOOK AT THE

10:06AM    1        INDIVIDUAL RESULTS AND IDENTIFY THEM INDIVIDUALLY AS ACCURATE

10:06AM    2        OR INACCURATE?

10:06AM    3        A.    NO.

10:06AM    4        Q.    I'D LIKE TO ASK YOU SOME QUESTIONS ABOUT THE HCG TEST.

10:06AM    5              CAN YOU REMIND US WHAT THAT TEST WAS USED FOR?

10:06AM    6        A.    THE COURT REPORTER IS PROBABLY USED TO THIS LONG WORD BY

10:06AM    7        NOW, BUT IT'S HUMAN CHORIONIC GONADOTROPIN, AND THAT'S A

10:06AM    8        PREGNANCY HORMONE.

10:06AM    9              MR. BOSTIC:  THANK YOU.

10:06AM   10              YOUR HONOR, 4147 IS ALREADY ADMITTED.

10:06AM   11              MAY WE PUBLISH?

10:07AM   12              THE COURT:  YES.

10:07AM   13        BY MR. BOSTIC:

10:07AM   14        Q.    DR. ROSENDORFF, WE SEE HERE AN EMAIL THAT WE REVIEWED

10:07AM   15        BEFORE FROM MAY 30TH, 2014, --

10:07AM   16              MR. COOPERSMITH:  I'M SORRY TO INTERRUPT,

10:07AM   17        YOUR HONOR.  BUT MY SCREEN IS SOMEHOW NOT -- YOU HAVE TO TURN

10:07AM   18        IT ON APPARENTLY.

10:07AM   19              (LAUGHTER.)

10:07AM   20        BY MR. BOSTIC:

10:07AM   21        Q.    DR. ROSENDORFF, YOUR SCREEN IS ON; CORRECT?

10:07AM   22        A.    YES, SIR.

10:07AM   23        Q.    DO YOU SEE YOUR EMAIL FROM MAY 30TH, 2014, WHERE YOU RELAY

10:07AM   24        YOUR DECISION TO STOP HCG TESTING ON THE EDISON?

10:07AM   25              DO YOU SEE THAT?

10:07AM   1      A.   YES.

10:07AM   2      Q.   IF I COULD ASK YOU TO LOOK NEXT, AND MAYBE WE CAN JUST --

10:07AM   3               THE COURT:  OH, THEIR MONITORS ARE OFF.  LET'S SEE

10:07AM   4      IF WE CAN FIX THE JURY'S MONITORS.

10:07AM   5         THEY'RE ON NOW?

10:07AM   6               JUROR:  YES.

10:07AM   7               THE COURT:  OKAY.

10:07AM   8      BY MR. BOSTIC:

10:07AM   9      Q.   I'M JUST ABOUT TO ASK IF THEY CAN BE TURNED OFF AGAIN.  IF

10:07AM  10      WE CAN JUST SHOW TO DR. ROSENDORFF --

10:07AM  11               THE COURT:  ARE YOU SURE WE WANT TO GO THERE,

10:07AM  12      MR. BOSTIC?

10:08AM  13               MR. BOSTIC:  LET'S TRY IT ONCE.

10:08AM  14         IF WE CAN JUST SHOW TO DR. ROSENDORFF EXHIBIT 5418.

10:08AM  15               THE COURT:  ALL RIGHT.  LET'S TRY THAT 5418 JUST TO

10:08AM  16      DR. ROSENDORFF.

10:08AM  17      BY MR. BOSTIC:

10:08AM  18      Q.   DO YOU HAVE THAT ON YOUR SCREEN, DR. ROSENDORFF?

10:08AM  19      A.   YES, I DO.

10:08AM  20      Q.   AND IS THIS A CONTINUATION OF THAT SAME EMAIL CHAIN

10:08AM  21      RELATING TO YOUR DECISION TO STOP HCG EDISON TESTING?

10:08AM  22      A.   YES, IT IS.

10:08AM  23               MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5418.

10:08AM  24               MR. COOPERSMITH:  NO OBJECTION.

10:08AM  25               THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:08AM  1    LET'S SEE IF IT IS.

10:08AM  2        GREAT.

10:08AM  3        (GOVERNMENT'S EXHIBIT 5418 WAS RECEIVED IN EVIDENCE.)

10:08AM  4    BY MR. BOSTIC:

10:08AM  5    Q.   SO, DR. ROSENDORFF, NOW LOOKING AT 5418, DO YOU SEE THAT

10:08AM  6    THIS IS -- WE SEE A COUPLE OF MESSAGES FROM JUNE 2014 FOLLOWING

10:08AM  7    YOUR DECISION.

10:08AM  8        DO YOU SEE THAT?

10:08AM  9    A.   YES, I DO.

10:08AM  10   Q.   AND DO YOU SEE THAT THERE'S A MESSAGE FROM DANIEL YOUNG TO

10:09AM  11   SUNNY BALWANI AND CHINMAY PANGARKAR SECOND TO THE TOP OF THE

10:09AM  12   PAGE?

10:09AM  13   A.   YES, I DO SEE THAT.

10:09AM  14   Q.   SO A FEW DAYS AFTER YOU SUSPENDED HCG EDISON TESTING,

10:09AM  15   DANIEL YOUNG WRITES TO THE DEFENDANT, "BY THE WAY, WE NEVER

10:09AM  16   SWITCHED TO IMMULITE IN LIS -- IT WAS NOT CLEAR TO ME THAT THIS

10:09AM  17   DECISION WAS MADE."

10:09AM  18       DO YOU SEE THAT?

10:09AM  19   A.   YES, I DO.

10:09AM  20   Q.   AROUND THIS TIME, LATE MAY, EARLY JUNE 2014, WAS THERE ANY

10:09AM  21   QUESTION IN YOUR MIND AS TO WHETHER THAT DECISION TO SUSPEND

10:09AM  22   EDISON HCG TESTING HAD BEEN MADE?

10:09AM  23   A.   NO, THERE WAS NO QUESTION.

10:09AM  24   Q.   NEXT, IF I COULD JUST SHOW YOU EXHIBIT 13875.

10:09AM  25       JUST ON DR. ROSENDORFF'S SCREEN.

10:09AM   1          AND DO YOU HAVE 13875 NOW?

10:09AM   2     A.   YES, I DO.

10:09AM   3     Q.   AND DO YOU SEE HERE SOME ADDITIONAL EMAIL CORRESPONDENCE,

10:10AM   4     INCLUDING YOU AND MR. BALWANI, ABOUT HCG STATUS?

10:10AM   5     A.   YES, I DO.

10:10AM   6          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:10AM   7     13875.

10:10AM   8          MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:10AM   9          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:10AM  10      (DEFENDANT'S EXHIBIT 13875 WAS RECEIVED IN EVIDENCE.)

10:10AM  11     BY MR. BOSTIC:

10:10AM  12     Q.   AND NOW THAT WE CAN ALL SEE THAT, LET'S LOOK AT THE BOTTOM

10:10AM  13     MESSAGE ON PAGE 1.

10:10AM  14          AND DO YOU SEE HERE, DR. ROSENDORFF, THERE'S AN EMAIL FROM

10:10AM  15     YOU TO MR. BALWANI AND DANIEL YOUNG ON JUNE 4TH?

10:10AM  16     A.   YES, I SEE THAT.

10:10AM  17     Q.   AND DO YOU SEE THAT THERE IS A DISCUSSION ABOUT THE PLAN

10:10AM  18     GOING FORWARD FOR HCG?

10:10AM  19     A.   YES.

10:10AM  20     Q.   AND UNDER GOING FORWARD, DO YOU SEE NUMBER 1, IT SAYS,

10:10AM  21     "CHANGE HCG TO VACUTAINER (SST OR GOLD-TOP), AND RUN ON

10:10AM  22     IMMULITE."

10:10AM  23          DO YOU SEE THAT?

10:10AM  24     A.   YES, I DO.

10:10AM  25     Q.   AND CAN YOU EXPLAIN WHAT THAT MEANS?

10:10AM   1    A.   THAT WOULD MEAN PERMANENTLY CHANGING THE WAY THERANOS

10:11AM   2    TESTED HCG TO DISCONTINUE TESTING ON VENOUS BLOOD USING THE

10:11AM   3    VACUTAINER -- I'M SORRY, TO DISCONTINUE TESTING USING THE

10:11AM   4    FINGER PRICK AND TO ONLY TEST USING VENOUS BLOOD OR VACUTAINER,

10:11AM   5    AND TO ONLY RUN ON THE IMMULITE.

10:11AM   6    Q.   WAS THE IMMULITE A NON-THERANOS ANALYZER?

10:11AM   7    A.   YES, IT WAS.

10:11AM   8    Q.   LET'S LOOK AT PAGE 2 AND CONTINUE IN YOUR EMAIL.

10:11AM   9         DO YOU SEE THAT NUMBER 3 IN THE PLAN THERE IS TO "RESUME

10:11AM  10    CTN HCG WHEN WE HAVE RESOLVED THESE ISSUES."

10:11AM  11         DO YOU SEE THAT?

10:11AM  12    A.   YES, I DO.

10:11AM  13    Q.   LET'S GO BACK TO PAGE 1 AND LOOK AT DR. YOUNG'S MESSAGE IN

10:11AM  14    THE MIDDLE.

10:11AM  15         AND DO YOU SEE IN DR. YOUNG'S MESSAGE HE SAYS AT THE

10:11AM  16    BOTTOM, "IF WE NEED TO COLLECT VACUTAINERS TOMORROW, WE WOULD

10:11AM  17    NEED TO SEND SPECIAL INSTRUCTIONS TO THE PSC'S.  RIGHT NOW WE

10:12AM  18    ARE NOT PLANNING ON DOING THIS."

10:12AM  19         DO YOU SEE THAT?

10:12AM  20    A.   YES, I DO.

10:12AM  21    Q.   IN OTHER WORDS, DOES THAT MEAN THAT IT WAS NOT PLANNED AT

10:12AM  22    THIS TIME TO ACTUALLY COLLECT VACUTAINERS FOR HCG THE FOLLOWING

10:12AM  23    DAY?

10:12AM  24              MR. COOPERSMITH:  OBJECTION.  CALLS FOR SPECULATION.

10:12AM  25              THE COURT:  CAN YOU REPHRASE THAT, PLEASE.

10:12AM 1    BY MR. BOSTIC:

10:12AM 2    Q.   DR. ROSENDORFF, IN ORDER TO ACTUALLY IMPLEMENT THIS CHANGE

10:12AM 3    AND RUN HCG ON VACUTAINERS AND NON-THERANOS DEVICES, WOULD IT

10:12AM 4    HAVE BEEN NECESSARY TO COMMUNICATE WITH THE THERANOS PATIENT

10:12AM 5    SERVICE CENTERS?

10:12AM 6    A.   YES.

10:12AM 7    Q.   AND WOULD THAT HAVE TO BE DONE IN ORDER FOR THEM TO KNOW

10:12AM 8    ABOUT THAT CHANGE?

10:12AM 9    A.   YES.

10:12AM 10   Q.   OKAY.  WE CAN SET THAT ASIDE.

10:12AM 11        AND NEXT, IF I COULD SHOW JUST ON YOUR SCREEN,

10:12AM 12   DR. ROSENDORFF, EXHIBIT 5420?

10:13AM 13   A.   I HAVE IT.

10:13AM 14   Q.   ACTUALLY, LET'S SKIP TO, INSTEAD, 13876.  AGAIN, JUST ON

10:13AM 15   YOUR SCREEN.

10:13AM 16        AND DO YOU SEE HERE AN EMAIL CHAIN INCLUDING YOU AND

10:13AM 17   MR. BALWANI ABOUT THE STATUS OF HCG TESTING?

10:13AM 18   A.   YES.

10:13AM 19        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:13AM 20   13876.

10:13AM 21        MR. COOPERSMITH:  NO OBJECTION.

10:13AM 22        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:13AM 23        (DEFENDANT'S EXHIBIT 13876 WAS RECEIVED IN EVIDENCE.)

10:13AM 24   BY MR. BOSTIC:

10:13AM 25   Q.   AND LET'S START ON PAGE 2 AT THE TOP OF THAT PAGE.

10:13AM 1           AND, DR. ROSENDORFF, DO YOU SEE AN EMAIL FROM YOU TO

10:13AM 2     CHINMAY PANGARKAR, SURAJ SAKSENA AND SUNNY BALWANI ASKING FOR A

10:13AM 3     STATUS UPDATE ON THE HCG EDISON?

10:13AM 4     A.   YES, I DO.

10:13AM 5     Q.   AND LET'S GO TO PAGE 1, AND DO WE SEE AT THE BOTTOM OF

10:14AM 6     PAGE 1 THERE'S AN EMAIL FROM CHINMAY PANGARKAR AND HE SAYS,

10:14AM 7     "BASED ON REPORTS SINCE FRIDAY, WE HAVE BEEN CONSISTENTLY

10:14AM 8     PASSING QC -- SO WE DON'T HAVE A PROBLEM WITH THE CURRENT

10:14AM 9     BUILD."

10:14AM 10          DO YOU SEE THAT?

10:14AM 11    A.   YES, I DO.

10:14AM 12    Q.   AND LET'S GO FORWARD IN TIME AND MOVE UP THE PAGE, AND

10:14AM 13    LOOK AT THE TOP OF THE PAGE, THE TOP TWO MESSAGES.

10:14AM 14          AND DO YOU SEE YOU ASK THAT GROUP, "SO HCG IS BACK ON

10:14AM 15    VACUTAINERS?"

10:14AM 16    A.   YES.

10:14AM 17    Q.   AND MR. BALWANI RESPONDS, "NO.  IT IS ON NANOTAINERS PER

10:14AM 18    CHINMAY'S EMAIL BELOW."

10:14AM 19          DO YOU SEE THAT?

10:14AM 20    A.   YES, I DO.

10:14AM 21    Q.   SO AS OF JUNE 16TH, WHAT METHOD WAS BEING USED AT THERANOS

10:14AM 22    TO RUN HCG TESTING, ACCORDING TO THIS?

10:14AM 23    A.   NANOTAINERS.

10:14AM 24    Q.   AND DOES THAT MEAN A THERANOS ANALYZER?

10:14AM 25    A.   YES.

10:14AM 1      Q.   IN THAT EMAIL YOU'RE ASKING THIS GROUP, INCLUDING

10:14AM 2      MR. BALWANI, WHAT METHOD IS BEING USED.

10:14AM 3           DO YOU SEE THAT?

10:15AM 4      A.   YES.

10:15AM 5      Q.   IF THIS HAD BEEN YOUR DECISION ABOUT WHICH METHOD WAS USED

10:15AM 6      TO RUN HCG TESTING, WOULD THERE HAVE BEEN ANY NEED FOR YOU TO

10:15AM 7      ASK ON THIS DATE?

10:15AM 8      A.   NO.  I WAS CONSTANTLY CLARIFYING -- I'M SORRY.

10:15AM 9           I WAS CONSTANTLY TRYING TO GET TO THE TRUTH OF HOW THINGS

10:15AM 10     ACTUALLY WERE BEING DONE, REGARDLESS OF MY INSTRUCTIONS.

10:15AM 11     Q.   FOLLOWING THIS TIME PERIOD IN MID-JUNE, DO YOU RECALL

10:15AM 12     WHETHER THE ISSUES WITH HCG, ACCURACY AND RELIABILITY, WERE

10:15AM 13     RESOLVED OR NOT?

10:15AM 14     A.   I DON'T BELIEVE THEY WERE, NO.

10:15AM 15     Q.   LET'S LOOK AT SOME EXAMPLES OF THAT.

10:15AM 16          FIRST OF ALL, IF I COULD JUST SHOW ON YOUR SCREEN 5421?

10:15AM 17     A.   I HAVE IT.

10:15AM 18     Q.   DO YOU SEE --

10:15AM 19     A.   I HAVE IT.

10:15AM 20     Q.   AND DO YOU SEE THAT 5421 IS AN EMAIL INCLUDING YOU AND

10:16AM 21     MR. BALWANI RELATING TO QUALITY CONTROL PERFORMANCE?

10:16AM 22     A.   YES.

10:16AM 23              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5421.

10:16AM 24              MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:16AM 25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:16AM  1          (GOVERNMENT'S EXHIBIT 5421 WAS RECEIVED IN EVIDENCE.)

10:16AM  2     BY MR. BOSTIC:

10:16AM  3     Q.   AND LOOKING AT 5421, DO YOU SEE THAT IN THIS EMAIL, THIS

10:16AM  4     MESSAGE FROM LANGLY GEE, THERE'S A REFERENCE TO 33 EDISONS

10:16AM  5     UNDERGOING QUALITY CONTROL ON THIS DATE IN LATE JUNE?

10:16AM  6     A.   YES.

10:16AM  7     Q.   AND DO YOU SEE OUT OF THOSE 33, IT'S REPORTED THAT ONLY 20

10:16AM  8     EDISONS PASSED.

10:16AM  9          DO YOU SEE THAT?

10:16AM 10     A.   YES.

10:16AM 11     Q.   AND DO YOU SEE THAT IT'S REPORTED THAT "9 EDISONS FOR TES,

10:16AM 12     TSH, HCG, FT4 AND VITAMIN D FAILED LEVEL 1 AND/OR LEVEL 2 QC"?

10:17AM 13     A.   YES.

10:17AM 14     Q.   SO, IN OTHER WORDS, ARE WE STILL SEEING EDISONS FAIL HCG

10:17AM 15     QUALITY CONTROL IN LATE JUNE 2014?

10:17AM 16     A.   YES, WE ARE.

10:17AM 17     Q.   AND IF I CAN SHOW YOU NEXT JUST ON YOUR SCREEN

10:17AM 18     EXHIBIT 5422?

10:17AM 19     A.   I HAVE IT.

10:17AM 20     Q.   OKAY.  AND DO YOU SEE THERE A SIMILAR UPDATE FROM

10:17AM 21     LANGLY GEE ABOUT QUALITY CONTROL PERFORMANCE FOR EDISONS?

10:17AM 22     A.   YES.

10:17AM 23               MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5422.

10:17AM 24               MR. COOPERSMITH:  NO OBJECTION.

10:17AM 25               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:17AM   1              (GOVERNMENT'S EXHIBIT 5422 WAS RECEIVED IN EVIDENCE.)

10:17AM   2       BY MR. BOSTIC:

10:17AM   3       Q.   DR. ROSENDORFF, HERE'S AN EMAIL FROM LANGLY GEE ON

10:17AM   4       JUNE 28TH, 2014.

10:17AM   5              IS THAT CORRECT?

10:17AM   6       A.   YES.

10:17AM   7       Q.   AND HERE UNDER THE SUBJECT LINE, INSTRUMENT BRING UP, HE

10:17AM   8       REPORTS THAT ONLY 17 OF 35 EDISONS PASSED QUALITY CONTROL FROM

10:18AM   9       THE PREVIOUS NIGHT.

10:18AM  10              DO YOU SEE THAT REPORT?

10:18AM  11       A.   YES.

10:18AM  12       Q.   AND THE NEXT SENTENCE REPORTS THAT HCG IS NOT AVAILABLE

10:18AM  13       YET FOR TESTING.

10:18AM  14              DO YOU SEE THAT?

10:18AM  15       A.   YES, I DO.

10:18AM  16       Q.   17 OUT OF 35 EDISONS PASSING, IS THAT LESS THAN HALF OF

10:18AM  17       THE NUMBER OF EDISONS THAT PASSED QUALITY CONTROL?

10:18AM  18       A.   YES, IT IS.

10:18AM  19       Q.   OKAY.  WE CAN SET THAT ASIDE.

10:18AM  20              WHEN IT CAME TO QUALITY CONTROL PERFORMANCE AT THERANOS,

10:18AM  21       WERE PROBLEMS RELATED ONLY TO THE HCG ASSAY?

10:18AM  22       A.   NO.

10:18AM  23       Q.   EXHIBIT 13809 WAS PREVIOUSLY ADMITTED.

10:18AM  24              MAY WE DISPLAY, YOUR HONOR?

10:18AM  25                  THE COURT:  YES.

10:18AM   1    BY MR. BOSTIC:

10:18AM   2    Q.   AND LOOKING AT THIS FIRST PAGE, DO YOU REMEMBER DISCUSSING

10:18AM   3    THIS PRESENTATION WITH MR. COOPERSMITH DURING

10:18AM   4    CROSS-EXAMINATION?

10:18AM   5    A.   YES, I DID.

10:18AM   6    Q.   AND I'D LIKE TO DRAW YOUR ATTENTION TO PAGE 12 OF THIS

10:18AM   7    PRESENTATION.

10:18AM   8        AND DO YOU REMEMBER LOOKING AT THIS SLIDE WITH

10:19AM   9    MR. COOPERSMITH?

10:19AM   10   A.   YES, I DID.

10:19AM   11   Q.   DO YOU RECALL THAT ON DIRECT WE LOOKED AT A REPORT

10:19AM   12   INDICATING A 26 PERCENT QUALITY CONTROL FAILURE RATE FOR

10:19AM   13   MARCH 2014?

10:19AM   14   A.   YES.  THAT WAS THE AVERAGE QC FAILURE RATE FOR THAT MONTH

10:19AM   15   ACROSS THE EDISONS.

10:19AM   16   Q.   DO YOU SEE THAT THIS CHART LISTS OTHER PERCENTAGES FOR

10:19AM   17   CONTROLS FAILED?

10:19AM   18   A.   YES, I DO.

10:19AM   19   Q.   FIRST OF ALL, LET ME ASK, ARE YOU ABLE TO VOUCH FOR THESE

10:19AM   20   NUMBERS AND WHETHER THEY REPRESENT THE TYPICAL PERFORMANCE OF

10:19AM   21   QUALITY CONTROL AT THERANOS?

10:19AM   22   A.   NO, I'M NOT.

10:19AM   23   Q.   LET ME ASK YOU ABOUT THE TWO SECTIONS AT THE BOTTOM, ONE

10:19AM   24   RELATES TO Q1 PREDICATE AND THE OTHER ONE SAYS Q1 THERANOS.

10:19AM   25       DO YOU SEE THAT?

ER-2748

ROSENDORFF REDIRECT BY MR. BOSTIC                          3745

10:19AM   1    A.   YES, I DO.

10:19AM   2    Q.   CAN YOU EXPLAIN WHAT THE DIFFERENCE IS BETWEEN THOSE TWO

10:19AM   3    SECTIONS?

10:19AM   4    A.   SO Q1 THERANOS WOULD BE ALL OF THE CONTROLS THAT WERE RUN

10:20AM   5    ON THE THERANOS INSTRUMENTS AND WHAT THAT FAILURE RATE WAS.

10:20AM   6         SO THOSE THERANOS INSTRUMENTS WOULD BE THE EDISON AND THE

10:20AM   7    MODIFIED SIEMENS TEST.

10:20AM   8    Q.   OKAY.  AND THE THIRD BULLET POINT DOWN UNDER EACH OF THESE

10:20AM   9    SHOWS THE PERCENTAGE OF CONTROLLED FAILS -- EXCUSE ME, OF

10:20AM  10    CONTROLS FAILED, AT LEAST ACCORDING TO THIS PRESENTATION.

10:20AM  11         DO YOU SEE THAT?

10:20AM  12    A.   YES.

10:20AM  13    Q.   AND DO YOU SEE THAT THE THERANOS DEVICES SHOW A

10:20AM  14    2.9 PERCENT CONTROL FAILURE RATE?

10:20AM  15    A.   YES, I DO.

10:20AM  16    Q.   AND THE PREDICATE DEVICES SHOW A .75 PERCENT CONTROL

10:20AM  17    FAILURE RATE?

10:20AM  18    A.   YES, I DO.

10:20AM  19    Q.   SO I ASKED YOU ABOUT THESE SPECIFIC NUMBERS ALREADY, BUT

10:20AM  20    LET ME ASK GENERALLY WHETHER IT SQUARES WITH YOUR RECOLLECTION

10:20AM  21    THAT THE THERANOS ASSAYS FAILED CONTROL ABOUT THREE OR FOUR

10:20AM  22    TIMES MORE OFTEN THAN THE PREDICATE DEVICES?

10:20AM  23    A.   AT LEAST.  AT LEAST.

10:20AM  24    Q.   OKAY.  WE CAN SET THAT ASIDE.

10:21AM  25         I'D LIKE TO ASK YOU SOME FOLLOW-UP QUESTIONS ABOUT AN

ER-2749

10:21AM  1    INSPECTION THAT OCCURRED AT THERANOS IN 2013.

10:21AM  2         DO YOU REMEMBER THAT?

10:21AM  3    A.   YES, I DO.

10:21AM  4              MR. BOSTIC:  YOUR HONOR, I'D LIKE TO DISPLAY

10:21AM  5    EXHIBIT 4047 THAT HAS BEEN PREVIOUSLY ADMITTED.

10:21AM  6              THE COURT:  YES.

10:21AM  7    BY MR. BOSTIC:

10:21AM  8    Q.   AND, DR. ROSENDORFF, DO YOU REMEMBER LOOKING AT THIS EMAIL

10:21AM  9    FROM MS. HOLMES ABOUT A PATH FOR THE AUDITORS TO AVOID AREAS

10:21AM  10   THAT CANNOT BE ACCESSED?

10:21AM  11   A.   YES.

10:21AM  12   Q.   YOU TESTIFIED ON CROSS-EXAMINATION THAT AT NO TIME WERE

10:21AM  13   YOU TRYING TO DECEIVE THE INSPECTORS OR CONCEAL ANYTHING FROM

10:21AM  14   THEM; CORRECT?

10:21AM  15   A.   I WAS NOT.

10:21AM  16   Q.   IF I COULD SHOW YOU JUST ON YOUR SCREEN EXHIBIT 4316.

10:22AM  17   A.   I SEE IT.

10:22AM  18   Q.   AND LET'S -- WELL, LET ME ASK, IS THIS AN EMAIL FROM

10:22AM  19   DANIEL YOUNG TO YOU RELATING TO THIS TOPIC AND WHAT WAS TO BE

10:22AM  20   COVERED ON THAT INSPECTION?

10:22AM  21   A.   YES, IT DOES.

10:22AM  22              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 4316.

10:22AM  23              MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  HEARSAY.

10:22AM  24              THE COURT:  IS THIS A BUSINESS RECORD?

10:22AM  25              MR. BOSTIC:  I BELIEVE IT IS, YOUR HONOR.  I THINK

ER-2750

10:22AM  1    THE FOUNDATION HAS BEEN LAID, BUT I'M HAPPY TO DO MORE.

10:22AM  2         THIS ALSO IS NOT OFFERED FOR THE TRUTH.  THIS IS A

10:22AM  3    DIRECTION BEING GIVEN.

10:22AM  4              THE COURT:  MR. COOPERSMITH.

10:22AM  5              MR. COOPERSMITH:  YOUR HONOR, IT'S HEARSAY.

10:22AM  6    MR. BALWANI IS NOT ON THIS EMAIL.

10:22AM  7              THE COURT:  ALL RIGHT.  THANK YOU.

10:22AM  8         WHY DON'T YOU LAY A FOUNDATION FOR A BUSINESS RECORD.

10:22AM  9    BY MR. BOSTIC:

10:22AM 10    Q.   DR. ROSENDORFF, AROUND THIS TIME PERIOD, WERE YOU AND

10:22AM 11    OTHERS AT THERANOS EXCHANGING EMAILS IN ORDER TO COORDINATE FOR

10:22AM 12    THIS UPCOMING INSPECTION?

10:22AM 13    A.   THIS EMAIL AT 11:58 WAS AN EMAIL THAT DANIEL SENT TO ME IN

10:23AM 14    RESPONSE TO AN EMAIL THAT I SENT TO HIM.

10:23AM 15    Q.   AND BEFORE WE GET INTO THE SPECIFIC EMAIL, BECAUSE IT'S

10:23AM 16    NOT ADMITTED YET --

10:23AM 17    A.   OH, I'M SORRY.

10:23AM 18    Q.   -- LET ME JUST ASK YOU GENERALLY, WAS THE EMAIL USED

10:23AM 19    INTERNALLY AT THERANOS FOR THE PURPOSES OF COORDINATING THIS

10:23AM 20    INSPECTION?

10:23AM 21    A.   YES, ABSOLUTELY.

10:23AM 22    Q.   AND IN THOSE EMAILS, WAS IT IMPORTANT FOR THE INDIVIDUALS

10:23AM 23    WRITING TO RELAY INSPECTION ACCURATELY?

10:23AM 24    A.   YES.

10:23AM 25    Q.   AND WERE THESE EMAILS PRESERVED SO THAT THEY COULD BE

ER-2751

10:23AM  1    REFERENCED LATER IF NEEDED?

10:23AM  2    A.   YES.

10:23AM  3          MR. BOSTIC:  YOUR HONOR, WE OFFER 4316 AS A BUSINESS

10:23AM  4    RECORD.

10:23AM  5          THE COURT:  IT'S ADMITTED.

10:23AM  6          MR. COOPERSMITH:  SAME OBJECTION, YOUR HONOR.

10:23AM  7          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:23AM  8       (GOVERNMENT'S EXHIBIT 4316 WAS RECEIVED IN EVIDENCE.)

10:23AM  9          MR. BOSTIC:  AND MAY WE PUBLISH, YOUR HONOR?

10:23AM 10          THE COURT:  YES.

10:23AM 11    BY MR. BOSTIC:

10:23AM 12    Q.   LOOKING AT 4316, DO YOU SEE AN EMAIL FROM DANIEL YOUNG TO

10:23AM 13    YOU WITH THE SUBJECT LINE NORMANDY LAB?

10:23AM 14    A.   YES, I DO SEE THAT.

10:23AM 15    Q.   AND THE TEXT SAYS, "LET'S NOT REMIND HER ABOUT THE

10:24AM 16    DOWNSTAIRS LAB UNLESS SHE ASKS AGAIN.  JUST SIMPLER IF WE CAN

10:24AM 17    JUST SHOW HER THE LAB UPSTAIRS."

10:24AM 18        DO YOU SEE THAT?

10:24AM 19    A.   YES, I DO.

10:24AM 20    Q.   AND WHAT IS THIS REFERRING TO?

10:24AM 21    A.   I'LL TRY TO EXPLAIN IT WITHOUT REFERENCING MY PREVIOUS

10:24AM 22    EMAIL I THINK IF THAT'S THE INSTRUCTIONS OF THE COURT.

10:24AM 23    Q.   NO, THAT'S FINE.  YOU CAN REFERENCE YOUR PREVIOUS EMAIL.

10:24AM 24    A.   OH.

10:24AM 25        MY PREVIOUS EMAIL ESSENTIALLY SAID -- I DON'T REMEMBER THE

10:24AM 1    EXACT TEXT, BUT IT WAS BASICALLY A QUESTION FROM ME TO DANIEL

10:24AM 2    SAYING, ARE WE GOING TO BE SHOWING HER THE DOWNSTAIRS

10:24AM 3    LABORATORY?

10:24AM 4    Q.   AND WHAT IS YOUR UNDERSTANDING OF THE DIRECTION THAT YOU

10:24AM 5    RECEIVED BACK FROM DANIEL YOUNG?

10:24AM 6    A.   HE SAID, NO, WE WILL NOT BE SHOWING HER THE DOWNSTAIRS

10:24AM 7    LABORATORY UNTIL SHE ASKS AGAIN.

10:24AM 8    Q.   AND WHO IS THE "HER" IN THIS EMAIL?

10:24AM 9    A.   THE INSPECTOR FROM LABORATORY FIELD SERVICES.

10:24AM 10   Q.   AND FINALLY, CAN YOU REMIND US OF THE DIFFERENCE BETWEEN

10:24AM 11   THE DOWNSTAIRS LAB AND THE UPSTAIRS LAB AT THERANOS?

10:24AM 12   A.   THE DOWNSTAIRS LAB CONTAINED ALL OF THE EDISONS, AND IT

10:25AM 13   WAS WHERE THE DILUTION METHODS WERE BEING RUN ON THE MODIFIED

10:25AM 14   SIEMENS INSTRUMENTS.

10:25AM 15       THE UPSTAIRS LAB CONTAINED EXCLUSIVELY PREDICATE DEVICES.

10:25AM 16   Q.   AT THE TOP PART OF THIS PAGE THAT YOU CAN SEE ON YOUR

10:25AM 17   SCREEN, YOU FORWARD THIS EMAIL TO AN EMAIL ADDRESS THAT WE HAVE

10:25AM 18   REDACTED.

10:25AM 19       BUT DO YOU RECALL FORWARDING THIS TO YOUR PERSONAL EMAIL

10:25AM 20   ADDRESS?

10:25AM 21   A.   YES, I DID.

10:25AM 22   Q.   AND WHY DID YOU DECIDE TO DO THAT IN NOVEMBER OF 2014, THE

10:25AM 23   FOLLOWING YEAR?

10:25AM 24   A.   I WAS, I WAS UNEASY.  I WAS UNCOMFORTABLE WITH THE

10:25AM 25   DIRECTION THAT I HAD BEEN GIVEN BY MR. YOUNG, AND I WANTED TO,

10:25AM  1    TO LEAVE A PAPER TRAIL FOR THE FUTURE.

10:25AM  2    Q.   AROUND THE TIME OF THIS INSPECTION, DO YOU RECALL

10:25AM  3    RECEIVING ADDITIONAL INSTRUCTION FROM MR. BALWANI ABOUT WHAT

10:25AM  4    AREAS OF THE LAB WOULD BE ACCESSIBLE TO THE INSPECTOR?

10:26AM  5    A.   WHAT I RECALL MR. BALWANI EXPLICITLY SAID IS I DON'T WANT

10:26AM  6    ANYBODY GOING IN AND OUT OF NORMANDY DURING THE PERIOD OF THE

10:26AM  7    INSPECTION.

10:26AM  8    Q.   OKAY.  LET'S LOOK AT ANOTHER EXAMPLE OF DIRECTION AT

10:26AM  9    EXHIBIT 1295.  AND IF WE CAN PUT THAT JUST ON DR. ROSENDORFF'S

10:26AM  10   SCREEN.

10:26AM  11       DR. ROSENDORFF, DO YOU SEE AN EXHIBIT MARKED 1295 IN FRONT

10:26AM  12   OF YOU?

10:26AM  13   A.   YES, I SEE IT.

10:26AM  14   Q.   AND DO YOU SEE THAT THIS IS AN EMAIL FROM MR. BALWANI TO

10:26AM  15   YOU AND OTHERS AT THERANOS PROVIDING SOME DIRECTION IN

10:26AM  16   CONNECTION WITH THAT INSPECTION?

10:26AM  17   A.   YES, SIR.

10:26AM  18           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1295.

10:26AM  19           MR. COOPERSMITH:  NO OBJECTION.

10:26AM  20           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:27AM  21       (GOVERNMENT'S EXHIBIT 1295 WAS RECEIVED IN EVIDENCE.)

10:27AM  22   BY MR. BOSTIC:

10:27AM  23   Q.   SO, DR. ROSENDORFF, LOOKING AT THIS EMAIL, IS THIS FROM

10:27AM  24   THAT SAME INSPECTION THAT WE'VE BEEN TALKING ABOUT?

10:27AM  25   A.   YES, IT IS.

10:27AM   1    Q.   AND DO YOU SEE THAT MR. BALWANI DIRECTS YOU AND OTHERS AT

10:27AM   2    THERANOS, "FOR THE AREA INSIDE OF THE NORMANDY LAB THAT IS

10:27AM   3    CORDONED OFF BY THE DIVIDERS -- IF THE INSPECTOR ASKS, WE

10:27AM   4    SHOULD SAY THAT THIS AREA IS FOR FUTURE GROWTH AND IS BEING

10:27AM   5    ORGANIZED (AS IS THE CASE) BUT IS STILL RESTRICTED ONLY TO THE

10:27AM   6    CLIA LAB AND AUTHORIZED TEAM (AS IS THE CASE)."

10:27AM   7         DO YOU SEE THAT?

10:27AM   8    A.   YES, I DO.

10:27AM   9    Q.   AND DURING THAT TIME PERIOD, DO YOU RECALL A PORTION OF

10:27AM  10    THE NORMANDY LAB BEING CORDONED OFF BY DIVIDERS FOR THIS

10:27AM  11    INSPECTION?

10:27AM  12    A.   I RECALL THAT THE BANKS OF EDISONS WERE BEHIND THE

10:27AM  13    DIVIDERS OR PARTITIONS, SIMILAR TO THE KIND YOU SEE IN OPEN

10:27AM  14    OFFICE SPACE WHERE YOU HAVE WALLS ON STANDS THAT WOULD SEPARATE

10:28AM  15    ONE OFFICE FROM ANOTHER.

10:28AM  16         I DON'T REMEMBER AT THIS SPECIFIC TIME WHAT NORMANDY

10:28AM  17    LOOKED LIKE.

10:28AM  18    Q.   LET ME ASK THEN, BASED ON YOUR PREVIOUS EXPERIENCE AS A

10:28AM  19    LAB DIRECTOR, WAS IT NORMAL OR UNUSUAL TO RECEIVE THIS KIND OF

10:28AM  20    DIRECTION FROM MANAGEMENT ABOUT HOW TO RESPOND TO INSPECTOR

10:28AM  21    QUESTIONS?

10:28AM  22    A.   SITTING HERE TODAY, I FEEL THAT IT IS INAPPROPRIATE.

10:28AM  23    Q.   DID YOU HAVE THAT REACTION AT THE TIME?

10:28AM  24    A.   I WAS UNCOMFORTABLE WITH THE DIRECTION THAT MR. BALWANI

10:28AM  25    WAS GIVING.

10:28AM   1    Q.   OKAY.  WE CAN SET THAT ASIDE.

10:28AM   2         I'D LIKE TO TALK TO YOU NEXT ABOUT THE VALIDATION WORK

10:28AM   3    THAT YOU WITNESSED AND WERE INVOLVED WITH AT THERANOS.

10:28AM   4    A.   YES.

10:28AM   5    Q.   I WANT TO MAKE SURE THAT WE'RE CLEAR ON THE RELATIONSHIP

10:28AM   6    BETWEEN VALIDATION AND ONGOING QUALITY EVALUATION STEPS.

10:29AM   7    A.   YES.

10:29AM   8    Q.   FIRST OF ALL, CAN YOU EXPLAIN THE DIFFERENCE BETWEEN THOSE

10:29AM   9    TWO?

10:29AM  10    A.   VALIDATION IS A SERIES OF DATA GATHERING EXERCISES --

10:29AM  11    THAT'S A LITTLE VERBOSE.  I APOLOGIZE.  IT'S A SERIES OF

10:29AM  12    EXPERIMENTS BASICALLY THAT THE R&D FOLKS DO FOLLOWING A STRICT

10:29AM  13    PLAN.

10:29AM  14         WHEN THEY DRAW UP THE PLAN, THEY REFERENCE CLIA LAW IN

10:29AM  15    TERMS OF WHAT NEEDS TO BE PROVEN, AND THEY ALSO -- WE ALSO

10:29AM  16    REFERENCED GUIDANCE DOCUMENTS.

10:29AM  17         THAT VALIDATION IS PERFORMED IN R&D AND THE DATA IS

10:29AM  18    RECORDED.  THE PERFORMANCE CHARACTERISTICS OF THE TEST ARE

10:29AM  19    PROVEN, AND THEN THE LABORATORY DIRECTOR MAKES A DECISION ABOUT

10:29AM  20    WHETHER THAT TEST IS APPROPRIATE FOR PATIENT CARE.

10:29AM  21    Q.   SO YOU JUST DESCRIBED THE VALIDATION PROCESS THAT OCCURS

10:29AM  22    BEFORE AN ASSAY IS USED FOR PATIENT TESTING; IS THAT RIGHT?

10:29AM  23    A.   YES.

10:29AM  24    Q.   AND HOW IS THAT DIFFERENT FROM WHAT HAPPENS AFTER A TEST

10:30AM  25    STARTS BEING USED ON PATIENTS?

| | | |
|---|---|---|
| 10:30AM | 1 | A.   THE QUALITY CONTROL DOESN'T STOP AFTER THE VALIDATION IS |
| 10:30AM | 2 | COMPLETE. |
| 10:30AM | 3 | AS MENTIONED, THERE'S DAILY OR PER SHIFT QC THAT NEEDS TO |
| 10:30AM | 4 | BE RUN BEFORE YOU COULD RUN PATIENT SAMPLES. |
| 10:30AM | 5 | THERE IS LONGITUDINAL QC, LEVEY-JENNINGS.  THERE IS |
| 10:30AM | 6 | INSTRUMENT MAINTENANCE.  THERE ARE A NUMBER OF THINGS THAT HAVE |
| 10:30AM | 7 | TO BE DONE TO ENSURE QUALITY AFTER VALIDATION IS COMPLETE. |
| 10:30AM | 8 | Q.   AND YOU TESTIFIED DURING CROSS-EXAMINATION ABOUT CHANGES |
| 10:30AM | 9 | THAT YOU WOULD SOMETIMES SEE MADE TO THERANOS ASSAYS AFTER |
| 10:30AM | 10 | VALIDATION. |
| 10:30AM | 11 | DO YOU RECALL THAT? |
| 10:30AM | 12 | A.   YES. |
| 10:30AM | 13 | Q.   AND CAN YOU EXPLAIN WHAT YOU WERE REFERRING TO THERE? |
| 10:30AM | 14 | A.   BECAUSE OF THE PROBLEMS WITH THE THERANOS TESTS, R&D WAS |
| 10:30AM | 15 | CONSTANTLY MAKING CHANGES TO THE INSTRUMENTATION, THE |
| 10:31AM | 16 | CHEMISTRY, THE SOFTWARE OF THE INSTRUMENTS. |
| 10:31AM | 17 | WHENEVER YOU HAVE ANY ONE OF THOSE CHANGES, YOU HAVE TO |
| 10:31AM | 18 | REVALIDATE THE TESTS BECAUSE IT'S A BRAND NEW TEST. |
| 10:31AM | 19 | Q.   AND IS THAT SOMETHING THAT YOU SAW HAPPEN FREQUENTLY AT |
| 10:31AM | 20 | THERANOS? |
| 10:31AM | 21 | A.   YES. |
| 10:31AM | 22 | Q.   THAT REVALIDATION WORK AND THOSE CHANGES TO THE ASSAYS, |
| 10:31AM | 23 | DID THAT CREATE ANY CHALLENGES FOR YOU IN YOUR ROLE TRYING TO |
| 10:31AM | 24 | ENSURE ACCURACY? |
| 10:31AM | 25 | A.   THERE WAS NO TRANSPARENCY REGARDING WHAT VERSION OF THE |

ER-2757

ROSENDORFF REDIRECT BY MR. BOSTIC                                    3754

10:31AM   1    TEST WAS BEING RUN, WHAT CHANGES HAD BEEN MADE, AND IT WAS

10:31AM   2    ESSENTIALLY IMPOSSIBLE FOR ME TO KEEP UP AND TO REVALIDATE

10:31AM   3    EVERY NEW TWEAK ON THE TEST.

10:31AM   4    Q.   ON THAT SAME TOPIC OF ASSAY VALIDATION, YOU'VE ALSO SEEN

10:31AM   5    SOME EXAMPLES OF ASSAY DEVELOPMENT REPORTS.

10:31AM   6         DO YOU RECALL THAT?

10:31AM   7    A.   YES.

10:31AM   8    Q.   IS AN ASSAY DEVELOPMENT REPORT SUFFICIENT FOR AN ASSAY TO

10:32AM   9    BE APPROVED AND USED ON PATIENTS?

10:32AM  10    A.   NO.  I'M NOT EVEN SURE WHAT COMPONENTS WENT INTO THE ASSAY

10:32AM  11    DEVELOPMENT REPORT.

10:32AM  12         I MEAN, THE ANTIBODIES, THE CHEMISTRIES, THE METHODS MAY

10:32AM  13    HAVE BEEN COMPLETELY DIFFERENT, SO I'M JUST NOT SURE WHAT THE

10:32AM  14    RELEVANCE OF THE REPORT IS TO THE ACTUAL VALIDATION.

10:32AM  15    Q.   SO AS A LAB DIRECTOR, IF YOU'RE TRYING TO ENSURE THAT THE

10:32AM  16    TEST THAT YOU'RE OFFERING IS ACCURATE, DO YOU LOOK BACK AT THE

10:32AM  17    ASSAY DEVELOPMENT REPORT FOR THAT SPECIFICALLY?

10:32AM  18    A.   NO, SIR.

10:32AM  19    Q.   WHAT DOCUMENT DO YOU RELY UPON FOR THAT?

10:32AM  20    A.   THE VALIDATION REPORT.

10:32AM  21    Q.   WHEN IT CAME TO THE THERANOS ASSAYS AND THEIR VALIDATION,

10:32AM  22    YOU TESTIFIED THAT YOU SIGNED MANY VALIDATION REPORTS FOR THOSE

10:32AM  23    ASSAYS; CORRECT?

10:32AM  24    A.   YES, I DID.

10:33AM  25    Q.   AND WHEN YOU SIGNED THEM, YOU WERE SATISFIED THAT THOSE

ER-2758

ROSENDORFF REDIRECT BY MR. BOSTIC                    3755

10:33AM  1    WERE SUFFICIENT FOR PATIENT USE?

10:33AM  2    A.   THOSE REPORTS ARE RAN UNDER IDEAL CONDITIONS BY R&D, AND I

10:33AM  3    RELIED ON THOSE FOLKS TO PRESENT ACCURATE DATA, IN OTHER WORDS,

10:33AM  4    DATA THAT REFLECTED WHAT -- THE DATA THAT THEY'RE ACTUALLY

10:33AM  5    GETTING WHEN THEY'RE RUNNING THE VALIDATION.

10:33AM  6         SO BASED ON ALL OF THAT, YES, I DIDN'T HAVE ANY GROUNDS TO

10:33AM  7    REJECT THE VALIDATION, YES.

10:33AM  8    Q.   AND BASED ON THE DATA IN THE VALIDATION REPORTS, DID THE

10:33AM  9    ASSAYS MEET THE STANDARDS IN YOUR VIEW?

10:33AM  10   A.   YES, THEY DID.

10:33AM  11   Q.   AND ONCE THE ASSAYS STARTED BEING USED ON PATIENTS, DID

10:33AM  12   THEY CONTINUE TO MEET THE APPLICABLE STANDARDS IN YOUR VIEW AS

10:33AM  13   LAB DIRECTOR?

10:33AM  14   A.   NO, THEY DID NOT.

10:33AM  15   Q.   YOU TESTIFIED PREVIOUSLY THAT -- SO I WANT TO TALK MORE

10:33AM  16   ABOUT THE DISCONNECT BETWEEN WHAT YOU SAW IN THE VALIDATION

10:33AM  17   REPORTS VERSUS WHAT YOU SAW IN THE PERFORMANCE OF THE TESTS.

10:34AM  18        YOU TESTIFIED EARLIER THAT IN YOUR VIEW THE VALIDATION

10:34AM  19   PHASE OF THINGS AT THERANOS WAS RUSHED; IS THAT CORRECT?

10:34AM  20   A.   YES.

10:34AM  21   Q.   AND WHAT MAKES YOU SAY THAT, OR WHAT MADE YOU FEEL THAT

10:34AM  22   WAY?

10:34AM  23   A.   THE APPROACH OF DILUTING BLOOD AND RUNNING THEM ON SIEMENS

10:34AM  24   WAS DECIDED ON I BELIEVE ONLY A MONTH OR TWO BEFORE THE GO LIVE

10:34AM  25   DATE, AND THERE WERE JUST DOZENS AND DOZENS OF TESTS THAT WE

ER-2759

| | | |
|---|---|---|
| 10:34AM | 1 | WERE REQUIRED TO VALIDATE, AND WE WERE WORKING 24/7 RUNNING |
| 10:34AM | 2 | THESE SIEMENS INSTRUMENTS DAY AND NIGHT, BLURRY EYED TECHS, AND |
| 10:34AM | 3 | I WAS GETTING A CONSTANT STREAM OF DATA AND REPORTS TO REVIEW. |
| 10:34AM | 4 | AND THERE WAS A CLEAR EXPECTATION THAT THIS WAS GOING TO |
| 10:34AM | 5 | GET DONE. |
| 10:34AM | 6 | Q.   AND WHERE WAS THAT EXPECTATION COMING FROM? |
| 10:35AM | 7 | A.   FROM MR. BALWANI AND MS. HOLMES. |
| 10:35AM | 8 | Q.   I'D LIKE TO SHOW YOU EXHIBIT 7314. |
| 10:35AM | 9 | THAT'S PREVIOUSLY ADMITTED, YOUR HONOR.  MAY WE DISPLAY? |
| 10:35AM | 10 | THE COURT:  YES. |
| 10:35AM | 11 | BY MR. BOSTIC: |
| 10:35AM | 12 | Q.   DR. ROSENDORFF, DO YOU REMEMBER REVIEWING THIS DOCUMENT |
| 10:35AM | 13 | DURING CROSS-EXAMINATION? |
| 10:35AM | 14 | A.   YES.  THIS IS THE ONE FROM MR. LUCAS. |
| 10:35AM | 15 | Q.   ALL RIGHT. |
| 10:35AM | 16 | A.   DR. YOUNG.  I'M SORRY.  I APOLOGIZE. |
| 10:35AM | 17 | Q.   AND DO YOU SEE THAT THIS IS FROM MID TO LATE AUGUST 2013, |
| 10:35AM | 18 | A FEW WEEKS BEFORE THE LAUNCH DATE? |
| 10:35AM | 19 | A.   YES. |
| 10:35AM | 20 | Q.   IF I COULD DRAW YOUR ATTENTION TO THE MIDDLE OF THE PAGE |
| 10:35AM | 21 | WHERE IT TALKS ABOUT ELISA ASSAYS. |
| 10:35AM | 22 | DO YOU SEE THAT IN DISCUSSING THE TEST MENU FOR LAUNCH, |
| 10:35AM | 23 | DR. YOUNG REFERENCES 92 ELISA OR IMMUNOASSAYS? |
| 10:35AM | 24 | A.   YES. |
| 10:35AM | 25 | Q.   AND DO YOU SEE THAT HE SAYS 62 ASSAYS ON EDISON AND 30 ON |

10:36AM   1    ADVIA WITH SIEMENS CHEMISTRY?

10:36AM   2    A.   YES.

10:36AM   3    Q.   DID THERANOS EVER VALIDATE 62 ASSAYS FOR USE ON THE

10:36AM   4    EDISON?

10:36AM   5    A.   NO.

10:36AM   6    Q.   DO YOU REMEMBER WHAT THE ACTUAL NUMBER WAS IN YOUR

10:36AM   7    RECOLLECTION?

10:36AM   8    A.   WHEN I LEFT, I THINK THERE WERE ABOUT 11 OR 12, BUT --

10:36AM   9    Q.   AND THAT'S EVEN AT THE TIME THAT YOU LEFT IN NOVEMBER OF

10:36AM  10    THE FOLLOWING YEAR?

10:36AM  11    A.   YES.

10:36AM  12    Q.   LET'S GO DOWN TO THE BOTTOM OF THIS PAGE, AND THERE'S A

10:36AM  13    PARAGRAPH BEGINNING "ONE MAJOR EFFORT INCLUDES."

10:36AM  14         DO YOU SEE HERE DR. YOUNG WRITES TO MR. BALWANI AND

10:36AM  15    MS. HOLMES, "ONE MAJOR EFFORT INCLUDES VALIDATING ALL 64

10:36AM  16    ELISA'S ON EDISON DEVICES."

10:36AM  17         DO YOU SEE THAT?

10:36AM  18    A.   OH, ARE WE STILL ON -- I'M SORRY, MY VOICE IS LOUD ALL OF

10:36AM  19    A SUDDEN.

10:36AM  20         ARE WE STILL ON MR. YOUNG'S EMAIL?

10:37AM  21    Q.   YES.  DO YOU SEE THIS IS THE SAME EXHIBIT AND EMAIL?

10:37AM  22    A.   YES.

10:37AM  23    Q.   AND HE WRITES, "ONE MAJOR EFFORT INCLUDES VALIDATING ALL

10:37AM  24    64 ELISA'S ON EDISON DEVICES."

10:37AM  25    A.   YES.

10:37AM  1    Q.   AND SO AT THIS TIME, A COUPLE WEEKS BEFORE THE LAUNCH, IS

10:37AM  2    IT YOUR RECOLLECTION THAT NO ASSAYS WERE VALIDATED ON THE

10:37AM  3    EDISON ITSELF?

10:37AM  4    A.   I DON'T RECALL SPECIFICALLY.  IF ANY WERE, IT WOULD HAVE

10:37AM  5    BEEN ONE OR TWO.

10:37AM  6    Q.   OKAY.  WE CAN SET THAT ASIDE.

10:37AM  7         DO YOU REMEMBER DISCUSSING -- SO BY THE WAY, THE EMAIL

10:37AM  8    THAT WE JUST LOOKED AT ALSO REFERENCES THIRD PARTY DEVICES.

10:37AM  9         DO YOU REMEMBER THAT?

10:37AM  10   A.   YES.

10:37AM  11   Q.   AND ON CROSS-EXAMINATION, MR. COOPERSMITH ASKED YOU ABOUT

10:37AM  12   THE THROUGHPUT OF THOSE THIRD PARTY DEVICES.

10:37AM  13        DO YOU REMEMBER THAT?

10:37AM  14   A.   YES, YES.

10:37AM  15   Q.   AND FROM YOUR TIME AT THERANOS OR WORKING AT PREVIOUS

10:38AM  16   LABS, CAN YOU TELL US, FOR EXAMPLE, ABOUT HOW MANY ASSAYS THE

10:38AM  17   SIEMENS ADVIA WAS ABLE TO RUN IN AN HOUR OR IN A DAY, OR CAN

10:38AM  18   YOU TELL US HOW MUCH HIGHER ITS THROUGHPUT WAS COMPARED TO THE

10:38AM  19   EDISON?

10:38AM  20   A.   SO IT'S THE ADVIA 1800, AND THE 1800 REFERS TO HOW MANY

10:38AM  21   SAMPLES CAN BE RUN.

10:38AM  22        I DON'T REMEMBER WHAT THE TIME PERIOD IS FOR THOSE 1800,

10:38AM  23   BUT THE SIEMENS -- SO YOU'RE ASKING ABOUT SIEMENS VERSUS

10:38AM  24   MODIFIED SIEMENS?

10:38AM  25   Q.   I'M ACTUALLY -- WELL, YOU CAN GIVE ME A DIFFERENT ANSWER

10:38AM  1    IF IT'S DIFFERENT FOR BOTH.

10:38AM  2         BUT I'M ASKING ABOUT THE DEVICE IN GENERAL.

10:38AM  3    A.   THE SIEMENS INSTRUMENTS HAD MUCH HIGHER THROUGHPUT AND

10:38AM  4    MUCH HIGHER RELIABILITY.

10:38AM  5    Q.   DO YOU HAVE EXHIBIT 204 IN ONE OF THE DEFENSE BINDERS?  IT

10:39AM  6    MIGHT BE IN VOLUME 1.

10:39AM  7    A.   YES.

10:39AM  8    Q.   AND DO YOU RECALL THAT THIS WAS THE OPERATOR'S MANUAL FOR

10:39AM  9    THE SIEMENS ADVIA 1800?

10:39AM 10    A.   YES.

10:39AM 11    Q.   CAN I ASK YOU TO LOOK AT PAGE 13 OF THAT DOCUMENT?

10:39AM 12    A.   YES.

10:39AM 13    Q.   AND AT THE TOP THERE'S A SECTION, SYSTEM OVERVIEW.

10:39AM 14         DO YOU SEE THAT?

10:39AM 15    A.   YES, I DO.

10:39AM 16    Q.   AND DOES THAT REFRESH YOUR RECOLLECTION AS TO THE

10:39AM 17    THROUGHPUT LEVEL OF THE SIEMENS ADVIA 1800?

10:39AM 18    A.   YES.  IT'S 1800 TESTS PER HOUR.

10:39AM 19    Q.   AND HOW MANY TESTS, APPROXIMATELY, WAS THE EDISON ABLE TO

10:39AM 20    RUN IN ONE HOUR?

10:39AM 21    A.   ONE IF YOU WERE LUCKY.

10:39AM 22    Q.   I'D LIKE TO SHOW YOU EXHIBIT 9921, WHICH I BELIEVE WAS

10:40AM 23    ALREADY ADMITTED.

10:40AM 24         MAY WE DISPLAY, YOUR HONOR?

10:40AM 25              THE COURT:  YES.

ROSENDORFF REDIRECT BY MR. BOSTIC                    3760

BY MR. BOSTIC:

Q.   DR. ROSENDORFF, DO YOU REMEMBER REVIEWING THIS DOCUMENT

WITH MR. COOPERSMITH?

A.   YES, I DO.

Q.   OKAY.  AND THIS DOCUMENT HAS AN EFFECTIVE DATE IN NOVEMBER

OF 2011.

     DO YOU SEE THAT?

A.   YES, I DO.

Q.   IS THAT ALMOST TWO YEARS BEFORE THERANOS LAUNCHED ITS

TESTING SERVICES?

A.   YES.

Q.   AND IF WE COULD LOOK AT THE TOP OF THIS PAGE UNDER TESTING

SYSTEMS AND ZOOM IN ON WHAT IT SAYS THERE.

     DO YOU SEE ABOUT HALFWAY OR TWO-THIRDS OF THE WAY DOWN

THAT PARAGRAPH IT SAYS, "THE SYSTEM ENABLES RESULTS IN UNDER AN

HOUR WITH PRECISION AND ACCURACY EQUIVALENT TO TRADITIONAL

CLINICAL LABORATORY ANALYZERS"?

A.   YES.

Q.   DR. ROSENDORFF, AFTER WORKING WITH THOSE DEVICES AND THOSE

SYSTEMS FOR MORE THAN A YEAR, WAS THAT YOUR EXPERIENCE WITH

THEM?

A.   THIS IS A LIE.

Q.   OKAY.  WE CAN PUT THAT ASIDE.

     SO LOOKING BACK AT THE VALIDATION WORK, LET ME ASK WHETHER

THOSE VALIDATION REPORTS AND THE VALIDATION DATA WAS ON YOUR

ROSENDORFF REDIRECT BY MR. BOSTIC                          3761

10:41AM   1    MIND THROUGHOUT YOUR TIME AT THERANOS WHEN YOU WERE SEEING

10:41AM   2    ISSUES COME UP WITH THE TESTING ACCURACY?

10:41AM   3    A.    YES.

10:41AM   4    Q.    AND HOW DID YOU RECONCILE WHAT YOU HAD SEEN IN VALIDATION

10:41AM   5    WITH WHAT YOU WERE SEEING WITH THE ASSAY'S OVERALL PERFORMANCE?

10:41AM   6    A.    I COULDN'T.  I COULDN'T AT ALL.  IT BOTHERED ME.  IT

10:42AM   7    PUZZLED ME.  I CAME UP WITH THEORIES AS TO WHY THAT WAS

10:42AM   8    HAPPENING.  WAS THE VALIDATION DATA REALLY CORRECT?  HAD THE

10:42AM   9    TEST CHANGED RADICALLY?

10:42AM   10        I SPOKE TO DR. YOUNG ABOUT IT.  HE ALSO WAS BOTHERED BY

10:42AM   11   THE FACT THAT THE TEST RESULTS WERE -- THE RELIABILITY OF THE

10:42AM   12   TESTING WAS NOT MATCHING WHAT WAS IN THE VALIDATION REPORTS.

10:42AM   13   Q.    SEEING THE PROBLEMS THAT YOU SAW WITH TESTING ACCURACY AND

10:42AM   14   RELIABILITY, DID THE VALIDATION REPORTS AND THE VALIDATION DATA

10:42AM   15   PROVIDE YOU ANY COMFORT ON THOSE TOPICS?

10:42AM   16   A.    NO, THEY DIDN'T.

10:42AM   17        AS I MENTIONED, IT WAS QUESTIONABLE WHETHER THOSE RESULTS

10:42AM   18   WERE EVEN RELEVANT TO THE TESTS THAT WERE RUNNING AT THE TIME.

10:42AM   19   Q.    DO YOU RECALL DURING CROSS-EXAMINATION SEEING A COUPLE

10:42AM   20   EXAMPLES OF EMAILS THAT YOU SENT TO MR. BALWANI OR OTHERS WHERE

10:42AM   21   YOU WERE POSITIVE OR EXCITED ABOUT DEVELOPMENTS AT THERANOS?

10:42AM   22   A.    YES.  THERE WERE TIMES WHERE I WANTED TO CONVEY ENTHUSIASM

10:43AM   23   AND TO BE ENCOURAGING TO MY COWORKERS.

10:43AM   24   Q.    WERE THOSE POSITIVE FEELINGS GENUINE THAT YOU CONVEYED IN

10:43AM   25   THE EMAILS?

10:43AM 1    A.   YES.

10:43AM 2    Q.   DID THAT POSITIVE FEELING LAST THROUGHOUT YOUR TIME AT THE

10:43AM 3    COMPANY?

10:43AM 4    A.   NO, IT DID NOT.

10:43AM 5    Q.   IN SPEAKING TO MR. BALWANI, DID YOU LIMIT YOURSELF TO

10:43AM 6    EXPRESSING POSITIVE VIEWS ONLY, OR DID YOU ALSO MAKE HIM AWARE

10:43AM 7    OF YOUR CONCERNS ABOUT THE PROBLEMS THAT YOU WERE SEEING?

10:43AM 8    A.   MOST OF MY COMMUNICATION WITH MR. BALWANI WAS ABOUT

10:43AM 9    PROBLEMS AND CONCERNS.

10:43AM 10   Q.   DO YOU RECALL THAT ON CROSS-EXAMINATION YOU WERE SHOWN A

10:43AM 11   LAB DIRECTOR ATTESTATION THAT YOU SIGNED ACKNOWLEDGING YOUR

10:43AM 12   RESPONSIBILITY FOR THE ACCURACY AND RELIABILITY OF THERANOS

10:43AM 13   TESTS?

10:43AM 14   A.   YES, I RECALL.

10:43AM 15   Q.   AT THERANOS, WERE YOU EMPOWERED TO DO WHAT NEEDED TO BE

10:43AM 16   DONE TO ENSURE TESTING ACCURACY AND RELIABILITY?

10:44AM 17   A.   NO, I WAS NOT.

10:44AM 18   Q.   WHAT MAKES YOU SAY THAT?

10:44AM 19   A.   I WAS LEFT OUT OF EMAILS.  I ESSENTIALLY WAS LIED TO.  I

10:44AM 20   KNOW THAT'S A STRONG WORD.

10:44AM 21       I WAS COUNTERMANDED.  CHAIN OF COMMAND WAS NOT OBEYED,

10:44AM 22   ET CETERA.

10:44AM 23   Q.   AND AS LAB DIRECTOR AT THERANOS, WHO WAS IT AT THE COMPANY

10:44AM 24   WHO DECIDED HOW MUCH POWER AND AUTHORITY YOU HAD?

10:44AM 25   A.   MR. BALWANI AND MS. HOLMES.

10:44AM 1     Q.   DURING CROSS-EXAMINATION YOU WERE ASKED ABOUT WHETHER

10:44AM 2     THOSE TWO INDIVIDUALS, MR. BALWANI OR MS. HOLMES, HAD EVER

10:44AM 3     ORDERED YOU TO SEND OUT A RESULT THAT YOU KNEW TO BE

10:44AM 4     INACCURATE.

10:44AM 5          DO YOU REMEMBER THAT QUESTION?

10:44AM 6     A.   YES, I DO.

10:44AM 7     Q.   FIRST OF ALL, WHEN A RESULT IS ABOUT TO BE SENT OUT, IS IT

10:44AM 8     ALWAYS POSSIBLE TO KNOW WHETHER THAT RESULT IS ACCURATE OR

10:45AM 9     INACCURATE?

10:45AM 10    A.   MOST OF THE TIME IT'S NOT POSSIBLE TO KNOW.  IN FACT,

10:45AM 11    ASSUMING QC PASSES, IT'S IMPOSSIBLE TO KNOW.

10:45AM 12    Q.   SO LET ME ASK YOU A DIFFERENT VERSION OF THAT QUESTION,

10:45AM 13    WHICH IS, AT THERANOS, WERE YOU REQUIRED TO RELY ON A TESTING

10:45AM 14    SYSTEM THAT YOU BELIEVED WAS NOT SUFFICIENTLY ACCURATE OR

10:45AM 15    RELIABLE?

10:45AM 16              MR. COOPERSMITH:  OBJECTION.  LEADING.

10:45AM 17              THE COURT:  SUSTAINED.

10:45AM 18    BY MR. BOSTIC:

10:45AM 19    Q.   LET ME ASK IT A DIFFERENT WAY.

10:45AM 20         DR. ROSENDORFF, BY THE TIME YOU LEFT THE COMPANY, DID YOU

10:45AM 21    HAVE FAITH IN THE ACCURACY AND RELIABILITY OF THE THERANOS

10:45AM 22    TESTING SYSTEMS?

10:45AM 23    A.   I DID NOT.

10:45AM 24    Q.   WAS THAT PART OF THE REASON WHY YOU LEFT THE COMPANY?

10:45AM 25    A.   THAT WAS THE MAIN REASON.

10:45AM  1    Q.   AND WHO WAS IT AT THE COMPANY WHO MADE THE DECISIONS ABOUT

10:45AM  2    WHAT SYSTEMS WOULD BE USED FOR PATIENT TESTING?

10:45AM  3    A.   MR. BALWANI.

10:45AM  4    Q.   BEFORE -- OR BESIDES LEAVING THE COMPANY, AND BESIDES YOUR

10:46AM  5    TESTIMONY IN THIS CASE, HAVE YOU TAKEN ANY OTHER STEPS IN

10:46AM  6    RESPONSE TO THE PROBLEMS THAT YOU SAW AT THERANOS?

10:46AM  7    A.   SORRY.  SO AFTER I LEFT THE COMPANY?

10:46AM  8              MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  RELEVANCE.

10:46AM  9              THE COURT:  WAS THAT THE QUESTION, AFTER HE LEFT THE

10:46AM 10    COMPANY?

10:46AM 11              MR. BOSTIC:  YES, YOUR HONOR.

10:46AM 12              THE WITNESS:  YEAH --

10:46AM 13              THE COURT:  EXCUSE ME.

10:46AM 14              THE WITNESS:  I'M SORRY.

10:46AM 15              THE COURT:  I'M NOT CERTAIN OF THE RELEVANCE OF

10:46AM 16    THAT.  I'LL SUSTAIN IT WITHOUT A FOUNDATION.

10:46AM 17              MR. BOSTIC:  SO, YOUR HONOR, I THINK THIS IS

10:46AM 18    RELEVANT TO THE IMPORTANCE THAT THIS WITNESS ASCRIBES TO THE

10:46AM 19    ISSUES THAT HE SAW.

10:46AM 20        I CAN ASK IT A DIFFERENT WAY TO TRY TO GET IT BACK.

10:46AM 21              THE COURT:  WHY DON'T YOU TRY TO DO THAT.  THANK

10:46AM 22    YOU.

10:46AM 23    BY MR. BOSTIC:

10:46AM 24    Q.   DR. ROSENDORFF, BASED ON THE PROBLEMS THAT YOU SAW AT

10:46AM 25    THERANOS, WERE YOU SATISFIED SIMPLY WITH SEPARATING YOURSELF

10:46AM  1    FROM THE COMPANY?

10:47AM  2    A.   NO.  MY CONSCIENCE WAS -- I WAS REALLY BOTHERED BY WHAT I

10:47AM  3    HAD EXPERIENCED AT THE COMPANY.

10:47AM  4    Q.   AND DID THAT FEELING AND WHAT YOU HAD SEEN AT THE COMPANY

10:47AM  5    CAUSE YOU TO TAKE ANY ADDITIONAL STEPS?

10:47AM  6            MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  SAME

10:47AM  7    QUESTION.  RELEVANCE.

10:47AM  8            THE COURT:  SUSTAINED.

10:47AM  9    BY MR. BOSTIC:

10:47AM 10    Q.   DR. ROSENDORFF, IN LEAVING THE COMPANY, OR WHEN YOU LEFT

10:47AM 11    THE COMPANY, DID MR. BALWANI ASK YOU ANY QUESTIONS ABOUT THE

10:47AM 12    VALIDATION WORK THAT HAD PREVIOUSLY BEEN PERFORMED?

10:47AM 13    A.   DURING MY TENURE OR AFTER I LEFT?  I'M SORRY.

10:47AM 14    Q.   AS YOU WERE DECIDING TO LEAVE THE COMPANY.

10:47AM 15    A.   AH.

10:47AM 16        NO.  I SAID TO MR. BALWANI IN THE LAST DAY THAT IT WASN'T

10:47AM 17    WORTH MY REPUTATION TO STAY AT THE COMPANY.

10:47AM 18            MR. BOSTIC:  ONE MOMENT, YOUR HONOR.

10:47AM 19        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

10:48AM 20            MR. BOSTIC:  NO FURTHER QUESTIONS AT THIS TIME.

10:48AM 21    THANK YOU.

10:48AM 22            THE COURT:  RECROSS.

10:48AM 23        FOLKS, WHY DON'T YOU STAND UP FOR A MOMENT WHILE

10:48AM 24    MR. COOPERSMITH COMES TO THE LECTERN.

10:49AM 25        (STRETCHING.)

**RECROSS-EXAMINATION**

10:49AM 1

10:49AM 2    BY MR. COOPERSMITH:

10:49AM 3    Q.   DR. ROSENDORFF, WE MIGHT BE ON THE HOME STRETCH HERE.

10:49AM 4         SO DURING REDIRECT, DO YOU REMEMBER MR. BOSTIC ASKED YOU

10:49AM 5    SOME ADDITIONAL QUESTIONS ABOUT HCG?

10:49AM 6    A.   YES.

10:49AM 7    Q.   AND HE SHOWED YOU SOME EMAILS.  IN FACT, HE SHOWED YOU

10:49AM 8    EXHIBIT 4147, WHICH IS THE MAY 30TH, 2014, EMAIL WHERE YOU

10:49AM 9    DIRECTED THAT HCG TESTING BE STOPPED?

10:49AM 10   A.   YES.

10:49AM 11   Q.   AND YOU DID THAT BECAUSE YOU HAD QUESTIONS ABOUT THAT

10:49AM 12   ASSAY AT THAT TIME; CORRECT?

10:49AM 13   A.   YES.

10:49AM 14   Q.   AND YOU DECIDED TO SEND AN EMAIL ORDERING THAT THE EDISON

10:49AM 15   TESTING BE STOPPED; RIGHT?

10:49AM 16   A.   YES, YES.

10:49AM 17   Q.   OKAY.  AND THEN YOU -- MR. BOSTIC SHOWED YOU AN EXHIBIT, I

10:50AM 18   BELIEVE IT WAS EXHIBIT 5418, WHERE THERE WAS AN ISSUE ABOUT

10:50AM 19   WHAT NOTATION WE'VE MADE IN LIS.

10:50AM 20   A.   I'M DRAWING A BLANK ON THAT ONE.  SORRY.

10:50AM 21   Q.   LET'S TAKE A LOOK AT IT SO IT'S EASIER.

10:50AM 22   A.   OKAY.

10:50AM 23   Q.   SO THIS IS 5418.

10:50AM 24        DO YOU SEE THAT IN FRONT OF YOU?

10:50AM 25   A.   YES.

10:50AM 1    Q.   AND I MIGHT HAVE BEEN THINKING ABOUT A DIFFERENT EXHIBIT.

10:50AM 2         NO, THIS IS THE ONE?

10:50AM 3         SO DO YOU SEE THAT MS. ALAMDAR SAYS, THIS IS ON JUNE 4TH,

10:50AM 4    2014, AND SHE SAYS, "HI ADAM,

10:50AM 5         "I SEE SOME RESULTS IN LIS FOR HCG (FROM EDISON)" AND THEN

10:50AM 6    THERE'S A PATIENT NAME THAT IS REDACTED.  AND IT SAYS, "THE

10:50AM 7    RESULT IS OORL; CAN WE RELEASE THIS PATIENT OR WE ONLY RELEASE

10:51AM 8    HCG FROM IMMULITE?"

10:51AM 9         DO YOU SEE THAT?

10:51AM 10   A.   YES.

10:51AM 11   Q.   AND THEN THE IMMULITE IS THE PREDICATE MACHINE?

10:51AM 12   A.   YES.

10:51AM 13   Q.   AND THEN WE ZOOM OUT AGAIN.

10:51AM 14        AND THEN AFTER MR. BALWANI FORWARDED THAT TO DANIEL YOUNG

10:51AM 15   AND DR. PANGARKAR, DO YOU SEE THERE'S AN EMAIL FROM

10:51AM 16   DANIEL YOUNG?

10:51AM 17   A.   YES.

10:51AM 18   Q.   AND HE SAYS, "BY THE WAY, WE NEVER SWITCHED TO IMMULITE IN

10:51AM 19   LIS -- IT WAS NOT CLEAR TO ME THAT THIS DECISION WAS MADE."

10:51AM 20        RIGHT?  AND THEN HE GOES ON.

10:51AM 21        DO YOU SEE THAT?

10:51AM 22   A.   YES.

10:51AM 23   Q.   AND WHETHER OR NOT THEY SWITCHED TO IMMULITE IN LIS, THIS

10:51AM 24   EMAIL BY ITSELF DOESN'T TELL US WHETHER RESULTS WERE BEING

10:51AM 25   RELEASED TO PATIENTS ON JUNE 4TH; CORRECT?

10:51AM   1      A.   SO HODA'S EMAIL SAYING, HEY, YOU KNOW, I SEE SOME RESULTS

10:51AM   2      FOR THE EDISON FOR HCG, I HAVE NO IDEA WHAT TIME PERIOD THOSE

10:51AM   3      RESULTS REFER TO.

10:51AM   4      Q.   RIGHT.

10:51AM   5      A.   YEAH.

10:51AM   6      Q.   THANK YOU.

10:51AM   7      A.   YES.

10:51AM   8      Q.   AND MY QUESTION IS, JUST TO MAKE SURE IT GETS ANSWERED --

10:52AM   9      A.   YES.

10:52AM  10      Q.   -- IN THIS EMAIL THAT WE'RE LOOKING AT NOW, AND IF WE JUST

10:52AM  11      ZOOM IN ON IT, IT'S THIS JUNE 4TH EMAIL AT 5:12 P.M., THIS

10:52AM  12      ISSUE ABOUT SWITCHING TO THE IMMULITE IN THE LABORATORY

10:52AM  13      INFORMATION SYSTEM, THE LIS --

10:52AM  14      A.   YES.

10:52AM  15      Q.   -- WE CAN'T TELL FROM THIS ONE EMAIL WHETHER THE RESULTS

10:52AM  16      WERE BEING RELEASED TO PATIENTS ON JUNE 4TH; CORRECT?

10:52AM  17      A.   CORRECT.

10:52AM  18      Q.   OKAY.  AND IF WE WANTED TO KNOW MORE ABOUT THAT, WE WOULD

10:52AM  19      HAVE TO LOOK AT LIS; RIGHT?

10:52AM  20      A.   YES, ABSOLUTELY.

10:52AM  21      Q.   OKAY.  DR. ROSENDORFF, YOU WERE THEN SHOWN ANOTHER EMAIL,

10:52AM  22      WHICH IS EXHIBIT 13875.

10:52AM  23           CAN WE SEE THAT?

10:52AM  24           AND THIS EMAIL, IF YOU LOOK AT THE VERY BOTTOM ONE, YOU'RE

10:52AM  25      GIVING SOME ADDITIONAL INSTRUCTIONS ON JUNE 4TH, 2014?

10:52AM 1     A.   YES.

10:52AM 2     Q.   AND THIS WAS JUST A FEW DAYS AFTER YOUR MAY 30TH DIRECTION

10:53AM 3     TO STOP EDISON TESTING?

10:53AM 4     A.   YES.

10:53AM 5     Q.   AND THEN YOU SAY THAT YOU, CHINMAY -- WHICH IS

10:53AM 6     DR. PANGARKAR; CORRECT?

10:53AM 7     A.   YES.

10:53AM 8     Q.   -- AND DR. YOUNG, WHO IS DANIEL, DISCUSSED THE PLAN FOR

10:53AM 9     HCG.

10:53AM 10         DO YOU SEE THAT?

10:53AM 11    A.   YES.

10:53AM 12    Q.   AND THEN YOU SAY, "GOING FORWARD."

10:53AM 13         DO YOU SEE THAT SECTION?

10:53AM 14    A.   YES.

10:53AM 15    Q.   AND THEN YOU SAY, "CHANGE HCG TO VACUTAINER."

10:53AM 16         RIGHT?

10:53AM 17    A.   YES.

10:53AM 18    Q.   "RUN ON IMMULITE."

10:53AM 19    A.   I MEAN, I HAD ALREADY SAID CHANGE BACK ON MAY 30TH.

10:53AM 20    Q.   RIGHT.  BUT YOU'RE SAYING IT AGAIN?

10:53AM 21    A.   I'M SAYING IT AGAIN, YES.

10:53AM 22    Q.   AND THEN NUMBER 2 SAYS, "HOLD RECURRENT CTN ORDERS FOR HCG

10:53AM 23    AND CALL FOR REDRAW ON VACUTAINER AS NEEDED."

10:53AM 24         RIGHT?

10:53AM 25    A.   YES.

10:53AM   1     Q.   AND SO ANY SAMPLE THAT WAS ALREADY COLLECTED UP TO THAT

10:53AM   2     POINT ON A CTN WOULD BE HELD ACCORDING TO YOUR INSTRUCTIONS;

10:53AM   3     RIGHT?

10:53AM   4     A.   YES.

10:53AM   5     Q.   OKAY.  NOW, LET'S LOOK AT THAT EXHIBIT WE SAW THE OTHER

10:54AM   6     DAY, WHICH IS 20564.

10:54AM   7          AND YOU SEE THIS IS JUST TWO DAYS LATER ON JUNE 6TH?

10:54AM   8     A.   YES.

10:54AM   9     Q.   AND THEN YOU WROTE IN THE MIDDLE EMAIL THERE AT

10:54AM  10     12:37 P.M., "HODA,

10:54AM  11          "CHINMAY WILL BE IMPLEMENTING A SCRIPT SHORTLY TO

10:54AM  12     REQUALIFY VALID VERSUS INVALID HCG VALUES.  STAY TUNED."

10:54AM  13          DO YOU SEE THAT?

10:54AM  14     A.   YES.

10:54AM  15     Q.   AND THEN IF YOU GO UP TO THE TOP THERE'S AN EMAIL THAT

10:54AM  16     SAYS, "WE ARE WORKING ON," AND THEN THERE'S A NUMBER, "AND WILL

10:54AM  17     LET YOU KNOW WHEN IT IS READY."

10:54AM  18          DO YOU SEE THAT?

10:54AM  19     A.   YES.

10:54AM  20     Q.   AND THEN DR. PANGARKAR SENDS YOU AN EMAIL AT THE TOP THERE

10:54AM  21     AT 9:06 P.M., UTC.

10:54AM  22          DO YOU SEE THAT?

10:54AM  23     A.   YES.

10:54AM  24     Q.   AND SO THIS LOOKS LIKE THIS IS AN EMAIL WHERE UTC TIME

10:54AM  25     SHOWS UP IN A THERANOS EMAIL?

10:55AM  1    A.   YES.

10:55AM  2    Q.   SO THAT CAN HAPPEN APPARENTLY?

10:55AM  3    A.   APPARENTLY.

10:55AM  4    Q.   AND THEN DR. PANGARKAR WRITES, "THESE PARTICULAR SAMPLES

10:55AM  5    ARE READY TO BE RELEASED.  THE LATEST RESULTS THAT YOU CAN

10:55AM  6    RELEASE ARE IN."

10:55AM  7         AND IT GIVES AN S DRIVE LOCATION; RIGHT?

10:55AM  8    A.   YES.

10:55AM  9    Q.   AND THAT'S A SHARED DRIVE WHERE PEOPLE CAN ACCESS THAT;

10:55AM  10   RIGHT?

10:55AM  11   A.   YES.

10:55AM  12   Q.   AND LET'S LOOK AT ANOTHER EXHIBIT, WHICH IS 20565, AND

10:55AM  13   THIS IS NOT IN EVIDENCE YET SO JUST LOOK AT IT ON YOUR SCREEN.

10:55AM  14        AND THIS IS AN EMAIL CHAIN BETWEEN YOU AND OTHERS IN THE

10:55AM  15   THERANOS LAB; IS THAT RIGHT?

10:55AM  16   A.   YES.

10:55AM  17   Q.   AND IT'S ON JUNE 10TH, 2014?

10:55AM  18   A.   YES.

10:56AM  19             MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20565.

10:56AM  20             MR. BOSTIC:  NO OBJECTION.

10:56AM  21             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:56AM  22        (DEFENDANT'S EXHIBIT 20565 WAS RECEIVED IN EVIDENCE.)

10:56AM  23   BY MR. COOPERSMITH:

10:56AM  24   Q.   OKAY.  LET'S START FROM THE EARLIEST EMAIL IN TIME SO WE

10:56AM  25   CAN GET ORIENTED.

| | | |
|---|---|---|
| 10:56AM | 1 | DO YOU SEE THERE'S AN EMAIL FROM TINA LIN? |
| 10:56AM | 2 | DO YOU SEE THAT? |
| 10:56AM | 3 | A.   YES. |
| 10:56AM | 4 | Q.   AND SHE WAS ONE OF THE CLS'S IN THE LAB? |
| 10:56AM | 5 | A.   YES.  -- UH, NO.  TINA WAS A MATH MAJOR AT BERKELEY, I |
| 10:56AM | 6 | THINK. |
| 10:56AM | 7 | Q.   OKAY. |
| 10:56AM | 8 | A.   SHE -- |
| 10:56AM | 9 | Q.   OKAY.  BUT SHE WORKED IN THE CLIA LAB? |
| 10:56AM | 10 | A.   SHE WORKED IN NORMANDY. |
| 10:56AM | 11 | Q.   OKAY.  AND WHICH IS PART OF THE CLIA LAB? |
| 10:56AM | 12 | A.   YES. |
| 10:56AM | 13 | Q.   OKAY.  AND MS. LYNN WRITES, "HI CLA'S, |
| 10:56AM | 14 | "CTN FOR NUMBER 89751 WAS CALCULATED TO NOT HAVE ENOUGH |
| 10:56AM | 15 | PLASMA." |
| 10:56AM | 16 | DO YOU SEE THAT EMAIL? |
| 10:56AM | 17 | A.   YES. |
| 10:56AM | 18 | Q.   AND THEN THE CTN REFERS TO THE CAPILLARY TUBE AND |
| 10:56AM | 19 | NANOTAINER; RIGHT? |
| 10:56AM | 20 | A.   YES. |
| 10:56AM | 21 | Q.   AND SO SHE'S REFERRING TO A FINGERSTICK SAMPLE? |
| 10:57AM | 22 | A.   YES. |
| 10:57AM | 23 | Q.   AND THEN IF YOU GO ABOVE THAT -- |
| 10:57AM | 24 | A.   SO THAT SAMPLE WOULD HAVE BEEN RUN OUTSIDE OF SOP. |
| 10:57AM | 25 | Q.   OKAY.  SHE'S JUST TELLING YOU ABOUT A SAMPLE THAT IS ON |

ROSENDORFF RECROSS BY MR. COOPERSMITH                    3773

```
10:57AM  1    FINGERSTICK; RIGHT?

10:57AM  2    A.   YES.

10:57AM  3    Q.   OKAY.  AND THEN ABOVE THAT HODA ALAMDAR WROTE:

10:57AM  4         "HI ADAM,

10:57AM  5         "I BELIEVE I CAN REPORT THIS PATIENT AS GREATER THAN

10:57AM  6    4941."

10:57AM  7         DO YOU SEE THAT?

10:57AM  8    A.   YES.

10:57AM  9    Q.   AND THEN IT GOES ON TO SAY, "LOOKS LIKE THIS PATIENT CAME

10:57AM 10    BACK AGAIN TODAY AND MOST LIKELY HER RESULTS WILL STILL BE

10:57AM 11    GREATER THAN 4941 SINCE SHE MIGHT BE PREGNANT.  SHOULD WE HAVE

10:57AM 12    THE HCG QUANT SAMPLES TO BE COLLECTED VENOUS SO THAT IT THEY

10:57AM 13    CAN BE RUN ON IMMULITE FOR DILUTION."

10:57AM 14         DO YOU SEE THAT?

10:57AM 15    A.   YES.

10:57AM 16    Q.   AND THEN YOU WROTE BACK TO MS. ALAMDAR, RIGHT ABOVE THAT,

10:57AM 17    YOU WROTE, "YES, PLEASE REPORT AS GREATER THAN 4941, IF THAT IS

10:57AM 18    THE LATEST OORH VALUE."

10:57AM 19         DO YOU SEE THAT?

10:57AM 20    A.   YES.

10:57AM 21    Q.   AND SO YOU WERE DIRECTING MS. ALAMDAR TO RELEASE THE

10:58AM 22    RESULTS FOR THAT CTN SAMPLE; CORRECT?

10:58AM 23    A.   YES.

10:58AM 24    Q.   AND THIS IS FOR HCG?

10:58AM 25    A.   YES.
```

ER-2777

10:58AM   1    Q.   OKAY.  AND NOW IF YOU GO TO THE FIRST PAGE OF THE EXHIBIT,

10:58AM   2    GO TO THE VERY TOP.

10:58AM   3         DO YOU SEE MS. ALAMDAR IS TELLING YOU, "HI ADAM,

10:58AM   4         "THIS PATIENT IS BACK AND HER NEW HCG RESULT IS 3121.1."

10:58AM   5         DO YOU SEE THAT?

10:58AM   6    A.   YES.

10:58AM   7    Q.   AND SHE SAYS, "I WILL RELEASE THIS PATIENT."

10:58AM   8         RIGHT?

10:58AM   9    A.   YES.

10:58AM  10    Q.   AND SHE'S TELLING YOU THIS ON JUNE 10TH?

10:58AM  11    A.   YES.

10:58AM  12         YOU DON'T REALLY KNOW FROM THE EMAIL HOW THIS WAS RUN,

10:58AM  13    JUST AS AN ASIDE.

10:59AM  14    Q.   IT WAS FROM A CTN FINGERSTICK SAMPLE; RIGHT?

10:59AM  15    A.   FROM THE LAST EMAIL --

10:59AM  16    Q.   LET'S GO TO THE SECOND PAGE OF THE SAME EXHIBIT.

10:59AM  17         SO IN YOUR EMAIL ON JUNE 9TH, 2014, YOU SAY, "YES PLEASE

10:59AM  18    REPORT AS GREATER THAN 4941?"

10:59AM  19         DO YOU SEE THAT?

10:59AM  20    A.   YES.

10:59AM  21    Q.   AND SO THAT'S WITH REGARDS TO A FINGERSTICK SAMPLE;

10:59AM  22    CORRECT?

10:59AM  23    A.   YES.

10:59AM  24    Q.   AND THAT'S ON JUNE 9TH?

10:59AM  25    A.   YES.

10:59AM   1    Q.   AND SO THAT'S ACTUALLY A DAY BEFORE?

10:59AM   2    A.   YES.

10:59AM   3    Q.   SO, DR. ROSENDORFF, YOU WERE ASKED SOME QUESTIONS ABOUT

11:00AM   4    THE SIEMENS ADVIA.

11:00AM   5         DO YOU RECALL THAT?

11:00AM   6    A.   I WAS ASKING?

11:00AM   7    Q.   YES -- NO, I'M SORRY.  MR. BOSTIC ASKED YOU SOME QUESTIONS

11:00AM   8    ABOUT THE SIEMENS ADVIA ON REDIRECT?

11:00AM   9    A.   OH, YES.

11:00AM  10    Q.   OKAY.  AND IT'S CORRECT THAT THERE IS ALSO DILUTION, OR

11:00AM  11    THERE IS DILUTION INTERNAL TO THAT ADVIA DEVICE; CORRECT?

11:00AM  12    A.   I JUST DON'T RECALL HONESTLY.  I MEAN, I CAN'T STATE AS A

11:00AM  13    MATTER OF FACT TODAY, YEAH.

11:00AM  14    Q.   OKAY.  LET'S LOOK AT ONE OF THE PRIOR TESTIMONIES FROM

11:00AM  15    YOU, DR. ROSENDORFF.

11:00AM  16         SO IF YOU COULD LOOK AT EXHIBIT 28053.  AND IT SHOULD BE

11:01AM  17    IN THAT PRIOR TESTIMONY BINDER.

11:01AM  18    A.   I HAVE IT.

11:01AM  19    Q.   IF YOU COULD TURN IN YOUR PRIOR -- IN THAT EXHIBIT 28053

11:01AM  20    TO PAGE 240.

11:02AM  21    A.   YES, YES.

11:02AM  22    Q.   AND IN PARTICULAR, AT LINE 12.

11:02AM  23         DO YOU SEE IT THERE?  LINE 12 THROUGH 14?

11:02AM  24    A.   YES.

11:02AM  25    Q.   AND DOES THAT REFRESH YOUR MEMORY THAT YOU'VE PREVIOUSLY

ROSENDORFF RECROSS BY MR. COOPERSMITH                    3776

11:02AM   1      TESTIFIED THAT THERE IS DILUTION INTERNAL TO THE ADVIA DEVICE?

11:02AM   2      A.   YES, THAT DOES REFRESH MY MEMORY.

11:02AM   3      Q.   OKAY.  AND THAT'S WHAT YOU SAID; RIGHT?

11:02AM   4      A.   YES.

11:02AM   5      Q.   OKAY.  AND IN ADDITION -- WELL, I THINK THAT'S SUFFICIENT.

11:02AM   6      A.   SO THIS MEANS DILUTION WOULD HAVE HAPPENED TWICE WITH THE

11:02AM   7      MODIFIED METHODS, ONCE OUTSIDE OF THE INSTRUMENT AND ONCE

11:02AM   8      INSIDE OF THE INSTRUMENT.

11:02AM   9      Q.   OKAY.  YOU WEREN'T HEAVILY INVOLVED IN THE MODIFICATION OF

11:02AM  10      THE ADVIA MACHINES TO RUN SMALL SAMPLES, WERE YOU?

11:02AM  11      A.   NO, I WAS NOT.

11:02AM  12      Q.   SO YOU DON'T REALLY KNOW WHAT DILUTION PROTOCOLS WERE

11:02AM  13      CHANGED INTERNALLY TO COMPENSATE FOR THE OUTSIDE DILUTION, DO

11:02AM  14      YOU?

11:02AM  15      A.   ARE YOU SAYING THAT I WASN'T FAMILIAR WITH HOW THE ASSAY

11:02AM  16      WAS RUN?

11:02AM  17      Q.   WELL, I'M HOPING YOU WERE, DR. ROSENDORFF.

11:03AM  18           BUT MY QUESTION TO YOU IS, ARE YOU -- YOU'RE AWARE, AREN'T

11:03AM  19      YOU, THAT WHEN THE MACHINES WERE MODIFIED, THERE WAS A

11:03AM  20      MODIFICATION OF THE DILUTION PROTOCOL INTERNAL TO THE ADVIA'S?

11:03AM  21      A.   NO, I DON'T BELIEVE SO, NO, NOT AT ALL.

11:03AM  22      Q.   YOU DON'T THINK THAT'S TRUE?

11:03AM  23      A.   NO.  THAT'S WRONG.

11:03AM  24      Q.   ALL RIGHT.

11:03AM  25      A.   THE DILUTIONS HAPPENED BEFORE THE SAMPLES GOT LOADED ON TO

ER-2780

11:03AM  1    THE INSTRUMENT, THE TECANS WOULD BE USED TO -- WOULD USE SALINE

11:03AM  2    OR WATER TO DO THE DILUTIONS.

11:03AM  3        I WAS NOT AWARE OF ANY MODIFICATION TO THE INTERNAL

11:03AM  4    DILUTION PROCEDURE.

11:03AM  5    Q.   YOU'RE NOT AWARE?

11:03AM  6    A.   NO.

11:03AM  7    Q.   OKAY.  DR. ROSENDORFF, DO YOU REMEMBER MR. BOSTIC ASKED

11:03AM  8    YOU SOME QUESTIONS DURING REDIRECT ABOUT THE LABORATORY

11:03AM  9    INFORMATION SYSTEM?

11:03AM  10   A.   YES.

11:03AM  11   Q.   AND HE ASKED YOU ABOUT WHETHER THE LIS AT THERANOS WOULD

11:04AM  12   HAVE PATIENT RESULTS THAT THERANOS DIDN'T CONDUCT AT ALL?

11:04AM  13   A.   YES.

11:04AM  14   Q.   AND, OF COURSE, IT WOULDN'T; RIGHT?

11:04AM  15   A.   IT WOULD NOT.

11:04AM  16   Q.   OKAY.  BUT WHEN YOU WERE LOOKING INTO A QUESTION, YOU

11:04AM  17   WOULD USE THE LIS AS ONE OF THE TOOLS TO DO YOUR INVESTIGATION;

11:04AM  18   RIGHT?

11:04AM  19   A.   YES.

11:04AM  20   Q.   AND YOU COULD ACCESS THAT?

11:04AM  21   A.   RIGHT.

11:04AM  22   Q.   AND THAT YOU WOULD ALSO LOOK AT TIMES AT PATIENT TRENDS;

11:04AM  23   RIGHT?

11:04AM  24   A.   YES.

11:04AM  25   Q.   AND SO, FOR EXAMPLE, IF THERE WAS A PATIENT ON A

11:04AM   1    PARTICULAR DAY WHERE THERE WAS AN INQUIRY AND YOU WANTED TO

11:04AM   2    KNOW ALL OF THE OTHER PATIENTS WHO HAD THAT SAME ASSAY RUN,

11:04AM   3    COULD YOU LOOK AT LIS AND LEARN THAT INFORMATION; RIGHT?

11:04AM   4    A.   YES, I COULD.

11:04AM   5    Q.   OKAY.  AND SO YOU COULD COMBINE THE INFORMATION FROM LIS

11:04AM   6    WITH OTHER INFORMATION ABOUT HOW THE PATIENT PRESENTED AND SO

11:04AM   7    FORTH TO COME UP WITH SOME CONCLUSIONS ABOUT WHAT HAD OCCURRED;

11:04AM   8    RIGHT?

11:04AM   9    A.   YES.

11:04AM  10    Q.   AND WITH REGARD TO QUALITY CONTROL, DO YOU REMEMBER THAT

11:05AM  11    MR. BOSTIC ASKED YOU SOME QUESTIONS ABOUT A PRESENTATION THAT

11:05AM  12    MR. GEE PRESENTED ON QUALITY CONTROL?

11:05AM  13    A.   ON REDIRECT, YES, YES.

11:05AM  14    Q.   RIGHT.  AND ALSO WHEN I --

11:05AM  15    A.   THAT WAS THE SECOND TIME I HAD SEEN IT TODAY.

11:05AM  16    Q.   RIGHT.

11:05AM  17    A.   I MEAN IN THIS TRIAL, YEAH.

11:05AM  18    Q.   OKAY.  AND THERE WAS A NUMBER THAT MR. BOSTIC FOCUSSED YOU

11:05AM  19    ON, AS I DID, WHICH WAS THE 2.9 PERCENT CONTROL FAILURE RATE.

11:05AM  20        DO YOU REMEMBER THAT?

11:05AM  21    A.   YES.

11:05AM  22    Q.   OKAY.  AND THEN MR. BOSTIC ASKED YOU SOME QUESTIONS ABOUT

11:05AM  23    HOW THAT SEEMED DIFFERENT THAN ANOTHER EXHIBIT WHICH SHOWED

11:05AM  24    SOME QC FAILURE RESULTS FROM MARCH OF 2014?

11:05AM  25    A.   I CAN FULLY EXPLAIN THAT.

11:05AM   1    Q.   WELL, LET'S -- LET ME JUST ASK THE QUESTIONS.  OKAY?

11:05AM   2    A.   UH-HUH.

11:05AM   3    Q.   AND THE SAME PERSON COMPILED THOSE TWO DIFFERENT

11:05AM   4    DOCUMENTS; RIGHT?

11:05AM   5    A.   YES.

11:05AM   6    Q.   AND THAT'S MR. GEE?

11:05AM   7    A.   YES.

11:05AM   8    Q.   AND, IN FACT, AS YOU SAID THE OTHER DAY WHEN I WAS

11:06AM   9    QUESTIONING YOU, THE QC DATA WAS ONE OF THE THINGS IN LIS;

11:06AM  10    CORRECT?

11:06AM  11    A.   YES.

11:06AM  12    Q.   OKAY.  SO IF WE WANTED TO KNOW EVERYTHING ABOUT QC DURING

11:06AM  13    ANY TIME PERIOD, WE COULD GO TO LIS AND LOOK AT THAT; RIGHT?

11:06AM  14    A.   YES.

11:06AM  15    Q.   IF WE HAD THE ABILITY TO DO THAT?

11:06AM  16    A.   YES.

11:06AM  17    Q.   OKAY.  AND, DR. ROSENDORFF, SWITCHING TO ANOTHER

11:06AM  18    SUBJECT --

11:06AM  19    A.   DO YOU WANT ME TO EXPLAIN OR NOT?

11:06AM  20    Q.   WELL, I'M GOING TO ASK YOU THE QUESTIONS, AND THAT'S ALL

11:06AM  21    I'VE GOT ON THAT.  OKAY?

11:06AM  22         SO I'M GOING TO GO TO THE NEXT TOPIC.

11:06AM  23         LET'S LOOK AT -- LET'S TALK ABOUT THE INSPECTION BY THE

11:06AM  24    CDPH INSPECTOR.

11:06AM  25    A.   OKAY.

ROSENDORFF RECROSS BY MR. COOPERSMITH                      3780

11:06AM  1    Q.   AND THAT WAS IN DECEMBER OF 2013?

11:06AM  2    A.   YES.

11:06AM  3    Q.   AND THE -- ON REDIRECT MR. BOSTIC ASKED YOU SOME QUESTIONS

11:06AM  4    ABOUT THAT INSPECTION.

11:06AM  5         DO YOU REMEMBER THAT?

11:06AM  6    A.   YES.

11:06AM  7    Q.   OKAY.  AND YOU TALKED ABOUT SOME PARTITIONS OR DIVIDERS IN

11:07AM  8    THE NORMANDY LAB?

11:07AM  9    A.   YES.

11:07AM  10   Q.   BUT YOU ACTUALLY, AS WE DISCUSSED THE OTHER DAY, YOU

11:07AM  11   ACTUALLY SHOWED THE INSPECTOR VALIDATION REPORTS FOR THE EDISON

11:07AM  12   DEVICE?

11:07AM  13   A.   YES, WE DID.

11:07AM  14   Q.   AND FOR THE MODIFIED PREDICATES?

11:07AM  15   A.   YES.

11:07AM  16   Q.   AND IF THE INSPECTOR HAD ASKED YOU TO SEE ANY PART OF THE

11:07AM  17   CLINICAL LAB, YOU WOULD HAVE SHOWED IT TO HER; RIGHT?

11:07AM  18   A.   YES.

11:07AM  19   Q.   YOU WOULDN'T HAVE REFUSED TO DO THAT; RIGHT?

11:07AM  20   A.   NO.

11:07AM  21   Q.   AND IT TURNS OUT SHE DIDN'T ASK THAT?

11:07AM  22   A.   SHE DID NOT.

11:07AM  23   Q.   SO SHE SAW VALIDATION REPORTS?

11:07AM  24   A.   YES.

11:07AM  25   Q.   AND SHE KNEW THERE WERE EDISONS -- BASED ON THAT

ER-2784

11:07AM  1     INFORMATION, YOU UNDERSTOOD THAT SHE KNEW THAT THERE WERE THOSE

11:07AM  2     DEVICES BEING RUN IN THE LAB; RIGHT?

11:07AM  3     A.   YES.

11:07AM  4     Q.   AND SHE DIDN'T ACTUALLY ASK TO SEE THE PHYSICAL DEVICE;

11:07AM  5     RIGHT?

11:07AM  6     A.   NO, SHE DID NOT.

11:07AM  7     Q.   OKAY.  I WANT TO SHOW YOU ANOTHER EXHIBIT, WHICH IS 20306,

11:07AM  8     AND YOU CAN LOOK AT THAT ON YOUR SCREEN.

11:08AM  9         OKAY.  DO YOU SEE AT THE BOTTOM THIS IS AN EMAIL STRING

11:08AM 10     FROM THERANOS AROUND OR ON DECEMBER 1ST, 2013?

11:08AM 11     A.   YES.

11:08AM 12     Q.   OKAY.  AND THIS IS RIGHT BEFORE THAT INSPECTION THAT WE

11:08AM 13     JUST DISCUSSED?

11:08AM 14     A.   YES.

11:08AM 15     Q.   AND THEN DO YOU SEE THERE'S AN EMAIL FROM SCOTT MARMER TO

11:08AM 16     YOU AND OTHERS?

11:08AM 17     A.   YES.

11:08AM 18     Q.   INCLUDING EDGAR PAZ?

11:08AM 19     A.   YES.

11:08AM 20     Q.   AND THEN ALSO THE ENTIRE CLIA LAB?

11:08AM 21     A.   YES.

11:08AM 22          MR. COOPERSMITH:  OKAY.  YOUR HONOR, WE OFFER 20306.

11:08AM 23          MR. BOSTIC:  NO OBJECTION.

11:08AM 24          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:08AM 25          (DEFENDANT'S EXHIBIT 20306 WAS RECEIVED IN EVIDENCE.)

11:08AM 1    BY MR. COOPERSMITH:

11:08AM 2    Q.   OKAY.  SO LET'S GO TO THE EARLIEST EMAIL IN TIME.

11:08AM 3         AND YOU WROTE ON DECEMBER 1ST, 2013, "PLEASE GRANT

11:09AM 4    PERMISSION FOR CLIA INSPECTORS TO VISIT US ON DECEMBER 3RD AT

11:09AM 5    10:30 A.M.  THEY WILL BE DOING DOCUMENT REVIEW IN CONFERENCE

11:09AM 6    ROOM 1776, AND WALK THROUGH THE UPSTAIRS CLIA LAB AS WELL AS

11:09AM 7    NORMANDY CLIA LAB."

11:09AM 8         DO YOU SEE THAT?

11:09AM 9    A.   YES.

11:09AM 10   Q.   AND "THE VISIT SHOULD LAST ABOUT 4 HOURS."

11:09AM 11   A.   YES.

11:09AM 12   Q.   AND YOU'RE GIVING INSTRUCTIONS TO VARIOUS THERANOS STAFF

11:09AM 13   PEOPLE THAT THAT IS GOING TO OCCUR; RIGHT?

11:09AM 14   A.   YES.

11:09AM 15   Q.   AND ABOVE THAT DO YOU SEE THERE'S AN EMAIL FROM EDGAR PAZ,

11:09AM 16   AND HE SAYS, "HELLO SUNNY,

11:09AM 17        "PLEASE READ EMAIL BELOW AND LET ME KNOW HOW YOU WOULD

11:09AM 18   LIKE US TO PROCEED WITH THE CLIA INSPECTOR VISIT."

11:09AM 19        DO YOU SEE THAT?

11:09AM 20   A.   YES.

11:09AM 21   Q.   AND THEN ABOVE THAT MR. BALWANI WRITES, "APPROVED."

11:09AM 22        "SCOTT CAN APPROVE SUCH VISITS."

11:09AM 23        DO YOU SEE THAT?

11:09AM 24   A.   YES.

11:09AM 25   Q.   AND THEN GOING ABOVE THAT, DO YOU SEE THERE'S A

| | | |
|---|---|---|
| 11:09AM | 1 | DECEMBER 1ST, 2013, EMAIL FROM MR. PAZ? |
| 11:10AM | 2 | A.   YES. |
| 11:10AM | 3 | Q.   AND HE WRITES, "CORRECT, WOULD YOU LIKE FOR US TO PROVIDE |
| 11:10AM | 4 | SECURITY ESCORT DURING THE VISIT INTO BOTH CLIA AREAS?" |
| 11:10AM | 5 | RIGHT? |
| 11:10AM | 6 | A.   YES, I SEE THAT. |
| 11:10AM | 7 | Q.   THAT'S NORMANDY AND THEN THE UPSTAIRS LAB AS WELL? |
| 11:10AM | 8 | A.   YES. |
| 11:10AM | 9 | Q.   AND THEN YOU SEE ABOVE THAT MR. BALWANI WROTE BACK TO |
| 11:10AM | 10 | MR. PAZ AND SAID "NO"? |
| 11:10AM | 11 | DO YOU SEE THAT? |
| 11:10AM | 12 | A.   I DON'T REALLY KNOW WHAT HE MEANS. |
| 11:10AM | 13 | Q.   YOU JUST SEE THAT MR. BALWANI RESPONDED "NO" TO MR. PAZ'S |
| 11:10AM | 14 | QUESTION; RIGHT? |
| 11:10AM | 15 | A.   YES. |
| 11:10AM | 16 | Q.   AND THE QUESTION WAS, "WOULD YOU LIKE FOR US TO PROVIDE |
| 11:10AM | 17 | SECURITY ESCORT DURING THE VISIT INTO BOTH CLIA AREAS?" |
| 11:10AM | 18 | DO YOU SEE THAT? |
| 11:10AM | 19 | A.   YES, I SEE THE WORD AND -- I SEE THE WORD "NO," YES. |
| 11:10AM | 20 | Q.   OKAY.  DR. ROSENDORFF, ARE YOU SAYING IN YOUR TESTIMONY |
| 11:11AM | 21 | TODAY THAT YOU RELEASED RESULTS TO PATIENTS WHILE YOU WERE A |
| 11:11AM | 22 | LAB DIRECTOR AT THERANOS THAT YOU DID NOT THINK WERE ACCURATE? |
| 11:11AM | 23 | A.   I'M A LITTLE CONFUSED BY THE DOUBLE NEGATIVE THERE. |
| 11:11AM | 24 | Q.   OKAY.  LET ME SEE IF I CAN HELP YOU. |
| 11:11AM | 25 | A.   YEAH. |

ER-2787

11:11AM  1    Q.    OKAY.   IS IT YOUR TESTIMONY UNDER OATH, DR. ROSENDORFF,

11:11AM  2    THAT WHILE YOU WERE AT THERANOS, THAT YOU RELEASED OR ALLOWED

11:11AM  3    THE RELEASE OF RESULTS TO PATIENTS THAT YOU DID NOT THINK WERE

11:11AM  4    ACCURATE?

11:11AM  5    A.    I NEVER RELEASED RESULTS THAT I THOUGHT WERE INACCURATE,

11:11AM  6    NO.

11:11AM  7    Q.    YOU NEVER DID THAT?

11:11AM  8    A.    NO.

11:12AM  9    Q.    BECAUSE YOU WOULDN'T DO THAT?

11:12AM  10   A.    NO, I WOULD NOT.

11:12AM  11           MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

11:12AM  12           THE COURT:  MR. BOSTIC?

11:12AM  13           MR. BOSTIC:  VERY BRIEFLY, YOUR HONOR.

11:12AM  14                **FURTHER REDIRECT EXAMINATION**

11:12AM  15   BY MR. BOSTIC:

11:12AM  16   Q.    DR. ROSENDORFF, DURING YOUR CONVERSATION WITH

11:12AM  17   MR. COOPERSMITH JUST NOW, YOU OFFERED TO PROVIDE AN EXPLANATION

11:12AM  18   AS TO THE DIFFERENCES BETWEEN THE QC FAILURE NUMBERS WE SAW IN

11:12AM  19   THE SLIDE PRESENTATION VERSUS THAT EMAIL IN MARCH 2014.

11:12AM  20       DO YOU RECALL THAT?

11:12AM  21   A.    YES, I DO.

11:12AM  22   Q.    I WOULD LIKE TO HEAR THAT EXPLANATION.  CAN YOU EXPLAIN?

11:12AM  23   A.    OH, SURE.

11:12AM  24       SO MR. GEE'S QC FAILURE RATE FOR Q1 ON THE THERANOS

11:13AM  25   METHODS INCLUDES BOTH EDISON AND MODIFIED SIEMENS.

11:13AM 1          THE EMAIL WE WERE REVIEWING PREVIOUSLY WITH THE 26 OR

11:13AM 2      20 PERCENT FAILURE RATE, THAT'S EDISONS ONLY.

11:13AM 3          HOWEVER, THERANOS WAS RUNNING NEAT QC, BIORAD QC ON THE

11:13AM 4      SIEMENS INSTRUMENT AND USING THAT QC FOR THE MODIFIED SIEMENS

11:13AM 5      TEST.

11:13AM 6          SO BECAUSE THERE WERE SO MANY MORE OF THOSE QC SAMPLES RUN

11:13AM 7      THAN THE EDISON QC SAMPLES, THAT THAT WOULD ARTIFICIALLY PAINT

11:13AM 8      A ROSY PICTURE OF HOW THE QC WAS ACTUALLY -- DOES THAT MAKE

11:13AM 9      SENSE TO YOU?

11:13AM 10     Q.   I THINK SO.

11:13AM 11         LET ME ASK, IN YOUR EXPERIENCE WITH THE EDISONS AND THE

11:13AM 12     MODIFIED THIRD PARTY DEVICES, WHICH PERFORMED BETTER ON QC?

11:13AM 13             MR. COOPERSMITH:  OBJECTION.  BEST EVIDENCE.

11:13AM 14             THE COURT:  THIS CALLS FOR HIS OBSERVATIONS, HIS

11:14AM 15     PERSONAL OBSERVATIONS?

11:14AM 16             MR. BOSTIC:  EXACTLY, YOUR HONOR.

11:14AM 17             THE COURT:  YOU CAN ANSWER THE QUESTION.

11:14AM 18             THE WITNESS:  AS I SAID, THE QC FOR THE MODIFIED

11:14AM 19     SIEMENS WAS NO DIFFERENT FROM THE QC FOR THE UNMODIFIED

11:14AM 20     SIEMENS.

11:14AM 21         THERE WAS NO DILUTION OF THOSE SAMPLES.  THERE SHOULD HAVE

11:14AM 22     BEEN BECAUSE PATIENT SAMPLES WERE BEING DILUTED, TOO.

11:14AM 23     BY MR. BOSTIC:

11:14AM 24     Q.   I SEE.  ARE YOU SAYING THERE WAS A DIFFERENCE BETWEEN HOW

11:14AM 25     QC WAS RUN ON THE MODIFIED INSTRUMENTS VERSUS HOW PATIENT

11:14AM  1    SAMPLES WERE RUN ON THE MODIFIED INSTRUMENTS?

11:14AM  2    A.   YES, YES, YES.

11:14AM  3          MR. COOPERSMITH:  OBJECTION.  MOVE TO STRIKE.

11:14AM  4          THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

11:14AM  5    BY MR. BOSTIC:

11:14AM  6    Q.   AND FINALLY, DR. ROSENDORFF, WE'VE DISCUSSED A COUPLE OF

11:14AM  7    TIMES YOUR DECISION IN LATE MAY TO DISCONTINUE HCG TESTING ON

11:14AM  8    THE EDISON.

11:14AM  9       DO YOU REMEMBER THAT?

11:14AM  10   A.   YES.

11:14AM  11   Q.   MR. COOPERSMITH JUST SHOWED YOU SOME EMAILS INDICATING

11:14AM  12   THAT HCG TESTING WAS STILL CONTINUING ON THE EDISON EVEN IN

11:15AM  13   JUNE OF 2014.

11:15AM  14       DID YOU SEE THAT?

11:15AM  15   A.   YES.

11:15AM  16   Q.   MY QUESTION FOR YOU IS, DID YOU DECIDE TO RESUME OR

11:15AM  17   CONTINUE HCG TESTING ON THE EDISON AS LAB DIRECTOR AT THERANOS?

11:15AM  18   A.   NO, I DID NOT.

11:15AM  19   Q.   NO FURTHER QUESTIONS.  THANK YOU.

11:15AM  20          MR. COOPERSMITH:  JUST BRIEFLY, YOUR HONOR.  THANK

11:15AM  21   YOU.

11:15AM  22                **FURTHER RECROSS-EXAMINATION**

11:15AM  23   BY MR. COOPERSMITH:

11:15AM  24   Q.   SO JUST NOW MR. BOSTIC ASKED YOU SOME QUESTIONS ABOUT THE

11:15AM  25   QC DATA THAT MR. GEE PRESENTED.

ROSENDORFF FURTHER RECROSS BY MR. COOPERSMITH          3787

11:15AM   1     A.   YES.

11:15AM   2     Q.   AND YOU OFFERED AN EXPLANATION; RIGHT?

11:15AM   3     A.   YES.

11:15AM   4     Q.   OKAY.  ARE YOU SAYING THAT YOU KNEW ABOUT THIS ISSUE AT

11:15AM   5     THE TIME IN THE MIDDLE OF 2014?

11:15AM   6     A.   WHICH ISSUE ARE YOU REFERRING TO?

11:15AM   7     Q.   WELL, YOU JUST DESCRIBED AN ISSUE ABOUT NEAT SAMPLES BEING

11:15AM   8     RUN ON THE QC FOR THE MODIFIED PREDICATES; RIGHT?

11:15AM   9     A.   YES.

11:15AM  10     Q.   AND YOU'RE NOW SAYING TODAY THAT YOU THINK THAT THAT WAS

11:16AM  11     NOT APPROPRIATE?

11:16AM  12     A.   YES.

11:16AM  13     Q.   AND ARE YOU SAYING THAT YOU KNEW THAT AT THE TIME,

11:16AM  14     DR. ROSENDORFF?

11:16AM  15     A.   I DON'T RECALL.

11:16AM  16     Q.   BUT YOU COULD HAVE TOLD MR. GEE, IF YOU WANTED TO, DO SOME

11:16AM  17     DIFFERENT METHOD OF QC IF YOU WANTED TO; RIGHT?

11:16AM  18     A.   HE WASN'T THE ONE RUNNING THE QC, SIR.  HE WAS JUST

11:16AM  19     REPORTING IT.

11:16AM  20     Q.   WELL, I THINK WE SAW LAST WEEK THAT YOU WERE THE ONE WHO

11:16AM  21     CIRCULATED THE QC PROTOCOL; RIGHT?

11:16AM  22     A.   THERE WERE A NUMBER OF QC PROTOCOLS SHOWN.

11:16AM  23     Q.   AND WE LOOKED AT ONE THAT YOU CIRCULATED?

11:16AM  24     A.   I THINK SO.

11:16AM  25     Q.   SETTING THE QC POLICY FOR THERANOS?

11:16AM  1    A.   I BELIEVE SO.

11:16AM  2    Q.   AND IF YOU WANTED TO CHANGE THAT PROTOCOL, YOU COULD HAVE

11:16AM  3    SENT ANOTHER QC POLICY THAT CHANGED WHATEVER YOU WANTED TO

11:16AM  4    CHANGE; CORRECT?

11:16AM  5    A.   WELL, THE QC POLICY NEVER SPELLED OUT, HEY, DILUTE THE QC

11:16AM  6    SAMPLES THE SAME WAY YOU'RE DILUTING THE PATIENT SAMPLES.

11:16AM  7    Q.   IF YOU WANTED TO INSTRUCT THE LAB TO DO A DIFFERENT

11:16AM  8    DILUTION PROTOCOL, YOU COULD HAVE DONE THAT; RIGHT?

11:17AM  9    A.   YES.

11:17AM  10           MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

11:17AM  11           MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

11:17AM  12           THE COURT:  MAY THIS WITNESS BE EXCUSED?

11:17AM  13           MR. COOPERSMITH:  YES, YOUR HONOR.

11:17AM  14           MR. BOSTIC:  NO, YOUR HONOR.

11:17AM  15           THE COURT:  YOU'RE EXCUSED, SIR.  YOU MAY LEAVE

11:17AM  16    THOSE BINDERS THERE.

11:17AM  17           THE WITNESS:  OKAY.

11:17AM  18           THE COURT:  WHY DON'T WE TAKE OUR MORNING BREAK NOW,

11:17AM  19    LADIES AND GENTLEMEN.  LET'S TAKE OUR MORNING BREAK.  LET'S

11:17AM  20    TAKE 30 MINUTES, PLEASE.

11:17AM  21        AND LET ME TELL YOU, IT MAY BE -- I HAVE SOME QUESTIONS

11:17AM  22    FOR THE LAWYERS ABOUT SOME ADDITIONAL EVIDENCE, SO IT MIGHT BE

11:17AM  23    A LITTLE LONGER.  I'M JUST TELLING YOU THAT.

11:17AM  24        ALSO, MY SENSE IS THAT WE'RE GOING TO BREAK TODAY NO LATER

11:17AM  25    THAN 2:45, COUNSEL, 2:45 THIS AFTERNOON.

11:17AM 1          SO ENJOY YOUR BREAK.

11:17AM 2          (JURY OUT AT 11:17 A.M.)

11:18AM 3               THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

11:18AM 4     YOU.

11:18AM 5          THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR A

11:18AM 6     MORNING BREAK.  ALL COUNSEL ARE PRESENT.

11:18AM 7          THE GOVERNMENT HAS ANOTHER WITNESS TO CALL THEN?

11:18AM 8               MR. LEACH:  YES, YOUR HONOR.

11:18AM 9               THE COURT:  AND IT'S MS. PETERSON?

11:18AM 10              MR. LEACH:  IT IS, YOUR HONOR.

11:18AM 11              THE COURT:  THANK YOU.  SHOULD WE DISCUSS ISSUES

11:18AM 12    REGARDING HER TESTIMONY NOW?

11:18AM 13              MR. LEACH:  SURE.

11:18AM 14              MR. COOPERSMITH:  THAT WOULD BE HELPFUL, YOUR HONOR.

11:18AM 15              THE COURT:  SURE.  OKAY.  SO THE GOVERNMENT WILL

11:19AM 16    CALL MS. PETERSON NEXT.

11:19AM 17              MR. LEACH:  YES, YOUR HONOR.

11:19AM 18              THE COURT:  ALL RIGHT.  THANK YOU.

11:19AM 19         AND DO YOU HAVE SOME DISCUSSION POINTS?

11:19AM 20              MR. COOPERSMITH:  YES, YOUR HONOR, THANK YOU.

11:19AM 21         JUST THREE THINGS.

11:19AM 22         THE FIRST ISSUE IS THAT WE RECEIVED AN FBI 302 LAST NIGHT

11:19AM 23    FROM MR. LEACH OF A VERY RECENT INTERVIEW WITH MS. PETERSON,

11:19AM 24    AND THERE'S INFORMATION IN THERE ABOUT HOW MS. PETERSON SAID

11:19AM 25    SHE WAS UNAWARE OF THE ROMANTIC RELATIONSHIP BETWEEN

11:19AM 1     MR. BALWANI AND MS. HOLMES.

11:19AM 2          AND I CONFERRED WITH MR. LEACH EARLIER THIS MORNING AND I

11:19AM 3     HAVE BEEN INFORMED THAT THE GOVERNMENT DOES, IF ALLOWED, INTEND

11:19AM 4     TO INQUIRE INTO THAT ISSUE, WHETHER MS. PETERSON WAS AWARE OF

11:19AM 5     THE RELATIONSHIP, AND PRESUMABLY SHE WOULD SAY NO.

11:19AM 6          AND THEN PERHAPS MR. LEACH WOULD INQUIRE INTO THE REASONS

11:20AM 7     WHY SHE MIGHT OR MIGHT NOT CONSIDER THAT IMPORTANT.

11:20AM 8          WE DON'T THINK THAT'S A PROPER SUBJECT.

11:20AM 9          I BELIEVE THAT THIS WAS A SUBJECT THAT WAS DESCRIBED, YOU

11:20AM 10    KNOW, IT SEEMS LIKE YEARS AGO NOW, BUT IT'S MAYBE ABOUT TWO

11:20AM 11    YEARS AGO IN THE GOVERNMENT'S 404(B) NOTICES IN 2020, THAT THIS

11:20AM 12    MIGHT BE AN AREA.  OBVIOUSLY THIS IS NOT SOMETHING CHARGED IN

11:20AM 13    THE INDICTMENT, YOU KNOW, HIDING A RELATIONSHIP.

11:20AM 14         WE JUST DON'T THINK THIS IS A PROPER SUBJECT.  WE THINK

11:20AM 15    IT'S NOT RELEVANT UNDER 401.

11:20AM 16         AND WE ALSO THINK IT'S MORE PREJUDICIAL THAN PROBATIVE

11:20AM 17    UNDER 403 BECAUSE MS. PETERSON IS REALLY HERE TO TALK ABOUT

11:20AM 18    WHAT SHE LEARNED ABOUT THE COMPANY AND, IN HER VIEW, WHY RDV,

11:20AM 19    THE DEVOS FAMILY COMPANY, INVESTED IN THERANOS.

11:20AM 20         AND AS TO WHETHER SHE WAS AWARE OF A RELATIONSHIP OR NOT

11:20AM 21    SHOULDN'T REALLY HAVE ANY BEARING ON THIS.

11:20AM 22         AND, FRANKLY, YOUR HONOR, THE FACT THAT MR. BALWANI AND

11:20AM 23    MS. HOLMES TRIED TO KEEP THINGS PROFESSIONAL, YOU KNOW, AT THE

11:21AM 24    OFFICE AND WEREN'T ENGAGING IN PUBLIC DISPLAYS OF AFFECTION IN

11:21AM 25    FRONT OF MS. PETERSON OR TELLING HER VERBALLY THAT, I DON'T

3791

11:21AM 1    THINK THAT REALLY BEARS ON THE CHARGES IN THIS CASE.

11:21AM 2        IN A NUTSHELL, WE DON'T THINK THAT SHOULD BE ALLOWED.

11:21AM 3            THE COURT:  THANK YOU.

11:21AM 4        SO IT'S THE QUESTIONS REGARDING WHETHER OR NOT

11:21AM 5    MS. PETERSON HAD KNOWLEDGE OF A RELATIONSHIP BETWEEN

11:21AM 6    MR. BALWANI AND MS. HOLMES?

11:21AM 7            MR. COOPERSMITH:  BASED ON DISCOVERY, I BELIEVE HER

11:21AM 8    ANSWER TO THAT WOULD BE NO, SHE DID NOT.  RIGHT?

11:21AM 9        AND THEN PRESUMABLY, I DON'T WANT TO PUT QUESTIONS IN

11:21AM 10   MR. LEACH'S MOUTH, BUT MY UNDERSTANDING FROM THE 302 AND A

11:21AM 11   LITTLE BIT FROM CONFERING WITH HIM IS THAT THERE WOULD BE

11:21AM 12   QUESTIONS ABOUT, YOU KNOW, WHETHER THAT MATTERED TO HER AND WHY

11:21AM 13   IT WAS IMPORTANT AND WOULD SHE HAVE WANTED TO KNOW THAT?

11:21AM 14           THE COURT:  FOR INVESTMENT PURPOSES?

11:21AM 15           MR. COOPERSMITH:  RIGHT.

11:21AM 16           THE COURT:  WOULD IT HAVE MADE A DIFFERENCE IF SHE

11:21AM 17   HAD KNOWN THAT FOR INVESTMENT PURPOSES?

11:21AM 18           MR. COOPERSMITH:  RIGHT, TO HER VIEW OF THE

11:21AM 19   INVESTMENT OR SOMETHING LIKE THAT.

11:21AM 20           THE COURT:  I SEE.

11:21AM 21           MR. COOPERSMITH:  MR. LEACH CAN OBVIOUSLY ARTICULATE

11:21AM 22   BETTER WHAT HE'S GOING AFTER BETTER THAN ME, BUT I THINK FROM

11:22AM 23   OUR STANDPOINT THIS SHOULD NOT BE A SUBJECT OF QUESTIONING.

11:22AM 24           THE COURT:  ALL RIGHT.

11:22AM 25       MR. LEACH.

ER-2795

11:22AM 1          MR. LEACH:  YOUR HONOR, THIS IS RELEVANT AND IT'S

11:22AM 2    INEXTRICABLY INTERTWINED WITH THE ALLEGATIONS OF THE

11:22AM 3    INDICTMENT.

11:22AM 4          THE FACT IS THAT MS. HOLMES AND MR. BALWANI CONCEALED

11:22AM 5    THEIR ROMANTIC RELATIONSHIP FROM INVENTORS.  MS. PETERSON IS

11:22AM 6    NOT THE ONLY ONE WHO WILL SAY THIS.  I ANTICIPATE VIRTUALLY ALL

11:22AM 7    OF THE OTHER INVESTORS WILL SAY THEY WERE UNAWARE OF A ROMANTIC

11:22AM 8    RELATIONSHIP BETWEEN THE CHIEF EXECUTIVE OFFICER AND THE CHIEF

11:22AM 9    OPERATING OFFICER OF THIS SMALL COMPANY WHO EXERCISED VIRTUALLY

11:22AM 10   TOTAL CONTROL OVER THE COMPANY.

11:22AM 11         MS. PETERSON WAS UNAWARE OF THAT.

11:22AM 12         WE'VE ASKED HER, WOULD THAT HAVE BEEN RELEVANT TO YOUR

11:22AM 13   INVESTMENT DECISION, TO THE DECISION TO PART WITH MONEY OR

11:22AM 14   PROPERTY?

11:22AM 15         I ANTICIPATE HER ANSWER WILL BE YES, AND THAT ANSWER MAKES

11:22AM 16   SENSE BECAUSE WHEN YOU'RE INVESTING IN A SMALL COMPANY, YOU

11:23AM 17   WOULD THINK THAT THE CEO WOULD HIRE NOT SIMPLY SOMEBODY WHO SHE

11:23AM 18   WAS ROMANTICALLY INVOLVED WITH, BUT SOMEBODY WHO WAS THE BEST

11:23AM 19   PERSON FOR THE JOB.

11:23AM 20         I ANTICIPATE THAT MS. PETERSON WILL SAY THE FACT THAT

11:23AM 21   THERE'S A ROMANTIC RELATIONSHIP BETWEEN THE CEO AND THE COO,

11:23AM 22   NOT JUST OF THIS COMPANY BUT OF ANY COMPANY, RAISES A NUMBER OF

11:23AM 23   QUESTIONS ABOUT CONFLICT OF INTEREST, WHETHER OR NOT THAT

11:23AM 24   PERSON IS THE APPROPRIATE PERSON FOR THE JOB.

11:23AM 25         AND I DON'T KNOW WHETHER THAT'S RIGHT OR THAT'S WRONG, BUT

3793

11:23AM 1    I ANTICIPATE THAT'S HER TESTIMONY, AS WELL AS THE TESTIMONY OF

11:23AM 2    MANY OTHER INVESTORS.

11:23AM 3         AND I DON'T UNDERSTAND THE BASIS FOR -- YOU KNOW,

11:23AM 4    MR. COOPERSMITH MIGHT DISAGREE WITH THAT.  MR. COOPERSMITH

11:23AM 5    MIGHT THINK THAT THIS IS PERSONAL.

11:23AM 6         BUT THEY HELD THEMSELVES OUT AS THE TWO MOST IMPORTANT

11:23AM 7    PEOPLE WITHIN THIS COMPANY, AND THEY HELD OUT THE FACT THAT

11:23AM 8    MR. BALWANI HAD A PARTICULAR EXPERTISE IN SOFTWARE THAT MADE

11:23AM 9    HIM THE BEST CANDIDATE TO RUN THIS NOVEL LAB TESTING COMPANY,

11:23AM 10   AND I THINK THE FACT THAT THEY HAD A RELATIONSHIP AND WERE

11:24AM 11   ROMANTICALLY INVOLVED WAS AN EQUAL, IF NOT GREATER, REASON FOR

11:24AM 12   WHY MR. BALWANI WAS THERE, AND IT'S CERTAINLY SOMETHING THAT

11:24AM 13   INVESTORS, IN HINDSIGHT, WANTED TO KNOW ABOUT AND THINK IS

11:24AM 14   RELEVANT TO THE INVESTMENT DECISION.

11:24AM 15        SO I DON'T SEE A BASIS UNDER 401 OR 403 FOR THIS TO BE

11:24AM 16   EXCLUDED.

11:24AM 17        I DON'T THINK IT'S 404(B), IT'S INEXTRICABLY INTERTWINED

11:24AM 18   WITH THE DEFENSE.

11:24AM 19        AT A MINIMUM, WE PROVIDED NOTICE, SO I DON'T THINK THERE'S

11:24AM 20   ANY ISSUE WITH THAT THERE.

11:24AM 21        AND YOU -- SHE'S NOT THE ONLY ONE WHO WILL SAY THIS.

11:24AM 22   INVESTORS WILL SAY, OF COURSE, IN A SMALL COMPANY WHERE WE'RE

11:24AM 23   INVESTING TENS, HUNDREDS OF MILLIONS OF DOLLARS, IF THERE IS A

11:24AM 24   RELATIONSHIP BETWEEN THE TWO MOST IMPORTANT PRINCIPALS OF THE

11:24AM 25   COMPANY THAT MIGHT AFFECT HOW THEY INTERACT, WHAT DECISIONS

ER-2797

11:24AM 1    THEY MAKE, HOW THEY'RE COMPENSATED, A WHOLE HOST OF POSSIBLE

11:24AM 2    CONFLICTS THAT ARISE, INVESTORS ARE GOING TO SAY THAT THEY

11:24AM 3    WANTED TO KNOW ABOUT THAT AND THEY THINK IT'S MATERIAL TO THE

11:24AM 4    INVESTMENT DECISION.

11:25AM 5         THOSE ARE THE FACTS, YOUR HONOR, AND THE JURY SHOULD HEAR

11:25AM 6    THAT.

11:25AM 7         THE OTHER ISSUE IS THAT THERE'S A GREAT DEAL OF --

11:25AM 8    CERTAINLY IN THE LAST TRIAL, AND TO SOME EXTENT IN THIS TRIAL,

11:25AM 9    THERE'S BEEN THEMES FROM THE DEFENSE OF MR. BALWANI RELIED ON

11:25AM 10   MS. HOLMES BECAUSE OF HER EXPERIENCE WITH THE TECHNOLOGY, OR,

11:25AM 11   YOU KNOW, I WAS JUST THE FINANCE GUY OR I WAS JUST RESPONSIBLE

11:25AM 12   FOR WALGREENS.

11:25AM 13        THERE'S A RELIANCE DEFENSE HERE, AND THE RELATIONSHIP IS

11:25AM 14   RELEVANT TO THAT RELIANCE DEFENSE AND THE INVESTORS'

11:25AM 15   UNDERSTANDING OF THAT IS RELEVANT TO AN ASSESSMENT OF WHY THEY

11:25AM 16   INVESTED.

11:25AM 17        SO WE THINK THIS IS COMPLETELY FAIR GAME.  IT'S NOT

11:25AM 18   EXCLUDABLE.  IT'S CERTAINLY RELEVANT AND IT'S NOT EXCLUDABLE

11:25AM 19   UNDER 403 OR 404.

11:25AM 20        I ADMIT, IT'S UNCOMFORTABLE ASKING QUESTIONS, DID YOU KNOW

11:25AM 21   ABOUT THE RELATIONSHIP?

11:25AM 22        AND PEOPLE ARE ENTITLED TO HAVE THEIR PRIVATE LIVES, BUT

11:25AM 23   WHEN IT'S THE TWO MOST IMPORTANT PEOPLE WITHIN THIS COMPANY,

11:26AM 24   THEY'RE HOLDING OUT SOME PARTICULAR EXPERTISE, IF THERE'S ANY

11:26AM 25   REASON, ROMANTIC OR OTHERWISE, WHY A PERSON MIGHT BE IN THAT

11:26AM 1    POSITION, EXERCISING CERTAIN RESPONSIBILITY, THAT'S SOMETHING

11:26AM 2    THAT INVESTORS WANT TO KNOW ABOUT.

11:26AM 3         THE COURT:  THANK YOU.

11:26AM 4         SO IS THE QUESTION, WERE YOU AWARE, AND WOULD THAT HAVE

11:26AM 5    MATTERED?

11:26AM 6         MR. LEACH:  YES.

11:26AM 7         THE COURT:  ARE THOSE THE TWO QUESTIONS?

11:26AM 8         MR. LEACH:  YES.

11:26AM 9         THE COURT:  IN GENERAL?

11:26AM 10        MR. LEACH:  YES, NO GREATER THAN THAT.

11:26AM 11        MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:26AM 12        I THINK I'M, INDEED, VERY FAR APART FROM MR. LEACH ON THIS

11:26AM 13   POINT.

11:26AM 14        I WILL NOTE, FIRST OF ALL, IN RESPONDING TO MR. LEACH,

11:26AM 15   THAT THE GOVERNMENT I BELIEVE HAS SAID THIS IS NOT AN OMISSIONS

11:26AM 16   CASE.

11:26AM 17        IN FACT, THE COURT MAY REMEMBER IN THE PREVIOUS TRIAL THAT

11:26AM 18   THE GOVERNMENT HAD DROPPED ITS REQUEST FOR AN INSTRUCTION THAT

11:26AM 19   TOLD THE JURY THAT IN FINAL INSTRUCTIONS ABOUT OMISSIONS.

11:26AM 20        AND THAT'S EVEN JUST TALKING ABOUT OMISSIONS THAT RELATE

11:26AM 21   TO, YOU KNOW, WHAT THE COMPANY WAS DOING WITH THEIR TECHNOLOGY

11:26AM 22   OR THEIR WALGREENS PROGRAM AND SO FORTH.

11:26AM 23        THIS IS VERY FAR AFIELD FROM THAT.  THIS IS OMISSIONS TO

11:27AM 24   TELL AN INVESTOR THAT MR. BALWANI AND MS. HOLMES ARE IN A

11:27AM 25   RELATIONSHIP, AND THEN IT SOUNDS LIKE SOME SPECULATIVE

11:27AM  1    TESTIMONY THAT THEY'RE TRYING TO ELICIT ABOUT, WELL, HOW COULD

11:27AM  2    THAT HAVE POSSIBLY, IF YOU LOOKED AT THIS IN THE RIGHT LIGHT,

11:27AM  3    HAVE MADE A DIFFERENCE?  COULD THERE SOMEHOW HAVE BEEN SOME

11:27AM  4    CONFLICT OR SOME OTHER ISSUE, NONE OF WHICH -- IT SOUNDS

11:27AM  5    SPECULATIVE, YOUR HONOR.

11:27AM  6         AND THEN FINALLY, I THINK THE WHOLE FACTUAL PREMISE FOR

11:27AM  7    THIS, WHAT MR. LEACH JUST SAID, IS WRONG.

11:27AM  8         WE ALREADY HEARD TESTIMONY IN THIS CASE FROM THE

11:27AM  9    GOVERNMENT'S WITNESS, MS. YAM, THAT BASED ON THE BOARD MINUTES,

11:27AM  10   THE BOARD INTERVIEWED CANDIDATES, THEY CONSIDERED OTHER

11:27AM  11   CANDIDATES, AND THEY SELECTED MR. BALWANI FOR THE ROLE THAT HE

11:27AM  12   HAD AT THERANOS.

11:27AM  13        SO I DON'T EVEN THINK THE FACTUAL PREMISES IS RIGHT.

11:27AM  14        BUT IN ANY EVENT, YOUR HONOR, THE IMPORTANT POINT IS THAT

11:27AM  15   THIS IS A ROMANTIC RELATIONSHIP, THIS IS NOTHING ABOUT THE

11:27AM  16   COMPANY.

11:27AM  17        THE FACT THAT TWO EXECUTIVES HAVE AN AFFAIR, IT HAPPENS

11:28AM  18   EVERY DAY ALL THROUGH CORPORATE AMERICA, AND IF THE PEOPLE

11:28AM  19   DECIDE TO KEEP IT PROFESSIONAL AT THE OFFICE OR NOT WEAR THEIR

11:28AM  20   HEARTS ON THEIR SLEEVES WHEN THEY'RE TALKING TO INVESTORS, THAT

11:28AM  21   SHOULD HAVE NO RELEVANCE OR BEARING ON THE ISSUES THAT ARE

11:28AM  22   ACTUALLY CHARGED IN THIS CASE.

11:28AM  23        THE COURT:  THANK YOU.

11:28AM  24        IS THERE GOING TO BE SOME FOUNDATIONAL TESTIMONY FROM THIS

11:28AM  25   WITNESS ABOUT -- AND PARDON ME, I'LL JUST PUT IT IN THE

11:28AM 1  COLLOQUIAL -- THE PITCH AND WHO MADE THE PITCH AND HOW THE

11:28AM 2  PITCH WAS MADE TO INVESTORS?

11:28AM 3       MR. LEACH:  YES, YOUR HONOR.

11:28AM 4       THE COURT:  AND DID THAT INCLUDE MS. HOLMES AND

11:28AM 5  MR. BALWANI, EACH OF THEM MAKING THE PITCH OR PART OF THE

11:28AM 6  PITCH?

11:28AM 7       MR. LEACH:  IT WILL, YOUR HONOR.  I ANTICIPATE THERE

11:28AM 8  WILL BE TESTIMONY ABOUT A MEETING IN PALO ALTO IN OCTOBER OF

11:28AM 9  2014, A ROUGHLY FOUR OR FIVE HOUR MEETING WHERE BOTH MS. HOLMES

11:28AM 10  AND MR. BALWANI PARTICIPATED IN AN INVESTMENT PITCH WITH

11:28AM 11  MS. PETERSON.

11:28AM 12      THERE ALSO WILL BE EVIDENCE THAT MR. BALWANI FOLLOWED UP

11:28AM 13  AFTER THAT MEETING TO, YOU KNOW, ACTUALLY SECURE THE INVESTMENT

11:29AM 14  AND THE WIRE.

11:29AM 15      SO THERE WILL BE EVIDENCE OF A PITCH IN THE MIDDLE OF

11:29AM 16  OCTOBER WHERE BOTH MS. HOLMES AND MR. BALWANI WERE PRESENT.

11:29AM 17      THE COURT:  OKAY.  THANK YOU.

11:29AM 18      YOU HAD ANOTHER POINT?  NOT ON THIS, BUT ON ANOTHER ONE

11:29AM 19  YOU WANTED TO RAISE?

11:29AM 20      MR. COOPERSMITH:  THERE WERE OTHERS, BUT DOES THE

11:29AM 21  COURT HAVE ENOUGH INFORMATION ABOUT --

11:29AM 22      THE COURT:  YES, I THINK SO.

11:29AM 23      MR. COOPERSMITH:  OKAY.  THANK YOU, YOUR HONOR.

11:29AM 24      THE NEXT ISSUE HAS TO DO WITH AN EXHIBIT THAT THE

11:29AM 25  GOVERNMENT I UNDERSTAND PLANS TO OFFER, WHICH IS 1944,

11:29AM  1    EXHIBIT 1944.

11:29AM  2        EXHIBIT 1944 IS AN EMAIL FROM A PERSON NAMED

11:29AM  3    JERRY TUBERGEN, WHO I BELIEVE IS SOMEONE THAT MS. PETERSON

11:29AM  4    WORKED WITH, AND HE WAS AT A HIGHER LEVEL THAN MS. PETERSON,

11:29AM  5    BUT SOMEONE SHE WORKED WITH.

11:29AM  6        AND THEN THE EMAIL IS NOT TO MS. PETERSON, BUT IT'S TO ONE

11:29AM  7    OF THE DEVOS FAMILY MEMBERS, A DICK DEVOS AND SOME OTHER FAMILY

11:30AM  8    MEMBERS AS WELL, AND IT ATTACHES AN ARTICLE THAT JERRY TUBERGEN

11:30AM  9    WAS POINTING OUT.

11:30AM  10       AND THE ARTICLE IS THE ROGER PARLOFF ARTICLE THAT THE

11:30AM  11   COURT IS FAMILIAR WITH.  IT HAS MS. HOLMES PICTURED ON IT, AND

11:30AM  12   THEN IT HAS VARIOUS QUOTATIONS FROM MS. HOLMES AND OTHERS ALL

11:30AM  13   THROUGHOUT THE ARTICLE ABOUT THERANOS AND ITS HISTORY AND WHAT

11:30AM  14   SUPPOSEDLY IT COULD DO.

11:30AM  15       SO THAT'S THE PARLOFF ARTICLE.

11:30AM  16       WE KNOW FROM OTHER EXHIBITS, YOUR HONOR, THAT THIS IS

11:30AM  17   SOMETHING THAT MR. TUBERGEN, ONE OF THE RDV PEOPLE, RECEIVED

11:30AM  18   FROM A DIFFERENT INVESTOR WITNESS, WHO WE WILL EVENTUALLY SEE

11:30AM  19   AT TRIAL, NAMED DAN MOSLEY, WHO'S A LAWYER AT

11:30AM  20   CRAVATH, SWAINE & MOORE.

11:30AM  21       MR. MOSLEY FORWARDS MR. TUBERGEN THE ARTICLE, MR. TUBERGEN

11:30AM  22   THEN FORWARDS IT TO SOME DEVOS FAMILY MEMBERS, AND THAT

11:30AM  23   FORWARDING IS EXHIBIT 1944.

11:30AM  24       SO IT DIDN'T COME FROM MR. BALWANI.  IT CAME FROM THIS

11:31AM  25   OTHER SOURCE.

11:31AM 1      THE COURT, DURING MR. EDLIN'S TESTIMONY, SUSTAINED AN

11:31AM 2  OBJECTION TO THE GOVERNMENT'S ATTEMPT TO INTRODUCE THE PARLOFF

11:31AM 3  ARTICLE AT THAT TIME.

11:31AM 4      THE GOVERNMENT NOW WANTS TO INTRODUCE IT THROUGH

11:31AM 5  MS. PETERSON.

11:31AM 6      I BELIEVE MS. PETERSON WOULD SAY, IF THE GOVERNMENT WAS

11:31AM 7  ALLOWED TO ASK HER, THAT SHE READ THE ARTICLE AND THAT SHE TOOK

11:31AM 8  SOME INFORMATION FROM IT.

11:31AM 9      BUT THE ARTICLE CONTAINS NOT ONLY DOUBLE, BUT I THINK

11:31AM 10  TRIPLE HEARSAY.  IT'S NOT FROM MR. BALWANI.

11:31AM 11      MR. PARLOFF HAS NOT TESTIFIED, AND MAY OR MAY NOT, WE

11:31AM 12  DON'T KNOW THAT YET.

11:31AM 13      AND IT'S A DOCUMENT THAT SHOULD BE EXCLUDED BECAUSE OF THE

11:31AM 14  HEARSAY PROBLEM AND THE SAME OBJECTION THAT THE COURT ALREADY

11:31AM 15  SUSTAINED IN THE CASE OF MR. EDLIN.

11:31AM 16          THE COURT:  OKAY.

11:31AM 17          MR. LEACH:  YOUR HONOR, MS. PETERSON WAS PROVIDED

11:31AM 18  WITH A BINDER OF DUE DILIGENCE MATERIALS UNDER A

11:31AM 19  CONFIDENTIALITY AGREEMENT SIGNED BY MR. BALWANI.

11:31AM 20      THE DUE DILIGENCE PACKAGE INCLUDES A REFERENCE TO A NUMBER

11:32AM 21  OF NEWS ARTICLES, INCLUDING THE PARLOFF ARTICLE.

11:32AM 22      AND I ANTICIPATE MS. PETERSON WILL SAY SHE UNDERSTOOD

11:32AM 23  THERANOS TO BE SAYING, GO TO THESE ARTICLES, READ THEM, THIS IS

11:32AM 24  WHAT YOU SHOULD RELY ON IN MAKING AN INVESTMENT DECISION.

11:32AM 25      WE ARE NOT OFFERING -- SO IT WAS ABSOLUTELY HELD OUT BY

11:32AM 1     THERANOS ESSENTIALLY AS A PROSPECTUS, SOMETHING THAT THE

11:32AM 2     INVESTORS SHOULD READ AND DIGEST AND RELY ON AND COUNT ON.

11:32AM 3     AND IT'S BEING PROVIDED UNDER A CONFIDENTIALITY AGREEMENT

11:32AM 4     EXECUTED BY THE DEFENDANT.

11:32AM 5     WE ARE NOT OFFERING THE PARLOFF ARTICLE FOR THE TRUTH OF

11:32AM 6     THE STATEMENTS IN THERE.  THESE ARE, ON A VERY REAL LEVEL, THE

11:32AM 7     REPRESENTATIONS THAT WERE MADE TO RDV AS PART OF ITS INVESTMENT

11:32AM 8     PROCESS.

11:32AM 9     AND MS. PETERSON IS GOING TO SAY, I'VE READ THIS, I'VE

11:32AM 10    RELIED ON THIS, THIS IS PART OF THE BASIS FOR MY INVESTMENT

11:32AM 11    DECISION.

11:32AM 12    THE TRUTH OR FALSITY OF THE STATEMENTS IN THE PARLOFF

11:33AM 13    ARTICLE ARE IRRELEVANT.  THEY ARE OFFERED SIMPLY BECAUSE THESE

11:33AM 14    ARE THE STATEMENTS THAT WERE MADE TO THE WORLD AND QUITE

11:33AM 15    FOCUSSED TO RDV THROUGH THE INVESTMENT MATERIALS TO

11:33AM 16    MS. PETERSON.

11:33AM 17    WE ARE OFFERING THIS BECAUSE WE THINK MANY OF THE

11:33AM 18    STATEMENTS IN THE PARLOFF ARTICLE ARE FALSE, AND I THINK WE

11:33AM 19    HAVE PROVEN THE FALSITY OF MANY OF THE REPRESENTATIONS IN THIS

11:33AM 20    ARTICLE.

11:33AM 21    SO I THINK THE WHOLE THING SHOULD COME IN, BUT AT A

11:33AM 22    MINIMUM, YOU KNOW, I'M PREPARED TO GO THROUGH MODEST PORTIONS

11:33AM 23    OF THE ARTICLE TO HIGHLIGHT PARTICULAR PHRASES THAT WE THINK

11:33AM 24    ARE FALSE THAT MS. PETERSON FOUND MATERIAL THAT WERE HELD OUT

11:33AM 25    TO HER BY THERANOS AND THESE DEFENDANTS AS INFORMATION THAT

11:33AM 1    THEY SHOULD RELY ON.

11:33AM 2         SO THERE IS NO HEARSAY PROBLEM HERE.  THAT'S THE ONLY

11:33AM 3    OBJECTION THAT I'M HEARING FROM THEM.

11:33AM 4         FRANKLY, WE'RE OFFERING IT FOR THE FALSITY, NOT FOR THE

11:34AM 5    TRUTH.  SO I DON'T THINK THE HEARSAY OBJECTION IS WELL TAKEN.

11:34AM 6         IF IT'S THE ENTIRETY, AND I'M ACTUALLY NOT QUITE SURE WHAT

11:34AM 7    PROVISION OF THIS IS CAUSING MR. COOPERSMITH ANGST, BUT IF

11:34AM 8    THERE IS SOMETHING IN THERE, YOU KNOW, THERE'S A SMALL

11:34AM 9    PERCENTAGE OF STATEMENTS I WANTED TO HIGHLIGHT WITH HER, AND WE

11:34AM 10   WOULD BE PREPARED TO DO THAT, TOO, IF NECESSARY.

11:34AM 11        MR. COOPERSMITH:  ALL OF IT, YOUR HONOR.

11:34AM 12        BUT HERE'S THE PROBLEM WITH WHAT MR. LEACH JUST SAID.

11:34AM 13        SO, FIRST OF ALL, WE DON'T EVEN KNOW AT THIS POINT IN THIS

11:34AM 14   TRIAL WHETHER MR. PARLOFF EVEN GOT IT RIGHT.  I DON'T KNOW

11:34AM 15   WHETHER THE STATEMENTS HE'S QUOTING FROM MS. HOLMES AND OTHERS

11:34AM 16   IN THE ARTICLE ARE CORRECT, AND WE DON'T KNOW THAT.

11:34AM 17        SO THERE'S THAT LAYER OF HEARSAY REGARDLESS OF WHAT THE

11:34AM 18   GOVERNMENT IS OFFERING THE OTHER STATEMENTS IN THERE.  SO

11:34AM 19   MR. LEACH HAS NOT SOLVED FOR THAT LAYER OF HEARSAY IN ANY WAY.

11:34AM 20        AND I WILL ALSO JUST SAY, YOUR HONOR, THAT IN THIS TRIAL,

11:34AM 21   THEY HAVE NOT EVEN LINKED THIS TO MR. BALWANI.

11:34AM 22        AS I SAID IN THE FIRST PLACE, THIS ARTICLE GETS TO RDV, TO

11:35AM 23   MR. TUBERGEN, WHO IS ULTIMATELY MS. PETERSON'S BOSS, IT GETS TO

11:35AM 24   RDV BECAUSE OF SOMEONE ELSE WHO SENDS IT AND NOT MR. BALWANI,

11:35AM 25   RIGHT?

3802

11:35AM 1          THE COURT:  OKAY.  BUT IS IT AN ISSUE -- PARDON ME

11:35AM 2     FOR INTERRUPTING YOU.

11:35AM 3          WHAT I HEARD MR. LEACH SAY IS THAT WHATEVER THE SOURCE OF

11:35AM 4     THE ARTICLE, IT WAS FORWARDED TO MS. PETERSON AS PART OF THE

11:35AM 5     INVESTMENT PITCH BY YOUR CLIENT.

11:35AM 6          DOES THAT CHANGE THINGS?

11:35AM 7          MR. COOPERSMITH:  WELL, FIRST OF ALL, THAT'S NOT

11:35AM 8     ACCURATE.

11:35AM 9          THE COURT:  OH.

11:35AM 10         MR. COOPERSMITH:  AND WE HEARD TESTIMONY FROM

11:35AM 11    MR. EDLIN ABOUT INVESTOR PITCHES, AND WHAT MR. EDLIN TESTIFIED

11:35AM 12    IS THAT THE ONLY THING THAT HE EVER GOT FROM MR. BALWANI WAS

11:35AM 13    THE FINANCIAL PIECE OF THIS PITCH, IF YOU WILL.

11:35AM 14         I'M SURE THAT MR. LEACH IS GOING TO GO INTO THAT FINANCIAL

11:35AM 15    PIECE AT LENGTH, AND WE'RE NOT OBJECTING TO THAT.

11:35AM 16         BUT THIS BINDER DOES NOT CONTAIN THE ARTICLE.  IT'S NOT IN

11:35AM 17    THE BINDER.

11:35AM 18         AND THIS IS -- I THINK WHAT MR. LEACH IS REFERRING TO IS

11:36AM 19    EXHIBIT 4858, WHICH IS A VERY LENGTHY DOCUMENT WITH A LOT OF

11:36AM 20    SLIDES AND OTHER MATERIALS.

11:36AM 21         AND ONE OF THE PAGES OF THAT DOCUMENT, I BELIEVE IT'S

11:36AM 22    PAGE 104 OF EXHIBIT 4858, HAS A LIST OF ARTICLES, AND I THINK

11:36AM 23    THE TITLE OF IT IS PRESS ABOUT THERANOS.

11:36AM 24         THE COURT:  OKAY.

11:36AM 25         MR. COOPERSMITH:  AND ONE OF THEM IS THE ARTICLE,

ER-2806

11:36AM 1    BUT THE ARTICLE ITSELF IS NOT THERE.

11:36AM 2        THERE'S NO EVIDENCE IN THIS TRIAL THAT MR. BALWANI

11:36AM 3    ASSEMBLED THAT PITCH OR SENT IT TO RDV.  IT'S JUST NOT LINKED

11:36AM 4    TO MR. BALWANI.

11:36AM 5        IN ADDITION TO THE FACT THAT THE ARTICLE, EVEN BEFORE THIS

11:36AM 6    SLIDE DECK WAS SENT AT RDV, THEY ALREADY HAD IT FROM A TOTALLY

11:36AM 7    DIFFERENT SOURCE.

11:36AM 8        SO IT'S JUST A NEWS MEDIA ARTICLE.  IT CONTAINS MULTIPLE

11:36AM 9    LAYERS OF HEARSAY THAT MR. LEACH HAS NOT SOLVED FOR AND IT

11:36AM 10   SHOULD NOT BE ADMITTED.

11:36AM 11       THE COURT:  WELL, LET ME EXPLORE THE ISSUE ABOUT THE

11:36AM 12   SOURCE OF IT.

11:36AM 13       MR. BALWANI DID NOT SEND THIS AS PART OF A PITCH?

11:36AM 14       MR. LEACH:  MR. BALWANI SIGNS A CONFIDENTIALITY

11:36AM 15   AGREEMENT FOR DUE DILIGENCE MATERIALS THAT GO TO RDV.

11:37AM 16       THOSE DUE DILIGENCE MATERIALS INCLUDE A POWERPOINT THAT,

11:37AM 17   AS MR. COOPERSMITH DESCRIBED, SAY RECENT PRESS, AND ONE OF THE

11:37AM 18   RECENT PRESS IS THE ARTICLE.

11:37AM 19       AND MS. PETERSON IS GOING TO SAY, WHEN I READ THESE DUE

11:37AM 20   DILIGENCE MATERIALS THAT WERE PROVIDED TO HER AS PART OF A

11:37AM 21   PROCESS THAT MR. BALWANI IS INVOLVED IN, I READ THAT AS

11:37AM 22   THERANOS SAYING GO TO THESE ARTICLES, READ THEM, RELY ON THEM.

11:37AM 23       THE COURT:  RIGHT.  AND SO -- I'M SORRY TO INTERRUPT

11:37AM 24   YOU, BUT IT'S IMPORTANT FOR ME TO KNOW MR. BALWANI'S ROLE IN

11:37AM 25   THE -- IN HER RECEIPT OF THOSE MATERIALS IN SUPPORT OF THE

11:37AM 1      INVESTMENT AND WHAT WAS HIS ROLE.

11:37AM 2               MR. LEACH:  HE SIGNS THE CONFIDENTIALITY AGREEMENT

11:37AM 3      UNDER WHICH THE MATERIALS ARE PROVIDED.

11:37AM 4          MS. HOLMES FOLLOWS UP WITH AN EMAIL THAT IS -- SO HE

11:37AM 5      CERTAINLY KNOWS THAT SOME MATERIALS ARE GOING OUT TO HER.

11:37AM 6          MS. HOLMES WRITES IN AN EMAIL, "OUR TEAM WILL GET YOU THE

11:38AM 7      MATERIALS."

11:38AM 8          HE'S THEN PART OF A MEETING IN OCTOBER OF 2014 WHERE, YOU

11:38AM 9      KNOW, I DON'T THINK THE ARTICLE WAS PASSED AROUND, BUT THEY

11:38AM 10     TALKED ABOUT INFORMATION THAT IS IN THE DUE DILIGENCE

11:38AM 11     MATERIALS.

11:38AM 12         MS. PETERSON WILL SAY, I BROUGHT THE DUE DILIGENCE

11:38AM 13     MATERIALS WITH ME AND WE WENT THROUGH THEM, INCLUDING A

11:38AM 14     FINANCIAL STATEMENT THAT MR. BALWANI TALKED TO SPECIFICALLY.

11:38AM 15         SO THESE WERE SENT IN ADVANCE OF A MEETING THAT

11:38AM 16     MR. BALWANI PARTICIPATED IN.

11:38AM 17         I DO WANT TO GO TO THIS CONCEPT THAT THE GOVERNMENT --

11:38AM 18     BEFORE INTRODUCING ANY EVIDENCE, THE GOVERNMENT IS REQUIRED TO

11:38AM 19     PROVE THAT MR. BALWANI REVIEWED AND APPROVED EVERY SINGLE PAGE

11:38AM 20     OF THE POWERPOINT.

11:38AM 21         I THINK THAT'S AN ISSUE THAT GOES TO WEIGHT, YOUR HONOR,

11:38AM 22     AND NOT THE ADMISSIBILITY OF THE DOCUMENT.

11:38AM 23         MS. HOLMES IS SENDING A NUMBER OF THESE POWERPOINTS IN

11:38AM 24     CERTAIN INSTANCES.

11:38AM 25         THE COURT WILL HEAR FROM AN INVESTOR LATER,

11:38AM 1    BRIAN GROSSMAN, WHO WILL SAY, I RECEIVED A DUE DILIGENCE

11:39AM 2    POWERPOINT DIRECTLY FROM MR. BALWANI.

11:39AM 3        THE TEXT MESSAGES THAT ARE IN EVIDENCE AT 5387H INCLUDE A

11:39AM 4    TEXT AT PAGE 17 WHERE MS. HOLMES AND MR. BALWANI ARE TALKING

11:39AM 5    ABOUT WHAT DOCUMENTS SHOULD BE INCLUDED AND NOT INCLUDED IN

11:39AM 6    INVESTOR MATERIALS.

11:39AM 7        MS. HOLMES WRITES, "AM PLANNING ON INCLUDING ALL WE SENT

11:39AM 8    DST," WHICH I THINK IS ANOTHER PROSPECTIVE INVESTOR, "INCLUDING

11:39AM 9    THE PFIZER REPORTS, LET ME KNOW IF YOU DISAGREE, ALSO THE

11:39AM 10   HOSPITAL LIST."

11:39AM 11       SO THERE IS EVIDENCE, OUTSIDE OF MR. EDLIN, THAT

11:39AM 12   MS. HOLMES AND MR. BALWANI WERE COLLABORATING ON WHAT SHOULD OR

11:39AM 13   SHOULDN'T GO TO INVESTORS.

11:39AM 14       MR. COOPERSMITH HAS POINTS ON CROSS-EXAMINATION THAT HE'S

11:39AM 15   NOT THE ONE WHO PHYSICALLY SENT THE PARLOFF ARTICLE TO HER.  I

11:39AM 16   DON'T THINK WE HAVE EVIDENCE OF WHO STAMPED THE MAILING FOR THE

11:40AM 17   DUE DILIGENCE PACKAGES TO MS. PETERSON.

11:40AM 18       BUT HE'S ABSOLUTELY INVOLVED IN THIS PROCESS.  HE'S

11:40AM 19   COLLABORATING WITH MS. HOLMES IN OTHER INSTANCES ABOUT WHAT

11:40AM 20   SHOULD OR SHOULDN'T BE IN THERE.  THEY'RE WORKING TOGETHER IN

11:40AM 21   INVESTOR MEETINGS.

11:40AM 22       I THINK THESE SUPPORT AN INFERENCE THAT MR. BALWANI HAS

11:40AM 23   FAMILIARITY WITH WHAT IS IN THERE.

11:40AM 24       AND AGAIN, THEY'RE HOLDING -- MS. HOLMES, THERE'S ACTUALLY

11:40AM 25   NO QUESTION ABOUT THAT, IS HOLDING OUT THE PARLOFF ARTICLE AS

11:40AM 1    SOMETHING THAT COULD BE RELIED ON.

11:40AM 2        MR. BALWANI IS SITTING THERE IN THE MEETING PARTICIPATING

11:40AM 3    WHERE TOPICS WITHIN THAT ARTICLE, MAYBE NOT THE ARTICLE ITSELF,

11:40AM 4    COME UP.

11:40AM 5        ALL OF THESE ARE WEIGHT ARGUMENTS.  THEY'RE NOT EVEN

11:40AM 6    HEARSAY ARGUMENTS.

11:40AM 7        AND THIS IS A FRAUD CASE, YOUR HONOR.  WHAT THE

11:40AM 8    DEFENDANT -- OR WHAT THE VICTIMS RELIED ON OR REVIEWED IS

11:40AM 9    RELEVANT TO MATERIALITY.  SHE'S GOING TO SAY SHE READ IT AND

11:40AM 10   PLACED WEIGHT ON IT.

11:40AM 11       IT'S A -- YOU KNOW, IT'S NOT JUST -- IT'S NOT JUST

11:40AM 12   IMPORTANT FOR WHO MADE THE STATEMENT, BUT FOR WHAT INFORMATION

11:41AM 13   WAS RELEVANT TO HER OR NOT RELEVANT TO HER IN MAKING HER

11:41AM 14   INVESTMENT DECISION.

11:41AM 15           THE COURT:  OKAY.

11:41AM 16           MR. COOPERSMITH:  YOUR HONOR, THE COURT ASKED A

11:41AM 17   DIRECT QUESTION OF MR. LEACH, WHICH WAS, WHAT EXACTLY WAS

11:41AM 18   MR. BALWANI'S ROLE IN SENDING THE POWERPOINT?

11:41AM 19       AND WHAT I HEARD FROM MR. LEACH WAS A LOT OF KIND OF

11:41AM 20   SKATING AROUND THE MARGINS OF THAT, BUT NOT AN ANSWER THAT

11:41AM 21   MR. BALWANI WAS INVOLVED IN SENDING THIS POWERPOINT.

11:41AM 22       THE TESTIMONY FROM MR. EDLIN WAS THAT HE WAS INVOLVED.

11:41AM 23   MR. EDLIN HAD ASKED FOR FINANCIAL INFORMATION FROM MR. BALWANI,

11:41AM 24   AND THAT WAS IT.

11:41AM 25       AND THE FACT THAT TOPICS THAT ALSO WERE ADDRESSED IN THE

11:41AM 1    PARLOFF ARTICLE WERE ALSO DISCUSSED AT THE MEETING THAT THE

11:41AM 2    DEVOS FAMILY AND MS. PETERSON ATTENDED IN MID-OCTOBER OF '14,

11:41AM 3    IF THE GOVERNMENT WANTS TO ASK MS. PETERSON WHAT SHE REMEMBERS

11:41AM 4    ABOUT THAT MEETING WHILE MR. BALWANI WAS PRESENT, I'M THINK

11:41AM 5    THAT'S FAIR GAME AND I'M SURE THEY WILL DO THAT.

11:41AM 6         BUT THE FACT THAT THERE WERE ALSO TOPICS THAT ALSO APPEAR

11:41AM 7    IN THE PARLOFF ARTICLE, WELL, BOTH WERE ABOUT THERANOS, SO IT'S

11:42AM 8    NOT SURPRISING THAT THERE WAS OVERLAP THERE.  BUT THAT DOES NOT

11:42AM 9    IN ANY WAY MAKE THE PARLOFF ARTICLE ADMISSIBLE.

11:42AM 10        SO THEY HAVE NOT -- IT IS REALLY IMPORTANT, AS THE COURT

11:42AM 11   ASKED, WHAT MR. BALWANI'S ROLE IS.  I HAVE NOT HEARD FROM

11:42AM 12   MR. LEACH AN EXPLANATION THAT WOULD MAKE THIS TRIPLE HEARSAY

11:42AM 13   DOCUMENT ADMISSIBLE.

11:42AM 14        THE COURT:  WELL, WHAT ABOUT MR. LEACH'S POINT THAT

11:42AM 15   THIS IS NOT, IT'S NOT HEARSAY, IT'S NOT OFFERED FOR THE TRUTH

11:42AM 16   OF THE MATTER ASSERTED?

11:42AM 17        MR. COOPERSMITH:  RIGHT.

11:42AM 18        SO, YOUR HONOR, WHERE THAT FAILS IS THERE'S A JOURNALIST

11:42AM 19   NAMED ROGER PARLOFF, RIGHT, WHO HAS NOT TESTIFIED IN THIS

11:42AM 20   TRIAL -- AND MAYBE HE WILL, MAYBE HE WON'T -- AND MR. PARLOFF

11:42AM 21   IS PUTTING DOWN IN AN ARTICLE WHAT HE CLAIMS PEOPLE SAID.

11:42AM 22        AS TO WHETHER HE'S CORRECT OR NOT CORRECT OR MAKING IT UP,

11:42AM 23   WE JUST DON'T KNOW BECAUSE WE HAVE NOT HEARD FROM HIM IN THIS

11:42AM 24   TRIAL.

11:42AM 25        SO THAT'S THE HEARSAY LAYER THAT MR. LEACH'S ARGUMENT

11:42AM 1    CANNOT SURMOUNT, AND IT'S HEARSAY BASED ON THAT.

11:42AM 2          AS TO WHAT IS THE CONTENT OF IT AS TO MS. HOLMES IS QUOTED

11:43AM 3    AS SAYING SOMETHING, IT MAY WELL BE TRUE THAT THEY'RE TRYING TO

11:43AM 4    OFFER THAT FOR THE FALSITY AS OPPOSED TO THE TRUTH.

11:43AM 5          BUT THEY CAN'T GET BY THAT LAYER OF HEARSAY WHERE IT'S

11:43AM 6    MR. PARLOFF WHO IS REPORTING ON WHAT, IN THIS CASE, MS. HOLMES

11:43AM 7    SAID AND OTHER PEOPLE SAID.

11:43AM 8          SO THAT'S THE LAYER OF HEARSAY THAT IS THE PROBLEM.

11:43AM 9                THE COURT:  OKAY.

11:43AM 10         MR. LEACH.

11:43AM 11               MR. LEACH:  YOUR HONOR, IF I TAKE THIS PIECE OF

11:43AM 12   PAPER RIGHT HERE, SOMETHING -- I HAPPENED TO WRITE ON THIS

11:43AM 13   ONE -- BUT THAT I DIDN'T WRITE AND THAT INCLUDES LOTS OF QUOTES

11:43AM 14   FROM SOMEONE ELSE AND I HAND THIS TO YOU AND I SAY, YOU SHOULD

11:43AM 15   RELY ON THIS FOR YOUR INVESTMENT DECISION, THERE'S NO HEARSAY

11:43AM 16   PROBLEM.  IT'S, IT'S -- THERE'S NO HEARSAY PROBLEM.  IT'S WHAT

11:43AM 17   SHE IS RELYING ON.

11:43AM 18         IT DOESN'T MATTER IF IT SAYS, PARLOFF SAYS HOLMES SAID X.

11:43AM 19         IT'S THE DEFENDANTS HOLDING THIS OUT IS THE THING THAT

11:43AM 20   SHOULD BE RELIED ON IT, WHOEVER SAID WHAT IN IT.

11:43AM 21         WE'RE NOT OFFERING IT FOR ITS TRUTH.  WE'RE NOT OFFERING

11:43AM 22   IT FOR HOLMES SAID THESE THINGS TO PARLOFF.

11:43AM 23         WE'RE OFFERING IT BECAUSE THERANOS, THROUGH MS. HOLMES AND

11:44AM 24   MR. BALWANI, HELD IT OUT THERE.

11:44AM 25         WHAT I HEAR OF THE CORE OF THE DEFENSE ARGUMENT IS THAT

| 11:44AM | 1 | BALWANI DIDN'T WRITE THIS, BALWANI MAY NOT HAVE EVEN KNOWN |

11:44AM 1  BALWANI DIDN'T WRITE THIS, BALWANI MAY NOT HAVE EVEN KNOWN

11:44AM 2  ABOUT IT.

11:44AM 3      ALL OF THOSE ARE WEIGHT ARGUMENTS.  HE WANTS TO

11:44AM 4  DISASSOCIATE HIMSELF FROM THE FALSE STATEMENTS IN THE ARTICLE.

11:44AM 5  HE CAN DO THAT THROUGH CROSS-EXAMINATION.

11:44AM 6      I DIDN'T SIT FOR IT.

11:44AM 7      WE THINK HE DID.

11:44AM 8      I DIDN'T KNOW THE ARTICLE -- DID MR. BALWANI HAND YOU THE

11:44AM 9  ARTICLE?

11:44AM 10     NO.

11:44AM 11     HE CAN DISASSOCIATE HIMSELF FROM THE STATEMENTS IN THERE

11:44AM 12 ALL HE WANTS THROUGH CROSS-EXAMINATION, AND THAT MAY OR MAY NOT

11:44AM 13 BE EFFECTIVE, BUT IT'S NOT HEARSAY.

11:44AM 14     AND HE'S LINKED TO THESE INVESTMENT PITCHES, NOT JUST IN

11:44AM 15 THIS PARTICULAR ONE, BUT VIRTUALLY EVERYONE THAT THE COURT IS

11:44AM 16 GOING TO HEAR FROM.

11:44AM 17     HE PERSONALLY SENDS OUT A DUE DILIGENCE PACKAGE TO

11:44AM 18 BRIAN GROSSMAN.

11:44AM 19     THE TEXT MESSAGES ARE CLEAR AS DAY THAT THEY'RE

11:44AM 20 COLLABORATING ABOUT WHAT SHOULD GO IN THERE.

11:44AM 21     EVERYTHING THAT MR. COOPERSMITH IS RAISING IS A WEIGHT

11:44AM 22 ARGUMENT, NOT A VALID HEARSAY ARGUMENT.

11:45AM 23         THE COURT:  OKAY.  THANK YOU.

11:45AM 24         MR. COOPERSMITH:  YOUR HONOR, JUST TO BRIEFLY

11:45AM 25 RESPOND TO THAT.

3810

11:45AM 1    WHAT I HEARD MR. LEACH SAYING AS THE ANSWER TO THE HEARSAY

11:45AM 2    PROBLEM OF MR. PARLOFF REPORTING ON THINGS IS THAT MR. BALWANI,

11:45AM 3    ACCORDING TO MR. LEACH, IS THE ONE WHO REPRESENTS, HEY, READ

11:45AM 4    THIS ARTICLE, THIS IS ABOUT THERANOS, THIS IS GREAT.

11:45AM 5    THE PROBLEM IS THAT THERE IS NO EVIDENCE THAT THAT'S WHAT

11:45AM 6    HAPPENED.  THAT'S NOT CORRECT.

11:45AM 7    MR. EDLIN SAID THE ONLY THING HE GOT FROM MR. BALWANI WAS

11:45AM 8    FINANCIAL INFORMATION.

11:45AM 9    AS I'VE SAID, THE RDV PEOPLE GET THIS ARTICLE FROM A

11:45AM 10   DIFFERENT SOURCE, NOT FROM MR. BALWANI.

11:45AM 11   THERE'S NO EVIDENCE THAT MR. BALWANI REPRESENTED THAT THIS

11:45AM 12   IS SOMETHING THAT THEY SHOULD READ.

11:45AM 13   MR. LEACH DOES NOT, APPARENTLY, HAVE EVIDENCE THAT THIS

11:45AM 14   ARTICLE WAS DISCUSSED AT THE MEETING HE'S REFERRING TO IN

11:45AM 15   OCTOBER.  IN FACT, HE ADMITTED THAT.

11:45AM 16   SO THESE ARE JUST NOT THE FACTS.

11:45AM 17   AS FOR MR. GROSSMAN, I THINK WHEN MR. GROSSMAN COMES ON

11:45AM 18   THE STAND, WE'LL DEAL WITH WHATEVER ISSUES WE HAVE WITH HIM,

11:45AM 19   BUT THAT'S NOT RELEVANT TO THIS MATTER.

11:45AM 20   THE COURT:  WHAT ABOUT THE FACT THAT MR. LEACH IS

11:46AM 21   TALKING ABOUT NDA'S THAT YOUR CLIENT SIGNED IN RELATION TO

11:46AM 22   THESE DOCUMENTS?

11:46AM 23   MR. COOPERSMITH:  RIGHT.  THAT WAS ONE OF WHAT I

11:46AM 24   DESCRIBED AS SKATING AROUND THE MARGINS OF THINGS.

11:46AM 25   SURE, MR. BALWANI'S ADMINISTRATIVE TASK OF MAKING SURE A

ER-2814

11:46AM 1    NONDISCLOSURE AGREEMENT WAS SIGNED BEFORE CONFIDENTIAL

11:46AM 2    MATERIALS WERE SENT TO THIS PROSPECTIVE INVESTOR, BUT THAT IN

11:46AM 3    NO WAY INFORMS AS TO WHAT WAS SENT, AND IT CERTAINLY IN NO WAY

11:46AM 4    INFORMS THAT MR. BALWANI SAID, WELL, SEND THE PARLOFF ARTICLE

11:46AM 5    TO HIM.

11:46AM 6        THIS WAS A JUST GENERAL NDA THAT WOULD COVER ANYTHING.  IN

11:46AM 7    FACT, IT'S THE KIND OF THING THAT WOULD COVER EVERYTHING BUT

11:46AM 8    SOMETHING LIKE THE PARLOFF ARTICLE.

11:46AM 9        NDA'S ARE FOR CONFIDENTIAL, YOU KNOW, TRADE SECRET,

11:46AM 10   PROPRIETARY TYPE OF INFORMATION DISCLOSURE ISSUES, NOT A PUBLIC

11:46AM 11   ARTICLE THAT IS IN "FORTUNE" ARTICLE.

11:46AM 12           THE COURT:  WELL, IS THAT A PITCH, THOUGH?  IS THAT

11:46AM 13   THE COMPANY'S PITCH?  IS THAT WHAT THE NDA WAS INVOLVING?

11:46AM 14           MR. COOPERSMITH:  THE NDA IS JUST FACILITATING THE

11:46AM 15   ABILITY TO SEND PROPRIETARY INFORMATION TO A POTENTIAL

11:46AM 16   INVESTOR.  THAT'S IT.

11:47AM 17           THE COURT:  IS THAT THE PITCH, WHAT WAS BEING SENT,

11:47AM 18   MR. LEACH?

11:47AM 19           MR. COOPERSMITH:  YES, YOUR HONOR.  IT WAS, IT WAS

11:47AM 20   FACILITATING THE SENDING OF PROPRIETARY INFORMATION, WHICH YOU

11:47AM 21   COULD DESCRIBE AS THE PITCH MATERIALS OR THE --

11:47AM 22           THE COURT:  RIGHT.

11:47AM 23           MR. COOPERSMITH:  -- BUT THAT'S NOT --

11:47AM 24           THE COURT:  DOES THAT MAKE A DIFFERENCE?

11:47AM 25           MR. LEACH:  IT ABSOLUTELY DOES NOT, YOUR HONOR.

11:47AM 1    THE DEFENSE WANT TO SAY THAT THE DEFENDANT SIGNED THE

11:47AM 2    CONFIDENTIALITY AGREEMENT UNDER WHICH THE DUE DILIGENCE

11:47AM 3    MATERIALS WERE SENT, BUT HE HAS NO IDEA WHAT IS IN THE DUE

11:47AM 4    DILIGENCE MATERIALS.

11:47AM 5    THAT'S AN ARGUMENT THAT CAN BE MADE.

11:47AM 6    BUT I THINK A FAIR INFERENCE FROM THE FACT THAT HE'S

11:47AM 7    SIGNING THE DOCUMENT UNDER WHICH THE DUE DILIGENCE MATERIALS

11:47AM 8    ARE PROVIDED SUPPORT AN INFERENCE THAT HE HAS SOME

11:47AM 9    UNDERSTANDING OF WHAT IS IN THE DUE DILIGENCE MATERIALS.

11:47AM 10    THE COURT:  I'M SORRY TO INTERRUPT YOU.

11:47AM 11    BUT, MR. COOPERSMITH, THAT'S WHAT SWAYS ME TO THINK THAT

11:47AM 12    THAT THEN -- IF THAT'S THE TRAIL -- I DON'T KNOW HOW THIS IS

11:47AM 13    GOING TO COME OUT, BUT LET ME TELL YOU, IF THAT IS THE

11:47AM 14    FOUNDATION FOR THIS, THEN IT SEEMS TO BE A WEIGHT ISSUE AS

11:48AM 15    OPPOSED TO AN ADMISSIBILITY ISSUE.

11:48AM 16    IF, IN FACT, THERE IS -- THIS NDA WAS SIGNED AND THE

11:48AM 17    REASON FOR THAT WAS TO ALLOW THE MATERIALS FOR A PITCH,

11:48AM 18    INVESTMENT PITCH TO BE SENT, AND IT HAS PARTIES' SIGNATURES ON

11:48AM 19    IT, THEN ALBEIT AS SMALL AS THAT MIGHT BE, MINUTE AS THAT MIGHT

11:48AM 20    BE, IF IT INFORMS, IF IT'S PART OF THE PITCH, THEN THAT -- IT

11:48AM 21    SEEMS TO ME THAT THAT MIGHT BE ADMISSIBLE, AND THEN IT BECOMES

11:48AM 22    AN ISSUE OF WEIGHT, AS YOU SAID, THE DILUTION OF IT.

11:48AM 23    SO LET ME JUST SAY, I'M GOING TO WAIT TO SEE HOW THAT

11:48AM 24    FOUNDATION DEVELOPS AND SEE IF IT'S SUFFICIENT OR NOT.

11:48AM 25    MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

3813

11:48AM 1      WELL, I THINK THIS ISSUE OF SIGNING AN NDA IS A SLENDER

11:48AM 2  READ INDEED, AND ONE OF THE REASONS IS THAT THE NDA WOULD IN NO

11:48AM 3  WAY BE NECESSARY TO SEND MS. PETERSON OR RDV THE PARLOFF

11:48AM 4  ARTICLE OR A CITATION TO IT.  THAT HAS NOTHING TO DO WITH IT.

11:49AM 5      THAT'S EXACTLY WHAT AN NDA DOES NOT COVER, RIGHT?  THIS IS

11:49AM 6  A "FORTUNE" ARTICLE --

11:49AM 7          THE COURT:  SURE, RIGHT.  WELL, LET'S JUST SEE WHAT

11:49AM 8  DEVELOPS.  WE'LL SEE HOW WIDE THAT NET DEVELOPS WITH THE

11:49AM 9  EVIDENCE.

11:49AM 10     WHAT WAS YOUR THIRD ISSUE?

11:49AM 11         MR. COOPERSMITH:  OH.  THANK YOU, YOUR HONOR.

11:49AM 12     IN THE SAME INVESTOR MATERIALS DOCUMENT THAT WE WERE JUST

11:49AM 13 TALKING ABOUT, WHICH IS EXHIBIT 4858, AND IT'S AT PAGE 104.

11:49AM 14 THIS IS ACTUALLY WHERE I THINK I MISCITED PAGE 104.

11:49AM 15     PAGE 104 IS WHERE THE PFIZER REPORT EXISTS.  I THINK THE

11:49AM 16 PRESS PART WAS ANOTHER PAGE.

11:49AM 17     BUT THE PFIZER REPORT APPEARS ON PAGE 104 OF EXHIBIT 4858,

11:49AM 18 AND THE COURT IS FAMILIAR WITH THAT DOCUMENT.  THIS IS THE

11:49AM 19 DOCUMENT THAT, AS IT EXISTS IN THIS EXHIBIT, HAS THE PFIZER

11:49AM 20 LOGO AND THE THERANOS LOGO, AND THEN IT HAS MANY PAGES OF

11:50AM 21 DESCRIPTION OF THE PROJECT THAT THEY WERE EXPECTING TO HAVE.

11:50AM 22     WE'RE NOT OBJECTING TO THE ADMISSIBILITY OF THAT REPORT.

11:50AM 23 I THINK MS. PETERSON WILL SAY THAT SHE RECEIVED THAT BINDER AND

11:50AM 24 THIS WAS AMONG THE THINGS THAT SHE REVIEWED IN HELPING RDV TO

11:50AM 25 MAKE AN INVESTMENT DECISION.

ER-2817

11:50AM 1       SO WE'RE NOT ASKING FOR THE REPORT TO BE EXCLUDED.

11:50AM 2       WHAT WE ARE ASKING FOR, YOUR HONOR, IS FOR THE GOVERNMENT

11:50AM 3   NOT TO BE ABLE TO HIGHLIGHT THE LOGOS ISSUE BECAUSE, AS THE

11:50AM 4   COURT MAY REMEMBER FROM ANOTHER ARGUMENT INVOLVING

11:50AM 5   SCHERING-PLOUGH, AT THAT TIME THE COURT ALLOWED THE

11:50AM 6   SCHERING-PLOUGH LOGOS ISSUE INTO EVIDENCE BECAUSE THERE WAS

11:50AM 7   EVIDENCE THAT MR. BALWANI AT LEAST HAD POSSESSION IN HIS EMAIL

11:50AM 8   ACCOUNT OF A SCHERING-PLOUGH REPORT WITHOUT THE LOGOS.

11:50AM 9       AND THERE WAS EVIDENCE THAT HE HAD POSSESSION OF THE

11:50AM 10  DOCUMENT WITH THE SCHERING-PLOUGH LOGO.

11:50AM 11      THAT DOES NOT EXIST FOR PFIZER, SO THERE'S NO EVIDENCE

11:50AM 12  THAT MR. BALWANI HAS EVER SEEN THE PFIZER REPORT WITHOUT THE

11:50AM 13  PFIZER LOGO.

11:50AM 14      SO AGAIN, THE REPORT IS PART OF EXHIBIT 4858, AND IT WILL

11:51AM 15  COME IN WITH THAT EXHIBIT, BUT WE DON'T THINK THE GOVERNMENT

11:51AM 16  SHOULD BE ALLOWED TO HIGHLIGHT, WELL, DO YOU SEE THIS LOGO?

11:51AM 17  AND DID THAT MAKE YOU THINK THAT --

11:51AM 18          THE COURT:  SO ARE YOU SAYING THAT THE LOGO SHOULD

11:51AM 19  BE REDACTED FROM THE EXHIBIT?

11:51AM 20          MR. COOPERSMITH:  NO.  I THINK THE LOGO CAN REMAIN.

11:51AM 21          THE COURT:  OH.

11:51AM 22          MR. COOPERSMITH:  IT'S A MATTER OF NOT ASKING

11:51AM 23  QUESTIONS DESIGNED TO ELICIT TESTIMONY THAT, YEAH, THE FACT

11:51AM 24  THAT PFIZER'S LOGO WAS ON THERE REALLY MATTERED TO ME AND THAT

11:51AM 25  MADE ME THINK IT WAS A PFIZER REPORT, RIGHT.

3815

11:51AM 1      THE COURT:  HOW DO WE DO THAT?  IF IT COMES IN WITH

11:51AM 2  THE LOGO ON IT, THE DOCUMENT SAYS WHAT IT SAYS, BUT YOU WOULD

11:51AM 3  ASK MR. LEACH NOT TO DRAW ATTENTION TO IT?

11:51AM 4      MR. COOPERSMITH:  YEAH, NOT TO HIGHLIGHT AND NOT ASK

11:51AM 5  QUESTIONS THAT ARE DESIGNED TO SHOW THAT THERE IS SOMETHING

11:51AM 6  WRONG WITH THE FACT THAT PFIZER'S LOGO WAS THERE AND THAT SORT

11:51AM 7  OF THING.

11:51AM 8      THE COURT:  SO HE COULD ASK, OR YOU COULD ASK, DO

11:51AM 9  YOU SEE TWO LOGOS ON THERE?

11:51AM 10     MR. COOPERSMITH:  I DON'T THINK, HAVING MADE THIS

11:51AM 11 ARGUMENT, YOUR HONOR, I'M GOING TO HIGHLIGHT ON CROSS.

11:51AM 12     THE COURT:  THAT'S WHAT I'M TRYING TO DEFINE IS WHEN

11:51AM 13 YOU SAY HIGHLIGHT, IF MR. LEACH SAYS, OKAY, WHAT IS THIS?

11:52AM 14   WELL, THIS IS A DOCUMENT AND IT HAS PFIZER AND IT HAS

11:52AM 15 THERANOS ON IT.

11:52AM 16     MR. COOPERSMITH:  THAT'S OKAY.

11:52AM 17   IT'S JUST WHEN YOU START SAYING, WELL, DID THE PFIZER

11:52AM 18 LOGO, DID THAT MATTER TO YOU?  DID THAT SEND YOU SOME MESSAGE

11:52AM 19 ABOUT WHO ACTUALLY WROTE THIS REPORT?  AND WOULD IT BE

11:52AM 20 INTERESTING FOR YOU TO KNOW, LIKE, ACTUALLY THERE'S ANOTHER

11:52AM 21 VERSION?  OR WOULD IT BE INTERESTING FOR YOU TO KNOW THAT

11:52AM 22 PFIZER DIDN'T APPROVE THIS?

11:52AM 23   OR THINGS LIKE THAT, RIGHT?

11:52AM 24     THE COURT:  SO I THINK FIRST QUESTION IS ONE IS

11:52AM 25 LIKELY TO BE ASKED, I DON'T KNOW.  WE WILL HAVE MR. LEACH --

3816

| 11:52AM | 1 | YOU AND I KEEP GETTING INTO MR. LEACH'S CASE ABOUT WHAT HE'S |

11:52AM 1 YOU AND I KEEP GETTING INTO MR. LEACH'S CASE ABOUT WHAT HE'S

11:52AM 2 GOING TO ASK -- BUT IT SEEMS THAT, BASED ON OUR CONVERSATION,

11:52AM 3 IF THAT DOCUMENT COMES IN, THE QUESTION WOULD BE, DID YOU RELY

11:52AM 4 ON THIS FOR YOUR INVESTMENT DECISION? YES, NO? IF SO, WHY?

11:52AM 5 WITHOUT ASKING THE QUESTION, IS THE FACT THAT THERE'S A

11:52AM 6 BRAND ON THERE, DID THAT INFORM YOU?

11:52AM 7 MR. COOPERSMITH: EXACTLY, YOUR HONOR.

11:52AM 8 IF THE GOVERNMENT WANTS TO ASK MS. PETERSON QUESTIONS

11:52AM 9 ABOUT WHETHER SHE RELIED ON THE REPORT, THAT'S FAIR GAME.

11:53AM 10 IT'S JUST ABOUT WHETHER SHE RELIED ON THE FACT THAT THERE

11:53AM 11 WAS A PFIZER LOGO OR WHETHER THAT WAS MEANINGFUL TO HER IN SOME

11:53AM 12 WAY. THAT'S WHERE THE LINE IS I THINK.

11:53AM 13 THE COURT: WELL, WE'VE MESSED AROUND WITH YOUR

11:53AM 14 DIRECT, MR. LEACH.

11:53AM 15 HOW WOULD YOU LIKE TO EXAMINE?

11:53AM 16 MR. LEACH: I APPRECIATE MR. COOPERSMITH'S

11:53AM 17 CONSTRUCTIVE SUGGESTIONS.

11:53AM 18 THIS IS A WEIGHT ISSUE, YOUR HONOR.

11:53AM 19 HE -- THE DEFENSE IS NOT OBJECTING TO THE ADMISSION OF THE

11:53AM 20 DOCUMENT. THEY'RE OBJECTING TO HIGHLIGHTS IN THE DOCUMENT AND

11:53AM 21 QUESTIONS IN THE DOCUMENT.

11:53AM 22 THAT, TO ME, SCREAMS OUT THAT THIS IS A WEIGHT ISSUE.

11:53AM 23 MS. PETERSON RECEIVES, IN THE DUE DILIGENCE MATERIALS THAT

11:53AM 24 MR. BALWANI AUTHORIZED, A REPORT WITH PFIZER'S LOGO AND

11:53AM 25 THERANOS'S LOGO WHICH SHE BELIEVED, NOT BECAUSE OF THE LOGOS,

ER-2820

11:53AM 1    BUT BECAUSE OF THE CONTENT OF THE ARTICLE, WERE THE CONCLUSIONS

11:53AM 2    OF PFIZER.

11:53AM 3        WE KNOW THAT THEY AREN'T.

11:53AM 4        I INTEND TO ASK HER, DID SHE THINK THAT THESE WERE

11:54AM 5    PFIZER'S CONCLUSIONS, AND DID THAT MATTER TO HER?

11:54AM 6        I DON'T NECESSARILY NEED TO DWELL ON THE LOGO.

11:54AM 7        BUT THIS ISSUE IS EMERGING BECAUSE WE'RE GOING TO HAVE, I

11:54AM 8    ANTICIPATE THERE MAY BE OTHER PHARMACEUTICAL WITNESSES WHO

11:54AM 9    TESTIFY TO THE VERSIONS THAT DON'T HAVE THE LOGOS.

11:54AM 10       SO THIS IS A WEIGHT QUESTION.  WHAT DID MR. BALWANI KNOW

11:54AM 11   ABOUT THIS AND WHEN DID HE KNOW ABOUT IT?

11:54AM 12       WE KNOW FROM THE TEXT MESSAGES THAT HE WAS DIRECTING, OR

11:54AM 13   MS. HOLMES WAS ASKING HIM, OR TELLING HIM, I'M GOING TO INCLUDE

11:54AM 14   THE PFIZER REPORT IN THE INVESTMENT MATERIALS.

11:54AM 15       SO THERE'S EVIDENCE FROM THE TEXT MESSAGES ON PAGE 17 OF

11:54AM 16   5387 THAT THEY'RE DISCUSSING, DO WE INCLUDE THIS?  DO WE NOT

11:54AM 17   INCLUDE THIS?

11:54AM 18       DURING THE CROSS-EXAMINATION OF MR. EDLIN, THE DEFENSE PUT

11:54AM 19   IN EMAILS BETWEEN PFIZER AND MR. BALWANI IN THE 2013 TO 2015

11:54AM 20   TIME PERIOD, WHICH ARE SUGGESTIVE THAT MR. BALWANI KNOWS

11:55AM 21   SOMETHING ABOUT THE PFIZER RELATIONSHIP.

11:55AM 22       IN ADDITION, IN THEIR OPENING STATEMENT THEY SAID THAT

11:55AM 23   MR. BALWANI DID HIS DUE DILIGENCE BEFORE COMING TO THE COMPANY,

11:55AM 24   AND WE THINK THAT DUE DILIGENCE WOULD INVOLVE UNDERSTANDING IN

11:55AM 25   AS MUCH DETAIL AS POSSIBLE WHAT THE COMPANY WAS OR WASN'T DOING

3818

11:55AM 1    WITH PFIZER.

11:55AM 2         THEY THINK THAT THERE'S INSUFFICIENT -- AND WE ALSO HAVE

11:55AM 3    EVIDENCE THAT WITH RESPECT TO ANOTHER PHARMACEUTICAL COMPANY,

11:55AM 4    HE RECEIVED THE VERSION THAT HAD ONLY THE THERANOS LOGO AND A

11:55AM 5    VERSION THAT HAD BOTH THE THERANOS AND THE PHARMACEUTICAL

11:55AM 6    COMPANY.

11:55AM 7         AND I THINK IT'S A FAIR WEIGHT ARGUMENT.  YOU KNOW, IF HE

11:55AM 8    HAD THAT INFORMATION FOR ONE PHARMACEUTICAL COMPANY, I THINK

11:55AM 9    THAT SUPPORTS THE EVIDENCE THAT HE HAD INFORMATION ABOUT OTHER

11:55AM 10   PHARMACEUTICAL COMPANIES.

11:55AM 11        IF THEY THINK THAT WE HAVEN'T TIED MR. BALWANI TO THIS

11:55AM 12   ISSUE OF THE DOCTRINE OF THE LOGOS, I'M SURE WE'LL HEAR ABOUT

11:55AM 13   THAT IN CLOSING ARGUMENT.

11:56AM 14        BUT THERE'S AMPLE EVIDENCE SHOWING THAT MR. BALWANI IS

11:56AM 15   INVOLVED IN THE PFIZER RELATIONSHIP, THAT HE KNOWS THE REVENUE

11:56AM 16   THAT IS NOT BEING GENERATED FROM IT, AND HE'S CONSULTING WITH

11:56AM 17   MS. HOLMES ABOUT JUDGMENTS ABOUT WHETHER TO INCLUDE IT OR NOT

11:56AM 18   INCLUDE IT IN INVESTOR MATERIALS.

11:56AM 19        DID HE KNOW ABOUT EVERY SINGLE ASPECT OF THE REPORT,

11:56AM 20   INCLUDING THE LOGO?  THAT'S A WEIGHT ARGUMENT.

11:56AM 21             THE COURT:  SO ARE YOU GOING TO -- THANK YOU.

11:56AM 22        ARE YOU GOING TO ASK, YOU RECEIVED THIS, YOU SAW THE

11:56AM 23   LOGOS, WAS THIS MATERIAL TO YOUR DECISION AND WHY?  AND THAT'S

11:56AM 24   IT?

11:56AM 25             MR. LEACH:  YES.

ER-2822

3819

11:56AM 1          THE COURT:  OKAY.  OKAY.  THAT SEEMS FAIR GAME TO

11:56AM 2  ME.

11:56AM 3          MR. COOPERSMITH:  WELL, I MEAN, THE FACT THAT

11:56AM 4  THERE'S A DOCUMENT AND IT HAS LOGOS ON IT, SURE.

11:56AM 5      BUT WHAT WOULD BE A PROBLEM -- AND AGAIN, I'M NOT TRYING

11:56AM 6  TO PUT WORDS OR SUGGEST QUESTIONS TO MR. LEACH, BUT I'M JUST

11:56AM 7  TRYING TO EXPLORE THE LENGTH OF THIS, RIGHT?

11:56AM 8          THE COURT:  YES, SURE.

11:57AM 9          MR. COOPERSMITH:  SO THERE WOULD HAVE TO BE A GOOD

11:57AM 10  FAITH BASIS TO ASK QUESTIONS THAT ARE DESIGNED TO CAST DOUBT ON

11:57AM 11  WHETHER THE PFIZER LOGO WAS REALLY AUTHENTICALLY ON THE

11:57AM 12  DOCUMENT.

11:57AM 13          THE COURT:  I DIDN'T HEAR MR. LEACH SAY THAT, AT

11:57AM 14  LEAST AS TO THIS WITNESS.  MAYBE I MISHEARD HIM.  BUT HE WAS

11:57AM 15  TALKING ABOUT OTHER WITNESSES THAT MAY COME UP.

11:57AM 16      I DON'T KNOW IF THIS WITNESS CAN TESTIFY ABOUT THIS.  MY

11:57AM 17  SENSE IS THAT SHE HAY NOT BE ABLE TO TESTIFY ABOUT THE

11:57AM 18  LEGITIMACY OF ONE DOCUMENT OR ANOTHER.

11:57AM 19      THE GRAVAMEN OF HER TESTIMONY, I THINK, IS THAT SHE WAS

11:57AM 20  EMPOWERED BY THE DEVOS FAMILY TO INVESTIGATE INVESTMENTS, TO

11:57AM 21  MAKE RECOMMENDATIONS TO THEM AS TO INVESTMENTS, AND THE

11:57AM 22  EXAMINATION WILL BE IF SHE MADE A RECOMMENDATION, AND IF SO,

11:57AM 23  WHY, AND WHAT DID SHE RELY ON IN THAT DECISION.  THAT'S IT.

11:57AM 24          MR. COOPERSMITH:  SURE, YOUR HONOR.

11:57AM 25      THE TYPE OF QUESTION -- AND THAT'S ALL FINE.

ER-2823

3820

11:58AM 1        THE TYPE OF QUESTION THAT WOULD BE IMPROPER IS, YOU KNOW,

11:58AM 2    MS. PETERSON, DOES THE PRESENCE OF THE PFIZER LOGO ON IT, DID

11:58AM 3    THAT MAKE YOU THINK THAT PFIZER ACTUALLY AUTHORED THIS REPORT?

11:58AM 4    RIGHT?

11:58AM 5        AND THAT TYPE OF QUESTION, OR EVEN GOING BEYOND THAT,

11:58AM 6    WOULD BE IMPROPER BECAUSE THERE'S NO GOOD FAITH BASIS TO

11:58AM 7    BELIEVE THAT MR. BALWANI -- THERE'S NO EVIDENCE THAT

11:58AM 8    MR. BALWANI KNOWS ANYTHING ABOUT THIS DOCUMENT EVER BEING

11:58AM 9    ANYTHING OTHER THAN A DOCUMENT WITH A PFIZER LOGO BECAUSE

11:58AM 10   THERE'S NO EVIDENCE THAT HE EVER RECEIVED IT IN ANY OTHER FORM.

11:58AM 11       I ALSO BELIEVE THAT THE REPORT WAS BEFORE HIS TIME AT

11:58AM 12   THERANOS.

11:58AM 13       SO THERE'S A REPORT.  IF SOMEONE PUT A PFIZER LOGO ON IT,

11:58AM 14   THEN THAT'S, ACCORDING TO THE EVIDENCE IN THIS CASE, NOT

11:58AM 15   SOMETHING THAT IS KNOWN TO MR. BALWANI.

11:58AM 16        THE COURT:  SO SHE'S NOT -- YOU WOULD OBJECT TO HER

11:58AM 17   TESTIFYING AS TO WHY THIS WAS MATERIAL TO HER BECAUSE IT HAD A

11:58AM 18   PFIZER LOGO ON IT?

11:58AM 19        MR. COOPERSMITH:  WELL, QUESTIONS DESIGNED TO

11:58AM 20   ELICIT, WHAT WAS REALLY IMPORTANT TO ME, FROM MS. PETERSON'S

11:59AM 21   PERSPECTIVE, IS THAT IT HAD THE PFIZER LOGO.

11:59AM 22       IF SHE WANTS TO TESTIFY THAT SHE LOOKED AT THE REPORT AND

11:59AM 23   THE REPORT HAD MEANING TO HER AND INFLUENCED HER DECISIONS AND

11:59AM 24   RECOMMENDATIONS, THAT'S FINE.

11:59AM 25       IT'S REALLY JUST THIS NARROW QUESTION ABOUT TRYING TO

ER-2824

11:59AM 1   ELICIT TESTIMONY THAT IS DESIGNED TO SHOW THAT THERE IS

11:59AM 2   SOMETHING WRONG WITH THE FACT THAT THERE'S A LOGO OF PFIZER ON

11:59AM 3   THE DOCUMENT.  THAT'S WHERE IT'S IMPROPER.

11:59AM 4           THE COURT:  DOES THAT, DOES THAT BLEED OVER TO A

11:59AM 5   QUESTION ABOUT, WHAT DO YOU SEE ON THE DOCUMENT?

11:59AM 6       I SEE A BRAND.  I SEE A BRAND NAME HERE.

11:59AM 7       OKAY.  DID THAT INFLUENCE YOUR DECISION?

11:59AM 8       YES, IT DID.

11:59AM 9       WHY?

11:59AM 10      BECAUSE THERE'S A BRAND NAME ON IT AND I FEEL STRONGLY

11:59AM 11  ABOUT PFIZER.  THEY'RE WORLD HEROS NOW.  THEY'VE CREATED A

11:59AM 12  VACCINE THAT SAVED LIVES.

11:59AM 13      NOT AT THE TIME OF THE DOCUMENT OF COURSE.

11:59AM 14      BUT JUST THE BRANDING ALONE, IS THAT WRONG FOR HER TO BE

11:59AM 15  ABLE TO SAY THAT?

11:59AM 16          MR. COOPERSMITH:  YOUR HONOR, THOSE KINDS OF

11:59AM 17  QUESTIONS ARE IMPROPER BECAUSE THEY ARE DRAWING ATTENTION TO

12:00PM 18  THIS LOGO ISSUE.

12:00PM 19      AND IF THE COURT REMEMBERS THE SCHERING-PLOUGH ISSUE,

12:00PM 20  WHICH DID COME INTO EVIDENCE AND THERE WAS EVEN A WITNESS FROM

12:00PM 21  SCHERING-PLOUGH, THE ONLY REASON WHY THAT CAME INTO EVIDENCE,

12:00PM 22  BASED ON THE COURT'S RULING, WAS BECAUSE THERE WAS EVIDENCE

12:00PM 23  THAT OF COURSE THE GOVERNMENT SAID WENT TO WEIGHT, THAT

12:00PM 24  MR. BALWANI AT LEAST HAD POSSESSION OF A VERSION OF THE

12:00PM 25  SCHERING-PLOUGH REPORT -- I'M GOING TO SAY POSSESSION, MEANING

3822

12:00PM 1     IT WAS ON HIS COMPUTER SYSTEM, WHETHER HE LOOKED AT IT OR NOT

12:00PM 2     IS NOT IN EVIDENCE -- BUT HE AT LEAST HAD POSSESSION OF A

12:00PM 3     SCHERING-PLOUGH REPORT WITHOUT THE SCHERING-PLOUGH LOGO.

12:00PM 4          THERE'S NOTHING LIKE THAT FOR PFIZER.  THERE'S NO EVIDENCE

12:00PM 5     THAT MR. BALWANI EVER SAW THE SCHERING-PLOUGH REPORT WITHOUT

12:00PM 6     THE PFIZER.  SO --

12:00PM 7               THE COURT:  NO.  I JUST DON'T UNDERSTAND -- AND I'M

12:00PM 8     SORRY I'M BEING A LITTLE THICK ON THIS I GUESS -- I JUST DON'T

12:00PM 9     UNDERSTAND WHY SHE CAN'T SAY, I RECEIVED THIS IN THE PACKET;

12:00PM 10    YEAH, IT HAS -- YOU KNOW, IT IS WHAT IT IS.  THE DOCUMENT

12:00PM 11    SPEAKS FOR ITSELF.

12:00PM 12         AND IT WAS OR WASN'T MATERIAL TO MY DECISION FOR WHATEVER

12:00PM 13    REASON.

12:00PM 14               MR. COOPERSMITH:  SO, YOUR HONOR, WE CAN'T -- I

12:00PM 15    CERTAINLY CAN'T THINK OF ALL OF THE QUESTIONS THAT MR. LEACH IS

12:01PM 16    CAPABLE OF ASKING, BUT I THINK THE POINT TO ME OUGHT TO BE

12:01PM 17    CLEAR, THAT WHAT MR. LEACH CAN SAY, YOU SEE THIS DOCUMENT?  YOU

12:01PM 18    SEE IT'S GOT PFIZER AT THE TOP?  OKAY.

12:01PM 19         BUT ONCE HE STARTS GETTING INTO, DID YOU REALLY THINK THAT

12:01PM 20    THIS WAS A PFIZER REPORT, YOU KNOW?  DID THE FACT THAT THIS HAD

12:01PM 21    THE IMPRIMATUR WITH A LOGO OF PFIZER, DID THAT MAKE A

12:01PM 22    DIFFERENCE?  IF THIS JUST A THERANOS REPORT, WOULD THAT -- WHEN

12:01PM 23    YOU START GETTING INTO THAT KIND OF THING, THAT'S WHERE THE

12:01PM 24    PROBLEM IS.

12:01PM 25         BUT, YEAH, THE DOCUMENT IS WHAT IT IS, AND IT'S COMING

12:01PM 1     INTO EVIDENCE I BELIEVE.

12:01PM 2             THE COURT:  BUT IF SHE SAYS, YEAH, I LOOKED AT IT

12:01PM 3     AND IT HAS THESE TWO BRAND NAMES ON IT.  I LOOKED AT IT, IT

12:01PM 4     INFLUENCED ME --

12:01PM 5             MR. COOPERSMITH:  RIGHT.

12:01PM 6             THE COURT:  -- BECAUSE OF THE BRAND NAMES.  BUT THAT

12:01PM 7     WAS ONE THING, BUT THE INFORMATION ON IT ALSO.

12:01PM 8             MR. COOPERSMITH:  SHE MAY SAY THAT, YOUR HONOR.  WE

12:01PM 9     DON'T KNOW THAT.

12:01PM 10        BUT THE ISSUE IS THAT WE CAN'T CONTROL EVERYTHING THAT

12:01PM 11    COMES OUT OF THE WITNESS'S MOUTH.

12:01PM 12        WHAT WE CAN CONTROL IS MR. LEACH DRAWING SOME ATTENTION TO

12:01PM 13    SOME KIND OF IMPROPRIETY.

12:01PM 14            THE COURT:  OKAY.  I THINK I UNDERSTAND.

12:01PM 15        DO YOU UNDERSTAND, MR. LEACH?

12:01PM 16            MR. LEACH:  I DO, YOUR HONOR.

12:02PM 17            THE COURT:  ALL RIGHT.  WELL, AS TO THIS, I WILL

12:02PM 18    PERMIT QUESTIONS ABOUT WHAT THE DOCUMENT IS AND WHAT IT SAYS,

12:02PM 19    AND ALSO QUESTIONS AS TO WHETHER IT INFORMED HER DECISION, HER

12:02PM 20    INVESTMENT DECISION, AND SHE CAN SAY WHY.

12:02PM 21        ANYTHING FURTHER WILL HAVE TO -- AND I TEND TO AGREE WITH

12:02PM 22    MR. COOPERSMITH, THIS ISN'T A SEARCH FOR WHETHER A DOCUMENT WAS

12:02PM 23    ALTERED OR NOT FROM THIS WITNESS.

12:02PM 24        THIS IS A SEARCH FOR WHAT INFORMED HER DECISION AND WHY.

12:02PM 25            MR. LEACH:  UNDERSTOOD, YOUR HONOR.

3824

12:02PM 1          THE COURT:  THAT MAKES SENSE TO ME.

12:02PM 2      AS TO YOUR FIRST QUESTION REGARDING THE INQUIRY ABOUT HER

12:02PM 3  AWARENESS OF A RELATIONSHIP, I DO THINK -- I AM GOING TO PERMIT

12:02PM 4  THAT QUESTION IF SHE, IF SHE KNEW ABOUT THAT.

12:02PM 5      I DO THINK THAT THAT IS RELEVANT TO AN INVESTMENT

12:02PM 6  DECISION.

12:02PM 7      WE'VE HEARD OTHER WITNESSES, NOT IN THIS CASE, BUT I

12:03PM 8  REFERENCED THE SAFEWAY GENTLEMAN WHO WAS THE CEO OF SAFEWAY, I

12:03PM 9  THINK HE WAS ASKED, WOULD THAT HAVE MADE A DIFFERENCE IF YOU

12:03PM 10  KNEW?  AND HE TALKED ABOUT -- HE'S A CORPORATE PERSON, AND HE

12:03PM 11  TALKED ABOUT SIMILAR THINGS THAT MR. LEACH TALKED ABOUT

12:03PM 12  INFORMING A DECISION.  WELL, IF THERE WAS A RELATIONSHIP, THAT

12:03PM 13  WOULD PRESENT CONFLICT.  I THINK HE EVEN TALKED ABOUT CONFLICTS

12:03PM 14  OF INTEREST.  IT WOULD TALK ABOUT THE WISDOM OF OPERATIONAL

12:03PM 15  FUNCTIONS.

12:03PM 16      OF COURSE, THIS WAS JUST HIS OPINION AS A CEO HIMSELF, BUT

12:03PM 17  HE RAISED THOSE ISSUES.

12:03PM 18      I THINK THERE'S SOME CURRENCY IN THOSE OBSERVATIONS AS TO

12:03PM 19  AN INVESTMENT AND A BUSINESS RELATIONSHIP FOR AN INVESTOR TO

12:03PM 20  MAKE A FULLY INFORMED DECISION ABOUT THAT, SO I WOULD ALLOW

12:03PM 21  THAT QUESTION.

12:03PM 22      IT IS MORE INEXTRICABLY INTERTWINED, IF YOU WILL, TO THE

12:03PM 23  SCHEME THAN NOT, AND I DON'T THINK 403 ISSUES PRECLUDE ITS

12:03PM 24  ADMISSION.

12:03PM 25      AS TO NUMBER 2, THE EXHIBIT 1944, THAT IS A LET'S HURRY UP

ER-2828

3825

| | | |
|---|---|---|
| 12:04PM | 1 | AND WAIT AND SEE WHAT HAPPENS WITH THAT FOUNDATIONALLY OR NOT. |
| 12:04PM | 2 | I THINK I'VE TOLD YOU WHAT -- THE OBSERVATIONS THAT I |
| 12:04PM | 3 | HAVE, AND WE'LL SEE IF THAT FOUNDATION CAN BE LAID. |
| 12:04PM | 4 | SO LET'S TAKE OUR BREAK. WE'LL TAKE ABOUT 15 MINUTES, I |
| 12:04PM | 5 | GUESS, SOMETHING LIKE THAT FOR US, AND THEN WE'LL COME BACK. |
| 12:04PM | 6 | AND THEN THIS WITNESS IS HERE? |
| 12:04PM | 7 | MR. LEACH: YES, YOUR HONOR. |
| 12:04PM | 8 | THE COURT: AND WE'LL GO FOR A COUPLE OF HOURS. I |
| 12:04PM | 9 | APOLOGIZE, BUT WE'LL DO THE BEST THAT WE CAN TODAY. |
| 12:04PM | 10 | MR. LEACH: THANK YOU, YOUR HONOR. |
| 12:04PM | 11 | MR. COOPERSMITH: OKAY. THANK YOU. |
| 12:04PM | 12 | (RECESS FROM 12:04 P.M. UNTIL 12:24 P.M.) |
| 12:26PM | 13 | (JURY IN AT 12:26 P.M.) |
| 12:26PM | 14 | THE COURT: THANK YOU. WE'RE BACK ON THE RECORD. |
| 12:26PM | 15 | THE JURY IS PRESENT. ALL COUNSEL ARE PRESENT. |
| 12:26PM | 16 | THANK YOU FOR YOUR PATIENCE, LADIES AND GENTLEMEN. I DID |
| 12:26PM | 17 | NEED TO KEEP COUNSEL A LITTLE LONGER TO HELP ME WITH SOME |
| 12:26PM | 18 | THINGS. |
| 12:26PM | 19 | DOES THE GOVERNMENT HAVE ANOTHER WITNESS? |
| 12:26PM | 20 | MR. LEACH: WE DO, YOUR HONOR. |
| 12:26PM | 21 | THE UNITED STATES CALLS LISA PETERSON. |
| 12:26PM | 22 | THE COURT: THANK YOU. |
| 12:26PM | 23 | GOOD AFTERNOON. |
| 12:26PM | 24 | IF YOU COULD COME HERE AND STAND HERE FOR A MOMENT WHILE |
| 12:26PM | 25 | YOU FACE OUR COURTROOM DEPUTY AND RAISE YOUR RIGHT HAND, SHE |

ER-2829

3826

| | | |
|---|---|---|
| 12:26PM | 1 | HAS A QUESTION FOR YOU. |
| 12:26PM | 2 | **(GOVERNMENT'S WITNESS, LISA PETERSON, WAS SWORN.)** |
| 12:27PM | 3 | THE WITNESS:  I DO. |
| 12:27PM | 4 | THE COURT:  PLEASE HAVE A SEAT UP HERE.  I'LL INVITE |
| 12:27PM | 5 | YOU TO MAKE YOURSELF COMFORTABLE. |
| 12:27PM | 6 | FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU |
| 12:27PM | 7 | NEED. |
| 12:27PM | 8 | THAT MICROPHONE WILL HAVE TO COME DOWN, WON'T IT.  IT WILL |
| 12:27PM | 9 | BEND DOWN A LITTLE MORE IF YOU WOULD LIKE. |
| 12:27PM | 10 | IF YOU'RE VACCINATED AND FULLY BOOSTED, YOU CAN TAKE YOUR |
| 12:27PM | 11 | MASK OFF.  THANK YOU. |
| 12:27PM | 12 | THE WITNESS:  YES, UH-HUH. |
| 12:27PM | 13 | THE COURT:  WHEN YOU ARE COMFORTABLE, WOULD YOU |
| 12:27PM | 14 | PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE. |
| 12:27PM | 15 | THE WITNESS:  LISA PETERSON.  L-I-S-A, |
| 12:27PM | 16 | P-E-T-E-R-S-O-N. |
| 12:27PM | 17 | THE COURT:  THANK YOU. |
| 12:27PM | 18 | AND, MS. PETERSON, IF YOU COULD JUST MAYBE BEND THAT MIKE |
| 12:27PM | 19 | UP.  THERE WE GO.  I THINK THAT MIGHT WORK BETTER. |
| 12:27PM | 20 | THE WITNESS:  IS THAT BETTER? |
| 12:27PM | 21 | THE COURT:  YES, I THINK SO.  LET'S SEE. |
| 12:27PM | 22 | THE WITNESS:  THAT'S BETTER. |
| 12:27PM | 23 | MR. LEACH:  I THINK THAT WORKS, MS. PETERSON. |
| 12:27PM | 24 | DOES THAT WORK FOR THE COURT? |
| 12:27PM | 25 | THE COURT:  YES.  THANK YOU. |

| | | |
|---|---|---|
| 12:27PM | 1 | MR. LEACH:  MAY I INQUIRE? |
| 12:27PM | 2 | THE COURT:  YES. |
| 12:27PM | 3 | **DIRECT EXAMINATION** |
| 12:28PM | 4 | BY MR. LEACH: |
| 12:28PM | 5 | Q.   GOOD AFTERNOON, MS. PETERSON. |
| 12:28PM | 6 | A.   HI. |
| 12:28PM | 7 | Q.   I NOTE YOU'VE TAKEN YOUR MASK OFF.  IF YOU'RE FULLY |
| 12:28PM | 8 | VACCINATED AND BOOSTED, AND IF YOU'RE COMFORTABLE, YOU CAN |
| 12:28PM | 9 | TESTIFY WITHOUT A MASK. |
| 12:28PM | 10 | A.   RIGHT. |
| 12:28PM | 11 | Q.   AND WHERE DO YOU WORK? |
| 12:28PM | 12 | A.   I WORK FOR RDV CORPORATION. |
| 12:28PM | 13 | Q.   WHAT IS RDV CORPORATION? |
| 12:28PM | 14 | A.   RDV CORPORATION IS THE FAMILY OFFICE FOR THE DEVOS FAMILY |
| 12:28PM | 15 | IN GRAND RAPIDS, MICHIGAN.  I WORK IN THEIR INVESTMENT GROUP. |
| 12:28PM | 16 | Q.   WHEN YOU SAY YOU WORK IN THEIR INVESTMENT GROUP, WHAT DO |
| 12:28PM | 17 | YOU DO? |
| 12:28PM | 18 | A.   WE INVEST IN PRIVATE EQUITY FIRMS ON BEHALF OF THE FAMILY. |
| 12:28PM | 19 | Q.   HOW LONG HAVE YOU WORKED FOR RDV CORPORATION? |
| 12:28PM | 20 | A.   I'VE BEEN THERE 17 YEARS. |
| 12:28PM | 21 | Q.   OKAY.  IN APPROXIMATELY OCTOBER 2014, DID RDV CORPORATION |
| 12:28PM | 22 | MAKE AN INVESTMENT IN THERANOS? |
| 12:28PM | 23 | A.   YES, WE DID. |
| 12:28PM | 24 | Q.   WE'RE GOING TO GET TO THAT IN A LITTLE DETAIL, BUT BEFORE |
| 12:28PM | 25 | WE DO, COULD YOU BRIEFLY DESCRIBE FOR US YOUR EDUCATIONAL AND |

12:28PM    1      PROFESSIONAL BACKGROUND?

12:28PM    2      A.   I GRADUATED FROM MICHIGAN STATE UNIVERSITY IN 1992, AND I

12:29PM    3      WORKED AT A COMMERCIAL BANK FOR A WHILE, AND THEN AN INVESTMENT

12:29PM    4      BANK FOR ABOUT SIX YEARS, AND THEN I'VE BEEN AT RDV EVER SINCE.

12:29PM    5      Q.   WHEN YOU WORKED AT THE INVESTMENT BANK, WHAT WERE YOUR JOB

12:29PM    6      RESPONSIBILITIES?

12:29PM    7      A.   WE DID A LOT OF PRIVATE PLACEMENTS, SO IN FINDING

12:29PM    8      INVESTORS TO INVEST IN CERTAIN COMPANIES AND DO THINGS, AS WELL

12:29PM    9      AS BUYING AND SELLING BUSINESSES.

12:29PM   10      Q.   OKAY.  AND WHEN DID YOU START WORKING FOR RDV?

12:29PM   11      A.   2000 -- JANUARY OF 2005.

12:29PM   12      Q.   AND DO YOU STILL WORK THERE TODAY?

12:29PM   13      A.   YES.

12:29PM   14      Q.   SO APPROXIMATELY 17 YEARS?

12:29PM   15      A.   YES.

12:29PM   16      Q.   AND WHAT POSITION -- MY QUESTIONS WILL RELATE PRIMARILY TO

12:29PM   17      THE TIME PERIOD 2014 AND 2015.

12:29PM   18           WHAT WAS YOUR POSITION IN THOSE YEARS?

12:29PM   19      A.   I WAS A MANAGING DIRECTOR IN THE INVESTMENT GROUP.

12:29PM   20      Q.   OKAY.  AND AS A MANAGING DIRECTOR IN THE INVESTMENT GROUP,

12:29PM   21      COULD YOU DESCRIBE FOR US YOUR JOB RESPONSIBILITIES?  WHAT DID

12:29PM   22      YOU DO?

12:29PM   23      A.   I MANAGED THE U.S. PORTFOLIO OF INVESTMENTS IN THE PRIVATE

12:30PM   24      EQUITY FIRMS THAT WE INVESTED IN.

12:30PM   25      Q.   WHAT DO YOU MEAN BY "PRIVATE EQUITY FIRMS"?

12:30PM   1    A.   WE DON'T INVEST IN COMPANIES DIRECTLY NORMALLY, AND WE

12:30PM   2    DON'T DO ANY VENTURE OR ANY PUBLIC INVESTING.

12:30PM   3        ALL WE DO IS INVEST IN PRIVATE EQUITY FIRMS, AND THEN

12:30PM   4    THOSE FIRMS USE OUR MONEY AND INVEST IN OTHER COMPANIES.

12:30PM   5    Q.   CAN YOU GIVE ME AN EXAMPLE OF SOME OF THE INVESTMENTS OF

12:30PM   6    PRIVATE EQUITY FIRMS THAT RDV INVESTS IN, MIGHT INVEST IN?

12:30PM   7    A.   THE NAMES PROBABLY NOBODY WOULD KNOW, LIKE VISTA EQUITY,

12:30PM   8    WE WOULD INVEST IN THAT, AND THEN THEY WOULD TAKE MULTIPLE

12:30PM   9    INVESTORS' MONEY AND INVEST IN COMPANIES, AND I MANAGE THOSE

12:30PM  10    TYPES OF RELATIONSHIPS.

12:30PM  11    Q.   OKAY.  SO YOU MANAGE RELATIONSHIPS WITH OTHER -- WITH

12:30PM  12    PRIVATE EQUITY FIRMS?

12:30PM  13    A.   CORRECT.

12:30PM  14    Q.   AND MAKE SURE THEY'RE DOING A GOOD JOB IN INVESTING YOUR

12:30PM  15    MONEY?

12:31PM  16    A.   CORRECT.

12:31PM  17    Q.   AND IN OR AROUND 2014, DID YOU BECOME FAMILIAR WITH A

12:31PM  18    COMPANY CALLED THERANOS?

12:31PM  19    A.   YES.

12:31PM  20    Q.   AND HOW DID YOU FIRST BECOME AWARE OF THERANOS?

12:31PM  21    A.   OUR CEO AND CIO, THAT'S ONE PERSON, IS JERRY TUBERGEN, HE

12:31PM  22    HAD BOTH TITLES, HE WAS MADE AWARE OF THERANOS AT A BDT

12:31PM  23    CONFERENCE.  HE MET ELIZABETH HOLMES.  AND I HAPPENED TO BE ON

12:31PM  24    THE PLANE ON THE WAY BACK RIDING WITH HIM, AND HE TOLD ME ALL

12:31PM  25    ABOUT IT.

PETERSON DIRECT BY MR. LEACH                                    3830

12:31PM  1    Q.   OKAY.  WHEN YOU SAY MR. TUBERGEN TOLD YOU ALL ABOUT IT,

12:31PM  2    DID HE EXPRESS SOME ENTHUSIASM ABOUT A POTENTIAL INVESTMENT?

12:31PM  3    A.   YES.

12:31PM  4    Q.   AND WERE YOU GIVEN ANY RESPONSIBILITIES IN CONNECTION WITH

12:31PM  5    A POSSIBLE INVESTMENT IN THERANOS?

12:31PM  6    A.   YES.  I ACTUALLY ASKED ON THAT PLANE RIDE IF I COULD WORK

12:31PM  7    ON THE TRANSACTION IF THEY DECIDED TO MOVE FORWARD WITH IT, AND

12:31PM  8    HE SAID YES.

12:31PM  9    Q.   WHEN YOU SAY YOU ASKED, DID YOU IN SOME SENSE VOLUNTEER

12:31PM  10   FOR THIS?

12:31PM  11   A.   YES.

12:31PM  12   Q.   WHY DID YOU VOLUNTEER FOR THIS?

12:31PM  13   A.   I FOUND IT VERY INTERESTING.  MY HUSBAND IS DIABETIC AND

12:32PM  14   HAS A LOT OF BLOOD TESTS, AND I MANAGE THE HEALTH CARE PRIVATE

12:32PM  15   EQUITY FIRMS THAT WE WORKED WITH, SO IT SORT OF WENT HAND IN

12:32PM  16   HAND WITH THAT.

12:32PM  17   Q.   SO YOU HAD AN INTEREST IN THE SUBJECT MATTER?  AM I

12:32PM  18   HEARING THAT CORRECT?

12:32PM  19   A.   YES.

12:32PM  20   Q.   AND WERE YOU ALSO IMPRESSED BY ELIZABETH HOLMES?

12:32PM  21   A.   YES.

12:32PM  22   Q.   OKAY.  HOW SO?

12:32PM  23   A.   JUST YOUNG, FEMALE, TOOK AN INTEREST IN WHAT SHE WAS

12:32PM  24   TRYING TO DO.

12:32PM  25   Q.   OKAY.  DID THIS POTENTIAL TRANSACTION WITH THERANOS DIFFER

PETERSON DIRECT BY MR. LEACH                                    3831

12:32PM   1    FROM OTHER INVESTMENTS THAT YOU TYPICALLY WORKED ON FOR RDV?

12:32PM   2    A.   YES.   TYPICALLY, AGAIN, THERE'S A PRIVATE EQUITY FIRM IN

12:32PM   3    BETWEEN US.   OFTENTIMES THE PRIVATE EQUITY FIRM WILL INVEST IN

12:32PM   4    SOMETHING THAT NEEDS MORE MONEY THAN THE FUND CAN DO AND THEY

12:32PM   5    WILL CALL US SO WE COINVEST ALONGSIDE OF THEM, SO I DO A LOT OF

12:32PM   6    THAT.

12:32PM   7         AND THAT'S SORT OF DIRECT.   IT'S KIND OF INDIRECT, BUT

12:33PM   8    IT'S ALONGSIDE THE PRIVATE EQUITY FIRM.

12:33PM   9         THIS WAS SOMETHING THAT WAS SHOWN TO US INDIRECTLY THROUGH

12:33PM  10    BDT, BUT THEY DIDN'T HAVE ANY ROLE IN IT.

12:33PM  11         SO IT WAS VERY DIFFERENT THAN WHAT WE NORMALLY DO, YES.

12:33PM  12    Q.   OKAY.   DIFFERENT BECAUSE YOU WERE CONTEMPLATING INVESTING

12:33PM  13    DIRECTLY AS OPPOSED TO THROUGH --

12:33PM  14              THE COURT:   MS. PETERSON, LET ME -- LET HIM FINISH

12:33PM  15    HIS QUESTION AND THEN YOU CAN ANSWER IT, AND HE'LL WAIT UNTIL

12:33PM  16    YOU'RE FINISHED.

12:33PM  17              THE WITNESS:   GREAT.   SORRY.

12:33PM  18    BY MR. LEACH:

12:33PM  19    Q.   SO IN THIS CIRCUMSTANCE, YOU WERE CONTEMPLATING INVESTING

12:33PM  20    DIRECTLY INTO A COMPANY AS OPPOSED TO A PRIVATE EQUITY FIRM

12:33PM  21    THAT WOULD PICK THE INVESTMENTS?

12:33PM  22    A.   YES.

12:33PM  23    Q.   LET ME DRAW YOUR --

12:33PM  24         MAY I APPROACH, YOUR HONOR?

12:33PM  25              THE COURT:   YES.

12:33PM   1              MR. LEACH:  (HANDING.)

12:34PM   2      Q.   MS. PETERSON, I'VE PLACED BEFORE YOU A BINDER OF

12:34PM   3   DOCUMENTS, AND IF I COULD ASK YOU TO TURN TO TAB 1944 IN YOUR

12:34PM   4   BINDER.

12:34PM   5          DO YOU HAVE THAT IN FRONT OF YOU?

12:34PM   6      A.   YES.

12:34PM   7      Q.   OKAY.  IS THIS AN EMAIL DATED SEPTEMBER 18TH, 2014, FROM

12:34PM   8   JERRY TUBERGEN?

12:34PM   9      A.   YES.

12:34PM  10      Q.   AND HE WAS YOUR BOSS AT RDV AT THE TIME?

12:34PM  11      A.   CORRECT.

12:34PM  12      Q.   AND THIS TIME PERIOD, SEPTEMBER OF 2014, IS THIS

12:34PM  13   CONSISTENT WITH THE TIME PERIOD WHEN YOU WERE FIRST APPROACHED

12:34PM  14   ABOUT WORKING ON A POTENTIAL INVESTMENT IN THERANOS?

12:34PM  15      A.   YES.

12:34PM  16      Q.   AND IS THIS -- WAS THIS EMAIL EXCHANGED IN THE ORDINARY

12:34PM  17   COURSE OF RDV'S BUSINESS?

12:34PM  18      A.   IT WAS VERY COMMON TO -- FOR JERRY TO SEND SOMETHING TO

12:35PM  19   THE INVESTMENT COMMITTEE IF HE SAW SOMETHING THAT WAS

12:35PM  20   INTERESTING, BUT IT -- JERRY IS NOT NORMALLY THE ONE ROUTING

12:35PM  21   SOMETHING THAT HE JUST SAW.  HE WAS JUST VERY -- HE, HE WAS

12:35PM  22   VERY INTERESTED AND ENTHUSED ABOUT WHAT HE HAD HEARD AT THE

12:35PM  23   MEETING THAT DAY.

12:35PM  24      Q.   OKAY.  AND WAS THIS PREPARED AT OR AROUND THE TIME OF THE

12:35PM  25   EMAIL BEING SENT?

12:35PM   1      A.   YES.

12:35PM   2      Q.   AND WAS IT MAINTAINED DURING THE ORDINARY COURSE OF RDV'S

12:35PM   3      BUSINESS?

12:35PM   4      A.   YES.

12:35PM   5           MR. LEACH:   YOUR HONOR, THE GOVERNMENT OFFERS --

12:35PM   6      THERE'S AN ATTACHMENT TO -- LET ME JUST ASK A FEW MORE

12:35PM   7      FOUNDATIONAL QUESTIONS, MS. PETERSON.

12:35PM   8      Q.   THERE'S AN ATTACHMENT TO THE EMAIL THAT STARTS ON PAGE 2.

12:35PM   9           DO YOU SEE THAT?

12:35PM  10      A.   YES.

12:35PM  11      Q.   ARE YOU FAMILIAR WITH THE ATTACHMENT?

12:35PM  12      A.   YES.

12:35PM  13      Q.   AND WHAT IS THE ATTACHMENT?

12:35PM  14      A.   IT'S AN ARTICLE THAT HE OBTAINED WHILE AT THAT MEETING,

12:35PM  15      AND WE WERE LOOKING AT IT ON THE PLANE RIDE ON THE WAY HOME.

12:36PM  16      Q.   OKAY.  AND DID YOU RELY ON THE ARTICLE IN THE COURSE OF

12:36PM  17      MAKING RECOMMENDATIONS ABOUT THERANOS?

12:36PM  18      A.   YES.

12:36PM  19      Q.   OKAY.

12:36PM  20           YOUR HONOR, AT THIS TIME THE GOVERNMENT OFFERS PAGE 2.

12:36PM  21      IT'S NUMBERED PAGE 2 OF EXHIBIT 1944.

12:36PM  22           IT'S THE FIRST PAGE OF THE DOCUMENT, BUT IT SAYS PAGE 2

12:36PM  23      DOWN AT THE BOTTOM?

12:36PM  24           THE COURT:   MR. COOPERSMITH, DO YOU HAVE THAT?

12:36PM  25           MR. COOPERSMITH:   YOUR HONOR, WE DON'T OBJECT TO THE

12:36PM  1    ADMISSION OF PAGE 2 OF EXHIBIT 1944 AS A BUSINESS RECORD OF

12:36PM  2    RDV.

12:36PM  3            THE COURT:  OKAY.

12:36PM  4            MR. COOPERSMITH:  IF THAT IS THE ONLY THING BEING

12:36PM  5    OFFERED, THEN NO OBJECTION TO THAT PAGE.

12:36PM  6            MR. LEACH:  THAT'S ALL I'M OFFERING AT THIS TIME,

12:36PM  7    YOUR HONOR.

12:36PM  8            THE COURT:  OKAY.  THAT PAGE IS ADMITTED UNDER

12:36PM  9    803(6), AND IT MAY BE PUBLISHED.

12:37PM  10        (GOVERNMENT'S EXHIBIT 1944, PAGE 2, WAS RECEIVED IN

12:37PM  11   EVIDENCE.)

12:37PM  12   BY MR. LEACH:

12:37PM  13   Q.   AND IF WE CAN PLEASE ZOOM IN ON THE TOP PORTION,

12:37PM  14   MS. WACHS.

12:37PM  15        MS. PETERSON, DO YOU SEE JERRY TUBERGEN'S NAME IN THE FROM

12:37PM  16   LINE AT THE VERY TOP?

12:37PM  17   A.   YES.

12:37PM  18   Q.   AND DO YOU SEE THE DATE, SEPTEMBER 18TH, 2014?

12:37PM  19   A.   YES.

12:37PM  20   Q.   OKAY.  AND IS THIS EMAIL TO MEMBERS OF THE DEVOS FAMILY

12:37PM  21   WITH RESPONSIBILITY FOR INVESTMENTS IN THERANOS?

12:37PM  22   A.   YES.

12:37PM  23   Q.   MR. TUBERGEN WRITES HERE, "THIS MORNING I HAD ONE OF THE

12:37PM  24   MOST INTERESTING MEETINGS I CAN RECALL WITH THE WOMAN PROFILED

12:37PM  25   IN THE ATTACHED 'FORTUNE' MAGAZINE ARTICLE."

12:37PM  1          DO YOU SEE THAT LANGUAGE?

12:37PM  2     A.    YES.

12:37PM  3     Q.    AND DO YOU BELIEVE THAT TO BE A REFERENCE TO

12:37PM  4     ELIZABETH HOLMES?

12:37PM  5     A.    YES.

12:37PM  6     Q.    "IF YOU GET A CHANCE TO TAKE A LOOK AT THIS ARTICLE PRIOR

12:37PM  7     TO TOMORROW'S FC MEETING I WOULD ENCOURAGE YOU TO DO SO."

12:37PM  8          WHAT IS THE FC MEETING?

12:37PM  9     A.    FAMILY COUNSEL.

12:37PM  10    Q.    "I WOULD LIKE TO SEE IF WE CAN FIND 15 MINUTES TOMORROW TO

12:37PM  11    SHARE WITH YOU AND DISCUSS A VERY UNIQUE INVESTMENT

12:38PM  12    OPPORTUNITY."

12:38PM  13         DO YOU SEE THAT?

12:38PM  14    A.    YES.

12:38PM  15    Q.    AND "THE VERY UNIQUE INVESTMENT OPPORTUNITY" WAS THERANOS?

12:38PM  16    A.    YES.

12:38PM  17    Q.    OKAY.  AND THIS IS ROUGHLY CONSISTENT WITH THE TIME PERIOD

12:38PM  18    WHEN YOU GOT INVOLVED IN THE THERANOS ASSIGNMENT?

12:38PM  19    A.    YES.

12:38PM  20    Q.    OKAY.  AFTER -- AND DID YOU RECEIVE A COPY OF THE ARTICLE

12:38PM  21    THAT IS ATTACHED TO THIS EMAIL?

12:38PM  22    A.    YES.

12:38PM  23    Q.    OKAY.  AFTER RECEIVING THE ARTICLE, AFTER BEING ASKED TO

12:38PM  24    LOOK AT THERANOS, WHAT DID YOU DO?

12:38PM  25    A.    I READ THE ARTICLE FULLY AND THEN STARTED LOOKING AROUND

12:38PM 1      ON THE INTERNET.

12:38PM 2      Q.   OKAY.  WHEN YOU SAY YOU LOOKED AROUND ON THE INTERNET,

12:38PM 3      WHAT WERE YOU LOOKING FOR?

12:38PM 4      A.   JUST GOOGLING AND TRYING TO GET TO BETTER KNOW THE COMPANY

12:38PM 5      AND WHAT I COULD FIND OF HER, WATCHING VIDEOS ON YOUTUBE.

12:38PM 6      Q.   OKAY.  AND AT SOME POINT DID YOU HAVE MORE SUBSTANTIVE

12:38PM 7      CONVERSATIONS WITH MS. HOLMES ABOUT A POTENTIAL INVESTMENT IN

12:38PM 8      THERANOS?

12:38PM 9      A.   YES.

12:38PM 10     Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO EXHIBIT 5809.

12:39PM 11          DO YOU HAVE THAT?

12:39PM 12     A.   YES.

12:39PM 13     Q.   OKAY.  IS THIS A TRUE AND CORRECT COPY OF AN EMAIL FROM

12:39PM 14     YOUR BOSS, MR. TUBERGEN, TO ELIZABETH HOLMES ON OR ABOUT

12:39PM 15     SEPTEMBER 19TH, 2014?

12:39PM 16     A.   YES.

12:39PM 17     Q.   AND DOES IT ATTACH A CONFIDENTIAL DISCLOSURE AGREEMENT

12:39PM 18     BETWEEN THERANOS AND RDV CORPORATION?

12:39PM 19     A.   YES.

12:39PM 20     Q.   OKAY.  I DRAW YOUR ATTENTION TO THE BOTTOM OF PAGE 2.

12:39PM 21          DO YOU SEE A SIGNATURE UNDER THE LINE THERANOS?

12:39PM 22     A.   YES.

12:39PM 23     Q.   AND DO YOU SEE A NAME ASSOCIATED WITH THAT SIGNATURE?

12:39PM 24     A.   YES.

12:39PM 25               MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

| | | |
|---|---|---|
| 12:39PM | 1 | EXHIBIT 5809. |
| 12:39PM | 2 | MR. COOPERSMITH:  WE OBJECT TO THE FIRST PAGE OF |
| 12:39PM | 3 | EXHIBIT 5809 AS HEARSAY. |
| 12:40PM | 4 | MR. LEACH:  I CAN ASK MORE FOUNDATIONAL QUESTIONS, |
| 12:40PM | 5 | YOUR HONOR. |
| 12:40PM | 6 | THE COURT:  SURE. |
| 12:40PM | 7 | BY MR. LEACH: |
| 12:40PM | 8 | Q.  MS. PETERSON, WITH RESPECT TO PAGE 1, WAS THIS EMAIL |
| 12:40PM | 9 | MAINTAINED IN THE ORDINARY COURSE OF RDV'S BUSINESS? |
| 12:40PM | 10 | A.  YES. |
| 12:40PM | 11 | Q.  AND WAS IT PRESERVED IN THE ORDINARY COURSE OF RDV'S |
| 12:40PM | 12 | BUSINESS? |
| 12:40PM | 13 | A.  YES, IN OUR DOCUMENT MANAGEMENT SYSTEM. |
| 12:40PM | 14 | Q.  OKAY.  AND WAS IT YOUR PRACTICE TO MAINTAIN AND RETAIN |
| 12:40PM | 15 | AGREEMENTS BETWEEN RDV AND POTENTIAL INVESTMENTS -- |
| 12:40PM | 16 | A.  YES. |
| 12:40PM | 17 | Q.  -- AS WELL AS THE COMMUNICATIONS BACK AND FORTH SO YOU |
| 12:40PM | 18 | COULD HAVE A RECORD OF THAT? |
| 12:40PM | 19 | A.  YES. |
| 12:40PM | 20 | MR. LEACH:  YOUR HONOR, I OFFER PAGE 1 OF |
| 12:40PM | 21 | EXHIBIT 5809. |
| 12:40PM | 22 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:40PM | 23 | (GOVERNMENT'S EXHIBIT 5809 WAS RECEIVED IN EVIDENCE.) |
| 12:40PM | 24 | MR. LEACH:  AND, MS. WACHS, IF WE CAN ZOOM IN TO THE |
| 12:40PM | 25 | TOP. |

12:41PM 1    Q.   DO YOU SEE THE FROM LINE WITH MR. TUBERGEN'S NAME IN IT,

12:41PM 2    MS. PETERSON?

12:41PM 3    A.   YES.

12:41PM 4    Q.   AND ABOVE THAT THERE'S A CC LINE WITH DMOSLEY@CRAVATH.COM.

12:41PM 5         DO YOU SEE THAT?

12:41PM 6    A.   YES.

12:41PM 7    Q.   AND WHO IS DMOSLEY@CRAVATH.COM?

12:41PM 8    A.   DAN MOSLEY IS AN ESTATE ATTORNEY THAT THE FAMILY HAS USED

12:41PM 9    IN THE PAST, AND HE IS -- HOW HE LEARNED ABOUT THERANOS, HE IS

12:41PM 10   THE ONE WHO SET UP THE MEETING WITH ELIZABETH IN CHICAGO AT THE

12:41PM 11   BDT CONFERENCE.

12:41PM 12   Q.   AND CRAVATH, IS THAT A LAW FIRM?

12:41PM 13   A.   YES.

12:41PM 14   Q.   IS THAT A LAW FIRM IN NEW YORK?

12:41PM 15   A.   I BELIEVE SO.

12:41PM 16   Q.   OKAY.

12:41PM 17   A.   HE WAS IN NEW YORK, YES.

12:41PM 18   Q.   OKAY.  AND MR. TUBERGEN WRITES, "HI ELIZABETH,

12:41PM 19        "I'VE ATTACHED AN EXECUTED COPY OF THE CONFIDENTIALITY

12:41PM 20   AGREEMENT.  PLEASE LET ME KNOW IF YOU NEED ANYTHING ELSE.

12:41PM 21        "THANKS SO MUCH AND HAVE A GREAT WEEKEND."

12:41PM 22        DO YOU SEE THAT LANGUAGE?

12:41PM 23   A.   YES.

12:41PM 24   Q.   AND IF WE CAN GO TO PAGE 2.

12:42PM 25        WHAT WAS THE PURPOSE OF THIS CONFIDENTIAL DISCLOSURE

12:42PM  1    AGREEMENT?

12:42PM  2    A.   THAT WE WOULD, AS AN INVESTOR AND AS WE CONTEMPLATE THE

12:42PM  3    INVESTMENT, THAT WE WOULD KEEP THINGS CONFIDENTIAL.

12:42PM  4    Q.   OKAY.  DID THIS IN ANY WAY FACILITATE THE PROVISION OF

12:42PM  5    DOCUMENTS TO RDV?

12:42PM  6    A.   YES, WE WERE TO KEEP THOSE CONFIDENTIAL AS WELL.

12:42PM  7    Q.   OKAY.  AND BEFORE YOU RECEIVED ANY CONFIDENTIAL -- I

12:42PM  8    GUESS, WHY DID YOU ENTER INTO THIS AGREEMENT?

12:42PM  9    A.   SO THAT WE COULD RECEIVE INFORMATION FROM THEM TO REVIEW

12:42PM 10    AS PART OF THE INVESTMENT DECISION.

12:42PM 11    Q.   OKAY.  UP IN THE TOP LEFT CORNER THERE'S A DATE,

12:42PM 12    AUGUST 19TH, 2014.

12:42PM 13         DO YOU SEE THAT?

12:42PM 14    A.   YES.

12:42PM 15    Q.   AND THEN DOWN AT THE BOTTOM THERE ARE TWO SIGNATURES.

12:42PM 16    A.   YES.

12:42PM 17    Q.   AND DO YOU SEE THE SIGNATURE OF SUNNY BALWANI?

12:43PM 18    A.   YES.

12:43PM 19    Q.   AND DO YOU RECOGNIZE MR. TUBERGEN'S SIGNATURE TO THE RIGHT

12:43PM 20    OF RDV?

12:43PM 21    A.   YES.

12:43PM 22    Q.   AND LET ME ASK YOU TO NEXT LOOK AT DOCUMENT 5432.

12:43PM 23         IS THIS ANOTHER EMAIL IN THE CHAIN THAT WE JUST SAW

12:43PM 24    RELATING TO THE CONFIDENTIAL DISCLOSURE AGREEMENT BETWEEN RDV

12:43PM 25    AND THERANOS?

12:43PM  1      A.   YES.

12:43PM  2      Q.   AND LIKE THE EMAIL THAT WE JUST LOOKED AT, WAS THIS

12:43PM  3      PREPARED IN THE ORDINARY COURSE OF RDV'S BUSINESS?

12:43PM  4      A.   YES.

12:43PM  5      Q.   AND DID YOU PRESERVE THIS IN THE ORDINARY COURSE OF RDV'S

12:43PM  6      BUSINESS?

12:43PM  7      A.   YES.

12:43PM  8      Q.   AND WAS IT IMPORTANT TO BE ACCURATE GOING BACK AND FORTH

12:43PM  9      WITH THE POTENTIAL COMPANY THAT RDV WAS GOING TO INVEST IN SO

12:43PM 10      YOU HAD A RECORD OF THE INVESTMENT AND THE DECISIONS?

12:44PM 11      A.   YES.

12:44PM 12              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5432.

12:44PM 13              MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

12:44PM 14              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:44PM 15          (GOVERNMENT'S EXHIBIT 5432 WAS RECEIVED IN EVIDENCE.)

12:44PM 16      BY MR. LEACH:

12:44PM 17      Q.   LET'S START AT THE BOTTOM, MS. PETERSON.

12:44PM 18          DO YOU SEE THE FIRST EMAIL IN THIS CHAIN IS THE ONE THAT

12:44PM 19      WE SAW IN THE PRIOR EXHIBIT, 5809?

12:44PM 20      A.   YES.

12:44PM 21      Q.   AND THEN AS WE GO UP, IT APPEARS THAT MS. HOLMES WROTE,

12:44PM 22      "GOT IT.  WE'RE VERY MUCH LOOKING FORWARD TO OUR MEETING.

12:44PM 23          "I'VE HAD OUR TEAM PREPARE MATERIALS FOR YOU -- LET US

12:44PM 24      KNOW THE BEST ADDRESS TO WHICH TO SEND THEM AND WE'LL GET THEM

12:44PM 25      OUT TO YOU."

PETERSON DIRECT BY MR. LEACH                3841

12:44PM   1          DO YOU SEE THAT LANGUAGE?

12:44PM   2     A.   YES.

12:44PM   3     Q.   DO YOU KNOW WHAT SHE'S REFERRING TO BY MATERIALS THAT THE

12:44PM   4     TEAM PREPARED?

12:44PM   5     A.   WE WERE SENT TWO LARGE BINDERS, DILIGENCE BINDERS FULL OF

12:44PM   6     INFORMATION.

12:44PM   7     Q.   AND AT A HIGH LEVEL, WHAT WAS IN THOSE TWO BINDERS OF

12:44PM   8     DILIGENCE INFORMATION?

12:44PM   9     A.   INFORMATION ABOUT THERANOS, ITS MISSION, A BIT OF ITS

12:45PM  10     HISTORY, AND PHARMACEUTICAL VERIFICATIONS OF THE -- THAT THE

12:45PM  11     EQUIPMENT WORKED, AND THEN A WHOLE LOT OF TESTING INFORMATION

12:45PM  12     THAT -- I'M NOT A SCIENTIST, SO THE SECOND BINDER WAS DIFFICULT

12:45PM  13     TO FOLLOW.

12:45PM  14     Q.   OKAY.  WE'LL GET BACK TO SOME OF THE DETAILS OF THAT.

12:45PM  15          BUT YOU BELIEVED THAT THE MATERIALS REFERRED TO IN THIS

12:45PM  16     EMAIL ARE THE DILIGENCE BINDERS THAT WERE PROVIDED TO YOU?

12:45PM  17     A.   YES.

12:45PM  18     Q.   OKAY.  MS. HOLMES ALSO WROTE, "WE CAN ALSO BE AVAILABLE TO

12:45PM  19     SET UP A CALL TO CONNECT ON BACKGROUND AND ANY ASSOCIATED

12:45PM  20     FOLLOW UP BY PHONE IN ADVANCE OF OUR MEETING IF WE DON'T HAVE

12:45PM  21     THE CHANCE TO SEE YOU UNTIL YOU'RE OTHERWISE OUT HERE IN

12:45PM  22     OCTOBER."

12:45PM  23          DO YOU SEE THAT?

12:45PM  24     A.   YES.

12:45PM  25     Q.   AND DID YOU, IN FACT, PARTICIPATE IN A CALL WITH

12:45PM   1     MS. HOLMES AFTER THIS EMAIL EXCHANGE?

12:45PM   2     A.   YES.

12:45PM   3     Q.   UP AT THE TOP THERE'S A RESPONSE BY MR. TUBERGEN WHERE HE

12:46PM   4     SAYS, "IS THERE SOMEONE I MAY HAVE MY EA" -- IS THAT EXECUTIVE

12:46PM   5     ASSISTANT?

12:46PM   6     A.   YES.

12:46PM   7     Q.   -- "CONNECT WITH TO ARRANGE THE DETAILS OF OUR VISIT ON

12:46PM   8     THE 14TH?"

12:46PM   9          DO YOU SEE THAT?

12:46PM  10     A.   YES.

12:46PM  11     Q.   AND THE VISIT ON THE 14TH, WHAT DOES THAT REFER TO?

12:46PM  12     A.   THAT WAS GOING TO BE OUR DILIGENCE MEETING, WHICH WAS

12:46PM  13     GOING TO BE US AND SUNNY AND ELIZABETH.

12:46PM  14     Q.   OKAY.  AND DID THAT MEETING END UP TAKING PLACE?

12:46PM  15     A.   YES.

12:46PM  16     Q.   WAS THAT OUT HERE IN CALIFORNIA?

12:46PM  17     A.   YES.

12:46PM  18     Q.   DID YOU PARTICIPATE IN THAT MEETING?

12:46PM  19     A.   YES.

12:46PM  20     Q.   DID MR. BALWANI PARTICIPATE IN THAT MEETING?

12:46PM  21     A.   YES.

12:46PM  22     Q.   DID MS. HOLMES PARTICIPATE?

12:46PM  23     A.   YES.

12:46PM  24     Q.   OKAY.  AND IN ADDITION TO THAT MEETING IN OCTOBER, YOU HAD

12:46PM  25     A PHONE CALL WITH MS. HOLMES IN ADVANCE; IS THAT FAIR?

| | | |
|---|---|---|
| 12:46PM | 1 | A.   CORRECT. |
| 12:46PM | 2 | Q.   OKAY.  LET'S LOOK AT EXHIBIT 2015. |
| 12:47PM | 3 |      DO YOU RECOGNIZE THIS? |
| 12:47PM | 4 | A.   YES. |
| 12:47PM | 5 | Q.   AND WHAT IS THIS? |
| 12:47PM | 6 | A.   THESE ARE THE NOTES THAT I TOOK DURING THE CALL THAT WE |
| 12:47PM | 7 | HAD WITH ELIZABETH ON OCTOBER 3RD. |
| 12:47PM | 8 | Q.   OKAY.  WHO PARTICIPATED IN THIS CALL? |
| 12:47PM | 9 | A.   JERRY TUBERGEN AND MYSELF AND ELIZABETH. |
| 12:47PM | 10 | Q.   MR. BALWANI WAS NOT PRESENT FOR THIS? |
| 12:47PM | 11 | A.   NOT THAT I KNOW OF. |
| 12:47PM | 12 | Q.   OKAY.  AND WAS THIS PHONE CALL WITH MS. HOLMES PART OF |
| 12:47PM | 13 | YOUR PROCESS IN TRYING TO OBTAIN INFORMATION ABOUT WHAT THE |
| 12:47PM | 14 | COMPANY WAS ABOUT? |
| 12:47PM | 15 | A.   YES.  TO OBTAIN SOME GENERAL INFORMATION, MORE MISSION |
| 12:47PM | 16 | TYPE STUFF, AND ALSO TO SET UP THE DUE DILIGENCE MEETING THAT |
| 12:47PM | 17 | WE WERE GOING TO HAVE LATER THAT MONTH. |
| 12:47PM | 18 | Q.   AND -- |
| 12:47PM | 19 | A.   ALL OF THAT. |
| 12:47PM | 20 | Q.   AND -- DID YOU RELY ON THE STATEMENTS OF MS. HOLMES IN THE |
| 12:47PM | 21 | COURSE OF MAKING A RECOMMENDATION TO INVEST IN THERANOS? |
| 12:48PM | 22 | A.   YES. |
| 12:48PM | 23 | Q.   OKAY.  THESE ARE YOUR NOTES OF THE MEETING? |
| 12:48PM | 24 | A.   YES. |
| 12:48PM | 25 | Q.   DID YOU PREPARE THESE IN THE ORDINARY COURSE OF BUSINESS? |

PETERSON DIRECT BY MR. LEACH                                      3844

12:48PM 1    A.   YES.

12:48PM 2    Q.   DID YOU PREPARE THEM AT OR AROUND THE TIME OF THE PHONE

12:48PM 3    CALL?

12:48PM 4    A.   YES.

12:48PM 5    Q.   AND DID YOU PRESERVE THEM IN ORDER TO MAINTAIN A RECORD OF

12:48PM 6    WHAT RDV WAS INVESTING IN AND WHY?

12:48PM 7    A.   YES.

12:48PM 8         THIS WAS PRESERVED, AS WELL AS A MUCH LONGER MEMO WAS MADE

12:48PM 9    AS WELL BECAUSE WE NEEDED TO COMMUNICATE THIS NOT JUST TO

12:48PM 10   MEMORIALIZE IT, BUT ALSO TO SEND IT TO THE FAMILY MEMBERS AS

12:48PM 11   WELL.

12:48PM 12        MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

12:48PM 13   EXHIBIT 2015.

12:48PM 14        MR. COOPERSMITH:  802 OBJECTION, YOUR HONOR.

12:48PM 15        THE COURT:  IS THIS COMING IN AS A BUSINESS RECORD?

12:48PM 16        MR. LEACH:  YES, YOUR HONOR.

12:48PM 17        THE COURT:  YES.  IT WILL BE ADMITTED PURSUANT TO

12:48PM 18   803(6) AS A BUSINESS RECORD, AND IT MAY BE PUBLISHED.

12:48PM 19        (GOVERNMENT'S EXHIBIT 2015 WAS RECEIVED IN EVIDENCE.)

12:48PM 20        MR. LEACH:  THANK YOU, YOUR HONOR.

12:48PM 21        MS. WACHS, IF WE CAN ZOOM IN ON THE TOP HALF OF THIS.

12:49PM 22   Q.   DO YOU SEE AT THE TOP, MS. PETERSON, WHERE IT SAYS

12:49PM 23   "THERANOS CONF CALL NOTES"?

12:49PM 24   A.   YES.

12:49PM 25   Q.   AND THEN THERE'S A DATE AND THE NAME ELIZABETH HOLMES AND

ER-2848

12:49PM  1    TWO ACRONYMS.  WHAT ARE THOSE ACRONYMS?

12:49PM  2    A.   THAT'S JERRY'S INITIALS AND MY INITIALS.

12:49PM  3    Q.   AND IS THEN SAYS, "WHAT IS THE LONG-TERM VISION OF

12:49PM  4    THERANOS?"

12:49PM  5         WAS THAT ONE OF THE TOPICS ON THE PHONE CALL ON THE 3RD?

12:49PM  6    A.   YES, THOSE WERE OUR -- THE DARKENED STUFF WAS OUR

12:49PM  7    QUESTIONS THAT WE ASKED OF HER.

12:49PM  8    Q.   YOU WROTE, "BUILD A PLATFORM FOR DECENTRALIZED HEALTH CARE

12:49PM  9    USING THERANOS'S INFRASTRUCTURE."

12:49PM  10        DO YOU SEE THAT?

12:49PM  11   A.   YES.

12:49PM  12   Q.   IS THAT SOMETHING THAT MS. HOLMES TOLD YOU?

12:49PM  13   A.   YES.

12:49PM  14   Q.   "START WITH LASER-FOCUS ON COMMERCIAL LAB MARKET, THEN

12:49PM  15   DIRECT TO CONSUMER MARKETS."

12:49PM  16        DO YOU SEE THAT LANGUAGE?

12:49PM  17   A.   YES.

12:49PM  18   Q.   AND THEN THERE'S A LINE FOR WALGREENS.  DID THE TOPIC OF

12:49PM  19   WALGREENS COME UP IN THIS CONVERSATION WITH MS. HOLMES?

12:50PM  20   A.   YES.

12:50PM  21   Q.   WHAT DID SHE TELL YOU ABOUT WALGREENS?

12:50PM  22   A.   SHE TOLD US THAT THEY HAD STARTED -- THEY HAD A CONTRACT

12:50PM  23   WITH THEM, THAT THEY WERE IN 40 STORES, AND THEY WERE GOING TO

12:50PM  24   BEGIN THEIR ROLLOUT AND IT WAS -- THEY HAD CONTRACTS WITH THEM

12:50PM  25   AND THAT THEY HAD JUST BOUGHT BOOTS IN EUROPE AT THE TIME,

12:50PM  1     WALGREENS HAD BOUGHT BOOTS, AND THAT THAT WAS GOING TO BE A

12:50PM  2     NICE SEGUE INTO GETTING INTO THE MORE GLOBAL MARKET.

12:50PM  3     Q.   THERE'S A LINE FOR INSURANCE.

12:50PM  4          DO YOU SEE THAT?

12:50PM  5     A.   YES.

12:50PM  6     Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT INSURANCE?

12:50PM  7     A.   THAT THIS WAS ANOTHER MARKET THAT DOES, THAT DOES BLOOD

12:50PM  8     TESTS, AND THAT WAS A MARKET THAT THEY WANTED TO TAP INTO.

12:50PM  9     Q.   SAME QUESTIONS FOR HOSPITAL/DOC GROUPS.

12:50PM 10          WHAT DOES THAT REFER TO?

12:50PM 11     A.   THAT THE HOSPITALS AND DOCTOR GROUPS PRESCRIBE TESTS TO

12:50PM 12     THEIR PATIENTS, AND THEY ALSO DO TESTS THAT SHE WANTED THAT

12:51PM 13     GROUP AS WELL.

12:51PM 14     Q.   AND THERE'S A REFERENCE TO PHARMA.

12:51PM 15          DO YOU SEE THAT?

12:51PM 16     A.   YES.

12:51PM 17     Q.   DID MS. HOLMES TELL YOU THERANOS WAS DOING WORK WITH

12:51PM 18     PHARMACEUTICAL COMPANIES?

12:51PM 19     A.   YES.

12:51PM 20     Q.   OKAY.  WHAT DID SHE SAY?

12:51PM 21     A.   SHE SAID THAT THEY HAD BEEN DOING WORK FOR PHARMACEUTICAL

12:51PM 22     COMPANIES, TEN OF THE TOP PHARMACEUTICAL COMPANIES FOR THE LAST

12:51PM 23     NINE TO TEN YEARS.

12:51PM 24     Q.   FURTHER BELOW -- IF WE CAN ZOOM OUT, MS. WACHS -- THERE'S

12:51PM 25     A LINE "WALGREENS.

12:51PM 1          "NATIONAL ROLLOUT.

12:51PM 2          "PROJECTIONS BASED ON 900 STORES."

12:51PM 3          DO YOU SEE THAT?

12:51PM 4     A.   YES.

12:51PM 5     Q.   AND WHAT DID THAT REFER TO?

12:51PM 6     A.   WITHIN THE BINDER THERE WERE TWO PAGES OF FINANCIAL

12:51PM 7     INFORMATION, AND WE WANTED TO KNOW WHAT THE WALGREENS ROLLOUT

12:51PM 8     WAS GOING TO BE AND WHAT WAS THE BASIS FOR THOSE PROJECTIONS OR

12:52PM 9     THOSE FINANCIAL STATEMENTS FOR 2015.

12:52PM 10         AND SHE SAID THAT WAS BASED ON 900 STORES, A ROLLOUT GOING

12:52PM 11    FROM 40 TO 900.

12:52PM 12    Q.   AND DURING THIS OCTOBER CALL, DID MS. HOLMES DESCRIBE FOR

12:52PM 13    YOU ANY ISSUES WITH THE WALGREENS ROLLOUT?

12:52PM 14    A.   NO.

12:52PM 15    Q.   DID SHE SAY ANYTHING TO THE EFFECT THAT WALGREENS WAS NOT

12:52PM 16    GOING TO EXPAND IN ADDITIONAL STORES UNTIL THERANOS COULD GET

12:52PM 17    ITS FINGERSTICK TESTING TO A LOWER PERCENTAGE?

12:52PM 18    A.   NO.

12:52PM 19         MR. COOPERSMITH:  OBJECTION.  LACKS FOUNDATION.

12:52PM 20    MOVE TO STRIKE.

12:52PM 21         THE COURT:  YOU'RE ASKING WHETHER SHE RECEIVED THIS

12:52PM 22    INFORMATION?

12:52PM 23         MR. LEACH:  YES.

12:52PM 24         THE COURT:  OVERRULED.  THAT ANSWER CAN REMAIN.

12:52PM 25    BY MR. LEACH:

PETERSON DIRECT BY MR. LEACH                                3848

12:52PM 1     Q.   FURTHER BELOW IT SAYS "RISKS."

12:52PM 2          DO YOU SEE THAT?

12:52PM 3     A.   YES.

12:52PM 4     Q.   AND THERE'S A LINE, "NOW HAVE LONG-TERM CONTRACTS, SO RISK

12:52PM 5     IS EXECUTION."

12:52PM 6          DO YOU SEE THAT?

12:52PM 7     A.   YES.

12:52PM 8     Q.   AND WHAT DID -- IS THAT SOMETHING THAT MS. HOLMES TOLD

12:52PM 9     YOU?

12:52PM 10    A.   YES.

12:52PM 11    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN, "RISK IS

12:53PM 12    EXECUTION"?

12:53PM 13    A.   THAT THEY HAD CONTRACTS WITH -- THE TWO THAT WE TALKED

12:53PM 14    ABOUT THE MOST WAS SAFEWAY AND WALGREENS, AND THAT THE RISK TO

12:53PM 15    IT WAS THE ROLLOUT AND MAKING SURE THAT THEY HAD THE PEOPLE IN

12:53PM 16    PLACE AND THE RESOURCES TO ACTUALLY EXECUTE ON THE ROLLOUT

12:53PM 17    PLAN.

12:53PM 18    Q.   IN THIS PHONE CALL, DID MS. HOLMES MENTION ANYTHING

12:53PM 19    RELATING TO TECHNOLOGY RISK?

12:53PM 20    A.   NO.

12:53PM 21    Q.   OKAY.  YOU MENTIONED A MEMO THAT YOU PREPARED AFTER THIS

12:53PM 22    PHONE CALL.

12:53PM 23         DO YOU RECALL THAT TESTIMONY, MS. PETERSON?

12:53PM 24    A.   YES.

12:53PM 25    Q.   OKAY.  LET ME ASK YOU TO PLEASE LOOK AT EXHIBIT 2073.

PETERSON DIRECT BY MR. LEACH 3849

12:54PM  1          DO YOU RECOGNIZE THIS EMAIL?

12:54PM  2     A.   YES.

12:54PM  3     Q.   AND I'M ON -- IT SAYS PAGE 3 DOWN AT THE BOTTOM, BUT IT'S

12:54PM  4     ACTUALLY THE FIRST PAGE OF THE EXHIBIT.

12:54PM  5          DO YOU SEE THAT?

12:54PM  6     A.   YES.

12:54PM  7     Q.   AND WHAT IS THIS DOCUMENT?

12:54PM  8     A.   THIS WAS AN EMAIL THAT I HAD SENT TO JERRY AND COPIED

12:54PM  9     MIKE LUNT, WHO WAS OUR IN-HOUSE COUNSEL AT THE TIME, JUST A

12:54PM 10     SUMMARY MEMO.

12:54PM 11          JERRY HAD ASKED FOR A SUMMARY NOT ONLY OF THE PHONE CALL,

12:54PM 12     BUT ALSO A SUMMARY OF THINGS THAT WERE IN THE BINDER, TO BEGIN

12:54PM 13     TO PREPARE FOR THE DILIGENCE MEETING THAT WE WERE GOING TO HAVE

12:54PM 14     IN CALIFORNIA.

12:54PM 15     Q.   OKAY.  IN ADVANCE OF THE PHONE CALL THAT YOU HAD WITH

12:54PM 16     MS. HOLMES, DID YOU RECEIVE THE TWO BINDERS OF DILIGENCE

12:54PM 17     DOCUMENTS?

12:54PM 18     A.   YES.

12:54PM 19     Q.   AND DID YOU REVIEW THOSE CAREFULLY?

12:54PM 20     A.   YES.

12:54PM 21     Q.   AND WHY DID YOU REVIEW THOSE CAREFULLY?

12:54PM 22     A.   THAT'S MY JOB.  YOU KNOW, TO BETTER UNDERSTAND EVERYTHING

12:55PM 23     THAT WE GOT, AND ALSO TO BEGIN TO FORM QUESTIONS TO ASK WHILE

12:55PM 24     WE WERE ON THE DILIGENCE RUN.

12:55PM 25     Q.   AND THE MEMO THAT IS ATTACHED TO THE EMAIL IN

PETERSON DIRECT BY MR. LEACH 3850

12:55PM  1    EXHIBIT 27-- 2073 BEGINNING ON PAGE 4, IS THIS SOMETHING THAT

12:55PM  2    YOU PREPARED?

12:55PM  3    A.   YES.

12:55PM  4    Q.   AND DID YOU PREPARE THIS IN THE ORDINARY COURSE OF

12:55PM  5    BUSINESS?

12:55PM  6    A.   YES.

12:55PM  7    Q.   AND DID YOU PREPARE THIS BASED ON THE DILIGENCE MATERIALS

12:55PM  8    THAT YOU HAD RECEIVED, THE PUBLIC INFORMATION THAT YOU HAD

12:55PM  9    REVIEWED, AND YOUR PHONE CONVERSATION WITH MS. HOLMES?

12:55PM 10    A.   YES.

12:55PM 11    Q.   AND WERE YOU TRYING TO BE AS ACCURATE AS POSSIBLE IN

12:55PM 12    SUMMARIZING THE INVESTMENT OPPORTUNITY?

12:55PM 13    A.   YES.

12:55PM 14    Q.   OKAY.  AND WAS THIS PRESERVED IN THE ORDINARY COURSE OF

12:55PM 15    RDV'S BUSINESS?

12:55PM 16    A.   YES.

12:55PM 17           MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

12:55PM 18    EXHIBIT 2073.

12:55PM 19           MR. COOPERSMITH:  YOUR HONOR, OBJECTION UNDER 802.

12:55PM 20      AND I'LL ALSO NOTE THAT THE DOCUMENT HAS MULTIPLE LAYERS

12:55PM 21    OF HEARSAY IN IT.

12:56PM 22           THE COURT:  YOU'RE SPEAKING ABOUT THE MEMO ITSELF?

12:56PM 23    IS THAT WHAT YOU'RE TALKING ABOUT?

12:56PM 24           MR. COOPERSMITH:  I'M TALKING ABOUT THE ATTACHMENT,

12:56PM 25    YOUR HONOR, YES.

PETERSON DIRECT BY MR. LEACH                    3851

12:56PM 1             THE COURT:  RIGHT, RIGHT.

12:56PM 2         MR. LEACH.

12:56PM 3             MR. LEACH:  YOUR HONOR, THIS IS A BUSINESS RECORD OF

12:56PM 4     RDV UNDER 803(6).

12:56PM 5         I'M ALSO OFFERING IT NOT FOR THE TRUTH, BUT ALSO AS THE

12:56PM 6     MEMORIALIZATION AS FOR THE REASONS OF WHY THEY INVESTED.

12:56PM 7             THE COURT:  AND THIS IS THE MEMO DATED OCTOBER 3RD,

12:56PM 8     2014?

12:56PM 9             MR. LEACH:  YES, YOUR HONOR.

12:56PM 10            THE COURT:  ALL RIGHT.  IT'S ADMITTED.  THE

12:56PM 11    OBJECTION IS OVERRULED, AND IT'S ADMITTED UNDER 803(6).

12:56PM 12        (GOVERNMENT'S EXHIBIT 2073 WAS RECEIVED IN EVIDENCE.)

12:56PM 13            MR. LEACH:  MAY I DISPLAY, YOUR HONOR?

12:56PM 14            THE COURT:  YES.

12:56PM 15            MR. LEACH:  THANK YOU.

12:56PM 16        IF WE CAN GO TO THE FIRST PAGE OF THE DOCUMENT, MS. WACHS.

12:56PM 17        EXCELLENT.  AND IF WE CAN ZOOM IN AT THE TOP, PLEASE.

12:56PM 18    Q.   MS. PETERSON, DO YOU SEE YOUR NAME IN THE FROM LINE?

12:57PM 19    A.   YES.

12:57PM 20    Q.   AND THE DATE OF THIS IS OCTOBER 12TH, 2014?

12:57PM 21    A.   CORRECT.

12:57PM 22    Q.   SO THAT'S AFTER YOUR PHONE CALL WITH MS. HOLMES?

12:57PM 23    A.   YES.

12:57PM 24    Q.   BUT BEFORE YOUR TRIP OUT TO CALIFORNIA?

12:57PM 25    A.   YES.

12:57PM   1    Q.   OKAY.  YOU WROTE, "HEY, JERRY, HERE'S THE MEMO YOU WERE

12:57PM   2    LOOKING FOR THAT GOES A LITTLE FURTHER BEYOND JUST SUMMARIZING

12:57PM   3    THE CALL LAST WEEK WITH ELIZABETH.  I ALSO TRIED TO INCORPORATE

12:57PM   4    A HIGH-LEVEL OVERVIEW OF THE KEY PARTS OF EVERYTHING I'VE READ

12:57PM   5    IN THE MATERIALS SHE SENT."

12:57PM   6        DO YOU SEE THAT LANGUAGE?

12:57PM   7    A.   YES.

12:57PM   8    Q.   THE MATERIALS SHE SENT, WAS THAT A REFERENCE TO THE DUE

12:57PM   9    DILIGENCE BINDERS?

12:57PM  10    A.   YES.

12:57PM  11    Q.   AND THOSE WERE PROVIDED UNDER THE CONFIDENTIALITY

12:57PM  12    AGREEMENT THAT MR. BALWANI EXECUTED?

12:57PM  13    A.   CORRECT.

12:57PM  14    Q.   AND YOU THEN WROTE, "I THINK IT GIVES YOU AND THE FAMILY

12:57PM  15    MEMBERS GOING ON THIS TRIP A SHORT BUT SOLID BASIS OF THE

12:57PM  16    COMPANY, ITS OBJECTIVES, ITS HISTORY, ITS ADVANTAGES, ITS

12:57PM  17    SKEPTIC'S VIEWS, ET CETERA, AND ENOUGH OF A VIEW TO HAVE AN

12:58PM  18    ENGAGED AND PRODUCTIVE MEETING ON TUESDAY WITHOUT HAVING TO

12:58PM  19    READ THROUGH THE FOOT OF MATERIALS SHE SENT."

12:58PM  20        DO YOU SEE THAT?

12:58PM  21    A.   YES.

12:58PM  22    Q.   AND IS THAT A FAIR SUMMARY OF YOUR MEMO?

12:58PM  23    A.   YES.

12:58PM  24    Q.   AND LET'S GO TO THE PAGE -- THE NEXT PAGE.

12:58PM  25        LET'S ZOOM IN ON THE FIRST HALF IF WE COULD, MS. WACHS.

PETERSON DIRECT BY MR. LEACH                                    3853

12:58PM  1           DO YOU SEE IN THE TO LINE IT'S FROM YOU AND AN INDIVIDUAL

12:58PM  2    NAMED MICHAEL LUNT?

12:58PM  3    A.   YES.

12:58PM  4    Q.   AND THERE'S A TO LINE FROM JERRY TUBERGEN AND A FROM LINE

12:58PM  5    FROM YOU AND MICHAEL LUNT.

12:58PM  6           WHO WAS MICHAEL LUNT?

12:58PM  7    A.   HE WAS OUR IN-HOUSE COUNSEL AT THE TIME.

12:58PM  8    Q.   YOU THEN WRITE, "RECAP OF CONVERSATIONS WITH

12:58PM  9    ELIZABETH HOLMES AND EXCERPTS FROM WRITTEN MATERIALS PROVIDED

12:58PM 10    TO RDV ON THE COMPANY."

12:58PM 11           DO YOU SEE THAT LANGUAGE?

12:58PM 12    A.   YES.

12:58PM 13    Q.   AND YOU THEN WROTE, "WHAT IS THERANOS TODAY?

12:58PM 14           "INSTEAD OF VIALS OF BLOOD (ONE FOR EVERY TEST NEEDED)

12:59PM 15    THERANOS REQUIRES ONLY A PINPRICK AND A DROP OF BLOOD TO

12:59PM 16    PERFORM HUNDREDS OF TESTS, FROM STANDARD CHOLESTEROL CHECKS TO

12:59PM 17    SOPHISTICATED GENETIC ANALYSES."

12:59PM 18           DO YOU SEE THAT LANGUAGE?

12:59PM 19    A.   YES.

12:59PM 20    Q.   WHERE DID YOU GET THAT INFORMATION?

12:59PM 21    A.   SHE HAD SAID THAT MANY TIMES IN DESCRIBING WHAT THERANOS

12:59PM 22    IS.

12:59PM 23           IT'S ALSO SUMMARIZED IN SOME OF THE OTHER MATERIALS THAT

12:59PM 24    WE READ, BUT WE HEARD THIS FROM HER MANY TIMES.

12:59PM 25    Q.   AND WAS THAT RELEVANT TO RDV'S INVESTMENT DECISION?

PETERSON DIRECT BY MR. LEACH                                    3854

12:59PM  1    A.   YES.

12:59PM  2    Q.   AND HOW SO?

12:59PM  3    A.   THAT YOU COULD DO THAT WITH A -- THAT THE MACHINE COULD DO

12:59PM  4    THAT WITH A PINPRICK AND IT COULD PERFORM HUNDREDS OF TESTS.

12:59PM  5    Q.   IT THEN GOES ON TO SAY, "THE RESULTS ARE FASTER (COUPLE

12:59PM  6    HOURS), MORE ACCURATE (100 PERCENT AUTOMATED, NO MANUAL

12:59PM  7    HANDLING OF THE SAMPLE), AND FAR CHEAPER THAN CONVENTIONAL

12:59PM  8    METHODS."

12:59PM  9         DO YOU SEE THAT LANGUAGE?

12:59PM  10   A.   YES.

12:59PM  11   Q.   AND WHERE DID YOU GET THAT INFORMATION?

01:00PM  12   A.   THAT CAME FROM HER AS WELL, AND I'M SURE IT'S PROBABLY IN

01:00PM  13   THE MATERIALS AS WELL.

01:00PM  14   Q.   WAS THAT INFORMATION RELEVANT TO RDV'S INVESTMENT

01:00PM  15   DECISION?

01:00PM  16   A.   YES.

01:00PM  17   Q.   WHY?

01:00PM  18   A.   WE REALLY THOUGHT, IF IT DID ALL OF THIS, IT WAS GOING TO

01:00PM  19   CHANGE HEALTH CARE.  IT WAS VERY TRANSFORMATIVE AND IT WAS

01:00PM  20   CHEAPER.

01:00PM  21   Q.   LET'S LOOK AT PAGE 2, PLEASE, OR 2 OF THE MEMO, PAGE 5 OF

01:00PM  22   THE EXHIBIT.

01:00PM  23        THERE'S A PARAGRAPH TITLED "DESCRIBE THE WALGREENS

01:00PM  24   OPPORTUNITY."

01:00PM  25        DO YOU SEE THAT?

01:00PM  1    A.   YES.

01:00PM  2    Q.   AND WAS THAT A QUESTION THAT YOU POSED TO MS. HOLMES AT

01:00PM  3    SOME POINT?

01:00PM  4    A.   YES.  THIS WAS FROM THE PHONE CALL.

01:00PM  5    Q.   OKAY.  AND I WANT TO DRAW YOUR ATTENTION TO THE MIDDLE OF

01:00PM  6    THE PARAGRAPH.  THERE'S A LINE THAT SAYS, "THERANOS'S REVENUE

01:00PM  7    FOR 2015 IS PROJECTED TO BE $990 MILLIN AND ASSUMES THEY OPEN

01:01PM  8    900 WALGREENS-THERANOS CENTERS NEXT YEAR."

01:01PM  9         DO YOU SEE THAT LANGUAGE?

01:01PM  10   A.   YES.

01:01PM  11   Q.   WAS THAT INFORMATION IMPORTANT TO RDV'S INVESTMENT

01:01PM  12   DECISION?

01:01PM  13   A.   EXTREMELY IMPORTANT, YES.

01:01PM  14   Q.   WHY IS THAT?

01:01PM  15   A.   BECAUSE IT SHOWED THAT THE REVENUE BEING PRESENTED IN 2015

01:01PM  16   WAS FULLY SUPPORTED BY CONTRACTS WITH WALGREENS THAT INCLUDED

01:01PM  17   THIS ROLLOUT, WHICH WE DID READ WITHIN THE WALGREENS 10-K THAT

01:01PM  18   THEY WERE MOVING FORWARD WITH THAT A YEAR -- I THINK IT WAS THE

01:01PM  19   2013 10-K.

01:01PM  20        SO WE DIDN'T HEAR ANYTHING CONTRARY TO THAT FROM

01:01PM  21   ELIZABETH HOLMES OR SUNNY.

01:01PM  22   Q.   AND THERE WAS A REFERENCE TO -- AND WHERE DID THIS

01:01PM  23   INFORMATION COME FROM, THE $990 MILLION AND THE 900 --

01:02PM  24   A.   THAT CAME FROM ELIZABETH WHEN WE WERE SPEAKING TO HER, AS

01:02PM  25   WELL AS THE FINANCIALS WERE IN THE BINDER.

PETERSON DIRECT BY MR. LEACH          3856

01:02PM   1    Q.   THE DUE DILIGENCE MATERIALS THAT WERE PROVIDED TO YOU?

01:02PM   2    A.   YES.

01:02PM   3    Q.   OKAY.  IF WE COULD GO FURTHER DOWN, MS. WACHS.

01:02PM   4         DO YOU SEE THE BOLD HEADLINE, "WHAT ARE THE MAIN RISKS

01:02PM   5    THAT THERANOS FACES?"

01:02PM   6    A.   YES.

01:02PM   7    Q.   AND YOU WROTE, "HOLMES BELIEVES THE COMPANY'S PRIMARY RISK

01:02PM   8    IS THE EXECUTION OF ITS BUSINESS PLAN, RATHER THAN TECHNOLOGY,

01:02PM   9    VALIDATION, AND CUSTOMER ACCEPTANCE."

01:02PM  10         DO YOU SEE THAT LANGUAGE?

01:02PM  11    A.   YES.

01:02PM  12    Q.   AND WAS THAT IMPORTANT TO RDV'S INVESTMENT DECISION?

01:02PM  13    A.   VERY.

01:02PM  14    Q.   OKAY.  AND WHERE DID YOU GET THIS INFORMATION?

01:02PM  15    A.   THIS CAME DIRECTLY FROM HER IN OUR PHONE CONVERSATION.

01:02PM  16    Q.   OKAY.  AND WHY WAS THIS RELEVANT TO YOU?

01:02PM  17    A.   BECAUSE IT SHOWED THAT IT HAS BEEN DOING TESTS FOR YEARS

01:02PM  18    AND WAS VALIDATED BY PHARMACEUTICAL COMPANIES.

01:02PM  19    Q.   IT GOES ON TO SAY, "SINCE 2005 THERANOS'S CLIENTS INCLUDED

01:03PM  20    10 OF THE TOP 15 PHARMACEUTICAL COMPANIES AS THEY CONDUCTED

01:03PM  21    CLINICAL TRIALS."

01:03PM  22         DO YOU SEE THAT LANGUAGE?

01:03PM  23    A.   YES.

01:03PM  24    Q.   AND WHERE DID YOU GET THAT INFORMATION?

01:03PM  25    A.   FROM ELIZABETH.

ER-2860

01:03PM   1    Q.   AND WAS THAT RELEVANT TO YOU?

01:03PM   2    A.   VERY, YES.

01:03PM   3    Q.   WHY?

01:03PM   4    A.   BECAUSE IT SHOWED THAT -- AGAIN, IT VALIDATED THE SCIENCE

01:03PM   5    AND THAT IT WORKED AND IT HAD BEEN WORKING FOR MANY YEARS WITH

01:03PM   6    PHARMACEUTICAL COMPANIES.

01:03PM   7    Q.   FURTHER ON IT SAYS, "THROUGH THIS WORK, THERANOS HAS BEEN

01:03PM   8    COMPREHENSIVELY VALIDATED OVER THE LAST 9 YEARS BY THE 10

01:03PM   9    LARGEST PHARMACEUTICAL COMPANIES."

01:03PM   10        IS THAT CONSISTENT WITH STATEMENTS THAT MS. HOLMES MADE TO

01:03PM   11   YOU?

01:03PM   12   A.   YES.

01:03PM   13   Q.   OKAY.  IF WE COULD ZOOM FURTHER DOWN, THERE'S A HEADING

01:03PM   14   "WHAT ARE THERANOS'S KEY OBJECTIVES FOR THE MEETING ON

01:03PM   15   OCTOBER 14TH?"

01:03PM   16        DO YOU SEE THAT PARAGRAPH?

01:04PM   17   A.   YES.

01:04PM   18   Q.   OKAY.  AND THE MEETING ON OCTOBER 14TH, IS THAT A

01:04PM   19   REFERENCE TO A MEETING BETWEEN RDV AND THERANOS?

01:04PM   20   A.   YES.

01:04PM   21   Q.   AND DID YOU ATTEND THAT MEETING?

01:04PM   22   A.   YES.

01:04PM   23   Q.   AND THAT'S THE MEETING OUT HERE IN PALO ALTO?

01:04PM   24   A.   YES.

01:04PM   25   Q.   YOU WROTE, "HOLMES IS SEEKING INVESTORS WHO WANT TO BUILD

PETERSON DIRECT BY MR. LEACH                                      3858

01:04PM 1    A GREAT COMPANY THAT WILL BOTH 'DO WELL AND DO GOOD' OVER THE

01:04PM 2    COURSE OF MULTIPLE GENERATIONS.

01:04PM 3        "THUS, HOLMES AND THE THERANOS TEAM WANT TO GET TO KNOW

01:04PM 4    THE PEOPLE MAKING THE INVESTMENT, UNDERSTANDING THEIR

01:04PM 5    INVESTMENT PHILOSOPHY AND TARGET INVESTMENT PROFILE AS WELL AS

01:04PM 6    MEET IN PERSON THOSE WHO WILL BE INTERACTING WITH THE COMPANY

01:04PM 7    ON A GO-FORWARD BASIS."

01:04PM 8        DO YOU SEE THAT LANGUAGE?

01:04PM 9    A.   YES.

01:04PM 10   Q.   AND WHAT WERE YOU GETTING AT THERE?

01:04PM 11   A.   I WAS TRYING TO CONVEY TO THE FAMILY MEMBERS THAT WERE

01:04PM 12   GOING TO GO ON THIS TRIP WHAT THE -- PART OF THE AGENDA FOR THE

01:04PM 13   MEETING WAS TO GET TO KNOW EACH OTHER.

01:04PM 14       SHE MADE IT CLEAR THAT THEY WANTED TO HAND PICK FIVE TO

01:04PM 15   EIGHT FAMILY INVESTORS BECAUSE THE TRADITIONAL INVESTORS OF,

01:05PM 16   I'LL CALL IT VENTURE FIRMS OR OTHER INSTITUTIONAL MONEY, KIND

01:05PM 17   OF HAD A TIMEFRAME ON THEY WANTED THEIR MONEY BACK.

01:05PM 18       SO SHE WAS LOOKING FOR FAMILY INVESTORS THAT COULD -- THAT

01:05PM 19   WERE SEEKING THIS MORE LONG-TERM, DO GOOD TRANSFORM HEALTH CARE

01:05PM 20   TYPE OF INVESTORS.

01:05PM 21       SO WE WANTED -- I WANTED TO MAKE SURE THAT THE FAMILY

01:05PM 22   UNDERSTOOD WHAT SHE WAS LOOKING FOR, YOU KNOW, AS WE WENT OUT

01:05PM 23   THERE.

01:05PM 24   Q.   WHEN YOU SAY "HAND PICKED," WAS THERE -- DID YOU FEEL AT

01:05PM 25   THE TIME THAT YOU WERE BEING PICKED AS MUCH AS YOU WERE PICKING

01:05PM 1    THERANOS?

01:05PM 2    A.   YES.

01:05PM 3              MR. COOPERSMITH:  OBJECTION.  LEADING.

01:05PM 4              THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

01:05PM 5    BY MR. LEACH:

01:05PM 6    Q.   CAN YOU EXPLAIN THAT?

01:05PM 7    A.   YES.  IT WAS PRETTY CLEAR TO US -- I THINK IT'S EVEN IN

01:05PM 8    THE LETTER THAT SHE HAD WRITTEN TO US IN THE FRONT OF THE

01:06PM 9    BINDERS -- THAT SHE WAS -- SHE DESIRED TO HAVE FIVE TO EIGHT

01:06PM 10   INVESTORS, FAMILY TYPE INVESTORS.

01:06PM 11        SO, YES, WE DID FEEL AS THOUGH -- THAT'S A SMALL NUMBER OF

01:06PM 12   PEOPLE, SO WE FELT, WHEN WE WENT OUT THERE, THAT WE WANTED TO

01:06PM 13   MAKE SURE THAT SHE UNDERSTOOD OUR BELIEFS AND INVESTMENT

01:06PM 14   PHILOSOPHIES AS MUCH AS WE UNDERSTOOD THEIRS.

01:06PM 15   Q.   DID THAT INFLUENCE IN ANY WAY HOW YOU WENT ABOUT YOUR

01:06PM 16   WORK?

01:06PM 17   A.   NOT ME PARTICULARLY.

01:06PM 18        BUT I THINK IT'S IMPORTANT FOR THE FAMILY, AND FOR JERRY,

01:06PM 19   THAT WE INVEST IN THINGS THAT SHARE THE SAME COMMON BELIEFS AND

01:06PM 20   VISION FOR THINGS SUCH AS HEALTH CARE AND EDUCATION.

01:06PM 21   Q.   LET'S LOOK AT THE NEXT PAGE OF THIS DOCUMENT.

01:06PM 22        DO YOU SEE UP AT THE TOP THE HEADING "APPENDIX --

01:07PM 23   STATISTICS AND NOTEWORTHY ITEMS"?

01:07PM 24   A.   YES.

01:07PM 25   Q.   AND THEN THERE'S A NUMBER OF BULLETS.

PETERSON DIRECT BY MR. LEACH                    3860

01:07PM  1          WHY WERE YOU INCLUDING THIS INFORMATION IN YOUR MEMO?

01:07PM  2     A.   THIS WAS JUST A NUMBER OF THINGS THAT I HAD TAKEN FROM THE

01:07PM  3     BINDERS AND THINGS THAT I HAD READ, A NUMBER -- THEY HAD

01:07PM  4     REFERENCED A NUMBER OF ARTICLES TO READ IN THE BINDER, AND A

01:07PM  5     LOT OF THIS STUFF WAS PULLED FROM THERE.

01:07PM  6          I JUST WANTED THE FAMILY TO HAVE A FULL -- THE DEVOSES

01:07PM  7     THAT WENT ON THE TRIP TO HAVE A FULL UNDERSTANDING OF

01:07PM  8     EVERYTHING THAT I HAD READ.

01:07PM  9     Q.   DID YOU BELIEVE THAT THIS INFORMATION WAS RELEVANT TO AN

01:07PM 10     INVESTMENT DECISION?

01:07PM 11     A.   VERY, YES.

01:07PM 12     Q.   OKAY.  IN THE THIRD BULLET IT SAYS, "THE PRE- AND

01:07PM 13     POST-ANALYTICAL PHASES OF THE LAB TESTING PROCESS (HUMAN

01:07PM 14     INTERACTION PARTS) ACCOUNT FOR 93 PERCENT OF ERRORS.  THERANOS

01:07PM 15     AUTOMATES THE PRE- AND POST-ANALYTIC PROCESSES (NO MANUAL

01:08PM 16     HANDLING OF THE SAMPLE), DRASTICALLY MINIMIZING THE HUMAN

01:08PM 17     ELEMENTS OF PROCESSING WHICH IS PROVEN TO CAUSE OF THE MAJORITY

01:08PM 18     OF LAB TEST ERRORS."

01:08PM 19          DO YOU SEE THAT LANGUAGE?

01:08PM 20     A.   YES.

01:08PM 21     Q.   AND WHERE DID YOU GET THAT INFORMATION?

01:08PM 22     A.   THAT COULD HAVE BEEN WRITTEN SOMEWHERE, TOO, BUT I DO

01:08PM 23     RECALL HER TALKING ABOUT THAT AT LENGTH.

01:08PM 24     Q.   AND WAS THIS IMPORTANT TO YOU?

01:08PM 25     A.   YES.

PETERSON DIRECT BY MR. LEACH                3861

01:08PM  1    Q.   DOWN TOWARDS THE BOTTOM THERE'S A BULLET, "THERANOS USES

01:08PM  2    THEIR OWN ANALYZER EQUIPMENT."

01:08PM  3         DO YOU SEE THAT LANGUAGE?

01:08PM  4    A.   YES.

01:08PM  5    Q.   AND WAS THAT YOUR UNDERSTANDING?

01:08PM  6    A.   YES.

01:08PM  7    Q.   WAS THAT IMPORTANT TO YOU?

01:08PM  8    A.   YES.

01:08PM  9    Q.   WHY?

01:08PM  10   A.   WE DID HAVE A DISCUSSION AROUND THE -- WHY IT DIDN'T HAVE

01:08PM  11   TO BE FDA APPROVED, AND THIS WAS KIND OF THE ANSWER THAT THEY

01:08PM  12   HAD GIVEN, THAT THEY USED THEIR OWN ANALYZER EQUIPMENT, THEY

01:08PM  13   DON'T SELL THEM.

01:08PM  14        SO, YEAH, IT WAS IMPORTANT FOR US TO UNDERSTAND AS MUCH AS

01:09PM  15   WE COULD HOW THEY DO WHAT THEY DO.

01:09PM  16   Q.   OKAY.  WAS IT IMPRESSIVE TO YOU THAT THERANOS USES ITS OWN

01:09PM  17   ANALYZER EQUIPMENT?

01:09PM  18   A.   YES, IT WAS IMPRESSIVE THAT IT WORKED.

01:09PM  19   Q.   OKAY.  AND WHERE DID YOU GET THIS INFORMATION, "THERANOS

01:09PM  20   USES THEIR OWN ANALYZER EQUIPMENT"?

01:09PM  21   A.   THAT WAS MENTIONED MANY TIMES THROUGH THE COURSE OF OUR

01:09PM  22   DILIGENCE, AND I'M SURE IT'S IN THE MATERIALS AS WELL.

01:09PM  23   Q.   OKAY.  WHEN YOU SAY IT WAS MENTIONED MANY TIMES, DO YOU

01:09PM  24   MEAN THE PHONE CALL WITH MS. HOLMES?

01:09PM  25   A.   YES, YES.  AND IT WAS SAID AGAIN AT THE MEETING.

01:09PM 1    Q.   THE MEETING OUT IN CALIFORNIA?

01:09PM 2    A.   YES.

01:09PM 3    Q.   OKAY.  IN THE NEXT -- AT ANY POINT IN TIME DID MS. HOLMES

01:09PM 4    OR MR. BALWANI TELL YOU THAT THERANOS USED EQUIPMENT

01:09PM 5    MANUFACTURED BY OTHERS?

01:09PM 6    A.   NO.

01:09PM 7    Q.   OKAY.  AT ANY POINT IN TIME DID THEY TELL YOU THAT THEY

01:09PM 8    WERE MODIFYING DEVICES MADE BY SIEMENS TO DO BLOOD TESTING?

01:10PM 9    A.   NO.

01:10PM 10   Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

01:10PM 11   A.   YES.

01:10PM 12   Q.   WHY?

01:10PM 13   A.   BECAUSE, AGAIN, WE NEEDED TO KNOW HOW THEY WERE DOING

01:10PM 14   THINGS, AND THEY TOLD US THAT EVERYTHING WAS BEING DONE ON

01:10PM 15   THEIR OWN ANALYZER EQUIPMENT AND THAT IT WORKED AND IT WAS

01:10PM 16   VALIDATED BY PHARMACEUTICAL COMPANIES.  THAT WAS VERY

01:10PM 17   IMPORTANT.

01:10PM 18   Q.   IN THE NEXT BULLET IT READS, "A THERANOS ANALYZER STATION

01:10PM 19   IS A SMALL FRACTION OF THE SIZE OF A CURRENT LAB MAKING IT

01:10PM 20   POSSIBLE TO PLACE A THERANOS LAB IN THE OPERATING ROOM OR IN A

01:10PM 21   MILITARY EVACUATION HELICOPTER," AND THEN IT CONTINUES.

01:10PM 22       DO YOU SEE THAT?

01:10PM 23   A.   YES.

01:10PM 24   Q.   WHERE DID YOU GET THIS INFORMATION?

01:10PM 25   A.   THAT MAY BE FROM ONE OF THE ARTICLES THAT I HAD READ, BUT

01:10PM   1      WE ALSO TALKED ABOUT THAT AGAIN, HER WORK WITH THE -- THEIR

01:10PM   2      WORK WITH THE DOD, THE DEPARTMENT OF DEFENSE, WHEN WE WERE AT

01:11PM   3      THE MEETING.

01:11PM   4      Q.   THE MEETING IN CALIFORNIA?

01:11PM   5      A.   YES.

01:11PM   6      Q.   AND WHAT WAS SAID THERE?

01:11PM   7      A.   THAT -- PRETTY MUCH THAT, THAT THEY WERE DOING A LOT OF

01:11PM   8      WORK FOR THE DEPARTMENT OF DEFENSE, AND THAT IT WAS ON MILITARY

01:11PM   9      HELICOPTERS.

01:11PM  10          THEY WERE ALSO WORKING ON EBOLA.  AT THE TIME I RECALL

01:11PM  11      TALKING A LOT ABOUT THAT THEY WERE TRYING TO WORK WITH THE DOD

01:11PM  12      ON HOW THEY COULD APPROACH THE EBOLA SCARE AT THE TIME.

01:11PM  13      Q.   THIS SAYS, "A THERANOS ANALYZER STATION IS A SMALL

01:11PM  14      FRACTION OF THE SIZE OF A CURRENT LAB."

01:11PM  15          WAS THAT IMPRESSIVE TO YOU?

01:11PM  16      A.   YES.

01:11PM  17      Q.   AND WAS IT RELEVANT TO THE INVESTMENT DECISION?

01:11PM  18      A.   YES.  BECAUSE OF THE SIZE, IT WAS POSSIBLE TO PUT THESE

01:11PM  19      THINGS -- SHE KEPT SAYING THAT SHE WANTED TO PUT AN ANALYZER

01:11PM  20      WITHIN, YOU KNOW, FIVE MILES OF EVERY HUMAN OR CONSUMER.

01:11PM  21          AND GIVEN THE SIZE OF IT, YOU COULD THEORETICALLY PUT IT

01:11PM  22      IN PEOPLE'S HOMES EVENTUALLY.

01:11PM  23      Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT BULLET.

01:12PM  24          ROUGHLY HALFWAY THROUGH IT READS, "UNLIKE MOST LABS,

01:12PM  25      THERANOS DOES NOT BUY ANALYZER EQUIPMENT FROM A 3RD PARTY, AND

PETERSON DIRECT BY MR. LEACH                    3864

01:12PM  1     THEY DO NOT SELL THEIR ANALYZERS TO OTHER LABS."

01:12PM  2         DO YOU SEE THAT?

01:12PM  3     A.  YES.

01:12PM  4     Q.  WAS THAT A TOPIC THAT WAS DISCUSSED IN THE OCTOBER -- IN

01:12PM  5     THE MEETING IN PALO ALTO?

01:12PM  6     A.  YES.

01:12PM  7     Q.  AND WAS THIS RELEVANT TO YOU?

01:12PM  8     A.  YES.

01:12PM  9     Q.  THANK YOU, MS. WACHS.  WE CAN TAKE THAT DOWN.

01:12PM 10         I'D LIKE TO FOCUS ON THE MEETING YOU'VE BEEN MENTIONING

01:12PM 11     OUT IN PALO ALTO.

01:12PM 12         WHO WENT TO -- YOU DON'T WORK IN PALO ALTO, DO YOU?

01:12PM 13     A.  NO.

01:12PM 14     Q.  WHERE DO YOU WORK?

01:12PM 15     A.  IN GRAND RAPIDS, MICHIGAN.

01:13PM 16     Q.  OKAY.  SO YOU FLEW OUT TO CALIFORNIA IN OCTOBER OF 2014?

01:13PM 17     A.  CORRECT.

01:13PM 18     Q.  AND WHO WAS WITH YOU?

01:13PM 19     A.  DOUG DEVOS, WHICH WAS THE CHAIRMAN OF OUR INVESTMENT

01:13PM 20     COMMITTEE AT THE TIME; JERRY TUBERGEN; MYSELF; RICK DEVOS, WHO

01:13PM 21     REPRESENTED DICK AND BETSY'S FAMILY; AND CHERI DEVOS, WHO IS

01:13PM 22     ONE OF THE OTHER CHILDREN, SECOND GENERATION CHILDREN.

01:13PM 23     Q.  AND WHO FROM THERANOS DID YOU MEET WITH?

01:13PM 24     A.  SUNNY BALWANI AND ELIZABETH HOLMES.

01:13PM 25     Q.  HOW LONG DID THE MEETING LAST?

01:13PM  1      A.   IT WAS A GOOD FOUR TO FOUR AND A HALF HOURS, WHICH

01:13PM  2      INCLUDED A TOUR, WHICH WAS ABOUT, I DON'T KNOW, 45 MINUTES TO

01:13PM  3      AN HOUR.

01:13PM  4      Q.   AND WHEN YOU SAY "A TOUR," WHAT DID YOU TOUR?

01:13PM  5      A.   WE TOURED THE LOCATION, THIS WAS DONE LAST, AND SAW THE

01:13PM  6      ANALYZER EQUIPMENT, AND THEN CHERI -- WE SAW THE WELLNESS ROOM

01:13PM  7      THAT THEY HAD IN THE BUILDING, WHICH WAS EXPLAINED TO US THAT

01:14PM  8      THIS WAS PRETTY MUCH THE SETUP THAT THEY HAD AT WALGREENS, AND

01:14PM  9      CHERI HAD HER BLOOD TESTED.

01:14PM  10          SO IT WAS KIND OF AN EXPERIENCE OF WHAT YOU WOULD HAVE

01:14PM  11     GOTTEN IF YOU HAD GONE TO WALGREENS.

01:14PM  12     Q.   AND WHEN YOU SAY "CHERI HAD HER BLOOD TESTED," WHAT DID

01:14PM  13     YOU OBSERVE?

01:14PM  14     A.   THAT SHE WENT IN AND HAD HER FINGERSTICK BLOOD TESTED.

01:14PM  15          AND THEN THEY DIDN'T SHOW US, YOU KNOW, RUNNING IT THROUGH

01:14PM  16     THE ANALYZER.  THEY JUST SAID THEY WOULD GET HER BACK HER TEST

01:14PM  17     RESULTS.

01:14PM  18     Q.   DID THEY SHOW YOU ANY DEVICES MANUFACTURED BY THIRD

01:14PM  19     PARTIES?

01:14PM  20     A.   NONE, NO.

01:14PM  21     Q.   AND DID THEY SHOW YOU ANY SIEMENS ANALYZERS?

01:14PM  22     A.   NO.

01:14PM  23     Q.   AND THE DEVICE THAT YOU WERE SHOWN, DESCRIBE IT FOR US.

01:14PM  24     WHAT DID YOU SEE?

01:14PM  25     A.   IT WAS ABOUT, I DON'T KNOW, A FOOT AND A HALF TALL, LIKE A

PETERSON DIRECT BY MR. LEACH                3866

01:14PM  1    COMPUTER CPU UNIT, IT LOOKED LIKE THAT.

01:14PM  2    Q.   AND DID YOU BELIEVE THAT WAS THE DEVICE THAT THERANOS WAS

01:15PM  3    USING FOR ITS TESTING?

01:15PM  4    A.   YES.  IT WAS VERY CLEAR THAT THAT'S WHAT THEY WERE USING.

01:15PM  5    Q.   WHY DO YOU SAY THAT?

01:15PM  6    A.   IT WAS REPEATEDLY SAID THAT THIS IS HOW THEY DID THINGS.

01:15PM  7    Q.   OKAY.  I WANT TO -- SO THE MEETING AS A WHOLE WAS ABOUT

01:15PM  8    FOUR AND A HALF HOURS?

01:15PM  9    A.   ROUGHLY, YEAH.

01:15PM  10   Q.   AND WAS MR. BALWANI PRESENT FOR ALL OF THE MEETING?

01:15PM  11   A.   HE WAS PRESENT FOR EVERYTHING IN THE ROOM WHERE WE WERE

01:15PM  12   DISCUSSING EVERYTHING.

01:15PM  13       HE DID NOT GO ON THE TOUR.

01:15PM  14   Q.   OKAY.  AND DESCRIBE THE SUBSTANCE OF THE MEETING.  WHAT

01:15PM  15   WAS SAID?

01:15PM  16   A.   WE SPENT A LOT OF TIME REALLY GOING OVER, FOR THE THREE

01:15PM  17   FAMILY MEMBERS THAT WERE PRESENT, A LOT OF THE MISSION AND HOW

01:15PM  18   IT DOES WHAT IT DOES, THE CONTRACTS.

01:15PM  19       WE SPENT A FAIR AMOUNT OF TIME ON THE FINANCIALS AND WHAT

01:15PM  20   MADE UP THOSE FINANCIALS, WHICH LED TO CONVERSATIONS AROUND THE

01:15PM  21   PHARMACEUTICAL COMPANIES THAT THEY HAD WORKED WITH AND JUST THE

01:16PM  22   MISSION OF WHERE SHE WANTED TO GO.

01:16PM  23       OUR SIDE OF THE TABLE TALKED A LOT ABOUT HEALTH CARE AND

01:16PM  24   THAT THEY HAVE A PASSION, THIS DEVOS FAMILY HAS A PASSION FOR

01:16PM  25   HEALTH CARE.

PETERSON DIRECT BY MR. LEACH                          3867

01:16PM   1        DOUG WAS THE CEO OF AMWAY AT THE TIME, AND THEY TALKED A

01:16PM   2   LOT ABOUT POTENTIAL WAYS THAT AMWAY COULD HELP THERANOS GO

01:16PM   3   GLOBAL.

01:16PM   4        SO THERE WAS A LOT OF BACK AND FORTH AROUND, YOU KNOW, THE

01:16PM   5   BASIS OF THE COMPANY, WHAT SHE WANTED TO DO WITH IT, THE

01:16PM   6   FINANCIALS, AND THEN POTENTIALLY HOW WE COULD HELP.

01:16PM   7   Q.   YOU TALKED EARLIER ABOUT THE TWO BINDERS OF DUE DILIGENCE

01:16PM   8   MATERIALS THAT YOU RECEIVED.

01:16PM   9        DID YOU BRING THOSE WITH YOU?

01:16PM  10   A.   I DID, YEAH.

01:16PM  11   Q.   AND DID YOU ASK QUESTIONS OF MS. HOLMES AND MR. BALWANI

01:16PM  12   BASED ON THOSE DUE DILIGENCE MATERIALS?

01:16PM  13   A.   THERE WERE QUESTIONS ASKED, YES, BY OUR SIDE OF THE TABLE.

01:16PM  14   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO WHAT WE'VE MARKED AS

01:17PM  15   EXHIBIT 4858.

01:17PM  16        4858 IS ABOUT 187 PAGES.

01:17PM  17        DO YOU SEE THAT?

01:17PM  18   A.   YES.

01:17PM  19   Q.   OKAY.  ARE YOU FAMILIAR WITH THIS DOCUMENT?

01:17PM  20   A.   YES.

01:17PM  21   Q.   AND WHAT IS IT?

01:17PM  22   A.   THIS WAS THE FIRST BINDER THAT WAS SENT TO US AS PART OF

01:17PM  23   THE DUE DILIGENCE MATERIALS.

01:17PM  24   Q.   OKAY.  AND DID YOU RELY ON THE STATEMENTS IN EXHIBIT 4858

01:17PM  25   IN THE COURSE OF MAKING AN INVESTMENT DECISION?

01:17PM  1      A.   YES.

01:17PM  2      Q.   OKAY.  AND ARE THESE THE DUE DILIGENCE MATERIALS THAT WERE

01:17PM  3      PROVIDED PURSUANT TO THE CONFIDENTIAL DISCLOSURE AGREEMENT THAT

01:17PM  4      WE LOOKED AT PREVIOUSLY?

01:17PM  5      A.   YES.

01:17PM  6      Q.   OKAY.

01:17PM  7           YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 4858.

01:17PM  8               MR. COOPERSMITH:  802, YOUR HONOR.

01:18PM  9               THE COURT:  AND YOU'RE OFFERING THE ENTIRETY OF THE

01:18PM 10      DOCUMENT?

01:18PM 11               MR. LEACH:  YES, YOUR HONOR.

01:18PM 12               THE COURT:  OKAY.  THE OBJECTION IS OVERRULED.  IT'S

01:18PM 13      ADMITTED, AND IT MAY BE PUBLISHED.

01:18PM 14           (GOVERNMENT'S EXHIBIT 4858 WAS RECEIVED IN EVIDENCE.)

01:18PM 15               MR. LEACH:  AND WE MAY DISPLAY, YOUR HONOR?

01:18PM 16               THE COURT:  YES.

01:18PM 17               MR. LEACH:  OKAY.

01:18PM 18      Q.   MS. PETERSON, I DRAW YOUR ATTENTION TO PAGE 1.

01:18PM 19           DO YOU SEE THE TITLE THERANOS CONFIDENTIAL OVERVIEW?

01:18PM 20      A.   YES.

01:18PM 21      Q.   AND THIS IS ESSENTIALLY A POWERPOINT OF INFORMATION ABOUT

01:18PM 22      THERANOS THAT YOU RELIED ON IN THE COURSE OF MAKING THE

01:19PM 23      INVESTMENT DECISION?

01:19PM 24      A.   YES.

01:19PM 25      Q.   AND WERE THE REPRESENTATIONS IN HERE IMPORTANT TO YOU?

01:19PM   1    A.   YES.

01:19PM   2    Q.   OKAY.  WHY?

01:19PM   3    A.   WELL, IT'S IMPORTANT TO KNOW EXACTLY WHAT WE'RE INVESTING

01:19PM   4    IN, AND THERE'S A LOT OF INFORMATION IN HERE.

01:19PM   5    Q.   INFORMATION THAT YOU COULDN'T GET FROM OTHER SOURCES?

01:19PM   6    A.   CORRECT.

01:19PM   7    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 3.

01:19PM   8         DO YOU SEE THE HEADING THERANOS INC.?

01:19PM   9    A.   YES.

01:19PM  10    Q.   AND THERE'S SOME HIGHLIGHTING -- WELL, WE'VE HIGHLIGHTED

01:19PM  11    THERANOS INC.

01:19PM  12         THERE'S SOME ADDITIONAL HIGHLIGHTING BELOW THAT IN THE

01:19PM  13    PARAGRAPH BEGINNING "THERANOS'S PROPRIETARY, PATENTED

01:19PM  14    TECHNOLOGY."

01:19PM  15         DO YOU SEE THE HIGHLIGHTING?

01:19PM  16    A.   YES.

01:19PM  17    Q.   IS THAT YOUR HIGHLIGHTING?

01:19PM  18    A.   YES.

01:19PM  19    Q.   AND THEN THERE IS SOME HANDWRITING.  IT SAYS, "CLINICAL

01:19PM  20    LAB IMPROVEMENT AMENDMENTS."

01:19PM  21         IS THAT YOUR HANDWRITING?

01:19PM  22    A.   YES.

01:19PM  23    Q.   THIS READS, "THERANOS'S PROPRIETARY, PATENTED TECHNOLOGY

01:20PM  24    RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK AND TESTS FOR

01:20PM  25    MICRO-SAMPLES OF OTHER MATRIXES AND GENERATES SIGNIFICANTLY

01:20PM 1     HIGHER INTEGRITY DATA THAN CURRENTLY POSSIBLE."

01:20PM 2         DO YOU SEE THAT LANGUAGE?

01:20PM 3     A.   YES.

01:20PM 4     Q.   AND WAS THIS INFORMATION IMPORTANT TO YOU?

01:20PM 5     A.   YES.

01:20PM 6     Q.   OKAY.  WHY DID YOU HIGHLIGHT "GENERATES SIGNIFICANTLY

01:20PM 7     HIGHER INTEGRITY DATA THAN CURRENTLY POSSIBLE"?

01:20PM 8     A.   BECAUSE IT'S IMPORTANT.

01:20PM 9     Q.   OKAY.  IN THE, IN THE THIRD PARAGRAPH IT SAYS, "CURRENT

01:20PM 10    AND PAST CLIENTS INCLUDE 10 OF THE TOP 15 MAJOR PHARMACEUTICAL

01:20PM 11    COMPANIES, MID SIZED BIO-PHARMAS, PROMINENT RESEARCH

01:20PM 12    INSTITUTIONS, HEALTH CARE PAYORS, AND U.S. AND FOREIGN

01:20PM 13    GOVERNMENT HEALTH AND MILITARY ORGANIZATIONS."

01:20PM 14        DO YOU SEE THAT LANGUAGE?

01:20PM 15    A.   YES.

01:20PM 16    Q.   WAS THAT IMPRESSIVE TO YOU?

01:20PM 17    A.   VERY.

01:20PM 18    Q.   DID THIS TOPIC COME UP IN YOUR MEETING OUT IN CALIFORNIA?

01:21PM 19    A.   YES.

01:21PM 20    Q.   AND WHAT DID MS. HOLMES AND MR. BALWANI TELL YOU ABOUT

01:21PM 21    THERANOS'S WORK WITH THE MILITARY?

01:21PM 22    A.   THAT THEY WERE DOING WORK FOR THE DEPARTMENT OF DEFENSE.

01:21PM 23    AND, AGAIN, I DON'T REMEMBER ALL OF THE SPECIFICS, BUT I RECALL

01:21PM 24    THEM TALKING ABOUT IT BEING IN HELICOPTERS, EVACUATION

01:21PM 25    HELICOPTERS, AS WELL AS I DO RECALL CONVERSATIONS AROUND EBOLA

01:21PM 1      AND THEM TRYING TO FIGURE OUT HOW TO TACKLE THAT ISSUE.

01:21PM 2      Q.   LET'S LOOK AT PAGE 4, PLEASE.

01:21PM 3           IS THIS A LISTING OF MEMBERS OF THERANOS'S BOARD OF

01:21PM 4      DIRECTORS?

01:21PM 5      A.   YES.

01:21PM 6      Q.   AND THIS WAS AN IMPRESSIVE LIST TO YOU?

01:21PM 7      A.   YES.

01:21PM 8      Q.   DOWN AT THE BOTTOM IT SAYS SUNNY BALWANI, THERANOS

01:21PM 9      PRESIDENT AND COO.

01:21PM 10          DO YOU SEE THAT LANGUAGE?

01:21PM 11     A.   YES.

01:21PM 12     Q.   AND YOU UNDERSTOOD MR. BALWANI WAS THE PRESIDENT AND CHIEF

01:21PM 13     EXECUTIVE OFFICER OF THE COMPANY?

01:21PM 14          MR. COOPERSMITH:  OBJECTION.  MISSTATES THE TITLE.

01:22PM 15          MR. LEACH:  I THINK I SAID EXECUTIVE.

01:22PM 16     CHIEF OPERATING OFFICER.

01:22PM 17     THANK YOU, MR. COOPERSMITH.

01:22PM 18          THE WITNESS:  CORRECT.

01:22PM 19     BY MR. LEACH:

01:22PM 20     Q.   AND WAS THERE ANYBODY ELSE BESIDES MS. HOLMES AND

01:22PM 21     MR. BALWANI IN YOUR MEETING OUT IN CALIFORNIA?

01:22PM 22     A.   NO.

01:22PM 23     Q.   IF WE LOOK AT THE NEXT SLIDE, PAGE 5, DO YOU SEE WHERE IT

01:22PM 24     SAYS "THERANOS IS CERTIFIED AS A HIGH COMPLEXITY CLIA

01:22PM 25     LABORATORY"?

PETERSON DIRECT BY MR. LEACH                                      3872

01:22PM 1          DO YOU SEE THAT?

01:22PM 2     A.   YES.

01:22PM 3     Q.   AND AT THE TIME, HAD YOU HAD ANY EXPERIENCE WITH SOMETHING

01:22PM 4     CALLED CLIA?

01:22PM 5     A.   NO.

01:22PM 6     Q.   I THINK YOU WROTE IN HANDWRITING "CLINICAL LAB IMPROVEMENT

01:22PM 7     AMENDMENTS"?

01:22PM 8     A.   CORRECT.

01:22PM 9     Q.   IS THAT -- WE NEED TO SPEAK ONE AT A TIME, MS. PETERSON.

01:22PM 10    A.   YEP.

01:22PM 11    Q.   IS THAT BECAUSE YOU WERE LEARNING ABOUT IT FOR THE FIRST

01:22PM 12    TIME?

01:22PM 13    A.   YES.

01:22PM 14    Q.   OKAY.  AND IN THE HIGHLIGHTED ROW IT SAYS, "HIGH

01:22PM 15    COMPLEXITY REQUIRES THE HIGHEST LEVEL OF TRAINING, TECHNIQUE,

01:23PM 16    AND RESULT INTERPRETATION MOST STRINGENT STANDARDS.  LABS ARE

01:23PM 17    SURVEYED ROUTINELY AND RANDOMLY."

01:23PM 18         IS THAT INFORMATION THAT YOU LEARNED FROM THERANOS THROUGH

01:23PM 19    THE DUE DILIGENCE MATERIALS?

01:23PM 20    A.   YES.

01:23PM 21    Q.   OKAY.  LET'S LOOK AT THE NEXT PAGE.

01:23PM 22         DO YOU SEE A CERTIFICATE OF COMPLIANCE?

01:23PM 23    A.   YES.

01:23PM 24    Q.   AND DO YOU SEE THE NAME ADAM ROSENDORFF, M.D., DIRECT?

01:23PM 25    A.   YES.

01:23PM  1    Q.   DID THE NAME ADAM ROSENDORFF COME UP IN YOUR MEETING IN

01:23PM  2    CALIFORNIA IN OCTOBER OF 2014?

01:23PM  3    A.   NOT THAT I RECALL.

01:23PM  4    Q.   OKAY.  DID MS. HOLMES OR MR. BALWANI BRING TO YOUR

01:23PM  5    ATTENTION ANY ISSUES THAT DR. ROSENDORFF WAS RAISING?

01:23PM  6    A.   NO.

01:23PM  7    Q.   LET'S LOOK AT THE NEXT TAB, TAB 7, OR PAGE 7.

01:23PM  8         DO YOU SEE WHERE IT SAYS, "THERANOS PROFICIENCY TESTING

01:23PM  9    AND AUDITS"?

01:24PM  10   A.   YES.

01:24PM  11   Q.   IT THEN READS, "SINCE 2011 THERANOS'S CLIA LAB HAS BEEN

01:24PM  12   SUBJECTED TO REGULAR PROFICIENCY TESTING (TESTING OF BLINDED

01:24PM  13   SAMPLES) BY MULTIPLE NATIONALLY RECOGNIZED AGENCIES."

01:24PM  14        DO YOU SEE THAT LANGUAGE?

01:24PM  15   A.   YES.

01:24PM  16   Q.   AND WAS THAT IMPRESSIVE TO YOU?

01:24PM  17   A.   YES.

01:24PM  18   Q.   AND DID YOU UNDERSTAND THAT THE PROFICIENCY TESTING

01:24PM  19   DESCRIBED IN THIS SLIDE RELATED TO THE DEVICE THAT THERANOS WAS

01:24PM  20   SHOWING YOU?

01:24PM  21   A.   THAT WAS MY UNDERSTANDING, YES.

01:24PM  22   Q.   WHY WAS THAT YOUR UNDERSTANDING?

01:24PM  23   A.   BECAUSE THAT WAS THE ONLY DEVICE THAT WE KNEW THAT THEY

01:24PM  24   USED.

01:24PM  25   Q.   OKAY.  THERE'S SOME LINES AND NUMBERS IN HERE UNDER THE

01:24PM  1    COLUMNS AGENCY SURVEY, DATE, SCORE.

01:24PM  2        DO YOU SEE THAT?

01:24PM  3    A.   YES.

01:24PM  4    Q.   AND THE FIRST ONE IS API HEMATOLOGY, NOVEMBER 23RD, 2011.

01:24PM  5        DO YOU SEE THAT?

01:24PM  6    A.   YES.

01:24PM  7    Q.   AND DID YOU BELIEVE THAT PROFICIENCY TESTING TO RELATE TO

01:24PM  8    THE DEVICE THAT YOU OBSERVED?

01:24PM  9    A.   YES.

01:24PM 10    Q.   BASED ON THIS, DID YOU UNDERSTAND THERANOS WAS USING ITS

01:25PM 11    DEVICE IN ITS CLIA LAB AT THE TIME OF THE PROFICIENCY TESTING?

01:25PM 12    A.   YES.

01:25PM 13    Q.   THE NEXT LINE SAYS, "API

01:25PM 14    CHEMISTRY/IMMUNOLOGY/IMMUNOCHEMISTRY."  AND THERE'S A DATE OF

01:25PM 15    JUNE 1, 2012.

01:25PM 16        DO YOU SEE THAT?

01:25PM 17    A.   YES.

01:25PM 18    Q.   BASED ON THIS STATEMENT, DID YOU BELIEVE THAT THERANOS WAS

01:25PM 19    USING ITS ANALYZER IN THE CLIA LAB IN 2012?

01:25PM 20    A.   YES.

01:25PM 21    Q.   WAS THAT IMPRESSIVE TO YOU?

01:25PM 22    A.   YES.

01:25PM 23    Q.   WHY?

01:25PM 24    A.   AGAIN, IT WAS THE ONLY ANALYZER MACHINE THAT WE THOUGHT

01:25PM 25    THEY EVER USED, SO -- AND IT WAS, TO US, THIRD PARTY VALIDATED

01:25PM  1    BY THIS PROFICIENCY TESTING AND AUDIT.

01:25PM  2    Q.   IF THIS PROFICIENCY TESTING RELATED TO FDA APPROVED

01:25PM  3    DEVICES MADE BY OTHERS, WOULD THAT HAVE BEEN EQUALLY RELEVANT

01:26PM  4    TO YOU?

01:26PM  5    A.   RELEVANT, BUT THAT -- BAD.

01:26PM  6    Q.   BAD WHY?

01:26PM  7    A.   THAT'S NOT AT ALL WHAT WE UNDERSTOOD AT THE TIME THAT THEY

01:26PM  8    WERE USING.

01:26PM  9    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 8.

01:26PM  10       DO YOU SEE WHERE IT SAYS VALIDATION OF THERANOS TESTS IN

01:26PM  11   BOLD?

01:26PM  12   A.   YES.

01:26PM  13   Q.   AND BENEATH THAT -- AND THERE'S -- I'VE HIGHLIGHTED THAT,

01:26PM  14   OR MS. WACHS HAS HIGHLIGHTED THAT HEADING AGAIN, BUT THERE'S

01:26PM  15   ALSO SOME HIGHLIGHTING BELOW THAT.

01:26PM  16       IS THAT YOUR HIGHLIGHTING AGAIN?

01:26PM  17   A.   YES.

01:26PM  18   Q.   THIS READS, "THERANOS HAS BEEN COMPREHENSIVELY VALIDATED

01:26PM  19   OVER THE COURSE OF THE LAST SEVEN YEARS BY TEN OF THE FIFTEEN

01:26PM  20   LARGEST PHARMACEUTICAL COMPANIES, WITH HUNDREDS OF THOUSANDS OF

01:26PM  21   ASSAYS PROCESSED."

01:26PM  22       IS THAT CONSISTENT WITH STATEMENTS MADE TO YOU BY

01:26PM  23   MS. HOLMES IN THE PHONE CALL THAT YOU HAD WITH HER?

01:27PM  24   A.   YES.

01:27PM  25   Q.   AND DID THIS TOPIC COME UP IN YOUR MEETING IN CALIFORNIA

01:27PM 1    IN OCTOBER?

01:27PM 2    A.   YES.

01:27PM 3    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 10.

01:27PM 4         MS. PETERSON, THERE'S SOME IMAGES ON THE SCREEN.

01:27PM 5         TO THE LEFT THERE ARE FOUR VIALS OF BLOOD, AND TO THE

01:27PM 6    RIGHT THERE IS A SMALLER VIAL WITH A SMALLER AMOUNT OF BLOOD.

01:27PM 7         DO YOU SEE THAT?

01:27PM 8    A.   YES.

01:27PM 9    Q.   AND WHAT DID YOU UNDERSTAND THIS TO REPRESENT?

01:27PM 10   A.   THAT THE LEFT, LARGER VIALS WERE THE TRADITIONAL VEIN DRAW

01:27PM 11   THAT OTHER LABS USE; AND THAT THE FINGERSTICK, SMALLER VIAL, IS

01:27PM 12   WHAT WAS USED BY THERANOS.

01:27PM 13   Q.   OKAY.  IF I COULD MOVE TO PAGE 14, PLEASE.

01:28PM 14        I'M SORRY.  PAGE 12, MS. WACHS.

01:28PM 15        DO YOU SEE THE HEADING OVERVIEW OF CURRENT LABORATORY

01:28PM 16   MARKET?

01:28PM 17   A.   YES.

01:28PM 18   Q.   OKAY.  AND IN THE FIRST BULLET IT READS, "DECADES OLD

01:28PM 19   BUSINESS PROCESSES -- AND TECHNOLOGY INVESTMENTS AROUND THOSE

01:28PM 20   BUSINESS PROCESSES -- WITH VERY LITTLE MOTIVATION TO INNOVATE,

01:28PM 21   HAS CREATED A DUOPOLY OF BUSINESSES BURDENED WITH

01:28PM 22   INFRASTRUCTURE COSTS AND LITTLE/NO R&D."

01:28PM 23        DO YOU SEE THAT?

01:28PM 24   A.   YES.

01:28PM 25   Q.   AND DID YOU UNDERSTAND R&D TO BE RESEARCH AND DEVELOPMENT?

PETERSON DIRECT BY MR. LEACH                    3877

01:28PM  1    A.   CORRECT.

01:28PM  2    Q.   AND TO THE RIGHT THERE'S SOME HANDWRITING, QUEST LAB CORP.

01:28PM  3         WAS THAT YOUR HANDWRITING?

01:28PM  4    A.   YES.

01:28PM  5    Q.   WHAT WERE YOU CONVEYING THERE?

01:28PM  6    A.   I WAS JUST NOTING WHO THE DUOPOLY WAS, WAS THOSE TWO.

01:28PM  7    Q.   OKAY.  IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES

01:28PM  8    AND MR. BALWANI?

01:28PM  9    A.   YES.

01:28PM  10   Q.   IT THEN SAYS, "SELECT CONTRACTS BETWEEN LABS AND INSURANCE

01:28PM  11   COMPANIES HAVE SET PRECEDENT FOR HIGHER COSTS FOR 'PULL

01:29PM  12   THROUGH' PATIENTS."

01:29PM  13        IN THE COURSE OF YOUR DIALOGUE WITH MS. HOLMES AND

01:29PM  14   MR. BALWANI, DID THEY MAKE STATEMENTS ABOUT THE COSTS OF THE

01:29PM  15   TESTS THAT THEY OFFERED?

01:29PM  16   A.   YES.

01:29PM  17   Q.   AND WAS THAT IMPRESSIVE TO YOU?

01:29PM  18   A.   YES.

01:29PM  19   Q.   AND DID YOU BELIEVE THAT THOSE TESTS COULD BE OFFERED AT A

01:29PM  20   LOW COST BECAUSE THERANOS WAS PROFITABLE?

01:29PM  21   A.   YES.

01:29PM  22   Q.   OKAY.  NOW, MS. WACHS, IF WE CAN GO TO PAGE 14.

01:29PM  23        DO YOU SEE THE HEADING COST SAVINGS, THE FULL RANGE OF

01:29PM  24   TESTS.  A FRACTION OF THE COSTS?

01:29PM  25   A.   YES.  I'M SORRY.

ER-2881

01:29PM   1    Q.   NO PROBLEM.

01:29PM   2         WAS THIS INFORMATION IMPORTANT TO YOU?

01:29PM   3    A.   YES.

01:29PM   4    Q.   WHY?

01:29PM   5    A.   BECAUSE, IF IT DID THAT, IT WAS DEFINITELY GOING TO

01:29PM   6    TRANSFORM HEALTH CARE.  IF YOU CAN OFFER THESE TYPES OF BLOOD

01:29PM   7    TESTS THAT WERE LESS INVASIVE TO PEOPLE VIA FINGERSTICK AND DO

01:30PM   8    IT AT MUCH LESS COST, MORE PEOPLE WOULD PROBABLY GET TESTED,

01:30PM   9    WHICH, AGAIN, IT GOES BACK TO TRYING TO IMPROVE PREVENTATIVE

01:30PM  10    HEALTH CARE.

01:30PM  11    Q.   CAN WE GO TO THE NEXT SLIDE, PLEASE, SLIDE 15.

01:30PM  12         DO YOU SEE THE FOURTH -- OR THE SECOND BULLET FROM THE

01:30PM  13    BOTTOM, "THE UNPRECEDENTED LACK OF VARIATION FROM SYSTEM TO

01:30PM  14    SYSTEM YIELDS HIGHER INTEGRITY DATA."

01:30PM  15         DO YOU SEE THAT LANGUAGE?

01:30PM  16    A.   YES.

01:30PM  17    Q.   WAS THIS INFORMATION IMPORTANT TO YOU?

01:30PM  18    A.   YES.

01:30PM  19    Q.   AND THEN IT LOOKS TO THE RIGHT LIKE YOU WROTE, "THERANOS

01:30PM  20    IS STANDARDIZED."

01:30PM  21         WHAT DID YOU MEAN BY THAT?

01:30PM  22    A.   I'M NOT EXACTLY SURE.

01:30PM  23    Q.   DID MS. HOLMES OR MR. BALWANI MAKE STATEMENTS TO YOU TO

01:30PM  24    THE EFFECT OF WE ARE AUTOMATED BY VIRTUE OF HAVING ONE MACHINE?

01:31PM  25    A.   THEY MADE A LOT OF STATEMENTS AROUND THE AUTOMATION, AS

ER-2882

01:31PM   1    WELL AS THE LESS FREQUENT HANDLING BY AN INDIVIDUAL.

01:31PM   2         I THINK THERE WERE STATS AROUND MANY OF THE ERRORS CAME

01:31PM   3    FROM THE HUMAN TOUCH OF THE SAMPLES, AND THEY DIDN'T HAVE THAT.

01:31PM   4    Q.   OKAY.

01:31PM   5    A.   SO IT WAS LESS ERRORS.

01:31PM   6    Q.   IF WE CAN NOW FLIP TO PAGE 28.

01:31PM   7         DO YOU SEE THE HEADING SAME TESTS, A WHOLE NEW APPROACH?

01:31PM   8    A.   YES.

01:31PM   9    Q.   AND BENEATH THAT DO YOU SEE WHERE IT SAYS, "THE ACTIONABLE

01:31PM  10    INFORMATION YOU NEED 1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW."

01:31PM  11         AND THEN THERE ARE SOME IMAGES.

01:31PM  12         DO YOU SEE THAT?

01:31PM  13    A.   YES.

01:31PM  14    Q.   "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL LABORATORIES,

01:31PM  15    AND PROCESSES ALL SAMPLE TYPES."

01:31PM  16         WAS THIS INFORMATION IMPORTANT TO YOU?

01:31PM  17    A.   VERY.

01:31PM  18    Q.   HOW SO?

01:32PM  19    A.   BECAUSE THAT WAS REVOLUTIONARY THAT THIS MACHINE COULD DO

01:32PM  20    THAT.  IT COULD PROCESS, WE WERE TOLD, HUNDREDS OF TESTS, AND

01:32PM  21    MULTIPLE TESTS WITH THE SAME FINGERSTICK DRAW.

01:32PM  22    Q.   OKAY.  DID MS. HOLMES OR MR. BALWANI EVER TELL YOU THAT

01:32PM  23    THERANOS WAS DOING THE MAJORITY OF ITS TESTS FROM VEIN DRAWS?

01:32PM  24    A.   NO.

01:32PM  25    Q.   FURTHER BELOW IT SAYS, "THERANOS PROVIDES THE HIGHEST

01:32PM   1    LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

01:32PM   2    AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

01:32PM   3    ACCURACY AND PRECISION."

01:32PM   4        WERE THOSE STATEMENTS IMPORTANT TO YOU?

01:32PM   5    A.   YES.

01:32PM   6    Q.   OKAY.  IF WE CAN GO TO PAGE 31, PLEASE.

01:32PM   7        DO YOU SEE THE HEADING A NEW STANDARD IN QUALITY?

01:33PM   8    A.   YES.

01:33PM   9    Q.   AND BENEATH THAT IT SAYS, "THE HIGHEST LEVELS OF

01:33PM  10    ACCURACY."

01:33PM  11        WHAT DID YOU UNDERSTAND THAT TO MEAN?

01:33PM  12    A.   THAT THE MACHINE WAS VERY ACCURATE.

01:33PM  13    Q.   WAS THAT IMPORTANT TO YOU?

01:33PM  14    A.   YES.

01:33PM  15    Q.   WHY?

01:33PM  16    A.   BECAUSE IT, IT WORKED.  IT DID WHAT THEY SAID IT WOULD

01:33PM  17    DO --

01:33PM  18    Q.   OKAY. AND DID THIS --

01:33PM  19    A.   -- ACCURATELY.

01:33PM  20    Q.   AND DID THIS TOPIC COME UP IN YOUR MEETING IN CALIFORNIA

01:33PM  21    WITH MR. BALWANI?

01:33PM  22    A.   YES.

01:33PM  23    Q.   OKAY.  AND WHAT WAS SAID?

01:33PM  24    A.   REPEATEDLY SAID THAT THE MACHINE WORKED, THAT -- IT WASN'T

01:33PM  25    EVER A QUESTION IN OUR MIND THAT IT DIDN'T WORK GIVEN ALL OF

PETERSON DIRECT BY MR. LEACH                                    3881

01:33PM 1    THE INFORMATION THAT THEY HAD SAID AND GIVEN US.

01:33PM 2    Q.   OKAY.  LET'S LOOK AT PAGE 32.

01:33PM 3         DO YOU SEE THE HEADING NEW POSSIBILITIES IN THE LAB?

01:33PM 4    A.   YES.

01:33PM 5    Q.   AND THEN IN THE LEFT COLUMN, UNDER ROUTINE, SPECIALTY AND

01:34PM 6    ESOTERIC TESTING, THERE ARE SOME BULLETS, "THERANOS RUNS ANY

01:34PM 7    TEST AVAILABLE IN CENTRAL LABORATORIES.

01:34PM 8         "THERANOS CAN PROCESS ANY SAMPLE TYPE."

01:34PM 9         AND THEN TO THE RIGHT, "THE UNPRECEDENTED LACK OF

01:34PM 10   VARIATION WITH THERANOS YIELDS:

01:34PM 11        "HIGHER INTEGRITY DATA AND LONGITUDINAL TRENDING?"

01:34PM 12        IS THIS ADDITIONAL INFORMATION YOU RELIED ON IN THE

01:34PM 13   INVESTMENT DECISION?

01:34PM 14   A.   YES.

01:34PM 15   Q.   AND IF WE CAN GO TO PAGE 33.

01:34PM 16        DO YOU SEE THE HEADING FASTER RESULTS.  FASTER ANSWERS?

01:34PM 17   A.   YES.

01:34PM 18   Q.   WAS THAT RELEVANT TO YOU?

01:34PM 19   A.   YES.  THAT THEY COULD DO A BLOOD TEST AND PROVIDE RESULTS

01:34PM 20   IN HOURS WAS VERY IMPORTANT; THAT IS, AGAIN, JUST

01:34PM 21   TRANSFORMING -- IT'S TRANSFORMATIVE IN HEALTH CARE TO BE ABLE

01:34PM 22   TO DO THAT.

01:34PM 23   Q.   OKAY.  HOW IS THAT TRANSFORMATIVE, IF IT CAN HAPPEN?

01:34PM 24   A.   MOST -- AGAIN, MY HUSBAND GETS A LOT OF BLOOD TESTS AND IT

01:35PM 25   TAKES A LOT LONGER THAN A COUPLE HOURS.

01:35PM   1          SO TO GET RESULTS QUICKER, AND TO ALSO DO MULTIPLE TESTS

01:35PM   2     WITH THE ONE VIAL WAS IMPORTANT TO US.

01:35PM   3     Q.   LET'S GO TO SLIDE 40.

01:35PM   4          DO YOU SEE THE HEADING THERANOS'S FOOTPRINT UPON NATIONAL

01:35PM   5     DEPLOYMENT:  THERANOS WELLNESS CENTERS IN WALGREENS?

01:35PM   6     A.   YES.

01:35PM   7     Q.   OKAY.  AND DO YOU SEE THE IMAGE OF THE MAP WITH LOTS OF

01:35PM   8     GREEN SCATTERED THROUGHOUT?

01:35PM   9     A.   YES.

01:35PM  10     Q.   OKAY.  IN YOUR -- DID THE NOTION OF THERANOS BEING IN 900

01:35PM  11     WALGREENS STORES BY THE END OF 2015 COME UP IN YOUR

01:35PM  12     CONVERSATION IN CALIFORNIA?

01:35PM  13     A.   YES.

01:35PM  14     Q.   OKAY.  AND AT ANY POINT IN TIME DID MS. HOLMES OR

01:35PM  15     MR. BALWANI TELL YOU OF ANY ISSUES OR PROBLEMS WITH THE

01:35PM  16     WALGREENS RELATIONSHIP?

01:35PM  17     A.   NO.

01:35PM  18     Q.   OKAY.  DID THEY TELL YOU THAT WALGREENS WAS FRUSTRATED BY

01:36PM  19     THE HIGH PERCENTAGE OF VENOUS DRAWS?

01:36PM  20     A.   NO.

01:36PM  21     Q.   LET'S GO TO PAGE 49.

01:36PM  22          DO YOU SEE THE HEADING RECENT PRESS?

01:36PM  23     A.   YES.

01:36PM  24     Q.   AND THERE'S A NUMBER OF ARTICLES LISTED, "BBC WORLD NEWS,"

01:36PM  25     "FORTUNE," "FORBES."

PETERSON DIRECT BY MR. LEACH                                    3883

01:36PM 1          DO YOU SEE THOSE?

01:36PM 2     A.   YES.

01:36PM 3     Q.   AND TO THE RIGHT THERE'S AN IMAGE OF A "FORTUNE" ARTICLE

01:36PM 4     THAT SAYS, "THIS CEO IS OUT FOR BLOOD."

01:36PM 5          DO YOU SEE THAT?

01:36PM 6     A.   YES.

01:36PM 7     Q.   AND WHAT DID YOU UNDERSTAND THIS SLIDE TO MEAN?

01:36PM 8     A.   THAT THIS WAS RECENT MEDIA AND PRESS AND INTERVIEWS THAT

01:36PM 9     SHE HAD GIVEN AND SUGGESTED TO ME TO GO OUT AND REVIEW ALL OF

01:36PM 10    THESE, WHICH I DID.

01:37PM 11    Q.   OKAY.  WE LOOKED EARLIER AT AN EMAIL FROM MR. TUBERGEN

01:37PM 12    WITH AN ARTICLE ATTACHED TO IT.

01:37PM 13         IS THAT PART OF WHAT YOU DID IN TERMS OF GOING OUT AND

01:37PM 14    READING EVERYTHING THAT YOU COULD?

01:37PM 15    A.   YES.

01:37PM 16    Q.   OKAY.  AND THE ARTICLE TO THE RIGHT, "THIS CEO IS OUT FOR

01:37PM 17    BLOOD," DO YOU UNDERSTAND THAT TO BE THE ARTICLE FROM

01:37PM 18    MR. PARLOFF?

01:37PM 19    A.   YES.

01:37PM 20    Q.   AND THAT'S SOMETHING THAT YOU READ AND RELIED ON?

01:37PM 21    A.   YES.

01:37PM 22    Q.   LET'S LOOK AT PAGE 103.

01:37PM 23         DO YOU SEE THE TITLE EXEMPLARY REPORTS FROM PHARMACEUTICAL

01:37PM 24    PARTNERS?

01:37PM 25    A.   YES.

01:37PM  1    Q.   OKAY.  AND WHAT DID YOU UNDERSTAND THIS TO BE?

01:37PM  2    A.   I UNDERSTOOD THESE TO BE KIND OF THIRD PARTY REPORTS AND

01:38PM  3    VALIDATION OF USING THE ANALYZERS.

01:38PM  4    Q.   AND WHAT DO YOU MEAN BY "THIRD PARTY"?

01:38PM  5    A.   NOT PART OF THERANOS.

01:38PM  6    Q.   AND THIS WAS PART OF THE DUE DILIGENCE MATERIALS THAT WERE

01:38PM  7    PROVIDED TO YOU?

01:38PM  8    A.   YES.

01:38PM  9    Q.   OKAY.  LET'S LOOK AT THE NEXT PAGE.  IF WE CAN ZOOM IN UP

01:38PM  10   A LITTLE BIT MORE ON PAGE 4, AND IF WE CAN ZOOM IN ON THE TOP

01:38PM  11   HALF ALL OF THE WAY DOWN TO THE BULLET FOR CONCLUSIONS.

01:38PM  12       WAS THIS PART OF WHAT YOU REVIEWED, MS. PETERSON?

01:38PM  13   A.   YES.

01:38PM  14   Q.   AND WHAT DID YOU UNDERSTAND THIS TO BE?

01:38PM  15   A.   A REPORT BY PFIZER THAT VALIDATED THE WORK THAT THEY HAD

01:38PM  16   DONE USING THEIR ANALYZER, USING THERANOS'S ANALYZERS.

01:38PM  17   Q.   DID YOU RELY ON THIS REPORT IN THE COURSE OF MAKING YOUR

01:38PM  18   INVESTMENT DECISION?

01:38PM  19   A.   YES.

01:38PM  20   Q.   OKAY.  WHY DID YOU RELY ON THIS?

01:38PM  21   A.   ANY OUTSIDE EXTERNAL VALIDATION OF THE ANALYZERS WAS

01:39PM  22   HELPFUL TO US, THAT IT WORKED.

01:39PM  23   Q.   AND DID THIS TOPIC OF EXTERNAL THIRD PARTY VALIDATIONS

01:39PM  24   COME UP IN YOUR MEETING IN CALIFORNIA WITH MR. BALWANI?

01:39PM  25   A.   YES.

PETERSON DIRECT BY MR. LEACH                                                3885

01:39PM   1      Q.   HOW SO?

01:39PM   2      A.   THEY TALKED A LOT ABOUT THE TEN YEARS OF WORK THAT THEY

01:39PM   3      HAD DONE WITH THE TOP PHARMACEUTICAL COMPANIES, WE TALKED ABOUT

01:39PM   4      THAT QUITE A BIT, AND HOW THEY COULD DO THEIR STUDIES AND DO

01:39PM   5      FINGERSTICK DRAWS SOONER.

01:39PM   6           YOU COULD ONLY DO VEIN DRAWS, LIKE, ONCE EVERY THREE DAYS,

01:39PM   7      AND THESE YOU COULD DO A COUPLE TIMES A DAY, AND IT WAS HELPFUL

01:39PM   8      TO THESE PHARMACEUTICAL STUDIES.

01:39PM   9           WE TALKED A LOT ABOUT HOW THE ANALYZERS WERE BEING USED

01:39PM  10      WITHIN THOSE COMPANIES.

01:39PM  11      Q.   BY THE WAY, DID MS. HOLMES DO ALL OF THE TALKING IN THIS

01:39PM  12      OCTOBER MEETING?

01:39PM  13      A.   NOT ALL OF THE TALKING, NO.

01:40PM  14      Q.   DID MR. BALWANI SPEAK TO PARTICULAR ISSUES IN THE MEETING?

01:40PM  15      A.   MY RECOLLECTION IS THAT THE MOST OF HIS PARTICIPATION WAS

01:40PM  16      AROUND THE FINANCIALS.

01:40PM  17      Q.   OKAY.  WERE THERE PARTS OF THE MEETING WHERE MS. HOLMES OR

01:40PM  18      MR. BALWANI DISAGREED WITH EACH OTHER?

01:40PM  19      A.   NO.

01:40PM  20      Q.   OKAY.  DID YOU VIEW THEM AS SPEAKING WITH ONE VOICE?

01:40PM  21      A.   YES.

01:40PM  22      Q.   ON THIS PAGE THERE'S A BULLET, CONCLUSIONS, GENERAL,

01:40PM  23      TECHNICAL, ECONOMIC.

01:40PM  24           DO YOU SEE THAT?

01:40PM  25      A.   YES.

PETERSON DIRECT BY MR. LEACH                    3886

01:40PM  1    Q.   IF YOU COULD NOW TURN TO PAGE 129, THERE ARE A NUMBER OF

01:40PM  2    CONCLUSIONS LISTED HERE, GENERAL, TECHNICAL, AND ECONOMIC.

01:40PM  3         DO YOU SEE THAT?

01:40PM  4    A.   YES.

01:40PM  5    Q.   AND THIS IS SOMETHING THAT YOU REVIEWED AND RELIED ON?

01:40PM  6    A.   YES.

01:40PM  7    Q.   OKAY.  DID YOU BELIEVE THESE TO BE CONCLUSIONS OF PFIZER?

01:41PM  8    A.   YES.

01:41PM  9    Q.   FOR EXAMPLE, IN GENERAL -- IN THE FIRST GENERAL CONCLUSION

01:41PM 10    IT SAYS, "THE THERANOS SYSTEM PERFORMED WITH SUPERIOR

01:41PM 11    PERFORMANCE TO REFERENCE ASSAYS WHILE RUNNING IN A COMPLEX

01:41PM 12    AMBULATORY ENVIRONMENT."

01:41PM 13         DID YOU BELIEVE THAT TO BE A CONCLUSION OF PFIZER?

01:41PM 14    A.   YES.

01:41PM 15    Q.   AND WAS THAT IMPORTANT TO YOU?

01:41PM 16    A.   YES.

01:41PM 17    Q.   OKAY.  WE CAN TAKE THAT DOWN.

01:41PM 18         IF I COULD PLEASE DRAW YOUR ATTENTION, MS. PETERSON, TO

01:41PM 19    EXHIBIT 1853.

01:41PM 20         DO YOU RECOGNIZE THIS?

01:41PM 21    A.   YES.

01:41PM 22    Q.   AND WHAT IS THIS?

01:41PM 23    A.   THESE ARE THE TWO FINANCIAL PAGES THAT CAME IN THE

01:42PM 24    DILIGENCE BINDER.

01:42PM 25    Q.   AND THERE'S SOME HANDWRITING ON THIS DOCUMENT.

01:42PM  1          IS THAT YOUR HANDWRITING?

01:42PM  2     A.   YES.

01:42PM  3     Q.   AND WAS ALL OF THE HANDWRITING DONE AT THE SAME TIME?

01:42PM  4     A.   NO.  THE QUESTIONS THAT ARE LIGHTER PRINT I KNOW WERE DONE

01:42PM  5     BEFORE THE MEETING IN PALO ALTO, AND THE DARKER PRINT WAS WHAT

01:42PM  6     WE TALKED ABOUT AT THE MEETING.

01:42PM  7     Q.   OKAY.  AND IS THIS -- DID YOU DISCUSS THIS DOCUMENT WITH

01:42PM  8     MR. BALWANI IN YOUR MEETING IN CALIFORNIA?

01:42PM  9     A.   YES.

01:42PM 10          MR. LEACH:  YOUR HONOR, I BELIEVE 1853 IS IN

01:42PM 11     EVIDENCE.  IT MIGHT BE WITH SOME CONDITIONS.

01:42PM 12          I'D LIKE TO OFFER IT UNCONDITIONALLY.

01:42PM 13          MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

01:42PM 14          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:42PM 15          (GOVERNMENT'S EXHIBIT 1853 WAS RECEIVED IN EVIDENCE.)

01:43PM 16     BY MR. LEACH:

01:43PM 17     Q.   SO THIS IS A DOCUMENT THAT YOU RECEIVED FROM THERANOS,

01:43PM 18     MS. PETERSON?

01:43PM 19     A.   YES.

01:43PM 20     Q.   AND YOU DISCUSSED IT WITH MS. HOLMES AND MR. BALWANI IN

01:43PM 21     YOUR MEETING IN CALIFORNIA?

01:43PM 22     A.   YES.

01:43PM 23     Q.   OKAY.  TO THE LEFT UP AT THE TOP IT SAYS, THERANOS

01:43PM 24     CONFIDENTIAL, PROJECTED STATEMENT OF INCOME.

01:43PM 25          DO YOU SEE THAT?

01:43PM  1    A.   YES.

01:43PM  2    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN PROJECTED

01:43PM  3    STATEMENT OF INCOME?

01:43PM  4    A.   YES.  2015 WOULD HAVE BEEN A PROJECTION BASED ON THE

01:43PM  5    CONTRACTS THAT THEY HAD, AND WE TALKED THROUGH WHERE THAT

01:43PM  6    REVENUE WAS GOING TO COME FROM.

01:43PM  7         THE 2014, IT WAS ALREADY MID-OCTOBER, SO WE ASSUMED THAT

01:43PM  8    THEY WERE VERY CLOSE TO THOSE NUMBERS FOR 2014.

01:43PM  9    Q.   YOU'RE REFERRING TO THE COLUMNS TO THE RIGHT WHERE IT SAYS

01:43PM 10    PERIOD ENDING DECEMBER 31ST, 2014?

01:44PM 11    A.   YES.

01:44PM 12    Q.   DECEMBER 31ST, 2015?

01:44PM 13    A.   YES.

01:44PM 14    Q.   OKAY.  AND YOU MADE REFERENCE TO THE TIME PERIOD WHEN YOU

01:44PM 15    RECEIVED THESE, OCTOBER OF 2014?

01:44PM 16    A.   YES.

01:44PM 17    Q.   AND HOW DID THAT RELATE TO THE FACT THAT THE COLUMN TO THE

01:44PM 18    LEFT RELATES TO NUMBERS FOR THE PERIOD ENDING DECEMBER 2014?

01:44PM 19    A.   THEY -- IT WAS OUR UNDERSTANDING THAT THEY WERE ON TRACK

01:44PM 20    TO PRODUCE THIS TYPE OF INCOME STATEMENT FOR THE YEAR ENDING

01:44PM 21    12/31/2014 GIVEN IT WAS ALREADY ALMOST THE END OF OCTOBER.

01:44PM 22    Q.   WHEN YOU SAY IT WAS ALREADY ALMOST THE END OF OCTOBER, CAN

01:44PM 23    YOU EXPLAIN WHY THAT FACT WAS RELEVANT TO YOU?

01:44PM 24    A.   THEY MADE NO MENTION THAT THEY WEREN'T ANYWHERE NEAR BEING

01:44PM 25    ON TRACK TO HIT THAT NUMBER FOR THAT YEAR.

01:44PM 1     Q.   IN THE LEFT THERE'S A ROW, REVENUE U.S. COMMERCIAL ONLY.

01:44PM 2        DO YOU SEE THAT?

01:44PM 3     A.   YES.

01:44PM 4     Q.   AND THEN BENEATH THAT THERE ARE A NUMBER OF ADDITIONAL

01:45PM 5     ROWS:  LAB SERVICES FROM REVENUE U.S. RETAIL PHARMACIES.

01:45PM 6        DO YOU SEE THAT?

01:45PM 7     A.   YES.

01:45PM 8     Q.   AND TO THE RIGHT THERE'S A NUMBER, 42 MILLION, IN THE

01:45PM 9     COLUMN 12/31/2014.

01:45PM 10       DO YOU SEE THAT?

01:45PM 11    A.   YES.

01:45PM 12    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

01:45PM 13    A.   THAT THAT WAS THE REVENUE THAT THEY EXPECTED TO GET FROM

01:45PM 14    RETAIL PHARMACIES, INCLUDING WALGREENS, FOR THAT YEAR.

01:45PM 15    Q.   AND BENEATH THAT THERE'S LAB SERVICES REVENUE FROM

01:45PM 16    PHYSICIANS' OFFICES, AND TO THE RIGHT $11 MILLION.

01:45PM 17       DO YOU SEE THAT?

01:45PM 18    A.   YES.

01:45PM 19    Q.   AND WHAT DID YOU UNDERSTAND THAT TO REPRESENT?

01:45PM 20    A.   THE REVENUE THAT THEY EXPECTED TO GET FROM THE PHYSICIAN

01:45PM 21    OFFICE WORK THAT THEY WERE DOING FOR 12/31/2014.

01:45PM 22    Q.   AND BENEATH THAT IT SAYS LAB SERVICES REVENUE FROM

01:45PM 23    HOSPITAL, AND TO THE RIGHT $47 MILLION.

01:45PM 24       WHAT DID YOU UNDERSTAND THAT TO BE?

01:45PM 25    A.   THEY HAD MENTIONED A NUMBER OF HOSPITAL SYSTEMS, LIKE

PETERSON DIRECT BY MR. LEACH                                      3890

01:46PM  1      DIGNITY HEALTH AND OTHERS, THAT WERE USING THE ANALYZER, SO WE

01:46PM  2      ASSUMED THAT THAT WAS COMING FROM THOSE CLIENTS.

01:46PM  3      Q.   AND THEN BENEATH THAT THERE'S A $40 MILLION ENTRY FOR

01:46PM  4      PHARMACEUTICAL SERVICES.

01:46PM  5           DO YOU SEE THAT?

01:46PM  6      A.   YES.

01:46PM  7      Q.   AND WHAT DID YOU UNDERSTAND THAT TO BE?

01:46PM  8      A.   I'M NOT SURE SPECIFICALLY THE SERVICES PIECE OF IT.  I

01:46PM  9      DON'T RECALL THE ANSWER TO THAT.

01:46PM  10          BUT THAT THEY HAD REVENUE COMING FROM SOME FORM OF

01:46PM  11     PHARMACEUTICAL SERVICES TO THE TUNE OF $40 MILLION FOR THAT

01:46PM  12     YEAR.

01:46PM  13     Q.   TO THE RIGHT IN THE COLUMN FOR 2015, IT LOOKS LIKE THE --

01:46PM  14     THERE WAS A NUMBER 161 MILLION -- WELL, BEFORE I GET TO THAT,

01:46PM  15     THERE'S A NUMBER 470 MILLION FOR LAB SERVICES FROM U.S. RETAIL

01:46PM  16     PHARMACIES.

01:46PM  17          DO YOU SEE THAT?

01:46PM  18          470 MILLION?

01:47PM  19     A.   OH, YES.

01:47PM  20     Q.   OKAY.  AND YOU THOUGHT THAT WAS FROM WALGREENS AND OTHER

01:47PM  21     RETAIL PHARMACIES?

01:47PM  22     A.   CORRECT, AND SAFEWAY.

01:47PM  23     Q.   OKAY.  AND ABOVE THAT THERE'S THE LINE -- THERE'S SOME

01:47PM  24     HANDWRITING, 900 LOCATIONS.

01:47PM  25          DO YOU SEE THAT?

PETERSON DIRECT BY MR. LEACH                                    3891

01:47PM  1      A.   YES.

01:47PM  2      Q.   AND DOES THAT SOMEHOW RELATE TO THE 470 MILLION IN

01:47PM  3      PROJECTED REVENUE?

01:47PM  4      A.   YES, THAT WAS THE ROLLOUT FOR WALGREENS.

01:47PM  5      Q.   BENEATH THAT IT LOOKS LIKE THERE WAS 161 MILLION

01:47PM  6      ASSOCIATED WITH LAB SERVICES REVENUE FROM PHYSICIAN OFFICES,

01:47PM  7      BUT THAT'S CROSSED OUT.

01:47PM  8           DID YOU CROSS THAT OUT?

01:47PM  9      A.   YES.  DURING THE MEETING THEY MADE SOME MINOR CHANGES THAT

01:47PM 10      THEY WANTED US TO NOTE, SO I NOTED THOSE ON THE PAGE.

01:47PM 11      Q.   WHEN YOU SAY "THEY," THAT'S MS. HOLMES AND MR. BALWANI?

01:47PM 12      A.   YES.

01:47PM 13      Q.   AND SO WERE MS. HOLMES AND MR. BALWANI TELLING RDV IN THE

01:47PM 14      MEETING, PHYSICIAN OFFICES REVENUE IS NOT GOING TO BE 161

01:47PM 15      MILLION, IT'S GOING TO BE 160 MILLION?

01:47PM 16      A.   YES.

01:48PM 17      Q.   IS THAT REPRESENTATIVE OF THE LEVEL OF CHANGES THAT THEY

01:48PM 18      WERE DESCRIBING IN THAT OCTOBER 2014 MEETING?

01:48PM 19      A.   YES.

01:48PM 20      Q.   SAME QUESTIONS WITH RESPECT TO WHAT YOU CROSSED OUT FOR

01:48PM 21      ONSITE SERVICES REVENUE FROM HOSPITALS AND PHARMACEUTICAL

01:48PM 22      SERVICES.

01:48PM 23           CAN YOU TELL US WHAT THOSE CHANGES REPRESENT?

01:48PM 24      A.   THIS SAME CONVERSATION, THEY JUST MADE SOME MINOR CHANGES

01:48PM 25      AS TO WHERE THE REVENUE SOURCES WERE COMING FROM, AND I JUST

01:48PM 1    NOTED THEM.

01:48PM 2    Q.   THE GRAND TOTAL OF REVENUE PROJECTED FOR 2015 IS

01:48PM 3    $990 MILLION.

01:48PM 4         DO YOU SEE THAT?

01:48PM 5    A.   YES.

01:48PM 6    Q.   AND WAS THAT RELEVANT TO YOU?

01:48PM 7    A.   YES.

01:48PM 8    Q.   HOW SO?

01:48PM 9    A.   WELL, IT SHOWED TREMENDOUS GROWTH, THE FACT THAT THEY

01:48PM 10   WERE, THEY WERE -- THAT REVENUE THAT WE WERE TOLD WAS ALL UNDER

01:48PM 11   CONTRACT, THAT WOULD MEAN SIGNIFICANT GROWTH FOR THE BUSINESS.

01:48PM 12        EVEN IF THEY HAD HIT HALF OF THAT NUMBER IN 2015, WE WOULD

01:49PM 13   HAVE CONSIDERED THIS A BIG SUCCESS.  THEY WERE ON THEIR WAY TO,

01:49PM 14   YOU KNOW, MOVING THE BALL FORWARD.

01:49PM 15        IN OUR WORLD, YOU DON'T HAVE TO EXACTLY HIT THAT NUMBER,

01:49PM 16   BUT YOU HAVE TO GET CLOSE, IN THE BALLPARK SO TO SPEAK.

01:49PM 17   Q.   IS $150,000 IN THE BALLPARK?

01:49PM 18   A.   NO.

01:49PM 19   Q.   OKAY.  AT ANY POINT IN TIME DID MS. HOLMES OR MR. BALWANI

01:49PM 20   TELL, PRIOR TO 2016, TELL YOU THAT 2014 REVENUE WAS LESS THAN A

01:49PM 21   MILLION DOLLARS?

01:49PM 22   A.   NO.

01:49PM 23   Q.   OKAY.  AT ANY POINT IN TIME DID THEY TELL YOU THAT

01:49PM 24   PHARMACEUTICAL REVENUE FOR 2014 WAS ZERO?

01:49PM 25   A.   NO.

01:49PM  1    Q.   AT ANY POINT IN TIME DID THEY TELL YOU THAT LAB SERVICES

01:49PM  2    REVENUE FROM HOSPITALS IN 2014 WAS ZERO?

01:49PM  3    A.   WELL, FROM HOSPITAL -- YEAH.  NO, THEY NEVER DID.

01:49PM  4    Q.   OKAY.  DID THEY EVER TELL YOU THAT REVENUE FROM 2014 FOR

01:50PM  5    PHYSICIAN OFFICES WAS ZERO?

01:50PM  6    A.   NO.

01:50PM  7    Q.   FURTHER BELOW IN THE EBITDA -- THERE'S A ROW FOR EBITDA,

01:50PM  8    E-B-I-T-D-A.

01:50PM  9         DO YOU SEE THAT?

01:50PM 10    A.   YES.

01:50PM 11    Q.   AND WHAT IS EBITDA?

01:50PM 12    A.   EARNINGS BEFORE INTEREST, TAXES, DEPRECIATION, AND

01:50PM 13    AMORTIZATION.

01:50PM 14         IT'S A MEASURE OF CASH FLOW.

01:50PM 15    Q.   AND TO THE FAR RIGHT THERE'S THE NUMBER 23.9 PERCENT AND

01:50PM 16    IT'S CIRCLED.

01:50PM 17    A.   YES.

01:50PM 18    Q.   AND WHAT WERE YOU GETTING AT THERE?

01:50PM 19    A.   I HAD CALC'D IT PRIOR TO THE MEETING, AND THAT'S WHY IT'S

01:50PM 20    LIGHTER, AND I CIRCLED IT, AND WE TALKED ABOUT THAT MARGIN

01:50PM 21    BEING THAT MARGIN AT THE TIME.

01:50PM 22    Q.   AND DID MR. BALWANI MAKE ANY STATEMENTS ABOUT WHERE THAT

01:50PM 23    MARGIN WAS HEADED?

01:50PM 24    A.   THEY EXPECTED IT TO GROW OVER TIME, THAT IT WOULD INCREASE

01:51PM 25    FROM THE 24 PERCENT.

01:51PM   1      Q.   BUT IT WAS ALREADY A PROFITABLE MARGIN?

01:51PM   2      A.   YES.

01:51PM   3      Q.   OKAY.  IF WE COULD GO BACK UP TO THE TOP AND LOOK AT 2015,

01:51PM   4      BACK TO THE NUMBER 470 MILLION FOR U.S. RETAIL PHARMACIES FOR

01:51PM   5      2015.

01:51PM   6      A.   YES.

01:51PM   7      Q.   DID MS. HOLMES OR MR. BALWANI EVER TELL YOU THAT THAT

01:51PM   8      NUMBER FOR 2015 WAS LESS THAN A MILLION DOLLARS?

01:51PM   9      A.   NO.

01:51PM  10      Q.   DID THEY EVER TELL YOU THAT THE 160 MILLION FOR PHYSICIAN

01:51PM  11      OFFICES WAS ZERO?

01:51PM  12      A.   NO.

01:51PM  13      Q.   DID THEY EVER TELL YOU THAT THE PHARMA REVENUE FOR 2015

01:51PM  14      WAS ZERO?

01:51PM  15      A.   NO.

01:51PM  16      Q.   I'D LIKE YOU TO NOW PLEASE LOOK, MS. PETERSON, AT WHAT WE

01:51PM  17      HAVE MARKED AS EXHIBIT 2107.

01:52PM  18              THE COURT:  WHILE THAT'S COMING UP, FOLKS, WHY DON'T

01:52PM  19      YOU STAND UP AND STRETCH IF YOU WOULD LIKE FOR A MOMENT.

01:52PM  20          YOU CAN, TOO, MS. PETERSON.

01:52PM  21              THE WITNESS:  THANK YOU.

01:52PM  22          (STRETCHING.)

01:52PM  23              THE COURT:  YOU MAY PROCEED.

01:52PM  24              MR. LEACH:  THANK YOU, YOUR HONOR.

01:52PM  25      Q.   MS. PETERSON, IS EXHIBIT 2107 AN EMAIL FROM MR. BALWANI TO

ER-2898

01:52PM  1    JERRY TUBERGEN WITH A CC TO ELIZABETH HOLMES AND DOUG DEVOS

01:52PM  2    FROM AMWAY?

01:52PM  3    A.   YES.

01:52PM  4           MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

01:52PM  5    EXHIBIT 2107.

01:53PM  6           MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

01:53PM  7           THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:53PM  8         (GOVERNMENT'S EXHIBIT 2107 WAS RECEIVED IN EVIDENCE.)

01:53PM  9           MR. LEACH:  I'D LIKE TO START, IF WE COULD,

01:53PM 10    MS. WACHS, ON PAGE 2.

01:53PM 11    Q.   DOWN TOWARDS THE BOTTOM THERE'S AN EMAIL FROM MR. TUBERGEN

01:53PM 12    TO ELIZABETH HOLMES AND SUNNY BALWANI DATED OCTOBER 19TH, 2014.

01:53PM 13         DO YOU SEE THAT?

01:53PM 14    A.   YES.

01:53PM 15    Q.   OKAY.  AND THIS STARTS OUT, "ELIZABETH AND SUNNY,

01:53PM 16         "THANK YOU SO VERY MUCH FOR OUR MEETING TUESDAY."

01:53PM 17         DO YOU SEE THAT?

01:53PM 18    A.   YES.

01:53PM 19    Q.   AND DO YOU BELIEVE THAT TO BE A REFERENCE TO YOUR MEETING

01:53PM 20    WITH MS. HOLMES AND MR. BALWANI IN CALIFORNIA?

01:53PM 21    A.   YES.

01:53PM 22    Q.   IN THE SECOND PARAGRAPH IT SAYS, "WE WOULD LOVE TO MOVE

01:53PM 23    FORWARD AND BE A PART OF THE NEW SHAREHOLDER BASE YOU ARE

01:53PM 24    ASSEMBLING.  AS WE DISCUSSED, AN INVESTMENT OF 100 MILLION," OR

01:53PM 25    100M, "SEEMS TO FIT, IF THAT WORKS FOR YOU AND THE COMPANY."

ER-2899

PETERSON DIRECT BY MR. LEACH                                    3896

01:54PM   1            DO YOU SEE THAT?

01:54PM   2    A.   YES.

01:54PM   3    Q.   AND IS THAT APPROXIMATELY THE INVESTMENT THAT RDV

01:54PM   4    ULTIMATELY MAKES IN THE COMPANY?

01:54PM   5    A.   YES.

01:54PM   6    Q.   IT THEN SAYS, "WE ARE TRULY HONORED TO HAVE THIS

01:54PM   7    OPPORTUNITY."

01:54PM   8            AND THEN IN THE NEXT PARAGRAPH, "PLEASE HAVE WHOMEVER IS

01:54PM   9    APPROPRIATE FOLLOW UP WITH ME REGARDING NEXT STEPS AT THEIR

01:54PM  10    EARLIEST CONVENIENCE."

01:54PM  11            DO YOU SEE THAT LANGUAGE?

01:54PM  12    A.   YES.

01:54PM  13    Q.   AND THEN IF WE CAN GO TO THE TOP, DO YOU SEE MS. HOLMES

01:54PM  14    REPLIES, "SUNNY WILL FOLLOW WITH A NOTE TOMORROW WITH THE

01:54PM  15    DETAILS FROM HERE."

01:54PM  16            DO YOU SEE THAT?

01:54PM  17    A.   YES.

01:54PM  18    Q.   AND IS THAT CONSISTENT WITH YOUR MEMORY OF THE OCTOBER

01:54PM  19    MEETING IN PALO ALTO, THAT MR. BALWANI TOOK OVER TO EXECUTE THE

01:54PM  20    INVESTMENT?

01:54PM  21    A.   YES.

01:54PM  22    Q.   LET'S GO TO THE FIRST PAGE.

01:55PM  23            DO YOU SEE WHERE MR. BALWANI WROTE, "PER ELIZABETH'S

01:55PM  24    EMAIL, ATTACHED PLEASE FIND ALL OF THE RELEVANT DOCUMENTS FOR

01:55PM  25    THE INVESTMENT."

ER-2900

PETERSON DIRECT BY MR. LEACH                                    3897

01:55PM  1        FIRST BULLET, "THE FILE NAMED NEWINVESTOR.ZIP IS A FOLDER

01:55PM  2   THAT CONTAINS THE SOFT COPY OF ALL OF THE INVESTMENT DOCUMENTS

01:55PM  3   YOU ALREADY HAVE IN THE INVESTMENT BINDER."

01:55PM  4        DO YOU SEE THAT?

01:55PM  5   A.   YES.

01:55PM  6   Q.   AND THE INVESTMENT BINDER, IS THAT A REFERENCE TO THE TWO

01:55PM  7   BINDERS OF DUE DILIGENCE MATERIALS THAT YOU RECEIVED?

01:55PM  8   A.   YES, THOSE WERE IN THERE.

01:55PM  9   Q.   IT THEN SAYS, "THE 2 ADDITIONAL DOCUMENTS ATTACHED TO THIS

01:55PM  10  EMAIL ARE THE SIGNATURE PAGE AND WIRING INSTRUCTIONS."

01:55PM  11       DO YOU SEE THAT?

01:55PM  12  A.   YES.

01:55PM  13  Q.   AND THEN IN THE NEXT PARAGRAPH IT ENDS, "ONCE EXECUTED,

01:55PM  14  YOU CAN SEND THE ORIGINAL OF THE EXECUTED DOCUMENT TO MY

01:55PM  15  ATTENTION AT THE ADDRESS BELOW."

01:55PM  16       DO YOU SEE THAT?

01:55PM  17  A.   YES.

01:55PM  18  Q.   AND THEN DO YOU SEE WHERE MR. BALWANI WROTE, "PLEASE LET

01:55PM  19  ME KNOW IF I CAN PROVIDE ANY ASSISTANCE WITH ANY OF THESE

01:55PM  20  DOCUMENTS"?

01:55PM  21  A.   YES.

01:55PM  22  Q.   OKAY.  I'D LIKE TO LOOK AT THE DOCUMENTS THAT ARE

01:56PM  23  ATTACHED, AND IF WE CAN START ON PAGE 56.

01:56PM  24       DO YOU SEE THE TITLE SERIES C-2 PREFERRED STOCK PURCHASE

01:56PM  25  AGREEMENT?

ER-2901

PETERSON DIRECT BY MR. LEACH                                    3898

01:56PM  1    A.    YES.

01:56PM  2    Q.    AND WHAT IS THE PURPOSE OF THIS DOCUMENT?

01:56PM  3    A.    THIS WAS THE SECURITY IN WHICH WE WERE INVESTING IN.

01:56PM  4    Q.    OKAY.  AND IF WE CAN LOOK AT PAGE 61.

01:56PM  5          DO YOU SEE THERE'S A SECTION FOR REPRESENTATIONS AND

01:56PM  6    WARRANTIES OF THE INVESTORS?

01:56PM  7    A.    YES.

01:56PM  8    Q.    AND THE INVESTOR HERE WAS RDV OR ONE OF ITS SUBSIDIARIES?

01:56PM  9    A.    CORRECT.

01:56PM  10   Q.    AND SO THESE ARE REPRESENTATIONS THAT THERANOS REQUIRES OF

01:56PM  11   RDV --

01:56PM  12   A.    YES.

01:56PM  13   Q.    -- FOR THE INVESTMENT TO TAKE PLACE?

01:56PM  14   A.    YES.

01:56PM  15   Q.    OKAY.  IF WE CAN GO TO THE NEXT PAGE, PAGE 62.

01:57PM  16         IN 4.3, DO YOU SEE THE HEADING INVESTMENT EXPERIENCE?

01:57PM  17   A.    YES.

01:57PM  18   Q.    AND IT READS, "SUCH INVESTOR" -- THAT'S RDV?

01:57PM  19   A.    YES.

01:57PM  20   Q.    -- "OR ITS PURCHASER REPRESENTATIVE, WITHIN THE MEANING OF

01:57PM  21   REGULATION D, RULE 501(H)," AND THEN IT CONTINUES, "HAS

01:57PM  22   SUBSTANTIAL EXPERIENCE IN EVALUATING AND INVESTING IN PRIVATE

01:57PM  23   PLACEMENT TRANSACTIONS OF SECURITIES IN COMPANIES SIMILAR TO

01:57PM  24   THE COMPANY."

01:57PM  25         DO YOU SEE THAT LANGUAGE?

PETERSON DIRECT BY MR. LEACH                                    3899

01:57PM   1    A.   YES.

01:57PM   2    Q.   AND THAT LANGUAGE WAS TRUE; CORRECT?

01:57PM   3    A.   YES.

01:57PM   4    Q.   RDV HAD SUBSTANTIAL INVESTMENT EXPERIENCE?

01:57PM   5    A.   YES.

01:57PM   6    Q.   IN 4.4 THERE'S A PARAGRAPH, SPECULATIVE NATURE OF

01:57PM   7    INVESTMENT.

01:57PM   8        DO YOU SEE THAT?

01:57PM   9    A.   YES.

01:57PM  10    Q.   AND IF WE CAN ZOOM IN, MS. HOLLIMAN (SIC), JUST SO WE CAN

01:57PM  11    SEE IT A LITTLE BETTER.

01:57PM  12        THIS SAYS, "SUCH INVESTOR UNDERSTANDS AND ACKNOWLEDGES

01:57PM  13    THAT THE COMPANY HAS A LIMITED FINANCIAL AND OPERATING HISTORY

01:58PM  14    AND THAT AN INVESTMENT IN THE COMPANY IS HIGHLY SPECULATIVE AND

01:58PM  15    INVOLVES SUBSTANTIAL RISKS."

01:58PM  16        DO YOU SEE THAT LANGUAGE?

01:58PM  17    A.   YES.

01:58PM  18    Q.   AND WERE THE REPRESENTATIONS IN PARAGRAPH 4.4 TRUE TO THE

01:58PM  19    BEST OF YOUR KNOWLEDGE?

01:58PM  20    A.   YES.

01:58PM  21    Q.   OKAY.  IF WE CAN LOOK AT 4.5, ACCESS TO DATA.

01:58PM  22        DOES THIS RELATE TO ACCESS THAT RDV WAS PROVIDED IN

01:58PM  23    ADVANCE OF THE INVESTMENT DECISION?

01:58PM  24    A.   IT DOES ACKNOWLEDGE THAT WE DID HAVE ACCESS TO THEM AND TO

01:58PM  25    ASK QUESTIONS AND GOT THE MATERIALS.

01:58PM  1    Q.   OKAY.  AND ARE THE REPRESENTATIONS IN PARAGRAPH 4.5 TRUE?

01:58PM  2    A.   YES.

01:58PM  3    Q.   OKAY.  DID YOU RELY ON THE DUE DILIGENCE MATERIALS THAT

01:58PM  4    WERE PROVIDED TO RDV?

01:58PM  5    A.   YES.

01:58PM  6    Q.   AND DID YOU RELY ON THE STATEMENTS THAT MS. HOLMES MADE IN

01:58PM  7    THE PHONE CALL YOU HAD WITH HER AND IN THE MEETING THAT YOU HAD

01:58PM  8    WITH MS. HOLMES AND MR. BALWANI?

01:58PM  9    A.   YES.

01:58PM 10    Q.   OKAY.  WE CAN TAKE THAT DOWN, MS. WACHS.

01:59PM 11         IF I CAN DRAW YOUR ATTENTION TO 2139.

01:59PM 12         IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI IN

01:59PM 13    OR AROUND OCTOBER 8TH, 2014?

01:59PM 14    A.   YES.

01:59PM 15              MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

01:59PM 16    EXHIBIT 2139.

01:59PM 17              MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

01:59PM 18              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:59PM 19         (GOVERNMENT'S EXHIBIT 2139 WAS RECEIVED IN EVIDENCE.)

01:59PM 20    BY MR. LEACH:

01:59PM 21    Q.   IF WE CAN PLEASE START ON PAGE 2.

01:59PM 22         MS. PETERSON, THERE'S AN EMAIL HERE THAT READS -- FROM YOU

01:59PM 23    TO MR. BALWANI WITH THE SUBJECT RDV INVESTMENTS.

01:59PM 24         DO YOU SEE THAT?

01:59PM 25    A.   YES.

PETERSON DIRECT BY MR. LEACH                3901

01:59PM  1    Q.   AND THIS SAYS, "HI SUNNY, DO YOU HAVE JUST A FEW MINUTES

02:00PM  2    YET TODAY TO TALK?  JUST TRYING TO MANAGE LOGISTICS OF CLOSING.

02:00PM  3    LET ME KNOW A GOOD TIME."

02:00PM  4         WHAT DID YOU MEAN BY "LOGISTICS OF CLOSING"?

02:00PM  5    A.   WHAT THE PLAN WAS AND HOW THEY WANTED TO RECEIVE THE

02:00PM  6    MONEY, AND I DID NOT HAVE THE WIRE INSTRUCTIONS FROM JERRY, SO

02:00PM  7    I NEEDED THOSE.

02:00PM  8    Q.   JERRY IS MR. TUBERGEN?

02:00PM  9    A.   CORRECT.

02:00PM  10   Q.   YOUR BOSS?

02:00PM  11   A.   YES.

02:00PM  12   Q.   OKAY.  AND IF WE CAN GO TO PAGE 1, PLEASE.

02:00PM  13        DO YOU SEE ROUGHLY HALFWAY THROUGH THE PAGE, MR. BALWANI

02:00PM  14   WRITES "HI LISA,

02:00PM  15        "GREAT TO TALK TO YOU.  ATTACHED ARE THE WIRING

02:00PM  16   INSTRUCTIONS"?

02:00PM  17   A.   YES.

02:00PM  18   Q.   SO MR. BALWANI GOT YOU THE WIRING INSTRUCTIONS?

02:00PM  19   A.   YES.

02:00PM  20   Q.   AND THEN UP AT THE TOP YOU REPLY, "WONDERFUL SUNNY, THANK

02:00PM  21   YOU."

02:00PM  22        IT THEN CONTINUES.

02:00PM  23        "I APPRECIATE THE COLOR ON REPORTING, HELPS ME IN MANAGING

02:00PM  24   THOSE EXPECTATIONS ON THIS END.  A CAP CHART ISN'T NECESSARY,

02:01PM  25   BUT CERTAINLY WOULD HELP ME MANAGE MY INTERNAL REPORTING, BUT

02:01PM   1    ONLY IF YOU ARE COMFORTABLE SHARING THAT AT SOME POINT POST

02:01PM   2    CLOSE -- AND IF YOU PREFER A REDACTED VERSION TO KEEP OTHER

02:01PM   3    INVESTOR NAMES CONFIDENTIAL, THAT WORKS TOO."

02:01PM   4         DO YOU SEE THAT?

02:01PM   5    A.   YES.

02:01PM   6    Q.   AND WHAT WERE YOU GETTING AT HERE?

02:01PM   7    A.   OTHER PARTS OF LOGISTICS OF CLOSING IS TO MAKE SURE THAT I

02:01PM   8    HAVE EVERYTHING THAT I NEED TO KIND OF MANAGE THE INVESTMENT

02:01PM   9    GOING FORWARD, AND TWO OF THOSE THINGS IS A CAP CHART SO THAT I

02:01PM  10    CAN -- I KNEW EXACTLY WHAT WE OWNED IN TERMS OF A PERCENTAGE SO

02:01PM  11    THAT I COULD EVENTUALLY DO VALUATIONS OF THE BUSINESS IN THE

02:01PM  12    FUTURE.  SO THAT WAS IMPORTANT TO ME.

02:01PM  13         AS WELL AS WE TYPICALLY GET MONTHLY FINANCIAL STATEMENTS

02:01PM  14    FROM ANY COINVESTMENT THAT WE MAKE WITH A PRIVATE EQUITY FUND.

02:01PM  15         I NEEDED TO FULLY UNDERSTAND AND MANAGE EXPECTATIONS OF

02:02PM  16    HOW WE WERE GOING TO RECEIVE FINANCIAL INFORMATION IN THE

02:02PM  17    FUTURE FROM THE COMPANY.

02:02PM  18         SO WE HAD A DISCUSSION AROUND THAT AS WELL.

02:02PM  19    Q.   WHAT DID MR. BALWANI SAY?

02:02PM  20    A.   HE TOLD ME THAT THEY WEREN'T GOING TO SEND ANYTHING OUT IN

02:02PM  21    WRITING IN TERMS OF FINANCIAL INFORMATION, THAT IT WAS FOR

02:02PM  22    CONFIDENTIALITY REASONS, AND THAT THEY EXPECTED TO MEET WITH

02:02PM  23    INVESTORS REGULARLY MORE OFTEN, EVEN MORE OFTEN THAN ANNUALLY

02:02PM  24    BECAUSE THEY WANTED TO AGAIN GET OUR INSIGHT.  ALL OF THE

02:02PM  25    INVESTORS HAD MANAGED BUSINESSES, LARGE BUSINESSES BEFORE, AND

PETERSON DIRECT BY MR. LEACH                                    3903

02:02PM  1    THEY WANTED TO GET OUR INPUT.

02:02PM  2         SO WE WERE LEFT WITH THE UNDERSTANDING THAT WE WERE GOING

02:02PM  3    TO HAVE REGULAR CONVERSATIONS AROUND THE FINANCIAL PERFORMANCE

02:02PM  4    OF THE COMPANY AND HOW IT WAS MOVING FORWARD, BUT IT WAS GOING

02:02PM  5    TO COME IN THE FORM OF VERBAL MEETINGS VERSUS IN TANGIBLE

02:03PM  6    WRITING OR EMAIL.

02:03PM  7    Q.   DID EVEN THOSE VERBAL MEETINGS END UP HAPPENING?

02:03PM  8    A.   NO.

02:03PM  9    Q.   THERE'S ALSO REFERENCE TO A CAP TABLE.

02:03PM  10        WHAT DID MR. BALWANI TELL YOU ABOUT THE CAP TABLE?

02:03PM  11   A.   I UNDERSTAND THE CONFIDENTIALITY AROUND WANTING -- NOT

02:03PM  12   WANTING NAMES PRESENTED IN A CAP CHART, SO I WAS OFFERING TO

02:03PM  13   REDACT THE NAMES.

02:03PM  14        I REALLY JUST WANTED TO UNDERSTAND THE OWNERSHIP

02:03PM  15   CAPITALIZATION OF THE BUSINESS, AND I WAS TRYING TO GET THAT

02:03PM  16   INFORMATION REDACTED OR NOT REDACTED.

02:03PM  17        HE -- I COULDN'T GET IT BEFORE CLOSE, BUT HE DID PROMISE

02:03PM  18   ME ON THIS PHONE CALL THAT I WOULD GET IT -- HAVE SOMETHING

02:03PM  19   AFTER CLOSE, AND I NEVER DID.

02:03PM  20   Q.   YOU NEVER GOT SOMETHING EVEN AFTER THE CLOSE?

02:03PM  21   A.   NO.

02:03PM  22   Q.   OKAY.  LET'S LOOK AT EXHIBIT 2146.

02:04PM  23        DO YOU HAVE THAT IN FRONT OF YOU?

02:04PM  24   A.   YES.

02:04PM  25   Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MR. TUBERGEN

PETERSON DIRECT BY MR. LEACH                3904

02:04PM  1    AROUND THE TIME OF YOUR PHONE CALL WITH MR. BALWANI?

02:04PM  2    A.   YES.

02:04PM  3    Q.   AND DID YOU SEND THIS EMAIL IN THE ORDINARY COURSE OF

02:04PM  4    RDV'S BUSINESS?

02:04PM  5    A.   YES.

02:04PM  6    Q.   AND WAS IT IMPORTANT FOR YOU TO BE TRUTHFUL WITH

02:04PM  7    MR. TUBERGEN REGARDING THE STATUS OF THE CLOSE?

02:04PM  8    A.   YES.

02:04PM  9    Q.   AND WAS THIS MAINTAINED IN THE ORDINARY COURSE OF RDV'S

02:04PM  10   BUSINESS?

02:04PM  11   A.   YES.

02:04PM  12         MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

02:04PM  13   EXHIBIT 2146.

02:04PM  14         MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

02:04PM  15         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:04PM  16      (GOVERNMENT'S EXHIBIT 2146 WAS RECEIVED IN EVIDENCE.)

02:04PM  17         MR. LEACH:  IF WE CAN ZOOM IN, PLEASE, MS. WACHS, ON

02:04PM  18   THE BOTTOM PORTION.

02:04PM  19   Q.   THERE'S AN EMAIL FROM YOU, MS. PETERSON, WHERE YOU WROTE,

02:04PM  20   "SPOKE TO SUNNY."

02:05PM  21      DO YOU SEE THAT?

02:05PM  22   A.   YES.

02:05PM  23   Q.   IS THAT A REFERENCE TO THE PHONE CALL THAT YOU JUST

02:05PM  24   TESTIFIED TO WITH MR. BALWANI?

02:05PM  25   A.   YES.

02:05PM  1    Q.   OKAY.  YOU WROTE, "THEIR GOAL IS TO HAVE ALL DOCS IN AS

02:05PM  2    SOON AS POSSIBLE THIS WEEK AND $$$ FROM ALL INVESTORS NO LATER

02:05PM  3    THAN FRIDAY.  THEY ARE CAPPING THE FUND RAISE AT 500M AND

02:05PM  4    EXPECT IT TO COME FROM 5-8 ENTITIES.  THEY HAVE MUCH MORE

02:05PM  5    DEMAND THAN 500M BUT WANT TO CAP IT AT 500M.  ONLY WAY THEY

02:05PM  6    TAKE MORE THAN 500M IS 'IF SOMEONE IS EXTREMELY DISGRUNTLED AND

02:05PM  7    COMPLAINED TO A BOARD MEMBER OR SOMETHING.'"

02:05PM  8         DO YOU SEE THAT?

02:05PM  9    A.   YES.

02:05PM  10   Q.   AND WHAT WERE YOU GETTING AT THERE?

02:05PM  11   A.   I WANTED TO GET A GOOD UNDERSTANDING OF WHAT THEY WERE

02:05PM  12   GOING TO DO WITH THE CASH AND HOW MUCH CASH THEY WERE GOING TO

02:05PM  13   GET IN, BECAUSE HOW MUCH CASH THEY BRING IN TELLS ME HOW MUCH

02:05PM  14   MY 100 MILLION IS OF THE TOTAL.  SO THAT WAS IMPORTANT TO ME.

02:06PM  15        AND THE FACT THAT THEY WERE CAPPING IT AT 500, I WAS GLAD

02:06PM  16   ABOUT THAT BECAUSE I DID NOT WANT THEM RAISING A BILLION

02:06PM  17   DOLLARS OR WHATEVER BECAUSE THAT JUST MEANS WE OWN LESS.

02:06PM  18        SO IT WAS GOOD TO HAVE AN UNDERSTANDING OF THAT.

02:06PM  19   Q.   IN THE NEXT PARAGRAPH IT SAYS, "THEY ARE PLANNING ON OUR

02:06PM  20   100M.  I TOLD HIM OUR DOCS WOULD BE IN BY TOMORROW."

02:06PM  21        YOU THEN CONTINUE.

02:06PM  22        "I ASKED IF THEY WERE PLANNING TO CASH SOME EXISTING

02:06PM  23   INVESTORS OUT RIGHT AWAY AND HE INDICATED THAT THEY HAVE NO

02:06PM  24   IMMEDIATE NEED FOR THE MONEY, THAT IT INITIALLY WILL JUST SIT

02:06PM  25   ON THE B/S."

02:06PM 1      DO YOU SEE THAT?

02:06PM 2   A.   YES.

02:06PM 3   Q.   AND IS B/S BALANCE SHEET?

02:06PM 4   A.   YES.

02:06PM 5   Q.   AND IS THIS ACCURATELY SUMMARIZING WHAT MR. BALWANI TOLD

02:06PM 6   YOU?

02:06PM 7   A.   YES.

02:06PM 8   Q.   AND WAS THIS RELEVANT TO YOU?

02:06PM 9   A.   YES, IT WAS VERY RELEVANT.

02:06PM 10  Q.   WHY?

02:06PM 11  A.   BECAUSE WE HAD ORIGINALLY BEEN TOLD IN THE MEETING IN

02:07PM 12  PALO ALTO A COUPLE WEEKS EARLIER THAT THEY WERE GOING TO USE

02:07PM 13  SOME OF THE MONEY, NOT ALL OF IT, BUT SOME OF THE MONEY TO CASH

02:07PM 14  OUT SOME EXISTING INVESTORS, SO I WAS SURPRISED THAT THERE WAS

02:07PM 15  NO IMMEDIATE NEED FOR THE CASH.

02:07PM 16  Q.   IN THE LAST PARAGRAPH YOU WROTE, "I ASKED WHEN WE SHOULD

02:07PM 17  CHECK BACK WITH THEM AGAIN ON ANY UPDATES AND HE SAID THEY

02:07PM 18  WOULD REACH OUT AT A MINIMUM ANNUALLY, BUT THEIR GOAL IS TO

02:07PM 19  MEET MUCH MORE OFTEN THAN THAT.  THIS GROUP OF INVESTORS IS

02:07PM 20  MUCH MORE STRATEGIC AND THEY WANT TO TAP INTO THAT MORE OFTEN

02:07PM 21  THAN ANNUALLY."

02:07PM 22      DO YOU SEE THAT LANGUAGE?

02:07PM 23  A.   YES.

02:07PM 24  Q.   AND IS THAT A FAIR SUMMARY OF WHAT MR. BALWANI SAID?

02:07PM 25  A.   YES.

PETERSON DIRECT BY MR. LEACH 3907

02:07PM 1    Q.   AND DID THOSE LESS THAN ANNUAL MEETINGS EVEN HAPPEN?

02:07PM 2    A.   NO.

02:07PM 3    Q.   "HE WAS TALKING ABOUT THEM COMING TO G.R." -- WHAT DOES

02:07PM 4    G.R. REFER TO?

02:07PM 5    A.   TO GRAND RAPIDS.

02:07PM 6    Q.   -- "TO HOPEFULLY TAP INTO DOUG/AMWAY MANAGEMENT TO LEARN

02:08PM 7    MORE ABOUT GOING GLOBAL.  NOT SURE HOW MUCH INTERACTION THERE

02:08PM 8    WILL BE WITH OTHER INVESTORS, WE'LL HAVE TO WAIT AND SEE."

02:08PM 9         AND THEN IT SAYS, "AT LEAST INITIALLY, HE WAS CLEAR THAT

02:08PM 10   THEY AREN'T PLANNING TO PUT ANY UPDATES OR FINANCIAL

02:08PM 11   INFORMATION IN WRITING FOR CONFIDENTIALITY PURPOSES."

02:08PM 12        DO YOU SEE THAT?

02:08PM 13   A.   YES.

02:08PM 14   Q.   IS THAT WHAT MR. BALWANI TOLD YOU?

02:08PM 15   A.   YES.

02:08PM 16   Q.   WAS THAT USUAL, UNUSUAL?

02:08PM 17   A.   UNUSUAL.

02:08PM 18   Q.   HOW SO?

02:08PM 19   A.   NORMALLY THERE'S NO -- I MEAN, WE'VE ALREADY SIGNED A

02:08PM 20   CONFIDENTIALITY AGREEMENT.  WE'RE AN INVESTOR.  NORMALLY

02:08PM 21   COMPANIES DON'T HAVE AN ISSUE SHARING FINANCIAL INFORMATION.

02:08PM 22   Q.   JUST TWO MORE DOCUMENTS, MS. PETERSON.

02:08PM 23        I'D LIKE TO DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

02:08PM 24   2166.

02:09PM 25        DO YOU RECOGNIZE THIS?

ER-2911

02:09PM  1     A.   YES.

02:09PM  2     Q.   AND WHAT IS THIS?

02:09PM  3     A.   THIS IS A FORMAL INVESTMENT MEMO THAT I DO TO THE

02:09PM  4     INVESTMENT COMMITTEE THAT GETS SIGNED TO APPROVE THE

02:09PM  5     INVESTMENT.

02:09PM  6     Q.   DO YOU RECOGNIZE THE SIGNATURES ON PAGE 7?

02:09PM  7     A.   YES.

02:09PM  8     Q.   DID YOU PREPARE THIS IN THE ORDINARY COURSE OF RDV'S

02:09PM  9     BUSINESS?

02:09PM 10     A.   YES.

02:09PM 11     Q.   DID YOU PREPARE THIS AT -- OR FROM INFORMATION AT THE TIME

02:09PM 12     YOU PREPARED THIS?

02:09PM 13     A.   YES.

02:09PM 14     Q.   AND DID YOU MAINTAIN THIS IN THE ORDINARY COURSE OF RDV'S

02:09PM 15     BUSINESS?

02:09PM 16     A.   YES.

02:09PM 17     Q.   DOES THIS ESSENTIALLY MEMORIALIZE THE REASONS FOR THE

02:09PM 18     INVESTMENT?

02:09PM 19     A.   YES, AND THE STRENGTHS AND WEAKNESSES, YES.

02:09PM 20          MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

02:09PM 21     EXHIBIT 2166.

02:09PM 22          MR. COOPERSMITH:  802, YOUR HONOR.

02:09PM 23          THE COURT:  THIS IS A BUSINESS RECORD?

02:09PM 24          MR. LEACH:  YES, YOUR HONOR.

02:09PM 25          THE COURT:  IT'S ADMITTED UNDER 803(6).

02:10PM   1              IT MAY BE PUBLISHED.

02:10PM   2              (GOVERNMENT'S EXHIBIT 2166 WAS RECEIVED IN EVIDENCE.)

02:10PM   3      BY MR. LEACH:

02:10PM   4      Q.   MS. PETERSON, I DRAW YOUR ATTENTION TO THE TOP PORTION OF

02:10PM   5      THE DOCUMENT.

02:10PM   6              DO YOU SEE WHERE IT SAYS, "RDV APPROVAL DOCUMENT -- NEW

02:10PM   7      EQUITY INVESTMENT.

02:10PM   8              "DIRECT INVESTMENT:  THERANOS INC."

02:10PM   9              DO YOU SEE THAT?

02:10PM   10     A.   YES.

02:10PM   11     Q.   AND IS THIS A FORM THAT YOU USE ORDINARILY IN YOUR

02:10PM   12     BUSINESS?

02:10PM   13     A.   YES.

02:10PM   14     Q.   OKAY.  TO THE RIGHT IT SAYS, "CLOSED:  OCTOBER 31ST,

02:10PM   15     2014."

02:10PM   16             IS THAT CONSISTENT WITH WHEN THE TRANSACTION CLOSED?

02:10PM   17     A.   YES.

02:10PM   18     Q.   THERE'S A SECTION RDV OPPORTUNITY, AND THEN ANOTHER

02:10PM   19     SECTION COMPANY OVERVIEW.

02:10PM   20             DO YOU SEE THAT?

02:10PM   21     A.   YES.

02:10PM   22     Q.   AND IS SOME OF THE INFORMATION IN HERE DRAWN FROM THE MEMO

02:10PM   23     THAT YOU PREPARED EARLIER?

02:10PM   24     A.   YES.

02:10PM   25     Q.   OKAY.  FOR EXAMPLE, YOU WROTE, "THERANOS MANUFACTURES ITS

ER-2913

02:10PM   1    ANALYZER EQUIPMENT."

02:10PM   2        DO YOU SEE THAT IN THE SECOND PARAGRAPH?

02:10PM   3    A.   YES.

02:10PM   4    Q.   AND IS THAT CONSISTENT WITH WHAT MS. HOLMES AND

02:11PM   5    MR. BALWANI TOLD YOU?

02:11PM   6    A.   YES.

02:11PM   7    Q.   IF WE GO TO THE NEXT PAGE, PLEASE.

02:11PM   8        DO YOU SEE THERE'S A FINANCIAL SUMMARY?

02:11PM   9    A.   YES.

02:11PM  10    Q.   AND IS THE DATA IN HERE DRAWN FROM THE SPREADSHEET THAT WE

02:11PM  11    SAW IN 1853 AS INFORMED BY YOUR CONVERSATION WITH MR. BALWANI

02:11PM  12    AND MS. HOLMES?

02:11PM  13    A.   YES.

02:11PM  14    Q.   TO THE FAR RIGHT THERE ARE SOME FINANCIAL NOTES?

02:11PM  15    A.   YES.

02:11PM  16    Q.   WHERE DOES THIS INFORMATION COME FROM?

02:11PM  17    A.   THAT ALL CAME FROM THE CONVERSATION IN PALO ALTO.

02:11PM  18    Q.   OKAY.  AND SO I SEE IN THE SECOND BULLET, "2015 ASSUMES

02:11PM  19    THEY OPEN APPROXIMATELY 1,200 LOCATIONS ACROSS WALGREENS AND

02:11PM  20    SAFEWAY."

02:11PM  21        DO YOU SEE THAT?

02:11PM  22    A.   YES.

02:11PM  23    Q.   AND THAT'S INFORMATION THAT MR. BALWANI PROVIDED YOU?

02:11PM  24    A.   YES.

02:11PM  25    Q.   IF WE CAN GO TO PAGE 5.

PETERSON DIRECT BY MR. LEACH                                3911

02:12PM  1          DO YOU SEE THAT THERE'S A DESCRIPTION OF THE CURRENT BOARD

02:12PM  2   OF DIRECTORS?

02:12PM  3   A.   YES.

02:12PM  4   Q.   AND THERE'S AN ENTRY FOR MR. BALWANI WHERE IT SAYS,

02:12PM  5   "PRESIDENT AND COO OF THERANOS:  ENTREPRENEUR AND COMPUTER

02:12PM  6   SCIENTIST; JOINED THERANOS AFTER DROPPING OUT OF THE COMPUTER

02:12PM  7   SCIENCE PROGRAM AT STANFORD UNIVERSITY."

02:12PM  8          AND THEN IT CONTINUES.

02:12PM  9          DO YOU SEE THAT?

02:12PM  10  A.   YES.

02:12PM  11  Q.   PRIOR TO THE END OF 2015, DID YOU HAVE ANY UNDERSTANDING

02:12PM  12  THAT MS. HOLMES AND MR. BALWANI WAS IN A ROMANTIC RELATIONSHIP?

02:12PM  13  A.   NO.

02:12PM  14          MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  THE SAME

02:12PM  15  REASONS THAT WE DISCUSSED EARLIER.

02:12PM  16          THE COURT:  OVERRULED.

02:12PM  17      YOUR ANSWER?

02:12PM  18          THE WITNESS:  NO.

02:12PM  19  BY MR. LEACH:

02:12PM  20  Q.   THEY NEVER TOLD YOU THAT?

02:12PM  21  A.   NO.

02:12PM  22  Q.   WOULD THAT HAVE BEEN RELEVANT TO THE INVESTMENT DECISION?

02:12PM  23  A.   I THINK IT WOULD HAVE SPURRED A LOT OF DISCUSSION NOT ONLY

02:13PM  24  AMONGST OURSELVES, BUT ALSO WITH THEM AT THE -- IN PALO ALTO.

02:13PM  25          IT'S FRAUGHT WITH CONFLICT, SO I THINK WE WOULD HAVE

02:13PM  1     WANTED TO DISCUSS THAT AT LENGTH.

02:13PM  2     Q.   WHEN YOU SAY "IT'S FRAUGHT WITH CONFLICT," WHAT DO YOU

02:13PM  3     MEAN?

02:13PM  4     A.   ANY TIME YOU HAVE A FAMILY MEMBER OR A SPOUSE OR SIBLING,

02:13PM  5     OR WHOMEVER, IN A BUSINESS AND WE'RE MAKING AN INVESTMENT, YOU

02:13PM  6     WANT TO MAKE SURE THAT THE PEOPLE YOU'RE INVESTING WITH ARE

02:13PM  7     MAKING SOUND BUSINESS DECISIONS, NOT EMOTIONAL DECISIONS.

02:13PM  8          SO I'M NOT SAYING THAT THAT'S WHAT WOULD HAVE HAPPENED,

02:13PM  9     BUT I THINK WE WOULD HAVE HAD A LOT OF DISCUSSION AROUND THAT

02:13PM 10     AS A GROUP AMONGST OURSELVES, AS WELL AS WITH THEM, WHETHER --

02:13PM 11     COULD WE IDENTIFY -- WERE THERE CONFLICTS, AND DID WE HAVE THE

02:14PM 12     RIGHT PEOPLE IN THE RIGHT SEATS AT THIS COMPANY TO MAKE THIS

02:14PM 13     LARGE OF AN INVESTMENT.

02:14PM 14     Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 6.

02:14PM 15          DO YOU SEE WHERE IT SAYS, "A THERANOS ANALYZER STATION IS

02:14PM 16     A SMALL FRACTION OF THE SIZE OF A CURRENT LAB"?

02:14PM 17     A.   YES.

02:14PM 18     Q.   OKAY.  PRIOR TO THE INVESTMENT, WERE YOU EVER TOLD THAT

02:14PM 19     THERANOS WAS USING THIRD PARTY MACHINES TO DO SOME OF ITS

02:14PM 20     TESTING?

02:14PM 21     A.   NO, NEVER.

02:14PM 22     Q.   WERE YOU EVER TELL TOLD THAT THEY WERE USING THIRD PARTY

02:14PM 23     MACHINES TO DO THE MAJORITY OF ITS TESTING?

02:14PM 24     A.   NO.

02:14PM 25     Q.   PRIOR TO THE INVESTMENT, WERE YOU EVER TOLD THAT THERANOS

02:14PM   1    WAS USING ITS ANALYZER FOR NO MORE THAN 12 ASSAYS?

02:14PM   2    A.    NO.

02:14PM   3    Q.    WOULD THAT HAVE BEEN IMPORTANT TO YOU?

02:14PM   4    A.    VERY, YES.

02:14PM   5    Q.    LET'S LOOK AT EXHIBIT 5808.

02:15PM   6          IS THIS A COPY OF THE WIRE TRANSFER FOR RDV'S INVESTMENT?

02:15PM   7    A.    YES.

02:15PM   8    Q.    AND DOES THIS ACCURATELY REFLECT THE DATES AND DETAILS OF

02:15PM   9    RDV'S INVESTMENT?

02:15PM  10    A.    YES.

02:15PM  11              MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

02:15PM  12    EXHIBIT 5808.

02:15PM  13              MR. COOPERSMITH:  ONE MOMENT, YOUR HONOR.

02:15PM  14          (PAUSE IN PROCEEDINGS.)

02:15PM  15              MR. COOPERSMITH:  NO OBJECTION.

02:15PM  16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:15PM  17          (GOVERNMENT'S EXHIBIT 5808 WAS RECEIVED IN EVIDENCE.)

02:15PM  18    BY MR. LEACH:

02:15PM  19    Q.    MS. PETERSON, UP IN THE LEFT CORNER THERE'S A DATE,

02:15PM  20    OCTOBER 31ST, 2014.

02:15PM  21          DO YOU SEE THAT?

02:15PM  22    A.    YES.

02:15PM  23    Q.    AND DOWN IN ROUGHLY THE MIDDLE, THERE'S AN AMOUNT RECEIVED

02:16PM  24    OF $99,999,984.

02:16PM  25          DO YOU SEE THAT?

PETERSON DIRECT BY MR. LEACH                                    3914

02:16PM  1      A.   YES.

02:16PM  2      Q.   IS THAT THE AMOUNT OF RDV'S INVESTMENT?

02:16PM  3      A.   YES.

02:16PM  4      Q.   OKAY.  THERE'S AN ORIGINATOR FOR THIS WIRE LISTED AS

02:16PM  5      LAKESHORE CAPITAL.

02:16PM  6           WHAT IS THAT?

02:16PM  7      A.   A CASH ACCOUNT OF THE DEVOS FAMILY.

02:16PM  8      Q.   OKAY.  AND THEN THERE'S AN ORIGINATOR'S BANK,

02:16PM  9      GRAND RAPIDS, MICHIGAN.

02:16PM 10           DO YOU SEE THAT?

02:16PM 11      A.   YES.

02:16PM 12      Q.   AND IS THAT WHERE RDV MAINTAINED BANK ACCOUNTS?

02:16PM 13      A.   THROUGH NORTHERN TRUST, WHICH WAS HEADQUARTERED IN

02:16PM 14      CHICAGO.

02:16PM 15      Q.   OKAY.  AND THERE'S AN ENTITY FOR THE BENEFICIARY -- OR FOR

02:16PM 16      THE REFERENCE TO THE BENEFICIARY LISTED AS DYNASTY FINANCIAL II

02:16PM 17      LLC.

02:16PM 18           DO YOU SEE THAT?

02:16PM 19      A.   YES.

02:16PM 20      Q.   AND WHAT IS THAT?

02:16PM 21      A.   THAT'S THE INVESTMENT ENTITY THAT WE USED.

02:17PM 22      Q.   AT ANY POINT IN TIME, DID RDV RECOVER ITS $99 MILLION?

02:17PM 23      A.   NO.

02:17PM 24           MR. LEACH:  YOUR HONOR, MAY I HAVE A MOMENT?

02:17PM 25           THE COURT:  YES.

02:17PM   1              (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:17PM   2       BY MR. LEACH:

02:17PM   3       Q.   JUST A FEW MORE QUESTIONS, MS. PETERSON.

02:17PM   4            IF WE CAN GO BACK TO EXHIBIT 5809.

02:17PM   5            YOUR HONOR, I'D LIKE TO MAKE SURE -- I'M OFFERING THE

02:17PM   6       ENTIRE EMAIL, BOTH THE EXHIBIT AND THE ATTACHMENT.

02:17PM   7              THE COURT:  YES, THERE WAS -- THANK YOU FOR THIS.  I

02:17PM   8       HAD A NOTE TO THIS.

02:18PM   9            I NOTICE THERE WAS SOME CONVERSATION ABOUT PAGE 1 AND THE

02:18PM  10       COURT ADMITTED PAGE 1 AND SAID IT MAY BE PUBLISHED, AND THEN

02:18PM  11       PAGE 2 WAS ACTUALLY PUBLISHED.

02:18PM  12            THE ENTIRETY OF THE DOCUMENT WAS ADMITTED.

02:18PM  13              MR. LEACH:  I APOLOGIZE, YOUR HONOR.  I INTENDED TO

02:18PM  14       MOVE THE ENTIRETY OF THE DOCUMENT.

02:18PM  15              THE COURT:  AND THAT WAS THE COURT'S UNDERSTANDING,

02:18PM  16       THAT THE ENTIRETY OF THE DOCUMENT WAS ADMITTED.  IT WAS

02:18PM  17       PUBLISHED.

02:18PM  18              MR. COOPERSMITH:  YES, YOUR HONOR, I UNDERSTAND.

02:18PM  19              THE COURT:  OKAY.  THANK YOU.  SO THE RECORD IS

02:18PM  20       CLEAR, IT WAS ADMITTED, BOTH PAGES.

02:18PM  21       BY MR. LEACH:

02:18PM  22       Q.   OKAY.  AND IF WE CAN GO BACK, PLEASE TO EXHIBIT 1944.

02:18PM  23            MS. PETERSON, DO YOU RECALL PAGE 1 OF THIS DOCUMENT, THE

02:18PM  24       EMAIL FROM MR. TUBERGEN ATTACHING THE ROGER PARLOFF ARTICLE?

02:18PM  25       A.   HANG ON.

02:18PM  1          19?  OR THERE IT IS, SORRY.

02:18PM  2          YES.

02:18PM  3     Q.   AND THE ARTICLE IS SOMETHING THAT YOU REVIEWED IN

02:19PM  4     CONNECTION WITH THE INVESTMENT DECISION?

02:19PM  5     A.   YES.

02:19PM  6     Q.   AND BASED ON THE DUE DILIGENCE MATERIALS THAT WE LOOKED

02:19PM  7     THROUGH, DID YOU UNDERSTAND THERANOS WAS REFERRING YOU TO THAT

02:19PM  8     ARTICLE?

02:19PM  9     A.   YES.

02:19PM  10    Q.   AND WAS THAT PART OF THE REASON WHY YOU PLACED WEIGHT ON

02:19PM  11    IT?

02:19PM  12    A.   YES.

02:19PM  13             MR. LEACH:  YOUR HONOR, AT THIS TIME I OFFER THE

02:19PM  14    ENTIRETY OF EXHIBIT 1944.

02:19PM  15             THE COURT:  ARE YOU OFFERING THE ARTICLE THAT IS

02:19PM  16    ATTACHED FOR THE TRUTH OF THE MATTER ASSERTED IN THAT ARTICLE?

02:19PM  17             MR. LEACH:  NO, YOUR HONOR.

02:19PM  18             THE COURT:  WHAT IS THE PURPOSE OF IT, OR WHAT DO

02:19PM  19    YOU SEEK TO ADMIT THEN?

02:20PM  20             MR. LEACH:  I SEEK TO ADMIT IT FOR THE FALSITY OF

02:20PM  21    CERTAIN OF THE STATEMENTS.

02:20PM  22        IN ADDITION, THIS IS PART OF THE BASIS OF RDV'S

02:20PM  23    INVESTMENT, BUT I'M NOT OFFERING IT FOR THE TRUTH OF THE

02:20PM  24    STATEMENTS IN THE ARTICLE.

02:20PM  25             THE COURT:  ALL RIGHT.

02:20PM 1          AND YOU WISH TO LODGE AN OBJECTION?

02:20PM 2               MR. COOPERSMITH:  FOR THE REASONS WE DISCUSSED

02:20PM 3     EARLIER, YOUR HONOR, YES.

02:20PM 4               THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU.

02:20PM 5          LADIES AND GENTLEMEN, THIS WILL BE ADMITTED OVER COUNSEL'S

02:20PM 6     OBJECTION.

02:20PM 7          HOWEVER, THIS -- THAT IS, THE ARTICLE THAT IS ATTACHED TO

02:20PM 8     1944 -- IS NOT OFFERED FOR THE TRUTH OF THE MATTER ASSERTED IN

02:20PM 9     THE ARTICLE, WHICH IS TO SAY IT'S NOT OFFERED FOR THE TRUTH OF

02:20PM 10    THE AUTHOR'S STATEMENT, NOR ANYONE THAT THE AUTHOR QUOTES IN

02:20PM 11    THE ARTICLE.

02:20PM 12         IT'S OFFERED, IS OFFERED RATHER, NOT FOR THE TRUTH BUT, AS

02:20PM 13    MR. LEACH HAS INDICATED, FOR ANY FALSE ISSUES REGARDING

02:20PM 14    FALSITY, NOT THE TRUTH.

02:20PM 15         DOES THAT CAPTURE THE REASON THAT YOU'RE INTRODUCING THIS,

02:20PM 16    MR. LEACH?

02:20PM 17              MR. LEACH:  IT DOES, YOUR HONOR.  THANK YOU.

02:20PM 18              THE COURT:  ALL RIGHT.  FOR THAT LIMITED PURPOSE

02:20PM 19    ONLY, LADIES AND GENTLEMEN.

02:20PM 20         (GOVERNMENT'S EXHIBIT 1944 WAS RECEIVED IN EVIDENCE.)

02:20PM 21              MR. LEACH:  AND IF I MAY DISPLAY, YOUR HONOR?

02:20PM 22              THE COURT:  YES.

02:20PM 23    BY MR. LEACH:

02:20PM 24    Q.  MS. PETERSON, DO YOU SEE THE CAPTION OF THIS ARTICLE IS

02:20PM 25    "NEW BLOOD."

PETERSON DIRECT BY MR. LEACH 3918

02:20PM 1    A.   YES.

02:20PM 2    Q.   AND DO YOU SEE THE AUTHOR OF THIS IS ROGER PARLOFF?

02:21PM 3    A.   YES.

02:21PM 4    Q.   AND IF WE LOOK AT PAGE 4, DO YOU SEE AN IMAGE OF

02:21PM 5    MS. HOLMES?

02:21PM 6    A.   YES.

02:21PM 7    Q.   LET'S LOOK BRIEFLY, PLEASE, AT PAGE 8 OF THE EXHIBIT.  IF

02:21PM 8    WE CAN ZOOM IN ON THE SECOND OR THE THIRD FULL PARAGRAPH ON THE

02:21PM 9    LEFT HAND COLUMN.

02:21PM 10        DO YOU SEE WHERE IT SAYS, "THERANOS, WHICH DOES NOT BUY

02:21PM 11   ANY ANALYZERS FROM THIRD PARTIES, IS THEREFORE IN A UNIQUE

02:21PM 12   POSITION.  WHILE IT WOULD NEED FDA APPROVAL TO SELL ITS OWN

02:21PM 13   ANALYZERS TO OTHER LABS, IT DOESN'T DO THAT.  IT USES ITS

02:21PM 14   ANALYZERS ONLY IN ITS OWN CMS CERTIFIED LAB."

02:21PM 15        DO YOU SEE THAT LANGUAGE?

02:21PM 16   A.   YES.

02:21PM 17   Q.   AND WAS THIS INFORMATION RELEVANT TO YOU?

02:21PM 18   A.   YES.

02:21PM 19   Q.   AND WAS THIS INFORMATION CONSISTENT WITH WHAT MS. HOLMES

02:21PM 20   AND MR. BALWANI TOLD YOU IN THE MEETING IN PALO ALTO?

02:21PM 21   A.   YES.

02:22PM 22        MR. LEACH:  THANK YOU, YOUR HONOR.

02:22PM 23        I HAVE NOTHING FURTHER.

02:22PM 24        THE COURT:  CROSS-EXAMINATION?

02:22PM 25        FOLKS, AGAIN, IF YOU WANT TO STRETCH, FEEL FREE TO DO

02:22PM   1    THAT.

02:22PM   2            AS I SAID, WE'LL END AT 2:45.

02:22PM   3            MR. COOPERSMITH, WE CAN GO UNTIL 3:00 O'CLOCK AND BE FINE,

02:22PM   4    JUST TO GET YOU STARTED.

02:22PM   5            MR. COOPERSMITH:  OKAY, YOUR HONOR.  THANK YOU.

02:22PM   6                         **CROSS-EXAMINATION**

02:22PM   7    BY MR. COOPERSMITH:

02:22PM   8    Q.   GOOD AFTERNOON, MS. PETERSON.

02:22PM   9    A.   HI.

02:22PM  10    Q.   MY NAME IS JEFF COOPERSMITH, AND I REPRESENT MR. BALWANI.

02:22PM  11    OKAY?

02:22PM  12         AND FOR THE REMAINDER OF THE AFTERNOON, I'LL ASK YOU SOME

02:23PM  13    QUESTIONS TO FOLLOW UP ON SOME THINGS THAT MR. LEACH ASKED YOU.

02:23PM  14         OKAY?

02:23PM  15    A.   OKAY.

02:23PM  16    Q.   AND UNFORTUNATELY IT'S PROBABLY GOING TO BE THE CASE THAT

02:23PM  17    YOU'LL BE BACK TOMORROW.

02:23PM  18    A.   OKAY.

02:23PM  19    Q.   SO SORRY ABOUT THAT, BUT THAT'S HOW IT GOES.  OKAY?

02:23PM  20         MS. PETERSON, I UNDERSTAND THAT YOU WORKED FOR, OR YOU

02:23PM  21    STILL WORK FOR RDV ACTUALLY; RIGHT?

02:23PM  22    A.   CORRECT.

02:23PM  23    Q.   AND YOU'VE WORKED THERE FOR 17 YEARS I THINK YOU SAID?

02:23PM  24    A.   YES.

02:23PM  25    Q.   AND SO YOU HAD CONSIDERABLE FAMILIARITY WITH RDV AND ITS

02:23PM  1    OPERATIONS?

02:23PM  2    A.   YES.

02:23PM  3    Q.   AND I JUST WANT TO MAKE SURE THAT WE UNDERSTAND WHAT RDV

02:23PM  4    IS.

02:23PM  5         I THINK RDV -- ARE THOSE THE INITIALS OF RICHARD DEVOS?

02:23PM  6    A.   YES.

02:23PM  7    Q.   AND IS HE THE FOUNDER OF AMWAY?

02:23PM  8    A.   YES, COFOUNDER.

02:23PM  9    Q.   THE COFOUNDER OF AMWAY?

02:23PM  10   A.   YES.

02:23PM  11   Q.   AND THAT'S A COMPANY THAT IS BASED IN GRAND RAPIDS,

02:23PM  12   MICHIGAN?

02:23PM  13   A.   YES.

02:23PM  14   Q.   AND THE AMWAY BUSINESS, DOES IT STILL EXIST?

02:24PM  15   A.   YES.

02:24PM  16   Q.   AND THAT BUSINESS GENERATED BASICALLY A FORTUNE FOR THE

02:24PM  17   DEVOS FAMILY; IS THAT RIGHT?

02:24PM  18   A.   YES.

02:24PM  19   Q.   OKAY.  AND WHEN YOU JOINED RDV, WAS AMWAY AN ALREADY GOING

02:24PM  20   BUSINESS?

02:24PM  21   A.   A GROWING OR?

02:24PM  22   Q.   WAS IT ALREADY GOING ON?

02:24PM  23   A.   YES.

02:24PM  24   Q.   IT HAD ALREADY BEEN FOUNDED BEFORE YOU GOT THERE?

02:24PM  25   A.   YES.  IT'S BEEN FOUNDED FOR 50 YEARS, 60 YEARS.

PETERSON CROSS BY MR. COOPERSMITH          3921

02:24PM  1     Q.   OKAY.  AND IT STILL OPERATES TODAY; RIGHT?

02:24PM  2     A.   YES.

02:24PM  3     Q.   IS RICHARD DEVOS STILL WITH US?

02:24PM  4     A.   NO.

02:24PM  5     Q.   SORRY ABOUT THAT.

02:24PM  6          DID YOU KNOW HIM PERSONALLY?

02:24PM  7     A.   YES.

02:24PM  8     Q.   OKAY.  AND WITHIN THE FAMILY, THERE ARE GENERATIONS OF

02:24PM  9     FAMILY MEMBERS; IS THAT RIGHT?

02:24PM 10     A.   YES.

02:24PM 11     Q.   AND SOME OF THEM ARE INVOLVED WITH THE BUSINESS?

02:24PM 12     A.   NOT ANYMORE.

02:24PM 13     Q.   OKAY.  BUT THERE ARE SOME FAMILY MEMBERS WHO ARE INVOLVED

02:24PM 14     WITH THE RDV INVESTMENT BUSINESS?

02:24PM 15     A.   THEY'RE ONLY ON OUR INVESTMENT COMMITTEE.

02:24PM 16          THEY'RE NOT -- THERE'S NO EMPLOYEES AT RDV THAT ARE

02:24PM 17     DEVOS FAMILY MEMBERS.

02:25PM 18     Q.   OKAY.  BUT THE INVESTMENT COMMITTEE IS A GROUP OF FAMILY

02:25PM 19     MEMBERS?

02:25PM 20     A.   YES.

02:25PM 21     Q.   AND AT THE TIME OF THE INVESTMENT THAT YOU DISCUSSED WITH

02:25PM 22     MR. LEACH IN OCTOBER OF 2014, WAS DICK DEVOS ON THE INVESTMENT

02:25PM 23     COMMITTEE?

02:25PM 24     A.   YES.

02:25PM 25     Q.   AND RICK DEVOS?

PETERSON CROSS BY MR. COOPERSMITH                      3922

02:25PM  1    A.   YES.

02:25PM  2    Q.   AND DAN DEVOS?

02:25PM  3    A.   YES.

02:25PM  4    Q.   AND DOUG DEVOS?

02:25PM  5    A.   YES.  DOUG WAS THE CHAIRMAN.

02:25PM  6    Q.   OKAY.

02:25PM  7    A.   I'M NOT SURE IF DICK WAS ON THE INVESTMENT COMMITTEE AT

02:25PM  8    THAT TIME OR RICK WAS HIS REPRESENTATIVE.  IT CHANGES A LOT.

02:25PM  9    THEY PUT DIFFERENT FAMILY MEMBERS ON IT ON OCCASION.

02:25PM  10   Q.   IT'S SORT OF A ROTATING GROUP OF FAMILY MEMBERS?

02:25PM  11   A.   YES, SOMEWHAT.

02:25PM  12   Q.   BUT THOSE WERE THE MEMBERS OF THE INVESTMENT COMMITTEE,

02:25PM  13   WHOEVER HAPPENS TO BE ON IT AT ANY GIVEN TIME, THOSE ARE

02:25PM  14   ACTUALLY THE PEOPLE WHO MAKE THE INVESTMENT DECISIONS FOR RDV;

02:25PM  15   IS THAT RIGHT?

02:25PM  16   A.   YES.  NOT ALL OF THEM.

02:25PM  17   Q.   I'M SORRY?

02:25PM  18   A.   NOT ALL OF THEM.

02:25PM  19   Q.   NOT ALL OF THEM?

02:25PM  20   A.   NO.  THEY APPROVE THE PRIVATE EQUITY GROUPS THAT WE INVEST

02:26PM  21   WITH, AND JERRY TUBERGEN AND NOW RANDY DAMSTRA HAVE AUTHORITY

02:26PM  22   TO APPROVE CERTAIN OF THESE COINVESTMENTS UNDERNEATH THERE

02:26PM  23   WITHOUT HAVING TO GO TO AN INVESTMENT COMMITTEE.

02:26PM  24   Q.   OKAY.

02:26PM  25   A.   BUT THIS PARTICULAR ONE HAD TO BE APPROVED BY THE

02:26PM 1     INVESTMENT COMMITTEE, YES.

02:26PM 2     Q.   WHEN YOU SAY "THIS PARTICULAR ONE," YOU MEAN THERANOS?

02:26PM 3     A.   YES.

02:26PM 4     Q.   OKAY.  THAT WAS GOING TO BE MY QUESTION, SO THANK YOU.

02:26PM 5          ALL RIGHT.  LET ME MAKE SURE I UNDERSTAND WHO THESE PEOPLE

02:26PM 6     ARE.

02:26PM 7          SO RICK DEVOS, IS HE WHAT YOU CALL A GENERATION 3 FAMILY

02:26PM 8     MEMBER?

02:26PM 9     A.   YES, THE OLDEST GRANDSON.

02:26PM 10    Q.   SO HE'S A GRANDSON OF RDV, OR RICHARD DEVOS; RIGHT?

02:26PM 11    A.   YES.

02:26PM 12    Q.   AND THEN DAN DEVOS, IS HE WHAT YOU CALL A GENERATION 2

02:26PM 13    FAMILY MEMBER?

02:26PM 14    A.   YES.

02:26PM 15    Q.   SO HE WOULD BE A SON OF RICHARD DEVOS?

02:26PM 16    A.   YES.

02:26PM 17    Q.   AND DOUG DEVOS?

02:26PM 18    A.   IS A G2, SON OF RICHARD DEVOS.

02:26PM 19    Q.   OKAY.  I THINK THE ONE WE DIDN'T MENTION WAS DICK DEVOS;

02:27PM 20    RIGHT?

02:27PM 21    A.   CORRECT.

02:27PM 22    Q.   AND WHAT WAS HIS RELATIONSHIP TO RICK DEVOS?

02:27PM 23    A.   HE'S A G2, A SON OF RICHARD DEVOS.

02:27PM 24    Q.   OKAY.  YOU ALSO MENTIONED SOMEONE EARLIER IN YOUR

02:27PM 25    TESTIMONY TODAY NAMED CHERI DEVOS; IS THAT RIGHT?

PETERSON CROSS BY MR. COOPERSMITH 3924

02:27PM 1   A.   YES.

02:27PM 2   Q.   AND IS SHE RELATED TO RICHARD DEVOS AS WELL?

02:27PM 3   A.   YES, SHE'S A DAUGHTER.

02:27PM 4   Q.   SO SHE'S A GENERATION 2 FAMILY MEMBER?

02:27PM 5   A.   CORRECT.

02:27PM 6   Q.   AND I THINK YOU SAID SOME OF THESE PEOPLE FROM THE DEVOS

02:27PM 7   FAMILY WERE ACTUALLY WITH YOU IN PALO ALTO WHEN YOU MET IN

02:27PM 8   OCTOBER 14TH, 2014?

02:27PM 9   A.   YES.   FOUR FAMILY MEMBERS OF THE G2 FAMILIES WERE

02:27PM 10   REPRESENTED AT THAT MEETING.   RICK REPRESENTING DICK -- AND I

02:27PM 11   GUESS DAN WAS NOT THERE, SO CHERI, RICK, AND DOUG WERE THERE.

02:27PM 12        AND DOUG WAS THE CHAIRMAN OF THE INVESTMENT COMMITTEE AT

02:27PM 13   THE TIME.

02:27PM 14   Q.   OKAY.   AND THESE INVESTMENT COMMITTEE MEMBERS HAD TO BE

02:27PM 15   THERE BECAUSE ULTIMATELY IT WAS THEIR DECISION WHETHER TO

02:27PM 16   INVEST?

02:28PM 17   A.   THEY DON'T NORMALLY GO ON A DILIGENCE CALL LIKE THIS ONE,

02:28PM 18   NOT ALWAYS.   OFTEN IT'S THE -- THE WORK IS DONE WITHIN THE

02:28PM 19   TEAMS, WITHIN THE INVESTMENT GROUP, AND JERRY PRESENTS IT TO

02:28PM 20   THE INVESTMENT COMMITTEE.

02:28PM 21   Q.   OKAY.   BUT IN THIS CASE THE MEMBERS OF THE INVESTMENT

02:28PM 22   COMMITTEE WHO WENT TO THE MEETING IN PALO ALTO, THEY WERE ABLE

02:28PM 23   TO TALK TO SUNNY BALWANI AND ELIZABETH HOLMES FIRSTHAND; RIGHT?

02:28PM 24   A.   YES.

02:28PM 25   Q.   AND THAT WAS ONE THING THAT THEY COULD USE TO HELP GUIDE

02:28PM  1    THEIR DECISION; RIGHT?

02:28PM  2    A.   YES.

02:28PM  3    Q.   AND YOUR ROLE WAS NOT TO MAKE AN INVESTMENT DECISION;

02:28PM  4    CORRECT?

02:28PM  5    A.   CORRECT.

02:28PM  6    Q.   AND YOUR ROLE WAS TO REVIEW MATERIALS AND WRITE MEMOS THAT

02:28PM  7    YOU WERE HOPING WOULD BE USED TO ASSESS THE INVESTMENT; RIGHT?

02:28PM  8    A.   I WAS THERE TO HELP FACILITATE A TRANSACTION SHOULD THEY

02:28PM  9    CHOOSE TO INVEST.  I CERTAINLY -- THEY LISTEN -- JERRY IS NOT

02:29PM 10    ON THE INVESTMENT COMMITTEE EITHER, BUT OUR OPINIONS MATTER TO

02:29PM 11    THEM.

02:29PM 12        BUT, NO, THEY WERE THE ONES WHO VOTE.

02:29PM 13    Q.   I MEAN, YOU AT LEAST HOPE YOUR OPINIONS MATTER; RIGHT?

02:29PM 14    A.   UH-HUH.

02:29PM 15    Q.   BECAUSE YOU WORK THERE?

02:29PM 16    A.   I HAVE WORKED THERE AND I'VE BEEN THERE FOR 17 YEARS, YES.

02:29PM 17    Q.   RIGHT.  SO LET'S TALK ABOUT JERRY TUBERGEN.

02:29PM 18        I THINK YOU SAID HE WAS, AT THE TIME AT LEAST, BOTH THE

02:29PM 19    CHIEF INVESTMENT OFFICER AND THE CHIEF EXECUTIVE OFFICER?

02:29PM 20    A.   YES, AND THE PRESIDENT.

02:29PM 21    Q.   OF RDV?

02:29PM 22    A.   CORRECT.

02:29PM 23    Q.   AND HE'S NOT A FAMILY MEMBER?

02:29PM 24    A.   CORRECT.

02:29PM 25    Q.   AND WOULD YOU DESCRIBE MR. TUBERGEN, JERRY TUBERGEN, AS AN

02:29PM  1    EXPERT IN INVESTMENTS?

02:29PM  2    A.   HE'S A VERY GOOD INVESTOR.  AN EXPERT, THAT'S SUBJECTIVE,

02:29PM  3    I GUESS.

02:29PM  4    Q.   YOU WOULD SAY HE'S A VERY GOOD --

02:29PM  5    A.   HE'S A VERY SUCCESSFUL INVESTOR, YES.

02:29PM  6    Q.   AND SO YOU WOULD DESCRIBE HIM AS A SAVVY PERSON?

02:29PM  7    A.   A SUCCESSFUL INVESTOR, YES.

02:29PM  8    Q.   AND SAVVY?

02:29PM  9    A.   I THINK HE MAKES VERY GOOD INVESTMENT DECISIONS, YES.

02:29PM 10    Q.   OKAY.  AND HOW MANY PEOPLE WORK IN YOUR OFFICE AT RDV?

02:30PM 11    A.   TODAY ABOUT -- AT RDV CORP., THERE'S ABOUT 140 PEOPLE.

02:30PM 12         IN THE INVESTMENT GROUP, IT'S ABOUT 35.

02:30PM 13    Q.   OKAY.  HOW ABOUT AT THE TIME OF THE THERANOS INVESTMENT,

02:30PM 14    HOW MANY PEOPLE WORKED THERE, AS BEST YOU CAN TELL US?

02:30PM 15    A.   PROBABLY 110 WITHIN RDV CORP., AND IN THE INVESTMENT GROUP

02:30PM 16    PROBABLY 20 TO 25.

02:30PM 17    Q.   OKAY.  AND ALL OF THOSE PEOPLE WHO WORK FOR RDV, THEIR JOB

02:30PM 18    IS IN SOME WAY TO HELP MANAGE THE INVESTMENTS OF THE RDV?

02:30PM 19    A.   THE 20 TO 25 PEOPLE IN THE INVESTMENT GROUP IS THE

02:30PM 20    INVESTMENT PIECE, AND WE UTILIZE BOTH THE TAX DEPARTMENT AND

02:30PM 21    THE ACCOUNTING DEPARTMENT, WHICH ALSO HAVE OTHER ROLES, TOO, IN

02:30PM 22    FAMILY SERVICES.

02:30PM 23         THERE'S A VERY LARGE ACCOUNTING GROUP AND A VERY LARGE TAX

02:30PM 24    GROUP THAT MANAGES THE FAMILY'S WEALTH OUT OF THAT GROUP, AS

02:30PM 25    WELL AS A FOUNDATION AND I.T. SUPPORT AND OTHER THINGS WITHIN

PETERSON CROSS BY MR. COOPERSMITH                        3927

02:31PM  1    RDV CORPORATION.

02:31PM  2    Q.   THANK YOU, MS. PETERSON.

02:31PM  3         AND THERANOS WAS JUST ONE OF MANY INVESTMENTS, I'M

02:31PM  4    ASSUMING.

02:31PM  5    A.   YES.

02:31PM  6    Q.   OKAY.  NOW, IN TERMS OF WHO YOU REPORTED TO, YOU REPORTED

02:31PM  7    TO SOMEONE NAMED RANDY DAMSTRA; RIGHT?

02:31PM  8    A.   YES.

02:31PM  9    Q.   AT THE TIME?

02:31PM  10   A.   YES.

02:31PM  11   Q.   AND STILL?

02:31PM  12   A.   YES.

02:31PM  13   Q.   AND WHO IS RANDY DAMSTRA?

02:31PM  14   A.   HE AT THE TIME WAS BASICALLY HEAD OF THE INVESTMENT GROUP

02:31PM  15   WHO REPORTED UP TO JERRY TUBERGEN, AND THERE WAS A

02:31PM  16   ROBERT SCHIERBEEK, S-C-H-I-E-R-B-E-E-K, AND HE RAN THE FAMILY

02:31PM  17   SERVICES SIDE OF THE BUSINESS, AND THEY BOTH REPORTED UP AND TO

02:31PM  18   JERRY.

02:31PM  19   Q.   OKAY.  AND THEN IN TURN, JERRY REPORTED DIRECTLY TO THE

02:31PM  20   FAMILY; IS THAT RIGHT?

02:31PM  21   A.   YES, AND TO THE INVESTMENT COMMITTEE, AND THE BOARD.

02:32PM  22   Q.   AND WAS THE BOARD MADE UP OF FAMILY MEMBERS AS WELL?

02:32PM  23   A.   YES.

02:32PM  24   Q.   OKAY.  I HAVE A COUPLE OF BINDERS THAT I'M GOING TO PASS

02:32PM  25   UP TO YOU IF THAT'S OKAY.

02:32PM  1          LET ME GET THEM.

02:33PM  2          MAY I APPROACH THE WITNESS, YOUR HONOR?

02:33PM  3               THE COURT:  YES.

02:33PM  4               MR. COOPERSMITH:  (HANDING.)

02:33PM  5          THANK YOU.

02:33PM  6     Q.   OKAY.  DO YOU REMEMBER A MINUTE AGO I ASKED YOU WHETHER

02:33PM  7     JERRY TUBERGEN WAS AN EXPERT ON INVESTMENTS IN YOUR VIEW?

02:33PM  8     A.   YES.

02:33PM  9     Q.   AND YOU SAID THAT YOU THOUGHT HE WAS A VERY GOOD INVESTOR,

02:33PM  10    BUT YOU DIDN'T QUITE SAY HE WAS AN EXPERT IN INVESTMENTS; IS

02:33PM  11    THAT RIGHT?

02:33PM  12    A.   I DON'T -- DEFINE "EXPERT" I GUESS.

02:33PM  13    Q.   OKAY.

02:33PM  14    A.   NEVER LOSES MONEY?  I MEAN, IS THAT AN EXPERT?

02:34PM  15    Q.   SO I'D LIKE YOU TO JUST TAKE A LOOK AT, I THINK IT'S IN

02:34PM  16    THE SECOND OF YOUR BINDERS, AND IT'S VOLUME 2, AND THERE'S AN

02:34PM  17    EXHIBIT THAT IS LABELLED 28412.

02:34PM  18    A.   YES.

02:34PM  19    Q.   AND IF YOU COULD TURN TO PAGE 4724 OF THAT EXHIBIT?

02:34PM  20    A.   WHAT PAGE?  I'M SORRY.

02:34PM  21    Q.   PAGE 4724.

02:34PM  22    A.   28412?

02:34PM  23    Q.   YES.  THANK YOU?

02:34PM  24    A.   PAGE 4 -- I'M SORRY, I'M NOT -- I'M SEEING PAGES 100.

02:34PM  25    Q.   IN THE EXHIBIT 4 -- I'M SORRY.  IN EXHIBIT 28412, THERE

02:34PM   1      SHOULD BE A PAGE 4724.

02:35PM   2                  THE COURT:  IN THE UPPER RIGHT-HAND CORNER.

02:35PM   3                  MR. COOPERSMITH:  YES.  SORRY ABOUT THAT.

02:35PM   4          YES, IN THE UPPER RIGHT-HAND CORNER.

02:35PM   5          THANK YOU, YOUR HONOR.

02:35PM   6          OH, 4724.  OKAY.

02:35PM   7      BY MR. COOPERSMITH:

02:35PM   8      Q.   AND DO YOU SEE ON THAT PAGE THERE ARE LINE NUMBERS?

02:35PM   9      A.   YES.

02:35PM  10      Q.   AND THEN IF YOU COULD LOOK AT LINES 20 THROUGH 22.

02:35PM  11          DO YOU SEE THAT?

02:35PM  12      A.   YES.

02:35PM  13      Q.   OKAY.  AND THIS IS PRIOR TESTIMONY THAT YOU GAVE?

02:35PM  14      A.   OKAY.  YES.

02:35PM  15      Q.   ALL RIGHT.  AND IN THAT PRIOR TESTIMONY YOU WERE ASKED A

02:35PM  16      QUESTION, DID YOU CONSIDER HIM TO BE AN EXPERT ON

02:35PM  17      INVESTMENTS --

02:35PM  18                  MR. LEACH:  YOUR HONOR, OBJECTION.  HEARSAY.

02:35PM  19                  THE COURT:  WHY DON'T YOU LAY A FOUNDATION AND ASK

02:35PM  20      THAT QUESTION AGAIN IN ANOTHER WAY.

02:35PM  21          THIS IS 613?

02:35PM  22                  MR. LEACH:  YES, YOUR HONOR.

02:35PM  23                  THE COURT:  ALL RIGHT.  SO WHY DON'T YOU LET HER

02:35PM  24      READ IT AND THEN ASK A QUESTION ABOUT HER TESTIMONY.

02:35PM  25                  MR. COOPERSMITH:  OKAY.

PETERSON CROSS BY MR. COOPERSMITH                    3930

02:35PM   1      Q.   MS. PETERSON, LET ME JUST ASK YOU A FEW OTHER THINGS.

02:36PM   2           SO YOU'VE TESTIFIED BEFORE IN CONNECTION WITH THERANOS;

02:36PM   3      RIGHT.

02:36PM   4      A.   YES.

02:36PM   5      Q.   AND ON MORE THAN ONE OCCASION?

02:36PM   6      A.   AT TRIAL OR DEPOSITION?  I'M --

02:36PM   7      Q.   WHATEVER THE PROCEEDING, YOU'VE TESTIFIED UNDER OATH ON

02:36PM   8      MORE THAN ONE OCCASION?

02:36PM   9      A.   YES.

02:36PM  10      Q.   OKAY.  AND WHEN YOU TESTIFIED BEFORE, EACH TIME YOU DID

02:36PM  11      THAT, YOU RAISED YOUR RIGHT HAND, YOU TOOK AN OATH TO TELL THE

02:36PM  12      TRUTH?

02:36PM  13      A.   YES.

02:36PM  14      Q.   AND YOU UNDERSTOOD THAT THAT'S WHAT YOU HAD TO DO; RIGHT?

02:36PM  15      A.   YES.

02:36PM  16      Q.   AND IN CONNECTION WITH THAT, YOU WERE ASKED QUESTIONS AND

02:36PM  17      YOU GAVE ANSWERS; RIGHT?

02:36PM  18      A.   YES.

02:36PM  19      Q.   AND YOU UNDERSTAND TRANSCRIPTS WERE CREATED?

02:36PM  20      A.   YES.

02:36PM  21      Q.   AND GOING BACK TO THE QUESTION OF THIS PARTICULAR POINT,

02:36PM  22      WHETHER MR. TUBERGEN WAS AN EXPERT, YOU SEE IN YOUR TESTIMONY

02:36PM  23      EARLIER YOU HAD AGREED THAT MR. TUBERGEN WAS AN EXPERT IN

02:36PM  24      INVESTMENTS; CORRECT?

02:36PM  25      A.   YES, EXPERT, EXCELLENT INVESTOR.

02:37PM  1          IT'S HARD TO DEFINE "EXPERT."

02:37PM  2     Q.   OKAY.  I'M JUST --

02:37PM  3     A.   I UNDERSTAND, YES.

02:37PM  4     Q.   IN YOUR PREVIOUS TESTIMONY, YOU AGREED THAT HE WAS AN

02:37PM  5     EXPERT ON INVESTMENTS; RIGHT?

02:37PM  6     A.   YES.

02:37PM  7     Q.   AND YOU AREN'T QUITE GETTING THERE WITH ME TODAY; RIGHT?

02:37PM  8     A.   YES.

02:37PM  9     Q.   OKAY.  LET'S GO TO AN EXHIBIT THAT THE GOVERNMENT SHOWED

02:37PM 10     YOU ON DIRECT, MS. PETERSON, AND THAT'S EXHIBIT 1944.

02:37PM 11          AND, YOU KNOW, YOU CAN FIND IT IN THE BINDER, OR I THINK

02:37PM 12     WE CAN SHOW IT ON THE SCREEN, TOO, WHATEVER YOUR PREFERENCE IS.

02:37PM 13     SOME PEOPLE LIKE PAPER AND SOME PEOPLE LIKE SCREENS.

02:37PM 14     A.   OKAY.

02:37PM 15     Q.   DO YOU SEE THIS IS AN EMAIL ON THE FIRST PAGE FROM

02:37PM 16     MR. TUBERGEN?

02:37PM 17     A.   YES.

02:37PM 18     Q.   AND HE IS ATTACHING THE ARTICLE FROM "FORTUNE" MAGAZINE?

02:38PM 19     A.   YES.

02:38PM 20     Q.   AND HE SAYS, "THIS MORNING I HAD ONE OF THE MOST

02:38PM 21     INTERESTING MEETINGS I CAN RECALL WITH THE WOMAN PROFILED IN

02:38PM 22     THE ATTACHED "FORTUNE" MAGAZINE ARTICLE.

02:38PM 23          DO YOU SEE THAT?

02:38PM 24     A.   YES.

02:38PM 25     Q.   AND I THINK YOU SAID HE WAS REFERRING TO MS. HOLMES?

02:38PM  1    A.   YES.

02:38PM  2    Q.   AND YOU UNDERSTAND THAT MR. TUBERGEN MET MS. HOLMES AT A

02:38PM  3    CONFERENCE?

02:38PM  4    A.   YES.

02:38PM  5    Q.   AND THAT WAS A CONFERENCE SPONSORED BY A GROUP CALLED BDT?

02:38PM  6    A.   YES.

02:38PM  7    Q.   AND BDT STANDS FOR BYRON D. TROTT?

02:38PM  8    A.   YES.

02:38PM  9    Q.   AND MR. TROTT IS AN INVESTMENT BANKER?

02:38PM 10    A.   HE'S AN INVESTOR BANKER AND PRIVATE EQUITY FIRM NOW.  HE'S

02:38PM 11    RAISED MONEY THAT HE INVESTS.

02:38PM 12    Q.   AND RDV HAS WORKED WITH MR. TROTT IN THE PAST?

02:38PM 13    A.   YES.

02:38PM 14    Q.   AND MR. TROTT IS SOMEONE THAT YOU WOULD DESCRIBE AS A WISE

02:38PM 15    INVESTOR?

02:38PM 16    A.   YES.

02:38PM 17    Q.   AND MR. TROTT HAS A SPECIALTY OF HELPING WEALTHY FAMILIES

02:38PM 18    INVEST FUNDS; IS THAT RIGHT?

02:38PM 19    A.   YES.

02:38PM 20    Q.   AND HE SPONSORS A CONFERENCE IN CHICAGO EVERY YEAR?

02:39PM 21    A.   AS PART OF HIS -- THE FUND THAT HE INVESTS MONEY FOR, YES,

02:39PM 22    THEY HOLD AN ANNUAL MEETING OF THEIR INVESTORS.

02:39PM 23    Q.   I'M SORRY TO INTERRUPT YOU.

02:39PM 24         HAVE YOU EVER BEEN TO THAT CONFERENCE?

02:39PM 25    A.   ONLY -- YES, I WAS THERE AFTER THIS INVESTMENT IN 2016,

02:39PM  1    2017.

02:39PM  2    Q.   OKAY.  BUT AT THE 2014 TIME PERIOD, YOU DIDN'T ATTEND

02:39PM  3    MR. TROTT'S CONFERENCE THAT YEAR?

02:39PM  4    A.   NO.  I WASN'T THE LEAD PERSON ON THIS INVESTMENT IN THIS

02:39PM  5    GROUP AT THE TIME.

02:39PM  6    Q.   BUT JERRY TUBERGEN DID ATTEND THE CONFERENCE?

02:39PM  7    A.   YES.

02:39PM  8    Q.   AND HE -- YOU UNDERSTAND HE CAME BACK FROM THAT CONFERENCE

02:39PM  9    WITH SOME INFORMATION ABOUT MS. HOLMES?

02:39PM  10   A.   YES.

02:39PM  11   Q.   BECAUSE HE ACTUALLY MET HER AT THE CONFERENCE; RIGHT?

02:39PM  12   A.   YES.

02:39PM  13   Q.   AND ONE OF THE THINGS THAT HE DID WAS PULL UP AN ARTICLE

02:39PM  14   FROM "FORTUNE"?

02:39PM  15   A.   YES.  I ACTUALLY RODE HOME ON A PRIVATE AIRPLANE WITH HIM

02:40PM  16   AFTER HE HAD HIS MEETING, AND HE GAVE ME THAT ARTICLE.

02:40PM  17   Q.   YOU WEREN'T AT THE BDT CONFERENCE, BUT YOU WERE ON THE

02:40PM  18   PRIVATE JET WITH MR. TUBERGEN?

02:40PM  19   A.   YES, ON THE WAY HOME.  I HAD OTHER MEETINGS IN CHICAGO.

02:40PM  20   Q.   I SEE.  SO YOU WERE FLYING BACK TO GRAND RAPIDS WITH

02:40PM  21   MR. TUBERGEN?

02:40PM  22   A.   CORRECT.

02:40PM  23   Q.   AND HE PULLED UP AN ARTICLE AND SHOWED IT TO YOU?

02:40PM  24   A.   YES.  HE SAID BASICALLY EXACTLY WHAT HE SAID HERE, IT WAS

02:40PM  25   ONE OF THE MOST INTERESTING MEETINGS THAT HE HAD EVER HAD.  AND

02:40PM 1    RANDY WAS WITH ME, MY BOSS, SO IT WAS THE TWO OF US, AND HIM,

02:40PM 2    TELLING US ABOUT THE MEETING HE HAD HAD AND HE HANDED ME THAT

02:40PM 3    ARTICLE.

02:40PM 4    Q.   NOW, MR. TUBERGEN AT THE CONFERENCE, HE DIDN'T MEET WITH

02:40PM 5    MR. BALWANI; CORRECT?

02:40PM 6    A.   I DON'T KNOW.

02:40PM 7    Q.   YOU DON'T KNOW ONE WAY OR THE OTHER?

02:40PM 8    A.   I DON'T KNOW.

02:40PM 9    Q.   OKAY.  BUT ON THE PLANE RIDE BACK, HE TOLD YOU ABOUT

02:40PM 10   MS. HOLMES?

02:40PM 11   A.   YES.

02:40PM 12   Q.   AND HE SHOWED YOU AN ARTICLE?

02:40PM 13   A.   YES, AND THAT HER BROTHER, CHRISTIAN, WAS THERE.  I DO

02:41PM 14   RECALL THAT.

02:41PM 15   Q.   CHRISTIAN HOLMES WAS AT THE CONFERENCE AS WELL?

02:41PM 16   A.   WAS AT THIS MEETING.

02:41PM 17   Q.   OKAY.  AND THEN WHEN MR. TUBERGEN SHOWED YOU THE

02:41PM 18   "FORTUNE" ARTICLE ON THE AIRPLANE, DID YOU READ IT RIGHT THEN?

02:41PM 19   A.   NO.

02:41PM 20   Q.   YOU READ IT LATER?

02:41PM 21   A.   YES.

02:41PM 22   Q.   OKAY.  BUT YOU UNDERSTAND THAT MR. TUBERGEN HAD PULLED

02:41PM 23   THAT ARTICLE UP OR IT HAD BEEN HANDED TO HIM OR SOMETHING OF

02:41PM 24   THAT NATURE?

02:41PM 25   A.   HE HAD BEEN GIVEN THAT TO HIM AT THE MEETING.

PETERSON CROSS BY MR. COOPERSMITH                    3935

02:41PM  1    Q.   OKAY.  SOMEONE GAVE IT TO HIM AT THE MEETING?

02:41PM  2    A.   YES.

02:41PM  3    Q.   OKAY.  BUT YOU DON'T KNOW EXACTLY WHO?

02:41PM  4    A.   NO.

02:41PM  5    Q.   OKAY.  NOW, AT SOME POINT, THOUGH, YOU DID READ THE

02:41PM  6    ARTICLE; CORRECT?

02:41PM  7    A.   YES.

02:41PM  8    Q.   AND THAT WAS ONE OF THE THINGS THAT YOU USED TO INFORM THE

02:41PM  9    MEMOS THAT YOU WROTE?

02:41PM 10    A.   ONE OF THE THINGS, YES.

02:41PM 11    Q.   OKAY.  AND LET'S LOOK AT THE ARTICLE A LITTLE BIT MORE

02:41PM 12    THAT YOU SAW ON DIRECT.

02:41PM 13         SO IF YOU GO TO THE FIRST PAGE, THAT'S THE EMAIL, BUT IF

02:41PM 14    YOU GO TO PAGE 3 OF THE EXHIBIT, I THINK IT'S LABELLED

02:42PM 15    PAGE 3 -- NOW I'M REFERRING TO THE BOTTOM MIDDLE NUMBERS,

02:42PM 16    MS. PETERSON.

02:42PM 17         YOU CAN SEE IT ON THE SCREEN IF THAT'S OKAY WITH YOU.

02:42PM 18    A.   CORRECT.

02:42PM 19    Q.   OKAY.  SO YOU SEE THE BOTTOM MIDDLE, THERE'S A PAGE 3?

02:42PM 20    A.   YES.

02:42PM 21    Q.   RIGHT.  AND THEN IT'S "NEW BLOOD" IT SAYS WITH KIND OF A

02:42PM 22    BLOOD DROP ON THE PAGE?

02:42PM 23    A.   YES.

02:42PM 24    Q.   OKAY.  AND THEN THE NEXT PAGE IS A PICTURE OF MS. HOLMES;

02:42PM 25    RIGHT?

02:42PM   1      A.   YES.

02:42PM   2      Q.   NOW, IF WE GO TO PAGE 5 OF THE ARTICLE, DO YOU SEE IN THE

02:42PM   3      VERY FIRST PARAGRAPH IN THE UPPER LEFT IT TALKS ABOUT

02:42PM   4      MS. HOLMES SPENDING A SUMMER WORKING IN A LAB.

02:42PM   5           DO YOU SEE THAT?

02:42PM   6      A.   YES.

02:42PM   7      Q.   AND THEN IT REFERS TO A PERSON NAMED ROBERTSON.

02:42PM   8           DO YOU SEE THAT?

02:42PM   9      A.   YES.

02:42PM  10      Q.   AND DO YOU UNDERSTAND THAT'S CHANNING ROBERTSON?

02:43PM  11      A.   YES, SOMEONE THAT SHE -- SOME PROFESSOR THAT SHE HAD AT

02:43PM  12      STANFORD, IF I RECALL CORRECTLY.

02:43PM  13      Q.   RIGHT.  AND MR. -- THE PARAGRAPH TALKS ABOUT

02:43PM  14      PROFESSOR ROBERTSON; CORRECT?

02:43PM  15      A.   YES.

02:43PM  16      Q.   AND IT SAYS IN THE SECOND PARAGRAPH, "I REMEMBER HER

02:43PM  17      SAYING, AND WE COULD PUT A CELL PHONE CHIP ON IT, AND IT COULD

02:43PM  18      TELEMETER OUT TO THE DOCTOR OR THE PATIENT WHAT WAS GOING ON,

02:43PM  19      ROBERTSON RECOUNTS.  AND I KIND OF KICKED MYSELF.  I'D

02:43PM  20      CONSULTED IN THIS AREA FOR 30 YEARS BUT I'D NEVER SAID HERE WE

02:43PM  21      MAKE ALL OF THESE GIZMOS THAT MEASURE, AND ALL OF THESE SYSTEMS

02:43PM  22      THAT DELIVER, BUT I NEVER BROUGHT THE TWO TOGETHER."

02:43PM  23           DO YOU SEE THAT?

02:43PM  24      A.   YES.

02:43PM  25      Q.   YOU UNDERSTAND THAT HE'S TALKING ABOUT SOMETHING THAT

02:43PM  1    MS. HOLMES CAME TO HIM WITH, SOME INVENTION?

02:43PM  2              MR. LEACH:  YOUR HONOR --

02:43PM  3              THE COURT:  EXCUSE ME, MR. COOPERSMITH.

02:43PM  4              MR. LEACH:  OBJECTION.  I THINK THIS GOES BEYOND THE

02:43PM  5    PURPOSE OF WHICH THIS EXHIBIT WAS ADMITTED.

02:43PM  6              THE COURT:  YOU'RE CALLING HER ATTENTION TO THIS AND

02:43PM  7    WHETHER SHE RED IT AND WHETHER THIS INFORMED HER DECISION?

02:44PM  8              MR. COOPERSMITH:  YES, YOUR HONOR.

02:44PM  9              THE COURT:  OKAY.  WELL, YOU CAN ASK ABOUT THOSE

02:44PM 10    THINGS.

02:44PM 11        BUT ANYTHING ABOUT THE INVENTION BEHIND THE SCENES MIGHT

02:44PM 12    NOT BE RELEVANT TO THAT IF IT'S OUTSIDE OF HER PERSONAL

02:44PM 13    KNOWLEDGE.

02:44PM 14              MR. COOPERSMITH:  OKAY.  I'LL TRY TO STAY WITHIN --

02:44PM 15    OR COLOR WITHIN THE LINES, AS THEY SAY.

02:44PM 16              THE COURT:  SURE.

02:44PM 17    BY MR. COOPERSMITH:

02:44PM 18    Q.   OKAY.  IF YOU GO ON TO THE PARAGRAPH THAT STARTS, "THAT

02:44PM 19    CLINCHED IT FOR HIM."

02:44PM 20        DO YOU SEE THAT?

02:44PM 21    A.   UH-HUH.

02:44PM 22    Q.   AND IT SAYS, "THAT CLINCHED IT FOR HIM, WHEN I FINALLY

02:44PM 23    CONNECTED WITH WHAT ELIZABETH FUNDAMENTALLY IS, HE SAYS, I

02:44PM 24    REALIZED THAT I COULD HAVE JUST AS WELL BEEN LOOKING INTO THE

02:44PM 25    EYES OF A STEVE JOBS OR A BILL GATES."

PETERSON CROSS BY MR. COOPERSMITH                           3938

02:44PM  1        DO YOU SEE THAT?

02:44PM  2   A.   YES.

02:44PM  3   Q.   AND THAT'S A QUOTE WHAT PROFESSOR CHANNING ROBERTSON, THIS

02:44PM  4   PROFESSOR, IS SAYING ABOUT MS. HOLMES?

02:44PM  5   A.   YES.

02:44PM  6   Q.   AND YOU YOURSELF, EVEN BEFORE YOU WERE INVOLVED WITH THIS

02:44PM  7   INVESTMENT, THOUGHT MS. HOLMES WAS VERY IMPRESSIVE; RIGHT?

02:44PM  8   A.   YES.

02:44PM  9   Q.   AND THAT'S ONE OF THE REASONS YOU WANTED TO BE INVOLVED

02:45PM  10  WITH THE INVESTMENT; RIGHT?

02:45PM  11  A.   YES, THAT I WANTED TO WORK ON IT, YES.

02:45PM  12  Q.   IN FACT, YOU VOLUNTEERED TO DO THAT BECAUSE YOU THOUGHT IT

02:45PM  13  WAS INTERESTING?

02:45PM  14  A.   YES.

02:45PM  15  Q.   AND THEN IT GOES ON IN THE VERY NEXT LINE TO SAY, "WITH

02:45PM  16  ROBERTSON'S BLESSING, HOLMES STARTED HER COMPANY."

02:45PM  17       DO YOU SEE THAT?

02:45PM  18  A.   YES.

02:45PM  19  Q.   OKAY.  IF YOU GO TO PAGE 6 OF THE ARTICLE.

02:45PM  20       AND IF YOU GO TO THE PARAGRAPH THAT STARTS "PRECISELY HOW

02:45PM  21  THERANOS."

02:45PM  22       DO YOU SEE THAT?

02:45PM  23  A.   YES.

02:45PM  24  Q.   AND I WANT TO GO TO THE NEXT PARAGRAPH, AND IT READS, "THE

02:45PM  25  SCALE OF THERANOS'S OPERATIONS AT THE MOMENT IS MODEST."

PETERSON CROSS BY MR. COOPERSMITH                    3939

02:45PM  1          DO YOU SEE THAT?

02:45PM  2     A.   YES.

02:45PM  3     Q.   AND YOU UNDERSTOOD THAT WAS THE CASE AT THE TIME IN

02:45PM  4     OCTOBER OF 2014; RIGHT?

02:45PM  5     A.   NO.

02:45PM  6     Q.   WELL, SO YOU DIDN'T BELIEVE THIS PART OF THE ARTICLE?

02:45PM  7     A.   THE PARTS OF THE ARTICLE THAT WERE RELEVANT TO US AND THE

02:45PM  8     PARTS THAT I RECALL AND REMEMBER ARE THE PARTS THAT ARE IN MY

02:46PM  9     MEMOS.

02:46PM 10     Q.   OKAY.  BUT NONETHELESS, THIS INFORMATION IS IN THE

02:46PM 11     ARTICLE; RIGHT?

02:46PM 12     A.   CORRECT.

02:46PM 13     Q.   AND THAT WAS AVAILABLE FOR YOU TO CONSIDER; CORRECT?

02:46PM 14     A.   CORRECT.

02:46PM 15     Q.   THEN IT GOES ON, "ITS PHLEBOTOMISTS CURRENTLY TAKE

02:46PM 16     PHYSICIAN-ORDERED BLOOD DRAWS (AND SALIVA, URINE, FECES, AND

02:46PM 17     OTHER SAMPLES) AT COLLECTION CENTERS THE COMPANY OPERATES AT

02:46PM 18     ITS HEADQUARTERS IN PALO ALTO AND AT 21 WALGREENS -- ONE IN

02:46PM 19     PALO ALTO AND THE REST IN PHOENIX."

02:46PM 20          DO YOU SEE THAT?

02:46PM 21     A.   YES.

02:46PM 22     Q.   AND SO THIS ARTICLE IS TELLING ANYONE WHO READ IT THAT

02:46PM 23     THERE ARE COLLECTION CENTERS WHERE THE BLOOD IS COLLECTED AT

02:46PM 24     WALGREENS?

02:46PM 25     A.   THAT WAS NEVER, EVER MENTIONED IN OUR CONVERSATIONS WITH

02:46PM  1    ELIZABETH OR SUNNY BALWANI AT THE PALO ALTO MEETING.

02:46PM  2         WE WERE UNDER THE COMPLETE UNDERSTANDING THAT THEIR

02:46PM  3    ANALYZER MACHINE IS THE ONLY THING THAT THEY USED, AND

02:46PM  4    FINGERSTICK WAS THE ONLY WAY THAT THEY WERE DOING BLOOD TESTS.

02:46PM  5    Q.   OKAY.  BUT MR. PARLOFF, IN HIS ARTICLE, WRITES THESE WORDS

02:47PM  6    THAT I JUST READ; CORRECT?

02:47PM  7    A.   YES, AND THEY WERE ALSO IN 40 WALGREENS STORES AND THIS

02:47PM  8    SAYS 21, SO --

02:47PM  9    Q.   OKAY.  WE'LL TALK ABOUT THAT IN A FEW MINUTES, OR PERHAPS

02:47PM  10   TOMORROW.

02:47PM  11        BUT RIGHT NOW MY ONLY QUESTION IS, THIS WAS AN ARTICLE

02:47PM  12   THAT YOU TESTIFIED THAT YOU CONSIDERED IN CONNECTION WITH

02:47PM  13   HELPING RDV DECIDE ON THIS INVESTMENT; CORRECT?

02:47PM  14   A.   YES, PARTS OF IT.

02:47PM  15   Q.   AND THESE WORDS OF MR. PARLOFF WERE RIGHT THERE IN THE

02:47PM  16   ARTICLE FOR YOU TO CONSIDER IF YOU HAD WANTED TO; CORRECT?

02:47PM  17   A.   YES.

02:47PM  18   Q.   ABOUT THE COLLECTION CENTERS?

02:47PM  19   A.   YES.

02:47PM  20   Q.   NOW, LET'S GO ON TO THE NEXT COLUMN.

02:47PM  21        DO YOU SEE IN THE SECOND PARAGRAPH UP FROM THE BOTTOM THAT

02:47PM  22   IS UP ON THE SCREEN RIGHT NOW, IT SAYS, "I JUST THINK THIS IS

02:48PM  23   SO EXCITING, SAYS MARK LARET, THE CEO OF UCSF MEDICAL CENTER,

02:48PM  24   ABOUT WHAT HE'S SEEN SO FAR."

02:48PM  25        DO YOU SEE THAT?

02:48PM   1    A.   YES.

02:48PM   2    Q.   "I MEAN, HERE IT IS.  THIS IS THE TRUE TRANSFORMATION OF

02:48PM   3    HEALTH CARE, RIGHT HERE IN FRONT OF US."

02:48PM   4         DO YOU SEE THAT?

02:48PM   5    A.   YES.

02:48PM   6    Q.   AND DO YOU UNDERSTAND THAT UCSF IS THE UNIVERSITY OF

02:48PM   7    CALIFORNIA SAN FRANCISCO MEDICAL CENTER?

02:48PM   8    A.   YES.

02:48PM   9    Q.   AND THEN IT GOES ON, "THE FIRST TIME I HEARD ABOUT THIS I

02:48PM   10   THOUGHT IT WAS SNAKE OIL AND MIRRORS, SAYS DAVID HELFET, THE

02:48PM   11   CHIEF OF ORTHOPEDIC TRAUMA AT THE HOSPITAL FOR SPECIAL SURGERY

02:48PM   12   IN MANHATTAN."

02:48PM   13        DO YOU SEE THAT?

02:48PM   14   A.   YES.

02:48PM   15   Q.   AND DID YOU EVER TALK TO DR. HELFET?

02:48PM   16   A.   NO.

02:48PM   17   Q.   AND THEN IT SAYS, "BUT AFTER REVIEWING VOLUMINOUS

02:48PM   18   VALIDATION STUDIES SUPPLIED TO HIM BY THE COMPANY, HE HAS

02:48PM   19   BECOME A BELIEVER AND IS URGING HIS HOSPITAL TO CONSIDER

02:48PM   20   ADOPTION."

02:48PM   21        DO YOU SEE THAT?

02:48PM   22   A.   YES.

02:48PM   23   Q.   AND THEN IT GOES ON TO SAY, "IT'S REAL DATA, HE SAYS.

02:49PM   24   IT'S NOT THEIR INTERPRETATION.  (THERANOS HAS INVITED HELFET TO

02:49PM   25   JOIN ITS MEDICAL ADVISORY BOARD, HE SAYS, BUT HE HAS NOT

02:49PM   1    DECIDED WHETHER TO DO SO.)"

02:49PM   2         DO YOU SEE THAT?

02:49PM   3    A.   YES.

02:49PM   4    Q.   AND THEN IT GOES ON TO SAY, "HELFET SEES AN OPPORTUNITY TO

02:49PM   5    ENLIST THERANOS LAB SERVICES IN THE IDENTIFICATION OF SO-CALLED

02:49PM   6    HOSPITAL-ACQUIRED INFECTIONS -- A MAJOR SCOURGE IN HEALTH CARE

02:49PM   7    TODAY."

02:49PM   8         DO YOU SEE THAT?

02:49PM   9    A.   YES.

02:49PM  10    Q.   OKAY.  AND DID YOU DO ANY FOLLOW-UP WITH THE HOSPITAL FOR

02:49PM  11    SPECIAL SURGERY IN MANHATTAN OR DR. HELFET?

02:49PM  12    A.   NO.

02:49PM  13    Q.   OKAY.  IF WE CAN GO TO PAGE 8 OF THE ARTICLE, AND GO TO

02:50PM  14    THE SECOND COLUMN -- ACTUALLY LET'S GO TO THE FIRST COLUMN,

02:50PM  15    FIRST.

02:50PM  16         IF YOU GO TWO PARAGRAPHS FROM THE BOTTOM OF THE FIRST

02:50PM  17    COLUMN THERE, DO YOU SEE WHERE IT SAYS, "MOREOVER, HOLMES

02:50PM  18    STRESSES, THERANOS IS CURRENTLY SEEKING FDA CLEARANCE FOR EVERY

02:50PM  19    ONE OF ITS TESTS, EVEN THOUGH IT'S UNDER NO LEGAL OBLIGATION TO

02:50PM  20    DO SO."

02:50PM  21         DO YOU SEE THAT?

02:50PM  22    A.   YES.

02:50PM  23    Q.   AND THEN IT SAYS, "(SHE HAS SUBMITTED MANY HUNDREDS OF

02:50PM  24    PAGES OF VALIDATION DATA IN THIS EFFORT, AND HAS SHOWN MUCH OF

02:50PM  25    THAT DATA TO 'FORTUNE.')"

02:50PM 1      DO YOU SEE THAT?

02:50PM 2    A.   YES.

02:50PM 3    Q.   AND THEN IT SAYS -- I'LL READ IT AGAIN.

02:50PM 4      DO YOU SEE WHERE IT SAYS, "THERANOS MAY, IN FACT, BE THE

02:50PM 5    ONLY LAB TO HAVE EVER SOUGHT FDA CLEARANCE FOR LDT'S"?

02:50PM 6      DO YOU SEE THAT?

02:50PM 7    A.   YES.

02:50PM 8    Q.   AND DO YOU UNDERSTAND THAT LDT'S ARE LAB DEVELOPED TESTS?

02:50PM 9    A.   YES.

02:50PM 10   Q.   AND YOU ARE AWARE THAT THERANOS DID SUBMIT AN APPLICATION

02:51PM 11   FOR FDA APPROVAL FOR ONE OF ITS ASSAYS RUNNING ON THE THERANOS

02:51PM 12   SYSTEM?

02:51PM 13   A.   YES.

02:51PM 14   Q.   AND YOU UNDERSTAND THE FDA APPROVED THAT PARTICULAR ASSAY?

02:51PM 15   A.   THE ONE, YES.

02:51PM 16   Q.   RIGHT, RUNNING ON THE THERANOS SYSTEM?

02:51PM 17   A.   YES.

02:51PM 18   Q.   AND THEN --

02:51PM 19   A.   THAT WAS AFTER OUR INVESTMENT, THOUGH.

02:51PM 20   Q.   RIGHT.  THE APPROVAL WAS AFTER THE INVESTMENT?

02:51PM 21   A.   YES.

02:51PM 22   Q.   AND THEN IF YOU GO TO THE PARAGRAPH RIGHT BELOW THAT, IT

02:51PM 23   SAYS, "BEYOND THE VALIDATION DISPUTES, SKEPTICS ALSO QUESTION

02:51PM 24   THERANOS'S BUSINESS MODEL."

02:51PM 25     DO YOU SEE THAT?

ER-2947

PETERSON CROSS BY MR. COOPERSMITH          3944

02:51PM   1    A.   YES.

02:51PM   2    Q.   AND THEN IT SAYS, "THEY DOUBT ITS ABILITY TO SCALE UP ANY

02:51PM   3    TIME SOON TO THE LEVELS NECESSARY TO BECOME A SERIOUS

02:51PM   4    COMPETITOR, ESPECIALLY SINCE THE BUSINESS HAS SO MANY

02:51PM   5    UNGLAMOROUS ASPECTS UNRELATED TO TESTING -- BILLING, CUSTOMER

02:51PM   6    SERVICE, SORTING, REGULATORY COMPLIANCE, AND THE LOGISTICS OF

02:51PM   7    TRANSPORTING SAMPLES FROM PHYSICIANS TO LABS."

02:52PM   8         DO YOU SEE THAT?

02:52PM   9    A.   YES.

02:52PM  10    Q.   AND THEN IT GOES ON IN THE NEXT PARAGRAPH, "QUEST" -- AND

02:52PM  11    YOU UNDERSTAND QUEST IS ONE OF THE COMPETITORS?

02:52PM  12              MR. LEACH:  YOUR HONOR --

02:52PM  13              THE COURT:  EXCUSE ME.

02:52PM  14              MR. LEACH:  YOUR HONOR, I OBJECT AND MOVE TO STRIKE

02:52PM  15    THIS.  HE'S READING FROM AN ARTICLE THAT IS NOT IN FOR ITS

02:52PM  16    TRUTH.

02:52PM  17              MR. COOPERSMITH:  YOUR HONOR, THEY PUT THIS ARTICLE

02:52PM  18    INTO EVIDENCE.

02:52PM  19              THE COURT:  OH, I REMEMBER WHO PUT IT IN, OF COURSE.

02:52PM  20         ARE WE GOING TO GO THROUGH THE WHOLE ARTICLE?

02:52PM  21              MR. COOPERSMITH:  NO, NO, YOUR HONOR.  I DON'T THINK

02:52PM  22    WE HAVE TIME FOR THAT.

02:52PM  23              THE COURT:  OKAY.  I AGREE.

02:52PM  24         WELL, LET'S CONTINUE.

02:52PM  25         YOU HAVE A QUESTION ABOUT QUEST?

ER-2948

02:52PM   1              MR. COOPERSMITH:  YES, YOUR HONOR.

02:52PM   2              THE COURT:  ALL RIGHT.  I'LL ALLOW YOU TO ASK THAT

02:52PM   3     QUESTION.

02:52PM   4              MR. COOPERSMITH:  THANK YOU.

02:52PM   5     Q.  MS. PETERSON, I THINK YOU SAID BEFORE THAT QUEST WAS ONE

02:52PM   6     OF THE MAJOR LABORATORY COMPANIES IN THE UNITED STATES THAT WAS

02:52PM   7     IDENTIFIED AS A MAJOR COMPETITOR TO THERANOS?

02:52PM   8     A.  YES.

02:52PM   9     Q.  A MUCH LARGER COMPANY AT THE TIME; CORRECT?

02:52PM  10     A.  YES.

02:52PM  11     Q.  AND ACCORDING TO THE ARTICLE, THEY EMPLOYED 45,000 PEOPLE,

02:52PM  12     AND OWNED A FLEET OF 3,000 VEHICLES AND 20 AIRPLANES AND SO ON

02:52PM  13     AND SO ON?

02:52PM  14         DO YOU SEE THAT?

02:52PM  15     A.  YES.

02:52PM  16     Q.  AND THERANOS DIDN'T HAVE THAT AT THE TIME.

02:53PM  17         YOU UNDERSTOOD THAT?

02:53PM  18     A.  CORRECT.

02:53PM  19     Q.  RIGHT.  AND THEN IT TALKED ABOUT HOW SKEPTICS WERE

02:53PM  20     DOUBTING THERANOS'S ABILITY TO SCALE; RIGHT?

02:53PM  21     A.  YES.

02:53PM  22     Q.  IS THAT RIGHT, MS. PETERSON?

02:53PM  23     A.  YES.

02:53PM  24     Q.  AND, IN FACT, YOU INCORPORATED THAT INFORMATION INTO YOUR

02:53PM  25     MEMOS THAT YOU LOOKED AT BEFORE WITH MR. LEACH?

02:53PM 1    A.   YES.  THIS IS ONE THING THAT I DID POINT OUT.

02:53PM 2    Q.   RIGHT.  ONE OF THE RISKS THAT YOU SAW IN THE INVESTMENT;

02:53PM 3    RIGHT?

02:53PM 4    A.   YES.

02:53PM 5    Q.   THAT THERANOS WOULD NOT --

02:53PM 6    A.   AGAIN, IT GOES BACK TO EXECUTION, THE EXECUTION RISK AND

02:53PM 7    RESOURCES AND THE ABILITY TO SCALE THE BUSINESS, NOT THAT IT

02:53PM 8    DIDN'T WORK.

02:53PM 9    Q.   RIGHT.  THANK YOU.

02:53PM 10       SO THE RISK THAT IS BEING DISCUSSED IN THE ARTICLE ABOUT

02:53PM 11   WHAT THE SKEPTICS THINK, THAT'S THE SAME POINT THAT YOU WERE

02:53PM 12   MAKING WHEN YOU WERE TALKING ABOUT EXECUTION RISK?

02:53PM 13   A.   SHE ALSO SAID THAT IN BOTH MEETINGS, SPECIFICALLY IN THE

02:53PM 14   PHONE CALL THAT WE HAD, THAT NOW THAT THEY HAD THE CONTRACTS,

02:54PM 15   THE RISK TO THEM WAS EXECUTION, THAT IT WAS ALL ABOUT THE

02:54PM 16   PEOPLE.

02:54PM 17   Q.   RIGHT.  AND THE EXECUTION RISK WOULD BE THAT THEY WOULDN'T

02:54PM 18   BE ABLE TO SCALE UP THEIR BUSINESS; RIGHT?

02:54PM 19   A.   NOT THAT THEY WOULDN'T BE ABLE TO, BUT THAT THAT IS THE

02:54PM 20   RISK, THAT THE EXECUTION PART OF THE BUSINESS IS WHERE THEY

02:54PM 21   NEEDED TO SPEND THE MOST TIME AND FOCUS.

02:54PM 22   Q.   RIGHT.

02:54PM 23       BUT THE EXECUTION RISK, AS YOU PUT IT, WOULD BE THAT THE

02:54PM 24   COMPANY WOULDN'T BE ABLE TO ACTUALLY OPEN ALL OF THE WALGREENS

02:54PM 25   STORES WITH WALGREENS THAT THEY WERE HOPING TO OPEN; RIGHT?

PETERSON CROSS BY MR. COOPERSMITH                                3947

02:54PM    1      A.    THEY -- THAT WAS THE GOAL.  THAT WAS THE WHOLE BUSINESS

02:54PM    2      PLAN WAS TO ROLL OUT TO WALGREENS, AND SO, YES, WE THOUGHT THAT

02:54PM    3      THEY COULD ROLL OUT.

02:54PM    4           WOULD THEY ROLL OUT TO 900 STORES IN THE FOLLOWING YEAR?

02:54PM    5           AGAIN, EVEN IF THEY HAD HIT HALF OF THOSE ROLLOUTS, WE

02:54PM    6      THOUGHT THEY WOULD GO BEYOND THE 42 OR 40 THAT THEY HAD AT THE

02:54PM    7      TIME.

02:54PM    8      Q.    OKAY.  THANK YOU, MS. PETERSON.

02:55PM    9           BUT I WANT TO HAVE A DIFFERENT QUESTION ANSWERED, RIGHT?

02:55PM   10           MY QUESTION IS VERY SIMPLE.  THE EXECUTION RISK THAT YOU

02:55PM   11      REFERRED TO IN THE MEMOS THAT YOU WROTE, OKAY --

02:55PM   12      A.    YES.

02:55PM   13      Q.    -- YOU'RE TALKING ABOUT THE RISK THAT THE COMPANY, DESPITE

02:55PM   14      THEIR GOALS, WOULD NOT ACTUALLY BE ABLE TO OPEN ALL OF THE

02:55PM   15      WALGREENS STORES THAT THEY WANTED TO; RIGHT?

02:55PM   16      A.    THAT WAS A RISK, YES.

02:55PM   17      Q.    RIGHT.

02:55PM   18      A.    BUT THAT'S NOT -- THAT WASN'T THEIR VISION.  THAT

02:55PM   19      WASN'T -- WE DIDN'T INTEND -- INVEST THINKING THAT THEY

02:55PM   20      WOULDN'T HIT THOSE NUMBERS.

02:55PM   21      Q.    YOU INVESTED HOPING THAT THEY WOULD HIT THOSE NUMBERS;

02:55PM   22      RIGHT?

02:55PM   23      A.    YES.

02:55PM   24      Q.    RIGHT?

02:55PM   25      A.    GIVEN EVERYTHING THAT THEY HAD SAID, WE HAD -- WE DIDN'T

ER-2951

02:55PM   1    HAVE ANY REASON TO BELIEVE THAT THEY WOULDN'T ROLL OUT AS

02:55PM   2    PLANNED.

02:55PM   3    Q.   BUT YOU UNDERSTOOD THAT THERE WAS A RISK?

02:55PM   4    A.   YES.   THERE'S A RISK IN EVERY INVESTMENT.

02:55PM   5    Q.   RIGHT.   AND THERE'S NOTHING -- WHEN SOMEONE IS PROJECTING

02:55PM   6    A FUTURE OF A BUSINESS, FOR EXAMPLE, OPENING UP HUNDREDS OF

02:56PM   7    STORES AT WALGREENS, THERE'S NO GUARANTEES THAT THAT WILL

02:56PM   8    ACTUALLY HAPPEN; RIGHT?

02:56PM   9    A.   CORRECT.   BUT THERE WERE FUNDAMENTAL THINGS THAT WE WERE

02:56PM  10    RELYING ON THAT WEREN'T TRUE THAT WERE -- THAT THE ANALYZER

02:56PM  11    ACTUALLY WORKED, AND IT DIDN'T.

02:56PM  12        AND AS WELL AS THAT THEY WERE DOING WORK FOR

02:56PM  13    PHARMACEUTICAL COMPANIES, WHICH THEY WEREN'T.

02:56PM  14        SO THERE WERE A LOT OF THINGS THAT WE RELIED ON.

02:56PM  15    Q.   MS. PETERSON, YOU'VE NEVER TESTED THE THERANOS ANALYZER?

02:56PM  16    A.   NO.

02:56PM  17    Q.   OKAY.   SO YOU DON'T HAVE ANY FIRST-HAND KNOWLEDGE AS TO

02:56PM  18    WHETHER IT WORKS OR NOT; CORRECT?

02:56PM  19    A.   CORRECT.

02:56PM  20    Q.   OKAY.   SO, MS. PETERSON, I JUST WANT TO GO BACK TO

02:56PM  21    EXECUTION RISK.

02:56PM  22        YOU UNDERSTOOD THAT THERE'S NO GUARANTEES THAT THE COMPANY

02:56PM  23    WOULD ACTUALLY BE ABLE TO EXECUTE THEIR BUSINESS PLAN TO OPEN

02:56PM  24    HUNDREDS OF WALGREENS STORES?

02:56PM  25    A.   CORRECT.

02:56PM  1    Q.   AND THERE'S NO GUARANTEES, JUST LIKE THERE'S NO GUARANTEES

02:56PM  2    FOR ANY BUSINESS; RIGHT?

02:56PM  3    A.   CORRECT.

02:56PM  4    Q.   AND FOR ALL OF THE OTHER INVESTMENTS THAT RDV, YOUR

02:56PM  5    EMPLOYER, MAKES, SOMETIMES SOME ARE SUCCESSFUL AND SOMETIMES

02:56PM  6    SOME ARE LESS THAN SUCCESSFUL; RIGHT?

02:56PM  7    A.   CORRECT.

02:56PM  8    Q.   RIGHT.  AND SOMETIMES, YOU KNOW, DESPITE EVERYONE'S BEST

02:57PM  9    EFFORTS, THOSE COMPANIES DON'T ACTUALLY SUCCEED; CORRECT?

02:57PM 10    A.   CORRECT.

02:57PM 11    Q.   AND RDV TRIES TO DO THE BEST IT CAN TO PUT ITS MONEY WHERE

02:57PM 12    IT THINKS IT WILL HAVE WINNERS; RIGHT?

02:57PM 13    A.   YES.

02:57PM 14    Q.   BUT IT DOESN'T ALWAYS PICK WINNERS?

02:57PM 15    A.   NO.

02:57PM 16    Q.   OKAY.  LET'S JUST RETURN TO THE EXHIBIT, WHICH IS 1944,

02:57PM 17    EXHIBIT 1944.

02:57PM 18         IF YOU GO TO PAGE 8, I THINK WE WERE ON THAT, ON THE

02:57PM 19    RIGHT-HAND SIDE.

02:57PM 20         DO YOU SEE IT REFERS TO BOARD MEETINGS IN THE SECOND TO

02:57PM 21    THE LAST PARAGRAPH?

02:57PM 22    A.   YES.

02:57PM 23    Q.   AND DO YOU SEE IT MENTIONS A PARTICULAR LAWYER WHO ATTENDS

02:57PM 24    BOARD MEETINGS, DAVID BOIES?

02:58PM 25         DO YOU SEE THAT?

02:58PM  1    A.    YES.

02:58PM  2    Q.    DO YOU KNOW MR. BOISE PERSONALLY?

02:58PM  3    A.    NO.

02:58PM  4    Q.    BUT DO YOU KNOW WHO HE IS?

02:58PM  5    A.    AS PART OF THIS, YES.

02:58PM  6    Q.    AND SOMEONE WHO HAD BEEN FAMOUS FOR CERTAIN CASES HE HAD

02:58PM  7    WORKED ON; RIGHT?

02:58PM  8    A.    WHAT I COULD GATHER FROM THE ARTICLE.

02:58PM  9          I DIDN'T KNOW HIM BEFORE THIS, NO.

02:58PM 10    Q.    OKAY.  LET'S GO TO PAGE 9 OF THE EXHIBIT.

02:58PM 11          AND THEN IF YOU GO TO THE SECOND, OR THE RIGHT-HAND COLUMN

02:58PM 12    ON PAGE 9 AND YOU SEE THERE'S A LINE, OR THERE'S A PARAGRAPH

02:58PM 13    REFERRING TO DR. HENRY KISSINGER?

02:58PM 14    A.    YES.

02:58PM 15    Q.    AND IT SAYS, "SHE LOOKS LIKE 19, SAYS BOARD MEMBER

02:58PM 16    HENRY KISSINGER, AGE 91," I GUESS; RIGHT?

02:58PM 17    A.    YES.

02:58PM 18    Q.    AND YOU KNOW WHO DR. KISSINGER IS?

02:59PM 19    A.    YES.

02:59PM 20    Q.    AND HE WAS THE SECRETARY OF STATE DURING THE NIXON

02:59PM 21    ADMINISTRATION; RIGHT?

02:59PM 22    A.    THAT PERSON I KNEW, YES.

02:59PM 23    Q.    YES.

02:59PM 24          AND THEN IT GOES ON TO SAY, "ASKED TO ASSESS HER AS A

02:59PM 25    LEADER -- BECAUSE HE'S SEEN A FEW" -- "HE," MEANING

PETERSON CROSS BY MR. COOPERSMITH                    3951

02:59PM  1    DR. KISSINGER, "RESPONDS, 'I CAN'T COMPARE HER TO ANYONE ELSE

02:59PM  2    BECAUSE I HAVEN'T SEEN ANYONE WITH HER SPECIAL ATTRIBUTES.  SHE

02:59PM  3    HAS IRON WILL, STRONG DETERMINATION.  BUT NOTHING DRAMATIC.

02:59PM  4    THERE IS NO PERFORMANCE ASSOCIATED WITH HER.  I HAVE SEEN NO

02:59PM  5    SIGN THAT FINANCIAL GAIN IS OF ANY INTEREST TO HER.  SHE'S LIKE

02:59PM  6    A MONK.  SHE ISN'T FLASHY.  SHE WOULDN'T WALK INTO A ROOM AND

02:59PM  7    TAKE IT OVER.  BUT SHE WOULD ONCE THE SUBJECT GETS TO HER

02:59PM  8    FIELD.'"

02:59PM  9        DO YOU SEE THAT?

02:59PM  10   A.   I DO.  BUT NONE OF THE OPINIONS OF THESE OTHER PEOPLE

02:59PM  11   REALLY MATTERED TO US.

02:59PM  12   Q.   BUT IT WAS RIGHT THERE FOR THE TAKING IN THE ARTICLE THAT

02:59PM  13   YOU REVIEWED; RIGHT?

02:59PM  14   A.   BUT IT DOESN'T REALLY MATTER WHAT A PERSON SAID ABOUT HER

02:59PM  15   LEADERSHIP CAPABILITIES.

03:00PM  16       WE WERE LISTENING TO WHAT THEY WERE SAYING -- WE WERE

03:00PM  17   INFORMED BY SOME OF THE THINGS THAT WERE IN THIS ARTICLE, BUT

03:00PM  18   WE DIDN'T BASE OUR ENTIRE INVESTMENT DECISION ON THIS ARTICLE.

03:00PM  19   Q.   OKAY.  BUT YOU RELIED ON THIS IN WRITING YOUR MEMO?

03:00PM  20   A.   PARTS OF IT, YES.

03:00PM  21   Q.   RIGHT.  OKAY.

03:00PM  22   A.   THE PARTS WHERE SHE'S TALKING.

03:00PM  23   Q.   RIGHT.  YOU CHOSE TO EMPHASIZE SOME PARTS OR PAY ATTENTION

03:00PM  24   TO SOME PARTS AND CHOSE NOT TO PAY ATTENTION TO OTHER PARTS;

03:00PM  25   RIGHT?

PETERSON CROSS BY MR. COOPERSMITH                    3952

03:00PM  1    A.   WE CHOSE TO PAY ATTENTION TO THE PARTS WHERE SHE'S

03:00PM  2    ACTUALLY TALKING ABOUT RELEVANT THINGS, NOT WHAT OTHER PEOPLE

03:00PM  3    WERE SAYING ABOUT HER.

03:00PM  4    Q.   OKAY.  YOU DIDN'T CARE ABOUT THAT?

03:00PM  5    A.   I DIDN'T SAY I DIDN'T CARE ABOUT IT.

03:00PM  6         IT'S JUST NOT -- IT WASN'T RELEVANT TO OUR INVESTMENT

03:00PM  7    DECISION WHAT HENRY KISSINGER THOUGHT OF HER.

03:00PM  8    Q.   OKAY.  LET'S GO TO PAGE 11.

03:00PM  9         THE COURT:  DO YOU -- MR. COOPERSMITH, DO YOU INTEND

03:00PM 10    TO GO TO SEVERAL OTHER PAGES?

03:00PM 11         SHOULD WE BREAK NOW?

03:00PM 12         MR. COOPERSMITH:  WELL, OBVIOUSLY, AS THE COURT

03:00PM 13    PREFERS.  THIS IS THE LAST PAGE, SO MAYBE A COUPLE OF POINTS.

03:01PM 14         THE COURT:  OKAY.  LET'S FINISH THAT THEN.

03:01PM 15         MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

03:01PM 16    Q.   IF YOU GO TO THE BOTTOM OF PAGE 11, DO YOU SEE AT THE VERY

03:01PM 17    BOTTOM THERE'S A QUOTE FROM MR. BALWANI?

03:01PM 18         DO YOU SEE THAT?

03:01PM 19    A.   WHERE IT STARTS "ELIZABETH"?

03:01PM 20    Q.   YES.

03:01PM 21    A.   YES.

03:01PM 22    Q.   IT SAYS, "ELIZABETH HAS HAD A VERY CLEAR VISION OF WHERE

03:01PM 23    SHE WANTED TO TAKE THIS SINCE THE TIME I MET HER, SAYS

03:01PM 24    SUNNY BALWANI."

03:01PM 25         DO YOU SEE THAT?

03:01PM  1    A.   YES.

03:01PM  2    Q.   AND IT GOES ON IN THE QUOTED PART, "THE BUSINESS STRATEGY,

03:01PM  3    THE TACTICS OF WHAT TO DO FIRST, WHAT TO OFFER WHEN -- THAT HAS

03:01PM  4    CHANGED, BUT THE OVERALL GOAL AND DIRECTION HAS BEEN LINEAR."

03:01PM  5         DO YOU SEE THAT?

03:01PM  6    A.   YES.

03:01PM  7    Q.   AND THEN IF YOU GO TO JUST THE LAST THING ON THE SAME

03:01PM  8    PAGE, GO OVER TO THE RIGHT-HAND COLUMN, AND THE LAST PARAGRAPH

03:01PM  9    BEFORE THE SECTION WITH THE BIG A, IT SAYS "TODAY HOLMES IS A

03:01PM  10   CO-INVESTOR ON 82 U.S. AND 189 FOREIGN PATENT APPLICATIONS, OF

03:02PM  11   WHICH 18 IN THE UNITED STATES AND 66 ABROAD HAVE BEEN GRANTED.

03:02PM  12   THOSE ARE IN ADDITION TO ANOTHER 186 APPLICATIONS THERANOS HAS

03:02PM  13   FILED WORLDWIDE THAT DON'T LIST HOLMES AS AN INVESTOR, OF WHICH

03:02PM  14   18 HAVE ALREADY BEEN GRANTED."

03:02PM  15        DO YOU SEE THAT?

03:02PM  16   A.   YES.

03:02PM  17   Q.   AND THE INTELLECTUAL PROPERTY ASPECT OF THERANOS, THAT WAS

03:02PM  18   INTERESTING TO YOU; RIGHT?

03:02PM  19   A.   YES.

03:02PM  20   Q.   AND, IN FACT, I THINK WE'LL HAVE TO TALK ABOUT THIS

03:02PM  21   TOMORROW, BUT THERE WAS SOME MORE INFORMATION ABOUT THAT IN THE

03:02PM  22   INVESTMENT MATERIALS THAT YOU RECEIVED; RIGHT?

03:02PM  23   A.   YES.

03:02PM  24        MR. COOPERSMITH:  OKAY.

03:02PM  25        YOUR HONOR, THAT'S GOOD FOR TODAY.

03:02PM   1            THE COURT:  OKAY.  LET'S TAKE OUR EVENING RECESS,

03:02PM   2    LADIES AND GENTLEMEN.

03:02PM   3        PLEASE, AS ALWAYS, I REMIND YOU OF THE ADMONITION.  DO NOT

03:02PM   4    READ, DISCUSS, OR IN ANY WAY ATTEMPT TO LEARN ANYTHING ABOUT

03:02PM   5    THIS CASE DURING THE BREAK.

03:02PM   6        WE'LL SEE YOU BACK TOMORROW MORNING AT 9:00 A.M.,

03:02PM   7    9:00 A.M., PLEASE.

03:02PM   8        AND, MS. PETERSON, IF YOU COULD RETURN TOMORROW MORNING, I

03:02PM   9    WOULD BE GRATEFUL.

03:02PM  10        AND HAVE A WONDERFUL EVENING.  THANK YOU.

03:03PM  11        (JURY OUT AT 3:03 P.M.)

03:03PM  12            THE COURT:  YOU CAN STAND DOWN.

03:03PM  13        ALL RIGHT.  THANK YOU.  PLEASE BE SEATED.

03:03PM  14        THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT.

03:03PM  15        MS. PETERSON HAS LEFT THE COURTROOM.

03:03PM  16        ALL COUNSEL AND MR. BALWANI REMAIN.

03:03PM  17        ANYTHING FURTHER BEFORE WE BREAK FOR THE DAY?

03:03PM  18        MR. LEACH?

03:03PM  19            MR. LEACH:  BRIEFLY, YOUR HONOR.

03:03PM  20            THE COURT:  SURE.

03:03PM  21            MR. LEACH:  I JUST WANTED TO EXPLAIN FURTHER THE

03:04PM  22    BASIS FOR THE OBJECTION.

03:04PM  23        THE ARTICLE IS IN EVIDENCE.  IT'S IN EVIDENCE FOR A

03:04PM  24    PARTICULAR PURPOSE.

03:04PM  25            MR. COOPERSMITH --

03:04PM 1          MR. COOPERSMITH:  IF I COULD JUST DIRECT, I THINK

03:04PM 2   MS. PETERSON'S COUNSEL IS STILL IN THE ROOM, AND I'M NOT SURE

03:04PM 3   THAT'S APPROPRIATE WHILE SHE'S STILL UNDER CROSS.

03:04PM 4          THE COURT:  WELL, OKAY.  IT LOOKS LIKE HE MIGHT BE

03:04PM 5   LEAVING.

03:04PM 6      (PROCEEDINGS HELD OUT OF THE PRESENCE OF MS. PETERSON'S

03:04PM 7   COUNSEL.)

03:04PM 8          THE COURT:  MR. LEACH.

03:04PM 9          MR. LEACH:  SO THE BASIS OF THE OBJECTION,

03:04PM 10  YOUR HONOR, WAS SIMPLY THE READING OF QUOTES FROM PARTICULAR

03:04PM 11  PEOPLE WITH NO QUESTION.

03:04PM 12     I THINK IT WAS ARGUMENT.  THE ARTICLE IS IN FOR THE

03:04PM 13  PURPOSE OF DID YOU READ THIS AND DID YOU RELY ON IT, AND I

03:04PM 14  THINK THE POINT OF THE EXAMINATION WAS TO SIMPLY READ IT.

03:04PM 15     SO I WANTED TO ARTICULATE THAT.  I THINK WE'RE AT THE END,

03:04PM 16  BUT THAT WAS THE BASIS OF THE OBJECTION.

03:04PM 17         THE COURT:  OKAY.  THANK YOU.

03:04PM 18         MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

03:04PM 19     WE ARE DONE WITH THAT EXHIBIT.

03:04PM 20         THE COURT:  OKAY.

03:04PM 21         MR. COOPERSMITH:  BUT IN ANY EVENT, I THINK IT'S

03:05PM 22  PROPER CROSS TO HIGHLIGHT THINGS THAT THE GOVERNMENT ITSELF PUT

03:05PM 23  INTO EVIDENCE, SO THAT'S WHAT I WAS DOING.

03:05PM 24         THE COURT:  OKAY.  ALL RIGHT.  WELL, IT'S DONE.  AND

03:05PM 25  THE JURY HAS IT, SO GREAT.

3956

```
03:05PM   1              MR. COOPERSMITH:  THANK YOU.

03:05PM   2              THE COURT:  SO TIMING, JUST TIMING, WHAT DO YOU

03:05PM   3    THINK ABOUT TOMORROW?

03:05PM   4              MR. COOPERSMITH:  YOU KNOW, I -- MY ESTIMATE FOR HER

03:05PM   5    WAS ABOUT TWO TO TWO AND A HALF HOURS, WHICH ABOUT HALF AN HOUR

03:05PM   6    IS DONE.

03:05PM   7         SO I'M HOPEFUL THAT I CAN GET THIS DONE, YOU KNOW,

03:05PM   8    TOMORROW MORNING.

03:05PM   9              THE COURT:  OH, OKAY.

03:05PM  10              MR. COOPERSMITH:  OBVIOUSLY THINGS HAPPEN, BUT

03:05PM  11    THAT'S MY GOAL.

03:05PM  12              THE COURT:  SURE.

03:05PM  13         MR. LEACH.

03:05PM  14              MR. LEACH:  REDIRECT WILL BE LIMITED.

03:05PM  15         WE HAVE ANOTHER WITNESS AVAILABLE TOMORROW AFTERNOON.

03:05PM  16         I THINK, GIVEN THE PACE, WE WON'T GET PAST THAT WITNESS.

03:05PM  17    BUT I'LL TALK WITH MR. SCHENK AND MR. BOSTIC ABOUT IF WE NEED

03:05PM  18    ANOTHER WITNESS EVEN AFTER THE WITNESS AFTER MS. PETERSON.

03:05PM  19         AND THEN ON FRIDAY, I THINK GIVEN THE PACE, WE MAY NEED TO

03:06PM  20    SUPPLEMENT OUR DISCLOSURES TO THE DEFENSE IN TERMS OF WHO WE

03:06PM  21    ARE CALLING.

03:06PM  22              THE COURT:  OKAY.  THE QUESTION ON MS. WALSH'S

03:06PM  23    MOTION, IS THAT SOMETHING THAT WE NEED TO TALK ABOUT TOMORROW

03:06PM  24    MORNING, OR IS THAT LIKELY WE'LL GET TO THAT WITNESS?

03:06PM  25              MR. SCHENK:  YES, YOUR HONOR.
```

| | | |
|---|---|---|
| 03:06PM | 1 | THE WITNESS AFTER MS. PETERSON IS DR. DHAWAN. |
| 03:06PM | 2 | THE COURT: OKAY. |
| 03:06PM | 3 | MR. SCHENK: DR. DHAWAN I THINK IS TRAVELLING TO A |
| 03:06PM | 4 | MEDICAL CONFERENCE. |
| 03:06PM | 5 | SO IF WE DON'T FINISH HIM ON WEDNESDAY, HE'S GOING TO BE |
| 03:06PM | 6 | OUT OF TOWN FOR A FEW DAYS, SO WE'LL HAVE TO AGAIN TAKE A |
| 03:06PM | 7 | WITNESS OUT OF ORDER. |
| 03:06PM | 8 | MY HOPE IS THAT HIS DIRECT AND CROSS ARE RELATIVELY BRIEF |
| 03:06PM | 9 | AND THAT WE COULD FINISH HIM. |
| 03:06PM | 10 | I'M NOT EXACTLY SURE HOW LATE WE'RE GOING TOMORROW, BUT I |
| 03:06PM | 11 | JUST WANTED TO INFORM THE COURT THAT IF WE DON'T FINISH HIM ON |
| 03:06PM | 12 | WEDNESDAY, MY UNDERSTANDING IS THAT HE'S UNAVAILABLE TO PICK UP |
| 03:06PM | 13 | HIS TESTIMONY FRIDAY MORNING AND WE'LL HAVE TO START WITH A |
| 03:06PM | 14 | DIFFERENT WITNESS. |
| 03:06PM | 15 | THE COURT: OKAY. |
| 03:06PM | 16 | MR. SCHENK: BUT, YES, TO ANSWER THE COURT'S |
| 03:06PM | 17 | QUESTION, IT SOUNDS LIKE TOMORROW MORNING -- OR IT SOUNDS LIKE |
| 03:06PM | 18 | THE FIRST BREAK WOULD BE THE APPROPRIATE TIME TO HANDLE THE |
| 03:07PM | 19 | DEFENSE MOTION REGARDING A DR. DHAWAN EXHIBIT. |
| 03:07PM | 20 | THE COURT: OKAY. THANK YOU. |
| 03:07PM | 21 | MS. WALSH. |
| 03:07PM | 22 | MS. WALSH: YES, YOUR HONOR. |
| 03:07PM | 23 | HOW LATE ARE WE GOING TOMORROW? |
| 03:07PM | 24 | THE COURT: WELL, I WAS GOING TO ASK WHICH ONE OF |
| 03:07PM | 25 | YOU WAS GOING TO ASK THE JURY IF THEY CAN STAY UNTIL 10:00 P.M. |

3958

03:07PM 1          (LAUGHTER.)

03:07PM 2               MS. WALSH:  MR. COOPERSMITH.

03:07PM 3               THE COURT:  I HAD PLANNED TO GO UNTIL 4:00 TOMORROW,

03:07PM 4     THAT WAS MY THOUGHT, TO HAVE ONE OF OUR LONGER DAYS, MAYBE

03:07PM 5     5:00.  BUT CERTAINLY AT LEAST UNTIL 4:00.  THAT WAS MY HOPE.

03:07PM 6               MS. WALSH:  OKAY.  IF IT'S A LONGER DAY, I

03:07PM 7     ANTICIPATE BEING FINISHED WITH CROSS OF DR. DHAWAN, BUT IT

03:07PM 8     DEPENDS ON THE DIRECT.

03:07PM 9          BUT THE LATER WE GO, THE GREATER CHANCE IT WILL BE --

03:07PM 10              THE COURT:  SURE.  AND IT MAY BE THAT I THINK THE

03:07PM 11    JURORS ARE EAGER TO HAVE THINGS MOVE ALONG AS WELL, AND YOU

03:07PM 12    KNOW, WHAT IS THE DIFFERENCE BETWEEN 4:00 AND 5:00 P.M.  IT'S

03:07PM 13    JUST ANOTHER HOUR ON THE FREEWAY, I SUPPOSE.  BUT WE'LL SEE HOW

03:07PM 14    THAT WORKS.  THANK YOU FOR THAT THEN.

03:08PM 15         OKAY.  MAYBE WE'LL HAVE DISCUSSION REGARDING YOUR MOTION

03:08PM 16    AT A BREAK TOMORROW.

03:08PM 17         AND I APOLOGIZE FOR THE LATE START THIS MORNING.

03:08PM 18         WE ALSO HAVE THE JUROR'S LISTS, AND WE'LL NEED TO TALK, WE

03:08PM 19    SHOULD TALK ABOUT THIS SOMETIME TO SEE WHERE WE CAN CAPTURE

03:08PM 20    SOME MORE TIME, BUT WE HAVE TO FIND TIME TO DO THAT.

03:08PM 21         OKAY.

03:08PM 22              MR. SCHENK:  THANK YOU.

03:08PM 23              MR. COOPERSMITH:  THANK YOU.

03:08PM 24              MR. LEACH:  THANK YOU.

03:08PM 25              THE COURT:  GREAT.  WE'LL SEE YOU TOMORROW.

ER-2962

3959

03:08PM 1          OH, YOU CAN SIT DOWN.  PLEASE.  GO AHEAD.

03:08PM 2          (COURT ADJOURNED AT 3:08 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ER-2963

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

        UNITED STATES OF AMERICA,           )
6                                           )   CR-18-00258-EJD
                         PLAINTIFF,         )
7                                           )   SAN JOSE, CALIFORNIA
                    VS.                     )
8                                           )   APRIL 27, 2022
        RAMESH "SUNNY" BALWANI,             )
9                                           )   VOLUME 23
                         DEFENDANT.         )
10      _____       )   PAGES 3960 - 4226

11

12                   TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                   UNITED STATES DISTRICT JUDGE

14      A P P E A R A N C E S:

15      FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                               BY:  JOHN C. BOSTIC
16                                  JEFFREY B. SCHENK
                               150 ALMADEN BOULEVARD, SUITE 900
17                             SAN JOSE, CALIFORNIA 95113

18                             BY:  ROBERT S. LEACH
                               1301 CLAY STREET, SUITE 340S
19                             OAKLAND, CALIFORNIA 94612

20           (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21      OFFICIAL COURT REPORTERS:
                               IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                             CERTIFICATE NUMBER 8074
                               LEE-ANNE SHORTRIDGE, CSR, CRR
23                             CERTIFICATE NUMBER 9595

24         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED WITH COMPUTER
25

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | SAN JOSE, CALIFORNIA                    APRIL 27, 2022       |
|       | 2  | P R O C E E D I N G S                                        |
| 09:05AM | 3  | (COURT CONVENED AT 9:05 A.M.)                             |
| 09:05AM | 4  | (JURY IN AT 9:05 A.M.)                                    |
| 09:05AM | 5  | THE COURT:  THANK YOU.  GOOD MORNING.                     |
| 09:05AM | 6  | PLEASE BE SEATED.  THANK YOU AGAIN FOR YOUR COURTESY.     |
| 09:05AM | 7  | WE'RE BACK ON THE RECORD.  OUR JURY IS PRESENT.           |
| 09:05AM | 8  | GOOD MORNING, LADIES AND GENTLEMEN.                       |
| 09:05AM | 9  | ALL COUNSEL AND MR. BALWANI IS PRESENT.                   |
| 09:05AM | 10 | AND MS. PETERSON IS BACK ON THE STAND.  GOOD MORNING.     |
| 09:05AM | 11 | THE WITNESS:  GOOD MORNING.                               |
| 09:05AM | 12 | THE COURT:  I'LL REMIND YOU THAT YOU ARE STILL UNDER      |
| 09:05AM | 13 | OATH.                                                        |
| 09:05AM | 14 | **(GOVERNMENT'S WITNESS, LISA PETERSON, PREVIOUSLY WAS**  |
| 09:05AM | 15 | **SWORN.)**                                                  |
| 09:05AM | 16 | THE COURT:  BEFORE MR. COOPERSMITH CONTINUES, LADIES      |
| 09:05AM | 17 | AND GENTLEMEN OF THE JURY, I HAVE TO ASK YOU THAT QUESTION|
| 09:05AM | 18 | AGAIN.                                                       |
| 09:05AM | 19 | DURING THE BREAK, HAVE ANY OF YOU HAD CAUSE TO SEE, HEAR, |
| 09:05AM | 20 | READ, DISCUSS, OR LEARN ANYTHING ABOUT THIS CASE?         |
| 09:05AM | 21 | IF SO, PLEASE RAISE YOUR HAND FOR ME.                     |
| 09:05AM | 22 | I SEE NO HANDS.                                           |
| 09:05AM | 23 | THANK YOU VERY MUCH FOR THAT.                             |
| 09:05AM | 24 | MR. COOPERSMITH, YOU HAVE ADDITIONAL QUESTIONS?           |
| 09:05AM | 25 | MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.            |

PETERSON CROSS BY MR. COOPERSMITH (RES.)                 3965

09:05AM  1          THE COURT:  PLEASE PROCEED.  THANK YOU.

09:05AM  2                    **CROSS-EXAMINATION (RESUMED)**

09:05AM  3      BY MR. COOPERSMITH:

09:05AM  4      Q.   GOOD MORNING.  MS. PETERSON.

09:06AM  5      A.   GOOD MORNING.

09:06AM  6      Q.   SO JUST TO START OFF HERE THIS MORNING, I THINK ON DIRECT

09:06AM  7      WHEN YOU WERE TALKING TO MR. LEACH YOU WERE ASKED SOME

09:06AM  8      QUESTIONS ABOUT THE RELATIONSHIP BETWEEN MR. BALWANI AND

09:06AM  9      MS. HOLMES.

09:06AM  10          DO YOU RECALL THAT?

09:06AM  11     A.   YES.

09:06AM  12     Q.   AND YOU SAID THAT YOU DIDN'T KNOW THAT THEY WERE IN A

09:06AM  13     RELATIONSHIP; IS THAT RIGHT?

09:06AM  14     A.   CORRECT.

09:06AM  15     Q.   AND YOU ALSO SAID THAT IF YOU HAD KNOWN THAT, YOU MIGHT

09:06AM  16     HAVE HAD SOME ADDITIONAL QUESTIONS.

09:06AM  17          DO YOU REMEMBER THAT?

09:06AM  18     A.   YEAH.  I BELIEVE IT WOULD HAVE SPURRED DISCUSSION, OF

09:06AM  19     COURSE.

09:06AM  20     Q.   RIGHT.  THAT'S WHAT YOU SAID ON DIRECT; RIGHT?

09:06AM  21     A.   UH-HUH.

09:06AM  22     Q.   AND I JUST WANT TO SHOW YOU A COUPLE OF EXHIBITS THAT ARE

09:06AM  23     ALREADY IN EVIDENCE.

09:06AM  24          OH, I'M SORRY.

09:06AM  25          ONE OF THE QUESTIONS THAT I THINK YOU HAD WAS YOU WOULD

09:06AM  1    WANT TO MAKE SURE THAT THE RIGHT PEOPLE WERE IN THE RIGHT

09:06AM  2    SEATS.  I THINK THOSE WERE THE WORDS YOU USED; RIGHT?

09:06AM  3    A.   YES.

09:06AM  4    Q.   MEANING THAT MR. BALWANI WAS IN HIS POSITION BECAUSE OF

09:06AM  5    MERIT AS OPPOSED TO HE WAS DATING MS. HOLMES; RIGHT?

09:07AM  6    A.   CORRECT.

09:07AM  7    Q.   OKAY.  I'D LIKE TO SHOW YOU THE FIRST EXHIBIT -- IT IS

09:07AM  8    ALREADY IN EVIDENCE, YOUR HONOR -- EXHIBIT 20510.

09:07AM  9         AND IF YOU'LL GO TO PAGE 4, MR. ALLEN.

09:07AM 10         THESE ARE BOARD MINUTES FROM AROUND THE TIME THAT

09:07AM 11    MR. BALWANI JOINED THE COMPANY.

09:07AM 12         DO YOU SEE WHERE IT SAYS, "THE BOARD DISCUSSED ADDING A

09:07AM 13    NEW DIRECTOR TO THE BOARD AND REVIEWED SEVERAL CANDIDATES FOR

09:07AM 14    CONSIDERATION"?

09:07AM 15         DO YOU SEE THAT?

09:07AM 16    A.   YES.

09:07AM 17    Q.   AND THEN IT SAYS, "AFTER DISCUSSION, THE BOARD UNANIMOUSLY

09:07AM 18    AGREED TO ELECT RAMESH 'SUNNY' BALWANI AS VICE CHAIRMAN."

09:07AM 19         DO YOU SEE THAT?

09:07AM 20    A.   YES.

09:07AM 21    Q.   GOING TO THE NEXT EXHIBIT, WHICH IS 20512.

09:08AM 22         AND THESE ARE BOARD MINUTES FROM AUGUST 10TH, 2010.

09:08AM 23         AND IF YOU GO TO PAGE 7, MR. ALLEN.

09:08AM 24         DO YOU SEE THERE'S A SECTION THERE CALLED "ADDITIONAL

09:08AM 25    COMPENSATION MATTERS; AMENDMENT OF BYLAWS," MS. PETERSON?

09:08AM 1      A.   YES.

09:08AM 2      Q.   AND THEN IT SAYS, "THE BOARD THEN APPROVED THE ADDITION OF

09:08AM 3      AN OPERATIONAL TITLE OF PRESIDENT AND COO FOR SUNNY BALWANI

09:08AM 4      AFTER DISCUSSING HIS PERFORMANCE AND CONTRIBUTIONS AND

09:08AM 5      OPERATIONAL ROLE."

09:08AM 6          DO YOU SEE THAT?

09:08AM 7      A.   YES.

09:08AM 8      Q.   OKAY.  AND YOU UNDERSTAND THAT THE BOARD WAS COMPOSED OF

09:08AM 9      PEOPLE OTHER THAN MS. HOLMES; RIGHT?

09:08AM 10     A.   YES.

09:08AM 11     Q.   OKAY.  OKAY.  WHEN YOU FIRST STARTED WORKING ON THE RDV

09:08AM 12     INVESTMENT IN THERANOS, ONE OF THE FIRST THINGS YOU DID IS YOU

09:08AM 13     PERFORMED SOME GOOGLE SEARCHES; IS THAT RIGHT?

09:09AM 14     A.   YES.

09:09AM 15     Q.   AND YOU WERE TRYING TO FIND ANYTHING YOU COULD ABOUT

09:09AM 16     THERANOS THAT WAS IN PUBLIC; RIGHT?

09:09AM 17     A.   YEAH.  I WAS JUST TRYING TO GOOGLE AND FIND THINGS THAT

09:09AM 18     TALKED ABOUT THERANOS AND SPEECHES OF HERS.

09:09AM 19     Q.   SO THINGS THAT YOU COULD FIND ON GOOGLE; RIGHT?

09:09AM 20     A.   UH-HUH.

09:09AM 21     Q.   SO THERE WERE SOME SPEECHES THAT SHE HAD ON YOUTUBE AND

09:09AM 22     THINGS LIKE THAT?

09:09AM 23     A.   YES.

09:09AM 24     Q.   OKAY.  AND THEN YOU ALSO UNDERSTAND THAT THE THERANOS

09:09AM 25     WEBSITE WAS PUBLICLY AVAILABLE; RIGHT?

09:09AM  1      A.   YES.

09:09AM  2      Q.   AND ALSO THE WALGREENS WEBSITE; RIGHT?

09:09AM  3      A.   YES.

09:09AM  4      Q.   AND YOU LOOKED AT THE WALGREENS WEBSITE?

09:09AM  5      A.   I DON'T RECALL.

09:09AM  6      Q.   YOU DON'T RECALL ONE WAY OR THE OTHER?

09:09AM  7      A.   I DON'T RECALL.

09:09AM  8      Q.   OKAY.  YOU MIGHT HAVE, OR YOU'RE SURE YOU DIDN'T?

09:09AM  9      A.   I DON'T RECALL IF I DID OR NOT.

09:09AM 10      Q.   OKAY.  CLEAR ENOUGH.

09:09AM 11           AND THEN THE THERANOS WEBSITE, YOU LOOKED AT THAT; RIGHT?

09:09AM 12      A.   I DID LOOK AT THAT.  I DO REMEMBER LOOKING AT THE PRICE

09:09AM 13      LIST.

09:09AM 14      Q.   AND SINCE YOU MENTIONED THAT, LET'S TAKE A LOOK AT

09:10AM 15      EXHIBIT 3741A WHICH IS ALREADY IN EVIDENCE.

09:10AM 16           AND WHEN YOU SAY -- I'M SORRY.  I'LL WAIT FOR YOUR --

09:10AM 17           (PAUSE IN PROCEEDINGS.)

09:10AM 18              THE WITNESS:  I DON'T SEE ANYTHING THAT IS 3.  37?

09:10AM 19      BY MR. COOPERSMITH:

09:10AM 20      Q.   YES.  CAN YOU SEE IT ON YOUR SCREEN, MS. PETERSON?

09:10AM 21      A.   YES.

09:10AM 22      Q.   OKAY.  AND YOU SEE THE THERANOS, AND THERE'S A LIST OF

09:10AM 23      ASSAYS, AND THERE ARE PRICES NEXT TO EACH ONE?

09:10AM 24      A.   YES.

09:10AM 25      Q.   AND WHEN YOU SAY YOU LOOKED AT THE THERANOS PRICE LIST,

09:10AM   1    THAT'S WHAT YOU'RE TALKING ABOUT; RIGHT?

09:10AM   2    A.   YES.

09:10AM   3    Q.   AND THEN YOU SEE THAT NEXT TO EACH OF THE BLOOD TESTS THAT

09:10AM   4    ARE LISTED THERE OF THE DIFFERENT ASSAYS, THESE ACTUALLY ARE

09:10AM   5    PRICE LISTED; RIGHT?

09:10AM   6    A.   YES.

09:10AM   7    Q.   AND THAT WAS ONE OF THE THINGS THAT THERANOS WAS TRYING TO

09:11AM   8    DO, TO CREATE SOME PRICE TRANSPARENCY AROUND TESTING; RIGHT?

09:11AM   9    A.   CORRECT.

09:11AM  10    Q.   WE'LL GO BACK TO THAT IN A MINUTE.

09:11AM  11         BUT LET'S LOOK AT EXHIBIT 5805, WHICH IS ALREADY IN

09:11AM  12    EVIDENCE.

09:11AM  13         AND THIS IS FROM THE THERANOS WEBSITE, MS. PETERSON.

09:11AM  14         IF WE CAN GO TO PAGE 4, MR. ALLEN.  AND IF WE BLOW UP "THE

09:11AM  15    ONLY THING WE WANT YOU TO FEEL IS BETTER."

09:11AM  16         DO YOU SEE THAT?

09:11AM  17    A.   YES.

09:11AM  18    Q.   AND THIS SAYS, "INSTEAD OF A BIG, INTIMIDATING NEEDLE, OUR

09:11AM  19    CERTIFIED PHLEBOTOMISTS CAN USE A TINY FINGERSTICK OR A

09:11AM  20    MICRO-SAMPLE FROM A VENOUS DRAW.  OCCASIONALLY A VENIPUNCTURE

09:11AM  21    MAY BE REQUIRED BASED ON THE LAB ORDER, BUT THIS IS UNCOMMON,

09:11AM  22    AND OUR AIM IS TO ELIMINATE THAT SCENARIO ENTIRELY."

09:12AM  23         DO YOU SEE THAT?

09:12AM  24    A.   YES.

09:12AM  25    Q.   OKAY.  SO THE WEBSITE TALKS ABOUT VENOUS DRAWS; RIGHT?

09:12AM   1      A.   YES, BUT THEY NEVER DID.

09:12AM   2      Q.   OKAY.  OKAY.  I'M JUST ASKING WHAT THE WEBSITE SAID.

09:12AM   3      A.   YEAH.

09:12AM   4      Q.   OKAY.  AND THEN IF WE GO TO EXHIBIT 14207, I DON'T THINK

09:12AM   5      THAT'S IN EVIDENCE, SO LET'S JUST SHOW THAT ON MS. PETERSON'S

09:12AM   6      SCREEN.

09:12AM   7           AND I KNOW, MS. PETERSON, YOU SAID YOU COULDN'T QUITE

09:12AM   8      REMEMBER THE WALGREENS WEBSITE, BUT I WANT TO SHOW IT TO YOU TO

09:12AM   9      SEE IF IT JOGS YOUR MEMORY.

09:12AM   10          DO YOU RECOGNIZE THIS AS THE WALGREENS WEBSITE THAT

09:12AM   11     EXISTED WITH REGARD TO THERANOS?

09:12AM   12     A.   NO.

09:12AM   13     Q.   OKAY.  SO LOOKING AT THIS WEB PAGE DOESN'T JOG YOUR

09:12AM   14     MEMORY?

09:12AM   15     A.   NO.

09:12AM   16     Q.   SO IT'S POSSIBLE THAT YOU NEVER GOOGLED THIS AT ALL OR

09:13AM   17     FOUND THIS ON GOOGLE?

09:13AM   18     A.   IT'S POSSIBLE.

09:13AM   19     Q.   OKAY.  LET'S GO TO EXHIBIT 1113, WHICH IS ALREADY IN

09:13AM   20     EVIDENCE.

09:13AM   21          AND DO YOU RECOGNIZE THIS AS A PRESS RELEASE THAT WAS PUT

09:13AM   22     OUT BY WALGREENS AND THERANOS?

09:13AM   23     A.   YES.

09:13AM   24     Q.   OKAY.  AND I NOTE THE DATE OF IT, SEPTEMBER 9TH, 2013, IS

09:13AM   25     PRIOR TO YOUR GETTING INVOLVED WITH WORKING ON THE THERANOS

PETERSON CROSS BY MR. COOPERSMITH (RES.)                3971

09:13AM   1    INVESTMENT; CORRECT?

09:13AM   2    A.   YES.

09:13AM   3    Q.   AND DID YOU -- WHEN YOU WERE DOING YOUR GOOGLING, DID YOU

09:13AM   4    COME ACROSS THIS?

09:14AM   5    A.   I DON'T RECALL SPECIFICALLY.

09:14AM   6         BUT I DO RECALL KNOWING THAT THE WALGREENS CONTRACT AND

09:14AM   7    STUFF WAS SIGNED AND LAUNCHING A YEAR BEFORE OUR INVESTMENT.

09:14AM   8    Q.   OKAY.  AND IF YOU LOOK AT THE FIRST PARAGRAPH THERE IN

09:14AM   9    THE -- I THINK IT'S THE LAST SENTENCE OF THE FIRST PARAGRAPH,

09:14AM  10    IT SAYS, "THE SAMPLES ARE EITHER TAKEN FROM A TINY FINGERSTICK

09:14AM  11    OR A MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS, ELIMINATING

09:14AM  12    THE NEED FOR LARGER NEEDLES AND NUMEROUS VIALS OF BLOOD

09:14AM  13    REQUIRED FOR MOST DIAGNOSTIC LAB TESTING."

09:14AM  14         DO YOU SEE THAT?

09:14AM  15    A.   YES.

09:14AM  16    Q.   AND YOU UNDERSTOOD THAT TRADITIONAL METHODS MEANS

09:14AM  17    VENOUS DRAWS?

09:14AM  18    A.   AGAIN, THAT WAS NEVER DISCUSSED, SO IF I READ THIS OR -- I

09:14AM  19    DON'T RECALL.

09:14AM  20    Q.   OKAY.  AND I'M ASKING A DIFFERENT QUESTION.

09:14AM  21         DO YOU UNDERSTAND THAT TRADITIONAL METHODS MEANS

09:14AM  22    VENOUS DRAWS?

09:14AM  23    A.   YEAH, I DO NOW.  YES.

09:14AM  24    Q.   OKAY.  THAT'S WHAT YOU UNDERSTAND?

09:14AM  25    A.   YES.  BUT EVERY CONVERSATION WAS AROUND FINGERSTICK, SO --

ER-2972

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    3972

09:15AM  1      Q.   OKAY.

09:15AM  2           YOUR HONOR, I MOVE TO STRIKE HER ANSWER AS NONRESPONSIVE.

09:15AM  3                THE COURT:  THE LAST ABOUT --

09:15AM  4                MR. COOPERSMITH:  YES.

09:15AM  5                THE COURT:  -- ABOUT EVERY CONVERSATION WAS ABOUT --

09:15AM  6                MR. COOPERSMITH:  RIGHT.  THAT WAS NOT MY QUESTION.

09:15AM  7                THE COURT:  THE LAST ABOUT EVERY PART WAS -- EVERY

09:15AM  8      PART OF THE CONVERSATION WAS ABOUT FINGERSTICKS, THAT'S WHAT

09:15AM  9      YOU'RE ASKING TO BE STRICKEN?

09:15AM 10                MR. COOPERSMITH:  RIGHT.

09:15AM 11                THE COURT:  ALL RIGHT.

09:15AM 12           THAT PORTION, LADIES AND GENTLEMEN, IS STRICKEN AS

09:15AM 13      NONRESPONSIVE.

09:15AM 14           YOU CAN ASK ANOTHER QUESTION.

09:15AM 15                MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:15AM 16      Q.   OKAY.  LET'S GO BACK TO THAT EXHIBIT THAT WE WERE JUST

09:15AM 17      LOOKING AT, WHICH IS EXHIBIT 3741A, MR. ALLEN.

09:15AM 18           OKAY.  THIS WAS THE BLOOD TESTING MENU.

09:15AM 19           NOW, MS. PETERSON, YOU DESCRIBED IN YOUR TESTIMONY

09:15AM 20      YESTERDAY THAT YOU ATTENDED A MEETING AT THERANOS ON

09:15AM 21      OCTOBER 14TH, 2014; RIGHT?

09:15AM 22      A.   CORRECT.

09:15AM 23      Q.   AND AT THAT MEETING, NO ONE EVER TOLD YOU THAT MR. BALWANI

09:16AM 24      OR MS. HOLMES -- NO ONE EVER TOLD YOU SPECIFICALLY THAT ALL OF

09:16AM 25      THESE TESTS ON THIS MENU WERE BEING RUN ON THERANOS TECHNOLOGY;

ER-2973

09:16AM   1    CORRECT?

09:16AM   2    A.   THEY CERTAINLY LED US TO BELIEVE THAT THERE WERE HUNDREDS

09:16AM   3    OF TESTS THAT THEY WERE DOING, WHICH IS WHY I LOOKED AT THIS,

09:16AM   4    BECAUSE I WAS TRYING TO GET A SENSE OF NOT ONLY THE PRICE, BUT

09:16AM   5    HOW MANY TESTS THEY WERE PERFORMING.

09:16AM   6    Q.   OKAY.  YOU SAID THAT THEY LED YOU TO BELIEVE.

09:16AM   7         BUT MY QUESTION IS, NO ONE SPECIFICALLY TOLD YOU THAT ALL

09:16AM   8    OF THESE TESTS WERE RUNNING ON THERANOS TECHNOLOGY; CORRECT?

09:16AM   9    A.   NO.  I WOULD SAY -- I WOULD DISAGREE WITH THAT.  THEY TOLD

09:16AM  10    US ALL OF THEIR TESTS WERE BEING RUN ON THEIR ANALYZER.

09:16AM  11    Q.   OKAY.  I'D LIKE TO REFER YOU TO AN EXHIBIT YOU SHOULD HAVE

09:16AM  12    IN YOUR BINDER.  IT'S EXHIBIT 28448.

09:17AM  13         OKAY.  DO YOU HAVE THAT, MS. PETERSON?

09:17AM  14    A.   YES.

09:17AM  15    Q.   AND IF YOU COULD TURN TO PAGE 68, PLEASE.

09:17AM  16         DO YOU HAVE THAT, MS. PETERSON?

09:17AM  17    A.   YES.

09:17AM  18    Q.   OKAY.  AND THIS IS TESTIMONY THAT YOU GAVE IN A GRAND JURY

09:17AM  19    PROCEEDING; CORRECT?

09:18AM  20    A.   YES.

09:18AM  21    Q.   AND YOU SWORE UNDER OATH TO TELL THE TRUTH?

09:18AM  22    A.   YES.

09:18AM  23    Q.   AND YOU KNEW THAT YOU WERE SUPPOSED TO TELL THE TRUTH;

09:18AM  24    RIGHT?

09:18AM  25    A.   YES.

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    3974

09:18AM  1   Q.   AND YOU WERE ASKED QUESTIONS AT THAT GRAND JURY SESSION;

09:18AM  2   RIGHT?

09:18AM  3   A.   YES.

09:18AM  4   Q.   IT WAS A VERY FORMAL SORT OF SESSION; RIGHT?

09:18AM  5   A.   YES.

09:18AM  6   Q.   SOLEMN EVEN; RIGHT?

09:18AM  7   A.   IT WAS A LONG TIME AGO, YEAH.

09:18AM  8   Q.   OKAY.  IT WAS IN 2018?

09:18AM  9   A.   YES.

09:18AM 10   Q.   AND YOU WERE ASKED A QUESTION BY ONE OF THE JURORS, RIGHT,

09:18AM 11   ON LINE 23 ON PAGE 68?

09:18AM 12   A.   THAT'S A STATEMENT BY SOMEONE ELSE.

09:18AM 13        I GUESS I'M MISUNDERSTANDING THE QUESTION.

09:18AM 14   Q.   OKAY.  I'M JUST GOING TO DIRECT YOU TO LINE 23 ON PAGE 68,

09:19AM 15   AND THE JUROR ASKED THE QUESTION:  WELL, I DON'T HEAR --

09:19AM 16            MR. LEACH:  YOUR HONOR, OBJECTION.  HEARSAY.  THIS

09:19AM 17   IS NOT PROPER.

09:19AM 18            THE COURT:  SUSTAINED.

09:19AM 19        YOU CAN DO THIS A DIFFERENT WAY.

09:19AM 20            MR. COOPERSMITH:  OKAY, YOUR HONOR.

09:19AM 21   Q.   OKAY.  MS. PETERSON, YOU WERE ASKED A QUESTION BY ONE OF

09:19AM 22   THE GRAND JURORS; CORRECT?

09:19AM 23        PAGE 68, LINE 23.

09:20AM 24   A.   WHAT I'M READING, IT'S JUST ONE LINE.

09:20AM 25   Q.   OKAY.

09:20AM  1    A.   IT'S NOT WHAT I -- IT'S NOT ME TALKING.

09:20AM  2    Q.   OKAY, MS. PETERSON.  I'LL GET THERE.

09:20AM  3         YOUR HONOR, I THINK WHAT WOULD BE EASIER IS, PURSUANT TO

09:20AM  4    RULE 801 AND RULE 613, I WOULD LIKE TO JUST PUT UP THE

09:20AM  5    TRANSCRIPT FOR MS. PETERSON SO WE CAN ALL SEE IT.

09:20AM  6         AND I THINK THE --

09:20AM  7              THE COURT:  CAN YOU ASK THE QUESTION ABOUT DID SHE

09:20AM  8    MAKE A STATEMENT AND CLASSIC 613?  IS THERE ANOTHER WAY THAT

09:20AM  9    YOU CAN DO THAT?

09:20AM  10             MR. COOPERSMITH:  I WILL TRY, YOUR HONOR, SURE.

09:20AM  11             THE COURT:  OKAY.

09:20AM  12   BY MR. COOPERSMITH:

09:20AM  13   Q.   MS. PETERSON, WE WERE TALKING ABOUT -- JUST A FEW MINUTES

09:20AM  14   AGO BEFORE I GOT INTO THIS TRANSCRIPT, YOU SAID THAT YOU WERE

09:20AM  15   TOLD THAT, SPECIFICALLY THAT THERANOS WAS RUNNING ALL OF THESE

09:20AM  16   BLOOD TESTS ON ITS THERANOS DEVICES; CORRECT?

09:20AM  17   A.   I SAID THAT IN THIS TRANSCRIPT, OR I SAID THAT I --

09:20AM  18   Q.   NO.  JUST A FEW MINUTES AGO WHEN I ASKED YOU THE QUESTION.

09:21AM  19   A.   IT WAS OUR UNDERSTANDING THAT THEY WERE DOING HUNDREDS OF

09:21AM  20   TESTS ON THEIR ANALYZER, YES.

09:21AM  21   Q.   AND I'M TRYING TO SEPARATE WHAT YOUR UNDERSTANDING WAS

09:21AM  22   VERSUS WHAT YOU WERE TOLD.

09:21AM  23        DO YOU UNDERSTAND?

09:21AM  24   A.   THEY NEVER, EVER MENTIONED TO US THAT THEY WERE DOING

09:21AM  25   VENOUS DRAWS.

PETERSON CROSS BY MR. COOPERSMITH (RES.)          3976

09:21AM  1    Q.   OKAY.

09:21AM  2    A.   VERBALLY, EVER.

09:21AM  3    Q.   MY QUESTION ISN'T THAT.

09:21AM  4    A.   OKAY.

09:21AM  5    Q.   SO LET ME START AGAIN.

09:21AM  6    A.   OKAY.

09:21AM  7    Q.   AGAIN, I'M TRYING TO SEPARATE WHAT YOU UNDERSTOOD AND WHAT

09:21AM  8    YOU WERE TOLD.

09:21AM  9    A.   OKAY.

09:21AM  10   Q.   AND I UNDERSTAND YOUR TESTIMONY AS YOU UNDERSTOOD THAT

09:21AM  11   THEY WERE DOING ALL OF THEIR TESTS ON THERANOS TECHNOLOGY;

09:21AM  12   RIGHT?

09:21AM  13   A.   YES.

09:21AM  14   Q.   THAT'S WHAT YOU'RE SAYING THAT YOU UNDERSTOOD?

09:21AM  15   A.   YES.

09:21AM  16   Q.   BUT YOU WERE NEVER SPECIFICALLY TOLD THAT BY ANYONE FROM

09:21AM  17   THERANOS?

09:21AM  18   A.   WHEN THEY SAID THEY WERE DOING HUNDREDS OF TESTS ON THEIR

09:21AM  19   ANALYZER, I THINK THAT'S TELLING ME THAT THEY DO ALL OF THEIR

09:21AM  20   TESTS ON THEIR ANALYZER.

09:21AM  21   Q.   SO IS IT YOUR TESTIMONY TODAY UNDER OATH THAT YOU RECEIVED

09:21AM  22   A SPECIFIC STATEMENT FROM MR. BALWANI THAT EVERY SINGLE TEST

09:22AM  23   THAT THEY WERE DOING WAS RUN ON A THERANOS ANALYZER?

09:22AM  24   A.   I DON'T RECALL SPECIFICALLY WHO SAID IT, BUT THAT'S --

09:22AM  25   THAT IS WHAT WE WERE TOLD.

ER-2977

PETERSON CROSS BY MR. COOPERSMITH (RES.)                3977

09:22AM  1   Q.   OKAY.  YOU DON'T RECALL SPECIFICALLY WHO SAID IT?

09:22AM  2   A.   NO.

09:22AM  3   Q.   OKAY.  AND SPECIFICALLY, WHAT IS IT THAT YOU'RE SAYING

09:22AM  4   THAT YOU WERE TOLD BY SOMEONE WHO YOU CAN'T IDENTIFY?

09:22AM  5   A.   I -- DEFINITELY ELIZABETH SAID THOSE THINGS.

09:22AM  6        I DON'T KNOW IF MR. BALWANI DID OR NOT, BUT HE WAS IN THE

09:22AM  7   ROOM THE ENTIRE MEETING THAT WE HAD AND DIDN'T CORRECT HER.

09:22AM  8        SO I DON'T RECALL SPECIFICALLY WHO SAID WHAT.

09:22AM  9   Q.   AND WHEN YOU SAY "THOSE THINGS," SPECIFICALLY WHAT IS THE

09:22AM 10   STATEMENT THAT YOU'RE REFERRING TO?

09:22AM 11   A.   THE COMMENT THAT YOU'RE TRYING TO GET ME TO SAY THAT NO

09:22AM 12   ONE EXACTLY SAID IT.

09:22AM 13   Q.   I'M JUST ASKING FOR YOUR WORDS, BEST AS YOU CAN RECALL,

09:22AM 14   WHAT IS THE STATEMENT THAT YOU ARE SAYING?

09:22AM 15   A.   THAT WE PERFORM HUNDREDS OF TESTS ON OUR THERANOS

09:22AM 16   EQUIPMENT.

09:22AM 17   Q.   OKAY.  AND THAT -- DOES IT ALSO INCLUDE THAT ALL OF THE

09:22AM 18   TESTS THAT THERANOS WAS RUNNING WERE ALL CONDUCTED ON THERANOS

09:23AM 19   EQUIPMENT?

09:23AM 20   A.   YES.

09:23AM 21   Q.   OKAY.

09:23AM 22        YOUR HONOR, I THINK WE HAVE AN INCONSISTENCY FROM THE

09:23AM 23   TRANSCRIPT, AND I'D LIKE TO PUBLISH IT.

09:23AM 24             THE COURT:  YOU WOULD LIKE TO PUBLISH PAGE 68,

09:23AM 25   LINE 23, THROUGH PAGE 69, LINE 11?

09:23AM  1              MR. COOPERSMITH:  YES, YOUR HONOR.

09:23AM  2              THE COURT:  ALL RIGHT.  WE CAN PUBLISH THAT.

09:23AM  3         (PUBLISHED. )

09:23AM  4    BY MR. COOPERSMITH:

09:23AM  5    Q.   OKAY.  SO THIS IS THE STATEMENT I WAS REFERRING TO --

09:23AM  6              THE COURT:  YES.

09:23AM  7              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:23AM  8    Q.   PAGE 68, LINE 23, DO YOU SEE THERE'S A GRAND JUROR WHO

09:23AM  9    ASKS, "WELL, I DON'T HEAR THAT THERE WAS A STATEMENT THAT THE

09:23AM 10    ACTUAL 150 OR 200 TESTS WERE ALL CONDUCTED," AND WE GO TO THE

09:23AM 11    NEXT PAGE, AND THEN YOU STARTED TALKING, "I CAN'T RECALL IS

09:23AM 12    HER --"

09:23AM 13         BUT THE GRAND JUROR FINISHES THE QUESTION "-- USING THAT

09:23AM 14    EQUIPMENT.  I DON'T HEAR THAT STATEMENT."

09:24AM 15         MR. ALLEN, IF WE CAN PUT THE FIRST PAGE UP AT THE SAME

09:24AM 16    TIME.  THANK YOU.  JUST SO WE CAN SEE THE WHOLE QUESTION.

09:24AM 17         SO THE QUESTION IS "WELL, I DON'T HEAR THAT THERE WAS EVER

09:24AM 18    A STATEMENT THAT THE ACTUAL 150 OR 200 TESTS WERE ALL CONDUCTED

09:24AM 19    USING THAT EQUIPMENT.  I DON'T HEAR THAT STATEMENT."

09:24AM 20         AND YOUR ANSWER WAS:  "I DON'T RECALL A SPECIFIC, YOU

09:24AM 21    KNOW, SHE SAID THIS ON THIS DATE.  BUT WE ABSOLUTELY, IT WAS

09:24AM 22    OUR UNDERSTANDING FOR SURE AFTER EVERYTHING WE READ AND WHAT WE

09:24AM 23    HEARD IS THAT THEIR COMPANY WAS -- WAS A COMPANY THAT WAS DOING

09:24AM 24    150 TO 200 PLUS TESTS ON THEIR EQUIPMENT THAT THEY MANUFACTURED

09:24AM 25    USING MICRO-SAMPLES OF BLOOD IN THESE 'NANOTAINERS' IN THEIR

09:24AM  1      BOX.  THERE WAS NEVER -- IT WAS NEVER A FOCAL POINT THAT THEY

09:24AM  2      WERE DOING IT ANY OTHER WAY."

09:24AM  3          DO YOU SEE THAT?

09:24AM  4      A.   YES.

09:24AM  5      Q.   AND SO IT WAS YOUR UNDERSTANDING THAT THEY WERE DOING IT

09:24AM  6      THAT WAY?

09:24AM  7      A.   YES.

09:24AM  8      Q.   BUT YOU DON'T RECALL A STATEMENT THAT WAS MADE TO YOU

09:25AM  9      ABOUT THAT POINT; RIGHT?

09:25AM  10             MR. LEACH:  OBJECTION, YOUR HONOR.  ASKED AND

09:25AM  11     ANSWERED.

09:25AM  12             THE COURT:  I THINK SHE ANSWERED THE QUESTION.

09:25AM  13     BY MR. COOPERSMITH:

09:25AM  14     Q.   OKAY.  AND YOUR TESTIMONY THAT WE'RE REFERRING TO IN THE

09:25AM  15     EXHIBIT ON THE SCREEN, THAT WAS TRUTHFUL TESTIMONY?

09:25AM  16     A.   YES.

09:25AM  17     Q.   OKAY.  OKAY.  YOU MENTIONED ON DIRECT, MS. PETERSON, THAT

09:25AM  18     YOU HAD REVIEWED AN S.E.C. FILING FROM WALGREENS; IS THAT

09:25AM  19     CORRECT?

09:25AM  20     A.   YES.

09:25AM  21     Q.   AND I THINK YOU MIGHT HAVE SAID IT WAS A 10-K?

09:25AM  22     A.   YES, FROM 2013, I THINK, THE YEAR BEFORE OUR INVESTMENT.

09:25AM  23     Q.   RIGHT.  THANK YOU.

09:25AM  24          IF YOU CAN TAKE A LOOK AT EXHIBIT 20433.  IT WILL JUST

09:25AM  25     COME UP ON YOUR SCREEN, OR IF YOU CAN FIND IT IN THE BINDERS,

09:25AM  1   IT'S NOT IN EVIDENCE YET.

09:26AM  2   A.   OKAY.

09:26AM  3   Q.   AND YOU SEE THAT THIS IS A FORM 8-K FILED BY WALGREENS?

09:26AM  4   A.   YES.

09:26AM  5   Q.   AND WHAT YOU LOOKED AT COULD HAVE BEEN AN 8-K?

09:26AM  6   A.   MY IN-HOUSE COUNSEL PULLED THIS AND I KNOW THERE WAS AN

09:26AM  7   EMAIL.  I DIDN'T LOOK AT THE FORM -- I DIDN'T LOOK THROUGH

09:26AM  8   THIS, HE DID.  AND HE SENT AN EMAIL TO JERRY AND I WITH A

09:26AM  9   HIGHLIGHT OF THE -- ONE LINE IN THE WHATEVER IT WAS.  IT WAS

09:26AM 10   THE YEAR-END REPORT FOR WALGREENS THAT SAID THAT THEY WERE

09:26AM 11   GOING TO -- THEY WERE WORKING ON THERANOS AND WORKING ON THE

09:26AM 12   ROLLOUT OF THAT.

09:26AM 13   Q.   OKAY.  YOU JUST GOT KIND OF A SNIPPET FROM YOUR IN-HOUSE

09:26AM 14   COUNSEL?

09:26AM 15   A.   CORRECT.

09:26AM 16   Q.   OKAY.  IF YOU COULD TURN IN THE EXHIBIT, OR MAYBE IT WILL

09:26AM 17   JUST COME UP ON YOUR SCREEN, TO PAGE 9 OF THE EXHIBIT.

09:27AM 18       AND DO YOU SEE THERE ARE BULLET POINTS THERE,

09:27AM 19   MS. PETERSON?

09:27AM 20   A.   YES.

09:27AM 21   Q.   AND IF YOU GO TO THE THIRD BULLET POINT ON THE PAGE, AND

09:27AM 22   JUST READ IT TO YOURSELF.

09:27AM 23   A.   YES.

09:27AM 24   Q.   OKAY.  AND THAT'S THE SNIPPET THAT YOU SAW?

09:27AM 25   A.   IT'S SOMETHING ALONG THOSE LINES, YES.

09:27AM   1     Q.   OKAY.

09:27AM   2          YOUR HONOR, WE OFFER THE FIRST PAGE OF EXHIBIT 20433 AND

09:27AM   3     PAGE 9.

09:27AM   4              MR. LEACH:  YOUR HONOR, I THINK THE WHOLE EXHIBIT

09:27AM   5     SHOULD COME IN.  NO OBJECTION TO THOSE PAGES, BUT I THINK THE

09:27AM   6     WHOLE EXHIBIT SHOULD COME IN.

09:27AM   7              MR. COOPERSMITH:  I DON'T HAVE ANY OBJECTION TO

09:27AM   8     THAT, YOUR HONOR.

09:27AM   9              THE COURT:  ALL RIGHT.  THE ENTIRETY OF THE EXHIBIT

09:27AM  10     WILL BE ADMITTED, AND IT MAY BE PUBLISHED.

09:27AM  11          (DEFENDANT'S EXHIBIT 20433 WAS RECEIVED IN EVIDENCE.)

09:27AM  12     BY MR. COOPERSMITH:

09:27AM  13     Q.   JUST TO ORIENT OURSELVES, MS. PETERSON, WE'LL GO TO THE

09:28AM  14     FIRST PAGE, AND DO YOU SEE THAT'S THE 8-K, FIRST PAGE OF THE

09:28AM  15     DOCUMENT?

09:28AM  16     A.   YES.  IS THERE A DATE?

09:28AM  17     Q.   THERE SHOULD BE.

09:28AM  18     A.   IT'S DECEMBER OF '13.

09:28AM  19     Q.   DO YOU SEE THAT NOW?

09:28AM  20     A.   YES.

09:28AM  21     Q.   OKAY.  AND IF YOU GO TO PAGE 9, AND IF WE CAN JUST

09:28AM  22     HIGHLIGHT THAT THIRD BULLET.

09:28AM  23          AND THEN YOU SEE IT SAYS, "TAKING THE NEXT STEP IN

09:28AM  24     THERANOS AND WALGREENS PLANNED NATIONAL ROLLOUT OF THERANOS

09:28AM  25     WELLNESS CENTERS BY OPENING TWO NEW CENTERS AT WALGREENS STORES

09:28AM 1    IN THE PHOENIX AREA.  A THERANOS WELLNESS CENTER IS ALSO

09:28AM 2    LOCATED AT A WALGREENS STORE IN PALO ALTO, CALIFORNIA."

09:28AM 3        DO YOU SEE THAT?

09:28AM 4    A.   YES.

09:28AM 5    Q.   AND SO THAT STATEMENT SAYS THAT THERE IS ONE WALGREENS

09:28AM 6    STORE IN PALO ALTO, AND THERE'S SOME MORE IN THE PHOENIX,

09:28AM 7    ARIZONA AREA; RIGHT?

09:28AM 8    A.   YES.

09:28AM 9    Q.   AND THIS IS WALGREENS SAYING THAT?  YOU UNDERSTAND THAT?

09:28AM 10   A.   YES.

09:29AM 11   Q.   OKAY.  YOU CAN PUT THAT ASIDE.

09:29AM 12           JUROR:  JUDGE, ARE WE SUPPOSED TO SEE THIS?

09:29AM 13           THE COURT:  IT SHOULD BE ADMITTED.

09:29AM 14           THE CLERK:  APOLOGIES.

09:29AM 15           THE COURT:  IS IT ON THE SCREEN NOW?

09:29AM 16           JUROR:  NO.

09:29AM 17           THE COURT:  OH, SORRY.

09:29AM 18       THANK YOU, MADAM JUROR.  GIVE US A SECOND.

09:29AM 19       IS IT UP NOW?

09:29AM 20           JUROR:  YES.

09:29AM 21           MR. COOPERSMITH:  AND I'M SORRY, I'LL HAVE TO GO

09:29AM 22   BACK OVER THIS, YOUR HONOR.

09:29AM 23           THE COURT:  OF COURSE.  OF COURSE.

09:29AM 24   BY MR. COOPERSMITH:

09:29AM 25   Q.   SORRY ABOUT THAT, MS. PETERSON, BUT WE NEED THE JURORS TO

09:29AM   1    SEE IT.

09:29AM   2    A.   OF COURSE.

09:29AM   3    Q.   AND NOW THAT EVERYONE HAS IT ON THE SCREEN AND I'M LOOKING

09:29AM   4    AT THE THIRD BULLET -- ACTUALLY LET'S GO TO THE FIRST PAGE SO

09:29AM   5    EVERYONE CAN SEE THE DOCUMENTS.

09:29AM   6         THIS IS A WALGREENS REPORT TO THE S.E.C.; CORRECT?

09:29AM   7    A.   CORRECT.

09:29AM   8    Q.   AND YOU SEE THERE'S A DATE ON IT, WHICH IS HIGHLIGHTED?

09:29AM   9    A.   YES.

09:29AM  10    Q.   OKAY.  AND NOW IF YOU GO TO THAT PAGE 9, AND YOU SEE

09:30AM  11    WALGREENS DISCLOSING THIS PARTICULAR INFORMATION; RIGHT?

09:30AM  12    A.   YES.

09:30AM  13    Q.   AND THIS IS WALGREENS MAKING THAT DISCLOSURE; CORRECT?

09:30AM  14    A.   CORRECT.

09:30AM  15    Q.   OKAY.  ALL RIGHT.  WE CAN PUT THAT ASIDE.

09:30AM  16         OKAY.  DURING YOUR TESTIMONY YESTERDAY, MS. PETERSON, YOU

09:30AM  17    REFERRED TO SOME BINDERS THAT YOU LOOKED AT IN EARLY OCTOBER OF

09:30AM  18    2014?

09:30AM  19    A.   YES.

09:30AM  20    Q.   AND THE BINDERS WERE SENT TO MR. TUBERGEN?

09:30AM  21    A.   CORRECT.

09:30AM  22    Q.   AND THEN YOU WENT TO HIS OFFICE AND RETRIEVED THE BINDERS

09:30AM  23    FROM HIM?

09:30AM  24    A.   YES.  I MADE A COPY.

09:30AM  25    Q.   RIGHT.  SO YOU WENT TO THE COPY MACHINE AND MADE COPIES?

09:31AM   1        A.   YES.

09:31AM   2        Q.   YOU PERSONALLY MADE THE COPIES?

09:31AM   3        A.   YES.

09:31AM   4        Q.   AND MR. TUBERGEN HAD NOT LOOKED AT THE BINDERS?

09:31AM   5        A.   NO.  HE -- I --

09:31AM   6              MR. LEACH:  OBJECTION, YOUR HONOR.  CALLS FOR

09:31AM   7        SPECULATION.

09:31AM   8              THE WITNESS:  I CAN'T SAY WHETHER HE LOOKED AT THEM.

09:31AM   9              THE COURT:  EXCUSE ME.  THERE'S AN OBJECTION.

09:31AM  10              THE WITNESS:  SORRY.

09:31AM  11              THE COURT:  SO DO YOU WANT TO --

09:31AM  12              MR. COOPERSMITH:  I'LL ASK A DIFFERENT QUESTION.

09:31AM  13              THE COURT:  WHY DON'T YOU ASK IT IN A DIFFERENT WAY?

09:31AM  14          THE RESPONSE IS STRICKEN.

09:31AM  15        BY MR. COOPERSMITH:

09:31AM  16        Q.   SO FROM WHAT YOU KNOW, YOU DON'T KNOW WHETHER MR. TUBERGEN

09:31AM  17        LOOKED AT THE BINDERS OR NOT; RIGHT?

09:31AM  18        A.   I DON'T KNOW.

09:31AM  19        Q.   BUT YOU MADE A COPY?

09:31AM  20        A.   YES.

09:31AM  21        Q.   AND SO YOU COULD LOOK AT THEM?

09:31AM  22        A.   YES, AND I LEFT HIM THE ORIGINALS.

09:31AM  23        Q.   AND YOU DID LOOK AT THE COPY YOU MADE; RIGHT?

09:31AM  24        A.   YES.

09:31AM  25        Q.   AND THEN THERE WERE TWO BINDERS?

09:31AM   1    A.   YES.

09:31AM   2    Q.   AND ONE OF THEM WAS THE MATERIAL THAT YOU REVIEWED WITH

09:31AM   3    MR. LEACH YESTERDAY?

09:31AM   4    A.   YES.

09:31AM   5    Q.   AND WE'LL LOOK AT THAT SOME MORE IN A BIT.

09:31AM   6         BUT THERE WAS A SECOND BINDER; RIGHT?

09:31AM   7    A.   YES.

09:31AM   8    Q.   AND THE SECOND BINDER HAD DATA IN IT; RIGHT?

09:31AM   9    A.   YES, IT WAS VERY SCIENTIFIC.

09:31AM  10    Q.   SCIENTIFIC, TECHNICAL DATA; RIGHT?

09:31AM  11    A.   YES.

09:31AM  12    Q.   BUT -- AND THERANOS SENT THAT TO YOU?

09:32AM  13    A.   YES.

09:32AM  14    Q.   OR SENT IT TO RDV; RIGHT?

09:32AM  15    A.   CORRECT.

09:32AM  16    Q.   AND YOU COULD HAVE DONE ANYTHING THAT YOU WANTED WITH THAT

09:32AM  17    DATA IF YOU HAD SO CHOSEN; RIGHT?

09:32AM  18    A.   CORRECT.

09:32AM  19    Q.   AND YOU NEVER, LIKE, HIRED ANY CONSULTANTS OR OTHERWISE

09:32AM  20    TRIED TO DIG INTO THE SCIENTIFIC DATA; RIGHT?

09:32AM  21              MR. LEACH:  OBJECTION.  RELEVANCE.  403.

09:32AM  22              THE COURT:  ARE YOU -- IS THIS THE LAST QUESTION IN

09:32AM  23    THIS AREA?

09:32AM  24              MR. COOPERSMITH:  ON THIS PARTICULAR TECHNICAL

09:32AM  25    BINDER ISSUE, YEAH.

PETERSON CROSS BY MR. COOPERSMITH (RES.)                3986

| | | |
|---|---|---|
| 09:32AM | 1 | THE COURT:  ALL RIGHT.  YOU CAN ASK ANOTHER |
| 09:32AM | 2 | QUESTION. |
| 09:32AM | 3 | MR. COOPERSMITH:  OKAY. |
| 09:32AM | 4 | THE COURT:  SO I'LL ALLOW THAT LAST QUESTION. |
| 09:32AM | 5 | MR. COOPERSMITH:  WAS THERE AN ANSWER?  I'M NOT SURE |
| 09:32AM | 6 | I HEARD IT. |
| 09:32AM | 7 | THE COURT:  NO.  SHE CAN ANSWER. |
| 09:32AM | 8 | THE WITNESS:  NO. |
| 09:32AM | 9 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR. |
| 09:32AM | 10 | Q.   BUT GOING TO THE FIRST BINDER, THAT'S WHAT YOU LOOKED |
| 09:32AM | 11 | THROUGH TO TRY TO UNDERSTAND WHAT THERANOS WAS SENDING; RIGHT? |
| 09:32AM | 12 | A.   YES. |
| 09:32AM | 13 | Q.   OKAY.  NOW, THE SAME DAY THAT YOU TOOK THE BINDERS AND |
| 09:33AM | 14 | MADE A COPY, THAT WAS THE SAME DAY THAT YOU HAD A CALL WITH |
| 09:33AM | 15 | MS. HOLMES? |
| 09:33AM | 16 | A.   I BELIEVE SO. |
| 09:33AM | 17 | Q.   AND MR. TUBERGEN WAS ON THE LINE? |
| 09:33AM | 18 | A.   YES. |
| 09:33AM | 19 | Q.   AND AT THE TIME THAT YOU HAD THE CALL, YOU HAD NOT ALREADY |
| 09:33AM | 20 | LOOKED AT THE BINDERS? |
| 09:33AM | 21 | A.   I BELIEVE I FLIPPED THROUGH THEM TO TRY TO GET A SENSE OF |
| 09:33AM | 22 | SOME HIGH-LEVEL QUESTIONS THAT WE WANTED TO ASK FIRST. |
| 09:33AM | 23 | Q.   OKAY.  AND FLIPPING THROUGH IT MEANS LOOKING AT IT BRIEFLY |
| 09:33AM | 24 | WITHOUT GETTING INTO DETAIL ABOUT IT?  IS THAT WHAT YOU'RE |
| 09:33AM | 25 | SAYING? |

09:33AM  1    A.   ENOUGH TO BE PREPARED TO HAVE A PHONE CALL, YES.

09:33AM  2    Q.   OKAY.  AND IS THAT HOW YOU WERE ABLE TO FORMULATE THE

09:33AM  3    QUESTIONS THAT YOU WANTED TO ASK MS. HOLMES IN THAT CALL?

09:33AM  4    A.   YES.

09:33AM  5    Q.   OKAY.  IF WE COULD TAKE A LOOK AT EXHIBIT 2015, WHICH IS

09:33AM  6    ALREADY IN EVIDENCE.

09:34AM  7         THESE ARE THE NOTES THAT YOU TOOK OF THAT CALL WITH

09:34AM  8    MS. HOLMES?

09:34AM  9    A.   YES.

09:34AM 10    Q.   AND MR. TUBERGEN WAS ALSO ON THE CALL; CORRECT?

09:34AM 11    A.   YES.

09:34AM 12    Q.   AND MR. BALWANI WAS NOT ON THE CALL?

09:34AM 13    A.   NOT THAT I KNOW OF.

09:34AM 14    Q.   OKAY.  WELL, NO ONE EVER ANNOUNCED HIM OR --

09:34AM 15    A.   CORRECT.

09:34AM 16    Q.   RIGHT.  OKAY.

09:34AM 17         AND THEN IF YOU GO THROUGH IT, YOU SEE THERE'S A BOLD AT

09:34AM 18    THE TOP, "WHAT IS THE LONG-TERM VISION OF THERANOS?"

09:34AM 19         DO YOU SEE THAT?

09:34AM 20    A.   YES.

09:34AM 21    Q.   AND THAT WAS A QUESTION THAT YOU HAD; RIGHT?

09:34AM 22    A.   YES.

09:34AM 23    Q.   AND YOU AND MR. TUBERGEN WERE INTERESTED IN WHAT THE

09:34AM 24    LONG-TERM VISION OF THERANOS WAS?

09:34AM 25    A.   YES, WE WANTED TO HEAR HER TELL US AGAIN -- HE ALREADY

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    3988

09:34AM  1    HEARD IT, I HAD NOT -- WHAT THEIR VISION OF THE COMPANY WAS.

09:34AM  2    Q.   AND LONG-TERM VISION MEANS YEARS OUT INTO THE FUTURE?

09:34AM  3    A.   WHERE THEY ARE NOW AND WHERE THEY ARE GOING, YES.

09:34AM  4    Q.   INCLUDING YEARS OUT INTO THE FUTURE?

09:35AM  5    A.   SURE.

09:35AM  6    Q.   AND THEN IT SAYS BELOW THAT, THERE'S A LINE THAT READS,

09:35AM  7    "START WITH A LASER-FOCUS ON COMMERCIAL LAB MARKET

09:35AM  8    ($180 BILLION), AND THEN DIRECT TO CONSUMER MARKETS."

09:35AM  9         DO YOU SEE THAT?

09:35AM 10    A.   YES.

09:35AM 11    Q.   AND YOU UNDERSTOOD FROM WHAT MS. HOLMES HAD TOLD YOU THAT

09:35AM 12    THE START THAT THERANOS WAS TRYING TO ENGAGE IN WAS TO HAVE A

09:35AM 13    LASER-FOCUS ON THE COMMERCIAL LAB MARKET; RIGHT?

09:35AM 14    A.   THAT WAS WHERE THEY WERE GOING TO BEGIN, YES.

09:35AM 15    Q.   FOR EXAMPLE, THE WALGREENS PROGRAM?

09:35AM 16    A.   YES.

09:35AM 17    Q.   OKAY.  AND THEN BELOW THAT IT HAS WALGREENS.

09:35AM 18         DO YOU SEE THAT?

09:35AM 19    A.   YES.

09:35AM 20    Q.   AND THEN IT HAS INSURANCE AND HOSPITAL.

09:35AM 21         DO YOU SEE THAT?

09:35AM 22    A.   YES.

09:35AM 23    Q.   AND THEN IT HAS PHARMA.

09:35AM 24         DO YOU SEE THAT?

09:35AM 25    A.   YES.

PETERSON CROSS BY MR. COOPERSMITH (RES.)    3989

09:35AM 1     Q.   AND IT SAYS, "MARKET:  TBD."

09:35AM 2          DO YOU SEE THAT?

09:35AM 3     A.   YES.

09:35AM 4     Q.   AND THAT MEANS TO BE DETERMINED?

09:35AM 5     A.   YES.

09:35AM 6     Q.   AND THEN IF YOU GO DOWN THE PAGE, IT SAYS WALGREENS.

09:35AM 7          SO YOU HAD -- AND IT'S IN BOLD.  SO THAT'S YOUR QUESTION

09:36AM 8     OR SERIES OF QUESTIONS; RIGHT?

09:36AM 9     A.   YES.  YES.

09:36AM 10    Q.   SO YOU HAD A PARTICULAR INTEREST IN WHAT WAS GOING ON WITH

09:36AM 11    WALGREENS; RIGHT?

09:36AM 12    A.   YES, THE CONTRACTS WERE PARAMOUNT TO OUR INVESTMENT

09:36AM 13    DECISION.

09:36AM 14    Q.   RIGHT.  THE WALGREENS PROGRAM WAS, LIKE, REALLY IMPORTANT

09:36AM 15    TO MAKING THE DECISION; RIGHT?

09:36AM 16    A.   YES.

09:36AM 17    Q.   OKAY.  AND THEN BELOW THAT IT SAYS "PROJECTIONS BASED ON

09:36AM 18    900 STORES."

09:36AM 19         DO YOU SEE THAT?

09:36AM 20    A.   YES.

09:36AM 21    Q.   AND YOU UNDERSTOOD THAT FINANCIAL INFORMATION, AND WE'LL

09:36AM 22    TALK ABOUT THIS A LITTLE MORE, TOO, THE FINANCIAL INFORMATION

09:36AM 23    FOR 2015 WAS BASED ON AN ASSUMPTION OF 200 STORES BEING IN

09:36AM 24    OPERATION BETWEEN WALGREENS AND THERANOS; RIGHT?

09:36AM 25    A.   200 --

PETERSON CROSS BY MR. COOPERSMITH (RES.)                3990

09:36AM  1      Q.   I'M SORRY, I SAID 900.  I MEANT TO SAY 900.

09:36AM  2      A.   YES, THAT'S WHAT THEY TOLD US.

09:36AM  3      Q.   RIGHT.  THAT THAT WAS AN ASSUMPTION, IF THEY ACTUALLY

09:36AM  4      BUILT THOSE STORES, THEN THAT'S WHAT THEIR REVENUE PROJECTION

09:36AM  5      FOR 2015 WOULD BE BASED ON; RIGHT?

09:36AM  6      A.   CORRECT.

09:36AM  7      Q.   OKAY.  NOW, YOU WOULD HAVE BEEN HAPPY -- I DON'T WANT TO

09:37AM  8      SAY YOU PERSONALLY -- IF THE 900 STORES WAS EVEN 200 STORES;

09:37AM  9      RIGHT?

09:37AM  10     A.   I WOULD LIKE TO HAVE SEEN MORE THAN -- TO GET MORE TO

09:37AM  11     HALF.  BUT ANYTHING ABOVE THE 40 THAT THEY WERE AT SHOWED THAT

09:37AM  12     THEY WERE MOVING IN THE RIGHT DIRECTION.

09:37AM  13          WE KNEW THAT THESE WERE PROJECTIONS, BUT THERE WAS NEVER

09:37AM  14     ANY INDICATION THAT WALGREENS WAS NOT GOING TO ROLL OUT PAST

09:37AM  15     THE 40 THAT THEY WERE ALREADY IN.

09:37AM  16     Q.   OKAY.  YOU WEREN'T PRIVY TO THE DISCUSSIONS BETWEEN

09:37AM  17     THERANOS AND WALGREENS?

09:37AM  18     A.   NO.

09:37AM  19     Q.   OKAY.  AND SO -- BUT YOU WOULD HAVE BEEN HAPPY WITH

09:37AM  20     ANYTHING OVER THE 40, RIGHT, IS WHAT YOU JUST SAID?

09:37AM  21     A.   WE WOULD HAVE -- I THINK I SAID YESTERDAY, IF THEY HAD HIT

09:37AM  22     HALF OF THESE STORES, WE WOULD HAVE CONSIDERED THAT A SUCCESS.

09:37AM  23     Q.   AND YOU WOULD HAVE BEEN HAPPY WITH EVEN 200 STORES IN

09:37AM  24     2015; RIGHT?

09:37AM  25     A.   WE PLANNED ON 900, AND WE ALSO PLANNED ON 300 FROM

09:38AM   1      SAFEWAY, AMONG MANY OTHERS.  SO, I MEAN, WE WOULD HAVE HOPED

09:38AM   2      THAT THEY WERE MOVING FORWARD ON THE PLAN OF WHAT THEY LAID OUT

09:38AM   3      FOR US.

09:38AM   4      Q.   OKAY.  AND MY QUESTION IS SIMPLY VERY NARROW.  IT'S YOU

09:38AM   5      WOULD HAVE BEEN HAPPY IF THERANOS EVEN HAD 200 STORES IN 2015?

09:38AM   6               MR. LEACH:  OBJECTION, YOUR HONOR.  ASKED AND

09:38AM   7      ANSWERED.

09:38AM   8               THE COURT:  I'LL ALLOW YOU TO ANSWER.

09:38AM   9          DO YOU UNDERSTAND THE QUESTION?

09:38AM  10               THE WITNESS:  I WOULD HAVE LIKED TO HAVE SEEN THEM

09:38AM  11      COME CLOSE TO THEIR PLAN.

09:38AM  12      BY MR. COOPERSMITH:

09:38AM  13      Q.   OKAY.  OKAY.  LET'S HAVE YOU TAKE A LOOK AT EXHIBIT 28311

09:38AM  14      IN YOUR BINDERS.

09:39AM  15          OKAY.  DO YOU HAVE THAT?

09:39AM  16      A.   YES.

09:39AM  17      Q.   OKAY.  AND DO YOU SEE THAT'S A MEMORANDUM?

09:39AM  18      A.   YES.

09:39AM  19      Q.   OKAY.  NOW, IN APRIL OF 2017, YOU GAVE AN INTERVIEW TO

09:39AM  20      SOME PEOPLE WHO WORKED FOR THE GOVERNMENT; RIGHT?

09:39AM  21      A.   YES.

09:39AM  22      Q.   AND ONE OF THE PEOPLE WHO WAS THERE WAS POSTAL INSPECTOR

09:39AM  23      CHRISTOPHER MCCOLLOW?

09:39AM  24      A.   OKAY.

09:39AM  25      Q.   AND HE'S SITTING RIGHT THERE (INDICATING)?

09:39AM   1     A.   OKAY.

09:39AM   2     Q.   DO YOU RECOGNIZE HIM?

09:39AM   3     A.   I DON'T.

09:39AM   4     Q.   AND THERE WERE OTHER PEOPLE THERE FROM OTHER GOVERNMENTAL

09:39AM   5     AGENCIES?

09:39AM   6     A.   YES.

09:39AM   7     Q.   AND DID YOU UNDERSTAND THAT YOU WERE GIVING AN INTERVIEW

09:39AM   8     IN CONNECTION WITH AN INVESTIGATION THAT THE GOVERNMENT WAS

09:39AM   9     DOING?

09:39AM  10     A.   YES.

09:39AM  11     Q.   AND YOU UNDERSTAND THAT YOU WERE REQUIRED TO TELL THE

09:39AM  12     TRUTH?

09:39AM  13     A.   YES.

09:39AM  14     Q.   AND THAT THERE WERE CONSEQUENCES IF YOU DIDN'T; RIGHT?

09:40AM  15     A.   YES.

09:40AM  16     Q.   AND YOU DID TRY TO TELL THE TRUTH; RIGHT?

09:40AM  17     A.   YES.

09:40AM  18     Q.   OKAY.  AND IF YOU COULD TAKE A LOOK AT PAGE 4 OF THE

09:40AM  19     DOCUMENT IN FRONT OF YOU, AND IF YOU WOULD LOOK AT THE THIRD

09:40AM  20     PARAGRAPH UP FROM IT THE BOTTOM.

09:40AM  21          YOU TOLD THE GOVERNMENT DURING THAT INTERVIEW THAT YOU

09:40AM  22     THOUGHT 900 STORES MAY HAVE BEEN AMBITIOUS, BUT YOU WERE STILL

09:40AM  23     COMFORTABLE WITH THE INVESTMENT EVEN IF THERANOS WAS ONLY

09:40AM  24     LOCATED IN 200 STORES?

09:40AM  25     A.   OKAY.

09:40AM 1    Q.   THAT'S WHAT YOU TOLD THE GOVERNMENT?

09:40AM 2    A.   YES, THEY WERE MOVING FORWARD.  THAT WOULD HAVE BEEN -- I

09:40AM 3    WOULDN'T HAVE BEEN -- I DON'T THINK WE WOULD HAVE BEEN SUPER

09:40AM 4    HAPPY THAT THEY DIDN'T HIT THEIR PLAN, BUT THEY WERE DEFINITELY

09:41AM 5    MOVING TOWARDS A ROLLOUT AT 200 STORES.

09:41AM 6    Q.   OKAY.  AND YOU UNDERSTOOD THAT 900 STORES MAY HAVE BEEN

09:41AM 7    AMBITIOUS?

09:41AM 8    A.   YES.

09:41AM 9    Q.   AND YOU WOULD HAVE BEEN STILL COMFORTABLE IF THEY HAD ONLY

09:41AM 10   HAD 200 STORES IN 2015?

09:41AM 11   A.   YES.

09:41AM 12   Q.   OKAY.  LET'S GO BACK TO EXHIBIT 2015 THAT WE WERE JUST

09:41AM 13   LOOKING AT A MINUTE AGO AND JUST FINISH THE DOCUMENT.

09:41AM 14        DO YOU SEE THERE'S A SECTION CALLED RISKS?

09:41AM 15   A.   YES.

09:41AM 16   Q.   AND UNDER THAT YOU WRITE, "NOW HAVE LONG-TERM CONTRACTS,

09:41AM 17   SO RISK IS EXECUTION"; RIGHT?

09:41AM 18   A.   YES.  ELIZABETH SAID THAT.

09:41AM 19   Q.   RIGHT.  AND WE TALKED ABOUT THAT YESTERDAY?

09:41AM 20   A.   YES.

09:41AM 21   Q.   OKAY.  IF YOU WOULD GO TO THE NEXT PAGE.

09:42AM 22        OH, I'M SORRY, JUST DO ONE OTHER THING ON THE FIRST PAGE.

09:42AM 23        UNDER THAT SAME SECTION, RISKS, DO YOU SEE THAT THERE'S A

09:42AM 24   SECTION THAT SAYS, "USED ARIZONA MARKET AS TEST"?

09:42AM 25   A.   YES.

ER-2994

09:42AM  1     Q.   AND THEN IF YOU GO TO THE NEXT PAGE, THERE'S A SECTION OR

09:42AM  2     A NOTE ABOUT "TALK ABOUT RDV INVESTMENT PHILOSOPHY"?

09:42AM  3     A.   YES.

09:42AM  4     Q.   AND ONE OF THEM IS TO "BUILD GREAT LONG-TERM COMPANIES"?

09:42AM  5     A.   YES.

09:42AM  6     Q.   AND BELOW THAT THERE'S A SECTION CALLED "THIS ROUND"?

09:42AM  7     A.   YES.

09:42AM  8     Q.   AND THAT'S REFERRING TO THE INVESTMENT ROUND; RIGHT?

09:42AM  9     A.   YES.  WE ASKED HER THE PLANS FOR THE CAPITAL RAISE.

09:42AM  10    Q.   OKAY.  AND THEN THERE'S A "USE OF PROCEEDS."

09:42AM  11         AND THEN YOU WROTE "DID NOT DISCUSS"; RIGHT?

09:42AM  12    A.   CORRECT.

09:42AM  13    Q.   AND SO ON THAT CALL, THAT WAS SOMETHING THAT WAS NOT

09:42AM  14    DISCUSSED; RIGHT?

09:42AM  15    A.   CORRECT.

09:42AM  16    Q.   OKAY.  OKAY.  LET'S PUT THAT ASIDE.

09:43AM  17         IF WE CAN GO TO EXHIBIT 2033.  THIS IS NOT IN EVIDENCE.

09:43AM  18         BUT IF YOU TAKE A LOOK AT IT ON YOUR SCREEN, MS. PETERSON,

09:43AM  19    DO YOU SEE THAT IT'S AN EMAIL -- IT'S AN EMAIL STRING BETWEEN

09:43AM  20    YOU AND OTHER PEOPLE AT RDV?

09:43AM  21    A.   YES.

09:43AM  22    Q.   AND IT RELATES TO THE THERANOS INVESTMENT?

09:43AM  23    A.   YES.

09:43AM  24         MR. COOPERSMITH:  YOUR HONOR, WE OFFER 2033.

09:43AM  25         MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:43AM 1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:43AM 2          (GOVERNMENT'S EXHIBIT 2033 WAS RECEIVED IN EVIDENCE.)

09:43AM 3      BY MR. COOPERSMITH:

09:43AM 4      Q.   OKAY.  AND AT THE BOTTOM THERE'S AN EMAIL FROM

09:43AM 5      KARIUKI KUNGU?

09:43AM 6      A.   YES, KARIUKI KUNGU.

09:43AM 7      Q.   KARIUKI KUNGU, THANK YOU.

09:44AM 8          AND HE SAYS, "HEY LISA,

09:44AM 9          "WE WERE WONDERING IF BDT IS THE GP WE SHOULD LIST FOR

09:44AM 10     THERANOS?"

09:44AM 11         DO YOU SEE THAT?

09:44AM 12     A.   YES.

09:44AM 13     Q.   AND BDT IS THE BYRON TROTT ORGANIZATION?

09:44AM 14     A.   YES, THEY'RE A PRIVATE EQUITY FIRM.

09:44AM 15     Q.   THANK YOU, MS. PETERSON.

09:44AM 16         AND GP, THAT REFERS TO GENERAL PARTNER; IS THAT RIGHT?

09:44AM 17     A.   CORRECT.

09:44AM 18     Q.   AND THEN YOU ANSWERED, "NO, THEY ARE NOT PART OF THIS

09:44AM 19     TRANSACTION.  IT'S A DIRECT."

09:44AM 20         IS THAT RIGHT?

09:44AM 21     A.   YES.

09:44AM 22     Q.   AND YOU TALKED ABOUT THIS YESTERDAY.  THIS WAS A DIRECT

09:44AM 23     INVESTMENT IN THERANOS; RIGHT?

09:44AM 24     A.   YES.

09:44AM 25     Q.   AND THEN ABOVE THAT MR. -- I'M SORRY, IS IT MISTER OR

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    3996

09:44AM  1     MISS?

09:44AM  2     A.   MISTER.

09:44AM  3     Q.   MR. KUNGU SAYS, "OK COOL.  ARE THERE ANY OF THE GP'S THAT

09:45AM  4     ARE INVESTING, KIND OF LIKE PARTNERS GROUP WITH MULTI PLAN."

09:45AM  5          DO YOU SEE THAT?

09:45AM  6     A.   YES.

09:45AM  7     Q.   AND THEN YOU RESPOND, "NO, SHE" -- ARE YOU REFERRING TO

09:45AM  8     MS. HOLMES THERE?

09:45AM  9     A.   YES.

09:45AM  10    Q.   "SHE DOESN'T WANT ANYONE WITH A FORCED TIME HORIZON

09:45AM  11    INVESTING."

09:45AM  12         DO YOU SEE THAT?

09:45AM  13    A.   YES.

09:45AM  14    Q.   "AND THE FAMILIES SHE IS BRINGING IN NOW ARE TAKING OUT

09:45AM  15    THE CURRENT VC."

09:45AM  16         DO YOU SEE THAT?

09:45AM  17    A.   YES.

09:45AM  18    Q.   AND THAT'S VENTURE CAPITAL?

09:45AM  19    A.   YES.

09:45AM  20    Q.   AND SO YOU UNDERSTOOD AT THIS TIME THAT YOU WERE HAVING

09:45AM  21    THIS EMAIL EXCHANGE THAT MS. HOLMES DID NOT WANT INVESTORS WHO

09:45AM  22    HAD A FORCED TIME HORIZON; RIGHT?

09:45AM  23    A.   THAT WAS MY UNDERSTANDING, YES.

09:45AM  24    Q.   MEANING PEOPLE THAT WANTED TO CASH OUT OF THE INVESTMENT

09:45AM  25    MORE QUICKLY?

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    3997

09:45AM   1    A.   SHE WANTED LONGER TERM CAPITAL.

09:45AM   2    Q.   RIGHT.  LONGER TERM INVESTORS?

09:45AM   3    A.   YES.

09:45AM   4    Q.   OKAY.  LET'S GO TO EXHIBIT 2073, AND THIS IS ALREADY IN

09:46AM   5    EVIDENCE.

09:46AM   6         THIS IS AN EMAIL AND AN ATTACHED MEMO THAT YOU PREPARED

09:46AM   7    RELATING TO THERANOS; CORRECT?

09:46AM   8    A.   YES.

09:46AM   9    Q.   AND IF YOU GO TO THE EMAIL JUST TO START WITH, THERE'S A

09:46AM  10    LINE THERE WHERE YOU SAY THAT YOU'RE PREPARING THE MEMO, AND

09:46AM  11    THE WORDS YOU USED ARE WITHOUT -- SO THAT OTHERS WOULDN'T HAVE

09:46AM  12    TO READ THROUGH THE WHOLE FOOT OF MATERIALS.

09:46AM  13         IS THAT WHAT YOU'RE SAYING?

09:46AM  14    A.   YES.

09:46AM  15    Q.   AND THAT'S WHY YOU TOOK ON THE TASK OF LOOKING THROUGH THE

09:46AM  16    BINDERS AND TRYING TO SYNTHESIZE MATERIALS; RIGHT?

09:46AM  17    A.   YES.

09:46AM  18    Q.   SO OTHERS WOULDN'T HAVE TO LOOK THROUGH THE BINDERS?

09:46AM  19    A.   CORRECT.

09:46AM  20         AND THEY WEREN'T ON THE PHONE CALL, SO CAPTURING WHAT WAS

09:46AM  21    SAID WAS IMPORTANT.

09:46AM  22    Q.   OKAY.  AND THIS IS A MEMO THAT YOU WROTE ON OCTOBER 3RD?

09:47AM  23    A.   CORRECT.

09:47AM  24    Q.   OKAY.

09:47AM  25    A.   WELL, BETWEEN THE 3RD AND THE 12TH.

PETERSON CROSS BY MR. COOPERSMITH (RES.)                3998

09:47AM  1    Q.   OKAY.  IF WE GO TO THE NEXT PAGE, THIS IS THE FIRST PAGE

09:47AM  2    OF THE MEMO, AND THEN AT THIS TIME BETWEEN THE 3RD AND THE

09:47AM  3    12TH, I THINK YOU JUST SAID, OF OCTOBER OF 2014, AT THAT POINT

09:47AM  4    YOU HAD NEVER MET OR SPOKEN TO SUNNY BALWANI; RIGHT?

09:47AM  5    A.   CORRECT.

09:47AM  6    Q.   AND THE ONLY CONTACT THAT YOU HAD WITH MR. BALWANI WAS AT

09:47AM  7    THAT MEETING ON OCTOBER 14TH AND IN SOME EMAILS AFTER THAT;

09:47AM  8    RIGHT?

09:47AM  9    A.   CORRECT.

09:47AM  10   Q.   OKAY.  AND I THINK YOU SAID THE MEETING ON OCTOBER 14TH,

09:47AM  11   WHICH WE'LL GET TO, WAS ABOUT FOUR TO FOUR AND A HALF HOURS?

09:47AM  12   A.   YES.

09:47AM  13   Q.   OKAY.  AND PART OF THAT, THE LAST PART OF IT WAS A TOUR;

09:47AM  14   RIGHT?

09:47AM  15   A.   CORRECT.

09:47AM  16   Q.   AND MR. BALWANI DIDN'T GO ON THE TOUR?

09:47AM  17   A.   CORRECT.

09:47AM  18   Q.   BUT HE WAS AT THE MEETING?

09:47AM  19   A.   YES.

09:47AM  20   Q.   OKAY.  LET'S JUST GO TO THE SECOND PAGE OF THE MEMO,

09:48AM  21   EXHIBIT 2073.

09:48AM  22        AND AT THIS TIME YOUR UNDERSTANDING WAS, IF YOU LOOK AT

09:48AM  23   THE FIRST LINE AFTER "DESCRIBE THE WALGREENS OPPORTUNITY," AT

09:48AM  24   THIS TIME YOU UNDERSTOOD THAT -- YOUR UNDERSTANDING WAS THAT

09:48AM  25   THERANOS OPERATES JUST 22 LAB LOCATIONS.

ER-2999

09:48AM  1          DO YOU SEE THAT?

09:48AM  2     A.   YES.

09:48AM  3     Q.   OKAY.  AND THEN IF YOU GO DOWN FURTHER, THERE'S A LINE IN

09:48AM  4     THAT SAME PARAGRAPH THAT SAYS, "THERANOS'S REVENUE FOR 2015 IS

09:48AM  5     PROJECTED TO BE $990 MILLION AND ASSUMES THEY OPEN 900

09:48AM  6     WALGREENS-THERANOS CENTERS NEXT YEAR."

09:48AM  7          DO YOU SEE THAT?

09:48AM  8     A.   YES.

09:48AM  9     Q.   OKAY.  NOW, THEN YOU HAVE A SECTION BELOW THAT CALLED

09:48AM 10     "WHAT ARE THE MAIN RISKS?"

09:48AM 11          DO YOU SEE THAT?

09:48AM 12     A.   YES.

09:48AM 13     Q.   AND AGAIN, YOU'RE IDENTIFYING THE SAME RISKS; RIGHT?

09:48AM 14     A.   I'M IDENTIFYING THE SAME RISKS, THE EXECUTION, YES.

09:48AM 15     Q.   RIGHT.  THAT'S WHAT I WAS REFERRING TO.

09:48AM 16     A.   YES.

09:48AM 17     Q.   AND SO THAT FIRST SENTENCE, IT SAYS, "HOLMES BELIEVES THE

09:49AM 18     COMPANY'S PRIMARY RISK IS THE EXECUTION OF ITS BUSINESS PLAN,

09:49AM 19     RATHER THAN TECHNOLOGY, VALIDATION, AND CUSTOMER ACCEPTANCE.

09:49AM 20          DO YOU SEE THAT?

09:49AM 21     A.   YES.

09:49AM 22     Q.   AND SO THAT'S WHAT YOU UNDERSTOOD THERANOS WAS TELLING YOU

09:49AM 23     THEIR MAIN RISK WAS; RIGHT?

09:49AM 24     A.   YES.

09:49AM 25     Q.   AND AGAIN, EXECUTION RISK, OR EXECUTION OF THE BUSINESS

09:49AM  1    PLAN, THAT'S THE RISK THAT DESPITE THEIR GOALS, THEY WOULDN'T

09:49AM  2    ACTUALLY ROLL OUT ALL OF THE STORES THAT THEY WANTED TO ROLL

09:49AM  3    OUT?

09:49AM  4    A.    THAT'S CORRECT.

09:49AM  5    Q.    OKAY.  IF WE GO TO THE LAST SECTION ON THAT SAME PAGE,

09:49AM  6    THAT'S PAGE 5 OF THE EXHIBIT, THERE'S A SECTION ABOUT "WHAT ARE

09:49AM  7    THERANOS'S KEY OBJECTIVES FOR THE MEETING ON OCTOBER 14TH?"

09:49AM  8          RIGHT?

09:49AM  9    A.    YES.

09:49AM  10   Q.    AND SO THIS WAS TRYING TO INFORM YOUR GROUP THAT -- JUST

09:49AM  11   PREPARING FOR THE OCTOBER 14TH MEETING; RIGHT?

09:49AM  12   A.    YES.

09:49AM  13   Q.    AND YOU WROTE, "THERANOS DESIRES A LONG-TERM PARTNERSHIP

09:49AM  14   WITH INVESTORS IN THE CURRENT FUNDRAISING ROUND.  IN

09:49AM  15   PARTICULAR, HOLMES IS SEEKING INVESTORS WHO WANT TO BUILD A

09:50AM  16   GREAT COMPANY THAT WILL BOTH 'DO WELL AND DO GOOD' OVER THE

09:50AM  17   COURSE OF MULTIPLE GENERATIONS."

09:50AM  18         DO YOU SEE THAT?

09:50AM  19   A.    YES.

09:50AM  20   Q.    "WITH LESS EMPHASIS ON LIQUIDITY AND MORE EMPHASIS ON

09:50AM  21   LONG-TERM CAPITAL APPRECIATION."

09:50AM  22         DO YOU SEE THAT?

09:50AM  23   A.    YES.

09:50AM  24   Q.    AND THAT'S WHAT YOU UNDERSTOOD FROM YOUR CONVERSATION WITH

09:50AM  25   MS. HOLMES?

PETERSON CROSS BY MR. COOPERSMITH (RES.)                4001

09:50AM  1    A.   YES.

09:50AM  2    Q.   AND RDV WAS PREPARED TO MAKE A MULTI-GENERATIONAL

09:50AM  3    COMMITMENT?

09:50AM  4    A.   YES.

09:50AM  5    Q.   LET'S GO TO THE NEXT PAGE, PAGE 6.

09:50AM  6         AND IN PARTICULAR, LET'S JUST START WITH THE BULLET POINT

09:50AM  7    THAT BEGINS WITH PATENTS, "HOLMES'S NAME IS ON 18 U.S. AND 66

09:50AM  8    FOREIGN."

09:50AM  9         DO YOU SEE THAT?

09:50AM 10    A.   YES.

09:50AM 11    Q.   AND WE TALKED ABOUT THIS YESTERDAY.  THIS WAS SOMETHING OF

09:50AM 12    INTEREST TO YOU, THAT THERANOS HAD ENGAGED IN THIS PROCESS OF

09:50AM 13    OBTAINING PATENTS ON THEIR TECHNOLOGY?

09:51AM 14    A.   YES.

09:51AM 15    Q.   AND THEN IF YOU GO TO, THERE'S A BULLET BELOW THAT AND IT

09:51AM 16    SAYS, "A THERANOS ANALYZER STATION IS A SMALL FRACTION OF THE

09:51AM 17    SIZE OF A CURRENT LAB."

09:51AM 18         DO YOU SEE THAT?

09:51AM 19    A.   YES.

09:51AM 20    Q.   AND IT SAYS, "MAKING IT POSSIBLE TO PLACE A THERANOS LAB

09:51AM 21    IN THE OPERATING ROOM OR IN A MILITARY EVACUATION HELICOPTER,

09:51AM 22    ON SHIPS, IN REFUGEE CAMPS, VIRTUALLY ANYWHERE."

09:51AM 23         AND THEN IT GOES ON.

09:51AM 24         DO YOU SEE THAT?

09:51AM 25    A.   YES.

ER-3002

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4002

09:51AM 1    Q.   AND YOU UNDERSTAND THAT IF THE DEVICE WAS SMALL, THAT

09:51AM 2    WOULD MAKE THINGS POSSIBLE; RIGHT?

09:51AM 3    A.   YES.

09:51AM 4    Q.   AND YOU DON'T REMEMBER THE SPECIFICS OF WHAT MS. HOLMES OR

09:51AM 5    MR. BALWANI TOLD YOU ABOUT THE MILITARY APPLICATION; CORRECT?

09:51AM 6    A.   AT THIS POINT IN TIME WHEN THIS MEMO WAS DONE, NO.

09:51AM 7         BUT WHEN WE WERE THERE ON THE 14TH THAT WAS DISCUSSED.

09:51AM 8    Q.   OKAY.  AND WHEN YOU WERE THERE ON THE 14TH, YOU REMEMBER

09:52AM 9    THAT THEY DISCUSSED SOMETHING ABOUT THE DEPARTMENT OF DEFENSE;

09:52AM 10   RIGHT?

09:52AM 11   A.   YES.

09:52AM 12   Q.   AND SOMETHING ABOUT HELICOPTERS?

09:52AM 13   A.   YES.

09:52AM 14   Q.   BUT YOU DON'T REMEMBER SPECIFICALLY WHAT THEY SAID?

09:52AM 15   A.   JUST THAT THE ANALYZERS WERE ON MILITARY HELICOPTERS AND

09:52AM 16   BEING USED BY THE DEPARTMENT OF DEFENSE.

09:52AM 17   Q.   BUT DO YOU REMEMBER THEIR EXACT WORDS?

09:52AM 18   A.   NOT THE EXACT WORDS, NO.

09:52AM 19   Q.   BUT YOU NEVER -- HELICOPTERS CAME UP IN THE CONVERSATION?

09:52AM 20   A.   YES.

09:52AM 21   Q.   AND THE DEPARTMENT OF DEFENSE?

09:52AM 22   A.   AND THAT THEY WERE BEING USED IN MILITARY USES ON

09:52AM 23   HELICOPTERS, YES.

09:52AM 24   Q.   THAT THEY HAD SOME RELATIONSHIP WITH THE MILITARY?

09:52AM 25   A.   YES.

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4003

09:52AM  1      Q.   AND THERE WAS SOME EFFORT TO PUT THESE DEVICES ON

09:52AM  2      HELICOPTERS?

09:52AM  3      A.   YES.

09:52AM  4      Q.   OKAY.  OKAY.  LET'S LOOK AT EXHIBIT 2192.

09:53AM  5           AND THIS IS NOT IN EVIDENCE, SO LET'S JUST LOOK AT IT

09:53AM  6      TOGETHER FOR A MINUTE, MS. PETERSON.

09:53AM  7           THIS IS AN EMAIL FROM A PERSON NAMED CAMDEN BRIEDEN?

09:53AM  8      A.   UH-HUH.

09:53AM  9      Q.   TO YOU AND OTHERS WITHIN RDV.

09:53AM 10           DO YOU SEE THAT?

09:53AM 11      A.   YES.

09:53AM 12      Q.   AND THIS IS NOVEMBER 6TH, 2014?

09:53AM 13      A.   YES.

09:53AM 14      Q.   AND SO THIS IS JUST ACTUALLY A FEW DAYS AFTER THE

09:53AM 15      INVESTMENT WAS MADE; RIGHT?

09:53AM 16      A.   YES.

09:53AM 17      Q.   AND WAS THAT ON OCTOBER 31ST?

09:53AM 18      A.   YES.

09:53AM 19      Q.   AND THIS IS A FORM THAT RDV ROUTINELY FILLS OUT IN THE

09:53AM 20      COURSE OF ITS INVESTMENT WORK?

09:53AM 21      A.   YES.

09:53AM 22      Q.   AND IT WAS FILLED OUT IN THE CASE OF THERANOS, TOO?

09:53AM 23      A.   YES.

09:53AM 24      Q.   OKAY.

09:53AM 25           YOUR HONOR, WE OFFER 2192.

09:53AM  1          MR. LEACH:  I'M SORRY, COUNSEL.  I DON'T HAVE A COPY

09:53AM  2     OF 2192 IN MY BINDER.

09:54AM  3          THE COURT:  I DON'T THINK I DO, EITHER.

09:54AM  4          MR. COOPERSMITH:  OKAY.  LET'S SEE.  DO YOU NEED

09:54AM  5     ANOTHER COPY?

09:54AM  6          MR. LEACH:  I CAN LOOK AT IT FIRST.

09:54AM  7          MR. COOPERSMITH:  OF COURSE.

09:54AM  8        (HANDING.)

09:54AM  9          MR. COOPERSMITH:  AND DOES YOUR HONOR HAVE A COPY?

09:54AM  10          THE COURT:  NO.

09:54AM  11          MR. COOPERSMITH:  YOUR HONOR, I GUESS I COULD HAND

09:54AM  12     UP MY COPY OR JUST TO NOT WASTE TIME.

09:54AM  13          THE COURT:  WELL, IT IS ON THE SCREEN, ISN'T IT?

09:54AM  14          MR. COOPERSMITH:  YES.

09:54AM  15          THE COURT:  THAT'S FINE.

09:54AM  16          MR. LEACH:  I HAVE NO OBJECTION.

09:54AM  17          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:54AM  18        (GOVERNMENT'S EXHIBIT 2192 WAS RECEIVED IN EVIDENCE.)

09:54AM  19          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:54AM  20     Q.   OKAY.  SO NOW WE'RE ALL LOOKING AT EXHIBIT 2192, AND THIS

09:54AM  21     IS THE FORM.  AND YOU SEE IT'S FROM THIS PERSON CAMDEN BRIEDEN?

09:54AM  22     A.   YES.

09:54AM  23     Q.   AND WHO IS THAT?

09:54AM  24     A.   HE'S AN ANALYST.

09:54AM  25     Q.   SOMEONE YOU WORK WITH AT RDV?

PETERSON CROSS BY MR. COOPERSMITH (RES.)    4005

09:55AM   1    A.   YES.

09:55AM   2    Q.   AND HE WROTE, "LISA -- CAN YOU PLEASE HELP FILL IN THE

09:55AM   3    BLANKS FOR THERANOS EFRONT TEMPLATE AS BEST AS POSSIBLE.  WE

09:55AM   4    UNDERSTAND THIS IS A UNIQUE INVESTMENT AND MAY NOT HAVE

09:55AM   5    PROJECTED EXIT OR RETURN NUMBERS.  IF YOU CAN PROVIDE A BEST

09:55AM   6    GUESS, THAT'S GREAT.  THIS WILL BE USED IN FORECASTING CASH

09:55AM   7    FLOWS.  ANY QUESTIONS, JUST ASK MYSELF OR ANDREW.  THANKS FOR

09:55AM   8    YOUR HELP WITH THIS -- CAM."

09:55AM   9         RIGHT?

09:55AM  10    A.   YES.

09:55AM  11    Q.   AND SO MR. BRIEDEN NEEDED THIS PIECE TO KEEP IN THE FILE

09:55AM  12    ABOUT THIS PARTICULAR INVESTMENT; RIGHT?

09:55AM  13    A.   IT'S VERY COMMON FOR US WHEN WE INVEST IN PRIVATE EQUITY

09:55AM  14    FUNDS AND DO THOSE COINVESTMENTS, THOSE HAVE MORE OF A FINITE

09:55AM  15    LIFE TO THEM BECAUSE THESE PRIVATE EQUITY FUNDS HAVE TO GET OUT

09:55AM  16    OF THE INVESTMENT.

09:55AM  17         THIS ONE WASN'T ATTACHED TO A PRIVATE EQUITY FUND, SO IT

09:55AM  18    WAS A LITTLE BIT DIFFICULT TO FILL OUT THIS FORM.

09:55AM  19    Q.   RIGHT.

09:55AM  20    A.   SO HE ASKED FOR MY HELP.

09:56AM  21         BUT THE -- YES, WE FILL THIS OUT FOR EVERYTHING.

09:56AM  22    Q.   OKAY.  AND SO EVEN THOUGH THERANOS WAS A LITTLE BIT OF A

09:56AM  23    DIFFERENT THING COMPARED TO THE PRIVATE EQUITY INVESTMENTS --

09:56AM  24    A.   YES.

09:56AM  25    Q.   -- MR. BRIEDEN AND YOURSELF STILL WANTED THE FORM TO BE

PETERSON CROSS BY MR. COOPERSMITH (RES.)                4006

09:56AM 1   FILLED OUT; RIGHT?

09:56AM 2   A.   WE ATTEMPTED TO.  AND THIS IS REALLY USED FOR THE FAMILY'S

09:56AM 3   CASH FLOW PLANNING PURPOSES.  IF IT DOESN'T COME OUT THE WAY

09:56AM 4   THAT WE FORECASTED IT IN THE SYSTEM, THEY JUST PUSH IT OUT.

09:56AM 5       IT'S REALLY USED AS A TOOL TO PLAN FOR THE FAMILY FOR CASH

09:56AM 6   FLOW INVESTING.

09:56AM 7   Q.   THANK YOU.  THE WRITING ON IT, IS THAT YOUR HANDWRITING?

09:56AM 8   A.   YES.  YES.

09:56AM 9   Q.   OKAY.  SO LET'S GO THROUGH IT A LITTLE BIT.

09:56AM 10      SO THE FIRST BOX I WANTED TO SHOW YOU IS THAT THERE'S A

09:56AM 11  SECTION FOR "PLANNED END FUND DATE/COINVESTMENT EXIT."

09:56AM 12      DO YOU SEE THAT?

09:56AM 13  A.   YES.

09:57AM 14  Q.   AND THAT WOULD BE FOR ANY INVESTMENT WHEN RDV WOULD BE

09:57AM 15  LIKE OUT OF THE INVESTMENT ALL TOGETHER; RIGHT?

09:57AM 16  A.   AGAIN, IT'S A PLANNING TOOL, SO WE USUALLY PUT FIVE YEARS

09:57AM 17  IN THERE, LIKE FOR EVERYTHING.

09:57AM 18  Q.   OKAY.  RIGHT.  BUT JUST SO WE UNDERSTAND WHAT THAT IS

09:57AM 19  REFERRING TO, THIS PARTICULAR ITEM, IT'S LIKE WHEN RDV WOULD BE

09:57AM 20  COMPLETELY OUT OF THE INVESTMENT; RIGHT?

09:57AM 21  A.   AGAIN, IT'S JUST A CASH FLOW PLANNING TOOL.

09:57AM 22      BUT, YES, IT'S A DATE WE PUT ON THERE SO WHEN WE DO OUR

09:57AM 23  CASH FLOW FORECASTING, THIS INVESTMENT SHOWS UP SOMEWHERE.

09:57AM 24      WE DON'T -- WE CAN'T PUT IT IN THERE AS INFINITE IF WE'RE

09:57AM 25  GOING TO HOLD IT LONG-TERM.  SO WE JUST DECIDED TO PUT IT OUT

09:57AM  1    THERE A LITTLE LONGER THAN WE PUT OTHER INVESTMENTS.

09:57AM  2    Q.   OKAY.  THANK YOU.  I JUST WANT TO MAKE SURE IN MY QUESTION

09:57AM  3    AND ANSWER.

09:57AM  4         MY QUESTION IS REALLY SIMPLE:  IT'S THIS PARTICULAR ITEM,

09:57AM  5    PUTTING ASIDE WHAT YOU WROTE, THE ITEM IS JUST CALLING FOR LIKE

09:57AM  6    AN EXIT DATE FOR THE INVESTMENT; RIGHT?

09:57AM  7    A.   YES.

09:58AM  8    Q.   OKAY.  SO AN EXIT DATE WOULD MEAN THE TIME THAT RDV SELLS

09:58AM  9    THE INVESTMENT OR IT'S OTHERWISE OVER; RIGHT?

09:58AM  10   A.   YES.

09:58AM  11   Q.   AND IN THE CASE OF THERANOS YOU WROTE ON THAT ITEM,

09:58AM  12   "GUESS."

09:58AM  13        RIGHT?

09:58AM  14   A.   YES.

09:58AM  15   Q.   AND NEXT TO THAT, SEVEN YEARS?

09:58AM  16   A.   YES.

09:58AM  17   Q.   AND SO THAT WAS A GUESS?

09:58AM  18   A.   YES.

09:58AM  19   Q.   AND THEN IF YOU GO BELOW THAT, YOU SEE THERE'S THIS

09:58AM  20   THING CALLED -- FURTHER DOWN THE PAGE, "TARGET IRR.

09:58AM  21        DO YOU SEE THAT?

09:58AM  22   A.   YES.

09:58AM  23   Q.   AND WHAT IS IRR?

09:58AM  24   A.   INTERNAL RATE OF RETURN.

09:58AM  25   Q.   SO THAT'S THE RATE OF RETURN ON THE INVESTMENT RDV MIGHT

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4008

09:58AM  1    REASONABLY EXPECT; RIGHT?

09:58AM  2    A.   YES.

09:58AM  3    Q.   SO IN OTHER WORDS, IF IT WAS A LOAN, HYPOTHETICALLY, AND

09:58AM  4    IN A DIFFERENT SITUATION IT WAS A LOAN AND THE INTEREST RATE

09:58AM  5    WAS 10 PERCENT, THE RATE OF RETURN IN THAT SITUATION WOULD BE

09:58AM  6    10 PERCENT; RIGHT?

09:58AM  7    A.   YES.

09:58AM  8    Q.   OKAY.  SO THIS IS ASKING WHAT RATE OF RETURN COULD RDV

09:59AM  9    REASONABLY EXPECT; RIGHT?

09:59AM  10   A.   YES.

09:59AM  11   Q.   OKAY.  AND THEN YOU WROTE THERE "GUESS."

09:59AM  12        CORRECT?

09:59AM  13   A.   YES.

09:59AM  14   Q.   AND THEN IT SAYS, "SEVEN YEARS; FIVE TIMES AT 30 PERCENT

09:59AM  15   IRR."

09:59AM  16        DO YOU SEE THAT?

09:59AM  17   A.   YES.

09:59AM  18   Q.   AND THEN BELOW THAT YOU WROTE, "NO RETURN ESTIMATES WERE

09:59AM  19   PROVIDED; THIS IS RDV TARGETS."

09:59AM  20   A.   YES.

09:59AM  21   Q.   SO THERANOS DID NOT PROVIDE ANY RETURN ESTIMATES TO YOU;

09:59AM  22   RIGHT?

09:59AM  23   A.   NO.

09:59AM  24   Q.   AND SO YOU WERE JUST DOING THIS INTERNALLY?

09:59AM  25   A.   THIS WAS KIND OF STANDARD.  AGAIN, IT WAS FOR CASH FLOW

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4009

09:59AM   1         PLANNING PURPOSES.

09:59AM   2         Q.   OKAY.  BECAUSE IT IS -- IN OTHER SITUATIONS, THE OTHER

09:59AM   3    PARTY THAT YOU INVESTED WITH COULD TELL YOU THAT WE EXPECT A

09:59AM   4    CERTAIN RATE OF RETURN; RIGHT?

09:59AM   5         A.   THEY ALWAYS DO, YES.

09:59AM   6         Q.   BUT IN THE CASE OF THERANOS, THEY DID NOT DO THAT?

09:59AM   7         A.   NO.

09:59AM   8         Q.   OKAY.  AND THEN YOU SEE ABOVE THAT IT SAYS, "THE HOLD

09:59AM   9    PERIOD IS INDEFINITE"?

09:59AM  10         A.   YES.

10:00AM  11         Q.   THAT MEANS THAT RDV DIDN'T HAVE A PARTICULAR END DATE

10:00AM  12    WHERE THEY WOULD BE OUT OF THE INVESTMENT; RIGHT?

10:00AM  13         A.   CORRECT.

10:00AM  14         Q.   THAT'S BECAUSE THIS WAS A MULTI-GENERATIONAL COMMITMENT

10:00AM  15    LIKE WE JUST DISCUSSED; RIGHT?

10:00AM  16         A.   YES, THEY VIEWED THIS AS A LONG-TERM HOLD.

10:00AM  17         Q.   OKAY.  LET'S GO TO ANOTHER EXHIBIT THAT YOU REVIEWED

10:00AM  18    ALREADY ON DOCUMENT 4858.

10:00AM  19              AND THIS IS ALREADY IN EVIDENCE, YOUR HONOR.

10:00AM  20                   THE COURT:  ALL RIGHT.

10:00AM  21    BY MR. COOPERSMITH:

10:00AM  22         Q.   DO YOU HAVE 4858 IN FRONT OF YOU?

10:00AM  23         A.   YES.

10:00AM  24         Q.   AND THIS IS THE FIRST OF THE TWO BINDERS; RIGHT?

10:00AM  25         A.   YES.

10:00AM  1          (LAUGHTER.)

10:00AM  2              THE WITNESS:  I THINK THEY BOTH HAVE THE SAME COVER

10:00AM  3  ON THEM, SO IF YOU SHOW ME MORE OF THE DOCUMENT I CAN TELL YOU.

10:00AM  4  BY MR. COOPERSMITH:

10:00AM  5  Q.   WELL, SURE.  AND WHEN WE FLIP THROUGH IT, YOU WILL SEE

10:00AM  6  THAT THIS IS NOT THE ONE WITH THE CLINICAL DATA.

10:01AM  7  A.   OKAY.

10:01AM  8  Q.   AND SO THAT MEANS IT'S THE FIRST OF THE BINDERS?

10:01AM  9  A.   CORRECT.

10:01AM 10  Q.   AND THE COVER PAGE WE'RE LOOKING AT IT JUST SAYS THERANOS,

10:01AM 11  AND THIS IS THERANOS PROPRIETARY AND CONFIDENTIAL.

10:01AM 12      DO YOU SEE THAT?

10:01AM 13  A.   YES.

10:01AM 14  Q.   LET'S GO TO -- I KNOW YOU LOOKED AT SOME OTHER PAGES WITH

10:01AM 15  MR. LEACH, BUT I WANT TO SHOW YOU SOME DIFFERENT PAGES IN SOME

10:01AM 16  CASES.

10:01AM 17      SO THE FIRST PAGE, IF YOU LOOK AT PAGE 8 OF THE DOCUMENT.

10:01AM 18  A.   YES.

10:01AM 19  Q.   AND YOU SEE IT'S HEADED VALIDATION OF THERANOS TESTS?

10:01AM 20  A.   YES.

10:01AM 21  Q.   AND THEN IT HAS A REFERENCE TO GLAXOSMITHKLINE.

10:01AM 22      DO YOU SEE THAT?

10:01AM 23  A.   YES.

10:01AM 24  Q.   AND THEN BELOW THAT IT SAYS, "EXCERPTS FROM JOHNS HOPKINS

10:01AM 25  DUE DILIGENCE AND TECHNOLOGY VALIDATION."

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4011

10:01AM  1        DO YOU SEE THAT?

10:01AM  2    A.  YES.

10:01AM  3    Q.  AND IT SAYS, "THE TECHNOLOGY IS NOVEL AND SOUND.  IT CAN

10:01AM  4    ACCURATELY RUN A WIDE RANGE OF ROUTINE AND SPECIAL ASSAYS"?

10:01AM  5    A.  YES.

10:01AM  6    Q.  "NO MAJOR WEAKNESSES WERE IDENTIFIED"?

10:02AM  7    A.  YES.

10:02AM  8    Q.  AND YOU UNDERSTAND WHAT JOHNS HOPKINS WAS; RIGHT?

10:02AM  9    A.  YES.

10:02AM  10   Q.  THIS IS A WORLD LEADING MEDICAL CENTER BASED IN BALTIMORE?

10:02AM  11   A.  YES.

10:02AM  12   Q.  AND THIS WAS SOMETHING THAT WOULD BE COMFORTING AND

10:02AM  13   ASSURING, REASSURING TO RDV; RIGHT?

10:02AM  14   A.  YES.

10:02AM  15   Q.  AND THIS WAS IMPRESSIVE TO YOU?

10:02AM  16   A.  YES.

10:02AM  17   Q.  LET'S LOOK AT EXHIBIT 20532, MR. ALLEN.

10:02AM  18       THIS IS ALSO IN EVIDENCE.

10:02AM  19   A.  2?

10:02AM  20   Q.  20532.  I THINK IT WILL JUST COME UP ON YOUR SCREEN.  I'M

10:02AM  21   NOT SURE YOU HAVE THAT IN YOUR BINDER.

10:02AM  22       DO YOU SEE THIS WAS A SUMMARY OF

10:02AM  23   HOPKINS/WALGREENS/THERANOS MEETING?

10:02AM  24   A.  YES.

10:02AM  25   Q.  FROM APRIL 27TH, 2010?

ER-3012

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4012

10:03AM   1    A.   YES.

10:03AM   2    Q.   AND, MR. ALLEN, IF WE CAN GO TO THE SECOND PAGE.

10:03AM   3         DO YOU SEE THAT LINE WHERE IT SAYS, "NO MAJOR WEAKNESSES

10:03AM   4    WERE IDENTIFIED"?

10:03AM   5    A.   YES.

10:03AM   6    Q.   DID THE GOVERNMENT EVER SHOW YOU THAT?

10:03AM   7    A.   I DON'T RECALL.

10:03AM   8    Q.   OKAY.  LET'S GO BACK TO EXHIBIT 4858.  LET'S GO TO

10:03AM   9    PAGE 14.

10:03AM  10         THIS SLIDE IS COST SAVINGS?

10:03AM  11    A.   YES.

10:03AM  12    Q.   AND DO YOU UNDERSTAND THAT THAT WAS ONE OF THE THINGS THAT

10:03AM  13    THERANOS WAS TRYING TO DO; RIGHT?

10:03AM  14    A.   YES.

10:03AM  15    Q.   AND THAT'S PART OF THE REASON WHY THEY HAD THESE PRICES

10:03AM  16    PUBLISHED ON THEIR WEBSITE?

10:03AM  17    A.   CORRECT.

10:03AM  18    Q.   AND THAT WAS INTERESTING TO RDV AS WELL?

10:03AM  19    A.   YES.

10:03AM  20    Q.   AND YOU UNDERSTAND THE BLOOD TESTS THAT WERE BEING OFFERED

10:03AM  21    IN WALGREENS STORES WERE ACTUALLY CHEAPER THAN OTHER BLOOD

10:03AM  22    TESTS THAT YOU MIGHT GET FROM OTHER COMPANIES?

10:04AM  23    A.   THAT WAS OUR UNDERSTANDING, YES.

10:04AM  24    Q.   OKAY.  IF YOU GO TO PAGE 19, YOU SEE THAT SLIDE IS COST

10:04AM  25    SAVINGS FOR NATIONAL MEDICAID?

PETERSON CROSS BY MR. COOPERSMITH (RES.)                      4013

10:04AM  1    A.   YES.

10:04AM  2    Q.   AND THEN IF YOU GO TO THE NEXT PAGE, IT'S COST SAVINGS FOR

10:04AM  3    NATIONAL MEDICARE; RIGHT?

10:04AM  4    A.   YES.

10:04AM  5    Q.   AND THESE ARE GOVERNMENT PROGRAMS THAT PAY HEALTH CARE

10:04AM  6    EXPENSES FOR SOME PEOPLE; RIGHT?

10:04AM  7    A.   YES.

10:04AM  8    Q.   OKAY.  AND FOR THE NATIONAL MEDICARE ONE, DO YOU SEE THAT

10:04AM  9    THERE'S A BAR GRAPH WHERE IT HAS THE SAVINGS ON THE VERTICAL

10:04AM  10   COLUMN, AND ON THE HORIZONTAL COLUMN THERE ARE YEARS?

10:04AM  11   A.   YES.

10:04AM  12   Q.   AND THAT FOR 2014, IT'S 2014E.

10:04AM  13        DO YOU SEE THAT?

10:04AM  14   A.   YES.

10:04AM  15   Q.   LIKE AN ESTIMATE; RIGHT?

10:04AM  16   A.   YES.

10:04AM  17   Q.   OKAY.  AND THE SAME FOR MEDICAID ON PAGE 19?

10:04AM  18   A.   YES.

10:04AM  19   Q.   OKAY.  LET'S GO TO PAGE 39.

10:05AM  20        DO YOU SEE THERE THIS SLIDE IS THERANOS INFRASTRUCTURE?

10:05AM  21   A.   YES.

10:05AM  22   Q.   AND IT SAYS IN THE FIRST PART THERE, "NATIONAL RETAIL

10:05AM  23   FOOTPRINT, HOSPITAL, AND HEALTH PLAN PARTNERSHIPS THROUGHOUT

10:05AM  24   THE UNITED STATES FOR AN UNPRECEDENTED INFRASTRUCTURE WHICH

10:05AM  25   EXCEEDS THAT ANY OF ANY RETAIL LABORATORY IN TODAY'S MARKET."

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4014

10:05AM   1        DO YOU SEE THAT?

10:05AM   2   A.   YES.

10:05AM   3   Q.   AND "EXCEEDS" YOU UNDERSTAND IS A PRESENT TENSE VERB;

10:05AM   4   RIGHT?

10:05AM   5   A.   YES.

10:05AM   6   Q.   SO WITHOUT KNOWING ANYTHING ELSE, IF YOU READ THAT, IT

10:05AM   7   WOULD SUGGEST THAT RIGHT AT THAT POINT, THERANOS HAS

10:05AM   8   "UNPRECEDENTED INFRASTRUCTURE WHICH EXCEEDS THAT OF ANY RETAIL

10:05AM   9   LABORATORY IN TODAY'S MARKET."

10:05AM  10        RIGHT?

10:05AM  11   A.   I'M NOT SURE I UNDERSTAND THE QUESTION.

10:05AM  12   Q.   OKAY.  WELL, I'LL ASK A DIFFERENT ONE.

10:05AM  13        SO, MS. PETERSON, YOU KNEW WHEN YOU WERE LOOKING AT THESE

10:06AM  14   BINDERS IN OCTOBER OF 2014 THAT THERANOS DID NOT HAVE AN

10:06AM  15   "UNPRECEDENTED INFRASTRUCTURE WHICH EXCEEDS THAT OF ANY RETAIL

10:06AM  16   LABORATORY IN TODAY'S MARKET"; RIGHT?

10:06AM  17   A.   YES, WE KNEW THAT THEY DID NOT HAVE THAT.

10:06AM  18   Q.   RIGHT.  AND, IN FACT, YOU KNEW THAT THERE WERE OTHER

10:06AM  19   COMPANIES, INCLUDING QUEST, THAT HAD MUCH LARGER FOOTPRINTS IN

10:06AM  20   THE UNITED STATES; RIGHT?

10:06AM  21   A.   YES.

10:06AM  22   Q.   OKAY.  SO THIS WAS ASPIRATIONAL FOR THERANOS?

10:06AM  23   A.   THIS WAS THEIR PROJECTIONS.

10:06AM  24        THEIR PROJECTIONS WERE THEIR PROJECTIONS.

10:06AM  25        BUT, YES, THEY WEREN'T WHERE THEY WANTED TO BE YET.

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4015

10:06AM   1    Q.   RIGHT.  THIS WAS A GOAL THAT THEY HAD?

10:06AM   2    A.   YES.

10:06AM   3    Q.   OKAY.  IF YOU GO TO THE NEXT PAGE, PAGE 40, YOU SEE

10:06AM   4    THERE'S A MAP WITH A LOT OF DOTS?

10:06AM   5    A.   YES.

10:06AM   6    Q.   AND UNFORTUNATELY THEY SEEM TO BE MOSTLY ON THE EAST

10:06AM   7    COAST.

10:06AM   8         DO YOU SEE THAT?

10:06AM   9    A.   YES.

10:07AM  10    Q.   BUT YOU SEE THIS IS A WALGREENS WELLNESS CENTER MAP OF

10:07AM  11    WHAT THE TOTAL WALGREENS FOOTPRINT COULD BE?

10:07AM  12    A.   YES.

10:07AM  13    Q.   AND YOU KNEW THAT WASN'T IN EXISTENCE AT THAT PARTICULAR

10:07AM  14    TIME THAT YOU WERE LOOKING AT THESE BINDERS; RIGHT?

10:07AM  15    A.   CORRECT.

10:07AM  16    Q.   OKAY.  AND IF YOU GO TO THE NEXT PAGE, PAGE 41.

10:07AM  17         YOU SEE THERANOS WELLNESS CENTERS; RIGHT?

10:07AM  18    A.   YES.

10:07AM  19    Q.   AND IT SAYS WALGREENS AND OTHER RETAIL PHARMACIES.

10:07AM  20         DO YOU SEE THAT?

10:07AM  21    A.   YES.

10:07AM  22    Q.   AND THEN BELOW THERANOS'S FOOTPRINT AT RETAIL IT SAYS,

10:07AM  23    "THERANOS WELLNESS CENTERS ARE LOCATED WITHIN A SMALLER RADIUS

10:07AM  24    FROM THE PATIENT, AND OPEN LONGER HOURS THAN CURRENTLY

10:07AM  25    AVAILABLE."

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4016

10:07AM   1        DO YOU SEE THAT?

10:07AM   2   A.   YES.

10:07AM   3   Q.   AND IT GOES ON AND SAYS, "THERANOS HAS MORE WELLNESS

10:07AM   4   CENTERS THAN ANY OTHER LAB PROVIDER IN CALIFORNIA."

10:07AM   5        DO YOU SEE THAT?

10:07AM   6   A.   YES.

10:07AM   7   Q.   AND YOU KNEW AT THE TIME THAT YOU WERE LOOKING AT THESE

10:07AM   8   BINDERS IN OCTOBER OF 2014 THAT THERANOS DID NOT HAVE MORE

10:08AM   9   WELLNESS CENTERS THAN ANY LAB PROVIDER IN CALIFORNIA?

10:08AM  10   A.   YES.

10:08AM  11   Q.   AND, IN FACT, IF YOU QUICKLY TURN TO PAGE 74, YOU SEE

10:08AM  12   UNDER CONVENIENT LOCATIONS --

10:08AM  13   A.   YES.

10:08AM  14   Q.   -- AND IT HAS A GREEN SYMBOL FOR THEIR HEADQUARTERS?

10:08AM  15   A.   YES.

10:08AM  16   Q.   AND THEN ANOTHER FLAG FOR THE WALGREENS STORE IN

10:08AM  17   PALO ALTO; RIGHT?

10:08AM  18   A.   YES.

10:08AM  19   Q.   AND THEN IF YOU GO TO THE PAGES BEFORE THAT, PAGES --

10:08AM  20   LET'S START WITH PAGE 72.  DO YOU SEE THAT IT HAS LOCATIONS

10:08AM  21   NOTED IN THE PHOENIX AREA?

10:08AM  22   A.   YES.

10:08AM  23   Q.   AND THEN IF YOU GO TO PAGE 73, IT ACTUALLY LISTS THOSE

10:08AM  24   LOCATIONS; RIGHT?

10:08AM  25   A.   YES.

ER-3017