No. 22-10338

---

IN THE

# United States Court of Appeals for the Ninth Circuit

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

---

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

---

**APPELLANT'S EXCERPTS OF RECORD**
**VOLUME 12 OF 26 (PAGES ER-3018 – ER-3317)**

---

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

| | | |
|---|---|---|
| 10:08AM | 1 | Q.   OKAY.  SO GOING BACK TO PAGE 41 WITH THE STATEMENT THAT |
| 10:08AM | 2 | "THERANOS HAS MORE WELLNESS CENTERS THAN ANY LAB PROVIDER IN |
| 10:09AM | 3 | CALIFORNIA," YOU UNDERSTOOD THAT THIS WAS A GOAL THAT THEY HAD; |
| 10:09AM | 4 | RIGHT? |
| 10:09AM | 5 | A.   YES. |
| 10:09AM | 6 | Q.   IF YOU WOULD GO TO PAGE 83. |
| 10:09AM | 7 | YOU SEE THIS SLIDE JUST HAS AN EXAMPLE OF PRICING FOR |
| 10:09AM | 8 | ASSAYS? |
| 10:09AM | 9 | A.   YES. |
| 10:09AM | 10 | Q.   AND IN THIS EXAMPLE IT WOULD BE CBC, CMP, LIPID, TSH, AND |
| 10:09AM | 11 | VITAMIN D? |
| 10:09AM | 12 | A.   YES. |
| 10:09AM | 13 | Q.   AND THE PRICE IN THIS EXAMPLE WOULD BE $54 FOR ALL OF |
| 10:09AM | 14 | THOSE TESTS? |
| 10:09AM | 15 | A.   YES. |
| 10:09AM | 16 | Q.   OKAY.  AND THEN IF YOU GO TO PAGE 90. |
| 10:10AM | 17 | DO YOU SEE THAT THERE'S A SLIDE THAT "EVERY THERANOS TEST |
| 10:10AM | 18 | BEGINS WITH YOU, THE PHYSICIAN"? |
| 10:10AM | 19 | A.   YES. |
| 10:10AM | 20 | Q.   AND SO THIS SLIDE, THE WAY THAT IT'S WRITTEN, IT SEEMS TO |
| 10:10AM | 21 | BE DIRECTED TO AN AUDIENCE OF PHYSICIANS; RIGHT? |
| 10:10AM | 22 | A.   YES. |
| 10:10AM | 23 | Q.   BECAUSE YOU, THE PHYSICIAN, DOESN'T REFER TO YOU OR YOUR |
| 10:10AM | 24 | COLLEAGUES AT RDV; RIGHT? |
| 10:10AM | 25 | A.   CORRECT. |

10:10AM 1    Q.  OKAY.  AND THEN HERE IT SAYS, "FAX ANY LAB ORDER FORM TO

10:10AM 2    THERANOS."

10:10AM 3         RIGHT?

10:10AM 4    A.  YES.

10:10AM 5    Q.  "DIRECT YOUR PATIENTS TO THE NEAREST THERANOS WELLNESS

10:10AM 6    CENTER."

10:10AM 7         RIGHT?

10:10AM 8    A.  YES.

10:10AM 9    Q.  AND THEN IT SAYS, "RECEIVE YOUR PATIENT'S RESULTS IN LESS

10:10AM 10   THAN 48 HOURS ON AVERAGE."

10:10AM 11        RIGHT?

10:10AM 12   A.  YES.

10:10AM 13   Q.  AND THAT WAS IN THE BINDER THAT YOU WERE LOOKING AT;

10:10AM 14   RIGHT?

10:10AM 15   A.  YES, AMONG OTHER THINGS.

10:11AM 16   Q.  LET'S GO TO PAGE 133, AND I WON'T GO THROUGH ALL OF THESE,

10:11AM 17   MS. PETERSON.

10:11AM 18        BUT IF YOU LOOK AT PAGE 133 ALL OF THE WAY THROUGH 187.

10:11AM 19   IF WE CAN JUST FLIP THROUGH THOSE.

10:11AM 20        YOU SEE THAT THESE ARE ALL JUST LISTS OF THERANOS PATENTS

10:11AM 21   AND OTHER INTELLECTUAL PROPERTY; CORRECT?

10:11AM 22   A.  CORRECT.

10:11AM 23   Q.  AND THAT'S -- WE TALKED ABOUT THIS BEFORE, BUT THIS WAS

10:11AM 24   SOMETHING THAT YOU WERE INTERESTED IN?

10:11AM 25   A.  YES.  ALL OF THIS SPEAKS TO US TRYING TO GET AT WHETHER

10:11AM   1    THE ANALYZER WORKED COMMERCIALLY.

10:11AM   2    Q.   RIGHT.  AND DID YOU, DID YOU GO TO THE U.S. PATENT AND

10:11AM   3    TRADEMARK OFFICE AND DO ANY RESEARCH ABOUT THAT?

10:11AM   4    A.   NO.

10:11AM   5             MR. LEACH:  OBJECTION.  RELEVANCE.

10:11AM   6             THE COURT:  I'LL LET THE ANSWER REMAIN.

10:11AM   7        YOU CAN CONTINUE.

10:11AM   8    BY MR. COOPERSMITH:

10:11AM   9    Q.   OKAY.  LET'S GO TO EXHIBIT 1853.  THAT'S ALREADY IN

10:12AM  10    EVIDENCE.

10:12AM  11        DO YOU SEE IT ON YOUR SCREEN?

10:12AM  12    A.   YES.

10:12AM  13    Q.   OKAY.  AND YOU DISCUSSED THIS WITH MR. LEACH YESTERDAY?

10:12AM  14    A.   YES.

10:12AM  15    Q.   AND THIS WAS A DOCUMENT THAT YOU LOOKED AT IN CONNECTION

10:12AM  16    WITH YOUR WORK WITH THE THERANOS INVESTMENT?

10:12AM  17    A.   YES.

10:12AM  18    Q.   OKAY.  LET'S JUST GO THROUGH A FEW POINTS ON IT.

10:12AM  19        SO DO YOU SEE THAT IT SAYS PROJECTED STATEMENT OF INCOME?

10:12AM  20        DO YOU SEE THAT?

10:12AM  21    A.   YES.

10:12AM  22    Q.   AND THAT THERE'S COLUMNS FOR A PERIOD ENDING JANUARY --

10:12AM  23    I'M SORRY, A PERIOD ENDING DECEMBER 31ST, 2014, AND A PERIOD

10:12AM  24    ENDING DECEMBER 31ST, 2015.

10:12AM  25        DO YOU SEE THAT?

10:12AM 1     A.   YES.

10:12AM 2     Q.   AND YOU ASSUMED THAT THE PROJECTIONS WERE REALLY APPLYING

10:12AM 3     TO 2015; RIGHT?

10:12AM 4     A.   I ASSUMED THAT THE PROJECTIONS -- YES.

10:13AM 5     Q.   OKAY.  THE -- IF YOU GO THROUGH IT, THOUGH, YOU SEE

10:13AM 6     THERE'S A SECTION RIGHT THERE ON "LAB SERVICES FROM U.S. RETAIL

10:13AM 7     PHARMACIES"?

10:13AM 8     A.   YES.

10:13AM 9     Q.   AND I THINK YOUR TESTIMONY WAS THAT IT WOULD BE EITHER

10:13AM 10    WALGREENS OR SAFEWAY; RIGHT?

10:13AM 11    A.   YES.

10:13AM 12    Q.   AND IT DIDN'T MATTER TO RDV IF IT WAS SAFEWAY IN

10:13AM 13    PARTICULAR; RIGHT?

10:13AM 14    A.   NO.

10:13AM 15    Q.   IT COULD BE ANOTHER RETAIL PHARMACY?

10:13AM 16    A.   NO.  BUT IT WAS IMPORTANT TO US THAT THEY HAD CONTRACTS

10:13AM 17    WITH SAFEWAY AND WALGREENS THAT SUPPORT THE 2015 PROJECTION.

10:13AM 18    Q.   RIGHT.  BUT IF IT ENDED UP THAT THE -- ANOTHER PHARMACY

10:13AM 19    BESIDES WALGREENS WAS ANOTHER ONE, LIKE, FOR EXAMPLE, CVS, THAT

10:13AM 20    WOULDN'T HAVE MATTERED; RIGHT?

10:13AM 21    A.   THAT WOULD HAVE BEEN FINE.

10:13AM 22         BUT WHAT WE WERE RELYING ON WAS THE FACT THAT THEY HAD

10:13AM 23    THESE CONTRACTS WITH THESE TWO INDIVIDUALS.

10:13AM 24    Q.   RIGHT, THE OPPORTUNITY --

10:13AM 25    A.   THESE TWO COMPANIES.

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4021

10:13AM  1    Q.   THE OPPORTUNITY TO ROLL OUT WITH THESE TWO COMPANIES?

10:14AM  2    A.   RIGHT.

10:14AM  3    Q.   BUT IF THEY ENDED UP SUBSTITUTING CVS FOR SAFEWAY, THAT

10:14AM  4    WOULDN'T HAVE BEEN A BIG DEAL?

10:14AM  5    A.   NO.

10:14AM  6    Q.   IF YOU GO TO THE NEXT LINE, "LAB SERVICES REVENUE FROM

10:14AM  7    PHYSICIANS OFFICES."

10:14AM  8    A.   YES.

10:14AM  9    Q.   YOU UNDERSTOOD THAT WOULD BE HAVING PHYSICIANS' OFFICES

10:14AM  10   USE THERANOS FOR THEIR BLOOD TESTING SERVICES?

10:14AM  11   A.   YES.

10:14AM  12   Q.   AND THEN SAME WITH "LAB SERVICES REVENUE FROM HOSPITALS"?

10:14AM  13   A.   YES.

10:14AM  14   Q.   AND THERE'S ANOTHER ONE BELOW THAT, "ON SITE SERVICES

10:14AM  15   REVENUE FROM HOSPITALS"; RIGHT?

10:14AM  16   A.   YES.

10:14AM  17   Q.   AND THAT'S A DIFFERENT ITEM, IT APPEARS FROM THE DOCUMENT,

10:14AM  18   COMPARED TO THE LAB SERVICES REVENUE FROM HOSPITAL?

10:14AM  19   A.   YES.

10:14AM  20   Q.   AND THEN FOR THE ON SITE SERVICES REVENUE FROM HOSPITALS,

10:14AM  21   DO YOU SEE THAT THERE'S NO, NO REVENUE PROJECTION FOR THAT

10:14AM  22   ITEM; RIGHT?

10:14AM  23   A.   FOR 2014.

10:15AM  24   Q.   RIGHT.  THERE IS ONE FOR 2015?

10:15AM  25   A.   YES.

ER-3023

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4022

10:15AM   1    Q.   BUT NOT FOR 2014?

10:15AM   2    A.   CORRECT.

10:15AM   3    Q.   AND THEN "PHARMACEUTICAL SERVICES."

10:15AM   4         DO YOU SEE THAT?

10:15AM   5    A.   YES.

10:15AM   6    Q.   AND THERE ARE NUMBERS IN THE PROJECTIONS FOR THOSE; RIGHT?

10:15AM   7    A.   YES.

10:15AM   8    Q.   AND DO YOU UNDERSTAND THAT IF A PHARMACEUTICAL COMPANY WAS

10:15AM   9    RUNNING A CLINICAL TRIAL AND THEY NEEDED THEIR CLINICAL TRIAL

10:15AM  10    SUBJECTS TO GET BLOOD TESTS, THOSE PEOPLE COULD GO TO WALGREENS

10:15AM  11    OR SOME OTHER LOCATION TO GET THOSE BLOOD TESTS; RIGHT?

10:15AM  12    A.   IT WAS OUR UNDERSTANDING THAT THE CLINICAL TRIALS THAT

10:15AM  13    THEY WERE DOING WITH THEIR ANALYZER WAS WITH -- WE WERE

10:15AM  14    ASSUMING THAT WHEN THEY SAID THAT THEY WERE WORKING WITH 10 OF

10:15AM  15    THE TOP 15 PHARMACEUTICAL COMPANIES, THAT THEY HAD THE

10:15AM  16    ANALYZERS AT THEIR CLINICAL TRIALS.

10:15AM  17    Q.   RIGHT.  BUT THE IDEA WAS TO IN SOME WAY USE THE ANALYZERS

10:15AM  18    IN CONNECTION WITH CLINICAL TRIALS; RIGHT?

10:15AM  19    A.   YES.

10:15AM  20    Q.   THERANOS'S BLOOD TESTING SERVICES?

10:15AM  21    A.   YES.

10:15AM  22    Q.   OKAY.  NOW, IF YOU HAD GO DOWN THE DOCUMENT -- WELL, LET'S

10:16AM  23    JUST STICK WITH THE SECOND COLUMN.  THIS IS THE PERIOD ENDING

10:16AM  24    DECEMBER 31ST, 2015.

10:16AM  25         DO YOU SEE THAT?

10:16AM 1      A.   YES.

10:16AM 2      Q.   AND YOU UNDERSTOOD THAT TO GET TO THE REVENUE NUMBER FOR

10:16AM 3      THE RETAIL PHARMACIES ITEM, THERE WOULD NEED TO BE 900

10:16AM 4      LOCATIONS; RIGHT?

10:16AM 5      A.   YES.

10:16AM 6      Q.   AND FEWER LOCATIONS WOULD MEAN FEWER REVENUE, LESS

10:16AM 7      REVENUE?

10:16AM 8      A.   YES.

10:16AM 9      Q.   OKAY.  AND THEN IF YOU GO DOWN, YOU SEE THERE'S AN

10:16AM 10     OPERATING EXPENSES SECTION?

10:16AM 11     A.   YES.

10:16AM 12     Q.   AND THEN THERE'S A PROJECTION FOR THE RESEARCH AND

10:16AM 13     DEVELOPMENT EXPENSE FOR BOTH YEARS.

10:16AM 14          DO YOU SEE THAT?

10:16AM 15     A.   YES.

10:16AM 16     Q.   AND THE PROJECTION FOR 2014, YEAR ENDING 2014 IS

10:16AM 17     $57 MILLION.

10:16AM 18          DO YOU SEE THAT?

10:16AM 19     A.   YES.

10:16AM 20     Q.   AND THAT'S THE R&D EXPENSE THERANOS WAS PROJECTING; RIGHT?

10:16AM 21     A.   YES.

10:17AM 22     Q.   AND THEN FOR THE YEAR ENDING 2015, THEY WERE PROJECTING

10:17AM 23     127 MILLION IN R&D EXPENSE?

10:17AM 24     A.   YES.

10:17AM 25     Q.   OKAY.  JUST TO FINISH THIS PAGE, IF YOU GO TO THE

| | | |
|---|---|---|
| 10:17AM | 1 | DIFFERENT SECTORS THERE, YOU SEE THERE'S ANOTHER ITEM FOR DOD, |
| 10:17AM | 2 | DEPARTMENT OF DEFENSE? |
| 10:17AM | 3 | A.   YES. |
| 10:17AM | 4 | Q.   AND YOU UNDERSTOOD THAT THAT MEANT DEPARTMENT OF DEFENSE? |
| 10:17AM | 5 | A.   OH, SURE, YEAH. |
| 10:17AM | 6 | Q.   AND THEN IT HAS, FOR THE YEAR ENDING 2014, TO BE |
| 10:17AM | 7 | DETERMINED, TBD? |
| 10:17AM | 8 | A.   YES. |
| 10:17AM | 9 | Q.   AND THEN FOR THE NEXT YEAR, ALSO TO BE DETERMINED? |
| 10:17AM | 10 | A.   YES. |
| 10:17AM | 11 | Q.   OKAY.  LET'S GO TO THE NEXT PAGE OF THE DOCUMENT, PAGE 2. |
| 10:17AM | 12 | THIS IS THE -- IT'S LIKE A BALANCE SHEET BASICALLY; RIGHT? |
| 10:17AM | 13 | A.   YES. |
| 10:17AM | 14 | Q.   AND IT'S FOR THE PERIOD ENDING JULY 14TH, 2014? |
| 10:17AM | 15 | A.   YES. |
| 10:17AM | 16 | Q.   AND YOU DIDN'T SEE ANY LATER BALANCE SHEET FOR SOME LATER |
| 10:17AM | 17 | PERIOD IN 2014? |
| 10:17AM | 18 | A.   NO. |
| 10:17AM | 19 | Q.   FOR EXAMPLE, WHEN YOU WERE THERE AT THERANOS IN OCTOBER, |
| 10:18AM | 20 | YOU DIDN'T GET AN UPDATED ONE FOR OCTOBER OF 2014? |
| 10:18AM | 21 | A.   NO. |
| 10:18AM | 22 | Q.   AND YOU DIDN'T ASK FOR ONE? |
| 10:18AM | 23 | A.   NO. |
| 10:18AM | 24 | Q.   IF YOU SEE THAT -- I'M SORRY.  ON THIS PAGE, THERE'S AN |
| 10:18AM | 25 | ITEM THERE FOR DEFERRED REVENUE AND CUSTOMER DEPOSITS? |

| | | |
|---|---|---|
| 10:18AM | 1 | A.   YES. |
| 10:18AM | 2 | Q.   AND THAT'S 168 MILLION AND A LITTLE MORE. |
| 10:18AM | 3 | DO YOU SEE THAT? |
| 10:18AM | 4 | A.   YES. |
| 10:18AM | 5 | Q.   OKAY.  AND YOU HAVE SOME HANDWRITING THERE. |
| 10:18AM | 6 | IS THAT YOUR HANDWRITING? |
| 10:18AM | 7 | A.   YES. |
| 10:18AM | 8 | Q.   AND A QUESTION MARK? |
| 10:18AM | 9 | A.   YES. |
| 10:18AM | 10 | Q.   AND DID YOU EVER FIND OUT WHAT THAT WAS? |
| 10:18AM | 11 | A.   NOT UNTIL LATER. |
| 10:18AM | 12 | Q.   OKAY.  AND LATER YOU FOUND OUT THAT IT WAS MONEY, AT LEAST |
| 10:18AM | 13 | SOME OF THAT 168 MILLION WAS MONEY FROM WALGREENS THAT THEY |
| 10:18AM | 14 | PROVIDED TO THERANOS TO HELP FUND A NATIONAL ROLLOUT? |
| 10:18AM | 15 | A.   YES, I FOUND THAT OUT WHEN THERE WAS THE LAWSUIT GOING ON |
| 10:18AM | 16 | BETWEEN THEM THAT THAT'S WHAT THAT WAS. |
| 10:18AM | 17 | Q.   OKAY.  BUT YOU DIDN'T KNOW AT THE TIME? |
| 10:18AM | 18 | A.   NO. |
| 10:18AM | 19 | Q.   OKAY.  LET'S TALK ABOUT THE MEETING ON OCTOBER 14TH; OKAY? |
| 10:19AM | 20 | AND YOU WENT THERE AND YOU HAD SOME DEVOS FAMILY MEMBERS |
| 10:20AM | 21 | WITH YOU? |
| 10:20AM | 22 | A.   YES, THREE OF THEM. |
| 10:20AM | 23 | Q.   AND THAT WAS DOUG DEVOS? |
| 10:20AM | 24 | A.   DOUG DEVOS, RICK DEVOS, AND CHERI VANDERWEIDE, |
| 10:20AM | 25 | V-A-N-D-E-R-W-E-I-D-E, DEVOS. |

10:20AM  1    Q.   AND DOUG AND RICK DEVOS, AT THE TIME IN OCTOBER OF 2014,

10:20AM  2    THEY WERE ON THE RDV INVESTMENT COMMITTEE?

10:20AM  3    A.   YES.   DOUG WAS THE CHAIRMAN.

10:20AM  4    Q.   AT THAT POINT CHERI DEVOS WAS NOT ON THE INVESTMENT

10:20AM  5    COMMITTEE?

10:20AM  6    A.   THERE WERE TWO OTHER FAMILY MEMBERS ON THE INVESTMENT

10:20AM  7    COMMITTEE.   I'M NOT SURE IF ONE WAS RELATED TO CHERI OR NOT.

10:20AM  8    Q.   OKAY.   AND YOU ALREADY SAID THE MEETING WAS FOUR, FOUR AND

10:20AM  9    A HALF HOURS OR SOMETHING LIKE THAT; RIGHT?

10:20AM  10   A.   YES.

10:20AM  11   Q.   AND YOU REMEMBER MR. BALWANI WAS THERE?

10:20AM  12   A.   YES.

10:20AM  13   Q.   AND MS. HOLMES?

10:20AM  14   A.   YES.

10:20AM  15   Q.   AND IF I HEARD YOU CORRECTLY YESTERDAY, YOUR TESTIMONY IS

10:20AM  16   THAT MR. BALWANI, HIS PARTICULAR FOCUS AT THE MEETING WAS ON

10:20AM  17   THE FINANCIAL INFORMATION?

10:20AM  18   A.   YES.

10:20AM  19   Q.   AND MR. BALWANI -- I THINK YOU SAID YESTERDAY THAT THERE

10:21AM  20   WAS A DISCUSSION ABOUT FINANCIAL INFORMATION AT THAT MEETING;

10:21AM  21   RIGHT?

10:21AM  22   A.   YES.

10:21AM  23   Q.   AND MR. BALWANI LED THAT DISCUSSION?

10:21AM  24   A.   YES.

10:21AM  25   Q.   AND MR. BALWANI PUT UP SOME ITEMS ON THE SCREEN RELATING

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4027

10:21AM   1    TO FINANCIALS; CORRECT?

10:21AM   2    A.   IT -- ELIZABETH DID A LOT OF THE TALKING.  WE DID SOME

10:21AM   3    TALKING AS WELL.

10:21AM   4        BUT I DO RECALL THE SECTION OF THE DISCUSSION THAT

10:21AM   5    INVOLVED THE FINANCIALS WAS MORE WHEN SUNNY TOOK THE LEAD.

10:21AM   6    Q.   OKAY.  AND IN THAT DISCUSSION THAT MR. BALWANI LED, HE PUT

10:21AM   7    UP SOME FINANCIAL INFORMATION ON THE SCREEN; RIGHT?

10:21AM   8    A.   THOSE TWO PAGES THAT WE JUST LOOKED AT.

10:21AM   9    Q.   WELL, OTHER FINANCIAL INFORMATION AS WELL; RIGHT?

10:21AM  10    A.   I DON'T BELIEVE SO.

10:21AM  11    Q.   OKAY.

10:21AM  12    A.   I DON'T RECALL IF THAT WAS THE CASE.

10:21AM  13    Q.   IS IT YOUR TESTIMONY TODAY, MS. PETERSON, THAT THE ONLY

10:21AM  14    THING PUT UP ON THE SCREEN WAS THE TWO PAGES OF FINANCIAL

10:21AM  15    INFORMATION THAT WE JUST LOOKED AT?

10:22AM  16    A.   THE ONLY TWO THINGS THAT I REMEMBER DISCUSSING WERE

10:22AM  17    THOSE -- ARE THOSE TWO PAGES.

10:22AM  18    Q.   OKAY.  BUT IS IT YOUR TESTIMONY THAT THERE WAS NOTHING

10:22AM  19    ELSE ON THE SCREEN?

10:22AM  20    A.   I DON'T REMEMBER.

10:22AM  21    Q.   YOU DON'T REMEMBER ONE WAY OR THE OTHER?

10:22AM  22    A.   NO.

10:22AM  23    Q.   OKAY.  SO IF THERE WAS MORE INFORMATION PRESENTED ON THE

10:22AM  24    SCREEN, YOU JUST CAN'T TELL US ABOUT THAT BECAUSE YOU DON'T

10:22AM  25    REMEMBER IT TODAY; RIGHT?

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4028

10:22AM  1    A.   CORRECT.

10:22AM  2    Q.   OKAY.  BUT YOU DO REMEMBER THERE WAS SOME FINANCIAL

10:22AM  3    INFORMATION PUT UP ON THE SCREEN; RIGHT?

10:22AM  4    A.   I DO REMEMBER THOSE TWO PAGES, AND THOSE TWO PAGES WERE

10:22AM  5    DISCUSSED BECAUSE THEY MADE CHANGES TO A FEW OF THE NUMBERS,

10:22AM  6    YES.

10:22AM  7    Q.   OKAY.  BUT YOU CAN'T REMEMBER WHAT ELSE MAY HAVE BEEN ON

10:22AM  8    THE SCREEN?

10:22AM  9    A.   NO.

10:22AM 10         MR. LEACH:  YOUR HONOR --

10:22AM 11         THE COURT:  I THINK WE'VE DEVELOPED THAT.

10:22AM 12         MR. COOPERSMITH:  WE ARE, YOUR HONOR.  WE ARE DONE

10:22AM 13    WITH THAT.

10:22AM 14    Q.   OKAY.  LET'S TAKE A LOOK AT EXHIBIT 2120.

10:23AM 15         DO YOU SEE THAT 2120 IS AN EMAIL STRING AMONG YOU AND

10:23AM 16    MR. TUBERGEN?

10:23AM 17    A.   YES.

10:23AM 18    Q.   AND THIS WAS IN CONNECTION WITH THE THERANOS INVESTMENT?

10:23AM 19    A.   YES.

10:23AM 20    Q.   AND IT'S AROUND OCTOBER -- WELL, IT'S IN OCTOBER OF 2014?

10:23AM 21    A.   OCTOBER 23RD, YES.

10:23AM 22    Q.   OKAY.  AND OTHER EMAILS EARLIER THAN THAT; RIGHT?  WE'LL

10:23AM 23    JUST LOOK AT IT.

10:23AM 24         YOUR HONOR, WE'LL OFFER 2120.

10:23AM 25         MR. LEACH:  I DON'T HAVE A COPY OF THIS.

ER-3030

10:23AM   1              THE COURT:  I DON'T EITHER.  IT'S NOT IN MY BINDER.

10:23AM   2              MR. COOPERSMITH:  MAY I SHOW COUNSEL?

10:23AM   3              THE COURT:  YES, PLEASE.

10:23AM   4              MR. COOPERSMITH:  (HANDING.)

10:24AM   5         YOUR HONOR, IS IT ACCEPTABLE FOR YOU TO LOOK AT IT ON THE

10:24AM   6    SCREEN?

10:24AM   7              THE COURT:  YOU'RE SEEKING TO ADMIT IT?

10:24AM   8              MR. COOPERSMITH:  YES, YOUR HONOR.

10:24AM   9              THE COURT:  ANY OBJECTION?

10:24AM  10              MR. LEACH:  I HAVE NO OBJECTION.

10:24AM  11              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:24AM  12         (GOVERNMENT'S EXHIBIT 2120 WAS RECEIVED IN EVIDENCE.)

10:24AM  13              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

10:24AM  14    Q.   LET'S GO TO THE EARLIEST EMAIL IN TIME, MS. PETERSON, AND

10:24AM  15    YOU SEE RICK DEVOS WRITES TO YOU ON OCTOBER 15TH AND HE SAYS,

10:24AM  16    "ARE YOU GOING TO FOLLOW UP WITH YOUR WALGREENS CONTACT ON

10:24AM  17    THERANOS?  CURIOUS FOR THEIR ASSESSMENT."

10:24AM  18         DO YOU SEE THAT?

10:24AM  19    A.   YES.

10:24AM  20    Q.   AND THEN YOU WROTE BACK AND SAY, "HEY RICK, SORRY FOR THE

10:24AM  21    DELAY.  I WAS IN-FLIGHT."

10:24AM  22         AND THAT'S BECAUSE YOU WERE ON YOUR WAY BACK FROM

10:24AM  23    CALIFORNIA.  RIGHT?

10:24AM  24    A.   I DON'T REMEMBER.

10:24AM  25    Q.   OKAY.  "I PLAN TO REGROUP WITH JERRY TO DISCUSS NEXT STEPS

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4030

10:25AM  1      (WE DIDN'T HAVE TIME TODAY TO TOUCH BASE ON THAT ONE GIVEN MY

10:25AM  2      FLIGHT SCHEDULE).  I'LL KEEP YOU POSTED."

10:25AM  3          DO YOU SEE THAT?

10:25AM  4      A.  YES.

10:25AM  5      Q.  AND THEN YOU RESPOND FURTHER A FEW DAYS LATER ON

10:25AM  6      OCTOBER 23RD AND YOU SAY, "JERRY ASKED ME TO HOLD OFF ON THAT

10:25AM  7      INQUIRY.  HE SAID HE'D CONNECT WITH YOU ON THOUGHT PROCESS."

10:25AM  8          DO YOU SEE THAT?

10:25AM  9      A.  YES.

10:25AM 10      Q.  AND THE INQUIRY BEING REFERRED TO THERE IS THE INQUIRY TO

10:25AM 11      A CONTACT AT WALGREENS; RIGHT?

10:25AM 12      A.  YES.

10:25AM 13      Q.  AND THEN IF YOU GO TO THE FIRST PAGE, YOU SEE AT THE

10:25AM 14      BOTTOM THAT'S OCTOBER 23RD, AND YOU SAY, "SLIGHT TEE-UP JUST SO

10:25AM 15      I DIDN'T LEAVE HIM HANGING... BY THE WAY, I'LL GET YOU WRITE-UP

10:26AM 16      TONIGHT OFF BPOC DINNER.

10:26AM 17          DO YOU SEE THAT?

10:26AM 18      A.  YES.

10:26AM 19      Q.  AND WHAT WAS THE WRITE-UP YOU WERE REFERRING TO?

10:26AM 20      A.  THAT WAS THE APPROVAL DOCUMENT.

10:26AM 21      Q.  OKAY.  AND THAT'S ONE OF THE EXHIBITS YOU SAW YESTERDAY?

10:26AM 22      A.  YES.

10:26AM 23      Q.  OKAY.  WE'LL GET TO THAT.

10:26AM 24          AND IF WE GO BELOW THAT, ABOVE THAT RATHER, THERE'S

10:26AM 25      ANOTHER EMAIL ON OCTOBER 23RD WHERE YOU WROTE, "THERE'S A BIG

PETERSON CROSS BY MR. COOPERSMITH (RES.)    4031

10:26AM   1    HOLE IN THE WRITE-UP THAT I LEFT OPEN FOR A VERY BASIC CAP

10:26AM   2    TABLE."

10:26AM   3        DO YOU SEE THAT?

10:26AM   4    A.   YES.

10:26AM   5    Q.   "THERE ARE SOME REALLY BASIC PRE- AND POST-DEAL FIGURES

10:26AM   6    THAT I SHOULD GET FROM SUNNY BEFORE I FINALIZE THIS"; RIGHT?

10:26AM   7    A.   YES.

10:26AM   8    Q.   NOTHING CONTROVERSIAL?

10:26AM   9    A.   CORRECT.

10:26AM  10    Q.   SO YOU'RE TALKING ABOUT THIS ISSUE OF WANTING THE CAP

10:26AM  11    TABLE THAT YOU DISCUSSED YESTERDAY?

10:26AM  12    A.   YES.

10:26AM  13    Q.   AND THEN MR. TUBERGEN RESPONDED; RIGHT?

10:26AM  14    A.   YES.

10:26AM  15    Q.   AND HE WROTE, "I WOULDN'T WORRY ABOUT THAT DETAIL RIGHT

10:26AM  16    NOW.  I DO KNOW THEY WILL HAVE SOMEWHERE BETWEEN 500 AND

10:26AM  17    POTENTIALLY 600 MILLION OF NEW CAPITAL COMING IN AT $17 PER

10:26AM  18    SHARE."

10:26AM  19        AND THEN IF YOU GO DOWN TO THE LAST PART, HE SAYS, "WE

10:26AM  20    DON'T NECESSARILY HAVE TO FOLLOW THE SAME TEMPLATE AS OUR OTHER

10:27AM  21    EQUITY INVESTMENTS."

10:27AM  22        DO YOU SEE THAT?

10:27AM  23    A.   YES.

10:27AM  24    Q.   AND THEN ABOVE THAT YOU SAY, "I CAN MAKE IT WORK."

10:27AM  25        RIGHT?

ER-3033

PETERSON CROSS BY MR. COOPERSMITH (RES.)    4032

10:27AM  1    A.   YES.

10:27AM  2    Q.   SO THAT'S YOU AND MR. TUBERGEN TALKING ABOUT THE NEED FOR

10:27AM  3    A CAP TABLE?

10:27AM  4    A.   YES.

10:27AM  5         THE ONLY REASON WE NEED A CAP TABLE IS TO ESTABLISH OUR

10:27AM  6    OWNERSHIP, WHICH YOU CAN DO WITH THE SIMPLE MATH THAT HE LAID

10:27AM  7    OUT.

10:27AM  8         WHAT I NEEDED IT FOR WAS IN THE FUTURE WHEN WE DID

10:27AM  9    VALUATIONS.

10:27AM  10   Q.   OKAY.  THANK YOU.

10:27AM  11        ALL RIGHT.  LET ME HAVE YOU TAKE A LOOK AT EXHIBIT 10588,

10:27AM  12   WHICH IS NOT IN EVIDENCE YET.

10:28AM  13        OKAY.  AND, MS. PETERSON, I THINK YOU REVIEWED SOME OF

10:28AM  14   THIS WITH MR. LEACH YESTERDAY.

10:28AM  15        BUT DO YOU SEE THAT THIS IS A THERANOS INC. SERIES C-2

10:28AM  16   PREFERRED STOCK AGREEMENT?

10:28AM  17   A.   YES.

10:28AM  18   Q.   STOCK PURCHASE AGREEMENT?

10:28AM  19   A.   YES.

10:28AM  20   Q.   AND DO YOU UNDERSTAND THAT THIS WAS A FORMAL DOCUMENT THAT

10:28AM  21   WAS SIGNED TO FACILITATE RDV'S INVESTMENT IN THERANOS?

10:28AM  22   A.   YES.

10:28AM  23   Q.   AND YOU'RE NOT THE SIGNATORY FOR THIS?

10:28AM  24   A.   NO.

10:28AM  25   Q.   AND THIS WOULD BE SOMEONE AT -- WHO WORKS FOR THE FAMILY?

PETERSON CROSS BY MR. COOPERSMITH (RES.)                4033

10:28AM   1    A.   IT'S AN EXECUTIVE WITHIN RDV CORP. WHO SIGNS DOCUMENTS.

10:28AM   2    Q.   OKAY.  AND IN THE CASE OF RDV, WAS THAT ROBERT SCHIERBEEK?

10:28AM   3    A.   YES.

10:28AM   4    Q.   AND HE'S THE CHIEF OPERATING OFFICER?

10:28AM   5    A.   AT THE TIME, YES.

10:28AM   6    Q.   OKAY.  SO LOOKING AT EXHIBIT 10588, YOU WILL RECOGNIZE

10:29AM   7    THIS AS THE STOCK PURCHASE AGREEMENT IN CONNECTION WITH THE

10:29AM   8    THERANOS INVESTMENT?

10:29AM   9    A.   YES.

10:29AM  10         MR. COOPERSMITH:  YOUR HONOR, WE OFFER

10:29AM  11    EXHIBIT 10588.

10:29AM  12         MR. LEACH:  NO OBJECTION.

10:29AM  13         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:29AM  14    (DEFENDANT'S EXHIBIT 10588 WAS RECEIVED IN EVIDENCE.)

10:29AM  15    BY MR. COOPERSMITH:

10:29AM  16    Q.   IF YOU LOOK AT THE FIRST PAGE AND THE TITLE, IT HAS SOME

10:29AM  17    LANGUAGE HERE, BUT YOU UNDERSTAND THAT THIS IS THE AGREEMENT TO

10:29AM  18    PURCHASE THERANOS STOCK; RIGHT?

10:29AM  19    A.   CORRECT.

10:29AM  20    Q.   OKAY.  AND IF YOU LOOK AT PAGE 7, OR RATHER PAGE 6.

10:29AM  21    I THINK MR. LEACH REVIEWED SOME OF THIS INFORMATION WITH

10:29AM  22    YOU, BUT THERE'S A SECTION CALLED "REPRESENTATIONS AND

10:29AM  23    WARRANTIES OF THE INVESTORS"; RIGHT?

10:29AM  24    A.   YES.

10:29AM  25    Q.   AND RDV IS ONE OF THE INVESTORS?

10:29AM 1      A.   YES.

10:29AM 2      Q.   SO THESE ARE THINGS THAT RDV IS PROMISING THERANOS?

10:29AM 3      A.   YES.

10:29AM 4      Q.   OKAY.  LET'S LOOK AT SECTION 4.2, "INVESTMENT INTENT.

10:30AM 5      SUCH INVESTOR IS ACQUIRING THE SHARES AND THE CONVERSION SHARES

10:30AM 6      FOR INVESTMENT FOR ITS OWN ACCOUNT, NOT AS A NOMINEE OR AGENT,

10:30AM 7      AND NOT WITH THE VIEW TO, OR FOR RESALE IN CONNECTION WITH, ANY

10:30AM 8      DISTRIBUTION THEREOF, AND SUCH INVESTOR HAS NO PRESENT

10:30AM 9      INTENTION OF SELLING, GRANTING ANY PARTICIPATION IN OR

10:30AM 10     OTHERWISE DISTRIBUTING THE SAME."

10:30AM 11          DO YOU SEE THAT?

10:30AM 12     A.   YES.

10:30AM 13     Q.   AND SO THAT MEANS THAT RDV AS AN INVESTOR DOESN'T HAVE ANY

10:30AM 14     PRESENT INTENTION AT THAT TIME OF SELLING ITS SHARES; RIGHT?

10:30AM 15     A.   THEY DON'T WANT US TO TRANSFER OUR SHARES TO SOMEONE ELSE.

10:30AM 16     THEY WANTED TO KNOW WHO THEIR PARTNERS WERE.  AND I'M TELLING

10:30AM 17     THEM THAT WE WON'T TRANSFER THEM.

10:30AM 18     Q.   THAT IS WHAT RDV IS PROMISING?

10:30AM 19     A.   YES.

10:30AM 20     Q.   AND THE NEXT SECTION 4.3, "INVESTMENT EXPERIENCE."  IT

10:30AM 21     SAYS, "SUCH INVESTOR, OR ITS PURCHASER REPRESENTATIVE, WITHIN

10:30AM 22     THE MEANING OF REGULATION D, PROMULGATED BY THE SECURITIES AND

10:30AM 23     EXCHANGE COMMISSION," -- INVESTMENT EXPERIENCE, IT JUST SAYS

10:31AM 24     THAT -- I'LL MAKE IT SIMPLER.

10:31AM 25          THIS IS JUST SAYING THAT THE -- RDV, AS SIGNING THIS, IS

PETERSON CROSS BY MR. COOPERSMITH (RES.)                4035

10:31AM   1    SAYING THAT RDV HAS SUBSTANTIAL EXPERIENCE IN EVALUATING AND IN

10:31AM   2    INVESTING IN TRANSACTIONS LIKE THIS; RIGHT?

10:31AM   3    A.   YES.

10:31AM   4    Q.   OKAY.  IT ALSO SAYS THAT RDV CAN PROTECT ITS OWN

10:31AM   5    INTERESTS; RIGHT?

10:31AM   6    A.   YES.

10:31AM   7    Q.   AND THAT RDV HAS THE KNOWLEDGE AND EXPERIENCE IN FINANCIAL

10:31AM   8    AND BUSINESS MATTERS, SO IT'S CAPABLE OF EVALUATING THE MERITS;

10:31AM   9    RIGHT?

10:31AM  10    A.   YES.

10:31AM  11    Q.   AND THAT WAS TRUE OF RDV; RIGHT?

10:31AM  12    A.   YES.

10:31AM  13    Q.   AND IT'S A FAIRLY LARGE STAFF OF PEOPLE DEDICATED TO THIS

10:31AM  14    PURPOSE; RIGHT?

10:31AM  15    A.   YES.

10:31AM  16    Q.   OF WHICH YOU WERE ONE?

10:31AM  17    A.   YES.

10:31AM  18    Q.   AND YOU SEE 4.4, SPECULATIVE NATURE OF INVESTMENT?

10:32AM  19    A.   YES.

10:32AM  20    Q.   AND HERE YOU UNDERSTAND THAT RDV IS PROMISING THAT IT

10:32AM  21    UNDERSTANDS AND ACKNOWLEDGES THAT THE COMPANY, MEANING

10:32AM  22    THERANOS, HAS A LIMITED FINANCIAL AND OPERATING HISTORY.

10:32AM  23        DO YOU SEE THAT?

10:32AM  24    A.   YES.

10:32AM  25    Q.   AND THAT AN INVESTMENT IN THE COMPANY IS HIGHLY

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4036

10:32AM   1    SPECULATIVE.

10:32AM   2         DO YOU SEE THAT?

10:32AM   3    A.   YES.

10:32AM   4    Q.   AND IT INVOLVES SUBSTANTIAL RISKS?

10:32AM   5    A.   YES.

10:32AM   6    Q.   AND THAT THE INVESTOR, IN THIS CASE RDV, CAN BEAR THE

10:32AM   7    ECONOMIC RISK OF THAT; RIGHT?

10:32AM   8    A.   YES.

10:32AM   9    Q.   AND THAT EVEN CAN BEAR THE ECONOMIC RISK OF SUFFERING THE

10:32AM  10    COMPLETE LOSS OF THE INVESTMENT; RIGHT?

10:32AM  11    A.   YES.

10:32AM  12    Q.   OKAY.  AND THEN THE NEXT SECTION, 4.5, IS CALLED ACCESS TO

10:32AM  13    DATA.

10:32AM  14         DO YOU SEE THAT?

10:32AM  15    A.   YES.

10:32AM  16    Q.   AND THE FIRST PART JUST SAYS THAT RDV HAD AN OPPORTUNITY

10:32AM  17    TO ASK QUESTIONS; RIGHT?

10:32AM  18    A.   YES.

10:32AM  19    Q.   AND RECEIVE OTHER INFORMATION?

10:32AM  20    A.   YES.

10:32AM  21    Q.   AND THEN IF YOU GO TO THE MIDDLE OF THAT, IT SAYS, "SUCH

10:32AM  22    INVESTOR UNDERSTANDS THAT SUCH DISCUSSIONS, AS WELL AS ANY

10:33AM  23    INFORMATION ISSUED BY THE COMPANY, WERE INTENDED TO DESCRIBE

10:33AM  24    CERTAIN ASPECTS OF THE COMPANY'S BUSINESS AND PROSPECTS, BUT

10:33AM  25    WERE NOT NECESSARILY A THOROUGH OR EXHAUSTIVE DESCRIPTION."

PETERSON CROSS BY MR. COOPERSMITH (RES.)          4037

10:33AM   1         DO YOU SEE THAT?

10:33AM   2    A.   YES.

10:33AM   3    Q.   AND THAT'S SAYING THAT THERE ARE OTHER THINGS THAT

10:33AM   4    THERANOS MIGHT BE DOING THAT WEREN'T IN THE DESCRIPTION THAT

10:33AM   5    THEY GAVE TO RDV; RIGHT?

10:33AM   6    A.   YES.

10:33AM   7    Q.   IT GOES ON AND SAYS, "SUCH INVESTOR ACKNOWLEDGES THAT ANY

10:33AM   8    BUSINESS PLANS PREPARED BY THE COMPANY HAVE BEEN, AND CONTINUE

10:33AM   9    TO BE, SUBJECT TO CHANGE."

10:33AM  10         DO YOU SEE THAT?

10:33AM  11    A.   YES.

10:33AM  12    Q.   "AND THAT ANY PROJECTIONS INCLUDED IN SUCH BUSINESS PLANS

10:33AM  13    OR OTHERWISE ARE NECESSARILY SPECULATIVE IN NATURE, AND IT CAN

10:33AM  14    BE EXPECTED THAT SOME OR ALL OF THE ASSUMPTIONS UNDERLYING THE

10:33AM  15    PROJECTIONS WILL NOT MATERIALIZE OR WILL VARY SIGNIFICANTLY

10:33AM  16    FROM ACTUAL RESULTS."

10:33AM  17         DO YOU SEE THAT?

10:33AM  18    A.   YES.

10:33AM  19    Q.   AND RDV IS PROMISING THERANOS THAT THEY UNDERSTAND THIS;

10:33AM  20    RIGHT?

10:33AM  21    A.   YES.

10:33AM  22    Q.   OKAY.  AND THEN 4.6, GOING TO THAT, THAT'S THE SECTION

10:33AM  23    ABOUT ACCREDITED INVESTOR.

10:34AM  24         DO YOU SEE THAT?

10:34AM  25    A.   YES.

ER-3039

PETERSON CROSS BY MR. COOPERSMITH (RES.)                4038

10:34AM   1    Q.   AND DO YOU UNDERSTAND THAT THAT JUST MEANS AN INVESTOR FOR

10:34AM   2    CERTAIN FINANCIAL WORTH THAT COULD MAKE AN INVESTMENT LIKE

10:34AM   3    THIS; RIGHT?

10:34AM   4    A.   YES.

10:34AM   5    Q.   SO JUST NOT ANYONE OFF THE STREET COULD MAKE AN INVESTMENT

10:34AM   6    LIKE THIS; RIGHT?

10:34AM   7    A.   CORRECT.

10:34AM   8    Q.   OKAY.  AND THEN IF YOU GO TO THE NEXT PAGE, SECTION 4.9,

10:34AM   9    DO YOU SEE IT SAYS, "NO PUBLIC MARKET"?

10:34AM  10    A.   YES.

10:34AM  11    Q.   AND SO DO YOU UNDERSTAND THAT THAT MEANS THAT THERE'S NO

10:34AM  12    PUBLIC TRADING OF THERANOS STOCK?

10:34AM  13    A.   CORRECT.

10:34AM  14    Q.   SO FINDING A BUYER FOR STOCK, IF ANYONE EVER WANTED TO

10:34AM  15    SELL IT, MIGHT BE DIFFICULT; RIGHT?

10:34AM  16    A.   CORRECT.

10:34AM  17    Q.   YOU COULDN'T JUST GO TO THE NEW YORK STOCK EXCHANGE AND

10:34AM  18    PLACE AN ORDER, LIKE A SALE ORDER OR SOMETHING; RIGHT?

10:34AM  19    A.   CORRECT.

10:34AM  20    Q.   AND IF YOU GO TO ONE OTHER THING PAGE 17, SECTION 7.8.

10:35AM  21         DO YOU SEE THERE'S A SECTION CALLED "ENTIRE AGREEMENT"?

10:35AM  22    A.   YES.

10:35AM  23    Q.   AND IT SAYS, "THIS AGREEMENT, INCLUDING THE EXHIBITS

10:35AM  24    ATTACHED HERETO, CONSTITUTE THE FULL AND ENTIRE UNDERSTANDING

10:35AM  25    AND AGREEMENT AMONG THE PARTIES WITH REGARD TO THE SUBJECTS

ER-3040

10:35AM   1    HEREOF AND SUPERSEDE ANY PRIOR AGREEMENTS OR UNDERSTANDING WITH

10:35AM   2    RESPECT TO THE SUBJECT MATTER HEREOF."

10:35AM   3         DO YOU SEE THAT?

10:35AM   4    A.   YES, I SEE THAT.

10:35AM   5    Q.   AND "THE SUBJECT MATTER HEREOF" WAS RDV'S INVESTMENT IN

10:35AM   6    THERANOS?

10:35AM   7    A.   CORRECT.

10:35AM   8    Q.   OKAY.  IF YOU GO TO PAGE -- WELL, IT MAY NOT HAVE A PAGE

10:35AM   9    NUMBER, BUT THERE'S A SECTION ABOUT MASTER SIGNATURE PAGES.

10:35AM  10         MR. ALLEN, IF YOU GO TO PAGE 18, AND THEN IT'S THREE MORE

10:35AM  11    PAGES AFTER THAT.

10:35AM  12         THERE YOU GO.

10:35AM  13         DO YOU SEE THAT IT SAYS, "MASTER SIGNATURE PAGES OF THE

10:35AM  14    INVESTORS LISTED ON THE SCHEDULE OF INVESTORS HAVE BEEN

10:35AM  15    INTENTIONALLY WITHHELD PER CONFIDENTIALITY AGREEMENTS WITH THE

10:35AM  16    COMPANY."

10:36AM  17         RIGHT?

10:36AM  18    A.   YES.

10:36AM  19    Q.   AND SO IF YOU COULD TAKE A LOOK AT EXHIBIT 2170.

10:36AM  20         DO YOU SEE THAT EXHIBIT 2170 IS AN EMAIL FROM MR. TUBERGEN

10:36AM  21    TO MR. BALWANI WITH A COPY TO MS. HOLMES AND MS. PETERSON?

10:36AM  22    A.   YES.

10:36AM  23    Q.   AND THAT'S DATED OCTOBER 31ST?

10:36AM  24    A.   YES.

10:36AM  25    Q.   AND THAT'S THE SIGNATURE PAGE BASICALLY; RIGHT?

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4040

10:36AM   1     A.   YES.

10:36AM   2     Q.   OKAY.

10:36AM   3          YOUR HONOR, WE OFFER 2170.

10:36AM   4              MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:36AM   5              THE COURT:  2170 IS ADMITTED.  IT MAY BE PUBLISHED.

10:36AM   6          (GOVERNMENT'S EXHIBIT 2170 WAS RECEIVED IN EVIDENCE.)

10:36AM   7     BY MR. COOPERSMITH:

10:36AM   8     Q.   AND IF YOU GO TO THE FIRST PAGE, THAT'S THE EMAIL THAT I

10:36AM   9     WAS JUST TALKING ABOUT; RIGHT?

10:36AM  10     A.   YES.

10:36AM  11     Q.   AND THEN THE SECOND PAGE IS ACTUALLY THE SIGNATURE PAGE

10:36AM  12     AND THAT'S WHERE MR. SCHIERBEEK'S SIGNATURE APPEARS; RIGHT?

10:36AM  13     A.   CORRECT.

10:36AM  14     Q.   AND YOU RECOGNIZE THAT?

10:36AM  15     A.   YES.

10:36AM  16     Q.   AND IT IS DATED OCTOBER 2014?

10:37AM  17     A.   YES.

10:37AM  18     Q.   AND SO THERE'S A DATE MISSING, BUT IT'S ACTUALLY

10:37AM  19     OCTOBER 31ST; RIGHT?

10:37AM  20     A.   YES.

10:37AM  21     Q.   OKAY.  YOU MENTIONED, BEFORE WE GOT INTO THAT DOCUMENT, AN

10:37AM  22     APPROVAL MEMORANDUM THAT YOU PREPARED.

10:37AM  23     A.   YES.

10:37AM  24     Q.   AND IF YOU COULD LOOK AT EXHIBIT 2166, WHICH IS ALREADY IN

10:37AM  25     EVIDENCE, THAT'S THE DOCUMENT THAT YOU'RE REFERRING TO?

ER-3042

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4041

10:37AM  1    A.   YES.

10:37AM  2    Q.   AND THIS IS A DOCUMENT THAT YOU PREPARED SO THAT

10:37AM  3    MR. TUBERGEN COULD SIGN IT SIGNIFYING APPROVAL FROM HIS

10:37AM  4    STANDPOINT?

10:37AM  5    A.   JERRY SIGNS ON BEHALF OF THE INVESTMENT COMMITTEE.

10:37AM  6    Q.   OKAY.  BUT THE ACTUAL DECISION IS MADE BY THE INVESTMENT

10:37AM  7    COMMITTEE?

10:37AM  8    A.   CORRECT.

10:37AM  9    Q.   NOT MR. TUBERGEN?

10:37AM  10   A.   CORRECT.

10:37AM  11   Q.   OKAY.

10:38AM  12          THE COURT:  FOLKS, WHY DON'T YOU STAND UP AND TAKE A

10:38AM  13   STANDING BREAK WHILE WE MOVE TO THE NEXT TOPIC.

10:38AM  14       YOU CAN, TOO, MS. PETERSON, IF YOU WOULD LIKE.

10:38AM  15          THE WITNESS:  THANK YOU.

10:38AM  16       (STRETCHING.)

10:39AM  17   BY MR. COOPERSMITH:

10:39AM  18   Q.   OKAY.  IF YOU COULD TAKE A LOOK, MS. PETERSON, AT

10:39AM  19   EXHIBIT 2098, WHICH IS NOT IN EVIDENCE YET.

10:39AM  20       DO YOU SEE THIS IS AN EMAIL STRING AMONG MR. TUBERGEN,

10:39AM  21   MS. HOLMES, MR. BALWANI, AND OTHERS, INCLUDING YOURSELF ON SOME

10:39AM  22   OF THE EMAILS.

10:39AM  23       DO YOU SEE THAT?

10:39AM  24   A.   YES.

10:39AM  25   Q.   AN INTERNAL EMAIL STRING WITHIN RDV?

ER-3043

10:39AM   1    A.   YES.

10:39AM   2    Q.   AND THIS IS RELATING TO THE THERANOS INVESTMENT?

10:39AM   3    A.   YES.

10:39AM   4         MR. COOPERSMITH:  YOUR HONOR, WE OFFER 2098.

10:39AM   5         MR. LEACH:  NO OBJECTION.

10:39AM   6         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:39AM   7    (GOVERNMENT'S EXHIBIT 2098 WAS RECEIVED IN EVIDENCE.)

10:39AM   8    BY MR. COOPERSMITH:

10:39AM   9    Q.   OKAY.  IF YOU GO TO THE EARLIEST EMAIL IN TIME FROM

10:39AM  10    MR. TUBERGEN ON SEPTEMBER 18TH, HE WRITES, "DEAR ELIZABETH,

10:39AM  11         "WHAT A GREAT PLEASURE IT WAS TO MEET YOU."

10:39AM  12         RIGHT?

10:39AM  13    A.   YES.

10:39AM  14    Q.   THAT WAS LONG BEFORE -- WELL, NOT LONG BEFORE.  IT WAS A

10:40AM  15    MONTH BEFORE THE MEETING AT THERANOS; RIGHT?

10:40AM  16    A.   YES.

10:40AM  17    Q.   AND THEN THE EMAIL CONTINUES WITH SOME ITEMS AFTER THE

10:40AM  18    MEETING.

10:40AM  19         SO IF YOU GO TO THE EMAIL FROM MR. TUBERGEN ON

10:40AM  20    OCTOBER 19TH AT 7:47 A.M., DO YOU SEE THAT IT SAYS, "THANK YOU

10:40AM  21    SO VERY MUCH FOR OUR MEETING TUESDAY"?

10:40AM  22         DO YOU SEE THAT?

10:40AM  23    A.   YES.

10:40AM  24    Q.   AND IN THE SECOND PARAGRAPH OF THAT, IT SAYS, "WE WOULD

10:40AM  25    LOVE TO MOVE FORWARD AND BE A PART OF THE NEW SHAREHOLDER BASE

PETERSON CROSS BY MR. COOPERSMITH (RES.)                4043

10:40AM   1    YOU ARE ASSEMBLING.  AS WE DISCUSSED, AN INVESTMENT OF

10:40AM   2    $100 MILLION SEEMS TO FIT, IF THAT WORKS FOR YOU AND THE

10:40AM   3    COMPANY."

10:40AM   4        DO YOU SEE THAT?

10:40AM   5    A.   YES.

10:40AM   6    Q.   AND ACTUALLY VERBALLY THE MEMBERS OF THE DEVOS FAMILY AT

10:40AM   7    THE MEETING ON OCTOBER 14TH AT THERANOS COMMITTED TO A

10:40AM   8    $100 MILLION INVESTMENT?

10:40AM   9    A.   THEY DIDN'T COMMIT TO 100 MILLION, BUT THEY DEFINITELY

10:40AM  10    TALKED ABOUT THE 100 MILLION.

10:40AM  11        THEY ASKED ELIZABETH IF THAT WAS APPROPRIATE SIZING GIVEN

10:41AM  12    SOME OF THE OTHER INVESTORS.

10:41AM  13        THEY MAY HAVE SAID WE WOULD LIKE TO DO 100 MILLION, BUT WE

10:41AM  14    STILL HAVE TO GO THROUGH OUR PROCESS OF APPROVING IT BEFORE

10:41AM  15    IT'S ACTUALLY FORMALLY COMMITTED.

10:41AM  16    Q.   OKAY.

10:41AM  17    A.   BUT, YES, AT THE MEETING -- WE WENT INTO THE MEETING

10:41AM  18    THINKING WE WOULD DO 50, AND AFTER THE MEETING -- OR DURING THE

10:41AM  19    MEETING IT WAS DISCUSSED SIZING OF THE INVESTMENT.

10:41AM  20        AND THEN I DO RECALL US DISCUSSING IT OUTSIDE OF THE

10:41AM  21    MEETING IN THE PARKING GARAGE, OR PARKING LOT, BECAUSE I WAS

10:41AM  22    GOING A DIFFERENT DIRECTION, AND THEY WANTED ME TO WORK UP THE

10:41AM  23    APPROVAL DOCUMENT FOR THE 100 MILLION.

10:41AM  24    Q.   OKAY.  BUT IF YOU COULD GO TO THAT BINDER OF YOUR PRIOR

10:41AM  25    TESTIMONY, MS. PETERSON.

10:42AM  1        AND THE QUESTION I WANT TO ASK YOU IS, ISN'T IT THE CASE

10:42AM  2   THAT BEFORE THE INVESTMENT MEMO, THAT APPROVAL MEMO THAT YOU

10:42AM  3   WROTE, THE COMMITMENT HAD ALREADY BEEN MADE VERBALLY?

10:42AM  4   A.   UM, IT WAS DEFINITELY SAID.  I MEAN "COMMITMENT" TO ME

10:42AM  5   MEANS IT'S APPROVED AND DONE, AND THERE'S STILL MORE STEPS TO

10:42AM  6   GO.

10:42AM  7        BUT, YES, THEY DID COMMIT, THEY DID COMMIT VERBALLY THAT

10:42AM  8   THEY WANTED TO DO 100 MILLION.  IT WAS UNDERSTOOD.

10:42AM  9        BUT WE STILL HAD TO TALK ABOUT IT INTERNALLY, AND ALSO

10:42AM  10  STILL GO THROUGH OUR PROCESS.

10:42AM  11  Q.   OKAY.  THANK YOU.

10:42AM  12       LET'S GO BACK TO THE EXHIBIT THAT WE WERE LOOKING AT,

10:42AM  13  WHICH IS 2098.  OKAY?

10:42AM  14  A.   YES.

10:42AM  15  Q.   AND IF YOU GO TO PAGE 3 -- I GUESS IT STARTS ON PAGE 2

10:42AM  16  FROM MR. TUBERGEN TO YOU ON OCTOBER 20TH.

10:43AM  17       DO YOU SEE THAT?

10:43AM  18  A.   YES.

10:43AM  19  Q.   AND HE WRITES, "DETAIL -- I JUST REREAD THE ATTACHED EMAIL

10:43AM  20  CHAIN AND NOTICED I OMITTED YOU IN REFERENCING OUR MEETING.  MY

10:43AM  21  APOLOGIES, AN OVERSIGHT ON MY PART THAT WAS CERTAINLY NOT

10:43AM  22  INTENTIONAL.  GOOD NEWS IS WE ARE IN AND I'M VERY ENCOURAGED BY

10:43AM  23  THIS DEAL.

10:43AM  24       "THANKS FOR YOUR HELP ON THIS, LISA."

10:43AM  25       DO YOU SEE THAT?

10:43AM   1   A.   YES.

10:43AM   2   Q.   AND YOU WROTE BACK, "NO WORRIES. I'LL DOCUMENT SOMETHING

10:43AM   3   FOR THE FILE THAT YOU CAN SIGN AS 'APPROVED.'"

10:43AM   4       DO YOU SEE THAT?

10:43AM   5   A.   YES.

10:43AM   6   Q.   "LET ME KNOW HOW I CAN BE HELPFUL GOING FORWARD. WOULD

10:43AM   7   LOVE TO STAY REMOTELY CONNECTED ON THIS AS IT REALLY FASCINATES

10:43AM   8   ME."

10:43AM   9       DO YOU SEE THAT?

10:43AM   10   A.   YES.

10:43AM   11   Q.   SO A PROFESSIONAL RESPONSE TO MR. TUBERGEN?

10:43AM   12   A.   YES.

10:43AM   13   Q.   AND THEN YOU SENT ANOTHER EMAIL TO SOMEONE NAMED

10:43AM   14   PAT LACROMBE?

10:43AM   15   A.   YES.

10:43AM   16   Q.   SOMEONE YOU THOUGHT YOU COULD CONFIDE IN?

10:43AM   17   A.   YES.

10:43AM   18   Q.   AND YOU WROTE "DIDN'T EVEN MENTION MY NAME"; RIGHT?

10:43AM   19   A.   YES.

10:43AM   20   Q.   AND THAT'S REFERRING TO MR. TUBERGEN?

10:44AM   21   A.   YES.

10:44AM   22   Q.   "WHAT A JOKE"; RIGHT?

10:44AM   23   A.   YES.

10:44AM   24   Q.   AND YOU SAID, "THAT STINGS BIG TIME AFTER PULLING AN

10:44AM   25   ALL-NIGHTER GETTING PREPARED. WHY DON'T I EVER LEARN?"

PETERSON CROSS BY MR. COOPERSMITH (RES.)                          4046

10:44AM  1          RIGHT?

10:44AM  2     A.   YES.

10:44AM  3     Q.   AND THAT'S HOW YOU FELT AT THE TIME?

10:44AM  4     A.   YES.  NO ONE LIKES TO BE SLIGHTED BY THEIR BOSS.

10:44AM  5     Q.   RIGHT.

10:44AM  6     A.   BUT HE DID EMAIL ME BACK AND HE SAID, I'M SORRY I OMITTED

10:44AM  7     YOU, AND I FELT A LOT BETTER ABOUT THAT.

10:44AM  8     Q.   AND THAT WAS NICE OF HIM?

10:44AM  9     A.   YEAH.

10:44AM  10    Q.   ALL RIGHT.  LET'S TAKE A LOOK AT EXHIBIT 13987.

10:44AM  11         13987 IS AN EMAIL THAT YOU SENT TO COLLEAGUES WITHIN RDV?

10:45AM  12    A.   YES.

10:45AM  13    Q.   AND A RESPONSE FROM ANDREW MASON?

10:45AM  14    A.   YES.

10:45AM  15    Q.   AND WHO IS ANDREW MASON?

10:45AM  16    A.   HE JUST WORKS IN THE INVESTMENT GROUP.

10:45AM  17    Q.   OKAY.  AND THIS IS ON NOVEMBER 5TH, 2014?

10:45AM  18    A.   YES.

10:45AM  19    Q.   AND SO THIS IS FIVE DAYS AFTER THE INVESTMENT WAS ACTUALLY

10:45AM  20    MADE; RIGHT?

10:45AM  21    A.   YES.

10:45AM  22              MR. COOPERSMITH:  YOUR HONOR, WE OFFER

10:45AM  23    EXHIBIT 13987.

10:45AM  24              MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:45AM  25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:45AM  1          (DEFENDANT'S EXHIBIT 13987 WAS RECEIVED IN EVIDENCE.)

10:45AM  2     BY MR. COOPERSMITH:

10:45AM  3     Q.   OKAY.  LOOKING AT THE BOTTOM EMAIL FROM NOVEMBER 5TH, YOU

10:45AM  4     WROTE TO MR. MASON AND OTHERS, "JERRY WANTS TO BRING THERANOS

10:45AM  5     TO IC."

10:45AM  6          DO YOU SEE THAT?

10:45AM  7     A.   YES.

10:45AM  8     Q.   AND THAT'S INVESTMENT COMMITTEE?

10:45AM  9     A.   YES.

10:45AM 10     Q.   "NOT SURE WHEN THAT WILL BE, NOR IS IT RELEVANT GIVEN

10:45AM 11     WE'VE FUNDED, BUT FYI, I WON'T HAVE SIGNATURE ON APPROVAL DOC

10:45AM 12     FOR A BIT."

10:45AM 13          DO YOU SEE THAT?

10:45AM 14     A.   YES.

10:45AM 15     Q.   AND SO AT THIS POINT THE APPROVAL MEMO THAT YOU WROTE HAD

10:45AM 16     NOT BEEN SIGNED; RIGHT?

10:46AM 17     A.   NO.

10:46AM 18     Q.   AND THAT WAS AFTER THE INVESTMENT WAS ALREADY MADE?

10:46AM 19     A.   IT WAS.  BUT THEY FLEW HOME TOGETHER AND I KNOW THEY

10:46AM 20     DISCUSSED THE INVESTMENT, AND GIVEN THAT THERE ARE THREE

10:46AM 21     MEMBERS OF THE INVESTMENT COMMITTEE ON THE PLANE ON THE WAY

10:46AM 22     HOME, JERRY HAD TOLD ME THAT IT WAS APPROVED VERBALLY BY THE

10:46AM 23     INVESTMENT COMMITTEE.

10:46AM 24     Q.   RIGHT.

10:46AM 25     A.   BUT HE WANTED TO TAKE THE MEMO THROUGH BECAUSE THERE WERE

PETERSON CROSS BY MR. COOPERSMITH (RES.)                     4048

10:46AM  1    SOME MEMBERS THAT WEREN'T ON THIS TRIP.

10:46AM  2    Q.   OKAY.  SO ON THE WAY BACK FROM CALIFORNIA ON THE RDV JET,

10:46AM  3    THEN THE INVESTMENT COMMITTEE PEOPLE WERE ON THAT PLANE; RIGHT?

10:46AM  4    A.   YES, AND THEY WERE AT THE MEETING IN PALO ALTO.

10:46AM  5    Q.   RIGHT.

10:46AM  6    A.   YES.

10:46AM  7    Q.   SO THERE WAS NO NEED TO HAVE AN INVESTMENT COMMITTEE

10:46AM  8    MEETING PRIOR TO INVESTMENT?

10:46AM  9    A.   THEY DID THAT EITHER ON THE PHONE -- THAT'S JERRY'S DOMAIN

10:46AM  10   OF GETTING THE OKAY FROM THE INVESTMENT COMMITTEE FOR ME TO

10:46AM  11   FUND.

10:46AM  12   Q.   OKAY.  AND YOU DIDN'T ATTEND ANY INVESTMENT COMMITTEE

10:47AM  13   MEETING; CORRECT?

10:47AM  14   A.   NO.

10:47AM  15   Q.   AND, IN FACT, YOU DON'T KNOW WHETHER ANY OF YOUR MEMOS

10:47AM  16   WERE EVER READ BY THE INVESTMENT COMMITTEE?

10:47AM  17   A.   THE, THE EARLY MEMO, THE FIRST MEMO WAS DEFINITELY READ

10:47AM  18   BECAUSE WE WENT THROUGH IT IN DETAIL ON THE PLANE ON THE WAY

10:47AM  19   OUT TO THE MEETING TOGETHER.

10:47AM  20   Q.   OKAY.  YOU DON'T KNOW WHETHER -- LET'S START WITH THE

10:47AM  21   SECOND ONE.

10:47AM  22        YOU DON'T KNOW WHETHER THE SECOND MEMO WAS EVER READ?

10:47AM  23   A.   I DON'T, NO.

10:47AM  24   Q.   AND THE FIRST ONE -- WELL, YOU WROTE TWO MEMOS; RIGHT?

10:47AM  25   A.   YES.

10:47AM   1    Q.   AND ONE WAS THE ONE ON OCTOBER 3RD THAT WE LOOKED AT;

10:47AM   2    RIGHT?

10:47AM   3    A.   YES, THAT WAS SENT ON THE 12TH, CORRECT.

10:47AM   4    Q.   OKAY.  AND THE OTHER ONE WAS THE APPROVAL MEMO THAT WE

10:47AM   5    TALKED ABOUT; RIGHT?

10:47AM   6    A.   YES.

10:47AM   7    Q.   AND YOU DON'T KNOW WHETHER EITHER OF THOSE WERE ACTUALLY

10:47AM   8    READ BY THE INVESTMENT COMMITTEE; CORRECT?

10:47AM   9    A.   LIKE I SAID, THERE ARE THREE PEOPLE THAT WERE ON THE

10:47AM  10    INVESTMENT COMMITTEE, INCLUDING THE CHAIRMAN THAT WAS AT THE

10:47AM  11    MEETING, AND WE TALKED ABOUT THE FIRST MEMO AT LENGTH ON THE

10:48AM  12    WAY OUT.  THERE WAS FOUR HOURS ON THE PLANE ON THE WAY OUT

10:48AM  13    THERE.

10:48AM  14         SO, YES, THAT WAS THOROUGHLY REVIEWED AND DISCUSSED.

10:48AM  15    THAT'S WHEN WE DISCUSSED WHETHER WE SHOULD TALK TO WALGREENS OR

10:48AM  16    NOT.

10:48AM  17         AND THEN ON THE WAY HOME, I WAS NOT ON THE PLANE, BUT IT

10:48AM  18    WAS -- THERE WAS APPROVAL RECEIVED BY JERRY.  OTHERWISE I

10:48AM  19    COULDN'T HAVE WIRED THE MONEY.

10:48AM  20    Q.   OKAY.  LET'S LOOK AT SOME PRIOR TESTIMONY AT 28412 IS THE

10:48AM  21    EXHIBIT NUMBER.  IT SHOULD BE IN YOUR TESTIMONY BINDER,

10:48AM  22    MS. PETERSON.

10:48AM  23    A.   YES.

10:48AM  24    Q.   AND IF YOU COULD TAKE A LOOK AT PAGE 4742.

10:49AM  25         DO YOU HAVE THAT?

10:49AM  1    A.   YES.

10:49AM  2    Q.   AND THIS WAS PRIOR TESTIMONY THAT YOU GAVE IN CONNECTION

10:49AM  3    WITH THE THERANOS MATTER?

10:49AM  4    A.   YES.

10:49AM  5    Q.   AND YOU WERE UNDER OATH WHEN YOU WERE TESTIFYING?

10:49AM  6    A.   YES, YES.

10:49AM  7    Q.   AND YOU KNEW YOU HAD TO TELL THE TRUTH; RIGHT?

10:49AM  8    A.   YES.

10:49AM  9    Q.   AND YOU WERE ASKED THE QUESTION ABOUT THE MEMOS, PLURAL;

10:49AM  10   RIGHT?

10:49AM  11   A.   YES.

10:49AM  12   Q.   AND YOU WERE ASKED A QUESTION ABOUT WHETHER YOU KNOW

10:49AM  13   WHETHER ANY OF THE MEMOS WERE EVER READ BY THE INVESTMENT

10:49AM  14   COMMITTEE; RIGHT?

10:49AM  15   A.   YES.

10:49AM  16   Q.   AND YOU SAID CORRECT, MEANING YOU DIDN'T KNOW IF THEY READ

10:49AM  17   THE MEMOS OR NOT; RIGHT?

10:49AM  18   A.   I CAN'T SAY THAT THEY READ THEM, BUT WE DEFINITELY

10:49AM  19   DISCUSSED THEM AT LENGTH ON THE PLANE TO CLARIFY THAT.

10:49AM  20   Q.   THAT WAS MY QUESTION.

10:49AM  21   A.   SORRY.

10:49AM  22   Q.   YOU DON'T KNOW WHETHER THE MEMOS WERE EVER READ BY THE

10:49AM  23   INVESTMENT COMMITTEE; CORRECT?

10:49AM  24   A.   I CAN'T SAY THAT SOMEONE PHYSICALLY READ THEM, NO.

10:50AM  25        BUT WE DEFINITELY WENT THROUGH THEM AND DISCUSSED THEM ON

10:50AM   1    THE PLANE.

10:50AM   2    Q.   AND DO YOU HAVE ANY NOTES OF THOSE CONVERSATIONS?

10:50AM   3    A.   NO.

10:50AM   4         (PAUSE IN PROCEEDINGS.)

10:50AM   5              MR. COOPERSMITH:   CAN I HAVE A MOMENT TO CONFER WITH

10:50AM   6    MY COLLEAGUES, YOUR HONOR?

10:50AM   7              THE COURT:   YES.

10:50AM   8         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:51AM   9              MR. COOPERSMITH:   NO FURTHER QUESTIONS, YOUR HONOR.

10:51AM  10              THE COURT:   REDIRECT?

10:51AM  11              MR. LEACH:   YES, YOUR HONOR, BRIEFLY.

10:51AM  12                        **REDIRECT EXAMINATION**

10:51AM  13    BY MR. LEACH:

10:52AM  14    Q.   DO YOU NEED A GLASS OF WATER, MS. PETERSON?

10:52AM  15    A.   NO, I'M GOOD.

10:52AM  16    Q.   GOOD MORNING.

10:52AM  17    A.   GOOD MORNING.

10:52AM  18    Q.   I JUST HAVE A FEW FOLLOW-UP QUESTIONS FOR YOU FOLLOWING

10:52AM  19    MR. COOPERSMITH'S EXAMINATION.

10:52AM  20         MS. WACHS, IF WE COULD PLEASE DISPLAY EXHIBIT 4858.

10:52AM  21         DO YOU RECALL QUESTIONS ABOUT THIS POWERPOINT THAT WAS

10:52AM  22    AMONG THE DUE DILIGENCE MATERIALS RDV RECEIVED FROM THERANOS?

10:52AM  23    A.   YES.

10:52AM  24    Q.   AND YOU WERE ASKED SOME QUESTIONS ABOUT WHETHER THE

10:52AM  25    COMMENTS MS. HOLMES AND MR. BALWANI MADE WERE ASPIRATIONAL OR

PETERSON REDIRECT BY MR. LEACH                                           4052

10:52AM  1    PRESENT TENSE.

10:52AM  2        DO YOU RECALL SOME OF THOSE QUESTIONS?

10:52AM  3    A.   YES.

10:52AM  4    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 3.

10:53AM  5        DO YOU SEE THE LINE, "THERANOS'S PROPRIETARY, PATENTED

10:53AM  6    TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK"?

10:53AM  7        DO YOU SEE THAT LANGUAGE?

10:53AM  8    A.   YES.

10:53AM  9    Q.   AND DID YOU UNDERSTAND "RUNS" TO BE PRESENT TENSE?

10:53AM  10   A.   YES.

10:53AM  11   Q.   DID YOU THINK THIS STATEMENT WAS ASPIRATIONAL?

10:53AM  12   A.   NO.

10:53AM  13   Q.   THIS SAYS, "GENERATES SIGNIFICANTLY HIGHER INTEGRITY DATA

10:53AM  14   THAN CURRENTLY POSSIBLE."

10:53AM  15       DO YOU SEE THAT?

10:53AM  16   A.   YES.

10:53AM  17   Q.   AND DID YOU THINK THAT WAS PRESENT TENSE?

10:53AM  18   A.   YES.

10:53AM  19   Q.   AND DID YOU THINK THAT WAS ASPIRATIONAL?

10:53AM  20   A.   NO.

10:53AM  21   Q.   IN THE THIRD PARAGRAPH, IT SAYS, "CURRENT AND PAST CLIENTS

10:53AM  22   INCLUDE 10 OF THE TOP 15 MAJOR PHARMACEUTICAL COMPANIES."

10:53AM  23       DO YOU SEE THAT?

10:53AM  24   A.   YES.

10:53AM  25   Q.   AND IT GOES ON TO TALK ABOUT MILITARY ORGANIZATIONS.

10:53AM 1          DO YOU SEE THAT?

10:53AM 2     A.   YES.

10:53AM 3     Q.   AND IN YOUR MEETING WITH MS. HOLMES AND MR. BALWANI IN

10:53AM 4     OCTOBER, DID THEY SAY THE DEVICE WAS BEING USED ON MILITARY

10:53AM 5     HELICOPTERS?

10:53AM 6     A.   THAT IT HAD BEEN.

10:53AM 7     Q.   OKAY.  WAS THERE ANYTHING ASPIRATIONAL ABOUT THAT?

10:54AM 8     A.   NO.

10:54AM 9     Q.   LET'S LOOK AT PAGE 7.

10:54AM 10         DO YOU SEE THIS LISTING OF PROFICIENCY TESTING RESULTS?

10:54AM 11    A.   YES.

10:54AM 12    Q.   FROM NATIONALLY RECOGNIZED AGENCIES?

10:54AM 13    A.   YES.

10:54AM 14    Q.   AND I THINK YOU SAID ON DIRECT THAT YOU BELIEVED THESE TO

10:54AM 15    RELATE TO THE THERANOS ANALYZER, NOT SOME THIRD PARTY DEVICE?

10:54AM 16    A.   YES.

10:54AM 17    Q.   AND DID YOU UNDERSTAND THIS TO BE ASPIRATIONAL?

10:54AM 18    A.   NO.

10:54AM 19    Q.   WAS THIS SOMETHING THAT HAD HAPPENED IN THE PAST?

10:54AM 20    A.   YES, SINCE 2011.

10:54AM 21    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 8, AND I DRAW YOUR

10:54AM 22    ATTENTION TO THE FIRST PARAGRAPH UNDER "VALIDATION OF THERANOS

10:54AM 23    TESTS."

10:54AM 24         DO YOU SEE WHERE IT SAYS, "THERANOS HAS BEEN

10:54AM 25    COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

10:54AM 1    YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES."

10:55AM 2         DID YOU CONSIDER THAT TO BE ASPIRATIONAL?

10:55AM 3    A.   NO.

10:55AM 4    Q.   AND LET'S LOOK AT PAGE 28, PLEASE.

10:55AM 5         DO YOU SEE THE LINE, "THERANOS RUNS ANY TEST AVAILABLE IN

10:55AM 6    CENTRAL LABORATORIES, AND PROCESSES ALL SAMPLE TYPES"?

10:55AM 7    A.   YES.

10:55AM 8    Q.   AND THAT'S -- DID YOU CONSIDER THAT TO BE ASPIRATIONAL?

10:55AM 9    A.   NO.

10:55AM 10   Q.   DID YOU THINK THAT WAS SOMETHING THAT THERANOS WAS

10:55AM 11   CURRENTLY DOING?

10:55AM 12   A.   YES.

10:55AM 13   Q.   WITH ITS ANALYZER?

10:55AM 14   A.   YES.

10:55AM 15   Q.   AND ALL OF THAT IS BASED ON YOUR CONVERSATIONS WITH

10:55AM 16   MS. HOLMES AND MR. BALWANI IN PALO ALTO?

10:55AM 17   A.   YES.

10:55AM 18   Q.   THANK YOU, MS. WACHS.  WE CAN TAKE THAT DOWN.

10:55AM 19        AND I THINK YOU WERE ASKED SOME QUESTIONS ABOUT THE

10:55AM 20   THERANOS WEBSITE.

10:55AM 21   A.   YES.

10:55AM 22   Q.   AND DO YOU RECALL SOME QUESTIONS FROM MR. COOPERSMITH

10:55AM 23   ABOUT THAT?

10:55AM 24   A.   YES.

10:55AM 25   Q.   AND IF WE COULD PLEASE DISPLAY EXHIBIT 5805.

10:56AM   1           MAY I HAVE ONE MOMENT, YOUR HONOR?

10:56AM   2               THE COURT:  YES.

10:56AM   3           (PAUSE IN PROCEEDINGS.)

10:56AM   4     BY MR. LEACH:

10:56AM   5     Q.   DO YOU RECALL BEING ASKED QUESTIONS ABOUT EXHIBIT 5805?

10:56AM   6     A.   YES.

10:56AM   7     Q.   OKAY.  IF WE COULD GO TO PAGE 2, PLEASE, MS. WACHS, AND IF

10:56AM   8     WE COULD PLEASE ZOOM IN ON THE PART THAT SAYS, "ONE DROP.  A

10:56AM   9     WORLD OF ANSWERS."

10:56AM  10           AND IF THERE'S A WAY WE CAN -- CAN WE TRY ZOOMING IN ON

10:56AM  11     THAT AGAIN, MS. WACHS.

10:56AM  12           DO YOU SEE WHERE IT SAYS, "OUR LABORATORY CAN PRECISELY

10:56AM  13     ANALYZE TINY SAMPLES.  A FEW DROPS ARE ALL WE NEED TO PERFORM

10:57AM  14     MOST TESTS."

10:57AM  15           DO YOU SEE THAT LANGUAGE?

10:57AM  16     A.   YES.

10:57AM  17     Q.   IS THAT CONSISTENT WITH WHAT MS. HOLMES AND MR. BALWANI

10:57AM  18     TOLD YOU IN YOUR MEETING IN PALO ALTO?

10:57AM  19     A.   YES.

10:57AM  20     Q.   IF WE CAN GO DOWN A LITTLE BIT FURTHER TO THE LINE THAT

10:57AM  21     SAYS, "A FULL RANGE OF TESTS.  A FRACTION OF THE COST."

10:57AM  22           DO YOU SEE WHERE IT SAYS, "WE OFFER A FULL RANGE OF

10:57AM  23     LABORATORY TESTS, FROM COMMON PANELS TO SPECIALIZED TESTS.  ALL

10:57AM  24     WITH SPEED AND THE HIGHEST LEVELS OF QUALITY."

10:57AM  25           DO YOU SEE THAT LANGUAGE?

10:57AM  1    A.   YES.

10:57AM  2    Q.   AND IS THAT CONSISTENT WITH WHAT MS. HOLMES AND

10:57AM  3    MR. BALWANI TOLD YOU IN THE MEETING IN PALO ALTO?

10:57AM  4    A.   YES.

10:57AM  5    Q.   IF WE CAN GO TO THE NEXT PAGE, MS. WACHS.

10:57AM  6         THERE'S A LINE THAT SAYS, "A FEW DROPS IS ALL IT TAKES."

10:57AM  7         DO YOU SEE ANOTHER REFERENCE TO THE HIGHEST LEVEL OF

10:57AM  8    QUALITY IN THIS PARAGRAPH?

10:57AM  9    A.   YES.

10:57AM  10   Q.   AND IS THAT CONSISTENT WITH WHAT MS. HOLMES AND

10:58AM  11   MR. BALWANI TOLD YOU AT THE MEETING IN PALO ALTO?

10:58AM  12   A.   YES.

10:58AM  13   Q.   OKAY.  THANK YOU, MS. WACHS.  WE CAN TAKE THAT DOWN.

10:58AM  14        YESTERDAY YOU WERE ASKED SOME QUESTIONS ABOUT THE PARLOFF

10:58AM  15   ARTICLE THAT YOU READ.

10:58AM  16   A.   YES.

10:58AM  17   Q.   DO YOU RECALL QUESTIONS ABOUT THAT?

10:58AM  18   A.   YES.

10:58AM  19   Q.   AND IF WE COULD DISPLAY EXHIBIT 1944.

10:58AM  20        IF WE CAN GO TO PAGE 5 OF THE EXHIBIT, MS. WACHS.

10:58AM  21        DO YOU RECALL QUESTIONS FROM MR. COOPERSMITH ABOUT ASPECTS

10:58AM  22   OF THIS ARTICLE?

10:58AM  23   A.   YES.

10:58AM  24   Q.   OKAY.  IF WE COULD PLEASE ENLARGE THE PARAGRAPH ON THE --

10:58AM  25   TOWARDS THE BOTTOM RIGHT IN THE COLUMN TO THE RIGHT WHERE IT

10:58AM 1    SAYS, "THE RESULTS OF THERANOS'S TESTS."

10:59AM 2        DO YOU SEE WHERE IT SAYS, "THE RESULTS OF THERANOS'S TESTS

10:59AM 3    ARE AVAILABLE WITHIN HOURS -- OFTEN MATCHING THE SPEED OF

10:59AM 4    EMERGENCY STAT LABS TODAY, THOUGH STAT LABS, WHICH ARE HIGHLY

10:59AM 5    INEFFICIENT, CAN USUALLY PERFORM ONLY IN A LIMITED MENU OF

10:59AM 6    MAYBE 40 TESTS."

10:59AM 7        DO YOU SEE THAT LANGUAGE?

10:59AM 8    A.   YES.

10:59AM 9    Q.   WAS THAT RELEVANT TO YOU?

10:59AM 10   A.   YES.

10:59AM 11   Q.   AND WAS THAT SOMETHING THAT YOU RELIED ON?

10:59AM 12   A.   YES, AND THAT WAS CONSISTENT WITH WHAT WE WERE TOLD.

10:59AM 13   Q.   OKAY.  IF WE CAN PLEASE GO TO PAGE 7.  AND IN THE COLUMN

10:59AM 14   TO THE RIGHT THERE'S A PARAGRAPH BEGINNING "IMPORTANTLY."

10:59AM 15       RIGHT IN THE MIDDLE.

10:59AM 16       DO YOU SEE WHERE IT SAYS, "IMPORTANTLY, IT'S NOT JUST THE

10:59AM 17   BLOOD DRAWS THAT ARE TINY.  IT'S ALSO THE ANALYTICAL SYSTEMS

10:59AM 18   THERANOS USES TO PERFORM THE TESTS.  THEY TAKE UP A SMALL

11:00AM 19   FRACTION OF THE FOOTPRINT REQUIRED BY A CONVENTIONAL LAB

11:00AM 20   TODAY."

11:00AM 21       DO YOU SEE THAT?

11:00AM 22   A.   YES.

11:00AM 23   Q.   AND WAS THAT RELEVANT TO YOU?

11:00AM 24   A.   YES.

11:00AM 25   Q.   WAS THAT CONSISTENT WITH WHAT MS. HOLMES AND MR. BALWANI

11:00AM  1    TOLD YOU?

11:00AM  2    A.  YES.

11:00AM  3    Q.  THANK YOU, MS. WACHS.  YOU CAN TAKE THAT DOWN, PLEASE.

11:00AM  4        AND IF WE COULD PLEASE DISPLAY EXHIBIT 1853.

11:00AM  5        DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT THIS

11:00AM  6    PROJECTED STATEMENT OF INCOME?

11:00AM  7    A.  YES.

11:00AM  8    Q.  AND TO THE RIGHT YOU HAD WRITTEN "900 LOCATIONS."

11:00AM  9        DO YOU SEE THAT?

11:00AM 10    A.  YES.

11:00AM 11    Q.  AND I THINK YOU TESTIFIED THAT YOU UNDERSTOOD THAT IN

11:00AM 12    2015, THERANOS MIGHT NOT BE ABLE TO ACHIEVE EXACTLY 900

11:00AM 13    LOCATIONS?

11:00AM 14    A.  CORRECT.

11:00AM 15    Q.  OKAY.  BUT YOU THOUGHT THAT THEY WOULD BE WITHIN THAT

11:00AM 16    BALLPARK?

11:00AM 17    A.  YES, THAT'S WHAT THEY WERE INDICATING, YES.

11:00AM 18    Q.  OKAY.  AND I THINK ON DIRECT YOU TESTIFIED THAT YOU

11:01AM 19    BELIEVED, YOU KNOW, THERE WAS SOME DEVIATION FROM A PROJECTION

11:01AM 20    THAT YOU WERE PREPARED FOR; IS THAT CORRECT?

11:01AM 21    A.  YES.

11:01AM 22    Q.  EXPLAIN WHAT YOU MEAN BY THAT.

11:01AM 23    A.  A PROJECTION IS A PROJECTION.  WE UNDERSTAND THAT.

11:01AM 24        BUT I NEVER RECEIVED PROJECTIONS THAT THEY DON'T COME

11:01AM 25    CLOSE TO, AT LEAST MOVING IN THE RIGHT DIRECTION.

11:01AM   1          THE 12 -- THE THING THAT REALLY GETS US ON THIS ONE IS

11:01AM   2     THAT THE 12/31/14 REVENUE SAID 140 MILLION AND WE WERE A MONTH

11:01AM   3     AND A HALF FROM YEAR END --

11:01AM   4     Q.   OKAY.

11:01AM   5     A.   -- AND THEY WERE NOT EVEN CLOSE TO THAT.

11:01AM   6          SO, YES, WE UNDERSTAND 2015 WAS A PROJECTION, BUT THEY

11:01AM   7     KNEW THEY WEREN'T GOING TO GET NEAR THESE NUMBERS.

11:01AM   8     Q.   DO YOU CONSIDER SOMETHING LESS THAN $1 MILLION TO BE CLOSE

11:01AM   9     TO $140 MILLION?

11:01AM  10     A.   NO.

11:01AM  11     Q.   DO YOU CONSIDER SOMETHING LESS THAN $200 MILLION TO BE

11:02AM  12     CLOSE TO $990 MILLION?

11:02AM  13     A.   WITHIN ABOUT 10 PERCENT WOULD HAVE BEEN OKAY.

11:02AM  14     Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THIS BEING A

11:02AM  15     LONG-TERM INVESTMENT FOR RDV.

11:02AM  16     A.   YES.

11:02AM  17     Q.   DOES THAT MEAN REVENUE PROJECTIONS ARE IRRELEVANT TO YOU?

11:02AM  18     A.   NOT THAT THEY'RE IRRELEVANT, NO.

11:02AM  19          BUT IT'S DIFFICULT TO PROJECT OUT THREE, FOUR, FIVE, TEN

11:02AM  20     YEARS FROM NOW.

11:02AM  21          BUT GIVEN EVERYTHING -- GIVEN THE VISION OF ELIZABETH AND

11:02AM  22     SUNNY, WE KNEW THAT THIS HAD THE POTENTIAL TO TRANSFORM HEALTH

11:02AM  23     CARE, WHICH IS -- WE RELIED, WE RELIED ON THE FACT THAT THEY

11:02AM  24     HAD DONE A LOT OF WORK IN THE PAST WITH PHARMACEUTICAL

11:02AM  25     COMPANIES TO GET THEM TO THIS POINT, AND THAT THEY HAD A LOT OF

11:02AM  1    GROWTH POTENTIAL FROM WHERE THEY WERE TODAY.

11:02AM  2    Q.   OKAY.

11:02AM  3    A.   AT THE TIME.  SORRY.

11:03AM  4    Q.   AND DID YOU RELY ON THE STATEMENTS THAT MS. HOLMES AND

11:03AM  5    MR. BALWANI MADE AT THE MEETING IN PALO ALTO IN OCTOBER?

11:03AM  6    A.   YES.

11:03AM  7    Q.   WERE THOSE RELEVANT TO THE INVESTMENT DECISIONS?

11:03AM  8    A.   ABSOLUTELY.

11:03AM  9    Q.   YOU WERE ALSO -- MR. COOPERSMITH WENT OVER WITH YOU, AS I

11:03AM 10    DID, SOME OF THE REPRESENTATIONS IN THE STOCK PURCHASE

11:03AM 11    AGREEMENT.

11:03AM 12        DO YOU RECALL THAT TESTIMONY?

11:03AM 13    A.   YES.

11:03AM 14    Q.   WHATEVER IS IN THE LEGAL DOCUMENT FORMALIZING THE

11:03AM 15    INVESTMENT, DID YOU NONETHELESS ACCEPT THE TRUTH OF WHAT

11:03AM 16    MS. HOLMES AND MR. BALWANI WERE SAYING TO YOU?

11:03AM 17    A.   YES.

11:03AM 18    Q.   AND DID YOU RELY ON THAT?

11:03AM 19    A.   YES.

11:03AM 20    Q.   MS. WACHS, IF WE COULD PLEASE DISPLAY EXHIBIT 2166.

11:03AM 21        DO YOU RECALL BEING ASKED QUESTIONS ABOUT THE APPROVAL

11:03AM 22    DOCUMENT THAT YOU PREPARED?

11:03AM 23    A.   YES.

11:03AM 24    Q.   OKAY.  AND YOU WERE ASKED SOME QUESTIONS ABOUT YOU DON'T

11:03AM 25    KNOW WHO READ THIS?

11:03AM   1      A.   CORRECT.

11:03AM   2      Q.   OKAY.  AND IF WE COULD PLEASE LOOK AT PAGE 7.

11:04AM   3           YOU RECOGNIZE THE SIGNATURES ON THIS DOCUMENT?

11:04AM   4      A.   YES.

11:04AM   5      Q.   THOSE ARE NOT YOUR SIGNATURES; RIGHT?

11:04AM   6      A.   NO.

11:04AM   7      Q.   THAT'S MR. TUBERGEN?

11:04AM   8      A.   YES.

11:04AM   9      Q.   AND MR. DAMSTRA?

11:04AM  10      A.   YES.

11:04AM  11      Q.   OKAY.  AND IN THE INVESTMENT RISK, THERE'S A PORTION THAT

11:04AM  12      SAYS, "FURTHERMORE, UNLIKE MOST LABS, THERANOS DOES NOT BUY

11:04AM  13      ANALYZER EQUIPMENT FROM A THIRD PARTY AND THEY DO NOT SELL

11:04AM  14      THEIR ANALYZERS TO OTHER LABS."

11:04AM  15           DO YOU SEE THAT?

11:04AM  16      A.   YES.

11:04AM  17      Q.   IS THAT SOMETHING THAT MS. HOLMES AND MR. BALWANI TALKED

11:04AM  18      ABOUT IN YOUR MEETING IN CALIFORNIA?

11:04AM  19      A.   YES.

11:04AM  20      Q.   AND IS THAT SOMETHING THAT YOU RELIED ON?

11:04AM  21      A.   YES.

11:04AM  22           MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

11:04AM  23           THE COURT:  YES.

11:04AM  24      (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:04AM  25           MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

11:04AM   1          THANK YOU.

11:04AM   2          THANK YOU, MS. PETERSON.

11:04AM   3              THE COURT:  MR. COOPERSMITH.

11:04AM   4              THE WITNESS:  THANK YOU.

11:05AM   5              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:05AM   6                      **RECROSS-EXAMINATION**

11:05AM   7   BY MR. COOPERSMITH

11:05AM   8   Q.   MS. PETERSON, I THINK WE REALLY ARE IN THE HOME STRETCH

11:05AM   9   NOW.

11:05AM  10          SO WHAT I WANTED TO START WITH IS JUST MR. LEACH ASKED YOU

11:05AM  11   SOME QUESTIONS JUST NOW ABOUT WHAT YOU RELIED ON.

11:05AM  12          DO YOU RECALL THAT?

11:05AM  13   A.   YES.

11:05AM  14   Q.   AND, IN FACT, THE PEOPLE WHO ACTUALLY MAKE THE DECISION AT

11:05AM  15   RDV TO INVEST OR NOT ARE THE PEOPLE FROM THE DEVOS FAMILY ON

11:05AM  16   THE INVESTMENT COMMITTEE; RIGHT?

11:05AM  17   A.   THAT'S CORRECT.

11:05AM  18   Q.   OKAY.  AND THEN MR. LEACH ASKED YOU SOME QUESTIONS ABOUT

11:05AM  19   THE OCTOBER 14TH, 2014, MEETING YOU ATTENDED WITH OTHERS AT

11:05AM  20   THERANOS?

11:05AM  21   A.   YES.

11:05AM  22   Q.   RIGHT?

11:05AM  23          AND DID MR. BALWANI OR MS. HOLMES TELL YOU THAT IN AUGUST

11:05AM  24   OF 2014 AN EXECUTIVE AT WALGREENS SENT THEM AN EMAIL SAYING

11:06AM  25   THAT WALGREENS WOULD TOUCH 2,000 STORES IN 2015?

PETERSON RECROSS BY MR. COOPERSMITH                    4063

11:06AM  1    A.   NO, I DON'T RECALL THEM SAYING THERE WAS A MEMO.

11:06AM  2    Q.   OKAY.  YOU DON'T RECALL EITHER OF THEM SAYING THAT THERE

11:06AM  3    WAS AN EMAIL FROM A WALGREENS EXECUTIVE ABOUT TOUCHING 2,000

11:06AM  4    STORES IN 2015?

11:06AM  5    A.   I DON'T RECALL THAT.

11:06AM  6    Q.   OKAY.  AND DID MR. BALWANI OR MS. HOLMES TELL YOU IN THE

11:06AM  7    OCTOBER 14TH MEETING THAT THERANOS, IN SEPTEMBER, HAD GIVEN

11:06AM  8    DIRECTION TO RAMP UP THEIR EMPLOYEE HIRING TO BE READY FOR A

11:06AM  9    LARGER ROLLOUT?

11:06AM  10   A.   WHAT IS THE QUESTION?  DID THEY TELL US THAT?

11:06AM  11   Q.   DID THEY TELL YOU AT THE MEETING THAT THERANOS WAS

11:06AM  12   DIRECTING THEIR HR PERSONNEL TO ENGAGE IN HIRING RAMP UP IN

11:06AM  13   ORDER TO ACCOMPLISH THE ROLLOUT?

11:06AM  14   A.   THEY DEFINITELY TOLD US THAT THEY WERE GETTING READY TO,

11:06AM  15   YES, ROLL IT OUT.

11:07AM  16   Q.   AND DID THEY TELL YOU THAT THEY WERE HIRING A LOT MORE

11:07AM  17   PEOPLE TO DO THAT?

11:07AM  18   A.   WELL, THAT ALL GOES BACK TO THE EXECUTION RISK AND MAKING

11:07AM  19   SURE THAT THEY HAD ENOUGH PEOPLE TO EXECUTE THE PLAN.  SO, YES.

11:07AM  20   Q.   SO YOU UNDERSTOOD THAT THEY WERE ENGAGING IN THAT HIRING

11:07AM  21   PRACTICE?

11:07AM  22   A.   YES.

11:07AM  23   Q.   RIGHT?

11:07AM  24   A.   YES.

11:07AM  25   Q.   IN ORDER TO DO THE ROLLOUT; RIGHT?

11:07AM  1        A.   YES.

11:07AM  2                   MR. COOPERSMITH:  OKAY.

11:07AM  3              NOTHING FURTHER, YOUR HONOR.

11:07AM  4                   MR. LEACH:  NOTHING FURTHER, YOUR HONOR.

11:07AM  5                   THE COURT:  MAY THIS WITNESS BE EXCUSED?

11:07AM  6                   MR. LEACH:  NO, YOUR HONOR.

11:07AM  7                   MR. COOPERSMITH:  YES, YOUR HONOR.

11:07AM  8                   THE COURT:  MS. PETERSON, YOU'RE EXCUSED.

11:07AM  9                   THE WITNESS:  THANK YOU.

11:07AM 10              THE COURT:  LADIES AND GENTLEMEN, WE'LL TAKE OUR

11:07AM 11       MORNING BREAK NOW, OUR MORNING BREAK OF 30 MINUTES, AND THEN

11:07AM 12       WE'LL COME BACK.

11:07AM 13           THE GOVERNMENT HAS ANOTHER WITNESS, I TAKE IT?

11:07AM 14                   MR. SCHENK:  YES.

11:07AM 15                   THE COURT:  ALL RIGHT.  THANK YOU.

11:07AM 16           (RECESS FROM 11:07 A.M. UNTIL 11:37 A.M.)

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,          )
6                                      )  CR-18-00258-EJD
                    PLAINTIFF,         )
7                                      )  SAN JOSE, CALIFORNIA
             VS.                       )
8                                      )  APRIL 29, 2022
    RAMESH "SUNNY" BALWANI,            )
9                                      )  VOLUME 24
                    DEFENDANT.         )
10  _____       )  PAGES 4227 - 4480

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                    UNITED STATES DISTRICT JUDGE

14  A P P E A R A N C E S :

15  FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                                KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
            (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
    OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

| | | |
|---|---|---|
| 09:19AM | 1 | MR. SCHENK:  THANK YOU. |
| 09:19AM | 2 | (RECESS FROM 9:19 A.M. UNTIL 9:27 A.M.) |
| 09:27AM | 3 | (JURY IN AT 9:27 A.M.) |
| 09:27AM | 4 | THE COURT:  THANK YOU AGAIN FOR YOUR COURTESY. |
| 09:27AM | 5 | WE ARE BACK ON THE RECORD. |
| 09:28AM | 6 | ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT. |
| 09:28AM | 7 | OUR JURY AND ALTERNATES ARE PRESENT. |
| 09:28AM | 8 | GOOD MORNING, LADIES AND GENTLEMEN.  I HAD TO GET SOME |
| 09:28AM | 9 | HELP FROM THE LAWYERS ON SOME MATTERS THIS MORNING, AND THAT'S |
| 09:28AM | 10 | WHY WE WERE DELAYED THIS MORNING.  I APOLOGIZE FOR THAT. |
| 09:28AM | 11 | BEFORE WE START, LET ME ASK YOU THAT QUESTION AGAIN. |
| 09:28AM | 12 | DURING OUR BREAK, HAVE ANY OF YOU HAD CAUSE TO LEARN, LISTEN, |
| 09:28AM | 13 | READ, OR DISCUSS ANYTHING ABOUT THIS CASE IN ANY WAY? |
| 09:28AM | 14 | IF SO, COULD I JUST SEE YOUR HAND? |
| 09:28AM | 15 | I SEE NO HANDS.  THANK YOU VERY MUCH. |
| 09:28AM | 16 | DOES THE GOVERNMENT HAVE A WITNESS TO CALL? |
| 09:28AM | 17 | MR. BOSTIC:  YES, YOUR HONOR. |
| 09:28AM | 18 | THE UNITED STATES CALLED PATRICK MENDENHALL. |
| 09:28AM | 19 | THE COURT:  THANK YOU. |
| 09:28AM | 20 | SIR, IF YOU WOULD COME FORWARD, PLEASE.  LET ME INVITE YOU |
| 09:28AM | 21 | TO STAND OVER HERE BY THE WITNESS STAND. |
| 09:28AM | 22 | IF YOU WOULD RAISE YOUR RIGHT HAND WHILE YOU FACE OUR |
| 09:29AM | 23 | COURTROOM DEPUTY, SHE HAS A QUESTION FOR YOU. |
| 09:29AM | 24 | **(GOVERNMENT'S WITNESS, PATRICK MENDENHALL, WAS SWORN.)** |
| 09:29AM | 25 | THE WITNESS:  YES, I DO. |

MENDENHALL DIRECT BY MR. BOSTIC                    4265

09:29AM   1        THE COURT:  PLEASE HAVE A SEAT UP HERE, SIR.

09:29AM   2        I'LL INVITE YOU TO MAKE YOURSELF COMFORTABLE.

09:29AM   3        FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

09:29AM   4    NEED, AND YOU CAN BEND THAT DOWN.

09:29AM   5        WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:29AM   6    AND THEN SPELL IT PLEASE.

09:29AM   7        THE WITNESS:  MY NAME IS PATRICK MENDENHALL, THAT'S

09:29AM   8    P-A-T-R-I-C-K, M-E-N-D-E-N-H-A-L-L.

09:29AM   9        THE COURT:  THANK YOU.  COUNSEL.

09:29AM  10        MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:29AM  11                       **DIRECT EXAMINATION**

09:29AM  12    BY MR. BOSTIC:

09:29AM  13    Q.  GOOD MORNING, MR. MENDENHALL.

09:29AM  14    A.  GOOD MORNING.

09:29AM  15    Q.  IF YOU ARE FULLY VACCINATED, THE COURT WILL ALLOW YOU TO

09:29AM  16    TESTIFY WITHOUT A MASK.

09:29AM  17    A.  I AM, THANK YOU.

09:29AM  18    Q.  MR. MENDENHALL, WHAT IS YOUR PROFESSION?

09:29AM  19    A.  I AM THE MANAGING PARTNER, CEO OF U.S. CAPITAL ADVISORS,

09:29AM  20    WHICH IS A WEALTH MANAGEMENT FIRM AND AN INVESTMENT BANKING

09:30AM  21    FIRM.

09:30AM  22    Q.  AND WAS THERE A TIME WHEN YOU WERE AN INVESTOR IN A

09:30AM  23    COMPANY CALLED THERANOS?

09:30AM  24    A.  YES.

09:30AM  25    Q.  WAS ONE OF THOSE INVESTMENTS IN LATE 2013, EARLY 2014?

09:30AM   1    A.   YES.

09:30AM   2    Q.   HAD THERE BEEN AN EARLIER INVESTMENT IN THE COMPANY?

09:30AM   3    A.   YES.

09:30AM   4    Q.   AND WHAT WAS THE APPROXIMATE TIMING OF THAT INVESTMENT?

09:30AM   5    A.   I BELIEVE THAT WAS IN 2005, 2006 RANGE.

09:30AM   6    Q.   FOR THE 2013, 2014 INVESTMENT, WHO WAS YOUR PRIMARY

09:30AM   7    CONTACT AT THERANOS?

09:30AM   8    A.   SUNNY BALWANI.

09:30AM   9    Q.   I WANT TO TALK WITH YOU A LITTLE LATER ABOUT WHAT LED YOU

09:30AM  10    TO INVEST, BUT FIRST LET ME ASK YOU SOME QUESTIONS ABOUT YOUR

09:30AM  11    BACKGROUND.

09:30AM  12         CAN YOU SUMMARIZE FOR US YOUR EDUCATION, PLEASE?

09:30AM  13    A.   YES.   I HAVE AN UNDERGRADUATE DEGREE FROM OREGON STATE

09:30AM  14    UNIVERSITY IN GENERAL BUSINESS.

09:30AM  15    Q.   AND CAN YOU GIVE US AN OVERVIEW OF YOUR WORK HISTORY

09:31AM  16    FOLLOWING OBTAINING YOUR DEGREE?

09:31AM  17    A.   YES.   I GRADUATED FROM OREGON STATE IN 1981.

09:31AM  18         IN 1982 I WAS HIRED BY MERRILL LYNCH IN HOUSTON, TEXAS.   I

09:31AM  19    SPENT A LITTLE -- AROUND A YEAR, A LITTLE OVER A YEAR THERE.

09:31AM  20         I WENT TO A FIRM CALLED LEHMAN BROTHERS; IT WAS BOUGHT OUT

09:31AM  21    BY SHEARSON; WENT TO DREXEL; IT WAS BOUGHT OUT BY SMITH BARNEY;

09:31AM  22    AND THEN I SPENT 20 YEARS AT PAINE WEBBER AND UBS AT WHICH I

09:31AM  23    WAS A MANAGING DIRECTOR, AND I RAN THEIR THIRD LARGEST WEALTH

09:31AM  24    MANAGEMENT IN THE COMPANY.

09:31AM  25         AND ALL OF THIS WAS BASED IN HOUSTON, TEXAS.

MENDENHALL DIRECT BY MR. BOSTIC                                    4267

```
09:31AM   1    Q.  AND ARE YOU CURRENTLY BASED IN HOUSTON, TEXAS?

09:31AM   2    A.  YES.  WE ARE HEADQUARTERED -- U.S. CAPITAL ADVISORS, WHICH

09:31AM   3    I FOUNDED IN 2010 AFTER LEAVING UBS, IS BASED IN HOUSTON, TEXAS

09:31AM   4    WITH OFFICES IN AUSTIN AND DALLAS, TEXAS.

09:31AM   5    Q.  SO YOU WERE IN THAT ROLE AT U.S. CAPITAL ADVISORS IN THE

09:31AM   6    2013, 2014 TIME PERIOD?

09:32AM   7    A.  YES.

09:32AM   8    Q.  YOU MENTIONED THAT YOU FIRST INVESTED IN THERANOS IN

09:32AM   9    APPROXIMATELY 2005, 2006; IS THAT RIGHT?

09:32AM  10    A.  YES.

09:32AM  11    Q.  HOW DID YOU FIRST HEAR ABOUT THE COMPANY?

09:32AM  12    A.  I HAD ONE OF MY FINANCIAL ADVISORS WHO HAD KNOWN

09:32AM  13    ELIZABETH HOLMES'S FAMILY, AND THEY HAD BEEN COMMUNICATING AND

09:32AM  14    HE BROUGHT IT -- I HAD TO APPROVE IT AS A SUPERVISOR, AND THERE

09:32AM  15    WERE SEVERAL OF MY ADVISORS THAT WERE INVESTING IN THE EARLY

09:32AM  16    STAGE OF THERANOS.

09:32AM  17        AND WHEN IT CAME ACROSS MY DESK, I JUST THOUGHT THESE GUYS

09:32AM  18    WERE SMART GUYS, SO I WENT AND INVESTED A LITTLE BIT WITH THEM.

09:32AM  19    Q.  AND WHAT WAS THE APPROXIMATE AMOUNT OF YOUR FIRST

09:32AM  20    INVESTMENT BACK THEN?

09:32AM  21    A.  I BELIEVE IT WAS $54,000 OR $56,000, SOMETHING IN THAT

09:32AM  22    RANGE.  RIGHT AROUND $50,000, YEAH.

09:32AM  23    Q.  I'M SORRY FOR TALKING OVER YOU.

09:32AM  24        YOU MENTIONED THAT THERE WAS AN ADVISOR.  WAS THAT SOMEONE

09:32AM  25    WHO WORKED WITH YOU AT U.S. CAPITAL ADVISORS?
```

ER-3071

09:32AM  1    A.   YES, HE CURRENTLY WORKS WITH ME AT U.S. CAPITAL ADVISORS

09:33AM  2    AS WELL.

09:33AM  3    Q.   AND WHERE WERE YOU WORKING AT THE TIME?

09:33AM  4    A.   WE WERE AT UBS.

09:33AM  5    Q.   AND WHAT WAS THE NAME OF THAT INDIVIDUAL?

09:33AM  6    A.   DAVID HARRIS.

09:33AM  7    Q.   AND WAS THAT THE PERSON WHO HAD THE CONNECTION TO

09:33AM  8    MS. HOLMES'S FAMILY?

09:33AM  9    A.   YES.

09:33AM  10   Q.   BACK THEN AT THE TIME OF YOUR INITIAL INVESTMENT IN 2005,

09:33AM  11   2006, WHAT WAS YOUR UNDERSTANDING OF WHAT THE COMPANY WAS

09:33AM  12   DOING?  WHAT KIND OF BUSINESS WAS IT?

09:33AM  13   A.   INITIALLY I THOUGHT IT WAS -- I KNEW IT HAD SOMETHING TO

09:33AM  14   DO WITH BLOOD OR BLOOD DIAGNOSIS.  I THOUGHT IT WAS A -- MORE

09:33AM  15   OF A REALTIME EFFICACY TECHNOLOGY THAT -- SOME SORT OF A PATCH

09:33AM  16   OR SOMETHING THAT WOULD GIVE REALTIME RESULTS AND BE TRACKED BY

09:33AM  17   DOCTORS TO MONITOR THE EFFICACY OF WHATEVER MEDICATION THEY

09:33AM  18   WERE ON.

09:33AM  19   Q.   AND BACK THEN, WHERE WAS YOUR KNOWLEDGE ABOUT THERANOS

09:33AM  20   COMING FROM?

09:33AM  21   A.   PROBABLY FROM DAVID HARRIS.

09:33AM  22   Q.   HOW ABOUT -- SO YOU TALKED JUST NOW ABOUT WHAT KIND OF

09:34AM  23   TECHNOLOGY THE COMPANY WAS WORKING WITH.

09:34AM  24        WHAT WAS YOUR UNDERSTANDING BACK THEN ABOUT HOW FAR ALONG

09:34AM  25   THAT TECHNOLOGY WAS?

09:34AM  1    A.   IT WAS VERY EARLY STAGE AT THAT TIME.  I KNEW IT WAS A

09:34AM  2    VERY SPECULATIVE INVESTMENT.

09:34AM  3    Q.   AND THAT'S MY NEXT QUESTION.

09:34AM  4         CAN YOU TELL US MORE ABOUT THAT?  HOW DOES THE EARLY STAGE

09:34AM  5    OF THE TECHNOLOGY AFFECT YOUR VIEW OF THE KIND OF INVESTMENT?

09:34AM  6    A.   YES.  BASED ON THE AMOUNT OF DOLLARS THAT WE INVESTED, WE

09:34AM  7    VIEWED IT AS MORE VENTURE CAPITAL, WHICH IS EARLY STAGE, NO

09:34AM  8    EXPECTATION -- I MEAN, A GOOD IDEA, BUT NO REAL TECHNOLOGY YET

09:34AM  9    TO BACK IT UP, BUT MAYBE THE BEGINNING OF THOSE TECHNOLOGIES OR

09:34AM 10    SOME PATENTS OR SOMETHING TO BACK IT UP.

09:34AM 11         SO VERY SPECULATIVE, AGGRESSIVE INVESTMENT THAT YOU FULLY

09:34AM 12    EXPECT TO LOSE ALL OF YOUR MONEY AT THAT STAGE OF AN

09:34AM 13    INVESTMENT.

09:34AM 14    Q.   LEADING UP TO THAT FIRST INVESTMENT IN 2005, 2006, DID YOU

09:34AM 15    HAVE ANY OPPORTUNITIES TO SPEAK TO ELIZABETH HOLMES?

09:35AM 16    A.   I DON'T RECALL SPEAKING TO ELIZABETH HOLMES AT THAT TIME.

09:35AM 17    Q.   AFTER YOU MADE THAT INVESTMENT THAT YOU SAID WAS A LITTLE

09:35AM 18    MORE THAN $50,000 -- IS THAT RIGHT?

09:35AM 19    A.   YES.

09:35AM 20    Q.   AFTER YOU MADE THAT INVESTMENT, WHAT HAPPENED OVER THE

09:35AM 21    FOLLOWING YEARS?  DID YOU GET MORE INFORMATION ABOUT THE

09:35AM 22    COMPANY'S ACTIVITY?

09:35AM 23    A.   THERE WAS SOME SPORADIC COMMUNICATION FROM THE COMPANY,

09:35AM 24    BUT NOTHING CONCRETE AT ALL.  VERY LITTLE COMMUNICATION UP

09:35AM 25    UNTIL THAT 2013 RANGE.  SO, LIKE, SEVEN YEARS OF PRETTY MUCH

09:35AM   1    NOTHING.

09:35AM   2    Q.   SO LET ME ASK YOU ABOUT THAT TIME PERIOD, JUST A COUPLE

09:35AM   3    MORE QUESTIONS.

09:35AM   4         WE'RE TALKING ABOUT THEN 2006 THROUGH 2012 APPROXIMATELY?

09:35AM   5    A.   YES, THAT'S MY RECOLLECTION.

09:35AM   6    Q.   AND DURING THAT TIME PERIOD, DO YOU RECALL GETTING ANY

09:35AM   7    UPDATES FROM THE COMPANY ABOUT THE STATE OF THE TECHNOLOGY?

09:35AM   8    A.   I DON'T RECALL.  THERE'S -- THERE WAS A LITTLE BIT OF

09:35AM   9    COMMUNICATION, BUT I DON'T RECALL.

09:35AM  10    Q.   HOW ABOUT THE COMPANY'S BUSINESS ACTIVITY AND REVENUE?

09:36AM  11         DID YOU GET UPDATES THAT YOU REMEMBER BETWEEN 2006 AND

09:36AM  12    2012 ON THOSE TOPICS?

09:36AM  13    A.   NO.

09:36AM  14    Q.   GIVEN THE LACK OF INFORMATION, HOW WERE YOU FEELING ABOUT

09:36AM  15    YOUR INVESTMENT IN THERANOS TOWARDS THE END OF THAT PERIOD IN

09:36AM  16    2011 OR 2012?

09:36AM  17    A.   I HAD LITERALLY, I HAD SOME OTHER -- THE MARKETS WERE

09:36AM  18    GOOD, THE REGULAR STOCK MARKET WAS DOING WELL, AND I HAD

09:36AM  19    APPROACHED MY ACCOUNTANT TO JUST WRITE IT OFF, BUT HE SUGGESTED

09:36AM  20    UNTIL I GOT FORMAL NOTICE THAT IT WAS DEAD, THEN TO JUST KEEP

09:36AM  21    IT.  SO I DID.

09:36AM  22    Q.   AT SOME POINT DID YOU START TO HEAR MORE INFORMATION ABOUT

09:36AM  23    THERANOS?

09:36AM  24    A.   YES.  THERE WAS A -- SEEMED TO BE A FLURRY OF ACTIVITY IN

09:36AM  25    THE 2013 RANGE AND HEARING SOME POSITIVE THINGS.

09:36AM    1    Q.   I'D LIKE TO ASK YOU FIRST ABOUT MID-2013.

09:36AM    2         IN THE MIDDLE OF THAT YEAR, DO YOU RECALL BEING IN TOUCH

09:36AM    3    WITH MS. HOLMES ABOUT THE COMPANY?

09:36AM    4    A.   I BELIEVE I WAS.  I WOULD NEED TO REFRESH MYSELF, BUT I

09:37AM    5    THINK WE STARTED COMMUNICATING, OR MAYBE I TALKED TO HER FOR

09:37AM    6    THE FIRST TIME AT THE END OF 2013.

09:37AM    7    Q.   AND IN THAT INITIAL CONVERSATION OR CONVERSATIONS, DO YOU

09:37AM    8    RECALL RECEIVING SIGNIFICANT ADDITIONAL INFORMATION ABOUT THE

09:37AM    9    COMPANY?

09:37AM   10    A.   UM, THERE WAS -- I RECALL THAT INFORMATION WAS MORE

09:37AM   11    FORTHCOMING AT THAT TIME.

09:37AM   12    Q.   IN THOSE FIRST CONVERSATIONS WITH MS. HOLMES IN 2013, DID

09:37AM   13    YOU FEEL LIKE ALL OF YOUR QUESTIONS WERE ANSWERED ABOUT WHERE

09:37AM   14    THE COMPANY'S TECHNOLOGY AND BUSINESS WERE?

09:37AM   15    A.   I FELT I WAS GETTING MORE ANSWERS, YES.

09:37AM   16         MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

09:37AM   17         THE COURT:  YES.

09:37AM   18         MR. BOSTIC:  (HANDING.)

09:38AM   19    Q.   MR. MENDENHALL, I'VE HANDED YOU A BINDER OF DOCUMENTS, AND

09:38AM   20    THE COURT HAS A COPY AND SO DOES THE DEFENSE.

09:38AM   21         AND, MR. MENDENHALL, IF I COULD ASK YOU TO TURN TO 1102 IN

09:38AM   22    THE BINDER.  IT SHOULD BE THE FIRST ONE.

09:38AM   23    A.   YES.

09:38AM   24    Q.   AND DO YOU SEE AN EMAIL IN THERE FROM THERANOS TO A NUMBER

09:38AM   25    OF INDIVIDUALS DATED SEPTEMBER 7TH, 2013?

09:38AM  1     A.   YES.

09:38AM  2               MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1102.

09:38AM  3               MR. CAZARES:  NO OBJECTION.

09:38AM  4               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:38AM  5          (GOVERNMENT'S EXHIBIT 1102 WAS RECEIVED IN EVIDENCE.)

09:38AM  6     BY MR. BOSTIC:

09:38AM  7     Q.   MR. MENDENHALL, THAT EMAIL IS NOW ON THE SCREEN IN FRONT

09:38AM  8     OF YOU.

09:38AM  9          AND IF I COULD DIRECT YOUR ATTENTION TO -- DO YOU SEE AT

09:38AM  10    THE TOP THERE'S A LARGE BLOCK OF EMAIL ADDRESS IN THE BCC

09:38AM  11    FIELD.

09:38AM  12         DO YOU SEE THAT?

09:38AM  13    A.   YES.  YES, I DO.

09:38AM  14    Q.   AND APPROXIMATELY TWO-THIRDS OF THE WAY DOWN THAT BLOCK

09:39AM  15    AND ON THE RIGHT SIDE, DO YOU SEE THE EMAIL ADDRESS

09:39AM  16    PMENDENHALL@USCALLC.COM?

09:39AM  17    A.   YES, I DO.

09:39AM  18    Q.   IS THAT YOUR EMAIL ADDRESS?

09:39AM  19    A.   YES, IT IS.

09:39AM  20    Q.   AND IS THIS AN EMAIL THAT YOU RECEIVED IN SEPTEMBER OF

09:39AM  21    2013?

09:39AM  22    A.   YES.

09:39AM  23    Q.   AND LET'S ZOOM IN ON THE BOTTOM OF THAT PAGE AND SEE SOME

09:39AM  24    OF THAT CONTENT.

09:39AM  25         AND DO YOU SEE THAT THIS EMAIL IS WRITTEN TO THE THERANOS

09:39AM  1    SHAREHOLDERS?

09:39AM  2    A.   YES, IT IS.

09:39AM  3    Q.   AND THE EMAIL SAYS, "I AM DELIGHTED TO SHARE THAT WE HAVE

09:39AM  4    NOW BEGUN THE COMMERCIAL LAUNCH OF THE NEW PRODUCTS AND

09:39AM  5    SERVICES WE'VE BEEN WORKING ON FOR THE PAST YEARS."

09:39AM  6         DO YOU SEE THAT?

09:39AM  7    A.   YES.

09:39AM  8    Q.   FIRST OF ALL, A SIMPLE QUESTION.  DO YOU SEE ANYWHERE IN

09:39AM  9    THIS EMAIL, MR. MENDENHALL, A MENTION THAT THIS LAUNCH WAS ONLY

09:39AM  10   FOR FRIENDS AND FAMILY OF THERANOS?

09:39AM  11   A.   IT WAS TO SHAREHOLDERS.

09:39AM  12   Q.   OKAY.  AND MY QUESTION IS ABOUT THE SCOPE OF THE

09:40AM  13   COMMERCIAL LAUNCH.

09:40AM  14        DO YOU SEE ANYWHERE IN THE EMAIL THE STATEMENT THAT THE

09:40AM  15   COMMERCIAL LAUNCH WAS ONLY TO FRIENDS AND FAMILY?

09:40AM  16   A.   NO.

09:40AM  17   Q.   DO YOU REMEMBER RECEIVING THIS EMAIL IN SEPTEMBER OF 2013?

09:40AM  18   A.   I BELIEVE SO.

09:40AM  19   Q.   AS AN INVESTOR, WHAT WAS YOUR REACTION TO BEING TOLD ABOUT

09:40AM  20   THE COMMERCIAL LAUNCH OF THERANOS'S PRODUCTS AND SERVICES?

09:40AM  21   A.   THIS WAS GREAT NEWS.

09:40AM  22   Q.   WHY SO?

09:40AM  23   A.   WELL, BECAUSE I THOUGHT WE HAD NOTHING, SO IT WAS REALLY

09:40AM  24   GONE FROM SOMETHING THAT I HAD BASICALLY WAS GOING TO DISCARD

09:40AM  25   TO SOMETHING THAT WAS, WOW, THIS THING IS DOING WELL AND ALIVE.

09:40AM   1    Q.   AND THIS EMAIL IN SEPTEMBER OF 2013, IS IT YOUR

09:40AM   2    RECOLLECTION THAT YOU HAD HAD CONVERSATIONS WITH MS. HOLMES

09:40AM   3    EARLIER THAT SAME YEAR?

09:40AM   4    A.   I DON'T RECALL THE TIMING OF MY CONVERSATIONS WITH

09:40AM   5    MS. HOLMES, BUT I HAD COMMUNICATED WITH HER AROUND THIS TIME,

09:41AM   6    MAYBE A LITTLE BEFORE OR AFTER THIS.  I JUST DON'T RECALL

09:41AM   7    SPECIFICS.

09:41AM   8    Q.   OKAY.  DO YOU SEE IN THE SECOND PARAGRAPH TO THIS EMAIL TO

09:41AM   9    SHAREHOLDERS THERE IS A REFERENCE TO THERANOS'S NEW WEBSITE?

09:41AM  10    A.   YES, I DO.

09:41AM  11    Q.   AND AROUND THIS TIME PERIOD, DID YOU VISIT THE THERANOS

09:41AM  12    WEBSITE?

09:41AM  13    A.   YES, I DID.

09:41AM  14    Q.   AND FOR WHAT PURPOSE DID YOU GO TO THE WEBSITE?

09:41AM  15    A.   IT WAS JUST TO LEARN ABOUT WHAT THEY WERE POSTING TO THE

09:41AM  16    GENERAL PUBLIC, AND I WAS EXCITED TO LEARN AS MUCH AS I COULD.

09:41AM  17    Q.   AND DO YOU SEE FOLLOWING THAT THERE'S A LINK REFERRING

09:41AM  18    SHAREHOLDERS TO A "WALL STREET JOURNAL" ARTICLE THAT WAS

09:41AM  19    PUBLISHED AROUND THAT TIME?

09:41AM  20    A.   YES, I SEE THAT.

09:41AM  21    Q.   I'D LIKE TO SHOW YOU EXHIBIT 1106, WHICH IS ALREADY

09:41AM  22    ADMITTED.

09:41AM  23         MAY WE PUBLISH, YOUR HONOR?

09:41AM  24             THE COURT:  YES.

09:41AM  25    BY MR. BOSTIC:

09:41AM 1    Q.   AND, MR. MENDENHALL, THIS IS IN YOUR BINDER AND ON THE

09:42AM 2    SCREEN.

09:42AM 3         DO YOU SEE A "WALL STREET JOURNAL" ARTICLE ENTITLED

09:42AM 4    "ELIZABETH HOLMES:  THE BREAKTHROUGH OF INSTANT DIAGNOSIS"

09:42AM 5    DATED SEPTEMBER OF 2013?

09:42AM 6    A.   YES.

09:42AM 7    Q.   AND DO YOU REMEMBER READING THIS ARTICLE?

09:42AM 8    A.   YES, I DO.

09:42AM 9    Q.   I'D LIKE TO DRAW YOUR ATTENTION TO A FEW STATEMENTS HERE

09:42AM 10   ON THE FIRST PAGE IN THE FIRST INDENTED PARAGRAPH -- LET ME ASK

09:42AM 11   FIRST, PRIOR TO THIS DATE, HAD THERE BEEN MUCH PUBLIC

09:42AM 12   INFORMATION AVAILABLE ABOUT THERANOS, THE COMPANY?

09:42AM 13   A.   NO.

09:42AM 14   Q.   AND WAS IT SIGNIFICANT TO YOU TO SEE THIS INFORMATION IN

09:42AM 15   "THE WALL STREET JOURNAL"?

09:42AM 16   A.   YES.

09:42AM 17   Q.   AND WHY WAS THAT?

09:42AM 18   A.   WELL, WE WERE INVESTORS, MYSELF, SOME OF MY EMPLOYEES AND

09:42AM 19   FRIENDS, AND IT WAS PRETTY EXCITING NEWS THAT THIS WAS

09:42AM 20   MATERIALIZING, OR HAD MATERIALIZED FOR THAT MATTER.

09:42AM 21   Q.   OKAY.  IN THE LANGUAGE ON THE SCREEN, THE ARTICLE STATES,

09:42AM 22   "THE SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW REFINING

09:43AM 23   INVOLVES DEVICES THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000

09:43AM 24   LABORATORY TESTS, FROM ROUTINE BLOOD WORK TO ADVANCED GENETIC

09:43AM 25   ANALYSES."

09:43AM 1      DO YOU SEE THAT?

09:43AM 2    A.  YES.

09:43AM 3    Q.  AND CAN WE LOOK AT PAGE 2, AND ZOOM IN ON THE BOTTOM FEW

09:43AM 4    PARAGRAPHS THERE.

09:43AM 5      AND DO YOU SEE AT THE TOP OF THIS SELECTION THERE'S

09:43AM 6    LANGUAGE THAT SAYS, "ANOTHER THERANOS ADVANCE IS ITS TESTING'S

09:43AM 7    ACCURACY"?

09:43AM 8    A.  YES, I SEE THAT.

09:43AM 9    Q.  AND LET'S LOOK AT THE VERY BOTTOM OF THIS PAGE, AND YOU

09:43AM 10   SEE THERE'S A LINE THERE THAT SAYS, "THERANOS'S TECHNOLOGY IS

09:43AM 11   AUTOMATED, STANDARDIZED," AND LET'S GO TO THE NEXT PAGE, "AND

09:43AM 12   ATTEMPTS TO SUBTRACT HUMAN ERROR FROM THE PROCESS."

09:43AM 13     DO YOU SEE THAT?

09:43AM 14   A.  YES.

09:43AM 15   Q.  AND IT SAYS, "IT CAN THUS ACHIEVE MUCH LOWER VARIANCE

09:43AM 16   RANGES FOR A GIVEN TEST."

09:44AM 17     DID I READ THAT CORRECTLY?

09:44AM 18   A.  YES.

09:44AM 19   Q.  SEEING INFORMATION LIKE THIS IN THE ARTICLE, HOW DID THAT

09:44AM 20   AFFECT YOUR VIEW OF YOUR INVESTMENT IN THERANOS?

09:44AM 21   A.  IT'S VERY IMPACTFUL TO NOT ONLY AN INVESTMENT, BUT MAYBE

09:44AM 22   TO EVERYBODY ON THE PLANET IF IT'S TRUE.

09:44AM 23   Q.  LET ME BREAK THAT INTO TWO QUESTIONS THEN.

09:44AM 24     FIRST OF ALL, AS AN INVESTOR, WHY WAS THAT KIND OF

09:44AM 25   INFORMATION SIGNIFICANT TO YOU?

09:44AM 1    A.   BECAUSE IT DIDN'T EXIST, AND IF YOU THINK ABOUT WHAT THEY

09:44AM 2    WERE -- WHAT THIS ARTICLE INDICATED THEY WERE ACCOMPLISHING, IT

09:44AM 3    WAS TRULY MIRACULOUS STUFF.

09:44AM 4    Q.   AND WHY DOES THAT MATTER FOR A PERSON WHO HAS A STAKE IN

09:44AM 5    THE COMPANY?

09:44AM 6    A.   BECAUSE MY STAKE IN THE COMPANY, ALBEIT A NORMAL SIZED

09:44AM 7    ALLOCATION, WOULD BE WORTH, FINANCIALLY, SIGNIFICANT DOLLARS TO

09:44AM 8    MYSELF AND MY FAMILY.

09:44AM 9    Q.   SO BESIDES THE INVESTOR STANDPOINT, DID YOU ALSO HAVE A

09:44AM 10   REACTION TO THIS NEWS JUST AS A PERSON?

09:45AM 11   A.   YEAH.

09:45AM 12         MR. CAZARES:  OBJECTION.  RELEVANCE.

09:45AM 13         THE COURT:  OVERRULED.

09:45AM 14   YOU CAN ANSWER THE QUESTION.

09:45AM 15         THE WITNESS:  YES, BECAUSE I THINK THAT ANYBODY WHO

09:45AM 16   HAS GONE IN AND BEEN STABBED WITH A NEEDLE WOULD APPRECIATE

09:45AM 17   JUST HAVING A LITTLE FINGER PRICK.

09:45AM 18   SO IT WAS, IT WAS PSYCHOLOGICALLY AND FOR MOST AMERICAN --

09:45AM 19   PEOPLE AROUND THE WORLD, IT WAS GLOBALLY IMPACTFUL, AND IT WAS

09:45AM 20   REVOLUTIONARY.

09:45AM 21   BY MR. BOSTIC:

09:45AM 22   Q.   AND WERE STATEMENTS SPECIFICALLY ABOUT THE NUMBER OF TESTS

09:45AM 23   THAT COULD BE PERFORMED AND THE ACCURACY OF THE TESTS MATERIAL

09:45AM 24   TO YOU AS AN INVESTOR?

09:45AM 25   A.   YES.  I DID NOT KNOW THAT YOU COULD RUN 1,000 TESTS ON

09:45AM   1    BLOOD.  I DIDN'T KNOW THERE WAS ANY SUCH THING, SO -- BUT THEY

09:45AM   2    DID SAY GENETIC TESTING AND THINGS LIKE THAT.

09:45AM   3        SO I HAD NO KNOWLEDGE, BUT 1,000 TESTS, PRETTY WILD, YOU

09:45AM   4    KNOW.

09:45AM   5    Q.   YOU MENTIONED THAT YOU VIEWED THE THERANOS WEBSITE AROUND

09:45AM   6    THIS TIME; IS THAT RIGHT?

09:45AM   7    A.   YES.

09:45AM   8    Q.   AND IF I COULD ASK YOU TO TURN TO TAB 5805.

09:46AM   9        YOUR HONOR, THIS EXHIBIT IS ALSO ADMITTED.  MAY WE

09:46AM  10    DISPLAY?

09:46AM  11            THE COURT:  YES.

09:46AM  12    BY MR. BOSTIC:

09:46AM  13    Q.   AND LOOKING AT 5805, DO YOU RECOGNIZE THE THERANOS

09:46AM  14    WEBSITE?

09:46AM  15    A.   YES.

09:46AM  16    Q.   AND IS THIS SIMILAR TO THE VERSION OF THE WEBSITE THAT YOU

09:46AM  17    REVIEWED AROUND THE TIME THAT WE'RE DISCUSSING?

09:46AM  18    A.   YES, IT LOOKS LIKE THE WEBSITE.

09:46AM  19    Q.   LET'S LOOK AT PAGE 2 OF THIS EXHIBIT.  AND ON THE SCREEN,

09:46AM  20    LET'S ZOOM IN TO THE PORTION THAT SAYS, "A FULL RANGE OF TESTS,

09:46AM  21    A FRACTION OF THE COST."

09:46AM  22        AND DO YOU SEE THERE THERE'S LANGUAGE THAT SAYS, "WE OFFER

09:46AM  23    A FULL RANGE OF LABORATORY TESTS, FROM COMMON PANELS TO

09:46AM  24    SPECIALIZED TESTS.  ALL WITH SPEED AND THE HIGHEST LEVELS OF

09:46AM  25    QUALITY."

MENDENHALL DIRECT BY MR. BOSTIC                                    4279

09:46AM  1          DO YOU SEE THAT?

09:46AM  2     A.   YES.

09:46AM  3     Q.   AND WAS THAT INFORMATION IMPORTANT TO YOU AS SOMEONE

09:46AM  4     INVESTING IN THE COMPANY?

09:46AM  5     A.   YES, VERY IMPORTANT.

09:46AM  6     Q.   LET'S LOOK AT PAGE 6.  LET'S ZOOM IN ON, YES,

09:47AM  7     COMPREHENSIVE TEST MENU.

09:47AM  8          AND, MR. MENDENHALL, DO YOU SEE HERE IT SAYS, "FROM COMMON

09:47AM  9     PANELS TO SPECIALIZED, THERANOS OFFERS A COMPREHENSIVE TESTING

09:47AM 10     MENU"?

09:47AM 11     A.   YES.

09:47AM 12     Q.   AND YOU TESTIFIED EARLIER THAT YOU CARED AS AN INVESTOR

09:47AM 13     ABOUT THE SCOPE OF THE TESTS AVAILABLE.

09:47AM 14     A.   OH, ABSOLUTELY, YES.

09:47AM 15     Q.   FINALLY, LET'S GO TO PAGE 22 IN THIS EXHIBIT.

09:47AM 16          AND LET'S LOOK AT THIS LANGUAGE TOWARDS THE TOP OF THE

09:47AM 17     PAGE THAT SAYS, "ONE TINY DROP.  THOUSANDS OF ANSWERS."

09:47AM 18          DO YOU SEE THAT?

09:47AM 19     A.   YES.

09:47AM 20     Q.   AND IT SAYS, "THERANOS CAN PERFORM A FULL RANGE OF TESTS

09:47AM 21     ON SAMPLES AS SMALL AS A FEW TINY DROPS."

09:48AM 22          DO YOU SEE THAT?

09:48AM 23     A.   YES.

09:48AM 24     Q.   AND IT GOES ON TO SAY, "OUR ASSAYS ARE VALIDATED UNDER

09:48AM 25     FDA, ICH, AND WHO GUIDELINES.  AND WE PROVIDE THE HIGHEST LEVEL

ER-3083

09:48AM  1    OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN BOTH OUR PRE-

09:48AM  2    AND POST-ANALYTIC PROCESSES, TO REALIZE THE HIGHEST LEVEL OF

09:48AM  3    ACCURACY AND PRECISION."

09:48AM  4        DO YOU SEE THAT?

09:48AM  5    A.   YES, I DO.

09:48AM  6    Q.   DO YOU RECALL SEEING THAT LANGUAGE OR SIMILAR LANGUAGE

09:48AM  7    WHEN YOU REVIEWED THE WEBSITE AROUND THE TIME OF THE LAUNCH?

09:48AM  8    A.   YES.

09:48AM  9    Q.   OKAY.  WE CAN PUT THAT EXHIBIT ASIDE.

09:48AM  10       AROUND THIS TIME IN LATE 2013, DID YOU BECOME AWARE OF

09:48AM  11   ANOTHER CHANCE TO INVEST IN THERANOS?

09:48AM  12   A.   YES, I DID.

09:48AM  13   Q.   AND HOW DID YOU FIND OUT ABOUT THAT, IF YOU RECALL?

09:48AM  14   A.   I THINK WE RECEIVED SOME SHAREHOLDER LETTERS AND

09:48AM  15   INFORMATION REGARDING STOCK SPLIT, CAPITAL RAISED, AND IT

09:48AM  16   LOOKED TO US -- IT LOOKED TO ME AT THE TIME THAT THEY WERE

09:49AM  17   PREPARING TO BRING IN INSTITUTIONAL CAPITAL AT THAT TIME.

09:49AM  18       I'M NOT SURE WHO THE INVESTORS WERE BESIDES MYSELF AND MY

09:49AM  19   FRIENDS UP UNTIL THAT POINT, BUT IT LOOKED LIKE THEY WERE

09:49AM  20   MAKING SOME INROADS INTO RAISING A SIGNIFICANT AMOUNT OF

09:49AM  21   CAPITAL.

09:49AM  22   Q.   AND YOU USED THE TERM "INSTITUTIONAL CAPITAL."  CAN YOU

09:49AM  23   BRIEFLY EXPLAIN WHAT THAT MEANS?

09:49AM  24   A.   IT WOULD BE MORE SOPHISTICATED.  IT COULD BE PRIVATE

09:49AM  25   EQUITY, HEDGE FUNDS, DIFFERENT CAPITAL MARKETS TYPE COMPANIES

09:49AM   1    AND ULTRA HIGH NET WORTH INDIVIDUALS.  FAMILY OFFICES I SHOULD

09:49AM   2    SAY.

09:49AM   3    Q.   OKAY.  LET ME ASK YOU TO TURN TO 5814 IN YOUR BINDER.

09:49AM   4         DO YOU SEE THERE AN EMAIL FROM THERANOS TO YOU IN

09:49AM   5    MID-DECEMBER 2013?

09:49AM   6    A.   I DO.

09:49AM   7              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5814.

09:50AM   8              MR. CAZARES:  NO OBJECTION.

09:50AM   9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:50AM  10         (GOVERNMENT'S EXHIBIT 5814 WAS RECEIVED IN EVIDENCE.)

09:50AM  11    BY MR. BOSTIC:

09:50AM  12    Q.   AND DO YOU SEE, FIRST OF ALL, MR. MENDENHALL, AT THE TOP

09:50AM  13    THIS WAS SENT FROM THERANOS TO YOU ON DECEMBER 16TH, 2013?

09:50AM  14    A.   YES, I SEE THAT.

09:50AM  15    Q.   AND LET'S LOOK AT THE TEXT OF THE LETTER UNDER "THERANOS

09:50AM  16    CONFIDENTIAL."

09:50AM  17         IT SAYS, "DEAR THERANOS STOCKHOLDER."

09:50AM  18         AND DO YOU SEE AT THE TOP THERE'S LANGUAGE THAT SAYS,

09:50AM  19    "WITH OUR LAUNCH TO CONSUMER HEALTH CARE THIS YEAR, WE ARE

09:50AM  20    RAPIDLY SCALING TO ESTABLISH A NATIONAL FOOTPRINT AND CAPTURE

09:50AM  21    THE OPPORTUNITY WE HAVE TO SERVE AS THE ONLY CERTIFIED,

09:50AM  22    NATIONAL LABORATORY CAPABLE OF RUNNING ANY OF ITS LABORATORY

09:50AM  23    TESTS FROM A FEW TINY DROPLETS OF BLOOD."

09:50AM  24         DO YOU SEE THAT LANGUAGE?

09:50AM  25    A.   YES, I DO.

MENDENHALL DIRECT BY MR. BOSTIC                                    4282

09:50AM  1    Q.   AND THIS LANGUAGE ABOUT SCALING TO ESTABLISH A NATIONAL

09:50AM  2    FOOTPRINT," WHAT DID THAT SIGNIFY TO YOU AS AN INVESTOR?

09:51AM  3    A.   IT SIGNALLED TO ME THAT THEY WERE RUNNING BLOOD TESTS AND

09:51AM  4    THAT THEY NEEDED TO MANUFACTURE AND GROW SALES AND GROW

09:51AM  5    LOCATIONS AND DISTRIBUTE THEIR PRODUCT AND GET IT OUT INTO THE

09:51AM  6    MARKET TO GENERATE REVENUE AS PART OF THEIR BUSINESS PLAN.

09:51AM  7         THAT WOULD BE MY ASSUMPTION.

09:51AM  8    Q.   AT THE BOTTOM OF THAT SAME PARAGRAPH IT SAYS, "AS WE

09:51AM  9    PREPARE FOR 2014 AND CLOSING YEAR END, WE ARE ACTIVELY

09:51AM  10   INVESTING IN INFRASTRUCTURE TO BUILD THIS NEW INDUSTRY WE HAVE

09:51AM  11   CREATED."

09:51AM  12        IS THAT LANGUAGE CONSISTENT WITH THE CONCEPT THAT YOU JUST

09:51AM  13   DESCRIBED?

09:51AM  14   A.   YES.

09:51AM  15   Q.   AROUND THIS TIME WHEN YOU FOUND OUT ABOUT THE OPPORTUNITY

09:51AM  16   TO INVEST MORE MONEY IN THERANOS, WERE YOU INTERESTED IN

09:51AM  17   POTENTIALLY PURSUING THAT?

09:51AM  18   A.   YES.

09:51AM  19   Q.   AND WHY WAS THAT?

09:51AM  20   A.   THIS IS, AGAIN, PROBABLY THE MOST INCREDIBLE INVESTMENT

09:52AM  21   OPPORTUNITY THAT ONE COULD SEE, AND IF YOU -- WHEN I DID JUST

09:52AM  22   BACK OF THE ENVELOPE MATH ON MY OWN, I THOUGHT, WOW, THIS THING

09:52AM  23   COULD REALLY BE A SIGNIFICANT OPPORTUNITY FOR INVESTORS LIKE

09:52AM  24   MYSELF.

09:52AM  25   Q.   AND WHAT WAS THE NEXT STEP THEN?  GIVEN THAT YOU WERE

09:52AM   1      INTERESTED IN POTENTIALLY PURSUING IT, WHAT DID YOU DO NEXT?

09:52AM   2      A.   I'M NOT SURE EXACTLY WHAT I DID, BUT THERE WAS SOME

09:52AM   3      OFFERING DOCUMENTS AND SOME MORE INFORMATION THAT CAME MY WAY

09:52AM   4      TO MAKE A DECISION.

09:52AM   5      Q.   DID YOU HAVE A CONVERSATION WITH MR. BALWANI IN DECEMBER

09:52AM   6      OF 2013 WHILE YOU WERE DECIDING WHETHER TO INVEST MORE?

09:52AM   7      A.   I DID.

09:52AM   8      Q.   IF I COULD ASK YOU TO LOOK AT TAB 5825.

09:53AM   9           AND DO YOU SEE AT 5825 AN EMAIL CHAIN BETWEEN YOU AND

09:53AM  10      MR. BALWANI IN THIS TIME PERIOD?

09:53AM  11      A.   I DO.

09:53AM  12              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5825.

09:53AM  13              MR. CAZARES:  NO OBJECTION.

09:53AM  14              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:53AM  15          (GOVERNMENT'S EXHIBIT 5825 WAS RECEIVED IN EVIDENCE.)

09:53AM  16      BY MR. BOSTIC:

09:53AM  17      Q.   OKAY.  LET'S ZOOM IN ON MR. BALWANI'S MESSAGE TO YOU.

09:53AM  18           DO YOU SEE THAT WE'RE LOOKING AT AN EMAIL FROM

09:53AM  19      DECEMBER 19TH, 2013?

09:53AM  20      A.   YES.

09:53AM  21      Q.   AND MR. BALWANI WRITES, "DEAR PAT.

09:53AM  22           "HOPE THIS EMAIL FINDS YOU WELL.

09:53AM  23           "I WAS INSTRUCTED BY ELIZABETH HOLMES, OUR CEO, TO REACH

09:53AM  24      OUT TO YOU IN REGARDS TO YOUR INTEREST IN PARTICIPATING IN THE

09:53AM  25      CURRENT ROUND OF EQUITY FINANCING FOR THE COMPANY."

MENDENHALL DIRECT BY MR. BOSTIC                    4284

09:53AM  1         DO YOU SEE THAT?

09:53AM  2    A.   YES.

09:53AM  3    Q.   AND DO YOU REMEMBER ANY CONVERSATIONS YOU HAD WITH

09:53AM  4    MS. HOLMES LEADING UP TO MR. BALWANI EMAILING YOU?

09:53AM  5    A.   YES.  I REMEMBER I DID TALK TO HER AND SHE SAID SHE WOULD

09:53AM  6    CONNECT ME WITH SUNNY AND HE WOULD ANSWER ALL OF THE QUESTIONS

09:54AM  7    THAT I WOULD HAVE ABOUT THE OFFERING AND THE BUSINESS AND THE

09:54AM  8    CURRENT STATUS OF THE BUSINESS.

09:54AM  9    Q.   WAS THAT MS. HOLMES'S IDEA TO CONNECT YOU WITH

09:54AM 10    MR. BALWANI, OR WAS IT IN RESPONSE TO QUESTIONS THAT YOU HAD

09:54AM 11    ABOUT THE COMPANY?

09:54AM 12    A.   IT WAS HER RESPONSE TO QUESTIONS THAT I HAD ABOUT THE

09:54AM 13    COMPANY.

09:54AM 14    Q.   DID SHE ALSO PROVIDE ANSWERS TO THOSE QUESTIONS, OR WAS

09:54AM 15    PUTTING YOU IN TOUCH WITH MR. BALWANI IN LIEU OF PROVIDING

09:54AM 16    THOSE ANSWERS HERSELF?

09:54AM 17    A.   MY RECOLLECTION IS THAT WE HAD A GENERAL CONVERSATION AND

09:54AM 18    I HAD A LOT OF SPECIFIC DETAILS THAT I WANTED, SO THIS WAS HER

09:54AM 19    ANSWER WAS TO CONNECT ME WITH MR. BALWANI.

09:54AM 20    Q.   AND DID YOU HAVE AN UNDERSTANDING AT THAT TIME ABOUT

09:54AM 21    MR. BALWANI'S ROLE IN THE COMPANY?

09:54AM 22    A.   YES.  AT THE TIME, HE WAS IDENTIFIED AS THE PRESIDENT AND

09:54AM 23    CHIEF OPERATING OFFICER OF THE COMPANY.

09:54AM 24    Q.   IN MR. BALWANI'S EMAIL HE SAID, "PLEASE ADVISE WHEN IS A

09:55AM 25    GOOD TIME TO CHAT," AND OFFERED TO CONNECT WITH YOU TO ANSWER

MENDENHALL DIRECT BY MR. BOSTIC                                    4285

09:55AM   1        THOSE QUESTIONS.

09:55AM   2            DO YOU SEE THAT?

09:55AM   3    A.   YES.

09:55AM   4    Q.   AND DID YOU HAVE A CONVERSATION WITH MR. BALWANI SHORTLY

09:55AM   5    AFTER THIS?

09:55AM   6    A.   YES, I DID.

09:55AM   7    Q.   LET ME ASK YOU TO LOOK AT TAB 4059, PLEASE.

09:55AM   8    A.   OKAY.

09:55AM   9    Q.   DO YOU HAVE 4059?

09:55AM  10    A.   YES, I DO.

09:55AM  11    Q.   AND IS THAT AN EMAIL FROM YOU TO YOUR COWORKER,

09:55AM  12    DAVID HARRIS, ON DECEMBER 2ND, 2013?

09:56AM  13    A.   I SEEM TO -- OH, I HAVE IT.  THERE IT IS.

09:56AM  14    Q.   AND I DON'T WANT YOU TO READ ANY OF THE CONTENT OUT LOUD,

09:56AM  15    BUT COULD YOU JUST TELL US WHAT THE EMAIL WAS AND WHAT WAS THE

09:56AM  16    PURPOSE OF YOU SENDING IT?

09:56AM  17    A.   THIS EMAIL WAS A COMPLETE RECAP OF MY CONVERSATION WITH

09:56AM  18    MR. BALWANI ON THAT DAY.

09:56AM  19    Q.   AND WHAT WAS THE PURPOSE OF YOU SENDING THAT RECAP TO YOUR

09:56AM  20    COWORKER, DAVID HARRIS?

09:56AM  21    A.   DAVID WAS -- HAD INTRODUCED SEVERAL OF OUR CLIENTS, WELL,

09:56AM  22    BACK AT UBS, TO THIS INVESTMENT, AND IT -- SOME OF THESE

09:56AM  23    CLIENTS WERE SHAREHOLDERS IN MY COMPANY AND SOME OF THESE

09:56AM  24    CLIENTS WERE CLIENTS OF MY CURRENT FIRM, U.S. CAPITAL ADVISORS,

09:56AM  25    SO I WANTED TO PASS ON THE CURRENT UPDATE ON -- FOR THE

MENDENHALL DIRECT BY MR. BOSTIC                          4286

09:56AM   1    INVESTORS.

09:56AM   2    Q.   AND WAS THAT PART OF YOUR USUAL PRACTICE AT U.S. CAPITAL

09:57AM   3    ADVISORS, TO SEND UPDATES LIKE THIS TO PEOPLE LIKE MR. HARRIS?

09:57AM   4    A.   YES.

09:57AM   5    Q.   AND WAS IT PART OF YOUR REGULAR PRACTICE AT U.S. CAPITAL

09:57AM   6    ADVISORS TO HAVE CALLS OR CONVERSATIONS WITH PEOPLE

09:57AM   7    REPRESENTING THE COMPANIES YOU WERE CONSIDERING INVESTING IN?

09:57AM   8    A.   YES, COMPANIES THAT WE HAD INVESTED IN, AND THAT CERTAINLY

09:57AM   9    WHEN WE'RE CONSIDERING AN INVESTMENT, WE HAVE THESE TYPES OF

09:57AM  10    CALLS.

09:57AM  11    Q.   AND AROUND THAT TIME PERIOD AT U.S. CAPITAL ADVISORS, DID

09:57AM  12    YOU HAVE A SPECIFIC PRACTICE WHEN IT CAME TO TAKING NOTES OF

09:57AM  13    THOSE CONVERSATIONS, MEMORIALIZING THOSE NOTES?

09:57AM  14    A.   I'M, I'M A HABITUAL NOTE-TAKER, ESPECIALLY AS I GET OLDER,

09:57AM  15    AND, YES, I TAKE NOTES ALL OF THE TIME.

09:57AM  16    Q.   AND DESCRIBE FOR US WHAT YOUR USUAL PRACTICE WAS BETWEEN

09:57AM  17    THE CONTENT OF THE CALL AND SENDING AN EMAIL LIKE THIS?

09:57AM  18    A.   I JOT DOWN THE NOTES FROM THE CONVERSATION, AND THEN I

09:57AM  19    TRANSLATE THEM INTO AN EMAIL OR A WORD DOCUMENT SO PEOPLE CAN

09:58AM  20    UNDERSTAND MY NOTES AND I CAN DETAIL MY NOTES AND WHAT MY

09:58AM  21    TAKEAWAYS WERE FROM THE CONVERSATION, AND I'M VERY DETAILED AND

09:58AM  22    SPECIFIC IN THAT.

09:58AM  23    Q.   AND IN DOING THAT WITH YOUR CALL WITH MR. BALWANI, DID YOU

09:58AM  24    CREATE THIS RECORD SHORTLY AFTER THE CALL?

09:58AM  25    A.   I BELIEVE I LITERALLY HUNG UP AND THEN WITHIN A SHORT

09:58AM  1    PERIOD OF TIME I -- THAT DAY I STARTED TYPING OUT MY NOTES.

09:58AM  2    Q.   AND WAS IT IMPORTANT FOR YOU TO BE ACCURATE IN RELAYING

09:58AM  3    THIS INFORMATION TO MR. HARRIS?

09:58AM  4    A.   YES.

09:58AM  5    Q.   AND WAS THIS EMAIL AND WERE EMAILS LIKE IT PRESERVED SO

09:58AM  6    THAT THEY COULD BE REFERENCED LATER IF NEEDED?

09:58AM  7    A.   YES.  REGULATORILY WE PRESERVE OUR EMAILS FOR SIX YEARS,

09:58AM  8    NO MATTER WHAT I DO.  SO EVERYTHING THAT I WRITE IS PRESERVED

09:58AM  9    REGULLATORILY FOR UP TO SIX YEARS, I BELIEVE.

09:58AM  10           MR. BOSTIC:  OKAY.  YOUR HONOR, THE GOVERNMENT

09:58AM  11   OFFERS 5059 -- EXCUSE ME, 4059.

09:59AM  12           MR. CAZARES:  802, YOUR HONOR.

09:59AM  13           THE COURT:  IS THIS 803(6)?

09:59AM  14           MR. BOSTIC:  YES, YOUR HONOR.

09:59AM  15           THE COURT:  AND COULD YOU JUST INQUIRE, WAS -- AND

09:59AM  16   I'M NOT SURE I HEARD IT, MAYBE YOU DID -- BUT WHETHER OR NOT

09:59AM  17   HIS PROTOCOL WAS SOMETHING THAT WAS IN THE NORMAL COURSE AND

09:59AM  18   SCOPE OF HOW HE RAN THE BUSINESS.

09:59AM  19           MR. BOSTIC:  YES, YOUR HONOR.

09:59AM  20           THE COURT:  THAT PIECE OF IT, IF YOU COULD.

09:59AM  21           MR. BOSTIC:  YES, YOUR HONOR.

09:59AM  22   Q.   MR. MENDENHALL, WHAT WAS YOUR ROLE AT U.S. CAPITAL

09:59AM  23   ADVISORS AT THIS TIME IN 2013?

09:59AM  24   A.   IT'S THE SAME ROLE.  I'M THE FOUNDER AND MANAGING PARTNER

09:59AM  25   AND CEO OF THE FIRM.

09:59AM  1    Q.   OKAY.  AND THE SEQUENCE THAT YOU JUST DESCRIBED WHERE YOU

09:59AM  2    WOULD TAKE NOTES OF A CALL, TRANSCRIBE THOSE NOTES, AND THEN

09:59AM  3    EMAIL THE RECAPS TO OTHER INDIVIDUALS AT U.S. CAPITAL THAT

09:59AM  4    NEEDED THAT INFORMATION, WAS THAT PART OF YOUR STANDARD

09:59AM  5    PRACTICE AND THE WAY THAT YOU OPERATED THE BUSINESS AT THAT

09:59AM  6    TIME?

09:59AM  7    A.   YES, IT'S -- IT'S THE STANDARD PRACTICE ON HOW I DEAL NOT

09:59AM  8    ONLY WITH EMPLOYEE/EMPLOYER MATTERS, BUT WITH INVESTMENT AND

09:59AM  9    INVESTMENT MATTERS, INCLUDING CLIENTS OF THE FIRM.

10:00AM 10         WHEN I AM COMMUNICATING -- THIS WOULD BE SIMILAR TO A

10:00AM 11    COMMUNICATION THAT I KNEW WAS GOING TO GO TO CLIENTS OF THE

10:00AM 12    FIRM, ALTHOUGH THE FIRM HAD NOT -- WASN'T ASSOCIATED WITH

10:00AM 13    RAISING THE CAPITAL FOR THERANOS, I KNEW OUR SHAREHOLDERS HAD

10:00AM 14    OWNERSHIP OF THAT.

10:00AM 15         SO I KNEW THIS WAS GOING TO SHAREHOLDERS, SO I TREATED IT

10:00AM 16    AS SUCH, SHAREHOLDERS OF THERANOS AND CLIENTS OF THE FIRM.

10:00AM 17    Q.   OKAY.  THANK YOU.

10:00AM 18         YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 4059.

10:00AM 19              THE COURT:  IT'S ADMITTED PURSUANT TO 803(6).

10:00AM 20              MR. BOSTIC:  MAY I PUBLISH, YOUR HONOR?

10:00AM 21              THE COURT:  YES, YOU MAY PUBLISH.

10:00AM 22         (GOVERNMENT'S EXHIBIT 4059 WAS RECEIVED IN EVIDENCE.)

10:00AM 23              MR. BOSTIC:  LET'S ZOOM IN ON THE TOP THIRD OF THE

10:00AM 24    PAGE OR SO.

10:00AM 25    Q.   AND SO, MR. MENDENHALL, CAN YOU TELL US ONE MORE TIME WHAT

10:00AM   1    WE'RE LOOKING AT HERE, THIS EMAIL FROM DECEMBER 22ND, 2013.

10:00AM   2    A.   THIS IS A RECAP OF MY CONVERSATION WITH MR. BALWANI

10:00AM   3    SUMMARIZING THE FACTS AS HE GAVE THEM TO ME AND SENDING THEM TO

10:00AM   4    ONE OF MY EMPLOYEES, DAVID HARRIS, AND SOME OF HIS CLIENTS WHO

10:01AM   5    ARE ALSO CLIENTS OF U.S. CAPITAL.

10:01AM   6    Q.   AND BESIDES THE -- WELL, LET'S LOOK BRIEFLY AT PAGE 2 OF

10:01AM   7    THIS DOCUMENT, AND LET'S ZOOM IN ON WHAT YOU WRITE AFTER YOU

10:01AM   8    SIGN OFF FROM THE EMAIL.

10:01AM   9        DO YOU SEE THERE THERE'S LANGUAGE THAT SAYS, "I

10:01AM  10    TRANSCRIBED THIS EMAIL FROM MY NOTES AND I AM CONFIDENT I DID

10:01AM  11    SO ACCURATELY"?

10:01AM  12        DO YOU SEE THAT?

10:01AM  13    A.   YES.

10:01AM  14    Q.   WAS THAT TRUE?

10:01AM  15    A.   YES.

10:01AM  16    Q.   LET'S GO BACK TO PAGE 1 AND ZOOM IN ON THAT TOP PORTION

10:01AM  17    AGAIN.

10:01AM  18        THIS CALL WITH MR. BALWANI, WHAT WAS ITS PURPOSE IN

10:01AM  19    DECEMBER OF 2013?

10:01AM  20    A.   THE PURPOSE WAS WE HAD AN OPPORTUNITY AS CURRENT

10:01AM  21    SHAREHOLDERS TO ADD TO OUR THERANOS POSITION, AND I NEEDED TO

10:01AM  22    DETERMINE WHETHER WE WOULD DO THAT OR NOT.

10:01AM  23    Q.   AND AT THIS TIME WERE YOU INVESTIGATING THE COMPANY SOLELY

10:02AM  24    FOR YOURSELF, OR DID YOU ALSO REPRESENT OTHER INVESTORS WHO

10:02AM  25    WERE CONSIDERING INVESTING?

10:02AM  1    A.    I BELIEVE I WAS REPRESENTING MYSELF AND OTHER INVESTORS

10:02AM  2    THAT WERE INTERESTED IN KNOWING WHAT TO DO GOING FORWARD.

10:02AM  3    Q.    AND THE INFORMATION THAT YOU GAINED FROM MR. BALWANI

10:02AM  4    DURING THIS CALL ON DECEMBER 22ND, DID YOU PASS THAT

10:02AM  5    INFORMATION ALONG TO THOSE OTHER INDIVIDUALS?

10:02AM  6    A.    YES, EVENTUALLY.

10:02AM  7          WELL, SOME HERE, AND THEN MORE LATER.

10:02AM  8    Q.    OKAY.  BESIDES THE NOTES THAT WE'RE LOOKING AT, DO YOU

10:02AM  9    ALSO HAVE AN INDEPENDENT MEMORY OF YOUR CONVERSATION WITH

10:02AM 10    MR. BALWANI ON THAT DAY?

10:02AM 11    A.    YES, I REALLY DO.

10:02AM 12    Q.    OKAY.  AND I'D LIKE TO ASK YOU SOME QUESTIONS ABOUT THE

10:02AM 13    CONTENT OF THAT CONVERSATION AND WHAT YOU WROTE IN THE NOTES.

10:02AM 14          LET'S START WITH ITEMS 3, 4, AND 5 ON YOUR LIST.

10:02AM 15          DO YOU SEE THAT IN FRONT OF YOU?

10:02AM 16    A.    YES.

10:02AM 17    Q.    AND THOSE ITEMS READ, "THE 'SCIENCE' BEHIND THERANOS IS

10:03AM 18    COMPLETE;

10:03AM 19          "NO NEW 'SCIENCE' NEEDED;

10:03AM 20          "NO NEW INVENTION NEEDED."

10:03AM 21          DO YOU SEE THAT?

10:03AM 22    A.    YES, I DO.

10:03AM 23    Q.    AND WHAT DO YOU REMEMBER MR. BALWANI TELLING YOU ABOUT THE

10:03AM 24    STATE OF THE SCIENCE AND THE INVENTION AT THERANOS?

10:03AM 25    A.    IT WAS DONE AND THERE WAS SOME SPECIFICITY AROUND OUR

10:03AM  1    CONVERSATION WHERE, KNOWING THAT THE SCIENCE AND THE INVENTION

10:03AM  2    WAS COMPLETE, THE NEW CAPITAL HAD A SPECIFIC PURPOSE, AND

10:03AM  3    THAT'S WHAT THIS CONVERSATION -- ONCE I HEARD THAT, I WAS MORE

10:03AM  4    INTERESTED IN WHAT THEY WERE GOING TO DO WITH THE MONEY SINCE

10:03AM  5    EVERYTHING WAS COMPLETE, WHICH WAS VERY EXCITING NEWS.

10:03AM  6    Q.   OKAY.  AND I'LL ASK YOU SHORTLY ABOUT WHAT YOU HEARD ABOUT

10:03AM  7    THE PURPOSE OF THE MONEY.

10:03AM  8        BUT FOR NOW, WHEN IT CAME TO THE STATE OF THE TECHNOLOGY,

10:03AM  9    WHY DID THAT MATTER TO YOU AS AN INVESTOR, IF IT DID?

10:03AM  10   A.   THIS MEANS THAT THIS COMPANY WENT FROM BEING A SPECULATIVE

10:03AM  11   VENTURE COMPANY TO A COMPANY THAT HAD DEVELOPED AND CREATED

10:04AM  12   TECHNOLOGY THAT WORKED AND WAS IN THE -- WAS NOW A REAL

10:04AM  13   BUSINESS, AND IT WAS GOING TO -- IT WAS HAVING SUCCESS.

10:04AM  14       SO IT WENT FROM BEING SPECULATIVE AND AGGRESSIVE TO

10:04AM  15   PROBABLY A PRETTY DECENTLY CONSERVATIVE INVESTMENT WITH A LOT

10:04AM  16   OF UPSIDE.

10:04AM  17   Q.   AND DOES THAT MAKE THE INVESTMENT OPPORTUNITY MORE OR LESS

10:04AM  18   ATTRACTIVE TO YOU?

10:04AM  19   A.   MUCH MORE ATTRACTIVE.

10:04AM  20   Q.   IF YOU'RE LOOKING AT A TECHNOLOGY COMPANY, DO YOU VIEW AN

10:04AM  21   INVESTMENT OPPORTUNITY DIFFERENTLY IF THE COMPANY HAS COMPLETE

10:04AM  22   AND FINISHED TECHNOLOGY VERSUS IF THE COMPANY IS STILL WORKING

10:04AM  23   ON DEVELOPING IT?

10:04AM  24   A.   YEAH, YEAH -- YES, OF COURSE.  AND AGAIN, JUST BECAUSE

10:04AM  25   THIS IS WHAT I DO FOR A LIVING, WHEN WE ALLOCATE OUR

10:04AM  1    CLIENTS' -- WE MANAGE ABOUT EIGHT AND A HALF BILLION DOLLARS AS

10:04AM  2    A FIRM, SO WHEN WE ALLOCATE OUR CLIENTS' MONEY, DEPENDING ON

10:04AM  3    HOW MUCH MONEY THEY HAVE IN THEIR INVESTMENT OBJECTIVES, YOU

10:05AM  4    WOULD BE -- YOU WOULD DO SOME AGGRESSIVE, SPECULATIVE VENTURE,

10:05AM  5    BUT YOU WOULD ALLOCATE MORE MONEY TO A COMPANY THAT WAS NOW

10:05AM  6    ESTABLISHED WITH A LOT MORE UPSIDE.  IT WOULD BE CONSIDERED

10:05AM  7    MORE OF AN AGGRESSIVE GROWTH COMPANY.

10:05AM  8         IT'S NOT A VALUE COMPANY YET, WHICH IS MORE CONSERVATIVE.

10:05AM  9         IT WOULD BE CONSIDERED GOING FROM A VENTURE FIRM TO AN

10:05AM 10    AGGRESSIVE GROWTH COMPANY.

10:05AM 11         THAT WOULD BE -- YOU WOULD BE MORE MOTIVATED TO PUT MORE

10:05AM 12    MONEY IN THAT.

10:05AM 13    Q.   THE STATEMENTS IN YOUR EMAIL ARE QUITE DEFINITIVE.

10:05AM 14         DO YOU SEE THOSE STATEMENTS?

10:05AM 15    A.   YES.

10:05AM 16    Q.   HOW DOES THAT COMPARE TO WHAT MR. BALWANI WAS TELLING YOU?

10:05AM 17    WAS THERE ADDITIONAL HEDGING OR NUANCE IN WHAT YOU HEARD FROM

10:05AM 18    HIM ON THAT DAY?

10:05AM 19    A.   NO.  HE WAS 100 PERCENT CONFIDENT, FACTUAL, PRECISE.

10:05AM 20    Q.   WELL, LET'S LOOK NEXT AT ITEM 2 IN YOUR LIST.

10:05AM 21         AND DO YOU SEE THERE IT SAYS, "EMPLOYEE RAMP IS IN SALES

10:05AM 22    AND MANUFACTURING"?

10:05AM 23    A.   YES.

10:05AM 24    Q.   AND WHAT DID MR. BALWANI TELL YOU ABOUT THAT?

10:05AM 25    A.   THAT THEY WERE GOING TO EXPAND IN THEIR MANUFACTURING

ER-3096

10:06AM  1    CAPABILITY, AND THEY WERE RAMPING UP THEIR SALES FORCE TO DRIVE

10:06AM  2    REVENUE FOR THIS NEW TECHNOLOGY.

10:06AM  3    Q.   AND IF THAT MATTERED TO YOU AS AN INVESTOR, WHY DID IT?

10:06AM  4    A.   BECAUSE I LIKE -- THIS IS WHAT I WOULD CALL GROWTH

10:06AM  5    CAPITAL, NOT VENTURE CAPITAL.

10:06AM  6         SO CAPITAL GOING INTO GROWTH USUALLY RESULTS IN HIGHER

10:06AM  7    REVENUE AND MORE PROFITS.

10:06AM  8    Q.   LET'S LOOK AT ITEMS 6, 7, AND 8 IN YOUR NOTES OF YOUR CALL

10:06AM  9    WITH MR. BALWANI.

10:06AM  10        AND THERE IT READS, "THEY ARE COMPLETELY VERTICALLY

10:06AM  11   INTEGRATED -- THEY OWN THE LAB AND THE MANUFACTURING;

10:06AM  12        "100 PERCENT MANUFACTURING IN U.S.A. -- NO SUBCONTRACTING;

10:06AM  13        "FULLY OWNED AND PROTECTED MANUFACTURING ASSURES PRICING

10:06AM  14   AND PROFIT STABILITY."

10:06AM  15        DO YOU SEE THAT?

10:06AM  16   A.   YES.

10:06AM  17   Q.   AND WHAT DID MR. BALWANI TELL YOU ABOUT THIS TOPIC?

10:07AM  18   A.   THAT THESE WERE -- HE TOLD ME THESE THINGS SPECIFICALLY,

10:07AM  19   BUT THE CONVERSATION AROUND THAT IS THAT IF YOU CONTROL THAT,

10:07AM  20   THEN YOU'RE NOT AT THE MERCY OF YOUR SUPPLIERS.

10:07AM  21        A LOT OF THAT EXAMPLE IS GOING ON TODAY IN THE MARKETS

10:07AM  22   WITH SUPPLY CHAIN ISSUES FOR PUBLIC COMPANIES THAT ARE ALWAYS

10:07AM  23   COMPLAINING THEY DON'T ACCESS TO THIS THIS.  THIS ALLEVIATES

10:07AM  24   THOSE POTENTIAL THREATS TO YOUR BUSINESS AND INTERRUPTION TO

10:07AM  25   YOUR BUSINESS.

10:07AM   1    Q.   AND TALKING ABOUT MANUFACTURING, FROM YOUR CONVERSATION

10:07AM   2    WITH MR. BALWANI, WHAT DID YOU UNDERSTAND WAS ACTUALLY BEING

10:07AM   3    MANUFACTURED BY THERANOS?

10:07AM   4    A.   I BELIEVE THEY WERE MANUFACTURING THIS DIAGNOSTIC MACHINE.

10:07AM   5    IT MIGHT HAVE BEEN THE EDISON MACHINE.  I DON'T KNOW IF IT HAD

10:07AM   6    A NAME YET.

10:07AM   7         AND THEY WERE ALSO MANUFACTURING THE LITTLE NANO

10:07AM   8    CONTAINERS.

10:07AM   9    Q.   DID THE FACT THAT THERANOS WAS MANUFACTURING ITS OWN

10:07AM  10    ANALYZER MAKE THE INVESTMENT MORE OR LESS ATTRACTIVE TO YOU?

10:08AM  11    A.   AGAIN, IT MAKES IT MORE ATTRACTIVE.

10:08AM  12    Q.   AT ANY POINT DURING THAT CALL, DID MR. BALWANI TELL YOU

10:08AM  13    THAT THERANOS WAS DEPENDENT ON THIRD PARTY ANALYZERS FOR THE

10:08AM  14    MAJORITY OF ITS TESTS?

10:08AM  15    A.   NO.

10:08AM  16    Q.   WOULD THAT FACT HAVE BEEN IMPORTANT TO YOU AS SOMEONE

10:08AM  17    CONSIDERING AN INVESTMENT IN THE COMPANY?

10:08AM  18    A.   EXTREMELY IMPORTANT.

10:08AM  19    Q.   WHY IS THAT?

10:08AM  20    A.   WHY WOULD -- IF YOUR SCIENCE WORKS AND YOU DON'T NEED

10:08AM  21    TECHNOLOGY AND THIS IS WORKING, WHY WOULD YOU NEED TO USE THIRD

10:08AM  22    PARTY BIG VEIN DRAWS WHEN YOUR WHOLE PREMISE IS SMALL FINGERTIP

10:08AM  23    DROPS OF BLOOD?

10:08AM  24         WHY IS IT -- IS THIS A TEMPORARY THING?  IS IT A PERMANENT

10:08AM  25    THING?

10:08AM 1        THERE WOULD HAVE BEEN A LOT OF QUESTIONS I WOULD HAVE HAD

10:08AM 2    TO ASK AND IT WOULD HAVE DIALLED DOWN THE MONEY THAT I WOULD

10:08AM 3    HAVE BEEN INTERESTED IN INVESTING IF THEY STILL RELYING ON -- I

10:08AM 4    DIDN'T KNOW THEY EVER USED ANOTHER TEST.

10:08AM 5    Q.   AND BECAUSE YOU MENTIONED VEIN DRAWS, LET ME ASK, DURING

10:08AM 6    THAT CONVERSATION, DID MR. BALWANI EVER TELL YOU THAT THE

10:08AM 7    COMPANY NEEDED TO RELY ON VEIN DRAWS FOR A SIGNIFICANT

10:09AM 8    PERCENTAGE OF ITS TESTS?

10:09AM 9    A.   NO.

10:09AM 10   Q.   WOULD THAT HAVE BEEN AN IMPORTANT FACT FOR YOU TO KNOW?

10:09AM 11   A.   YES.

10:09AM 12   Q.   THOSE FACTS ABOUT THE USE OF THIRD PARTY DEVICES OR VEIN

10:09AM 13   DRAWS, DID MR. BALWANI EVER DISCLOSE THOSE FACTS TO YOU DURING

10:09AM 14   YOUR DEALINGS WITH THE COMPANY?

10:09AM 15   A.   NO.

10:09AM 16   Q.   OKAY.  LET'S ZOOM OUT AND ZOOM BACK IN TO ITEM 12 AND

10:09AM 17   BELOW.

10:09AM 18       AND DO YOU SEE THAT ITEM 12 ON YOUR LIST YOU REPORT,

10:09AM 19   "CURRENT CLINICAL TRIALS TAKE 6 VIALS AND CAN RUN 10 TO 12

10:09AM 20   TESTS.  THERANOS TAKES 3 DROPS AND CAN RUN 60 TO 70 TESTS."

10:09AM 21       DO YOU SEE THAT?

10:09AM 22   A.   YES.

10:09AM 23   Q.   AND WHAT DID MR. BALWANI TELL YOU ABOUT THE NUMBER OF

10:09AM 24   TESTS THAT THERANOS COULD RUN ON A SINGLE SAMPLE?

10:09AM 25   A.   EXACTLY WHAT I WROTE.

ER-3099

MENDENHALL DIRECT BY MR. BOSTIC                                    4296

10:09AM   1    Q.   OKAY.  AND THE DIFFERENCE IN THIS REGARD IN ABILITY

10:10AM   2    BETWEEN THERANOS AND CURRENT CLINICAL TRIALS, DID THAT MATTER

10:10AM   3    TO YOU AS AN INVESTOR?

10:10AM   4    A.   YES, VERY MUCH SO.

10:10AM   5    Q.   LOOKING AT 17, YOU RELAY THAT YOU HEARD "THE COMPETITION

10:10AM   6    IS YEARS BEHIND ON TECHNOLOGY (MAYBE LONGER) AND WITH BLOATED

10:10AM   7    OVERHEADS AND BUREAUCRACY WOULD HAVE TO CHARGE THE SAME RATES

10:10AM   8    THEY CURRENTLY CHARGE OR HIGHER THEREFORE MAKING THEIR ABILITY

10:10AM   9    TO COMPETE LET ALONE CATCH UP VERY DIFFICULT IF NOT

10:10AM  10    IMPOSSIBLE."

10:10AM  11         IS THAT SOMETHING THAT YOU HEARD FROM MR. BALWANI?

10:10AM  12    A.   YES.

10:10AM  13    Q.   AND IN CONNECTION WITH DISCUSSING THE COMPETITION, DID

10:10AM  14    MR. BALWANI TELL YOU ABOUT THERANOS'S USE OF COMMERCIALLY

10:10AM  15    AVAILABLE ANALYZERS?

10:10AM  16    A.   NO.

10:10AM  17    Q.   LOOKING AT 21, THERE'S MENTION OF WHAT YOU HEARD ABOUT

10:10AM  18    PRICING.

10:10AM  19         DO YOU SEE THAT?

10:10AM  20    A.   YES.

10:10AM  21    Q.   AND IT SAYS, "THEIR PRICING COULD HAVE BEEN SIGNIFICANTLY

10:10AM  22    HIGHER BUT THEY DESIGNED IT TO BE PROFITABLE, EFFECTIVE, AND

10:10AM  23    DISRUPTIVE TO THE STATUS QUO.  IT IS ALL DESIGNED TO CRUSH THE

10:10AM  24    COMPETITION WHILE REVOLUTIONIZING THE HEALTH CARE INDUSTRY."

10:11AM  25         DO YOU SEE THAT?

ER-3100

10:11AM  1    A.   YES.

10:11AM  2    Q.   AND I WANT TO FOCUS ON THAT WORD "PROFITABLE."

10:11AM  3         WHAT, IF ANYTHING, DID MR. BALWANI TELL YOU ABOUT PRICING

10:11AM  4    AND PROFITABILITY AT THERANOS?

10:11AM  5    A.   I BELIEVE HE SAID THAT THEY WERE FULLY SELF-FUNDING AT

10:11AM  6    THIS POINT AND THAT THEY WERE EARNING ENOUGH MONEY TO PAY THEIR

10:11AM  7    OWN OPERATIONS, AND THAT THIS MONEY WAS JUST TO EXPAND THAT

10:11AM  8    WITH MORE RAPIDITY OR FASTER, AND THAT THEY WERE FREE CASH

10:11AM  9    FLOWING, OR CASH FLOWING THEIR OWN BUSINESSES AT THIS TIME.

10:11AM  10   Q.   AND FROM STATEMENTS LIKE THIS, WAS IT YOUR UNDERSTANDING

10:11AM  11   THAT THAT PROFITABILITY CAME FROM THE PRICING THAT THERANOS WAS

10:11AM  12   OFFERING ITS TESTS AT?

10:11AM  13   A.   YES.

10:11AM  14   Q.   LET'S LOOK AT SOME MORE INFORMATION THAT YOU OBTAINED

10:11AM  15   ABOUT THE FINANCIALS.

10:11AM  16        IF WE ZOOM IN ON THE BOTTOM OF THIS PAGE.

10:11AM  17        AND DO YOU SEE THERE UNDER ITEM 1 OF THIS NEW LIST IT

10:11AM  18   SAYS, "THEY PREFER TO KEEP THE COMPETITION GUESSING AS TO HOW

10:12AM  19   MUCH MONEY THEY HAVE AND WHAT THEIR CURRENT REVENUE, PROFIT

10:12AM  20   MARGINS, REVENUES SOURCES, ET CETERA, ARE."

10:12AM  21        DO YOU SEE THAT?

10:12AM  22   A.   YES.

10:12AM  23   Q.   AND TELL US ABOUT THIS PART OF THE CONVERSATION.  WAS THAT

10:12AM  24   INFORMATION FROM MR. BALWANI IN RESPONSE TO A QUESTION FROM

10:12AM  25   YOU?

10:12AM   1    A.   YES.  A STANDARD PART OF OUR INVESTING IN ANY COMPANY

10:12AM   2    WOULD BE TO REVIEW FINANCIALS, AUDITED FINANCIALS.

10:12AM   3         THERE WAS SECRECY AROUND THIS COMPANY FROM THE VERY

10:12AM   4    BEGINNING, AND WHEN ASKED, THIS IS WHAT THE RESPONSE WAS TO MY

10:12AM   5    REQUEST FOR FINANCIALS.

10:12AM   6    Q.   SO DURING THE CALL, AM I UNDERSTANDING CORRECTLY THAT YOU

10:12AM   7    ASKED MR. BALWANI FOR FINANCIAL RECORDS OF THE COMPANY?

10:12AM   8    A.   I AM -- YES.  I DON'T RECALL IN THIS SPECIFIC CALL.  I

10:12AM   9    ASKED ABOUT HOW THEY WERE DOING, IT WAS JUST, GIVE ME A HIGH

10:12AM  10    LEVEL REVENUE, PROFITABILITY, CASH, BALANCES.  JUST COMMON

10:13AM  11    BASIC THINGS THAT ONE MIGHT REQUIRE PRIOR TO INVESTING.

10:13AM  12         AND THIS WAS THE RESPONSE.

10:13AM  13    Q.   BESIDES THIS, WERE YOU GIVEN ANY INFORMATION, EVEN THAT

10:13AM  14    HIGH LEVEL INFORMATION, ABOUT THE COMPANY'S FINANCIAL

10:13AM  15    PERFORMANCE?

10:13AM  16    A.   NO, OTHER THAN THEY WERE -- WELL, I DON'T WANT TO --

10:13AM  17    Q.   OTHER THAN?

10:13AM  18    A.   I DON'T WANT TO READ DOWN MY OWN EMAIL, SO YEAH.

10:13AM  19    Q.   WELL, LET'S GO THERE THEN.  LET'S LOOK AT ITEMS 2 AND 3 ON

10:13AM  20    THIS LIST HERE.

10:13AM  21         YOU RELAY IN THIS EMAIL, "THEY CAN FUND GROWTH THROUGH

10:13AM  22    CURRENT OPERATIONS -- NO NEED FOR CAPITAL."

10:13AM  23         AND THEN NUMBER 3 SAYS, "THEY ARE RAISING MONEY ONLY TO

10:13AM  24    RAPIDLY ACCELERATE THE BUSINESS."

10:13AM  25         DO YOU SEE THAT?

10:13AM  1    A.   YES.

10:13AM  2    Q.   AND WHAT DID MR. BALWANI TELL YOU ABOUT THAT TOPIC?

10:13AM  3    A.   THAT THEY WERE SELF-FUNDING NOW, AND THEIR CURRENT

10:13AM  4    OPERATIONS WERE GROWING.  THEY WERE DOING CLINICAL TRIALS AND

10:13AM  5    GETTING PAID TO DO CLINICAL TRIALS AND RUNNING TESTS, AND THAT

10:13AM  6    THEY WERE JUST RAISING THIS ROUND OF CAPITAL TO GROW THEIR

10:14AM  7    BUSINESS.

10:14AM  8    Q.   AND DOES THAT MATTER TO YOU AS AN INVESTOR, HEARING THAT

10:14AM  9    ABOUT THE COMPANY'S FINANCIAL STATUS?

10:14AM 10    A.   OH, INCREDIBLY.

10:14AM 11    Q.   WHY?

10:14AM 12    A.   I MEAN, IT'S VERY IMPRESSIVE IF YOU'RE ALREADY

10:14AM 13    SELF-FUNDING AT THIS STAGE AND THE MONEY IS GOING PURELY TO

10:14AM 14    HIRE PEOPLE TO GROW YOUR REVENUE AND MANUFACTURE YOUR PRODUCT.

10:14AM 15         THEN, AGAIN, IT MAKES IT FEEL LIKE A MORE CONSERVATIVE

10:14AM 16    INVESTMENT THAN AN AGGRESSIVE, SPECULATIVE INVESTMENT.

10:14AM 17    Q.   AND DOES HEARING THAT MAKE THE INVESTMENT OPPORTUNITY MORE

10:14AM 18    OR LESS ATTRACTIVE TO YOU?

10:14AM 19    A.   YEAH, MUCH MORE ATTRACTIVE.

10:14AM 20    Q.   DURING THIS CONVERSATION, DID MR. BALWANI TELL YOU THAT

10:14AM 21    THE COMPANY WAS ACTUALLY DEPENDENT ON MONEY COMING IN FROM

10:14AM 22    INVESTORS IN ORDER TO CONTINUE OPERATING?

10:14AM 23    A.   IT WAS THE OPPOSITE.

10:14AM 24    Q.   WOULD THAT FACT HAVE BEEN IMPORTANT FOR YOU TO KNOW AS A

10:14AM 25    POTENTIAL INVESTOR?

10:14AM   1     A.   YES.

10:14AM   2     Q.   WOULD IT HAVE CHANGED YOUR VIEW OF THE INVESTMENT

10:14AM   3     OPPORTUNITY?

10:14AM   4     A.   OH, SURE.

10:14AM   5     Q.   AND DID MR. BALWANI TELL YOU AT ANY POINT DURING THAT CALL

10:15AM   6     THAT THERANOS HAD NO REVENUE GENERATING ACTIVITY WITH

10:15AM   7     PHARMACEUTICAL COMPANIES AT THIS TIME?

10:15AM   8     A.   HE DID NOT TELL ME THAT.

10:15AM   9     Q.   LET'S GO TO THE NEXT PAGE OF THIS EXHIBIT.  LET'S LOOK AT

10:15AM  10     ITEM 13 IN THE LIST.

10:15AM  11          AND DO YOU SEE HERE THERE'S MENTION OF LIQUIDITY AND A

10:15AM  12     POTENTIAL IPO?

10:15AM  13     A.   YES.

10:15AM  14     Q.   AND WHAT DO YOU RECALL MR. BALWANI SAYING ABOUT THAT?

10:15AM  15     A.   YOU KNOW, JUST THAT THEY KNEW THAT THE ORIGINAL

10:15AM  16     SHAREHOLDERS WERE IN FOR EIGHT YEARS AT THIS POINT, AND THAT

10:15AM  17     AROUND THE TEN YEAR MARK THEY FULLY PLANNED TO BE UP AND

10:15AM  18     RUNNING TO A DEGREE WHERE THEY COULD SUSTAIN A PUBLIC OFFERING

10:15AM  19     OR FIND OTHER SOURCES OF LIQUIDITY FOR THE EARLY INVESTORS.

10:15AM  20     Q.   AND DID THAT FACT OR THAT ASSERTION MAKE THE INVESTMENT

10:16AM  21     MORE OR LESS ATTRACTIVE TO YOU?

10:16AM  22     A.   YEAH.  WELL, GETTING LIQUIDITY AFTER 10 YEARS IS ALWAYS

10:16AM  23     ATTRACTIVE, AND MAYBE WITHIN 24 MONTHS OF THIS POTENTIAL NEW

10:16AM  24     INVESTMENT THAT WOULD BE ATTRACTIVE AS WELL.

10:16AM  25     Q.   SO WE'VE TALKED ABOUT THE SUBSTANCE OF YOUR CONVERSATION

10:16AM  1    WITH MR. BALWANI, OR SOME HIGH POINTS.

10:16AM  2         I'D LIKE TO ASK ABOUT THE TONE OF THE CONVERSATION.  WHAT

10:16AM  3    WAS MR. BALWANI'S DEMEANOR DURING YOUR CONVERSATION?

10:16AM  4    A.   HE WAS VERY ARTICULATE, VERY INTELLIGENT, VERY SPECIFIC,

10:16AM  5    AND I FELT LIKE HE HAD STRONG COMMAND OVER THE DETAILS.

10:16AM  6    Q.   AND WHEN YOU'RE TALKING ABOUT A STRONG COMMAND OVER THE

10:16AM  7    DETAILS, DOES THAT INCLUDE THE STATE OF THE COMPANY'S

10:16AM  8    TECHNOLOGY?

10:16AM  9    A.   YES.

10:16AM  10   Q.   DOES IT INCLUDE THE BUSINESS ACTIVITIES OF THE COMPANY?

10:16AM  11   A.   YES.

10:16AM  12   Q.   DID IT INCLUDE THE FINANCIAL STATE AND PERFORMANCE OF THE

10:17AM  13   COMPANY?

10:17AM  14   A.   YES.

10:17AM  15   Q.   DURING THAT CALL, DID YOU FIND MR. BALWANI PERSUASIVE?

10:17AM  16   A.   VERY.

10:17AM  17   Q.   WHAT ABOUT HIS PRESENTATION MADE HIM PERSUASIVE?

10:17AM  18   A.   THE DETAIL THAT CAME TO ME THROUGH THIS CONVERSATION WAS

10:17AM  19   SO DETAILED AND COMPELLING TO MAKE ANOTHER INVESTMENT THAT, YOU

10:17AM  20   KNOW, AND HE WAS EXTREMELY CREDIBLE.  HE KNEW THE BUSINESS, AND

10:17AM  21   I FELT HE WAS -- YOU KNOW, HE WAS PRESIDENT OF THE FIRM, CHIEF

10:17AM  22   OPERATING OFFICER, SO HE KNEW EVERYTHING.

10:17AM  23   Q.   AND DID YOU RELY ON THE INFORMATION THAT YOU GOT FROM

10:17AM  24   MR. BALWANI IN DECIDING WHETHER TO INVEST MORE MONEY IN

10:17AM  25   THERANOS?

10:17AM 1     A.   YES.

10:17AM 2     Q.   IF I COULD ASK YOU TO TURN TO THE NEXT TAB IN YOUR BINDER,

10:17AM 3     WHICH IS 4060, 4060.

10:18AM 4     A.   YES.

10:18AM 5     Q.   AND DO YOU SEE THAT THAT INCLUDES YOUR SAME EMAIL FROM

10:18AM 6     DECEMBER 22ND REPORTING ON YOUR CALL WITH MR. BALWANI?

10:18AM 7     A.   YES.

10:18AM 8     Q.   AND DO YOU SEE ABOVE THAT, THAT IT WAS FORWARDED ON?

10:18AM 9     A.   YES.

10:18AM 10          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 4060.

10:18AM 11          MR. CAZARES:  NO OBJECTION WITH THE REDACTION THAT I

10:18AM 12    DISCUSSED WITH THE GOVERNMENT.

10:18AM 13          MR. BOSTIC:  THAT REDACTION IS COMPLETE, YOUR HONOR.

10:18AM 14          THE COURT:  ALL RIGHT.  IT'S ADMITTED.  IT MAY BE

10:18AM 15    PUBLISHED WITH REDACTIONS.

10:18AM 16       (GOVERNMENT'S EXHIBIT 4060, WITH REDACTIONS, WAS RECEIVED

10:18AM 17    IN EVIDENCE.)

10:18AM 18    BY MR. BOSTIC:

10:18AM 19    Q.   MR. MENDENHALL, DO YOU SEE THAT YOUR EMAIL REPORTING ON

10:18AM 20    YOUR CALL WITH MR. BALWANI WAS FORWARDED TO DAVID HARRIS AND A

10:18AM 21    NUMBER OF PEOPLE, INCLUDING SOMEONE NAMED ALAN EISENMAN?

10:18AM 22    A.   YES.

10:18AM 23    Q.   AND WHO IS ALAN EISENMAN?

10:19AM 24    A.   ALAN EISENMAN IS AN INVESTOR IN A COUPLE OF THINGS, AT

10:19AM 25    LEAST ONE THING THAT U.S. CAPITAL HAS DONE, AND HE'S IN

10:19AM 1    HOUSTON, AND HE'S AN INVESTOR AND HE'S A FRIEND.

10:19AM 2    Q.   AND SKIPPING AHEAD IN TIME, DID MR. EISENMAN INVEST SOME

10:19AM 3    OF HIS MONEY IN THERANOS?

10:19AM 4    A.   YES, I BELIEVE SO.

10:19AM 5    Q.   OKAY.  AND IF WE CAN PUT THAT ASIDE.

10:19AM 6         LET'S GO NEXT TO TAB 5824.

10:19AM 7         BASED ON YOUR CALL WITH MR. BALWANI AND THE OTHER

10:19AM 8    INFORMATION THAT WE HAVE TALKED ABOUT, DID YOU DECIDE THAT YOU

10:19AM 9    WANTED TO INVEST MORE MONEY IN THERANOS?

10:19AM 10   A.   YES, WE DID.  I DID.

10:19AM 11   Q.   AND YOU SAID THAT "WE DID."

10:19AM 12        SO CAN YOU EXPLAIN WHAT GROUP WE'RE TALKING ABOUT HERE?

10:19AM 13   A.   I HAD SOME FAMILY AND FRIENDS AND CLIENTS THAT WANTED TO

10:20AM 14   PULL SOME CAPITAL TOGETHER TO MAKE ANOTHER INVESTMENT.

10:20AM 15   Q.   AND WAS THE DECISION TO INVEST MADE COLLECTIVELY BY YOU

10:20AM 16   AND THAT GROUP?  CAN YOU EXPLAIN THAT FOR US?

10:20AM 17   A.   THERE WAS -- I THINK IT WAS BASICALLY ME LEADING THAT

10:20AM 18   GROUP.

10:20AM 19   Q.   AND DID YOU MAKE THAT DECISION BASED ON THE INFORMATION

10:20AM 20   THAT YOU HAD RECEIVED?

10:20AM 21   A.   YES.

10:20AM 22   Q.   LOOKING AT 5824, DO YOU SEE AN EMAIL CHAIN BETWEEN YOU AND

10:20AM 23   MR. BALWANI RELATING TO THAT INVESTMENT?

10:20AM 24   A.   I DO.

10:20AM 25             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5824.

ER-3107

10:20AM   1            MR. CAZARES:  NO OBJECTION.

10:20AM   2            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:20AM   3        (GOVERNMENT'S EXHIBIT 5824 WAS RECEIVED IN EVIDENCE.)

10:20AM   4   BY MR. BOSTIC:

10:20AM   5   Q.   AND LET'S START AT THE BOTTOM OF PAGE 1.  WE SEE -- WE'RE

10:20AM   6   ABOUT TO LOOK AT AN EMAIL FROM MR. BALWANI ON DECEMBER 27TH.

10:21AM   7        DO YOU SEE THAT?

10:21AM   8   A.   YES.

10:21AM   9   Q.   AND LET'S GO TO PAGE 2.

10:21AM  10        AND DO YOU SEE THAT IN THIS EMAIL, MR. BALWANI IS SENDING

10:21AM  11   YOU THE SIGNATURE PAGE FOR INVESTMENT?

10:21AM  12   A.   YES.

10:21AM  13   Q.   BY THIS TIME, HAD YOU MADE THE DECISION TO INVEST MORE IN

10:21AM  14   THERANOS?

10:21AM  15   A.   YES.

10:21AM  16   Q.   LET'S LOOK AT PAGE 1, AND LET'S LOOK AT THE MIDDLE TWO

10:21AM  17   MESSAGES IN THE PAGE.

10:21AM  18        DO YOU SEE THAT YOU WRITE BACK ON JANUARY 9TH, A FEW DAYS

10:21AM  19   AFTER MR. BALWANI'S EMAIL?

10:21AM  20   A.   YES.

10:21AM  21   Q.   AND YOU WRITE THAT YOU ARE INTERESTED IN MAKING AN

10:21AM  22   INVESTMENT IF THE DEAL HASN'T CLOSED.

10:21AM  23        DO YOU SEE THAT?

10:21AM  24   A.   CORRECT, YES.

10:21AM  25   Q.   AND MR. BALWANI RESPONDS ABOVE THAT INDICATING THAT THE

10:21AM 1    DEAL IS STILL ACCESSIBLE AS HE SAYS?

10:21AM 2    A.   YES.

10:21AM 3    Q.   LET'S GO TO 5823.

10:22AM 4        AND DO YOU SEE AT 5823 IN YOUR BINDER, THERE'S A SIMILAR

10:22AM 5    EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI RELATING TO THAT

10:22AM 6    INVESTMENT?

10:22AM 7    A.   YES, I DO.

10:22AM 8            MR. BOSTIC:   YOUR HONOR, THE GOVERNMENT OFFERS 5823.

10:22AM 9            MR. CAZARES:   NO OBJECTION.

10:22AM 10           THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

10:22AM 11       (GOVERNMENT'S EXHIBIT 5823 WAS RECEIVED IN EVIDENCE.)

10:22AM 12   BY MR. BOSTIC:

10:22AM 13   Q.   LET'S LOOK AT THE TOP MESSAGE HERE.

10:22AM 14       SO, MR. MENDENHALL, ARE YOU INFORMING MR. BALWANI HERE

10:22AM 15   ABOUT THE AMOUNT OF YOUR INCOMING INVESTMENT FOR THERANOS?

10:22AM 16   A.   YES.

10:22AM 17   Q.   AND WHAT DID THE ACTUAL AMOUNT OF YOUR INVESTMENT END UP

10:22AM 18   BEING, APPROXIMATELY?

10:22AM 19   A.   IT WAS 1,300,000 AND CHANGE, I BELIEVE.

10:22AM 20   Q.   AND AS PART OF THAT 1.3 MILLION, WAS YOUR PERSONAL MONEY

10:22AM 21   INCLUDED IN THAT?

10:22AM 22   A.   YES.

10:22AM 23   Q.   WHAT FORM DID THAT TAKE?

10:22AM 24   A.   I HAD ENTITIES AND INVESTORS AND SOME EMPLOYEES AT MY FIRM

10:23AM 25   AND A BUNCH OF GROUPS, SO I PUT THE WHOLE -- I HIRED A LAWYER

10:23AM   1     AND PUT THE PARTNERSHIP TOGETHER, WHICH IS WHY IT TOOK A LITTLE

10:23AM   2     BIT LONGER, AND AGREED TO PAY FOR ALL OF THE ACCOUNTING AND

10:23AM   3     STUFF.

10:23AM   4         SO I TOOK THAT AMOUNT OF MONEY, WHICH WAS $15,000 OR

10:23AM   5     $20,000 IN COSTS AND FUTURE COSTS, AND I TOOK SHARES FROM THAT

10:23AM   6     AMOUNT.

10:23AM   7     Q.   WAS THAT YOUR AGREEMENT WITH THE OTHER MEMBERS OF YOUR

10:23AM   8     INVESTING GROUP?

10:23AM   9     A.   YES.

10:23AM  10     Q.   LET'S LOOK AT 5822.

10:23AM  11         AND AT THAT TAB, DO YOU SEE ADDITIONAL CORRESPONDENCE

10:23AM  12     BETWEEN YOU AND MR. BALWANI ON THAT SAME TOPIC?

10:23AM  13     A.   YES, I DO.

10:23AM  14             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5822.

10:23AM  15             MR. CAZARES:  NO OBJECTION.

10:23AM  16             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:24AM  17         (GOVERNMENT'S EXHIBIT 5822 WAS RECEIVED IN EVIDENCE.)

10:24AM  18     BY MR. BOSTIC:

10:24AM  19     Q.   AND LET'S START ON PAGE 2 AT THE BOTTOM.

10:24AM  20         AND DO WE SEE HERE, MR. MENDENHALL, YOUR JANUARY 9TH EMAIL

10:24AM  21     ABOUT YOUR INTEREST IN MAKING THAT INVESTMENT IN 2014?

10:24AM  22     A.   YES.

10:24AM  23     Q.   AND THAT'S JANUARY 9TH.

10:24AM  24         LET'S GO TO PAGE 1 AND LOOK AT THE BOTTOM JUST BRIEFLY.

10:24AM  25         DO YOU SEE HERE WE'RE ABOUT TO LOOK AT AN EMAIL HERE FROM

10:24AM   1    MR. BALWANI TO YOU ABOUT THREE WEEKS LATER, THE END OF JANUARY?

10:24AM   2    A.   YES, CORRECT.

10:24AM   3    Q.   OKAY.  LET'S GO TO PAGE 2 AND LOOK AT THE CONTENT OF THAT

10:24AM   4    EMAIL.

10:24AM   5         AND AT THE TOP, CAN YOU EXPLAIN WHAT MR. BALWANI IS

10:24AM   6    WRITING ABOUT HERE A FEW WEEKS AFTER YOUR INVESTMENT?

10:24AM   7    A.   YES.  HE -- THEY WERE RAISING -- THERE WAS AN OPPORTUNITY

10:24AM   8    TO INVEST MORE CAPITAL.

10:24AM   9    Q.   SO WAS HE OFFERING YOU A CHANCE TO INVEST EVEN MORE IN

10:25AM  10    THERANOS A FEW WEEKS AFTER YOUR PREVIOUS INVESTMENT?

10:25AM  11    A.   YES.

10:25AM  12    Q.   LET'S LOOK AT PAGE 1, AND THE MESSAGE FROM YOU AT THE TOP

10:25AM  13    OF THE PAGE.

10:25AM  14         AND IS THIS YOUR RESPONSE TO THAT OFFER?

10:25AM  15    A.   YES.

10:25AM  16    Q.   YOU WRITE, "THE 1.3 PLUS MILLION I JUST INVESTED IS MONEY

10:25AM  17    I AM OWNER/TRUSTEE FOR MY KIDS ON."

10:25AM  18         DO YOU SEE THAT?

10:25AM  19    A.   YES.

10:25AM  20    Q.   "AND I AM COMFORTABLE WITH THE INFORMATION I HAVE RECEIVED

10:25AM  21    FROM U AND READ IN PUBLIC RECORDS IN MAKING THAT LEVEL OF

10:25AM  22    INVESTMENT."

10:25AM  23         WAS THAT TRUE AT THE TIME?

10:25AM  24    A.   YES.

10:25AM  25    Q.   AND YOU SAY, "I AM INTERESTED IN DOING A LARGER INVESTMENT

10:25AM  1    BUT AS A FIDUCIARY HAVE A DUTY TO COLLECT A LITTLE MORE

10:25AM  2    DILIGENCE.  IT IS RARE THAT I INVEST WITHOUT KNOWING MORE ABOUT

10:25AM  3    THE FIRM'S FINANCIALS."

10:25AM  4         CAN YOU EXPLAIN WHAT YOU MEANT BY THAT?

10:25AM  5    A.   THAT I HAD NOT EVER REALLY RECEIVED THE DETAILED

10:25AM  6    FINANCIALS THAT I WOULD NORMALLY REQUIRE FOR AN INVESTMENT OF

10:26AM  7    ANY LEVEL.

10:26AM  8    Q.   AND WOULD RECEIVING THOSE ADDITIONAL DETAILS BE A

10:26AM  9    PRE-CONDITION FOR YOU TO INVEST MORE MONEY IN THE COMPANY?

10:26AM  10   A.   IT WAS, YES.

10:26AM  11   Q.   AND WAS THIS YOU CONVEYING THAT TO MR. BALWANI?

10:26AM  12   A.   YES.

10:26AM  13   Q.   IN THE FOLLOWING SENTENCE, DO YOU SEE THAT YOU OFFER TO

10:26AM  14   SIGN A NONDISCLOSURE AGREEMENT SO YOU COULD RECEIVE THAT

10:26AM  15   INFORMATION?

10:26AM  16   A.   I DID, BECAUSE PRIOR CONVERSATIONS INDICATED THAT THEY

10:26AM  17   WANTED TO KEEP THE FINANCIALS CONFIDENTIAL TO PROHIBIT

10:26AM  18   COMPETITION FROM LEARNING ABOUT THEIR -- HOW THEY PRICE, AND

10:26AM  19   THEIR COSTS, AND THEIR INFRASTRUCTURE.

10:26AM  20   Q.   AND IN RESPONSE TO YOUR REQUESTING FOR INFORMATION, DID

10:26AM  21   MR. BALWANI EVER PROVIDE YOU ADDITIONAL DISCLOSURES ABOUT THE

10:26AM  22   COMPANY?

10:26AM  23   A.   NO.

10:26AM  24   Q.   FOLLOWING THIS, DID YOU PURSUE AN ADDITIONAL INVESTMENT IN

10:26AM  25   THE COMPANY?

10:26AM  1       A.    NO.

10:26AM  2       Q.    OKAY.  YOU CAN SET THAT ASIDE.

10:27AM  3             FOLLOWING YOUR INVESTMENT IN THERANOS IN JANUARY OF 2014,

10:27AM  4       DID YOU CONTINUE TO BE IN TOUCH WITH MR. BALWANI AND GET

10:27AM  5       INFORMATION ABOUT THE COMPANY?

10:27AM  6       A.    I BELIEVE THAT THAT LAST EMAIL THAT I SENT HIM REQUESTING

10:27AM  7       FINANCIALS IN ORDER TO LOOK AT DOING MORE INVESTING WAS THE

10:27AM  8       LAST TIME THAT I EVER COMMUNICATED WITH MR. BALWANI.

10:27AM  9       Q.    OKAY.  LET'S LOOK AT 5821, PLEASE.

10:27AM  10            LET ME KNOW ONCE YOU'RE THERE.

10:27AM  11      A.    I'M THERE.

10:27AM  12      Q.    AT 5821, DO YOU SEE AN EMAIL THAT YOU SENT TO MR. BALWANI

10:27AM  13      IN MID-MAY 2014?

10:27AM  14      A.    YES.

10:27AM  15                   MR. BOSTIC:  YOUR HONOR, WE OFFER 5821.

10:27AM  16                   MR. CAZARES:  NO OBJECTION.

10:27AM  17                   THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:28AM  18            (GOVERNMENT'S EXHIBIT 5821 WAS RECEIVED IN EVIDENCE.)

10:28AM  19      BY MR. BOSTIC:

10:28AM  20      Q.    SO, MR. MENDENHALL, WE'RE IN MID-MAY 2014, ABOUT FOUR

10:28AM  21      MONTHS AFTER YOUR INVESTMENT; IS THAT CORRECT?

10:28AM  22      A.    YES.

10:28AM  23      Q.    AND YOU WRITE TO MR. BALWANI, "HI SUNNY,

10:28AM  24            "I'M SURE U ARE VERY BUSY AND I HATE TO ASK BUT IS THERE

10:28AM  25      ANY WAY YOU COULD GIVE ME A HIGH LEVEL VERBAL UPDATE ON

10:28AM  1      THERANOS?"

10:28AM  2          DO YOU SEE THAT?

10:28AM  3      A.   YES.

10:28AM  4      Q.   WHY WERE YOU ASKING FOR INFORMATION ON THERANOS AT THIS

10:28AM  5      TIME?

10:28AM  6      A.   WITH THE PARTNERSHIP THAT I HAD FORMED AND OTHER FRIENDS

10:28AM  7      THAT HAD INVESTED, AND CLIENTS AND COLLEAGUES, WE WERE JUST

10:28AM  8      REALLY QUIET SINCE THE CAPITAL WAS RAISED, AND WE JUST WANTED

10:28AM  9      TO GET AN UPDATE AND SEE WHAT WAS GOING ON.

10:28AM 10      Q.   AND DO YOU SEE AT THE TOP OF THIS PAGE, MR. BALWANI

10:28AM 11      FORWARDS THIS EMAIL TO MS. HOLMES WITHOUT COMMENT?

10:28AM 12      A.   I DO SEE THAT, YEAH.

10:28AM 13      Q.   LET ME ASK YOU TO TURN NEXT TO 5820.

10:28AM 14          AND AT 5820, DO YOU SEE THAT SAME EMAIL WITH ADDITIONAL

10:29AM 15      FOLLOWUP?

10:29AM 16      A.   YES.

10:29AM 17              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5820.

10:29AM 18              MR. CAZARES:  NO OBJECTION.

10:29AM 19              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:29AM 20          (GOVERNMENT'S EXHIBIT 5820 WAS RECEIVED IN EVIDENCE.)

10:29AM 21      BY MR. BOSTIC:

10:29AM 22      Q.   AND SO AT THE BOTTOM, MR. MENDENHALL, DO YOU SEE THIS SAME

10:29AM 23      EMAIL FROM YOU TO MR. BALWANI ASKING FOR A HIGH LEVEL VERBAL

10:29AM 24      UPDATE?

10:29AM 25      A.   YES.

10:29AM  1   Q.   OKAY.  ABOVE THAT, DO YOU SEE THAT MR. BALWANI FORWARDS

10:29AM  2   YOUR EMAIL ALSO TO SOMEONE NAMED DANISE YAM?

10:29AM  3   A.   YES.

10:29AM  4   Q.   AND HE ASKS, "CAN YOU TELL ME WHICH ROUND HE INVESTED IN

10:29AM  5   AND HOW MUCH?"

10:29AM  6        DO YOU SEE THAT?

10:29AM  7   A.   YES.

10:29AM  8   Q.   AND DO YOU SEE THAT ABOVE THAT MS. YAM WRITES BACK TO

10:29AM  9   MR. BALWANI AND PROVIDES THAT INFORMATION, INDICATING THAT

10:29AM 10   YOU'D INVESTED A TOTAL OF 1.3 SOMETHING MILLION DOLLARS.

10:29AM 11        DO YOU SEE THAT?

10:29AM 12   A.   YES.

10:29AM 13   Q.   AND FOLLOWING THIS, DID YOU GET FROM MR. BALWANI A HIGH

10:29AM 14   LEVEL UPDATE THAT YOU WERE ASKING FOR?

10:30AM 15   A.   NO.

10:30AM 16   Q.   LET ME ASK YOU TO TURN TO -- ACTUALLY, EXHIBIT 1776 IS

10:30AM 17   ALREADY ADMITTED.

10:30AM 18        MAY WE DISPLAY, YOUR HONOR?

10:30AM 19            THE COURT:  YES.

10:30AM 20   BY MR. BOSTIC:

10:30AM 21   Q.   MR. MENDENHALL, DO YOU RECALL READING AN ARTICLE ABOUT

10:30AM 22   THERANOS IN "FORTUNE" MAGAZINE IN JUNE 2014?

10:30AM 23   A.   YES.

10:30AM 24   Q.   AND GENERALLY SPEAKING, WAS THE ARTICLE FAVORABLE OR

10:30AM 25   NEGATIVE ABOUT THERANOS?

10:30AM   1       A.   IT WAS POSITIVE.

10:30AM   2       Q.   OKAY.  IF I COULD JUST DIRECT YOU TO A FEW OF THE POINTS

10:30AM   3       IN THIS ARTICLE.

10:30AM   4            FIRST, IF WE COULD LOOK AT PAGE 4 -- ACTUALLY, LET'S GO TO

10:30AM   5       PAGE 6.

10:30AM   6            AND BELOW THE INDENT, THE SECOND TO THE BOTTOM PARAGRAPH,

10:31AM   7       DO YOU SEE LANGUAGE THERE THAT SAYS, "THE COMPANY HAS PERFORMED

10:31AM   8       AS MANY AS 70 DIFFERENT TESTS FROM A SINGLE DRAW OF 25 TO 50

10:31AM   9       MICROLITERS"?

10:31AM  10       A.   YES, I SEE THAT.

10:31AM  11       Q.   AND DO YOU SEE THAT IT GOES ON TO SAY THAT THE SAMPLE IS

10:31AM  12       "COLLECTED IN A TINY VIAL THE SIZE OF AN ELECTRIC FUSE, WHICH

10:31AM  13       HOLMES HAS DUBBED THE 'NANOTAINER.'"

10:31AM  14            DO YOU SEE THAT?

10:31AM  15       A.   YES.

10:31AM  16       Q.   AND AROUND THIS TIME AS AN INVESTOR, WAS IT STILL

10:31AM  17       IMPORTANT TO YOU HOW MANY TESTS THERANOS COULD PURPORTEDLY RUN

10:31AM  18       FROM A SINGLE SAMPLE?

10:31AM  19       A.   YES.

10:31AM  20       Q.   LET'S GO TO PAGE 9 AND, AGAIN, THE SECOND TO THE BOTTOM

10:31AM  21       PARAGRAPH.

10:31AM  22            DO YOU SEE THERE IT SAYS, "IMPORTANTLY, IT'S NOT JUST THE

10:31AM  23       BLOOD DRAWS THAT ARE TINY.  IT'S ALSO THE ANALYTICAL SYSTEMS

10:31AM  24       THERANOS USES TO PERFORM THE TESTS."

10:31AM  25            DO YOU SEE THAT?

10:31AM  1    A.    YES.

10:31AM  2    Q.    AND WAS THIS LANGUAGE ABOUT THERANOS USING SMALL ANALYZERS

10:31AM  3    CONSISTENT WITH YOUR DISCUSSION WITH MR. BALWANI?

10:32AM  4    A.    YES.

10:32AM  5    Q.    FINALLY, LET'S GO TO PAGE 11.

10:32AM  6          AND IN THE SECOND FULL PARAGRAPH, DO YOU SEE THERE'S

10:32AM  7    LANGUAGE THAT SAYS, "THERANOS, WHICH DOES NOT BUY ANY ANALYZERS

10:32AM  8    FROM THIRD PARTIES, IS THEREFORE IN A UNIQUE POSITION"?

10:32AM  9    A.    YES.

10:32AM  10   Q.    AND WAS THAT CONSISTENT WITH WHAT MR. BALWANI HAD TOLD YOU

10:32AM  11   ABOUT WHAT DEVICES THE COMPANY WAS USING?

10:32AM  12   A.    YES.

10:32AM  13   Q.    YOU MENTIONED THAT THIS ARTICLE WAS FAVORABLE IN JUNE OF

10:32AM  14   2014; IS THAT RIGHT?

10:32AM  15   A.    YES, VERY.

10:32AM  16   Q.    AND AS AN INVESTOR READING THIS ARTICLE, WHAT EFFECT DID

10:32AM  17   CLAIMS LIKE THESE HAVE ON YOUR STATE OF MIND?

10:32AM  18   A.    WELL, I THINK IT CAME OUT AROUND THE SAME TIME THAT I WAS

10:32AM  19   ASKING FOR MORE INFORMATION, SO IT KIND OF ALLEVIATED SOME

10:32AM  20   CONCERNS THAT I WAS -- NOT CONCERNS, BUT IT SEEMED LIKE IT WAS

10:32AM  21   ANSWERING THE QUESTIONS THAT I MIGHT HAVE HAD AT THE TIME.

10:32AM  22   Q.    AND DID IT MAKE YOU MORE OR LESS LIKELY TO GET MORE

10:33AM  23   INSISTENT AND DEMANDING WITH THERANOS AND REQUESTING THAT

10:33AM  24   INFORMATION?

10:33AM  25   A.    WELL, THE ARTICLE WOULD PROBABLY MAKE ME LESS DEMANDING

10:33AM  1    THAN MORE DEMANDING.

10:33AM  2    Q.   AND DID IT HAVE THAT EFFECT ON YOU IN 2014?

10:33AM  3    A.   YES.

10:33AM  4    Q.   AND LET ME ASK YOU TO LOOK AT 5819 IN YOUR BINDER.

10:33AM  5         DO YOU SEE 5819?

10:33AM  6    A.   YES.

10:33AM  7    Q.   AND IS THAT ANOTHER MESSAGE THAT YOU SENT TO MR. BALWANI,

10:33AM  8    THIS TIME IN DECEMBER OF 2014?

10:33AM  9    A.   YES.

10:33AM  10            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5819.

10:33AM  11            MR. CAZARES:  OBJECTION.  HEARSAY.  MIDDLE OF THE

10:33AM  12   MESSAGE.

10:34AM  13            THE COURT:  MR. BOSTIC.

10:34AM  14            MR. BOSTIC:  THIS IS NOT OFFERED FOR THE TRUTH,

10:34AM  15   YOUR HONOR.  THIS IS OFFERED TO SHOW WHAT QUESTIONS THIS

10:34AM  16   WITNESS WAS ASKING MR. BALWANI AT THE TIME.

10:34AM  17            MR. CAZARES:  SAME OBJECTION, YOUR HONOR.  THAT'S

10:34AM  18   THE TRUTH.

10:34AM  19            THE COURT:  1 THROUGH 4.

10:34AM  20            MR. BOSTIC:  YES, YOUR HONOR, 1 THROUGH 4.

10:34AM  21       NO, NOT OFFERED FOR THE TRUTH.  IT'S OFFERED TO SHOW THAT

10:34AM  22   MR. BALWANI WAS BEING POSED THESE QUESTIONS AT THE TIME.

10:34AM  23       I THINK THE DEFENDANT'S RECEIPT OF THESE QUESTIONS AND HIS

10:34AM  24   LACK OF RESPONSE IS APPROPRIATE.

10:34AM  25            THE COURT:  ALL RIGHT.  THANK YOU.

10:34AM   1        I WILL OVERRULE THE OBJECTION.

10:34AM   2        BUT, LADIES AND GENTLEMEN, I'LL ADMIT THIS.  YOU'LL SEE 1

10:34AM   3   THROUGH 4.  THOSE STATEMENTS ARE NOT OFFERED FOR THE TRUTH OF

10:34AM   4   THE MATTER ASSERTED, BUT ONLY AS TO ESTABLISH QUESTIONS POSED,

10:34AM   5   BUT NOT FOR THE TRUTH OF THE MATTER ASSERTED.

10:34AM   6        WITH THAT LIMITATION, IT MAY BE ADMITTED AND PUBLISHED.

10:35AM   7        MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:35AM   8        (GOVERNMENT'S EXHIBIT 5819 WAS RECEIVED IN EVIDENCE.)

10:35AM   9   BY MR. BOSTIC:

10:35AM  10   Q.   LOOKING AT 5819, LET'S ZOOM IN ON YOUR EMAIL TO

10:35AM  11   MR. BALWANI.

10:35AM  12        AND DO YOU SEE HERE NOW WE'RE IN DECEMBER OF 2014?

10:35AM  13   A.   YES.

10:35AM  14   Q.   AND YOU INVESTED AT THE VERY BEGINNING OF THIS YEAR; IS

10:35AM  15   THAT RIGHT?

10:35AM  16   A.   YES.

10:35AM  17   Q.   YOU WRITE AN EMAIL TO MR. BALWANI REPORTING THAT YOU'VE

10:35AM  18   BEEN ASKED BY SEVERAL OF YOUR SHAREHOLDERS -- OR SEVERAL

10:35AM  19   THERANOS SHAREHOLDERS TO ASK FOR AS MUCH OF AN UPDATE THAT HE

10:35AM  20   CAN PROVIDE.

10:35AM  21        DO YOU SEE THAT?

10:35AM  22   A.   YES.

10:35AM  23   Q.   AND YOU THEN SAY, "THERE HAS BEEN NO UPDATE SINCE THE LAST

10:35AM  24   ROUND OF CAPITAL SEVERAL US COMMITTED IN JANUARY."

10:35AM  25        IS THAT ACCURATE?

10:35AM  1     A.    YES.

10:35AM  2     Q.    AND YOU ALSO RELAY -- YOU SAY SOME THINGS THAT THE GROUP

10:35AM  3     WAS HEARING ABOUT THE COMPANY.

10:35AM  4           DO YOU SEE THAT?

10:35AM  5     A.    YES.

10:35AM  6     Q.    AND THERE'S A LIST THERE.

10:35AM  7           NUMBER 1 SAYS, "THERE IS A COMPETITOR THAT CAN PERFORM

10:35AM  8     OVER 100 TESTS ON A SINGLE DROP OF BLOOD."

10:35AM  9           DO YOU SEE THAT?

10:35AM 10     A.    YES.

10:35AM 11     Q.    AND WHY WERE YOU ASKING MR. BALWANI TO RESPOND ON THAT

10:36AM 12     TOPIC?

10:36AM 13     A.    THIS WAS A PRETTY ACTIVE GROUP OF INVESTORS, AND THERE WAS

10:36AM 14     VERY LITTLE COMMUNICATION FOR THAT -- DURING THAT PERIOD FROM

10:36AM 15     THE COMPANY, AND THEN THERE WERE RUMORS CIRCULATING AROUND THAT

10:36AM 16     WHILE --

10:36AM 17               MR. CAZARES:  OBJECTION.  HEARSAY.

10:36AM 18               THE WITNESS:  WELL, I'M JUST --

10:36AM 19               THE COURT:  NO, NO, NO.  THE OBJECTION IS SUSTAINED.

10:36AM 20     THAT LAST PORTION IS STRICKEN.

10:36AM 21           YOU CAN ASK ANOTHER QUESTION.

10:36AM 22     BY MR. BOSTIC:

10:36AM 23     Q.    SO, MR. MENDENHALL, WITHOUT DISCUSSING THE RUMORS, WHY WAS

10:36AM 24     IT IMPORTANT TO YOU AS AN INVESTOR THAT MR. BALWANI ANSWER

10:36AM 25     THESE QUESTIONS?

10:36AM 1     A.   BECAUSE THERE WERE RUMORS, AND WE JUST WANTED AN UPDATE.

10:36AM 2          AND AS THIS GROUP HAD INVESTED A LOT OF CAPITAL, THERE

10:36AM 3     WAS -- I WOULD SPECULATE, BUT THEY ALL HAD A LOT OF MONEY IN

10:36AM 4     THE DEAL, AND FORTUNATELY OR UNFORTUNATELY, THEY WERE ASKING ME

10:36AM 5     TO, BECAUSE IT LOOKED LIKE I HAD A RELATIONSHIP WITH

10:37AM 6     MR. BALWANI, TO REACH OUT AND SEE WHAT I COULD FIND OUT.

10:37AM 7     Q.   AND THE ITEMS IN THIS LIST, 1 THROUGH 4, WERE THESE FACTS

10:37AM 8     THAT, IF TRUE, WOULD HAVE MADE YOU AS AN INVESTOR FEEL MORE OR

10:37AM 9     LESS POSITIVE ABOUT YOUR INVESTMENT IN THE COMPANY?

10:37AM 10    A.   LESS POSITIVE.

10:37AM 11    Q.   IS THAT TRUE FOR ALL FOUR OF THESE ITEMS?

10:37AM 12    A.   YES.

10:37AM 13    Q.   AS TO ITEM 2, IT SAYS, "RESULTS FROM WALGREENS REQUIRE

10:37AM 14    SHIPPING BLOOD AND TAKE 24 TO 48 HOURS TO RECEIVE."

10:37AM 15         DO YOU SEE THAT?

10:37AM 16    A.   YES.

10:37AM 17    Q.   HAD MR. BALWANI EVER TOLD YOU THOSE FACTS BEFORE?

10:37AM 18    A.   NO.

10:37AM 19    Q.   AND 3 AND 4 ARE ALSO ABOUT THE STATUS OF THE WALGREENS

10:37AM 20    ROLLOUT.

10:37AM 21         DO YOU SEE THAT?

10:37AM 22    A.   YES.

10:37AM 23    Q.   AND WAS THE STATUS AND PACE OF THE WALGREENS ROLLOUT

10:37AM 24    SOMETHING THAT MATTERED TO YOU AS AN INVESTOR?

10:37AM 25    A.   VERY MUCH SO.

10:37AM  1    Q.   LET'S LOOK AT THE TOP OF THIS EMAIL AND SEE WHAT

10:37AM  2    MR. BALWANI DID AFTER RECEIVING IT.

10:38AM  3         DO YOU SEE THERE THAT HE AGAIN FORWARDED IT TO MS. HOLMES

10:38AM  4    WITHOUT COMMENT ON THE SAME DAY, DECEMBER 3RD, 2014?

10:38AM  5    A.   YES.

10:38AM  6    Q.   DID MR. BALWANI EVER GET BACK TO YOU AND ANSWER THESE

10:38AM  7    QUESTIONS THAT YOU POSED TO HIM?

10:38AM  8    A.   NO.

10:38AM  9    Q.   THE FOLLOWING YEAR IN 2015, DO YOU RECALL A NEGATIVE

10:38AM  10   ARTICLE ABOUT THERANOS BEING PUBLISHED BY "THE

10:38AM  11   WALL STREET JOURNAL"?

10:38AM  12   A.   YES.

10:38AM  13   Q.   DID THAT ARTICLE DISCUSS THE COMPANY'S USE OF THIRD PARTY

10:38AM  14   DEVICES?

10:38AM  15   A.   I BELIEVE SO, YES.

10:38AM  16   Q.   PRIOR TO READING THAT ARTICLE, HAD YOU KNOWN ABOUT

10:38AM  17   THERANOS'S USE OF NON-THERANOS ANALYZERS?

10:38AM  18   A.   NO.

10:38AM  19   Q.   UPON READING THAT ARTICLE, DID YOU IMMEDIATELY BELIEVE ALL

10:38AM  20   OF THE NEGATIVE REPORTING ABOUT THE COMPANY?

10:38AM  21   A.   NO.

10:38AM  22   Q.   FOLLOWING READING THAT ARTICLE, DID YOU HAVE ADDITIONAL

10:38AM  23   CONVERSATIONS WITH EITHER MR. BALWANI OR MS. HOLMES?

10:39AM  24   A.   MY COMMUNICATIONS WERE REVERTED TO MS. HOLMES AT THAT TIME

10:39AM  25   GOING FORWARD.

10:39AM  1    Q.   DURING THOSE COMMUNICATIONS WITH MS. HOLMES, DO YOU RECALL

10:39AM  2    HER ADMITTING ANY OF THE TRUTH OF THE ALLEGATIONS IN "THE

10:39AM  3    WALL STREET JOURNAL" ARTICLE?

10:39AM  4    A.   NOT IMMEDIATELY, OR NEVER TO ME I SHOULD SAY.

10:39AM  5    Q.   FOLLOWING READING THAT ARTICLE, DID YOUR ATTITUDE ABOUT

10:39AM  6    YOUR INVESTMENT IN THERANOS EVENTUALLY CHANGE?

10:39AM  7    A.   IT -- MY ATTITUDE -- I WAS CONCERNED, BUT TRYING TO BE

10:39AM  8    SUPPORTIVE.

10:39AM  9    Q.   AND DID THAT CONTINUE FOR SEVERAL MONTHS AFTERWARDS?

10:39AM  10   A.   YES.

10:39AM  11   Q.   WHAT IS THE CURRENT VALUE OF YOUR INVESTMENT IN THERANOS

10:39AM  12   AS YOU UNDERSTAND IT?

10:39AM  13   A.   IT'S ZERO.

10:39AM  14          MR. BOSTIC:  CAN I HAVE A MOMENT, YOUR HONOR?

10:40AM  15          THE COURT:  YES.

10:40AM  16       (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

10:40AM  17          MR. BOSTIC:  NO FURTHER QUESTIONS FOR NOW.  THANK

10:40AM  18   YOU.

10:40AM  19          THE COURT:  CROSS-EXAMINATION?

10:40AM  20          MR. CAZARES:  YES, YOUR HONOR.

10:40AM  21          THE COURT:  FOLKS, WHILE WE'RE WAITING, YOU CAN

10:40AM  22   STAND AND STRETCH.

10:40AM  23       SIR, IF YOU WOULD LIKE TO STAND AND STRETCH.

10:40AM  24       (STRETCHING.)

10:40AM  25          MR. CAZARES:  YOUR HONOR, MAY I APPROACH THE

10:40AM   1        WITNESS?

10:40AM   2                    THE COURT:  YES.

10:40AM   3                    MR. CAZARES:  (HANDING.)

10:41AM   4             YOUR HONOR, MAY I REMOVE MY MASK?

10:41AM   5                    THE COURT:  YES.

10:41AM   6                    MR. CAZARES:  THANK YOU.

10:41AM   7                        **CROSS-EXAMINATION**

10:41AM   8        BY MR. CAZARES:

10:41AM   9        Q.   GOOD MORNING, MR. MENDENHALL.

10:41AM   10       A.   GOOD MORNING.

10:41AM   11       Q.   MY NAME IS STEPHEN CAZARES, AND I REPRESENT MR. BALWANI.

10:41AM   12       AND I HAVE A FEW QUESTIONS FOR YOU REGARDING YOUR TESTIMONY

10:41AM   13       HERE THIS MORNING.

10:41AM   14            WOULD THAT BE OKAY?

10:41AM   15       A.   YES.

10:41AM   16       Q.   OKAY.  SO THIS MORNING YOU DESCRIBED YOUR BACKGROUND TO

10:41AM   17       THE JURY, AND I JUST WANTED TO CONFIRM SOME OF THAT.

10:41AM   18            SO YOU WERE A VERY EXPERIENCED INVESTOR AS OF 2013; IS

10:41AM   19       THAT CORRECT?

10:41AM   20       A.   I WOULD SAY SO.

10:41AM   21       Q.   OKAY.  THAT'S BOTH PRIMARILY RELATING TO PUBLIC

10:42AM   22       SECURITIES, BUT ALSO PRIVATE INVESTMENTS; CORRECT?

10:42AM   23       A.   YES.

10:42AM   24       Q.   OKAY.  AND THE COMPANIES THAT YOU WORKED AT THAT YOU

10:42AM   25       OUTLINED THROUGHOUT YOUR CAREER, MERRILL LYNCH,

10:42AM   1    LEHMAN BROTHERS, PAINE WEBBER, THESE AT RELEVANT TIMES WERE AT

10:42AM   2    THE FOREFRONT OF AMERICAN FINANCING; CORRECT?

10:42AM   3    A.    YES.

10:42AM   4    Q.    AND YOU'VE BEEN THE HEAD OF U.S. CAPITAL ADVISORS NOW FOR

10:42AM   5    MORE THAN A DECADE?

10:42AM   6    A.    YES.

10:42AM   7    Q.    AND U.S. CAPITAL ADVISORS HANDLES, YOU KNOW, CORPORATE

10:42AM   8    FINANCE, MONEY MANAGEMENT FOR INDIVIDUAL FAMILIES, AS WELL AS

10:42AM   9    INVESTMENT OPPORTUNITIES FOR THEIR CLIENTS; CORRECT?

10:42AM  10    A.    YES.

10:42AM  11    Q.    NOW, AT THE TIME THAT YOU INVESTED IN THERANOS, YOU WERE

10:42AM  12    STILL AT UBS; IS THAT CORRECT?

10:42AM  13    A.    THE FIRST ROUND, YES.

10:42AM  14    Q.    OKAY.  AND THAT'S BACK IN 2005, 2006 THAT YOU INDICATED?

10:43AM  15    A.    CORRECT.

10:43AM  16    Q.    OKAY.  AND YOU WERE ACTUALLY THE MANAGING DIRECTOR OF UBS;

10:43AM  17    IS THAT CORRECT?

10:43AM  18    A.    YES.

10:43AM  19    Q.    AND IT'S A HIGH RANKING POSITION?

10:43AM  20    A.    YES.

10:43AM  21    Q.    OKAY.  NOW, YOU DESCRIBED A COLLEAGUE OF YOURS AT U.S.

10:43AM  22    CAPITAL, A MR. DAVID HARRIS.

10:43AM  23         DO YOU REMEMBER THAT?

10:43AM  24    A.    YES.

10:43AM  25    Q.    AND MR. HARRIS WORKED FOR YOU AT U.S. CAPITAL?

10:43AM  1    A.   HE REPORTED TO ME, YES.

10:43AM  2    Q.   HE WAS --

10:43AM  3    A.   HE REPORTS TO ME.

10:43AM  4    Q.   I APOLOGIZE.  I DON'T MEAN TO STEP OVER YOU.

10:43AM  5    A.   NO, THAT'S OKAY.

10:43AM  6    Q.   I APOLOGIZE.

10:43AM  7         AND MR. HARRIS WAS AN INVESTMENT ADVISOR?

10:43AM  8    A.   YES.

10:43AM  9    Q.   SO A MONEY MANAGER FOR INDIVIDUALS AND COMPANIES?

10:43AM 10    A.   YES.

10:43AM 11    Q.   AND HE WAS A SENIOR ADVISOR AT UBS AT THE TIME?

10:43AM 12    A.   STILL IS, YES.

10:43AM 13    Q.   AND MR. HARRIS MANAGED THE FAMILY MONEY FOR MS. HOLMES'S

10:43AM 14    FAMILY; IS THAT CORRECT?

10:43AM 15    A.   AT SOME POINT I BELIEVE THAT'S TRUE.

10:44AM 16    Q.   AND SO IT WAS MR. HARRIS WHO WAS KIND OF THE INTRO TO

10:44AM 17    MS. HOLMES AND THERANOS; CORRECT?

10:44AM 18    A.   YES.

10:44AM 19    Q.   AND IS IT ACCURATE TO SAY THEN THAT MR. HARRIS WAS REALLY

10:44AM 20    YOUR SOURCE OF INFORMATION RELATING TO THERANOS IN THOSE EARLY

10:44AM 21    YEARS?

10:44AM 22    A.   YES.

10:44AM 23    Q.   AND BACK IN THAT EARLY TIME PERIOD, THE 2005, 2006 TIME

10:44AM 24    PERIOD, WE'RE TALKING ABOUT YOUR INITIAL INVESTMENT OF ABOUT

10:44AM 25    $50,000.

10:44AM  1          TO THE EXTENT THAT YOU LEARNED ANYTHING ABOUT THERANOS'S

10:44AM  2   TECHNOLOGY, AGAIN, THAT CAME FROM MR. HARRIS?

10:44AM  3   A.   YES.

10:44AM  4   Q.   BUT YOU DID UNDERSTAND AT THAT TIME THAT THERANOS WAS

10:44AM  5   STILL A THE DEVELOPMENT STAGE COMPANY; IS THAT FAIR?

10:44AM  6   A.   YES.

10:44AM  7   Q.   AND AT THAT TIME BACK IN 2006, YOU RECEIVED NO WRITTEN

10:44AM  8   MATERIALS RELATING TO THE INVESTMENT; CORRECT?

10:44AM  9   A.   YES, NOT THAT I RECALL.

10:44AM 10   Q.   NO PROSPECTUS?

10:45AM 11   A.   IT'S POSSIBLE.  I JUST DON'T RECALL.

10:45AM 12   Q.   NO FINANCIAL DETAILS?

10:45AM 13   A.   NO REAL FINANCIALS.

10:45AM 14   Q.   AND IS IT FAIR TO SAY THAT YOU NEVER RECEIVED FINANCIAL

10:45AM 15   INFORMATION OR DETAILS FROM MS. HOLMES RELATING TO THERANOS?

10:45AM 16   A.   NOT THAT I RECALL.

10:45AM 17   Q.   OKAY.  AND BACK IN THAT TIME PERIOD, 2005 OR 2006, YOU

10:45AM 18   NEVER ASKED FOR IT; CORRECT?

10:45AM 19   A.   NO.  I HAD NO DIRECT COMMUNICATION WITH THE COMPANY.

10:45AM 20   Q.   AND BACK IN THAT EARLY TIME PERIOD, 2005, 2006, OF YOUR

10:45AM 21   INITIAL INVESTMENT, YOU NEVER RECEIVED ANY SORT OF, LIKE,

10:45AM 22   DEMONSTRATION OF THE TECHNOLOGY, THE STATUS OF THE TECHNOLOGY;

10:45AM 23   CORRECT?

10:45AM 24   A.   CORRECT.

10:45AM 25   Q.   AND JUST TO CONFIRM, SO PRIOR TO YOUR INVESTMENT OF THE

10:45AM   1    50-SOME THOUSAND DOLLARS IN 2006, YOU HAD NEVER SPOKEN TO

10:46AM   2    MS. HOLMES?

10:46AM   3    A.   CORRECT.

10:46AM   4    Q.   NEVER EMAILED MS. HOLMES?

10:46AM   5    A.   CORRECT.

10:46AM   6    Q.   AND NEVER COMMUNICATED WITH MS. HOLMES?

10:46AM   7    A.   CORRECT.

10:46AM   8    Q.   OR ANYONE AT THERANOS AT THAT TIME?

10:46AM   9    A.   CORRECT.

10:46AM  10    Q.   SO THE INVESTMENT WAS ENTIRELY RELIANT OF YOUR

10:46AM  11    UNDERSTANDING UPON MR. HARRIS AND WHAT HE TOLD YOU?

10:46AM  12    A.   YES.

10:46AM  13    Q.   AND IT WOULD BE ACCURATE, WOULD IT NOT, THAT IN THAT 2005

10:46AM  14    AND 2006 TIME PERIOD, YOU HAD NO IDEA WHO MR. BALWANI WAS;

10:46AM  15    CORRECT?

10:46AM  16    A.   CORRECT.

10:46AM  17    Q.   AND HAD NEVER COMMUNICATED WITH HIM?

10:46AM  18    A.   NO.

10:46AM  19    Q.   DIDN'T KNOW OF ANY RELATIONSHIP BETWEEN MR. BALWANI AND

10:46AM  20    MS. HOLMES?

10:46AM  21    A.   NO.

10:46AM  22    Q.   AND IS IT CORRECT THEN FROM THAT TIME PERIOD IN 2006 AND

10:46AM  23    UNTIL LATE 2012, 2013, YOU HEARD NOTHING FROM ANYONE AT

10:46AM  24    THERANOS?

10:46AM  25    A.   I BELIEVE I HEARD NOTHING OR NEXT TO NOTHING, YEAH.

10:46AM  1    Q.   BUT YOU DID --

10:46AM  2    A.   THERE WERE SOME NOTICES AND THINGS THAT WOULD COME, BUT

10:46AM  3    NOTHING SPECIFIC THAT I CAN RECALL.

10:47AM  4    Q.   AND YOU DID PERIODICALLY RECEIVE SOME INFORMATION FROM

10:47AM  5    MR. HARRIS THOUGH; CORRECT?

10:47AM  6    A.   UM, I BELIEVE JUST VERBALLY, WHATEVER HE WAS HEARING.

10:47AM  7    Q.   AND DID YOU TAKE ANY NOTES OF THOSE COMMUNICATIONS WITH

10:47AM  8    MR. HARRIS, THOSE UPDATES?

10:47AM  9    A.   NO.

10:47AM  10   Q.   AND YOU DON'T RECALL THE DETAILS, DO YOU?

10:47AM  11   A.   NO.

10:47AM  12   Q.   AND YOU HAVEN'T PROVIDED THOSE TO THE GOVERNMENT HERE IN

10:47AM  13   THIS CASE, HAVE YOU?

10:47AM  14   A.   NO.

10:47AM  15   Q.   NOW, IN 2006 WHEN YOU INVESTED IN THERANOS, IT WAS

10:47AM  16   EXCITING, THE IDEA, WAS IT NOT?

10:47AM  17   A.   YES, IT SOUNDED LIKE A GOOD IDEA.

10:47AM  18   Q.   AND AT THAT TIME, GIVEN THE DEVELOPMENT STAGE OF THE

10:48AM  19   COMPANY, YOU UNDERSTOOD IT WAS A LONG-TERM INVESTMENT; CORRECT?

10:48AM  20   A.   YES.  IT WAS -- I BELIEVE IT WAS MORE OF AN INVESTMENT IN

10:48AM  21   ELIZABETH HOLMES AND WHAT SHE WAS ATTEMPTING TO DO AT THAT

10:48AM  22   POINT.

10:48AM  23   Q.   AND GIVEN THAT, THERANOS WAS A PRIVATELY HELD COMPANY AT

10:48AM  24   THE TIME; CORRECT?

10:48AM  25   A.   YES.

10:48AM  1    Q.   AND WAS ALWAYS A PRIVATELY HELD COMPANY; CORRECT?

10:48AM  2    A.   YES.

10:48AM  3    Q.   AND GIVEN THAT, YOU UNDERSTOOD WHEN YOU WERE INVESTING IN

10:48AM  4    THERANOS THAT YOU WEREN'T NECESSARILY ENTITLED TO OBTAIN

10:48AM  5    FINANCIAL INFORMATION OR CORPORATE DETAILS AS ONE WOULD WHEN

10:48AM  6    ONE INVESTS IN A PUBLIC COMPANY; CORRECT?

10:48AM  7    A.   YES.

10:48AM  8    Q.   AND YOU UNDERSTAND THAT -- YOU UNDERSTOOD THAT BEFORE

10:48AM  9    INVESTING IN 2006?

10:48AM  10   A.   YOU KNOW, I WOULD -- A LOT OF TIMES THERE ARE DOCUMENTS

10:48AM  11   THAT YOU SIGN OUTLINING THE RESPONSIBILITY OF THE CORPORATION

10:48AM  12   TO REPORT TO YOU.

10:48AM  13        I JUST DON'T RECALL IN THE DOCUMENTS THAT I SIGNED TO

10:49AM  14   INITIALLY INVEST IF THEY HAD OUTLINED THAT THEY WOULD PROVIDE

10:49AM  15   QUARTERLY OR ANNUAL FINANCIALS.  I DON'T RECALL THAT.

10:49AM  16        BUT, YEAH, THEY DID NOT PROVIDE ANY.

10:49AM  17   Q.   SO AS A PRACTICAL MATTER, YOU UNDERSTOOD AT THE TIME THAT

10:49AM  18   YOU WEREN'T RECEIVING DETAILS; CORRECT?

10:49AM  19   A.   YES.

10:49AM  20   Q.   AND BY THE TIME OF THE 2013 INVESTMENT BY YOUR FRIENDS AND

10:49AM  21   FAMILY, YOU ALSO UNDERSTOOD THAT YOU WEREN'T RECEIVING

10:49AM  22   FINANCIAL DETAILS OR PROSPECTUSES OR A FINANCIAL REPORT BY THE

10:49AM  23   COMPANY; CORRECT?

10:49AM  24   A.   I HAD NOT RECEIVED ANY, CORRECT.

10:49AM  25   Q.   BUT YOU STILL INVESTED; CORRECT?

10:49AM 1    A.   YES.

10:49AM 2    Q.   MR. MENDENHALL -- I WAS GOING TO SAY MENDELSON.  SORRY.

10:49AM 3         MR. MENDENHALL, IF YOU COULD TAKE A LOOK AT THE BINDER

10:49AM 4    I'VE HANDED YOU, IT HAS SOME EXHIBITS IN THERE.  IF YOU COULD

10:50AM 5    TAKE A LOOK AT EXHIBIT 5814.

10:50AM 6         AND ACTUALLY 5814, I BELIEVE, IS ALREADY IN EVIDENCE.

10:50AM 7              THE COURT:  I DON'T BELIEVE IT'S IN THE BINDER.

10:50AM 8              THE WITNESS:  YEAH, I DON'T SEE IT IN THE BINDER.

10:50AM 9              MR. CAZARES:  AM I CORRECT THAT 5814 IS IN EVIDENCE?

10:50AM 10             THE CLERK:  IT IS.

10:50AM 11             MR. CAZARES:  MAY I PUBLISH, YOUR HONOR?

10:50AM 12             THE COURT:  YES.

10:50AM 13             THE WITNESS:  IS IT ON THE SCREEN OR --

10:50AM 14   BY MR. CAZARES:

10:50AM 15   Q.   IT IS.  IT IS BEING PUBLISHED FOR YOU.

10:50AM 16        SO 5814 YOU TALKED ABOUT A LITTLE BIT THIS MORNING IS THIS

10:50AM 17   DECEMBER 16TH, 2013 EMAIL FROM THERANOS TO YOURSELF, AND

10:50AM 18   THERE'S A DESCRIPTION, "BELOW FIND A MEMO TO STOCKHOLDERS

10:50AM 19   REGARDING CERTAIN DEALS AND TRANSACTIONS WE'RE WORKING TO CLOSE

10:51AM 20   BY YEAR END.  WE'VE ATTACHED YOUR SIGNATURE PAGES TO THE

10:51AM 21   ASSOCIATED SHAREHOLDER CONSENTS TO THIS EMAIL."

10:51AM 22        DO YOU SEE THAT?

10:51AM 23   A.   YES.

10:51AM 24   Q.   NOW, WHEN YOU RECEIVED THIS EMAIL, YOU HAD ALREADY

10:51AM 25   RECEIVED SOME UPDATES REGARDING THE COMPANY FROM MS. HOLMES AND

10:51AM   1    SOME PUBLIC REPORTING; CORRECT?

10:51AM   2    A.   I BELIEVE SO, YES.

10:51AM   3    Q.   SO YOU DESCRIBED, I THINK, A COUPLE OF CONVERSATIONS YOU

10:51AM   4    MAY HAVE HAD WITH MS. HOLMES IN 2013.

10:51AM   5    A.   YES.

10:51AM   6    Q.   OKAY.  AND THEN THERE WERE SOME PUBLIC ANNOUNCEMENTS

10:51AM   7    RELATING TO THE WALGREENS ROLLOUT.

10:51AM   8         YOU SAW THAT?

10:51AM   9    A.   YES.

10:51AM  10    Q.   AND YOU ALSO SAW "THE WALL STREET JOURNAL" ARTICLE THAT

10:51AM  11    YOU SPOKE ABOUT THIS MORNING?

10:51AM  12    A.   YES.

10:51AM  13    Q.   AND ALL OF THAT WAS EXCITING; CORRECT?

10:51AM  14    A.   YES.

10:51AM  15    Q.   AND GIVEN THE YEARS HAD PASSED AND YOU HEARD NOTHING AND

10:51AM  16    ALL OF A SUDDEN THE COMPANY THAT YOU PUT $50,000 INTO IN 2006

10:51AM  17    WAS NOW IN "THE WALL STREET JOURNAL" BEING COVERED, THAT WAS

10:51AM  18    EXCITING?

10:51AM  19    A.   YES.

10:51AM  20    Q.   AND THAT KIND OF BODED WELL FOR THE POTENTIAL FUTURE OF

10:51AM  21    THE COMPANY; CORRECT?

10:52AM  22    A.   YES.

10:52AM  23    Q.   NOW, YOU DESCRIBED THIS EMAIL AS INDICATING TO YOU THAT

10:52AM  24    THE COMPANY WAS GOING TO BE RAISING MORE FUNDS; CORRECT?

10:52AM  25    A.   YES.

MENDENHALL CROSS BY MR. CAZARES                                    4329

10:52AM  1     Q.   AND THOSE FUNDS WERE LIKELY GOING TO BE COMING FROM LARGE

10:52AM  2     INSTITUTIONAL INVESTORS; CORRECT?

10:52AM  3     A.   I WASN'T SURE WHERE THEY WERE COMING FROM, BUT MY -- THE

10:52AM  4     THOUGHTS WERE THAT THEY WERE GOING TO BE COMING FROM LARGER

10:52AM  5     SOURCES, YES.

10:52AM  6     Q.   OKAY.  AND THAT ALSO WAS EXCITING, WAS IT NOT?

10:52AM  7     A.   YEAH.  IT VALIDATES YOUR VALUES WHEN MORE SOPHISTICATED

10:52AM  8     INVESTORS GET IN.

10:52AM  9     Q.   AND THE FACT THAT MORE SOPHISTICATED INVESTORS WERE COMING

10:52AM 10     IN WITH MORE FUNDS, AGAIN, BODED WELL FOR THE FUTURE OF THE

10:52AM 11     COMPANY TO GROW AND EXECUTE ON ITS BUSINESS PLAN; CORRECT?

10:52AM 12     A.   YES.

10:52AM 13     Q.   AND THAT ALSO CONTRIBUTED TO YOUR DECISION TO INVEST;

10:52AM 14     CORRECT?

10:52AM 15     A.   YES.

10:52AM 16     Q.   THE FACT THAT OTHER INVESTORS WERE REVIEWING THE SAME

10:52AM 17     COMPANY AND COMING TO SIMILAR CONCLUSIONS THAT YOU WERE;

10:53AM 18     CORRECT?

10:53AM 19     A.   YES.

10:53AM 20     Q.   AND I THINK YOU DESCRIBED WHEN YOU LEARNED ABOUT THIS

10:53AM 21     OPPORTUNITY TO POTENTIALLY INVEST COMBINED WITH THE COVERAGE

10:53AM 22     THAT THE COMPANY HAD BEEN GETTING, AGAIN, FROM

10:53AM 23     "THE WALL STREET JOURNAL," THE ANNOUNCEMENT OF THE WALGREENS

10:53AM 24     RELATIONSHIP, IN YOUR MIND YOU VIEWED THIS OPPORTUNITY TO

10:53AM 25     INVEST AS INCREDIBLE; CORRECT?

MENDENHALL CROSS BY MR. CAZARES                    4330

10:53AM  1    A.   YES.

10:53AM  2    Q.   NOW, THE FACT OF THIS PUBLIC COVERAGE OF THERANOS, AGAIN,

10:54AM  3    "WALL STREET JOURNAL," THE WALGREENS RELATIONSHIP, COMBINED

10:54AM  4    WITH THIS INFORMATION THAT YOU WERE RECEIVING THAT THEY WERE

10:54AM  5    GOING TO BE RECEIVING LIKELY SOME ADDITIONAL FUNDS TO GROW THE

10:54AM  6    BUSINESS, YOU UNDERSTOOD THAT THAT STILL DIDN'T MEAN A

10:54AM  7    GUARANTEE THAT THERANOS WAS GOING TO WORK OUT AND EXECUTE ON

10:54AM  8    THE BUSINESS PLAN; CORRECT?

10:54AM  9    A.   YES.

10:54AM 10    Q.   NOTWITHSTANDING YOUR OWN, YOU KNOW, ANALYSIS OF THE

10:54AM 11    COMPANY AND POSSIBLY THESE OTHER SOPHISTICATED INVESTORS

10:54AM 12    REVIEWING THE COMPANY POSITIVELY, THAT THERE ARE STILL

10:54AM 13    EXECUTION RISKS IN ANY BUSINESS PLAN; CORRECT?

10:54AM 14    A.   YES.

10:54AM 15    Q.   AND YOU UNDERSTOOD THAT?

10:54AM 16    A.   YES.

10:54AM 17    Q.   AND YOU ALSO UNDERSTOOD THAT IN THAT TIME PERIOD, AGAIN,

10:54AM 18    THIS IS LATE 2013, THE RETAIL BUSINESS OF THERANOS IS STARTING

10:54AM 19    TO OFFER BLOOD TESTING TO PATIENTS IN WALGREENS STORES, THAT

10:54AM 20    PART OF THE BUSINESS WAS BRAND NEW; CORRECT?

10:54AM 21    A.   YES.

10:54AM 22    Q.   AND GIVEN THAT IT WAS A BRAND NEW VENTURE REALLY FOR THE

10:55AM 23    COMPANY GOING FROM THIS KIND OF UNDERGROUND TIME PERIOD TO NOW

10:55AM 24    OFFERING A RETAIL PRODUCT TO PATIENTS, THAT AGAIN ADDED

10:55AM 25    ADDITIONAL RISKS TO THE BUSINESS THAT YOU UNDERSTOOD; CORRECT?

10:55AM   1     A.   YEAH.  I MEAN, THERE'S AN ELEMENT OF ASSUMPTION THAT A

10:55AM   2     PUBLIC COMPANY THE SIZE OF WALGREENS HAD DONE THEIR HOMEWORK,

10:55AM   3     TOO.

10:55AM   4     Q.   AND AGAIN, THAT ALSO KIND OF INFLUENCED AND CONTRIBUTED TO

10:55AM   5     YOUR DECISION TO INVEST WITH YOUR FRIENDS AND FAMILY; CORRECT?

10:55AM   6     A.   YES.

10:55AM   7     Q.   ABSENT THAT RELATIONSHIP WITH WALGREENS, THERE MAY NOT

10:55AM   8     HAVE BEEN A GOOD REASON TO INVEST IN THERANOS AT THAT TIME;

10:55AM   9     CORRECT?

10:55AM   10          MR. BOSTIC:  OBJECTION.  IT CALLS FOR SPECULATION.

10:55AM   11          THE COURT:  SUSTAINED.

10:55AM   12     YOU CAN REPHRASE THAT IF YOU WOULD LIKE.

10:55AM   13     BY MR. CAZARES:

10:55AM   14     Q.   THE RELATIONSHIP WITH WALGREENS WAS IMPORTANT TO YOUR

10:55AM   15     DECISION TO INVEST; CORRECT?

10:55AM   16     A.   IT CERTAINLY WAS A CONTRIBUTOR.

10:55AM   17     Q.   OKAY.  NOW, IN THIS -- IN THE TIME PERIOD BEFORE 2013 WHEN

10:56AM   18     YOU WERE NOT RECEIVING MUCH INFORMATION FROM MR. HARRIS, DID

10:56AM   19     YOU EVER LEARN ABOUT THERANOS RUNNING LOW ON FUNDS IN AROUND

10:56AM   20     2009?

10:56AM   21     A.   NOT THAT I CAN RECALL.

10:56AM   22     Q.   NOW, GIVEN YOU WERE IN FINANCE, IN 2009, THAT TIME PERIOD,

10:56AM   23     THESE WERE ROCKY TIMES IN AMERICAN FINANCE AND CORPORATE

10:56AM   24     AMERICA; CORRECT?

10:56AM   25     A.   YES.

10:56AM   1    Q.   WHAT WAS HAPPENING AT THAT TIME?

10:56AM   2    A.   WELL, THERE WAS A FINANCIAL CRISIS IN 2008 AND THE MARKETS

10:56AM   3    MELTED DOWN, AND THERE WAS A LOT OF CRAZINESS.

10:56AM   4    Q.   AND AMONG THE CRISES, ONE OF THE EFFECTS BECAME KIND OF A

10:56AM   5    LIQUIDITY CRISIS, WASN'T IT?  AN INABILITY OF CORPORATIONS TO

10:57AM   6    GAIN FINANCING, OR OBTAIN FINANCING EASILY ANYWAY?

10:57AM   7    A.   YES, IT BECAME MORE DIFFICULT.

10:57AM   8    Q.   OKAY.  AND IN THAT TIME PERIOD, DID MR. HARRIS LET YOU

10:57AM   9    KNOW THAT THERANOS WAS RUNNING INTO SIMILAR ISSUES WITH ACCESS

10:57AM  10    TO CAPITAL LIKE MANY IN CORPORATE AMERICA WERE AT THE TIME?

10:57AM  11    A.   NOT THAT I CAN RECALL.

10:57AM  12    Q.   DID YOU EVER LEARN THAT MR. BALWANI HIMSELF GUARANTEED A

10:57AM  13    $10 MILLION LINE OF CREDIT FOR THERANOS SO IT COULD STAY IN

10:57AM  14    OPERATION DURING THOSE ROCKY TIMES IN 2009?

10:57AM  15    A.   I DID NOT KNOW THAT.  I DID NOT KNOW THAT UNTIL TODAY.

10:57AM  16    Q.   AND IS IT ACCURATE TO SAY THAT PRIOR TO 2013, YOU HAD NO

10:57AM  17    IDEA OF MR. BALWANI'S ROLE IN THE COMPANY; CORRECT?

10:57AM  18    A.   CORRECT.  I'M NOT SURE WHEN I -- IT WAS AROUND THAT PERIOD

10:57AM  19    THAT I'M SURE I LEARNED ABOUT IT, BUT I DON'T KNOW EXACTLY -- I

10:57AM  20    CAN'T RECALL SPECIFICALLY WHEN I LEARNED ABOUT HIS ROLE.

10:58AM  21         MR. CAZARES:  YOUR HONOR, I BELIEVE EXHIBIT 1113 IS

10:58AM  22    IN EVIDENCE.

10:58AM  23         MAY I PUBLISH?

10:58AM  24              THE COURT:  YES.

10:58AM  25    BY MR. CAZARES:

10:58AM  1    Q.   MR. MENDENHALL, ON THE SCREEN IS A PRESS RELEASE, AN

10:58AM  2    ANNOUNCEMENT BY THERANOS AND WALGREENS RELATING TO A

10:58AM  3    PARTNERSHIP, THAT WAS ISSUED ON SEPTEMBER 9TH OF 2013.

10:58AM  4         DO YOU SEE THAT?

10:58AM  5    A.   YES.

10:58AM  6    Q.   AND IN THAT TIME PERIOD, ROUGHLY, WERE YOU AWARE OF THIS

10:58AM  7    PUBLIC ANNOUNCEMENT OF THE WALGREENS PARTNERSHIP?

10:58AM  8    A.   YES.

10:58AM  9    Q.   OKAY.  AND LIKE YOU SAID BEFORE, THAT WAS EXCITING?

10:58AM 10    A.   YES.

10:58AM 11    Q.   WALGREENS WAS ACTUALLY AN INTERNATIONAL RETAILER; CORRECT?

10:58AM 12    A.   YES.

10:58AM 13    Q.   AND YOU BELIEVED WALGREENS HAD THE ABILITY TO HELP A SMALL

10:59AM 14    COMPANY LIKE THERANOS SCALE ITS BUSINESS NATIONALLY; CORRECT?

10:59AM 15    A.   YES.

10:59AM 16    Q.   NOW, IN YOUR, IN YOUR TESTIMONY THIS MORNING IN RESPONSE

10:59AM 17    TO, I THINK, MULTIPLE QUESTIONS BY THE GOVERNMENT, YOU WERE

10:59AM 18    ASKED ABOUT YOUR UNDERSTANDING OF THERANOS'S TECHNOLOGY.

10:59AM 19         IS IT FAIR TO SAY THAT YOUR UNDERSTANDING OF THERANOS'S

10:59AM 20    TECHNOLOGY, ITS PROPRIETARY TECHNOLOGY, WAS THIS FINGERSTICK

10:59AM 21    TESTING; CORRECT?

10:59AM 22    A.   YES.

10:59AM 23    Q.   AND YOU UNDERSTAND THAT THEY HAD DEVELOPED THEIR OWN

10:59AM 24    ANALYZER OR DEVICE THAT WAS USED TO DO THE ANALYSIS OF BLOOD

10:59AM 25    SAMPLES FROM A FINGERSTICK?

MENDENHALL CROSS BY MR. CAZARES                            4334

10:59AM 1    A.   YES.

10:59AM 2    Q.   BUT YOU WERE NEVER AWARE IN THIS 2013 TIME PERIOD OF THE

10:59AM 3    DETAILS OF HOW THERANOS PERFORMED THE TESTING THAT THEY DID ON

10:59AM 4    FINGERSTICK SAMPLES; CORRECT?

10:59AM 5    A.   CORRECT.

10:59AM 6    Q.   NOW, YOU ALSO TESTIFIED, I THINK, IN RESPONSE TO THE

11:00AM 7    QUESTIONS BY THE GOVERNMENT, THAT YOU WERE UNAWARE OF THE FACT

11:00AM 8    THAT THERANOS, BY THE TIME IT STARTED TESTING PATIENT SAMPLES

11:00AM 9    THROUGH WALGREENS STORES, WAS STILL USING VENOUS DRAW OR

11:00AM 10   TRADITIONAL METHODS; CORRECT?

11:00AM 11   A.   YES.

11:00AM 12   Q.   AND I THINK WHAT YOU SAID WAS NO ONE TOLD YOU THAT FACT,

11:00AM 13   OR MR. BALWANI DIDN'T TELL YOU THAT FACT.

11:00AM 14        IS THAT WHAT YOU SAID THIS MORNING?

11:00AM 15   A.   YES.

11:00AM 16   Q.   NOW, IF WE TAKE A LOOK BACK AT EXHIBIT 1113, THE

11:00AM 17   ANNOUNCEMENT THAT YOU SAID YOU SAW, WOULD YOU TAKE A LOOK AT

11:00AM 18   THAT FIRST PARAGRAPH.

11:00AM 19        AND YOU SEE IN THE MIDDLE OF THAT FIRST PARAGRAPH THE

11:00AM 20   ANNOUNCEMENT SAYS, "AS THE SERVICE BECOMES AVAILABLE THROUGH

11:00AM 21   THERANOS WELLNESS CENTERS INSIDE WALGREENS STORES, CONSUMERS

11:00AM 22   WILL BE ABLE TO ACCESS LESS INVASIVE AND MORE AFFORDABLE

11:00AM 23   CLINICIAN-DIRECTED LAB TESTING."

11:01AM 24        DO YOU SEE THAT?

11:01AM 25   A.   YES.

11:01AM  1    Q.   AND THEN IT CONTINUES.

11:01AM  2         "FROM A BLOOD SAMPLE AS SMALL AS A FEW DROPS, OR 1/1,000

11:01AM  3    THE SIZE OF A TYPICAL BLOOD DRAW."

11:01AM  4         DO YOU SEE THAT?

11:01AM  5    A.   YES.

11:01AM  6    Q.   AND THEN IT SAYS, "THE SAMPLES ARE EITHER TAKEN FROM A

11:01AM  7    TINY FINGERSTICK OR A MICRO-SAMPLE TAKEN FROM TRADITIONAL

11:01AM  8    METHODS, ELIMINATING THE NEED FOR LARGER NEEDLES."

11:01AM  9         DO YOU SEE THAT?

11:01AM 10    A.   YES.

11:01AM 11    Q.   AND NOW, YOU UNDERSTOOD AT THE TIME IN THIS 2013 TIME

11:01AM 12    PERIOD THAT TRADITIONAL TESTING METHODS MEANS A VEIN DRAW;

11:01AM 13    CORRECT?

11:01AM 14    A.   YES.

11:01AM 15    Q.   NOW, I THINK YOU ALSO MENTIONED IN YOUR TESTIMONY THIS

11:01AM 16    MORNING THAT YOU WERE UNAWARE OF THE FACT THAT THERANOS, I

11:01AM 17    THINK THERE WERE SOME RUMORS -- LET ME BACK UP.

11:01AM 18         YOU HAD SOME QUESTIONS FOR MR. BALWANI ABOUT RUMORS AND

11:02AM 19    QUESTIONS THAT YOU HAD HEARD ABOUT THERANOS SHIPPING SAMPLES TO

11:02AM 20    A CENTRAL LAB AND TAKING, LIKE, 24 OR 48 HOURS TO REPORT

11:02AM 21    RESULTS.

11:02AM 22         DO YOU REMEMBER THAT?

11:02AM 23    A.   YES.

11:02AM 24    Q.   AND I THINK YOU SAID YOU WERE UNAWARE OF THAT FACT;

11:02AM 25    CORRECT?

11:02AM  1      A.    YES.

11:02AM  2      Q.    AND THAT'S WHY YOU WERE ASKING QUESTIONS?  YOU DIDN'T KNOW

11:02AM  3      IF IT WAS TRUE?  YOU KIND OF DIDN'T KNOW ONE WAY OR THE OTHER?

11:02AM  4      A.    YES.

11:02AM  5      Q.    NOW RETURNING BACK TO EXHIBIT 1113, THE PUBLIC

11:02AM  6      ANNOUNCEMENT OF THE RELATIONSHIP WITH WALGREENS AND THIS KIND

11:02AM  7      OF PARTNERSHIP TO OFFER BLOOD TESTING.

11:02AM  8           AND ON PAGE 2, THAT SECOND FULL PARAGRAPH, AROUND THE

11:02AM  9      MIDDLE OF THE PARAGRAPH TO THE BOTTOM STARTING "THERANOS

11:02AM 10      SEAMLESSLY."

11:02AM 11           DO YOU SEE THAT?

11:02AM 12      A.    YES.

11:02AM 13      Q.    AND SO THE ANNOUNCEMENT BY WALGREENS AND THERANOS HERE

11:02AM 14      REPORTS, "THERANOS SEAMLESSLY INTEGRATES WITH EXISTING PRACTICE

11:02AM 15      WORK FLOWS AND OFFERS A FULL SPECTRUM OF LABORATORY TESTS, FROM

11:03AM 16      THE MOST COMMON PANELS TO HIGHLY SPECIALIZED TESTS."

11:03AM 17           DO YOU SEE THAT?

11:03AM 18      A.    YES.

11:03AM 19      Q.    AND THEN IT CONTINUES.

11:03AM 20           "COLLECTION FOR THERANOS TESTS WILL BE PERFORMED IN

11:03AM 21      THERANOS WELLNESS CENTERS BY LICENSED PHLEBOTOMISTS OR

11:03AM 22      APPROPRIATELY STATE CERTIFIED PERSONNEL."

11:03AM 23           DO YOU SEE THAT?

11:03AM 24      A.    YES.

11:03AM 25      Q.    AND SO THE ANNOUNCEMENT REFERENCES COLLECTING SAMPLES

11:03AM 1    WITHIN THE STORES; CORRECT?

11:03AM 2    A.   YES.

11:03AM 3    Q.   BUT IT DOESN'T SAY THAT THEY'RE PERFORMING THE ANALYSIS IN

11:03AM 4    THE STORE; CORRECT?

11:03AM 5    A.   YES.

11:03AM 6    Q.   OKAY.  NOW, YOU HAD SOME EXPERIENCE INVESTING IN MEDICAL

11:03AM 7    TECHNOLOGY COMPANIES, PHARMACEUTICAL COMPANIES, LAB TESTING,

11:03AM 8    ANY OF THAT BY 2013?

11:03AM 9    A.   I HAD INVESTED IN FREESTANDING EMERGENCY ROOMS.

11:03AM 10   Q.   IN THE TIME PERIOD OF 2013, DID YOU UNDERSTAND THAT FOR

11:03AM 11   THERANOS TO PUT ITS DEVICE IN A WALGREENS STORE TO DO THE

11:03AM 12   ACTUAL TESTING, THEY NEEDED TO HAVE FDA APPROVAL TO ACTUALLY

11:04AM 13   PLACE THE DEVICE IN STORE TO TEST.

11:04AM 14        DID YOU UNDERSTAND THAT?

11:04AM 15            MR. BOSTIC:  CALLS FOR A LEGAL CONCLUSION.

11:04AM 16            MR. CAZARES:  I'M JUST ASKING FOR HIS UNDERSTANDING.

11:04AM 17            THE COURT:  ARE YOU ASKING HIM IF HE KNEW ABOUT ANY

11:04AM 18   REGULATION ABOUT THAT?

11:04AM 19        WHY DON'T YOU REPHRASE IT?

11:04AM 20            MR. CAZARES:  SURE.

11:04AM 21   Q.   MR. MENDENHALL, DID YOU HAVE ANY KNOWLEDGE OR

11:04AM 22   UNDERSTANDING RELATING TO FDA REGULATIONS REGARDING WHEN,

11:04AM 23   WHERE, AND HOW A MEDICAL DEVICE LIKE THERANOS BLOOD ANALYZER

11:04AM 24   COULD BE USED?

11:04AM 25   A.   I DID NOT HAVE KNOWLEDGE OF REGULATORY REQUIREMENTS.

11:04AM  1    Q.   FAIR ENOUGH.

11:04AM  2         BUT YOU WERE AWARE AT SOME POINT IN TIME, WHETHER IT WAS

11:04AM  3    BEFORE YOU INVESTED OR AFTER, THAT THERANOS INTENDED TO SEEK

11:04AM  4    FDA APPROVAL; CORRECT?

11:04AM  5    A.   YES.

11:04AM  6    Q.   BECAUSE ULTIMATELY IT HAPPENED; RIGHT?

11:04AM  7    A.   I BELIEVE THEY DID SEEK FDA APPROVAL.

11:04AM  8    Q.   OKAY.  AND YOU RECEIVED AN ANNOUNCEMENT THAT THEY OBTAINED

11:04AM  9    THE APPROVAL; CORRECT?

11:04AM  10   A.   I BELIEVE SO, YES.

11:04AM  11   Q.   OKAY.  AND THE ANNOUNCEMENT AT 1113 CONTINUES, ON THAT

11:05AM  12   SECOND PAGE NEAR THE BOTTOM, "AS THE NATION'S LARGEST RETAIL

11:05AM  13   PHARMACY CHAIN WITH MORE THAN 8,100 NEIGHBORHOOD PHARMACIES,

11:05AM  14   WALGREENS HAS THE INFRASTRUCTURE TO HELP BRING THERANOS TO

11:05AM  15   CONSUMERS NATIONWIDE."

11:05AM  16        DO YOU SEE THAT?

11:05AM  17   A.   YES.

11:05AM  18   Q.   AND YOU BELIEVED THAT WAS TRUE AT THE TIME; CORRECT?

11:05AM  19   A.   YES.

11:05AM  20   Q.   YOU CAN SET THAT ASIDE.

11:05AM  21        YOUR HONOR, I BELIEVE 1106 IS ALSO IN EVIDENCE.  MAY I

11:05AM  22   PUBLISH?

11:05AM  23             THE COURT:  YES.

11:05AM  24   BY MR. CAZARES:

11:05AM  25   Q.   AND DO YOU SEE, MR. MENDENHALL, 1106 IS THAT

11:05AM  1    "WALL STREET JOURNAL" ARTICLE THAT YOU REFERENCED THAT YOU

11:05AM  2    INDICATED THAT YOU SAW AND KIND OF GENERATED SOME EXCITEMENT ON

11:05AM  3    YOUR BEHALF AS AN INVESTOR IN THE COMPANY; CORRECT?

11:05AM  4    A.   YES.

11:05AM  5    Q.   AND THE GOVERNMENT REVIEWED SOME OF THIS WITH YOU THIS

11:05AM  6    MORNING; CORRECT?

11:05AM  7    A.   YES.

11:05AM  8    Q.   OKAY.  AND AGAIN, JUST TO CONFIRM, YOU REVIEWED THE

11:06AM  9    ARTICLE BACK WHEN IT WAS PUBLISHED AROUND THIS TIME?

11:06AM 10    A.   YES, I READ IT.

11:06AM 11    Q.   OKAY.  NOW, THE GOVERNMENT POINTED OUT A PARAGRAPH TO YOU

11:06AM 12    AT THE FOURTH PARAGRAPH BEGINNING "THE SECRET."

11:06AM 13         DO YOU SEE THAT?

11:06AM 14    A.   YES.

11:06AM 15    Q.   AND IT SAYS, "THE SECRET THAT HUNDREDS OF EMPLOYEES ARE

11:06AM 16    NOW REFINING INVOLVES DEVICES THAT AUTOMATE AND MINIATURIZE

11:06AM 17    MORE THAN 1,000 LABORATORY TESTS, FROM ROUTINE BLOOD WORK TO

11:06AM 18    ADVANCED GENETIC ANALYSES."

11:06AM 19         DO YOU SEE THAT?

11:06AM 20    A.   YES.

11:06AM 21    Q.   NOW, THE ARTICLE DESCRIBES REFINING THE DEVICES.

11:06AM 22         DO YOU SEE THAT?

11:06AM 23    A.   YES.

11:06AM 24    Q.   I THINK IN YOUR TESTIMONY THIS MORNING IN QUESTION -- IN

11:06AM 25    RESPONSE TO QUESTIONS FROM THE GOVERNMENT ABOUT YOUR

ER-3143

11:06AM  1    UNDERSTANDING OF HOW YOUR MONEY WOULD BE USED, THE 2013

11:06AM  2    INVESTOR MONEY, YOU HAD A SENSE AND UNDERSTANDING FROM

11:07AM  3    MR. BALWANI THAT THE SCIENCE OF THE TECHNOLOGY WAS COMPLETE, IT

11:07AM  4    WAS DONE?

11:07AM  5    A.   YEAH, THE SCIENCE AND THE TECHNOLOGY, YES.

11:07AM  6    Q.   OKAY.  AND YOU TOLD THE JURY HERE THIS MORNING THAT THAT

11:07AM  7    CAME FROM MR. BALWANI; CORRECT?

11:07AM  8    A.   YES.

11:07AM  9    Q.   OKAY.  THAT SAID, YOU, AS A SOPHISTICATED INVESTOR,

11:07AM  10   UNDERSTAND COMPANIES ARE ALWAYS TRYING TO IMPROVE AND PERFECT

11:07AM  11   THEIR PRODUCTS AND THEIR TECHNOLOGY; CORRECT?

11:07AM  12   A.   I, I WOULD BELIEVE SO.  I MEAN, THAT'S -- I WOULD THINK

11:07AM  13   THAT IF YOU CAN IMPROVE IT, YOU WOULD.

11:07AM  14   Q.   AND IF YOU HAD AN IPHONE 6 TO AN IPHONE 12, GREAT DEVICE

11:07AM  15   HERE, BUT NOT CLOSE TO THE DEVICE THAT YOU HAD YEARS LATER;

11:07AM  16   CORRECT?

11:07AM  17   A.   UNDERSTOOD.

11:07AM  18   Q.   AND YOU WOULD -- YOU EXPECTED THERANOS TO CONTINUE TO

11:07AM  19   PERFECT ITS TECHNOLOGY; CORRECT?

11:07AM  20   A.   I WAS JUST HAPPY THAT THEY HAD THE TECHNOLOGY DONE, YES.

11:07AM  21   Q.   OKAY.  AND YOU ALSO WOULD HAVE EXPECTED THERANOS TO USE

11:08AM  22   INVESTOR MONEY TO PERFORM RESEARCH AND DEVELOPMENT, TO PERFECT

11:08AM  23   ITS TECHNOLOGY TOWARDS THE GOAL OF FDA APPROVAL.

11:08AM  24        YOU THOUGHT THAT WAS APPROPRIATE; CORRECT?

11:08AM  25   A.   YES.  IT'S NOT NECESSARILY WHAT I WAS TOLD, BUT, YES, IF

11:08AM   1        THAT'S WHAT THEY THOUGHT THEY NEEDED TO DO TO IMPROVE THE

11:08AM   2        COMPANY.  BUT I WAS TOLD IT WAS FOR MARKETING AND

11:08AM   3        MANUFACTURING.

11:08AM   4        Q.   AND YOU BECAME AWARE OF THE FACT THAT AFTER YOU INVESTED,

11:08AM   5        THERANOS DID EXPAND ITS BUSINESS; CORRECT?

11:08AM   6        A.   WELL, THEY WERE TRYING TO ROLL OUT TO WALGREENS IS WHAT I

11:08AM   7        UNDERSTOOD.

11:08AM   8        Q.   AND THEY WENT FROM JUST A FEW STORES IN 2013 WHEN YOU

11:08AM   9        INVESTED WITH YOUR FRIENDS AND FAMILY, TO MANY MORE STORES --

11:08AM  10        A.   YES.

11:08AM  11        Q.   -- THE NEXT YEAR; CORRECT?

11:08AM  12        A.   YES, I BELIEVE SO.

11:08AM  13        Q.   AND AS A PART OF THAT, YOU UNDERSTOOD THAT THERANOS WAS

11:08AM  14        MARKETING ITS BUSINESS; CORRECT?

11:09AM  15        A.   YEAH, THEY WERE EXPANDING.

11:09AM  16        Q.   AND THAT WAS AN APPROPRIATE USE OF FUNDS; CORRECT?

11:09AM  17        A.   YEAH.

11:09AM  18        Q.   AND IN ADDITION TO USING FUNDS IN THAT MANNER, YOU

11:09AM  19        UNDERSTOOD THAT MS. HOLMES AND MR. BALWANI HAD OBLIGATIONS TO

11:09AM  20        YOU AS INVESTORS, AND TO ALL INVESTORS, TO USE INVESTOR MONEY

11:09AM  21        AS THEY SAW BEST TO GROW THE BUSINESS FOR INVESTORS; CORRECT?

11:09AM  22        A.   YES.

11:09AM  23        Q.   THAT'S WHAT YOU EXPECTED; RIGHT?

11:09AM  24        A.   YES.

11:09AM  25        Q.   AND SO THE FACT THAT THERANOS MAY HAVE BEEN REFINING ITS

11:09AM  1    TECHNOLOGY IN 2013 AND 2014, THERE'S NOTHING WRONG WITH THAT;

11:09AM  2    CORRECT?

11:09AM  3    A.   YEAH.  IT'S DIFFERENT THAN WHAT I WAS TOLD.  YOU KNOW, IT

11:09AM  4    WAS -- I MEAN, THE ARTICLE IS DIFFERENT THAN BEING TOLD

11:09AM  5    DIRECTLY FROM THE PRESIDENT AND CHIEF OPERATING OFFICER OF THE

11:09AM  6    COMPANY THAT THEY WERE DONE WITH THE TECHNOLOGY.

11:09AM  7         I WOULD HAVE HAD NO KNOWLEDGE ON WHETHER THEY NEEDED TO

11:09AM  8    REFINE IT FOR ANY SPECIFIC REASON.  I JUST REMEMBER WHAT I WAS

11:09AM  9    TOLD.

11:09AM  10   Q.   AND TO THE EXTENT THAT THE TECHNOLOGY WAS DONE IN LATE

11:09AM  11   2013 AND 2014 AND THAT SAME TECHNOLOGY WAS THE TECHNOLOGY USED

11:10AM  12   TO GET FDA APPROVAL, THAT'S WHAT YOU WOULD HAVE EXPECTED TO

11:10AM  13   HAVE HAPPEN; CORRECT?

11:10AM  14   A.   YES.

11:10AM  15   Q.   THE TECHNOLOGY THAT THEY HAD IN LATE 2013, 2014, WAS DONE

11:10AM  16   OR COMPLETE AND USED TO GET FDA APPROVAL.  THAT WAS -- THAT

11:10AM  17   COINCIDED WITH YOUR UNDERSTANDING; RIGHT?

11:10AM  18   A.   YES.

11:10AM  19   Q.   IS IT -- AM I CORRECT THAT YOU NEVER YOURSELF WENT AND

11:10AM  20   KIND OF TESTED OUT THERANOS'S BLOOD TESTING PRIOR TO INVESTING;

11:11AM  21   IS THAT RIGHT?

11:11AM  22   A.   CORRECT.

11:11AM  23   Q.   BECAUSE YOU LIVED IN HOUSTON AND THEY WERE IN PALO ALTO,

11:11AM  24   SO --

11:11AM  25   A.   YEAH.

11:11AM   1    Q.   -- IT WAS A LITTLE INCONVENIENT; RIGHT?

11:11AM   2    A.   YES.

11:11AM   3    Q.   AND THERE MAY HAVE BEEN A FEW STORES IN ARIZONA, BUT THAT

11:11AM   4    STILL IS NOT CONVENIENT FROM HOUSTON?

11:11AM   5    A.   YES.

11:11AM   6    Q.   OKAY.  BUT PRIOR TO YOUR INVESTMENT IN DECEMBER, LATE 2013

11:11AM   7    AND EARLY 2014 I GUESS IS WHEN THE FUNDS WERE ACTUALLY

11:11AM   8    SUBMITTED, YOU -- I THINK YOU SAID YOU KNEW OF THE WEBSITE;

11:11AM   9    CORRECT?

11:11AM  10    A.   YES.

11:11AM  11    Q.   AND YOU VISITED THE WEBSITE?

11:11AM  12    A.   YES.

11:11AM  13    Q.   REVIEWED IT?

11:11AM  14    A.   YES.

11:11AM  15    Q.   PRIOR TO INVESTING?

11:11AM  16    A.   I'M NOT SURE OF THE TIMING, BUT I DID -- I HAVE REVIEWED

11:11AM  17    THE WEBSITE.

11:11AM  18    Q.   OKAY.  IT WOULD HAVE BEEN YOUR HABIT, THOUGH, TO LOOK AT

11:11AM  19    WHATEVER PUBLIC INFORMATION WAS AVAILABLE PRIOR TO RECOMMENDING

11:11AM  20    FRIENDS AND FAMILY INVEST IN THERANOS; CORRECT?

11:11AM  21    A.   YES.  THERE WAS A BUNCH OF INFORMATION COMING OUT.  I JUST

11:12AM  22    DON'T KNOW WHEN THE WEBSITE WAS LIVE, IF IT WAS LIVE BEFORE OR

11:12AM  23    AFTER I INVESTED.

11:12AM  24    Q.   IF IT WAS LIVE, YOU LOOKED AT IT?

11:12AM  25    A.   SURE.

11:12AM  1      Q.   IF YOU COULD TAKE A LOOK AT EXHIBIT 5805.  I THINK YOU

11:12AM  2    LOOKED AT IT ALREADY THIS MORNING.  IT'S IN EVIDENCE.

11:12AM  3         AND WE CAN JUST PUT IT UP ON THE SCREEN.

11:12AM  4         AGAIN, THIS RESEMBLES THE WEBSITE AS YOU SAW IT BACK IN

11:12AM  5    2013, 2014?

11:12AM  6      A.   OKAY.  YEAH, I'VE SEEN IT.

11:12AM  7      Q.   OKAY.  AND IF YOU TAKE A LOOK -- THE GOVERNMENT REVIEWED A

11:12AM  8    FEW PASSAGES WITH YOU THIS MORNING; CORRECT?

11:12AM  9      A.   YES.

11:12AM 10      Q.   AND IF YOU TAKE A LOOK AT PAGE 2 ON THE WEBSITE THAT YOU

11:12AM 11    REVIEWED, NEAR THE MIDDLE, AND IT'S A LITTLE HARD TO READ, BUT

11:12AM 12    IF WE CAN BLOW THAT UP.

11:12AM 13         AMONG THE STATEMENTS IN THE WEBSITE MADE TO EVERYBODY, THE

11:12AM 14    PUBLIC, PATIENTS, INVESTORS, AND OTHERS, THE WEBSITE REPORTS,

11:12AM 15    "GOODBYE, BIG BAD NEEDLE."

11:13AM 16         DO YOU SEE THAT?

11:13AM 17      A.   YES.

11:13AM 18      Q.   AND IT SAYS, "INSTEAD OF A HUGE NEEDLE, WE CAN USE A TINY

11:13AM 19    FINGERSTICK OR COLLECT A MICRO-SAMPLE FROM A VENOUS DRAW."

11:13AM 20         DO YOU SEE THAT?

11:13AM 21      A.   YES.

11:13AM 22      Q.   "IT'S PRACTICALLY PAINLESS AND A LOT LESS SCARY.  IN FACT,

11:13AM 23    WE'VE MADE THE ENTIRE LAB TESTING PROCESS COMFORTABLE,

11:13AM 24    ACCOMMODATING, AND LESS INTIMIDATING -- FOR PEOPLE BIG AND

11:13AM 25    SMALL."

MENDENHALL CROSS BY MR. CAZARES                4345

11:13AM   1          DID I READ THAT RIGHT?

11:13AM   2     A.   YES.

11:13AM   3     Q.   AND AGAIN, YOU UNDERSTAND THAT VENOUS DRAW IS A

11:13AM   4     TRADITIONAL VEIN DRAW USED IN BLOOD TESTING FOR DECADES; RIGHT?

11:13AM   5     A.   YES.

11:13AM   6     Q.   BUT YOU YOURSELF, IN YOUR OWN MIND, WERE KIND OF UNAWARE

11:13AM   7     OF THE FACT THAT THERANOS WAS USING VENOUS DRAW TESTING IN

11:13AM   8     CONJUNCTION WITH ITS FINGERSTICK TESTING; CORRECT?

11:13AM   9     A.   YES.

11:13AM  10     Q.   BUT YOU DID LOOK AT THE WEBSITE BEFORE YOU INVESTED?

11:13AM  11     A.   YES.

11:13AM  12     Q.   NOW, THAT ARTICLE THAT WE SAW, THE RAGO "WALL STREET

11:14AM  13     JOURNAL" ARTICLE THAT YOU LOOKED AT, THERE WAS A REFERENCE TO

11:14AM  14     1,000 TESTS WERE BEING REFINED I THINK WAS THE WORD.

11:14AM  15          DO YOU REMEMBER THAT?

11:14AM  16     A.   YES.

11:14AM  17     Q.   AND I THINK YOU TESTIFIED THAT YOU HAD SOME UNDERSTANDING

11:14AM  18     THAT THERANOS COULD PERFORM A LOT OF TESTS WITH ITS TECHNOLOGY;

11:14AM  19     CORRECT?

11:14AM  20     A.   YES.

11:14AM  21     Q.   AND MR. BALWANI DIDN'T TELL YOU IN ANY COMMUNICATION THAT

11:14AM  22     YOU HAD WITH HIM THAT EVERY TEST THERANOS OFFERED WAS BEING

11:14AM  23     TESTED USING ITS OWN PROPRIETARY DEVICE; CORRECT?

11:14AM  24     A.   HE DID NOT SAY THAT, NO.  YOU'RE RIGHT, HE DID NOT TELL ME

11:14AM  25     THAT.

ER-3149

11:14AM   1          HE JUST TOLD ME THAT THEY COULD DO 60 TO 70 TESTS.

11:14AM   2     Q.   THE CAPABILITIES OF THE TECHNOLOGY IS WHAT HE TOLD YOU;

11:14AM   3     RIGHT?

11:14AM   4     A.   YES, I BELIEVE SO.

11:14AM   5     Q.   WHAT IT WAS CAPABLE OF DOING?

11:14AM   6     A.   YES.

11:14AM   7     Q.   AND LOOKING BACK AT THE WEBSITE AT EXHIBIT 5805, YOU SEE

11:15AM   8     THERE'S A MENU STARTING AFTER PAGE 6 -- DO I HAVE IT RIGHT?

11:15AM   9     YEAH.  ONE, TWO, THREE, FOUR, FIVE -- THAT'S IT.  ABOUT FIVE

11:15AM  10     PAGES OF LISTS OF TESTS AND A PRICE.

11:15AM  11          DO YOU SEE THAT?

11:15AM  12     A.   YES.

11:15AM  13     Q.   AND YOU WERE GENERALLY AWARE OF THE MENU.  YOU SAW THAT?

11:15AM  14     A.   I'VE SEEN IT, YEAH.

11:15AM  15     Q.   OKAY.  BACK IN 2013?

11:15AM  16     A.   I SAW IT, YEAH.

11:15AM  17     Q.   OKAY.  AND I'M NOT GOING TO ASK YOU TO COUNT BECAUSE IT'S

11:15AM  18     A LOT OF TESTS, BUT IF YOU FLIP THROUGH THESE PAGES HERE,

11:15AM  19     YOU'RE LOOKING AT A COUPLE HUNDRED TESTS; CORRECT?

11:15AM  20     A.   YES.

11:15AM  21     Q.   AND SO WHEN YOU INVESTED IN 2013, OR LED YOUR FRIENDS AND

11:15AM  22     FAMILY TO INVEST, YOU DIDN'T HAVE IN YOUR MIND, WELL, THERANOS

11:15AM  23     WAS OFFERING A THOUSAND TESTS ON ITS FINGERSTICK TESTING TO THE

11:15AM  24     PUBLIC; CORRECT?

11:15AM  25     A.   CORRECT.

11:15AM   1    Q.   BUT YOU UNDERSTOOD IT HAD THE POTENTIAL.   THAT WAS THE

11:15AM   2    WHOLE POINT; RIGHT?

11:15AM   3    A.   I BELIEVE SO, YEAH.   I KNEW, I KNEW 60 TO 70 I WAS PRETTY

11:16AM   4    IMPRESSED WITH.

11:16AM   5    Q.   OKAY.   GETTING BACK TO THIS 2013 TIME PERIOD.

11:16AM   6         SO YOU SAW THE PUBLIC ANNOUNCEMENTS OF THE WALGREENS

11:16AM   7    RELATIONSHIP AND THE RAGO ARTICLE, "THE WALL STREET JOURNAL"

11:16AM   8    ARTICLE; RIGHT?

11:16AM   9    A.   YES.

11:16AM  10    Q.   AND YOU DID YOUR OWN KIND OF INQUIRY ON WHATEVER WAS

11:16AM  11    PUBLICLY AVAILABLE, INCLUDING ON THE WEBSITE; RIGHT?

11:16AM  12    A.   YES.

11:16AM  13    Q.   AND THEN WERE YOU SPEAKING TO DAVID HARRIS AT THE TIME?

11:16AM  14    A.   I BELIEVE SO, YES.

11:16AM  15    Q.   AND WAS HE PROVIDING YOU OTHER INFORMATION?

11:16AM  16    A.   NOT THAT I'M AWARE OF.   NOT THAT I CAN RECALL, I SHOULD

11:16AM  17    SAY.

11:16AM  18    Q.   FAIR ENOUGH.

11:16AM  19         AND THEN YOU RECEIVED THAT NOTICE FROM THE COMPANY ABOUT

11:16AM  20    GETTING CONSENTS BECAUSE THEY WERE DOING A 5-TO-1 SPLIT AND YOU

11:17AM  21    UNDERSTOOD THAT TO MEAN, WELL, THEY'RE GOING TO GET SOME

11:17AM  22    ADDITIONAL FINANCING IN THE NEXT YEAR; CORRECT?

11:17AM  23    A.   YES.

11:17AM  24    Q.   AND THAT TRIGGERED YOUR INTEREST IN EXPLORING A NEW

11:17AM  25    INVESTMENT; CORRECT?

11:17AM   1   A.   YES.

11:17AM   2   Q.   AND YOU FOLLOWED UP TO TRY TO MAKE IT HAPPEN; CORRECT?

11:17AM   3   A.   YES.

11:17AM   4   Q.   NOW, PRIOR TO SPEAKING WITH MR. BALWANI IN DECEMBER OF

11:17AM   5   2013, DO YOU RECALL HAVING A DISCUSSION WITH AN ATTORNEY AT

11:17AM   6   THERANOS ABOUT THIS OPPORTUNITY TO INVEST?

11:17AM   7   A.   YES.

11:17AM   8   Q.   OKAY.  AND IN THAT DISCUSSION YOU HAD WITH THE ATTORNEY,

11:18AM   9   DID YOU ESSENTIALLY EXPRESS JUST THAT, YOU WERE INTERESTED IN

11:18AM  10   INVESTING, YOU AND YOUR FRIENDS?

11:18AM  11   A.   YES, YES.  WE WERE INTERESTED IN GETTING MORE INVOLVED AND

11:18AM  12   INVESTING.

11:18AM  13   Q.   AND THAT WAS DUE IN PART TO SOME OF WHAT WE HAVE ALREADY

11:18AM  14   TALKED ABOUT, THE WALGREENS RELATIONSHIP?

11:18AM  15   A.   YES.

11:18AM  16   Q.   AND THE MEDIA COVERAGE AND "THE WALL STREET JOURNAL"?

11:18AM  17   A.   YES.

11:18AM  18   Q.   THE WEBSITE, THE FACT THAT THEY WERE GOING PUBLIC NOW WITH

11:18AM  19   THE BUSINESS?

11:18AM  20   A.   YES.

11:18AM  21   Q.   NOW, IN THAT DISCUSSION -- DO YOU RECALL ENTIRELY WHAT YOU

11:18AM  22   DISCUSSED WITH THE ATTORNEY?

11:18AM  23   A.   SOME OF IT.

11:18AM  24   Q.   OKAY.  AND IN THAT DISCUSSION WITH THE ATTORNEY, DID YOU

11:18AM  25   EXPRESS A DESIRE OR AN INTEREST IN EVEN HELPING THE COMPANY

ER-3152

11:18AM  1    RAISE MONEY?

11:18AM  2    A.   YES.

11:18AM  3    Q.   BECAUSE THAT'S -- IN SOME WAYS, THAT'S PART OF THE

11:18AM  4    BUSINESS OF U.S. CAPITAL; RIGHT?

11:18AM  5    A.   YES, YES.

11:18AM  6    Q.   YOU HAVE EXPERIENCE DOING FUND RAISING, PRIVATE FINANCING,

11:18AM  7    PRIVATE OFFERINGS, THAT SORT OF THING; CORRECT?

11:18AM  8    A.   YES, WE DID.

11:19AM  9    Q.   AND AS PART OF THAT CONVERSATION WITH THE ATTORNEY, AGAIN,

11:19AM  10   YOU TOLD HER OR EXPRESSED TO HER THAT YOU AND YOUR FRIENDS OR

11:19AM  11   FAMILY WERE INTERESTED IN INVESTING; CORRECT?

11:19AM  12   A.   YES.

11:19AM  13   Q.   AND DO YOU RECALL TELLING THE ATTORNEY THAT YOU WERE KIND

11:19AM  14   OF INTERESTED IN INVESTING REGARDLESS OF WHETHER OR NOT YOU GOT

11:19AM  15   FINANCIAL INFORMATION OR DETAILS?

11:19AM  16   A.   I DON'T, I DON'T RECALL SPECIFICALLY WHAT I SAID.

11:19AM  17        I WAS ALWAYS SEEKING AS MUCH INFORMATION AS POSSIBLE.

11:19AM  18   Q.   MIGHT IT HELP YOUR RECOLLECTION REGARDING WHAT YOU SAID TO

11:19AM  19   THE ATTORNEY IF YOU SAW SOME NOTES FROM THAT PHONE CALL?

11:19AM  20   A.   SURE.

11:19AM  21   Q.   OKAY.  IF YOU CAN TAKE A LOOK AT EXHIBIT 20594 IN THE

11:19AM  22   BINDER.

11:19AM  23        AND YOU CAN IGNORE THE FIRST PAGE.

11:19AM  24        IF YOU WOULD LOOK AT THE SECOND PAGE, THERE'S SOME TEXTS.

11:20AM  25        AGAIN, WE CAN'T READ THIS TO THE JURY, SO JUST READ IT TO

11:20AM 1    YOURSELF, UNDER WHERE IT SAYS CALL NUMBER 2.

11:20AM 2         DO YOU SEE THAT IN THE MIDDLE OF PAGE 2?

11:20AM 3    A.   YES.

11:20AM 4    Q.   AND IF YOU LOOK AT THE LAST PARAGRAPH OF THAT PASSAGE

11:20AM 5    BEGINNING ON PAGE 3 BEGINNING YOUR NAME AND THEN REQUESTED.

11:20AM 6         CAN YOU READ THAT PARAGRAPH TO YOURSELF?

11:20AM 7    A.   YES.

11:20AM 8    Q.   AND LET ME KNOW WHEN YOU'RE DONE.

11:20AM 9    A.   YOU WANT ME TO READ THE ONE AT THE BOTTOM OF PAGE 2 OR ON

11:20AM 10   THE --

11:20AM 11   Q.   TOP -- JUST THE TOP OF PAGE 3, THAT LAST PARAGRAPH.

11:20AM 12   A.   YES, I'M DONE.

11:20AM 13   Q.   OKAY.  AND DID YOU TELL THE ATTORNEY AT THERANOS, PRIOR TO

11:20AM 14   SPEAKING WITH MR. BALWANI, THAT YOU AND YOUR FRIENDS WERE

11:20AM 15   WILLING TO INVEST IN THERANOS BLINDLY?

11:21AM 16   A.   I NEVER SAID "BLINDLY."

11:21AM 17   Q.   YOU WERE WILLING TO INVEST WITHOUT GETTING FINANCIAL

11:21AM 18   INFORMATION; CORRECT?

11:21AM 19   A.   I ASKED THEM FOR A FINANCIAL UPDATE THEN, TOO.

11:21AM 20   Q.   BUT YOU DIDN'T GET A FINANCIAL UPDATE; CORRECT?

11:21AM 21   A.   NO.

11:21AM 22   Q.   BUT YOU STILL INVESTED?

11:21AM 23   A.   MY FIRM DID NOT RAISE CAPITAL FOR -- THIS CONVERSATION IS

11:21AM 24   AROUND MY FIRM RAISING CAPITAL.  MY FIRM COULD NEVER RAISE

11:21AM 25   CAPITAL FOR A COMPANY THAT DIDN'T PROVIDE FINANCIALS.

11:21AM   1        BUT I INVESTED PERSONALLY AND MY FRIENDS INVESTED

11:21AM   2   PERSONALLY THROUGH MY PARTNERSHIP.

11:21AM   3   Q.   BUT YOU TOLD THE ATTORNEY YOU WERE WILLING TO INVEST

11:21AM   4   BLINDLY FOR YOUR OWN SELF, NOT YOUR CLIENTS' --

11:21AM   5             MR. BOSTIC:  OBJECT TO THE QUESTION.  HE'S READING

11:21AM   6   FROM A DOCUMENT NOT IN EVIDENCE, AND ALSO ASKED AND ANSWERED.

11:21AM   7             THE COURT:  AS TO THAT ONE WORD, THAT WAS ASKED AND

11:22AM   8   ANSWERED.

11:22AM   9             MR. CAZARES:  UNDERSTOOD.

11:22AM  10   Q.   YOU TOLD THE ATTORNEY THAT YOU WERE WILLING TO INVEST

11:22AM  11   BECAUSE YOU BELIEVED IN THE SIGNIFICANT POTENTIAL OF THERANOS

11:22AM  12   PRIOR TO YOUR DISCUSSIONS WITH MR. BALWANI; CORRECT?

11:22AM  13   A.   AT THAT POINT I WAS BELIEVING THAT I WANTED TO INVEST,

11:22AM  14   YES.

11:22AM  15   Q.   OKAY.

11:22AM  16        YOUR HONOR, THIS MIGHT BE A GOOD PLACE TO TAKE A BREAK.

11:22AM  17             THE COURT:  IF YOU HAVE MORE, WE CAN --

11:22AM  18             MR. CAZARES:  I CAN KEEP GOING.  I WASN'T SURE WHAT

11:22AM  19   THE COURT WAS INTENDING.

11:22AM  20             THE COURT:  LET'S SEE IF WE CAN GO UNTIL NOON.

11:22AM  21             MR. CAZARES:  OKAY.  I DIDN'T WANT TO STRESS

11:22AM  22   ANYBODY.

11:22AM  23             THE COURT:  OKAY.  YES.

11:22AM  24   BY MR. CAZARES:

11:22AM  25   Q.   YOU CAN SET THAT ASIDE.

11:23AM  1            IF YOU CAN TAKE A LOOK AT EXHIBIT 20593.

11:23AM  2            DO YOU HAVE 20593?

11:23AM  3       A.   YES.

11:23AM  4       Q.   AND 20593 APPEARS TO BE AN EMAIL EXCHANGE INVOLVING

11:23AM  5       YOURSELF RELATING TO KIND OF THE BREAKDOWN OF THE INVESTMENT BY

11:23AM  6       YOUR FRIENDS AND FAMILY?

11:23AM  7       A.   YES.

11:23AM  8       Q.   AND IT'S A DOCUMENT THAT YOU PRODUCED IN THE COURSE OF ALL

11:23AM  9       OF THESE INVESTIGATIONS, OR YOUR COMPANY PRODUCED?

11:23AM  10      A.   YES, IT'S A DOCUMENT FROM ME INSTRUCTING MY ATTORNEY.

11:24AM  11           MR. CAZARES:  YOUR HONOR, MOVE THE ADMISSION OF

11:24AM  12      EXHIBIT 20593.

11:24AM  13           MR. BOSTIC:  NO OBJECTION.

11:24AM  14           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:24AM  15      (DEFENDANT'S EXHIBIT 20593 WAS RECEIVED IN EVIDENCE.)

11:24AM  16      BY MR. CAZARES:

11:24AM  17      Q.   AND FOCUSSING ON THE TOP PORTION OF THE MESSAGE, THIS IS

11:24AM  18      FEBRUARY 24TH, 2014.

11:24AM  19           DO YOU SEE THAT?

11:24AM  20      A.   YES.

11:24AM  21      Q.   AND THIS IS AFTER YOU AND YOUR FRIENDS AND FAMILY HAD

11:24AM  22      FUNDED THE INVESTMENT; CORRECT?

11:24AM  23      A.   YES.

11:24AM  24      Q.   AND IN THE MESSAGE YOU'RE PROVIDING KIND OF A BREAKDOWN OF

11:24AM  25      THE INVESTORS IN THERANOS; CORRECT?

11:24AM 1      A.   YES.

11:24AM 2      Q.   AND THAT FIRST INDIVIDUAL, RICHARD AAB?

11:24AM 3      A.   YES.

11:24AM 4      Q.   AM I SAYING THAT RIGHT?

11:24AM 5      A.   YES.

11:24AM 6      Q.   HE PROVIDED MOST OR THE MAJORITY OF THE FUNDS FOR THAT

11:24AM 7      $1.3 MILLION INVESTMENT; CORRECT?

11:24AM 8      A.   YES, $750,000.

11:24AM 9      Q.   OKAY.  AND MR. AAB LEARNED ABOUT THERANOS -- FIRST HE

11:25AM 10     LEARNED ABOUT YOUR RELATIONSHIP OR PARTICIPATION IN THERANOS;

11:25AM 11     CORRECT?

11:25AM 12     A.   YES.

11:25AM 13     Q.   YOU HAD DISCUSSED THAT WITH HIM IN THE PAST?

11:25AM 14     A.   YES.

11:25AM 15     Q.   BUT IN THIS TIME PERIOD WHEN YOU WERE INVESTING, MR. AAB

11:25AM 16     WAS STAYING WITH YOU AT YOUR HOME ONE TIME; CORRECT?

11:25AM 17     A.   YES.

11:25AM 18     Q.   AND SAW SOME DOCUMENTS OR SOMETHING ABOUT THERANOS?

11:25AM 19     A.   YES.

11:25AM 20     Q.   AND TOLD YOU HE WANTED TO INVEST?

11:25AM 21     A.   YES.

11:25AM 22     Q.   AND THAT WAS BEFORE YOU REPORTED TO HIM ANYTHING THAT

11:25AM 23     MR. BALWANI HAD TO SAY; CORRECT?

11:25AM 24     A.   UM, I'M NOT, I'M NOT QUITE SURE OF THE SEQUENCING.

11:25AM 25     Q.   WHEN MR. AAB TOLD YOU HE WANTED TO INVEST, YOU HAD NO

11:25AM  1   FINANCIAL STATEMENTS TO THERANOS; CORRECT?

11:25AM  2   A.   CORRECT.

11:25AM  3   Q.   NO PROSPECTUS; CORRECT?

11:25AM  4   A.   I HAD OFFERING DOCUMENTS I BELIEVE, YES.

11:25AM  5   Q.   AND OFFERING DOCUMENTS BEING THE SIGNATURE PAGES OF THE

11:25AM  6   FINAL AGREEMENTS?

11:25AM  7   A.   I'M NOT, I'M NOT -- I DON'T RECALL, BUT HE SAW THEM IN MY

11:25AM  8   HOME AND ASKED IF HE COULD READ THEM, AND I LET HIM.

11:26AM  9   Q.   AND THEN HE TOLD YOU HE WANTED TO INVEST?

11:26AM  10  A.   YES.

11:26AM  11  Q.   BASED ON READING THE OFFERING DOCUMENTS?

11:26AM  12  A.   WELL, BASED ON HIS KNOWLEDGE AND WHAT HE HAD HEARD ABOUT

11:26AM  13  THERANOS.

11:26AM  14  Q.   AND YOU'RE NOT AWARE OF ANY COMMUNICATIONS BETWEEN MR. AAB

11:26AM  15  AND MR. BALWANI; CORRECT?

11:26AM  16  A.   CORRECT.

11:26AM  17  Q.   OR ANY OF THE OTHER INVESTORS LISTED HERE IN

11:26AM  18  EXHIBIT 20593?

11:26AM  19  A.   CORRECT.

11:26AM  20  Q.   YOU CAN SET THAT ASIDE.

11:26AM  21       IF YOU COULD PUT UP ON THE SCREEN EXHIBIT 4059, WHICH IS

11:27AM  22  ALREADY IN EVIDENCE.

11:27AM  23       NOW, MR. MENDENHALL, DO YOU SEE UP ON THE SCREEN, THESE

11:27AM  24  ARE YOUR NOTES; CORRECT?

11:27AM  25  A.   YES.

11:27AM  1    Q.    AND I THINK YOU DESCRIBED YOURSELF AS A HABITUAL

11:27AM  2    NOTE-TAKER; CORRECT?

11:27AM  3    A.    I TAKE NOTES, YES.

11:27AM  4    Q.    YOU TAKE DETAILED AND SPECIFIC NOTES WERE YOUR WORDS THIS

11:27AM  5    MORNING; CORRECT?

11:27AM  6    A.    YEAH, SPECIFICALLY WHEN I'M TALKING TO A LEADERSHIP OF

11:27AM  7    COMPANIES THAT WE'RE INVESTING IN, YES, PUBLIC AND PRIVATE

11:27AM  8    COMPANIES.

11:27AM  9    Q.    AND I THINK YOU DESCRIBED THIS MORNING THAT YOU HUNG UP ON

11:27AM 10    THE PHONE WITH MR. BALWANI, TOOK YOUR HANDWRITTEN NOTES, AND

11:27AM 11    THEN TRANSMITTED THEM INTO A TYPEWRITTEN DOCUMENT; IS THAT

11:27AM 12    RIGHT?

11:27AM 13    A.    YES.

11:27AM 14    Q.    AND AT THAT TIME YOU KNEW IT WAS IMPORTANT TO BE ACCURATE;

11:27AM 15    CORRECT?

11:27AM 16    A.    YES.

11:27AM 17    Q.    SO WHILE YOU RECALL THE CONVERSATION WITH MR. BALWANI, THE

11:28AM 18    NOTES THEMSELVES ARE PROBABLY A BETTER INDICATION OF WHAT

11:28AM 19    MR. BALWANI ACTUALLY SAID; CORRECT?

11:28AM 20    A.    THESE ARE MY REGURGITATION OF MY NOTES, YES, IN THE EMAIL.

11:28AM 21    Q.    BUT CLOSER IN TIME TO THE COMMUNICATION WITH MR. BALWANI;

11:28AM 22    CORRECT?

11:28AM 23    A.    YES, I WOULD -- I THINK SO, YES.

11:28AM 24    Q.    OKAY.  SO THE GOVERNMENT REVIEWED THE NOTES WITH YOU AND

11:28AM 25    ASKED YOU ABOUT A FEW THINGS, AND I WANTED TO REVISIT A FEW OF

MENDENHALL CROSS BY MR. CAZARES                    4356

11:28AM  1     THE ITEMS.

11:28AM  2         AT NUMBERS 3, 4, AND 5, YOU TOOK DOWN NOTES INDICATING

11:28AM  3     THAT THE SCIENCE BEHIND THERANOS IS COMPLETE.

11:28AM  4         DO YOU SEE THAT?

11:29AM  5     A.   YES.

11:29AM  6     Q.   AND AGAIN, "NO NEW SCIENCE NEEDED"; CORRECT?

11:29AM  7     A.   YES, THAT'S CORRECT.

11:29AM  8     Q.   AND "NO NEW INVENTION"; CORRECT?

11:29AM  9     A.   YES.

11:29AM  10    Q.   AT THE TIME IN DECEMBER OF 2013, WERE YOU AWARE OF THE

11:29AM  11    FACT THAT THERANOS'S 4.0 DEVICE WAS ALREADY DEVELOPED?

11:29AM  12    A.   I'M NOT SURE WHAT THE DEVICE WAS CALLED OR WHAT -- HOW IT

11:29AM  13    WAS NUMBERED.

11:29AM  14        MY UNDERSTANDING IS THAT IT WAS, IT WAS DEVELOPED AND

11:29AM  15    FUNCTIONING, YEAH.

11:29AM  16    Q.   OKAY.  AND YOU HAD NO KNOWLEDGE OR UNDERSTANDING OF ANY

11:29AM  17    LATER DEVICE THAT THERANOS DEVELOPED BEYOND THE 4.0 SERIES THAT

11:29AM  18    THEY HAD AT THE TIME?

11:29AM  19    A.   I DON'T KNOW.  I KNOW THERE WAS A DEVICE CALLED EDISON,

11:29AM  20    BUT I DON'T KNOW WHAT THAT DEVICE WAS OR THE DIFFERENCE BETWEEN

11:29AM  21    4.0 AND EDISON.

11:29AM  22        I JUST KNEW IT GOT A NAME, THEIR DEVICE GOT A NAME AT SOME

11:30AM  23    POINT.

11:30AM  24    Q.   OKAY.  BUT YOU DON'T KNOW WHO GAVE IT THAT NAME; CORRECT?

11:30AM  25    A.   NO, I DON'T KNOW.

11:30AM  1    Q.   OKAY.  NOW, YOU ALSO WITH THE GOVERNMENT DISCUSSED ITEM

11:30AM  2    NUMBER 11 IN YOUR NOTES.

11:30AM  3    A.   YES, I SEE NUMBER 11.  I DON'T KNOW THAT THE GOVERNMENT

11:30AM  4    ASKED ME ANY QUESTIONS ABOUT NUMBER 11.

11:30AM  5    Q.   OKAY.  UNDER ITEM 11 YOU WROTE, "THEY CAN RUN A FULL BODY

11:30AM  6    RESPONSE TO MEDICATION WITH DROPS IN A DAY."

11:30AM  7         DO YOU SEE THAT?

11:30AM  8    A.   YES.

11:30AM  9    Q.   AND THAT'S IN RELATION TO KIND OF A PHARMACEUTICAL STUDY;

11:30AM 10    RIGHT?

11:30AM 11    A.   I'M NOT SURE WHAT IT'S IN RELATION TO.  THAT'S JUST WHAT I

11:30AM 12    WAS TOLD --

11:30AM 13    Q.   OKAY.

11:31AM 14    A.   -- ABOUT THEIR CAPABILITIES.

11:31AM 15    Q.   THAT WOULD MAKE SENSE, RIGHT?  A PHARMACEUTICAL COMPANY

11:31AM 16    TESTING THE IMPACT OF ITS MEDICATION ON A PATIENT, HAVING AN

11:31AM 17    ANALYZER THAT COULD MEASURE THAT IMPACT, THAT'S CONSISTENT WITH

11:31AM 18    WHAT MR. BALWANI TOLD YOU; RIGHT?

11:31AM 19    A.   YES.

11:31AM 20    Q.   AND AGAIN, ITEM 12 IN THE NOTES, YOU WROTE, "CURRENT

11:31AM 21    CLINICAL TRIALS TAKE 6 VIALS AND CAN RUN 10 TO 12 TESTS."

11:31AM 22         DO YOU SEE THAT?

11:31AM 23    A.   YES.

11:31AM 24    Q.   AND THAT'S MR. BALWANI TALKING ABOUT CLINICAL TRIALS USING

11:31AM 25    TECHNOLOGY AND NOT THERANOS; CORRECT?

11:31AM  1    A.   CORRECT.

11:31AM  2    Q.   BUT THEN HE DESCRIBES, "THERANOS TAKES 3 DROPS AND CAN RUN

11:31AM  3    60 TO 70 TESTS."

11:31AM  4         DO YOU SEE THAT?

11:31AM  5    A.   YES.

11:31AM  6    Q.   AND THIS IS MR. BALWANI EXPRESSING TO YOU AGAIN THE

11:31AM  7    CAPABILITIES OF THE TECHNOLOGY; RIGHT?

11:31AM  8    A.   WELL, HE SAID THAT THEY -- YEAH, THAT THEY CAN TAKE THREE

11:31AM  9    DROPS AND RUN 60, 70 TESTS.

11:31AM  10   Q.   AND THAT'S THE CAPABILITY OF THE TECHNOLOGY?

11:32AM  11   A.   YES.

11:32AM  12   Q.   NOW, ITEMS 6, 7, AND 8, I THINK YOU ALSO TALKED A LITTLE

11:32AM  13   BIT ABOUT THIS MORNING.

11:32AM  14        IN ITEM 6 YOU WROTE, "THEY ARE COMPLETELY VERTICALLY

11:32AM  15   INTEGRATED -- THEY OWN THE LAB AND THE MANUFACTURING."

11:32AM  16        DO YOU SEE THAT?

11:32AM  17   A.   YES.

11:32AM  18   Q.   OKAY.  AND YOU'RE AWARE OF THE FACT THAT THERANOS HAS A

11:32AM  19   LAB, OR HAD A LAB AT THE TIME; CORRECT?

11:32AM  20   A.   YES.

11:32AM  21   Q.   AND IN SOME OF THESE PUBLIC ANNOUNCEMENTS, THEY WOULD

11:32AM  22   INCLUDE A DESCRIPTION OF A CLIA LAB THAT THEY HAD; CORRECT?

11:32AM  23   A.   I BELIEVE SO.  I DON'T RECALL.

11:32AM  24   Q.   OKAY.  AND MR. BALWANI WAS TELLING YOU THAT THERANOS

11:32AM  25   MANUFACTURED ITS ANALYZER, THE EDISON YOU CALLED IT; CORRECT?

11:32AM 1      A.   YES.

11:32AM 2      Q.   AND THAT'S WHAT HE TOLD YOU?

11:32AM 3      A.   I BELIEVE SO, YEAH.  I BELIEVE THEY SAID THEY MANUFACTURED

11:33AM 4      ALL OF THEIR OWN COMPONENTS.

11:33AM 5      Q.   AND THE OTHER COMPONENT BEING KIND OF THE CONTAINER FOR

11:33AM 6      THE BLOOD?

11:33AM 7      A.   YEAH.

11:33AM 8      Q.   THAT LITTLE NANOTAINER?

11:33AM 9      A.   YES.

11:33AM 10     Q.   OKAY.  AND DO YOU UNDERSTAND THAT THE USE OF THAT

11:33AM 11     NANOTAINER WAS PART OF THIS FINGERSTICK TECHNOLOGY THAT

11:33AM 12     THERANOS WAS OFFERING TO PATIENTS; RIGHT?

11:33AM 13     A.   YES.

11:33AM 14     Q.   NOW, ITEM 21, I THINK THAT WAS DISCUSSED A LITTLE BIT THIS

11:33AM 15     MORNING IN YOUR NOTES.

11:33AM 16          ITEM 21 IN YOUR NOTES REFLECT "THEIR PRICING COULD HAVE

11:33AM 17     BEEN SIGNIFICANTLY HIGHER."

11:33AM 18          DO YOU SEE THAT?

11:33AM 19     A.   YES.

11:33AM 20     Q.   BUT THEN YOU WROTE, "BUT THEY DESIGNED IT TO BE

11:34AM 21     PROFITABLE, EFFECTIVE, AND DISRUPTIVE TO THE STATUS QUO."

11:34AM 22          DO YOU SEE THAT?

11:34AM 23     A.   YES.

11:34AM 24     Q.   AND SO MR. BALWANI DESCRIBED TO YOU THAT THEY TRIED TO SET

11:34AM 25     THEIR PRICING AT A LEVEL WHERE IT WOULD BE PROFITABLE; RIGHT?

11:34AM  1     A.   YES.

11:34AM  2     Q.   AND MAYBE CAPTURE SOME MARKET SHARE.

11:34AM  3          FAIR ENOUGH?

11:34AM  4     A.   YEAH, THAT MAKES SENSE.

11:34AM  5     Q.   BUT THIS LINE, ENTRY 21 IN THE NOTES, DOESN'T SAY THAT

11:34AM  6     THERANOS WAS NET INCOME PROFITABLE; CORRECT?

11:34AM  7     A.   NO, IT DOES NOT, NOT IN LINE 21.

11:34AM  8     Q.   NOW, YOU DESCRIBED IN YOUR TESTIMONY THIS MORNING THAT YOU

11:34AM  9     UNDERSTOOD FROM WHAT THERANOS TOLD -- YOU UNDERSTOOD FROM WHAT

11:34AM 10     MR. BALWANI TOLD YOU THAT THERANOS COULD FUND ITS OPERATIONS

11:35AM 11     FROM FREE CASH FLOW; CORRECT?

11:35AM 12     A.   YEAH, THAT THEY COULD FUND THEIR OPERATION FROM CASH FLOW,

11:35AM 13     YES.

11:35AM 14     Q.   BUT CONVERSELY, YOU KNEW THEY WERE RAISING NEW MONEY;

11:35AM 15     CORRECT?

11:35AM 16     A.   YES.

11:35AM 17     Q.   AND YOU ALSO KNEW OF THE WALGREENS RELATIONSHIP AT THE

11:35AM 18     TIME; CORRECT?

11:35AM 19     A.   YES.

11:35AM 20     Q.   WERE YOU AWARE OF THE FACT THAT, CONCURRENT WITH YOUR

11:35AM 21     INVESTMENT, THERANOS RECEIVED THE BALANCE OF $100 MILLION FROM

11:35AM 22     WALGREENS AS PART OF THEIR PARTNERSHIP?

11:35AM 23     A.   I KNEW THAT AT SOME POINT.  I DON'T KNOW THE SEQUENCING OF

11:35AM 24     WHEN I KNEW THAT.  BUT, YES, I KNEW THEY INVESTED.

11:35AM 25     Q.   AND YOU UNDERSTOOD THAT PAYMENT WAS PART OF THEIR

11:35AM   1      PARTNERSHIP?

11:35AM   2      A.   I BELIEVE SO.  I BELIEVE I KNEW THAT, YES.

11:35AM   3      Q.   OKAY.  CONTINUING WITH YOUR KIND OF SUMMARY AT THE BOTTOM

11:36AM   4      OF PAGE 1 INTO PAGE 2 AT 4059, YOU WROTE, "I WAS AND CONTINUE

11:36AM   5      TO BE VERY IMPRESSED WITH EVERYTHING I HEAR."

11:36AM   6           DO YOU SEE THAT?

11:36AM   7      A.   YES.

11:36AM   8      Q.   AND THEN THE PASSAGE CONTINUES ON THE NEXT PAGE.

11:36AM   9           "THEY ARE NOW DOING GENETIC AND HUMAN GENOME WORK THAT

11:36AM  10      WILL PUSH HEALTH CARE INTO AREAS NOT CURRENTLY ATTAINABLE."

11:36AM  11           DO YOU SEE THAT?

11:36AM  12      A.   YES.

11:36AM  13      Q.   AND THAT'S RELATING TO THIS KIND OF NUCLEIC ACID

11:37AM  14      AMPLIFICATION STYLE OF TESTING; CORRECT?

11:37AM  15      A.   I HAVE NO IDEA.

11:37AM  16      Q.   SO THE REFERENCE TO HUMAN GENOME WORK, YOU'RE NOT REALLY

11:37AM  17      SURE WHAT THAT MEANS?

11:37AM  18      A.   NOT REALLY.

11:37AM  19      Q.   OKAY.

11:37AM  20      A.   I MEAN, I UNDERSTAND HUMAN GENOME WORK IS BEING CONDUCTED,

11:37AM  21      BUT I DON'T -- TO WHAT END, I DON'T KNOW.  IT SOUNDED

11:37AM  22      IMPORTANT, THOUGH.

11:37AM  23      Q.   FAIR ENOUGH.

11:37AM  24           AND THEN YOU WROTE, "IT LOOKS AND SOUNDS LIKE EVEN AT

11:37AM  25      CURRENT LEVELS THIS IS AN INTERESTING STOCK.  OF COURSE THEY

11:37AM   1    NEED TO EXECUTE WHICH THEY ARE DOING NOW."

11:37AM   2         DO YOU SEE THAT?

11:37AM   3    A.   YES.

11:37AM   4    Q.   AND BY THAT YOU MEANT YOU UNDERSTOOD, OF COURSE,

11:37AM   5    ULTIMATELY THEY HAVE TO EXECUTE ON THIS BUSINESS PLAN TO ROLL

11:37AM   6    OUT THIS TESTING BUSINESS INTO WALGREENS OR OTHER STORES

11:37AM   7    NATIONWIDE; CORRECT?

11:37AM   8    A.   YES.

11:37AM   9    Q.   AND WHETHER THAT MAY OR MAY NOT HAPPEN, IT WAS UNCLEAR?

11:37AM  10    A.   YEAH.   YEAH.

11:37AM  11    Q.   YOU CAN TAKE THAT DOWN.

11:38AM  12         NOW, AGAIN, WHEN YOU SPOKE WITH MR. BALWANI, HE DESCRIBED

11:38AM  13    TO YOU KIND OF HIGH LEVEL DESCRIPTIONS OF THE BUSINESS AND THE

11:38AM  14    TECHNOLOGY.

11:38AM  15         IS THAT FAIR?

11:38AM  16    A.   NOT THE DETAIL OF THE TECHNOLOGY, JUST THAT THE TECHNOLOGY

11:38AM  17    WAS THERE AND COMPLETE.

11:38AM  18    Q.   OKAY.   AND THEN HIGH LEVEL DISCUSSION OF FINANCIALS, THEY

11:38AM  19    COULD FUND THEIR OPERATIONS, BUT THEY WERE RAISING MONEY TO

11:38AM  20    KIND OF ACCELERATE THIS BUSINESS; CORRECT?

11:38AM  21    A.   YES.

11:38AM  22    Q.   BUT THE DETAILS, THE DETAILS REGARDING THE TECHNOLOGY,

11:38AM  23    EXACTLY WHAT IT WAS, HOW EXTENSIVE IT WAS, WHAT MAY OR MAY NOT

11:39AM  24    HAVE BEEN USED, MR. BALWANI DIDN'T TELL YOU ANYTHING ABOUT

11:39AM  25    THAT; CORRECT?

11:39AM  1      A.   CORRECT.

11:39AM  2      Q.   AND THE DETAILS, YOU KNOW, THERANOS'S ACTUAL REVENUES AT

11:39AM  3      THE TIME, INCOME AT THE TIME, EXPENSES AT THE TIME, PROJECTED

11:39AM  4      REVENUE MAYBE OVER THE NEXT FEW YEARS, NONE OF THAT WAS

11:39AM  5      PROVIDED TO YOU?

11:39AM  6      A.   CORRECT.

11:39AM  7      Q.   AND NOTWITHSTANDING THAT FACT, YOU STILL DECIDED TO INVEST

11:39AM  8      WITH YOUR FRIENDS AND FAMILY AT THE TIME; CORRECT?

11:39AM  9      A.   YES.

11:39AM  10     Q.   NOW, I THINK YOU DESCRIBED -- SO YOU MADE THE INVESTMENT

11:39AM  11     ALONG WITH THE FRIENDS AND FAMILY AND POOLED MONEY TOGETHER AND

11:39AM  12     EVENTUALLY PUT IN THE 1.3 MILLION; CORRECT?

11:40AM  13     A.   YES.

11:40AM  14     Q.   AND THEN THERE WAS THAT MESSAGE THAT YOU SAW FROM

11:40AM  15     MR. BALWANI IN LATE JANUARY OF 2014 RELATING TO WHETHER YOU

11:40AM  16     MIGHT HAVE FURTHER INTEREST IN INVESTMENT; CORRECT?

11:40AM  17     A.   YES.

11:40AM  18     Q.   BUT TO DO THAT, YOU NEEDED SOME DETAILS; CORRECT?

11:40AM  19     A.   YES.

11:40AM  20     Q.   OKAY.  AND YOU SOUGHT FINANCIAL INFORMATION AND DETAILS

11:40AM  21     OVER THE ENSUING PERIOD; CORRECT?

11:40AM  22     A.   YES.

11:40AM  23     Q.   BUT NONE WAS PROVIDED?

11:40AM  24     A.   CORRECT.

11:40AM  25     Q.   BUT MR. BALWANI WAS NOT STILL SEEKING OR PITCHING AN

11:40AM 1    INVESTMENT FROM YOU AT THAT TIME, EITHER; CORRECT?

11:40AM 2    A.   NO, WE WERE NOT COMMUNICATING PAST THAT REQUEST.

11:40AM 3    Q.   YOUR ONLY VERBAL COMMUNICATION WITH MR. BALWANI WAS ON

11:40AM 4    THAT PHONE CALL; CORRECT?

11:40AM 5    A.   YES, TRUE.

11:40AM 6    Q.   OKAY.  THERE WERE SOME EMAIL EXCHANGES, BUT ACTUAL

11:40AM 7    DISCUSSION WAS JUST THE ONE PHONE CALL?

11:40AM 8    A.   YES.

11:40AM 9    Q.   NOW, IF YOU COULD TAKE A LOOK AT EXHIBIT 20596.  20596 IS

11:41AM 10   A SHORT EMAIL CHAIN, THE LATTER OF WHICH IS DATED JULY 30,

11:41AM 11   2015.

11:41AM 12        DO YOU SEE THAT?

11:41AM 13   A.   YES.

11:41AM 14   Q.   AND IT'S AN EXCHANGE AMONGST YOURSELF AND SOME OF YOUR

11:41AM 15   FRIENDS AND FAMILY INVESTORS IN THERANOS; CORRECT?

11:41AM 16   A.   YES.

11:41AM 17        MR. CAZARES:  MOVE TO ADMIT 20596, YOUR HONOR.

11:41AM 18        MR. BOSTIC:  YOUR HONOR, 802 AS TO THE MESSAGE FROM

11:41AM 19   THERANOS.

11:41AM 20        THE COURT:  COUNSEL, DO YOU HAVE ANOTHER USE FOR

11:41AM 21   THAT?

11:41AM 22        MR. CAZARES:  YOUR HONOR, I BELIEVE THERANOS'S

11:41AM 23   SHAREHOLDER INFORMATION AND COMMUNICATIONS HAVE BEEN

11:42AM 24   COMMUNICATED AND INTRODUCED IN EVIDENCE.

11:42AM 25        THE -- IT'S OFFERED HERE TO INDICATE WHAT THIS INVESTOR

11:42AM  1     RECEIVED.

11:42AM  2          CONTRARY TO HIS TESTIMONY THIS MORNING THAT HE WASN'T

11:42AM  3     GETTING UPDATES, HE IS GETTING UPDATES.  HE RECEIVED A

11:42AM  4     SIGNIFICANT UPDATE, AND I WANTED TO QUERY, WELL, WHAT DID YOU

11:42AM  5     DO WITH THAT INFORMATION.

11:42AM  6               MR. BOSTIC:  YOUR HONOR, ON THAT, FIRST, THIS IS

11:42AM  7     FROM MID-2015, WHICH IS LONG AFTER THE PERIOD DURING WHICH THE

11:42AM  8     WITNESS WAS SAYING HE WASN'T GETTING UPDATES.

11:42AM  9          AND IT SOUNDS LIKE COUNSEL IS EXPRESSING A NON FOR THE

11:42AM 10     TRUTH PURPOSE.

11:42AM 11          NO OBJECTION TO IT COMING IN IF IT'S NOT FOR THE TRUTH.

11:42AM 12          IT STILL MIGHT BE A 401 ISSUE, BUT SUBMIT IT.

11:42AM 13               THE COURT:  THAT'S WHAT I WAS ASKING YOU FOR.

11:42AM 14     WHAT'S --

11:42AM 15               MR. CAZARES:  I CAN WORK WITH THAT, YOUR HONOR.

11:42AM 16     THAT'S FINE.  I'LL JUST ASK QUESTIONS.

11:42AM 17               THE COURT:  OKAY.

11:42AM 18     BY MR. CAZARES:

11:42AM 19     Q.   SO AT SOME POINT IN TIME YOU LEARNED THAT THERANOS

11:43AM 20     OBTAINED FDA APPROVAL; CORRECT?

11:43AM 21     A.   YEAH.  IT WAS ON A SINGLE TEST, YES.

11:43AM 22     Q.   BUT THAT WAS STILL FDA APPROVAL; RIGHT?

11:43AM 23     A.   YEAH.

11:43AM 24     Q.   THAT WAS EXCITING?

11:43AM 25     A.   YEAH.

11:43AM   1      Q.   AND BASED ON YOUR JUST GENERAL UNDERSTANDING, THE FDA

11:43AM   2      STILL HAS REQUIREMENTS THAT DEVICE MAKERS HAVE TO MEET, AND IT

11:43AM   3      SOUNDS LIKE THERANOS SATISFIED THE FDA?

11:43AM   4      A.   YEAH, IT WAS A GOOD ANNOUNCEMENT.

11:43AM   5      Q.   NOW, IN YOUR TESTIMONY THIS MORNING IN RESPONSE TO

11:43AM   6      QUESTIONS, YOU DESCRIBED HAVING FURTHER COMMUNICATIONS WITH

11:43AM   7      MS. HOLMES IN 2015 AND MAYBE EVEN LATER; CORRECT?

11:43AM   8      A.   YES.

11:43AM   9      Q.   BUT YOU HAD NO DISCUSSIONS WITH MR. BALWANI; CORRECT?

11:43AM   10     A.   CORRECT.

11:43AM   11     Q.   AND YOU HAVE NO IDEA, KNOWLEDGE WHETHER OR NOT MR. BALWANI

11:43AM   12     WAS AWARE OF THE SUBSTANCE OF YOUR DISCUSSIONS WITH MS. HOLMES;

11:43AM   13     CORRECT?

11:43AM   14     A.   CORRECT.

11:44AM   15             MR. CAZARES:  YOUR HONOR, MAY I HAVE A MOMENT?

11:44AM   16             THE COURT:  YES.

11:44AM   17      (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

11:44AM   18             MR. CAZARES:  THANK YOU, MR. MENDENHALL.

11:44AM   19      YOUR HONOR, NO FURTHER QUESTIONS.

11:44AM   20             THE COURT:  REDIRECT?

11:44AM   21             MR. BOSTIC:  YES, YOUR HONOR.

11:44AM   22                       **REDIRECT EXAMINATION**

11:44AM   23     BY MR. BOSTIC:

11:45AM   24     Q.   GOOD MORNING AGAIN, MR. MENDENHALL.

11:45AM   25     A.   GOOD MORNING.

11:45AM   1    Q.   I'D LIKE TO JUST FOLLOW UP ON A FEW OF THE TOPICS THAT YOU

11:45AM   2    DISCUSSED WITH MR. CAZARES.

11:45AM   3         FIRST, MR. CAZARES ASKED YOU WHETHER YOU WERE AWARE EARLY

11:45AM   4    ON ABOUT THE RELATIONSHIP BETWEEN MS. HOLMES AND MR. BALWANI.

11:45AM   5         DO YOU REMEMBER THAT QUESTION?

11:45AM   6    A.   YES.

11:45AM   7    Q.   WHEN, IF EVER, DID YOU BECOME AWARE THAT MS. HOLMES AND

11:45AM   8    MR. BALWANI WERE ROMANTICALLY INVOLVED?

11:45AM   9    A.   IT CAME OUT PUBLICLY AT SOME POINT.  I'M NOT SURE WHEN I

11:45AM  10    WAS MADE AWARE, BUT I WAS NOT MADE AWARE OF THAT BY EITHER

11:45AM  11    MS. HOLMES OR MR. BALWANI.

11:45AM  12    Q.   WERE YOU AWARE OF THEIR ROMANTIC RELATIONSHIP WHEN YOU

11:45AM  13    MADE THE INVESTMENT IN THE COMPANY IN EARLY 2014?

11:45AM  14    A.   NO.

11:45AM  15    Q.   WOULD THAT HAVE BEEN AN IMPORTANT FACT FOR YOU TO CONSIDER

11:45AM  16    AS SOMEONE DECIDING WHETHER TO INVEST IN THE COMPANY?

11:46AM  17    A.   YES.

11:46AM  18    Q.   AND WHY IS THAT?

11:46AM  19    A.   I THINK FROM A GOVERNANCE PERSPECTIVE, WHEN YOU'RE RUNNING

11:46AM  20    A COMPANY LIKE THIS, OR ANY CORPORATION, THOSE TYPES OF

11:46AM  21    RELATIONSHIPS, BECAUSE THEY CAN BE CONFLICTING AND YOU DON'T

11:46AM  22    HAVE -- IT KIND OF REMOVES SOME OF THE INDEPENDENCE OF THE

11:46AM  23    LEADERSHIP, IT'S IMPORTANT FOR PEOPLE TO KNOW.  IT SHOULD BE

11:46AM  24    DISCLOSED TO THE BOARD, THROUGH GENERAL COUNSEL, IT SHOULD BE

11:46AM  25    JUST DISCLOSED AND COMMUNICATED TO LET US HAVE FULL VIEW OF --

11:46AM   1    I MEAN, THERE'S ALWAYS POTENTIAL CONFLICTS WHEN THE TWO LEADERS

11:46AM   2    OF A FIRM ARE ROMANTICALLY INVOLVED.

11:46AM   3    Q.   AND WOULD YOU HAVE WANTED TO KNOW ABOUT THEIR RELATIONSHIP

11:46AM   4    IN CONSIDERING THE THINGS THAT MR. BALWANI TOLD YOU DURING YOUR

11:46AM   5    45 MINUTE PHONE CALL?

11:46AM   6    A.   IT CAN HAVE INFLUENCE, YES.

11:46AM   7    Q.   I'D LIKE TO TALK TO YOU ABOUT WHAT MR. BALWANI TOLD YOU

11:47AM   8    ABOUT THE STATE OF THE TECHNOLOGY JUST BEFORE YOU INVESTED, AND

11:47AM   9    IF WE CAN PUT BACK UP EXHIBIT 4059.

11:47AM  10        IF WE CAN ZOOM IN ON THE TOP PORTION OF YOUR LIST, SO

11:47AM  11    AGAIN, WE'RE LOOKING AT ITEMS 3 THROUGH 5 WHERE IT SAYS NO --

11:47AM  12    OR SORRY.  "THE 'SCIENCE' BEHIND THERANOS IS COMPLETE;

11:47AM  13        "NO NEW SCIENCE NEEDED;

11:47AM  14        "NO NEW INVENTION NEEDED."

11:47AM  15        DO YOU SEE THAT?

11:47AM  16    A.   YES.

11:47AM  17    Q.   AND DURING CROSS-EXAMINATION MR. CAZARES SHOWED YOU SOME

11:47AM  18    LANGUAGE FROM "THE WALL STREET JOURNAL" THAT TALKED WITH THE

11:47AM  19    SECRET THAT EMPLOYEES ARE NOW REFINING INVOLVES DEVICES THAT

11:47AM  20    CAN PERFORM THOSE TESTS.

11:47AM  21        DO YOU RECALL THAT?

11:47AM  22    A.   YES.

11:47AM  23    Q.   FIRST OF ALL, DO YOU RECALL THE DATE OF THAT

11:47AM  24    "WALL STREET JOURNAL" ARTICLE?

11:47AM  25    A.   I DO NOT, BUT IT WAS, IT LOOKS LIKE, BEFORE I SENT THIS

11:47AM  1      EMAIL.  IT LOOKS LIKE THE 16TH.  I DON'T RECALL.

11:47AM  2      Q.   NO PROBLEM.

11:47AM  3           LET ME DIRECT YOUR ATTENTION TO, IN THE BINDER, TAB 1106

11:48AM  4      IN THE WHITE BINDER.

11:48AM  5      A.   OKAY.

11:48AM  6      Q.   AND DOES THAT REMIND YOU WHEN THAT "WALL STREET JOURNAL"

11:48AM  7      ARTICLE CAME OUT THAT TALKED ABOUT REFINING THAT SECRET

11:48AM  8      INVOLVING THE DEVICES?

11:48AM  9      A.   YES.  IT WAS SEPTEMBER OF 2013.

11:48AM  10     Q.   OKAY.  WAS THAT MORE THAN THREE MONTHS BEFORE YOUR

11:48AM  11     CONVERSATION WITH MR. BALWANI?

11:48AM  12     A.   YES.

11:48AM  13     Q.   THAT ARTICLE TALKS ABOUT -- WELL, FIRST OF ALL, DOES THE

11:48AM  14     ARTICLE SAY ANYTHING ABOUT REFINING THE DEVICES SPECIFICALLY?

11:48AM  15     A.   I WOULD HAVE TO REREAD IT, BUT --

11:48AM  16     Q.   TAKE A MOMENT AND REVIEW IT IF YOU WOULD LIKE.  IT'S ON

11:48AM  17     THE PAGE 1 OF THE ARTICLE IN THAT FIRST INDENTED PARAGRAPH.

11:48AM  18     A.   IT JUST SAYS THE SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW

11:48AM  19     REFINING.  IT SOUNDS LIKE THEY'RE -- I DON'T KNOW IF THEY'RE

11:49AM  20     REFINING THEIR SECRET OR REFINING THEIR TECHNOLOGY.  IT

11:49AM  21     INVOLVES DEVICES.

11:49AM  22     Q.   OKAY.  IN ANY EVENT, IS THAT THE SAME THING THAT

11:49AM  23     MR. BALWANI TOLD YOU MONTHS LATER DURING YOUR ONE-ON-ONE

11:49AM  24     CONVERSATION WITH THE PRESIDENT ON DECEMBER 22ND?

11:49AM  25     A.   NO.  MY NOTES ARE CLEAR THAT NO NEW INVENTION OR NO NEW

ER-3173

11:49AM 1    SCIENCE WAS NEEDED IS WHAT I WAS TOLD.

11:49AM 2    Q.   MR. CAZARES ASKED YOU ABOUT WHETHER YOU WOULD EXPECT A

11:49AM 3    TECHNOLOGY COMPANY TO ALWAYS BE IMPROVING ITS TECHNOLOGY.

11:49AM 4       DO YOU REMEMBER THAT?

11:49AM 5    A.   YES.

11:49AM 6    Q.   AT THIS TIME WHEN MR. BALWANI SAID THE SCIENCE WAS

11:49AM 7    COMPLETE, NO NEW INVENTION NEEDED, DID YOU TAKE THAT TO MEAN

11:49AM 8    THE COMPANY WOULD NEVER DO ANY WORK TO IMPROVE ITS TECHNOLOGY?

11:49AM 9    A.   NO.

11:49AM 10   Q.   WHAT DID YOU THINK THAT MEANT?

11:49AM 11   A.   WELL, I THINK IT MEANT THAT THEY WERE FUNCTIONING AS A

11:49AM 12   BLOOD TESTING COMPANY ON SMALL DROPS OF BLOOD, FULLY

11:49AM 13   FUNCTIONING.

11:50AM 14   Q.   IF YOU HAD BEEN TOLD THAT THE COMPANY'S HOME BUILT

11:50AM 15   ANALYZER COULD NEVER DO MORE THAN A DOZEN OF THE MANY TESTS

11:50AM 16   THAT IT OFFERED, WOULD THAT --

11:50AM 17           MR. CAZARES:  LEADING.

11:50AM 18           MR. BOSTIC:  I HADN'T FINISHED THE QUESTION YET,

11:50AM 19   YOUR HONOR.

11:50AM 20           THE COURT:  GO AHEAD.

11:50AM 21   BY MR. BOSTIC:

11:50AM 22   Q.   IF YOU HAD BEEN TOLD THAT THE COMPANY'S HOME GROWN

11:50AM 23   ANALYZER COULD NEVER PERFORM MORE THAN A DOZEN TESTS OF THE

11:50AM 24   MANY TESTS THAT IT OFFERED, WOULD THAT HAVE BEEN CONSISTENT

11:50AM 25   WITH OR INCONSISTENT WITH WHAT MR. BALWANI TOLD YOU ABOUT THE

11:50AM  1    STATE OF THE TECHNOLOGY?

11:50AM  2              MR. CAZARES:  OBJECTION.  FOUNDATION AND LEADING.

11:50AM  3              THE COURT:  OVERRULED.

11:50AM  4        YOU CAN ANSWER THE QUESTION, SIR.

11:50AM  5              THE WITNESS:  IT WOULD BE INCONSISTENT WITH WHAT I

11:50AM  6    TOOK AWAY FROM THIS CONVERSATION.

11:50AM  7    BY MR. BOSTIC:

11:50AM  8    Q.   AND WHY IS THAT?

11:50AM  9    A.   BECAUSE I THOUGHT THEY HAD 60 TO 70 TESTS THAT THEY COULD

11:50AM 10    RUN SUCCESSFULLY.

11:50AM 11    Q.   AND LET'S LOOK ON YOUR LIST, SCROLLING DOWN A LITTLE BIT,

11:51AM 12    TO ITEM NUMBER 12.

11:51AM 13        IS THIS WHAT MR. BALWANI TOLD YOU ABOUT THESE 60 TO 70

11:51AM 14    TESTS?

11:51AM 15    A.   YES.

11:51AM 16    Q.   AND DO YOU SEE HERE IT INDICATES THAT "WHILE CURRENT

11:51AM 17    CLINICAL TRIALS CAN TAKE 6 VIALS AND CAN RUN 10 TO 12 TESTS.

11:51AM 18    THERANOS TAKES 3 DROPS AND CAN RUN 60 TO 70 TESTS.

11:51AM 19        DO YOU SEE THAT?

11:51AM 20    A.   YES.

11:51AM 21    Q.   AND DID YOU THINK AT THIS TIME THAT CONVENTIONAL

11:51AM 22    TECHNOLOGY WAS ONLY CAPABLE OF DOING 10 TO 12 BLOOD TESTS

11:51AM 23    OVERALL?

11:51AM 24    A.   I DIDN'T KNOW.  JUST FOR WHATEVER THE 10 OR 12 TESTS, HE

11:51AM 25    INDICATED IT WOULD TAKE 6 VIALS.

11:51AM  1          I THINK IT WAS MORE OF A SAMPLE OF WHAT THE THERANOS

11:51AM  2   CAPABILITIES WERE.

11:51AM  3   Q.   I SEE.

11:51AM  4          AND IS THIS LINE ITEM 12 ABOUT HOW MANY DIFFERENT KINDS OF

11:51AM  5   TESTS THE DEVICE CAN DO, OR HOW MANY DIFFERENT TESTS CAN BE

11:51AM  6   DONE ON A SINGLE SAMPLE AS YOU UNDERSTOOD IT?

11:51AM  7   A.   UM, MY UNDERSTANDING WAS THAT IT COULD TAKE 3 DROPS AND

11:52AM  8   RUN 60 OR 70 TESTS.

11:52AM  9   Q.   ON THAT SINGLE SAMPLE?

11:52AM 10   A.   YES.

11:52AM 11   Q.   LET'S GO BACK TO 2 -- OR, I'M SORRY, 3 THROUGH 5.

11:52AM 12          YOU ALSO WERE ASKED ABOUT THE USE OF INVESTOR MONEY AND

11:52AM 13   WHETHER IT WOULD BE USED FOR SCALING OR FOR RESEARCH AND

11:52AM 14   DEVELOPMENT.

11:52AM 15          DO YOU REMEMBER THAT?

11:52AM 16   A.   YES.

11:52AM 17   Q.   MR. CAZARES ASKED YOU WHETHER THERE WAS ANYTHING WRONG

11:52AM 18   WITH THE COMPANY USING INVESTOR MONEY FOR RESEARCH AND

11:52AM 19   DEVELOPMENT.

11:52AM 20          WHAT IS YOUR VIEW ON THAT?

11:52AM 21   A.   WELL, THERE'S NOTHING WRONG WITH IT.

11:52AM 22          BUT BASED ON MY CONVERSATION, INVESTMENT DECISIONS WERE

11:52AM 23   LARGELY MADE OR RELAYED REGARDING WHAT THIS MONEY WAS FOR.  I

11:52AM 24   RELAYED TO MY SHAREHOLDERS -- TO SHAREHOLDERS, INVESTORS,

11:52AM 25   FRIENDS, THAT THIS MONEY WAS USED FOR GROWTH.  IT WAS GROWTH

11:53AM 1    CAPITAL VERSUS MORE INVENTION.

11:53AM 2    Q.   OKAY.  SO JUST SO YOUR TESTIMONY IS CLEAR, ARE YOU SAYING

11:53AM 3    THAT, BY DEFINITION, IT'S IMPROPER FOR A COMPANY TO USE

11:53AM 4    INVESTOR MONEY FOR RESEARCH AND DEVELOPMENT?

11:53AM 5    A.   I, I THINK THAT A COMPANY, IF IT DETERMINED THAT IT HAD

11:53AM 6    ENOUGH CAPITAL TO INVEST AND IMPROVE UPON THE VALUE FOR THE

11:53AM 7    SHAREHOLDERS, THAT WOULD BE FINE.

11:53AM 8         I, I WAS UNDER THE IMPRESSION THAT THEY WERE ALREADY FREE

11:53AM 9    GENERATING CASH AND OPERATIONS AND THIS MONEY WAS JUST FOR

11:53AM 10   GROWTH, AND I UNDERSTAND FROM EXPERIENCE THAT GROWTH CAPITAL IS

11:53AM 11   FOR GROWING THE FIRM AND THERE WAS NO MORE VENTURE CAPITAL

11:53AM 12   NEEDED.  THAT'S MORE OF A VENTURE DEAL.

11:53AM 13        BUT THEY WOULD IMPROVE.  I MEAN, APPLE PUTS MONEY BACK

11:53AM 14   INTO THEIR IPHONE, SO I UNDERSTAND THE SAMPLE.

11:54AM 15        BUT IF THERE WAS A WAY TO IMPROVE UPON THEIR TECHNOLOGY

11:54AM 16   THAT MADE IT MORE EFFICIENT OR EXPANDED ITS CAPABILITIES, YEAH,

11:54AM 17   I WOULD SAY TO DO THAT SINCE THEY WERE CASH FLOWING.

11:54AM 18   Q.   BUT BASED ON WHAT MR. BALWANI TOLD YOU ABOUT HOW THE MONEY

11:54AM 19   WAS GOING TO BE USED, HOW DID THAT AFFECT YOUR VIEW OF YOUR

11:54AM 20   INVESTMENT DECISION?

11:54AM 21   A.   THAT THEY HAD NEW, STATE-OF-THE-ART TECHNOLOGY THAT THEY

11:54AM 22   HAD INVENTED AND THAT IT WAS VALUABLE, AND THEY WOULD BE

11:54AM 23   HARVESTING THE RETURNS FROM THAT TECHNOLOGY, AND THIS CAPITAL

11:54AM 24   WOULD HELP THEM EXPAND AND HARVEST THOSE RETURNS.

11:54AM 25   Q.   ON DIRECT I ASKED YOU ABOUT WHETHER YOU WERE AWARE OF

11:54AM  1    THERANOS'S RELIANCE ON VEIN DRAWS FOR ITS BLOOD TESTING.

11:54AM  2        DO YOU REMEMBER THAT QUESTION?

11:54AM  3    A.   YES.

11:54AM  4    Q.   ON CROSS, MR. CAZARES ASKED YOU A DIFFERENT QUESTION,

11:54AM  5    WHICH WAS WHETHER YOU WERE AWARE OF THE COMPANY'S USE OF VEIN

11:54AM  6    DRAWS.

11:54AM  7        DO YOU RECALL THAT DISCUSSION?

11:54AM  8    A.   YES.

11:54AM  9    Q.   AND HE SHOWED YOU SOME INSTANCES WHERE, ON THE WEBSITE AND

11:54AM  10   IN OTHER PUBLIC MATERIALS, VEIN DRAWS WERE REFERENCED.

11:54AM  11       DO YOU REMEMBER THAT?

11:54AM  12   A.   YES.

11:54AM  13   Q.   SO LET ME ASK YOU AGAIN, AT ANY POINT WERE YOU TOLD THAT

11:55AM  14   THE COMPANY NEEDED TO RELY ON VEIN DRAW SAMPLES BECAUSE ITS

11:55AM  15   TECHNOLOGY WAS NOT CAPABLE OF PERFORMING ALL OF ITS TESTS?

11:55AM  16       MR. CAZARES:  OBJECTION.  CALLS FOR SPECULATION.

11:55AM  17   FOUNDATION.  ALSO LEADING.

11:55AM  18       THE COURT:  OVERRULED.

11:55AM  19       MR. BOSTIC:  I'LL START THAT QUESTION AGAIN.  I'M

11:55AM  20   SORRY.

11:55AM  21   Q.   THE QUESTION WAS, AT ANY POINT, WERE YOU TOLD THAT THE

11:55AM  22   COMPANY NEEDED TO RELY ON VEIN SAMPLES BECAUSE ITS TECHNOLOGY

11:55AM  23   DID NOT PERFORM ALL OF THE TESTS ON A FINGERSTICK?

11:55AM  24   A.   NO.

11:55AM  25   Q.   WOULD THAT FACT HAVE BEEN IMPORTANT TO YOU AS SOMEONE

11:55AM 1    CONSIDERING AN INVESTMENT IN THE COMPANY?

11:55AM 2    A.   YES.

11:55AM 3    Q.   AND WHY WOULD THAT HAVE BEEN IMPORTANT?

11:55AM 4    A.   THE DISCLOSURE IS IMPORTANT TO UNDERSTAND WHAT THE

11:55AM 5    CAPABILITIES WE WERE INVESTING IN COULD DO.

11:55AM 6        SO THE DISCLOSURE IS IMPORTANT.

11:55AM 7        IF THEY WERE DRAWING FROM VEINS ON CERTAIN TESTS, IT

11:55AM 8    DOESN'T MEAN IT'S UNACCEPTABLE.  IT JUST MEANS THAT MY

11:55AM 9    UNDERSTANDING WAS THAT THE DROPS OF BLOOD WERE RUNNING 60 TO 70

11:56AM 10   TESTS, AND THAT WAS INCREDIBLE, YOU KNOW?  WE WERE EXCITED

11:56AM 11   ABOUT THAT.

11:56AM 12   Q.   DO YOU RECALL A DISCUSSION WITH MR. CAZARES ABOUT WHAT HE

11:56AM 13   CALLED AN FDA APPROVAL OF THE THERANOS TECHNOLOGY?

11:56AM 14   A.   YES.

11:56AM 15   Q.   SITTING HERE TODAY, DO YOU HAVE ANY KNOWLEDGE ABOUT ANY

11:56AM 16   IMPORTANT DIFFERENCES BETWEEN AN FDA APPROVAL VERSUS AN FDA

11:56AM 17   CLEARANCE?

11:56AM 18   A.   I DON'T REALLY HAVE A TREMENDOUS AMOUNT OF KNOWLEDGE ON

11:56AM 19   REGULATORY.

11:56AM 20   Q.   FOR THE FDA CLEARANCE THAT DID HAPPEN IN 2015, YOU

11:56AM 21   TESTIFIED THAT IT WAS RELATED TO A SINGLE TEST.

11:56AM 22       IS THAT YOUR UNDERSTANDING?

11:56AM 23   A.   YES, THE ANNOUNCEMENT HAD SOMETHING TO DO WITH HERPES.

11:56AM 24   Q.   MR. CAZARES ASKED YOU ABOUT WHETHER YOU KNEW WHETHER IT

11:56AM 25   WAS THE SAME TECHNOLOGY THAT GOT THAT CLEARANCE VERSUS WHAT WAS

11:56AM   1    BEING USED IN 2013.

11:56AM   2         DO YOU REMEMBER THAT?

11:56AM   3    A.   VAGUELY, YEAH.

11:56AM   4    Q.   DO YOU KNOW?  DO YOU HAVE KNOWLEDGE ABOUT WHETHER THAT

11:57AM   5    INVOLVED THE SAME TECHNOLOGY OR THE SAME DEVICE AT ALL AS TO

11:57AM   6    WHAT THERANOS WAS USING IN 2013?

11:57AM   7    A.   I HAVE NO KNOWLEDGE.

11:57AM   8    Q.   DO YOU KNOW WHETHER THE EDISON DEVICE THERANOS WAS USING

11:57AM   9    IN 2013 WAS EVEN CAPABLE OF RUNNING A HERPES TEST?

11:57AM  10    A.   I DON'T KNOW.

11:57AM  11    Q.   DO YOU ALSO REMEMBER MR. CAZARES MENTIONING THE 4.0 DEVICE

11:57AM  12    TO YOU?

11:57AM  13    A.   YES.

11:57AM  14    Q.   AND DO YOU KNOW WHETHER THERANOS EVER USED THE 4.0 DEVICE

11:57AM  15    FOR A SINGLE CLINICAL PATIENT TEST?

11:57AM  16    A.   I DON'T RECALL WHAT THE 4.0 WAS VERSUS ANY OTHER TESTING.

11:57AM  17    Q.   THERE WAS SOME DISCUSSION ABOUT THE AMOUNT OF FINANCIAL

11:57AM  18    DISCLOSURES THAT YOU RECEIVED FROM THERANOS, AND MR. CAZARES

11:57AM  19    ASKED YOU WHETHER YOU WERE -- WHETHER YOU UNDERSTOOD THAT YOU

11:57AM  20    WERE NOT LEGALLY ENTITLED TO MORE INFORMATION.

11:57AM  21         DO YOU RECALL THAT?

11:57AM  22    A.   YES.

11:57AM  23    Q.   WAS THE AMOUNT OF INFORMATION AND TRANSPARENCY THAT YOU

11:57AM  24    WERE GETTING FROM THERANOS NORMAL OR UNUSUAL BASED ON YOUR

11:58AM  25    PREVIOUS EXPERIENCE INVESTING IN COMPANIES?

11:58AM 1    A.   IT WAS UNUSUAL.  UNUSUALLY NONEXISTENT.

11:58AM 2    Q.   MR. CAZARES LISTED SOME THINGS THAT YOU DIDN'T HAVE, LIKE

11:58AM 3    FINANCIAL DETAILS AND OTHER WRITTEN MATERIALS.

11:58AM 4        DO YOU RECALL THAT?

11:58AM 5    A.   YES.

11:58AM 6    Q.   SO MY QUESTION IS, WHAT DID YOU RELY UPON INSTEAD IN

11:58AM 7    MAKING YOUR DECISION?  IF YOU DIDN'T HAVE THOSE THINGS, WHAT

11:58AM 8    DID YOU PLACE YOUR TRUST IN?

11:58AM 9    A.   WELL, I PLACED A LOT OF TRUST IN THE COMMUNICATION THAT I

11:58AM 10   HAD WITH THE SENIOR LEADERSHIP OF THE FIRM, ELIZABETH HOLMES

11:58AM 11   AND SUNNY, ON THIS CONVERSATION.

11:58AM 12       AND THEN I RELIED ON, YOU KNOW, CONTRACTS FROM WALGREENS,

11:58AM 13   ASSUMING THEY DID THEIR HOMEWORK; VERY LARGE INVESTORS THAT

11:58AM 14   CAME -- THE INVESTOR NAMES BECAME SOMEHOW PUBLIC AND THEY

11:58AM 15   SEEMED LIKE THEY WOULD DO THEIR HOMEWORK; THEIR BOARD OF

11:58AM 16   DIRECTORS WAS HIGHLY -- A HIGH QUALITY BUNCH OF PEOPLE,

11:58AM 17   SENATOR TRENT LOTT, THERE WAS A DOCTOR WHO INVOLVED OR AN

11:59AM 18   INVESTOR, LARRY ELLISON FROM ORACLE WAS AN INVESTOR.

11:59AM 19       SO WE RELIED ON THIS INCREDIBLE PEDIGREE OF ALL OF THESE

11:59AM 20   INVESTORS IN THIS THING, AND YOU KNOW, IT SEEMED LIKE SOME

11:59AM 21   PRETTY SMART PEOPLE, SO WE -- I DROPPED MY JUDGMENT A LITTLE

11:59AM 22   BIT TO INVEST ALONGSIDE THESE PEOPLE.

11:59AM 23       NOW, WE WERE IN AHEAD OF MOST OF THESE PEOPLE, BUT THEY

11:59AM 24   WERE EVALUATING WHAT THE COMPANY SAID AND WHAT WE LEARNED.

11:59AM 25   Q.   AND THE FIRST THING THAT YOU MENTIONED IN THAT LIST WERE

11:59AM  1    THE COMMUNICATIONS THAT YOU HAD WITH MS. HOLMES AND

11:59AM  2    MR. BALWANI; CORRECT?

11:59AM  3    A.   YES.

11:59AM  4    Q.   AND WOULD YOU HAVE INVESTED REGARDLESS OF WHAT MR. BALWANI

11:59AM  5    TOLD YOU IN THAT CALL, OR DID THE THINGS THAT HE TOLD YOU ABOUT

11:59AM  6    THE COMPANY MATTER TO YOUR DECISION?

11:59AM  7    A.   THESE WERE VERY, VERY SPECIFIC AND COMPELLING DETAILS, AND

11:59AM  8    THEY WERE WHAT I WAS SEEKING.

11:59AM  9       THE ONLY THING I DIDN'T GET WAS A BALANCE SHEET AND

12:00PM  10   REVENUE AND P&L.

12:00PM  11      BUT THESE WERE VERY SPECIFIC TO WHAT I NEEDED TO KNOW AND

12:00PM  12   WHAT I ASSUMED EVERYBODY KNEW, WHICH IS WHY THEY INVESTED.

12:00PM  13   Q.   THANK YOU.

12:00PM  14      NO FURTHER QUESTIONS.

12:00PM  15         THE COURT:   SURE.

12:00PM  16         MR. CAZARES:   BRIEFLY, YOUR HONOR.

12:00PM  17               **RECROSS-EXAMINATION**

12:00PM  18   BY MR. CAZARES:

12:00PM  19   Q.   GOOD AFTERNOON NOW, MR. MENDENHALL.

12:00PM  20   A.   YES.

12:00PM  21   Q.   I THINK WE'RE ALMOST THERE.   JUST A FEW FOLLOW-UP

12:00PM  22   QUESTIONS.

12:00PM  23      YOU WERE ASKED SOME FOLLOWUP ABOUT YOUR KNOWLEDGE OF THE

12:00PM  24   RELATIONSHIP BETWEEN MR. BALWANI AND MS. HOLMES.

12:00PM  25      DO YOU RECALL THAT?

MENDENHALL RECROSS BY MR. CAZARES                    4379

12:00PM   1    A.   YES.

12:00PM   2    Q.   AND YOU INDICATED YOU WERE UNAWARE OF ANY ROMANTIC

12:00PM   3    RELATIONSHIP PRIOR TO YOUR INVESTING; CORRECT?

12:00PM   4    A.   YES.

12:00PM   5    Q.   AND YOU INDICATED THAT IN YOUR MIND THAT RAISES SOME

12:00PM   6    GOVERNANCE QUESTIONS IN A CORPORATION; CORRECT?

12:01PM   7    A.   SURE.

12:01PM   8    Q.   GOVERNANCE MEANING POTENTIAL CONFLICT ISSUES MAYBE?

12:01PM   9    A.   YES.

12:01PM   10   Q.   BUT YOU DID UNDERSTAND, AS YOU INDICATED HERE JUST A

12:01PM   11   COUPLE MINUTES AGO, THERANOS HAD A QUITE NOTABLE BOARD OF

12:01PM   12   DIRECTORS; CORRECT?

12:01PM   13   A.   YES.

12:01PM   14   Q.   AND YOU HAD, GIVEN YOUR EXPERIENCE IN FINANCE, UNDERSTOOD

12:01PM   15   AT THE TIME OF ROLE OF A CORPORATE BOARD; CORRECT?

12:01PM   16   A.   YES.

12:01PM   17   Q.   AND YOU UNDERSTOOD THAT IN MANY AREAS OF THE GOVERNANCE IN

12:01PM   18   THE CORPORATION, INCLUDING EXECUTIVE HIRES, IT'S THE BOARD WHO

12:01PM   19   HAS THE FINAL SAY; CORRECT?

12:01PM   20   A.   YES.

12:01PM   21   Q.   I STEPPED OVER YOUR ANSWER.

12:01PM   22        WAS THAT RIGHT?

12:01PM   23   A.   YES.

12:01PM   24   Q.   OKAY.  AND AGAIN, YOU, AS YOU'VE JUST TOLD THE JURY, YOU

12:01PM   25   TRUSTED THE BOARD OF THERANOS, THAT THEY WERE OVERSEEING THINGS

ER-3183

12:01PM   1    AND WERE MAKING THE RIGHT DECISIONS; CORRECT?

12:01PM   2    A.   YES, IT WAS A VERY CREDIBLE BOARD.

12:01PM   3    Q.   INCLUDING THEIR APPROVAL OF THE ROLE OF MR. BALWANI WITHIN

12:01PM   4    THERANOS; CORRECT?

12:01PM   5    A.   I ASSUME SO, YEAH.

12:02PM   6    Q.   NOW, YOU WERE ASKED SOME QUESTIONS ABOUT THERANOS'S USE OF

12:02PM   7    TRADITIONAL VENOUS TESTING.

12:02PM   8        DO YOU RECALL THAT?

12:02PM   9    A.   YES.

12:02PM  10    Q.   AND YOU WERE ASKED SOME QUESTIONS, THE GIST OF WHICH, WERE

12:02PM  11    YOU AWARE OF THE FACT THAT THERANOS NEEDED TO USE VENOUS

12:02PM  12    TESTING BECAUSE ITS TECHNOLOGY COULDN'T PERFORM ALL TESTS.

12:02PM  13        DO YOU RECALL THAT?

12:02PM  14    A.   YES.

12:02PM  15    Q.   AND I THINK YOUR ANSWER WAS THAT YOU WERE UNAWARE OF THAT;

12:02PM  16    CORRECT?

12:02PM  17    A.   YES.

12:02PM  18    Q.   NOW, YOU UNDERSTAND, DON'T YOU, AS A SOPHISTICATED

12:02PM  19    INVESTOR, THAT THERE MIGHT BE SOME AREAS OF A BUSINESS, LIKE

12:02PM  20    BLOOD TESTING, WHERE IT MAY NOT MAKE ECONOMIC SENSE FOR

12:02PM  21    THERANOS TO DEVELOP, SPEND THE RESEARCH AND DEVELOPMENT,

12:02PM  22    SCIENTIFIC TIME, ET CETERA, TO DEVELOP A TEST AND SELL IT WHEN

12:03PM  23    SOMEBODY -- WHEN THERE'S NO MARKETS OR A VERY SMALL MARKET?

12:03PM  24        YOU UNDERSTAND THAT, RIGHT?

12:03PM  25             MR. BOSTIC:  FOUNDATION.  SPECULATION.

12:03PM  1              THE COURT:  ARE YOU ASKING THIS AS A GENERAL

12:03PM  2    BUSINESS PROP --

12:03PM  3              MR. CAZARES:  AS A GENERAL BUSINESS MATTER, YES.

12:03PM  4              THE COURT:  A GENERAL BUSINESS PROPOSITION BASED ON

12:03PM  5    HIS EXPERIENCE AS AN INVESTOR?

12:03PM  6              MR. CAZARES:  YES.

12:03PM  7              THE COURT:  CAN YOU ANSWER THAT QUESTION WITH THAT

12:03PM  8    CONTEXT?

12:03PM  9              THE WITNESS:  YEAH, IT DOES MAKE SENSE TO NOT

12:03PM 10    DEVELOP TESTING ON TESTS THAT WOULD NEVER BE USED OR THAT WERE

12:03PM 11    TOO EXPENSIVE TO PERFORM.

12:03PM 12    BY MR. CAZARES:

12:03PM 13    Q.   AND YOU WOULD EXPECT MS. HOLMES AND MR. BALWANI TO FOCUS

12:03PM 14    THEIR TECHNOLOGY, THEIR FINGERSTICK TESTING TECHNOLOGY ON THE

12:03PM 15    MOST COMMONLY USED TESTS; RIGHT?

12:03PM 16    A.   YES.

12:03PM 17    Q.   THAT'S WHERE THE MONEY IS GOING TO BE; RIGHT?

12:03PM 18    A.   YES.

12:03PM 19    Q.   SO THAT FEW PERCENTAGE, 1, 2, 3 PERCENT MAYBE OF TESTS

12:03PM 20    THAT DON'T GET SOLD THAT OFTEN, YOU WOULDN'T REALLY EXPECT THEM

12:04PM 21    TO SPEND A LOT OF TIME AND RESOURCES TO DEVELOP THOSE KIND OF

12:04PM 22    TESTS; CORRECT?

12:04PM 23    A.   THAT WOULD BE MY DESIRE, YES.

12:04PM 24    Q.   BECAUSE IT WOULD BE A WASTE OF YOUR MONEY AS AN INVESTOR;

12:04PM 25    RIGHT?

12:04PM  1    A.   YEP.  YES, I SHOULD SAY.

12:04PM  2    Q.   THANK YOU.  IT'S OKAY.  WE'RE ALMOST THERE.

12:04PM  3         NOW, YOU DESCRIBED, IN RESPONSE TO QUESTIONS FROM

12:04PM  4    MR. BOSTIC, YOUR EXPECTATION, BASED ON THE DISCUSSION WITH

12:04PM  5    MR. BALWANI, THAT THE FUND RAISING AT THE TIME IN DECEMBER OF

12:04PM  6    2013 WAS INTENDED TO FUEL GROWTH; CORRECT?

12:04PM  7    A.   YES, YES.

12:04PM  8    Q.   AND YOU HAVE NO KNOWLEDGE, DO YOU, THAT YOUR MONEY WAS

12:04PM  9    USED FOR ANYTHING OTHER THAN THE GROWTH OF THE COMPANY;

12:04PM 10    CORRECT?

12:04PM 11    A.   I HAVE NO KNOWLEDGE, RIGHT.

12:04PM 12    Q.   BUT YOU ARE AWARE OF THE FACT THAT THERANOS'S EXPANSION OF

12:04PM 13    PATIENT TESTING IN WALGREENS STORES, FROM THE TIME THAT YOU

12:04PM 14    INVESTED THROUGH 2014, EXPANDED; RIGHT?

12:04PM 15    A.   YES, I BELIEVE THEY GOT TO 48 STORES OR SOMETHING LIKE

12:05PM 16    THAT.

12:05PM 17    Q.   OKAY.  AND IN ORDER TO DO THAT, BASED ON WHAT YOU

12:05PM 18    OBSERVED, YOU SAW THE FACT THAT THE COMPANY GREW, EXPANDED THE

12:05PM 19    NUMBER OF STORES, YOU HAD TO HAVE KNOWN THAT THERANOS WAS

12:05PM 20    HIRING MORE PEOPLE TO HANDLE THAT AND INCREASE THE DEMAND;

12:05PM 21    CORRECT?

12:05PM 22              MR. BOSTIC:  CALLS FOR SPECULATION.

12:05PM 23              THE COURT:  I THINK -- AS A GENERAL BUSINESS

12:05PM 24    PROPOSITION, I THINK THE QUESTION IS, DOES GROWTH REQUIRE

12:05PM 25    ADDITIONAL EMPLOYMENT HIRING?

MENDENHALL RECROSS BY MR. CAZARES                4383

12:05PM   1              IS THAT WHAT YOUR QUESTION IS?

12:05PM   2                  MR. CAZARES:  YES, YOUR HONOR, BETTER SAID.

12:05PM   3                  THE WITNESS:  I WOULD ASSUME SO.

12:05PM   4       BY MR. CAZARES:

12:05PM   5       Q.   OKAY.  AND DID YOU BECOME AWARE OF THE FACT, IN 2014,

12:05PM   6       THERANOS OPENED ANOTHER LAB IN ARIZONA TO HANDLE THE INCREASED

12:05PM   7       VOLUME?

12:05PM   8       A.   I BELIEVE I KNEW THAT, YES.

12:05PM   9       Q.   AND THAT WOULD HAVE TAKEN MONEY AS WELL; RIGHT?

12:05PM  10       A.   YES.

12:05PM  11       Q.   AND THAT WOULD HAVE BEEN CONSISTENT WITH YOUR

12:05PM  12       UNDERSTANDING OF HOW YOUR MONEY WAS BEING USED?

12:05PM  13       A.   CERTAINLY.  PARTIALLY, YES.

12:06PM  14       Q.   NOW, YOU WERE ASKED SOME QUESTIONS ABOUT THERANOS'S TESTS,

12:06PM  15       AND I THINK YOU WERE ASKED A QUESTION, DID YOU KNOW THAT

12:06PM  16       THERANOS'S TECHNOLOGY COULD ONLY DO 12 TESTS.

12:06PM  17              DO YOU REMEMBER THAT?

12:06PM  18       A.   YES.

12:06PM  19       Q.   AND YOU SAID THAT YOU WERE UNAWARE OF THAT FACT; CORRECT?

12:06PM  20       A.   YES.

12:06PM  21       Q.   NOW, WERE YOU AWARE OF THE FACT, WHETHER IT WAS FROM

12:06PM  22       MR. BALWANI OR ANYONE ELSE, THAT THERANOS'S SCIENTISTS HAD

12:06PM  23       DEVELOPED HUNDREDS OF TESTS THAT RAN ON ITS PROPRIETARY

12:06PM  24       TECHNOLOGY?

12:06PM  25       A.   I WAS UNAWARE.

ER-3187

12:06PM  1     Q.   OKAY.  BUT YOU WERE AWARE THAT THE FINGERSTICK TESTING WAS

12:06PM  2     REALLY THERANOS'S PRIMARY BUSINESS; CORRECT?

12:06PM  3     A.   YES.

12:06PM  4     Q.   THAT WAS THE GOAL OVER THE FUTURE, TO EXPAND THAT

12:06PM  5     OPERATION AND THE USE OF THEIR PROPRIETARY FINGERSTICK

12:06PM  6     TECHNOLOGY; CORRECT?

12:06PM  7     A.   YES.

12:06PM  8     Q.   WERE YOU AWARE IN THIS 2013, 2014 TIME PERIOD WHEN YOU

12:07PM  9     INVESTED THAT THERANOS SCIENTISTS HAD FIGURED OUT A WAY TO

12:07PM  10    MODIFY A COMMERCIAL DEVICE, LIKE A SIEMENS DEVICE, TO RUN

12:07PM  11    FINGERSTICK SAMPLES JUST LIKE ITS OWN EDISON?  WERE YOU AWARE

12:07PM  12    OF THAT?

12:07PM  13    A.   NO.

12:07PM  14    Q.   SETTING THAT ASIDE, WERE YOU AWARE OF THE FACT THAT

12:07PM  15    COMMERCIAL LAB EQUIPMENT, LIKE A SIEMENS DEVICE, HAD THE

12:07PM  16    CAPABILITY OF DOING KIND OF HIGH VOLUME TESTING IN ORDER TO

12:07PM  17    FILL KIND OF DEMAND?

12:07PM  18         DID YOU UNDERSTAND THAT?

12:07PM  19    A.   I DON'T HAVE A LOT OF KNOWLEDGE ON THE SYSTEMS AND THE

12:07PM  20    PROCESSES OF TESTING BLOOD.

12:07PM  21    Q.   OKAY.  PERIODICALLY, THOUGH, YOU WOULD KIND OF DO INTERNET

12:07PM  22    SEARCHES TO SEE WHAT YOU COULD LEARN ABOUT THERANOS'S BUSINESS

12:07PM  23    DURING THE TIME BEFORE AND AFTER WHEN YOU INVESTED; RIGHT?

12:07PM  24    A.   YES.

12:07PM  25    Q.   OKAY.  AND YOU WERE AWARE OF THE FACT THAT THERANOS

12:07PM   1      OBTAINED PATENTS FOR ITS TECHNOLOGY; RIGHT?  YOU KNEW THAT?

12:07PM   2      A.   I KNEW THEY HAD SOME PATENTS, YES.

12:07PM   3      Q.   DID YOU EVER READ THE PATENTS?

12:07PM   4      A.   NEVER READ A PATENT.

12:08PM   5      Q.   OKAY.  THEY'RE KIND OF TECHNICAL IN NATURE; RIGHT?

12:08PM   6      A.   YES.  I WENT TO OREGON STATE UNIVERSITY.

12:08PM   7      Q.   FINE SCHOOL, A GREAT BASKETBALL SCHOOL.

12:08PM   8           BUT YOU UNDERSTOOD THAT PATENT APPLICATIONS AND ACTUAL

12:08PM   9      PATENTS, THOSE ARE AVAILABLE ON THE INTERNET; RIGHT?

12:08PM  10      A.   I ASSUME SO.

12:08PM  11      Q.   YEAH, THE U.S. PTO, YOU CAN KIND OF GO AND DO A SEARCH AND

12:08PM  12      FIND PATENTS THERE?

12:08PM  13      A.   I'LL BELIEVE YOU.

12:08PM  14      Q.   OKAY.  BUT YOU UNDERSTAND THAT'S GENERALLY AVAILABLE;

12:08PM  15      RIGHT?

12:08PM  16      A.   SURE.  YEAH.

12:08PM  17      Q.   AND DID YOU KNOW THAT THERANOS HAD ACTUALLY SUBMITTED AND

12:08PM  18      FILED AND OBTAINED PATENT PROTECTION FOR ITS COMMERCIAL

12:08PM  19      MODIFICATION DEVICES TO RUN FINGERSTICK SAMPLES JUST LIKE THE

12:08PM  20      EDISON?

12:08PM  21      A.   I UNDERSTOOD THAT THEY HAD PATENTS, YES.

12:08PM  22      Q.   OKAY.  BUT YOU DIDN'T KNOW ABOUT THE FACT THAT THEY

12:08PM  23      PATENTED THIS ADDITIONAL TECHNIQUE THAT THEY DEVELOPED TO RUN

12:08PM  24      FINGERSTICK SAMPLES ON A COMMERCIAL DEVICE?

12:08PM  25      A.   NO, I WAS NOT AWARE.

ER-3189

12:08PM  1     Q.   BUT IF THEY DID SPEND TIME AND RESOURCES, INVESTOR MONEY

12:08PM  2     TO DEVELOP THAT SORT OF TECHNOLOGY AND SCIENCE TO RUN

12:09PM  3     FINGERSTICK SAMPLES ON A COMMERCIAL DEVICE, YOU WOULD HAVE

12:09PM  4     EXPECTED THERANOS TO TAKE STEPS TO PROTECT THAT TECHNOLOGY AS

12:09PM  5     WELL; RIGHT?

12:09PM  6     A.   SURE.

12:09PM  7     Q.   BECAUSE ULTIMATELY ANYTHING THAT IS THERANOS DEVELOPED

12:09PM  8     TECHNOLOGICALLY COULD BE IN FURTHERANCE OF THE COMPANY'S GROWTH

12:09PM  9     AND PROFITS IN THE FUTURE; RIGHT?

12:09PM  10    A.   YES.

12:09PM  11    Q.   AND YOU WOULD EXPECT THEM TO PURSUE ANY AVENUE THAT COULD

12:09PM  12    GROW THE BUSINESS; RIGHT?

12:09PM  13    A.   YES.

12:09PM  14         MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

12:09PM  15         THE COURT:  MR. BOSTIC, ANY QUESTIONS?

12:09PM  16         MR. BOSTIC:  TWO QUESTIONS, YOUR HONOR.

12:09PM  17                    **FURTHER REDIRECT EXAMINATION**

12:09PM  18    BY MR. BOSTIC:

12:09PM  19    Q.   MR. MENDENHALL, IN YOUR DISCUSSION WITH MR. BALWANI, DID

12:09PM  20    HE TELL YOU ABOUT ANY PART OF THERANOS'S TECHNOLOGY BESIDES THE

12:09PM  21    SMALL ANALYZER, THE EDISON?

12:09PM  22    A.   HE JUST TOLD ME THAT THE TECHNOLOGY WAS DONE AND THERE WAS

12:09PM  23    NO NEW SCIENCE NEEDED AND NO NEW TECHNOLOGY NEEDED.

12:09PM  24         SO I WASN'T -- I DIDN'T KNOW WHAT THAT APPLIED TO.  THAT'S

12:10PM  25    WHAT I KNEW WAS DONE, AND IT HAD THE CAPABILITIES OF RUNNING

12:10PM   1    SMALL SAMPLES SUCCESSFULLY ON WHATEVER THE TECHNOLOGY WAS,

12:10PM   2    YEAH.

12:10PM   3    Q.   AND BASED ON YOUR CONVERSATION WITH MR. BALWANI, DID YOU

12:10PM   4    HAVE AN UNDERSTANDING AS TO WHETHER THE THERANOS ANALYZER, THE

12:10PM   5    EDISON, WAS UP TO THE TASK OF HANDLING THE TESTING THAT

12:10PM   6    THERANOS WAS OFFERING TO THE PUBLIC?

12:10PM   7    A.   THAT WAS MY ASSUMPTION.

12:10PM   8    Q.   THAT WHAT?

12:10PM   9    A.   THAT THE THERANOS ANALYZER WAS RUNNING THE TEST.

12:10PM  10    Q.   THANK YOU.

12:10PM  11         NO FURTHER QUESTIONS.

12:10PM  12              THE COURT:  ANYTHING FURTHER?

12:10PM  13              MR. CAZARES:  VERY QUICKLY, YOUR HONOR.

12:10PM  14         (LAUGHTER.)

12:10PM  15              MR. CAZARES:  I PROMISE IT'S QUICK.

12:10PM  16                    **FURTHER RECROSS-EXAMINATION**

12:10PM  17    BY MR. CAZARES:

12:10PM  18    Q.   IF WE CAN PUT UP ON THE SCREEN EXHIBIT 4059, WHICH ARE THE

12:11PM  19    NOTES.

12:11PM  20         THE SCREEN IS NOT WORKING?  THERE IT GOES.

12:11PM  21         DO YOU HAVE THE EXHIBIT ON YOUR SCREEN, SIR?

12:11PM  22    A.   YES.

12:11PM  23    Q.   AND AGAIN, YOU WROTE, "NO NEW SCIENCE IS NEEDED"; CORRECT?

12:11PM  24    A.   YES.

12:11PM  25    Q.   AND THEN "THE 'SCIENCE' BEHIND THERANOS IS COMPLETE";

12:11PM  1    CORRECT?

12:11PM  2    A.   YES.

12:11PM  3    Q.   AND YOU UNDERSTOOD THAT MEANS THEIR PROPRIETARY

12:11PM  4    TECHNOLOGY; CORRECT?

12:11PM  5    A.   THAT'S WHAT I FELT, YES.

12:11PM  6    Q.   BUT YOUR NOTES DON'T SAY, LIKE, "THE EDISON"; CORRECT?

12:11PM  7    A.   CORRECT.

12:11PM  8    Q.   AND WHATEVER THEIR PROPRIETARY FINGERSTICK TECHNOLOGY WAS,

12:11PM  9    THAT'S WHAT YOU WERE BEING TOLD?

12:11PM  10   A.   YES.

12:11PM  11            MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

12:11PM  12            MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

12:11PM  13            THE COURT:  MAY THIS WITNESS BE EXCUSED?

12:11PM  14            MR. CAZARES:  YES, YOUR HONOR.

12:11PM  15            MR. BOSTIC:  YES, YOUR HONOR.

12:11PM  16            THE COURT:  SIR, YOU'RE EXCUSED.

12:11PM  17            THE WITNESS:  THANK YOU.

12:11PM  18            THE COURT:  YOU'RE WELCOME.

12:11PM  19       LADIES AND GENTLEMEN, THIS SEEMS LIKE A GOOD TIME TO TAKE

12:11PM  20   OUR BREAK, SO LET'S TAKE 30 MINUTES, 30 MINUTES PLEASE, AND

12:12PM  21   WE'LL SEE YOU BACK THEN.  THANK YOU.

12:12PM  22       (RECESS FROM 12:12 P.M. UNTIL 12:46 P.M.)

12:46PM  23       (JURY OUT AT 12:46 P.M.)

24

25

12:46PM 1          **AFTERNOON SESSION**

12:46PM 2          THE COURT:  LET'S GO ON THE RECORD.

12:46PM 3      WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  ALL COUNSEL

12:46PM 4  ARE PRESENT.  MR. BALWANI IS PRESENT.

12:46PM 5      SHOULD WE RETURN TO OUR CONVERSATION FROM THIS MORNING?

12:46PM 6  ARE THE MIKES ON?

12:46PM 7          THE CLERK:  SORRY.

12:46PM 8          MR. SCHENK:  YES, YOUR HONOR.

12:46PM 9          MR. CAZARES:  YES, YOUR HONOR.

12:46PM 10         THE COURT:  WHERE ARE WE?

12:46PM 11         MR. CAZARES:  WELL, YOUR HONOR, SO WHERE WE LEFT OFF

12:46PM 12  IS THIS QUESTION ABOUT WHETHER OR NOT, RAISED BY THE

12:46PM 13  GOVERNMENT, ABOUT WHETHER THE DEFENSE WOULD BE LIMITED IN ITS

12:46PM 14  CLOSING ARGUMENTS RELATING TO THE WALGREENS LAUNCH, THE

12:46PM 15  AFGHANISTAN ISSUE, MAYBE OTHER ISSUES, THROUGH INTRODUCTION OF

12:46PM 16  THE RECORDINGS FOR -- YOU KNOW, NOT FOR THE TRUTH, FOR SOME

12:47PM 17  EXCEPTION AND NOT FOR THE TRUTH.

12:47PM 18      BUT I THINK THE PLACE TO REALLY START IS WE BELIEVE THAT

12:47PM 19  THERE ARE EXCEPTIONS TO THE HEARSAY RULE THAT WOULD ADMIT THE

12:47PM 20  TAPES FOR THE TRUTH, AND I DON'T THINK THAT'S INCONSISTENT WITH

12:47PM 21  THE PRACTICE THAT HAS TAKEN PLACE IN THIS COURT UP UNTIL NOW,

12:47PM 22  BECAUSE WHAT IS GOING TO HAPPEN IS THAT THE RECORDINGS, WE KNOW

12:47PM 23  THEY'RE AUTHENTIC.  WE KNOW THAT MR. TOLBERT HAS TESTIFIED

12:47PM 24  ABOUT THEM BEFORE, SO THEY'RE CREDIBLE.

12:47PM 25      THE GOVERNMENT IS GOING TO INTRODUCE HIS RECOLLECTION

4390

| | | |
|---|---|---|
| 12:47PM | 1 | ABOUT THE VERY CONFERENCE CALL, AND, YOU KNOW, UNDER RULE 102, |
| 12:47PM | 2 | UNDER THE BEST EVIDENCE RULE, THE TAPE IS THE ACTUAL BEST |
| 12:47PM | 3 | EVIDENCE OF WHAT SHE SAID, THE TRUTH OF WHAT SHE SAID, NOT HIS |
| 12:47PM | 4 | RECOLLECTION. |
| 12:47PM | 5 | I DON'T THINK THAT'S A CONTROVERSIAL FACT, AND THAT ALONE |
| 12:47PM | 6 | SHOULD ADMIT THE TAPES. |
| 12:47PM | 7 | BUT IN ADDITION TO THAT, YOU KNOW, JUST, YOU KNOW, UNDER |
| 12:47PM | 8 | THE RULE OF COMPLETENESS AND JUST FAIRNESS -- AND I'M NOT |
| 12:47PM | 9 | SUGGESTING IN ANY WAY THAT THE COURT IS TRYING TO BE UNFAIR -- |
| 12:48PM | 10 | I THINK IT'S IMPORTANT FOR THE JURY TO BE ABLE TO HEAR THE |
| 12:48PM | 11 | ACTUAL WORDS IF THAT'S WHAT THE GOVERNMENT IS GOING TO ASSERT |
| 12:48PM | 12 | WERE MISLEADING AND FALSE RATHER THAN RECOLLECTION FROM AN |
| 12:48PM | 13 | INDIVIDUAL CONVERSATION, YOU KNOW, 12 YEARS AGO OR 10 YEARS AGO |
| 12:48PM | 14 | ALMOST. |
| 12:48PM | 15 | SO THAT'S OUR POSITION, THEY SHOULD COME IN FOR THE TRUTH. |
| 12:48PM | 16 | THE COURT:  FOR THE TRUTH? |
| 12:48PM | 17 | MR. CAZARES:  FOR THE TRUTH. |
| 12:48PM | 18 | THE COURT:  OKAY.  ALL RIGHT. |
| 12:48PM | 19 | MR. SCHENK:  YOUR HONOR, THIS IS THE SECOND OR THIRD |
| 12:48PM | 20 | TIME THE DEFENSE HAS CITED THE BEST EVIDENCE RULE TO THE COURT, |
| 12:48PM | 21 | AND THE SECOND OR THIRD TIME THAT THEY HAVE CITED IT |
| 12:48PM | 22 | INCORRECTLY. |
| 12:48PM | 23 | THERE'S A CASE CALLED DIAZ-LOPEZ IN THE NINTH CIRCUIT THAT |
| 12:48PM | 24 | DISCUSSES SOME OF THE HISTORY OF THE BEST EVIDENCE RULE, AND IT |
| 12:48PM | 25 | MAKES CLEAR THAT THE BEST EVIDENCE RULE DOES NOT COMPARE TWO |

ER-3194

4391

| | | |
|---|---|---|
| 12:48PM | 1 | DIFFERENT TYPES OF EVIDENCE, TOLBERT'S RECOLLECTION OF THE TAPE |
| 12:48PM | 2 | WITH THE TAPE, AND THEN INSTRUCTS THE COURT THAT THE TAPE IS |
| 12:48PM | 3 | THE BETTER OF THE TWO EVIDENCE, IT SHOULD ADMIT THAT ONE. |
| 12:49PM | 4 | THAT'S NOT HOW THE BEST EVIDENCE RULE WORKS. |
| 12:49PM | 5 | WHAT THE BEST EVIDENCE RULE IS IS PERMISSION TO ADMIT THE |
| 12:49PM | 6 | ORIGINAL OF A DOCUMENT WHEN THERE'S A QUESTION ABOUT A COPY OF |
| 12:49PM | 7 | THAT DOCUMENT. |
| 12:49PM | 8 | IT DOES NOT COMPARE TWO DIFFERENT TYPES OF EVIDENCE AND |
| 12:49PM | 9 | TELL THE COURT THAT IT MUST ADMIT THE TAPE BECAUSE THAT'S |
| 12:49PM | 10 | BETTER THAN MR. TOLBERT'S RECOLLECTION OF IT. |
| 12:49PM | 11 | SO ONE OF THE BASES THAT YOU JUST HEARD TO ADMIT THE |
| 12:49PM | 12 | TOLBERT TAPES FOR THE TRUTH IS THE BEST EVIDENCE RULE, AND IT'S |
| 12:49PM | 13 | DIAZ-LOPEZ, 625 F. 3D 1198, A NINTH CIRCUIT CASE FROM 2010. |
| 12:49PM | 14 | BUT THIS CASE ALSO COLLECTS SOME OTHER NINTH CIRCUIT CASES THAT |
| 12:49PM | 15 | CITE THE BEST EVIDENCE RULE FOR THIS SAME CONCEPT. |
| 12:49PM | 16 | THE COURT, I THINK, ALSO HEARD THE RULE OF COMPLETENESS. |
| 12:49PM | 17 | WE'VE DISCUSSED THIS MORNING IF THE GOVERNMENT OFFERED, FOR |
| 12:49PM | 18 | INSTANCE, 1348-1 AND THE DEFENSE FELT THAT 1348-2 WAS NECESSARY |
| 12:50PM | 19 | IN ORDER TO PROVIDE COMPLETE CONTEXT TO THE JURY, THE COURT |
| 12:50PM | 20 | COULD ADMIT 1348-2 UNDER THE RULE OF COMPLETENESS. |
| 12:50PM | 21 | IT DOES NOT SUGGEST THAT IF THE GOVERNMENT ASKS |
| 12:50PM | 22 | MR. TOLBERT HIS RECOLLECTION OF THE TAPE, THE COURT MUST THEN, |
| 12:50PM | 23 | FOR COMPLETENESS PURPOSES, ADMIT THE TAPE. |
| 12:50PM | 24 | THE COURT HAS NOT HEARD A BASIS TO THE HEARSAY RULES THAT |
| 12:50PM | 25 | ALLOW THE DEFENSE TO OFFER A CODEFENDANT'S STATEMENTS OUT OF |

ER-3195

4392

12:50PM 1    COURT FOR THE TRUTH.

12:50PM 2        AND WHAT WE ORIGINALLY CAME TO YOUR HONOR TO DISCUSS THIS

12:50PM 3    MORNING WAS A HEARSAY OBJECTION TO THE DEFENSE PLAYING THE

12:50PM 4    TAPES, AND I STILL HAVEN'T HEARD AN EXCEPTION TO THE HEARSAY

12:50PM 5    RULE THAT PERMITS THE DEFENSE TO PLAY THE TOLBERT TAPES.

12:50PM 6        MR. CAZARES:  I MEAN -- I APPRECIATE THE

12:50PM 7    GOVERNMENT'S POSITION, BUT IT'S STILL KIND OF DODGING THE

12:50PM 8    ISSUE, WHICH IS WHY THIS JURY SHOULDN'T BE HEARING THE ACTUAL

12:50PM 9    WORDS OF MS. HOLMES AS OPPOSED TO MR. TOLBERT'S RECOLLECTION

12:51PM 10   BASED ON SOME NOTES OF THE SAME CONVERSATION, BECAUSE THE

12:51PM 11   INFORMATION THAT THE GOVERNMENT WANTS TO CONVEY TO THE JURY IS

12:51PM 12   PURPORTEDLY WHAT MS. HOLMES SAID, NOT HIS INTERPRETATION.

12:51PM 13       MAYBE THEY CAN ASK THAT QUESTION AFTERWARDS.  THAT'S

12:51PM 14   ALWAYS A FAIR FOLLOW-UP QUESTION.

12:51PM 15       BUT THE GOVERNMENT WANTS THIS JURY TO TAKE INFERENCES FROM

12:51PM 16   THE WORDS THAT MS. HOLMES MADE IN THAT CONFERENCE CALL AND THAT

12:51PM 17   INFLUENCED MR. TOLBERT AND HIS BOSS TO INVEST, BUT THE

12:51PM 18   GOVERNMENT DOESN'T WANT THE JURY TO HEAR THE ACTUAL WORDS,

12:51PM 19   YOUR HONOR.

12:51PM 20       AND THE RULE OF COMPLETENESS DOES APPLY, NOT ON ITS OWN,

12:51PM 21   BUT IN COMBINATION WITH, YOU KNOW, COMMON LAW 611(A)(1).

12:51PM 22       YOU KNOW, THE COURT IS NOT REQUIRED.  OF COURSE NOT.  THE

12:51PM 23   COURT ALWAYS HAS DISCRETION ON EVIDENTIARY MATTERS, YOUR HONOR.

12:51PM 24       BUT IT SEEMS IN A SITUATION LIKE THIS WHERE THE GOVERNMENT

12:51PM 25   KNOWS THE TAPES ARE AUTHENTIC, THE GOVERNMENT THEMSELVES EVEN

ER-3196

4393

12:52PM 1    INTRODUCED THEM, OBVIOUSLY NOT BOUND, IN THE PRIOR TRIAL.

12:52PM 2        THE GOVERNMENT NOW WANTS TO LIMIT OR PREVENT THE JURY FROM

12:52PM 3    HEARING THE COMMUNICATION AND THE CONTEXT OF THE COMMUNICATION

12:52PM 4    AND THE DETAILS.  THEY WANT TO GIVE THE JURY SNIPPETS, AND THE

12:52PM 5    RULE OF COMPLETENESS AND RULE 611 PERMIT THIS COURT TO ALLOW

12:52PM 6    THE JURY TO SEE AND HEAR THE WHOLE PICTURE AND NOT JUST THE

12:52PM 7    SNIPPETS.

12:52PM 8        AND THAT'S WHAT WE THINK SHOULD HAPPEN HERE, AND THAT'S A

12:52PM 9    RULE THAT WOULD PERMIT THE FACTS TO COME IN FOR THEIR TRUTH.

12:52PM 10       THE GOVERNMENT CAN CONTINUE TO MAKE THEIR ARGUMENTS THAT

12:52PM 11   THEY'RE MISLEADING, AND WE CAN CONTINUE TO MAKE OUR ARGUMENTS

12:52PM 12   THAT WE THINK THERE IS OTHER EVIDENCE THAT SHOWS THOSE

12:52PM 13   STATEMENTS WERE ACCURATE AND CONSISTENT WITH OTHER EVIDENCE IN

12:52PM 14   THE CASE.

12:52PM 15       THE COURT:  OKAY.  MR. SCHENK, ARE YOU -- YOUR

12:52PM 16   EXAMINATION OF MR. TOLBERT, ARE YOU INTENDING TO INTRODUCE THE

12:52PM 17   TAPES IN YOUR CASE?

12:52PM 18       MR. SCHENK:  NOT IN DIRECT, YOUR HONOR.

12:52PM 19       THE COURT:  OKAY.

12:53PM 20       AND THEN WHAT IS THE -- YOU'RE SEEKING TO INTRODUCE THE

12:53PM 21   TAPES.  YOU WOULD LIKE TO GET THE TAPES IN IN YOUR

12:53PM 22   CROSS-EXAMINATION, WHICH IS YOUR CASE, AND I'M NOT CERTAIN I'VE

12:53PM 23   HEARD YOU TELL ME THE EXCEPTION TO THE HEARSAY RULE, WHY THOSE

12:53PM 24   TAPES SHOULD BE ADMITTED FOR THEIR TRUTH, PARTICULARLY IF

12:53PM 25   THEY'RE THE STATEMENT OF A CODEFENDANT IN THIS PARTICULAR CASE.

ER-3197

4394

12:53PM 1      MR. CAZARES:  WELL, I JUST THINK I SAID THE RULE OF

12:53PM 2    COMPLETENESS AND FAIRNESS, YOUR HONOR.

12:53PM 3      THE RULE OF COMPLETENESS REBUTS THE HEARSAY RULE AND ISN'T

12:53PM 4    UNDERMINED BY THE HEARSAY RULE, IT ACTUALLY COMPLEMENTS IT, AND

12:53PM 5    ALLOWS THE JURY TO ACTUALLY HEAR THE WHOLE PICTURE, WHERE THE

12:53PM 6    INITIAL INTRODUCTION OF FACTS OR EVIDENCE DOESN'T NECESSARILY

12:53PM 7    TELL THE WHOLE PICTURE.

12:53PM 8      AND PARTICULARLY WHEN IT'S A FACT OF IMPORTANCE HERE, LIKE

12:54PM 9    MS. HOLMES'S WORDS THAT THE GOVERNMENT HAS CHARGED IN

12:54PM 10   EXECUTION, ONE OF THE COUNTS IS THE TOLBERT-HALL INVESTMENT,

12:54PM 11   THEY'RE POINTING TO HER WORDS BUT SAYING, NO, THE JURY

12:54PM 12   SHOULDN'T HEAR THOSE WORDS BECAUSE IT MIGHT BE HEARSAY AND

12:54PM 13   IGNORE THESE OTHER BASES THAT WOULD PERMIT THE JURY TO HEAR

12:54PM 14   THOSE FACTS.

12:54PM 15     WE JUST THINK THAT THAT'S NOT CONSISTENT WITH COMMON LAW

12:54PM 16   AND THE RULE OF COMPLETENESS.

12:54PM 17     YOU KNOW, THERE ARE HEARSAY EXCEPTIONS THAT WOULD NOT BE

12:54PM 18   FOR THE TRUTH.  WE DON'T THINK THOSE ARE APPROPRIATE, BUT TO BE

12:54PM 19   FRANK, YOUR HONOR, WE HAVE SOME CONCERNS THAT WE'RE SOMEHOW

12:54PM 20   GOING TO BE LIMITED IN OUR CLOSING ARGUMENT, WHICH WE DON'T

12:54PM 21   THINK WOULD BE APPROPRIATE, THAT KIND OF TIES OUR HANDS,

12:54PM 22   YOUR HONOR.

12:54PM 23     THE COURT:  WELL, I HAVEN'T SAID TODAY THAT I WOULD

12:54PM 24   LIMIT YOU IN ANY WAY.  I HAVE NOT SAID THAT.

12:54PM 25     BUT WHAT I SAID BEFORE WE STARTED THIS MORNING WAS, I

4395

12:54PM 1    THINK ALL PARTIES SHOULD LOOK AND TAKE A MEASURED VIEW AS TO

12:55PM 2    WHAT IT IS THE PARTIES SEEK TO INTRODUCE AND WHAT IMPACT, IF

12:55PM 3    ANY, THAT MIGHT HAVE.

12:55PM 4        I'M NOT SUGGESTING THE COURT HAS MADE ANY DECISION ON

12:55PM 5    ANYTHING IN THAT REGARD.  I'M JUST TRYING TO LET EVERYBODY

12:55PM 6    KNOW, CHECK YOURSELVES, CHECK YOUR CASES, MAKE SURE WHEN YOU

12:55PM 7    ASK FOR SOMETHING, YOU KNOW, IT'S WHAT YOU WANT AND YOU'VE

12:55PM 8    FULLY CONSIDERED IT.

12:55PM 9        I'M NOT LOOKING YOU AT AND THE DEFENSE.  I'M TALKING ABOUT

12:55PM 10   BOTH SIDES.

12:55PM 11           MR. CAZARES:  I UNDERSTAND, YOUR HONOR.

12:55PM 12           THE COURT:  RIGHT.

12:55PM 13       BOTH SIDES, WHEN YOU TAKE ACTIONS THERE ARE CONSEQUENCES

12:55PM 14   FOR THAT.

12:55PM 15       I JUST WANTED TO MAKE SURE EVERYBODY HAD A MEASURED

12:55PM 16   APPROACH AND HAD AN OPPORTUNITY TO REVIEW THAT.

12:55PM 17       I WAS NOT SAYING, IF YOU DO THIS, I'M GOING TO LIMIT YOU.

12:55PM 18       THE DISCUSSION WAS, WELL, IF THIS COMES IN AND IF IT COMES

12:55PM 19   IN IN THIS WAY, WE MIGHT BE ASKING THIS.  AND THAT -- FROM THE

12:55PM 20   GOVERNMENT'S PERSPECTIVE.  AND THAT MIGHT CAUSE SOME

12:55PM 21   LIMITATIONS.

12:55PM 22       MY POINT THIS MORNING WAS, LET'S ALL STEP BACK AND THINK

12:55PM 23   ABOUT WHERE WE ARE BEFORE WE CALL THE WITNESS IN TO MAKE SURE

12:55PM 24   THAT WE UNDERSTAND THE FULL, THE FULL RAMIFICATIONS OF WHAT WE

12:55PM 25   DO.

| | | |
|---|---|---|
| 12:55PM | 1 | I'M GLAD YOU'VE DONE THAT.  THANKS FOR THAT. |
| 12:56PM | 2 | ANYTHING FURTHER ON THIS? |
| 12:56PM | 3 | MR. SCHENK:  SUBMIT IT. |
| 12:56PM | 4 | MR. CAZARES:  SUBMIT IT. |
| 12:56PM | 5 | THE COURT:  OKAY.  THANK YOU. |
| 12:56PM | 6 | IF THERE'S -- IF THE GOVERNMENT IS NOT GOING TO PUT THESE |
| 12:56PM | 7 | IN, I DON'T SEE GROUNDS TO ALLOW THE DEFENSE AT THIS TIME TO |
| 12:56PM | 8 | PUT THESE IN.  SO I DON'T KNOW IF THAT WAS A REQUEST TO ADMIT |
| 12:56PM | 9 | AT THIS STAGE OR NOT. |
| 12:56PM | 10 | BUT I WOULD INDICATE, AS THE RECORD IS RIGHT NOW, I WOULD |
| 12:56PM | 11 | NOT PERMIT IT.  LET ME JUST INDICATE THAT. |
| 12:56PM | 12 | MR. CAZARES:  UNDERSTOOD, YOUR HONOR.  OKAY. |
| 12:56PM | 13 | THE COURT:  OKAY.  SO WE'RE READY FOR MR. TOLBERT I |
| 12:56PM | 14 | TAKE IT. |
| 12:56PM | 15 | MR. SCHENK:  YES. |
| 12:56PM | 16 | THE COURT:  OKAY. |
| 12:56PM | 17 | MR. COOPERSMITH:  YOUR HONOR, I HAVE ONE THING, ONE |
| 12:56PM | 18 | MINOR THING TO RAISE IF I CAN. |
| 12:56PM | 19 | THE COURT:  SURE. |
| 12:56PM | 20 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR.  I |
| 12:56PM | 21 | APPRECIATE IT. |
| 12:56PM | 22 | I WILL JUST SAY ONE THING.  I HAVE NEVER SEEN BEFORE IN A |
| 12:56PM | 23 | FRAUD CASE -- |
| 12:56PM | 24 | THE COURT:  YOU'RE GOING TO TALK ABOUT MY DECISION |
| 12:56PM | 25 | THAT I JUST MADE? |

4397

| | | |
|---|---|---|
| 12:56PM | 1 | MR. COOPERSMITH: WELL, NO, YOUR HONOR. I'LL HOLD |
| 12:57PM | 2 | MY TONGUE ON THAT. |
| 12:57PM | 3 | THE COURT: OKAY. YOU HAD ONE OTHER THING. |
| 12:57PM | 4 | MR. COOPERSMITH: YES, YOUR HONOR. |
| 12:57PM | 5 | THE ONE OTHER THING IS THAT WE HAVE A CONCERN ABOUT SOME |
| 12:57PM | 6 | OF THE QUESTIONING WE SAW WITH MR. MENDENHALL, AND WE'VE SEEN |
| 12:57PM | 7 | IT WITH OTHER WITNESSES, AND I THINK IT'S IMPORTANT TO RAISE. |
| 12:57PM | 8 | AND THE CONCERN WE HAVE IS THAT THE QUESTION TO |
| 12:57PM | 9 | MR. MENDENHALL -- AND AGAIN, WITH OTHER WITNESSES, WE EXPECT |
| 12:57PM | 10 | THERE WILL BE OTHER INVESTORS WHO TESTIFY, SO THE SAME ISSUE |
| 12:57PM | 11 | MAY ARISE AGAIN -- IS THAT MR. BOSTIC ASKED THE WITNESS, DID |
| 12:57PM | 12 | YOU KNOW THAT THE EDISON DEVICE COULD ONLY DO 12 TESTS? |
| 12:57PM | 13 | AND IF MR. BOSTIC WANTS TO ASK, DID YOU KNOW IT WAS |
| 12:57PM | 14 | ACTUALLY DOING 12 TESTS, THAT'S FAIR GAME, OKAY, BECAUSE THAT |
| 12:57PM | 15 | IS TRUE. THE EVIDENCE ESTABLISHES THAT THERANOS WAS RUNNING |
| 12:57PM | 16 | THE EDISON FOR ABOUT 12 TESTS AT THE PEAK OF IT. |
| 12:57PM | 17 | BUT IF THE QUESTION IS, COULD IT DO OR IS IT CAPABLE, |
| 12:57PM | 18 | THERE IS NO QUESTION THAT THE EDISON -- I'M SORRY. THERE IS NO |
| 12:58PM | 19 | EVIDENCE THAT THE EDISON WAS NOT CAPABLE OF RUNNING ADDITIONAL |
| 12:58PM | 20 | IMMUNOASSAYS. |
| 12:58PM | 21 | IN FACT, THE EVIDENCE IS THAT IT COULD RUN IMMUNOASSAYS, |
| 12:58PM | 22 | AND THERE'S FAR MORE IMMUNOASSAYS THAN JUST THE 12, AND THAT |
| 12:58PM | 23 | CAME IN WITH MS. CHEUNG. |
| 12:58PM | 24 | SO I THINK THE PROPER QUESTION THAT MR. BOSTIC COULD |
| 12:58PM | 25 | ASK -- AGAIN, PUTTING ASIDE THE ISSUE OF OMISSIONS, WHICH IS |

ER-3201

4398

| | | |
|---|---|---|
| 12:58PM | 1 | ANOTHER ISSUE IN THE CASE -- BUT IN TERMS OF THE FAIR QUESTION |
| 12:58PM | 2 | WITH A GOOD FAITH BASIS, IT'S, DID YOU KNOW THAT THE EDISON WAS |
| 12:58PM | 3 | ONLY RUNNING 12 TESTS IN THE LAB?  NOT, DID YOU KNOW IT COULD |
| 12:58PM | 4 | ONLY RUN? |
| 12:58PM | 5 | I DON'T THINK THAT'S ESTABLISHED BY THE EVIDENCE, AND IT'S |
| 12:58PM | 6 | NOT, IN OUR VIEW, A GOOD FAITH QUESTION, SO I WANTED TO RAISE |
| 12:58PM | 7 | THAT. |
| 12:58PM | 8 | THE COURT:  WAS THERE AN OBJECTION OF -- |
| 12:58PM | 9 | MR. COOPERSMITH:  THERE WAS.  A FOUNDATION |
| 12:58PM | 10 | OBJECTION, YOUR HONOR. |
| 12:58PM | 11 | THE COURT:  -- ASSUMING FACTS NOT IN EVIDENCE? |
| 12:58PM | 12 | MR. COOPERSMITH:  I THINK IT WAS FOUNDATION, WHICH I |
| 12:58PM | 13 | THINK AMOUNTS TO THE SAME THING. |
| 12:58PM | 14 | MR. BOSTIC:  SO, YOUR HONOR, I DISAGREE WITH THE |
| 12:58PM | 15 | DEFENSE'S INTERPRETATION OF THE QUESTION. |
| 12:58PM | 16 | FIRST OF ALL, IT MAY BE THAT I ASKED THE QUESTION IN THE |
| 12:59PM | 17 | WAY THAT MR. COOPERSMITH IS RECITING. |
| 12:59PM | 18 | BUT I THINK, IN CASE IT MATTERS, IS THAT WHAT I ACTUALLY |
| 12:59PM | 19 | ASKED IS, WERE YOU TOLD? |
| 12:59PM | 20 | SO MY QUESTION ACTUALLY IS NOT, STRICTLY SPEAKING, |
| 12:59PM | 21 | ASSUMING FACTS.  IT'S ASKING WHETHER MR. BALWANI MADE CERTAIN |
| 12:59PM | 22 | REPRESENTATIONS TO HIM. |
| 12:59PM | 23 | TO THE CENTRAL ISSUE, THOUGH, IT SOUNDS LIKE THIS COMES |
| 12:59PM | 24 | DOWN TO A DEFINITION OF THE WORD "COULD," WHICH MIGHT BE A |
| 12:59PM | 25 | LITTLE TOO SEMANTIC FOR PURPOSES OF SETTING UP GUARDRAILS FOR |

ER-3202

12:59PM 1    HOW QUESTIONS COULD BE FORMULATED.

12:59PM 2         THE FACT IS THAT, AND I THINK THE EVIDENCE SHOWS THIS,

12:59PM 3    THAT THERANOS WANTED TO RUN MORE TESTS ON THE EDISON, IT WORKED

12:59PM 4    TO PUT MORE TESTS ON ITS EDISON DEVICE, IT ONLY EVER GOT TO 12.

12:59PM 5         MY UNDERSTANDING IS THAT ONLY 12 TESTS WERE VALIDATED FOR

12:59PM 6    USE IN THE CLIA LAB.

12:59PM 7         WHETHER THE DEVICE COULD HAVE BEEN USED TO RUN ADDITIONAL

12:59PM 8    TESTS, WHETHER THERANOS MIGHT HAVE BEEN SUCCESSFUL HAD IT TRIED

01:00PM 9    HARDER TO VALIDATE ADDITIONAL TESTS I THINK IS A HYPOTHETICAL

01:00PM 10   THAT DOESN'T MAKE THAT QUESTION IMPROPER.

01:00PM 11        I THINK THE COMPANY WANTED TO USE ITS TECHNOLOGY, ITS

01:00PM 12   DEVICE FOR AS MUCH AS POSSIBLE, AND 12 WAS THE MAXIMUM THAT IT

01:00PM 13   ACHIEVED DURING THE RELEVANT TIME PERIOD.

01:00PM 14        THE COURT:  OKAY.  ALL RIGHT.

01:00PM 15        MR. COOPERSMITH:  YOUR HONOR, I'M SORRY.  I DON'T

01:00PM 16   THINK THERE'S ANY EVIDENCE THAT THE EVIDENCE COULD ONLY DO.

01:00PM 17        AT THE END OF THE DAY, OUR TOOL AS LAWYERS AND JUDGES IS

01:00PM 18   WORDS.  SO IT MAY WELL COME DOWN TO A DEFINITION OF THE WORD

01:00PM 19   "COULD," AND THAT'S IMPORTANT.

01:00PM 20        BUT THERE'S NO EVIDENCE, AGAIN, THAT THE EDISON COULD ONLY

01:00PM 21   DO 12 TESTS, MEANING IT WAS ONLY CAPABLE OF DOING 12 TESTS, AND

01:00PM 22   I JUST DON'T THINK THERE'S A GOOD FAITH BASIS FOR THAT

01:00PM 23   QUESTION, AND THAT'S OUR CONCERN AND WE WOULD ASK THE COURT TO

01:00PM 24   TELL THE GOVERNMENT NOT TO DO THAT.

01:00PM 25        MR. BOSTIC:  I'M HAPPY TO ANSWER ANY CONCERNS OR

4400

| | | |
|---|---|---|
| 01:00PM | 1 | QUESTIONS THAT THE COURT MIGHT HAVE, BUT I DISAGREE WITH THE |
| 01:00PM | 2 | DEFENSE'S POSITION. |
| 01:00PM | 3 | THE COURT: OKAY. LET'S SEE WHERE QUESTIONS GO, AND |
| 01:00PM | 4 | IF THE OBJECTION IS MADE, THE COURT WILL RULE ON IT. |
| 01:01PM | 5 | OKAY. THANK YOU. |
| 01:01PM | 6 | MR. COOPERSMITH: THANK YOU, YOUR HONOR. |
| 01:01PM | 7 | MR. BOSTIC: THANK YOU, YOUR HONOR. |
| 01:01PM | 8 | (RECESS FROM 1:01 P.M. UNTIL 1:04 P.M.) |
| 01:04PM | 9 | (JURY IN AT 1:04 P.M.) |
| 01:04PM | 10 | THE COURT: WE'RE BACK ON THE RECORD. |
| 01:04PM | 11 | ALL OF THE PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE |
| 01:04PM | 12 | AGAIN. |
| 01:04PM | 13 | DOES THE GOVERNMENT HAVE A WITNESS TO CALL? |
| 01:05PM | 14 | MR. SCHENK: YES, YOUR HONOR. |
| 01:05PM | 15 | THE GOVERNMENT CALLS BRYAN TOLBERT. |
| 01:05PM | 16 | THE COURT: GOOD AFTERNOON, SIR. |
| 01:05PM | 17 | IF YOU WOULD COME FORWARD, PLEASE. JUST STAND RIGHT OVER |
| 01:05PM | 18 | HERE BY THE WITNESS STAND. |
| 01:05PM | 19 | IF YOU COULD FACE OUR COURTROOM DEPUTY WHILE YOU RAISE |
| 01:05PM | 20 | YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 01:05PM | 21 | **(GOVERNMENT'S WITNESS, JOHN BRYAN TOLBERT, WAS SWORN.)** |
| 01:05PM | 22 | THE WITNESS: YES, MA'AM. |
| 01:05PM | 23 | THE COURT: PLEASE HAVE A SEAT HERE, SIR. |
| 01:05PM | 24 | I'LL INVITE YOU TO MAKE YOURSELF COMFORTABLE. |
| 01:05PM | 25 | FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU |

ER-3204

01:05PM 1      NEED.

01:05PM 2           WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

01:05PM 3      AND THEN SPELL IT, PLEASE.

01:05PM 4               THE WITNESS:  JOHN BRYAN TOLBERT.  J-O-H-N,

01:05PM 5      B-R-Y-A-N, T-O-L-B-E-R-T.

01:05PM 6               THE COURT:  THANK YOU.  COUNSEL.

01:05PM 7               MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR.

01:05PM 8                        **DIRECT EXAMINATION**

01:05PM 9      BY MR. SCHENK:

01:05PM 10     Q.   GOOD AFTERNOON, MR. TOLBERT.  IF YOU ARE FULLY VACCINATED,

01:05PM 11     I UNDERSTAND THE COURT WILL PERMIT YOU TO TESTIFY WITHOUT A

01:06PM 12     MASK ON.

01:06PM 13     A.   I AM FULLY VACCINATED.

01:06PM 14               THE COURT:  YES.  THANK YOU.

01:06PM 15               MR. SCHENK:  THANK YOU, YOUR HONOR.

01:06PM 16     Q.   MR. TOLBERT, DO YOU WORK FOR A COMPANY CALLED HALL GROUP?

01:06PM 17     A.   YES, SIR.

01:06PM 18     Q.   AND WHILE WORKING AT HALL, DID YOU BECOME FAMILIAR WITH A

01:06PM 19     COMPANY CALLED THERANOS?

01:06PM 20     A.   I DID.

01:06PM 21     Q.   DO YOU REMEMBER WHEN YOU INITIALLY BECAME FAMILIAR WITH

01:06PM 22     THERANOS?

01:06PM 23     A.   IN THE FALL OF 2006.

01:06PM 24     Q.   IN AROUND THAT TIME, DID THE HALL GROUP MAKE AN INVESTMENT

01:06PM 25     IN THERANOS?

01:06PM   1    A.   WE DID.

01:06PM   2    Q.   AND WAS THAT THE ONLY INVESTMENT THAT HALL MADE IN

01:06PM   3    THERANOS?

01:06PM   4    A.   IN 2006 IT WAS.  WE HAD INVESTED ABOUT $2 MILLION.

01:06PM   5         WE HAD A SUBSEQUENT INVESTMENT IN DECEMBER OF 2013.

01:06PM   6         THOSE WERE THE TWO INVESTMENTS THAT WE MADE.

01:06PM   7    Q.   SO HALL MADE TWO SEPARATE INVESTMENTS, ONE IN 2006 AND THE

01:06PM   8    OTHER IN DECEMBER OF 2013?

01:06PM   9    A.   CORRECT.

01:06PM  10    Q.   WOULD YOU DESCRIBE TO THE JURY FIRST WHAT WORK, OR WHAT

01:07PM  11    LINE OF WORK THE HALL GROUP IS INVOLVED IN?

01:07PM  12    A.   THE HALL GROUP IS A PRIVATE INVESTMENT COMPANY, SO WE DO A

01:07PM  13    LOT OF WORK AROUND REAL ESTATE, INVESTING IN REAL ESTATE

01:07PM  14    INVESTMENT.  WE HAVE WINE OPERATIONS IN NAPA VALLEY.

01:07PM  15         AND WE DO PRIVATE INVESTING IN COMPANIES, YOU KNOW, OF ALL

01:07PM  16    DIFFERENT KIND OF SHAPES AND SIZES.

01:07PM  17    Q.   WHERE IS HALL LOCATED?

01:07PM  18    A.   OUR HEADQUARTERS ARE IN DALLAS, TEXAS.

01:07PM  19    Q.   AND THEN HOW ABOUT YOUR JOB AT THE HALL GROUP?  WHAT DO

01:07PM  20    YOU DO THERE?

01:07PM  21    A.   SO MY JOB IS RELATED TO FINANCE.  SO I DO CORPORATE

01:07PM  22    FINANCE KIND OF WORK, BUDGETS AND CASH FLOWS.

01:07PM  23         I ALSO OVERSEE OUR VENTURE INVESTING, SO INVESTMENTS THAT

01:07PM  24    WE MAKE IN PUBLIC AND PRIVATE COMPANIES.

01:07PM  25    Q.   AND WHAT IS YOUR JOB TITLE?

01:07PM 1    A.   SENIOR VICE PRESIDENT AND TREASURER.

01:07PM 2    Q.   AND WHEN YOU SAY YOU OVERSEE VENTURE INVESTING, DID THE

01:08PM 3    TWO THERANOS INVESTMENTS THAT YOU TOLD US ABOUT FALL WITHIN

01:08PM 4    THAT PART OF YOUR JOB?

01:08PM 5    A.   THEY WOULD HAVE COME UNDER THAT UMBRELLA, YES.

01:08PM 6    Q.   SO DID YOU OVERSEE THE INVESTMENT THAT HALL MADE IN 2006

01:08PM 7    AND AGAIN IN 2013?

01:08PM 8    A.   I DID.

01:08PM 9    Q.   WOULD YOU BRIEFLY DESCRIBE FOR THE JURY YOUR EDUCATIONAL

01:08PM 10   BACKGROUND?

01:08PM 11   A.   SO I HAVE A BACHELOR'S DEGREE FROM THE UNIVERSITY OF

01:08PM 12   GEORGIA, AND A MASTER'S IN BUSINESS FROM BRIGHAM YOUNG IN

01:08PM 13   PROVO.

01:08PM 14   Q.   AND HOW LONG HAVE YOU WORKED AT HALL GROUP?

01:08PM 15   A.   I STARTED AT HALL GROUP IN 1999, SO 23 YEARS.

01:08PM 16   Q.   AND HAVE YOUR JOB RESPONSIBILITIES, HAVE THEY CHANGED IN

01:08PM 17   THAT PERIOD OF TIME?

01:08PM 18   A.   THEY HAVE.  SO I STARTED OFF AS A FINANCIAL ANALYST, AND,

01:08PM 19   YOU KNOW, HAVE BEEN THERE LONG ENOUGH THAT I HAVE HAD MORE

01:08PM 20   RESPONSIBILITY OVER TIME.

01:08PM 21   Q.   I'D LIKE TO NOW FOCUS YOUR ATTENTION ON THE 2006 TIME

01:08PM 22   PERIOD WHEN YOU SAID THAT HALL MADE THIS INITIAL INVESTMENT IN

01:09PM 23   THERANOS.

01:09PM 24       DO YOU REMEMBER HOW THERANOS CAME ON TO YOUR RADAR?

01:09PM 25   A.   SO MY BOSS, CRAIG HALL, HAD APPROACHED ME ONE DAY AND

TOLBERT DIRECT BY MR. SCHENK                                    4404

01:09PM 1    SAID, YOU KNOW, I HAD A CONVERSATION WITH A FRIEND ABOUT A

01:09PM 2    POTENTIAL INVESTMENT IN A COMPANY NAMED THERANOS, HERE'S THE

01:09PM 3    INFORMATION THAT I HAVE.  I WOULD LIKE YOU TO REVIEW IT AND

01:09PM 4    LET'S HAVE MORE CONVERSATIONS ABOUT IT.

01:09PM 5        SO HE HAD, HE HAD BROUGHT IT TO ME AND SAID, LOOK, THIS IS

01:09PM 6    AN OPPORTUNITY THAT HAS PRESENTED ITSELF.

01:09PM 7    Q.   AND THEN DID YOU TAKE EFFORTS TO LEARN MORE ABOUT

01:09PM 8    THERANOS?

01:09PM 9    A.   WE DID.  I DID, YEAH.

01:09PM 10   Q.   AND WHAT WERE THOSE EFFORTS?

01:09PM 11   A.   OH, WHAT WERE THE EFFORTS?

01:09PM 12       WE HAD SCHEDULED A SERIES OF PHONE CALLS WITH THE PEOPLE

01:09PM 13   WHO HAD INTRODUCED US TO THE OPPORTUNITY, AS WELL AS WITH THE

01:09PM 14   COMPANY, WITH THERANOS AND ELIZABETH HOLMES, AS WELL AS DOING

01:09PM 15   SOME OTHER DUE DILIGENCE AROUND THAT TIME.

01:10PM 16   Q.   WHEN YOU SAID THAT THERE WERE SOME INDIVIDUALS OR I THINK

01:10PM 17   FRIENDS OF MR. HALL WHO BROUGHT THE OPPORTUNITY TO YOU, THOSE

01:10PM 18   INDIVIDUALS DID NOT WORK AT THERANOS, DID THEY?

01:10PM 19   A.   THEY DID NOT.

01:10PM 20   Q.   THEY WERE INDIVIDUALS THAT MR. HALL KNEW FROM OTHER PARTS

01:10PM 21   OF HIS LIFE; IS THAT CORRECT?

01:10PM 22   A.   THAT'S CORRECT.  IT WAS FROM A FRIEND WHO I THINK HAD BEEN

01:10PM 23   A PRIOR INVESTOR IN THERANOS AND WHO HAD REACHED OUT TO HIM AND

01:10PM 24   SAID, I KNOW ABOUT AN OPPORTUNITY TO MAKE AN INVESTMENT IN

01:10PM 25   THERANOS, AND SO THAT'S HOW THE OPPORTUNITY KIND OF CAME TO US.

TOLBERT DIRECT BY MR. SCHENK                                    4405

01:10PM   1    Q.    DO YOU RECALL THAT INDIVIDUAL'S NAME?

01:10PM   2    A.    THAT INDIVIDUAL'S NAME IS GARY NORDHEIMER.

01:10PM   3    Q.    CAN YOU SPELL THAT LAST NAME FOR US?

01:10PM   4    A.    I BELIEVE IT'S N-O-R-D-H-E-I-M-E-R.

01:10PM   5    Q.    THANK YOU.

01:10PM   6          AND YOU DESCRIBED, I THINK -- IN ADDITION TO SPEAKING WITH

01:10PM   7    MR. NORDHEIMER, DID YOU ALSO SPEAK TO ELIZABETH HOLMES?

01:10PM   8    A.    WE DID.

01:10PM   9    Q.    AND WAS THAT ON THE TELEPHONE OR IN PERSON?  WHAT DO YOU

01:11PM  10    RECALL ABOUT THAT?

01:11PM  11    A.    IT WAS A TELEPHONE CALL.  WE HAD A CONFERENCE CALL WITH,

01:11PM  12    AS I REMEMBER, WITH ELIZABETH AND -- YOU KNOW, MAYBE A LITTLE

01:11PM  13    CONTEXT IS HELPFUL.

01:11PM  14          SO MR. NORDHEIMER HAD CALLED MR. HALL AND SAID THERE IS AN

01:11PM  15    OPPORTUNITY TO POTENTIALLY INVEST IN THIS COMPANY THAT I'M

01:11PM  16    AFFILIATED WITH NAMED THERANOS.

01:11PM  17          HE HAD INVESTED THROUGH A FRIEND OF HIS NAMED CHRIS LUCAS.

01:11PM  18          AND SO AS I RECALL, THOSE PHONE CALLS THAT WE HAD WITH THE

01:11PM  19    COMPANY, WITH THERANOS AND WITH ELIZABETH, WERE ALSO WITH

01:11PM  20    CHRIS LUCAS.  CHRIS IS THE ONE WHO WOULD HAVE ORGANIZED THESE

01:11PM  21    CALLS WITH US.

01:11PM  22    Q.    I SEE.  SO THIS INITIAL 2006 TIMEFRAME INCLUDED A PHONE

01:11PM  23    CONVERSATION WITH MR. NORDHEIMER, WITH MR. LUCAS, AND WHO ELSE?

01:11PM  24    A.    WELL, MR. NORDHEIMER WOULD NOT HAVE BEEN ON THE CALL.  HE

01:11PM  25    JUST MADE US AWARE OF THE OPPORTUNITY.

TOLBERT DIRECT BY MR. SCHENK                                    4406

01:11PM 1           AND THEN MR. LUCAS WOULD HAVE ORGANIZED THE CALL WITH

01:12PM 2    ELIZABETH AND MR. HALL AND MYSELF.

01:12PM 3    Q.   SO DID YOU PARTICIPATE IN A PHONE CALL WITH

01:12PM 4    ELIZABETH HOLMES?

01:12PM 5    A.   I DID.

01:12PM 6    Q.   AND DID YOU ALSO GO OUT TO PALO ALTO TO VISIT THERANOS?

01:12PM 7    A.   AFTER THAT INITIAL PHONE CALL, THERE WAS ENOUGH INTEREST

01:12PM 8    ON OUR PART THAT I DID TAKE A TRIP OUT TO CALIFORNIA TO VISIT

01:12PM 9    WITH HER AND CHRIS LUCAS.

01:12PM 10   Q.   AND WAS THAT ALSO IN 2006?

01:12PM 11   A.   THAT WOULD HAVE BEEN IN PROBABLY NOVEMBER OF 2006.

01:12PM 12   Q.   ON THE PHONE AND WHEN YOU WENT IN PERSON, DID YOU EVER

01:12PM 13   SPEAK WITH SOMEONE NAMED SUNNY BALWANI?

01:12PM 14   A.   I DID NOT.

01:12PM 15   Q.   SO YOU DIDN'T MEET HIM, EXCUSE ME, WHEN YOU WENT TO

01:12PM 16   CALIFORNIA IN 2006?

01:12PM 17   A.   I DID NOT.

01:12PM 18   Q.   AND HOW ABOUT IN 2013?  YOU DESCRIBED TO THE JURY BRIEFLY

01:12PM 19   AN INVESTMENT THAT WAS MADE IN 2013.

01:12PM 20         DID YOU EVER SPEAK WITH MR. BALWANI AT THAT TIME?

01:12PM 21   A.   I HAVE NEVER SPOKEN WITH MR. BALWANI.

01:12PM 22   Q.   PERIOD?  NOT IN 2006 OR 2013 AT ANY POINT?

01:12PM 23   A.   NO, NEVER.  TODAY IS THE FIRST TIME THAT I HAVE EVER SEEN

01:13PM 24   MR. BALWANI IN PERSON.

01:13PM 25   Q.   THANK YOU.

TOLBERT DIRECT BY MR. SCHENK                                    4407

01:13PM  1        I WANT TO TALK ABOUT WHAT YOU LEARNED ABOUT THERANOS IN

01:13PM  2   2006, AND THEN I'LL ASK YOU TO COMPARE THAT TO WHAT YOU LEARNED

01:13PM  3   IN 2013.

01:13PM  4        SO LET'S START WITH 2006.  WHEN YOU WERE EITHER SPEAKING

01:13PM  5   TO MS. HOLMES ON THE PHONE OR IN PALO ALTO, DID YOU LEARN ABOUT

01:13PM  6   THE LINE OF BUSINESS THAT THERANOS WAS INVOLVED IN?

01:13PM  7   A.   I DID.  WE -- SO WHEN I CAME TO CALIFORNIA AND MET WITH

01:13PM  8   MS. HOLMES, WE HAD DINNER TOGETHER WITH MR. LUCAS AND WITH HIS

01:13PM  9   UNCLE, DON LUCAS, AND WE TALKED ABOUT THE COMPANY AND THE

01:13PM 10   VISION OF THE COMPANY AND, YOU KNOW, THE ABILITY OR THE VISION

01:13PM 11   TO TAKE DROPS OF BLOOD AND PERFORM TESTS ON THAT AND TO BE ABLE

01:13PM 12   TO HAVE RESULTS COME BACK AND, YOU KNOW, KIND OF IN REALTIME AS

01:13PM 13   IT WERE AND BE COMMUNICATED TO THE DOCTORS WHO HAD ORDERED

01:14PM 14   THOSE TESTS.

01:14PM 15   Q.   YOU HAVE USED THE WORD "VISION."

01:14PM 16        WHAT DO YOU MEAN BY THAT?

01:14PM 17   A.   WELL, IN 2006 IT WAS THE VERY BEGINNING AS THE OPERATIONS

01:14PM 18   OF THE COMPANY WERE JUST STARTING, AND SO THE VISION WAS THAT,

01:14PM 19   YOU KNOW, THERE WOULD BE A LOT OF THINGS THAT WOULD BE

01:14PM 20   DEVELOPED OVER TIME AROUND THIS INITIAL IDEA OF TAKING SMALL,

01:14PM 21   YOU KNOW, DROPS OF BLOOD AND DOING TESTS ON THEM.

01:14PM 22   Q.   AND YOU SAID THAT IT WAS EARLY ON.

01:14PM 23        WHAT DID YOU MEAN BY THAT?

01:14PM 24   A.   WELL, I THINK THE COMPANY WAS STILL, YOU KNOW, IN THE

01:14PM 25   BEGINNING STAGES.  I DON'T KNOW WHEN THE FIRST INVESTMENTS HAD

TOLBERT DIRECT BY MR. SCHENK                    4408

01:14PM  1    BEEN MADE.  YOU KNOW, I THINK A YEAR OR TWO PRIOR TO WHEN OUR

01:14PM  2    INVESTMENT WAS MADE IN 2006.

01:14PM  3        SO I THINK, YOU KNOW, THE COMPANY HAD COME TO A POINT AT

01:14PM  4    THAT TIME -- THIS WAS NOVEMBER, DECEMBER OF 2006 -- WHERE THEY

01:14PM  5    HAD SOME MACHINES THAT WERE BUILT, SOME CARTRIDGES THAT BLOOD

01:14PM  6    COULD GO ON, AND THEY WERE STARTING TO BE ABLE TO DO THAT KIND

01:14PM  7    OF TESTING.

01:15PM  8        AS WE INVESTED IN 2006, YOU KNOW, MY UNDERSTANDING WAS

01:15PM  9    THAT THEY WERE ABLE TO DO SOME OF THAT TESTING FOR

01:15PM 10    PHARMACEUTICAL COMPANIES.

01:15PM 11        AND SO THERE WAS A PRODUCT AND IT HAD BEEN DEVELOPED AND

01:15PM 12    IT WAS OPERATIONAL, BUT IT WASN'T PERFECTED, RIGHT?  THERE WAS

01:15PM 13    A LOT OF, A LOT OF KIND OF ADD ON THINGS OR DEVELOPMENT THAT

01:15PM 14    COULD -- IT WAS ANTICIPATED TO TAKE PLACE FROM THEN FORWARD.

01:15PM 15    Q.   THANK YOU.

01:15PM 16        SO YOU UNDERSTOOD IN 2006 THAT THE TECHNOLOGY WAS NOT

01:15PM 17    PERFECTED; IS THAT RIGHT?

01:15PM 18    A.   CORRECT.

01:15PM 19    Q.   AND THEN YOU'VE DESCRIBED TO THE JURY SOME OF WHAT YOU

01:15PM 20    UNDERSTOOD THE INVESTMENT IN THERANOS, OR AT LEAST WHAT

01:15PM 21    THERANOS WAS INVOLVED IN.

01:15PM 22        WHERE DID YOU GET THAT UNDERSTANDING?  FROM WHOM?

01:15PM 23    A.   SO THAT UNDERSTANDING WOULD HAVE COME FROM, YOU KNOW, MY

01:15PM 24    CONVERSATIONS WITH ELIZABETH AND FROM THE INFORMATION THAT SHE

01:15PM 25    AND CHRIS HAD PROVIDED ABOUT THE COMPANY.

TOLBERT DIRECT BY MR. SCHENK                                    4409

01:15PM   1    Q.   AND WHEN IN 2006 WAS THE DECISION MADE TO INVEST?

01:16PM   2    A.   IT WAS MADE, AS I RECALL, IN NOVEMBER OR DECEMBER OF 2006.

01:16PM   3    Q.   AND I THINK YOU TOLD THE JURY THE AMOUNT, BUT PLEASE

01:16PM   4    REMIND US.

01:16PM   5    A.   YOU KNOW, HALL HAD INVESTED $2 MILLION.

01:16PM   6         YOU KNOW, SUBSEQUENTLY, THERE WERE A FEW PEOPLE WHO WERE

01:16PM   7    ALLOWED TO PARTICIPATE IN THAT ON OUR SIDE, SO I THINK HALL'S

01:16PM   8    ACTUAL INVESTMENT WAS LIKE A MILLION 875.

01:16PM   9    Q.   AND WHEN YOU SAY "HALL," DO YOU MEAN HALL GROUP?

01:16PM  10    A.   THAT'S CORRECT.

01:16PM  11    Q.   AND WAS THE INVESTMENT A DIRECT INVESTMENT IN THERANOS?

01:16PM  12    A.   IT WAS NOT.  SO, YOU KNOW, I HAD MENTIONED THAT

01:16PM  13    MR. NORDHEIMER HAD BROUGHT THIS OPPORTUNITY TO US THROUGH HIS

01:16PM  14    INVESTMENT IN CHRIS LUCAS'S COMPANY.

01:16PM  15         SO WHEN WE MADE THE DECISION TO INVEST, WE INVESTED IN AN

01:16PM  16    INVESTMENT VEHICLE THAT CHRIS LUCAS HAD ESTABLISHED TO INVEST

01:16PM  17    IN THERANOS, AND SO WE INVESTED THROUGH MR. LUCAS'S COMPANY.

01:17PM  18    Q.   SO YOU PROVIDED YOUR MONEY TO MR. LUCAS TO MAKE AN

01:17PM  19    INVESTMENT IN THERANOS; IS THAT RIGHT?

01:17PM  20    A.   CORRECT.

01:17PM  21    Q.   IS THAT DIFFERENT THAN THE STRUCTURE OF THE 2013

01:17PM  22    INVESTMENT?

01:17PM  23    A.   IT IS.

01:17PM  24         SO ULTIMATELY IN 2013, WHEN WE MADE THE DECISION TO MAKE A

01:17PM  25    FURTHER INVESTMENT, WE WANTED TO HAVE A DIRECT RELATIONSHIP

ER-3213

TOLBERT DIRECT BY MR. SCHENK 4410

01:17PM 1   WITH THE COMPANY, NOT, YOU KNOW, NOT THROUGH AN INTERMEDIARY,

01:17PM 2   SO WE MADE A DIRECT INVESTMENT IN 2013.

01:17PM 3   Q.   IN 2006 WHEN YOU WERE DECIDING WHETHER TO INVEST, DID YOU

01:17PM 4   VIEW THE INVESTMENT AS A RISKY INVESTMENT?

01:17PM 5   A.   YOU KNOW, CERTAINLY BY NATURE OF INVESTING IN THOSE KINDS

01:17PM 6   OF COMPANIES, THERE WAS RISK ASSOCIATED WITH IT IN 2006.

01:17PM 7   Q.   TELL US ABOUT THAT.

01:17PM 8       WHAT DID YOU VIEW THE RISKS OF THE INVESTMENT IN 2006 TO

01:17PM 9   REALLY BE?

01:17PM 10  A.   SO, YOU KNOW, THERE WAS A MULTITUDE OF RISKS, RIGHT?

01:18PM 11  THERE WAS RISK THAT ONCE THE TESTS WERE DEVELOPED OR ONCE THE

01:18PM 12  TECHNOLOGIES WERE DEVELOPED, THAT THEY COULDN'T BE MANUFACTURED

01:18PM 13  COST EFFICIENTLY.

01:18PM 14      THERE WERE, YOU KNOW, RISKS THAT THE SCIENCE I GUESS

01:18PM 15  WOULDN'T WORK, THAT THE TESTS WOULDN'T BE ABLE TO BE PERFECTED,

01:18PM 16  OR THAT THE NUMBER OF TESTS THAT COULD BE DONE WOULDN'T BE ABLE

01:18PM 17  TO, YOU KNOW, DEVELOP IN A WAY THAT WOULD MAKE IT INTO A

01:18PM 18  PROFITABLE INVESTMENT.

01:18PM 19  Q.   AND WHEN YOU INVESTED IN 2013, DID YOU THINK THAT THE SAME

01:18PM 20  RISKS WERE PRESENT OR DIFFERENT?

01:18PM 21  A.   WE DID NOT.  WE FELT LIKE THE RISKS HAD BEEN MITIGATED A

01:18PM 22  LOT, THAT BETWEEN 2006 AND 2013, THERE WERE SEVEN YEARS WORTH

01:18PM 23  OF DEVELOPMENT AND THAT IT HAD HAPPENED.

01:18PM 24      OUR UNDERSTANDING WAS THAT THE COMMERCIAL APPLICATIONS OF

01:18PM 25  THE TECHNOLOGY HAD BEEN DEVELOPED IN A WAY THAT, YOU KNOW,

TOLBERT DIRECT BY MR. SCHENK                                              4411

01:19PM   1        PRESENTED GREAT OPPORTUNITIES.

01:19PM   2             AND IN 2013, THE PRIMARY RISK WAS ONE OF ROLLING THE

01:19PM   3        TECHNOLOGY OUT AND COMMERCIALIZING IT, YOU KNOW, FOR A MASS

01:19PM   4        RETAILER CONSUMER AUDIENCE.

01:19PM   5             BUT IT FELT LIKE THE UNDERLYING SCIENCE AND THE ABILITY OF

01:19PM   6        THE TECHNOLOGY TO DO WHAT -- TO DO THE TESTS AND PERFORM

01:19PM   7        ACCURATE RESULTS HAD BEEN LARGELY ACCOMPLISHED.

01:19PM   8        Q.   DID YOU GET INFORMATION FROM SOMEONE AT THERANOS IN

01:19PM   9        ADVANCE OF YOUR 2013 INVESTMENT THAT MADE YOU EVALUATE THESE

01:19PM  10        RISKS DIFFERENTLY, THE 2006 VERSUS THE 2013 RISKS?

01:19PM  11        A.   YOU KNOW, I GUESS IF IT'S HELPFUL, A LITTLE CONTEXT.

01:19PM  12             SO BETWEEN 2006 AND 2013, YOU KNOW, I HAD MULTIPLE

01:19PM  13        CONVERSATIONS WITH MR. LUCAS EVERY YEAR TALKING ABOUT, YOU

01:19PM  14        KNOW, WHAT THE COMPANY WAS ACCOMPLISHING, YOU KNOW, WHAT

01:20PM  15        DEVELOPMENTS THERE HAD BEEN.

01:20PM  16             AND THEN IN 2013, YOU KNOW, WE WANTED TO BE A DIRECT

01:20PM  17        INVESTOR SO THAT WE WOULD HAVE AN ABILITY TO HAVE MORE DIRECT

01:20PM  18        COMMUNICATIONS FROM THE COMPANY.

01:20PM  19             AND SO, YOU KNOW, AS WE KIND OF CAME INTO THAT OPPORTUNITY

01:20PM  20        IN 2013, WE DID SEEK AN OPPORTUNITY TO VISIT WITH MS. HOLMES

01:20PM  21        DIRECTLY ABOUT THAT, AND SO WE HAD SOME DIRECT CONVERSATIONS

01:20PM  22        WITH HER ABOUT THE STATE OF THE BUSINESS AND WHAT WAS GOING ON.

01:20PM  23        Q.   SO THEN AGAIN, BEFORE YOU INVESTED IN 2013, YOU HAD

01:20PM  24        FURTHER CONVERSATIONS WITH MS. HOLMES; IS THAT RIGHT?

01:20PM  25        A.   CORRECT.

TOLBERT DIRECT BY MR. SCHENK                    4412

01:20PM  1    Q.   YOU MENTIONED IT BRIEFLY.  LET'S TALK ABOUT THAT A LITTLE

01:20PM  2    BIT MORE.

01:20PM  3         THE TIME PERIOD AFTER YOUR 2006 INVESTMENT LEADING UP TO

01:20PM  4    THE INVESTMENT IN 2013, DID YOU HAVE ANY COMMUNICATION WITH

01:20PM  5    MS. HOLMES DURING THAT PERIOD OF TIME?

01:20PM  6    A.   NOT DIRECTLY THAT I REMEMBER.

01:20PM  7    Q.   WERE YOU GETTING ANY INFORMATION ABOUT THERANOS AT THAT

01:21PM  8    TIME?

01:21PM  9    A.   YEAH.  LIKE I MENTIONED, I WOULD HAVE PERIODIC PHONE CALLS

01:21PM  10   WITH MR. LUCAS.  YOU KNOW, MY UNDERSTANDING WAS THAT HE WAS

01:21PM  11   GETTING REGULAR UPDATES FROM ELIZABETH AND FROM THE COMPANY.

01:21PM  12        AND SO ANY TIME IT FELT LIKE HE HAD RECEIVED THAT, HE

01:21PM  13   WOULD CALL ME AND WE WOULD TALK THROUGH THOSE, OR I WOULD

01:21PM  14   PROMPT HIM TO HAVE A PHONE CALL AND TALK ABOUT WHAT THE MOST

01:21PM  15   RECENT DEVELOPMENTS HAD BEEN.

01:21PM  16   Q.   SO IS IT FAIR TO SAY THAT CHRIS LUCAS, IN FACT, WAS YOUR

01:21PM  17   SOURCE OF INFORMATION ABOUT THERANOS BETWEEN THE TWO

01:21PM  18   INVESTMENTS?

01:21PM  19   A.   YEAH, DIRECT INFORMATION.

01:21PM  20        I MEAN, CERTAINLY KIND OF THROUGH THAT TIME WE TRIED TO

01:21PM  21   FIND OTHER WAYS TO VALIDATE WHAT HE WAS TELLING US, RIGHT?  WE

01:21PM  22   DID INTERNET SEARCHES AND OTHERWISE.

01:21PM  23        BUT HE WAS THE PRIMARY SOURCE OF INFORMATION DIRECT AT

01:21PM  24   THAT TIME.

01:21PM  25   Q.   GREAT.  SO NOW I'D LIKE TO BRING YOU UP TO 2013.

TOLBERT DIRECT BY MR. SCHENK 4413

01:21PM 1          YOUR HONOR, MAY I APPROACH?

01:21PM 2                THE COURT:  YES.

01:21PM 3                MR. SCHENK:  (HANDING.)

01:22PM 4     Q.   MR. TOLBERT, IF I COULD DRAW YOUR ATTENTION TO TAB 3940 IN

01:22PM 5     THE BINDER IN FRONT OF YOU.

01:22PM 6          YOUR HONOR, THE DEFENSE AND I BELIEVE THE COURT HAVE A

01:22PM 7     COPY?

01:22PM 8                THE COURT:  THANK YOU.

01:22PM 9     BY MR. SCHENK:

01:22PM 10    Q.   MR. TOLBERT, DO YOU SEE THE EMAIL AT 3940?

01:22PM 11    A.   I DO.

01:22PM 12    Q.   AND IS THIS ONE OF THE COMMUNICATIONS YOU'VE DESCRIBED TO

01:22PM 13    THE JURY FROM MR. LUCAS TO YOU ABOUT THERANOS?

01:22PM 14    A.   IT IS.

01:22PM 15                MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3940.

01:22PM 16                MR. CAZARES:  NO OBJECTION.

01:22PM 17                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:22PM 18          (GOVERNMENT'S EXHIBIT 3940 WAS RECEIVED IN EVIDENCE.)

01:23PM 19    BY MR. SCHENK:

01:23PM 20    Q.   MR. TOLBERT, DO YOU SEE THIS EMAIL IN JULY OF 2013 FROM

01:23PM 21    CHRIS LUCAS?

01:23PM 22    A.   I DO.

01:23PM 23    Q.   WAS JULY, THIS LATTER PART OF JULY 2013, THE BEGINNING OF

01:23PM 24    A PERIOD OF TIME WHEN YOU BEGAN TO RECEIVE MORE INFORMATION

01:23PM 25    FROM THERANOS?

01:23PM 1    A.   IT WAS.  SO MR. LUCAS AND I HAD, YOU KNOW, CONVERSATIONS

01:23PM 2    COMING INTO 2013 AND KIND OF THROUGH THIS PERIOD THAT THE

01:23PM 3    COMPANY WAS IN A PLACE THAT IT WAS GOING TO BE MORE PUBLIC WITH

01:23PM 4    INFORMATION.

01:23PM 5         I THINK, YOU KNOW, THERE HAD BEEN SOME REFERENCE THAT THEY

01:23PM 6    WERE COMING OUT OF STEALTH MODE, AND SO THIS WAS THE FIRST

01:23PM 7    THING THAT I REMEMBER THAT WAS, YOU KNOW, KIND OF PUBLIC

01:23PM 8    INFORMATION THAT HE HAD SENT OVER.

01:23PM 9    Q.   AND YOU USED A PHRASE, "STEALTH MODE."

01:23PM 10        WHAT DOES THAT MEAN?

01:23PM 11   A.   WELL, JUST -- YOU KNOW, DURING THE PERIOD FROM 2006

01:24PM 12   ONWARD, WE KNEW THAT THE COMPANY WAS TRYING TO DO THINGS IN A

01:24PM 13   WAY THAT WOULDN'T ALERT COMPETITORS OR PROVOKE A COMPETITIVE

01:24PM 14   RESPONSE AND WOULD ALLOW THEM TO DEVELOP THIS TECHNOLOGY IN A

01:24PM 15   WAY THAT, YOU KNOW, THAT DIDN'T -- THAT KIND OF WASN'T PUBLIC

01:24PM 16   TO THE WORLD UNTIL IT WAS PERFECTED.

01:24PM 17        SO THAT'S WHAT I MEANT WHEN I SAID STEALTH MODE.

01:24PM 18   Q.   AND YOU, I THINK, DESCRIBED THAT THERANOS WAS COMING OUT

01:24PM 19   OF STEALTH MODE.

01:24PM 20   A.   THAT'S RIGHT.  SO WE HAD COME TO THIS PLACE WHERE THEY HAD

01:24PM 21   PUBLISHED ON THEIR WEBSITE AND CHRIS HAD INDICATED THAT THERE

01:24PM 22   WAS GOING TO BE KIND OF MORE AND MORE OF THAT COMING IN A

01:24PM 23   PUBLIC WAY.

01:24PM 24   Q.   DID LEAVING STEALTH MODE SAY ANYTHING TO YOU ABOUT THE

01:24PM 25   MATURITY OF THE TECHNOLOGY?

TOLBERT DIRECT BY MR. SCHENK                                    4415

```
01:24PM   1    A.   IT CERTAINLY GAVE US CONFIDENCE THAT THE TECHNOLOGY HAD

01:24PM   2    BEEN, YOU KNOW, DEVELOPED AND PERFECTED IN A WAY THAT NOW IT

01:24PM   3    WAS READY TO KIND OF HAVE SCRUTINY FROM THE OUTSIDE WORLD.

01:25PM   4    Q.   IN THE EMAIL IT LOOKS LIKE MR. LUCAS MAKES REFERENCE TO

01:25PM   5    RECEIVING MORE COMMUNICATION FROM THE COMPANY.

01:25PM   6         DO YOU SEE THAT?

01:25PM   7    A.   CORRECT.

01:25PM   8    Q.   AND DID YOU SHARE THAT SENTIMENT?

01:25PM   9    A.   I DID.

01:25PM  10    Q.   WHY?

01:25PM  11    A.   WELL, YOU KNOW, THROUGH THOSE INTERVENING YEARS, 2006

01:25PM  12    UNTIL 2013, YOU KNOW, WE WERE EXCITED ABOUT THIS OPPORTUNITY,

01:25PM  13    AND IT FELT LIKE THERE WAS GREAT PROGRESS BEING MADE, SO, YOU

01:25PM  14    KNOW, IT FELT LIKE WE HAD REASON TO BELIEVE THAT THIS WAS GOING

01:25PM  15    TO BE A VERY SUCCESSFUL INVESTMENT.

01:25PM  16         ON TOP OF THE FACT THAT IT WAS, YOU KNOW -- THAT THE

01:25PM  17    INVESTMENT WAS BASED ON SOMETHING THAT WE FELT GOOD ABOUT.

01:25PM  18         YOU KNOW, I DON'T LIKE GOING TO THE DOCTOR AND HAVING BIG

01:25PM  19    VIALS OF BLOOD DRAWN, SO WE WERE EXCITED NOT ONLY ABOUT WHAT

01:26PM  20    THE COMPANY WAS GOING TO DO, BUT THE WAY THEY WERE DOING IT.

01:26PM  21         AND SO AS THINGS WERE BECOMING MORE AND MORE READY TO BE

01:26PM  22    ROLLED OUT, IT FELT LIKE THAT MEANT THAT THINGS WERE -- THAT

01:26PM  23    THEY WERE WORKING AND THAT WE WERE EXCITED TO BE ABLE TO HAVE

01:26PM  24    MORE VISIBILITY INTO THE PROGRESS.

01:26PM  25    Q.   THANK YOU.
```

TOLBERT DIRECT BY MR. SCHENK                                    4416

01:26PM   1          WOULD YOU NOW TURN TO THE FIRST TAB IN YOUR BINDER.  IT'S

01:26PM   2    949.

01:26PM   3          MR. TOLBERT, IS THIS A GROUP OF EMAILS FROM THERANOS TO

01:26PM   4    YOU THROUGH INDIVIDUALS THAT WORK WITH MR. LUCAS?

01:26PM   5    A.   IT IS.

01:26PM   6              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 949.

01:26PM   7              MR. CAZARES:  NO OBJECTION.

01:26PM   8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:26PM   9          (GOVERNMENT'S EXHIBIT 949 WAS RECEIVED IN EVIDENCE.)

01:26PM  10    BY MR. SCHENK:

01:27PM  11    Q.   MR. TOLBERT, IF WE CAN START ON PAGE 2.

01:27PM  12          DO YOU SEE AN EMAIL FROM THERANOS TO THERANOS ON

01:27PM  13    JULY 29TH, 2013?

01:27PM  14    A.   I DO.

01:27PM  15    Q.   AND THE EMAIL IS FROM SOMETHING CALLED

01:27PM  16    SHAREHOLDERINFO@THERANOS.COM.

01:27PM  17          DO YOU SEE THAT?

01:27PM  18    A.   I DO.

01:27PM  19    Q.   WITHIN THE BODY IT LOOKS LIKE IT SAYS, "DEAR SHAREHOLDER,

01:27PM  20          "IT IS WITH GREAT PLEASURE THAT I WRITE TO INFORM YOU OF

01:27PM  21    OUR UPCOMING CONSUMER LAUNCH."

01:27PM  22          AND THEN IT CONTINUES.

01:27PM  23          "WE HAVE BEEN WORKING IN STEALTH MODE FOR SEVERAL YEARS TO

01:27PM  24    PREPARE FOR THIS."

01:27PM  25          AND THEN THE NEXT PARAGRAPH.

TOLBERT DIRECT BY MR. SCHENK                                    4417

01:27PM   1          "WE WILL BEGIN SENDING INFORMATION TO OUR SHAREHOLDERS

01:27PM   2     THROUGH EMAIL BRIEFS."

01:27PM   3          DO YOU SEE THAT?

01:27PM   4     A.   I DO.

01:27PM   5     Q.   SO AFTER THIS TIME, JULY OF 2013, DID YOU, IN FACT, BEGIN

01:27PM   6     TO GET MORE INFORMATION FROM THERANOS OVER EMAIL?

01:27PM   7     A.   A LITTLE BIT MORE INFORMATION.  CERTAINLY MORE THAN WE HAD

01:28PM   8     PRIOR TO THIS.

01:28PM   9     Q.   MORE COMPARED TO 2006 THROUGH 2012?

01:28PM  10     A.   2006 THROUGH 2012, YEAH.  WE HAD NOTHING DIRECT IN THOSE

01:28PM  11     INTERVENING YEARS, AND SO, YES, THIS REPRESENTS THE FIRST KIND

01:28PM  12     OF TIME THAT WE HAD HEARD DIRECTLY FROM THE COMPANY.

01:28PM  13     Q.   THANK YOU.

01:28PM  14          AND THEN IN THE NEXT PARAGRAPH, DO YOU SEE THAT THERE'S A

01:28PM  15     REFERENCE TO THE FIRST NEW WEBSITE CONTENT IS UP TODAY?

01:28PM  16     A.   I DO.

01:28PM  17     Q.   AND THE COMPANY, IT LOOKS LIKE, IS ISSUING A PRESS

01:28PM  18     RELEASE.

01:28PM  19          DO YOU SEE THAT?

01:28PM  20     A.   I DO.

01:28PM  21     Q.   AND THEN IF WE TURN TO THE NEXT PAGE, PAGE 3, IT LOOKS

01:28PM  22     LIKE IT'S THEN SIGNED OFF BY ELIZABETH, ELIZABETH HOLMES.

01:28PM  23          DO YOU SEE THAT?

01:28PM  24     A.   I DO.

01:28PM  25     Q.   BELOW THAT IT LOOKS AS THOUGH IT SAYS, "THERANOS ANNOUNCED

TOLBERT DIRECT BY MR. SCHENK                                    4418

01:28PM  1    TODAY THAT RICHARD M. KOVACEVICH AND GENERAL JAMES MATTIS WERE

01:29PM  2    APPOINTED TO ITS BOARD OF DIRECTORS."

01:29PM  3        WAS THIS THE PRESS RELEASE THAT WAS REFERENCED IN THE BODY

01:29PM  4    OF THE EMAIL?

01:29PM  5    A.   IT IS.

01:29PM  6    Q.   AND THEN BELOW A LITTLE FURTHER DOWN THERE'S A SECTION

01:29PM  7    THAT SAYS, "FOR ADDITIONAL PRESS LINKS," AND THEN THERE ARE

01:29PM  8    SOME CITATIONS TO ARTICLES, SOME CLICKABLE LINKS.

01:29PM  9        DO YOU SEE THAT?

01:29PM  10   A.   YES.

01:29PM  11   Q.   SOMETHING ON MARKET WATCH AND CNBC.

01:29PM  12       DO YOU HAVE A RECOLLECTION AS TO WHETHER YOU FOLLOWED

01:29PM  13   THOSE LINKS AND READ ARTICLES ABOUT THERANOS AT THE TIME?

01:29PM  14   A.   I CERTAINLY WOULD HAVE FOLLOWED THOSE AND READ THEM.

01:29PM  15   Q.   AND HOW ABOUT INFORMATION IN THE PRESS MORE GENERALLY, NOT

01:29PM  16   JUST THESE TWO CITATIONS, BUT LEADING UP TO AN INVESTMENT LATER

01:29PM  17   IN 2013, WAS INFORMATION IN THE PRESS ALSO SOMETHING THAT YOU

01:29PM  18   REVIEWED AND USED TO EVALUATE AN INVESTMENT DECISION?

01:29PM  19   A.   CERTAINLY IT WAS.  I MEAN, WE WERE -- YOU KNOW, I WAS

01:29PM  20   DOING GOOGLE SEARCHES EVERY FEW DAYS AT THIS POINT.

01:29PM  21   Q.   WHY?

01:29PM  22   A.   YOU KNOW, AS INFORMATION BECAME MORE PUBLIC AND MORE

01:30PM  23   AVAILABLE, WE WERE INTERESTED TO SEE HOW IT WAS RECEIVED AND

01:30PM  24   PORTRAYED, AND JUST TO HAVE AS MUCH VISIBILITY AS WE COULD INTO

01:30PM  25   WHAT WAS GOING ON.

TOLBERT DIRECT BY MR. SCHENK                                    4419

01:30PM  1    Q.   THANK YOU.

01:30PM  2         NOW, IF YOU CAN GO TO THE FIRST PAGE OF THIS DOCUMENT,

01:30PM  3    949.  IT LOOKS LIKE THERE ARE A COUPLE OF EMAILS FROM SOMEONE

01:30PM  4    NAMED ANA QUINTANA.

01:30PM  5         DO YOU SEE THAT?

01:30PM  6    A.   I DO.

01:30PM  7    Q.   AND DO YOU KNOW WHO MS. QUINTANA IS?

01:30PM  8    A.   YEAH, SHE IS ONE OF THE PRINCIPALS AT BLACK DIAMOND

01:30PM  9    VENTURES, WHICH IS CHRIS LUCAS'S FUND.  SO SHE'S AN EMPLOYEE

01:30PM  10   WITH CHRIS AT BLACK DIAMOND VENTURES.

01:30PM  11   Q.   I SEE.  AND IT REFERENCES IN BOTH EMAILS INFORMATION ABOUT

01:30PM  12   SHAREHOLDER LETTERS, OR SHAREHOLDER UPDATES.

01:30PM  13        DO YOU SEE THAT?

01:30PM  14   A.   I DO.

01:30PM  15   Q.   AND WAS THAT INFORMATION PROVIDED TO YOU BECAUSE OF YOUR

01:30PM  16   INVESTMENT IN THERANOS, BUT THROUGH BLACK DIAMOND VENTURES?

01:31PM  17   A.   CORRECT.

01:31PM  18   Q.   THANK YOU.

01:31PM  19        IF WE CAN NOW TURN TO PAGE -- I'M SORRY, EXHIBIT 4030?

01:31PM  20        MR. TOLBERT, DO YOU SEE THE EMAIL AND ATTACHMENTS LOCATED

01:31PM  21   AT 4030?

01:31PM  22   A.   I DO.

01:31PM  23   Q.   AND IS THIS ALSO INFORMATION THAT YOU RECEIVED FROM

01:31PM  24   BLACK DIAMOND VENTURES REGARDING YOUR THERANOS INVESTMENT?

01:31PM  25   A.   YES.

TOLBERT DIRECT BY MR. SCHENK                        4420

01:31PM   1              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4030.

01:31PM   2              MR. CAZARES:  NO OBJECTION.

01:31PM   3              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:31PM   4         (GOVERNMENT'S EXHIBIT 4030 WAS RECEIVED IN EVIDENCE.)

01:31PM   5    BY MR. SCHENK:

01:31PM   6    Q.   IF WE CAN START ON PAGE 1.

01:32PM   7         DO YOU SEE THIS EMAIL?  IT LOOKS LIKE IT'S FROM SOMEONE

01:32PM   8    NAMED YASMIN IBARRA?

01:32PM   9    A.   I DO.

01:32PM  10    Q.   AND DOES SHE ALSO WORK FOR CHRIS LUCAS'S FUND,

01:32PM  11    BLACK DIAMOND?

01:32PM  12    A.   YEAH, SHE DID.

01:32PM  13    Q.   SHE DID?

01:32PM  14    A.   I DON'T KNOW IF SHE DOES NOW, BUT SHE DID.

01:32PM  15    Q.   THANK YOU.

01:32PM  16         SO WE'VE NOW MOVED INTO NOVEMBER OF 2013, AND IT -- IT'S

01:32PM  17    AN EMAIL SENT TO BLACK DIAMOND INVESTORS.

01:32PM  18         DO YOU SEE THAT?

01:32PM  19    A.   I DO.

01:32PM  20    Q.   AND IT LOOKS LIKE IT INCLUDES SOME INFORMATION ABOUT

01:32PM  21    THERANOS, SOME SLIDES; IS THAT RIGHT?

01:32PM  22    A.   YES.  SO EVERY YEAR BLACK DIAMOND VENTURES WOULD HAVE AN

01:32PM  23    INVESTOR UPDATE IN THE ANNUAL MEETING WHERE THEY WOULD UPDATE

01:32PM  24    THE INVESTORS ON ALL OF THE PORTFOLIO COMPANIES THAT THEY HAD,

01:32PM  25    AND THIS WAS, YOU KNOW, THE FIRST ONE THAT INCLUDED A

01:32PM  1    SUBSTANTIAL UPDATE ON THERANOS.

01:32PM  2    Q.   I WOULD LIKE TO ASK YOU SOME QUESTIONS ABOUT A FEW SLIDES.

01:32PM  3         WOULD YOU START WITH PAGE 6.

01:33PM  4         ON PAGE 6, DO YOU SEE -- AT THE VERY BOTTOM THERE'S SOME

01:33PM  5    TEXT THAT READS, "FOR THE FIRST TIME, THERANOS IS INTRODUCING

01:33PM  6    CLIA-CERTIFIED LABORATORY SERVICES WITH THE ABILITY TO RUN ITS

01:33PM  7    TESTS ON MICRO-SAMPLES."

01:33PM  8         DO YOU SEE THAT?

01:33PM  9    A.   I DO.

01:33PM  10   Q.   WAS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE

01:33PM  11   THERANOS TECHNOLOGY?

01:33PM  12   A.   IT IS.

01:33PM  13   Q.   AND TALK TO ME FOR A MOMENT ABOUT WHETHER THIS IS AN

01:33PM  14   EVOLUTION FROM YOUR UNDERSTANDING IN 2006.

01:33PM  15   A.   YEAH.  SO CERTAINLY IN 2006 WHEN WE INVESTED, WE KNEW

01:33PM  16   THAT, YOU KNOW, AS THE TECHNOLOGY DEVELOPED AND, YOU KNOW,

01:33PM  17   WANTED TO BE CONSUMER FACING, THAT THE FDA OR OTHER AGENCIES

01:33PM  18   WOULD HAVE TO CERTIFY IT.  THERE WOULD HAVE TO BE, YOU KNOW,

01:33PM  19   SOME BLESSINGS -- TESTING THAT WOULD HAVE BEEN RUN AND

01:34PM  20   BLESSINGS THAT WOULD HAVE BEEN GIVEN TO THE TECHNOLOGY.

01:34PM  21        AND SO THROUGH THOSE INTERVENING YEARS, CHRIS AND I TALKED

01:34PM  22   A LOT ABOUT, YOU KNOW, WHAT HAD BEEN SUBMITTED FOR FDA

01:34PM  23   APPROVAL, OR WHAT THE STATUS OF THAT WAS.

01:34PM  24        SO FOR THE FIRST TIME IN 2013, AS I REMEMBER, THIS WAS --

01:34PM  25   KIND OF AROUND THIS TIMEFRAME IS THE FIRST TIME THAT WE KNEW

TOLBERT DIRECT BY MR. SCHENK                    4422

01:34PM 1    THAT THAT HAD BEEN GRANTED AND THAT, YOU KNOW, IT MEANT THAT

01:34PM 2    THERE HAD BEEN SOME VALIDATION OF THE TECHNOLOGY AND THE

01:34PM 3    ABILITY TO KIND OF TRUST WHAT THE RESULTS WERE THAT WAS COMING

01:34PM 4    FROM THOSE TESTS.

01:34PM 5    Q.   I SEE.  AND WHEN YOU'RE TALKING ABOUT FDA GRANTING

01:34PM 6    SOMETHING, ARE YOU REFERRING TO THE PHRASE "CLIA-CERTIFIED" ON

01:34PM 7    THIS DOCUMENT?

01:34PM 8    A.   NO.  I'M SORRY.

01:34PM 9        SO MY UNDERSTANDING WAS THAT THE FDA COULD APPROVE

01:34PM 10   DIFFERENT TESTS, AND THAT THERE WAS ALSO A CLIA-CERTIFIED

01:34PM 11   LABORATORY -- THERE WAS A CLIA CERTIFICATION THAT COULD COME

01:35PM 12   FROM CMS, MEDICARE, MEDICAID, AN AGENCY THAT WOULD OFFER THAT

01:35PM 13   CERTIFICATION.

01:35PM 14       SO I THINK THIS WAS DIFFERENT FROM THE FDA, BUT IT WAS

01:35PM 15   STILL KIND OF -- YOU KNOW, WE SAW THOSE CERTIFICATIONS AS

01:35PM 16   VALIDATIONS AS TO WHAT THE TECHNOLOGY COULD DO.

01:35PM 17   Q.   I SEE.  SO THE CLIA CERTIFICATION THAT WAS BEING ANNOUNCED

01:35PM 18   HERE, BEING SHARED WITH YOU, YOU UNDERSTOOD WAS SOME SORT OF

01:35PM 19   VALIDATION OF THE THERANOS TECHNOLOGY?

01:35PM 20   A.   I DID.

01:35PM 21   Q.   AND I ASKED YOU TO COMPARE THAT TO WHAT YOU UNDERSTOOD IN

01:35PM 22   2006.  HOW DID THIS SLIDE INFLUENCE OR CAUSE YOUR THINKING TO

01:35PM 23   EVOLVE BASED ON WHAT YOU KNEW IN 2006?

01:35PM 24   A.   YEAH.  SO IN 2006, LIKE I INDICATED, WE -- THERE WEREN'T

01:35PM 25   ANY OF THESE IN PLACE, AND WE KNEW THAT THOSE WOULD BE, YOU

ER-3226

01:35PM 1    KNOW, SOUGHT AFTER AND GRANTED, THE CERTIFICATIONS FROM

01:36PM 2    DIFFERENT AGENCIES.

01:36PM 3        THE FACT THAT IT WAS NOW CERTIFIED IN 2013, YOU KNOW,

01:36PM 4    MEANT THAT THE TECHNOLOGY HAD PROGRESSED IN A WAY THAT IT

01:36PM 5    COULD, AS I UNDERSTOOD, GO OUT TO CONSUMERS.

01:36PM 6        AND SO, YOU KNOW, CERTAINLY IF THERANOS WOULD HAVE COME

01:36PM 7    OUT AND SAID, YOU KNOW, WE MADE AN APPLICATION FOR THESE

01:36PM 8    CERTIFICATIONS AND WE DIDN'T GET THEM, WE WERE DENIED, THEN,

01:36PM 9    YOU KNOW, WE WOULD NOT HAVE PURSUED AN INVESTMENT.

01:36PM 10       BUT, YOU KNOW, THIS VALIDATION KIND OF ENCOURAGED US THAT

01:36PM 11   THE TECHNOLOGY WAS, WAS CONSUMER READY.

01:36PM 12   Q.   THANK YOU.

01:36PM 13       IF YOU WOULD NOW TURN TO THE NEXT PAGE, PAGE 7.

01:36PM 14       DO YOU SEE HERE IN THE MIDDLE THE PHRASE "THE LAB TEST,

01:36PM 15   REINVENTED."

01:36PM 16       AND THEN AN IMAGE?

01:36PM 17   A.   I DO.

01:36PM 18   Q.   AND WHEN YOU SAW THE PHRASE "THE LAB TEST, REINVENTED,"

01:36PM 19   PAST TENSE, "REINVENTED," DID THAT CHANGE YOUR THINKING BASED

01:36PM 20   ON WHAT YOU UNDERSTOOD THERANOS TO BE DOING IN 2006 VERSUS NOW

01:37PM 21   IN 2013?

01:37PM 22   A.   I GUESS -- LET ME ANSWER THE QUESTION AND SAY, YOU KNOW,

01:37PM 23   WHEN I READ THIS, I DIDN'T THINK THAT THIS HAD BEEN REINVENTED

01:37PM 24   AT THIS MOMENT IN TIME.

01:37PM 25       I MEAN, WE HAD FELT LIKE THIS EVOLUTION THROUGH THE YEARS

TOLBERT DIRECT BY MR. SCHENK                    4424

01:37PM  1    WAS THE REINVENTION, THAT IT WAS NOW AT A POINT WHERE IT HAD

01:37PM  2    BEEN REINVENTED.

01:37PM  3         BUT IT WASN'T JUST THIS WEEK, BUT, YOU KNOW, IT HAD BEEN

01:37PM  4    THE PROCESS ALONG THE WAY.

01:37PM  5    Q.   I SEE.  YOU FELT -- I'M SORRY, GO AHEAD.

01:37PM  6    A.   BUT WHEN I READ THIS, YOU KNOW, IT FELT LIKE THAT

01:37PM  7    REINVENTION WAS COMPLETE, AND THEN CERTAINLY THERE WOULD BE

01:37PM  8    MORE EVOLUTIONS GOING FORWARD.

01:37PM  9         BUT THAT IT WAS, YOU KNOW, ABLE TO -- THAT THE TESTS WERE

01:37PM  10   ABLE TO BE DONE ON THESE SMALL SAMPLES.

01:37PM  11   Q.   AND WHEN YOU SAY "THE TESTS," YOU MEAN TESTING BLOOD --

01:37PM  12   A.   BLOOD TESTS.

01:37PM  13   Q.   THANK YOU.

01:37PM  14        IF YOU WOULD NOW TURN TO THE NEXT PAGE, PAGE 8.

01:37PM  15        AND UNDER "WELCOME TO THERANOS," THERE'S A PARAGRAPH THAT

01:38PM  16   I'D LIKE TO ASK YOU A QUESTION ABOUT.

01:38PM  17        DO YOU SEE THAT PARAGRAPH THAT BEGINS, "THERANOS'S

01:38PM  18   LABORATORY"?

01:38PM  19   A.   YES.

01:38PM  20   Q.   "THERANOS'S LABORATORY CAN ANALYZE SMALLER SAMPLES THAN

01:38PM  21   PREVIOUSLY POSSIBLE WITH SPEED AND THE HIGHEST LEVELS OF

01:38PM  22   ACCURACY.  IT IS EASIER ON YOUR PATIENTS.  AND HELPS YOU MAKE

01:38PM  23   THE BEST DIAGNOSIS AS FAST AS POSSIBLE."

01:38PM  24        THERE'S A REFERENCE HERE TO TESTING ON SMALLER SAMPLES

01:38PM  25   WITH SPEED AND THE HIGHEST LEVELS OF ACCURACY.

ER-3228

TOLBERT DIRECT BY MR. SCHENK                                    4425

01:38PM  1        HOW ABOUT THAT PHRASE, "HIGHEST LEVELS OF ACCURACY"?  WAS

01:38PM  2   THAT SIGNIFICANT IN YOUR EVALUATION IN 2013 AS TO WHETHER TO

01:38PM  3   MAKE AN INVESTMENT?

01:38PM  4   A.   IT WAS.  GIVEN THAT THE TESTS WERE ABLE TO BE DONE

01:38PM  5   ACCURATELY OBVIOUSLY, YOU KNOW, WOULD HAVE FACTORED INTO THAT

01:38PM  6   INVESTMENT DECISION.

01:38PM  7        IF THE TEST WOULD HAVE BEEN INACCURATE OR WOULD HAVE ONLY

01:39PM  8   BEEN 50 PERCENT ACCURATE, THEN, YOU KNOW, IT PROBABLY WOULD

01:39PM  9   HAVE CAUSED A DIFFERENT INVESTMENT DECISION.

01:39PM 10        BUT THE FACT THAT THE TECHNOLOGY HERE CAN DO WHAT IT'S

01:39PM 11   BEEN DESIGNED TO DO ALL ALONG IS CERTAINLY SOMETHING THAT WAS

01:39PM 12   OF GREAT INTEREST TO US.

01:39PM 13   Q.   AND IN THE NEXT SENTENCE THERE'S A REFERENCE TO "YOUR

01:39PM 14   PATIENTS."

01:39PM 15        DO YOU SEE THAT?

01:39PM 16   A.   YES.

01:39PM 17   Q.   AND DO YOU THINK THAT THAT MEANS THAT THAT SLIDE WAS THERE

01:39PM 18   FOR DOCTORS OR FOR SOME OTHER MEDICAL PROFESSIONALS?  DID YOU

01:39PM 19   HAVE A THOUGHT ON THAT?

01:39PM 20             MR. CAZARES:  OBJECTION.  FOUNDATION.  CALLS FOR

01:39PM 21   SPECULATION.

01:39PM 22             THE COURT:  THE QUESTION WAS, DID HE HAVE A THOUGHT

01:39PM 23   ON THAT?

01:39PM 24        YES, YOU CAN ANSWER THAT QUESTION.

01:39PM 25             THE WITNESS:  YOU KNOW, I DON'T KNOW WHEN I READ

TOLBERT DIRECT BY MR. SCHENK                    4426

01:39PM   1    THIS SLIDE IF I THOUGHT IT WAS DESIGNED TO BE ONLY MARKETED TO

01:39PM   2    DOCTORS.

01:39PM   3         I DO KNOW THAT I TRIED TO CONVINCE MY DOCTOR SEVERAL TIMES

01:39PM   4    THAT HE NEEDED TO REACH OUT TO THE COMPANY AND SEE IF HE COULD,

01:39PM   5    YOU KNOW, HAVE THEIR TESTING IN HIS OFFICE.

01:40PM   6    BY MR. SCHENK:

01:40PM   7    Q.   I SEE.

01:40PM   8    A.   BUT, YOU KNOW, WHEN IT TALKS ABOUT PATIENTS, I WOULD HAVE

01:40PM   9    ALSO ASSUMED THAT -- JUST AN INTEREST OF COMPLETENESS, I GUESS,

01:40PM  10    I WOULD HAVE ALSO ASSUMED -- WELL, I KNEW YOU HAD TO HAVE

01:40PM  11    DOCTOR'S ORDERS TO HAVE THESE TESTS DONE IN LOTS OF PLACES, SO

01:40PM  12    IT'S LIKELY THAT THESE ORDERS WOULD HAVE COME FROM DOCTORS.

01:40PM  13    Q.   THANK YOU.

01:40PM  14         WOULD YOU NOW TURN TO SLIDE 10.

01:40PM  15         AT THE VERY BOTTOM, DO YOU SEE IT SAYS, "THERANOS WELLNESS

01:40PM  16    CENTERS WILL SOON BE LOCATED WITHIN WALGREENS STORES

01:40PM  17    NATIONWIDE"?

01:40PM  18    A.   I DO.

01:40PM  19    Q.   DID THAT REPRESENTATION HAVE SIGNIFICANCE TO YOU WHEN YOU

01:40PM  20    WERE MAKING A DECISION ABOUT WHETHER TO INVEST IN 2013?

01:41PM  21    A.   IT DID.

01:41PM  22         YOU KNOW, MY CONVERSATIONS WITH MR. LUCAS KIND OF THROUGH

01:41PM  23    THOSE YEARS LEADING UP TO 2013 WAS THAT, YOU KNOW, THAT

01:41PM  24    THERANOS WAS AIMING TOWARDS A ROLLOUT, A COMMERCIALIZATION OF

01:41PM  25    THIS TECHNOLOGY THAT WOULD PUT IT, YOU KNOW, KIND OF READILY

ER-3230

TOLBERT DIRECT BY MR. SCHENK                                    4427

01:41PM  1    AVAILABLE THROUGH THE COUNTRY.

01:41PM  2         I KNOW WE HAD HAD SOME DISCUSSIONS, HE AND I, ABOUT WHAT

01:41PM  3    THOSE LOCATIONS MAY BE.

01:41PM  4         AND SO, YOU KNOW, FOR IT TO BE IN, IN ALL OF THE WALGREENS

01:41PM  5    STORES THROUGH THE COUNTRY REPRESENTED KIND OF A VALIDATION OF

01:41PM  6    WHAT I HAD TALKED WITH HIM ABOUT, WHAT HE HAD REFLECTED TO US

01:41PM  7    FROM THE COMPANY, AND WHAT HIS CONVERSATIONS WITH THERANOS HAD

01:41PM  8    BEEN.

01:41PM  9         BUT ALSO IT REPRESENTED THAT, HEY, LOOK, HERE'S AN

01:41PM  10   OPPORTUNITY TO KIND OF HAVE THIS BE A NEW INDUSTRY, AND SO IT

01:42PM  11   CERTAINLY WOULD HAVE, IT WOULD HAVE GIVEN LOTS OF MOMENTUM TO

01:42PM  12   OUR INVESTMENT DISCUSSIONS.

01:42PM  13   Q.   AND NOW DESCRIBE FOR ME HOW THIS COMPARED TO WHAT YOU

01:42PM  14   UNDERSTOOD WHEN YOU MADE THE 2006 INVESTMENT.

01:42PM  15   A.   SO WHEN WE MADE THE 2006 INVESTMENT, YOU KNOW, THE USE

01:42PM  16   CASE FOR THERANOS AND ITS TECHNOLOGY WAS MOSTLY CENTERED AROUND

01:42PM  17   PHARMACEUTICAL OPPORTUNITIES ABOUT HELPING, YOU KNOW, MAKE DRUG

01:42PM  18   TRIALS MORE EFFICIENT AND, YOU KNOW, EVENTUALLY GETTING HERE.

01:42PM  19        BUT IT WAS FOCUSSED ON KIND OF A LIMITED THING.

01:42PM  20        AND SO THIS WOULD REPRESENT AN EVOLUTION, YOU KNOW, THAT

01:42PM  21   WOULD MAKE IT, THAT WOULD MAKE THE COMMERCIAL OPPORTUNITIES FOR

01:42PM  22   THAT TECHNOLOGY KIND OF WIDELY AVAILABLE.

01:42PM  23        AND ON THE INVESTMENT SIDE, IT WOULD HAVE MADE IT A VERY

01:42PM  24   PROFITABLE INVESTMENT.

01:42PM  25   Q.   GREAT.  IF YOU'LL NOW TURN TO PAGE 11, I THINK IT'S THE

TOLBERT DIRECT BY MR. SCHENK                                         4428

01:43PM  1     NEXT PAGE.

01:43PM  2          DO YOU SEE MORE CITATIONS TO MEDIA ABOUT THERANOS?

01:43PM  3     A.   I DO.

01:43PM  4     Q.   AND IN PARTICULAR THERE'S ONE THAT'S FOUR DOWN,

01:43PM  5     "ELIZABETH HOLMES:  THE BREAKTHROUGH OF INSTANT DIAGNOSIS."

01:43PM  6          IT'S IN "THE WALL STREET JOURNAL" IT LOOKS LIKE

01:43PM  7     SEPTEMBER 7TH, 2013.

01:43PM  8          DO YOU SEE THAT?

01:43PM  9     A.   I DO.

01:43PM  10    Q.   AND DO YOU KNOW WHETHER YOU READ THAT ARTICLE?

01:43PM  11    A.   I WOULD HAVE READ THAT ARTICLE.

01:43PM  12    Q.   AND WHY DO YOU SAY THAT?

01:43PM  13    A.   BECAUSE MY HABIT WAS TO READ EVERYTHING THAT I COULD FIND,

01:43PM  14    AND SO I'M SURE THAT I WOULD HAVE READ EACH ONE OF THOSE THINGS

01:43PM  15    REFERENCED HERE.

01:43PM  16    Q.   AND YOU'VE DESCRIBED SOME OF THE THINGS THAT INFLUENCED

01:43PM  17    THE DECISION TO INVEST IN 2013.

01:43PM  18          WAS INFORMATION YOU READ IN THE PRESS ALSO ONE OF THE

01:43PM  19    THINGS THAT INFLUENCED YOUR DECISION TO INVEST IN 2013?

01:43PM  20    A.    IT CERTAINLY WOULD HAVE BEEN AS TO THE VALIDATED THINGS

01:44PM  21    THAT I WAS ALREADY HEARING OR THINKING FROM OTHER SOURCES.

01:44PM  22    Q.    THANK YOU.

01:44PM  23          SO THIS EXHIBIT 4030 WAS ATTACHED TO AN EMAIL THAT WAS

01:44PM  24    SENT IN NOVEMBER, NOVEMBER 8TH, 2013.

01:44PM  25          DO YOU SEE THAT?

TOLBERT DIRECT BY MR. SCHENK                              4429

01:44PM  1    A.   CORRECT.

01:44PM  2    Q.   THE NEXT MONTH, IN DECEMBER OF 2013, DID YOU PARTICIPATE

01:44PM  3    IN A CALL WITH ELIZABETH HOLMES?

01:44PM  4    A.   I DID.

01:44PM  5    Q.   LET'S TALK ABOUT THE LEAD UP TO THAT.  IF YOU'LL TURN TO

01:44PM  6    EXHIBIT 1346.

01:44PM  7         IS EXHIBIT -- ARE YOU THERE, SIR?

01:44PM  8    A.   I AM.

01:44PM  9    Q.   IS EXHIBIT 1346 AN EMAIL FROM MS. QUINTANA TO OTHERS,

01:44PM  10   INCLUDING YOU, ANNOUNCING THAT CALL THAT WE JUST DISCUSSED?

01:44PM  11   A.   IT IS.

01:44PM  12        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1346.

01:44PM  13        MR. CAZARES:  NO OBJECTION.

01:45PM  14        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:45PM  15        (GOVERNMENT'S EXHIBIT 1346 WAS RECEIVED IN EVIDENCE.)

01:45PM  16   BY MR. SCHENK:

01:45PM  17   Q.   SIR, THIS AGAIN REFERENCES BLACK DIAMOND VENTURES.  THAT'S

01:45PM  18   THE GROUP THAT YOU INVESTED THE 2006 INVESTMENT THROUGH; IS

01:45PM  19   THAT RIGHT?

01:45PM  20   A.   CORRECT.

01:45PM  21   Q.   AND IT READS, "AN INVESTOR CONFERENCE CALL HAS BEEN

01:45PM  22   SCHEDULED FOR THIS FRIDAY, DECEMBER 20TH, PROMPTLY STARTING AT

01:45PM  23   10:15 A.M. PACIFIC.  THE CONFIDENTIAL UPDATE WILL BE PRESENTED

01:45PM  24   BY THERANOS'S CEO ELIZABETH HOLMES."

01:45PM  25        DO YOU SEE THAT?

TOLBERT DIRECT BY MR. SCHENK                                    4430

01:45PM   1      A.   I DO.

01:45PM   2      Q.   AND WAS THERE A CALL ON DECEMBER 20TH OF 2013?

01:45PM   3      A.   THERE WAS.

01:45PM   4      Q.   AND DID YOU PARTICIPATE IN THAT CALL?

01:45PM   5      A.   I DID.

01:45PM   6      Q.   YOU'VE MENTIONED ANOTHER INDIVIDUAL NAMED CRAIG HALL,

01:45PM   7      MR. HALL.

01:45PM   8           DO YOU KNOW IF HE ALSO PARTICIPATED?

01:45PM   9      A.   HE DID.

01:45PM  10      Q.   THE NEXT PARAGRAPH READS, "WITH THEIR LAUNCH TO CONSUMER

01:45PM  11      HEALTH CARE THIS YEAR, THEY ARE RAPIDLY SCALING TO ESTABLISH A

01:45PM  12      NATIONAL FOOTPRINT AND CAPTURE THE OPPORTUNITY WE HAVE TO SERVE

01:46PM  13      AS THE ONLY CERTIFIED, NATIONAL LABORATORY CAPABLE OF RUNNING

01:46PM  14      ANY OF ITS LABORATORY TESTS FROM A FEW TINY DROPLETS OF BLOOD."

01:46PM  15           THAT MAKES SOME REPRESENTATIONS ABOUT THE THERANOS

01:46PM  16      TECHNOLOGY.

01:46PM  17           I'M WONDERING IF THAT WAS CONSISTENT WITH YOUR

01:46PM  18      UNDERSTANDING OF THE THERANOS TECHNOLOGY WHEN YOU MADE THE 2013

01:46PM  19      INVESTMENT DECISION.

01:46PM  20      A.   IT IS.  I MEAN, IT'S -- YOU KNOW, I BELIEVE IN

01:46PM  21      SEPTEMBER -- SO THIS IS IN DECEMBER.

01:46PM  22           IN SEPTEMBER THEY HAD -- THERANOS HAD RELEASED THE PRESS

01:46PM  23      RELEASE ABOUT THE PARTNERSHIP WITH WALGREENS, AND SO THIS, YOU

01:46PM  24      KNOW, CERTAINLY KIND OF PULLED ALL OF THAT TOGETHER AND SAID,

01:46PM  25      LOOK, IT'S A REAL THING AND IT'S AN OPPORTUNITY TO ROLL IT OUT

ER-3234

TOLBERT DIRECT BY MR. SCHENK                                      4431

01:46PM   1        IN A BIG WAY.

01:46PM   2        Q.   THANK YOU.

01:46PM   3             THE NEXT PARAGRAPH READS, "AS PART OF THIS INITIATIVE,

01:46PM   4        THEY ARE COMPLETING A SERIES OF FINANCIAL TRANSACTIONS WITH

01:47PM   5        STRATEGIC PARTNERS THAT PROVIDE ACCESS TO ADDITIONAL CAPITAL IN

01:47PM   6        ORDER TO ACCELERATE THEIR GROWTH."

01:47PM   7             AND THEN I THINK A SENTENCE LATER IT READS, "THE PRICE PER

01:47PM   8        SHARE OF THERANOS SERIES C-1 PREFERRED STOCK IN THE

01:47PM   9        TRANSACTIONS CLOSING BETWEEN NOW AND DECEMBER 31ST, 2013, IS

01:47PM  10        $75/PER SHARE (PRE-SPLIT)."

01:47PM  11             SO I WANT TO ASK YOU SOME QUESTIONS ABOUT THAT.

01:47PM  12             FIRST, WERE YOU INVESTORS BEFORE THIS C ROUND?

01:47PM  13        A.   YOU KNOW, SO I THINK OUR INVESTMENT IN 2006 WAS IN THE

01:47PM  14        SERIES C.

01:47PM  15        Q.   IT WAS --

01:47PM  16        A.   AND THIS WAS AN ADDITIONAL -- THIS WAS AN ADDITIONAL

01:47PM  17        SERIES C-1.

01:47PM  18        Q.   I SEE.  SO THERE WAS A C, AND THEN A C-1?

01:47PM  19        A.   I BELIEVE THAT'S CORRECT.

01:48PM  20        Q.   DO YOU REMEMBER WHAT THE SHARE PRICE WAS IN 2006?

01:48PM  21        A.   SO OUR INVESTMENT IN 2006 WAS A LITTLE LESS THAN $3 A

01:48PM  22        SHARE.  I THINK IT WAS LIKE 2.82 OR 2.83 A SHARE.

01:48PM  23        Q.   AND THE PRICE FOR C-1 STOCK WAS $75 PER SHARE ACCORDING TO

01:48PM  24        THIS?

01:48PM  25        A.   CORRECT.

TOLBERT DIRECT BY MR. SCHENK 4432

01:48PM 1    Q.   HOW ABOUT THAT FACT, LESS THAN $3, NOW $75.  HOW DID THAT

01:48PM 2    INFLUENCE, IF IT DID, YOUR THINKING ABOUT THE INVESTMENT OR

01:48PM 3    ABOUT THERANOS GENERALLY FROM 2006 UNTIL THIS TIME?

01:48PM 4    A.   SURE.  IT FELT LIKE WE HAD HIT A HOME RUN, RIGHT?  THAT

01:48PM 5    THE TECHNOLOGY HAD BEEN DEVELOPED AND HAD DONE EVERYTHING THAT

01:48PM 6    WE HAD THOUGHT WHEN WE FIRST INVESTED, AND THAT NOW IT WAS AT A

01:48PM 7    PLACE TO KIND OF HAVE A WIDE ROLLOUT AND BE COMMERCIALIZED.

01:48PM 8         IT FELT LIKE THERE WERE LOTS OF PEOPLE WHO WERE INVESTING

01:49PM 9    AT $75 A SHARE IN 2013 WHO WOULD NOT BE INVESTING TO JUST HAVE

01:49PM 10   THAT INVESTMENT STAY AT THE PLACE THAT THEY HAD INVESTED.

01:49PM 11        SO IT REALLY FELT LIKE, YOU KNOW, EVERYTHING WAS GOING

01:49PM 12   WELL AND THAT $75 A SHARE WAS A VALIDATION OF WHY WE SHOULD

01:49PM 13   INVEST MORE.

01:49PM 14   Q.   AND IT ALSO TALKS ABOUT CLOSING BETWEEN NOW -- THE DATE OF

01:49PM 15   THE EMAIL IS DECEMBER 18TH -- AND DECEMBER 31ST, 2013.

01:49PM 16        DID YOU HAVE ANY THOUGHTS ABOUT THE AMOUNT OF TIME THAT

01:49PM 17   YOU HAD TO MAKE A DECISION?

01:49PM 18   A.   YEAH.  WE HAD HAD SEVERAL CONVERSATIONS WITH MR. LUCAS

01:49PM 19   ABOUT A FOLLOW-ON INVESTMENT AND, YOU KNOW, AT SOME POINT

01:49PM 20   WANTED TO BE DIRECT WITH THE COMPANY.

01:49PM 21        CHRIS HAD INDICATED -- MR. LUCAS HAD INDICATED THAT, THAT

01:50PM 22   KIND OF THE OFFER TO INVEST ADDITIONAL FUNDS WAS GOOD THROUGH

01:50PM 23   DECEMBER 31ST, AND THAT AFTER THAT THERE WERE A FEW PEOPLE FOR

01:50PM 24   CONTRACTUAL REASONS, I THINK, WHO HAD TO INVEST A LITTLE LATER,

01:50PM 25   BUT THAT IT WOULD BE AT A HIGHER VALUATION, AND THAT, YOU KNOW,

TOLBERT DIRECT BY MR. SCHENK 4433

01:50PM 1    OUR OPPORTUNITY TO INVEST MORE WOULD, WOULD KIND OF EXPIRE ON

01:50PM 2    DECEMBER 31ST.

01:50PM 3    Q.   SO YOU HAD A FEW WEEKS OR SO TO MAKE A DECISION ABOUT

01:50PM 4    INVESTING IN 2013?

01:50PM 5    A.   YEAH, THAT'S CORRECT.

01:50PM 6    Q.   I'D LIKE TO NOW TALK TO YOU ABOUT THE CALL ON

01:50PM 7    DECEMBER 20TH.

01:50PM 8        WHERE WERE YOU WHEN YOU PARTICIPATED IN THE CALL?

01:50PM 9    A.   I WAS IN FRISCO, TEXAS.

01:50PM 10   Q.   AND DO YOU KNOW WHERE MR. HALL WAS?

01:50PM 11   A.   YOU KNOW, I DIDN'T ON THAT DAY, BUT NOW I DO.  I BELIEVE

01:50PM 12   HE WAS IN CALIFORNIA, OR HE WAS TRAVELLING SOMEWHERE.

01:50PM 13   Q.   OKAY.  HE WASN'T WITH YOU IN TEXAS?

01:50PM 14   A.   HE WASN'T WITH ME IN TEXAS.

01:50PM 15   Q.   DO YOU REMEMBER ABOUT HOW LONG THE CALL WAS?

01:51PM 16   A.   I THINK IT WAS PROBABLY ABOUT AN HOUR, MAYBE A LITTLE

01:51PM 17   LONGER.

01:51PM 18   Q.   DID MS. HOLMES SPEAK?

01:51PM 19   A.   SHE DID.

01:51PM 20   Q.   DO YOU KNOW IF ANY OTHER EMPLOYEES FROM THERANOS SPOKE?

01:51PM 21   A.   NOT THAT I RECALL.  I ONLY RECALL HER.

01:51PM 22   Q.   I'D LIKE TO TALK TO YOU ABOUT A FEW DIFFERENT CATEGORIES

01:51PM 23   OF INFORMATION AND SEE IF, IF MS. HOLMES TALKED ABOUT THESE

01:51PM 24   CATEGORIES.

01:51PM 25       DO YOU HAVE A RECOLLECTION OF THE CALL?

TOLBERT DIRECT BY MR. SCHENK                                    4434

01:51PM   1   A.   I DO.

01:51PM   2   Q.   THE FIRST I'D LIKE TO TALK TO YOU ABOUT IS THE THERANOS

01:51PM   3   BLOOD TESTING TECHNOLOGY GENERALLY.

01:51PM   4        DURING THE CALL, DID MS. HOLMES TALK TO YOU ABOUT THE

01:51PM   5   THERANOS BLOOD TESTING TECHNOLOGY?

01:51PM   6   A.   SHE DID.

01:51PM   7   Q.   AND WHAT DO YOU REMEMBER HER SAYING?

01:51PM   8   A.   YOU KNOW, AS I REMEMBER THAT CALL, I REMEMBER HER SAYING,

01:51PM   9   YOU KNOW, THAT THE TECHNOLOGY WAS DEVELOPED TO A POINT WHERE

01:51PM  10   THERE COULD BE LOTS AND LOTS OF TESTS THAT WOULD BE RUN ON A

01:51PM  11   SMALL DROP OF BLOOD, AND THAT IT WAS ABLE TO BE, YOU KNOW, KIND

01:52PM  12   OF DONE FROM ANY LOCATION SO THAT, YOU KNOW, THERE WASN'T A BIG

01:52PM  13   CENTRAL LAB THAT THOSE TESTS HAD TO BE FILTERED THROUGH.

01:52PM  14        AND I REMEMBER HER SAYING THAT -- I BELIEVE THAT THE

01:52PM  15   ECONOMICS OF THOSE TESTS WERE SUCH THAT IT MADE IT VERY COST

01:52PM  16   EFFICIENT FOR THE COMPANY TO DO THAT, AS OPPOSED TO SOME OTHER

01:52PM  17   COMPETITORS AND WHAT THEY WOULD CHARGE.

01:52PM  18   Q.   THANK YOU.

01:52PM  19        DO YOU REMEMBER WHETHER MS. HOLMES TALKED ABOUT THE KIND

01:52PM  20   OF TUBES OF BLOOD THAT THERANOS USED VERSUS WHAT TRADITIONAL

01:52PM  21   LAB TESTING INVOLVED?

01:52PM  22   A.   YOU KNOW, I WOULD HAVE TO LOOK BACK AT THE TRANSCRIPT OF

01:52PM  23   THE CALL, BUT I THINK THERE WAS SOME DISCUSSION ABOUT THE, YOU

01:52PM  24   KNOW, ABOUT THE SMALL NANOTAINERS OR CONTAINERS OF BLOOD THAT

01:52PM  25   WOULD TAKE JUST A FEW DROPS.

01:53PM  1    Q.   YOU REFERENCED A TRANSCRIPT OF THE CALL.

01:53PM  2         WHAT DO YOU MEAN?

01:53PM  3    A.   WELL, AT SOME POINT THAT PHONE CALL WAS RECORDED AND THERE

01:53PM  4    WAS A TRANSCRIPTION MADE OF IT.

01:53PM  5    Q.   I SEE.

01:53PM  6    A.   AND SO, YOU KNOW, I'VE -- SO I KNOW THERE'S A TRANSCRIPT

01:53PM  7    OF THAT CALL, AND I JUST HAVEN'T REVIEWED IT.

01:53PM  8    Q.   AND AS YOU'RE TESTIFYING TODAY, IS SOME OF YOUR MEMORY

01:53PM  9    BASED UPON HAVING REVIEWED THAT TRANSCRIPT AT SOME POINT SINCE

01:53PM 10    2013?

01:53PM 11    A.   CERTAINLY.

01:53PM 12         WHEN I SAY I HAVEN'T REVIEWED THE TRANSCRIPT, I HAVEN'T

01:53PM 13    REVIEWED IT ENOUGH TO MEMORIZE IT AND KNOW EXACTLY -- RECALL

01:53PM 14    EXACTLY WHAT WAS SAID.

01:53PM 15    Q.   I SEE.  BUT WHEN YOU'RE TESTIFYING TODAY ABOUT THE CALL,

01:53PM 16    YOU'RE SAYING THAT SOME OF THAT IS BASED ON HAVING REVIEWED THE

01:53PM 17    TRANSCRIPT SINCE THE CALL?

01:53PM 18    A.   CORRECT.

01:53PM 19    Q.   OKAY.  HOW ABOUT THE TOPIC OF THERANOS'S WORK WITH THE

01:53PM 20    MILITARY?  DID MS. HOLMES TALK ABOUT THAT?

01:53PM 21    A.   SHE DID TALK ABOUT MILITARY APPLICATIONS AND ABOUT, YOU

01:54PM 22    KNOW, THAT THERANOS DEVICES WERE EMPLOYED ON THE MEDEVAC

01:54PM 23    HELICOPTERS AND BEING USED TO KIND OF IMPROVE SURVIVAL RATES OF

01:54PM 24    MILITARY PERSONNEL WHO HAD BEEN INJURED IN COMBAT.

01:54PM 25    Q.   OKAY.  WE'LL COME BACK TO THAT IN A MOMENT.

TOLBERT DIRECT BY MR. SCHENK                                    4436

01:54PM  1          DID MS. HOLMES TALK ABOUT FINANCIALS, THE FINANCIAL HEALTH

01:54PM  2   OF THERANOS OR HOW IT WAS SPENDING THE MONEY THAT IT WAS

01:54PM  3   MAKING?

01:54PM  4   A.   I BELIEVE THERE WAS SOME DISCUSSION ABOUT FINANCIAL KIND

01:54PM  5   OF MATTERS.

01:54PM  6   Q.   AND WHAT DO YOU RECALL ABOUT THAT?

01:54PM  7   A.   I JUST RECALL THAT THERE WAS SOME GENERAL MENTION, YOU

01:54PM  8   KNOW, SOMETHING ABOUT KIND OF THE PRICING OF WHAT THOSE TESTS

01:54PM  9   WERE AND KIND OF THE USE OF THE FUNDS THAT WERE BEING RAISED

01:54PM  10  AND HOW THOSE WOULD FACTOR INTO THE FINANCIAL HEALTH OF THE

01:54PM  11  COMPANY.

01:54PM  12  Q.   AND WHAT ABOUT THE RETAIL LAUNCH?  DO YOU REMEMBER

01:54PM  13  MS. HOLMES SAYING ANYTHING ABOUT THE RETAIL LAUNCH?

01:54PM  14  A.   SO THERE WAS SOME DISCUSSION ABOUT THE RETAIL LAUNCH AND

01:55PM  15  ABOUT, YOU KNOW, THE TECHNOLOGY BEING READY TO BE ROLLED OUT TO

01:55PM  16  THE WALGREENS LOCATIONS AND HOW THAT WOULD BE OF BENEFIT TO THE

01:55PM  17  COMPANY.

01:55PM  18  Q.   SO LET'S TAKE EACH OF THOSE THEN.

01:55PM  19          THE STATEMENTS THAT YOU HEARD ABOUT THE THERANOS

01:55PM  20  TECHNOLOGY, I THINK YOU SAID LOTS AND LOTS OF TESTS FROM SMALL

01:55PM  21  SAMPLES.

01:55PM  22          DID THAT MATTER WHEN YOU WERE MAKING A DECISION TO INVEST

01:55PM  23  IN THERANOS IN 2013?

01:55PM  24  A.   IT DID.

01:55PM  25          YOU KNOW, CERTAINLY OUR, YOU KNOW, OUR UNDERSTANDING OF

ER-3240

TOLBERT DIRECT BY MR. SCHENK                                    4437

01:55PM   1    WHAT THE TECHNOLOGY COULD DO IS THAT -- YOU KNOW, EVEN AS I

01:55PM   2    REMEMBER, THERE WAS A LISTING POSTED ON THE WEBSITE AT SOME

01:55PM   3    POINT ON ALL OF THE TESTS THAT COULD BE DONE AND THE PRICES

01:55PM   4    THAT WOULD BE CHARGED FOR THOSE.

01:55PM   5        SO OUR UNDERSTANDING WAS THAT WITH THIS MULTITUDE OF

01:55PM   6    TESTS, YOU KNOW, ANYBODY COULD REALLY GO GET A TEST AND HAVE

01:55PM   7    SOME VALUE OR BENEFIT FROM THAT, AND SO I THINK THERE WAS SOME

01:56PM   8    REFERENCE TO THAT ON THE CALL.

01:56PM   9    Q.   AND HOW DID THAT COMPARE TO YOUR UNDERSTANDING IN 2006?

01:56PM  10    A.   WHEN WE INVESTED IN 2006, THERE WAS A LIMITED AMOUNT OF

01:56PM  11    TESTS THAT COULD BE DONE.  WE KNEW THAT, YOU KNOW, THERE WERE

01:56PM  12    SOME CAPABILITIES, BUT THAT OVER TIME THAT THAT WOULD INCREASE.

01:56PM  13        AND SO IT FELT LIKE, YOU KNOW, AT THIS POINT THE

01:56PM  14    TECHNOLOGY HAD PROGRESSED TO A PLACE THAT THOSE TESTS REALLY

01:56PM  15    COULD BE DONE.

01:56PM  16    Q.   AND HOW ABOUT THE STATEMENTS THAT YOU DESCRIBED WITH

01:56PM  17    REGARD TO THE MILITARY WORK?  DID THOSE STATEMENTS MATTER IN

01:56PM  18    YOUR DECISION TO INVEST?

01:56PM  19    A.    THEY DID.  YOU KNOW, WE HAD WATCHED WITH GREAT INTEREST --

01:56PM  20    HER BOARD OF DIRECTORS WAS UNVEILED IN JULY, AND WE HAD SEEN,

01:56PM  21    YOU KNOW, KIND OF THE MEMBERS OF THAT BOARD, AND IN

01:56PM  22    CONVERSATIONS THAT I HAD HAD WITH CHRIS LUCAS OVER THAT YEAR,

01:57PM  23    YOU KNOW, THERE WAS REFERENCE TO GOVERNMENTAL CONTRACTS AND,

01:57PM  24    YOU KNOW, KIND OF SEEING THE MEMBERS OF HER BOARD OF DIRECTORS

01:57PM  25    WHO WERE PARTICIPATING IN HELPING THOSE GOVERNMENT CONTRACTS

TOLBERT DIRECT BY MR. SCHENK                                    4438

01:57PM  1    ALONG THE WAY.

01:57PM  2         IT CERTAINLY FELT LIKE THAT REPRESENTED A GREAT

01:57PM  3    OPPORTUNITY FOR THE COMPANY AND ONE THAT WE WERE INTERESTED IN.

01:57PM  4    Q.   WAS THERE MENTION OF MILITARY WORK IN 2006?

01:57PM  5    A.   THERE WAS NOT.

01:57PM  6    Q.   SO HOW DOES THIS, THIS CONCEPT OR THIS AREA OF WORK

01:57PM  7    COMPARE WITH YOUR UNDERSTANDING OF WHAT THERANOS WAS DOING IN

01:57PM  8    2006?

01:57PM  9    A.   SO IT REPRESENTED A BROADENING OF THEIR BUSINESS

01:57PM  10   OPPORTUNITIES, ONE THAT WAS EXCITING, NOTWITHSTANDING THE FACT

01:57PM  11   THAT IT WAS HELPING PEOPLE THAT WERE INJURED, AND THAT'S NEVER

01:57PM  12   AN EXCITING THING.

01:57PM  13        BUT, YOU KNOW, I THINK IN A PERSONAL WAY, IT RESONATED.  I

01:57PM  14   HAVE A BROTHER WHO WAS IN THE MARINES AND WHO WAS IN

01:57PM  15   AFGHANISTAN FOR A PERIOD OF TIME, SO, YOU KNOW, THE THOUGHT

01:58PM  16   THAT THESE SERVICE MEN AND WOMEN WHO GET HURT CAN BE HELPED WAS

01:58PM  17   CERTAINLY SOMETHING THAT WE FELT, YOU KNOW, WHOLEHEARTED

01:58PM  18   SUPPORT FOR.

01:58PM  19   Q.   HOW ABOUT THE STATEMENTS THAT YOU HEARD ABOUT THE

01:58PM  20   FINANCIAL STATE OF THERANOS?  DID THOSE STATEMENTS MATTER IN

01:58PM  21   YOUR DECISION TO INVEST?

01:58PM  22   A.   THEY DID.

01:58PM  23        YOU KNOW, OUR UNDERSTANDING HAD BEEN ALONG THE WAY THAT

01:58PM  24   THERANOS WAS ABLE TO CAPTURE, YOU KNOW, SUBSTANTIAL REVENUE

01:58PM  25   FROM PHARMACEUTICAL CONTRACTS AND FROM OTHER SOURCES AND THAT,

01:58PM 1    YOU KNOW, AT SOME POINT HAD BEEN ABLE TO BE CASH FLOW POSITIVE

01:58PM 2    OR SUSTAIN ITSELF FROM KIND OF REVENUES FROM OPERATIONS.

01:58PM 3        SO TO HEAR HER TALK ABOUT FINANCIAL KINDS OF THINGS IN A

01:58PM 4    POSITIVE WAY WAS, WAS EXTREMELY HELPFUL.

01:58PM 5    Q.   AND HOW DID THAT COMPARE TO YOUR UNDERSTANDING IN 2006?

01:58PM 6    A.   IN 2006, YOU KNOW, WHEN WE MADE THE INVESTMENT, OUR

01:58PM 7    UNDERSTANDING WAS THAT THERE WERE LOTS OF THOSE PHARMACEUTICAL

01:59PM 8    CONTRACTS IN PLACE, AND THEN THERE WAS CONTRACTS THAT WERE IN

01:59PM 9    PLACE AT THE TIME THAT WE INVESTED THAT HAD BEEN SIGNED WOULD,

01:59PM 10   YOU KNOW, BE A SUBSTANTIAL SOURCE OF REVENUE.

01:59PM 11       SO, YOU KNOW, THE OPPORTUNITY IN 2013 FELT A LOT BIGGER

01:59PM 12   THAN IT DID IN 2006, LIKE IT HAD MATURED AND THE COMPANY WAS

01:59PM 13   GOING TO BE ABLE TO ADDRESS IT.

01:59PM 14   Q.   THANK YOU.

01:59PM 15       AND FINALLY, THE STATEMENTS THAT MS. HOLMES MADE ABOUT THE

01:59PM 16   WALGREENS ROLLOUT, DID THOSE HAVE SIGNIFICANCE IN YOUR DECISION

01:59PM 17   TO INVEST?

01:59PM 18   A.   THEY DID.

01:59PM 19       LIKE I HAD REFERENCED BEFORE, YOU KNOW, MR. LUCAS AND I

01:59PM 20   HAD CONVERSATIONS ABOUT A RETAIL ROLLOUT AND ABOUT THE

01:59PM 21   COMPANY'S, YOU KNOW, FOCUS ON DEVELOPING THESE KIND OF LOCAL

01:59PM 22   PLACES WHERE THE TESTS COULD BE ADMINISTERED.

01:59PM 23       WE HAD HAD CONVERSATIONS ABOUT SAFEWAY, ABOUT WAL-MART,

01:59PM 24   ABOUT WALGREENS, AND SO THE FACT THAT ONE OF THOSE HAD ACTUALLY

02:00PM 25   MATURED TO A PLACE WHERE THE TECHNOLOGY WAS EMBRACED AND

TOLBERT DIRECT BY MR. SCHENK    4440

02:00PM  1    ADOPTED, YOU KNOW, CERTAINLY WAS SOMETHING THAT WAS PIVOTAL TO

02:00PM  2    OUR INVESTMENT.

02:00PM  3    Q.   YOU'VE DESCRIBED TO THE JURY THE RISKS THAT YOU SAW IN THE

02:00PM  4    2006 INVESTMENT.

02:00PM  5         DID YOUR VIEW OF THE RISKS OF A 2013 INVESTMENT, DID THEY

02:00PM  6    CHANGE?

02:00PM  7    A.   THEY DID.  IT FELT LIKE IN 2013 THE RISK WAS REALLY, YOU

02:00PM  8    KNOW, COULD THEY, COULD THEY ACTUALLY DO WHAT THEY NEEDED TO DO

02:00PM  9    BY WAY OF ROLLING THIS OUT?

02:00PM 10         IT WASN'T WHETHER THE TECHNOLOGY WORKED.  IT WASN'T

02:00PM 11    WHETHER THERE WAS A MARKET FOR IT.

02:00PM 12         IT WAS WHETHER THEY COULD, YOU KNOW, FINANCIALLY ROLL IT

02:00PM 13    OUT AND NOT HAVE A COMPETITIVE RESPONSE THAT WOULD, YOU KNOW,

02:00PM 14    BE ADVERSE TO THEM.

02:00PM 15    Q.   AFTER THE CALL, DID YOU, IN FACT, MAKE A DECISION TO

02:00PM 16    INVEST IN THERANOS?

02:00PM 17    A.   WE DID.

02:00PM 18    Q.   DESCRIBE THAT PROCESS, THE DECISION PROCESS.

02:00PM 19    A.   WELL, SO WE, WE HAD THIS CALL ON DECEMBER 20TH, AS I

02:01PM 20    UNDERSTAND.

02:01PM 21         YOU KNOW, MR. HALL HAD AN ADDITIONAL FURTHER CONVERSATION

02:01PM 22    WITH ELIZABETH.

02:01PM 23         A FEW DAYS LATER WE CONTINUED TO HAVE SOME DISCUSSIONS

02:01PM 24    WITH CHRIS LUCAS ABOUT THAT INVESTMENT AND WHETHER WE WOULD BE

02:01PM 25    ABLE TO INVEST IN THE COMPANY DIRECTLY.

TOLBERT DIRECT BY MR. SCHENK                            4441

02:01PM 1        AND ONCE THAT WAS SETTLED, WE, WE DECIDED TO INVEST AN

02:01PM 2    ADDITIONAL $5 MILLION, AND WE SENT THAT IN ON DECEMBER 31ST

02:01PM 3    TRYING TO GET IT IN BEFORE THE DEADLINE.

02:01PM 4    Q.   LET'S TALK ABOUT THAT PROCESS.  FIRST, YOU SAID YOU SENT

02:01PM 5    IT IN ON DECEMBER 31ST; IS THAT RIGHT?

02:01PM 6    A.   I BELIEVE THAT'S RIGHT.

02:01PM 7    Q.   WOULD YOU TURN IN YOUR BINDER TO TAB 5811.

02:02PM 8        I WANT TO ASK YOU QUESTIONS ABOUT THE TOP THREE EMAILS IN

02:02PM 9    THIS DOCUMENT.

02:02PM 10       DO YOU SEE THOSE?

02:02PM 11   A.   I DO.

02:02PM 12   Q.   SO THE FURTHEST ONE DOWN FROM THERANOS TO ANA, IS THAT

02:02PM 13   ANA QUINTANA AT BLACK DIAMOND VENTURES?

02:02PM 14   A.   THAT WOULD BE.

02:02PM 15   Q.   AND THEN ABOVE THAT IS ALSO MS. QUINTANA TO THERANOS.

02:02PM 16       DO YOU SEE THAT?

02:02PM 17   A.   I DO.

02:02PM 18   Q.   AND THE FINALLY THE ONE ABOVE THAT IS AN EMAIL FROM

02:02PM 19   MR. BALWANI TO MS. HOLMES.

02:02PM 20       DO YOU SEE THAT?

02:02PM 21   A.   I DO SEE THAT.

02:02PM 22           MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 5811

02:02PM 23   FOR NOTICE PURPOSES.

02:02PM 24           THE COURT:  ALL OF THE THREE PAGES?

02:02PM 25           MR. SCHENK:  NO, JUST THOSE THREE EMAILS, THE TOP

TOLBERT DIRECT BY MR. SCHENK                           4442

02:02PM   1      THREE EMAILS ON THE FIRST PAGE.

02:02PM   2              THE COURT:  SO NOT FOR THE TRUTH OF THE MATTER

02:02PM   3      ASSERTED, BUT SOLELY FOR NOTICE AS TO MR. BALWANI?

02:02PM   4              MR. SCHENK:  YES, SIR.

02:02PM   5              THE COURT:  COUNSEL?

02:03PM   6              MR. CAZARES:  NO OBJECTION.

02:03PM   7              THE COURT:  LADIES AND GENTLEMEN, THIS WILL BE

02:03PM   8      ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED, BUT SOLELY

02:03PM   9      FOR THE ISSUE AS TO NOTICE TO MR. BALWANI AS TO THE ISSUES

02:03PM  10      CONTAINED IN THESE EMAILS.

02:03PM  11          THERE'S THREE?

02:03PM  12              MR. SCHENK:  YES, YOUR HONOR.

02:03PM  13              THE COURT:  ALL RIGHT.  THEY MAY BE PUBLISHED.

02:03PM  14          (GOVERNMENT'S EXHIBIT 5811, TOP THREE EMAILS ON FIRST

02:03PM  15      PAGE, WAS RECEIVED IN EVIDENCE.)

02:03PM  16      BY MR. SCHENK:

02:03PM  17      Q.   MR. TOLBERT, DO YOU SEE ON THE SCREEN THOSE TOP THREE

02:03PM  18      EMAILS?

02:03PM  19      A.   I DO.

02:03PM  20      Q.   AND IF WE START WITH THE ONE ON THE VERY BOTTOM, IT'S FROM

02:03PM  21      AN EMAIL ACCOUNT THAT IS TITLED SHAREHOLDERINFO@THERANOS.COM.

02:03PM  22          DO YOU SEE THAT?

02:03PM  23      A.   YES.

02:03PM  24      Q.   AND THAT WAS SENT TO ANA@BDVENTURES.

02:03PM  25          WHO, AGAIN, IS SHE?

TOLBERT DIRECT BY MR. SCHENK                                      4443

02:03PM  1    A.   SO ANA IS AN EMPLOYEE WITH CHRIS LUCAS AT BLACK DIAMOND

02:03PM  2    VENTURES, AND SHE WAS, YOU KNOW, ONE OF THE PRINCIPALS IN THAT

02:03PM  3    ENTERPRISE.

02:03PM  4    Q.   THANK YOU.

02:03PM  5         SO IF WE GO UP ONE EMAIL, MS. QUINTANA WRITES -- DO YOU

02:04PM  6    SEE THE PARAGRAPH THAT BEGINS "ADDITIONALLY"?

02:04PM  7    A.   I DO.

02:04PM  8    Q.   "PER CHRIS LUCAS'S CONVERSATION WITH ELIZABETH OVER THE

02:04PM  9    WEEKEND, CRAIG HALL WHO INITIALLY INVESTED THROUGH BLACK

02:04PM  10   DIAMOND VENTURES WILL NOW BE INVESTING DIRECTLY."

02:04PM  11        DO YOU SEE THAT?

02:04PM  12   A.   I DO.

02:04PM  13   Q.   AND WAS THAT, IN FACT, TRUE?  WAS THE INVESTMENT THAT THE

02:04PM  14   HALL GROUP, CRAIG HALL, MADE NOW DIRECTLY INTO THERANOS?

02:04PM  15   A.   IT WAS.  IT WAS.

02:04PM  16   Q.   IF WE LOOK AT THE DATE OF THIS EMAIL, IT'S DECEMBER 30TH.

02:04PM  17        WAS THAT THE DAY BEFORE THE WIRE TRANSFER THAT YOU TALKED

02:04PM  18   ABOUT A MOMENT AGO?

02:04PM  19   A.   THAT'S CORRECT.

02:04PM  20   Q.   NOW, IF WE LOOK AT THE VERY TOP EMAIL, DO YOU SEE

02:04PM  21   MR. BALWANI RECEIVING THIS EMAIL FROM -- I'M SORRY, MR. BALWANI

02:04PM  22   SENDING THIS EMAIL TO MS. HOLMES?

02:04PM  23   A.   I DO.

02:04PM  24   Q.   AND THE TEXT IS, "WANT TO MAKE SURE YOU SAW THIS."

02:04PM  25        IS THAT RIGHT?

ER-3247

TOLBERT DIRECT BY MR. SCHENK                                    4444

02:05PM 1   A.   CORRECT.

02:05PM 2   Q.   AND NOW IF YOU COULD TURN TO 3530 IN YOUR BINDER.

02:05PM 3        IF YOU'LL LOOK AT PAGES 1 THROUGH 24 AND PAGE 32.

02:05PM 4        I'M GOING TO ASK IF YOU RECOGNIZE THOSE PAGES.

02:05PM 5   A.   I DO.

02:05PM 6   Q.   WHAT ARE THEY?

02:05PM 7   A.   SO THIS IS THE STOCK PURCHASE AGREEMENT THAT KIND OF

02:05PM 8   GOVERNED OUR INVESTMENT IN 2013.

02:05PM 9   Q.   INTO THERANOS?

02:05PM 10  A.   CORRECT.

02:05PM 11          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3530,

02:05PM 12  PAGES 1 THROUGH 24 AND PAGE 32.

02:05PM 13          MR. CAZARES:  NO OBJECTION.

02:05PM 14          THE COURT:  THOSE PAGES ARE ADMITTED, AND THEY MAY

02:05PM 15  BE PUBLISHED.

02:05PM 16          MR. SCHENK:  THANK YOU.

02:05PM 17       (GOVERNMENT'S EXHIBIT 3530, PAGES 1-24 AND 32, WAS

02:05PM 18  RECEIVED IN EVIDENCE.)

02:05PM 19  BY MR. SCHENK:

02:05PM 20  Q.   YOU SAID THAT THIS IS THE PURCHASE AGREEMENT FOR THE STOCK

02:06PM 21  IN 2013; IS THAT RIGHT?

02:06PM 22  A.   CORRECT.

02:06PM 23  Q.   I'M GOING TO ASK YOU SOME QUESTIONS ABOUT A FEW PAGES.

02:06PM 24       WOULD YOU PLEASE TURN FIRST TO PAGE 11.

02:06PM 25       AT THE VERY BOTTOM THERE'S A SECTION 4.4, SPECULATIVE

02:06PM   1    NATURE OF INVESTMENT.

02:06PM   2        DO YOU SEE THAT?

02:06PM   3    A.   I DO.

02:06PM   4    Q.   AND IT CARRIES OVER TO THE NEXT PAGE.

02:06PM   5        DID ULTIMATELY YOU SIGN THIS AGREEMENT?

02:06PM   6    A.   I DID.

02:06PM   7    Q.   AND WHEN YOU SIGNED IT, WERE YOU ACKNOWLEDGING THAT YOU

02:06PM   8    UNDERSTOOD THAT THE INVESTMENT WAS SPECULATIVE?

02:06PM   9    A.   I DID.

02:06PM  10    Q.   AND WHAT DID THAT MEAN TO YOU?

02:06PM  11    A.   YOU KNOW, WITH ANY INVESTMENT THERE IS RISK, AND SO, YOU

02:06PM  12    KNOW, THERE'S ALWAYS THE OPPORTUNITY FOR THOSE RISKS TO BE KIND

02:06PM  13    OF SET FORTH, YOU KNOW, AND SO WE KNEW THAT THERE WOULD -- THAT

02:06PM  14    BECAUSE IT WAS AN INVESTMENT, THERE WOULD BE SOME RISK

02:06PM  15    ASSOCIATED WITH THAT, YOU KNOW, BUT THAT CAN TAKE LOTS OF

02:07PM  16    DIFFERENT FORMS, I GUESS.

02:07PM  17        BUT I UNDERSTOOD WHAT -- I UNDERSTOOD THAT, BY THE NATURE

02:07PM  18    OF MAKING AN INVESTMENT, THERE WAS SOME RISK ASSOCIATED WITH

02:07PM  19    THAT.

02:07PM  20    Q.   THANK YOU.

02:07PM  21        NOW, ON PAGE 12, 4.5 IS ACCESS TO DATA.

02:07PM  22        DO YOU SEE THAT?

02:07PM  23    A.   YES.

02:07PM  24    Q.   AND THIS PARAGRAPH DISCUSSES SOME OF THE INFORMATION THAT

02:07PM  25    YOU HAD ACCESS TO; IS THAT RIGHT?

TOLBERT DIRECT BY MR. SCHENK                                      4446

02:07PM   1      A.   CORRECT.

02:07PM   2      Q.   WHEN YOU HAD THAT DECEMBER 20TH PHONE CALL WITH

02:07PM   3      MS. HOLMES, WAS THE INFORMATION THAT SHE COMMUNICATED TO YOU

02:07PM   4      PART OF THE INFORMATION THAT INFORMED YOUR DECISION TO INVEST?

02:07PM   5      A.   CERTAINLY IT WAS.

02:07PM   6      Q.   WOULD YOU NOW LOOK AT PARAGRAPH 4.6, ACCREDITED INVESTOR.

02:07PM   7           DO YOU SEE THAT?

02:07PM   8      A.   I DO.

02:07PM   9      Q.   IS IT TRUE THAT THE HALL GROUP WAS AN ACCREDITED INVESTOR?

02:07PM  10      A.   CORRECT.

02:07PM  11      Q.   WOULD YOU NOW TURN, PLEASE, TO PAGE 32.

02:08PM  12           ON PAGE 32, IS THAT YOUR SIGNATURE?

02:08PM  13      A.   THAT IS.

02:08PM  14      Q.   AND THE DATE IS --

02:08PM  15      A.   DECEMBER 31, 2013.

02:08PM  16      Q.   AND THEN BELOW THAT, DO YOU SEE A SIGNATURE ON A LINE, AND

02:08PM  17      THE LINE INCLUDES NAME, ELIZABETH HOLMES, CEO.

02:08PM  18           DO YOU SEE THAT?

02:08PM  19      A.   I DO.

02:08PM  20      Q.   AND SO WE'VE TALKED ABOUT THE FACT THAT YOU WORKED FOR THE

02:08PM  21      HALL GROUP AND THERE IS A PERSON NAMED CRAIG HALL, BUT YOU ARE

02:08PM  22      SIGNING THIS DOCUMENT; IS THAT RIGHT?

02:08PM  23      A.   CORRECT.

02:08PM  24      Q.   AND WHY DID THAT HAPPEN?  WHY WERE YOU THE ONE WHO SIGNED

02:08PM  25      THE SIGNATURE PAGE IF THE COMPANY IS CALLED HALL GROUP?

TOLBERT DIRECT BY MR. SCHENK                    4447

02:08PM  1    A.   BECAUSE I AM AN OFFICER OF THE COMPANY AND MR. HALL HAD

02:08PM  2    GIVEN ME THE AUTHORITY TO SIGN OFF ON THIS INVESTMENT.

02:08PM  3    Q.   OKAY.  AFTER YOU MADE THE DECISION TO INVEST, DID YOU WIRE

02:08PM  4    FUNDS TO THERANOS?

02:08PM  5    A.   WE DID.

02:08PM  6    Q.   AND WAS THAT ON THE SAME DATE, DECEMBER 31ST?

02:08PM  7    A.   IT WAS.

02:08PM  8    Q.   DO YOU REMEMBER THE AMOUNT?

02:08PM  9    A.   SO WE -- SO WE MADE AN INVESTMENT OF $5 MILLION.

02:09PM  10        AS PART OF OUR AGREEMENT, BASED ON CONVERSATIONS WITH

02:09PM  11   ELIZABETH HOLMES AND CHRIS LUCAS, AND NOT INVESTING THROUGH

02:09PM  12   CHRIS'S FUND, WE PAID A COMMISSION TO CHRIS, I BELIEVE, OF

02:09PM  13   $125,000.

02:09PM  14        SO THE WIRE WOULD HAVE BEEN IN THE AMOUNT OF 4 MILLION,

02:09PM  15   875, I BELIEVE.

02:09PM  16   Q.   4,875,000?

02:09PM  17   A.   YES.

02:09PM  18   Q.   OKAY.  DID YOU INITIATE THAT WIRE?

02:09PM  19   A.   I DID.

02:09PM  20   Q.   AND WHERE WERE YOU WHEN YOU INITIATED THAT WIRE?

02:09PM  21   A.   IN FRISCO, TEXAS.

02:09PM  22   Q.   AND DID YOU MAKE THE DOLLAR AMOUNT DECISION, 4.8 MILLION,

02:09PM  23   AS OPPOSED TO A DIFFERENT AMOUNT?

02:09PM  24   A.   SO WE HAD HAD A DISCUSSION ABOUT AN INVESTMENT ANYWHERE

02:09PM  25   FROM 0 UP TO $5 MILLION.

TOLBERT DIRECT BY MR. SCHENK                          4448

02:09PM 1      SO BASED ON THE CONVERSATIONS AND THE THINGS THAT WE

02:10PM 2   LEARNED, I MADE A DECISION TO INVEST AN ADDITIONAL 5 MILLION.

02:10PM 3   Q.   YOU SAID WE HAD HAD DISCUSSIONS.

02:10PM 4        WHO IS THE "WE"?

02:10PM 5   A.   SO MR. HALL AND I HAD DISCUSSIONS ALONG THE WAY ABOUT

02:10PM 6   WHETHER TO INVEST MORE OR HOW MUCH TO INVEST, AND GIVEN THAT HE

02:10PM 7   WAS GOING TO BE TRAVELLING, HE GAVE ME THE ABILITY TO FINALIZE

02:10PM 8   WHATEVER THAT AMOUNT WAS GOING TO BE.

02:10PM 9   Q.   I SEE.  SO IN YOUR CONVERSATIONS WITH MR. HALL, YOU

02:10PM 10  DISCUSSED A RANGE, AND THEN YOU PICKED THE NUMBER WITHIN THE

02:10PM 11  RANGE?

02:10PM 12  A.   CORRECT.

02:10PM 13  Q.   AFTER DECEMBER 31ST, 2013, I WANT TO TALK TO YOU ABOUT THE

02:10PM 14  INFORMATION, IF ANY, YOU RECEIVED IN 2014 AND 2015.

02:10PM 15       DO YOU RECALL RECEIVING UPDATES FROM THERANOS DURING THAT

02:10PM 16  PERIOD OF TIME?

02:10PM 17  A.   I BELIEVE WE RECEIVED A FEW UPDATES FROM THE COMPANY ALONG

02:10PM 18  THE WAY, YOU KNOW, SO THERE WERE A FEW UPDATES.

02:10PM 19       I ALSO CONTINUED TO STAY -- BECAUSE WE HAD A CONTINUING

02:10PM 20  INVESTMENT WITH CHRIS THROUGH HIS FUND, I ALSO STAYED IN CLOSE

02:11PM 21  CONTACT WITH HIM ABOUT THE COMPANY AND WHAT WAS DEVELOPING.

02:11PM 22  Q.   GREAT.  THANK YOU.

02:11PM 23       DID YOU READ AN ARTICLE IN "THE WALL STREET JOURNAL" IN

02:11PM 24  2015, IN OCTOBER OF 2015?

02:11PM 25       DO YOU RECALL THAT?

02:11PM  1    A.   I DO.

02:11PM  2    Q.   AND GENERALLY SPEAKING, WAS THE ARTICLE NEGATIVE?

02:11PM  3    A.   IT WAS.  IT FELT LIKE THAT WAS THE FIRST TIME THAT

02:11PM  4    SOMETHING HAD POPPED UP ON OUR RADAR SCREEN THAT WASN'T KIND

02:11PM  5    OF -- THAT WASN'T EXTREMELY POSITIVE.

02:11PM  6    Q.   I'D LIKE TO ASK YOU IF, AFTER YOUR INVESTMENT IN 2013, THE

02:11PM  7    WIRE THAT WE'VE DISCUSSED, IF THERE WERE THINGS THAT YOU

02:11PM  8    LEARNED ABOUT THE THERANOS TECHNOLOGY THAT WERE DIFFERENT THAN

02:11PM  9    WHAT YOU UNDERSTOOD IT TO BE WHEN YOU MADE THE INVESTMENT.

02:11PM 10        DO YOU UNDERSTAND THAT?

02:11PM 11            MR. CAZARES:  OBJECTION.  FOUNDATION ABOUT THE

02:11PM 12    TECHNOLOGY.

02:11PM 13            THE COURT:  WELL, THIS IS A FOUNDATION FOR THE TOPIC

02:11PM 14    THAT YOU'RE GOING TO ASK?

02:11PM 15            MR. SCHENK:  YES.

02:12PM 16            THE COURT:  ALL RIGHT.

02:12PM 17        DID YOU UNDERSTAND THAT THIS WAS FOUNDATIONAL TO --

02:12PM 18            THE WITNESS:  I MAY GET HIM TO RE-ASK THE QUESTION?

02:12PM 19            THE COURT:  OKAY, LET'S DO THAT.

02:12PM 20    BY MR. SCHENK:

02:12PM 21    Q.   I'M WONDERING AFTER YOU MADE THIS WIRE TRANSFER

02:12PM 22    DECEMBER 31ST, 2013, IF AFTER THAT DATE YOU LEARNED ADDITIONAL

02:12PM 23    INFORMATION ABOUT THE TECHNOLOGY THAT WAS DIFFERENT THAN WHAT

02:12PM 24    YOU UNDERSTOOD IT TO BE WHEN YOU MADE YOUR INVESTMENT?

02:12PM 25    A.   YOU KNOW, AS I RECALL --

TOLBERT DIRECT BY MR. SCHENK                    4450

02:12PM  1              THE COURT:  EXCUSE ME.  IS THAT A YES OR NO

02:12PM  2      QUESTION?

02:12PM  3              MR. SCHENK:  YES.

02:12PM  4              THE WITNESS:  OKAY.  I'M SORRY.

02:12PM  5          YES.

02:12PM  6      BY MR. SCHENK:

02:12PM  7      Q.  AND I WANT TO ASK YOU NOT WHAT IT IS YOU LEARNED, BUT THE

02:12PM  8      SOURCES.

02:12PM  9      A.  AND JUST TO BE CLEAR, SO 2015 IS THE FIRST TIME THAT I

02:12PM  10     LEARNED SOMETHING THAT FELT LIKE IT WAS DIFFERENT THAN WHAT I

02:12PM  11     HAD LEARNED ALONG THE WAY.

02:12PM  12     Q.  I SEE.  SO BY GIVING THAT ANSWER, ARE YOU SAYING THAT THE

02:12PM  13     SOURCES WERE THE MEDIA?

02:12PM  14     A.  CORRECT.

02:12PM  15     Q.  OKAY.  I WANT TO SHOW YOU ONE FINAL EXHIBIT.

02:12PM  16         WOULD YOU TURN TO 3086.

02:13PM  17         IS 3086 TWO EMAILS, ONE FROM THAT

02:13PM  18     SHAREHOLDERINFO@THERANOS.COM EMAIL ADDRESS, AND THEN ONE FROM

02:13PM  19     YOU AND INDIVIDUALS INCLUDING CRAIG HALL?

02:13PM  20     A.  CORRECT.

02:13PM  21             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3086.

02:13PM  22             MR. CAZARES:  NO OBJECTION.

02:13PM  23             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:13PM  24         (GOVERNMENT'S EXHIBIT 3086 WAS RECEIVED IN EVIDENCE.)

02:13PM  25     BY MR. SCHENK:

TOLBERT DIRECT BY MR. SCHENK                        4451

02:13PM  1    Q.   MR. TOLBERT, I'M NOT GOING TO ASK YOU TO READ THE TWO PAGE

02:13PM  2    EMAIL, BUT DO YOU RECALL THIS?  DO YOU RECALL THIS EMAIL?

02:14PM  3    A.   I DO.

02:14PM  4    Q.   AND GENERALLY, WHAT WAS THERANOS INFORMING YOU?

02:14PM  5    A.   SO THERANOS WAS LETTING US KNOW THAT THERE HAD BEEN SOME

02:14PM  6    FINDINGS MADE FROM CMS BASED ON A VISIT THAT CMS HAD MADE TO

02:14PM  7    THEIR LAB.

02:14PM  8        AND THEN THERE HAD BEEN SOME ISSUES THAT HAD BEEN FOUND, I

02:14PM  9    THINK.

02:14PM  10   Q.   AND IN IT, DOES THERANOS ALSO DESCRIBE NEW LEADERSHIP IN

02:14PM  11   THE LAB?

02:14PM  12   A.   THEY DO.

02:14PM  13   Q.   AND THEN IT LOOKS LIKE AT THE VERY TOP YOU FORWARD THIS

02:14PM  14   ALONG TO INDIVIDUALS, INCLUDING CRAIG HALL.

02:14PM  15   A.   CORRECT.

02:14PM  16   Q.   AND WHY DID YOU DO THAT?

02:14PM  17   A.   YOU KNOW, CERTAINLY WE HAD GONE ON THIS INVESTMENT FROM

02:14PM  18   THE STATE OF FEELING LIKE EVERYTHING WAS GOING EXTREMELY WELL

02:14PM  19   TO, YOU KNOW, HAVING SOME QUESTIONS ABOUT IT IN THE LATER PART

02:14PM  20   OF 2015 UNTIL THIS TIME IN 2016.

02:15PM  21       AND SO, YOU KNOW, AS I FORWARDED THIS EMAIL, YOU CAN SEE

02:15PM  22   WHAT I WROTE TO MR. HALL, THAT, LOOK, HERE'S SOME MORE BAD

02:15PM  23   NEWS, AND THIS IS REALLY BAD, AND THE COMPANY HAS GOT TO FIND A

02:15PM  24   WAY TO GET IN FRONT OF THIS AND REBUT THESE ALLEGATIONS BEFORE

02:15PM  25   THINGS GET SO NEGATIVE IN THE PRESS.

TOLBERT DIRECT BY MR. SCHENK                                    4452

02:15PM  1        Q.   THANK YOU.

02:15PM  2             YOUR HONOR, MAY I HAVE ONE MOMENT?

02:15PM  3                  THE COURT:  YES.

02:15PM  4             (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:15PM  5                  MR. SCHENK:  THANK YOU, MR. TOLBERT.

02:15PM  6                  THE COURT:  CROSS-EXAMINATION?

02:15PM  7                  MR. CAZARES:  YES, YOUR HONOR.

02:15PM  8             MAY I HAVE A SHORT COMFORT BREAK?

02:15PM  9                  THE COURT:  SURE.  LET'S DO THAT.  LET'S TAKE ABOUT

02:15PM 10        10, 15 MINUTES, 15 MINUTE BREAK, LADIES AND GENTLEMEN.

02:15PM 11             YOU MAY STAND DOWN.

02:16PM 12             (JURY OUT AT 2:16 P.M.)

02:16PM 13                  THE COURT:  YOU CAN STAND DOWN IF YOU WOULD LIKE.

02:16PM 14             PLEASE BE SEATED.  THANK YOU.  WE'LL BE IN RECESS FOR A

02:16PM 15        MOMENT.

02:16PM 16             (RECESS FROM 2:16 P.M. UNTIL 2:29 P.M.)

02:29PM 17             (JURY IN AT 2:29 P.M.)

02:29PM 18                  THE COURT:  WE'RE BACK ON THE RECORD.

02:29PM 19             PLEASE BE SEATED.

02:29PM 20             ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

02:29PM 21             AND, COUNSEL, DO YOU HAVE CROSS-EXAMINATION?

02:29PM 22                  MR. CAZARES:  YES, YOUR HONOR.  THANK YOU VERY MUCH.

02:30PM 23             MAY I REMOVE MY MASK, YOUR HONOR?

02:30PM 24                  THE COURT:  YES, OF COURSE.

02:30PM 25                  MR. CAZARES:  THANK YOU.

ER-3256

**CROSS-EXAMINATION**

BY MR. CAZARES:

Q.   MR. TOLBERT, GOOD AFTERNOON.

A.   HI.

Q.   MY NAME IS STEPHEN CAZARES AND I REPRESENT MR. BALWANI.

     I JUST HAVE A FEW QUESTIONS FOR YOU THIS AFTERNOON.

A.   OKAY.

Q.   SO I JUST WANT TO FIRST REVIEW KIND OF YOUR BACKGROUND AND

MR. HALL'S BACKGROUND.

     I UNDERSTAND THAT MR. HALL AND YOURSELF HAVE WORKED

TOGETHER SINCE 2000 -- SINCE 1999 OR SO?

A.   CORRECT.

Q.   AND THIS IS RUNNING THE HALL GROUP; CORRECT?

A.   CORRECT.  HE RUNS THE HALL GROUP.  I DON'T.

Q.   YOU HELP HIM DO IT?

A.   I'M NOT --

Q.   I'M SORRY.  AND THE PRINCIPAL BUSINESS OF THE HALL GROUP

IS REAL ESTATE INVESTING; IS THAT RIGHT?

A.   THAT'S ONE OF OUR PRINCIPAL BUSINESS LINES RIGHT NOW.

Q.   AS WELL AS OTHERS, INCLUDING I THINK THERE WAS A WINERY IN

NAPA?

A.   SO WE ALSO DO -- WE'RE IN THE WINE BUSINESS IN NAPA, AND

WE ALSO HAVE A BUSINESS THAT MAKES LOANS ON CONSTRUCTION

RELATED PROJECTS.

Q.   UH-HUH, OKAY.

TOLBERT CROSS BY MR. CAZARES                                            4454

02:31PM  1              AND IT WOULD BE FAIR TO DESCRIBE MR. HALL AS A SUCCESSFUL

02:31PM  2      BUSINESSMAN; CORRECT?

02:31PM  3      A.   CORRECT.

02:31PM  4      Q.   A SAVVY INVESTOR?

02:31PM  5      A.   CORRECT.

02:31PM  6      Q.   DOES HIS DUE DILIGENCE?

02:31PM  7      A.   CORRECT.

02:31PM  8      Q.   AND PART OF YOUR JOB IS TO HELP HIM DO THAT AND, YOU KNOW,

02:31PM  9      MAKE GOOD DECISIONS REGARDING HIS INVESTMENT PORTFOLIO?

02:31PM 10      A.   THAT'S CORRECT.

02:31PM 11      Q.   AND AM I CORRECT, I THINK YOU SAID THAT THE INTRODUCTION

02:31PM 12      TO THERANOS CAME FROM GARY NORDHEIMER?

02:31PM 13      A.   THAT'S CORRECT.

02:31PM 14      Q.   AND MR. NORDHEIMER WAS A COLLEAGUE OF MR. HALL?

02:31PM 15      A.   YEAH, THEY'RE FRIENDS, ACQUAINTANCES.  I'M NOT SURE OF THE

02:31PM 16      EXACT NATURE OF THEIR RELATIONSHIP, BUT, YEAH, FRIENDS.

02:31PM 17      Q.   OKAY.  AND ULTIMATELY MR. NORDHEIMER WOUND UP PUTTING

02:31PM 18      MR. HALL AND YOURSELF IN CONTACT WITH CHRIS LUCAS; IS THAT

02:32PM 19      RIGHT?

02:32PM 20      A.   THAT'S CORRECT.

02:32PM 21      Q.   AND AS YOU UNDERSTOOD IT, CHRIS LUCAS WAS ALREADY INVESTED

02:32PM 22      IN THERANOS PRIOR TO YOUR AND MR. HALL'S INITIAL INVESTMENT;

02:32PM 23      CORRECT?

02:32PM 24      A.   THAT'S CORRECT.

02:32PM 25      Q.   AND AS A PART OF THAT CONNECTION TO CHRIS LUCAS, YOU WERE

02:32PM   1    ULTIMATELY INTRODUCED TO DON LUCAS; CORRECT?

02:32PM   2    A.   THAT IS CORRECT.

02:32PM   3    Q.   AND WHEN YOU FIRST MET DON LUCAS IN THAT TIME PERIOD, THAT

02:32PM   4    EARLY 2006 TIME PERIOD --

02:32PM   5    A.   OR LATE 2006.

02:32PM   6    Q.   LATE -- THANK YOU FOR THE CORRECTION.  LATE 2006 TIME

02:32PM   7    PERIOD, AT THE TIME YOU REALLY DIDN'T KNOW WHO DON LUCAS WAS;

02:32PM   8    CORRECT?

02:32PM   9    A.   I DIDN'T.

02:32PM  10    Q.   BUT YOU LEARNED?

02:32PM  11    A.   I DID.

02:32PM  12    Q.   AND WHAT YOU LEARNED WAS THAT MR. LUCAS WAS AN EXTREMELY

02:32PM  13    SUCCESSFUL INVESTOR HERE IN SILICON VALLEY; CORRECT?

02:32PM  14    A.   THAT'S CORRECT.

02:32PM  15    Q.   OKAY.  AND HE WAS THE CHAIRMAN OF VERY SUCCESSFUL

02:32PM  16    COMPANIES AND ACTUALLY INVESTED EARLY IN MANY SUCCESSFUL

02:33PM  17    SILICON VALLEY COMPANIES?

02:33PM  18    A.   CORRECT.

02:33PM  19    Q.   AND YOU WOULD DEFINE DONE LUCAS AS A VERY SUCCESSFUL

02:33PM  20    PERSON?

02:33PM  21    A.   I WOULD.

02:33PM  22    Q.   AND HIS PARTICIPATION IN THERANOS HAD SOME INFLUENCE ON

02:33PM  23    YOURSELF AND MR. HALL'S WILLINGNESS TO INVEST IN THERANOS;

02:33PM  24    CORRECT?

02:33PM  25    A.   IT CERTAINLY WAS A POSITIVE.

TOLBERT CROSS BY MR. CAZARES                      4456

02:33PM   1    Q.   SO, AGAIN, YOU SAID BACK IN THIS 2006 TIME PERIOD, I

02:33PM   2    THINK -- DO I HAVE IT RIGHT? -- YOU HAD SOME CALLS WITH

02:33PM   3    CHRIS LUCAS; CORRECT?

02:33PM   4    A.   CORRECT.

02:33PM   5    Q.   AND THIS RELATED TO MR. HALL'S INSTRUCTION TO LOOK INTO

02:33PM   6    THE THERANOS OPPORTUNITY; RIGHT?

02:33PM   7    A.   THAT'S RIGHT.

02:33PM   8    Q.   AND I THINK YOU SAID AT LEAST ONE OF THOSE CALLS WAS WITH

02:33PM   9    MS. HOLMES, OR INCLUDED MS. HOLMES?

02:33PM   10   A.   THAT'S CORRECT.

02:33PM   11   Q.   YOU VISITED CALIFORNIA?

02:33PM   12   A.   I DID.

02:33PM   13   Q.   BUT THE VISIT TO CALIFORNIA WASN'T JUST FOR THERANOS, YOU

02:33PM   14   ACTUALLY HAD OTHER BUSINESS HERE; CORRECT?

02:33PM   15   A.   THAT'S CORRECT.

02:33PM   16   Q.   BUT YOU KIND OF MADE A SIDE TRIP FOR THE THERANOS

02:33PM   17   BUSINESS?

02:33PM   18   A.   THAT'S CORRECT.

02:33PM   19   Q.   AND YOU ACTUALLY VISITED THERANOS'S FACILITIES?

02:33PM   20   A.   YOU KNOW, AS I RECALL, I DID.

02:33PM   21   Q.   AND THEN YOU ALSO HAD DINNER WITH CHRIS LUCAS, DON LUCAS,

02:34PM   22   AND MS. HOLMES?

02:34PM   23   A.   THAT'S CORRECT.

02:34PM   24   Q.   AND IN THAT DINNER, I'LL GET MY NUMBERS RIGHT, THE FOUR OF

02:34PM   25   YOU DISCUSSED THERANOS AND ITS BUSINESS?

02:34PM  1      A.   THAT'S RIGHT.

02:34PM  2      Q.   AND KIND OF ELIZABETH'S VISION FOR THE BUSINESS; CORRECT?

02:34PM  3      A.   CORRECT.

02:34PM  4      Q.   YOU DISCUSSED THE TECHNOLOGY; CORRECT?

02:34PM  5      A.   CORRECT.

02:34PM  6      Q.   AND EVERYONE WAS PARTICIPATING IN THIS; CORRECT?

02:34PM  7      A.   YES.

02:34PM  8      Q.   IT WASN'T JUST ELIZABETH, IT WAS DON AND CHRIS LUCAS?

02:34PM  9      A.   THAT'S CORRECT.  EVERYONE WAS PARTICIPATING.

02:34PM  10     Q.   BECAUSE CHRIS AND DON LUCAS ALREADY HAD EXPERIENCE WITH

02:34PM  11     THERANOS; CORRECT?

02:34PM  12     A.   THAT'S CORRECT.

02:34PM  13     Q.   AND YOU HAD DINNER AND LEARNED ABOUT THERANOS.

02:34PM  14          DID YOU TAKE ANY NOTES OF THE DISCUSSION THAT EVENING?

02:34PM  15     A.   I DID NOT.

02:34PM  16     Q.   YOU TRIED TO DO OTHER DUE DILIGENCE, MAYBE SEARCHING THE

02:34PM  17     INTERNET OR OTHER THINGS TO LEARN WHAT YOU COULD?

02:34PM  18     A.   YOU MEAN THAT NIGHT, OR?

02:34PM  19     Q.   AT THAT TIME, BEFORE THE INVESTMENT.

02:34PM  20     A.   AT THAT TIME?

02:35PM  21          SO I DID.  SO WE, YOU KNOW, SEARCHED THE INTERNET.

02:35PM  22          WE ALSO HAD SOME OTHER DUE DILIGENCE THAT WE UNDERTOOK.  I

02:35PM  23     DON'T KNOW HOW MUCH YOU WANT TO KNOW ABOUT WHAT WE DID.

02:35PM  24     Q.   WHAT ELSE DID YOU DO?

02:35PM  25     A.   YOU KNOW, WE HAD -- WE HAD REACHED OUT TO A PATENT

TOLBERT CROSS BY MR. CAZARES                                      4458

02:35PM   1    ATTORNEY, A FELLOW THAT WE KNEW WHO WAS A PATENT ATTORNEY, AND

02:35PM   2    ASKED HIM TO DO A BRIEF REVIEW OF THE INTELLECTUAL PROPERTY

02:35PM   3    THAT WAS IN PLACE AT THAT TIME.

02:35PM   4        WE REACHED OUT TO A FEW PEOPLE WHO WE KNEW WHO WERE IN

02:35PM   5    MEDICAL HEALTH CARE TECHNOLOGY COMPANIES TO HAVE SOME

02:35PM   6    THEORETICAL DISCUSSIONS ABOUT OPPORTUNITY, ABOUT IF SOMEBODY

02:35PM   7    WAS ABLE TO MEET THIS OPPORTUNITY, WHAT WOULD THAT LOOK LIKE.

02:35PM   8        SO WE HAD SOME ADDITIONAL CONVERSATIONS OUTSIDE OF JUST

02:35PM   9    THE DIRECT ONES THAT WE HAD WITH ELIZABETH.

02:35PM  10    Q.   AND THIS EXTRA DUE DILIGENCE THAT YOU DID ESTABLISHED, AT

02:36PM  11    LEAST TO YOUR AND MR. HALL'S SATISFACTION, THE VISION WAS

02:36PM  12    VIABLE; RIGHT?

02:36PM  13    A.   CORRECT.

02:36PM  14    Q.   THERE WERE SOME PATENTS ALREADY IN PLACE?

02:36PM  15    A.   THAT'S CORRECT.

02:36PM  16    Q.   AND THE PERSONS YOU SPOKE TO ABOUT THE INDUSTRY BELIEVED

02:36PM  17    THIS IS POSSIBLE; CORRECT?

02:36PM  18    A.   CORRECT.

02:36PM  19    Q.   OKAY.  AND THAT'S WHY YOU INVESTED; CORRECT?

02:36PM  20    A.   YES.  WELL, THAT'S NOT WHY WE INVESTED, BUT IT CERTAINLY

02:36PM  21    DIDN'T GIVE US A REASON NOT TO INVEST.

02:36PM  22    Q.   CONTRIBUTED TO THE DECISION?

02:36PM  23    A.   CORRECT.

02:36PM  24    Q.   OKAY.  BUT IT'S ALSO FAIR TO SAY THAT YOUR PRIMARY SOURCES

02:36PM  25    OF INFORMATION WERE CHRIS LUCAS, DON LUCAS, AND MS. HOLMES?

TOLBERT CROSS BY MR. CAZARES                                    4459

02:36PM  1    A.   THAT'S CORRECT.

02:36PM  2    Q.   AND AT THE TIME IN 2006, I THINK YOU ALREADY SAID IT, YOU

02:36PM  3    DIDN'T KNOW WHO MR. BALWANI WAS; CORRECT?

02:36PM  4    A.   I DID NOT.

02:36PM  5    Q.   AND YOU HAD NEVER SPOKEN TO MR. BALWANI?

02:36PM  6    A.   I HAD NOT.

02:36PM  7    Q.   OKAY.

02:36PM  8    A.   I STILL HAVE NEVER SPOKEN TO MR. BALWANI.

02:36PM  9    Q.   NOW, YOU DESCRIBED THE INTERIM PERIOD, I'LL CALL IT, FROM

02:37PM  10   LATE 2006 TO 2012 WHERE YOU DIDN'T REALLY GET ANY DIRECT

02:37PM  11   COMMUNICATIONS FROM THERANOS IN THE FORM OF UPDATES OR

02:37PM  12   FINANCIAL DETAILS, THAT SORT OF THING; CORRECT?

02:37PM  13   A.   THAT'S CORRECT.

02:37PM  14   Q.   BUT YOU DID GET PERIODIC UPDATES FROM CHRIS LUCAS?

02:37PM  15   A.   THAT'S CORRECT.

02:37PM  16   Q.   AND LUCAS, AT LEAST TO YOUR EYE, APPEARED TO BE

02:37PM  17   KNOWLEDGEABLE ABOUT THERANOS; CORRECT?

02:37PM  18   A.   HE DID.

02:37PM  19        MY UNDERSTANDING WAS THAT HE, YOU KNOW, BY HIS ACCOUNT TO

02:37PM  20   ME, HE SPENT SOME TIME VISITING THE HEADQUARTERS, INTERACTING

02:37PM  21   WITH ELIZABETH, INTERACTING WITH OTHER MEMBERS OF THE COMPANY,

02:37PM  22   AND SO IT FELT LIKE HIS REPORTS WERE CREDIBLE.

02:37PM  23   Q.   AND PERIODICALLY YOU WOULD GET UPDATES THAT SOUNDED LIKE

02:37PM  24   PROGRESS IN THE BUSINESS; CORRECT?

02:37PM  25   A.   YEAH.  I MEAN, REALLY EVERYONE SOUNDED LIKE PROGRESS

TOLBERT CROSS BY MR. CAZARES                                    4460

02:37PM  1    THROUGH THOSE YEARS.

02:37PM  2    Q.   YOU LEARNED A LITTLE BIT ABOUT THE PHARMACEUTICAL

02:37PM  3    RELATIONSHIPS; CORRECT?

02:37PM  4    A.   CORRECT.

02:37PM  5    Q.   ULTIMATELY YOU LEARNED, THROUGH CHRIS LUCAS, DURING THIS

02:38PM  6    TIME PERIOD THAT THERE WAS A RELATIONSHIP WITH A RETAILER,

02:38PM  7    MAYBE SAFEWAY?

02:38PM  8    A.   WELL, MR. LUCAS HAD REPRESENTED THAT THERE WAS

02:38PM  9    CONVERSATIONS WITH POTENTIAL RETAILERS.  AT FIRST THOSE WERE

02:38PM  10   UNNAMED.

02:38PM  11        LATER SAFEWAY WAS MENTIONED, AS WELL AS WAL-MART AND

02:38PM  12   WALGREENS WERE THE THREE THAT I REMEMBER BY NAME.

02:38PM  13   Q.   AND THAT WAS POSITIVE INFORMATION AS WELL?

02:38PM  14   A.   THAT'S CORRECT.

02:38PM  15   Q.   OKAY.  POSITIVE DEVELOPMENTS; IS THAT RIGHT?

02:38PM  16   A.   CORRECT.  SORRY.

02:38PM  17   Q.   SORRY.  I ASKED THE SAME QUESTION TWICE.  I'LL TRY NOT TO

02:38PM  18   DO THAT.

02:38PM  19        BUT CHRIS LUCAS, DURING THAT INTERIM PERIOD, WASN'T

02:38PM  20   PROVIDING YOU WITH FINANCIAL DETAILS; IS THAT CORRECT?

02:38PM  21   A.   HE WAS NOT.  WE HAD SEVERAL SPECIFIC CONVERSATIONS ABOUT

02:38PM  22   FINANCIAL INFORMATION AND, YOU KNOW, THERE WAS A LITTLE

02:38PM  23   FRUSTRATION ON OUR PART THAT THERE WASN'T MORE FINANCIAL

02:38PM  24   INFORMATION, OR ANY FINANCIAL INFORMATION, THAT CAME.

02:38PM  25        YOU KNOW, MY UNDERSTANDING WAS THAT CHRIS DIDN'T HAVE ANY

ER-3264

TOLBERT CROSS BY MR. CAZARES                    4461

02:39PM   1    TO GIVE TO US.

02:39PM   2         YOU KNOW, AT ONE POINT IN MY NOTES, I THINK I REFERENCED

02:39PM   3    CHRIS BEING TIGHT FISTED WITH FINANCIAL INFORMATION, AND SO WE

02:39PM   4    DIDN'T HAVE A LOT OF VISIBILITY WITH FINANCIAL INFORMATION

02:39PM   5    ALONG THE WAY.

02:39PM   6    Q.   SO YOU WERE INTERESTED IN THE INFORMATION, IT JUST WASN'T

02:39PM   7    FORTHCOMING?

02:39PM   8    A.   CORRECT.

02:39PM   9    Q.   AND IN THAT TIME PERIOD, MR. LUCAS, DID HE EVER REPORT TO

02:39PM  10    YOU CASH FLOW ISSUES THAT THERANOS WAS HAVING IN 2009?

02:39PM  11    A.   NOT THAT I REMEMBER WITH ANY SPECIFICS OR WITH ANY

02:39PM  12    CLARITY.

02:39PM  13    Q.   SO WERE YOU AWARE OF THE FACT THAT MR. BALWANI GUARANTEED

02:39PM  14    A $10 MILLION LINE OF CREDIT FOR THERANOS IN AUGUST OF 2009 TO

02:39PM  15    HELP IT STAY IN BUSINESS?

02:39PM  16    A.   I WAS NOT.  I WAS NOT AT THAT TIME.

02:39PM  17    Q.   WERE YOU AWARE OF MR. BALWANI'S ROLE AT THERANOS IN 2009?

02:39PM  18    A.   YOU KNOW, MY ONLY RECOLLECTION OF MR. BALWANI IS MR. LUCAS

02:40PM  19    HAD REFERENCED AT SOME POINT THAT ELIZABETH HAD A BOYFRIEND WHO

02:40PM  20    HAD BEEN VERY SUCCESSFUL AND WHO IS NOW ENGAGED IN THE

02:40PM  21    BUSINESS.

02:40PM  22         AND THEN AT SOME POINT, YOU KNOW, IN ONE OF OUR NEXT

02:40PM  23    UPDATES, CHRIS HAD TOLD ME WHO -- WHAT HIS NAME WAS.

02:40PM  24         BUT I DIDN'T HAVE ANY UNDERSTANDING BEYOND THAT.

02:40PM  25    Q.   OKAY.  SO ULTIMATELY YOU LEARNED THAT IT WAS MR. BALWANI

ER-3265

02:40PM 1    WHO WAS MS. HOLMES'S BOYFRIEND WHO WORKED WITHIN THERANOS?

02:40PM 2    A.   CORRECT.

02:40PM 3    Q.   NOW, BUT AS YOU GOT INTO 2013, YOU BEGAN TO GET SOME

02:40PM 4    UPDATES THAT WERE HELPFUL AND NOTABLE; CORRECT?

02:40PM 5    A.   CORRECT.

02:40PM 6    Q.   INCLUDING, I THINK WE SAW THIS MORNING, THE ANNOUNCEMENT

02:40PM 7    RELATING TO DICK KOVACEVICH AND GENERAL MATTIS JOINING THE

02:40PM 8    BOARD.

02:40PM 9        DO YOU REMEMBER THAT?

02:40PM 10   A.   THAT'S CORRECT.  I'M GLAD YOU HAVE AS MUCH PROBLEM WITH

02:41PM 11   HIS NAME AS I DO.

02:41PM 12   Q.   I DO.  BUT THEY WERE BOTH IMPRESSIVE INDIVIDUALS JOINING

02:41PM 13   THE BOARD; CORRECT?

02:41PM 14   A.   THAT'S TRUE.

02:41PM 15   Q.   AND AS YOU GOT TOWARDS THE LATER 2013 TIME PERIOD WHEN YOU

02:41PM 16   INVESTED, YOU TOOK SOME COMFORT IN THE FACT THAT THERANOS HAD

02:41PM 17   AN EXPERIENCED BOARD OF DIRECTORS; CORRECT?

02:41PM 18   A.   I DID.  IN FACT, YOU KNOW IT WAS A VERY IMPRESSIVE BOARD.

02:41PM 19   NOT TO CAST ASPERSIONS OR BURST ANY BUBBLES OF HOW IMPORTANT

02:41PM 20   PEOPLE WERE, BUT I WAS FROM GEORGIA, I GREW UP IN GEORGIA AND

02:41PM 21   SAM NUNN WAS MY SENATOR, SO WHEN I SAW SAM NUNN'S NAME ON THE

02:41PM 22   BOARD OF DIRECTORS, I MEAN, THAT IS SOMEBODY THAT REALLY, OVER

02:41PM 23   AND ABOVE EVERYBODY ELSE, RESONATED WITH ME.

02:41PM 24   Q.   FORMER SECRETARY OF STATE SHULTZ ALSO?

02:41PM 25   A.   YES.

TOLBERT CROSS BY MR. CAZARES                                   4463

02:41PM   1    Q.   AND OTHER SIMILAR PERSONS?

02:41PM   2    A.   CORRECT.

02:41PM   3    Q.   AND AT THE TIME, OBVIOUSLY BEING IN THE BUSINESS THAT YOU

02:41PM   4    AND MR. HALL WERE IN, YOU UNDERSTOOD THE ROLE OF THE BOARD OF

02:42PM   5    DIRECTORS IN A COMPANY LIKE THERANOS?

02:42PM   6    A.   CORRECT.

02:42PM   7    Q.   BUT ULTIMATELY THE BOARD HAD THE FINAL SAY ON BUSINESS

02:42PM   8    MATTERS; CORRECT?

02:42PM   9    A.   YOU KNOW, THE BOARD'S PRIMARY RESPONSIBILITY, OBJECTIVE IS

02:42PM  10    OVERSIGHT OF THE MANAGEMENT OF THE COMPANY.

02:42PM  11    Q.   TO ENSURE THAT MANAGEMENT IS EXECUTING ON THE COMPANY'S

02:42PM  12    BUSINESS PLAN?

02:42PM  13    A.   CORRECT.

02:42PM  14    Q.   TO PROTECT INVESTORS; CORRECT?

02:42PM  15    A.   CORRECT.

02:42PM  16    Q.   IN THAT FALL OF 2019 TIME PERIOD, YOU LEARNED ABOUT THE

02:42PM  17    END OF STEALTH MODE AND PUBLIC ANNOUNCEMENTS ABOUT THERANOS IN

02:42PM  18    THE PARTNERSHIP WITH WALGREENS; CORRECT?

02:42PM  19    A.   THAT'S CORRECT.

02:42PM  20    Q.   AND THAT STEALTH MODE THAT THERANOS WAS KIND OF IN FOR ALL

02:42PM  21    OF THOSE YEARS AS IT WAS GROWING AND DEVELOPING, YOU DIDN'T

02:42PM  22    VIEW NECESSARILY THAT STRATEGY AS A NEGATIVE, DID YOU?

02:42PM  23    A.   ALONG THE WAY I DIDN'T, NO.  CERTAINLY IT FELT STRATEGIC

02:43PM  24    ALONG THE WAY TO STAY UNDER THE RADAR SCREEN.

02:43PM  25         LIKE I REFERENCED, I WISH WE HAD SEEN A LITTLE MORE

02:43PM   1    FINANCIAL INFORMATION ALONG THE WAY.

02:43PM   2         AND, YOU KNOW, WE HAD SOME INTERNAL DISCUSSIONS ABOUT

02:43PM   3    THAT, BUT, YOU KNOW, CERTAINLY IT FELT LIKE WAITING UNTIL

02:43PM   4    THINGS WERE READY TO BE ROLLED OUT COMMERCIALLY WAS A VIABLE

02:43PM   5    OPTION.

02:43PM   6    Q.   FAIR ENOUGH.

02:43PM   7         YOUR HONOR, I'D LIKE TO PUBLISH 1113.  I THINK IT'S

02:43PM   8    ALREADY IN EVIDENCE.

02:43PM   9              THE COURT:  SURE.

02:43PM  10              MR. CAZARES:  MAY I PUT IT UP ON THE SCREEN?

02:43PM  11              THE COURT:  YES.

02:43PM  12    BY MR. CAZARES:

02:43PM  13    Q.   SO, MR. TOLBERT, UP ON THE SCREEN IS THIS JOINT PUBLIC

02:43PM  14    ANNOUNCEMENT BY THERANOS AND WALGREENS RELATING TO THE

02:43PM  15    PARTNERSHIP.

02:43PM  16         DO YOU SEE THAT?

02:43PM  17    A.   I DO.

02:43PM  18    Q.   AND IT'S SEPTEMBER 9, 2013.

02:43PM  19         YOU'VE SEEN THIS BEFORE; CORRECT?

02:43PM  20    A.   I HAVE.

02:43PM  21    Q.   AND CONTEMPORANEOUS WITH THE RELEASE OF THE INFORMATION;

02:43PM  22    RIGHT?

02:43PM  23    A.   CORRECT.

02:43PM  24    Q.   OKAY.  AND THIS WAS GREAT NEWS FOR YOU AS AN INVESTOR AND

02:43PM  25    FOR MR. HALL AS AN INVESTOR IN THERANOS; RIGHT?

02:44PM 1      A.   THAT'S CORRECT.

02:44PM 2      Q.   AFTER YEARS OF SOMEWHAT SILENCE AND SLOWED DEVELOPMENTS,

02:44PM 3      NOW A PARTNERSHIP WITH A NATIONAL AND INTERNATIONAL RETAILER TO

02:44PM 4      EXPAND THE BUSINESS, THAT WAS GREAT NEWS?

02:44PM 5      A.   THAT WAS A VERY POSITIVE STEP.

02:44PM 6      Q.   AND THAT HAD SOME INFLUENCE ON YOUR DECISION TO INVEST IN

02:44PM 7      DECEMBER OF 2013; RIGHT?

02:44PM 8      A.   CORRECT.

02:44PM 9      Q.   BECAUSE IT MADE SENSE THAT A CORPORATION LIKE WALGREENS

02:44PM 10     AND THE RESOURCES THAT THEY HAVE WOULD SEEM TO BE THE PERFECT

02:44PM 11     PARTNER FOR SOMEONE LIKE THERANOS; RIGHT?

02:44PM 12     A.   THEY WERE CERTAINLY SOMEBODY THAT WAS VERY STRATEGIC.

02:44PM 13     Q.   AND YOU WOULD ALSO EXPECT THAT A LARGE CORPORATION LIKE

02:44PM 14     WALGREENS WOULD HAVE AT LEAST DONE SOME OF THEIR DUE DILIGENCE

02:44PM 15     REGARDING THERANOS AND ITS TECHNOLOGY TO AT LEAST GAIN SOME

02:44PM 16     COMFORT THAT IT WAS POSSIBLE TO TAKE IT NATIONAL; RIGHT?

02:44PM 17     A.   THAT'S CORRECT.

02:44PM 18     Q.   NOW, YOU ALSO TESTIFIED I THINK THAT YOU -- I DON'T WANT

02:45PM 19     TO SAY DEVELOPED THE HABIT -- BUT YOU ACTIVELY SEARCHED FOR

02:45PM 20     INFORMATION ABOUT THERANOS IN THIS LATE 2013 TIME PERIOD,

02:45PM 21     PARTICULARLY AFTER THESE PUBLIC ANNOUNCEMENTS STARTED TO

02:45PM 22     SURFACE; CORRECT?

02:45PM 23     A.   THAT'S CORRECT.

02:45PM 24     Q.   AND WHATEVER YOU COULD GET YOUR HANDS ON, I THINK YOU

02:45PM 25     SAID, YOU DID AND YOU READ; RIGHT?

02:45PM    1        A.    WHATEVER MY SEARCHES PRODUCED, I DID.

02:45PM    2        Q.    SURE.  AND THAT WOULD HAVE INCLUDED THERANOS'S WEBSITE;

02:45PM    3        RIGHT?

02:45PM    4        A.    THAT'S CORRECT.

02:45PM    5        Q.    AND SO WHATEVER WAS ON THE WEBSITE, FAIR TO SAY AT THAT

02:45PM    6        TIME YOU WOULD HAVE LOOKED AT IT?  AND THIS IS LATE 2013?

02:45PM    7        A.    THAT'S CORRECT.

02:45PM    8        Q.    SO WHATEVER WAS ON THAT WEBSITE WOULD HAVE BEEN KNOWN TO

02:45PM    9        YOU AT THE TIME THAT YOU INVESTED; CORRECT?

02:45PM   10        A.    THAT'S CORRECT.

02:45PM   11        Q.    OKAY.  AND IN THAT TIME PERIOD, THOUGH, YOU DID KNOW THAT

02:45PM   12        THIS ROLLOUT WITH WALGREENS WAS NEW, IT WAS NASCENT?

02:45PM   13        A.    YES.

02:45PM   14        Q.    JUST A FEW STORES?

02:45PM   15        A.    THAT'S CORRECT.  I THINK WHEN THIS ANNOUNCEMENT CAME OUT,

02:45PM   16        THERE WAS ONLY THE ONE LOCATION OPEN.

02:45PM   17        Q.    YEAH.  AND YOU DIDN'T HAVE A CHANCE TO VISIT THAT LOCATION

02:46PM   18        TO GET TESTED, DID YOU?

02:46PM   19        A.    NOT IN 2013.

02:46PM   20              I DID GO AND GET TESTED LATER ON, BUT NOT IN 2013.

02:46PM   21        Q.    AFTER YOUR INVESTMENT?

02:46PM   22        A.    CORRECT.

02:46PM   23        Q.    AND I THINK YOU HAD MENTIONED IN PRIOR STATEMENTS OR

02:46PM   24        TESTIMONY THAT --

02:46PM   25                    MR. SCHENK:  OBJECTION.  INADMISSIBLE.  RELEVANCE.

TOLBERT CROSS BY MR. CAZARES                    4467

02:46PM   1          THE COURT:  WHY DON'T YOU ASK A FOUNDATIONAL

02:46PM   2     QUESTION ABOUT THIS.

02:46PM   3     BY MR. CAZARES:

02:46PM   4     Q.   YOU GOT TESTED AT A THERANOS LOCATION; CORRECT?

02:46PM   5     A.   I DID GO TO THE PALO ALTO LOCATION TO GET TESTED.

02:46PM   6     Q.   BECAUSE YOU WANTED TO EXPERIENCE THE FINGERSTICK

02:46PM   7     TECHNOLOGY; CORRECT?

02:46PM   8     A.   CORRECT.

02:46PM   9     Q.   AND YOU DID EXPERIENCE THE FINGERSTICK TECHNOLOGY?

02:46PM   10    A.   I DID.

02:46PM   11    Q.   YEAH.  YOUR PHYSICIAN ORDERED SOME TESTS, OR A TEST THAT

02:46PM   12    WASN'T AVAILABLE ON THE FINGERSTICK, SO YOU SAID, DON'T GIVE ME

02:46PM   13    THAT ONE, I WANT TO DO THE FINGERSTICK?

02:46PM   14    A.   WELL, HE ORDERED TWO OR THREE OR FOUR TESTS, AND WHEN I

02:46PM   15    GOT THERE THEY SAID, LOOK, WE CAN DO THESE WITH THE FINGERSTICK

02:46PM   16    AND THESE WITH THE REGULAR BLOOD DRAW, AND I SAID SIGN ME UP

02:46PM   17    FOR THE FINGERSTICK.

02:46PM   18    Q.   AND THAT WAS COMMUNICATED TO YOU ON SITE AT THE WALGREENS?

02:47PM   19    A.   THAT'S CORRECT.

02:47PM   20    Q.   OKAY.  NOW, YOU DESCRIBED THE PHONE CALL THAT YOU HAD, OR

02:47PM   21    ACTUALLY IT WAS A LITTLE MORE OF A CONFERENCE CALL; IS THAT

02:47PM   22    FAIR?

02:47PM   23    A.   THAT'S CORRECT.

02:47PM   24    Q.   WITH MS. HOLMES IN DECEMBER OF 2013?

02:47PM   25    A.   IT WAS A CONFERENCE CALL.

02:47PM  1    Q.   AND ON THE CALL WAS MS. HOLMES, MR. LUCAS, CHRIS LUCAS?

02:47PM  2    A.   YEAH, MR. LUCAS HAD INVITED HIS INVESTOR GROUP, SO, YOU

02:47PM  3    KNOW, THE INDIVIDUALS WHO HAD INVESTED THROUGH HIS

02:47PM  4    BLACK DIAMOND ENTITY, TO HEAR FROM MS. HOLMES ON THAT DAY.

02:47PM  5    Q.   AND MR. HALL ATTENDED, OR LISTENED IN?

02:47PM  6    A.   HE WAS ON THE CALL.

02:47PM  7    Q.   OKAY.  AND YOU HAD MENTIONED ON DIRECT THAT YOU ACTUALLY

02:48PM  8    RECORDED THE CALL; CORRECT?

02:48PM  9    A.   THAT'S CORRECT.

02:48PM 10    Q.   AND YOU RECORDED IT BECAUSE YOU WANTED TO PRESERVE KIND OF

02:48PM 11    WHAT WAS SAID FOR FUTURE REFERENCE; RIGHT?

02:48PM 12    A.   WELL, I RECORDED IT BECAUSE MR. HALL AND I HAD SOME

02:48PM 13    DISCUSSIONS PRIOR TO THAT CALL ABOUT QUESTIONS THAT WE WANTED

02:48PM 14    TO HEAR ADDRESSED.

02:48PM 15         HE WAS GOING TO BE TRAVELLING, AND I KNEW HE WOULD, YOU

02:48PM 16    KNOW, CALL ME AFTER THAT CALL AND ASK EVERYTHING THAT WAS SAID.

02:48PM 17         AND SO I RECORDED IT TO MAKE SURE THAT I DIDN'T MISS ANY

02:48PM 18    OF THE SALIENT POINTS.

02:48PM 19    Q.   FAIR ENOUGH.

02:48PM 20         AND YOU'VE PRODUCED A COPY OF THAT RECORDING IN THE COURSE

02:48PM 21    OF THESE INVESTIGATIONS, HAVEN'T YOU?

02:48PM 22    A.   THAT'S CORRECT.

02:48PM 23    Q.   AND YOU'VE DISCUSSED THAT RECORDING WITH THE GOVERNMENT,

02:48PM 24    HAVEN'T YOU?

02:48PM 25    A.   I HAVE.

02:48PM   1     Q.   DID YOU LISTEN TO THE RECORDING BEFORE YOU TESTIFIED HERE

02:48PM   2     TODAY?

02:48PM   3     A.   YOU MEAN DID I LISTEN TO IT TODAY?

02:48PM   4     Q.   OR RECENTLY?

02:49PM   5     A.   I HAVE NOT.

02:49PM   6     Q.   IT'S BEEN, NOT TEN YEARS, BUT ABOUT NINE, NINE AND A THIRD

02:49PM   7     YEARS I GUESS SINCE THAT TELEPHONE CONVERSATION WITH

02:49PM   8     MS. HOLMES; RIGHT?  DECEMBER OF 2013?

02:49PM   9     A.   I GUESS THAT'S RIGHT.

02:49PM  10     Q.   OKAY.  I TRIED TO DO MY MATH.

02:49PM  11          YOU DON'T REMEMBER WORD FOR WORD WHAT MS. HOLMES SAID THAT

02:49PM  12     DAY?

02:49PM  13     A.   I DO NOT.

02:49PM  14     Q.   IT'S A ONE HOUR TELEPHONE CALL OR SO; RIGHT?

02:49PM  15     A.   I HAVE NEVER KNOWN WORD FOR WORD WHAT WAS ON THE TAPE.

02:49PM  16     Q.   OKAY.  WOULD IT HELP YOU TO RECALL WHAT WAS ON THE TAPE IF

02:49PM  17     YOU LOOKED AT A TRANSCRIPT OF THE TAPE?

02:49PM  18     A.   I'M CERTAIN.  I'M CERTAIN IT WOULD HELP ME REMEMBER.

02:49PM  19     Q.   OKAY.  BUT YOU DON'T --

02:49PM  20     A.   WHICH IS WHY I MADE THE RECORDING IN THE FIRST PLACE,

02:49PM  21     RIGHT?

02:49PM  22     Q.   YEAH.

02:49PM  23          NOW, MR. BALWANI WAS NOT ON THAT CONFERENCE CALL; CORRECT?

02:50PM  24     A.   HE WAS NOT.

02:50PM  25     Q.   HE DIDN'T SAY --

02:50PM 1      A.   AT LEAST TO MY KNOWLEDGE HE WAS NOT.

02:50PM 2      Q.   FAIR ENOUGH.

02:50PM 3           HE DIDN'T -- HE WASN'T A SPEAKER IN THE CALL AS FAR AS YOU

02:50PM 4      KNOW?

02:50PM 5      A.   HE WAS NOT.

02:50PM 6      Q.   AND YOU HAVE NO KNOWLEDGE YOURSELF THAT MR. BALWANI WAS

02:50PM 7      EVEN LISTENING IN ON THE CALL; CORRECT?

02:50PM 8      A.   I DON'T.

02:50PM 9      Q.   AND JUST TO MAKE CLEAR, MS. HOLMES WASN'T THE ONLY SPEAKER

02:50PM 10     ON THE CALL; RIGHT?

02:50PM 11     A.   SHE WAS THE ONLY OUTSIDE SPEAKER FROM THERANOS WHO WAS ON

02:50PM 12     THE CALL, BUT, I MEAN, A LOT OF THE PEOPLE ON THE CALL SPOKE AS

02:50PM 13     WELL.

02:50PM 14     Q.   AND CHRIS LUCAS ASKED QUESTIONS AS WELL?

02:50PM 15     A.   THAT'S CORRECT.

02:50PM 16     Q.   YOU DID NOT ASK QUESTIONS ON THE CALL?

02:50PM 17     A.   I DID NOT.

02:50PM 18     Q.   MR. HALL ASKED A COUPLE?

02:50PM 19     A.   AS I REMEMBER HE ASKED A COUPLE.

02:50PM 20     Q.   NOW, IN THAT LATE TIME PERIOD, YOU, YOU INDICATED THAT IN

02:51PM 21     THE PRIOR INVESTMENT, AND EVEN IN THAT DARK PERIOD BETWEEN 2006

02:51PM 22     AND '12, YOU KIND OF SOUGHT FINANCIAL INFORMATION, WOULD HAVE

02:51PM 23     LIKED TO GET IT, BUT IT WAS NEVER FORTHCOMING; CORRECT?

02:51PM 24     A.   THAT'S CORRECT.

02:51PM 25     Q.   AND PRIOR TO YOUR DECEMBER 2013 INVESTMENT, YOU STILL

02:51PM  1    DIDN'T GET ANY FINANCIAL DETAILS OR INFORMATION; CORRECT?

02:51PM  2    A.   WE DIDN'T.

02:51PM  3         WE ASKED FOR IT, BUT THAT WASN'T PROVIDED.

02:51PM  4    Q.   AND NOTWITHSTANDING THAT FACT, YOU STILL, YOU AND MR. HALL

02:51PM  5    DECIDED IT WAS WORTH IT TO INVEST; CORRECT?

02:51PM  6    A.   CORRECT.

02:51PM  7    Q.   AND YOU HAVE NO KNOWLEDGE OR INFORMATION THAT MR. HALL

02:51PM  8    EVER SPOKE TO MR. BALWANI EITHER; CORRECT?

02:51PM  9    A.   I DO NOT.

02:51PM  10   Q.   SO IT'S FAIR TO SAY THAT MR. BALWANI HAD NO RELATIONSHIP

02:51PM  11   OR CONNECTION TO YOUR 2006 INVESTMENT; CORRECT?

02:51PM  12   A.   CORRECT.

02:51PM  13   Q.   AND MR. BALWANI HIMSELF HAD NO INFLUENCE ON YOUR DECISION

02:52PM  14   TO INVEST IN 2013; CORRECT?

02:52PM  15   A.   CORRECT.

02:52PM  16         MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

02:52PM  17         THE COURT:  REDIRECT?

02:52PM  18         MR. SCHENK:  YES.  THANK YOU.

02:52PM  19                    **REDIRECT EXAMINATION**

02:52PM  20   BY MR. SCHENK:

02:52PM  21   Q.   GOOD AFTERNOON AGAIN, MR. TOLBERT.

02:52PM  22        THERE'S JUST ONE AREA I WANT TO FOLLOW UP ON, AND THAT WAS

02:52PM  23   THE RESPONSIBILITY OF THE BOARD OF DIRECTORS.  I THINK YOU WERE

02:52PM  24   ASKED SOME QUESTIONS ABOUT THAT?

02:52PM  25        DO YOU RECALL THOSE QUESTIONS?

02:52PM  1     A.   I DO.

02:52PM  2     Q.   AND I CAN'T REMEMBER IF YOU SAID OR MR. CAZARES SAID THAT

02:52PM  3     THEY HAD AN OBLIGATION TO PROTECT INVESTORS; IS THAT RIGHT?

02:52PM  4     A.   THAT'S CORRECT.  HE ASKED ME IF THEY HAD A RESPONSIBILITY

02:52PM  5     TO PROTECT INVESTORS.

02:53PM  6     Q.   AND ARE THERE DIFFERENT KINDS OF BOARDS OR DIRECTORS,

02:53PM  7     FIDUCIARY BOARDS, OR ADVISORY BOARDS, OR ARE ALL BOARD OF

02:53PM  8     DIRECTORS THE SAME?

02:53PM  9     A.   NO.   THERE ARE DIFFERENT BOARDS WITH DIFFERENT

02:53PM 10     RESPONSIBILITIES.

02:53PM 11     Q.   AND DO YOU KNOW WHICH KIND THERANOS HAD?

02:53PM 12     A.   YOU KNOW, I KNOW THERE WERE SOME CHANGES ALONG THE WAY,

02:53PM 13     SO, I MEAN, IT DEPENDS ON I GUESS WHAT EXACT MOMENT IN TIME.

02:53PM 14          YOU KNOW, IT'S ALSO THE CASE THAT A BOARD OF DIRECTORS,

02:53PM 15     YOU KNOW, HAS A, HAS A FIDUCIARY DUTY TO INVESTORS AND

02:53PM 16     STOCKHOLDERS AND BOND HOLDERS IN A DIFFERENT WAY WHEN, YOU

02:53PM 17     KNOW, THERE'S A CONCERN ABOUT A BUSINESS'S ONGOING VIABILITY.

02:53PM 18     Q.   WHEN YOU MADE THE DECISION TO INVEST IN 2013,

02:53PM 19     DECEMBER 31ST, 2013, DID YOU KNOW WHAT KIND OF BOARD OF

02:53PM 20     DIRECTORS THERANOS HAD?

02:53PM 21     A.   YOU KNOW, I THINK THEY HAD A FIDUCIARY BOARD AT THAT POINT

02:54PM 22     IS WHAT MY ASSUMPTION WOULD HAVE BEEN.

02:54PM 23     Q.   WHEN YOU SAID YOUR ASSUMPTION, I'M JUST WONDERING WHAT

02:54PM 24     THAT WAS BASED ON.  DO YOU REMEMBER?

02:54PM 25     A.   WELL, IN 2013 I HAD ONLY SEEN THE POSTING ON THE WEBSITE

02:54PM 1    ABOUT WHO WAS SERVING ON THE BOARD, SO THAT IS ALL OF THE

02:54PM 2    VISIBILITY I WOULD HAVE HAD INTO THE BOARD OR WHAT THEIR

02:54PM 3    RESPONSIBILITIES WERE.

02:54PM 4    Q.   OKAY.  THANK YOU VERY MUCH.

02:54PM 5         YOUR HONOR, NO FURTHER QUESTIONS.

02:54PM 6              MR. CAZARES:  JUST TWO QUESTIONS.

02:54PM 7              THE COURT:  SURE.

02:54PM 8                    **RECROSS-EXAMINATION**

02:54PM 9    BY MR. CAZARES:

02:54PM 10   Q.   MR. TOLBERT, IN THAT TIME PERIOD OF THE 2006 INVESTMENT

02:54PM 11   FORWARD AND INTO THOSE, I'LL CALL THEM, MORE SILENT YEARS INTO

02:54PM 12   2012, YOU UNDERSTOOD THAT DON LUCAS WAS AN INVESTOR IN

02:54PM 13   THERANOS; RIGHT?

02:54PM 14   A.   THAT'S CORRECT.

02:54PM 15   Q.   AND YOU UNDERSTOOD HE WAS A MEMBER OF THE BOARD OR

02:54PM 16   DIRECTORS; CORRECT?

02:54PM 17   A.   FOR A PERIOD OF TIME HE WAS.

02:54PM 18   Q.   AND HE WAS EVEN THE CHAIRMAN; CORRECT?

02:54PM 19   A.   CORRECT.

02:54PM 20   Q.   AND JUST TO BE CLEAR -- OH, GO AHEAD.

02:55PM 21   A.   I GUESS IT DEPENDS ON WHAT EXACT MOMENT IN TIME.  I KNOW

02:55PM 22   CHRIS HAD TOLD ME AT SOME POINT THAT HIS UNCLE HAD HEALTH

02:55PM 23   PROBLEMS THAT CAUSED HIM TO STEP OFF THE BOARD, AND I DON'T

02:55PM 24   REMEMBER EXACTLY WHAT MOMENT IN TIME THAT WAS.

02:55PM 25   Q.   FAIR ENOUGH.  AND NEW BOARD MEMBERS JOINED LATER ON?

TOLBERT RECROSS BY MR. CAZARES                                    4474

02:55PM  1    A.   CORRECT.

02:55PM  2    Q.   AND JUST TO BE CLEAR, YOU PROVIDED A COPY OF THE RECORDING

02:55PM  3    OF THE CONFERENCE CALL WITH MS. HOLMES TO THE GOVERNMENT;

02:55PM  4    CORRECT?

02:55PM  5            MR. SCHENK:  OBJECTION.  BEYOND THE SCOPE.

02:55PM  6            THE COURT:  SUSTAINED.

02:55PM  7            MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

02:55PM  8            THE COURT:  ANYTHING FURTHER?

02:55PM  9            MR. SCHENK:  NO, YOUR HONOR.

02:55PM 10            MR. CAZARES:  NO, YOUR HONOR.

02:55PM 11            THE COURT:  MAY THIS WITNESS BE EXCUSED?

02:55PM 12            MR. SCHENK:  YES, YOUR HONOR.

02:55PM 13            MR. CAZARES:  YES, YOUR HONOR.

02:55PM 14            THE COURT:  YOU'RE EXCUSED.

02:55PM 15            THE WITNESS:  THANK YOU.

02:55PM 16            THE COURT:  DOES THE GOVERNMENT HAVE A WITNESS TO

02:55PM 17    FILL OUR LAST 65 MINUTES?

02:55PM 18            MR. SCHENK:  NO, NOT TODAY, YOUR HONOR.

02:55PM 19            THE COURT:  OKAY.

02:55PM 20        JUST LEAVE THAT THERE.  THEY'LL COLLECT IT.  THANK YOU.

02:55PM 21            THE WITNESS:  OKAY.

02:56PM 22            THE COURT:  SO WE HAVE -- LET'S SEE.  OUR NEXT TIME

02:56PM 23    TOGETHER, FOLKS, IS TUESDAY, TUESDAY.

02:56PM 24        AND I'M HOPING THAT WE CAN GO UNTIL 4:00 O'CLOCK ON

02:56PM 25    TUESDAY AND WE'LL HAVE WITNESSES AVAILABLE FOR US FOR TUESDAY.

4475

02:56PM  1      AND THEN WEDNESDAY.  WE'RE ONLY IN SESSION TWO DAYS NEXT

02:56PM  2    WEEK.

02:56PM  3      LEST YOU HAVE ANY CONCERNS ABOUT THIS, IT'S NOT BECAUSE

02:56PM  4    CINCO DE MAYO FALLS NEXT WEEK, I JUST WANT YOU TO KNOW THAT.

02:56PM  5    THERE'S NO CONNECTION BETWEEN THE RECESSES FOR THAT PURPOSE.

02:56PM  6      SO WE WILL BREAK AGAIN TODAY, NOW.

02:56PM  7      ANY REASON WHY WE SHOULDN'T BREAK NOW FOR THE WEEKEND?

02:56PM  8          MR. SCHENK:  NO, YOUR HONOR.

02:56PM  9          MR. CAZARES:  NO, YOUR HONOR.

02:56PM 10          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, I TOLD

02:56PM 11    YOU I'D KEEP YOU UNTIL 4:00 AND I JUST KEEP DISAPPOINTING YOU.

02:56PM 12    SO WE'RE GOING TO RECESS NOW FOR THE WEEKEND.

02:56PM 13      PLEASE -- I'LL REMIND YOU OF THE ADMONITION.  PLEASE DON'T

02:56PM 14    LEARN, DISCUSS, DO ANY INVESTIGATION, OR WATCH OR READ ANYTHING

02:56PM 15    ABOUT THIS CASE DURING THE WEEKEND.

02:57PM 16      ENJOY YOUR WEEKEND, AND WE'LL SEE YOU TUESDAY NEXT,

02:57PM 17    TUESDAY NEXT AT 9:00 A.M., PLEASE.

02:57PM 18      (JURY OUT AT 2:57 P.M.)

02:57PM 19          THE COURT:  THE JURY HAS LEFT FOR THE EVENING.

02:57PM 20      PLEASE BE SEATED.

02:57PM 21      JUST TO REVIEW SCHEDULE FOR NEXT WEEK IF WE COULD.

02:57PM 22          MR. SCHENK:  THANK YOU, YOUR HONOR.

02:57PM 23      THE GOVERNMENT DISCLOSED YESTERDAY TWO WITNESSES TO THE

02:57PM 24    DEFENSE.

02:57PM 25      WE ALSO REMINDED THE DEFENSE THAT ON WEDNESDAY WE ARE

02:58PM 1    RECALLING MR. JHAVERI.

02:58PM 2             THE COURT:  RIGHT.

02:58PM 3             MR. SCHENK:  WE HAVE MADE A REPRESENTATION TO

02:58PM 4    MR. JHAVERI THAT HE WOULD START AT 9:00 A.M. ON WEDNESDAY, EVEN

02:58PM 5    IF OUR 4:00 P.M. TUESDAY WITNESS IS STILL CARRYING OVER, TO

02:58PM 6    INCREASE THE LIKELIHOOD THAT MR. JHAVERI COMPLETES HIS

02:58PM 7    TESTIMONY ON WEDNESDAY.

02:58PM 8         WE ACTUALLY REACHED OUT TO THE DEFENSE TO HELP US

02:58PM 9    ESTABLISH A SCHEDULE FOR NEXT WEEK, TO GIVE US SOME INSIGHT

02:58PM 10   INTO HOW LONG THEIR REMAINING CROSS IS OF MR. JHAVERI, BUT WE

02:58PM 11   HAVE NOT HEARD.

02:58PM 12        THAT WOULD BE HELPFUL AS WE FILL OUT THE REST OF

02:58PM 13   WEDNESDAY.  WE DON'T KNOW HOW MUCH TIME WE HAVE TO FILL NEXT

02:58PM 14   TUESDAY AND WEDNESDAY GIVEN THAT MR. JHAVERI IS GOING TO BE

02:58PM 15   TAKEN POTENTIALLY OUT OF ORDER.

02:58PM 16            THE COURT:  AND HE, MR. JHAVERI, IS AVAILABLE ALL

02:58PM 17   DAY ON WEDNESDAY?

02:58PM 18            MR. SCHENK:  YES.

02:58PM 19            THE COURT:  WE'RE NOT IN SESSION ANY OTHER DAYS NEXT

02:58PM 20   WEEK, SO LET'S SEE IF WE CAN -- DO YOU KNOW, JUST TALKING ABOUT

02:58PM 21   MR. JHAVERI, MR. COOPERSMITH, DO YOU KNOW IF WE'LL BE ABLE TO

02:59PM 22   FINISH HIM ON WEDNESDAY?

02:59PM 23            MR. COOPERSMITH:  YES, YOUR HONOR.  HE'S NOT BEING

02:59PM 24   RECALLED.  HE'S STILL ON CROSS.

02:59PM 25            THE COURT:  WELL, HIS TESTIMONY, WILL WE COMPLETE IT

4477

```
02:59PM   1    ON WEDNESDAY?

02:59PM   2              MR. COOPERSMITH:  WE WILL CONTINUE WITH HIS CROSS,

02:59PM   3    AND I ANTICIPATE I WILL FINISH HIS EXAMINATION WITHIN A FEW

02:59PM   4    HOURS.  IT WILL DEFINITELY BE BEFORE THE END OF THE DAY.

02:59PM   5         I ANTICIPATE THERE WILL BE TIME FOR THE GOVERNMENT'S

02:59PM   6    REDIRECT AS WELL ON WEDNESDAY, BUT I WILL CHECK MY NOTES AND

02:59PM   7    CONFER WITH MR. SCHENK OVER THE WEEKEND SO THAT HE'S CLEAR ON

02:59PM   8    THAT.

02:59PM   9              THE COURT:  OKAY.  OKAY.  THAT'S HELPFUL.

02:59PM  10              MR. SCHENK:  IT IS.  THANK YOU.

02:59PM  11         YES, THAT'S HELPFUL.  THANK YOU.

02:59PM  12              THE COURT:  SO TUESDAY WE'LL HAVE A WITNESS, AND --

02:59PM  13              MR. SCHENK:  YES.  YES, YOUR HONOR.

02:59PM  14         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:59PM  15              MR. SCHENK:  THE INDIVIDUALS THAT WE DISCLOSED ARE A

02:59PM  16    CMS EMPLOYEE AND A PFIZER EMPLOYEE.

03:00PM  17         I DON'T KNOW, WE MAY HAVE TO CONFER WITH THE DEFENSE,

03:00PM  18    WHETHER THOSE FILL TUESDAY.  I SUSPECT THAT THEY MIGHT.

03:00PM  19         BUT IT SOUNDS LIKE MR. JHAVERI MAY NOT FILL ALL OF

03:00PM  20    WEDNESDAY, ALTHOUGH I APPRECIATE THAT MR. COOPERSMITH WILL

03:00PM  21    PROVIDE ADDITIONAL INFORMATION TO US, ALL TO SAY IT SOUNDS LIKE

03:00PM  22    WE MAY NEED ANOTHER WITNESS IF WE'RE GOING 9:00 TO 4:00 ON TWO

03:00PM  23    DAYS NEXT WEEK, SO --

03:00PM  24              THE COURT:  RIGHT.

03:00PM  25              MR. SCHENK:  SO WE WILL MEET AND CONFER ON THAT.
```

ER-3281

```
03:00PM   1                    THE COURT:  OKAY.  THAT'S HELPFUL.

03:00PM   2              SO DO YOU THINK -- MAYBE I MISHEARD MR. COOPERSMITH.

03:00PM   3              SO DO YOU THINK MR. JHAVERI WILL FINISH BY THE END OF

03:00PM   4      WEDNESDAY?

03:00PM   5                    MR. COOPERSMITH:  YES, I WOULD -- JUST ROUGHLY,

03:00PM   6      AGAIN, YOUR HONOR, I WILL TELL MR. SCHENK OVER THE WEEKEND.

03:00PM   7                    THE COURT:  YES.

03:00PM   8                    MR. COOPERSMITH:  BUT I'M THINKING MY ADDITIONAL

03:00PM   9      CROSS OF MR. JHAVERI COULD BE TWO AND A HALF HOURS, AROUND THAT

03:00PM  10      LENGTH, POSSIBLY A LITTLE LONGER.

03:00PM  11              AGAIN, I'LL CONFIRM THAT.

03:00PM  12                    THE COURT:  YES.

03:01PM  13                    MR. COOPERSMITH:  I THINK THAT'S WHAT WE'RE TALKING

03:01PM  14      ABOUT.

03:01PM  15                    THE COURT:  GREAT.

03:01PM  16                    MR. COOPERSMITH:  REDIRECT, I DON'T KNOW OBVIOUSLY

03:01PM  17      HOW LONG THAT IS GOING TO TAKE.  BUT THEY MIGHT WELL NEED

03:01PM  18      ANOTHER WITNESS.

03:01PM  19              IF MS. BENNETT IS THE CMS EMPLOYEE THAT MR. SCHENK IS

03:01PM  20      REFERRING TO, IF SHE TESTIFIES, THAT COULD TAKE A LITTLE WHILE

03:01PM  21      TO DEAL WITH HER.

03:01PM  22                    THE COURT:  SURE.

03:01PM  23                    MR. COOPERSMITH:  WE MAY HAVE SOME ADDITIONAL

03:01PM  24      MATTERS TO RAISE WITH THE COURT ABOUT MS. BENNETT.

03:01PM  25              AND FOR THAT MATTER, WE MAY HAVE SOME ADDITIONAL MATTERS
```

4479

03:01PM  1    TO RAISE ABOUT MR. WEBER, WHO THE COURT MAY REMEMBER IS AN

03:01PM  2    EMPLOYEE OF PFIZER AND THERE'S SOME ISSUE AROUND THAT REPORT.

03:01PM  3        SO WE WILL ENDEAVOR TO BRING THOSE TO THE COURT'S

03:01PM  4    ATTENTION AT THE EARLIEST OPPORTUNITY, BUT THAT'S WHAT WE'VE

03:01PM  5    GOT.

03:01PM  6            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

03:01PM  7        I WAS JUST CONCERNED ABOUT MR. JHAVERI HAVING TO STAY

03:01PM  8    ANOTHER WEEK.

03:01PM  9            MR. COOPERSMITH:  YOUR HONOR, THAT'S NOT MY PLAN,

03:01PM 10    YOUR HONOR.  I DON'T WANT TO DO THAT TO MR. JHAVERI.

03:01PM 11            THE COURT:  OKAY.  GREAT.  WELL, THANK YOU.

03:01PM 12        OKAY.  ANYTHING FURTHER THEN BEFORE WE BREAK TODAY?

03:01PM 13            MR. SCHENK:  NO.  THANK YOU VERY MUCH.

03:01PM 14            MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

03:01PM 15            THE COURT:  THANKS VERY MUCH.

03:01PM 16            MR. COOPERSMITH:  HAVE A NICE WEEKEND.

03:02PM 17            THE COURT:  YOU AS WELL.

03:02PM 18            THE CLERK:  COURT IS ADJOURNED.

03:02PM 19        (COURT ADJOURNED AT 3:02 P.M.)

        20

        21

        22

        23

        24

        25

ER-3283

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,          )
6                                        )  CR-18-00258-EJD
                      PLAINTIFF,         )
7                                        )  SAN JOSE, CALIFORNIA
              VS.                        )
8                                        )  MAY 3, 2022
      RAMESH "SUNNY" BALWANI,            )
9                                        )  VOLUME 25
                      DEFENDANT.         )
10    _____   )  PAGES 4481 - 4747

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
                BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                                JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:  ROBERT S. LEACH
                             1301 CLAY STREET, SUITE 340S
19                           OAKLAND, CALIFORNIA 94612

20         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21    OFFICIAL COURT REPORTERS:
                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                           CERTIFICATE NUMBER 8074
                             LEE-ANNE SHORTRIDGE, CSR, CRR
23                           CERTIFICATE NUMBER 9595

24         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER
25

11:35AM  1        MAY THIS WITNESS BE EXCUSED?

11:35AM  2              MR. LEACH:  YES, YOUR HONOR.

11:35AM  3              MR. CAZARES:  YES, YOUR HONOR.

11:35AM  4              THE COURT:  YOU'RE EXCUSED, SIR.  YOU CAN JUST LEAVE

11:35AM  5    THOSE BINDERS THERE.  THANK YOU SO MUCH.

11:35AM  6              THE WITNESS:  THANK YOU.

11:35AM  7              THE COURT:  YOU'RE WELCOME.

11:35AM  8        DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL?

11:35AM  9              MR. LEACH:  YES, YOUR HONOR.

11:35AM 10        THE UNITED STATES CALLED SARAH BENNETT.

11:35AM 11              THE COURT:  LADIES AND GENTLEMEN, WE'LL TAKE OUR

11:35AM 12    BREAK AROUND NOON, MAYBE A LITTLE THEREAFTER.  I'D LIKE TO GET

11:35AM 13    THE WITNESS STARTED.

11:36AM 14        GOOD MORNING.  COME FORWARD, PLEASE.

11:36AM 15        I'LL ASK YOU TO STAND OVER HERE WHILE YOU FACE OUR

11:36AM 16    COURTROOM DEPUTY.  AND IF YOU RAISE YOUR RIGHT HAND, SHE HAS A

11:36AM 17    QUESTION FOR YOU.

11:36AM 18        **(GOVERNMENT'S WITNESS, SARAH BENNETT, WAS SWORN.)**

11:36AM 19              THE WITNESS:  I DO.

11:36AM 20              THE COURT:  PLEASE HAVE A SEAT UP HERE.

11:36AM 21        PLEASE ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

11:36AM 22        WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

11:36AM 23    AND SPELL IT.

11:36AM 24              THE WITNESS:  SURE.  MY NAME IS SARAH BENNETT,

11:36AM 25    S-A-R-A-H, B-E-N-N-E-T-T.

BENNETT DIRECT BY MR. LEACH                                    4602

11:36AM  1              THE COURT:  THANK YOU.

11:36AM  2         COUNSEL.

11:36AM  3              MR. LEACH:  THANK YOU, YOUR HONOR.

11:36AM  4         MAY I APPROACH THE COURTROOM DEPUTY?

11:37AM  5              THE COURT:  YES.

11:37AM  6              MR. LEACH:  (HANDING.)

11:37AM  7                        **DIRECT EXAMINATION**

11:37AM  8    BY MR. LEACH:

11:37AM  9    Q.   GOOD MORNING, MS. BENNETT.  HOW ARE YOU?

11:37AM  10   A.   I'M GOOD.

11:37AM  11   Q.   AND IF YOU ARE FULLY VACCINATED AND COMFORTABLE, YOU CAN

11:37AM  12   TAKE OFF YOUR MASK.  YOU CAN TAKE IT OFF.

11:37AM  13        AND I HAVE TAKEN OFF MINE AS WELL.

11:37AM  14        WHERE DO YOU WORK?

11:37AM  15   A.   I WORK FOR CMS, WHICH IS THE CENTER FOR MEDICARE AND

11:37AM  16   MEDICAID SERVICES.

11:37AM  17   Q.   AND WHAT IS CMS?

11:37AM  18   A.   CMS IS THE CENTER FOR MEDICARE AND MEDICAID SERVICES,

11:37AM  19   WHICH IS A DEPARTMENT UNDER THE DEPARTMENT OF HEALTH, AN AGENCY

11:37AM  20   UNDER THE DEPARTMENT OF HEALTH AND HUMAN SERVICES.

11:37AM  21   Q.   OKAY.  DO YOU WORK WITHIN A PARTICULAR DIVISION OF CMS?

11:37AM  22   A.   YES.  I WORK IN THE DIVISION OF CLINICAL LABORATORY

11:37AM  23   IMPROVEMENT AND QUALITY.

11:37AM  24   Q.   AND CAN YOU SAY THAT ONE MORE TIME SLOWLY, PLEASE?

11:37AM  25   A.   SURE.  DCLIQ, THE DIVISION OF CLINICAL LABORATORY

BENNETT DIRECT BY MR. LEACH                                  4603

11:38AM  1    IMPROVEMENT AND QUALITY.

11:38AM  2    Q.  AND WHAT ARE THE RESPONSIBILITIES OF THAT DIVISION WITHIN

11:38AM  3    CMS?

11:38AM  4    A.  THAT DIVISION WITHIN CMS IS RESPONSIBLE FOR DETERMINING

11:38AM  5    NATIONAL POLICY RELATED TO CLINICAL LABORATORIES AND THE

11:38AM  6    OVERSIGHT OF LABORATORIES.

11:38AM  7    Q.  WHEN YOU SAY THE OVERSIGHT OF LABORATORIES, WHAT DO YOU

11:38AM  8    MEAN?

11:38AM  9    A.  WE SET NATIONAL POLICY FOR HOW LABORATORIES SHOULD BE

11:38AM  10   SURVEYED AND INTERPRET THE REGULATIONS.

11:38AM  11       WE ENSURE THAT THERE IS SURVEYOR CONSISTENCY AMONG OUR

11:38AM  12   SURVEYORS AS THEY'RE GOING INTO CLINICAL LABORATORIES.

11:38AM  13   Q.  WHEN DID YOU START WORKING FOR CMS?

11:38AM  14   A.  I STARTED WORKING FOR CMS IN 2011.

11:38AM  15   Q.  OKAY.  WE'LL FOLLOW UP ON THAT.

11:38AM  16       BUT FOR NOW, CAN YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL

11:38AM  17   BACKGROUND.

11:38AM  18   A.  SURE.

11:38AM  19       I HAVE A BACHELOR'S DEGREE FROM THE MEDICAL COLLEGE OF

11:38AM  20   VIRGINIA, VIRGINIA COMMONWEALTH UNIVERSITY.

11:38AM  21   Q.  OKAY.  AND WOULD YOU BRIEFLY DESCRIBE YOUR PROFESSIONAL

11:39AM  22   BACKGROUND AFTER OBTAINING YOUR DEGREE.

11:39AM  23   A.  SURE.

11:39AM  24       I -- AFTER I GRADUATED FROM COLLEGE, I STARTED WORKING AT

11:39AM  25   HOSPITAL LABORATORIES.

BENNETT DIRECT BY MR. LEACH                                    4604

11:39AM  1        AFTER I WORKED IN HOSPITAL LABORATORIES, I WENT TO WORK AT

11:39AM  2   DOCTOR -- AT PHYSICIAN OFFICE LABORATORIES WHERE I OVERSAW THE

11:39AM  3   LABORATORY TESTING IN THOSE LABORATORIES.

11:39AM  4        IN 2007 I WENT TO THE MARYLAND STATE AGENCY WHERE I WAS

11:39AM  5   THE SUPERVISOR OF THE IMPLEMENTATION OF THE CLIA PROGRAM AND

11:39AM  6   THE STATE LICENSURE PROGRAM, AND I ALSO -- AND THE OVERSIGHT OF

11:39AM  7   THE LABORATORIES IN THE STATE OF MARYLAND, AND I ALSO SURVEYED

11:39AM  8   LABORATORIES IN THAT CAPACITY.

11:39AM  9   Q.   SO YOU WERE WORKING FOR THE STATE OF MARYLAND BETWEEN 2007

11:39AM  10  AND 2011?

11:39AM  11  A.   YES.

11:39AM  12  Q.   AND YOU SAID YOU HAD SOME RESPONSIBILITIES FOR SURVEYS?

11:39AM  13  A.   YES.

11:39AM  14  Q.   AND WHAT IS A SURVEY?

11:39AM  15  A.   A SURVEY IS WHERE -- WHEN WE TALK ABOUT SURVEY, WE USE

11:39AM  16  THAT WORD INTERCHANGEABLY WITH INSPECTION.  TO US IT MEANS THE

11:40AM  17  SAME THING.

11:40AM  18       AND WHAT WE DO IS WE GO INTO LABORATORIES AND WE LOOK AT

11:40AM  19  HOW THE LABORATORY IS PERFORMING TESTING, WHETHER THEY'RE

11:40AM  20  FOLLOWING THE MINIMAL STANDARDS THAT THEY'RE REQUIRED TO FOLLOW

11:40AM  21  TO ENSURE ACCURACY AND RELIABILITY AND TIMELINESS OF TEST

11:40AM  22  RESULTS.

11:40AM  23  Q.   YOU JOINED CMS IN 2011?

11:40AM  24  A.   YES.

11:40AM  25  Q.   AND WHAT WERE YOU HIRED TO DO?

ER-3288

BENNETT DIRECT BY MR. LEACH                                    4605

11:40AM   1    A.   I WAS HIRED TO BE A MEDICAL TECHNOLOGIST, OR CLINICAL

11:40AM   2    LABORATORY SCIENTIST, AND I HAD CERTAIN AREAS OF EXPERTISE THAT

11:40AM   3    I WAS CONSIDERING A SUBJECT MATTER EXPERT IN.

11:40AM   4    Q.   AND WHAT AREAS WERE YOU CONSIDERED A SUBJECT MATTER EXPERT

11:40AM   5    IN?

11:40AM   6    A.   SURVEY, TRAINING, SURVEYOR TRAINING, ENFORCEMENT,

11:40AM   7    REVIEWING THE STATE AGENCY'S PERFORMANCE, PROFICIENCY TESTING,

11:40AM   8    PERSONNEL REQUIREMENTS.

11:40AM   9    Q.   HOW LONG DID YOU SERVE AS A MEDICAL TECHNOLOGIST?

11:40AM  10    A.   I WAS A MEDICAL TECHNOLOGIST AT CMS UNTIL 2018 WHEN I

11:41AM  11    BECAME A TECHNICAL DIRECTOR.

11:41AM  12    Q.   OKAY.  AND ARE YOU STILL AN EMPLOYEE OF CMS TODAY?

11:41AM  13    A.   I AM.

11:41AM  14    Q.   AND AT CMS, HAVE YOU PARTICIPATED IN SURVEYS OF

11:41AM  15    LABORATORIES THAT ARE REGISTERED OR CERTIFIED BY CMS?

11:41AM  16    A.   YES, I HAVE.

11:41AM  17    Q.   OKAY.  I'D LIKE TO TALK TO YOU A LITTLE BIT ABOUT THE ROLE

11:41AM  18    OF CMS AND WHAT IT DOES VIS-A-VIS LABORATORIES.

11:41AM  19         CAN YOU DESCRIBE TO ME WHAT CMS RESPONSIBILITIES ARE

11:41AM  20    RELATING TO LABORATORIES?

11:41AM  21    A.   CMS IS RESPONSIBLE FOR THE OVERSIGHT OF LABORATORIES.

11:41AM  22    WE'RE RESPONSIBLE -- OUR DIVISION AND THE SURVEYORS IN OUR

11:41AM  23    DIVISION AND THE STATE AGENCIES ARE RESPONSIBLE FOR ENSURING

11:41AM  24    THAT LABORATORIES FOLLOW THE STANDARD AND CONDITION LEVEL

11:41AM  25    REQUIREMENTS FOR COMPLIANCE.

11:41AM 1    Q.   APPROXIMATELY HOW MANY LABORATORIES DOES CMS REGULATE?

11:41AM 2    A.   APPROXIMATELY 323,000 LABORATORIES.

11:42AM 3    Q.   ARE YOU FAMILIAR WITH THE TERM "CLIA"?

11:42AM 4    A.   I AM.

11:42AM 5    Q.   WHAT DOES CLIA STAND FOR?

11:42AM 6    A.   THE CLINICAL LABORATORY IMPROVEMENT AMENDMENTS.  THAT'S

11:42AM 7    THE LAW AND THE REGULATIONS THAT SET THE MINIMAL STANDARDS FOR

11:42AM 8    LABORATORIES.

11:42AM 9    Q.   OKAY.  AND DO YOU HAVE FAMILIARITY WITH CMS'S CLIA

11:42AM 10   PROGRAM?

11:42AM 11   A.   I DO.  THAT'S WHERE I WORK.

11:42AM 12   Q.   OKAY.  WHAT IS THE OBJECTIVE OF CMS'S CLIA PROGRAM?

11:42AM 13           MR. CAZARES:  OBJECTION.  702 AND FOUNDATION.

11:42AM 14           THE COURT:  WELL, YOU CAN LAY A FOUNDATION FOR THAT

11:42AM 15   QUESTION.

11:42AM 16   BY MR. LEACH:

11:42AM 17   Q.   THROUGH YOUR RESPONSIBILITIES AS MEDICAL TECHNOLOGIST AND

11:42AM 18   NOW TECHNICAL DIRECTOR AT CMS, ARE YOU RESPONSIBLE FOR

11:42AM 19   IMPLEMENTING THE CLIA PROGRAM?  DO YOU HAVE RESPONSIBILITIES IN

11:42AM 20   THAT REGARD?

11:42AM 21   A.   YES, I DO.

11:42AM 22   Q.   OKAY.  AND DOES PART OF THAT INVOLVE TEACHING SURVEYORS

11:42AM 23   WHAT TO LOOK FOR IN INSPECTIONS?

11:42AM 24   A.   YES.

11:42AM 25   Q.   AND DOES PART OF THAT ACTUALLY INVOLVE DOING SURVEYS OF

11:42AM   1    LABORATORIES?

11:42AM   2    A.   YES.

11:42AM   3    Q.   AND BY VIRTUE OF YOUR WORK IN YOUR JOB, RELATING TO

11:43AM   4    SURVEYS, DO YOU HAVE SOME UNDERSTANDING OF WHAT THE GOAL OF THE

11:43AM   5    CLIA PROGRAM IS?

11:43AM   6    A.   YES.

11:43AM   7    Q.   WHAT IS THAT UNDERSTANDING?

11:43AM   8         MR. CAZARES:  OBJECTION.  702 AND CALLS FOR A LEGAL

11:43AM   9    CONCLUSION.

11:43AM  10         THE COURT:  OVERRULED.

11:43AM  11         YOU CAN ANSWER THE QUESTION.

11:43AM  12         THE WITNESS:  OKAY.  SO THE CLIA PROGRAM IS THE

11:43AM  13    PROGRAM IN THE FEDERAL GOVERNMENT THAT IS RESPONSIBLE FOR THE

11:43AM  14    OVERSIGHT OF LABORATORIES TO ENSURE THAT THEY ARE FOLLOWING THE

11:43AM  15    STANDARDS AND CONDITIONS THAT THEY ARE SUPPOSED TO FOLLOW IN

11:43AM  16    ORDER TO ALLOW LABORATORIES TO REPORT ACCURATE, RELIABLE, AND

11:43AM  17    TIMELY PATIENT TEST RESULTS.

11:43AM  18    BY MR. LEACH:

11:43AM  19    Q.   ARE THERE DIFFERENT LICENSES THAT LABORATORIES CAN OBTAIN

11:43AM  20    AS PART OF THE CLIA PROGRAM?

11:43AM  21    A.   THERE ARE DIFFERENT TYPES OF CLIA CERTIFICATES, YES.

11:43AM  22    Q.   WHAT ARE THE DIFFERENT TYPES OF CLIA CERTIFICATES?

11:43AM  23    A.   THERE ARE FOUR TYPES OF CLIA CERTIFICATES.  THERE'S A

11:43AM  24    CERTIFICATE OF A WAIVER; CERTIFICATE FOR PROVIDER PERFORMED

11:44AM  25    MICROSCOPY; CERTIFICATE OF COMPLIANCE; AND A CERTIFICATE OF

11:44AM  1    ACCREDITATION.

11:44AM  2    Q.   A CERTIFICATE OF WAIVER, WHAT IS THAT?

11:44AM  3    A.   THAT IS A CERTIFICATE THAT ALLOWS A LABORATORY TO PERFORM

11:44AM  4    ONLY WAIVED TESTS THAT THE FDA CATEGORIZES TESTS, AND THOSE

11:44AM  5    CERTIFICATES -- THOSE LABORATORIES CAN ONLY PERFORM THOSE TESTS

11:44AM  6    CLIA APPROVED AS WAIVED BY THE FDA.

11:44AM  7    Q.   AND WHEN YOU SAY A "WAIVED" TEST, CAN YOU GIVE US AN

11:44AM  8    EXAMPLE OF ONE OF THOSE?

11:44AM  9    A.   LIKE A BLOOD GLUCOSE METER THAT YOU WOULD USE, OR A URINE

11:44AM 10    PREGNANCY TEST, THINGS THAT YOU CAN BUY -- AND ONE OF THE WAYS

11:44AM 11    THE TESTS CAN BE BECOME WAIVED IS BY BEING SOLD OVER THE

11:44AM 12    COUNTER.

11:44AM 13    Q.   AND YOU ALSO MENTIONED SOMETHING CALLED A CERTIFICATE OF

11:44AM 14    PROVIDER MICROSCOPY PROCEDURE?

11:44AM 15    A.   YES.   THAT'S A VERY LIMITED CERTIFICATE WHERE THERE ARE --

11:44AM 16    THEY CAN PERFORM NINE TESTS THAT ARE CONSIDERED PROVIDER

11:45AM 17    PERFORMED MICROSCOPY AND WAIVED TESTS, AND THOSE ARE TESTS LIKE

11:45AM 18    YOU TAKE URINE AND YOU SPIN IT DOWN AND YOU GET SOME SEDIMENT

11:45AM 19    IN THE BOTTOM, AND THEN YOU LOOK AT IT UNDER A MICROSCOPE.

11:45AM 20        THOSE ARE TESTS THAT ARE USUALLY PERFORMED VERY CLOSE TO

11:45AM 21    THE PATIENT BEDSIDE, AND YOU NEED TO PERFORM THEM RIGHT AWAY OR

11:45AM 22    THE TESTS MAY NOT NECESSARILY GIVE YOU RESULTS.

11:45AM 23    Q.   YOU ALSO MENTIONED TWO CERTIFICATES CALLED A CERTIFICATE

11:45AM 24    OF COMPLIANCE AND A CERTIFICATE OF ACCREDITATION.

11:45AM 25        WHAT ARE THOSE?

ER-3292

BENNETT DIRECT BY MR. LEACH                                    4609

11:45AM  1    A.   CERTIFICATE OF COMPLIANCE AND CERTIFICATE OF ACCREDITATION

11:45AM  2    ALLOW LABORATORIES TO PERFORM WAIVED, MODERATE, AND HIGH

11:45AM  3    COMPLEXITY TESTING AS LONG AS THEY MEET THE REQUIREMENTS FOR

11:45AM  4    THOSE, WHATEVER COMPLEXITY THEY'RE TESTING.

11:45AM  5         THE CERTIFICATE OF COMPLIANCE LABORATORY IS TYPICALLY

11:45AM  6    SURVEYED BY THE STATE AGENCY, BUT MAY ALSO BE INSPECTED BY

11:45AM  7    FEDERAL SURVEYORS.

11:45AM  8         AND THE CERTIFICATE OF ACCREDITATION, THE SURVEYS ARE

11:46AM  9    NORMALLY PERFORMED BY AN HHS APPROVED ACCREDITED ORGANIZATION.

11:46AM  10   Q.   YOU MENTIONED SOMETHING CALLED HIGH COMPLEXITY AND

11:46AM  11   MODERATE COMPLEXITY TESTS, AND I THINK YOU EARLIER MENTIONED

11:46AM  12   WAIVED TESTS.

11:46AM  13        CAN YOU EXPLAIN WHAT THOSE ARE?

11:46AM  14   A.   SURE.  WAIVED TESTS ARE TESTS THAT ARE GENERALLY EASY TO

11:46AM  15   PERFORM, AND IF THERE'S AN ERRONEOUS RESULT, THERE'S NOT

11:46AM  16   NECESSARILY A HIGH RISK TO THE PATIENT IF THE RESULT IS

11:46AM  17   INCORRECT.

11:46AM  18        MODERATE AND HIGH ARE CONSIDERED NON-WAIVED TESTS, AND THE

11:46AM  19   DIFFERENCE BETWEEN MODERATE AND HIGH IS THAT HIGH COMPLEXITY

11:46AM  20   TESTS USUALLY REQUIRE HIGHER QUALIFICATIONS FOR PERSONNEL IN

11:46AM  21   THE LABORATORY.  THEY REQUIRE ADDITIONAL STEPS TO BE ABLE TO

11:46AM  22   PERFORM THOSE TESTS.  THEY'RE USUALLY MORE COMPLICATED AND MAY

11:46AM  23   HAVE MORE STEPS THAN A MODERATE COMPLEXITY TEST.

11:46AM  24   Q.   YOU -- ARE YOU FAMILIAR WITH THE TERM LDT, OR LABORATORY

11:47AM  25   DEVELOPED TEST?

BENNETT DIRECT BY MR. LEACH                                    4610

11:47AM  1    A.    I AM.

11:47AM  2    Q.    IS THAT A TERM OF ART IN THE CMS WORLD?

11:47AM  3    A.    IT IS NOT.  WE --

11:47AM  4    Q.    IS THAT A TERM OF ART IN THE FDA WORLD?

11:47AM  5    A.    YES, IT IS.  BUT MOST PEOPLE UNDERSTAND, WHEN WE SAY LDT,

11:47AM  6    OR LABORATORY DEVELOPED TESTS, WHEN WE TALK ABOUT THOSE.

11:47AM  7         IN THE CLIA WORLD WE HAVE TESTS THAT ARE APPROVED.

11:47AM  8    THEY'RE CLEARED BY THE FDA OR THEY'RE NOT.  THOSE THAT ARE NOT

11:47AM  9    APPROVED BY THE FDA, WE GENERALLY CONSIDER THOSE TO BE LDT'S.

11:47AM 10    Q.    AND WHAT TYPES OF LABS ARE PERMITTED TO PERFORM LDT'S?

11:47AM 11    A.    HIGH COMPLEXITY LABORATORIES THAT HAVE QUALIFIED PERSONNEL

11:47AM 12    TO PERFORM HIGH COMPLEXITY TESTS.

11:47AM 13    Q.    CAN LDT'S BE PERFORMED IN A MODERATE COMPLEXITY LAB?

11:47AM 14    A.    THEY CANNOT.

11:47AM 15    Q.    YOU MENTIONED SOMETHING CALLED FDA CLEARANCE.

11:47AM 16         WHAT IS THAT?

11:47AM 17    A.    TESTS THAT ARE PUT OUT INTO THE MARKET ARE -- THEY HAVE

11:47AM 18    SEVERAL PROCESSES THEY CAN GO THROUGH THE FDA, WHETHER THEY'RE

11:48AM 19    CLEAR OR APPROVED, AND THEN THE FDA IS THE ONE THAT ASSIGNS THE

11:48AM 20    CLIA COMPLEXITY SO WE KNOW WHETHER IT'S HIGH, MODERATE, OR

11:48AM 21    WAIVED.

11:48AM 22    Q.    AND FDA IS THE U.S. FOOD AND DRUG ADMINISTRATION?

11:48AM 23    A.    YES.

11:48AM 24    Q.    AND DOES THEIR AUTHORITY OVERLAP WITH CMS'S IN TERMS OF

11:48AM 25    LAB REGULATION?

11:48AM  1       A.   THEY HAVE A DIFFERENT FOCUS THAN WHAT CLIA HAS.

11:48AM  2            THE CLIA PROGRAM IS ACTUALLY IMPLEMENTED BY THREE

11:48AM  3       DIFFERENT AGENCIES, CMS, THE FDA, AND THE CDC.

11:48AM  4            CMS IS RESPONSIBLE FOR THE OVERSIGHT OF THE LABORATORIES.

11:48AM  5       WE WRITE THE REGULATIONS, WE COLLECT ALL OF THE FEES.

11:48AM  6            THE FDA CATEGORIZES TESTS FOR US, AND THE CDC ARE OUR

11:48AM  7       TECHNICAL -- THEY GIVE US TECHNICAL ADVICE.

11:48AM  8            BUT FOR LABORATORIES, CMS USUALLY DEALS SPECIFICALLY WITH

11:48AM  9       LABORATORIES.  THE FDA DEALS MORE WITH MANUFACTURERS.

11:49AM 10       Q.   WHEN YOU SAY CMS DEALS WITH LABORATORIES AND THE FDA DEALS

11:49AM 11       WITH MANUFACTURERS, WHAT DO YOU MEAN BY THAT?

11:49AM 12       A.   CLIA DEALS -- CLIA IS LOOKING AT SPECIFIC LABORATORIES AND

11:49AM 13       THE PRACTICES WITHIN A SPECIFIC LABORATORY WHEN WE GO IN TO

11:49AM 14       INSPECT OR SURVEY A LABORATORY.

11:49AM 15            THE FDA IS --

11:49AM 16                 MR. CAZARES:  OBJECTION.  FOUNDATION AS TO THE FDA.

11:49AM 17                 THE COURT:  IS THIS BASED ON THIS WITNESS'S

11:49AM 18       KNOWLEDGE?

11:49AM 19                 MR. LEACH:  YES, YOUR HONOR.  I CAN ASK SOME MORE

11:49AM 20       QUESTIONS ON THIS.

11:49AM 21                 THE COURT:  SURE.

11:49AM 22       BY MR. LEACH:

11:49AM 23       Q.   IN THE COURSE OF YOUR CAREER WITHIN THE -- MY APOLOGIES,

11:49AM 24       MS. RODRIGUEZ.  I'LL GO SLOWER.

11:49AM 25            IN YOUR EXPERIENCE AS A MEDICAL TECHNOLOGIST AT CMS, HAVE

11:49AM 1   YOU HAD MEETINGS WITH THE FDA?

11:49AM 2   A.   YES.

11:49AM 3   Q.   HAVE YOU HAD MEETINGS WITH THE FDA DIRECTLY RELATED TO

11:49AM 4   THERANOS?

11:49AM 5   A.   NO.

11:49AM 6   Q.   DID YOU PARTICIPATE IN A MEETING WITH THE FDA WHERE --

11:50AM 7   WITH THERANOS WHERE THE FDA WAS ON THE PHONE?

11:50AM 8   A.   OH, YES, SORRY.  I DID, YES.

11:50AM 9   Q.   AND PUTTING ASIDE THAT INTERACTION, IN THE COURSE, HAVE

11:50AM 10  YOU HAD CONVERSATIONS WITH THE FDA ABOUT HOW CMS REGULATES

11:50AM 11  LABORATORIES AND THE FDA REGULATES MEDICAL DEVICE

11:50AM 12  MANUFACTURERS?

11:50AM 13  A.   YES.

11:50AM 14  Q.   AND WHAT IS THAT DISTINCTION?  CAN YOU EXPLAIN WHAT YOU

11:50AM 15  MEAN BY THAT?

11:50AM 16          MR. CAZARES:  SAME OBJECTION.

11:50AM 17          THE COURT:  OVERRULED.

11:50AM 18       YOU CAN ANSWER THE QUESTION.

11:50AM 19          THE WITNESS:  OKAY.  SO CMS, LIKE I SAID, WE DEAL

11:50AM 20  SPECIFICALLY WITH LABORATORIES AND OVERSIGHT AND IMPLEMENTING

11:50AM 21  AND MAKING SURE THAT LABORATORIES ARE FOLLOWING THE CLIA

11:50AM 22  REQUIREMENTS, THE STANDARDS AND CONDITIONS OF THE CLIA

11:50AM 23  REQUIREMENTS.

11:50AM 24       THE FDA DEALS WITH MANUFACTURERS WHO ARE TRYING TO

11:50AM 25  MANUFACTURE THE PRODUCTS TO OTHER LABORATORIES OR TO ANY

BENNETT DIRECT BY MR. LEACH                                    4613

11:50AM   1    LABORATORY.

11:50AM   2    BY MR. LEACH:

11:50AM   3    Q.   WHEN YOU SAY "MARKET TO OTHERS," WHAT DO YOU MEAN BY THAT?

11:50AM   4    A.   ONCE THE -- ONCE A TEST GOES THROUGH THE FDA PROCESS, THEN

11:51AM   5    THEY'RE ABLE TO MARKET THAT TO WHICHEVER LABORATORY THAT -- THE

11:51AM   6    MANUFACTURER OR DISTRIBUTOR IS ALLOWED TO DISTRIBUTE THAT TEST

11:51AM   7    OR SELL THAT TEST TO ANY LABORATORY THAT WANTS IT.

11:51AM   8           THE COURT:  MS. BENNETT, I'M GOING TO ASK YOU TO

11:51AM   9    SLOW DOWN JUST A LITTLE BIT.

11:51AM  10           THE WITNESS:  THANK YOU.

11:51AM  11    BY MR. LEACH:

11:51AM  12    Q.   WE NEED TO MAKE SURE WE'RE SPEAKING ONE AT A TIME,

11:51AM  13    MS. BENNETT, AND ALSO MAKE SURE THAT THE COURT REPORTER IS ABLE

11:51AM  14    TO GET ALL OF OUR DIALOGUE.

11:51AM  15         YOU TALKED EARLIER ABOUT SURVEYS THAT CMS CONDUCTS.

11:51AM  16         WHAT IS INVOLVED IN A SURVEY?

11:51AM  17    A.   PRIOR TO GOING ON THE SURVEY, WE DO A LITTLE BIT OF LEG

11:51AM  18    WORK.  WE LOOK AT SOME REPORTS.  WE LOOK AT, LIKE, A PREVIOUS

11:51AM  19    REPORT FROM THE LAST SURVEY TO SEE WHAT THE ISSUES WERE,

11:51AM  20    BECAUSE WE WANT TO MAKE SURE THAT WHEN WE GO ONSITE TO DO A

11:51AM  21    SURVEY THAT THEY ACTUALLY CORRECTED WHAT THEY -- WHAT WAS FOUND

11:51AM  22    IN A PREVIOUS SURVEY IF THERE IS ONE.

11:51AM  23         WHAT I DO IS THAT I PULL PROFICIENCY TESTING RECORDS AND

11:52AM  24    REPORTS TO SEE HOW THEIR PROFICIENCY TESTING LOOKS.

11:52AM  25         AND WE CAN ALSO PULL A SUMMARY REPORT SO THAT WE KNOW

11:52AM  1     APPROXIMATELY WHAT TYPES OF TESTING, NOT SPECIFIC TESTS, BUT IN

11:52AM  2     WHAT AREAS THEY'RE TESTING.

11:52AM  3     Q.   AND WHEN YOU GO ONSITE FOR A SURVEY, DO YOU REQUEST

11:52AM  4     DOCUMENTS?

11:52AM  5     A.   WE DO.

11:52AM  6     Q.   IS THE LABORATORY REQUIRED TO PROVIDE DOCUMENTS TO YOU?

11:52AM  7     A.   THEY ARE REQUIRED TO SUPPLY TO US WHATEVER DOCUMENTS WE

11:52AM  8     REQUEST.

11:52AM  9     Q.   AND DO YOU ALSO CONDUCT INTERVIEWS?

11:52AM 10     A.   YES.

11:52AM 11     Q.   AND WHY DO YOU CONDUCT INTERVIEWS?

11:52AM 12     A.   WE HAVE THREE MECHANISMS BY WHICH WE COLLECT INFORMATION.

11:52AM 13     ONE IS BY RECORDS REVIEW OR DOCUMENTS, AND THE SECOND IS

11:52AM 14     INTERVIEW, AND THE THIRD IS OBSERVATION.

11:52AM 15         SO IT'S A WAY FOR US TO COLLECT INFORMATION, AND ALSO

11:52AM 16     VERIFY INFORMATION THAT WE FIND OR ARE TOLD.

11:52AM 17     Q.   ARE YOU FAMILIAR WITH A COMPANY CALLED THERANOS?

11:52AM 18     A.   YES, I AM.

11:52AM 19     Q.   AND HOW DID YOU BECOME FAMILIAR WITH THERANOS?

11:52AM 20     A.   THERANOS CAME TO CMS I BELIEVE IN JANUARY OF 2014 TO SHOW

11:53AM 21     US AND TALK TO US ABOUT THEIR TECHNOLOGY.

11:53AM 22         AND THEN I WAS ASKED TO PARTICIPATE IN A SURVEY OF THE

11:53AM 23     CALIFORNIA AND THE ARIZONA FACILITIES.

11:53AM 24     Q.   I'D LIKE TO FOCUS ON THE MEETING THAT YOU JUST DESCRIBED

11:53AM 25     AND TALK ABOUT THE SURVEY A LITTLE BIT LATER.

11:53AM  1     A.   SURE.

11:53AM  2     Q.   SO FOCUSSING ON THE MEETING THAT YOU JUST DESCRIBED, YOU

11:53AM  3     SAID THAT WAS AT SOME POINT IN 2014?

11:53AM  4     A.   I BELIEVE IT WAS JANUARY OF 2014.

11:53AM  5     Q.   OKAY.  AND WHERE WAS THIS MEETING?

11:53AM  6     A.   IT WAS AT CMS.

11:53AM  7     Q.   OKAY.  WHO ATTENDED FROM CMS TO THE BEST OF YOUR

11:53AM  8     KNOWLEDGE?

11:53AM  9     A.   AS BEST I CAN RECALL, KAREN DYER, PENNY FULLER,

11:53AM  10    PENNY MYERS, MYSELF, I BELIEVE JUDY YOST WAS THERE.

11:53AM  11    Q.   AND WHO IS KAREN DYER?

11:54AM  12    A.   KAREN DYER WAS THE PREVIOUS DIRECTOR OF THE CLIA PROGRAM.

11:54AM  13    Q.   SOMEONE YOU REPORTED TO?

11:54AM  14    A.   YES.

11:54AM  15    Q.   AND KAREN FULLER, WHO IS THAT?

11:54AM  16    A.   KAREN FULLER WAS THE MANAGER IN THE SAN FRANCISCO REGIONAL

11:54AM  17    OFFICE.

11:54AM  18    Q.   AND WHAT ARE THE RESPONSIBILITIES OF THE SAN FRANCISCO

11:54AM  19    REGIONAL OFFICE?

11:54AM  20    A.   THE -- WHAT WE CALL THE CENTRAL OFFICE, OR CMS BALTIMORE,

11:54AM  21    IS THE AREA OF THE CLIA PROGRAM WE USUALLY DEVELOP POLICY FOR

11:54AM  22    LABORATORIES AND FOR OUR SURVEYORS.

11:54AM  23         THE REGIONAL OFFICE, LIKE CMS SAN FRANCISCO, THEY'RE

11:54AM  24    USUALLY RESPONSIBLE FOR PERFORMING SURVEYS AND THE DIRECT

11:54AM  25    OVERSIGHT OF LABORATORIES IN THE STATES.

BENNETT DIRECT BY MR. LEACH                      4616

11:54AM   1    Q.   AND ARE THERE OTHER OFFICES BESIDES THE SAN FRANCISCO ONE

11:54AM   2    THAT DO THE SURVEYS, OR IS THAT JUST THE ONE THAT HAPPENS TO BE

11:54AM   3    HERE IN OUR NECK OF THE WOODS?

11:54AM   4    A.   THAT'S HERE IN YOUR NECK OF THE WOODS.

11:54AM   5    Q.   OKAY.

11:54AM   6    A.   WE HAVE TEN REGIONAL OFFICES AROUND THE UNITED STATES.

11:54AM   7    Q.   SO MS. DYER WAS THERE, MS. FULLER WAS THERE?

11:55AM   8    A.   I DON'T KNOW WHETHER MS. FULLER WAS AT THAT MEETING.

11:55AM   9    Q.   OKAY.  WHO FROM THERANOS WAS THERE?

11:55AM  10    A.   I BELIEVE MS. HOLMES AND MR. BALWANI WERE THERE.

11:55AM  11    Q.   OKAY.  AND DID ANY INDIVIDUALS FROM THE FDA PARTICIPATE?

11:55AM  12    A.   I BELIEVE THEY WERE ON THE PHONE.

11:55AM  13    Q.   OKAY.  AND WHAT WAS THE PURPOSE OF THE MEETING?

11:55AM  14    A.   MY UNDERSTANDING OF THE PURPOSE OF THE MEETING WAS THAT

11:55AM  15    THERANOS WAS COMING TO SHOW US THEIR TECHNOLOGY.  THEY WANTED

11:55AM  16    TO TRY TO PUT THE DEVICES IN A LOT OF -- IN MULTIPLE FACILITIES

11:55AM  17    WITHOUT A CLIA CERTIFICATE, AND WE TOLD THEM THAT THEY WOULD

11:55AM  18    NEED CLIA CERTIFICATES AT EACH OF THE FACILITIES.

11:55AM  19    Q.   AND WHEN YOU SAY "PUT THE DEVICES IN A LOT OF FACILITIES,"

11:55AM  20    WHAT DO YOU MEAN BY "DEVICES"?

11:55AM  21    A.   THE LITTLE BLACK BOX.

11:55AM  22    Q.   AND DID THEY BRING A BLACK BOX WITH THEM?

11:55AM  23    A.   NOT THAT I RECALL.

11:55AM  24    Q.   BUT WHAT WERE THEY TELLING YOU THAT THEY WANTED TO DO WITH

11:55AM  25    THE BLACK BOX?

11:55AM 1    A.    THEY WANTED TO BE ABLE TO PUT THE PATIENT SPECIMEN INTO

11:56AM 2    THE BOX, AND THEN THE INFORMATION WOULD GO BACK TO CALIFORNIA,

11:56AM 3    AND THEN THE RESULTS WOULD BE LOOKED AT AND REPORTED OUT FROM

11:56AM 4    CALIFORNIA.

11:56AM 5    Q.    AND WHAT DID CMS TELL THERANOS AT THIS MEETING?

11:56AM 6    A.    WE TOLD THEM THAT THEY WOULD NEED TO HAVE A CLIA

11:56AM 7    CERTIFICATE AT EACH PLACE THAT THE BLACK BOX WAS --

11:56AM 8    Q.    OKAY.

11:56AM 9    A.    -- LOCATED.

11:56AM 10    Q.    AND BY "CLIA CERTIFICATE," IS THAT A CERTIFICATE OF

11:56AM 11    COMPLIANCE?  A CERTIFICATE OF WAIVER?  WHAT TYPE OF CERTIFICATE

11:56AM 12    WOULD BE REQUIRED?

11:56AM 13    A.    IN THIS PARTICULAR INSTANCE, IT WOULD HAVE BEEN A

11:56AM 14    CERTIFICATE OF COMPLIANCE OR A CERTIFICATE OF ACCREDITATION

11:56AM 15    BECAUSE IT WAS NOT FDA APPROVED OR CLEARED, SO IT WOULD BE HIGH

11:56AM 16    COMPLEXITY.

11:56AM 17    Q.    OKAY.  AND WHEN YOU SAY "NOT FDA APPROVED OR CLEARED,"

11:56AM 18    WHAT IS THE DIFFERENCE BETWEEN APPROVAL AND CLEARANCE?

11:56AM 19    A.    THERE'S A DIFFERENCE IN THE PROCESS DEPENDING ON THE TEST.

11:56AM 20    THE FDA HAS SEVERAL PATHWAYS THAT TESTS CAN BE APPROVED OR

11:56AM 21    CLEARED, AND DEPENDING ON THE PATHWAY, IT'S EITHER APPROVED OR

11:56AM 22    CLEARED.

11:56AM 23    Q.    AND IS ONE OF THEM MORE RIGOROUS THAN THE OTHER?

11:57AM 24    A.    I DON'T KNOW.

11:57AM 25    Q.    AND IS YOUR NEXT INTERACTION WITH THERANOS AT SOME POINT

11:57AM   1    IN CONNECTION WITH A SURVEY THAT YOU CONDUCTED?

11:57AM   2    A.   YES.

11:57AM   3    Q.   WAS THAT IN 2015?

11:57AM   4    A.   YES.

11:57AM   5         MR. LEACH:  YOUR HONOR, I'M ABOUT TO MOVE INTO

11:57AM   6    ANOTHER TOPIC.  THIS MIGHT BE A CONVENIENT TIME TO BREAK.

11:57AM   7         THE COURT:  ALL RIGHT.  LET'S DO THAT THEN.

11:57AM   8    WE'LL TAKE OUR NOON BREAK.  IT'S 30 MINUTES, 30 MINUTES.

11:57AM   9    AND WE'LL COME BACK AND FINISH YOUR TESTIMONY.

11:57AM  10    THANK YOU.

11:57AM  11         MR. LEACH:  THANK YOU.

12:12PM  12    (RECESS FROM 12:12 P.M. UNTIL 12:33 P.M.)

12:34PM  13    (JURY IN AT 12:34 P.M.)

12:34PM  14         THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

12:34PM  15    OUR JURY IS PRESENT.  ALL PARTIES PREVIOUSLY PRESENT ARE

12:34PM  16    PRESENT AGAIN.

12:35PM  17         MR. LEACH, YOU'D LIKE TO CONTINUE?

12:35PM  18         MR. LEACH:  I WOULD, YOUR HONOR.  THANK YOU.

12:35PM  19    Q.   MS. BENNETT, BEFORE WE BROKE, WE WERE ABOUT TO GET INTO A

12:35PM  20    SURVEY THAT YOU PERFORMED OR PARTICIPATED IN WITH RESPECT TO

12:35PM  21    THERANOS IN 2015.

12:35PM  22    DO YOU RECALL STARTING TO TALK ABOUT THAT?

12:35PM  23    A.   YES.

12:35PM  24    Q.   OKAY.  HOW DID YOU FIRST LEARN THAT -- HOW DID IT COME

12:35PM  25    ABOUT THAT YOU WERE TO PARTICIPATE IN A SURVEY OF THERANOS?

BENNETT DIRECT BY MR. LEACH                    4619

12:35PM 1    A.   MY SUPERVISOR, KAREN DYER, ASKED ME IF I WOULD

12:35PM 2    PARTICIPATE.

12:35PM 3    Q.   AND YOU WORK IN THE HOME OFFICE, OR THE CENTRAL OFFICE OF

12:35PM 4    CMS?

12:35PM 5    A.   YES.

12:35PM 6    Q.   WAS IT COMMON OR UNUSUAL FOR YOU TO PARTICIPATE IN SURVEYS

12:35PM 7    IN YOUR ROLE?

12:35PM 8    A.   I PARTICIPATED IN SEVERAL SURVEYS SINCE I CAME TO THE

12:35PM 9    CENTRAL OFFICE IN BALTIMORE.

12:35PM 10   Q.   AND WERE YOU ASKED TO PARTNER WITH ANY PARTICULAR PERSON

12:36PM 11   ON THIS SURVEY?

12:36PM 12   A.   YES.

12:36PM 13   Q.   WHO WAS THAT?

12:36PM 14   A.   GARY YAMAMOTO.

12:36PM 15   Q.   AND MR. YAMAMOTO WORKS IN SAN FRANCISCO OFFICE?

12:36PM 16   A.   HE DOES.

12:36PM 17   Q.   AND WHAT WAS YOUR UNDERSTANDING OF WHY YOU WERE CONDUCTING

12:36PM 18   A SURVEY OF THERANOS?

12:36PM 19   A.   MY UNDERSTANDING, BECAUSE OF MY SURVEY BACKGROUND, I WAS

12:36PM 20   ASKED TO PARTICIPATE AND HELP OUT.

12:36PM 21   Q.   LET ME ASK A DIFFERENT QUESTION.  WHY WAS CMS SURVEYING

12:36PM 22   THERANOS AT SOME POINT IN 2015?

12:36PM 23   A.   I DON'T KNOW THE EXACT REASON.  IT COULD HAVE BEEN THAT

12:36PM 24   THEY WERE SHORT OF SURVEYORS IN CALIFORNIA, OR IT WAS JUST THAT

12:36PM 25   THEY WANTED US TO PERFORM THAT SURVEY.

12:36PM  1    Q.   AT THE TIME THAT YOU -- WHEN DID YOU ACTUALLY CONDUCT THE

12:36PM  2    SURVEY?

12:36PM  3    A.   THE FIRST VISIT WAS SEPTEMBER OF 2015, AND THEN WE WENT

12:36PM  4    BACK TO COMPLETE THE SURVEY IN NOVEMBER OF 2015.

12:37PM  5    Q.   PRIOR TO SEPTEMBER OF 2015, DID YOU HAVE AN UNDERSTANDING

12:37PM  6    OF WHEN IN THE SURVEY CYCLE THERANOS WOULD FALL?

12:37PM  7    A.   YES.

12:37PM  8    Q.   AND WHEN WAS THAT?

12:37PM  9    A.   WE KNEW THAT THE SURVEY NEEDED TO BE PERFORMED LATE

12:37PM  10   SUMMER, EARLY FALL BECAUSE WE NEEDED TO PERFORM THE

12:37PM  11   RECERTIFICATION SURVEY, AND WE RECEIVED A COMPLAINT, AND SO

12:37PM  12   WE -- THE DECISION WAS MADE TO PERFORM THOSE TWO SURVEYS

12:37PM  13   TOGETHER AS ONE.

12:37PM  14   Q.   OKAY.  THE RECERTIFICATION SURVEY, WHAT DO YOU MEAN BY

12:37PM  15   THAT?

12:37PM  16   A.   EVERY LABORATORY THAT HAS A CERTIFICATE OF COMPLIANCE

12:37PM  17   EVERY OTHER YEAR HAS TO BE SURVEYED FOR -- TO MAKE SURE THAT

12:37PM  18   THEY'RE FOLLOWING THE STANDARDS AND CONDITIONS THAT THEY ARE

12:37PM  19   REQUIRED TO FOLLOW.

12:37PM  20   Q.   AND THERANOS WAS DUE FOR THAT AT SOME POINT AT THE END OF

12:37PM  21   2015?

12:37PM  22   A.   YES.

12:37PM  23   Q.   OKAY.  YOU ALSO MENTIONED THAT IT CAME TO YOUR ATTENTION

12:37PM  24   THAT THERE HAD BEEN A COMPLAINT ABOUT THERANOS?

12:38PM  25   A.   YES.

12:38PM  1    Q.   OKAY.  WITHOUT TALKING ABOUT THE SUBSTANCE OF THE

12:38PM  2    COMPLAINT, DID THAT INFORM SOME OF THE TOPIC AREAS THAT YOU

12:38PM  3    ELECTED TO FOCUS ON IN YOUR SURVEY?

12:38PM  4    A.   IT DID.

12:38PM  5    Q.   OKAY.  AND WHAT TOPIC AREAS WERE THOSE?

12:38PM  6    A.   IT WAS THAT THIS PARTICULAR COMPLAINT WAS RELATED TO --

12:38PM  7         MR. CAZARES:  OBJECTION.  HEARSAY AND 403.

12:38PM  8         THE COURT:  SUSTAINED.

12:38PM  9         IF YOU COULD JUST GET THE, I THINK, THE AREAS.

12:38PM  10   BY MR. LEACH:

12:38PM  11   Q.   OKAY.  AS A RESULT OF THE COMPLAINT, MS. BENNETT, DID YOU

12:38PM  12   MAKE A DECISION TO FOCUS ON PARTICULAR AREAS WITHIN THE CMS

12:38PM  13   SURVEY?

12:38PM  14   A.   YES.

12:38PM  15   Q.   AND WHAT AREAS DID YOU ELECT TO FOCUS ON?

12:38PM  16   A.   PROFICIENCY TESTING.

12:38PM  17   Q.   OKAY.  DID YOU ALSO ELECT TO FOCUS ON QUALITY CONTROL?

12:38PM  18   A.   WE DID.

12:38PM  19   Q.   OKAY.  WITHOUT DESCRIBING THE SUBSTANCE OF THE COMPLAINTS,

12:38PM  20   DID YOU HAVE AN UNDERSTANDING OF WHERE THE COMPLAINTS WERE

12:38PM  21   COMING FROM?

12:38PM  22   A.   WE, WE KNEW THAT THE COMPLAINTS HAD COME FROM INDIVIDUALS.

12:39PM  23   Q.   OKAY.  INDIVIDUALS OUTSIDE OF THE COMPANY OR INSIDE OF THE

12:39PM  24   COMPANY?

12:39PM  25   A.   ONE COMPLAINT WE KNEW WAS INSIDE OF THE COMPANY.  THE

BENNETT DIRECT BY MR. LEACH                                    4622

12:39PM   1    OTHER ONE WE DID NOT KNOW -- I DID NOT KNOW.

12:39PM   2    Q.   OKAY.  AT SOME POINT IN TIME DID YOU BECOME AWARE THAT A

12:39PM   3    REPORTER FROM "THE WALL STREET JOURNAL" WAS ASKING CMS

12:39PM   4    QUESTIONS ABOUT THERANOS?

12:39PM   5    A.   I DID.

12:39PM   6    Q.   OKAY.  AND DID THAT HAPPEN BEFORE YOUR SURVEY IN SEPTEMBER

12:39PM   7    OF 2015?

12:39PM   8    A.   IT DID.

12:39PM   9    Q.   DID THAT IN ANY WAY AFFECT HOW YOU WENT ABOUT CONDUCTING

12:39PM  10    THE SURVEY?

12:39PM  11    A.   IT DID NOT.

12:39PM  12    Q.   PRIOR TO CONDUCTING THE SURVEY BEGINNING AT THE END OF

12:39PM  13    SEPTEMBER 2015, WHAT DID YOU DO?  HOW DID YOU PREPARE FOR THE

12:39PM  14    SURVEY?

12:39PM  15    A.   I REQUESTED THE PREVIOUS SURVEY REPORT FROM THE LAST

12:39PM  16    SURVEY THAT HAD BEEN PERFORMED ON THERANOS; I LOOKED AT THE

12:40PM  17    PROFICIENCY TESTING INFORMATION; AND I ALSO PULLED A REPORT

12:40PM  18    THAT SUMMARIZED INFORMATION ABOUT THE LABORATORY.

12:40PM  19    Q.   OKAY.  DID YOU LOOK AT THE RESULTS OF PRIOR INSPECTIONS OF

12:40PM  20    THERANOS?

12:40PM  21    A.   I DID.

12:40PM  22    Q.   OKAY.  AND WHEN YOU SAY YOU PULLED PROFICIENCY TESTING,

12:40PM  23    HOW DID YOU DO THAT?  WHAT DID YOU DO?

12:40PM  24    A.   WE HAVE AN INTERNAL REPORT WHERE WE CAN PUT IN THE

12:40PM  25    LABORATORY NAME OR CLIA NUMBER, AND IT PULLS UP THEIR

BENNETT DIRECT BY MR. LEACH                                    4623

12:40PM  1      PROFICIENCY TESTING HISTORY.

12:40PM  2      Q.   AND THE PROFICIENCY TESTING THAT YOU REVIEWED, WAS THIS --

12:40PM  3      WERE THESE RESULTS PROVIDED BY A THIRD PARTY PROVIDER, OR WERE

12:40PM  4      THEY SOME OTHER FORM OF PROFICIENCY TESTING?

12:40PM  5      A.   THE INFORMATION IS PUT INTO OUR SYSTEM BY THE PT PROGRAMS.

12:40PM  6      WHEN THEY GRADE THE RESULTS, THEY ENTER IT INTO THE SYSTEM, AND

12:40PM  7      THEN WE CAN PULL THE REPORT.

12:40PM  8      Q.   SO IF A LAB IS PERFORMING ALTERNATE ASSESSMENT OF

12:41PM  9      PROFICIENCIES, IS THAT SOMETHING THAT IS AVAILABLE TO YOU

12:41PM  10     BEFORE YOU GO IN TO DO YOUR SURVEY?

12:41PM  11     A.   NO.

12:41PM  12     Q.   DO YOU KNOW THE NAME ERIKA CHEUNG?

12:41PM  13     A.   I DO.

12:41PM  14     Q.   AND WHO IS ERIKA CHEUNG?

12:41PM  15     A.   SHE WAS A COMPLAINANT.  SHE WAS ONE OF THE COMPLAINTS THAT

12:41PM  16     WE RECEIVED.

12:41PM  17     Q.   AND PRIOR TO GOING IN TO CONDUCT YOUR SURVEY, DID YOU HAVE

12:41PM  18     AN UNDERSTANDING OF SOME OF THE THINGS THAT MS. CHEUNG WAS

12:41PM  19     ALLEGING?

12:41PM  20     A.   I DID.

12:41PM  21     Q.   AND DID YOU CONDUCT THE SURVEY WITH AN EYE TOWARDS SOME OF

12:41PM  22     THOSE ALLEGATIONS?

12:41PM  23     A.   YES.

12:41PM  24     Q.   LET ME PLEASE DRAW YOUR ATTENTION TO EXHIBIT 5831.

12:41PM  25          BEFORE I DO THAT, MAY I APPROACH, YOUR HONOR?

BENNETT DIRECT BY MR. LEACH                                    4624

12:41PM   1                    THE COURT:  YES.

12:42PM   2                    MR. LEACH:  (HANDING.)

12:42PM   3        Q.   MS. BENNETT, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS.

12:42PM   4        IF YOU COULD TURN TO THE LAST TAB, EXHIBIT 5831?

12:42PM   5        A.   OKAY.

12:42PM   6        Q.   OKAY.  DO YOU SEE AT THE TOP THERE APPEARS TO BE AN EMAIL

12:42PM   7        FROM LANGLY GEE?

12:42PM   8        A.   I DO.

12:42PM   9        Q.   OKAY.  DO YOU KNOW MR. GEE?

12:42PM  10        A.   I DO.

12:42PM  11        Q.   OKAY.  IS HE SOMEONE THAT YOU INTERACTED WITH IN THE

12:42PM  12        SURVEY?

12:42PM  13        A.   YES.

12:42PM  14        Q.   AND DID YOU UNDERSTAND THAT HE HAD RESPONSIBILITY FOR

12:42PM  15        QUALITY CONTROL AT THERANOS?

12:42PM  16        A.   YES.

12:42PM  17        Q.   AND THIS APPEARS TO BE AN EMAIL FROM MR. GEE TO

12:42PM  18        SUNNY BALWANI AND SOMEONE NAMED BRAD ARINGTON.

12:43PM  19             DO YOU SEE THAT?

12:43PM  20        A.   YES.

12:43PM  21        Q.   AND THE DATE OF THIS EMAIL IS JUNE 13TH, 2015.

12:43PM  22             DO YOU SEE THAT?

12:43PM  23        A.   I DO.

12:43PM  24        Q.   AND IS THAT BEFORE YOU ACTUALLY WENT IN TO CONDUCT THE

12:43PM  25        SURVEY?

BENNETT DIRECT BY MR. LEACH                                    4625

12:43PM  1    A.   YES.

12:43PM  2    Q.   OKAY.  THERE'S AN ATTACHMENT TO THIS EMAIL TO MR. BALWANI

12:43PM  3    BEGINNING ON PAGE 2.

12:43PM  4         DO YOU SEE THAT?

12:43PM  5    A.   YES.

12:43PM  6    Q.   AND YOU SEE THERE APPEARS TO BE A LETTER WITH A FORM

12:43PM  7    BEGINNING ON PAGE 5?

12:43PM  8    A.   YES.

12:43PM  9    Q.   DOWN AT THE BOTTOM OF PAGE 5 IS A LINE FORM CMS-2567.

12:43PM 10         DO YOU SEE THAT?

12:43PM 11    A.   YES.

12:43PM 12    Q.   AND ARE YOU FAMILIAR WITH THAT TYPE OF FORM?

12:43PM 13    A.   YES.

12:43PM 14    Q.   AND WHAT IS THAT FORM?

12:43PM 15    A.   FORM CMS-2567, IT IS THE STATEMENT OF DEFICIENCIES FORM.

12:44PM 16    Q.   IS THIS SOMETHING THAT YOU -- IS THE STATEMENT OF

12:44PM 17    DEFICIENCIES ATTACHED TO EXHIBIT 5831 SOMETHING THAT YOU

12:44PM 18    REVIEWED PRIOR TO YOUR SURVEY?

12:44PM 19    A.   IT IS.

12:44PM 20         MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS 5831.

12:44PM 21         MR. CAZARES:  OBJECTION.  HEARSAY AS TO THE EMAIL,

12:44PM 22    AS TO THE LETTER; DOUBLE HEARSAY AND FOUNDATION ON THE

12:44PM 23    ATTACHMENT TO THE LETTER, ATTACHMENTS; ALSO 403.

12:44PM 24         MR. LEACH:  I'M OFFERING THIS FOR THE PURPOSE OF

12:44PM 25    NOTICE TO MR. BALWANI.

12:44PM 1          THE COURT:  AND NOT FOR THE TRUTH OF THE MATTER

12:44PM 2     ASSERTED?

12:44PM 3          MR. LEACH:  CORRECT.

12:44PM 4          THE COURT:  IN ANY OF THESE DOCUMENTS, INCLUDING THE

12:44PM 5     ATTACHMENT?

12:44PM 6          MR. LEACH:  CORRECT.

12:44PM 7          THE COURT:  ALL RIGHT.  THANK YOU.

12:44PM 8       LADIES AND GENTLEMEN, THE OBJECTION IS OVERRULED.  THIS

12:45PM 9     WILL BE ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED IN

12:45PM 10    THE EMAILS NOR THE ATTACHMENTS, BUT ONLY AS TO THE ISSUE OF

12:45PM 11    NOTICE, NOTICE AS TO MR. BALWANI, AND FOR THAT PURPOSE THE

12:45PM 12    PROBATIVE VALUE OUTWEIGHS ANY PREJUDICIAL EFFECT.

12:45PM 13      SO IT CAN BE ADMITTED, AND IT MAY BE PUBLISHED FOR THAT

12:45PM 14    LIMITED PURPOSE.

12:45PM 15         MR. LEACH:  THANK YOU, YOUR HONOR.

12:45PM 16      (GOVERNMENT'S EXHIBIT 5831 WAS RECEIVED IN EVIDENCE.)

12:45PM 17    BY MR. LEACH:

12:45PM 18    Q.  IF WE CAN PLEASE ZOOM IN ON THE BOTTOM PORTION OF THIS

12:45PM 19    EMAIL, MS. WACHS.

12:45PM 20      MS. BENNETT, DO YOU SEE AT THE BOTTOM WHERE MR. BALWANI IS

12:45PM 21    EMAILING LANGLY GEE AND BRAD ARINGTON, "LANGLY.

12:45PM 22      "CAN YOU PLEASE EMAIL ME A COPY OF ALL OF OUR AUDIT

12:45PM 23    REPORTS."

12:45PM 24      DO YOU SEE THAT?

12:45PM 25    A.  I DO.

BENNETT DIRECT BY MR. LEACH                                    4627

12:45PM  1    Q.   OKAY.  AND IF WE CAN GO TO THE TOP, DO YOU SEE WHERE

12:45PM  2    MR. GEE WRITES, "SUNNY:

12:45PM  3        "ATTACHED ARE THE CLIA INSPECTION REPORT FOR 2013 AND THE

12:46PM  4    CORRECTIVE ACTIONS."

12:46PM  5        DO YOU SEE THAT?

12:46PM  6    A.   I DO.

12:46PM  7    Q.   AND PRIOR INSPECTION REPORTS ARE SOMETHING THAT YOU WOULD

12:46PM  8    REVIEW TO INFORM THE SURVEY THAT YOU WERE ABOUT TO CONDUCT IN

12:46PM  9    2015?

12:46PM 10    A.   YES.

12:46PM 11    Q.   LET'S LOOK AT PAGE 2.

12:46PM 12        DO YOU SEE ON PAGE 2 THERE'S A LETTER DATED DECEMBER 10TH,

12:46PM 13    2013?

12:46PM 14    A.   YES.

12:46PM 15    Q.   IF YOU WERE CONDUCTING YOUR SURVEY AT THE END OF 2015, IS

12:46PM 16    THAT CONSISTENT WITH THE TIME PERIOD WHEN THERANOS WOULD HAVE

12:46PM 17    BEEN -- HAD ITS MOST RECENT RECERTIFICATION INSPECTION?

12:46PM 18    A.   YES.

12:46PM 19    Q.   AND DID CMS CONDUCT THAT 2013 INSPECTION?

12:46PM 20    A.   I BELIEVE THAT THE STATE AGENCY PERFORMED THAT SURVEY.

12:46PM 21    Q.   OKAY.  IS -- ARE THERE OCCASIONS WHEN THE STATE WILL

12:46PM 22    PERFORM INSPECTIONS RATHER THAN CMS?

12:46PM 23    A.   YES.

12:46PM 24    Q.   CAN YOU EXPLAIN THAT?

12:46PM 25    A.   GENERALLY LABORATORIES THAT DON'T HAVE ANY CONFLICT OF

BENNETT DIRECT BY MR. LEACH                                    4628

12:47PM  1    INTEREST OR ARE NOT FEDERAL LABORATORIES WOULD BE INSPECTED BY

12:47PM  2    THE STATE.

12:47PM  3         IT'S JUST -- IT'S DONE ON A CASE-BY-CASE BASIS.  THERE ARE

12:47PM  4    SITUATIONS WHERE WE WOULD GO IN AND PERFORM A SURVEY, OR GO IN

12:47PM  5    JOINTLY WITH THE STATE TO PERFORM A SURVEY.

12:47PM  6    Q.   OKAY.  SO THERE ARE TIMES WHEN CMS WILL DO AN INSPECTION

12:47PM  7    ON ITS OWN?

12:47PM  8    A.   YES.

12:47PM  9    Q.   AND THERE ARE TIMES WHEN THE STATE MIGHT DO AN INSPECTION?

12:47PM 10    A.   YES.

12:47PM 11    Q.   AND THERE ARE TIMES WHEN THE STATE AND CMS MIGHT DO IT

12:47PM 12    TOGETHER?

12:47PM 13    A.   YES.

12:47PM 14    Q.   OKAY.  DO YOU SEE THAT THIS LETTER IS ADDRESSED TO

12:47PM 15    DR. ROSENDORFF?

12:47PM 16    A.   I DO.

12:47PM 17    Q.   DO YOU KNOW SOMEONE NAMED ADAM ROSENDORFF?

12:47PM 18    A.   I DO NOT.

12:47PM 19    Q.   OKAY.  AND IF WE COULD -- IF I COULD DRAW YOUR ATTENTION

12:47PM 20    TO PAGE 4, DO YOU SEE THAT THERE'S A SIGNATURE FROM SOMEONE

12:48PM 21    NAMED EILEEN NORKIN?

12:48PM 22    A.   I DO.

12:48PM 23    Q.   OKAY.  DID SHE PARTICIPATE IN THE 2015 INSPECTION?

12:48PM 24    A.   SHE DID NOT.

12:48PM 25    Q.   AND THERE'S AN ENCLOSURE TO THIS LETTER "CMS-2567,

12:48PM  1      STATEMENT OF DEFICIENCIES."

12:48PM  2           IS THAT A FORM THAT YOU USE REGULARLY IN SURVEYS?

12:48PM  3      A.   YES.

12:48PM  4      Q.   AND LET'S LOOK AT THE NEXT PAGE OF 5831.

12:48PM  5           DO YOU SEE IN THE UPPER RIGHT CORNER THERE'S DATE SURVEY

12:48PM  6      COMPLETED, DECEMBER 3RD, 2013?

12:48PM  7      A.   I DO.

12:48PM  8      Q.   AND IS THAT CONSISTENT WITH THE TIME PERIOD WHEN

12:48PM  9      THERANOS'S RECERTIFICATION WOULD HAVE OCCURRED BACK THEN?

12:48PM  10     A.   YES.

12:48PM  11     Q.   AND TO THE RIGHT THERE'S A NUMBER OF -- TO THE RIGHT

12:48PM  12     THERE'S SOMETHING CALLED AN I.D. PREFIX TAG AND D5215.

12:49PM  13          DO YOU SEE THAT?

12:49PM  14     A.   I DO.

12:49PM  15     Q.   AND ARE YOU FAMILIAR WITH SOMETHING CALLED AN I.D. PREFIX

12:49PM  16     TAG?

12:49PM  17     A.   YES.  WE CALL THEM D-TAGS.

12:49PM  18     Q.   AND WHAT IS A D-TAG?

12:49PM  19     A.   THE D-TAG IS THE DEFICIENCY TAG, AND THE DEFICIENCY TAG IS

12:49PM  20     SPECIFICALLY ASSIGNED TO A REGULATION.

12:49PM  21     Q.   AND WHAT IS THE PURPOSE OF THE 2567?

12:49PM  22     A.   THE PURPOSE OF THE 2567 IS TO ALLOW THE LABORATORY TO KNOW

12:49PM  23     WHAT STANDARDS AND/OR CONDITIONS HAVE NOT BEEN MET SO THEY CAN

12:49PM  24     CORRECT THE DEFICIENCIES THAT WERE CITED.

12:49PM  25     Q.   AND THE DEFICIENCY THAT IS LISTED HERE IS EVALUATION OF

12:49PM  1    PROFICIENCY PERFORMANCE.

12:49PM  2         DO YOU SEE THAT?

12:49PM  3    A.   I DO.

12:49PM  4    Q.   AND IS THIS SOMETHING THAT YOU REVIEWED PRIOR TO GOING

12:49PM  5    INTO THE LAB IN -- GOING INTO THERANOS'S LAB IN 2015?

12:49PM  6    A.   IT IS.

12:49PM  7              THE COURT:  AND, MR. LEACH, THIS IS PAGE 5 OF THE

12:49PM  8    EXHIBIT?

12:50PM  9              MR. LEACH:  YES, YOUR HONOR.

12:50PM 10              THE COURT:  OKAY.  THANK YOU.

12:50PM 11    BY MR. LEACH:

12:50PM 12    Q.   OKAY.  WE CAN PUT THAT TO THE SIDE.

12:50PM 13         AND LET ME ASK YOU ABOUT, I WANT TO FOCUS ON THE TIME

12:50PM 14    PERIOD AT THE END OF SEPTEMBER OF 2015 WHEN YOU TRAVELLED TO

12:50PM 15    CALIFORNIA FOR THE INSPECTION.

12:50PM 16         DO YOU HAVE THAT TIME PERIOD IN MIND?

12:50PM 17    A.   I DO.

12:50PM 18    Q.   OKAY.  HOW DID THE INSPECTION START?  TELL US WHAT

12:50PM 19    HAPPENED.

12:50PM 20    A.   WHEN WE GO IN TO DO AN INSPECTION, WE GENERALLY MEET WITH

12:50PM 21    THE REPRESENTATIVES OF THE LABORATORY THAT ARE INVOLVED WITH

12:50PM 22    THE SURVEY.  WE CALL THAT THE ENTRANCE CONFERENCE.

12:50PM 23         TYPICALLY AFTER THAT -- TYPICALLY AFTER THAT WE ASK TO

12:50PM 24    TOUR THE LABORATORY.

12:50PM 25         AND ONCE WE TOUR THE LABORATORY, WE COME BACK AND WE START

12:50PM  1    LOOKING AT THE LABORATORY'S DOCUMENTS AND INTERVIEW STAFF AND

12:51PM  2    OBSERVE HOW TESTING IS OCCURRING, OR HOW EMPLOYEES ARE

12:51PM  3    PERFORMING TESTING.

12:51PM  4         AND WE THEN WILL, YOU KNOW, JUST ASSESS WHETHER THEY'VE

12:51PM  5    MET THE MINIMUM STANDARDS AND CONDITIONS THAT THEY'RE REQUIRED

12:51PM  6    TO MEET.

12:51PM  7    Q.   AND ON THIS OCCASION WITH THERANOS, WAS THERE AN ENTRANCE

12:51PM  8    INTERVIEW?

12:51PM  9    A.   THERE WAS.

12:51PM  10   Q.   OKAY.  WHO WAS PRESENT FOR THAT?

12:51PM  11   A.   MR. BALWANI WAS THERE, DR. YOUNG WAS THERE, MR. SAKSENA.

12:51PM  12   I CAN'T REMEMBER HOW TO SAY IT.  MS. -- THERE WAS SEVERAL OTHER

12:51PM  13   STAFF.  LANGLY GEE WAS THERE.  THE GENERAL SUPERVISOR, GURBIR;

12:51PM  14   THE TECHNICAL CONSULTANT, HODA -- I'M SORRY I DON'T REMEMBER

12:52PM  15   THEIR LAST NAMES -- AND SEVERAL OTHER STAFF.

12:52PM  16        AND THERE WERE TWO ATTORNEYS THERE, HEATHER KING, AND I

12:52PM  17   DON'T REMEMBER THE NAME OF THE OTHER ATTORNEY.

12:52PM  18   Q.   AND WHO WAS LEADING FROM THE THERANOS SIDE?

12:52PM  19   A.   MR. BALWANI.

12:52PM  20   Q.   AND WHY DO YOU SAY THAT?

12:52PM  21   A.   BECAUSE HE TOOK CHARGE OF THE CONFERENCE, HE PRESENTED THE

12:52PM  22   POWERPOINT, THE STAFF DEFERRED TO HIM AND ALLOWED HIM TO TAKE

12:52PM  23   THE LEAD.

12:52PM  24   Q.   WERE THERE OCCASIONS WHERE MR. BALWANI DIRECTED THERANOS

12:52PM  25   STAFF IN FRONT OF YOU TO PROVIDE DOCUMENTS?

BENNETT DIRECT BY MR. LEACH                                    4632

12:52PM   1        A.   YES.

12:52PM   2        Q.   OKAY.  WHAT DID HE SAY?

12:52PM   3        A.   HE ASKED THEM TO GO FIND DOCUMENTS THAT WE WERE

12:52PM   4    REQUESTING.

12:52PM   5        Q.   OKAY.  AND YOU MENTIONED A POWERPOINT.  WHAT DO YOU MEAN

12:52PM   6    BY THAT?

12:52PM   7        A.   AS PART OF THE ENTRANCE, MR. BALWANI GAVE US A POWERPOINT

12:52PM   8    THAT WAS AN OVERVIEW OF THERANOS AND THE STAFF, THE TECHNICAL

12:53PM   9    STAFF, LIKE THE DIRECTOR OF ASSAYS, THE TECHNICAL CONSULT AT

12:53PM  10    ANY TIME, THE QA/QC QUALITY CONTROL MANAGER.

12:53PM  11        Q.   LET ME PLEASE DIRECT YOUR ATTENTION TO TAB 5830.

12:53PM  12             DOES THIS APPEAR TO BE AN EMAIL FROM SUNNY BALWANI TO

12:53PM  13    OTHERS AT THERANOS DATED SEPTEMBER 22ND, 2015?

12:53PM  14        A.   IT DOES.

12:53PM  15        Q.   AND SEPTEMBER 22ND, 2015, IS THAT THE FIRST DAY OF YOUR

12:53PM  16    SURVEY?

12:53PM  17        A.   YES.

12:53PM  18        Q.   THERE'S AN ATTACHMENT TO THIS.  IF I COULD DRAW YOUR

12:53PM  19    ATTENTION TO PAGE 2.

12:53PM  20             DO YOU SEE THAT?

12:53PM  21        A.   YES.

12:53PM  22        Q.   AND DOES THIS APPEAR TO BE A POWERPOINT?

12:53PM  23        A.   YES.

12:54PM  24        Q.   DOES THIS APPEAR TO BE A COPY OF THE POWERPOINT

12:54PM  25    PRESENTATION THAT MR. BALWANI MADE TO YOU AT THE OUTSET OF THE

BENNETT DIRECT BY MR. LEACH                                    4633

12:54PM   1      SURVEY?

12:54PM   2      A.   IT DOES.

12:54PM   3             MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

12:54PM   4      EXHIBIT 5830.

12:54PM   5             MR. CAZARES:  OBJECTION.  HEARSAY AND FOUNDATION AS

12:54PM   6      TO THE EMAIL.

12:54PM   7             MR. LEACH:  901 IS SATISFIED BY THE BATES NUMBER.

12:54PM   8         IT'S NOT HEARSAY BECAUSE IT'S A STATEMENT BY A PARTY

12:54PM   9      OPPONENT, AND THE WITNESS HAS JUST TESTIFIED THAT SHE RECEIVED

12:54PM  10      AN ITERATION OF THIS DIRECTLY FROM THE DEFENDANT.

12:54PM  11             THE COURT:  THIS IS SUBJECT TO THE STIPULATION OF

12:54PM  12      THE PARTIES AS TO THE BATES NUMBERS?

12:54PM  13             MR. LEACH:  YES.

12:55PM  14             THE COURT:  ALL RIGHT.  THANK YOU.

12:55PM  15         THE OBJECTION IS OVERRULED.  AND THIS MAY BE ADMITTED AND

12:55PM  16      PUBLISHED.

12:55PM  17         (GOVERNMENT'S EXHIBIT 5830 WAS RECEIVED IN EVIDENCE.)

12:56PM  18             MR. LEACH:  THERE WE GO.  THANK YOU, MS. WACHS.

12:56PM  19         IF WE CAN ZOOM IN AT THE TOP BRIEFLY, MS. WACHS.

12:56PM  20      Q.   DO YOU SEE AT THE TOP IN THE FROM LINE MR. BALWANI'S NAME?

12:56PM  21      A.   I DO.

12:56PM  22      Q.   AND IN THE TO LINE, THERE'S SOMEONE NAMED HEATHER KING.

12:56PM  23         DO YOU SEE THAT?

12:56PM  24      A.   YES.

12:56PM  25      Q.   AND DO YOU KNOW WHO MS. KING WAS?

ER-3317