No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 14 OF 26 (PAGES ER-3618 – ER-3917)**

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

01:45PM 1    SIGNED AT THE END OF DECEMBER 2013, THE PROPOSAL WAS THAT THERE

01:45PM 2    WOULD BE 3,000 STORES ROLLED OUT?

01:45PM 3        "DO YOU RECALL THAT?"

01:45PM 4        AND YOUR ANSWER IS, "I DON'T RECALL THAT, BUT, YES."

01:45PM 5        DO YOU SEE THAT?

01:45PM 6    A.   YES.

01:45PM 7    Q.   AND THEN THE QUESTION IS, "OKAY.  SO THE PROJECTION OF

01:45PM 8    2,000 TO 2,500 STORES WAS A REDUCTION IN WHAT WAS DESCRIBED IN

01:45PM 9    THAT DECEMBER 2013 AGREEMENT; CORRECT?"

01:46PM 10       AND YOUR ANSWER IS AS FOLLOWS:  "IF THE NUMBER WAS

01:46PM 11   REDUCED, YES.

01:46PM 12       "AGAIN, AS I MENTIONED EARLIER, WHENEVER DISCUSSIONS OF

01:46PM 13   LAUNCH ARE HAD, WE LOOK AT ALL OF THE VARIABLES OF BOTH

01:46PM 14   PARTIES, IN THIS CASE THERANOS AS WELL AS WALGREENS, AND WE

01:46PM 15   CHANGE THOSE NUMBERS BASED ON WHAT WE'RE SEEING, THE RESULTS

01:46PM 16   THAT WE'RE EXPERIENCING, THE PATIENT EXPERIENCE THAT YOU TALKED

01:46PM 17   ABOUT THAT WE ARE SEEING.

01:46PM 18       "SO WHAT YOU ARE SEEING IS REALLY THOSE TYPES OF INPUTS

01:46PM 19   GOING INTO WHAT THE NUMBER OF LAUNCHES SHOULD BE.

01:46PM 20       "NATIONWIDE LAUNCH?  YES.  WE HAD EVERY INTENTION AS

01:46PM 21   WALGREENS TO LAUNCH NATIONWIDE.

01:46PM 22       "BUT AGAIN, HOW WE LAUNCH, WHAT WE DO, HOW WAS WE GO IS

01:46PM 23   DEPENDENT ON MANY, MANY VARIABLES THAT I SPOKE ABOUT EARLIER."

01:46PM 24       DO YOU SEE THAT?

01:46PM 25   A.   YES, SIR.

01:46PM 1    Q.   AND THEN GOING ON LINE 21 ON PAGE 3671, IT'S ACTUALLY

01:46PM 2    PAGE 134 OF THE EXHIBIT IN THOSE NUMBERS, LINE 21, THE QUESTION

01:46PM 3    YOU WERE ASKED IS, "OKAY.  BUT AS OF AUGUST 2014, THIS 2500 WAS

01:47PM 4    YOUR PROJECTION; CORRECT?"

01:47PM 5        DO YOU SEE THAT?

01:47PM 6    A.   YES, SIR.

01:47PM 7    Q.   AND YOUR ANSWER WAS, "CORRECT."

01:47PM 8        AM I READING THAT CORRECTLY?

01:47PM 9    A.   YOU ARE.

01:47PM 10   Q.   AND THAT WAS TESTIMONY THAT YOU GAVE UNDER OATH IN A PRIOR

01:47PM 11   PROCEEDING; RIGHT?

01:47PM 12   A.   YES.

01:47PM 13   Q.   AND MR. SCHENK DIDN'T SHOW YOU THAT ON HIS REDIRECT, DID

01:47PM 14   HE?

01:47PM 15   A.   RIGHT NOW, NO.

01:47PM 16   Q.   MR. JHAVERI, LET'S GO TO A DIFFERENT TOPIC.

01:47PM 17       MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT PERCENTAGE OF

01:47PM 18   VENIPUNCTURE NUMBERS.

01:47PM 19       DO YOU REMEMBER THAT?

01:47PM 20   A.   YES, SIR.

01:47PM 21   Q.   AND HE TALKED ABOUT SOME OF THE CUSTOMER FEEDBACK.

01:47PM 22       DO YOU REMEMBER?

01:47PM 23   A.   YES, SIR.

01:47PM 24   Q.   AND THAT HE ASKED, I THINK, THE QUESTION ABOUT WHETHER THE

01:47PM 25   CUSTOMER FEEDBACK THAT WAS ON A PARTICULAR PAGE HE SHOWED YOU

JHAVERI RECROSS BY MR. COOPERSMITH                          4940

01:47PM  1    WAS ALL ABOUT PRICE.

01:48PM  2        DO YOU REMEMBER THAT QUESTION?

01:48PM  3    A.   CORRECT, YES.

01:48PM  4    Q.   AND I THINK YOU SAID YES.

01:48PM  5    A.   YES.

01:48PM  6    Q.   BUT, ACTUALLY, WE TALKED EARLIER ABOUT SOME BAR GRAPHS

01:48PM  7    WHERE IT TRACKED SOME PATIENTS EVERY SINGLE TIME AND HOW MANY

01:48PM  8    PATIENTS RESPONDED WITH 1, 2, 3, 4, 5'S BASED ON THEIR RATINGS

01:48PM  9    OF THE SERVICE; RIGHT?

01:48PM 10    A.   WE DID.

01:48PM 11    Q.   AND ONE OF THOSE BAR GRAPHS HAD TO DO WITH SAMPLE

01:48PM 12    COLLECTIONS; RIGHT?

01:48PM 13    A.   YES.

01:48PM 14    Q.   AND YOU REMEMBER OVERWHELMINGLY PATIENT WERE PUTTING 5'S,

01:48PM 15    THE BEST RATING FOR SAMPLE COLLECTION; RIGHT?

01:48PM 16    A.   YES.

01:48PM 17    Q.   AND THEY WERE NOT OVERWHELMINGLY SAYING NO, WE WERE REALLY

01:48PM 18    UPSET BECAUSE WE DIDN'T GET FINGERSTICK; RIGHT?

01:48PM 19    A.   THAT'S THE ASSUMPTION BASED ON THE METRICS.

01:48PM 20    Q.   OKAY.  LET'S TALK ABOUT A DIFFERENT TOPIC, AND THAT IS,

01:49PM 21    MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT THE JOHNS HOPKINS

01:49PM 22    REPORT.

01:49PM 23    A.   YES, SIR.

01:49PM 24    Q.   AND HE ASKED YOU SOME QUESTIONS IN PARTICULAR ABOUT

01:49PM 25    WHETHER THE DISCLAIMER AT THE BOTTOM WAS AN ISSUE.

ER-3621

JHAVERI RECROSS BY MR. COOPERSMITH                    4941

01:49PM   1        DO YOU REMEMBER THOSE QUESTIONS?

01:49PM   2   A.   YES.

01:49PM   3   Q.   AND THE DISCLAIMER SAID SOMETHING ABOUT HOW THIS WAS

01:49PM   4   INFORMATION TRANSMITTED FOR THE USE OF WALGREENS ONLY.

01:49PM   5        DO YOU REMEMBER THAT?

01:49PM   6   A.   YES, SIR.

01:49PM   7   Q.   AND IT WENT ON ABOUT WHETHER JOHNS HOPKINS WAS ENDORSING A

01:49PM   8   PRODUCT OR SERVICE?

01:49PM   9   A.   YES, I REMEMBER THAT.

01:49PM  10   Q.   OKAY.  SO LET'S JUST START WITH THE EXHIBIT THAT

01:49PM  11   MR. SCHENK SHOWED YOU, WHICH IS 20532.

01:49PM  12        I BELIEVE THAT'S IT.  RIGHT.

01:50PM  13        SO THIS IS EXHIBIT 20532 THAT WE'RE LOOKING AT, AND IT'S

01:50PM  14   THE THIRD AND FOURTH PAGES.

01:50PM  15        SO WE'RE AT THE THIRD PAGE NOW UP ON THE SCREEN.

01:50PM  16        AND PUTTING ASIDE THE DISCLAIMER AT THE VERY BOTTOM, IN

01:50PM  17   FACT, IF WE LOOK AT THE VERY BOTTOM OF THE PAGE, DO YOU SEE

01:50PM  18   THAT THERE'S THAT -- I'M SORRY.  IT'S THE DISCLAIMER ON PAGE 4

01:50PM  19   THAT IS BEING HIGHLIGHTED NOW.

01:50PM  20        THAT'S A DISCLAIMER THAT MR. SCHENK ASKED YOU ABOUT?

01:50PM  21   A.   YES, SIR.

01:50PM  22   Q.   OKAY.  AND NOTWITHSTANDING THE DISCLAIMER ABOUT NOT

01:50PM  23   ENDORSING, THE TEXT OF THE REPORT HAS, FOR EXAMPLE, NO MAJOR

01:50PM  24   WEAKNESSES WERE IDENTIFIED; RIGHT?

01:50PM  25   A.   YES.

01:50PM   1    Q.   RIGHT.  SO WHATEVER THE DISCLAIMER SAYS, JOHNS HOPKINS

01:50PM   2    PHYSICIANS ARE GIVING THEIR VIEWS ABOUT THE THERANOS

01:50PM   3    TECHNOLOGY; RIGHT?

01:50PM   4              MR. SCHENK:  OBJECTION.  CALLS FOR SPECULATION.

01:51PM   5              THE COURT:  WITHOUT A FOUNDATION.

01:51PM   6    BY MR. COOPERSMITH:

01:51PM   7    Q.   OKAY.  JUST STICKING TO THE REPORT ITSELF, DO YOU SEE THAT

01:51PM   8    ON THE FIRST PAGE THERE ARE JOHNS HOPKINS PHYSICIANS ON THE

01:51PM   9    FIRST PAGE?

01:51PM  10    A.   YES.

01:51PM  11    Q.   AND IT HAS THREE OF THEM LISTED THERE?

01:51PM  12    A.   YES.

01:51PM  13    Q.   OKAY.  AND THEN IF YOU GO TO PAGE 4, YOU SEE IT SAYS KEY

01:51PM  14    FINDINGS?

01:51PM  15    A.   I DO.

01:51PM  16    Q.   AND IT SAYS, "BASED ON THIS EVALUATION, THE CONSENSUS OF

01:51PM  17    THE HOPKINS TEAM WAS AS FOLLOWS"; RIGHT?

01:51PM  18    A.   YES.

01:51PM  19    Q.   AND IT GIVES BULLET POINTS, BUT WE DISCUSSED THEM A COUPLE

01:51PM  20    WEEKS AGO; RIGHT?

01:51PM  21    A.   YES.

01:51PM  22    Q.   AND GOING TO THE DISCLAIMER, IT WAS -- THERE WAS A

01:51PM  23    RELATIONSHIP BETWEEN WALGREENS AND JOHNS HOPKINS; RIGHT?

01:51PM  24    A.   WE DID HAVE A BUSINESS RELATIONSHIP, YES.

01:51PM  25    Q.   RIGHT.  AND THAT'S WHY WALGREENS USED JOHNS HOPKINS TO

01:51PM   1    HELP EVALUATE THIS TECHNOLOGY; RIGHT?

01:51PM   2    A.   CORRECT.

01:51PM   3    Q.   OKAY.  AND JUST ON THE POINT OF, YOU KNOW, THE DISCLAIMER

01:52PM   4    AND TRANSMITTING INFORMATION OR WHETHER IT WAS FOR THE SOLE

01:52PM   5    BENEFIT OF WALGREENS, I'D LIKE TO HAVE YOU TAKE A LOOK AT

01:52PM   6    EXHIBIT 20533.

01:52PM   7         I'M SORRY, 20553.  20553.

01:52PM   8         AND DO YOU SEE THIS IS AN EMAIL FROM --

01:52PM   9         AND IT'S NOT IN EVIDENCE, YOUR HONOR.

01:52PM  10         MR. JHAVERI, WE'LL JUST DISCUSS IT FOR A MINUTE, BUT DO

01:52PM  11    YOU SEE IT'S AN EMAIL FROM MR. JAY ROSAN TO ELIZABETH HOLMES

01:52PM  12    AND OTHERS?

01:52PM  13    A.   SIR, I JUST NEED TO FIND IT.

01:52PM  14    Q.   OH, OF COURSE.  I'M SORRY.

01:53PM  15         (PAUSE IN PROCEEDINGS.)

01:53PM  16             THE WITNESS:  I HAVE IT.

01:53PM  17    BY MR. COOPERSMITH:

01:53PM  18    Q.   OKAY.  THANK YOU.

01:53PM  19         WE'RE EXHIBIT 20553.

01:53PM  20         DO YOU SEE IN THE MIDDLE THERE'S AN EMAIL FROM JAY ROSAN

01:53PM  21    TO ELIZABETH HOLMES AND SOME OTHER PEOPLE WERE COPIED?

01:53PM  22    A.   YES, SIR.

01:53PM  23    Q.   AND THEN ABOVE THAT YOU SEE THAT THERE'S A FORWARDING OF

01:53PM  24    THE SAME EMAIL FROM ELIZABETH HOLMES TO SUNNY BALWANI AND

01:53PM  25    DANIEL YOUNG?

01:53PM  1    A.    YES, I DO.

01:53PM  2    Q.    AND WE TALKED ABOUT JAY ROSAN; RIGHT?

01:53PM  3    A.    YES.

01:53PM  4    Q.    HE WAS THE MEDICAL DOCTOR --

01:53PM  5    A.    YES.

01:53PM  6    Q.    -- WHO WORKED FOR WALGREENS; RIGHT?

01:53PM  7    A.    CORRECT.

01:53PM  8    Q.    AND HE WAS THE VICE PRESIDENT OF HEALTH INNOVATION?

01:53PM  9    A.    THAT'S CORRECT.

01:53PM  10   Q.    OKAY.  AND HE WAS SENDING THIS EMAIL TO MS. HOLMES; RIGHT?

01:54PM  11   A.    YES, ACCORDING TO THIS.

01:54PM  12   Q.    RIGHT.  WITH AN ATTACHMENT?

01:54PM  13   A.    YES.

01:54PM  14          MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20553.  I

01:54PM  15   THINK THE GOVERNMENT OPENED THE DOOR TO THIS BY TALKING ABOUT

01:54PM  16   THE DISCLAIMER INFORMATION THAT THEY HIGHLIGHTED WITH

01:54PM  17   MR. JHAVERI.

01:54PM  18          MR. SCHENK:  NO OBJECTION.

01:54PM  19          THE COURT:  IT'S ADMITTED.

01:54PM  20      (DEFENDANT'S EXHIBIT 20553 WAS RECEIVED IN EVIDENCE.)

01:54PM  21          MR. COOPERSMITH:  YES.  MAY WE PUBLISH IT?

01:54PM  22          THE COURT:  YES.

01:54PM  23   BY MR. COOPERSMITH:

01:54PM  24   Q.    SO YOU SEE, MR. JHAVERI, THERE WAS THAT EMAIL THAT WE JUST

01:54PM  25   TALKED ABOUT FROM JAY ROSAN?

01:54PM  1    A.   YES.

01:54PM  2    Q.   AND THEN THERE'S ABOVE THAT YOU SEE THE FORWARDING OF THE

01:54PM  3    EMAIL TO --

01:54PM  4    A.   I DO.

01:54PM  5    Q.   AND THAT'S ON SEPTEMBER 10TH, 2010; RIGHT?

01:54PM  6    A.   CORRECT.

01:54PM  7    Q.   AND THEN IF YOU GO TO THE ATTACHMENT, THAT'S PAGE 2 OF THE

01:54PM  8    EXHIBIT, YOU SEE THAT'S THE SAME REPORT, SUMMARY OF THE

01:55PM  9    HOLMES/WALGREENS/THERANOS MEETING THAT WE WERE JUST LOOKING AT?

01:55PM  10   A.   YES.

01:55PM  11   Q.   AND THEN IF YOU GO TO THE NEXT PAGE, IT'S THE SAME SECOND

01:55PM  12   PAGE AS WELL WITH THE KEY FINDINGS AND EVEN THE DISCLAIMER;

01:55PM  13   RIGHT?

01:55PM  14   A.   CORRECT.

01:55PM  15   Q.   SO BASED ON WHAT WE'RE SEEING IN FRONT OF US,

01:55PM  16   NOTWITHSTANDING THE DISCLAIMER, SOMEONE AT WALGREENS, A GUY

01:55PM  17   NAMED JAY ROSAN, ACTUALLY TRANSMITTED THE INFORMATION TO

01:55PM  18   THERANOS; RIGHT?

01:55PM  19   A.   RIGHT, ACCORDING TO THIS.

01:55PM  20   Q.   ALL RIGHT.  WHILE WE'RE ON THE SUBJECT OF JAY ROSAN, I'D

01:55PM  21   LIKE TO HAVE YOU TAKE A LOOK AT EXHIBIT 20442.

01:56PM  22   A.   I HAVE IT.

01:56PM  23   Q.   OKAY.  AND DO YOU SEE THAT EXHIBIT 20442 IS AN EMAIL FROM

01:56PM  24   PATTY HAWORTH AT THE TOP TO DANIEL YOUNG?

01:56PM  25   A.   I DO.

01:56PM  1    Q.   AND THERE'S A COPY TO DR. ROSAN FROM WALGREENS AND

01:56PM  2    SUNNY BALWANI.

01:56PM  3         DO YOU SEE THAT?

01:56PM  4    A.   YES.

01:56PM  5    Q.   AND THIS RELATES TO -- THE SUBJECT LINE IS ASTHMA TEST,

01:56PM  6    PATTY HAWORTH?

01:56PM  7    A.   YES.

01:56PM  8    Q.   AND WE TALKED EARLIER ABOUT PATTY HAWORTH; RIGHT?

01:56PM  9    A.   YES, WE DID.

01:56PM  10   Q.   SHE WAS THE EMPLOYEE AT WALGREENS WHO WAS RESPONSIBLE FOR

01:56PM  11   KEEPING THE PARTNERSHIP MEETING MINUTES?

01:56PM  12   A.   HER TITLE WAS THE PROJECT MANAGER.

01:56PM  13   Q.   AND YOU SEE THE EMAIL IS DATED IN APRIL OF 2011?

01:56PM  14   A.   YES.

01:56PM  15   Q.   OKAY.

01:57PM  16        YOUR HONOR, WE OFFER EXHIBIT 20442?

01:57PM  17             MR. SCHENK:  OBJECTION.  BEYOND THE SCOPE.

01:57PM  18             MR. COOPERSMITH:  WE THINK THAT, YOUR HONOR, WITH

01:57PM  19   THAT OBJECTION, IT WAS MR. SCHENK HAD MADE A POINT ABOUT

01:57PM  20   DR. ROSAN, AND I THINK THIS IS RELEVANT TO THE ISSUES ABOUT

01:57PM  21   WHAT WALGREENS WAS DOING AND WHAT THEY HAD.

01:57PM  22        IN FACT, MR. SCHENK ASKED A QUESTION ABOUT THE ACCURACY OF

01:57PM  23   THE DEVICES, AND THE TOPICS ADDRESSED IN THE EMAIL GO DIRECTLY

01:57PM  24   TO WALGREENS'S ABILITY TO OBSERVE THAT BEFORE THEY STARTED

01:57PM  25   LAUNCHING WITH THERANOS.

01:57PM 1          THE COURT:  THIS IS IN 2011?

01:58PM 2          MR. COOPERSMITH:  YES, YOUR HONOR.

01:58PM 3          THE COURT:  AND THIS IS ABOUT MS. HAWORTH.

01:58PM 4      WAS SHE TALKED ABOUT IN PREVIOUS TESTING?

01:58PM 5          MR. COOPERSMITH:  OH, YES.  SHE WAS THE ONE WHO KEPT

01:58PM 6  THE PARTNERSHIP MEETING MINUTES.

01:58PM 7          THE COURT:  I KNOW SHE WAS.

01:58PM 8      BUT WAS THERE DISCUSSION ABOUT HER TESTING IN ANY WAY?  I

01:58PM 9  DON'T RECALL THAT.

01:58PM 10         MR. COOPERSMITH:  YOU MEAN DURING REDIRECT,

01:58PM 11 YOUR HONOR?

01:58PM 12         THE COURT:  RIGHT.

01:58PM 13         MR. COOPERSMITH:  I DON'T REMEMBER A REFERENCE TO

01:58PM 14 MS. HAWORTH IN PARTICULAR.

01:58PM 15     BUT WHAT MR. SCHENK ASKED WERE QUESTIONS ABOUT THE

01:58PM 16 ACCURACY AND RELIABILITY OF THE TESTING, AND THIS GOES DIRECTLY

01:58PM 17 TO WALGREENS'S OPPORTUNITY TO OBSERVE THAT FIRST HAND.

01:58PM 18     (PAUSE IN PROCEEDINGS.)

01:58PM 19         THE COURT:  I'LL ALLOW IT.

01:58PM 20         MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

01:58PM 21     (DEFENDANT'S EXHIBIT 20442 WAS RECEIVED IN EVIDENCE.)

01:59PM 22 BY MR. COOPERSMITH:

01:59PM 23 Q.  MR. JHAVERI, TAKE A LOOK AT EXHIBIT 20442.

01:59PM 24     AND YOU SEE, IF WE GO TO THE EARLIEST EMAIL IN TIME,

01:59PM 25 THERE'S AN EMAIL FROM PATTY HAWORTH TO JAY ROSAN WITH A COPY TO

01:59PM   1    BARBARA FLOHR.

01:59PM   2         DO YOU SEE THAT?

01:59PM   3    A.   YES.

01:59PM   4    Q.   AND SHE SAYS, "DR. JAY,

01:59PM   5         "I JUST DID A TEST ON MYSELF TODAY TO MAKE SURE THE

01:59PM   6    MACHINE IS STILL WORKING.  THE I.D.," AND IT HAS AN I.D.

01:59PM   7    NUMBER.

01:59PM   8         DO YOU SEE THAT?

01:59PM   9    A.   YES.

01:59PM  10    Q.   AND IT SAYS, "IT WAS MY ASTHMA TEST.  MY CELL NUMBER IS

01:59PM  11    LISTED BELOW.

01:59PM  12         "ALSO PLEASE LET ME KNOW IF YOU NEED ANY INFORMATION ABOUT

01:59PM  13    THIS."

01:59PM  14         AND THEN THERE'S A RESPONSE FROM JAY ROSAN RIGHT ABOVE

01:59PM  15    THAT, AND HE'S SENDING IT TO DANIEL YOUNG WITH A COPY TO

01:59PM  16    MS. HAWORTH.

01:59PM  17         AND HE SAYS, "PATTY HAWORTH, DAN, I DID NOT GET ANY

01:59PM  18    RESULTS ON THIS.  DID YOU GET THIS AND IF NOT ARE YOU GETTING A

02:00PM  19    HEARTBEAT?"

02:00PM  20         SO DR. ROSAN IS ASKING DR. YOUNG ABOUT THAT; RIGHT?

02:00PM  21    A.   YES.

02:00PM  22    Q.   ABOVE THAT, A FEW DAYS LATER MS. HAWORTH WRITES, "HI

02:00PM  23    DANIEL.

02:00PM  24         "ANY NEWS?"

02:00PM  25         DO YOU SEE THAT?

02:00PM 1    A.   YEP.

02:00PM 2    Q.   AND THEN HE RESPONDS, "THESE DATA WERE SENT TO DR. JAY ON

02:00PM 3    TUESDAY.  DR. JAY HAS CONFIRMED THAT HE RECEIVED THE DATA.

02:00PM 4        "PLEASE LET ME KNOW IF YOU HAVE ANY FURTHER QUESTIONS."

02:00PM 5        DO YOU SEE THAT?

02:00PM 6    A.   I DO.

02:00PM 7    Q.   AND THEN MS. HAWORTH WRITES, "NO FURTHER QUESTIONS.  JUST

02:00PM 8    WANTED TO MAKE SURE THE DEVICE WAS WORKING AS EXPECTED.

02:00PM 9        "THANK YOU FOR YOUR QUICK RESPONSE."

02:00PM 10       SO DR. ROSAN AND MS. HAWORTH, THEY ACTUALLY HAD A THERANOS

02:00PM 11   DEVICE THAT THEY WERE USING FOR MS. HAWORTH TO RUN TESTS ON

02:00PM 12   HERSELF AT WALGREENS; RIGHT?

02:01PM 13   A.   ACCORDING TO THIS.

02:01PM 14       AGAIN, I HAVE NO KNOWLEDGE OF THIS.  I WAS NOT PART OF

02:01PM 15   THIS.

02:01PM 16   Q.   OKAY.  BUT THAT'S WHAT THE EMAIL SAYS?

02:01PM 17   A.   THAT'S WHAT THE EMAIL SAYS.

02:01PM 18   Q.   OKAY.

02:01PM 19       (PAUSE IN PROCEEDINGS.)

02:01PM 20           MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

02:01PM 21           THE COURT:  ANYTHING FURTHER?

02:02PM 22           MR. SCHENK:  NO, YOUR HONOR.

02:02PM 23           THE COURT:  MAY THIS WITNESS BE EXCUSED?

02:02PM 24           MR. COOPERSMITH:  YES, YOUR HONOR.

02:02PM 25           MR. SCHENK:  YES, YOUR HONOR.

02:02PM   1            THE COURT:  YOU MAY BE EXCUSED.

02:02PM   2        DOES THE GOVERNMENT HAVE ANOTHER WITNESS?

02:02PM   3        IS THIS MS. BENNETT?

02:02PM   4        ALL RIGHT.  FOLKS, WHY DON'T YOU STAND UP AND STRETCH FOR

02:02PM   5   A MOMENT.

02:02PM   6        (STRETCHING.)

02:03PM   7            THE COURT:  THANK YOU.  WE ARE ON THE RECORD AGAIN.

02:03PM   8        MS. BENNETT, DR. BENNETT IS ON THE STAND.

02:03PM   9        YOU WOULD LIKE TO CONTINUE WITH YOUR EXAMINATION?

02:03PM  10            MR. CAZARES:  YES, YOUR HONOR.

02:03PM  11            THE COURT:  PLEASE PROCEED.

02:03PM  12            MR. CAZARES:  THANK YOU, YOUR HONOR.

02:03PM  13                    **CROSS-EXAMINATION (RESUMED)**

02:03PM  14   BY MR. CAZARES:

02:03PM  15   Q.   GOOD AFTERNOON, MS. BENNETT.

02:03PM  16   A.   GOOD AFTERNOON.

02:03PM  17   Q.   SO I WANT TO KIND OF RETURN BACK TO KIND OF THE BIGGER

02:04PM  18   PICTURE ABOUT SOME OF YOUR TESTIMONY FROM YESTERDAY AND GET

02:04PM  19   BACK TO -- SO BEGINNING IN SEPTEMBER OF 2015, YOURSELF AND

02:04PM  20   MR. YAMAMOTO VISITED THERANOS'S LABORATORY TO BEGIN A

02:04PM  21   RECERTIFICATION SURVEY; CORRECT?

02:04PM  22   A.   YES, RECERTIFICATION, AND A COMPLAINT.

02:04PM  23   Q.   YES, THERE WAS A COMPLAINT YOU MENTIONED.

02:04PM  24        AND THAT SURVEY CONTINUED WITH A FOLLOW-UP VISIT IN

02:04PM  25   NOVEMBER OF 2015?

BENNETT CROSS BY MR. CAZARES (RES.)                    4951

02:04PM  1    A.   IT WAS A CONTINUATION OF THE SAME SURVEY.

02:04PM  2    Q.   AND REVIEW AND EXAMINATION OF DOCUMENTATION CONTINUED INTO

02:04PM  3    JANUARY OF 2016; CORRECT?

02:04PM  4    A.   DECEMBER OR JANUARY, YES.

02:04PM  5    Q.   OKAY.  AND THEN THE REPORT WAS ULTIMATELY ISSUED IN

02:04PM  6    JANUARY OF 2016; CORRECT?

02:04PM  7    A.   I BELIEVE IT WAS JANUARY.

02:04PM  8    Q.   OKAY.  AND WHEN YOU PERFORMED THE SURVEY, WHAT YOU WERE

02:04PM  9    LOOKING FOR IN THIS SURVEY OF THERANOS'S LABORATORY WAS

02:05PM  10   EVIDENCE OF COMPLIANCE WITH THE CLIA REGULATIONS; CORRECT?

02:05PM  11   A.   YES.

02:05PM  12   Q.   SO YOU WERE LOOKING TO ENSURE THAT THE LABORATORY WAS

02:05PM  13   FOLLOWING THE RULES; IS THAT FAIR?

02:05PM  14   A.   THAT THEY WERE MEETING THE REQUIREMENTS, YES.

02:05PM  15   Q.   NOW, PRIOR TO BEGINNING THE SURVEY, YOU DESCRIBED

02:05PM  16   YESTERDAY SOME PRELIMINARY WORK; IS THAT RIGHT?

02:05PM  17   A.   YES.

02:05PM  18   Q.   AND SOME OF THAT WORK INCLUDED LOOKING BACK AT A PRIOR

02:05PM  19   SURVEY THAT TOOK PLACE A COUPLE OF YEARS PRIOR IN DECEMBER OF

02:05PM  20   2013; CORRECT?

02:05PM  21   A.   YES.

02:05PM  22   Q.   YOU ALSO OBTAINED SOME INFORMATION REGARDING THERANOS,

02:05PM  23   INCLUDING THEIR PROFICIENCY TESTING RECORDS OR DATA; CORRECT?

02:05PM  24   A.   I PULLED THE REPORTS ABOUT THE PROFICIENCY TESTING.

02:05PM  25   Q.   OKAY.  AND YOU REQUESTED INFORMATION FROM THERANOS, OR AT

02:05PM   1    LEAST YOURSELF OR MR. YAMAMOTO DID; CORRECT?

02:05PM   2    A.   PRIOR TO THE SURVEY?  I'M NOT SURE.

02:05PM   3    Q.   DO YOU REMEMBER YESTERDAY WITH MR. LEACH YOU WERE SHOWN

02:06PM   4    SOME LISTS OF TESTS DURING YOUR DIRECT EXAMINATION?

02:06PM   5         DO YOU REMEMBER THAT?

02:06PM   6    A.   YES.

02:06PM   7    Q.   AND ONE OF THOSE WAS DATED AROUND JUNE OF 2015.

02:06PM   8         DO YOU REMEMBER THAT?

02:06PM   9    A.   OH, OKAY.  SURE, YES.

02:06PM  10    Q.   AND THAT IDENTIFIED LDT'S VERSUS FDA APPROVED.

02:06PM  11         DO YOU REMEMBER THAT?

02:06PM  12    A.   I REMEMBER THE LIST.  I THOUGHT WE GOT THAT ON SURVEY.

02:06PM  13    Q.   OKAY.  BUT ULTIMATELY YOU DID RECEIVE THAT BEFORE THE

02:06PM  14    SURVEY COMPLETED.

02:06PM  15         FAIR ENOUGH?

02:06PM  16    A.   YES.

02:06PM  17    Q.   OKAY.  NOW, IN THE COURSE OF THE SURVEY, YOU OBVIOUSLY

02:06PM  18    REQUESTED INFORMATION FROM THE LAB WHILE YOU WERE DOING THE

02:06PM  19    WORK; CORRECT?

02:06PM  20    A.   YES.

02:06PM  21    Q.   AND YOU DESCRIBED SOME OF THAT BACK AND FORTH WITH

02:06PM  22    INDIVIDUALS WITHIN THE LAB, INCLUDING LANGLY GEE.

02:06PM  23         DO YOU REMEMBER THAT?

02:06PM  24    A.   I DO.

02:06PM  25    Q.   OKAY.  AND IN ADDITION, YOU WERE PROVIDED WITH A LETTER

02:06PM   1    FROM THE LABORATORY RELATING TO I THINK THE TESTING TIME

02:06PM   2    PERIODS THAT THE LAB WAS USING ITS PROPRIETARY DEVICE, THE

02:06PM   3    EDISON.

02:06PM   4        DO YOU REMEMBER THAT?

02:06PM   5    A.   I DO.

02:06PM   6    Q.   AND I THINK THIS IS ALREADY IN EVIDENCE, AND IF I COULD

02:07PM   7    PUT IT UP ON THE SCREEN.  IT'S EXHIBIT 4533.

02:07PM   8        AND YOU'LL SEE UP ON THE SCREEN, MS. BENNETT, 4533 IS

02:07PM   9    DATED SEPTEMBER 23RD, 2015.

02:07PM  10        DO YOU SEE THAT?

02:07PM  11    A.   I DO.

02:07PM  12    Q.   AND THAT WAS THE TIME PERIOD WHEN YOU WERE ACTUALLY ON

02:07PM  13    SITE; CORRECT?

02:07PM  14    A.   YES.

02:07PM  15    Q.   AND YOU INDICATED THAT, BECAUSE OF THE COMPLAINT, YOU

02:07PM  16    WANTED TO FIGURE OUT, OR AT LEAST GET INFORMATION RELATING TO

02:07PM  17    THE TIME PERIODS OF USE OF THE EDISON DEVICES AT THERANOS;

02:07PM  18    CORRECT?

02:07PM  19    A.   YES.

02:07PM  20    Q.   OKAY.  AND THIS WAS THE LAB'S RESPONSE TO YOU; CORRECT?

02:07PM  21    A.   THIS WAS MR. BALWANI'S RESPONSE TO ME.

02:07PM  22    Q.   OKAY.  SO YOU GOT IT FROM MR. BALWANI?

02:07PM  23    A.   YES.

02:07PM  24    Q.   OKAY.  AND IN THAT LETTER MR. BALWANI DISCLOSED TO YOU THE

02:07PM  25    TIME PERIODS WHEN THE EDISON WAS USED, THE START DATES AND THE

BENNETT CROSS BY MR. CAZARES (RES.)                    4954

02:07PM   1    END DATES; CORRECT?

02:07PM   2    A.   YES.

02:07PM   3    Q.   OKAY.  NOW, IF WE FOCUS UP ON THE FIRST PARAGRAPH OF THE

02:07PM   4    LETTER THAT YOU INDICATED CAME FROM MR. BALWANI, YOU'LL NOTICE

02:08PM   5    THAT MR. BALWANI WROTE AROUND THE MIDDLE OF THE PARAGRAPH

02:08PM   6    STARTING, "THERANOS RECENTLY RECEIVED FDA CLEARANCE FOR ITS

02:08PM   7    THERANOS SYSTEM -- INCLUDING THE DEVICE, THE THERANOS SAMPLE

02:08PM   8    COLLECTION DEVICE (INCLUDING THE NANOTAINERS) AND OTHER

02:08PM   9    COMPONENTS OF THE SYSTEM."

02:08PM  10         DO YOU SEE THAT?

02:08PM  11    A.   I DO.

02:08PM  12    Q.   AND THEN MR. BALWANI REPORTED TO YOU THAT "THE LAB PLANS

02:08PM  13    TO BRING THESE UNITS LIVE AGAIN IN THE LAB AS 510K-CLEARED

02:08PM  14    ANALYZERS RATHER THAN LDT'S ONCE ADDITIONAL CLEARANCES ARE

02:08PM  15    OBTAINED."

02:08PM  16         DO YOU SEE THAT?

02:08PM  17    A.   I DO.

02:08PM  18    Q.   OKAY.  SO THIS CAME FROM MR. BALWANI; CORRECT?

02:08PM  19    A.   IT DID.

02:08PM  20    Q.   OKAY.  AND THEN FURTHER DOWN, THE NEXT PARAGRAPH,

02:08PM  21    MR. BALWANI EXPLAINED TO YOU THAT "THERANOS CHANGES THE

02:08PM  22    PLATFORMS ON WHICH IT RUNS TESTS FROM TIME TO TIME."

02:08PM  23         DO YOU SEE THAT?

02:08PM  24    A.   I DO.

02:08PM  25    Q.   AND IN YOUR SURVEY, YOU SAW EVIDENCE OF THAT, DIDN'T YOU?

02:08PM  1    YOU SAW FOR SOME ASSAYS AND TESTS, THERANOS WAS USING MULTIPLE

02:09PM  2    DEVICES; CORRECT?

02:09PM  3    A.   THAT IS TRUE, YES.

02:09PM  4    Q.   AND SOMETIMES THE TIME PERIODS CHANGED PERIODICALLY;

02:09PM  5    CORRECT?

02:09PM  6    A.   THE --

02:09PM  7    Q.   WHAT I MEAN -- I'LL CLARIFY.

02:09PM  8         THE EVIDENCE THAT YOU SAW DIDN'T SHOW THERANOS USING TWO

02:09PM  9    DEVICES CONCURRENTLY FOR THE ENTIRETY OF THE TIME IT WAS

02:09PM  10   OPERATING?

02:09PM  11        FAIR ENOUGH?

02:09PM  12   A.   THERANOS WAS USING TWO DIFFERENT METHODS FOR THE SAME TYPE

02:09PM  13   OF TESTING.

02:09PM  14   Q.   AT VARIOUS TIMES?

02:09PM  15   A.   AT VARIOUS TIMES AND AT THE SAME TIME.

02:09PM  16   Q.   FAIR ENOUGH.  THANK YOU.

02:09PM  17        AND MR. BALWANI CONTINUES, "THE DECISION TO MOVE TESTING

02:09PM  18   OFF OF TSPU'S AND ON TO OTHER PLATFORMS IN THIS CASE WAS A

02:09PM  19   BUSINESS DECISION TO TRANSITION TO THE MANUFACTURING QUALITY

02:09PM  20   SYSTEMS TO QSR COMPLIANCE UNDER FDA GUIDELINES."

02:10PM  21        DO YOU SEE THAT?

02:10PM  22   A.   I DO.

02:10PM  23   Q.   SO CLIA HAS ITS OWN REGULATORY REQUIREMENTS FOR QUALITY

02:10PM  24   CONTROL AND QUALITY ASSURANCE.

02:10PM  25        YOU TESTIFIED ABOUT THAT QUITE A BIT YESTERDAY; CORRECT?

BENNETT CROSS BY MR. CAZARES (RES.)                    4956

02:10PM   1      A.   YES.

02:10PM   2      Q.   AND CLIA'S REQUIREMENTS FOR QUALITY ASSURANCE AND QUALITY

02:10PM   3      CONTROL ARE DIFFERENT THAN FDA'S QUALITY KIND OF MANUFACTURING

02:10PM   4      REQUIREMENTS; CORRECT?

02:10PM   5      A.   FDA HAS SEPARATE QUALITY SYSTEMS REQUIREMENTS FROM CLIA.

02:10PM   6      THEY'RE COMPLETELY DIFFERENT SETS OF REGULATIONS.

02:10PM   7      Q.   THANK YOU.

02:10PM   8           AND THEN MR. BALWANI CONTINUED IN THE LETTER, "AND DOES

02:10PM   9      NOT REFLECT ON THE RELIABILITY OR ACCURACY OF ANY PLATFORM."

02:10PM  10           DO YOU SEE THAT?

02:10PM  11      A.   I DO.

02:10PM  12      Q.   AND THAT'S WHAT HE REPRESENTED TO YOU.

02:10PM  13           AND THEN FURTHER DOWN IN THE LETTER THERE'S THE CHART WITH

02:10PM  14      START AND END DATES FOR THE VARIOUS TESTS RUN ON THE EDISON.

02:10PM  15           DO YOU SEE THAT?

02:10PM  16      A.   I DO.

02:10PM  17      Q.   AND MOST OF THESE STOPPED USE WELL BEFORE YOU ARRIVED;

02:11PM  18      CORRECT?

02:11PM  19      A.   YES.

02:11PM  20      Q.   AND EVEN WELL BEFORE THE SURVEY WAS SCHEDULED IN THE

02:11PM  21      SUMMER OF 2015; CORRECT?

02:11PM  22      A.   YES.

02:11PM  23      Q.   YOU CAN TAKE THAT DOWN.

02:11PM  24           NOW, IN THE COURSE OF THE SURVEY IN SEPTEMBER, I'LL JUST

02:11PM  25      FOCUS ON THAT TIME PERIOD, YOU DESCRIBED THE INITIAL MEETING,

BENNETT CROSS BY MR. CAZARES (RES.)                    4957

02:11PM  1    THE CONFERENCE; IS THAT CORRECT?

02:11PM  2    A.   YES.

02:11PM  3    Q.   AND DURING THAT CONFERENCE MR. BALWANI WAS PRESENT,

02:11PM  4    DR. YOUNG, AND OTHER STAFF MANAGERS AND STAFF, AS YOU'VE TOLD

02:11PM  5    US YESTERDAY; CORRECT?

02:11PM  6    A.   YES.

02:11PM  7    Q.   AND THEN THERE WAS THE TOURS?

02:11PM  8    A.   YES.

02:11PM  9    Q.   AND ON THE TOURS, AM I RIGHT THAT MR. BALWANI ACCOMPANIED

02:11PM  10   MR. YAMAMOTO?

02:11PM  11   A.   I BELIEVE, IF I REMEMBER CORRECTLY, WE STARTED OUT

02:12PM  12   TOGETHER, AND THEN MR. BALWANI WAS WITH MR. YAMAMOTO.

02:12PM  13   Q.   OKAY.  SO IS IT FAIR TO SAY THAT IN THE SEPTEMBER TIME

02:12PM  14   PERIOD OF THE SURVEY, MR. YAMAMOTO SPENT MORE TIME WITH

02:12PM  15   MR. BALWANI THAN YOURSELF?

02:12PM  16   A.   THAT'S FAIR TO SAY.

02:12PM  17   Q.   NOW, DURING THE TIME PERIOD OF THE LABORATORY SURVEY, YOU

02:12PM  18   HAD SOME OPPORTUNITY TO INTERVIEW SOME OR -- I WON'T CALL THEM

02:12PM  19   FORMAL, BUT SOME FORMAL INTERVIEWS OR SOME DISCUSSIONS OR

02:12PM  20   QUESTIONS TO LAB PERSONNEL; CORRECT?

02:12PM  21   A.   YES.

02:12PM  22   Q.   AND YOU DESCRIBED THE PRESENCE OF SOME LAWYERS FOR SOME OF

02:12PM  23   THOSE AND THERE WAS SOME CONCERN, I GUESS, ON YOUR PART ABOUT

02:12PM  24   THAT?

02:12PM  25   A.   YES, I WAS CONCERNED.

ER-3638

BENNETT CROSS BY MR. CAZARES (RES.)                4958

02:12PM    1    Q.   OKAY.  IN THE COURSE OF YOUR SURVEY, THOUGH, YOU NEVER

02:12PM    2    INTERVIEWED MR. BALWANI; CORRECT?

02:12PM    3    A.   I DID NOT, NOT A FORMAL INTERVIEW.

02:12PM    4    Q.   AND YOU NEVER INTERVIEWED MR. BALWANI ABOUT LABORATORY

02:12PM    5    NONCOMPLIANCE ISSUES; CORRECT?

02:13PM    6    A.   THERE WERE DISCUSSIONS, BUT I DID NOT DIRECTLY INTERVIEW

02:13PM    7    HIM ABOUT THAT.

02:13PM    8    Q.   NOW, YESTERDAY IN YOUR TESTIMONY, PARTICULARLY ON DIRECT,

02:13PM    9    YOU WERE ASKED QUESTIONS ABOUT THE COAGULATION TESTING AT

02:13PM   10    THERANOS, THE PT INR TESTING.

02:13PM   11         DO YOU REMEMBER THAT?

02:13PM   12    A.   I DO.

02:13PM   13    Q.   AND THE PT INR TESTING, ALONG WITH RELATED HEMATOLOGY, WAS

02:13PM   14    THE SUBJECT OF ONE OF THOSE CONDITION LEVEL DEFICIENCIES;

02:13PM   15    CORRECT?

02:13PM   16    A.   YES.

02:13PM   17    Q.   OKAY.  AND CONDITION LEVEL DEFICIENCY, THAT'S ONE TYPE OF

02:13PM   18    DEFICIENCY, MORE SERIOUS THAN THE STANDARD LEVEL; CORRECT?

02:13PM   19    A.   THAT'S CORRECT.

02:13PM   20    Q.   OKAY.  AND YOU IDENTIFIED SOME OF THE ISSUES WITH THE

02:13PM   21    PT INR TESTING IN THOSE FIRST TWO DAYS IN SEPTEMBER OF 2015;

02:13PM   22    CORRECT?

02:13PM   23    A.   I DID.

02:13PM   24    Q.   OKAY.  AND IT'S THOSE ISSUES THAT YOU NOTIFIED THE

02:14PM   25    LABORATORY ABOUT; CORRECT?

BENNETT CROSS BY MR. CAZARES (RES.)                4959

02:14PM 1    A.   THE LABORATORY AND THE STAFF THAT WAS IN THE DISCUSSION AT

02:14PM 2    THE END OF THE DAY, YES.

02:14PM 3    Q.   OKAY.  AND IT WOULD BE FAIR TO SAY THAT YOUR ANALYSIS AND

02:14PM 4    CONCLUSIONS REGARDING THE LAB'S TESTING ON PT INR DIDN'T END

02:14PM 5    THERE, YOU CONTINUED EVALUATING THAT TESTING WITH RECORDS

02:14PM 6    REVIEW, ET CETERA; CORRECT?

02:14PM 7    A.   I CONTINUED REVIEWING IT, YES.

02:14PM 8    Q.   NOW, IN RESPONSE TO SOME QUESTIONS FROM MR. LEACH

02:14PM 9    YESTERDAY, YOU WERE ASKED, DID YOU ALERT MR. BALWANI TO THE

02:14PM 10   PROBLEMS WITH PT INR IN THE SEPTEMBER PORTION OF THE EXAM.

02:14PM 11        DO YOU REMEMBER THAT?

02:14PM 12   A.   I DO.

02:14PM 13   Q.   AND YOU ANSWERED YES?

02:14PM 14   A.   THAT IS CORRECT.

02:14PM 15   Q.   OKAY.  AND THEN MR. LEACH ASKED YOU, WELL, WHAT HAPPENED

02:14PM 16   WHEN YOU CAME BACK IN NOVEMBER?

02:14PM 17        DO YOU REMEMBER THAT?

02:14PM 18   A.   I DO.

02:14PM 19   Q.   AND YOU STARTED OUT ANSWERING NOTHING.

02:14PM 20        DO YOU REMEMBER THAT?

02:14PM 21   A.   I DO.

02:14PM 22   Q.   BUT YOU STOPPED YOURSELF?

02:14PM 23   A.   I DID.

02:15PM 24   Q.   AND THEN YOU FOLLOWED UP AND SAID, WELL, THE LAB DID

02:15PM 25   NOTIFY THE PATIENTS OF THE ISSUE WITH THE PT INR; CORRECT?

ER-3640

BENNETT CROSS BY MR. CAZARES (RES.)                              4960

02:15PM  1      A.   YES.

02:15PM  2      Q.   OKAY.  BUT THERE WAS AN ISSUE WITH, IN YOUR MIND, THE

02:15PM  3      TIMING OF THAT NOTICE, THAT THEY TOOK SEVEN WEEKS TO ACTUALLY

02:15PM  4      DO THAT NOTICE TO THE PATIENTS; CORRECT?

02:15PM  5      A.   YES.

02:15PM  6      Q.   AND IN YOUR MIND THAT WAS A CONCERN?

02:15PM  7      A.   THAT WAS A CONCERN, YES.

02:15PM  8      Q.   OKAY.  BUT THEY DID NOTIFY THE PATIENTS AS FAR AS YOU WERE

02:15PM  9      MADE AWARE WHEN YOU CAME BACK IN NOVEMBER; CORRECT?

02:15PM  10     A.   THEY PROVIDED DOCUMENTATION THAT THEY HAD PROVIDED SOME,

02:15PM  11     THAT THEY HAD NOTIFIED SOME, BUT NOT ALL, PATIENTS.

02:15PM  12     Q.   OKAY.  AND THE TOTALITY OF THE PATIENTS INVOLVED, THERE

02:15PM  13     WAS ABOUT 81 PATIENTS; CORRECT?

02:15PM  14     A.   YES.

02:15PM  15     Q.   NOW, DO YOU RECALL LEARNING, PRIOR TO YOUR TESTIMONY

02:15PM  16     YESTERDAY -- PRIOR TO YOUR TESTIMONY, DO YOU RECALL LEARNING

02:15PM  17     THAT UPON YOUR NOTICE OF THESE ISSUES WITH PT INR, THERANOS

02:16PM  18     ACTUALLY STOPPED, PAUSED FURTHER TESTING OF PT INR?

02:16PM  19          DO YOU REMEMBER LEARNING THAT PRIOR TO YOUR TESTIMONY

02:16PM  20     YESTERDAY?

02:16PM  21     A.   I DON'T RECALL.

02:16PM  22     Q.   OKAY.  IN THIS LABORATORY SURVEY PROCESS WHERE -- WITH

02:16PM  23     THERANOS WHERE YOU ISSUED YOUR SURVEY REPORT, THERE WERE SOME

02:16PM  24     EXCHANGES BACK AND FORTH WITH THE LABORATORY; CORRECT?

02:16PM  25     A.   YES.

ER-3641

BENNETT CROSS BY MR. CAZARES (RES.)                    4961

02:16PM  1    Q.  WHERE THE LABORATORY MADE EFFORTS AT LEAST TO RESPOND TO

02:16PM  2    YOUR IDENTIFIED DEFICIENCIES; CORRECT?

02:16PM  3    A.  YES.

02:16PM  4    Q.  AND YOU SAW THOSE AND REVIEWED THOSE; CORRECT?

02:16PM  5    A.  YES.

02:16PM  6    Q.  BECAUSE THAT WAS YOUR JOB?

02:16PM  7    A.  THAT'S MY JOB.

02:16PM  8    Q.  OKAY.  AND ULTIMATELY YOU WEREN'T SATISFIED WITH

02:16PM  9    THERANOS'S RESPONSES; CORRECT?

02:16PM  10   A.  THAT'S CORRECT.

02:16PM  11   Q.  IF WE COULD TAKE A LOOK AT, I THINK YOU HAVE THE DEFENSE

02:16PM  12   BINDERS THERE, EXHIBIT 5257.

02:17PM  13   A.  I DO NOT HAVE A 5257.

02:17PM  14        MR. CAZARES:  MAY I APPROACH, YOUR HONOR?

02:17PM  15        THE COURT:  YES.

02:17PM  16        MR. CAZARES:  YOU DON'T HAVE IT BECAUSE I HAVE IT.

02:17PM  17   LET ME GET IT TO YOU.

02:17PM  18        WHOOPS, THAT IS THE WRONG ONE.  I HAVE NOTES ON THAT.

02:17PM  19        (HANDING.)

02:18PM  20   Q.  AND I'M NOT GOING TO ASK YOU QUESTIONS ABOUT THE ENTIRE

02:18PM  21   DOCUMENT, BUT IF YOU COULD TAKE A LOOK AT PAGE -- NOW, YOU'RE

02:18PM  22   FAMILIAR WITH THE DOCUMENT; CORRECT?

02:18PM  23   A.  I AM.

02:18PM  24   Q.  OKAY.  THIS IS THERANOS'S RESPONSE TO THE SURVEY REPORT;

02:18PM  25   CORRECT?

02:18PM   1     A.   IT'S A RESPONSE, YES.

02:18PM   2     Q.   THERE WERE MULTIPLE?

02:18PM   3     A.   YES.

02:18PM   4     Q.   OKAY.  IF YOU WOULD TURN TO PAGE 19, THE EXHIBIT PAGE IN

02:18PM   5     THE MIDDLE OF THE BOTTOM OF THE DOCUMENT.

02:18PM   6          DO YOU SEE THAT?

02:18PM   7     A.   I DO.

02:18PM   8     Q.   OKAY.  AND THEN ON THE RIGHT-HAND COLUMN, THIS IS DEALING

02:18PM   9     WITH D-TAG 5413.

02:18PM  10          DO YOU SEE THAT?

02:18PM  11     A.   I DO.

02:18PM  12     Q.   AND JUST READ THAT FIRST PARAGRAPH TO YOURSELF.

02:19PM  13          DOES THAT REFRESH YOUR RECOLLECTION THAT PRIOR TO YOUR

02:19PM  14     TESTIMONY YESTERDAY YOU LEARNED THAT THERANOS PAUSED ITS

02:19PM  15     TESTING ON PT INR?

02:19PM  16     A.   YES.

02:19PM  17     Q.   OKAY.  YOU CAN SET THAT ASIDE.

02:19PM  18          NOW, THE PT INR TESTING, THE ONE YOU DESCRIBED, WAS ONE OF

02:19PM  19     THE CONDITION LEVEL DEFICIENCIES; CORRECT?

02:19PM  20     A.   IT WAS.

02:19PM  21     Q.   AND THE FACT THAT THERANOS STOPPED THE TESTING FIRST WAS A

02:19PM  22     GOOD FIRST STEP; CORRECT?

02:19PM  23     A.   IT'S A GOOD STEP.

02:19PM  24     Q.   AND YOU WOULD EXPECT MORE, BUT THAT'S A GOOD FIRST STEP?

02:19PM  25     A.   YES.

BENNETT CROSS BY MR. CAZARES (RES.)                    4963

02:19PM  1    Q.   AND WHAT YOU WOULD EXPECT THE LAB TO DO IS INVESTIGATE

02:19PM  2    WHAT HAPPENED?

02:19PM  3    A.   THAT'S CORRECT.

02:19PM  4    Q.   BECAUSE IN ORDER TO DETERMINE, LIKE, WHY THEY HAD THESE

02:20PM  5    PROBLEMS; CORRECT?

02:20PM  6    A.   YES.

02:20PM  7    Q.   AND THE NEXT STEP YOU WOULD ALSO EXPECT WAS TO NOTIFY THE

02:20PM  8    PATIENTS; CORRECT?

02:20PM  9    A.   THAT'S ONE OF THE REQUIREMENTS IS TO NOTIFY THE PATIENTS,

02:20PM  10   YES.

02:20PM  11   Q.   AND ULTIMATELY THE LAB DID NOTIFY THE PATIENTS; CORRECT?

02:20PM  12   A.   WE WERE NEVER ABLE TO DETERMINE IF THEY NOTIFIED ALL OF

02:20PM  13   THE PATIENTS.

02:20PM  14   Q.   OKAY.  YOU RECEIVED EVIDENCE OF AT LEAST SOME OF THE

02:20PM  15   NOTIFICATIONS; CORRECT?

02:20PM  16   A.   YES.

02:20PM  17   Q.   SORRY.  JUST GETTING THE TRANSCRIPT RIGHT.

02:20PM  18        NOW, ONE OF THE OTHER ISSUES YOU TESTIFIED YESTERDAY ABOUT

02:20PM  19   WAS THE ULTIMATE FINDING, YOU KNOW, THERE WERE SOME STANDARD

02:20PM  20   LEVEL DEFICIENCIES THAT WERE IDENTIFIED, THERE WERE SOME

02:20PM  21   CONDITION LEVEL NONCOMPLIANCE THAT YOU IDENTIFIED, AND THEN FOR

02:20PM  22   THE HEMATOLOGY AREA, I'LL CALL IT, THERE WAS ALSO AN IMMEDIATE

02:21PM  23   JEOPARDY FINDING; CORRECT?

02:21PM  24   A.   CORRECT.

02:21PM  25   Q.   OKAY.  AND AGAIN, THAT DETERMINATION WAS NOT MADE UNTIL

02:21PM  1    MONTHS AFTER THE SURVEY BEGAN; CORRECT?

02:21PM  2    A.   THAT DETERMINATION WAS MADE WHEN THE SURVEY WAS COMPLETED,

02:21PM  3    BUT THE LABORATORY HAD BEEN NOTIFIED THAT WE WERE CONSIDERING

02:21PM  4    IT IN SEPTEMBER.

02:21PM  5    Q.   ARE YOU SURE ABOUT THAT?

02:21PM  6    A.   THAT'S MY RECOLLECTION.

02:21PM  7    Q.   OKAY.  LET MET GET YOU -- YOUR HONOR, I'M NOT SURE.  DID

02:21PM  8    THE COURT GET A TRANSCRIPT BINDER?  I'M NOT SURE WE HANDED

02:21PM  9    THOSE OUT.  NO?  LET ME GET IT.

02:22PM 10        (HANDING.)

02:22PM 11        AND WITHIN THE BINDER, THE TESTIMONY BINDER,

02:22PM 12    EXHIBIT 28009, YOUR HONOR, AT PAGE 25, LINES 7 TO 24.

02:23PM 13            THE COURT:  WOULD YOU LIKE THIS WITNESS TO READ THEM

02:23PM 14    TO HERSELF?

02:23PM 15            MR. CAZARES:  NO.  I HAVE A VIDEO, YOUR HONOR.

02:23PM 16            THE COURT:  MR. LEACH.

02:23PM 17            MR. LEACH:  OBJECTION.  THIS IS NOT PROPER 611, AND

02:23PM 18    IT'S HEARSAY.

02:23PM 19            MR. CAZARES:  PRIOR SWORN TESTIMONY.

02:23PM 20            THE COURT:  I'M NOT SURE WHAT THIS RELATES TO.

02:23PM 21        WHAT QUESTION DOES THIS RELATE TO?

02:24PM 22            MR. CAZARES:  RELATING TO THE TIMING OF

02:24PM 23    DETERMINATION OF IMMEDIATE JEOPARDY AND NOTICE TO THE LAB.

02:24PM 24            MR. LEACH:  THAT IS NOT HIS QUESTION, YOUR HONOR.

02:24PM 25        THE QUESTION WAS WHETHER SHE WAS CONSIDERING IT IN

02:24PM   1    SEPTEMBER --

02:24PM   2            MR. CAZARES:  I DIDN'T SAY CONSIDER.

02:24PM   3            THE COURT:  ONE AT A TIME, PLEASE.

02:24PM   4        THIS IS RELATED TO YOUR QUESTION, "THE DETERMINATION WAS

02:24PM   5    NOT MADE UNTIL MONTHS AFTER THE SURVEY BEGAN"?

02:24PM   6            MR. CAZARES:  AND THE WITNESS JUST TESTIFIED THAT

02:24PM   7    THE LAB WAS NOTIFIED IN SEPTEMBER, AND IF YOU LOOK AT LINE 17

02:24PM   8    TO 21 IN PARTICULAR --

02:24PM   9            THE COURT:  I'M SORRY, 17 TO?

02:24PM  10            MR. CAZARES:  17 TO 21, AND YOU CAN EVEN CONTINUE

02:24PM  11    UNTIL 24.

02:25PM  12            THE COURT:  THIS LOOKS A LITTLE DIFFERENT.

02:25PM  13            MR. CAZARES:  I CAN RESET IT UP, YOUR HONOR.

02:25PM  14            THE COURT:  LINE 18 REFERENCES COMPLIANCE ABOUT A

02:25PM  15    SPECIFIC ISSUE.

02:25PM  16            MR. CAZARES:  THAT ISSUE IS THE SAME ISSUE.  IT'S A

02:25PM  17    DIFFERENT WORD.  COAGULATION, PT INR, IT'S THE SAME TEST.

02:25PM  18            THE COURT:  WELL, I THINK IT -- YOU NEED TO LAY A

02:25PM  19    FOUNDATION.

02:25PM  20            MR. CAZARES:  OKAY.

02:25PM  21    Q.   SO, MS. BENNETT, I THINK YOU ALREADY TESTIFIED THAT THE

02:25PM  22    PT INR TEST IS A COAGULATION TEST; CORRECT?

02:25PM  23    A.   YES, IT'S A TYPE OF COAGULATION TEST.

02:25PM  24    Q.   AND THE PT INR COAGULATION TEST IS THE TEST AT ISSUE IN

02:26PM  25    RELATION TO THE CONDITION LEVEL NONCOMPLIANCE THAT YOU FOUND;

02:26PM   1    CORRECT?

02:26PM   2    A.   THE PT INR WAS PART OF THE CONDITION LEVEL NONCOMPLIANCE,

02:26PM   3    YES.

02:26PM   4    Q.   AND ALSO PART OF THE ULTIMATE IMMEDIATE JEOPARDY ISSUE AS

02:26PM   5    WELL; CORRECT?

02:26PM   6    A.   YES.

02:26PM   7    Q.   OKAY.  AND YOU JUST TESTIFIED, I BELIEVE RIGHT NOW, THAT

02:26PM   8    IN SEPTEMBER OF 2015, YOU NOTIFIED THE LAB THAT YOU WERE

02:26PM   9    CONSIDERING IMMEDIATE JEOPARDY REGARDING PT INR; CORRECT?

02:26PM  10    A.   WE NOTIFIED THE LAB THAT WE WERE CONSIDERING IT, BUT THAT

02:26PM  11    A FINAL DETERMINATION HAD NOT BEEN MADE.

02:26PM  12    Q.   AND SO WAS THAT MADE CLEAR TO MR. BALWANI, THAT YOU HAD

02:26PM  13    NOT MADE A DETERMINATION OF IMMEDIATE JEOPARDY IN SEPTEMBER OF

02:26PM  14    2015?

02:26PM  15    A.   IT WAS MADE CLEAR.

02:26PM  16    Q.   OKAY.  AND THAT DETERMINATION REGARDING IMMEDIATE JEOPARDY

02:27PM  17    WAS NOT CONCLUDED AND DETERMINED FINALLY IN NOVEMBER OF 2015

02:27PM  18    EITHER; CORRECT?

02:27PM  19    A.   WE HAD NOT MADE A DECISION, A FINAL DECISION WHETHER WE

02:27PM  20    WERE GOING TO CALL I.J. BY THE END OF SEPTEMBER, IMMEDIATE

02:27PM  21    JEOPARDY.

02:27PM  22    Q.   UNTIL THE END --

02:27PM  23         THE COURT:  PULL THAT MICROPHONE CLOSER TO YOU.

02:27PM  24    BY MR. CAZARES:

02:27PM  25    Q.   JUST SO THE TRANSCRIPT IS CLEAR, THAT CONCLUSION REGARDING

BENNETT CROSS BY MR. CAZARES (RES.)                4967

02:27PM  1    IMMEDIATE JEOPARDY WAS NOT MADE UNTIL THE CONCLUSION OF THE

02:27PM  2    SURVEY; CORRECT?

02:27PM  3    A.   THAT IS CORRECT.

02:27PM  4    Q.   AND THE SURVEY DIDN'T CONCLUDE ULTIMATELY UNTIL THE SURVEY

02:27PM  5    REPORT WAS ISSUED; CORRECT?

02:27PM  6    A.   THE SURVEY CONCLUDES ON THE EXIT DAY OF THE CONFERENCE,

02:27PM  7    WHICH I BELIEVE WAS NOVEMBER 20TH, AND THEN WE NOTIFIED THE

02:27PM  8    LABORATORY IN WRITING ABOUT IMMEDIATE JEOPARDY.

02:28PM  9    Q.   OKAY.  IS IT CORRECT THAT THERE IS NO PARTICULAR AMOUNT OF

02:28PM  10   EVIDENCE REQUIRED UNDER CLIA IN ORDER TO MAKE A CONDITION LEVEL

02:28PM  11   FINDING?

02:28PM  12   A.   THAT IS CORRECT, ALTHOUGH WE DO HAVE SOME --

02:28PM  13   Q.   THERE'S NO QUESTION PENDING HERE, MS. BENNETT.  MR. LEACH

02:28PM  14   WILL HAVE A CHANCE TO ASK FOLLOWUPS IF HE DECIDES TO.

02:28PM  15        I DON'T MEAN TO BE RUDE.  THAT'S NOT MY INTENT.

02:28PM  16   A.   SURE.

02:28PM  17   Q.   MY NEXT QUESTION IS, I GUESS A FINDING OF NONCOMPLIANCE IN

02:28PM  18   THE LABORATORY BY YOU DID NOT REQUIRE EVIDENCE THAT THE LAB

02:29PM  19   DIRECTOR WAS AWARE OF THE DEFICIENT PRACTICES; CORRECT?

02:29PM  20   A.   I'M SORRY.  CAN YOU RE-ASK THE QUESTION?

02:29PM  21   Q.   YOUR FINDINGS OF NONCOMPLIANCE WITH CLIA AT THERANOS DID

02:29PM  22   NOT REQUIRE EVIDENCE IDENTIFIED BY YOURSELF THAT THE LAB

02:29PM  23   DIRECTOR EVEN KNEW ABOUT THE NONCOMPLIANT PRACTICES?

02:29PM  24   A.   THAT'S TRUE.

02:29PM  25   Q.   SAME GOES FOR THE STAFF?  THE LAB STAFF?

BENNETT CROSS BY MR. CAZARES (RES.)                                    4968

02:29PM 1     A.    RIGHT.  THAT'S TRUE.

02:29PM 2     Q.    SAME FOR THE OWNERS OF THE LAB?

02:29PM 3     A.    THAT'S TRUE.

02:29PM 4     Q.    NOW, YOU DESCRIBED SOME ISSUES AGAIN, AGAIN, WE'RE TALKING

02:29PM 5     ABOUT THE PT INR AND THE COAGULATION TESTING, ISSUES RELATING

02:29PM 6     TO THE STABILITY TIME PERIOD FOR THE REAGENT, THE INNOVANT.

02:30PM 7           DO YOU REMEMBER THAT?

02:30PM 8     A.    YES.

02:30PM 9     Q.    AND THAT WAS ONE OF THE MAJOR ISSUES THAT YOU IDENTIFIED;

02:30PM 10    CORRECT?

02:30PM 11    A.    YES.

02:30PM 12    Q.    BECAUSE YOU, AND I'LL GET INTO MORE DETAIL LATER, BUT AT

02:30PM 13    LEAST TO START, YOU LOOKED INTO THE ISSUE AND SAW BOTTLES, I

02:30PM 14    GUESS, OF THE INNOVANT WITH A STABILITY TIME PERIOD OR

02:30PM 15    EXPIRATION DATE OF FIVE DAYS, BUT YOU WENT AND LOOKED AT THE

02:30PM 16    PACKAGING AND THERE WAS LIKE A LITTLE PINK INSERT IN THE

02:30PM 17    PACKAGE, AND IT HAD CHANGED.  IT WAS ONLY STABLE FOR TWO DAYS;

02:30PM 18    IS THAT RIGHT?

02:30PM 19    A.    THAT'S CORRECT.

02:30PM 20    Q.    OKAY.  AND THE LAB STAFF WAS SURPRISED AT YOUR FINDING;

02:30PM 21    CORRECT?

02:30PM 22          MR. LEACH:  OBJECTION.  SPECULATION.

02:30PM 23          THE COURT:  YOU CAN ANSWER THE QUESTION IF YOU HAVE

02:30PM 24    PERSONAL KNOWLEDGE OF THEIR DEMEANOR.

02:30PM 25          THE WITNESS:  OKAY.  THEY WERE UNAWARE OF THE

BENNETT CROSS BY MR. CAZARES (RES.)                4969

02:30PM  1    CHANGE.

02:31PM  2    BY MR. CAZARES:

02:31PM  3    Q.   NOW, IN THE COURSE OF THE SURVEY, YOU IDENTIFIED SOME

02:31PM  4    ISSUES RELATING TO, SOME TRAINING ISSUES I'LL CALL IT, RELATING

02:31PM  5    TO SOME OF THE STAFF, AND EVEN SOME OF THE MANAGEMENT; CORRECT?

02:31PM  6    A.   I BELIEVE I LOOKED AT STAFF.

02:31PM  7    Q.   AND PART OF THIS PROCESS IS LOOKING FOR DOCUMENTATION IN

02:31PM  8    THE EMPLOYEE'S FILES TO DEMONSTRATE TO YOU THAT THE EMPLOYEE

02:31PM  9    HAS THE REQUIRED MINIMUM KIND OF EDUCATIONAL AND TRAINING

02:31PM  10   EXPERIENCE; CORRECT?

02:31PM  11   A.   YES.

02:31PM  12   Q.   AND IN THE COURSE OF THE SURVEY, YOU IDENTIFIED SOME LAB

02:31PM  13   STAFF IN WHICH THEIR FILES DIDN'T HAVE THE REQUIRED

02:31PM  14   DOCUMENTATION TO DEMONSTRATE EITHER THEIR EDUCATION OR TRAINING

02:31PM  15   REQUIREMENTS; CORRECT?

02:31PM  16   A.   YES.

02:31PM  17   Q.   AND YOU WOULD AGREE WITH ME THAT YOU IDENTIFIED NO

02:31PM  18   EVIDENCE THAT MR. BALWANI WAS AWARE OF THE FACT THAT THE LAB

02:32PM  19   HAD INSUFFICIENT DOCUMENTATION OF TRAINING OR EXPERIENCE FOR

02:32PM  20   SOME OF THE LABORATORY STAFF?

02:32PM  21   A.   I CAN'T SPEAK TO WHAT MR. BALWANI UNDERSTOOD.

02:32PM  22   Q.   THAT WASN'T EXACTLY MY QUESTION.

02:32PM  23   A.   OKAY.

02:32PM  24   Q.   MY QUESTION WAS, YOU IDENTIFIED NO EVIDENCE THAT

02:32PM  25   MR. BALWANI WAS AWARE OF THE FACT THAT THERE WAS INSUFFICIENT

ER-3650

BENNETT CROSS BY MR. CAZARES (RES.)                                    4970

02:32PM   1    DOCUMENTATION FOR EDUCATION AND TRAINING FOR SOME OF THE LAB

02:32PM   2    STAFF?

02:32PM   3    A.   NOT THAT I RECALL.

02:32PM   4    Q.   NOW, AGAIN, GETTING BACK TO THESE ISSUES OF THE CONDITION

02:32PM   5    LEVEL NONCOMPLIANCE, THERE WERE DIFFERENT ISSUES THAT SUPPORTED

02:32PM   6    THE CONDITION LEVEL NONCOMPLIANCE.

02:32PM   7         ONE WAS, LIKE WE SAID, THE HEMATOLOGY, AND PT INR.

02:33PM   8         AND JUST TO MAKE IT CLEAR, THE TESTING BY THERANOS FOR

02:33PM   9    PT INR, THAT WAS NOT PERFORMED ON THERANOS'S EDISON DEVICE;

02:33PM  10    CORRECT?

02:33PM  11    A.   IT WAS NOT.

02:33PM  12    Q.   NOW, IN THE COURSE OF A SURVEY, ACTUALLY THERANOS'S

02:33PM  13    SURVEY -- IN THE COURSE OF YOUR SURVEY OF THERANOS, IS IT

02:33PM  14    CORRECT THAT YOU, AS A CMS SURVEYOR, WERE UNABLE TO DETERMINE

02:33PM  15    WHETHER OR NOT ANY PATIENTS WERE ACTUALLY AFFECTED BY THE

02:33PM  16    NONCOMPLIANCE YOU FOUND?

02:33PM  17    A.   WE -- I'M SORRY.  CAN YOU ASK THE QUESTION AGAIN?

02:33PM  18    Q.   AS A CMS SURVEYOR --

02:33PM  19    A.   UH-HUH.

02:33PM  20    Q.   -- IN RELATION TO YOUR SURVEY OF THERANOS, YOU WERE UNABLE

02:34PM  21    TO DETERMINE WHETHER ANY PATIENTS WERE ACTUALLY AFFECTED BY THE

02:34PM  22    NONCOMPLIANCE YOU IDENTIFIED IN THE SURVEY?

02:34PM  23    A.   ARE YOU TALKING ABOUT PT INR?

02:34PM  24    Q.   NO.  I'M TALKING ABOUT OTHER TESTING.

02:34PM  25    A.   OKAY.  WE CAN IDENTIFY IF PATIENTS HAVE THE POTENTIAL TO

ER-3651

BENNETT CROSS BY MR. CAZARES (RES.)                    4971

02:34PM  1    BE AFFECTED, AND SOMETIMES WE CAN DETERMINE THAT SPECIFIC

02:34PM  2    PATIENTS MAY HAVE BEEN AFFECTED.

02:34PM  3    Q.   BUT, AGAIN, IT'S POTENTIAL OR MAY, CORRECT, WHAT YOU JUST

02:34PM  4    TESTIFIED TO?

02:34PM  5    A.   YES.  WE ALSO --

02:34PM  6    Q.   WELL, I'M NOT ASKING ANOTHER QUESTION RIGHT NOW.

02:34PM  7    A.   OKAY.

02:34PM  8    Q.   BUT MY QUESTION TO YOU IS A LITTLE BIT DIFFERENT.  AND MY

02:34PM  9    QUESTION IS, IN YOUR SURVEY OF THERANOS, YOU DID NOT IDENTIFY

02:34PM  10   PATIENTS WHO WERE ACTUALLY AFFECTED BY THE NONCOMPLIANCE YOU

02:34PM  11   IDENTIFIED; CORRECT?

02:34PM  12   A.   I DID IN PT INR.

02:34PM  13   Q.   AND WE'LL TALK ABOUT THAT.  LET'S SET PT INR ASIDE --

02:35PM  14   A.   OKAY.

02:35PM  15   Q.   -- BECAUSE THAT'S A UNIQUE CATEGORY.  WE'LL TALK ABOUT

02:35PM  16   THAT.

02:35PM  17        SETTING THAT ONE ASIDE, THAT WASN'T ON THE EDISON;

02:35PM  18   CORRECT?

02:35PM  19   A.   CORRECT.

02:35PM  20   Q.   AND ALL OF THE OTHER NONCOMPLIANCE THAT YOU IDENTIFIED,

02:35PM  21   YOU WERE NOT ABLE TO IDENTIFY OR CONFIRM WHETHER ANY PATIENT

02:35PM  22   WAS ACTUALLY AFFECTED BY THE NONCOMPLIANCE YOU IDENTIFIED IN

02:35PM  23   YOUR SURVEY REPORT?

02:35PM  24   A.   WE CAN IDENTIFY PATIENTS BY THEIR UNIQUE SPECIMEN

02:35PM  25   IDENTIFIER, AND IF THERE WAS A NONCOMPLIANCE THAT OCCURRED,

ER-3652

BENNETT CROSS BY MR. CAZARES (RES.)                    4972

02:35PM  1    THEN WE CAN IDENTIFY THAT THOSE PATIENTS MAY, COULD HAVE BEEN,

02:35PM  2    OR MAY HAVE BEEN AFFECTED, YES.

02:35PM  3    Q.   OKAY.  AND JUST TO BE CLEAR SO WE KNOW WHAT WE'RE TALKING

02:35PM  4    ABOUT --

02:35PM  5    A.   RIGHT.

02:35PM  6    Q.   -- THERE MAY BE A TIME PERIOD OF NONCOMPLIANCE THAT IS

02:35PM  7    CALLED QC FAILURES, FOR EXAMPLE, YOU COULD IDENTIFY PATIENTS

02:35PM  8    WHO RECEIVED RESULTS MAYBE DURING THAT TIME OF NONCOMPLIANCE.

02:35PM  9         IS THAT WHAT YOU JUST DESCRIBED TO ME?

02:36PM 10    A.   YES.

02:36PM 11    Q.   AND MY QUESTION IS GOING A LITTLE FURTHER THAN THAT.

02:36PM 12         AS A SURVEYOR OF CMS -- AS A CMS SURVEYOR OF THERANOS'S

02:36PM 13    LABORATORY, YOU DID NOT IDENTIFY PATIENTS WHO WERE ACTUALLY

02:36PM 14    AFFECTED BY POTENTIALLY INACCURATE RESULTS OR THE NONCOMPLIANCE

02:36PM 15    YOU IDENTIFIED, SETTING APART THE PT INR.

02:36PM 16    A.   THAT WOULD BE FOR THE PATIENT'S PROVIDER TO DETERMINE IF A

02:36PM 17    PATIENT WAS SPECIFICALLY AFFECTED.

02:36PM 18    Q.   BECAUSE TO THE EXTENT THAT THERE MAY HAVE BEEN SOME ISSUE

02:36PM 19    WITH A PATIENT RESULT, IT'S REALLY A MEDICAL DOCTOR WHO IS IN

02:36PM 20    THE BEST POSITION TO DETERMINE WHETHER OR NOT THAT RESULT,

02:36PM 21    VARIANCE, OR SOME OTHER ISSUE, MAY HAVE HAD SOME MEDICAL

02:36PM 22    SIGNIFICANCE; CORRECT?

02:36PM 23    A.   CLIA DOES NOT GET INTO THE CLINICAL USE OF THE TEST

02:36PM 24    RESULTS.  THAT'S NOT UNDER OUR PURVIEW.

02:36PM 25    Q.   AND MEDICAL DOCTORS WOULD BE IN A BETTER POSITION TO

ER-3653

BENNETT CROSS BY MR. CAZARES (RES.)                    4973

02:36PM  1      DETERMINE THAT; CORRECT?

02:36PM  2      A.   IT WOULD BE THEIR CALL.

02:37PM  3      Q.   LET'S GO TO THE ACTUAL PT INR.  WE'LL TALK ABOUT THAT.

02:37PM  4           WITH RESPECT TO THE CONDITION LEVEL NONCOMPLIANCE AND

02:37PM  5      IMMEDIATE JEOPARDY RELATED TO THE PT INR TESTING, THE CLIA

02:37PM  6      RULES AND REGULATIONS DO NOT REQUIRE A FINDING BY YOU OF ACTUAL

02:37PM  7      PATIENT IMPACT OR AFFECT DUE TO THE NONCOMPLIANCE; CORRECT?

02:37PM  8      A.   THAT'S CORRECT.

02:37PM  9      Q.   THERE WAS A LITTLE BIT OF DISCUSSION -- ACTUALLY, VERY

02:37PM  10     LITTLE DISCUSSION -- ABOUT DR. DHAWAN, WHO WAS THE LAB DIRECTOR

02:37PM  11     WHO WAS IN PLACE DURING YOUR TIME PERIOD OF 2015.

02:38PM  12          DO YOU RECALL THAT?

02:38PM  13     A.   I DO.

02:38PM  14     Q.   SO, DR. DHAWAN, I THINK YOU RECALL HIM BEING PRESENT IN

02:38PM  15     SEPTEMBER, OR MAYBE THE FIRST DAY OF THE SEPTEMBER 2015 VISIT;

02:38PM  16     IS THAT RIGHT?

02:38PM  17     A.   HE WAS PRESENT AT ONE POINT.  I'M NOT SURE EXACTLY WHICH

02:38PM  18     DAY.

02:38PM  19     Q.   OKAY.  AND THE ABSENCE OF A LAB DIRECTOR DURING A SURVEY

02:38PM  20     BY YOURSELF OR CMS OF A LABORATORY, THAT ON ITS OWN IS NOT

02:38PM  21     UNUSUAL; CORRECT?

02:38PM  22     A.   IT IS NOT UNUSUAL.

02:38PM  23     Q.   TYPICALLY YOU'LL HAVE ACCESS TO LAB STAFF OR PEOPLE WHO

02:38PM  24     ARE DOING MORE HANDS-ON WORK; IS THAT FAIR?

02:38PM  25     A.   WE'LL HAVE ACCESS TO THE STAFF AND THE LABORATORY

BENNETT CROSS BY MR. CAZARES (RES.)                                    4974

02:38PM  1    DIRECTOR, THEY JUST MAY NOT BE ACTUALLY PRESENT.

02:38PM  2    Q.   FAIR ENOUGH.

02:38PM  3         NOW, WITH RESPECT TO DR. DHAWAN, HE WAS QUALIFIED UNDER

02:38PM  4    CLIA TO BE THE LAB DIRECTOR OF THERANOS'S HIGH COMPLEXITY LAB;

02:38PM  5    CORRECT?

02:38PM  6    A.   HE WAS.

02:38PM  7    Q.   NOW, WE TALKED A LITTLE BIT ABOUT THE KIND OF BACK AND

02:39PM  8    FORTH THAT TOOK PLACE BETWEEN CMS AND THERANOS IN THIS CASE,

02:39PM  9    BUT EVEN STEPPING BACK FROM THAT SPECIFIC TO TALK ABOUT JUST

02:39PM  10   LABORATORY'S RESPONSE TO DEFICIENCY FINDINGS OR NONCOMPLIANCE

02:39PM  11   BY CMS, OR MAYBE IT'S A STATE REGULATOR, THE LAB IS REQUIRED TO

02:39PM  12   TAKE SOME SORT OF CORRECTIVE ACTION AND DEMONSTRATE THAT THEY

02:39PM  13   FIXED THE NONCOMPLIANCE.

02:39PM  14        IS THAT FAIR?

02:39PM  15   A.   THAT IS FAIR.

02:39PM  16   Q.   AND I THINK WE TALKED ABOUT THIS A LITTLE BIT YESTERDAY,

02:39PM  17   YOU KNOW, ONE TYPE OF RESPONSE A LAB MAY HAVE IS TO PROVIDE

02:39PM  18   DOCUMENTATION TO CMS OF SOME SORT OF COMPARISON OF PATIENT

02:39PM  19   RESULTS WITH THE NONCOMPLIANCE TIME PERIOD, SAYING IT'S QUALITY

02:39PM  20   CONTROL, SO SOME SORT OF COMPARISON COULD BE DONE.

02:39PM  21        IS THAT FAIR?

02:39PM  22   A.   IT WOULD DEPEND ON WHAT THE DEFICIENCY WAS.  THE

02:40PM  23   DEFICIENCY THAT WAS CITED WOULD BE WHAT THEY WOULD SUBMIT.

02:40PM  24   Q.   OKAY.  AND IF THE DEFICIENCIES RELATED TO ISSUES WITH

02:40PM  25   QUALITY CONTROL OR FAILURES TO FOLLOW PROCEDURES WITH RESPECT

ER-3655

BENNETT CROSS BY MR. CAZARES (RES.)                    4975

02:40PM  1    TO QUALITY CONTROL, ONE CORRECTIVE ACTION A LAB MAY TAKE IS TO

02:40PM  2    PROVIDE DOCUMENTATION SHOWING PATIENT RESULTS AND TRENDS IN

02:40PM  3    COMPARISON TO THAT PERIOD OF NONCOMPLIANCE; CORRECT?

02:40PM  4    A.   PATIENT TRENDS COMPARED TO WHAT?

02:40PM  5    Q.   PATIENT RESULTS AND TRENDS DURING THE TIME PERIOD OF

02:40PM  6    NONCOMPLIANCE?

02:40PM  7    A.   THAT COULD BE PART OF WHAT THEY SUBMIT.

02:40PM  8    Q.   ALONG WITH SOME EVALUATION OR ANALYSIS OF THOSE RECORDS;

02:40PM  9    CORRECT?

02:40PM 10    A.   YES, YES.

02:40PM 11    Q.   FOR EXAMPLE, IF A LAB -- IF YOU IDENTIFIED NONCOMPLIANCE

02:40PM 12    IN THE AREA OF PROFICIENCY TESTING, AGAIN, A LABORATORY MAY

02:40PM 13    PROVIDE OR SUBMIT EVIDENCE OF ANALYSIS OF PATIENT RESULTS

02:41PM 14    COMPARED WITH THE TIME PERIOD WHEN THERE WAS THIS NONCOMPLIANCE

02:41PM 15    WITH PROFICIENCY TESTING; CORRECT?

02:41PM 16    A.   I GUESS I'M NOT UNDERSTANDING WHAT YOU MEAN BY PATIENT

02:41PM 17    COMPARISON.  I'M NOT UNDERSTANDING WHAT YOU'RE COMPARING IT TO.

02:41PM 18    Q.   TO THE TIME PERIOD OF NONCOMPLIANCE IN ORDER TO DETERMINE

02:41PM 19    WHETHER THE PATIENT RESULTS APPEAR TO HAVE ANY IMPACT FROM THE

02:41PM 20    NONCOMPLIANCE.

02:41PM 21    A.   YES, THEY HAVE TO LOOK TO SEE IF PATIENTS TESTED DURING

02:41PM 22    THE NONCOMPLIANCE COULD HAVE BEEN AFFECTED BY THEIR DEFICIENT

02:41PM 23    PRACTICE, YES.

02:41PM 24    Q.   AND TO DO THAT, YOU HAVE TO -- THE LAB, ANYWAY, WOULD HAVE

02:41PM 25    TO LOOK AT THE PATIENT RESULTS AND RECORDS; CORRECT?

| | | |
|---|---|---|
| 02:41PM | 1 | A.   YES, AS PART OF THEIR INVESTIGATION. |
| 02:41PM | 2 | Q.   AND THEY COULD ALSO, FOR EXAMPLE, EVEN IF THERE WAS AN |
| 02:41PM | 3 | ISSUE WITH A PATIENT RESULT DURING A PERIOD OF NONCOMPLIANCE, |
| 02:42PM | 4 | THE LAB COULD COMPARE THAT PATIENT'S RESULTS WITH THE QUALITY |
| 02:42PM | 5 | CONTROL RESULTS THAT RAN ON THAT PARTICULAR DEVICE DURING THE |
| 02:42PM | 6 | RELEVANT TIME PERIOD; CORRECT? |
| 02:42PM | 7 | A.   WE WOULD EXPECT THEM TO DO THAT. |
| 02:42PM | 8 | Q.   OKAY.  AND THE LAB COULD ALSO POSSIBLY COMPARE THAT OWN |
| 02:42PM | 9 | PATIENT'S HISTORY OF TEST RESULTS AGAINST THE RESULT THAT TOOK |
| 02:42PM | 10 | PLACE DURING THE PERIOD OF NONCOMPLIANCE MIGHT BE ANOTHER |
| 02:42PM | 11 | EFFORT TO DO ANALYSIS; CORRECT? |
| 02:42PM | 12 | A.   THEY CAN LOOK AT PATIENT HISTORICAL INFORMATION. |
| 02:42PM | 13 | Q.   OKAY.  NOW, IN THE COURSE OF THE SURVEY, AGAIN, I THINK WE |
| 02:42PM | 14 | DESCRIBED IT YESTERDAY, YOU WERE REQUESTING RECORDS, |
| 02:42PM | 15 | MR. BALWANI WAS -- CORRECT? |
| 02:42PM | 16 | A.   I WAS, YES. |
| 02:42PM | 17 | Q.   OKAY.  YOU DESCRIBED MR. BALWANI WAS TELLING HIS STAFF TO |
| 02:42PM | 18 | RESPOND TO YOUR REQUESTS; CORRECT? |
| 02:42PM | 19 | A.   YES. |
| 02:42PM | 20 | Q.   AND YOU DESCRIBED SOME ISSUES WITH THE TIMELINESS AND |
| 02:43PM | 21 | THOROUGHNESS OF THE RESPONSES FROM SOME OF THE STAFF; CORRECT? |
| 02:43PM | 22 | A.   YES. |
| 02:43PM | 23 | Q.   OKAY.  AND I THINK YOU DESCRIBED ONE INDIVIDUAL, MR. GEE, |
| 02:43PM | 24 | AS SOMEWHAT LOOKING LIKE A DEER IN THE HEADLIGHTS IN RESPONSE |
| 02:43PM | 25 | TO SOME OF YOUR QUESTIONS AND REQUESTS; CORRECT? |

BENNETT CROSS BY MR. CAZARES (RES.)                          4977

02:43PM   1      A.   YES.

02:43PM   2      Q.   AND HE WAS THE QUALITY ASSURANCE/QUALITY CONTROL MANAGER?

02:43PM   3      A.   YES.

02:43PM   4      Q.   AND SOME OF THE RECORDS THAT YOU WERE REQUESTING RELATED

02:43PM   5      TO TESTING ON THE EDISON; CORRECT?

02:43PM   6      A.   MOST.  NOT MR. GEE.

02:43PM   7      Q.   YOUR REQUEST FROM OTHER INDIVIDUALS?

02:43PM   8      A.   YES.

02:43PM   9      Q.   OKAY.  BUT YOU DID REQUEST THOSE KIND OF RECORDS?

02:43PM  10      A.   I DID.

02:43PM  11      Q.   AND THEN QUALITY CONTROL WAS ONE OF THOSE SETS OF RECORDS?

02:43PM  12      A.   YES.

02:43PM  13      Q.   AND IS IT CORRECT THAT YOU UNDERSTOOD THAT SOME OF THE

02:44PM  14      INFORMATION, SOME OF WHAT YOU WERE REQUESTING RELATING TO

02:44PM  15      EDISON QUALITY CONTROL RECORDS, THAT DATA WENT STRAIGHT TO

02:44PM  16      THERANOS'S LABORATORY INFORMATION SYSTEMS, THAT'S WHERE THE

02:44PM  17      INFORMATION WAS PULLED FROM; CORRECT?

02:44PM  18      A.   IT WAS MY UNDERSTANDING THAT THEY HAD TO PULL THE

02:44PM  19      INFORMATION FROM SOMEWHERE.

02:44PM  20           I DON'T RECALL WHERE THEY HAD TO PULL IT FROM.

02:44PM  21      Q.   OKAY.  IN YOUR WORK AS A CMS SUPERVISOR AND SENIOR

02:44PM  22      EXECUTIVE NOW, BUT ALSO AS A SURVEYOR IN THE PAST, YOU

02:44PM  23      UNDERSTAND THAT LABORATORIES MAINTAIN RECORDS IN SOME SORT OF

02:44PM  24      DATABASE OF SOME SORT; CORRECT?

02:44PM  25      A.   SOME LABORATORIES DO.  SOME LABORATORIES DO NOT.

ER-3658

BENNETT CROSS BY MR. CAZARES (RES.)    4978

02:44PM  1    Q.   SOME LABS DO IT OLD SCHOOL PAPER RECORDS; CORRECT?

02:44PM  2    A.   THAT'S CORRECT.

02:44PM  3    Q.   THERANOS KEPT THEIR RECORDS PRINCIPALLY ELECTRONIC;

02:44PM  4    CORRECT?

02:44PM  5    A.   I CANNOT SPEAK TO HOW THEY KEPT THEIR RECORDS.

02:44PM  6    Q.   YOU RECEIVED ELECTRONIC RECORDS; CORRECT?

02:44PM  7    A.   I RECEIVED PRINTOUTS, YES.

02:44PM  8    Q.   OKAY.  NOW TO GET BACK TO THE SURVEY REPORT THAT YOU WERE

02:45PM  9    ASKED QUESTIONS ABOUT BY MR. LEACH YESTERDAY.

02:45PM  10        SO THAT SURVEY REPORT IS QUITE LONG.  IT'S ABOUT 20 PAGES

02:45PM  11   OR SO.

02:45PM  12        DO YOU RECALL THAT?

02:45PM  13   A.   I DO.

02:45PM  14   Q.   AND THE SURVEY REPORT INCLUDES, I GUESS, DESCRIPTIONS, OR

02:45PM  15   ACTUALLY MAYBE QUOTATIONS OF THE RELEVANT REGULATORY

02:45PM  16   REQUIREMENTS; CORRECT?

02:45PM  17   A.   YES.

02:45PM  18   Q.   AND THEN RECITATION OF THE FACTS OR EVIDENCE THAT YOU OR

02:45PM  19   MR. YAMAMOTO IDENTIFIED TO SUPPORT YOUR FINDINGS; CORRECT?

02:45PM  20   A.   YES, TO SUPPORT THE NONCOMPLIANCE.

02:45PM  21   Q.   OKAY.  SO IS IT FAIR TO SAY THAT THAT SURVEY REPORT IS THE

02:45PM  22   BEST EVIDENCE OF YOUR FINDINGS OF THE NONCOMPLIANCE BY THERANOS

02:45PM  23   IN YOUR SURVEY?

02:45PM  24   A.   THAT IS THE SURVEY REPORT THAT LISTS THE DEFICIENT

02:45PM  25   PRACTICES FOR THE INFORMATION THAT WE LOOKED AT DURING THE

02:45PM    1        SURVEY.

02:45PM    2        Q.   OKAY.  AND SO THE SURVEY REPORT CONTAINS ALL OF THE

02:46PM    3        EVIDENCE THAT YOU IDENTIFIED TO SUPPORT YOUR FINDINGS OF

02:46PM    4        NONCOMPLIANCE?

02:46PM    5        A.   YES.

02:46PM    6        Q.   DO YOU HAVE A BINDER UP THERE THAT -- I SHOULD HAVE SAID

02:46PM    7        THE GOVERNMENT'S BINDER?

02:46PM    8        A.   YES.

02:46PM    9        Q.   THE WHITE ONE.  YES, I THINK THAT'S IT.

02:46PM   10             AND IF YOU COULD TAKE A LOOK AT EXHIBIT 4621.

02:46PM   11             AND 4621 IS THE JANUARY 25TH, 2016 SURVEY REPORT; CORRECT?

02:46PM   12        A.   THE -- THAT'S THE DATE OF THE LETTER.  THE SURVEY IS DATED

02:47PM   13        NOVEMBER 20TH, 2015.

02:47PM   14        Q.   OKAY.  THE LETTER IS I GUESS ATTACHED TO THE -- THE SURVEY

02:47PM   15        REPORT IS ATTACHED TO THE LETTER?

02:47PM   16        A.   THAT'S CORRECT.

02:47PM   17        Q.   OKAY.  AND IF WE CAN TURN TO -- AND IT WILL BE UP ON THE

02:47PM   18        SCREEN AS WELL.  THE SCREEN MAY BE EASIER FOR YOU THAN FLIPPING

02:47PM   19        THROUGH THE BOOK.

02:47PM   20             BUT IF WE CAN TAKE A LOOK STARTING AT PAGE 41, AND I'M

02:47PM   21        LOOKING AT THE EXHIBIT PAGE, NOT THE DOCUMENT PAGE.  SO THE

02:47PM   22        PAGE AT THE BOTTOM OF THE DOCUMENT.

02:47PM   23             AND WE'RE AT D-TAG 5481.

02:47PM   24             DO YOU SEE THAT?

02:47PM   25        A.   I DO.

BENNETT CROSS BY MR. CAZARES (RES.)                    4980

```
02:47PM   1        Q.   AND IF YOU LOOK AT PAGE 40, ABOUT MOST OF THE WAY UP,

02:47PM   2        D-TAG 5481, THAT'S CONTROL PROCEDURES.

02:47PM   3             DO YOU SEE THAT?

02:47PM   4        A.   I DO.

02:47PM   5        Q.   OKAY.  AND THEN THIS IS A STANDARD LEVEL NONCOMPLIANCE;

02:48PM   6        CORRECT?

02:48PM   7        A.   YES.

02:48PM   8        Q.   OKAY.

02:48PM   9        A.   IT'S CITED AS A STANDARD.

02:48PM  10        Q.   AND THEN IF WE TAKE A LOOK AT NUMBER 2, WHICH AGAIN IS ON

02:48PM  11        PAGE 41, THAT FIRST PARAGRAPH OF THE REPORT SAYS, "BASED ON

02:48PM  12        REVIEW OF THE QUALITY CONTROL PROCEDURE RECORDS AND RAW DATA

02:48PM  13        FROM PATIENT TEST RUNS AND INTERVIEW WITH THE GENERAL

02:48PM  14        SUPERVISOR, THE LABORATORY FAILED TO ENSURE THAT THE QC WAS

02:48PM  15        ACCEPTABLE FOR THE THERANOS PROPRIETARY SYSTEM PRIOR TO

02:48PM  16        REPORTING PATIENT RESULTS."

02:48PM  17             DO YOU SEE THAT?

02:48PM  18        A.   I DO.

02:48PM  19        Q.   OKAY.  AND SO THIS IS ONE OF THE CONTROL PROCEDURES

02:48PM  20        STANDARD LEVEL NONCOMPLIANCE; CORRECT?

02:48PM  21        A.   YES.

02:48PM  22        Q.   AND THE NEXT PARAGRAPH I'M NOT GOING TO READ IT ALL, BUT

02:48PM  23        THE NEXT PARAGRAPH, JUST TO ORIENT US A BIT, THE NEXT PARAGRAPH

02:49PM  24        SUB A READS, "CL SOP-15026 REVISION A, EDISON 3.5 THERANOS

02:49PM  25        SYSTEM DAILY QC PROCEDURES, STATED THE FOLLOWING:  FOR ANY
```

ER-3661

BENNETT CROSS BY MR. CAZARES (RES.)                    4981

02:49PM   1    SINGLE EDISON INSTRUMENT, REJECT QC IF EITHER LEVEL IS GREATER

02:49PM   2    THAN 2 SD OR IF EITHER LEVEL FALLS ON THE SAME SIDE OF THE MEAN

02:49PM   3    FOR 10 CONSECUTIVE DAYS."

02:49PM   4        DO YOU SEE THAT?

02:49PM   5    A.   I DO.

02:49PM   6    Q.   AND THEN ON THE NEXT PAGE, ON PAGE 42 THERE'S A

02:49PM   7    DESCRIPTION OF YOUR FINDINGS.

02:49PM   8        DO YOU SEE THAT?

02:49PM   9    A.   YES.

02:49PM   10   Q.   OKAY.  AND, FOR EXAMPLE, IN SUB C THE REPORT SAYS, "THE

02:49PM   11   GENERAL SUPERVISOR STATED THAT WHEN THE QC WAS UNACCEPTABLE,

02:49PM   12   THE TPS DEVICE LOCKED OUT PATIENT TESTING FOR 24 HOURS OR UNTIL

02:49PM   13   THE QC WAS ACCEPTABLE, AND IF THE QC WAS UNACCEPTABLE, ANOTHER

02:50PM   14   DEVICE WOULD BE USED FOR TESTING."

02:50PM   15       DO YOU SEE THAT?

02:50PM   16   A.   I DO.

02:50PM   17   Q.   OKAY.  AND THEN YOU IDENTIFY SOME EVIDENCE SHOWING

02:50PM   18   THERANOS'S NONCOMPLIANCE WITH ITS QC POLICY; CORRECT?

02:50PM   19   A.   YES.

02:50PM   20   Q.   AND JUST TO BE CLEAR, IT'S THE FAILURE TO FOLLOW THE

02:50PM   21   POLICY THAT'S THE VIOLATION; CORRECT?

02:50PM   22   A.   THE VIOLATION IS THAT THEY DID NOT HAVE ACCEPTABLE CONTROL

02:50PM   23   VALUES BEFORE THEY RELEASED PATIENT TEST RESULTS.

02:50PM   24   Q.   WHICH WAS IN VIOLATION OF THE LAB'S POLICY; CORRECT?

02:50PM   25   A.   IT'S A REQUIREMENT THAT QUALITY CONTROL BE ACCEPTABLE

02:50PM  1      PRIOR TO RELEASING PATIENT TEST RESULTS.

02:50PM  2      Q.   AND --

02:50PM  3      A.   AND THEY DIDN'T FOLLOW THEIR PROCEDURE.

02:50PM  4           BUT THEY DIDN'T MEET THE REQUIREMENT FOR ACCEPTABLE

02:51PM  5      CONTROLS BEFORE REPORTING PATIENT RESULTS.

02:51PM  6      Q.   CORRECT.  AND WE'LL LOOK AT SOME OF THESE.

02:51PM  7           SO IF YOU LOOK AT SUB D.  UNDER SUB D THERE'S AN

02:51PM  8      IDENTIFICATION "QC RECORDS FOR SEX HORMONE BINDING GLOBULIN."

02:51PM  9           DO YOU SEE THAT?

02:51PM 10      A.   I DO.

02:51PM 11      Q.   "SHOWED ON A DEVICE," AND THERE'S A DEVICE NUMBER.

02:51PM 12           DO YOU SEE THAT?

02:51PM 13      A.   I DO.

02:51PM 14      Q.   "QC LEVEL 2'S 24-HOUR EXPIRATION WAS ON 8/14/14 AT 18:54

02:51PM 15      AND WAS NOT RUN AGAIN UNTIL 8/15/2014 AT 05."

02:51PM 16           DO YOU SEE THAT?

02:51PM 17      A.   YES.

02:51PM 18      Q.   AND SO IT LOOKS LIKE THE 24-HOUR EXPIRATION PERIOD ON THE

02:51PM 19      PRIOR QC EXPIRED AT, WHAT IS THAT, 6:54 P.M.?

02:51PM 20      A.   YES.

02:51PM 21      Q.   I GUESS THAT'S MILITARY TIME, OR SOMETHING LIKE THAT.

02:51PM 22           IT'S 6:54 P.M.?

02:51PM 23      A.   THAT'S HOW IT WAS REFLECTED ON THE QC PRINTOUT.

02:51PM 24      Q.   OKAY.  AND IT WASN'T RUN AGAIN UNTIL IT LOOKS LIKE JUST

02:52PM 25      AFTER MIDNIGHT; CORRECT?

ER-3663

BENNETT CROSS BY MR. CAZARES (RES.)                    4983

02:52PM   1    A.   YES.

02:52PM   2    Q.   BUT A PATIENT'S RESULT WAS RUN SOMEWHERE AROUND 7:09 P.M.

02:52PM   3         DO YOU SEE THAT?

02:52PM   4    A.   I DO.

02:52PM   5    Q.   SO THAT PATIENT RUN SHOULDN'T HAVE HAPPENED UNTIL AFTER

02:52PM   6    THE NEXT QC PASSED; CORRECT?

02:52PM   7    A.   YES.

02:52PM   8    Q.   SO THE RUNNING OF IT AFTER THE EXPIRATION OF THE PRIOR QC,

02:52PM   9    THAT WAS THE VIOLATION; CORRECT?

02:52PM  10    A.   THE VIOLATION WAS THAT THEY DIDN'T HAVE ACCEPTABLE QC

02:52PM  11    BEFORE THEY RAN THE REPORTED PATIENT RESULTS.

02:52PM  12    Q.   AND IN THIS INSTANCE IT WAS THE PRIOR QC PASSED, BUT IT

02:52PM  13    EXPIRED AND THEY DIDN'T RUN ANOTHER QC BEFORE RUNNING THIS

02:52PM  14    PATIENT SAMPLE; CORRECT?

02:52PM  15    A.   I DO NOT KNOW IF THE 24-HOUR -- 24-HOUR QUALITY CONTROL

02:52PM  16    WAS ACCEPTABLE OR NOT BECAUSE IT'S NOT IN THE 2567.

02:52PM  17         THE VIOLATION WAS THAT THEY REPORTED PATIENT TEST RESULTS

02:52PM  18    WITHOUT ACCEPTABLE QUALITY CONTROL.

02:52PM  19    Q.   SO IN THIS INSTANCE THEN, YOU DON'T KNOW, OR YOU'RE NOT

02:53PM  20    REPORTING THAT A PATIENT RESULT WAS ISSUED AFTER A FAILED QC;

02:53PM  21    CORRECT?

02:53PM  22    A.   NOT IN THIS PARTICULAR CITATION.

02:53PM  23    Q.   OKAY.  BUT IN OTHER CITATIONS, THERE WERE FAILED QC'S AND

02:53PM  24    RESULTS?

02:53PM  25    A.   I BELIEVE SO.  I BELIEVE SO.

BENNETT CROSS BY MR. CAZARES (RES.)                    4984

02:53PM  1    Q.   OKAY.  NOW, IN THIS SECTION THAT WE'RE TALKING ABOUT, THIS

02:53PM  2    QC POLICY NONCOMPLIANCE RELATING TO THE EDISON TESTING, IT'S

02:53PM  3    CORRECT THAT THE REPORT IDENTIFIES NO EVIDENCE THAT PATIENTS

02:53PM  4    ACTUALLY RECEIVED INACCURATE RESULTS; CORRECT?

02:53PM  5    A.   THAT'S NOT WHAT THIS CITATION IS ABOUT, AND I CAN'T SPEAK

02:53PM  6    TO THAT, WHETHER THEY RECEIVED INACCURATE RESULTS OR NOT.

02:53PM  7    Q.   OKAY.  BECAUSE THAT'S NOT WHAT THE CITATION IS ABOUT?

02:53PM  8    A.   THAT'S NOT WHAT THE CITATION IS ABOUT.

02:53PM  9    Q.   OKAY.

02:53PM  10        AND THIS CITATION IDENTIFIES NO EVIDENCE THAT PATIENTS

02:53PM  11   WERE ACTUALLY AFFECTED BY THE DEFICIENCY; CORRECT?

02:53PM  12   A.   I CAN SAY THAT THERE WAS POTENTIAL FOR THEM TO BE

02:54PM  13   AFFECTED, BUT I CANNOT SPECIFICALLY SAY THAT A SPECIFIC PATIENT

02:54PM  14   WAS AFFECTED.

02:54PM  15   Q.   AND THE REPORT IDENTIFIES NO PATIENTS AFFECTED BY THE

02:54PM  16   NONCOMPLIANCE; CORRECT?

02:54PM  17   A.   THE CITATIONS INCLUDE A PATIENT IDENTIFIER TO IDENTIFY THE

02:54PM  18   PATIENT THAT WOULD HAVE BEEN -- COULD HAVE BEEN AFFECTED BY

02:54PM  19   THIS DEFICIENT PRACTICE.

02:54PM  20   Q.   BUT MY POINT IS THAT YOUR WORK DID NOT REACH ANY

02:54PM  21   CONCLUSION THAT THE PATIENT IDENTIFIED WAS ACTUALLY AFFECTED BY

02:54PM  22   THE NONCOMPLIANCE; CORRECT?

02:54PM  23   A.   NO, BECAUSE THAT'S NOT WHAT THE CITATION IS ABOUT.

02:54PM  24   Q.   OKAY.  NOW, FOR EXAMPLE, THIS ISSUE TOOK PLACE THAT WE

02:54PM  25   JUST TALKED ABOUT ON SUB D ON PAGE 42 IN AUGUST OF 2014.

ER-3665

BENNETT CROSS BY MR. CAZARES (RES.)                    4985

02:54PM  1            DO YOU SEE THAT?

02:54PM  2        A.   I DO.

02:54PM  3        Q.   NOW, WITHIN THE LABORATORY AT THAT TIME, THE CLINICAL

02:55PM  4    LABORATORY, THE LABORATORY DIRECTOR ULTIMATELY HAS

02:55PM  5    RESPONSIBILITY TO ENSURE THAT HIS STAFF IS FOLLOWING CLIA AND

02:55PM  6    THE POLICIES OF THE LAB; CORRECT?

02:55PM  7        A.   YES.

02:55PM  8        Q.   AND THE LAB DIRECTOR MAY EVEN DELEGATE SOME OF THOSE

02:55PM  9    RESPONSIBILITIES TO OTHER QUALIFIED PERSONS; CORRECT?

02:55PM  10       A.   CORRECT.

02:55PM  11       Q.   OKAY.  IN ADDITION, IN THIS PASSAGE THAT WE'RE LOOKING AT

02:55PM  12   RIGHT HERE UNDER D-TAG 5481 RELATING TO THE QC NONCOMPLIANCE

02:55PM  13   THAT WE JUST TALKED ABOUT, THE REPORT IDENTIFIES NO EVIDENCE

02:55PM  14   THAT MR. BALWANI WAS AWARE OF THIS QC NONCOMPLIANCE PRIOR TO

02:55PM  15   THE SURVEY; CORRECT?

02:55PM  16       A.   IT DOES NOT.

02:55PM  17       Q.   IF WE CAN TURN TO PAGE 9, OR PUT THAT UP ON THE SCREEN.

02:56PM  18            AND THAT PAGE 9 IS D-TAG 5311.

02:56PM  19            AND AT THE TOP OF THE SCREEN AND THE PAGE, 5311 IS

02:56PM  20   DESCRIBED AS SPECIMEN SUBMISSION HANDLING AND REFERRAL.

02:56PM  21            DO YOU SEE THAT?

02:56PM  22       A.   I DO.

02:56PM  23       Q.   AND THIS IS ALSO A STANDARD LEVEL DEFICIENCY LIKE THE LAST

02:56PM  24   ONE WE TALKED ABOUT; CORRECT?

02:56PM  25       A.   IT IS.

ER-3666

02:56PM  1    Q.   AND HERE THE NONCOMPLIANCE IS DESCRIBED AS THIS STANDARD

02:56PM  2    IS NOT MET AS EVIDENCED BY:  PREANALYTIC POLICIES AND

02:57PM  3    PROCEDURES -- I'M SORRY.  LET ME BACK UP.

02:57PM  4         "THIS STANDARD IS NOT MET AS EVIDENCED BY," AND THEN,

02:57PM  5    "BASED ON LABORATORY PERSONNEL INTERVIEWS, AND PREANALYTIC

02:57PM  6    POLICIES AND PROCEDURES RECORD REVIEW.  ON SEPTEMBER 23RD,

02:57PM  7    2015, THE LABORATORY FAILED TO ESTABLISH WRITTEN POLICIES AND

02:57PM  8    PROCEDURES FOR PATIENT SPECIMEN HANDLING," AND THEN IT

02:57PM  9    DESCRIBES THE FINDINGS INCLUDED.

02:57PM 10         "IT WAS THE PRACTICE OF THE LABORATORY TO REQUIRE THAT ALL

02:57PM 11    PATIENT SPECIMENS RECEIVED BE LABELLED WITH LABORATORY

02:57PM 12    GENERATED BAR CODES THAT WERE ISSUED AT THE POINT OF SPECIMEN

02:57PM 13    COLLECTION."

02:57PM 14         SO I GUESS IT WAS DESCRIBED TO YOU THAT THE LAB HAD A

02:57PM 15    PRACTICE OF LABELLING SPECIMENS UPON RECEIPT IN THIS

02:57PM 16    PREANALYTIC TIME PERIOD; CORRECT?

02:57PM 17    A.   THIS IS MR. YAMAMOTO'S CITATION, NOT MINE.

02:57PM 18    Q.   OKAY.  SO YOU'RE NOT FAMILIAR WITH THE DETAILS?

02:57PM 19    A.   I DID NOT CITE THIS.  HE CITED THIS.

02:57PM 20    Q.   BUT THE BOTH OF YOU KIND OF WORKED TOGETHER ON THE

02:57PM 21    ULTIMATE FINAL PRODUCT OF THE SURVEY REPORT; CORRECT?

02:58PM 22    A.   WE WORKED ON EACH OF OUR PARTS AND COMBINED THEM INTO ONE,

02:58PM 23    YES.

02:58PM 24    Q.   OKAY.  BUT THIS PART ISN'T YOURS?

02:58PM 25    A.   THAT IS NOT.

BENNETT CROSS BY MR. CAZARES (RES.)                    4987

02:58PM 1     Q.   OKAY.  THEN THE REPORT CONTINUES, "THE LABORATORY

02:58PM 2     MAINTAINED NO WRITTEN POLICIES AND PROCEDURES DETAILING THIS

02:58PM 3     PATIENT SPECIMEN LABELLING POLICY AND PROCEDURE."

02:58PM 4          DO YOU SEE THAT?

02:58PM 5     A.   I DO.

02:58PM 6     Q.   SO IT SOUNDS LIKE THEY HAD A PRACTICE, BUT NOT ACTUALLY A

02:58PM 7     WRITTEN POLICY TO GOVERN THE PRACTICE; IS THAT A FAIR READING?

02:58PM 8     A.   IT APPEARS FROM SUB B THAT THEY DID NOT HAVE A WRITTEN

02:58PM 9     POLICY, A PROCEDURE ABOUT PATIENT SPECIMEN LABELLING.

02:58PM 10    Q.   OKAY.  AND THEN THAT SECTION OF THE REPORT CONTINUED,

02:58PM 11    "ACCORDING TO LABORATORY RECORDS, THE LABORATORY PERFORMED

02:58PM 12    APPROXIMATELY 890,000 PATIENT TESTS ANNUALLY."

02:59PM 13         DO YOU SEE THAT?

02:59PM 14    A.   I DO.

02:59PM 15    Q.   AND THAT'S CONSISTENT WITH SOME OF THE DOCUMENTS OR THE

02:59PM 16    RECORDS THAT WE LOOKED AT YESTERDAY RELATING TO THE APPLICATION

02:59PM 17    FOR RENEWAL BY THE LAB; CORRECT?

02:59PM 18    A.   YES.

02:59PM 19    Q.   OKAY.  IF WE CAN TURN TO PAGE 51.

02:59PM 20         51 RELATES TO WHAT IS D-TAG 5791, ANALYTIC SYSTEMS QUALITY

02:59PM 21    ASSESSMENT.

02:59PM 22         DO YOU SEE THAT?

02:59PM 23    A.   I DO.

02:59PM 24    Q.   AND THIS ISSUE IS DESCRIBED AS, "THE LABORATORY MUST

02:59PM 25    ESTABLISH AND FOLLOW WRITTEN POLICIES AND PROCEDURES FOR AN

ER-3668

BENNETT CROSS BY MR. CAZARES (RES.)                    4988

02:59PM   1    ONGOING MECHANISM TO MONITOR, ASSESS, AND WHEN INDICATED,

02:59PM   2    CORRECT PROBLEMS IDENTIFIED IN THE ANALYTICAL SYSTEMS SPECIFIED

03:00PM   3    IN," AND I'M NOT SURE IF THE NEXT PAGE CONTINUES THAT SENTENCE

03:00PM   4    FULLY, BUT I'LL CONTINUE WITH THE NEXT PAGE.

03:00PM   5        THIS ISSUE, IS, AGAIN, IDENTIFIED AS A STANDARD LEVEL

03:00PM   6    DEFICIENCY; CORRECT?

03:00PM   7    A.   YES.

03:00PM   8    Q.   AND THIS DEFICIENCY, IF WE CONTINUE ON PAGE 2, I THINK YOU

03:00PM   9    REVIEWED THIS WITH THE GOVERNMENT, RELATES TO, AGAIN, QUALITY

03:00PM  10    CONTROL RELATING TO THE EDISON.

03:00PM  11        DO YOU SEE THAT AT THE BOTTOM OF PAGE 53?

03:00PM  12    A.   YES.

03:00PM  13    Q.   AND AGAIN, IF YOU TURN TO THE NEXT PAGE.

03:00PM  14        THIS IS THE ISSUE WHERE IT LOOKS LIKE -- AND I THINK THIS

03:00PM  15    IS YOUR PORTION OF THE SURVEY; CORRECT?  THIS IS YOUR WORK?

03:00PM  16    A.   THIS IS MY WORK.

03:00PM  17    Q.   OKAY.  AND YOU REVIEWED THE MASTER VALIDATION PLAN FOR

03:00PM  18    ROUTINE CHEMISTRY ASSAYS ON THERANOS'S DEVICES AS DESCRIBED IN

03:00PM  19    THE REPORT?

03:00PM  20    A.   YES.

03:00PM  21    Q.   AND THAT PLAN REQUIRED PERCENT CV OF REPLICATES TO BE NOT

03:01PM  22    MORE THAN 15 PERCENT; IS THAT RIGHT?

03:01PM  23    A.   THAT'S TRUE.

03:01PM  24    Q.   AND THEN AS YOU DESCRIBED WITH MR. LEACH, YOU IDENTIFIED

03:01PM  25    INSTANCES WHERE THE QC WAS NOT MEETING THAT REQUIREMENT;

BENNETT CROSS BY MR. CAZARES (RES.)                4989

03:01PM  1    CORRECT?

03:01PM  2    A.   YES.

03:01PM  3    Q.   AND THAT WAS, AGAIN, THE QC NOT MEETING THE LAB'S OWN PLAN

03:01PM  4    FOR THESE ASSAYS; CORRECT?

03:01PM  5    A.   YES.

03:01PM  6    Q.   AND THAT'S THE NONCOMPLIANCE; CORRECT?

03:01PM  7    A.   THE NONCOMPLIANCE IS THAT THEY DID NOT IDENTIFY THE

03:01PM  8    PROBLEM WITH THE HIGH CV'S AND COME UP WITH A PLAN TO

03:01PM  9    INVESTIGATE IT AND CORRECT THE PROBLEM.

03:01PM  10       THEY HAD NOTHING IN THEIR QUALITY ASSESSMENT PLAN THAT

03:01PM  11   WOULD IDENTIFY AND CORRECT THIS ISSUE, SO IT CONTINUED.

03:02PM  12   Q.   AND AS YOU DESCRIBED TO MR. LEACH, THESE ARE UNDESIRABLE

03:02PM  13   RESULTS, THE CV NUMBERS THAT YOU SEE ON THE PAGE; CORRECT?

03:02PM  14   A.   YES.

03:02PM  15   Q.   BUT THE SURVEY REPORT IDENTIFIES NO EVIDENCE THAT

03:02PM  16   MR. BALWANI WAS AWARE OF THIS SPECIFIC QC NONCOMPLIANCE PRIOR

03:02PM  17   TO YOUR SURVEY; CORRECT?

03:02PM  18   A.   NOT THAT I'M AWARE.

03:02PM  19   Q.   JUST TO CONFIRM HERE.  SO THE VIOLATION IS NOT HAVING A

03:02PM  20   QUALITY ASSURANCE PLAN?

03:02PM  21   A.   THEY HAVE TO HAVE A QUALITY ASSURANCE PLAN THAT WILL

03:02PM  22   IDENTIFY ISSUES.  THEY HAVE TO HAVE POLICIES AND PROCEDURES TO

03:02PM  23   IDENTIFY PROBLEMS, CORRECT THE PROBLEMS, AND MAKE SURE THAT

03:02PM  24   THEY DON'T RECUR.

03:02PM  25   Q.   AND THAT'S THE LAB DIRECTOR'S RESPONSIBILITY; RIGHT?

03:02PM  1    A.   THAT'S A LABORATORY -- IT'S A REQUIREMENT FOR THE

03:03PM  2    LABORATORY.

03:03PM  3    Q.   AND THE LAB DIRECTOR IS RESPONSIBLE FOR THE LAB; CORRECT?

03:03PM  4    A.   YES.

03:03PM  5    Q.   AND ANY SUCH PLANS THAT YOU DESCRIBED THAT THIS LAB

03:03PM  6    APPARENTLY DIDN'T HAVE, THE LAB DIRECTOR WOULD NEED TO

03:03PM  7    IMPLEMENT AND APPROVE THOSE PLANS; CORRECT?

03:03PM  8    A.   YES, THE LABORATORY DIRECTOR HAS TO APPROVE OF THE

03:03PM  9    PROCEDURES.

03:03PM  10   Q.   IF WE CAN GO TO PAGE 16.

03:03PM  11           THE COURT:  WHY DON'T WE TAKE A BREAK NOW?  CAN WE

03:03PM  12   TAKE 15 MINUTES, FOLKS?  CAN WE TAKE 15 MINUTES?  AND THEN

03:03PM  13   WE'LL RETURN TO PAGE 16.

03:03PM  14        (RECESS FROM 3:03 P.M. UNTIL 3:20 P.M.)

03:20PM  15           THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

03:20PM  16   RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

03:20PM  17        MS. BENNETT, I FAILED TO ASK YOU TO STATE YOUR NAME WHEN

03:20PM  18   YOU SAT DOWN EARLIER THIS AFTERNOON.

03:20PM  19        WE KNOW WHO YOU ARE NOW.  I JUST WANT TO REMIND YOU, AND I

03:20PM  20   FAILED TO TELL YOU, YOU ARE STILL UNDER OATH.  AND YOU

03:20PM  21   RECOGNIZED THAT WHEN YOU BEGAN YOUR TESTIMONY TODAY, DID YOU?

03:20PM  22           THE WITNESS:  I DID.

03:20PM  23           THE COURT:  THANK YOU VERY MUCH.  I APOLOGIZE FOR

03:20PM  24   THAT INCONVENIENCE.

03:20PM  25           COUNSEL.

BENNETT CROSS BY MR. CAZARES (RES.)                    4991

03:20PM   1              MR. CAZARES:  THANK YOU, YOUR HONOR.

03:20PM   2    Q.   MS. BENNETT, I HAVE SOME FURTHER QUESTIONS AGAIN RELATING

03:20PM   3    TO THE SURVEY REPORT THAT WE WERE JUST TALKING ABOUT.

03:20PM   4         IF WE CAN PUT UP ON THE SCREEN AND START WITH PAGE 58 AT

03:21PM   5    D-TAG 5793.

03:21PM   6         AND I THINK YOU TALKED A LITTLE BIT ABOUT THIS TOPIC WITH

03:21PM   7    THE GOVERNMENT YESTERDAY.

03:21PM   8         AND SO D-TAG 5793 IS THE SUBJECT OF ANALYTIC SYSTEMS

03:21PM   9    QUALITY ASSESSMENT.

03:21PM  10         DO YOU SEE THAT?

03:21PM  11    A.   I DO.

03:21PM  12    Q.   AND THEN, AGAIN, ONE OF THE STANDARD LEVEL NONCOMPLIANCE;

03:21PM  13    CORRECT?

03:22PM  14    A.   YES.

03:22PM  15    Q.   AND THE DESCRIPTION OF THE REQUIREMENT IS "THE ANALYTIC

03:22PM  16    SYSTEMS QUALITY ASSESSMENT MUST INCLUDE A REVIEW OF THE

03:22PM  17    EFFECTIVENESS OF CORRECTIVE ACTIONS TAKEN TO RESOLVE PROBLEMS,

03:22PM  18    REVISION OF POLICIES AND PROCEDURES NECESSARY TO PREVENT

03:22PM  19    REOCCURRENCE OF PROBLEMS AND DISCUSSION OF ANALYTIC SYSTEMS

03:22PM  20    QUALITY ASSESSMENT REVIEWS WITH APPROPRIATE STAFF."

03:22PM  21         DO YOU SEE THAT?

03:22PM  22    A.   I DO.

03:22PM  23    Q.   AND THEN IF WE TURN TO PAGE 71 AT ITEM 9 NEAR THE BOTTOM

03:22PM  24    OF 71.

03:22PM  25         DO YOU SEE THAT?

ER-3672

BENNETT CROSS BY MR. CAZARES (RES.)                    4992

03:22PM   1    A.   I DO.

03:22PM   2    Q.   AND ITEM 9 READS, "BASED ON REVIEW OF THE ALTERNATIVE

03:22PM   3    ASSESSMENT PROCEDURE AND RESULTS OF AAP FROM AUGUST 2014

03:22PM   4    THROUGH MARCH 2015, THE LABORATORY FAILED TO IDENTIFY THROUGH

03:22PM   5    THE QUALITY ASSESSMENT ACTIVITIES THAT THE AAP FOR THE THERANOS

03:22PM   6    PROPRIETARY SYSTEM WAS NOT PERFORMED EVERY 6 MONTHS AND WAS NOT

03:22PM   7    REVIEWED AND APPROVED BY THE LABORATORY DIRECTOR IN A TIMELY

03:22PM   8    MANNER AS REQUIRED BY THE LABORATORY'S PROCEDURES, AND

03:22PM   9    THEREFORE, INEFFECTIVE."

03:22PM  10         DO YOU SEE THAT?

03:22PM  11    A.   I DO.

03:23PM  12    Q.   AND WAS THIS ONE OF YOUR -- YOUR WORK PRODUCT OR

03:23PM  13    MR. YAMAMOTO?

03:23PM  14    A.   THIS IS MINE.

03:23PM  15    Q.   OKAY.  AND THE FINDINGS ARE DESCRIBED AS, A, "CL SOP-00020

03:23PM  16    REVISION B PROFICIENCY TESTING FOR THERANOS LAB-DEVELOPED TESTS

03:23PM  17    EFFECTIVE JANUARY 1, 2014, STATED IN SECTION 3.1 THAT THE

03:23PM  18    TECHNICAL SUPERVISOR WAS RESPONSIBLE FOR ENSURING THAT THE AAP

03:23PM  19    WAS CONDUCTED EVERY 6 MONTHS FOR ALL ANALYTES."

03:23PM  20         DO YOU SEE THAT?

03:23PM  21    A.   I DO.

03:23PM  22    Q.   AND THEN THE NEXT PARAGRAPH, SUB B, DESCRIBES THE

03:23PM  23    TECHNICAL SUPERVISOR RESPONSIBLE FOR EVALUATING.

03:23PM  24         DO YOU SEE THAT?

03:23PM  25    A.   I DO.

03:23PM 1    Q.   OKAY.  AND THEN BELOW THAT ON SUB C, THERE'S A DESCRIPTION

03:23PM 2    OF "REVIEW OF THE AAP RESULT FORMS," AND THERE'S A DOCUMENT

03:23PM 3    I.D., "REVEALED THAT THE AAP WAS PERFORMED ON AUGUST 18TH,

03:24PM 4    2014, OCTOBER 21ST, 2014, AND MARCH 13TH, 2015."

03:24PM 5        DO YOU SEE THAT?

03:24PM 6    A.   I DO.

03:24PM 7    Q.   AND THE CITATION HERE, DOES THAT INDICATE THAT YOU

03:24PM 8    ACTUALLY RECEIVED THE RECORDS FOR THAT; CORRECT?

03:24PM 9    A.   I DID.

03:24PM 10   Q.   OKAY.  AND SO THE LAB ACTUALLY PERFORMED THE AAP

03:24PM 11   PROCEDURE; CORRECT?

03:24PM 12   A.   ON THOSE DATES.

03:24PM 13   Q.   AS REFLECTED IN THE EVIDENCE THAT YOU WERE GIVEN?

03:24PM 14   A.   YES.

03:24PM 15   Q.   AND THEN YOU CONTINUE, "ALL THREE RESULT FORMS DID NOT

03:24PM 16   INCLUDE A DOCUMENTED EVALUATION BY THE TECHNICAL SUPERVISOR."

03:24PM 17       DO YOU SEE THAT?

03:24PM 18   A.   I DO.

03:24PM 19   Q.   AND THEN THE SECTION CONTINUES, "THE RESULT DOCUMENTS FROM

03:24PM 20   AUGUST 18, 2014, AND MARCH 15, 2015, WERE NOT SIGNED BY THE

03:24PM 21   LABORATORY DIRECTOR UNTIL NOVEMBER 15TH, 2015, AND THE RESULT

03:24PM 22   FORM FROM OCTOBER 12TH, 2014, WAS NOT SIGNED BY THE LAB

03:25PM 23   DIRECTOR."

03:25PM 24       DO YOU SEE THAT?

03:25PM 25   A.   I DO.

03:25PM 1   Q.   AND SO ONE OF THE ISSUES HERE IS THAT THE TECHNICAL

03:25PM 2   SUPERVISOR, THERE WAS NO DOCUMENTATION THAT THE TECHNICAL

03:25PM 3   SUPERVISOR EVALUATED THE AAP RESULTS; CORRECT?

03:25PM 4   A.   THAT'S TRUE.

03:25PM 5   Q.   AND THEN THE SIGNATURES AND APPROVAL BY THE LAB DIRECTOR

03:25PM 6   WERE MISSING FOR ONE AND WERE NOT SIGNED UNTIL 2015 FOR OTHERS;

03:25PM 7   CORRECT?

03:25PM 8   A.   CORRECT, RIGHT BEFORE WE CAME BACK IN NOVEMBER.

03:25PM 9   Q.   BUT, AGAIN, IT DOES APPEAR THAT THE LAB PERFORMED THE AAP

03:25PM 10  PROCEDURE; CORRECT?

03:25PM 11  A.   IT DOES.

03:25PM 12  Q.   AND IN THIS PASSAGE OF THE SURVEY REPORT RELATING TO THIS

03:25PM 13  AAP ISSUE, I GUESS IS THE ISSUE THEN THAT THE LAB DIDN'T MEET

03:26PM 14  THE SIX MONTH REQUIREMENT; IS THAT CORRECT?

03:26PM 15  A.   THE ISSUE IS THAT THEIR QUALITY ASSESSMENT PROCESS DID NOT

03:26PM 16  IDENTIFY THAT THEY WERE NOT PERFORMING THE AAP AS THEY WERE

03:26PM 17  SUPPOSED TO.

03:26PM 18      THEY WERE --

03:26PM 19  Q.   AND THAT WAS A SIX MONTH REQUIREMENT; CORRECT?

03:26PM 20  A.   YEAH, THAT WAS THEIR REQUIREMENT.

03:26PM 21  Q.   OKAY.  AND --

03:26PM 22      MR. LEACH:  YOUR HONOR, MAY THE WITNESS BE PERMITTED

03:26PM 23  TO FINISH HER ANSWER?

03:26PM 24      THE COURT:  YEAH, SHE WAS IN THE MIDDLE OF HER

03:26PM 25  ANSWER.

03:26PM   1                    MR. CAZARES:  I WILL NOT STEP OVER HER STATEMENT.

03:26PM   2                    THE COURT:  DID YOU FINISH YOUR ANSWER?

03:26PM   3                    THE WITNESS:  NOT QUITE.

03:26PM   4                    THE COURT:  WHY DON'T YOU FINISH YOUR ANSWER.

03:26PM   5                    THE WITNESS:  AND THE REST OF THE ISSUE WAS THAT

03:26PM   6      THEY HAD NOT PERFORMED IT ON -- PERFORMED THE AAP ON TESTS THAT

03:26PM   7      WERE INITIALLY STARTED IN NOVEMBER OF 2013.

03:26PM   8      BY MR. CAZARES:

03:26PM   9      Q.   BECAUSE SUB F DESCRIBES "FOUR TESTS (VITAMIN D, THYROID

03:27PM  10      STIMULATING HORMONE, FREE T4, AND TOTAL PROSTATE SPECIFIC

03:27PM  11      ANTIGEN) WERE INITIALLY IMPLEMENTED IN NOVEMBER OF 2013."

03:27PM  12           DO YOU SEE THAT?

03:27PM  13      A.   I DO.

03:27PM  14      Q.   SO YOU RECEIVED SOME RECORDS SHOWING THAT THEY STARTED

03:27PM  15      THAT TESTING IN NOVEMBER OF 2013; RIGHT?

03:27PM  16      A.   THAT WAS THE LETTER FROM MR. BALWANI.

03:27PM  17      Q.   AND THEN THE INITIAL AAP PROCEDURE OR CHALLENGE DIDN'T

03:27PM  18      TAKE PLACE UNTIL AUGUST 18TH OF 2014 ACCORDING TO THE RECORDS;

03:27PM  19      CORRECT?

03:27PM  20      A.   THAT'S -- YES.

03:27PM  21      Q.   AND AUGUST 18TH, 2014 IS MORE THAN SIX MONTHS BEYOND

03:27PM  22      NOVEMBER 2013?

03:27PM  23      A.   THAT'S CORRECT.

03:27PM  24      Q.   OKAY.  SO IF THEY HAD DONE IT A COUPLE MONTHS EARLIER,

03:27PM  25      THEY AT LEAST MAY HAVE SATISFIED THAT SIX MONTH REQUIREMENT;

03:27PM   1    CORRECT?

03:27PM   2    A.   YES.  BUT THEY DID NOT.

03:27PM   3    Q.   OKAY.  AND YOU IDENTIFY NO EVIDENCE IN THE SURVEY REPORT

03:28PM   4    THAT THIS FAILURE TO MEET THE SIX MONTH REQUIREMENT FOR THE AAP

03:28PM   5    ACTUALLY AFFECTED PATIENT RESULTS; CORRECT?

03:28PM   6    A.   THAT'S NOT THE PURPOSE OF THIS.  SO I GUESS THE ANSWER

03:28PM   7    WOULD BE NO.

03:28PM   8    Q.   THANK YOU.

03:28PM   9         IN THE BINDER OF DOCUMENTS THAT YOU HAVE, THERE SHOULD BE

03:28PM   10   A DOCUMENT IDENTIFIED AS 26 -- OH, NO, IT'S NOT.  I HAVE IT.

03:28PM   11        YOUR HONOR, MAY I APPROACH?

03:28PM   12             THE COURT:  YES.

03:28PM   13             MR. CAZARES:  (HANDING.)

03:29PM   14   Q.   MS. BENNETT, I'M HANDING YOU A DOCUMENT MARKED 20633.

03:29PM   15        ARE YOU LOOKING AT EXHIBIT 20633?

03:29PM   16   A.   YES.

03:29PM   17   Q.   OKAY.  AND YOU SEE AT THE TOP IT'S TITLED STANDARD

03:29PM   18   OPERATING PROCEDURE, ALTHOUGH THE TYPING IS A LITTLE UNCLEAR?

03:29PM   19   A.   YES.

03:29PM   20   Q.   AND THE DOCUMENT APPEARS TO BE EFFECTIVE JANUARY 1, 2014?

03:29PM   21   A.   YES.

03:29PM   22   Q.   AND IT'S TITLED PROFICIENCY TESTING FOR THERANOS

03:29PM   23   LAB-DEVELOPED TESTS IMMUNOASSAYS.

03:29PM   24        DO YOU SEE THAT?

03:29PM   25   A.   I DO.

03:29PM   1    Q.   AND IF YOU LOOK AT THE DOCUMENT --

03:29PM   2         WELL, MR. ALLEN, IF WE CAN PUT UP ON THE SCREEN ON

03:30PM   3    PAGE 72 --

03:30PM   4              THE COURT:  IS THIS IN EVIDENCE?

03:30PM   5              MR. CAZARES:  OH, NOT THIS DOCUMENT.  A PRIOR

03:30PM   6    EXHIBIT.  I WAS GOING TO ASK HIM TO PUT UP A PRIOR EXHIBIT,

03:30PM   7    YOUR HONOR.  I'M SORRY.

03:30PM   8         EXHIBIT 4621, SUB A ON THE LEFT-HAND SIDE.

03:30PM   9    Q.   AND DO YOU SEE THE DOCUMENT NUMBER ON EXHIBIT 20633?

03:30PM  10    A.   I DO.

03:30PM  11    Q.   AND DOES THAT APPEAR TO BE THE SAME DOCUMENT NUMBER THAT

03:30PM  12    YOU'VE IDENTIFIED IN THE REPORT, CORRECT, CL SOP-00020,

03:30PM  13    REVISION B?

03:30PM  14    A.   IT APPEARS TO BE THE SAME DOCUMENT.

03:30PM  15              MR. CAZARES:  OKAY.  YOUR HONOR, MOVE TO ADMIT

03:30PM  16    26333.

03:30PM  17              THE COURT:  IT'S 20633.

03:30PM  18              MR. CAZARES:  YES, YOUR HONOR.

03:30PM  19              MR. LEACH:  NO OBJECTION.

03:30PM  20              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:30PM  21         (DEFENDANT'S EXHIBIT 20633 WAS RECEIVED IN EVIDENCE.)

03:30PM  22    BY MR. CAZARES:

03:30PM  23    Q.   AND JUST TO LOOK AT THE FIRST PAGE OF EXHIBIT 20633,

03:30PM  24    AGAIN, IT APPEARS TO BE THE PROFICIENCY TESTING FOR THERANOS

03:30PM  25    LAB-DEVELOPED TESTS (IMMUNOASSAYS).

03:31PM  1          DO YOU SEE THAT?

03:31PM  2     A.   I DO.

03:31PM  3     Q.   AND THIS IS THE DOCUMENT YOU REVIEWED IN WRITING UP THIS

03:31PM  4     NONCOMPLIANCE IN AAP FOR THE EDISON; CORRECT?

03:31PM  5     A.   IT APPEARS SO, YES.

03:31PM  6     Q.   AND IF YOU TURN TO THE THIRD PAGE OF THE DOCUMENT UNDER

03:31PM  7     PURPOSE, IF WE CAN BLOW THAT UP.

03:31PM  8          THE SOP READS, "THE PURPOSE OF THIS PROPOSAL IS TO DEVISE

03:31PM  9     AN ALTERNATIVE ASSESSMENT PROTOCOL FOR LABORATORY-DEVELOPED

03:31PM  10    TESTS ON THE EDISON 3.5 IMMUNOASSAY INSTRUMENT."

03:31PM  11         DO YOU SEE THAT?

03:31PM  12    A.   I DO.

03:31PM  13    Q.   AND THEN 1.2 READS, "GUIDELINE:  FOR NON-CMS-REGULATED

03:31PM  14    TESTS OR THOSE WHICH LACK FDA CLEARANCE, COMMERCIAL OR EXTERNAL

03:31PM  15    PT PROGRAMS MAY NOT BE AVAILABLE FOR CERTAIN ANALYTES."

03:31PM  16         DO YOU SEE THAT?

03:31PM  17    A.   YES.

03:31PM  18    Q.   AND THEN IT CONTINUES.

03:32PM  19         "IN SUCH INSTANCES, AN AAP WILL BE USED TO ENSURE ACCURACY

03:32PM  20    OF THE ONGOING TEST SYSTEM PERFORMANCE."

03:32PM  21         DO YOU SEE THAT?

03:32PM  22    A.   I DO.

03:32PM  23    Q.   AND IT IS WITHIN THE PURVIEW OF THE LAB DIRECTOR'S

03:32PM  24    AUTHORITY TO IMPLEMENT AN AAP PROGRAM AS REFLECTED IN 20633;

03:32PM  25    CORRECT?

BENNETT CROSS BY MR. CAZARES (RES.)                    4999

03:32PM  1       A.   IT IS.

03:32PM  2       Q.   AND THEN UNDER .2, SCOPE, THE AAP READS, "THE ALTERNATIVE

03:32PM  3   ASSESSMENT PROTOCOL APPLIES TO ALL LABORATORY DEVELOPED TESTS

03:32PM  4   ON THE EDISON 3.5 INSTRUMENT, AND WILL BE CONDUCTED EVERY

03:32PM  5   6 MONTHS."

03:32PM  6       DO YOU SEE THAT?

03:32PM  7       A.   I DO.

03:32PM  8       Q.   AND THAT WAS ONE OF THE ISSUES THAT YOU FOUND IN THAT THE

03:32PM  9   TESTING STARTED IN NOVEMBER OF 2014, BUT THE AAP PROCEDURES

03:32PM 10   DIDN'T START UNTIL AUGUST OF 2014; CORRECT?

03:32PM 11       A.   THAT'S CORRECT.

03:32PM 12       THE OTHER, THE OTHER ISSUE WITH THIS IS THAT --

03:32PM 13       Q.   I WAS JUST ASKING IF IT WAS CORRECT.

03:32PM 14       THANK YOU.

03:32PM 15       A.   SURE.

03:32PM 16       Q.   AND THEN IF WE TURN TO PAGE 6 OF THE SOP, YOU SEE THERE'S

03:33PM 17   A REVISION HISTORY?

03:33PM 18       A.   YES.

03:33PM 19       Q.   AND IT APPEARS THAT THE SOP DATES BACK TO NOVEMBER OF

03:33PM 20   2013.

03:33PM 21       DO YOU SEE THAT?

03:33PM 22       A.   I DO.

03:33PM 23       Q.   WE CAN SET THAT ASIDE.

03:33PM 24       AND, MR. ALLEN, IF WE CAN LEAVE UP ON THE SCREEN PAGE --

03:33PM 25   ON DOCUMENT 4621, PAGE 72, SUB B -- NO, SUB C ON THAT PAGE.

ER-3680

BENNETT CROSS BY MR. CAZARES (RES.)                                    5000

```
03:33PM   1              AND IN THE BINDER YOU HAVE, MS. BENNETT, IF YOU COULD TAKE
03:33PM   2     A LOOK AT EXHIBIT 20619, 20619.
03:34PM   3              ARE YOU LOOKING AT 20619?
03:34PM   4     A.   I AM.
03:34PM   5     Q.   OKAY.  SO THE FIRST PAGE OF 20619 APPEARS TO BE AN EMAIL
03:34PM   6     FROM YOURSELF TO MR. YAMAMOTO.
03:34PM   7              DO YOU SEE THAT?
03:34PM   8     A.   I DO.
03:34PM   9     Q.   AND IT APPEARS TO BE DATED OCTOBER 31, 2016.
03:34PM  10              DO YOU SEE THAT?
03:34PM  11     A.   I DO.
03:34PM  12     Q.   AND THEN THE SUBJECT APPEARS TO SAY EVIDENCE HASH TAG 7.
03:34PM  13              DO YOU SEE THAT?
03:34PM  14     A.   I DO.
03:34PM  15     Q.   AND THEN THERE ARE SOME ATTACHMENTS REFLECTED IN THE
03:34PM  16     EMAIL.
03:34PM  17              DO YOU SEE THAT?
03:34PM  18     A.   I DO.
03:34PM  19     Q.   OKAY.  AND THEN IF YOU FLIP, THERE ARE SOME ATTACHMENTS,
03:35PM  20     INCLUDING DOCUMENTS THAT APPEAR TO BE TITLED ALTERNATIVE
03:35PM  21     ASSESSMENT PROGRAM, THERANOS AT THE TOP?
03:35PM  22     A.   YES.
03:35PM  23     Q.   OKAY.  AND BEHIND THAT THERE ARE SOME OTHER DOCUMENTATION.
03:35PM  24              DO YOU SEE THAT?
03:35PM  25     A.   I DO.
```

BENNETT CROSS BY MR. CAZARES (RES.)                                    5001

03:35PM   1      Q.   OKAY.  AND AGAIN, IN YOUR WORK AT CMS, WHILE YOU WERE

03:35PM   2      DOING THE SURVEY WITH MR. YAMAMOTO AND THE WORK INVOLVED IN

03:35PM   3      SURVEYING THERANOS'S LABORATORY, YOU USED EMAIL TO COMMUNICATE

03:35PM   4      WITH MR. YAMAMOTO?

03:35PM   5      A.   WE DID.

03:35PM   6      Q.   OKAY.  AND INCLUDING EXCHANGING DOCUMENTS?

03:35PM   7      A.   YES.

03:35PM   8      Q.   OKAY.

03:35PM   9           MOVE TO ADMIT 20619, YOUR HONOR.

03:35PM  10               MR. LEACH:  NO OBJECTION.

03:35PM  11               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:35PM  12          (DEFENDANT'S EXHIBIT 20619 WAS RECEIVED IN EVIDENCE.)

03:35PM  13      BY MR. CAZARES:

03:35PM  14      Q.   OKAY.  SO THE FIRST PAGE, AGAIN, THIS IS AN EXCHANGE

03:35PM  15      BETWEEN YOURSELF AND MR. YAMAMOTO.

03:35PM  16          DO YOU SEE THAT?

03:35PM  17      A.   I DO.

03:35PM  18      Q.   AND THIS IS OCTOBER 31, 2016?

03:35PM  19      A.   YES.

03:35PM  20      Q.   AND THEN IF WE FLIP TO THE FIRST PAGE -- THE SECOND PAGE,

03:36PM  21      SORRY.

03:36PM  22          THERE'S A DOCUMENT AT THE TOP THAT SAYS, "THERANOS

03:36PM  23      ALTERNATIVE ASSESSMENT PROGRAM.

03:36PM  24          DO YOU SEE THAT?

03:36PM  25      A.   I DO.

BENNETT CROSS BY MR. CAZARES (RES.)                          5002

03:36PM   1       Q.   AND THEN THERE'S A DOCUMENT IDENTIFICATION NUMBER THERE

03:36PM   2       THAT SAYS CL FRM-00022-F3?

03:36PM   3       A.   YES.

03:36PM   4       Q.   OKAY.  AND DOES THAT APPEAR TO BE THE SAME DOCUMENT

03:36PM   5       REFLECTED IN THE SURVEY REPORT PASSAGE UP ON THE SCREEN AS WELL

03:36PM   6       THAT WE WERE LOOKING AT RELATING TO THERANOS AAP?

03:36PM   7       A.   IT DOES.

03:36PM   8       Q.   SO THIS APPEARS TO BE EVIDENCE THAT YOU REVIEWED IN

03:36PM   9       REACHING THOSE FINDINGS FOR THE AAP NONCOMPLIANCE DESCRIBED IN

03:36PM  10       THE SURVEY REPORT?

03:36PM  11       A.   IT DOES.

03:36PM  12       Q.   OKAY.  AND WE CAN SET ASIDE FOR NOW ON THE SCREEN THE

03:36PM  13       SURVEY REPORT, MR. ALLEN.

03:36PM  14            STICKING WITH PAGE 2 OF THE AAP DATA, AND YOU'LL SEE IF WE

03:37PM  15       FOCUS ON THE FIRST SECTION, THE FIRST COLUMN, OR I'LL SAY THE

03:37PM  16       FIRST ROWS, IT DESCRIBES AAP PROGRAM TESTING DATE AUGUST 18,

03:37PM  17       2014.

03:37PM  18            DO YOU SEE THAT?

03:37PM  19       A.   I DO.

03:37PM  20       Q.   AND THAT'S THE FIRST CHALLENGED EVENT DESCRIBED IN YOUR

03:37PM  21       SURVEY REPORT RELATING TO THE AAP; CORRECT?

03:37PM  22       A.   IT IS.

03:37PM  23       Q.   AND THEN YOU'LL SEE IN THIS FIRST SECTION THERE ARE ONE,

03:37PM  24       TWO, THREE, FOUR, FIVE SAMPLES TESTED REFLECTED IN THE

03:37PM  25       DOCUMENT?

ER-3683

BENNETT CROSS BY MR. CAZARES (RES.)                5003

03:37PM   1    A.   YES.

03:37PM   2    Q.   AND THIS APPEARS TO BE FOR THYROXINE.

03:37PM   3         DO YOU SEE THAT?

03:37PM   4    A.   YES.

03:37PM   5    Q.   AND AGAIN, THIS IS RUN ON THE EDISON; CORRECT?

03:37PM   6         AS WE DESCRIBED IN YOUR SURVEY REPORT, THE AAP

03:37PM   7    NONCOMPLIANCE RELATED TO AAP ON THE EDISON; CORRECT?

03:37PM   8    A.   YES, THERE'S - THE EDISON DEVICE APPEARS TO BE IN HERE.

03:38PM   9    Q.   OKAY.  AND THEN ON THE -- FIVE ROWS DOWN ON THE FIRST

03:38PM  10    COLUMN, TAE.

03:38PM  11         DO YOU SEE THAT?

03:38PM  12    A.   YES.

03:38PM  13    Q.   AND THAT'S AN ACRONYM FOR TOTAL ALLOWABLE ERROR.

03:38PM  14         DO YOU SEE THAT?

03:38PM  15    A.   YES.

03:38PM  16    Q.   OKAY.  AND THEN FOR THIS AAP CHALLENGE, THE TOTAL

03:38PM  17    ALLOWABLE ERROR'S PLUS/MINUS 20 PERCENT.

03:38PM  18         DO YOU SEE THAT?

03:38PM  19    A.   I DO.

03:38PM  20    Q.   AND THEN THE LAST ROW FOR THIS SECTION READS, PREDICATE

03:38PM  21    VALUE, ANALYTE PREDICATE VALUE, PERCENT.

03:38PM  22         DO YOU SEE THAT?

03:38PM  23    A.   I DO.

03:38PM  24    Q.   AND THEN THE DATA REFLECTS A DIFFERENCE IN THE RESULT

03:38PM  25    BETWEEN THE PREDICATE DEVICE AND THE THERANOS DEVICE; CORRECT?

ER-3684

BENNETT CROSS BY MR. CAZARES (RES.)                    5004

03:38PM  1    A.   YES.

03:38PM  2    Q.   AT LEAST THAT'S HOW YOU READ IT; CORRECT?

03:38PM  3    A.   THAT'S HOW I READ IT.

03:38PM  4    Q.   AND THEN IF YOU GO ACROSS THAT LAST ROW WITH THE PREDICATE

03:38PM  5    VALUE, THE PERCENTAGES APPEAR TO BE 16 PERCENT -- MINUS

03:38PM  6    16 PERCENT, THE FIRST ONE.

03:38PM  7         DO YOU SEE THAT?

03:38PM  8    A.   I DO.

03:38PM  9    Q.   AND THEN MINUS 2 FOR SAMPLE 2?

03:38PM 10    A.   YES.

03:39PM 11    Q.   AND THEN 8 PERCENT FOR SAMPLE 3?

03:39PM 12    A.   YES.

03:39PM 13    Q.   AND THEN FOR SAMPLE 4, MINUS 16 PERCENT?

03:39PM 14    A.   YES.

03:39PM 15    Q.   AND THEN FOR SAMPLE 5, 0 PERCENT; CORRECT?

03:39PM 16    A.   YES.

03:39PM 17    Q.   AND THEN THE DOCUMENT DESCRIBES THE SCORE FOR THAT

03:39PM 18    CHALLENGE TO BE 100 PERCENT.

03:39PM 19         DO YOU SEE THAT?

03:39PM 20    A.   I DO.

03:39PM 21    Q.   OKAY.  AND THEN CONTINUING WITH THE NEXT SET OF DATA

03:39PM 22    BELOW, THAT DESCRIBES 8/17/2014.

03:39PM 23         DO YOU SEE THAT?

03:39PM 24    A.   YES.

03:39PM 25    Q.   AND THIS IS FOR PSA, A DIFFERENT ASSAY; CORRECT?

BENNETT CROSS BY MR. CAZARES (RES.)                    5005

03:39PM   1    A.   YES.

03:39PM   2    Q.   ALSO RUN ON THE EDISON; CORRECT?

03:39PM   3    A.   YES.

03:39PM   4    Q.   AND THEN AGAIN, IN THIS CHALLENGE THERE'S A PSA TOTAL

03:39PM   5    PREDICATE, AND THEN PSA TOTAL THERANOS.

03:39PM   6         DO YOU SEE THAT?

03:39PM   7    A.   I DO.

03:39PM   8    Q.   AND, AGAIN, THIS IS COMPARING THE PREDICATE RESULT WITH

03:39PM   9    THE EDISON RESULT; CORRECT?

03:39PM  10    A.   YES.

03:39PM  11    Q.   AND THEN, AGAIN, THE TOTAL ALLOWABLE ERROR HERE IS AGAIN

03:40PM  12    20 PERCENT.

03:40PM  13         DO YOU SEE THAT?

03:40PM  14    A.   YES.

03:40PM  15    Q.   AND THEN THE PREDICATE VALUE VERSUS THE -- THE PREDICATE

03:40PM  16    VALUE VERSUS THE ANALYTE PREDICATE YOU SEE IN THE LAST ROW,

03:40PM  17    AGAIN, MINUS 16 PERCENT FOR THE FIRST SAMPLE.

03:40PM  18         DO YOU SEE THAT?

03:40PM  19    A.   I DO.

03:40PM  20    Q.   AND THEN 0 PERCENT FOR THE NEXT SAMPLE?

03:40PM  21         DO YOU SEE THAT?

03:40PM  22    A.   I DO.

03:40PM  23    Q.   AND THEN 8 PERCENT FOR SAMPLE 3?

03:40PM  24         DO YOU SEE THAT?

03:40PM  25    A.   I DO.

BENNETT CROSS BY MR. CAZARES (RES.)                                5006

03:40PM   1      Q.   AND THEN MINUS 9 PERCENT FOR SAMPLE 4.

03:40PM   2           DO YOU SEE THAT?

03:40PM   3      A.   I DO.

03:40PM   4      Q.   AND THEN MINUS 18 PERCENT FOR SAMPLE 5.

03:40PM   5           DO YOU SEE THAT?

03:40PM   6      A.   YES.

03:40PM   7      Q.   SO AT LEAST FOR THIS AAP CHALLENGE, THE PERFORMANCE OF THE

03:40PM   8      EDISON AGAINST THE PREDICATE IS FALLING WITHIN THE TOTAL

03:40PM   9      ALLOWABLE ERROR; CORRECT?

03:40PM  10      A.   YES.

03:40PM  11      Q.   OKAY.  AND, AGAIN, THE SCORE FOR THIS CHALLENGE IS

03:40PM  12      100 PERCENT.

03:40PM  13           DO YOU SEE THAT?

03:40PM  14      A.   I DO.

03:40PM  15      Q.   AND THEN IF WE GO TO THE NEXT ASSAY, THIS IS THYROID

03:40PM  16      STIMULATING HORMONE, TSH.

03:41PM  17           DO YOU SEE THAT?

03:41PM  18      A.   I DO.

03:41PM  19      Q.   AND, AGAIN, COMPARING THE PREDICATE RESULTS VERSUS THE

03:41PM  20      THERANOS RESULTS.

03:41PM  21           DO YOU SEE THAT?

03:41PM  22      A.   I DO.

03:41PM  23      Q.   AND, AGAIN, THE LAST ROW, THE PERCENTAGE BEING 4 PERCENT,

03:41PM  24      9 PERCENT, DO YOU SEE THOSE, FOR SAMPLES 1 AND 2?

03:41PM  25      A.   I DO.

ER-3687

BENNETT CROSS BY MR. CAZARES (RES.)                    5007

03:41PM   1    Q.   AND THEN FOR SAMPLES 3 AND 4, 17 AND 12 PERCENT.

03:41PM   2         DO YOU SEE THAT?

03:41PM   3    A.   I DO.

03:41PM   4    Q.   AND THEN FOR SAMPLE 5, 10 PERCENT.

03:41PM   5         DO YOU SEE THAT?

03:41PM   6    A.   I DO.  MINUS 10 PERCENT.

03:41PM   7    Q.   MINUS 10 PERCENT.  THANK YOU.

03:41PM   8         AGAIN, ALL WITHIN THE TOTAL ALLOWABLE ERROR WITHIN THE

03:41PM   9    PREDICATE VERSUS THE EDISON DEVICE; CORRECT?

03:41PM  10    A.   YES.

03:41PM  11    Q.   AND, AGAIN, THE SCORE BEING 100 PERCENT.

03:41PM  12         DO YOU SEE THAT?

03:41PM  13    A.   I DO.

03:41PM  14    Q.   AND THEN IF WE CONTINUE WITH VITAMIN D, AGAIN, COMPARING

03:41PM  15    PREDICATE VERSUS THERANOS.

03:41PM  16         DO YOU SEE THAT?

03:41PM  17    A.   I DO.

03:41PM  18    Q.   SAME TOTAL ALLOWABLE ERROR.

03:41PM  19         DO YOU SEE THAT?

03:41PM  20    A.   I DO.

03:41PM  21    Q.   AND THEN EACH OF THE RESULTS FALLING WITHIN THE ALLOWABLE

03:41PM  22    ERROR; CORRECT?

03:41PM  23    A.   I DO.

03:41PM  24    Q.   AND SOME PRETTY CLOSE.

03:41PM  25         FOR EXAMPLE, SAMPLE 4 ON THE VITAMIN D CHALLENGE WITHIN

ER-3688

BENNETT CROSS BY MR. CAZARES (RES.)                              5008

03:42PM   1    1 PERCENT OF EACH OTHER; CORRECT?

03:42PM   2    A.   I SEE THAT.

03:42PM   3    Q.   OKAY.  NOW, EACH OF THE SCORES WERE 100 PERCENT, BUT THE

03:42PM   4    SIGNATURES FOR REVIEW BY LAB MANAGEMENT APPEAR TO BE IN 2015.

03:42PM   5         DO YOU SEE THAT?

03:42PM   6    A.   I DO.

03:42PM   7    Q.   OKAY.  NOW, IF YOU TURN TO PAGE 3 OF THE SAME EXHIBIT,

03:42PM   8    THIS APPEARS TO BE THE CHALLENGE FOR OCTOBER 21, 2014,

03:42PM   9    REFLECTED IN YOUR SURVEY REPORT.

03:42PM  10         DO YOU SEE THAT?

03:42PM  11    A.   YES.

03:42PM  12    Q.   OKAY.  AND THE ASSAYS AT ISSUE HERE APPEAR TO BE

03:42PM  13    ESTRADIOL.

03:42PM  14         DO YOU SEE THAT?

03:42PM  15    A.   I DO.

03:42PM  16    Q.   AND THEN THYROXINE.

03:42PM  17         DO YOU SEE THAT?

03:42PM  18    A.   I DO.

03:42PM  19    Q.   AND THEN HUMAN CHORIONIC GONADOTROPIN, HCG?

03:42PM  20    A.   YES.

03:42PM  21    Q.   AND THEN THE LAST BEING PROLACTIN.

03:42PM  22         DO YOU SEE THAT?

03:42PM  23    A.   I DO.

03:42PM  24    Q.   AND THEN AGAIN, THIS AAP PROCEDURE IN OCTOBER OF 2014 IS

03:43PM  25    AGAIN COMPARING THE EDISON DEVICE VERSUS THE PREDICATE.

BENNETT CROSS BY MR. CAZARES (RES.)                    5009

03:43PM   1          DO YOU SEE THAT?

03:43PM   2     A.   I DO.

03:43PM   3     Q.   AND THEN FOR EACH OF THE CHALLENGES REFLECTED FOR PAGE 3

03:43PM   4     FOR OCTOBER OF 2013 FOR ESTRADIOL, AGAIN, TOTAL ALLOWABLE ERROR

03:43PM   5     BEING 20 PERCENT.

03:43PM   6          DO YOU SEE THAT?

03:43PM   7     A.   I DO.

03:43PM   8     Q.   AND THEN FOR ESTRADIOL THERE ARE SOME NOT APPLICABLE

03:43PM   9     RESULTS REFLECTED IN THE SHEET.

03:43PM  10          DO YOU SEE THAT?

03:43PM  11     A.   I DO.

03:43PM  12     Q.   OKAY.  AND THEN FOR THYROXINE, DO YOU SEE EACH OF THE

03:43PM  13     RESULTS BEING WITHIN THE 20 PERCENT TOTAL ALLOWABLE ERROR?

03:43PM  14     A.   I DO.

03:43PM  15     Q.   AND DO YOU SEE PROLACTIN ALL BEING WITHIN THE TOTAL

03:43PM  16     ALLOWABLE ERROR?

03:43PM  17     A.   I DO.

03:43PM  18     Q.   OKAY.  AND THAT OCTOBER CHALLENGE SHEET APPEARS TO

03:44PM  19     CONTINUE ON PAGE 4 REFLECTING SOME CHALLENGES IN NOVEMBER AND

03:44PM  20     OCTOBER OF 2014.

03:44PM  21          DO YOU SEE THAT?

03:44PM  22     A.   I DO.

03:44PM  23     Q.   OKAY.  AGAIN FOR T3.

03:44PM  24          DO YOU SEE THAT FOR TRIIODOTHYRONINE?

03:44PM  25          DO YOU SEE THAT?

BENNETT CROSS BY MR. CAZARES (RES.)                    5010

03:44PM  1     A.   YES, THAT IS T3.

03:44PM  2     Q.   I THOUGHT SO.  AND THYROXINE?

03:44PM  3     A.   YES.

03:44PM  4     Q.   VITAMIN B12?

03:44PM  5     A.   YES.

03:44PM  6     Q.   AND VITAMIN D?

03:44PM  7     A.   YES.

03:44PM  8     Q.   AND AGAIN, EACH OF THE CHALLENGED SCORES APPEARS TO BE

03:44PM  9     WITHIN THE TOTAL ALLOWABLE ERROR AND 100 PERCENT SCORES;

03:44PM  10    CORRECT?

03:44PM  11    A.   YES.

03:44PM  12    Q.   BUT, AGAIN, WE HAD THIS ISSUE OF LAB MANAGEMENT FAILING TO

03:44PM  13    REVIEW IN A TIMELY MANNER; CORRECT?

03:44PM  14    A.   RUNNING IN THE INTERVAL THAT THEIR PROCEDURE SAID AND

03:44PM  15    REVIEWING IT IN A TIMELY MANNER, YES.

03:44PM  16    Q.   AND THEN IF WE CONTINUE WITH THE LAST PAGE THAT I'LL ASK

03:44PM  17    YOU ABOUT, ON PAGE 5 THERE ARE SOME CHALLENGES IN MARCH OF

03:45PM  18    2015.

03:45PM  19         DO YOU SEE THAT?

03:45PM  20    A.   YES.

03:45PM  21    Q.   AND THEN THIS IS RELATING TO SHGB; CORRECT?

03:45PM  22    A.   YES.

03:45PM  23    Q.   AND THE OTHER IS PSA TOTAL?

03:45PM  24    A.   YES, SHBG.

03:45PM  25    Q.   SHBG.  THANK YOU.

ER-3691

BENNETT CROSS BY MR. CAZARES (RES.)                    5011

03:45PM   1          AND THE TOTAL ALLOWABLE ERROR IS 20 PERCENT FOR EACH OF

03:45PM   2   THE CHALLENGES?

03:45PM   3   A.   I DO.

03:45PM   4   Q.   AND EACH OF THE COMPARISONS OF THE EDISON VERSUS THE

03:45PM   5   PREDICATE ARE ALL WITHIN THE TOTAL ALLOWABLE ERROR; CORRECT?

03:45PM   6   A.   THEY ARE.

03:45PM   7   Q.   YOU CAN SET THAT ASIDE.

03:45PM   8          IF WE CAN GO BACK TO EXHIBIT 4621, THE SURVEY REPORT.

03:46PM   9          IF WE GO TO PAGE 67.

03:46PM  10          ACTUALLY START AT -- YES, 67.  SORRY.  ABOUT MID-PAGE,

03:46PM  11   ITEM 7, THE REPORT READS, "BASED ON LABORATORY PERSONNEL

03:46PM  12   INTERVIEWS AND LABORATORY'S ALTERNATIVE ASSESSMENT PROGRAM

03:46PM  13   RECORD REVIEW ON NOVEMBER 20, 2015, THE LABORATORY FAILED TO

03:46PM  14   HAVE AN ANALYTIC SYSTEMS QUALITY ASSESSMENT MECHANISM THAT

03:46PM  15   INCLUDED THE TIMELY REVIEW OF THE EFFECTIVENESS OF ACTIONS

03:47PM  16   TAKEN."

03:47PM  17          AND THEN "FINDINGS INCLUDED TO COMPLY WITH THE CLIA

03:47PM  18   REQUIREMENT AT 42 C.F.R. 493.1281(A), THE LABORATORY MAINTAINED

03:47PM  19   A PROTOCOL TITLED PROFICIENCY TESTING FOR THERANOS

03:47PM  20   LAB-DEVELOPED TESTS, THAT INCLUDED A LABORATORY PROCESS CALLED

03:47PM  21   AAP IN WHICH TESTS PERFORMED USING THE ADVIA 1800 WOULD BE

03:47PM  22   EVALUATED AND DEFINED IN RELATIONSHIP TO THE ADVIA XPT."

03:47PM  23          DO YOU SEE THAT?

03:47PM  24   A.   I DO.

03:47PM  25   Q.   OKAY.  SO THIS IS ANOTHER ISSUE RELATING TO THERANOS'S

ER-3692

BENNETT CROSS BY MR. CAZARES (RES.)                    5012

03:47PM  1    EXECUTION OF ITS AAP PROGRAM; CORRECT?

03:47PM  2    A.   THIS IS MR. YAMAMOTO'S CITATION.

03:47PM  3    Q.   OKAY.  SO YOU'RE NOT FAMILIAR WITH THIS ISSUE?

03:47PM  4    A.   I DID NOT CITE THIS, SO HE WOULD HAVE PUT ALL OF THE

03:47PM  5    FINDINGS IN HERE.

03:47PM  6    Q.   NOW, THE ADVIA 1800, THAT'S A COMMERCIAL DEVICE?

03:47PM  7    A.   IT IS.

03:47PM  8    Q.   AND THE ADVIA XPT IS ALSO A COMMERCIAL DEVICE?

03:48PM  9    A.   IT IS.

03:48PM 10    Q.   BUT IN THE COURSE OF YOUR SURVEY YOU LEARNED THAT -- IN

03:48PM 11    THE COURSE OF YOUR SURVEY OF THERANOS, YOU LEARNED THAT

03:48PM 12    THERANOS HAD MODIFIED ADVIA 1800 SYSTEMS TO RUN FINGERSTICK

03:48PM 13    SAMPLES; CORRECT?

03:48PM 14    A.   YES.

03:48PM 15    Q.   OKAY.  AND SO IT APPEARS THAT THIS CHALLENGE, THIS

03:48PM 16    NONCOMPLIANCE BEING WRITTEN UP IN THE REPORT DESCRIBES AN AAP

03:48PM 17    PROCESS COMPARING THE 1800 TO THE XPT; CORRECT?

03:48PM 18    A.   I DID NOT SURVEY THE FINGERSTICK PART OF THE LABORATORY,

03:48PM 19    SO I CANNOT SPEAK TO THIS CITATION.

03:48PM 20    Q.   AND SO JUST TO BE CLEAR THEN, THE PORTIONS OF THE SURVEY

03:48PM 21    THAT YOU YOURSELF HANDLED INCLUDED REVIEW OF EDISON QC;

03:48PM 22    CORRECT?

03:48PM 23    A.   I REVIEWED EDISON QC.

03:48PM 24    Q.   EDISON VALIDATION REPORTS; CORRECT?

03:48PM 25    A.   YES.

ER-3693

BENNETT CROSS BY MR. CAZARES (RES.)                    5013

03:48PM   1       Q.   COAGULATION ISSUE?

03:49PM   2       A.   YES.

03:49PM   3       Q.   PERSONNEL TRAINING RECORDS?

03:49PM   4       A.   YES.

03:49PM   5       Q.   AND THEN BEYOND THAT YOU ALSO HAD RESPONSIBILITY FOR I

03:49PM   6       THINK I'LL CALL IT THE JURASSIC PARK, THE TRADITIONAL VENOUS

03:49PM   7       BLOOD TESTING LAB?

03:49PM   8       A.   THE ONLY PART OF THAT THAT I REVIEWED WAS THE COAGULATION,

03:49PM   9       THE PT INR.

03:49PM  10       Q.   OKAY.  AND YOU SAID YOU DID NOT EXAMINE YOURSELF ANY OF

03:49PM  11       THE MODIFIED PREDICATE TESTING AT THERANOS?

03:49PM  12       A.   IN THE FINGERSTICK LABORATORY, I DID NOT.

03:49PM  13       Q.   OKAY.  MR. ALLEN, IF WE COULD TAKE A LOOK AT PAGE 68.

03:50PM  14           AT THE BOTTOM OF PAGE 68 THERE'S A DESCRIPTION OF, AT

03:50PM  15       SUB 8, "BASED ON THE REVIEW OF THE QUALITY CONTROL PROCEDURE,

03:50PM  16       LEVEY-JENNING REPORTS FOR THE ADVIA 1800 AND THE ADVIA XPT

03:50PM  17       PROFICIENCY TESTING RESULTS AND QUALITY ASSESSMENT

03:50PM  18       DOCUMENTATION THE LABORATORY FAILED TO TAKE CORRECTIVE ACTIONS

03:50PM  19       WHEN CHEMISTRY QC IN THE VENIPUNCTURE LABORATORY WAS OBSERVED

03:50PM  20       TEN CONSECUTIVE TIMES ON THE SAME SIDE OF THE MEAN."

03:50PM  21           DO YOU SEE THAT?

03:50PM  22       A.   I DO.

03:50PM  23       Q.   AND THEN AFTER THAT THE REPORT READS, "CL QOP-00013

03:50PM  24       REVISION D QUALITY CONTROL IN CHEMISTRY STATED IS SEEMED TO

03:51PM  25       HAVE PASSED WHEN... WESTGARD RULES HAVE NOT BEEN VIOLATED."

BENNETT CROSS BY MR. CAZARES (RES.)                    5014

03:51PM    1            DO YOU SEE THAT?

03:51PM    2    A.   I DO.

03:51PM    3    Q.   AND THEN BEYOND THAT, "CL QOP-00013 REVISION D ALSO STATED

03:51PM    4    IN SECTION 6.3.2.5 THAT TEN CONSECUTIVE OBSERVATIONS ON THE

03:51PM    5    SAME SIDE OF THE MEAN SHOULD BE MONITORED."

03:51PM    6            CORRECT?

03:51PM    7    A.   YES.

03:51PM    8    Q.   NOW, THAT MONITORING IS SUPPOSED TO BE SUPERVISED BY THE

03:51PM    9    LABORATORY DIRECTOR; CORRECT?

03:51PM   10    A.   HE HAS THE OVERALL RESPONSIBILITY, BUT HE CAN DELEGATE

03:51PM   11    THAT TO AN INDIVIDUAL.

03:51PM   12    Q.   FAIR ENOUGH.

03:51PM   13            AND THIS PACKAGE OF THE SURVEY REPORT REGARDING QC

03:51PM   14    COMPLIANCE, WAS THIS YOUR WORK OR MR. YAMAMOTO'S?

03:51PM   15    A.   IT'S MINE.

03:51PM   16    Q.   OKAY.  IF YOU GO DOWN ALBUMIN.

03:52PM   17            "REVIEW OF THE PT RESULTS FOR ALBUMIN FOR THE FIRST AND

03:52PM   18    SECOND EVENTS OF 2015 REVEALED THAT THE SUBMITTED RESULTS

03:52PM   19    SHOWED A NEGATIVE BIAS RANGING FROM NEGATIVE 3 TO NEGATIVE 4.9

03:52PM   20    AND NEGATIVE 1.8 TO NEGATIVE 3.5, RESPECTIVELY."

03:52PM   21            DO YOU SEE THAT?

03:52PM   22    A.   I DO.

03:52PM   23    Q.   AND THEN IT CONTINUES, "REVIEW OF LEVEY-JENNING REPORTS

03:52PM   24    FROM APRIL 2014 AND SEPTEMBER 2014, REVEALED THAT THE MULTI

03:52PM   25    QUAL LEVEL 1 AND MULTI QUAL LEVEL 2 HAD AT LEAST 10 CONSECUTIVE

03:52PM 1    RESULTS BELOW THE MEAN BUT WITHIN 2 STANDARD DEVIATIONS."

03:52PM 2         DO YOU SEE THAT?

03:52PM 3    A.   YES.

03:52PM 4    Q.   AND THEN THE NEXT PASSAGE READS, "REVIEW OF THE

03:53PM 5    LEVEY-JENNING REPORTS FOR JANUARY 2015 THROUGH APRIL 2015

03:53PM 6    REVEALED THAT MQ1 (LOT NUMBER) HAD 10 CONSECUTIVE RESULTS BELOW

03:53PM 7    THE MEAN AND MULTIQUAL LEVEL 3 HAD 10 CONSECUTIVE RESULTS BELOW

03:53PM 8    THE MEAN BUT WITHIN 2 STANDARD DEVIATIONS FOR ALL FOUR MONTHS."

03:53PM 9         DO YOU SEE THAT?

03:53PM 10   A.   I DO.

03:53PM 11   Q.   AND THIS RELATES TO TESTING ON PREDICATE DEVICES

03:53PM 12   COMMERCIAL DEVICES; CORRECT?

03:53PM 13   A.   YES.

03:53PM 14   Q.   AND SO WHAT YOU'RE DESCRIBING IS PT RESULTS WERE SHOWING A

03:53PM 15   BIAS WHEN RUN ON THE COMMERCIAL DEVICE; CORRECT?

03:53PM 16   A.   BOTH THE PT AND THE QUALITY CONTROL.

03:53PM 17   Q.   OKAY.  AND THE NONCOMPLIANCE IDENTIFIED HERE IS THE LAB

03:54PM 18   DIRECTOR'S FAILURE TO MONITOR AND OVERSEE AND IDENTIFY THE BIAS

03:54PM 19   YOU IDENTIFIED IN THE PT AND QUALITY CONTROL RESULTS; CORRECT?

03:54PM 20   A.   THE NONCOMPLIANCE HERE IS THAT THE QUALITY ASSESSMENT

03:54PM 21   PROGRAM DID NOT IDENTIFY THIS SO THAT NO CORRECTIVE ACTION WAS

03:54PM 22   EVER TAKEN.

03:54PM 23   Q.   AND THE LAB DIRECTOR HAD RESPONSIBILITY FOR THAT; CORRECT?

03:54PM 24   A.   THE LAB DIRECTOR OR WHOMEVER HE DELEGATED THAT

03:54PM 25   RESPONSIBILITY TO.

BENNETT CROSS BY MR. CAZARES (RES.)                        5016

03:54PM  1    Q.   AND IN YOUR FINDINGS RELATED TO THIS NONCOMPLIANCE, YOU

03:54PM  2    DIDN'T IDENTIFY ANY EVIDENCE THAT SUGGESTS PATIENTS WERE

03:54PM  3    ACTUALLY AFFECTED BY THE NONCOMPLIANCE YOU IDENTIFIED RIGHT

03:54PM  4    HERE; CORRECT?

03:54PM  5    A.   AGAIN, THAT'S NOT REALLY WHAT THE CITATION IS ABOUT, BUT I

03:54PM  6    GUESS THE ANSWER IS NO.

03:55PM  7    Q.   WITHIN THE -- I BELIEVE IT'S IN THE BINDER -- OH, NO.

03:55PM  8        ACTUALLY, MR. ALLEN, CAN WE GO TO PAGE 79 OF 4621.

03:55PM  9        MS. BENNETT, WE PUT UP ON THE SCREEN D-TAG 6085,

03:55PM 10    LABORATORY DIRECTOR RESPONSIBILITIES.

03:55PM 11        DO YOU SEE THAT?

03:55PM 12    A.   I DO.

03:55PM 13    Q.   AND AGAIN, THIS IS A STANDARD LEVEL NONCOMPLIANCE;

03:55PM 14    CORRECT?

03:55PM 15    A.   YES.

03:55PM 16    Q.   AND THE ISSUE HERE IS IDENTIFIED, "BASED ON REVIEW OF

03:55PM 17    VALIDATION DOCUMENTS ON THE THERANOS PROPRIETARY SYSTEM (TPS)

03:56PM 18    THE LABORATORY DIRECTOR FAILED TO ENSURE THAT THE QUALITY OF

03:56PM 19    RESULTS ON THE TPS; FAILED TO ENSURE THE ESTABLISHMENT OF

03:56PM 20    PERFORMANCE SPECIFICATIONS FOLLOWED THE LABORATORY'S PROCEDURES

03:56PM 21    TO ESTABLISH ACCURACY, PRECISION, REPORTABLE RANGE, AND/OR

03:56PM 22    REFERENCE RANGE.  FINDINGS INCLUDE."

03:56PM 23        AND THERE'S A DESCRIPTION OF YOUR FINDINGS; CORRECT?

03:56PM 24    A.   YES.

03:56PM 25    Q.   AND THIS IS YOUR WORK; CORRECT?

03:56PM  1      A.   YES.

03:56PM  2      Q.   AND I THINK YOU DISCUSSED SOME OF THIS YESTERDAY WITH

03:56PM  3      MR. LEACH; CORRECT?

03:56PM  4      A.   YES.

03:56PM  5      Q.   AND THE REPORT DESCRIBES SUB A, "VALIDATION REPORTS FOR

03:56PM  6      VITD, T3, HCG, AND SHBG WERE REVIEWED."

03:56PM  7           DO YOU SEE THAT?

03:56PM  8      A.   YES.

03:56PM  9      Q.   AND YOU PERFORMED THAT REVIEW; CORRECT?

03:56PM  10     A.   I DID.

03:56PM  11     Q.   AND AS A PART OF THIS WORK, IN SUB B THERE'S A DESCRIPTION

03:56PM  12     OF THE MASTER VALIDATION PLAN FOR THE ROUTINE CHEMISTRY ASSAYS

03:56PM  13     ON THERANOS DEVICES.

03:56PM  14          DO YOU SEE THAT?

03:56PM  15     A.   I DO.

03:56PM  16     Q.   AND YOU REVIEWED THAT PLAN AS PART OF THE WORK; CORRECT?

03:57PM  17     A.   YES.

03:57PM  18     Q.   AND THEN AT SUB C, AND THERE'S A DESCRIPTION IN THE REPORT

03:57PM  19     THAT "VITD, HCG, AND SHBG VALIDATION REPORTS INCLUDED

03:57PM  20     THERANOS-CORRECTED RESULTS WITHOUT AN EXPLANATION AS TO HOW THE

03:57PM  21     THERANOS RESULT WAS CORRECTED OR WHICH RESULT WAS REPORTED."

03:57PM  22          DO YOU SEE THAT?

03:57PM  23     A.   I DO.

03:57PM  24     Q.   AND THEN IF WE CONTINUE, ON PAGE 80 THERE'S A DESCRIPTION

03:57PM  25     OF FINDINGS.

BENNETT CROSS BY MR. CAZARES (RES.)                    5018

03:57PM   1        ACCURACY FOR ALL FOUR ASSAYS WAS NOT DETERMINED FOLLOWING

03:57PM   2   THE PLAN.

03:57PM   3        DO YOU SEE THAT?

03:57PM   4   A.   I DO.

03:57PM   5   Q.   AND THEN PRECISION ALSO WAS NOT DETERMINED FOLLOWING THE

03:57PM   6   PLAN.

03:57PM   7        DO YOU SEE THAT?

03:57PM   8   A.   I DO.

03:57PM   9   Q.   AND THEN REPORTABLE RANGE WAS NOT DETERMINED FOLLOWING THE

03:57PM  10   PLAN.

03:57PM  11        AND THEN THE PERCENT RECOVERY DID NOT MEET THE ACCEPTABLE

03:57PM  12   CRITERIA FOR VITD, TT3, AND SHBG.

03:58PM  13        DO YOU SEE THAT?

03:58PM  14   A.   YES.

03:58PM  15   Q.   AND THEN "ALLOWABLE BIAS DID NOT MEET THE LABORATORY'S

03:58PM  16   ACCEPTABLE CRITERIA FOR VITAMIN D, TT3, AND SHBG."

03:58PM  17        DO YOU SEE THAT?

03:58PM  18   A.   I DO.

03:58PM  19   Q.   AND THEN IN ORDER TO DRAFT AND -- IN ORDER TO DO THIS WORK

03:58PM  20   RELATING TO THIS NONCOMPLIANCE RELATING TO LABORATORY DIRECTOR

03:58PM  21   RESPONSIBILITIES, YOU ACTUALLY AGAIN LOOKED AT THE VALIDATION

03:58PM  22   REPORTS THEMSELVES; CORRECT?

03:58PM  23   A.   I DID.

03:58PM  24   Q.   AND YOU COMPARED IT WITH THE PLAN AND SAW THAT THE REPORT

03:58PM  25   WASN'T FOLLOWING THE PLAN; CORRECT?

03:58PM    1       A.    THAT'S CORRECT.

03:58PM    2       Q.    AND IN YOUR WORK YOU IDENTIFIED NO EVIDENCE THAT

03:58PM    3    MR. BALWANI WAS AWARE OF THE FACT THAT THE VALIDATION REPORTS

03:58PM    4    YOU LOOKED AT FAILED TO FOLLOW THE PLANS YOU LOOKED AT;

03:58PM    5    CORRECT?

03:58PM    6       A.    NOT PRIOR TO THE SURVEY.

03:58PM    7       Q.    WITHIN YOUR BINDER THERE SHOULD BE A DOCUMENT,

03:59PM    8    EXHIBIT 9384.

03:59PM    9          MR. ALLEN, YOU CAN TAKE THE SURVEY REPORT DOWN.

03:59PM   10       A.    WHICH BINDER?

03:59PM   11       Q.    THE GOVERNMENT'S BINDER.  THERE SHOULD BE A WHITE BINDER

03:59PM   12    WITH A GREEN AND WHITE LABEL.

03:59PM   13             THE COURT:  9384?

03:59PM   14             MR. CAZARES:  9384.

03:59PM   15             THE COURT:  THAT'S IN YOUR BINDER.  VOLUME 1, I

03:59PM   16    BELIEVE.

03:59PM   17             MR. CAZARES:  YOU KNOW, YOUR HONOR, MAYBE I SHOULD

03:59PM   18    FIND THAT DOCUMENT.

03:59PM   19          I'M NOT GOING TO FINISH THIS WITNESS TODAY, YOUR HONOR.  I

03:59PM   20    SEE IT'S 4:00 O'CLOCK.

04:00PM   21             THE COURT:  HOW MUCH TIME DO YOU THINK YOU HAVE?

04:00PM   22             MR. CAZARES:  UP TO AN HOUR, SOMEWHERE IN THAT

04:00PM   23    RANGE, HOUR, HOUR AND A HALF.  SOMEWHERE AROUND THERE.

04:00PM   24             THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, LET'S

04:00PM   25    TAKE OUR BREAK.

5020

04:00PM 1    PLEASE RECALL THAT WE'RE GOING TO HAVE A LONG BREAK.  WE

04:00PM 2  WON'T SEE YOU BACK UNTIL I THINK IT'S TUESDAY NEXT.

04:00PM 3    IS THAT RIGHT, MS. ROBINSON?

04:00PM 4    THE CLERK:  YES.

04:00PM 5    THE COURT:  TUESDAY NEXT AT 9:00 A.M.  SO WE'LL TAKE

04:00PM 6  OUR LONG BREAK.  I THINK IT'S GOING TO BE WARM AND THEN COLD

04:00PM 7  AGAIN.  IMAGINE THAT.

04:00PM 8    SO ENJOY YOUR WEEKEND.

04:00PM 9    LET ME REMIND YOU OF THE ADMONITION.  PLEASE DO NOT DO ANY

04:00PM 10 INVESTIGATION.  DO NOT SPEAK OR LEARN ABOUT ANYTHING ABOUT THIS

04:00PM 11 CASE OR LISTEN OR WATCH ANYTHING TO DO WITH IT.

04:00PM 12    HAVE A PLEASANT WEEKEND, AND WE'LL SEE YOU NEXT WEEK,

04:00PM 13 PLEASE.  THANK YOU.

04:01PM 14    (JURY OUT AT 4:01 P.M.)

04:01PM 15    THE COURT:  MS. BENNETT, I'M AFRAID I'M GOING TO

04:01PM 16 HAVE TO HAVE YOU COME BACK NEXT WEEK, MONDAY -- EXCUSE ME,

04:01PM 17 TUESDAY NEXT AT 9:00 A.M., PLEASE.

04:01PM 18    THE WITNESS:  OKAY.

04:01PM 19    THE COURT:  THANK YOU.

04:01PM 20    PLEASE BE SEATED.  THANK YOU.

04:01PM 21    THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE

04:01PM 22 WEEKEND.

04:01PM 23    MS. BENNETT HAS LEFT THE COURTROOM.

04:01PM 24    SO, COUNSEL, YOU'VE GOT, DID YOU SAY, ABOUT AN HOUR AND A

04:01PM 25 HALF LEFT?

ER-3701

5021

04:01PM  1          MR. CAZARES:  I'M HOPING NOT THAT MUCH, YOUR HONOR.

04:02PM  2     I'M GATHERING MYSELF THIS WEEKEND.  HOPEFULLY I CAN MAKE IT

04:02PM  3     SHORTER.

04:02PM  4          THE COURT:  WELL, WHATEVER YOU NEED.

04:02PM  5          MR. CAZARES:  YES, YOUR HONOR.

04:02PM  6          THE COURT:  SO JUST SCHEDULING FOR THE GOVERNMENT

04:02PM  7     THEN, WE'LL HAVE -- WE'LL FINISH THIS WITNESS.

04:02PM  8        MR. SCHENK?

04:02PM  9          MR. SCHENK:  YES.  THANK YOU, YOUR HONOR.

04:02PM 10       I SURE HOPE THAT WE'RE ON THE PATH TO FINISHING

04:02PM 11     MS. BENNETT ON TUESDAY.

04:02PM 12       AND OUR DISCLOSURES ARE DUE TO THE DEFENSE TOMORROW

04:02PM 13     EVENING, THURSDAY EVENING.  WE WILL MEET THAT DEADLINE.  WE

04:02PM 14     HAVE TO LOOK AND SEE WHICH WITNESSES WE WILL FLY INTO TOWN.

04:02PM 15          THE COURT:  SURE.

04:02PM 16          MR. SCHENK:  BUT WE WILL PROVIDE THAT TIMELY.

04:03PM 17          THE COURT:  OKAY.  THAT'S FINE.  THANK YOU.

04:03PM 18          MR. COOPERSMITH:  THAT SOUNDS GOOD, YOUR HONOR.

04:03PM 19     THANK YOU.

04:03PM 20          THE COURT:  OKAY.  ANYTHING FURTHER BEFORE WE BREAK?

04:03PM 21          MR. SCHENK:  NO, YOUR HONOR.

04:03PM 22          MR. COOPERSMITH:  NOT FROM THE DEFENSE, YOUR HONOR.

04:03PM 23     THANK YOU.

04:03PM 24          THE COURT:  OKAY.  THANK YOU.  SAFE TRAVELS.

04:03PM 25          MR. COOPERSMITH:  THANK YOU.  I APPRECIATE IT.

ER-3702

5022

04:03PM  1            THE CLERK:  COURT IS ADJOURNED.

04:03PM  2        (COURT ADJOURNED AT 4:03 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ER-3703

5023

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,        )
6                                     )  CR-18-00258-EJD
                   PLAINTIFF,         )
7                                     )  SAN JOSE, CALIFORNIA
              VS.                     )
8                                     )  MAY 10, 2022
    RAMESH "SUNNY" BALWANI,           )
9                                     )  VOLUME 27
                   DEFENDANT.         )
10   _____  )  PAGES 5023 - 5286

11

12                TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

ER-3704

BENNETT CROSS BY MR. CAZARES (RES.)                    5029

09:15AM    1      OUR JURORS, DURING THE BREAK, DID ANY OF YOU HAVE CAUSE TO

09:15AM    2      READ, LEARN, DISCUSS, VIEW, OR DO ANYTHING IN REGARDS TO

09:15AM    3      LEARNING ANYTHING ABOUT THIS CASE?

09:15AM    4          IF SO, PLEASE RAISE YOUR HANDS.

09:15AM    5          ONCE AGAIN, I SEE NO HANDS.  THANK YOU VERY MUCH.  I

09:15AM    6      APPRECIATE THAT.

09:15AM    7          AND IS MS. BENNETT HERE?  LET'S HAVE HER RETURN.

09:15AM    8          GOOD MORNING, MS. BENNETT.

09:15AM    9              THE WITNESS:  GOOD MORNING.

09:15AM   10              THE COURT:  THANKS FOR COMING BACK.

09:15AM   11          PLEASE FEEL FREE TO MAKE YOURSELF COMFORTABLE.

09:16AM   12          I'LL JUST REMIND YOU THAT YOU'RE STILL UNDER OATH.

09:16AM   13          WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:16AM   14      AGAIN, PLEASE.

09:16AM   15              THE WITNESS:  MY NAME IS SARAH BENNETT.

09:16AM   16              THE COURT:  THANK YOU.

09:16AM   17          **(GOVERNMENT'S WITNESS, SARAH BENNETT, WAS PREVIOUSLY**

09:16AM   18      **SWORN.)**

09:16AM   19              THE COURT:  THANK YOU.  COUNSEL.

09:16AM   20              MR. CAZARES:  THANK YOU, YOUR HONOR.

09:16AM   21                  **CROSS-EXAMINATION (RESUMED)**

09:16AM   22      BY MR. CAZARES:

09:16AM   23      Q.   GOOD MORNING.

09:16AM   24      A.   GOOD MORNING.

09:16AM   25      Q.   SO I WANTED TO REMIND THE JURY WHERE WE ARE WHEN WE LEFT

BENNETT CROSS BY MR. CAZARES (RES.)                    5030

09:16AM   1    OFF LAST WEEK, AND WE TALKED ABOUT THIS DIVISION OF LABOR

09:16AM   2    BETWEEN YOURSELF AND MR. YAMAMOTO WITH RESECT TO THE SURVEY.

09:16AM   3        DO YOU RECALL THOSE DISCUSSIONS?

09:16AM   4    A.   YES.

09:16AM   5    Q.   OKAY.  AND I THINK YOU MENTIONED THAT, WITH RESPECT TO THE

09:16AM   6    WORK THAT YOU DID IN THE SURVEY AND REFLECTED IN THE SURVEY

09:16AM   7    REPORT, THAT YOU DID NOT SURVEY THE FINGERSTICK PART OF THE

09:16AM   8    LABORATORY; IS THAT CORRECT?

09:16AM   9    A.   I DID NOT.

09:16AM  10    Q.   AND THAT WOULD INCLUDE THEN THAT YOU DID NOT EXAMINE ANY

09:16AM  11    OF THE FINGERSTICK TESTING ON THE MODIFIED PREDICATE DEVICES;

09:16AM  12    IS THAT RIGHT?

09:16AM  13    A.   CORRECT.

09:16AM  14    Q.   OKAY.  NOW, YOU DID EXAMINE TESTING RELATING TO THE

09:17AM  15    PT INR, THE COAGULATION TEST; CORRECT?

09:17AM  16    A.   I DID.

09:17AM  17    Q.   BUT OTHER THAN THAT, YOU DIDN'T EXAMINE ANY OF THE

09:17AM  18    TRADITIONAL VENOUS BLOOD TESTING; CORRECT?

09:17AM  19    A.   I MAY HAVE, IF I REMEMBER CORRECTLY, REVIEWED SOME OF THE

09:17AM  20    QUALITY CONTROL DATA AND THE PERFORMANCE SPECIFICATIONS.

09:17AM  21    Q.   OKAY.  NOW, GETTING BACK TO THAT PT INR TEST, THAT WAS THE

09:17AM  22    TEST THAT WAS THE SUBJECT OF A CONDITION LEVEL NONCOMPLIANCE;

09:17AM  23    CORRECT?

09:17AM  24    A.   YES.

09:17AM  25    Q.   AND THE PT INR WAS ALSO THE SUBJECT OF THE IMMEDIATE

BENNETT CROSS BY MR. CAZARES (RES.)                    5031

09:17AM  1      JEOPARDY FINDING; CORRECT?

09:17AM  2      A.   IT WAS PART OF THE IMMEDIATE JEOPARDY, YES.

09:17AM  3      Q.   OKAY.  AND THAT PT INR TEST, THE ISSUES FOR THAT TEST WERE

09:17AM  4      THERE WAS A REAGENT STABILITY ISSUE; CORRECT?

09:17AM  5      A.   YES.

09:17AM  6      Q.   THERE WERE SOME QUALITY CONTROL ISSUES; CORRECT?

09:17AM  7      A.   YES.

09:17AM  8      Q.   AND THEN THERE WAS AN ISSUE RELATING TO THE CALCULATION OF

09:17AM  9      THE RESULTS; CORRECT?

09:17AM  10     A.   YES.

09:18AM  11     Q.   AND THAT PT INR TEST, THAT WAS RUN ON A SIEMENS MACHINE;

09:18AM  12     CORRECT?

09:18AM  13     A.   I BELIEVE IT WAS A SIEMENS, YES.

09:18AM  14     Q.   OKAY.  AND THAT'S AN FDA APPROVED COMMERCIAL DEVICE;

09:18AM  15     CORRECT?

09:18AM  16     A.   YES.

09:18AM  17     Q.   AND THEN THE REAGENT, THAT STABILITY ISSUE, THAT REAGENT

09:18AM  18     WAS MADE BY A COMPANY, NOT THERANOS; CORRECT?

09:18AM  19     A.   THAT IS CORRECT.

09:18AM  20     Q.   OKAY.  YOU SHOULD HAVE SOME BINDERS THERE IN FRONT OF YOU.

09:18AM  21          IF YOU COULD TAKE A LOOK AT THE GOVERNMENT'S BINDER, THE

09:18AM  22     WHITE BINDER, AT 4621.

09:18AM  23          WE CAN ALSO PUT IT UP ON THE SCREEN.  IF WE CAN LOOK AT

09:18AM  24     PAGE 16, UNDER D-TAG 5413.

09:18AM  25          AND YOU CAN LOOK ON THE BINDER OR ON THE SCREEN,

ER-3707

BENNETT CROSS BY MR. CAZARES (RES.)                                    5032

09:18AM   1         MS. BENNETT.  IT WILL BE IN BOTH.

09:18AM   2              AND I WANT TO DRAW YOUR ATTENTION TO, AT THE BOTTOM OF

09:18AM   3    PAGE -- WELL, ACTUALLY, AT THE BOTTOM OF PAGE 17, SO THE BOTTOM

09:19AM   4    OF PAGE 17 THERE'S D5413.

09:19AM   5              DO YOU SEE THAT?

09:19AM   6    A.   I DO.

09:19AM   7    Q.   AND IT RELATES TO TEST SYSTEMS, EQUIPMENT, INSTRUMENTS,

09:19AM   8    REAGENT.

09:19AM   9              DO YOU SEE THAT?

09:19AM  10    A.   I DO.

09:19AM  11    Q.   AND THEN THERE'S A DESCRIPTION OF THE REQUIREMENT, "THE

09:19AM  12    LABORATORY MUST DEFINE CRITERIA FOR THOSE CONDITIONS THAT ARE

09:19AM  13    ESSENTIAL FOR PROPER STORAGE OF REAGENTS AND SPECIMENS,

09:19AM  14    ACCURATE AND RELIABLE TEST SYSTEM OPERATION, AND TEST RESULT

09:19AM  15    REPORTING."

09:19AM  16              DO YOU SEE THAT?

09:19AM  17    A.   I DO.

09:19AM  18    Q.   AND THEN THE SURVEY REPORT CONTINUES.  "THE CRITERIA MUST

09:19AM  19    BE CONSISTENT WITH THE MANUFACTURER'S INSTRUCTIONS, IF

09:19AM  20    PROVIDED.  THESE CONDITIONS MUST BE MONITORED AND DOCUMENTED

09:19AM  21    AND, IF APPLICABLE, INCLUDE THE FOLLOWING," AND THERE'S A LIST

09:19AM  22    OF CONDITIONS THAT HAVE TO BE MONITORED.

09:19AM  23              DO YOU SEE THAT?

09:19AM  24    A.   I DO.

09:19AM  25    Q.   AND THEN ON THE NEXT PAGE, PAGE 18, THIS ISSUE IS

BENNETT CROSS BY MR. CAZARES (RES.)                    5033

09:19AM  1    IDENTIFIED AS A STANDARD LEVEL NONCOMPLIANCE.

09:19AM  2        DO YOU SEE THAT?

09:19AM  3    A.   I DO.

09:19AM  4    Q.   AND THEN IF WE CONTINUE ONTO PAGE, AT THE BOTTOM, PAGE 18,

09:20AM  5    ITEM 2.

09:20AM  6        DO YOU SEE THAT?

09:20AM  7    A.   I DO.

09:20AM  8    Q.   AND IS THIS THE PT INR REAGENT STABILITY ISSUE THAT YOU

09:20AM  9    IDENTIFY?

09:22AM  10   A.   YES.

09:22AM  11   Q.   AND JUST SO THE JURY UNDERSTANDS, SO YOU WROTE THAT

09:22AM  12   REVIEW, "BASED ON REVIEW OF THE PROCEDURE, MANUFACTURE PACKAGE

09:22AM  13   INSERT AND OBSERVATION, THE LABORATORY FAILED TO FOLLOW THE

09:22AM  14   MANUFACTURER INSTRUCTIONS FOR EXPIRATION DATE OF INNOVIN USED

09:22AM  15   FOR PROTHROMBIN TIME/INTERNATIONAL NORMALIZED RATIO TESTING."

09:22AM  16       DO YOU SEE THAT?

09:22AM  17   A.   I DO.

09:22AM  18   Q.   AND INNOVIN, THAT'S THE REAGENT; CORRECT?

09:22AM  19   A.   YES.

09:22AM  20   Q.   AND IT'S MADE BY A COMPANY CALLED DADE; IS THAT RIGHT?

09:22AM  21   A.   I BELIEVE SO, YES.

09:22AM  22   Q.   AND THAT'S A COMMERCIALLY MADE REAGENT?

09:22AM  23   A.   IT IS.

09:22AM  24   Q.   AND AT SUB A, YOU IDENTIFIED HERE IN THE SURVEY REPORT

09:22AM  25   THAT "DADE INNOVIN LOT NUMBER 539280 WAS PUT INTO USE BY THE

ER-3709

BENNETT CROSS BY MR. CAZARES (RES.)                5034

09:22AM   1    LABORATORY AT THE END OF MARCH 2015."

09:22AM   2         DO YOU SEE THAT?

09:22AM   3    A.   I DO.

09:22AM   4    Q.   AND SO YOU IDENTIFY SOME RECORDS THAT SHOWED THE LAB

09:22AM   5    STARTED TO USE THIS LOT OF REAGENT IN MARCH OF 2015; IS THAT

09:22AM   6    CORRECT?

09:22AM   7    A.   YES.

09:22AM   8    Q.   AND THEN AT SUB B, THE REPORT READS, "THE GENERAL

09:22AM   9    SUPERVISOR STATED THAT THE PACKAGE INSERTS WERE USUALLY WHITE."

09:22AM  10         WAS THAT YOUR FINDING?

09:22AM  11    A.   YES.

09:22AM  12    Q.   AND THEN SUB C READS, "THE PACKAGE INSERT FOR LOT NUMBER

09:22AM  13    539280 WAS PINK WHICH INDICATED THAT THE MANUFACTURER HAD

09:22AM  14    INCLUDED SPECIAL INSTRUCTIONS FOR THE SPECIFIC LOT NUMBER OF

09:22AM  15    INNOVIN."

09:22AM  16         DO YOU SEE THAT?

09:22AM  17    A.   I DO.

09:22AM  18    Q.   OKAY.  AND THEN AT SUB D, THE SURVEY REPORT READS, "SURVEY

09:22AM  19    REVIEW OF THE PI REVEALED AN IMPORTANT NOTE THAT THIS SPECIFIC

09:22AM  20    LOT NUMBER WAS ONLY STABLE FOR 2 DAYS INSTEAD OF 10 DAYS AFTER

09:22AM  21    RECONSTITUTION."

09:22AM  22         DO YOU SEE THAT?

09:22AM  23    A.   I DO.

09:22AM  24    Q.   SO DOES THAT MEAN PRIOR TO THE COMPANY'S INSTITUTION OF

09:22AM  25    THIS LOT NUMBER REAGENT, THE STABILITY OF THE INNOVIN WAS TEN

ER-3710

BENNETT CROSS BY MR. CAZARES (RES.)                    5035

09:22AM 1    DAYS?

09:22AM 2    A.   I CAN'T SAY IF THE PREVIOUS LOT NUMBERS WERE FOR TEN DAYS

09:22AM 3    UNLESS I WOULD SEE THE PACKAGE INSERT.

09:22AM 4    Q.   OKAY.  BUT HERE IN YOUR REPORT YOU WROTE THAT "THIS

09:22AM 5    SPECIFIC LOT NUMBER WAS ONLY STABLE FOR 2 DAYS INSTEAD OF

09:22AM 6    10 DAYS."

09:22AM 7    A.   CORRECT.

09:22AM 8    Q.   OKAY.

09:22AM 9        SO FOR THIS LOT, INSTEAD OF TEN, IT WAS DOWN TO TWO; IS

09:22AM 10   THAT CORRECT?

09:22AM 11   A.   YES.

09:22AM 12   Q.   AND THAT'S BECAUSE THE COMPANY CHANGED THE TIME PERIOD FOR

09:22AM 13   THE STABILITY FOR THE USE OF THIS REAGENT; CORRECT?

09:22AM 14   A.   YES.

09:22AM 15   Q.   AND THAT'S NOT EXACTLY THE SAME, BUT SOMETHING LIKE THE

09:22AM 16   MILK EXPIRATION DATE, DON'T USE IT AFTER X DATE; CORRECT?

09:22AM 17   A.   FOR REAGENTS, IF AN EXPIRATION DATE IS DEFINED BY THE

09:23AM 18   MANUFACTURER OR THE LABORATORY, THEY CANNOT USE IT PAST THE

09:23AM 19   DATE.

09:23AM 20       I PERSONALLY DO USE MILK PAST THE EXPIRATION DATE

09:23AM 21   SOMETIMES.

09:23AM 22       (LAUGHTER.)

09:23AM 23   BY MR. CAZARES:

09:23AM 24   Q.   BUT IN SOME INSTANCES A LAB COULD USE THE REAGENT AFTER

09:23AM 25   THE EXPIRATION DATE IF THEY DID SOME STUDIES TO DETERMINE

ER-3711

BENNETT CROSS BY MR. CAZARES (RES.)                5036

09:23AM  1    WHETHER OR NOT THE STABILITY MIGHT BE LONGER THAN THE

09:23AM  2    MANUFACTURER IDENTIFIED, COULDN'T THEY?

09:23AM  3    A.   THEY CAN.

09:23AM  4    Q.   SO IT'S NOT NECESSARILY A HARD DATE, BUT IT'S A HARD DATE

09:23AM  5    UNLESS YOU'VE DONE SOME WORK TO DETERMINE THAT THE REAGENT MAY

09:23AM  6    BE STABLE BEYOND WHAT THE MANUFACTURER SAID; CORRECT?

09:23AM  7    A.   YES, IT IS A HARD DATE UNLESS THEY DO THE EXTRA WORK.

09:23AM  8    Q.   FAIR ENOUGH.

09:23AM  9         AND IN THIS INSTANCE, THE INSERT IS A DIFFERENT COLOR?

09:23AM 10    IT'S PINK INSTEAD OF WHITE; CORRECT?

09:23AM 11    A.   YES.

09:23AM 12    Q.   AND THEN YOU IDENTIFY THAT THE "THE CURRENT VIAL OF

09:23AM 13    INNOVIN REAGENT WAS OBSERVED IN THE 2-8 CELSIUS REFRIGERATOR

09:24AM 14    WITH A 5 DAY EXPIRATION DATE."

09:24AM 15         DO YOU SEE THAT?

09:24AM 16    A.   I DO.

09:24AM 17    Q.   SO DID YOU YOURSELF GO IN THE REFRIGERATOR AND SEE THE

09:24AM 18    INNOVIN IN THE FRIDGE?

09:24AM 19    A.   I DID.

09:24AM 20    Q.   AND THERE WAS A TYPEWRITTEN LABEL?

09:24AM 21    A.   IT WAS A HANDWRITTEN LABEL.

09:24AM 22    Q.   AND THE LABEL YOU SAW WAS FIVE DAYS?

09:24AM 23    A.   IT WAS FIVE DAYS.  THE EXPIRATION ON THE VIAL WAS WRITTEN

09:24AM 24    FIVE DAYS AFTER THE OPEN DAY WAS WRITTEN ON THE BOTTOM.

09:24AM 25    Q.   AND THE STABILITY INDICATED CHANGED FROM TEN TO TWO DAYS;

BENNETT CROSS BY MR. CAZARES (RES.)                    5037

09:24AM   1    CORRECT?

09:24AM   2    A.   YES.

09:24AM   3    Q.   PER THAT PINK LITTLE SHEET?

09:24AM   4    A.   YES.

09:24AM   5    Q.   OKAY.  AND THEN AT SUB F, IN THIS SECTION YOU WROTE, "CL

09:24AM   6    SOP-10001 REVISION A, 'MEASURING PROTHROMBIN TIME' STATED ON

09:24AM   7    PAGE 2 SECTION 12.1 THAT THE PACKAGE INSERT FOR NEW LOT MUST BE

09:24AM   8    REVIEWED FOR ANY CHANGES BEFORE USE."

09:24AM   9         DO YOU SEE THAT?

09:24AM  10    A.   YES.

09:24AM  11    Q.   AND SO THAT'S THE LAB'S POLICY; RIGHT?

09:25AM  12    A.   YES.

09:25AM  13    Q.   IS THAT RIGHT?

09:25AM  14    A.   YES.

09:25AM  15    Q.   OKAY.  AND AT SUB G YOU WROTE, "THE GENERAL SUPERVISOR

09:25AM  16    CONFIRMED ON 9/23/15 THAT THE CHANGE IN STORAGE AND STABILITY

09:25AM  17    OF THE INNOVIN REAGENT HAD NOT BEEN IDENTIFIED FROM MARCH 2015

09:25AM  18    THROUGH SEPTEMBER 2015."

09:25AM  19         DO YOU SEE THAT?

09:25AM  20    A.   I DO.

09:25AM  21    Q.   AND SO THE GENERAL SUPERVISOR WAS ONE OF THE LAB PERSONNEL

09:25AM  22    YOU SPOKE WITH?

09:25AM  23    A.   YES, I INTERVIEWED THE GENERAL SUPERVISOR.

09:25AM  24    Q.   AND THE GENERAL SUPERVISOR INDICATED TO YOU THAT THE LAB

09:25AM  25    STAFF WERE UNAWARE OF THE CHANGE IN STABILITY; CORRECT?

BENNETT CROSS BY MR. CAZARES (RES.)                    5038

09:25AM  1    A.   FROM MARCH 2015 THROUGH SEPTEMBER 2015.

09:25AM  2    Q.   OKAY.  AND THAT VIOLATED THE LAB'S POLICY?

09:25AM  3    A.   YES, AND THE REGULATIONS.

09:25AM  4    Q.   IF YOU TAKE A LOOK AT PAGE 40.  ON PAGE 40, THREE QUARTERS

09:26AM  5    OF THE WAY UP, THERE'S A D-TAG 5481.

09:26AM  6         DO YOU SEE THAT?

09:26AM  7    A.   I DO.

09:26AM  8    Q.   AND IT SAYS CONTROL PROCEDURES.

09:26AM  9         DO YOU SEE THAT?

09:26AM 10    A.   YES.

09:26AM 11    Q.   AND THEN THIS REQUIREMENT STATES, "RESULTS OF CONTROL

09:26AM 12    MATERIALS MUST MEET THE LABORATORY'S AND AS APPLICABLE THE

09:26AM 13    MANUFACTURER'S TEST SYSTEM CRITERIA FOR ACCEPTABILITY BEFORE

09:26AM 14    REPORTING PATIENT TEST RESULTS."

09:26AM 15         DO YOU SEE THAT?

09:26AM 16    A.   I DO.

09:26AM 17    Q.   AND SO DOES THAT MEAN ESSENTIALLY QUALITY CONTROL NEEDS TO

09:26AM 18    PASS BEFORE PATIENT RESULTS ARE REPORTED?

09:26AM 19    A.   YES.

09:26AM 20    Q.   AND THIS IS ANOTHER STANDARD LEVEL DEFICIENCY; CORRECT?

09:26AM 21    A.   IT IS.

09:26AM 22    Q.   AND THEN UNDER ITEM 1, IT SAYS, "BASED ON THE REVIEW OF

09:26AM 23    THE PROTHROMBIN TIME/INTERNATIONAL NORMALIZED RATIO PROCEDURE,

09:26AM 24    QUALITY CONTROL RECORDS, PATIENT RESULTS AND INTERVIEW WITH THE

09:26AM 25    GENERAL SUPERVISOR, THE LABORATORY FAILED TO ENSURE THAT THE QC

ER-3714

BENNETT CROSS BY MR. CAZARES (RES.)                    5039

09:27AM   1    FOR PT INR WAS ACCEPTABLE PRIOR TO REPORTING PATIENT RESULTS

09:27AM   2    FROM APRIL 2015 THROUGH SEPTEMBER 2015."

09:27AM   3         DO YOU SEE THAT?

09:27AM   4    A.   I DO.

09:27AM   5    Q.   OKAY.  THEN THE NEXT SUB A, THERE'S A "CL SOP-1001

09:27AM   6    REVISION A MEASURING PROTHROMBIN TIME-INNOVIN (TP ON THE

09:27AM   7    SIEMENS BCS XP INSTRUMENT)."

09:27AM   8         DO YOU SEE THAT?

09:27AM   9    A.   I DO.

09:27AM  10    Q.   AND IT SAYS, "AS STATED ON THE PAGE 6, SECTION 8.6 THAT IF

09:27AM  11    CONTROL VALUES ARE OUTSIDE OF THE DETERMINED RANGE, THE

09:27AM  12    CONTROLS, REAGENTS, AND INSTRUMENT PERFORMANCE SHOULD BE

09:27AM  13    CHECKED AND THAT IDENTIFICATION AND CORRECTION OF THE PROBLEM

09:27AM  14    SHOULD BE DOCUMENTED PRIOR TO REPORTING PATIENT RESULTS."

09:27AM  15         DO YOU SEE THAT?

09:27AM  16    A.   I DO.

09:27AM  17    Q.   AND SO, AGAIN, THIS IS A TEST RUN ON THE SIEMENS BCS XP

09:27AM  18    DEVICE; CORRECT?

09:27AM  19    A.   IT IS.

09:27AM  20    Q.   AND THEN IT LOOKS LIKE AT SUB B, C, AND THEN CONTINUE ON

09:28AM  21    THE NEXT PAGE, YOU REVIEWED QC RECORDS FOR CITROL IN THAT APRIL

09:28AM  22    TO SEPTEMBER TIME PERIOD; IS THAT RIGHT?

09:28AM  23    A.   YES.

09:28AM  24    Q.   AND CITROL IS A COMMERCIALLY AVAILABLE QUALITY CONTROL

09:28AM  25    MATERIAL?

BENNETT CROSS BY MR. CAZARES (RES.)                    5040

09:28AM  1    A.   IT IS.

09:28AM  2    Q.   AND THEN AT SUB C YOU WROTE THAT "THE GENERAL SUPERVISOR

09:28AM  3    STATED THAT QC WAS ACCEPTABLE IF THE VALUES WERE PLUS MINUS 2

09:28AM  4    SD FROM THE MEAN."

09:28AM  5         DO YOU SEE THAT?

09:28AM  6    A.   I DO.

09:28AM  7    Q.   AND THEN IT LOOKS LIKE YOU IDENTIFIED D, E, F, AND G,

09:28AM  8    INSTANCES WHERE THAT REQUIREMENT WASN'T MET; IS THAT FAIR?

09:28AM  9    A.   YES.

09:28AM  10   Q.   AND THEN AT SUB I YOU IDENTIFIED THAT THERE WERE 81

09:28AM  11   PATIENTS REPORTED DURING THAT TIME PERIOD WHEN QUALITY CONTROL

09:28AM  12   WAS NOT PASSING ON THE SIEMENS DEVICE; CORRECT?

09:28AM  13   A.   YES.

09:28AM  14   Q.   AND THIS CONTRIBUTED TO THAT CONDITION LEVEL DEFICIENCY?

09:28AM  15   A.   IT DID.

09:29AM  16   Q.   AND THEN IF WE CAN TAKE A LOOK AT PAGE 73.

09:29AM  17        AT 73 THERE'S A D-TAG 5801.

09:29AM  18        DO YOU SEE THAT?

09:29AM  19   A.   YES.

09:29AM  20   Q.   AND IT SAYS, "THE LABORATORY MUST HAVE AN ADEQUATE MANUAL

09:29AM  21   OR ELECTRONIC SYSTEMS IN PLACE TO ENSURE TEST RESULTS AND OTHER

09:29AM  22   PATIENT-SPECIFIC DATA ARE ACCURATELY AND RELIABLY SENT FROM THE

09:29AM  23   POINT OF DATA ENTRY (WHETHER INTERFACED OR ENTERED MANUALLY) TO

09:29AM  24   FINAL REPORT DESTINATION, IN A TIMELY MANNER.  THIS INCLUDES

09:29AM  25   THE FOLLOWING."

ER-3716

BENNETT CROSS BY MR. CAZARES (RES.)                    5041

09:29AM   1          AND THEN THERE ARE SOME DESCRIPTIONS.

09:29AM   2          "RESULTS REPORTED FROM CALCULATED DATA.

09:29AM   3          "RESULTS TO NETWORK OR INTERFACED SYSTEMS."

09:29AM   4          AND THEN THE LAST ITEM SAYS, "MANUALLY TRANSCRIBED OR

09:30AM   5   ELECTRONICALLY TRANSMITTED RESULTS AND PATIENT-SPECIFIC

09:30AM   6   INFORMATION REPORTED DIRECTLY OR UPON RECEIPT FROM OUTSIDE

09:30AM   7   REFERRAL LABORATORIES, SATELLITE OR POINT-OF-CARE TESTING

09:30AM   8   LOCATIONS."

09:30AM   9          DO YOU SEE THAT?

09:30AM  10   A.   YES, TESTING LOCATIONS, YES.

09:30AM  11   Q.   AND THEN THIS IS ANOTHER STANDARD LEVEL NONCOMPLIANCE?

09:30AM  12   A.   YES.

09:30AM  13   Q.   AND THIS RELATES TO THE CALCULATION OF THE PT INR RESULTS;

09:30AM  14   IS THAT RIGHT?

09:30AM  15   A.   YES.

09:30AM  16   Q.   NOW, IN THE REPORT UNDER THE STANDARD YOU WROTE, "BASED ON

09:30AM  17   REVIEW OF THE PATIENT RESULTS, MANUFACTURER INTERNATIONAL

09:30AM  18   SENSITIVITY INDEX NUMBER," I'LL STOP RIGHT THERE.

09:30AM  19          WHAT IS THAT?

09:30AM  20   A.   THAT IS A NUMBER THAT THE MANUFACTURER PROVIDED FOR EACH

09:30AM  21   LOT NUMBER OF THROMBOPLASTIN, WHICH IS ALSO INNOVIN.

09:30AM  22   Q.   AND THIS NUMBER, THIS ISI NUMBER, YOU SAID IS DETERMINED

09:31AM  23   BY THE MANUFACTURER?

09:31AM  24   A.   IT IS.

09:31AM  25   Q.   SO HERE THAT WOULD BE SIEMENS?

BENNETT CROSS BY MR. CAZARES (RES.)                          5042

09:31AM   1        A.   YES.

09:31AM   2        Q.   OKAY.  AND THAT'S DETERMINED BY THE MANUFACTURER DOING

09:31AM   3    SOME SORT OF A STUDY?

09:31AM   4        A.   IT WOULD BE BY DADE.  THEY'RE THE ONES THAT MAKE IT.

09:31AM   5             SORRY.

09:31AM   6        Q.   I LED YOU TO THAT.

09:31AM   7        A.   SORRY.

09:31AM   8        Q.   SO THE ISI NUMBERS ARE PROVIDED BY DADE, THE MANUFACTURER

09:31AM   9    OF THE REAGENT?

09:31AM  10        A.   YES.

09:31AM  11        Q.   OKAY.  AND THAT'S DETERMINED USING A STUDY?

09:31AM  12        A.   I DON'T KNOW HOW THE MANUFACTURER DETERMINES THE ISI.

09:31AM  13        Q.   OKAY.  BUT IT'S PROVIDED BY THE MANUFACTURER?

09:31AM  14        A.   YES.

09:31AM  15        Q.   AND THAT'S SPECIFIC TO EACH LOT NUMBER; CORRECT?

09:31AM  16        A.   IT IS.

09:31AM  17        Q.   AND THAT NUMBER NEEDS TO BE ENTERED INTO THE SIEMENS

09:31AM  18    DEVICE BEFORE RUNNING THE PATIENT TEST, OR THE PATIENT RESULTS;

09:31AM  19    CORRECT?

09:31AM  20        A.   YES.

09:31AM  21        Q.   AND THEN GETTING BACK TO THE REPORT YOU WROTE, "AND THE

09:31AM  22    LABORATORY'S MEAN NORMAL PROTHROMBIN TIME, THE LABORATORY

09:31AM  23    FAILED TO ENSURE THAT THE REPORTED INTERNATIONAL NORMALIZED

09:31AM  24    RATIO WAS CALCULATED ACCURATELY PRIOR TO REPORTING FINAL

09:31AM  25    PATIENT TEST RESULTS."

BENNETT CROSS BY MR. CAZARES (RES.)                    5043

09:32AM   1            SO IN YOUR SURVEY RELATING TO THIS ISSUE, DID YOU NOT FIND

09:32AM   2    EVIDENCE THAT THERANOS'S LAB PERSONNEL HAD DOCUMENTED AND

09:32AM   3    ENTERED THE CORRECT ISI VALUE INTO THE MACHINE BEFORE RUNNING

09:32AM   4    THE TEST?

09:32AM   5    A.   I BELIEVE THAT I DID.

09:32AM   6    Q.   OKAY.  SO THEY SHOULD HAVE HAD DOCUMENTATION BACK FROM

09:32AM   7    MARCH OF 2015, BUT WHAT THEY GAVE YOU WAS SOME DOCUMENTATION I

09:32AM   8    THINK IT WAS FROM SEPTEMBER OF 2015; CORRECT?

09:32AM   9    A.   THE DOCUMENTATION THAT THE LABORATORY HAS TO RUN IS THE

09:32AM  10    MEAN NORMAL PROTHROMBIN TIME, AND THEY WERE UNABLE TO PRODUCE

09:32AM  11    THAT DOCUMENTATION UNTIL SEPTEMBER, AND IT SHOULD HAVE BEEN RUN

09:32AM  12    PRIOR TO MARCH BEFORE THEY STARTED.

09:32AM  13    Q.   AND JUST TO BE CLEAR, THEY DIDN'T HAVE DOCUMENTATION OF

09:32AM  14    RUNNING IT IN MARCH OF 2015; CORRECT?

09:32AM  15    A.   THEY DID NOT.

09:32AM  16    Q.   OKAY.  IT COULD HAVE HAPPENED, BUT THEY'RE SUPPOSED TO

09:32AM  17    HAVE DOCUMENTATION; CORRECT?

09:32AM  18    A.   IF IT'S NOT DOCUMENTED, IT'S NOT DONE.

09:32AM  19    Q.   ACCORDING TO THE REGULATIONS?

09:32AM  20    A.   WELL, IN ORDER TO BE ABLE TO SUPPORT THAT IT'S BEEN DONE,

09:33AM  21    THEY HAD TO BE ABLE TO PROVIDE THE DOCUMENTATION AND THEY COULD

09:33AM  22    NOT.

09:33AM  23    Q.   FAIR ENOUGH.

09:33AM  24            AND YOU USED THIS NUMBER YOU WERE PROVIDED IN SEPTEMBER OF

09:33AM  25    2015 RELATING TO THE ISI NUMBER, AND YOU RECALCULATED THE

BENNETT CROSS BY MR. CAZARES (RES.)                    5044

09:33AM  1      PATIENT RESULTS YOURSELF; CORRECT?

09:33AM  2      A.   I USED THE ISI NUMBER AND THE DOCUMENTATION FROM SEPTEMBER

09:33AM  3      TO RECALCULATE THE INR'S, YES.

09:33AM  4      Q.   AND YOU DID THAT MANUALLY; CORRECT?

09:33AM  5      A.   I DID.

09:33AM  6      Q.   NOW, ORDINARILY WHEN THE ISI VALUE IS ENTERED INTO THE

09:33AM  7      MACHINE AND THE PATIENT SAMPLE IS RUN AND PROCESSED, THE

09:33AM  8      CALCULATION IS DONE INSIDE OF THE MACHINE; CORRECT?

09:33AM  9      A.   YES.

09:33AM  10     Q.   SO THIS WOULD ALL BE DONE WITHIN THE MACHINE?  LAB STAFF

09:33AM  11     WOULDN'T BE CALCULATING OR DOING THE MATH THEMSELVES; CORRECT?

09:33AM  12     A.   THEY WOULD NOT.

09:33AM  13     Q.   WHAT IS THE CALCULATION?

09:33AM  14     A.   I DON'T KNOW THE EXACT CALCULATION FOR IT.  YOU CAN

09:34AM  15     CERTAINLY GOOGLE IT AND FIND IT.

09:34AM  16     Q.   BUT YOU DID THE CALCULATION YOURSELF THOUGH?

09:34AM  17     A.   RIGHT.  I USED A PROGRAM TO PLUG THE NUMBERS IN AND

09:34AM  18     RECALCULATE, YES.

09:34AM  19     Q.   OKAY.  AND AS A RESULT OF THE WORK THAT YOU DID, YOU CAME

09:34AM  20     UP WITH A NUMBER THAT WAS DIFFERENT THAN WHAT WAS REPORTED TO

09:34AM  21     PATIENTS; IS THAT RIGHT?

09:34AM  22     A.   THAT'S CORRECT.

09:34AM  23     Q.   AND I THINK AT SUB C YOU ITEMIZED, GETTING BACK TO

09:34AM  24     PAGE 74, YOU SAID, "THE FINAL REPORTED RESULTS VARIED FROM THE

09:34AM  25     TRUE RESULTS BY .1 TO .5 UNITS."

ER-3720

BENNETT CROSS BY MR. CAZARES (RES.)                    5045

09:34AM   1           DO YOU SEE THAT?

09:34AM   2      A.   I DO.

09:34AM   3      Q.   AND THAT WAS THEIR CALCULATION AND WHAT THE LAB REPORTED;

09:34AM   4      CORRECT?

09:34AM   5      A.   YES.

09:34AM   6      Q.   NOW, I THINK ON WEDNESDAY WE WERE TALKING ABOUT THIS ISSUE

09:34AM   7      ABOUT WHEN IT WAS DETERMINED BY YOURSELF AND MR. YAMAMOTO THAT

09:34AM   8      YOU WERE GOING TO CITE AN IMMEDIATE JEOPARDY FINDING.

09:34AM   9           DO YOU REMEMBER THAT?

09:34AM  10      A.   I DO.

09:34AM  11      Q.   AND I THINK YOU PUT THE TIME PERIOD AROUND THE END OF THE

09:35AM  12      NOVEMBER 2015 VISIT; CORRECT?

09:35AM  13      A.   IT WAS -- YES, IT WAS AFTER WE FINISHED THE ENTIRE SURVEY,

09:35AM  14      YES.

09:35AM  15      Q.   AND I GUESS, DOES IT MEAN THAT THE IJ FINDING WAS MADE

09:35AM  16      WHEN YOU LEFT THE LABORATORY IN NOVEMBER OF 2015, OR WAS THERE

09:35AM  17      FURTHER WORK TO BE DONE?

09:35AM  18      A.   IT WAS MADE AFTER WE LEFT THE LABORATORY IN NOVEMBER.

09:35AM  19      Q.   OKAY.  BECAUSE YOU WERE STILL REVIEWING DOCUMENTATION;

09:35AM  20      CORRECT?

09:35AM  21      A.   YES.

09:35AM  22      Q.   WITHIN THE BINDER THAT YOU SHOULD HAVE THERE IN FRONT OF

09:35AM  23      YOU, IF YOU COULD TAKE A LOOK AT EXHIBIT OR TAB NUMBER 4600.

09:36AM  24           DO YOU HAVE 4600 UP THERE IN FRONT OF YOU?

09:36AM  25      A.   I DO.

ER-3721

09:36AM   1    Q.   OKAY.  AND 4600 APPEARS TO BE AN INTERNAL EMAIL EXCHANGE

09:36AM   2    BETWEEN YOURSELF AND SOME OF YOUR COLLEAGUES AT CMS?

09:36AM   3    A.   YES.

09:36AM   4    Q.   OKAY.  AND THE LATER OF THE TWO MESSAGES LOOKED TO BE

09:36AM   5    DATED DECEMBER 8TH, 2015.

09:36AM   6         DO YOU SEE THAT?

09:36AM   7    A.   I DO.

09:36AM   8    Q.   OKAY.  AND THIS LATTER MESSAGE IS FROM YOURSELF TO A

09:36AM   9    THOMAS HAMILTON.

09:36AM  10         DO YOU SEE THAT?

09:36AM  11    A.   I DO.

09:36AM  12    Q.   AND THEN COPIES TO MS. DYER AND MR. YAMAMOTO; CORRECT?

09:36AM  13    A.   YES.

09:36AM  14              MR. CAZARES:  MOVE TO ADMIT 4600, YOUR HONOR.

09:36AM  15              MR. LEACH:  IS THIS COMING IN AS A BUSINESS RECORD?

09:36AM  16              MR. CAZARES:  YES.

09:36AM  17              MR. LEACH:  NO OBJECTION.

09:36AM  18              THE COURT:  IT WILL BE ADMITTED, 4600, AND IT MAY BE

09:36AM  19    PUBLISHED.

09:36AM  20         (GOVERNMENT'S EXHIBIT 4600 WAS RECEIVED IN EVIDENCE.)

09:36AM  21    BY MR. CAZARES:

09:36AM  22    Q.   IF YOU TAKE A LOOK AT THE LOWER TWO MESSAGES, THERE

09:36AM  23    APPEARS TO BE AN EMAIL AT THE BOTTOM HALF FROM MR. HAMILTON TO

09:36AM  24    YOURSELF.

09:36AM  25         DO YOU SEE THAT?

ER-3722

09:36AM  1    A.   I DO.

09:36AM  2    Q.   AND THAT'S DECEMBER 8TH, 2015?

09:37AM  3         (PAUSE IN PROCEEDINGS.)

09:37AM  4              THE COURT:  IS IT ON THE SCREEN?

09:37AM  5              JUROR:  NO.

09:37AM  6              THE COURT:  ALL RIGHT.  IT SEEMS LIKE IT'S UP NOW.

09:37AM  7    BY MR. CAZARES:

09:37AM  8    Q.   ALL RIGHT.  BACK TO 4600.  THE LOWER PORTION OF THE

09:37AM  9    MESSAGE, IT SHOULD BE UP ON THE SCREEN.

09:37AM  10        DO YOU SEE THAT?

09:37AM  11   A.   I DO.

09:37AM  12   Q.   AND THIS IS FROM MR. HAMILTON TO YOURSELF?

09:37AM  13   A.   YES.

09:37AM  14   Q.   AND THEN MR. HAMILTON WROTE, "NICE PRESENTATION TODAY.  I

09:37AM  15   THINK IT DID GOOD, TRIPLE DUTY:  PROVIDING A CLEAR EXAMPLE OF

09:37AM  16   CLIA'S APPLICATION TO A SPECIFIC TEST, EXEMPLIFYING HOW A

09:37AM  17   SURVEY PROCESS WOULD LOOK AT THINGS, AND THEN UPDATING ON

09:37AM  18   THERANOS."

09:37AM  19        DO YOU SEE THAT?

09:37AM  20   A.   I DO.

09:37AM  21   Q.   SO IT LOOKS LIKE THIS IS IN RELATION TO A PRESENTATION YOU

09:37AM  22   MADE RELATING TO THE THERANOS SURVEY?

09:37AM  23   A.   RELATED TO PT INR.

09:37AM  24   Q.   OKAY.  AND THEN MR. HAMILTON WROTE, "IN YOUR OPINION, IS

09:38AM  25   THERE ANYTHING THAT THE RO OR WE COULD DO TO FREE UP ANY OF

BENNETT CROSS BY MR. CAZARES (RES.)                    5048

09:38AM 1      GARY'S TIME."

09:38AM 2          JUST TO STOP THERE, R-O IS, IS THAT THE REGIONAL OFFICE?

09:38AM 3      A.  YES.

09:38AM 4      Q.  IS THAT MR. YAMAMOTO'S OFFICE WITHIN CMS?

09:38AM 5      A.  YES.

09:38AM 6      Q.  AND THEN "OF GARY'S TIME SO HE COULD EXPEDITE HIS PART OF

09:38AM 7      THE 2567?"

09:38AM 8          DO YOU SEE THAT?

09:38AM 9      A.  I DO.

09:38AM 10     Q.  AND SO BY THIS TIME, DECEMBER 8TH, 2015, THE SURVEY REPORT

09:38AM 11     HAD NOT BEEN COMPLETED; CORRECT?

09:38AM 12     A.  CORRECT.

09:38AM 13     Q.  AND FINAL DECISIONS HAD NOT YET BEEN MADE; CORRECT?

09:38AM 14     A.  CORRECT.

09:38AM 15     Q.  AND THEN MR. HAMILTON WROTE, "ESPECIALLY IF THE FINDING IS

09:38AM 16     IN IJ, THE TIME LAG BECOMES A LITTLE PROBLEMATIC."

09:38AM 17         DO YOU SEE THAT?

09:38AM 18     A.  I DO.

09:38AM 19     Q.  AND WHAT MR. HAMILTON IS GETTING AT, YOU WOULD AGREE, THAT

09:38AM 20     THE SURVEY STARTED IN SEPTEMBER OF 2015 AND IT'S NOW DECEMBER,

09:38AM 21     AND THE FINAL DETERMINATION OF IJ HAD NOT YET BEEN MADE; IS

09:38AM 22     THAT RIGHT?

09:38AM 23     A.   IT HAD NOT BEEN MADE BECAUSE WE WERE STILL REVIEWING

09:38AM 24     DOCUMENTS.

09:39AM 25     Q.  AND THEN IF WE FOCUS ON THE UPPER HALF OF THE MESSAGE, YOU

ER-3724

BENNETT CROSS BY MR. CAZARES (RES.)                    5049

09:39AM  1    WROTE BACK TO MR. HAMILTON, "I CHECKED WITH GARY.  WE ARE NOW

09:39AM  2    IN THE PROCESS OF GOING THROUGH THE MANY DOCUMENTS COLLECTED ON

09:39AM  3    THE SURVEY TO DETERMINE COMPLIANCE -- GIVEN THE VOLUME AND THE

09:39AM  4    TECHNICAL NATURE OF THE DOCUMENTS, IT IS A TIME-CONSUMING

09:39AM  5    PROCESS."

09:39AM  6        DO YOU SEE THAT?

09:39AM  7    A.   YES.

09:39AM  8    Q.   IS THAT ACCURATE?

09:39AM  9    A.   IT IS ACCURATE.

09:39AM  10   Q.   AND THEN YOU WROTE, "WE FEEL THAT THE EARLIEST WE CAN HAVE

09:39AM  11   A 2567 READY IS JANUARY."

09:39AM  12       DO YOU SEE THAT?

09:39AM  13   A.   YES.

09:39AM  14   Q.   AND THEN YOU WROTE, "WE BOTH NEED TO WRITE OUR

09:39AM  15   DEFICIENCIES THEN COME TOGETHER TO DISCUSS THE DEFICIENCIES AS

09:39AM  16   WELL AS WHAT LEVEL OF NONCOMPLIANCE (NON-IJ VERSUS IJ) THE

09:39AM  17   DEFICIENCIES RISE TO."

09:39AM  18       DO YOU SEE THAT?

09:39AM  19   A.   I DO.

09:39AM  20   Q.   AND IS THAT AN ACCURATE DESCRIPTION OF THE KIND OF

09:39AM  21   DIVISION OF LABOR BETWEEN YOURSELF AND MR. YAMAMOTO?  HE WROTE

09:39AM  22   HIS PORTION, YOU WROTE YOURS, AND THEN YOU CAME TOGETHER AND

09:39AM  23   DISCUSSED?

09:39AM  24   A.   YES.

09:39AM  25   Q.   OKAY.  "OUR PLAN IS TO HAVE THE DISCUSSION THE WEEK OF

ER-3725

BENNETT CROSS BY MR. CAZARES (RES.)                    5050

09:40AM  1     JANUARY 11TH SO THAT THE 2567 CAN BE RELEASED ASAP AFTER IT IS

09:40AM  2     FINALIZED."

09:40AM  3         DO YOU SEE THAT?

09:40AM  4     A.  I DO.

09:40AM  5     Q.  OKAY.  AND THEN AT THE BOTTOM PORTION OF THE MESSAGE YOU

09:40AM  6     WROTE, "IT IS OUR UNDERSTANDING THAT THE FINGERSTICK TESTING

09:40AM  7     HAS BEEN STOPPED; HOWEVER, THE VENIPUNCTURE TESTING CONTINUES."

09:40AM  8         DO YOU SEE THAT?

09:40AM  9     A.  I DO.

09:40AM  10    Q.  OKAY.  YOU CAN SET THAT ASIDE.

09:40AM  11        IF YOU COULD GO BACK TO THE 4621, THE SURVEY REPORT.

09:40AM  12        AND IF YOU CAN LOOK AT PAGE 67.  AND YOU CAN LOOK AT IT,

09:40AM  13    MS. BENNETT, IN THE BINDER OR UP ON THE SCREEN.

09:41AM  14        NOW, AT PAGE 67, AT ITEM 7, THIS IS RELATING TO D-TAG

09:41AM  15    5793.

09:41AM  16        DO YOU SEE THAT?

09:41AM  17    A.  I DO.

09:41AM  18    Q.  AND THEN ITEM 7 IN THE REPORT READS, "BASED ON LABORATORY

09:41AM  19    PERSONNEL INTERVIEWS AND THE LABORATORY'S ALTERNATIVE

09:41AM  20    ASSESSMENT PROGRAM RECORD REVIEW ON NOVEMBER 20, 2015, THE

09:41AM  21    LABORATORY FAILED TO HAVE AN ANALYTIC SYSTEMS QUALITY

09:41AM  22    ASSESSMENT MECHANISM THAT INCLUDED THE TIMELY REVIEW OF THE

09:41AM  23    EFFECTIVENESS OF ACTIONS TAKEN."

09:41AM  24        DO YOU SEE THAT?

09:41AM  25    A.  I DO.

BENNETT CROSS BY MR. CAZARES (RES.)                    5051

09:41AM  1    Q.   AND THEN THE NEXT PARAGRAPH THERE'S A DESCRIPTION, "TO

09:41AM  2    COMPLY WITH THE CLIA REQUIREMENT," A CITATION TO THE

09:41AM  3    REGULATION, "THE LABORATORY MAINTAINED A PROTOCOL TITLED

09:41AM  4    PROFICIENCY FOR THERANOS LAB-DEVELOPED TESTS THAT INCLUDED A

09:41AM  5    LABORATORY PROCESS CALLED AAP IN WHICH TESTS PERFORMED USING

09:41AM  6    THE ADVIA 1800 WOULD BE EVALUATED AND DEFINED IN RELATIONSHIP

09:41AM  7    TO THE ADVIA XPT."

09:42AM  8         DO YOU SEE THAT?

09:42AM  9    A.   YES.

09:42AM  10   Q.   AND THOSE ARE TWO COMMERCIAL DEVICES; CORRECT?

09:42AM  11   A.   THEY ARE.

09:42AM  12   Q.   AND THEN AT SUB B THERE'S A DESCRIPTION, "A REVIEW OF

09:42AM  13   LABORATORY DOCUMENTS INDICATED THAT FOR THE FOLLOWING AAP

09:42AM  14   EVENTS, THE LABORATORY'S EVALUATION WAS NOT TIMELY AND,

09:42AM  15   THEREFORE, INEFFECTIVE."

09:42AM  16        DO YOU SEE THAT?

09:42AM  17   A.   I DO, AND THIS IS MR. YAMAMOTO'S CITATION.

09:42AM  18   Q.   I THINK YOU MENTIONED THAT BEFORE, YES, ON WEDNESDAY.

09:42AM  19        SO THIS IS RELATING TO THE MODIFIED PREDICATE FINGERSTICK

09:42AM  20   TESTING?

09:42AM  21   A.   I'M NOT SURE.

09:42AM  22   Q.   OKAY.  CONTINUING WITH THE REPORT THOUGH, AT THE NEXT

09:42AM  23   ITEM, THE REPORT READS, "ON APRIL 1, 2014, THE LABORATORY

09:42AM  24   COMPLETED TESTING FOR 18 ROUTINE CHEMISTRY ANALYTES."

09:42AM  25        DO YOU SEE THAT?

ER-3727

BENNETT CROSS BY MR. CAZARES (RES.)                    5052

09:42AM 1    A.   I DO.

09:42AM 2    Q.   AND THEN ON THE NEXT PAGE IT CONTINUES, "THE LAB RECORDS

09:42AM 3    INDICATED THAT REVIEW OF THIS AAP WAS NOT COMPLETED UNTIL

09:43AM 4    NOVEMBER 16, 2015.

09:43AM 5        DO YOU SEE THAT?

09:43AM 6    A.   YES.

09:43AM 7    Q.   AND THAT'S THE ISSUE, THE REVIEW WAS NOT DONE TIMELY?

09:43AM 8    A.   THIS IS MR. YAMAMOTO'S CITATION.

09:43AM 9    Q.   BUT THE REPORT INDICATES THAT THE LAB DID NOT REVIEW THE

09:43AM 10   AAP RESULTS IN A TIMELY MANNER; IS THAT RIGHT?

09:43AM 11   A.   IF THEY DON'T REVIEW THE INFORMATION IN A TIMELY MANNER,

09:43AM 12   THEN THE QUALITY ASSESSMENT PROGRAM IS REALLY NOT EFFECTIVE.

09:43AM 13   Q.   AND THAT'S NECESSARY TO COMPLY WITH THE REGULATION;

09:43AM 14   CORRECT?

09:43AM 15   A.   IT IS.

09:43AM 16   Q.   OKAY.  AND THEN THE NEXT PARAGRAPH READS, "ON MAY 15TH,

09:43AM 17   2014, THE LABORATORY COMPLETED TESTING FOR 14 ROUTINE CHEMISTRY

09:43AM 18   ANALYTES."

09:43AM 19       DO YOU SEE THAT?

09:43AM 20   A.   I DO.

09:43AM 21   Q.   AND THEN, AGAIN, THE RECORDS INDICATED THAT THE LAB

09:43AM 22   DIRECTOR OR MANAGEMENT DID NOT TIMELY REVIEW THE RESULTS.

09:44AM 23       DO YOU SEE THAT?

09:44AM 24   A.   THAT'S WHAT THE CITATION SAYS.

09:44AM 25   Q.   OKAY.  AND THEN ON THE NEXT PARAGRAPH THE REPORT INDICATES

ER-3728

09:44AM 1    THAT "ON JULY 31, 2014, THE LABORATORY COMPLETED TESTING FOR

09:44AM 2    18 ROUTINE CHEMISTRY ANALYTES."

09:44AM 3        DO YOU SEE THAT?

09:44AM 4    A.   I DO.

09:44AM 5    Q.   AND THEN THE RECORDS REVEAL THAT THE LABORATORY AND

09:44AM 6    MANAGEMENT DID NOT REVIEW THEM IN A TIMELY MANNER; CORRECT?

09:44AM 7    A.   YES.

09:44AM 8    Q.   AND THEN ON THE SAME ISSUE FOR SUB IV, "ON NOVEMBER 20,

09:44AM 9    2014, THE LABORATORY COMPLETED TESTING FOR 14 ROUTINE CHEMISTRY

09:44AM 10   ANALYTES," AND AGAIN THE LAB DIRECTOR DIDN'T APPEAR TO HAVE

09:44AM 11   REVIEWED IT IN A TIMELY MANNER; CORRECT?

09:44AM 12   A.   IT SAYS THAT THE AAP WAS NOT COMPLETED UNTIL NOVEMBER 15TH

09:45AM 13   BY THE APPROPRIATE LABORATORY PERSONNEL.

09:45AM 14   Q.   CORRECT.  THANK YOU.

09:45AM 15       NOW, IF WE CAN LEAVE THAT UP ON THE SCREEN, AND IF YOU CAN

09:45AM 16   TAKE A LOOK WITHIN THE BINDER YOU HAVE AT TAB 20620, 20620.

09:45AM 17   A.   IT'S IN A DIFFERENT BINDER.

09:45AM 18           THE COURT:  IT'S IN THE BLACK BINDER, VOLUME 1.

09:45AM 19           THE WITNESS:  RIGHT.  YEAH.

09:45AM 20   BY MR. CAZARES:

09:45AM 21   Q.   DO YOU HAVE 20620?

09:45AM 22   A.   I DO.

09:45AM 23   Q.   OKAY.

09:46AM 24       AND UP ON THE SCREEN, MR. ALLEN, IF YOU COULD TURN TO THE

09:46AM 25   BOTTOM OF PAGE 67.

BENNETT CROSS BY MR. CAZARES (RES.)                    5054

09:46AM  1          NOW, IN THE EXHIBIT THAT YOU HAVE IN FRONT OF YOU, 20627,

09:46AM  2     THAT APPEARS TO BE AN ALTERNATIVE ASSESSMENT PROGRAM REPORT;

09:46AM  3     CORRECT?

09:46AM  4     A.   YES.

09:46AM  5     Q.   AND YOU'LL SEE IN THE BOTTOM RIGHT-HAND CORNER THERE'S A

09:46AM  6     LITTLE MARK, A STAMP THAT SAYS CMS 2 DASH AND THEN A PAGE

09:46AM  7     NUMBER.

09:46AM  8          DO YOU SEE THAT?

09:46AM  9     A.   002886?

09:46AM  10    Q.   YES.

09:46AM  11    A.   YES.

09:46AM  12    Q.   OKAY.  AND THEN ON THIS FIRST PAGE OF 20620, THE TESTING

09:46AM  13    DATE APPEARS TO BE 4-1-2014.

09:46AM  14         DO YOU SEE THAT?

09:46AM  15    A.   I DO.

09:46AM  16    Q.   AND THAT'S THE SAME AS WHAT IS REFLECTED IN THE SURVEY

09:46AM  17    REPORT AT THE BOTTOM OF PAGE 67; CORRECT?

09:46AM  18    A.   YES.

09:47AM  19    Q.   OKAY.  AND THEN AT THE BOTTOM OF PAGE 67, THE ITEM

09:47AM  20    REFLECTED IN THE SURVEY REPORT IDENTIFIES COMPLETED TESTING FOR

09:47AM  21    18 ROUTINE CHEMISTRY ANALYTES USING THE ADVIA 1800.

09:47AM  22         DO YOU SEE THAT?

09:47AM  23    A.   I DO.

09:47AM  24    Q.   AND THEN ON PAGES 1, 2, AND 3 OF 260, THESE ARE GENERAL

09:47AM  25    CHEMISTRY ANALYTES; CORRECT?

BENNETT CROSS BY MR. CAZARES (RES.)                    5055

09:47AM   1    A.   YES.

09:47AM   2    Q.   AND IF YOU COUNT THEM UP FROM PAGE 1 TO 3, THAT'S 18;

09:47AM   3    CORRECT?

09:47AM   4    A.   YES.

09:47AM   5    Q.   OKAY.  AND CONTINUING ON THE SCREEN, MR. ALLEN, IF YOU

09:48AM   6    COULD TURN THE PAGE TO THE TOP OF PAGE 68, THE DATE IN THE

09:48AM   7    SURVEY REPORT INDICATES THAT THE REVIEW OF THE APRIL 1ST

09:48AM   8    CHALLENGE WAS NOVEMBER 16, 2015.

09:48AM   9        DO YOU SEE THAT ON THE SCREEN?

09:48AM  10    A.   I DO.

09:48AM  11    Q.   OKAY.  AND THE DATE ON PAGE 3 OF EXHIBIT 262, THE

09:48AM  12    HANDWRITTEN DATES ARE 11-16-2015; CORRECT?

09:48AM  13    A.   YES.

09:48AM  14    Q.   OKAY.  AND THEN IF YOU COULD TURN TO THE NEXT PAGE OF

09:48AM  15    20620, THE CHALLENGES HERE ARE DATED MAY 15TH, 2014; CORRECT?

09:48AM  16    A.   YES.

09:48AM  17    Q.   AND THE SAME AS SUB II ON PAGE 68 OF THE SURVEY REPORT?

09:48AM  18    A.   YES.

09:48AM  19    Q.   AND THE SURVEY REPORT SAYS "14 ROUTINE CHEMISTRY

09:48AM  20    ANALYTES."

09:48AM  21        DO YOU SEE THAT?

09:48AM  22    A.   I DO.

09:48AM  23    Q.   AND THEN ON PAGES 4 AND 5 OF 20620, THOSE ARE ROUTINE

09:48AM  24    CHEMISTRY ANALYTES; CORRECT?

09:49AM  25    A.   YES.

BENNETT CROSS BY MR. CAZARES (RES.)                    5056

09:49AM 1    Q.   AND IT'S 14?

09:49AM 2    A.   YES.

09:49AM 3    Q.   OKAY.  AND AGAIN, THE SIGNATURE DATE BY THE LAB MANAGEMENT

09:49AM 4    ON EXHIBIT 20620 SAYS ON MAY 15, 2014; CORRECT?

09:49AM 5    A.   YES.

09:49AM 6    Q.   SAME AS THE OF REPORT ON SUB II?

09:49AM 7    A.   YES.

09:49AM 8    Q.   AND IF YOU TOOK TO 20620, THE NEXT CHALLENGE IS 731, 2014.

09:49AM 9         DO YOU SEE THAT?

09:49AM 10   A.   I DO.

09:49AM 11   Q.   SAME AS SUB III IN THE SURVEY REPORT?

09:49AM 12   A.   YES.

09:49AM 13   Q.   AND THE SURVEY REPORT REFLECTS AGAIN 18 ROUTINE CHEMISTRY

09:49AM 14   ANALYTES IN THIS CHALLENGE; CORRECT?

09:49AM 15   A.   YES.

09:49AM 16   Q.   AND THE REVIEW DATE IN 20620, THE HANDWRITTEN DATE BY THE

09:49AM 17   LAB STAFF APPEARS TO BE 11-16-15?

09:49AM 18   A.   YES.

09:49AM 19   Q.   SAME AS IN THE SURVEY REPORT?

09:50AM 20   A.   YES.

09:50AM 21   Q.   OKAY.  AND THEN THE LAST OF THE CHALLENGES REFLECTED HERE

09:50AM 22   IN 20620 IS DATED 11-20-2014.

09:50AM 23        DO YOU SEE THAT?

09:50AM 24   A.   YES.

09:50AM 25   Q.   AND SAME AS SUB IV IN THE SURVEY REPORT?

ER-3732

09:50AM 1    A.   YES.

09:50AM 2    Q.   AND 14 ROUTINE CHEMISTRY ANALYTES REFLECTED IN THE SURVEY

09:50AM 3    REPORT, ARE WE DEALING WITH THE SAME IN 20620?

09:50AM 4    A.   YES.

09:50AM 5    Q.   AND THE REVIEW FOR 20620 ON PAGE 10 IS 11-15-2015;

09:50AM 6    CORRECT?

09:50AM 7    A.   YES.

09:50AM 8    Q.   SAME AS THE WHAT IS REFLECTED IN SUB IV OF THE SURVEY

09:50AM 9    REPORT?

09:50AM 10   A.   YES.

09:50AM 11   Q.   AND SO WHAT WE'RE LOOKING AT APPEARS TO BE THE LAB RECORD

09:50AM 12   THAT IS CITED IN THE LAB REPORT HERE; CORRECT?

09:50AM 13   A.   YES.

09:50AM 14        MR. CAZARES:  MOVE TO ADMIT 20620, YOUR HONOR.

09:50AM 15        MR. LEACH:  HEARSAY, YOUR HONOR.

09:50AM 16        THE COURT:  ARE YOU OFFERING THIS FOR THE TRUTH?

09:50AM 17        MR. CAZARES:  AS A BUSINESS RECORD, YOUR HONOR.

09:50AM 18   IT'S A BUSINESS RECORD.  I CAN ASK MS. BENNETT --

09:50AM 19        THE COURT:  LAY A FOUNDATION.

09:50AM 20        MR. CAZARES:  I APOLOGIZE.  YES.

09:51AM 21   Q.   MS. BENNETT, IN THE COURSE OF THE SURVEY, YOU REQUESTED

09:51AM 22   MATERIALS OF THERANOS TO PERFORM THE SURVEY WORK; CORRECT?

09:51AM 23   A.   YES.

09:51AM 24   Q.   AND MR. YAMAMOTO DID THE SAME; CORRECT?

09:51AM 25   A.   YES.

09:51AM   1      Q.   AND IT'S THE PRACTICE AT CMS TO MAINTAIN THE RECORDS

09:51AM   2      OBTAINED FROM LABORATORIES USED TO DOCUMENT THE SURVEY;

09:51AM   3      CORRECT?

09:51AM   4      A.   YES.

09:51AM   5      Q.   OKAY.

09:51AM   6            MR. CAZARES:  MOVE TO ADMIT 20620, YOUR HONOR.

09:51AM   7            MR. LEACH:  OBJECTION.

09:51AM   8            THE COURT:  I'M NOT SURE A FOUNDATION HAS BEEN MET.

09:51AM   9      MR. LEACH?

09:51AM  10            MR. LEACH:  SAME OBJECTION.

09:51AM  11            THE COURT:  I'M NOT SURE THIS WITNESS CAN LAY THE

09:51AM  12      FOUNDATION.

09:51AM  13      BY MR. CAZARES:

09:51AM  14      Q.   DO LABORATORIES HAVE REQUIREMENTS TO MAINTAIN THEIR OWN

09:51AM  15      RECORDS SO THAT CMS HAS THE ABILITY TO REVIEW THOSE RECORDS?

09:51AM  16      A.   YES.

09:51AM  17      Q.   AND THAT'S A REQUIREMENT UNDER CLIA; CORRECT?

09:51AM  18      A.   YES.

09:51AM  19      Q.   AND WHEN YOU DO YOUR SURVEY REVIEW, YOU REQUEST THESE

09:51AM  20      REQUIRED RECORDS OF THE LAB IN ORDER TO PERFORM YOUR OWN WORK;

09:51AM  21      CORRECT?

09:51AM  22      A.   I REQUEST THE RECORDS THAT I NEED TO PERFORM THE PART OF

09:51AM  23      THE SURVEY THAT I'M RESPONSIBLE FOR.

09:51AM  24      Q.   AND THE LAB IS REQUIRED TO MAINTAIN THOSE RECORDS;

09:52AM  25      CORRECT?

09:52AM  1    A.    THEY ARE.

09:52AM  2    Q.    OKAY.  IF THEY DON'T HAVE THE RECORDS, THAT'S A VIOLATION

09:52AM  3    AS WELL; CORRECT?

09:52AM  4    A.    YES.

09:52AM  5    Q.    AND, IN FACT, CMS HAS ITS OWN POLICIES TO MAINTAIN THE

09:52AM  6    RECORDS THAT IT OBTAINS IN THE SURVEYS BECAUSE CMS RELIES UPON

09:52AM  7    THOSE RECORDS TO PERFORM ITS OWN WORK; CORRECT?

09:52AM  8    A.    WE HAVE A RECORD RETENTION REQUIREMENT, YES.  I'M NOT SURE

09:52AM  9    IT'S POLICY.  I THINK IT'S A LITTLE STRONGER THAN THAT.

09:52AM  10   Q.    UNDERSTOOD.

09:52AM  11         AND WHEN YOU COMPLETE THE SURVEY REPORTS IDENTIFYING

09:52AM  12   NONCOMPLIANCE, THERE'S AN EFFORT TO ACCURATELY REFLECT THE

09:52AM  13   ITEMS IN THE LAB RECORDS THAT ARE IDENTIFIED IN THE SURVEY

09:52AM  14   REPORT; CORRECT?

09:52AM  15   A.    YES.

09:52AM  16         MR. CAZARES:  MOVE TO ADMIT 20260, YOUR HONOR.

09:52AM  17         MR. LEACH:  SAME OBJECTION.

09:52AM  18         THE COURT:  I NEVER HEARD HER SAY SHE HAS KNOWLEDGE

09:52AM  19   ABOUT THIS.

09:52AM  20   BY MR. CAZARES:

09:52AM  21   Q.    THIS APPEARS TO BE THE ITEM, THE LAB RECORDS CITED IN THE

09:53AM  22   SURVEY REPORT; CORRECT?

09:53AM  23   A.    THIS IS THE FIRST TIME THAT I'VE SEEN THE DOCUMENT, BUT,

09:53AM  24   YES, IT DOES.

09:53AM  25   Q.    OKAY.  AND YOU AND MR. YAMAMOTO, HE WROTE HIS PORTION OF

09:53AM   1    THE REPORT, AND YOU WROTE YOUR PORTION; CORRECT?

09:53AM   2    A.   YES.

09:53AM   3    Q.   AND YOU CAME TOGETHER TO DISCUSS THE ULTIMATE CONCLUSIONS

09:53AM   4    THAT ARE REFLECTED IN THE SURVEY REPORT; CORRECT?

09:53AM   5    A.   WE DID, BUT WE DIDN'T DISCUSS THE DOCUMENTS PARTICULARLY.

09:53AM   6    Q.   HOWEVER, YOU MADE YOUR BEST EFFORTS TO ACCURATELY REFLECT

09:53AM   7    THE DOCUMENTS THAT YOU RELIED UPON IN DRAFTING YOUR PORTION OF

09:53AM   8    THE SURVEY REPORT; CORRECT?

09:53AM   9    A.   I DID.

09:53AM  10    Q.   AND YOU BELIEVE THAT MR. YAMAMOTO DID THE SAME; CORRECT?

09:53AM  11    A.   YES.

09:53AM  12    Q.   HE'S A KNOWLEDGEABLE, SKILLED SURVEYOR; CORRECT?

09:53AM  13    A.   YES.

09:53AM  14         MR. CAZARES:  MOVE TO ADMIT 20620, YOUR HONOR.

09:53AM  15         THE COURT:  IS THERE TESTIMONY THAT THESE WERE GIVEN

09:53AM  16    TO HER BY THE COMPANY?

09:53AM  17         MR. CAZARES:  THIS WITNESS HAS BEEN INTRODUCED INTO

09:53AM  18    THIS TRIAL TO TESTIFY ABOUT THE ENTIRETY OF THE 121 PAGE SURVEY

09:54AM  19    REPORT THAT HAS BEEN ENTERED INTO EVIDENCE.

09:54AM  20         I ALSO THINK THAT THE LAB RECORD ITSELF IS EVIDENCE OF

09:54AM  21    NOTICE TO CMS OF THE UNDERLYING EVENTS AND LAB POLICIES AND

09:54AM  22    PRACTICES THAT CMS THEN RELIED UPON IN PERFORMING ITS WORK.

09:54AM  23         THE COURT:  SO YOU WOULD LIKE IT INTRODUCED FOR

09:54AM  24    NOTICE ONLY, AS OPPOSED TO FOR THE TRUTH OF THE MATTER

09:54AM  25    ASSERTED?

09:54AM 1          MR. CAZARES:  WELL, I'D LIKE IT FOR BOTH,

09:54AM 2     YOUR HONOR, BUT I'LL TAKE NOTICE.

09:54AM 3          THE COURT:  WELL, MY PROBLEM IS THAT I UNDERSTAND

09:54AM 4     THAT THESE RECORDS ARE PART OF THE WORK THAT WAS DONE, BUT I

09:54AM 5     HAVEN'T HEARD HER SAY THAT SHE -- SHE HAS TOLD US THIS IS THE

09:54AM 6     FIRST TIME THAT SHE HAS SEEN THIS.

09:54AM 7        I DON'T KNOW THAT THIS WITNESS CAN SAY THAT THIS WAS PART

09:54AM 8     OF -- GIVEN TO HER AS PART OF THE INVESTIGATION, AND THEN IT

09:54AM 9     WAS THEN KEPT AS PART OF THE RECORD.

09:54AM 10         MR. CAZARES:  BUT SHE'S DESCRIBED IT AS APPEARING TO

09:54AM 11    BE THE DOCUMENT CITED IN THE REPORT GIVEN TO HER COLLEAGUE IN

09:54AM 12    THE PERFORMANCE OF THE SAME SURVEY CONCURRENTLY WITH HER OWN

09:54AM 13    WORK, AND THAT ITS THEIR PRACTICE TO REQUEST SUCH RECORDS,

09:55AM 14    MAINTAIN SUCH RECORDS, RELY UPON SUCH RECORDS, AND IT'S CLEARLY

09:55AM 15    THE DOCUMENT CITED IN THE SURVEY REPORT THAT IS ALREADY IN

09:55AM 16    EVIDENCE.

09:55AM 17         THE COURT:  I THINK YOU'RE CORRECT ON ALL OF THOSE.

09:55AM 18       BUT WHETHER IT'S A BUSINESS RECORD IS WHAT I THINK THERE

09:55AM 19    IS STILL A DEFICIT ON.

09:55AM 20       I'LL ADMIT IT FOR NOTICE, AND IT CAN BE, IT CAN BE

09:55AM 21    PUBLISHED.

09:55AM 22       LADIES AND GENTLEMEN, THE DOCUMENT IS ADMITTED, NOT FOR

09:55AM 23    THE TRUTH OF THE MATTER ASSERTED, BUT FOR NOTICE AS TO CMS AS

09:55AM 24    THEY CONDUCTED THEIR INVESTIGATION.

09:55AM 25         YOU CAN INQUIRE ON THAT.

ER-3737

BENNETT CROSS BY MR. CAZARES (RES.)                    5062

09:55AM  1            MR. CAZARES:  THANK YOU, YOUR HONOR.

09:55AM  2         (DEFENDANT'S EXHIBIT 20620 WAS RECEIVED IN EVIDENCE.)

09:55AM  3            MR. CAZARES:  IF YOU CAN PUT UP 20620 UP ON THE

09:55AM  4    SCREEN, AND TAKE DOWN THE SURVEY REPORT, MR. ALLEN.

09:55AM  5    Q.   IF YOU LOOK AT THE PAGE 1 OF THE 20620 UP ON THE SCREEN,

09:55AM  6    DO YOU SEE IT'S ENTITLED ALTERNATIVE ASSESSMENT PROGRAM?

09:55AM  7    A.   I DO.

09:55AM  8    Q.   AND THIS IS THE AAP PROFICIENCY PROCEDURE AT THERANOS;

09:56AM  9    CORRECT?

09:56AM 10    A.   YES.

09:56AM 11    Q.   AND THE FIRST CHALLENGE IDENTIFIED ON PAGE 1 LOOKS TO BE

09:56AM 12    ALBUMIN; CORRECT?

09:56AM 13    A.   YES.

09:56AM 14    Q.   AND THAT'S A GENERAL CHEMISTRY ANALYTE?

09:56AM 15    A.   YES.

09:56AM 16    Q.   AND THIS APRIL 1ST, 2014 CHALLENGE IDENTIFIES FIVE

09:56AM 17    SAMPLES.

09:56AM 18         DO YOU SEE THAT?

09:56AM 19    A.   YES.

09:56AM 20    Q.   AND THEN THE TOTAL ALLOWABLE ERROR FOR THIS TEST IS PLUS

09:56AM 21    OR MINUS 10 PERCENT.

09:56AM 22         DO YOU SEE THAT?

09:56AM 23    A.   I DO.

09:56AM 24    Q.   AND THEN THE ROW BELOW TAE, THE DOCUMENT IDENTIFIES AS

09:56AM 25    COMPARING THE ANALYTE PREDICATE VALUE.

BENNETT CROSS BY MR. CAZARES (RES.)                    5063

09:56AM   1         DO YOU SEE THAT?

09:56AM   2    A.   I DO.

09:56AM   3    Q.   AND THEN THERE ARE NUMBERS AND COMPARISONS FOR EACH OF THE

09:56AM   4    SAMPLES.

09:56AM   5         SAMPLE 1, FOR EXAMPLE, ALBUMIN PREDICATE 4.5, ALBUMIN LDT

09:56AM   6    4.8.

09:56AM   7         DO YOU SEE THAT?

09:56AM   8    A.   YES.

09:56AM   9    Q.   SO THE PREDICATE YOU'D UNDERSTAND TO BE A COMMERCIAL

09:57AM  10    DEVICE; CORRECT?

09:57AM  11    A.   YES.

09:57AM  12    Q.   AND THEN THE LDT IS THERANOS'S OWN LAB DEVELOPED TEST FOR

09:57AM  13    THIS ASSAY; CORRECT?

09:57AM  14    A.   THAT'S WHAT I WOULD ASSUME, YES.

09:57AM  15    Q.   OKAY.  AND THEN THE NUMBERS ARE 4.5 VERSUS 4.8.

09:57AM  16         DO YOU SEE THAT?

09:57AM  17    A.   I DO.

09:57AM  18    Q.   AND IT'S WITHIN THE TOTAL ALLOWABLE ERROR.

09:57AM  19         DO YOU SEE THAT AS WELL?

09:57AM  20    A.   I DO.

09:57AM  21    Q.   AND THEN FOR EACH OF THE NEXT FOUR SAMPLES, AGAIN, THE

09:57AM  22    NUMBERS FOR SAMPLE 2, 4.48 VERSUS 4.5 FOR THERANOS'S TEST.

09:57AM  23         DO YOU SEE THAT?

09:57AM  24    A.   YES.

09:57AM  25    Q.   AND FOR SAMPLE 3, 4.5 VERSUS 4.9 FOR THERANOS'S TEST.

BENNETT CROSS BY MR. CAZARES (RES.)                          5064

09:57AM  1            DO YOU SEE THAT?

09:57AM  2      A.   I DO.

09:57AM  3      Q.   AND THEN FOR SAMPLE 5, AGAIN, 4.2 VERSUS 4.1 -- SORRY, FOR

09:57AM  4      SAMPLE 4, 4.2 VERSUS 4.1.

09:57AM  5            DO YOU SEE THAT?

09:57AM  6      A.   I DO.

09:57AM  7      Q.   AND THEN FOR SAMPLE 5, IT'S 4.6 VERSUS 4.8.

09:57AM  8            DO YOU SEE THAT?

09:57AM  9      A.   YES.

09:57AM  10     Q.   AND ALL ARE WITHIN THE 10 PERCENT TOTAL ALLOWABLE ERROR?

09:57AM  11     A.   YES.

09:57AM  12     Q.   WHICH REFLECTS A PASS FOR THIS AAP?

09:58AM  13     A.   YES.

09:58AM  14     Q.   OKAY.  BUT, AGAIN, THE FACT THAT IT PASSED WASN'T THE

09:58AM  15     ISSUE FOR CMS.

09:58AM  16           THE ISSUE WAS APPARENTLY SOMEONE IN THE LAB DIDN'T REVIEW,

09:58AM  17     OR THE LAB DIRECTOR DIDN'T REVIEW THESE RECORDS UNTIL NOVEMBER

09:58AM  18     OF 2015, AT LEAST ACCORDING TO THE DOCUMENTATION THAT YOU SAW?

09:58AM  19     A.   COULD I LOOK BACK TO THE -- I HAVE TO LOOK AT THE SURVEY

09:58AM  20     REPORT BECAUSE IT'S NOT MY CITATION.

09:58AM  21     Q.   OKAY.  FAIR ENOUGH.

09:58AM  22           AND LOOKING AT THE NEXT ASSAY, SO IT'S ALKALINE

09:58AM  23     PHOSPHATASE.

09:58AM  24           DO YOU SEE THAT?

09:58AM  25     A.   I DO.

ER-3740

BENNETT CROSS BY MR. CAZARES (RES.)                    5065

09:58AM   1     Q.   AND THEN AGAIN WE HAVE FIVE SAMPLES.

09:58AM   2          DO YOU SEE THAT?

09:58AM   3     A.   YES.

09:58AM   4     Q.   AND FOR THIS TEST, THE TOTAL ALLOWABLE ERROR IS PLUS OR

09:58AM   5     MINUS 30 PERCENT.

09:58AM   6          DO YOU SEE THAT?

09:58AM   7     A.   I DO.

09:58AM   8     Q.   AND SO IT'S DIFFERENT THAN THE ALBUMIN TOTAL ALLOWABLE

09:58AM   9     ERROR.

09:58AM  10          DO YOU SEE THAT?

09:58AM  11     A.   I DO.

09:58AM  12     Q.   AND IS THAT SOMETHING THAT YOU'RE FAMILIAR WITH, DIFFERENT

09:58AM  13     TESTS, DIFFERENT ASSAYS, DIFFERENT ANALYTES CAN HAVE DIFFERENT

09:58AM  14     TOTAL ALLOWABLE ERRORS BASED ON THE LAB'S OWN WORK IN

09:58AM  15     VALIDATION OR VERIFICATION OF SUCH TESTS?

09:59AM  16     A.   DIFFERENT TESTS CAN HAVE DIFFERENT TOTAL ALLOWABLE ERRORS.

09:59AM  17     IT'S DEPENDENT ON CERTAIN THINGS, EVEN THE TEST ITSELF.

09:59AM  18     Q.   FAIR ENOUGH.

09:59AM  19          AND FOR THIS ONE IT'S 30 PERCENT, AT LEAST ACCORDING TO

09:59AM  20     THERANOS; CORRECT?

09:59AM  21     A.   YES.

09:59AM  22     Q.   AND THEN FOR ALKALINE PHOSPHATASE FOR SAMPLES, THE FIVE

09:59AM  23     SAMPLES, THE NUMBERS, SAMPLE 1, 48.2 VERSUS 50.

09:59AM  24          DO YOU SEE THAT?

09:59AM  25     A.   YES.

ER-3741

BENNETT CROSS BY MR. CAZARES (RES.)                    5066

09:59AM   1     Q.   AND THEN FOR SAMPLE 2, 73.8 VERSUS 73.

09:59AM   2          DO YOU SEE THAT?

09:59AM   3     A.   I DO.

09:59AM   4     Q.   AND THEN FOR SAMPLE 3, THE PREDICATE HAD 49.2 AND THERANOS

09:59AM   5     HAD 52.

09:59AM   6          DO YOU SEE THAT?

09:59AM   7     A.   I DO.

09:59AM   8     Q.   AND THEN FOR SAMPLE 4, THE PREDICATE HAD 90.5 WHERE

09:59AM   9     THERANOS CAME UP WITH 95.

09:59AM  10          DO YOU SEE THAT?

09:59AM  11     A.   I DO.

09:59AM  12     Q.   AND THEN SAMPLE 5, 85.8 VERSUS 87.

09:59AM  13          DO YOU SEE THAT?

09:59AM  14     A.   I DO.

09:59AM  15     Q.   AND EACH WITHIN THE TOTAL ALLOWABLE ERROR?

10:00AM  16     A.   THEY ARE, BUT IT'S ALSO WITHIN THE NARROW RANGE OF TEST

10:00AM  17     VALUES.  IT DOESN'T CHALLENGE THE LOWER END OF THE REPORTABLE

10:00AM  18     RANGE OR THE UPPER END OF THE REPORTABLE RANGE.

10:00AM  19     Q.   WELL, AT LEAST ACCORDING TO THIS REPORT, THOUGH, THE

10:00AM  20     RESULTS WERE WITHIN THE TOTAL ALLOWABLE ERROR; CORRECT?

10:00AM  21     A.   THEY WERE FOR NORMAL PATIENTS.

10:00AM  22     Q.   OKAY.  IF WE GO FURTHER DOWN, MR. ALLEN.  WE SEE, AGAIN,

10:00AM  23     THREE MORE ASSAYS HERE:  ALANINE AMINOTRANSFERASE.

10:00AM  24          DO YOU SEE THAT?

10:00AM  25     A.   I DO.

BENNETT CROSS BY MR. CAZARES (RES.)                5067

10:00AM  1     Q.   AND THIS IS, AGAIN, APRIL 1ST OF 2014.

10:00AM  2          AND THEN THERE'S AN ASPARTATE AMINOTRANSFERASE.

10:00AM  3          DO YOU SEE THAT?

10:00AM  4     A.   YES.

10:00AM  5     Q.   AND BELOW THAT IS BICARBONATE?

10:00AM  6     A.   YES.

10:00AM  7     Q.   AND THEN FOR THE ALAMINE AMINOTRANSFERASE, THE TOTAL

10:01AM  8     ALLOWABLE ERROR IS 20 PERCENT.

10:01AM  9          DO YOU SEE THAT?

10:01AM 10     A.   I DO.

10:01AM 11     Q.   AND THE SAME FOR THE OTHER TWO?

10:01AM 12     A.   YES.

10:01AM 13     Q.   AND FOR EACH OF THESE THREE CHALLENGES, YOU'LL SEE THE

10:01AM 14     TOTAL ALLOWABLE ERRORS ARE MET FOR ALL OF THE SAMPLES SCORED;

10:01AM 15     CORRECT?

10:01AM 16     A.   AGAIN, THEY'RE ALL NORMAL VALUES.  THEY'RE NOT ABNORMAL

10:01AM 17     VALUES AT ALL.

10:01AM 18     Q.   BUT ACCORDING TO THE CITATION HERE CITED BY MR. YAMAMOTO

10:01AM 19     WAS THAT THE LAB DIRECTOR DID NOT APPEAR TO REVIEW THE AAP

10:01AM 20     PROCEDURE TIMELY; CORRECT?

10:01AM 21     A.   YES.

10:01AM 22     Q.   OKAY.  IF WE CAN GO TO THE BOTTOM OF THAT FIRST PAGE,

10:01AM 23     MR. ALLEN.

10:01AM 24          WE HAVE TWO MORE ASSAYS, CALCIUM AND CHOLESTEROL.

10:01AM 25          DO YOU SEE THAT?

10:01AM  1    A.   I DO.

10:01AM  2    Q.   AND THEN EACH OF THEM -- I GUESS FOR CALCIUM THERE'S A

10:01AM  3    TOTAL ALLOWABLE ERROR OF PLUS/MINUS 1.

10:01AM  4         DO YOU SEE THAT?

10:01AM  5    A.   YES.

10:01AM  6    Q.   AND THEN FOR CHOLESTEROL, THE TOTAL ALLOWABLE ERROR IS

10:02AM  7    PLUS/MINUS 10.

10:02AM  8         DO YOU SEE THAT?

10:02AM  9    A.   I DO.

10:02AM  10   Q.   AND THEN FOR EACH OF THE FIVE CHALLENGED SAMPLES, HERE

10:02AM  11   AGAIN THE LAB APPEARS TO HAVE PASSED; CORRECT?

10:02AM  12        MR. LEACH:  OBJECTION, YOUR HONOR.  CALLS FOR

10:02AM  13   HEARSAY.

10:02AM  14        MR. CAZARES:  ACCORDING TO THE DOCUMENT.

10:02AM  15        THE COURT:  IT SAYS WHAT IT SAYS.

10:02AM  16        MR. CAZARES:  YEAH.

10:02AM  17        THE COURT:  YOU CAN ANSWER THE QUESTION.

10:02AM  18        THE WITNESS:  OKAY.  YES, THEY CERTAINLY SEEM TO BE

10:02AM  19   100 PERCENT RIGHT AROUND 9.

10:02AM  20        MR. CAZARES:  OKAY.

10:02AM  21   Q.   OKAY.  IF WE CAN SKIP NOW TO PAGE 4.

10:02AM  22        SO PAGE 4, THIS IS ANOTHER CHALLENGE ON MAY 15, 2014.

10:02AM  23        DO YOU SEE THAT?

10:02AM  24   A.   I DO.

10:02AM  25   Q.   AND HERE WE'RE LOOKING AT -- THE ASSAY IS AMYLASE,

BENNETT CROSS BY MR. CAZARES (RES.)                    5069

10:02AM    1      BILIRUBIN, AND CREATINE KINASE.

10:02AM    2           DO YOU SEE THAT?

10:03AM    3      A.   I DO.

10:03AM    4      Q.   AND AGAIN, THESE ARE ALL GENERAL CHEMISTRY TESTS?

10:03AM    5      A.   YES.

10:03AM    6      Q.   AND THE TOTAL ALLOWABLE ERROR FOR AMYLASE IS 30 PERCENT

10:03AM    7      PLUS OR MINUS?

10:03AM    8      A.   YES.

10:03AM    9      Q.   AND THEN BILIRUBIN, 20 PERCENT PLUS OR MINUS?

10:03AM   10      A.   YES.

10:03AM   11      Q.   AND THE CREATINE, AGAIN, 30 PERCENT?

10:03AM   12           DO YOU SEE THAT?

10:03AM   13      A.   YES.

10:03AM   14      Q.   AND EACH OF THE FIVE CHALLENGES FOR EACH OF THOSE THREE

10:03AM   15      ASSAYS APPEARS TO HAVE FALLEN WITHIN THE TOTAL ALLOWABLE ERROR;

10:03AM   16      CORRECT?

10:03AM   17      A.   IT DOES, YES.

10:03AM   18      Q.   AND THIS IS AGAIN COMPARING THERANOS'S TEST VERSUS THE

10:03AM   19      PREDICATE COMMERCIAL DEVICE; CORRECT?

10:03AM   20      A.   THAT WOULD HAVE BEEN WHAT MR. YAMAMOTO WAS COMPARING.

10:03AM   21      Q.   OKAY.  AND IF WE CAN TURN TO PAGE 6, MR. ALLEN.  AND WE'LL

10:03AM   22      LOOK AT THE TOP OF THE PAGE.

10:03AM   23           THESE ARE CHALLENGES ON JULY 31ST, 2014.

10:03AM   24           DO YOU SEE THAT?

10:03AM   25      A.   I DO.

ER-3745

BENNETT CROSS BY MR. CAZARES (RES.)                    5070

10:03AM  1    Q.   AND HERE AGAIN WE'RE DEALING WITH ALBUMIN, ALKALINE

10:03AM  2    PHOSPHATASE, AND ALANINE AMINOTRANSFERASE.

10:04AM  3         DO YOU SEE THAT?

10:04AM  4    A.   I DO.

10:04AM  5    Q.   AND THE TOTAL ALLOWABLE ERROR WAS PLUS 10 OR MINUS 10 FOR

10:04AM  6    ALBUMIN.

10:04AM  7         DO YOU SEE THAT?

10:04AM  8    A.   I DO.

10:04AM  9    Q.   AND THE OTHER TWO ASSAYS, 20 PERCENT AND 30 PERCENT PLUS

10:04AM  10   OR MINUS.

10:04AM  11        DO YOU SEE THAT?

10:04AM  12   A.   I DO.

10:04AM  13   Q.   AND THEN FOR EACH OF THESE THREE ASSAYS, FOR EACH OF THE

10:04AM  14   FIVE SAMPLES, THE RESULTS APPEAR TO FALL WITHIN THE TOTAL

10:04AM  15   ALLOWABLE ERROR; CORRECT?

10:04AM  16   A.   YES.  BUT, AGAIN, THEY DID NOT CHALLENGE THEIR WHOLE

10:04AM  17   REPORTABLE RANGE, WHICH WE WOULD EXPECT TO SEE.

10:04AM  18   Q.   BUT THAT'S NOT WHAT'S CITED BY MR. YAMAMOTO.

10:04AM  19   A.   I KNOW.

10:04AM  20   Q.   THE ISSUE MR. YAMAMOTO CITED HERE WAS THE LAB DIRECTOR

10:04AM  21   APPEARS NOT TO HAVE REVIEWED THE RESULTS IN A TIMELY MANNER;

10:04AM  22   CORRECT?

10:04AM  23   A.   YES, HE CITED THEM FOR TIMELY REVIEW.

10:04AM  24   Q.   OKAY.  AND IF WE CAN GO TO PAGE 9, MR. ALLEN.

10:05AM  25        ON PAGE 9, THESE ARE CHALLENGES ON NOVEMBER 20TH, 2014.

BENNETT CROSS BY MR. CAZARES (RES.)                     5071

10:05AM   1         DO YOU SEE THAT?

10:05AM   2    A.   I DO.

10:05AM   3    Q.   AND THEN AGAIN HERE THE THREE ASSAYS ARE AMYLASE,

10:05AM   4    BILIRUBIN, AND CREATINE AGAIN.

10:05AM   5         DO YOU SEE THAT?

10:05AM   6    A.   I DO.

10:05AM   7    Q.   AND THEN FOR EACH OF THE FIVE SAMPLES FOR EACH OF THE

10:05AM   8    THREE ASSAYS, THE LAB APPEARS TO HAVE OBTAINED RESULTS WITHIN

10:05AM   9    THE TOTAL ALLOWABLE ERROR; CORRECT?

10:05AM  10    A.   THAT'S WHAT IT APPEARS.

10:05AM  11    Q.   AND THAT'S COMPARING THE THERANOS TESTS TO THE COMMERCIAL

10:05AM  12    DEVICE; CORRECT?

10:05AM  13    A.   THE COMMERCIAL DEVICE VERSUS I BELIEVE THE FINGERSTICK

10:05AM  14    LDT, NOT THE EDISON.

10:05AM  15    Q.   OKAY.  YOU CAN TAKE THAT DOWN, MR. ALLEN.

10:05AM  16         IF WE CAN TAKE A LOOK AT PAGE 31 OF EXHIBIT 4621, THE

10:06AM  17    SURVEY REPORT.

10:06AM  18         ON PAGE 31 THERE'S A D-TAG 5429.

10:06AM  19         DO YOU SEE THAT?

10:06AM  20    A.   I DO.

10:06AM  21    Q.   AND THIS IS RELATING TO MAINTENANCE AND FUNCTION CHECKS.

10:06AM  22         DO YOU SEE THAT?

10:06AM  23    A.   I DO.

10:06AM  24    Q.   AND THEN THIS IS A STANDARD LEVEL NONCOMPLIANCE; CORRECT?

10:06AM  25    A.   IT IS.

ER-3747

BENNETT CROSS BY MR. CAZARES (RES.)                                    5072

10:06AM  1    Q.   AND THEN HERE THE ISSUE IS "FOR UNMODIFIED MANUFACTURER'S

10:06AM  2    EQUIPMENT, INSTRUMENTS OR TEST SYSTEMS, THE LABORATORY MUST

10:06AM  3    PERFORM AND DOCUMENT MAINTENANCE AS DEFINED BY THE MANUFACTURER

10:06AM  4    AND WITH AT LEAST THE FREQUENCY SPECIFIED BY THE MANUFACTURER."

10:06AM  5         DO YOU SEE THAT?

10:06AM  6    A.   I DO.

10:06AM  7    Q.   OKAY.  AND IS THIS MR. YAMAMOTO'S WORK OR YOURS?

10:07AM  8    A.   IT'S MR. YAMAMOTO'S WORK.

10:07AM  9    Q.   AND THEN THE REPORT READS, "THIS STANDARD IS NOT MET AS

10:07AM 10    EVIDENCED BY:

10:07AM 11         "BASED ON TECHNICAL SUPERVISOR INTERVIEWS AND EVOLIS

10:07AM 12    MAINTENANCE LOG RECORD REVIEW ON NOVEMBER 17TH, 2015, THE

10:07AM 13    LABORATORY FAILED TO PERFORM WEEKLY EVOLIS MAINTENANCE AS

10:07AM 14    DEFINED BY THE MANUFACTURER.  FINDINGS INCLUDED:"

10:07AM 15         AND THEN IT DESCRIBES, "IN GENERAL IMMUNOLOGY, IT WAS THE

10:07AM 16    PRACTICE OF THE LABORATORY TO TEST PATIENT ANA, HIV, AND

10:07AM 17    QUANTIFERON USING THE BIORAD EVOLIS SYSTEM."

10:07AM 18         DO YOU SEE THAT?

10:07AM 19    A.   YES.

10:07AM 20    Q.   SO THESE ARE THREE TESTS, ANA, HIV, AND QUANTIFERON; IS

10:07AM 21    THAT RIGHT?

10:07AM 22    A.   YES.

10:07AM 23    Q.   AND THEN THE BIORAD EVOLIS, THAT'S AN FDA APPROVED

10:07AM 24    COMMERCIAL DEVICE; CORRECT?

10:07AM 25    A.   I BELIEVE SO.  I'M NOT FAMILIAR WITH IT.

ER-3748

BENNETT CROSS BY MR. CAZARES (RES.)                5073

10:08AM  1    Q.   IF WE TAKE A LOOK AT PAGE 32, D-TAG 5437.

10:08AM  2         THIS IS CALIBRATION AND CALIBRATION VERIFICATION.

10:08AM  3         DO YOU SEE THAT?

10:08AM  4    A.   I DO.

10:08AM  5    Q.   AND THIS IS ALSO A STANDARD LEVEL NONCOMPLIANCE; CORRECT?

10:08AM  6    A.   YES.

10:08AM  7    Q.   AND THEN AT ITEM 1 AT THE BOTTOM OF PAGE 32, THE REPORT

10:08AM  8    READS, "BASED ON LABORATORY PERSONNEL INTERVIEWS AND COMPLETE

10:08AM  9    BLOOD COUNTS CALIBRATION DOCUMENTATION RECORD REVIEWS ON

10:08AM 10    SEPTEMBER 23RD, 2015, THE LABORATORY FAILED TO DOCUMENT ALL CBC

10:08AM 11    INSTRUMENT CALIBRATIONS PERFORMED USING THE DREW3 INSTRUMENTS."

10:08AM 12         DO YOU SEE THAT?

10:08AM 13    A.   I DO.

10:08AM 14    Q.   AND IS THIS MR. YAMAMOTO'S WORK OR YOURS?

10:08AM 15    A.   IT'S MR. YAMAMOTO'S WORK.

10:08AM 16    Q.   AND THAT'S BECAUSE THE DREW3 IS A COMMERCIAL DEVICE?

10:08AM 17    A.   YES.

10:08AM 18    Q.   AND NOT THERANOS EQUIPMENT?

10:08AM 19    A.   IT'S A COMMERCIAL DEVICE.

10:08AM 20    Q.   OKAY.  CONTINUED AT SUB A, "IT WAS THE PRACTICE OF THE

10:09AM 21    LABORATORY TO TEST PATIENT CAPILLARY CBC SPECIMENS USING TWO

10:09AM 22    DREW3 INSTRUMENTS THE LABORATORY DESIGNATED AS DREW NUMBER 2

10:09AM 23    AND DREW NUMBER 3."

10:09AM 24         DO YOU SEE THAT?

10:09AM 25    A.   YES, I DO.

ER-3749

10:09AM 1    Q.   AND SO THE ISSUE HERE IS THE LABORATORY DOES NOT HAVE

10:09AM 2    RECORDS OF THE MAINTENANCE THEY WERE REQUIRED TO DO; CORRECT?

10:09AM 3    A.   THEY FAILED TO DOCUMENT THE CALIBRATION.

10:09AM 4    Q.   FAIR ENOUGH.  YOU DON'T HAVE ANY IDEA OR INFORMATION THAT

10:09AM 5    MR. BALWANI WAS AWARE OF THIS PRIOR TO THE NONCOMPLIANCE OF THE

10:09AM 6    SURVEY; IS THAT CORRECT?

10:09AM 7    A.   I DO NOT.

10:09AM 8    Q.   YOU HAVE NO EVIDENCE THAT MR. BALWANI WAS AWARE OF ANY OF

10:09AM 9    THE NONCOMPLIANCE PRIOR TO THE BEGINNING OF THE SURVEY;

10:10AM 10   CORRECT?

10:10AM 11   A.   TO SEPTEMBER.

10:10AM 12   Q.   SEPTEMBER OF 2015; CORRECT?

10:10AM 13   A.   YES.

10:10AM 14         MR. CAZARES:  YOUR HONOR, MAY I HAVE A MOMENT?

10:10AM 15         THE COURT:  YES.

10:10AM 16      (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:10AM 17         MR. CAZARES:  NO FURTHER QUESTIONS.

10:11AM 18         THE COURT:  REDIRECT?

10:11AM 19         MR. LEACH:  YES, YOUR HONOR.

10:11AM 20         THE COURT:  FOLKS, YOU MAY STAND AND STRETCH YOUR

10:11AM 21   LEGS FOR A MOMENT.

10:11AM 22      (STRETCHING.)

10:11AM 23                  **REDIRECT EXAMINATION**

10:11AM 24   BY MR. LEACH:

10:11AM 25   Q.   GOOD MORNING, MS. BENNETT.  HOW ARE YOU?

10:11AM  1    A.   I'M GOOD.  HOW ARE YOU?

10:11AM  2    Q.   I'M GOOD.  THANK YOU.

10:11AM  3         I HAVE A FEW FOLLOW-UP QUESTIONS THAT I'D LIKE TO GO OVER

10:11AM  4    WITH YOU.

10:11AM  5         FIRST I'D LIKE TO START WHERE MR. CAZARES ENDED.  YOU WERE

10:11AM  6    ASKED SOME QUESTIONS ABOUT MR. BALWANI'S KNOWLEDGE OF

10:11AM  7    PARTICULAR CONDITIONS THAT YOU OBSERVED IN THE LAB.

10:11AM  8         DO YOU RECALL THOSE QUESTIONS?

10:11AM  9    A.   I DO.

10:11AM  10   Q.   IS THAT SOMETHING THAT YOU INSPECT FOR?

10:11AM  11   A.   INSPECT?

10:11AM  12   Q.   IS THAT SOMETHING THAT YOU LOOK FOR IN THE SURVEY, WHETHER

10:12AM  13   THE COO KNOWS OF A PARTICULAR CONDITION?

10:12AM  14   A.   NO.

10:12AM  15   Q.   OKAY.  DID YOU ASK FOR INTERNAL EMAILS OF THERANOS BETWEEN

10:12AM  16   MS. HOLMES AND MR. BALWANI?

10:12AM  17   A.   WE DID NOT.

10:12AM  18   Q.   OKAY.  DID YOU ASK FOR TEXT MESSAGES BETWEEN MS. HOLMES

10:12AM  19   AND MR. BALWANI?

10:12AM  20   A.   WE DID NOT.

10:12AM  21   Q.   IS THAT SOMETHING THAT YOU ORDINARILY ASK FOR IN AN

10:12AM  22   INSPECTION?

10:12AM  23   A.   IT IS NOT.

10:12AM  24   Q.   OKAY.  AND DID YOU INTERVIEW ERIKA CHEUNG?

10:12AM  25   A.   NO.

10:12AM 1    Q.   DID YOU INTERVIEW DR. ADAM ROSENDORFF?

10:12AM 2    A.   NO.

10:12AM 3    Q.   DID YOU INTERVIEW DR. MARK PANDORI?

10:12AM 4    A.   NO.

10:12AM 5    Q.   AND THEY WERE WITH THE LAB AT THE TIME; IS THAT YOUR

10:12AM 6    UNDERSTANDING?

10:12AM 7         MR. CAZARES:  OBJECTION.  FOUNDATION.

10:12AM 8    BY MR. LEACH:

10:12AM 9    Q.   WERE THEY IN THE --

10:12AM 10        THE COURT:  YOU'RE ASKING A NEW QUESTION?

10:12AM 11        MR. LEACH:  I'LL ASK A DIFFERENT QUESTION,

10:12AM 12   YOUR HONOR.

10:12AM 13   Q.   AT ANY POINT IN TIME, DID YOU SEE MS. CHEUNG OR

10:12AM 14   DR. ROSENDORFF OR DR. PANDORI IN THE LAB WHILE YOU WERE DOING

10:12AM 15   YOUR INSPECTION?

10:12AM 16   A.   NO.

10:12AM 17   Q.   OKAY.  YOU WERE ASKED SOME QUESTIONS ABOUT EXHIBIT 4533.

10:13AM 18        DO YOU HAVE THAT HANDY?

10:13AM 19   A.   YES.

10:13AM 20   Q.   AND THIS IS A LIST OF THE EDISON ASSAYS AND A TIME

10:13AM 21   PERIOD --

10:13AM 22        AND THIS IS IN EVIDENCE, MS. WACHS.  WE CAN DISPLAY IT.

10:13AM 23        THIS IS THE LISTING OF THE 12 EDISON TESTS THAT WERE RUN

10:13AM 24   IN THE CLIA LAB?

10:13AM 25   A.   YES.

10:13AM  1     Q.   AND THIS IS SOMETHING THAT YOU HAD TO ASK FOR?

10:13AM  2     A.   YES.

10:13AM  3     Q.   AND MR. BALWANI WASN'T VOLUNTEERING THIS TO YOU IN YOUR

10:13AM  4     INITIAL MEETING?

10:13AM  5     A.   THAT'S CORRECT.

10:13AM  6     Q.   OKAY.  AND MR. CAZARES DREW YOUR ATTENTION TO THE LANGUAGE

10:13AM  7     IN THE SECOND PARAGRAPH ABOUT THE CHANGES IN THE PLATFORMS NOT

10:13AM  8     REFLECTING ON THE RELIABILITY OR ACCURACY OF ANY PLATFORM.

10:13AM  9          DO YOU SEE THAT LANGUAGE?

10:13AM 10     A.   I DO.

10:13AM 11     Q.   DID YOU BELIEVE THAT?

10:14AM 12               MR. CAZARES:  OBJECTION.  FOUNDATION.

10:14AM 13               THE COURT:  DID SHE BELIEVE WHAT THE DOCUMENT SAYS?

10:14AM 14     BY MR. LEACH:

10:14AM 15     Q.   YES.  DID YOU BELIEVE THAT STATEMENT IN THE SECOND

10:14AM 16     PARAGRAPH, THAT MR. BALWANI --

10:14AM 17               MR. CAZARES:  AND RELEVANCE.

10:14AM 18               THE COURT:  OVERRULED.

10:14AM 19          YOU CAN ANSWER THE QUESTION.

10:14AM 20               THE WITNESS:  I DID NOT.

10:14AM 21     BY MR. LEACH:

10:14AM 22     Q.   YOU WERE ALSO --

10:14AM 23          THANK YOU, MS. WACHS.  WE CAN TAKE THAT DOWN.

10:14AM 24          YOU WERE ALSO ASKED SOME QUESTIONS ABOUT WHETHER YOU

10:14AM 25     INTERVIEWED MR. BALWANI FORMALLY IN CONNECTION WITH THE

BENNETT REDIRECT BY MR. LEACH                    5078

10:14AM 1      INSPECTION.

10:14AM 2           DO YOU RECALL THOSE QUESTIONS?

10:14AM 3      A.   I DO.

10:14AM 4      Q.   AND DO YOU NORMALLY INTERVIEW THE CHIEF OPERATING OFFICER?

10:14AM 5      A.   NOT NORMALLY.

10:14AM 6      Q.   OKAY.  AND I BELIEVE YOU TESTIFIED THAT EACH DAY OF THE

10:14AM 7      INSPECTION YOU WOULD PROVIDE AN UPDATE TO MR. BALWANI ABOUT

10:14AM 8      WHAT CMS WAS FINDING; IS THAT CORRECT?

10:14AM 9      A.   THAT'S CORRECT.

10:14AM 10     Q.   SO IF YOU SAW SOMETHING THAT IS REPORTED IN THE 2567,

10:14AM 11     THAT'S SOMETHING THAT YOU WOULD BRING TO MR. BALWANI'S

10:14AM 12     ATTENTION EACH DAY OF THE SURVEY?

10:14AM 13     A.   WE TOLD MR. BALWANI EVERY DAY WHAT DEFICIENCIES WE FOUND.

10:15AM 14     Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THE TIMELINESS OF

10:15AM 15     THE NOTIFICATIONS RELATING TO PT INR.

10:15AM 16          DO YOU RECALL SOME QUESTIONS ABOUT THAT?

10:15AM 17     A.   I DO.

10:15AM 18     Q.   AND I THINK YOU SAID THAT YOU WERE SURPRISED THAT THE LAB

10:15AM 19     WAS JUST GETTING AROUND TO NOTIFYING PATIENTS AT THE END OF

10:15AM 20     NOVEMBER.

10:15AM 21     A.   YES.

10:15AM 22     Q.   AND WHY WERE YOU SURPRISED?

10:15AM 23     A.   I WAS SURPRISED BECAUSE WE HAD MADE THEM AWARE OF THE

10:15AM 24     ISSUES WITH PT INR IN SEPTEMBER, AND I WOULD HAVE EXPECTED THAT

10:15AM 25     THEY WOULD HAVE NOTIFIED THE AUTHORIZED PERSON, THE PERSON WHO

10:15AM 1    ORDERED THE TEST, AS SOON AS POSSIBLE SO THAT THE AUTHORIZED

10:15AM 2    PERSON OR THE PHYSICIAN COULD HAVE USED THAT INFORMATION FOR

10:15AM 3    PATIENT CARE.

10:15AM 4    Q.   AND WHAT ABOUT THAT TIMELINESS?  I GUESS WHY DID YOU THINK

10:15AM 5    THAT?

10:15AM 6          MR. CAZARES:  OBJECTION.  FOUNDATION AND 702.

10:16AM 7          THE COURT:  IF YOU COULD LAY A FOUNDATION FOR THAT

10:16AM 8    QUESTION.

10:16AM 9          MR. LEACH:  OKAY.

10:16AM 10   Q.   WHY WERE YOU HIGHLIGHTING THE PT INR ISSUE TO MR. BALWANI?

10:16AM 11   A.   PT INR IS A TEST THAT IS RELATED TO CLOTTING AND WHETHER A

10:16AM 12   PERSON'S BLOOD CLOTS APPROPRIATELY, AND ON CERTAIN DRUGS IT HAS

10:16AM 13   TO BE IN A THERAPEUTIC RANGE, AND IF IT'S NOT, THE PATIENT'S

10:16AM 14   HEALTH CAN BE AFFECTED.

10:16AM 15   Q.   AND WAS THAT KNOWLEDGE PART OF THE REASON WHY YOU WERE

10:16AM 16   RAISING THIS AS A DEFICIENCY IN YOUR INSPECTION?

10:16AM 17   A.   THAT'S PART OF IT.

10:16AM 18   Q.   WHAT IS THE OTHER PART?

10:16AM 19   A.   THE ISSUES WITH THE PT INR WERE, YOU KNOW, AS WE TALKED

10:16AM 20   ABOUT THE REAGENT, THE FACT THAT THEY DIDN'T HAVE DOCUMENTATION

10:17AM 21   TO SUPPORT HOW THEY CALCULATED THEIR INR, AND THE FACT THAT

10:17AM 22   EVEN WHEN THE CONTROLS WERE OUT AND KEPT GOING DOWN, ALL THEY

10:17AM 23   DID WAS CHANGE THE ACCEPTABLE RANGE OF THE CONTROL.  THEY NEVER

10:17AM 24   INVESTIGATED WHAT THE PROBLEM WITH THE CONTROLS WERE.

10:17AM 25   Q.   THANK YOU.

BENNETT REDIRECT BY MR. LEACH                                    5080

10:17AM   1          YOU WERE ALSO SHOWN EXHIBIT 4600, WHICH WAS -- I THINK

10:17AM   2     THIS WILL BE IN THE BLACK BINDER.  THIS IS AN EMAIL FROM

10:17AM   3     DECEMBER OF 2015.

10:17AM   4          DO YOU RECALL QUESTIONS ABOUT THAT?

10:17AM   5     A.   I DO.

10:17AM   6     Q.   AND YOU WROTE IN THAT EMAIL "FINGERSTICK TESTING HAS BEEN

10:17AM   7     STOPPED."

10:17AM   8          WHAT DID YOU MEAN BY THAT?

10:17AM   9     A.   THAT AT THAT POINT IT WAS MY UNDERSTANDING THAT THE

10:17AM  10     TESTING THAT WAS USING THE FINGERSTICK SAMPLES HAD -- WAS NO

10:17AM  11     LONGER BEING PERFORMED.

10:17AM  12     Q.   HOW DID YOU COME TO HAVE THAT UNDERSTANDING?

10:17AM  13     A.   OH.  I DON'T RECALL.

10:18AM  14     Q.   OKAY.  YOU WERE ALSO ASKED QUESTIONS ABOUT THE DIFFERENCE

10:18AM  15     BETWEEN A STANDARD LEVEL AND A CONDITION LEVEL DEFICIENCY.

10:18AM  16          DO YOU RECALL QUESTIONS ABOUT THAT?

10:18AM  17     A.   I DO.

10:18AM  18     Q.   AND HOW DO THE STANDARD LEVEL CONDITIONS RELATE TO

10:18AM  19     CONDITIONS?  DO THE STANDARD LEVEL CONDITIONS FEED INTO THE

10:18AM  20     CONDITION LEVEL OBSERVATIONS?

10:18AM  21     A.   YES.  WHAT WE DO IS THAT WE LOOK AT ALL OF THE

10:18AM  22     DEFICIENCIES THAT THE LABORATORY HAD IN SPECIFIC AREAS, AND IF

10:18AM  23     IT'S SERIOUS ENOUGH, THEN THE STANDARDS WILL GET WRAPPED UP

10:18AM  24     INTO THE CONDITION LEVEL, AND THE CONDITION LEVEL IS MORE

10:18AM  25     SERIOUS THAN THE STANDARD LEVEL.

| | | |
|---|---|---|
| 10:18AM | 1 | Q.   AND AM I RIGHT NO SINGLE STANDARD LEVEL OBSERVATION |
| 10:18AM | 2 | MEANS -- WELL, CAN YOU HAVE A CONDITION LEVEL OBSERVATION WITH |
| 10:19AM | 3 | ONLY ONE STANDARD LEVEL OBSERVATION? |
| 10:19AM | 4 | A.   YOU CAN. |
| 10:19AM | 5 | Q.   AND CAN YOU HAVE A CONDITION LEVEL OBSERVATION IF THERE'S |
| 10:19AM | 6 | MULTIPLE STANDARD LEVEL VIOLATIONS? |
| 10:19AM | 7 | A.   YOU CAN. |
| 10:19AM | 8 | Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 7 OF |
| 10:19AM | 9 | EXHIBIT 4621. |
| 10:19AM | 10 | THIS IS IN EVIDENCE, MS. WACHS.  YOU CAN DISPLAY THAT. |
| 10:19AM | 11 | DO YOU SEE WHERE IT SAYS D5024 AND THEN HEMATOLOGY? |
| 10:19AM | 12 | A.   YES. |
| 10:19AM | 13 | Q.   AND THAT'S A D-TAG RELATING TO HEMATOLOGY? |
| 10:19AM | 14 | A.   IT'S THE CONDITION LEVEL D-TAG FOR HEMATOLOGY. |
| 10:19AM | 15 | Q.   OKAY.  AND YOU WROTE, "THIS CONDITION HAS NOT BEEN MET AS |
| 10:19AM | 16 | EVIDENCED BY," AND THEN YOU LIST YOUR OBSERVATIONS. |
| 10:20AM | 17 | DO YOU SEE THAT? |
| 10:20AM | 18 | A.   YES. |
| 10:20AM | 19 | Q.   AND THEN WITHIN THE DESCRIPTION THERE ARE SOME D-TAGS IN |
| 10:20AM | 20 | PARENTHESES, (SEE D5403), (SEE D5437) AND (SEE D5447) AND THERE |
| 10:20AM | 21 | ARE ADDITION ONES. |
| 10:20AM | 22 | DO YOU SEE THAT? |
| 10:20AM | 23 | A.   YES. |
| 10:20AM | 24 | Q.   ARE THOSE EXAMPLES OF HOW STANDARD LEVEL OBSERVATIONS CAN |
| 10:20AM | 25 | FEED INTO A CONDITION LEVEL OBSERVATION? |

BENNETT REDIRECT BY MR. LEACH                                    5082

10:20AM   1    A.   YES.  WHEN WE CITE A CONDITION, ANY OF THESE STANDARDS,

10:20AM   2    INCLUDING THAT CONDITION, ARE LISTED IN THE CONDITION LEVEL

10:20AM   3    CITATION.

10:20AM   4    Q.   YOU WERE ASKED SOME QUESTIONS ABOUT SOME DOCUMENTS THAT

10:20AM   5    THERANOS PROVIDED TO MR. YAMAMOTO RELATING TO PROFICIENCY

10:21AM   6    TESTING RESULTS.

10:21AM   7         DO YOU RECALL THOSE QUESTIONS?

10:21AM   8    A.   I DO.

10:21AM   9    Q.   AND THOSE ARE FROM DOCUMENTS THAT THERANOS GAVE YOU;

10:21AM  10    CORRECT?

10:21AM  11    A.   YES.

10:21AM  12    Q.   AND DID YOU -- DID CMS DO ANYTHING TO VERIFY OR

10:21AM  13    CORROBORATE ANY OF THE NUMBERS IN THOSE ALTERNATIVE ASSESSMENT

10:21AM  14    PROGRAM DOCUMENTS?

10:21AM  15         MR. CAZARES:  OBJECTION.  FOUNDATION RELATING TO HER

10:21AM  16    TESTIMONY ABOUT HER ROLE.

10:21AM  17         THE COURT:  IS THIS SPECIFIC TO HER, WHAT SHE DID?

10:21AM  18    DID SHE DO THE INVESTIGATION TO CORROBORATE OR VERIFY?

10:21AM  19         MR. LEACH:  HE ASKED A LOT OF QUESTIONS ABOUT WHAT

10:21AM  20    MR. YAMAMOTO DID.

10:21AM  21         THE COURT:  RIGHT.

10:21AM  22         MR. LEACH:  I'M FOLLOWING UP ON THAT LINE OF

10:21AM  23    QUESTIONING, YOUR HONOR.

10:21AM  24         I CAN FRAME IT IN TERMS OF INDIVIDUALS.

10:21AM  25         THE COURT:  SURE.  WHY DON'T YOU START WITH THAT?

10:21AM  1    BY MR. LEACH:

10:21AM  2    Q.   OKAY.  DID YOU DO ANYTHING TO VERIFY OR CORROBORATE THE

10:22AM  3    NUMBERS THAT WERE PROVIDED TO CMS IN THE ALTERNATIVE ASSESSMENT

10:22AM  4    PROGRAM DOCUMENT?

10:22AM  5    A.   NOT RELATED TO THE ROUTINE CHEMISTRIES.

10:22AM  6    Q.   OKAY.  TO YOUR KNOWLEDGE DID MR. YAMAMOTO DO ANY OF THAT?

10:22AM  7    A.   I DON'T KNOW.

10:22AM  8            MR. CAZARES: OBJECTION.  FOUNDATION.

10:22AM  9            THE COURT:  OVERRULED.

10:22AM  10           THE WITNESS:  I DO NOT.

10:22AM  11   BY MR. LEACH:

10:22AM  12   Q.   OKAY.  DID CMS, TO YOUR KNOWLEDGE, DO ANYTHING TO ASSESS

10:22AM  13   OR DO ANYTHING WITH RESPECT TO THE TOTAL ALLOWABLE ERROR THAT

10:22AM  14   IS INCLUDED IN THE PROFICIENCY TESTING RESULTS?

10:22AM  15           MR. CAZARES: OBJECTION.  FOUNDATION.

10:22AM  16           THE COURT:  CAN YOU LAY A FOUNDATION AS TO WHETHER

10:22AM  17   OR NOT THAT'S PART OF HER -- THE INVESTIGATION AND THE SCOPE OF

10:22AM  18   THE INVESTIGATION.

10:22AM  19           MR. LEACH:  SURE.

10:23AM  20   Q.   TO YOUR KNOWLEDGE, MS. BENNETT, IS IT WITHIN THE SCOPE OF

10:23AM  21   CMS'S INVESTIGATION TO ASSESS THE TOTAL ALLOWABLE ERROR THAT

10:23AM  22   THE LAB IS USING IN ITS PROFICIENCY TESTING?

10:23AM  23   A.   WHAT WE DO IS WE LOOK AT WHAT THE LAB ALLOWS FOR THE TOTAL

10:23AM  24   ALLOWABLE ERROR, AND THEN WE ASSESS WHETHER THEY'RE

10:23AM  25   COMPLIANT -- WHETHER THEY'RE DEFICIENT WITH THEIR REQUIREMENTS

ER-3759

10:23AM  1    FOR TOTAL ALLOWABLE ERROR.

10:23AM  2    Q.   SO THE LAB SETS THE TOTAL ALLOWABLE ERROR?

10:23AM  3    A.   YES.

10:23AM  4    Q.   AND YOU DON'T COMPARE THAT TO SOMEBODY ELSE'S TOTAL

10:23AM  5    ALLOWABLE ERROR?

10:23AM  6    A.   WE DO NOT.

10:23AM  7    Q.   OKAY.  AND WITH RESPECT TO EXHIBIT -- I WANT TO DRAW YOUR

10:23AM  8    ATTENTION TO EXHIBIT 20620.

10:24AM  9         DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT THIS?

10:24AM  10   A.   I DO.

10:24AM  11   Q.   AND AGAIN, THIS ISN'T A DOCUMENT THAT YOU WERE PROVIDED AS

10:24AM  12   PART OF YOUR WORK?

10:24AM  13   A.   THIS WAS PROVIDED TO MR. YAMAMOTO, NOT TO ME.

10:24AM  14   Q.   OKAY.  AND YOU HAVE NO KNOWLEDGE ABOUT HOW THESE NUMBERS

10:24AM  15   WERE DERIVED AT?

10:24AM  16   A.   I DO NOT.

10:24AM  17   Q.   YOU HAVE NO KNOWLEDGE ABOUT WHEN THEY WERE DERIVED?

10:24AM  18   A.   I DO NOT.

10:24AM  19   Q.   YOU HAVE NO KNOWLEDGE ABOUT WHETHER ANY OF THE NUMBERS IN

10:24AM  20   THERE WERE CHANGED OR MODIFIED OVER THE COURSE OF TIME?

10:24AM  21   A.   I DO NOT.

10:24AM  22   Q.   OKAY.

10:24AM  23        MAY I APPROACH, YOUR HONOR?

10:24AM  24             THE COURT:  YES.

10:24AM  25             MR. LEACH:  (HANDING.)

10:25AM  1        YOUR HONOR, MAY I HAND THE DOCUMENTS UP TO THE COURT?

10:25AM  2             THE COURT:  YES.  DOES THE DEFENSE HAVE THEM?

10:25AM  3             MR. LEACH:  I'M ABOUT TO GIVE THEM TO THEM.

10:25AM  4        (HANDING.)

10:25AM  5   Q.   I'VE PLACED BEFORE YOU, MS. BENNETT, WHAT WE'VE MARKED AS

10:25AM  6   EXHIBIT 5834.

10:25AM  7        DO YOU SEE THAT NUMBER DOWN AT THE BOTTOM?

10:25AM  8   A.   I DO.

10:25AM  9   Q.   AND DOES THIS APPEAR TO BE AN EMAIL FROM SURAJ SAKSENA TO

10:25AM 10   DANIEL YOUNG AND LANGLY GEE DATED MAY 29TH, 2015?

10:25AM 11   A.   IT DOES.

10:25AM 12   Q.   OKAY.  AND YOU MET MR. SAKSENA, OR DR. SAKSENA, DURING THE

10:25AM 13   INSPECTION?

10:25AM 14   A.   YES.

10:25AM 15   Q.   AND YOU ALSO REVIEWED SOME DOCUMENTS EXECUTED BY

10:26AM 16   DR. SAKSENA IN THE COURSE OF YOUR WORK?

10:26AM 17        OR DID YOU HAVE INTERACTIONS WITH DR. SAKSENA DURING THE

10:26AM 18   INSPECTION?

10:26AM 19   A.   YES.

10:26AM 20   Q.   AND DID DR. SAKSENA PROVIDE INFORMATION TO YOU FROM TIME

10:26AM 21   TO TIME?

10:26AM 22   A.   YES.

10:26AM 23   Q.   I ALSO DRAW YOUR ATTENTION TO PAGE 21 OF THIS DOCUMENT.

10:26AM 24        DO YOU SEE THAT THERE IS SOME METADATA LISTED ABOUT SOME

10:26AM 25   OF THE BATES NUMBERS AND THE CUSTODIAN FOR THIS DOCUMENT?

10:26AM   1    A.   YES.

10:26AM   2    Q.   AND DO YOU SEE SOME NAMES LISTED IN THE CUSTODIAN ROW

10:26AM   3    ASSOCIATED WITH THIS PARTICULAR DOCUMENT?

10:26AM   4    A.   I DO.

10:26AM   5    Q.   AND DO YOU SEE THAT THE SUBJECT OF THIS EMAIL IS AAP

10:26AM   6    REPORT?

10:26AM   7         DO YOU SEE THAT?

10:26AM   8    A.   I DO.

10:27AM   9    Q.   OKAY.

10:27AM  10         YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 5384.

10:27AM  11              MR. CAZARES:  OBJECTION.  HEARSAY AND FOUNDATION.

10:27AM  12              MR. LEACH:  YOUR HONOR, I THINK THE BUSINESS RECORDS

10:27AM  13    FOUNDATION HAS BEEN LAID THROUGH OTHER WITNESSES, AND AT A

10:27AM  14    MINIMUM I OFFER THIS AS NOTICE TO THE DEFENDANT.

10:27AM  15              THE COURT:  WELL, THIS IS A SIMILAR -- THANK YOU.

10:27AM  16         THIS IS A SIMILAR EMAIL AS THE OTHER DOCUMENT, THE 20620.

10:27AM  17    I DON'T THINK THIS WITNESS CAN LAY A PROPER BUSINESS FOUNDATION

10:27AM  18    UNDER 803(6).

10:27AM  19         I WILL ADMIT IT NOT FOR THE TRUTH OF THE MATTER ASSERTED,

10:27AM  20    LADIES AND GENTLEMEN, BUT PURELY FOR ANY NOTICE, NOTICE ISSUES.

10:27AM  21              MR. CAZARES:  AND JUST FOR THE RECORD, YOUR HONOR,

10:27AM  22    WE OBJECT TO THE NOTICE ADMISSION BECAUSE MR. BALWANI IS NOT

10:27AM  23    REFLECTED IN THE EMAIL EXCHANGE AT ALL.

10:27AM  24              THE COURT:  WELL, THIS IS NOTICE AS TO THIS WITNESS.

10:27AM  25    IS THAT WHO IT'S GOING FOR?

10:27AM  1        MR. CAZARES:  IT'S ALSO NOT REFLECTED --

10:27AM  2        MR. LEACH:  IT'S NOTICE TO MR. BALWANI, YOUR HONOR,

10:27AM  3   AND I'M DRAWING YOUR ATTENTION TO THE BOX FOR THE CUSTODIAN.

10:28AM  4   IT APPEARS THAT MR. BALWANI DID HAVE POSSESSION OF THIS

10:28AM  5   DOCUMENT, SO IT WOULD BE OFFERED FOR NOTICE TO HIM.

10:28AM  6        THE COURT:  WELL, I'M NOT SURE THAT THE -- THE EMAIL

10:28AM  7   IS CERTAINLY NOT ADDRESSED TO HIM.  THIS IS A METADATA BOX, AS

10:28AM  8   YOU SAID, AND WITHOUT FOUNDATION AS TO THIS WITNESS'S KNOWLEDGE

10:28AM  9   OF THE METADATA AND WHAT THIS MEANS, I DON'T THINK IT SHOWS,

10:28AM 10   THAT BOX SHOWS NOTICE DIRECTLY WITHOUT SOME FURTHER FOUNDATION.

10:28AM 11        MR. LEACH:  OKAY, YOUR HONOR.

10:28AM 12   Q.   MS. BENNETT, YOU -- WITH RESPECT TO EXHIBIT 20620, AM I

10:28AM 13   RIGHT, YOU HAVE NO IDEA WHERE THAT DATA COMES FROM; CORRECT?

10:28AM 14   A.   I DO NOT.

10:28AM 15   Q.   AND YOU DON'T KNOW WHEN IT WAS PREPARED?

10:28AM 16   A.   I DO NOT.

10:28AM 17   Q.   AND YOU DON'T KNOW HOW IT WAS PREPARED?

10:29AM 18   A.   I DO NOT.

10:29AM 19   Q.   AND YOU DON'T KNOW WHETHER CERTAIN CHALLENGES ON CERTAIN

10:29AM 20   EVENTS --

10:29AM 21        MR. CAZARES:  OBJECTION.

10:29AM 22        THE COURT:  OVERRULED.

10:29AM 23   BY MR. LEACH:

10:29AM 24   Q.   YOU DON'T KNOW WHETHER ANY OF THE CHALLENGES WERE CHANGED

10:29AM 25   FROM PASS TO FAIL PRIOR TO CMS BEING PROVIDED THAT DOCUMENT?

10:29AM  1              MR. CAZARES:  OBJECTION.  FOUNDATION.  403.

10:29AM  2              THE COURT:  IS THE QUESTION SHE HAS NO IDEA ABOUT

10:29AM  3      KNOWLEDGE OF HOW THAT WAS CREATED, ALTERED IN ANY WAY?

10:29AM  4              MR. LEACH:  CORRECT.

10:29AM  5              THE COURT:  OKAY.  WHY DON'T YOU ASK THAT QUESTION?

10:29AM  6      BY MR. LEACH:

10:29AM  7      Q.   OKAY.  YOU HAVE NO KNOWLEDGE ABOUT WHETHER ANY OF THE

10:29AM  8      NUMBERS IN 20620, OR THE 100 PERCENT PASS/FAIL, WHETHER ANY OF

10:29AM  9      THAT CHANGED PRIOR TO THE DOCUMENT BEING PROVIDED TO CMS?  YOU

10:29AM 10      HAVE NO KNOWLEDGE OF THAT?

10:29AM 11              MR. CAZARES:  OBJECTION.  FOUNDATION.  403.

10:29AM 12              THE COURT:  OVERRULED.

10:29AM 13          YOU CAN ANSWER THE QUESTION.

10:29AM 14              THE WITNESS:  I DO NOT.

10:29AM 15      BY MR. LEACH:

10:29AM 16      Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT WHETHER

10:29AM 17      THE 2567 IDENTIFIES ANY ACTUAL PATIENT HARM.

10:30AM 18          DO YOU RECALL THOSE QUESTIONS?

10:30AM 19      A.   I DO.

10:30AM 20      Q.   AND DO YOU RECALL BEING ASKED, IN YOUR FINDINGS YOU DIDN'T

10:30AM 21      IDENTIFY ANY EVIDENCE THAT SUGGESTS PATIENTS WERE ACTUALLY

10:30AM 22      AFFECTED BY THE NONCOMPLIANCE YOU IDENTIFIED.

10:30AM 23          DO YOU RECALL BEING ASKED A NUMBER OF QUESTIONS ALONG

10:30AM 24      THOSE LINES?

10:30AM 25      A.   I DO.

BENNETT REDIRECT BY MR. LEACH                                           5089

10:30AM   1    Q.   AND YOU WERE ASKED WHETHER CMS DID ANY TYPE OF PATIENT

10:30AM   2    IMPACT ASSESSMENTS.

10:30AM   3         DO YOU RECALL QUESTIONS ALONG THOSE LINES?

10:30AM   4    A.   I DO.

10:30AM   5    Q.   AND IS THAT SOMETHING THAT YOU WOULD EXPECT THE LABORATORY

10:30AM   6    TO DO?

10:30AM   7    A.   WE DO.

10:30AM   8    Q.   WHY DO YOU EXPECT THAT?

10:30AM   9    A.   WE EXPECT THE LABORATORIES TO LOOK AT ANY PATIENT THAT HAS

10:30AM  10    BEEN OR HAS POTENTIALLY BEEN AFFECTED BY A DEFICIENT PRACTICE

10:30AM  11    THAT THE LABORATORY DOES.  IT'S THEIR RESPONSIBILITY TO MAKE

10:30AM  12    SURE THAT PATIENTS WERE NOT AFFECTED OR HAD THE POTENTIAL TO BE

10:30AM  13    AFFECTED WHEN THEY HAD DEFICIENCIES THAT -- DEFICIENCIES IN

10:31AM  14    WHAT THEY WERE SUPPOSED TO BE DOING TO ENSURE ACCURATE AND

10:31AM  15    RELIABLE TESTING.

10:31AM  16    Q.   AND THAT'S SOMETHING THAT YOU WOULD EXPECT THE LABORATORY

10:31AM  17    TO DO; CORRECT?

10:31AM  18    A.   YES.

10:31AM  19    Q.   OKAY.

10:31AM  20         MAY I APPROACH, YOUR HONOR?

10:31AM  21             THE COURT:  YES.

10:31AM  22             MR. LEACH:  (HANDING.)

10:32AM  23    Q.   MS. BENNETT, I'VE PLACED BEFORE YOU EXHIBIT 4943.

10:32AM  24         DO YOU HAVE THAT IN FRONT OF YOU?

10:32AM  25    A.   I DO.

ER-3765

10:32AM 1    Q.   AND DO YOU SEE THAT THERE'S A CMS BATES LABEL TO THE

10:32AM 2    RIGHT?

10:32AM 3    A.   YES.

10:32AM 4    Q.   AND DO YOU SEE ON THE FIRST PAGE THERE'S A TABLE OF

10:32AM 5    CONTENTS WITH A TABLE OF BINDER LETTERS AND A SUMMARY?

10:32AM 6    A.   I DO.

10:32AM 7    Q.   OKAY.  IS THIS SOMETHING THAT THERANOS PROVIDED TO YOU IN

10:32AM 8    THE COURSE OF CMS'S INSPECTION?

10:32AM 9    A.   THIS APPEARS TO BE PART OF THEIR RESPONSE TO US, TO THE

10:32AM 10   SURVEY.

10:32AM 11   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 9 OF THE

10:33AM 12   EXHIBIT.

10:33AM 13        DO YOU SEE A HEADING AT THE TOP RELATING TO A TPS 3.5?

10:33AM 14   A.   YES.

10:33AM 15   Q.   AND THAT'S A REFERENCE TO THE EDISON DEVICE?

10:33AM 16   A.   YES.

10:33AM 17   Q.   AND THIS IS A DOCUMENT THAT THERANOS PROVIDED TO YOU?

10:33AM 18   A.   YES.

10:33AM 19   Q.   AND DO YOU SEE A PARAGRAPH, THE FOURTH FULL PARAGRAPH

10:33AM 20   UNDER THE HEADING PATIENT IMPACT?

10:33AM 21        DO YOU SEE THAT PARAGRAPH?

10:33AM 22   A.   I DO.

10:33AM 23   Q.   AND DO YOU SEE THAT THERE IS ALSO -- AND DOES THIS RELATE

10:33AM 24   TO WHAT THE COMPANY WAS TELLING YOU ABOUT POTENTIAL IMPACT TO

10:33AM 25   PATIENTS FOR DEFICIENCIES IDENTIFIED DURING YOUR SURVEY?

10:33AM 1    A.   YES.

10:33AM 2    Q.   AND DO YOU SEE THAT THERE'S A PARAGRAPH DOWN AT THE BOTTOM

10:33AM 3    WITH SOME ADDITIONAL INFORMATION ABOUT WHAT THERANOS IS DOING?

10:33AM 4    A.   UNDER CORRECTIVE ACTION?

10:34AM 5    Q.   YES.

10:34AM 6    A.   YES.

10:34AM 7            MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

10:34AM 8    EXHIBIT 4943.

10:34AM 9            MR. CAZARES:  OBJECTION.  FOUNDATION.  HEARSAY.

10:34AM 10   403.

10:34AM 11           THE COURT:  GO AHEAD, MR. LEACH.

10:34AM 12           MR. LEACH:  HE OPENED THE DOOR TO THIS, YOUR HONOR,

10:34AM 13   BY ASKING, YOU KNOW, DOES CMS IDENTIFY PATIENT IMPACT IN THE

10:34AM 14   2567.

10:34AM 15           MR. CAZARES:  IT'S STILL HEARSAY, AND THIS ITEM IS

10:34AM 16   NOT IDENTIFIED IN THE SURVEY REPORT AT 4621, WHICH IS IN

10:34AM 17   EVIDENCE.

10:34AM 18           THE COURT:  WELL, WHY DON'T YOU LAY SOME ADDITIONAL

10:34AM 19   FOUNDATION AS TO WHAT THIS INFORMATION IS AND WHETHER SHE HAS

10:34AM 20   KNOWLEDGE OF IT?

10:34AM 21   BY MR. LEACH:

10:34AM 22   Q.   DO YOU HAVE KNOWLEDGE OF THIS DOCUMENT, MS. BENNETT?

10:34AM 23   A.   YES.

10:34AM 24   Q.   AND IS THIS SOMETHING THAT THERANOS PROVIDED TO YOU?

10:34AM 25   A.   YES.

10:34AM   1    Q.   AND IS THIS SOMETHING THAT THERANOS PROVIDED TO YOU IN

10:34AM   2    RELATION TO A DETERMINATION OF WHETHER THERE WAS OR WASN'T AN

10:34AM   3    IMPACT TO PATIENTS?

10:34AM   4    A.   YES.

10:34AM   5    Q.   AND DID YOU RELY ON THIS IN THE COURSE OF YOUR WORK IN

10:35AM   6    EVALUATING THERANOS'S RESPONSE TO THE 2567?

10:35AM   7    A.   YES.

10:35AM   8    Q.   AND WHEN YOU'RE PREPARING A 2567 AND LISTING PARTICULAR

10:35AM   9    OBSERVATIONS, YOU EXPECT THE LAB TO RESPOND TO THOSE; CORRECT?

10:35AM  10    A.   YES.

10:35AM  11    Q.   AND IS THIS PART OF YOUR WORK IN EVALUATING WHETHER OR NOT

10:35AM  12    THE COMPANY HAS RESPONDED TO OR NOT RESPONDED TO THE

10:35AM  13    DEFICIENCIES?

10:35AM  14    A.   YES.

10:35AM  15    Q.   AND THIS WAS PROVIDED TO YOU AT SOME POINT IN EARLY 2016?

10:35AM  16    A.   I BELIEVE SO.

10:35AM  17    Q.   OKAY.

10:35AM  18         YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 4943.

10:35AM  19              MR. CAZARES:  OBJECTION.  I APOLOGIZE.

10:35AM  20         OBJECTION.  FOUNDATION.  HEARSAY.

10:35AM  21         THERE'S ALSO A RELEVANCE ISSUE DUE TO THE TIMING OF THE

10:35AM  22    ITEM AND THE AUTHOR OF THE ITEM THAT IS REFLECTED IN THIS

10:36AM  23    EXHIBIT.

10:36AM  24              THE COURT:  FIRST OF ALL, MR. LEACH, ARE YOU ASKING

10:36AM  25    FOR THE ENTIRETY OF THIS DOCUMENT, OR JUST THIS PAGE THAT

10:36AM  1    YOU'RE REFERENCING?

10:36AM  2              MR. LEACH:  JUST PAGE 1 AND PAGE 9, YOUR HONOR.

10:36AM  3              THE COURT:  PAGE 1 IS THE TABLE OF CONTENTS?

10:36AM  4              MR. LEACH:  YES.

10:36AM  5              THE COURT:  AND CAN YOU TIME STAMP THIS PAGE 9?

10:36AM  6              MR. LEACH:  YES, YOUR HONOR.

10:36AM  7    Q.  MS. BENNETT, LET ME DRAW YOUR ATTENTION TO PAGE 1 OF THE

10:36AM  8    DOCUMENT.

10:36AM  9       DO YOU SEE SOME BINDER LETTERS IN THE LEFT COLUMN?

10:37AM 10    A.  YES.

10:37AM 11    Q.  AND THOSE LETTERS ARE AA?

10:37AM 12    A.  YES.

10:37AM 13    Q.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 5471.

10:37AM 14       IS THIS A LETTER DATED APRIL 1ST, 2016?

10:37AM 15    A.  YES.

10:37AM 16    Q.  ROUGHLY THREE MONTHS AFTER THE 2567 WAS ISSUED?

10:37AM 17    A.  YES.

10:37AM 18    Q.  OKAY.  AND IN THE RE LINE, DO YOU SEE MR. BALWANI'S NAME

10:37AM 19    IN THE RE LINE?

10:37AM 20    A.  YES.

10:37AM 21    Q.  SITTING HERE TODAY, DO YOU KNOW IF HE WAS OR WAS NOT WITH

10:37AM 22    THE COMPANY IN APRIL OF 2016?

10:37AM 23    A.  I DON'T KNOW.

10:37AM 24    Q.  OKAY.  AND IF I DRAW YOUR ATTENTION TO PAGE 50.

10:38AM 25       IN THE FIRST FULL PARAGRAPH OF PAGE 50, DO YOU SEE A

10:38AM 1     REFERENCE TO EXHIBIT AA?

10:38AM 2     A.   YES.

10:38AM 3     Q.   AND BASED ON THE SUBJECT MATTER IN THIS PARAGRAPH AND THE

10:38AM 4     REFERENCE TO AA, DO YOU BELIEVE THAT YOU RECEIVED 4943 AT SOME

10:38AM 5     POINT PRIOR TO APRIL OF 2016?

10:38AM 6     A.   YES.

10:38AM 7              THE COURT:  ALL RIGHT.

10:38AM 8              MR. LEACH:  WE OFFER PAGES 1 AND 9 OF 4943.

10:38AM 9              MR. CAZARES:  MY OBJECTION IS RELEVANCE DUE TO

10:38AM 10    TIMING AND SUBJECT MATTER; HEARSAY DUE TO THE TRUTH OF THE

10:38AM 11    MATTER IN THE ITEM; 403; AS WELL AS THIS IS THE SUBJECT OF THE

10:38AM 12    COURT'S ORDER REGARDING MOTIONS IN LIMINE AT DOCKET 1326,

10:38AM 13    PAGES 9 TO 12 RELATING TO ANOTHER WITNESS, THE AUTHOR,

10:39AM 14    YOUR HONOR.

10:39AM 15             THE COURT:  MR. LEACH.

10:39AM 16             MR. LEACH:  THEY OPENED THE DOOR, YOUR HONOR, BY

10:39AM 17    ASKING ABOUT WHY PATIENT IMPACT ISN'T IDENTIFIED IN THE 2667.

10:39AM 18        THIS IS DURING THE TIME PERIOD WHEN MR. BALWANI IS STILL

10:39AM 19    THE COO.  IT'S AN AUTHORIZED ADMISSION.  IT SHOULD COME IN.

10:39AM 20             THE COURT:  WELL, WHAT I'LL DO IS I'LL LOOK AT -- I

10:39AM 21    WANT TO LOOK AT THE MIL ORDER AND REFERENCE THOSE PARAGRAPHS.

10:39AM 22        LET'S TAKE A BREAK, LADIES AND GENTLEMEN, SO WE CAN LOOK

10:39AM 23    AT THIS.  LET'S TAKE ABOUT A -- WELL, LET'S TAKE OUR 30 MINUTE

10:39AM 24    BREAK NOW.  MAYBE WE'LL TAKE THAT NOW.

10:40AM 25        (JURY OUT AT 10:40 A.M.)

BENNETT REDIRECT BY MR. LEACH                                    5095

10:40AM   1                THE COURT:  YOU CAN STAND DOWN.  THANK YOU.

10:40AM   2          (RECESS FROM 10:40 A.M. UNTIL 11:13 A.M.)

11:13AM   3                THE COURT:  ALL RIGHT.  THANK YOU.

11:13AM   4       WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

11:13AM   5   ARE PRESENT ONCE AGAIN.

11:13AM   6       WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

11:13AM   7          THE COURT DID, DURING THE RECESS, REVIEW DOCUMENT 1236 AND

11:13AM   8   THE PAGES CITED BY COUNSEL, 9 TO 12, AS WELL AS OTHER ITEMS,

11:13AM   9   PAGE 26 REGARDING THE COURT'S ORDER IN REGARDS TO THE RELEASE

11:13AM  10   OF THE -- I GUESS IT'S THE 3.5 AND THE VOIDING OF THE TESTS.

11:14AM  11          WHAT WOULD THE PARTIES LIKE ME TO KNOW ABOUT THIS?

11:14AM  12                MR. CAZARES:  YOUR HONOR, AS I SAID BEFORE,

11:14AM  13   MR. LEACH'S THEORY IS THAT THE GOVERNMENT -- THE DEFENSE HAS

11:14AM  14   OPENED DOOR TO VOIDING BY ASKING ABOUT PATIENT IMPACT OR EFFECT

11:14AM  15   OF THE NONCOMPLIANCE ON THE PATIENTS WHO WERE TESTED DURING THE

11:14AM  16   RELEVANT TIME PERIOD.

11:14AM  17       THE PROBLEM IS THAT EVEN IF THAT'S SO, AND I'M NOT SURE IT

11:14AM  18   IS, THAT'S NOT AN EXCEPTION TO HEARSAY OR 702 EXPERT TESTIMONY

11:14AM  19   OR OPINION TESTIMONY, WHICH IS ESSENTIALLY WHAT THIS DOCUMENT

11:14AM  20   IS.

11:14AM  21       THE COURT WILL RECALL THAT DR. DAS AUTHORED A LETTER TO

11:14AM  22   CMS DATED APRIL 1, 2016, INDICATING HIS CONCLUSIONS, INCLUDING

11:14AM  23   HIS DECISION TO VOID ALL TESTS RUN ON THE THERANOS DEVICE.

11:14AM  24       THIS PATIENT IMPACT ASSESSMENT AT 4943 IS THE UNDERLYING

11:15AM  25   WORK PRODUCT, IF YOU WILL, THAT DR. DAS PUT TOGETHER AND HIS

ER-3771

11:15AM 1    TEAM PUT TOGETHER OVER MONTHS OF ANALYSIS TO REACH THAT

11:15AM 2    OPINION.  THIS DOCUMENT ITSELF IS HEARSAY.  IT'S 702 OPINION

11:15AM 3    AFTER THE FACT, AFTER THE FACT OF THE UNDERLYING TESTING THAT

11:15AM 4    TOOK PLACE.

11:15AM 5         AND I DON'T SEE HOW THIS WITNESS CAN TESTIFY TO ANYTHING

11:15AM 6    ABOUT THIS DOCUMENT SIMPLY BECAUSE CMS MAY HAVE RECEIVED A

11:15AM 7    LETTER THAT REFERENCED THE FACT THAT TESTS WERE VOIDED WITHOUT

11:15AM 8    HAVING ANY FOUNDATION AS TO WHY, WHEN, WHO DID IT, AND WHAT WAS

11:15AM 9    THE BASIS FOR THAT VOIDING.

11:15AM 10        AGAIN, SHE DOESN'T KNOW.  SHE'LL OFFER SOME OPINIONS ABOUT

11:15AM 11   HOW TERRIBLE THE DEVICE WAS IN HER OPINION, BUT, AGAIN, THAT'S

11:15AM 12   NOT ADMISSIBLE EITHER.  SHE'S NOT AN EXPERT WITNESS.

11:15AM 13        SO I DON'T SEE HOW THE GOVERNMENT GETS THIS DOCUMENT IN IN

11:15AM 14   RELATION TO THIS ISSUE BASED ON THIS OPENING THE DOOR THEORY.

11:15AM 15             THE COURT:  THROUGH THIS WITNESS?

11:16AM 16             MR. CAZARES:  THROUGH THIS WITNESS.

11:16AM 17             THE COURT:  DR. DAS IS A DIFFERENT DISCUSSION.

11:16AM 18             MR. CAZARES:  DIFFERENT ISSUE TOTALLY.

11:16AM 19             THE COURT:  MR. LEACH.

11:16AM 20             MR. LEACH:  THANK YOU, YOUR HONOR.

11:16AM 21        THE DEFENSE ASKED NO FEWER THAN SIX TIMES AT PAGES 4970,

11:16AM 22   5016, 4971, 4972, 4984, AND 4996 OF THE TRANSCRIPT, NO FEWER

11:16AM 23   THAN SIX TIMES WHETHER CMS IDENTIFIED ANY ACTUAL PATIENT

11:16AM 24   IMPACT.

11:16AM 25        IT HAS CREATED THE IMPRESSION WITH THE JURY THAT ALL OF

BENNETT REDIRECT BY MR. LEACH                    5097

11:16AM   1     THE OBSERVATIONS BY CMS DON'T MATTER EITHER BECAUSE THEY'RE

11:16AM   2     TECHNICAL OR IT DEALS WITH THE REFRIGERATOR OR THEY DON'T HAVE

11:16AM   3     ANY REAL WORLD IMPACT, WHEN THE CONCLUSION -- WHEN THE OPPOSITE

11:16AM   4     IS TRUE.

11:16AM   5         THERANOS ITSELF, IN A PATIENT IMPACT ASSESSMENT TO CMS,

11:16AM   6     SAID, "THERE'S A POSSIBLE PATIENT IMPACT FOR EVERY TEST

11:16AM   7     REPORTED FROM THE LABORATORY'S TPS 3.5 DEVICE."

11:17AM   8         THIS IS NECESSARY TO DISPEL THE IMPRESSION THAT THE

11:17AM   9     DEFENSE HAS CREATED THROUGH ITS LINE OF QUESTIONING.  IT'S NOT

11:17AM  10     HEARSAY.  IT'S A STATEMENT BY A PARTY OPPONENT.  IT'S EITHER AN

11:17AM  11     ADOPTED ADMISSION, AN AUTHORIZED ADMISSION, OR A STATEMENT OF

11:17AM  12     AN AGENT.

11:17AM  13         MR. BALWANI WAS THE COO OF THE COMPANY AT THE TIME.

11:17AM  14     MS. BENNETT HAS TESTIFIED THAT HE LED THE TEAM THAT WAS

11:17AM  15     RESPONDING TO THE CMS INSPECTION, SO IT'S NOT HEARSAY.

11:17AM  16         THE VOIDING OF THE TEST, THERE'S BEEN EXTENSIVE LITIGATION

11:17AM  17     OVER THIS.  IT'S NOT AN EXPERT OPINION.  IT'S AN ACTION BY THE

11:17AM  18     COMPANY DURING THE TIME PERIOD WHEN MR. BALWANI WAS THE COO.

11:17AM  19         AND IT'S NECESSARY TO DISPEL THE IMPRESSION THAT THE

11:17AM  20     DEFENSE HAS CREATED THAT THERE WAS NO POTENTIAL IMPACT TO

11:17AM  21     PATIENTS BASED ON CMS'S OBSERVATIONS.

11:17AM  22         IT'S NOT HEARSAY UNDER 801(D)(2), AND THEY HAVE OPENED THE

11:18AM  23     DOOR TO THIS.

11:18AM  24         IF THE ISSUE IS THE VOIDING AS OPPOSED TO THE STATEMENTS

11:18AM  25     THAT THERANOS IS MAKING TO CMS AND EVIDENCE OF WHY CMS WOULD

ER-3773

11:18AM 1    NOT CITE POSSIBLE PATIENT IMPACT BECAUSE THAT'S THE

11:18AM 2    LABORATORY'S JOB, I THINK THAT COULD BE CURED BY REDACTING THE

11:18AM 3    LAST PARAGRAPH OF PAGE 9 UNDER CORRECTIVE ACTION WHERE IT

11:18AM 4    REFERS TO THE VOIDING.

11:18AM 5        WHAT I'M MOST FOCUSSED ON IS THE PARAGRAPH ABOVE THAT

11:18AM 6    TALKING ABOUT PATIENT IMPACT.

11:18AM 7            THE COURT:  THANK YOU.

11:18AM 8        I DON'T KNOW IF THAT CHANGES YOUR RATIONALE AT ALL.  THERE

11:18AM 9    WAS TESTIMONY FROM THIS WITNESS, MS. BENNETT, ABOUT REASONS FOR

11:18AM 10   IMPACT ON PATIENTS AND HOW IT MIGHT -- CMS'S OPINION ON HOW

11:18AM 11   THAT MIGHT AFFECT AND REASONS FOR WHY THEY DID CERTAIN THINGS.

11:18AM 12           MR. CAZARES:  IN HER DIRECT EXAMINATION IN RESPONSE

11:18AM 13   TO THE GOVERNMENT'S QUESTIONS, SHE DESCRIBED IMMEDIATE JEOPARDY

11:18AM 14   AND THE POTENTIAL -- ACTUAL HARM, POTENTIAL HARM, POSSIBILITY

11:19AM 15   OF HARM.

11:19AM 16       THAT WAS THE GOVERNMENT.  THAT WASN'T ME.  THAT WAS THEM

11:19AM 17   ELICITING TESTIMONY FROM HER ABOUT WHAT IMMEDIATE JEOPARDY

11:19AM 18   MEANT.

11:19AM 19       I, IN CROSS, RAISED THE SAME ISSUE CONFIRMING WHERE WITHIN

11:19AM 20   THAT SPECTRUM SHE HAD EVIDENCE OF, AND SHE DID NOT HAVE

11:19AM 21   EVIDENCE OF ACTUAL HARM, JUST POSSIBILITIES, WAS THE CROSS

11:19AM 22   RESPONSE TO THOSE QUESTIONS.

11:19AM 23       THE -- GETTING BACK TO THE DOCUMENT, THOUGH, THIS IS ABOUT

11:19AM 24   TWO OR THREE LAYERS OF HEARSAY, EVEN FROM THE LETTER, BECAUSE

11:19AM 25   THE APRIL 1ST LETTER, WHICH THE GOVERNMENT ISN'T TRYING TO

11:19AM  1    INTRODUCE RIGHT NOW, THEY'RE TRYING TO INTRODUCE THE WORK

11:19AM  2    PRODUCT UNDERLYING IT.

11:19AM  3         THESE ARE LIKE A COLLECTIVE WORK PRODUCT OF MULTIPLE

11:19AM  4    PARTIES, NOT JUST DR. DAS HIMSELF -- WHO, BY THE WAY, IS NOT

11:19AM  5    HERE TESTIFYING.  HE'S ALSO NOT AN AGENT OF MR. BALWANI.

11:19AM  6         THERANOS ISN'T A DEFENDANT IN THIS CASE.  DR. DAS WAS AN

11:19AM  7    AGENT OF THERANOS ON APRIL 1, 2016, AND BY THAT TIME I THINK

11:20AM  8    DR. DAS TESTIFIED IN THIS COURTROOM HE HAD HAD ALMOST LITTLE OR

11:20AM  9    NO CONTACT WITH MR. BALWANI EVEN WHEN MR. BALWANI WAS THERE.

11:20AM  10        SO I'M NOT SURE THERE'S ANY AGENCY THEORY THAT IS GOING TO

11:20AM  11   SOMEHOW UNDERMINE A HEARSAY OBJECTION.

11:20AM  12             THE COURT:  SO I DON'T KNOW IF DR. DAS IS GOING TO

11:20AM  13   TESTIFY IN THIS TRIAL.  ASSUMING HE DOES AND HE TESTIFIES ABOUT

11:20AM  14   VOIDING, ACTIONS TAKEN, HE MAY DO THAT, I DON'T KNOW.  HE WOULD

11:20AM  15   CERTAINLY BE ASKED, IF HE WERE -- MY SENSE IS THAT HE WOULD BE

11:20AM  16   ASKED ABOUT HIS WORK THAT HE DID, AND I GUESS WHAT I'M SAYING

11:20AM  17   IS THAT, MR. LEACH, IS IT LIKELY THAT THIS IS GOING TO COME IN

11:20AM  18   THROUGH DR. DAS?  OR CAN YOU REVEAL THAT NOW?

11:20AM  19             MR. LEACH:  I DON'T THINK IT RISES OR FALLS,

11:20AM  20   YOUR HONOR, ON WHETHER DR. DAS ACTUALLY TESTIFIES.

11:20AM  21             THE COURT:  I AGREE.  I AGREE.

11:20AM  22             MR. LEACH:  YEAH.  AND THE GOVERNMENT HAS NOT MADE A

11:20AM  23   FINAL DECISION IN THAT REGARD.

11:20AM  24             THE COURT:  OKAY.

11:20AM  25             MR. LEACH:  IT WAS NOT MY INTENTION TO OFFER THIS

11:20AM  1    EXHIBIT THROUGH MS. BENNETT UNTIL THE DEFENDANT STARTED ASKING

11:20AM  2    QUESTIONS ABOUT POSSIBLE PATIENT IMPACT, AND WE THINK IT'S

11:21AM  3    RELEVANT FOR THOSE PURPOSES.

11:21AM  4         BUT WE HAVE NOT MADE A FINAL DECISION ON DR. DAS.

11:21AM  5              THE COURT:  OKAY.  OKAY.  FAIR ENOUGH.

11:21AM  6         WELL, THE ISSUE OF PATIENT IMPACT IS COMING IN, AND THE

11:21AM  7    CORRECTIVE ACTION, AND I APPRECIATE MR. LEACH'S REPRESENTATION

11:21AM  8    THAT THAT'S -- HE'S NOT PUSHING THAT THAT COME IN.

11:21AM  9         AND I THINK THAT'S -- THAT MIGHT BE A BRIDGE TOO FAR FOR

11:21AM 10    THIS PURPOSE, THAT IS THE CORRECTIVE ACTION PARAGRAPH.

11:21AM 11         ABOVE IT IS THE PARAGRAPH PATIENT IMPACT.  AND WE HAVE

11:21AM 12    HEARD TESTIMONY, BOTH ON DIRECT AND CROSS, REGARDING CMS'S AND

11:21AM 13    THIS WITNESS'S THOUGHTS AND OPINIONS ABOUT PATIENT IMPACT.

11:21AM 14         I HAVEN'T REVIEWED THE TRANSCRIPT JUST RECENTLY, BUT I DO

11:21AM 15    REMEMBER HER TESTIFYING, SOME OF HER LAST TESTIMONY WAS

11:21AM 16    REGARDING PATIENT IMPACT FROM BOTH OF YOU.

11:21AM 17              MR. CAZARES:  WELL, BUT THAT'S THE POINT,

11:21AM 18    YOUR HONOR.

11:21AM 19         THE GOVERNMENT'S THEORY RIGHT NOW IS I HAVE OPENED THE

11:21AM 20    DOOR, THE DEFENSE HAS OPENED THE DOOR.

11:21AM 21         THEY ASKED THE QUESTIONS ABOUT WHETHER IMMEDIATE JEOPARDY

11:22AM 22    RELATES TO ACTUAL HARM, POTENTIAL HARM, AND MS. BENNETT

11:22AM 23    RESPONDED AND DEFINED WHAT ALL OF THAT MEANT, WHICH INCLUDED

11:22AM 24    ACTUAL OR POTENTIAL HARM, AND I FOLLOWED UP.

11:22AM 25         AGAIN, TO CABIN THAT, I DIDN'T INTRODUCE A NEW CONCEPT,

BENNETT REDIRECT BY MR. LEACH                    5101

11:22AM  1    JUST THE FACT THAT SHE DIDN'T HAVE EVIDENCE OF ONE PORTION OF

11:22AM  2    THE DEFINITION OF IMMEDIATE JEOPARDY, SO THERE'S NO OPENING THE

11:22AM  3    DOOR BY THE DEFENSE HERE.

11:22AM  4         AND AGAIN, WHILE I APPRECIATE THAT THE CORRECTIVE ACTION

11:22AM  5    LANGUAGE MAY BE OMITTED, BUT THERE'S OTHER DESCRIPTIONS OF WORK

11:22AM  6    AND ANALYSIS BY DR. DAS AND HIS TEAM, IT'S NOT JUST HIM, DOING

11:22AM  7    ANALYSIS OF PATIENT RESULTS.

11:22AM  8         MS. BENNETT HAS TESTIFIED RIGHT NOW, SHE DIDN'T DO ANY

11:22AM  9    ANALYSIS OF PATIENT RESULTS, JUST THE TIME PERIODS WHEN

11:22AM 10    PATIENTS WERE TESTED RELATIVE TO NONCOMPLIANCE.

11:22AM 11         IT'S NOT THE SAME THING.

11:22AM 12         AGAIN, THIS IS TESTIMONY ESSENTIALLY THAT THEORETICALLY

11:22AM 13    WOULD NEED TO COME FROM SOMEBODY, DR. DAS OR SOMEONE AT THE

11:22AM 14    LAB, ABOUT THIS WORK DONE TO REACH THIS CONCLUSION THAT THERE

11:23AM 15    MAY HAVE BEEN SOME PATIENT IMPACT, THEREFORE, THERANOS WAS

11:23AM 16    GOING TO DO SOMETHING, TAKE SOME ACTION, WHICH MS. BENNETT HAS

11:23AM 17    ALREADY MADE CLEAR, CMS DOESN'T DO THAT, THE LAB IS RESPONSIBLE

11:23AM 18    FOR THAT.

11:23AM 19              THE COURT:  HAS SHE TESTIFIED THAT -- ABOUT THE

11:23AM 20    POTENTIAL FOR PATIENT IMPACT FOR EVERY TEST FROM THE 3.5, FROM

11:23AM 21    THE EDISON?  WHAT HAS SHE TESTIFIED ABOUT THAT?

11:23AM 22              MR. LEACH:  DURING HER DIRECT EXAMINATION,

11:23AM 23    YOUR HONOR, THE GOVERNMENT SHOWED QUALITY CONTROL RESULTS

11:23AM 24    RELATING TO THE EDISON 3.5 AND ASKED HER WHETHER THESE WERE

11:23AM 25    DESIRABLE OR UNDESIRABLE RESULTS.  SHE SAID THEY WERE

ER-3777

11:23AM  1    UNDESIRABLE.

11:23AM  2         I DON'T THINK I ASKED IN THE MOMENT, DO THESE QUALITY

11:23AM  3    CONTROL RESULTS HAVE IMPLICATION FOR PATIENTS, BUT I ANTICIPATE

11:23AM  4    HER ANSWER WOULD BE ABSOLUTELY.

11:23AM  5              MR. CAZARES:  THE SURVEY REPORT ITSELF, THOUGH,

11:23AM  6    WHICH IS IN EVIDENCE, IDENTIFIES PATIENT NUMBERS, ASCENSION

11:24AM  7    NUMBERS IN RELATION TO THE QC ISSUES THAT THE GOVERNMENT

11:24AM  8    POINTED OUT WITH MS. BENNETT.

11:24AM  9         SO THE IMPLICATION IS ALREADY THERE.  VIOLATION, PATIENT

11:24AM  10   RESULTS WERE RELEASED CONTEMPORANEOUSLY.  THAT WAS IN THE

11:24AM  11   PORTIONS OF THE SURVEY REPORT THAT THE GOVERNMENT REVIEWED.

11:24AM  12        SO THEY HAVE ALREADY KIND OF SHOWN THAT AND GOTTEN INTO IT

11:24AM  13   WITHOUT HAVING HER TO ELABORATE.

11:24AM  14             THE COURT:  AND WE DON'T KNOW WHETHER SHE HAS SEEN

11:24AM  15   THIS OR NOT?  OR SHE HAS SEEN THIS?

11:24AM  16             MR. LEACH:  SHE HAS SEEN THIS.

11:24AM  17             THE COURT:  SHE HAS SEEN THIS?

11:24AM  18             MR. LEACH:  YES.

11:24AM  19             THE COURT:  AND DID THIS FORM -- HAS IT BEEN ASKED,

11:24AM  20   DID THIS FORM THE BASIS OF ANY OF HER REPORTS OR HER FINDINGS?

11:24AM  21             MR. LEACH:  I DON'T THINK IT CONTRIBUTES TO THE 2567

11:24AM  22   ITSELF, YOUR HONOR, BECAUSE THAT'S CAME IN JANUARY.

11:24AM  23        BUT I DO ANTICIPATE, I THINK SHE SAID SOMETHING TO THIS

11:24AM  24   EFFECT, AND IF NOT, I CAN CLEAR THAT UP, THAT SHE DID REVIEW

11:24AM  25   THIS, THAT SHE DID EVALUATE IT, THAT IT WAS PART OF HER

ER-3778

11:24AM   1    ASSESSMENT OF WHETHER THE LAB APPROPRIATELY RESPONDED TO THE

11:25AM   2    DEFICIENCIES THAT THEY IDENTIFIED.

11:25AM   3        SO THIS IS IMPORTANT INFORMATION FOR HER WORK, BUT I'M NOT

11:25AM   4    SURE THAT I HAVE ASKED THAT PRECISE QUESTION.

11:25AM   5             MR. CAZARES:  AND, YOUR HONOR, WHAT IT TIES INTO IS,

11:25AM   6    AGAIN, MR. BALWANI'S RELATIONSHIP.

11:25AM   7        SO THE ANALYSIS AND THE INFORMATION SHARED BY DR. DAS AND

11:25AM   8    HIS TEAM IN RELATION TO THIS PATIENT IMPACT ASSESSMENT WAS THEN

11:25AM   9    TRANSMITTED TO CMS, THEY USED IT OVER THE SPRING AND SUMMER OF

11:25AM  10    2016 TO REACH THEIR CONCLUSIONS THAT MR. LEACH DOESN'T WANT TO

11:25AM  11    REFERENCE BECAUSE THAT'S OUT IN JULY OF 2016 WHEN MR. BALWANI

11:25AM  12    IS GONE AND WHEN MR. BALWANI IS NOT INVOLVED IN ANY DECISION

11:25AM  13    MAKING AT THAT TIME.

11:25AM  14        SO THERE'S NO CONNECTION TO ANY DECISION CMS MADE OR ANY

11:25AM  15    DECISION THAT MS. BENNETT MADE FROM THIS DOCUMENT BECAUSE IT

11:25AM  16    DOESN'T RELATE TO MR. BALWANI'S WORK.

11:25AM  17             THE COURT:  WELL, I WANT TO TIME STAMP IT, TOO.  HE

11:25AM  18    LEFT IN JULY OF 2016, SOMETIME IN 2016.

11:25AM  19             MR. CAZARES:  YES.

11:25AM  20             THE COURT:  THE LAB IN MS. BENNETT'S WORK WAS WHEN?

11:26AM  21             MR. LEACH:  THE INSPECTION BEGINS IN SEPTEMBER OF

11:26AM  22    2015 AND THE REPORT IS JANUARY OF 2016, AND THIS IS PROVIDED

11:26AM  23    SOMETIME BEFORE APRIL OF 2016.

11:26AM  24             THE COURT:  RIGHT.  RIGHT.

11:26AM  25        SO I LOOKED AT THAT AND IT SEEMED TO ME THAT IT CABINS

11:26AM  1    WITH MR. BALWANI'S TENURE AT THE COMPANY.

11:26AM  2              MR. CAZARES:  WELL, HE WAS STILL -- I GUESS YOU

11:26AM  3    COULD SAY HE WAS AN EMPLOYEE --

11:26AM  4              THE COURT:  RIGHT.

11:26AM  5              MR. CAZARES:  -- OF CMS.  HE WAS NOT DR. DAS'S

11:26AM  6    SUPERVISOR.

11:26AM  7              THE COURT:  OF THERANOS.

11:26AM  8              MR. CAZARES:  DR. DAS WAS NOT MR. BALWANI'S AGENT.

11:26AM  9         MR. BALWANI LEFT, HE RESIGNED IN MAY.

11:26AM 10         HE CONTINUED ON ESSENTIALLY IN A KIND OF CONSULTANT MANNER

11:26AM 11    TO RESPOND TO QUESTIONS AS THE TRANSITION TO FILL WHATEVER HE

11:26AM 12    DID AT THE COMPANY CONTINUED.

11:26AM 13         AND, YES, HIS EFFECTIVE LAST DATE IN THE DOOR I THINK WAS

11:26AM 14    THE SECOND WEEK OR THE THIRD WEEK OF JULY.

11:26AM 15              THE COURT:  JULY 7TH, I BELIEVE.

11:26AM 16              MR. CAZARES:  JULY 7TH.

11:26AM 17         BUT HE WAS GONE BY MAY AND HAD NO IMPACT OR NO ROLE IN THE

11:26AM 18    INTERACTIONS WITH CMS AFTER THE APRIL 1, 2016 LETTER BY DAS.

11:27AM 19              THE COURT:  BUT THIS DOCUMENT IS DATED?

11:27AM 20              MR. LEACH:  SOMETIME BETWEEN JANUARY OF 2016 AND

11:27AM 21    APRIL OF 2016.

11:27AM 22              THE COURT:  SO WHILE HE'S STILL THERE IN SOME

11:27AM 23    CAPACITY.

11:27AM 24              MR. CAZARES:  THEORETICALLY, YEAH.

11:27AM 25              THE COURT:  RIGHT.  AND THE TABLE OF CONTENTS, WHY

11:27AM  1    IS THAT RELEVANT, MR. LEACH?

11:27AM  2                    MR. LEACH:  JUST TO --

11:27AM  3                    THE COURT:  WHAT DOES THAT SHOW?

11:27AM  4                    MR. LEACH:  JUST TO ORIENT.  JUST FOR CONTEXT FOR

11:27AM  5    PAGE 9.  I'M HAPPY TO LIVE WITHOUT PAGE 1, YOUR HONOR.

11:27AM  6                    THE COURT:  WELL, I THINK -- I THOUGHT THAT THAT

11:27AM  7    MIGHT BE WHAT IT'S FOR.

11:27AM  8         AS TO LAYING A FOUNDATION FOR THIS PATIENT IMPACT, PAGE 9,

11:27AM  9    I'M GOING TO ALLOW YOU TO MAKE SOME INQUIRY INTO THIS FROM THIS

11:27AM  10   WITNESS AND FOLLOW UP ON THIS.

11:27AM  11        THERE HAS BEEN DISCUSSION ABOUT PATIENT IMPACT.  BOTH OF

11:27AM  12   YOU HAVE ASKED HER QUESTIONS AS TO WHETHER OR NOT THAT IMPACT

11:27AM  13   WOULD BE THERE.

11:27AM  14        I RECALL, I THINK, HER MOST RECENT TESTIMONY WAS THAT SHE

11:27AM  15   TALKED ABOUT PATIENT IMPACT AND THE NEGATIVE EFFECT IT WOULD

11:28AM  16   HAVE ON PATIENTS BASED ON AN INCORRECT RESULT.

11:28AM  17        I THINK YOU GOT THAT IN.  THAT WAS ONE OF THE LAST THINGS

11:28AM  18   THAT YOU WERE ASKING HER BEFORE WE TOOK OUR BREAK.

11:28AM  19        SO I'LL ALLOW YOU TO CONTINUE TO EXAMINE THAT.

11:28AM  20        AS FAR AS THE TIME STAMPING AND THE REFERENCE TO THE

11:28AM  21   PAGES 9 THROUGH 12 OF 1326, LOOKING AT THAT, YOU CAN SEE THAT

11:28AM  22   THE COURT DEFERRED ANY RULING ON THAT CONTINGENT ON A

11:28AM  23   CONNECTION WITH MR. BALWANI AND HIS EMPLOYMENT WITH THE

11:28AM  24   COMPANY.

11:28AM  25        IT APPEARS, BASED ON OUR CONVERSATION HERE, THAT THE

11:28AM  1    REPORT, THE INSPECTION CERTAINLY OCCURRED WHILE HE WAS THERE.

11:28AM  2         THE -- THIS REPORT, IF IT'S TIME STAMPED, AND I DON'T KNOW

11:28AM  3    HOW YOU DO THAT, BUT IF IT'S TIME STAMPED IN THAT SAME PERIOD,

11:28AM  4    I WILL ALLOW SOME DISCUSSION ON IT.

11:28AM  5         WHETHER OR NOT I'M GOING TO ALLOW YOU TO DISPLAY JUST THE

11:29AM  6    PATIENT IMPACT, WE WON'T DO THE CORRECTIVE ACTION THROUGH THIS

11:29AM  7    WITNESS, BUT WHETHER OR NOT JUST THAT PATIENT IMPACT PORTION IS

11:29AM  8    ADMITTED WILL REMAIN TO BE SEEN.

11:29AM  9         BUT I'LL LET YOU EXAMINE SOME MORE ON THIS ON YOUR

11:29AM  10   REDIRECT, AND, OF COURSE, THERE WILL BE RECROSS ON THIS AS

11:29AM  11   WELL.

11:29AM  12        MR. CAZARES:  AND, YOUR HONOR, WITH RESPECT TO THE

11:29AM  13   PATIENT IMPACT, AGAIN, WE BELIEVE IT'S ALSO AN OPINION OF A

11:29AM  14   WITNESS, NOT MS. BENNETT, BASED ON EXPERT ANALYSIS.

11:29AM  15        AND EVEN IF NOT, IT'S A LAY OPINION FROM SOMEONE WHO IS

11:29AM  16   NOT HERE TESTIFYING.

11:29AM  17        THE COURT:  SURE.

11:29AM  18        MR. CAZARES:  SO EITHER WAY IT'S OPINION.

11:29AM  19        IT'S NOT SOME SORT OF BUSINESS RECORD IN THE REGULARLY

11:29AM  20   CONDUCTED COURSE OF BUSINESS, BECAUSE THIS WAS ANYTHING BUT

11:29AM  21   REGULAR, THE CMS INSPECTION, WHAT HAPPENED AT THERANOS.

11:29AM  22        THE COURT:  WELL, WE'LL SEE WHAT FOUNDATION IS LAID.

11:29AM  23   I UNDERSTAND.  I UNDERSTAND THAT.

11:29AM  24        IT MAY BE THAT SHE'LL TESTIFY ABOUT THIS, AND THE DOCUMENT

11:29AM  25   MAY NOT BE NEEDED.  I DON'T KNOW.  WE'LL SEE.

BENNETT REDIRECT BY MR. LEACH                                      5107

11:29AM  1           BUT THANK YOU FOR THAT.  I APPRECIATE YOU RAISING THAT.

11:29AM  2           SHOULD WE TALK ABOUT SOMETHING ELSE NOW WHILE WE -- WAS

11:30AM  3    THERE SOMETHING ELSE ABOUT THE NEXT WITNESS?

11:30AM  4               MR. LEACH:  THERE IS ANOTHER ISSUE WITH RESPECT TO

11:30AM  5    THE NEXT WITNESS, YOUR HONOR.

11:30AM  6               THE COURT:  WHY DON'T WE PREVIEW THAT NOW?

11:30AM  7               MR. LEACH:  I'LL PASS THE MIKE.

11:30AM  8               MR. CAZARES:  THANK YOU, YOUR HONOR.

11:30AM  9           IT'S RELATING TO AN EXHIBIT THAT THE GOVERNMENT NOTICED IT

11:30AM  10   INTENDED TO USE WITH MR. MOSLEY, AND MS. ESTRADA IS GOING TO

11:30AM  11   ADDRESS THIS ISSUE FOR MR. BALWANI.

11:30AM  12              THE COURT:  ALL RIGHT.  THANK YOU.

11:30AM  13              MS. ESTRADA:  GOOD MORNING, YOUR HONOR.

11:30AM  14          SHAWN ESTRADA ON BEHALF OF MR. BALWANI.

11:30AM  15          MAY I REMOVE MY MASK?

11:30AM  16              THE COURT:  YES.  THANK YOU.

11:30AM  17              MS. ESTRADA:  THANK YOU.

11:30AM  18          THE ISSUE WE WOULD LIKE TO ADDRESS BEFORE THE COURT

11:30AM  19   BRIEFLY TODAY RELATES TO EXHIBIT 2065.  I HAVE COPIES I CAN

11:30AM  20   PASS UP TO THE COURT.

11:30AM  21              THE COURT:  THANK YOU.

11:30AM  22              MS. ESTRADA:  I ASSUME THE GOVERNMENT HAS ONE.

11:30AM  23          (HANDING.)

11:31AM  24          EXHIBIT 2065 IS AN EMAIL CHAIN FROM OCTOBER OF 2014

11:31AM  25   BETWEEN MR. BALWANI, MS. HOLMES, AND MR. HOLMES.

BENNETT REDIRECT BY MR. LEACH                                5108

11:31AM   1         AND THE GOVERNMENT INTENDS TO OFFER IT THROUGH MR. MOSLEY,

11:31AM   2    WHO IS NOT A PARTY TO THIS EMAIL.

11:31AM   3         AND THIS IS AN EMAIL CHAIN REGARDING ACTION PLANNING IS

11:31AM   4    THE WORDS THAT MR. HOLMES USES, REGARDING BLOOD TESTING THAT

11:31AM   5    WAS GOING TO OCCUR FOR A PRIVATE EQUITY FIRM, BDT AT WALGREENS

11:31AM   6    IN RELATION TO A VIP MEETING THAT WAS GOING TO TAKE PLACE

11:31AM   7    BETWEEN BDT AND THERANOS.

11:31AM   8         AND WE WOULD OBJECT ON THE GROUNDS OF FOUNDATION, 403, AND

11:31AM   9    HEARSAY.

11:31AM  10         THERE ARE SOME STATEMENTS PARTICULARLY TOWARDS THE BOTTOM

11:31AM  11    OF PAGE 1 UNDERNEATH THE HEADER SCENARIO 1, THE LAST BULLET

11:31AM  12    POINT, THAT CONTAINS AN OFFHAND COMMENT MADE BY MR. HOLMES THAT

11:32AM  13    THE JURY COULD INFER SOMETHING NEFARIOUS THAT MR. BALWANI

11:32AM  14    EITHER CONDONED OR TOOK PART IN, AND WITHOUT ANY CONTEXT FROM

11:32AM  15    MR. MOSLEY, THAT -- THIS EMAIL IS INADMISSIBLE UNDER RULE 403,

11:32AM  16    AND I CAN ADDRESS THE HEARSAY ISSUE IN A MOMENT.

11:32AM  17         THE COURT:  I'M SORRY.  THIS IS UNDER THE NEGATIVES,

11:32AM  18    AND IT'S THE SECOND BULLET UNDER NEGATIVES?

11:32AM  19         MS. ESTRADA:  THAT'S CORRECT, YOUR HONOR.

11:32AM  20         THE COURT:  OKAY.

11:32AM  21         MS. ESTRADA:  SO THAT BULLET POINT IN PARTICULAR IS

11:32AM  22    PROBLEMATIC UNDER RULE 403, BUT ALSO FOR THE EMAIL CHAIN IN ITS

11:32AM  23    ENTIRETY.  MR. MOSLEY SIMPLY DOESN'T HAVE PERSONAL KNOWLEDGE OF

11:32AM  24    THIS EMAIL.

11:32AM  25         AND SO IF I CAN SPEAK A LITTLE MORE SPECIFICALLY ABOUT

11:32AM  1    MR. MOSLEY'S LACK OF ANY RELATIONSHIP TO THIS EMAIL?

11:32AM  2        SO AS I MENTIONED, THIS IS AN EMAIL FROM MR. HOLMES SENT

11:32AM  3    TO MR. BALWANI AND MS. HOLMES.  THIS IS NOT WORDS OR LANGUAGE

11:33AM  4    THAT MR. BALWANI USED.  THESE ARE MR. HOLMES'S WORDS.

11:33AM  5        AND NOTHING FROM THE FACE OF THE EMAIL SHOWS WHETHER

11:33AM  6    MR. BALWANI RESPONDED; WHETHER MR. BALWANI CONDONED WHAT

11:33AM  7    MR. HOLMES SUGGESTED HERE; WHAT, IF ANYTHING, MR. BALWANI SAID

11:33AM  8    IN A CONVERSATION EITHER BEFORE THE EMAIL OR AFTER THE EMAIL.

11:33AM  9        THERE'S NO CONTEXT THAT THE FACE OF THIS EMAIL CAN PROVIDE

11:33AM 10    BASED ON WHAT REACTION THAT MR. BALWANI, IF ANY, HAD TO THAT

11:33AM 11    PARTICULAR COMMENT OR TO THE EMAIL AS A WHOLE.

11:33AM 12        AND MR. MOSLEY, WHO IS NOT A PARTY TO THIS EMAIL, IS NOT

11:33AM 13    AN EMPLOYEE OF THERANOS, CERTAINLY CAN'T PROVIDE THAT CONTEXT.

11:33AM 14        AND FOR THAT PARTICULAR STATEMENT, AND THIS EMAIL AS A

11:33AM 15    WHOLE, TO BE PLACED BEFORE THE JURY WITHOUT ANY CONTEXT IS

11:34AM 16    PREJUDICIAL UNDER RULE 403.

11:34AM 17        AND IN ADDITION, YOUR HONOR, BECAUSE MR. MOSLEY LACKS

11:34AM 18    PERSONAL KNOWLEDGE OF THIS EMAIL IN PARTICULAR, AND ALSO THE

11:34AM 19    INNER WORKINGS OF THE BLOOD TESTS AND DEMO PROCESS AT THERANOS,

11:34AM 20    WE WOULDN'T HAVE ANY WAY OF MEANINGFULLY CROSS-EXAMINING HIM TO

11:34AM 21    PROVIDE THAT CONTEXT.  WE WOULDN'T BE ABLE TO ASK MR. MOSLEY,

11:34AM 22    WELL, DO YOU KNOW ANYTHING ABOUT WHAT HAPPENED IN THIS

11:34AM 23    CONVERSATION?

11:34AM 24        DO YOU KNOW ANYTHING ABOUT WHAT HAPPENED IN THIS

11:34AM 25    PARTICULAR DEMO?

11:34AM  1          DO YOU KNOW ANYTHING ABOUT WHAT HAPPENED AT WALGREENS?

11:34AM  2          DO YOU KNOW ANYTHING ABOUT WHAT MR. BALWANI MAY HAVE SAID

11:34AM  3     IN RESPONSE TO THIS, EITHER VIA EMAIL OR IN PERSON?

11:34AM  4          MR. MOSLEY JUST SIMPLY WOULDN'T KNOW THAT.

11:34AM  5          AND SO THAT LACK OF PERSONAL KNOWLEDGE MEANS THAT IT'S NOT

11:34AM  6     APPROPRIATE FOR THIS EXHIBIT TO COME IN THROUGH HIM.

11:34AM  7               THE COURT:  OKAY.  THANK YOU.

11:35AM  8          SO MR. MOSLEY WAS AN INVESTOR, I BELIEVE.  IS THAT RIGHT?

11:35AM  9               MS. ESTRADA:  THAT'S CORRECT, YOUR HONOR.

11:35AM 10               THE COURT:  AND HE WAS PART OF THE BDT GROUP THAT

11:35AM 11     WAS -- THE EVIDENCE MAY SHOW THIS -- THAT WAS GOING TO BE

11:35AM 12     TESTED?  THIS VIP, HE'S PART OF THE VIP TOUR?

11:35AM 13               MS. ESTRADA:  SO ACTUALLY, YOUR HONOR, WHAT IS

11:35AM 14     CONFUSING ABOUT THIS IS THAT MR. MOSLEY WORKS AT BDT CURRENTLY,

11:35AM 15     BUT AT THE TIME HE DID NOT.

11:35AM 16          HE WAS AN ATTORNEY AT THE CRAVATH FIRM.  I EXPECT THAT

11:35AM 17     MR. MOSLEY WILL TESTIFY THAT HE HAD MANY CONVERSATIONS WITH HIS

11:35AM 18     CLIENTS WHO INVESTED IN THERANOS, OR AT THE VERY LEAST WERE

11:35AM 19     INVOLVED IN CONVERSATIONS AND MEETINGS WITH MS. HOLMES, BUT

11:35AM 20     BDT -- IT'S MY UNDERSTANDING THAT WHAT MR. MOSLEY WILL TESTIFY

11:35AM 21     TO IS THAT HE DOESN'T KNOW WHETHER OR NOT BDT TESTIFIED.  BDT

11:36AM 22     WAS NOT ONE OF HIS CLIENTS.

11:36AM 23          AS FAR AS I'M AWARE, THE ONLY CONNECTION BETWEEN

11:36AM 24     MR. MOSLEY AND BDT AND THERANOS IS THAT HE ATTENDED A

11:36AM 25     CONFERENCE PRIOR TO, AND THAT'S HOW HE MET MS. HOLMES.

BENNETT REDIRECT BY MR. LEACH                                    5111

11:36AM  1          BUT THERE'S NO FOUNDATION THAT I THINK THAT MR. MOSLEY

11:36AM  2     WILL BE ABLE TO LAY LINKING HIS KNOWING MR. TROTT, KNOWING

11:36AM  3     PEOPLE THAT WORKED AT BDT, ATTENDING THAT CONFERENCE, TO THIS

11:36AM  4     PARTICULAR EMAIL ABOUT BLOOD TESTING THAT WAS DONE AT

11:36AM  5     WALGREENS.

11:36AM  6          THE COURT:  OKAY.  AND SO HE WASN'T A VIP WHO

11:36AM  7     ATTENDED THIS?

11:36AM  8          MS. ESTRADA:  NOT THIS -- MR. MOSLEY IS A VIP WHO

11:36AM  9     HAD ATTENDED MEETINGS OF HIS OWN, BUT NOT THIS ONE, NO.

11:36AM 10          THE COURT:  I SEE.

11:36AM 11          MS. ESTRADA:  AND MR. MOSLEY HAD -- I EXPECT THAT HE

11:36AM 12     WILL TESTIFY THAT HE RECEIVED BLOOD TESTING FROM WALGREENS

11:36AM 13     HIMSELF, BUT IN JUNE OF 2015, AND THIS IS IN OCTOBER OF 2014.

11:36AM 14          THE COURT:  OKAY.  THANK YOU.

11:37AM 15          ON THE BOTTOM OF THE SHEET THAT I HAVE, IT SAYS FROM

11:37AM 16     SUNNY BALWANI.  IS THAT AN EMAIL?

11:37AM 17          MS. ESTRADA:  OH, THAT'S AN EMAIL --

11:37AM 18          THE COURT:  NEXT TO THE TOP.

11:37AM 19          MS. ESTRADA:  -- ON THE SECOND PAGE, YOUR HONOR.

11:37AM 20          THE COURT:  IS THAT RELATED TO THIS CHAIN?

11:37AM 21          MS. ESTRADA:  SO AS I UNDERSTAND IT, THIS CHAIN

11:37AM 22     CONTAINS ON PAGE 2 AN EMAIL FROM CHRISTIAN HOLMES, AND THEN

11:37AM 23     MR. BALWANI WRITES THE NEXT EMAIL UP THAT SAYS, "DIANA, CAN YOU

11:37AM 24     SEND CHRISTIAN," AND SO ON.

11:37AM 25          AND THEN MR. HOLMES -- THIS EMAIL THAT TAKES UP PRETTY

11:37AM  1    MUCH THE WHOLE FIRST PAGE IS FROM MR. HOLMES.

11:37AM  2          THE COURT:  OKAY.  DOES THAT HAVE ANYTHING TO DO

11:37AM  3    WITH THE ANALYSIS, THAT IS, THAT MR. BALWANI IS IN THE MIDDLE

11:37AM  4    OF THE CHAIN?

11:37AM  5          MS. ESTRADA:  I DON'T THINK SO, YOUR HONOR, BECAUSE

11:37AM  6    IN THIS CHAIN -- OR IN THIS EMAIL THAT MR. BALWANI SENDS, IT

11:37AM  7    APPEARS THAT HE'S JUST SIMPLY ASKING HIS ASSISTANT, DIANA LEE,

11:37AM  8    TO SEND PLAINTIFF A LIST OF PEOPLE FROM BDT WHO VISITED A FEW

11:37AM  9    DAYS BACK.

11:38AM 10          AND SO MR. HOLMES THEN RESPONDS WITH -- I'M READING FROM

11:38AM 11    THE BEGINNING OF THE EMAIL, "SEND ALONG OUR THOUGHTS FOR HOW TO

11:38AM 12    ACCOMPLISH," AND THEN HE CONTINUES WITH BASICALLY HOW TO

11:38AM 13    ACCOMPLISH THE PLAN, AND WHAT HE LAYS OUT AS DIFFERENT

11:38AM 14    SCENARIOS FOR BLOOD TESTING AT WALGREENS THAT BDT IS TO

11:38AM 15    EXPERIENCE.

11:38AM 16          SO THOSE REALLY AREN'T RELATED.

11:38AM 17          THE COURT:  OKAY.  THANK YOU.

11:38AM 18          MR. SCHENK.

11:38AM 19          MR. SCHENK:  YES, YOUR HONOR, A FEW THOUGHTS.

11:38AM 20          FIRST, LET ME START WHERE THE COURT FINISHED, AND THAT IS

11:38AM 21    THAT MR. BALWANI IS ON THIS EMAIL CHAIN WHERE MS. HOLMES,

11:38AM 22    MR. HOLMES, AND THE DEFENDANT ARE DISCUSSING HOW TO DECEIVE

11:38AM 23    FOLKS FROM BDT.

11:38AM 24          AT THE VERY LEAST, THIS EXHIBIT, 2065, IS ADMISSIBLE FOR

11:38AM 25    NOTICE TO MR. BALWANI, THAT IS, FOR KNOWLEDGE AND INTENT TO

| | | |
|---|---|---|
| 11:38AM | 1 | MR. BALWANI. |
| 11:38AM | 2 | IT IS ADMISSIBLE, THOUGH, BEYOND THAT.  IT IS ADMISSIBLE |
| 11:38AM | 3 | FOR ITS TRUTH, AND IT IS ADMISSIBLE FOR THAT REASON UNDER |
| 11:39AM | 4 | 803(6), THE BUSINESS RECORD EXCEPTION. |
| 11:39AM | 5 | AND LET ME EXPLAIN.  FIRST, THE COURT -- I AGREE WITH THE |
| 11:39AM | 6 | FACTUAL RECITATION THAT THE COURT JUST HEARD ABOUT WHAT |
| 11:39AM | 7 | MR. MOSLEY WOULD LIKELY SAY ABOUT THIS EMAIL, AND THAT IS, I |
| 11:39AM | 8 | DIDN'T WORK AT BDT AT THE TIME, AND I WAS NOT A PART OF THE |
| 11:39AM | 9 | GROUP OF INDIVIDUALS REFERENCED IN THIS EMAIL THAT WERE GOING |
| 11:39AM | 10 | TO VISIT A WALGREENS STORE. |
| 11:39AM | 11 | HE WASN'T PART OF THAT GROUP. |
| 11:39AM | 12 | MR. MOSLEY RECEIVED A SEPARATE PITCH AND A SEPARATE TEST, |
| 11:39AM | 13 | THE DEFENSE IS CORRECT, ON DIFFERENT DATES. |
| 11:39AM | 14 | BUT IT IS STILL ADMISSIBLE AS A BUSINESS RECORD, AND THAT |
| 11:39AM | 15 | IS BECAUSE THE COURT HAS HEARD SUFFICIENT BUSINESS RECORD |
| 11:39AM | 16 | FOUNDATION ON THIS EXACT ISSUE FROM PRIOR WITNESSES. |
| 11:39AM | 17 | THE DEFENSE THEMSELVES HAVE ESTABLISHED THE BUSINESS |
| 11:39AM | 18 | RECORD FOUNDATION THROUGH DAN EDLIN ON APRIL 13TH.  THAT'S AT |
| 11:39AM | 19 | PAGE 2598 OF THE TRANSCRIPT. |
| 11:39AM | 20 | THE GOVERNMENT ESTABLISHED BUSINESS RECORD -- I'M SORRY. |
| 11:40AM | 21 | THE DEFENSE ESTABLISHED BUSINESS RECORD FOUNDATION THROUGH |
| 11:40AM | 22 | DR. ROSENDORFF ON APRIL 22ND ON PAGE 3546 OF THE TRANSCRIPT. |
| 11:40AM | 23 | SO TWO INSTANCES, EDLIN AND ROSENDORFF, THE COURT HAS |
| 11:40AM | 24 | ALREADY HEARD THE BUSINESS RECORDS FOUNDATION THROUGH THE |
| 11:40AM | 25 | DEFENSE. |

BENNETT REDIRECT BY MR. LEACH 5114

11:40AM 1     THERE ARE SEVERAL OTHER CITES THAT THE GOVERNMENT PROVIDED

11:40AM 2  BUSINESS RECORDS FOUNDATION, AND THAT WAS EDLIN ON THE 6TH OF

11:40AM 3  APRIL, PAGES 2379 THROUGH 2380.

11:40AM 4     THE GOVERNMENT ALSO PROVIDED BUSINESS RECORD FOUNDATION

11:40AM 5  THROUGH DR. ROSENDORFF ON APRIL 20TH ON PAGE 3273 OF THE

11:40AM 6  TRANSCRIPT.

11:40AM 7     SO FOUR INSTANCES THE COURT HAS ALREADY HEARD BUSINESS

11:40AM 8  RECORD FOUNDATION FOR THIS TYPE OF EMAIL.

11:40AM 9     I CAN GO FURTHER, THOUGH.

11:40AM 10    THIS EXACT SITUATION, THAT IS, AN INTERNAL THERANOS EMAIL

11:40AM 11  BEING OFFERED TO A WITNESS WHO IS NOT ON THAT EMAIL, WAS DONE

11:41AM 12  BY THE DEFENSE.  I CAN PASS UP THE EXHIBIT, AND I'LL PASS UP

11:41AM 13  THE TRANSCRIPT.

11:41AM 14    THE DEFENSE DID THAT THROUGH DR. ROSENDORFF ON APRIL 22ND.

11:41AM 15  THE EXHIBIT NUMBER WAS 7314, AND IT'S ON PAGE 3559 OF THE

11:41AM 16  TRANSCRIPT.

11:41AM 17    SO I'M HANDING UP NOW -- (HANDING.)

11:41AM 18    I'M PASSING UP TO THE COURT A PORTION OF THE TRANSCRIPT

11:41AM 19  AND THE EXHIBIT WHERE MR. COOPERSMITH, DURING DR. ROSENDORFF'S

11:41AM 20  TESTIMONY, ADMITTED EXHIBIT 7314.  THE COURT HAS A COPY NOW OF

11:41AM 21  7314.  THAT IS ONE EMAIL.  IT'S TWO PAGES.

11:41AM 22    THE RECIPIENTS ON THE EMAIL ARE MS. HOLMES AND

11:41AM 23  MR. BALWANI.  THE SENDER WAS DR. YOUNG.

11:41AM 24    DR. ROSENDORFF WAS ON THE STAND.  AND YOU CAN SEE FROM THE

11:42AM 25  PORTION OF THE TRANSCRIPT THAT I PASSED UP MR. COOPERSMITH'S

BENNETT REDIRECT BY MR. LEACH                    5115

11:42AM 1   ARGUMENTS TO THE COURT ARE PRECISELY WHAT WE'RE DEALING WITH

11:42AM 2   RIGHT NOW, AND THAT IS, IT DOESN'T MATTER THAT THE WITNESS WHO

11:42AM 3   IS ON THE STAND WASN'T ON THE EMAIL, THE EMAIL ITSELF APPEARS

11:42AM 4   TO BE A BUSINESS RECORD.

11:42AM 5       AND THE COURT OVERRULED THE GOVERNMENT'S OBJECTION AND

11:42AM 6   ADMITTED THE DOCUMENT AS A BUSINESS RECORD.

11:42AM 7       SO THE COURT SHOULD ADMIT 2065, THE EMAIL WE'RE NOW

11:42AM 8   DISCUSSING, AS A BUSINESS RECORD BECAUSE IT'S HEARD SUFFICIENT

11:42AM 9   FOUNDATION THROUGH TWO PRIOR WITNESSES, AND A PARTICULAR

11:42AM 10  WITNESS ON THE STAND IS NOT RELEVANT TO THE ANALYSIS, PURSUANT

11:42AM 11  TO THIS PRIOR INSTANCE THAT I'VE PROVIDED TO THE COURT,

11:42AM 12  DR. ROSENDORFF AND AN EMAIL THAT DR. ROSENDORFF WASN'T ON.

11:42AM 13      THE DEFENSE'S ARGUMENT TO THE COURT JUST A MOMENT AGO WHEN

11:42AM 14  SHE DESCRIBED THE CONTENT OF THE EMAIL WAS THESE ARE VIP'S

11:42AM 15  GETTING A BLOOD TEST, AND THAT'S PRECISELY WHAT SOME OF THE

11:43AM 16  BUSINESS RECORD CITATIONS I'VE PROVIDED TO THE COURT DEALT

11:43AM 17  WITH; THAT IS, EDLIN AND ROSENDORFF EXPLAIN TO THIS JURY THAT

11:43AM 18  EMAILS WITHIN THERANOS WERE USED TO ARRANGE AND PROVIDE THE

11:43AM 19  CIRCUMSTANCES AND SETUPS FOR THESE KIND OF VIP DEMOS.

11:43AM 20      SO THE COURT HAS AND THIS JURY ALSO HAS A SUFFICIENT BASIS

11:43AM 21  TO ADMIT THIS EMAIL AS A BUSINESS RECORD.

11:43AM 22      LET ME TOUCH JUST BRIEFLY ON THE 403 QUESTION.  THE COURT

11:43AM 23  SHOULD ADMIT IT AS NONHEARSAY, BUT ALSO IT HAS TO APPRECIATE

11:43AM 24  WHETHER THE EMAIL IS TOO PREJUDICIAL.

11:43AM 25      AND THE FACT OF THE MATTER IS THAT IT IS NOT TOO

11:43AM   1    PREJUDICIAL.  IT GOES TO THE HEART OF THE ISSUE THAT THE TWO

11:43AM   2    SIDES HAVE BEEN ASKING THIS JURY TO WRESTLE WITH, AND THAT IS,

11:43AM   3    WHAT DO INDIVIDUALS KNOW WHEN THEY RECEIVE DEMONSTRATIONS, WHEN

11:43AM   4    VIP'S RECEIVE BLOOD TESTS?

11:43AM   5         AND WHEN MR. BALWANI IS ON THIS EMAIL CHAIN WHERE IT

11:44AM   6    APPEARS WHAT MR. HOLMES WRITES PURSUANT TO INSTRUCTIONS FROM

11:44AM   7    ELIZABETH HOLMES, WE KNOW THAT THESE INDIVIDUALS MUST RECEIVE A

11:44AM   8    FINGERSTICK, AND IF CERTAIN TESTS NEED TO BE REMOVED IN ORDER

11:44AM   9    TO GENERATE A FINGERSTICK, FINE, SO BE IT, DO THAT, BUT LET'S

11:44AM  10    ANALYZE THE WAYS IN WHICH THE RECIPIENTS OF THE FINGERSTICK

11:44AM  11    MIGHT BECOME AWARE OF THE FACT THAT CERTAIN TESTS WERE REMOVED

11:44AM  12    IN ORDER TO GENERATE THE FINGERSTICK TEST.

11:44AM  13         AND THE ADVICE HERE, THERE'S A FEW OF THEM, THE COURT SEES

11:44AM  14    UNDER SCENARIO 1 THERE'S CASE A AND CASE B.  AND WHAT IS

11:44AM  15    ANALYZED IS THE BENEFITS OR THE ADVANTAGES AND DISADVANTAGES TO

11:44AM  16    EACH APPROACH, AND ONE OF THE RISKS OR NEGATIVES TO ONE OF THE

11:44AM  17    APPROACHES IS THAT THEY MIGHT ACTUALLY HAVE TO PHYSICALLY

11:44AM  18    DISTRACT BDT FROM LOOKING AT THE RECEIPT SO THAT THEY DON'T

11:44AM  19    NOTICE THAT CERTAIN TESTS WERE REMOVED.

11:44AM  20         I AGREE IT'S PREJUDICIAL, BUT THAT'S WHAT MAKES IT

11:44AM  21    RELEVANT.

11:44AM  22         IT IS NOT UNFAIRLY PREJUDICIAL BECAUSE, AGAIN, THIS IS THE

11:45AM  23    HEART OF ONE OF THE ISSUES THAT THE PARTIES HAVE BEEN ASKING

11:45AM  24    THIS JURY TO WRESTLE WITH, AND THAT JUST MAKES THIS EMAIL MORE

11:45AM  25    RELEVANT.

BENNETT REDIRECT BY MR. LEACH                                              5117

11:45AM   1                    THE COURT:  THANK YOU.

11:45AM   2              MS. ESTRADA.

11:45AM   3                    MS. ESTRADA:  YES, YOUR HONOR.

11:45AM   4              SO THE DIFFERENCE BETWEEN WHAT MR. SCHENK JUST DESCRIBED

11:45AM   5        AND THIS EMAIL IS EXHIBIT 7314 AS ADMITTED THROUGH

11:45AM   6        DR. ROSENDORFF IS THAT DR. ROSENDORFF WAS A THERANOS EMPLOYEE.

11:45AM   7              WE -- THE GOVERNMENT WOULD HAVE BEEN ABLE, AFTER WE

11:45AM   8        ADMITTED THIS EXHIBIT, TO ASK QUESTIONS OF DR. ROSENDORFF ABOUT

11:45AM   9        WHAT WAS CONTAINED IN THIS EMAIL.

11:45AM  10              BUT MR. MOSLEY IS NOT AN EMPLOYEE OF THERANOS, AND SO HE

11:45AM  11        DOESN'T HAVE THE PERSONAL KNOWLEDGE TO ALLOW ANY MEANINGFUL

11:45AM  12        CROSS-EXAMINATION OF EXHIBIT 2065.

11:45AM  13              AND IN ADDITION TO THAT, YOUR HONOR, THE WITNESS ON THE

11:45AM  14        STAND HAS TO BE ABLE TO LAY THE FOUNDATION FOR A BUSINESS

11:45AM  15        RECORD.

11:45AM  16              MR. EDLIN WAS ABLE TO LAY THE FOUNDATION WITH RESPECT TO

11:46AM  17        BUSINESS RECORDS THAT -- BECAUSE HE WORKED AT THE COMPANY.  HE

11:46AM  18        WAS FAMILIAR WITH HOW EMAIL WAS USED WITH RESPECT TO VIP DEMOS.

11:46AM  19              SAME WITH DR. ROSENDORFF.

11:46AM  20              BUT MR. MOSLEY IS NOT AN EMPLOYEE OF THERANOS, AND HE

11:46AM  21        HAS -- HE'S NOT ABLE TO LAY THAT FOUNDATION.  HE DOESN'T HAVE

11:46AM  22        THE PERSONAL KNOWLEDGE.

11:46AM  23                    THE COURT:  SO, SO LET ME STOP YOU THERE AND ASK

11:46AM  24        MR. SCHENK THAT.

11:46AM  25              THAT WAS A THOUGHT THAT I HAD.  IRRESPECTIVE OF THE FACT

ER-3793

BENNETT REDIRECT BY MR. LEACH                                    5118

11:46AM  1    THAT PREVIOUS SCENARIOS LIKE THIS HAVE COME UP AND THE COURT

11:46AM  2    HAS ADMITTED OTHER DOCUMENTS UNDER THE 803(6) EXCEPTION, HOW,

11:46AM  3    HOW WOULD THAT WORK WITH THIS WITNESS IF HE LACKS THAT

11:46AM  4    KNOWLEDGE, OR WHAT FOUNDATION WOULD YOU LAY FOR THAT?

11:46AM  5            MR. SCHENK:  I WOULD LAY NO FOUNDATION FOR THE EMAIL

11:46AM  6    THROUGH MR. MOSLEY.  HE COULD NOT PROVIDE THAT FOUNDATION.

11:46AM  7        SO IF THE DEFENSE IS CORRECT THAT EVERY TIME YOU ADMIT A

11:46AM  8    BUSINESS RECORD, THE WITNESS ON THE STAND MUST BE REQUIRED TO

11:46AM  9    LAY THE BUSINESS RECORD FOUNDATION, I FAIL THAT TEST AND THE

11:47AM  10   COURT SHOULD EXCLUDE THIS EMAIL.

11:47AM  11       THAT'S NOT THE TEST, THOUGH.  THAT IS A DISTINCTION

11:47AM  12   WITHOUT A DIFFERENCE.

11:47AM  13       THE DEFENSE'S ARGUMENT IS BASED ON THE ABILITY TO

11:47AM  14   MEANINGFULLY CROSS THE WITNESS ON THE CONTENT OF THIS EMAIL

11:47AM  15   AND, FRANKLY, IT'S A DISTINCTION WITHOUT A DIFFERENCE THAT

11:47AM  16   ADAM ROSENDORFF WORKED AT THERANOS AND, THEREFORE, AN EMAIL

11:47AM  17   SENT AMONG OTHER INDIVIDUALS STILL GAVE HIM THE OPPORTUNITY TO

11:47AM  18   MEANINGFULLY CROSS OR EXAMINE DR. ROSENDORFF ABOUT THE EMAIL

11:47AM  19   BECAUSE HE ALSO WORKED AT THERANOS -- NO, IT DOES NOT WORK THAT

11:47AM  20   WAY.

11:47AM  21       EITHER YOU MEET THE HEARSAY EXCEPTION AND THE EMAIL COMES

11:47AM  22   IN, OR IT DOESN'T.

11:47AM  23       BUT THE TEST IS NOT WHETHER MEANINGFUL CROSS CAN BE

11:47AM  24   CONDUCTED BASED UPON WHO'S ON THE STAND.

11:47AM  25       AND I THINK THAT BECAUSE THE COURT HAS HEARD SUFFICIENT

ER-3794

11:47AM  1    EVIDENCE REGARDING THE WAY THERANOS EMAILS WERE USED, AND IN

11:47AM  2    PARTICULAR FOR ARRANGING VIP BLOOD TESTS, IT CAN ADMIT THE

11:47AM  3    EMAIL AS A BUSINESS RECORD.

11:48AM  4         IT DOES NOT NEED, EACH TIME THAT AN EMAIL IS PROFFERED,

11:48AM  5    THE PARTICULAR WITNESS TO RE-LAY THAT BUSINESS RECORD

11:48AM  6    FOUNDATION BECAUSE WE HAVE THE AUTHENTICITY STIP.

11:48AM  7              THE COURT:  YES, THAT'S RIGHT.  THERE'S AN

11:48AM  8    AUTHENTICITY STIP AS TO THIS -- THAT WAS MY NEXT QUESTION --

11:48AM  9    AND THIS FALLS UNDER THAT STIPULATION THAT THE PARTIES MADE.

11:48AM  10   THERE'S A BATE STAMP AND THE AUTHENTICITY IS THERE.

11:48AM  11        THE NEXT STEP, I THINK, MR. SCHENK, YOU'RE SAYING IS THAT,

11:48AM  12   NO, CERTAINLY THIS WITNESS CAN'T LAY A FOUNDATION FOR THIS.

11:48AM  13   HE'S NOT ALLOWED TO DO THAT.

11:48AM  14        BUT THE COURT SHOULD LOOK AT PRIOR TESTIMONY, PRIOR

11:48AM  15   SIMILAR TESTIMONY ABOUT SIMILAR EMAILS.

11:48AM  16        AND WHAT IS WRONG WITH THAT PROCESS, MS. ESTRADA?  WHY

11:48AM  17   CAN'T THE COURT DO THAT?

11:48AM  18              MS. ESTRADA:  I THINK BECAUSE THIS IS A SLIGHTLY

11:48AM  19   DIFFERENT EMAIL ALSO FROM THE EMAILS THAT MR. SCHENK HAS

11:48AM  20   REFERENCED.

11:48AM  21        MR. EDLIN TESTIFIED ABOUT VIP DEMONSTRATIONS THAT TOOK

11:48AM  22   PLACE AT THERANOS, OR IN SOME CASES HE TALKED ABOUT VIP

11:49AM  23   DEMONSTRATIONS THAT OCCURRED IN NEW YORK AND CHICAGO.

11:49AM  24        BUT FOR THE MOST PART, HE TALKED ABOUT VIP DEMONSTRATIONS

11:49AM  25   WHERE A VIP CAME TO THERANOS AND HAD THEIR BLOOD TESTED THERE,

BENNETT REDIRECT BY MR. LEACH                    5120

11:49AM  1    OR IN SOME CASES JUST SAW THE TECHNOLOGY BEING DEMONSTRATED.

11:49AM  2         AND THEN THIS EMAIL FROM DR. ROSENDORFF IS RELATED TO

11:49AM  3    PATIENTS, NON-VIP'S, WHO MAY HAVE GONE TO WALGREENS ON THEIR

11:49AM  4    OWN.

11:49AM  5         BUT THIS IS SLIGHTLY DIFFERENT.  THIS IS A MIXTURE OF SORT

11:49AM  6    OF THE TWO, A VIP WHO WAS IN COMMUNICATIONS WITH MS. HOLMES

11:49AM  7    GOING TO WALGREENS AND HAD THEIR -- HAVING THEIR BLOOD TESTED

11:49AM  8    THERE.

11:49AM  9         AND SO WITH RESPECT TO THIS PARTICULAR EMAIL, I'M NOT

11:49AM 10    HEARING FROM THE GOVERNMENT WHY THIS SHOULD BE ADMITTED THROUGH

11:49AM 11    MR. MOSLEY, WHO DOES NOT HAVE PERSONAL KNOWLEDGE.

11:49AM 12         AND IN ADDITION TO THAT, YOUR HONOR, IF THIS EMAIL IS

11:49AM 13    ADMITTED THROUGH MR. MOSLEY AND NOT THROUGH SOMEONE, SAY,

11:50AM 14    MR. HOLMES, WHO WAS THE WRITER OF THIS EMAIL WHO HAS THE MOST

11:50AM 15    PERSONAL KNOWLEDGE ABOUT WHAT TOOK PLACE, IT WOULD SHIFT THE

11:50AM 16    BURDEN TO THE DEFENSE TO CALL A WITNESS TO PROVIDE CONTEXT, AND

11:50AM 17    IT WOULD JUST LEAVE THE JURY WITH THIS MISIMPRESSION THAT THIS

11:50AM 18    OFF-HAND COMMENT FROM MR. HOLMES WAS IMPUTED ON TO MR. BALWANI.

11:50AM 19         THE COURT:  WELL, THANK YOU.

11:50AM 20         BUT THERE IS EVIDENCE ABOUT TESTS AND VIP TESTING.

11:50AM 21         AND MR. SCHENK TELLS US THAT THE RECORD SHOWS THAT, THAT

11:50AM 22    THAT WAS SOMETHING THAT WAS NOT UNCOMMON FOR THE COMPANY TO

11:50AM 23    ENGAGE IN, AND THIS IS JUST ANOTHER ONE OF THOSE.

11:50AM 24         AND HE SUGGESTS THAT IT SHOULD COME IN AS A BUSINESS

11:50AM 25    RECORD BECAUSE IT SPEAKS TO THAT, THAT CONTINUED COURSE OF

11:50AM 1    CONDUCT.

11:50AM 2        SO THERE'S THAT.

11:50AM 3        AND THEN MR. SCHENK SAYS, AT A MINIMUM, IF IT DOESN'T COME

11:51AM 4    IN UNDER 803(6), IT SHOULD COME IN AS TO NOTICE OF YOUR CLIENT.

11:51AM 5        AND WHAT IS YOUR THOUGHT ON THAT?

11:51AM 6        MS. ESTRADA:  YES, YOUR HONOR.

11:51AM 7        IF I MAY, JUST ONE MORE THING ABOUT THE BUSINESS RECORD

11:51AM 8    EXCEPTION.

11:51AM 9        THE FOUNDATION HAS TO BE LAID FOR EACH DOCUMENT THROUGH

11:51AM 10   EACH WITNESS THAT IT IS PROVIDED, AND MR. MOSLEY SIMPLY WON'T

11:51AM 11   BE ABLE TO LAY THAT FOUNDATION.

11:51AM 12       AND WITH REGARD TO NOTICE TO MR. BALWANI, I THINK THE ONLY

11:51AM 13   WAY THAT THIS PARTICULAR EMAIL, THESE WORDS FROM MR. HOLMES,

11:51AM 14   FOR THAT TO BE RELEVANT TO NOTICE TO MR. BALWANI, IT HAS TO BE

11:51AM 15   OFFERED FOR THE TRUTH OF THE MATTER ASSERTED, THAT, IN FACT,

11:51AM 16   THIS IS WHAT OCCURRED DURING THIS VIP DEMO AT WALGREENS WITH

11:51AM 17   BDT.

11:51AM 18       AND SO FOR THIS PLAN THAT MR. HOLMES PUTS FORTH, WITHOUT

11:51AM 19   ANY CONTEXT REGARDING WHAT MR. BALWANI'S RESPONSE WAS OR WHAT

11:52AM 20   ACTUALLY HAPPENED, BECAUSE MR. MOSLEY WON'T BE ABLE TO TESTIFY

11:52AM 21   TO THAT, THAT -- THEN THESE STATEMENTS WOULD BE TAKEN FOR THE

11:52AM 22   TRUTH OF THE MATTER ASSERTED, THAT THIS IS WHAT MR. HOLMES

11:52AM 23   COMMUNICATED TO MR. BALWANI, THIS IS THE PLAN THAT SHOULD TAKE

11:52AM 24   PLACE, AND THAT'S IMPERMISSIBLE.

11:52AM 25       THE COURT:  WELL, IT'S MR. HOLMES SAYING TO

11:52AM 1    MR. BALWANI, HERE'S HOW WE'LL DO THIS, HERE'S OUR THOUGHTS ON

11:52AM 2    HOW TO DO THIS.

11:52AM 3        SHOULDN'T THAT COME IN, AT A MINIMUM, FOR NOTICE TO

11:52AM 4    MR. BALWANI THAT MR. HOLMES, WHO IS IN CHARGE OF THE VIP

11:52AM 5    TESTINGS, OR WHATEVER, VISITS, WAS PLANNING THIS SCENARIO FOR

11:52AM 6    THIS PARTICULAR VISIT, AND HE'S REPORTING TO HIS COO?

11:52AM 7        MS. ESTRADA:  BUT WITHOUT ANY ABILITY TO

11:52AM 8    MEANINGFULLY CROSS-EXAMINE THE WITNESS WHO IS THE PROPONENT OF

11:53AM 9    THIS EXHIBIT AS TO WHETHER OR NOT MR. BALWANI RESPONDED TO THIS

11:53AM 10   PLAN FROM MR. HOLMES THAT SOUNDS NEFARIOUS, TO DISTRACT THE

11:53AM 11   VIP'S FROM LOOKING AT THE RECEIPT, WITHOUT ANY ABILITY TO

11:53AM 12   MEANINGFULLY CROSS-EXAMINE ON THAT, THAT'S PREJUDICIAL.  THAT

11:53AM 13   WOULD LEAVE THE JURY WITH A MISIMPRESSION ABOUT WHAT MAY HAVE

11:53AM 14   OCCURRED AFTER THIS EMAIL.

11:53AM 15       THE COURT:  OKAY.

11:53AM 16     MR. SCHENK.

11:53AM 17       MR. SCHENK:  YES.  A FEW THOUGHTS, THANK YOU,

11:53AM 18   YOUR HONOR.

11:53AM 19       FIRST, EVERY EMAIL, BY THAT LOGIC, REQUIRES THE

11:53AM 20   OPPORTUNITY TO ASK THE WITNESS IF FURTHER EMAILS WERE SENT.

11:53AM 21   EVERY SINGLE EMAIL SUFFERS FROM THAT SAME CRITIQUE.

11:53AM 22       SECOND, THERE IS NO BURDEN SHIFTING THAT IS OCCURRING

11:53AM 23   HERE.

11:53AM 24       THE DEFENSE IS FREE TO STAND ON WHETHER THE GOVERNMENT MET

11:53AM 25   ITS BURDEN, AND IN ORDER TO MEET OUR BURDEN, WE GET TO OFFER

11:53AM 1    ADMISSIBLE RELEVANT EVIDENCE SUCH AS THIS.

11:53AM 2         THE DEFENSE DOES NOT HAVE AN OBLIGATION TO RESPOND TO

11:53AM 3    THIS, TO EXPLAIN HOW MR. BALWANI FELT ABOUT THIS.  NONE OF

11:54AM 4    THOSE THINGS ARE REQUIRED THROUGH THE ADMISSION OF THIS

11:54AM 5    DOCUMENT.

11:54AM 6         AGAIN, THE SAME LOGIC WOULD APPLY TO THE TEXT MESSAGES.

11:54AM 7         THE GOVERNMENT, THE COURT HAS SEEN, INTRODUCES TEXT

11:54AM 8    MESSAGES THROUGH WITNESSES WHO ARE NOT A PART OF THOSE TEXT

11:54AM 9    MESSAGES, A PREVIOUSLY ADMITTED EXHIBIT, BUT ASKS QUESTIONS OF

11:54AM 10   WITNESSES WHO WERE NOT A PART OF THAT TEXT MESSAGE.

11:54AM 11        AND BY THAT SAME LOGIC THE DEFENSE JUST PROPOUNDED, THE

11:54AM 12   GOVERNMENT SHOULD NOT BE ALLOWED TO DO THAT BECAUSE THEY CANNOT

11:54AM 13   MEANINGFULLY ASK MR. MOSLEY OR MR. JHAVERI WHAT WAS MEANT BY

11:54AM 14   SOME TEXT MESSAGE THAT THEY WEREN'T A PARTY TO.

11:54AM 15        SO FOLLOW-UP MEANINGFUL CROSS IS NOT THE LITMUS TEST.

11:54AM 16   IT'S NOT THE MEASURE OF WHETHER THE COURT SHOULD ADMIT A

11:54AM 17   PARTICULAR DOCUMENT.

11:54AM 18        AND FINALLY, THE COURT IS RIGHT, AT A MINIMUM, THE

11:54AM 19   DOCUMENT COMES IN BECAUSE IT IS NOTICE TO THE DEFENDANT, AND IT

11:54AM 20   DOESN'T NEED TO COME IN FOR ITS TRUTH IN ORDER TO ACCOMPLISH

11:54AM 21   THAT.

11:54AM 22        IN FACT, WE DON'T KNOW WHETHER BDT WENT TO WALGREENS AND

11:55AM 23   HAD THE TEST.

11:55AM 24        SO EVEN IF THE COURT ADMITTED THIS AS A BUSINESS RECORD,

11:55AM 25   THE GOVERNMENT COULDN'T MAKE ARGUMENTS WITHOUT FURTHER EVIDENCE

ER-3799

11:55AM 1    THAT THE EVENTS IN THIS EMAIL CAME TO PASS.

11:55AM 2         THE RELEVANCE OF THE EMAIL IS THE FACT THAT THIS IS BEING

11:55AM 3    DISCUSSED, THAT DECEPTION IS BEING DISCUSSED.  THAT'S WHAT IS

11:55AM 4    RELEVANT, NOT THAT BDT WENT TO WALGREENS AND THAT THEY WERE

11:55AM 5    THEN DISTRACTED AND THEN HOW DID THEY FEEL ABOUT THAT?

11:55AM 6         THE GOVERNMENT WOULD HAVE TO, I ACKNOWLEDGE, CALL

11:55AM 7    ADDITIONAL WITNESSES, EVEN IF THE COURT ADMITTED THIS AS A

11:55AM 8    BUSINESS RECORD.  ITS RELEVANCE DOES NOT TURN ON THE COURT

11:55AM 9    ADMITTING IT FOR THE TRUTH.

11:55AM 10        THERE IS THE NONHEARSAY PURPOSE THAT I JUST ARTICULATED TO

11:55AM 11   THE COURT.

11:55AM 12             MS. ESTRADA:  IF I MAY JUST REMIND THE COURT

11:55AM 13   BRIEFLY?

11:55AM 14        THIS EMAIL WAS ACTUALLY THE SUBJECT OF A SIMILAR COLLOQUY

11:55AM 15   DURING THE HOLMES TRIAL, DURING THE REDIRECT EXAMINATION OF

11:56AM 16   MS. PETERSON.

11:56AM 17        AND I MENTION THAT BOTH TO JUST REMIND THE COURT THAT THE

11:56AM 18   COURT ACTUALLY DID EXCLUDE THIS EXHIBIT FOR SIMILAR REASONS TO

11:56AM 19   WHAT I'M RAISING, BUT IN ADDITION TO THAT -- AND OF COURSE THE

11:56AM 20   GOVERNMENT MAY OR MAY NOT MAKE THIS SAME ARGUMENT -- BUT WHAT

11:56AM 21   IS TROUBLING ABOUT THIS EMAIL IS THAT THE GOVERNMENT MIGHT USE

11:56AM 22   THIS EMAIL TO ARGUE TO THE JURY THAT BECAUSE THIS NEFARIOUS ACT

11:56AM 23   WAS TAKING PLACE AT BLOOD TESTING OCCURRING WITH BDT, IT MUST

11:56AM 24   HAVE BEEN TAKING PLACE WITH OTHER INVESTORS.

11:56AM 25        AND IF THAT IS HOW THEY INTEND TO USE IT WITH, FOR

ER-3800

11:56AM 1    EXAMPLE, MR. MOSLEY, WHO WAS AN INVESTOR WHO DID RECEIVE BLOOD

11:56AM 2    TESTING AT WALGREENS, THEN THAT IS SUBSTANTIALLY MORE

11:56AM 3    PREJUDICIAL THAN IT IS PROBATIVE GIVEN THAT WE DON'T HAVE THE

11:56AM 4    CONTEXT OF THE RESPONSE FROM MR. BALWANI, IF ANY, TO THIS

11:57AM 5    OFF-HAND COMMENT FROM MR. HOLMES.

11:57AM 6         IN ADDITION TO THAT, I HAVE HEARD MR. SCHENK SAY THAT

11:57AM 7    EVERY EMAIL WOULD NEED TO HAVE CROSS-EXAMINATION ABOUT WHETHER

11:57AM 8    THERE WAS A RESPONSE.  THAT'S NOT MY ARGUMENT.

11:57AM 9         IT'S SIMPLY THAT WHEN EVIDENCE IS OFFERED THROUGH THE

11:57AM 10   WITNESS, THAT WITNESS HAS TO HAVE PERSONAL KNOWLEDGE, AT LEAST

11:57AM 11   A BASELINE PERSONAL KNOWLEDGE.

11:57AM 12        BUT IN THIS CASE MR. MOSLEY IS NOT A THERANOS EMPLOYEE, HE

11:57AM 13   WAS NOT A PARTY TO THIS CONVERSATION, HE DOESN'T WORK WITH BDT,

11:57AM 14   HE RECEIVED HIS BLOOD TESTING NINE MONTHS LATER.

11:57AM 15        FINALLY, ONE THING I'LL SAY, YOUR HONOR, IS THAT I THINK

11:57AM 16   THERE IS A DIFFERENCE BETWEEN WHAT MR. SCHENK SUGGESTS WITH

11:57AM 17   RESPECT TO THE TEXT MESSAGES.  THERE'S A DIFFERENCE BETWEEN

11:57AM 18   DISCUSSING AN EXHIBIT THAT IS ALREADY IN EVIDENCE WITH THE

11:57AM 19   WITNESS AND OFFERING TO ADMIT IT THROUGH A WITNESS WHO LACKS

11:58AM 20   PERSONAL KNOWLEDGE.

11:58AM 21            THE COURT:  ALL RIGHT.  THANK YOU.

11:58AM 22        MR. SCHENK, I THINK, TOLD US THAT HE WOULD NEED ADDITIONAL

11:58AM 23   EVIDENCE TO PROVE THAT THIS ACTUALLY HAPPENED, AND THAT ABSENT

11:58AM 24   THAT, JUST BASED ON HIS STATEMENT, HE WOULDN'T BE ARGUING THAT

11:58AM 25   UNLESS HE HAD THE EVIDENCE TO SUPPORT THAT.

BENNETT REDIRECT BY MR. LEACH                                    5126

11:58AM  1          SO I DON'T THINK THAT -- UNLESS THERE'S ADDITIONAL

11:58AM  2     EVIDENCE, I THINK YOUR CONCERN ABOUT THAT ARGUMENT IS SOMETHING

11:58AM  3     THAT YOU NEEDN'T BE CONCERNED ABOUT BECAUSE HE'S NOT GOING TO

11:58AM  4     BE ABLE TO MAKE THAT ARGUMENT UNLESS THE EVIDENCE SUPPORTS IT.

11:58AM  5          MS. ESTRADA:  UNDERSTOOD, YOUR HONOR.

11:58AM  6          THE COURT:  I DO FIND THAT AT A MINIMUM, THIS SHOULD

11:58AM  7     COME IN FOR NOTICE.

11:58AM  8          I SEE MR. BALWANI'S NAME ON IT.  HE'S IN THE MIDDLE OF THE

11:58AM  9     EMAIL CHAIN, AND HE'S A RECIPIENT AT THE TOP.

11:58AM 10          AND WHETHER OR NOT THIS HAPPENED, WHETHER OR NOT THIS CAME

11:58AM 11     TO FRUITION OR WHAT HAD HAPPENED, AT LEAST THE PLAN, THIS PLAN,

11:58AM 12     THIS OUTLINE WAS EMAILED TO HIM, ACCORDING TO THIS EMAIL, ON

11:59AM 13     OCTOBER 10TH OF 2014, AND SO IT DOES SHOW THAT HE WAS ON NOTICE

11:59AM 14     OF AT LEAST MR. HOLMES'S PLAN OF THE BDT VIP PROTOCOL.

11:59AM 15          AND AT A MINIMUM, I'M GOING TO ALLOW IT TO COME IN FOR

11:59AM 16     THAT PURPOSE, MR. SCHENK.

11:59AM 17          I'M NOT -- I STILL HAVE SOME DISCOMFORT ABOUT --

11:59AM 18     NOTWITHSTANDING YOUR ARGUMENTS -- ABOUT HAVING IT COME IN AS A

11:59AM 19     PURE BUSINESS RECORD.

11:59AM 20          AND I THINK I UNDERSTAND, WELL, WE'VE DONE IT BEFORE AND

11:59AM 21     THERE ARE SIMILAR CIRCUMSTANCES AND THIS SHOULD FALL UNDER THAT

11:59AM 22     SAME UMBRELLA.

11:59AM 23          I'LL LOOK AT THESE CITES THAT YOU GAVE ME, BUT AT LEAST

11:59AM 24     FOR NOW, FOR PURPOSES OF NOW, I WILL, OVER THE DEFENDANT'S

11:59AM 25     OBJECTION, ALLOW THIS TO COME IN FOR NOTICE, NOTICE AS TO

11:59AM  1        MR. BALWANI OF THE ACTIONS TAKEN.

11:59AM  2        AND I UNDERSTAND YOUR ARGUMENT, MS. ESTRADA, THAT THIS

11:59AM  3    WITNESS, OR THE WITNESS WHO TESTIFIES ABOUT THIS, WASN'T HERE

11:59AM  4    AND DIDN'T KNOW ANYTHING ABOUT IT, HE JUST HAPPENS TO HAVE THE

12:00PM  5    GOOD FORTUNE TO BE ON THE STAND TESTIFYING AT THE TIME THAT

12:00PM  6    THIS EMAIL IS GOING TO COME UP.  I DO UNDERSTAND THAT.

12:00PM  7        I DO THINK IT HAS VALUE FOR THE NOTICE, OR VALUE, I SHOULD

12:00PM  8    SAY RELEVANCE, FOR THE NOTICE ISSUE.

12:00PM  9        ANY PREJUDICE THAT IT MAY CONTAIN IS NOT UNFAIR PREJUDICE.

12:00PM  10       AND OF COURSE WE HAVE SAID THIS BEFORE SOMEWHAT TONGUE IN

12:00PM  11   CHEEK, BUT WE ALL RECOGNIZE THAT, MORE OFTEN THAN NOT, ANY

12:00PM  12   EVIDENCE THAT COMES FROM THE GOVERNMENT AGAINST THE DEFENDANT

12:00PM  13   IS PREJUDICIAL TO THE DEFENDANT.

12:00PM  14       THE QUESTION IS, IS IT UNFAIR PREJUDICE?

12:00PM  15       AND FOR THE PURPOSES OF NOTICE, THE COURT FINDS THAT THIS

12:00PM  16   IS NOT UNFAIR, UNFAIRLY PREJUDICIAL TO MR. BALWANI.

12:00PM  17       SO I'LL ADMIT IT AT A MINIMUM FOR THE NOTICE PURPOSE, AND

12:00PM  18   THEN I'LL REVIEW THESE OTHER TRANSCRIPT CITES AND SEE IF THAT

12:00PM  19   HELPS ANY FURTHER.

12:00PM  20            MR. SCHENK:  THANK YOU.

12:00PM  21            MS. ESTRADA:  UNDERSTOOD.

12:01PM  22       I WILL JUST NOTE THAT MY COLLEAGUE, MR. CAZARES, WILL BE

12:01PM  23   CONDUCTING THE CROSS-EXAMINATION, AND WILL LIKELY RERAISE OUR

12:01PM  24   OBJECTIONS, BUT WITH THESE COMMENTS IN MIND.

12:01PM  25            THE COURT:  SURE.  YOU CAN DO THAT DURING THAT

BENNETT REDIRECT BY MR. LEACH                                      5128

12:01PM   1    EXAMINATION, OR PRESERVE THEM, WHATEVER YOU WOULD LIKE TO DO.

12:01PM   2    THAT'S FINE.

12:01PM   3         OKAY.  WHERE ARE WE NOW?  WE'RE FURTHER IN THE DAY THAN WE

12:01PM   4    THOUGHT.

12:01PM   5         DID COUNSEL NEED A COUPLE MORE MINUTES?  SHOULD WE TAKE

12:01PM   6    ABOUT ANOTHER FIVE, SEVEN MINUTES, AND THEN WE'LL BRING THE

12:01PM   7    JURY IN?

12:01PM   8         LET ME ASK ABOUT OUR SCHEDULE.  I'M ASKING TOO MANY

12:01PM   9    QUESTIONS IN SUCCESSION.  I'M SORRY.

12:01PM  10         MY SENSE IS THAT WE'LL FINISH MS. BENNETT IN THE NEXT HOUR

12:01PM  11    OR SO I GUESS.

12:01PM  12         AND THEN WE'LL MOVE ON TO THE GOVERNMENT'S NEXT WITNESS?

12:01PM  13              MR. SCHENK:  I WOULD EXPECT THAT WE'LL FINISH

12:01PM  14    MS. BENNETT EVEN SOONER, IN LESS TIME THAN THAT.

12:01PM  15         AND YES, THEN MR. MOSLEY.  I ANTICIPATE THE DIRECT FOR

12:01PM  16    MR. MOSLEY BEING ABOUT 90 MINUTES, BETWEEN AN HOUR AND AN HOUR

12:01PM  17    AND A HALF.

12:01PM  18              THE COURT:  OKAY.

12:02PM  19              MR. SCHENK:  IN THAT WINDOW.

12:02PM  20              THE COURT:  GOTCHA.

12:02PM  21              MR. CAZARES:  CROSS WILL PROBABLY ROLL INTO

12:02PM  22    TOMORROW.

12:02PM  23              THE COURT:  OKAY.  GOOD TO KNOW.

12:02PM  24         I THINK WE'RE ENDING AT 4:00 TODAY.  I THINK THAT'S WHAT

12:02PM  25    WE'VE ADVERTISED.

BENNETT REDIRECT BY MR. LEACH                                    5129

12:02PM  1              MR. CAZARES:  THAT'S MY EXPECTATION, YOUR HONOR.  I

12:02PM  2       THINK WE'LL ROLL INTO TOMORROW.

12:02PM  3              THE COURT:  GREAT.  OKAY.  WE'LL TAKE ABOUT ANOTHER

12:02PM  4       SEVEN MINUTES, AND THEN WE'LL CALL OUR JURY IN.

12:02PM  5              MR. SCHENK:  THANK YOU.

12:02PM  6              THE COURT:  THANK YOU.

12:02PM  7          (RECESS FROM 12:02 P.M. UNTIL 12:15 P.M.)

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

ER-3805

12:15PM  1                    **AFTERNOON SESSION**

12:15PM  2            (JURY IN AT 12:15 P.M.)

12:15PM  3                 THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

12:15PM  4    THE RECORD.

12:15PM  5         ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

12:15PM  6         MS. BENNETT IS ON THE STAND.

12:15PM  7         LADIES AND GENTLEMEN, THANK YOU FOR THE LONG BREAK.  I

12:15PM  8    HOPE YOU ENJOYED IT.  I NEEDED SOME OF THESE LAWYERS' TIME TO

12:15PM  9    HELP ME OUT ON SOME ISSUES.

12:15PM 10         BUT I THINK WE'RE READY TO GO NOW.

12:15PM 11         MR. LEACH.

12:15PM 12                 MR. LEACH:  WE ARE, YOUR HONOR.  THANK YOU.

12:15PM 13                 THE COURT:  YES.

12:15PM 14    BY MR. LEACH:

12:15PM 15    Q.   GOOD AFTERNOON, MS. BENNETT.

12:16PM 16         WHEN WE BROKE, WE WERE DISCUSSING EXHIBIT 4943.

12:16PM 17         DO YOU STILL HAVE THAT IN FRONT OF YOU?

12:16PM 18    A.   YES.

12:16PM 19    Q.   OKAY.  AND THIS WAS A DOCUMENT THAT WAS PROVIDED TO YOU BY

12:16PM 20    THERANOS?

12:16PM 21    A.   YES.

12:16PM 22    Q.   AND YOU BELIEVE THIS WAS DONE SO AT SOME POINT PRIOR TO

12:16PM 23    APRIL OF 2016?

12:16PM 24    A.   YES.

12:16PM 25    Q.   AND THIS IS SOMETHING THAT YOU REVIEWED?

12:16PM 1     A.   YES.

12:16PM 2     Q.   IS THIS SOMETHING THAT YOU REVIEWED FOR THE PURPOSE OF

12:16PM 3     ASSESSING THERANOS'S RESPONSE AND ACTION TO 2567?

12:16PM 4     A.   YES.

12:16PM 5     Q.   AND DID YOU HAVE CONVERSATIONS WITH ANYBODY WITHIN CMS

12:16PM 6     ABOUT WHAT THERANOS WAS REPORTING TO YOU?

12:16PM 7     A.   PROBABLY DISCUSSED IT WITH MR. YAMAMOTO.

12:16PM 8     Q.   OKAY.  AND IF I COULD DRAW YOUR ATTENTION, PLEASE, TO

12:16PM 9     PAGE 9.

12:16PM 10         DO YOU SEE THE TITLE PATIENT IMPACT ASSESSMENT, TPS 3.5?

12:17PM 11    A.   YES.

12:17PM 12    Q.   AND BENEATH THAT THERE'S A REFERENCE TO D5403, D5481.

12:17PM 13    THERE ARE OTHER NUMBERS THERE.

12:17PM 14         DO YOU SEE THAT?

12:17PM 15    A.   YES.

12:17PM 16    Q.   AND ARE THOSE A REFERENCE TO THE D-TAGS WITHIN THE 2567?

12:17PM 17    A.   THEY ARE.

12:17PM 18    Q.   AND THIS PATIENT IMPACT ASSESSMENT RELATES TO THE EDISON

12:17PM 19    DEVICE THAT YOU REVIEWED AND CONSIDERED?

12:17PM 20    A.   YES.

12:17PM 21    Q.   AND FURTHER BELOW, DO YOU SEE A PARAGRAPH UNDER PATIENT

12:17PM 22    IMPACT?

12:17PM 23    A.   YES.

12:17PM 24    Q.   AND IN THAT LAST LINE, DID THERANOS PROVIDE --

12:17PM 25              MR. CAZARES:  OBJECTION.  HEARSAY.

12:17PM   1          THE COURT:  WHY DON'T YOU FINISH THE QUESTION?

12:17PM   2    BY MR. LEACH:

12:17PM   3    Q.   DID THERANOS PROVIDE YOU INFORMATION ABOUT WHAT IT

12:17PM   4    PERCEIVED THE POSSIBLE PATIENT IMPACT FOR EDISON 3.5 TEST WAS?

12:17PM   5    A.   YES.

12:17PM   6    Q.   AND WHAT DID THERANOS TELL YOU?

12:17PM   7          MR. CAZARES:  OBJECTION.  HEARSAY.  702.

12:17PM   8       THERE IS ALSO A TEMPORAL RELEVANCE ISSUE.

12:18PM   9          THE COURT:  I DON'T THINK IT'S 702.

12:18PM  10       BUT ARE YOU OFFERING THIS FOR THE TRUTH?

12:18PM  11          MR. LEACH:  I'M NOT OFFERING IT FOR THE TRUTH,

12:18PM  12    YOUR HONOR.  I WAS ASKING HER ABOUT THE DOCUMENTS.  I THINK

12:18PM  13    IT'S A -- I AM OFFERING THE STATEMENT UNDER 801(D)(2), SO --

12:18PM  14          MR. CAZARES:  ALSO FOUNDATION RELATING TO THE

12:18PM  15    SUBSTANCE OF THE DOCUMENT.

12:18PM  16          THE COURT:  WELL, I WAS GOING TO ASK YOU TO LAY A

12:18PM  17    LITTLE MORE FOUNDATION FOR THIS, IF YOU WOULD, MR. LEACH, AS TO

12:18PM  18    THIS WITNESS'S KNOWLEDGE.

12:18PM  19    BY MR. LEACH:

12:18PM  20    Q.   OKAY.  AND IS THIS PATIENT IMPACT ASSESSMENT SOMETHING

12:18PM  21    THAT YOU CONSIDERED AS PART OF YOUR WORK, MS. BENNETT?

12:18PM  22    A.   YES.

12:18PM  23    Q.   WHEN THERANOS MADE STATEMENTS TO YOU ABOUT WHAT IT

12:18PM  24    PERCEIVED THE PATIENT IMPACT TO BE, DID YOU EVALUATE THAT AND

12:18PM  25    CONSIDER IT IN CONNECTION WITH FOLLOWUP IN CONNECTION WITH THE

BENNETT REDIRECT BY MR. LEACH 5133

12:19PM 1      2567?

12:19PM 2      A. YES.

12:19PM 3      Q. AND IN YOUR 2567 FOR EACH CONDITION OR STANDARD, DO YOU

12:19PM 4      ALWAYS REPORT IN THAT PART OF THE DOCUMENT WHAT PATIENT IMPACT

12:19PM 5      WAS?

12:19PM 6          MR. CAZARES: OBJECTION. FOUNDATION. CMS DOESN'T

12:19PM 7      DO A PATIENT IMPACT REPORT.

12:19PM 8          THE COURT: THIS IS ASKING WHAT SHE DOES IN HER

12:19PM 9      REPORT?

12:19PM 10          MR. LEACH: YES.

12:19PM 11          THE COURT: OBJECTION IS OVERRULED.

12:19PM 12      YOU CAN ANSWER THE QUESTION.

12:19PM 13          THE WITNESS: WHEN WE RECEIVE A RESPONSE FROM THE

12:19PM 14      LABORATORY, WE LOOK TO ENSURE THAT THEY HAVE ADDRESSED PATIENT

12:19PM 15      IMPACT.

12:19PM 16      BY MR. LEACH:

12:19PM 17      Q. OKAY. AND DID YOU DO THAT HERE?

12:19PM 18      A. YES.

12:19PM 19      Q. IN CONNECTION WITH THIS DOCUMENT?

12:19PM 20      A. YES.

12:19PM 21      Q. AND WHAT DID THERANOS TELL YOU IN CONNECTION WITH ANY

12:19PM 22      POSSIBLE PATIENT IMPACT?

12:19PM 23          MR. CAZARES: OBJECTION. HEARSAY, RELEVANCE,

12:19PM 24      FOUNDATION, AND THE 702 ISSUE.

12:19PM 25          THE COURT: OVERRULED.

12:19PM  1          YOU CAN ANSWER THE QUESTION.

12:20PM  2              THE WITNESS:  THERANOS SAID THAT THE LABORATORY HAD

12:20PM  3   CONCLUDED THAT THERE IS POSSIBLE PATIENT IMPACT FOR EVERY TEST

12:20PM  4   REPORTED FROM THE LABORATORY'S TPS 3.5 INSTRUMENT.

12:20PM  5   BY MR. LEACH:

12:20PM  6   Q.   GOING BACK TO THE 2567, MS. BENNETT, I'D LIKE TO DRAW YOUR

12:20PM  7   ATTENTION TO PAGE 46.

12:20PM  8          IF WE COULD DISPLAY.

12:20PM  9          IS THIS THE PORTION OF THE 2567 WHERE YOU DISCUSS YOUR

12:20PM  10  REVIEW OF THERANOS'S QUALITY CONTROL FOR THE EDISON DEVICE?

12:20PM  11  A.   THIS IS WHERE I'M TALKING ABOUT THAT THEY DID NOT HAVE A

12:21PM  12  SYSTEM THAT TWICE A YEAR EVALUATED AND DEFINED THE RELATIONSHIP

12:21PM  13  BETWEEN THE EDISON AND THE PREDICATE INSTRUMENT, THE COMMERCIAL

12:21PM  14  INSTRUMENT.

12:21PM  15  Q.   OKAY.  AND IF WE CAN NOW GO TO PAGE 54 OF THE EXHIBIT.

12:21PM  16          IS THIS THE PORTION OF THE 2567 WHERE YOU DISCUSS THE

12:21PM  17  PERCENTAGE OF CV YOU OBSERVED ON EDISON DEVICES WITH RESPECT TO

12:21PM  18  PARTICULAR ASSAYS THROUGHOUT 2014 AND 2015?

12:21PM  19  A.   YES.

12:21PM  20  Q.   AND ON PAGE 56 AND 57, DO YOU FURTHER DISCUSS WHAT YOU

12:21PM  21  OBSERVED WITH RESPECT TO THERANOS'S QUALITY CONTROL FOR THE

12:21PM  22  EDISON DEVICE IN THE 2014 THROUGH JUNE OF 2015 TIME PERIOD?

12:22PM  23  A.   YES.

12:22PM  24  Q.   AND WERE THESE ISSUES SYSTEMIC IN YOUR MIND?

12:22PM  25  A.   YES.

12:22PM   1        Q.    WERE THEY ONE-OFFS?

12:22PM   2               MR. CAZARES:  OBJECTION.  FOUNDATION.

12:22PM   3               THE COURT:  SUSTAINED.

12:22PM   4               MR. LEACH:  OKAY.

12:22PM   5        MAY I HAVE A MOMENT, YOUR HONOR?

12:22PM   6               THE COURT:  YES.

12:22PM   7        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:22PM   8               MR. LEACH:  NO FURTHER QUESTIONS, YOUR HONOR.

12:22PM   9        THANK YOU.

12:22PM  10        THANK YOU, MS. BENNETT.

12:22PM  11               THE COURT:  RECROSS?

12:22PM  12               MR. CAZARES:  YES, YOUR HONOR.

12:22PM  13                         **RECROSS-EXAMINATION**

12:22PM  14        BY MR. CAZARES:

12:22PM  15        Q.    GOOD AFTERNOON, MS. BENNETT.

12:22PM  16        A.    HELLO.

12:22PM  17        Q.    MS. BENNETT, YOU WOULD AGREE THAT CMS WAS NOT RESPONSIBLE,

12:22PM  18        IN RELATION TO THERANOS, FOR DETERMINING WHETHER THERE WAS A

12:22PM  19        PATIENT IMPACT FROM ANY IDENTIFIED NONCOMPLIANCE; CORRECT?

12:23PM  20        YOU DID NOT DETERMINE PATIENT IMPACT; CORRECT?

12:23PM  21        A.    CORRECT.

12:23PM  22        Q.    THE LAB AND THE LAB DIRECTOR HAVE RESPONSIBILITY FOR

12:23PM  23        INVESTIGATING AND DETERMINING PATIENT IMPACT; CORRECT?

12:23PM  24        A.    YES.

12:23PM  25        Q.    NOW, IN RESPONSE TO SOME QUESTIONS MR. LEACH ASKED YOU

ER-3811

BENNETT RECROSS BY MR. CAZARES                              5136

12:23PM  1     ABOUT THOSE AAP DATA AT EXHIBIT 20620, DO YOU RECALL THAT?

12:23PM  2     A.   YES.

12:23PM  3     Q.   OKAY.  AND MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THE

12:23PM  4     SUBSTANCE OF THOSE REPORTS.

12:23PM  5          DO YOU REMEMBER?

12:23PM  6     A.   YES.

12:23PM  7     Q.   OKAY.  AND YOU HAVE NO EVIDENCE THAT THE DATA IN THE AAP

12:23PM  8     EXHIBITS THAT YOU WERE ASKED ABOUT HERE IN THIS COURT WERE

12:23PM  9     WRONG; CORRECT?

12:23PM  10    A.   NO.

12:23PM  11    Q.   YOU HAVE NO EVIDENCE THAT THERE WAS ANYTHING INACCURATE --

12:24PM  12    YOU HAVE NO EVIDENCE THAT THE AAP WAS NOT DONE AT THE TIME

12:24PM  13    PERIOD REFLECTED IN THOSE DOCUMENTS; CORRECT?

12:24PM  14    A.   NO.

12:24PM  15    Q.   NOW, YOU WERE ASKED SOME QUESTIONS BY MR. LEACH, AGAIN,

12:24PM  16    ABOUT THE TIMELINESS OF THE REPORTING TO PATIENTS WITH THE

12:24PM  17    CORRECTED RESULTS RELATING TO PT INR.

12:24PM  18         DO YOU REMEMBER THAT?

12:24PM  19    A.   I DO.

12:24PM  20    Q.   OKAY.  AND THE ISSUE THERE AGAIN WAS THE SEVEN WEEK DELAY

12:24PM  21    BETWEEN YOUR CONCLUSION OF THE SEPTEMBER VISIT IN 2015, WHICH

12:24PM  22    WAS SEPTEMBER 23RD, 2015, AND UNTIL MID-NOVEMBER OF 2015;

12:24PM  23    CORRECT?

12:24PM  24    A.   YES.

12:24PM  25    Q.   AND, AGAIN, THE PT INR TEST WAS DONE ON AN FDA APPROVED

12:24PM 1    COMMERCIAL DEVICE; CORRECT?

12:24PM 2    A.   YES.

12:24PM 3    Q.   AND IT'S NOT THERANOS FINGERSTICK TECHNOLOGY; CORRECT?

12:24PM 4    A.   CORRECT.

12:24PM 5    Q.   AND YOU CITED OTHER LABS FOR NONCOMPLIANCE RELATING TO

12:24PM 6    PT INR; CORRECT?

12:24PM 7          MR. LEACH:  OBJECTION.  RELEVANCE.

12:25PM 8          THE COURT:  I'LL ALLOW IT.

12:25PM 9      YOU CAN ANSWER THAT QUESTION.

12:25PM 10         THE WITNESS:  YES, I HAVE CITED OTHER LABS.

12:25PM 11         MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

12:25PM 12         THE COURT:  ANY REDIRECT?

12:25PM 13         MR. LEACH:  NO, YOUR HONOR.  THANK YOU.

12:25PM 14         THE COURT:  MAY THIS WITNESS BE EXCUSED?

12:25PM 15         MR. LEACH:  YES.

12:25PM 16         MR. CAZARES:  YES, YOUR HONOR.

12:25PM 17         THE COURT:  YOU'RE EXCUSED.  THANK YOU, MS. BENNETT.

12:25PM 18         THE WITNESS:  THANK YOU.

12:25PM 19         THE COURT:  DOES THE GOVERNMENT HAVE ANOTHER WITNESS

12:25PM 20   TO CALL?

12:25PM 21         MR. SCHENK:  YES, WE DO, YOUR HONOR.

12:25PM 22      THE UNITED STATES CALLS DANIEL MOSLEY.

12:27PM 23      (PAUSE IN PROCEEDINGS.)

12:27PM 24         THE COURT:  GOOD AFTERNOON, SIR.  IF YOU WOULD COME

12:27PM 25   FORWARD, PLEASE.

ER-3813

5138

12:27PM 1          I'LL ASK YOU TO STAND HERE AND FACE OUR COURTROOM DEPUTY

12:27PM 2     WHILE YOU RAISE YOUR RIGHT HAND.  SHE HAS A QUESTION FOR YOU.

12:27PM 3          **(GOVERNMENT'S WITNESS, DANIEL MOSLEY, WAS SWORN.)**

12:27PM 4               THE WITNESS:  I DO.

12:27PM 5               THE CLERK:  THANK YOU.

12:27PM 6               THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  MAKE

12:27PM 7     YOURSELF COMFORTABLE.

12:27PM 8          FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

12:27PM 9     NEED.

12:27PM 10         AND THERE'S SOME WATER THERE FOR REFRESHMENT SHOULD YOU

12:27PM 11    NEED IT.  HELP YOURSELF.

12:27PM 12              THE WITNESS:  THANK YOU.

12:27PM 13              THE COURT:  YOU'RE WELCOME.

12:27PM 14         AND WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR

12:27PM 15    NAME AND THEN SPELL IT, PLEASE.

12:27PM 16              THE WITNESS:  OKAY.  SHOULD I LEAVE MY MASK ON?

12:27PM 17              THE COURT:  ARE YOU FULLY VACCINATED?

12:27PM 18              THE WITNESS:  I AM.

12:27PM 19              THE COURT:  ALL RIGHT.  YOU MAY REMOVE IT.  THANK

12:27PM 20    YOU.

12:27PM 21              THE WITNESS:  DANIEL LYNN MOSTLY.  LAST NAME

12:28PM 22    M-O-S-L-E-Y.

12:28PM 23              THE COURT:  THANK YOU.  COUNSEL.

12:28PM 24              MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR.  I

12:28PM 25    WILL ALSO REMOVE MY MASK.

ER-3814

**DIRECT EXAMINATION**

BY MR. SCHENK:

Q.   GOOD AFTERNOON, MR. MOSLEY.

A.   GOOD AFTERNOON.

Q.   MR. MOSLEY, HAVE YOU HEARD OF A COMPANY CALLED THERANOS?

A.   YES, I HAVE.

Q.   HOW DID YOU BECOME FAMILIAR WITH THAT COMPANY?

A.   I FIRST BECAME FAMILIAR WITH IT FROM SOMEBODY I KNEW,

DR. KISSINGER, WHO MENTIONED THE NAME OF THE COMPANY TO ME.

Q.   AND YOU SAID YOU BECAME FAMILIAR WITH IT WITH AN

INDIVIDUAL -- I'M SORRY, FROM AN INDIVIDUAL NAMED

DR. KISSINGER?

A.   THAT IS CORRECT.

Q.   AND HOW DID YOU KNOW DR. KISSINGER?

A.   HE HAD BEEN A LONG-TERM CLIENT OF MINE, A LONG-TERM CLIENT

AND A FRIEND.

Q.   AND WE'LL COVER THIS MORE A LITTLE BIT LATER, BUT DID YOU

INVEST MONEY IN THERANOS?

A.   YES, I DID.

Q.   DO YOU KNOW ROUGHLY HOW MUCH?

A.   IT WAS ALMOST 6 MILLION.  JUST SLIGHTLY UNDER $6 MILLION.

Q.   AND DO YOU KNOW ROUGHLY WHEN?

A.   IT WOULD HAVE BEEN IN OCTOBER OF 2014.

Q.   THANK YOU.

     LET'S GO BACK TO THE CONVERSATION THAT YOU SAID YOU HAD

1    WITH DR. KISSINGER.  WAS THAT YOUR FIRST EXPOSURE TO THERANOS?

2    A.   YES.

3    Q.   AND DID DR. KISSINGER ASK YOU TO DO SOMETHING THAT LED TO

4    YOUR EXPOSURE?

5    A.   YES.

6    Q.   AND WHAT WAS THAT?

7    A.   HE ASKED ME TO SORT OF FAMILIARIZE MYSELF WITH THE COMPANY

8    AND TO GIVE HIM MY VIEWS ON THE COMPANY.

9    Q.   WE'LL COVER THAT IN A MOMENT.

10       I THINK YOU TOLD THE JURY THAT DR. KISSINGER WAS A CLIENT;

11   IS THAT RIGHT?

12   A.   THAT IS CORRECT.

13   Q.   AT THE TIME -- FIRST, COULD YOU GIVE US A YEAR?  WHEN WAS

14   THAT?

15   A.   THIS WOULD HAVE BEEN IN 2014.

16   Q.   WAS THAT BEFORE OR AFTER YOUR INVESTMENT?

17   A.   BEFORE.

18   Q.   AND WHAT WERE YOU DOING FOR A LIVING IN 2014?

19   A.   I WAS PRACTICING LAW.

20   Q.   WHERE?

21   A.   IN NEW YORK CITY.

22   Q.   FOR A -- FOR THE GOVERNMENT?  FOR A PRIVATE FIRM?  FOR?

23   A.   FOR A PRIVATE FIRM.

24   Q.   AND WHAT IS THE NAME OF THAT FIRM?

25   A.   CRAVATH, SWAINE & MOORE.

MOSLEY DIRECT BY MR. SCHENK                                         5141

12:29PM   1      Q.   AND HOW LONG DID YOU WORK AT THE LAW FIRM OF CRAVATH?

12:29PM   2      A.   FROM 20 -- 1984 UNTIL 2018.

12:30PM   3      Q.   AND WHAT AREAS DID YOU PRACTICE?

12:30PM   4      A.   TRUSTS AND ESTATES.

12:30PM   5      Q.   AND WAS IT THROUGH YOUR WORK IN THAT AREA THAT YOU MET

12:30PM   6      DR. KISSINGER?

12:30PM   7      A.   YES.

12:30PM   8      Q.   DO YOU STILL WORK AT CRAVATH?

12:30PM   9      A.   NO.

12:30PM   10     Q.   ARE YOU EMPLOYED NOW?

12:30PM   11     A.   YES.

12:30PM   12     Q.   HOW ARE YOU EMPLOYED?

12:30PM   13     A.   I WORK FOR A FIRM CALLED BDT & COMPANY.

12:30PM   14     Q.   AND WHAT LINE OF WORK IS BDT & COMPANY IN?

12:30PM   15     A.   WE'RE A MERCHANT BANK FOR CLOSELY HELD COMPANIES AND

12:30PM   16     FAMILIES.

12:30PM   17     Q.   YOU SAID A MERCHANT BANK?

12:30PM   18     A.   MERCHANT BANK.

12:30PM   19     Q.   AND WHAT DO YOU DO FOR BDT?

12:30PM   20     A.   I'M INVOLVED IN THE MANAGEMENT, AND I'M ALSO -- AND I

12:30PM   21     ADVISE CLIENTS IN OUR NETWORK.

12:30PM   22     Q.   YOU SAID THAT YOU INVESTED IN 2014 IN THERANOS; IS THAT

12:30PM   23     RIGHT?

12:30PM   24     A.   THAT'S CORRECT.

12:30PM   25     Q.   WERE YOU LIVING IN NEW YORK CITY AT THE TIME?

ER-3817

12:30PM  1    A.   HUH --

12:30PM  2    Q.   LET ME REPHRASE.  WERE YOU WORKING IN NEW YORK CITY AT THE

12:30PM  3    TIME?

12:30PM  4    A.   YES.

12:30PM  5    Q.   AND CURRENTLY, WHILE YOU'RE DOING WORK FOR BDT, DO YOU

12:31PM  6    ALSO WORK IN NEW YORK?

12:31PM  7    A.   YES.

12:31PM  8    Q.   LET'S NOW GO TO THAT PERIOD OF TIME IN 2014 WHERE YOU SAID

12:31PM  9    THAT DR. KISSINGER ASKED YOU TO BECOME MORE FAMILIAR WITH

12:31PM 10    THERANOS.

12:31PM 11         DO YOU HAVE THAT TIME PERIOD IN MIND?

12:31PM 12    A.   YES.

12:31PM 13    Q.   AND WHAT WAS THE FIRST STEP OR TWO THAT YOU TOOK TO GET

12:31PM 14    FAMILIAR WITH THERANOS?

12:31PM 15    A.   HE INTRODUCED ME TO ELIZABETH HOLMES, AND I BEGAN TO HAVE

12:31PM 16    CONVERSATIONS WITH HER.

12:31PM 17    Q.   WITH MS. HOLMES?

12:31PM 18    A.   CORRECT.

12:31PM 19              MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

12:31PM 20              THE COURT:  YES.

12:31PM 21              MR. SCHENK:  THANK YOU.

12:31PM 22         (HANDING.)

12:32PM 23    Q.   MR. MOSLEY, I'VE HANDED YOU TWO BINDERS OF EXHIBITS, AND

12:32PM 24    THEY'RE LABELLED 1 OF 2 AND 2 OF 2.

12:32PM 25         AND I'D LIKE TO START IN THE FIRST BINDER.

12:32PM 1          IF YOU WOULD, PLEASE, TURN TO TAB 4163.

12:32PM 2          AND IF YOU WOULD, LET ME KNOW WHEN YOU ARE THERE?

12:32PM 3     A.   I'M THERE.

12:32PM 4     Q.   MR. MOSLEY, ARE YOU FAMILIAR WITH THE DOCUMENT LOCATED AT

12:32PM 5     TAB 4163?

12:32PM 6     A.   YES, I AM.

12:32PM 7     Q.   IS THIS AN EMAIL BETWEEN YOU AND MS. HOLMES IN JULY OF

12:32PM 8     2014?

12:32PM 9     A.   IT IS.

12:32PM 10              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4163.

12:32PM 11              MR. CAZARES:  NO OBJECTION.

12:32PM 12          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:32PM 13     (GOVERNMENT'S EXHIBIT 4163 WAS RECEIVED IN EVIDENCE.)

12:33PM 14          THE COURT:  JUST GIVE US A MOMENT HERE.

12:33PM 15     IT'S STILL NOT ON IN THE JURY BOX I THINK.

12:33PM 16     I THINK THE TUBES HAVE WARMED UP, AND I THINK IT'S ON IN

12:33PM 17     THE JURY BOX.

12:33PM 18              MR. SCHENK:  THANK YOU, YOUR HONOR.

12:33PM 19     Q.   MR. MOSLEY, DO YOU SEE AN EXHIBIT NOW ON THE SCREEN IN

12:33PM 20     FRONT OF YOU?

12:33PM 21     A.   I DO.

12:33PM 22     Q.   SO FEEL FREE TO USE EITHER THE PAPER COPY OR THE SCREEN,

12:33PM 23     WHICHEVER IS EASIER FOR YOU.

12:33PM 24     THIS EMAIL IS DATED JULY 22ND OF 2014.

12:33PM 25     MY FIRST QUESTION IS, IS THAT RIGHT AROUND THE TIME THAT

MOSLEY DIRECT BY MR. SCHENK                                    5144

12:33PM  1    DR. KISSINGER ASKED YOU TO BEGIN TO BECOME FAMILIAR WITH

12:33PM  2    THERANOS?

12:33PM  3    A.   YES.

12:33PM  4    Q.   AND I THINK YOU TOLD THE JURY THAT IN OCTOBER OF 2014 YOU

12:33PM  5    MADE AN INVESTMENT; IS THAT CORRECT?

12:34PM  6    A.   YES.

12:34PM  7    Q.   AND SO I'D LIKE TO FOCUS OUR QUESTIONS FOR MUCH OF THE

12:34PM  8    TIME NOW BETWEEN THESE FEW MONTHS, JULY AND OCTOBER OF 2014, IF

12:34PM  9    THAT WOULD BE OKAY WITH YOU.

12:34PM  10        IN THIS EMAIL, DO YOU SEE IN THE FIRST LINE IT APPEARS

12:34PM  11   THAT YOU'RE INFORMING MS. HOLMES THAT IT WAS A PLEASURE

12:34PM  12   SPEAKING WITH YOU YESTERDAY.

12:34PM  13        DO YOU SEE THAT?

12:34PM  14   A.   YES.

12:34PM  15   Q.   AND DID YOU, IN FACT, HAVE A PHONE CALL WITH MS. HOLMES ON

12:34PM  16   OR AROUND THE 21ST OF JULY?

12:34PM  17   A.   I DID.

12:34PM  18   Q.   YOU ALSO SAY, ONCE YOU RECEIVE THE PRIVATE PLACEMENT

12:34PM  19   MEMORANDUM, YOU WILL GIVE HER A CALL OR AN EMAIL TO GET A

12:34PM  20   FURTHER BRIEFING.

12:34PM  21        DO YOU SEE THAT?

12:34PM  22   A.   I DO.

12:34PM  23   Q.   AND WHAT IS A PRIVATE PLACEMENT MEMORANDUM?

12:34PM  24   A.   IT IS A DOCUMENT THAT IS SOMETIMES PREPARED IN CONNECTION

12:34PM  25   WITH A PRIVATELY HELD COMPANY THAT IS RAISING CAPITAL.

ER-3820

12:34PM   1     Q.   IN YOUR DISCUSSIONS THE DAY PRIOR WITH MS. HOLMES, DID YOU

12:34PM   2     DISCUSS MS. HOLMES SENDING YOU CERTAIN DOCUMENTS?

12:35PM   3     A.   YES.

12:35PM   4     Q.   AND FOR WHAT PURPOSE?

12:35PM   5     A.   FOR THE PURPOSE OF FAMILIARIZING MYSELF WITH THE COMPANY

12:35PM   6     PURSUANT TO DR. KISSINGER'S REQUEST.

12:35PM   7     Q.   AND AT THIS TIME ON JULY 22ND, 2014, WERE YOU YOURSELF

12:35PM   8     THINKING OF BECOMING AN INVESTOR IN THERANOS?

12:35PM   9     A.   NO.

12:35PM   10     Q.   SO THE MATERIAL WAS BEING SENT TO YOU SORT OF ON BEHALF OF

12:35PM   11     THE WORK THAT YOU WERE DOING FOR DR. KISSINGER; IS THAT FAIR?

12:35PM   12     A.   THAT IS CORRECT.

12:35PM   13     Q.   THANK YOU.

12:35PM   14         AND THEN THE NEXT PARAGRAPH AND BELOW, WE SEE A REFERENCE

12:35PM   15     TO AN INDIVIDUAL NAMED GREG PENNER.

12:35PM   16         DO YOU SEE THAT?

12:35PM   17     A.   I DO.

12:35PM   18     Q.   AND IT APPEARS THAT HE'S ROB WALTON'S SON-IN-LAW.

12:35PM   19         CAN YOU EXPLAIN TO THE JURY WHAT THAT IS DISCUSSING?

12:35PM   20     A.   IT'S DISCUSSING ANOTHER CLIENT OF MINE THAT I THOUGHT SHE

12:35PM   21     MIGHT LIKE TO TALK TO, ELIZABETH.

12:35PM   22     Q.   I'M SORRY?

12:35PM   23     A.   SORRY.

12:35PM   24     Q.   AND "SHE" IS MS. HOLMES?

12:35PM   25     A.   YEAH.

12:35PM 1    Q.   AND WHY DID YOU THINK THAT MS. HOLMES WOULD BE INTERESTED

12:35PM 2    IN THIS CONNECTION?

12:35PM 3    A.   I BELIEVE SHE MENTIONED TO ME ON THE CALL THAT SHE WAS

12:36PM 4    LOOKING FOR OTHER LARGE INVESTORS.

12:36PM 5    Q.   ON THE CALL ON THE 21ST OF JULY, DID YOU DISCUSS WITH

12:36PM 6    MS. HOLMES THE FACT THAT MS. HOLMES WAS RAISING FUNDS OR

12:36PM 7    SEEKING INVESTORS FOR THERANOS?

12:36PM 8    A.   YES.

12:36PM 9    Q.   I'D LIKE TO NOW HAVE YOU TURN TO TAB 4173.

12:36PM 10        IT SHOULD BE THE NEXT TAB IN YOUR BINDER.

12:36PM 11        DO YOU RECOGNIZE THE DOCUMENT AT 4173?

12:36PM 12   A.   I DO.

12:36PM 13   Q.   WHAT IS THIS DOCUMENT?

12:36PM 14   A.   IT'S A LETTER FROM ELIZABETH HOLMES TO ME.

12:36PM 15   Q.   AND IS IT DATED AUGUST 18TH, 2014?

12:36PM 16   A.   IT IS.

12:36PM 17          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4173.

12:36PM 18          MR. CAZARES:  OBJECTION.  HEARSAY.

12:37PM 19          THE COURT:  MR. SCHENK.

12:37PM 20          MR. SCHENK:  I COULD LAY ADDITIONAL FOUNDATION.

12:37PM 21          THE COURT:  SURE.  WHY DON'T YOU?

12:37PM 22   BY MR. SCHENK:

12:37PM 23   Q.   MR. MOSLEY, DO YOU RECALL RECEIVING THIS LETTER?

12:37PM 24   A.   I DO.

12:37PM 25   Q.   AND DID THIS LETTER ACCOMPANY FURTHER DOCUMENTS,

12:37PM  1    ADDITIONAL MATERIALS?

12:37PM  2    A.   YES, IT DID.

12:37PM  3    Q.   AND WHAT WERE THOSE MATERIALS?

12:37PM  4    A.   UM, A LARGE, A LARGE STACK OF PAPERS ABOUT THE COMPANY.

12:37PM  5    Q.   AND DID YOU REQUEST THAT MS. HOLMES SEND THIS MATERIAL TO

12:37PM  6    YOU?

12:37PM  7    A.   I DON'T KNOW WHETHER I REQUESTED IT OR SHE VOLUNTEERED TO

12:37PM  8    SEND IT.

12:37PM  9    Q.   WAS, WAS THIS MATERIAL DISCUSSED ON YOUR PHONE CALL IN

12:37PM 10    JULY WITH MS. HOLMES?

12:37PM 11    A.   YES.

12:37PM 12    Q.   AND WE SAW AN EMAIL A MOMENT AGO THAT INCLUDED A REFERENCE

12:37PM 13    TO A DOCUMENT CALLED A PRIVATE PLACEMENT MEMORANDUM.

12:37PM 14         DO YOU RECALL THAT?

12:37PM 15    A.   I DO.

12:37PM 16    Q.   AND WAS THIS LETTER, 4173, A COVER LETTER TO A STACK OF

12:37PM 17    DOCUMENTS, INCLUDING THE PRIVATE PLACEMENT MEMORANDUM?

12:37PM 18    A.   IT WAS.

12:38PM 19              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4173.

12:38PM 20              MR. CAZARES:  SAME OBJECTION.

12:38PM 21              THE COURT:  THE OBJECTION IS OVERRULED.

12:38PM 22         IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:38PM 23         (GOVERNMENT'S EXHIBIT 4173 WAS RECEIVED IN EVIDENCE.)

12:38PM 24              MR. SCHENK:  THANK YOU.

12:38PM 25    Q.   MR. MOSLEY, I FIRST WANT TO ASK YOU ABOUT THE DATE.  IT

12:38PM 1      LOOKS LIKE IT WAS SENT ON AUGUST 18TH, 2014.

12:38PM 2          YOU TOLD THE JURY A MOMENT AGO THAT YOU HAD A PHONE CALL

12:38PM 3      WITH MS. HOLMES AROUND THE 21ST OF JULY; IS THAT RIGHT?

12:38PM 4      A.   YES.

12:38PM 5      Q.   DO YOU RECALL WHETHER YOU DID MUCH WORK ON THERANOS IN

12:38PM 6      THOSE INTERVENING FEW WEEKS, OR DID YOU HAVE THE CALL WITH

12:38PM 7      MS. HOLMES AND THEN A FEW WEEKS LATER YOU RECEIVED THESE

12:38PM 8      DOCUMENTS?

12:38PM 9      A.   I BELIEVE I HAD THE CALL AND THEN RECEIVED THESE DOCUMENTS

12:38PM 10     A FEW WEEKS LATER.

12:38PM 11     Q.   OKAY.  AND NOW I'D LIKE TO ASK YOU ABOUT SOME OF THE

12:38PM 12     CONTENT OF THE LETTER.

12:38PM 13         IN THE FIRST LINE IT SAYS, "DEAR DAN,

12:38PM 14         "IT IS WITH GREAT PLEASURE I WRITE THIS LETTER AND ENCLOSE

12:38PM 15     THIS PACKAGE FOR YOU."

12:38PM 16         DO YOU SEE THAT?

12:38PM 17     A.   I DO.

12:38PM 18     Q.   ENCLOSED WITH THIS LETTER, DID YOU RECEIVE ADDITIONAL

12:39PM 19     DOCUMENTS?

12:39PM 20     A.   I DID.

12:39PM 21     Q.   CAN YOU DESCRIBE FOR THE JURY THE VOLUME?  WAS IT A LARGE

12:39PM 22     VOLUME OF DOCUMENTS?

12:39PM 23     A.   IT WAS A LARGE VOLUME.  I THINK IT WAS, YOU KNOW, THREE,

12:39PM 24     FOUR INCHES WORTH AT LEAST.

12:39PM 25     Q.   GREAT.

12:39PM  1          IN THE NEXT PARAGRAPH, IT LOOKS LIKE MS. HOLMES WRITES,

12:39PM  2     "BY WAY OF BACKGROUND," AND THEN IT CONTINUES.

12:39PM  3          DO YOU SEE A DESCRIPTION ABOUT THERANOS IN THAT PARAGRAPH?

12:39PM  4     A.   I THINK IT'S ALL ABOUT THERANOS.

12:39PM  5     Q.   WHEN YOU HAD SAY THAT, DO YOU MEAN THE WHOLE LETTER?

12:39PM  6     A.   WELL, THE WHOLE PARAGRAPH THAT YOU'VE HIGHLIGHTED.

12:39PM  7     Q.   YES, SIR, THANK YOU.

12:39PM  8          DO YOU SEE HER WRITING THAT "THERANOS HAS A VERY LONG-TERM

12:39PM  9     MISSION."

12:39PM 10          THAT'S IN THE THIRD LINE OF THE PARAGRAPH?

12:39PM 11     A.   I SEE THAT, YES.

12:39PM 12     Q.   AND THEN FURTHER DOWN A COUPLE LINES BELOW THAT IT SAYS,

12:40PM 13     "WE HAVE BENEFITTED."

12:40PM 14          DO YOU SEE THAT?

12:40PM 15     A.   YES.

12:40PM 16     Q.   "WE HAVE BENEFITED GREATLY FROM THE ABILITY TO EXECUTE,

12:40PM 17     KEEP A LASER FOCUS ON OUR OPERATIONS, AND SHIP TRANSFORMATIONAL

12:40PM 18     AND DISRUPTIVE TECHNOLOGY, AS WE'VE JUST DONE," EXCUSE ME,

12:40PM 19     "WITHOUT HAVING TO TALK IT UP WITH ANALYSTS OR OTHERS BEFORE

12:40PM 20     IT'S DONE."

12:40PM 21          DO YOU SEE THAT?

12:40PM 22     A.   I DO.

12:40PM 23     Q.   AND IN THE NEXT PARAGRAPH, MS. HOLMES WRITES THAT

12:40PM 24     "THERANOS HAS RAISED OVER $400 MILLION IN EQUITY CAPITAL."

12:40PM 25          AND THEN IN A SENTENCE -- TWO SENTENCES FURTHER IT

MOSLEY DIRECT BY MR. SCHENK                                    5150

12:40PM  1    CONTINUES, "THERE ARE MANY INDUSTRIES IN WHICH THE COMPANY'S

12:40PM  2    EXISTING PRODUCTS HAVE THE POTENTIAL TO PLAY A SIGNIFICANT ROLE

12:40PM  3    LONG TERM, RANGING FROM CHEMICAL AND WATER TESTING TO

12:40PM  4    ANIMAL/PET AND LIVESTOCK TESTING TO THE REPLACEMENT OF INVASIVE

12:40PM  5    MEDICAL DIAGNOSTIC PROCEDURES WITH TESTING."

12:41PM  6        DO YOU SEE THAT?

12:41PM  7    A.   I DO.

12:41PM  8    Q.   WHEN YOU HAD THE PHONE CALL IN JULY WITH MS. HOLMES, DID

12:41PM  9    YOU TALK ABOUT THE THERANOS TECHNOLOGY, THAT IS, WHAT LINE OF

12:41PM  10   BUSINESS THERANOS WAS IN?

12:41PM  11   A.   WE DID.

12:41PM  12   Q.   AND WHAT DID SHE TELL YOU?

12:41PM  13   A.   AS I REMEMBER, SHE JUST TOLD ME THAT THE COMPANY WAS

12:41PM  14   DISRUPTIVE AND IN BLOOD TESTING.

12:41PM  15   Q.   AND DID SHE DESCRIBE ANY TECHNOLOGY THAT THERANOS HAD

12:41PM  16   DEVELOPED?

12:41PM  17   A.   NOT IN ANY, NOT IN ANY DETAIL.

12:41PM  18   Q.   NOT ON THAT PHONE CALL?

12:41PM  19   A.   NOT ON THAT PHONE CALL.

12:41PM  20   Q.   OKAY.  DID YOU LATER LEARN ABOUT TECHNOLOGY THAT THERANOS

12:41PM  21   HAD DEVELOPED?

12:41PM  22   A.   I DID.

12:41PM  23   Q.   AND WHAT WERE THE SOURCES OF THAT INFORMATION?

12:41PM  24   A.   LARGELY THE DOCUMENTS THAT ELIZABETH HAD SENT ME AND

12:41PM  25   SUBSEQUENT PHONE CALLS.

ER-3826

12:41PM 1    Q.    AND WHEN YOU SAY "THE DOCUMENTS SHE SENT YOU," DO YOU MEAN

12:41PM 2    THE ONES THAT WERE ATTACHED TO THIS COVER LETTER THAT YOU AND I

12:42PM 3    ARE REVIEWING?

12:42PM 4    A.    YES.

12:42PM 5    Q.    IF YOU NOW GO TO THE NEXT PARAGRAPH, THE ONE THAT BEGINS

12:42PM 6    "HISTORICALLY."

12:42PM 7          "HISTORICALLY, THERANOS'S WORK WAS FOCUSSED ON CONTRACTS

12:42PM 8    WITH PHARMACEUTICAL AND MILITARY CLIENTS."

12:42PM 9          DO YOU SEE THAT?

12:42PM 10   A.    I DO.

12:42PM 11   Q.    AND THEN THE NEXT PARAGRAPH, "THERANOS HAS NOT ONLY

12:42PM 12   REDUCED TO PRACTICE AND PATENTED ITS COMPREHENSIVE

12:42PM 13   TECHNOLOGICAL AND OPERATIONAL INFRASTRUCTURE OVER THE PAST TEN

12:42PM 14   YEARS, BUT HAS ALSO HAD REGULATORY CERTIFICATIONS TO OPERATE

12:42PM 15   COMMERCIALLY, INCLUDING AS A CLIA-CERTIFIED LABORATORY (THE

12:42PM 16   REGULATORY CERTIFICATION FOR LABS) SINCE 2011."

12:42PM 17         DO YOU SEE THAT?

12:42PM 18   A.    I DO.

12:42PM 19   Q.    AND THEN THE NEXT PARAGRAPH BEGINS, "ONCE THE COMPANY WAS

12:42PM 20   READY TO LAUNCH ITS COMMERCIAL LABORATORY AND ANNOUNCED ITS

12:42PM 21   NATIONAL CONTRACT WITH WALGREENS IN FALL OF 2013, THERANOS

12:42PM 22   BEGAN OPERATING IN THE CONSUMER, PHYSICIAN, AND HOSPITAL

12:43PM 23   LABORATORY TESTING BUSINESS IN THE U.S., WITH PLANS FOR

12:43PM 24   INTERNATIONAL EXPANSION."

12:43PM 25         MR. MOSLEY, WHEN YOU WERE DOING THIS WORK IN ABOUT AUGUST

12:43PM  1    OF 2014, WERE YOU AWARE OF THERANOS'S BUSINESS RELATIONSHIP

12:43PM  2    WITH WALGREENS?

12:43PM  3    A.   I WAS.

12:43PM  4    Q.   DO YOU REMEMBER HOW YOU BECAME FAMILIAR WITH THAT OR

12:43PM  5    BECAME AWARE OF IT?

12:43PM  6    A.   I BELIEVE I WAS FIRST TOLD IT BY ELIZABETH, TO THE BEST OF

12:43PM  7    MY RECOLLECTION.

12:43PM  8    Q.   THAT'S YOUR RECOLLECTION?

12:43PM  9    A.   YES.

12:43PM  10   Q.   IF YOU'LL NOW TURN TO THE SECOND PAGE OF THIS EXHIBIT.

12:43PM  11        DO YOU SEE THE PARAGRAPH THAT BEGINS, "THERANOS HAS

12:43PM  12   GROWN," THE SECOND ONE DOWN?

12:43PM  13   A.   I SEE IT.

12:43PM  14   Q.   THE FIRST LINE READS, "THERANOS HAS GROWN FROM CASH FROM

12:43PM  15   ITS CONTRACTS FOR SOME TIME."

12:43PM  16        WITHIN THE MATERIALS THAT MS. HOLMES SENT YOU, WAS THERE A

12:43PM  17   DISCUSSION OF THE FINANCIAL STATE OF THERANOS?

12:44PM  18   A.   THERE WAS.

12:44PM  19   Q.   I'D NOW LIKE TO ASK YOU ABOUT TWO PARAGRAPHS BELOW THAT,

12:44PM  20   THE ONE THAT BEGINS "THERANOS IS INSTEAD."

12:44PM  21        "THERANOS IS INSTEAD, AS ABOVE, VERY SELECTIVELY AND

12:44PM  22   METHODICALLY SELECTING THE SHAREHOLDERS IT WISHES TO BE OWNERS

12:44PM  23   OF THE COMPANY LONG TERM, AND CONSIDERING THEIR PARTICIPATION

12:44PM  24   IN A FINAL EQUITY TRANSACTION."

12:44PM  25        DO YOU SEE THAT?

12:44PM 1      A.    I DO.

12:44PM 2      Q.    AND IT USES THE PHRASE "SELECTING THE SHAREHOLDERS."

12:44PM 3            LATER ON WHEN YOU BEGAN TO CONSIDER AN INVESTMENT ON YOUR

12:44PM 4      OWN, DID YOU FEEL THAT THERANOS WAS SELECTING YOU?

12:44PM 5      A.    YES.

12:44PM 6      Q.    WHAT DO YOU MEAN?

12:44PM 7      A.    WELL, BY THAT I MEAN THAT THEY WERE WILLING TO LET ME

12:44PM 8      INVEST, SELECT ME AS ONE OF THEIR INVESTORS, PERMIT ME TO

12:44PM 9      INVEST.

12:44PM 10     Q.    I'M CURIOUS ABOUT THE PHRASE "PERMIT YOU" OR "LET YOU" TO

12:45PM 11     INVEST.

12:45PM 12           WHEN YOU -- DO YOU HAVE EXPERIENCE BUYING PUBLICLY TRADED

12:45PM 13     STOCK?

12:45PM 14     A.    I DO.

12:45PM 15     Q.    AND WHEN YOU DO THAT, DOES THE COMPANY HAVE TO ALLOW YOU

12:45PM 16     TO BUY IT?

12:45PM 17     A.    NO.

12:45PM 18     Q.    SO EXPLAIN THAT DIFFERENCE.  WHY DID YOU FEEL IN THIS

12:45PM 19     INVESTMENT YOU WERE BEING ALLOWED TO, OR LET TO INVEST?

12:45PM 20     A.    WELL, WITH A CLOSELY HELD COMPANY, YOU'RE BUYING STOCK IN

12:45PM 21     THIS KIND OF A SITUATION FROM THE COMPANY, AND THE COMPANY

12:45PM 22     COULD EITHER CHOOSE TO SELL IT TO YOU OR NOT SELL IT TO YOU.

12:45PM 23     Q.    THANK YOU.

12:45PM 24           IF WE COULD NOW GO TO THE NEXT PARAGRAPH, THE ONE THAT

12:45PM 25     BEGINS "WITH."

12:45PM  1        THE FIRST LINE READS, "WITH THIS LETTER AND AS PROMISED ON

12:45PM  2   OUR CALL, I WOULD LIKE TO FORMALLY EXTEND TO YOU THE INVITATION

12:45PM  3   TO PARTICIPATE IN THIS EQUITY TRANSACTION TO WHATEVER EXTENT

12:45PM  4   YOU ARE INTERESTED."

12:45PM  5        I THINK YOU MENTIONED THAT INITIALLY YOU WERE DOING WORK

12:45PM  6   FOR DR. KISSINGER, AND AT SOME POINT IT TRANSITIONED TO

12:45PM  7   EVALUATING AN INVESTMENT OPPORTUNITY FOR YOURSELF.

12:46PM  8        IS THAT CORRECT?

12:46PM  9   A.   IT EVOLVED TO BEING BOTH OF THOSE.

12:46PM 10   Q.   WAS THERE A CLEAR MOMENT WHEN IT EXPANDED FROM ORIGINALLY

12:46PM 11   JUST BEING WORK ON BEHALF OF DR. KISSINGER TO ALSO AN

12:46PM 12   EVALUATION OF A PERSONAL INVESTMENT?

12:46PM 13   A.   I DON'T HAVE A CLEAR DATE IN MIND.

12:46PM 14   Q.   SO DID IT -- COULD YOU DESCRIBE THAT TO THE JURY, THE

12:46PM 15   PROCESS OF THE EVOLUTION?

12:46PM 16   A.   WELL, IN THE COURSE OF LOOKING AT IT, I THOUGHT IT WAS A

12:46PM 17   VERY INTERESTING COMPANY AND DEVELOPED A PERSONAL INTEREST IN

12:46PM 18   THINKING ABOUT IT AS AN INVESTMENT.

12:46PM 19   Q.   THANK YOU.

12:46PM 20        NOW I'D LIKE TO ASK YOU ABOUT THE VERY LAST LINE OF THE

12:46PM 21   LETTER AT THE BOTTOM OF THIS PAGE.

12:46PM 22        DO YOU SEE WHERE MS. HOLMES WRITES, "THE ADDITIONAL

12:46PM 23   MATERIALS FOCUS ON THE INFRASTRUCTURE THERANOS HAS DEVELOPED

12:46PM 24   AND INITIAL MARKET OF COMMERCIAL LABORATORY TESTING THAT

12:46PM 25   THERANOS HAS ENTERED."

12:47PM  1    A.   I DO.

12:47PM  2    Q.   I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THE MATERIALS

12:47PM  3    THAT MS. HOLMES PROVIDED, BUT GENERALLY SPEAKING, DID YOU THINK

12:47PM  4    THAT THE MATERIALS DESCRIBED THERANOS'S CURRENT CAPABILITIES OR

12:47PM  5    FUTURE ASPIRATIONS?

12:47PM  6    A.   I BELIEVED IT DESCRIBED CURRENT CAPABILITIES.

12:47PM  7    Q.   WOULD YOU NOW TURN IN THIS SAME BINDER TO EXHIBIT 3387.

12:47PM  8         DO YOU SEE THE EXHIBIT AT 3387?

12:47PM  9    A.   I DO.

12:47PM 10    Q.   THIS EXHIBIT APPEARS TO BE ABOUT 524 PAGES.

12:47PM 11         DO YOU SEE THAT?

12:47PM 12    A.   IT'S VERY LONG.

12:48PM 13    Q.   AND AT THE SAME TIME, I'M GOING TO ASK YOU ALSO TO GRAB

12:48PM 14    THAT SECOND BINDER THAT I HANDED TO YOU.

12:48PM 15         IN THAT BINDER YOU'LL FIND EXHIBIT 3392.

12:48PM 16    A.   UH-HUH.

12:48PM 17    Q.   DO YOU RECOGNIZE 3387 AND 3392?

12:48PM 18    A.   I DO.

12:48PM 19    Q.   AND WHAT ARE THEY?

12:48PM 20    A.   I BELIEVE THEY WERE IN THE PACKAGE OF MATERIALS THAT I WAS

12:48PM 21    SENT BY ELIZABETH HOLMES.

12:48PM 22    Q.   THE MATERIALS THAT YOU DESCRIBED AS BEING SEVERAL INCHES A

12:48PM 23    MOMENT AGO?

12:48PM 24    A.   THAT'S CORRECT.

12:48PM 25              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3387

12:48PM 1    AND 3392.

12:48PM 2            MR. CAZARES:  OBJECTION.

12:48PM 3            THE COURT:  OVERRULED.

12:48PM 4        IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:48PM 5        (GOVERNMENT'S EXHIBITS 3387 AND 3392 WERE RECEIVED IN

12:48PM 6    EVIDENCE.)

12:48PM 7            MR. SCHENK:  THANK YOU.

12:48PM 8    Q.   MR. MOSLEY, LET'S START WITH EXHIBIT 3387.  YOU CAN PUT

12:48PM 9    THE OTHER BINDER AWAY FOR A MOMENT.

12:49PM 10       IN 3387, IF YOU COULD TURN TO PAGE 128.  AGAIN, IT WILL BE

12:49PM 11   ON THE SCREEN IN FRONT OF YOU OR THE PAPER COPY, WHICHEVER IS

12:49PM 12   EASIER FOR YOU.

12:49PM 13   A.   I HAVE IT.

12:49PM 14   Q.   DO YOU SEE ON PAGE 128 OF THIS EXHIBIT IT LOOKS LIKE THERE

12:49PM 15   IS SOME UNDERLINING, SOME HANDWRITTEN UNDERLINES?

12:49PM 16   A.   I SEE IT.

12:49PM 17   Q.   ARE THOSE MARKINGS FAMILIAR TO YOU?

12:49PM 18   A.   THEY ARE.

12:49PM 19   Q.   AND WHO MADE THOSE, DO YOU KNOW?

12:49PM 20   A.   I MADE THOSE UNDERLININGS.

12:49PM 21   Q.   AND WHEN DID YOU DO THAT?

12:49PM 22   A.   SOME TIME AFTER I RECEIVED THE DOCUMENTS AND WAS READING

12:49PM 23   THE DOCUMENTS.

12:49PM 24   Q.   AS YOU WERE REVIEWING THE MATERIALS THAT YOU WERE SENT,

12:49PM 25   YOU WROTE ON THE DOCUMENTS?

12:49PM  1     A.   YES.

12:49PM  2     Q.   LET'S START WITH PARAGRAPH 2, LIQUIDATION RIGHTS.

12:50PM  3          DO YOU SEE THAT?

12:50PM  4     A.   I DO.

12:50PM  5     Q.   AND DO YOU HAVE A RECOLLECTION OF LIQUIDATION RIGHTS

12:50PM  6     WITHIN THIS DOCUMENT?

12:50PM  7     A.   I DO.

12:50PM  8     Q.   AND THIS IS WITHIN A DOCUMENT THAT IS CALLED THE

12:50PM  9     DESIGNATION OF SERIES C-2 PREFERRED STOCK.

12:50PM  10         DO YOU SEE THAT?

12:50PM  11    A.   YES.

12:50PM  12    Q.   AND WHAT IS THAT?  WHAT IS THE DESIGNATION OR THE

12:50PM  13    CERTIFICATE OF DESIGNATION OF C-2 STOCK?

12:50PM  14    A.   WELL, IT IS GENERALLY A DOCUMENT THAT IS ADOPTED BY THE

12:50PM  15    BOARD OF DIRECTORS DESIGNATING THE TERMS AND CONDITIONS OF THE

12:50PM  16    NEW CLASS OF STOCK.

12:50PM  17    Q.   AND THIS ONE IS CALLED C-2; IS THAT RIGHT?

12:50PM  18    A.   THAT'S CORRECT.

12:50PM  19    Q.   WHEN YOU EVENTUALLY MADE YOUR INVESTMENT IN THERANOS,

12:50PM  20    WHICH CLASS OF STOCK DID YOU PURCHASE?

12:50PM  21    A.   IT WAS C-2 PREFERRED STOCK.

12:50PM  22    Q.   AND IT USES THE WORD "PREFERRED."

12:50PM  23         ARE YOU FAMILIAR WITH THAT TERM?

12:50PM  24    A.   YES, I AM.

12:50PM  25    Q.   AND WHAT DOES THAT TERM MEAN TO YOU?

12:50PM  1    A.   IT MEANS THAT IT HAS A PREFERENCE -- IN THE EVENT THE

12:51PM  2    COMPANY WAS EVER LIQUIDATED, IT HAS A PREFERENCE FOR GETTING

12:51PM  3    BACK THE MONEY THAT YOU HAD INVESTED BEFORE THE COMMON STOCK.

12:51PM  4    Q.   IS THAT ADVANTAGEOUS?

12:51PM  5    A.   IT IS.

12:51PM  6    Q.   WHY?

12:51PM  7    A.   WELL, BECAUSE IF THERE IS EVER A PROBLEM WITH THE COMPANY,

12:51PM  8    YOU WOULD GET YOUR MONEY BACK BEFORE SOMEBODY THAT OWNED COMMON

12:51PM  9    STOCK, SO YOU WOULD COME EARLIER IN THE RETURN OF YOUR CAPITAL.

12:51PM  10   Q.   AND WHEN YOU USE THE WORD "YOU" IN THAT --

12:51PM  11   A.   THE OWNER OF THE C-2.  I'M SORRY.

12:51PM  12   Q.   AND BY "OWNER OF THE C-2," DO YOU MEAN THE INVESTORS?

12:51PM  13   A.   THE INVESTORS THAT BOUGHT C-2 SHARES.

12:51PM  14   Q.   GOT IT.

12:51PM  15        SO NOW THE LIQUIDATION RIGHTS PARAGRAPH, WHY DID YOU FIND

12:51PM  16   IT NECESSARY TO UNDERLINE INFORMATION IN THIS PARAGRAPH?  WHAT

12:51PM  17   WAS SIGNIFICANT?

12:51PM  18   A.   ONLY THAT IT SAID WHAT I WOULD HAVE EXPECTED IT TO SAY,

12:52PM  19   WHICH IS THAT THE C-2 SHARES HAD A PREFERENCE OVER ALL COMMON

12:52PM  20   STOCK AND PREVIOUS CLASSES OF PREFERRED STOCK BEFORE THE C-2.

12:52PM  21   Q.   I SEE.  SO THIS IS THE PART OF THE DOCUMENT THAT CONTAINS

12:52PM  22   WHAT YOU WERE JUST EXPLAINING TO ME, THAT IS, THE PREFERENCE OF

12:52PM  23   C-2 OVER COMMON?

12:52PM  24   A.   THAT'S CORRECT.

12:52PM  25   Q.   OKAY.  IF YOU'LL NOW TURN TO THE NEXT PAGE, PAGE 129.

12:52PM   1          DO YOU SEE SECTION 6, A SECTION CALLED MANDATORY

12:52PM   2   REDEMPTION?

12:52PM   3   A.   I DO.

12:52PM   4   Q.   IT ALSO APPEARS THAT YOU MADE SOME UNDERLINES IN THIS

12:52PM   5   PARAGRAPH; IS THAT RIGHT?

12:52PM   6   A.   YES.

12:52PM   7   Q.   WHAT WAS SIGNIFICANT ABOUT THE MANDATORY REDEMPTION

12:52PM   8   SECTION?

12:52PM   9   A.   IT WAS AN UNUSUAL PROVISION THAT I HAD NEVER SEEN, OR

12:52PM  10   DIDN'T RECOLLECT THAT I HAD EVER SEEN IN A DOCUMENT LIKE THIS

12:52PM  11   BEFORE.

12:52PM  12   Q.   AND WHAT WAS UNUSUAL ABOUT IT?

12:52PM  13   A.   IT PROVIDED THAT THE COMPANY COULD DECIDE -- LET ME LOOK

12:53PM  14   AT THE SPECIFIC WORDING OF IT.

12:53PM  15          THE COMPANY COULD DECIDE TO REDEEM ANY SHARES OF STOCK

12:53PM  16   THAT IT WISHED TO REDEEM AT WHATEVER THE BOARD DETERMINED THE

12:53PM  17   FAIR MARKET VALUE OF THE SHARES TO BE AT THAT TIME.

12:53PM  18   Q.   DID YOU THINK THAT THAT WAS AN ADVANTAGEOUS PROVISION FOR

12:53PM  19   AN INVESTOR?

12:53PM  20   A.   I THOUGHT IT WAS A DISADVANTAGEOUS PROVISION.

12:53PM  21   Q.   AND AS A RESULT, DID YOU TAKE ANY ACTION WITH REGARD TO

12:53PM  22   THIS SECTION BEFORE INVESTING?

12:53PM  23   A.   I DID.

12:53PM  24   Q.   AND WHAT WAS THAT?

12:53PM  25   A.   I RAISED THE QUESTION WITH ELIZABETH THAT I DIDN'T

12:53PM  1     UNDERSTAND THE PURPOSE FOR THIS PROVISION, AND I THOUGHT IT WAS

12:53PM  2     NOT A FAIR PROVISION TO INVESTORS.

12:53PM  3     Q.   AND DID, DID THERANOS MAKE SOME ACCOMMODATION FOR YOU?

12:53PM  4     A.   IT DID.

12:53PM  5     Q.   AND WHAT WAS THAT?

12:53PM  6     A.   IT GAVE ME A SHORT COMMITMENT THAT IT WOULD NOT EXERCISE

12:54PM  7     THIS PROVISION TO EVER BUY BACK STOCK FROM ME AT A PRICE LESS

12:54PM  8     THAN I PAID FOR THE STOCK.

12:54PM  9     Q.   AND WAS THAT COMMITMENT THAT THERANOS MADE LIMITED TO YOU?

12:54PM 10     A.   NO, IT WAS NOT.

12:54PM 11     Q.   WHO ALSO RECEIVED THAT BENEFIT?

12:54PM 12     A.   IT SAID BROADLY THAT ANY OF MY CLIENTS THAT HAD ALSO

12:54PM 13     INVESTED WOULD HAVE THE BENEFIT OF THAT SAME COMMITMENT.

12:54PM 14     Q.   AND DID YOU ASK FOR THE EXPANSION OF THAT COMMITMENT

12:54PM 15     BEYOND JUST YOU TO INCLUDE YOUR CLIENTS?

12:54PM 16     A.   I DID.

12:54PM 17     Q.   WHY?

12:54PM 18     A.   WELL, AS A LAWYER, YOU HAVE A FIDUCIARY OBLIGATION TO ALL

12:54PM 19     OF YOUR CLIENTS.

12:54PM 20          AND KNOWING THAT SOME OF MY CLIENTS WERE LOOKING AT IT AS

12:54PM 21     A POSSIBLE INVESTMENT, I WOULD NEVER HAVE BEEN COMFORTABLE

12:54PM 22     SECURING SOME PROVISION THAT WAS FAVORABLE TO ME WITHOUT

12:54PM 23     SECURING IT FOR THEM AS WELL.

12:54PM 24     Q.   YOU SAID "KNOWING THAT SOME OF YOUR CLIENTS WERE LOOKING

12:54PM 25     AT INVESTING."

12:54PM   1            WHAT DID YOU MEAN BY THAT?

12:54PM   2       A.   WELL, I KNEW THAT SOME OF MY CLIENTS WERE THINKING --

12:54PM   3       LOOKING AND DOING THEIR OWN DUE DILIGENCE AND THINKING ABOUT

12:54PM   4       INVESTING IN THE COMPANY.

12:55PM   5       Q.   WAS THAT A REFERENCE TO INDIVIDUALS BEYOND DR. KISSINGER?

12:55PM   6       WAS THIS OTHER CLIENTS THAT YOU'RE TALKING ABOUT?

12:55PM   7       A.   IT WAS OTHER CLIENTS.

12:55PM   8       Q.   AND WHAT WAS YOUR ROLE, IF ANY, IN THESE OTHER CLIENTS'

12:55PM   9       INTEREST OR DECISIONS REGARDING INVESTING IN THERANOS?

12:55PM  10       A.   WELL, SOME OF THEM MET ME -- MET HER THROUGH ME, BUT THAT

12:55PM  11       WAS THE EXTENT OF MY ROLE WAS AN INTRODUCTION OR -- EITHER AT

12:55PM  12       THEIR REQUEST OR AT MY SUGGESTION.

12:55PM  13       Q.   AND WHEN YOU SAID "HER," DO YOU MEAN MS. HOLMES?

12:55PM  14       A.   YES.

12:55PM  15       Q.   DID YOU ENCOURAGE THESE INDIVIDUALS, THESE CLIENTS, TO

12:55PM  16       INVEST IN THERANOS?

12:55PM  17       A.   NO.

12:55PM  18       Q.   WOULD YOU NOW TURN TO PAGE 144 OF THIS EXHIBIT.

12:55PM  19            SIR, ARE WE LOOKING AT SOME HANDWRITTEN NOTES NOW?

12:55PM  20       A.   YES.

12:55PM  21       Q.   AND DO YOU RECOGNIZE THE HANDWRITING?

12:56PM  22       A.   I DO.

12:56PM  23       Q.   AND WHOSE HANDWRITING IS IT?

12:56PM  24       A.   IT'S MY HANDWRITING.

12:56PM  25       Q.   AND IF WE COULD ZOOM IN ON IT.

12:56PM   1            I GUESS WHAT I'LL FIRST ASK YOU TO DO, IF YOU CAN, JUST

12:56PM   2       READ THE ENTIRE DOCUMENT TO THE JURY.

12:56PM   3       A.   OKAY.

12:56PM   4            NUMBER 1.  "PENETRATION ASSUMED IN 2015 NUMBERS."

12:56PM   5            BELOW THAT, DASH, "FIRST LOCATION IN PALO ALTO IN 2012."

12:56PM   6            BELOW THAT, DASH, "NOW."

12:56PM   7            BELOW THAT, DASH, "PARTNERSHIP WITH WALGREENS FALL 2013."

12:56PM   8            BELOW THAT, DASH, "NOW IN 30 WALGREENS, 29 IN ARIZONA AND

12:56PM   9       1 IN PALO ALTO."

12:56PM  10            BELOW THAT, DASH, "WELL 11,000 STORE IN 10 COUNTRIES."

12:56PM  11            BELOW THAT, DASH, "COLLABORATIONS WITH 3 HOSPITAL GROUPS

12:57PM  12       AS REFERENCE LABS."

12:57PM  13            AND THEN IN QUOTES, "MASSIVE UNDERTAKING," END QUOTE.

12:57PM  14       Q.   ARE THESE SOME NOTES THAT YOU TOOK?

12:57PM  15       A.   THEY ARE.

12:57PM  16       Q.   AND NOTES FROM WHAT?

12:57PM  17       A.   I BELIEVE THEY WERE BASED ON A TELEPHONE CONVERSATION WITH

12:57PM  18       ELIZABETH HOLMES.

12:57PM  19       Q.   AND WOULD THIS HAVE BEEN A CONVERSATION AFTER THE

12:57PM  20       JULY 21St CONVERSATION THAT YOU AND I SPOKE ABOUT?

12:57PM  21       A.   THAT IS CORRECT.

12:57PM  22       Q.   DO YOU KNOW IF THIS CONVERSATION WOULD HAVE OCCURRED AFTER

12:57PM  23       YOU HAD RECEIVED THIS BINDER OF MATERIALS?

12:57PM  24       A.   IT WAS AFTER.

12:57PM  25       Q.   AND HOW DO YOU KNOW THAT?

12:57PM 1    A.   AMONG OTHER THINGS, I THINK IT WAS WRITTEN ON ONE OF THE

12:57PM 2    PAGES THAT WAS PART OF THE PACKAGE.

12:57PM 3    Q.   SO YOU THINK YOU RECEIVED THE BINDER, AND THEN HAD ANOTHER

12:57PM 4    CALL WITH MS. HOLMES AND WROTE NOTES IN THE BINDER?

12:57PM 5    A.   I THINK THAT IS CORRECT.

12:57PM 6    Q.   IN NUMBER 1 YOU SAID THAT THAT READ, "PENETRATION ASSUMED

12:58PM 7    IN 2015 NUMBERS."

12:58PM 8        IS THAT CORRECT?

12:58PM 9    A.   THAT'S CORRECT.

12:58PM 10   Q.   AND DO YOU KNOW WHAT THAT MEANT?

12:58PM 11   A.   IT WAS REFERRING TO THE THERANOS LABS THAT WERE LOCATED IN

12:58PM 12   THE WALGREENS DRUG STORES.

12:58PM 13   Q.   AND WHEN YOU SAY "IT WAS REFERRING TO," I'M SORRY, WHAT DO

12:58PM 14   YOU MEAN?

12:58PM 15   A.   WELL, THE SENTENCE SAYS, "PENETRATION."

12:58PM 16       I WAS REFERRING TO WHAT EXTENT, TO WHAT NUMBERS OF

12:58PM 17   WALGREENS STORES WERE THERE THERANOS FACILITIES LOCATED IN.

12:58PM 18   Q.   I SEE.

12:58PM 19       IT WAS SIGNIFICANT -- THE NUMBER OF THERANOS STORES

12:58PM 20   LOCATED WITHIN A WALGREENS WAS A SIGNIFICANT NUMBER; IS THAT

12:58PM 21   RIGHT?

12:58PM 22   A.   YES.

12:58PM 23   Q.   DO YOU KNOW WHAT IT WAS SIGNIFICANT TO, OR WHAT INFLUENCE

12:58PM 24   IT HAD ON OTHER INFORMATION?

12:58PM 25   A.   WELL, IT WOULD HAVE IMPACTED THE LEVEL OF REVENUE.

12:58PM   1    Q.   I SEE.

12:58PM   2         AND DID YOU LEARN THAT INFORMATION ON THIS PHONE CALL WITH

12:59PM   3    MS. HOLMES?

12:59PM   4    A.   I BELIEVE I DID, AND IT MIGHT HAVE BEEN ALSO THE CALL AND

12:59PM   5    THE ADDITIONAL MATERIALS.

12:59PM   6    Q.   THANK YOU.

12:59PM   7         IF YOU'LL NOW TURN TO PAGE 275 OF THIS EXHIBIT.

12:59PM   8         DO YOU SEE THE FIRST PARAGRAPH IN THIS DOCUMENT THAT

12:59PM   9    READS, "HEADQUARTERED IN PALO ALTO, THERANOS IS A CONSUMER

12:59PM  10    HEALTH CARE TECHNOLOGY COMPANY.  THERANOS'S CLINICAL LABORATORY

12:59PM  11    OFFERS COMPREHENSIVE LABORATORY TESTS FROM SAMPLES AS SMALL AS

12:59PM  12    A FEW DROPS OF BLOOD AT UNPRECEDENTED LOW PRICES."

12:59PM  13         DO YOU SEE THAT?

12:59PM  14    A.   I DO.

12:59PM  15    Q.   AND DID YOU RECEIVE THIS ALSO BEFORE MAKING A DECISION TO

01:00PM  16    INVEST?

01:00PM  17    A.   I DID.

01:00PM  18    Q.   THE REFERENCE THERE TO THERANOS'S CLINICAL LAB OFFERING

01:00PM  19    COMPREHENSIVE LAB TESTS, WAS THAT CONSISTENT WITH YOUR

01:00PM  20    UNDERSTANDING OF THE CURRENT CAPABILITIES OF THERANOS'S

01:00PM  21    TECHNOLOGY?

01:00PM  22    A.   IT WAS.

01:00PM  23    Q.   WOULD YOU NOW TURN TO PAGE 278.

01:00PM  24         THE NEXT SEVERAL SLIDES THAT I'M GOING TO DISCUSS WITH YOU

01:00PM  25    LOOK LIKE, LOOK LIKE SLIDES OR POWERPOINT SLIDES.

01:00PM  1          DO YOU RECALL THESE?

01:00PM  2     A.   I DO.

01:00PM  3     Q.   AND WAS THE CONTENT OF THESE SLIDES ALSO IMPORTANT IN YOUR

01:00PM  4     EVENTUAL DECISION TO INVEST?

01:00PM  5     A.   THEY WERE.

01:00PM  6     Q.   IF YOU'LL TURN TO THE NEXT PAGE, PAGE 279, THERE'S AN

01:00PM  7     IMAGE OF A CHILD AND THE PHRASE "GOODBYE, BIG BAD NEEDLE."

01:01PM  8          DO YOU SEE THAT?

01:01PM  9     A.   NOT ON WHAT IS MY -- OH, MAYBE I'M ON THE WRONG PAGE.

01:01PM  10    HOLD IT.  I MAY BE -- I WAS LOOKING AT THE WRONG PAGE.  I WAS

01:01PM  11    LOOKING AT ANOTHER STAMP OF NUMBERS ON THE BOTTOM OF THE PAGE.

01:01PM  12    Q.   I'M SORRY.  THE BOTTOM MIDDLE?

01:01PM  13    A.   YES.

01:01PM  14    Q.   IT SHOULD SAY PAGE -- THREE LEAD ZEROS AND THEN 279.

01:01PM  15    A.   I HAVE IT NOW.

01:01PM  16    Q.   SO ON THIS PAGE, DO YOU SEE THE PHRASE "GOODBYE, BIG BAD

01:01PM  17    NEEDLE"?

01:01PM  18    A.   I SEE IT.

01:01PM  19    Q.   AND DID YOU UNDERSTAND WHAT THAT MEANS?  DID YOU

01:01PM  20    UNDERSTAND WHAT THAT WAS A REFERENCE TO?

01:01PM  21    A.   I DID.

01:01PM  22    Q.   AND WHAT DID THAT MEAN?

01:01PM  23    A.   TO ME IT MEANT IT WAS GOING TO BE TAKING BLOOD SAMPLES BY

01:01PM  24    A FINGERPRICK AND, THEREFORE, WOULD NOT NEED A BIG NEEDLE TO

01:01PM  25    DRAW BLOOD FROM A VEIN.

01:01PM   1    Q.   AND WAS THAT YOUR UNDERSTANDING BEFORE INVESTING IN

01:02PM   2    THERANOS?

01:02PM   3    A.   IT WAS.

01:02PM   4    Q.   WOULD YOU NOW TURN TO THE NEXT PAGE, PAGE 280.

01:02PM   5         ON THIS SLIDE, THE FIRST INTENDED PARAGRAPH READS,

01:02PM   6    "THERANOS'S PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE

01:02PM   7    BLOOD TESTS FROM A FINGERSTICK AND TESTS FROM MICRO-SAMPLES OF

01:02PM   8    OTHER MATRICES AND GENERATES SIGNIFICANTLY HIGHER INTEGRITY

01:02PM   9    DATA THAN CURRENTLY POSSIBLE."

01:02PM  10         DO YOU SEE THAT?

01:02PM  11    A.   I DO.

01:02PM  12    Q.   AND WAS THAT REPRESENTATION SIGNIFICANT TO YOU WHEN YOU

01:02PM  13    MADE A DECISION TO INVEST?

01:02PM  14    A.   IT WAS.

01:02PM  15    Q.   WHY?

01:02PM  16    A.   WELL, THAT WAS -- AS IT SAYS, I UNDERSTAND IT TO BE

01:02PM  17    PROPRIETARY, I UNDERSTOOD IT TO BE PATENTED, AND THAT WAS AN

01:02PM  18    IMPORTANT DEVELOPMENT.

01:02PM  19    Q.   AND DID YOU, DID YOU BELIEVE THAT YOU WERE INVESTING IN A

01:02PM  20    COMPANY THAT RAN BLOOD TESTS?

01:02PM  21    A.   I DID.

01:02PM  22    Q.   DID YOU BELIEVE THAT YOU WERE INVESTING IN A COMPANY THAT

01:03PM  23    RAN BLOOD TESTS USING ITS OWN DEVICES OR USING DEVICES THAT IT

01:03PM  24    PURCHASED FROM THIRD PARTY MANUFACTURERS?

01:03PM  25    A.   USING ITS OWN DEVICES.

01:03PM 1    Q.   AND WAS THIS SENTENCE THAT I JUST READ TO YOU AT LEAST ONE

01:03PM 2    OF THE SOURCES WHERE YOU REACHED THAT CONCLUSION?

01:03PM 3    A.   YES.

01:03PM 4    Q.   IF YOU WILL LOOK NOW AT THE NEXT LINE, "THERANOS IS THE

01:03PM 5    WORLD'S FIRST AND ONLY CLIA-CERTIFIED LABORATORY RUNNING ITS

01:03PM 6    TESTS ON MICRO-SAMPLES."

01:03PM 7    A.   I SEE THAT.

01:03PM 8    Q.   YOU SEE THAT?

01:03PM 9         AND WAS THAT REPRESENTATION SIGNIFICANT IN YOUR DECISION

01:03PM 10   TO INVEST?

01:03PM 11   A.   IT WAS.

01:03PM 12   Q.   WHY?

01:03PM 13   A.   WELL, IT INDICATED THAT THE LABORATORY HAD BEEN CERTIFIED

01:03PM 14   AND THAT IT WAS RUNNING TESTS ON MICRO SAMPLES.

01:03PM 15   Q.   THE NEXT PARAGRAPH READS, "CURRENT AND PAST CLIENTS

01:03PM 16   INCLUDE 10 OF THE TOP 15 MAJOR PHARMACEUTICAL COMPANIES,

01:03PM 17   MIDSIZED BIO-PHARMAS, PROMINENT RESEARCH INSTITUTIONS, HEALTH

01:04PM 18   CARE PAYORS, AND U.S. AND FOREIGN GOVERNMENT HEALTH AND

01:04PM 19   MILITARY ORGANIZATIONS."

01:04PM 20        I WANT TO ASK YOU IN PARTICULAR ABOUT THAT FIRST PART, "10

01:04PM 21   OF THE TOP 15 MAJOR PHARMACEUTICAL COMPANIES."

01:04PM 22   A.   UH-HUH.

01:04PM 23   Q.   WAS THAT REPRESENTATION SIGNIFICANT TO YOU IN YOUR

01:04PM 24   DECISION TO INVEST?

01:04PM 25   A.   YES.

01:04PM   1    Q.   WHY?

01:04PM   2    A.   WELL, BECAUSE THE PHARMACEUTICAL COMPANIES ARE LARGE --

01:04PM   3    THE TOP 15 OR TOP 10 WERE VERY LARGE COMPANIES THAT WERE VERY

01:04PM   4    SOPHISTICATED.

01:04PM   5    Q.   IN FACT, DID YOU AT SOME POINT REVIEW A REPORT FROM A

01:04PM   6    COMPANY CALLED PFIZER?

01:04PM   7    A.   YES, I DID.

01:04PM   8    Q.   AND WAS THAT PARTICULAR REPORT SIGNIFICANT TO YOU?

01:04PM   9    A.   IT WAS.

01:04PM   10   Q.   WHY?

01:04PM   11   A.   WELL, IT WAS A VERY DETAILED, LONG REPORT ABOUT THE USE OF

01:04PM   12   THE EQUIPMENT, AND IT WAS HIGHLY COMPLIMENTARY.

01:04PM   13   Q.   IF YOU'LL NOW TURN TO PAGE 85, I'M SORRY, 285.

01:05PM   14        DO YOU SEE THE SLIDE ENTITLED VALIDATION OF THERANOS

01:05PM   15   TESTS?

01:05PM   16   A.   I SEE IT.

01:05PM   17   Q.   THE FIRST PARAGRAPH READS, "THERANOS HAS BEEN

01:05PM   18   COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

01:05PM   19   YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES,

01:05PM   20   WITH HUNDREDS OF THOUSANDS OF ASSAYS PROCESSED."

01:05PM   21        DO YOU SEE THAT LINE?

01:05PM   22   A.   I DO.

01:05PM   23   Q.   WAS THAT REPRESENTATION SIGNIFICANT IN YOUR DECISION TO

01:05PM   24   INVEST?

01:05PM   25   A.   IT WAS.

MOSLEY DIRECT BY MR. SCHENK                    5169

01:05PM   1    Q.   WHY?

01:05PM   2    A.   BECAUSE IT WAS REFERRING TO PHARMACEUTICAL COMPANIES WHICH

01:05PM   3    WERE INDICATED TO BE HIGHLY SOPHISTICATED, AND IT WAS

01:05PM   4    INDICATING THAT, ONCE AGAIN, 10 OF THE 15 LARGEST

01:05PM   5    PHARMACEUTICAL COMPANIES HAD WORKED WITH THERANOS AND IT

01:05PM   6    INVOLVES HUNDREDS OF THOUSANDS OF ASSAYS.

01:05PM   7    Q.   AND FURTHER DOWN, DO YOU SEE THE IMAGE OR THE LOGO FROM

01:06PM   8    JOHNS HOPKINS MEDICINE?

01:06PM   9    A.   I DO.

01:06PM  10    Q.   DID YOU THINK THAT JOHNS HOPKINS HAD VALIDATED THERANOS

01:06PM  11    TESTS?

01:06PM  12    A.   YES.

01:06PM  13    Q.   IF YOU'LL NOW TURN TO PAGE 299.

01:06PM  14    A.   OKAY.

01:06PM  15    Q.   ON 299, DO YOU SEE WHERE IT SAYS "SAME TESTS, A WHOLE NEW

01:06PM  16    APPROACH"?

01:06PM  17    A.   I DO.

01:06PM  18    Q.   AND BELOW THAT, "THE ACTIONABLE INFORMATION YOU NEED,

01:06PM  19    1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW?"

01:07PM  20         DO YOU SEE THAT?

01:07PM  21    A.   I DO.

01:07PM  22    Q.   AND IT APPEARS THERE ARE THREE IMAGES BELOW THAT ON THE

01:07PM  23    SLIDE.

01:07PM  24         DO YOU SEE THAT?

01:07PM  25    A.   I DO.

MOSLEY DIRECT BY MR. SCHENK                    5170

01:07PM  1    Q.   AND THEN, "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL

01:07PM  2    LABORATORIES, AND PROCESSES ALL SAMPLE TYPES."

01:07PM  3         AND THEN AT THE VERY END IT READS, "THERANOS PROVIDES THE

01:07PM  4    HIGHEST LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN

01:07PM  5    OUR PRE AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST

01:07PM  6    LEVELS OF ACCURACY AND PRECISION."

01:07PM  7         AGAIN, MR. MOSLEY, DID YOU RECEIVE THIS SLIDE BEFORE

01:07PM  8    INVESTING?

01:07PM  9    A.   YES, I DID.

01:07PM 10    Q.   WAS THIS SIGNIFICANT IN YOUR DECISION TO INVEST?

01:07PM 11    A.   IT WAS.

01:07PM 12    Q.   WHY?

01:07PM 13    A.   WELL, BECAUSE IT PROVIDED THAT THEY CAN RUN ALL OF THE

01:07PM 14    TESTS, RUN IT WITH A SMALL SAMPLE SIZE, AND AS IT SAYS, IT SAYS

01:07PM 15    THAT OVERSIGHT, AUTOMATION AND STANDARDIZATION AND THE HIGHEST

01:07PM 16    LEVELS OF ACCURACY AND PRECISION?

01:07PM 17    Q.   AND I APPRECIATE IT MAY BE OBVIOUS, BUT WHY IS ACCURACY

01:07PM 18    AND PRECISION IMPORTANT IN YOUR DECISION TO INVEST?

01:07PM 19    A.   WELL, YOU KNOW, BLOOD TESTING OBVIOUSLY INVOLVES HUMAN

01:08PM 20    HEALTH AND ACCURACY IS CRITICAL IN DETERMINING WHETHER, YOU

01:08PM 21    KNOW, A TEST IS APPROPRIATE AND RELIABLE.

01:08PM 22    Q.   AT THE VERY TOP WHERE IT SAYS "SAME TESTS, A WHOLE NEW

01:08PM 23    APPROACH," WHAT DID THAT MEAN TO YOU IN PARTICULAR, "A WHOLE

01:08PM 24    NEW APPROACH"?

01:08PM 25    A.   MY UNDERSTANDING WAS THAT IT WAS COMPLETELY NEW TECHNOLOGY

01:08PM 1    THAT ALLOWED THIS TO BE DONE WITH SMALL SAMPLE SIZES.

01:08PM 2    Q.   THANK YOU.

01:08PM 3         IF YOU'LL NOW TURN TO PAGE 301, TWO PAGES FORWARD.

01:08PM 4    A.   OKAY.

01:08PM 5    Q.   DO YOU SEE A SLIDE TITLED "A NEW STANDARD IN QUALITY"?

01:08PM 6    A.   I DO.

01:08PM 7    Q.   AND IT READS, "THE HIGHEST LEVELS OF ACCURACY.

01:08PM 8         "BY SYSTEMATICALLY CONTROLLING AND STANDARDIZING OUR

01:08PM 9    PROCESSES, THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF

01:08PM 10   ACCURACY."

01:08PM 11        DO YOU SEE THAT?

01:08PM 12   A.   I DO.

01:08PM 13   Q.   AND AGAIN, WAS THE ACCURACY OF THERANOS TESTS IMPORTANT IN

01:08PM 14   YOUR DECISION TO INVEST?

01:08PM 15   A.   IT WAS.

01:08PM 16   Q.   IF YOU'LL TURN NOW TWO PAGES FORWARD AGAIN TO PAGE 303.

01:09PM 17   A.   OKAY.

01:09PM 18   Q.   DO YOU SEE THE SLIDE TITLED "NEW POSSIBILITIES IN LAB"?

01:09PM 19   A.   I DO.

01:09PM 20   Q.   AND ON THE LEFT SIDE THE FIRST BULLET READS, "ALL 1,000

01:09PM 21   PLUS CURRENTLY RUN TESTS/CPT CODES ARE AVAILABLE THROUGH

01:09PM 22   THERANOS."

01:09PM 23        AND THE SECOND BULLET READS, "THERANOS RUNS ANY TEST

01:09PM 24   AVAILABLE IN CENTRAL LABORATORIES."

01:09PM 25        WAS THE VOLUME OF TESTS THAT THERANOS WAS OFFERING, WAS

01:09PM 1    THAT SIGNIFICANT IN YOUR DECISION TO INVEST?

01:09PM 2    A.   IT WAS.

01:09PM 3    Q.   AND WHY DID THE VOLUME OF TESTS MATTER?

01:09PM 4    A.   WELL, BECAUSE IT WOULD -- IF YOU WERE GOING TO HAVE A

01:09PM 5    TESTING DEVICE, IT WAS IMPORTANT THAT IT COULD RUN THE FULL

01:09PM 6    RANGE OF TESTS THAT YOU WOULD EXPECT TO BE ABLE TO OBTAIN.

01:09PM 7    Q.   THANK YOU.

01:09PM 8         IF YOU'LL NOW TURN TO THE NEXT PAGE, PAGE 304.

01:10PM 9         DO YOU SEE "FASTER RESULTS.  FASTER ANSWERS."

01:10PM 10        AND BELOW THAT, "THERANOS'S MICRO-SAMPLE ANALYSIS IS

01:10PM 11   PERFORMED AT AMAZING SPEED, SO WE CAN REPORT RESULTS FASTER

01:10PM 12   THAN PREVIOUSLY POSSIBLE."

01:10PM 13        WHAT I'M WONDERING IS WHAT DID "FASTER THAN PREVIOUS

01:10PM 14   POSSIBLE," THAT COMPARATIVE, WHAT DID THAT MEAN TO YOU?

01:10PM 15   A.   TO ME IT MEANT THAT RATHER THAN HAVING A BLOOD DRAW AND

01:10PM 16   WAITING A DAY OR TWO OR THREE DAYS TO GET BLOOD TESTS, OR

01:10PM 17   LONGER, THAT YOU WOULD GET THE RESULTS BACK MUCH FASTER.

01:10PM 18   Q.   DID YOU THINK THAT THERANOS BLOOD TESTING TECHNOLOGY WAS

01:10PM 19   THEREFORE ABLE TO GENERATE ITS RESULTS FASTER THAN WHAT WAS

01:10PM 20   CURRENTLY AVAILABLE IN THE MARKET?

01:10PM 21   A.   YES.

01:10PM 22   Q.   AND WAS THAT ADVANTAGE IMPORTANT TO YOUR INVESTMENT

01:11PM 23   DECISION?

01:11PM 24   A.   IT WAS.

01:11PM 25   Q.   WHY?

01:11PM 1     A.   WELL, BECAUSE, YOU KNOW, ANY TECHNOLOGY THAT WOULD ALLOW

01:11PM 2     SOMETHING TO BE DONE FASTER WOULD MAKE IT HIGHLY DESIRABLE AND

01:11PM 3     HIGHLY COMMERCIAL.

01:11PM 4     Q.   THANK YOU.

01:11PM 5          IF YOU'LL NOW TURN TO PAGE 320.

01:11PM 6          DO YOU SEE THE SLIDE THAT IS ENTITLED "RECENT PRESS"?

01:11PM 7     A.   ONE -- PAGE 330 DID YOU SAY?

01:11PM 8     Q.   320.

01:11PM 9     A.   320.

01:11PM 10    Q.   OKAY.

01:11PM 11         DO YOU SEE THE SECOND IMAGE DOWN ON THE LEFT THE WORD

01:11PM 12    "FORTUNE"?

01:11PM 13    A.   I DO.

01:11PM 14    Q.   AND THEN ACROSS FROM THAT, "THIS CEO IS OUT FOR BLOOD,"

01:12PM 15    FOLLOWED BY AN IMAGE OF A "FORTUNE" MAGAZINE COVER.

01:12PM 16         DO YOU SEE THAT?

01:12PM 17    A.   I DO.

01:12PM 18    Q.   AND WHAT DID IT MEAN TO YOU THAT WITHIN THIS PACKAGE

01:12PM 19    YOU'RE RECEIVING IMAGES FROM MAGAZINES, OR IMAGES FROM THE NAME

01:12PM 20    OF A PERIODICAL, EVEN A SLIDE CALLED "RECENT PRESS," WHAT DID

01:12PM 21    THAT MEAN TO YOU?

01:12PM 22    A.   WELL, IT MEANT THIS TECHNOLOGY WAS BEING RECOGNIZED BY THE

01:12PM 23    PRESS.

01:12PM 24    Q.   WAS THAT SIGNIFICANT?

01:12PM 25    A.   IT WAS.

01:12PM 1    Q.   WHY?

01:12PM 2    A.   WELL, BECAUSE IT WAS A FURTHER VALIDATION AND GOOD

01:12PM 3    MARKETING.

01:12PM 4    Q.   AFTER YOU RECEIVED THIS, DO YOU KNOW WHETHER YOU LOOKED AT

01:12PM 5    ANY OF THE PRESS?

01:12PM 6    A.   I DON'T REMEMBER SPECIFICALLY, BUT I DO REMEMBER I READ

01:12PM 7    THE "FORTUNE" -- I CERTAINLY READ THE "FORTUNE" ARTICLE, AND I

01:13PM 8    PROBABLY READ ONE OR MORE OTHER ARTICLES.

01:13PM 9    Q.   YOU SAID YOU HAD A SPECIFIC RECOLLECTION OF READING THE

01:13PM 10   "FORTUNE" ARTICLE?

01:13PM 11   A.   I DO.  I KNOW I READ THE "FORTUNE" ARTICLE.

01:13PM 12   Q.   THANK YOU.

01:13PM 13        IF YOU'LL NOW TURN TO PAGE 419.

01:13PM 14   A.   I HAVE IT.

01:13PM 15   Q.   PAGE 419 THROUGH PAGE 445, I'M WONDERING IF YOU'RE

01:13PM 16   FAMILIAR WITH THE DOCUMENTS LOCATED THERE?

01:13PM 17   A.   I AM.

01:13PM 18   Q.   AND WHAT ARE THOSE DOCUMENTS?

01:13PM 19   A.   THIS IS A REPORT BY PFIZER OF A STUDY USING THERANOS'S

01:13PM 20   TECHNOLOGY.

01:13PM 21   Q.   AND IN THE COPY IN THE BINDER AND ON THE SCREEN, IT LOOKS

01:13PM 22   LIKE SOME PARAGRAPHS CONTAIN HIGHLIGHTING; IS THAT RIGHT?

01:14PM 23   A.   THEY DO.

01:14PM 24   Q.   AND DO YOU RECOGNIZE THAT HIGHLIGHTING ON THE DOCUMENT?

01:14PM 25   A.   I DID IT.

01:14PM  1    Q.   YOU DID THE HIGHLIGHTING?

01:14PM  2    A.   I DID THE HIGHLIGHTING, YES.

01:14PM  3    Q.   I'M SORRY TO TALK OVER YOU.

01:14PM  4         YOU DID THE HIGHLIGHTING?

01:14PM  5    A.   YES.

01:14PM  6    Q.   WHEN YOU WERE REVIEWING THIS PFIZER REPORT, WERE THE

01:14PM  7    CONCLUSIONS OR THE REPRESENTATIONS IN IT, WERE THEY SIGNIFICANT

01:14PM  8    TO YOU?

01:14PM  9    A.   YES.

01:14PM  10   Q.   WHY?

01:14PM  11   A.   PFIZER IS A LARGE, VERY SOPHISTICATED PHARMACEUTICAL

01:14PM  12   COMPANY THAT WOULD HAVE HAD A LOT OF KNOWLEDGE AND EXPERIENCE

01:14PM  13   IN THIS AREA, AND THE CONCLUSIONS WERE VERY POSITIVE ABOUT THE

01:14PM  14   TECHNOLOGY.

01:14PM  15   Q.   THANK YOU.

01:14PM  16        YOUR HONOR, PERMISSION TO PUBLISH 5387H, PAGE 17.

01:14PM  17   PREVIOUSLY ADMITTED.

01:14PM  18             THE COURT:  IT CAN BE PUBLISHED.

01:14PM  19   BY MR. SCHENK:

01:14PM  20   Q.   SO, MR. MOSLEY, I'M SHOWING YOU A GROUP OF TEXT MESSAGES.

01:15PM  21   YOU'RE NOT ON THESE TEXT MESSAGES; IS THAT CORRECT?

01:15PM  22   A.   NO, I'M NOT.

01:15PM  23   Q.   SO IF WE CAN ZOOM IN ON THE TEXT MESSAGES, THE SECOND ONE

01:15PM  24   FROM THE BOTTOM.  PRECISELY.  THANK YOU.

01:15PM  25        DO YOU SEE THAT ON NOVEMBER 20TH, 2013, MS. HOLMES WRITES

01:15PM  1    TO MR. BALWANI, "AM PLANNING ON INCLUDING ALL WE SENT DST,

01:15PM  2    INCLUDING THE PFIZER REPORT.  LET ME KNOW IF U DISAGREE."

01:15PM  3         DO YOU SEE THAT?

01:15PM  4    A.   I DO.

01:15PM  5    Q.   AND, MR. MOSLEY, I THINK YOU TOLD THE JURY YOU RECEIVED

01:15PM  6    THIS BINDER IN AROUND AUGUST OF 2014; IS THAT CORRECT?

01:15PM  7    A.   THAT IS CORRECT.

01:15PM  8    Q.   I'D LIKE TO NOW RETURN TO THE BINDER.  IF YOU'LL TURN TO

01:15PM  9    PAGE 445.

01:15PM 10         THIS PAGE APPEARS TO BE A LIST OF SELECT ANCHOR HOSPITAL

01:15PM 11    PARTNERS.

01:16PM 12         DO YOU SEE THAT?

01:16PM 13    A.   I DO.

01:16PM 14    Q.   AND DID YOU HAVE AN UNDERSTANDING OF WHAT WAS BEING

01:16PM 15    REPRESENTED OR WHAT WAS BEING DISCUSSED HERE?

01:16PM 16    A.   I BELIEVE THESE WERE HOSPITALS THAT THERANOS WAS ALREADY

01:16PM 17    WORKING WITH.

01:16PM 18    Q.   THANK YOU.

01:16PM 19         IF YOU'LL NOW TURN TO PAGE 510.

01:16PM 20         DO YOU RECOGNIZE THE DOCUMENT ON PAGE 510?

01:16PM 21    A.   I DO.

01:16PM 22    Q.   AND WHAT IS THIS?

01:16PM 23    A.   IT'S TYPICALLY REFERRED TO AS A CAP TABLE.

01:16PM 24    Q.   WHAT IS A CAP TABLE?

01:16PM 25    A.   A CAP TABLE SHOWS THE DIFFERENT SERIES OF STOCK THAT HAS

01:16PM 1      BEEN ISSUED BY VARIOUS -- BY A PARTICULAR COMPANY, AND THE

01:16PM 2      PRICE, AND THE DATE OF ISSUANCE, AND THE TOTAL PROCEEDS.

01:16PM 3      Q.   SO WE SEE THERE'S A LINE FOR SERIES C-2.

01:16PM 4           DO YOU SEE THAT?

01:16PM 5      A.   I DO.

01:16PM 6      Q.   AND I THINK YOU SAID EARLIER THAT WHEN YOU INVESTED IN

01:17PM 7      THERANOS YOU PURCHASED C-2 STOCK; IS THAT RIGHT?

01:17PM 8      A.   THAT IS CORRECT.

01:17PM 9      Q.   AND DID YOU PAY $17 PER SHARE?

01:17PM 10     A.   I DID.

01:17PM 11     Q.   AND IT LOOKS LIKE LISTED HERE THERE IS AN AMOUNT ABOUT

01:17PM 12     $194 MILLION.

01:17PM 13          DO YOU SEE THAT?

01:17PM 14     A.   I DO.

01:17PM 15     Q.   AND WHAT DOES THAT MEAN?

01:17PM 16     A.   THAT WOULD HAVE BEEN THE TOTAL DOLLARS RAISED BY SELLING

01:17PM 17     C-2 SHARES AS OF THAT DATE.

01:17PM 18     Q.   SO BECAUSE YOU RECEIVED THIS DOCUMENT BEFORE YOU HAD

01:17PM 19     INVESTED, IT WOULD NOT INCLUDE YOUR INVESTMENT, FOR INSTANCE?

01:17PM 20     A.   THAT IS CORRECT.

01:17PM 21     Q.   SO THE -- IS THE CAP TABLE SORT OF A MOMENT IN TIME?

01:17PM 22     A.   YES.

01:17PM 23     Q.   IF YOU'LL NOW TURN TO PAGE 512.

01:17PM 24          DO YOU RECOGNIZE THE DOCUMENT ON PAGE 512?

01:17PM 25     A.   I DO.

01:17PM 1    Q.   WHAT IS THIS DOCUMENT?

01:17PM 2    A.   IT WAS A PROJECTED STATEMENT OF INCOME.

01:17PM 3    Q.   AND DO YOU SEE THE LINE FOR TOTAL REVENUE?

01:18PM 4    A.   I DO.

01:18PM 5    Q.   AND WHAT WAS THE TOTAL REVENUE PROJECTED FOR THE END OF

01:18PM 6    2014?

01:18PM 7    A.   $140 MILLION.

01:18PM 8    Q.   AND DO WE KNOW THAT IT'S THE END OF 2014 BECAUSE OF THE

01:18PM 9    PERIOD ENDING DATE?

01:18PM 10   A.   I SEE THE PERIOD ENDING DATE, YES.

01:18PM 11   Q.   THE PERIOD ENDING DATE APPEARS TO BE THE LAST DAY OF THE

01:18PM 12   YEAR, DECEMBER 31ST OF 2014; IS THAT RIGHT?

01:18PM 13   A.   THAT'S CORRECT.

01:18PM 14   Q.   AND YOU SAID THAT THE PROJECTED REVENUE WAS $140 MILLION

01:18PM 15   FOR 2014; IS THAT RIGHT?

01:18PM 16   A.   CORRECT.

01:18PM 17   Q.   WHEN DID YOU RECEIVE THIS PROJECTION?

01:18PM 18   A.   I BELIEVE I RECEIVED IT AS PART OF THE INITIAL PACKET OF

01:18PM 19   DOCUMENTS.

01:18PM 20   Q.   WITH THE AUGUST COVER LETTER?

01:18PM 21   A.   CORRECT.

01:18PM 22   Q.   SO IN AUGUST OF 2014 WERE YOU BEING TOLD THAT THERANOS WAS

01:18PM 23   PROJECTING $140 MILLION OF REVENUE BY THE END OF THAT YEAR?

01:18PM 24   A.   YES.

01:18PM 25   Q.   AND HOW ABOUT THE SAME FOR 2015?

01:18PM 1          WHAT IS THE TOTAL REVENUE PROJECTED FOR 2015?

01:19PM 2     A.   990 MILLION.

01:19PM 3     Q.   AND I WANT TO ASK ABOUT A FEW OF THE LINE ENTRIES.

01:19PM 4          DO YOU SEE LAB SERVICES FOR U.S. RETAIL PHARMACIES?

01:19PM 5     A.   I DO.

01:19PM 6     Q.   AND WHAT WAS THE PROJECTED REVENUE FOR '14, 2014?

01:19PM 7     A.   42 MILLION.

01:19PM 8     Q.   AND HOW ABOUT FOR 2015?

01:19PM 9     A.   470 MILLION.

01:19PM 10    Q.   WERE THOSE PROJECTIONS SIGNIFICANT IN YOUR DECISION TO

01:19PM 11    INVEST?

01:19PM 12         AND TO BE CLEAR, WHAT I MEAN IS THE PROJECTIONS AS A

01:19PM 13    WHOLE, THE TOTAL AMOUNT OF 2014 AND THE TOTAL AMOUNT FOR 2015?

01:19PM 14    A.   WAS IT SIGNIFICANT?

01:19PM 15    Q.   YES.

01:19PM 16    A.   YES.

01:19PM 17    Q.   WHY?

01:19PM 18    A.   IT OBVIOUSLY SHOWED INCREDIBLE GROWTH IN THE REVENUES,

01:19PM 19    INCREDIBLE PROJECTED GROWTH IN THE REVENUES OF THE COMPANY.

01:19PM 20    Q.   TALK TO ME FOR A MOMENT ABOUT THAT PHRASE "PROJECTED."

01:19PM 21         YOU RECEIVED IT IN AUGUST OF 2014.

01:19PM 22    A.   RIGHT.

01:19PM 23    Q.   AND IT'S PROJECTED REVENUE FOR THE REST OF THE YEAR.

01:19PM 24         WHEN YOU'RE EVALUATING THE SIGNIFICANCE OF THE

01:20PM 25    PROJECTIONS, HOW DO YOU, HOW DO YOU QUANTIFY, OR HOW IS IT

01:20PM  1    RELEVANT TO YOU THAT THESE NUMBERS ARE PROJECTIONS?

01:20PM  2    A.   WELL, IT'S -- WHEN YOU'RE IN THE MIDDLE OF THE YEAR AND

01:20PM  3    YOU GET A PROJECTED STATEMENT FOR THE ENTIRE YEAR, YOU WOULD

01:20PM  4    EXPECT THAT IT WOULD BE ACTUAL NUMBERS UP UNTIL THAT POINT IN

01:20PM  5    TIME, AND THE PROJECTION WOULD BE THE PORTION OF THE YEAR THAT

01:20PM  6    HAD NOT YET ELAPSED.

01:20PM  7    Q.   SO -- AND THEN TELL ME ABOUT 2015.

01:20PM  8    A.   AND SO FOR 2015 IT WOULD HAVE BEEN A PROJECTION FOR THE

01:20PM  9    WHOLE YEAR.

01:20PM  10   Q.   AND DOES WHAT YOU JUST SAID SAY SOMETHING ABOUT HOW

01:20PM  11   ACCURATE YOU PERSONALLY EXPECTED EACH OF THESE PROJECTIONS TO

01:20PM  12   BE?

01:20PM  13   A.   YES.

01:20PM  14   Q.   AND WHAT IS THAT?

01:20PM  15   A.   MORE ACCURATE FOR 2014 SINCE IT WOULD HAVE HAD ACTUAL

01:20PM  16   NUMBERS FOR A PERIOD OF TIME AND PROJECTED FOR THE BALANCE.

01:20PM  17        AND, BY DEFINITION, LESS ACCURATE FOR 2015 BECAUSE IT WAS

01:21PM  18   A PROJECTION FOR THE ENTIRE YEAR.

01:21PM  19   Q.   IF THE REVENUE FOR 2015 WAS NEGLIGIBLE, A FEW HUNDRED

01:21PM  20   THOUSAND DOLLARS OR LESS, TELL ME HOW THAT WOULD FACTOR INTO

01:21PM  21   YOUR ANALYSIS OF IT BEING A PROJECTION IN 2015.

01:21PM  22   A.   I'M NOT SURE WHAT YOU MEAN.

01:21PM  23   Q.   YOU -- I THINK YOU SAID A MOMENT AGO THAT YOU EXPECTED THE

01:21PM  24   2015 NUMBERS TO JUST BE A PROJECTION BECAUSE NO PORTION OF THAT

01:21PM  25   YEAR HAD OCCURRED.

01:21PM  1    A.   CORRECT.

01:21PM  2    Q.   SO HOW ACCURATE DO THE NUMBERS HAVE TO BE THEN?

01:21PM  3    A.   WELL, YOU WOULD EXPECT THEM TO HAVE A CERTAIN DEGREE OF

01:21PM  4    ACCURACY BECAUSE THEY WOULD BE BASED ON -- THE REVENUES THAT

01:21PM  5    ARE BEING REALIZED IN 2014 HAD ALREADY BEEN REALIZED UP UNTIL

01:21PM  6    THAT DATE, AND WHAT THEY COULD REASONABLY FORESEE THEREAFTER

01:21PM  7    FOR THE BALANCE OF THE YEAR.

01:21PM  8         SO IT WOULD BE -- THEY'RE VERY MEANINGFUL BECAUSE IT'S

01:21PM  9    ONLY ANOTHER 18 MONTHS OR 17 MONTHS AFTER THE DATE I RECEIVED

01:22PM  10   THEM.

01:22PM  11   Q.   AND WHEN YOU SAID "THEY ARE VERY MEANINGFUL," DO YOU MEAN

01:22PM  12   THE 2015 PROJECTIONS?

01:22PM  13   A.   YEAH, THE 2015 NUMBERS ARE MEANINGFUL.

01:22PM  14   Q.   GREAT.  THANK YOU VERY MUCH.

01:22PM  15        IF YOU'LL NOW TURN TO PAGE 516.

01:22PM  16        DO YOU SEE THE DOCUMENT ON PAGE 516?

01:22PM  17   A.   I DO.

01:22PM  18   Q.   ON THIS PAGE, WERE YOU BEING PROVIDED AN ACTUAL NEWSPAPER

01:22PM  19   ARTICLE?

01:22PM  20   A.   YES.

01:22PM  21   Q.   AND DO YOU RECALL WHETHER YOU READ THIS AT THE TIME?

01:22PM  22   A.   I DID READ IT.

01:22PM  23   Q.   DO YOU ALSO SEE ON THIS DOCUMENT SOME, IT LOOKS LIKE, SOME

01:22PM  24   HIGHLIGHTING?

01:22PM  25   A.   I DO.

01:22PM 1    Q.   IS THAT YOUR HIGHLIGHTING?

01:22PM 2    A.   IT IS.

01:22PM 3    Q.   I'M GOING TO ASK YOU ABOUT ONE PORTION OF IT IF IT CAN BE

01:22PM 4    ZOOMED TO A LEGIBLE STAGE.

01:22PM 5         DO YOU SEE THE PARAGRAPH THAT IS NOW ZOOMED IN THAT

01:22PM 6    BEGINS, "THERANOS'S TECHNOLOGY"?

01:23PM 7    A.   I SEE IT.

01:23PM 8    Q.   IT READS, "THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE LAB

01:23PM 9    TRIPS BECAUSE IT CAN 'RUN ANY COMBINATION OF TESTS, INCLUDING

01:23PM 10   SETS OF FOLLOW-ON TESTS,' AT ONCE, VERY QUICKLY, ALL FROM A

01:23PM 11   SINGLE MICROSAMPLE."

01:23PM 12        DO YOU SEE THAT?

01:23PM 13   A.   I DO.

01:23PM 14   Q.   AND WAS THAT STATEMENT CONSISTENT WITH YOUR UNDERSTANDING

01:23PM 15   OF THE PRESENT CAPABILITIES OF THE THERANOS TECHNOLOGY WHEN YOU

01:23PM 16   WERE DECIDING TO INVEST?

01:23PM 17   A.   IT WAS.

01:23PM 18   Q.   WOULD YOU NOW PLEASE TURN TO PAGE 523.

01:23PM 19        MR. MOSLEY, WAS THE "FORTUNE" ARTICLE THAT YOU REFERENCED

01:23PM 20   A MOMENT AGO ALSO INCLUDED IN THE BINDER?  DO YOU RECALL?

01:23PM 21   A.   I DON'T REMEMBER.

01:23PM 22   Q.   YOU DON'T REMEMBER IF YOU RECEIVED THE -- JUST THE COVER

01:24PM 23   OR THE ENTIRE ARTICLE?

01:24PM 24   A.   I DON'T REMEMBER WHETHER IT WAS JUST THE COVER OR THE

01:24PM 25   ENTIRE ARTICLE.

01:24PM   1    Q.   DID YOU MAKE EFFORTS TO OBTAIN THE ARTICLE?

01:24PM   2    A.   IF IT WASN'T IN THE PACKAGE, THEN I OBTAINED THE ARTICLE

01:24PM   3    AND READ IT.

01:24PM   4    Q.   THANK YOU.

01:24PM   5         AND DO YOU KNOW IF YOU READ IT BEFORE INVESTING?

01:24PM   6    A.   I DID.

01:24PM   7    Q.   NOW, IF YOU'LL GRAB THAT SECOND BINDER THAT I HANDED YOU.

01:24PM   8         IN THE SECOND BINDER, WHICH IS EXHIBIT 3392, WOULD YOU

01:24PM   9    JUST TURN TO PAGE 2 OF THAT.

01:24PM  10         AND THIS WAS ALSO ADMITTED, YOUR HONOR.  PERMISSION TO

01:24PM  11    PUBLISH?

01:24PM  12              THE COURT:  YES.

01:24PM  13              MR. SCHENK:  THANK YOU.

01:24PM  14    Q.   DO YOU SEE THE SECOND LINE ON THE SCREEN NOW IN FRONT OF

01:24PM  15    YOU THAT READS, "THERANOS TECHNOLOGY IS ABLE TO PERFORM THE

01:25PM  16    FULL MENU OF LABORATORY TESTS"?

01:25PM  17         DO YOU SEE THAT?

01:25PM  18    A.   I DO.

01:25PM  19    Q.   AND WAS THAT REPRESENTATION SIGNIFICANT IN YOUR DECISION

01:25PM  20    TO INVEST?

01:25PM  21    A.   IT WAS.

01:25PM  22    Q.   AND WAS THAT STATEMENT, WHAT YOU AND I WERE TALKING ABOUT

01:25PM  23    A MOMENT AGO, THE IMPORTANCE OF A VOLUME OF TESTS THAT THERANOS

01:25PM  24    WAS CAPABLE OF DOING?

01:25PM  25    A.   YES.

01:25PM 1    Q.   WOULD YOU NOW TURN TO EXHIBIT 3844.

01:25PM 2         I'M SORRY, THIS WILL BE BACK IN THAT FIRST BINDER.  YOU

01:25PM 3    CAN PUT THE SECOND BINDER ASIDE.

01:25PM 4    A.   DID YOU SAY 3844?

01:25PM 5    Q.   YES, SIR.

01:25PM 6    A.   OKAY.

01:26PM 7    Q.   DO YOU RECOGNIZE THE DOCUMENT AT 3844?

01:26PM 8    A.   I DO.

01:26PM 9    Q.   DID YOU REVIEW THIS DOCUMENT BEFORE INVESTING?

01:26PM 10   A.   YES, I DID.

01:26PM 11        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3844.

01:26PM 12        MR. CAZARES:  NO OBJECTION.

01:26PM 13        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:26PM 14   (GOVERNMENT'S EXHIBIT 3844 WAS RECEIVED IN EVIDENCE.)

01:26PM 15   BY MR. SCHENK:

01:26PM 16   Q.   MR. MOSLEY, WHAT DID YOU UNDERSTAND THIS DOCUMENT TO BE?

01:26PM 17   A.   I UNDERSTOOD IT TO BE A SUMMARY OF THE TECHNOLOGY AS

01:26PM 18   REVIEWED BY JOHNS HOPKINS.

01:26PM 19   Q.   AND DID YOU UNDERSTAND THIS TO BE A VALIDATION OF

01:26PM 20   THERANOS'S TECHNOLOGY BY JOHNS HOPKINS?

01:26PM 21   A.   I DID.

01:26PM 22   Q.   IF YOU'LL NOW TURN TO -- I'M SORRY.

01:26PM 23        WAS THAT SIGNIFICANT IN YOUR DECISION TO INVEST?

01:26PM 24   A.   IT WAS.

01:26PM 25   Q.   WHY?

01:26PM    1      A.    JOHNS HOPKINS IS A LARGE, VERY HIGHLY RESPECTED HOSPITAL,

01:27PM    2      AND I THOUGHT IT WOULD BE VERY CAPABLE OF MAKING A JUDGMENT OF

01:27PM    3      THIS TYPE.

01:27PM    4      Q.    THANK YOU.

01:27PM    5            IF YOU'LL NOW TURN TO TAB 4202.

01:27PM    6            IS 4202 AN EMAIL THREAD BETWEEN YOU AND MS. HOLMES?

01:27PM    7      A.    IT IS.

01:27PM    8      Q.    IN SEPTEMBER OF 2014?

01:27PM    9      A.    YES.

01:27PM   10            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4202.

01:27PM   11            MR. CAZARES:  NO OBJECTION.

01:27PM   12            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:27PM   13      (GOVERNMENT'S EXHIBIT 4202 WAS RECEIVED IN EVIDENCE.)

01:27PM   14            MR. SCHENK:  THANK YOU.

01:27PM   15      Q.    MR. MOSLEY, IF WE CAN START ON THE SECOND PAGE OF THIS

01:27PM   16      DOCUMENT, THE EMAIL THAT IS SENT FROM YOU TO MS. HOLMES ON

01:28PM   17      SEPTEMBER 2ND, 2014.

01:28PM   18            DO YOU SEE THAT EMAIL?

01:28PM   19      A.    I DO.

01:28PM   20      Q.    IN IT, IT LOOKS LIKE YOU'RE THANKING MS. HOLMES FOR THE

01:28PM   21      EXTENSIVE MATERIALS ON THERANOS.

01:28PM   22            WAS THAT AT LEAST SOME OF -- WAS AT LEAST SOME OF THAT THE

01:28PM   23      MATERIAL THAT YOU AND I JUST REVIEWED?

01:28PM   24      A.    IT WAS.

01:28PM   25      Q.    THOSE TWO LARGE STACKS OF DOCUMENTS?

ER-3861

MOSLEY DIRECT BY MR. SCHENK                    5186

01:28PM  1    A.   IT WAS.

01:28PM  2    Q.   YOU TELL HER THAT YOU ENJOYED READING THEM AND YOU ARE

01:28PM  3    APPRECIATIVE OF THE OPPORTUNITY TO BECOME A SHAREHOLDER.

01:28PM  4         DO YOU SEE THAT?

01:28PM  5    A.   I DO.

01:28PM  6    Q.   AND THEN A SENTENCE OR TWO LATER, YOU WRITE THAT YOU

01:28PM  7    PREPARED AN OUTLINE OVER THE WEEKEND WITH YOUR THOUGHTS AND

01:28PM  8    ANALYSIS THAT YOU ARE SENDING TO DR. KISSINGER.

01:28PM  9         DO YOU SEE THAT?

01:28PM 10    A.   I DO.

01:28PM 11    Q.   WHAT IS THAT DOCUMENT, THE OUTLINE?  WHAT ARE YOU

01:28PM 12    REFERRING TO?

01:28PM 13    A.   AN OUTLINE THAT I WROTE WITH SORT OF MY THOUGHTS AND SORT

01:28PM 14    OF PULLING TOGETHER THE INFORMATION THAT I HAD ABOUT THE

01:28PM 15    COMPANY.

01:28PM 16    Q.   AND WHAT WAS THE PURPOSE OF THAT?  WHY DID YOU PUT YOUR

01:29PM 17    THOUGHTS INTO AN OUTLINE?

01:29PM 18    A.   REALLY PRIMARILY BECAUSE, AS I THINK I MENTIONED,

01:29PM 19    DR. KISSINGER HAD ASKED ME TO LOOK AT THE COMPANY AND MEET

01:29PM 20    ELIZABETH AND GIVE HIM MY VIEWS.  AND IT WAS A WAY OF DOING

01:29PM 21    THAT.

01:29PM 22    Q.   WHEN DR. KISSINGER MADE THAT REQUEST, DID YOU KNOW WHETHER

01:29PM 23    DR. KISSINGER HAD A POSITION AT THERANOS AT THE TIME?

01:29PM 24    A.   I DID.

01:29PM 25    Q.   AND WHAT POSITION WAS THAT?

01:29PM  1    A.   HE WAS ON THE BOARD OF DIRECTORS.

01:29PM  2    Q.   AND THEN ABOVE THIS EMAIL, YOU FOLLOW UP WITH MS. HOLMES,

01:29PM  3    IT LOOKS LIKE ONE DAY LATER, WITH A REFERENCE TO AN UPCOMING

01:29PM  4    BYRON TROTT CONFERENCE.

01:29PM  5         DO YOU SEE THAT?

01:29PM  6    A.   I DO.

01:29PM  7    Q.   THAT CONFERENCE APPEARS TO BE LATER THAT SEPTEMBER IN

01:29PM  8    CHICAGO; IS THAT RIGHT?

01:29PM  9    A.   THAT'S CORRECT.

01:29PM  10   Q.   IS THIS -- WHO IS BYRON TROTT?

01:29PM  11   A.   BYRON TROTT WAS AN INVESTMENT BANKER AT GOLDMAN SACHS THAT

01:29PM  12   LEFT TO START HIS OWN FIRM.

01:29PM  13   Q.   AND WHAT FIRM IS THAT?

01:29PM  14   A.   IT'S BDT & COMPANY.

01:30PM  15   Q.   WHERE YOU CURRENTLY WORK?

01:30PM  16   A.   THAT IS CORRECT.

01:30PM  17   Q.   AND DID YOU GO TO THIS CHICAGO CONFERENCE?

01:30PM  18   A.   YES, I DID.

01:30PM  19   Q.   AND DID YOU SEE MS. HOLMES THERE?

01:30PM  20   A.   I DID.

01:30PM  21   Q.   AND DID YOU DISCUSS YOUR POSSIBLE INVESTMENT IN THERANOS

01:30PM  22   WHILE YOU WERE AT THE BDT CONFERENCE IN CHICAGO?

01:30PM  23   A.   I DON'T REMEMBER WHETHER WE SPECIFICALLY DISCUSSED IT AT

01:30PM  24   THAT TIME OR NOT.

01:30PM  25   Q.   DID YOU DISCUSS THERANOS MORE GENERALLY, NOT SPECIFICALLY

01:30PM  1     YOUR INVESTMENT?

01:30PM  2     A.   YES.

01:30PM  3     Q.   IN THOSE DISCUSSIONS, DID MS. HOLMES SAY ANYTHING

01:30PM  4     DIFFERENT OR CONTRADICTORY TO THE MATERIALS THAT YOU AND I JUST

01:30PM  5     REVIEWED?

01:30PM  6     A.   NO.

01:30PM  7     Q.   DID YOU LEAVE WITH A DIFFERENT IMPRESSION OF WHAT THE

01:30PM  8     THERANOS TECHNOLOGY WAS THAN YOU HAD AFTER REVIEWING THE

01:30PM  9     MATERIALS?

01:30PM  10    A.   NO.

01:30PM  11    Q.   WOULD YOU NOW TURN TO 4197.

01:31PM  12         DO YOU RECOGNIZE THE DOCUMENT AT 4197?

01:31PM  13    A.   I DO.

01:31PM  14    Q.   AND WHAT IS THIS DOCUMENT?

01:31PM  15    A.   IT IS A LETTER FROM ME TO DR. KISSINGER.

01:31PM  16    Q.   AND WHAT IS THE DOCUMENT AFTER THE LETTER?

01:31PM  17         AFTER PAGE 1 THERE'S SOME FURTHER PAGES.  DO YOU RECOGNIZE

01:31PM  18    THOSE PAGES?

01:31PM  19    A.   IT'S THE OUTLINE THAT I PREPARED.

01:31PM  20    Q.   THAT YOU JUST REFERENCED A MOMENT AGO IN THAT EMAIL?

01:31PM  21    A.   YES.

01:31PM  22         MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4197.

01:31PM  23         MR. CAZARES:  NO OBJECTION.

01:31PM  24         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:31PM  25         (GOVERNMENT'S EXHIBIT 4197 WAS RECEIVED IN EVIDENCE.)

01:31PM   1    BY MR. SCHENK:

01:31PM   2    Q.   MR. MOSLEY, IT LOOKS LIKE IN THE COVER LETTER YOU'RE

01:31PM   3    WRITING TO DR. KISSINGER TO INFORM HIM THAT YOU'RE ENCLOSING A

01:31PM   4    COPY OF THE OUTLINE; IS THAT CORRECT?

01:31PM   5    A.   YES.

01:31PM   6    Q.   AND YOU'VE DESCRIBED TO THE JURY SORT OF A DUAL PURPOSE

01:32PM   7    REVIEW OF THERANOS, TO PROVIDE SOME INFORMATION TO

01:32PM   8    DR. KISSINGER, AND ALSO TO EVALUATE A PERSONAL INVESTMENT

01:32PM   9    OPPORTUNITY; IS THAT CORRECT?

01:32PM  10    A.   YES.

01:32PM  11    Q.   WHICH OF THOSE TWO, OR BOTH, DID THIS OUTLINE SERVE?

01:32PM  12    A.   THE FORMER, PROVIDING THE INFORMATION TO DR. KISSINGER.

01:32PM  13    Q.   LET'S LOOK NOW ON PAGE 2 OF THE EXHIBIT, THE FIRST PAGE OF

01:32PM  14    YOUR OUTLINE.

01:32PM  15         FIRST, IF YOU'LL DESCRIBE FOR THE JURY GENERALLY WHAT THIS

01:32PM  16    DOCUMENT IS AND WHAT IT CONTAINS.

01:32PM  17    A.   AS I SAID, IT WAS A SUMMARY OF ALL OF THE INFORMATION AND

01:32PM  18    MY THOUGHT WITH REGARD TO THE INFORMATION THAT I HAD RECEIVED

01:32PM  19    ABOUT THE COMPANY.

01:32PM  20    Q.   THE SUMMARY OF THE INFORMATION INCLUDING THE LARGE STACKS

01:32PM  21    OF DOCUMENTS THAT YOU AND I LOOKED THROUGH?

01:32PM  22    A.   CORRECT.

01:32PM  23    Q.   IF YOU'LL NOW LOOK UNDER 1A.  WE SEE SOME -- ON THE SCREEN

01:32PM  24    IT LOOKS RED.

01:32PM  25         DO YOU SEE THAT UNDERLINING?

01:33PM  1    A.   I DO.

01:33PM  2    Q.   AND DO YOU RECOGNIZE THAT UNDERLINING?

01:33PM  3    A.   I BELIEVE IT WAS MY UNDERLINING.

01:33PM  4    Q.   I WOULD LIKE TO ASK YOU FIRST ABOUT A.  YOU WRITE, "THERE

01:33PM  5    IS SUBSTANTIAL DATA AND OTHER INFORMATION ATTESTING TO THE

01:33PM  6    QUALITY, PERFORMANCE AND RELIABILITY OF THE THERANOS TECHNOLOGY

01:33PM  7    AND EQUIPMENT.  THERE DOES NOT APPEAR TO BE ANY SIGN OF ANY

01:33PM  8    QUESTION ABOUT THE QUALITY, ACCURACY, OR RELIABILITY OF

01:33PM  9    THERANOS'S BLOOD TESTING TECHNOLOGY."

01:33PM  10        DO YOU SEE THAT?

01:33PM  11   A.   I DO.

01:33PM  12   Q.   AND WAS THIS YOUR CONCLUSION?

01:33PM  13   A.   BASED ON EVERYTHING I HAD READ, YES.

01:33PM  14   Q.   I WAS JUST GOING TO ASK, WHAT IS THIS BASED ON?

01:33PM  15   A.   THE MATERIALS THAT I RECEIVED.

01:33PM  16   Q.   AND YOU SAID THE PURPOSE OF THIS DOCUMENT WAS TO PROVIDE

01:33PM  17   INFORMATION TO DR. KISSINGER; IS THAT RIGHT?

01:33PM  18   A.   THAT'S CORRECT.

01:33PM  19   Q.   IS THIS ALSO TRUE, THOUGH, OF YOUR UNDERSTANDING WHEN YOU

01:33PM  20   WERE MAKING A DECISION TO INVEST?

01:33PM  21   A.   IT WAS.

01:33PM  22   Q.   DID YOU THINK THAT THERE WAS ANY QUESTION ABOUT THE

01:34PM  23   QUALITY, ACCURACY, OR RELIABILITY OF THERANOS'S TECHNOLOGY?

01:34PM  24   A.   I DID NOT.

01:34PM  25   Q.   IF YOU'LL NOW TURN TO PAGE 3 OF THE EXHIBIT.  DO YOU

01:34PM  1    SEE -- AND IF IT'S HELPFUL, YOU CAN TURN BACK TO THE FIRST

01:34PM  2    PAGE TO SEE THE CARRY-OVER -- THE DUE DILIGENCE AND TECHNOLOGY

01:34PM  3    REVIEW PREPARED BY JOHNS HOPKINS?

01:34PM  4        DO YOU SEE THAT?

01:34PM  5    A.   YES.

01:34PM  6    Q.   IT LOOKS LIKE THAT YOU PULLED SOME QUOTES FROM THE

01:34PM  7    JOHNS HOPKINS DOCUMENT; IS THAT RIGHT?

01:34PM  8    A.   I DID.

01:34PM  9    Q.   AND DID YOU THINK THAT THIS DOCUMENT, THE JOHNS HOPKINS

01:34PM 10    DOCUMENT, SUPPORTED THE CONCLUSION THAT YOU AND I JUST READ

01:34PM 11    TOGETHER, THAT THERE DOESN'T APPEAR TO BE A QUESTION ABOUT THE

01:34PM 12    QUALITY, ACCURACY, OR RELIABILITY OF THERANOS'S BLOOD TESTING

01:34PM 13    TECHNOLOGY?

01:34PM 14    A.   I BELIEVED THAT IT DID.

01:34PM 15    Q.   YOU BELIEVED THAT THE JOHNS HOPKINS REPORT SUPPORTED THAT?

01:34PM 16    A.   YES.

01:34PM 17    Q.   AND THEN THE SECOND BULLET DOWN ON THE SCREEN IS ABOUT THE

01:35PM 18    PFIZER REPORT.

01:35PM 19        DO YOU SEE THAT?

01:35PM 20    A.   I DO.

01:35PM 21    Q.   AND YOU WROTE, "THE MOST EXTENSIVE EVIDENCE SUPPLIED

01:35PM 22    REGARDING THE RELIABILITY OF THE THERANOS TECHNOLOGY AND ITS

01:35PM 23    APPLICATION IS A STUDY REPORT PREPARED BY PFIZER BASED ON A

01:35PM 24    CLINICAL CANCER TREATMENT TRIAL."

01:35PM 25        DO YOU SEE THAT?

ER-3867

MOSLEY DIRECT BY MR. SCHENK                                    5192

01:35PM  1    A.   I DO.

01:35PM  2    Q.   AND DID YOU THINK THAT THE REPORT YOU AND I LOOKED AT A

01:35PM  3    MOMENT AGO, THE PFIZER REPORT, WAS PREPARED BY PFIZER?

01:35PM  4    A.   I DID.

01:35PM  5    Q.   WHY DID YOU THINK THAT?

01:35PM  6    A.   IT HAD THE PFIZER LOGO ON EVERY SINGLE PAGE OF IT, AND IT

01:35PM  7    WAS TALKING ABOUT A PFIZER STUDY.

01:35PM  8    Q.   AND DID YOU, DID YOU READ THE CONTENT OF THE PFIZER

01:35PM  9    REPORT?

01:35PM  10   A.   YES, I DID.

01:35PM  11   Q.   WERE THE CONCLUSIONS WITHIN IT SIGNIFICANT TO YOU?

01:35PM  12   A.   THEY WERE.

01:35PM  13   Q.   WHY?

01:35PM  14   A.   THEY WERE HIGHLY, HIGHLY COMPLIMENTARY OF THE RELIABILITY

01:35PM  15   AND EASE OF USE OF THE EQUIPMENT.

01:35PM  16   Q.   THANK YOU.

01:35PM  17        AND THEN IF WE LOOK A LITTLE FURTHER DOWN, IT LOOKS LIKE

01:36PM  18   YOU WROTE THAT HERE.

01:36PM  19        DO YOU SEE THE PARAGRAPH BEGINNING, "THE CONCLUSIONS,"

01:36PM  20   TOWARDS THE BOTTOM OF THE PAGE?

01:36PM  21   A.   I DO.

01:36PM  22   Q.   "THE CONCLUSIONS IN THE PFIZER STUDY REPORT ARE

01:36PM  23   EXTRAORDINARILY COMPLIMENTARY AND VALIDATE THE THERANOS

01:36PM  24   TECHNOLOGY AND ITS APPLICATIONS."

01:36PM  25        MR. MOSLEY, DID YOU THINK THAT THE PFIZER REPORT VALIDATED

ER-3868

01:36PM   1      THE THERANOS TECHNOLOGY?

01:36PM   2      A.   I DID.

01:36PM   3      Q.   AND SAME QUESTION.  WAS THAT SOMETHING THAT YOU BOTH WERE

01:36PM   4      PROVIDING TO DR. KISSINGER, BUT THAT YOU ALSO PERSONALLY

01:36PM   5      BELIEVED WHEN YOU MADE YOUR INVESTMENT DECISION?

01:36PM   6      A.   THAT IS CORRECT.

01:36PM   7      Q.   AND THEN BELOW THAT ON THE NEXT PAGE AND A HALF, DID YOU

01:36PM   8      ACTUALLY PULL QUOTES FROM THE PFIZER REPORT AND PUT IT INTO

01:36PM   9      THIS OUTLINE?

01:36PM  10      A.   I DID.

01:36PM  11      Q.   IF YOU'LL NOW TURN TO PAGE 4 UNDER THE THERANOS BUSINESS

01:36PM  12      APPROACH.

01:36PM  13          IN THAT FIRST BULLET, YOU'RE DESCRIBING HOW MS. HOLMES AND

01:36PM  14      THERANOS STAYED WELL BELOW THE RADAR SCREEN AND SORT OF SOME OF

01:37PM  15      THE ADVANTAGES, IT GAVE THERANOS TIME TO, AND THEN YOU LIST

01:37PM  16      SOME ADVANTAGES; IS THAT RIGHT?

01:37PM  17      A.   YES.

01:37PM  18      Q.   DID YOU THINK THAT THERANOS MADE A CONSCIOUS DECISION TO

01:37PM  19      LEAVE THIS UNDER THE RADAR PERIOD OF TIME?

01:37PM  20      A.   I DID.

01:37PM  21      Q.   AND WHAT WAS YOUR UNDERSTANDING ABOUT THAT DECISION?  DID

01:37PM  22      YOU THINK THAT THERANOS WAS READY WHEN IT DECIDED TO LEAVE?

01:37PM  23      A.   I THOUGHT THEY WERE READY TO HAVE IT MORE PUBLIC.

01:37PM  24      Q.   AND HOW DID YOU REACH THAT CONCLUSION?

01:37PM  25      A.   OBVIOUSLY THEY ENTERED INTO THE PARTNERSHIP WITH

01:37PM  1    WALGREENS, WHICH WAS PUBLICLY ANNOUNCED IN "THE

01:37PM  2    WALL STREET JOURNAL."

01:37PM  3    Q.   IF YOU'LL TURN TO PAGE 5, WHICH CONTINUES SOME OF YOUR

01:37PM  4    LISTS OF ADVANTAGES THAT THERANOS HAD TIME TO.

01:37PM  5         THE SECOND BULLET DOWN READS, "THE WORK WITH THE PHARMA

01:38PM  6    COMPANIES (WHICH WERE UNDOUBTEDLY REQUIRED TO SIGN

01:38PM  7    CONFIDENTIALITY AGREEMENTS) PROVIDED VALIDATION OF THE

01:38PM  8    TECHNOLOGY AND APPROACH."

01:38PM  9         DO YOU SEE THAT ONE?

01:38PM  10   A.   I DO.

01:38PM  11   Q.   AND DID YOU THINK THAT THE WORK THAT THERANOS HAD DONE

01:38PM  12   WITH SOME OF THE PHARMACEUTICAL COMPANIES PROVIDED VALIDATION

01:38PM  13   FOR THE THERANOS TECHNOLOGY?

01:38PM  14   A.   I DID.

01:38PM  15   Q.   WHY DID YOU REACH THAT CONCLUSION?

01:38PM  16   A.   WELL, BECAUSE OBVIOUSLY PFIZER IS ONE OF THE PHARMA

01:38PM  17   COMPANIES AND THEY WROTE A REPORT THAT WAS HIGHLY

01:38PM  18   COMPLIMENTARY.

01:38PM  19   Q.   THE NEXT BULLET READS "A COMBINATION OF," AND THEN YOU

01:38PM  20   LIST FIVE SUBPARTS, "THE PRICE OF TESTS BY THERANOS; THE SPEED

01:38PM  21   OF THE DELIVERY OF THE RESULTS; THE RELIABILITY OF THE TEST

01:38PM  22   RESULTS; THE ABILITY TO PERFORM A VAST ARRAY OF TESTS; AND THE

01:38PM  23   ABILITY TO PERFORM A VAST NUMBER OF TESTS WITH ONLY A FEW DROPS

01:38PM  24   OF BLOOD REQUIRING JUST A FINGER PRICK."

01:38PM  25        DO YOU SEE THAT?

01:39PM  1     A.   I DO.

01:39PM  2     Q.   AND DID YOU UNDERSTAND THAT ALL OF THESE ITEMS THAT YOU

01:39PM  3     LISTED WERE CURRENT CAPABILITIES OF THERANOS TECHNOLOGY?

01:39PM  4     A.   I DID.

01:39PM  5     Q.   WHY DID YOU REACH THAT CONCLUSION?

01:39PM  6     A.   WELL, BASED ON ALL OF THE MATERIALS, THAT WAS MY

01:39PM  7     UNDERSTANDING, THAT IT WAS AT THAT LEVEL, STAGE.

01:39PM  8     Q.   I'M SORRY.  THANK YOU.

01:39PM  9          IF YOU'LL NOW TURN TO PAGE 7 OF THIS EXHIBIT.

01:39PM  10         UNDER NUMBER 4, DO YOU SEE CURRENT AND PROJECTED FINANCIAL

01:39PM  11    RESULTS?

01:39PM  12    A.   I DO.

01:39PM  13    Q.   A INCLUDES THE 2014 CALENDAR YEAR.

01:39PM  14         DID YOU WRITE THAT "THERANOS WAS PROJECTING $140 MILLION

01:39PM  15    OF REVENUE WITH A NET LOSS OF $3 MILLION"?

01:39PM  16    A.   I DID.

01:39PM  17    Q.   AND THEN DO YOU ACTUALLY INCLUDE THE BREAKDOWN FROM THAT

01:39PM  18    DOCUMENT THAT YOU AND I LOOKED AT A MOMENT AGO?

01:39PM  19    A.   YES.

01:39PM  20    Q.   AND YOU DO THE SAME FOR 2015, THE PROJECTING OF

01:40PM  21    $990 MILLION OF REVENUE?

01:40PM  22    A.   YES.

01:40PM  23    Q.   WITH A BREAKDOWN.

01:40PM  24         AND WAS THIS ALSO RELEVANT FOR BOTH THE WORK YOU WERE

01:40PM  25    DOING WITH DR. KISSINGER, BUT ALSO FOR YOUR PERSONAL

ER-3871

01:40PM  1    INVESTMENT?

01:40PM  2    A.   IT WAS.

01:40PM  3    Q.   FINALLY, IF YOU'LL TURN TO 5B TOWARDS THE BOTTOM, THE

01:40PM  4    PARAGRAPH THAT BEGINS, "ELIZABETH HOLMES."

01:40PM  5         IT'S AT THE BOTTOM OF PAGE 7.

01:40PM  6    A.   OKAY, I'M THERE.

01:40PM  7    Q.   THE PARAGRAPH THAT DESCRIBES THE SHARES THAT MS. HOLMES

01:40PM  8    OWNS.

01:40PM  9         DO YOU SEE THAT?

01:40PM  10   A.   I DO.

01:40PM  11   Q.   AND WHAT WAS THE POINT HERE?  WHY WERE YOU SORT OF DOING

01:40PM  12   ANALYSIS OF THE OWNERSHIP OF SHARES?

01:40PM  13   A.   IT WAS FOR PURPOSES OF INDICATING THAT SHE HAD ABSOLUTE

01:40PM  14   COMPLETE CONTROL OF THE COMPANY.

01:40PM  15   Q.   AND IS THAT SIGNIFICANT BOTH FOR THE WORK THAT YOU WERE

01:40PM  16   DOING FOR DR. KISSINGER, AND ALSO FOR YOUR PERSONAL INVESTMENT?

01:40PM  17   A.   IT WAS.

01:40PM  18   Q.   HOW SO?

01:41PM  19   A.   WELL, IF SHE WAS THE PERSON RESPONSIBLE FOR HAVING

01:41PM  20   DEVELOPED THE TECHNOLOGY, YOU WOULD WANT TO BE SURE THAT SHE

01:41PM  21   WOULD BE IN CONTROL OF THE COMPANY THAT WOULD THEN ROLL OUT

01:41PM  22   THAT TECHNOLOGY.

01:41PM  23   Q.   UNDERSTOOD.

01:41PM  24        IF YOU'LL NOW TURN TO PAGE 9 OF THIS EXHIBIT.

01:41PM  25        YOU HAVE A SECTION ENTITLED QUESTIONS, CONCERNS, AND

01:41PM  1      RISKS.

01:41PM  2          DO YOU SEE THAT?

01:41PM  3      A.   I DO.

01:41PM  4      Q.   AND THE RISKS IN B INCLUDE THE REVENUE PROJECTIONS BEING

01:41PM  5      SUBSTANTIAL; IS THAT RIGHT?

01:41PM  6      A.   CORRECT.

01:41PM  7      Q.   AND THE -- THERE'S A REFERENCE TO THE NUMBER OF THERANOS

01:41PM  8      LOCATIONS WITHIN WALGREENS AT THE TIME, AND I THINK YOU WRITE

01:41PM  9      THAT IT WOULD BE HELPFUL TO KNOW HOW MANY LOCATIONS ARE ASSUMED

01:41PM  10     IN THE 2015 PROJECTIONS; IS THAT RIGHT?

01:41PM  11     A.   YES.

01:41PM  12     Q.   AND IN C YOU WRITE, "AN IMPORTANT QUESTION IS WHY THERANOS

01:41PM  13     IS NOW WILLING TO SELL ADDITIONAL SHARES AND WISHES TO RAISE

01:42PM  14     ADDITIONAL CASH."

01:42PM  15         WAS THAT ANOTHER QUESTION OR A CONCERN?

01:42PM  16     A.   IT WAS A QUESTION.

01:42PM  17     Q.   AND THEN IN D YOU WRITE ABOUT THE FAIRLY UNUSUAL

01:42PM  18     PROVISION.

01:42PM  19         IS THIS THE PROVISION YOU AND I SPOKE ABOUT EARLIER ABOUT

01:42PM  20     REDEEMING YOUR SHARES?

01:42PM  21     A.   YES, IT IS.

01:42PM  22     Q.   AMONG THE RISKS THAT YOU IDENTIFY, WERE ANY ABOUT THE

01:42PM  23     TECHNOLOGY, THE ACCURACY, RELIABILITY OF THE TECHNOLOGY?

01:42PM  24     A.   THEY WERE NOT.

01:42PM  25     Q.   WHY?

01:42PM   1    A.   BECAUSE I BELIEVED EVERYTHING I HAD READ AND SEEN AND THAT

01:42PM   2    IT WAS VERY RELIABLE.

01:42PM   3    Q.   WERE ANY OF THE RISKS THAT YOU IDENTIFIED RECEIVING FALSE

01:42PM   4    STATEMENTS OR FALSE INFORMATION FROM INDIVIDUALS AT THERANOS?

01:42PM   5              MR. CAZARES:  OBJECTION.  FOUNDATION.

01:42PM   6              THE COURT:  WOULD YOU ASK THAT AGAIN?  I'M NOT SURE

01:42PM   7    I UNDERSTAND THAT QUESTION.

01:42PM   8              MR. SCHENK:  YES, YOUR HONOR.

01:42PM   9    Q.   MR. MOSLEY, YOU'VE IDENTIFIED SOME RISKS HERE THAT INCLUDE

01:43PM  10    THE NUMBER OF STORES THAT THERANOS HAS ENTERED INTO WITH

01:43PM  11    WALGREENS, WHY THEY'RE SELLING SHARES, AND THIS UNUSUAL

01:43PM  12    PROVISION, AMONG OTHERS; IS THAT RIGHT?

01:43PM  13    A.   YES.

01:43PM  14    Q.   AND I'M ASKING YOU ABOUT SOME RISKS THAT YOU DID NOT

01:43PM  15    IDENTIFY, THINGS THAT YOU DIDN'T THINK WERE A RISK.  IS THAT --

01:43PM  16    DO YOU UNDERSTAND THAT LINE OF QUESTIONING?

01:43PM  17    A.   I DO.

01:43PM  18    Q.   AND I ASKED YOU A MOMENT AGO IF ONE OF THE RISKS YOU

01:43PM  19    IDENTIFIED WAS A RISK ASSOCIATED WITH THE TECHNOLOGY, WHETHER

01:43PM  20    IT PROVIDED ACCURATE RESULTS.

01:43PM  21    DO YOU UNDERSTAND THAT QUESTION?

01:43PM  22    A.   I DO.

01:43PM  23    Q.   AND WHAT WAS YOUR ANSWER ON THAT ONE?

01:43PM  24    A.   MY ANSWER WAS THAT I DID NOT CONSIDER THAT A RISK.

01:43PM  25    Q.   WHY NOT?

ER-3874

01:43PM 1    A.   BECAUSE I THOUGHT EVERYTHING I HAD READ AND RECEIVED

01:43PM 2    INDICATED THAT THE TECHNOLOGY WAS SOUND.

01:43PM 3    Q.   AND TO FOLLOW UP ON THAT, YOU SAID THAT EVERYTHING THAT

01:43PM 4    YOU RECEIVED SAID THE TECHNOLOGY WAS SOUND.

01:43PM 5         I'M WONDERING IF YOU IDENTIFIED AS A RISK THAT THE THINGS

01:43PM 6    THAT YOU RECEIVED MIGHT NOT BE ACCURATE?  THE FOUNDATION OF THE

01:44PM 7    INFORMATION YOU RECEIVED, DID YOU EVER CALL INTO QUESTION THAT

01:44PM 8    ACCURACY?

01:44PM 9              MR. CAZARES:  OBJECTION.  FOUNDATION AND RELEVANCE.

01:44PM 10             THE COURT:  OVERRULED.

01:44PM 11        YOU CAN ANSWER THE QUESTION.

01:44PM 12             THE WITNESS:  I DID NOT FACTOR IN SOME POSSIBILITY

01:44PM 13   THAT THINGS THAT I RECEIVED WERE NOT ACCURATE.

01:44PM 14   BY MR. SCHENK:

01:44PM 15   Q.   WHY NOT?

01:44PM 16   A.   BECAUSE I BELIEVED THEY WERE ACCURATE.

01:44PM 17   Q.   FAIR ENOUGH.  THANK YOU.

01:44PM 18        IF YOU'LL TURN TO TAB 4221.

01:44PM 19        MR. MOSLEY, IS THIS ALSO AN EMAIL THREAD THAT CONTAINS

01:44PM 20   SEVERAL EMAILS BETWEEN YOU AND MS. HOLMES?

01:44PM 21   A.   IT IS.

01:44PM 22   Q.   IS THIS ONE ALSO IN SEPTEMBER, A LITTLE BIT LATER,

01:44PM 23   SEPTEMBER OF 2014?

01:44PM 24   A.   THEY ARE.

01:44PM 25             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4221.

01:44PM  1           MR. CAZARES:  NO OBJECTION.

01:45PM  2           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:45PM  3           (GOVERNMENT'S EXHIBIT 4221 WAS RECEIVED IN EVIDENCE.)

01:45PM  4      BY MR. SCHENK:

01:45PM  5      Q.   MR. MOSLEY, ON THE FIRST PAGE, DO YOU SEE THE EMAIL FROM

01:45PM  6      THURSDAY, THE 25TH OF SEPTEMBER, FROM YOU TO MS. HOLMES?

01:45PM  7      A.   I DO.

01:45PM  8      Q.   AND IN IT YOU WRITE THAT YOU'RE LOOKING FORWARD TO GETTING

01:45PM  9      OUT TO CALIFORNIA TO SEE MS. HOLMES AND MEET HER TEAM.

01:45PM 10           AND THERE'S A REFERENCE TO THE NIARCHOS FOUNDATION.

01:45PM 11           DO YOU SEE THAT?

01:45PM 12      A.   I DO.

01:45PM 13      Q.   DID YOU COME OUT TO CALIFORNIA AND MEET WITH MS. HOLMES AT

01:45PM 14      SOME POINT FOLLOWING THIS EMAIL?

01:45PM 15      A.   I DID.

01:45PM 16      Q.   A LITTLE FURTHER DOWN IN THAT EMAIL YOU REFERENCE THE

01:45PM 17      DR. KISSINGER MEMO OR SUMMARY.

01:45PM 18           DO YOU SEE THAT?

01:45PM 19      A.   YES, I DO.

01:45PM 20      Q.   AND IT LOOKS LIKE YOU'RE ASKING ABOUT MS. HOLMES'S COMFORT

01:45PM 21      LEVEL IN SHARING THE MEMO; IS THAT RIGHT?

01:46PM 22           I'M SORRY, LET ME REPHRASE THAT.

01:46PM 23           I THINK YOU'RE SAYING THAT DR. KISSINGER IS WONDERING

01:46PM 24      ABOUT AN ABILITY TO SHARE THE MEMO; IS THAT CORRECT?

01:46PM 25      A.   THAT IS CORRECT.

ER-3876

01:46PM  1      Q.   AND WHAT WAS -- WHAT WAS HAPPENING THERE?  CAN YOU EXPLAIN

01:46PM  2      TO THE JURY THAT?

01:46PM  3      A.   WELL, HE OBVIOUSLY, AS IT SAYS HERE, ASKED ME IF I WAS

01:46PM  4      COMFORTABLE SENDING THE MEMO THAT I PREPARED TO OTHERS THAT HE

01:46PM  5      KNEW THAT MIGHT BE INTERESTED IN THE COMPANY.

01:46PM  6      Q.   AND DO YOU KNOW WHETHER -- FIRST, LET ME ASK YOU, DID YOU

01:46PM  7      SHARE THAT MEMO WITH OTHER INDIVIDUALS WHO WERE CONSIDERING AN

01:46PM  8      INVESTMENT IN THERANOS?

01:46PM  9      A.   I BELIEVE THAT I DID.

01:46PM  10     Q.   DO YOU KNOW WHETHER DR. KISSINGER DID?

01:46PM  11     A.   I SUSPECT THAT HE DID, BUT I DON'T KNOW FOR SURE.

01:46PM  12     Q.   OKAY.  AND TO BE CLEAR, THAT WAS THE MEMO THAT YOU AND I

01:46PM  13     LOOKED AT A MOMENT AGO?  I THINK IT WAS 4197.

01:46PM  14     A.   YES.

01:46PM  15     Q.   THERE'S THE REFERENCE TO GOING OUT TO CALIFORNIA.  LET'S

01:46PM  16     TALK ABOUT THAT FOR A MOMENT.

01:46PM  17          DID YOU MAKE A TRIP OUT TO CALIFORNIA IN THIS TIMEFRAME,

01:47PM  18     SEPTEMBER OR OCTOBER OF 2014?

01:47PM  19     A.   I DID.

01:47PM  20     Q.   HOW MANY TRIPS?

01:47PM  21     A.   I BELIEVE TWO.

01:47PM  22     Q.   AND DID YOU HAVE MEETINGS?  WAS ONE OF THEM IN REFERENCE

01:47PM  23     TO THE NIARCHOS FOUNDATION?

01:47PM  24     A.   YES.

01:47PM  25     Q.   AND WHAT WAS THE OTHER ONE?

MOSLEY DIRECT BY MR. SCHENK                                    5202

01:47PM  1    A.    SOME INDIVIDUALS FROM COX.

01:47PM  2    Q.    IS THAT C-O-X?

01:47PM  3    A.    C-O-X.

01:47PM  4    Q.    AND LET'S TALK FIRST ABOUT THE NIARCHOS MEETING.

01:47PM  5          FIRST, WHAT WAS THE PURPOSE OF THAT MEETING?  DO YOU

01:47PM  6    RECALL?

01:47PM  7    A.    THE PURPOSE OF IT WAS TO LET INDIVIDUALS FROM THE NIARCHOS

01:47PM  8    FOUNDATION THAT RAN THEIR INVESTMENT OPERATIONS TO GET TO KNOW

01:47PM  9    THE COMPANY AND SEE WHETHER THEY HAD ANY INTEREST IN IT.

01:47PM 10    Q.    AND WHY DID YOU GO?

01:47PM 11    A.    ANDREAS, WHO IS REFERRED TO HERE, IS A FRIEND OF MINE AND

01:47PM 12    A CLIENT, AND HE HAD SUGGESTED THAT IT WOULD BE NICE IF I WENT

01:48PM 13    WITH THEM.

01:48PM 14    Q.    AND DID YOU HAVE A MEETING WITH MS. HOLMES?

01:48PM 15    A.    WE DID.

01:48PM 16    Q.    DO YOU KNOW, WERE ANY OTHER PEOPLE FROM THERANOS PRESENT

01:48PM 17    FOR THE MEETING?

01:48PM 18    A.    YES.

01:48PM 19    Q.    WHO?

01:48PM 20    A.    MR. BALWANI WAS PRESENT.

01:48PM 21    Q.    DO YOU KNOW HOW LONG THE MEETING LASTED?

01:48PM 22    A.    I DON'T REMEMBER FOR SURE, BUT IT WAS A RELATIVELY LENGTHY

01:48PM 23    MEETING.  I BELIEVE IT WAS AT LEAST AN HOUR AND A HALF.

01:48PM 24    Q.    AND WAS THIS MEETING BEFORE YOU INVESTED IN THERANOS?

01:48PM 25    A.    YES, IT WAS.

01:48PM   1    Q.   AND THE MEETING I'LL TALK TO YOU ABOUT IN A MOMENT, THE

01:48PM   2    COX MEETING, WAS THAT ALSO BEFORE YOU INVESTED IN THERANOS?

01:48PM   3    A.   YES, IT WAS.

01:48PM   4    Q.   DO YOU HAVE A RECOLLECTION OF THE TOPICS THAT WERE

01:48PM   5    DISCUSSED DURING THIS NIARCHOS MEETING?

01:48PM   6    A.   NOT SPECIFICALLY, JUST A WHOLE RANGE OF TOPICS ABOUT THE

01:48PM   7    COMPANY.

01:48PM   8    Q.   YOU DON'T HAVE A SPECIFIC RECOLLECTION OF SPECIFIC TOPICS,

01:48PM   9    BUT RATHER JUST A GENERAL RECOLLECTION THAT THE MEETING

01:48PM  10    OCCURRED?

01:48PM  11    A.   JUST A GENERAL RECOLLECTION, THE FACT THAT WE DISCUSSED A

01:48PM  12    LOT OF ASPECTS OF THE COMPANY.

01:48PM  13    Q.   DO YOU RECALL THE TOPICS THAT MS. HOLMES SPOKE ABOUT, THE

01:49PM  14    SPECIFIC TOPICS THAT MS. HOLMES SPOKE ABOUT?

01:49PM  15    A.   NO, NOT IN PARTICULAR, NO.

01:49PM  16    Q.   DO YOU RECALL WHETHER MR. BALWANI SPOKE DURING THE

01:49PM  17    MEETING?

01:49PM  18    A.   I BELIEVE HE DID.

01:49PM  19    Q.   DO YOU REMEMBER THE SPECIFIC TOPICS THAT MR. BALWANI SPOKE

01:49PM  20    ABOUT?

01:49PM  21    A.   I DON'T HAVE A SPECIFIC MEMORY.

01:49PM  22    Q.   YOU AND I HAVE REVIEWED THE BINDER, THE STACKS OF

01:49PM  23    DOCUMENTS THAT YOU RECEIVED FROM THERANOS.

01:49PM  24         DO YOU RECALL THAT?

01:49PM  25    A.   YES.

ER-3879

MOSLEY DIRECT BY MR. SCHENK                                          5204

01:49PM  1    Q.   AND YOU DESCRIBED TO THE JURY AN UNDERSTANDING OF THE

01:49PM  2    TECHNOLOGY THAT YOU RECEIVED FROM REVIEWING THOSE MATERIALS; IS

01:49PM  3    THAT RIGHT?

01:49PM  4    A.   RIGHT.

01:49PM  5    Q.   I'M WONDERING IF ANYTHING IN THIS NIARCHOS MEETING CHANGED

01:49PM  6    YOUR UNDERSTANDING OF THE TECHNOLOGY?

01:49PM  7    A.   IT DID NOT.

01:49PM  8    Q.   DID ANYTHING OCCUR DURING THIS MEETING THAT DISCOURAGED

01:49PM  9    YOU FROM INVESTING?

01:49PM  10   A.   NO.

01:49PM  11   Q.   WERE THERE ANY REVISIONS?  WERE THERE ANY CORRECTIONS OR

01:49PM  12   AMENDMENTS TO MATERIAL THAT YOU RECEIVED IN THOSE STACKS THAT

01:49PM  13   YOU AND I REVIEWED?

01:49PM  14   A.   NO.

01:49PM  15   Q.   WERE THERE ANY INSTANCES WHEN MS. HOLMES SAID SOMETHING TO

01:49PM  16   YOU AND MR. BALWANI CORRECTED HER?

01:49PM  17   A.   NO.

01:49PM  18   Q.   HOW ABOUT THE REVERSE?  WERE THERE ANY INSTANCES WHERE

01:50PM  19   MR. BALWANI SAID SOMETHING TO YOU AND MS. HOLMES CORRECTED HIM?

01:50PM  20   A.   NO.

01:50PM  21   Q.   THE COX MEETING, DO YOU REMEMBER HOW LONG AFTER THE

01:50PM  22   NIARCHOS MEETING THAT ONE HAPPENED?

01:50PM  23   A.   I BELIEVE IT PREDATED.

01:50PM  24   Q.   OH, I'M SORRY.  I DID THE ORDER INCORRECTLY?

01:50PM  25   A.   RIGHT.  I THINK IT PREDATED THE NIARCHOS MEETING.

01:50PM  1      Q.   AND DO YOU KNOW WHETHER THE COX MEETING WAS IN SEPTEMBER

01:50PM  2      OR OCTOBER?

01:50PM  3      A.   IT WAS IN OCTOBER.

01:50PM  4      Q.   AND WAS THE NIARCHOS MEETING ALSO IN OCTOBER?

01:50PM  5      A.   IN OCTOBER AS WELL.

01:50PM  6      Q.   WERE THEY BOTH IN PERSON IN PALO ALTO?

01:50PM  7      A.   THEY WERE.

01:50PM  8      Q.   AND DO YOU REMEMBER WHETHER MS. HOLMES WAS PRESENT FOR THE

01:50PM  9      COX MEETING?

01:50PM 10      A.   SHE WAS.

01:50PM 11      Q.   WAS ANYBODY ELSE FROM THERANOS PRESENT?

01:50PM 12      A.   MR. BALWANI WAS PRESENT.

01:50PM 13      Q.   DO YOU RECALL WHETHER THERE WAS ANY THIRD PERSON?  ANYBODY

01:50PM 14      ELSE AT THAT MEETING?

01:50PM 15      A.   NOT THAT I REMEMBER.

01:50PM 16      Q.   I'M NOT SURE IF I ASKED YOU THAT QUESTION FOR NIARCHOS.

01:50PM 17           WAS THERE A THIRD PERSON FROM THERANOS AT THE NIARCHOS

01:50PM 18      MEETING?

01:50PM 19      A.   NOT THAT I REMEMBER.

01:51PM 20      Q.   SO SAME QUESTIONS FOR THE COX MEETING.

01:51PM 21           THE BINDERS OF THE DOCUMENTS THAT YOU RECEIVED GAVE YOU AN

01:51PM 22      UNDERSTANDING OF THERANOS.

01:51PM 23           DID THAT UNDERSTANDING CHANGE DURING THE COURSE OF THE COX

01:51PM 24      MEETING?

01:51PM 25      A.   IT DID NOT.

01:51PM  1    Q.   WERE THERE ANY AMENDMENTS OR CORRECTIONS THAT WERE MADE

01:51PM  2    DURING THAT MEETING, THINGS LIKE IN THE BINDER OF DOCUMENTS YOU

01:51PM  3    RECEIVED A DOCUMENT THAT SAID THE FOLLOWING, BUT I WANT TO

01:51PM  4    REFINE OR ALTER THAT?

01:51PM  5         DID THAT EVER HAPPEN DURING THE MEETING?

01:51PM  6    A.   IT DID NOT.

01:51PM  7    Q.   DO YOU REMEMBER THE TOPICS THAT MS. HOLMES ADDRESSED IN

01:51PM  8    THE COX MEETING?

01:51PM  9    A.   NOT SPECIFICALLY.

01:51PM  10   Q.   DO YOU REMEMBER WHETHER SHE SPOKE DURING THE COX MEETING?

01:51PM  11   A.   YES.

01:51PM  12   Q.   AND WHAT DO YOU RECALL?

01:51PM  13   A.   SHE -- I RECALL THAT SHE SPOKE AT GREAT LENGTH ABOUT THE

01:51PM  14   COMPANY.

01:51PM  15   Q.   AND DO YOU RECALL THE LENGTH OF THE COX MEETING?

01:51PM  16   A.   AGAIN, I BELIEVE IT WAS WELL WITHIN -- CERTAINLY IN EXCESS

01:51PM  17   OF AN HOUR AND A HALF.  IT COULD HAVE BEEN SUBSTANTIALLY MORE

01:51PM  18   THAN THAT.

01:51PM  19   Q.   DO YOU RECALL WHETHER MR. BALWANI SPOKE IN THE COX

01:52PM  20   MEETING?

01:52PM  21   A.   I BELIEVE HE DID.

01:52PM  22   Q.   DO YOU RECALL ANY SPECIFIC TOPICS THAT MR. BALWANI

01:52PM  23   ADDRESSED DURING THAT MEETING?

01:52PM  24   A.   I DON'T.

01:52PM  25   Q.   WERE THERE ANY INSTANCES WHEN MS. HOLMES WAS SPEAKING AND

01:52PM   1     MR. BALWANI CORRECTED HER DURING THE COX MEETING?

01:52PM   2     A.   NO.

01:52PM   3     Q.   WERE THERE ANY INSTANCES WHEN MR. BALWANI WAS SPEAKING AND

01:52PM   4     MS. HOLMES CORRECTED HIM?

01:52PM   5     A.   I DON'T REMEMBER ANY.

01:52PM   6     Q.   BY THE END OF THE COX MEETING, WERE THERE -- DID YOU HAVE

01:52PM   7     A DIFFERENT EXCITEMENT LEVEL ABOUT INVESTING?  WERE YOU LESS

01:52PM   8     INTERESTED IN INVESTING AT THE END OF THE MEETING?

01:52PM   9     A.   NO.

01:52PM  10     Q.   AND I THINK I ASKED THAT QUESTION, BUT JUST TO BE SURE, IS

01:52PM  11     THE SAME TRUE FOR NIARCHOS?  DID YOU LEAVE THE MEETING WITH THE

01:52PM  12     SAME LEVEL OF INVESTMENT ENTHUSIASM?

01:52PM  13     A.   I DID.

01:52PM  14     Q.   WOULD YOU NOW PLEASE TURN TO EXHIBIT 4284.

01:53PM  15          MR. MOSLEY, IS THIS AN EMAIL FROM YOU TO MS. HOLMES, AND

01:53PM  16     THEN A RESPONSE FROM MS. HOLMES TO YOU IN OCTOBER OF 2014?

01:53PM  17     A.   YES.

01:53PM  18               MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4284.

01:53PM  19               MR. CAZARES:  NO OBJECTION.

01:53PM  20               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:53PM  21          (GOVERNMENT'S EXHIBIT 4284 WAS RECEIVED IN EVIDENCE.)

01:53PM  22     BY MR. SCHENK:

01:53PM  23     Q.   MR. MOSLEY, THE EMAIL ON THE BOTTOM, THE ONE FROM YOU TO

01:53PM  24     MS. HOLMES, IS SENT ON MONDAY, OCTOBER 20TH OF 2014; IS THAT

01:53PM  25     RIGHT?

MOSLEY DIRECT BY MR. SCHENK                                    5208

```
01:53PM   1    A.   CORRECT.

01:53PM   2    Q.   AND YOU BEGIN BY SAYING, "ELIZABETH,

01:53PM   3         "IT WAS GOOD TO SEE YOU ON FRIDAY."

01:53PM   4         DO YOU SEE THAT?

01:53PM   5    A.   I DO.

01:53PM   6    Q.   AND SO WOULD AT LEAST ONE OF THOSE TWO MEETINGS THAT YOU

01:53PM   7    AND I JUST DISCUSSED HAVE OCCURRED THE FRIDAY BEFORE YOU SENT

01:53PM   8    THIS EMAIL?

01:53PM   9    A.   IT DID.

01:53PM  10    Q.   YOU WERE OUT IN PALO ALTO IN PERSON AT THAT POINT?

01:54PM  11    A.   THAT IS CORRECT.

01:54PM  12    Q.   AND THEN IF YOU'LL LOOK SEVERAL PARAGRAPHS DOWN, THERE'S A

01:54PM  13    PARAGRAPH THAT BEGINS, "AS WE DISCUSSED, I WILL SPEAK."

01:54PM  14         DO YOU SEE THAT ONE?

01:54PM  15    A.   YES.

01:54PM  16    Q.   YOU WILL SPEAK WITH DAVID ABOUT THE CONCERN WITH THE

01:54PM  17    MANDATORY REDEMPTION CLAUSE.

01:54PM  18         DO YOU SEE THAT?

01:54PM  19    A.   I DO.

01:54PM  20    Q.   AND IS THAT THE SECTION THAT YOU AND I TALKED ABOUT AT THE

01:54PM  21    BEGINNING OF YOUR TESTIMONY WHERE THE BOARD COULD BUY BACK

01:54PM  22    SHARES?

01:54PM  23    A.   THAT'S CORRECT.

01:54PM  24    Q.   AND THERE'S A REFERENCE TO DAVID.  AND WHO IS THAT?

01:54PM  25    A.   DAVID BOIES.
```

ER-3884

01:54PM 1    Q.   AND WHO IS THAT?

01:54PM 2    A.   DAVID BOIES WAS A FORMER PARTNER OF MINE AT

01:54PM 3    CRAVATH, SWAINE & MOORE WHO, BY THIS POINT, HAD RETIRED FROM

01:54PM 4    CRAVATH AND WAS WORKING AND STARTED HIS OWN FIRM.

01:54PM 5    Q.   AND YOU MENTIONED TO MS. HOLMES THAT YOU'RE GOING TO

01:54PM 6    DISCUSS THAT PROVISION WITH MR. BOIES.  WHY WOULD HE BE THE

01:54PM 7    PERSON THAT YOU'RE GOING TO TALK TO ABOUT THIS PROVISION?

01:54PM 8    A.   I BELIEVE AT THE TIME HE WAS DOING LEGAL WORK FOR THE

01:54PM 9    COMPANY.

01:55PM 10   Q.   FOR THE COMPANY?

01:55PM 11   A.   FOR THE COMPANY OR THE BOARD.  I DIDN'T SPECIFICALLY KNOW.

01:55PM 12   BUT DOING LEGAL WORK IN CONNECTION WITH THE COMPANY.

01:55PM 13   Q.   AND YOU REFERENCE THAT YOU WILL SPEAK TO HIM.

01:55PM 14        DID YOU, IN FACT, THEN SPEAK TO MR. BOIES ABOUT THIS

01:55PM 15   PROVISION?

01:55PM 16   A.   I DID.

01:55PM 17   Q.   AND THEN YOU WRITE AT THE VERY END, "PERSONALLY, I WOULD

01:55PM 18   BE DELIGHTED AND HONORED TO BE PART OF YOUR FIRST CLOSING.  MY

01:55PM 19   HOPE WOULD BE TO INVEST $6 MILLION, WHICH I WOULD PROPOSE TO

01:55PM 20   INVEST THROUGH AN LLC WHOLLY OWNED BY ME AND TRUSTS FOR MY

01:55PM 21   THREE DAUGHTERS, SO THAT IT WILL LIMIT THE NUMBER OF YOUR

01:55PM 22   SEPARATE SHAREHOLDERS RESULTING FROM MY INVESTMENT TO ONE."

01:55PM 23        MR. MOSLEY, IS THIS THE INSTANCE WHEN YOU INFORMED

01:55PM 24   MS. HOLMES OF YOUR DECISION TO INVEST?

01:55PM 25   A.   I BELIEVE IT IS.

01:55PM 1    Q.   AND HOW ABOUT THE DOLLAR AMOUNT?  HOW DID YOU COME UP WITH

01:55PM 2    THAT DOLLAR AMOUNT?  WHY DID YOU INVEST $6 MILLION?

01:55PM 3    A.   IT WAS, IT WAS JUST A LEVEL OF INVESTMENT THAT I WAS

01:55PM 4    COMFORTABLE WITH UNDER THE CIRCUMSTANCES.

01:56PM 5    Q.   AND ABOVE MS. HOLMES RESPONDS TO YOU ON THE 23RD OF

01:56PM 6    OCTOBER, AND IN IT, IN THE THIRD LINE, SHE WRITES, "WE HAVE

01:56PM 7    SPENT A LOT OF TIME ON HOW WE'RE SIZING THIS TRANSACTION AND

01:56PM 8    WHO WE'RE BRINGING IN AND I CAN HEREIN CONFIRM THE ALLOCATIONS

01:56PM 9    FOR YOU, ANDREAS, AND THE COXES, IN ADDITION TO THE DEVOS

01:56PM 10   COMMITMENT AT THE NUMBERS BELOW.  WE WILL FOLLOW UP TOMORROW ON

01:56PM 11   PAPERWORK THERE."

01:56PM 12       DO YOU SEE THAT?

01:56PM 13   A.   I DO.

01:56PM 14   Q.   AND THERE'S A REFERENCE TO A FEW OTHER INDIVIDUALS,

01:56PM 15   ANDREAS, THE COXES, AND DEVOS?

01:56PM 16   A.   RIGHT.

01:56PM 17   Q.   GO THROUGH THOSE WITH ME.  WHO IS ANDREAS?

01:56PM 18   A.   ANDREAS WAS A PERSONAL FRIEND OF MINE AND A CLIENT AT THE

01:56PM 19   TIME.

01:56PM 20   Q.   AND COX, IS THAT -- WE WERE TALKING ABOUT --

01:56PM 21   A.   COX WAS A CLIENT, RIGHT, WHO WAS INDEPENDENTLY LOOKING AT

01:56PM 22   THIS AS AN INVESTMENT.

01:56PM 23       AND THE DEVOS FAMILY WAS A CLIENT OF MINE THAT WAS ALSO

01:57PM 24   INDEPENDENTLY LOOKING AT THIS AS A POSSIBLE INVESTMENT.

01:57PM 25   Q.   OKAY.  I'M NOT SURE IF I MISSED IT.  WAS ANDREAS A CLIENT

01:57PM  1    OF YOURS?

01:57PM  2    A.   HE WAS.  HE WAS A CLIENT.

01:57PM  3    Q.   I SEE.  SO ALL THREE OF THESE INDIVIDUALS ARE CURRENT

01:57PM  4    CLIENTS AT THE TIME?

01:57PM  5    A.   THAT'S CORRECT.

01:57PM  6    Q.   DID YOU PLAY A ROLE IN THEIR INVESTMENT DECISION?

01:57PM  7    MS. HOLMES IS CONFIRMING THEIR ALLOCATIONS, THEIR INVESTMENT

01:57PM  8    ALLOCATIONS.  I'M WONDERING IF YOU PLAYED A ROLE IN THEIR

01:57PM  9    INVESTMENT DECISION PROCESS.

01:57PM  10             MR. CAZARES:  OBJECTION.  FOUNDATION.

01:57PM  11             THE COURT:  YOU'RE ASKING IF HE HAD ANYTHING TO DO

01:57PM  12   WITH THEIR DECISION?

01:57PM  13             MR. SCHENK:  YES.

01:57PM  14             THE COURT:  OVERRULED.

01:57PM  15        YOU CAN ANSWER.

01:57PM  16             THE WITNESS:  I DID NOT.

01:57PM  17   BY MR. SCHENK:

01:57PM  18   Q.   WOULD YOU NOW TURN TO TAB 4286.

01:58PM  19        MR. MOSLEY, IS 4286 AN EMAIL FROM MR. BALWANI TO YOU AND A

01:58PM  20   CC TO MS. HOLMES?

01:58PM  21   A.   YES.

01:58PM  22   Q.   AND IS IT DATED OCTOBER 24TH, 2014?

01:58PM  23   A.   IT IS.

01:58PM  24             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4286.

01:58PM  25             MR. CAZARES:  NO OBJECTION.

01:58PM 1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:58PM 2          (GOVERNMENT'S EXHIBIT 4286 WAS RECEIVED IN EVIDENCE.)

01:58PM 3     BY MR. SCHENK:

01:58PM 4     Q.   MR. MOSLEY, DOES MR. BALWANI WRITE TO YOU, "DEAR DAN.

01:58PM 5          "I HOPE YOU ARE DOING WELL.

01:58PM 6          "FOLLOWING ELIZABETH'S EMAIL, PLEASE FIND THE DOCUMENTS

01:58PM 7     ATTACHED FOR THE THERANOS SHARE ALLOCATIONS FOR YOU, ANDREAS,

01:58PM 8     AND THE COX FAMILY."

01:58PM 9          AND THEN IT CONTINUES WITH SOME DISCUSSION OF SIGNATURE

01:58PM 10    PAGES.

01:58PM 11         DO YOU SEE THAT?

01:58PM 12    A.   I DO.

01:58PM 13    Q.   AND THEN TWO PARAGRAPHS DOWN IT INCLUDES FILE NAMES AND IT

01:59PM 14    REFERENCES SOFT COPIES OF INVESTMENT DOCUMENTS YOU ALREADY HAVE

01:59PM 15    IN THE INVESTMENT BINDER ALONG WITH SIGNATURE PAGES.

01:59PM 16         DO YOU SEE THAT?

01:59PM 17    A.   I DO.

01:59PM 18    Q.   AND THEN AFTER THIS PAGE OF THE EXHIBIT, DO YOU SEE SOME

01:59PM 19    PRINTED MATERIALS THAT WERE ATTACHED BEGINNING, IT LOOKS LIKE,

01:59PM 20    ON PAGE 3?

01:59PM 21    A.   I SEE THE TERMS.

01:59PM 22    Q.   YOU SEE THEM?

01:59PM 23    A.   YES.

01:59PM 24    Q.   AND WHAT ARE THESE?

01:59PM 25    A.   THE FIRST ONE IS THE AMENDED AND RESTATED INVESTORS'

01:59PM   1      RIGHTS AGREEMENT DATED FEBRUARY 7TH, 2014.

01:59PM   2      Q.   AND THEN IF YOU'LL TURN -- I HAVE A QUESTION ON PAGE 60.

01:59PM   3      THIS IS SORT OF IN THE MIDDLE OF THE DOCUMENT.

01:59PM   4           DO YOU KNOW WHAT, IF YOU LOOK AT PAGE 54, THAT IS?

02:00PM   5      A.   I SEE IT.

02:00PM   6      Q.   WHAT IS PAGE 54 THE BEGINNING OF?

02:00PM   7      A.   IT'S THE BEGINNING OF A STOCK PURCHASE AGREEMENT INVOLVING

02:00PM   8      SERIES C-2 PREFERRED STOCK.

02:00PM   9      Q.   AND DID YOU REVIEW THIS AGREEMENT BEFORE PURCHASING SERIES

02:00PM  10      C-2 STOCK?

02:00PM  11      A.   I DID.

02:00PM  12      Q.   AND IF YOU'LL TURN TO PAGE 60, I HAVE A COUPLE OF

02:00PM  13      QUESTIONS ON SECTION IN THE PURCHASE AGREEMENT?

02:00PM  14      A.   OKAY.

02:00PM  15      Q.   4.3 IS ENTITLED INVESTMENT EXPERIENCE.

02:00PM  16           DO YOU SEE THAT?

02:00PM  17      A.   I DO.

02:00PM  18      Q.   AND DID YOU HAVE THE INVESTMENT EXPERIENCE THAT WAS

02:00PM  19      NECESSARY TO MAKE THIS INVESTMENT?

02:00PM  20      A.   I DID.

02:00PM  21      Q.   4.4 REFERS TO THE SPECULATIVE NATURE OF THE INVESTMENT.

02:00PM  22           DO YOU SEE THAT?

02:00PM  23      A.   I DO.

02:00PM  24      Q.   AND DID YOU UNDERSTAND THAT THIS INVESTMENT WAS

02:00PM  25      SPECULATIVE?

02:00PM    1       A.    I DID.

02:00PM    2       Q.    AND IT SAYS IT INVOLVED SUBSTANTIAL RISKS.

02:00PM    3             DID YOU SEE THAT ALSO?

02:00PM    4       A.    I DID.

02:00PM    5       Q.    IN FACT, IN YOUR OUTLINE FOR DR. KISSINGER, DID YOU

02:01PM    6       OUTLINE SOME OF THE RISKS THAT YOU SAW IN THE INVESTMENT?

02:01PM    7       A.    I DID.

02:01PM    8       Q.    4.5 IS A SECTION THAT INVOLVES ACCESS TO DATA.

02:01PM    9             DO YOU SEE THAT?

02:01PM   10       A.    I DO.

02:01PM   11       Q.    AND DID YOU THINK THAT THIS WAS TRUE?  IN OTHER WORDS, DID

02:01PM   12       YOU HAVE ACCESS TO CERTAIN DATA, BUT NOT ALL DATA, WHEN YOU

02:01PM   13       MADE THE INVESTMENT DECISION?

02:01PM   14       A.    I DID.

02:01PM   15       Q.    WHEN YOU RECEIVED THE BINDERS OF INFORMATION THAT YOU AND

02:01PM   16       I LOOKED THROUGH, DID YOU THINK THAT THAT WAS SOME OF THE

02:01PM   17       INFORMATION OR SOME OF THE DATA THAT WAS PART OF THE

02:01PM   18       INFORMATION THAT THE COMPANY WAS PROVIDING FOR YOU TO EVALUATE

02:01PM   19       WHEN MAKING AN INVESTMENT DECISION?

02:01PM   20       A.    I DID.

02:01PM   21       Q.    4.6 IS CALLED ACCREDITED INVESTOR.

02:01PM   22             ARE YOU FAMILIAR WITH THAT TERM?

02:01PM   23       A.    I AM.

02:01PM   24       Q.    AND WERE YOU AN ACCREDITED INVESTOR WHEN YOU MADE THE

02:01PM   25       INVESTMENT?

02:01PM  1     A.   YES, I WAS.

02:01PM  2     Q.   WOULD YOU TURN TO PAGE 73.

02:02PM  3          ON PAGE 73, ABOVE TWO LINES THAT HAVE THE PRINTED NAME

02:02PM  4     ELIZABETH HOLMES, DO YOU SEE SIGNATURES?

02:02PM  5     A.   I DO.

02:02PM  6     Q.   AND DID YOU RECEIVE THESE SIGNED VERSIONS FROM MS. HOLMES

02:02PM  7     BEFORE YOU MADE YOUR INVESTMENT DECISION?

02:02PM  8     A.   I BELIEVE I DID.

02:02PM  9     Q.   IF YOU'LL NOW TURN TO PAGE -- I'M SORRY, EXHIBIT 4303.

02:02PM 10          MR. MOSLEY, IS 4303 AN EMAIL FROM YOU TO MS. HOLMES AND

02:02PM 11     MR. BALWANI?

02:02PM 12     A.   YES, IT IS.

02:02PM 13     Q.   WITH SOME ATTACHMENTS?

02:02PM 14     A.   CORRECT.

02:02PM 15          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4303.

02:02PM 16          MR. CAZARES:  NO OBJECTION.

02:02PM 17          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:02PM 18        (GOVERNMENT'S EXHIBIT 4303 WAS RECEIVED IN EVIDENCE.)

02:02PM 19          MR. SCHENK:  THANK YOU.

02:02PM 20     Q.   MR. MOSLEY, IT LOOKS LIKE NOW ON OCTOBER 30TH OF 2014

02:03PM 21     YOU'RE SENDING MS. HOLMES AND MR. BALWANI WHAT ARE CALLED

02:03PM 22     MASTER SIGNATURE PAGES.

02:03PM 23          DO YOU SEE THAT?

02:03PM 24     A.   I DO.

02:03PM 25     Q.   AND WHY DID YOU SEND THEM THESE DOCUMENTS?

02:03PM  1    A.   WELL, THESE WERE DOCUMENTS THAT WERE NECESSARY IN ORDER TO

02:03PM  2    MAKE THE INVESTMENT.

02:03PM  3    Q.   IF YOU'LL TURN TO PAGE 2 OF THE EXHIBIT.

02:03PM  4         IS THIS YOUR SIGNATURE PAGE?

02:03PM  5    A.   YES.  WELL, IT'S A SIGNATURE PAGE FOR THE ENTITY THROUGH

02:03PM  6    WHICH I INVESTED.

02:03PM  7    Q.   THANK YOU.  THE LLC THROUGH WHICH YOU MADE THE INVESTMENT?

02:03PM  8    A.   THAT'S CORRECT.

02:03PM  9    Q.   AND TO BE CLEAR, THERE'S AN ADDRESS HERE.  THAT'S A WORK

02:03PM  10   ADDRESS; RIGHT?

02:03PM  11   A.   YES, IT IS.

02:03PM  12   Q.   AND THEN THE NEXT PAGE IS ANOTHER SIGNATURE PAGE.

02:03PM  13        WHY WERE YOU SENDING MR. DRACOPOULOS'S SIGNATURE PAGE TO

02:03PM  14   MS. HOLMES AND MR. BALWANI?

02:03PM  15   A.   HE ASKED ME, ARE YOU SENDING YOUR PAGE?

02:03PM  16        AND I SAID YES.

02:03PM  17        AND HE SAID, DO YOU MIND SENDING MINE AT THE SAME TIME?

02:04PM  18        AND I SAID I WOULD BE HAPPY TO.

02:04PM  19   Q.   AND SO YOU DID HIM THAT FAVOR?

02:04PM  20   A.   RIGHT.

02:04PM  21   Q.   I WANT YOU TO TURN TO TAB 2172.  IT'S TOWARDS THE FRONT OF

02:04PM  22   YOUR BINDER.

02:04PM  23   A.   I'M THERE.

02:04PM  24   Q.   MR. MOSLEY, DO YOU RECOGNIZE THIS DOCUMENT?

02:04PM  25   A.   I DO.

02:04PM   1      Q.   AND WHAT IS THIS DOCUMENT?

02:04PM   2      A.   THIS IS THE DOCUMENT THAT I REFERRED TO DEALING WITH THAT

02:04PM   3      PARTICULAR PROVISION IN THE CERTIFICATE OF INCORPORATION OF THE

02:04PM   4      COMPANY RELATING TO THE RIGHT TO REDEEM PREFERRED STOCK, OR

02:04PM   5      REDEEM STOCK PERIOD.

02:04PM   6      Q.   AND THE DATE ON THIS DOCUMENT?

02:05PM   7      A.   OCTOBER 31, 2014.

02:05PM   8      Q.   AND IS THAT THE DATE OF THE ELECTRONIC WIRE THAT YOU SENT

02:05PM   9      FUNDS?

02:05PM  10      A.   IT WAS THAT DATE.

02:05PM  11      Q.   I'M SORRY, THE ANSWER?

02:05PM  12      A.   IT WAS THAT DATE.

02:05PM  13           MR. SCHENK:  THANK YOU.

02:05PM  14      YOUR HONOR, THE GOVERNMENT OFFERS 2172.

02:05PM  15           MR. CAZARES:  NO OBJECTION.

02:05PM  16           THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:05PM  17      (GOVERNMENT'S EXHIBIT 2172 WAS RECEIVED IN EVIDENCE.)

02:05PM  18           MR. SCHENK:  THANK YOU.

02:05PM  19      Q.   MR. MOSLEY, THE LETTER MAKES REFERENCE TO YOUR CLIENTS.

02:05PM  20           DO YOU SEE THAT?

02:05PM  21      A.   YES.

02:05PM  22      Q.   AND I THINK YOU MAY HAVE DESCRIBED THIS EARLIER.

02:05PM  23           WHY DID YOU HAVE THIS AGREEMENT COVER NOT JUST YOURSELF,

02:05PM  24      BUT ALSO YOUR CLIENTS?

02:05PM  25      A.   AS I POINTED OUT, I KNEW THAT SOME OF MY CLIENTS WERE

02:05PM  1    LOOKING AT THE COMPANY AS A POSSIBLE INVESTMENT AND CONSIDERING

02:05PM  2    IT.

02:05PM  3        I CERTAINLY NEVER WOULD HAVE BEEN COMFORTABLE OBTAINING

02:05PM  4    THIS KIND OF COMFORT FOR MYSELF PERSONALLY WITHOUT IT HAVING --

02:05PM  5    EXTENDING TO EVERYBODY ELSE THAT I KNEW MIGHT BE LOOKING AT THE

02:06PM  6    COMPANY.

02:06PM  7    Q.   THANK YOU.

02:06PM  8        ON OCTOBER 31ST OF 2014, DID YOU WIRE, DID YOU

02:06PM  9    ELECTRONICALLY WIRE FUNDS TO THERANOS?

02:06PM  10   A.   I DID.

02:06PM  11   Q.   DO YOU RECALL THE AMOUNT?

02:06PM  12   A.   IT WAS JUST SLIGHTLY UNDER $6 MILLION.

02:06PM  13   Q.   AND WHEN YOU INITIATED THAT WIRE, WHERE WERE YOU?

02:06PM  14   PHYSICALLY, WHERE WERE YOU?

02:06PM  15   A.   I BELIEVE I WAS IN NEW YORK CITY.

02:06PM  16   Q.   AND YOU SENT THAT TO THERANOS; IS THAT RIGHT?

02:06PM  17   A.   I DID.

02:06PM  18        WELL, THE WIRE WAS TO THEIR BANK, WHICH I THINK WAS

02:06PM  19   SILICON VALLEY OR SOMETHING LIKE THAT.

02:06PM  20   Q.   THE WIRE WAS FROM YOUR BANK TO THERANOS'S --

02:06PM  21   A.   YES.

02:06PM  22   Q.   -- BANK?

02:06PM  23        THANK YOU.

02:06PM  24        IF YOU'LL NOW TURN, I THINK IT'S ONE TAB BEFORE THAT, IN

02:06PM  25   YOUR BINDER TO 2065.

02:06PM  1            DO YOU SEE THAT EXHIBIT?

02:06PM  2     A.   I DO.

02:06PM  3     Q.   MR. MOSLEY, YOU'RE NOT ON THIS EMAIL; IS THAT CORRECT?

02:06PM  4     A.   I AM NOT.

02:07PM  5     Q.   DO YOU KNOW -- THERE'S AN INDIVIDUAL HERE LISTED,

02:07PM  6     CHRISTIAN HOLMES.

02:07PM  7            DO YOU KNOW WHO THAT IS?

02:07PM  8     A.   I DO.

02:07PM  9     Q.   AND WHO WAS THAT?

02:07PM  10    A.   THAT WAS ELIZABETH HOLMES'S BROTHER.

02:07PM  11    Q.   AND DO YOU KNOW WHERE HE WORKED?

02:07PM  12    A.   I BELIEVE HE WORKED AT THERANOS, BUT I DON'T KNOW FOR

02:07PM  13    SURE, BUT I BELIEVE HE DID.

02:07PM  14    Q.   AND DO YOU KNOW -- DO YOU RECALL WHETHER YOU EVER HAD

02:07PM  15    INTERACTIONS WITH MR. HOLMES?

02:07PM  16    A.   CHRISTIAN HOLMES?

02:07PM  17    Q.   YES.

02:07PM  18    A.   I DID MEET HIM ON ONE OR MORE OCCASIONS, MAYBE JUST ONE

02:07PM  19    OCCASION.

02:07PM  20    Q.   AND WHEN WAS THAT?

02:07PM  21    A.   IT WAS AT THE BDT CONFERENCE I ATTENDED AND WHICH

02:07PM  22    ELIZABETH ATTENDED.

02:07PM  23    Q.   THE ONE IN CHICAGO THAT WE SAW THE EMAIL ABOUT?

02:07PM  24    A.   THAT'S CORRECT.

02:07PM  25            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2065.

02:07PM  1          MR. CAZARES:  OBJECTION.  FOUNDATION, HEARSAY, 403.

02:07PM  2          THE COURT:  THIS WOULD BE ADMITTED FOR NOTICE

02:07PM  3  PURPOSES ONLY, NOT FOR THE TRUTH OF THE MATTER ASSERTED,

02:07PM  4  MR. SCHENK?

02:08PM  5          MR. SCHENK:  YES, YOUR HONOR.

02:08PM  6          THE COURT:  ALL RIGHT.  THANK YOU.

02:08PM  7      I'LL OVERRULE THE OBJECTIONS.

02:08PM  8      LADIES AND GENTLEMEN, THIS DOCUMENT WILL BE ADMITTED,

02:08PM  9  AGAIN, ONLY AS TO THE ISSUE OF NOTICE, NOTICE AS TO THE

02:08PM 10  INDIVIDUALS MENTIONED ON THE EMAIL, THAT IS, TO/FROM, AND NOT

02:08PM 11  FOR THE TRUTH OF THE MATTERS ASSERTED IN THE EMAIL.

02:08PM 12      IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:08PM 13      (GOVERNMENT'S EXHIBIT 2065 WAS RECEIVED IN EVIDENCE.)

02:08PM 14          MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR.

02:08PM 15  Q.   MR. MOSLEY, I'D LIKE TO START ON PAGE 2, AND THEN WE'LL

02:08PM 16  WORK OUR WAY UP THROUGH THE EMAIL.

02:08PM 17      DO YOU SEE ON PAGE 2 AN EMAIL FROM CHRISTIAN HOLMES TO

02:08PM 18  ELIZABETH HOLMES AND SUNNY BALWANI?

02:08PM 19  A.   I DO.

02:08PM 20  Q.   AND THIS EMAIL IS DATED OCTOBER 9TH, 2014.

02:08PM 21      SO A MOMENT AGO YOU AND I WERE TALKING ABOUT YOUR

02:08PM 22  INVESTMENT ON OCTOBER 31ST; IS THAT CORRECT?

02:08PM 23  A.   THAT'S CORRECT.

02:08PM 24  Q.   AND THIS EMAIL WAS SENT, IT APPEARS, A FEW WEEKS BEFORE

02:08PM 25  THAT?

02:08PM 1      A.   CORRECT.

02:08PM 2      Q.   DO YOU SEE THAT MR. HOLMES WRITES, "WHERE CAN I FIND THE

02:08PM 3      LIST OF NAMES YOU MENTIONED FROM BDT WHO COULD COME INTO WAG ON

02:09PM 4      SATURDAY?"

02:09PM 5           DO YOU SEE THAT?

02:09PM 6      A.   I SEE THAT.

02:09PM 7      Q.   AND THEN IT CONTINUES.  "WE WILL SEND OVER THE DIFFERENT

02:09PM 8      WORK FLOWS FOR HOW WE WILL ACCOMMODATE FINGERSTICK REGARDLESS

02:09PM 9      OF WHAT'S ON THE ORDER, AND POSSIBLE ISSUES ASSOCIATED, AS

02:09PM 10     REQUESTED."

02:09PM 11          DID I READ THAT CORRECTLY?

02:09PM 12     A.   YES, YOU DID.

02:09PM 13     Q.   AND THEN I WOULD LIKE TO GO UP ONE EMAIL, BUT CAN YOU SEE

02:09PM 14     THE SCREEN -- THE FROM LINE IS CUT OFF ON THE TOP OF THIS

02:09PM 15     EMAIL?  IT INCLUDES A SENT TO AND A CC, BUT NO FROM LINE?

02:09PM 16     A.   I SEE THAT.

02:09PM 17     Q.   IF YOU'LL TURN TO THE FIRST PAGE AT THE VERY BOTTOM, DO

02:09PM 18     YOU SEE ON THE FIRST PAGE AT THE VERY BOTTOM, DO YOU SEE A FROM

02:09PM 19     LINE?

02:09PM 20     A.   I DO.

02:09PM 21     Q.   THE EMAIL APPEARS TO BE FROM MR. BALWANI; IS THAT RIGHT?

02:09PM 22     A.   CORRECT.

02:09PM 23     Q.   IF NOW WE CAN TURN BACK TO THAT SECOND PAGE.

02:09PM 24          THAT SAME DAY, OCTOBER 9TH, MR. BALWANI WRITES, "DIANA.

02:09PM 25     CAN YOU SEND CHRISTIAN LIST OF 4 PEOPLE FROM BDT WHO VISITED US

02:10PM  1    FEW DAYS BACK THIS WAS BYRON TROTT AND HIS TEAM."

02:10PM  2         DO YOU SEE THAT?

02:10PM  3    A.   I DO.

02:10PM  4    Q.   AND NOW IF WE CAN GO TO THE FIRST PAGE AND LOOK AT THE

02:10PM  5    LENGTHY EMAIL IN RESPONSE.

02:10PM  6         AT THE VERY TOP, MR. HOLMES WRITES TO MR. BALWANI AND

02:10PM  7    ELIZABETH HOLMES IT APPEARS ON THE NEXT DAY, ON OCTOBER 10TH.

02:10PM  8         DO YOU SEE THAT?

02:10PM  9    A.   I DO.

02:10PM  10   Q.   AND MR. HOLMES WRITES, "ALSO WANTED TO SEND ALONG OUR

02:10PM  11   THOUGHTS FOR HOW TO ACCOMPLISH THE FS IN" THIS SCENARIO, THEIR

02:10PM  12   ORDERS PROMPT VENOUS.

02:10PM  13        I'M SORRY.  LET ME REREAD THAT.

02:10PM  14        "ALSO WANTED TO SEND ALONG OUR THOUGHTS FOR HOW TO

02:10PM  15   ACCOMPLISH THE FS IN THE SCENARIO THEIR ORDERS PROMPT VENOUS.

02:10PM  16   ASSUMPTIONS HERE FROM EAH ARE THAT WE MUST NOT DO VENOUS DRAW

02:10PM  17   AND WE CANNOT TELL THEM THAT THEIR ORDER PROMPTS VENOUS IF IT

02:11PM  18   DOES.  THE FOLLOWING IS THE ACTION PLANNING TO ACCOMPLISH

02:11PM  19   THIS."

02:11PM  20        DO YOU SEE THAT, MR. MOSLEY?

02:11PM  21   A.   I DO.

02:11PM  22   Q.   AND NOW IF YOU'LL LOOK DOWN WITH ME, THERE'S A SECTION

02:11PM  23   CALLED PREP ACTIONS.

02:11PM  24        THE FIRST BULLET OR DASH, "ANAM/ROBIN HAVE LIST OF NAMES

02:11PM  25   WHICH INCLUDES POSSIBLE PATIENTS FROM BDT."

02:11PM  1        DO YOU SEE THAT?

02:11PM  2   A.   I DO.

02:11PM  3   Q.   AND NOW IF WE LOOK AT SCENARIO 1, THE NEXT SECTION, IT

02:11PM  4   READS, "SCENARIO 1:  SCANNED ORDER FROM BDT VIP CONTAINS TESTS

02:11PM  5   THAT PROMPT FOR VENOUS DRAW."

02:11PM  6        THE SECOND DASH, "USE CASE A:  VENOUS IS PROMPTED DUE TO

02:11PM  7   SOME TESTS NOT YET BEING ON FS, BUT WOULD OTHERWISE PROMPT FS.

02:12PM  8        "REMOVE TESTS THAT ARE NOT YET ON FS AND COMPLETE

02:12PM  9   TRANSCRIPTION.

02:12PM  10       "VISIT IS COMPLETED PER SOP."

02:12PM  11       AND THEN A SECTION CALLED "NEGATIVES."

02:12PM  12       THE FIRST BULLET, "NEED TO EITHER TELL THE PATIENT AT THE

02:12PM  13  STORE THAT WE WILL NOT RUN A FEW TESTS, OR TELL THEM ON THE

02:12PM  14  BACK END THAT WE COULD NOT RUN CERTAIN TESTS."

02:12PM  15       DO YOU SEE THAT, SIR?

02:12PM  16  A.   I DO.

02:12PM  17  Q.   AND NOW IF WE LOOK FURTHER DOWN, "USE CASE B:  VENOUS IS

02:12PM  18  PROMPTED DUE TO VOLUME OF TESTS BUT TESTS WOULD PROMPT FS IF

02:12PM  19  ORDERED INDIVIDUALLY."

02:12PM  20       THE FIRST DASH, "REMOVE ENOUGH TESTS IN SM TO ALLOW THE

02:12PM  21  PATIENT TO PROCEED WITH FS."

02:12PM  22       AND IF YOU LOOK AT NEGATIVES, THE SECOND BULLET READS, "IF

02:12PM  23  THEY NOTICE MISSING TESTS ON THE RECEIPT, THEY MAY ASK THE WAG

02:12PM  24  TECH ABOUT IT.  WORST CASE THEY WOULD MAKE A CALL TO CS AND

02:13PM  25  ANAM WOULD TELL THEM EVERYTHING IS FINE.  CIARA WILL ALSO BE

02:13PM   1    ABLE TO COME OUT OF THE DRAW ROOM ONCE CHECK-IN IS COMPLETE TO

02:13PM   2    WELCOME THEM INTO THE ROOM AND DISTRACT FROM LOOKING AT THE

02:13PM   3    RECEIPT."

02:13PM   4         DID I READ THAT CORRECTLY?

02:13PM   5    A.   YOU DID.

02:13PM   6    Q.   MR. MOSLEY, I WANT TO ASK YOU ONE QUESTION ABOUT

02:13PM   7    EXHIBIT 3387 -- THIS HAS BEEN PREVIOUSLY ADMITTED,

02:13PM   8    YOUR HONOR -- PAGE 512.

02:13PM   9         PERMISSION TO PUBLISH?

02:13PM   10             THE COURT:   YES.

02:13PM   11   BY MR. SCHENK:

02:13PM   12   Q.   MR. MOSLEY, DO YOU RECALL THIS EXHIBIT THAT YOU AND I

02:13PM   13   SPOKE ABOUT A MOMENT AGO?

02:13PM   14   A.   I DO.

02:13PM   15   Q.   WE TALKED ABOUT TWO MEETINGS THAT YOU HAD IN AROUND

02:13PM   16   OCTOBER OF 2014 IN PALO ALTO.

02:13PM   17        DO YOU RECALL THAT?

02:13PM   18   A.   YES.

02:13PM   19   Q.   DO YOU WANT ME TO GIVE YOU A MOMENT TO GET TO THE PAGE?

02:13PM   20   A.   NO.  I CAN SEE IT ON THE SCREEN.  THAT'S FINE.

02:13PM   21   Q.   OKAY.  I WONDER IF, AFTER THAT, AFTER OCTOBER OF 2014, DID

02:14PM   22   YOU HAVE THE OCCASION TO BE ON A CONFERENCE CALL WHERE

02:14PM   23   MS. HOLMES AND MR. BALWANI WERE PRESENT IN 2015?

02:14PM   24   A.   NOT THAT I RECALL WHERE THEY WERE BOTH PRESENT ON A

02:14PM   25   PARTICULAR CALL.

02:14PM   1    Q.   WERE THERE INSTANCES WHEN YOU WERE ON A CONFERENCE CALL

02:14PM   2    WITH JUST MR. BALWANI?

02:14PM   3    A.   WELL, JUST WITH MR. BALWANI FROM THE COMPANY AND OTHER

02:14PM   4    INDIVIDUALS, YES.

02:14PM   5    Q.   THANK YOU.

02:14PM   6         IN 2015, WERE YOU ON A CONFERENCE CALL WHERE THE ONLY

02:14PM   7    REPRESENTATIVE THAT YOU WERE AWARE OF FROM THERANOS WAS

02:14PM   8    MR. BALWANI?

02:14PM   9    A.   THAT'S CORRECT.

02:14PM  10    Q.   AND IN 2015 WHEN YOU WERE HAVING THIS CALL, DID

02:14PM  11    MR. BALWANI MAKE ANY STATEMENTS TO YOU THAT THE NUMBERS IN

02:14PM  12    2014, WHAT LOOKS TO BE TOTAL REVENUE OF $140 MILLION, DID NOT

02:14PM  13    COME THROUGH?

02:14PM  14    A.   HE DID NOT.

02:14PM  15    Q.   SO IN 2015 WHEN YOU WERE ON A CONFERENCE CALL WITH

02:15PM  16    MR. BALWANI, DID YOU DISCUSS THE FINANCES, THE FINANCIAL

02:15PM  17    SITUATION AT THERANOS?

02:15PM  18    A.   I BELIEVE THE FINANCES WERE DISCUSSED, BUT I DON'T HAVE

02:15PM  19    ANY SPECIFIC RECOLLECTION OF DETAILS.

02:15PM  20    Q.   YOU DON'T HAVE A RECOLLECTION OF THE SPECIFIC DETAILS

02:15PM  21    DISCUSSED?

02:15PM  22    A.   RIGHT.

02:15PM  23    Q.   DO YOU HAVE A RECOLLECTION THAT MR. BALWANI SAID, I NEED

02:15PM  24    TO REFINE THE NUMBER THAT WE PROVIDED TO YOU IN 2014, AND NOW

02:15PM  25    THAT IT IS 2015, WE DIDN'T HIT 100 MILLION IN REVENUE?

MOSLEY DIRECT BY MR. SCHENK                    5226

02:15PM  1              MR. CAZARES:  OBJECTION.  LEADING, ASKED AND

02:15PM  2       ANSWERED.

02:15PM  3              THE COURT:  OVERRULED.

02:15PM  4          WHY DON'T YOU ASK THE QUESTION AGAIN?

02:15PM  5              THE WITNESS:  I SAID THANKS FOR READING THE QUESTION

02:15PM  6       AGAIN.

02:15PM  7       BY MR. SCHENK:

02:15PM  8       Q.   IN 2015 ON THIS CALL WHERE MR. BALWANI WAS PRESENT, I

02:15PM  9       THINK YOU SAID THAT FINANCES WERE DISCUSSED.

02:15PM 10       A.   YES.

02:15PM 11       Q.   AND I'M WONDERING IF THERE WAS AN OCCASION ON THE CALL

02:15PM 12       WHEN MR. BALWANI SAID, THE FINANCIAL PROJECTIONS WE HAVE

02:15PM 13       PROVIDED TO YOU IN 2014 REGARDING 2014 NEED TO BE REFINED OR

02:16PM 14       CORRECTED.

02:16PM 15          DID THAT EVER HAPPEN?

02:16PM 16              MR. CAZARES:  OBJECTION.  ASKED AND ANSWERED.

02:16PM 17              THE COURT:  OVERRULED.

02:16PM 18              THE WITNESS:  NO.

02:16PM 19       BY MR. SCHENK:

02:16PM 20       Q.   AND THEN SAME QUESTION FOR 2015.  YOU'RE HAVING THIS CALL

02:16PM 21       IN 2015.  DID MR. BALWANI SAY, OUR 2015 PROJECTIONS, THE ONE

02:16PM 22       THAT PREDICTS ABOUT A BILLION DOLLARS IN REVENUE, DID THAT GET

02:16PM 23       REFINED?

02:16PM 24              MR. CAZARES:  OBJECTION.  FOUNDATION.

02:16PM 25              THE COURT:  DURING THE CONVERSATION?

ER-3902

MOSLEY CROSS BY MR. CAZARES                                    5227

02:16PM  1              MR. SCHENK:  YES, YOUR HONOR.

02:16PM  2              THE COURT:  ALL RIGHT.

02:16PM  3         YOU CAN ANSWER THE QUESTION.

02:16PM  4              THE WITNESS:  NO.

02:16PM  5              MR. SCHENK:  YOUR HONOR, MAY I HAVE ONE MOMENT?

02:16PM  6              THE COURT:  YES.

02:16PM  7         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:16PM  8              MR. LEACH:  THANK YOU VERY MUCH, YOUR HONOR.  NO

02:16PM  9     FURTHER QUESTIONS.

02:16PM 10              THE COURT:  WHY DON'T WE TAKE OUR BREAK, LADIES AND

02:16PM 11     GENTLEMEN, ABOUT 20, 25 MINUTES, AND THEN YOU'LL HAVE

02:16PM 12     CROSS-EXAMINATION.

02:16PM 13              MR. CAZARES:  YES, YOUR HONOR.

02:16PM 14              THE COURT:  ALL RIGHT.  WE'LL TAKE OUR SECOND BREAK,

02:16PM 15     SIR, AND THEN WE'LL ENGAGE AGAIN.

02:17PM 16         (RECESS FROM 2:17 P.M. UNTIL 2:47 P.M.)

02:49PM 17              THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES

02:49PM 18     PREVIOUSLY PRESENT ARE PRESENT AGAIN.

02:49PM 19         COUNSEL, YOU HAVE CROSS-EXAMINATION?

02:49PM 20              MR. CAZARES:  YES, YOUR HONOR.  THANK YOU VERY MUCH,

02:49PM 21     YOUR HONOR.

02:49PM 22                     **CROSS-EXAMINATION**

02:49PM 23     BY MR. CAZARES:

02:49PM 24     Q.  GOOD AFTERNOON, MR. MOSLEY.  MY NAME IS STEVE CAZARES, AND

02:49PM 25     I REPRESENT MR. BALWANI.

02:49PM  1          I JUST HAVE A FEW QUESTIONS FOR YOU THIS AFTERNOON.

02:49PM  2     A.   OKAY.

02:49PM  3     Q.   WILL THAT BE OKAY?

02:49PM  4          JUST TO GET BACK TO A LITTLE BIT OF BACKGROUND FOR

02:49PM  5     CONTEXT.

02:49PM  6          SO YOU CURRENTLY WORK AT THE INVESTMENT FIRM BDT; IS THAT

02:49PM  7     RIGHT?

02:49PM  8     A.   THAT'S CORRECT.

02:49PM  9     Q.   AND YOU'VE BEEN AT BDT NOW FOR A FEW YEARS; CORRECT?

02:49PM 10     A.   A LITTLE OVER FOUR YEARS.

02:49PM 11     Q.   AT BDT, YOU WORK WITH MR. TROTT; IS THAT CORRECT?

02:49PM 12     A.   YES, I DO.

02:49PM 13     Q.   AND MR. TROTT HAS DECADES OF EXPERIENCE IN INVESTMENT AND

02:49PM 14     FINANCE; CORRECT?

02:50PM 15     A.   YES, HE DOES.

02:50PM 16     Q.   OKAY.  AND YOU YOURSELF HAVE YEARS OF EXPERIENCE RELATING

02:50PM 17     TO INVESTMENTS BOTH ON BEHALF OF YOURSELF AND YOUR FAMILY;

02:50PM 18     CORRECT?

02:50PM 19     A.   I DO.

02:50PM 20     Q.   INCLUDING PUBLIC COMPANY INVESTING?

02:50PM 21     A.   YES.

02:50PM 22     Q.   AS WELL AS PRIVATE COMPANY INVESTING PRIOR TO YOUR

02:50PM 23     INTRODUCTION TO THERANOS; IS THAT RIGHT?

02:50PM 24     A.   THAT'S CORRECT.

02:50PM 25     Q.   AND INVESTING IN PUBLIC COMPANIES VERSUS PRIVATE

02:50PM 1    COMPANIES, THEY'RE QUITE DIFFERENT; IS THAT FAIR?

02:50PM 2    A.   YES.

02:50PM 3    Q.   AND IN A PUBLIC COMPANY SETTING, YOU KNOW, PUBLIC

02:50PM 4    COMPANIES ARE REQUIRED TO FILE REPORTS, FINANCIAL INFORMATION,

02:50PM 5    OTHER DETAILS WITH THE SECURITIES AND EXCHANGE COMMISSION.

02:50PM 6         YOU'RE FAMILIAR WITH THAT?

02:50PM 7    A.   I AM.

02:50PM 8    Q.   WHEREAS IN A PRIVATE SETTING, PRIVATE COMPANIES, BY

02:50PM 9    DEFINITION, DON'T HAVE TO DISCLOSE OR REPORT ANYTHING; IS THAT

02:50PM 10   FAIR?

02:50PM 11   A.   THAT IS CORRECT.

02:50PM 12   Q.   OKAY.  AND YOU ALSO DESCRIBED THE CIRCUMSTANCES WHERE, YOU

02:50PM 13   KNOW, YOU MAY REQUEST INFORMATION FROM THE PRIVATE COMPANY, YOU

02:50PM 14   MAY GET A RESPONSE, OR YOU MAY GET NOTHING; IS THAT ACCURATE?

02:51PM 15   A.   THAT IS CORRECT.

02:51PM 16   Q.   AND THEN THE PRIVATE COMPANY MAY INVITE YOUR INTEREST TO

02:51PM 17   INVEST IN A COMPANY, BUT THEY MAY DECLINE YOUR INVESTMENT; IS

02:51PM 18   THAT FAIR AS WELL?

02:51PM 19   A.   THAT'S FAIR.

02:51PM 20   Q.   NOW, DURING THE RELEVANT TIME PERIOD IN THIS 2014 TIME

02:51PM 21   PERIOD THAT YOU TALKED ABOUT IN YOUR CONNECTION WITH THERANOS,

02:51PM 22   YOU WERE STILL WORKING AT THE CRAVATH LAW FIRM; CORRECT?

02:51PM 23   A.   I WAS.

02:51PM 24   Q.   AND BY THAT TIME YOU HAD BEEN A PARTNER AT CRAVATH FOR

02:51PM 25   30 YEARS?

02:51PM  1      A.   OH, I BECAME A PARTNER IN 1987.  SO --

02:51PM  2      Q.   ALMOST?

02:51PM  3      A.   ALMOST.

02:51PM  4      Q.   OKAY.  AND FOR THOSE WHO DON'T KNOW, CRAVATH IS QUITE A

02:51PM  5      PRESTIGIOUS LAW FIRM; CORRECT?

02:51PM  6      A.   YES.

02:51PM  7      Q.   BOTH IN THE UNITED STATES AND WORLDWIDE; CORRECT?

02:51PM  8      A.   THAT'S CORRECT.

02:51PM  9      Q.   IT REPRESENTS SOME OF THE LARGEST, MOST SOPHISTICATED

02:51PM 10      CORPORATIONS IN THE WORLD; CORRECT?

02:52PM 11      A.   THAT'S CORRECT.

02:52PM 12      Q.   AND YOUR ROLE AT CRAVATH WAS IN TRUSTS AND ESTATES; IS

02:52PM 13      THAT CORRECT?

02:52PM 14      A.   CORRECT.

02:52PM 15      Q.   BECAUSE YOU ALSO HAD A TAX BACKGROUND AS I RECALL?

02:52PM 16      A.   I DID, OR I DO.

02:52PM 17      Q.   YOU RECEIVED AN LLM, OR A MASTER'S IN, LIKE, TAXATION LAW;

02:52PM 18      IS THAT CORRECT?

02:52PM 19      A.   THAT IS CORRECT.

02:52PM 20      Q.   AND SO PART OF YOUR WORK WAS HELPING WEALTHY FAMILIES,

02:52PM 21      COMPANIES, KIND OF MANAGE THEIR ESTATES AND THEIR FINANCES;

02:52PM 22      CORRECT?

02:52PM 23      A.   FAMILIES AND INDIVIDUALS, NOT COMPANIES.

02:52PM 24      Q.   FAIR ENOUGH.

02:52PM 25           AND AMONGST YOUR CLIENTS, FAIR TO SAY SOME OF THE MOST

5231

02:52PM 1      PROMINENT, KIND OF INDUSTRIAL FAMILIES IN AMERICA; IS THAT

02:52PM 2      FAIR?

02:52PM 3      A.   THEY WERE PROMINENT FAMILIES, YES.

02:52PM 4      Q.   INCLUDING, I THINK YOU MENTIONED A FEW OF THEM, THE WALTON

02:52PM 5      FAMILY?

02:52PM 6      A.   YES.

02:52PM 7      Q.   WHO ARE RELATED TO WAL-MART?

02:52PM 8      A.   YES.

02:52PM 9      Q.   AND I THINK YOU MENTIONED MORE THAN A FEW TIMES THE

02:52PM 10     DEVOS FAMILY; CORRECT?

02:52PM 11     A.   I DID.

02:52PM 12     Q.   AND THE DEVOS FAMILY WAS CONNECTED TO THE AMWAY BUSINESS;

02:52PM 13     IS THAT CORRECT?

02:52PM 14     A.   THAT'S CORRECT.

02:52PM 15     Q.   AND THEN YOU MENTIONED THE COX COMMUNICATIONS FAMILY, I'LL

02:53PM 16     CALL IT?

02:53PM 17     A.   RIGHT.

02:53PM 18     Q.   OKAY.  AND THERE'S A MR. ALEX TAYLOR, AT LEAST CURRENTLY

02:53PM 19     AT THE HEAD OF COX; CORRECT?

02:53PM 20     A.   THAT IS CORRECT.

02:53PM 21     Q.   AND THOSE ARE ALL CLIENTS OF YOURS, OR WERE AT THE TIME?

02:53PM 22     A.   YES, THEY WERE.

02:53PM 23     Q.   AND THEN THERE'S A REFERENCE TO, IN YOUR TESTIMONY, THE

02:53PM 24     NIARCHOS FAMILY.

02:53PM 25          DO YOU REMEMBER THAT?

ER-3907

02:53PM  1    A.   TO THE NIARCHOS FOUNDATION, YES.

02:53PM  2    Q.   FOUNDATION.  AND YOU DID SOME WORK FOR THE NIARCHOS

02:53PM  3    FOUNDATION?

02:53PM  4    A.   I DID.

02:53PM  5    Q.   AND I THINK YOU INDICATED THAT YOU WERE KIND OF A

02:53PM  6    FRIENDSHIP WITH MR. ANDREAS DRACOPOULOS; CORRECT?

02:53PM  7    A.   YES, I DID.

02:53PM  8    Q.   AND HE WAS RELATED TO THE NIARCHOS FAMILY I THINK BY

02:53PM  9    MARRIAGE?

02:53PM  10   A.   NO.  HE'S RELATED BY BLOOD.

02:53PM  11   Q.   OKAY.  SO HE'S A MEMBER OF THE FAMILY?

02:53PM  12   A.   HE'S A MEMBER OF THE FAMILY.

02:53PM  13   Q.   AND THEN YOU ALSO INDICATED THAT DR. KISSINGER WAS A

02:53PM  14   FRIEND AND A CLIENT OF YOURS AS WELL?

02:53PM  15   A.   THAT IS CORRECT.

02:53PM  16   Q.   OKAY.  AND IN RELATION TO THESE CLIENTS OF YOURS, WHEN YOU

02:53PM  17   WERE AT THE CRAVATH LAW FIRM IN THE 2014 TIME PERIOD, YOU

02:54PM  18   DESCRIBED VARIOUS COMMUNICATIONS BETWEEN YOURSELF, MS. HOLMES,

02:54PM  19   AND SOME OF THESE CLIENTS OF YOURS FOR THE PURPOSES OF

02:54PM  20   INTRODUCING THE CLIENTS TO THERANOS; CORRECT?

02:54PM  21   A.   YES.  I MEAN, SOME WERE INTRODUCED BY ME AND SOME WERE

02:54PM  22   INTRODUCED BY OTHERS, YES.

02:54PM  23   Q.   OKAY.  AND SOME OF THOSE CLIENTS ENDED UP INVESTING;

02:54PM  24   CORRECT?

02:54PM  25   A.   YES.

MOSLEY CROSS BY MR. CAZARES                                    5233

02:54PM  1    Q.   NOW, YOU DESCRIBED YOUR FIRST INTRODUCTION TO THERANOS AS

02:54PM  2    COMING FROM DR. KISSINGER; RIGHT?

02:54PM  3    A.   THAT'S CORRECT.

02:54PM  4    Q.   AND DR. KISSINGER WAS ALREADY ON THE BOARD OF DIRECTORS OF

02:54PM  5    THERANOS; RIGHT?

02:54PM  6    A.   THAT'S CORRECT.

02:54PM  7    Q.   AND UNDERSTANDING THAT YOU HAVE AN ATTORNEY-CLIENT

02:54PM  8    RELATIONSHIP WITH DR. KISSINGER, I -- MY QUESTIONS ARE NOT

02:54PM  9    MEANING OR INTENDING TO INTERFERE WITH THAT, SO IF I'M STARTING

02:54PM  10   TO STEP ON THAT WITH MY QUESTIONS, PLEASE JUST LET ME KNOW.

02:54PM  11   A.   OKAY.

02:54PM  12   Q.   PRIOR TO DR. KISSINGER ASKING YOU TO LOOK INTO THERANOS,

02:55PM  13   WERE YOU ALREADY AWARE OF DR. KISSINGER'S RELATIONSHIP WITH

02:55PM  14   THERANOS?

02:55PM  15   A.   I WAS.

02:55PM  16   Q.   OKAY.  AND WOULD THAT BE, AT A HIGH LEVEL, SOMEWHAT IN

02:55PM  17   RELATIONSHIP TO YOUR TRUSTS AND ESTATES WORK FOR MR. KISSINGER?

02:55PM  18   A.   IT WOULD HAVE BEEN IN RELATIONSHIP TO MY WORK WITH HIM AS

02:55PM  19   A CLIENT.

02:55PM  20   Q.   OKAY.  AND THE FACT THAT DR. KISSINGER HIMSELF WAS ON THE

02:55PM  21   BOARD OF DIRECTORS PIQUED YOUR INTEREST IN THERANOS; RIGHT?

02:55PM  22   A.   PERHAPS.

02:55PM  23   Q.   YOU TRUST DR. KISSINGER'S JUDGMENT; CORRECT?

02:55PM  24   A.   I DO.

02:55PM  25   Q.   I THINK A LOT OF PEOPLE HAVE TRUSTED DR. KISSINGER'S

02:55PM   1    JUDGMENT IN THE LAST 40 TO 50 YEARS; RIGHT?

02:55PM   2    A.   RIGHT.

02:55PM   3    Q.   AND SO DR. KISSINGER ASKED YOU TO KIND OF LOOK INTO AND

02:55PM   4    LEARN ABOUT THERANOS AND TO ADVISE HIM ON YOUR VIEWS; RIGHT?

02:55PM   5    A.   HE ASKED ME TO LOOK INTO IT AND GIVE HIM MY VIEWS.

02:55PM   6    Q.   OKAY.  BUT HE ALREADY HAD A CONNECTION TO THERANOS; RIGHT?

02:56PM   7    A.   HE DID.

02:56PM   8    Q.   OKAY.  AND AS A RESULT OF THAT REQUEST, YOU REACHED OUT TO

02:56PM   9    MS. HOLMES; IS THAT RIGHT?

02:56PM  10    A.   I DON'T KNOW HOW THE CONTACT WAS ORIGINALLY MADE, WHETHER

02:56PM  11    HE CALLED HER OR -- I DON'T REMEMBER SPECIFICALLY.

02:56PM  12    Q.   FAIR ENOUGH TO SAY THAT IN SOME WAY, AS A RESULT OF

02:56PM  13    DR. KISSINGER'S REQUEST, YOU WERE PUT INTO CONNECTION WITH

02:56PM  14    MS. HOLMES?

02:56PM  15    A.   THAT IS CORRECT.

02:56PM  16    Q.   OKAY.  AND THAT ULTIMATELY LED TO A PHONE CALL THAT YOU

02:56PM  17    TESTIFIED ABOUT?

02:56PM  18    A.   YES.

02:56PM  19    Q.   AND IN THAT PHONE CALL, THAT WAS JUST YOURSELF AND

02:56PM  20    MS. HOLMES?

02:56PM  21    A.   THAT'S CORRECT.

02:56PM  22    Q.   AND WOULD THIS HAVE BEEN IN THIS JULY 2014 TIME PERIOD?

02:56PM  23    A.   IT WOULD HAVE BEEN, YES.

02:56PM  24    Q.   OKAY.  AND HOW LONG DID THE PHONE CALL LAST?

02:56PM  25    A.   I DON'T REMEMBER.

02:56PM 1    Q.   OKAY.  AND YOU DON'T REMEMBER SIGNIFICANT DETAILS FROM

02:56PM 2    THAT PHONE CALL?

02:56PM 3    A.   I REMEMBER THAT WE HAD A CONVERSATION ABOUT THE COMPANY

02:56PM 4    AND SHE GAVE ME A GENERAL SUMMARY OF WHAT THE COMPANY WAS

02:56PM 5    DOING, AND THAT KIND OF INFORMATION.

02:56PM 6    Q.   OKAY.  AND THEN AFTER THAT PHONE CALL, MS. HOLMES CAUSED

02:57PM 7    SOME MATERIALS TO BE SENT TO YOU; IS THAT RIGHT?

02:57PM 8    A.   THAT'S CORRECT.

02:57PM 9    Q.   AND THAT WAS THE COVER LETTER THAT WE SAW, AND THEN THE

02:57PM 10   SUBSTANTIAL STACK OF DOCUMENTS, SOME OF WHICH YOU REVIEWED WITH

02:57PM 11   MR. SCHENK; RIGHT?

02:57PM 12   A.   THAT'S CORRECT.

02:57PM 13   Q.   IS IT FAIR TO SAY THAT YOU BASED YOUR DECISION ULTIMATELY

02:57PM 14   TO INVEST IN THERANOS IN PART UPON YOUR COMMUNICATIONS WITH

02:57PM 15   MS. HOLMES AND IN PART UPON THE DOCUMENTATION THAT YOU RECEIVED

02:57PM 16   FROM MS. HOLMES?

02:57PM 17   A.   THAT'S CORRECT.

02:57PM 18   Q.   AND IF WE CAN PUT UP ON THE SCREEN, I THINK IT'S ALREADY

02:57PM 19   IN EVIDENCE, EXHIBIT 4173.

02:57PM 20       IT'S IN THE GOVERNMENT'S BINDER, AND ALSO UP ON THE

02:58PM 21   SCREEN, SIR.

02:58PM 22   A.   UH-HUH.

02:58PM 23   Q.   ARE YOU THERE?

02:58PM 24   A.   I'M THERE.

02:58PM 25   Q.   OKAY.  SO 4173 IS THE AUGUST 18, 2014 LETTER, TWO PAGES,

02:58PM  1    FROM MS. HOLMES TO YOURSELF.

02:58PM  2        DO YOU SEE THAT?

02:58PM  3    A.   I DO.

02:58PM  4    Q.   OKAY.  AND SOME OF THIS YOU REVIEWED WITH MR. SCHENK, AND

02:58PM  5    I JUST HAD A FEW QUESTIONS ABOUT SOME OF THE -- SOME OF

02:58PM  6    MS. HOLMES'S LETTER TO YOU.

02:58PM  7        NOW, IN THE FIRST PARAGRAPH OF THE LETTER BEGINNING, "BY

02:58PM  8    WAY OF BACKGROUND," DO YOU SEE MS. HOLMES WROTE, "I FOUNDED

02:58PM  9    THIS COMPANY TO MAKE A DIFFERENCE IN THE WORLD, AND HAVE

02:58PM  10   RETAINED MAJORITY CONTROL OF THE SHARES IN ORDER TO REALIZE

02:58PM  11   THAT VISION FOR THE LONG TERM."

02:58PM  12       DO YOU SEE THAT?

02:58PM  13   A.   I DO.

02:58PM  14   Q.   AND THAT WAS ATTRACTIVE TO YOU; CORRECT?

02:58PM  15   A.   IT WAS.

02:59PM  16   Q.   THE FACT THAT MS. HOLMES LOOKED TO MAKE A DIFFERENCE IN

02:59PM  17   THE WORLD, BUT ALSO SHE MAINTAINED CONTROL OF THE COMPANY SO

02:59PM  18   THAT SHE COULD, YOU KNOW, PURSUE THAT VISION AS OPPOSED TO,

02:59PM  19   LET'S SAY, MAKING BUSINESS DECISIONS THAT MAY HAVE HAD

02:59PM  20   SHORT-TERM BENEFIT, BUT NOT SO LONG TERM; IS THAT FAIR?

02:59PM  21   A.   THAT'S FAIR.

02:59PM  22   Q.   AND YOU HAVE OTHER CLIENTS WHO OPERATE THEIR BUSINESSES

02:59PM  23   PRIVATELY AS OPPOSED TO PUBLICLY FOR THAT VERY REASON; RIGHT?

02:59PM  24   A.   THAT'S CORRECT.

02:59PM  25   Q.   AND THEN SHE WROTE, "WE HAVE A VERY LONG TERM MISSION, AND

MOSLEY CROSS BY MR. CAZARES                                    5237

02:59PM  1    ARE DEEPLY COMMITTED TO REALIZING THAT MISSION BY BUILDING A

02:59PM  2    COMPANY THAT ESTABLISHES A NEW INDUSTRY, AND STANDARD IN THE

02:59PM  3    MARKETPLACE, NOT JUST OVER THE COMING YEARS BUT OVER THE COMING

02:59PM  4    DECADES."

02:59PM  5        DO YOU SEE THAT?

02:59PM  6    A.   I DO.

02:59PM  7    Q.   AND YOU UNDERSTAND THAT TO BE MS. HOLMES'S VISION OF,

02:59PM  8    AGAIN, SEEKING LONG-TERM SUCCESS AS OPPOSED TO SHORT-TERM

02:59PM  9    PROFIT OR GAINS; CORRECT?

02:59PM 10    A.   THAT'S THE WAY I UNDERSTOOD IT.

02:59PM 11    Q.   AND THAT'S WHAT YOU WERE INTERESTED IN; RIGHT?

03:00PM 12    A.   YES.

03:00PM 13    Q.   AND AT THE BOTTOM OF THAT PARAGRAPH SHE WROTE, "WE ALSO

03:00PM 14    BELIEVE IN THE ABILITY TO CREATE THE GREATEST RETURN ON

03:00PM 15    INVESTMENT FOR OUR SHAREHOLDERS BY REALIZING OUR LONG TERM

03:00PM 16    VISION AND NOT BEING SUBJECT TO THE WHIMS OF THE PUBLIC MARKET.

03:00PM 17    AS SUCH, THE COMPANY PLANS TO BE PRIVATE FOR THE LONG TERM."

03:00PM 18        DO YOU SEE THAT?

03:00PM 19    A.   I DO.

03:00PM 20    Q.   AND YOU UNDERSTOOD AT THE TIME THAT THERANOS HAD NO INTENT

03:00PM 21    TO ENGAGE IN SOME SORT OF LIQUIDITY EVENT, LIKE GOING PUBLIC IN

03:00PM 22    AN IPO?  YOU UNDERSTOOD THAT?

03:00PM 23    A.   I DID.

03:00PM 24    Q.   AND THAT WAS FINE WITH YOU; CORRECT?

03:00PM 25    A.   THAT WAS FINE.

03:00PM 1    Q.   NOW, IN THE LETTER MS. HOLMES CONTINUES ABOUT MIDWAY DOWN,

03:00PM 2    "HISTORICALLY, THERANOS'S WORK WAS FOCUSSED ON CONTRACTS WITH

03:00PM 3    PHARMACEUTICAL AND MILITARY CLIENTS."

03:00PM 4        DO YOU SEE THAT?

03:00PM 5    A.   I DO.

03:00PM 6    Q.   AND I THINK YOU INDICATED EARLIER TODAY THAT THAT WAS

03:01PM 7    SIGNIFICANT TO YOU; CORRECT?

03:01PM 8    A.   YES.

03:01PM 9    Q.   AND I THINK YOU MENTIONED THAT PHARMACEUTICAL COMPANIES

03:01PM 10   YOU UNDERSTOOD TO BE QUITE SOPHISTICATED IN THEIR AREAS OF

03:01PM 11   BUSINESS; IS THAT CORRECT?

03:01PM 12   A.   THAT'S CORRECT.

03:01PM 13   Q.   AND OBVIOUSLY HAVING MILITARY CLIENTS, THERE'S A POTENTIAL

03:01PM 14   SCALE THERE IF YOU'RE TALKING ABOUT THE U.S. MILITARY; CORRECT?

03:01PM 15   A.   YES.

03:01PM 16   Q.   AND YOU WOULD HAVE EXPECTED ANY PHARMACEUTICAL CLIENTS WHO

03:01PM 17   WERE DOING BUSINESS WITH THERANOS TO BE, YOU KNOW, SATISFIED

03:01PM 18   WITH THE WORK AND WOULD HAVE PAID FOR THE WORK; CORRECT?

03:01PM 19   A.   YES.

03:01PM 20   Q.   AND IT WAS REALLY THE RELATIONSHIPS WITH THE

03:01PM 21   PHARMACEUTICAL COMPANIES AT THERANOS THAT WAS ATTRACTIVE.  IS

03:01PM 22   THAT FAIR TO SAY?

03:01PM 23   A.   YES.

03:01PM 24   Q.   PARTICULARLY IF A COMPANY CAME BACK AND DID ADDITIONAL

03:01PM 25   WORK WITH THERANOS MORE THAN ONCE, THAT WOULD HAVE BEEN

03:01PM   1    ATTRACTIVE TO YOU; RIGHT?

03:01PM   2    A.   YES.

03:01PM   3    Q.   BECAUSE IT SUGGESTS THE WORK WAS VALID AND LEGIT; CORRECT?

03:01PM   4    A.   RIGHT.

03:01PM   5    Q.   NOW, YOU ALSO KNEW AT THE TIME IN THIS TIME PERIOD WHEN

03:02PM   6    YOU WERE INTRODUCED TO THERANOS THAT THEY HAD SUBSTANTIAL

03:02PM   7    MILITARY PRESENCE ON THE BOARD OF DIRECTORS AS WELL; RIGHT?

03:02PM   8    A.   I WAS AWARE OF THAT, YES.

03:02PM   9    Q.   OKAY.  AND THAT THEORETICALLY COULD HAVE FACILITATED

03:02PM  10    FUTURE BUSINESS MAYBE WITH THE MILITARY; CORRECT?

03:02PM  11    A.   CORRECT.

03:02PM  12    Q.   AND THAT'S SOMETHING THAT YOU WOULD HAVE HAD IN THE BACK

03:02PM  13    OF YOUR MIND?

03:02PM  14    A.   YES.

03:02PM  15    Q.   NOW, THIS LETTER, AGAIN, THIS IS AUGUST 18TH, 2014, THE

03:02PM  16    FOURTH FULL PARAGRAPH DOWN, "THERANOS HAS NOT ONLY REDUCED TO

03:02PM  17    PRACTICE AND PATENTED ITS COMPREHENSIVE TECHNOLOGICAL AND

03:02PM  18    OPERATIONAL INFRASTRUCTURE OVER THE PAST TEN YEARS."

03:02PM  19        WE'LL STOP THERE.

03:02PM  20        I THINK YOU MENTIONED EARLIER IN YOUR TESTIMONY ON DIRECT

03:02PM  21    THAT YOU'RE AWARE THAT THERANOS HAD SUBSTANTIAL PATENTS

03:02PM  22    PROTECTING ITS PROPRIETARY TECHNOLOGY?

03:02PM  23    A.   I WAS AWARE OF THAT.

03:02PM  24    Q.   AND THAT WAS SOMETHING THAT YOU WOULD HAVE EXPECTED;

03:02PM  25    RIGHT?

MOSLEY CROSS BY MR. CAZARES                                    5240

03:02PM   1    A.   RIGHT.

03:02PM   2    Q.   AND IT WAS ATTRACTIVE TO YOU THAT THE COMPANY WAS TAKING

03:03PM   3    SERIOUSLY ITS TECHNOLOGY AND TRYING TO PROTECT IT FROM

03:03PM   4    COMPETITORS?

03:03PM   5    A.   YES.

03:03PM   6    Q.   NOW, THAT PARAGRAPH CONTINUES.

03:03PM   7         "BUT ALSO HAD REGULATORY CERTIFICATIONS TO OPERATE

03:03PM   8    COMMERCIALLY, INCLUDING A CLIA-CERTIFIED LABORATORY (THE

03:03PM   9    REGULATORY CERTIFICATION FOR LABS) SINCE 2011."

03:03PM  10         DO YOU SEE THAT?

03:03PM  11    A.   I SEE IT.

03:03PM  12    Q.   AT THE TIME DID YOU UNDERSTAND WHAT CLIA-CERTIFIED

03:03PM  13    LABORATORY MEANT?

03:03PM  14    A.   PROBABLY NOT COMPLETELY.

03:03PM  15    Q.   BUT DID YOU UNDERSTAND THAT IT WAS SOME SORT OF FEDERAL

03:03PM  16    REGULATORY REGIME?

03:03PM  17    A.   I DID.

03:03PM  18    Q.   OKAY.  AND DID THAT GIVE YOU SOME CONFIDENCE THAT THERE

03:03PM  19    WAS A REGULATOR OVERSEEING SOME ELEMENT AT LEAST OF THERANOS'S

03:03PM  20    BUSINESS?

03:03PM  21    A.   CORRECT.

03:03PM  22    Q.   AND THAT ALSO KIND OF VALIDATED THE TECHNOLOGY IN YOUR

03:03PM  23    MIND; CORRECT?

03:03PM  24    A.   YES.

03:03PM  25    Q.   THEN THE LETTER CONTINUES.

MOSLEY CROSS BY MR. CAZARES                                    5241

03:03PM    1            "ONCE THE COMPANY WAS READY TO LAUNCH ITS COMMERCIAL

03:03PM    2    LABORATORY AND ANNOUNCED ITS NATIONAL CONTRACT WITH WALGREENS

03:04PM    3    IN THE FALL OF 2013, THERANOS BEGAN OPERATING IN THE CONSUMER,

03:04PM    4    PHYSICIAN, AND HOSPITAL LABORATORY TESTING BUSINESS IN THE

03:04PM    5    U.S."

03:04PM    6         DO YOU SEE THAT?

03:04PM    7    A.   I SEE THAT.

03:04PM    8    Q.   AND I THINK YOU TESTIFIED THAT YOU WERE AWARE WHEN

03:04PM    9    THERANOS LAUNCHED ITS KIND OF COMMERCIAL OFFERING OF BLOOD

03:04PM   10    TESTING IN WALGREENS STORES; CORRECT?

03:04PM   11    A.   YES.

03:04PM   12    Q.   AND THAT WOULD HAVE BEEN THE PRIOR FALL OF 2013; RIGHT?

03:04PM   13    A.   THAT IS CORRECT.

03:04PM   14    Q.   AND WERE YOU MADE AWARE OF THAT AT THE TIME THAT YOU WERE

03:04PM   15    LOOKING INTO THERANOS FOR DR. KISSINGER, OR WERE YOU

03:04PM   16    INDEPENDENTLY AWARE OF SOME OF THE COVERAGE OF THERANOS?

03:04PM   17    A.   I BELIEVE I BECAME AWARE OF IT AFTER I WAS LOOKING AT THE

03:04PM   18    COMPANY AFTER HAVING BEEN INTRODUCED BY DR. KISSINGER.

03:04PM   19    Q.   OKAY.  AND WHEN YOU LEARNED ABOUT THE RELATIONSHIP WITH

03:04PM   20    WALGREENS AND THE PUBLIC LAUNCH, THAT WAS IMPORTANT TO YOUR

03:04PM   21    ULTIMATE DECISION TO INVEST; CORRECT?

03:04PM   22    A.   IT WAS.

03:04PM   23    Q.   AND THE REASON THAT WAS IMPORTANT WAS BECAUSE, ONE, YOU

03:05PM   24    KNEW THAT WALGREENS WAS A SIGNIFICANT NATIONAL AND EVEN

03:05PM   25    INTERNATIONAL RETAILER; CORRECT?