No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 15 OF 26 (PAGES ER-3918 – ER-4217)

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

03:05PM  1     A.   THAT'S CORRECT.

03:05PM  2     Q.   WHICH SUGGESTED THAT THEY MAY HAVE HAD THE RESOURCES TO

03:05PM  3     REALLY HELP THERANOS TAKE ITS BUSINESS NATIONWIDE; CORRECT?

03:05PM  4     A.   THAT IS CORRECT.

03:05PM  5     Q.   AND AT THE TIME, DUE TO THAT RELATIONSHIP WITH WALGREENS,

03:05PM  6     YOU WOULD HAVE BELIEVED ANYWAY THAT WALGREENS DID SOME DUE

03:05PM  7     DILIGENCE INTO THERANOS BEFORE ENTERING INTO A CONTRACTUAL

03:05PM  8     RELATIONSHIP?

03:05PM  9          MR. SCHENK:  OBJECTION.  RELEVANCE.

03:05PM  10          THE COURT:  WHY DON'T YOU REPHRASE THAT QUESTION?

03:05PM  11     I'LL SUSTAIN THE OBJECTION.

03:05PM  12     BY MR. CAZARES:

03:05PM  13     Q.   THE RELATIONSHIP WITH WALGREENS WAS IMPORTANT TO YOUR

03:05PM  14     INVESTMENT; RIGHT?

03:05PM  15     A.   YES.

03:05PM  16     Q.   AND ONE ELEMENT WAS BECAUSE YOU BELIEVED THAT A COMPANY

03:05PM  17     LIKE WALGREENS, A LARGE, SOPHISTICATED CORPORATION, WOULD HAVE

03:05PM  18     DONE SOME DUE DILIGENCE BEFORE ENTERING INTO BUSINESS WITH

03:05PM  19     THERANOS; RIGHT?

03:05PM  20          MR. SCHENK:  OBJECTION.  RELEVANCE.

03:05PM  21          THE COURT:  SUSTAINED.

03:05PM  22     YOU CAN ASK ANOTHER QUESTION.

03:06PM  23     BY MR. CAZARES:

03:06PM  24     Q.   NOW, GETTING BACK TO THE LETTER, THIS NEXT TO THE LAST

03:06PM  25     PARAGRAPH, MS. HOLMES WROTE, "ALL CURRENT RESOURCES ARE

03:06PM 1    FOCUSSED ON THIS COMMERCIAL LABORATORY BUSINESS."

03:06PM 2        DO YOU SEE THAT?

03:06PM 3    A.   I DO SEE IT.

03:06PM 4    Q.   "ALL CURRENT RESOURCES ARE FOCUSSED."

03:06PM 5        SO IT WAS FAIR TO SAY THAT MS. HOLMES WAS UP-FRONT

03:06PM 6    REPORTING TO YOU AT THE TIME THAT THERANOS WAS ENTIRELY

03:06PM 7    FOCUSSED ON THE RETAIL ELEMENT OF THEIR BUSINESS; CORRECT?

03:06PM 8    A.   I WOULD NOT HAVE INTERPRETED IT THAT WAY.

03:06PM 9    Q.   OKAY.  BUT THE LETTER SAYS "ALL CURRENT RESOURCES."

03:06PM 10       YOU SEE THAT; RIGHT?

03:06PM 11   A.   BUT THERE'S THE REST OF THE SENTENCE THAT FOLLOWS, "AND

03:06PM 12   FUTURE GROWTH IN PHARMACEUTICAL, MILITARY, AND OTHER BUSINESS."

03:06PM 13   Q.   YEAH, I WAS GOING TO GET TO THAT.

03:06PM 14       THE FIRST PART -- ANYWAY, SHE WRITES, "ALL CURRENT

03:06PM 15   RESOURCES ARE FOCUSSED ON THIS COMMERCIAL LABORATORY BUSINESS."

03:06PM 16       YOU SEE THAT; RIGHT?

03:07PM 17   A.   I DO SEE THOSE WORDS, YES.

03:07PM 18   Q.   AND THEN THE SENTENCE CONTINUES, "AND FUTURE GROWTH IN

03:07PM 19   PHARMACEUTICAL, MILITARY, AND OTHER BUSINESS WILL FOLLOW THE

03:07PM 20   SUCCESSFUL ESTABLISHMENT OF THERANOS'S COMMERCIAL LABORATORY

03:07PM 21   INFRASTRUCTURE."

03:07PM 22       DO YOU SEE THAT?

03:07PM 23   A.   I DO.

03:07PM 24   Q.   OKAY.  NOW, ULTIMATELY I THINK YOU ALREADY TESTIFIED THAT

03:07PM 25   IN THIS LATE SUMMER, EARLY FALL 2013 TIME PERIOD THAT THERANOS

03:07PM 1    HAD 29 RETAIL LOCATIONS IN ARIZONA AND 1 IN CALIFORNIA;

03:07PM 2    CORRECT?

03:07PM 3    A.   CORRECT.

03:07PM 4    Q.   SO THE KIND OF NATIONAL LABORATORY INFRASTRUCTURE HAD NOT

03:07PM 5    YET BEEN ESTABLISHED; CORRECT?

03:07PM 6    A.   SAY THAT AGAIN.

03:07PM 7    Q.   YOU KNEW AT THE TIME THAT THERANOS DID NOT HAVE A NATIONAL

03:07PM 8    FOOTPRINT WITH ITS RETAIL OPERATIONS ACROSS THE UNITED STATES?

03:07PM 9    A.   I UNDERSTOOD THAT WITH RESPECT TO WALGREENS, THEY WERE

03:07PM 10   LOCATED IN 29 IN ARIZONA AND 1 IN PALO ALTO.

03:07PM 11   Q.   AND YOU SEE THAT MS. HOLMES WROTE, "AND FUTURE GROWTH IN

03:08PM 12   PHARMACEUTICAL, MILITARY, AND OTHER BUSINESS WILL FOLLOW THE

03:08PM 13   SUCCESSFUL ESTABLISHMENT OF THERANOS'S COMMERCIAL LABORATORY

03:08PM 14   INFRASTRUCTURE NATIONWIDE."

03:08PM 15        DO YOU SEE THAT?

03:08PM 16   A.   I DO.

03:08PM 17   Q.   AND FAIR TO INTERPRET THAT PHARMACEUTICAL, MILITARY, AND

03:08PM 18   OTHER BUSINESS GROWTH IS GOING TO COME AFTER THE WALGREENS

03:08PM 19   ROLLOUT?

03:08PM 20   A.   OR GROWTH FROM WHERE IT IS TODAY WOULD COME AFTERWARDS,

03:08PM 21   YES.

03:08PM 22   Q.   FAIR ENOUGH.

03:08PM 23        TURNING TO THE TOP OF THE SECOND PAGE, THE PARAGRAPH

03:08PM 24   READS, FROM MS. HOLMES TO YOU, "IN ADDITION TO ITS WALGREENS

03:08PM 25   CONTRACT, THERANOS HAS ENTERED INTO LONG TERM CONTRACTS WITH

03:08PM 1    INSURANCE PROVIDERS, MEDICARE, MEDICAID PROGRAMS, HOSPITAL

03:08PM 2    SYSTEMS AND PHYSICIAN GROUPS."

03:08PM 3        DO YOU SEE THAT?

03:08PM 4    A.   I DO.

03:08PM 5    Q.   DID MS. HOLMES TELL YOU THAT THERANOS HAD ENTERED INTO A

03:08PM 6    CONTRACT TO PROVIDE SERVICES TO UNITED HEALTH PATIENTS?

03:09PM 7    A.   I DON'T REMEMBER THAT SPECIFICALLY.

03:09PM 8    Q.   OKAY.  DID MS. HOLMES TELL YOU THAT THERANOS HAD ENTERED

03:09PM 9    INTO AGREEMENTS WITH THE BLUE CROSS, BLUE SHIELD BUSINESSES TO

03:09PM 10   PROVIDE SERVICES TO INSURED PATIENTS OF THOSE ORGANIZATIONS?

03:09PM 11   A.   I HAVE SOME KNOWLEDGE OF THAT, BUT I DON'T KNOW WHERE IN

03:09PM 12   THE PROCESS SHE TOLD ME THAT.

03:09PM 13   Q.   NOW, YOUR COMMUNICATIONS WITH MS. HOLMES WERE THE PHONE

03:09PM 14   CALL, THE DOCUMENTS, AND I THINK THERE WERE TWO MEETINGS IN

03:09PM 15   OCTOBER OF 2014; IS THAT RIGHT?

03:09PM 16   A.   THAT'S CORRECT.

03:09PM 17   Q.   SO IF YOU LEARNED ABOUT THE BLUE CROSS, BLUE SHIELD

03:09PM 18   RELATIONSHIP, IT WOULD HAVE TAKEN PLACE IN THAT TIME PERIOD?

03:09PM 19   A.   WELL, I OBVIOUSLY KNEW HER AND FOLLOWED THE COMPANY EVEN

03:09PM 20   AFTER THAT PERIOD OF TIME, SO IT COULD HAVE COME AT A LATER

03:09PM 21   DATE.

03:09PM 22   Q.   NOW, AT THE BOTTOM OF THE SECOND PAGE MS. HOLMES WROTE, "I

03:09PM 23   AM HAPPY TO PROVIDE MORE BACKGROUND ON ANY OF THE ABOVE, OR ANY

03:10PM 24   OF THE MATERIALS ENCLOSED IN THIS PACKAGE.  THERANOS'S

03:10PM 25   INVESTMENT DOCUMENTS ARE ENCLOSED HEREIN.  THE ADDITIONAL

03:10PM   1    MATERIALS FOCUS ON THE INFRASTRUCTURE THERANOS HAS DEVELOPED

03:10PM   2    AND INITIAL MARKET OF COMMERCIAL LABORATORY TESTING THAT

03:10PM   3    THERANOS HAS ENTERED."

03:10PM   4       DO YOU SEE THAT?

03:10PM   5    A.   I DO.

03:10PM   6    Q.   SO IT'S FAIR TO SAY THAT MS. HOLMES INVITED YOU TO ASK

03:10PM   7    QUESTIONS RELATING TO THE MATERIALS THAT SHE WAS PROVIDING;

03:10PM   8    CORRECT?

03:10PM   9    A.   YES.

03:10PM  10    Q.   AND YOU FELT FREE TO DO SO?

03:10PM  11    A.   I DID.

03:10PM  12    Q.   AND, IN FACT, IN RELATION TO SOME ISSUES THAT WERE

03:10PM  13    IMPORTANT TO YOU, YOU DID FOLLOW UP; RIGHT?

03:10PM  14    A.   I DID.

03:10PM  15    Q.   IF WE CAN PUT UP ON THE SCREEN -- I THINK IT'S ALREADY IN

03:11PM  16    EVIDENCE, YOUR HONOR -- EXHIBIT 7753?

03:11PM  17         THE COURT:  ALL RIGHT.

03:11PM  18         MR. CAZARES:  7753.  THERE'S AN ATTACHMENT,

03:11PM  19    NUMBER 1.

03:11PM  20    Q.   THIS ISN'T SOMETHING THAT IS GOING TO BE IN YOUR BINDER,

03:11PM  21    MR. MOSLEY.  I APOLOGIZE.  BUT IT WILL BE UP ON THE SCREEN.

03:11PM  22       HOPEFULLY IT'S BLOWN UP LARGE ENOUGH FOR YOU TO SEE THAT.

03:11PM  23       AND YOU SEE UP ON THE SCREEN THERE'S A SPREADSHEET, AN

03:11PM  24    EXCEL SPREADSHEET IDENTIFYING SOME CUSTOMERS ON THE LEFT-HAND

03:11PM  25    COLUMN.

03:11PM   1              DO YOU SEE THAT?

03:11PM   2       A.   I DO.

03:11PM   3       Q.   AND SOME OF THESE NAMES IN THIS COLUMN, THESE ARE FAMILIAR

03:11PM   4       TO YOU; RIGHT?

03:11PM   5       A.   MOST OF THEM ARE, YES.

03:11PM   6       Q.   OKAY.  THESE ARE SOME RELATIVELY LARGE PHARMACEUTICAL

03:11PM   7       COMPANIES IN THE U.S. AND ELSEWHERE; CORRECT?

03:11PM   8       A.   CORRECT.

03:11PM   9       Q.   AND IS IT FAIR TO SAY THAT THIS LIST HERE IS REFLECTIVE OF

03:11PM  10       THE PHARMACEUTICAL RELATIONSHIPS THAT MS. HOLMES DESCRIBED TO

03:11PM  11       YOU?

03:11PM  12       A.   I DON'T REMEMBER WHETHER SHE GAVE ME A SPECIFIC LIST, BUT

03:12PM  13       THESE ARE SIMILAR COMPANIES.  THEY WERE THE COMPANIES THAT I

03:12PM  14       WOULD EXPECT TO BE ON SUCH A REPORT, SUCH A LIST.

03:12PM  15       Q.   AND I THINK BECAUSE YOU INDICATED THAT MS. HOLMES TOLD YOU

03:12PM  16       10 OF THE 15 LARGEST PHARMACEUTICAL COMPANIES; CORRECT?

03:12PM  17       A.   THAT'S CORRECT.

03:12PM  18       Q.   AND MANY OF THESE ARE VERY -- ARE COMPANIES THAT ARE

03:12PM  19       FAMILIAR TO YOU; RIGHT?

03:12PM  20       A.   YES.

03:12PM  21       Q.   FOR EXAMPLE, PFIZER?

03:12PM  22       A.   I DON'T THINK I SEE PFIZER ON THIS LIST.

03:12PM  23       Q.   OKAY.  NOVARTIS?

03:12PM  24       A.   NOVARTIS IS A LARGE PHARMACEUTICAL.

03:12PM  25       Q.   ASTRAZENECA?

03:12PM  1     A.   YES.  SCHERING-PLOUGH.

03:12PM  2     Q.   CELGENE.  OKAY.

03:12PM  3          AND AGAIN, THE RELATIONSHIPS WITH THESE PHARMACEUTICAL

03:12PM  4     COMPANIES WAS IMPORTANT TO YOU; CORRECT?

03:12PM  5     A.   YES.

03:12PM  6     Q.   IN YOUR REVIEW OF MATERIALS RELATING TO THERANOS, YOU HAD

03:13PM  7     A CHANCE TO TAKE A LOOK AT THERANOS'S WEBSITE; CORRECT?

03:13PM  8     A.   I DID, YES.

03:13PM  9     Q.   OKAY.  SO AT SOME POINT PRIOR TO THE TIME OF INVESTING,

03:13PM  10    YOU TOOK A LOOK AROUND JUST TO GATHER WHATEVER INFORMATION YOU

03:13PM  11    COULD GATHER; RIGHT?

03:13PM  12    A.   YES.

03:13PM  13    Q.   IS IT FAIR TO SAY WHATEVER IS IN THE WEBSITE, YOU PROBABLY

03:13PM  14    SAW?  FAIR?

03:13PM  15    A.   I THINK THAT'S LIKELY.

03:13PM  16    Q.   IF YOU CAN TAKE A LOOK AT EXHIBIT 5805.

03:13PM  17         AGAIN, THIS IS ONE OF THOSE ONES ON THE SCREEN.  I KNOW

03:13PM  18    THE HARD COPY MAY BE EASIER, BUT THIS IS WHAT I'VE GOT RIGHT

03:13PM  19    NOW.

03:13PM  20         SO ON THE SCREEN IS AN IMAGE OF THERANOS'S WEBSITE.

03:13PM  21         DO YOU SEE THAT?

03:13PM  22    A.   I SEE IT.

03:13PM  23    Q.   DOES IT LOOK FAMILIAR?

03:13PM  24    A.   IT CERTAINLY LOOKS LIKE THE WEBSITE.

03:13PM  25    Q.   OKAY.  NOW, IF WE GO TO PAGE 2 UNDER THE "GOODBYE, BIG BAD

03:14PM 1    NEEDLE" -- AND YOU REMEMBER MR. SCHENK SHOWED YOU SOME IMAGES

03:14PM 2    FROM THE BINDER THAT YOU WERE SEEING THAT ALSO REFERENCED

03:14PM 3    "GOODBYE, BIG BAD NEEDLE," AND THERE WAS SOME REFERENCE TO A

03:14PM 4    CHILD.

03:14PM 5        DO YOU REMEMBER THAT?

03:14PM 6    A.   I DO.

03:14PM 7    Q.   AND NOW ON THE WEBSITE IT INDICATES, "INSTEAD OF A HUGE

03:14PM 8    NEEDLE, WE CAN USE A TINY FINGERSTICK OR COLLECT A MICRO-SAMPLE

03:14PM 9    FROM A VENOUS DRAW."

03:14PM 10       DO YOU SEE THAT?

03:14PM 11   A.   I SEE THAT.

03:14PM 12   Q.   NOW, YOU INDICATED THAT YOU UNDERSTOOD THERANOS'S CORE

03:14PM 13   BUSINESS TO BE THIS FINGERSTICK TECHNOLOGY; RIGHT?

03:14PM 14   A.   I DID.

03:14PM 15   Q.   OKAY.  BUT YOU ALSO UNDERSTOOD THAT THERE WERE SOME TESTS

03:14PM 16   THAT THERANOS COULD NOT DO YET ON ITS FINGERSTICK TECHNOLOGY;

03:14PM 17   RIGHT?

03:14PM 18   A.   I DID NOT KNOW THAT.

03:14PM 19   Q.   ON THE WEBSITE IT INDICATES THAT SOME TESTS WILL BE RUN

03:14PM 20   USING A VENOUS DRAW.

03:14PM 21       DO YOU SEE THAT?

03:14PM 22   A.   I DO SEE IT.

03:14PM 23   Q.   OKAY.  AND YOU DID LOOK AT THE WEBSITE AT THE TIME;

03:14PM 24   CORRECT?

03:14PM 25   A.   I SAID I DID, YES.

03:14PM  1    Q.   OKAY.  IF WE CAN CONTINUE ON TO PAGE 7 OF THE WEBSITE.

03:15PM  2         AT THE TIME DID YOU HAVE A CHANCE TO TAKE A LOOK AT THE

03:15PM  3    TEST MENU THAT THERANOS POSTED ON ITS WEBSITE?

03:15PM  4    A.   I MAY HAVE, BUT I DON'T REMEMBER IT SPECIFICALLY.

03:15PM  5    Q.   OKAY.  AND YOU SEE THE TESTS, THE PRICING RANGES,

03:15PM  6    SOMETIMES FROM THE SINGLE DOLLAR FIGURES INTO THE 10, $20 RANGE

03:15PM  7    FOR MANY OF THEM.

03:15PM  8         DO YOU SEE THAT?

03:15PM  9    A.   I SEE THAT.

03:15PM  10   Q.   AND ONE OF THE BUSINESS PROPOSITIONS AND VISIONS THAT

03:15PM  11   ELIZABETH COMMUNICATED TO YOU WAS THIS KIND OF PRICING POWER

03:15PM  12   THAT THERANOS WAS GOING TO HAVE COMPARED TO THEIR COMPETITORS,

03:15PM  13   LOWER PRICE, HOPEFULLY LARGER VOLUME OF WORK; RIGHT?

03:15PM  14   A.   CORRECT.

03:15PM  15   Q.   OKAY.  AND IN ORDER TO REALIZE THAT, THE NATIONAL ROLLOUT

03:15PM  16   WOULD REALLY HAVE TO GAIN PENETRATION THROUGH THE WALGREENS

03:16PM  17   STORES, I THINK AS YOU SAID EARLIER TODAY; CORRECT?

03:16PM  18   A.   I SAID THAT, OR HOSPITALS, OR ALL OF THE OTHER PLACES THAT

03:16PM  19   THEY INTENDED TO ROLL OUT.

03:16PM  20   Q.   OKAY.  I THINK YOU SAID YOU UNDERSTOOD THAT THE 2015

03:16PM  21   PROJECTIONS THAT YOU RECEIVED IN THAT BINDER OF DOCUMENTS

03:16PM  22   ASSUMED A SIGNIFICANT PENETRATION IN THE WALGREENS STORES;

03:16PM  23   CORRECT?

03:16PM  24   A.   YEAH.  THERE WAS ONE, ONE REVENUE LINE THAT WAS FOR

03:16PM  25   PHARMACEUTICAL, NOT PHARMACEUTICAL, BUT DRUG STORES, WALGREENS.

03:16PM 1    Q.   OKAY.  AND AGAIN, YOU UNDERSTOOD THAT THAT WAS DEPENDENT

03:16PM 2    UPON NATIONWIDE PENETRATION IN WALGREENS STORES; CORRECT?

03:16PM 3    A.   AGAIN, I HAD NO PARTICULAR KNOWLEDGE CERTAINLY AT THE TIME

03:16PM 4    WHAT LEVEL OF PENETRATION THAT REQUIRED.  I DID NOT KNOW THAT.

03:16PM 5    Q.   BUT YOU COULD HAVE ASKED; RIGHT?

03:16PM 6    A.   YES.

03:16PM 7    Q.   BUT YOU DID KNOW THERE WERE ABOUT 30 STORES IN OCTOBER OF

03:17PM 8    2013; RIGHT?

03:17PM 9    A.   I DID.

03:17PM 10   Q.   YOU CAN TAKE THAT DOWN, MR. ALLEN.

03:17PM 11        NOW, ONE OF THE ITEMS THAT MR. SCHENK SHOWED YOU IN YOUR

03:17PM 12   DIRECT WAS THIS JOHNS HOPKINS REPORT.

03:17PM 13        DO YOU REMEMBER THAT?

03:17PM 14   A.   I DO.

03:17PM 15   Q.   AND IF YOU COULD PUT UP ON THE SCREEN 20553, WHICH IS

03:17PM 16   ALREADY IN EVIDENCE.

03:17PM 17        AND IF WE CAN GO TO PAGE 2.

03:17PM 18        THIS IS A COPY OF THE JOHNS HOPKINS REPORT THAT YOU

03:17PM 19   TESTIFIED ABOUT EARLIER TODAY; RIGHT?

03:17PM 20   A.   IT IS.

03:17PM 21   Q.   OKAY.  AND YOU'RE VERY FAMILIAR WITH WHAT JOHNS HOPKINS

03:17PM 22   IS, ONE OF THE FOREMOST MEDICAL INSTITUTIONS IN THE COUNTRY;

03:18PM 23   RIGHT?

03:18PM 24   A.   I'M FAMILIAR WITH IT, YES.

03:18PM 25   Q.   OKAY.  AND YOU KNEW FROM EXPERIENCE THAT A COMPANY LIKE

03:18PM 1    WALGREENS WOULD DO EXTENSIVE DUE DILIGENCE BEFORE ENGAGING IN

03:18PM 2    BUSINESS WITH THERANOS; RIGHT?

03:18PM 3              MR. SCHENK:  YOUR HONOR, OBJECTION.  RELEVANCE.

03:18PM 4              THE COURT:  SUSTAINED.

03:18PM 5    BY MR. CAZARES:

03:18PM 6    Q.   YOU WERE AWARE THAT WALGREENS HAD ENGAGED JOHNS HOPKINS TO

03:18PM 7    EVALUATE THERANOS; CORRECT?

03:18PM 8    A.   I HAD CERTAINLY READ THIS REPORT, CORRECT.

03:18PM 9    Q.   NOW, IF WE GO TO THE BOTTOM OF THE REPORT, THE SECOND

03:18PM 10   PAGE, UNDER DISCLAIMER, DO YOU SEE THE DISCLAIMER ON THIS

03:18PM 11   REPORT SAYS, "THIS INFORMATION IS BEING PROVIDED SOLELY FOR THE

03:18PM 12   BENEFIT OF WALGREENS AND SHALL BE USED BY WALGREENS FOR ITS

03:18PM 13   INTERNAL PURPOSES ONLY.  IN ADDITION, THE MATERIALS PROVIDED IN

03:18PM 14   NO WAY SIGNIFY AN ENDORSEMENT BY JOHNS HOPKINS TO ANY PRODUCT

03:18PM 15   OR SERVICE."

03:18PM 16        DO YOU SEE THAT?

03:18PM 17   A.   I DO.

03:18PM 18   Q.   AND THAT'S HOW YOU LEARNED THAT THE REPORT WAS PREPARED

03:18PM 19   FOR WALGREENS AND NOT FOR THERANOS; CORRECT?

03:19PM 20   A.   I'M NOT SURE THAT'S HOW I CAME TO BELIEVE IT WAS PREPARED

03:19PM 21   FOR WALGREENS.  I MEAN, I SEE THE DISCLAIMER, BUT I DON'T THINK

03:19PM 22   I WOULD HAVE FOCUSSED ON THAT WORDING AND MADE THAT CONCLUSION

03:19PM 23   FROM THAT WORDING.

03:19PM 24   Q.   OKAY.  BUT THE DOCUMENT, I'M READING IT CORRECTLY, RIGHT?

03:19PM 25   IT SAYS, "THIS INFORMATION IS BEING PROVIDED SOLELY FOR THE

03:19PM 1    BENEFIT OF WALGREENS"?

03:19PM 2    A.   IT DOES SAY THAT, YES.

03:19PM 3    Q.   OKAY.  AND THEN GETTING BACK TO THE FIRST PAGE OF THE

03:19PM 4    REPORT UNDER MEETING OBJECTIVES, DO YOU SEE THE REPORT THAT YOU

03:19PM 5    READ SAID, "HOPKINS TEAM WAS ASKED TO COMMENT ON VALIDITY AND

03:19PM 6    USEFULNESS OF THERANOS'S PRODUCT."

03:19PM 7         DO YOU SEE THAT?

03:19PM 8    A.   I DO.

03:19PM 9    Q.   AND IT SAYS, "SPECIFICALLY RELATED TO THE SCIENCE THAT

03:19PM 10   SUPPORTS THE TECHNOLOGY AND THE APPLICATION OF THE TECHNOLOGY."

03:20PM 11        DO YOU SEE THAT?

03:20PM 12   A.   I DO.

03:20PM 13   Q.   AND IT SAYS, "IN A VARIETY OF SETTINGS INCLUDING HOSPITAL,

03:20PM 14   CLINIC, LABORATORY, AND POTENTIALLY WITHIN WALGREENS AS AN ADD

03:20PM 15   ON TO THE CLINICAL PROGRAMS AND RETAIL PHARMACY BUSINESS."

03:20PM 16        DO YOU SEE THAT?

03:20PM 17   A.   I DO.

03:20PM 18   Q.   NOW, THE DATE OF THE REPORT IS APRIL 27, 2010.

03:20PM 19        DID YOU NOTICE THAT WHEN YOU REVIEWED IT?

03:20PM 20   A.   I MAY OR MAY NOT.  I DON'T REMEMBER.

03:20PM 21   Q.   OKAY.  BUT APRIL 2010, THAT WAS MORE THAN FOUR YEARS

03:20PM 22   BEFORE YOU HAD YOUR INTRODUCTION TO THERANOS IN THE SUMMER OF

03:20PM 23   2014; RIGHT?

03:20PM 24   A.   THAT IS CORRECT.

03:20PM 25   Q.   OKAY.  AND YOU WOULD HAVE EXPECTED THERANOS TO DEVELOP

03:20PM  1     ADDITIONAL TECHNOLOGY AND FURTHER ADVANCE ITS TECHNOLOGY SINCE

03:20PM  2     2010; RIGHT?

03:20PM  3     A.   I PROBABLY WOULD HAVE ASSUMED IT WAS LIKELY.

03:20PM  4     Q.   IN ORDER FOR THERE ULTIMATELY TO BE A ROLLOUT WITH

03:20PM  5     WALGREENS STORES; RIGHT?

03:20PM  6     A.   I DIDN'T HAVE ANY PARTICULAR KNOWLEDGE ABOUT THAT.

03:20PM  7     Q.   OKAY.  AND THEN THE JOHNS HOPKINS REPORT CONTINUES.

03:20PM  8          UNDER METHODOLOGY, IT DESCRIBES, "THE HOPKINS TEAM

03:21PM  9     REVIEWED PROPRIETARY DATA ON TEST PERFORMANCE FOR ROUTINE TESTS

03:21PM  10    (CLINICAL PATHOLOGY, HEMATOLOGY, AND SPECIAL TESTS)."

03:21PM  11         DO YOU SEE THAT?

03:21PM  12    A.   I DO.

03:21PM  13    Q.   AND THEN "THERANOS PRESENTED ADDITIONAL DATA ON

03:21PM  14    TECHNOLOGY, TEST PERFORMANCE, AND BUSINESS VISION -- AND

03:21PM  15    DEMONSTRATED TECHNOLOGY ON SITE."

03:21PM  16         DO YOU SEE THAT?

03:21PM  17    A.   I DO.

03:21PM  18    Q.   AND, AGAIN, THE OPINIONS STATED IN THE REPORT WERE

03:21PM  19    IMPORTANT TO YOUR INVESTMENT DECISION; RIGHT?

03:21PM  20    A.   THEY WERE.

03:21PM  21    Q.   AND THEN YOU SEE ON THE NEXT BULLET ON THE REPORT IT

03:21PM  22    STATES, "DR. ROSAN COMMENTED ON WALGREENS PRELIMINARY STRATEGY

03:21PM  23    TO EXPLORE EXPANDING INTO THE LABORATORY SPACE, EXPANDING ITS

03:21PM  24    HEALTH SERVICES OFFERINGS TO INCLUDE LAB AND PATHOLOGY TESTING

03:21PM  25    WITHIN WALGREENS RETAIL SPACE."

03:21PM   1         DO YOU SEE THAT?

03:21PM   2     A.   I DO.

03:21PM   3     Q.   AND SOME OF THIS INFORMATION IN THE WALGREENS REPORT YOU

03:22PM   4     IDENTIFIED IN THAT MEMO THAT YOU SENT TO DR. KISSINGER;

03:22PM   5     CORRECT?

03:22PM   6     A.   I DID.

03:22PM   7     Q.   AND YOU QUOTED SOME OF THE JOHNS HOPKINS REPORT TO

03:22PM   8     DR. KISSINGER, AGAIN, BECAUSE YOU RECOGNIZED JOHNS HOPKINS IS A

03:22PM   9     WELL RESPECTED MEDICAL INSTITUTION; CORRECT?

03:22PM   10    A.    THAT IS CORRECT.

03:22PM   11    Q.    AND AN EXTERNAL PARTY TO THERANOS; CORRECT?

03:22PM   12    A.    CORRECT.

03:22PM   13    Q.    IF WE CAN TAKE A LOOK AT EXHIBIT 14118, AND THAT SHOULD BE

03:23PM   14    IN THE DARKER BINDER THAT I SET ON THE TABLE WITH A GREEN AND

03:23PM   15    WHITE LABEL, 14118.

03:23PM   16         THE COURT:  IS THIS A NEW BINDER?

03:23PM   17         MR. CAZARES:  OH, NO.  DID I NOT GIVE YOU YOUR

03:23PM   18    BINDER, YOUR HONOR?  I APOLOGIZE.  SORRY ABOUT THAT.

03:23PM   19         THE COURT:  YES.  SURE.

03:23PM   20         MR. CAZARES:  (HANDING.)

03:23PM   21    Q.    HAVE YOU HAD A CHANCE TO TAKE A LOOK AT 14118, MR. MOSLEY?

03:24PM   22    A.    I HAVE.

03:24PM   23    Q.    AND IT APPEARS TO BE AN EMAIL CHAIN, THE LATTER OF WHICH

03:24PM   24    IS DATED 8-21-2014.

03:24PM   25         DO YOU SEE THAT AT THE TOP OF THE PAGE?

03:24PM  1      A.   I DO.

03:24PM  2      Q.   AND THIS LAST MESSAGE IS FROM MS. HOLMES TO YOURSELF,

03:24PM  3      COPYING A DAN EDLIN.

03:24PM  4           DO YOU SEE THAT?

03:24PM  5      A.   I DO.

03:24PM  6      Q.   AND THE SUBJECT MATTER IS BLANK CDA.

03:24PM  7           DO YOU SEE THAT?

03:24PM  8      A.   I DO.

03:24PM  9                MR. CAZARES:  MOVE TO ADMIT 14118, YOUR HONOR.

03:24PM  10               MR. SCHENK:  NO OBJECTION.

03:24PM  11               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:24PM  12          (DEFENDANT'S EXHIBIT 14118 WAS RECEIVED IN EVIDENCE.)

03:24PM  13     BY MR. CAZARES:

03:24PM  14     Q.   SO TAKING A LOOK AT THE EARLIEST OF THE MESSAGES IN THE

03:24PM  15     CHAIN ON PAGE 2 AT THE TOP OF THE SECOND PAGE.

03:24PM  16          AND IT'S ALSO UP ON THE SCREEN, MR. MOSLEY.

03:24PM  17          AND IT'S A MESSAGE DATED 8-19-2014.  THIS ONE ACTUALLY

03:25PM  18     STARTS ON THE BOTTOM OF THE FIRST PAGE -- I APOLOGIZE -- FROM

03:25PM  19     MS. HOLMES TO YOURSELF AND COPYING MR. EDLIN.

03:25PM  20          DO YOU SEE THAT?

03:25PM  21     A.   I SEE IT.

03:25PM  22     Q.   OKAY.  AND MS. HOLMES WROTE, "DAN:  IT WAS GREAT TO

03:25PM  23     CONNECT YESTERDAY.

03:25PM  24          "PLEASE FIND OUR CDA ATTACHED.  MATERIALS ARE FOLLOWING BY

03:25PM  25     MAIL.

03:25PM  1          "I'M LOOKING FORWARD TO OUR NEXT CONVERSATION."

03:25PM  2          DO YOU SEE THAT?

03:25PM  3     A.   I DO.

03:25PM  4     Q.   AND DO YOU UNDERSTAND THE CDA TO BE A CONFIDENTIAL

03:25PM  5     DISCLOSURE AGREEMENT?

03:25PM  6     A.   I DO.

03:25PM  7     Q.   AND PRIOR TO YOUR RELATIONSHIP WITH THERANOS, YOU HAD

03:25PM  8     ENGAGED IN EXECUTING CONFIDENTIALITY AGREEMENTS IN RELATIONSHIP

03:25PM  9     WITH BUSINESS IN THE PAST; RIGHT?

03:25PM 10     A.   YES.

03:25PM 11     Q.   AND WHEN YOU SIGNED THE CDA, YOU'RE KIND OF AGREEING TO

03:25PM 12     KEEP THINGS CONFIDENTIAL; CORRECT?

03:25PM 13     A.   THAT IS CORRECT.

03:25PM 14     Q.   FOR THE BENEFIT OF THE PARTIES; CORRECT?

03:25PM 15     A.   YES.

03:25PM 16     Q.   AND CONTINUING IN THE EMAIL CHAIN ON THE BOTTOM OF PAGE 1,

03:26PM 17     IT LOOKS LIKE YOU RESPONDED ON AUGUST 20TH OF 2014.

03:26PM 18          DO YOU SEE THAT?

03:26PM 19     A.   I DO.

03:26PM 20     Q.   AND IT APPEARS THAT YOU WROTE, "IT WAS GREAT TO CONNECT

03:26PM 21     WITH YOU AS WELL.

03:26PM 22          "I FULLY UNDERSTAND THE IMPORTANCE OF THE CDA."

03:26PM 23          AND THAT WAS CORRECT; RIGHT?

03:26PM 24     A.   THAT'S WHAT IT SAYS.

03:26PM 25     Q.   YOU UNDERSTOOD THAT AT THE TIME; RIGHT?

ER-3934

03:26PM 1     A.   I UNDERSTOOD THE IMPORTANCE OF THE CDA?  YES, I DID.

03:26PM 2     Q.   OKAY.  AND YOU WROTE, "IT IS A VERY BALANCED AND

03:26PM 3     REASONABLE DOCUMENT."

03:26PM 4          RIGHT?

03:26PM 5     A.   YES.

03:26PM 6     Q.   AND YOU DIDN'T SEE ANYTHING UNUSUAL ABOUT THERANOS

03:26PM 7     REQUESTING A CDA FROM YOU?

03:26PM 8     A.   I DID NOT.

03:26PM 9     Q.   AND THEN YOU CONTINUE THAT YOU WILL PROCEED TO GET IT

03:26PM 10    SIGNED BY THE STAVROS NIARCHOS FOUNDATION, AND ANYONE AT THAT

03:26PM 11    ORGANIZATION WILL HAVE A CHANCE TO REVIEW THE MATERIALS AND

03:26PM 12    GREG PENNER AND ANYONE ELSE IN OR WITH THE WALTON FAMILY WHO

03:26PM 13    WILL SEE THE MATERIALS.

03:26PM 14         AND YOU SAID YOU WOULD SIGN IT YOURSELF; CORRECT?

03:26PM 15    A.   I DID.

03:26PM 16    Q.   AND YOU ULTIMATELY DID SIGN THE CDA; RIGHT?

03:27PM 17    A.   YES, I DID.

03:27PM 18    Q.   AND THE CDA FACILITATED YOUR RECEIPT OF INFORMATION FROM

03:27PM 19    THERANOS; RIGHT?

03:27PM 20    A.   THAT IS CORRECT.

03:27PM 21    Q.   AND UP UNTIL THIS POINT, AUGUST OF 2014, YOU HAD NO

03:27PM 22    CONVERSATIONS OR COMMUNICATIONS WITH MR. BALWANI; CORRECT?

03:27PM 23    A.   I HAD NOT.

03:27PM 24    Q.   AND THEN IT LOOKS LIKE, CONTINUING ON THE CHAIN, IT LOOKS

03:27PM 25    LIKE YOU RETURNED THE CDA'S SIGNED BY SOME OF YOUR CLIENTS AND

03:27PM   1    YOURSELF, AND THEN MS. HOLMES WROTE SHE "LOOKS FORWARD TO OUR

03:27PM   2    NEXT CONVERSATION."

03:27PM   3         DO YOU SEE THAT?

03:27PM   4    A.   I DO.

03:27PM   5    Q.   AND AS A RESULT OF SIGNING THE CDA, YOU ALSO RECEIVED THAT

03:27PM   6    BINDER OF DOCUMENTS FROM MS. HOLMES; CORRECT?

03:27PM   7    A.   THAT IS CORRECT.

03:27PM   8    Q.   AND THAT'S SOME OF WHAT YOU DISCUSSED WITH MR. SCHENK

03:27PM   9    EARLIER TODAY; RIGHT?

03:27PM   10   A.   I DID.

03:27PM   11   Q.   NOW, IF WE CAN TAKE A LOOK AT EXHIBIT 3387, WHICH IS THE

03:28PM   12   PACKET OF DOCUMENTS FROM THE INVESTOR BINDER.

03:28PM   13   A.   OKAY.

03:28PM   14   Q.   AND IF WE CAN TAKE A LOOK AT PAGE 280, WHICH IS THE PAGE

03:28PM   15   AT THE BOTTOM OF THE DOCUMENT.  IT'S ALSO UP ON THE SCREEN,

03:28PM   16   SIR.

03:29PM   17   A.   OKAY.  I HAVE IT.

03:29PM   18   Q.   AND, AGAIN, THE DOCUMENT IN THE INVESTOR PACKET THAT YOU

03:29PM   19   RECEIVED ON THIS PAGE, 280, APPEARS TO READ, "THERANOS'S

03:29PM   20   PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS

03:29PM   21   FROM A FINGERSTICK AND TESTS FROM MICRO-SAMPLES OF OTHER

03:29PM   22   MATRICES AND GENERATES SIGNIFICANTLY HIGHER INTEGRITY DATA THAN

03:29PM   23   CURRENTLY POSSIBLE."

03:29PM   24        DO YOU SEE THAT?

03:29PM   25   A.   I DO.

03:29PM   1     Q.   AND YOU REVIEWED THE INVESTOR MATERIALS YOU RECEIVED;

03:29PM   2     RIGHT?

03:29PM   3     A.   YES, I DID.

03:29PM   4     Q.   AND YOU EVEN CITED MUCH OF IT IN THE MEMO YOU WROTE TO

03:29PM   5     DR. KISSINGER; RIGHT?

03:29PM   6     A.   I CITED SOME PARTS OF IT, YES.

03:29PM   7     Q.   AND THE DOCUMENTATION INDICATES THAT THERANOS RUNS

03:29PM   8     COMPREHENSIVE BLOOD TESTS FROM FINGERSTICK AND TESTS FROM

03:29PM   9     OTHER -- FROM MICRO-SAMPLES OF OTHER MATRICES.

03:29PM  10         DO YOU SEE THAT?

03:29PM  11     A.   I DO.

03:29PM  12     Q.   AND SO FINGERSTICK WAS NOT THE ONLY MATRICES THAT THERANOS

03:29PM  13     TESTED WITH ITS DEVICES; RIGHT?

03:29PM  14              MR. SCHENK:  OBJECTION.  MISSTATES THE DOCUMENT.

03:29PM  15              THE COURT:  YOU'RE ASKING IF HE HAS KNOWLEDGE OF

03:29PM  16     THAT, PERSONAL KNOWLEDGE?

03:30PM  17     BY MR. CAZARES:

03:30PM  18     Q.   DID YOU UNDERSTAND THE DISCLOSURE INDICATED ON PAGE 280 TO

03:30PM  19     BE INFORMING THE READER THAT THERANOS'S ANALYZERS TEST

03:30PM  20     DIFFERENT MATRICES BEYOND JUST A FINGERSTICK?

03:30PM  21     A.   I DID UNDERSTAND THAT THEY COULD TEST OTHER TYPES OF

03:30PM  22     SAMPLES, YES.

03:30PM  23     Q.   AND IF WE CAN TURN TO PAGE 281 OF 3387.

03:30PM  24         NOW, 281 ON EXHIBIT 3387 IDENTIFIES THE MEMBERS OF THE

03:30PM  25     BOARD OF DIRECTORS FOR THERANOS AT THE TIME.

03:30PM 1           DO YOU SEE THAT?

03:30PM 2       A.  I SEE IT.

03:30PM 3       Q.  AND WHEN YOU LEARNED ABOUT -- WELL, LET ME STOP YOU.

03:30PM 4           BEFORE YOU RECEIVED THE DOCUMENTATION FROM MS. HOLMES

03:30PM 5   REFLECTED IN THIS EXHIBIT, DID YOU KNOW WHO THE MEMBERS OF THE

03:31PM 6   BOARD OF DIRECTORS AT THERANOS WERE, BEYOND DR. KISSINGER?

03:31PM 7       A.  I THINK I WAS AWARE OF SOME OF THESE MEMBERS, BUT I

03:31PM 8   PROBABLY WASN'T AWARE OF ALL OF THEM.

03:31PM 9       Q.  OKAY.  AND CORRECT ME IF I'M WRONG, BUT EACH OF THE

03:31PM 10  INDIVIDUALS ON THIS LIST YOU WERE FAMILIAR WITH SEPARATE AND

03:31PM 11  APART FROM THERANOS; CORRECT?

03:31PM 12      A.  MOST ALL OF THEM, YES.

03:31PM 13      Q.  OKAY.  GEORGE SHULTZ, FORMER SECRETARY OF STATE, YOU WERE

03:31PM 14  FAMILIAR WITH HIM?

03:31PM 15      A.  YES.

03:31PM 16      Q.  AND GARY ROUGHEAD, FORMER UNITED STATES ADMIRAL AND CHIEF

03:31PM 17  OF NAVAL OPERATIONS?

03:31PM 18      A.  I'M NOT SURE I WAS FAMILIAR WITH HIM.

03:31PM 19      Q.  BUT SENIOR OFFICER IN THE U.S. MILITARY, THAT WAS A

03:31PM 20  POSITIVE; CORRECT?

03:31PM 21      A.  YES.

03:31PM 22      Q.  DUE TO THE POTENTIAL DOD RELATIONSHIPS?

03:31PM 23      A.  YES.

03:31PM 24      Q.  AND THEN WILLIAM J. PERRY, MICHAEL AND BARBARA BERBERIAN

03:31PM 25  PROFESSOR AT STANFORD, FORMER U.S. SECRETARY OF DEFENSE?  WERE

03:31PM    1    YOU FAMILIAR WITH MR. PERRY?

03:31PM    2    A.   YES, I WAS.

03:32PM    3    Q.   AND SAM NUNN?

03:32PM    4    A.   YES.

03:32PM    5    Q.   YOU'RE FAMILIAR WITH HIM AS WELL?

03:32PM    6    A.   YES.

03:32PM    7    Q.   RICHARD KOVACEVICH?

03:32PM    8    A.   KOVACEVICH.

03:32PM    9    Q.   KOVACEVICH.  THANK YOU FOR CORRECTING ME.

03:32PM   10         GENERAL MATTIS?

03:32PM   11    A.   YES.

03:32PM   12    Q.   FAIR TO SAY IT WAS AN IMPRESSIVE BOARD OF DIRECTORS?

03:32PM   13    A.   IT WAS.

03:32PM   14    Q.   AND THAT ALSO CONTRIBUTED TO YOUR DECISION TO INVEST;

03:32PM   15    CORRECT?

03:32PM   16    A.   YES.

03:32PM   17    Q.   AND AT THE TIME YOU RECEIVED THESE INVESTOR MATERIALS, YOU

03:32PM   18    REALLY DIDN'T KNOW ANYTHING ABOUT MR. BALWANI'S BACKGROUND;

03:32PM   19    CORRECT?

03:32PM   20    A.   I DID NOT.

03:32PM   21    Q.   AND IF WE CAN TURN TO PAGE 289 OF 3387.

03:32PM   22         NOW, AT THIS PAGE OF THE INVESTOR MATERIALS YOU RECEIVED,

03:33PM   23    THERE'S A DESCRIPTION OF OVERVIEW OF CURRENT LABORATORY MARKET.

03:33PM   24         DO YOU SEE THAT?

03:33PM   25    A.   I SEE IT.

03:33PM  1    Q.   AND AGAIN, THERE'S A DESCRIPTION OF THE FIRST BULLET,

03:33PM  2    "DECADES OLD BUSINESS PROCESSES -- AND TECHNOLOGY INVESTMENTS

03:33PM  3    AROUND THOSE BUSINESS PROCESSES -- WITH VERY LITTLE MOTIVATION

03:33PM  4    TO INNOVATE, HAS CREATED A DUOPOLY OF BUSINESSES BURDENED WITH

03:33PM  5    INFRASTRUCTURE COSTS AND LITTLE TO NO R&D."

03:33PM  6         DO YOU SEE THAT?

03:33PM  7    A.   I SEE THE STATEMENT, YES.

03:33PM  8    Q.   AT THE TIME THAT YOU WERE DOING THIS REVIEW AND LEARNING

03:33PM  9    ABOUT THERANOS PRIOR TO INVESTING, YOU CAME TO UNDERSTAND THAT

03:33PM 10    THE PRIMARY PLAYERS IN THE U.S. LAB MARKET WERE LABCORP AND

03:33PM 11    QUEST; CORRECT?

03:33PM 12    A.   YES, I DID.

03:33PM 13    Q.   AND THOSE WERE LARGE PUBLIC COMPANIES; CORRECT?

03:33PM 14    A.   YES.

03:33PM 15    Q.   AND YOU VIEWED AS ATTRACTIVE THERANOS'S OPPORTUNITY TO

03:33PM 16    POSSIBLY TAKE MARKET SHARE FROM LABCORP AND QUEST; CORRECT?

03:34PM 17    A.   YES.

03:34PM 18    Q.   AND THAT MOTIVATED THE INVESTMENT?

03:34PM 19    A.   IT WAS A FACTOR.

03:34PM 20    Q.   IN PARTICULAR, DUE TO THIS PRICING OPPORTUNITY THAT

03:34PM 21    THERANOS INTENDED TO PURSUE; IS THAT RIGHT?

03:34PM 22    A.   YES.

03:34PM 23    Q.   NOW IF YOU CAN TURN TO PAGE 299 OF THE PRESENTATION.

03:34PM 24         299 OF EXHIBIT 3387.

03:34PM 25         I THINK YOU WERE SHOWN SOME OF THIS BY MR. SCHENK.

03:34PM   1          AND, YOU KNOW, IT DESCRIBES "SAME TESTS, A WHOLE NEW

03:34PM   2     APPROACH."

03:34PM   3          DO YOU SEE THAT?

03:35PM   4          PAGE 299?

03:35PM   5     A.   I SEE IT, YES.

03:35PM   6     Q.   AND ON THIS PAGE OF THE DOCUMENT MATERIALS, IT SAYS,

03:35PM   7     "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL LABORATORIES, AND

03:35PM   8     PROCESSES ALL SAMPLE TYPES."

03:35PM   9          DO YOU SEE THAT?

03:35PM  10     A.   I DO.

03:35PM  11     Q.   NOW, DO YOU RECALL BEING TOLD AT VARIOUS TIMES BY

03:35PM  12     MS. HOLMES THAT THERANOS COULD NOT DO ALL TESTS ON ITS OWN

03:35PM  13     TECHNOLOGY?

03:35PM  14     A.   I DO NOT RECALL BEING TOLD THAT.

03:35PM  15     Q.   IF YOU COULD TAKE A LOOK IN -- I LEFT ANOTHER BINDER NEAR

03:35PM  16     YOUR FEET, I THINK TO THE RIGHT THERE.

03:35PM  17     A.   YEAH, THIS ONE?  VOLUME 2 (INDICATING)?

03:35PM  18     Q.   YES.

03:35PM  19          IF YOU COULD TAKE A LOOK AT EXHIBIT 28040, 28040.  IF YOU

03:36PM  20     COULD LOOK AT PAGE 132.

03:36PM  21     A.   OKAY.

03:36PM  22     Q.   AND DO YOU RECALL BEING DEPOSED IN SOME LITIGATION RELATED

03:36PM  23     TO THIS INVESTIGATION AND THERANOS?

03:36PM  24     A.   I DO.

03:36PM  25     Q.   AND AT THE TIME YOU WERE DEPOSED, YOU WERE ASKED QUESTIONS

03:36PM 1    ABOUT THERANOS; CORRECT?

03:36PM 2    A.   I WAS.

03:36PM 3    Q.   AND THE QUESTIONS -- YOU WERE DEPOSED UNDER OATH; CORRECT?

03:36PM 4    A.   I WAS.

03:36PM 5    Q.   AND YOU DID YOUR BEST TO TELL THE TRUTH AT THE TIME?

03:36PM 6    A.   YES, I DID.

03:36PM 7    Q.   AND IF YOU COULD TAKE A LOOK AT LINES 16 TO 23 AT

03:36PM 8    PAGE 132.

03:37PM 9    A.   I SEE IT.

03:37PM 10   Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE TOLD

03:37PM 11   THAT THERANOS COULD NOT DO ALL TESTS ON ITS OWN FINGERSTICK

03:37PM 12   TECHNOLOGY?

03:37PM 13   A.   I DON'T BELIEVE IT SAYS THAT.

03:37PM 14   Q.   AND YOU DON'T RECALL BEING TOLD THAT?

03:37PM 15   A.   I DO RECALL BEING TOLD THIS, BUT -- I DO RECALL BEING TOLD

03:37PM 16   WHAT I SAID RIGHT HERE, BUT I DON'T -- I DON'T INTERPRET WHAT

03:37PM 17   YOU'RE SAYING TO BE CONSISTENT WITH IT.

03:37PM 18   Q.   SO YOU WERE TOLD THAT THERANOS AT VARIOUS TIMES --

03:37PM 19            MR. SCHENK:  EXCUSE ME.  OBJECTION.

03:37PM 20            THE COURT:  EXCUSE ME.  ARE WE ON THE SAME PAGE?

03:37PM 21            MR. CAZARES:  YES, SIR.

03:37PM 22            THE WITNESS:  MAYBE WE'RE NOT.  PAGE 132?

03:37PM 23            MR. CAZARES:  132, LINES 16 TO 23.

03:37PM 24            THE COURT:  28040?

03:38PM 25            MR. CAZARES:  YES.  I'M NOT SURE I HAVE THE RIGHT

03:38PM   1       CITE.  I'LL MOVE ON, YOUR HONOR.

03:38PM   2               MR. SCHENK:  YOUR HONOR, I WOULD MOVE THEN TO STRIKE

03:38PM   3       THE PRIOR QUESTIONS ABOUT PRIOR TESTIMONY.

03:38PM   4               MR. CAZARES:  NO OBJECTION.

03:38PM   5               THE COURT:  THE PRIOR QUESTION AND ANY ANSWER,

03:38PM   6       COLLOQUY, IS STRICKEN, LADIES AND GENTLEMEN.

03:38PM   7       BY MR. CAZARES:

03:38PM   8       Q.  IF YOU COULD PUT UP ON THE SCREEN PAGE 310 OF 3387.

03:39PM   9           NOW, IN THE SAME INVESTMENT BINDER THAT YOU WERE PROVIDED

03:39PM  10       BY MS. HOLMES ON THIS PAGE WAS A DESCRIPTION OF "NATIONAL

03:39PM  11       RETAIL FOOTPRINT AND HEALTH PLAN PARTNERSHIPS THROUGHOUT THE

03:39PM  12       UNITED STATES FOR AN UNPRECEDENTED INFRASTRUCTURE WHICH EXCEEDS

03:39PM  13       THAT OF ANY COMMERCIAL LABORATORY IN TODAY'S MARKET."

03:39PM  14           DO YOU SEE THAT?

03:39PM  15       A.  I SEE IT BUT I'M NOT SURE WHAT BOOK WE'RE IN.

03:39PM  16       Q.  IT'S 3387.  I'M NO LONGER IN THE STATEMENTS BOOK, SIR.

03:39PM  17       A.  OH, OKAY.

03:39PM  18       Q.  SORRY ABOUT THAT.  I DIDN'T MEAN TO RUSH YOU.

03:39PM  19           SO WE'RE BACK INTO DOCUMENT 3387 --

03:39PM  20       A.  YES.

03:39PM  21       Q.  -- WHICH IS THE INVESTOR BINDER?

03:39PM  22       A.  WHAT PAGE?

03:39PM  23       Q.  AND WE ARE AT PAGE 310.

03:39PM  24       A.  I SEE IT.

03:39PM  25       Q.  AND IT'S ALSO UP ON THE SCREEN.

03:39PM   1            AND ON THIS PAGE IT DESCRIBES "NATIONAL RETAIL FOOTPRINT

03:40PM   2    AND HEALTH PLAN PARTNERSHIPS THROUGHOUT THE UNITED STATES FOR

03:40PM   3    AN UNPRECEDENTED INFRASTRUCTURE WHICH EXCEEDS THAT OF ANY

03:40PM   4    COMMERCIAL LABORATORY IN TODAY'S MARKET."

03:40PM   5            DO YOU SEE THAT?

03:40PM   6    A.    I DO.

03:40PM   7    Q.    AND NOW, YOU UNDERSTAND THIS WAS FUTURE LOOKING

03:40PM   8    PERSPECTIVE AND IT WASN'T A DESCRIPTION OF THERANOS'S THEN

03:40PM   9    BUSINESS; CORRECT?

03:40PM  10    A.    THAT'S THE WAY I WOULD HAVE UNDERSTOOD IT, YES.

03:40PM  11    Q.    IS IT FAIR TO SAY THAT YOU UNDERSTOOD THAT THERANOS'S

03:40PM  12    RELATIONSHIP WITH WALGREENS WAS EVOLVING AND THE ROLLOUT INTO

03:40PM  13    WALGREENS STORES BEYOND THE THEN 30 STORES WAS GOING TO EVOLVE

03:40PM  14    OVER TIME; CORRECT?

03:40PM  15    A.    YES.

03:40PM  16    Q.    AND FAIR TO SAY THAT YOU UNDERSTOOD THAT THE SPEED OF THAT

03:40PM  17    ROLLOUT WAS KIND OF DEPENDENT IN PART ON WALGREENS AS WELL AS

03:40PM  18    THERANOS; CORRECT?

03:40PM  19    A.    I WOULD HAVE UNDERSTOOD THAT, YES.

03:40PM  20    Q.    AND YOU UNDERSTOOD AT THE TIME THAT IN THIS SORT OF

03:40PM  21    UNDERTAKING, THIS MASSIVE UNDERTAKING, THERE IS EXECUTION RISK?

03:41PM  22    A.    YES.

03:41PM  23    Q.    AND SOME OF THAT EXECUTION RISK CAN RELATE TO THE ABILITY

03:41PM  24    OF THE PARTNERS TO ACTUALLY BUILD OUT THESE STORES BEYOND THE

03:41PM  25    ARIZONA MARKET; CORRECT?

03:41PM 1    A.   I WOULD HAVE UNDERSTOOD THAT, YES.

03:41PM 2    Q.   AND PART OF THE EXECUTION RISK WOULD ALSO RELATE TO THE

03:41PM 3    ABILITY TO HIRE PERSONNEL TO ACTUALLY DO THIS WORK?

03:41PM 4    A.   YES.

03:41PM 5    Q.   AND PART OF THE EXECUTION RISK WOULD ALSO IN SOME WAY

03:41PM 6    RELATE TO, AGAIN, THERANOS'S ABILITY TO PERFORM THE TESTS;

03:41PM 7    CORRECT?

03:41PM 8    A.   I GUESS.

03:41PM 9    Q.   OKAY.

03:41PM 10   A.   BUT THAT -- NO.  I GUESS.  I MEAN, I DIDN'T UNDERSTAND

03:41PM 11   THAT TO BE PART OF THE RISK, BUT --

03:41PM 12   Q.   WHEN YOU INVESTED, YOU UNDERSTOOD THAT THERANOS WAS IN 30

03:41PM 13   STORES; RIGHT?

03:41PM 14   A.   THAT'S CORRECT.

03:41PM 15   Q.   AND YOU UNDERSTAND THAT THERE'S A SIGNIFICANT DIFFERENCE

03:41PM 16   IN SCALE IN SELLING A PRODUCT FROM 30 STORES TO, LET'S SAY,

03:41PM 17   8,000 NATIONWIDE; RIGHT?

03:41PM 18   A.   YES.

03:41PM 19   Q.   SO EVEN IF, EVEN IF YOUR PRODUCT WORKS NICELY IN A SMALL,

03:42PM 20   COMPACT MARKET, SCALING IT NATIONWIDE MAY BE A DIFFERENT STORY;

03:42PM 21   RIGHT?

03:42PM 22   A.   IT COULD BE, YES.

03:42PM 23   Q.   OKAY.  AND YOU UNDERSTOOD THAT AT THE TIME?

03:42PM 24   A.   YES.

03:42PM 25   Q.   NOW IF YOU COULD PUT UP PAGE 354 FROM THE INVESTOR BINDER.

ER-3945

03:42PM 1          I'M SORRY, 454.

03:42PM 2          AND 454, OVER THE NEXT COUPLE OF PAGES, REFLECTS REFERENCE

03:42PM 3     TO PATENTS HELD BY THERANOS; CORRECT?

03:42PM 4     A.   YES.

03:42PM 5     Q.   AND AGAIN, THIS WAS PART OF WHY YOU WERE INTERESTED IN

03:43PM 6     THERANOS, THE FACT THAT THEY APPEARED TO HAVE A SUBSTANTIAL

03:43PM 7     PATENT PORTFOLIO SUPPORTING ITS TECHNOLOGY; RIGHT?

03:43PM 8     A.   I WAS INTERESTED BECAUSE OF THE TECHNOLOGY, AND CERTAINLY

03:43PM 9     YOU WOULD EXPECT THE PATENTS TO FOLLOW.

03:43PM 10    Q.   AND YOU UNDERSTOOD THAT MUCH OF THE R&D WORK THAT THERANOS

03:43PM 11    DID TO DEVELOP ITS TECHNOLOGY WAS PERFORMED IN THE KIND OF

03:43PM 12    STEALTH MODE BEFORE THEY WENT PUBLIC WITH THEIR RETAIL

03:43PM 13    RELATIONSHIP WITH WALGREENS; CORRECT?

03:43PM 14    A.   THAT IS CORRECT.

03:43PM 15    Q.   AND THAT SEEMED NORMAL TO YOU; RIGHT?

03:43PM 16    A.   YES.

03:43PM 17    Q.   AND YOU UNDERSTOOD THERANOS'S EFFORTS TO MAINTAIN THE

03:43PM 18    CONFIDENTIALITY OF ITS TECHNOLOGY WAS APPROPRIATE; CORRECT?

03:43PM 19    A.   YES.

03:43PM 20    Q.   BECAUSE SOMETIMES COMPETITORS, FORMER EMPLOYEES CAN LEAK

03:44PM 21    INFORMATION THAT COULD PUT THERANOS AT A COMPETITIVE

03:44PM 22    DISADVANTAGE; CORRECT?

03:44PM 23    A.   CORRECT.

03:44PM 24    Q.   NOW, IF YOU COULD TAKE A LOOK AT PAGE 510 OF THE INVESTOR

03:44PM 25    BINDER.

03:44PM   1           NOW, 510 IS THE START OF ABOUT THREE OR FOUR PAGES OF SOME

03:44PM   2     FINANCIAL INFORMATION.

03:44PM   3           DO YOU RECALL THAT?

03:44PM   4     A.   I DO.

03:44PM   5     Q.   AND YOU WERE ASKED SOME QUESTIONS BY MR. SCHENK ABOUT

03:44PM   6     THESE (INDICATING).

03:44PM   7           DO YOU RECALL THAT?

03:44PM   8     A.   I DO.

03:44PM   9     Q.   AND THE FIRST PAGE AT 510 REFLECTS THE SUMMARY

03:44PM   10    CAPITALIZATION; IS THAT CORRECT?

03:44PM   11    A.   THAT'S CORRECT.

03:44PM   12    Q.   AND ESSENTIALLY THIS IS THE CAPITALIZATION INVESTED IN

03:44PM   13    THERANOS BY ITS INVESTOR BASE; CORRECT?

03:44PM   14    A.   THAT IS CORRECT.

03:44PM   15    Q.   AND YOU UNDERSTOOD THIS CAP TABLE IS GOING UP TO 2013;

03:44PM   16    RIGHT?

03:44PM   17    A.   YES, THAT'S WHAT IT INDICATES.

03:45PM   18    Q.   BUT BY THE TIME THAT YOU WERE TALKING WITH MS. HOLMES AND

03:45PM   19    RECEIVING THESE MATERIALS, THERANOS WAS ENGAGING IN A NEW ROUND

03:45PM   20    OF FUNDING; CORRECT?

03:45PM   21    A.   THAT IS CORRECT.

03:45PM   22    Q.   WHICH WOULD INDICATE TO YOU THAT THERANOS REQUIRED,

03:45PM   23    DESIRED ADDITIONAL FUNDS IN ORDER TO EXECUTE ON THIS NATIONAL

03:45PM   24    RETAIL ROLLOUT; CORRECT?

03:45PM   25    A.   YOU KNOW, I CERTAINLY ASSUMED THEY WOULDN'T BE RAISING

03:45PM 1     FUNDS UNLESS THEY NEEDED FUNDS.

03:45PM 2     Q.   AND IF YOU COULD TAKE A LOOK AT 511.

03:45PM 3          WELL, ACTUALLY SKIP THAT.  512.

03:45PM 4          AND 512 IS THE PROJECTED STATEMENT OF INCOME.

03:45PM 5          DO YOU SEE THAT?

03:45PM 6     A.   I DO.

03:45PM 7     Q.   AND YOU WERE ASKED SOME QUESTIONS BY MR. SCHENK ABOUT THE

03:45PM 8     PROJECTED STATEMENT OF INCOME; CORRECT?

03:45PM 9     A.   YES.

03:45PM 10    Q.   AND YOU UNDERSTOOD THAT THESE ARE PROJECTIONS; RIGHT?

03:45PM 11    A.   YES.

03:45PM 12    Q.   THESE WERE NOT ACTUAL FINANCIAL RETURN FINANCIAL

03:46PM 13    STATEMENTS; CORRECT?

03:46PM 14    A.   THAT IS CORRECT.

03:46PM 15    Q.   THESE ARE NOT AUDITED FINANCIAL STATEMENTS; CORRECT?

03:46PM 16    A.   THAT IS CORRECT.

03:46PM 17    Q.   THE KIND OF FINANCIAL STATEMENTS THAT YOU MIGHT GET IF YOU

03:46PM 18    INVESTED IN A PUBLIC COMPANY; CORRECT?

03:46PM 19    A.   CAN YOU REPHRASE THE QUESTION?  I DIDN'T QUITE UNDERSTAND

03:46PM 20    THAT.

03:46PM 21    Q.   NO PROBLEM.

03:46PM 22         YOU'RE AWARE THAT TWICE -- OR ANNUALLY PUBLIC COMPANIES

03:46PM 23    ARE REQUIRED TO REPORT, DISCLOSE KIND OF AUDITED FINANCIAL

03:46PM 24    STATEMENTS; CORRECT?

03:46PM 25    A.   CORRECT.

03:46PM  1    Q.   WHEREAS A PRIVATE COMPANY ISN'T IN THAT SITUATION; DIRECT?

03:46PM  2    A.   THAT'S CORRECT.

03:46PM  3    Q.   AND YOU UNDERSTOOD THAT THIS PROJECTED STATEMENT OF INCOME

03:46PM  4    WAS NOT AN ACTUAL FINANCIAL STATEMENT; CORRECT?  YOU UNDERSTOOD

03:46PM  5    THAT AT THE TIME?

03:46PM  6    A.   I UNDERSTAND IT -- I UNDERSTOOD IT WAS A FINANCIAL

03:46PM  7    STATEMENT.  IT WAS A PROJECTION FINANCIAL STATEMENT, BUT IT IS

03:46PM  8    A FINANCIAL STATEMENT.

03:46PM  9    Q.   OKAY.  BUT A PROJECTION?

03:46PM  10   A.   IT'S A PROJECTION.

03:46PM  11   Q.   OKAY.  AND IF WE CAN TURN TO THE NEXT PAGE.

03:46PM  12        I DON'T THINK YOU WERE ASKED QUESTIONS ABOUT THIS, BUT

03:46PM  13   THIS IS THE PRO FORMA STATEMENT OF CASH FLOW.

03:47PM  14        DO YOU SEE THAT?

03:47PM  15   A.   I DO.

03:47PM  16   Q.   AND PRO FORMA, YOU UNDERSTAND THAT PRO FORMA IS KIND OF

03:47PM  17   ANOTHER WORD FOR PROJECTION; RIGHT?

03:47PM  18   A.   GENERALLY, YES.

03:47PM  19   Q.   AND THEN IF WE CAN GO TO THE NEXT PAGE, 514 IN THE

03:47PM  20   DOCUMENTS THAT YOU WERE PROVIDED.

03:47PM  21        HERE WE'RE LOOKING AT THE BALANCE SHEET; IS THAT RIGHT?

03:47PM  22   CURRENT ASSETS, TOTAL ASSETS?

03:47PM  23   A.   YES, THAT IS CORRECT.

03:47PM  24   Q.   AND THE DOCUMENT INDICATES THAT IT'S THE BALANCE SHEET FOR

03:47PM  25   THE PERIOD ENDING JULY 14TH, 2014; RIGHT?

03:47PM   1    A.   THAT IS CORRECT.

03:47PM   2    Q.   WHICH IS ABOUT A MONTH BEFORE YOU RECEIVED THE INVESTOR

03:47PM   3    PACKET FROM MS. HOLMES; RIGHT?

03:47PM   4    A.   THAT IS CORRECT.

03:47PM   5    Q.   OKAY.  AND DO YOU SEE AT THE TIME THERANOS HAD TOTAL

03:47PM   6    CURRENT ASSETS OF APPROXIMATELY $196 MILLION?

03:48PM   7         DO YOU SEE THAT?

03:48PM   8    A.   I DO.

03:48PM   9    Q.   WITH ABOUT 162 MILLION IN CASH AND INVESTMENTS.

03:48PM  10         DO YOU SEE THAT?

03:48PM  11    A.   I DO.

03:48PM  12    Q.   AND TOTAL ASSETS OF ABOUT 245 MILLION.

03:48PM  13         DO YOU SEE THAT?

03:48PM  14    A.   TOTAL ASSETS ARE 245 MILLION, YES.

03:48PM  15    Q.   OKAY.  AND I THINK YOU INDICATED IN YOUR NOTES THAT YOU

03:48PM  16    DIDN'T BELIEVE THERANOS HAD ANY OUTSTANDING DEBT; CORRECT?

03:48PM  17    A.   I SAID NO MEANINGFUL DEBT.

03:48PM  18    Q.   NO MEANINGFUL DEBT, SO NO SIGNIFICANT DEBT; CORRECT?

03:48PM  19    A.   YES.

03:48PM  20    Q.   YOU CAN TAKE THAT DOWN, MR. ALLEN.

03:48PM  21         IF YOU COULD TAKE A LOOK AT EXHIBIT 14119 IN THE

03:48PM  22    GOVERNMENT BINDER OF DOCUMENTS THAT YOU HAVE.

03:49PM  23    A.   14119?

03:49PM  24    Q.   YES, 14119.

03:49PM  25    A.   I DON'T SEEM TO HAVE SUCH A -- IN VOLUME 1?  IN VOLUME 1?

03:49PM 1     Q.   IT SHOULD BE IN THE BLACK BINDER?

03:49PM 2     A.   OH, YOU --

03:49PM 3     Q.   SORRY ABOUT THAT.

03:49PM 4     A.   THESE WERE THE DOCUMENTS THAT WERE GIVEN TO ME BY THE

03:49PM 5     GOVERNMENT.

03:49PM 6          YOU'RE TALKING ABOUT THIS BLACK BINDER (INDICATING)?

03:49PM 7     Q.   YES.  SORRY ABOUT THAT.

03:49PM 8     A.   THIS BINDER (INDICATING)?

03:49PM 9     Q.   YES, THAT'S CORRECT.  THE BLACK BINDER.  I APOLOGIZE.

03:49PM 10    A.   NO PROBLEM.

03:49PM 11         WHAT WAS THAT?

03:49PM 12    Q.   14119.

03:50PM 13         ARE WE THERE?

03:50PM 14    A.   YEP.

03:50PM 15    Q.   SO 14119 IS A SHORT EMAIL CHAIN, THE LATTER OF WHICH AT

03:50PM 16    THE TOP PAGE APPEARS TO BE FROM YOURSELF, I'M SORRY, FROM

03:50PM 17    MS. HOLMES TO YOU DATED SEPTEMBER 4, 2014.

03:50PM 18         DO YOU SEE THAT?

03:50PM 19    A.   YES.

03:50PM 20    Q.   AND BELOW THAT THERE IS ANOTHER MESSAGE FROM YOURSELF TO

03:50PM 21    MS. HOLMES.

03:50PM 22         DO YOU SEE THAT AS WELL?

03:50PM 23    A.   THAT IS CORRECT.

03:50PM 24    Q.   AND THE EARLIER MESSAGE IS SEPTEMBER 22ND, 2014?

03:50PM 25    A.   CORRECT.

03:50PM  1    Q.   AND THIS IS SUBSEQUENT TO YOUR RECEIPT OF THE INVESTOR

03:50PM  2    MATERIALS THAT WE JUST TALKED ABOUT; RIGHT?

03:50PM  3    A.   THAT'S CORRECT.

03:50PM  4    Q.   OKAY.

03:50PM  5         MOVE TO ADMIT 14119, YOUR HONOR.

03:50PM  6              MR. SCHENK:  NO OBJECTION.

03:50PM  7              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:50PM  8         (DEFENDANT'S EXHIBIT 14119 WAS RECEIVED IN EVIDENCE.)

03:50PM  9    BY MR. CAZARES:

03:50PM  10   Q.   AND IF YOU LOOK AT THE LOWER PORTION OF THE EXHIBIT,

03:50PM  11   YOU'LL SEE THE MESSAGE ON SEPTEMBER 2ND FROM YOURSELF TO

03:50PM  12   MS. HOLMES, AND IT APPEARS THAT YOU WROTE, "ELIZABETH,

03:51PM  13        "THANK YOU FOR THE EXTENSIVE MATERIALS ON THERANOS.  I

03:51PM  14   THOROUGHLY ENJOYED READING THE MATERIALS AND CAN'T TELL YOU HOW

03:51PM  15   APPRECIATIVE AND THANKFUL I AM FOR THE OPPORTUNITY TO BECOME

03:51PM  16   ONE OF YOUR SHAREHOLDERS."

03:51PM  17        DO YOU SEE THAT?

03:51PM  18   A.   I DO.

03:51PM  19   Q.   AND YOU WERE SINCERE WHEN YOU WROTE THAT TO MS. HOLMES;

03:51PM  20   RIGHT?

03:51PM  21   A.   YES, I WAS.

03:51PM  22   Q.   BECAUSE YOU WERE IMPRESSED WITH THE WRITTEN MATERIALS?

03:51PM  23   A.   I WAS.

03:51PM  24   Q.   OKAY.  AND YOU SAID, "I COULD NOT BE MORE IMPRESSED WITH

03:51PM  25   WHAT YOU HAVE ACCOMPLISHED AND WHAT LIES AHEAD FOR THERANOS."

03:51PM  1        DO YOU SEE THAT?

03:51PM  2     A.   I DO.

03:51PM  3     Q.   AND BY "WHAT LIES AHEAD," SOME OF THAT WAS THIS WALGREENS

03:51PM  4     RELATIONSHIP AND THE POTENTIAL OPPORTUNITY; RIGHT?

03:51PM  5     A.   YES.

03:51PM  6     Q.   YOU WROTE, "I SPOKE TO DR. KISSINGER EARLIER TODAY AND

03:51PM  7     GAVE HIM MY THOUGHTS ON THE MATERIALS.  I ALSO PREPARED AN

03:51PM  8     OUTLINE OVER THE WEEKEND WITH MY THOUGHTS AND ANALYSIS, WHICH I

03:51PM  9     AM SENDING TO HIM BY HAND AND HAVE ALSO SENT ALONG TO THE

03:51PM  10    NIARCHOS FOUNDATION."

03:51PM  11       DO YOU SEE THAT?

03:51PM  12    A.   I DO.

03:51PM  13    Q.   AND THIS IS THAT DOCUMENT THAT YOU REVIEWED WITH

03:51PM  14    MR. SCHENK, THE OUTLINE?

03:52PM  15    A.   YES, THAT IS CORRECT.

03:52PM  16    Q.   AND THEN YOU WROTE, "I HAVE A FEW QUESTIONS AND WANT TO

03:52PM  17    FOLLOW UP ON YOUR OFFER OF A BRIEFING BUT THOUGHT I WOULD WAIT

03:52PM  18    UNTIL I HAVE ANY FURTHER QUESTIONS THAT MIGHT BE RAISED BY THE

03:52PM  19    NIARCHOS FOUNDATION PEOPLE AFTER THEY HAVE HAD A CHANCE TO

03:52PM  20    REVIEW THE MATERIALS AND MY OUTLINE."

03:52PM  21       DO YOU SEE THAT?

03:52PM  22    A.   I SEE THAT.

03:52PM  23    Q.   AND THIS IS YOU KIND OF RESPONDING TO MS. HOLMES'S

03:52PM  24    INVITATION TO ASK QUESTIONS; RIGHT?

03:52PM  25    A.   CORRECT.

03:52PM 1     Q.   AND THEN YOU WROTE, "WITH RESPECT TO THE WALTON FAMILY, I

03:52PM 2     CHECKED IN WITH GREG PENNER BUT HE HAS NOT YET RECEIVED THE

03:52PM 3     MATERIALS.  HE HAS SIGNED THE CDA AND I WANTED TO CHECK TO BE

03:52PM 4     SURE THAT ONE OF THE COPIES OF THE MATERIALS THAT CAME TO ME

03:52PM 5     WAS NOT INTENDED TO BE FOR HIM.  I HAVE ENCLOSED A COPY OF HIS

03:52PM 6     ADDRESS CARD TO CONFIRM HIS ADDRESS."

03:52PM 7          DO YOU SEE THAT?

03:52PM 8     A.   I DO.

03:52PM 9     Q.   AND YOU'RE AWARE THAT ULTIMATELY MATERIALS WERE SENT TO

03:52PM 10    MR. PENNER AS WELL?

03:52PM 11    A.   I BELIEVE THEY WERE.

03:52PM 12    Q.   AND IS IT CORRECT, SIR, WOULD YOU AGREE BY THIS TIME,

03:53PM 13    SEPTEMBER 2ND, 2014, YOU HAD NEVER SPOKEN TO MR. BALWANI;

03:53PM 14    CORRECT?

03:53PM 15    A.   I HAD NOT TO MY KNOWLEDGE.

03:53PM 16    Q.   IF WE CAN PUT UP ON THE SCREEN EXHIBIT 4197.  I BELIEVE

03:53PM 17    THIS IS ALREADY IN EVIDENCE FROM EARLIER TODAY.

03:53PM 18              THE COURT:  IT IS.

03:53PM 19              MR. CAZARES:  THANK YOU, YOUR HONOR.

03:53PM 20    Q.   4197 IS THE COVER LETTER AND MEMO TO DR. KISSINGER.

03:53PM 21         DO YOU RECALL THAT, MR. MOSLEY?

03:53PM 22    A.   I DO.

03:53PM 23    Q.   OKAY.  AND IN THE COVER LETTER ANYWAY, YOU REFERENCE THE

03:53PM 24    FACT THAT MS. HOLMES WAS CAREFUL ABOUT OBTAINING NONDISCLOSURE

03:54PM 25    AGREEMENTS BEFORE PROVIDING ANY IN DEPTH INFORMATION ABOUT

03:54PM  1    THERANOS.

03:54PM  2         DO YOU RECALL THAT?

03:54PM  3    A.   YES.

03:54PM  4    Q.   AND I WON'T GO OVER THE REST OF THE LETTER, BUT BASICALLY

03:54PM  5    YOU INDICATED THAT YOU WERE GOING TO GET CDA'S FROM ANYONE YOU

03:54PM  6    SHARED THE MEMO WITH; CORRECT?

03:54PM  7    A.   THAT IS CORRECT.

03:54PM  8    Q.   AND YOU DID SO; CORRECT?

03:54PM  9    A.   AND I DID SO.

03:54PM  10   Q.   OKAY.  IF WE CAN GO TO PAGE 2 OF THE EXHIBIT.

03:54PM  11        AND SOME OF THIS YOU REVIEWED WITH MR. SCHENK, BUT ON

03:54PM  12   PAGE 2 UNDER THE HEADER "QUALITY OF THE TECHNOLOGY/APPLICATION

03:55PM  13   AND PERFORMANCE."

03:55PM  14        DO YOU SEE THAT?

03:55PM  15   A.   I DO.

03:55PM  16   Q.   AND IN THE MEMO, I THINK YOU DESCRIBED EARLIER TODAY, BUT

03:55PM  17   YOU WROTE, "THERE IS SUBSTANTIAL DATA AND OTHER INFORMATION

03:55PM  18   ATTESTING TO THE QUALITY, PERFORMANCE, AND RELIABILITY OF THE

03:55PM  19   THERANOS TECHNOLOGY AND EQUIPMENT."

03:55PM  20        DO YOU SEE THAT?

03:55PM  21   A.   I DO.

03:55PM  22   Q.   OKAY.  AND YOU WROTE, "THERE DOES NOT APPEAR TO BE ANY

03:55PM  23   SIGN OF ANY QUESTION ABOUT THE QUALITY, ACCURACY AND

03:55PM  24   RELIABILITY OF THERANOS'S BLOOD TESTING TECHNOLOGY.  THE

03:55PM  25   INFORMATION SUPPORTING THESE CONCLUSIONS IS SUBSTANTIAL," AND

MOSLEY CROSS BY MR. CAZARES                                5279

03:55PM 1    THEN YOU LIST SOME OF THE BASES FOR THE CONCLUSION; CORRECT?

03:55PM 2    A.   I DO.

03:55PM 3    Q.   OKAY.  AND SOME OF THESE WE REVIEWED, BUT IN THE MEMO THE

03:55PM 4    FIRST ITEM THAT YOU IDENTIFY AS SUPPORTING THE BELIEF THAT THE

03:55PM 5    TECHNOLOGY WORKED WAS THE FACT THAT CMS WAS THE KIND OF

03:55PM 6    OVERSEER, REGULATOR, FOR THE CLIA LABORATORY; CORRECT?

03:56PM 7    A.   THAT'S MY UNDERSTANDING, YES.

03:56PM 8    Q.   AND THAT GAVE YOU SOME COMFORT IN MAKING THE INVESTMENT;

03:56PM 9    CORRECT?

03:56PM 10   A.   YES, IT DID.

03:56PM 11   Q.   AND IN THIS TIME PERIOD, THE LATE SUMMER, EARLY FALL 2014,

03:56PM 12   YOU'RE NOT AWARE OF ANY INDICATIONS OF PROBLEMS WITH RESPECT TO

03:56PM 13   THERANOS'S CLINICAL LAB; CORRECT?

03:56PM 14   A.   I WAS NOT AWARE.

03:56PM 15   Q.   AND THEN THE NEXT ENTRY, IN SUPPORT OF YOUR CONCLUSIONS,

03:56PM 16   YOU WROTE, "THERANOS HAS SUCCESSFULLY COMPLETE THE INSPECTIONS

03:56PM 17   BY THE NEW YORK DEPARTMENT OF HEALTH AND BY A NUMBER OF OTHER

03:56PM 18   NATIONALLY RECOGNIZED AGENCIES, ALL WITH THE HIGHEST POSSIBLE

03:56PM 19   RATINGS."

03:56PM 20        DO YOU SEE THAT?

03:56PM 21   A.   I DO.

03:56PM 22   Q.   AND THAT'S A REFERENCE TO SOMETHING THAT YOU SAW IN THE

03:56PM 23   MATERIALS; CORRECT?

03:56PM 24   A.   CORRECT.

03:56PM 25   Q.   AND AT THE TIME WERE YOU AWARE THAT CLINICAL LABS

03:56PM   1       SOMETIMES HAVE DUAL REGULATORS, THEY HAVE CMS AND THEN STATE

03:56PM   2       REGULATORY AGENCIES?

03:56PM   3       A.   I WAS NOT AWARE OF THAT.

03:56PM   4       Q.   OKAY.  BUT YOU CITED THE FACT THAT THE NEW YORK DEPARTMENT

03:57PM   5       OF HEALTH AND OTHERS HAD COMPLETED INSPECTIONS AT THERANOS;

03:57PM   6       CORRECT?

03:57PM   7       A.   CORRECT.

03:57PM   8       Q.   AND SO THAT WAS NEW INFORMATION TO YOU AT THE TIME?

03:57PM   9       A.   WHEN I GOT THE MATERIALS, YES.

03:57PM  10       Q.   AND THEN YOU FOLLOWED WITH CITING THE PHARMACEUTICAL

03:57PM  11       RELATIONSHIPS, 10 OF 15.

03:57PM  12            DO YOU SEE THAT?

03:57PM  13       A.   I DO.

03:57PM  14       Q.   AND THEN AGAIN WE GET TO YOU WROTE, "THERANOS HAS WORKED

03:57PM  15       WITH A NUMBER OF HOSPITAL GROUPS.  THESE INCLUDE CEDARS-SINAI."

03:57PM  16       AND YOU'RE FAMILIAR WITH CEDARS-SINAI?

03:57PM  17       A.   YES.

03:57PM  18       Q.   A RENOWNED INSTITUTION; CORRECT?

03:57PM  19       A.   CORRECT.

03:57PM  20       Q.   HOSPITAL CORP OF AMERICA, HOSPITAL FOR SPECIAL SURGERY,

03:57PM  21       AND THEN JOHNS HOPKINS, WHICH WE TALKED ABOUT EARLIER.

03:57PM  22            DO YOU SEE THAT?

03:57PM  23       A.   I DO.

03:57PM  24       Q.   AND IT'S THE RELATIONSHIPS IDENTIFIED IN THESE FOUR

03:57PM  25       BULLETS TO THERANOS THAT GAVE YOU COMFORT; CORRECT?

03:57PM  1      A.   THEY DID.

03:57PM  2                MR. CAZARES:  YOUR HONOR, I'M AT A SPOT WHERE I'M

03:57PM  3      GOING TO BE VEERING INTO OTHER MATERIALS.  IT MIGHT BE A GOOD

03:57PM  4      TIME.

03:57PM  5                THE COURT:  THANK YOU.  LET'S DO THAT.

03:57PM  6          LET'S TAKE OUR EVENING BREAK NOW, LADIES AND GENTLEMEN.

03:57PM  7      WE'LL START AGAIN AT 9:00 O'CLOCK.

03:57PM  8          I MIGHT HAVE SOME QUESTIONS FOR THE LAWYERS, SO WE MIGHT

03:58PM  9      NOT START UNTIL 9:30, JUST FAIR WARNING.  BUT I'LL TRY TO KEEP

03:58PM 10      MY QUESTIONS BRIEF FOR THEM.  BUT 9:00 O'CLOCK.

03:58PM 11          SIR, 9:00 O'CLOCK TOMORROW TO RETURN.

03:58PM 12                THE WITNESS:  THANK YOU.

03:58PM 13                THE COURT:  PLEASE REMEMBER THE ADMONITION.  DON'T

03:58PM 14      TRY TO LEARN ANYTHING ABOUT THIS CASE, LISTEN, READ OR DISCUSS

03:58PM 15      THIS CASE WITH ANYONE.

03:58PM 16          HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW.  THANK YOU.

03:58PM 17          (JURY OUT AT 3:58 P.M.)

03:59PM 18                THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:59PM 19                THE WITNESS:  SHOULD I STAY?

03:59PM 20                THE COURT:  OH, NOT YOU, SIR.  SORRY.  YOU'RE FREE

03:59PM 21      TO GO.  SORRY.

03:59PM 22          ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT OUR

03:59PM 23      JURY HAS LEFT FOR THE EVENING.

03:59PM 24          MR. MOSLEY HAS LEFT THE COURTROOM.

03:59PM 25          ALL COUNSEL AND MR. BALWANI ARE PRESENT.

03:59PM 1      ANYTHING FURTHER BEFORE WE BREAK FOR THE NIGHT?

03:59PM 2      MR. BOSTIC.

03:59PM 3          MR. BOSTIC:  IF THE COURT HAS A MOMENT JUST TO

03:59PM 4  DISCUSS THE SCHEDULE FOR TOMORROW?

03:59PM 5          THE COURT:  SURE.

03:59PM 6          MR. BOSTIC:  WE ARE CONSIDERING WHICH WITNESSES TO

03:59PM 7  CALL TOMORROW, AND WE HAVE A TRAVEL DECISION TO MAKE ABOUT AN

03:59PM 8  OUT OF TOWN WITNESS.  ONCE BEFORE I ASKED THE COURT AND THE

03:59PM 9  DEFENSE TO HELP US MAKE THE DECISION, AND I WAS WONDERING IF I

03:59PM 10 COULD DO THE SAME THING.

03:59PM 11         THE COURT:  SURE.

03:59PM 12         MR. BOSTIC:  SO MR. MOSLEY NEEDS TO FINISH HIS

03:59PM 13 CROSS-EXAMINATION, THERE MAY BE REDIRECT.

04:00PM 14     AND THEN TOMORROW THE GOVERNMENT IS CONSIDERING CALLING

04:00PM 15 DR. LYNETTE SAWYER, CHRIS LUCAS, AND ALAN EISENMAN.

04:00PM 16     MR. LUCAS IS NOT YET IN TOWN AND IS CONSIDERING WHETHER TO

04:00PM 17 FLY IN FIRST THING TOMORROW MORNING.

04:00PM 18     SO I THINK THE QUESTION IS, WILL WE NEED MR. LUCAS TO FLY

04:00PM 19 IN IN THE MORNING TO BE AVAILABLE TO TESTIFY IN THE AFTERNOON,

04:00PM 20 OR NOT?

04:00PM 21     I THINK IT WOULD BE HELPFUL TO KNOW HOW MUCH MORE

04:00PM 22 CROSS-EXAMINATION IS STILL ON DECK FOR THE PENDING WITNESS, AND

04:00PM 23 IF THE DEFENSE COULD LET US KNOW HOW MUCH TIME THEY EXPECT TO

04:00PM 24 TAKE WITH THE OTHER WITNESSES AS WELL.

04:00PM 25         THE COURT:  OKAY.

5283

04:00PM 1          MR. COOPERSMITH, YOU'RE IN THE DRIVER'S SEAT HERE.

04:00PM 2              MR. COOPERSMITH:  WELL, THAT'S ALWAYS NICE,

04:00PM 3      YOUR HONOR.  THANK YOU.

04:00PM 4          SO WITH REGARD TO -- IT SOUNDS LIKE, FROM MR. BOSTIC, THE

04:00PM 5      NEXT WITNESS AFTER MR. MOSLEY IS CHRIS LUCAS.

04:00PM 6          DID I HEAR THAT CORRECTLY?

04:00PM 7              MR. BOSTIC:  IT DEPENDS, YOUR HONOR.  IT COULD BE

04:00PM 8      MR. LUCAS OR DR. SAWYER.

04:01PM 9              THE COURT:  IS DR. SAWYER LOCAL?

04:01PM 10             MR. BOSTIC:  SHE'S LOCAL.

04:01PM 11             THE COURT:  RIGHT, RIGHT.

04:01PM 12             MR. COOPERSMITH:  I JUST WANT TO MAKE SURE I

04:01PM 13     UNDERSTAND THE QUESTION, WHICH WE'RE HAPPY TO TRY TO ANSWER, IS

04:01PM 14     THAT IF MR. MOSLEY IS GOING TO GO THE WHOLE DAY TOMORROW, THEY

04:01PM 15     WOULD NOT BRING MR. LUCAS IN FROM OUT OF TOWN, OR IF --

04:01PM 16             MR. BOSTIC:  SO IF MR. MOSLEY WOULD TAKE UP -- IF

04:01PM 17     THE COMBINATION OF MR. MOSLEY AND MR. EISENMAN, FOR EXAMPLE,

04:01PM 18     WOULD TAKE UP ALL OF THE DAY TOMORROW, THEN WE MIGHT TELL

04:01PM 19     MR. LUCAS NOT TO FLY INTO TOWN, AND WE MIGHT TELL DR. SAWYER

04:01PM 20     NOT TO TRAVEL TO THE COURTHOUSE.

04:01PM 21             MR. COOPERSMITH:  I SEE, YOUR HONOR.  THAT'S

04:01PM 22     HELPFUL.

04:01PM 23         SO I'LL -- MR. CAZARES, I'M SURE, WILL JUMP UP AND YELL AT

04:01PM 24     ME IF I'M SPEAKING OUT OF TURN, BUT I DON'T BELIEVE THAT

04:01PM 25     MR. MOSLEY IS GOING TO OCCUPY THE ENTIRE DAY.  I SUSPECT IT

ER-3960

04:01PM 1    WILL BE SOME OF THE MORNING.

04:01PM 2        I SEE NODDING IN THE REFLECTIVE GLASS HERE, SO THAT SOUNDS

04:01PM 3    RIGHT.

04:01PM 4        SO THEN MS. SAWYER, I BELIEVE -- WELL, OBVIOUSLY WE HAVE

04:02PM 5    NOT SEEN THE GOVERNMENT'S DIRECT, AND I THINK MS. WALSH WILL BE

04:02PM 6    TAKING THAT WITNESS.  I DON'T EXPECT THAT TO BE A LENGTHY

04:02PM 7    EXAMINATION.  I SUSPECT IT WON'T BE LENGTHY ON EITHER SIDE, BUT

04:02PM 8    MR. BOSTIC CAN SPEAK TO THAT.

04:02PM 9        SO I THINK IT'S LIKELY THE GOVERNMENT WILL NEED TO FILL UP

04:02PM 10   THE TIME WITH ANOTHER WITNESS, AND IF IT'S MR. EISENMAN, IT'S

04:02PM 11   LIKELY THAT WE WOULDN'T GET TO YET EVEN ANOTHER WITNESS AFTER

04:02PM 12   THAT, IF THAT ANSWERS MR. BOSTIC'S QUESTION.  I HOPE IT DOES.

04:02PM 13        THE COURT:  RIGHT.  MY SENSE IS DR. SAWYER -- THIS

04:02PM 14   IS FROM PAST EXPERIENCE -- WILL NOT BE AN EXTENSIVE WITNESS.  I

04:02PM 15   DON'T THINK SHE WILL BE HOURS.

04:02PM 16        MR. COOPERSMITH:  I THINK THAT'S RIGHT, YOUR HONOR.

04:02PM 17        THE COURT:  AND THEN THE QUESTION IS, DO YOU PUT

04:02PM 18   MR. EISENMAN ON NEXT OR FLY OUT MR. LUCAS?

04:02PM 19        MR. BOSTIC:  AND I THINK IN THAT CASE, BECAUSE

04:02PM 20   MR. EISENMAN WILL BE IN TOWN, WE'LL CALL MR. EISENMAN AND SAVE

04:02PM 21   MR. LUCAS THE TRIP.

04:02PM 22        AND JUST TO CONFIRM, I THINK THE DIRECT EXAM FOR

04:03PM 23   DR. SAWYER WILL BE ABOUT HALF AN HOUR OR LESS, SO IF THE CROSS

04:03PM 24   IS ON THAT SAME SCALE, THEN I THINK WE'RE ON THE SAME PAGE.

04:03PM 25        THE COURT:  AND MR. EISENMAN, MY SENSE IS THAT HIS

04:03PM 1    EXAMINATION WILL PROBABLY REQUIRE A LITTLE MORE TIME, I THINK,

04:03PM 2    CERTAINLY MORE THAN DR. SAWYER'S.

04:03PM 3              MR. BOSTIC:  YES, YOUR HONOR.  HIS DIRECT WILL BE

04:03PM 4    ABOUT 90 MINUTES, SIMILAR TO WHAT WAS OBSERVED IN THE HOLMES

04:03PM 5    TRIAL.

04:03PM 6              THE COURT:  RIGHT.  SO HE PROBABLY WILL BE -- IF WE

04:03PM 7    GET THROUGH SAWYER TOMORROW -- WE FINISH MR. MOSLEY TOMORROW

04:03PM 8    MORNING, I'M THINKING MID-MORNING OR SOMETHING, MAYBE BY OUR

04:03PM 9    FIRST BREAK, DOES THAT SOUND REASONABLE?

04:03PM 10        I SEE HIS LAWYER HERE.  HE WOULD LIKE TO KNOW, TOO.

04:03PM 11             MR. CAZARES:  I THINK IT'S VERY POSSIBLE WE WILL

04:03PM 12   FINISH BOTH SIDES BY THE FIRST BREAK.

04:03PM 13             THE COURT:  OKAY.  GREAT.  THANK YOU.  THAT'S

04:03PM 14   HELPFUL.

04:03PM 15        AND THEN THE DECISION IS, IS IT DR. SAWYER OR EISENMAN?

04:03PM 16             MR. BOSTIC:  I'M NOT SURE IT MATTERS BETWEEN THOSE

04:03PM 17   TWO, YOUR HONOR, WHO IS NEXT IF THOSE TWO ARE BOTH CONFIRMED

04:03PM 18   FOR TOMORROW.

04:03PM 19             THE COURT:  I THINK THAT WILL FILL OUR DAY TOMORROW.

04:04PM 20             MR. BOSTIC:  IT SOUNDS LIKE THAT'S WHERE WE'RE

04:04PM 21   LANDING.

04:04PM 22             MR. COOPERSMITH:  THAT SOUNDS RIGHT.  OBVIOUSLY WITH

04:04PM 23   ALL OF THE UNUSUAL CAVEATS, BECAUSE TESTIMONY IS UNPREDICTABLE,

04:04PM 24   BUT I DO AGREE THAT THAT'S THE LIKELY WAY.

04:04PM 25             THE COURT:  JUST FROM MY PERSPECTIVE, I DON'T SEE

5286

04:04PM 1    ANY REASON TO HAVE THE GOVERNMENT FLY MR. LUCAS IN TONIGHT, OR

04:04PM 2    TOMORROW MORNING FOR THAT LATER.

04:04PM 3            MR. COOPERSMITH:  THAT SOUNDS RIGHT, ESPECIALLY

04:04PM 4    SINCE, IF HE GOT ON AT ALL, WHICH IS DOUBTFUL, IT WOULD BE

04:04PM 5    PRETTY BRIEF.  SO TO MAKE A SPECIAL TRIP FOR HALF AN HOUR OR

04:04PM 6    SOMETHING DOESN'T SOUND REASONABLE.

04:04PM 7            MR. BOSTIC:  UNDERSTOOD.  THAT'S HELPFUL.

04:04PM 8        THANK YOU, YOUR HONOR.

04:04PM 9            THE COURT:  OKAY.  HAVE WE ANSWERED -- OR HAVE WE

04:04PM 10   SOLVED ALL OF THE WORLD'S PROBLEMS?

04:04PM 11           MR. BOSTIC:  ALL OF MY QUESTIONS, YOUR HONOR.

04:04PM 12           MR. COOPERSMITH:  AND WE'LL SEE YOUR HONOR AT 8:30

04:04PM 13   TOMORROW?

04:04PM 14           THE COURT:  I HOPE SO.  WHAT HAVE YOU HEARD?

04:04PM 15           MR. COOPERSMITH:  I'M THINKING YES, SO THAT'S GOOD

04:04PM 16   TO HEAR.  THANK YOU.

04:04PM 17           THE COURT:  ALL RIGHT.  WE'LL SEE YOU THEN.  THANK

04:04PM 18   YOU.

04:04PM 19           MR. BOSTIC:  THANK YOU.

04:04PM 20       (COURT ADJOURNED AT 4:04 P.M.)

21

22

23

24

25

ER-3963

1

2                     UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,          )
6                                      )  CR-18-00258-EJD
                   PLAINTIFF,          )
7                                      )  SAN JOSE, CALIFORNIA
              VS.                      )
8                                      )  MAY 11, 2022
    RAMESH "SUNNY" BALWANI,            )
9                                      )  VOLUME 28
                   DEFENDANT.          )
10  _____      )  PAGES 5287 - 5562

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                           BY:   JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:   ROBERT S. LEACH
                                 KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
    OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

ER-3964

09:32AM  1          THE COURT:  YES.

09:33AM  2          (DISCUSSION OFF THE RECORD.)

09:33AM  3          THE COURT:  RIGHT, IT'S 17TH, 18TH, AND 20TH.

09:33AM  4          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:33AM  5          MR. SCHENK:  THANK YOU.

09:33AM  6          (RECESS FROM 9:33 A.M. UNTIL 9:49 A.M.)

09:49AM  7          THE COURT:  PLEASE BE SEATED.  THANK YOU AGAIN FOR

09:49AM  8   YOUR COURTESY.

09:49AM  9          WE'RE BACK ON THE RECORD IN THE BALWANI MATTER.

09:49AM 10          ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

09:49AM 11          OUR JURY IS PRESENT.

09:49AM 12          GOOD MORNING, LADIES AND GENTLEMEN.  I WAS ALMOST ACCURATE

09:49AM 13   IN MY PREDICTION OF WHEN WE WOULD START.

09:49AM 14          THANK YOU FOR YOUR PATIENCE.

09:49AM 15          LET ME ASK YOU AGAIN, DURING THE BREAK, DID ANY OF YOU,

09:49AM 16   MEMBERS OF THE JURY, HAVE CAUSE TO LEARN, LISTEN, SEE, OR

09:49AM 17   DISCUSS ANYTHING ABOUT THIS CASE?  IF SO, MAY I SEE YOUR HANDS?

09:49AM 18          I SEE NO HANDS.  THANK YOU VERY MUCH.

09:49AM 19          SHALL WE CONTINUE WITH OUR WITNESS THEN, MR. MOSLEY, I

09:49AM 20   THINK?

09:50AM 21          GOOD MORNING, SIR.

09:50AM 22          THE WITNESS:  GOOD MORNING.

09:50AM 23          THE COURT:  PLEASE MAKE YOURSELF COMFORTABLE.

09:50AM 24   TAKE YOUR MASK OFF IF YOU WOULD LIKE.

09:50AM 25          THE WITNESS:  OH.  THANK YOU.

09:50AM   1            THE COURT:  YOU'RE WELCOME.

09:50AM   2        I REMIND YOU YOU'RE STILL UNDER OATH.

09:50AM   3        AND WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE JUST STATE

09:50AM   4    YOUR NAME AGAIN.

09:50AM   5            THE WITNESS:  YES, SIR.

09:50AM   6        DANIEL LYNN MOSTLY.

09:50AM   7        **(GOVERNMENT'S WITNESS, DANIEL MOSLEY, WAS PREVIOUSLY**

09:50AM   8    **SWORN.)**

09:50AM   9            THE COURT:  THANK YOU.  COUNSEL.

09:50AM  10            MR. CAZARES:  THANK YOU, YOUR HONOR.

09:50AM  11                    **CROSS-EXAMINATION (RESUMED)**

09:50AM  12    BY MR. CAZARES:

09:50AM  13    Q.   GOOD MORNING, MR. MOSLEY.

09:50AM  14    A.   GOOD MORNING.

09:50AM  15    Q.   AND I WANT TO PICK OFF WHERE WE LEFT OFF YESTERDAY, AND

09:50AM  16    WHERE WE LEFT OFF WAS I THINK YOUR LETTER AND MEMO TO

09:50AM  17    DR. KISSINGER DATED SEPTEMBER 2ND, 2014.

09:50AM  18        COULD WE PUT UP ON THE SCREEN EXHIBIT 4197.

09:50AM  19        JUST TO CONFIRM, THE DATE OF THE COVER LETTER IN THE MEMO

09:50AM  20    IS SEPTEMBER 2ND, 2014; IS THAT RIGHT?

09:50AM  21    A.   YES.

09:50AM  22    Q.   AND JUST TO CONFIRM, YOU DRAFTED THIS MEMO PRIOR TO EVER

09:51AM  23    HAVING ANY COMMUNICATIONS WITH MR. BALWANI; CORRECT?

09:51AM  24    A.   THAT IS CORRECT.

09:51AM  25    Q.   OKAY.  NOW, IF WE GO TO PAGE 4 OF THE MEMO UNDER THE

09:51AM  1      SECTION TITLED BUSINESS APPROACH.

09:51AM  2          DO YOU SEE THAT?

09:51AM  3      A.   I DO.

09:51AM  4      Q.   AND SOME OF THIS WE HAVE ALREADY SPOKEN ABOUT.  I DON'T

09:51AM  5      WANT TO REVISIT ALL OF THIS.

09:51AM  6          BUT IN THIS SECTION, ESSENTIALLY YOU HAVE IDENTIFIED

09:51AM  7      FACTORS CONFIRMING KIND OF THERANOS'S BUSINESS STRATEGY AND

09:51AM  8      APPROACH AS YOU UNDERSTOOD IT FROM THE MATERIALS; IS THAT FAIR?

09:51AM  9      A.   THAT IS CORRECT.

09:51AM  10     Q.   OKAY.  AND YOU THOUGHT THESE WERE ALL NOTABLE FACTORS IN

09:51AM  11     THERANOS'S BUSINESS APPROACH ACCORDING TO YOUR OWN ANALYSIS;

09:51AM  12     CORRECT?

09:51AM  13     A.   YES.

09:51AM  14     Q.   OKAY.  AND THAT INCLUDED THE FACT OF THE PATENTS AND

09:51AM  15     PATENT PORTFOLIO THAT THERANOS HAD; IS THAT CORRECT?

09:51AM  16     A.   CORRECT.

09:51AM  17     Q.   TRADEMARKS THAT THE COMPANY OWNED; CORRECT?

09:51AM  18     A.   CORRECT.

09:51AM  19     Q.   THE PHARMACEUTICAL RELATIONSHIPS, AS WE TALKED ABOUT

09:52AM  20     BEFORE; CORRECT?

09:52AM  21     A.   RIGHT.

09:52AM  22     Q.   AND ARE YOU AWARE OF THE FACT THAT THE PHARMACEUTICAL

09:52AM  23     RELATIONSHIPS BETWEEN THERANOS AND THE PHARMACEUTICAL

09:52AM  24     COMPANIES, THAT MUCH OF THAT TOOK PLACE PRIOR TO MR. BALWANI

09:52AM  25     EVER JOINING THERANOS?

09:52AM  1      A.   I HAVE NO KNOWLEDGE ABOUT WHEN HE JOINED OR ANYTHING ELSE,

09:52AM  2      SO I DON'T KNOW HOW I CAN ANSWER THAT QUESTION.

09:52AM  3      Q.   I THINK YOU JUST DID.  THANK YOU.

09:52AM  4           AND YOU CALLED THE PARTNERSHIP WITH WALGREENS BRILLIANT IN

09:52AM  5      YOUR MEMO TO DR. KISSINGER; CORRECT?

09:52AM  6      A.   I DID.

09:52AM  7      Q.   AND YOU BELIEVED THAT AT THE TIME?

09:52AM  8      A.   YES, I DID.

09:52AM  9      Q.   AND THAT WAS, AGAIN, RELATED TO THIS KIND OF STRATEGY FOR

09:52AM 10      A SMALLER COMPANY LIKE THERANOS TO HAVE THE AVAILABLE

09:52AM 11      RESOURCES, I GUESS I COULD SAY, OF WALGREENS TO HELP TAKE IT

09:52AM 12      NATIONAL; CORRECT?

09:52AM 13      A.   CORRECT.

09:52AM 14      Q.   AND YOU THOUGHT WALGREENS WAS A CAPABLE PARTNER TO HELP A

09:52AM 15      SMALL COMPANY LIKE THERANOS TO COMPETE WITH LABCORP AND QUEST;

09:53AM 16      CORRECT?

09:53AM 17      A.   I DID.

09:53AM 18      Q.   AND CONTINUING ON THE BUSINESS APPROACH AGAIN.  YOU SAID

09:53AM 19      YESTERDAY THAT THE HIGH POWERED BOARD OF DIRECTORS OF THERANOS

09:53AM 20      ALSO CONTRIBUTED TO YOUR DECISION TO INVEST; CORRECT?

09:53AM 21      A.   YES.

09:53AM 22      Q.   NOW, IF WE COULD TURN TO PAGE 9 OF THE MEMO.

09:53AM 23           AND THIS IS THE -- THIS PORTION THAT YOU REVIEWED WITH

09:53AM 24      MR. SCHENK CONCERNING RISKS THAT YOU YOURSELF IDENTIFIED AFTER

09:53AM 25      YOUR OWN REVIEW OF THE MATERIALS; IS THAT FAIR?

09:53AM 1      A.   THAT'S CORRECT.

09:53AM 2      Q.   AND AMONG THE RISKS THAT YOU IDENTIFIED IN SUB A, YOU

09:53AM 3      INDICATE THAT THE RELATIONSHIP DEPENDS UPON -- THE BUSINESS

09:53AM 4      STRATEGY DEPENDS UPON WALGREENS; CORRECT?

09:53AM 5      A.   CORRECT.

09:53AM 6      Q.   AND, AND YOU --

09:53AM 7      A.   IT'S AN IMPORTANT PART OF THE BUSINESS PLAN THAT DEPENDS

09:53AM 8      ON THE RELATIONSHIP WITH WALGREENS.

09:54AM 9      Q.   AND YOU NOTE THAT IT WILL BE HELPFUL TO KNOW WALGREENS'S

09:54AM 10     PERSPECTIVE ON THIS RELATIONSHIP AND HOW IT IS CURRENTLY

09:54AM 11     WORKING OUT?

09:54AM 12     A.   CORRECT.

09:54AM 13     Q.   AND THESE ARE QUESTIONS THAT YOU COULD HAVE PUT TO

09:54AM 14     MS. HOLMES; CORRECT?

09:54AM 15            MR. SCHENK:  OBJECTION.  RELEVANCE.

09:54AM 16            THE COURT:  SUSTAINED.

09:54AM 17     BY MR. CAZARES:

09:54AM 18     Q.   AND YOU ALSO INDICATE, "IT WOULD ALSO BE HELPFUL TO KNOW

09:54AM 19     SOME ADDITIONAL DETAILS OF THE STRUCTURE AND TERMS OF THE

09:54AM 20     PARTNERSHIP BETWEEN WALGREENS AND THERANOS."

09:54AM 21       DO YOU SEE THAT?

09:54AM 22     A.   CORRECT.

09:54AM 23     Q.   AND DID YOU EVER GET ANSWERS TO THE QUESTIONS THAT YOU

09:54AM 24     RAISED IN THIS PORTION OF YOUR MEMO?

09:54AM 25     A.   YOU KNOW, I BELIEVE OVER TIME I DID GET MORE INSIGHT INTO

ER-3969

09:54AM   1    THE STRUCTURE OF THE TERMS OF THE AGREEMENT, BUT I DIDN'T AT

09:54AM   2    THIS TIME.

09:54AM   3    Q.   AND IF YOU CONTINUE UNDER THE RISK PORTION TO THE NEXT

09:54AM   4    SECTION.

09:54AM   5         AND YOU NOTE, FROM SOME OF THE FINANCIAL NUMBERS THAT WERE

09:54AM   6    WITHIN THE INVESTOR MATERIALS, SOME OF THOSE PROJECTION

09:54AM   7    NUMBERS.

09:54AM   8         DO YOU SEE THAT?

09:54AM   9    A.   I SEE IT.

09:54AM  10    Q.   OKAY.  AND YOU ALSO NOTE THAT AT THE TIME THAT YOU WERE

09:55AM  11    AWARE OF THE FACT THAT THERANOS WAS IN 30 WALGREENS PHARMACIES;

09:55AM  12    CORRECT?

09:55AM  13    A.   YES.

09:55AM  14    Q.   AND THAT IT WOULD BE HELPFUL TO KNOW HOW MANY PHARMACY

09:55AM  15    LOCATIONS ARE ASSUMED FOR THOSE 2015 PROJECTIONS; CORRECT?

09:55AM  16    A.   CORRECT.

09:55AM  17    Q.   SO YOU UNDERSTOOD THAT THE 2015 PROJECTIONS WERE DEPENDENT

09:55AM  18    ON THE EXECUTION OF THE WALGREENS ROLLOUT; CORRECT?

09:55AM  19    A.   UM, WOULD YOU READ THAT AGAIN, PLEASE?

09:55AM  20    Q.   I CAN RESTATE IT.

09:55AM  21    A.   YES, PLEASE.

09:55AM  22    Q.   YOUR, YOUR -- YOU WROTE THAT IT WOULD BE HELPFUL TO KNOW

09:55AM  23    HOW MANY PHARMACY LOCATIONS ARE ASSUMED IN THE 2015

09:55AM  24    PROJECTIONS.

09:55AM  25         DO YOU SEE THAT?

ER-3970

MOSLEY CROSS BY MR. CAZARES (RES.)                          5341

09:55AM  1    A.    I DO.

09:55AM  2    Q.    OKAY.  AND SO THAT YOU UNDERSTOOD AT THE TIME THAT THOSE

09:55AM  3    2015 PROJECTIONS WERE DEPENDENT UPON THE ABILITY TO ROLL OUT

09:55AM  4    THERANOS TESTING IN WALGREENS STORES OVER THE NEXT YEAR;

09:55AM  5    CORRECT?

09:55AM  6    A.    YES.  IT ASSUMED SOME LEVEL OF ROLLOUT, ABSOLUTELY.

09:55AM  7    Q.    AND YOU UNDERSTOOD THAT THERE WAS SOME RISK THAT MAYBE THE

09:55AM  8    PARTIES WOULDN'T AGREE ON THE TERMS AND MAYBE IT MIGHT NEVER

09:56AM  9    HAPPEN?

09:56AM  10   A.    YES.

09:56AM  11   Q.    AND IF WE CAN GO DOWN TO SUB C.

09:56AM  12         YOU IDENTIFY FINANCIAL CIRCUMSTANCE OF THERANOS CASH ON

09:56AM  13   HAND; CORRECT?

09:56AM  14   A.    CORRECT.

09:56AM  15   Q.    YOU ASKED A QUESTION ABOUT WHY THERANOS WAS RAISING FUNDS;

09:56AM  16   CORRECT?

09:56AM  17   A.    CORRECT.

09:56AM  18   Q.    AND WHY THERANOS DIDN'T SIMPLY BORROW FUNDS TO EXPAND THE

09:56AM  19   BUSINESS; RIGHT?

09:56AM  20   A.    CORRECT.

09:56AM  21   Q.    OKAY.  AND THEN IN SUB D YOU NOTE SOME OF THE CORPORATE

09:56AM  22   DOCUMENTS AND THE REDEMPTION ISSUE THAT YOU RAISED WITH

09:56AM  23   MS. HOLMES; CORRECT?

09:56AM  24   A.    CORRECT.

09:56AM  25   Q.    AND YOU DID GET RESOLUTION ON THAT AS YOU DISCUSSED

ER-3971

09:56AM   1    YESTERDAY?

09:56AM   2    A.   YES, I DID.

09:56AM   3    Q.   AND THAT WAS IMPORTANT TO YOU?

09:56AM   4    A.   IT WAS.

09:56AM   5    Q.   TO PROTECT YOURSELF AND YOUR CLIENT INVESTORS RELATING TO

09:56AM   6    THIS ISSUE OF REDEMPTION RIGHTS; CORRECT?

09:56AM   7    A.   THAT IS CORRECT.

09:56AM   8    Q.   AND IF WE CAN GO DOWN TO SUB C.  THAT'S THE LAST SUB.

09:57AM   9         NOW, IF I CAN JUST CONFIRM, SO YOU SHARED THE MEMO WITH

09:57AM  10    DR. KISSINGER; CORRECT?

09:57AM  11    A.   I DID.

09:57AM  12    Q.   YOU SHARED IT WITH SOME OF YOUR INVESTOR CLIENTS?

09:57AM  13    A.   YOU KNOW, I DON'T KNOW WHO I SHARED IT WITH.

09:57AM  14         I DO KNOW IT WAS GIVEN TO THE PEOPLE AT THE NIARCHOS

09:57AM  15    FOUNDATION.

09:57AM  16    Q.   OKAY.  YOU DID NOT SHARE IT WITH MS. HOLMES?

09:57AM  17    A.   I DID NOT.

09:57AM  18    Q.   AND YOU DID NOT SHARE IT WITH MR. BALWANI?

09:57AM  19    A.   I DID NOT.

09:57AM  20         AND I'M NOT SURE I SHARED IT WITH ANY OTHER PERSON I KNEW

09:57AM  21    THAT WAS LOOKING AT THE COMPANY.

09:57AM  22    Q.   FAIR ENOUGH.  THANK YOU.

09:57AM  23         NOW, WITHIN THE -- I THINK THE BINDERS ARE STILL THERE.

09:57AM  24    WITHIN THE DARK BINDER --

09:57AM  25    A.   UH-HUH, I'VE GOT IT.

09:57AM   1      Q.   -- THERE SHOULD BE A DOCUMENT TAB 14124.  SO 14124.

09:58AM   2      A.   I HAVE IT.

09:58AM   3      Q.   AND 14124 APPEARS TO BE AN EMAIL EXCHANGE BETWEEN YOURSELF

09:58AM   4      AND MS. HOLMES.

09:58AM   5           DO YOU SEE THAT?

09:58AM   6      A.   I DO.

09:58AM   7      Q.   AND IT'S DATED OCTOBER 6TH, 2014?

09:58AM   8      A.   CORRECT.

09:58AM   9              MR. CAZARES:  MOVE TO ADMIT 14124, YOUR HONOR.

09:58AM  10              MR. SCHENK:  NO OBJECTION.

09:58AM  11              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:58AM  12         (DEFENDANT'S EXHIBIT 14124 WAS RECEIVED IN EVIDENCE.)

09:58AM  13      BY MR. CAZARES:

09:58AM  14      Q.   OKAY.  IF WE CAN FOCUS ON THE TWO MESSAGES IN THE LOWER

09:58AM  15      PORTION OF THE EXHIBIT.  THIS WAS OCTOBER 6TH, 2014.

09:58AM  16           THIS WAS AROUND THE TIME THAT YOU WERE TO VISIT THERANOS

09:58AM  17      AND YOU HAD SOME MEETINGS; CORRECT?

09:58AM  18      A.   THAT'S CORRECT.

09:58AM  19      Q.   AND IN THE FIRST OF THE MESSAGES IN THIS EXHIBIT FROM

09:58AM  20      YOURSELF TO MS. HOLMES ON OCTOBER 6TH, 2014, YOU WROTE,

09:58AM  21      "ELIZABETH,

09:58AM  22           "I HOPE ALL IS WELL.  I AM HAPPY THAT EACH OF THE

09:58AM  23      POTENTIAL INVESTORS FROM THE WALTON, COX, DEVOS AND THE

09:59AM  24      NIARCHOS FAMILIES ARE PROCEEDING VERY WELL AS I WOULD EXPECT."

09:59AM  25           DO YOU SEE THAT?

MOSLEY CROSS BY MR. CAZARES (RES.)                                    5344

```
09:59AM   1        A.   I DO SEE THAT.

09:59AM   2        Q.   AND YOU INDICATED "GREG BROUGHT ME UP TO SPEED ON WHERE

09:59AM   3    THE WALTONS STAND."

09:59AM   4             DO YOU SEE THAT?

09:59AM   5        A.   I DO.

09:59AM   6        Q.   AND THEN THE NEXT PARAGRAPH, "I KNOW JERRY TUBERGEN IS SET

09:59AM   7    TO MEET WITH YOU IN PALO ALTO ON THE 14TH AND HE IS BRINGING

09:59AM   8    SEVERAL FAMILY MEMBERS, INCLUDING DOUG, WHO RUNS AMWAY, WHO I

09:59AM   9    THINK YOU WILL ENJOY MEETING.  THEY ARE VERY ENTHUSIASTIC ABOUT

09:59AM  10    BEING IN YOUR CORE GROUP GOING FORWARD."

09:59AM  11             DO YOU SEE THAT?

09:59AM  12        A.   I DO.

09:59AM  13        Q.   AND WERE YOU REPORTING TO MS. HOLMES COMMUNICATIONS THAT

09:59AM  14    YOU HAD WITH MR. TUBERGEN?

09:59AM  15        A.   WELL, THAT'S WHERE I WOULD HAVE GOT THAT INFORMATION WOULD

09:59AM  16    BE FROM JERRY TUBERGEN.

09:59AM  17        Q.   FAIR ENOUGH.  THANK YOU.

09:59AM  18             AND THEN YOU SAY, "I WILL SEE YOU ON THE 17TH WITH AT

09:59AM  19    LEAST TWO OR MORE OF THE NIARCHOS FOUNDATION.  ONCE I KNOW WHO

09:59AM  20    WILL BE COMING, I WILL LET YOU KNOW AND WILL SEND YOU THE

09:59AM  21    TOPICS THAT THEY WOULD LIKE TO COVER.  AGAIN, VERY ENTHUSIASTIC

10:00AM  22    ABOUT THE OPPORTUNITY."

10:00AM  23             DO YOU SEE THAT?

10:00AM  24        A.   I DO.

10:00AM  25        Q.   AND, AGAIN, WERE YOU INDICATING ENTHUSIASM THAT YOU WERE
```

ER-3974

MOSLEY CROSS BY MR. CAZARES (RES.)                              5345

10:00AM  1    HEARING FROM MEMBERS OF THE NIARCHOS FOUNDATION?

10:00AM  2    A.   I'M NOT SURE WHAT I'M SAYING THERE.  I JUST SAY, "AGAIN,

10:00AM  3    VERY ENTHUSIASTIC ABOUT THE OPPORTUNITY."

10:00AM  4        I DON'T KNOW WHETHER THAT IS SOMETHING THAT I GOT FROM THE

10:00AM  5    NIARCHOS FOUNDATION OR NOT.  IT'S NOT REFERRING TO ANY

10:00AM  6    PARTICULAR PERSON.

10:00AM  7    Q.   OKAY.

10:00AM  8    A.   AND I DIDN'T, I DIDN'T REALLY KNOW THE TWO INDIVIDUALS WHO

10:00AM  9    WERE DOING THE DUE DILIGENCE FOR THE NIARCHOS FOUNDATION.

10:00AM  10   Q.   FAIR ENOUGH.  THANK YOU.

10:00AM  11       AND THE NEXT LINE IN THE EMAIL YOU WROTE, "ON THE COX

10:00AM  12   FAMILY, IT SOUNDS LIKE YOU HAD A VERY GOOD MEETING WITH

10:00AM  13   ALEX TAYLOR WHO REALLY ENJOYED THE OPPORTUNITY TO MEET WITH

10:00AM  14   YOU.  IF YOU CAN MAKE IT WORK, ALEX, JOHN DYER (CEO OF COX

10:00AM  15   ENTERPRISES) HOPE TO MEET WITH YOU FRIDAY.  AGAIN, VERY

10:00AM  16   ENTHUSIASTIC AND EXCITED ABOUT BEING PART OF YOUR CORE GROUP."

10:00AM  17       DO YOU SEE THAT?

10:00AM  18   A.   I DO.

10:00AM  19   Q.   AND THAT MEETING DID TAKE PLACE?

10:00AM  20   A.   YES, IT DID.

10:00AM  21   Q.   AND YOU PARTICIPATED IN THAT MEETING; RIGHT?

10:01AM  22   A.   YES, I DID.

10:01AM  23   Q.   THAT'S ONE OF THE TWO MEETINGS THAT YOU HAD?

10:01AM  24   A.   YES.

10:01AM  25   Q.   AND THEN MS. HOLMES RESPONDED BACK THANKING YOU FOR THE

ER-3975

10:01AM  1    NOTE AND YOUR COMMENTS.

10:01AM  2        DO YOU SEE THAT?

10:01AM  3    A.   I DO SEE THAT.

10:01AM  4    Q.   AND THAT SHE WAS GOING TO GIVE YOU A CALL TO CONNECT

10:01AM  5    RE GREG.

10:01AM  6        AND THAT'S MR. PENNER?

10:01AM  7    A.   THAT IS CORRECT.

10:01AM  8    Q.   AND MS. HOLMES REPORTED BACK TO YOU ABOUT A CALL SHE HAD

10:01AM  9    WITH JERRY AND A WOMAN ON HIS TEAM.

10:01AM  10       DO YOU SEE THAT?

10:01AM  11   A.   YES, I DO.

10:01AM  12   Q.   AND THAT'S A REFERENCE TO JERRY TUBERGEN?

10:01AM  13   A.   YES, IT IS.

10:01AM  14   Q.   AND THEN MS. HOLMES CONFIRMS A FRIDAY MEETING WITH ALEX.

10:01AM  15       DO YOU SEE THAT?

10:01AM  16   A.   YES, I DO SEE THAT.

10:01AM  17   Q.   AND THAT'S ALEX TAYLOR OF THE COX FAMILY?

10:01AM  18   A.   THAT IS CORRECT.

10:01AM  19   Q.   SO JUST TO CONFIRM, SO YOU TRAVELLED TO CALIFORNIA TO MEET

10:02AM  20   WITH MS. HOLMES TWICE, ONCE ON THE 10TH OF OCTOBER, AND THEN

10:02AM  21   THE SECOND TIME WITH THE NIARCHOS FOUNDATION PERSON A WEEK

10:02AM  22   LATER; CORRECT?

10:02AM  23   A.   THAT IS CORRECT.

10:02AM  24   Q.   AND ON ONE OF THOSE TWO VISITS TO CALIFORNIA, YOU WERE

10:02AM  25   GIVEN A TOUR OF THERANOS'S LAB; CORRECT?

10:02AM 1     A.   I THINK I WAS GIVEN A TOUR, YES.

10:02AM 2     Q.   OKAY.  AND ON THE TOUR OF THE LAB IN OCTOBER OF 2014, YOU

10:02AM 3     SAW ONE VERY LARGE MACHINE; CORRECT?

10:02AM 4     A.   I DID SEE ONE VERY LARGE MACHINE, YES.

10:02AM 5     Q.   AND THIS WAS A LARGE MACHINE, NOT ONE OF THE SMALL

10:03AM 6     THERANOS DEVICES; CORRECT?

10:03AM 7     A.   AS I REMEMBER, IT WAS JUST A LONG, LONG, LARGE MACHINE.

10:03AM 8     Q.   LIKE A COMMERCIAL MACHINE OF SOME SORT?

10:03AM 9     A.   IT WAS A LARGE MACHINE.

10:03AM 10    Q.   OKAY.  AND THAT MACHINE WAS REFERRED TO AS A HIGH

10:03AM 11    THROUGHPUT; CORRECT?

10:03AM 12    A.   IT, IT MAY HAVE BEEN.  I DON'T REMEMBER SPECIFICALLY.

10:03AM 13    Q.   OKAY.  NOW, IN THE COURSE OF YOUR MEETINGS WITH

10:03AM 14    MS. HOLMES, YOU REVIEWED THESE MATERIALS, YOU ALSO HAD SOME

10:03AM 15    COMMUNICATIONS WITH DAVID BOIES, DID YOU NOT?

10:03AM 16    A.   YES, I DID.

10:03AM 17    Q.   AND MR. BOIES WAS, AGAIN, A PARTNER OF YOURS AT CRAVATH?

10:03AM 18    A.   HE WAS NOT A PARTNER OF MINE AT THE TIME, BUT HE HAD BEEN

10:03AM 19    A PARTNER, YES.

10:03AM 20    Q.   A FORMER PARTNER?

10:03AM 21    A.   FORMER PARTNER.

10:03AM 22    Q.   AND YOU UNDERSTOOD THAT MR. BOIES WAS DOING LEGAL WORK FOR

10:03AM 23    THERANOS AT THAT TIME?

10:04AM 24    A.   I KNEW HE WAS DOING LEGAL WORK IN CONNECTION WITH

10:04AM 25    THERANOS.

10:04AM  1        I DON'T KNOW WHO HE WAS REPRESENTING PARTICULARLY.

10:04AM  2    Q.   OKAY.  NOW, IS IT CORRECT THAT YOU UNDERSTOOD AT THIS TIME

10:04AM  3    IN THE FALL OF 2014 THAT THERANOS DEVICES, THEIR TESTING

10:04AM  4    ANALYZERS, WERE NOT ACTUALLY IN WALGREENS STORES FOR THE

10:04AM  5    PURPOSE OF PERFORMING THE TESTS?

10:04AM  6    A.   I DID REALIZE THAT THEY WERE NOT CURRENTLY IN THE STORES,

10:04AM  7    YES.

10:04AM  8    Q.   OKAY.  AND SO YOU UNDERSTOOD THAT THE TESTING WAS BEING

10:04AM  9    DONE OFFSITE, NOT IN THE STORES?

10:04AM 10    A.   I DID.

10:04AM 11    Q.   WITHIN THAT SAME BINDER -- ACTUALLY I THINK IT'S ALREADY

10:04AM 12    ADMITTED, 4284.

10:04AM 13        IF WE CAN PUT THAT UP ON THE SCREEN, MR. ALLEN.

10:04AM 14        4284 IS PROBABLY IN BOTH BINDERS.

10:04AM 15    A.   I'VE GOT IT.

10:04AM 16    Q.   OKAY.  AND 4284 IS AN EMAIL CHAIN -- YOU CAN ALSO SEE IT

10:05AM 17    UP ON THE SCREEN -- THE LATTER OF WHICH IS DATED

10:05AM 18    OCTOBER 23RD, 2014.

10:05AM 19        THAT'S A MESSAGE FROM MS. HOLMES TO YOURSELF.

10:05AM 20        DO YOU SEE THAT?

10:05AM 21    A.   I DO.

10:05AM 22    Q.   AND BELOW THAT IS A MESSAGE FROM YOU TO MS. HOLMES, AND

10:05AM 23    THE SUBJECT IS MEETING LAST FRIDAY.

10:05AM 24        DO YOU SEE THAT?

10:05AM 25    A.   I DO SEE THAT.

10:05AM 1     Q.   AND IN THE MESSAGE YOU WROTE TO MS. HOLMES, "IT WAS GOOD

10:05AM 2     TO SEE YOU ON FRIDAY.

10:05AM 3          "OVER THE WEEKEND I HAD A CHANCE TO FILL ANDREAS IN ON THE

10:05AM 4     MEETING."

10:05AM 5          THE REFERENCE TO ANDREAS, IS THAT MR. DRACOPOULOS?

10:05AM 6     A.   YES, IT IS.

10:05AM 7     Q.   AND THEN YOU CONTINUED, "HOWEVER, BEFORE I HAD A CHANCE TO

10:05AM 8     DESCRIBE THE MEETING, ANDREAS STATED THAT HE SUSPECTED THAT

10:05AM 9     THREE FOUNDATION STAFF MEMBERS WHO WERE THERE WITH ME WERE NOT

10:05AM 10    ABLE TO SEE THE TRUE OPPORTUNITY AND INSTEAD WERE FOCUSSED ON

10:05AM 11    DOTTING EVERY 'I' AND CROSSING EVERY 'T.'"

10:06AM 12         DO YOU SEE THAT?

10:06AM 13    A.   I DO SEE THAT.

10:06AM 14    Q.   AND THIS WAS BEING -- THIS WAS REPORTED TO YOU BY

10:06AM 15    MR. DRACOPOULOS?

10:06AM 16    A.   YES, IT WAS.

10:06AM 17    Q.   AND YOU OBSERVED THAT IN THE MEETING; CORRECT?

10:06AM 18    A.   I'M NOT, I'M NOT SURE WHAT I OBSERVED IN THE MEETING.

10:06AM 19    Q.   OKAY.  AND THEN YOU CONTINUED.

10:06AM 20         "NEEDLESS TO SAY, I TOLD HIM THAT WAS EXACTLY HOW IT

10:06AM 21    PROCEEDED.  HE ASKED ME TO APOLOGIZE FOR NOT BEING THERE TO CUT

10:06AM 22    THROUGH THE NONSENSE."

10:06AM 23         DO YOU SEE THAT?

10:06AM 24    A.   I DO SEE THAT.

10:06AM 25    Q.   AND, AGAIN, THAT CAME FROM MR. DRACOPOULOS?

10:06AM 1    A.   YES, IT DID.

10:06AM 2    Q.   "I HAVE TO FIND A WAY FOR THE TWO OF YOU TO MEET.  YOU

10:06AM 3    WOULD ENJOY GETTING TO KNOW HIM AND WOULD UNDOUBTEDLY FIND HIS

10:06AM 4    CANDOR REFRESHING."

10:06AM 5        DO YOU SEE THAT?

10:06AM 6    A.   I SEE THAT.

10:06AM 7    Q.   AND NOW, ULTIMATELY MR. DRACOPOULOS DID INVEST HIMSELF;

10:06AM 8    CORRECT?

10:06AM 9    A.   YES, HE DID.

10:06AM 10   Q.   PERSONALLY?

10:06AM 11   A.   YES.

10:06AM 12   Q.   AND THE FOUNDATION, WHICH WAS REPRESENTED BY THESE OTHER

10:06AM 13   INDIVIDUALS, DECIDED NOT TO INVEST; CORRECT?

10:06AM 14   A.   THAT IS CORRECT.

10:06AM 15   Q.   AND IS IT CORRECT THAT THE REPRESENTATIVES OF THE

10:07AM 16   FOUNDATION HAD QUESTIONS REGARDING FINANCIAL DETAILS; CORRECT?

10:07AM 17   A.   THEY HAD A LOT OF QUESTIONS.

10:07AM 18   Q.   OKAY.  AND NOT ALL OF THOSE QUESTIONS WERE ANSWERED TO

10:07AM 19   THEIR SATISFACTION; IS THAT FAIR?

10:07AM 20   A.   THAT IS CORRECT.

10:07AM 21   Q.   AND MR. DRACOPOULOS INVESTED IN THERANOS BEFORE EVER

10:07AM 22   VISITING AND MEETING MS. HOLMES; IS THAT CORRECT?

10:07AM 23   A.   THAT'S CORRECT.

10:07AM 24   Q.   AND YOU'RE NOT AWARE OF ANY MEETING BETWEEN

10:07AM 25   MR. DRACOPOULOS AND MR. BALWANI; CORRECT?

10:07AM   1    A.   I AM NOT.

10:07AM   2    Q.   NOW, WE CAN PUT UP ON THE SCREEN EXHIBIT 2065.

10:07AM   3         NOW, 2065 IS AN OCTOBER 10, 2014 EMAIL EXCHANGE,

10:08AM   4    MR. MOSLEY, THAT YOU WERE NOT A PARTY TO, INCLUDING

10:08AM   5    CHRISTIAN HOLMES RELATING TO BDT VISITORS TO WAG SATURDAY.

10:08AM   6         DO YOU SEE THAT?

10:08AM   7    A.   THAT'S WHAT IT INDICATES, YES.

10:08AM   8    Q.   AND DO YOU REMEMBER YOU WERE SHOWN THIS EMAIL IN YOUR

10:08AM   9    DIRECT EXAMINATION BY MR. SCHENK?

10:08AM  10         DO YOU RECALL THAT?

10:08AM  11    A.   YES, I WAS.

10:08AM  12    Q.   OKAY.  NOW, MR. MOSLEY, YOU HAVE NO IDEA WHETHER

10:08AM  13    MR. BALWANI AGREED TO ANY OF THE PROPOSALS BY MR. HOLMES

10:08AM  14    REFLECTED IN THE EMAIL; CORRECT?

10:08AM  15    A.   I DO NOT.

10:08AM  16    Q.   OKAY.  AND YOU ALSO HAVE NO IDEA WHETHER ANYTHING

10:08AM  17    REFLECTED IN THE EMAIL ACTUALLY HAPPENED OR TOOK PLACE;

10:08AM  18    CORRECT?

10:08AM  19    A.   I DO NOT.

10:08AM  20    Q.   YOU CAN TAKE THAT DOWN, MR. ALLEN.

10:08AM  21         NOW, MR. MOSLEY, I THINK YOU TESTIFIED YESTERDAY THAT YOU

10:08AM  22    DID NOT ENCOURAGE YOUR CLIENTS TO INVEST IN THERANOS; IS THAT

10:08AM  23    RIGHT?

10:08AM  24    A.   I DID NOT.  I DID TESTIFY TO THAT EFFECT, YES.

10:08AM  25    Q.   OKAY.  AND DOES THAT MEAN THAT YOU YOURSELF DID NOT

10:09AM  1    RECOMMEND TO YOUR CLIENTS THAT THEY INVEST IN THERANOS?

10:09AM  2    A.   THAT IS CORRECT.

10:09AM  3    Q.   IF YOU COULD TAKE A LOOK AT THE BINDER IN FRONT OF YOU,

10:09AM  4    AGAIN, EXHIBIT 14135.  14135.

10:09AM  5    A.   I DON'T SEEM TO HAVE THAT.  I DON'T HAVE AN EXHIBIT WITH

10:09AM  6    THAT NUMBER ON IT.

10:09AM  7              MR. CAZARES:  YOUR HONOR, DOES YOUR HONOR HAVE THE

10:09AM  8    DOCUMENT?

10:09AM  9              THE COURT:  NOT IN MY BINDER.

10:09AM  10             MR. CAZARES:  IS IT POSSIBLE TO SHOW MR. MOSLEY JUST

10:09AM  11   THE SCREEN OF 14135?

10:09AM  12             THE COURT:  DOES THE GOVERNMENT HAVE THIS?

10:09AM  13             MR. SCHENK:  I DO NOT.

10:09AM  14             MR. CAZARES:  HERE (HANDING).  I HAVE ONE COPY.

10:10AM  15             THE COURT:  THIS IS ON DISPLAY FOR THE WITNESS ONLY?

10:10AM  16             MR. CAZARES:  YES.

10:10AM  17        YOUR HONOR, SHOULD I HAND UP A COPY OR DOES YOUR HONOR

10:10AM  18   HAVE THE SCREEN?

10:10AM  19             THE COURT:  I HAVE THE SCREEN AS WELL.

10:10AM  20             MR. CAZARES:  OKAY.  I APOLOGIZE, YOUR HONOR.

10:10AM  21   Q.   HAVE YOU HAD A CHANCE TO LOOK AT THE EXCHANGE, MR. MOSLEY?

10:10AM  22   A.   I HAVE.

10:10AM  23   Q.   OKAY.  THE EXHIBIT 14135 IS AN EMAIL CHAIN, THE LATTER OF

10:10AM  24   WHICH APPEARS TO BE DATED OCTOBER 31, 2014.

10:10AM  25        THAT'S A MESSAGE FROM MS. HOLMES TO YOURSELF.

MOSLEY CROSS BY MR. CAZARES (RES.)                    5353

10:10AM  1          DO YOU SEE THAT?

10:10AM  2     A.   I DO SEE THAT.

10:10AM  3     Q.   AND THEN WITHIN THE CHAIN, THERE'S A PRIOR EXCHANGE

10:10AM  4     BETWEEN YOURSELF AND MR. CHRISTOPHER BOIES.

10:10AM  5          DO YOU SEE THAT?

10:10AM  6     A.   I DO SEE THAT.

10:10AM  7     Q.   AND YOUR EXCHANGE WITH MR. CHRISTOPHER BOIES RELATES TO

10:11AM  8     THAT REDEMPTION RIGHTS ISSUE; CORRECT?

10:11AM  9     A.   YES, IT DOES.

10:11AM 10          MR. CAZARES:  MOVE TO ADMIT 14135, YOUR HONOR.

10:11AM 11          MR. SCHENK:  NO OBJECTION.

10:11AM 12          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:11AM 13     (DEFENDANT'S EXHIBIT 14135 WAS RECEIVED IN EVIDENCE.)

10:11AM 14     BY MR. CAZARES:

10:11AM 15     Q.   NOW, YOU DON'T SEE MR. BALWANI COPIED ON THIS MESSAGE;

10:11AM 16     CORRECT?

10:11AM 17     A.   I DO NOT.

10:11AM 18     Q.   OKAY.  IT'S JUST YOURSELF AND MS. HOLMES IN THE LATTER

10:11AM 19     MESSAGES?

10:11AM 20     A.   AND CHRISTOPHER BOIES.

10:11AM 21     Q.   OKAY.  AND FOCUSSING ON THE SECOND MESSAGE FROM THE TOP

10:11AM 22     FROM YOURSELF TO MR. BOIES, YOU WROTE, "CHRIS,

10:11AM 23     "I AM MORE THAN OKAY WITHOUT IT AND HOPE ELIZABETH DOES

10:11AM 24     NOT THINK IT NECESSARY."

10:11AM 25          THAT'S RELATING TO THE REDEMPTION RIGHTS ISSUE; IS THAT

ER-3983

10:11AM   1    CORRECT?

10:11AM   2    A.   THAT IS CORRECT.

10:11AM   3    Q.   AND THEN I WROTE, "IF I DO NOT HAVE DEEP TRUST AND FAITH

10:11AM   4    IN ELIZABETH, I WOULD NOT BE INVOLVED WITH THERANOS AND

10:12AM   5    RECOMMENDING AN INVESTMENT BY MY CLIENTS."

10:12AM   6         DO YOU SEE THAT?

10:12AM   7    A.   I DO SEE THAT.

10:12AM   8    Q.   AND THOSE ARE YOUR WORDS?

10:12AM   9    A.   THOSE ARE MY WORDS.

10:12AM  10    Q.   THEN YOU WROTE, "I TOLD ELIZABETH EARLY ON THAT I WAS

10:12AM  11    INCREDIBLY APPRECIATIVE TO HAVE AN OPPORTUNITY TO BE INVOLVED

10:12AM  12    WITH HER AND THERANOS AND I FEEL EVEN MORE SO AT THIS POINT."

10:12AM  13         DO YOU SEE THAT?

10:12AM  14    A.   I DO SEE THAT.

10:12AM  15    Q.   YOU CAN SET THAT ASIDE.

10:12AM  16         NOW, MR. MOSLEY, YESTERDAY YOU TESTIFIED THAT YOU DID NOT

10:12AM  17    KNOW THAT THERE WERE SOME TESTS THAT THERANOS COULD NOT YET RUN

10:12AM  18    ON ITS FINGERSTICK TECHNOLOGY; CORRECT?

10:12AM  19    A.   I DID.

10:12AM  20    Q.   OKAY.  NOW -- BUT AT SOME POINT MS. HOLMES TOLD YOU THAT

10:13AM  21    THERANOS COULD NOT DO ALL OF THE TESTS THAT PATIENTS MIGHT

10:13AM  22    ORDER; IS THAT RIGHT?

10:13AM  23    A.   I DON'T REMEMBER.  I DON'T REMEMBER WHETHER SHE TOLD ME,

10:13AM  24    AND IF SHE DID, I DON'T KNOW WHEN SHE WOULD HAVE TOLD ME.

10:13AM  25         BUT CERTAINLY AT THIS POINT I DID NOT KNOW THAT.

10:13AM 1    Q.   AND YOU WERE TOLD BY MS. HOLMES THAT AT VARIOUS TIMES IT

10:13AM 2    COULD NOT DO ALL OF THE TESTS; CORRECT?

10:13AM 3    A.   I WAS NOT TOLD THAT.

10:13AM 4    Q.   OKAY.  IF YOU CAN TAKE OUT THE STATEMENTS BINDER, THERE

10:13AM 5    SHOULD BE A WHITE BINDER THERE WITH -- IT'S VOLUME 2.

10:13AM 6    A.   YOU MEAN FROM THE GOVERNMENT?

10:13AM 7    Q.   FROM THE DEFENSE?

10:13AM 8    A.   I HAVE A VOLUME 2.  IT DOESN'T --

10:13AM 9    Q.   OKAY.

10:13AM 10   A.   -- SAY STATEMENTS, BUT --

10:14AM 11   Q.   LOOK AT EXHIBIT 28040, 28040.

10:14AM 12   A.   I HAVE IT.

10:14AM 13   Q.   AND GO TO PAGE 134.

10:14AM 14        YOUR HONOR, 134 AT LINES 16 TO 23.

10:14AM 15        DO YOU SEE THAT, MR. MOSLEY?

10:14AM 16   A.   I DO.

10:14AM 17        MR. CAZARES:  YOUR HONOR, I'D LIKE TO PUBLISH.

10:14AM 18        THE COURT:  WHY DON'T YOU LAY A FOUNDATION FOR HIM?

10:14AM 19        MR. CAZARES:  YES, YOUR HONOR.

10:14AM 20   Q.   MR. MOSLEY, YOU TESTIFIED YESTERDAY THAT YOU RECALL

10:14AM 21   TESTIFYING IN A DEPOSITION RELATING TO THERANOS A COUPLE OF

10:14AM 22   YEARS AGO; CORRECT?

10:14AM 23   A.   YES, I DID.

10:14AM 24   Q.   AND IN THE DEPOSITION, OF COURSE, YOU SWORE TO TELL THE

10:14AM 25   TRUTH; CORRECT?

10:14AM   1        A.   I DID.

10:14AM   2        Q.   AND YOU DID YOUR BEST TO TELL THE TRUTH AT THE TIME;

10:14AM   3    CORRECT?

10:14AM   4        A.   I DID.

10:15AM   5        Q.   AND WHAT YOU'RE LOOKING AT HERE IN THE TRANSCRIPT, THIS IS

10:15AM   6    A TRANSCRIPT FROM YOUR DEPOSITION; CORRECT?

10:15AM   7        A.   YES.

10:15AM   8        Q.   OKAY.

10:15AM   9             YOUR HONOR, I'D LIKE TO PUBLISH.

10:15AM  10                  THE COURT:   LINES?

10:15AM  11                  MR. CAZARES:   16 TO 23, AND THAT'S ALL.

10:15AM  12                  THE COURT:   ALL RIGHT.

10:15AM  13                  MR. CAZARES:   THANK YOU, YOUR HONOR.

10:15AM  14        Q.   SO, MR. MOSLEY, FROM YOUR DEPOSITION YOU'LL SEE THE

10:15AM  15    QUESTION PUT TO YOU AT THE TIME WAS:   "SO AT SOME POINT

10:15AM  16    ELIZABETH TOLD YOU THAT THERANOS COULDN'T DO ALL OF THE TESTS

10:15AM  17    THAT PATIENTS MIGHT ORDER; IS THAT RIGHT?"

10:15AM  18             DO YOU SEE THAT?

10:15AM  19        A.   I DO SEE THAT.

10:15AM  20        Q.   AND THEN YOU ANSWER:   "I BELIEVE I WAS TOLD THAT AT

10:15AM  21    THAT -- AT VARIOUS TIMES IT COULD NOT DO ALL THE TESTS."

10:15AM  22             DO YOU SEE THAT?

10:15AM  23        A.   YES, I DO.

10:15AM  24        Q.   AND THOSE ARE YOUR WORDS?

10:15AM  25        A.   THOSE ARE MY WORDS.

10:16AM  1    Q.   YOU CAN TAKE THAT DOWN.

10:16AM  2         JUST ONE MOMENT, YOUR HONOR.

10:16AM  3         MAY I HAVE A MOMENT TO CONFER, YOUR HONOR?

10:16AM  4              THE COURT:  YES.

10:16AM  5         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:16AM  6              MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

10:16AM  7         THANK YOU, MR. MOSLEY.

10:16AM  8              THE COURT:  REDIRECT.

10:16AM  9                      **REDIRECT EXAMINATION**

10:17AM 10    BY MR. SCHENK:

10:17AM 11    Q.   GOOD MORNING, MR. MOSLEY.

10:17AM 12    A.   GOOD MORNING.

10:17AM 13    Q.   I WANT TO FOLLOW UP ON JUST TWO LINES OF QUESTIONING THAT

10:17AM 14    THE DEFENSE COVERED WITH YOU ON CROSS-EXAMINATION.

10:17AM 15         THE FIRST -- IF WE COULD BRING UP EXHIBIT 3387.

10:17AM 16         YOUR HONOR, THIS WAS ADMITTED PREVIOUSLY.

10:17AM 17         AND PAGE 280.

10:17AM 18              THE COURT:  YES.

10:17AM 19              MR. SCHENK:  THANK YOU.

10:17AM 20    Q.   MR. MOSLEY, DO YOU RECALL THIS BEING ONE OF THE SLIDES

10:17AM 21    THAT WAS LOCATED WITHIN THE BINDER OF MATERIAL THAT YOU

10:17AM 22    RECEIVED FROM MS. HOLMES UNDER THE COVER LETTER THAT YOU AND I

10:17AM 23    DISCUSSED?

10:17AM 24    A.   YES, I DO.

10:17AM 25    Q.   AND MR. CAZARES JUST SHOWED YOU SOME PRIOR TESTIMONY ABOUT

10:17AM  1     THIS ISSUE OF SORT OF KNOWING THE NUMBER OF TESTS THAT THERANOS

10:17AM  2     WAS CAPABLE OF RUNNING.

10:17AM  3          DO YOU RECALL THAT LINE OF QUESTIONING?

10:17AM  4     A.   I DO.

10:17AM  5     Q.   DID THE MATERIAL THAT YOU REVIEWED BEFORE MAKING A

10:17AM  6     DISCUSSION TO INVEST INFORM YOU THAT THERANOS COULD RUN

10:18AM  7     COMPREHENSIVE TESTS?

10:18AM  8     A.   YES, IT DID.

10:18AM  9     Q.   EXPLAIN TO THE JURY THEN, IF YOU WOULD, WHAT YOUR

10:18AM 10     UNDERSTANDING WAS REGARDING THE CURRENT TESTING CAPABILITY OF

10:18AM 11     THERANOS BEFORE YOU MADE A DECISION TO INVEST?

10:18AM 12     A.   YOU KNOW, IT WAS MY UNDERSTANDING THAT IT COULD RUN ALL OF

10:18AM 13     THE TESTS THAT WERE NORMALLY PERFORMED BY VARIOUS LABS.

10:18AM 14          SO IT WAS CAPABLE OF RUNNING THE FULL SET OF TESTS THAT

10:18AM 15     LABS WERE RUNNING.

10:18AM 16     Q.   AND THIS WAS WITHIN THE BINDER OF MATERIAL THAT YOU

10:18AM 17     RECEIVED; IS THAT CORRECT?

10:18AM 18     A.   THAT IS CORRECT.

10:18AM 19     Q.   AND I WANT TO TALK JUST BRIEFLY WITH YOU ABOUT THE SOURCES

10:18AM 20     OF INFORMATION, THAT SORT OF THE BUCKET OF INFORMATION THAT YOU

10:18AM 21     HAD WHEN YOU MADE THE DECISION TO INVEST AT THE END OF OCTOBER.

10:18AM 22     A.   RIGHT.

10:18AM 23     Q.   WAS THE BINDER OF MATERIAL AMONG THE INFORMATION THAT YOU

10:18AM 24     RELIED ON WHEN YOU MADE THE INVESTMENT DECISION?

10:18AM 25     A.   ABSOLUTELY.

10:18AM  1    Q.   AND THEN YOU COVERED WITH MR. CAZARES TWO IN-PERSON

10:18AM  2    MEETINGS IN PALO ALTO IN OCTOBER.

10:19AM  3    A.   YES.

10:19AM  4    Q.   WAS THE CONTENT OF THOSE MEETINGS AS WELL A SOURCE OF

10:19AM  5    INFORMATION WHEN YOU DECIDED TO INVEST?

10:19AM  6    A.   YES, ABSOLUTELY.

10:19AM  7    Q.   AND WAS MS. HOLMES PRESENT FOR THOSE TWO MEETINGS?

10:19AM  8    A.   YES, SHE WAS.

10:19AM  9    Q.   AND WAS MR. BALWANI PRESENT FOR THOSE TWO MEETINGS?

10:19AM  10   A.   YES, HE WAS.

10:19AM  11   Q.   YOU ALSO LOOKED AT A DOCUMENT -- I DON'T HAVE A COPY TO

10:19AM  12   SHOW YOU, I DON'T THINK YOU HAVE A COPY -- IF YOU COULD DO IT

10:19AM  13   FROM MEMORY, IT WAS 14135, THE ONE WITH CHRISTOPHER BOIES.

10:19AM  14   A.   YES.

10:19AM  15   Q.   YOU RECALL YOU USED THE PHRASE "RECOMMENDING INVESTMENT"?

10:19AM  16   A.   YES.

10:19AM  17   Q.   DO YOU RECALL THAT?

10:19AM  18   A.   YES, I DID.

10:19AM  19   Q.   AND SO I THINK YOU TESTIFIED, BOTH ON DIRECT AND CROSS,

10:19AM  20   THAT YOU DID NOT RECOMMEND AN INVESTMENT TO YOUR CLIENTS, AN

10:19AM  21   INVESTMENT IN THERANOS TO YOUR CLIENTS.

10:19AM  22       DO YOU RECALL THAT TESTIMONY?

10:19AM  23   A.   YES, I DO.

10:19AM  24   Q.   BUT IN THAT EMAIL WE SAW THE WORD "RECOMMENDING."

10:19AM  25   A.   RIGHT.

10:19AM  1     Q.   EXPLAIN WHAT IS GOING ON HERE?

10:19AM  2     A.   YOU KNOW, OBVIOUSLY IT WASN'T A GOOD USE OF WORDS BECAUSE

10:19AM  3     I THINK, AS I'VE TESTIFIED, VARIOUS OF MY CLIENTS HAD BEEN

10:19AM  4     INTRODUCED TO THERANOS AND TO ELIZABETH HOLMES, AND THEY WERE

10:20AM  5     OFF DOING THEIR OWN DUE DILIGENCE AS EVIDENCED BY ALL OF THE

10:20AM  6     OTHER EMAILS ABOUT THEIR TRIPS OUT THERE.

10:20AM  7          YOU KNOW, CLEARLY I WAS DISCUSSING THERANOS WITH THOSE

10:20AM  8     CLIENTS.  THEY WERE GOOD CLIENTS, AND PEOPLE I KNEW WELL, SO I

10:20AM  9     WAS CLEARLY DISCUSSING IT WITH THEM.

10:20AM 10          BUT, YOU KNOW, I'M A LAWYER.  I'M NOT AN INVESTMENT

10:20AM 11     ADVISOR.

10:20AM 12          I DON'T THINK ANY RECOMMENDATION I WOULD MAKE WOULD -- I

10:20AM 13     WOULD NOT MAKE A RECOMMENDATION ON AN INVESTMENT.

10:20AM 14     Q.   THANK YOU.

10:20AM 15          SO, BOTTOM LINE, DID YOU RECOMMEND THAT YOUR CLIENTS

10:20AM 16     INVEST IN THERANOS?

10:20AM 17     A.   I DID NOT.

10:20AM 18     Q.   THANK YOU.

10:20AM 19          NO FURTHER QUESTIONS, YOUR HONOR.

10:20AM 20               THE COURT:  RECROSS?

10:20AM 21               MR. CAZARES:  NO.  THANK YOU, YOUR HONOR.

10:20AM 22               THE COURT:  MAY THIS WITNESS BE EXCUSED?

10:20AM 23               MR. CAZARES:  YES, YOUR HONOR.

10:20AM 24               MR. SCHENK:  YES, YOUR HONOR.

10:20AM 25               THE COURT:  THANK YOU, SIR.  YOU MAY BE EXCUSED.

5361

| | | |
|---|---|---|
| 10:20AM | 1 | THE WITNESS: THANK YOU. I APPRECIATE IT. |
| 10:20AM | 2 | THE COURT: YOU'RE WELCOME. |
| 10:21AM | 3 | DOES THE GOVERNMENT HAVE AN ADDITIONAL WITNESS TO CALL? |
| 10:21AM | 4 | MR. BOSTIC: YES, YOUR HONOR. |
| 10:21AM | 5 | THE UNITED STATES CALLED ALAN EISENMAN. |
| 10:21AM | 6 | THE COURT: SIR, IF YOU WOULD COME FORWARD AND STAND |
| 10:21AM | 7 | JUST THERE WHILE YOU FACE OUR COURTROOM DEPUTY WITH YOUR RIGHT |
| 10:22AM | 8 | HAND RAISED, SHE HAS A QUESTION FOR YOU. |
| 10:22AM | 9 | **(GOVERNMENT'S WITNESS, ALAN EISENMAN, WAS SWORN.)** |
| 10:22AM | 10 | THE WITNESS: YES, I DO. |
| 10:22AM | 11 | THE CLERK: THANK YOU. |
| 10:22AM | 12 | THE WITNESS: YOU'RE WELCOME. |
| 10:22AM | 13 | THE COURT: PLEASE HAVE A SEAT HERE, SIR, AND MAKE |
| 10:22AM | 14 | YOURSELF COMFORTABLE. |
| 10:22AM | 15 | FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU |
| 10:22AM | 16 | NEED. |
| 10:22AM | 17 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 10:22AM | 18 | AND THEN SPELL IT, PLEASE. |
| 10:22AM | 19 | THE WITNESS: MASK ON OR OFF? |
| 10:22AM | 20 | THE COURT: ARE YOU FULLY VACCINATED, SIR? |
| 10:22AM | 21 | THE WITNESS: I AM. |
| 10:22AM | 22 | THE COURT: YOU MAY TAKE IT OFF. |
| 10:22AM | 23 | THE WITNESS: THANK YOU. |
| 10:22AM | 24 | ALAN JAY EISENMAN. |
| 10:22AM | 25 | THE COURT: AND IF YOU WOULD SPELL IT, PLEASE. |

ER-3991

EISENMAN DIRECT BY MR. BOSTIC                                    5362

10:22AM  1              THE WITNESS:  A-L-A-N, J-A-Y, E-I-S-E-N-M-A-N.

10:22AM  2              THE COURT:  THANK YOU.  COUNSEL.

10:23AM  3              MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:23AM  4                      **DIRECT EXAMINATION**

10:23AM  5      BY MR. BOSTIC:

10:23AM  6      Q.   GOOD MORNING, MR. EISENMAN.

10:23AM  7      A.   GOOD MORNING.

10:23AM  8              MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

10:23AM  9              THE COURT:  YES.

10:23AM 10              MR. BOSTIC:  (HANDING.)

10:23AM 11      Q.   MR. EISENMAN, I'VE JUST HANDED YOU A DOCUMENT OF SOME

10:23AM 12      MATERIALS THAT I WOULD LIKE TO DISCUSS WITH YOU THIS MORNING.

10:23AM 13              BUT FIRST LET ME ASK YOU SOME PRELIMINARY QUESTIONS.

10:23AM 14              WERE YOU AT ONE TIME AN INVESTOR IN A COMPANY CALLED

10:23AM 15      THERANOS?

10:23AM 16      A.   YES.

10:23AM 17      Q.   LET ME GET SOME BACKGROUND ABOUT YOU BEFORE WE TALK ABOUT

10:23AM 18      YOUR DEALINGS WITH THE COMPANY.

10:23AM 19              FIRST OF ALL, WHERE DO YOU LIVE?

10:23AM 20      A.   HOUSTON, TEXAS.

10:23AM 21      Q.   AND ARE YOU CURRENTLY EMPLOYED?

10:23AM 22      A.   I'M NOT.

10:23AM 23      Q.   WHEN YOU WERE EMPLOYED, WHAT WAS YOUR PROFESSION?

10:23AM 24      A.   EARLY IN MY CAREER I DID SOME ESTATE AND TAX LEGAL WORK; I

10:23AM 25      DID SOME ACCOUNTING WORK.

EISENMAN DIRECT BY MR. BOSTIC                    5363

```
10:23AM   1              LATER IN MY CAREER I GOT A SERIES 7 AND BECAME A WEALTH

10:23AM   2     MANAGER AND WAS INVOLVED IN SECURITIES WITH CLIENTS WITH

10:24AM   3     INVESTMENTS, PUBLIC -- I'M SORRY, PUBLIC INVESTMENTS WITH

10:24AM   4     CLIENTS.

10:24AM   5     Q.   AND WERE YOU AN INVESTMENT ADVISOR?

10:24AM   6     A.   NO, I WAS NOT AN RIA, REGISTERED INVESTMENT ADVISOR, BUT I

10:24AM   7     WAS A CFP, A CERTIFIED FINANCIAL PLANNER.

10:24AM   8     Q.   AND WHEN DID YOU RETIRE FROM THAT WORK?

10:24AM   9     A.   ABOUT FIVE OR SIX YEARS AGO.

10:24AM  10     Q.   CAN YOU GIVE US A BRIEF SUMMARY OF YOUR EDUCATIONAL

10:24AM  11     BACKGROUND BEFORE YOU STARTED WORKING IN THOSE ROLES?

10:24AM  12     A.   SURE.

10:24AM  13              I DID MY UNDERGRADUATE WORK AT UNIVERSITY OF TEXAS AT

10:24AM  14     AUSTIN.

10:24AM  15              MY DEGREE WAS IN A PROGRAM CALLED PLAN 2, WHICH IS A

10:24AM  16     LIBERAL ARTS HONORS PROGRAM, AND IT WAS PRIMARILY FOR PEOPLE

10:24AM  17     WHO WERE DOING PRELAW, PREMED.

10:24AM  18              I WAS PRELAW AT THE TIME.

10:24AM  19              I WENT TO LAW SCHOOL IN 1977 TO 1980 AT UNIVERSITY OF

10:24AM  20     HOUSTON LAW SCHOOL.

10:24AM  21              THAT THE EXTENT OF MY EDUCATION.

10:24AM  22     Q.   AND YOU MENTIONED THAT YOU HAD DONE SOME LEGAL WORK.  DID

10:25AM  23     YOU EVER PRACTICE AS A LAWYER?

10:25AM  24     A.   YES, I DID.

10:25AM  25     Q.   AND APPROXIMATELY FOR HOW LONG?
```

EISENMAN DIRECT BY MR. BOSTIC                    5364

10:25AM  1    A.   JUST MY FIRST FEW YEARS OUT OF LAW SCHOOL I DID SOME

10:25AM  2    ESTATE PLANNING AND TAX WORK, TRUSTS, WILLS, TAX RETURNS.

10:25AM  3         BY THE WAY, MY FIRST YEAR OUT OF LAW SCHOOL, I DID A YEAR

10:25AM  4    OF TAX WORK AT COOPERS & LYBRAND.  THEY WERE WHAT WAS CALLED

10:25AM  5    THE BIG EIGHT ACCOUNTING FIRMS.  THAT WAS ONE OF THE BIG EIGHT

10:25AM  6    ACCOUNTING FIRMS.

10:25AM  7    Q.   AND IN THAT ROLE, WERE YOU WORKING AS AN ACCOUNTANT?

10:25AM  8    A.   I WAS WORKING AS AN ACCOUNTANT, BUT NOT A CPA, BECAUSE THE

10:25AM  9    REQUIREMENT IN TEXAS IS THAT YOU HAD TO HAVE A YEAR OF

10:25AM 10    EXPERIENCE BEFORE YOU COULD SIT FOR THE CPA EXAM.

10:25AM 11    Q.   DID YOU EVER BECOME A CPA?

10:25AM 12    A.   I DID.

10:25AM 13    Q.   IN THE 2005, 2006 TIME PERIOD, WHERE WERE YOU EMPLOYED?

10:25AM 14    A.   I WAS SELF-EMPLOYED AT THAT TIME PERIOD.

10:26AM 15    Q.   AND WHAT KIND OF WORK WERE YOU DOING IN 2005, 2006?

10:26AM 16    A.   I WAS PRIMARILY INVESTING IN LISTED SECURITIES FOR

10:26AM 17    CLIENTS.

10:26AM 18    Q.   IN ADDITION TO THAT, DID YOU ALSO ENGAGE IN SOME

10:26AM 19    INVESTMENT ACTIVITY OF PERSONAL OR FAMILY MONEY?

10:26AM 20    A.   YES, I DID.

10:26AM 21    Q.   AND WHEN DID YOU FIRST BECOME AWARE OF A COMPANY CALLED

10:26AM 22    THERANOS?

10:26AM 23    A.   IT WAS IN THAT 2005, 2006 PERIOD.

10:26AM 24    Q.   PRIOR TO THAT TIME PERIOD, HAD YOU HAD ANY EXPERIENCE IN

10:26AM 25    INVESTING IN SCIENCE OR BIOTECHNOLOGY COMPANIES?

10:26AM  1    A.   NO.

10:26AM  2    Q.   AND HOW DID YOU FIRST HEAR ABOUT THERANOS?

10:26AM  3    A.   I HAD A FRIEND THAT WAS THE WEALTH MANAGER FOR ELIZABETH'S

10:26AM  4    PARENTS AND THEY WERE DOING AN EARLY ROUND.  THIS WAS THEIR

10:27AM  5    SECOND SEED ROUND.

10:27AM  6         HE HAD PARTICIPATED IN THE FIRST, AND HE HAD A GROUP OF

10:27AM  7    FRIENDS THAT WERE INVESTING IN THE EARLY SEED ROUNDS.

10:27AM  8    Q.   AND JUST TO FOLLOW UP ON TWO THINGS.

10:27AM  9         YOU SAID ELIZABETH.  ARE YOU REFERRING TO

10:27AM  10   ELIZABETH HOLMES?

10:27AM  11   A.   YES.

10:27AM  12   Q.   AND YOU SAID THAT AT THE TIME THAT YOU UNDERSTOOD THE

10:27AM  13   COMPANY WAS DOING A ROUND.

10:27AM  14        CAN YOU EXPLAIN WHAT THAT MEANS?

10:27AM  15   A.   YES.  COMPANIES HAVE TO DO FUND RAISING TO EXIST, AND THEY

10:27AM  16   HAD RAISED MONEY I BELIEVE IN 2004.  I WASN'T AWARE OF THE

10:27AM  17   COMPANY AT THAT POINT.

10:27AM  18        BUT THEY WERE DOING A SECOND ROUND, RAISING MORE MONEY TO

10:27AM  19   GIVE THEM MORE WHAT IS CALLED RUNWAY.  IT GIVES THEM MORE TIME

10:27AM  20   TO DEVELOP.

10:27AM  21        AND I WAS MADE AWARE OF THE COMPANY AND INVESTED IN THE

10:27AM  22   SECOND ROUND IN 2006.

10:27AM  23   Q.   BEFORE YOU INVESTED IN THERANOS IN 2006, DID YOU HAVE THE

10:27AM  24   OPPORTUNITY TO HAVE ANY CONVERSATIONS WITH ELIZABETH HOLMES?

10:27AM  25   A.   YES, I DID.

10:27AM  1    Q.   AND WHAT DO YOU RECALL ABOUT THOSE CONVERSATIONS

10:28AM  2    GENERALLY?

10:28AM  3    A.   AT THE TIME --

10:28AM  4         MS. WALSH:  OBJECTION, YOUR HONOR.  THIS GOES -- WE

10:28AM  5    PREVIOUSLY DISCUSSED THIS, THIS TIME PERIOD THAT IS OUTSIDE OF

10:28AM  6    THE RELEVANT TIME PERIOD.

10:28AM  7         WE HAVE -- WE WILL BE OBJECTING TO THOSE QUESTIONS, OR

10:28AM  8    MAYBE WE CAN LODGE A STANDING OBJECTION TO THIS TIME PERIOD.

10:28AM  9         THE COURT:  ALL RIGHT.  THANK YOU.

10:28AM 10    MR. BOSTIC, IS THIS FOUNDATIONAL?

10:28AM 11         MR. BOSTIC:  IT IS, YOUR HONOR.

10:28AM 12    I THINK ALL OF THE INFORMATION THAT HE GAINED LEADING UP

10:28AM 13    TO THE SECOND INVESTMENT THAT WE'RE GOING TO TALK ABOUT IS

10:28AM 14    RELEVANT TO HIS DECISION MAKING.

10:28AM 15         THE COURT:  THE OBJECTION IS NOTED.  IT'S OVERRULED.

10:28AM 16    AND THIS IS FOUNDATIONAL FOR SUBSEQUENT CONDUCT.

10:28AM 17         MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:28AM 18         THE COURT:  SO WHY DON'T YOU ASK THE QUESTION AGAIN?

10:28AM 19    BY MR. BOSTIC:

10:28AM 20    Q.   THE QUESTION WAS, MR. EISENMAN, YOU REFERRED TO

10:28AM 21    CONVERSATIONS THAT YOU HAD WITH MS. HOLMES AROUND THE TIME OF

10:28AM 22    THAT 2006 INVESTMENT.

10:28AM 23         DO YOU RECALL THOSE CONVERSATIONS?

10:28AM 24    A.   I DO, YES.

10:28AM 25    Q.   AND GENERALLY SPEAKING, WHAT DID MS. HOLMES TELL YOU ABOUT

10:28AM 1      THERANOS AT THAT TIME?

10:28AM 2      A.   SHE TOLD ME THAT THEY CURRENTLY HAD CONTRACTS WITH FOUR

10:29AM 3      MAJOR INTERNATIONAL PHARMACEUTICAL COMPANIES.

10:29AM 4           SHE TOLD ME THAT THEY WERE GOING TO HAVE SIGNIFICANCE

10:29AM 5      REVENUE GROWTH OVER THE NEXT TWO YEARS, I BELIEVE IT WAS

10:29AM 6      SOMEWHERE IN THE NEIGHBORHOOD OF 40 TO $50 MILLION IN REVENUE

10:29AM 7      THE VERY NEXT YEAR AFTER THIS ROUND, AND SHE ANTICIPATED $200

10:29AM 8      TO $300 MILLION IN REVENUE THE SECOND YEAR AFTER THIS ROUND.

10:29AM 9           SHE ALSO SAID THAT LARRY ELLISON, WHO WAS A CREDIBLE

10:29AM 10     BUSINESS PERSON, WAS HER ADVISOR, WAS INVESTING IN THESE

10:29AM 11     ROUNDS, AND THAT HE WAS ONE OF HER MENTORS.

10:29AM 12     Q.   AND AROUND THAT TIME PERIOD, DID YOU CONTINUE TO HAVE

10:29AM 13     ADDITIONAL CONVERSATIONS WITH MS. HOLMES?

10:29AM 14     A.   YES.

10:29AM 15     Q.   HOW ACCESSIBLE WAS MS. HOLMES TO YOU AROUND THAT TIME

10:29AM 16     PERIOD?

10:29AM 17     A.   VERY ACCESSIBLE.

10:29AM 18          FOR THE FIRST TWO OR THREE YEARS, WE SCHEDULED AND HAD A

10:30AM 19     QUARTERLY UPDATE CALL.  SOMETIMES IT WAS ME.  SOMETIMES IT WAS

10:30AM 20     OUR GROUP OF HOUSTON INVESTORS.

10:30AM 21          OCCASIONALLY THERE WOULD BE AN ISSUE WHERE WE WOULD REACH

10:30AM 22     OUT TO HER IN ADDITION TO THE QUARTERLY CALLS, AND SHE WAS VERY

10:30AM 23     ACCESSIBLE.

10:30AM 24     Q.   AND HOW DID YOU CONTACT MS. HOLMES?  WHAT CONTACT

10:30AM 25     INFORMATION DID YOU HAVE FOR HER?

10:30AM  1    A.   WE HAD HER PERSONAL CELL NUMBER.

10:30AM  2    Q.   AND, GENERALLY SPEAKING, WAS SHE RESPONSIVE TO YOUR

10:30AM  3    INQUIRIES DURING THAT TIME PERIOD?

10:30AM  4    A.   YES, SHE WAS.

10:30AM  5    Q.   WHAT CAN YOU TELL ME ABOUT, FROM YOUR CONVERSATIONS WITH

10:30AM  6    MS. HOLMES, WHAT WAS YOUR UNDERSTANDING OF THE BUSINESS THAT

10:30AM  7    THE COMPANY WAS IN AND WHAT KIND OF TECHNOLOGY THE COMPANY HAD?

10:30AM  8         AND THIS IS, AGAIN, BACK IN THE 2006 TIMEFRAME.

10:30AM  9    A.   THEY HAD A TECHNOLOGY THAT WOULD TAKE A MUCH SMALLER

10:30AM  10   SAMPLE OF BLOOD THAN CONVENTIONAL TECHNOLOGY, COULD RUN A

10:30AM  11   MULTIPLE OF TESTS AT THE SAME TIME, AND GET RESULTS BACK WITHIN

10:30AM  12   A PERIOD OF HOURS.

10:30AM  13   Q.   AND FROM YOUR DISCUSSIONS WITH MS. HOLMES, WHAT DID YOU

10:31AM  14   UNDERSTAND ABOUT THE STATE OF THE TECHNOLOGY, HOW FAR ALONG IT

10:31AM  15   WAS?

10:31AM  16   A.   WE UNDERSTOOD THAT THE TECHNOLOGY WORKED AT THE EARLY

10:31AM  17   STAGE; THAT IT WAS BEING ACCEPTED IN THE MARKETPLACE.

10:31AM  18        THERE WAS SOME TESTING GOING ON WITH PHARMACEUTICAL

10:31AM  19   COMPANIES.  IT WAS BEING USED FOR BLOOD TESTING, BLOOD DOSING,

10:31AM  20   CHECKING ADVERSE REACTIONS WHEN YOU HAVE MULTIPLE PRODUCTS IN A

10:31AM  21   BODY.

10:31AM  22   Q.   WHAT WAS YOUR UNDERSTANDING ABOUT ANY DEVELOPMENT THAT

10:31AM  23   STILL HAD TO HAPPEN WITH THE TECHNOLOGY, IF YOU HAD AN

10:31AM  24   UNDERSTANDING?

10:31AM  25   A.   YEAH.  WELL, LIKE ANYTHING ELSE, LIKE THE IPHONE OR

10:31AM  1    ANYTHING ELSE, IT WAS AN EARLY STAGE, BUT APPARENTLY IT WAS AT

10:31AM  2    A STAGE WHERE IT WAS SUCCESSFUL IN WORKING, BUT IT WAS GOING TO

10:31AM  3    BE DEVELOPED AND IMPROVED.

10:31AM  4    Q.   AND AS AN INVESTOR LOOKING INTO A COMPANY LIKE THIS, WAS

10:31AM  5    THE STATE OF THE TECHNOLOGY AN IMPORTANT FACT FOR YOU?

10:32AM  6    A.   YES.

10:32AM  7    Q.   HOW DID YOUR UNDERSTANDING THAT THIS WAS EARLY STAGE

10:32AM  8    TECHNOLOGY AFFECT YOUR VIEW OF THE RISK OF THE INVESTMENT?

10:32AM  9    A.   UM, FOR AN EARLY STAGE COMPANY, I ASSESSED THE RISK BEING

10:32AM 10    LOWER THAN MOST EARLY STAGE COMPANIES BECAUSE THEY HAD A

10:32AM 11    TECHNOLOGY, IT HAD MARKET ACCEPTANCE, IT WAS BEING USED BY FOUR

10:32AM 12    INTERNATIONAL PHARMACEUTICAL COMPANIES.

10:32AM 13         THERE WAS THE CREDIBLE BOARD MEMBER ADVISOR,

10:32AM 14    LARRY ELLISON.

10:32AM 15         AND IN THAT EARLY CONVERSATION BEFORE WE MADE OUR FIRST

10:32AM 16    INVESTMENT, A PROJECTION OF $200 TO $300 MILLION IN REVENUES,

10:32AM 17    ONLY TWO YEARS AFTER WE WERE PUTTING -- MAKING OUR INVESTMENT.

10:32AM 18         AND THE WHOLE VALUE OF THE COMPANY AT THIS STAGE WAS

10:32AM 19    $150 MILLION, AND IN TWO YEARS WE WERE UNDER THE IMPRESSION,

10:33AM 20    FROM OUR CONVERSATION WITH ELIZABETH, THAT SHE THOUGHT THEY

10:33AM 21    WERE GOING TO GENERATE $200 TO $300 MILLION IN REVENUES IN TWO

10:33AM 22    YEARS.  THAT WAS A VERY, VERY RARE INVESTMENT OPPORTUNITY.

10:33AM 23    Q.   YOU'RE TALKING ABOUT FACTS YOU BELIEVED TO BE TRUE AT THE

10:33AM 24    TIME ABOUT THE COMPANY?

10:33AM 25    A.   YES.

EISENMAN DIRECT BY MR. BOSTIC                                    5370

10:33AM  1    Q.   AND WHAT WAS YOUR SOURCE OF INFORMATION ABOUT THE COMPANY

10:33AM  2    DURING THIS TIME PERIOD?

10:33AM  3    A.   ELIZABETH HOLMES.

10:33AM  4    Q.   DURING YOUR CONVERSATIONS WITH MS. HOLMES, DID YOU TAKE

10:33AM  5    NOTES?

10:33AM  6    A.   I DID.

10:33AM  7    Q.   AND HAVE YOU REVIEWED THOSE NOTES SUBSEQUENT, IN BETWEEN

10:33AM  8    WHEN THOSE CONVERSATIONS HAPPENED AND TESTIFYING TODAY?

10:33AM  9    A.   YES, I HAVE.

10:33AM  10   Q.   DO YOU REMEMBER MS. HOLMES TELLING YOU DURING THAT TIME

10:33AM  11   PERIOD ANYTHING ABOUT THE COMPANY AND ITS PROFITABILITY?

10:33AM  12   A.   WHICH TIME PERIOD?  ARE YOU TALKING ABOUT BEFORE MY FIRST

10:33AM  13   INVESTMENT OR THE 2006, '07, '08?

10:34AM  14   Q.   LET'S TALK GENERALLY ABOUT THE 2006 TO 2008 TIME PERIOD.

10:34AM  15   A.   OKAY.  YES, I DO.

10:34AM  16        I RECALL THAT THEY HAD ONE ANNUAL MEETING IN THE WHOLE

10:34AM  17   HISTORY OF THE COMPANY THAT I TOOK NOTES, AND IN THAT ANNUAL

10:34AM  18   MEETING THEY WERE DOING SOME MULTIPLE TESTS WITH BRISTOL MYERS

10:34AM  19   I REMEMBER, QUOTE-UNQUOTE; THE TESTS WERE FLAWLESS, IT WAS LIKE

10:34AM  20   A 747 TAKING OFF.

10:34AM  21        THERE WAS AN IMPRESSION AFTER THAT ANNUAL MEETING, THE

10:34AM  22   YEAR OR SO AFTER WE INVESTED, THAT THEY WERE GAINING MARKET

10:34AM  23   ACCEPTANCE.

10:34AM  24        THE OTHER THING THAT CAME FROM THAT MEETING AND OTHER

10:34AM  25   CONVERSATIONS WAS THAT THEY WERE ALSO CAPTURING VALUABLE DATA

ER-4000

EISENMAN DIRECT BY MR. BOSTIC                                    5371

10:34AM  1    DOING THESE STUDIES WITH PHARMACEUTICAL COMPANIES, AND THEY

10:34AM  2    WERE GOING TO HAVE A SECOND SOURCE OF REVENUE, NOT ONLY THE

10:34AM  3    TESTING ITSELF, BUT THE DATA THAT THEY WERE CAPTURING, THEY

10:34AM  4    WOULD BE ABLE TO SELL THAT AND THAT WOULD POTENTIALLY BE

10:34AM  5    ANOTHER EQUAL SOURCE OF REVENUE.

10:34AM  6    Q.   AND I THINK I FORGOT TO ASK YOU, WHEN YOU DID INVEST IN

10:34AM  7    2006, WHAT WAS THE APPROXIMATE AMOUNT OF THAT INVESTMENT?

10:34AM  8    A.   ABOUT $1,200,000.

10:35AM  9    Q.   IN THE TIME PERIOD WE'RE TALKING ABOUT FOLLOWING THAT

10:35AM  10   FIRST INVESTMENT, APPROXIMATELY HOW FREQUENTLY DID YOU HAVE

10:35AM  11   CALLS WITH MS. HOLMES?

10:35AM  12   A.   I'M SORRY, IN WHICH TIME PERIOD?

10:35AM  13   Q.   SO FOLLOWING YOUR 2006 INVESTMENT.  SO LET'S TALK ABOUT

10:35AM  14   2006 THROUGH 2010.

10:35AM  15   A.   WE WOULD HAVE QUARTERLY UPDATE CALLS, FOR THE FIRST TWO OR

10:35AM  16   THREE YEARS, EVERY QUARTER.  AND OCCASIONALLY WE WOULD REACH

10:35AM  17   OUT TO HER AND GET AN UPDATE ON SOMETHING THAT CAME TO OUR

10:35AM  18   ATTENTION.

10:35AM  19        AND THEN THERE WAS ALSO ONE PERSONAL VISIT A COUPLE OF

10:35AM  20   YEARS AFTER WE INVESTED.  WE WERE IN CALIFORNIA FOR MY HIGH

10:35AM  21   SCHOOL SON'S SPRING BREAK TRIP AND WE PAID A VISIT TO HER AND

10:35AM  22   HER HEADQUARTERS.

10:35AM  23   Q.   AND APPROXIMATELY WHAT YEAR WOULD THAT HAVE BEEN?

10:35AM  24   A.   2008, 2009.

10:35AM  25   Q.   DURING THOSE DISCUSSIONS, WHAT DO YOU REMEMBER MS. HOLMES

ER-4001

10:36AM 1    TELLING YOU ABOUT PRODUCT DEVELOPMENT AND THE STATE OF THE

10:36AM 2    COMPANY'S ANALYZER DEVICE?

10:36AM 3    A.   WE WERE ALWAYS LEFT WITH THE IMPRESSION THAT THE

10:36AM 4    TECHNOLOGY WORKED; THAT IT HAD MARKET ACCEPTANCE,

10:36AM 5    PHARMACEUTICAL COMPANIES WERE USING THIS TECHNOLOGY.

10:36AM 6        SO WE WERE ALWAYS LEFT WITH THE IMPRESSION THAT THIS WAS A

10:36AM 7    TECHNOLOGY THAT WAS WORKING.

10:36AM 8    Q.   AND WHEN YOU VISITED THERANOS HEADQUARTERS DURING THE

10:36AM 9    SPRING BREAK TRIP, DO YOU RECALL THAT VISIT GENERALLY?

10:36AM 10   A.   YES.

10:36AM 11   Q.   WHAT DO YOU REMEMBER SEEING WITHIN THE COMPANY AT THAT

10:36AM 12   TIME?

10:36AM 13   A.   I REMEMBER SEEING THE READERS THAT THEY WOULD PUT THE

10:36AM 14   BLOOD SAMPLES IN, AND I REMEMBER SEEING THE MACHINES THAT THE

10:36AM 15   READERS WOULD GO IN THAT WOULD READ THE BLOOD SAMPLES.

10:36AM 16   Q.   AND CAN YOU DESCRIBE THE APPEARANCE OF WHAT YOU SAW.  HOW

10:36AM 17   BIG WAS IT?  WHAT DID IT LOOK LIKE?

10:36AM 18   A.   MY RECOLLECTION, IF I CAN USE MY HANDS, WERE THE READERS

10:36AM 19   WERE SO BIG, AND IT HAD SPOTS TO, YOU KNOW, PUT THE BLOOD IN,

10:37AM 20   AND MY RECOLLECTION THAT THE MACHINE THAT READ THE READERS WERE

10:37AM 21   THE SIZE OF COMPUTERS AT THAT TIME (INDICATING).

10:37AM 22   Q.   OKAY.  SO JUST FOR THE RECORD, I THINK THE DEVICE THAT THE

10:37AM 23   BLOOD WENT IN YOU DESCRIBED AS BEING MAYBE FOUR INCHES OR SO;

10:37AM 24   IS THAT CORRECT?

10:37AM 25   A.   THE SAMPLE WENT INTO SOMETHING THAT WAS MAYBE

10:37AM  1    THREE-QUARTERS OF AN INCH TO AN INCH BY THREE OR FOUR INCHES

10:37AM  2    AND THIN.

10:37AM  3    Q.   AND THIN YOU SAID?

10:37AM  4    A.   AND THIN.

10:37AM  5    Q.   AND THE ANALYZER DEVICE ITSELF WAS THE SIZE OF A COMPUTER.

10:37AM  6    CAN YOU ESTIMATE THE DIMENSIONS FOR US, PLEASE?

10:37AM  7    A.   MAYBE TWO, TWO AND A HALF FEET BY TWO, TWO AND A HALF

10:37AM  8    FEET.

10:37AM  9    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT WHO HAD DEVELOPED

10:37AM 10    AND MANUFACTURED THAT ANALYZER THAT YOU WERE LOOKING AT?

10:37AM 11    A.   I DON'T RECALL IF SHE SPECIFICALLY SAID WHO DEVELOPED IT,

10:38AM 12    BUT WE WERE UNDER THE IMPRESSION THAT THAT WAS PROPRIETARY

10:38AM 13    TECHNOLOGY, THAT IT WAS ALL DEVELOPED IN HOUSE.

10:38AM 14    Q.   AT ANY TIME DURING THAT VISIT, DID MS. HOLMES SHOW YOU OR

10:38AM 15    MENTION A THIRD PARTY, NON-THERANOS BLOOD ANALYZER?

10:38AM 16    A.   NO.

10:38AM 17    Q.   DURING THOSE CONVERSATIONS IN 2006 THROUGH 2010 OR SO, DID

10:38AM 18    MS. HOLMES EVER MENTION TO YOU THE POSSIBILITY OF AN IPO AT THE

10:38AM 19    COMPANY?

10:38AM 20    A.   YES.

10:38AM 21    Q.   AND WHAT DID SHE --

10:38AM 22    A.   I RECALL THAT.

10:38AM 23    Q.   I'M SORRY.  I DON'T MEAN TO TALK OVER YOU.

10:38AM 24         MS. WALSH:  OBJECTION.  RELEVANCE.

10:38AM 25         THE COURT:  EXCUSE ME.  EXCUSE ME.

ER-4003

10:38AM 1          THE WITNESS:  OH.

10:38AM 2          MS. WALSH:  OBJECTION.  RELEVANCE.

10:38AM 3          MR. BOSTIC:  SO THE DEFENSE HAS ASKED I THINK A

10:38AM 4   COUPLE OF WITNESSES NOW ABOUT STATEMENTS AND THEIR INTENTIONS

10:38AM 5   ABOUT BEING LONG-TERM PARTNERS.

10:38AM 6       I THINK THE DEFENDANT'S STATEMENTS ABOUT THE IPO

10:38AM 7   POSSIBILITY AND THE LIQUIDITY EVENT ARE RELEVANT.

10:39AM 8          THE COURT:  ALL RIGHT.  I'LL OVERRULE THE OBJECTION.

10:39AM 9       DID YOU UNDERSTAND THE QUESTION?

10:39AM 10          THE WITNESS:  YES.

10:39AM 11       WE WERE TOLD BEFORE OUR FIRST INVESTMENT THAT AN IPO WAS A

10:39AM 12   REASONABLE ASSUMPTION A FEW YEARS DOWN THE ROAD, AND IN THE

10:39AM 13   EARLY YEARS, 2006, 2007, 2008, WE WERE TOLD THAT AN IPO WAS A

10:39AM 14   REASONABLE ASSUMPTION WITHIN A YEAR OR TWO.

10:39AM 15       AND WHEN THAT YEAR OR TWO PASSED, WE WERE TOLD THAT IT'S A

10:39AM 16   REASONABLE ASSUMPTION WITHIN A YEAR OR TWO.

10:39AM 17       AND IN MY NOTES THERE WAS, THERE WAS, THERE WAS ONE TIME

10:39AM 18   WHEN IT WAS SUPPOSED TO BE POTENTIALLY 2008 AND THEN 2009, AND

10:39AM 19   IN ONE CONVERSATION DEFINITELY BY 2011.

10:39AM 20   BY MR. BOSTIC:

10:39AM 21   Q.   AND THESE WERE ALL STATEMENTS BY WHOM?

10:39AM 22   A.   BY MS. HOLMES.

10:39AM 23   Q.   AND WAS THE POSSIBILITY AND TIMING OF AN IPO SOMETHING

10:39AM 24   THAT MATTERED TO YOU AS AN INVESTOR?

10:39AM 25   A.   YES.

10:39AM  1    Q.   AND WHY IS THAT?

10:39AM  2    A.   BECAUSE YOU -- AT SOME POINT YOU WANT TO HARVEST YOUR

10:40AM  3    INVESTMENTS, AND WITH AN IPO THAT MEANS THAT THERE'S A PUBLIC

10:40AM  4    MARKET AND YOU CAN MAKE A DECISION THERE THEN TO POSSIBLY SELL

10:40AM  5    SOME OR ALL OF THE INVESTMENT.

10:40AM  6    Q.   GOING BACK TO THE STATE OF THE TECHNOLOGY OVER THOSE YEARS

10:40AM  7    AND WHAT MS. HOLMES SAID ON THAT.

10:40AM  8         DO YOU RECALL HER MENTIONING CARTRIDGES TO YOU AT ANY

10:40AM  9    POINT?

10:40AM  10   A.   YES.

10:40AM  11   Q.   AND WHAT WAS YOUR UNDERSTANDING OF WHAT A CARTRIDGE MEANT

10:40AM  12   IN CONNECTION WITH THERANOS?

10:40AM  13   A.   A CARTRIDGE WAS THE DEVICE WHERE YOU WOULD PUT THE BLOOD

10:40AM  14   SAMPLE AND THEN YOU WOULD PUT THE CARTRIDGE IN THE READER.

10:40AM  15   Q.   AND DURING THE YEARS WE'RE TALKING ABOUT, 2006 THROUGH

10:40AM  16   2010 OR SO, DID MS. HOLMES MAKE ANY STATEMENTS TO YOU ABOUT THE

10:40AM  17   NUMBERS OF CARTRIDGES THAT THERANOS WAS PRODUCING?

10:40AM  18   A.   YES, SHE DID.

10:40AM  19   Q.   WHAT DO YOU REMEMBER ABOUT THAT?

10:40AM  20   A.   THEY WERE PRODUCING ABOUT 400,000 CARTRIDGES A MONTH,

10:40AM  21   BECAUSE THAT WAS THE -- THE DEMAND WAS A MILLION CARTRIDGES A

10:40AM  22   MONTH.

10:40AM  23        THEY WERE GEARING UP, BY THE END OF THE YEAR, TO PRODUCE A

10:41AM  24   MILLION CARTRIDGES A MONTH.

10:41AM  25        AND SHE TOLD ME THAT THEY EXPECTED THE DEMAND TO GROW TO

10:41AM  1    TWO MILLION CARTRIDGES A MONTH THE VERY NEXT YEAR.

10:41AM  2         EACH OF THOSE CARTRIDGES COULD DO I BELIEVE IT WAS FIVE

10:41AM  3    TESTS, AND EACH OF THOSE TESTS WOULD SELL FOR ABOUT $30.

10:41AM  4         SO WHETHER YOU PUT A PEN TO INK AND DO THE CALCULATION,

10:41AM  5    THE CURRENT DEMAND AND THE DEMAND THAT SHE SAID WAS HAPPENING

10:41AM  6    THIS YEAR AND THE NEXT YEAR WAS POTENTIALLY TENS OR HUNDREDS OF

10:41AM  7    MILLIONS OF DOLLARS OF REVENUE.

10:41AM  8    Q.   AND WHEN MS. HOLMES WAS TELLING YOU ABOUT THESE CARTRIDGE

10:41AM  9    NUMBERS, WERE THOSE STATEMENTS LIMITED TO PROJECTIONS ABOUT THE

10:41AM 10    FUTURE, OR DID THEY INCLUDE STATEMENTS ABOUT WHAT THE COMPANY

10:41AM 11    WAS DOING AT THAT MOMENT?

10:41AM 12    A.   NO, THEY WERE BOTH CURRENT AND FUTURE.  AND I BELIEVE I'VE

10:41AM 13    GOT ONE IN MY NOTES THAT IT WAS CURRENT PRODUCTION AND DEMAND

10:41AM 14    FOR 400,000 GROWING TO A MILLION.  THE 400,000 WAS CURRENT.

10:41AM 15    Q.   I'D LIKE TO SHIFT NOW TO THE TIME PERIOD OF 2010 AND THE

10:42AM 16    YEARS FOLLOWING THAT.  OKAY?

10:42AM 17         IN EARLY 2010, DO YOU RECALL A CONVERSATION WITH

10:42AM 18    MS. HOLMES ABOUT WHETHER THE COMPANY WAS SCALING OR NOT?

10:42AM 19    A.   I WOULD HAVE TO CHECK MY NOTES.

10:42AM 20    Q.   OKAY.  I'LL DIRECT YOUR ATTENTION TO THE NOTES IN FRONT OF

10:42AM 21    YOU.  WOULD REVIEWING THOSE NOTES HELP REFRESH YOUR

10:42AM 22    RECOLLECTION?

10:42AM 23    A.   YES.

10:42AM 24    Q.   IN THE BINDER IN FRONT OF YOU, IF YOU'LL TURN TO TAB 14,

10:42AM 25    AND I'LL DIRECT YOUR ATTENTION TO PAGE 15.  THEY'RE NUMBERED AT

10:42AM   1        THE BOTTOM.

10:42AM   2             WHEN YOU GET TO PAGE 15, TAKE A MOMENT TO REVIEW THAT PAGE

10:42AM   3        AND READ IT TO YOURSELF, PLEASE, AND THEN I'LL ASK YOU IF IT

10:42AM   4        REFRESHES YOUR MEMORY.

10:43AM   5             (PAUSE IN PROCEEDINGS.)

10:43AM   6                 THE WITNESS:  OKAY.

10:43AM   7        BY MR. BOSTIC:

10:43AM   8        Q.   HAS REVIEWING THOSE NOTES REFRESHED YOUR MEMORY ABOUT A

10:43AM   9        CONVERSATION THAT YOU HAD WITH MS. HOLMES ABOUT SCALING?

10:43AM  10        A.   YES.

10:43AM  11        Q.   AND WHAT DO YOU REMEMBER MS. HOLMES TELLING YOU ABOUT

10:43AM  12        WHETHER THE COMPANY WAS SCALING IN 2010?

10:43AM  13        A.   THAT THEY WERE HAVING CONVERSATIONS WITH RETAILERS; THAT

10:43AM  14        THERE WAS A POTENTIAL TO HAVE LABS, MINILABS, I DON'T KNOW WHAT

10:43AM  15        THEY CALLED THEM AT THE TIME, IN RETAILERS; THAT THE MARKET WAS

10:44AM  16        HUGE; THAT THEY HAD A BETTER PRODUCT THAN THE TWO LEADING

10:44AM  17        COMPANIES, QUEST AND LABCORP; THAT THEY WERE GOING TO GO AFTER

10:44AM  18        THE QUEST AND LABCORP BUSINESS.

10:44AM  19             THEY WERE ALSO HAVING CONVERSATIONS WITH DIFFERENT

10:44AM  20        GOVERNMENTS THAT WERE HAVING DIFFERENT ISSUES; THEY WERE HAVING

10:44AM  21        CONVERSATIONS WITH THE MEXICAN GOVERNMENT.

10:44AM  22             AND THERE WERE DIFFERENT TYPES OF DISEASES IN DIFFERENT

10:44AM  23        PARTS OF THE COUNTRY AND THEY WERE STARTING TO LOOK AT THE

10:44AM  24        EMERGING MARKETS, TAKING THEIR TECHNOLOGY TO SOLVE NEW AND

10:44AM  25        ADDITIONAL PROBLEMS WITH DIFFERENT KINDS OF DISEASES IN OTHER

EISENMAN DIRECT BY MR. BOSTIC                    5378

```
10:44AM    1    PARTS OF THE WORLD.

10:44AM    2    Q.   AND WAS THIS POSITIVE NEWS TO YOU AS AN INVESTOR IN THE

10:44AM    3    COMPANY?

10:44AM    4    A.   YES, IT WAS.

10:44AM    5    Q.   IN 2010, DID YOU CONTINUE TO DISCUSS WITH MS. HOLMES THE

10:44AM    6    POSSIBILITY OF AN IPO AT THERANOS?

10:44AM    7    A.   YES, WE DISCUSSED THE POSSIBILITY OF AN IPO IN MOST

10:45AM    8    CONVERSATIONS AND EVERY YEAR.

10:45AM    9    Q.   AND AT THAT TIME WAS MS. HOLMES STILL TELLING YOU THAT AN

10:45AM   10    IPO WAS STILL IN THERANOS'S FUTURE?

10:45AM   11    A.   YES.

10:45AM   12    Q.   IF I COULD ASK YOU TO TURN TO TAB 663 IN YOUR BINDER.

10:45AM   13    A.   OKAY.

10:45AM   14    Q.   IN 663, DO YOU SEE AN EMAIL CHAIN THAT INCLUDES MESSAGES

10:45AM   15    BETWEEN YOU AND MS. HOLMES?

10:45AM   16    A.   YES.

10:45AM   17         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 663.

10:45AM   18         MS. WALSH:  YOUR HONOR, OTHER THAN THE STANDING

10:45AM   19    OBJECTION REGARDING THE TIME PERIOD, NO OBJECTION BEYOND THAT.

10:45AM   20         THE COURT:  ALL RIGHT.  THANK YOU.  THAT'S NOTED.

10:45AM   21    THIS IS ADMITTED, AND IT MAY BE PUBLISHED.

10:45AM   22    (GOVERNMENT'S EXHIBIT 663 WAS RECEIVED IN EVIDENCE.)

10:46AM   23    BY MR. BOSTIC:

10:46AM   24    Q.   LET'S START ON PAGE 4 AT THE VERY BOTTOM.

10:46AM   25         DO YOU SEE -- MR. EISENMAN, WE'RE ABOUT TO SEE AN EMAIL
```

ER-4008

10:46AM 1   FROM YOU TO MS. HOLMES.

10:46AM 2       DO YOU SEE THAT?

10:46AM 3   A.   YES.

10:46AM 4   Q.   AND LET'S GO TO PAGE 5 AND ZOOM IN ON THE TOP HALF OF THE

10:46AM 5   PAGE OR SO.

10:46AM 6       DO YOU SEE THIS IS A MESSAGE FROM MAY 3RD, 2010?

10:46AM 7   A.   YES.

10:46AM 8   Q.   SO A FEW YEARS AFTER YOUR FIRST INVESTMENT IN THE COMPANY;

10:46AM 9   CORRECT?

10:46AM 10  A.   CORRECT.

10:46AM 11  Q.   YOU WRITE TO MS. HOLMES, "CAN WE SCHEDULE OUR QUARTERLY

10:46AM 12  UPDATE THE WEEK OF JUNE 1ST THROUGH JUNE 4TH?"

10:46AM 13      DO YOU SEE THAT?

10:46AM 14  A.   YES.

10:46AM 15  Q.   AND THEN YOU PROVIDE A NUMBERED LIST OF SOME QUESTIONS

10:46AM 16  THAT YOU HAVE TO MS. HOLMES ABOUT THERANOS; IS THAT RIGHT?

10:46AM 17  A.   CORRECT.

10:46AM 18  Q.   AND UNDER NUMBER 1 YOU WRITE, "YOU SAID THAT IN MARCH, YOU

10:46AM 19  WERE MANUFACTURING ABOUT 500,000 CARTRIDGES, AND SELLING ABOUT

10:46AM 20  400,000 AT ABOUT $80 PER CARTRIDGE."

10:46AM 21      DO YOU REMEMBER MS. HOLMES MAKING THAT REPRESENTATION TO

10:46AM 22  YOU?

10:46AM 23  A.   YES, I DO.

10:46AM 24  Q.   YOU ASK, "CAN YOU SHARE THE SAME STATISTICS FOR APRIL, AND

10:47AM 25  AN ESTIMATE FOR MAY?"

EISENMAN DIRECT BY MR. BOSTIC                                    5380

10:47AM 1        DO YOU SEE THAT?

10:47AM 2    A.   YES.

10:47AM 3    Q.   WHY WERE YOU INTERESTED IN HAVING THAT INFORMATION?

10:47AM 4    A.   BECAUSE SHE TOLD ME THAT THERE WAS A DEMAND FOR A MILLION

10:47AM 5    CARTRIDGES CURRENTLY AND THEY WERE SCALING UP TO PRODUCE A

10:47AM 6    MILLION CARTRIDGES BY THE END OF THE YEAR, AND IF THEY'RE

10:47AM 7    SELLING HUNDREDS OF THOUSANDS OF CARTRIDGES AT $80 PER

10:47AM 8    CARTRIDGE, THAT'S A LOT OF REVENUE FOR THE COMPANY.

10:47AM 9    Q.   UNDER ITEM 3 IN THE LIST, DO YOU SEE THAT THERE'S A

10:47AM 10   QUESTION ABOUT AN IPO AS WE'VE BEEN DISCUSSING?

10:47AM 11   A.   YES.

10:47AM 12   Q.   LET'S GO TO PAGE 4.  SO MOVING FORWARD IN TIME.

10:47AM 13       THERE'S A MESSAGE IN THE MIDDLE OF THE PAGE FROM YOU DATED

10:47AM 14   MAY 10TH.  IS THAT A WEEK AFTER YOUR FIRST EMAIL?

10:47AM 15   A.   YES.

10:47AM 16   Q.   AND YOU'RE ASKING FOR A RESPONSE; IS THAT RIGHT?

10:47AM 17   A.   YES.

10:47AM 18   Q.   LET'S GO TO PAGE 3 AND SEE MS. HOLMES'S RESPONSE.

10:48AM 19   A.   OKAY.

10:48AM 20   Q.   JUST GIVE US A SECOND FOR TECHNOLOGY TO CATCH UP.

10:48AM 21       OKAY.  ON PAGE 3, LET'S ZOOM IN ON THE MIDDLE OF THE PAGE

10:48AM 22   TO MS. HOLMES'S RESPONSE.

10:48AM 23       DO YOU SEE SHE WRITES TO YOU NEAR THE TOP OF HER MESSAGE,

10:48AM 24   "JUNE IS A TOUGH MONTH FOR US AND I DON'T KNOW WHEN WE CAN DO

10:48AM 25   OUR NEXT CALL"?

EISENMAN DIRECT BY MR. BOSTIC                                    5381

10:48AM   1    A.   YES.

10:48AM   2    Q.   SHE THEN SAYS IN THE PARAGRAPH BELOW, "AS I DISCUSSED IN

10:48AM   3    OUR CALL IN MARCH, WE CANNOT PROVIDE THE LEVEL OF COMMUNICATION

10:48AM   4    YOU KEEP REQUESTING."

10:48AM   5         DO YOU SEE THAT?

10:48AM   6    A.   YES.

10:48AM   7    Q.   WHAT WAS HAPPENING AROUND THIS TIME WITH THE LEVEL OF

10:48AM   8    COMMUNICATION AND INFORMATION THAT YOU WERE GETTING FROM

10:49AM   9    THERANOS?

10:49AM   10   A.   IT WAS DIMINISHING.

10:49AM   11   Q.   AND WAS THAT A SUBJECT OF CONVERSATION BETWEEN YOU AND

10:49AM   12   MS. HOLMES?

10:49AM   13   A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION?

10:49AM   14   Q.   WAS THE FACT THAT COMMUNICATION WAS DIMINISHING SOMETHING

10:49AM   15   THAT YOU TALKED ABOUT WITH MS. HOLMES?

10:49AM   16   A.   I CAN'T REALLY ANSWER THAT BECAUSE IT WAS SOMETHING THAT I

10:49AM   17   WAS AWARE OF AND I WAS TRYING TO REMEDY, BUT THERE WAS -- THERE

10:49AM   18   WAS LESS COMMUNICATION SO IT WAS -- IT WAS MORE ONE-SIDED

10:49AM   19   THINKING THAT THIS IS -- THAT THE COMMUNICATION IS DIMINISHING.

10:49AM   20        I DON'T KNOW IF I'M ANSWERING THE QUESTION.  YOU MAY WANT

10:49AM   21   TO RE-ASK IT.

10:49AM   22   Q.   UNDERSTOOD.

10:49AM   23   A.   OKAY.

10:49AM   24   Q.   GOING BACK TO MS. HOLMES'S EMAIL, DO YOU SEE THAT SHE

10:49AM   25   SAYS, "WITH THE DEALS WE ARE FORMALIZING WITH RETAILERS, WE ARE

ER-4011

10:49AM  1    NOW OBLIGATED NOT TO DISCLOSE OUR PRODUCTION VOLUMES AND

10:50AM  2    CARTRIDGE SALE PRICES."

10:50AM  3         DO YOU SEE THAT?

10:50AM  4    A.   YES.

10:50AM  5    Q.   AT ANY POINT IN YOUR DEALINGS WITH THERANOS, DID YOU SIGN

10:50AM  6    A NONDISCLOSURE AGREEMENT SO THAT YOU COULD RECEIVE

10:50AM  7    CONFIDENTIAL INFORMATION FROM THE COMPANY?

10:50AM  8    A.   NO.

10:50AM  9    Q.   DID MS. HOLMES OR MR. BALWANI EVER ASK YOU TO SIGN A

10:50AM  10   NONDISCLOSURE AGREEMENT FOR THAT PURPOSE?

10:50AM  11   A.   NO.

10:50AM  12   Q.   WOULD YOU HAVE BEEN WILLING TO SIGN A NONDISCLOSURE

10:50AM  13   AGREEMENT IN ORDER TO GET MORE INFORMATION ABOUT THE COMPANY?

10:50AM  14   A.   YES.

10:50AM  15   Q.   DO YOU SEE THAT MS. HOLMES'S EMAIL ALSO SAYS, "AT THIS

10:50AM  16   POINT, WE ALSO DON'T HAVE ANY PLANS TO DO AN IPO ANY TIME

10:50AM  17   SOON"?

10:50AM  18   A.   YES.

10:50AM  19   Q.   WAS THAT DIFFERENT FROM WHAT SHE PREVIOUSLY TOLD YOU?

10:50AM  20   A.   YES, 180 DEGREES.

10:50AM  21   Q.   HOW SO?

10:50AM  22        AT THE BOTTOM OF THAT PAGE, SHE SAYS, "GIVEN YOUR

10:50AM  23   FRUSTRATION LEVEL AND OUR FRUSTRATION LEVEL WITH THIS

10:50AM  24   INTERACTION, I STRONGLY ENCOURAGE YOU TO RE-CONSIDER THE

10:50AM  25   OPPORTUNITY I PRESENTED ON OUR LAST CALL TO REALIZE THE RETURN

10:50AM  1    ON YOUR INVESTMENT."

10:50AM  2        WHAT IS THAT REFERRING TO?

10:50AM  3    A.   WE WERE ON A CALL WHERE SHE SAID THAT THEY WERE TRYING TO

10:51AM  4    ARRANGE A FACILITY TO BUY OUR STOCK AT A LITTLE GREATER THAN

10:51AM  5    FIVE TIMES OUR ORIGINAL COST.

10:51AM  6    Q.   AND AROUND THIS TIME PERIOD, DID YOU MAKE A DECISION ABOUT

10:51AM  7    WHETHER TO PURSUE THAT OPPORTUNITY OR NOT?

10:51AM  8    A.   WE, WE DID PURSUE THAT OPPORTUNITY.

10:51AM  9    Q.   DID YOU END UP SELLING YOUR SHARES AT THAT FIVE TIMES

10:51AM  10   RETURN?

10:51AM  11   A.   NO.  BECAUSE AS WE PURSUED THE OPPORTUNITY, THE COMPANY

10:51AM  12   WENT SILENT.  THEY DID NOT FOLLOW THROUGH ON THEIR

10:51AM  13   COMMUNICATION.

10:51AM  14   Q.   OKAY.  LET'S GO TO PAGE 2 AND SEE YOUR RESPONSE TO

10:51AM  15   MS. HOLMES.

10:52AM  16       JUST GIVE US ONE MOMENT.

10:52AM  17       AND ON PAGE 2, LET'S ZOOM IN ON THE TOP HALF OF THE PAGE.

10:52AM  18       MR. EISENMAN, IS THIS YOUR RESPONSE TO MS. HOLMES?

10:52AM  19   A.   YES, YES, IT IS.

10:52AM  20   Q.   YOU WRITE THAT YOUR QUESTIONS WERE MERELY A FOLLOW-UP FROM

10:52AM  21   YOUR DECEMBER CALL.

10:52AM  22       DO YOU SEE THAT?

10:52AM  23   A.   YES.

10:52AM  24   Q.   AND YOU SAY THAT MS. HOLMES SAID THAT THERANOS WAS CLOSE

10:52AM  25   TO ACHIEVING $200 MILLION IN SALES FOR 2009 IN THAT DECEMBER

10:52AM  1    CALL.

10:52AM  2         DO YOU REMEMBER HER SAYING THAT?

10:52AM  3    A.   I DO.

10:52AM  4    Q.   UNDER ITEM NUMBER 2, DO YOU SEE THAT YOU'RE ASKING FOR 20

10:52AM  5    TO 30 MINUTES FOR AN UPDATE CALL?

10:52AM  6    A.   YES.

10:52AM  7    Q.   AND GOING DOWN IN THAT SAME EMAIL, DO YOU SEE UNDER ITEM 3

10:53AM  8    AND 4, THERE'S DISCUSSION ABOUT THE MILLION CARTRIDGES PER

10:53AM  9    MONTH FIGURE THAT WE DISCUSSED PREVIOUSLY?

10:53AM 10    A.   YES.

10:53AM 11    Q.   AND YOU ALSO RELAY TO HER HER PREVIOUS STATEMENT THAT

10:53AM 12    THERE WAS A HIGH LIKELIHOOD OF AN IPO BY THE END OF 2010.

10:53AM 13         DO YOU SEE THAT?

10:53AM 14    A.   YES.

10:53AM 15    Q.   LET'S LOOK AT ITEM 6 HERE.

10:53AM 16         YOU SAY, "BOTTOM LINE -- IN OUR PRIOR CONVERSATIONS, YOU

10:53AM 17    SET CERTAIN EXPECTATIONS ABOUT AN INVESTORS MEETING, AN IPO,

10:53AM 18    AND SALES AND PRODUCTION FIGURES.  I DON'T MIND IF THESE ITEMS

10:53AM 19    CHANGE, BUT I WOULD LIKE TO KNOW WHY THEY CHANGE."

10:53AM 20         DO YOU SEE THAT?

10:53AM 21    A.   YES.

10:53AM 22    Q.   AND DID THAT ACCURATELY REFLECT YOUR ATTITUDE AT THE TIME?

10:53AM 23    A.   YES.

10:53AM 24    Q.   AND WHY DID THESE THINGS MATTER TO YOU AS SOMEONE WHO HAD

10:53AM 25    MONEY INVESTED IN THE COMPANY?

ER-4014

EISENMAN DIRECT BY MR. BOSTIC                                    5385

10:53AM  1      A.   BECAUSE THESE ARE METRICS THAT INCREASE VALUE, AND THESE

10:54AM  2      ARE ALL IMPORTANT METRICS.

10:54AM  3           SO IT'S A FINANCIAL -- IT'S OF IMPORTANCE FINANCIALLY.

10:54AM  4           IT'S ALSO IMPORTANT AS FAR AS CREDIBILITY, BECAUSE WHEN

10:54AM  5      SOMEONE COMMUNICATES INFORMATION AND THEY DON'T MEET A DEADLINE

10:54AM  6      AND THEY COMMUNICATE ADDITIONAL INFORMATION AND THEY DON'T MEET

10:54AM  7      A DEADLINE AND THIS BECOMES A PATTERN, THEN THERE'S A

10:54AM  8      CREDIBILITY ISSUE.

10:54AM  9      Q.   SO YOU TESTIFIED THAT EVEN AFTER DISCUSSION OF A POTENTIAL

10:54AM 10      BUYOUT OF YOUR SHARES, YOU ENDED UP REMAINING AN INVESTOR IN

10:54AM 11      THERANOS; IS THAT RIGHT?

10:54AM 12      A.   I HAD NO CHOICE.  THERE WAS NO OPPORTUNITY TO SELL SHARES.

10:54AM 13      Q.   AFTER THIS COMMUNICATION FROM MS. HOLMES ABOUT NOT BEING

10:54AM 14      ABLE TO GIVE YOU THE LEVEL OF COMMUNICATION THAT YOU WERE

10:54AM 15      REQUESTING, DID YOU CONTINUE TO HAVE SOME CALLS WITH HER?

10:54AM 16      A.   YES, ATTEMPTED.  ATTEMPTED CALLS.

10:55AM 17      Q.   AND DID SOME OF THOSE CALLS ACTUALLY TAKE PLACE?

10:55AM 18      A.   NO.

10:55AM 19      Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES IN DECEMBER OF

10:55AM 20      THE FOLLOWING YEAR, 2011?

10:55AM 21      A.   I WOULD HAVE TO LOOK AT THE NOTES.

10:55AM 22      Q.   DO YOU HAVE THE NOTES?

10:55AM 23      A.   YES.

10:55AM 24      Q.   WOULD LOOKING AT THE NOTES REFRESH YOUR RECOLLECTION?

10:55AM 25      A.   YES.

10:55AM   1    Q.   YES.  LOOK AT IN TAB 14 OF THE BINDER, PAGE 28 NUMBER ON

10:55AM   2    THE BOTTOM.

10:55AM   3         ACTUALLY, PAGE 27 ACCORDING TO THE NUMBERS ON THE BOTTOM.

10:55AM   4    SORRY.

10:55AM   5         (PAUSE IN PROCEEDINGS.)

10:55AM   6           THE WITNESS:  UM -- WELL, I'VE GOT ONE THAT SAYS

10:56AM   7    PAGE 28 AT THE TOP AND PAGE 27 AT THE BOTTOM.  IS THAT THE ONE

10:56AM   8    YOU WANT ME TO LOOK AT?

10:56AM   9    BY MR. BOSTIC:

10:56AM  10    Q.   THAT'S CORRECT.

10:56AM  11    A.   OKAY.

10:56AM  12    Q.   TAKE A MOMENT TO REVIEW THAT TO YOURSELF AND LET ME KNOW

10:56AM  13    IF THAT REFRESHES YOUR MEMORY.

10:56AM  14    A.   OKAY.  YES.

10:56AM  15    Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES AT THE END OF

10:56AM  16    2011?

10:56AM  17    A.   YES.

10:56AM  18    Q.   AND WHAT DID MS. HOLMES TELL YOU THEN ABOUT THE REVENUE OF

10:56AM  19    THERANOS, IF ANYTHING?

10:56AM  20    A.   ANTICIPATED $500 MILLION IN REVENUE NEXT YEAR.

10:56AM  21    Q.   THAT $500 MILLION REVENUE NUMBER IS SIGNIFICANTLY HIGHER

10:56AM  22    THAN THE $200 MILLION REVENUE NUMBER THAT WE PREVIOUSLY

10:56AM  23    DISCUSSED.

10:56AM  24    A.   YES.

10:56AM  25    Q.   DO YOU KNOW WHETHER THERANOS EVER REACHED THAT

10:56AM   1    $200 MILLION ANNUAL REVENUE NUMBER?

10:56AM   2    A.   NOT TO MY KNOWLEDGE.

10:56AM   3    Q.   FOLLOWING THAT CALL, WHAT HAPPENED GENERALLY WITH THE

10:56AM   4    FREQUENCY OF CONTACT WITH MS. HOLMES?

10:56AM   5    A.   IT DROPPED OFF.

10:57AM   6    Q.   DID YOU MAKE MORE ATTEMPTS TO GET INFORMATION FROM THE

10:57AM   7    COMPANY AND HER DURING THAT SILENT TIME PERIOD?

10:57AM   8    A.   YES, I DID.

10:57AM   9    Q.   AND, GENERALLY SPEAKING, HOW DID YOU GO ABOUT TRYING TO

10:57AM  10    GET MORE INFORMATION FROM THE COMPANY?

10:57AM  11    A.   EMAILS TO ELIZABETH, I REACHED OUT TO DIRECTORS, CHAIRMAN

10:57AM  12    OF THE BOARD OF THE COMPANY, ATTEMPTED.

10:57AM  13    Q.   AND WERE THOSE ATTEMPTS SUCCESSFUL IN GETTING SOME MORE

10:57AM  14    CONCRETE INFORMATION ABOUT WHAT THE COMPANY WAS DOING?

10:57AM  15    A.   NO.

10:57AM  16    Q.   DID THERE COME A TIME AFTER THIS WHEN YOU CONSIDERED A

10:57AM  17    SECOND INVESTMENT IN THERANOS?

10:57AM  18    A.   YES.

10:57AM  19    Q.   DID YOU END UP MAKING A SECOND INVESTMENT IN THE COMPANY?

10:57AM  20    A.   YES.

10:57AM  21    Q.   APPROXIMATELY WHEN DID THAT SECOND INVESTMENT HAPPEN?

10:57AM  22    A.   THE END OF IT WAS EITHER 2013 OR 2015.

10:57AM  23    Q.   OKAY.  I CAN SHOW YOU SOME DOCUMENTS THAT MIGHT REFRESH

10:57AM  24    YOUR MEMORY ON THAT.

10:57AM  25         LET ME ASK YOU FIRST ABOUT SUNNY BALWANI.

10:58AM   1          DO YOU RECALL AT SOME POINT BEING INTRODUCED TO

10:58AM   2     MR. BALWANI?

10:58AM   3     A.   UM, I'VE HAD A FEW PHONE CONVERSATIONS AND A FEW EMAIL

10:58AM   4     EXCHANGES.

10:58AM   5     Q.   DO YOU RECALL WHEN THAT BEGAN?  WHEN DID YOU FIRST BECOME

10:58AM   6     ACQUAINTED WITH MR. BALWANI IN CONNECTION WITH THERANOS?

10:58AM   7     A.   I'D HAVE TO LOOK AT THE NOTES.

10:58AM   8     Q.   LET ME DIRECT YOUR ATTENTION TO THE PAGE NUMBER 23 IN

10:58AM   9     TAB 14.

10:58AM  10          TAKE A MOMENT TO REVIEW PAGE 23 TO YOURSELF.

10:58AM  11     A.   OKAY.

10:58AM  12     Q.   DOES THAT REFRESH YOUR MEMORY ABOUT THE TIMING OF AT LEAST

10:58AM  13     ONE CONVERSATION YOU HAD WITH MR. BALWANI?

10:58AM  14     A.   YES, I WROTE THE DATE DOWN.

10:58AM  15     Q.   AND WHEN DO YOU REMEMBER SPEAKING TO MR. BALWANI IN

10:59AM  16     MID-2013?

10:59AM  17     A.   THIS WAS DATED JUNE 17TH, SO THAT'S WHEN THE CONVERSATION

10:59AM  18     TOOK PLACE.

10:59AM  19     Q.   AND DO YOU RECALL THAT CONVERSATION GENERALLY?

10:59AM  20     A.   I DO.

10:59AM  21     Q.   AND WHAT WAS THE PURPOSE OF SPEAKING WITH MR. BALWANI IN

10:59AM  22     JUNE OF 2013?

10:59AM  23     A.   THE PURPOSE WAS TO DETERMINE WHERE THE COMPANY WAS, WHAT

10:59AM  24     KIND OF PROGRESS THAT THEY WERE MAKING.

10:59AM  25     Q.   AND DO YOU REMEMBER WHETHER MR. BALWANI WAS SOMEONE THAT

10:59AM  1    MS. HOLMES PUT YOU IN TOUCH WITH?

10:59AM  2    A.   I DON'T RECALL.

10:59AM  3    Q.   DURING YOUR CONVERSATION WITH MR. BALWANI, DID HE TELL YOU

10:59AM  4    ANYTHING ABOUT THE STATE OF THE COMPANY'S BUSINESS AND THE

10:59AM  5    PRODUCT ROLLOUT?

10:59AM  6    A.   YES, JUST READING FROM MY NOTES WHICH I --

10:59AM  7         MS. WALSH:  OBJECTION, YOUR HONOR.

10:59AM  8    BY MR. BOSTIC:

10:59AM  9    Q.   SO, MR. EISENMAN, WHAT I'LL ASK YOU TO DO IS REVIEW YOUR

10:59AM  10   NOTES TO YOURSELF, AND TELL ME IF THE NOTES REFRESH YOUR MEMORY

10:59AM  11   OF THAT CONVERSATION.

10:59AM  12   A.   OKAY.

10:59AM  13   Q.   AND THEN I'LL ASK YOU QUESTIONS ABOUT WHAT YOU REMEMBER

10:59AM  14   FROM THAT CONVERSATION.

10:59AM  15   A.   OKAY.  I REMEMBER THE CONVERSATION GENERALLY, AND THE

10:59AM  16   NOTES REFRESH MY MEMORY OF THE CONVERSATION.

10:59AM  17   Q.   OKAY.  SO TESTIFYING FROM YOUR MEMORY OF THAT

11:00AM  18   CONVERSATION, WHAT DO YOU REMEMBER MR. BALWANI SAYING TO YOU

11:00AM  19   ABOUT THE STATE OF THE COMPANY'S BUSINESS AND ITS PRODUCTS?

11:00AM  20   A.   THAT THE COMPANY WAS GEARING UP; THAT THERE WAS MARKET

11:00AM  21   ACCEPTANCE; THAT THEY HAD A HEAD COUNT OF 340 PEOPLE; THEY WERE

11:00AM  22   TRYING TO HIRE 150 TO 200 PEOPLE; THERE WAS A PRODUCT ROLLOUT

11:00AM  23   THAT WAS GOING TO OCCUR WITHIN THE NEXT MONTH OR TWO.

11:00AM  24   Q.   AND FROM YOUR CONVERSATION WITH MR. BALWANI, DID YOU HAVE

11:00AM  25   AN UNDERSTANDING ABOUT WHAT THAT PRODUCT ROLLOUT MEANT?  WHAT

11:00AM   1    DID IT MEAN FOR THIS COMPANY TO ROLL OUT ITS PRODUCT?

11:00AM   2    A.   IT MEANT THAT IT WAS GAINING WIDER MARKET ACCEPTANCE, AND

11:00AM   3    IT WAS, IT WAS KIND OF THE ROAD TO ADDITIONAL SUCCESS.

11:00AM   4    Q.   OKAY.  DURING THAT CONVERSATION, DID MR. BALWANI TELL YOU

11:00AM   5    ANYTHING ABOUT THE STATE OF THE COMPANY'S TECHNOLOGY?

11:00AM   6    A.   NOT TO MY RECOLLECTION.

11:00AM   7    Q.   DID MR. BALWANI TELL YOU, DURING THAT CONVERSATION, THAT

11:01AM   8    THE THERANOS EDISON ANALYZER ONLY HAD THE COMPONENTS TO DO ONE

11:01AM   9    CATEGORY OF BLOOD TESTS?

11:01AM  10    A.   UM --

11:01AM  11         MS. WALSH:  OBJECTION.  HE SAID HE DIDN'T RECALL, HE

11:01AM  12    DIDN'T RECALL ANYTHING ABOUT THE TECHNOLOGY.

11:01AM  13         THE COURT:  OVERRULED.

11:01AM  14    BY MR. BOSTIC:

11:01AM  15    Q.   WOULD YOU LIKE THE QUESTION?

11:01AM  16    A.   NO.  IN THE CONVERSATION, THEY WERE WAITING FOR THEIR

11:01AM  17    PARTNER TO PULL THE TRIGGER ON THEIR AGREEMENT WITH THEM.

11:01AM  18         AND IT'S KIND OF ASSUMED THAT IF A PARTNER IS GOING TO GET

11:01AM  19    INVOLVED IN A PRODUCT ROLLOUT, THAT THERE IS MARKET ACCEPTANCE,

11:01AM  20    THAT IT'S A PRODUCT THAT IS A VALUABLE PRODUCT THAT WORKS.

11:01AM  21    Q.   AND WHEN IT CAME TO THE ACTUAL TECHNOLOGICAL READINESS OF

11:01AM  22    THE THERANOS ANALYZER, DID MR. BALWANI TELL YOU ANYTHING ABOUT

11:01AM  23    THE LIMITATIONS OF WHAT THAT PRODUCT COULD DO OR HOW FAR ALONG

11:02AM  24    IT WAS IN DEVELOPMENT?

11:02AM  25    A.   NO.

ER-4020

11:02AM 1      Q.   OKAY.  WOULD THOSE FACTORS HAVE MATTERED TO YOU IF THERE

11:02AM 2      HAD BEEN LIMITATIONS ABOUT WHAT THE PRODUCT COULD DO?

11:02AM 3      A.   WELL, IT WOULD HAVE, IT WOULD HAVE WEIGHED ON -- IT WOULD

11:02AM 4      HAVE CONTRADICTED ANYTHING AND EVERYTHING THAT I LEARNED TO

11:02AM 5      THAT POINT.

11:02AM 6           TO THAT POINT THE PRODUCT WAS SUCCESSFUL, IT WORKED, IT

11:02AM 7      WAS BEING IMPROVED, AND ANYTHING TO THE CONTRARY WOULD HAVE

11:02AM 8      KIND OF NEGATED KIND OF THE NARRATIVE TO THAT POINT IN TIME.

11:02AM 9      Q.   LATER IN 2013, AFTER YOUR CONVERSATION WITH MR. BALWANI,

11:02AM 10     DID YOU BEGIN TO SEE PUBLIC NEWS COVERAGE ABOUT THERANOS?

11:02AM 11     A.   YES.

11:02AM 12     Q.   AND DID THAT REPRESENT A CHANGE FROM HOW THINGS HAD BEEN

11:02AM 13     IN THE PAST?

11:02AM 14     A.   WELL, IT WAS KIND OF A VALIDATION OF MARKET ACCEPTANCE.

11:02AM 15          THERE WERE REPORTS ABOUT THERANOS TECHNOLOGY IN CREDIBLE

11:03AM 16     FINANCIAL PUBLICATIONS.

11:03AM 17          AND IT WAS, IT WAS JUST ANOTHER, ANOTHER -- I GUESS

11:03AM 18     ANOTHER RATIFICATION OF A PRODUCT THAT WAS WORKING, EFFECTIVE,

11:03AM 19     THERE WAS A NEED.

11:03AM 20     Q.   LET ME SHOW YOU AN EXAMPLE OF THE NEWS COVERAGE THAT WE'RE

11:03AM 21     TALKING ABOUT.

11:03AM 22          YOUR HONOR, EXHIBIT 1106 IS ALREADY ADMITTED.

11:03AM 23          MAY WE PUBLISH?

11:03AM 24             THE COURT:  YES.

11:03AM 25     BY MR. BOSTIC:

11:03AM 1    Q.   AND, MR. EISENMAN, DO YOU SEE ON YOUR SCREEN -- AND IT'S

11:03AM 2    ALSO AT TAB 1106 -- AN EMAIL -- I'M SORRY, AN ARTICLE IN "THE

11:03AM 3    WALL STREET JOURNAL" DATED SEPTEMBER 8TH, 2013 ENTITLED,

11:03AM 4    "ELIZABETH HOLMES:  THE BREAKTHROUGH OF INSTANT DIAGNOSIS"?

11:03AM 5    A.   I DO SEE THAT.

11:03AM 6    Q.   DO YOU REMEMBER READING THIS ARTICLE IN "THE

11:03AM 7    WALL STREET JOURNAL" IN SEPTEMBER 2013?

11:03AM 8    A.   YES, I DO RECALL READING THE ARTICLE.

11:03AM 9    Q.   AND DO YOU REMEMBER WHAT YOUR REACTION WAS TO SEEING THIS

11:03AM 10   ARTICLE?

11:03AM 11   A.   ELATION.

11:03AM 12   Q.   EXPLAIN THAT.  WHY WERE YOU ELATED TO SEE THIS ARTICLE

11:04AM 13   COME OUT?

11:04AM 14   A.   BECAUSE IT RATIFIED TO WHAT WE HAD BEEN LED TO BELIEVE ALL

11:04AM 15   ALONG, THAT THIS WAS A SUCCESSFUL TECHNOLOGY THAT HAD WIDE

11:04AM 16   ACCEPTANCE, AND THE COMPANY HAD THE POTENTIAL TO BE HUGELY

11:04AM 17   PROFITABLE.

11:04AM 18        AND "THE WALL STREET JOURNAL" IS A VERY CREDIBLE SOURCE OF

11:04AM 19   INFORMATION, SO WHEN WE, WHEN WE READ THIS ARTICLE, IT WAS JUST

11:04AM 20   A VERY SIGNIFICANT STAMP OF APPROVAL.

11:04AM 21   Q.   IF I COULD DRAW YOUR ATTENTION TO THE FIRST INDENTED

11:04AM 22   PARAGRAPH ON PAGE 1.

11:04AM 23        DO YOU SEE THERE THERE IS SOME LANGUAGE ABOUT "DEVICES

11:04AM 24   THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000 LABORATORY

11:04AM 25   TESTS."

11:04AM 1          DO YOU SEE THAT?

11:04AM 2     A.   YES.

11:04AM 3     Q.   IS THAT CONSISTENT WITH THE DESCRIPTIONS OF THE TECHNOLOGY

11:04AM 4     THAT YOU HAD HEARD FROM MS. HOLMES AND MR. BALWANI PREVIOUSLY?

11:04AM 5     A.   YES.

11:04AM 6     Q.   AND DO YOU SEE THAT THERE'S A CLAIM, "THERANOS'S PROCESSES

11:04AM 7     ARE FASTER, CHEAPER, AND MORE ACCURATE THAN THE CONVENTIONAL

11:04AM 8     METHODS."

11:04AM 9          DO YOU SEE THAT?

11:05AM 10    A.   YES.

11:05AM 11    Q.   WAS THAT CONSISTENT WITH WHAT YOU HAD HEARD FROM HOLMES

11:05AM 12    AND BALWANI PREVIOUSLY?

11:05AM 13    A.   YES, I HAD HEARD THE SAME CLAIMS.

11:05AM 14              MS. WALSH:  OBJECTION.

11:05AM 15              THE COURT:  PARDON ME, SIR.  JUST A MOMENT.

11:05AM 16              THE WITNESS:  OH, SORRY.

11:05AM 17              MS. WALSH:  OBJECTION.  FOUNDATION.  THE WITNESS HAS

11:05AM 18    TESTIFIED THAT MR. BALWANI DIDN'T HAVE ANY CONVERSATIONS WITH

11:05AM 19    HIM ABOUT THE TECHNOLOGY.

11:05AM 20         THESE ARE FROM MS. HOLMES.

11:05AM 21              THE COURT:  DO YOU WANT TO ASK YOUR QUESTION AGAIN

11:05AM 22    AS TO THIS?

11:05AM 23    BY MR. BOSTIC:

11:05AM 24    Q.   SO, MR. EISENMAN, LET ME ASK, DURING YOUR CONVERSATION

11:05AM 25    WITH MR. BALWANI, DID HE DISCUSS WITH YOU A ROLLOUT OF A

EISENMAN DIRECT BY MR. BOSTIC                    5394

11:05AM  1     COMPANY PRODUCT?

11:05AM  2     A.   CAN I GO BACK TO THE OTHER TAB?

11:05AM  3          IT WAS IN THAT CONVERSATION THAT THERE WAS A PRODUCT

11:05AM  4     ROLLOUT WITHIN 30 TO 60 DAYS, THEY WERE WAITING FOR THEIR

11:05AM  5     PARTNER TO PULL THE TRIGGER.

11:05AM  6          ACTUALLY, I DON'T KNOW IF WE NEED TO GO BACK.  I RECALL

11:05AM  7     THAT.

11:05AM  8     Q.   LET ME ASK YOU THEN, WHEN MR. BALWANI WAS DISCUSSING THE

11:05AM  9     ROLLOUT OF THAT PRODUCT, DID HE SAY ANYTHING INCONSISTENT WITH

11:05AM  10    THE CLAIMS IN "THE WALL STREET JOURNAL" ARTICLE THAT YOU'RE

11:05AM  11    LOOKING AT?

11:05AM  12    A.   NO.

11:05AM  13    Q.   LET'S LOOK AT PAGE 2 OF THE ARTICLE.

11:06AM  14         ABOUT HALFWAY DOWN THE PAGE, THERE'S A PARAGRAPH THAT

11:06AM  15    BEGINS, "THERANOS'S TECHNOLOGY."

11:06AM  16         DO YOU SEE THAT?

11:06AM  17    A.   YES.

11:06AM  18    Q.   AND IT SAYS, "THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE

11:06AM  19    LAB TRIPS BECAUSE IT CAN 'RUN ANY COMBINATION OF TESTS,

11:06AM  20    INCLUDING SETS OF FOLLOW-ON TESTS,' AT ONCE, VERY QUICKLY, ALL

11:06AM  21    FROM A SINGLE MICRO-SAMPLE."

11:06AM  22         DO YOU SEE THAT?

11:06AM  23    A.   YES.

11:06AM  24    Q.   WAS THIS FACT SOMETHING THAT WAS IMPORTANT TO YOU AS

11:06AM  25    SOMEONE WHO HAD INVESTED IN THE COMPANY?

11:06AM 1    A.   YES.

11:06AM 2    Q.   AND WHY WAS THAT?

11:06AM 3    A.   BECAUSE THIS WAS A BETTER PRODUCT THAN THEIR TWO

11:06AM 4    COMPETITORS THAT THEY WERE TRYING TO CAPTURE THEIR MARKET,

11:06AM 5    LABCORP AND QUEST.  AND LABCORP AND QUEST ARE BOTH

11:06AM 6    MULTI-BILLION DOLLAR COMPANIES, AND THIS IS BASICALLY DOING

11:06AM 7    WHAT THEY'RE DOING, BUT BETTER, CHEAPER, QUICKER, FASTER, MORE

11:07AM 8    ACCURATE.

11:07AM 9    Q.   AND A LITTLE FURTHER DOWN THAT PAGE THERE'S A PARAGRAPH

11:07AM 10   THAT BEGINS, "ANOTHER THERANOS ADVANCE."

11:07AM 11        AND DO YOU SEE IT SAYS, "ANOTHER THERANOS ADVANCE IS ITS

11:07AM 12   TESTING'S ACCURACY"?

11:07AM 13   A.   YES.

11:07AM 14   Q.   AND WE SAW ON THE PREVIOUS PAGE SOME CLAIMS ABOUT ACCURACY

11:07AM 15   AS WELL.

11:07AM 16        DO YOU REMEMBER THAT?

11:07AM 17   A.   YES.

11:07AM 18   Q.   AS AN INVESTOR IN THE COMPANY, WERE THE ACCURACY OF THE

11:07AM 19   TESTS SOMETHING THAT MATTERED TO YOU?

11:07AM 20   A.   OF UTMOST IMPORTANCE.

11:07AM 21   Q.   WHY IS THAT?

11:07AM 22   A.   BECAUSE YOU'RE DEALING WITH PEOPLE'S HEALTH, AND IF, IF

11:07AM 23   YOUR TESTS ARE NOT AS ACCURATE AS SCIENTIFICALLY POSSIBLE, THEN

11:07AM 24   YOU'RE COMPROMISING SOMEONE'S HEALTH.

11:07AM 25   Q.   ALL RIGHT.  THANK YOU.

EISENMAN DIRECT BY MR. BOSTIC                              5396

11:07AM   1        LET ME ASK YOU TO TURN NEXT TO TAB 1334.

11:07AM   2        AND IN YOUR BINDER, ONCE YOU'RE THERE, DO YOU RECOGNIZE

11:07AM   3   THE DOCUMENT THAT IS AT TAB 1334?

11:08AM   4   A.   YES.

11:08AM   5   Q.   AND IS THAT AN EMAIL CHAIN BETWEEN YOU AND THERANOS

11:08AM   6   RELATING TO SHAREHOLDER CONSENTS?

11:08AM   7   A.   YES.

11:08AM   8        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1334.

11:08AM   9        MS. WALSH:  NO OBJECTION.

11:08AM  10        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:08AM  11   (GOVERNMENT'S EXHIBIT 1334 WAS RECEIVED IN EVIDENCE.)

11:08AM  12   BY MR. BOSTIC:

11:08AM  13   Q.   AND LET'S START AT THE BOTTOM OF PAGE 1.

11:08AM  14        DO YOU SEE, MR. EISENMAN, THIS IS AN EMAIL FROM THERANOS

11:08AM  15   TO YOU IN MID-DECEMBER 2013?

11:08AM  16   A.   YES.

11:08AM  17   Q.   AND IT INCLUDES A MEMO TO STOCKHOLDERS, IT SAYS, REGARDING

11:08AM  18   CERTAIN DEALS AND TRANSACTIONS.

11:08AM  19        DO YOU SEE THAT?

11:08AM  20   A.   YES.

11:08AM  21   Q.   AND IF WE TURN TO THE FOLLOWING PAGE, PAGE 2, DO YOU SEE

11:08AM  22   THAT THERE IS A MEMO SENT TO YOU AS A THERANOS STOCKHOLDER?

11:09AM  23   A.   YES.

11:09AM  24   Q.   OKAY.  LET'S LOOK AT THE TOP PARAGRAPH THERE.

11:09AM  25        AND DO YOU SEE THERANOS TELLS YOU, "WITH OUR LAUNCH TO

11:09AM 1      CONSUMER HEALTH CARE THIS YEAR, WE ARE RAPIDLY SCALING TO

11:09AM 2      ESTABLISH A NATIONAL FOOTPRINT AND CAPTURE THE OPPORTUNITY WE

11:09AM 3      HAVE TO SERVE AS THE ONLY CERTIFIED, NATIONAL LABORATORY

11:09AM 4      CAPABLE OF RUNNING ANY OF ITS LABORATORY TESTS FROM A FEW TINY

11:09AM 5      DROPLETS OF BLOOD."

11:09AM 6          DO YOU SEE THAT?

11:09AM 7      A.   YES.

11:09AM 8      Q.   WAS THAT CONSISTENT WITH WHAT YOU HAD COME TO UNDERSTAND

11:09AM 9      OF THE CAPABILITIES OF THE THERANOS ANALYZER?

11:09AM 10     A.   YES.

11:09AM 11     Q.   AND AT THE BOTTOM OF THAT PARAGRAPH, DO YOU SEE THAT

11:09AM 12     THERE'S A CLAIM THAT, "WE ARE ACTIVELY INVESTING IN

11:09AM 13     INFRASTRUCTURE TO BUILD THIS NEW INDUSTRY WE HAVE CREATED"?

11:09AM 14     A.   YES.

11:09AM 15     Q.   WAS THIS GOOD NEWS TO YOU AS AN INVESTOR?

11:09AM 16     A.   THIS WAS GREAT NEWS.

11:09AM 17     Q.   THAT LANGUAGE AT THE TOP OF THE MEMO ABOUT RAPIDLY

11:10AM 18     SCALING, DID THAT SIGNAL ANYTHING TO YOU AS AN INVESTOR IN THE

11:10AM 19     COMPANY?

11:10AM 20     A.   YES.

11:10AM 21     Q.   AND WHAT DID THAT MEAN TO YOU?

11:10AM 22     A.   IT MEANS THAT THE TECHNOLOGY WAS ACCEPTED IN THE

11:10AM 23     MARKETPLACE AND THEY WERE RAISING MONEY TO MEET THE POTENTIAL

11:10AM 24     INCREASED AND GROWING DEMAND.

11:10AM 25     Q.   AND AS SOMEONE CONSIDERING WHETHER TO INVEST ADDITIONAL

ER-4027

11:10AM 1    MONEY IN THE COMPANY, HOW DID THAT FACT AFFECT YOUR VIEW OF THE

11:10AM 2    RISK INVOLVED?

11:10AM 3    A.   THAT THIS WAS DERISKED.  THE RISK HAD BEEN TAKEN OUT OF

11:10AM 4    THIS INVESTMENT.

11:10AM 5    Q.   AND EXPLAIN WHY THAT IS THE CASE.

11:10AM 6    A.   BECAUSE IT HAS ACCEPTANCE IN THE MARKETPLACE.  IT'S

11:10AM 7    MEETING A HEALTH CARE PROBLEM.  THEIR SOLUTION WAS BETTER THAN

11:10AM 8    CURRENT SOLUTIONS.

11:11AM 9        BASICALLY WE DON'T HAVE THE RISK OF AN EARLY STAGE COMPANY

11:11AM 10   THAT IS TRYING TO PROVE ITSELF.  THIS INFERS THAT THE COMPANY

11:11AM 11   HAS ALREADY PROVEN ITSELF, AND IT'S AN OPPORTUNITY FOR THE

11:11AM 12   COMPANY TO NOW GROW ON THEIR PROVEN SUCCESS.

11:11AM 13   Q.   LOOKING DOWN A LITTLE FURTHER ON THAT SAME PAGE, THERE'S A

11:11AM 14   PARAGRAPH THAT BEGINS, "IN LINE WITH PAST COMMUNICATIONS."

11:11AM 15       AND DO YOU SEE THERE THAT THERE'S A REFERENCE REFERRING

11:11AM 16   INVESTORS TO THERANOS'S WEBSITE AT WWW.THERANOS.COM?

11:11AM 17   A.   YES.

11:11AM 18   Q.   DID YOU VISIT THE THERANOS WEBSITE AROUND THIS TIME IN

11:11AM 19   LATE FEBRUARY 2013?

11:11AM 20   A.   YES.

11:11AM 21   Q.   AND WHAT WAS THE PURPOSE OF VISITING THE WEBSITE?

11:11AM 22   A.   JUST TO GAIN ANY ADDITIONAL INSIGHTS OR INFORMATION THAT,

11:11AM 23   THAT I WASN'T GAINING ELSEWHERE.

11:12AM 24       AND, YOU KNOW, IT'S ALWAYS IMPORTANT TO SEE THE

11:12AM 25   INFORMATION THAT THE COMPANY PUTS OUT DIRECTLY VERSUS A THIRD

ER-4028

11:12AM  1    PARTY FINANCIAL PRESS THAT WRITES ABOUT THEM.

11:12AM  2    Q.   AND DID YOU RELY ON THE INFORMATION YOU SAW ON THE WEBSITE

11:12AM  3    IN DECIDING WHETHER TO INVEST MORE MONEY IN THE COMPANY?

11:12AM  4    A.   UM, GENERAL RECOLLECTION IS THAT I LOOKED AT THEIR WEBSITE

11:12AM  5    BEFORE AND AFTER THIS SECOND ROUND, AND IT WAS ONE OF MANY

11:12AM  6    FACTORS THAT I LOOKED TO TO MAKE AN ADDITIONAL INVESTMENT.

11:12AM  7    Q.   AND SPECIFICALLY DID THE CONTENT OF THE WEBSITE MATTER TO

11:12AM  8    YOU AS SOMEONE CONSIDERING WHETHER TO INVEST MORE?

11:12AM  9    A.   NO.  IT WAS ONE OF MANY FACTORS THAT MATTERED TO ME.

11:12AM 10    Q.   IF I COULD DRAW YOUR ATTENTION TO TAB 4060.

11:12AM 11         YOUR HONOR, I BELIEVE THIS IS ALREADY IN EVIDENCE.

11:12AM 12         MAY WE PUBLISH?

11:13AM 13              THE COURT:  YES.

11:13AM 14    BY MR. BOSTIC:

11:13AM 15    Q.   YOU MENTIONED MANY FACTORS THAT INFLUENCED YOUR DECISION

11:13AM 16    TO INVEST; IS THAT RIGHT, MR. EISENMAN?

11:13AM 17    A.   YES.

11:13AM 18    Q.   LOOKING AT EXHIBIT 4060, DO YOU SEE AT THE BOTTOM THAT

11:13AM 19    THERE'S AN EMAIL FROM SOMEONE NAMED PAT MENDENHALL?

11:13AM 20    A.   YES.

11:13AM 21    Q.   AND IT SAYS "I JUST SPENT 45 MINUTES SPEAKING WITH

11:13AM 22    SUNNY BALWANI, PRESIDENT AND COO OF THERANOS."

11:13AM 23    A.   YES.

11:13AM 24    Q.   AND WHO WAS PAT MENDENHALL TO YOU AT THIS TIME?

11:13AM 25    A.   PAT MENDENHALL WAS A PARTNER OF THE FINANCIAL ADVISOR THAT

11:13AM   1    WAS MY FRIEND THAT WAS ELIZABETH'S FINANCIAL ADVISOR.

11:13AM   2    Q.   AND WHAT WAS THE NAME OF THAT FINANCIAL ADVISOR, IF YOU

11:13AM   3    CAN REMIND US?

11:13AM   4    A.   DAVID HARRIS.

11:13AM   5    Q.   AND DO YOU SEE HERE THAT MR. MENDENHALL HAD EMAILED SOME

11:13AM   6    INFORMATION TO DAVID HARRIS ON DECEMBER 22ND, 2013?

11:13AM   7    A.   YES.

11:13AM   8    Q.   OKAY.  AND LOOKING ABOVE THAT, DO YOU SEE THAT MR. HARRIS

11:14AM   9    THEN FORWARDED THAT INFORMATION TO YOU THAT SAME DAY,

11:14AM  10    DECEMBER 22ND?

11:14AM  11    A.   YES.

11:14AM  12    Q.   OKAY.  LET'S LOOK AT THE INFORMATION THAT YOU GOT ON

11:14AM  13    DECEMBER 22ND.

11:14AM  14        LET'S TURN TO PAGE 2.

11:14AM  15        SO, MR. EISENMAN, LET ME ASK, FIRST OF ALL, WHEN YOU

11:14AM  16    RECEIVED THIS EMAIL ON DECEMBER 22ND, DO YOU REMEMBER REVIEWING

11:14AM  17    IT?

11:14AM  18    A.   YES.

11:14AM  19    Q.   AND FOR WHAT PURPOSE WERE YOU INTERESTED IN WHAT

11:14AM  20    MR. BALWANI HAD SAID ABOUT THERANOS?

11:14AM  21    A.   WELL, THIS WAS A CONVERSATION THAT OCCURRED RIGHT BEFORE

11:14AM  22    WE MADE A DECISION TO INVEST IN THE FOLLOW-UP INVESTMENT ROUND

11:14AM  23    IN THERANOS.

11:14AM  24    Q.   AND HOW DID THAT RELATE TO YOUR INTEREST IN STATEMENTS BY

11:14AM  25    MR. BALWANI?

11:14AM   1    A.    IT WAS VERY IMPORTANT.

11:14AM   2    Q.    AND WHY IS THAT?

11:14AM   3    A.    BECAUSE IF, IF YOU'RE GOING TO INVEST MORE MONEY IN A

11:15AM   4    COMPANY, YOU WANT TO HAVE ALL OF THE INFORMATION THAT IS

11:15AM   5    AVAILABLE, AND THIS WAS CRITICAL AND IMPORTANT INFORMATION THAT

11:15AM   6    WAS MADE AVAILABLE RIGHT BEFORE WE, WE MADE THE FINAL DECISION

11:15AM   7    TO INVEST AGAIN.

11:15AM   8    Q.    AND I'D LIKE TO ASK YOU ABOUT SOME OF THE SPECIFIC CLAIMS

11:15AM   9    THAT WERE RELAYED TO YOU FROM MR. BALWANI JUST BEFORE YOU MADE

11:15AM  10    THAT DECISION TO INVEST.

11:15AM  11         AND IF WE COULD START WITH ITEMS 3, 4, AND 5 ON THIS

11:15AM  12    NUMBERED LIST.

11:15AM  13         DO YOU SEE THOSE ITEMS?

11:15AM  14    A.    YES.

11:15AM  15    Q.    IT WAS RELAYED TO YOU THAT MR. BALWANI SAID THAT "THE

11:15AM  16    'SCIENCE' BEHIND THERANOS IS COMPLETE.

11:15AM  17         "NO NEW SCIENCE NEEDED.

11:15AM  18         "NO NEW INVENTION NEEDED."

11:15AM  19         DO YOU SEE THAT?

11:15AM  20    A.    YES.

11:15AM  21    Q.    AND WAS THAT AN IMPORTANT FACT FOR YOU IN DETERMINING

11:15AM  22    WHETHER TO INVEST MORE MONEY IN THE COMPANY?

11:15AM  23    A.    YES, IT WAS.

11:15AM  24    Q.    AND CAN YOU EXPLAIN WHY?

11:15AM  25    A.    WE HAD BEEN LED TO BELIEVE THAT THE SCIENCE WAS PERFECTED

11:16AM  1      AT MANY POINTS BEFORE THIS, BUT THIS WAS ANOTHER STATEMENT --

11:16AM  2      AND LET ME GO BACK.  A LOT OF OUR CONVERSATIONS AND

11:16AM  3      COMMUNICATION EARLY ON WERE WITH MS. HOLMES.

11:16AM  4          THIS WAS WITH ANOTHER TOP EXECUTIVE WITH THE COMPANY, AND

11:16AM  5      AGAIN, TIMING WISE, THIS WAS BEFORE WE DECIDED TO INVEST MORE

11:16AM  6      MONEY, AND THIS RATIFIED THAT THERE IS NO, NO RISK IN THIS

11:16AM  7      COMPANY NOT BEING ABLE TO DO WHAT THE MARKET IS, IS

11:16AM  8      ANTICIPATING THEM DOING, THAT THE TECHNOLOGY WAS PROVEN.

11:16AM  9      Q.   LET'S LOOK AT ITEMS 6, 7, AND 8 IN THAT SAME LIST.

11:16AM 10          AND AGAIN, SO SOME ADDITIONAL INFORMATION THAT WAS RELAYED

11:16AM 11      TO YOU AS HAVING COME FROM MR. BALWANI; CORRECT?

11:16AM 12      A.   YES.

11:16AM 13      Q.   AND HERE WE SEE CLAIMS THAT THERANOS IS "COMPLETELY

11:17AM 14      VERTICALLY INTEGRATED -- THEY OWN THE LAB AND THE

11:17AM 15      MANUFACTURING."

11:17AM 16          DO YOU SEE THAT?

11:17AM 17      A.   YES.

11:17AM 18      Q.   IT SAYS, "100 PERCENT MANUFACTURING IN THE U.S.A.

11:17AM 19          "FULLY OWNED AND PROTECTED MANUFACTURING ASSURES PRICING

11:17AM 20      AND PROFIT STABILITY."

11:17AM 21          DO YOU SEE THAT?

11:17AM 22      A.   YES.

11:17AM 23      Q.   AND DURING ANY OF YOUR CONVERSATIONS WITH MS. HOLMES OR

11:17AM 24      MR. BALWANI BEFORE YOUR 2013 INVESTMENT, DID EITHER OF THEM

11:17AM 25      TELL YOU ABOUT THE COMPANY'S DEPENDENCE ON NON-THERANOS THIRD

11:17AM  1    PARTY ANALYZERS?

11:17AM  2    A.   NO.

11:17AM  3              MS. WALSH:  OBJECTION.  LEADING.

11:17AM  4              THE COURT:  OVERRULED.  THE ANSWER WILL REMAIN.

11:17AM  5    BY MR. BOSTIC:

11:17AM  6    Q.   MR. EISENMAN, YOUR ANSWER TO THAT QUESTION?

11:17AM  7    A.   NO.

11:17AM  8    Q.   WOULD A FACT LIKE THAT HAVE BEEN AN IMPORTANT THING FOR

11:17AM  9    YOU TO KNOW AS SOMEONE CONSIDERING AN INVESTMENT?

11:17AM 10    A.   THE FACT THAT SOME OF THE MANUFACTURING IS DONE OUTSIDE

11:17AM 11    UNITED STATES.

11:17AM 12    Q.   LET ME ASK, IF YOU HAD BEEN ASKED OR BEEN TOLD THAT THE

11:18AM 13    COMPANY WAS DEPENDENT OR RELIANT ON NON-THERANOS THIRD PARTY

11:18AM 14    ANALYZERS FOR MANY OF ITS TESTS, WOULD THAT HAVE BEEN A

11:18AM 15    RELEVANT FACT FOR YOU?

11:18AM 16    A.   YES.

11:18AM 17    Q.   AND WHY WAS THAT?

11:18AM 18    A.   WE WERE UNDER THE UNDERSTANDING THAT IT WAS PROPRIETARY

11:18AM 19    TECHNOLOGY, THAT THEY HAD DEVELOPED THIS IN HOUSE, AND THIS IS

11:18AM 20    WHAT THEY WERE USING EXCLUSIVELY.

11:18AM 21    Q.   CONTINUING IN THAT SAME THEME, LET'S LOOK AT ITEM 17 ON

11:18AM 22    THE LIST, AND DO YOU SEE THERE THAT THE CLAIM IS "THE

11:18AM 23    COMPETITION IS YEARS BEHIND TECHNOLOGY (MAYBE LONGER)."

11:18AM 24       DO YOU SEE THAT?

11:18AM 25    A.   YES.

11:18AM  1     Q.   DID THAT MATTER TO YOU AS AN INVESTOR?

11:18AM  2     A.   YES.

11:18AM  3     Q.   AND LET'S LOOK UNDER FINANCIALS IN THIS LIST OF CLAIMS

11:18AM  4     THAT MR. BALWANI RELAYED TO YOU.  AND UNDER FINANCIALS, DO YOU

11:18AM  5     SEE ITEM 1 SAYS, "THEY PREFER TO KEEP THE COMPETITION GUESSING

11:18AM  6     AS TO HOW MUCH MONEY THEY HAVE AND WHAT THEIR CURRENT REVENUE,

11:19AM  7     PROFIT MARGINS, REVENUES SOURCES, ET CETERA, ARE"?

11:19AM  8     A.   YES.

11:19AM  9     Q.   AND DO YOU SEE ITEMS 2 AND 3 SAY, "THEY CAN FUND GROWTH

11:19AM 10     THRU CURRENT OPERATIONS -- NO NEED FOR CAPITAL 3 -- THEY ARE

11:19AM 11     RAISING MONEY ONLY TO RAPIDLY ACCELERATE THE BUSINESS."

11:19AM 12          DO YOU SEE THAT?

11:19AM 13     A.   YES.

11:19AM 14     Q.   AND WAS THAT AN IMPORTANT THING FOR YOU TO KNOW AS AN

11:19AM 15     INVESTOR?

11:19AM 16     A.   YES.

11:19AM 17     Q.   AND WHAT DID THAT MEAN AS SOMEONE DECIDING TO INVEST MORE?

11:19AM 18     A.   THAT MEANT THE TECHNOLOGY WORKED, THEY WERE SUCCESSFUL,

11:19AM 19     THEY WERE GAINING MARKET ACCEPTANCE, AND THIS CAPITAL RAISE WAS

11:19AM 20     TO HELP THEM GROW FASTER.

11:19AM 21     Q.   AND FINALLY LET'S LOOK AT ITEM 13 UNDER FINANCIALS.

11:19AM 22          DO YOU SEE THERE'S A STATEMENT ATTRIBUTED TO MR. BALWANI,

11:19AM 23     THAT "THEY ARE AWARE THEY RAISED MONEY IN 2005 AND ARE

11:19AM 24     CONSCIOUS ABOUT NEEDING TO OFFER LIQUIDITY TO SHAREHOLDERS."

11:19AM 25          DO YOU SEE THAT?

11:19AM   1    A.   YES.

11:19AM   2    Q.   AND IT SAYS, "THIS CAN HAPPEN IN A TRADITIONAL WAY LIKE

11:20AM   3    IPO OR NONTRADITIONAL WAY LIKE FACEBOOK IN PRIVATE ROUND

11:20AM   4    TRANSACTIONS."

11:20AM   5         DO YOU SEE THAT?

11:20AM   6    A.   YES.

11:20AM   7    Q.   AND DID THAT SIGNAL TO YOU THAT AN IPO WAS STILL A

11:20AM   8    POSSIBILITY IN THE NEAR FUTURE?

11:20AM   9    A.   YES.

11:20AM  10    Q.   OKAY.  WE CAN SET THAT ASIDE.

11:20AM  11         LET'S LOOK NEXT AT TAB 1371 IN YOUR BINDER.

11:20AM  12              THE COURT:  WHILE WE'RE DOING THAT, WHY DON'T WE

11:20AM  13    STAND UP AND STRETCH FOR A MOMENT, LADIES AND GENTLEMEN.

11:20AM  14         1371, MR. BOSTIC?

11:20AM  15              MR. BOSTIC:  1371.

11:21AM  16         (STRETCHING.)

11:21AM  17    BY MR. BOSTIC:

11:21AM  18    Q.   MR. EISENMAN, DO YOU HAVE 1371 IN FRONT OF YOU?

11:21AM  19    A.   YES.

11:21AM  20    Q.   IS THIS AN EMAIL CHAIN BETWEEN YOU AND MR. BALWANI

11:21AM  21    RELATING TO YOUR INVESTMENT IN 2013?

11:21AM  22    A.   YES.

11:21AM  23              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS PAGES

11:21AM  24    1 THROUGH 8 OF 1371.

11:21AM  25              MS. WALSH:  NO OBJECTION.

11:21AM  1          THE COURT:  THEY'RE ADMITTED, AND THEY MAY BE

11:21AM  2   PUBLISHED.

11:21AM  3          (GOVERNMENT'S EXHIBIT 1371, PAGES 1-8, WAS RECEIVED IN

11:21AM  4   EVIDENCE.)

11:21AM  5   BY MR. BOSTIC:

11:21AM  6   Q.   LET'S START ON PAGE 6.

11:21AM  7          AND DO YOU SEE ON PAGE 6, THIS BEGINS WITH THE EMAIL THAT

11:21AM  8   YOU GOT FROM THERANOS ATTACHING THAT MEMO TO STOCKHOLDERS?

11:21AM  9   A.   YES.

11:21AM 10   Q.   AND LET'S CONTINUE UP THAT CHAIN AND GO TO PAGE 3, AND ON

11:21AM 11   PAGE 3 AT THE BOTTOM, DO YOU SEE THAT YOU WRITE AN EMAIL TO

11:21AM 12   THERANOS ASKING FOR A CALL TO INQUIRE ABOUT HOW MUCH ADDITIONAL

11:21AM 13   INVESTMENT IS AVAILABLE AND WHAT THE TIMING IS FOR PAPERWORK.

11:22AM 14          DO YOU SEE THAT?

11:22AM 15   A.   YES.

11:22AM 16   Q.   AND IT SAYS, "WE MAY BE INTERESTED IN $1 MILLION."

11:22AM 17          DO YOU SEE THAT?

11:22AM 18   A.   YES.

11:22AM 19   Q.   AND THE DATE OF THIS EMAIL WAS DECEMBER 23RD; IS THAT

11:22AM 20   RIGHT?

11:22AM 21   A.   YES.

11:22AM 22   Q.   WAS THAT THE DAY AFTER YOU RECEIVED THE REPORT ABOUT

11:22AM 23   MR. MENDENHALL'S CALL WITH SUNNY BALWANI?

11:22AM 24   A.   YES.

11:22AM 25   Q.   LET'S LOOK AT THE EMAIL ABOUT THAT.  SO YOU EMAILED

11:22AM   1    THERANOS'S EMAIL ADDRESS; CORRECT?

11:22AM   2    A.   YES.

11:22AM   3    Q.   AND YOU GET A RESPONSE BACK FROM SUNNY BALWANI.

11:22AM   4         DO YOU SEE THAT?

11:22AM   5    A.   YES.

11:22AM   6    Q.   AND ON THAT SAME DAY HE WRITES YOU, "LET ME KNOW WHAT TIME

11:22AM   7    WOULD BE GOOD TO TALK AND I CAN CALL AND DISCUSS THIS."

11:22AM   8         DO YOU SEE THAT?

11:22AM   9    A.   YES.

11:22AM  10    Q.   AND AFTER SOME FOLLOW-UP COMMUNICATIONS ABOUT THE CALL AND

11:22AM  11    TIMING, DID YOU END UP SPEAKING TO MR. BALWANI ON THAT DATE?

11:22AM  12    A.   YES.

11:22AM  13    Q.   AND DO YOU REMEMBER ANYTHING SPECIFIC ABOUT WHAT YOU

11:23AM  14    LEARNED DURING THAT CALL?

11:23AM  15    A.   DO YOU HAVE A NOTE THAT I CAN --

11:23AM  16    Q.   NO.  I'M JUST ASKING YOU IF YOU REMEMBER RECEIVING ANY

11:23AM  17    IMPORTANT FACTS ABOUT THE COMPANY DURING THAT PARTICULAR CALL

11:23AM  18    WITH THE COMPANY?

11:23AM  19    A.   MY RECOLLECTION IS IT WAS A GENERAL CALL JUST RATIFYING

11:23AM  20    ALL OF THESE THINGS THAT I HAD LEARNED FROM PAT MENDENHALL AND

11:23AM  21    FROM THE EMAIL THAT I GOT FROM THE COMPANY GENERALLY; THAT THE

11:23AM  22    TECHNOLOGY WORKED; THAT THIS WAS FOR GROWTH CAPITAL.

11:23AM  23         AND THEN ONE OTHER FACTOR THAT I LEARNED IS THAT THIS IS

11:23AM  24    WHAT IS CALLED A FRIENDS AND FAMILY ROUND; THAT THESE WERE FOR

11:23AM  25    EXISTING SHAREHOLDERS; IT WAS A SMALL FINANCIAL RAISE AT THE

11:23AM   1    EQUIVALENT OF $15 A SHARE.  THEY WERE GOING TO CLOSE THIS OUT

11:23AM   2    AND RIGHT AFTER THE FIRST OF THE YEAR THERE WAS A MUCH LARGER

11:24AM   3    INSTITUTIONAL RAISE THAT PRESUMABLY WAS GOING TO BE AT A HIGHER

11:24AM   4    PLACE, IT WAS MENTIONED MAYBE $17 PER SHARE, AND THE

11:24AM   5    INSTITUTIONAL ROUND WAS OVERSUBSCRIBED.

11:24AM   6    Q.   AND DURING THAT CONVERSATION WITH MR. BALWANI, DID

11:24AM   7    ANYTHING THAT HE SAID CHANGE THE PREVIOUS UNDERSTANDING YOU HAD

11:24AM   8    HAD ABOUT THE COMPANY'S TECHNOLOGY, WHAT IT COULD DO OR THINGS

11:24AM   9    LIKE THAT?

11:24AM  10    A.   NO.

11:24AM  11    Q.   AFTER SPEAKING WITH MR. BALWANI, DID YOU DECIDE TO INVEST

11:24AM  12    MORE MONEY IN THERANOS?

11:24AM  13    A.   YES.

11:24AM  14    Q.   APPROXIMATELY HOW MUCH MORE DID YOU INVEST IN THE COMPANY

11:24AM  15    IN 2013?

11:24AM  16    A.   $100,000.

11:24AM  17    Q.   IN CONNECTION WITH THAT INVESTMENT, DID YOU SIGN A STOCK

11:24AM  18    PURCHASE AGREEMENT?

11:24AM  19    A.   YES.

11:24AM  20    Q.   IF I COULD ASK YOU TO GO BACK TO 1334.

11:24AM  21         LET'S DISPLAY PAGE 59.

11:25AM  22         AND, MR. EISENMAN, IS THIS THE FIRST PAGE OF THE STOCK

11:25AM  23    PURCHASE AGREEMENT THAT YOU EXECUTED?  IT'S ALSO ON THE SCREEN

11:25AM  24    IF THAT'S EASIER.

11:25AM  25    A.   YES.  YES.

11:25AM  1    Q.   LET'S LOOK AT A FEW PROVISIONS HERE ON PAGE 65.

11:25AM  2         DO YOU SEE UNDER SECTION 4 HERE THERE'S A TITLE

11:25AM  3    REPRESENTATIONS AND WARRANTIES OF THE INVESTORS?

11:25AM  4    A.   YES.

11:25AM  5    Q.   UNDER 4.3 IT TALKS ABOUT INVESTMENT EXPERIENCE AND THE

11:25AM  6    INVESTOR HAVING SUBSTANTIAL EXPERIENCE IN EVALUATING AND

11:25AM  7    INVESTING IN PRIVATE PLACEMENT TRANSACTIONS OF SECURITIES AND

11:25AM  8    COMPANIES SIMILAR TO THE COMPANY.

11:25AM  9         DO YOU SEE THAT?

11:25AM 10    A.   YES.

11:25AM 11    Q.   AND LET'S GO TO THE NEXT PAGE, TO PAGE 4.6.

11:25AM 12         LET ME ASK YOU, WERE YOU AN EXPERIENCED INVESTOR AT THIS

11:25AM 13    TIME?

11:25AM 14    A.   YES.

11:26AM 15    Q.   UNDER 4.6, DO YOU SEE THERE'S A REPRESENTATION THAT THE

11:26AM 16    INVESTOR IS AN ACCREDITED INVESTOR UNDER A CERTAIN REGULATION?

11:26AM 17    A.   YES.

11:26AM 18    Q.   AND WAS THAT TRUE FOR YOU AT THE TIME?

11:26AM 19    A.   YES.

11:26AM 20    Q.   LET'S GO TO THE NEXT PAGE, 4.9.

11:26AM 21         DO YOU SEE THERE IT SAYS, "THE INVESTOR UNDERSTANDS AND

11:26AM 22    ACKNOWLEDGES THAT NO PUBLIC MARKET NOW EXISTS FOR ANY OF THE

11:26AM 23    SECURITIES ISSUED BY THE COMPANY"?

11:26AM 24    A.   YES.

11:26AM 25    Q.   AND DID YOU UNDERSTAND THAT AT THE TIME?

EISENMAN DIRECT BY MR. BOSTIC                                    5410

11:26AM  1    A.   YES.

11:26AM  2    Q.   LET'S GO BACK TO PAGE 65 AND LOOK AT SECTION 4.4 AT THE

11:26AM  3    BOTTOM.

11:26AM  4         AND THAT'S TITLED SPECULATIVE NATURE OF INVESTMENT.

11:26AM  5         DO YOU SEE THAT?

11:26AM  6    A.   YES.

11:26AM  7    Q.   AND HERE IT SAYS, "THE INVESTOR UNDERSTANDS AND

11:26AM  8    ACKNOWLEDGES THAT THE COMPANY HAS A LIMITED FINANCIAL AND

11:26AM  9    OPERATING HISTORY AND THAT AN INVESTMENT IN THE COMPANY IS

11:26AM  10   HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS."

11:26AM  11        DO YOU SEE THAT?

11:26AM  12   A.   YES.

11:26AM  13   Q.   AND DID YOU AGREE WITH THAT LANGUAGE AT THE TIME?

11:27AM  14   A.   NO.

11:27AM  15   Q.   YOU ENTERED INTO THIS AGREEMENT; CORRECT?

11:27AM  16   A.   YES.

11:27AM  17   Q.   AND CAN YOU EXPLAIN WHAT YOU MEAN WHEN YOU SAY YOU DIDN'T

11:27AM  18   AGREE WITH THAT PARTICULAR LANGUAGE?

11:27AM  19   A.   BECAUSE THE INFORMATION THAT I HAD AT THAT POINT IN TIME,

11:27AM  20   THIS WAS NOT A SPECULATIVE AND RISKY INVESTMENT.  THE RISK HAD

11:27AM  21   BEEN TAKEN OUT.

11:27AM  22   Q.   AND YOU SAY THE INFORMATION THAT YOU HAD AT THE TIME.

11:27AM  23        WHAT INFORMATION ARE YOU REFERRING TO?

11:27AM  24   A.   THE EMAIL THAT I GOT FROM PAT MENDENHALL OF HIS

11:27AM  25   CONVERSATION WITH MR. BALWANI, THE INFORMATION THAT CAME

EISENMAN DIRECT BY MR. BOSTIC                                    5411

11:27AM   1    DIRECTLY FROM THE THERANOS WEBSITE, FINANCIAL PRESS, BUT

11:27AM   2    PRIMARILY THE COMMUNICATION DIRECTLY FROM THE COMPANY AND

11:27AM   3    MR. BALWANI WERE OF PRIMARY IMPORTANCE.

11:27AM   4    Q.   LET'S LOOK AT 4.5, AND IT SAYS ACCESS TO DATA.

11:27AM   5         "SUCH AN INVESTOR HAS HAD AN OPPORTUNITY TO ASK QUESTIONS

11:28AM   6    OF, AND RECEIVE ANSWERS FROM, THE OFFICERS OF THE COMPANY

11:28AM   7    CONCERNING AGREEMENTS," AND OTHER ITEMS.

11:28AM   8         AND IT SAYS, "SUCH INVESTOR BELIEVES THAT IT HAS RECEIVED

11:28AM   9    ALL OF THE INFORMATION SUCH INVESTOR CONSIDERS NECESSARY OR

11:28AM  10    APPROPRIATE FOR DECIDING WHETHER TO PURCHASE THE SHARES."

11:28AM  11         DO YOU SEE THAT?

11:28AM  12    A.   YES.

11:28AM  13    Q.   DID YOU AGREE WITH THAT LANGUAGE AT THE TIME?

11:28AM  14    A.   NO.

11:28AM  15    Q.   WHY NOT?

11:28AM  16    A.   BECAUSE I HAD ALSO REQUESTED FINANCIAL INFORMATION, AND

11:28AM  17    THE OTHER CIRCUMSTANCE WAS THAT I INVESTED IN OTHER COMPANIES

11:28AM  18    AT VARIOUS STAGES, THEY PROVIDE EITHER -- THEY PROVIDE HISTORIC

11:28AM  19    FINANCIAL DATA, AND SOMETIMES THEY HAVE WHAT IS CALLED A PRO

11:28AM  20    FORMA, SOME FUTURE LOOKING ESTIMATES OF WHAT THEY THINK IS

11:28AM  21    GOING TO HAPPEN IN THE NEXT YEAR OR TWO.

11:28AM  22         I HAD REQUESTED THAT INFORMATION, BUT I NEVER RECEIVED IT.

11:28AM  23    Q.   OKAY.  SO I WANT YOU TO THINK ABOUT YOUR DECISION TO

11:28AM  24    INVEST IN 2013.

11:28AM  25         SO FAR WE HAVE DISCUSSED ATTEMPTS THAT YOU HAVE MADE TO

ER-4041

11:29AM 1    GET MORE INFORMATION ABOUT THE COMPANY AND HOW THOSE ATTEMPTS

11:29AM 2    WERE UNSUCCESSFUL; IS THAT RIGHT?

11:29AM 3    A.   YES.

11:29AM 4    Q.   WE ALSO SAW SOME COMMUNICATION, AT LEAST WITH MS. HOLMES,

11:29AM 5    THAT INDICATED SOME TENSION IN THE RELATIONSHIP; IS THAT FAIR

11:29AM 6    TO SAY?

11:29AM 7    A.   YES.

11:29AM 8    Q.   GIVEN THOSE ISSUES, WHY DID YOU MAKE THE DECISION TO

11:29AM 9    INVEST MORE MONEY IN THE COMPANY IN 2013?

11:29AM 10   A.   BECAUSE THIS WAS WHAT'S CALLED A SEAT AT THE TABLE.  WHEN

11:29AM 11   YOU INVEST IN AN EARLY STAGE COMPANY, A LOT OF TIMES YOU'RE

11:29AM 12   GIVEN THE OPPORTUNITY TO INVEST IN LATER ROUNDS BEFORE THE

11:29AM 13   GENERAL PUBLIC OR BEFORE INSTITUTIONS, AS WAS THE CASE IN THIS

11:29AM 14   SITUATION.

11:29AM 15       WHEN WE HAD THE OPPORTUNITY TO INVEST IN THIS LATER ROUND,

11:29AM 16   WE WERE PRIVY TO A LOT MORE INFORMATION; WE WERE PRIVY TO

11:29AM 17   INFORMATION DIRECTLY FROM MR. BALWANI AND THE FINANCIAL PRESS

11:29AM 18   THAT THIS WAS TECHNOLOGY THAT WAS PROVEN, THAT WAS SUCCESSFUL,

11:30AM 19   THAT WAS WORKING; THERE WAS A LARGE MARKETPLACE THAT WAS

11:30AM 20   ALREADY ESTABLISHED BY THEIR COMPETITORS.

11:30AM 21       THEY HAD GIVEN US AN INDICATION THAT THIS WAS A BETTER

11:30AM 22   TECHNOLOGY FOR VARIOUS REASONS THAN THEIR COMPETITORS, AND THEY

11:30AM 23   WERE GOING TO CAPTURE A LOT OF THAT MULTI, MULTI BILLION DOLLAR

11:30AM 24   MARKET.

11:30AM 25       SO IN SPITE OF THE FACT THAT I DID NOT HAVE EVERY PIECE OF

11:30AM   1    INFORMATION THAT I REQUESTED, I.E., THE FINANCIAL INFORMATION,

11:30AM   2    I HAD ENOUGH INFORMATION TO ASSURE ME THAT THIS WAS A VERY,

11:30AM   3    VERY GOOD INVESTMENT IN TERMS OF RISK AND REWARD.

11:30AM   4          AND THE OTHER CARROT, EVEN THOUGH IT WAS A SMALLER CARROT

11:30AM   5    WAS THIS WAS A FAVOR TO EXISTING SHAREHOLDERS TO INVEST AT A

11:30AM   6    MORE FAVORABLE PRICE BECAUSE THERE WAS OVERSUBSCRIBED DEMAND TO

11:30AM   7    INSTANTLY CLOSE THIS ROUND, MARK THE PRICE UP, AND RAISE A LOT

11:30AM   8    MORE MONEY FROM INSTITUTIONS.

11:30AM   9    Q.   LET ME ASK ABOUT THE TONE OF YOUR COMMUNICATIONS WITH

11:30AM  10    MR. BALWANI AROUND THE TIME OF YOUR INVESTMENT IN 2013.

11:31AM  11          AFTER YOU EMAILED AND INDICATED THAT YOU MIGHT BE

11:31AM  12    INTERESTED IN INVESTING ANOTHER MILLION DOLLARS, WHAT WAS THE

11:31AM  13    TONE OF YOUR CONVERSATION WITH MR. BALWANI LIKE?

11:31AM  14    A.   VERY CORDIAL.

11:31AM  15    Q.   YOU CAN PUT THAT EXHIBIT ASIDE, AND LET'S LOOK AT

11:31AM  16    EXHIBIT 2057 IN YOUR BINDER.  LET ME KNOW WHEN YOU'RE THERE.

11:31AM  17    A.   YES.

11:31AM  18    Q.   AFTER YOU INVESTED MORE MONEY IN THERANOS, DID YOU

11:31AM  19    CONTINUE TO TRY TO GET MORE INFORMATION ABOUT THE COMPANY?

11:31AM  20    A.   YES.

11:31AM  21    Q.   AND HOW DID YOU GO ABOUT DOING THAT?

11:31AM  22    A.   CALLS, EMAILS.

11:31AM  23    Q.   AND WAS THE COMPANY -- LET ME ASK SPECIFICALLY.  WERE

11:31AM  24    MS. HOLMES AND MR. BALWANI FORTHCOMING WITH YOU, FOLLOWING YOUR

11:31AM  25    INVESTMENT, ABOUT ADDITIONAL INFORMATION ABOUT THE COMPANY?

11:32AM   1    A.   NO.

11:32AM   2    Q.   DID YOU REVIEW PUBLICLY AVAILABLE INFORMATION ABOUT

11:32AM   3    THERANOS?

11:32AM   4    A.   YES.

11:32AM   5    Q.   AT 2057, DO YOU SEE AN EMAIL EXCHANGE BETWEEN YOU AND

11:32AM   6    MR. BALWANI RELATING TO SOME PUBLIC INFORMATION THAT YOU FOUND?

11:32AM   7    A.   YES.

11:32AM   8            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 2057.

11:32AM   9            MS. WALSH:  NO OBJECTION.

11:32AM  10            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:32AM  11        (GOVERNMENT'S EXHIBIT 2057 WAS RECEIVED IN EVIDENCE.)

11:32AM  12    BY MR. BOSTIC:

11:32AM  13    Q.   LET'S START ON PAGE 1 -- ACTUALLY, JUST THE BOTTOM HALF.

11:32AM  14        DO YOU SEE, MR. EISENMAN, THAT THIS BEGINS WITH AN

11:32AM  15    OCTOBER 8TH, 2014 EMAIL FROM YOU TO MR. BALWANI AND

11:32AM  16    MS. HOLMES?

11:32AM  17    A.   YES.

11:32AM  18    Q.   AND THE SUBJECT IS NEGATIVE REPORT ON THERANOS FROM UBS.

11:32AM  19        DO YOU SEE THAT?

11:32AM  20    A.   YES.

11:32AM  21    Q.   AND WHAT WAS THIS ABOUT?

11:32AM  22    A.   UBS IS A WALL STREET FIRM, A CREDIBLE FIRM, LARGE

11:33AM  23    WALL STREET FIRM, AND THEY PUT OUT A RESEARCH REPORT WITH --

11:33AM  24    CASTING DOUBT ON SOME OF THERANOS'S CLAIMS.

11:33AM  25    Q.   LET'S LOOK AT THAT REPORT BRIEFLY ON PAGE 2 OF YOUR EMAIL.

11:33AM  1           AND AT THE TOP OF THE PAGE THERE, DO YOU SEE THAT THERE'S

11:33AM  2    A HEADING "THERANOS REMAINS A FOCUS FOR INVESTORS"?

11:33AM  3    A.   YES.

11:33AM  4    Q.   AND DO YOU SEE THAT IN THE MIDDLE OF THAT PARAGRAPH IT

11:33AM  5    SAYS, "THE MODEL, AS SEEN IN A HANDFUL OF WALGREENS LOCATIONS,

11:33AM  6    HAS EVOLVED INTO A TRADITIONAL REFERENCE LAB OFFERING WHERE

11:33AM  7    BLOOD IS DRAWN MOSTLY THROUGH VENIPUNCTURE AND SENT TO A

11:33AM  8    REGIONAL LAB LOCATION WITH A 24 PLUS HOUR TURN AROUND."

11:33AM  9           DO YOU SEE THAT?

11:33AM  10   A.   YES.

11:33AM  11   Q.   AND AT THE BOTTOM OF THE PARAGRAPH IT SAYS, "OUR

11:33AM  12   CONSULTANT BELIEVES IT IS HIGHLY UNLIKELY THAT ALL OF THESE

11:33AM  13   TESTS ARE BEING DONE ON ONE MACHINE."

11:33AM  14          DO YOU SEE THAT?

11:33AM  15   A.   YES.

11:33AM  16   Q.   WAS THAT INFORMATION CONCERNING TO YOU AT THE TIME?

11:34AM  17   A.   TREMENDOUSLY.

11:34AM  18   Q.   WHY?

11:34AM  19   A.   BECAUSE WE WERE UNDER THE IMPRESSION THAT THE TECHNOLOGY

11:34AM  20   WORKED, IT WORKED ON SITE, IT WAS A SMALL BLOOD DRAW, IT WAS

11:34AM  21   ANALYZED WITHIN A PERIOD OF A FEW HOURS ON SITE, AND THIS

11:34AM  22   CONTRADICTED ALL OF THE COMPETITIVE ADVANTAGES THAT WE WERE LED

11:34AM  23   TO BELIEVE THAT THERANOS HAD.

11:34AM  24   Q.   LET'S GO BACK TO PAGE 1 AND SEE YOUR EMAIL AND

11:34AM  25   MR. BALWANI'S RESPONSE.

EISENMAN DIRECT BY MR. BOSTIC                                    5416

11:34AM   1          ACTUALLY, JUST BELOW THAT.

11:34AM   2          SORRY, MS. WACHS.  CAPTURING THE ORIGINAL EMAIL.  THANK

11:34AM   3     YOU.

11:34AM   4          DO YOU SEE AT THE BOTTOM OF THAT SECTION YOU WRITE ABOUT

11:34AM   5     THE UBS REPORT, "THEY CLAIM THAT THE BLOOD SAMPLES HAVE TO BE

11:34AM   6     SENT TO PALO ALTO, THEY ARE LESS RELIABLE THAN TRADITIONAL

11:35AM   7     TESTS, AND THE TURN-AROUND TIME IS OVER 24 HOURS"?

11:35AM   8     A.   YES.

11:35AM   9     Q.   WERE YOU RAISING THESE CONCERNS ASKING FOR A RESPONSE FROM

11:35AM  10     MR. BALWANI AND MS. HOLMES?

11:35AM  11     A.   YES.

11:35AM  12     Q.   LET'S SEE MR. BALWANI'S RESPONSE JUST ABOVE THAT.

11:35AM  13          AND DO YOU SEE THAT HE WRITES BACK, "DOESN'T SURPRISE US.

11:35AM  14     SOUNDS LIKE AN UNINFORMED CONSULTANT."

11:35AM  15          DO YOU SEE THAT?

11:35AM  16     A.   YES.

11:35AM  17     Q.   AND WHAT DID THAT RESPONSE SIGNAL TO YOU?

11:35AM  18     A.   IT SIGNALLED THEY WERE HEDGING BECAUSE HE DID NOT DENY

11:35AM  19     WHAT WE HAD BEEN LED TO BELIEVE.

11:35AM  20     Q.   YOU RESPONDED TO THAT EMAIL FROM MR. BALWANI WRITING, "THE

11:35AM  21     BLOOD SAMPLES CAN BE ANALYZED ON SITE, AND DON'T HAVE TO BE

11:35AM  22     SENT TO A LAB, CORRECT?"

11:35AM  23          DO YOU SEE THAT?

11:35AM  24     A.   YES.

11:35AM  25     Q.   AND MR. BALWANI WRITES BACK, "WE HAVEN'T ANNOUNCED THESE

11:35AM  1      DETAILS ABOUT WHAT CAN BE DONE.  THANKS."

11:35AM  2           DO YOU SEE THAT?

11:35AM  3      A.   YES.

11:35AM  4      Q.   AND THEN AT THE TOP YOU WRITE, "I THOUGHT ELIZABETH SAID

11:35AM  5      THE RESULTS WERE AVAILABLE IN 2-4 HOURS, WHICH IMPLIES THE

11:36AM  6      SAMPLES ARE TESTED LOCALLY."

11:36AM  7           YOU THEN SAY A COUPLE OF SENTENCES LATER, "IF THIS IS

11:36AM  8      PROPRIETARY INFO, I WILL STOP ASKING.  I HAVE ALSO NOT RECEIVED

11:36AM  9      ANY INFORMATION ON HOW I CAN RECEIVE MY STOCK SPLIT SHARES."

11:36AM 10           DO YOU SEE THAT?

11:36AM 11      A.   YES.

11:36AM 12      Q.   DID MR. BALWANI OR MS. HOLMES EVER GET BACK TO YOU TO

11:36AM 13      EXPLAIN TO YOU HOW THERANOS WAS ACTUALLY OPERATING IN TERMS OF

11:36AM 14      WHAT YOU READ IN THE UBS REPORT?

11:36AM 15      A.   NO.

11:36AM 16      Q.   OKAY.  WE CAN SET THAT ASIDE.

11:36AM 17           LET'S LOOK AT 2468 IN YOUR BINDER.

11:36AM 18           LET'S MOVE FORWARD INTO 2015.  LET ME ASK YOU, DURING THAT

11:36AM 19      TIME PERIOD, DID YOU CONTINUE TO HAVE COMMUNICATIONS WITH

11:36AM 20      MR. BALWANI AND MS. HOLMES?

11:36AM 21      A.   ATTEMPTED.

11:36AM 22      Q.   AND WAS THE SUBJECT OF SOME OF THOSE ATTEMPTED

11:37AM 23      COMMUNICATIONS A POSSIBILITY OF GETTING RID OF YOUR SHARES IN

11:37AM 24      THERANOS?

11:37AM 25      A.   YES.

ER-4047

11:37AM  1    Q.   CAN YOU EXPLAIN HOW THAT CAME TO HAPPEN AND WHAT THE

11:37AM  2    CIRCUMSTANCES WERE?

11:37AM  3    A.   I WAS ALWAYS LOOKING FOR LIQUIDITY EVENTS, WHETHER IT BE

11:37AM  4    BY IPO OR PRIVATE TRANSACTION OR A COMPANY BUYING BACK STOCK,

11:37AM  5    SO IT WAS JUST A CONSTANT ATTEMPT TO FIND OUT IF ANY OF THOSE

11:37AM  6    AVENUES WERE AVAILABLE.

11:37AM  7    Q.   LOOKING AT TAB 2468, DO YOU SEE AN EMAIL EXCHANGE BETWEEN

11:37AM  8    YOU, MS. HOLMES, AND MR. BALWANI IN APRIL OF 2015 ON THAT

11:37AM  9    TOPIC?

11:37AM  10   A.   YES.

11:37AM  11        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 2468.

11:37AM  12        MS. WALSH:  NO OBJECTION, YOUR HONOR, EXCEPT THAT

11:37AM  13   THERE IS A REDACTION THAT WE WOULD REQUEST ON PAGE 2.  IT'S THE

11:38AM  14   REFERENCE IN THE FIRST SENTENCE OF -- AT THE TOP OF PAGE 2.

11:38AM  15        MR. BOSTIC:  YOUR HONOR, I'M NOT SURE THAT THE

11:38AM  16   REDACTION IS NECESSARY, BUT WE'LL, WE'LL ABIDE BY THE COURT'S

11:38AM  17   ORDER.

11:38AM  18        MS. WALSH:  JUST THE PERSONAL CIRCUMSTANCES.

11:38AM  19        THE COURT:  YES.  I SEE THAT.

11:38AM  20   CAN THAT BE REDACTED?

11:38AM  21        MR. BOSTIC:  IT CAN BE, YOUR HONOR.

11:38AM  22        THE COURT:  THIS IS FOLLOWING "RETIRING"?

11:38AM  23        MR. BOSTIC:  THE REST OF THE SENTENCE FOLLOWING THE

11:38AM  24   WORD "RETIRING"?

11:38AM  25        THE COURT:  JUST TO THE WORD "AND."  I THINK THAT

11:38AM  1    CENTER PIECE THERE, IF YOU FOLLOW THAT.

11:38AM  2            MR. BOSTIC:  JUST THE CLAUSE BETWEEN THE COMMAS?

11:38AM  3            THE COURT:  CORRECT.

11:38AM  4            MR. BOSTIC:  ONE MOMENT, YOUR HONOR, IF I COULD?

11:38AM  5            THE COURT:  SURE.

11:38AM  6            MR. BOSTIC:  YOUR HONOR, WITH THAT REDACTION, MAY WE

11:39AM  7    PUBLISH?

11:39AM  8            THE COURT:  YES, SURE.

11:39AM  9            MR. BOSTIC:  AND IS THIS EXHIBIT ADMITTED,

11:39AM 10    YOUR HONOR?

11:39AM 11            THE COURT:  IT IS.

11:39AM 12            MR. BOSTIC:  APOLOGIES.

11:39AM 13        (GOVERNMENT'S EXHIBIT 2468, REDACTED, WAS RECEIVED IN

11:39AM 14    EVIDENCE.)

11:39AM 15    BY MR. BOSTIC:

11:39AM 16    Q.   LOOKING AT THIS CHAIN, MR. EISENMAN, DO YOU SEE THAT WE'RE

11:39AM 17    LOOKING AT THIS EMAIL BETWEEN YOU, MR. BALWANI, AND MS. HOLMES

11:39AM 18    IN MARCH OF 2015?

11:39AM 19    A.   YES.

11:39AM 20    Q.   AND LET'S LOOK AT PAGE 2, AND AT THE BOTTOM OF THE PAGE

11:39AM 21    YOU WRITE IN MARCH OF 2015 JUST TO MR. BALWANI.

11:39AM 22        DO YOU SEE THAT?

11:39AM 23    A.   YES.

11:39AM 24    Q.   AND YOU SAY, "SUNNY,

11:39AM 25        "WE HAVE BEEN INFORMED OF AN OPPORTUNITY TO SELL THERANOS

EISENMAN DIRECT BY MR. BOSTIC                                    5420

11:39AM  1    STOCK.  BEFORE WE DO, WE WANTED TO GET SOME NARRATIVE FROM YOU,

11:39AM  2    TO GET A SENSE WHETHER OUR VALUE HAS GROWN IN THE YEAR AND

11:39AM  3    3 MONTHS SINCE THE ROUND VALUING THE COMPANY AT 9 BILLION WAS

11:39AM  4    PRICED."

11:39AM  5        DO YOU SEE THAT?

11:39AM  6    A.  YES.

11:39AM  7    Q.  WHY WERE YOU REACHING OUT TO MR. BALWANI TO GET THIS

11:39AM  8    INFORMATION?

11:39AM  9    A.  BECAUSE MR. BALWANI WAS ONE OF THE KEY EXECUTIVES AT THE

11:39AM  10   COMPANY AND WOULD BE PRIVY TO THE TYPE OF INFORMATION AN

11:39AM  11   INVESTOR WOULD WANT TO HAVE BEFORE MAKING A DECISION TO SELL

11:40AM  12   STOCK.

11:40AM  13   Q.  OKAY.  LET'S LOOK AT MR. BALWANI'S RESPONSE TO YOUR

11:40AM  14   REQUEST.

11:40AM  15       AND JUST ABOVE THAT THERE'S AN EMAIL FROM HIM TO YOU.

11:40AM  16       HE SAYS, "THE LAST TRANSACTION WAS AT $17 PER SHARE AS YOU

11:40AM  17   ALREADY KNOW.

11:40AM  18       "I DID NOT SAY WE WILL HAVE, OR CONSIDER A LIQUIDITY EVENT

11:40AM  19   IN 2015.

11:40AM  20       "WE DON'T KNOW ANYTHING OF THIS TRANSACTION BELOW."

11:40AM  21       DO YOU SEE THAT?

11:40AM  22   A.  YES.

11:40AM  23   Q.  IN THAT RESPONSE, DID HE PROVIDE YOU ANY OF THE

11:40AM  24   INFORMATION THAT YOU REQUESTED ABOUT WHERE THINGS STOOD WITH

11:40AM  25   THE COMPANY IN ITS VALUE?

ER-4050

11:40AM  1    A.   NO.

11:40AM  2    Q.   LET'S GO JUST ABOVE THAT TO THE TOP OF PAGE 2 AND SEE YOUR

11:40AM  3    MESSAGE.

11:40AM  4         IN RESPONSE, DO YOU SEE THAT YOU PROVIDE MR. BALWANI WHAT

11:40AM  5    YOU SAY ARE A FEW FACTS?

11:40AM  6    A.   YES.

11:40AM  7    Q.   AND YOU SAY WHEN YOU FIRST SPOKE TO ELIZABETH OVER NINE

11:41AM  8    YEARS AGO AND MADE YOUR INVESTMENT, SHE THOUGHT THE COMPANY

11:41AM  9    WOULD IPO IN THREE TO FIVE YEARS.

11:41AM  10        DO YOU REMEMBER SAYING THAT?

11:41AM  11   A.   YES.

11:41AM  12   Q.   AND UNDER ITEM 2 YOU WRITE, "WHEN I SPOKE TO YOU IN THE

11:41AM  13   LAST QUARTER OF 2014, YOU DID SAY THAT YOU UNDERSTOOD THAT SOME

11:41AM  14   INVESTORS WOULD LIKE AN EXIT AFTER 10 YEARS, AND THAT THERE MAY

11:41AM  15   BE A PRIVATE TRANSACTION TO FACILITATE THIS."

11:41AM  16        DO YOU REMEMBER MR. BALWANI SAYING THAT?

11:41AM  17   A.   YES.

11:41AM  18   Q.   LET'S GO TO PAGE 1.

11:41AM  19        AND DO YOU SEE AT THE BOTTOM OF PAGE 1 YOU'RE STILL TRYING

11:41AM  20   TO GET ANSWERS TO YOUR QUESTIONS?

11:41AM  21   A.   YES.

11:41AM  22   Q.   AND DO YOU SEE THAT MR. BALWANI WRITES BACK TO YOU IN THE

11:41AM  23   MIDDLE OF THE PAGE, "I ALREADY RESPONDED TO YOUR QUESTION ABOUT

11:41AM  24   YOU WANTING TO SELL YOUR SHARES TO SOMEONE WHO WANTS TO BUY

11:41AM  25   YOUR SHARES."

EISENMAN DIRECT BY MR. BOSTIC                                    5422

11:41AM   1            DO YOU SEE THAT?

11:41AM   2     A.    YES.

11:41AM   3     Q.    HAD YOU ACTUALLY GOTTEN A RESPONSE FROM MR. BALWANI

11:42AM   4     ANSWERING YOUR QUESTIONS?

11:42AM   5     A.    NO.

11:42AM   6     Q.    AROUND THIS TIME PERIOD, WERE MR. BALWANI AND MS. HOLMES

11:42AM   7     GIVING YOU ANY SUBSTANTIVE INFORMATION ABOUT THE COMPANY'S

11:42AM   8     ACTIVITIES OR ITS BUSINESS?

11:42AM   9     A.    NO.

11:42AM  10     Q.    GOING UP THE PAGE, LOOKING AT YOUR RESPONSE TO

11:42AM  11     MR. BALWANI, AND YOU INCLUDE MS. HOLMES AGAIN.

11:42AM  12            DO YOU SEE THAT?

11:42AM  13     A.    YES.

11:42AM  14     Q.    YOU SAY, "THE RESPONSE I AM LOOKING FOR FROM YOU OR

11:42AM  15     ELIZABETH IS A BUSINESS UPDATE LIKE YOU PROVIDED LAST YEAR WHEN

11:42AM  16     WE DISCUSSED THE COMPANY'S TIMETABLE FOR A PRIVATE OR PUBLIC

11:42AM  17     LIQUIDITY EVENT," AND OTHER ITEMS.

11:42AM  18            DO YOU SEE THAT?

11:42AM  19     A.    YES.

11:42AM  20     Q.    AND IN THE ABOVE PARAGRAPH YOU WRITE, "IT IS REALLY UNFAIR

11:42AM  21     FOR YOU TO PLAY THIS CAT AND MOUSE GAME WITH ME.  I HAVE BEEN A

11:42AM  22     SHAREHOLDER FOR OVER 9 YEARS AND I, AS WELL AS MY DAUGHTER,

11:42AM  23     ALSO AS A SHAREHOLDER, ARE IN A DIFFERENT STAGE OF LIFE.  I

11:42AM  24     CAN'T MAKE A RATIONALE DECISION TO SELL OR HOLD MY STOCK WITH

11:42AM  25     THE LACK OF INFORMATION YOU HAVE PROVIDED."

11:43AM 1          DOES THAT ACCURATELY REFLECT HOW YOU FELT AT THE TIME?

11:43AM 2     A.   YES.

11:43AM 3     Q.   AND YOU WRITE, "I AM REALLY HOPING FOR A MEANINGFUL

11:43AM 4     DIALOGUE ADDRESSING THE ISSUES ABOVE."

11:43AM 5          FOLLOWING THIS, DID YOU EVER GET A MEANINGFUL DIALOGUE

11:43AM 6     WITH MS. HOLMES OR MR. BALWANI ABOUT THE ACTIVITIES OF

11:43AM 7     THERANOS?

11:43AM 8     A.   NO.

11:43AM 9     Q.   LET'S LOOK AT MR. BALWANI'S RESPONSE TO YOU AT THE TOP OF

11:43AM 10    THE PAGE.  DO YOU SEE HE WRITES, "ALAN.

11:43AM 11         "YOUR EMAILS ARE INSULTING, FULL OF INACCURATE STATEMENTS

11:43AM 12    AND WASTEFUL OF OUR TIME.

11:43AM 13         "OUR NEXT RESPONSE TO THIS EMAIL AND ALL OF YOUR FUTURE

11:43AM 14    EMAILS WILL COME FROM OUR COUNSEL."

11:43AM 15         DO YOU SEE THAT?

11:43AM 16    A.   YES.

11:43AM 17    Q.   DID YOU END UP SELLING YOUR THERANOS SHARES TO A THIRD

11:43AM 18    PART OR ANYONE ELSE?

11:43AM 19    A.   NO.

11:43AM 20    Q.   DID YOU EVER REALIZE ANY PROFIT ON YOUR PURCHASE OF EQUITY

11:43AM 21    IN THERANOS?

11:43AM 22    A.   NO.

11:43AM 23    Q.   AND WHAT IS YOUR UNDERSTANDING OF THE CURRENT VALUE OF

11:44AM 24    YOUR HOLDING IN THERANOS?

11:44AM 25    A.   IT'S WORTHLESS.

11:44AM 1        MR. BOSTIC: MAY I HAVE A MOMENT, YOUR HONOR?

11:44AM 2        THE COURT: YES.

11:44AM 3        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:44AM 4    BY MR. BOSTIC:

11:44AM 5    Q.   MR. EISENMAN, MY LAST KIND OF CLEAN-UP QUESTION FOR YOU IS

11:44AM 6    THE TIMING OF YOUR INVESTMENT IN 2013.  DO YOU REMEMBER WHEN

11:44AM 7    THAT TOOK PLACE, THE ACTUAL INVESTMENT?

11:44AM 8    A.   IT WAS END OF DECEMBER.

11:44AM 9    Q.   END OF DECEMBER 2013?

11:44AM 10   A.   YES.

11:44AM 11   Q.   THANK YOU.

11:44AM 12       NO FURTHER QUESTIONS, YOUR HONOR.

11:44AM 13       THE COURT: YOU WILL HAVE CROSS-EXAMINATION?

11:44AM 14       MS. WALSH: I WILL, YOUR HONOR.

11:44AM 15       THE COURT: SHOULD WE TAKE OUR BREAK NOW, LADIES AND

11:44AM 16   GENTLEMEN?

11:44AM 17       WHY DON'T WE DO THAT?  LET'S TAKE ABOUT 30 MINUTES, AND

11:44AM 18   THEN WE'LL RESUME WITH CROSS-EXAMINATION.

11:44AM 19       THE WITNESS: OKAY.  THANK YOU.

11:44AM 20       (RECESS FROM 11:44 A.M. UNTIL 12:46 P.M.)

21

22

23

24

25

ER-4054

|   | 1  | **AFTERNOON SESSION** |
|---|----|----|

12:46PM 2      (JURY IN AT 12:46 P.M.)

12:46PM 3          THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

12:46PM 4      ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

12:46PM 5      OUR JURY IS BACK.

12:46PM 6      MR. EISENMAN IS ON THE STAND.

12:46PM 7      I APOLOGIZE FOR THE DELAY, LADIES AND GENTLEMEN.

12:46PM 8      MS. WALSH, YOU HAVE CROSS-EXAMINATION?

12:46PM 9          MS. WALSH:  I DO, YOUR HONOR.  THANK YOU.

12:47PM 10     MAY I APPROACH THE WITNESS, YOUR HONOR?

12:47PM 11         THE COURT:  OH, YES.  THANK YOU.

12:47PM 12         MS. WALSH:  (HANDING.)

12:47PM 13         THE COURT:  DO I GET ONE?

12:47PM 14         MS. WALSH:  YES.  IT'S RIGHT OVER HERE (INDICATING).

12:47PM 15         THE COURT:  THANK YOU.

12:47PM 16         MS. WALSH:  AND THE GOVERNMENT HAS ONE.

12:47PM 17                  **CROSS-EXAMINATION**

12:47PM 18 BY MS. WALSH:

12:47PM 19 Q.   GOOD AFTERNOON, MR. EISENMAN.

12:47PM 20 A.   GOOD AFTERNOON.

12:47PM 21 Q.   MY NAME IS AMY WALSH, AND I REPRESENT MR. BALWANI.

12:47PM 22     I'M GOING TO ASK YOU A FEW QUESTIONS ABOUT YOUR TESTIMONY

12:47PM 23 TODAY.

12:47PM 24     I'D LIKE TO START WITH YOUR BACKGROUND.

12:47PM 25     YOU HAVE A LAW DEGREE; CORRECT?

EISENMAN CROSS BY MS. WALSH                                          5426

12:47PM  1      A.   I DID.

12:47PM  2      Q.   YOU DID?

12:47PM  3      A.   I DID.  I DON'T HAVE ANY ACTIVE LICENSES NOW.  I RETIRED

12:47PM  4      ABOUT FIVE OR SIX YEARS AGO.

12:47PM  5      Q.   OKAY.  BUT AT SOME POINT YOU BRIEFLY PRACTICED LAW;

12:47PM  6      CORRECT?

12:47PM  7      A.   CORRECT.

12:47PM  8      Q.   AND THE TYPE OF LAW THAT YOU PRACTICED WAS TRUSTS AND

12:48PM  9      ESTATES; IS THAT RIGHT?

12:48PM  10     A.   YES.

12:48PM  11     Q.   YOU WERE ALSO LICENSED AS A CPA; CORRECT?

12:48PM  12     A.   CORRECT.

12:48PM  13     Q.   AND THAT'S A CERTIFIED PUBLIC ACCOUNTANT?

12:48PM  14     A.   CORRECT.

12:48PM  15     Q.   AND YOU, IN ADDITION TO BEING LICENSED, YOU WORKED AS AN

12:48PM  16     ACCOUNTANT; RIGHT?

12:48PM  17     A.   YES.

12:48PM  18     Q.   AND DURING YOUR WORK AS AN ACCOUNTANT, YOU FOCUSSED ON TAX

12:48PM  19     ISSUES; IS THAT CORRECT?

12:48PM  20     A.   PRIMARILY DID TAX RETURNS.

12:48PM  21     Q.   SO IS THE ANSWER YES TO MY QUESTION, YOU FOCUSSED ON TAX

12:48PM  22     ISSUES?

12:48PM  23     A.   IT'S A LITTLE, IT'S A LITTLE NUANCED BECAUSE I WAS

12:48PM  24     PREPARING TAX RETURNS.  I WASN'T REALLY RESEARCHING OR INVOLVED

12:48PM  25     IN TAX ISSUES.

EISENMAN CROSS BY MS. WALSH                                    5427

12:48PM  1     Q.   SO YOU WERE PREPARING TAX RETURNS; IS THAT RIGHT?

12:48PM  2     A.   CORRECT.

12:48PM  3     Q.   AND YOU WERE ALSO A CERTIFIED FINANCIAL PLANNER AT SOME

12:48PM  4     POINT IN TIME; CORRECT?

12:48PM  5     A.   CORRECT.

12:48PM  6     Q.   AND IN THAT WORK, YOU ADVISE PEOPLE ON HOW TO MANAGE THEIR

12:49PM  7     MONEY; IS THAT RIGHT?

12:49PM  8     A.   THAT'S ONE OF THE AREAS.  IT'S INSURANCE PLANNING,

12:49PM  9     RETIREMENT PLANNING, INVESTMENT PLANNING.

12:49PM 10     Q.   SO YOU ADVISE PEOPLE ON HOW TO MANAGE THEIR MONEY; IS THAT

12:49PM 11     RIGHT?

12:49PM 12     A.   YES.

12:49PM 13     Q.   YOU WERE ALSO LICENSED TO TRADE SECURITIES; CORRECT?

12:49PM 14     A.   CORRECT.

12:49PM 15     Q.   AND YOU GOT YOUR LICENSE TO DO THAT IN AROUND 1980; IS

12:49PM 16     THAT RIGHT?

12:49PM 17     A.   MY RECOLLECTION IS THAT IT WAS IN THE EARLY '80S.

12:49PM 18          I DON'T REMEMBER SPECIFICALLY.

12:49PM 19     Q.   OKAY.  AND ONCE YOU WERE LICENSED TO TRADE SECURITIES, YOU

12:49PM 20     ADVISED CLIENTS ON HOW THEY SHOULD INVEST THEIR MONEY; IS THAT

12:49PM 21     RIGHT?

12:49PM 22     A.   CORRECT.

12:49PM 23     Q.   YOU WERE A WEALTH MANAGER DURING THE COURSE OF YOUR

12:49PM 24     CAREER; IS THAT RIGHT?

12:49PM 25     A.   YES.

ER-4057

12:49PM  1     Q.   AND WHAT THAT MEANS IS THAT YOU ADVISE YOUR CLIENTS ON HOW

12:49PM  2     TO POSITION THEIR ASSETS; IS THAT RIGHT?

12:50PM  3     A.   YES.

12:50PM  4     Q.   AND HOW TO -- WITHDRAWN.

12:50PM  5          YOU ALSO ADVISE THEM ON DIFFERENT THINGS TO INVEST IN; IS

12:50PM  6     THAT RIGHT?

12:50PM  7     A.   YES.

12:50PM  8     Q.   AND YOU, THROUGH THE COURSE OF YOUR CAREER, YOU'VE HAD

12:50PM  9     EXTENSIVE EXPERIENCE IN INVESTING; IS THAT FAIR?

12:50PM  10    A.   YES.

12:50PM  11    Q.   YOU HAVE INVESTED IN PUBLIC COMPANIES; RIGHT?

12:50PM  12    A.   YES.

12:50PM  13    Q.   AND PRIVATE COMPANIES?

12:50PM  14    A.   YES.

12:50PM  15    Q.   AND IN START-UP COMPANIES; CORRECT?

12:50PM  16    A.   YES.

12:50PM  17    Q.   AND YOU'VE DONE THAT WORK FOR, BEFORE YOU RETIRED, FOR 30

12:50PM  18    OR 40 YEARS; RIGHT?

12:50PM  19    A.   YES.

12:50PM  20    Q.   NOW, YOU ALSO, YOU ALSO LOOK AT DEALS IN CONNECTION WITH

12:50PM  21    YOUR WIFE'S FAMILY OFFICE; IS THAT RIGHT?

12:50PM  22    A.   UM, AGAIN, IT'S A LITTLE MORE NUANCED.

12:51PM  23         WE ALL INDEPENDENTLY LOOK FOR OPPORTUNITIES, AND WHEN WE

12:51PM  24    SEE OPPORTUNITIES THAT WE THINK ARE INTERESTING, WE SHARE.

12:51PM  25    Q.   OKAY.  SO YOU DISCUSS DEALS WITH PEOPLE WHO ARE INVOLVED

12:51PM 1    IN YOUR WIFE'S FAMILY OFFICE; IS THAT RIGHT?

12:51PM 2    A.   YES.

12:51PM 3    Q.   AND A FAMILY OFFICE IS A PRIVATE COMPANY; RIGHT?

12:51PM 4    A.   IT'S NOT REALLY A COMPANY.  IT'S JUST, IT'S JUST AN

12:51PM 5    ARRANGEMENT WHERE THEY SHARE OFFICE SPACE AND SHARE IDEAS.

12:51PM 6    Q.   WELL, A FAMILY OFFICE IS AN ORGANIZATION, IS IT NOT?

12:51PM 7    A.   I DON'T KNOW IF OUR PARTICULAR FAMILY OFFICE IS AN

12:51PM 8    ORGANIZATION.

12:51PM 9    Q.   OKAY.  WHETHER IT'S AN ORGANIZATION OR NOT, THE -- THERE

12:51PM 10   IS AN OFFICE; RIGHT?

12:51PM 11   A.   YES.

12:51PM 12   Q.   AND THE OFFICE EMPLOYS EMPLOYEES; RIGHT?

12:51PM 13   A.   THERE IS ONE EMPLOYEE.

12:51PM 14   Q.   THERE'S ONE EMPLOYEE.  OKAY.

12:51PM 15        AND THE --

12:52PM 16   A.   ACTUALLY, CORRECT.

12:52PM 17        THERE'S A RECEPTIONIST AND ONE EMPLOYEE.

12:52PM 18   Q.   OKAY.  AND THE PURPOSE OF THE FAMILY OFFICE IS TO INCREASE

12:52PM 19   THE WEALTH OF WHATEVER FAMILY IT PERTAINS TO; IS THAT FAIR?

12:52PM 20   A.   INCREASE, AND ALSO JUST TO MANAGE WHAT ASSETS ARE UNDER

12:52PM 21   MANAGEMENT.

12:52PM 22   Q.   OKAY.  SO ONE OF THE PURPOSES IS TO INCREASE THE WEALTH OF

12:52PM 23   THE FAMILY; IS THAT RIGHT?

12:52PM 24   A.   YES.

12:52PM 25             MR. BOSTIC:  ASKED AND ANSWERED.

12:52PM  1        THE COURT:  I'LL LET THE ANSWER REMAIN.

12:52PM  2        YOU CAN ASK ANOTHER QUESTION.

12:52PM  3   BY MS. WALSH:

12:52PM  4   Q.   AND IS ANOTHER PURPOSE THAT YOU JUST MENTIONED TO MANAGE

12:52PM  5   THE INVESTMENTS OF THE FAMILY OFFICE?

12:52PM  6   A.   YES.

12:52PM  7   Q.   AND ANOTHER PURPOSE IS TO TRANSFER WHATEVER WEALTH IS

12:52PM  8   CREATED ACROSS GENERATIONS OF THE FAMILY; IS THAT RIGHT?

12:52PM  9   A.   THAT CAN BE A PURPOSE.

12:52PM 10   Q.   AND SO YOU AND YOUR WIFE -- THIS IS YOUR WIFE'S FAMILY

12:53PM 11   OFFICE; CORRECT?

12:53PM 12   A.   YES.

12:53PM 13   Q.   AND YOU AND YOUR WIFE AND HER SIBLINGS LOOK AT POTENTIAL

12:53PM 14   DEALS THAT COME ALONG; RIGHT?

12:53PM 15   A.   YES.

12:53PM 16   Q.   AND YOU DECIDE WHETHER TO INVEST IN THOSE DEALS; CORRECT?

12:53PM 17   A.   YES.

12:53PM 18   Q.   AND YOU MIGHT DECIDE TO INVEST TOGETHER; RIGHT?

12:53PM 19   A.   RIGHT.

12:53PM 20   Q.   OR SEPARATELY; CORRECT?

12:53PM 21   A.   CORRECT.

12:53PM 22   Q.   OR NOT AT ALL; RIGHT?

12:53PM 23   A.   CORRECT.

12:53PM 24   Q.   IS THAT --

12:53PM 25   A.   CORRECT.  CORRECT.

12:53PM 1      Q.   OKAY.  AND AT THE HEIGHT OF YOUR INVESTMENT CAREER, YOU

12:53PM 2      MANAGED ABOUT $20 MILLION IN ASSETS; IS THAT CORRECT?

12:53PM 3      A.   I DON'T RECALL, BUT THAT SOUNDS ABOUT CORRECT.  THAT

12:53PM 4      SOUNDS ABOUT RIGHT.

12:53PM 5      Q.   OKAY.  SO TO THE BEST OF YOUR RECOLLECTION SITTING HERE

12:53PM 6      TODAY --

12:53PM 7      A.   YES.

12:53PM 8      Q.   -- THAT'S CORRECT; IS THAT RIGHT?

12:53PM 9      A.   YES.

12:53PM 10     Q.   AND YOU UNDERSTOOD THROUGHOUT YOUR CAREER THAT INVESTING

12:54PM 11     IN PRIVATE COMPANIES IS HIGHER RISK THAN INVESTING IN PUBLIC

12:54PM 12     COMPANIES; IS THAT RIGHT?

12:54PM 13     A.   GENERALLY SPEAKING, THAT'S A FAIR STATEMENT.

12:54PM 14     Q.   AND, IN FACT, YOU NEVER INVESTED YOUR CLIENTS' FUNDS IN

12:54PM 15     PRIVATE COMPANIES; IS THAT RIGHT?

12:54PM 16     A.   THAT'S CORRECT.

12:54PM 17     Q.   ONLY YOUR OWN MONEY; RIGHT?

12:54PM 18     A.   YES.

12:54PM 19     Q.   AND THAT'S BECAUSE IT'S HIGHER RISK; IS THAT RIGHT?

12:54PM 20     A.   IT'S BECAUSE IT'S HIGHER RISK, AND THERE WOULD ALSO

12:54PM 21     POTENTIALLY BE COMPLIANCE ISSUES.

12:54PM 22     Q.   SO ONE OF THE REASONS THAT YOU DIDN'T INVEST YOUR CLIENTS'

12:54PM 23     MONEY IN PRIVATE COMPANIES IS BECAUSE THEY'RE HIGHER RISK; IS

12:54PM 24     THAT RIGHT?

12:54PM 25     A.   THAT IS ONE OF THE PRIMARY REASONS, CORRECT.

12:54PM  1    Q.   NOW, YOU TESTIFIED DURING YOUR DIRECT TESTIMONY THAT YOU

12:54PM  2    LEARNED ABOUT THERANOS FROM DAVID HARRIS; IS THAT CORRECT?

12:54PM  3    A.   YES.

12:54PM  4    Q.   AND HE WAS A FRIEND OF YOURS; IS THAT RIGHT?

12:55PM  5    A.   YES.

12:55PM  6    Q.   AND HE WAS ALSO THE WEALTH MANAGER FOR ELIZABETH HOLMES'S

12:55PM  7    PARENTS; IS THAT CORRECT?

12:55PM  8    A.   THAT'S CORRECT.

12:55PM  9    Q.   AND HE TOLD YOU AT THE TIME THAT HE HAD INVESTED IN A

12:55PM  10   COMPANY IN CALIFORNIA NAMED THERANOS; RIGHT?

12:55PM  11   A.   YES.

12:55PM  12   Q.   AND HE TOLD YOU ABOUT THE FOUNDER OF THE COMPANY; RIGHT?

12:55PM  13   A.   YES.

12:55PM  14   Q.   THAT WAS MS. HOLMES; CORRECT?

12:55PM  15   A.   CORRECT.

12:55PM  16   Q.   AND HE TOLD YOU THAT SHE HAD INVENTED A NEW TECHNOLOGY;

12:55PM  17   RIGHT?

12:55PM  18   A.   CORRECT.

12:55PM  19   Q.   AND THAT TECHNOLOGY RELATED TO BLOOD TESTING; IS THAT

12:55PM  20   RIGHT?

12:55PM  21   A.   YES.

12:55PM  22   Q.   AND HE ALSO TOLD YOU, DID HE NOT, THAT MS. HOLMES ACTUALLY

12:55PM  23   HAD ROOTS IN HOUSTON; RIGHT?

12:55PM  24   A.   YES.

12:55PM  25   Q.   AND THAT'S WHERE YOU'RE FROM; CORRECT?

ER-4062

12:55PM 1      A.   THAT'S WHERE I'VE BEEN LIVING SINCE 1977.

12:55PM 2      Q.   OKAY.  AND HE TOLD YOU THAT MS. HOLMES WENT TO HIGH SCHOOL

12:55PM 3      IN HOUSTON; RIGHT?

12:56PM 4      A.   CORRECT.

12:56PM 5      Q.   AND THEN SHE WENT ON TO ATTEND STANFORD UNIVERSITY; RIGHT?

12:56PM 6      A.   YES.

12:56PM 7      Q.   MR. HARRIS ALSO TOLD YOU THAT WHILE MS. HOLMES WAS AT

12:56PM 8      STANFORD, SHE HAD COME UP WITH AN IDEA FOR AN INVENTION AND SHE

12:56PM 9      APPLIED FOR A PATENT; IS THAT RIGHT?

12:56PM 10     A.   YES.

12:56PM 11     Q.   AND MR. HARRIS TOLD YOU AT THE TIME AS WELL THAT HE VIEWED

12:56PM 12     MS. HOLMES AS A GENIUS; IS THAT CORRECT?

12:56PM 13     A.   YES.

12:56PM 14     Q.   AND YOU BELIEVED HIM; RIGHT?

12:56PM 15     A.   YES.

12:56PM 16     Q.   AND HE SAID NOT ONLY IS SHE A GENIUS, BUT HE HIMSELF HAD A

12:56PM 17     LOT OF CONFIDENCE IN HER; IS THAT RIGHT?

12:56PM 18     A.   YES.

12:56PM 19     Q.   AND SO IS IT FAIR TO SAY THAT MR. HARRIS'S CONFIDENCE IN

12:56PM 20     MS. HOLMES WAS A MAJOR FACTOR FOR YOU WHEN YOU INVESTED BACK IN

12:56PM 21     2006?

12:56PM 22     A.   IT WAS A FACTOR.  I WOULDN'T SAY IT WAS A MAJOR FACTOR.

12:56PM 23     Q.   OKAY.  AND IT WAS MR. HARRIS'S CONTINUED CONFIDENCE IN

12:57PM 24     MS. HOLMES THAT WAS A FACTOR LEADING TO YOUR INVESTMENT IN

12:57PM 25     THERANOS IN 2013; IS THAT FAIR?

EISENMAN CROSS BY MS. WALSH                                    5434

12:57PM   1    A.   NO.  I WOULD HAVE TO DISAGREE.

12:57PM   2    Q.   OKAY.  I'M GOING TO ASK YOU TO TURN TO AN EXHIBIT IN YOUR

12:57PM   3    BINDER.  IT'S 20601.  IT'S PROBABLY TOWARDS THE BACK.

12:57PM   4    A.   OKAY.

12:58PM   5    Q.   DO YOU SEE IT?

12:58PM   6    A.   YES.

12:58PM   7    Q.   OKAY.  I'M GOING TO DIRECT YOUR ATTENTION TO THE MIDDLE

12:58PM   8    PARAGRAPH WHERE THERE'S A DATE AND THEN YOUR NAME, AND THEN

12:58PM   9    MOST, AND THE LAST SENTENCE OF THAT PARAGRAPH.

12:58PM  10        DO YOU SEE THAT?

12:58PM  11    A.   YES.

12:58PM  12    Q.   HAVE YOU READ IT?

12:58PM  13    A.   ARE YOU TALKING ABOUT THIS SENTENCE THAT STARTS WITH

12:58PM  14    "MOST"?

12:58PM  15    Q.   YES.

12:58PM  16    A.   YES.  BY THE WAY, WILL THIS BE ON THE SCREEN, TOO?

12:58PM  17    Q.   NO.

12:58PM  18    A.   NO?  JUST TO --

12:58PM  19    Q.   CAN YOU READ IT OKAY?

12:58PM  20        THE COURT:  DO YOU WANT HIM TO READ IT TO HIMSELF?

12:58PM  21    BY MS. WALSH:

12:58PM  22    Q.   JUST TO YOURSELF.

12:58PM  23    A.   OKAY.

12:58PM  24        YES, I READ IT.

12:58PM  25    Q.   OKAY.  SO IT'S TRUE, IS IT NOT, THAT ONE FACTOR IN YOUR

| | | |
|---|---|---|
| 12:58PM | 1 | INVESTMENT IN 2013 WAS MR. HARRIS'S CONTINUED CONFIDENCE IN |
| 12:59PM | 2 | MS. HOLMES? |
| 12:59PM | 3 | A.   I WOULD SAY THAT'S FAIR TO SAY THAT THAT'S ONE FACTOR. |
| 12:59PM | 4 | Q.   ALL RIGHT.  NOW TURNING BACK TO YOUR 2006 INVESTMENT. |
| 12:59PM | 5 | YOU ALSO BECAME AWARE PRIOR TO THAT INVESTMENT THAT |
| 12:59PM | 6 | LARRY ELLISON HAD A SIGNIFICANT STAKE IN THERANOS; IS THAT |
| 12:59PM | 7 | RIGHT? |
| 12:59PM | 8 | A.   YES. |
| 12:59PM | 9 | Q.   AND YOU KNEW WHO LARRY ELLISON WAS; RIGHT? |
| 12:59PM | 10 | A.   YES. |
| 12:59PM | 11 | Q.   HE -- PARDON ME? |
| 12:59PM | 12 | A.   I SAID YES. |
| 12:59PM | 13 | Q.   HE WAS THE PERSON WHO BUILT ORACLE; CORRECT? |
| 12:59PM | 14 | A.   CORRECT. |
| 12:59PM | 15 | Q.   AND PRIOR TO YOUR 2006 INVESTMENT, YOU ALSO LEARNED THAT A |
| 12:59PM | 16 | PERSON NAMED DON LUCAS WAS ON THERANOS'S BOARD OF DIRECTORS; |
| 12:59PM | 17 | CORRECT? |
| 12:59PM | 18 | A.   CORRECT. |
| 12:59PM | 19 | Q.   AND YOU LEARNED THAT MR. LUCAS HAD A GOOD REPUTATION IN |
| 12:59PM | 20 | SILICON VALLEY; CORRECT? |
| 12:59PM | 21 | A.   CORRECT. |
| 12:59PM | 22 | Q.   AND THAT REPUTATION WAS AS A SUCCESSFUL INVESTOR IN |
| 12:59PM | 23 | START-UP COMPANIES; RIGHT? |
| 12:59PM | 24 | A.   I KNEW OF HIS INVOLVEMENT WITH ORACLE, BUT I DIDN'T KNOW |
| 12:59PM | 25 | HIS OTHER HISTORY. |

EISENMAN CROSS BY MS. WALSH                                     5436

01:00PM  1    Q.   OKAY.  AND YOU ALSO KNEW THAT HE WAS CHAIRMAN OF THE BOARD

01:00PM  2    OF ORACLE; RIGHT?

01:00PM  3    A.   YES.

01:00PM  4    Q.   OKAY.  AND THE PRESENCE OF MR. LUCAS ON THE BOARD AT

01:00PM  5    THERANOS AND MR. ELLISON'S STAKE IN THERANOS, THEY WERE ALSO

01:00PM  6    FACTORS IN YOUR DECISION TO INVEST IN THERANOS IN 2006; IS THAT

01:00PM  7    RIGHT?

01:00PM  8    A.   YES.

01:00PM  9    Q.   AND PRIOR TO YOUR INVESTMENT IN THERANOS IN 2006, THE ONLY

01:00PM  10   PERSON THAT YOU WERE INTERACTING WITH FROM THERANOS AT THE TIME

01:00PM  11   WAS ELIZABETH HOLMES; IS THAT RIGHT?

01:00PM  12   A.   YES.

01:00PM  13   Q.   YOU HAD NOT HEARD OF SUNNY BALWANI AT THAT POINT; CORRECT?

01:00PM  14   A.   CORRECT.

01:00PM  15   Q.   YOU DIDN'T EVEN KNOW WHEN HE STARTED AT THE COMPANY;

01:00PM  16   CORRECT?

01:00PM  17   A.   CORRECT.

01:00PM  18   Q.   YOU HAD NO COMMUNICATIONS WITH HIM AT THE TIME?

01:00PM  19   A.   CORRECT.

01:00PM  20   Q.   AND WHEN YOU MADE THE INVESTMENT IN 2006, YOU UNDERSTOOD

01:00PM  21   AT THE TIME THAT THERANOS WAS A PRIVATE COMPANY; CORRECT?

01:00PM  22   A.   CORRECT.

01:00PM  23   Q.   AND BECAUSE OF THAT, YOU UNDERSTOOD THAT THERE WAS NO

01:01PM  24   PUBLIC MARKET WHERE YOU COULD SELL YOUR SHARES OF THERANOS; IS

01:01PM  25   THAT RIGHT?

01:01PM 1    A.   CORRECT.

01:01PM 2    Q.   AND, IN FACT, THERANOS NEVER GUARANTEED THAT THERE WOULD

01:01PM 3    BE ANY PUBLIC MARKET WHERE YOU COULD SELL YOUR THERANOS SHARES;

01:01PM 4    CORRECT?

01:01PM 5    A.   IT'S NOT SOMETHING THAT A PRIVATE COMPANY WOULD GUARANTEE

01:01PM 6    TO A SHAREHOLDER.

01:01PM 7    Q.   SO THE ANSWER TO MY QUESTION IS YES, THERANOS NEVER

01:01PM 8    GUARANTEED THAT THERE WOULD BE A PUBLIC MARKET FOR YOUR SHARES?

01:01PM 9    A.   WELL, AGAIN, IT'S NUANCED.

01:01PM 10        WE HAD COMMUNICATION AT EVERY STAGE THAT THEY WERE

01:01PM 11   PLANNING AN IPO AND THEY GAVE US A TIMETABLE AT SEVERAL STAGES.

01:01PM 12   FIRST IT WAS THREE TO FIVE YEARS, AND THEN THEY SPECIFICALLY

01:01PM 13   OUTLINED YEARS IT WAS GOING TO HAPPEN IN 2011 AT THE LATEST.

01:01PM 14        SO THERE WERE A SERIES OF STATEMENTS WHERE THEY GAVE

01:01PM 15   STRONG INDICATION THAT THEY WOULD PURSUE AN IPO.

01:02PM 16   Q.   RIGHT.  BUT THAT'S NOT MY QUESTION, MR. EISENMAN.

01:02PM 17        MY QUESTION, MR. EISENMAN, IS, DID THERANOS EVER GUARANTEE

01:02PM 18   TO YOU THAT THERE WOULD BE A PUBLIC MARKET WHERE YOU COULD SELL

01:02PM 19   YOUR SHARES?  YES OR NO?

01:02PM 20   A.   NO.

01:02PM 21   Q.   NOW, YOU ALSO KNEW THAT TO BUY THERANOS STOCK, YOU HAD TO

01:02PM 22   BE AN ACCREDITED INVESTOR; IS THAT RIGHT?

01:02PM 23   A.   YES.

01:02PM 24   Q.   AND WHAT THAT MEANS IS THAT YOU NEEDED TO HAVE A CERTAIN

01:02PM 25   LEVEL OF NET WORTH; RIGHT?

EISENMAN CROSS BY MS. WALSH                                    5438

01:02PM 1     A.   CORRECT.

01:02PM 2     Q.   AND YOU REPRESENTED, WHEN YOU ENTERED INTO THE AGREEMENT

01:02PM 3     TO BUY THERANOS SHARES, THAT YOU COULD BEAR THE RISK OF LOSING

01:02PM 4     THAT INVESTMENT; IS THAT RIGHT?

01:02PM 5     A.   YES.

01:02PM 6     Q.   AND THAT IT WOULDN'T IMPAIR YOUR FINANCIAL CONDITION IF

01:02PM 7     YOU LOST YOUR INVESTMENT; CORRECT?

01:02PM 8     A.   CORRECT.

01:02PM 9     Q.   AND WHEN YOU SIGNED THAT SHARE PURCHASE AGREEMENT IN 2006,

01:03PM 10    YOU MADE THOSE REPRESENTATIONS; RIGHT?

01:03PM 11    A.   YES.

01:03PM 12    Q.   OKAY.  AND FOR YOUR 2006 INVESTMENT, YOU ALSO REPRESENTED

01:03PM 13    THAT YOU WERE AWARE THAT THIS WAS A SPECULATIVE INVESTMENT;

01:03PM 14    CORRECT?

01:03PM 15    A.   WELL, AGAIN, THAT'S NUANCED.  THAT'S WHAT THE LANGUAGE

01:03PM 16    SAYS IN THE PRIVATE PLACEMENT, OR THE AGREEMENT THAT I SIGNED,

01:03PM 17    WHICH IS SIMILAR TO AGREEMENTS THAT YOU ARE REQUESTED TO SIGN

01:03PM 18    ANY TIME YOU INVEST IN AN EARLY STAGE COMPANY, BUT IT SOMEWHAT

01:03PM 19    CONTRADICTED THE INFORMATION FLOW THAT I GOT BEFORE I MADE MY

01:03PM 20    INVESTMENT.

01:03PM 21    Q.   OKAY.  SO WITH REGARD TO THE 2006 AGREEMENT, IT WAS AN

01:03PM 22    AGREEMENT TO BUY SHARES; RIGHT?

01:03PM 23    A.   YES.

01:03PM 24    Q.   AND YOU SIGNED THE AGREEMENT; RIGHT?

01:03PM 25    A.   YES.

01:03PM 1    Q.   AND THERE WAS A PARAGRAPH IN THE AGREEMENT THAT SAID THIS

01:03PM 2    IS A SPECULATIVE INVESTMENT; IS THAT CORRECT?  YES OR NO?

01:03PM 3    A.   YES, CORRECT.

01:03PM 4    Q.   REGARDING YOUR 2006 INVESTMENT, YOU INVESTED A TOTAL OF

01:04PM 5    $1,134,243; IS THAT RIGHT?

01:04PM 6    A.   YES.

01:04PM 7    Q.   AND THE NUMBER OF SHARES THAT YOU BOUGHT WAS 402,214

01:04PM 8    SHARES?

01:04PM 9    A.   YES.

01:04PM 10   Q.   OKAY.  AND THE PRICE PER SHARE IN 2006 WAS $2.82; IS THAT

01:04PM 11   RIGHT?

01:04PM 12   A.   YES.

01:04PM 13   Q.   OKAY.  SO AFTER YOUR 2006 INVESTMENT, YOU TESTIFIED THAT

01:04PM 14   YOU GOT QUARTERLY UPDATES FROM THE COMPANY; CORRECT?

01:04PM 15   A.   CORRECT.

01:04PM 16   Q.   AND YOU GOT THOSE FROM MS. HOLMES; RIGHT?

01:04PM 17   A.   CORRECT.

01:04PM 18   Q.   AND THEY, AGAIN, THEY WERE EXCLUSIVELY FROM MS. HOLMES;

01:04PM 19   RIGHT?

01:04PM 20   A.   CORRECT.

01:04PM 21   Q.   AND YOU UNDERSTOOD, OR YOU NOW UNDERSTAND THAT MR. BALWANI

01:05PM 22   DID NOT EVEN JOIN THERANOS UNTIL 2009; IS THAT RIGHT?

01:05PM 23   A.   I DON'T RECALL WHEN HE JOINED.

01:05PM 24   Q.   OKAY.  BUT YOU KNOW HE WASN'T THERE IN 2006; RIGHT?

01:05PM 25   A.   I DON'T KNOW THAT FOR A FACT, BUT I PRESUME SO.

01:05PM  1    Q.   BECAUSE YOU NEVER COMMUNICATED WITH HIM AT THAT TIME;

01:05PM  2    CORRECT?

01:05PM  3    A.   THAT IS CORRECT.

01:05PM  4    Q.   AND YOU NEVER EVEN HEARD OF HIM AT THAT TIME; RIGHT?

01:05PM  5    A.   CORRECT.

01:05PM  6    Q.   YOU ALSO UNDERSTOOD, MR. EISENMAN, DIDN'T YOU, THAT YOU

01:05PM  7    HAD NO LEGAL RIGHT TO ADDITIONAL INFORMATION ABOUT THE COMPANY;

01:05PM  8    CORRECT?

01:05PM  9    A.   CORRECT.

01:05PM 10    Q.   ALL RIGHT.  SO NOW LET'S TURN TO THE TIME PERIOD 2010 TO

01:05PM 11    2013.

01:05PM 12        AND I'M GOING TO ASK YOU TO TURN IN YOUR BINDER TO

01:05PM 13    EXHIBIT 4 -- SORRY.  EXHIBIT 14103.

01:06PM 14    A.   OKAY.

01:06PM 15    Q.   OKAY.  LET ME JUST GET THERE.

01:06PM 16        ALL RIGHT.  14103 IS AN EMAIL CHAIN BETWEEN YOU AND

01:06PM 17    MS. HOLMES, IS IT NOT?

01:06PM 18    A.   YES.

01:06PM 19    Q.   AND THE DATE OF THE CHAIN RANGES FROM MAY 3RD TO MAY 11TH,

01:06PM 20    2010; RIGHT?

01:06PM 21    A.   YES.

01:06PM 22    Q.   AND THIS IS ABOUT YOU ATTEMPTING TO GET UPDATES FROM

01:06PM 23    MS. HOLMES ABOUT THERANOS; RIGHT?

01:06PM 24    A.   RIGHT.

01:06PM 25            MS. WALSH:  YOUR HONOR, WE OFFER 14103.

01:06PM   1            MR. BOSTIC:  NO OBJECTION.

01:06PM   2            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:06PM   3        (DEFENDANT'S EXHIBIT 14103 WAS RECEIVED IN EVIDENCE.)

01:06PM   4    BY MS. WALSH:

01:06PM   5    Q.   OKAY.  SO LET'S GO TO THE FIRST EMAIL IN TIME.

01:07PM   6        (DISCUSSION OFF THE RECORD.)

01:07PM   7            THE CLERK:  I DON'T KNOW WHAT IS WRONG WITH THE

01:07PM   8    SCREEN.

01:07PM   9            MS. WALSH:  I THINK IT'S JUST MINE.

01:07PM  10            THE COURT:  ARE THE JUROR'S SCREENS UP?

01:07PM  11        YES.  ALL RIGHT.

01:07PM  12            MS. WALSH:  I CAN USE MY HARD COPY UNTIL WE FIX IT.

01:07PM  13            THE COURT:  THANK YOU.

01:07PM  14    BY MS. WALSH:

01:07PM  15    Q.   OKAY.  SO TURNING TO THE FIRST EMAIL IN TIME, THAT'S ON

01:07PM  16    MAY 3RD, 2010; RIGHT?

01:08PM  17    A.   YES.

01:08PM  18    Q.   DO YOU SEE THAT, MR. EISENMAN?

01:08PM  19    A.   YES.

01:08PM  20    Q.   OKAY.  AND IT'S FROM YOU TO ELIZABETH HOLMES; RIGHT?

01:08PM  21    A.   YES.

01:08PM  22    Q.   AND YOU'RE CC'ING CAROLYN BALKENHOL; RIGHT?

01:08PM  23    A.   YES.

01:08PM  24    Q.   AND WHO WAS CAROLYN BALKENHOL?

01:08PM  25    A.   ELIZABETH'S ADMINISTRATIVE ASSISTANT.

EISENMAN CROSS BY MS. WALSH                                    5442

01:08PM  1    Q.   OKAY.  AND THE SUBJECT LINE IS JUNE QUARTERLY UPDATE.

01:08PM  2         DO YOU SEE THAT?

01:08PM  3    A.   YES.

01:08PM  4    Q.   AND WHAT YOU SAY IS, "ELIZABETH,

01:08PM  5         "CAN WE SCHEDULE OUR QUARTERLY UPDATE THE WEEK OF JUNE 1ST

01:08PM  6    THROUGH JUNE 4TH?

01:08PM  7         "SINCE IT HAS BEEN 2 MONTHS SINCE WE TALKED, AND WILL

01:08PM  8    PROBABLY BE ANOTHER MONTH UNTIL WE TALK AGAIN, I WAS WONDERING

01:08PM  9    IF YOU COULD EMAIL ME A RESPONSE TO THE FOLLOWING ITEMS?"

01:08PM  10        AND THEN YOU LIST ITEMS THAT YOU WANT INFORMATION ON?

01:08PM  11   A.   YES.

01:08PM  12   Q.   DO YOU SEE THAT?

01:08PM  13   A.   YES.

01:08PM  14   Q.   AND THE FIRST ITEM, YOU SAY, "YOU SAID THAT IN MARCH, YOU

01:08PM  15   WERE MANUFACTURING ABOUT 500,000 CARTRIDGES AND SELLING ABOUT

01:08PM  16   400,000 AT ABOUT $80 PER CARTRIDGE.  CAN YOU SHARE THE SAME

01:09PM  17   STATISTICS FOR APRIL, AND AN ESTIMATE FOR MAY?"

01:09PM  18        DO YOU SEE THAT?

01:09PM  19   A.   YES.

01:09PM  20   Q.   AND THE SECOND QUESTION YOU ASK IS, "ARE YOU ENTERTAINING

01:09PM  21   ANY THOUGHTS OF A SHAREHOLDER'S MEETING?  IF SO, WHEN?"

01:09PM  22        AND THE THIRD QUESTION IS, "IS THERE A POSSIBILITY OF AN

01:09PM  23   IPO IN THE FORESEEABLE FUTURE.  IF SO, WHEN?"

01:09PM  24        DO YOU SEE THAT?

01:09PM  25   A.   YES.

ER-4072

EISENMAN CROSS BY MS. WALSH                                                5443

01:09PM 1    Q.   OKAY.  AND THEN THE NEXT EMAIL UP IS AGAIN FROM YOU TO

01:09PM 2    MS. HOLMES AND YOU SAY, "WOULD IT BE POSSIBLE TO GET A RESPONSE

01:09PM 3    TODAY?  I HAVE BEEN TRYING SINCE LAST MONDAY."

01:09PM 4        DO YOU SEE THAT?

01:09PM 5    A.   YES.

01:09PM 6    Q.   AND THEN IT LOOKS LIKE YOU EMAIL AGAIN JUST WITH NO TEXT;

01:09PM 7    RIGHT?

01:09PM 8        DO YOU SEE THAT IN THE MIDDLE AT 8:12 A.M.?

01:09PM 9    A.   YES.

01:09PM 10   Q.   OKAY.  AND THEN LET'S GO TO THE NEXT EMAIL UP.  AND THIS

01:09PM 11   IS FROM MS. HOLMES TO YOU AND SHE SAYS, "ALAN,

01:09PM 12       "I RECEIVED YOUR EMAILS, AND CAROLYN JUST RELAYED TO ME

01:10PM 13   THE VOICEMAIL YOU LEFT TODAY.  JUNE IS A TOUGH MONTH FOR US AND

01:10PM 14   I DON'T KNOW WHEN WE CAN DO OUR NEXT CALL.  AS YOU KNOW, WE

01:10PM 15   DON'T DO QUARTERLY CALLS WITH OUR OTHER INVESTORS, MANY OF WHOM

01:10PM 16   INVESTED MUCH GREATER AMOUNTS THAN YOU DID, AND I CANNOT COMMIT

01:10PM 17   TO AN EXACT QUARTERLY SCHEDULE GOING FORWARD."

01:10PM 18       DO YOU SEE THAT?

01:10PM 19   A.   YES.

01:10PM 20   Q.   AND THE NEXT PARAGRAPH SAYS, "AS DISCUSSED IN OUR CALL IN

01:10PM 21   MARCH, WE CANNOT PROVIDE THE LEVEL OF COMMUNICATION YOU KEEP

01:10PM 22   REQUESTING."

01:10PM 23       DO YOU SEE THAT?

01:10PM 24   A.   YES.

01:10PM 25   Q.   AND THEN SHE CONTINUES.

EISENMAN CROSS BY MS. WALSH                                    5444

01:10PM 1        "WITH THE DEALS WE ARE FORMALIZING WITH RETAILERS, WE ARE

01:10PM 2    NOW OBLIGATED NOT TO DISCLOSE OUR PRODUCTION VOLUMES AND

01:10PM 3    CARTRIDGE SALE PRICES.  I CANNOT PROVIDE THE METRICS YOU ARE

01:10PM 4    REQUESTING IN YOUR EMAIL."

01:10PM 5        AND THEN SHE GOES ON.

01:10PM 6        "AT THIS POINT, WE ALSO DON'T HAVE ANY PLANS TO DO AN IPO

01:10PM 7    ANY TIME SOON.  IN LINE WITH MY COMMENT ABOVE, WE CURRENTLY DO

01:11PM 8    NOT HAVE A SHAREHOLDERS MEETING ON THE CALENDAR.  I WILL BE

01:11PM 9    REACHING OUT TO ALL SHAREHOLDERS IN THE COMING WEEKS TO

01:11PM 10   CIRCULATE THE OPPORTUNITY FOR LIQUIDATION I REFERENCED ON OUR

01:11PM 11   LAST CALL WITH EVERYONE."

01:11PM 12       DO YOU SEE THAT?

01:11PM 13   A.   YES.

01:11PM 14   Q.   AND THIS IS IN MAY 2010; RIGHT?

01:11PM 15   A.   YES.

01:11PM 16   Q.   OKAY.

01:11PM 17       THE LAST PARAGRAPH SAYS, "GIVEN YOUR FRUSTRATION LEVEL AND

01:11PM 18   OUR FRUSTRATION LEVEL WITH THIS INTERACTION, I STRONGLY

01:11PM 19   ENCOURAGE YOU TO RE-CONSIDER THE OPPORTUNITY I PRESENTED ON OUR

01:11PM 20   LAST CALL TO REALIZE THE RETURN ON YOUR INVESTMENT.  WE

01:11PM 21   RECOGNIZE YOU HAVE BEEN AN INVESTOR FOR SOME TIME, AND IF WE

01:11PM 22   PROCEED WITH THE TRANSACTION WE ARE PROPOSING WE CAN PROVIDE

01:11PM 23   YOU WITH A GREATER THAN 5 TIMES RETURN ON YOUR INVESTMENT IN

01:11PM 24   THERANOS.

01:11PM 25       "PLEASE LET ME KNOW."

EISENMAN CROSS BY MS. WALSH                                              5445

01:11PM   1         DO YOU SEE THAT?

01:11PM   2    A.   YES.

01:11PM   3    Q.   OKAY.  AND AT THE TIME YOU GOT THIS EMAIL, YOU HAD NOT

01:12PM   4    SEEN ANY DOCUMENTS AT THE TIME RELATED TO ANY RETAIL

01:12PM   5    RELATIONSHIPS THERANOS WAS ENGAGING IN; IS THAT RIGHT?

01:12PM   6    A.   YES.

01:12PM   7    Q.   AND YOU WERE NOT AWARE AT THE TIME IF THERE WERE ANY

01:12PM   8    RESTRICTIONS PLACED ON THERANOS BY THE RETAIL RELATIONSHIPS ON

01:12PM   9    THE INFORMATION THEY COULD PROVIDE TO SHAREHOLDERS; IS THAT

01:12PM  10    RIGHT?

01:12PM  11    A.   YES.

01:12PM  12    Q.   AND YOU ALSO DON'T KNOW WHETHER THE FINAL AGREEMENT --

01:12PM  13    WHETHER IN THE FINAL AGREEMENT THERE WAS ANY RESTRICTION ON THE

01:12PM  14    INFORMATION THAT THERANOS COULD PROVIDE; CORRECT?

01:12PM  15    A.   CORRECT.

01:12PM  16    Q.   BECAUSE YOU NEVER SAW THE FINAL AGREEMENT; IS THAT RIGHT?

01:12PM  17    A.   YES.

01:12PM  18    Q.   OKAY.  OKAY.  NOW IF YOU CAN TURN IN YOUR BINDER TO

01:12PM  19    EXHIBIT 12285.

01:13PM  20         DO YOU HAVE THAT IN FRONT OF YOU?

01:13PM  21    A.   YES.

01:13PM  22    Q.   OKAY.  AND SO THIS IS AN EMAIL CHAIN BETWEEN YOU AND

01:13PM  23    MS. HOLMES; CORRECT?

01:13PM  24    A.   YES.

01:13PM  25    Q.   AND IT IS ON -- OR IT SPANS JUNE 8TH TO JUNE 18TH, 2010;

ER-4075

01:13PM  1    RIGHT?

01:13PM  2    A.   YES.

01:13PM  3    Q.   AND, AGAIN, IT RELATES TO YOUR SEEKING INFORMATION FROM

01:13PM  4    THERANOS; IS THAT RIGHT?

01:13PM  5    A.   YES.

01:13PM  6            MS. WALSH:  YOUR HONOR, WE OFFER 12285.

01:13PM  7            MR. BOSTIC:  801, YOUR HONOR.

01:13PM  8            MS. WALSH:  SO, YOUR HONOR, THIS AT LEAST GOES TO

01:14PM  9    MR. EISENMAN'S STATE OF MIND AS HE'S CONSIDERING INVESTING IN

01:14PM 10    THERANOS.

01:14PM 11            THE COURT:  SO NOT FOR THE TRUTH OF THE MATTER

01:14PM 12    ASSERTED IN THE EMAIL?  IS THAT WHAT YOU'RE SAYING?

01:14PM 13            MS. WALSH:  I MEAN, I DON'T THINK IT'S AN 801

01:14PM 14    PROBLEM, BUT TO THE EXTENT THAT THE COURT HAS ANY RESERVATION,

01:14PM 15    IT CERTAINLY IS RELEVANT AND NOT HEARSAY AS TO MR. EISENMAN'S

01:14PM 16    STATE OF MIND.

01:14PM 17        (PAUSE IN PROCEEDINGS.)

01:14PM 18            MR. BOSTIC:  ON THAT POINT, YOUR HONOR, I'M NOT SURE

01:14PM 19    THE FOUNDATION HAS BEEN LAID, BUT THIS ACTUALLY IMPACTED THIS

01:14PM 20    WITNESS'S STATE OF MIND.

01:15PM 21            THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR THE

01:15PM 22    STATE OF MIND ISSUE IF YOU CAN?

01:15PM 23            MS. WALSH:  SURE.  SURE, YOUR HONOR.

01:15PM 24    Q.   SO OVER THE COURSE OF THE YEARS, MR. EISENMAN, YOU WERE

01:15PM 25    TRYING TO GET INFORMATION FROM THERANOS; RIGHT?

EISENMAN CROSS BY MS. WALSH                                    5447

01:15PM  1      A.   YES.

01:15PM  2      Q.   AND YOU SENT MANY EMAILS TO TRY TO DO THAT; CORRECT?

01:15PM  3      A.   CORRECT.

01:15PM  4      Q.   AND YOU ENGAGED IN EMAIL CORRESPONDENCE WITH MS. HOLMES

01:15PM  5      ESPECIALLY TO TRY TO GET INFORMATION FROM HER; RIGHT?

01:15PM  6      A.   YES.

01:15PM  7      Q.   AND IT WAS IMPORTANT FOR YOU TO GET INFORMATION FROM

01:15PM  8      THERANOS; CORRECT?

01:15PM  9      A.   CORRECT.

01:15PM 10      Q.   AND YOU HAD A LOT OF BACK AND FORTH WITH MS. HOLMES ABOUT

01:15PM 11      QUESTIONS YOU HAD AND RESPONSES THAT SHE GAVE; CORRECT?

01:15PM 12      A.   CORRECT.

01:15PM 13      Q.   AND IT WAS IMPORTANT TO YOUR DECISION TO INVEST AS TO THE

01:15PM 14      LEVEL OF INFORMATION THAT YOU WERE GETTING; RIGHT?

01:15PM 15      A.   WELL, THIS IS 2010.  I INVESTED IN 2006 AND AGAIN IN 2013.

01:16PM 16           SO THIS DIDN'T DIRECTLY RELATE TO MY DECISION TO INVEST.

01:16PM 17      Q.   RIGHT.  BUT OVER THE COURSE OF TIME, MR. EISENMAN, YOU

01:16PM 18      WERE EMAILING QUITE FREQUENTLY TO GET INFORMATION FROM

01:16PM 19      THERANOS, WERE YOU NOT?

01:16PM 20      A.   CORRECT.

01:16PM 21      Q.   AND THIS IS ONE OF THOSE EMAILS; RIGHT?

01:16PM 22      A.   YES.

01:16PM 23      Q.   AND GENERALLY GETTING INFORMATION FROM THERANOS WAS

01:16PM 24      IMPORTANT TO YOUR DECISION, TO YOUR INVESTMENT DECISIONS;

01:16PM 25      CORRECT?

ER-4077

EISENMAN CROSS BY MS. WALSH                                    5448

01:16PM 1    A.  WELL, AGAIN, THIS IS 2010 AND I INVESTED FOUR YEARS BEFORE

01:16PM 2    AND MY NEXT INVESTMENT WAS THREE YEARS LATER.

01:16PM 3        SO IT DID NOT DIRECTLY RELATE TO A DECISION TO INVEST.

01:16PM 4    Q.  RIGHT.  BUT IT WAS IMPORTANT GENERALLY FOR YOU TO GET

01:16PM 5    INFORMATION FROM THERANOS, WASN'T IT?

01:16PM 6    A.  YES.

01:16PM 7            MS. WALSH:  YOUR HONOR, WE OFFER 12285.

01:16PM 8            MR. BOSTIC:  801, 403.

01:16PM 9            MS. WALSH:  YOUR HONOR, THIS WITNESS HAS TESTIFIED

01:16PM 10   ABOUT TRYING TO GET INFORMATION FROM THERANOS, AND THIS IS JUST

01:16PM 11   ANOTHER EXAMPLE OF HIM TRYING TO DO THIS.

01:17PM 12           MR. BOSTIC:  YOUR HONOR, NO OBJECTION TO THE

01:17PM 13   COMMUNICATION FROM THE WITNESS THAT SHOWS THAT.

01:17PM 14           MS. WALSH:  YOUR HONOR, THIS WITNESS HAS ALSO

01:17PM 15   TESTIFIED ABOUT THE IMPORTANCE OF LIQUIDATION EVENTS AND THIS

01:17PM 16   EMAIL DIRECTLY RESPONDS TO THAT.

01:17PM 17       AND EVEN IF WHAT IS IN IT IS TRUE OR NOT TRUE, IT GOES TO

01:17PM 18   HIS STATE OF MIND REGARDING THE OPPORTUNITIES TO LIQUIDATE.

01:17PM 19           THE COURT:  DO YOU WANT TO ASK HIM ABOUT THAT?

01:17PM 20           MS. WALSH:  SURE.

01:17PM 21   Q.  SO, MR. EISENMAN, SINCE YOU INVESTED IN 2006, YOU ASKED

01:17PM 22   MANY QUESTIONS ABOUT WHEN IT WAS THAT THERE WOULD BE AN

01:17PM 23   OPPORTUNITY TO LIQUIDATE YOUR INVESTMENT IN THERANOS; IS THAT

01:18PM 24   RIGHT?

01:18PM 25   A.  NOT EXACTLY.

01:18PM  1        I, I QUESTIONED THE COMPANY, OR ELIZABETH, ALONG THE WAY

01:18PM  2   ABOUT THE POTENTIAL FOR IPO, AND UPON AN IPO, THAT DOESN'T

01:18PM  3   NECESSARILY MEAN THAT I WOULD LIQUIDATE, BUT THERE WOULD BE AN

01:18PM  4   OPPORTUNITY IF THERE WAS A PUBLIC MARKET.

01:18PM  5   Q.   SO YOU QUESTIONED MS. HOLMES ABOUT OPPORTUNITIES TO

01:18PM  6   LIQUIDATE; IS THAT RIGHT?

01:18PM  7   A.   NO.  I QUESTIONED HER ABOUT OPPORTUNITIES ABOUT THE

01:18PM  8   POTENTIAL TIMING FOR AN IPO.

01:18PM  9   Q.   AND AN IPO IS AN OPPORTUNITY TO LIQUIDATE, ISN'T IT?

01:18PM 10   A.   IT MEANS THAT THERE IS A PUBLIC MARKET AND THEN YOU MAKE A

01:18PM 11   DECISION WHETHER TO LIQUIDATE.

01:18PM 12        I WAS NOT CONTEMPLATING A LIQUIDATION IN ANY OF THESE

01:18PM 13   CONVERSATIONS.  I WAS TRYING TO DETERMINE IF AND WHEN THERE

01:18PM 14   WOULD BE AN IPO.

01:18PM 15        SO, YES, THAT OPPORTUNITY WOULD BE THERE.  BUT THAT

01:18PM 16   DOESN'T NECESSARILY MEAN THAT I WOULD TAKE ADVANTAGE OF THAT

01:18PM 17   OPPORTUNITY.

01:18PM 18   Q.   RIGHT.

01:18PM 19        SO AN IPO GIVES YOU THE OPPORTUNITY TO LIQUIDATE YOUR

01:19PM 20   THERANOS SHARES; IS THAT RIGHT?

01:19PM 21   A.   THAT'S CORRECT.

01:19PM 22        MS. WALSH:  YOUR HONOR, WE OFFER 12285.

01:19PM 23        THE COURT:  YOU KNOW, IT SEEMS TO ME THAT THIS

01:19PM 24   INFORMATION IS ALREADY IN FRONT OF THE JURY THROUGH ANOTHER --

01:19PM 25   I DO SEE SOME 801 ISSUES WITH THE FIRST PAGE, PAGE 1.

01:19PM  1          LET ME JUST SUSTAIN THE OBJECTION AT THIS POINT, AND IF

01:19PM  2     YOU WANT TO LAY A FOUNDATION TO CHANGE THAT?

01:19PM  3               MS. WALSH:  OKAY.  AND, YOUR HONOR, ON THE HEARSAY

01:19PM  4     ISSUE, EVEN IF IT'S NOT COMING IN FOR THE TRUTH, SO THERE

01:19PM  5     WOULDN'T BE ANY 801 ISSUE.

01:19PM  6               THE COURT:  WELL, I SUPPOSE THEN IT'S A 104 ISSUE.

01:19PM  7     WHAT IS THE RELEVANCE OF SOME OF THIS OTHER -- THE COLLOQUY

01:19PM  8     HERE?

01:19PM  9               MS. WALSH:  JUST THE OPPORTUNITIES TO LIQUIDATE AND

01:19PM 10     THE QUESTIONS ABOUT --

01:19PM 11               THE COURT:  I'M SORRY TO INTERRUPT YOU.

01:20PM 12          THE SECOND PARAGRAPH MIGHT HAVE 403 ISSUES.

01:20PM 13               MS. WALSH:  THE SECOND PARAGRAPH OF MS. HOLMES'S

01:20PM 14     EMAIL?

01:20PM 15               THE COURT:  YES.

01:20PM 16               MS. WALSH:  I SEE.

01:20PM 17          WE CAN REDACT THAT PARAGRAPH.

01:20PM 18          I'M REALLY INTERESTED IN ONE SENTENCE IN THE FIRST

01:20PM 19     PARAGRAPH, THE THIRD PARAGRAPH, AND SOME OF THE BULLETS.

01:20PM 20          THAT SECOND PARAGRAPH, I'M HAPPY TO REDACT THAT.

01:20PM 21               THE COURT:  OKAY.  ALL RIGHT.

01:20PM 22          IF YOU COULD REDACT THE SECOND PARAGRAPH IN MS. HOLMES'S

01:20PM 23     EMAIL --

01:20PM 24               MS. WALSH:  GREAT.

01:20PM 25               THE COURT:  -- THEN I'LL ALLOW THIS TO COME IN.

01:20PM  1              MS. WALSH:  OKAY.  THANK YOU.

01:20PM  2          AND CAN IT BE PUBLISHED WITH THAT REDACTION?

01:20PM  3              THE COURT:  YES.  YES.

01:20PM  4              MS. WALSH:  GREAT.

01:20PM  5          (DEFENDANT'S EXHIBIT 12285, REDACTED, WAS RECEIVED IN

01:20PM  6      EVIDENCE.)

01:20PM  7      BY MS. WALSH:

01:20PM  8      Q.   SO TURNING TO THE FIRST EMAIL IN TIME, MR. EISENMAN, THIS

01:20PM  9      IS TUESDAY, JUNE 8TH, 2010, FROM YOU TO MS. HOLMES REGARDING A

01:20PM  10     JUNE CALL.

01:20PM  11         AND YOU SAY, "ELIZABETH,

01:21PM  12         I HAVE BEEN TRYING TO CONTACT YOU OR CAROLYN" --

01:21PM  13         THAT'S MS. HOLMES'S ASSISTANT; RIGHT?

01:21PM  14     A.   YES.

01:21PM  15     Q.   -- "FOR THE PAST WEEK BY EMAIL AND PHONE TO SCHEDULE OUR

01:21PM  16     JUNE CALL, AND A JULY MEETING.  IN MY 23 YEARS IN THE

01:21PM  17     INVESTMENT BUSINESS, I HAVE NEVER BEEN TREATED WITH SUCH

01:21PM  18     DISREGARD.  MY INVESTMENT MAY PALE IN COMPARISON TO SOME OF

01:21PM  19     YOUR OTHER INVESTORS, BUT IT IS EXTREMELY MATERIAL TO ME.  WILL

01:21PM  20     YOU OR CAROLYN PLEASE RESPOND REGARDING THE JUNE CALL AND THE

01:21PM  21     JULY MEETING."

01:21PM  22         AND THEN MS. HOLMES RESPONDS TO YOU AND SHE SAYS, "ALAN,

01:21PM  23         "AS I HAVE COMMUNICATED MULTIPLE TIMES, WE CANNOT COMMIT

01:21PM  24     TO QUARTERLY INVESTOR UPDATES, ESPECIALLY ON AN EXACT SCHEDULE.

01:21PM  25     WE ARE WORKING ON PROCESSING YOUR REQUEST TO GET YOU THE PAPERS

EISENMAN CROSS BY MS. WALSH                                          5452

01:21PM   1    ON THE TRANSACTION TO SELL YOUR SHARES.  WE NEED TO PROCESS

01:21PM   2    THAT BEFORE SCHEDULING ANY MEETING AT THERANOS -- WHICH WOULD

01:21PM   3    NOT BE NECESSARY AT THAT POINT."

01:21PM   4        AND THEN GOING DOWN TO THE PARAGRAPH STARTING WITH "AS YOU

01:21PM   5    HAVE ACKNOWLEDGED, THERANOS IS AN EARLY STAGE LIFE SCIENCES

01:22PM   6    STARTUP AND BY IT'S VERY NATURE CARRIES IMMENSE RISK AND

01:22PM   7    UNPREDICTABILITY AS YOU ALREADY KNOW AS A SAVVY INVESTOR.  THIS

01:22PM   8    MAY NOT CHANGE FOR YEARS TO COME."

01:22PM   9        DO YOU SEE THAT, MR. EISENMAN?

01:22PM  10    A.   YES.

01:22PM  11    Q.   OKAY.  AND THEN GOING DOWN TO THE SECOND BULLET WHERE SHE

01:22PM  12    SAYS, "I HAVE INCLUDED ANSWERS TO YOUR QUESTIONS FROM YOUR

01:22PM  13    VARIOUS EMAILS BELOW."

01:22PM  14        THE SECOND BULLET SAYS, "PER YOUR QUESTION, WE DID NOT

01:22PM  15    ACHIEVE $200 MILLION IN SALES IN 2009."

01:22PM  16        DO YOU SEE THAT?

01:22PM  17    A.   YES.

01:22PM  18    Q.   SO SHE'S TELLING YOU WHAT THERANOS DID NOT ACHIEVE; RIGHT?

01:22PM  19    A.   RIGHT.

01:22PM  20    Q.   AND THEN IF WE GO DOWN TO THE FOURTH BULLET, SHE SAYS, "WE

01:22PM  21    CURRENTLY DO NOT HAVE PLANS TO GO IPO BY THE END OF 2011 AND DO

01:22PM  22    NOT HAVE 'A NEW WINDOW' PER YOUR EMAIL."

01:22PM  23        DO YOU SEE THAT?

01:22PM  24    A.   YES.

01:22PM  25    Q.   OKAY.  WE CAN TAKE THAT DOWN.

ER-4082

01:23PM  1        IF YOU CAN TURN IN YOUR BINDER TO 14224.

01:23PM  2   A.   OKAY.

01:23PM  3   Q.   IS THAT AN EMAIL BETWEEN YOU AND MS. HOLMES, CC'ING

01:23PM  4   DAVID HARRIS AND CAROLYN BALKENHOL?

01:23PM  5   A.   YES.

01:23PM  6   Q.   AND THAT'S -- THE DATE OF THE EMAIL IS JULY 1ST, 2010; IS

01:23PM  7   THAT RIGHT?

01:23PM  8   A.   YES.

01:23PM  9   Q.   AND IT RELATES TO A DECISION TO SELL STOCK; CORRECT?

01:23PM  10  A.   YES.

01:23PM  11          MS. WALSH:  YOUR HONOR, WE OFFER 14224.

01:23PM  12          MR. BOSTIC:  NO OBJECTION.

01:23PM  13          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:23PM  14       (DEFENDANT'S EXHIBIT 14224 WAS RECEIVED IN EVIDENCE.)

01:23PM  15  BY MS. WALSH:

01:23PM  16  Q.   OKAY.  SO THIS EMAIL, MR. EISENMAN, IS ABOUT A MONTH AFTER

01:23PM  17  THE EMAIL THAT WE LAST -- JUST SAW FROM MS. HOLMES WHERE SHE

01:23PM  18  WAS TALKING ABOUT AN OFFER TO -- SO THAT YOU COULD SELL YOUR

01:24PM  19  STOCK; RIGHT?

01:24PM  20  A.   RIGHT.

01:24PM  21  Q.   AND WHAT YOU SAY IN THIS EMAIL IS, "ELIZABETH,

01:24PM  22       "I HAVEN'T MADE A DECISION WHETHER TO SELL STOCK."

01:24PM  23       AND THEN, "ACCORDINGLY, I WOULD GREATLY APPRECIATE IF YOU

01:24PM  24  WOULD TRY TO SCHEDULE OUR QUARTERLY UPDATE," AND SO FORTH.

01:24PM  25       DO YOU SEE THAT?

EISENMAN CROSS BY MS. WALSH                                              5454

01:24PM   1    A.   YES.

01:24PM   2    Q.   AND SO YOU HADN'T DECIDED WHETHER YOU WERE GOING TO SELL

01:24PM   3    YOUR STOCK; RIGHT?

01:24PM   4    A.   CORRECT.

01:24PM   5    Q.   OKAY.  LET'S TURN TO 14225.

01:24PM   6    A.   OKAY.

01:24PM   7    Q.   OKAY.  AND THIS IS AN EMAIL CHAIN BETWEEN YOU AND

01:24PM   8    MS. HOLMES AND MS. BALKENHOL IN JULY 2010 ALSO TALKING ABOUT

01:24PM   9    TRYING TO GET INFORMATION REGARDING THERANOS.

01:24PM  10         DO YOU SEE THAT?

01:24PM  11    A.   YES.

01:24PM  12    Q.   OKAY.  AND IT'S -- YOU WANT TO KNOW VARIOUS PIECES OF

01:25PM  13    INFORMATION.

01:25PM  14         YOU'RE EMAILING THEM TRYING TO GET THIS INFORMATION AS A

01:25PM  15    PART OF JUST KEEPING UP WITH WHAT THERANOS WAS DOING; RIGHT?

01:25PM  16    A.   YES.

01:25PM  17    Q.   MONITORING YOUR INVESTMENT; CORRECT?

01:25PM  18    A.   IT WAS, IT WAS MONITORING THE INVESTMENT GENERALLY.

01:25PM  19         BUT SPECIFICALLY IT WAS POTENTIALLY AN OFFER TO BUY STOCK,

01:25PM  20    SO I WAS PURSUING THAT OFFER, AND ALSO TRYING TO PURSUE WHAT

01:25PM  21    INFORMATION THEY WOULD SHARE TO MAKE AN INTELLIGENT DECISION

01:25PM  22    WHETHER OR NOT TO SELL STOCK.

01:25PM  23    Q.   OKAY.  SO YOU WERE MAKING IT -- YOU WANTED INFORMATION TO

01:25PM  24    MAKE AN ASSESSMENT; CORRECT?

01:25PM  25    A.   CORRECT.

ER-4084

01:25PM  1     Q.   OKAY.

01:25PM  2          YOUR HONOR, WE OFFER 14225.

01:25PM  3          MR. BOSTIC:  NO OBJECTION.

01:25PM  4          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:25PM  5          (DEFENDANT'S EXHIBIT 14225 WAS RECEIVED IN EVIDENCE.)

01:25PM  6     BY MS. WALSH:

01:25PM  7     Q.   LET'S TURN TO THE FIRST EMAIL IN TIME.

01:25PM  8          THIS IS FROM YOU TO ELIZABETH HOLMES, CC'ING DAVID HARRIS

01:25PM  9     AND CAROLYN BALKENHOL, AND THAT'S ON JULY 13TH, 2010.

01:26PM 10          AND YOU SAY, "ELIZABETH,

01:26PM 11          "I HEARD YESTERDAY THAT YOU COMPLETED AN EQUITY OFFERING.

01:26PM 12     I ALSO HEARD FROM DAVID THAT THE OFFER TO BUY STOCK MAY NOT

01:26PM 13     COME UNTIL YEAR END, INSTEAD OF BY THE END OF THE SUMMER."

01:26PM 14          AND THEN YOU SAY AT THE END, "ALSO, CAN YOU PLEASE TELL ME

01:26PM 15     WHAT VALUATION THIS EQUITY ROUND WAS PRICED?"

01:26PM 16          SO YOU WANT TO KNOW THE PRICE; RIGHT?

01:26PM 17     A.   RIGHT.

01:26PM 18     Q.   AND THEN IN RESPONSE MS. HOLMES SAYS, "ALAN,

01:26PM 19          "PER MY PREVIOUS EMAIL I WILL CALL YOU WHEN WE HAVE

01:26PM 20     SOMETHING CONCRETE."

01:26PM 21          DO YOU SEE THAT?

01:26PM 22     A.   YES.

01:26PM 23     Q.   AND THEN YOU SAY, "ELIZABETH,

01:26PM 24          "I AM REALLY TRYING TO KEEP MY EMAILS TO A MINIMUM.  CAN

01:26PM 25     YOU RESPOND TO MY INQUIRY BELOW ABOUT THE PRICING OF THE EQUITY

01:26PM   1    ROUND AND IF THE OFFER TO BUY OUR STOCK IS DELAYED UNTIL YEAR

01:26PM   2    END?

01:26PM   3         "ALSO, YOUR RESPONSE TO AN UPDATE CALL IS VAGUE.  DO YOU

01:27PM   4    THINK YOU CAN SCHEDULE A MEETING?"

01:27PM   5         DO YOU SEE THAT?

01:27PM   6    A.   YES.

01:27PM   7    Q.   AND LET'S GO TO THE NEXT ONE UP IN THE EMAIL CHAIN.  THIS

01:27PM   8    ONE YOU TOOK MS. HOLMES OFF OF THE CHAIN; RIGHT?  THIS IS THE

01:27PM   9    ONE AT 1:14 P.M.?

01:27PM  10    A.   AGAIN, I DON'T RECALL -- THIS MAY HAVE BEEN INTENDING TO

01:27PM  11    GO TO ELIZABETH AND FOR SOME REASON IT ONLY GOT SENT TO HER

01:27PM  12    ADMINISTRATIVE ASSISTANT.

01:27PM  13    Q.   OKAY.  BUT ELIZABETH HOLMES DOES NOT APPEAR ON THIS EMAIL;

01:27PM  14    RIGHT?

01:27PM  15    A.   RIGHT.

01:27PM  16    Q.   AND SO YOU'RE EMAILING HER ASSISTANT; CORRECT?

01:27PM  17    A.   YES.

01:27PM  18    Q.   AND THEN YOU SAY, "AS YOU CAN SEE, THIS WAS SENT ON

01:27PM  19    JULY 13TH, AND AGAIN ON JULY 16TH WITH NO RESPONSE.  CAN YOU,"

01:27PM  20    THEN IN ALL CAPS, "PLEASE RESPOND TODAY?"

01:27PM  21         DO YOU SEE THAT?

01:27PM  22    A.   YES.

01:27PM  23    Q.   AND YOU WERE AWARE, MR. EISENMAN, THAT PUTTING ALL CAPS IN

01:27PM  24    EMAILS IS YELLING IN AN EMAIL.

01:27PM  25         WERE YOU AWARE OF THAT?

01:27PM 1    A.   NO.

01:27PM 2    Q.   LET'S GO TO THE NEXT PART OF THE CHAIN.

01:28PM 3         THIS IS FROM MS. HOLMES'S ASSISTANT TO YOU AND SHE SAYS,

01:28PM 4    "ALAN,

01:28PM 5         "I HAVEN'T BEEN RESPONDING, BECAUSE I DON'T HAVE ANY NEW

01:28PM 6    INFORMATION FOR YOU, AND I ASSUMED THAT WOULD ONLY FRUSTRATE

01:28PM 7    YOU.  I ASSURE YOU THAT AS SOON AS I HAVE NEW INFORMATION, YOU

01:28PM 8    WILL BE THE VERY FIRST TO KNOW."

01:28PM 9         DO YOU SEE THAT?

01:28PM 10   A.   YES.

01:28PM 11   Q.   AND THEN LET'S GO UP TO THE NEXT PART OF THE CHAIN, WHICH

01:28PM 12   IS YOUR RESPONSE TO, AGAIN, MS. HOLMES'S ASSISTANT.

01:28PM 13        AND YOU SAY, "SURELY YOU CAN TELL ME THE PRICING OF THE

01:28PM 14   EQUITY OFFERING.  IF YOU DON'T KNOW, PLEASE ASK ELIZABETH.  SHE

01:28PM 15   SHOULD ALSO BE ABLE TO LET ME KNOW IF THE OFFERING MATERIALS

01:28PM 16   HAVE BEEN DELAYED.  IN HER ORIGINAL COMMUNICATION TO ME, SHE

01:28PM 17   SAID WE WOULD RECEIVE THEM THIS SUMMER.  IN HER COMMUNICATION

01:28PM 18   TO DAVID, SHE SAID WE WOULD RECEIVE THEM BY THE END OF THE

01:28PM 19   YEAR.  IF ELIZABETH WOULD SCHEDULE OUR CALL, SHE COULD CLEAR UP

01:29PM 20   A LOT OF THIS CONFUSION.  WE ARE ALMOST INTO AUGUST FOR OUR

01:29PM 21   JUNE CALL.  MY WIFE IS A PARTNER IN THIS INVESTMENT, AND THE

01:29PM 22   TWO OF US REALLY DON'T APPRECIATE THE COMMUNICATION BREAKDOWN."

01:29PM 23        DO YOU SEE THAT?

01:29PM 24   A.   YES.

01:29PM 25   Q.   AND THEN YOU EMAIL AGAIN, I GUESS THIS IS AN HOUR LATER ON

EISENMAN CROSS BY MS. WALSH                                    5458

01:29PM  1    THE SAME DAY, TO MS. HOLMES'S ASSISTANT.

01:29PM  2         "I WOULD GREATLY APPRECIATE AN ANSWER TODAY.  THANKS

01:29PM  3    AGAIN, ALAN."

01:29PM  4         DO YOU SEE THAT?

01:29PM  5    A.   YES.

01:29PM  6    Q.   AND THEN YOU EMAIL AGAIN A COUPLE OF DAYS LATER AND YOU

01:29PM  7    SAY, "NEITHER OF US WANTS TO HAVE MULTIPLE EMAILS FOR WHAT

01:29PM  8    SHOULD BE A STRAIGHTFORWARD AND SIMPLE REQUEST FOR INFORMATION.

01:29PM  9    IS THERE A REASON YOU HAVEN'T ANSWERED THE EMAIL BELOW?  I

01:29PM  10   WOULD GREATLY APPRECIATE A RESPONSE TODAY."

01:29PM  11        DO YOU SEE THAT?

01:29PM  12   A.   YES.

01:29PM  13   Q.   AND THEN THE NEXT EMAIL UP IS THE NEXT DAY, AND YOU EMAIL

01:29PM  14   MS. HOLMES'S ASSISTANT, COPYING MS. HOLMES AGAIN, YOU PUT HER

01:29PM  15   BACK INTO THE CHAIN, AND YOU SAY, "IS THERE A REASON MY EMAILS

01:29PM  16   ARE NOT GETTING A RESPONSE?  THIS IS UPSETTING TO BOTH ME AND

01:30PM  17   MY WIFE.  PLEASE CALL OR EMAIL TODAY."

01:30PM  18        DO YOU SEE THAT?

01:30PM  19   A.   YES.

01:30PM  20   Q.   AND THEN MS. HOLMES FINALLY RESPONDS AT THE END OF THE

01:30PM  21   CHAIN AND SHE SAYS, "ALAN,

01:30PM  22        "YOUR CONTINUED DAILY CALLS AND EMAILS AFTER WE'VE ALREADY

01:30PM  23   TOLD YOU MULTIPLE TIMES THAT WE DO NOT HAVE ADDITIONAL

01:30PM  24   INFORMATION WE CAN DISCLOSE BEYOND WHAT WE'VE ALREADY SHARED

01:30PM  25   WITH DAVID ARE UPSETTING TO US.  ONCE WE HAVE ADDITIONAL

01:30PM   1    INFORMATION WE CAN SHARE WITH YOU WE WILL CONTACT YOU AS

01:30PM   2    MENTIONED MULTIPLE TIMES BEFORE -- YOU'RE NOT GETTING A

01:30PM   3    RESPONSE BECAUSE IT IS NOT AN EFFECTIVE USE OF OUR TIME TO KEEP

01:30PM   4    REPEATING THIS."

01:30PM   5        DO YOU SEE THAT?

01:30PM   6    A.   YES.

01:30PM   7    Q.   OKAY.  WE CAN TAKE THAT DOWN.

01:30PM   8        NOW, IF YOU COULD TURN TO 14226 IN YOUR BINDER.

01:31PM   9        DO YOU SEE THAT?

01:31PM  10    A.   YES.

01:31PM  11    Q.   AND IS THIS ANOTHER EMAIL CHAIN BETWEEN YOU AND MS. HOLMES

01:31PM  12    TRYING TO GET INFORMATION ABOUT THERANOS?

01:31PM  13    A.   YES.

01:31PM  14    Q.   AND THIS IS IN SEPTEMBER 2010; IS THAT RIGHT?

01:31PM  15    A.   YES.

01:31PM  16         MS. WALSH:  YOUR HONOR, WE OFFER 14226.

01:31PM  17         MR. BOSTIC:  NO OBJECTION.

01:31PM  18         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:31PM  19    (DEFENDANT'S EXHIBIT 14226 WAS RECEIVED IN EVIDENCE.)

01:31PM  20    BY MS. WALSH:

01:31PM  21    Q.   OKAY.  TURNING TO THE FIRST EMAIL IN TIME FROM YOU TO

01:31PM  22    MS. HOLMES ON SEPTEMBER 27TH, 2010, THE SUBJECT LINE IS

01:31PM  23    LARRY ELLISON.

01:31PM  24        "ELIZABETH,

01:31PM  25        "I NOTICED THAT LARRY IS NOT CURRENTLY LISTED AS A

01:31PM  1      DIRECTOR.  DID HE GO OFF THE BOARD?  IF SO, WHY?  ALSO, DO YOU

01:31PM  2      HAVE ANY VISIBILITY WHEN WE WILL RECEIVE INFORMATION ABOUT THE

01:31PM  3      DUTCH OFFER?"

01:31PM  4          DO YOU SEE THAT?

01:31PM  5      A.  YES.

01:31PM  6      Q.  OKAY.  AND THEN SHE RESPONDS, "ALAN,

01:31PM  7          "I RECEIVED THIS EMAIL FROM SATURDAY AS WELL -- AT THIS

01:31PM  8      POINT, PER OUR CALL, THERE IS NO NEW INFORMATION TO BE SHARED

01:31PM  9      WITH OUR INVESTOR BASE.  AS DISCUSSED, WHEN WE COMMUNICATE

01:32PM  10     ANYTHING WITH OUR INVESTOR BASE, YOU WILL BE INCLUDED ON THOSE

01:32PM  11     COMMUNICATIONS AS WELL."

01:32PM  12         DO YOU SEE THAT?

01:32PM  13     A.  YES.

01:32PM  14     Q.  OKAY.  WE CAN TAKE THAT DOWN.

01:32PM  15         LET'S GO TO 12185.

01:32PM  16         DO YOU SEE THAT?

01:32PM  17     A.  YES.

01:32PM  18     Q.  OKAY.  THIS IS AN EMAIL IN FEBRUARY 2011.  SO WE'RE

01:32PM  19     MARCHING FORWARD IN TIME THROUGH THE YEARS.  WE'RE NOW IN 2011.

01:32PM  20         AND IT'S BETWEEN YOU AND MS. HOLMES AND MR. BALWANI.

01:32PM  21         DO YOU SEE THAT?

01:32PM  22     A.  YES.

01:32PM  23     Q.  AND THIS IS ANOTHER EXAMPLE OF YOUR TRYING TO GET

01:33PM  24     INFORMATION ABOUT THE COMPANY AGAIN; CORRECT?

01:33PM  25     A.  CORRECT.

01:33PM 1    Q.   AND IT RELATES TO A POSSIBLE TENDER AND THE BUSINESS;

01:33PM 2    CORRECT?

01:33PM 3    A.   CORRECT.

01:33PM 4           MS. WALSH:  YOUR HONOR, WE OFFER 12185.

01:33PM 5           MR. BOSTIC:  NO OBJECTION.

01:33PM 6           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:33PM 7         (DEFENDANT'S EXHIBIT 12185 WAS RECEIVED IN EVIDENCE.)

01:33PM 8    BY MS. WALSH:

01:33PM 9    Q.   ALL RIGHT.  LET'S START WITH THE FIRST EMAIL IN TIME.

01:33PM 10        ON JANUARY 31ST, MR. EISENMAN, YOU EMAIL MS. HOLMES AND

01:33PM 11   MR. BALWANI.

01:33PM 12        AND WHAT YOU SAY IS "ANOTHER 2 MONTHS HAVE PASSED WITHOUT

01:33PM 13   ANY UPDATES ON THE TENDER OR THE BUSINESS.  CAN WE SCHEDULE A

01:33PM 14   CALL SOMETIME OVER THE NEXT COUPLE OF WEEKS?"

01:33PM 15        AND THEN MR. BALWANI REPLIES ON FEBRUARY 1ST AND HE SAYS,

01:33PM 16   "THERE IS NO QUARTERLY UPDATE WE PROVIDE.  AS MENTIONED TO YOU

01:33PM 17   BEFORE, WE WILL SEND UPDATES TO ALL INVESTORS AT THE SAME

01:33PM 18   TIME."

01:33PM 19        DO YOU SEE THAT?

01:33PM 20   A.   YES.

01:34PM 21   Q.   AND THEN YOU RESPOND IN THE NEXT PART OF THE CHAIN.

01:34PM 22        AND YOU'RE SENDING IT TO MR. BALWANI, BUT YOU SAY

01:34PM 23   "ELIZABETH,

01:34PM 24        "YOU HAVE PROVIDED A QUARTERLY UPDATE TO ME, AND SOMETIMES

01:34PM 25   TO OTHER INVESTORS, FROM THE TIME I INVESTED IN THERANOS OVER

EISENMAN CROSS BY MS. WALSH                                          5462

01:34PM   1    4 YEARS AGO, UNTIL THE MIDDLE OF LAST YEAR.  YOU ALSO INDICATED

01:34PM   2    THAT THERE WOULD BE THE KIND OF INFORMATION I WAS LOOKING FOR

01:34PM   3    WHEN THE TENDER MATERIALS WERE TO BE CIRCULATED.  NOW, YOU HAVE

01:34PM   4    LEFT US TOTALLY CLUELESS IF AND WHEN THESE MATERIALS WILL BE

01:34PM   5    CIRCULATED.  I UNDERSTAND YOU DON'T HAVE AN OBLIGATION TO

01:34PM   6    UPDATE US, BUT IT WOULD BE APPRECIATED IF YOU WOULD ARRANGE A

01:34PM   7    CALL."

01:34PM   8        DO YOU SEE THAT?

01:34PM   9    A.   YES.

01:34PM   10   Q.   AND THEN YOU EMAIL AGAIN A FEW DAYS LATER, I GUESS THREE

01:34PM   11   DAYS LATER, SAYING, "ELIZABETH,

01:34PM   12       "SENT 3 DAYS AGO WITH NO RESPONSE.  CAN YOU PLEASE EMAIL

01:34PM   13   OR CALL THIS WEEKEND IF YOU ARE TOO BUSY TODAY."

01:35PM   14       AND THEN MR. BALWANI RESPONDS, "ALAN.

01:35PM   15       WE HAVE ALREADY RESPONDED TO YOUR EMAILS.  NOTHING MORE TO

01:35PM   16   ADD."

01:35PM   17       DO YOU SEE THAT?

01:35PM   18   A.   YES.

01:35PM   19   Q.   WE CAN TAKE THAT DOWN.

01:35PM   20       LET'S GO TO 12252.  AGAIN, WE ARE GOING FORWARD IN TIME.

01:35PM   21       I'LL WAIT UNTIL YOU GET THERE.  OKAY.

01:35PM   22       IS THIS AN EMAIL ON MAY 16TH, 2012?

01:35PM   23   A.   YES.

01:35PM   24   Q.   AND IT'S FROM -- IT'S BETWEEN YOU AND A PERSON NAMED

01:35PM   25   NANCY MINNIG; CORRECT?

ER-4092

01:35PM  1      A.   CORRECT.

01:35PM  2      Q.   AND NANCY MINNIG WAS THE ASSISTANT FOR DON LUCAS; CORRECT?

01:35PM  3      A.   CORRECT.

01:35PM  4      Q.   AND DON LUCAS WAS ON THE BOARD OF THERANOS; RIGHT?

01:35PM  5      A.   RIGHT.

01:35PM  6      Q.   AND THIS IS ANOTHER EMAIL OF YOU TRYING TO GET INFORMATION

01:35PM  7      ABOUT THERANOS; CORRECT?

01:35PM  8      A.   CORRECT.

01:35PM  9            MS. WALSH:  YOUR HONOR, WE OFFER 12252.

01:36PM  10           MR. BOSTIC:  NO OBJECTION.

01:36PM  11           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:36PM  12      (DEFENDANT'S EXHIBIT 12252 WAS RECEIVED IN EVIDENCE.)

01:36PM  13      BY MS. WALSH:

01:36PM  14      Q.   SO ON THE BOTTOM EMAIL, MS. MINNIG SAYS, "HI ALAN,

01:36PM  15           "MY APOLOGIES FOR NOT GETTING BACK TO YOU.  I SPOKE TO DON

01:36PM  16      AND HE DOESN'T HAVE ANY FURTHER INFORMATION AT THIS TIME.

01:36PM  17      THERE HAVE BEEN ARTICLES IN THE NEWS AS YOU HAD MENTIONED YOU

01:36PM  18      WERE AWARE OF AND DON SUGGESTED THAT YOU CONTINUE TO FOLLOW THE

01:36PM  19      COMPANY IN THIS MANNER.  WHEN THERE IS INFORMATION THAT DON CAN

01:36PM  20      SHARE WITH YOU WE WILL BE IN TOUCH."

01:36PM  21           AND THEN YOU RESPOND, "THANKS NANCY.  CAN YOU ASK DON IF

01:36PM  22      IT IS REASONABLE TO EXPECT SOME TYPE OF UPDATE THIS YEAR?"

01:36PM  23           DO YOU SEE THAT?

01:36PM  24      A.   YES.

01:36PM  25      Q.   AND AT SOME POINT AFTER THIS EMAIL, YOU LEARNED THAT

01:36PM 1    MR. LUCAS RELAYED TO MS. HOLMES THAT YOU HAD TRIED TO CONTACT

01:36PM 2    HIM; IS THAT RIGHT?

01:36PM 3    A.   YES.

01:36PM 4    Q.   OKAY.  SO LET'S TURN TO 713 IN YOUR BINDER.

01:37PM 5         I THINK THIS IS IN EVIDENCE, 713?

01:37PM 6              THE COURT:  DO YOU SHOW IT IN EVIDENCE, CHERE?

01:37PM 7              THE CLERK:  NO.

01:37PM 8              THE COURT:  OKAY.

01:37PM 9    BY MS. WALSH:

01:37PM 10   Q.   DO YOU HAVE 713 IN FRONT OF YOU?

01:37PM 11   A.   YES.

01:37PM 12   Q.   AND THIS IS ANOTHER EMAIL CHAIN WITH MS. MINNIG; RIGHT?

01:37PM 13   A.   RIGHT.

01:37PM 14   Q.   AND THAT IS NOVEMBER 2012; CORRECT?

01:37PM 15   A.   CORRECT.

01:37PM 16   Q.   AND THIS IS MORE COMMUNICATIONS OF YOU TRYING TO GET

01:37PM 17   INFORMATION FROM MR. LUCAS; RIGHT?

01:37PM 18   A.   CORRECT.

01:37PM 19              MS. WALSH:  YOUR HONOR, WE OFFER 713.

01:37PM 20              MR. BOSTIC:  NO OBJECTION.

01:37PM 21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:37PM 22        (GOVERNMENT'S EXHIBIT 713 WAS RECEIVED IN EVIDENCE.)

01:38PM 23   BY MS. WALSH:

01:38PM 24   Q.   LET'S GO TO PAGE 3.

01:38PM 25              AND THIS IS FROM MS. MINNIG TO MS. HOLMES ON

01:38PM   1    NOVEMBER 19TH, 2012.

01:38PM   2         AND SHE SAYS, "HELLO ELIZABETH,

01:38PM   3         "PLEASE SEE THE NOTE BELOW FROM ALAN EISENMAN.  WOULD YOU

01:38PM   4    PLEASE HAVE THE APPROPRIATE PERSON GET IN TOUCH WITH HIM TO

01:38PM   5    PROVIDE A STATUS REPORT?  DON DOES NOT WANT TO GET INVOLVED IN

01:38PM   6    COMMUNICATIONS REGARDING THERANOS WITH ANY OF ITS

01:38PM   7    SHAREHOLDERS."

01:38PM   8         DO YOU SEE THAT?

01:38PM   9    A.   YES.

01:38PM  10    Q.   AND THEN SHE EMAILS YOU AND SAYS, "ALAN," -- "SHE" BEING

01:38PM  11    MS. HOLMES; RIGHT?  MS. HOLMES EMAILS YOU; RIGHT?

01:38PM  12    A.   RIGHT.

01:38PM  13    Q.   AND SHE SAYS, "ALAN,

01:38PM  14         "WE HAVE COMMUNICATED ABOUT THIS MULTIPLE TIMES BEFORE,

01:38PM  15    YET YOU CHOOSE TO CONTINUE TO GO DOWN THIS PATH."

01:38PM  16         DO YOU SEE THIS?

01:38PM  17    A.   YES.

01:39PM  18    Q.   AND THEN YOU REPLY TO HER, "ELIZABETH,

01:39PM  19         "IT HAS BEEN OVER 2 YEARS SINCE YOU HAVE COMMUNICATED WITH

01:39PM  20    YOUR INVESTORS.  I EMAILED YOU ONE WEEK AGO, FOLLOWING YOUR

01:39PM  21    INSTRUCTIONS TO DAVID HARRIS THAT INVESTORS SHOULD COMMUNICATE

01:39PM  22    DIRECTLY WITH THE COMPANY FOR AN UPDATE.  WHEN I DIDN'T GET A

01:39PM  23    RESPONSE SIX DAYS LATER, I REACHED OUT TO YOUR CHAIRMAN.  I DO

01:39PM  24    NOT UNDERSTAND YOUR EMAIL.  DOES THIS MEAN THAT YOU CAN OR

01:39PM  25    WON'T COMMUNICATE WITH ME OR THE OTHER INVESTORS?  I WAS LED TO

EISENMAN CROSS BY MS. WALSH                                        5466

01:39PM  1    BELIEVE THAT THERE WOULD BE EVENTS HAPPENING BEFORE THE END OF

01:39PM  2    2012 THAT WOULD BE PUBLICLY COMMUNICATED.  HAS THIS CHANGED?"

01:39PM  3        DO YOU SEE THAT?

01:39PM  4    A.   YES.

01:39PM  5    Q.   AND THEN MS. HOLMES EMAILS YOU BACK SAYING, "NO, ALAN, IT

01:39PM  6    HAS BEEN ABOUT THAT LONG SINCE YOU DECIDED TO START HARASSING

01:39PM  7    OUR CHAIRMAN, DESPITE THE FACT THAT WE COMMUNICATED MULTIPLE

01:39PM  8    TIMES THAT IF YOU DID SO, WE WOULD NO LONGER RESPOND TO YOUR

01:39PM  9    REQUESTS TO TALK WITH YOU IN LIGHT OF ALL OF OUR PAST

01:39PM  10   INTERACTIONS.  TO THE COMPANY'S AMAZEMENT, YOU HAVE CONTINUED

01:39PM  11   TO DO SO ON AN ONGOING BASIS EVER SINCE WE HAD THOSE

01:40PM  12   CONVERSATIONS WITH YOU."

01:40PM  13       DO YOU SEE THAT?

01:40PM  14   A.   YES.

01:40PM  15   Q.   OKAY.  THEN YOU EMAIL MS. MINNIG AGAIN AND YOU SAY, I

01:40PM  16   DON'T KNOW HOW TO REACT TO ELIZABETH'S EMAIL, AND YOU APOLOGIZE

01:40PM  17   IF YOU WERE OUT OF LINE.

01:40PM  18       AND YOU ASK HER, IS THERE A HAPPY MEDIUM THAT YOU OR DON

01:40PM  19   CAN SUGGEST?

01:40PM  20       AND SHE EMAILS YOU BACK SAYING, "HELLO ALAN,

01:40PM  21       "OUR OFFICE DOES NOT HAVE ANY FURTHER SUGGESTIONS TO OFFER

01:40PM  22   YOU."

01:40PM  23       DO YOU SEE THAT?

01:40PM  24   A.   YES.

01:40PM  25   Q.   OKAY.  AND THEN AFTER MR. LUCAS DECLINED TO COMMUNICATE

ER-4096

01:40PM  1    WITH YOU, YOU TRIED CONTACTING OTHER THERANOS BOARD MEMBERS; IS

01:40PM  2    THAT RIGHT?

01:40PM  3    A.   CAN YOU BE MORE SPECIFIC?

01:40PM  4    Q.   SURE.  YOU REACHED OUT TO BILL FRIST; IS THAT RIGHT?

01:40PM  5    A.   THAT IS A BOARD MEMBER, NOT MEMBERS.

01:40PM  6    Q.   SURE.  DID YOU REACH OUT TO BILL FRIST?

01:41PM  7    A.   YES, I DID.

01:41PM  8    Q.   OKAY.  AND HE'S A FORMER SENATOR; RIGHT?

01:41PM  9    A.   YES.

01:41PM 10    Q.   AND HE WAS THE FORMER MAJORITY LEADER IN THE U.S. SENATE;

01:41PM 11    IS THAT CORRECT?

01:41PM 12    A.   THAT'S CORRECT.

01:41PM 13    Q.   AND HE WAS A WELL RESPECTED SURGEON; IS THAT RIGHT?

01:41PM 14    A.   CORRECT.

01:41PM 15    Q.   AND YOU DIDN'T KNOW HIM PERSONALLY; RIGHT?

01:41PM 16    A.   CORRECT.

01:41PM 17    Q.   BUT HE WAS A FAMILY FRIEND; RIGHT?

01:41PM 18    A.   CORRECT.

01:41PM 19    Q.   HE WAS A FRIEND OF YOUR FATHER-IN-LAW'S; CORRECT?

01:41PM 20    A.   CORRECT.

01:41PM 21    Q.   AND YOUR FATHER-IN-LAW IS FROM TENNESSEE; CORRECT?

01:41PM 22    A.   CORRECT.

01:41PM 23    Q.   AND SENATOR FRIST REPRESENTED THE STATE OF TENNESSEE;

01:41PM 24    RIGHT?

01:41PM 25    A.   YES.

EISENMAN CROSS BY MS. WALSH                                    5468

01:41PM  1    Q.   OKAY.  AND YOU SUCCEEDED IN CONTACTING DR. FRIST; RIGHT?

01:41PM  2    A.   YES.

01:41PM  3    Q.   AND YOU ASKED HIM SOME QUESTIONS ABOUT THERANOS; RIGHT?

01:41PM  4    A.   YES.

01:41PM  5    Q.   BUT ULTIMATELY SENATOR FRIST STOPPED COMMUNICATING WITH

01:41PM  6    YOU ABOUT THERANOS; IS THAT RIGHT?

01:41PM  7    A.   YES.

01:41PM  8    Q.   SO WE'VE GONE THROUGH A LOT OF EMAILS.  IT'S FAIR TO SAY

01:42PM  9    THAT YOU BECAME VERY FRUSTRATED WITH THE LEVEL OF COMMUNICATION

01:42PM  10   YOU WERE GETTING ABOUT DETAILS FROM THERANOS; RIGHT?

01:42PM  11   A.   YES.

01:42PM  12   Q.   YOU FELT YOU WERE NOT GETTING THE LEVEL OF COMMUNICATION

01:42PM  13   THAT YOU WANTED; RIGHT?

01:42PM  14   A.   YES.

01:42PM  15   Q.   OR THE INFORMATION THAT YOU SOUGHT; CORRECT?

01:42PM  16   A.   CORRECT.

01:42PM  17   Q.   BUT ULTIMATELY YOU DECIDED TO ULTIMATELY INCREASE YOUR

01:42PM  18   STAKE IN THERANOS IN 2013; RIGHT?

01:42PM  19   A.   YES.

01:42PM  20   Q.   NOW, YOU TESTIFIED THAT YOU LOOKED AT THE THERANOS WEBSITE

01:42PM  21   BEFORE YOUR INVESTMENT IN 2013; RIGHT?

01:42PM  22   A.   YES.

01:42PM  23   Q.   AND YOU BECAME AWARE THAT THERANOS WAS LAUNCHING ITS

01:42PM  24   SERVICES IN WALGREENS; RIGHT?

01:42PM  25   A.   YES.

ER-4098

01:42PM   1    Q.   AND YOU READ PUBLICITY AT THE TIME ABOUT THE WALGREENS

01:42PM   2    LAUNCH; CORRECT?

01:42PM   3    A.   CORRECT.

01:42PM   4    Q.   AND THEN THERE CAME A TIME IN DECEMBER OF 2013 WHERE YOU

01:42PM   5    BECAME AWARE OF THE OPPORTUNITY TO INCREASE YOUR STAKE IN

01:42PM   6    THERANOS; RIGHT?

01:42PM   7    A.   YES.

01:42PM   8    Q.   OKAY.  SO LET'S TURN TO 16 -- 1363.  1363.

01:43PM   9    A.   MY BINDER GOES FROM 1362 TO 1370.

01:43PM  10    Q.   YEP.  OKAY.

01:43PM  11         TAKE A LOOK AT 1362.

01:43PM  12    A.   OKAY.

01:43PM  13    Q.   OKAY.  DO YOU HAVE THAT IN FRONT IT OF YOU?

01:44PM  14    A.   YES.

01:44PM  15    Q.   ALL RIGHT.  AND IS THIS AN EMAIL CHAIN IN DECEMBER OF 2013

01:44PM  16    BETWEEN YOU AND MR. BALWANI ABOUT INVESTING IN THERANOS IN

01:44PM  17    2013?

01:44PM  18    A.   YES.

01:44PM  19              MS. WALSH:  YOUR HONOR, WE OFFER 1362.

01:44PM  20              MR. BOSTIC:  NO OBJECTION.

01:44PM  21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:44PM  22         (GOVERNMENT'S EXHIBIT 1362 WAS RECEIVED IN EVIDENCE.)

01:44PM  23    BY MS. WALSH:

01:44PM  24    Q.   OKAY.  AND IN THIS EMAIL IN THE MIDDLE OF PAGE 1

01:44PM  25    MR. BALWANI SAYS TO YOU, "ALAN.

EISENMAN CROSS BY MS. WALSH                                      5470

01:44PM   1          "I CHECKED WITH OUR LEGAL ABOUT YOUR QUESTION ABOUT

01:44PM   2    INVESTING THROUGH A NEW ENTITY.  THIS SHOULDN'T BE AN ISSUE."

01:44PM   3          RIGHT?

01:44PM   4    A.   YES.

01:44PM   5    Q.   AND YOU REPLY TO HIM, "SUNNY,

01:44PM   6          "WE WOULD LIKE TO MAKE THE FOLLOWING INVESTMENTS."

01:45PM   7          AND THEN YOU LIST THE DIFFERENT PEOPLE AND DIFFERENT

01:45PM   8    INVESTMENTS; CORRECT?

01:45PM   9    A.   YES.

01:45PM  10    Q.   WITH THE DIFFERENT AMOUNTS?

01:45PM  11    A.   RIGHT.

01:45PM  12    Q.   AND THAT WAS ON DECEMBER 24TH, 2013; RIGHT?

01:45PM  13    A.   YES.

01:45PM  14    Q.   AND THEN VERY CLOSE IN TIME TO THAT -- LET'S TURN TO

01:45PM  15    EXHIBIT 1371.

01:45PM  16    A.   I DON'T HAVE A 1371.

01:45PM  17              THE COURT:  70?

01:45PM  18              MS. WALSH:  ACTUALLY, 1371 IS IN EVIDENCE.  IF WE

01:45PM  19    COULD JUST DOUBLE-CHECK THAT.

01:45PM  20          I THINK IT'S THE FIRST EIGHT PAGES.

01:45PM  21              THE CLERK:  IT IS.

01:45PM  22              MS. WALSH:  YEAH.

01:45PM  23          SO IF WE COULD PUBLISH THAT, YOUR HONOR?

01:45PM  24              THE COURT:  YES.

01:45PM  25    BY MS. WALSH:

ER-4100

EISENMAN CROSS BY MS. WALSH                                           5471

01:45PM  1      Q.   IT WILL BE ON YOUR SCREEN, MR. EISENMAN.

01:45PM  2      A.   YEAH.

01:45PM  3      Q.   AND WHAT I WANT TO DIRECT YOUR ATTENTION TO PAGE 1.

01:46PM  4           THE BOTTOM OF PAGE 1, YOU EMAIL MR. BALWANI; RIGHT?

01:46PM  5      A.   RIGHT.

01:46PM  6      Q.   DO YOU SEE THAT?

01:46PM  7      A.   YES.

01:46PM  8      Q.   OKAY.  THAT'S ON DECEMBER 29TH, 2013, AT 9:09 A.M.; RIGHT?

01:46PM  9      A.   RIGHT.

01:46PM 10      Q.   OKAY.  AND YOU'RE ASKING, "DID YOU GET MY MESSAGE LAST

01:46PM 11      THURSDAY?"

01:46PM 12           YOU'VE BEEN OUT OF THE COUNTRY.

01:46PM 13           AND THEN YOU POSE THREE QUESTIONS TO HIM:

01:46PM 14           "WHAT IS THE SIZE OF THIS ROUND?"

01:46PM 15           RIGHT?

01:46PM 16      A.   RIGHT.

01:46PM 17      Q.   "ARE ANY DIRECTORS PARTICIPATING IN THIS ROUND?

01:46PM 18           AND "AM I CORRECT THAT THERE WILL BE ANOTHER ROUND OF

01:46PM 19      APPROXIMATELY 200 MILLION IN JANUARY AT A HIGHER PRICE?"

01:46PM 20           DO YOU SEE THAT?

01:46PM 21      A.   YES.

01:46PM 22      Q.   AND MR. BALWANI RESPONDS.

01:46PM 23           AND THIS IS BEFORE YOU ACTUALLY INVESTED IN 2013; RIGHT?

01:46PM 24      A.   RIGHT.

01:46PM 25      Q.   AND MR. BALWANI RESPONDS:

EISENMAN CROSS BY MS. WALSH                                    5472

01:46PM  1        "ALAN.

01:46PM  2        "WE CAN'T ANSWER YOUR QUESTIONS ABOUT DIRECTORS, OTHER

01:47PM  3   INVESTORS AND CERTAINLY NOT ABOUT ANY FUTURE INVESTMENT ROUNDS

01:47PM  4   AND SPECULATE ON WHAT THOSE VALUATIONS MAY BE.  THOSE MAY OR

01:47PM  5   MAY NOT HAPPEN."

01:47PM  6        DO YOU SEE THAT?

01:47PM  7   A.   YES.

01:47PM  8   Q.   AND THEN HE SAYS, "SECONDLY, MY PERSONAL ASSISTANTS ARE

01:47PM  9   NOT PRIVY TO CONFIDENTIAL FINANCIAL INFORMATION SO PLEASE DON'T

01:47PM  10  LEAVE MESSAGES WITH THEM ABOUT COMPANY'S FINANCIAL DETAILS AND

01:47PM  11  ACTIVITIES."

01:47PM  12       DO YOU SEE THAT?

01:47PM  13  A.   YES.

01:47PM  14  Q.   SO MR. BALWANI WAS SAYING TO YOU ON DECEMBER 29TH, I'M NOT

01:47PM  15  GOING TO ANSWER THE QUESTIONS THAT YOU POSED TO ME; RIGHT?

01:47PM  16  A.   YES.

01:47PM  17  Q.   OKAY.  OKAY.  SO YOU TESTIFIED THAT YOU HAD A PHONE CALL

01:48PM  18  WITH MR. BALWANI LEADING UP TO YOUR INVESTMENT IN 2013; IS THAT

01:48PM  19  RIGHT?

01:48PM  20  A.   YES.

01:48PM  21  Q.   AND THAT HE TOLD YOU ABOUT THE ACTIVITIES OF THERANOS; IS

01:48PM  22  THAT RIGHT?  IS THAT WHAT YOU TESTIFIED TO?

01:48PM  23  A.   I DON'T UNDERSTAND YOUR QUESTION.

01:48PM  24  Q.   YOU TESTIFIED ABOUT A PHONE CALL THAT YOU HAD WITH

01:48PM  25  MR. BALWANI; CORRECT?

EISENMAN CROSS BY MS. WALSH                                          5473

01:48PM  1    A.   CORRECT.

01:48PM  2    Q.   AND DURING THAT PHONE CALL, HE TOLD YOU ABOUT WHAT

01:48PM  3    THERANOS WAS DOING AT THE TIME; IS THAT RIGHT?

01:49PM  4    A.   CAN YOU CLARIFY THAT?  WHAT DO YOU MEAN WHAT --

01:49PM  5    Q.   WELL, I'M ASKING, YOU TESTIFIED ABOUT THAT PHONE CALL;

01:49PM  6    RIGHT?

01:49PM  7    A.   YES.

01:49PM  8    Q.   AND YOU TESTIFIED THAT THE PHONE CALL WAS ABOUT THERANOS'S

01:49PM  9    ACTIVITIES AND TECHNOLOGY AND OTHER ITEMS ABOUT THERANOS DURING

01:49PM 10    THIS PHONE CALL?  THAT'S WHAT YOU TESTIFIED TO?

01:49PM 11    A.   OKAY.

01:49PM 12    Q.   OKAY.  BUT DURING THAT PHONE CALL, MR. EISENMAN, LEADING

01:49PM 13    UP TO YOUR INVESTMENT, THAT PHONE CALL WAS JUST ABOUT THE

01:49PM 14    ADMINISTRATIVE MATTERS OF GETTING YOUR INVESTMENT -- FILLING

01:49PM 15    OUT THE RIGHT FORMS AND THE RIGHT NUMBERS FOR THE DIFFERENT

01:49PM 16    ENTITIES THAT YOU WERE INVESTING THROUGH; ISN'T THAT RIGHT?

01:49PM 17    A.   NO.  THE PHONE CALL WAS MORE DETAILED THAN THAT.

01:49PM 18    Q.   UH-HUH.  OKAY.

01:49PM 19         AND YOU TESTIFIED THAT -- SO -- WITHDRAWN.

01:49PM 20         SO THE PHONE CALL WAS MORE DETAILED?  IS THAT WHAT YOUR

01:49PM 21    TESTIMONY IS?

01:49PM 22    A.   YES.

01:49PM 23    Q.   AND YOU'VE TESTIFIED BEFORE THAT YOU TAKE DETAILED NOTES

01:50PM 24    OF PHONE CALLS; RIGHT?

01:50PM 25    A.   YES.

ER-4103

01:50PM 1    Q.   AND YOU TAKE NOTES OF PHONE CALLS TO KEEP TRACK OF WHAT

01:50PM 2    PEOPLE SAY; RIGHT?

01:50PM 3    A.   RIGHT.

01:50PM 4    Q.   AND IT'S IMPORTANT TO DO THAT TO MAKE SURE THAT YOU GET

01:50PM 5    THEIR WORDS DOWN RIGHT; CORRECT?

01:50PM 6    A.   CORRECT.

01:50PM 7    Q.   BECAUSE YOU'VE SAID SOMETIMES PEOPLE EXAGGERATE; RIGHT?

01:50PM 8    A.   CORRECT.

01:50PM 9    Q.   OKAY.  SO I WANT YOU TO LOOK IN THE WHITE BINDER AT YOUR

01:50PM 10   NOTES OF ALL OF THE DIFFERENT PHONE CALLS THAT YOU'VE HAD WITH

01:50PM 11   THERANOS -- WITH MS. HOLMES AND MR. BALWANI.

01:50PM 12       I'M GOING TO GIVE YOU THE NUMBER IN A SECOND.  OKAY?

01:50PM 13              MR. BOSTIC:  OBJECTION.  MISSTATES THE NATURE OF

01:50PM 14   EXHIBIT 14.

01:50PM 15              THE COURT:  WELL, --

01:50PM 16              MS. WALSH:  I CAN REPHRASE.

01:50PM 17              THE COURT:  -- YOU'RE GOING TO ASK HIM TO DO

01:50PM 18   SOMETHING?

01:50PM 19              MS. WALSH:  YEAH.

01:50PM 20              THE COURT:  ALL RIGHT.

01:50PM 21   BY MS. WALSH:

01:50PM 22   Q.   SO IN THE WHITE BINDER, MR. EISENMAN, PLEASE TURN TO

01:50PM 23   EXHIBIT 14.

01:50PM 24   A.   OKAY.

01:50PM 25   Q.   DO YOU HAVE IT?

EISENMAN CROSS BY MS. WALSH                                    5475

01:51PM   1    A.   YES.

01:51PM   2    Q.   EXHIBIT 14 CONTAINS THE NOTES OF CONVERSATIONS THAT YOU'VE

01:51PM   3    HAD WITH VARIOUS PEOPLE ABOUT THERANOS OVER THE YEARS; CORRECT?

01:51PM   4    A.   CORRECT.

01:51PM   5    Q.   AND THIS CONTAINS ALL OF YOUR NOTES OF YOUR CONVERSATIONS;

01:51PM   6    RIGHT?

01:51PM   7    A.   RIGHT.

01:51PM   8    Q.   THERE ISN'T ANYTHING MISSING FROM IT; RIGHT?

01:51PM   9    A.   RIGHT.

01:51PM  10    Q.   BECAUSE YOU TURNED ALL OF THOSE OVER TO THE GOVERNMENT;

01:51PM  11    RIGHT?

01:51PM  12    A.   RIGHT.

01:51PM  13    Q.   OKAY.  AND YOU TESTIFIED ABOUT WHAT YOU SAY NOW IS A

01:51PM  14    DETAILED CONVERSATION WITH MR. BALWANI AT THE END OF DECEMBER,

01:51PM  15    RIGHT BEFORE YOU INVESTED, THAT CONTAINED DETAILS ABOUT

01:51PM  16    THERANOS; IS THAT YOUR TESTIMONY?

01:51PM  17    A.   MY TESTIMONY IS THAT WE -- THERE WERE SOME QUESTIONS

01:51PM  18    ASKED.  I DON'T RECALL THAT IT WAS A DETAILED CONVERSATION, BUT

01:51PM  19    I DO RECALL THAT THERE WERE QUESTIONS ASKED BEFORE WE MADE THE

01:51PM  20    FINAL DECISION TO INVEST.

01:51PM  21    Q.   DIDN'T YOU JUST TESTIFY THAT IT WAS A DETAILED

01:51PM  22    CONVERSATION?  YOU JUST TESTIFIED TO THAT.

01:51PM  23    A.   THEN I STAND CORRECTED.

01:52PM  24    Q.   OKAY.  SO IT WASN'T, IT WASN'T A CONVERSATION ABOUT THE

01:52PM  25    DETAILS OF THERANOS, WAS IT?

01:52PM   1    A.   NO.  NO.

01:52PM   2         YOU'RE TWISTING MY WORDS.  I'M SORRY.

01:52PM   3         THERE WERE SOME ELEMENTS IN THAT CONVERSATION ABOUT THE

01:52PM   4    DETAILS OF THERANOS, BUT IT WASN'T A DETAILED CONVERSATION.

01:52PM   5         THERE WERE A FEW BULLETS POINTS THAT WERE DISCUSSED IN

01:52PM   6    THAT CONVERSATION.

01:52PM   7    Q.   OKAY.  WHAT WERE THOSE BULLET POINTS?

01:52PM   8    A.   IF THE TECHNOLOGY WORKED AND CONFIRMING THAT THIS WAS A

01:52PM   9    ROUND THAT WAS GOING TO CLOSE, AND THERE WAS GOING TO BE A

01:52PM  10    LARGER ROUND THAT WAS GOING TO OCCUR RIGHT AFTER THIS ROUND

01:52PM  11    CLOSED, AN INSTITUTIONAL ROUND.  THAT'S WHAT I WAS TOLD.

01:52PM  12    Q.   OKAY.  SO ON THE SECOND POINT, WHETHER THERE WAS GOING TO

01:52PM  13    BE A LARGER ROUND, IF YOU LOOK AT EXHIBIT 1371, WHICH IS THE

01:52PM  14    EMAIL THAT YOU HAVE WITH MR. BALWANI, HE SPECIFICALLY DECLINES

01:52PM  15    TO ANSWER THAT QUESTION; RIGHT?

01:52PM  16    A.   THE -- ARE YOU TALKING ABOUT WHAT I LOOKED AT A MINUTE

01:52PM  17    AGO?

01:52PM  18    Q.   YEAH, 13 --

01:53PM  19    A.   OKAY.  BUT THAT CONTRADICTED WHAT HE TOLD ME IN THAT

01:53PM  20    CONVERSATION BEFORE WE INVESTED.

01:53PM  21    Q.   I SEE.  SO YOUR TESTIMONY IS THAT YOU HAD A PHONE CALL

01:53PM  22    WITH MR. BALWANI WHERE YOU ASKED HIM, HOW BIG IS THE NEXT ROUND

01:53PM  23    GOING TO BE?  IS THAT RIGHT?  IS THAT YOUR TESTIMONY?

01:53PM  24    A.   I DON'T THINK THAT WAS IN THE PHONE CALL.  THAT WAS IN THE

01:53PM  25    EMAIL, HOW LARGE WAS THE NEXT ROUND.  I WAS CONFIRMING -- I

EISENMAN CROSS BY MS. WALSH                                    5477

01:53PM  1   DON'T REMEMBER THE SOURCE, BUT SOMEWHERE THERE WAS INFORMATION

01:53PM  2   THAT THE INSTITUTIONAL ROUND WAS $200 MILLION DOLLARS, AND I

01:53PM  3   WAS TRYING TO CONFIRM THAT THAT WAS ACCURATE.

01:53PM  4   Q.   RIGHT.  AND IN THE EMAIL, HE WON'T CONFIRM THAT; RIGHT?

01:53PM  5   A.   IN THE EMAIL, YOU'RE CORRECT, HE DID NOT CONFIRM WHAT HE

01:53PM  6   SAID TO ME IN THE CONVERSATION BEFORE I INVESTED IN DECEMBER.

01:53PM  7   Q.   SO YOUR TESTIMONY IS THAT YOU HAD A PHONE CALL WITH

01:53PM  8   MR. BALWANI WHERE HE CONFIRMED THE SIZE OF THE ROUND?  IS THAT

01:53PM  9   YOUR TESTIMONY?  YOU REMEMBER THAT?

01:53PM 10   A.   NO.  MY TESTIMONY IS THAT HE CONFIRMED GETTING THE

01:54PM 11   INFORMATION THAT THIS WAS A FRIENDS AND FAMILY ROUND -- I'M

01:54PM 12   SORRY.  LET ME START OVER.

01:54PM 13       HE CONFIRMED THAT THIS WAS A SMALLER FUND RAISING ROUND

01:54PM 14   FOR EXISTING SHAREHOLDERS, THEY CALLED IT FRIENDS AND FAMILY

01:54PM 15   ROUND, AND IT WAS GOING TO BE PRICED AT $15 A SHARE; THEY WERE

01:54PM 16   GOING TO CLOSE THIS ROUND BY THE END OF THE YEAR; THEY

01:54PM 17   IMMEDIATELY HAD TEED UP OR LINED UP A MUCH LARGER INSTITUTIONAL

01:54PM 18   ROUND AT A HIGHER PRICE, AT $17 A SHARE.

01:54PM 19   Q.   SO YOUR TESTIMONY IS THAT'S WHAT MR. BALWANI TOLD YOU IN

01:54PM 20   DECEMBER 2013?

01:54PM 21   A.   YES.

01:54PM 22   Q.   IS THAT YOUR TESTIMONY?

01:54PM 23   A.   YES.

01:54PM 24   Q.   AND YOUR TESTIMONY IS THAT HE TOLD YOU THAT ON THE PHONE,

01:54PM 25   EVEN THOUGH HE'S REFUSING TO TELL YOU THAT IN THE EMAIL; IS

ER-4107

01:54PM  1      THAT RIGHT?

01:54PM  2      A.   YES.

01:54PM  3      Q.   OKAY.  AND WHERE -- SO TURNING BACK TO YOUR NOTES, WHICH

01:54PM  4      IS EXHIBIT 14, THAT CONTAINS ALL OF YOUR NOTES OF ALL OF THE

01:54PM  5      CONVERSATIONS THAT YOU'VE HAD ABOUT THERANOS; RIGHT?

01:55PM  6           MR. BOSTIC:  MISSTATES THE TESTIMONY AND THE

01:55PM  7      EXHIBIT.

01:55PM  8           MS. WALSH:  WELL, LET ME ASK AGAIN.

01:55PM  9      Q.   YOU SEE EXHIBIT 14; RIGHT?

01:55PM 10      A.   YES.

01:55PM 11      Q.   AND EXHIBIT 14 CONTAINS YOUR NOTES OF CONVERSATIONS THAT

01:55PM 12      YOU'VE HAD WITH OTHERS ABOUT THERANOS OVER THE YEARS, DOES IT

01:55PM 13      NOT?

01:55PM 14      A.   IT DOES NOT CONTAIN EVERY BIT OF CONVERSATION THAT I HAD

01:55PM 15      WITH EVERY -- IN EVERY ONE OF THOSE SITUATIONS.

01:55PM 16      Q.   BUT IT CONTAINS ALL OF YOUR NOTES OF CONVERSATIONS; RIGHT?

01:55PM 17      A.   YES, IT CONTAINS ALL OF MY NOTES OF CONVERSATIONS, THAT IS

01:55PM 18      CORRECT.

01:55PM 19      Q.   RIGHT.  AND SO I WOULD LIKE YOU TO LOOK THROUGH EXHIBIT 14

01:55PM 20      FOR WHERE THERE IS A NOTE REFLECTING THE TELEPHONE CALL WITH

01:55PM 21      MR. BALWANI IN LATE DECEMBER 2013 THAT YOU JUST TESTIFIED

01:55PM 22      ABOUT.

01:56PM 23           (PAUSE IN PROCEEDINGS.)

01:56PM 24           THE WITNESS:  IT'S APPARENTLY NOT WRITTEN DOWN IN MY

01:56PM 25      NOTES.

01:56PM  1    BY MS. WALSH:

01:56PM  2    Q.   THERE IS NO NOTE REFLECTING THAT CONVERSATION; CORRECT?

01:56PM  3    A.   NO.   IT'S JUST A RECOLLECTION.

01:57PM  4         (PAUSE IN PROCEEDINGS.)

01:57PM  5              MS. WALSH:   MAY I HAVE A MOMENT, YOUR HONOR?

01:57PM  6              THE COURT:   YES.

01:57PM  7         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:58PM  8              MS. WALSH:   SORRY, YOUR HONOR.

01:58PM  9    Q.   OKAY.   MR. EISENMAN, THE CONVERSATION THAT YOU JUST

01:58PM  10   TESTIFIED ABOUT IS NOT IN YOUR NOTES; RIGHT?

01:58PM  11   A.   RIGHT.

01:58PM  12   Q.   YOU'RE SAYING THAT IT'S JUST YOUR RECOLLECTION SITTING

01:58PM  13   HERE TODAY; CORRECT?

01:58PM  14   A.   CORRECT.

01:58PM  15   Q.   BUT YOU'VE SPOKEN ON MANY DIFFERENT OCCASIONS WITH THE

01:58PM  16   GOVERNMENT ABOUT YOUR RECOLLECTION OF THE CONVERSATIONS THAT

01:58PM  17   YOU HAD WITH MR. BALWANI IN DECEMBER 2013; ISN'T THAT RIGHT?

01:58PM  18   A.   I DON'T RECALL THAT.   IT'S VERY VAGUE.

01:58PM  19   Q.   WELL, YOU'VE SPOKEN WITH THE GOVERNMENT ABOUT THIS CASE,

01:58PM  20   HAVEN'T YOU?

01:58PM  21   A.   YES.

01:58PM  22   Q.   AND IN THOSE MEETINGS YOU WERE ASKED QUESTIONS ABOUT YOUR

01:58PM  23   COMMUNICATIONS WITH MR. BALWANI; RIGHT?

01:58PM  24   A.   PRESUMABLY SO.   I DON'T RECALL.

01:58PM  25   Q.   OKAY.   LET ME DIRECT YOUR ATTENTION TO 28198.

EISENMAN CROSS BY MS. WALSH                                              5480

01:59PM   1           DO YOU HAVE 28198?

01:59PM   2      A.   YES.

01:59PM   3      Q.   WHY DON'T YOU TURN TO PAGE 4 OF THAT EXHIBIT.

01:59PM   4      A.   OKAY.

01:59PM   5      Q.   AND 28198 REFLECTS A MEETING THAT YOU HAD WITH THE

01:59PM   6      GOVERNMENT; RIGHT?

01:59PM   7      A.   OKAY.

01:59PM   8      Q.   AND THAT WAS BACK IN 2018; RIGHT?

01:59PM   9      A.   YES.

01:59PM  10      Q.   IF YOU LOOK AT THE TOP RIGHT OF THE DOCUMENT?

01:59PM  11      A.   YES.

01:59PM  12      Q.   DO YOU SEE THAT DATE?

02:00PM  13           AND 2018 WAS MUCH CLOSER IN TIME TO THE EVENTS IN

02:00PM  14      QUESTION; CORRECT?

02:00PM  15      A.   CORRECT.

02:00PM  16      Q.   AND IF YOU LOOK AT THE TOP TWO PARAGRAPHS, JUST READ THE

02:00PM  17      TOP PARAGRAPH AND THEN THE FIRST SENTENCE OF THE FIRST FULL

02:00PM  18      PARAGRAPH ON THAT PAGE.

02:00PM  19           DO YOU SEE THAT?

02:00PM  20      A.   YES.

02:00PM  21      Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. BALWANI DID

02:00PM  22      NOT --

02:00PM  23      A.   I'M STILL READING.

02:00PM  24      Q.   SURE.

02:01PM  25           (PAUSE IN PROCEEDINGS.)

ER-4110

EISENMAN CROSS BY MS. WALSH                                    5481

02:01PM  1   BY MS. WALSH:

02:01PM  2   Q.   HAVE YOU FINISHED READING, MR. EISENMAN?

02:01PM  3   A.   NOT YET.

02:01PM  4        (PAUSE IN PROCEEDINGS.)

02:01PM  5            THE WITNESS:  I'VE FINISHED READING.

02:01PM  6   BY MS. WALSH:

02:01PM  7   Q.   OKAY.  SO I WANT TO FOCUS YOU ON THE FIRST SENTENCE OF THE

02:01PM  8   FIRST FULL PARAGRAPH ON PAGE 4.

02:01PM  9   A.   OKAY.

02:01PM 10   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. BALWANI DID

02:01PM 11   NOT DESCRIBE THERANOS'S ACTIVITIES DURING HIS CALLS WITH YOU

02:01PM 12   REGARDING THE 2013 INVESTMENT?

02:01PM 13   A.   WELL, IT CLARIFIES THAT HE DID NOT DISCUSS THE BUSINESS OF

02:01PM 14   THERANOS.

02:01PM 15        BUT I HAVE A RECOLLECTION THAT I WAS TOLD THAT THIS WAS A

02:02PM 16   FRIENDS AND FAMILY ROUND; IT WAS A $15 ROUND; THAT THIS WAS AN

02:02PM 17   INCENTIVE TO INVEST AT THIS POINT IN TIME BECAUSE THERE WAS A

02:02PM 18   FOLLOW-UP ROUND IMMEDIATELY AFTER THIS CLOSED AT $17.

02:02PM 19   Q.   BUT MR. BALWANI DID NOT TALK ABOUT THERANOS'S ACTIVITIES

02:02PM 20   DURING THIS CONVERSATION; ISN'T THAT RIGHT?

02:02PM 21   A.   DID NOT TALK -- NO, HE DID NOT TALK ABOUT THE ACTUAL

02:02PM 22   BUSINESS ACTIVITIES.

02:02PM 23        AND IT'S BEEN A LONG TIME AGO, BUT I SEEM TO RECALL THAT I

02:02PM 24   ASKED THE SAME QUESTION THAT I ASKED EVERY TIME.  I TRIED, TO

02:02PM 25   EITHER ELIZABETH OR SUNNY, DOES THE TECHNOLOGY WORK?

EISENMAN CROSS BY MS. WALSH                          5482

02:02PM  1        AND MY RECOLLECTION IS, WHETHER IT WAS FROM THIS

02:02PM  2   CONVERSATION OR WHETHER IT WAS FROM A CONVERSATION THAT

02:02PM  3   MR. BALWANI HAD A WEEK EARLIER WITH PAT MENDENHALL THAT WE

02:02PM  4   TALKED ABOUT EARLIER IN COURT, THAT HE VERBALLY COMMUNICATED

02:02PM  5   THAT THE SCIENCE WAS PROVEN, THAT THE TECHNOLOGY WORKED, AND

02:02PM  6   THAT WAS A VERY IMPORTANT FACTOR THAT I HAD IN FRONT OF ME A

02:02PM  7   WEEK BEFORE, OR AT THAT POINT IN TIME BEFORE I DECIDED TO MAKE

02:02PM  8   MY INVESTMENT.

02:02PM  9   Q.   RIGHT.  AND I'M NOT ASKING ABOUT MR. MENDENHALL.

02:03PM 10        I'M ASKING ABOUT WHAT MR. BALWANI TOLD YOU, YOU PERSONALLY

02:03PM 11   IN THE CONVERSATION IN LATE DECEMBER 2013.

02:03PM 12   A.   OKAY.

02:03PM 13   Q.   AND I WANT TO BE REALLY CLEAR ABOUT THIS:  YOU DON'T HAVE

02:03PM 14   A SPECIFIC RECOLLECTION THAT HE TALKED TO YOU ABOUT THE

02:03PM 15   THERANOS TECHNOLOGY OR THE THERANOS BUSINESS IN THAT TELEPHONE

02:03PM 16   CALL; IS THAT RIGHT?

02:03PM 17   A.   IT IS CORRECT THAT I DON'T HAVE A SPECIFIC RECOLLECTION.

02:03PM 18        I KNOW WHEN I DO BUSINESS --

02:03PM 19   Q.   I'M JUST ASKING ABOUT YOUR RECOLLECTION, NOT THE WAY YOU

02:03PM 20   DO BUSINESS.

02:03PM 21        SO IF THAT'S A "NO, I DON'T HAVE A SPECIFIC RECOLLECTION,"

02:03PM 22   THAT WILL SUFFICE.

02:03PM 23   A.   OKAY.

02:03PM 24        MR. BOSTIC:  YOUR HONOR, I ASK THAT THE WITNESS BE

02:03PM 25   ALLOWED TO COMPLETE HIS ANSWER.

EISENMAN CROSS BY MS. WALSH                                              5483

02:03PM   1              THE COURT:  HAVE YOU COMPLETED YOUR ANSWER, SIR?

02:03PM   2              THE WITNESS:  NO.

02:03PM   3              THE COURT:  OKAY.  YOU CAN COMPLETE IT.

02:03PM   4              THE WITNESS:  OKAY.  EVERY OPPORTUNITY THAT I HAVE,

02:03PM   5      ESPECIALLY BEFORE I INVEST MONEY, I ASK AS MANY QUESTIONS AS I

02:03PM   6      CAN THAT I THINK WILL BE ANSWERED.

02:03PM   7          AND I DON'T HAVE A CLEAR RECOLLECTION IF I ASKED

02:04PM   8      MR. BALWANI IF THE TECHNOLOGY WORKED.

02:04PM   9          I THINK I -- I THINK I DID, BUT I DON'T HAVE A CLEAR

02:04PM  10      RECOLLECTION.

02:04PM  11          BUT I DID BASICALLY HAVE MR. BALWANI TELLING OUR GROUP,

02:04PM  12      THROUGH PAT MENDENHALL, IN AN EMAIL ONE WEEK EARLIER, THAT THE

02:04PM  13      SCIENCE WORKED, THAT IT WAS, IT WAS -- THERE WAS NO DOUBT THAT

02:04PM  14      THE TECHNOLOGY WORKED.

02:04PM  15          AND THAT WAS INFORMATION THAT CAME DIRECTLY TO ME, AND

02:04PM  16      THAT WAS ONE OF THE KEY FACTORS IN MY MAKING A DECISION TO

02:04PM  17      INVEST MORE MONEY.

02:04PM  18      BY MS. WALSH:

02:04PM  19      Q.   AND I JUST WANT TO MAKE SURE THAT MY QUESTION WAS

02:04PM  20      ANSWERED.

02:04PM  21          DO YOU HAVE A SPECIFIC RECOLLECTION OF MR. BALWANI TELLING

02:04PM  22      YOU IN THAT PHONE CALL IN DECEMBER OF 2013 ANYTHING ABOUT

02:04PM  23      THERANOS TECHNOLOGY OR THERANOS ACTIVITIES?

02:04PM  24      A.   I DO NOT HAVE A SPECIFIC RECOLLECTION.

02:04PM  25      Q.   OKAY.  LET'S TURN TO EXHIBIT 12999.

02:05PM 1    A.   OKAY.

02:05PM 2    Q.   OKAY.  THIS IS AN EMAIL BETWEEN YOU AND MS. HOLMES AND

02:05PM 3    MR. BALWANI IN JANUARY 2015; CORRECT?

02:05PM 4    A.   CORRECT.

02:05PM 5    Q.   AND IT'S ABOUT INFORMATION YOU HAD RECEIVED THROUGH A

02:05PM 6    GOOGLE ALERT ABOUT THERANOS; RIGHT?

02:05PM 7    A.   RIGHT.

02:05PM 8    Q.   AND YOU'RE FOLLOWING UP WITH THEM TO ASK QUESTIONS ABOUT

02:05PM 9    IT; CORRECT?

02:05PM 10   A.   CORRECT.

02:05PM 11          MS. WALSH:  YOUR HONOR, WE OFFER 12999.

02:05PM 12          MR. BOSTIC:  801, YOUR HONOR.

02:06PM 13       (PAUSE IN PROCEEDINGS.)

02:06PM 14          THE COURT:  MS. WALSH.

02:06PM 15          MS. WALSH:  YES, YOUR HONOR.

02:06PM 16       IT'S COMING IN, AGAIN, FOR MR. EISENMAN'S STATE OF MIND.

02:06PM 17   HE'S CONTINUING TO FOLLOW UP WITH MR. BALWANI AND MS. HOLMES

02:06PM 18   ABOUT THE STATUS OF THERANOS.

02:06PM 19       AND THE GOVERNMENT, I THINK, OFFERED ANOTHER EMAIL OUTSIDE

02:06PM 20   OF THE TIME PERIOD FOR THE SAME PURPOSE, SO THIS IS IN THE SAME

02:06PM 21   CATEGORY.

02:06PM 22          THE COURT:  YOU'RE ASKING THAT THE ENTIRE DOCUMENT,

02:06PM 23   INCLUDING THE PAGE 8769?

02:06PM 24          MS. WALSH:  LET ME JUST TAKE A LOOK.

02:06PM 25          THE COURT:  IT'S THE LAST PAGE OF THIS.

02:06PM 1           MS. WALSH:  I WAS, YOUR HONOR.

02:07PM 2       BUT IF THAT'S -- IF THE COURT WOULD PREFER, WE CAN REDACT

02:07PM 3   THAT.

02:07PM 4           THE COURT:  NO, THAT'S FINE.  I JUST WANTED TO KNOW

02:07PM 5   HOW MUCH OF THIS.

02:07PM 6       ALL RIGHT.  I'LL ADMIT IT, AND IT MAY BE PUBLISHED.

02:07PM 7       (DEFENDANT'S EXHIBIT 12999 WAS RECEIVED IN EVIDENCE.)

02:07PM 8   BY MS. WALSH:

02:07PM 9   Q.  OKAY.  LET'S LOOK AT PAGE 1.

02:07PM 10      ACTUALLY, LET'S LOOK AT -- IT'S NOT -- THERE ARE NO PAGE

02:07PM 11  NUMBERS, SO LET'S LOOK AT THE PAGE ENDING WITH BATES STAMP

02:07PM 12  8768.

02:07PM 13      OKAY.  MR. EISENMAN, THIS IS AN EMAIL FROM YOU ON

02:07PM 14  JANUARY 21ST, 2015.  IT'S TO MS. HOLMES AND MR. BALWANI

02:07PM 15  REGARDING A GOOGLE ALERT THAT YOU GOT; CORRECT?

02:07PM 16  A.  CORRECT.

02:07PM 17  Q.  OKAY.  AND YOU SAY, "ELIZABETH AND SUNNY,

02:07PM 18      "THIS IS THE SECOND GOOGLE ALERT I HAVE RECEIVED RECENTLY

02:07PM 19  THAT CLAIMS THAT THERANOS COULD BECOME OBSOLETE.  CAN WE HAVE A

02:07PM 20  BRIEF CATCH UP CALL THIS WEEK?  PLEASE DON'T IGNORE THIS

02:08PM 21  REQUEST."

02:08PM 22      AND MR. BALWANI RESPONDS, "ALAN.

02:08PM 23      "I THINK THESE EMAILS ARE BEYOND RIDICULOUS.  YES,

02:08PM 24  THERANOS LIKE ANY OTHER COMPANY, CAN BECOME OBSOLETE.  THIS

02:08PM 25  DOES NOT WARRANT INVESTOR CALLS AND UPDATES BECAUSE SOMEONE

EISENMAN CROSS BY MS. WALSH                                          5486

02:08PM   1    WROTE AN ARTICLE THAT THERANOS CAN BECOME OBSOLETE.

02:08PM   2        "YOU CONTINUE TO BOMBARD US WITH EMAILS AND PHONE CALLS

02:08PM   3    EVEN THOUGH JUST 12 SHORT MONTHS AGO I SPOKE WITH YOU IN DETAIL

02:08PM   4    THAT YOU WILL NOT GET UPDATES, THAT YOU SHOULDN'T INVEST AND

02:08PM   5    THAT MANAGEMENT WILL NOT BE SPENDING ANY TIME WITH YOU

02:08PM   6    PROVIDING YOU UPDATES AND RESPONDING TO YOUR EMAILS ABOUT

02:08PM   7    BUSINESS OPERATIONS, STRATEGY AND DETAILS.

02:08PM   8        "YOU WILL GET UPDATES ALONG WITH OTHER INVESTORS."

02:08PM   9        DO YOU SEE THAT?

02:08PM  10    A.   YES.

02:08PM  11    Q.   AND YOU RESPOND "SUNNY,

02:08PM  12        "WHEN WE SPOKE SEVERAL MONTHS AGO, YOU SAID THAT WE COULD

02:08PM  13    HAVE A SHORT QUARTERLY CALL.  I DON'T THINK THIS IS AN

02:08PM  14    UNREASONABLE REQUEST."

02:08PM  15        AND THEN MR. BALWANI RESPONDS, "ALAN.

02:08PM  16        "NO ONE FROM THIS COMPANY HAS EVER COMMITTED TO A SHORT

02:09PM  17    QUARTERLY CALL WITH YOU OR ANY OTHER INVESTOR SELECTIVELY.  I

02:09PM  18    WAS VERY EXPLICITLY DISCOURAGING YOU FROM INVESTING IN JANUARY

02:09PM  19    OF 2014 AND NO INFORMATION HAS BEEN DISSEMINATED."

02:09PM  20        DO YOU SEE THAT?

02:09PM  21    A.   YES.

02:09PM  22    Q.   WE CAN TAKE THAT DOWN.

02:09PM  23        OKAY.  LET'S TURN NOW TO 3530.

02:09PM  24    A.   OKAY.

02:09PM  25    Q.   OKAY.  AND THIS SHOULD BE 3550.

02:09PM  1        IS THAT WHAT YOU HAVE, MR. EISENMAN?

02:09PM  2   A.   THE AMENDED RESTATED --

02:09PM  3   Q.   YEAH.

02:09PM  4   A.   IT SAYS 3530 IN MY BOOK.

02:10PM  5   Q.   OKAY.  OKAY.  SO THIS IS A -- LET ME FIRST DIRECT YOUR

02:10PM  6   ATTENTION TO PAGE 1 WHICH SAYS, AMENDED AND RESTATED SERIES C-1

02:10PM  7   PREFERRED STOCK PURCHASE AGREEMENT, INITIAL CLOSING DATE

02:10PM  8   JULY 1ST, 2010.

02:10PM  9        DO YOU SEE THAT?

02:10PM 10   A.   YES.

02:10PM 11   Q.   AND THEN I'M GOING TO DIRECT YOUR ATTENTION --

02:10PM 12        MR. BOSTIC:  I APOLOGIZE.  THIS IS NOT IN EVIDENCE,

02:10PM 13   YOUR HONOR.

02:10PM 14        THE CLERK:  IT IS IN EVIDENCE.

02:10PM 15        MS. WALSH:  IT IS IN EVIDENCE?

02:10PM 16        THE CLERK:  3530 IS IN EVIDENCE.

02:10PM 17        MR. BOSTIC:  MY APOLOGIES.

02:10PM 18        THE COURT:  THANK YOU.

02:10PM 19   BY MS. WALSH:

02:10PM 20   Q.   OKAY.  SO, MR. EISENMAN, LET ME DIRECT YOUR ATTENTION TO

02:10PM 21   PAGE 29 OF THIS DOCUMENT.

02:10PM 22        THAT'S YOUR SIGNATURE; RIGHT?

02:10PM 23   A.   YES.

02:10PM 24   Q.   AND IT'S DATED 12/30/13; RIGHT?

02:11PM 25   A.   RIGHT.

02:11PM  1    Q.   AND THEN PAGE 11 OF THE DOCUMENT, SECTION 4.4, THIS

02:11PM  2    STATES, "THE SPECULATIVE NATURE OF THE AGREEMENT."

02:11PM  3         DO YOU SEE THAT?

02:11PM  4    A.   YES.

02:11PM  5    Q.   AND I KNOW YOU TESTIFIED BEFORE THAT YOU DISAGREED WITH

02:11PM  6    THIS.

02:11PM  7    A.   YES.

02:11PM  8    Q.   BUT YOU SIGNED THIS AGREEMENT; RIGHT?

02:11PM  9    A.   YES.

02:11PM  10   Q.   AND IT CONTAINS THIS PROVISION; CORRECT?

02:11PM  11   A.   CORRECT.

02:11PM  12   Q.   AND WHAT THE PROVISION SAYS IS, "SUCH INVESTOR UNDERSTANDS

02:11PM  13   AND ACKNOWLEDGES THAT THE COMPANY HAS A LIMITED FINANCIAL AND

02:11PM  14   OPERATING HISTORY AND THAT AN INVESTMENT IN THE COMPANY IS

02:11PM  15   HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS."

02:11PM  16        CORRECT?  THAT'S WHAT IT SAYS; RIGHT?

02:11PM  17   A.   THAT'S WHAT IT SAYS.

02:11PM  18   Q.   AND THEN LET'S GO TO PAGE 42 OF THE EXHIBIT.

02:12PM  19        IT SHOWS THE NUMBER OF SHARES YOU'RE PURCHASING; IS THAT

02:12PM  20   RIGHT?

02:12PM  21   A.   RIGHT.

02:12PM  22   Q.   AND THAT'S 6,666; IS THAT CORRECT?

02:12PM  23   A.   CORRECT.

02:12PM  24   Q.   AND FOR A TOTAL DOLLAR AMOUNT OF 99,990; CORRECT?

02:12PM  25   A.   CORRECT.

EISENMAN CROSS BY MS. WALSH                                    5489

02:12PM   1    Q.   AND THE PURCHASE PRICE WAS $15 PER SHARE; RIGHT?

02:12PM   2    A.   RIGHT.

02:12PM   3    Q.   SO THE TOTAL AMOUNT THAT YOU INVESTED IN THERANOS AFTER

02:12PM   4    2013 WAS $1,234,233; CORRECT?

02:12PM   5    A.   CORRECT.

02:12PM   6    Q.   AND YOU HAD 408,880 SHARES; CORRECT?

02:12PM   7    A.   I DON'T RECALL THE NUMBER OF SHARES.

02:12PM   8    Q.   BUT IF YOU, IF YOU ADD YOUR 2006 INVESTMENT WITH THE 2013,

02:12PM   9    DOES THAT SOUND ABOUT RIGHT?

02:12PM  10    A.   IT SOUNDS REASONABLE.

02:12PM  11    Q.   YEAH.   OKAY.   LET'S GO TO 14103.

02:13PM  12    A.   OKAY.

02:13PM  13    Q.   OKAY.   ALL RIGHT.   14103 IS IN EVIDENCE.

02:13PM  14         AND I WANT TO DRAW YOUR ATTENTION TO MS. HOLMES'S -- THE

02:13PM  15    TOP EMAIL, HER LAST PARAGRAPH ABOUT THE FRUSTRATION WITH THE

02:13PM  16    LEVEL OF INTERACTION.

02:13PM  17         DO YOU SEE THAT?

02:13PM  18    A.   YES.

02:13PM  19    Q.   AND SHE WAS STRONGLY ENCOURAGING YOU TO RECONSIDER THE

02:13PM  20    OPPORTUNITY TO SELL YOUR SHARES; RIGHT?

02:13PM  21    A.   RIGHT.

02:13PM  22    Q.   AND SHE WAS SAYING THAT WE CAN PROVIDE YOU WITH A GREATER

02:14PM  23    THAN FIVE TIMES RETURN ON YOUR INVESTMENT; CORRECT?

02:14PM  24    A.   THAT'S WHAT SHE PROPOSED.

02:14PM  25    Q.   OKAY.   AND THAT WAS IN 2010; RIGHT?

EISENMAN CROSS BY MS. WALSH                                                      5490

02:14PM 1    A.   RIGHT.  BUT AS YOU KNOW, THIS NEVER CAME TO FRUITION.

02:14PM 2    Q.   OKAY.  LET'S GO TO 2468.

02:14PM 3         2468 IS IN EVIDENCE.

02:14PM 4         AND IF WE LOOK AT PAGE 2.

02:14PM 5         THIS IS IN 2015, MARCH OF 2015.

02:14PM 6         DO YOU SEE THAT?

02:14PM 7    A.   YES.

02:14PM 8    Q.   OKAY.  AND YOU'RE DESCRIBING AN OFFER FROM BROADMARK TO

02:14PM 9    PURCHASE THERANOS STOCK; IS THAT RIGHT?

02:14PM 10   A.   NO, IT WASN'T AN OFFER.

02:14PM 11   Q.   WELL, AN OPPORTUNITY TO SELL THERANOS STOCK; IS THAT

02:14PM 12   RIGHT?

02:14PM 13   A.   IT WAS A POTENTIAL OPPORTUNITY.  THERE WERE OPPORTUNITIES

02:15PM 14   THAT CAME ALONG THAT WEREN'T LEGITIMATE.

02:15PM 15   Q.   OKAY.  THIS WAS, AS YOU STATE IN THE EMAIL, YOU STATE, "WE

02:15PM 16   HAVE BEEN INFORMED OF AN OPPORTUNITY TO SELL THERANOS STOCK."

02:15PM 17        IS THAT WHAT YOU SAY IN THE EMAIL?

02:15PM 18   A.   IT WAS A POTENTIAL OPPORTUNITY.  I DIDN'T KNOW WHETHER IT

02:15PM 19   WAS LEGITIMATE OR NOT.

02:15PM 20   Q.   DO YOU SEE IN THE EMAIL, "WE HAVE BEEN INFORMED OF AN

02:15PM 21   OPPORTUNITY TO SELL THERANOS STOCK"?

02:15PM 22   A.   YES.

02:15PM 23   Q.   ARE THOSE YOUR WORDS?

02:15PM 24   A.   YES.

02:15PM 25   Q.   OKAY.  AND MR. BALWANI RESPONDS SAYING, "THE LAST

EISENMAN CROSS BY MS. WALSH                                    5491

02:15PM  1    TRANSACTION WAS AT $17 PER SHARE AS YOU ALREADY KNOW"; RIGHT?

02:15PM  2    A.   I DIDN'T KNOW.  THAT WAS INFORMATION THAT WAS PUT OUT

02:15PM  3    THERE, BUT NEVER CONFIRMED.

02:15PM  4    Q.   WELL, I THOUGHT YOU JUST SAID THAT YOU HAD A PHONE CALL

02:15PM  5    WITH MR. BALWANI WHERE HE TOLD YOU THAT?  WASN'T THAT YOUR

02:15PM  6    TESTIMONY EARLIER?

02:15PM  7    A.   THE TESTIMONY IS WHEN WE INVESTED AT 15, THAT THEY WERE

02:15PM  8    GOING TO DO ANOTHER LARGER INSTITUTIONAL ROUND AT 17.  BUT I

02:16PM  9    NEVER GOT CONFIRMATION ABOUT THE SIZE OF THE ROUND.

02:16PM  10        THERE MIGHT HAVE BEEN A LATER EMAIL.  THIS MIGHT BE THE

02:16PM  11   ONLY CONFIRMATION THAT THERE WAS A $17 A SHARE ROUND.

02:16PM  12   Q.   OKAY.  PUTTING ASIDE THAT, AT $17 A SHARE, YOU WOULD HAVE

02:16PM  13   MADE MONEY ON YOUR INVESTMENT; CORRECT?

02:16PM  14   A.   WELL, THE KEY WORD IS "WOULD."

02:16PM  15        THERE WAS NEVER --

02:16PM  16   Q.   IF YOU SOLD YOUR SHARES --

02:16PM  17   A.   CAN I FINISH?

02:16PM  18        THERE WAS NEVER A LEGITIMATE OPPORTUNITY FROM THE COMPANY

02:16PM  19   OR FROM A THIRD PARTY TO BUY MY STOCK.  I PURSUED MANY

02:16PM  20   OPPORTUNITIES, BUT NONE OF THEM WERE LEGITIMATE OPPORTUNITIES.

02:16PM  21   Q.   WELL, MS. HOLMES EMAILED YOU ABOUT AN OPPORTUNITY TO SELL

02:16PM  22   YOUR STOCK AT FIVE TIMES THE VALUE; RIGHT?  WE SAW THAT IN

02:16PM  23   2010?  WE JUST SAW THAT EMAIL; CORRECT?

02:16PM  24   A.   AND WHEN I FOLLOWED UP TO PURSUE THAT OPPORTUNITY, SHE

02:17PM  25   STOPPED COMMUNICATING.  SO THAT OPPORTUNITY WAS EITHER NEVER

ER-4121

02:17PM 1    LEGITIMATE, OR IF IT MAY HAVE BEEN LEGITIMATE IN THE EARLY

02:17PM 2    STAGES, SHE DROPPED THE BALL.

02:17PM 3    Q.   AND LET'S TURN NOW TO 13150.

02:17PM 4         THIS IS AN EMAIL BETWEEN YOU AND CHRIS BOIES; RIGHT?

02:17PM 5    A.   YES.

02:17PM 6    Q.   AND IT'S ON AUGUST 18TH, 2015; CORRECT?

02:17PM 7    A.   CORRECT.

02:17PM 8    Q.   AND THE SUBJECT IS THERANOS FOLLOW UP FROM OUR

02:17PM 9    CONVERSATION TODAY; RIGHT?

02:17PM 10   A.   RIGHT.

02:17PM 11   Q.   AND CHRIS BOIES WAS THE SON OF DAVID BOIES; RIGHT?

02:17PM 12   A.   YES.

02:17PM 13   Q.   WHO WAS THE LAWYER FOR THERANOS; RIGHT?

02:17PM 14   A.   DAVID BOIES WAS THE LAWYER FOR THERANOS.  FOR THERANOS.

02:17PM 15        CHRIS APPARENTLY WAS DOING SOME THERANOS WORK BECAUSE HE'S

02:17PM 16   THE ONE THAT APPROACHED ME.

02:17PM 17   Q.   OKAY.  AND IN THIS EMAIL HE SAYS -- I'M SORRY.

02:18PM 18        YOU SAY, "CHRIS,

02:18PM 19        "I CIRCLE BACK WITH SOME OF THE" --

02:18PM 20        I'M SORRY, YOUR HONOR.  THIS IS NOT IN EVIDENCE.

02:18PM 21        I OFFER 13150.

02:18PM 22            MR. BOSTIC:  NO OBJECTION.

02:18PM 23            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:18PM 24        (DEFENDANT'S EXHIBIT 13150 WAS RECEIVED IN EVIDENCE.)

02:18PM 25            MS. WALSH:  SORRY.  NOW I CAN READ THE EMAIL.

02:18PM 1    Q.   "CHRIS,

02:18PM 2         "I CIRCLED BACK WITH SOME OF THE EARLY STAGE CO-INVESTORS

02:18PM 3    TODAY."

02:18PM 4         DO YOU SEE THAT?

02:18PM 5    A.   YES.

02:18PM 6    Q.   "FIRST OF ALL, THEY THOUGHT THERE WAS A POST MONEY ROUND

02:18PM 7    AT $19?  IS THIS TRUE?  THEY ALSO FELT THAT CURRENT VALUATION

02:18PM 8    IS PROBABLY WELL IN EXCESS OF THE $15 OFFERED BY THE COMPANY."

02:18PM 9         DO YOU SEE THAT?

02:18PM 10   A.   YES.

02:18PM 11   Q.   OKAY.  AND SO THIS IS AN EMAIL ABOUT A POTENTIAL BUYOUT;

02:18PM 12   RIGHT?

02:18PM 13   A.   YES.

02:18PM 14   Q.   AND IT'S A BUYOUT AT $15 PER SHARE; RIGHT?

02:18PM 15   A.   POTENTIAL.

02:18PM 16   Q.   AND THAT WOULD HAVE BEEN, TO YOU, BASED ON THE VALUATION

02:18PM 17   OF THE COMPANY AT THE TIME, WORTH ABOUT $25 MILLION; IS THAT

02:19PM 18   RIGHT?

02:19PM 19   A.   POTENTIAL.  IT'S NOT A DONE DEAL UNTIL BOTH PARTIES AGREE,

02:19PM 20   AND THIS IS ANOTHER OFFER THAT CHRIS BOIES DID NOT FOLLOW

02:19PM 21   THROUGH.

02:19PM 22   Q.   BUT IF IT HAD COME TO FRUITION, IT WOULD HAVE BEEN

02:19PM 23   $25 MILLION FOR YOU; RIGHT?

02:19PM 24   A.   IF IT HAD.  THAT'S SPECULATIVE.  THIS WAS ANOTHER OFFER AS

02:19PM 25   THE FIRST OFFER AT THE GREATER THAN FIVE TIMES THAT WAS PUT OUT

ER-4123

02:19PM  1     THERE, BUT THERE WAS NO FOLLOW THROUGH.

02:19PM  2          I FOLLOWED THROUGH.  I WAS PURSUING THIS OFFER AND IT WENT

02:19PM  3     AWAY.

02:19PM  4          CHRIS BOIES STOPPED COMMUNICATING WITH ME WHEN I WAS

02:19PM  5     TRYING TO PURSUE THIS OFFER.

02:19PM  6     Q.   SO IT'S CLEAR THAT A SALE DIDN'T HAPPEN.

02:19PM  7          MY QUESTION IS JUST ABOUT THE MATH.

02:19PM  8          IF YOU HAD SOLD YOUR STOCK PURSUANT TO THIS OFFER, YOU

02:19PM  9     WOULD HAVE MADE ABOUT $25 MILLION; IS THAT RIGHT?  JUST THE

02:20PM 10     MATH?  IS THAT RIGHT?

02:20PM 11     A.   I DON'T SEE WHERE THAT IS RELEVANT.  I'M SORRY.

02:20PM 12     Q.   IS THE MATH RIGHT?

02:20PM 13               THE COURT:  CAN YOU ANSWER HER QUESTION?

02:20PM 14               THE WITNESS:  OKAY.

02:20PM 15          IF THIS OFFER WAS LEGITIMATE, AND THEY FOLLOWED THROUGH ON

02:20PM 16     THIS OFFER, THAT IS THE POTENTIAL.

02:20PM 17          BUT MY TESTIMONY IS THAT THIS WAS ANOTHER ILLEGITIMATE

02:20PM 18     OFFER.  THEY DID NOT FOLLOW THROUGH WITH THIS OFFER, AND I

02:20PM 19     DON'T KNOW WHY BECAUSE I'VE PURSUED THE OFFER AND CHRIS BOIES

02:20PM 20     DROPPED THE BALL.  HE STOPPED COMMUNICATING.

02:20PM 21     BY MS. WALSH:

02:20PM 22     Q.   OKAY.  SO PUT ASIDE LEGITIMATE, NOT LEGITIMATE, I'M JUST

02:20PM 23     FOCUSSED ON THE MATH.

02:20PM 24          IF YOU HAD ACCEPTED THIS OFFER AND THE DEAL HAD GONE

02:20PM 25     THROUGH, YOU WOULD HAVE MADE $25 MILLION BASED ON THE VALUATION

EISENMAN CROSS BY MS. WALSH                                5495

02:20PM 1    OF THERANOS AT THE TIME.  IS THAT MATH CORRECT?

02:20PM 2    A.   IT'S HARD TO ANSWER BECAUSE IT WAS NOT AN OFFER.  IT WAS

02:20PM 3    NOT A LEGITIMATE OFFER.

02:20PM 4    Q.   IS THE MATH CORRECT?

02:20PM 5    A.   IF THAT WAS A LEGITIMATE OFFER AND I HAD ACCEPTED IT, THE

02:21PM 6    MATH IS CORRECT.

02:21PM 7    Q.   SO THE ANSWER IS YES, THE MATH IS CORRECT?  IS THAT YOUR

02:21PM 8    ANSWER?

02:21PM 9    A.   YES.

02:21PM 10   Q.   LET'S TURN TO 13191.

02:21PM 11        DO YOU SEE THAT?

02:21PM 12   A.   YES.

02:21PM 13   Q.   THIS IS AN EMAIL BETWEEN YOU AND SOME INDIVIDUALS AT A

02:21PM 14   PLACE CALLED SHARES POST.

02:21PM 15        DO YOU SEE THAT?

02:21PM 16   A.   YES.

02:21PM 17   Q.   AND IT'S IN SEPTEMBER 2015; CORRECT?

02:21PM 18   A.   YES.

02:21PM 19   Q.   AND THIS EMAIL RELATED TO YOU PURSUING OR TRYING TO SELL

02:22PM 20   YOUR STOCK; IS THAT RIGHT?

02:22PM 21   A.   YES.

02:22PM 22   Q.   OKAY.

02:22PM 23        YOUR HONOR, WE OFFER 13191.

02:22PM 24          MR. BOSTIC:  801, YOUR HONOR.

02:22PM 25        (PAUSE IN PROCEEDINGS.)

EISENMAN CROSS BY MS. WALSH                                    5496

02:22PM  1            MS. WALSH:  MR. EISENMAN HAS TESTIFIED THAT HIS

02:22PM  2    INVESTMENT IS NOW WORTHLESS, AND THIS GOES TO ANOTHER INSTANCE

02:22PM  3    OF HIM BEING GIVEN AN OPPORTUNITY TO SELL AND HIM NOT SELLING.

02:22PM  4            MR. BOSTIC:  THAT SOUNDS LIKE IT'S BEING OFFERED FOR

02:22PM  5    THE TRUTH, YOUR HONOR.

02:22PM  6            THE COURT:  IS IT?

02:22PM  7            MS. WALSH:  IT GOES TO HIS STATE OF MIND.

02:22PM  8            THE COURT:  SO IS IT OFFERED FOR THE TRUTH OF THE

02:22PM  9    MATTER ASSERTED?

02:22PM 10            MS. WALSH:  NO.

02:22PM 11            THE COURT:  ALL RIGHT.

02:22PM 12            MR. BOSTIC:  YOUR HONOR, THE WITNESS'S STATE OF MIND

02:22PM 13    POST-INVESTMENT IS NOT AN ISSUE IN THIS CASE.

02:22PM 14            MS. WALSH:  WELL, IT --

02:22PM 15            THE COURT:  WELL, THAT WAS MY NEXT QUESTION.

02:22PM 16        GO AHEAD.

02:22PM 17            MS. WALSH:  WELL, IT IS AN ISSUE IF MR. EISENMAN

02:22PM 18    TESTIFIED ABOUT WHAT HAPPENED WITH HIS STOCK AT THE END OF THE

02:23PM 19    DAY OR WHAT WAS THE VALUE OF HIS SHARES AT THE END OF THE DAY.

02:23PM 20            THE COURT:  I'M NOT CERTAIN I CAPTURE THAT.

02:23PM 21        THIS IS POST-INVESTMENT?

02:23PM 22            MS. WALSH:  IT IS POST-INVESTMENT.

02:23PM 23        THE OTHER THING I WOULD JUST POINT OUT IS THAT THE TOP

02:23PM 24    EMAIL IS A SERIES OF QUESTIONS.  SO THEY'RE NOT FACTUAL

02:23PM 25    ASSERTIONS, THEY'RE JUST QUESTIONS BEING POSED.

02:23PM   1                    THE COURT:  WELL, IT ALSO CREATES SOME 403 TYPE

02:23PM   2      ISSUES, DOES IT?  IT SEEMS IT MIGHT.

02:23PM   3                    MS. WALSH:  IT IS PROBATIVE OF MR. EISENMAN'S

02:24PM   4      OPPORTUNITIES TO SELL HIS STOCK.

02:24PM   5          I DON'T THINK THERE ARE ANY ASSERTIONS IN HERE THAT GO TO

02:24PM   6      THE TRUTH.  THERE'S NO ASSERTION THAT IS BEING MADE.  THERE ARE

02:24PM   7      QUESTIONS BEING POSED.

02:24PM   8                    THE COURT:  ALL RIGHT.  THERE HAVE BEEN DISCUSSIONS

02:24PM   9      ABOUT THIS.

02:24PM  10          I'LL PERMIT THIS TO BE ADMITTED, BUT NOT FOR THE TRUTH OF

02:24PM  11      THE MATTER ASSERTED, LADIES AND GENTLEMEN, NOT FOR THE TRUTH OF

02:24PM  12      ANY OF THE ITEMS, INCLUDING NUMBERS AND THOSE THINGS THAT ARE

02:24PM  13      ASSERTED IN THESE DOCUMENTS.

02:24PM  14          THIS JUST GOES TO THE WITNESS'S STATE OF MIND IN REGARDS

02:24PM  15      TO HIS FORMER TESTIMONY ABOUT HIS THOUGHTS ABOUT VALUATION AND

02:24PM  16      SELLING AND FOR THAT LIMITED PURPOSE.

02:24PM  17          IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:24PM  18                    MS. WALSH:  THANK YOU.

02:24PM  19          (DEFENDANT'S EXHIBIT 13191 WAS RECEIVED IN EVIDENCE.)

02:24PM  20      BY MS. WALSH:

02:24PM  21      Q.   OKAY.  IF WE CAN GO TO THE EMAIL FIRST IN TIME,

02:24PM  22      SEPTEMBER 3RD, 2015.

02:24PM  23          MR. EISENMAN, YOU WRITE TO A FELLOW NAMED BRYSON TOMBRIDGE

02:24PM  24      AT SHARES POST; RIGHT?

02:24PM  25      A.   YES.

EISENMAN CROSS BY MS. WALSH                                         5498

02:25PM  1    Q.   AND WHAT IS SHARES POST?

02:25PM  2    A.   IT IS A MARKET MAKER THAT TRIES TO MATCH BUYERS AND

02:25PM  3    SELLERS WITH NONPUBLIC STOCKS, NONPUBLIC SECURITIES.

02:25PM  4    Q.   OKAY.  AND WHAT YOU SAY TO MR. TOMBRIDGE IS, "BRYSON,

02:25PM  5         "I WANTED TO MAKE SURE YOU RECEIVED ALL DOCUMENTATION TO

02:25PM  6    LIST MY THERANOS FOR SALE.  COULD YOU UPDATE ME ON THE CURRENT

02:25PM  7    MARKET... WHERE STOCK HAS BEEN TRADING, BOTH GROSS SALES PRICE

02:25PM  8    AND NET OF COMMISSIONS, AND ALSO HOW MUCH STOCK IS IN FRONT OF

02:25PM  9    ME AND AT WHAT PRICE."

02:25PM 10         DO YOU SEE THAT?

02:25PM 11    A.   YES.

02:25PM 12    Q.   AND THEN MR. TOMBRIDGE WRITES BACK SAYING "HI ALAN,

02:25PM 13         "YES, WE RECEIVED YOUR DOCUMENTATION."

02:25PM 14         AND HE SAYS SOME MORE THINGS.

02:25PM 15         "WE COMPLETED A TRANSACTION AT THE PRICE OF 14.75.

02:25PM 16         "IN TERMS OF THE MARKET, WE HAVE A LARGE BLOCK OF SELLERS

02:26PM 17    AT $19 PER SHARE."

02:26PM 18         AND THEN YOU WRITE, "HI BRYSON,

02:26PM 19         "THIS CONFLICTS WITH MY CONVERSATION WITH GENO.  I THOUGHT

02:26PM 20    HE SAID THAT YOUR FIRM HAD DONE SEVERAL TRANSACTIONS IN

02:26PM 21    THERANOS STOCK, AND CURRENT TRANSACTIONS WERE SELLING IN THE

02:26PM 22    $17 TO $19 PRICE RANGE BEFORE COMMISSION.  HE ALSO SAID THAT

02:26PM 23    THE COMPANY HAD EXERCISED ITS FIRST RIGHT OF REFUSAL ON SOME OF

02:26PM 24    THE TRANSACTIONS AND PURCHASED STOCK FOR AS MUCH AS $17.40.  I

02:26PM 25    NEED CURRENT AND ACCURATE INFORMATION, SO I CAN SET MY PRICES

02:26PM   1    AND QUANTITIES.  CAN YOU CONFIRM WITH ZENO AND RESPOND TODAY?"

02:26PM   2         I THINK IT'S ACTUALLY GENO.

02:26PM   3         AND GENO RESPONDS SAYING "HI ALAN,

02:26PM   4         "SORRY, I HAVE JUST RETURNED FROM A WEEK LONG VACATION AND

02:26PM   5    I ACTUALLY WAS UNPLUGGED FOR ONCE.  NO RUSH AS WE HAVE SEVERAL

02:26PM   6    LARGE BLOCKS TO FILL IN THE NEXT FEW MONTHS BEFORE WE GET TO

02:26PM   7    YOUR PRICE LEVEL."

02:26PM   8         DO YOU SEE THAT?

02:26PM   9    A.   YES.

02:26PM   10   Q.   AND YOU RESPOND, "GENO,

02:26PM   11        "I NEED ACCURATE INFORMATION.  PLEASE LET ME KNOW THE

02:27PM   12   TOTAL DOLLAR AMOUNT OF THERANOS YOUR FIRM HAS CROSSED SINCE

02:27PM   13   INCEPTION."

02:27PM   14        AND BY "CROSS" YOU MEAN?

02:27PM   15   A.   MATCHING BUYERS AND SELLERS.

02:27PM   16   Q.   BY "CROSS" YOU MEAN MATCHING BUYERS AND SELLERS?

02:27PM   17   A.   YES.

02:27PM   18   Q.   "WHAT ARE THE DOLLAR AMOUNTS OF LARGER TRADE?  WHAT ARE

02:27PM   19   THE GROSS AND NET PRICES OF THE MOST RECENT TRADES?  WHAT NET

02:27PM   20   PRICE CAN I EXPECT FOR MY STOCK IF I WANT TO SELL 100,000, A

02:27PM   21   MILLION, OR 10 MILLION?  IS THE MARKET LIQUID ENOUGH TO ABSORB

02:27PM   22   $10 MILLION WITHOUT LOWERING MY PRICE?"

02:27PM   23        DO YOU SEE THAT?

02:27PM   24   A.   YES.

02:27PM   25   Q.   AND WE CAN TAKE THAT DOWN.

EISENMAN CROSS BY MS. WALSH                                           5500

02:27PM    1          OKAY.  SO YOU'VE TESTIFIED TODAY ABOUT INFORMATION THAT

02:28PM    2     YOU WANTED TO GET FROM THERANOS THAT YOU DID NOT GET.  IS THAT

02:28PM    3     FAIR?

02:28PM    4     A.   YES.

02:28PM    5     Q.   AND THAT'S INFORMATION THAT YOU ASKED FROM MS. HOLMES AND

02:28PM    6     MR. BALWANI; RIGHT?

02:28PM    7     A.   YES.

02:28PM    8     Q.   AND SO LET'S TALK ABOUT OTHER INFORMATION THAT MR. BALWANI

02:28PM    9     MAY NOT HAVE GIVEN YOU.  OKAY?

02:28PM   10     A.   OKAY.

02:28PM   11     Q.   DID MR. BALWANI TELL YOU THAT HE GUARANTEED A LINE OF

02:28PM   12     CREDIT FOR THERANOS FOR $10 MILLION?

02:28PM   13     A.   NO.

02:28PM   14     Q.   DID HE TELL YOU THAT THAT WAS IN 2009 DURING THE HEIGHT OF

02:28PM   15     THE FINANCIAL CRISIS?

02:28PM   16     A.   NO.

02:28PM   17     Q.   DID HE TELL YOU THAT HE USED HIS PERSONAL MONEY TO DO

02:28PM   18     THAT?

02:28PM   19     A.   NO.

02:28PM   20     Q.   AND DID HE TELL YOU THAT HE DIDN'T CHARGE INTEREST ON

02:28PM   21     HAVING HIS MONEY TIED UP IN THAT WAY?

02:28PM   22     A.   NO.

02:28PM   23     Q.   OKAY.  DID MR. BALWANI TELL YOU THAT HE MADE NO MORE THAN

02:28PM   24     $99,000 A YEAR AS A CEO AT A COMPANY THAT WAS VALUED AT

02:28PM   25     $9 BILLION?

02:28PM  1    A.   NO.

02:29PM  2    Q.   AND DID HE TELL YOU THAT HE NEVER ASKED FOR ANY OTHER

02:29PM  3    COMPENSATION FROM THE COMPANY?

02:29PM  4    A.   NO.

02:29PM  5    Q.   DID HE TELL YOU THAT WALGREENS MADE A COMMITMENT TO

02:29PM  6    THERANOS AT THE END OF DECEMBER OF 2013 TO DO A NATIONAL

02:29PM  7    ROLLOUT OF THERANOS TECHNOLOGY?

02:29PM  8    A.   I'M SORRY.  DID HE TELL ME?

02:29PM  9    Q.   DID MR. BALWANI TELL YOU THAT?

02:29PM 10    A.   I DON'T THINK I GOT THAT INFORMATION FROM MR. BALWANI.

02:29PM 11    Q.   OKAY.  AND DID MR. BALWANI TELL YOU THAT WALGREENS AGREED

02:29PM 12    TO PAY, IN DECEMBER OF 2013, $75 MILLION TO THERANOS?  DID HE

02:29PM 13    TELL YOU THAT?

02:29PM 14    A.   NO.

02:29PM 15         MS. WALSH:  MAY I HAVE A MOMENT, YOUR HONOR?

02:29PM 16         THE COURT:  YES.

02:29PM 17    (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:29PM 18         MS. WALSH:  I DON'T HAVE ANY FURTHER QUESTIONS.

02:29PM 19         THE COURT:  WILL YOU HAVE REDIRECT?

02:29PM 20         MR. BOSTIC:  I WILL, YOUR HONOR.

02:30PM 21         THE COURT:  I WONDER IF WE SHOULD TAKE OUR BREAK NOW

02:30PM 22    BEFORE YOUR REDIRECT, OR DO YOU THINK WE SHOULD GO FORWARD WITH

02:30PM 23    THAT?

02:30PM 24         MR. BOSTIC:  I THINK NOW MAY BE A GOOD TIME FOR A

02:30PM 25    BREAK, YOUR HONOR.

EISENMAN REDIRECT BY MR. BOSTIC                                    5502

02:30PM   1              THE COURT:  WELL, LET'S DO THAT NOW, LADIES AND

02:30PM   2   GENTLEMEN.  LET'S TAKE A BREAK NOW.  WE'LL TAKE ABOUT 25 OR

02:30PM   3   30 MINUTES, AND THEN WE'LL RESUME.

02:30PM   4         (RECESS FROM 2:30 P.M. UNTIL 3:01 P.M.)

03:07PM   5              THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

03:07PM   6         SORRY FOR THE DELAY.

03:07PM   7         THE PARTIES WHO WERE PREVIOUSLY PRESENT ARE PRESENT ONCE

03:07PM   8   AGAIN.

03:07PM   9         MR. BOSTIC, YOU HAVE QUESTIONS?

03:07PM  10              MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

03:07PM  11                    **REDIRECT EXAMINATION**

03:07PM  12   BY MR. BOSTIC:

03:07PM  13   Q.   GOOD AFTERNOON, MR. EISENMAN.

03:07PM  14   A.   GOOD AFTERNOON.

03:07PM  15   Q.   I'D LIKE TO START ON THE TOPIC OF THE EFFORTS THAT YOU

03:07PM  16   MADE TO EXPLORE POTENTIAL SALES OF YOUR THERANOS SHARES IN

03:07PM  17   2015.

03:07PM  18         DO YOU HAVE THAT IN MIND?

03:07PM  19   A.   YES.

03:07PM  20   Q.   LET ME START BY ASKING, WHY WERE YOU INTERESTED IN

03:08PM  21   POTENTIAL OPPORTUNITIES TO SELL YOUR THERANOS SHARES IN 2015?

03:08PM  22   A.   BECAUSE I HAD AN OVERWEIGHTED POSITION IF THE MARKET WAS

03:08PM  23   AS IT WAS PRESENTED IN FINANCIAL PRESS, AND PARTIALLY A

03:08PM  24   FRUSTRATION BECAUSE I HAD NO TANGIBLE FINANCIAL INFORMATION TO

03:08PM  25   BASE THE VALUE OF MY SHARES.

UNITED STATES COURT REPORTERS

03:08PM  1    Q.   SO DID YOUR LACK OF INFORMATION FROM MR. BALWANI AND

03:08PM  2    MS. HOLMES CONTRIBUTE TO YOUR INTEREST IN POTENTIALLY PARTING

03:08PM  3    WAYS WITH THE COMPANY?

03:08PM  4    A.   YES, IT DID.

03:08PM  5    Q.   JUST SO THE RECORD IS CLEAR, AT ANY POINT AFTER YOU

03:08PM  6    INVESTED IN 2013, WAS THERE A COMPLETE OFFER TO SELL YOUR

03:08PM  7    SHARES THAT YOU COULD HAVE ACCEPTED?

03:08PM  8    A.   NO.

03:08PM  9    Q.   IF THERE HAD BEEN AN OFFER TO SELL YOUR SHARES THAT YOU

03:08PM  10   COULD HAVE ACCEPTED, DID YOU HAVE THE INFORMATION THAT YOU

03:09PM  11   WOULD HAVE NEEDED TO EVALUATE THAT OFFER?

03:09PM  12   A.   NO, I DIDN'T.

03:09PM  13   Q.   AND WHAT DO YOU MEAN BY THAT?

03:09PM  14   A.   I HAD NO EVEN BASIC FINANCIAL INFORMATION ABOUT REVENUES

03:09PM  15   THAT THE COMPANY HAD DONE HISTORICALLY, WHAT THEY WERE

03:09PM  16   CURRENTLY DOING.  THERE WAS BASICALLY NO -- DESPITE MY MANY

03:09PM  17   ATTEMPTS, THERE WAS NO RELEVANT OR MATERIAL INFORMATION THAT I

03:09PM  18   COULD OBTAIN FROM ANY SOURCE.

03:09PM  19   Q.   LET'S TALK SOME MORE ABOUT THOSE ATTEMPTS THAT YOU MADE TO

03:09PM  20   GET INFORMATION, AND LET'S GO BACK TO 2010.

03:09PM  21        DO YOU RECALL MS. WALSH SHOWING YOU SOME EMAILS DURING THE

03:09PM  22   SUMMER OF 2010 WHERE YOU WERE CONTACTING MS. HOLMES AND

03:09PM  23   MR. BALWANI TRYING TO GET MORE INFORMATION ABOUT THE COMPANY?

03:09PM  24   A.   YES.

03:09PM  25   Q.   AND WERE THOSE EFFORTS, GENERALLY SPEAKING, SUCCESSFUL OR

03:09PM  1    UNSUCCESSFUL IN GETTING INFORMATION?

03:09PM  2    A.    UNSUCCESSFUL.

03:09PM  3    Q.    AT THAT TIME IN MID-2010, HOW MUCH OF YOUR MONEY WAS

03:10PM  4    INVESTED IN THE COMPANY?

03:10PM  5    A.    ARE YOU TALKING ABOUT DOLLARS?

03:10PM  6    Q.    DOLLARS, YES.

03:10PM  7    A.    IN 2010?  OF THE FAMILY INVESTMENTS, MY PERSONAL

03:10PM  8    INVESTMENT WAS APPROXIMATELY $450,000.

03:10PM  9    Q.    AND OF THE TOTAL AMOUNT, INCLUDING INDIVIDUALS ASSOCIATED

03:10PM  10   WITH YOU, WHAT WAS THE TOTAL THAT YOU HAD INVESTED?

03:10PM  11   A.    THE TOTAL AMOUNT FOR MY IMMEDIATE FAMILY WAS APPROXIMATELY

03:10PM  12   A MILLION -- BETWEEN 1 MILLION 1 AND 1 MILLION 2.

03:10PM  13   Q.    YOU TESTIFIED EARLIER ABOUT QUARTERLY CALLS THAT YOU HAD

03:10PM  14   PREVIOUSLY HAD WITH MS. HOLMES.

03:10PM  15         DO YOU RECALL THAT?

03:10PM  16   A.    YES.

03:10PM  17   Q.    AND HOW LONG WERE THOSE QUARTERLY CALLS?

03:10PM  18   A.    HOW LONG WAS THE DURATION OF EACH CALL?

03:10PM  19   Q.    ON AVERAGE, YES.

03:10PM  20   A.    ON AVERAGE, 5 TO 15 MINUTES.

03:10PM  21   Q.    SO ARE WE TALKING ABOUT APPROXIMATELY ONE HOUR PER YEAR OF

03:10PM  22   PHONE CONVERSATIONS BETWEEN YOU AND MS. HOLMES DURING THAT TIME

03:10PM  23   PERIOD?

03:10PM  24   A.    YES, YES.

03:11PM  25   Q.    AND AT THE TIME THAT YOU WERE MAKING THESE REQUESTS FOR

03:11PM  1    INFORMATION, DID YOU THINK IT WAS REASONABLE THAT YOUR MILLION

03:11PM  2    DOLLAR INVESTMENT IN THE COMPANY WOULD ENTITLE YOU TO AN HOUR A

03:11PM  3    YEAR OF THE CEO'S TIME?

03:11PM  4    A.   YES.

03:11PM  5    Q.   DO YOU RECALL SEEING IN SOME OF THE COMMUNICATIONS FROM

03:11PM  6    THERANOS THAT IF INFORMATION WAS PROVIDED TO OTHER

03:11PM  7    SHAREHOLDERS, YOU WOULD RECEIVE THAT INFORMATION AS WELL?

03:11PM  8    A.   YES.

03:11PM  9    Q.   DO YOU HAVE ANY KNOWLEDGE OF OTHER SHAREHOLDERS OR

03:11PM  10   POTENTIAL SHAREHOLDERS OF THERANOS RECEIVING MORE DETAILED

03:11PM  11   INFORMATION THAN WHAT YOU WERE GIVEN?

03:11PM  12   A.   WE HAD SOME COMMUNICATION THROUGH DAVID HARRIS THAT THERE

03:11PM  13   WERE OTHER SHAREHOLDERS THAT, THAT WERE PRIVY TO FINANCIAL

03:11PM  14   INFORMATION.

03:11PM  15   Q.   IS THAT ONE OF THE REASONS WHY YOU WERE PRESSING THERANOS

03:11PM  16   TO GET THOSE DISCLOSURES YOURSELF?

03:11PM  17   A.   THAT WAS ONE OF MANY REASONS.

03:12PM  18   Q.   AT ANY POINT WHEN YOU WERE ASKING FOR MORE INFORMATION

03:12PM  19   FROM THERANOS, WAS YOUR GOAL TO GET INFORMATION THAT WAS NOT

03:12PM  20   GOING TO BE SHARED WITH OTHER INVESTORS?

03:12PM  21   A.   I'M SORRY.  COULD YOU RESTATE THE QUESTION?

03:12PM  22   Q.   LET ME ASK IT A DIFFERENT WAY.

03:12PM  23        AT ANY POINT WAS YOUR GOAL TO GET AN ADVANTAGE, AS

03:12PM  24   COMPARED TO OTHER INVESTORS, BY GETTING INFORMATION THAT THEY

03:12PM  25   DID NOT HAVE?

ER-4135

03:12PM   1    A.   NO.

03:12PM   2              MS. WALSH:   OBJECTION.   LEADING.

03:12PM   3              THE COURT:   OVERRULED.   THE ANSWER CAN REMAIN.

03:12PM   4    BY MR. BOSTIC:

03:12PM   5    Q.   AND YOUR ANSWER, MR. EISENMAN?

03:12PM   6    A.   NO.

03:12PM   7              MR. BOSTIC:   YOUR HONOR, EXHIBIT 3387 WAS PREVIOUSLY

03:12PM   8    ADMITTED.

03:12PM   9         MAY WE PUBLISH?

03:12PM  10              THE COURT:   YES.

03:12PM  11    BY MR. BOSTIC:

03:12PM  12    Q.   LET'S START WITH PAGE 143.

03:12PM  13         MR. EISENMAN, DO YOU SEE ON THE SCREEN A DOCUMENT THAT IS

03:12PM  14    LABELLED CONFIDENTIAL INVESTMENT MATERIALS FOR DANIEL MOSLEY?

03:12PM  15    A.   YES.

03:12PM  16    Q.   AND DO YOU KNOW THE NAME DANIEL MOSLEY?

03:12PM  17    A.   NO.

03:12PM  18    Q.   DO YOU SEE THE THERANOS LOGO AT THE TOP?

03:13PM  19    A.   YES.

03:13PM  20    Q.   LET'S LOOK AT PAGE 277 NEXT.

03:13PM  21         AND DO YOU SEE NOW THAT WE'RE LOOKING AT A PAGE LABELLED

03:13PM  22    CONFIDENTIAL THERANOS BRIEFING?

03:13PM  23    A.   YES.

03:13PM  24    Q.   LET'S LOOK AT THE FOLLOWING PAGE, 278.

03:13PM  25         DO YOU SEE HERE THERE'S THE BEGINNING OF A DOCUMENT THAT

03:13PM  1    IS LABELLED THERANOS CONFIDENTIAL OVERVIEW?

03:13PM  2    A.   YES.

03:13PM  3    Q.   AT ANY POINT DID YOU RECEIVE THIS DOCUMENT OR A DOCUMENT

03:13PM  4    LIKE IT FROM MR. BALWANI OR MS. HOLMES?

03:13PM  5    A.   NO.

03:13PM  6    Q.   DID ANYONE AT THERANOS EVER SEND YOU THE THERANOS

03:13PM  7    CONFIDENTIAL OVERVIEW?

03:13PM  8    A.   NO.

03:13PM  9    Q.   IN YOUR COMMUNICATIONS WITH MR. BALWANI AND MS. HOLMES,

03:13PM  10   WAS ONE THING THAT YOU WERE ASKING FOR CONCRETE FINANCIAL

03:13PM  11   INFORMATION ABOUT THE COMPANY?

03:13PM  12   A.   YES.

03:13PM  13   Q.   LET'S LOOK IN THIS SAME EXHIBIT AT PAGE 513.

03:13PM  14        DO YOU SEE ON THE SCREEN IN FRONT OF YOU IN THE MATERIALS

03:14PM  15   PROVIDED TO DANIEL MOSLEY SOMETHING LABELED THERANOS

03:14PM  16   CONFIDENTIAL PRO FORMA STATEMENT OF CASH FLOW?

03:14PM  17   A.   YES.

03:14PM  18   Q.   WERE YOU EVER PROVIDED THIS INFORMATION BY THERANOS?

03:14PM  19   A.   NO (LAUGHTER).

03:14PM  20   Q.   WERE YOU EVER PROVIDED ANY SIMILAR FINANCIAL INFORMATION

03:14PM  21   IN RESPONSE TO YOUR REQUEST?

03:14PM  22   A.   NONE WHATSOEVER.

03:14PM  23   Q.   LET'S LOOK AT THE FOLLOWING PAGE.

03:14PM  24        DO YOU SEE ON THE SCREEN ADDITIONAL INFORMATION FOR THE

03:14PM  25   BALANCE SHEET FOR THERANOS FOR THE PERIOD ENDING

03:14PM   1      JULY 14TH, 2014?

03:14PM   2      A.   YES.

03:14PM   3      Q.   DID YOU EVER RECEIVE ANYTHING LIKE THIS IN RESPONSE TO

03:14PM   4      YOUR REQUEST FROM MR. BALWANI AND MS. HOLMES?

03:14PM   5      A.   NO.

03:14PM   6      Q.   THE ANSWER, SIR?

03:14PM   7      A.   NO.

03:14PM   8      Q.   AND FINALLY, LET'S LOOK AT THE NEXT PAGE.

03:14PM   9           AND THE PAGE AFTER THAT.

03:14PM   10          OKAY.  WE CAN SET THAT ASIDE.

03:14PM   11          DO YOU RECALL LOOKING WITH MS. WALSH AT AN EMAIL WHERE

03:15PM   12     MS. HOLMES INFORMED YOU THAT THERANOS WAS AN EARLY STAGE LIFE

03:15PM   13     SCIENCES COMPANY?

03:15PM   14     A.   YES.

03:15PM   15     Q.   AND DO YOU RECALL HER SAYING IN THAT EMAIL THAT BY ITS

03:15PM   16     VERY NATURE, THE COMPANY CARRIED IMMENSE RISK AND

03:15PM   17     UNPREDICTABILITY AS YOU KNOW AS A SAVVY INVESTOR?

03:15PM   18     A.   I RECALL.

03:15PM   19     Q.   DO YOU RECALL THAT THAT EMAIL WAS FROM JUNE OF 2010?

03:15PM   20     A.   YES.

03:15PM   21     Q.   AND MS. HOLMES SAID IN THAT EMAIL, "THIS MAY NOT CHANGE

03:15PM   22     FOR YEARS TO COME."

03:15PM   23          DO YOU REMEMBER THAT?

03:15PM   24     A.   YES.

03:15PM   25     Q.   FOLLOWING JUNE 2010, DID YOUR UNDERSTANDING OF THE RISK

03:15PM 1    INHERENT IN THE INVESTMENT CHANGE BASED ON WHAT MR. BALWANI AND

03:15PM 2    MS. HOLMES SAID?

03:15PM 3    A.   I'M SORRY.  COULD YOU RESTATE THE QUESTION?

03:15PM 4    Q.   SURE.  I CAN TRY TO ASK IT BETTER.

03:15PM 5    A.   OKAY.

03:15PM 6    Q.   MS. HOLMES SAID IN JUNE OF 2010 THAT THERANOS WAS AN EARLY

03:16PM 7    STAGE LIFE SCIENCES STARTUP AND, BY ITS VERY NATURE, CARRIES

03:16PM 8    IMMENSE RISK.  "THIS MAY NOT CHANGE FOR YEARS TO COME."

03:16PM 9        IN YOUR VIEW, HAD THAT CHANGED BY THE TIME THAT YOU MADE

03:16PM 10   THE INVESTMENT IN 2013?

03:16PM 11   A.   YES.

03:16PM 12   Q.   AND WHAT MADE YOU UNDERSTAND THAT THIS HAD CHANGED AND IT

03:16PM 13   WAS NO LONGER THE CASE IN 2013?

03:16PM 14   A.   RELYING ON SEVERAL PIECES OF INFORMATION, PRIMARILY THE

03:16PM 15   PHONE CONVERSATION A WEEK BEFORE THE ROUND CLOSED WITH

03:16PM 16   PAT MENDENHALL THAT HE SHARED WITH ALL OF US THAT THE RISK HAD

03:16PM 17   TAKEN OUT, THE SCIENCE HAD PROVEN, IT WAS AN ACCEPTABLE

03:16PM 18   SCIENCE, AND THIS ROUND WAS NOT REALLY FOR THE COMPANY TO

03:16PM 19   DEVELOP.  THE COMPANY HAD ALREADY DEVELOPED.  THEY WERE RAISING

03:16PM 20   MONEY TO GROW THE COMPANY.

03:16PM 21   Q.   LEADING UP TO YOUR INVESTMENT IN 2013, YOU HAD

03:16PM 22   CONVERSATIONS WITH MR. BALWANI AND MS. HOLMES; CORRECT?

03:16PM 23   A.   CORRECT.

03:16PM 24   Q.   IN ANY OF THOSE CONVERSATIONS PRIOR TO YOUR 2013

03:17PM 25   INVESTMENT, AROUND THAT TIME PERIOD, DID EITHER OF THEM SAY

03:17PM  1      ANYTHING LIKE WHAT MS. HOLMES HAD SAID IN 2010, THAT THE

03:17PM  2      INVESTMENT CARRIED IMMENSE RISK?

03:17PM  3      A.   COULD YOU RESTATE THE QUESTION?

03:17PM  4      Q.   SURE.  WE SAW THE STATEMENT FROM 2010 WHEN MS. HOLMES TOLD

03:17PM  5      YOU THE INVESTMENT CARRIED IMMENSE RISK.

03:17PM  6      A.   HIGH RISK, YES.

03:17PM  7      Q.   DID EITHER MR. BALWANI OR MS. HOLMES SAY THAT TO YOU

03:17PM  8      LEADING UP TO YOUR 2013 INVESTMENT?

03:17PM  9      A.   OKAY.  IN, IN PHONE CONVERSATION OR EMAIL OR EITHER?

03:17PM  10     Q.   EITHER.

03:17PM  11     A.   OKAY.  I DON'T RECALL.

03:17PM  12     Q.   IF THEY HAD TOLD YOU, LEADING UP TO YOUR 2013 INVESTMENT,

03:17PM  13     THAT THERE WAS IMMENSE RISK INVOLVED, WOULD THAT HAVE CHANGED

03:17PM  14     YOUR UNDERSTANDING ABOUT THE 2013 INVESTMENT?

03:17PM  15     A.   YES.

03:17PM  16          MS. WALSH:  OBJECTION.

03:17PM  17          THE COURT:  OVERRULED.

03:17PM  18          THE WITNESS:  YES.

03:17PM  19     BY MR. BOSTIC:

03:17PM  20     Q.   YOU TESTIFIED EARLIER THAT YOU HAVE YEARS OF EXPERIENCE

03:18PM  21     INVESTING IN PRIVATE AND PUBLIC COMPANIES; CORRECT?

03:18PM  22     A.   THAT'S CORRECT.

03:18PM  23     Q.   WHEN IT COMES TO INVESTING IN A PRIVATE COMPANY, DOES THE

03:18PM  24     COMPANY ITSELF HAVE A SAY OVER WHO IS ABLE TO PURCHASE SHARES

03:18PM  25     IN THE COMPANY?

03:18PM   1    A.   IN A PRIVATE COMPANY?

03:18PM   2    Q.   YES.

03:18PM   3    A.   DID THEY DETERMINE WHO IS ALLOWED TO BUY STOCK?

03:18PM   4    Q.   YES.

03:18PM   5    A.   YES.

03:18PM   6    Q.   SO WHEN YOU INVESTED IN 2013, COULD THERANOS HAVE SAID,

03:18PM   7    NO, THANK YOU, WE DON'T WANT YOUR INVESTMENT?

03:18PM   8    A.   YES.

03:18PM   9    Q.   THAT WAS YOUR UNDERSTANDING AT THE TIME?

03:18PM  10    A.   YES.

03:18PM  11    Q.   IN 2013 WHEN YOU WERE DISCUSSING THAT INVESTMENT WITH

03:18PM  12    MR. BALWANI AND MS. HOLMES, DID THEY AT ANY POINT REFUSE THE

03:18PM  13    ADDITIONAL MONEY THAT YOU WERE OFFERING?

03:18PM  14    A.   NO, QUITE TO THE CONTRARY.

03:18PM  15         MR. BALWANI WAS UNUSUALLY CORDIAL AND FRIENDLY AND

03:18PM  16    RESPONSIVE TO A RETURN CALL, WHICH WAS VERY DIFFERENT THAN OUR

03:18PM  17    HISTORY FOR THE PRIOR FEW YEARS.

03:18PM  18    Q.   DO YOU RECALL SEEING, DURING CROSS-EXAMINATION, SOME

03:19PM  19    EMAILS THAT MR. BALWANI SENT YOU LATER WHERE HE CLAIMED THAT HE

03:19PM  20    TOLD YOU NOT TO INVEST IN LATE 2013, EARLY 2014?

03:19PM  21    A.   I SAW THOSE.

03:19PM  22    Q.   WERE THOSE STATEMENTS TRUE?

03:19PM  23    A.   NO.

03:19PM  24    Q.   DID HE ACTUALLY SAY THAT TO YOU?

03:19PM  25    A.   NO, HE DIDN'T.

EISENMAN REDIRECT BY MR. BOSTIC                              5512

03:19PM   1    Q.   WAS MR. BALWANI, IN YOUR VIEW, WELCOMING OF YOUR

03:19PM   2    INVESTMENT IN THERANOS IN 2013?

03:19PM   3    A.   YES, HE WAS.

03:19PM   4    Q.   MS. WALSH ALSO ASKED YOU WHETHER MR. BALWANI OR MS. HOLMES

03:19PM   5    EVER GUARANTEED THAT THERE WOULD BE A PUBLIC MARKET FOR

03:19PM   6    THERANOS SHARES.

03:19PM   7         DO YOU RECALL THAT?

03:19PM   8    A.   YES.

03:19PM   9    Q.   AND YOU ANSWERED THAT YOU NEVER RECEIVED AN EXPLICIT

03:19PM  10    GUARANTEE; IS THAT RIGHT?

03:19PM  11    A.   THAT'S CORRECT.

03:19PM  12    Q.   AS SOMEONE INVESTING IN A COMPANY, OR CONSIDERING AN

03:19PM  13    INVESTMENT, DO YOU RELY ON STATEMENTS MADE BY EXECUTIVES EVEN

03:19PM  14    WHEN THEY'RE NOT STYLED AS EXPLICIT GUARANTEES?

03:19PM  15    A.   YES.

03:19PM  16    Q.   AND DO YOU RELY ON THE TRUTH OF THE STATEMENTS EVEN WHEN

03:20PM  17    THEY'RE NOT EXPLICIT GUARANTEES?

03:20PM  18    A.   YES.

03:20PM  19    Q.   MS. WALSH ALSO ASKED YOU ABOUT SOME OF THE OTHER FACTORS

03:20PM  20    THAT INFLUENCED YOUR DECISION TO INVEST IN 2013.

03:20PM  21         DO YOU RECALL THOSE QUESTIONS?

03:20PM  22    A.   YES.

03:20PM  23    Q.   AND SHE DISCUSSED THINGS LIKE THE CONFIDENCE THAT

03:20PM  24    DAVID HARRIS HAD IN THE COMPANY.

03:20PM  25         DO YOU REMEMBER THAT?

03:20PM  1    A.   YES.

03:20PM  2    Q.   AND SHE DISCUSSED THE PRESENCE OF DON LUCAS ON THE BOARD;

03:20PM  3    IS THAT RIGHT?

03:20PM  4    A.   YES.

03:20PM  5    Q.   AND THE FACT THAT LARRY ELLISON HAD INVESTED IN THE

03:20PM  6    COMPANY?

03:20PM  7    A.   YES.

03:20PM  8    Q.   AND YOU WERE ALSO AWARE OF THE WALGREENS PARTNERSHIP WITH

03:20PM  9    THERANOS WHEN YOU INVESTED IN 2013; RIGHT?

03:20PM  10   A.   YES.

03:20PM  11   Q.   AND DID ALL OF THOSE THINGS INFLUENCE YOUR DECISION TO

03:20PM  12   INVEST?

03:20PM  13   A.   YES, THEY DID.

03:20PM  14   Q.   SO LET ME ASK THEN, WHEN IT CAME TO THE STATEMENTS THAT

03:20PM  15   YOU RECEIVED FROM MS. HOLMES ABOUT THE COMPANY, IN LIGHT OF ALL

03:20PM  16   OF THE OTHER INFORMATION THAT ALSO INFLUENCED YOUR DECISION,

03:20PM  17   DID THE THINGS THAT MS. HOLMES SAID MATTER TO YOU IN MAKING

03:20PM  18   YOUR DECISION TO INVEST MORE MONEY IN THE COMPANY IN 2013?

03:21PM  19   A.   YES.

03:21PM  20   Q.   AND HOW ABOUT FOR MR. BALWANI?

03:21PM  21        DID HIS STATEMENTS, BOTH DIRECTLY TO YOU AND THROUGH

03:21PM  22   MR. MENDENHALL, MAKE A DIFFERENCE TO YOU IN YOUR DECISION TO

03:21PM  23   INVEST IN THE COMPANY IN 2013?

03:21PM  24   A.   YES.  IT GAVE ME A GREATER DEGREE OF CONFIDENCE THAT, THAT

03:21PM  25   THE COMPANY HAD DEVELOPED A SUCCESSFUL TECHNOLOGY AND THE RISK

03:21PM 1     WAS SUBSTANTIALLY TAKEN OUT OF THIS INVESTMENT.

03:21PM 2     Q.   AND IN MAKING THAT INVESTMENT, WERE YOU ASSUMING THE TRUTH

03:21PM 3     OF THE THINGS THAT MR. BALWANI HAD SAID?

03:21PM 4     A.   YES.

03:21PM 5     Q.   THANK YOU.

03:21PM 6          NO FURTHER QUESTIONS.

03:21PM 7              THE COURT:   RECROSS.

03:21PM 8                    **RECROSS-EXAMINATION**

03:21PM 9     BY MS. WALSH:

03:22PM 10    Q.   GOOD AFTERNOON, MR. EISENMAN.

03:22PM 11    A.   GOOD AFTERNOON.

03:22PM 12    Q.   LET ME TAKE OFF MY MASK.

03:22PM 13         MR. EISENMAN, YOU TESTIFIED ON REDIRECT THAT NEITHER

03:22PM 14    MR. BALWANI NOR MS. HOLMES TOLD YOU IN AN EMAIL OR A PHONE CALL

03:23PM 15    THAT THERANOS, YOUR THERANOS INVESTMENT IN 2013 CARRIED GREAT

03:23PM 16    RISK.

03:23PM 17         CORRECT?

03:23PM 18    A.   I'M SORRY.  COULD YOU RESTATE THE QUESTION?

03:23PM 19    Q.   SURE.  YOU JUST TESTIFIED -- MR. BOSTIC JUST ASKED YOU IF

03:23PM 20    THERE WAS ANY PHONE CALL OR EMAIL WITH MR. BALWANI OR

03:23PM 21    MS. HOLMES LEADING UP TO YOUR 2013 INVESTMENT WHERE THEY TOLD

03:23PM 22    YOU THERANOS IS A RISKY INVESTMENT; IS THAT RIGHT?

03:23PM 23    A.   ARE YOU TALKING ABOUT JUST BEFORE THE 2013, OR ARE YOU

03:23PM 24    TALKING ABOUT THE PERIOD OF 2010 TO 2013?  WHAT TIME PERIOD ARE

03:23PM 25    YOU REFERRING TO?

03:23PM  1    Q.   SO LET'S FOCUS ON THE TIME PERIOD JUST BEFORE THE 2013

03:23PM  2    INVESTMENT LEADING UP TO THAT INVESTMENT.

03:23PM  3    A.   YES.

03:23PM  4    Q.   I THINK YOU JUST TESTIFIED IN RESPONSE TO MR. BOSTIC'S

03:23PM  5    QUESTIONS THAT YOU DON'T REMEMBER HAVING A PHONE CALL OR AN

03:23PM  6    EMAIL WITH MR. BALWANI OR MS. HOLMES ABOUT YOUR INVESTMENT IN

03:24PM  7    THERANOS BEING A SPECULATIVE INVESTMENT?

03:24PM  8    A.   NO.

03:24PM  9    Q.   DO YOU REMEMBER THAT TESTIMONY?

03:24PM  10   A.   IF YOU'RE ASKING ME IF I HAD AN EMAIL OR CONVERSATION WITH

03:24PM  11   MS. HOLMES OR MR. BALWANI IMMEDIATELY PRIOR TO MY 2013

03:24PM  12   INVESTMENT WHERE THEY TOLD ME IT WAS A SPECULATIVE INVESTMENT,

03:24PM  13   NO, I DON'T RECALL HAVING ANY COMMUNICATION.

03:24PM  14        TO THE CONTRARY.  EVERYTHING LEADING UP TO THAT 2013

03:24PM  15   INVESTMENT WAS THE SCIENCE HAS BEEN PROVEN, THE RISK HAS BEEN

03:24PM  16   TAKEN OUT, AND THIS WAS MONEY TO HELP THE COMPANY GROW FASTER

03:24PM  17   TO CAPTURE A MARKET OPPORTUNITY AT A QUICKER PACE.

03:24PM  18   Q.   RIGHT.  AND YOU HAVE A LAW DEGREE, DON'T YOU,

03:24PM  19   MR. EISENMAN?

03:24PM  20   A.   YES.

03:24PM  21   Q.   AND YOU'RE A CPA; RIGHT?

03:24PM  22   A.   I WAS.

03:24PM  23   Q.   YOU WERE BEFORE YOU RETIRED; RIGHT?

03:24PM  24   A.   RIGHT.

03:24PM  25   Q.   AND YOU HAVE BEEN INVESTING IN COMPANIES FOR 20 TO

ER-4145

EISENMAN RECROSS BY MS. WALSH                                    5516

03:25PM  1    30 YEARS; RIGHT?

03:25PM  2    A.   CORRECT.

03:25PM  3    Q.   AND FOR THE THERANOS INVESTMENT IN 2013, YOU SIGNED A

03:25PM  4    SHAREHOLDER AGREEMENT, DID YOU NOT?

03:25PM  5    A.   I DID.

03:25PM  6    Q.   AND THAT AGREEMENT SPECIFICALLY SAID THAT THE INVESTMENT

03:25PM  7    IN THERANOS IS OF A SPECULATIVE NATURE.  THAT AGREEMENT SAID

03:25PM  8    THAT, DIDN'T IT?

03:25PM  9    A.   I THINK WE'VE ALREADY TALKED ABOUT THIS EARLIER.  THAT IS

03:25PM  10   WHAT IS CALLED BOILERPLATE, AND THAT IS LANGUAGE THAT IS PUT IN

03:25PM  11   ALL DOCUMENTATION, OR MOST OR ALL DOCUMENTATION ON ANY PRIVATE

03:25PM  12   EQUITY OFFERING.

03:25PM  13        AND AS A PRACTICAL MATTER, THAT'S, THAT'S PUT IN THE

03:25PM  14   DOCUMENTS TO REDUCE POTENTIAL LIABILITY OF A COMPANY.

03:25PM  15        BUT AS A PRACTICAL MATTER, THAT TOTALLY CONTRADICTED WHAT

03:25PM  16   I HAD BEEN LED TO BELIEVE BY THE, THE COMMUNICATION WITH

03:25PM  17   MR. MENDENHALL AND OTHER COMMUNICATION, AND I RELIED MORE ON

03:25PM  18   THAT COMMUNICATION THAN A MULTIPAGE LEGAL DOCUMENT THAT

03:26PM  19   BASICALLY HAS THE SAME TYPE OF DISCLAIMERS THAT EVERY OTHER

03:26PM  20   DOCUMENT OF ITS ILK HAS.

03:26PM  21   Q.   SO THE AGREEMENT SAID IT WAS A SPECULATIVE INVESTMENT, DID

03:26PM  22   IT NOT?

03:26PM  23   A.   THE AGREEMENT SAID IT WAS A SPECULATIVE INVESTMENT, BUT

03:26PM  24   THAT CONTRADICTED WHAT WAS MORE IMPORTANT, THE INFORMATION THAT

03:26PM  25   I GOT DIRECTLY FROM THE TOP PEOPLE IN THE COMPANY.

EISENMAN RECROSS BY MS. WALSH                                    5517

03:26PM 1      Q.   THE AGREEMENT SAID IT WAS A SPECULATIVE INVESTMENT, DID IT

03:26PM 2      NOT?

03:26PM 3      A.   YES, THE AGREEMENT SAID IT WAS A SPECULATIVE INVESTMENT.

03:26PM 4      Q.   OKAY.  OKAY.  SO LET'S GO TO -- MR. BOSTIC ASKED YOU ABOUT

03:26PM 5      THIS EMAIL IN 2015, WHICH IS EXHIBIT 12999.

03:27PM 6           SO CAN WE PULL THAT EXHIBIT UP.

03:27PM 7           OKAY.  LET'S GO TO -- DO YOU SEE THAT, MR. EISENMAN, ON

03:27PM 8      YOUR SCREEN?

03:27PM 9      A.   YES.  YES.

03:27PM 10     Q.   LET'S GO TO PAGE 2 OF THAT EXHIBIT.

03:27PM 11     A.   OKAY.

03:27PM 12     Q.   SO I CAN READ IT.  OKAY.

03:27PM 13          SO IN THE MIDDLE OF THE PAGE, MR. BALWANI SAYS TO YOU IN

03:27PM 14     THAT MIDDLE PARAGRAPH STARTING WITH "YOU CONTINUE TO BOMBARD

03:27PM 15     US."

03:27PM 16          DO YOU SEE THAT PARAGRAPH?

03:27PM 17     A.   YES.

03:27PM 18     Q.   "JUST 12 SHORT MONTHS AGO I SPOKE WITH YOU IN DETAIL THAT

03:27PM 19     YOU WILL NOT GET ANY UPDATES, THAT YOU SHOULD NOT INVEST."

03:27PM 20          DO YOU SEE THAT?

03:28PM 21     A.   YES.  BUT IF THIS TIMELINE WAS CORRECT, THIS WAS AFTER I

03:28PM 22     HAD ALREADY INVESTED.

03:28PM 23     Q.   YES.  DO YOU SEE THAT LANGUAGE IN THE EMAIL?

03:28PM 24     A.   YES.  BUT THAT CONTRADICTS WHAT, WHAT I WAS TOLD BEFORE I

03:28PM 25     INVESTED.

EISENMAN RECROSS BY MS. WALSH                                    5518

03:28PM   1    Q.   RIGHT.  AND SO WHEN YOU RESPOND TO MR. BALWANI ON

03:28PM   2    PAGE 1 -- DO YOU SEE YOUR RESPONSE ON PAGE 1?

03:28PM   3    A.   YES.

03:28PM   4    Q.   YOU DON'T SAY TO MR. BALWANI "THAT'S NOT TRUE," DO YOU?

03:28PM   5    A.   NO, I DO NOT SAY THAT IN THIS EMAIL.

03:28PM   6    Q.   YOU DON'T SAY "THAT'S A LIE, MR. BALWANI," DO YOU?

03:28PM   7    A.   UM, IN THIS EMAIL I, I DID NOT SAY THAT, BUT I WAS

03:28PM   8    PROBABLY THINKING THAT.

03:28PM   9    Q.   BUT YOU DIDN'T SAY IT; RIGHT?

03:28PM  10    A.   I DID NOT SAY THAT IN THIS SHORT AND SWEET EMAIL, NO, I

03:29PM  11    DIDN'T.

03:29PM  12    Q.   OKAY.  AND LET'S GO UP THE CHAIN ONE MORE.

03:29PM  13         MR. BALWANI SAYS "ALAN.

03:29PM  14         "NO ONE FROM THIS COMPANY HAS EVER COMMITTED TO A SHORT

03:29PM  15    QUARTERLY CALL WITH YOU OR ANY OTHER INVESTOR SELECTIVELY.  I

03:29PM  16    WAS VERY EXPLICITLY DISCOURAGING YOU FROM INVESTING IN JANUARY

03:29PM  17    OF 2014."

03:29PM  18         DO YOU SEE THAT LANGUAGE?

03:29PM  19    A.   YES.  BUT I DON'T UNDERSTAND BECAUSE THE INVESTMENT WAS IN

03:29PM  20    DECEMBER OF 2013, AND HE DID NOT DISCOURAGE ME IN ANY WAY FROM

03:29PM  21    INVESTING IN 2013.

03:29PM  22    Q.   DO YOU SEE THAT LANGUAGE IN THE EMAIL?

03:29PM  23    A.   I DO SEE THE LANGUAGE.

03:29PM  24    Q.   AND THEN LET'S GO UP THE CHAIN TO YOUR RESPONSE.

03:29PM  25         DO YOU SEE YOUR RESPONSE?

EISENMAN RECROSS BY MS. WALSH                                    5519

03:29PM   1        A.   YES.

03:29PM   2        Q.   THERE'S NOTHING IN YOUR RESPONSE SAYING, "NO, SUNNY,

03:29PM   3    THAT'S NOT TRUE."  CORRECT?

03:29PM   4        A.   IF YOU WANT TO, IF YOU WANT TO SAY SPECIFICALLY, YES, IN A

03:29PM   5    SHORT EMAIL, EVEN THOUGH I FELT THAT THIS WAS NOT TRUE, I DID

03:29PM   6    NOT STATE IT IN THIS PARTICULAR EMAIL.

03:30PM   7        Q.   SO YOU DON'T SAY THAT IN THE EMAIL; RIGHT?

03:30PM   8        A.   I DO NOT SAY THAT IN THIS EMAIL.

03:30PM   9        Q.   OKAY.  SO IN THIS EMAIL CHAIN, MR. BALWANI SAYS TO YOU TWO

03:30PM  10    DIFFERENT TIMES THAT HE TOLD YOU THAT YOU SHOULDN'T INVEST, AND

03:30PM  11    HE WAS DISCOURAGING YOU FROM INVESTING; CORRECT?

03:30PM  12        A.   UH --

03:30PM  13        Q.   IN THIS EMAIL?

03:30PM  14        A.   IN THIS EMAIL.

03:30PM  15             BUT AS I JUST SAID, THE EMAILS ARE MISLEADING BECAUSE

03:30PM  16    THAT'S NOT WHAT HE -- THAT'S NOT THE WAY HE RESPONDED WHEN I

03:30PM  17    WAS INVESTING IN DECEMBER OF 2013.  HE WAS ENCOURAGING.

03:30PM  18             THESE TWO EMAILS CONTRADICT THE, THE INFORMATION AND THE

03:30PM  19    MANNER THAT INFORMATION WAS PRESENTED BEFORE WE INVESTED IN

03:30PM  20    THAT 2013 ROUND.

03:30PM  21        Q.   AND IN THIS EMAIL HE SAYS TWO DIFFERENT TIMES HE WAS

03:30PM  22    DISCOURAGING YOU FROM INVESTING; CORRECT?

03:30PM  23             YES OR NO?

03:30PM  24        A.   IF YOU WANT THE SPECIFIC ANSWER, HE IS DISCOURAGING ME IN

03:31PM  25    THIS EMAIL.

EISENMAN RECROSS BY MS. WALSH                                                      5520

03:31PM   1          BUT YOU HAVE TO TAKE IT WITH A GRAIN OF SALT.  THIS IS NOT

03:31PM   2     ACCURATE, AND IT'S NOT TRUTHFUL.

03:31PM   3     Q.   SO THE ANSWER TO MY QUESTION ABOUT WHETHER HE SAID HE

03:31PM   4     DISCOURAGED YOU TWICE IN THIS EMAIL IS, YES, THAT'S CORRECT?

03:31PM   5     A.   THE ANSWER THAT HE STATED THAT HE DISCOURAGED ME FROM

03:31PM   6     INVESTING AFTER I HAD INVESTED, YES, IT'S TRUE THAT HE SAID

03:31PM   7     THAT HE DISCOURAGED ME.

03:31PM   8          BUT THAT'S NOT TRUE.

03:31PM   9     Q.   SO IT'S IN THE EMAIL THAT HE SAID HE DISCOURAGED YOU TWO

03:31PM  10     DIFFERENT TIMES; IS THAT RIGHT?  YES OR NO?

03:31PM  11          IT'S A YES OR NO QUESTION, YOUR HONOR.

03:31PM  12               MR. BOSTIC:  OBJECTION.  ASKED AND ANSWERED.

03:31PM  13     ARGUMENTATIVE.

03:31PM  14               THE COURT:  WELL, CAN YOU ANSWER THE QUESTION YES OR

03:31PM  15     NO?

03:31PM  16               THE WITNESS:  YES, I CAN.

03:31PM  17               THE COURT:  YES OR NO.

03:31PM  18               THE WITNESS:  SO IS THE QUESTION, DID HE DISCOURAGE

03:31PM  19     ME FROM --

03:31PM  20               THE COURT:  EXCUSE ME, SIR.

03:31PM  21               THE WITNESS:  I'M SORRY.

03:31PM  22               THE COURT:  WOULD YOU ASK THE QUESTION ONE MORE

03:31PM  23     TIME?

03:31PM  24          I BELIEVE THIS IS GOING TO BE A YES OR NO QUESTION.

03:31PM  25               THE WITNESS:  OKAY.

EISENMAN RECROSS BY MS. WALSH                                                5521

03:31PM   1              THE COURT:  SO YOU CAN ASK THE QUESTION ONE MORE

03:31PM   2    TIME.

03:31PM   3              THE WITNESS:  OKAY.

03:31PM   4    BY MS. WALSH:

03:31PM   5    Q.   IN EXHIBIT 12999, THE EMAIL CHAIN THAT WE'RE LOOKING AT,

03:32PM   6    DID MR. BALWANI SAY IN THAT EMAIL CHAIN, ON TWO DIFFERENT

03:32PM   7    OCCASIONS, THAT HE DISCOURAGED YOU FROM INVESTING?

03:32PM   8    A.   YES, HE DID SAY THAT.

03:32PM   9    Q.   OKAY.  AND IN THAT SAME EMAIL CHAIN, YOU DO NOT SAY IN

03:32PM  10    RESPONSE TO EITHER OF THOSE STATEMENTS, "NO, SUNNY, THAT IS NOT

03:32PM  11    ACCURATE."

03:32PM  12         IS THAT RIGHT?

03:32PM  13    A.   THAT IS RIGHT.

03:32PM  14    Q.   MR. BOSTIC ALSO ASKED YOU ABOUT OFFERS FOR YOU TO SELL

03:32PM  15    YOUR THERANOS STOCK.

03:32PM  16         DO YOU REMEMBER THAT?

03:32PM  17    A.   YES.

03:32PM  18    Q.   OKAY.  AND YOUR TESTIMONY WAS THAT THE OFFERS NEVER CAME

03:32PM  19    TO FRUITION; RIGHT?

03:32PM  20    A.   THAT IS CORRECT.  NONE OF THE OFFERS WERE -- EITHER THEY

03:33PM  21    WEREN'T LEGITIMATE OR THEY NEVER CAME TO FRUITION.  NONE,

03:33PM  22    NONE -- I PURSUED EVERY OFFER THAT WAS MADE TO ME, AND I COULD

03:33PM  23    NOT GET TO THE FINISH LINE ON ANY OF THE OFFERS THAT WERE

03:33PM  24    PRESENTED.

03:33PM  25    Q.   OKAY.  YOU ARE A PERSISTENT SHAREHOLDER; IS THAT FAIR TO

EISENMAN RECROSS BY MS. WALSH                                    5522

03:33PM 1      SAY, MR. EISENMAN?

03:33PM 2      A.   THAT'S FAIR.

03:33PM 3      Q.   YOU FOLLOW UP ON EVERY QUESTION THAT YOU DO NOT GET

03:33PM 4      ANSWERED; IS THAT RIGHT?

03:33PM 5      A.   I ATTEMPT.

03:33PM 6      Q.   YOU TRY TO DO THAT; RIGHT?

03:33PM 7      A.   YES.

03:33PM 8      Q.   OKAY.  AND WHEN YOU DON'T GET AN ANSWER OR WHEN YOU DON'T

03:33PM 9      GET A RESPONSE FROM SOMEONE, YOU FOLLOW UP WITH AN EMAIL;

03:33PM 10     CORRECT?

03:33PM 11     A.   SOMETIMES.

03:33PM 12     Q.   YOU DO THAT MOST OF THE TIME, DON'T YOU?

03:33PM 13     A.   IT DEPENDS ON THE CIRCUMSTANCE.

03:33PM 14     Q.   WELL, YOU DID THAT HERE WITH THERANOS.  WE JUST WENT

03:33PM 15     THROUGH DOZENS OF EMAILS WHERE YOU'RE FOLLOWING UP FOR

03:33PM 16     INFORMATION OVER AND OVER AGAIN; RIGHT?

03:33PM 17     A.   THERANOS WAS A UNIQUE SITUATION.

03:33PM 18          I HAD SIGNIFICANTLY MORE INVESTED IN THIS THAN ANY OTHER

03:34PM 19     EARLY STAGE COMPANY, AND TYPICALLY WHERE THERE'S SMOKE, THERE'S

03:34PM 20     FIRE, AND THERE WAS A LOT OF SMOKE THROUGH THE YEARS.  THERE

03:34PM 21     WAS A LOT OF INFORMATION THAT REALLY WAS NOT MAKING SENSE.

03:34PM 22     Q.   SO LET'S TALK ABOUT THERANOS.

03:34PM 23          REGARDING THERANOS, YOU FOLLOWED UP EVERY TIME YOU DIDN'T

03:34PM 24     GET THE INFORMATION THAT YOU WERE LOOKING FOR; ISN'T THAT

03:34PM 25     RIGHT?

ER-4152

03:34PM  1    A.   I WOULD SAY THAT I FOLLOWED UP A LOT.  I DON'T KNOW IF IT

03:34PM  2    WAS EVERY SINGLE TIME.

03:34PM  3    Q.   QUITE A BIT; RIGHT?

03:34PM  4    A.   WITH SOME FREQUENCY.

03:34PM  5    Q.   WE JUST SAW A LOT OF EMAILS ABOUT THAT; RIGHT?

03:34PM  6    A.   THIS WAS OVER A, A 10, 11 YEAR PERIOD OF TIME.

03:34PM  7    Q.   SO WE JUST SAW A LOT OF EMAILS ABOUT THAT; CORRECT?

03:34PM  8    A.   RIGHT.  BUT IT WAS EMAILS OVER A 10 OR 11 YEAR PERIOD OF

03:34PM  9    TIME.

03:34PM 10    Q.   AND WHEN YOU DON'T GET A RESPONSE FROM SOMEONE AT

03:34PM 11    THERANOS, YOU FOLLOW UP TO GET AN ANSWER; RIGHT?

03:34PM 12    A.   I DO MY BEST.

03:34PM 13    Q.   OKAY.  AND WE DIDN'T SEE ANY EMAILS IN THE EMAILS THAT THE

03:34PM 14    GOVERNMENT SHOWED YOU OR I SHOWED YOU WHERE YOU SAY, "HEY, WHAT

03:34PM 15    ABOUT THAT OFFER FOR ME TO SELL MY SHARES?  I WANT OUT OF

03:35PM 16    THERANOS."

03:35PM 17        WE DIDN'T SEE AN EMAIL TO THAT EFFECT; RIGHT?

03:35PM 18    A.   I'M SORRY.  ARE YOU TALKING ABOUT THE GREATER THAN FIVE

03:35PM 19    TIMES OFFER, OR ARE YOU TALKING ABOUT THE CHRIS BOIES OFFER?

03:35PM 20    Q.   ANY OFFER AT ALL.

03:35PM 21    A.   I FOLLOWED UP WITH ANY OFFER AS AGGRESSIVELY AS I COULD,

03:35PM 22    AND THEY WENT AWAY.  THEY WERE FICTION.

03:35PM 23    Q.   AND WE DON'T SEE ANY EMAILS REFLECTING THAT, DO WE,

03:35PM 24    MR. EISENMAN?

03:35PM 25    A.   I DON'T KNOW.  I COULD GO THROUGH MY INFORMATION.  I DON'T

EISENMAN RECROSS BY MS. WALSH                                    5524

03:35PM  1      HAVE IT AT MY FINGERTIPS.

03:35PM  2          BUT IF YOU FOLLOW THE EMAIL CHAIN, I FOLLOWED UP AS

03:35PM  3      AGGRESSIVELY AS I COULD TO BRING ANY OF THOSE OFFERS TO THE

03:35PM  4      FINISH LINE, AND IN THE FIRST OFFER THERANOS TOTALLY DROPPED

03:35PM  5      THE BALL AND THEY REFUSED TO COMMUNICATE WITH ME.

03:35PM  6          THE SECOND OFFER, THE SAME THING HAPPENED.  THEY DROPPED

03:35PM  7      THE BALL AND THEY REFUSED TO COMMUNICATE WITH ME.

03:35PM  8      Q.   BUT WE HAVEN'T SEEN A SINGLE EMAIL TODAY WHERE YOU SAY, "I

03:35PM  9      WANT TO SELL MY SHARES.  MAKE IT HAPPEN."  YOU DON'T SAY

03:35PM  10     ANYTHING OR WORDS TO THAT EFFECT, DO YOU?

03:35PM  11     A.   WE WEREN'T IN THAT PART OF THE DEAL.

03:36PM  12         WE WERE IN THE PART OF THE DEAL WHERE I WAS MADE AN OFFER

03:36PM  13     AND I WAS TRYING TO PURSUE THAT.  THEY NEVER MADE A FIRM OFFER.

03:36PM  14     NONE OF THOSE OFFERS WERE FIRM.  THEY WERE JUST COMMUNICATION

03:36PM  15     TO ME ABOUT WE'RE TRYING.  IT WAS NEVER A FIRM OFFER.  THERE

03:36PM  16     WAS NOTHING THAT WAS FIRM OR ESTABLISHED.

03:36PM  17     Q.   AND WE DON'T SEE ANY EMAILS FROM YOU SAYING, "HEY, WHERE

03:36PM  18     IS MY FIRM OFFER," DO WE?

03:36PM  19     A.   I THINK IF YOU SEE MY EMAILS, I PURSUED THEM AS

03:36PM  20     AGGRESSIVELY AS I COULD.

03:36PM  21         WHAT HAPPENED TO THE FIRST OFFER?  WHERE IS IT?  WHEN ARE

03:36PM  22     YOU GOING TO COMMUNICATE?

03:36PM  23         IT WAS SUPPOSED TO BE BY THE END OF THE SUMMER.  THEN IT

03:36PM  24     WAS SUPPOSED TO BE BY THE END OF THE YEAR.

03:36PM  25         YES, I DID FOLLOW UP.

EISENMAN RECROSS BY MS. WALSH                    5525

03:36PM   1           AND THEN ON THE SECOND OFFER, I HAVE A WHOLE CHAIN OF

03:36PM   2    COMMUNICATION WITH CHRIS BOIES AND HE WENT SILENT FOR A PERIOD

03:36PM   3    OF MONTHS AFTER HE BROUGHT THAT OFFER TO ME.

03:36PM   4    Q.   AND WHEN HE WENT SILENT, YOU DIDN'T SEND ANY EMAILS TO

03:36PM   5    FOLLOW UP AS TO, WHERE IS MY FIRM OFFER, DID YOU?

03:36PM   6    A.   I DON'T KNOW IF THEY WERE EMAILS OR CALLS, BUT I FOLLOWED

03:37PM   7    UP AGGRESSIVELY WITH CHRIS BOIES.

03:37PM   8    Q.   AND THE ONLY EMAIL THAT WE HAVE SEEN TODAY REGARDING AN

03:37PM   9    OFFER FOR YOU TO SELL YOUR SHARES IS YOU TELLING

03:37PM  10    ELIZABETH HOLMES THAT YOU HAVEN'T DECIDED WHETHER YOU WANT TO

03:37PM  11    SELL YOUR SHARES?

03:37PM  12    A.   THAT'S NOT TRUE.

03:37PM  13    Q.   WELL, WE SAW THAT EMAIL; RIGHT?

03:37PM  14    A.   NO.  SHOW ME THE EMAIL.

03:37PM  15           THERE WAS A PERIOD WHEN --

03:37PM  16    Q.   THERE'S NO QUESTION PENDING.

03:37PM  17    A.   OKAY.

03:37PM  18    Q.   TURN TO EXHIBIT, I THINK THIS IS IN EVIDENCE, 14224.

03:37PM  19           MS. ROBINSON, CAN YOU JUST CONFIRM?

03:37PM  20                THE CLERK:  CAN YOU REPEAT THAT?

03:37PM  21                MS. WALSH:  I'M SORRY.  14224.

03:37PM  22                THE CLERK:  YES, THAT IS IN EVIDENCE.

03:37PM  23                MS. WALSH:  OKAY.  WE CAN BRING THAT UP?

03:37PM  24                THE COURT:  YES.

03:37PM  25    BY MS. WALSH:

EISENMAN RECROSS BY MS. WALSH                                          5526

03:37PM  1    Q.   THIS IS AN EMAIL, ISN'T IT, MR. EISENMAN?

03:37PM  2    A.   YES.

03:37PM  3    Q.   AND IT'S FROM YOU TO ELIZABETH HOLMES; CORRECT?

03:38PM  4    A.   CORRECT.

03:38PM  5    Q.   AND IT'S ON JULY 1ST, 2010; RIGHT?

03:38PM  6    A.   CORRECT.

03:38PM  7    Q.   AND YOU SAY "ELIZABETH,

03:38PM  8         "I HAVEN'T MADE A DECISION WHETHER TO SELL STOCK."

03:38PM  9         RIGHT?

03:38PM  10   A.   CAN I EXPLAIN THAT?

03:38PM  11   Q.   JUST DO THE WORDS ON THIS EMAIL SAY "I HAVEN'T MADE A

03:38PM  12   DECISION WHETHER TO SELL STOCK"?

03:38PM  13        YES OR NO?

03:38PM  14   A.   THAT IS WHAT THE WORDS SAY.

03:38PM  15        BUT IT'S NUANCED AND I'D LIKE AN OPPORTUNITY TO EXPLAIN

03:38PM  16   THAT IF POSSIBLE.

03:38PM  17   Q.   OKAY.  WELL, MR. BOSTIC WILL HAVE AN OPPORTUNITY TO ASK

03:38PM  18   YOU THOSE QUESTIONS.

03:38PM  19        I JUST WANTED TO KNOW AND TO CONFIRM THAT THAT WAS AN

03:38PM  20   EMAIL FROM YOU TELLING ELIZABETH HOLMES THAT YOU HADN'T DECIDED

03:38PM  21   WHETHER TO SELL YOUR STOCK.

03:38PM  22        THAT'S THE CASE; RIGHT?

03:38PM  23   A.   IF YOU LOOK AT THE WORDS ON THE PAGE, YES, THOSE ARE THE

03:38PM  24   WORDS ON THE PAGE.

03:38PM  25        BUT SOMETIMES THEY NEED A LITTLE ADDITIONAL EXPLANATION.

03:38PM  1    Q.   SO THE WORDS ON THE PAGE SAY "I HAVEN'T MADE A DECISION

03:38PM  2    WHETHER TO SELL STOCK"; CORRECT?

03:38PM  3    A.   YES, THAT'S WHAT THE WORDS ON THE PAGE SAY.

03:38PM  4    Q.   OKAY.

03:38PM  5         I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

03:38PM  6              THE COURT:   RECROSS?

03:38PM  7              MR. BOSTIC:   VERY BRIEFLY, YOUR HONOR.

03:39PM  8              **FURTHER REDIRECT EXAMINATION**

03:39PM  9    BY MR. BOSTIC:

03:39PM  10   Q.   MR. EISENMAN, MS. WALSH WAS JUST ASKING YOU ABOUT AN EMAIL

03:39PM  11   WHERE YOU SAID THAT YOU HADN'T MADE A DECISION WHETHER TO SELL

03:39PM  12   STOCK.

03:39PM  13   A.   CORRECT.

03:39PM  14   Q.   I JUST WANTED TO GIVE YOU AN OPPORTUNITY TO EXPLAIN THAT

03:39PM  15   SENTENCE THAT YOU SAID THERE WAS MORE TO THAT SITUATION.

03:39PM  16        TELL US WHAT THAT WAS.

03:39PM  17   A.   THEY HAD MADE AN OFFER TO BUY OUR STOCK POTENTIALLY AT

03:39PM  18   GREATER THAN FIVE TIMES OUR ORIGINAL INVESTMENT, AND IT WAS

03:39PM  19   PENDING APPROVALS, WHATEVER THAT MEANT.   THEY DIDN'T EXPLAIN

03:39PM  20   WHAT THAT MEANT.

03:39PM  21        THAT OFFER WAS SUPPOSED TO COME BEFORE THE SUMMER, AND

03:39PM  22   THEN THAT OFFER WAS EXTENDED AND WE'RE STILL WORKING ON IT AND

03:39PM  23   MAYBE IT WILL COME BY THE END OF THE YEAR AND MAYBE IT WILL GO

03:39PM  24   AWAY.

03:39PM  25        BUT IN THE MEANTIME, LIKE ANY REASONABLE INVESTOR, I HAD

03:39PM 1   REQUESTED WHATEVER FINANCIAL INFORMATION THAT THEY COULD SHARE

03:39PM 2   BECAUSE THIS WAS BY FAR THE LARGEST INVESTMENT IN MY PORTFOLIO

03:39PM 3   AND ONE OF THE MOST POTENTIAL SUCCESSFUL INVESTMENTS THAT I

03:39PM 4   COULD EVER MAKE IN MY LIFE.

03:39PM 5       AND BEFORE I ACCEPT AN OFFER FROM THE COMPANY, IT WOULD

03:40PM 6   ONLY BE FAIR TO SHARE SOME FINANCIAL INFORMATION TO KNOW IF

03:40PM 7   THIS WAS A REASONABLE TRANSACTION.

03:40PM 8       AND ONE OF THE WAYS THAT, IF THERE WAS SOME CONFIDENTIAL

03:40PM 9   INFORMATION, I COULD HAVE SIGNED A NONDISCLOSURE AGREEMENT,

03:40PM 10   WHICH MEANS THAT I WAS FORBIDDEN TO DISCUSS ANY OF THE DETAILS

03:40PM 11   OF THIS WITH ANYONE.

03:40PM 12       THERE WAS, THERE WAS A CHANCE I MIGHT HAVE TAKEN THAT

03:40PM 13   OFFER ANYWAY BECAUSE I WAS SO FRUSTRATED WITH THE COMPANY THAT

03:40PM 14   I WAS REQUESTING MORE FINANCIAL INFORMATION TO MAKE AN

03:40PM 15   INTELLIGENT DECISION.

03:40PM 16       BUT THE POINT IS MOOT BECAUSE THAT OFFER NEVER CAME TO

03:40PM 17   FRUITION.  I PURSUED THAT OFFER, AND THEY JUST, THEY JUST

03:40PM 18   REFUSED TO COMMUNICATE.

03:40PM 19   Q.   MS. WALSH ALSO ASKED YOU ABOUT YOUR EFFORTS TO FOLLOW UP

03:40PM 20   ON OFFERS TO SELL YOUR SHARES.

03:40PM 21       DO YOU RECALL THAT?

03:40PM 22   A.   YES.

03:40PM 23   Q.   AND SHE ASKED YOU ABOUT THE EMAILS THAT WE HAD SEEN IN

03:40PM 24   COURT TODAY.

03:40PM 25       DO YOU RECALL THAT QUESTION?

03:40PM  1    A.   YES.

03:40PM  2    Q.   DID THE EMAILS THAT WERE INTRODUCED INTO EVIDENCE TODAY IN

03:41PM  3    COURT INCLUDE ALL OF THE COMMUNICATIONS YOU HAD WITH THERANOS

03:41PM  4    OR OTHERS ABOUT SELLING YOUR STOCK?

03:41PM  5    A.   PROBABLY NOT.

03:41PM  6              MR. BOSTIC:  NO FURTHER QUESTIONS.  THANK YOU.

03:41PM  7              THE COURT:  MS. WALSH.

03:41PM  8         (PAUSE IN PROCEEDINGS.)

03:41PM  9              MS. WALSH:  NOTHING FURTHER, YOUR HONOR.

03:41PM  10             THE COURT:  MAY THIS WITNESS BE EXCUSED?

03:41PM  11             MR. BOSTIC:  YES, YOUR HONOR.

03:41PM  12             MS. WALSH:  YES, YOUR HONOR.

03:41PM  13             THE COURT:  YOU MAY BE EXCUSED.

03:41PM  14        WE HAVE SOME TIME LEFT IN OUR DAY.  DO YOU HAVE A WITNESS

03:41PM  15    HERE WE COULD START?

03:41PM  16             MR. LEACH:  WE DO, YOUR HONOR.

03:41PM  17             THE COURT:  GREAT.

03:41PM  18             MR. LEACH:  THE GOVERNMENT CALLS LYNETTE SAWYER.

03:41PM  19             THE COURT:  PLEASE FEEL FREE TO STAND AND STRETCH.

03:41PM  20        LET ME ASK THE JURY COLLECTIVELY ALSO, MY SENSE IS THAT

03:41PM  21    THIS WITNESS MIGHT BE BRIEF.  I DON'T THINK WE'LL COMPLETE THIS

03:42PM  22    WITNESS BY 4:00 O'CLOCK.

03:42PM  23        IS THAT LIKELY?

03:42PM  24             MR. LEACH:  YOUR HONOR, I THINK I CAN COMPLETE THE

03:42PM  25    DIRECT EXAMINATION BY 4:00 O'CLOCK, BUT I'M ASSUMING THERE IS

5563

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,           )
                                    )   CR-18-00258-EJD
              PLAINTIFF,            )
                                    )   SAN JOSE, CALIFORNIA
         VS.                        )
                                    )   MAY 13, 2022
RAMESH "SUNNY" BALWANI,             )
                                    )   VOLUME 29
              DEFENDANT.            )
_____    )   PAGES 5563 - 5837


                TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE EDWARD J. DAVILA
                UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:   JOHN C. BOSTIC
                             JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:   ROBERT S. LEACH
                             KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:
                       IRENE L. RODRIGUEZ, CSR, RMR, CRR
                       CERTIFICATE NUMBER 8074


        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

ER-4160

SAWYER RECROSS BY MS. WALSH                                        5587

09:30AM  1       TO; IS THAT RIGHT?

09:30AM  2       A.   YES.

09:30AM  3                 MS. WALSH:  I HAVE NOTHING FURTHER, YOUR HONOR.

09:30AM  4                 THE COURT:  MR. LEACH?

09:30AM  5                 MR. LEACH:  NOTHING FURTHER.

09:30AM  6                 THE COURT:  MAY THIS WITNESS BE EXCUSED?

09:30AM  7                 MR. LEACH:  SHE MAY, YES.

09:30AM  8                 MS. WALSH:  YES.

09:30AM  9                 THE COURT:  YOU'RE EXCUSED.

09:30AM 10                 THE WITNESS:  THANK YOU.

09:30AM 11                 THE COURT:  YOU'RE WELCOME.

09:31AM 12          DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL?

09:31AM 13                 MR. BOSTIC:  YES, YOUR HONOR.

09:31AM 14          THE UNITED STATES CALLS CHRIS LUCAS.

09:31AM 15          (PAUSE IN PROCEEDINGS.)

09:31AM 16                 THE COURT:  GOOD MORNING, SIR.

09:31AM 17                 THE WITNESS:  YES.

09:31AM 18                 THE COURT:  IF YOU WOULD COME OVER TO THE SIDE AND

09:32AM 19       FACE OUR COURTROOM DEPUTY, AND RAISE YOUR RIGHT HAND, SHE HAS A

09:32AM 20       QUESTION FOR YOU.

09:32AM 21                 THE WITNESS:  I'LL TAKE THE QUESTION.

09:32AM 22          **(GOVERNMENT'S WITNESS, CHRISTOPHER LUCAS, WAS SWORN.)**

09:32AM 23                 THE WITNESS:  I DO.

09:32AM 24                 THE COURT:  PLEASE HAVE A SEAT UP HERE, SIR, AND

09:32AM 25       MAKE YOURSELF COMFORTABLE.

09:32AM  1                    THE WITNESS:  THANK YOU.

09:32AM  2                    THE COURT:  YOU'RE WELCOME.

09:32AM  3                    THE WITNESS:  GOOD MORNING, JUDGE.

09:32AM  4              THE COURT:  FEEL FREE TO ADJUST THAT CHAIR AND

09:32AM  5     MICROPHONE AS YOU NEED.  THERE'S SOME WATER THERE SHOULD YOU

09:32AM  6     WISH TO PARTAKE.

09:32AM  7                    THE WITNESS:  OKAY.

09:32AM  8              THE COURT:  AND WHEN YOU ARE COMFORTABLE, WOULD YOU

09:32AM  9     PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE.

09:32AM 10              THE WITNESS:  SURE.  MY NAME IS CHRISTOPHER LUCAS.

09:32AM 11     C-H-R-I-S-T-O-P-H-E-R, LUCAS, L-U-C-A-S.

09:32AM 12                    THE COURT:  THANK YOU.  COUNSEL.

09:32AM 13                    MR. BOSTIC:  THANK YOU.

09:32AM 14                         **DIRECT EXAMINATION**

09:32AM 15     BY MR. BOSTIC:

09:32AM 16     Q.   GOOD MORNING, MR. LUCAS.

09:32AM 17     A.   GOOD MORNING.

09:32AM 18     Q.   MR. LUCAS, IF YOU'RE FULLY VACCINATED, I UNDERSTAND THE

09:32AM 19     COURT WILL ALLOW YOU TO TESTIFY WITHOUT A MASK IF YOU'RE

09:32AM 20     COMFORTABLE DOING SO.

09:32AM 21     A.   I AM COMFORTABLE.  THANK YOU.

09:33AM 22     Q.   MR. LUCAS, WERE YOU AN INVESTOR IN A COMPANY CALLED

09:33AM 23     THERANOS?

09:33AM 24     A.   YES, WE WERE.

09:33AM 25     Q.   I WANT TO ASK YOU SOME QUESTIONS ABOUT THAT THIS MORNING,

09:33AM  1    BUT FIRST LET ME ASK YOU A FEW QUESTIONS ABOUT YOUR BACKGROUND.

09:33AM  2    A.   SURE.

09:33AM  3    Q.   CAN WE START WITH YOUR EDUCATION.  CAN YOU SUMMARIZE YOUR

09:33AM  4    EDUCATION FOR US?

09:33AM  5    A.   I HAVE A BACHELOR'S IN ENGINEERING FROM UCLA AND AN MBA

09:33AM  6    FROM U.S.C.

09:33AM  7    Q.   AND CAN YOU GIVE US A SUMMARY OF YOUR EMPLOYMENT HISTORY

09:33AM  8    AFTER YOU OBTAINED THOSE DEGREES?

09:33AM  9    A.   YES.  GENERALLY I WORKED AT TECHNOLOGY STARTUPS AS A CFO

09:33AM  10   AND IN SOME CASES SALES POSITIONS.

09:33AM  11       AND THEN LATER AFTERWARDS -- AND I'VE BEEN AROUND VENTURE

09:33AM  12   CAPITAL, DUE TO SOME MEMBERS OF MY FAMILY, FOR MOST OF MY LIFE.

09:33AM  13   AND SO STARTING IN THE LATE '90S, I STARTED A VENTURE FIRM.

09:34AM  14   Q.   IS THAT YOUR CURRENT OCCUPATION, WORKING IN VENTURE

09:34AM  15   CAPITAL?

09:34AM  16   A.   CORRECT.

09:34AM  17   Q.   LET ME ASK YOU FIRST, THE TECHNOLOGY STARTUPS YOU WORKED

09:34AM  18   WITH BEFORE, WERE ANY IN THE BIOTECH FIELD?

09:34AM  19   A.   NO.

09:34AM  20   Q.   LET'S TALK ABOUT YOUR CURRENT PROFESSION THEN.

09:34AM  21       WHERE ARE YOU CURRENTLY EMPLOYED?

09:34AM  22   A.   OUR FIRM IS BLACK DIAMOND VENTURES.

09:34AM  23   Q.   AND WHAT DOES BLACK DIAMOND VENTURES DO?

09:34AM  24   A.   AS I SAID, I'M IN THE VENTURE BUSINESS, AND WE INVEST IN

09:34AM  25   TECHNOLOGY COMPANIES.

ER-4163

09:34AM  1    Q.   AND WHAT IS YOUR POSITION AT BLACK DIAMOND VENTURES?

09:34AM  2    A.   I'M MANAGING DIRECTOR.

09:34AM  3    Q.   AND IN PLAIN LANGUAGE, WHAT DOES THAT TITLE MEAN?

09:34AM  4    A.   I STARTED THE FIRM BACK IN THE LATE '90S, AND I'M A SENIOR

09:34AM  5    PERSON IN THE FIRM.

09:34AM  6    Q.   AND IN THAT ROLE, HAVE YOU WORKED ON A NUMBER OF

09:34AM  7    INVESTMENTS IN COMPANIES AS PART OF BLACK DIAMOND VENTURES?

09:34AM  8    A.   YES.

09:34AM  9    Q.   I'D LIKE TO TALK TO YOU A BIT ABOUT HOW YOU APPROACH

09:35AM  10   EVALUATING A POTENTIAL INVESTMENT.

09:35AM  11        FIRST OF ALL, ARE THERE STANDARD STEPS THAT BLACK DIAMOND

09:35AM  12   TAKES IN THE PROCESS OF LOOKING AT A COMPANY THAT IT MIGHT

09:35AM  13   INVEST IN?

09:35AM  14   A.   WELL, I THINK ALL VENTURE FIRMS TYPICALLY FOLLOW THE SAME.

09:35AM  15   WE, IN PARTICULAR, GENERALLY INVEST IN COMPANIES THAT HAVE BEEN

09:35AM  16   REFERRED TO US BY OTHERS THAT WE KNOW.

09:35AM  17        AND ONCE WE'VE BEEN INTRODUCED TO THE COMPANY, THEN WE DO

09:35AM  18   OUR DUE DILIGENCE, WHICH INCLUDES MARKET ANALYSIS, THE

09:35AM  19   COMPANY'S TECHNOLOGY, THE PERSONNEL, AND WHAT THEY'RE TRYING TO

09:35AM  20   ACCOMPLISH.

09:35AM  21        SO IT'S QUITE STANDARD FOR FIRMS LIKE US.

09:35AM  22   Q.   AND IN DOING THAT RESEARCH, GATHERING THAT INFORMATION,

09:35AM  23   WHAT ARE YOUR SOURCES OF INFORMATION ABOUT THE COMPANY?

09:36AM  24   A.   SO WE WOULD HAVE ANALYSTS OR OURSELVES LOOK AT ANY

09:36AM  25   AVAILABLE MATERIAL, TALK TO ANY OF OUR FRIENDS OR PROFESSIONALS

LUCAS DIRECT BY MR. BOSTIC                                                    5591

09:36AM  1     THAT WOULD HAVE SOME EXPERTISE IN THAT PARTICULAR AREA.

09:36AM  2     Q.   DOES THAT PROCESS TYPICALLY INVOLVE GETTING INFORMATION

09:36AM  3     FROM THE COMPANY ITSELF?

09:36AM  4     A.   AND, OF COURSE, FROM THE COMPANY.  THEY WOULD TYPICALLY

09:36AM  5     PUT TOGETHER WHAT IS CALLED THE DATA ROOM WHERE THEY'D HAVE ALL

09:36AM  6     OF THE FINANCIAL INFORMATION, ANY OF THE PATENT INFORMATION AND

09:36AM  7     SO FORTH, THERE THAT WE COULD THEN REVIEW.

09:36AM  8     Q.   AND WHEN YOU'RE LOOKING AT A COMPANY AND CONSIDERING

09:36AM  9     WHETHER TO INVEST, DO YOU CATEGORIZE THOSE INVESTMENTS BASED ON

09:36AM  10    HOW MATURE THE COMPANY IS, HOW LONG IT'S BEEN AROUND AND THINGS

09:36AM  11    LIKE THAT?

09:36AM  12    A.   YES.  TYPICALLY THOSE WHO HAVE JUST STARTED OBVIOUSLY ARE

09:36AM  13    THE MOST RISKY AND POTENTIALLY, BECAUSE OF THE VALUATION, HAVE

09:37AM  14    A LOWER VALUATION, AND YOU WOULD HOPE TO THEN MAKE A HIGHER

09:37AM  15    MULTIPLE ON WHAT YOU'VE INVESTED AT THAT TIME.

09:37AM  16         AND WE TYPICALLY INVEST FROM THAT STAGE ALL OF THE WAY UP

09:37AM  17    TO MORE MATURE COMPANIES WHERE MAYBE YOU'RE MORE -- WHERE IT'S

09:37AM  18    MORE CLEAR THAT YOU WILL MAKE A RETURN, BUT IT WOULD BE A LESS

09:37AM  19    RETURN BECAUSE THE RISK PROFILE WOULD HAVE GONE DOWN BY THEN.

09:37AM  20    Q.   ON THE TOPIC OF RISK, AS SOMEONE EXPERIENCED IN MAKING

09:37AM  21    THESE KINDS OF INVESTMENTS, IS THERE RISK INHERENT IN EVERY

09:37AM  22    INVESTMENT OF THIS TYPE?

09:37AM  23    A.   YES.

09:37AM  24    Q.   OVER THE COURSE OF YOUR CAREER, HAS EVERY ONE OF YOUR

09:37AM  25    INVESTMENTS TURNED OUT TO RETURN A PROFIT?

09:37AM  1    A.   I'D LIKE TO SAY THAT, BUT I CAN'T.  IT IS RISK.

09:38AM  2         THE TYPICAL VC PROFILE IS MAYBE A FEW INVESTING IN TEN

09:38AM  3    COMPANIES, MAYBE ONE OR TWO IS A BIG HOME RUN, AND SOME ARE

09:38AM  4    OKAY, AND THREE OR FOUR YOU TAKE A ZERO.

09:38AM  5    Q.   SO LET ME ASK YOU SOME QUESTIONS ABOUT THERANOS THEN.

09:38AM  6         HOW DID YOU FIRST BECOME AWARE OF THE COMPANY, THERANOS?

09:38AM  7    A.   I WAS INTRODUCED BY MY UNCLE, DON LUCAS, WHO HAD BEEN

09:38AM  8    INTRODUCED TO ELIZABETH HOLMES BACK IN I THINK AROUND 2004,

09:38AM  9    2005.  SOMETHING LIKE THAT.

09:38AM  10        AND HE WAS VERY IMPRESSED WITH HER AND WHAT SHE WAS TRYING

09:38AM  11   TO DO.  AND THEN I MET HER BECAUSE OF HIM.

09:38AM  12   Q.   AND DID YOUR UNCLE, DON LUCAS, END UP HAVING A ROLE OR A

09:38AM  13   JOB IN CONNECTION WITH THERANOS?

09:38AM  14   A.   HE DID INVEST IN THE COMPANY, PERSONALLY JOINED THE BOARD,

09:39AM  15   AND FOR A WHILE HE WAS CHAIRMAN.

09:39AM  16   Q.   DID THERE COME A TIME WHEN HE STEPPED BACK FROM HIS

09:39AM  17   INVOLVEMENT WITH THERANOS AND WAS NO LONGER ON THE BOARD?

09:39AM  18   A.   HE DID, AND THAT WAS THE FIRST PART OF 2013.

09:39AM  19   Q.   WHEN YOU FIRST BECAME AWARE OF THERANOS, DID THERE COME A

09:39AM  20   TIME WHEN YOU CONSIDERED INVESTING IN THERANOS YOURSELF?

09:39AM  21   A.   YES.

09:39AM  22   Q.   AND DID YOU END UP INVESTING IN THE COMPANY?

09:39AM  23   A.   WE DID.

09:39AM  24   Q.   AND WHAT WAS THE APPROXIMATE TIME OF YOUR FIRST INVESTMENT

09:39AM  25   IN THERANOS?

ER-4166

09:39AM 1      A.    2006.

09:39AM 2      Q.    AND DO YOU REMEMBER THE APPROXIMATE AMOUNT OF THAT FIRST

09:39AM 3      INVESTMENT?

09:39AM 4      A.    THE FIRST INVESTMENT WAS ABOUT 400,000.

09:39AM 5      Q.    AND WHAT WAS THE SOURCE OF THAT MONEY?  IS THESE -- ARE

09:39AM 6      THESE PERSONAL FUNDS THAT WE'RE TALKING ABOUT THAT BDT IS

09:39AM 7      INVESTING?

09:39AM 8      A.    WE HAVE INDIVIDUAL INVESTORS AND THAT NET COMPRISE THE

09:40AM 9      MAJORITY OF THE FUNDS.  AND THEN IN EVERY DEAL WE DO, I INVEST

09:40AM 10     ALSO PERSONALLY.

09:40AM 11     Q.    AROUND THE TIME OF THAT FIRST INVESTMENT IN 2006, DID YOU

09:40AM 12     HAVE ANY CONVERSATIONS WITH MS. HOLMES ABOUT THE COMPANY?

09:40AM 13     A.    YES.

09:40AM 14     Q.    GENERALLY, WHAT WAS THE PURPOSE OF THOSE CONVERSATIONS

09:40AM 15     WITH MS. HOLMES AROUND THE TIME OF YOUR FIRST INVESTMENT?

09:40AM 16     A.    GENERALLY, TO UNDERSTAND WHAT SHE WAS TRYING TO ACCOMPLISH

09:40AM 17     AND CLEARLY GET TO KNOW ELIZABETH AS WELL.

09:40AM 18     Q.    LEADING UP TO THAT 2006 INVESTMENT, DID YOU HAVE A CHANCE

09:40AM 19     TO REVIEW ANY WRITTEN MATERIALS ABOUT THERANOS?

09:40AM 20     A.    YES.  I THINK THERE WAS A RUDIMENTARY BUSINESS PLAN AT THE

09:40AM 21     TIME AND WHICH DESCRIBED THE TECHNOLOGY AND WHAT THEY WERE

09:40AM 22     TRYING TO ACCOMPLISH.

09:40AM 23     Q.    AND SO AT THAT TIME, FROM THE BUSINESS PLAN THAT YOU WERE

09:40AM 24     GIVEN AND FROM YOUR CONVERSATIONS WITH MS. HOLMES, WHAT DID YOU

09:41AM 25     UNDERSTAND THE COMPANY'S TECHNOLOGY TO BE?

LUCAS DIRECT BY MR. BOSTIC                                5594

09:41AM  1    A.   IT WAS WITH A -- SHE HAD ALWAYS TALKED ABOUT HER FEAR OF

09:41AM  2    NEEDLES AND HAVING HER BLOOD DRAWN, AND THAT THAT'S A PROBLEM

09:41AM  3    FOR MANY PEOPLE, WHICH IT IS, AND THAT WITH A SMALL AMOUNT OF

09:41AM  4    BLOOD, WITH A PINPRICK OF BLOOD, HER GOAL AND MISSION WAS TO

09:41AM  5    THEN BE ABLE TO RUN GENERALLY ANY BLOOD TEST ON HER TECHNOLOGY.

09:41AM  6    Q.   AND YOU JUST USED THE WORDS "GOAL" AND "MISSION," AND THAT

09:41AM  7    LEADS TO MY NEXT QUESTION, WHICH IS WHAT DID YOU UNDERSTAND TO

09:41AM  8    BE THE STATE OF THE TECHNOLOGY BACK THEN IN 2006?  HOW FAR

09:41AM  9    ALONG WAS IT?

09:41AM 10    A.   MAYBE -- CERTAINLY WELL AT THE EARLY STAGE.  AND AT THAT

09:41AM 11    TIME, FRANKLY, WE DIDN'T KNOW IF IT WOULD EVER FULLY WORK OR

09:42AM 12    NOT BECAUSE IT WAS SO EARLY.

09:42AM 13         BUT IT SOUNDED SO PROMISING AND WHERE WE COULD GO WITH THE

09:42AM 14    TECHNOLOGY, THAT WE MADE THE DECISION TO INVEST.

09:42AM 15    Q.   CAN YOU TELL US ABOUT WHAT THOSE FACTS DO TO YOUR

09:42AM 16    ASSESSMENT OF THE RISK OF THE INVESTMENT?  WE'RE TALKING ABOUT

09:42AM 17    THE FACT THAT THE TECHNOLOGY IS IN THE EARLY STAGE, YOU'RE NOT

09:42AM 18    SURE WHETHER IT'S GOING TO WORK.

09:42AM 19         HOW DOES THAT CAUSE YOU TO WEIGH THE RISK OF THIS

09:42AM 20    INVESTMENT?

09:42AM 21    A.   A VERY HIGH RISK.

09:42AM 22    Q.   WAS THE 2006 INVESTMENT THE ONLY TIME THAT

09:42AM 23    BLACK DIAMOND VENTURES INVESTED IN THERANOS?

09:42AM 24    A.   WE INVESTED TWO TIMES ACTUALLY IN 2006, ONE EARLY IN THE

09:42AM 25    YEAR AND THEN ONE LATER IN THE YEAR.

ER-4168

09:42AM  1          AND THEN WE INVESTED AGAIN IN 2013, THE END OF 2013.

09:42AM  2     Q.   AND DO YOU RECALL THE APPROXIMATE AMOUNT OF THAT 2013

09:42AM  3     INVESTMENT?

09:42AM  4     A.   ABOUT 5.4 MILLION.

09:43AM  5     Q.   SO I'D LIKE TO ASK YOU ABOUT INFORMATION THAT YOU HAD

09:43AM  6     LEARNED FROM THERANOS BETWEEN THOSE TWO INVESTMENTS, BETWEEN

09:43AM  7     2006 AND 2013.

09:43AM  8          FIRST OF ALL, AFTER YOUR 2006 INVESTMENT IN THERANOS, DID

09:43AM  9     YOU RECEIVE MORE INFORMATION ABOUT THE COMPANY OVER THE YEARS?

09:43AM 10     A.   YES.

09:43AM 11     Q.   AND HOW DID YOU GET THAT INFORMATION?

09:43AM 12     A.   GENERALLY FROM -- DIRECTLY FROM ELIZABETH.

09:43AM 13     Q.   WERE THERE OTHER SOURCES THAT YOU HAD FOR INFORMATION

09:43AM 14     BETWEEN 2006 AND 2013?

09:43AM 15     A.   IF I TALKED TO ANY OF THE FOLKS AT THE COMPANY, IT WOULD

09:43AM 16     HAVE BEEN FROM THEM.

09:43AM 17          BUT IN TERMS OF ANY WRITTEN MATERIAL -- ACTUALLY, I

09:43AM 18     SHOULD -- YES, THERE WAS A FINANCIAL PERSON AT THE COMPANY BACK

09:43AM 19     THEN THAT I WORKED WITH AS WELL, BUT PRIMARILY MOST OF THE

09:44AM 20     INFORMATION CAME DIRECTLY FROM ELIZABETH.

09:44AM 21     Q.   AND HOW FREQUENTLY WERE YOU IN TOUCH WITH MS. HOLMES

09:44AM 22     DURING THAT TIME PERIOD, IF YOU CAN ESTIMATE?

09:44AM 23     A.    IN PERSON, MAYBE A HALF A DOZEN TO A DOZEN TIMES A YEAR,

09:44AM 24     AND ON THE PHONE, MAYBE MORE FREQUENTLY.  BUT SOMETHING LIKE

09:44AM 25     THAT.

LUCAS DIRECT BY MR. BOSTIC                                    5596

09:44AM   1    Q.   AND DURING THOSE CONVERSATIONS, DID MS. HOLMES GIVE YOU

09:44AM   2    INFORMATION ABOUT THE COMPANY'S TECHNOLOGY?

09:44AM   3    A.   YES.

09:44AM   4    Q.   AND DURING THOSE CONVERSATIONS, DID MS. HOLMES GIVE YOU

09:44AM   5    UPDATES ABOUT THE COMPANY'S BUSINESS ACTIVITY?

09:44AM   6    A.   YES.

09:44AM   7    Q.   YOU MENTIONED THAT YOUR UNCLE, DON LUCAS, WAS CHAIRMAN OF

09:44AM   8    THE BOARD DURING SOME OF THAT TIME; IS THAT CORRECT?

09:44AM   9    A.   YES.

09:44AM   10   Q.   AND DID YOU ALSO GET INFORMATION ABOUT THERANOS FROM HIM?

09:44AM   11   A.   YES.

09:44AM   12   Q.   HOW WOULD YOU DESCRIBE THE KINDS OF INFORMATION THAT YOU

09:45AM   13   GOT FROM HIM VERSUS THE KINDS OF INFORMATION YOU GOT FROM

09:45AM   14   MS. HOLMES, WERE THE RELATIVE AMOUNTS OF INFORMATION THAT YOU

09:45AM   15   GOT FROM THOSE TWO?

09:45AM   16   A.   GENERALLY IT WAS CONSISTENT.

09:45AM   17        WHAT ELIZABETH WOULD TELL ME, DON MAY HAVE TOLD ME.  MAYBE

09:45AM   18   ELIZABETH WOULD GO INTO MORE SPECIFICS, BUT IT WAS DURING THAT

09:45AM   19   EARLY PERIOD.  IT WAS VERY EXCITING.  VERY POSITIVE

09:45AM   20   INFORMATION.

09:45AM   21   Q.   AND BETWEEN THOSE TWO INDIVIDUALS, YOUR UNCLE, DON LUCAS,

09:45AM   22   AND ELIZABETH HOLMES, THE CEO, WAS ONE OF THEM YOUR PRIMARY

09:45AM   23   SOURCE OF INFORMATION ABOUT THERANOS?

09:45AM   24   A.   PROBABLY EQUAL DURING THE EARLY, EARLY PERIODS.

09:45AM   25   Q.   DID THAT STOP BEING THE CASE WHEN YOUR UNCLE STEPPED AWAY

09:45AM  1     FROM THE BOARD AT THE BEGINNING OF 2013?

09:45AM  2     A.   YES.

09:45AM  3     Q.   GENERALLY SPEAKING, DURING YOUR CONVERSATIONS WITH

09:46AM  4     MS. HOLMES, WERE THE UPDATES THAT SHE GAVE YOU ABOUT THE

09:46AM  5     COMPANY POSITIVE OR NEGATIVE?

09:46AM  6     A.   POSITIVE TO VERY POSITIVE.

09:46AM  7     Q.   DO YOU RECALL DURING THAT TIME PERIOD EVER HEARING ANY

09:46AM  8     SIGNIFICANT NEGATIVE NEWS ABOUT THERANOS FROM MS. HOLMES?

09:46AM  9     A.   NOT THAT I RECALL.

09:46AM  10    Q.   DURING THAT TIME PERIOD, HOW DID THE LEVEL OF INFORMATION

09:46AM  11    AND TRANSPARENCY THAT YOU WERE GETTING COMPARE TO WHAT YOU HAD

09:46AM  12    EXPERIENCED WITH OTHER SIMILAR INVESTMENTS?

09:46AM  13    A.   ACTUALLY, HIGHLY IRREGULAR.  SHE WAS VERY GUARDED IN HOW

09:46AM  14    MUCH INFORMATION SHE PROVIDED.  FINANCIAL INFORMATION IN

09:46AM  15    PARTICULAR WAS VERY MINIMAL.

09:46AM  16    Q.   AND YOU FOUND THAT UNUSUAL COMPARED TO PREVIOUS

09:46AM  17    INVESTMENTS THAT YOU HAD WORKED WITH?

09:47AM  18    A.   YES.  COMPLETELY OUT OF THE ORDINARY.

09:47AM  19    Q.   PRIOR TO YOUR INVOLVEMENT WITH THERANOS, HAD YOU INVESTED

09:47AM  20    IN COMPANIES THAT HAD PROPRIETARY TECHNOLOGY THAT THEY WERE

09:47AM  21    TRYING TO PROTECT FROM COMPETITORS?

09:47AM  22    A.   YES.

09:47AM  23    Q.   AND DID THE LEVEL OF SECRECY AND LACK OF TRANSPARENCY WITH

09:47AM  24    THERANOS STRIKE YOU AS UNUSUAL EVEN COMPARED TO THOSE OTHER

09:47AM  25    COMPANIES?

09:47AM  1     A.   YES.

09:47AM  2     Q.   IF I COULD ASK YOU.

09:47AM  3          MAY I APPROACH, YOUR HONOR?

09:47AM  4               THE COURT:  YES.

09:47AM  5               MR. BOSTIC:  (HANDING.)

09:47AM  6     Q.   MR. LUCAS, IN THE BINDER THAT I'VE JUST HANDED YOU, CAN I

09:47AM  7     ASK YOU TO TURN TO TAB 5095.

09:48AM  8          AND BEFORE WE LOOK AT THAT DOCUMENT, LET ME ASK YOU,

09:48AM  9     DURING THIS TIME PERIOD 2006 TO, LET'S SAY, THE FIRST HALF OF

09:48AM 10     2013, WAS THERE ANY PUBLICLY AVAILABLE INFORMATION ABOUT

09:48AM 11     THERANOS THAT YOU RECALL?

09:48AM 12     A.   I BELIEVE TOWARD 2013, OR 2012, 2013 MAYBE THERE WERE SOME

09:48AM 13     ARTICLES STARTING TO COME OUT ABOUT THE COMPANY.

09:48AM 14          BUT EARLIER ON THERE WASN'T A LOT OF -- IT WAS VERY MUCH

09:48AM 15     IN THE STEALTH MODE, SO THERE WAS NOT MUCH INFORMATION, IF ANY.

09:48AM 16     Q.   OKAY.  UNDERSTOOD.

09:48AM 17          LOOKING AT EXHIBIT 5095.  DO YOU SEE THAT THAT'S AN EMAIL

09:48AM 18     DATED JULY 30TH, 2013, FROM THERANOS TO A GROUP OF INDIVIDUALS,

09:49AM 19     INCLUDING YOU?

09:49AM 20     A.   YES.

09:49AM 21               MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5095.

09:49AM 22               MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

09:49AM 23               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:49AM 24          (GOVERNMENT'S EXHIBIT 5095 WAS RECEIVED IN EVIDENCE.)

09:49AM 25     BY MR. BOSTIC:

09:49AM   1      Q.   MR. LUCAS, YOU'LL SEE THAT THE VERSION ON THE SCREEN,

09:49AM   2   WE'VE REDACTED EMAIL ADDRESSES.

09:49AM   3          BUT DO YOU SEE ONE THAT SAYS CHRIS@BDTVENTURES.COM?

09:49AM   4      A.   YES.

09:49AM   5      Q.   IS THAT YOUR WORK EMAIL ADDRESS?

09:49AM   6      A.   YES.

09:49AM   7      Q.   AND LET'S ZOOM IN ON -- AND FIRST OF ALL, AT THE VERY TOP

09:49AM   8   OF THIS PAGE, DO YOU SEE THAT THIS EMAIL IS SENT FROM THERANOS,

09:49AM   9   AND IT'S SENT TO A GROUP OF BCC'ED INDIVIDUALS BUT ALSO TO AN

09:49AM  10   ADDRESS SHAREHOLDERINFO@THERANOS.COM?

09:49AM  11      A.   YES.

09:49AM  12      Q.   LET'S GO DOWN AND LOOK AT THE CONTENT OF THIS MESSAGE.

09:49AM  13          THE EMAIL TO SHAREHOLDERS READS, "IT IS WITH GREAT

09:49AM  14   PLEASURE THAT I WRITE TO INFORM YOU OF OUR UPCOMING CONSUMER

09:50AM  15   LAUNCH."

09:50AM  16          DO YOU SEE THAT?

09:50AM  17      A.   YES.

09:50AM  18      Q.   DO YOU REMEMBER LEARNING ABOUT AN UPCOMING CONSUMER LAUNCH

09:50AM  19   IN MIDDLE OF 2013?

09:50AM  20      A.   YES.

09:50AM  21      Q.   HOW DID YOU TAKE THIS NEWS AS SOMEONE WHO HAD INVESTED IN

09:50AM  22   THE COMPANY?

09:50AM  23      A.   WONDERFUL, RIGHT?

09:50AM  24      Q.   DESCRIBE HOW THIS WAS GOOD NEWS FOR YOU?

09:50AM  25      A.   WELL, IT MEANT THE COMPANY -- THE TECHNOLOGY WAS READY FOR

09:50AM   1     PRIME TIME AND ABLE TO BE SOLD INTO THE MARKETPLACE.

09:50AM   2     Q.   AND DO YOU SEE THAT IN THE THIRD PARAGRAPH DOWN IT

09:50AM   3     MENTIONS A NEW WEBSITE BEING PREPARED IN ANTICIPATION OF THE

09:50AM   4     LAUNCH?

09:50AM   5     A.   YES.

09:50AM   6     Q.   OKAY.  WE CAN SET THAT ASIDE.

09:50AM   7          IF I CAN ASK YOU TO LOOK AT EXHIBIT 1102.

09:51AM   8          I BELIEVE THIS EXHIBIT HAS BEEN ADMITTED ALREADY.

09:51AM   9          MAY WE PUBLISH, YOUR HONOR?

09:51AM  10               THE COURT:  YES.  YES.

09:51AM  11     BY MR. BOSTIC:

09:51AM  12     Q.   MR. LUCAS, DO YOU SEE HERE AN EMAIL SENT ON SEPTEMBER 7TH,

09:51AM  13     2013?

09:51AM  14     A.   YES.

09:51AM  15     Q.   AND DO YOU SEE THAT IT'S TO A GROUP OF INDIVIDUALS, AND

09:51AM  16     INCLUDING YOU, ABOUT A QUARTER OF THE WAY DOWN THE PAGE, NEAR

09:51AM  17     THE TOP, ON THE LEFT SIDE?

09:51AM  18     A.   YES.

09:51AM  19     Q.   AND THIS IS SENT FROM THERANOS TO THAT SAME

09:51AM  20     SHAREHOLDERINFO@THERANOS.COM ADDRESS.

09:51AM  21          DO YOU SEE THAT?

09:51AM  22     A.   YES.

09:51AM  23     Q.   THIS EMAIL READS, "TO OUR SHAREHOLDERS,

09:51AM  24          "I AM DELIGHTED TO SHARE THAT WE HAVE NOW BEGUN THE

09:51AM  25     COMMERCIAL LAUNCH OF THE NEW PRODUCTS AND SERVICES WE'VE BEEN

09:51AM  1    WORKING ON FOR THE PAST YEARS."

09:52AM  2         DO YOU SEE THAT?

09:52AM  3    A.   YES.

09:52AM  4    Q.   WHAT WAS THE SIGNIFICANCE OF THAT NEWS TO YOU AS AN

09:52AM  5    INVESTOR?

09:52AM  6    A.   WELL, EARLIER, AS I SAID, IT'S NOW -- IF YOU SAY IT'S

09:52AM  7    LAUNCHING, IT'S GOING OUT IN THE MARKETPLACE.  SO GREAT NEWS.

09:52AM  8    Q.   DO YOU SEE THAT THIS MESSAGE TO SHAREHOLDERS ALSO REFERS

09:52AM  9    THEN TO THE COMPANY'S NEW WEBSITE AT WWW.THERANOS.COM?

09:52AM 10    A.   YES.

09:52AM 11    Q.   AND IT ALSO PROVIDES A LINK TO AN ARTICLE PUBLISHED BY

09:52AM 12    "THE WALL STREET JOURNAL."

09:52AM 13         DO YOU SEE THAT?

09:52AM 14    A.   YES.

09:52AM 15    Q.   AND LET'S LOOK AT THAT ARTICLE, WHICH IS 1106, WHICH HAS

09:52AM 16    ALREADY BEEN ADMITTED.

09:52AM 17         MAY WE PUBLISH, YOUR HONOR?

09:52AM 18              THE COURT:  YES.

09:52AM 19    BY MR. BOSTIC:

09:52AM 20    Q.   AND DO YOU SEE HERE A "WALL STREET JOURNAL" ARTICLE FROM

09:52AM 21    EARLY SEPTEMBER TITLED "ELIZABETH HOLMES:  THE BREAKTHROUGH OF

09:52AM 22    INSTANT DIAGNOSIS"?

09:52AM 23    A.   YES.

09:52AM 24    Q.   AND DO YOU REMEMBER READING THIS ARTICLE WHEN IT CAME OUT?

09:53AM 25    A.   I'M SURE I DID.

LUCAS DIRECT BY MR. BOSTIC                                      5602

09:53AM  1    Q.   DURING THAT TIME PERIOD, WERE YOU READING EVERYTHING YOU

09:53AM  2    COULD FIND IN THE PRESS ABOUT THERANOS?

09:53AM  3    A.   ABSOLUTELY.

09:53AM  4    Q.   DID THAT HAVE ANYTHING TO DO WITH THE LEVEL OF

09:53AM  5    TRANSPARENCY THAT YOU WERE GETTING FROM MS. HOLMES AND THE

09:53AM  6    COMPANY?

09:53AM  7    A.   NOT NECESSARILY.

09:53AM  8    Q.   IS THAT SOMETHING THAT YOU WOULD DO WITH ANY COMPANY THAT

09:53AM  9    YOU HAD INVESTED IN?

09:53AM  10   A.   OH, YES.  ABSOLUTELY.

09:53AM  11   Q.   I'D LIKE TO SHOW YOU SOME OF THE CONTENT IN THIS ARTICLE.

09:53AM  12   LET'S START WITH THE FIRST INDENTED PARAGRAPH.

09:53AM  13        AND DO YOU SEE THERE THERE'S A REFERENCE TO "SECRET THAT

09:53AM  14   HUNDREDS OF EMPLOYEES ARE NOW REFINING INVOLVES DEVICES THAT

09:53AM  15   AUTOMATE AND MINIATURIZE MORE THAN 1,000 LABORATORY TESTS, FROM

09:53AM  16   ROUTINE BLOOD WORK TO ADVANCED GENETIC ANALYSES"?

09:53AM  17   A.   YES.

09:53AM  18   Q.   AND DO YOU SEE THE NEXT SENTENCE SAYS, "THERANOS'S

09:53AM  19   PROCESSES ARE FASTER, CHEAPER AND MORE ACCURATE THAN THE

09:53AM  20   CONVENTIONAL METHODS AND REQUIRE ONLY MICROSCOPIC BLOOD

09:54AM  21   VOLUMES, NOT VIAL AFTER VIAL OF THE STUFF."

09:54AM  22        DO YOU SEE THAT?

09:54AM  23   A.   YES.

09:54AM  24   Q.   AND WAS THAT CONSISTENT WITH YOUR UNDERSTANDING OF WHAT

09:54AM  25   THE TECHNOLOGY COULD DO BASED ON YOUR CONVERSATIONS WITH

ER-4176

09:54AM  1     MS. HOLMES?

09:54AM  2     A.   THAT CERTAINLY WAS THE HOPE, THAT AT SOME TIME IT WOULD DO

09:54AM  3     ALL OF THE TESTS.

09:54AM  4         I DID NOT BELIEVE AT THE TIME THAT -- YOU KNOW, THIS IS

09:54AM  5     MORE OF A MARKETING.  I DID NOT BELIEVE AT THE TIME THAT THE

09:54AM  6     COMPANY COULD DO 1,000 TESTS.

09:54AM  7         MAYBE THEY COULD DO DOZENS OF TESTS, BUT --

09:54AM  8     Q.   SORRY.  GO -- FINISH YOUR ANSWER, PLEASE.

09:54AM  9     A.   OH.  JUST DOZENS OF TESTS, THE MOST COMMON TESTS THAT

09:54AM  10    WOULD BE PRESCRIBED, IF THAT'S THE RIGHT WORD.

09:54AM  11    Q.   SO YOU UNDERSTOOD AT THIS TIME THAT THE COMPANY'S

09:54AM  12    TECHNOLOGY COULD PERFORM DOZENS OF TESTS?

09:54AM  13    A.   YES.

09:54AM  14    Q.   AND WHERE DID THAT UNDERSTANDING COME FROM?

09:55AM  15    A.   FROM ELIZABETH.

09:55AM  16    Q.   AND WHEN WE'RE TALKING ABOUT THE COMPANY'S TECHNOLOGY,

09:55AM  17    WERE YOU AWARE OF A PARTICULAR DEVICE OR GROUP OF DEVICES THAT

09:55AM  18    THE COMPANY WAS USING TO RUN THESE TESTS?

09:55AM  19    A.   WELL, THERE WAS THE COLLECTION AND IT WOULD BE -- THE

09:55AM  20    BLOOD WOULD BE PUT IN A CARTRIDGE, AND THE CARTRIDGE WAS THEN

09:55AM  21    INSERTED INTO AN ANALYZER, IF THAT'S WHAT IT WAS CALLED, I'M

09:55AM  22    FORGETTING, AND THE ANALYZER WAS ABOUT THE SIZE OF A PC.

09:55AM  23    Q.   AND YOUR UNDERSTANDING ABOUT THE ANALYZER AND WHAT IT

09:55AM  24    LOOKED LIKE, WHERE DID THAT UNDERSTANDING COME FROM?

09:55AM  25    A.   I SAW IT.

09:55AM  1    Q.   WHERE DID YOU SEE IT?

09:55AM  2    A.   BOTH AT THE COMPANY AND THEN OUTSIDE WE WOULD HAVE AN

09:56AM  3    INVESTORS' CONFERENCE OR MY UNCLE HAD AN INVESTORS' CONFERENCE,

09:56AM  4    AND SHE WOULD BRING IT.

09:56AM  5    Q.   SO WAS THAT ANALYZER THAT YOU DESCRIBED BEING THE SIZE OF

09:56AM  6    A PC, SOMETHING THAT YOU DISCUSSED MULTIPLE TIMES WITH

09:56AM  7    MS. HOLMES?

09:56AM  8    A.   YES.

09:56AM  9    Q.   THIS SENTENCE THAT SAYS, "THERANOS'S PROCESSES ARE FASTER,

09:56AM 10    CHEAPER AND MORE ACCURATE THAN CONVENTIONAL METHODS."

09:56AM 11         WAS THE ACCURACY OF THERANOS'S TESTS IMPORTANT TO YOU AS

09:56AM 12    SOMEONE WHO HAD INVESTED IN THE COMPANY?

09:56AM 13    A.   WELL, ACCURACY IS VERY IMPORTANT.  I'M JUST LOOKING HERE.

09:56AM 14    "MORE ACCURATE THAN CONVENTIONAL METHODS."

09:56AM 15         YOU WOULD TYPICALLY JUST HOPE AND BELIEVE THAT IF TESTED

09:56AM 16    TO THE GOLD STANDARD OF ALREADY COMMERCIALLY AVAILABLE

09:56AM 17    MACHINES, THAT THE RESULTS WOULD BE CONSISTENT.

09:56AM 18         SO I DON'T NECESSARILY RECOLLECT THAT THEY WOULD BE MORE

09:57AM 19    ACCURATE, BUT CERTAINLY AT LEAST AS ACCURATE AS THE COMMERCIAL

09:57AM 20    MACHINES.

09:57AM 21    Q.   THE CLAIM THAT THERANOS'S TESTS WERE MORE ACCURATE, HOW

09:57AM 22    DID THAT AFFECT YOUR VIEW OF YOUR INVESTMENT IN THE COMPANY, IF

09:57AM 23    IT WOULD AT ALL?

09:57AM 24    A.   WELL, IF THAT WERE TRUE, IT WOULD JUST BE ONE MORE ADDED

09:57AM 25    BONUS THAT MORE ACCURATE, FASTER, AND AS THE ARTICLE SAYS,

09:57AM  1    CHEAPER THAN CONVENTIONAL METHODS.

09:57AM  2    Q.    OKAY.  YOU CAN SAID THAT ASIDE FOR NOW.

09:57AM  3         AND LET ME ASK YOU TO TURN TO TAB 5132 IN YOUR BINDER.

09:57AM  4         DO YOU SEE AT 5132 THERE'S AN EMAIL CHAIN INCLUDING

09:57AM  5    MESSAGES BETWEEN YOU AND MS. HOLMES FROM NOVEMBER OF 2013?

09:57AM  6    A.    YES.

09:57AM  7              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5132.

09:58AM  8         (PAUSE IN PROCEEDINGS.)

09:58AM  9              MR. COOPERSMITH:  YOUR HONOR, OUR OBJECTION IS 802

09:58AM  10   AND 401.

09:58AM  11              MR. BOSTIC:  SO, YOUR HONOR, I DON'T THINK THIS

09:58AM  12   NEEDS TO COME IN FOR THE TRUTH.  IT'S BEING OFFERED TO SHOW THE

09:58AM  13   CONVERSATION THAT THIS INVESTOR WAS HAVING WITH MS. HOLMES

09:58AM  14   AROUND THE TIME LEADING UP TO HIS SECOND INVESTMENT IN 2013.

09:58AM  15              THE COURT:  SO THIS MEMORIALIZES A CONVERSATION AND

09:58AM  16   THE PURPOSE OF IT FROM YOUR SEEKING TO ADMIT IT IS THAT IT

09:58AM  17   MEMORIALIZES CONVERSATIONS THAT WERE ATTENDANT TO THE

09:59AM  18   INVESTMENT.

09:59AM  19        YOU'RE NOT ASKING THAT IT BE ADMITTED FOR THE TRUTH OF THE

09:59AM  20   MATTER ASSERTED?

09:59AM  21              MR. BOSTIC:  CORRECT, YOUR HONOR.

09:59AM  22        IT'S RELEVANT TO SHOW THE STATEMENTS THAT WERE MADE BY

09:59AM  23   MS. HOLMES AND WHAT SHE WAS AWARE OF AT THE TIME.

09:59AM  24              THE COURT:  ALL RIGHT.  THANK YOU.

09:59AM  25        SO THERE WAS AN OBJECTION UNDER FEDERAL RULES OF EVIDENCE

09:59AM  1      802, LADIES AND GENTLEMEN, THAT THIS IS HEARSAY.

09:59AM  2          I'M GOING TO OVERRULE THAT OBJECTION AND ALLOW THIS TO BE

09:59AM  3      ADMITTED, AND NOT FOR THE TRUTH OF THE MATTER ASSERTED.

09:59AM  4          AGAIN, YOU'VE HEARD ME SAY THAT AS TO OTHER PIECES OF

09:59AM  5      EVIDENCE, BUT AS TO THE CONVERSATION BETWEEN THE WITNESS AND

09:59AM  6      MS. HOLMES, AND IT'S NOT OFFERED AGAIN FOR THE TRUTH OF THE

09:59AM  7      MATTER ASSERTED.  IT GOES TO ANY NOTICE ISSUES AND ALSO AS TO

09:59AM  8      THE SUBSTANTIATION OF A CONVERSATION DURING THE TIME PERIOD.

09:59AM  9          SO FOR THAT LIMITED PURPOSE, IT IS ADMITTED.

09:59AM 10              MR. COOPERSMITH:  YOUR HONOR, TO POINT OUT THE

10:00AM 11      NOTICE ISSUE -- I'M SORRY.  REGARDING THE NOTICE ISSUE, JUST TO

10:00AM 12      BE CLEAR, MR. BALWANI IS NOT ON THIS EMAIL STRING.

10:00AM 13              THE COURT:  YOU'LL BE ABLE TO ASK THAT QUESTION

10:00AM 14      WHEN -- IF YOU CHOOSE TO CROSS-EXAMINE THIS WITNESS.

10:00AM 15              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

10:00AM 16              THE COURT:  OKAY.

10:00AM 17              MR. BOSTIC:  MAY WE PUBLISH, YOUR HONOR?

10:00AM 18              THE COURT:  YES.

10:00AM 19          (GOVERNMENT'S EXHIBIT 5132 WAS RECEIVED IN EVIDENCE.)

10:00AM 20      BY MR. BOSTIC:

10:00AM 21      Q.   LET'S START, IF WE COULD, ON PAGE 5.  AND LET'S LOOK AT

10:00AM 22      THE BOTTOM OF THE PAGE AND THE MESSAGE FROM SOMEONE NAMED

10:00AM 23      STEPHANIE HAGEN TO YOU AND LEONA GARRIOTT IN LATE OCTOBER 2013.

10:00AM 24          DO YOU SEE THAT?

10:00AM 25      A.   YES.

10:00AM  1     Q.   AND YOU SEE THAT THIS REFERENCES A MEETING THAT YOU

10:00AM  2     PREVIOUSLY HAD WITH MS. HOLMES?

10:00AM  3     A.   YES.

10:00AM  4     Q.   AROUND THIS TIME PERIOD, WERE YOUR REGULAR CONVERSATIONS

10:00AM  5     WITH MS. HOLMES CONTINUING?

10:00AM  6     A.   YES.

10:00AM  7     Q.   LET'S LOOK AT PAGE 4 OF THIS EXHIBIT.

10:01AM  8          AND DO YOU SEE THAT HERE THERE'S AN EMAIL FROM YOU BACK TO

10:01AM  9     STEPHANIE HAGEN ON OCTOBER 24TH, 2013?

10:01AM  10    A.   YES.

10:01AM  11    Q.   AND YOU MENTION AN ANNUAL MEETING AND WHETHER MS. HOLMES

10:01AM  12    MIGHT HAVE AVAILABILITY THAT DAY.

10:01AM  13         DO YOU SEE THAT?

10:01AM  14    A.   YES.

10:01AM  15    Q.   AND THEN BELOW YOU ADD A PARAGRAPH REGARDING THERANOS,

10:01AM  16    WHICH WAS SENT OUT BY NEWT GINGRICH TO HIS CONSTITUENTS WHICH

10:01AM  17    INCLUDED ONE OF YOUR INVESTORS.

10:01AM  18         DO YOU SEE THAT?

10:01AM  19    A.   YES.

10:01AM  20    Q.   AND DO YOU SEE THAT THAT CONTENT THAT WAS SENT OUT

10:01AM  21    APPARENTLY BY MR. GINGRICH SAYS THAT, "THERANOS IS A

10:01AM  22    BREAKTHROUGH BIOTECH COMPANY WHICH MAY SAVE $61 BILLION IN

10:01AM  23    MEDICARE AND $96.1 BILLION IN MEDICAID OVER THE NEXT DECADE."

10:01AM  24         DO YOU SEE THAT LANGUAGE?

10:01AM  25    A.   I DO.

10:01AM   1    Q.   AND AFTER THAT IT SAYS, "ITS NEW TECHNOLOGY CONDUCTS A

10:01AM   2    BATTERY OF UP TO 1,000 COMMON MEDICAL TESTS VERY INEXPENSIVE

10:01AM   3    AND FROM JUST ONE DROP OF BLOOD."

10:02AM   4         DO YOU SEE THAT?

10:02AM   5    A.   I DO.

10:02AM   6    Q.   AND SO YOU UNDERSTOOD AT THE TIME THAT THERANOS'S

10:02AM   7    TECHNOLOGY WAS CAPABLE OF CONDUCTING, I THINK YOU SAID, DOZENS

10:02AM   8    OF TESTS; IS THAT RIGHT?

10:02AM   9    A.   YES.

10:02AM  10    Q.   AND YOU SAW BACK THEN, APPARENTLY, THAT CLAIMS WERE

10:02AM  11    CIRCULATING THAT THE TECHNOLOGY COULD DO MANY MORE TESTS THAN

10:02AM  12    THAT.

10:02AM  13         FAIR TO SAY?

10:02AM  14    A.   YES, AND THAT WAS CERTAINLY THE GOAL.

10:02AM  15    Q.   LET'S GO FORWARD IN THIS EMAIL CHAIN TO PAGE 2.

10:02AM  16    A.   ACTUALLY, IF I COULD ASK, WHEN I'M LOOKING AT THIS, EVEN

10:02AM  17    THOUGH I HAVE MY GLASSES ON, IF THE FONT COULD BE PUMPED UP.

10:02AM  18    Q.   IF WE CAN ZOOM IN MORE?

10:02AM  19    A.   YES.

10:02AM  20    Q.   OF COURSE.

10:02AM  21    A.   YEAH.

10:02AM  22    Q.   AT THE TOP OF THIS PAGE, MAYBE A THIRD OF THE WAY DOWN, DO

10:02AM  23    YOU SEE THAT THIS EMAIL CHAIN WAS FORWARDED TO

10:02AM  24    ELIZABETH HOLMES.

10:03AM  25         MAYBE WE CAN ZOOM IN ON THAT.

10:03AM 1    A.   YES, YES.

10:03AM 2    Q.   AND DO YOU SEE THAT MS. HOLMES WAS SENT THIS ON

10:03AM 3    NOVEMBER 5TH, 2013?

10:03AM 4    A.   YES.

10:03AM 5    Q.   OKAY.  WE CAN SET THAT ASIDE.

10:03AM 6         LET ME ASK YOU TO LOOK AT TAB 5143.

10:03AM 7         AND DO YOU HAVE 5143?

10:03AM 8    A.   I DO.

10:03AM 9    Q.   AND IS 5143 AN EMAIL CHAIN BETWEEN YOU AND THERANOS IN

10:03AM 10   DECEMBER OF 2013?

10:03AM 11   A.   YES.

10:03AM 12          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5143.

10:03AM 13          MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:03AM 14          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:03AM 15      (GOVERNMENT'S EXHIBIT 5143 WAS RECEIVED IN EVIDENCE.)

10:03AM 16   BY MR. BOSTIC:

10:04AM 17   Q.   LET'S START ON THE SECOND PAGE HERE.

10:04AM 18        AND DO YOU SEE THAT THIS BEGINS WITH A MESSAGE FROM

10:04AM 19   THERANOS TO STOCKHOLDERS?

10:04AM 20   A.   YES.

10:04AM 21   Q.   AND MAYBE WE CAN ZOOM IN ON THE TOP COUPLE PARAGRAPHS OF

10:04AM 22   THAT MESSAGE.

10:04AM 23        AND DO YOU SEE THAT THIS MESSAGE READS FROM DECEMBER 2013,

10:04AM 24   "WITH OUR LAUNCH TO CONSUMER HEALTH CARE THIS YEAR, WE ARE

10:04AM 25   RAPIDLY SCALING TO ESTABLISH A NATIONAL FOOTPRINT AND CAPTURE

LUCAS DIRECT BY MR. BOSTIC                                         5610

10:04AM  1    THE OPPORTUNITY WE HAVE TO SERVE AS THE ONLY CERTIFIED NATIONAL

10:04AM  2    LABORATORY CAPABLE OF RUNNING ANY OF ITS LABORATORY TESTS FROM

10:04AM  3    A FEW TINY DROPLETS OF BLOOD."

10:04AM  4        DO YOU SEE THAT?

10:04AM  5    A.   YES.

10:04AM  6    Q.   AND AT THE BOTTOM OF THAT PARAGRAPH IT SAYS, "AS WE

10:04AM  7    PREPARE FOR 2014 AND CLOSING YEAR END, WE ARE ACTIVELY

10:04AM  8    INVESTING IN INFRASTRUCTURE TO BUILD THIS NEW INDUSTRY WE HAVE

10:04AM  9    CREATED."

10:04AM  10       DO YOU SEE THAT?

10:04AM  11   A.   YES.

10:04AM  12   Q.   THAT CLAIM THAT THE COMPANY WAS INVESTING IN

10:04AM  13   INFRASTRUCTURE TO BUILD THAT NEW INDUSTRY, WHAT DID THAT SIGNAL

10:04AM  14   TO YOU AS AN INVESTOR?

10:04AM  15   A.   AGAIN, AS WE WERE TALKING BEFORE THAT IT'S NOW READY, THE

10:05AM  16   TECHNOLOGY IS READY FOR PRIME TIME, AND TO ROLL IT OUT

10:05AM  17   THROUGHOUT THE COUNTRY.

10:05AM  18   Q.   LET'S LOOK AT PAGE 1 OF THIS EXHIBIT.

10:05AM  19       DO YOU SEE THAT THE BOTTOM HALF OF THE PAGE IS A MESSAGE

10:05AM  20   FROM SOMEONE NAMED ANA QUINTANA?

10:05AM  21   A.   YES.

10:05AM  22   Q.   AND WHO WAS ANA QUINTANA?

10:05AM  23   A.   SHE HAS WORKED WITH ME AS A PRINCIPAL BACK IN AROUND 2000,

10:05AM  24   AND NOW SHE'S ALSO A SENIOR PERSON IN THE FIRM AS A PARTNER.

10:05AM  25   Q.   AND WHAT DOES HER ROLE MEAN THEN AT

LUCAS DIRECT BY MR. BOSTIC                          5611

10:05AM  1    BLACK DIAMOND VENTURES?  WHAT KIND OF WORK DOES SHE DO?

10:05AM  2    A.   SHE ALSO HELPS VET THE VARIOUS COMPANIES THAT WE LOOK AT

10:05AM  3    TO INVEST.

10:05AM  4    Q.   AND HER MESSAGE TO THERANOS CC'S YOU ON DECEMBER 16TH.

10:06AM  5         DO YOU SEE THAT?

10:06AM  6    A.   YES.

10:06AM  7    Q.   AND SHE WRITES, "BLACK DIAMOND VENTURES IS INTERESTED IN

10:06AM  8    IN INCREASING ITS EQUITY POSITION IN THERANOS."

10:06AM  9         DO YOU SEE THAT?

10:06AM  10   A.   YES.

10:06AM  11   Q.   AND LET ME ASK, FIRST OF ALL, AT THIS TIME ON

10:06AM  12   DECEMBER 16TH, HAD THE FINAL DECISION BEEN MADE TO INVEST MORE

10:06AM  13   MONEY IN THERANOS OR WERE THERE SOME ADDITIONAL QUESTIONS TO BE

10:06AM  14   ANSWERED, IF YOU RECALL?

10:06AM  15   A.   WELL, WE CERTAINLY WERE INTERESTED IN INCREASING OUR

10:06AM  16   INVESTMENT.  AND THE WAY OUR FIRM WORKED IS ALL OF OUR

10:06AM  17   INVESTORS ARE INDIVIDUALS, AND THEN WE WOULD TYPICALLY HAVE THE

10:06AM  18   CEO OF THE COMPANY PRESENT TO OUR GROUP, AND IT'S AFTER THAT

10:06AM  19   TIME, ONCE WE DETERMINE INTEREST FROM OUR INVESTORS, THEN WE

10:06AM  20   MAKE THE FINAL DECISION TO INVEST.

10:06AM  21   Q.   IF I COULD ASK YOU TO LOOK NEXT AT TAB 5144, WHICH IS THE

10:07AM  22   NEXT ONE.

10:07AM  23        AND AT 5144, DO YOU SEE SOME CONTINUING DISCUSSION IN THIS

10:07AM  24   SAME EMAIL CHAIN?

10:07AM  25   A.   YES.

ER-4185

10:07AM  1          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5144.

10:07AM  2          MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:07AM  3          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:07AM  4      (GOVERNMENT'S EXHIBIT 5144 WAS RECEIVED IN EVIDENCE.)

10:07AM  5  BY MR. BOSTIC:

10:07AM  6  Q.  LET'S START ON PAGE 3.

10:07AM  7      DO YOU SEE HERE IT BEGINS WITH THAT SAME MESSAGE TO

10:07AM  8  SHAREHOLDERS?

10:07AM  9  A.  YES.

10:07AM 10  Q.  AND LET'S LOOK AT PAGE 2.  LET'S ZOOM IN ON YOUR MESSAGE

10:07AM 11  IN THE MIDDLE OF THE PAGE.

10:07AM 12      THIS IS DECEMBER 18TH, 2013, TWO DAYS AFTER THE MESSAGE WE

10:07AM 13  WERE JUST LOOKING AT; RIGHT?

10:07AM 14  A.  YES.

10:07AM 15  Q.  AND DO YOU SEE HERE THAT YOU SEND SOME QUESTIONS BACK TO

10:07AM 16  THERANOS?

10:07AM 17  A.  YES.

10:07AM 18  Q.  I WANT TO ASK YOU ABOUT A COUPLE OF THESE.  THE FIRST

10:07AM 19  QUESTION SAYS, "WHEN AND HOW CAN WE EXPECT A PARTIAL OR FULL

10:08AM 20  LIQUIDITY EVENT?"

10:08AM 21      DO YOU SEE THAT?

10:08AM 22  A.  YES.

10:08AM 23  Q.  AND CAN YOU DESCRIBE WHAT THAT MEANS AND WHY YOU WERE

10:08AM 24  ASKING ABOUT THAT?

10:08AM 25  A.  WELL, WHEN YOU INVEST IN A COMPANY, AND YOU'RE OBVIOUSLY

LUCAS DIRECT BY MR. BOSTIC                                    5613

10:08AM   1    INVESTING TO MAKE A RETURN FOR YOUR INVESTORS, AND THE WAY YOU

10:08AM   2    DO THAT, IS YOU EITHER HAVE A PARTIAL LIQUIDITY EVENT, MEANING

10:08AM   3    A PARTIAL SALE OF YOUR STOCKS, OR A FULL LIQUIDITY EVENT WHERE

10:08AM   4    YOU'RE SELLING EITHER ALL OF YOUR STOCK OR THE COMPANY ITSELF

10:08AM   5    HAS BEEN SOLD.

10:08AM   6    Q.   AND HAD YOU HAD CONVERSATIONS WITH MS. HOLMES ABOUT THE

10:08AM   7    POSSIBILITY OF A LIQUIDITY EVENT?

10:08AM   8    A.   YES.

10:08AM   9    Q.   NUMBER 4 IN YOUR LIST SAYS, "WE HAVE EXPRESSED INTEREST IN

10:08AM  10    THIS ROUND, HOWEVER, OUR CONCERN IS THAT THE EXPECTED CLOSING

10:08AM  11    DATE OF DECEMBER 31ST, 2013, MAY PRECLUDE US FROM

10:08AM  12    PARTICIPATING.  DUE TO THIS SHORT PERIOD OF TIME, IS AN

10:09AM  13    EXTENSION CONTEMPLATED?"

10:09AM  14        DO YOU SEE THAT?

10:09AM  15    A.   YES.

10:09AM  16    Q.   AND CAN YOU DESCRIBE WHY THE CLOSING DATE WAS CREATING

10:09AM  17    SOME DIFFICULTY OR MIGHT HAVE PRECLUDED BLACK DIAMOND VENTURES

10:09AM  18    FROM PARTICIPATING?

10:09AM  19    A.   WELL, BECAUSE IT WAS SO SHORT, WE MAY NOT HAVE BEEN ABLE

10:09AM  20    TO GO GET ALL OF THE INFORMATION OUT TO OUR INVESTORS AND HAVE

10:09AM  21    THE CONVERSATIONS TO DETERMINE THEIR INTEREST, FIRSTLY;

10:09AM  22        AND THEN, SECONDLY, HAVE THEM ALL WIRE THEIR FUNDS SO WE

10:09AM  23    COULD MAKE THE DECEMBER 31ST TIMEFRAME.

10:09AM  24    Q.   WERE YOU FEELING TIME PRESSURE TO GET THESE THINGS FIGURED

10:09AM  25    OUT IN TIME FOR THAT CLOSING DATE?

ER-4187

10:09AM   1                    MR. COOPERSMITH:  OBJECTION.  LEADING.

10:09AM   2                    THE COURT:  WELL, IT WAS LEADING.  IF YOU WANT TO

10:09AM   3      REPHRASE.

10:09AM   4      BY MR. BOSTIC:

10:09AM   5      Q.   HOW DID THE APPROACHING CLOSING DATE AFFECT YOUR PROCESS

10:09AM   6      AND YOUR FEELING ABOUT INVESTIGATING OR EXPLORING THIS

10:09AM   7      INVESTMENT?

10:09AM   8      A.   WELL, WE CERTAINLY HAD TO HUSTLE AND -- BUT I UNDERSTOOD

10:10AM   9      THE REASON THAT IT HAD TO CLOSE BY DECEMBER 31ST AS WALGREENS

10:10AM  10      HAD SOME SORT OF AGREEMENT WITH THE COMPANY TO -- I'M

10:10AM  11      FORGETTING A LITTLE BIT -- BUT TO CONVERT SOME OF THE MONEY

10:10AM  12      THAT THEY LOANED TO THE COMPANY INTO EQUITY, AND IT HAD TO BE

10:10AM  13      ACCOMPLISHED BY THE END OF 2013.

10:10AM  14      Q.   AND WHERE DID THAT UNDERSTANDING COME FROM?

10:10AM  15      A.   FROM ELIZABETH.

10:10AM  16      Q.   DID MS. HOLMES GIVE YOU AN EXPLANATION AS TO WHY THIS

10:10AM  17      OPPORTUNITY TO INVEST WAS NOT ANNOUNCED BEFORE

10:10AM  18      MID-DECEMBER 2013?

10:10AM  19      A.   I DON'T RECALL.

10:10AM  20      Q.   DO YOU SEE AT THE TOP OF PAGE 2, IF WE CAN ZOOM IN THERE,

10:10AM  21      THERE'S A REFERENCE TO A CALL THAT HAD HAPPENED RECENTLY

10:10AM  22      BETWEEN YOU AND MS. HOLMES?

10:11AM  23      A.   YES.

10:11AM  24      Q.   AROUND THIS TIME PERIOD, SO MID-DECEMBER 2013, DID YOU

10:11AM  25      CONTINUE TO BE IN FREQUENT CONTACT WITH ELIZABETH HOLMES, THE

LUCAS DIRECT BY MR. BOSTIC                                5615

10:11AM   1    CEO?

10:11AM   2    A.   YES.

10:11AM   3    Q.   AND DID YOU CONTINUE TO GET INFORMATION FROM HER ABOUT THE

10:11AM   4    COMPANY'S TECHNOLOGY AND BUSINESS?

10:11AM   5    A.   YES.

10:11AM   6    Q.   OKAY.  WE CAN SET THAT ASIDE.

10:11AM   7         LET'S LOOK AT 5444.

10:11AM   8         AND AT 5444, DO YOU SEE AN EMAIL CHAIN BETWEEN YOU AND

10:11AM   9    MS. HOLMES IN LATE DECEMBER 2013?

10:11AM  10    A.   YES.

10:11AM  11              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5444.

10:11AM  12              MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:11AM  13              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:11AM  14         (GOVERNMENT'S EXHIBIT 5444 WAS RECEIVED IN EVIDENCE.)

10:11AM  15    BY MR. BOSTIC:

10:11AM  16    Q.   LET'S START ON PAGE 2.

10:11AM  17         DO YOU SEE THAT IN THE TOP HALF OF THE PAGE THERE'S A

10:11AM  18    MESSAGE FROM YOU TO MS. HOLMES ON DECEMBER 25TH, 2013?

10:12AM  19    A.   YES.  I'M ONLY SMILING THAT I EVEN EMAILED ON CHRISTMAS.

10:12AM  20         (LAUGHTER.)

10:12AM  21    BY MR. BOSTIC:

10:12AM  22    Q.   OKAY.  LET'S LOOK AT A MESSAGE THAT YOU SENT THE DAY

10:12AM  23    BEFORE TO SEE HOW THIS CONVERSATION GOT STARTED ACTUALLY.

10:12AM  24         AT THE BOTTOM OF PAGE 2, DO YOU SEE THAT THIS BEGINS WITH

10:12AM  25    A MESSAGE FROM YOU TO MS. HOLMES THE PREVIOUS DAY?

10:12AM  1    A.   YES.  AND IT STILL GOES, WHY AM I EMAILING ON

10:12AM  2    CHRISTMAS EVE?  BUT ANYWAY.

10:12AM  3         (LAUGHTER.)

10:12AM  4    BY MR. BOSTIC:

10:12AM  5    Q.   FAIR TO SAY YOU WERE WORKING HARD DURING THIS TIME PERIOD

10:12AM  6    TO TRY TO MEET THAT DECEMBER 31ST DEADLINE?

10:12AM  7    A.   YES.

10:12AM  8         AND TO ADD SOME COLOR, I TOLD ANA I WOULD NOT SHAVE UNTIL

10:13AM  9    WE FINISHED THE FINANCING.  SO WE WENT FOR SOME PERIOD OF TIME

10:13AM  10   24/7 ACTUALLY.

10:13AM  11   Q.   AND LET'S LOOK AT THE FOLLOWING PAGE AND LOOK AT THE

10:13AM  12   CONTENT OF YOUR DECEMBER 24TH EMAIL.

10:13AM  13        DO YOU SEE THERE YOU ARE ASKING MS. HOLMES SOME QUESTIONS?

10:13AM  14   A.   YES.

10:13AM  15   Q.   AND YOU SAY AT THE TOP, "THERE IS SIGNIFICANT INTEREST IN

10:13AM  16   PARTICIPATING IN THIS ROUND.  THE CHALLENGE WILL BE GETTING ALL

10:13AM  17   OF THE FUNDS PRIOR TO YEAREND."

10:13AM  18        DO YOU SEE THAT?

10:13AM  19   A.   YES.

10:13AM  20   Q.   AND YOU THEN ASK, ARE THE STRATEGIC PARTNERS CONVERTING

10:13AM  21   THE ENTIRE AMOUNT OF THEIR NOTES IN THIS OFFERING?

10:13AM  22        DO YOU SEE THAT QUESTION?

10:13AM  23   A.   YES.

10:13AM  24   Q.   AND THEN YOU ALSO ASK "HOW MUCH NEW CAPITAL IS COMING IN?"

10:13AM  25        DO YOU SEE THAT?

10:13AM 1    A.   YES.

10:13AM 2    Q.   AND WHY WERE YOU INTERESTED IN THE ANSWERS TO THOSE

10:13AM 3    QUESTIONS?

10:13AM 4    A.   WELL, SO IF YOU'RE SCALING UP AND TRY TO BUILD THE

10:13AM 5    INFRASTRUCTURE, YOU WANT TO MAKE SURE THAT THE REQUISITE AMOUNT

10:14AM 6    OF MONEY IS COMING IN, AND I'M FORGETTING THE ANSWERS AT THE

10:14AM 7    TIME, BUT CLEARLY A LARGE AMOUNT OF MONEY IS COMING IN.

10:14AM 8    Q.   LET'S LOOK AT THE ANOTHER QUESTION YOU HAD IN THE SAME

10:14AM 9    CHAIN ON PAGE 1 OF THE EXHIBIT.

10:14AM 10       DO YOU SEE TOWARDS THE BOTTOM OF THE PAGE THERE'S A

10:14AM 11   MESSAGE FROM YOU ON DECEMBER 26TH WHERE YOU SAY, "ON A

10:14AM 12   DIFFERENT TOPIC."

10:14AM 13       YOU ASK, "ONE OF OUR INVESTORS ASKED WHAT INFORMATION WAS

10:14AM 14   PROVIDED TO THE STRATEGIC PARTNERS SO THAT THEY COULD MAKE

10:14AM 15   THEIR DECISION WHETHER TO CONVERT OR NOT?"

10:14AM 16       DO YOU SEE THAT QUESTION?

10:14AM 17   A.   YES.

10:14AM 18   Q.   AND CAN YOU EXPLAIN WHAT YOU WERE ASKING HERE?

10:14AM 19   A.   WELL, AS I SAID EARLIER, THAT THERE WAS SOME PROVISION

10:14AM 20   FOR, AND I BELIEVE IT WAS WALGREENS, YOU KNOW, WHAT INFORMATION

10:14AM 21   WAS BEING PROVIDED TO THEM SO THAT THEY COULD DECIDE WHETHER TO

10:14AM 22   CONVERT INTO THIS EQUITY, INTO THIS EQUITY RAISE.

10:15AM 23   Q.   AROUND THIS TIME PERIOD, WERE YOU AND THE INVESTORS WHO

10:15AM 24   WORK WITH BLACK DIAMOND VENTURES INTERESTED IN TRYING TO GET

10:15AM 25   MORE INFORMATION FROM THERANOS?

LUCAS DIRECT BY MR. BOSTIC                                    5618

10:15AM   1      A.   SURE.

10:15AM   2      Q.   LET'S LOOK AT THE MESSAGE JUST ABOVE THAT, WHERE

10:15AM   3      MS. HOLMES RESPONDS TO YOUR QUESTION AND SAYS, "OUR RECENT

10:15AM   4      MILESTONES IN ENTERING THIS 180 BILLION PLUS INDUSTRY, AND THE

10:15AM   5      POTENTIAL OUR PARTNERS THINK WE HAVE TO REVOLUTIONIZE HEALTH

10:15AM   6      CARE, OBVIOUSLY ALSO SPEAK FOR THEMSELVES IN THIS CONTEXT BASED

10:15AM   7      ON EVERYTHING IN THE PUBLIC DOMAIN..."

10:15AM   8           DO YOU SEE THAT?

10:15AM   9      A.   YES.

10:15AM  10      Q.   AND DO YOU RECALL MS. HOLMES GIVING YOU ANY ADDITIONAL,

10:15AM  11      FOR EXAMPLE, WRITTEN MATERIALS AROUND THIS TIME PERIOD

10:15AM  12      DETAILING WHAT THE COMPANY WAS DOING?

10:15AM  13      A.   I DON'T RECALL.

10:15AM  14      Q.   AND JUST ABOVE THAT YOU WRITE, "AS WE PULL TOGETHER OUR

10:16AM  15      FINANCING, I WOULD LIKE TO HAVE A CONVERSATION WITH YOU."

10:16AM  16           DO YOU SEE THAT?

10:16AM  17      A.   YES.

10:16AM  18      Q.   OKAY.  LET'S LOOK AT 5447.

10:16AM  19           SO THROUGHOUT THIS TIME PERIOD, DID YOU CONTINUE TO BE IN

10:16AM  20      TOUCH WITH MS. HOLMES NOT ONLY BY EMAIL BUT ALSO BY TELEPHONE?

10:16AM  21      A.   I WOULD SAY SO, YES.

10:16AM  22      Q.   LOOKING AT 5447, DO YOU SEE THAT THAT IS AN EMAIL CHAIN

10:16AM  23      BETWEEN BLACK DIAMOND VENTURES AND THERANOS RELATING TO YOUR

10:16AM  24      INVESTMENT?

10:16AM  25      A.   YES.

10:16AM  1              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5447.

10:16AM  2              MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:16AM  3              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:16AM  4         (GOVERNMENT'S EXHIBIT 5447 WAS RECEIVED IN EVIDENCE.)

10:16AM  5    BY MR. BOSTIC:

10:16AM  6    Q.   LET'S ZOOM IN ON THE SECOND TO THE TOP EMAIL.

10:16AM  7         DO YOU SEE HERE, MR. LUCAS, THERE'S A MESSAGE FROM

10:17AM  8    MS. QUINTANA, CC'ING YOU AND CONFIRMING THAT THE WIRE FROM

10:17AM  9    BLACK DIAMOND VENTURES WAS INITIATED THAT MORNING?

10:17AM 10    A.   YES.

10:17AM 11    Q.   AND DO YOU SEE THAT THE AMOUNT OF THE INVESTMENT WAS

10:17AM 12    $5,349,900?

10:17AM 13    A.   YES.

10:17AM 14    Q.   AND WAS THAT BLACK DIAMOND VENTURES'S, I GUESS, THIRD

10:17AM 15    INVESTMENT IN THERANOS?

10:17AM 16    A.   CORRECT.

10:17AM 17    Q.   OKAY.  AND THE DATE OF THIS IS DECEMBER 31ST, 2013;

10:17AM 18    CORRECT?

10:17AM 19    A.   YES.

10:17AM 20    Q.   AND WE CAN SET THAT ASIDE.

10:17AM 21         LET'S LOOK AT 7366, WHICH SHOULD BE AT THE BACK OF YOUR

10:17AM 22    BINDER.

10:17AM 23         AND DO YOU HAVE 7366 IN FRONT OF YOU?

10:17AM 24    A.   I DO.

10:17AM 25    Q.   AND LET'S START ON THE SECOND PAGE, AND I'LL ASK YOU TO

10:17AM 1    LOOK AT THAT PAGE OF THE DOCUMENT.

10:17AM 2         DO YOU SEE THAT THAT IS A MESSAGE FROM MS. QUINTANA,

10:18AM 3    CC'ING YOU AND INCLUDING SOME MATERIALS RELATING TO THE

10:18AM 4    THERANOS INVESTMENT?

10:18AM 5    A.   YES.

10:18AM 6              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:18AM 7    EXHIBIT 7366, EXCLUDING PAGE 1.

10:18AM 8              MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:18AM 9              THE COURT:  IT'S ADMITTED, EXCLUDING PAGE 1.  THE

10:18AM 10   BALANCE IS ADMITTED.  IT MAY BE PUBLISHED.

10:18AM 11        (DEFENDANT'S EXHIBIT 7366, EXCLUDING PAGE 1, WAS RECEIVED

10:18AM 12   IN EVIDENCE.)

10:18AM 13   BY MR. BOSTIC:

10:18AM 14   Q.   AND LET'S START WITH PAGE 2 OF THAT EXHIBIT.

10:18AM 15        AND DO YOU SEE HERE WE'RE LOOKING AT A MESSAGE SENT ON

10:18AM 16   DECEMBER 29TH, 2013?

10:18AM 17   A.   YES.

10:18AM 18   Q.   AND THE TEXT OF THAT EMAIL SAYS, "DEAR BDT INVESTOR,

10:18AM 19        "THANK YOU FOR YOUR INTEREST AND PARTICIPATION IN THIS

10:18AM 20   SERIES C-1 STOCK FINANCING."

10:18AM 21        WAS THIS RELATING TO THE THERANOS INVESTMENT?

10:19AM 22   A.   YES.

10:19AM 23   Q.   AND IT SAYS, "PER OUR COUNSEL'S RECOMMENDATION, WE WOULD

10:19AM 24   LIKE TO SHARE ADDITIONAL INFORMATION AND DISCLOSURES IN THE

10:19AM 25   ATTACHED ACKNOWLEDGEMENT LETTER AND ACCOMPANYING EXHIBIT A."

LUCAS DIRECT BY MR. BOSTIC                                    5621

10:19AM  1          DO YOU SEE THAT?

10:19AM  2     A.   YES.

10:19AM  3     Q.   AND THEN IF WE LOOK AT PAGE 4 OF THE EXHIBIT.

10:19AM  4          DO YOU SEE THAT THIS IS A COVER LETTER FROM

10:19AM  5     BLACK DIAMOND VENTURES TO SOME OF ITS INVESTORS?

10:19AM  6     A.   YES.

10:19AM  7     Q.   CAN YOU EXPLAIN FOR US WHAT THE PURPOSE OF THIS LETTER

10:19AM  8     WAS, IF YOU RECALL?

10:19AM  9     A.   YES, IT -- AS I'VE SAID BEFORE, THEY WERE NOT VERY

10:19AM 10     TRANSPARENT WITH THE INFORMATION AND FINANCIALS, PATENT

10:19AM 11     PORTFOLIO, ET CETERA, ET CETERA, SO WE WANTED TO MAKE SURE THAT

10:20AM 12     OUR INVESTORS WERE CLEAR EYED IN UNDERSTANDING THAT THAT WAS

10:20AM 13     THE CASE.

10:20AM 14     Q.   AND WHEN YOU SAY, "THEY WERE NOT VERY TRANSPARENT," ARE

10:20AM 15     YOU REFERRING TO MS. HOLMES AND THERANOS?

10:20AM 16     A.   YES.

10:20AM 17     Q.   AND THIS STEP OF SENDING OUT THIS KIND OF DISCLOSURE OR

10:20AM 18     DOCUMENT TO BDT INVESTORS, WAS THIS SOMETHING THAT COMMONLY

10:20AM 19     HAPPENED WITH INVESTMENTS AT BLACK DIAMOND VENTURES?

10:20AM 20     A.   NO.

10:20AM 21     Q.   LET'S LOOK AT PAGE 6 OF THE EXHIBIT.

10:20AM 22          DO YOU SEE HERE WE'RE LOOKING AT THE DISCLOSURE THAT WAS

10:20AM 23     SENT TO THE BDT INVESTORS?

10:20AM 24     A.   YES.

10:20AM 25     Q.   LET'S LOOK AT PAGE 8 OF THIS SAME DOCUMENT.  LET'S ZOOM IN

LUCAS DIRECT BY MR. BOSTIC                                      5622

10:20AM   1    ON THE BOTTOM PORTION OF THE PAGE WHICH IS REPRESENTATIONS,

10:21AM   2    WARRANTIES, DELIVERABLES, AND COVENANTS.

10:21AM   3         DO YOU SEE THERE THAT THERE IS SOME LANGUAGE THAT SAYS

10:21AM   4    THAT "THE PURCHASE AGREEMENT DOES NOT PROVIDE MANY OF THE

10:21AM   5    STANDARD REPRESENTATIONS, WARRANTIES AND DELIVERABLES WE WOULD

10:21AM   6    EXPECT TO SEE IN AN INVESTMENT OF THIS NATURE, AND THOSE THAT

10:21AM   7    HAVE BEEN PROVIDED ARE SERIOUSLY CURTAILED."

10:21AM   8         DO YOU SEE THAT?

10:21AM   9    A.   YES.

10:21AM   10   Q.   AND CAN YOU EXPLAIN WHAT THAT MEANS IN PLAIN LANGUAGE?

10:21AM   11   A.   THAT THE INFORMATION THAT WE WOULD HAVE EXPECTED TO HAVE,

10:21AM   12   WE DID NOT HAVE, AND SO WE WANTED TO DISCLOSE AND LET OUR

10:21AM   13   INVESTORS KNOW THAT WE DID NOT HAVE THAT INFORMATION.

10:21AM   14   Q.   WOULD BLACK DIAMOND VENTURES HAVE PREFERRED TO HAVE HAD

10:21AM   15   MORE DETAILED INFORMATION FROM THERANOS PRIOR TO MAKING THAT

10:21AM   16   DECEMBER 2013 INVESTMENT?

10:21AM   17   A.   YES.

10:21AM   18   Q.   LET'S LOOK AT THE FOLLOWING PAGE.  AND THERE'S A LIST OF

10:21AM   19   THINGS THAT THE PURCHASE AGREEMENT DOES NOT CONTAIN.

10:22AM   20        AND DO YOU SEE THAT THAT INCLUDES, FOR EXAMPLE, UNDER ITEM

10:22AM   21   3 -- OH, SORRY, AT THE TOP OF THE PAGE.

10:22AM   22        "COMPLIANCE CERTIFICATE OF AN OFFICER OF THERANOS,

10:22AM   23   CERTIFYING TO THE TRUTH AND CORRECTNESS OF THERANOS'S

10:22AM   24   REPRESENTATIONS AND WARRANTIES IN THE PURCHASE AGREEMENT."

10:22AM   25        DO YOU SEE THAT?

LUCAS DIRECT BY MR. BOSTIC                                    5623

10:22AM   1    A.   YES.

10:22AM   2    Q.   AND THEN THERE IS SOME ADDITIONAL LANGUAGE BELOW THAT

10:22AM   3    UNDER B THAT SAYS, "THE AMENDED AND RESTATED INVESTORS' RIGHTS

10:22AM   4    AGREEMENT LACKS REPRESENTATIONS, WARRANTIES, AND COVENANTS

10:22AM   5    TYPICAL FOR AN INVESTMENT OF THIS TYPE."

10:22AM   6         DO YOU SEE THAT?

10:22AM   7    A.   YES.

10:22AM   8    Q.   AND IS THAT A SIMILAR DISCLOSURE ABOUT THE LACK OF

10:22AM   9    INFORMATION THAT HAD COME FROM THERANOS?

10:22AM  10    A.   CORRECT.

10:22AM  11    Q.   GIVEN THAT YOU WOULD HAVE WANTED MORE INFORMATION FROM

10:23AM  12    THERANOS PRIOR TO THIS INFORMATION, AND THE FACT THAT YOU TOOK

10:23AM  13    THE STEP OF SENDING THIS OUT TO YOUR INVESTORS, LET ME ASK YOU,

10:23AM  14    WHAT MADE YOU PERSONALLY COMFORTABLE WITH MOVING FORWARD WITH

10:23AM  15    THIS INVESTMENT AT THIS TIME?

10:23AM  16    A.   MY RELATIONSHIP WITH ELIZABETH.  I BELIEVE SHE WAS

10:23AM  17    TRUTHFUL AND EARNEST IN WHAT SHE WAS TRYING TO ACCOMPLISH,

10:23AM  18    NUMBER ONE;

10:23AM  19         AND, SECONDLY, THIS WAS ALL COINCIDENT WITH WALGREENS

10:23AM  20    GOING TO ROLL OUT THE TECHNOLOGY, AND YOU WOULD HOPE AND DREAM

10:23AM  21    A COMPANY THE SIZE OF WALGREENS WOULD WANT TO ROLL OUT YOUR

10:23AM  22    TECHNOLOGY.

10:23AM  23         SO THAT WAS EXTREMELY VALIDATING.

10:23AM  24    Q.   DID THIS INVESTMENT BY BDT RELY MORE ON PERSONAL TRUST AND

10:23AM  25    THE HONESTY OF THE CEO THAN THE TYPICAL INVESTMENT THAT YOU

| | | |
|---|---|---|
| 10:23AM | 1 | MADE? |
| 10:23AM | 2 | MR. COOPERSMITH: OBJECTION. LEADING. |
| 10:23AM | 3 | THE COURT: SUSTAINED. |
| 10:24AM | 4 | BY MR. BOSTIC: |
| 10:24AM | 5 | Q. HOW DID THIS INVESTMENT COMPARE TO PREVIOUS INVESTMENTS |
| 10:24AM | 6 | THAT YOU HAD MADE IN TERMS OF HOW MUCH YOU WERE RELYING ON THE |
| 10:24AM | 7 | HONESTY OF THE CEO? |
| 10:24AM | 8 | A. WELL, YOU HOPE YOU'RE RELYING ON THE HONESTY OF ALL OF THE |
| 10:24AM | 9 | CEO'S AND FOUNDERS THAT YOU'RE WORKING WITH, IN PARTICULAR AS |
| 10:24AM | 10 | IT RELATES TO ELIZABETH AND THERANOS, BECAUSE THE INFORMATION |
| 10:24AM | 11 | WAS NOT READILY AVAILABLE. YOU REALLY HAD TO HAVE A LOT OF |
| 10:24AM | 12 | TRUST IN HER AND THE OTHERS THAT YOU SPOKE WITH. |
| 10:24AM | 13 | Q. WE CAN SET THIS EXHIBIT ASIDE. |
| 10:24AM | 14 | LET ME ASK YOU, JUST SO WE'RE CLEAR ABOUT THE SOURCES OF |
| 10:24AM | 15 | INFORMATION THAT YOU HAD WHEN YOU INVESTED. |
| 10:24AM | 16 | YOU TESTIFIED ABOUT YOUR UNCLE, DON LUCAS, AND RECEIVING |
| 10:24AM | 17 | INFORMATION FROM HIM ABOUT THERANOS; IS THAT CORRECT? |
| 10:24AM | 18 | A. CORRECT. |
| 10:24AM | 19 | Q. AND CAN YOU REMIND US WHEN THAT STOPPED, WHEN HE WAS NO |
| 10:24AM | 20 | LONGER A REGULAR SOURCE OF INFORMATION FOR YOU ABOUT THE |
| 10:24AM | 21 | COMPANY? |
| 10:24AM | 22 | A. I'D SAY COMPLETELY BY EARLY 2013, BUT CERTAINLY ALSO |
| 10:25AM | 23 | DURING 2012. |
| 10:25AM | 24 | Q. SO FAIR TO SAY AT LEAST A YEAR OR APPROXIMATELY A YEAR |
| 10:25AM | 25 | BEFORE -- |

10:25AM   1      A.   YES.

10:25AM   2      Q.   -- YOU MADE THE 2013 INVESTMENT?

10:25AM   3      A.   YES.

10:25AM   4      Q.   SO IN THE YEAR ACTUALLY LEADING UP TO YOUR INVESTMENT, DID

10:25AM   5      YOU GET SOME INFORMATION FROM THE THERANOS WEBSITE THAT YOU

10:25AM   6      RELIED ON?

10:25AM   7      A.   YES.

10:25AM   8      Q.   HOW ABOUT NEWS ARTICLES?  DID THOSE PLAY A ROLE IN

10:25AM   9      EDUCATING YOU AND HELPING YOU EVALUATE YOUR INVESTMENT

10:25AM  10      DECISION?

10:25AM  11      A.   YES.

10:25AM  12      Q.   YOU TALKED ABOUT A VISIT TO THERANOS HEADQUARTERS.

10:25AM  13           DO YOU RECALL THAT VISIT?

10:25AM  14      A.   I'VE BEEN THERE A FEW TIMES.  I'M NOT SURE WHICH VISIT --

10:25AM  15      Q.   FAIR ENOUGH.

10:25AM  16      A.   -- YOU'RE TALKING ABOUT.

10:25AM  17      Q.   LET'S TALK ABOUT DURING THE SECOND HALF OF 2013.  DID YOU

10:26AM  18      VISIT THERANOS ONE OR MORE TIMES DURING THAT TIME PERIOD?

10:26AM  19      A.   I WOULD EXPECT SO, YES.

10:26AM  20      Q.   AND DO YOU REMEMBER ON YOUR VISIT BEING SHOWN THE

10:26AM  21      COMPANY'S TECHNOLOGY?

10:26AM  22      A.   YES.

10:26AM  23      Q.   DO YOU RECALL WHO GAVE YOU THE TOUR OR WHO WAS SHOWING YOU

10:26AM  24      AROUND DURING YOUR VISIT OR VISITS IN THE LATTER HALF OF 2013?

10:26AM  25      A.   I WOULD EXPECT THAT IT WAS ELIZABETH AND/OR ONE OF THE LAB

10:26AM 1    DIRECTORS.

10:26AM 2    Q.   AND DURING YOUR VISITS TO THE COMPANY, YOU TESTIFIED THAT

10:26AM 3    YOU WERE SHOWN THE THERANOS ANALYZER AND YOU DESCRIBED ITS

10:26AM 4    SIZE.

10:26AM 5        DO YOU RECALL THAT?

10:26AM 6    A.   YES.

10:26AM 7    Q.   WERE YOU EVER SHOWN A THIRD PARTY NON-THERANOS BLOOD

10:26AM 8    ANALYZER DURING YOUR VISITS TO THE COMPANY?

10:27AM 9    A.   NO.

10:27AM 10   Q.   YOU ALSO TESTIFIED THAT YOU WERE IN REGULAR CONTACT WITH

10:27AM 11   MS. HOLMES IN DISCUSSING THE COMPANY'S TECHNOLOGY AND BUSINESS

10:27AM 12   LEADING UP TO YOUR INVESTMENT; IS THAT RIGHT?

10:27AM 13   A.   YES.

10:27AM 14   Q.   DID THE STATEMENTS THAT SHE WAS MAKING TO YOU AT THAT TIME

10:27AM 15   MATTER TO YOUR THOUGHT PROCESS ABOUT WHETHER TO INVEST IN THE

10:27AM 16   COMPANY OR NOT?

10:27AM 17   A.   YES.

10:27AM 18   Q.   DURING THAT TIME PERIOD, DID YOU EVER HAVE A CONVERSATION

10:27AM 19   WITH SUNNY BALWANI?

10:27AM 20   A.   NO.

10:27AM 21   Q.   DO YOU RECALL EVER MEETING SUNNY BALWANI?

10:27AM 22   A.   NO.

10:27AM 23   Q.   IF I COULD ASK YOU TO LOOK AT TAB 5837 IN YOUR BINDER.

10:27AM 24       DURING YOUR CONVERSATIONS WITH MS. HOLMES, DO YOU RECALL

10:28AM 25   HER EVER TALKING ABOUT SUNNY BALWANI?

ER-4200

10:28AM  1    A.   I DON'T BELIEVE SO.

10:28AM  2    Q.   LOOKING AT 5837, DO YOU SEE THAT THAT'S AN EMAIL BETWEEN

10:28AM  3    MS. QUINTANA AND THERANOS, CC'ING YOU, RELATING TO YOUR

10:28AM  4    DECEMBER INVESTMENT?

10:28AM  5    A.   IS THAT RESPONDING FROM ANA TO THERANOS, IS THAT WHAT

10:28AM  6    YOU'RE SAYING?

10:28AM  7    Q.   YES.  DO YOU SEE THAT?

10:28AM  8    A.   YES.

10:28AM  9         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5837.

10:28AM  10        MR. COOPERSMITH:  NO OBJECTION.

10:28AM  11        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:28AM  12    (GOVERNMENT'S EXHIBIT 5837 WAS RECEIVED IN EVIDENCE.)

10:28AM  13    BY MR. BOSTIC:

10:28AM  14    Q.   AND DO YOU SEE ABOUT A THIRD OF THE WAY DOWN THE PAGE, OR

10:28AM  15    MAYBE A QUARTER, THERE'S AN EMAIL FROM MS. QUINTANA TO

10:28AM  16    THERANOS, CC'ING YOU ON DECEMBER 23RD?

10:29AM  17    A.   YES.

10:29AM  18    Q.   AND IT TALKS ABOUT THE MECHANICS OF THE INVESTMENT AND

10:29AM  19    WHAT ENTITIES WILL BE INVOLVED; RIGHT?

10:29AM  20    A.   YES.

10:29AM  21    Q.   AND LET'S LOOK ABOVE THAT.

10:29AM  22         AND DO YOU SEE, WHILE THAT EMAIL WAS SENT TO THERANOS,

10:29AM  23    MR. BALWANI THEN FORWARD THE EMAIL TO MS. HOLMES THE FOLLOWING

10:29AM  24    DAY.

10:29AM  25         DO YOU SEE THAT?

10:29AM  1    A.   YES.

10:29AM  2    Q.   AND HIS MESSAGE IS, "JUST MAKING SURE YOU SAW THIS..."

10:29AM  3         DO YOU SEE THAT?

10:29AM  4    A.   YES.

10:29AM  5    Q.   AND IF WE LOOK AT THE BOTTOM OF THIS PAGE, DO YOU SEE THAT

10:29AM  6    THERE'S A MESSAGE FROM THERANOS, AND WE SEE THAT THE EMAIL

10:29AM  7    ADDRESS THERE IS SHAREHOLDERINFO@THERANOS.COM?

10:29AM  8    A.   YES.

10:29AM  9    Q.   IF I COULD ASK YOU TO TURN TO 5836.

10:30AM  10        AND AT 5836, DO YOU SEE ANOTHER SIMILAR EMAIL INCLUDING

10:30AM  11   MS. QUINTANA, THAT THERANOS ADDRESS, MR. BALWANI, AND

10:30AM  12   MS. HOLMES?

10:30AM  13   A.   YES.

10:30AM  14        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5836.

10:30AM  15        MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:30AM  16        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:30AM  17   (GOVERNMENT'S EXHIBIT 5836 WAS RECEIVED IN EVIDENCE.)

10:30AM  18   BY MR. BOSTIC:

10:30AM  19   Q.   MR. LUCAS, DO YOU SEE HERE THAT WE HAVE ANOTHER EMAIL FROM

10:30AM  20   MS. QUINTANA TO THAT SHAREHOLDER INFO ADDRESS AT THERANOS?

10:30AM  21   A.   YES.

10:30AM  22   Q.   AND THIS IS ON DECEMBER 30TH, 2013; IS THAT RIGHT?

10:30AM  23   A.   YES.

10:30AM  24   Q.   AND THEN IF WE LOOK ABOVE THAT, WE SEE THAT MR. BALWANI

10:30AM  25   FORWARDS THAT EMAIL TO THE THERANOS EMAIL ADDRESS DIRECTLY TO

10:30AM  1    ELIZABETH HOLMES.

10:30AM  2         DO YOU SEE THAT?

10:30AM  3    A.   YES.

10:30AM  4    Q.   AROUND THIS TIME PERIOD, DO YOU RECALL MS. HOLMES EVER

10:31AM  5    MENTIONING TO YOU WHETHER MR. BALWANI EVER HAD A ROLE IN

10:31AM  6    CONNECTION WITH YOUR INVESTMENT?

10:31AM  7    A.   I DON'T RECALL.

10:31AM  8    Q.   OKAY.  WE CAN SET THAT ASIDE.

10:31AM  9         I'D LIKE TO ASK YOU JUST A COUPLE OF QUESTIONS ABOUT YOUR

10:31AM  10   UNDERSTANDING OF THE COMPANY'S STATUS AT THE TIME THAT YOU MADE

10:31AM  11   YOUR INVESTMENT.

10:31AM  12        WE TALKED ABOUT THE SOURCES OF INFORMATION THAT YOU HAD.

10:31AM  13   BUT LET ME ASK YOU, AT THE TIME THAT YOU INVESTED IN THE

10:31AM  14   COMPANY, WHAT DID YOU UNDERSTAND ITS TECHNOLOGY TO BE?

10:31AM  15   A.   WE'RE TALKING IN 2013?

10:31AM  16   Q.   YES, IN LATE 2013.

10:31AM  17   A.   YEAH.  THAT IT WAS FULLY FUNCTIONING, CAPABLE OF DOING, AS

10:31AM  18   I SAID EARLIER, DOING DOZENS OF TESTS, AND THIS WAS ALL BASED

10:32AM  19   ON A FEW DROPS OF BLOOD.

10:32AM  20   Q.   AND WHEN YOU WERE UNDERSTANDING THE COMPANY'S TECHNOLOGY,

10:32AM  21   DID YOUR UNDERSTANDING INVOLVE A SINGLE ANALYZER THAT WAS BEING

10:32AM  22   USED OR A GROUP OF DIFFERENT KINDS OF ANALYZERS?

10:32AM  23   A.    I BELIEVE MY UNDERSTANDING WAS THAT IT WAS ONE CARTRIDGE

10:32AM  24   GOES INTO ONE ANALYZER AND, SURE, YOU COULD HAVE MULTIPLE

10:32AM  25   ANALYZERS, BUT EACH ANALYZER WOULD HANDLE ONE SAMPLE.

10:32AM   1    Q.   AROUND THE TIME OF YOUR 2013 INVESTMENT, WOULD IT HAVE

10:32AM   2    SURPRISED YOU TO HEAR THAT THE THERANOS ANALYZER YOU SAW WAS

10:32AM   3    NEVER USED FOR MORE THAN A DOZEN TESTS IN THE CLINICAL LAB?

10:32AM   4    A.   PLEASE SAY AGAIN.

10:32AM   5    Q.   SURE.

10:32AM   6         WOULD IT HAVE BEEN NEW INFORMATION FOR YOU THAT IN 2013,

10:33AM   7    THERANOS COULD USE ITS EDISON ANALYZER FOR FEWER THAN A DOZEN

10:33AM   8    TESTS IN THE LAB?

10:33AM   9    A.   YES, THAT WOULD HAVE BEEN SURPRISING.

10:33AM  10    Q.   WOULD THAT HAVE BEEN INCONSISTENT WITH THE UNDERSTANDING

10:33AM  11    THAT YOU HAD FOLLOWING YOUR CONVERSATIONS WITH MS. HOLMES?

10:33AM  12    A.   YES.

10:33AM  13    Q.   HOW ABOUT PARTNERSHIPS THAT THE COMPANY HAD?  WHEN YOU

10:33AM  14    INVESTED IN 2013, WERE YOU AWARE OF THE PARTNERSHIP WITH

10:33AM  15    WALGREENS?

10:33AM  16    A.   YES.

10:33AM  17    Q.   AND WAS THE STATUS OF THAT PARTNERSHIP RELEVANT TO YOUR

10:33AM  18    VIEW OF THE COMPANY'S TECHNOLOGY?

10:33AM  19    A.   PARAMOUNT.

10:33AM  20    Q.   AND WHY WAS THAT?

10:33AM  21    A.   BECAUSE WALGREENS WAS GETTING READY TO ROLL IT OUT

10:33AM  22    NATIONALLY, AND THAT WAS VERY EXCITING AND VALIDATING FOR THE

10:33AM  23    COMPANY.

10:33AM  24    Q.   STILL ON THE SUBJECT OF PARTNERSHIPS.

10:33AM  25         DID YOU HAVE ANY CONVERSATIONS WITH MS. HOLMES ABOUT THE

| | | |
|---|---|---|
| 10:33AM | 1 | COMPANY'S WORK WITH THE U.S. MILITARY OR DEPARTMENT OF DEFENSE? |
| 10:34AM | 2 | A.   YES. |
| 10:34AM | 3 | Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THAT? |
| 10:34AM | 4 | A.   THAT IT WAS VERY EXCITING, THAT THE TECHNOLOGY WAS BEING |
| 10:34AM | 5 | USED IN THE MIDDLE EAST AND IN PARTICULAR IN THE -- ON THE |
| 10:34AM | 6 | BATTLEFIELD. |
| 10:34AM | 7 | Q.   AND YOU SAID THAT WAS EXCITING.  WHY WAS THAT EXCITING FOR |
| 10:34AM | 8 | YOU AS AN INVESTOR? |
| 10:34AM | 9 | A.   THAT, AGAIN, THE TECHNOLOGY WAS OPERATING, WORKING, AND |
| 10:34AM | 10 | THAT THE MILITARY FOUND IT VERY HELPFUL FOR THEM. |
| 10:34AM | 11 | AND SO OBVIOUSLY IF THEY THOUGHT IT WAS GOOD, POTENTIALLY |
| 10:34AM | 12 | THEY WOULD ORDER -- PLACE A NICE ORDER FOR A LOT OF THE |
| 10:34AM | 13 | TECHNOLOGY, AND ANALYZERS, AND SO FORTH. |
| 10:34AM | 14 | Q.   THAT TOPIC, THAT BEING THE MILITARY'S USE OF THE THERANOS |
| 10:34AM | 15 | ANALYZER, WAS THAT SOMETHING THAT YOU DISCUSSED WITH MS. HOLMES |
| 10:34AM | 16 | ONCE OR MULTIPLE TIMES? |
| 10:35AM | 17 | A.   MULTIPLE TIMES. |
| 10:35AM | 18 | Q.   HOW ABOUT THE COMPANY'S FINANCIAL HEALTH? |
| 10:35AM | 19 | BASED ON YOUR CONVERSATIONS WITH MS. HOLMES, AND THE |
| 10:35AM | 20 | PUBLIC INFORMATION THAT YOU HAD READ, AND THE COMMUNICATIONS |
| 10:35AM | 21 | FROM THERANOS, WHAT WAS YOUR UNDERSTANDING ABOUT HOW THE |
| 10:35AM | 22 | COMPANY WAS DOING FINANCIALLY? |
| 10:35AM | 23 | A.   AND AGAIN, THIS IS THE 2013 TIMEFRAME? |
| 10:35AM | 24 | Q.   YES. |
| 10:35AM | 25 | A.   CLEARLY THE COMPANY NEEDED TO RAISE MONEY TO SCALE UP AND |

ER-4205

10:35AM   1    FOR THE INFRASTRUCTURE AND ROLLOUT.  SO WE CERTAINLY UNDERSTOOD

10:35AM   2    THAT.

10:35AM   3         AND AS I SAID EARLIER, A LARGE AMOUNT OF MONEY WAS BEING

10:35AM   4    RAISED, AND AT THAT TIME MY UNDERSTANDING WAS THAT AT LEAST A

10:35AM   5    COUPLE HUNDRED MILLION DOLLARS.

10:35AM   6    Q.   AND THE FACT THAT THAT MONEY WAS BEING RAISED FOR, AS YOU

10:35AM   7    SAID, SCALING, HOW DID THAT AFFECT YOUR VIEW OF THE INVESTMENT

10:35AM   8    AND THE RISK OF THE INVESTMENT?

10:35AM   9    A.   AGAIN, VERY EXCITING.  WE WERE ROLLING OUT, AND WE ARE

10:36AM  10    GOING TO HAVE SOME BIG REVENUE.

10:36AM  11    Q.   AFTER YOUR 2013 INVESTMENT, DID YOU CONTINUE TO STAY IN

10:36AM  12    CONTACT WITH MS. HOLMES ABOUT THE COMPANY?

10:36AM  13    A.   YES.

10:36AM  14    Q.   AND DID YOU CONTINUE TO SOMETIMES GET COMMUNICATIONS FROM

10:36AM  15    MS. HOLMES AND THERANOS?

10:36AM  16    A.   YES.

10:36AM  17    Q.   LET ME ASK YOU TO LOOK AT TAB 1770.

10:36AM  18         DO YOU SEE AT 1770 THERE'S AN EMAIL FROM THERANOS TO

10:36AM  19    THERANOS SHAREHOLDERS DATED JUNE 12TH, 2014?

10:36AM  20    A.   YES.

10:36AM  21              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1770.

10:37AM  22              MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:37AM  23              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:37AM  24         (GOVERNMENT'S EXHIBIT 1770 WAS RECEIVED IN EVIDENCE.)

10:37AM  25    BY MR. BOSTIC:

LUCAS DIRECT BY MR. BOSTIC                                    5633

10:37AM  1   Q.   SO WE SEE THIS EMAIL IN JUNE OF 2014; IS THAT CORRECT?

10:37AM  2   A.   YES.

10:37AM  3   Q.   AND WE'VE REDACTED EMAIL ADDRESSES EXCEPT FOR YOURS AND

10:37AM  4   MS. HOLMES; IS THAT CORRECT?

10:37AM  5   A.   YES.

10:37AM  6   Q.   AND LET'S LOOK AT PAGE 2.

10:37AM  7        AND DO YOU SEE HERE THAT THERE'S A MESSAGE FROM THERANOS

10:37AM  8   TO SHAREHOLDERS, SAYING IN THAT SECOND PARAGRAPH, "WITH THIS

10:37AM  9   EMAIL, WE'RE VERY PLEASED TO SHARE WITH YOU THIS MONTH'S

10:37AM  10  'FORTUNE' MAGAZINE COVER STORY."

10:37AM  11       IT SAYS, "'FORTUNE' DID IN-DEPTH RESEARCH TO UNDERSTAND

10:37AM  12  THE IMPACT OF OUR WORK" -- EXCUSE ME, "THE IMPACT OUR WORK WILL

10:37AM  13  HAVE ON THE WORLD, AND WE SELECTIVELY SHARED MORE OF OUR WORK

10:37AM  14  FOR THIS PIECE."

10:37AM  15       DO YOU SEE THAT?

10:37AM  16  A.   YES.

10:37AM  17  Q.   AND LET'S TURN THE PAGE TO PAGE 3.

10:37AM  18       AND DO YOU SEE THERE THAT THE EMAIL INCLUDES THE CONTENT

10:37AM  19  OF THIS ARTICLE FROM "FORTUNE" IN JUNE OF 2014?

10:38AM  20  A.   YES.

10:38AM  21  Q.   YES.  AND DO YOU RECALL READING THIS ARTICLE WHEN IT CAME

10:38AM  22  OUT IN MID-JUNE OF 2014?

10:38AM  23  A.   YES.

10:38AM  24  Q.   AND DO YOU RECALL THAT THAT ARTICLE WAS POSITIVE ABOUT

10:38AM  25  THERANOS?

ER-4207

LUCAS DIRECT BY MR. BOSTIC                                    5634

10:38AM   1        A.    EXTREMELY.

10:38AM   2                    MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

10:38AM   3                    THE COURT:  YES.

10:38AM   4             (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

10:38AM   5                    MR. BOSTIC:  NO FURTHER QUESTIONS.  THANK YOU.

10:38AM   6                    THE COURT:  YOU'LL HAVE CROSS-EXAMINATION,

10:38AM   7        MR. COOPERSMITH?

10:38AM   8                    MR. COOPERSMITH:  YES, YOUR HONOR.

10:38AM   9                    THE COURT:  FOLKS, WOULD YOU LIKE TO STAND UP NOW OR

10:38AM  10        TAKE A BRIEF BREAK NOW?

10:38AM  11             LET'S TAKE ABOUT 10 MINUTES, 15 MINUTE BREAK, AND THEN

10:38AM  12        WE'LL ENGAGE CROSS-EXAMINATION.

10:38AM  13             WE'LL BE BACK IN 15 MINUTES.

10:38AM  14                    THE WITNESS:  OKAY.

10:38AM  15             (RECESS FROM 10:38 A.M. UNTIL 11:10 A.M.)

11:10AM  16                    THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

11:10AM  17        ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

11:10AM  18             OUR JURY IS PRESENT.

11:10AM  19             DO YOU HAVE CROSS-EXAMINATION, MR. COOPERSMITH?

11:10AM  20                    MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

11:10AM  21             MAY I REMOVE MY MASK?

11:10AM  22                    THE COURT:  YES, YES.  OF COURSE.

11:10AM  23                    MR. COOPERSMITH:  THANK YOU.

11:10AM  24        ///

11:10AM  25        ///

ER-4208

LUCAS CROSS BY MR. COOPERSMITH                                    5635

                          **CROSS-EXAMINATION**

BY MR. COOPERSMITH:

Q.   GOOD MORNING.  MR. LUCAS.

A.   GOOD MORNING.

Q.   I'M JEFF COOPERSMITH.  I REPRESENT SUNNY BALWANI IN THIS

CASE.

     AND I'M GOING TO ASK YOU SOME QUESTIONS ABOUT YOUR

EXPERIENCES THAT ARE RELEVANT TO THIS MATTER.  OKAY?

A.   SURE.

Q.   THANK YOU.

     SO JUST TO START OFF WITH, AND I THINK YOU TALKED ABOUT

THIS ON DIRECT, BUT, IN FACT, YOU'VE NEVER MET MR. BALWANI?

A.   CORRECT.

Q.   AND YOU'VE NEVER HAD A CONVERSATION WITH MR. BALWANI?

A.   NO.

Q.   AND YOU -- IN FACT, IN THE COURTROOM TODAY, IS THIS THE

FIRST TIME THAT YOU'VE EVER EVEN SEEN HIM?

A.   YES.

Q.   AND YOUR CONTACT AT THERANOS WAS PRIMARILY

ELIZABETH HOLMES?

A.   CORRECT.

Q.   NOT MR. BALWANI?

A.   THAT'S CORRECT.

Q.   AND JUST TO BE ABSOLUTELY CLEAR, YOU NEVER SPOKE WITH

MR. BALWANI BEFORE ANY INVESTMENT YOU MADE OR YOUR FIRM MADE IN

LUCAS CROSS BY MR. COOPERSMITH                    5636

11:11AM  1    THERANOS?

11:11AM  2    A.   NO.

11:11AM  3    Q.   AND NOT BEFORE THE 2006 INVESTMENT?

11:11AM  4    A.   NO.

11:11AM  5    Q.   OR THE SECOND 2006 INVESTMENT?

11:11AM  6    A.   NO.

11:11AM  7    Q.   OR THE 2013 INVESTMENT?

11:11AM  8    A.   NO.

11:11AM  9    Q.   AND MR. BALWANI WAS NEVER ANNOUNCED AS BEING A PARTICIPANT

11:11AM  10   ON ANY PHONE CALL YOU WERE ON PERTAINING TO THERANOS?

11:11AM  11   A.   NOT TO MY KNOWLEDGE.

11:11AM  12   Q.   OR ANYTHING ELSE?

11:11AM  13   A.   CORRECT.

11:11AM  14   Q.   AND THERE'S NOTHING THAT MR. BALWANI EVER SAID OR DID THAT

11:11AM  15   INFLUENCED ANY OF YOUR DECISIONS TO INVEST IN THERANOS;

11:11AM  16   CORRECT?

11:11AM  17   A.   CORRECT.

11:11AM  18   Q.   OKAY.  LET'S JUST PIVOT TO ELIZABETH HOLMES, WHO YOU DID

11:11AM  19   HAVE A RELATIONSHIP WITH; RIGHT?

11:12AM  20   A.   YES, I HAD A -- SO I HAD BUSINESS RELATIONSHIP.

11:12AM  21        (LAUGHTER.)

11:12AM  22   BY MR. COOPERSMITH:

11:12AM  23   Q.   I DIDN'T MEAN TO IMPLY ANYTHING DIFFERENT.

11:12AM  24   A.   SORRY.

11:12AM  25   Q.   A BUSINESS RELATIONSHIP?

LUCAS CROSS BY MR. COOPERSMITH                    5637

11:12AM   1    A.   YES.

11:12AM   2    Q.   AND YOU MET ELIZABETH HOLMES IN 2006?

11:12AM   3    A.   PROBABLY SOONER.

11:12AM   4    Q.   BEFORE 2006?

11:12AM   5    A.   YES.

11:12AM   6    Q.   OKAY.  AND YOU MET HER BECAUSE YOUR UNCLE, DON LUCAS,

11:12AM   7    WAS --

11:12AM   8    A.   MADE THE INTRODUCTION, YES.

11:12AM   9    Q.   HE MADE THE INTRODUCTION?

11:12AM   10   A.   YES.

11:12AM   11   Q.   AND YOUR UNCLE, DON LUCAS, WAS ONE OF THE EARLY INVESTORS

11:12AM   12   IN THERANOS?

11:12AM   13   A.   CORRECT.

11:12AM   14   Q.   AND EVENTUALLY HE BECAME A MEMBER OF THE BOARD OF

11:12AM   15   DIRECTORS AT THERANOS?

11:12AM   16   A.   THAT'S RIGHT.

11:12AM   17   Q.   AND HE EVEN BECAME THE CHAIRMAN OF THE BOARD OF DIRECTORS?

11:12AM   18   A.   YES.

11:12AM   19   Q.   AND YOUR UNCLE, DON LUCAS, HE HAS A REPUTATION IN THE

11:12AM   20   INVESTMENT COMMUNITY HERE IN SILICON VALLEY; IS THAT RIGHT?

11:12AM   21   A.   YES.  HE HAD A GREAT CAREER.

11:12AM   22   Q.   RIGHT.

11:12AM   23   A.   YES.

11:13AM   24   Q.   AND CAN YOU JUST BRIEFLY DESCRIBE WHAT THAT WAS?

11:13AM   25   A.   HE, EARLY ON, WAS WITH THE FIRST VENTURE CAPITAL FIRM ON

ER-4211

LUCAS CROSS BY MR. COOPERSMITH                5638

11:13AM  1    THE WEST COAST, WHICH WAS CALLED DRAPER, GAITHER & ANDERSON.

11:13AM  2         AND AFTER THAT, HE WENT OUT ON HIS OWN AND WAS A PRIVATE

11:13AM  3    INVESTOR.

11:13AM  4    Q.   OKAY.  AND HE INVESTED IN SOME NOW FAMOUS SILICON VALLEY

11:13AM  5    COMPANIES?

11:13AM  6    A.   YES.

11:13AM  7    Q.   AND ONE OF THEM WAS ORACLE?

11:13AM  8    A.   YES.

11:13AM  9    Q.   AND THAT YOU CONSIDERED YOUR UNCLE, DON LUCAS, A SAVVY

11:13AM  10   INVESTOR?

11:13AM  11   A.   YES.

11:13AM  12   Q.   ONE OF THE BEST?

11:13AM  13   A.   AS I SAID, HE HAD A GREAT CAREER, YEAH.

11:13AM  14   Q.   AND A LOT OF THINGS THAT YOU PRACTICED IN YOUR OWN CAREER,

11:13AM  15   YOU LEARNED FROM DON LUCAS?

11:13AM  16   A.   CORRECT.

11:13AM  17   Q.   NOW, GOING BACK TO MS. HOLMES, WHEN YOU MET HER AND DURING

11:13AM  18   THE TIME THAT YOU WERE IN A BUSINESS RELATIONSHIP WITH HER --

11:14AM  19   A.   (LAUGHTER.)

11:14AM  20   Q.   YOU FOUND HER TO BE ARTICULATE?

11:14AM  21   A.   ABSOLUTELY.

11:14AM  22   Q.   ENGAGING?

11:14AM  23   A.   YES.

11:14AM  24   Q.   GENERALLY IMPRESSIVE?

11:14AM  25   A.   VERY IMPRESSIVE.

ER-4212

LUCAS CROSS BY MR. COOPERSMITH                                5639

11:14AM  1    Q.   VERY HARD WORKING?

11:14AM  2    A.   VERY HARD WORKING.

11:14AM  3    Q.   AND VERY DRIVEN TO ACCOMPLISH THE GOALS THAT SHE HAD SET

11:14AM  4    FOR HERSELF?

11:14AM  5    A.   ABSOLUTELY.

11:14AM  6    Q.   AND THAT YOU BELIEVED THAT SHE HAD A WONDERFUL VISION FOR

11:14AM  7    THE COMPANY THAT ULTIMATELY BECAME THERANOS; CORRECT?

11:14AM  8    A.   YES.

11:14AM  9    Q.   AND YOU'RE AWARE THAT YOUR UNCLE, DON LUCAS, HAD A SIMILAR

11:14AM  10   OPINION OF HER?

11:14AM  11   A.   YES.

11:14AM  12   Q.   AND WHEN YOU MAKE INVESTMENTS, YOU PUT A LOT OF FAITH IN

11:14AM  13   THE FOUNDERS OF A COMPANY?

11:14AM  14   A.   YES.  THAT WAS ONE OF HIS PRIMARY TENETS WAS YOU'RE

11:14AM  15   INVESTING IN THE PEOPLE.

11:14AM  16   Q.   OKAY.  AND ALSO YOU FOUND MS. HOLMES VERY PASSIONATE ABOUT

11:14AM  17   WHAT SHE DID?

11:14AM  18   A.   YES.

11:14AM  19   Q.   AND SINCERE?

11:14AM  20   A.   YES.

11:14AM  21   Q.   AND THAT WAS ANOTHER REASON WHY YOU WERE COMFORTABLE WITH

11:14AM  22   YOUR INVESTMENTS --

11:14AM  23   A.   YES.

11:14AM  24   Q.   -- AND INVOLVEMENT WITH THERANOS?

11:14AM  25   A.   YES.

LUCAS CROSS BY MR. COOPERSMITH                                    5640

11:15AM  1     Q.   YES?

11:15AM  2     A.   YES.

11:15AM  3     Q.   OKAY.  PIVOTING TO ANOTHER PERSON.

11:15AM  4          YOU ALSO KNEW OF A STANFORD PROFESSOR NAMED

11:15AM  5     CHANNING ROBERTSON?

11:15AM  6     A.   YES.

11:15AM  7     Q.   AND YOU'VE MET DR. ROBERTSON?

11:15AM  8     A.   I HAVE.

11:15AM  9     Q.   AND YOU UNDERSTAND THAT DR. ROBERTSON HAD A LONG AND

11:15AM  10    DISTINGUISHED CAREER AT STANFORD UNIVERSITY?

11:15AM  11    A.   YES.

11:15AM  12    Q.   AND HE WAS IN THE CHEMICAL ENGINEERING DEPARTMENT?

11:15AM  13    A.   YES.

11:15AM  14    Q.   AND, IN FACT, AT ONE POINT HE HAD BEEN A DEAN AT STANFORD?

11:15AM  15    A.   I, I DON'T KNOW, BUT, YES.

11:15AM  16    Q.   AND YOU UNDERSTAND THAT THERE WAS A CONNECTION BETWEEN

11:15AM  17    MS. HOLMES AND PROFESSOR ROBERTSON AT STANFORD?

11:15AM  18    A.   YES.

11:15AM  19    Q.   AND YOU'VE MET PROFESSOR ROBERTSON; RIGHT?

11:15AM  20    A.   MAYBE A COUPLE OF TIMES, YES.

11:15AM  21    Q.   OKAY.  AND, IN FACT, YOU MET HIM IN THE CONTEXT OF

11:15AM  22    THERANOS; CORRECT?

11:15AM  23    A.   THAT WOULD HAVE BEEN THE ONLY REASON.

11:15AM  24    Q.   RIGHT.

11:15AM  25         AND YOU HAD A DISCUSSION WITH DR. ROBERTSON ABOUT

ER-4214

11:16AM  1    THERANOS'S TECHNOLOGY?

11:16AM  2    A.   YES.

11:16AM  3    Q.   AND DR. ROBERTSON TOLD YOU THAT --

11:16AM  4         MR. BOSTIC:  OBJECTION.  HEARSAY IF IT'S BEING

11:16AM  5    OFFERED FOR THE TRUTH.

11:16AM  6         MR. COOPERSMITH:  IT'S BEING OFFERED TO SHOW THE

11:16AM  7    INFORMATION THAT THE INVESTOR HAD GOING INTO THE INVESTMENTS.

11:16AM  8         THE COURT:  FOR THE TRUTH OF THAT INFORMATION?

11:16AM  9         MR. COOPERSMITH:  NO.  JUST FOR NOTICE TO MR. LUCAS.

11:16AM  10        THE COURT:  THAT HE RECEIVED INFORMATION FROM THE

11:16AM  11   DOCTOR?

11:16AM  12        MR. COOPERSMITH:  YES, YOUR HONOR.

11:16AM  13        THE COURT:  ALL RIGHT.  THIS WILL BE ADMITTED NOT

11:16AM  14   FOR THE TRUTH OF THE MATTER ASSERTED, LADIES AND GENTLEMEN, BUT

11:16AM  15   JUST AS TO THE ISSUE OF INFORMATION PROVIDED IN REGARDS TO THIS

11:16AM  16   INVESTMENT BY MR. LUCAS.

11:16AM  17        MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:16AM  18   Q.   SO LET ME STATE MY QUESTION AGAIN.

11:16AM  19        MR. LUCAS, DR. ROBERTSON TOLD YOU THAT THE THERANOS

11:16AM  20   TECHNOLOGY WORKED GREAT?

11:16AM  21   A.   YES.

11:16AM  22   Q.   AND THAT WAS IMPORTANT TO YOU; RIGHT?

11:16AM  23   A.   YES, VALIDATING.

11:17AM  24   Q.   BECAUSE DR. ROBERTSON WAS A SCIENTIST?

11:17AM  25   A.   YES.

11:17AM  1    Q.   AND SOMEONE WHO WOULD HAVE HAD SUPERIOR KNOWLEDGE TO YOUR

11:17AM  2    OWN ABOUT TECHNICAL MATTERS LIKE THAT?

11:17AM  3    A.   YES.

11:17AM  4    Q.   AND YOU UNDERSTAND THAT DR. ROBERTSON ALSO JOINED THE

11:17AM  5    THERANOS BOARD AT SOME POINT?

11:17AM  6    A.   YES.

11:17AM  7    Q.   AND HE WAS A MENTOR TO ELIZABETH HOLMES?

11:17AM  8    A.   YES.

11:17AM  9    Q.   OKAY.  TURNING TO -- BACK TO MS. HOLMES FOR A MINUTE.

11:17AM  10        YOU WERE AWARE -- WELL, EVEN THOUGH YOU NEVER MET

11:17AM  11   MR. BALWANI, YOU HAD HEARD HIS NAME AT SOME POINT I'M ASSUMING?

11:17AM  12   A.   YES.  THE TIMEFRAME, I DON'T REMEMBER.

11:17AM  13   Q.   OKAY.  AND, IN FACT, YOU KNEW THAT MS. HOLMES HAD A

11:17AM  14   ROMANTIC RELATIONSHIP WITH A PERSON WHO HAD BECOME AN EXECUTIVE

11:17AM  15   AT THERANOS; CORRECT?

11:18AM  16   A.   YES.  AGAIN, I DON'T KNOW IN WHAT TIMEFRAME.

11:18AM  17   Q.   OKAY.  LET ME SHOW YOU SOMETHING THAT MIGHT REFRESH YOUR

11:18AM  18   MEMORY.  IF YOU COULD TURN -- WELL, I BETTER HAND OUT THE

11:18AM  19   BINDERS FIRST.

11:18AM  20   A.   OKAY.

11:18AM  21            MR. COOPERSMITH:  MAY I, YOUR HONOR?

11:18AM  22            THE COURT:  YES.

11:18AM  23            MR. COOPERSMITH:  (HANDING.)

11:18AM  24       MAY I APPROACH THE WITNESS, YOUR HONOR?

11:18AM  25            THE COURT:  YES.

11:18AM  1          MR. COOPERSMITH:  (HANDING.)

11:19AM  2      Q.  OKAY.  MR. LUCAS, JUST TO SEE IF I CAN REFRESH YOUR MEMORY

11:19AM  3      ABOUT THIS PARTICULAR POINT, COULD YOU PLEASE FIND IN YOUR

11:19AM  4      BINDER THAT I'VE JUST HANDED YOU TAB 4873.

11:19AM  5          YOU FOUND IT?

11:19AM  6      A.  OH, YES.

11:19AM  7      Q.  THANK YOU.  AND YOU KNOW WHO BRYAN TOLBERT IS?

11:19AM  8      A.  YES.

11:19AM  9      Q.  AND HE WAS ANOTHER INVESTOR IN THERANOS?

11:19AM  10     A.  YES.

11:19AM  11     Q.  AND HE WORKED FOR AN INDIVIDUAL NAMED CRAIG HALL; RIGHT?

11:19AM  12     A.  CORRECT.

11:19AM  13     Q.  AND CRAIG HALL IS THE HEAD OF THE HALL GROUP; CORRECT?

11:19AM  14     A.  YES.

11:19AM  15     Q.  AND MR. HALL IS ALSO AN INVESTOR WHO INVESTS IN VARIOUS

11:20AM  16     COMPANIES; RIGHT?

11:20AM  17     A.  CORRECT.

11:20AM  18     Q.  AND THROUGH HIS COMPANY, ALSO THERANOS?

11:20AM  19     A.  YES.

11:20AM  20     Q.  AND YOU UNDERSTAND MR. HALL AT ONE POINT WAS THE LARGEST

11:20AM  21     SHAREHOLDER IN AMERICAN AIRLINES; IS THAT RIGHT?

11:20AM  22     A.  THAT'S AS I UNDERSTAND IT, YES.

11:20AM  23     Q.  OKAY.  SO YOU HAD A LOT OF CONVERSATIONS WITH

11:20AM  24     BRYAN TOLBERT OVER THE YEARS ABOUT THERANOS; RIGHT?

11:20AM  25     A.  CORRECT.

ER-4217