No. 22-10338

IN THE
# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 18 OF 26 (PAGES ER-4818 – ER-5117)

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

01:09PM   1    A.   THAT'S CORRECT.

01:09PM   2    Q.   AND YOU WERE AWARE AT THE TIME THAT THERANOS HAD

01:09PM   3    $25 MILLION IN REVENUE AT THAT TIME; RIGHT?

01:09PM   4    A.   YES.

01:09PM   5    Q.   AND SO YOU WERE PROJECTING GROWTH IN 2014 TO GO FROM

01:09PM   6    25 MILLION TO 250 MILLION; IS THAT RIGHT?

01:09PM   7    A.   YES.

01:09PM   8    Q.   AND THEN IN 2015 YOU WERE PROJECTING GROWTH TO GO FROM

01:09PM   9    250 MILLION TO 1.56 BILLION; IS THAT CORRECT?

01:09PM   10   A.   THAT'S CORRECT.

01:09PM   11   Q.   AND THAT LAST INCREASE WAS AN INCREASE OF 525 PERCENT; IS

01:09PM   12   THAT RIGHT?

01:09PM   13   A.   YES.

01:09PM   14   Q.   OKAY.  LET'S GO TO THE ROW ON THIS TAB, ROW 3, COLUMN B,

01:09PM   15   WHICH IS TOTAL VALUE.

01:09PM   16        DO YOU SEE THAT?

01:09PM   17   A.   I DO.

01:10PM   18   Q.   OKAY.  AND SO ACCORDING TO YOUR MODEL, YOU ASSESS THE

01:10PM   19   TOTAL VALUE OF THERANOS TO BE $20.3 BILLION; IS THAT RIGHT?

01:10PM   20   A.   WELL, THIS IS THE U.S. PORTION OF THEIR BUSINESS, YES.

01:10PM   21   Q.   RIGHT.

01:10PM   22   A.   YOU'RE ASSUMING THAT -- WE'RE NOT INCLUDING ANY OF THE

01:10PM   23   OTHER INTERNATIONAL MARKETS IN THIS MODEL.  THIS IS JUST THE

01:10PM   24   U.S. RETAIL HOSPITAL, HOSPITAL (COURIER), PHARMA SERVICES, AND

01:10PM   25   THE PHYSICIAN OFFICE BUSINESS.

GROSSMAN CROSS BY MS. WALSH (RES.)                           6286

01:10PM 1    Q.   RIGHT.  BECAUSE THE INTERNATIONAL, THERANOS TOLD YOU OR

01:10PM 2    INDICATED THAT THERE WAS NO REVENUE EXPECTED ON THAT; RIGHT?

01:10PM 3    A.   THEY -- THAT'S NOT -- I DON'T THINK THAT'S QUITE ACCURATE.

01:10PM 4         I THINK WHAT THEY TOLD US WAS THAT THERE WAS NO NEAR TERM

01:10PM 5    REVENUE.

01:10PM 6         BUT EVEN IN OUR SECOND MEETING, THEY EXPLAINED A MAJOR

01:10PM 7    INITIATIVE TO PARTNER WITH EUROPEAN RESELLERS AND LAUNCH THEIR

01:11PM 8    SERVICE IN MULTIPLE EUROPEAN COUNTRIES.

01:11PM 9         SO OVER THE COURSE OF THIS MODEL, WHICH REALLY GOES OUT

01:11PM 10   FOR MANY YEARS, THE EUROPEAN OPPORTUNITY, THE GLOBAL

01:11PM 11   OPPORTUNITY WAS AN ENORMOUS PART OF THE VALUE HERE.  BUT WE

01:11PM 12   WERE NOT INCLUDING THAT IN THIS ANALYSIS HERE.

01:11PM 13        SO TO ANSWER THAT QUESTION, THAT 20 BILLION WAS THE VALUE

01:11PM 14   OF THE U.S. BUSINESS.  THE 20 BILLION IN CELL B3, WAS JUST U.S.

01:11PM 15   PART OF THERANOS.

01:11PM 16   Q.   RIGHT.  IT DID NOT INCLUDE INTERNATIONAL; RIGHT?

01:11PM 17   A.   NO.

01:11PM 18   Q.   AND PFM'S INVESTMENT IN THAT C2 ROUND THAT WE LOOKED AT ON

01:11PM 19   WEDNESDAY, THAT WAS AT $17 A SHARE; CORRECT?

01:11PM 20   A.   I BELIEVE THAT'S RIGHT, YES.

01:11PM 21   Q.   AND THERANOS'S VALUATION BASED ON $17 A SHARE WAS

01:11PM 22   $9 BILLION; CORRECT?

01:11PM 23   A.   I BELIEVE THAT'S, THAT'S ROUGHLY RIGHT, YES.

01:11PM 24   Q.   OKAY.  I WANTED TO ASK YOU ONE MORE THING ABOUT YOUR

01:12PM 25   MODEL.  THERE WAS NO ASSUMPTION IN THERE OR PROJECTION BASED ON

ER-4820

01:12PM   1      THERANOS DOING ANY WORK WITH THE MILITARY; IS THAT RIGHT?

01:12PM   2      A.   I DON'T BELIEVE WE INCLUDED THE MILITARY, EVEN THOUGH, AS

01:12PM   3      YOU HIGHLIGHTED A MOMENT AGO, THEY HAD TBD IN THEIR MODEL --

01:12PM   4      Q.   OKAY.

01:12PM   5      A.   -- THAT THEY SENT US.

01:12PM   6      Q.   OKAY.

01:12PM   7      A.   BUT WE DID INCLUDE THE PHARMA SERVICES REVENUE.  OBVIOUSLY

01:12PM   8      YOU CAN SEE THAT THERE.

01:12PM   9      Q.   BUT NO MILITARY; RIGHT?

01:12PM  10      A.   THAT'S RIGHT.

01:12PM  11      Q.   OKAY.  WE CAN TAKE THAT MODEL DOWN.

01:12PM  12           OKAY.  SO MR. BALWANI PROVIDED YOU WITH A SLIDE DECK THAT

01:12PM  13      WAS PRESENTED IN THE THERANOS MEETING; RIGHT?

01:12PM  14      A.   YES.

01:12PM  15      Q.   AND HE PRESENTED -- HE SENT YOU THE EXCEL VERSION OF THE

01:12PM  16      SPREADSHEET SO YOU COULD SEE ALL OF THE ASSUMPTIONS BEHIND HIS

01:13PM  17      NUMBERS; CORRECT?

01:13PM  18      A.   YES.

01:13PM  19      Q.   AND HE ANSWERED QUESTIONS FOR YOU WHEN YOU HAD QUESTIONS;

01:13PM  20      RIGHT?

01:13PM  21      A.   YES.

01:13PM  22      Q.   AND YOU SPOKE TO OTHER PEOPLE BESIDES MR. BALWANI AND

01:13PM  23      MS. HOLMES; RIGHT?

01:13PM  24      A.   YES.

01:13PM  25      Q.   YOU SPOKE TO A PERSON NAMED CHANNING ROBERTSON; IS THAT

GROSSMAN CROSS BY MS. WALSH (RES.)                    6288

01:13PM   1    CORRECT?

01:13PM   2    A.   YES.

01:13PM   3    Q.   AND YOU SPOKE TO, I GUESS IT'S DR. ROBERTSON, TWO

01:13PM   4    DIFFERENT TIMES, RIGHT, BEFORE YOUR INVESTMENT?

01:13PM   5    A.   I BELIEVE THAT'S RIGHT.

01:13PM   6    Q.   OKAY.  SO LET'S TAKE A LOOK AT 7398.

01:13PM   7         DO YOU SEE THAT?

01:13PM   8    A.   OH, I'M SORRY.

01:13PM   9    Q.   AND THIS IS AN EMAIL BETWEEN YOU AND DAVID BRADY ON

01:13PM  10    JANUARY 18TH; RIGHT?

01:13PM  11    A.   YES.

01:13PM  12    Q.   AND IT'S REGARDING -- AND THE SUBJECT LINE IS COMPANY;

01:14PM  13    RIGHT?

01:14PM  14    A.   YES.

01:14PM  15    Q.   AND COMPANY REFERS TO THERANOS; CORRECT?

01:14PM  16    A.   YES.

01:14PM  17    Q.   OKAY.  AND IS THIS AN EMAIL WHERE YOU WERE GETTING

01:14PM  18    INFORMATION ABOUT DR. ROBERTSON?

01:14PM  19    A.   I MEAN, I'M GETTING HIS CELL PHONE INFORMATION IF THAT'S

01:14PM  20    HOPEFULLY RESPONSIVE TO YOUR QUESTION, AND IT'S ABOUT WHERE HE

01:14PM  21    IS AT THAT POINT IN TIME.

01:14PM  22    Q.   SURE.  OKAY.

01:14PM  23         AND YOU KNEW THAT, THAT DR. ROBERTSON WAS A PROFESSOR AT

01:14PM  24    STANFORD UNIVERSITY; RIGHT?

01:14PM  25    A.   YES.

ER-4822

01:14PM 1    Q.   AND HE WAS A PROFESSOR OF CHEMICAL ENGINEERING; CORRECT?

01:14PM 2    A.   I BELIEVE THAT'S RIGHT, YES.

01:14PM 3    Q.   AND YOU KNEW THAT HE IS SOMEONE WHO HELPED

01:14PM 4    ELIZABETH HOLMES START THERANOS; RIGHT?

01:14PM 5    A.   YES.

01:14PM 6    Q.   OKAY.  AND HE HAD BEEN ON THE STANFORD FACULTY FOR MANY

01:14PM 7    DECADES; CORRECT?

01:14PM 8    A.   I DON'T KNOW HOW LONG, BUT I BELIEVE THAT'S ACCURATE.

01:15PM 9    Q.   OKAY.  AND YOU KNEW DR. ROBERTSON WAS ALSO ON THE BOARD AT

01:15PM 10   THERANOS; RIGHT?

01:15PM 11   A.   I'M NOT SURE IF I KNEW THAT AT THAT POINT IN TIME, BUT I

01:15PM 12   KNEW HE WAS INVOLVED WITH THE COMPANY.

01:15PM 13   Q.   OKAY.  AND HE WAS A WELL RESPECTED SCIENTIST; RIGHT?

01:15PM 14   A.   YES.

01:15PM 15   Q.   AND HE HAD BEEN INVOLVED IN OTHER HEALTH CARE STARTUPS.

01:15PM 16        IS THAT FAIR?

01:15PM 17   A.   YES.

01:15PM 18   Q.   AND YOU RELIED ON THE INFORMATION THAT DR. ROBERTSON

01:15PM 19   PROVIDED TO YOU; IS THAT RIGHT?

01:15PM 20   A.   YES.

01:15PM 21   Q.   OKAY.  ALL RIGHT.  IF YOU COULD TURN TO EXHIBIT 20200.

01:16PM 22   A.   OKAY.

01:16PM 23   Q.   OKAY.  AND JUST TURN TO PAGE -- ACTUALLY, IF YOU COULD

01:16PM 24   TURN TO PAGE 1 OF THE EXHIBIT.

01:16PM 25        YOU SAID YOU REMEMBERED HAVING TWO CALLS WITH

01:16PM 1    DR. ROBERTSON; RIGHT?

01:16PM 2    A.   YES.

01:16PM 3    Q.   AND ONE WAS IN JANUARY; CORRECT?

01:16PM 4    A.   YES.

01:16PM 5    Q.   AND THE OTHER ONE WAS IN FEBRUARY; RIGHT?

01:16PM 6    A.   I BELIEVE THAT'S RIGHT.

01:16PM 7    Q.   BUT BOTH WERE BEFORE YOU MADE YOUR INVESTMENT; CORRECT?

01:16PM 8    A.   I BELIEVE THAT'S RIGHT.

01:16PM 9    Q.   OKAY.  AND IF YOU CAN TURN TO PAGE 5.

01:16PM 10   A.   OKAY.

01:16PM 11   Q.   AND DR. ROBERTSON TOLD YOU DURING YOUR SECOND CALL WITH

01:17PM 12   HIM THAT THERANOS WAS WAY BEYOND PROOF OF CONCEPT.

01:17PM 13       DID HE TELL YOU THAT?

01:17PM 14   A.   YES.

01:17PM 15   Q.   AND THAT WENT INTO -- THAT WAS ANOTHER DATA POINT IN YOU

01:17PM 16   MAKING YOUR DECISION TO INVEST; RIGHT?

01:17PM 17   A.   YES.

01:17PM 18   Q.   AND HE ALSO SAID THE TECHNOLOGY WORKS; RIGHT?

01:17PM 19   A.   YES.

01:17PM 20   Q.   OKAY.  AND HE ALSO SAID THAT IT'S --

01:17PM 21          MR. LEACH:  YOUR HONOR, I HAVE A HEARSAY OBJECTION.

01:17PM 22   I THINK THIS IS BEING OFFERED FOR A DIFFERENT PURPOSE, AND IF

01:17PM 23   THAT'S THE CASE, THEN I HAVE NO OBJECTION.

01:17PM 24          THE COURT:  ARE YOU MOVING THIS EXHIBIT INTO

01:17PM 25   EVIDENCE?

01:17PM 1          MS. WALSH:  NO.

01:17PM 2          MR. LEACH:  IT'S TO THE PREVIOUS QUESTION ABOUT --

01:17PM 3          THE COURT:  RIGHT.

01:17PM 4      THEN THE PREVIOUS QUESTION CALLED FOR HEARSAY.

01:17PM 5          MS. WALSH:  YOUR HONOR, IT'S REALLY OFFERED FOR A

01:17PM 6  NONHEARSAY PURPOSE, WHICH IS THIS IS MORE INFORMATION THAT

01:17PM 7  MR. GROSSMAN IS GETTING IN MAKING A DECISION WHETHER TO INVEST

01:17PM 8  IN THERANOS.

01:17PM 9      IT'S NOT OFFERED FOR THE TRUTH.  IT'S WHAT THE EFFECT IT

01:18PM 10 HAD ON HIS STATE OF MIND IN MAKING THE DECISION WHETHER OR NOT

01:18PM 11 TO INVEST.

01:18PM 12         MR. LEACH:  I HAVE NO ISSUE WITH THAT, YOUR HONOR.

01:18PM 13         THE COURT:  SO, LADIES AND GENTLEMEN, IN RESPONSE TO

01:18PM 14 MR. GROSSMAN'S PREVIOUS ANSWER TO THE QUESTION OF WHAT

01:18PM 15 DR. ROBERTSON TOLD HIM, THAT RESPONSE IS NOT IN EVIDENCE FOR

01:18PM 16 THE TRUTH OF THE MATTER ASSERTED BY THE DOCTOR, NOR HIS

01:18PM 17 OPINIONS.

01:18PM 18     IT'S OFFERED SOLELY FOR THE IMPACT AND EFFECT ON

01:18PM 19 MR. GROSSMAN IN REGARDS TO ACCUMULATION OF INFORMATION

01:18PM 20 REGARDING THE DECISION TO INVEST AND FOR THAT PURPOSE ONLY.

01:18PM 21 BY MS. WALSH:

01:18PM 22 Q.   AND SO, MR. GROSSMAN, DR. ROBERTSON SAID THERANOS IS WAY

01:18PM 23 BEYOND PROOF OF CONCEPT; RIGHT?

01:18PM 24 A.   HE DID SAY THAT.

01:19PM 25 Q.   AND HE TOLD YOU THAT HIS VIEW WAS THE TECHNOLOGY WORKED;

GROSSMAN CROSS BY MS. WALSH (RES.)                                6292

01:19PM   1        RIGHT?

01:19PM   2        A.   THAT WAS HIS GENERAL MESSAGE, YES.

01:19PM   3        Q.   AND HE TOLD YOU THAT THE TEAM AT THERANOS WAS PHENOMENAL,

01:19PM   4        HE HAD NEVER SEEN ANYTHING LIKE THIS IN THE 40 STARTUPS HE HAS

01:19PM   5        WORKED ON; IS THAT RIGHT?

01:19PM   6        A.   I DON'T RECALL THAT SPECIFICALLY, BUT I DO KNOW THAT HE

01:19PM   7        SAID THAT THERE WAS A GOOD TEAM OF PEOPLE AT THE COMPANY.

01:19PM   8        Q.   OKAY.  AND IF YOU COULD TURN TO 14072.

01:19PM   9        A.   OKAY.

01:19PM  10        Q.   OKAY.  IS THIS AN EMAIL BETWEEN YOU AND CHRIS JAMES ON

01:20PM  11        JANUARY 26TH, 2014?

01:20PM  12        A.   IT IS, YES.

01:20PM  13        Q.   AND THIS EMAIL RELATES TO A THERANOS INVESTMENT; IS THAT

01:20PM  14        RIGHT?

01:20PM  15        A.   YES.

01:20PM  16        Q.   AND IT ALSO RELATES TO A CALL THAT YOU HAD WITH

01:20PM  17        DR. ROBERTSON; RIGHT?

01:20PM  18        A.   THE FIRST CALL, YES.

01:20PM  19        Q.   THE FIRST CALL, CORRECT.

01:20PM  20             THE SECOND CALL WAS IN FEBRUARY; RIGHT?

01:20PM  21        A.   YES.

01:20PM  22        Q.   OKAY.

01:20PM  23             YOUR HONOR, WE OFFER 14072.

01:20PM  24             MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:20PM  25             THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

GROSSMAN CROSS BY MS. WALSH (RES.)                    6293

01:20PM    1            (DEFENDANT'S EXHIBIT 14072 WAS RECEIVED IN EVIDENCE.)

01:20PM    2    BY MS. WALSH:

01:20PM    3    Q.   SO IF WE JUST GO DOWN TO THE BOTTOM OF THAT CHAIN FIRST.

01:20PM    4            MR. JAMES IS REACHING OUT TO YOU, MR. GROSSMAN, SAYING,

01:20PM    5    "WHEN CAN U DO THERANOS INTERNAL PRESENTATION?"

01:20PM    6            DO YOU SEE THAT?

01:20PM    7    A.   I DO.

01:20PM    8    Q.   "WE NEED TO FIRM UP SIZE IN NEXT COUPLE OF DAYS AT

01:20PM    9    LATEST."

01:20PM   10            AND THEN YOU REPLY IN THE TOP EMAIL AND YOU SAY, "WELL,

01:21PM   11    I'M TAKING OFF TUESDAY AFTERNOON.  IDEALLY WE SHOULD TRY TO DO

01:21PM   12    A FIRST PASS ON TUESDAY MORNING.  OTHERWISE THURSDAY, I COULD

01:21PM   13    DIAL IN, LEAD THE MEETING FROM NEW YORK AND THE DEAL TEAM WOULD

01:21PM   14    BE IN SAN FRANCISCO IN BIG CONFERENCE ROOM."

01:21PM   15            AND YOU'RE TALKING ABOUT THE PRESENTATION, AREN'T YOU?

01:21PM   16    A.   I BELIEVE, YES, HE'S ASKING ME ABOUT AN INTERNAL THERANOS

01:21PM   17    PRESENTATION.

01:21PM   18            SO I THINK THAT PART OF THE EMAIL I'M RESPONDING TO THE

01:21PM   19    INTERNAL THERANOS PRESENTATION.

01:21PM   20    Q.   OKAY.  AND THAT PRESENTATION WAS TO POTENTIAL INVESTORS IN

01:21PM   21    THERANOS; IS THAT RIGHT?

01:21PM   22    A.   I'M NOT SURE.  I DON'T REMEMBER THAT PRESENTATION.  I

01:21PM   23    DON'T BELIEVE I ACTUALLY WAS PART OF THAT PRESENTATION, SO I'M

01:21PM   24    NOT SURE WHO WAS THERE.

01:21PM   25            BUT I -- I'LL TELL YOU WHAT MY UNDERSTANDING WAS.  IT WAS

01:21PM  1      FOR INTERNAL PEOPLE AT THE EVENT, OUR OWN EMPLOYEES THAT WERE

01:22PM  2      INTERESTED IN POTENTIALLY INVESTING.

01:22PM  3      Q.   OKAY.  AND -- RIGHT.  SO THAT PRESENTATION WAS A

01:22PM  4      PRESENTATION ABOUT POTENTIAL INVESTMENT IN THERANOS; RIGHT?

01:22PM  5      A.   YEAH.  AND AS THE EMAIL SAYS, IT'S AN INTERNAL

01:22PM  6      PRESENTATION.

01:22PM  7      Q.   SURE.  AND EVEN THOUGH YOU WEREN'T IN SAN FRANCISCO, YOU

01:22PM  8      LED THAT PRESENTATION FROM NEW YORK; IS THAT RIGHT?

01:22PM  9      A.   I DON'T BELIEVE THAT I WAS INVOLVED IN THIS PRESENTATION.

01:22PM 10      SO, NO, I DIDN'T LEAD IT FROM NEW YORK.

01:22PM 11      Q.   OKAY.  YOU DIDN'T PARTICIPATE IN IT AT ALL?

01:22PM 12      A.   I DON'T REMEMBER IT SPECIFICALLY.  I HAVE NO MEMORY OF

01:22PM 13      THIS PRESENTATION, SO I DON'T KNOW -- I DON'T BELIEVE I WAS

01:22PM 14      INVOLVED IN THIS MEETING.

01:22PM 15      Q.   OKAY.  BUT YOU WERE LEADING THE EFFORT TO DECIDE WHETHER

01:22PM 16      TO INVEST IN THERANOS; RIGHT?

01:22PM 17      A.   I HAVE THE FINAL SAY, LIKE I DO FOR EVERYTHING, IN THE

01:22PM 18      PORTFOLIO.

01:22PM 19           BUT IT WAS A COLLABORATIVE TEAM EFFORT.  WE HAD THREE

01:22PM 20      SENIOR PEOPLE WORKING ON IT, ONE JUNIOR PERSON, AND ANY OF THEM

01:22PM 21      WOULD HAVE BEEN QUALIFIED TO DESCRIBE THE INVESTMENT, THE

01:23PM 22      COMPANY TO THEIR COLLEAGUES INTERNALLY.

01:23PM 23      Q.   OKAY.  SO JUST MOVING DOWN THE EMAIL, IN THE SECOND

01:23PM 24      PARAGRAPH I THE SECOND SENTENCE YOU SAY, "I'M FEELING EVEN

01:23PM 25      BETTER ABOUT THIS NOW. "

01:23PM  1          THAT'S REFERRING TO THE INVESTMENT IN THERANOS; IS THAT

01:23PM  2     RIGHT?

01:23PM  3     A.   YES.

01:23PM  4     Q.   "I HAD A MIND BLOWING CALL WITH ELIZABETH'S PROFESSOR WHO

01:23PM  5     HELPED HER START THIS."

01:23PM  6          THAT'S A REFERENCE TO DR. ROBERTSON; IS THAT RIGHT?

01:23PM  7     A.   YES.

01:23PM  8     Q.   AND THAT'S THE JANUARY CALL; CORRECT?

01:23PM  9     A.   YES.

01:23PM  10    Q.   AND THEN YOU SAY, "WAS THE ORIGINAL BOARD MEMBER."

01:23PM  11         DO YOU SEE THAT?

01:23PM  12    A.   I DO.

01:23PM  13    Q.   OKAY.  LET'S TURN TO 7411.

01:24PM  14    A.   OKAY.

01:24PM  15    Q.   IS 7411 AN EMAIL FROM DR. RABODZEY TO YOU, AND MR. KHANNA,

01:24PM  16    AND MS. SUMME?

01:24PM  17         DO YOU SEE THAT?

01:24PM  18    A.   I DO.

01:24PM  19    Q.   OKAY.  AND THE DATE OF THE EMAIL IS JANUARY 30TH, 2014;

01:24PM  20    RIGHT?

01:24PM  21    A.   YES.

01:24PM  22    Q.   AND IT RELATES TO THE FINAL VERSION OF THE THERANOS

01:24PM  23    PRESENTATION; CORRECT?

01:24PM  24    A.   THAT'S WHAT IT SAYS, YES.

01:24PM  25    Q.   OKAY.  AND IT ATTACHES A PDF RELATED TO THERANOS; CORRECT?

01:24PM   1    A.   YES.

01:24PM   2    Q.   AND THIS IS ONE OF THE PRESENTATIONS THAT WAS MADE IN

01:24PM   3    DECIDING WHETHER TO INVEST IN THERANOS; CORRECT?

01:24PM   4    A.   THIS WAS A PRESENTATION THAT WAS FOR I BELIEVE THIS

01:24PM   5    INTERNAL MEETING.

01:24PM   6    Q.   OKAY.

01:25PM   7         YOUR HONOR, WE OFFER 7411.

01:25PM   8              MR. LEACH:  NO OBJECTION.

01:25PM   9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:25PM  10         (DEFENDANT'S EXHIBIT 7411 WAS RECEIVED IN EVIDENCE.)

01:25PM  11    BY MS. WALSH:

01:25PM  12    Q.   SO IT WAS YOUR -- I THINK YOU JUST SAID THIS, IT WAS YOUR

01:25PM  13    ENTIRE TEAM WHO PUT THIS SLIDE DECK TOGETHER; IS THAT RIGHT?

01:25PM  14    A.   IT WAS A COLLABORATIVE EFFORT.  I'M NOT SURE WHO ON THE

01:25PM  15    TEAM DID WHAT AS IT RELATES TO THIS PARTICULAR DOCUMENT.

01:25PM  16    Q.   OKAY.  BUT YOUR TEAM MEMBERS WORKED IN COLLABORATION TO

01:25PM  17    COME UP WITH A WORK PRODUCT; CORRECT?

01:25PM  18    A.   YES.

01:25PM  19    Q.   AND THIS IS THE RESULT OF THAT WORK; RIGHT?

01:25PM  20    A.   YES.

01:25PM  21    Q.   OKAY.  AND THIS -- YOU BELIEVE THIS WAS PRESENTED

01:25PM  22    INTERNALLY TO EMPLOYEES WHO MAY HAVE WANTED TO INVEST IN

01:25PM  23    THERANOS; IS THAT RIGHT?

01:25PM  24    A.   THAT'S MY UNDERSTANDING.  I DON'T RECALL SPECIFICALLY.

01:26PM  25         AND AS I SAID BEFORE, I WASN'T PART OF THIS MEETING.

GROSSMAN CROSS BY MS. WALSH (RES.)                          6297

01:26PM  1    Q.   OKAY.  BUT IS IT FAIR TO SAY THAT IN WHATEVER PRESENTATION

01:26PM  2    WAS GIVEN TO THE PFM EMPLOYEES, YOU WOULD HAVE INCLUDED WHAT

01:26PM  3    YOU VIEWED AS THE RELEVANT INFORMATION TO COMMUNICATE; IS THAT

01:26PM  4    RIGHT?

01:26PM  5    A.   WELL, WE CERTAINLY WOULDN'T WANT TO GIVE THEM EVERY PIECE

01:26PM  6    OF INFORMATION THAT WE ACCUMULATED.  THAT WOULDN'T -- THAT

01:26PM  7    WOULD HAVE TAKEN WAY TOO LONG.

01:26PM  8         SO I THINK WE, WE -- THE EFFORT IS REALLY AROUND GIVING

01:26PM  9    THEM A VIEW OF THE COMPANY AND THE BUSINESS WITHOUT GIVING THEM

01:26PM  10   TOO MUCH DETAIL.

01:26PM  11   Q.   OKAY.  BUT YOU WOULD INCLUDE THE RELEVANT THINGS THAT YOU

01:26PM  12   FELT WERE IMPORTANT; RIGHT?

01:26PM  13   A.   I MEAN, THAT'S A SUBJECTIVE PERSPECTIVE.  I MEAN,

01:26PM  14   DIFFERENT PEOPLE MAY THINK DIFFERENT THINGS ARE RELEVANT, BUT,

01:26PM  15   YEAH, WE WOULD CERTAINLY WANT PEOPLE TO WALK AWAY AND

01:26PM  16   UNDERSTAND THE COMPANY.

01:26PM  17   Q.   OKAY.  SO LET'S TAKE A LOOK AT SLIDE 3, WHICH IS MARKET

01:27PM  18   OVERVIEW.

01:27PM  19        GREAT.  AND THIS WAS THE SLIDE THAT WE JUST LOOKED AT IN

01:27PM  20   YOUR MODEL, RIGHT, AND YOU SAID THIS WAS A PART OF THE

01:27PM  21   PRESENTATION; CORRECT?

01:27PM  22   A.   YES.

01:27PM  23   Q.   OKAY.  AND THIS WAS JUST INFORMATION ABOUT THE U.S. LAB

01:27PM  24   MARKET, DIFFERENT SEGMENTS WITHIN THAT MARKET TO GIVE SOME

01:27PM  25   CONTEXT TO THE INVESTMENT; CORRECT?

ER-4831

01:27PM 1    A.  YES.

01:27PM 2    Q.  OKAY.  AND THEN IF WE CAN GO TO SLIDE 4.  THAT'S LABELLED

01:27PM 3    BUSINESS OVERVIEW.

01:27PM 4        LET'S GO DOWN TO THE THIRD BULLET.

01:27PM 5        YOU SAY IN THE THIRD BULLET, "MODEST NUMBER OF CURRENT

01:27PM 6    TESTS REQUIRE VENOUS BLOOD DRAW, WHICH WILL BE TRANSITIONED TO

01:28PM 7    FINGERSTICK IN THE NEXT FEW MONTHS."

01:28PM 8        DO YOU SEE THAT?

01:28PM 9    A.  I DO.

01:28PM 10   Q.  AND THE NEXT BULLET SAYS, "ANNOUNCE ROLLOUT OF PLATFORM IN

01:28PM 11   8,000 PLUS WALGREENS STORES NATIONWIDE."

01:28PM 12       DO YOU SEE THAT?

01:28PM 13   A.  IT'S NOT ON THIS SCREEN.  THERE WE GO.

01:28PM 14   Q.  YES.

01:28PM 15   A.  YES.

01:28PM 16   Q.  AND THEN GOING DOWN TO THE LAST BULLET, "FASTER AND MORE

01:28PM 17   CONVENIENT LAB TESTING EXPERIENCE FOR CONSUMER -- WALGREENS

01:28PM 18   OPEN 24/7," ET CETERA.

01:28PM 19       DO YOU SEE THAT?

01:28PM 20   A.  I DO.

01:28PM 21   Q.  NOW IF WE CAN GO TO SLIDE 5.

01:28PM 22       SLIDE 5 IS LABELLED BUSINESS OUTLOOK.  AND THERE'S AN

01:28PM 23   UPSIDE SCENARIO AND A DOWNSIDE SCENARIO.

01:28PM 24       DO YOU SEE THAT?

01:28PM 25   A.  I DO.

01:28PM  1    Q.   OKAY.  AND WE'RE GOING TO GO THROUGH SOME OF THE DOWNSIDE

01:29PM  2    SCENARIO.

01:29PM  3         SO THE FIRST BULLET SAYS, "HUB AND SPOKE MODEL LIMITS

01:29PM  4    THERANOS TO SELECTED MAJOR CITIES."

01:29PM  5         IS THAT RIGHT?

01:29PM  6    A.   YES.

01:29PM  7    Q.   OKAY.  THE NEXT IS, "LOBBYING EFFORTS FROM QUEST AND

01:29PM  8    LABCORP DELAY CUTS IN MEDICARE REIMBURSEMENT."

01:29PM  9         DO YOU SEE THAT?

01:29PM  10   A.   I DO SEE THAT.

01:29PM  11   Q.   AND THE NEXT ONE, "RETAIL STORES REQUIRE STAFFING OF

01:29PM  12   PHLEBOTOMISTS REDUCING PROFITABILITY IN RETAIL SEGMENT."

01:29PM  13        DO YOU SEE THAT?

01:29PM  14   A.   I DO SEE THAT.

01:29PM  15   Q.   AND THEN SKIPPING DOWN TO THE SECOND TO THE LAST BULLET,

01:29PM  16   "EXECUTION OF THE ROLLOUT TAKES LONGER BECAUSE OF TEST

01:29PM  17   VALIDATION."

01:29PM  18        DO YOU SEE THAT?

01:29PM  19   A.   I DO.

01:29PM  20   Q.   "GEOGRAPHIC CONSTRAINTS, PAYER CONTRACTING AND OTHER

01:29PM  21   UNFORESEEN CIRCUMSTANCES."

01:29PM  22        THE NEXT BULLET SAYS, "CUSTOMER EXPERIENCE IS NOT AS GOOD

01:29PM  23   AS EXPECTED AND DISTRIBUTION PARTNERS SCALE BACK THEIR

01:29PM  24   ROLLOUT."

01:29PM  25        DO YOU SEE THAT?

ER-4833

01:30PM  1      A.   I DO.

01:30PM  2      Q.   AND SO THOSE WERE ALL POTENTIAL DOWNSIDES; RIGHT?

01:30PM  3      A.   YES.

01:30PM  4      Q.   AND ON THE UPSIDE SCENARIO, IF WE LOOK AT THE SECOND

01:30PM  5      BULLET IT SAYS, "REGULATORY APPROVAL REQUIRED TO PLACE THERANOS

01:30PM  6      UNITS WITHIN RETAIL STORES VERSUS HUB AND SPOKE MODEL."

01:30PM  7           DO YOU SEE THAT?

01:30PM  8      A.   I DO.

01:30PM  9      Q.   AND SO THAT WOULD BE A GOOD THING, RIGHT, IF THERANOS GOT

01:30PM  10     APPROVAL TO PUT ITS DEVICE RUNNING TESTS INTO WALGREENS; RIGHT?

01:30PM  11     A.   YES.  THIS KIND OF REFERENCES OUR BULL CASE, WHICH WE

01:30PM  12     TRIED TO KIND OF BUILD OUR BASE CASE AND DOWNSIDE CASE AROUND

01:30PM  13     THE HUB AND SPOKE MODEL, WHICH TOOK THAT REGULATORY RISK OFF

01:30PM  14     THE TABLE.

01:30PM  15          BUT IF THEY WERE ABLE TO GET APPROVAL TO PUT THEM IN THE

01:30PM  16     THERANOS STORES, WE JUST WANTED PEOPLE TO KNOW THAT THAT WOULD

01:30PM  17     BE AN UPSIDE SCENARIO VERSUS WHAT WE'RE MODELING AS OUR BASE

01:31PM  18     CASE.

01:31PM  19          SO THAT'S WHY WE INCLUDED THAT BULLET POINT THERE.

01:31PM  20     Q.   OKAY.  AND IN THIS PRESENTATION, THERE'S NO MENTION OF ANY

01:31PM  21     DEPARTMENT OF DEFENSE BUSINESS; CORRECT?

01:31PM  22     A.   THAT'S CORRECT.

01:31PM  23     Q.   AND THERE'S NO MENTION THAT THERANOS HAD $220 MILLION IN

01:31PM  24     REVENUE SINCE ITS INCEPTION; RIGHT?

01:31PM  25     A.   YEAH.  LIKE I SAID, WE'RE NOT GOING TO PUT EVERY SINGLE

01:31PM   1    DATA POINT FROM ALL OF OUR MEETINGS INTO THIS DOCUMENT.

01:31PM   2        SO THERE ARE OTHER THINGS THAT WOULD NOT BE IN HERE, TOO.

01:31PM   3    Q.   OKAY.  ABOUT $220 MILLION IN REVENUE SINCE INCEPTION IS

01:31PM   4    DEFINITELY NOT IN THIS PRESENTATION; RIGHT?

01:31PM   5    A.   I MEAN, I HAVE NOT BEEN THROUGH THE WHOLE PRESENTATION,

01:31PM   6    BUT I DON'T BELIEVE IT'S ON THIS PAGE.

01:31PM   7    Q.   OKAY.  DO YOU WANT TO TAKE A LOOK AT IT TO MAKE SURE.

01:31PM   8    A.   NO.  THAT'S OKAY.  WE CAN KEEP GOING.

01:31PM   9    Q.   OKAY.  AND THERE'S NOTHING -- YOU TESTIFIED ON WEDNESDAY

01:31PM  10    THAT MS. HOLMES AND MR. BALWANI TOLD YOU THAT THE DEVICE HAD

01:32PM  11    FLOWN ON MEDEVACS IN AFGHANISTAN AND HAD SAVED SOLDIERS' LIVES.

01:32PM  12        DO YOU REMEMBER THAT TESTIMONY?

01:32PM  13    A.   I DO.

01:32PM  14    Q.   AND THERE'S NOTHING ABOUT THAT IN THIS PRESENTATION, IS

01:32PM  15    THERE?

01:32PM  16    A.   NO.

01:32PM  17    Q.   OKAY.

01:32PM  18        MAY I HAVE A MOMENT, YOUR HONOR?

01:32PM  19            THE COURT:  FOLKS, IF YOU WANT TO STAND UP FOR A

01:32PM  20    MINUTE, FEEL FREE.

01:32PM  21        YOU MAY AS WELL.

01:32PM  22            THE WITNESS:  THANK YOU.

01:33PM  23        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:33PM  24        (STRETCHING.)

01:33PM  25            MS. WALSH:  I HAVE NO FURTHER QUESTIONS AT THIS

01:33PM  1        TIME.

01:33PM  2                THE COURT:  THANK YOU.

01:33PM  3            REDIRECT?

01:33PM  4                MR. LEACH:  THANK YOU, YOUR HONOR.

01:33PM  5                      **REDIRECT EXAMINATION**

01:33PM  6    BY MR. LEACH:

01:34PM  7    Q.   GOOD AFTERNOON, MR. GROSSMAN.

01:34PM  8    A.   GOOD AFTERNOON.

01:34PM  9    Q.   I HAVE A FEW QUESTIONS RELATING TO SOME OF THE QUESTIONS

01:34PM  10   THAT MS. WALSH ASKED YOU ON CROSS-EXAMINATION.

01:34PM  11       AND I'D LIKE TO START WHERE MS. WALSH ENDED.

01:34PM  12       DO YOU RECALL BEING ASKED QUESTIONS ABOUT MS. HOLMES AND

01:34PM  13   MR. BALWANI'S STATEMENTS ABOUT THE THERANOS DEVICE BEING ON

01:34PM  14   MEDEVAC HELICOPTERS.

01:35PM  15       DO YOU RECALL THOSE QUESTIONS?

01:35PM  16   A.   I DO.

01:35PM  17   Q.   AND WHAT, AGAIN, DID MS. HOLMES AND MR. BALWANI TELL YOU

01:35PM  18   IN THAT DECEMBER 2013 MEETING ABOUT MEDEVACS?

01:35PM  19               MS. WALSH:  OBJECTION.  ASKED AND ANSWERED.

01:35PM  20               THE COURT:  OVERRULED.

01:35PM  21               THE WITNESS:  THEY, THEY -- IT WAS AT THE BEGINNING

01:35PM  22   OF THE MEETING, AFTER THEY HAD TOLD US THAT THEY HAD BEEN IN

01:35PM  23   STEALTH MODE FOR OVER TEN YEARS.

01:35PM  24       AND DURING THAT TEN YEAR PERIOD OF TIME, THEY HAD BEEN

01:35PM  25   WORKING WITH THE DEPARTMENT OF DEFENSE AND THEIR TECHNOLOGY HAD

ER-4836

01:35PM 1   BEEN DEPLOYED ON MEDEVACS, AND THEY WENT THROUGH THIS EXAMPLE

01:35PM 2   ABOUT HOW GIVING DIAGNOSTIC INFORMATION TO THE EMERGENCY ROOM

01:35PM 3   IN THE MILITARY SETTING WITHIN A SHORT -- WITHIN AN HOUR SAVED

01:35PM 4   LIVES, AND THEIR TECHNOLOGY HAD BEEN DOING THAT IN THE

01:35PM 5   BATTLEFIELD.

01:35PM 6        THEY ALSO, SUBSEQUENT TO THAT, TOLD US IT WAS ALSO USED TO

01:35PM 7   IDENTIFY, AGAIN, IN THE BATTLEFIELD, SOLDIERS THAT GOT SICK,

01:35PM 8   THEY COULD QUICKLY, WITH THIS TECHNOLOGY, IDENTIFY THE VIRUS OR

01:35PM 9   THE BACTERIA, AND THAT ALSO WAS ABLE TO SAVE LIVES.

01:36PM 10  Q.   AND SUBSEQUENT TO THAT DECEMBER 2013 MEETING, DID

01:36PM 11  MR. BALWANI ALSO SAY THAT THE DEVICE HAD BEEN IN AFGHANISTAN?

01:36PM 12  A.   YES.  WE WERE ASKING HIM ABOUT HOW RELIABLE THIS EQUIPMENT

01:36PM 13  WAS IN THE REAL WORLD, HOW WILL IT HOLD UP IF YOU HAVE TO RUN

01:36PM 14  YOUR MINILABS 24/7 TO SUPPORT THESE DIFFERENT RETAIL

01:36PM 15  GEOGRAPHIES, AND HE EXPLAINED HOW EACH DEVICE HAD A HEARTBEAT,

01:36PM 16  THEY COULD MONITOR THE DEVICE REMOTELY, AND THE WORK AND THE

01:36PM 17  TIME THAT THEY HAD SPENT WITH THE MILITARY USING THIS

01:36PM 18  TECHNOLOGY HAD GIVEN THEM IMPORTANT INSIGHTS FOR HOW A REAL

01:36PM 19  WORLD APPLICATION WOULD WORK.

01:36PM 20       THE ENVIRONMENT IN THE MILITARY BEING CHALLENGING,

01:36PM 21  DIFFICULT, YOU KNOW, THE PLACES WHERE THIS WAS USED, THE

01:36PM 22  WEATHER, THE HUMIDITY, YOU KNOW, THE, THE -- JUST A LOT OF

01:36PM 23  DUST, THOSE TYPES OF THINGS REALLY HELPED THEM CREATE A VERY

01:37PM 24  ROBUST REAL WORLD 24/7 WORK FORCE ANALYZER.

01:37PM 25  Q.   AND THE STATEMENTS ABOUT MEDEVACS, AFGHANISTAN, USED BY

01:37PM  1    THE MILITARY, WERE THEY RELEVANT TO YOU?

01:37PM  2    A.   THEY WERE VERY RELEVANT.  I MEAN, AS I SAID THE OTHER DAY,

01:37PM  3    YOU KNOW WHAT -- ANYTHING THAT THE MILITARY WOULD USE ON A

01:37PM  4    SOLDIER HAS TO GO THROUGH A RIGOROUS VETTING PROCESS AND MEET

01:37PM  5    THE HIGHEST STANDARDS.

01:37PM  6         AND SO -- NOT TO MENTION HOW DIFFICULT CONDITIONS CAN BE

01:37PM  7    IN THE PARTS OF THE WORLD WHERE OUR MILITARY AT THAT POINT IN

01:37PM  8    TIME HAD BEEN DEPLOYED, YOU KNOW, THE MIDDLE EAST, AFGHANISTAN,

01:37PM  9    THOSE TYPES OF PLACES.  IT COULD BE REALLY HARSH ENVIRONMENTS

01:37PM 10    TO OPERATE A DEVICE LIKE THIS.

01:37PM 11         SO FOR ALL OF THOSE REASONS, WE WERE IMPRESSED AND IT

01:37PM 12    REALLY SPOKE TO HOW MUCH THIS COMPANY HAD ACCOMPLISHED OVER

01:38PM 13    THAT TEN YEAR STEALTH PERIOD.

01:38PM 14    Q.   MS. WALSH SHOWED YOU A POWERPOINT PRESENTATION THAT YOU

01:38PM 15    DID NOT PREPARE FOR A MEETING THAT YOU DID NOT ATTEND.  IT

01:38PM 16    DOESN'T MAKE REFERENCE TO MEDEVACS.

01:38PM 17         DOES THAT MEAN THAT THAT INFORMATION IS NOT RELEVANT TO

01:38PM 18    YOU?

01:38PM 19    A.   NO.  WE WERE INVESTING, WE WERE INVESTING IN THE RETAIL

01:38PM 20    HOSPITAL PHYSICIAN ROLLOUT.

01:38PM 21         AS IMPRESSIVE AS THE MEDEVAC EXAMPLE WAS, I'M NOT SURE

01:38PM 22    THAT THAT WOULD BE A GREAT BUSINESS.  I'M NOT SURE WHAT THE

01:38PM 23    MARKET OPPORTUNITY FOR THIS TECHNOLOGY IN A MILITARY SETTING

01:38PM 24    WOULD BE.

01:38PM 25         IT PROBABLY WOULDN'T BE THE TYPE OF THING THAT WE WOULD

ER-4838

01:38PM   1    GET REALLY EXCITED ABOUT.

01:38PM   2         SO OUR FOCUS FROM AN INVESTMENT PERSPECTIVE IS HOW THIS

01:38PM   3    TECHNOLOGY WAS GOING TO BE ROLLED OUT, USED IN A REAL WORLD

01:38PM   4    SETTING BOTH THE RETAIL SIDE, AND ACTUALLY JUST AS IMPORTANTLY,

01:38PM   5    THE HOSPITAL AND THE PHYSICIAN OFFICE PIECE OF IT WAS ALSO

01:38PM   6    EQUALLY IMPORTANT AS WAS THE INTERNATIONAL OPPORTUNITY THAT WE

01:39PM   7    DID NOT INCLUDE IN OUR BASE CASE -- ACTUALLY IN ANY OF OUR

01:39PM   8    ANALYSES.

01:39PM   9    Q.   DID THE STATEMENTS ABOUT THE MILITARY LEND CREDIBILITY TO

01:39PM   10   THE REVENUE PROJECTIONS THAT THERANOS WAS PROVIDING YOU?

01:39PM   11   A.   YES.

01:39PM   12   Q.   HOW SO?

01:39PM   13   A.   IT JUST -- YOU KNOW, I MEAN, IT KIND OF GOES TO JUST THE

01:39PM   14   SEAL OF APPROVAL THAT THE TECHNOLOGY VALIDATION THAT YOU HAVE

01:39PM   15   AS AN INVESTOR OR ANYONE WHO HEARS THOSE TYPES OF

01:39PM   16   REPRESENTATIONS, YOU KNOW, YOU CANNOT NOT IMPRESSED WITH WHAT

01:39PM   17   THAT TECHNOLOGY IS CAPABLE OF, HOW IT'S BEEN USED, AND

01:39PM   18   OBVIOUSLY, YOU KNOW, CONSISTENT WITH WALGREENS WANTING TO USE

01:39PM   19   THIS IN THEIR RETAIL SETTINGS, CONSISTENT WITH REALLY WELL

01:39PM   20   RESPECTED HOSPITAL ORGANIZATIONS LIKE INTERMOUNTAIN HEALTH,

01:39PM   21   DIGNITY HEALTH WAS ANOTHER PARTNER THAT THEY HAD IN CALIFORNIA,

01:39PM   22   THEY RUN ONE OF THE LARGEST NETWORKS OF HOSPITALS IN THE ENTIRE

01:40PM   23   COUNTRY, AND THEN OBVIOUSLY SAFEWAY.

01:40PM   24        YOU KNOW, THEY ALL HAD A SIMILAR PERSPECTIVE ON WHAT THIS

01:40PM   25   TECHNOLOGY WAS CAPABLE OF DOING.

01:40PM  1    Q.   WHILE WE'RE ON THE SUBJECT OF THE MODEL, THE MODEL THAT

01:40PM  2    PFM DEVELOPED THAT MS. WALSH SHOWED YOU IN EXHIBIT 13702A, AND

01:40PM  3    WE LOOKED AT SOME BLUE TABS AND SOME ORANGE TABS.  THE BLUE

01:40PM  4    TABS RELATED TO THERANOS?

01:40PM  5    A.   I BELIEVE THE BLUE TABS WERE THE THERANOS TABS, YES.

01:40PM  6    Q.   AND THAT WAS INFORMATION PROVIDED BY THERANOS?

01:40PM  7    A.   YES.

01:40PM  8    Q.   AND IS THAT WHERE YOU START WHEN PUTTING TOGETHER YOUR OWN

01:40PM  9    MODEL?

01:40PM 10    A.   YEAH, WE, WE USED -- WE RELIED HEAVILY ON THEIR 2014 AND

01:40PM 11    '15 MONTHLY PROJECTIONS, VERY DETAILED ROLLOUTS FOR BOTH --

01:41PM 12    WELL, REALLY ALL OF THE BUSINESSES, INCLUDING WALGREENS,

01:41PM 13    SAFEWAY, THE HOSPITAL BUSINESS, THE PHYSICIAN OFFICE BUSINESS,

01:41PM 14    AND EVEN THE PHARMACEUTICAL SERVICES BUSINESS, THE CLINICAL

01:41PM 15    TRIALS BUSINESS, ALL OF THAT WE HAD DETAILED FORECASTS.

01:41PM 16         SO WE USED -- WE RELIED HEAVILY ON THOSE ESTIMATES FOR '14

01:41PM 17    AND '15.

01:41PM 18         BEYOND THAT, WE HAD TO COME UP WITH OUR OWN METHODOLOGY,

01:41PM 19    OUR OWN WAY OF FORECASTING REVENUES, SO AT THAT POINT WE KIND

01:41PM 20    OF TRANSFERRED TO A DIFFERENT WAY OF MODELING THE COMPANY.

01:41PM 21         BUT WE DID TAKE THEIR ESTIMATES, AND WE USED THOSE.

01:41PM 22         BUT WE ALSO HAD LOWER NUMBERS THAN THE COMPANY.

01:41PM 23         SO OUR, OUR BASE CASE 2014 AND 2015 WAS BELOW THE COMPANY

01:41PM 24    MODEL THAT THEY SENT US.

01:41PM 25         THE BEAR CASE WAS EVEN MORE BELOW.

01:41PM  1        SO IT FACTORED HEAVILY INTO OUR ANALYTIC MODELING

01:41PM  2   EXERCISE.  AND THEN BEYOND 2015, WE HAD TO MAKE OUR OWN

01:41PM  3   ASSUMPTIONS.

01:41PM  4   Q.   AND DID YOU ASSUME THE GOOD FAITH OF THE PROJECTIONS THAT

01:42PM  5   MR. BALWANI WAS GIVING YOU?

01:42PM  6   A.   YES, ESPECIALLY SINCE THE SECOND MEETING THE DESCRIPTION

01:42PM  7   OF HOW WELL THE PARTNERSHIP WAS GOING, RAISED OUR NUMBERS

01:42PM  8   TWICE, I THINK WE FELT LIKE THEY HAD EXCELLENT VISIBILITY INTO

01:42PM  9   THE INITIAL ROLLOUT OF THIS TECHNOLOGY, BOTH WITH WALGREENS AND

01:42PM 10   SAFEWAY AND THE OTHER IMPORTANT REVENUE LINES AS WELL.

01:42PM 11   Q.   OKAY.  YOU ALSO MENTIONED INTERMOUNTAIN AND DIGNITY.

01:42PM 12        THOSE ARE HOSPITAL CHAINS?

01:42PM 13   A.   YES.

01:42PM 14   Q.   WOULD IT SURPRISE YOU THAT THERANOS HAD NO REVENUE FROM

01:42PM 15   HOSPITAL CHAINS IN 2014 AND 2015?

01:42PM 16   A.   THAT WOULD BE --

01:42PM 17             MS. WALSH:  OBJECTION.

01:42PM 18             THE COURT:  OVERRULED.

01:42PM 19             THE WITNESS:  THAT WOULD BE SHOCKING.

01:42PM 20   BY MR. LEACH:

01:42PM 21   Q.   MS. WALSH ALSO WALKED YOU THROUGH PORTIONS OF THE MODEL

01:42PM 22   RELATING TO THE DEVICE COSTS AND SOME OF THE ASSUMPTIONS WITHIN

01:42PM 23   THE THERANOS MODEL.

01:42PM 24        DO YOU RECALL THAT?

01:42PM 25   A.   YEAH.  PER MY LAST ANSWER, NOT ONLY WOULD IT BE SHOCKING,

01:43PM   1    IT WOULD DIRECTLY CONTRADICT STATEMENTS THAT THE COMPANY HAD

01:43PM   2    MADE TO US OVER MULTIPLE MEETINGS IF THERE WAS ZERO REVENUES IN

01:43PM   3    THE HOSPITAL BUSINESS IS THE QUESTION.  THAT'S WHY I SAID

01:43PM   4    SHOCKING.  SORRY.

01:43PM   5    Q.    THANK YOU FOR THAT, MR. GROSSMAN.

01:43PM   6          GOING BACK TO THE MODEL, YOU WERE SHOWN SOME OF THE MARKET

01:43PM   7    ASSUMPTIONS AND SOME COSTS RELATING TO THE THERANOS DEVICE.

01:43PM   8          DO YOU RECALL THAT?

01:43PM   9    A.    MAYBE YOU COULD BE A LITTLE MORE SPECIFIC.

01:43PM   10   Q.    YOU WERE SHOWN IN THE BLUE SPREADSHEETS SOME TABS WITH,

01:43PM   11   YOU KNOW, ASSUMPTIONS ABOUT THE NUMBER OF RETAIL PHARMACIES?

01:43PM   12   A.    OH, YES.

01:43PM   13   Q.    AT ANY POINT IN TIME IN THE THERANOS MODEL, DID YOU SEE A

01:43PM   14   REFERENCE TO SIEMENS MACHINES?

01:43PM   15   A.    NO.

01:43PM   16   Q.    DID YOU SEE ANYTHING SUGGESTING TO YOU THAT THERANOS WOULD

01:43PM   17   NEED TO BUY THIRD PARTY ANALYZERS TO DO ITS BLOOD TESTING

01:44PM   18   BUSINESS?

01:44PM   19   A.    NO.  AND AS I THINK I MENTIONED ON WEDNESDAY, I MEAN, IT

01:44PM   20   WOULDN'T HAVE MADE ANY ECONOMIC SENSE.  THEY WOULD HAVE HAD TO

01:44PM   21   BUY THOSE MACHINES AT A HIGHER PRICE THAN LABCORP AND QUEST.

01:44PM   22   THEY'RE CHARGING HALF THE PRICE OF MEDICARE.  I MEAN, IT

01:44PM   23   DOESN'T MAKE ANY ECONOMIC SENSE WHY YOU WOULD DO THAT.

01:44PM   24         SO, NO, THAT -- THERE WAS NO REFERENCE OR MENTION OF ANY

01:44PM   25   OF THAT IN THE MODEL OR ANY OF THE MEETINGS.

01:44PM  1    Q.   AND I'M GATHERING FROM YOUR STATEMENTS THAT SUCH

01:44PM  2    INFORMATION WOULD HAVE BEEN RELEVANT TO YOU?

01:44PM  3    A.   YES.

01:44PM  4    Q.   MS. WALSH ALSO SHOWED YOU EXHIBIT 4089.  AND IF WE CAN

01:44PM  5    CALL THAT UP, PLEASE.

01:44PM  6         DO YOU RECALL QUESTIONS ABOUT THIS EMAIL FROM DR. RABODZEY

01:44PM  7    ABOUT FDA APPROVAL?

01:45PM  8    A.   I DO.

01:45PM  9    Q.   OKAY.  AND IF WE COULD ZOOM IN ON THE BOTTOM PORTION UNDER

01:45PM 10    "LET ME DIGEST THIS IN A SIMPLE WAY."

01:45PM 11         DO YOU SEE BULLET 3 WHERE IT SAYS, "LH AND DGX ARE USING

01:45PM 12    MINI (I AM NOT SURE IF ALL) FDA APPROVED TESTS AND THEY ARE

01:45PM 13    USING FDA APPROVED MACHINES, WHILE THERANOS IS NOT."

01:45PM 14         DO YOU SEE THAT LANGUAGE?

01:45PM 15    A.   YES.

01:45PM 16    Q.   AND WAS THAT CONSISTENT WITH YOUR UNDERSTANDING OF

01:45PM 17    THERANOS'S BUSINESS AT THE TIME?

01:45PM 18    A.   THAT WAS CONSISTENT WITH OUR UNDERSTANDING THAT THEY WOULD

01:45PM 19    HAVE THEIR OWN PROPRIETARY MINILABS IN THEIR CLIA LABORATORIES

01:45PM 20    PROCESSING HUMAN SAMPLES FROM THOSE WALGREENS STORES IN

01:45PM 21    ADDITION TO THE PHYSICIAN OFFICE, IN ADDITION TO THE SAMPLES

01:45PM 22    THEY COLLECTED FROM PHYSICIAN OFFICES.

01:45PM 23    Q.   AND THAT UNDERSTANDING WAS BASED ON YOUR PHONE CALLS WITH

01:45PM 24    MR. BALWANI, YOUR MEETINGS WITH MR. BALWANI AND THE WRITTEN

01:46PM 25    MATERIALS THAT HE PROVIDED?

GROSSMAN REDIRECT BY MR. LEACH                                    6310

01:46PM  1    A.   YES.

01:46PM  2    Q.   AND I THINK YOU SAID THAT THERANOS TOLD YOU THAT THEY

01:46PM  3    DIDN'T BELIEVE THAT FDA APPROVAL WAS REQUIRED BUT THEY INTENDED

01:46PM  4    TO PURSUE THAT?

01:46PM  5    A.   YES, THAT CAME UP IN, IN OUR SECOND MEETING, AND IT WAS A

01:46PM  6    FREQUENT TOPIC IN CONVERSATIONS WITH THE COMPANY.

01:46PM  7         THEY EXPLAINED THAT AS A LAB SERVICE PROVIDER, NOT A

01:46PM  8    MEDICAL OR DIAGNOSTIC EQUIPMENT MANUFACTURER, AS A LAB SERVICE

01:46PM  9    PROVIDER, THEY HAD TO MEET THE CLIA STANDARDS, WHICH ACTUALLY

01:46PM 10    THEY EXPLAINED TO US FROM THEIR PERSPECTIVE, THAT WAS A HIGHER

01:46PM 11    STANDARD, AND THEY HAD TO, THEY HAD TO MEASURE SOMETHING

01:46PM 12    ACCURATELY.  THEY REFERRED TO IT AS THE TRUTH.

01:46PM 13         AND SO AS LONG AS THEY OPERATED IN THE CLIA LAB

01:46PM 14    ENVIRONMENT, THEY WERE FREE TO USE THEIR PROPRIETARY TECHNOLOGY

01:46PM 15    AND CONTINUE TO PROVIDE THAT RETAIL PRODUCT.

01:46PM 16         THE FDA APPROVAL PROCESS WAS SOMETHING THAT THEY OFFERED

01:47PM 17    AS A STRATEGY THAT THEY WERE GOING TO PURSUE, WHICH WOULD PUT

01:47PM 18    THEIR TECHNOLOGY ON AN EVEN HIGHER PLANE, AND WOULD SORT OF

01:47PM 19    ELEVATE IT RELATIVE TO WHAT THE REST OF THE LABORATORY INDUSTRY

01:47PM 20    IS DOING, WHICH IS OPERATING IT UNDER THE CLIA LAWS IN THESE

01:47PM 21    CLIA REGULATORY ENVIRONMENTS.

01:47PM 22         AND SO -- AND, YOU KNOW, THEN THAT'S THE, THAT'S THE

01:47PM 23    STATEMENT THAT MR. BALWANI MADE ABOUT NOBODY, NOBODY FILES

01:47PM 24    THOUSANDS OF ASSAYS WITH THE FDA.

01:47PM 25         THEY HAD SUBMITTED IN NOVEMBER, AND THEN WE HAD MULTIPLE

ER-4844

GROSSMAN REDIRECT BY MR. LEACH                                    6311

01:47PM   1      FOLLOWUPS OVER THIS AND TRYING TO UNDERSTAND THE FDA STRATEGY.

01:47PM   2          IT WAS IMPORTANT IN THE SENSE THAT, YOU KNOW, IT WAS GOOD

01:47PM   3    MARKETING, AND I THINK THAT'S THE PART THAT WE REALLY WANTED TO

01:47PM   4    UNDERSTAND, ESPECIALLY SINCE WE WERE INVESTING OVER A COUPLE

01:47PM   5    YEAR PERIOD, AND WE REALLY WANTED THAT FDA APPROVAL TO KIND OF

01:47PM   6    HELP GET SOME GOOD PUBLICITY FOR THE PLATFORM.

01:47PM   7          BUT IN TERMS OF THE BUSINESS AND THE WAY WE MODELLED IT,

01:48PM   8    THE WAY WE OPERATED AND THE LAB OPERATIONS, THEY WERE PRETTY

01:48PM   9    CLEAR THEY DIDN'T NEED FDA APPROVAL TO PROVIDE LABORATORY

01:48PM  10    SERVICES.

01:48PM  11          AND THEY EVEN FELT IN PHASE II, WHERE THEY WERE GOING TO

01:48PM  12    PUT THE MACHINES IN THE WALGREENS STORES, THEY FELT THAT THEY

01:48PM  13    HAD A STRATEGY THAT WOULD HAVE AVOIDED THE NEED FOR FDA

01:48PM  14    APPROVAL IN PHASE II.

01:48PM  15          NOW, WE WENT AND DID OUR OWN ANALYSIS ON THAT, AND WE FELT

01:48PM  16    THAT PARTICULAR PIECE WAS A LITTLE RISKIER.  SO WE REFLECTED

01:48PM  17    THAT IN HOW WE MODELLED THE COMPANY, AND THAT'S WHY WE CHOSE

01:48PM  18    THE HUB AND SPOKE MODEL.

01:48PM  19          AND EVEN THOUGH THE COMPANY HAS A VERY COMPETENT

01:48PM  20    PERSPECTIVE ON THE REGULATION, THE ABILITY TO USE THE MACHINES,

01:48PM  21    AND EVEN THOUGH THE COMPANY HAS A VERY STRONG OPTIMISTIC VIEW

01:48PM  22    OF THE REGULATORY RISK AROUND USING MINILABS IN WALGREENS,

01:48PM  23    WE'RE GOING TO TAKE A LITTLE BIT MORE OF A CONSERVATIVE VIEW OF

01:48PM  24    THAT, WHICH IS WHY WE MODELLED THE COMPANY ON OUR BASE CASE AND

01:49PM  25    OUR DOWNSIDE CASE USING THE HUB AND SPOKE MODEL, WHERE THEY

ER-4845

01:49PM 1      DIDN'T NEED FDA APPROVAL PUTTING THE DEVICES IN THE WALGREENS

01:49PM 2      IN ORDER TO GENERATE THOSE TYPES OF REVENUES.

01:49PM 3          IT WOULD BE A -- JUST A CLASSIC KIND OF REFERENCE

01:49PM 4      LABORATORY MODEL.

01:49PM 5      Q.   MS. WALSH ALSO ASKED YOU SOME QUESTIONS ABOUT

01:49PM 6      EXHIBIT 7391.

01:49PM 7          IF WE CAN PLEASE CALL THAT UP, MS. WACHS?

01:49PM 8          AND IF WE CAN GO TO THE NEXT PAGE, PLEASE.  I WANT TO

01:49PM 9      START FROM THE EMAIL FROM DR. RABODZEY ON JANUARY 10TH, 2014.

01:49PM 10         DO YOU SEE THAT?

01:49PM 11     A.   I DO.

01:49PM 12     Q.   AND THIS IS AFTER YOUR SECOND MEETING WITH MR. BALWANI IN

01:49PM 13     PALO ALTO IN EARLY JANUARY?

01:49PM 14     A.   YES.

01:49PM 15     Q.   OKAY.  AND MR. RABODZEY SAYS, "EVERYTHING I'VE HEARD ABOUT

01:49PM 16     THE TECHNOLOGY SOUNDS VERY GOOD, BUT IT IS WORTH BOUNCING THIS

01:50PM 17     OFF LH AND DGX," AND SOME OTHER ACRONYMS, "OBVIOUSLY WITHOUT

01:50PM 18     DISCLOSING ANYTHING WE SHOULD BE DISCLOSING."

01:50PM 19         WAS THIS A NORMAL PART OF YOUR PROCESS, TO SPEAK TO OTHERS

01:50PM 20     WITHIN THE INDUSTRY ABOUT WHAT THEY'VE HEARD ABOUT ANOTHER

01:50PM 21     COMPANY?

01:50PM 22     A.   YES.

01:50PM 23     Q.   AND IS THIS PART OF YOUR PROCESS IN EVALUATING

01:50PM 24     INVESTMENTS?

01:50PM 25     A.   YES.

01:50PM   1    Q.   DID YOU DISCLOSE ANY CONFIDENTIAL INFORMATION FROM

01:50PM   2    THERANOS TO ANY OUTSIDERS?

01:50PM   3    A.   NOT TO MY KNOWLEDGE, NO.

01:50PM   4    Q.   AND WHEN YOU'RE GATHERING INFORMATION ABOUT A POTENTIAL

01:50PM   5    INVESTMENT, CAN YOU WEIGHT WHETHER YOU RELY MORE ON WHAT YOU'RE

01:50PM   6    HEARING FROM OUTSIDERS VERSUS WHAT YOU'RE HEARING FROM THE

01:50PM   7    COMPANY ITSELF?

01:50PM   8    A.   SO MAYBE TWO PERSPECTIVES ON THAT.

01:50PM   9         ONE IS, HEARING WHAT OTHER COMPANIES HAVE TO SAY THAT IS

01:50PM  10    NOT POSITIVE CAN BE HELPFUL TO ASKING QUESTIONS AND TO HELP YOU

01:51PM  11    FORM QUESTIONS WHEN YOU DO MEET WITH MANAGEMENT.

01:51PM  12         AND, TWO, IT'S A NORMAL PART OF -- IT'S A NORMAL RESPONSE.

01:51PM  13    ANY TIME A COMPANY IN AN EXISTING INDUSTRY IS STRENGTHENED BY

01:51PM  14    SOMETHING DISRUPTIVE, SOMETHING NEW, SOMEBODY OPEN ENDED,

01:51PM  15    THEY'RE ALWAYS GOING TO HAVE SOME, YOU KNOW, WHAT WE WOULD CALL

01:51PM  16    COUNTER DETAIL, SOME ARGUMENT OR MULTIPLE ARGUMENTS FOR WHY

01:51PM  17    THAT COMPANY ISN'T REALLY A RISK, ISN'T REALLY A THREAT.

01:51PM  18         SO IT'S VERY NORMAL, TYPICAL KIND OF THING THAT WE WOULD

01:51PM  19    HEAR.

01:51PM  20         AND THEN AS I SAID BEFORE, WE WANT TO USE THAT TO HELP US

01:51PM  21    ASK BETTER QUESTIONS.  IN OTHER WORDS, WHY IS THAT WRONG?

01:51PM  22    OKAY.  FINE.

01:51PM  23         AND SO I THINK IN THE BEGINNING OF OUR DUE DILIGENCE

01:51PM  24    PROCESS, WE WERE JUST TRYING TO GET ALL OF THE -- AS MUCH

01:51PM  25    PUBLIC INFORMATION AS WE COULD SO THAT THEY WOULD -- THAT COULD

01:51PM  1    GO INTO THE FORMULATION OF OUR DUE DILIGENCE QUESTIONS THAT WE

01:51PM  2    SENT THE COMPANY.

01:51PM  3    Q.   AND WE CAN GO BACK TO THE FIRST PAGE, MS. WACHS.

01:52PM  4         DR. KHANNA OR MR. KHANNA ALSO PROVIDES SOME THOUGHTS AND

01:52PM  5    ONE OF THEM WAS, "PRICING OF MEDICARE IS INTERESTING, BUT OTHER

01:52PM  6    COMMERCIAL PAYORS ARE ALREADY REIMBURSING AT 50-70 PERCENT."

01:52PM  7         "THEY CITE MOORE'S LAW AS DRIVING DOWN COGS -- WE NEED TO

01:52PM  8    GET COMFORTABLE WITH THIS TRAJECTORY."

01:52PM  9         FIRST OF ALL, WHAT IS MOORE'S LAW?

01:52PM 10    A.   IT'S A RELATIONSHIP BETWEEN VOLUME AND COST THAT THE

01:52PM 11    FORMER CHAIRMAN AND CEO OF INTEL WAS FAMOUS FOR KIND OF

01:52PM 12    EXPLAINING.

01:52PM 13         IT'S A COST VOLUME RELATIONSHIP THAT INTEL USED THAT HAS

01:53PM 14    BECOME PART OF COMMON BUSINESS TERMS THAT EVERYONE -- THAT

01:53PM 15    PEOPLE USE TO DESCRIBE THAT RELATIONSHIP BETWEEN HIGHER

01:53PM 16    MANUFACTURING VOLUMES AND LOWER COSTS.

01:53PM 17         AND I THINK IN PARTICULAR, IT REFERS TO THE ABILITY OF

01:53PM 18    EVERY 18 MONTHS YOU CAN CUT YOUR COST IN HALF BY DOUBLING YOUR

01:53PM 19    VOLUME.  SOME RELATIONSHIP ALONG THOSE LINES.

01:53PM 20    Q.   AND IT SAYS, "THEY CITE MOORE'S LAW."

01:53PM 21         WHO IS THE "THEY" IN WHAT MR. KHANNA IS WRITING HERE?

01:53PM 22    A.   I, I -- THIS IS, I BELIEVE, REFERRING TO COMMENTS THAT

01:53PM 23    THERANOS MADE TO US IN THAT JANUARY 10TH DUE DILIGENCE MEETING,

01:53PM 24    WHICH MR. KHANNA WAS PART OF THAT MEETING.

01:53PM 25         THAT WAS THE FIRST TIME THAT HE HAD HEARD THE COMPANY, AND

GROSSMAN REDIRECT BY MR. LEACH                                          6315

01:53PM 1    THEY TALKED ABOUT HOW MOORE'S LAW WOULD HELP THEM DRIVE DOWN

01:53PM 2    THE COST OF BOTH -- THE EQUIPMENT ORIGINALLY WAS GOING TO BE

01:54PM 3    20, 80 PERCENT OF THE COST OF THE COMPETITIVE EQUIPMENT, AND

01:54PM 4    THEY THOUGHT THEY COULD DRIVE THAT DOWN TO 10- TO 15,000.

01:54PM 5        IT ALSO APPLIED TO THE ASSAYS, LOADING ASSAYS ON

01:54PM 6    CARTRIDGES, AND THEY WOULD ALSO HAVE ECONOMIES OF SCALE.  THEY

01:54PM 7    WOULD HAVE COST ADVANTAGES FROM THE VOLUME GROWTH THAT THEY

01:54PM 8    WOULD SEE ON THE TESTING SIDE.

01:54PM 9    Q.   YOU ALSO WERE SHOWN -- THANK YOU, MS. WACHS.  WE CAN TAKE

01:54PM 10   THAT DOWN.

01:54PM 11       MS. WALSH ALSO WALKED YOU THROUGH THE POWERPOINT THAT

01:54PM 12   MR. BALWANI PROVIDED TO YOU IN THE MIDDLE OF JANUARY.

01:54PM 13       DO YOU RECALL QUESTIONS ABOUT THAT?

01:54PM 14   A.   YES.

01:54PM 15   Q.   AND THE POWERPOINT THAT YOU GOT, WAS THAT AN IMPORTANT

01:54PM 16   DOCUMENT, AS PART OF YOUR REVIEW OF THE THERANOS INVESTMENT?

01:54PM 17   A.   YES.

01:54PM 18   Q.   AND SHE SHOWED YOU A CHART OF THE WALGREENS, OF ALL OF THE

01:54PM 19   DIFFERENT WALGREENS WITHIN THE UNITED STATES.

01:54PM 20       DO YOU REMEMBER THAT?

01:54PM 21   A.   YES.

01:54PM 22   Q.   AND THE RIGHT-HAND SIDE WAS ALL GREEN.

01:55PM 23       DO YOU REMEMBER THAT?

01:55PM 24   A.   YEAH.  YOU COULDN'T FIT ANYTHING ELSE IN THERE.

01:55PM 25   Q.   OKAY.  AND YOU UNDERSTOOD THAT THAT WAS FUTURE LOOKING?

ER-4849

GROSSMAN REDIRECT BY MR. LEACH 6316

01:55PM 1    A.    YEAH.   THAT WAS THE ROLLOUT FOR THE NEXT TWO OR THREE

01:55PM 2    YEARS.

01:55PM 3    Q.    OKAY.   HOW DID YOU UNDERSTAND THAT?

01:55PM 4    A.    WELL, THEY EXPLAINED TO US THAT -- I MEAN, THE FIRST THING

01:55PM 5    WE TALKED ABOUT IN THE SECOND MEETING AT THEIR CORPORATE

01:55PM 6    HEADQUARTERS WAS HOW THEY HAD TO MOVE QUICKLY TO ROLL OUT

01:55PM 7    NATIONALLY WITH WALGREENS AND HOW THEY NEEDED MONEY TO HELP

01:55PM 8    BUILD MINILABS TO INVEST IN THEIR DATABASE, AND SOME OF THE

01:55PM 9    I.T. THAT -- YOU KNOW, THE INFORMATION TECHNOLOGY THAT THEY

01:55PM 10   NEEDED TO BUILD THE DATA ANALYTICS AROUND THE TESTING VOLUMES

01:55PM 11   THAT THEY WOULD BE -- THE GROWTH IN THE TESTING VOLUMES FROM

01:55PM 12   THE NATIONAL ROLLOUT OF WALGREENS.

01:55PM 13       SO FROM THE VERY BEGINNING, THAT WAS A HUGE FOCUS.  AND

01:55PM 14   THAT WAS THE REASON WHY THEY WERE RAISING MONEY.

01:56PM 15   Q.    AND IT WAS SOMETHING THAT THEY TOLD YOU?

01:56PM 16   A.    YES.

01:56PM 17   Q.    OKAY.   MS. HOLMES AND MR. BALWANI?

01:56PM 18   A.    BOTH.

01:56PM 19   Q.    OKAY.   LET'S GO TO 4077, PAGE 51.

01:56PM 20       DO YOU SEE THAT NEW POSSIBILITIES IN LAB?

01:56PM 21       IT SHOULD BE ON THE SCREEN, TOO.

01:56PM 22   A.    I DO.

01:56PM 23   Q.    AND DO YOU SEE WHERE IT SAYS, "ALL 1,000 PLUS CURRENTLY

01:56PM 24   RUN TESTS/CPT CODES ARE AVAILABLE THROUGH THERANOS."

01:56PM 25   A.    I DO.

01:56PM   1    Q.   AND DID YOU BELIEVE THAT TO BE FORWARD LOOKING?

01:56PM   2    A.   NO.

01:56PM   3    Q.   DID YOU BELIEVE THAT TO BE ASPIRATIONAL?

01:56PM   4    A.   NO.

01:56PM   5    Q.   AT ANY POINT IN TIME DID MS. HOLMES OR MR. BALWANI TELL

01:56PM   6    YOU THAT WAS FORWARD LOOKING OR ASPIRATIONAL?

01:56PM   7    A.   NO.

01:56PM   8    Q.   AND BENEATH THAT IT SAYS, "THERANOS RUNS ANY TEST

01:56PM   9    AVAILABLE IN CENTRAL LABORATORIES."

01:56PM  10         DO YOU BELIEVE THAT TO BE FORWARD LOOKING?

01:56PM  11    A.   NO.

01:56PM  12    Q.   AT ANY POINT IN TIME DID MR. BALWANI TELL YOU THAT WAS

01:56PM  13    FORWARD LOOKING?

01:56PM  14    A.   NO.

01:56PM  15    Q.   IF WE CAN GO TO PAGE.

01:57PM  16         DO YOU SEE THE HEADING, "EXCERPTS FROM THERANOS'S TEST

01:57PM  17    MENU"?

01:57PM  18    A.   I DO.

01:57PM  19    Q.   DO YOU SEE THAT?

01:57PM  20    A.   YES.

01:57PM  21    Q.   OKAY.  DID YOU BELIEVE THIS TO BE FORWARD LOOKING?

01:57PM  22    A.   NO.

01:57PM  23    Q.   OKAY.  DID MR. BALWANI EVER TELL YOU THAT THIS WAS FORWARD

01:57PM  24    LOOKING?

01:57PM  25    A.   NO.

01:57PM  1    Q.   LET'S GO BACK TO PAGE 67.

01:57PM  2         DO YOU SEE THE IMAGE OF THE THERANOS SYSTEMS?

01:57PM  3    A.   YES.

01:57PM  4    Q.   DID MR. BALWANI EVER TELL YOU THAT THESE WERE ANALYZERS

01:57PM  5    THAT WE USED TO USE FOR ALL OF OUR ASSAYS SOME DAY?

01:57PM  6    A.   NO.

01:57PM  7    Q.   AND IF WE COULD GO TO 66.  THERE'S A DESCRIPTION OF

01:57PM  8    PRODUCTS.

01:57PM  9         DO YOU SEE THAT?

01:57PM 10    A.   I DO.

01:57PM 11    Q.   AND THE DEVICE IS MINILAB AND 4S.

01:58PM 12         DO YOU SEE THAT?

01:58PM 13    A.   I DO.

01:58PM 14    Q.   AND DID YOU BELIEVE THAT TO BE FORWARD LOOKING?

01:58PM 15    A.   NO.

01:58PM 16         MR. LEACH:  YOUR HONOR, MAY I HAVE A MOMENT?

01:58PM 17         THE COURT:  YES.

01:58PM 18    (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

01:58PM 19         MR. LEACH:  THANK YOU, MR. GROSSMAN.  I HAVE NO

01:58PM 20    FURTHER QUESTIONS.

01:58PM 21         THANK YOU, YOUR HONOR.

01:58PM 22         MS. WALSH:  NOTHING FURTHER, YOUR HONOR.

01:58PM 23         THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:58PM 24         MS. WALSH:  YES, YOUR HONOR.

01:58PM 25         MR. LEACH:  YES.

ER-4852

| | | |
|---|---|---|
| 01:58PM | 1 | THE COURT:  MR. GROSSMAN, YOU'RE EXCUSED. |
| 01:58PM | 2 | THE WITNESS:  THANK YOU. |
| 01:58PM | 3 | THE COURT:  LET ME INQUIRE, WAS THERE AN EXHIBIT |
| 01:59PM | 4 | THAT WAS GOING TO BE INTRODUCED BY STIPULATION OR OTHERWISE? |
| 01:59PM | 5 | MR. LEACH:  WE HAVE TWO HOUSEKEEPING MATTERS, |
| 01:59PM | 6 | YOUR HONOR. |
| 01:59PM | 7 | THE COURT:  YES. |
| 01:59PM | 8 | MR. LEACH:  I THINK I HAVE THE FIRST ONE AND |
| 01:59PM | 9 | MR. SCHENK HAS THE SECOND ONE. |
| 01:59PM | 10 | THE COURT:  OKAY.  THAT'S FINE. |
| 01:59PM | 11 | MR. LEACH:  THE FIRST ONE IS EXHIBIT 4859, WHICH WAS |
| 01:59PM | 12 | CONDITIONALLY ADMITTED DURING THE TESTIMONY OF MS. SPIVEY.  I |
| 01:59PM | 13 | UNDERSTAND THERE'S NO OBJECTION TO IT BEING FULLY ADMITTED AT |
| 01:59PM | 14 | THIS TIME. |
| 01:59PM | 15 | MR. COOPERSMITH:  MAY I JUST INQUIRE OF MR. LEACH |
| 01:59PM | 16 | FOR A SECOND, YOUR HONOR? |
| 01:59PM | 17 | THE COURT:  SURE. |
| 01:59PM | 18 | (DISCUSSION OFF THE RECORD.) |
| 01:59PM | 19 | MR. COOPERSMITH:  THAT'S CORRECT, YOUR HONOR.  NO |
| 01:59PM | 20 | OBJECTION. |
| 01:59PM | 21 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 01:59PM | 22 | LADIES AND GENTLEMEN, YOU MAY RECALL, AND IT MAY BE |
| 01:59PM | 23 | REFLECTED IN THE NOTES IF YOU TOOK SOME, THAT EXHIBIT 4859 WAS |
| 01:59PM | 24 | ADMITTED ONLY CONDITIONALLY PENDING FURTHER EVIDENCE.  THAT |
| 01:59PM | 25 | ITEM 4859 IS NOW ADMITTED IN TOTAL. |

ER-4853

02:00PM 1    SO IT IS IN EVIDENCE.

02:00PM 2    (GOVERNMENT'S EXHIBIT 4859 WAS RECEIVED IN EVIDENCE.)

02:00PM 3     MR. LEACH:  MY COLLEAGUE, MR. SCHENK, HAS A

02:00PM 4 STIPULATION THAT I BELIEVE THE PARTIES HAVE REACHED.

02:00PM 5     THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

02:00PM 6     MR. SCHENK:  MAY I APPROACH?

02:00PM 7     THE COURT:  YES.  THANK YOU.

02:00PM 8     MR. SCHENK:  (HANDING.)

02:00PM 9     THE COURT:  THANK YOU.

02:00PM 10   MR. SCHENK, I'VE BEEN HANDED DOCUMENT 1355, WHICH IS

02:00PM 11 TITLED TRIAL STIPULATION 1.  IT APPEARS THAT THE PARTIES HAVE

02:00PM 12 AGREED TO THIS STIPULATION AND THESE ITEMS; IS THAT CORRECT?

02:00PM 13     MR. SCHENK:  YES, IT IS.

02:01PM 14     THE COURT:  IS THAT CORRECT, MR. COOPERSMITH?

02:01PM 15     MR. COOPERSMITH:  YES, YOUR HONOR.

02:01PM 16     THE COURT:  ALL RIGHT.  THANK YOU.

02:01PM 17   THEN, LADIES AND GENTLEMEN, I'M GOING TO READ A

02:01PM 18 STIPULATION TO YOU NOW AND THIS WILL BECOME PART OF THE RECORD

02:01PM 19 AS WELL, AND YOU'LL HAVE THIS DOCUMENT IN EVIDENCE.

02:01PM 20   THE STIPULATION BETWEEN COUNSEL IS AS FOLLOWS:  "THE

02:01PM 21 UNITED STATES AND RAMESH BALWANI THROUGH UNDERSIGNED COUNSEL

02:01PM 22 HEREBY STIPULATE AND AGREE AS FOLLOWS:

02:01PM 23   "1.  IN 2013 AND 2014 THERANOS MAINTAINED A BANK ACCOUNT

02:01PM 24 AT COMERICA BANK.  DURING THIS TIME PERIOD, THERANOS RECEIVED

02:02PM 25 MONEY VIA THE WIRE TRANSFERS LISTED BELOW FROM THE BANK

02:02PM 1     ACCOUNTS LISTED BELOW TO THERANOS'S COMERICA ACCOUNT.  THESE

02:02PM 2     FUNDS WERE TRANSMITTED BY WIRES IN INTERSTATE COMMERCE WITHIN

02:02PM 3     THE MEANING OF 18 UNITED STATES CODE SECTION 1343 VIA THE

02:02PM 4     FEDWIRE FUNDS SERVICE OPERATED BY THE FEDERAL RESERVE BANK OF

02:02PM 5     NEW YORK.  EACH WIRE IS AN INTERSTATE WIRE COMMUNICATION."

02:02PM 6         I'LL NOW READ THESE TRANSFERS TO YOU, LADIES AND

02:02PM 7     GENTLEMEN.

02:02PM 8         AGAIN, A COPY OF THIS DOCUMENT WILL BE WITH YOU IN

02:02PM 9     EVIDENCE.

02:03PM 10        I WILL READ THE DATES, THE AMOUNT OF THE TRANSFER, I WILL

02:03PM 11    READ WHO THE TRANSFER IS FROM AND WHO THE TRANSFER IS TO.

02:03PM 12        "DATE:  12-30-2013; THE AMOUNT OF WIRE TRANSFER $99,990

02:03PM 13    FROM ALAN EISENMAN'S CHARLES SCHWAB, WELLS FARGO BANK ACCOUNT

02:03PM 14    TO THERANOS'S COMERICA BANK ACCOUNT.

02:03PM 15        "DECEMBER 31, 2013; $5,349,900 FROM BLACK DIAMOND VENTURES

02:03PM 16    PACIFIC WESTERN BANK ACCOUNT TO THERANOS'S COMERICA BANK

02:03PM 17    ACCOUNT.

02:03PM 18        "DECEMBER 31, 2013; $4,875,000 FROM HALL PHOENIX/INWOOD

02:04PM 19    LIMITED TEXAS CAPITAL BANK ACCOUNT TO THERANOS'S COMERICA BANK

02:04PM 20    ACCOUNT.

02:04PM 21        "FEBRUARY 6TH, 2014; $38,336,632 FROM PFM HEALTH CARE

02:04PM 22    MASTER FUND LP'S CITIBANK ACCOUNT TO THERANOS'S COMERICA BANK

02:04PM 23    ACCOUNT.

02:04PM 24        "OCTOBER 31ST, 2014; $99,999,984 FROM LAKE SHORE CAPITAL

02:04PM 25    MANAGEMENT, LP'S NORTHERN CHICAGO BANK ACCOUNT TO THERANOS

ER-4855

6322

02:05PM 1    COMERICA BANK ACCOUNT.

02:05PM 2         "OCTOBER 31, 2014; $5,999,997 FROM MOSLEY FAMILY HOLDINGS

02:05PM 3    LLC'S JP MORGAN CHASE ACCOUNT TO THERANOS'S COMERICA BANK

02:05PM 4    ACCOUNT.

02:05PM 5         "AUGUST 3, 2015; $1,126,661 FROM THERANOS'S WELLS FARGO

02:05PM 6    BANK ACCOUNT TO HORIZON MEDIA'S JP MORGAN CHASE BANK ACCOUNT."

02:05PM 7         THIS IS DATED MARCH 11, 2022, AND IT'S SIGNED BY

02:06PM 8    ROBERT LEACH FOR THE GOVERNMENT AND AMY WALSH FOR THE

02:06PM 9    DEFENDANT.

02:06PM 10        COUNSEL, DID I READ THAT STIPULATION ACCURATELY?

02:06PM 11             MR. SCHENK:  YES.  THANK YOU.

02:06PM 12             MR. COOPERSMITH:  YES, YOUR HONOR.

02:06PM 13             THE COURT:  ALL RIGHT.  THANK YOU.

02:06PM 14        LADIES AND GENTLEMEN, THAT IS THE STIPULATION THAT HAS

02:06PM 15   BEEN ENTERED BY THE PARTIES.  PLEASE RECALL IN MY PRELIMINARY

02:06PM 16   INSTRUCTIONS I INSTRUCTED YOU WHAT THE STIPULATION MEANS, AND

02:06PM 17   THIS IS PART OF THE EVIDENCE IN THIS CASE.  YOU WILL RECEIVE

02:06PM 18   FINAL INSTRUCTIONS, AGAIN, AS TO STIPULATIONS.

02:06PM 19        ANYTHING FURTHER AS TO HOUSEKEEPING MATTERS FROM THE

02:06PM 20   GOVERNMENT?

02:06PM 21             MR. SCHENK:  NO, YOUR HONOR.

02:06PM 22             THE COURT:  DOES THE GOVERNMENT HAVE ANOTHER WITNESS

02:06PM 23   TO CALL?

02:06PM 24             MR. SCHENK:  YOUR HONOR, THE UNITED STATES RESTS.

02:06PM 25             THE COURT:  ALL RIGHT.  THANK YOU.

UNITED STATES COURT REPORTERS

ER-4856

| | | |
|---|---|---|
| 02:06PM | 1 | LADIES AND GENTLEMEN, THE UNITED STATES HAS RESTED IN THIS |
| 02:06PM | 2 | MATTER.  THAT MEANS THAT THEY HAVE PUT ON ALL OF THE EVIDENCE |
| 02:06PM | 3 | IN THEIR CASE-IN-CHIEF THAT THEY WISH TO PRESENT TO YOU. |
| 02:06PM | 4 | LET ME TURN TO THE DEFENDANTS.  DOES THE DEFENDANT HAVE |
| 02:06PM | 5 | ANY EVIDENCE TO OFFER? |
| 02:06PM | 6 | MR. COOPERSMITH:  WE DO, YOUR HONOR.  WE HAVE SOME |
| 02:07PM | 7 | MATTERS TO TAKE UP WITH THE COURT OUTSIDE OF THE PRESENCE OF |
| 02:07PM | 8 | THE JURY. |
| 02:07PM | 9 | THE COURT:  ALL RIGHT.  SHOULD WE TAKE A BRIEF |
| 02:07PM | 10 | RECESS FOR THAT. |
| 02:07PM | 11 | MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU. |
| 02:07PM | 12 | THE COURT:  THANK YOU.  LET'S TAKE A BRIEF RECESS, |
| 02:07PM | 13 | LADIES AND GENTLEMEN, SO I CAN TALK WITH THE LAWYERS. |
| 02:07PM | 14 | (JURY OUT AT 2:07 P.M.) |
| 02:07PM | 15 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 02:07PM | 16 | THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE |
| 02:07PM | 17 | COURTROOM. |
| 02:07PM | 18 | ALL COUNSEL, MR. BALWANI REMAIN. |
| 02:07PM | 19 | MR. COOPERSMITH. |
| 02:07PM | 20 | MR. COOPERSMITH:  YES, YOUR HONOR. |
| 02:08PM | 21 | BEFORE I PROCEED, COULD I TAKE A THREE MINUTE COMFORT |
| 02:08PM | 22 | BREAK?  WOULD THAT BE -- |
| 02:08PM | 23 | THE COURT:  SURE.  LET'S TAKE FIVE MINUTES, AND THEN |
| 02:08PM | 24 | WE'LL COME BACK AND WE'LL PROCEED. |
| 02:08PM | 25 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR. |

| | | |
|---|---|---|
| 02:08PM | 1 | (RECESS FROM 2:08 P.M. UNTIL 2:25 P.M.) |
| 02:25PM | 2 | (JURY OUT AT 2:25 P.M.) |
| 02:25PM | 3 | THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON |
| 02:25PM | 4 | THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN. |
| 02:25PM | 5 | MR. BALWANI IS PRESENT.  WE'RE OUTSIDE OF THE PRESENCE OF |
| 02:25PM | 6 | THE JURY. |
| 02:25PM | 7 | MR. COOPERSMITH. |
| 02:26PM | 8 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR.  THANK YOU |
| 02:26PM | 9 | FOR THE ACCOMMODATION. |
| 02:26PM | 10 | THE COURT:  OF COURSE. |
| 02:26PM | 11 | MR. COOPERSMITH:  SO WE HAVE TWO MATTERS TO TAKE UP |
| 02:26PM | 12 | AT THIS TIME NOW THAT THE GOVERNMENT HAS RESTED. |
| 02:26PM | 13 | THE FIRST ONE IS AN ORAL MOTION THAT WE WOULD LIKE TO MAKE |
| 02:26PM | 14 | TO STRIKE CERTAIN TESTIMONY FROM A WITNESS THAT THE GOVERNMENT |
| 02:26PM | 15 | CALLED NAMED SARAH BENNETT.  THE COURT MAY RECALL THAT WAS A |
| 02:26PM | 16 | WITNESS WHO WAS AN EMPLOYEE OF CMS. |
| 02:26PM | 17 | THE COURT:  OKAY. |
| 02:26PM | 18 | MR. COOPERSMITH:  YES, YOUR HONOR. |
| 02:26PM | 19 | IN PARTICULAR, IN THE TRANSCRIPT OF THIS TRIAL AT PAGE |
| 02:26PM | 20 | 5088, LINE 16 TO PAGE 509 -- AT PAGES 5088, LINE 16 TO |
| 02:26PM | 21 | PAGE 5094, LINE 6, AND THEN IN ADDITION, AT PAGE 5130, LINE 15 |
| 02:27PM | 22 | TO 5134, LINE 4. |
| 02:27PM | 23 | THAT TESTIMONY OF MS. BENNETT RELATES TO SOMETHING KNOWN |
| 02:27PM | 24 | AS THE PATIENT IMPACT ASSESSMENT THAT THERANOS PREPARED, |
| 02:27PM | 25 | SOMEONE AT THERANOS PREPARED. |

02:27PM 1     I'LL ALSO NOTE THAT THE KEY OR THE CRUCIAL TESTIMONY IS AT

02:27PM 2     LINE -- I'M SORRY, PAGE 5133, LINE 21 TO 5134, LINE 4.  THAT'S

02:27PM 3     A BRIEF QUESTION AND ANSWER, AND WHEN I READ IT, I THINK THE

02:27PM 4     COURT WILL UNDERSTAND WHAT I'M GETTING AT HERE.

02:27PM 5         SO THE QUESTION WAS AT PAGE 5133, LINE 21:

02:27PM 6         "AND WHAT DID THERANOS TELL YOU IN CONNECTION WITH ANY

02:27PM 7     POSSIBLE PATIENT IMPACT?"

02:27PM 8         AND THEN THERE'S AN OBJECTION BASED ON HEARSAY, RELEVANCE,

02:27PM 9     FOUNDATION, AND RULE 702.

02:28PM 10        THE COURT OVERRULED THE OBJECTION.

02:28PM 11        THE WITNESS THEN ANSWERED:  "THERANOS SAID THAT THE

02:28PM 12    LABORATORY HAD CONCLUDED THAT THERE'S A POSSIBLE PATIENT IMPACT

02:28PM 13    FOR EVERY TEST REPORTED FROM THE LABORATORY'S TPS 3.5

02:28PM 14    INSTRUMENT."

02:28PM 15        THAT WAS THE TESTIMONY.  THAT'S THE CORE OF WHAT WE'RE

02:28PM 16    MOVING TO STRIKE, YOUR HONOR.

02:28PM 17        THE REST OF THE TESTIMONY THAT I CITED BY PAGE AND LINE

02:28PM 18    NUMBER, THAT IS THE FOUNDATION, BASICALLY, TO GET TO THAT POINT

02:28PM 19    OF THE QUESTION AND ANSWER.

02:28PM 20        SO THE REASON THAT WE'RE MOVING TO STRIKE, YOUR HONOR, IS

02:28PM 21    THAT THIS IS CLEARLY HEARSAY.  THIS IS -- THERE'S NO NONHEARSAY

02:28PM 22    PURPOSE FOR THE STATEMENT.

02:28PM 23        THE GOVERNMENT, I BELIEVE, SUGGESTED THERE MIGHT BE NOTICE

02:28PM 24    TO THE CMS EMPLOYEE, MS. BENNETT.  I DON'T THINK THAT IS A

02:28PM 25    RELEVANT REASON TO HAVE IT ADMITTED OR ALLOW THE QUESTION AND

02:28PM 1    ANSWER.

02:28PM 2         THE NOTICE TO MS. BENNETT IS IRRELEVANT AT THAT POINT IN

02:28PM 3    TIME, AND IT'S HEARSAY.

02:28PM 4         AND WHAT I RECALL FROM THE TIME THAT TESTIMONY WAS

02:29PM 5    OFFERED, YOUR HONOR, WAS THAT THERE WAS AN ARGUMENT THAT THIS

02:29PM 6    WAS AN AGENCY SITUATION.  THERE WAS AN ADMISSION UNDER

02:29PM 7    801(D)(2).

02:29PM 8         I JUST WANT TO TICK THROUGH THOSE, SO MY ARGUMENT IS AS

02:29PM 9    CLEAR AS I CAN MAKE IT.

02:29PM 10        THE STATEMENT, OF COURSE, WAS NOT MADE BY MR. BALWANI.

02:29PM 11   THERE WAS NO EVIDENCE THAT DR. DAS, WHO WE BELIEVE IS THE

02:29PM 12   PERSON WHO WROTE THE -- OR AUTHORED THE STATEMENT, THERE WAS NO

02:29PM 13   EVIDENCE THAT DR. DAS WAS REPRESENTING MR. BALWANI UNDER

02:29PM 14   SUBSECTION (D)(2)(A); THERE'S NO EVIDENCE THAT MR. BALWANI

02:29PM 15   ADOPTED OR BELIEVED THE STATEMENT TO BE TRUE UNDER (D)(2)(B);

02:29PM 16   THERE'S NO EVIDENCE THAT MR. BALWANI AUTHORIZED DR. DAS TO MAKE

02:29PM 17   THE STATEMENT UNDER SUBSECTION (D)(2)(C); THERE'S NO EVIDENCE

02:29PM 18   THAT DR. DAS WAS MR. BALWANI'S AGENT, NOT AN ACTUAL AGENT AND

02:29PM 19   NOT AN APPARENT AGENT FOR PURPOSES OF THE STATEMENT; THERE'S NO

02:29PM 20   EVIDENCE, OF COURSE, THAT DR. DAS WAS A COCONSPIRATOR UNDER

02:30PM 21   (D)(2)(E); AND THERE IS NO EVIDENCE THAT MR. BALWANI SUPERVISED

02:30PM 22   DR. DAS.

02:30PM 23        IN FACT, THE COURT MAY RECALL WHAT WE DO KNOW ABOUT

02:30PM 24   DR. DAS FROM THE PREVIOUS TRIAL, HE OBVIOUSLY DIDN'T TESTIFY

02:30PM 25   HERE.  WHAT WE KNOW FROM THE PREVIOUS TRIAL, AND THAT'S THE

6327

02:30PM 1    TRIAL TRANSCRIPT OF THE HOLMES TRIAL AT PAGE 5794, THAT DR. DAS

02:30PM 2    TESTIFIED HE HAD QUITE A MINIMUM NUMBER OF INTERACTIONS WITH

02:30PM 3    MR. BALWANI, FAIRLY LIMITED CHANCES TO INTERACT.

02:30PM 4        SO FOR THESE REASONS, YOUR HONOR, WE THINK THAT THE

02:30PM 5    STATEMENT SHOULD BE STRICKEN OR STRUCK FROM THE RECORD.

02:30PM 6        I'LL JUST ADD, YOUR HONOR, THAT DR. DAS'S CONCLUSION THAT

02:30PM 7    WENT INTO THAT QUESTION ABOUT PATIENT IMPACT AND THE CONCLUSION

02:30PM 8    THAT DR. DAS HAD REACHED THAT THERE WAS A POSSIBLE PATIENT

02:30PM 9    IMPACT FOR EVERY TEST REPORTED ON THE 3.5 EDISON, THAT WAS THE

02:31PM 10   RESULT OF A SOPHISTICATED TECHNICAL ANALYSIS USING THE LIS

02:31PM 11   SYSTEM.  THE GOVERNMENT CONCEDED THAT AT DOCKET 1440 AT

02:31PM 12   PAGE 14.

02:31PM 13       AND BY OFFERING THIS CONCLUSION AS HEARSAY THROUGH

02:31PM 14   MS. BENNETT, THE GOVERNMENT IS REALLY INFRINGING ON

02:31PM 15   MR. BALWANI'S CONFRONTATION CLAUSE RIGHTS TO TEST THE

02:31PM 16   STATEMENT, TO TEST THE QUALIFICATIONS AND THE CONCLUSIONS OF

02:31PM 17   DR. DAS BASED ON THE DATA THAT DR. DAS REVIEWED, WHICH WE THINK

02:31PM 18   IS NO LONGER AVAILABLE.

02:31PM 19       AND THEN THE HEARSAY APPROACH TO GETTING IN THAT EVIDENCE

02:31PM 20   I THINK EXACERBATES THE PROBLEM OF THE MISSING LIS DATABASE,

02:31PM 21   BECAUSE THAT WAS THE BASIS OF WHAT DR. DAS WAS REVIEWING IN

02:31PM 22   ORDER TO REACH THAT CONCLUSION.

02:31PM 23       SO FOR THOSE REASONS, YOUR HONOR, WE ARE MOVING TO STRIKE

02:31PM 24   THAT TESTIMONY, AND I HAVE ALREADY CITED THE LINES AND PAGE

02:31PM 25   NUMBERS.

ER-4861

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 02:31PM | 1  | THE COURT: ALL RIGHT. THANK YOU.                             |
| 02:32PM | 2  | MR. LEACH.                                                   |
| 02:32PM | 3  | MR. LEACH: YOUR HONOR, THE GOVERNMENT OPPOSES THE            |
| 02:32PM | 4  | MOTION TO STRIKE MS. BENNETT'S TESTIMONY.                    |
| 02:32PM | 5  | WE THINK THE COURT APPROPRIATELY RULED IN THE MOMENT         |
| 02:32PM | 6  | REGARDING THE POTENTIAL PATIENT IMPACT WAS APPROPRIATE AT THE|
| 02:32PM | 7  | TIME. THE STATEMENTS WERE NOT HEARSAY.                       |
| 02:32PM | 8  | MR. BALWANI WAS THE CHIEF OPERATING OFFICER OF THE COMPANY   |
| 02:32PM | 9  | AT THE TIME, AND THERE ARE MULTIPLE SPREADSHEETS SHOWING THAT|
| 02:32PM | 10 | AS CHIEF OPERATING OFFICER, HE HAD RESPONSIBILITY FOR THE    |
| 02:32PM | 11 | ENTIRE LAB. AND IN THE CONTEXT OF THIS PARTICULAR INSPECTION,|
| 02:32PM | 12 | HE PROVIDED A DOCUMENT TO CMS THAT SAYS I'M FULLY RESPONSIBLE |
| 02:32PM | 13 | FOR THE LAB. HE CONTINUED IN THAT EMPLOYMENT THROUGH JULY OF |
| 02:33PM | 14 | 2016. SO WE THINK IT'S NOT HEARSAY UNDER 801(D)(2).         |
| 02:33PM | 15 | IN ADDITION, IT'S APPROPRIATELY OFFERED FOR THE NONHEARSAY   |
| 02:33PM | 16 | PURPOSE OF EXPLAINING WHY MS. BENNETT DID NOT PUT IN HER     |
| 02:33PM | 17 | STATEMENT OF DEFICIENCIES OR ANY SUBSEQUENT ITERATION OF THEM A|
| 02:33PM | 18 | PATIENT IMPACT ASSESSMENT WITH RESPECT TO THE PARTICULAR THINGS|
| 02:33PM | 19 | SHE WAS FINDING.                                            |
| 02:33PM | 20 | THERE WERE MULTIPLE QUESTIONS IN CROSS-EXAMINATION WHERE     |
| 02:33PM | 21 | THE DEFENSE ELICITED TESTIMONY, "AND YOU DIDN'T SAY HERE THERE|
| 02:33PM | 22 | WAS A POTENTIAL PATIENT IMPACT?"                            |
| 02:33PM | 23 | THE REASON FOR THAT IS BECAUSE THE LAB IS EXPECTED TO DO     |
| 02:33PM | 24 | THAT AND THE LAB DIRECTOR, UNDER THE SUPERVISION OF MS. HOLMES|
| 02:33PM | 25 | AND MR. BALWANI, ARE EXPECTED TO DO THAT. AND THE EVIDENCE WAS|

6329

02:33PM 1    IMPORTANT CONTEXT TO EXPLAIN WHY THAT INFORMATION WASN'T THERE,

02:33PM 2    AND IT WASN'T ADDED IN A SECOND PERIOD OF TIME.

02:33PM 3        FINALLY, IT'S NOT EXPERT TESTIMONY.  IT'S THE CONCLUSIONS

02:34PM 4    MADE IN THE TIME BY APPROPRIATE PERSONNEL IN THERANOS.  I DON'T

02:34PM 5    THINK IT'S APPROPRIATE TO LOOK TO EVIDENCE IN THE HOLMES CASE

02:34PM 6    ABOUT WHAT THE BASIS OF THE ADMISSION IS IN THIS CASE.

02:34PM 7        BUT MY MEMORY OF DR. DAS IS THAT HE DID NOT RELY ON THE

02:34PM 8    LIS FOR THOSE CONCLUSIONS.  HE RELIED ON VALIDATION REPORTS,

02:34PM 9    WHICH ARE IN EVIDENCE IN THIS CASE.

02:34PM 10       SO FOR A HOST OF REASONS, WE THINK THE MOTION TO STRIKE

02:34PM 11   SHOULD BE DENIED.  AND THE COURT MADE THE APPROPRIATE RULINGS

02:34PM 12   IN THE MOMENT, I WOULD SAY AFTER EXTENSIVE ARGUMENT FROM, FROM

02:34PM 13   BOTH SIDES, AND AN OPPORTUNITY BY THE COURT TO GO BACK AND

02:34PM 14   REVIEW ITS MOTION AND IN LIMINE ORDER.  SO I SEE NO REASON TO

02:34PM 15   REVISIT THOSE.  THE ADMISSION WASN'T CONDITIONED ON ANY

02:34PM 16   SUBSEQUENT EVIDENCE.

02:34PM 17       SO FOR ALL OF THESE REASONS AND OTHERS, WE OPPOSE THE

02:34PM 18   MOTION.  AND TO THE EXTENT THAT THE COURT HAS FURTHER CONCERNS

02:34PM 19   ABOUT IT, WE WOULD LIKE THE OPPORTUNITY TO BRIEF IT AT AN

02:34PM 20   APPROPRIATE TIME.

02:35PM 21           THE COURT:  OKAY.  THANK YOU.

02:35PM 22           MR. COOPERSMITH:  YOUR HONOR, I'M HAPPY TO BRIEF THE

02:35PM 23   ISSUE IF THE COURT FOUND THAT -- FINDS THAT HELPFUL.

02:35PM 24       BUT I'LL JUST SAY THAT THE BASIC ISSUE HERE, OF COURSE, IS

02:35PM 25   WHO IS MR. DAS -- DR. DAS SPEAKING FOR WHEN HE MAKES THE

ER-4863

02:35PM 1    STATEMENT THAT WAS ADMITTED THROUGH MS. BENNETT, NOT DR. DAS.

02:35PM 2         AND HE WORKED FOR THERANOS, WE ALL KNOW THAT.  BUT HE'S

02:35PM 3    NOT MR. BALWANI'S AGENT.  THERE'S BEEN NO EVIDENCE ADDUCED AT

02:35PM 4    THIS TRIAL THAT MR. -- DR. DAS IS MR. BALWANI'S AGENT OR THAT

02:35PM 5    MR. BALWANI IN ANY WAY AUTHORIZED THIS.

02:35PM 6         AND GENERAL STATEMENTS THAT MR. BALWANI WAS STILL THE COO

02:35PM 7    I DON'T THINK DO IT, ESPECIALLY GIVEN WHAT WE KNOW IS THAT

02:35PM 8    THERE WAS LITTLE INTERACTION BETWEEN THE TWO.

02:35PM 9         AND THEN AS FOR THE NONHEARSAY PURPOSE, AS I'VE SAID, I

02:35PM 10   THINK THAT WOULD BE, YOU KNOW, A SIGNIFICANT 403 AND

02:35PM 11   CONFRONTATION CLAUSE PROBLEM ISSUE TO HAVE -- TO ALLOW THAT

02:35PM 12   KIND OF TESTIMONY FOR THE SIMPLE REASON OF GIVING THE CMS

02:36PM 13   EMPLOYEE NOTICE.

02:36PM 14        BUT I DON'T EVEN SEE HOW THAT'S RELEVANT THAT SHE HAS

02:36PM 15   NOTICE OF SOMETHING THAT WOULD HAVE ENABLED HER TO DECIDE WHAT

02:36PM 16   TO DO WITH THE LAB AFTER THE STATEMENT WAS MADE, WHICH WAS SOME

02:36PM 17   TIME IN THE SPRING OF 2016.  THAT WOULD BE AFTER ALL OF THE

02:36PM 18   EVENTS REALLY AT ISSUE OCCURRED, INCLUDING THE CMS INSPECTION

02:36PM 19   AND THE CMS REPORT, WHICH WAS IN JANUARY '16.

02:36PM 20        SO I DON'T THINK THAT THOSE THINGS SHOULD SWAY IT.

02:36PM 21        AGAIN, WE'RE HAPPY TO BRIEF IT --

02:36PM 22            THE COURT:  OKAY.

02:36PM 23            MR. COOPERSMITH:  -- IF THAT'S WHAT THE COURT WANTS,

02:36PM 24   BUT I DON'T THINK IT IS ADMISSIBLE.

02:36PM 25        AND THEN THE LAST THING I'LL SAY IS THAT IF IT IS ONLY FOR

02:36PM 1    THE NONHEARSAY PURPOSE, THEN THERE WAS NO LIMITING INSTRUCTION,

02:36PM 2    AND THE JURY WAS NOT TOLD THAT THAT'S THE ONLY THING THAT THEY

02:36PM 3    CAN CONSIDER IT FOR.  AT A BEAR MINIMUM, THAT WOULD BE

02:36PM 4    APPROPRIATE.

02:36PM 5         BUT OUR ARGUMENT IS THAT THE WHOLE TESTIMONY SHOULD BE

02:36PM 6    STRUCK.

02:36PM 7              THE COURT:  ALL RIGHT.  ANYTHING FURTHER?

02:36PM 8              MR. LEACH:  NO, YOUR HONOR.

02:36PM 9              THE COURT:  OKAY.  ANYTHING FURTHER?

02:36PM 10             MR. COOPERSMITH:  NO, YOUR HONOR.

02:36PM 11             THE COURT:  OKAY.  THANK YOU VERY MUCH.  THANKS.

02:37PM 12        I'LL LOOK AT THIS.

02:37PM 13        DO YOU NEED A DECISION ON THIS BEFORE YOU BEGIN YOUR

02:37PM 14   CASE-IN-CHIEF?

02:37PM 15             MR. COOPERSMITH:  NO, YOUR HONOR.

02:37PM 16             THE COURT:  ALL RIGHT.  I'LL TAKE THIS UNDER

02:37PM 17   ADVISEMENT, AND I'LL LOOK AT THE PAGES THAT YOU CITED.

02:37PM 18        AND SHOULD I WISH YOU TO FILE SOME LIMITED BRIEFING, I'LL

02:37PM 19   ASK YOU FOR THAT.

02:37PM 20        WILL THAT IN ANY WAY JEOPARDIZE YOUR ABILITY TO GO

02:37PM 21   FORWARD?

02:37PM 22             MR. COOPERSMITH:  NO, YOUR HONOR.

02:37PM 23             THE COURT:  ALL RIGHT.  OKAY.  THANK YOU.

02:37PM 24             MR. COOPERSMITH:  AND THEN THE SECOND MATTER IS THAT

02:37PM 25   AT THIS TIME WE MOVE FOR JUDGMENT OF ACQUITTAL UNDER RULE 29.

6332

| | |
|---|---|
| 02:37PM | 1 |

WE MOVE FOR JUDGMENT OF ACQUITTAL BECAUSE WE BELIEVE THE

02:37PM  2   GOVERNMENT'S CASE HAS FAILED TO PRESENT SUFFICIENT EVIDENCE ON

02:37PM  3   EVERY ELEMENT OF EVERY COUNT.

02:37PM  4       WE ARE HAPPY TO ADDRESS THIS IN MORE DETAIL WHEN IT'S

02:37PM  5   CONVENIENT FOR THE COURT AT A LATER TIME, BUT WE DO WANT TO

02:37PM  6   MAKE THAT MOTION NOW UNDER RULE 29.

02:37PM  7           THE COURT:  OKAY.  THANK YOU.

02:37PM  8       MR. LEACH, ANYTHING AT LEAST FOR THIS PRELIMINARILY?

02:37PM  9           MR. LEACH:  NO, YOUR HONOR.

02:37PM  10      WE OPPOSE THE MOTION.  WE BELIEVE THE GOVERNMENT HAS

02:37PM  11  SUBMITTED SUFFICIENT EVIDENCE TO SUPPORT EACH OF THE ELEMENTS

02:38PM  12  OF EACH OF THE COUNTS, AND THE COURT IS WITHIN ITS PREROGATIVE

02:38PM  13  TO DECIDE THE MOTION OR RESERVE UNTIL A LATER DATE.

02:38PM  14          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

02:38PM  15      ANYTHING FURTHER?

02:38PM  16          MR. COOPERSMITH:  NO, YOUR HONOR.

02:38PM  17          THE COURT:  WELL, UNDER RULE 29(B), THE COURT WILL

02:38PM  18  RESERVE ANY POSITION ON THIS, BUT THE RECORD SHOULD REFLECT

02:38PM  19  THAT YOU HAVE TIMELY MADE A RULE 29 MOTION AT THE CLOSE OF THE

02:38PM  20  GOVERNMENT'S CASE AND PRIOR TO ANY EVIDENCE OFFERED BY THE

02:38PM  21  DEFENDANT.

02:38PM  22      SO YOUR RULE 29 MOTION IS PRESERVED FOR THAT PURPOSE, AND

02:38PM  23  UNDER RULE 29(B), THE COURT WILL RESERVE ANY DECISION UNTIL A

02:38PM  24  LATER TIME.

02:38PM  25          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

02:38PM 1          THE COURT:  YOU'RE WELCOME.

02:38PM 2       ANYTHING FURTHER ON THIS?

02:38PM 3          MR. COOPERSMITH:  NO, YOUR HONOR.

02:38PM 4          THE COURT:  OKAY.

02:38PM 5       DO YOU HAVE A WITNESS TO CALL THEN?

02:38PM 6          MR. COOPERSMITH:  YES, YOUR HONOR.

02:38PM 7          THE COURT:  ALL RIGHT.  SHOULD WE BRING THE JURY IN

02:38PM 8    NOW?

02:38PM 9          MR. COOPERSMITH:  THAT WOULD BE FINE.

02:38PM 10         MR. LEACH:  YES, YOUR HONOR.

02:38PM 11         THE COURT:  OKAY.

02:41PM 12      (JURY IN AT 2:41 P.M.)

02:41PM 13         THE COURT:  PLEASE BE SEATED.  THANK YOU, LADIES AND

02:41PM 14   GENTLEMEN.

02:41PM 15      ALL RIGHT.  WE'RE BACK ON THE RECORD.

02:41PM 16      OUR JURY AND ALTERNATES ARE PRESENT.

02:41PM 17      ALL COUNSEL ARE PRESENT.  THE DEFENDANT IS PRESENT.

02:41PM 18      MR. COOPERSMITH, DOES THE DEFENSE HAVE A WITNESS TO CALL?

02:41PM 19         MR. COOPERSMITH:  YES, YOUR HONOR.

02:41PM 20      THE DEFENSE CALLS DR. TRACY WOOTEN.

02:41PM 21         THE COURT:  ALL RIGHT.  GOOD AFTERNOON.  IF YOU

02:42PM 22   WOULD COME FORWARD AND STAND OVER HERE WHILE YOU FACE OUR

02:42PM 23   COURTROOM DEPUTY.  IF YOU WOULD RAISE YOUR RIGHT HAND, SHE HAS

02:42PM 24   A QUESTION FOR YOU.

02:42PM 25      **(DEFENDANT'S WITNESS, TRACY WOOTEN, WAS SWORN.)**

02:42PM  1              THE WITNESS:  YES.

02:42PM  2              THE COURT:  THANK YOU.

02:42PM  3          PLEASE HAVE A SEAT UP HERE AND MAKE YOURSELF COMFORTABLE.

02:42PM  4              THE WITNESS:  OKAY.

02:42PM  5              THE COURT:  PLEASE FEEL FREE TO ADJUST THE CHAIR AND

02:42PM  6  MICROPHONE AS YOU NEED.

02:42PM  7          THERE'S SOME WATER THERE FOR YOUR REFRESHMENT SHOULD YOU

02:42PM  8  WISH IT.

02:42PM  9          WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

02:42PM 10  AND THEN SPELL IT, PLEASE.

02:42PM 11              THE WITNESS:  TRACY WOOTEN.  T-R-A-C-Y, WOOTEN,

02:42PM 12  W-O-O-T-E-N.

02:42PM 13              THE COURT:  THANK YOU.

02:43PM 14          COUNSEL.

02:43PM 15              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

02:43PM 16                        **DIRECT EXAMINATION**

02:43PM 17  BY MR. COOPERSMITH:

02:43PM 18  Q.   GOOD AFTERNOON, DR. WOOTEN.

02:43PM 19  A.   GOOD AFTERNOON.

02:43PM 20  Q.   AND DO YOU PREFER TO TESTIFY IN A CLEAR MASK AS YOU HAVE

02:43PM 21  ON RIGHT NOW?

02:43PM 22  A.   WHAT?

02:43PM 23  Q.   IF YOU WOULD LIKE TO TESTIFY IN A CLEAR MASK, THAT'S FINE.

02:43PM 24  I JUST WANTED TO ASK YOU.

02:43PM 25  A.   OH, THAT'S FINE.

02:43PM   1    Q.   OKAY.  DR. WOOTEN, WHERE DID YOU TRAVEL FROM TO ATTEND

02:43PM   2    COURT THIS AFTERNOON?

02:43PM   3    A.   I CAME FROM PHOENIX, ARIZONA.

02:43PM   4    Q.   AND WHAT DO YOU DO IN PHOENIX, ARIZONA?

02:43PM   5    A.   I'M A LICENSED NATUROPATHIC PHYSICIAN.

02:43PM   6    Q.   AND WHAT IS A NATUROPATHIC PHYSICIAN?

02:43PM   7    A.   A NATUROPATHIC PHYSICIANS ARE PRIMARY CARE PROVIDERS THAT

02:43PM   8    USE A HOLISTIC APPROACH TO TREAT THEIR PATIENTS.

02:43PM   9    Q.   AND WHEN YOU SAY "HOLISTIC APPROACH," COULD YOU GIVE US A

02:43PM  10    BIT LITTLE MORE DETAIL ABOUT WHAT THAT MEANS?

02:43PM  11    A.   YES, DEFINITELY.

02:43PM  12         SO WE DIAGNOSE AND TREAT ACUTE OR CHRONIC ILLNESSES.  WE

02:43PM  13    TRY TO TREAT THE WHOLE BODY AND LOOK FOR UNDERLYING ISSUES THAT

02:44PM  14    CAUSE THE ILLNESS VERSUS JUST TREAT THE SYMPTOMS.

02:44PM  15    Q.   OKAY.  THANK YOU.

02:44PM  16         IN ARIZONA, IS THERE A LICENSE YOU HAVE TO OBTAIN TO BE A

02:44PM  17    NATUROPATHIC PHYSICIAN?

02:44PM  18    A.   YES.  WE HAVE TO HAVE A DOCTORATE OF NATUROPATHIC MEDICINE

02:44PM  19    AND WE ALSO HAVE TO HAVE A MEDICAL LICENSE.

02:44PM  20    Q.   AND WHO ISSUES THAT LICENSE?

02:44PM  21    A.   THE ARIZONA BOARD OF NATUROPATHIC -- I'M SORRY.

02:44PM  22    NP BOMAX, AND THEN WE HAVE A LICENSING BOARD.

02:44PM  23    Q.   OKAY.  AND HOW LONG HAVE YOU BEEN A NATUROPATHIC PHYSICIAN

02:44PM  24    IN THE PHOENIX, ARIZONA AREA?

02:44PM  25    A.   SEVENTEEN YEARS.

ER-4869

02:44PM 1    Q.   SO DOES THAT GO BACK TO ABOUT 2005?

02:44PM 2    A.   CORRECT, I GRADUATED.

02:44PM 3    Q.   AND WHAT EDUCATION DID YOU HAVE TO OBTAIN TO BECOME A

02:44PM 4    NATUROPATHIC PHYSICIAN?

02:44PM 5    A.   YOU HAVE TO HAVE AN UNDERGRAD DEGREE, AND THEN GO TO A

02:44PM 6    NATUROPATHIC MEDICAL SCHOOL, AND THEN PASS A MEDICAL BOARD

02:45PM 7    EXAM.

02:45PM 8    Q.   ARE THERE EXAMS THAT YOU HAVE TO TAKE?

02:45PM 9    A.   YES, WE HAVE A MEDICAL LICENSE.

02:45PM 10   Q.   OKAY.  AND WHERE DID YOU GO TO UNDERGRADUATE?

02:45PM 11   A.   ORAL ROBERTS UNIVERSITY.

02:45PM 12   Q.   DID YOU GRADUATE FROM ORAL ROBERTS?

02:45PM 13   A.   I DID.

02:45PM 14   Q.   AND WHERE DID YOU ATTEND NATUROPATHIC MEDICAL SCHOOL?

02:45PM 15   A.   SOUTHWEST COLLEGE OF NATUROPATHIC MEDICINE.

02:45PM 16   Q.   WHERE IS THAT?

02:45PM 17   A.   IN TEMPE, ARIZONA.

02:45PM 18   Q.   OKAY.  TEMPE, ARIZONA.  IS THAT NEAR WHERE YOU CURRENTLY

02:45PM 19   LIVE?

02:45PM 20   A.   CORRECT.

02:45PM 21   Q.   WHAT WAS YOUR UNDERGRADUATE DEGREE IN?

02:45PM 22   A.   EXERCISE PHYSIOLOGY.

02:45PM 23   Q.   OKAY.  DO YOU WORK FOR AN EMPLOYER OR DO YOU HAVE YOUR OWN

02:45PM 24   BUSINESS?

02:45PM 25   A.   I HAVE A PRIVATE PRACTICE.  I WORK FOR MYSELF.

ER-4870

02:45PM  1    Q.   YOU HAVE YOUR OWN PRACTICE?

02:45PM  2    A.   YEAH.

02:45PM  3    Q.   AND WHAT IS THE NAME OF YOUR PRACTICE?

02:45PM  4    A.   WOOTEN NATUROPATHIC.

02:45PM  5    Q.   AND HOW LONG HAVE YOU HAD THAT BUSINESS?

02:45PM  6    A.   SEVENTEEN YEARS.

02:46PM  7    Q.   AND DO YOU HAVE EMPLOYEES THAT WORK FOR YOU?

02:46PM  8    A.   I DO.

02:46PM  9    Q.   AND DO YOU HAVE PATIENTS WHO COME TO SEE YOU FOR YOUR

02:46PM 10    MEDICAL SERVICES?

02:46PM 11    A.   I DO.

02:46PM 12    Q.   AS WE SIT HERE TODAY, ABOUT HOW MANY PATIENTS DO YOU HAVE

02:46PM 13    OVERALL IN YOUR PRACTICE?

02:46PM 14    A.   CURRENTLY THIS YEAR I HAVE SEEN OVER 500.

02:46PM 15    Q.   AND IF YOU THINK BACK TO THE, YOU KNOW, 2015 TIMEFRAME,

02:46PM 16    HOW MANY PATIENTS WILL YOU ESTIMATE YOU WOULD HAVE HAD IN YOUR

02:46PM 17    PRACTICE AT THAT TIME?

02:46PM 18    A.   PROBABLY AROUND 350.

02:46PM 19    Q.   OKAY.  SO HAS YOUR PRACTICE GROWN SINCE 2015?

02:46PM 20    A.   IT HAS.

02:46PM 21    Q.   IN CONNECTION WITH YOUR PRACTICE -- WELL, LET ME ASK YOU

02:46PM 22    THIS FIRST, IN ARIZONA, CAN A NATUROPATHIC PHYSICIAN LIKE

02:46PM 23    YOURSELF PRESCRIBE MEDICATION FOR PATIENTS?

02:46PM 24    A.   WE CAN.

02:46PM 25    Q.   AND THAT'S ALLOWED BY YOUR LICENSING?

02:46PM  1     A.   CORRECT.

02:46PM  2     Q.   AND CAN A NATUROPATHIC PHYSICIAN IN ARIZONA ORDER BLOOD

02:46PM  3     TESTS FOR PATIENTS?

02:46PM  4     A.   WE CAN.

02:46PM  5     Q.   AND DO YOU DO THAT?

02:46PM  6     A.   YES.

02:46PM  7     Q.   FOR WHAT PURPOSE DO YOU ORDER BLOOD TESTS FOR YOUR

02:46PM  8     PATIENTS IN GENERAL?

02:46PM  9     A.   I DO A LOT OF LAB TESTING TO ESTABLISH A BASE LINE TO HELP

02:47PM 10     ME WITH DIAGNOSING AND TREATMENT AND ALSO TO MONITOR THERAPIES.

02:47PM 11     Q.   WHEN YOU SAY, "TO ESTABLISH A BASE LINE," CAN YOU GIVE US

02:47PM 12     A LITTLE MORE DETAIL ABOUT WHAT THAT MEANS?

02:47PM 13     A.   YES.  TYPICALLY WHEN A PATIENT COMES TO ME, IF THEY

02:47PM 14     HAVEN'T HAD BLOOD WORK DONE RECENTLY WITHIN THE LAST TWO

02:47PM 15     MONTHS, I GET BLOOD WORK DONE TO SEE WHAT THEIR STARTING STATS

02:47PM 16     ARE, AND THEN, THEREFORE, WHEN WE START TREATMENT, I HAVE A

02:47PM 17     BASE LINE.

02:47PM 18     Q.   OKAY.  AND IF YOU'RE TREATING A HEALTHY PATIENT IN YOUR

02:47PM 19     PRACTICE, IN GENERAL, ABOUT HOW OFTEN WOULD YOU HAVE BLOOD

02:47PM 20     TESTS DONE FOR THAT PATIENT?

02:47PM 21     A.   IF THE PATIENT IS HEALTHY AND ALSO DEPENDING ON THE

02:47PM 22     ISSUES, ABOUT EVERY THREE MONTHS.

02:47PM 23     Q.   ABOUT EVERY THREE MONTHS?

02:47PM 24     A.   CORRECT.

02:47PM 25     Q.   AND IS THAT, IN YOUR VIEW, DR. WOOTEN, A FREQUENT -- A LOT

02:47PM   1     OF BLOOD TESTS --

02:47PM   2     A.   YES.

02:47PM   3     Q.   -- GIVEN OTHER SITUATIONS?

02:47PM   4     A.   CORRECT.

02:47PM   5     Q.   AND WHY DO YOU DO SO MANY BLOOD TESTS?

02:48PM   6     A.   BECAUSE I WANT TO ESTABLISH TREATMENT AND MAKE SURE THE

02:48PM   7     THERAPY IS GOING IN THE RIGHT DIRECTION, AND ALSO MAKE SURE WE

02:48PM   8     CATCH ANYTHING.  IT IS MORE OF A PREVENTATIVE HOLISTIC

02:48PM   9     APPROACH.  SO WE WANT TO MAKE SURE THINGS ARE GOING IN THE

02:48PM   10    RIGHT DIRECTION BEFORE THEY GO OFF.

02:48PM   11    Q.   SO, IF I UNDERSTAND THAT, WHEN YOU ORDER BLOOD TESTS FOR

02:48PM   12    YOUR PATIENTS, DO YOU LOOK AT THE TRENDS THAT THE PATIENTS ARE

02:48PM   13    EXPERIENCING?

02:48PM   14    A.   CORRECT.

02:48PM   15    Q.   OKAY.  AND DO YOU COMPARE ONE BLOOD TEST TO THE OTHER FOR

02:48PM   16    THAT PURPOSE?

02:48PM   17    A.   ABSOLUTELY.

02:48PM   18    Q.   OKAY.  AND IS THAT COMMON IN THE NATUROPATHIC MEDICAL

02:48PM   19    FIELD TO ORDER BLOOD TESTS AS YOU UNDERSTAND IT?

02:48PM   20    A.   YES.

02:48PM   21          MR. SCHENK:  OBJECTION.  702.

02:48PM   22          THE COURT:  ARE YOU ASKING IF THIS IS HOW SHE WAS

02:48PM   23    TRAINED?

02:48PM   24          MR. COOPERSMITH:  HER OWN EXPERIENCE AND HOW SHE WAS

02:48PM   25    TRAINED, YES, YOUR HONOR.

02:48PM   1              THE COURT:  I'LL ALLOW THAT ANSWER TO REMAIN.

02:48PM   2              MR. COOPERSMITH:  OKAY.  I'M NOT SURE WE GOT AN

02:48PM   3     ANSWER, BUT MAYBE I CAN ASK IT AGAIN, YOUR HONOR.

02:48PM   4              THE COURT:  HER ANSWER WAS YES.

02:48PM   5              MR. COOPERSMITH:  OKAY.  THANK YOU.  THAT'S HELPFUL.

02:49PM   6     Q.   OKAY.  DR. WOOTEN, IS THAT PRACTICE THAT YOU ENGAGE OF

02:49PM   7     HAVING PATIENTS TAKE BLOOD TESTS AND THEN COMPARE THE RESULTS,

02:49PM   8     DOES THAT GIVE YOU AN OPPORTUNITY TO COMPARE THE DIFFERENT

02:49PM   9     BLOOD TESTS THAT THE PATIENTS ARE TAKING OVER TIME?

02:49PM  10     A.   CORRECT, YES.

02:49PM  11     Q.   AND WE'LL GET TO THERANOS IN A MINUTE, BUT PUTTING THAT

02:49PM  12     ASIDE, WHERE, PRIOR TO 2015, LET'S SAY, DID YOU SEND YOUR

02:49PM  13     PATIENTS FOR BLOOD TESTS?

02:49PM  14     A.   I MAINLY USED SONORAQUEST LABS.

02:49PM  15     Q.   SONORAQUEST?

02:49PM  16     A.   YES.

02:49PM  17     Q.   AND IS THAT A WELL ESTABLISHED LAB IN ARIZONA?

02:49PM  18     A.   IT IS.

02:49PM  19     Q.   AND ABOUT HOW LONG BEFORE 2015 HAD YOU BEEN SENDING YOUR

02:49PM  20     PATIENTS TO SONORAQUEST?

02:49PM  21     A.   2006.

02:49PM  22     Q.   AND DO YOU USE OTHER LABS OR HAD YOU USED OTHER LABS IN

02:49PM  23     ADDITION TO SONORAQUEST?

02:49PM  24     A.   YES, I HAVE.

02:49PM  25     Q.   CAN YOU REMEMBER THE NAMES?

02:49PM  1    A.   YES, LIKE LABCORP.

02:49PM  2    Q.   IS LABCORP ONE?

02:49PM  3    A.   YES.

02:49PM  4    Q.   ANYTHING ELSE THAT YOU CAN REMEMBER?

02:49PM  5    A.   AND THEN I ALSO USE SPECIALTY LABS FOR FOOD TESTING.

02:50PM  6    Q.   OKAY.  IN CONNECTION WITH YOUR EXPERIENCE WITH

02:50PM  7    SONORAQUEST, TAKING THAT ONE, CAN YOU REMEMBER WHETHER OR NOT

02:50PM  8    THERE WERE ANY ERRORS THAT YOU EVER GOT FOR A PATIENT?

02:50PM  9         MR. SCHENK:  OBJECTION.  401 AND 702.

02:50PM  10         THE COURT:  SUSTAINED.

02:50PM  11   BY MR. COOPERSMITH:

02:50PM  12   Q.   OKAY.  SO, DR. WOOTEN, AT SOME POINT DID YOU HEAR ABOUT A

02:50PM  13   COMPANY CALLED THERANOS?

02:50PM  14   A.   YES, I HAD.

02:50PM  15   Q.   AND HOW DID YOU LEARN ABOUT THERANOS?

02:50PM  16   A.   WHEN I FIRST HEARD ABOUT IT, A FEW REPS CAME INTO MY

02:50PM  17   OFFICE GIVING ME BROCHURES AND TELLING ME ABOUT THEIR LAB.

02:50PM  18   Q.   OKAY.  DO YOU KNOW WHEN THAT WAS?

02:50PM  19   A.   I BELIEVE IT WAS IN 2014.

02:50PM  20   Q.   OKAY.  AND DID YOU IMMEDIATELY START SENDING PATIENTS TO

02:50PM  21   THERANOS?

02:50PM  22   A.   I DID NOT.

02:50PM  23   Q.   AT SOME POINT DID YOU START SENDING PATIENTS TO THERANOS?

02:50PM  24   A.   I DID.

02:50PM  25   Q.   AND WHEN WAS THAT?

02:51PM  1      A.   PROBABLY 2015.

02:51PM  2      Q.   AND DO YOU REMEMBER WHEN IN 2015?

02:51PM  3      A.   I DON'T KNOW EXACTLY.

02:51PM  4      Q.   OKAY.  WHY DID YOU START USING THERANOS FOR SENDING

02:51PM  5      PATIENTS FOR LAB TESTS?

02:51PM  6      A.   ANOTHER PATIENT CAME INTO MY OFFICE WITH LABS FROM

02:51PM  7      THERANOS WHICH TRIGGERED MY MEMORY ABOUT THERANOS.  AND THEN I

02:51PM  8      LIKED THE SETUP OF THERANOS.  THEY WERE AVAILABLE FOR MY

02:51PM  9      PATIENTS, THEY WERE EASILY ACCESSIBLE.  SO I STARTED USING

02:51PM 10      THERANOS.

02:51PM 11      Q.   OKAY.  AND AT THE TIME, LET'S JUST SAY IN 2015, 2016

02:51PM 12      TIMEFRAME, CAN YOU TELL US APPROXIMATELY HOW MANY PATIENTS YOU

02:51PM 13      SENT TO THERANOS FOR LAB TESTING?

02:51PM 14      A.   I BELIEVE I SENT OVER 150.

02:51PM 15      Q.   AND WOULD EACH OF THOSE PATIENTS, AMONG THE APPROXIMATELY

02:51PM 16      150, GENERALLY HAVE HAD ONLY ONE LAB TEST OR MULTIPLE LAB

02:51PM 17      TESTS?

02:51PM 18      A.   MULTIPLE.

02:52PM 19      Q.   AND AT THE TIME THAT YOU WERE SENDING PATIENTS TO

02:52PM 20      THERANOS, WAS THAT THE ONLY LAB THAT YOU WERE SENDING PATIENTS

02:52PM 21      TO?

02:52PM 22      A.   NO.

02:52PM 23      Q.   AND HOW DID YOU DECIDE, OR HOW DID THE PATIENTS DECIDE, IF

02:52PM 24      YOU KNOW, WHICH LAB THE PATIENT SHOULD GO TO?

02:52PM 25      A.   YEAH.  SO I STILL USE SONORAQUEST IN MY PRACTICE.  SO

02:52PM   1    DEPENDING ON THE TIME OF DAY AND THE SCHEDULING OF THE PATIENT,

02:52PM   2    SO IF THE PATIENT WAS COMING EARLY IN THE MORNING, I WOULD DO

02:52PM   3    SONORAQUEST.  IF THEY COULDN'T DO BLOOD DRAW IN MY OFFICE THAT

02:52PM   4    DAY, I WOULD SEND THEM TO THERANOS.

02:52PM   5    Q.   AT WHAT POINT, IF YOU CAN REMEMBER, DID YOU STOP SENDING

02:52PM   6    PATIENTS TO THERANOS?

02:52PM   7    A.   2016.

02:52PM   8    Q.   AND DID YOU STOP BECAUSE OF ANY PROBLEM THAT AROSE AT

02:52PM   9    THERANOS?

02:52PM  10              MR. SCHENK:  OBJECTION.  RELEVANCE.

02:52PM  11              THE COURT:  SUSTAINED.

02:52PM  12    BY MR. COOPERSMITH:

02:52PM  13    Q.   AT SOME POINT WERE YOU STILL ABLE TO SEND LAB TESTS TO

02:52PM  14    THERANOS, PATIENTS TO THERANOS.

02:52PM  15         WAS THERE A TIME WHEN IT WAS NOT POSSIBLE FOR YOU TO SEND

02:52PM  16    PATIENTS TO THERANOS ANYMORE?

02:52PM  17    A.   CORRECT.

02:53PM  18    Q.   OKAY.  DURING THE TIME, JUST AT A GENERAL LEVEL FOR

02:53PM  19    STARTERS, DURING THE TIME THAT YOU WERE SENDING PATIENTS TO

02:53PM  20    THERANOS, DO YOU RECALL ANYTHING OUT OF THE ORDINARY WITH THE

02:53PM  21    LAB TESTING THAT YOU WERE GETTING?

02:53PM  22              MR. SCHENK:  OBJECTION.  702.

02:53PM  23              THE COURT:  SUSTAINED.

02:53PM  24              MR. COOPERSMITH:  YOUR HONOR, THIS IS JUST BASED ON

02:53PM  25    HER OWN OBSERVATIONS OF WHAT SHE OBSERVED IN HER PRACTICE.

02:53PM  1              THE COURT:  YOU CAN TRY TO LAY A FOUNDATION IF YOU

02:53PM  2    WOULD LIKE.

02:53PM  3              MR. COOPERSMITH:  OKAY.  THANK YOU, YOUR HONOR.

02:53PM  4    Q.   DR. WOOTEN, IN YOUR PRACTICE, DID YOU HAVE OCCASION TO

02:53PM  5    REVIEW THE BLOOD TESTS THAT CAME BACK FROM THE THERANOS LAB?

02:53PM  6    A.   YES.

02:53PM  7    Q.   AND DID YOU HAVE A CHANCE TO REVIEW THE BLOOD TEST THAT

02:53PM  8    CAME BACK FROM OTHER LABS LIKE SONORAQUEST?

02:53PM  9    A.   YES.

02:53PM  10   Q.   DID YOU REVIEW EACH AND EVERY LAB TEST THAT CAME BACK FROM

02:53PM  11   THOSE LABS?

02:53PM  12   A.   YES.

02:53PM  13   Q.   IS THAT PART OF YOUR JOB AS A NATUROPATHIC PHYSICIAN?

02:53PM  14   A.   YES.

02:53PM  15   Q.   AND IN THE COURSE OF REVIEWING THOSE, DID YOU HAVE

02:53PM  16   OCCASION TO COMPARE THE RESULTS FROM THE DIFFERENT THERANOS

02:53PM  17   TESTS THAT THE PATIENTS WERE GETTING OVER TIME?

02:53PM  18   A.   YES.

02:53PM  19   Q.   AND DID YOU HAVE A CHANCE TO COMPARE THE THERANOS LAB

02:54PM  20   TESTS THAT YOU WERE RECEIVING WITH THE LAB TESTS FROM OTHER

02:54PM  21   LABS SUCH AS SONORAQUEST?

02:54PM  22   A.   YES.

02:54PM  23   Q.   AND BASED ON THAT COMPARISON, WERE YOU ABLE TO FORM ANY

02:54PM  24   OBSERVATION ABOUT WHETHER THE LAB TESTS APPEARED TO MATCH OR

02:54PM  25   NOT MATCH?

02:54PM 1                    MR. SCHENK:  OBJECTION.  702.  CALLS FOR AN EXPERT

02:54PM 2        OPINION.

02:54PM 3                    THE COURT:  SUSTAINED.  SUSTAINED.

02:54PM 4                    MR. COOPERSMITH:  YOUR HONOR, JUST FOR THE RECORD,

02:54PM 5        I'M NOT ASKING FOR AN EXPERT OPINION, I'M JUST ASKING WHAT SHE

02:54PM 6        OBSERVED ON THE PAPER THAT CAME BACK TO HER.

02:54PM 7            I'M NOT ASKING HER TO INTERPRET ANYTHING.  IT'S SIMPLY

02:54PM 8        WHAT SHE OBSERVED ON THE PAGE.

02:54PM 9                    THE COURT:  SUSTAINED.

02:54PM 10                    MR. COOPERSMITH:  OKAY.

02:54PM 11       Q.   DR. WOOTEN, DID YOU YOURSELF AT SOME POINT HAVE YOUR OWN

02:54PM 12       BLOOD TESTED AT THERANOS?

02:54PM 13       A.   YES.

02:54PM 14       Q.   AND WHEN YOU DID THAT?  DO YOU REMEMBER WHAT TYPE OF BLOOD

02:54PM 15       DRAW IT WAS?

02:54PM 16       A.   YES.

02:54PM 17       Q.   AND WHAT DO YOU REMEMBER ABOUT THAT?

02:54PM 18       A.   WHICH LAB DID I DRAW MYSELF?

02:54PM 19       Q.   YES.

02:54PM 20       A.   I DID AN HCG.

02:54PM 21       Q.   OKAY.  BUT WHAT TYPE OF DRAW WAS IT?  WAS IT A VEIN --

02:55PM 22       A.   OH.  IT WAS A VENOUS.

02:55PM 23       Q.   A VENOUS DRAW?

02:55PM 24       A.   IT WAS.

02:55PM 25       Q.   FOR THE OTHER PATIENTS, OTHER THAN YOURSELF, DO YOU

02:55PM 1     REMEMBER WHETHER THIS WAS A VEIN DRAW OR A FINGERSTICK?

02:55PM 2     A.   IT WAS A VENOUS.

02:55PM 3     Q.   FOR ALL OF THE OTHER PATIENTS?

02:55PM 4     A.   OH, I'M NOT SURE.

02:55PM 5     Q.   OKAY.  SO JUST TO BE CLEAR, FOR -- OTHER THAN YOURSELF,

02:55PM 6     FOR ALL OF THE OTHER PATIENTS THAT YOU SENT TO THERANOS FOR

02:55PM 7     YOUR LAB TESTS, DO YOU KNOW ONE WAY OR THE OTHER WHETHER THEY

02:55PM 8     GOT FINGERSTICK TESTING, BLOOD FROM THE FINGER, OR A DRAW FROM

02:55PM 9     THE ARM?

02:55PM 10    A.   NO.

02:55PM 11    Q.   YOU DON'T KNOW EITHER WAY?

02:55PM 12    A.   I DON'T KNOW EITHER WAY.

02:55PM 13    Q.   DID YOU CARE?

02:55PM 14    A.   NO, I DID NOT.

02:55PM 15    Q.   WHY DIDN'T YOU CARE?

02:55PM 16    A.   IT WASN'T IMPORTANT TO ME.  I WAS JUST LOOKING FOR THE LAB

02:55PM 17    RESULTS.

02:55PM 18    Q.   OKAY.  LET'S GO BACK TO YOUR OWN TESTING.

02:55PM 19    A.   YES.

02:55PM 20    Q.   AND WE'LL GET TO HCG IN A MINUTE.

02:55PM 21         BUT DID YOU TEST YOUR OWN -- DID YOU HAVE TESTS AT

02:55PM 22    THERANOS FOR YOURSELF OTHER THAN HCG?

02:56PM 23    A.   YES.

02:56PM 24    Q.   AND WHAT TYPES OF TESTS WERE THOSE?

02:56PM 25    A.   I DID A REGULAR CHEM PANEL, A CBC PANEL, A THYROID PANEL,

02:56PM 1    A LIPID PANEL.

02:56PM 2    Q.   ARE THOSE COMMONLY ORDERED TESTS?

02:56PM 3    A.   YES.

02:56PM 4    Q.   AND ARE THOSE SIMILAR TO THE TESTS THAT YOU WOULD ORDER

02:56PM 5    FOR YOUR OTHER PATIENTS?

02:56PM 6    A.   CORRECT.

02:56PM 7    Q.   AND BY THE WAY, JUST GOING BACK TO THE OTHER PATIENTS FOR

02:56PM 8    A MINUTE, DID YOU MAKE TREATMENT DECISIONS BASED ON THE LAB

02:56PM 9    RESULTS THAT YOU WERE GETTING FROM THERANOS?

02:56PM 10   A.   YES.

02:56PM 11   Q.   AND DID YOU BELIEVE YOU HAD A SOUND BASIS TO MAKE THOSE

02:56PM 12   TREATMENT DECISIONS?

02:56PM 13            MR. SCHENK:  OBJECTION.  702.

02:56PM 14            THE COURT:  SUSTAINED.

02:56PM 15   BY MR. COOPERSMITH:

02:56PM 16   Q.   DR. WOOTEN, WHEN YOU MADE TREATMENT DECISIONS FOR YOUR

02:56PM 17   PATIENTS, WERE THERE -- WAS THERE --

02:56PM 18       WELL, LET ME JUST MOVE ON, YOUR HONOR.

02:56PM 19       SO, DR. WOOTEN, LET'S GO BACK TO YOUR OWN TESTING.

02:56PM 20   A.   YES.

02:56PM 21   Q.   SO THE COMMON -- THE TESTS THAT YOU DESCRIBED THAT YOU

02:56PM 22   TOOK, WERE THOSE COMMONLY ORDERED TESTS?

02:57PM 23   A.   YES.

02:57PM 24   Q.   WHEN YOU TOOK THOSE COMMONLY ORDERED TESTS, DID YOU JUST

02:57PM 25   TAKE ONE TEST AT THERANOS OR WERE THERE MULTIPLE TESTS OVER

02:57PM 1    TIME?

02:57PM 2    A.   I DON'T RECALL EXACTLY, BUT I REMEMBER THERE WAS THREE TO

02:57PM 3    FOUR.

02:57PM 4    Q.   SO OVER TIME, DO YOU REMEMBER TAKING THREE TO FOUR

02:57PM 5    DIFFERENT BLOOD TESTS FOR YOURSELF?

02:57PM 6    A.   CORRECT.

02:57PM 7    Q.   OKAY.  AND THOSE WERE ALL AT THERANOS?

02:57PM 8    A.   YES.

02:57PM 9    Q.   AND THE THREE DIFFERENT BLOOD TESTS THAT YOU TOOK AT

02:57PM 10   THERANOS, DID YOU GET RESULTS FROM THERANOS FOR YOUR OWN BLOOD

02:57PM 11   TESTS?

02:57PM 12   A.   YES.

02:57PM 13   Q.   OKAY.  AND DID YOU LOOK AT THE NUMBERS ON THE PAGE THAT

02:57PM 14   CAME BACK FOR THE TEST RESULTS?

02:57PM 15   A.   YES.

02:57PM 16   Q.   AND DID YOU LOOK AT THE NUMBERS ON THE PAGE LOOKING AT ONE

02:57PM 17   SET OF RESULTS, VERSUS ANOTHER SET OF RESULTS, VERSUS THE THIRD

02:57PM 18   AND FOURTH SET OF RESULTS?

02:57PM 19   A.   YES.

02:57PM 20          MR. SCHENK:  OBJECTION.  VAGUE.

02:57PM 21          THE COURT:  YOU KNOW, COULD YOU BE A LITTLE MORE

02:58PM 22   SPECIFIC WITH THAT QUESTION.

02:58PM 23          MR. COOPERSMITH:  SURE, YOUR HONOR.

02:58PM 24          THE COURT:  WHY DON'T YOU ASK ANOTHER QUESTION.  IF

02:58PM 25   THERE WAS AN ANSWER, THE ANSWER IS STRICKEN.  YOU CAN ASK

02:58PM  1     ANOTHER QUESTION.

02:58PM  2             MR. COOPERSMITH:  SURE.

02:58PM  3     Q.  SO, DR. WOOTEN, WHEN YOU GOT THE LAB RESULTS BACK FROM

02:58PM  4     THERANOS -- WELL, FIRST OF ALL, DID YOU GET TEST RESULTS BACK

02:58PM  5     FROM THERANOS?

02:58PM  6     A.  I DID.

02:58PM  7             THE COURT:  THIS IS REGARDING THE WITNESS'S TEST?

02:58PM  8             MR. COOPERSMITH:  I'M SORRY?

02:58PM  9             THE COURT:  THE WITNESS'S TEST?

02:58PM  10            MR. COOPERSMITH:  FOR HER OWN TEST.

02:58PM  11            THE COURT:  OKAY.  THANK YOU.

02:58PM  12    BY MR. COOPERSMITH:

02:58PM  13    Q.  AND WHEN YOU GOT THE TEST RESULTS BACK, WHAT DID THE PAGE

02:58PM  14    LOOK LIKE GENERALLY?

02:58PM  15    A.  IT WOULD BE A LIST OF ALL OF THE TESTS THAT I ORDERED WITH

02:58PM  16    THE RESULTS.

02:58PM  17    Q.  OKAY.  AND ARE THE RESULTS EXPRESSED IN A NUMERICAL FORM?

02:58PM  18    A.  YES.

02:58PM  19    Q.  THERE'S A NUMBER?

02:58PM  20    A.  THERE'S A NUMBER.

02:58PM  21    Q.  OKAY.  AND DID YOU, FOR THE SECOND TEST AND THE THIRD TEST

02:58PM  22    AND SO FORTH, DID YOU -- WERE THOSE TESTS ALSO LIKE THAT WHERE

02:58PM  23    THEY HAD NUMBERS NEXT TO THE PARTICULAR TESTS THAT WERE TAKEN?

02:58PM  24    A.  CORRECT.

02:58PM  25    Q.  OKAY.  AND DID YOU EVER LOOK AT THE NUMBERS FROM THE

ER-4883

02:58PM  1      DIFFERENT TESTS AND COMPARE THEM TO ONE ANOTHER?

02:59PM  2               MR. SCHENK:  OBJECTION.  702.

02:59PM  3               THE COURT:  WELL, SHE CAN ANSWER THAT QUESTION YES

02:59PM  4      OR NO.

02:59PM  5               THE WITNESS:  YES.

02:59PM  6      BY MR. COOPERSMITH:

02:59PM  7      Q.   OKAY.  AND WHAT WAS THAT COMPARISON?

02:59PM  8           I MEAN, IT IS JUST HER OWN TESTS, YOUR HONOR, THE NUMBERS

02:59PM  9      ON THE PAGE THAT SHE'S OBSERVING WITH HER OWN EYES.

02:59PM  10              MR. SCHENK:  OBJECTION.  702.

02:59PM  11              THE COURT:  I THINK IT IS, YES.  SO SUSTAINED.

02:59PM  12     PARDON ME.

02:59PM  13              MR. COOPERSMITH:  OKAY.  YOUR HONOR, COULD I HAVE A

02:59PM  14     MOMENT?

02:59PM  15              THE COURT:  OF COURSE.

02:59PM  16          (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

03:00PM  17              MR. COOPERSMITH:  YOUR HONOR, COULD WE HAVE A BRIEF

03:00PM  18     SIDE-BAR?

03:00PM  19              THE COURT:  SURE.  OKAY.

03:00PM  20          YOU AND -- WHO WOULD LIKE TO JOIN?

03:00PM  21          MR. SCHENK?

03:00PM  22              MR. SCHENK:  YES.

03:00PM  23              THE COURT:  LADIES AND GENTLEMEN, WE'RE GOING TO GO

03:00PM  24     IN THE BACK ROOM FOR JUST A MOMENT.  EVERYONE ELSE COULD STAY

03:00PM  25     HERE IN THE COURTROOM.

03:00PM 1       WHILE WE'RE GONE, LADIES AND GENTLEMEN, DO NOT DISCUSS

03:00PM 2   AMONGST YOURSELVES ANYTHING ABOUT THIS CASE AND FORM ANY

03:00PM 3   OPINION ABOUT IT.

03:00PM 4       WE'LL BRING OUR COURT REPORTER BACK.

03:00PM 5       (SIDE-BAR CONFERENCE ON THE RECORD.)

03:25PM 6       THE COURT:  OKAY.  WE ARE OUTSIDE OF THE PRESENCE OF

03:25PM 7   THE JURY IN THE DELIBERATION ROOM THAT IS NOT BEING USED.

03:25PM 8       COUNSEL ARE PRESENT.

03:25PM 9       MR. COOPERSMITH.

03:25PM 10      MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

03:25PM 11  WE OBVIOUSLY TRY TO KEEP THESE SIDE-BARS TO A MINIMUM, SO

03:25PM 12  I APPRECIATE THE COURT'S TIME.

03:25PM 13      THE COURT:  SURE.  NO, I UNDERSTAND.

03:25PM 14      MR. COOPERSMITH:  SO, FIRST OF ALL, WITH REGARD TO

03:25PM 15  HER REMEMBERING RESULTS AND SAYING I THOUGHT THESE WERE SIMILAR

03:25PM 16  OR NOT SIMILAR, I THINK THIS IS VERY -- ALMOST IDENTICAL TO THE

03:25PM 17  TESTIMONY THAT THE GOVERNMENT OFFERED FROM PATIENT

03:25PM 18  BRENT BINGHAM WHO TESTIFIED THAT THERE WAS NO PHYSICIAN.  AND

03:25PM 19  HE OBVIOUSLY WASN'T AN EXPERT.  HE WAS A GENTLEMAN WHO HAD A

03:25PM 20  MEDICAL CONDITION THAT REQUIRED HIM TO TAKE A LOT OF PLATELET

03:25PM 21  COUNT TESTS, AND HE TALKED ABOUT HIS LEVELS AND HOW THOSE

03:25PM 22  CORRELATED, AND HOW IN MOST OF THE CASES, EXCEPT I THINK FOR

03:25PM 23  ONE, HE DIDN'T HAVE ANY LAB RESULTS.

03:25PM 24      HE JUST SAID THAT THEY DIDN'T SEEM RIGHT GIVEN HOW HE

03:25PM 25  FELT.  OBVIOUSLY THERE WAS NO QUESTION OF EXPERT TESTIMONY.

03:25PM   1          SO I THINK IT'S SIMILAR TO THAT.

03:25PM   2          AND THEN I ALSO WANT TO POINT OUT, YOUR HONOR, THAT

03:25PM   3    DR. ROSENDORFF TESTIFIED ABOUT ALL MATTERS OF TECHNICAL

03:25PM   4    SUBJECTS, AND HE WAS NOT QUALIFIED AS AN EXPERT EITHER.

03:25PM   5          HE IS A DOCTOR, AND DR. WOOTEN IS A NATUROPATHIC DOCTOR.

03:25PM   6          SO I DON'T REALLY SEE HOW THESE QUESTIONS ABOUT HER JUST

03:25PM   7    OBSERVATION -- I'M NOT ASKING HER TO INTERPRET ANYTHING.  I'M

03:25PM   8    NOT ASKING HER TO INTERPRET, YOU KNOW, WHAT CREATINE IS AND

03:25PM   9    WHAT LEVELS ARE APPROPRIATE AND NOT APPROPRIATE.

03:25PM  10          I'M JUST ASKING HER TO SAY, EVEN WITH HER OWN TESTS, MY

03:25PM  11    RESULTS OVER SEVERAL DIFFERENT LAB TESTS WITH THERANOS WERE

03:25PM  12    CONSISTENT OR NOT CONSISTENT, WHATEVER SHE CHOOSES TO TESTIFY.

03:25PM  13          AND THEN WITH --

03:25PM  14              THE COURT:  WHAT DOES THAT MEAN "CONSISTENT"?

03:25PM  15              MR. COOPERSMITH:  IN OTHER WORDS, LIKE, I TOOK A

03:25PM  16    TEST AT THERANOS AND WHATEVER THE ASSAY WAS, LET'S SAY IT WAS

03:25PM  17    CHOLESTEROL, AND THEN SHE TAKES ANOTHER TEST AT THERANOS A FEW

03:25PM  18    MONTHS LATER, AND SHE RECALLS THEM BEING CONSISTENT, LIKE THE

03:25PM  19    NUMBERS WERE THE SAME NUMBER OR VERY SIMILAR NUMBERS, RIGHT?

03:25PM  20          OR THE SAME WOULD BE TRUE FOR A PATIENT EVEN IF IT WASN'T

03:25PM  21    HERSELF.

03:25PM  22          SO I'M NOT ASKING, YOU KNOW, COULD YOU TELL ME MORE ABOUT

03:25PM  23    WHAT THAT MEANS.

03:25PM  24          I'M JUST ASKING HER IS THAT THE EXPERIENCE THAT YOU HAD?

03:25PM  25          SO I DON'T THINK THAT IS EXPERT TESTIMONY.  I THINK IT'S

03:25PM   1    JUST OBSERVATION.  AND I THINK THE COURT IS FAMILIAR WITH THE

03:25PM   2    SUBJECT.  WE'VE HAD EXTENSIVE BRIEFING ON THE LINE OF EXPERT

03:25PM   3    TESTIMONY AND NOT EXPERT TESTIMONY.

03:25PM   4         THE OTHER THING I WANTED TO SAY, YOUR HONOR, IS THAT THIS

03:25PM   5    CASE HAS BEEN ABOUT THERANOS, THE GOVERNMENT'S PRESENTATION

03:25PM   6    THAT THERANOS IS JUST A LAB THAT IS NOT CAPABLE OF PRODUCING

03:25PM   7    RESULTS THAT YOU CAN TRUST.

03:25PM   8         AND I THINK IT SHOULD BE THE CASE THAT SHE HAS HAD, AND

03:25PM   9    SHE WILL TESTIFY, I BELIEVE, THAT THERE ARE OTHER LABS, SUCH AS

03:25PM  10    SONORAQUEST, WHERE SHE HAD SOME BAD EXPERIENCES.

03:25PM  11         DR. BURNES TALKED ABOUT THAT.  HE HAD A BAD EXPERIENCE

03:25PM  12    WITH LABCORP.

03:25PM  13         I DON'T THINK THAT'S EXPERT TESTIMONY.  THAT'S NOT 401 OR

03:25PM  14    403.

03:25PM  15         I THINK IT'S CORE TO THE DEFENSE THAT EVERY LABORATORY

03:25PM  16    MAKES ERRORS.  AND THIS IS A WITNESS FROM HER OWN PERSONAL

03:25PM  17    OBSERVATION CAN SAY I GOT LABS BACK FROM SONORAQUEST THAT JUST

03:25PM  18    WEREN'T RIGHT.

03:25PM  19         AND SHE'S IN A REALLY GREAT POSITION TO DO THAT BECAUSE

03:25PM  20    SHE ORDERED SO MANY BLOOD TESTS, AND SHE CAN DO THAT

03:25PM  21    COMPARISON.

03:25PM  22         SO WE ARE NOT SURE -- I MEAN, THE GOVERNMENT CAN MAKE

03:25PM  23    THEIR OBJECTIONS, BUT WE DON'T THINK THAT THEY'RE WELL TAKEN.

03:25PM  24              THE COURT:  OKAY.

03:25PM  25              MR. COOPERSMITH:  AND THEN THE LAST THING I WOULD

ER-4887

03:25PM  1      SAY, IS THAT WE CAN QUALIFY HER AS AN EXPERT.

03:25PM  2              THE COURT:  HAS SHE BEEN LISTED?

03:25PM  3              MR. COOPERSMITH:  I'M GOING TO SAY NO.

03:25PM  4      BUT WE WEREN'T ANTICIPATING THIS TYPE OF OBJECTION, WHICH

03:25PM  5  WE THINK IS REALLY NOT APPROPRIATE.

03:25PM  6              THE COURT:  OKAY.

03:25PM  7              MR. SCHENK:  THANK YOU.

03:25PM  8      I'LL ADDRESS A COUPLE OF THE POINTS THAT MR. COOPERSMITH

03:25PM  9  MADE AND ALLOW MR. BOSTIC TO ADDRESS THE PARTICULAR STATEMENTS

03:25PM 10  ABOUT PATIENT BRENT BINGHAM.

03:25PM 11      FIRST, ON THIS IDEA THAT NOW THEY'RE GOING TO QUALIFY THIS

03:25PM 12  INDIVIDUAL AS AN EXPERT.  I DON'T KNOW HOW THEY GET LEAVE OF

03:25PM 13  COURT TO MAKE SUCH A LATE DISCLOSURE AT THIS POINT.

03:25PM 14      THEY SAT THROUGH THE ELIZABETH HOLMES TRIAL.

03:25PM 15      THIS IS NOT A CASE WHERE THEY WERE SURPRISED BY NEARLY ANY

03:25PM 16  WITNESS THAT TESTIFIED.

03:25PM 17      SO THE IDEA THAT NOT ONLY THROUGHOUT THE COURSE OF OUR

03:25PM 18  TRIAL, THE BALWANI TRIAL THEY DIDN'T BECOME AWARE OF THE NEED

03:25PM 19  TO QUALIFY THIS INDIVIDUAL AS AN EXPERT, BUT STARTING LAST

03:25PM 20  AUGUST WHEN THEY SAT THROUGH A TRIAL WHERE MANY OF THE SAME

03:25PM 21  WITNESSES TESTIFIED CONSISTENTLY SUGGESTS THAT THEY SHOULD HAVE

03:25PM 22  TO MAKE A PARTICULAR SHOWING TO THE COURT FOR WHY THEY SHOULD

03:25PM 23  BE EXCUSED FROM THE RULES REGARDING EXPERT DISCLOSURES.

03:25PM 24      THEY MET PRIOR OBLIGATIONS.  THEY MADE EXPERT DISCLOSURES

03:25PM 25  TO US THAT WERE TIMELY.  THEY CHOSE NOT TO DISCLOSE THIS

03:25PM  1    INDIVIDUAL.

03:25PM  2         WE DO HAVE QUESTIONS, SHOULD IT GET THERE, ABOUT HER

03:25PM  3    QUALIFICATIONS TO TESTIFY AS AN EXPERT.  BUT THAT'S THE CART

03:25PM  4    BEFORE THE HORSE.  THE COURT SHOULD NOT ALLOW A LATE DISCLOSURE

03:25PM  5    ON THIS ISSUE.

03:25PM  6         MR. COOPERSMITH RAISED A COUPLE OF POINTS THAT I WILL

03:25PM  7    RESPOND TO.  THE FIRST OF THE SUBSTANTIVE POINTS WAS PROBLEMS

03:25PM  8    AT QUEST OR OTHER LABS SHOULD COME IN THROUGH THIS WITNESS

03:25PM  9    BECAUSE THEY'RE RELEVANT.

03:25PM 10         IT SIMPLY IS NOT TRUE.  THEY DON'T MEET THE 401 TEST, AND

03:25PM 11    THROUGH THIS WITNESS IT'S 403.  BECAUSE IF SHE'S NOT AN EXPERT,

03:25PM 12    THERE'S NO EXPLANATION, THERE'S NO TESTIMONY ABOUT THE BASIS

03:25PM 13    FOR THE DIFFERENCES.

03:25PM 14         ALL SHE SAYS FROM -- WITHOUT PROVIDING ANY EXPERT

03:25PM 15    TESTIMONY IS I GOT A SEVEN FROM QUEST AND I GOT A THREE FROM

03:25PM 16    THERANOS.

03:25PM 17         AND IF THERE'S NO EXPERT TESTIMONY, THERE'S NO ANALYSIS

03:25PM 18    THAT IS PROVIDED, AND, THEREFORE, IT ISN'T 401 AND IT ALSO IS

03:25PM 19    403, NO COMPARISON ABOUT THE FAILURES AND HER OPINION OF QUEST

03:25PM 20    IS ADMISSIBLE ABSENT SOME DISCLOSURE THAT WASN'T MADE, A

03:25PM 21    QUALIFICATION THAT SHE WOULDN'T MEET.

03:25PM 22         MR. COOPERSMITH ALSO SUGGESTED THAT SOMEHOW IT'S RELEVANT

03:25PM 23    FOR HER TO TESTIFY THAT EITHER ON HER OWN, OR ON ANOTHER

03:25PM 24    PATIENT'S TEST, ONE MONTH THE CHOLESTEROL SCORE WAS X AND THREE

03:25PM 25    MONTHS LATER THE CHOLESTEROL SCORE WAS ALSO X, AND THAT'S

ER-4889

03:25PM   1    RELEVANT OF ANYTHING, AND THAT DOES NOT PROVE THAT THERANOS IS

03:25PM   2    CAPABLE OF GENERATING ACCURATE RESULTS.  IT MIGHT BE CAPABLE OF

03:25PM   3    GENERATING CONSISTENT RESULTS, BUT THAT DOESN'T SAY ANYTHING

03:25PM   4    ABOUT ACCURACY.

03:25PM   5        AND TO SUGGEST BECAUSE TWO NUMBERS WERE THE SAME DOESN'T

03:25PM   6    SAY ANYTHING.  IT DOESN'T ASSIST THIS THE JURY AT ALL TO SAY A

03:25PM   7    TEST SEVERAL MONTHS LATER WAS JUST LIKE A TEST TODAY.

03:25PM   8        IT WOULD REQUIRE HER TO SAY AND I ATE THE SAME FOOD AND MY

03:25PM   9    LIFESTYLE WAS SIMILAR OR HERE ARE ALL OF THE REASONS WHY A

03:25PM  10    SECOND TEST THAT MIRRORED THE FIRST TEST HELPED ME BELIEVE THAT

03:25PM  11    I COULD TRUST THERANOS.  IT REQUIRED THAT TESTIMONY IN ORDER TO

03:25PM  12    MAKE JUST TWO NUMBERS RELEVANT.

03:25PM  13        IT REQUIRES SOME FURTHER EXPLANATION.  THAT ALSO IS

03:25PM  14    PROPERLY EXCLUDED AT THIS POINT.

03:25PM  15        I'M GOING TO ALLOW MR. BOSTIC TO ADDRESS THE BRENT BINGHAM

03:25PM  16    ISSUE.

03:25PM  17            MR. BOSTIC:  THANK YOU, YOUR HONOR.  I'LL ADDRESS

03:25PM  18    BRIEFLY THE POINTS MR. COOPERSMITH MADE ABOUT BRENT BINGHAM AND

03:25PM  19    ADAM ROSENDORFF.

03:25PM  20        WHEN IT CAME TO BRENT BINGHAM, PIVOTALLY, THERE WAS NO

03:25PM  21    JUDGMENT OR OPINION DELIVERED BY MR. BINGHAM.  WE WERE NEVER

03:25PM  22    ASKING THE JURY TO RELY ON HIS ULTIMATE OPINION AS TO WHETHER A

03:25PM  23    TEST RESULT WAS ACCURATE OR NOT.

03:25PM  24        IN THAT CASE THERE WAS ONE INSTANCE WHERE HE HAD PARALLEL

03:25PM  25    TESTING DONE BY THERANOS AT A CONVENTIONAL LAB.  THOSE RESULTS

WOOTEN DIRECT BY MR. COOPERSMITH                                6357

03:25PM  1    CAME IN, BUT HE DIDN'T MAKE ANY JUDGMENT AS TO WHETHER THOSE

03:25PM  2    TWO WERE CONSISTENT, I THINK WAS THE TERM THAT MR. COOPERSMITH

03:25PM  3    JUST USED.

03:25PM  4         THAT KIND OF TESTIMONY COMING FROM A DOCTOR WOULD BE

03:25PM  5    ESPECIALLY PROBLEMATIC AND CROSS INTO 702 LAND BECAUSE THEN WE

03:25PM  6    WOULD BE ASKED TO RELY ON THAT DOCTOR'S MEDICAL JUDGMENT IN

03:25PM  7    TERMS OF WHAT IS CONSISTENT VERSUS INCONSISTENT.

03:25PM  8         WITH MR. BINGHAM, HE WAS TESTIFYING ABOUT HIS EXPERIENCE

03:25PM  9    OF HOW THE NUMBERS THAT HE WOULD GET BACK FROM LABS MATCHED UP

03:25PM 10    OR DID NOT MATCH UP WITH HIS ACTUAL SYMPTOMS THAT HE COULD

03:25PM 11    EXPERIENCE AND THAT HE WAS IN THE ONLY POSITION TO TESTIFY

03:25PM 12    ABOUT.  SO THAT IS A DIFFERENT KIND OF TESTIMONY FROM THE

03:25PM 13    TESTIMONY THAT IS BEING OFFERED NOW.

03:25PM 14             THE COURT:  LET ME STOP YOU THERE.  THAT WAS

03:25PM 15    SOMETHING THAT I THINK WE ALL HEARD.

03:25PM 16         MR. BINGHAM WAS NOT AN EXPERT, BUT HE WAS -- HE COULD

03:25PM 17    TESTIFY ABOUT AND HE TOLD US ABOUT HIS CONDITION, HIS HISTORY

03:25PM 18    OF LIVING WITH THE CONDITION, AND HIS PERSONAL KNOWLEDGE OF HOW

03:25PM 19    HE FEELS BASED ON ELEVATIONS AND INCREASES.

03:25PM 20         HIS OPINION ABOUT THE LABS WAS BASED ON HIM RECEIVING

03:25PM 21    TESTING -- AS I RECALL, AND PLEASE HELP ME IF YOU HAVE A

03:25PM 22    DIFFERENT MEMORY, OF RECEIVING TEST RESULTS THAT DID NOT

03:25PM 23    CORRELATE WITH HIS PHYSICAL SYMPTOMS.

03:25PM 24         AND SO I SUPPOSE I DON'T WANT TO CALL HIM AN EXPERT OF HIS

03:25PM 25    OWN FEELINGS, BUT THAT'S IN ESSENCE WHAT HE WAS SAYING, I KNOW

ER-4891

03:25PM  1      WHEN I FEEL THIS WAY, MY NUMBERS ARE GOING TO BE HERE.  I FELT

03:25PM  2      THIS WAY, I SAW THE NUMBERS, THOSE DID NOT CORRELATE.

03:25PM  3          THAT'S DIFFERENT, THOUGH.  I THINK ASKING THIS WITNESS TO

03:25PM  4      TESTIFY ABOUT THE NUMBERS AND WHAT THEY MEAN WHEN SHE DOESN'T

03:25PM  5      HAVE THE SAME TYPE OF MR. BINGHAM REFERENCE POINT, HER

03:25PM  6      REFERENCE POINT IS GOING TO BE THEN EXPERT OR OTHERWISE SPECIAL

03:25PM  7      TESTIMONY THAT I THINK WOULD REQUIRE THAT.  THAT'S WHY I

03:25PM  8      SUSTAINED THE 702 OBJECTION.

03:25PM  9          MR. COOPERSMITH:  OKAY.  THANK YOU, YOUR HONOR.

03:25PM  10     THAT'S HELPFUL.

03:25PM  11         SO, FIRST OF ALL, WITH MR. BINGHAM, YOUR HONOR IS RIGHT

03:25PM  12     THAT I THINK HE HAD FOUR TESTS.  FOR SOME OF THE TESTS HE TOOK

03:25PM  13     AT THERANOS, HE WAS ABLE TO SAY THAT IT WASN'T CONSISTENT WITH

03:25PM  14     HOW I KNOW I USUALLY FEEL AT A CERTAIN LEVEL OF PLT, RIGHT?  HE

03:25PM  15     DID SAY THAT.  AND I SUPPOSE HE KNOWS HOW HE FEELS, RIGHT?

03:25PM  16         OF COURSE, FOR HIM TO SAY THIS CORRELATES OR DOESN'T

03:25PM  17     CORRELATE WITH A CERTAIN LEVEL OF PLT DOESN'T SEEM TO GET INTO

03:25PM  18     THAT 702 AREA.

03:25PM  19         BUT MORE TO THE POINT, YOUR HONOR, THERE WAS, AS

03:25PM  20     MR. BOSTIC SAID, THERE WAS THIS ONE TEST WHERE HE HAD HAVE

03:25PM  21     PARTICULAR RESULTS, AND THERE WAS A PARTICULAR TEST WHERE HE

03:25PM  22     GOT THE THERANOS TEST AND IT WAS AROUND 1100 FOR HIS PLT, AND

03:25PM  23     HE GOT ANOTHER TEST FROM A DIFFERENT LAB AND I THINK HE

03:25PM  24     DELIBERATELY GOT THE COMPARISON.

03:25PM  25         THE COURT:  SAME DAY.

03:25PM    1           MR. COOPERSMITH:  WITHIN AN HOW ARE OR SO, AND THAT

03:25PM    2    RESULT CAME BACK AT AROUND 700.

03:25PM    3       AND HE TESTIFIED THAT -- THAT CAME INTO EVIDENCE.  AND HE

03:25PM    4    SAID, WELL, THAT'S THE PROBLEM, RIGHT, IT'S DIFFERENT, RIGHT?

03:25PM    5       SO I THINK THAT'S SIMILAR, REALLY ALMOST IDENTICAL, IN OUR

03:25PM    6    VIEW, TO WHAT WE'RE TRYING TO HAVE DR. WOOTEN TESTIFY TO.

03:25PM    7           THE COURT:  WELL, THE DIFFERENCE IS, THOUGH, ISN'T

03:25PM    8    IT, IS THAT THE REFERENCE POINT OF HIS REFERENCE POINT WAS HIS

03:25PM    9    OWN PERSONAL KNOWLEDGE ABOUT THAT'S HIS EXPERTISE, IF YOU WILL,

03:25PM   10    I KNEW THESE -- THERE WAS SOMETHING WRONG WITH THAT.

03:25PM   11       AND TO HAVE HER ANSWER THIS QUESTION IS GOING TO CALL UPON

03:25PM   12    HER ANALYSIS, ISN'T IT?  SHE'S NOT MR. BINGHAM -- SHE'S NOT

03:25PM   13    TESTIFYING ABOUT HER OWN PERSONAL PHYSICAL CHARACTERISTICS AND

03:25PM   14    COMPARING IT WITH TESTS THAT WAY.

03:25PM   15           MR. COOPERSMITH:  RIGHT.

03:25PM   16           THE COURT:  SO I THINK THERE'S A DIFFERENCE.  OR

03:25PM   17    HELP ME WITH THAT.

03:25PM   18           MR. COOPERSMITH:  I THINK THERE'S A DIFFERENCE.  I'M

03:25PM   19    NOT SURE IT'S A LEGALLY MEANINGFUL DIFFERENCE.

03:25PM   20       BUT HERE'S ONE THING THAT I THINK, YOU KNOW, MR. SCHENK

03:25PM   21    ADDRESSED, WELL, WE DIDN'T NOTICE THE EXPERT.

03:25PM   22       WHAT WE RELIED ON IS WHEN WE HAD OUR MIL'S BACK IN THE

03:25PM   23    FALL, WE HAD FILED MIL'S WITH RESPECT TO DR. DAS, WHO WE

03:25PM   24    THOUGHT WAS GOING TO TESTIFY, AND HE ENDED UP NOT BEING CALLED.

03:25PM   25       BUT WE HAD HIGHLIGHTED CERTAIN TESTIMONY FROM THE

ER-4893

03:25PM 1    ELIZABETH HOLMES'S CASE AND WE SAID, WELL, IF THEY WERE TO ASK

03:25PM 2    THESE SAME QUESTIONS, WE THINK IT WOULD BE EXPERT OPINION IN

03:25PM 3    THE WAY THAT HE TESTIFIED.

03:25PM 4        AND THE COURT, I BELIEVE, ULTIMATELY DEFERRED ON RULING ON

03:25PM 5    THOSE QUESTIONS, BUT I DO REMEMBER --

03:25PM 6            THE COURT:  FOR DR. DAS?

03:25PM 7            MR. COOPERSMITH:  YEAH.  AND IF I'M WRONG, I'M SURE

03:25PM 8    SOMEONE WILL TELL ME.

03:25PM 9        BUT WHAT I RECALL ABOUT THAT RULING, WAS THAT THE COURT

03:25PM 10   FELT THAT IF THE DOCTOR WAS SIMPLY TESTIFYING ABOUT WHAT HE

03:25PM 11   OBSERVED IN THE COURSE OF HIS DUTIES AND WORK, JUST LIKE

03:25PM 12   DR. ROSENDORFF WAS, LIKE, TALKING ABOUT WHAT HE OBSERVED IN THE

03:25PM 13   COURSE OF HIS WORK, THEN THAT WOULD BE APPROPRIATE AS NONEXPERT

03:25PM 14   TESTIMONY, AND THAT'S WHAT DR. WOOTEN IS DOING OR TRYING TO DO.

03:25PM 15           THE COURT:  I THINK IT'S DIFFERENT, THOUGH.  I THINK

03:25PM 16   THAT THOSE, THOSE DOCTORS WORKED AT THERANOS, AND THEY HAD

03:25PM 17   INTIMACY WITH THERANOS, AND THEIR OBSERVATIONS ARE A LITTLE

03:25PM 18   DIFFERENT.  I DON'T THINK THEY'RE THE SAME.

03:25PM 19           MR. COOPERSMITH:  I SEE WHAT YOU'RE SAYING,

03:25PM 20   YOUR HONOR.

03:25PM 21       BUT SHE WORKS AT WOOTEN NATUROPATHIC MEDICINE; RIGHT?

03:25PM 22   THAT'S HER BUSINESS.

03:25PM 23           THE COURT:  SURE.

03:25PM 24       BUT IF SHE CAN TESTIFY LIKE MR. BINGHAM DID ABOUT HER OWN

03:25PM 25   RESULTS, WE'RE IN BINGHAM FIELD, IF YOU'LL PARDON ME.  I

03:25PM  1      INTERRUPTED YOU.

03:25PM  2            MR. COOPERSMITH:  IF I COULD SAY ONE MORE THING?

03:25PM  3      AND I'M SORRY.  I DON'T MEAN TO INTERRUPT MR. BOSTIC.

03:25PM  4          BUT JUST BY WAY OF PROFFER, THERE IS ADDITIONAL TESTIMONY,

03:25PM  5      WHICH IS WHAT I BELIEVE SHE'LL SAY IS HER OWN EXPERIENCE WITH

03:25PM  6      HCG TESTING.  AND THIS IS VERY SIMILAR TO BRITTANY GOULD,

03:25PM  7      RIGHT?

03:25PM  8          SHE'S GOING TO SAY SHE WANTED TO KNOW IF SHE WAS PREGNANT,

03:25PM  9      AND SHE TOOK AN HCG TEST AT THERANOS.  AND THEN SHE KNOWS,

03:25PM 10      BECAUSE IT'S IMPORTANT TO SEE IF IT DOUBLES, SHE KNOWS THAT

03:25PM 11      FROM HER EXPERIENCE, SO SHE GOES AND TAKES ANOTHER THERANOS

03:25PM 12      TEST, AND THAT'S TWO TESTS, AND SHE SEES IT'S DOUBLED AND THEN

03:25PM 13      SHE WAS PREGNANT AND HAD A SUCCESSFUL DELIVERY OF HER BABY.

03:25PM 14            THE COURT:  SO YOU WANT TO ASK DID YOU GET AN HCG

03:25PM 15      TEST AT THERANOS?

03:25PM 16          YES.

03:25PM 17          AND WHAT DID IT SAY?  PREGNANT?  NOT PREGNANT?

03:25PM 18            MR. COOPERSMITH:  WELL, IT WOULD HAVE A VALUE.

03:25PM 19            THE COURT:  A NUMBER?

03:25PM 20            MR. COOPERSMITH:  YEAH.

03:25PM 21            THE COURT:  AND DID THAT HELP YOU ASSESS WHETHER OR

03:25PM 22      NOT YOU WERE PREGNANT OR YOU THOUGHT YOU WERE PREGNANT?

03:25PM 23            MR. COOPERSMITH:  RIGHT.

03:25PM 24            THE COURT:  AND THEN ULTIMATELY DID YOU DELIVER A

03:25PM 25      HEALTHY CHILD?

WOOTEN DIRECT BY MR. COOPERSMITH                          6362

03:25PM  1           MR. COOPERSMITH:  EXACTLY, YOUR HONOR, WITH ONE

03:25PM  2    EXTRA LITTLE PIECE.

03:25PM  3        SO SHE TAKES AN HCG AT THERANOS, IT HAS A VALUE, WHICH

03:25PM  4    INDICATES PREGNANCY, AND THEN SHE TAKES ANOTHER TEST.

03:25PM  5        AND AS THE COURT REMEMBERS FROM THE OTHER WITNESSES, SHE

03:25PM  6    RECALLS THE VALUE DOUBLING, WHICH INDICATES A VIABLE PREGNANCY,

03:25PM  7    THEN SHE GOES FORWARD WITH GETTING OBGYN CARE.

03:25PM  8           THE COURT:  DO YOU WANT TO SPEAK TO THAT?

03:25PM  9           MR. SCHENK:  YOUR HONOR, THAT FACT THAT THE HCG

03:25PM 10    VALUE SHOULD DOUBLE, WAS QUALIFIED EXPERT TESTIMONY FROM

03:25PM 11    DR. ZACHMAN.

03:25PM 12           THE COURT:  RIGHT.

03:25PM 13           MR. SCHENK:  WE WILL OBJECT.  OUR PLAN WOULD BE TO

03:25PM 14    OBJECT.

03:25PM 15           THE COURT:  THAT'S HOW THAT CAME IN.

03:25PM 16           MR. COOPERSMITH:  THAT'S ALREADY IN THE RECORD.  THE

03:25PM 17    GOVERNMENT HAS ESTABLISHED WHAT THE HCG SHOULD LOOK LIKE.  I

03:25PM 18    JUST WANT TO ASK HER DID IT DOUBLE.  I WON'T ASK HER IS THAT

03:25PM 19    INDICATIVE OF ANYTHING.  I DON'T NEED TO GET INTO WHAT DOUBLING

03:25PM 20    MEANS.

03:25PM 21        IT'S KIND OF INTERESTING, THE GOVERNMENT ALREADY ELICITED

03:25PM 22    THAT TESTIMONY FROM DR. ZACHMAN, AND I THINK EVERYONE IN THE

03:25PM 23    COURTROOM KNOWS THAT.

03:25PM 24           THE COURT:  SO IF YOU WANT TO ASK HER DID YOU --

03:25PM 25    WERE YOU CURIOUS ABOUT WHETHER YOU WERE PREGNANT OR NOT?  AND

03:25PM    1    YOU WENT TO THERANOS, YOU GOT TESTING, THE TESTING SUGGESTED TO

03:25PM    2    YOU THAT YOU WERE.  AND DID YOU DELIVER, DID YOU DELIVER A

03:25PM    3    HEALTHY CHILD?

03:25PM    4         YES.

03:25PM    5         YOU CAN ASK HER THOSE QUESTIONS.

03:25PM    6              MR. COOPERSMITH:  OKAY.  OKAY.  THAT'S HELPFUL.

03:25PM    7    THANK YOU.

03:25PM    8         THE OTHER THING I THINK TO ASK HER IN GENERAL, ALL OF THE

03:25PM    9    TIME THAT SHE WAS SENDING PATIENTS TO THERANOS, DID SHE EVER

03:25PM   10    HAVE A BAD EXPERIENCE, I THINK --

03:25PM   11              THE COURT:  IS THE QUESTION WERE YOU COMFORTABLE

03:25PM   12    SENDING YOUR PATIENTS THERE?

03:25PM   13              MR. COOPERSMITH:  WERE YOU COMFORTABLE SENDING YOUR

03:25PM   14    PATIENTS THERE?  AND DO YOU KEEP ON DOING THAT; RIGHT?

03:25PM   15              MR. SCHENK:  I HAVE NO OBJECTION TO WERE YOU

03:25PM   16    COMFORTABLE SENDING YOUR PATIENTS TO THERANOS.

03:25PM   17              THE COURT:  AND SHE DID IT.

03:25PM   18              MR. COOPERSMITH:  SHE KEPT ON DOING IT.

03:25PM   19              THE COURT:  YES, THAT'S FINE.

03:25PM   20         MR. BOSTIC.

03:25PM   21              MR. BOSTIC:  THAT'S DIFFERENT FROM THE FIRST

03:25PM   22    QUESTION THAT MR. COOPERSMITH PROFFERED, DID YOU EVER HAVE A

03:25PM   23    BAD EXPERIENCE?

03:25PM   24         WHEN YOU ASK A DOCTOR, DID YOU EVER HAVE A BAD EXPERIENCE,

03:25PM   25    ONE INTERPRETATION OF THAT IS DID YOU EVER GET AN INACCURATE

03:25PM 1     TEST RESULT BACK WHEN THE GOVERNMENT'S WITNESSES TESTIFIED

03:25PM 2     ABOUT INACCURATE RESULTS, AND THAT WAS NOTICED EXPERT

03:25PM 3     TESTIMONY, THIS IS JUST THE INVERSE OF THAT, DID THAT EVER

03:25PM 4     HAPPEN?

03:25PM 5          FOR HER TO SAY NO, IS THE SAME KIND OF TESTIMONY THAT THE

03:25PM 6     GOVERNMENT'S EXPERTS PROVIDED AFTER BEING NOTICED AS EXPERTS.

03:25PM 7               THE COURT:  SURE.

03:25PM 8               MR. BOSTIC:  BRIEFLY ON THE COMPARISON WITH THE

03:25PM 9     DOCTORS WHO ACTUALLY WORKED AT THERANOS.

03:25PM 10         DRS. ROSENDORFF AND DAS, I THINK THE COURT HIT ON THAT

03:25PM 11    DISTINCTION.  THE KEY DIFFERENCE IS THEY WERE ON THE INSIDE

03:25PM 12    SEEING HOW THE COMPANY WAS HANDLING THESE PROBLEMS AND WHAT THE

03:25PM 13    COMPANY WAS AWARE OF COLLECTIVELY.

03:25PM 14         DR. ROSENDORFF ESPECIALLY RAISED CONCERNS TO THIS

03:25PM 15    DEFENDANT AND ULTIMATELY QUIT HIS JOB BECAUSE OF THE PROBLEMS

03:25PM 16    THAT HE WAS SEEING.

03:25PM 17         SO HIS TESTIMONY ABOUT ISSUES THAT HE SAW WITH TEST

03:25PM 18    RESULTS WAS DIRECTLY RELEVANT TO THE ISSUES IN THIS CASE

03:25PM 19    BECAUSE THEY WENT TO THE ACTIONS THAT HE TOOK AND DIRECTLY TO

03:25PM 20    THIS DEFENDANT'S NOTICE AND INTENT.

03:25PM 21         THE SAME CAN'T BE SAID FOR ANYTHING THAT THIS WITNESS IS

03:25PM 22    OFFERING.

03:25PM 23              THE COURT:  I THINK THAT'S THE DISTINCTION, I CALL

03:25PM 24    IT THE INTIMACY, BUT, YOU KNOW, THEY WORKED THERE.

03:25PM 25              MR. COOPERSMITH:  I DON'T THINK THAT'S -- WELL, I

ER-4898

03:25PM  1    UNDERSTAND THE DISTINCTION.  I DON'T THINK THAT'S THE REASON,

03:25PM  2    FROM MY RECOLLECTION OF THE COURT'S RULING, WHY THAT TESTIMONY

03:25PM  3    WAS ALLOWED.

03:25PM  4              THE COURT:  WELL, I'M SORRY TO INTERRUPT YOU.

03:25PM  5              MR. COOPERSMITH:  SURE.

03:25PM  6              THE COURT:  THAT INTIMACY, THAT CONNECTION, THAT

03:25PM  7    EXPERIENCE, THIS WITNESS DOES NOT HAVE FOR WHATEVER IT IS.

03:25PM  8              MR. COOPERSMITH:  YES, THAT IS TRUE.

03:25PM  9              THE COURT:  THAT'S WHY I'M NOT GOING TO PERMIT HER

03:25PM 10    TO TESTIFY CONCURRENT WITH THEIR TESTIMONY UNDER THAT THEORY.

03:25PM 11              MR. COOPERSMITH:  OKAY.  I UNDERSTAND.

03:25PM 12         WHAT SHE IS INTIMATELY FAMILIAR WITH IS NOT INSIDE

03:25PM 13    THERANOS, SHE WASN'T THERE, BUT SHE'S FAMILIAR WITH A LOT OF

03:25PM 14    THERANOS LAB RESULTS THAT SHE'S SEEING OVER AND OVER AGAIN.

03:25PM 15    THAT'S WHAT SEES INTIMATELY FAMILIAR WITH.

03:25PM 16              THE COURT:  AND YOU CAN ASK HER, WERE YOU

03:25PM 17    COMFORTABLE -- WAS IT 500 TESTS?  I CAN'T REMEMBER.

03:25PM 18         WERE YOU COMFORTABLE SENDING YOUR PATIENTS THERE?  AND SHE

03:25PM 19    WILL TELL US.

03:25PM 20              MR. COOPERSMITH:  OKAY.  THANK YOU, YOUR HONOR.

03:25PM 21         ONE LAST THING ON THE DOUBLING OF THE HCG ISSUE.

03:25PM 22         I RECALL THAT BRITTANY GOULD TESTIFIED THAT HCG IS

03:25PM 23    SUPPOSED TO DOUBLE.

03:25PM 24              THE COURT:  SHE HAD TRAINING.

03:25PM 25              MR. COOPERSMITH:  SHE WAS A NONMEDICAL EXPERT.  SHE

03:25PM  1    HAS TRAINING HERSELF AS THIS WITNESS HAD.

03:25PM  2              THE COURT:  I'M TRYING TO REMEMBER IF MS. GOULD --

03:25PM  3    AND WHAT WAS THE SOURCE OF HER INFORMATION AND DID SHE TESTIFY

03:25PM  4    TO DOUBLING.  I THINK SHE DID.

03:25PM  5              MR. BOSTIC:  I THINK, YOUR HONOR, SHE HAS WORKED IN

03:25PM  6    MEDICAL OFFICES BEFORE, BUT SHE DIDN'T TESTIFY AS AN EXPERT

03:25PM  7    WITNESS.

03:25PM  8              THE COURT:  RIGHT, RIGHT.

03:25PM  9              MR. BOSTIC:  HER TESTIMONY FOLLOWED THAT OF

03:25PM  10   DR. ZACHMAN WHO BROUGHT IN THAT FACT.

03:25PM  11       HER KNOWLEDGE OF HOW HCG WAS SUPPOSED TO WORK CAME FROM

03:25PM  12   HER KNOWLEDGE AS A PATIENT IS MY RECOLLECTION.

03:25PM  13              MR. COOPERSMITH:  RIGHT.

03:25PM  14              MR. SCHENK:  THERE WAS NO OBJECTION.

03:25PM  15              THE COURT:  THAT'S TRUE, THERE WASN'T.

03:25PM  16              MR. COOPERSMITH:  WELL, YOU KNOW, YES.  SO NOW WE'RE

03:25PM  17   INTO ANGELS ON THE HEAD OF THE PIN.

03:25PM  18       THERE IS ACTUALLY TESTIMONY IN THE RECORD THAT HCG IS

03:25PM  19   SUPPOSED TO DOUBLE, SO I'M NOT SURE WHY THIS IS SUCH A VERBOTEN

03:25PM  20   SUBJECT AT THIS POINT, BUT OKAY.

03:25PM  21              THE COURT:  SO WERE YOU COMFORTABLE CONTINUING TO

03:25PM  22   SEND YOUR PATIENTS TO THERANOS FOR TEST?  YES, NO, WHATEVER

03:25PM  23   SHE'LL SAY.

03:25PM  24       YOU WANT TO THEN ASK HER, WAS THERE A TIME WHEN YOU WERE

03:25PM  25   SEEKING TO CONCEIVE, OR HOWEVER DELICATELY YOU WANT TO ASK THAT

ER-4900

03:25PM    1       QUESTION, I'M NOT SURE.

03:25PM    2            AND SHE'LL SAY YES.

03:25PM    3            WHAT DID YOU DO?

03:25PM    4            I WENT TO GET HCG TESTING.  OKAY.

03:25PM    5            WHERE DID YOU GO?

03:25PM    6            THERANOS.

03:25PM    7            YOU GOT YOUR RESULT.

03:25PM    8            DID YOU GO BACK?

03:25PM    9            YES.

03:25PM   10            AND YOU WANT TO ASK THE NUMBER, WHAT WAS THE VALUE, OR DO

03:25PM   11       YOU WANT TO ASK HER DID THAT VALUE DOUBLE IN YOUR SECOND TEST?

03:25PM   12                MR. COOPERSMITH:  I THINK I WOULD ASK HER IF THE

03:25PM   13       FIRST TEST SHE GOT AT THERANOS, LIKE, PRODUCED A VALUE, AND

03:25PM   14       WHETHER THAT VALUE WAS CONSISTENT WITH PREGNANCY.

03:25PM   15            AND SHE'LL SAY, YES, I THINK.

03:25PM   16            AND THEN I'LL ASK IF SHE GOT ANOTHER TEST.  AND I'LL SAY,

03:25PM   17       DID THAT VALUE TELL YOU ANYTHING?

03:25PM   18            AND SHE'LL SAY THAT THAT VALUE TOLD ME THERE WAS A VIABLE

03:25PM   19       PREGNANCY AND THEN I WENT TO SEE AN OBGYN.

03:25PM   20                MR. SCHENK:  THAT IS EXPERT.  THE FIRST QUESTION, IS

03:25PM   21       THE NUMBER CONSISTENT WITH PREGNANCY, AND THE SECOND QUESTION,

03:25PM   22       IS IT VIABLE, WERE THE EXACT QUESTIONS THAT ZACHMAN TESTIFIED

03:25PM   23       TO.

03:25PM   24                THE COURT:  IF YOU COULD ASK THAT SUCH THAT IT

03:25PM   25       DOESN'T CALL FOR EXPERT TESTIMONY.

03:25PM  1            MR. COOPERSMITH:  I THINK I CAN.

03:25PM  2            THE COURT:  I THINK YOU CAN TOO.

03:25PM  3            MR. COOPERSMITH:  DID YOU TAKE A TEST?  DID YOU GET

03:25PM  4    A VALUE?  AND DID YOU TAKE ANOTHER TEST?  DID YOU GET A VALUE

03:25PM  5    AND DID YOU GO SEE AN OB.

03:25PM  6            THE COURT:  ABSOLUTELY.  SHE WENT TO THERANOS, SHE

03:25PM  7    GOT A TEST.  SHE WENT TO THERANOS, SHE GOT A TEST.  IT TOLD HER

03:25PM  8    SOMETHING, AND IT ULTIMATELY CAME TO FRUITION.

03:25PM  9            MR. COOPERSMITH:  RIGHT.  IF I COULD REMEMBER THOSE

03:25PM 10    QUESTIONS, THEN I WILL ENDEAVOR.

03:25PM 11        YOUR HONOR, JUST SO I UNDERSTAND THE COURT'S GUIDANCE,

03:25PM 12    WHAT I WAS PLANNING TO ASK HER, AND I THOUGHT THERE WAS NO

03:25PM 13    OBJECTION TO THIS, BUT I COULD BE CORRECTED, IS THAT I'LL ASK

03:25PM 14    HER IF SHE EVER HAD A BAD EXPERIENCE WITH SENDING PATIENTS TO

03:25PM 15    THERANOS, AND I THINK SHE'LL SAY NO.

03:25PM 16            THE COURT:  NO.  I WOULD -- THERE WAS AN OBJECTION

03:25PM 17    TO THAT, AND I DON'T KNOW IF YOU OBJECTED YET TO THAT QUESTION.

03:25PM 18    MAYBE YOU HADN'T.

03:25PM 19            MR. SCHENK:  YES, THAT IS AN OBJECTIONABLE QUESTION.

03:25PM 20            THE COURT:  WHAT YOU SAID WAS THAT YOU CONTINUE TO

03:25PM 21    SEND PATIENTS THERE DURING YOUR PRACTICE.  WERE YOU COMFORTABLE

03:25PM 22    DOING SO, CONTINUING?

03:25PM 23            MR. COOPERSMITH:  OKAY.

03:25PM 24            THE COURT:  AND HOW MANY YEARS WAS THAT?  AND WHEN

03:25PM 25    YOU CONTINUED, AND CONTINUING, AND CONTINUING.

ER-4902

03:25PM  1          YOU CAN DO THAT IN 9, 10, 11 -- I DON'T KNOW HOW MANY IT

03:25PM  2     WAS.

03:25PM  3               MR. COOPERSMITH:  I DON'T HAVE ANYTHING ELSE,

03:25PM  4     YOUR HONOR.

03:25PM  5               THE COURT:  OKAY.

03:25PM  6               MR. SCHENK:  NOTHING FURTHER.

03:25PM  7               THE COURT:  GREAT.

03:25PM  8          DO YOU THINK WE'LL FINISH BY 4:00 TODAY?

03:25PM  9               MR. COOPERSMITH:  I DON'T HAVE -- BASED ON THIS, I

03:25PM 10     DON'T HAVE THAT MUCH MORE.

03:25PM 11               THE COURT:  RIGHT.

03:25PM 12               MR. COOPERSMITH:  SO I GUESS THAT'S UP TO THE

03:25PM 13     GOVERNMENT.

03:25PM 14               THE COURT:  OKAY.  THANK YOU.

03:25PM 15               MR. SCHENK:  THANK YOU.

03:25PM 16          (END OF DISCUSSION AT SIDE-BAR.)

03:26PM 17               THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

03:26PM 18          ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

03:26PM 19          THANK YOU FOR YOUR PATIENCE, LADIES AND GENTLEMEN.

03:26PM 20          MR. COOPERSMITH.

03:26PM 21               MR. COOPERSMITH:  YES.  THANK YOU.

03:26PM 22     Q.  DR. WOOTEN, I'M JUST GOING TO ASK YOU SOME MORE QUESTIONS.

03:26PM 23     A.  YEAH.

03:26PM 24     Q.  SO, FIRST OF ALL, DO YOU KNOW WHEN PATIENTS THAT YOU HAD

03:26PM 25     WENT TO THERANOS FOR THEIR LAB TESTS, DO YOU KNOW WHERE THEY

03:26PM  1     WENT TO GET THOSE TESTS?

03:26PM  2     A.    WHAT LOCATION?

03:26PM  3     Q.    YEAH, OR JUST IN GENERAL WHERE THEY WOULD GO?

03:26PM  4     A.    YES.

03:26PM  5            THE COURT:  MR. COOPERSMITH, COULD YOU SPEAK IN THE

03:26PM  6     MIKE?

03:26PM  7            MR. COOPERSMITH:  YES, OF COURSE.

03:26PM  8            THE COURT:  THAT WOULD BE HELPFUL.

03:26PM  9     BY MR. COOPERSMITH:

03:26PM 10     Q.    SO LET ME ASK THE QUESTION AGAIN, DR. WOOTEN.

03:27PM 11            WHEN YOUR PATIENTS, AS WE DISCUSSED EARLIER, WENT TO

03:27PM 12     THERANOS TO GET THEIR BLOOD TESTS, DO YOU KNOW WHERE THEY WENT

03:27PM 13     TO GET THEIR BLOOD DRAWN?

03:27PM 14     A.    THEY WENT TO THE WALGREENS LOCATION.

03:27PM 15     Q.    AND WERE THERE WALGREENS LOCATIONS NEAR YOUR OFFICE?

03:27PM 16     A.    THERE WERE WALGREENS NEAR THEIR HOME OR WORK.

03:27PM 17     Q.    OKAY.  AND DID YOUR PATIENTS, JUST IN GENERAL AT A HIGH

03:27PM 18     LEVEL, GENERALLY LIKE TO GO TO THERANOS?

03:27PM 19     A.    YES, THEY DID.

03:27PM 20     Q.    FOR ABOUT HOW LONG -- I THINK YOU SAID THAT YOU STARTED

03:27PM 21     USING THERANOS IN 2015?

03:27PM 22     A.    YES.

03:27PM 23     Q.    AND THEN THAT PRACTICE OF SENDING PATIENTS TO THERANOS

03:27PM 24     ENDED SOME TIME IN 2016; IS THAT RIGHT?

03:27PM 25     A.    CORRECT.

03:27PM   1     Q.   AND WERE YOU COMFORTABLE SENDING PATIENTS THERE FOR THAT

03:27PM   2     TIME PERIOD?

03:27PM   3     A.   VERY COMFORTABLE.

03:27PM   4     Q.   AND YOU CONTINUED TO SEND PATIENTS TO THERANOS DURING THAT

03:28PM   5     WHOLE PERIOD OF TIME?

03:28PM   6     A.   CORRECT.

03:28PM   7     Q.   AND ABOUT HOW MANY PATIENTS WAS THAT?

03:28PM   8     A.   OVER 150.

03:28PM   9     Q.   OKAY.  LET'S GO BACK TO HCG TESTING FOR A MINUTE.

03:28PM  10     A.   YES.

03:28PM  11     Q.   OKAY.  IN -- WAS THERE A TIME WHEN YOU TOOK AN HCG TEST

03:28PM  12     THROUGH THERANOS?

03:28PM  13     A.   YES.

03:28PM  14     Q.   AND WHERE DID YOU GO TO GET THAT TEST?

03:28PM  15     A.   I WENT TO A WALGREENS LOCATION.

03:28PM  16     Q.   OKAY.  AND WHY DID YOU WANT TO GET A THERANOS TEST FOR

03:28PM  17     HCG?

03:28PM  18     A.   I WANTED TO CONFIRM MY RESULTS.

03:28PM  19     Q.   OKAY.  CONFIRM YOUR RESULTS FOR WHAT?

03:28PM  20     A.   FROM A URINE TEST THAT I TOOK.

03:28PM  21     Q.   FOR WHAT CONDITION?

03:28PM  22     A.   FOR PREGNANCY.  I'M SORRY.

03:28PM  23     Q.   OKAY.  SO DID YOU TAKE AN HCG TEST AT THERANOS?

03:28PM  24     A.   YES, I DID.

03:28PM  25     Q.   OKAY.  AND DID YOU GET A RESULT FOR THAT?

ER-4905

03:28PM  1    A.   YES, I DID.

03:28PM  2    Q.   AND DID YOU REVIEW THE RESULT?

03:28PM  3    A.   I DID.

03:28PM  4    Q.   DID YOU THEN AT ANY POINT AFTER THAT TAKE ANOTHER HCG TEST

03:29PM  5    AT THERANOS?

03:29PM  6    A.   I DID.

03:29PM  7    Q.   AND DID YOU GET A RESULT FOR THAT?

03:29PM  8    A.   I DID.

03:29PM  9    Q.   DID YOU REVIEW THAT RESULT?

03:29PM  10   A.   I DID.

03:29PM  11   Q.   AND DID YOU COMPARE THAT RESULT TO THE FIRST RESULT?

03:29PM  12   A.   I DID.

03:29PM  13   Q.   AND WHAT DID YOU DO AFTER THAT SECOND RESULT?

03:29PM  14   A.   WHAT DID I DO?

03:29PM  15   Q.   YEAH.

03:29PM  16   A.   I CALLED AN OB TO MAKE AN APPOINTMENT.

03:29PM  17   Q.   WHEN YOU SAY "OB," AN OBSTETRICIAN GYNECOLOGIST?

03:29PM  18   A.   CORRECT.

03:29PM  19   Q.   AND WERE YOU PREGNANT?

03:29PM  20   A.   YES, I WAS.

03:29PM  21   Q.   AND DID YOU ACTUALLY HAVE A CHILD?

03:29PM  22   A.   I DID.

03:29PM  23   Q.   HOW OLD IS THAT CHILD TODAY?

03:29PM  24   A.   FIVE AND A HALF.

03:29PM  25        MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

ER-4906

03:29PM   1              THE COURT:  CROSS-EXAMINATION?

03:29PM   2              MR. SCHENK:  YES.  THANK YOU.

03:30PM   3          YOUR HONOR, MAY I APPROACH?

03:30PM   4              THE COURT:  YES.

03:30PM   5              MR. SCHENK:  (HANDING.)

03:30PM   6                    **CROSS-EXAMINATION**

03:30PM   7      BY MR. SCHENK:

03:30PM   8      Q.   GOOD AFTERNOON, DR. WOOTEN.

03:30PM   9      A.   GOOD AFTERNOON.

03:30PM  10      Q.   MY NAME IS JEFF SCHENK, AND I REPRESENT THE UNITED STATES

03:30PM  11      IN THIS MATTER.  IT'S NICE TO MEET YOU.

03:30PM  12      A.   NICE TO MEET YOU.

03:30PM  13      Q.   I'D LIKE TO START BY ASKING YOU ABOUT A VIEW THAT YOU JUST

03:31PM  14      EXPRESSED ON DIRECT, AND, THAT IS, THAT YOU WERE COMFORTABLE

03:31PM  15      SENDING PATIENTS OF YOURS TO THERANOS, TO THE LOCATIONS WITHIN

03:31PM  16      WALGREENS STORES IN THE PHOENIX AREA TO GET BLOOD TESTING.

03:31PM  17           IS THAT ACCURATE?

03:31PM  18      A.   CORRECT.

03:31PM  19      Q.   AND THAT WAS ABOUT IN THE -- I THINK YOU SAID 2015 AND

03:31PM  20      2016 TIMEFRAME?

03:31PM  21      A.   CORRECT.

03:31PM  22      Q.   ABOUT 150 PATIENTS OF YOURS IN TOTAL; IS THAT RIGHT?

03:31PM  23      A.   CORRECT.

03:31PM  24      Q.   SO I WANT TO COME BACK TO THAT IN JUST A MOMENT, BUT I

03:31PM  25      WANT TO SPEND A MOMENT TO TALK TO YOU ABOUT HOW YOU PREPARED TO

03:31PM  1     TESTIFY TODAY?

03:31PM  2     A.   YES.

03:31PM  3     Q.   BEFORE YOU COMING, DID YOU MEET WITH THE DEFENSE TO TALK

03:31PM  4     ABOUT YOUR TESTIMONY?

03:31PM  5     A.   I DID.

03:31PM  6     Q.   WAS THAT IN PERSON, OR WAS THAT ON SKYPE OR FACEBOOK OR

03:31PM  7     SOMETHING?

03:31PM  8     A.   BOTH.

03:31PM  9     Q.   BOTH?

03:31PM  10    A.   UH-HUH.

03:31PM  11    Q.   DID YOU SEE DOCUMENTS?  DID THEY GIVE YOU ANYTHING TO

03:31PM  12    REVIEW IN ADVANCE OF TESTIMONY?

03:31PM  13    A.   NO.

03:31PM  14    Q.   DID YOU TAKE NOTES?  DID YOU WRITE DOWN?

03:32PM  15    A.   NO.

03:32PM  16    Q.   DID THEY TELL YOU NOT TO TAKE NOTES OR THAT'S NOT YOUR

03:32PM  17    PRACTICE?

03:32PM  18    A.   THAT'S NOT MY PRACTICE.

03:32PM  19    Q.   OKAY.  HOW ABOUT THEN, DID YOU NOTICE WHETHER PEOPLE ON

03:32PM  20    THE DEFENSE SIDE WERE TAKING NOTES?  DO YOU RECALL?

03:32PM  21    A.   I DON'T RECALL.

03:32PM  22    Q.   AND I THINK YOU SAID THEY DIDN'T SHOW YOU DOCUMENTS; IS

03:32PM  23    THAT RIGHT?

03:32PM  24    A.   CORRECT.

03:32PM  25    Q.   OKAY.  SO I WANT TO GO THROUGH SOME DOCUMENTS WITH YOU.

ER-4908

03:32PM   1    AND ESSENTIALLY WHAT I'M WONDERING IS NOW SEEING THESE

03:32PM   2    DOCUMENTS, BECAUSE IT SOUNDS LIKE YOU MAY NOT HAVE SEEN THEM

03:32PM   3    BEFORE, WHETHER IT AFFECTS THAT VIEW, IF YOU WOULD CHANGE YOUR

03:32PM   4    VIEW ABOUT WHETHER YOU WERE COMFORTABLE SENDING PATIENTS TO

03:32PM   5    THERANOS.

03:32PM   6        I'VE HANDED YOU A BINDER OF DOCUMENTS JUST A MOMENT AGO,

03:32PM   7    AND I WONDER IF YOU'LL TURN TO THE FIRST TAB IN THE BINDER,

03:32PM   8    IT'S TAB 1049.

03:32PM   9    A.   OKAY.

03:32PM  10           MR. SCHENK:  YOUR HONOR, PERMISSION TO PUBLISH 1049?

03:32PM  11    THAT HAS BEEN PREVIOUSLY ADMITTED.

03:32PM  12           THE COURT:  YES.

03:32PM  13        (GOVERNMENT'S EXHIBIT 1049 WAS RECEIVED IN EVIDENCE.)

03:33PM  14           THE COURT:  WE HAVE TO -- WE LOST OUR DIRECTOR.

03:33PM  15    SHE'LL BE RIGHT BACK.

03:33PM  16        (LAUGHTER.)

03:33PM  17    BY MR. SCHENK:

03:33PM  18    Q.   SO NOW THERE'S A DOCUMENT ON THE SCREEN IN FRONT OF YOU.

03:33PM  19    YOU ALSO HAVE A PAPER COPY, SO PLEASE USE WHATEVER IS EASIER

03:33PM  20    FOR YOU.

03:33PM  21    A.   OKAY.

03:33PM  22    Q.   THERE'S AN EMAIL ON THE MIDDLE OF THE PAGE FROM

03:33PM  23    ADAM ROSENDORFF TO ELIZABETH HOLMES, AND THERE'S A SUBJECT,

03:33PM  24    CONCERNS ABOUT THE LAUNCH.

03:33PM  25        DO YOU SEE THAT?

03:33PM   1      A.   I DO.

03:33PM   2      Q.   AND YOU SAID YOU PREPARED FOR TESTIMONY TODAY BY MEETING

03:34PM   3      WITH INDIVIDUALS FROM THE DEFENSE TEAM.

03:34PM   4           WAS THE INDIVIDUAL WHO WAS JUST ASKING YOU QUESTIONS,

03:34PM   5      MR. COOPERSMITH, WAS HE ONE OF THE PEOPLE THAT YOU MET WITH?

03:34PM   6      A.   YES.

03:34PM   7      Q.   SO WHEN YOU WERE PREPARING TO TESTIFY, DID MR. COOPERSMITH

03:34PM   8      TELL YOU THAT DR. ADAM ROSENDORFF WAS THERANOS'S LAB DIRECTOR

03:34PM   9      IN 2013?

03:34PM  10      A.   NO.

03:34PM  11      Q.   DID MR. COOPERSMITH TELL YOU THAT DR. ROSENDORFF SENT AN

03:34PM  12      EMAIL JUST BEFORE THE LAUNCH WITH WALGREENS EXPRESSING THESE

03:34PM  13      MEDICAL AND OPERATIONAL CONCERNS?

03:34PM  14              MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  401.  IT'S

03:34PM  15      NOT RELEVANT.

03:34PM  16              THE COURT:  MR. SCHENK.

03:34PM  17              MR. SCHENK:  SHE TESTIFIED SHE WAS COMFORTABLE

03:34PM  18      SENDING PATIENTS TO THERANOS, AND I'M JUST WONDERING WHETHER

03:34PM  19      ANY OF THIS WOULD CHANGE HER OPINION ABOUT WHETHER SHE WAS

03:34PM  20      COMFORTABLE SENDING PATIENTS TO THERANOS.

03:34PM  21              MR. COOPERSMITH:  YOUR HONOR, THE EMAIL HE'S SHOWING

03:34PM  22      HER IS FROM 2013.  SHE HAS NO TESTIMONY ABOUT THAT TIME PERIOD,

03:34PM  23      AND I DON'T THINK THIS IS RELEVANT TO HER TESTIMONY.

03:34PM  24              THE COURT:  IF YOU HAVE SOMETHING THAT IS CLOSER IN

03:34PM  25      TIME TO THIS.

03:35PM   1            MR. SCHENK:  YOUR HONOR, IF I MAY?

03:35PM   2            THE COURT:  YES.

03:35PM   3            MR. SCHENK:  I THINK THAT'S THE POINT, THIS WAS

03:35PM   4   AVAILABLE INFORMATION.  IT DIDN'T POST DATE THE TIME THAT SHE

03:35PM   5   WAS SENDING PATIENTS TO THERANOS.

03:35PM   6        IT WAS INFORMATION THAT THERANOS HAD SENT -- IF THIS WAS

03:35PM   7   INFORMATION THAT THERANOS WAS SHARING WITH INDIVIDUALS LIKE

03:35PM   8   DR. WOOTEN, IT MIGHT HAVE AFFECTED HER DECISION TO SEND

03:35PM   9   PATIENTS.  IT ALSO MIGHT HAVE AFFECTED HER DECISION TO TESTIFY.

03:35PM  10   SHE JUST EXPRESSED AN OPINION.

03:36PM  11        (PAUSE IN PROCEEDINGS.)

03:36PM  12            THE COURT:  SO YOU'RE ASKING HAD SHE KNOWN THIS

03:36PM  13   INFORMATION, WOULD IT AFFECT HER OPINION, --

03:36PM  14            MR. SCHENK:  PRECISELY.

03:36PM  15            THE COURT:  -- HER COMFORT LEVEL?

03:36PM  16            MR. SCHENK:  PRECISELY.

03:36PM  17            MR. COOPERSMITH:  YOUR HONOR, I DON'T SEE HOW

03:36PM  18   SOMETHING THAT DR. ROSENDORFF SAYS IN 2013 HAS ANY BEARING TO

03:36PM  19   DR. WOOTEN'S EXPERIENCE BEING COMFORTABLE WITH SENDING HER

03:36PM  20   PATIENTS IN 2015 AND 2016.

03:36PM  21        IT JUST SEEMS APPLES AND ORANGES HERE, AND I DON'T THINK

03:36PM  22   IT'S RELEVANT.

03:36PM  23            THE COURT:  WELL, MR. SCHENK, I'LL ALLOW YOU TO ASK

03:36PM  24   QUESTIONS ABOUT WHETHER OR NOT SHE WAS INFORMED OF THIS

03:36PM  25   INFORMATION AND WHAT EFFECT THAT HAD, IF ANY.

03:36PM   1          SO I'LL OVERRULE THE OBJECTION FOR THIS QUESTION.  SO YOU

03:36PM   2     CAN START OVER.

03:36PM   3              MR. SCHENK:  THANK YOU.

03:36PM   4     Q.   DR. WOOTEN, DO YOU SEE HERE AN EMAIL FROM SOMEONE NAMED

03:37PM   5     DR. ADAM ROSENDORFF?

03:37PM   6     A.   YES.

03:37PM   7     Q.   SENT IN 2013?

03:37PM   8     A.   YES.

03:37PM   9     Q.   AND THE SUBJECT IS ABOUT CONCERNS ABOUT THE LAUNCH, THE

03:37PM  10     SUBJECT LINE?

03:37PM  11     A.   YES.

03:37PM  12     Q.   AND MY FIRST QUESTION IS WHEN PREPARING TO TESTIFY TODAY,

03:37PM  13     DID MR. COOPERSMITH SHOW YOU THIS EMAIL?

03:37PM  14     A.   NO.

03:37PM  15     Q.   AND I'M WONDERING IF NOW, SEEING THIS EMAIL WHERE THE LAB

03:37PM  16     DIRECTOR IS EXPRESSING MEDICAL AND OPERATIONAL CONCERNS ABOUT

03:37PM  17     THERANOS'S READINESS FOR LAUNCH, WHETHER IF YOU HAD KNOWN THAT

03:37PM  18     WHEN DECIDING TO SEND YOUR PATIENTS TO THERANOS, TO THE

03:37PM  19     WALGREENS LOCATIONS, WOULD THAT HAVE AFFECTED YOUR OPINION

03:37PM  20     ABOUT WHETHER YOU WOULD SEND YOUR PATIENTS TO A THERANOS INSIDE

03:37PM  21     OF A WALGREENS STORE?

03:37PM  22     A.   IT MAY HAVE BACK IN 2013.

03:37PM  23     Q.   I'M SORRY?

03:37PM  24     A.   IT MAY HAVE BACK IN 2013.

03:37PM  25     Q.   AND IF WE CAN NOW ZOOM OUT OF THE EMAIL AND LOOK UP AT THE

ER-4912

03:37PM   1    TOP OF IT.

03:37PM   2        DO YOU SEE THAT THIS EMAIL GETS FORWARDED TO AN INDIVIDUAL

03:38PM   3    NAMED SUNNY BALWANI?

03:38PM   4    A.   YES.

03:38PM   5    Q.   AND YOU MENTIONED TO ME THAT IT MAY HAVE AFFECTED YOUR

03:38PM   6    OPINION IN 2013; IS THAT RIGHT?

03:38PM   7    A.   CORRECT.

03:38PM   8    Q.   AND BY THAT, DO YOU MEAN IF THERANOS'S LAB DIRECTOR WAS

03:38PM   9    EXPRESSING SOME CONCERNS ABOUT WHETHER THERANOS WAS READY TO

03:38PM  10    LAUNCH, YOU WOULD WANT TO KNOW WHETHER THEY WERE FIXED, AND

03:38PM  11    WHETHER THERE WERE PROBLEMS, AND IF THERE WERE PROBLEMS, AND IT

03:38PM  12    WOULD HAVE BEEN HELPFUL TO KNOW IF THE PROBLEMS WERE FIXED

03:38PM  13    BEFORE YOU REFERRED PATIENTS; IS THAT ACCURATE?

03:38PM  14    A.   CORRECT.

03:38PM  15    Q.   THANK YOU.

03:38PM  16        WOULD YOU NOW TURN TO TAB 4147.

03:38PM  17        YOUR HONOR, 4147 HAS ALREADY BEEN ADMITTED.  PERMISSION TO

03:38PM  18    PUBLISH?

03:38PM  19            THE COURT:  YES.

03:38PM  20            MR. SCHENK:  THANK YOU.

03:38PM  21    Q.   IF WE COULD LOOK AT THE EMAIL, THE THIRD ONE DOWN FROM

03:39PM  22    ADAM ROSENDORFF AGAIN.

03:39PM  23        DR. WOOTEN, DID MR. COOPERSMITH SHOW YOU THIS EMAIL BEFORE

03:39PM  24    YOU TESTIFIED TODAY?

03:39PM  25    A.   NO.

03:39PM   1      Q.   AND YOU TESTIFIED ON DIRECT THAT YOU YOURSELF HAD HCG

03:39PM   2      TESTING DONE; IS THAT RIGHT?

03:39PM   3      A.   YES.

03:39PM   4      Q.   AND YOU MADE THE DECISION TO GET HCG TESTING DONE AT

03:39PM   5      THERANOS; CORRECT?

03:39PM   6      A.   YES.

03:39PM   7      Q.   AND DID YOU ALSO REFER SOME OF YOUR PATIENTS TO THERANOS

03:39PM   8      FOR HCG TESTING?

03:39PM   9      A.   I CANNOT RECALL.

03:39PM  10      Q.   I'LL SHOW YOU A DOCUMENT IN A MOMENT THAT MIGHT HELP

03:39PM  11      REFRESH, BUT BEFORE WE GET THERE, A SIMILAR QUESTION HERE.

03:39PM  12           DO YOU SEE NUMBER 1 WHERE DR. ROSENDORFF IS HALTING HCG

03:39PM  13      TESTING?

03:39PM  14           DO YOU SEE THAT?

03:39PM  15      A.   CORRECT.

03:39PM  16      Q.   AND IF YOU HAD KNOWN IN 2015 THAT HCG TESTING AT THERANOS

03:39PM  17      HAD BEEN HALTED BY THE LAB DIRECTOR, WOULD THAT HAVE AFFECTED

03:39PM  18      YOUR DECISION TO YOURSELF GO GET HCG TESTING AT THERANOS?

03:39PM  19      A.   IT WOULDN'T HAVE HALTED ME IN 2015.

03:40PM  20      Q.   WHY IS THAT?  YOU WOULD HAVE ASSUMED THEY FIXED THE

03:40PM  21      PROBLEM?

03:40PM  22      A.   CORRECT.

03:40PM  23      Q.   I SEE.

03:40PM  24           BUT IF THEY HADN'T, WOULD THAT HAVE AFFECTED YOUR OPINION?

03:40PM  25      A.   CORRECT.

03:40PM   1    Q.   NOW LOOK AT THE VERY TOP.

03:40PM   2         DO YOU SEE THAT THIS EMAIL GETS FORWARDED -- I'M SORRY,

03:40PM   3    GETS SENT FROM MR. BALWANI TO MS. HOLMES?  DO YOU SEE AT THE

03:40PM   4    VERY TOP?

03:40PM   5    A.   YES.

03:40PM   6    Q.   WOULD YOU NOW TURN TO TAB 5421.

03:40PM   7         5421 HAS BEEN PREVIOUSLY ADMITTED.

03:40PM   8         PERMISSION TO PUBLISH, YOUR HONOR?

03:40PM   9              THE COURT:  YES.

03:40PM  10    BY MR. SCHENK:

03:40PM  11    Q.   DO YOU SEE, DR. WOOTEN, DO YOU SEE THIS EMAIL HERE?  WAS

03:40PM  12    THIS SHOWN TO YOU BY MR. COOPERSMITH BEFORE YOU TESTIFIED?

03:40PM  13    A.   NO.

03:40PM  14    Q.   IN THIS EMAIL, DO YOU SEE WHERE IT SAYS THAT 33 EDISONS QC

03:40PM  15    ON JUNE 24TH IN THE EVENING, 20 EDISONS PASSED, 9 EDISONS FOR,

03:41PM  16    AND THEN IT LISTS SOME ASSAYS.

03:41PM  17         AND DO YOU SEE HCG IS INCLUDED AS ONE OF THE ASSAYS?

03:41PM  18    A.   CORRECT.

03:41PM  19    Q.   AND DO YOU SEE THAT IT SAYS THAT NINE EDISONS FAILED

03:41PM  20    LEVEL 1 AND/OR LEVEL 2 QC ON HCG?

03:41PM  21    A.   YES.

03:41PM  22    Q.   SO NOW SEEING THAT SOME EDISON DEVICES WERE FAILING QC FOR

03:41PM  23    THE HCG ASSAY, DO YOU THINK THAT KNOWLEDGE WOULD HAVE AFFECTED

03:41PM  24    YOUR DECISION, EITHER YOURSELF TO GET HCG TESTING AT THERANOS,

03:41PM  25    OR TO REFER PATIENTS?

WOOTEN CROSS BY MR. SCHENK                                    6382

03:41PM  1    A.   IT WOULD NOT.

03:41PM  2    Q.   WHY IS THAT?

03:41PM  3    A.   BECAUSE I KNEW I WAS PREGNANT, SO I WANTED TO CONFIRM IT,

03:41PM  4    AND IT WAS EASY TO CONFIRM.

03:41PM  5    Q.   YOU KNEW YOU WERE PREGNANT BECAUSE OF THE URINE TEST?

03:41PM  6    A.   CORRECT.

03:41PM  7    Q.   AND WAS PART OF YOUR CONFIDENCE YOUR MEDICAL TRAINING?

03:41PM  8    A.   CORRECT.

03:41PM  9    Q.   SO HOW ABOUT THE SAME QUESTION FOR YOUR PATIENTS.  WOULD

03:41PM  10   YOU STILL FEEL COMFORTABLE REFERRING ONE OF YOUR PATIENTS WHO

03:42PM  11   DID NOT HAVE MEDICAL TRAINING AND DID NOT HAVE CONFIDENCE IN

03:42PM  12   THE URINE TEST, WOULD YOU REFER THEM TO THERANOS FOR HCG

03:42PM  13   TESTING?

03:42PM  14   A.   I WOULD.

03:42PM  15   Q.   EVEN THOUGH YOU SEE IT FAILS QC.

03:42PM  16        WHY IS THAT?

03:42PM  17   A.   BECAUSE IF I KNOW THE PERSON IS PREGNANT, AND I KNOW TO

03:42PM  18   USE A BACK-UP LAB TO CONFIRM THE RESULTS EITHER WAY.

03:42PM  19   Q.   I'M SORRY.  I MISSED WHAT YOU SAID AFTER --

03:42PM  20   A.   I WOULD USE A DIFFERENT LAB TO CONFIRM THE RESULTS EITHER

03:42PM  21   WAY.

03:42PM  22   Q.   I SEE.  SO YOU WOULDN'T TRUST THE THERANOS, YOU WOULD GO

03:42PM  23   TO A DIFFERENT LAB ANYWAY?

03:42PM  24   A.   IF I FELT THAT THE THERANOS LAB WAS INCORRECT.

03:42PM  25   Q.   THEN YOU -- IF YOU THOUGHT THEY WERE INCORRECT, YOU

ER-4916

03:42PM   1     WOULDN'T USE THEM?

03:42PM   2     A.   CORRECT.

03:42PM   3     Q.   OKAY.  AND THIS WASN'T INFORMATION THAT YOU HAD AT THE

03:42PM   4     TIME WHEN YOU SAID EARLIER YOU WERE COMFORTABLE SENDING

03:42PM   5     PATIENTS?

03:42PM   6     A.   CORRECT.

03:42PM   7     Q.   I GOT IT.  THANK YOU.

03:42PM   8          BEFORE YOU TESTIFIED TODAY, DID MR. COOPERSMITH TELL YOU A

03:43PM   9     STORY ABOUT A PATIENT NAMED BRITTANY GOULD?

03:43PM  10     A.   NO.

03:43PM  11     Q.   HE DIDN'T TELL YOU THERE WAS A PATIENT WHO WAS NOT A

03:43PM  12     DOCTOR WHO WENT TO THERANOS AND GOT AN HCG TEST THAT TOLD HER

03:43PM  13     SHE DID NOT HAVE A VIABLE PREGNANCY WHEN SHE DID?

03:43PM  14     A.   NO.

03:43PM  15     Q.   YOU DIDN'T KNOW THAT?

03:43PM  16     A.   NO.

03:43PM  17     Q.   KNOWING THAT NOW, WOULD YOU BE COMFORTABLE REFERRING

03:43PM  18     PATIENTS IN THE 2015 TIMEFRAME?

03:43PM  19     A.   I WOULD STILL BE COMFORTABLE?

03:43PM  20     Q.   YOU STILL WOULD REFER PATIENTS?

03:43PM  21     A.   UH-HUH.

03:43PM  22     Q.   IS IT BECAUSE OF THE REASON YOU TOLD ME A MOMENT AGO, AND

03:43PM  23     THAT'S BECAUSE YOU WOULD GO TO ANOTHER LAB TO GET A

03:43PM  24     CONFIRMATORY TEST, SO YOU WOULDN'T REALLY RELY ON THAT FIRST

03:43PM  25     THERANOS TEST?

WOOTEN CROSS BY MR. SCHENK                                            6384

03:43PM  1      A.   IF I TRULY BELIEVED THE PATIENT WAS PREGNANT, YES, I WOULD

03:43PM  2      DO A FOLLOWUP.   BUT OTHER LABS MAKE HONEST MISTAKES, TOO.

03:43PM  3      Q.   THERE'S MISTAKES THAT OCCUR AT VARIOUS LABS?

03:43PM  4      A.   YEAH.

03:43PM  5      Q.   RIGHT.

03:43PM  6           AND IF THERE WAS, IN THIS OTHER LAB THAT, AS YOU SAY, IT

03:43PM  7      WOULD MAKE AN HONEST MISTAKE, WOULD YOU EXPECT THAT IN THAT

03:43PM  8      LAB, THE ACTUAL LAB DIRECTORS, THE MEDICAL PROFESSIONALS, WOULD

03:44PM  9      BE THE ONES MAKING THE DECISIONS, IS THAT HOW YOU WOULD EXPECT

03:44PM 10      IT TO WORK, NOT MBA'S, FOR INSTANCE?

03:44PM 11                MR. COOPERSMITH:   OBJECTION.   LACKS FOUNDATION.

03:44PM 12      MISSTATES TESTIMONY.

03:44PM 13                THE COURT:   SUSTAINED.   SUSTAINED.

03:44PM 14      BY MR. SCHENK:

03:44PM 15      Q.   YOU SAID YOU FEEL COMFORTABLE SENDING PATIENTS TO THERANOS

03:44PM 16      BECAUSE ALL LABS MAKE MISTAKES?

03:44PM 17      A.   CORRECT.

03:44PM 18      Q.   AND I'M SORT OF WONDERING ABOUT YOUR CONFIDENCE LEVEL IN

03:44PM 19      LABS TO FIX PROBLEMS.

03:44PM 20           IF MISTAKES ARE INEVITABLE, THEN WE SHOULD SPEND A MOMENT

03:44PM 21      TALKING ABOUT HOW THOSE MISTAKES GET FIXED IF THEY'RE

03:44PM 22      INEVITABLE.

03:44PM 23           AND WHEN YOU WOULD EXPECT A LAB TO FIX THEIR MISTAKES, WHO

03:44PM 24      THERE WOULD YOU EXPECT TO DO THAT, TO MAKE THOSE DECISIONS AT

03:44PM 25      THE LAB?

ER-4918

03:44PM  1    A.   TO WHOEVER IS IN CHARGE OF THE LAB.

03:44PM  2    Q.   WHOEVER IS IN CHARGE OF THE LAB?

03:44PM  3    A.   UH-HUH.

03:44PM  4    Q.   THANK YOU.

03:44PM  5         YOU SAID THAT IF THE THERANOS TEST WASN'T RELIABLE, AND

03:44PM  6    YOU STILL UNDERSTOOD THAT THE PATIENT WAS PREGNANT, YOU WOULD

03:44PM  7    SEND THEM OUT TO GET A CONFIRMATORY TEST, A SECOND TEST?

03:45PM  8    A.   CORRECT.

03:45PM  9    Q.   IF THE THERANOS TEST SAID TO MS. GOULD THAT SHE WAS NOT

03:45PM 10    PREGNANT AND SHE WAS PREGNANT, THERE'S NO OTHER VALUE TO THAT

03:45PM 11    LAB TEST, RIGHT, AN INACCURATE LAB TEST HAS NO VALUE?  WE AGREE

03:45PM 12    ON THAT?

03:45PM 13    A.   CORRECT.

03:45PM 14    Q.   SO WHEN YOU TELL ME YOU WOULD GO TO ANOTHER LAB, IT'S

03:45PM 15    BECAUSE YOU WOULD DISREGARD OR IGNORED THE THERANOS LAB TEST;

03:45PM 16    CORRECT?

03:45PM 17    A.   CORRECT.

03:45PM 18    Q.   YOU AND I HAVE BEEN TALKING ABOUT A PATIENT YOU DON'T

03:45PM 19    KNOW, SOMEONE NAMED BRITTANY GOULD, WHO RECEIVED AN INACCURATE

03:45PM 20    HCG TEST.

03:45PM 21         I ASSUME THAT STORY IS NOT SURPRISING TO YOU.  DO YOU

03:45PM 22    RECALL ONE OF YOUR PATIENTS HAVING AN HCG TEST FROM THERANOS

03:45PM 23    VOIDED?

03:45PM 24    A.   I DON'T RECALL.

03:45PM 25    Q.   YOU DON'T RECALL THAT?

03:45PM   1          AT TAB 5861 -- THIS HAS NOT BEEN ADMITTED -- WOULD YOU

03:45PM   2    TURN TO PAGE 42.

03:46PM   3          PLEASE DON'T READ OUT LOUD THE CONTENT OF THE DOCUMENT.

03:46PM   4    I'M JUST ASKING IF THIS REFRESHES YOUR RECOLLECTION THAT ONE OF

03:46PM   5    YOUR PATIENTS THAT WAS SENT TO THERANOS AND GOT AN HCG HAD THAT

03:46PM   6    TEST VOIDED.

03:46PM   7          DOES THIS REFRESH YOUR RECOLLECTION THAT THAT HAPPENED?

03:46PM   8    A.   WHAT PAGE AM I LOOKING AT?

03:46PM   9              THE COURT:  THE PAGES ARE IN THE MIDDLE ON THE

03:46PM  10    BOTTOM IN THE SMALL PRINT I THINK.

03:46PM  11          IS THAT RIGHT, MR. SCHENK?

03:46PM  12              MR. SCHENK:  YES.  THANK YOU, YOUR HONOR.

03:46PM  13              THE COURT:  THE LOWER.

03:46PM  14              MR. COOPERSMITH:  THE VERY BOTTOM OF THE DOCUMENT,

03:46PM  15    SORT OF IN THE CENTER IT SAYS TRIAL EXHIBIT 861, AND THEN PAGE,

03:46PM  16    AND IT'S A FIVE DIGIT NUMBER.

03:46PM  17              THE WITNESS:  OKAY.

03:46PM  18              MR. SCHENK:  42.

03:46PM  19    Q.   WOULD YOU LIKE THE QUESTION AGAIN?

03:47PM  20    A.   YES.

03:47PM  21    Q.   THE QUESTION IS, DOES LOOKING AT THIS DOCUMENT REFRESH

03:47PM  22    YOUR RECOLLECTION THAT ONE OF YOUR PATIENTS THAT WENT TO

03:47PM  23    THERANOS FOR AN HCG TEST HAD THAT TEST RESULT VOIDED?

03:47PM  24    A.   I CAN'T RECALL.

03:47PM  25    Q.   YOU DON'T RECALL.

03:47PM   1            DO YOU RECALL THIS AT LEAST OCCURRING IN THE LATTER PART,

03:47PM   2    LIKE DECEMBER OF 2014, OR DOES THE DOCUMENT REFRESH YOUR

03:47PM   3    RECOLLECTION THAT THAT'S WHEN THIS OCCURRED?

03:47PM   4    A.   THE DATE AGAIN?

03:47PM   5    Q.   DECEMBER OF 2014?

03:47PM   6    A.   2014.  I CAN'T RECALL.

03:48PM   7            MR. SCHENK:  YOUR HONOR, PERMISSION TO PUBLISH

03:48PM   8    ADMITTED EXHIBIT 4533.

03:48PM   9            THE COURT:  YES.

03:48PM   10   BY MR. SCHENK:

03:48PM   11   Q.   DR. WOOTEN, BEFORE TESTIFYING TODAY, DID MR. COOPERSMITH

03:48PM   12   SHOW YOU THIS DOCUMENT THAT SHOWS WHEN THERANOS WAS RUNNING

03:48PM   13   CERTAIN TESTS ON THE EDISON DEVICE?

03:48PM   14   A.   NO.

03:48PM   15   Q.   IF WE COULD ZOOM IN ON THAT CHART.

03:48PM   16            DO YOU SEE THERE THAT HCG WAS TESTED ON THE EDISON DURING

03:48PM   17   THE DECEMBER 2014 TIMEFRAME?

03:48PM   18            DO YOU SEE THAT?

03:48PM   19   A.   YES.

03:48PM   20   Q.   SO IF NOW SEEING THAT ONE OF YOUR PATIENTS HAD A VOIDED

03:48PM   21   TEST IN THIS DECEMBER TIMEFRAME, WOULD YOU STILL FEEL

03:48PM   22   COMFORTABLE SENDING PATIENTS TO THERANOS?

03:48PM   23   A.   NOT FOR AN HCG TEST.

03:48PM   24   Q.   COULD YOU NOW TURN TO EXHIBIT 1548 IN THE BINDER.

03:49PM   25            YOUR HONOR, PERMISSION TO PUBLISH 1548?  IT'S BEEN

03:49PM  1      PREVIOUSLY ADMITTED.

03:49PM  2               THE COURT:  YES.

03:49PM  3      BY MR. SCHENK:

03:49PM  4      Q.   IF WE CAN BRING UP THE EXCEL DOCUMENT, MS. WACHS.

03:49PM  5           DR. WOOTEN, DO YOU SEE HERE AN EXCEL CHART THAT CONTAINS

03:49PM  6      SOME VARIOUS ASSAYS DOWN THE LEFT-HAND COLUMN?

03:49PM  7      A.   YES.

03:49PM  8      Q.   AND DID MR. COOPERSMITH SHOW YOU THIS DOCUMENT BEFORE YOU

03:49PM  9      TESTIFIED TODAY?

03:49PM  10     A.   NO.

03:49PM  11     Q.   ON PSA, DO YOU SEE WHERE IT COMPARES THERANOS TEST RESULTS

03:49PM  12     TO THE PREDICATE METHOD?

03:49PM  13          DO YOU SEE THAT?

03:49PM  14     A.   YES.

03:49PM  15     Q.   AND DO YOU SEE HOW THE PREDICATE, IF YOU FOLLOW ME THROUGH

03:50PM  16     IN COLUMNS D, E, F, AND G, THE PREDICATE REPEATS ITSELF?  IT

03:50PM  17     GETS 3.1 AND THEN 3.1 AGAIN.

03:50PM  18          DO YOU SEE THAT?

03:50PM  19     A.   YES.

03:50PM  20     Q.   AND THEN 7.5 AND 7.5 AGAIN.

03:50PM  21          DO YOU SEE THAT?

03:50PM  22     A.   YES.

03:50PM  23     Q.   BUT BELOW ON THE THERANOS DEVICE, DO YOU SEE HOW THE

03:50PM  24     RERUNS ARE DIFFERENT, IT'S 1.9, AND THEN IT'S 2.6 OR IT'S 4.9,

03:50PM  25     AND THEN IT'S 7.2?

03:50PM  1          DO YOU SEE THAT FOR PSA?

03:50PM  2     A.   YES.

03:50PM  3     Q.   SEEING HERE THAT IN FEBRUARY OF 2014, IF YOU WOULD LIKE TO

03:50PM  4     LOOK -- I MOVED QUICKLY PAST IT, BUT THIS WAS ATTACHED TO AN

03:50PM  5     EMAIL THAT WAS FROM FEBRUARY OF 2014.  IF YOU TURN BACK TO THAT

03:50PM  6     FIRST PAGE.

03:50PM  7     A.   I'M SORRY.  WHAT PAGE?

03:50PM  8     Q.   PAGE 1 OF TRIAL EXHIBIT 1548.

03:50PM  9     A.   OKAY.

03:50PM 10     Q.   DO YOU SEE THAT THAT'S AN EMAIL DATED IN FEBRUARY OF 2014?

03:51PM 11     A.   YES.

03:51PM 12     Q.   SO IF YOU HAD KNOWN THAT THERANOS WAS NOT GETTING THESE

03:51PM 13     REPEATABLE PSA VALUES, WOULD YOU HAVE BEEN COMFORTABLE SENDING

03:51PM 14     YOUR PATIENTS TO THERANOS FOR PSA TESTS?

03:51PM 15          MR. COOPERSMITH:  OBJECTION.  MISCHARACTERIZES PRIOR

03:51PM 16     TESTIMONY ABOUT THIS DOCUMENT.

03:51PM 17          THE COURT:  I'M SORRY, SAY AGAIN.

03:51PM 18          MR. COOPERSMITH:  OBJECTION.  IT'S LACK OF

03:51PM 19     FOUNDATION BECAUSE IT MISCHARACTERIZES THE PRIOR TESTIMONY AND

03:51PM 20     THE EVIDENCE ABOUT THIS PARTICULAR EXHIBIT.

03:51PM 21          THE COURT:  YOU KNOW, I'M GOING TO SUSTAIN THE

03:51PM 22     OBJECTION FOR DIFFERENT GROUNDS, AS TO TESTIFYING TO THIS.  I

03:51PM 23     DON'T THINK SHE'S QUALIFIED TO TESTIFY ABOUT THESE.

03:51PM 24          MR. SCHENK:  OKAY.  I'LL MOVE ON.

03:51PM 25          THE COURT:  SO I'LL SUSTAIN THE OBJECTION.

03:51PM  1          MR. SCHENK:  OKAY.  PERMISSION TO PUBLISH 4938.

03:52PM  2          THE COURT:  YES.

03:52PM  3  BY MR. SCHENK:

03:52PM  4  Q.  DR. WOOTEN, BEFORE HE TESTIFIED TODAY, DID MR. COOPERSMITH

03:52PM  5  TALK TO YOU ABOUT A CERTAIN PATIENT NAMED MEHRL ELLSWORTH?

03:52PM  6  A.  NO.

03:52PM  7  Q.  HAVE YOU SEEN MEHRL ELLSWORTH'S TESTS BEFORE?

03:52PM  8  A.  NO.

03:52PM  9  Q.  AND DO YOU SEE HERE THAT DR. ELLSWORTH RECEIVED A PSA

03:52PM 10  SCORE IN THE 20'S ON THIS TEST, 26.1?

03:52PM 11  A.  YES.

03:52PM 12  Q.  YOU TOLD ME A MOMENT AGO YOU WOULDN'T FEEL COMFORTABLE

03:52PM 13  SENDING HCG, OR PATIENTS WHO NEEDED AN HCG TEST, TO THERANOS

03:52PM 14  NOW SEEING THE DOCUMENTS THAT I'VE SHOWN YOU; IS THAT FAIR?

03:52PM 15  A.  THAT'S FAIR.

03:52PM 16  Q.  AND SAME QUESTION FOR PSA.  IF YOU KNEW THAT

03:52PM 17  MEHRL ELLSWORTH RECEIVED A 26 ON HIS PSA WHEN THAT'S NOT AN

03:52PM 18  ACCURATE VALUE, WOULD YOU FEEL COMFORTABLE SENDING YOUR

03:52PM 19  PATIENTS FOR A PSA TEST TO THERANOS?

03:52PM 20          MR. COOPERSMITH:  YOUR HONOR, 702.

03:52PM 21          THE COURT:  SUSTAINED.  SUSTAINED.

03:53PM 22      (LAUGHTER.)

03:53PM 23          MR. SCHENK:  PERMISSION TO PUBLISH 4182?

03:53PM 24          THE COURT:  YES.

03:53PM 25  BY MR. SCHENK:

ER-4924

03:53PM   1    Q.   I'LL GIVE YOU A MINUTE.

03:53PM   2    A.   YES.

03:53PM   3    Q.   BEFORE TESTIFYING TODAY, DID MR. COOPERSMITH SHOW YOU THIS

03:53PM   4    EXHIBIT 4182?

03:53PM   5    A.   NO.

03:53PM   6    Q.   IN THE TOP EMAIL HERE, THE ONE THAT GOES FROM SOMEONE

03:53PM   7    NAMED DANIEL YOUNG TO SUNNY BALWANI, DO YOU SEE A LIST OF

03:53PM   8    ISSUES WITH ASSAYS BEING DISCUSSED, PT INR, HCG, TESTOSTERONE,

03:53PM   9    VITAMIN B12, TSH, C02 AND A FEW MORE IN THE LAST BULLET.

03:53PM  10        DO YOU SEE THAT?

03:53PM  11    A.   I DO.

03:53PM  12    Q.   AND SO THEN THE SAME QUESTION.  IF YOU KNEW THAT INSIDE OF

03:54PM  13    THERANOS THEY WERE DISCUSSING ISSUES WITH THIS HALF A DOZEN OR

03:54PM  14    SO ASSAYS AT THE TIME, WOULD YOU HAVE FELT COMFORTABLE SENDING

03:54PM  15    YOUR PATIENTS TO THERANOS IN THE 2015, 2016 TIMEFRAME?

03:54PM  16    A.   WHICH TIMEFRAME?

03:54PM  17    Q.   THIS EMAIL IS DATED AUGUST OF 2014, AND I THINK YOU AND I

03:54PM  18    JUST LOOKED AT AN EXAMPLE OF A PATIENT THAT YOU SENT IN

03:54PM  19    DECEMBER OF 2014.

03:54PM  20        DO YOU RECALL THAT?

03:54PM  21    A.   CORRECT.

03:54PM  22    Q.   SO IT LOOKS LIKE YOU WERE EVEN SENDING PATIENTS TO

03:54PM  23    THERANOS IN 2014; IS THAT RIGHT?

03:54PM  24    A.   I ASSUME SO.

03:54PM  25    Q.   IT LOOKS LIKE IT?

03:54PM    1      A.    YEAH.

03:54PM    2      Q.    SO SEEING THIS EMAIL NOW IN THE AUGUST 2014 TIMEFRAME, IF

03:54PM    3      YOU HAD KNOWN THAT INSIDE THE FOUR WALLS AT THERANOS THEY WERE

03:55PM    4      DISCUSSING THESE KIND OF ASSAY ISSUES, WOULD YOU STILL FEEL

03:55PM    5      COMFORTABLE SENDING PATIENTS TO THERANOS?

03:55PM    6      A.    WOULD THEY LET ME KNOW THAT THEY WERE VOIDED OR INCORRECT?

03:55PM    7      Q.    I'M SORRY?

03:55PM    8      A.    WAS THE LAB LETTING ME KNOW THAT THEY WERE INCORRECT?

03:55PM    9      Q.    WAS THE LAB?

03:55PM   10      A.    WAS THE LAB GOING TO LET ME KNOW THAT THE VALUE WAS

03:55PM   11      INCORRECT?

03:55PM   12      Q.    IT WOULD BE HELPFUL IF --

03:55PM   13      A.    RIGHT.

03:55PM   14      Q.    I'M SORRY.  WOULD IT BE HELPFUL TO EVEN ANSWER MY

03:55PM   15      QUESTION.  IF YOU KNEW WHETHER THE LAB WAS LETTING YOU KNOW

03:55PM   16      ABOUT THESE KIND OF VOIDED ASSAYS, IS THAT WHAT YOU'RE SAYING?

03:55PM   17      A.    RIGHT.  WITH THE PATIENT THAT WE HAD WITH THE HCG, I KNEW

03:55PM   18      IT WAS VOIDED, SO LET ME RETEST ANOTHER WAY.

03:55PM   19      Q.    SURE.  SO, FOR INSTANCE, YOU SEE HCG IS HERE?

03:55PM   20      A.    RIGHT.

03:55PM   21      Q.    AND THIS IS IN AUGUST.

03:56PM   22            AND THE ONE WE TALKED ABOUT WAS -- YOU ACTUALLY SENT

03:56PM   23      SOMEONE IN DECEMBER.  SO EVEN AFTER THE LAB IS TALKING ABOUT

03:56PM   24      ISSUES; RIGHT?

03:56PM   25            HOW ABOUT VITAMIN B12?  SO IF YOU'LL GO BACK TO THAT

03:56PM 1    EXHIBIT THAT I POINTED TO YOU A MOMENT AGO, EXHIBIT 5861.

03:56PM 2        LET ME KNOW WHEN I'VE POINTED YOU TO ENOUGH PAGE NUMBERS

03:56PM 3    TO ANSWER MY QUESTION.

03:56PM 4        START AT PAGE 89.

03:56PM 5    A.   ONE MOMENT.

03:56PM 6    Q.   THE SAME LITTLE PAGE NUMBERS AT THE VERY, VERY BOTTOM?

03:56PM 7    A.   WHAT IS THE TAB?  I'M SORRY.

03:56PM 8    Q.   SORRY.  IT'S 5821.

03:56PM 9        I'M SORRY, 5861.

03:56PM 10   A.   5861.  OKAY.  I'M THERE.

03:56PM 11   Q.   AND IF YOU'LL LOOK AT PAGE 89.

03:56PM 12   A.   YES.

03:56PM 13   Q.   SO I THINK YOU ASKED ME IF THERE WERE INSTANCES WHEN THESE

03:56PM 14   KINDS OF TESTS WERE LAB TESTS THAT YOUR PATIENTS HAD THAT

03:57PM 15   THERANOS THEN VOIDED.

03:57PM 16       AND DO YOU SEE HERE IS AN EXAMPLE?

03:57PM 17   A.   RIGHT, I SEE THE B12 IS VOIDED.

03:57PM 18   Q.   AND HOW ABOUT PAGES -- YOU CAN LOOK AT PAGE 47.

03:57PM 19   A.   OKAY.  OKAY.

03:57PM 20   Q.   DO YOU SEE THAT ONE, TOO?

03:57PM 21   A.   YES.

03:57PM 22   Q.   AND 94, PAGE 94?

03:58PM 23   A.   YES.

03:58PM 24   Q.   PAGE 143?

03:58PM 25   A.   YES.

03:58PM  1    Q.   I CAN KEEP GOING, BUT LET ME CHECK AND SEE.  IS THAT

03:58PM  2    ENOUGH?

03:58PM  3    A.   OH, THAT'S ENOUGH.  I'VE GOT THEM RIGHT HERE.

03:58PM  4    Q.   SO JUST TO CLOSE THE LOOP ON THAT.

03:58PM  5         THEN IS YOUR ANSWER THAT YOU WOULD THEN NOT BE COMFORTABLE

03:58PM  6    SENDING PATIENTS -- YOU WOULDN'T HAVE BEEN COMFORTABLE SENDING

03:58PM  7    PATIENTS IF YOU HAD KNOWN THIS?

03:58PM  8    A.   WELL, I THINK I DID KNOW THIS BECAUSE THEY SAID THAT

03:58PM  9    WITHDRAW IS RECOMMENDED.

03:58PM 10         I WOULDN'T HAVE BEEN COMFORTABLE IF THEY -- I WOULD NOT

03:58PM 11    HAVE BEEN COMFORTABLE --

03:59PM 12    Q.   YOU WOULD NOT HAVE BEEN COMFORTABLE SENDING PATIENTS TO

03:59PM 13    THERANOS --

03:59PM 14    A.   -- IF THEY DIDN'T LET ME KNOW THAT IT WAS VOIDED.

03:59PM 15    Q.   HELP ME UNDERSTAND THAT.

03:59PM 16         YOU'RE SENDING PATIENTS TO GET A BLOOD TEST?

03:59PM 17    A.   RIGHT, UH-HUH.

03:59PM 18    Q.   AND THAT LAB COMPANY HAS TO VOID THE TESTS?

03:59PM 19    A.   RIGHT.

03:59PM 20    Q.   AND YOU'RE SAYING YOU'RE COMFORTABLE BECAUSE YOU KNOW THEY

03:59PM 21    VOIDED THE TESTS?

03:59PM 22    A.   ON CERTAIN TESTS, YES.

03:59PM 23         SO IF THEY WOULD HAVE GIVEN ME A B12, THEY DIDN'T VOID IT

03:59PM 24    OUT, AND I THOUGHT IT WAS AN ACCURATE TEST, THEN I WOULD HAVE

03:59PM 25    BEEN NOT COMFORTABLE.

ER-4928

03:59PM   1            BUT SINCE YOU TOLD ME TO REDRAW IT, THEN I WOULD REDRAW IT

03:59PM   2   AT A DIFFERENT LAB.

03:59PM   3   Q.   OH.  YOU WOULDN'T GO BACK TO THERANOS AFTER GETTING THE

03:59PM   4   VOID?

03:59PM   5   A.   CORRECT.

03:59PM   6   Q.   BECAUSE YOU WOULD WANT IT TO BE ACCURATE THE FIRST TIME?

03:59PM   7            YOU SAID IF THEY TOLD YOU TO VOID THIS TEST, YOU WOULD

03:59PM   8   APPRECIATE KNOWING THAT BECAUSE THEN YOU COULD SEND YOUR

03:59PM   9   PATIENT TO A DIFFERENT LAB; IS THAT RIGHT?

03:59PM  10   A.   CORRECT.

03:59PM  11   Q.   AND I GUESS MY QUESTION WAS, IF YOU HAD SEEN THIS EMAIL,

03:59PM  12   THE ONE THAT IS ON THE SCREEN IN FRONT OF YOU --

04:00PM  13   A.   UH-HUH.

04:00PM  14   Q.   -- THAT SHOWED IN AUGUST OF 2014, THERANOS DISCUSSING

04:00PM  15   ISSUES RELATING TO VARIOUS ASSAYS, INCLUDING VITAMIN B12, IF

04:00PM  16   YOU HAD KNOWN THAT INFORMATION, WOULD YOU HAVE BEEN COMFORTABLE

04:00PM  17   FOR EVEN SENDING THEM TO THERANOS IN THE FIRST PLACE?

04:00PM  18   A.   CORRECT.

04:00PM  19   Q.   AND I'M WONDERING WHAT YOUR ANSWER IS?

04:00PM  20   A.   OH.  I PROBABLY WOULDN'T HAVE ASKED FOR THOSE TESTS AT

04:00PM  21   THERANOS.

04:00PM  22   Q.   YOU WOULD HAVE TRUSTED OTHER TESTS AT THERANOS, BUT NOT

04:00PM  23   THESE?

04:00PM  24   A.   CORRECT.

04:00PM  25   Q.   INTERESTING.  OKAY.

04:00PM 1          WOULD YOU TURN NOW TO 4189.

04:00PM 2          YOUR HONOR, 4189 HAS BEEN PREVIOUSLY ADMITTED.

04:00PM 3          PERMISSION TO PUBLISH?

04:00PM 4              THE COURT:  YES.

04:00PM 5     BY MR. SCHENK:

04:00PM 6     Q.   DR. WOOTEN, DO YOU SEE THE SECOND EMAIL DOWN FROM THE TOP

04:01PM 7     FROM DR. ROSENDORFF TO MR. BALWANI?

04:01PM 8     A.   YES.

04:01PM 9     Q.   AND DID MR. COOPERSMITH SHOW YOU THIS BEFORE YOU TESTIFIED

04:01PM 10    TODAY?

04:01PM 11    A.   NO.

04:01PM 12    Q.   DO YOU SEE WHERE THE LAB DIRECTOR WRITES TO MR. BALWANI IN

04:01PM 13    AUGUST OF 2014, "I AM THINKING THAT SINCE WE VOID ALL ABNORMAL

04:01PM 14    BICARBONATE RESULTS, THE TEST HAS LOST ANY DIAGNOSTIC VALUE,

04:01PM 15    AND PROBABLY ALSO RELIABILITY WHEN RESULTS ARE REPORTED IN THE

04:01PM 16    NORMAL RANGE.  FOR INSTANCE, THE CORRECT BICARB VALUE IN THE

04:01PM 17    PATIENT MAY, IN FACT, BE HIGH AND DUE TO OUTGASSING THE BICARB

04:01PM 18    MIGHT NORMALIZE AND WE WOULD BE REPORTING A FALSELY NORMAL

04:01PM 19    BICARB, WHEN IN FACT IT SHOULD BE HIGH.

04:01PM 20         "PROBABLY WE SHOULD DISCONTINUE THIS METHOD UNTIL WE HAVE

04:01PM 21    WORKED IT OUT BETTER."

04:01PM 22         DO YOU SEE THAT?

04:01PM 23    A.   YES.

04:01PM 24    Q.   IF YOU HAD KNOWN ABOUT THERANOS'S CHALLENGES WITH C02 AT

04:01PM 25    THIS TIME, WOULD YOU HAVE STILL FELT COMFORTABLE SENDING YOUR

04:02PM   1    PATIENTS TO THERANOS?

04:02PM   2    A.   NOT UNTIL THEY WORKED IT OUT.

04:02PM   3    Q.   WOULD YOU TURN TO 1555.

04:02PM   4         MR. SCHENK:  YOUR HONOR, 1555 HAS ALSO BEEN

04:02PM   5    ADMITTED.

04:02PM   6         PERMISSION TO PUBLISH?

04:02PM   7         THE COURT:  YES.

04:02PM   8         MR. SCHENK:  IF WE COULD GO TO PAGE 2 ON 1555.

04:02PM   9    Q.   DO YOU SEE THE EMAIL AT THE VERY TOP FROM MR. BALWANI TO

04:02PM  10    SOMEONE NAMED DANIEL YOUNG, ADAM ROSENDORFF, AND

04:02PM  11    ELIZABETH HOLMES, THAT ONE AT THE VERY TOP.

04:02PM  12    A.   YES.

04:02PM  13    Q.   WHEN YOU WERE PREPARING TO TESTIFY TODAY, I TAKE IT

04:02PM  14    MR. COOPERSMITH DIDN'T SHOW YOU THIS ONE ALSO?

04:02PM  15    A.   CORRECT.

04:02PM  16    Q.   DO YOU SEE WHERE MR. BALWANI WRITES, "DANIEL, PUT EVERYONE

04:02PM  17    NEEDED ON THIS PROJECT, INCLUDING SAM AND EREZ, NISHIT AND

04:03PM  18    TINA.  WE CANNOT REVERT BACK TO VENIPUNCTURE FOR HDL."

04:03PM  19         DO YOU SEE THAT?

04:03PM  20    A.   YES.

04:03PM  21    Q.   YOU WERE TELLING ME A MOMENT AGO THAT YOU WOULDN'T FEEL

04:03PM  22    COMFORTABLE SENDING PATIENTS TO THERANOS UNTIL THEY'VE WORKED

04:03PM  23    IT OUT.

04:03PM  24         I'VE SHOWED YOU SOME ISSUES AND YOU WOULD WANT THEM TO

04:03PM  25    WORK OUT THE PROBLEMS BEFORE YOU FELT COMFORTABLE SENDING

04:03PM  1    PATIENTS BACK TO THERANOS?

04:03PM  2    A.   CORRECT.

04:03PM  3    Q.   AND WHEN YOU ARE ASSUMING OR HOPING OR WISHING THAT

04:03PM  4    THERANOS DOES WORK OUT THOSE PROBLEMS, ARE YOU PUTTING SOME

04:03PM  5    TRUST OR SOME FAITH THAT THEY WOULD DO THAT?  THAT IF THEY'RE

04:03PM  6    SEEING PROBLEMS, THAT THERANOS WOULD TRY TO FIX THOSE PROBLEMS?

04:03PM  7    IS THAT AN ASSUMPTION THAT YOU'RE MAKING?

04:03PM  8    A.   UH-HUH.

04:03PM  9    Q.   I'M SORRY?

04:03PM 10    A.   CORRECT.

04:03PM 11    Q.   AND WHEN YOU'RE MAKING THAT ASSUMPTION THAT THERANOS

04:03PM 12    WOULD, IF THEY IDENTIFIED THESE PROBLEMS -- YOU TOLD ME A

04:03PM 13    MOMENT AGO THAT ALL LABS HAVE PROBLEMS.

04:03PM 14         AND WHEN I'VE SHOWN YOU THESE AT THERANOS, YOUR HOPE IS

04:03PM 15    THAT THEY WOULD TRY TO FIX THEM WHEN THEY BECOME AWARE OF THEM

04:04PM 16    AT THERANOS; IS THAT RIGHT?

04:04PM 17    A.   CORRECT.

04:04PM 18    Q.   AND WHEN YOU'RE MAKING THAT ASSUMPTION, WHEN YOU'RE HOPING

04:04PM 19    THAT AT THERANOS THEY ARE WORKING TO FIX THOSE PROBLEMS, ARE

04:04PM 20    YOU PUTTING YOUR FAITH OR YOUR TRUST IN THE MEDICAL

04:04PM 21    PROFESSIONALS AT THERANOS TO MAKE THOSE CHANGES?

04:04PM 22    A.   CORRECT.

04:04PM 23    Q.   THANK YOU.

04:04PM 24         IF YOU'LL TURN TO 2228.

04:04PM 25         YOUR HONOR, 2228 HAS BEEN PREVIOUSLY ADMITTED.

04:04PM   1              PERMISSION TO PUBLISH?

04:04PM   2                   THE COURT:  YES.

04:04PM   3     BY MR. SCHENK:

04:04PM   4     Q.   AT THE VERY TOP OF THIS EMAIL, DR. WOOTEN, DO YOU SEE

04:04PM   5     WHERE MR. BALWANI WRITES TO MS. HOLMES, "WE NEED TO RESPOND TO

04:04PM   6     HIM NOW AND CUT HIM MONDAY."

04:04PM   7          DO YOU SEE THAT?

04:04PM   8     A.   YES.

04:04PM   9     Q.   AND DID MR. COOPERSMITH TELL YOU THAT MR. BALWANI WAS

04:04PM  10     TALKING ABOUT THE MEDICAL PROFESSIONALS THAT YOU AND I WERE

04:04PM  11     JUST TALKING ABOUT, DR. ROSENDORFF, CUTTING HIM ON MONDAY?

04:04PM  12     A.   NO.

04:04PM  13     Q.   WHEN YOU WERE PREPARING TO TESTIFY TODAY, MR. COOPERSMITH

04:05PM  14     DIDN'T TELL YOU ABOUT MR. BALWANI SENDING AN EMAIL TALKING

04:05PM  15     ABOUT FIRING THE LAB DIRECTOR AT THERANOS?

04:05PM  16     A.   CORRECT.

04:05PM  17     Q.   IF WE COULD BRING UP EXHIBIT 5387H, PAGE 31.

04:05PM  18          YOUR HONOR, THIS HAS BEEN PREVIOUSLY ADMITTED.  I DON'T

04:05PM  19     THINK THIS ONE IS IN THE BINDER.  JUST ON THE SCREEN.

04:05PM  20          WILL THAT BE OKAY?

04:05PM  21                   THE COURT:  YES.

04:05PM  22     BY MR. SCHENK:

04:05PM  23     Q.   5387H, PAGE 31.

04:05PM  24          DR. WOOTEN, DO YOU SEE SOME TEXT MESSAGES NOW ON THE

04:05PM  25     SCREEN IN FRONT OF YOU?

04:05PM  1    A.   I DO.

04:05PM  2    Q.   AND DID MR. COOPERSMITH SHOW YOU TEXT MESSAGES BETWEEN

04:05PM  3    MR. BALWANI AND MS. HOLMES BEFORE YOU TESTIFIED TODAY?

04:05PM  4    A.   NO, HE DID NOT.

04:05PM  5    Q.   DO YOU SEE HERE WHERE MR. BALWANI IS WRITING ABOUT THE

04:05PM  6    DISASTER ZONE THAT THE LAB WAS IN NOVEMBER OF 2014?

04:05PM  7             MR. COOPERSMITH:  OBJECTION.  HE'S NOT READING THE

04:05PM  8    TEXT APPROPRIATELY.  HE'S JUST PARAPHRASING IT.

04:06PM  9             THE COURT:  WELL, DO YOU WANT HIM TO READ THE TEXT?

04:06PM 10             MR. COOPERSMITH:  I THINK WE CAN ALL SEE IT.

04:06PM 11        (LAUGHTER.)

04:06PM 12             MR. COOPERSMITH:  BUT I DON'T THINK HE'S ALLOWED TO

04:06PM 13    JUST GIVE HIS OWN SPIN ON IT.

04:06PM 14             MR. SCHENK:  I THINK I AM ALLOWED TO ASK THE

04:06PM 15    QUESTIONS HOW I WANT.

04:06PM 16             THE COURT:  WELL, GO AHEAD AND ASK THE QUESTIONS.

04:06PM 17    BY MR. SCHENK:

04:06PM 18    Q.   THIS TEXT MESSAGE THAT IS NOW ON THE SCREEN SAYS,

04:06PM 19    "NORMANDY LAB IS AN" EXPLETIVE "DISASTER ZONE.  GLAD I CAME

04:06PM 20    HERE.  WILL WORK ON FIXING THIS."

04:06PM 21        DO YOU SEE THAT?

04:06PM 22    A.   YES.

04:06PM 23    Q.   SO IN DECEMBER OF 2014, JUST A FEW DAYS LATER, WITH THAT

04:06PM 24    VERY FIRST HCG -- DO YOU REMEMBER THAT FIRST HCG LAB THAT YOU

04:06PM 25    AND I JUST LOOKED AT A LITTLE WHILE AGO?

04:06PM   1    A.   YES.

04:06PM   2    Q.   DO YOU REMEMBER IT WAS RIGHT AT THE BEGINNING OF DECEMBER

04:06PM   3    OF 2014?

04:06PM   4    A.   YES.

04:06PM   5    Q.   SO DAYS EARLIER, DAYS BEFORE YOU SENT YOUR PATIENT TO GET

04:06PM   6    THAT HCG TEST, MR. BALWANI IS SENDING THIS TEXT.

04:06PM   7         IF YOU HAD KNOWN THAT, WOULD YOU STILL HAVE SENT HER TO

04:06PM   8    GET THAT HCG TEST?

04:06PM   9    A.   I WOULD NOT.

04:06PM  10    Q.   ONE LAST TOPIC I WANT TO COVER WITH YOU.

04:07PM  11         TODAY ISN'T THE FIRST TIME THAT THERANOS HAS CALLED UPON

04:07PM  12    YOU TO SPEAK OUT ON ITS BEHALF; IS THAT RIGHT?

04:07PM  13    A.   CORRECT.

04:07PM  14    Q.   TO SAY THINGS NICE ABOUT THERANOS?

04:07PM  15    A.   CORRECT.

04:07PM  16    Q.   THE PRIOR TIME THAT YOU WERE ASKED TO WAS AFTER "THE

04:07PM  17    WALL STREET JOURNAL" CAME OUT IN 2015, AND IT WAS PARTICULARLY

04:07PM  18    NEGATIVE.  THERANOS WAS TRYING TO FIND ADVOCATES, I THINK THEY

04:07PM  19    WERE CALLED, IN THE ARIZONA COMMUNITY TO GO ON T.V. OR RECORD

04:07PM  20    ADVERTISING FOR THERANOS TO CHANGE THE NARRATIVE, TO CHANGE

04:07PM  21    PUBLIC OPINION, AND THEY ASKED YOU TO DO IT THEN ALSO; IS THAT

04:07PM  22    RIGHT?

04:07PM  23    A.   I DO REMEMBER THEM ASKING ME TO DO A VIDEO FOR THEM.

04:07PM  24    Q.   TO DO A VIDEO.  RIGHT.

04:07PM  25         AND YOU SAT THROUGH THE VIDEO AND YOU SAID THINGS ABOUT

04:07PM  1    THERANOS; RIGHT?

04:07PM  2    A.   CORRECT.

04:07PM  3    Q.   AND BEFORE YOU DID THAT, DID ANYBODY SHOW YOU ANY OF THE

04:07PM  4    DOCUMENTS I JUST SHOWED YOU?

04:07PM  5    A.   NO.

04:07PM  6    Q.   NO ONE SHOWED YOU THE EMAILS?

04:07PM  7    A.   NO.

04:07PM  8    Q.   NO ONE SHOWED YOU THE TEXT MESSAGES?

04:08PM  9    A.   NO.

04:08PM  10   Q.   NO ONE ASKED YOU QUESTIONS ABOUT YOUR LAB RESULTS, THE

04:08PM  11   ONES I SHOWED YOU, COMPARED TO THE EMAILS THAT WERE GOING ON

04:08PM  12   INSIDE THE FOUR WALLS OF THERANOS?

04:08PM  13   A.   CORRECT.

04:08PM  14   Q.   NO ONE DID THAT BEFORE THEY ASKED YOU TO SIT FOR THAT

04:08PM  15   VIDEO?

04:08PM  16   A.   NO.

04:08PM  17   Q.   THANK YOU.

04:08PM  18        NO FURTHER QUESTIONS.

04:08PM  19            THE COURT:   REDIRECT?

04:08PM  20            MR. COOPERSMITH:   THANK YOU, YOUR HONOR.

04:08PM  21        MAY I PROCEED?

04:08PM  22            THE COURT:   YES.

04:08PM  23   ///

04:08PM  24   ///

04:08PM  25   ///

04:08PM  1                    **REDIRECT EXAMINATION**

04:08PM  2    BY MR. COOPERSMITH:

04:08PM  3    Q.   MS. WOOTEN, LET'S START OFF WHERE MR. SCHENK LEFT OFF.

04:08PM  4         DO YOU RECALL MAKING A VIDEO OR APPEARING IN A VIDEO FOR

04:08PM  5    THERANOS?

04:08PM  6    A.   I DO RECALL.

04:08PM  7    Q.   AND DID YOU GET PAID ANYTHING FOR THAT?

04:08PM  8    A.   I DID NOT.

04:08PM  9    Q.   MS. WOOTEN -- DR. WOOTEN, MR. SCHENK ASKED YOU SOME

04:09PM 10    QUESTIONS AND HE SHOWED YOU SOME DOCUMENTS WITH SOME INTERNAL

04:09PM 11    EMAILS OF THERANOS.

04:09PM 12         DO YOU REMEMBER THAT A FEW MINUTES AGO?

04:09PM 13    A.   YES.

04:09PM 14    Q.   AND YOU TESTIFIED THAT YOU HAD NEVER SEEN THOSE THINGS

04:09PM 15    BEFORE; CORRECT?

04:09PM 16    A.   CORRECT.

04:09PM 17    Q.   AND YOU DIDN'T WORK AT THERANOS; RIGHT?

04:09PM 18    A.   CORRECT.

04:09PM 19    Q.   AND YOU TESTIFIED THAT SOME OF THOSE THINGS MIGHT GIVE YOU

04:09PM 20    PAUSE; IS THAT FAIR?

04:09PM 21    A.   CORRECT.

04:09PM 22    Q.   OKAY.  BUT WERE YOU COMFORTABLE SENDING YOUR PATIENTS TO

04:09PM 23    THERANOS DURING THE TIME PERIOD THAT YOU SENT THEM THERE?

04:09PM 24    A.   I WAS.

04:09PM 25    Q.   AND, IN FACT, NOW WE KNOW THAT YOU ACTUALLY STARTED

ER-4937

04:09PM   1      SENDING PATIENTS OF THERANOS AS EARLY AS 2014; IS THAT RIGHT?

04:09PM   2      A.   YES.

04:09PM   3      Q.   AND WHY WERE YOU COMFORTABLE SENDING YOUR PATIENTS TO

04:09PM   4      THERANOS?

04:09PM   5              MR. SCHENK:  OBJECTION.  702.

04:09PM   6              THE COURT:  SHE CAN ANSWER THE QUESTION.

04:09PM   7          YOU CAN ANSWER THAT QUESTION.

04:09PM   8              THE WITNESS:  CAN YOU REPEAT THE QUESTION.  I'M

04:09PM   9      SORRY.

04:09PM  10      BY MR. COOPERSMITH:

04:09PM  11      Q.   WHY WERE YOU COMFORTABLE SENDING YOUR PATIENTS TO THERANOS

04:09PM  12      ALL OF THAT TIME?

04:09PM  13      A.   DURING THE WHOLE TIME I SENT THEM?

04:09PM  14      Q.   YEAH.  WHY WERE YOU COMFORTABLE?

04:09PM  15      A.   BECAUSE I REVIEWED THE LABS.  I TEST QUITE OFTEN.  I DO A

04:10PM  16      COMPARATIVE WITH OTHER LABS, AND THE RESULTS THAT I WAS GETTING

04:10PM  17      FOR MY PATIENTS, THEY WERE -- WHAT IS THE WORD I'M LOOKING FOR?

04:10PM  18      -- THEY WERE CONSISTENT WITH OTHER LABS AS WELL.

04:10PM  19      Q.   OKAY.  DR. WOOTEN, I WANT TO SHOW YOU AN EXHIBIT THAT IS

04:10PM  20      PREVIOUSLY IN EVIDENCE.

04:10PM  21          IF WE CAN PULL UP EXHIBIT 13876.

04:10PM  22          OKAY.  DID I EVER SHOW YOU THIS DOCUMENT BEFORE?

04:10PM  23      A.   NO.

04:10PM  24      Q.   OKAY.  SO MR. SCHENK SHOWED YOU A DOCUMENT WHERE

04:10PM  25      ADAM ROSENDORFF, A LAB DIRECTOR, WAS TALKING ABOUT STOPPING HCG

04:10PM  1    TESTING ON A CERTAIN INSTRUMENT.

04:10PM  2         DO YOU RECALL THAT?

04:10PM  3    A.   YES.

04:10PM  4    Q.   OKAY.  AND DID MR. SCHENK SHOW YOU THIS EMAIL ON DIRECT --

04:10PM  5    ON CROSS RATHER?

04:10PM  6    A.   NO.

04:11PM  7    Q.   AND DID MR. SCHENK EVER ASK YOU ANY QUESTIONS DURING HIS

04:11PM  8    CROSS-EXAMINATION, ABOUT DR. ROSENDORFF KNOWING FULL WELL THAT

04:11PM  9    THE HCG WAS GOING BACK ON THE EDISON?

04:11PM 10         MR. SCHENK:  OBJECTION.  LEADING.

04:11PM 11         THE COURT:  WHY DON'T YOU REPHRASE THAT QUESTION.

04:11PM 12    BY MR. COOPERSMITH:

04:11PM 13    Q.   DID MR. SCHENK, ON HIS CROSS-EXAMINATION, TELL YOU

04:11PM 14    ANYTHING ABOUT DR. ROSENDORFF APPROVING OR KNOWING ABOUT HCG

04:11PM 15    GOING BACK ON THE EDISON DEVICE AFTER HE INITIALLY SAID TO

04:11PM 16    STOP?

04:11PM 17    A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION.

04:11PM 18    Q.   WERE YOU ASKED THOSE QUESTIONS DURING CROSS?

04:11PM 19    A.   NO.

04:11PM 20    Q.   OKAY.  AND YOU SAID ON, I THINK ON CROSS THAT YOU THOUGHT

04:11PM 21    THAT YOU WOULD EXPECT A LAB AT THERANOS TO FIX ANY PROBLEMS?

04:11PM 22    A.   CORRECT.

04:11PM 23    Q.   AND DO YOU HAVE ANY KNOWLEDGE WHETHER THEY WERE DOING THAT

04:11PM 24    OR NOT DOING THAT?

04:11PM 25    A.   NO.

04:11PM   1    Q.   AND WAS -- WERE THE EMAILS THAT MR. SCHENK WAS SHOWING

04:12PM   2    YOU, THE OTHER DOCUMENTS, CONSISTENT WITH YOUR OWN EXPERIENCE

04:12PM   3    AT THERANOS?

04:12PM   4    A.   NO.

04:12PM   5    Q.   BECAUSE WAS YOUR OWN EXPERIENCE AT THERANOS GOOD OR BAD?

04:12PM   6    A.   IT WAS GOOD.

04:12PM   7    Q.   MR. SCHENK SHOWED YOU SOME DOCUMENTS IN THE EXHIBIT, AND

04:12PM   8    IF YOU COULD TURN IN THE GOVERNMENT'S BINDER TO TAB 5861.

04:12PM   9         TAKE A LOOK AT PAGES 1 AND 12.

04:12PM  10    A.   YES.

04:12PM  11    Q.   DO YOU KNOW WHO SHAWN WOOTEN IS?

04:12PM  12    A.   YES, HE'S MY BROTHER.

04:12PM  13    Q.   IS THAT YOUR BROTHER?

04:12PM  14    A.   YES.

04:12PM  15    Q.   DID YOU HAVE YOUR BROTHER GO AND TAKE LABS AT THERANOS?

04:13PM  16    A.   I DID.

04:13PM  17    Q.   MORE THAN ONCE?

04:13PM  18    A.   I BELIEVE SO, YES.

04:13PM  19    Q.   MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT HCG, AND YOU

04:13PM  20    TESTIFIED ON DIRECT THAT YOU YOURSELF HAD HCG TESTS AT

04:13PM  21    THERANOS; IS THAT RIGHT?

04:13PM  22    A.   YES.

04:13PM  23    Q.   AND YOU HAD TWO DIFFERENT TESTS AT THERANOS?

04:13PM  24    A.   CORRECT.

04:13PM  25    Q.   DID YOU HAVE ANY EXPERIENCE -- BAD EXPERIENCES OR ISSUES

04:13PM  1    WITH THOSE HCG TESTS?

04:13PM  2    A.   NO, I DID NOT.

04:13PM  3    Q.   MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT SOME RESULTS

04:13PM  4    THAT YOU GOT THAT WERE VOIDED.

04:13PM  5    A.   YES.

04:13PM  6    Q.   AND IF A LAB HAD MADE A MISTAKE IN ANY WAY, WOULD YOU

04:13PM  7    EXPECT THEM TO DO THAT?

04:13PM  8    A.   YES.

04:13PM  9    Q.   AND IS THERANOS THE ONLY LAB THAT EVER DID THAT?

04:13PM  10   A.   NO.

04:13PM  11            MR. SCHENK:  OBJECTION.  401.

04:13PM  12            THE COURT:  SUSTAINED.  THE ANSWER IS STRICKEN,

04:13PM  13   LADIES AND GENTLEMEN.

04:13PM  14   BY MR. COOPERSMITH:

04:13PM  15   Q.   WHEN YOU GOT SOME VOIDED RESULTS FROM THERANOS, WHAT WAS

04:14PM  16   YOUR REACTION TO THAT?

04:14PM  17   A.   I WOULD DISREGARD THE TEST.

04:14PM  18   Q.   RIGHT.  BUT DID YOU CARE THAT THERANOS WAS VOIDING TESTS

04:14PM  19   OR NOT?  DID IT MATTER TO YOU?

04:14PM  20            MR. SCHENK:  OBJECTION. RELEVANCE.

04:14PM  21            THE COURT:  IN RELATION TO HER PRACTICE?

04:14PM  22            MR. COOPERSMITH:  YES, YOUR HONOR.

04:14PM  23            THE COURT:  YOU CAN ANSWER THE QUESTION IN RELATION

04:14PM  24   TO YOUR PRACTICE.

04:14PM  25            THE WITNESS:  SURE.  CAN YOU ASK THE QUESTION AGAIN.

04:14PM   1    BY MR. COOPERSMITH:

04:14PM   2    Q.   SURE.

04:14PM   3         IN RELATION TO YOUR PRACTICE AS A NATUROPATHIC PHYSICIAN,

04:14PM   4    WHEN YOU GOT THESE VOIDED RESULTS FROM THERANOS, DID YOU CARE?

04:14PM   5    A.   OH, NO.

04:14PM   6    Q.   AND WHY NOT?

04:14PM   7    A.   BECAUSE I HAVE AN ONGOING TREND OF MY PATIENT'S LABS AND

04:14PM   8    IN SYMPTOMOLOGY, AND I MONITOR MY PATIENTS VERY CLOSELY.

04:14PM   9         SO WHEN I SEE AN OUTLIER, I DON'T DIAGNOSE JUST BASED ON

04:14PM  10    THAT ONE OUTLIER.

04:14PM  11    Q.   OKAY.  AND WERE THE, THE FACT THAT YOU GOT SOME VOIDED

04:15PM  12    RESULTS, DID THAT CHANGE YOUR VIEW OF YOUR EXPERIENCE WITH

04:15PM  13    THERANOS WHEN YOU GOT THOSE?

04:15PM  14    A.   NO.

04:15PM  15    Q.   AND ARE YOU -- DID YOU TESTIFY TODAY BASED ON YOUR OWN

04:15PM  16    EXPERIENCE WITH THERANOS?  DID YOU TESTIFY BASED ON YOUR OWN

04:15PM  17    EXPERIENCE WITH THERANOS?

04:15PM  18    A.   OH, BOTH.

04:15PM  19    Q.   WHEN YOU SAY BOTH?

04:15PM  20    A.   LIKE MY OWN EXPERIENCE AND THEN THE EXPERIENCE MY PATIENTS

04:15PM  21    HAD.

04:15PM  22    Q.   OKAY.  AND THAT'S THE BASIS OF YOUR KNOWLEDGE, YOUR OWN

04:15PM  23    EXPERIENCE AND THEN YOUR PATIENT'S AS WELL; CORRECT?

04:15PM  24    A.   CORRECT.

04:15PM  25    Q.   AND THEN THE THINGS THAT MR. SCHENK SHOWED YOU, THOSE WERE

04:15PM  1    OUTSIDE OF YOUR WORLD, SO TO SPEAK; RIGHT?

04:15PM  2    A.   CORRECT.

04:15PM  3    Q.   AND SO IN WHAT YOU KNEW, DID THERANOS -- WERE YOU WILLING

04:15PM  4    TO KEEP SENDING PATIENTS TO THERANOS?

04:15PM  5    A.   CORRECT.

04:15PM  6    Q.   AND IF YOU HAD RECEIVED SOME INFORMATION THAT THERANOS WAS

04:15PM  7    HAVING A PROBLEM WITH ONE TEST OR THE OTHER OVER TIME, WOULD

04:15PM  8    YOU HAVE DECIDED TO JUST NOT SEND PATIENTS THERE ANYMORE?

04:15PM  9    A.   NOT TO ORDER THAT TEST.

04:16PM  10   Q.   OKAY.  WELL, WHAT WOULD YOU HAVE NEEDED, MORE INFORMATION?

04:16PM  11   A.   YES.

04:16PM  12   Q.   AND WHAT MORE INFORMATION WOULD YOU HAVE WANTED?

04:16PM  13   A.   DID THEY GET THE TEST RESULT, WAS THERE AN ISSUE WITH IT,

04:16PM  14   DID IT AFFECT THE RESULTS THAT THEY WERE GETTING.

04:16PM  15   Q.   AND WOULD YOU WANT TO KNOW THE TOTAL NUMBER OF TESTS THAT

04:16PM  16   THERANOS WAS CONDUCTING ON THAT PARTICULAR TEST?

04:16PM  17        WOULD YOU WANT TO KNOW THE TOTAL NUMBER OF TESTS AND WHAT

04:16PM  18   PERCENTAGE OF THE PROBLEM -- WHAT PERCENTAGE OF THE TESTS WERE

04:16PM  19   PROBLEMATIC?

04:16PM  20   A.   CORRECT.

04:16PM  21   Q.   OKAY.  MR. SCHENK SHOWED YOU A TEXT MESSAGE?

04:16PM  22   A.   YES.

04:16PM  23   Q.   HAD YOU EVER SEEN THAT BEFORE?

04:16PM  24   A.   NO.

04:16PM  25   Q.   DO YOU KNOW WHAT MR. BALWANI WAS REFERRING TO?

04:16PM  1    A.   NO.

04:16PM  2    Q.   DO YOU KNOW WHAT ASPECT OF THE NORMANDY LAB AT THAT TIME

04:16PM  3    HE CONSIDERED TO BE A QUOTE, "DISASTER"?

04:16PM  4    A.   NO.

04:16PM  5    Q.   DO YOU HAVE ANY KNOWLEDGE ABOUT THAT AT ALL?

04:17PM  6    A.   NOT AT ALL.

04:17PM  7    Q.   DO YOU HAVE ANY CONTEXT AT ALL FOR ANY OF THE MATERIAL

04:17PM  8    THAT MR. SCHENK SHOWED YOU?

04:17PM  9    A.   NO.

04:17PM  10            MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

04:17PM  11            THE COURT:  RECROSS?

04:17PM  12                    **RECROSS-EXAMINATION**

04:17PM  13   BY MR. SCHENK:

04:17PM  14   Q.   HI, DR. WOOTEN.  I JUST WANT TO FOLLOW UP ON ONE AREA.

04:17PM  15            MR. COOPERSMITH ASKED YOU ABOUT A FAMILY MEMBER THAT YOU

04:17PM  16   ALSO SENT TO THERANOS?

04:17PM  17   A.   YES, I DID.

04:17PM  18   Q.   THAT FAMILY MEMBER HAD VOIDED TESTS AS WELL; IS THAT

04:17PM  19   RIGHT?

04:17PM  20   A.   CAN YOU POINT OUT.

04:17PM  21   Q.   YEAH, I WOULD BE HAPPY TO.

04:17PM  22            YOU CAN START ON PAGE 2.  DO YOU SEE A VOIDED -- A GROUP

04:17PM  23   OF VOIDED TESTS ON PAGE 2?

04:17PM  24   A.   CORRECT.

04:18PM  25   Q.   DO YOU SEE A GROUP OF -- OH, I'M SORRY.

04:18PM  1          DO YOU SEE ONE MORE VOIDED TEST ON PAGE 7 FOR A FAMILY

04:18PM  2     MEMBER?

04:18PM  3     A.   CORRECT.

04:18PM  4     Q.   DO YOU SEE ANOTHER ONE ON PAGE 12 FOR A FAMILY MEMBER?

04:18PM  5     A.   YES.

04:18PM  6     Q.   AND IF YOU'LL TURN TO PAGE 158.

04:18PM  7          DO YOU SEE EVEN YOURSELF HAD A VOIDED TEST FROM THERANOS?

04:18PM  8     A.   YES.

04:19PM  9     Q.   THANK YOU.

04:19PM 10          NO FURTHER QUESTIONS.

04:19PM 11              THE COURT:  ANYTHING FURTHER?

04:19PM 12              MR. COOPERSMITH:  JUST BRIEFLY, YOUR HONOR.

04:19PM 13                    **FURTHER REDIRECT EXAMINATION**

04:19PM 14     BY MR. COOPERSMITH:

04:19PM 15     Q.   DR. WOOTEN, MR. SCHENK JUST ASKED YOU ABOUT SOME VOIDED

04:19PM 16     TESTS?

04:19PM 17     A.   YEAH.

04:19PM 18     Q.   AND WE'VE DISCUSSED THAT TOPIC ALREADY.  RIGHT?

04:19PM 19     A.   RIGHT.

04:19PM 20     Q.   BUT MY QUESTION TO YOU IS, WHEN YOU GOT THE VOIDED TEST,

04:19PM 21     DID YOU LOOK AT THE ORIGINAL TEST AS WELL?

04:19PM 22              MR. SCHENK:  OBJECTION.  BEYOND THE SCOPE.

04:19PM 23              THE COURT:  YOU CAN ANSWER THAT QUESTION.

04:19PM 24              THE WITNESS:  OKAY.  CAN YOU REPEAT THE QUESTION.

04:19PM 25     BY MR. COOPERSMITH:

WOOTEN FURTHER REDIRECT BY MR. COOPERSMITH                    6412

04:19PM   1    Q.   SURE.

04:19PM   2         WHEN YOU GOT THE VOIDED TEST, DID YOU ALSO LOOK AT THE

04:19PM   3    ORIGINAL TEST?

04:19PM   4    A.   THE ORIGINAL TEST.

04:19PM   5    Q.   THAT THERANOS CONDUCTED AT THE TIME THAT THE PATIENT, BE

04:19PM   6    IT A FAMILY MEMBER, FIRST VISITED THERANOS?

04:20PM   7    A.   I WANT TO MAKE SURE THAT YOU'RE TALKING ABOUT THE

04:20PM   8    ORIGINAL --

04:20PM   9    Q.   OKAY.  LET ME ASK A SIMILAR BUT HOPEFULLY BETTER QUESTION.

04:20PM   10   A.   YEAH.

04:20PM   11   Q.   SO WHEN YOU GOT A TEST RESULT FROM THERANOS THAT THEY SAID

04:20PM   12   SHOULD BE VOIDED, FIRST OF ALL, DID YOU KNOW WHY THERANOS WAS

04:20PM   13   VOIDING --

04:20PM   14        MR. SCHENK:  OBJECTION.  BEYOND THE SCOPE.

04:20PM   15        THE COURT:  YOU'RE GETTING BEYOND THE SCOPE.

04:20PM   16   WHY DON'T YOU ASK ANOTHER QUESTION.

04:20PM   17        MR. COOPERSMITH:  SURE, YOUR HONOR.

04:20PM   18   Q.   AND DID YOU -- AT THE TIME -- THE VOIDED TEST, RIGHT, WHEN

04:20PM   19   YOU GET A VOIDED TEST, DOES THAT MEAN THAT THERE WAS A TEST AT

04:20PM   20   SOME PREVIOUS TIME?

04:20PM   21        IN OTHER WORDS, LIKE, IF -- FOR THERANOS TO SEND YOU A

04:20PM   22   NOTICE THAT SOMETHING IS BEING VOIDED, DOES THAT MEAN THAT

04:20PM   23   THERE WAS A TEST AT SOME PREVIOUS TIME BEFORE THAT NOTICE?

04:20PM   24   A.   I THINK IT'S SAYING THAT IT WAS VOIDED THROUGH THE DRAW --

04:20PM   25   THE DAY OF THE DRAW.

6413

| | | |
|---|---|---|
| 04:20PM | 1 | Q. OKAY. I SEE. |
| 04:20PM | 2 | A. UH-HUH. |
| 04:20PM | 3 | Q. AND WAS THAT ALARMING TO YOU IN ANY WAY? |
| 04:20PM | 4 | A. ALARMING THAT IT WAS VOIDED? |
| 04:20PM | 5 | Q. YEP. |
| 04:20PM | 6 | A. NO. |
| 04:20PM | 7 | Q. OKAY. AND IF THERANOS WAS STILL AROUND TODAY, BASED ON |
| 04:21PM | 8 | YOUR OWN EXPERIENCE, WOULD YOU SEND PATIENTS THERE? |
| 04:21PM | 9 | MR. SCHENK: OBJECTION. BEYOND THE SCOPE. |
| 04:21PM | 10 | THE COURT: SUSTAINED. SUSTAINED. |
| 04:21PM | 11 | MR. COOPERSMITH: NOTHING FURTHER, YOUR HONOR. |
| 04:21PM | 12 | THE COURT: ANYTHING FURTHER? |
| 04:21PM | 13 | MR. SCHENK: NO, YOUR HONOR. |
| 04:21PM | 14 | THE COURT: MAY THIS WITNESS BE EXCUSED? |
| 04:21PM | 15 | MR. COOPERSMITH: YES, YOUR HONOR. |
| 04:21PM | 16 | MR. SCHENK: YES, YOUR HONOR. |
| 04:21PM | 17 | THE COURT: ALL RIGHT. THANK YOU, DOCTOR. |
| 04:21PM | 18 | LADIES AND GENTLEMEN, WE'RE GOING TO TAKE OUR BREAK NOW. |
| 04:21PM | 19 | I APOLOGIZE. I THOUGHT WE WOULD BREAK EARLY, BUT WE EXTENDED |
| 04:21PM | 20 | THROUGH THE AFTERNOON. |
| 04:21PM | 21 | THANK YOU FOR YOUR PATIENCE. I WANTED TO FINISH THIS LAST |
| 04:21PM | 22 | WITNESS'S TESTIMONY, SO I APPRECIATE YOUR ACCOMMODATION. |
| 04:21PM | 23 | WE WILL BE IN RECESS. |
| 04:21PM | 24 | I THINK WE HAVE A LONG BREAK. WE'RE NOT DUE TO RETURN |
| 04:21PM | 25 | UNTIL NEXT FRIDAY, WHICH IS -- WHAT DATE IS THAT? |

ER-4947

6414

04:22PM 1      THE CLERK:   27TH, YOUR HONOR.

04:22PM 2      THE COURT:   MAY 27TH.   THIS IS A VERY LONG BREAK.

04:22PM 3   SO IT'S EVER IMPORTANT NOW FOR YOU DURING THIS BREAK TO

04:22PM 4   NOT, NOT DISCUSS THIS CASE WITH ANYONE, NOT TO DO ANY

04:22PM 5   INDEPENDENT RESEARCH, READ, LISTEN TO OR DISCUSS ANYTHING ABOUT

04:22PM 6   THIS CASE AND TO PLEASE AVOID AS BEST YOU CAN ANY INFORMATION

04:22PM 7   THAT MAY COME TO YOUR ATTENTION.

04:22PM 8   IF YOU SEE SOMETHING ON A TELEVISION OR HEAR SOMETHING,

04:22PM 9   TURN IT OFF, TURN AWAY.

04:22PM 10   I WILL, ON MAY 27TH, ASK YOU AGAIN WHETHER YOU'VE BEEN

04:22PM 11   SUCCESSFUL IN CONTINUING TO AVOID LEARNING ANYTHING ABOUT THIS

04:22PM 12   CASE.

04:22PM 13   WE WILL GIVE YOU, I THINK WE HAVE PROVIDED YOU WITH SOME

04:22PM 14   TEST KITS AGAIN.   WE HAVEN'T DONE THAT YET?

04:22PM 15      OKAY.   YOU'LL GET THOSE.

04:22PM 16      DO YOU HAVE THOSE, MS. ROBINSON?

04:22PM 17      THE CLERK:   YES, I DO.

04:22PM 18      THE COURT:   GREAT.   YOU'LL GET THOSE WHEN YOU LEAVE

04:22PM 19   TODAY.

04:22PM 20   WE'LL ALSO PROVIDE YOU WITH THE CDC GUIDANCE WEB PAGE HARD

04:23PM 21   COPY THAT YOU CAN REFERENCE.

04:23PM 22   I'D ASK YOU TO KEEP IN CONTACT WITH MS. ROBINSON NEXT WEEK

04:23PM 23   AS TO IF THERE'S ANY CHANGE IN YOUR HEALTH CONDITIONS, PLEASE

04:23PM 24   ALERT HER AND LET US KNOW THAT AS WELL.

04:23PM 25   OTHER THAN THAT, PLEASE STAY HEALTHY AND ENJOY.   I THINK

ER-4948

6415

04:23PM 1    WE HAVE SOME GOOD WEATHER COMING UP.  ENJOY NEXT WEEK.

04:23PM 2        I'M SURE YOUR EMPLOYERS WILL BE HAPPY TO SEE YOU AGAIN FOR

04:23PM 3    A BIT, AND WE WELCOME YOU REACQUAINTING YOURSELF WITH ALL OF

04:23PM 4    THOSE OTHER THINGS.

04:23PM 5        SO HAVE A GOOD BREAK.  WE'LL SEE YOU NEXT FRIDAY.  THAT'S

04:23PM 6    GOING TO BE AT 9:00 A.M., 9:00 A.M., FOLKS.

04:24PM 7        (JURY OUT AT 4:24 P.M.)

04:24PM 8            THE COURT:  THANK YOU.  PLEASE BE SEATED.

04:24PM 9        THE RECORD SHOULD REFLECT OUR JURY HAS LEFT FOR THE DAY.

04:24PM 10       SO, COUNSEL, WE CAN -- WE HAVE ADJUSTED OUR SCHEDULE FOR

04:24PM 11   MONDAY.

04:24PM 12       I SHOULD TELL YOU WE HAVE A SENTENCING AT 10:30 AM AND

04:24PM 13   THEN ANOTHER MATTER ON AT 1:00 O'CLOCK.

04:24PM 14       I THINK WE CAN FIT OUR CONVERSATION ABOUT THE PENDING

04:24PM 15   MOTION IN PERHAPS THAT MORNING IF WE START AT 8:30.  I THINK WE

04:24PM 16   COULD AT LEAST GET SOME THINGS DONE, AND THEN IF WE NEEDED TO,

04:24PM 17   WE'LL TAKE A BREAK AND COME BACK IN THAT INTERIM BETWEEN THE

04:25PM 18   CONCLUSION OF THE SENTENCING MATTER AND THE 1:00 P.M. START.

04:25PM 19       SO LET'S DO THAT.  LET'S SEE IF WE CAN HAVE SOME

04:25PM 20   DISCUSSION MONDAY.

04:25PM 21       I THINK THE TIME FOR THE REST OF THE WEEK, UNFORTUNATELY,

04:25PM 22   IS NOT AVAILABLE.

04:25PM 23       OKAY.  AGAIN, IF -- I'LL RECEIVE THE GOVERNMENT'S REPLY

04:25PM 24   6:00 P.M. SUNDAY, AND I DON'T NEED ANYTHING ELSE FROM THE

04:25PM 25   DEFENSE ON THAT.  WE'LL HAVE THEN A MOTION, AN OPPOSITION, AND

6416

04:25PM 1     A REPLY, AND THAT SHOULD BE SUFFICIENT.

04:25PM 2          AND I SAY 6:00 P.M.  I WELCOME RECEIVING IT ANY EARLIER.

04:25PM 3          ALL RIGHT.  ANYTHING FURTHER BEFORE WE BREAK?

04:25PM 4               MR. COOPERSMITH:  YOUR HONOR, JUST ON THAT

04:25PM 5     SCHEDULING ISSUE.

04:25PM 6          SO 8:30 A.M. ON MONDAY I THINK THE COURT SAID?

04:25PM 7               THE COURT:  RIGHT.

04:25PM 8               MR. COOPERSMITH:  AND I TOLD THE COURT EARLIER THAT

04:25PM 9     WE HAD -- I HAD AN APPOINTMENT AT 9:45.

04:26PM 10         IF I'M ABLE TO MOVE THAT, WHICH NOW THAT I SEE THE COURT'S

04:26PM 11    JAMMED SCHEDULE, I WILL ATTEMPT THAT, MAYBE I'LL JUST LET

04:26PM 12    MS. ROBINSON KNOW, AND WE WOULDN'T HAVE TO TAKE A BREAK IF WE

04:26PM 13    NEEDED MORE TIME AFTER THE 9:45.

04:26PM 14         IN OTHER WORDS, I THINK THE COURT SAID WE WOULD COME BACK

04:26PM 15    LATER IN THE AFTERNOON.  BUT IF I'M ABLE TO MOVE THAT 9:45,

04:26PM 16    COULD THE COURT SORT OF CONTINUE AS LONG AS NECESSARY UNTIL THE

04:26PM 17    MATTER YOU HAVE AT 10:00, 10:30?

04:26PM 18              THE COURT:  YOU KNOW, I HAVE TO CONFESS, THAT WAS MY

04:26PM 19    INTENT.

04:26PM 20              MR. COOPERSMITH:  I SEE.

04:26PM 21              THE COURT:  I THOUGHT WE WOULD JUST GO FORWARD.  I

04:26PM 22    APOLOGIZE.  I REMEMBER YOU SAID YOU HAD A CONFLICT.  BUT I

04:26PM 23    THOUGHT WE WOULD GO 8:30 TO 10:30.

04:26PM 24              MR. COOPERSMITH:  I KNOW I'M GOING TO HAVE A

04:26PM 25    CONFLICT, YOUR HONOR.

ER-4950

04:26PM 1          THE COURT:  I APOLOGIZE.

04:26PM 2       SO -- WELL, WE'LL SEE WHAT WE CAN DO.

04:26PM 3          MR. COOPERSMITH:  NO.  I UNDERSTAND THE SCHEDULE.

04:26PM 4    THANK YOU.

04:26PM 5          THE COURT:  THANK YOU.  HAVE GOOD A WEEKEND.  THANK

04:26PM 6    YOU.

04:26PM 7       (COURT ADJOURNED AT 4:26 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,          )
6                                       )  CR-18-00258-EJD
                    PLAINTIFF,          )
7                                       )  SAN JOSE, CALIFORNIA
              VS.                       )
8                                       )  JUNE 9, 2022
    RAMESH "SUNNY" BALWANI,             )
9                                       )  VOLUME 36
                    DEFENDANT.          )
10   _____    )  PAGES 6669 - 6893

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                            150 ALMADEN BOULEVARD, SUITE 900
17                          SAN JOSE, CALIFORNIA 95113

18                          BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                          1301 CLAY STREET, SUITE 340S
                            OAKLAND, CALIFORNIA 94612
20
         (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTERS:
22                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                              CERTIFICATE NUMBER 8074
23                            LEE-ANNE SHORTRIDGE, CSR, CRR
                              CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED WITH COMPUTER

6710

10:06AM 1    ADMONITION.  ALL OF US ARE APPRECIATIVE OF THAT FACT, AND I

10:06AM 2    RECOGNIZE IT'S DIFFICULT TO DO, AND WE'RE GRATEFUL.

10:06AM 3        IT'S NICE TO SEE YOU ALL AGAIN.

10:06AM 4        I'M ABOUT TO ASK THE DEFENSE IF THEY HAVE A WITNESS TO

10:06AM 5    CALL.

10:06AM 6            MR. BRECHER:  WE DO, YOUR HONOR.

10:06AM 7        THE DEFENSE CALLS RICHARD SONNIER.

10:06AM 8            THE COURT:  ALL RIGHT.  SIR, IF YOU COULD COME

10:06AM 9    FORWARD AND STAND OVER HERE AND FACE OUR COURTROOM DEPUTY AND

10:06AM 10   RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

10:06AM 11           **(DEFENDANT'S WITNESS, RICHARD SONNIER, WAS SWORN.)**

10:06AM 12           THE WITNESS:  YES.

10:07AM 13           THE COURT:  SIR, LET ME INVITE YOU TO HAVE A SEAT UP

10:07AM 14   HERE AND MAKE YOURSELF COMFORTABLE.

10:07AM 15       FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

10:07AM 16       THERE'S SOME WATER THERE THAT YOU CAN USE TO REFRESH

10:07AM 17   YOURSELF SHOULD YOU NEED IT.

10:07AM 18       WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

10:07AM 19   AND THEN SPELL IT, PLEASE.

10:07AM 20           THE WITNESS:  YES.  MY NAME IS RICHARD SONNIER.  THE

10:07AM 21   LAST NAME IS SPELLED S-O-N-N-I-E-R.

10:07AM 22           THE COURT:  THANK YOU.  AND RICHARD IS THE CLASSIC

10:07AM 23   SPELLING?

10:07AM 24           THE WITNESS:  YES, STANDARD SPELLING FOR RICHARD.

10:07AM 25           THE COURT:  ALL RIGHT.  THANK YOU.

ER-4953

10:07AM   1          COUNSEL.

10:07AM   2                  MR. BRECHER:  THANK YOU, YOUR HONOR.

10:07AM   3                      **DIRECT EXAMINATION**

10:07AM   4   BY MR. BRECHER:

10:07AM   5   Q.   GOOD MORNING, MR. SONNIER.  THANK YOU FOR BEING HERE WITH

10:07AM   6   US TODAY.

10:07AM   7   A.   YES.

10:07AM   8   Q.   MR. SONNIER, IF YOU ARE FULLY VACCINATED AND FEELING

10:07AM   9   COMFORTABLE, YOU CAN REMOVE YOUR MASK DURING THE TESTIMONY.

10:07AM  10   A.   OKAY.  THANK YOU.

10:08AM  11   Q.   AND I THINK I'LL DO THE SAME.

10:08AM  12        YOUR HONOR, MAY I APPROACH THE COURT AND THE WITNESS?

10:08AM  13                  THE COURT:  YES.

10:08AM  14                  MR. BRECHER:  (HANDING.)

10:08AM  15   Q.   GOOD MORNING AGAIN, MR. SONNIER.  YOU AND I HAVE MET

10:08AM  16   BEFORE, BUT FOR THE RECORD, MY NAME IS AARON BRECHER AND I'M AN

10:08AM  17   ATTORNEY FOR SUNNY BALWANI.  I'D LIKE TO ASK YOU SOME QUESTIONS

10:08AM  18   TODAY.

10:08AM  19        LET'S START WITH, MR. SONNIER, WHAT DO YOU DO FOR A

10:08AM  20   LIVING, SIR?

10:08AM  21   A.   I'M AN I.T. CONSULTANT.

10:08AM  22   Q.   AND WHO IS YOUR EMPLOYER?

10:08AM  23   A.   IT'S MY OWN COMPANY, IT'S NAMED NIMBLE SERVICES

10:08AM  24   INCORPORATED.

10:08AM  25   Q.   OKAY.  AND, MR. SONNIER, WERE YOU RETAINED BY THE DEFENSE

SONNIER DIRECT BY MR. BRECHER                                    6712

10:08AM  1    IN THIS CASE?

10:08AM  2    A.   YES, I WAS.

10:08AM  3    Q.   OKAY.  WE'LL TALK ABOUT THAT A BIT MORE IN A MINUTE, BUT

10:08AM  4    VERY BRIEFLY, WHAT WERE YOU HIRED TO DO, SIR?

10:08AM  5    A.   I WAS HIRED TO LOOK INTO THE FEASIBILITY OF RECOVERING THE

10:09AM  6    LIS DATABASE.

10:09AM  7    Q.   OKAY.  AND YOU UNDERSTAND THAT TO BE THE THERANOS

10:09AM  8    LABORATORY INFORMATION DATABASE?

10:09AM  9    A.   YES, THAT'S MY UNDERSTANDING.

10:09AM  10   Q.   OKAY.  AND LET'S BACK UP A LITTLE BIT.

10:09AM  11       COULD YOU BRIEFLY DESCRIBE FOR THE JURY YOUR EDUCATIONAL

10:09AM  12   BACKGROUND, SIR?

10:09AM  13   A.   I HAVE BACHELORS OF SCIENCE DEGREES IN COMPUTER SCIENCE,

10:09AM  14   AND A SECOND INDEPENDENT ONE IN PHYSICS.

10:09AM  15       I ALSO HAVE A -- WHAT IS CALLED A MINI MBA, IT'S A MASTERS

10:09AM  16   IN BUSINESS ADMINISTRATION, OR A CERTIFICATE IN THAT.

10:09AM  17       AND I'VE ALSO ATTENDED GRAD SCHOOL IN COMPUTER SCIENCE.

10:09AM  18   Q.   WHAT SORT OF COURSE WORK AT THE GRADUAL LEVEL, SIR?

10:09AM  19   A.   RELATIONSHIP DATABASE, AND I CAN'T REMEMBER THE OTHER ONES

10:09AM  20   RIGHT NOW.

10:09AM  21   Q.   FAIR ENOUGH.

10:09AM  22       MR. SONNIER, CAN YOU BRIEFLY DESCRIBE YOUR PROFESSIONAL

10:09AM  23   BACKGROUND FOR THE JURY?

10:09AM  24   A.   YES.  I STARTED MY CAREER AT LITTON INDUSTRIES WHERE I WAS

10:10AM  25   THE SOLE I.T. SUPPORT FOR A NAVAL PROJECT TO BUILD A LARGE

ER-4955

SONNIER DIRECT BY MR. BRECHER                                          6713

10:10AM   1   DATABASE OF SHIP INFORMATION, NAVY SHIP INFORMATION.

10:10AM   2       AND I ENDED MY CAREER AT LITTON AS A DB2, DATABASE

10:10AM   3   ADMINISTRATOR, JUST EXACTLY THOSE LETTERS AND NUMBERS, DATABASE

10:10AM   4   ADMINISTRATOR.

10:10AM   5       AND THEN FROM THERE I MOVED ON TO WORK AT -- AS A

10:10AM   6   CONTRACTOR AT EXXON, IT WAS EXXON BACK THEN, NOW EXXON MOBILE.

10:10AM   7       FROM EXXON I JOINED A STARTUP COMPANY NAMED PARANET, AND

10:10AM   8   THAT'S WHEN I STARTED DOING, REALLY, I.T. CONSULTING FULL TIME.

10:10AM   9   I DID ALL KINDS OF PROJECTS AT PARANET, AND LEFT PARANET WITH

10:10AM  10   ANOTHER GENTLEMAN AND WE FORMED OUR OWN I.T. CONSULTING FIRM,

10:11AM  11   AND THEN FROM THAT FIRM WE SPLIT THAT FIRM UP AND MY HALF

10:11AM  12   BECAME NIMBLE SERVICES.

10:11AM  13   Q.   I SEE.  AND, MR. SONNIER, THERE'S ONE ASPECT OF THAT I

10:11AM  14   DIDN'T HEAR YOU DESCRIBE.

10:11AM  15       WHAT DID YOU DO WHEN YOU WERE WORKING AT EXXON, SIR?

10:11AM  16   A.   I DID ALL KINDS OF PROJECTS FOR EXXON, INCLUDING BACKUP

10:11AM  17   SYSTEMS, BACKUP, RESTORE, SECURITY ANALYSIS.  I DESIGNED A

10:11AM  18   HIGHLY SECURE REPLACEMENT NETWORK FOR THEIR GEOPHYSICAL

10:11AM  19   ENVIRONMENT, AS WELL AS OTHER ASPECTS OF ENCRYPTION AND

10:11AM  20   SECURITY OF THEIR DATABASES, AND BACKUPS OF THEIR DATA IN

10:11AM  21   GENERAL.

10:11AM  22   Q.   AND, MR. SONNIER, ALL TOGETHER, HOW LONG HAVE YOU WORKED

10:11AM  23   IN THE I.T. FIELD?

10:11AM  24   A.   OVER 35 YEARS.

10:11AM  25   Q.   AND YOU MENTIONED BACKUPS.  DID I HEAR THAT RIGHT, SIR?

SONNIER DIRECT BY MR. BRECHER                                    6714

10:11AM   1       A.   YES, THAT'S RIGHT.

10:11AM   2       Q.   SO COULD YOU BRIEFLY TELL THE JURY WHAT EXPERIENCE, IF

10:11AM   3       ANY, YOU HAVE WITH DATA RECOVERY?

10:12AM   4       A.   YES.  SO THE POINT OF ANY BACKUP SYSTEM -- AND I'VE

10:12AM   5       DONE -- BACKUP HAS ALWAYS BEEN PART OF MY JOB RESPONSIBILITY MY

10:12AM   6       WHOLE CAREER -- IS, IN FACT, RECOVERY, UP TO AND INCLUDING

10:12AM   7       RECOVERY IN A DISASTER SITUATION WHERE THE ORIGINAL EQUIPMENT

10:12AM   8       MAY HAVE BEEN DESTROYED, SAY, FOR EXAMPLE, IN AN EARTHQUAKE AND

10:12AM   9       YOU NEED TO GET REPLACEMENT EQUIPMENT AND THEN RESTORE ALL OF

10:12AM   10      THE DATA BACK TO THAT REPLACEMENT EQUIPMENT AND RECOVER THE

10:12AM   11      PRODUCTION SYSTEM.

10:12AM   12      Q.   THANK YOU, MR. SONNIER.

10:12AM   13           YOU USED ANOTHER WORD EARLIER, ENCRYPTION.  AT A HIGH

10:12AM   14      LEVEL, SIR, COULD YOU TELL THE JURY WHAT THAT IS AND WHAT YOUR

10:12AM   15      EXPERIENCE WITH IT IS?

10:12AM   16      A.   YEAH, CERTAINLY.

10:12AM   17           SO ENCRYPTION MERELY MEANS TAKING SOME SORT OF INFORMATION

10:12AM   18      THAT IS TOTALLY READABLE, INTELLIGIBLE, YOU CAN JUST LOOK AT IT

10:12AM   19      AND SEE WHAT IT MEANS, AND RENDERING IT UNINTELLIGIBLE USING A

10:12AM   20      KEY.  YOU HAVE SOME SORT OF KEY, OR PERHAPS IT'S CALLED

10:12AM   21      PASSWORD, THAT YOU APPLY AN ALGORITHM OR PROCEDURE TO THAT

10:13AM   22      READABLE DATA AND MAKE IT UNREADABLE, OR AT LEAST OBFUSCATE IT

10:13AM   23      TO THE POINT WHERE, WHEN YOU LOOK AT IT, IT DOESN'T MAKE ANY

10:13AM   24      SENSE COMPARED TO THE ORIGINAL FORM.

10:13AM   25      Q.   AND HOW MUCH EXPERIENCE DO YOU HAVE WITH DATA ENCRYPTION,

UNITED STATES COURT REPORTERS

10:13AM 1    SIR?

10:13AM 2    A.   YEAH, I'VE DONE ENCRYPTION AND DATA ENCRYPTION MY ENTIRE

10:13AM 3    CAREER.

10:13AM 4    Q.   AND WHAT ABOUT DATA RECOVERY THAT WE TALKED ABOUT A MOMENT

10:13AM 5    AGO, HOW MUCH EXPERIENCE WITH THAT?

10:13AM 6    A.   YEAH, I DO ROUTINELY RECOVER DATA FOR OUR CLIENTS EVERY

10:13AM 7    YEAR.

10:13AM 8    Q.   OKAY.  AND, MR. SONNIER, DOES THE TERM "SQL" MEAN ANYTHING

10:13AM 9    TO YOU?

10:13AM 10   A.   YES.  SQL IS AN ACRONYM FOR STRUCTURE QUERY LANGUAGE, BUT

10:13AM 11   IN PRACTICE IT REFERS TO A TYPE OF DATABASE.

10:13AM 12   Q.   OKAY.  AND WOULD I BE CORRECT IF I CALLED OR PRONOUNCED IT

10:13AM 13   SQL?

10:13AM 14   A.   YES.  THE ACRONYM IS OFTEN PRONOUNCED SQL.

10:13AM 15   Q.   OKAY.  AND YOU SAID IT'S A TYPE OF -- IT'S OFTEN A TYPE OF

10:14AM 16   DATABASE.  CAN YOU EXPLAIN A LITTLE BIT MORE ABOUT WHAT THAT

10:14AM 17   MEANS?

10:14AM 18   A.   RIGHT.  SO THERE -- BEFORE SQL WAS INVENTED AT I.B.M.,

10:14AM 19   THERE WERE MANY DIFFERENT TYPES OF DATABASES, THERE STILL ARE,

10:14AM 20   BUT IT BECAME THE DOMINANT ONE AFTER ITS INVENTION AT I.B.M.

10:14AM 21   OVER THE YEARS.

10:14AM 22       SO IT STORES THE DATA INSIDE OF ITSELF AS TABLES OF

10:14AM 23   INFORMATION, ORGANIZED IN ROWS AND COLUMNS, SIMILAR TO AN EXCEL

10:14AM 24   SPREADSHEET, ALTHOUGH YOU CAN HAVE LOTS AND LOTS OF TABLES.

10:14AM 25   AND IT ALSO KNOWS THE RELATIONSHIP BETWEEN THOSE DATA ITEMS IN

SONNIER DIRECT BY MR. BRECHER                                    6716

10:14AM   1      THOSE TABLES.

10:14AM   2      Q.   AND WHAT KIND OF EXPERIENCE DO YOU HAVE WORKING WITH SQL

10:14AM   3      DATABASES, SIR?

10:14AM   4      A.   YES.  I'VE WORKED WITH SQL DATABASES MY WHOLE CAREER.

10:14AM   5      Q.   IS THERE ALSO A PROPRIETARY SOFTWARE MADE BY MICROSOFT

10:15AM   6      THAT GOES BY THAT NAME?

10:15AM   7      A.   YES.

10:15AM   8      Q.   AND CAN YOU EXPLAIN WHAT THAT IS FOR THE JURY?

10:15AM   9      A.   SURE.  SO SQL IS A CONCEPT IN THE I.T. INDUSTRY AND

10:15AM  10      DIFFERENT VENDORS MAKE DIFFERENT IMPLEMENTATIONS OF IT.

10:15AM  11           MICROSOFT'S IMPLEMENTATION IS IN FACT CALLED SQL SERVER,

10:15AM  12      OR YOU COULD PRONOUNCE IT SQL SERVER.

10:15AM  13      Q.   AND, MR. SONNIER, DO YOU HAVE ANY PRIOR EXPERIENCE BEING

10:15AM  14      RETAINED BY A CRIMINAL DEFENDANT?

10:15AM  15             THE COURT:  LET'S TAKE A BRIEF RECESS FOR JUST A

10:15AM  16      MOMENT.

10:16AM  17           LET'S TAKE A RECESS FOR A FEW MINUTES, LADIES AND

10:16AM  18      GENTLEMEN.  THANK YOU.

10:16AM  19           YOU CAN STAND DOWN IF YOU WISH, SIR.

10:23AM  20           (RECESS FROM 10:16 A.M. UNTIL 10:35 A.M.)

10:35AM  21             THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

10:35AM  22           ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

10:35AM  23           MR. BRECHER, WOULD YOU LIKE TO CONTINUE?

10:35AM  24             MR. BRECHER:  YES.  THANK YOU, YOUR HONOR.

10:35AM  25      Q.   THANK YOU, MR. SONNIER.  YOU CAN REMOVE YOUR MASK AGAIN,

10:36AM  1    SIR.

10:36AM  2         MR. SONNIER, WHEN WE LEFT OFF I WAS ASKING YOU ABOUT YOUR

10:36AM  3    EXPERIENCE WITH SQL DATABASES AND MICROSOFT SQL SERVERS.

10:36AM  4         DO YOU REMEMBER THAT, SIR?

10:36AM  5    A.   YES.

10:36AM  6    Q.   COULD YOU SAY A LITTLE BIT MORE ABOUT YOUR PAST WORK WITH

10:36AM  7    THOSE PRODUCTS?

10:36AM  8    A.   RIGHT.  SO I'VE DONE LOTS OF WORK WITH ALL MANNER OF SQL

10:36AM  9    SERVERS SYSTEMS, BUT IN PARTICULAR MICROSOFT SQL SERVER, I USE

10:36AM 10    THAT DAILY ALL OF THE TIME.  SO --

10:36AM 11    Q.   AND FOR HOW LONG HAVE YOU USED IT DAILY ALL OF THE TIME,

10:36AM 12    SIR?

10:36AM 13    A.   TWENTY YEARS.

10:36AM 14    Q.   AND, MR. SONNIER, DO YOU HAVE ANY PRIOR EXPERIENCE BEING

10:36AM 15    RETAINED BY A DEFENDANT IN A CRIMINAL CASE?

10:36AM 16    A.   NO.

10:36AM 17    Q.   NO.  ABOUT WHAT OTHER PRIOR EXPERIENCE WITH LEGAL

10:36AM 18    PROCEEDINGS?

10:36AM 19    A.   YES.  I AM RETAINED IN SEVERAL, OR MANY, CIVIL MATTERS.

10:37AM 20    Q.   AND, MR. SONNIER, ARE YOU BEING COMPENSATED FOR YOUR TIME

10:37AM 21    TODAY AND FOR YOUR WORK IN THIS CASE?

10:37AM 22    A.   YES, I AM.

10:37AM 23    Q.   HOW MUCH, SIR?

10:37AM 24    A.   MY TIME IS BILLED AT $300 AN HOUR.  I GET -- ABOUT HALF OF

10:37AM 25    THAT SORT OF COMES TO ME AS MY COMPENSATION.

10:37AM  1    Q.   OKAY.  AND DOES YOUR COMPENSATION TURN IN ANY WAY ON THE

10:37AM  2    SUBSTANCE OF THE OPINIONS YOU OFFER TODAY?

10:37AM  3    A.   NO, IT DOES NOT.

10:37AM  4    Q.   DOES YOUR COMPENSATION DEPEND IN ANY WAY ON THE OUTCOME OF

10:37AM  5    THIS TRIAL?

10:37AM  6    A.   NO, IT DOES NOT.

10:37AM  7    Q.   AND DOES YOUR COMPENSATION IN ANY WAY AFFECT THE OPINIONS

10:37AM  8    THAT YOU'VE REACHED IN THIS CASE?

10:37AM  9    A.   NO.

10:37AM  10        MR. BRECHER:  YOUR HONOR, THE DEFENSE OFFERS

10:37AM  11   MR. SONNIER AS AN EXPERT IN SQL DATA RECOVERY AND DATA

10:37AM  12   ENCRYPTION.

10:37AM  13        MR. BOSTIC:  NO OBJECTION.

10:37AM  14        THE COURT:  ALL RIGHT.  THANK YOU.

10:37AM  15   LADIES AND GENTLEMEN, THIS WITNESS WILL BE PERMITTED TO

10:38AM  16   TESTIFY AS AN EXPERT IN THE AREA OF SQL DATA RECOVERY AND DATA

10:38AM  17   ENCRYPTION.

10:38AM  18   YOU WILL BE INSTRUCTED IN THE FINAL INSTRUCTIONS HOW YOU

10:38AM  19   MAY CHARACTERIZE AND EVALUATE THIS TESTIMONY.

10:38AM  20   COUNSEL.

10:38AM  21        MR. BRECHER:  THANK YOU, YOUR HONOR.

10:38AM  22   Q.   SO, MR. SONNIER, LET'S TURN TO THE SUBSTANCE A BIT MORE.

10:38AM  23        AND WE'RE TALKING ABOUT THE THERANOS LABORATORY

10:38AM  24   INFORMATION SYSTEM.

10:38AM  25        DID YOU SAY THAT EARLIER?

ER-4961

10:38AM   1      A.   YES.

10:38AM   2      Q.   AND JUST TO MAKE CLEAR, ARE YOU A LABORATORY SCIENTIST BY

10:38AM   3      TRAINING?

10:38AM   4      A.   NO.

10:38AM   5      Q.   ARE YOU A MEDICAL DOCTOR?

10:38AM   6      A.   NO, I'M NOT.

10:38AM   7      Q.   DO YOU HAVE ANY PRIOR EXPERIENCE WITH BLOOD TESTING OR

10:38AM   8      BLOOD TESTING TECHNOLOGY?

10:38AM   9      A.   NO.  ONLY AS I'VE HAD A BLOOD TEST MYSELF.

10:38AM  10      Q.   OKAY.  FAIR ENOUGH.

10:38AM  11           MR. SONNIER, DO YOU HAVE ANY KNOWLEDGE ABOUT THE CONTENT

10:38AM  12      OF THE THERANOS LIS OR WHAT IT WOULD SHOW?

10:38AM  13      A.   THERE WERE SOME MATERIALS THAT I REVIEWED, LIKE IT WAS THE

10:38AM  14      USER'S GUIDE FOR THAT SYSTEM, SO I KNOW SORT OF SOME OF THE

10:39AM  15      INFORMATION THAT WAS DOCUMENTED THERE.

10:39AM  16      Q.   OKAY.  BUT YOU DON'T KNOW ANYTHING, FOR INSTANCE, ABOUT

10:39AM  17      PATIENT TESTING RESULTS OR ANYTHING LIKE THAT?

10:39AM  18      A.   NO.

10:39AM  19      Q.   OKAY.  AND DO THE OPINIONS THAT YOU FORMED IN THIS CASE

10:39AM  20      TURN ON THAT INFORMATION?

10:39AM  21      A.   NO, THEY DO NOT.

10:39AM  22      Q.   OKAY.  SO I GUESS, AND I THINK I ASKED YOU THIS EARLIER,

10:39AM  23      BUT WHAT WERE YOU ASKED TO EXAMINE?

10:39AM  24      A.   I WAS ASKED TO LOOK AT THE FEASIBILITY OF THE RECOVERY OF

10:39AM  25      THE LIS DATA.

10:39AM 1    Q.   OKAY.  AND I THINK YOU'VE TOUCHED ON THIS, BUT WHAT SORT

10:39AM 2    OF MATERIALS DID YOU REVIEW TO FORM YOUR OPINIONS IN THIS CASE?

10:39AM 3    A.   THERE WERE A WHOLE SERIES OF INFORMATION, SOME LEGAL

10:39AM 4    FILINGS, SOME DEPOSITIONS, FBI INTERVIEW, SUMMARIES.

10:39AM 5         PREVIOUSLY I MENTIONED SOME SORT OF LIS USER

10:40AM 6    DOCUMENTATION.

10:40AM 7         I THINK THERE WERE SOME THERANOS POLICY AND PROCEDURES

10:40AM 8    SORT OF STANDARDS DOCUMENTS, EMAILS, THE LEASE AGREEMENT, AND

10:40AM 9    THEN SOME PUBLIC INFORMATION THAT'S JUST AVAILABLE ON THE

10:40AM 10   INTERNET.

10:40AM 11   Q.   OKAY.  AND, MR. SONNIER, ARE THESE THE SORTS OF MATERIALS

10:40AM 12   THAT YOU TYPICALLY RELY ON IN YOUR WORK?

10:40AM 13   A.   IT'S VERY COMMON, DOING WHAT I DO, TO RECEIVE A BUNCH OF

10:40AM 14   INFORMATION, WRITTEN EMAILS, TRANSCRIPTS, DOCUMENTATION, AND

10:40AM 15   THEN TO PUT TOGETHER HOW TO SOLVE THE PROBLEM AT HAND.

10:40AM 16   Q.   AND, MR. SONNIER, WE'VE TALKED ABOUT SOME OF THE THINGS

10:40AM 17   THAT YOU'RE NOT HERE TO DISCUSS, THE CONTENT OF ANY PATIENT

10:40AM 18   TESTING DATA.

10:40AM 19        BUT LET'S TURN TO A LITTLE BIT ABOUT THE TECHNICAL ASPECTS

10:40AM 20   OF THE LIS SYSTEM.

10:40AM 21        CAN YOU BREAK DOWN SOME TERMS FOR ME?  DO YOU HAVE AN

10:40AM 22   UNDERSTANDING OF THE TERM "LIS SYSTEM" FROM A TECHNICAL

10:41AM 23   PERSPECTIVE BASED ON THE MATERIALS THAT YOU'VE REVIEWED?

10:41AM 24            MR. BOSTIC:  OBJECTION.  FOUNDATION.  CALLS FOR

10:41AM 25   HEARSAY.

10:41AM   1          THE COURT:  WELL, LET ME -- YOU CAN ANSWER THE

10:41AM   2     QUESTIONS FOR FOUNDATIONAL PURPOSES.

10:41AM   3          MR. BRECHER:  THANK YOU, YOUR HONOR.

10:41AM   4          THE WITNESS:  SO IN THE INFORMATION THAT I REVIEWED,

10:41AM   5     THE LIS SYSTEM WAS PRETTY STANDARD.  IT WAS COMPOSED OF THE

10:41AM   6     DATABASE, THE LIS DATABASE, WHERE THE INFORMATION WAS ACTUALLY

10:41AM   7     STORED, AND THEN PROGRAMS, IN THIS CASE IT'S DOT NET PROGRAMS,

10:41AM   8     VERY STANDARD IN CORPORATE ENVIRONMENTS, AND A WEB SERVER THAT

10:41AM   9     UTILIZED THOSE PROGRAMS TO READ AND WRITE THAT DATA INTO AND

10:41AM  10     OUT OF THE DATABASE AND PRESENT IT TO THE USER.

10:41AM  11     BY MR. BRECHER:

10:41AM  12     Q.   AND YOU HAVE A BINDER OF DOCUMENTS IN FRONT OF YOU.  I

10:41AM  13     THINK THAT SHOULD STILL BE THERE.

10:41AM  14     A.   YES.

10:41AM  15     Q.   COULD YOU TURN TO THE TAB MARKED 20005?

10:42AM  16     A.   I'M THERE.

10:42AM  17     Q.   THANK YOU.  I'LL ASK YOU TO TURN TO PAGES 2 AND 3 OF THAT

10:42AM  18     EXHIBIT.  LET ME KNOW WHEN YOU'RE THERE.

10:42AM  19     A.   I'M THERE.

10:42AM  20     Q.   AND DO YOU SEE SOME IMAGES OR DIAGRAMS?

10:42AM  21     A.   YES.

10:42AM  22     Q.   AND DO THOSE IMAGES REFLECT THE STRUCTURE OF THE EQUIPMENT

10:42AM  23     RELATED TO THE THERANOS LIS BASED ON THE MATERIALS THAT YOU

10:42AM  24     REVIEWED?

10:42AM  25     A.   YES, BASED ON THE MATERIAL THAT I REVIEWED, THIS IS A

SONNIER DIRECT BY MR. BRECHER                                    6722

10:42AM   1    DIAGRAM OF THE EQUIPMENT THAT RAN THE LIS SYSTEM.

10:42AM   2    Q.   AND IS THIS DIAGRAM CONSISTENT WITH YOUR TRAINING AND

10:42AM   3    EXPERIENCE ABOUT WHAT A SYSTEM OF THIS SORT WOULD LOOK LIKE?

10:42AM   4    A.   YES, IT'S EXACTLY WHAT I WOULD HAVE EXPECTED.

10:42AM   5              MR. BRECHER:  YOUR HONOR, I'D LIKE TO PUBLISH

10:42AM   6    PAGES 2 AND 3 OF EXHIBIT 20005 FOR PURPOSES OF DEMONSTRATIVE

10:42AM   7    PURPOSES ONLY.

10:42AM   8              MR. BOSTIC:  FOUNDATION AND RELEVANCE, YOUR HONOR.

10:42AM   9              THE COURT:  WHY DON'T YOU LAY A FOUNDATION FOR THIS

10:43AM  10    A LITTLE BIT MORE?

10:43AM  11              MR. BRECHER:  SURE.

10:43AM  12              THE COURT:  NO, GO AHEAD.

10:43AM  13              MR. BRECHER:  THANK YOU, YOUR HONOR.

10:43AM  14    Q.   SO, MR. SONNIER, YOU TESTIFIED THAT YOU REVIEWED SOME

10:43AM  15    LEASE AGREEMENTS; IS THAT RIGHT?

10:43AM  16    A.   YES.

10:43AM  17    Q.   AND YOU TESTIFIED THAT YOU REVIEWED INTERNAL

10:43AM  18    CORRESPONDENCE.  DID I HEAR THAT RIGHT?

10:43AM  19    A.   YES, EMAILS.

10:43AM  20    Q.   OKAY.  AND THIS -- THESE DIAGRAMS YOU SAID ARE CONSISTENT

10:43AM  21    WITH WHAT YOU WOULD EXPECT AN LIS SYSTEM -- EXCUSE ME, A SQL

10:43AM  22    SERVER SYSTEM WOULD LOOK LIKE?

10:43AM  23    A.   YES.

10:43AM  24    Q.   WOULD IT BE HELPFUL FOR YOU, IN EXPLAINING THE CONSTITUENT

10:43AM  25    PARTS OF THAT SYSTEM, TO POINT US TO IMAGES ON THIS DIAGRAM?

10:43AM  1    A.   YES, PICTURES ARE ALWAYS GOOD.

10:43AM  2            MR. BRECHER:  YOUR HONOR, I'D LIKE TO PUBLISH

10:43AM  3    PAGES 2 AND 3, AGAIN, FOR DEMONSTRATIVE PURPOSES ONLY.  WE

10:43AM  4    WON'T BE OFFERING THIS INTO EVIDENCE.

10:43AM  5            THE COURT:  MR. BOSTIC.

10:43AM  6            MR. BOSTIC:  YOUR HONOR, IF THIS IS BEING OFFERED TO

10:43AM  7    SHOW A GENERIC STRUCTURE OF THE SQL SYSTEM?

10:44AM  8            THE COURT:  THAT WAS MY QUESTION.

10:44AM  9        IS THIS GOING TO BE A GENERIC DESCRIPTION OF THIS DATABASE

10:44AM 10    OR THE CONFIGURATION, OR IS THIS -- ARE YOU SEEKING TO OFFER

10:44AM 11    THIS OR EXPLAIN THAT THIS WAS THE ACTUAL CONFIGURATION AND

10:44AM 12    ARCHITECTURE OF THERANOS?

10:44AM 13            MR. BRECHER:  OF COURSE, YOUR HONOR.  WHY DON'T I

10:44AM 14    ASK SOME FOUNDATIONAL QUESTIONS?

10:44AM 15            THE COURT:  SURE.  RIGHT.

10:44AM 16            MR. BRECHER:  AND WE CAN FIND OUT.

10:44AM 17    Q.   MR. SONNIER, DO YOU UNDERSTAND -- WHAT DO YOU UNDERSTAND

10:44AM 18    THESE DIAGRAMS TO BE, MORE SPECIFICALLY?

10:44AM 19    A.   THESE DIAGRAMS ARE A SERIES OF NETWORK EQUIPMENT,

10:44AM 20    FIREWALLS, LOAD BALANCERS, NETWORK SWITCHES -- I'M SORRY IF

10:44AM 21    THOSE ARE ALL TECHNICAL TERMS -- AND THEN SEVERAL SERVERS.  ONE

10:44AM 22    IS A BACKUP SERVER, AND ONE WOULD BE THE SERVER ON WHICH THE

10:44AM 23    LIS SYSTEM WOULD HAVE RUN.

10:44AM 24    Q.   AND DID YOU LOOK TO OTHER MATERIALS BEYOND THIS DIAGRAM TO

10:44AM 25    COME TO YOUR UNDERSTANDING OF THE STRUCTURE OF THE LIS SYSTEM?

SONNIER DIRECT BY MR. BRECHER                                    6724

10:45AM  1      A.   DO YOU MEAN THE EQUIPMENT THAT WAS RUNNING IT?

10:45AM  2      Q.   YES.

10:45AM  3      A.   YES.  SO I REVIEWED THE LEASE AGREEMENT THAT THERANOS HAD,

10:45AM  4      AND IN THAT LEASE AGREEMENT, WHICH WAS WITH DELL CORPORATION,

10:45AM  5      IT PROVIDES WHAT ARE CALLED SERVICE TAGS.  THAT'S ESSENTIALLY A

10:45AM  6      DELL SERIAL NUMBER, AND DELL IS VERY NICE, THEY PUBLISH THAT

10:45AM  7      INFORMATION PUBLICLY ON THE INTERNET.

10:45AM  8          SO I WAS ABLE TO LOOK UP AND ESSENTIALLY GET A FULL

10:45AM  9      INVENTORY OF ALL OF THE BITS AND PIECES THAT MADE UP THAT

10:45AM  10     EQUIPMENT THAT WAS REPRESENTED IN THAT LEASE.

10:45AM  11     Q.   AND IS THAT REVIEW CONSISTENT WITH THE DIAGRAMS THAT

10:45AM  12     YOU'RE LOOKING AT IN EXHIBIT 20005?

10:45AM  13     A.   YES.

10:45AM  14          MR. BRECHER:  YOUR HONOR, I THINK UNDER 703, IT

10:45AM  15     WOULD BE HELPFUL FOR US TO SEE A VISUAL REPRESENTATION.

10:45AM  16          MR. BOSTIC:  YOUR HONOR, IF THIS IS MEANT TO

10:45AM  17     REPRESENT THE ACTUAL LIS, THEN THE OBJECTION IS FOUNDATION,

10:46AM  18     HEARSAY, AND BEST EVIDENCE.

10:46AM  19          THE COURT:  IS THIS -- ARE YOU SUGGESTING AND

10:46AM  20     OFFERING THIS TO BE THE ACTUAL ARCHITECTURE, THE SERVERS IN

10:46AM  21     PLACE, OR IS THIS A REPRESENTATIVE OF OR SOMETHING IN BETWEEN?

10:46AM  22          MR. BRECHER:  SOMETHING IN BETWEEN.  BUT I'M MORE

10:46AM  23     THAN HAPPY TO KEEP IT LIMITED TO A GENERIC REPRESENTATIVE OF.

10:46AM  24     I JUST WANT TO MAKE SURE THAT WE CAN UNDERSTAND THE DIFFERENT

10:46AM  25     PARTS.

ER-4967

10:46AM  1          THE COURT:  OKAY.  ALL RIGHT.

10:46AM  2          WITH THE UNDERSTANDING THAT THIS IS NOT AND YOU'RE NOT

10:46AM  3   OFFERING THIS IN ANY WAY TO REPRESENT THE SPECIFIC ARCHITECTURE

10:46AM  4   THAT EXISTED AT THE TIME, BUT RATHER REPRESENTATIVE OF THE

10:46AM  5   ARCHITECTURE OF A SIMILAR TYPE, IS THAT ACCURATE?

10:46AM  6          MR. BRECHER:  I THINK THAT'S FAIR, YOUR HONOR.

10:46AM  7          THE COURT:  ALL RIGHT.  THEN THESE CAN BE PUBLISHED.

10:46AM  8          LADIES AND GENTLEMEN, THESE WILL BE PUBLISHED, NOT

10:46AM  9   ADMITTED AS EVIDENCE, BUT PUBLISHED AS A DEMONSTRATIVE TO

10:46AM 10   ASSIST THE TESTIMONY OF THE WITNESS.

10:46AM 11          MR. BRECHER:  THANK YOU, YOUR HONOR.

10:47AM 12          AND, MR. ALLEN, IF WE CAN PUT UP PAGES 2 AND 3 TOGETHER

10:47AM 13   JUST SO WE CAN SEE THEIR RELATIONSHIP.

10:47AM 14   Q.   MR. SONNIER, DO YOU HAVE THAT ON THE SCREEN IN FRONT OF

10:47AM 15   YOU, SIR?

10:47AM 16   A.   YES, I DO.

10:47AM 17   Q.   IT'S ALSO IN YOUR BINDER IF THAT'S EASIER.

10:47AM 18   A.   YES.

10:47AM 19   Q.   DO YOU HAVE AN UNDERSTANDING OF THE RELATIONSHIP BETWEEN

10:47AM 20   PAGE 2, THE IMAGE ON THE LEFT, AND PAGE 3, THE IMAGE ON THE

10:47AM 21   RIGHT?

10:47AM 22   A.   YES.  THEY'RE JUST TWO DIAGRAMS OF THE SAME THING.  THE

10:47AM 23   LEFT -- THE IMAGE ON THE LEFT IS WHAT I WOULD CALL SORT OF A

10:47AM 24   CONNECTION DIAGRAM SHOWING HOW THE PIECES ARE CONNECTED TO EACH

10:47AM 25   OTHER AND KIND OF BLOWN OUT MAYBE MAKES IT A LITTLE EASIER TO

SONNIER DIRECT BY MR. BRECHER                          6726

10:47AM  1    INSTRUCT THAT, WHEREAS THE ONE ON THE RIGHT IS A MORE PHYSICAL

10:47AM  2    DIAGRAM OF HOW SUCH SAID EQUIPMENT WOULD BE STORED IN THE

10:47AM  3    TYPICAL SERVER ROOM.

10:47AM  4    Q.   AND THINKING ABOUT A TYPICAL SERVER ENVIRONMENT -- AND I'M

10:48AM  5    NOW GOING TO ASK, MR. ALLEN, IF YOU COULD JUST FOCUS ON PAGE 2,

10:48AM  6    PLEASE -- I SEE A SERIES OF THIN HORIZONTAL STRIPS IN THIS --

10:48AM  7    WHAT DID YOU CALL IT?  A BLOWN OUT VERSION?

10:48AM  8    A.   YES.  IT'S LIKE A CONNECTION DIAGRAM JUST SHOWING THE

10:48AM  9    DIFFERENT PIECES, AND THE LITTLE LINES REPRESENT SORT OF HOW

10:48AM  10   THEY'RE HOOKED TOGETHER.

10:48AM  11   Q.   OKAY.  AND DO YOU HAVE A SENSE OF WHAT THESE THIN

10:48AM  12   HORIZONTAL STRIPS REPRESENT?

10:48AM  13   A.   YES, THOSE ARE ALL VARIOUS ASPECTS OF THE NETWORK.

10:48AM  14       I CAN DETAIL A LITTLE BIT.  THE TWO AT THE TOP ARE

10:48AM  15   FIREWALLS; THE NEXT TWO SORT OF YELLOW ORANGE ONES ARE LOAD

10:48AM  16   BALANCERS; THE NEXT FOUR THINNER BOXES ARE SWITCHES THAT ALLOW

10:48AM  17   THE EQUIPMENT TO TALK TO EACH OTHER, AS WELL AS THE INTERNET

10:48AM  18   AND THE WIDE WORLD.

10:48AM  19   Q.   AND -- I'M SORRY, SIR.  WERE YOU FINISHED?

10:48AM  20   A.   NO.  I DIDN'T KNOW IF YOU WANTED ME TO CONTINUE DOWN THE

10:48AM  21   PAGE OR NOT.

10:48AM  22   Q.   NO.  WE'LL GET THERE STEP BY STEP.  THANK YOU, SIR.

10:49AM  23       MR. SONNIER, THINKING ABOUT A TYPICAL MICROSOFT SQL SYSTEM

10:49AM  24   ARCHITECTURE, THOSE THIN, I THINK YOU CALLED IT THEM NETWORK

10:49AM  25   STRIPS THAT WE WERE JUST TALKING ABOUT, WERE THOSE IMPORTANT TO

10:49AM  1    UNDERSTAND IN FORMING YOUR OPINIONS ABOUT THE RECOVERABILITY OF

10:49AM  2    THE LIS?

10:49AM  3    A.   NO, THE NETWORK WOULDN'T HAVE HAD ANY IMPACT ON THE

10:49AM  4    RECOVERABILITY.

10:49AM  5    Q.   OKAY.  I'M LOOKING STILL ON PAGE 2 ON THE TOP HALF, AND I

10:49AM  6    SEE IN THE CENTER TWO LARGER STRIPS.  THE FIRST ONE IS LABELLED

10:49AM  7    DELL R520.

10:49AM  8        DO YOU SEE THAT, SIR?

10:49AM  9    A.   YES.

10:49AM 10    Q.   AGAIN, THINKING ABOUT THIS AS A GENERIC OR HOPEFULLY

10:49AM 11    TYPICAL SQL SERVER ARCHITECTURE, WHAT IS THAT, SIR?

10:49AM 12    A.   SO THAT'S A STANDARD DELL SERVER FOR THE TIME, VERY

10:50AM 13    GENERIC, LOTS OF THEM IN THE WORLD.

10:50AM 14        AND THEN THE LARGER BOX UNDERNEATH IT IS ESSENTIALLY A

10:50AM 15    DATA STORAGE DEVICE.  IT'S A LOWER PERFORMANCE.

10:50AM 16        THESE TWO TOGETHER HAD THE FUNCTION -- OR IN THE MATERIALS

10:50AM 17    I REVIEWED, THESE TWO WERE BASICALLY DESIGNATED AS THE BACKUP

10:50AM 18    FOR THE SQL SYSTEM OR FOR THE LIS SYSTEM.

10:50AM 19    Q.   OKAY.  LET'S TURN DOWN TO THE BOTTOM OF PAGE 2.  I'M

10:50AM 20    SEEING ANOTHER TWO STRIPS HERE.  ONE OF THEM IS LABELLED 5108

10:50AM 21    UCS CHASSIS.

10:50AM 22        DO YOU SEE THAT, SIR?

10:50AM 23    A.   YES, I DO.

10:50AM 24    Q.   AND THE ONE BELOW THAT IS LABELLED NIMBLE CS300.

10:50AM 25        DO YOU SEE THAT, SIR?

SONNIER DIRECT BY MR. BRECHER                                    6728

10:50AM  1    A.    YES, I DO.

10:50AM  2    Q.    WHAT WOULD THOSE BE IN ARCHITECTURE LIKE THIS?

10:51AM  3    A.    SO THE LARGER UNIT IS ESSENTIALLY A SERVER ARRAY.  SO AS

10:51AM  4    THE ONE ABOVE THAT WHOLE BOX WAS ONE SERVER, THIS IS REALLY A

10:51AM  5    DENSER CONFIGURATION THAT ALLOWS YOU TO PUT SERVERS IN ONE BOX.

10:51AM  6    IT ALLOWS YOU TO SAVE SPACE WHEN YOU'RE RENTING DATA CENTER

10:51AM  7    SPACE BY THE FOOT, AND IN THAT ONE BOX YOU CAN PUT FOUR OR

10:51AM  8    EIGHT SERVERS INTO IT.

10:51AM  9    Q.    OKAY.

10:51AM 10    A.    THE FINAL BOX AT THE VERY BOTTOM IS A HIGH PERFORMANCE

10:51AM 11    DISK ARRAY THAT PROVIDES ALL OF THE STORAGE OF ALL OF THE

10:51AM 12    SERVERS IN THE LARGER BOX.

10:51AM 13    Q.    THANK YOU, MR. SONNIER.

10:51AM 14          AND THEN TURNING TO PAGE 3 OF THE EXHIBIT.  COULD YOU

10:51AM 15    EXPLAIN AGAIN TO US WHAT THIS IS?

10:51AM 16    A.    YES.  SO ALL OF THE BOXES WE JUST TALKED ABOUT IN THE

10:52AM 17    CONNECTION DIAGRAM ARE ARRANGED TOP TO BOTTOM IN WHAT --

10:52AM 18    ESSENTIALLY THIS IS A COMPUTER RACK IS WHAT WE CALL IT, OR A

10:52AM 19    SERVER RACK.

10:52AM 20          SO IN AN ACTUAL DATA CENTER, ALL OF THAT EQUIPMENT WOULD

10:52AM 21    BE MOUNTED INTO THIS RACK, WHICH IS THE LARGE GRAY BARS AROUND

10:52AM 22    THE OUTSIDE OF THE DIAGRAM, AND EACH OF THE BOXES IS THEN

10:52AM 23    BOLTED IN PLACE, AND THEN FROM THERE IT WOULD HAVE BEEN

10:52AM 24    CONNECTED TO POWER AND THE NETWORK WOULD HAVE BEEN WIRED UP PER

10:52AM 25    THE CONNECTION DIAGRAM.

SONNIER DIRECT BY MR. BRECHER                                    6729

10:52AM   1    Q.   OKAY.  AND, MR. SONNIER, I THINK WE MAY HAVE COVERED THIS,

10:52AM   2    BUT BASED ON YOUR TRAINING AND EXPERIENCE, DOES THIS

10:52AM   3    ARCHITECTURE LOOK LIKE WHAT ONE WOULD EXPECT A SQL SERVER

10:52AM   4    SYSTEM OF THIS NATURE TO RESEMBLE?

10:52AM   5    A.   YES, PRETTY STANDARD.

10:52AM   6    Q.   MR. ALLEN, I THINK WE CAN TAKE THAT DOWN.

10:52AM   7         AND, MR. SONNIER, LET'S TALK A LITTLE BIT MORE ABOUT SQL,

10:53AM   8    BECAUSE WHEN WE WERE SPEAKING EARLIER, I THINK I HEARD THE

10:53AM   9    TERMS SQL FILE, SQL SERVER, SQL DATABASE, AND MICROSOFT SQL.

10:53AM  10    SO WHY DON'T WE BREAK THOSE DOWN ONE BY ONE.

10:53AM  11         WHAT EXACTLY IS A SQL FILE?

10:53AM  12    A.   SO ALL DATABASES HAVE TO STORE INFORMATION FOR

10:53AM  13    PERMANENTLY, AND SO THEY WRITE IT INTO A FILE, SIMILAR TO A

10:53AM  14    WORD DOCUMENT OR AN EXCEL DOCUMENT THAT YOU MIGHT HAVE ON YOUR

10:53AM  15    PERSONAL COMPUTER.  SO ALL SQL SYSTEMS HAVE TO ACTUALLY WRITE

10:53AM  16    INTO A FILE.

10:53AM  17         SO THEY ALL STORE INTO FILES, AND SOMETIMES PEOPLE WILL

10:53AM  18    REFER TO THE FILE AS THE DATABASE ITSELF, OR THEY MAY CALL IT

10:53AM  19    JUST THE SQL FILE BECAUSE YOU MIGHT THINK OF THE DATABASE AS

10:53AM  20    NOT JUST THE FILE, BUT ALSO THE SOFTWARE TO ACCESS THE FILE.

10:53AM  21    Q.   OKAY.  AND I THINK YOU MENTIONED A COUPLE OF OTHER TERMS

10:54AM  22    THAT AT LEAST I AM A BIT MORE FAMILIAR WITH.

10:54AM  23         YOU SAID A WORD DOCUMENT, AND I THINK YOU SAID AN EXCEL

10:54AM  24    DOCUMENT; IS THAT RIGHT?

10:54AM  25    A.   YES.

SONNIER DIRECT BY MR. BRECHER                                      6730

10:54AM   1    Q.   AND CAN WE COMPARE A LITTLE BIT IN TERMS OF FUNCTION?  HOW

10:54AM   2    DOES A SQL FILE COMPARE TO SOMETHING LIKE AN EXCEL FILE THAT WE

10:54AM   3    MIGHT BE A LITTLE BIT MORE FAMILIAR WITH?

10:54AM   4    A.   SURE.  SO AN EXCEL FILE IS COMMONPLACE.  IT'S A

10:54AM   5    REPRESENTATION OF A SPREADSHEET GENERALLY USED FOR COMPUTING

10:54AM   6    FORMULAS AND ACCOUNTING NUMBERS.

10:54AM   7         AND YOU HAVE THE SAME SORT OF THING FOR A DATABASE OR A

10:54AM   8    SQL DATABASE.  THE INFORMATION THAT REPRESENTS TABLES, ROWS AND

10:54AM   9    COLUMNS, JUST LIKE IN AN EXCEL SPREADSHEET, ARE STORED IN THE

10:54AM  10    SQL FILE OR THE SQL DATABASE, AND THEN YOU CAN USE THE SQL

10:54AM  11    SOFTWARE TO RETRIEVE IT, JUST LIKE YOU CAN USE EXCEL TO OPEN UP

10:55AM  12    THIS EXCEL FILE AND THEN DISPLAY THE ROWS AND COLUMNS IN AN

10:55AM  13    EXCEL SPREADSHEET.

10:55AM  14    Q.   WHAT SORT OF DIFFERENCES EXIST BETWEEN A SQL FILE AND AN

10:55AM  15    EXCEL FILE, TO STICK WITH THAT ANALOGY?

10:55AM  16    A.   SURE.  SO A SQL FILE WOULD BE MORE LIMITED THAN A

10:55AM  17    RELATIONAL DATABASE WOULD BE OR A SQL DATABASE WOULD BE.  IT

10:55AM  18    PROBABLY COULDN'T STORE ANYWHERE NEAR THE AMOUNT OF DATA.

10:55AM  19    Q.   I'M SORRY, MR. SONNIER.  I'M GOING TO PAUSE.  I MAY HAVE

10:55AM  20    MISHEARD YOU.  DID YOU SAY THAT A SQL FILE WOULD BE MORE

10:55AM  21    LIMITED THAN A SQL DATABASE, OR DID I MISHEAR YOU?

10:55AM  22    A.   NO.  AN EXCEL FILE WOULD BE MORE LIMITED THAN A SQL

10:55AM  23    DATABASE.

10:55AM  24    Q.   OKAY.  THANK YOU.

10:55AM  25         MR. SONNIER, LET'S -- WE'LL FLESH THIS OUT IN A FEW

ER-4973

SONNIER DIRECT BY MR. BRECHER                                          6731

10:55AM   1    MOMENTS, BUT WE WERE TALKING A LOT ABOUT WHAT YOU WERE ASKED TO

10:55AM   2    EXAMINE, AND AT A VERY HIGH LEVEL, WHAT DID YOU ULTIMATELY

10:56AM   3    CONCLUDE ABOUT THE RECOVERABILITY OF THE THERANOS LABORATORY

10:56AM   4    INFORMATION SYSTEM?

10:56AM   5    A.   SO ULTIMATELY, AFTER REVIEWING ALL OF THE MATERIALS THAT I

10:56AM   6    REVIEWED, I CONCLUDED THAT, CERTAINLY BEFORE AUGUST 2018, IT

10:56AM   7    WOULD HAVE BEEN A VERY STRAIGHTFORWARD TECHNICAL TASK TO

10:56AM   8    RECOVER THAT DATA, AND EVEN AFTER AUGUST 2018 IT WOULD BE THE

10:56AM   9    SAME, YOU COULD STILL RECOVER THAT INFORMATION.

10:56AM   10   Q.   AND YOU USED A DATE THERE, AUGUST OF 2018, AND I THINK

10:56AM   11   WE'LL GET INTO WHY THAT DATE IS SIGNIFICANT IN JUST A MOMENT.

10:56AM   12        LET'S START, AND MAYBE THIS WILL BE A NATURAL SEGUE, SIR,

10:56AM   13   CAN YOU TELL US A BIT ABOUT THE FACTUAL ASSUMPTIONS THAT FORMED

10:56AM   14   THE OPINIONS THAT YOU REACHED IN THIS CASE?  WHY ARE WE TALKING

10:56AM   15   ABOUT NEEDING TO RECOVER THE LIS?

10:56AM   16   A.   SO FROM THE MATERIALS THAT I REVIEWED, IT WAS THE CASE

10:57AM   17   THAT THE MATERIALS THAT WERE BEING SUBPOENAED TO SUPPLY

10:57AM   18   INFORMATION FROM THEIR LIS SYSTEM TO THE GOVERNMENT, AND THERE

10:57AM   19   WAS AN ATTEMPT TO PROVIDE THAT INFORMATION IN THE FORM OF A SQL

10:57AM   20   SERVER BACKUP.  I THINK ULTIMATELY IT WAS DELIVERED IN AUGUST

10:57AM   21   OF 2018.

10:57AM   22        THEREAFTER, THE PRODUCTION SYSTEM, THE LIS PRODUCTION

10:57AM   23   SYSTEM IN PARTICULAR, THE SQL DATABASE SYSTEM, WAS DISASSEMBLED

10:57AM   24   AND THE HARD DRIVES WERE SENT TO ONE STORAGE LOCATION AND THE

10:57AM   25   EQUIPMENT WENT TO A DIFFERENT STORAGE LOCATION.

SONNIER DIRECT BY MR. BRECHER                                   6732

10:57AM  1    Q.   OKAY.  AND WE'LL BREAK THAT DOWN IN A MOMENT, BUT YOU USED

10:57AM  2    A TERM "PRODUCTION SYSTEM" OR "PRODUCTION EQUIPMENT."

10:57AM  3         WHAT DO YOU MEAN BY THAT, SIR?

10:58AM  4    A.   SO IN STANDARD I.T. ENVIRONMENTS WITHIN CORPORATE

10:58AM  5    ENVIRONMENTS, YOU HAVE DIFFERENT TYPES OF SETUPS.

10:58AM  6         SO THE ONE THAT IS ACTUALLY RUNNING, THAT USERS ARE

10:58AM  7    INTERACTING WITH AND MAKING, YOU KNOW, DECISIONS ON IS CALLED

10:58AM  8    THE PRODUCTION SYSTEM, AND IT'S GENERALLY VERY SECURE AND

10:58AM  9    CHANGES ARE NOT ALLOWED TO IT.

10:58AM 10         YOU THEN ALSO HAVE TEST SYSTEMS TO ALLOW NEW VERSIONS OF

10:58AM 11    THE SYSTEM TO BE TESTED, AND NORMALLY IF, IN FACT, THE COMPANY

10:58AM 12    IS DEVELOPING THAT SYSTEM, CREATING THE SOFTWARE OR DESIGNING

10:58AM 13    THE DATABASE, THEY'LL HAVE DEVELOPMENT SYSTEMS AS WELL.

10:58AM 14         SO KIND OF THINK OF IT AS AN ASSEMBLY LINE.  THE

10:58AM 15    DEVELOPMENT TEAM ROLLS OUT A NEW VERSION IN THE DEVELOPMENT

10:58AM 16    SYSTEMS AND THEY PLACE IT ON A TEST AND GET EVERYONE TO SIGN

10:59AM 17    OFF ON IT, AND THEN IT GOES INTO THE SECURE PRODUCTION

10:59AM 18    ENVIRONMENT.

10:59AM 19    Q.   OKAY.  YOU MENTIONED SOMETHING ELSE AS WELL.  YOU

10:59AM 20    MENTIONED THAT ONE OF THE ASSUMPTIONS THAT INFORMED YOUR

10:59AM 21    OPINIONS IS THAT THE GOVERNMENT RECEIVED A BACKUP COPY.

10:59AM 22         DID I HEAR THAT RIGHT?

10:59AM 23    A.   MATERIAL THAT I REVIEWED HAS VARIOUS CORRESPONDENCE, AND

10:59AM 24    PRIMARILY EMAIL, THAT DISCUSS A USB DEVICE, I THINK ACTUALLY

10:59AM 25    MORE THAN ONE, AND THE LAST BACKUP OF THE LIS DATABASE WAS

SONNIER DIRECT BY MR. BRECHER                                      6733

10:59AM  1    PLACED ON EACH OF THESE EXTERNAL DISK DRIVES.

10:59AM  2         THOSE DISK DRIVES THEN WERE FULLY ENCRYPTED, AND SOME OF

10:59AM  3    THE INFORMATION, IT'S MY UNDERSTANDING, WAS CONFIDENTIAL IN THE

10:59AM  4    LIS DATABASE.

10:59AM  5         AND SO THEN THOSE UNITS WERE DELIVERED TO VARIOUS

11:00AM  6    ATTORNEYS, AND ULTIMATELY ONE OR MORE COPIES MADE ITS WAY TO

11:00AM  7    THE GOVERNMENT.

11:00AM  8    Q.   ALL RIGHT.  SO YOU SAID "ONE OR MORE OF THESE BACKUP

11:00AM  9    COPIES WENT TO THE GOVERNMENT."

11:00AM  10   A.   YES.

11:00AM  11   Q.   DO YOU HAVE AN UNDERSTANDING OF WHETHER OR NOT THE DEFENSE

11:00AM  12   ALSO GOT THIS COPY?

11:00AM  13   A.   THAT'S MY UNDERSTANDING.

11:00AM  14   Q.   OKAY.  AND I GUESS, MR. SONNIER, WHY AREN'T WE DEALING

11:00AM  15   WITH THIS COPY IN YOUR UNDERSTANDING?

11:00AM  16   A.   FROM THE MATERIALS THAT I REVIEWED, THERE WERE SEVERAL

11:00AM  17   DIFFICULTIES WITH ACCESSING THE INFORMATION ON THIS EXTERNAL

11:00AM  18   DRIVE.

11:00AM  19        THE FIRST STUMBLING BLOCK SEEMED TO BE THE FACT THAT THE

11:00AM  20   ENTIRE DRIVE WAS ENCRYPTED.  THAT SEEMED TO CAUSE SOME DELAY IN

11:00AM  21   ACCESSING IT.

11:00AM  22        IT SEEMS LIKE, THOUGH, THE PASSWORD TO UNLOCK THAT

11:00AM  23   ENCRYPTION WAS AVAILABLE AND EVERYBODY WAS POTENTIALLY ABLE TO

11:01AM  24   DECRYPT THE OVERALL DRIVE.

11:01AM  25        THE SECOND PROBLEM SEEMED TO BE THAT THE BACKUP WAS VERY

SONNIER DIRECT BY MR. BRECHER                                          6734

11:01AM 1    LARGE, AND THE VARIOUS SOFTWARE THAT WAS BEING UTILIZED, AT

11:01AM 2    LEAST AT THE GOVERNMENT FACILITIES, HAD A LIMITATION AND

11:01AM 3    COULDN'T PROCESS A SQL DATABASE BACKUP THAT LARGE.

11:01AM 4         FARTHER DOWN THE ROAD, MAYBE TWO YEARS LATER, IT WAS

11:01AM 5    REALIZED THAT EVEN AFTER DECRYPTING THE DRIVE AND ACCESSING

11:01AM 6    THESE LARGE BACKUPS WITH APPROPRIATE SOFTWARE, THAT THE BACKUP

11:01AM 7    ITSELF WAS SEPARATELY AND SORT OF INDEPENDENTLY ENCRYPTED AND A

11:02AM 8    SECOND PASSWORD WAS NEEDED TO ACTUALLY RECOVER THAT BACKUP TO A

11:02AM 9    RUNNING SQL SERVER WHERE YOU COULD ACTUALLY ACCESS THE DATA.

11:02AM 10   Q.   AND, MR. SONNIER, WERE YOU GIVEN ACCESS TO THIS BACKUP

11:02AM 11   COPY TO EXAMINE?

11:02AM 12   A.   YES.  I WAS GIVEN ACCESS REMOTELY WHILE THE DEVICE WAS

11:02AM 13   RESIDING IN THE ATTORNEY'S OFFICE AND I PERFORMED THE

11:02AM 14   DECRYPTION OF THE OVERALL DISK DRIVE AND ACCESSED THE FILES ON

11:02AM 15   IT.

11:02AM 16   Q.   AND WHAT ABOUT THAT SECOND LAYER OF ENCRYPTION THAT YOU

11:02AM 17   MENTIONED?  DID YOU EVER TRY TO GET PAST THAT?

11:02AM 18   A.   YES.  IN THE REVIEW MATERIAL, THERE WAS AT LEAST ONE

11:02AM 19   DOCUMENT THAT HAD A LOT OF PASSWORDS THAT POTENTIALLY COULD

11:02AM 20   HAVE BEEN THE PASSWORD NEEDED TO RECOVER THE BACKUP OR RESTORE

11:03AM 21   IT.

11:03AM 22        AND SO I COPIED A FEW OF THE FILES OFF THE EXTERNAL DISK

11:03AM 23   DRIVE OVER TO MY OFFICE AND THEN PROCEEDED TO TRY THOSE

11:03AM 24   PASSWORDS THAT WERE IN THE MATERIAL.

11:03AM 25   Q.   WHY DID YOU DO THAT, SIR?

11:03AM 1     A.   I WAS ASKED TO BY THE ATTORNEYS.

11:03AM 2     Q.   OKAY.  THAT'S OUR TEAM?

11:03AM 3     A.   YES.

11:03AM 4     Q.   OKAY.  AND WHAT WERE THE RESULTS?

11:03AM 5     A.   UNFORTUNATELY NONE OF THE PASSWORDS FROM THE MATERIALS

11:03AM 6     THAT I REVIEWED WORKED TO RECOVER THE DATA.

11:03AM 7     Q.   SO, MR. SONNIER, YOU SAID THAT YOU ASSUMED THAT THERANOS

11:03AM 8     HAD PROVIDED THIS BACKUP COPY TO THE GOVERNMENT; IS THAT RIGHT?

11:03AM 9     A.   YEAH.  THE INFORMATION THAT I SAW INDICATED THAT IT WENT

11:03AM 10    TO THE THERANOS ATTORNEY AND THAT THE ATTORNEY FOR THERANOS HAD

11:03AM 11    FORWARDED IT ON BY COURIER.

11:03AM 12    Q.   OKAY.  AND THAT SAME COPY WAS LATER GIVEN TO THE DEFENSE

11:04AM 13    AS WELL?

11:04AM 14    A.   SO I THINK THERE WERE INDEPENDENT COPIES, IDENTICAL, AND I

11:04AM 15    THINK DIFFERENT PHYSICAL DEVICES WENT TO DIFFERENT PLACES.

11:04AM 16    Q.   I SEE.  BUT IDENTICAL COPIES?

11:04AM 17    A.   YES.  ALL OF THE INFORMATION INDICATES THAT HE COPIED THE

11:04AM 18    EXACT SAME FILES TO ALL OF THE DEVICES.

11:04AM 19    Q.   AND, MR. SONNIER, IN YOUR OPINIONS TODAY, YOU DON'T FAULT

11:04AM 20    THE GOVERNMENT FOR NOT BEING ABLE TO OPEN THIS COPY, DO YOU?

11:04AM 21    A.   NO.  THIS SORT OF THING HAPPENS PERIODICALLY IN THE

11:04AM 22    INDUSTRY.

11:04AM 23    Q.   OKAY.  AND I THINK YOU JUST TESTIFIED THAT YOU WERE NOT

11:04AM 24    ABLE TO OPEN IT EITHER?

11:04AM 25    A.   THAT'S CORRECT.

ER-4978

11:04AM   1   Q.   OKAY.  DO YOU HAVE AN UNDERSTANDING -- OR TO YOUR

11:04AM   2   KNOWLEDGE, HAS IT EVER BEEN OPENED?

11:04AM   3   A.   NONE OF THE MATERIALS THAT I'VE SEEN INDICATE ANYONE WAS

11:04AM   4   SUCCESSFUL IN RESTORING THAT BACKUP.

11:04AM   5   Q.   OKAY.  I'M SORRY.  I SHOULD HAVE ASKED, YOU SAID THIS COPY

11:04AM   6   WAS PROVIDED IN I THINK YOU SAID AUGUST 2018?

11:05AM   7   A.   YES.

11:05AM   8   Q.   DO YOU HAVE AN UNDERSTANDING AS TO WHETHER MR. BALWANI WAS

11:05AM   9   AT THERANOS IN AUGUST 2018?

11:05AM  10          MR. BOSTIC:  OBJECTION.  FOUNDATION.

11:05AM  11          THE COURT:  SUSTAINED.

11:05AM  12   BY MR. BRECHER:

11:05AM  13   Q.   MR. SONNIER, LET'S TURN TO I GUESS THE SUBSTANCE OF WHAT

11:05AM  14   YOU'RE HERE TO TALK ABOUT.  WE'VE ADDRESSED THIS COPY.

11:05AM  15          IS THAT THE END OF THE MATTER?

11:05AM  16   A.   SO FROM WHAT I WAS ASKED TO DO, THE BACKUP COPY WAS SORT

11:05AM  17   OF A DISTRACTION.  FROM MY ORIGINAL REVIEW OF THE MATERIAL, I

11:05AM  18   SORT OF CONCLUDED THAT THE BEST WAY WOULD BE TO SORT OF GO TO

11:05AM  19   THE SOURCE OF THAT BACKUP AND NOT WORRY ABOUT THE BACKUP

11:05AM  20   ITSELF.

11:05AM  21          OBVIOUSLY IF YOU COULD GET THE BACKUP RESTORED, THEN THAT

11:05AM  22   WOULD BE GREAT.  BUT IT SEEMED LIKE A LOT OF PEOPLE HAD ALREADY

11:05AM  23   TRIED AND WERE UNSUCCESSFUL.

11:05AM  24          SO I THOUGHT YOU SHOULD GO AFTER THE PRODUCTION SERVERS

11:05AM  25   THEMSELVES.

SONNIER DIRECT BY MR. BRECHER                                    6737

11:05AM  1    Q.   OKAY.  AND WHEN YOU DESCRIBED THIS OPINION IN HIGH LEVEL

11:06AM  2    FORM EARLIER, I THINK YOU DREW A DISTINCTION BETWEEN

11:06AM  3    AUGUST 2018 AND BEFORE AND AFTER THAT DATE.

11:06AM  4         WHY DID YOU SAY THAT, SIR?

11:06AM  5    A.   IN THE MATERIALS THAT I REVIEWED, IT WAS VERY CLEAR THAT

11:06AM  6    THERE WERE STILL PEOPLE ACCESSING THE DATABASE ALL OF THE WAY

11:06AM  7    THROUGH THE END OF AUGUST 2018.

11:06AM  8         SO IT WAS UP AND RUNNING AND IT WAS FULLY FUNCTIONAL, AND

11:06AM  9    OBVIOUSLY THAT WOULD BE AN IDEAL SITUATION TO GO AND EXTRACT

11:06AM  10   THE DATA, WHATEVER DATA YOU WANTED OUT OF IT.

11:06AM  11        AT THE END OF AUGUST 2018, AT THE DIRECTION OF THERANOS,

11:06AM  12   THE THERANOS CONTRACTOR DISASSEMBLED THE SYSTEM, SO TURNED IT

11:06AM  13   OFF, UNPLUGGED IT TO PROTECT THE CONFIDENTIAL INFORMATION --

11:06AM  14             MR. BOSTIC:  OBJECTION.  FOUNDATION.

11:06AM  15             THE COURT:  SUSTAINED.

11:06AM  16   BY MR. BRECHER:

11:06AM  17   Q.   SO, MR. SONNIER, LET'S FOCUS ON THAT PERIOD AFTER 2018.  I

11:07AM  18   THINK WE'VE ESTABLISHED YOUR ASSUMPTION THAT THE SYSTEM WAS

11:07AM  19   DISASSEMBLED; IS THAT FAIR?

11:07AM  20   A.   CORRECT.

11:07AM  21   Q.   OKAY.  COULD YOU STILL GET THIS DATA AFTER IT WAS

11:07AM  22   DISASSEMBLED?

11:07AM  23   A.   YES.  SO RIGHT AFTER IT WAS ASSEMBLED, YOU COULD JUST --

11:07AM  24   DISASSEMBLED, YOU COULD REVERSE THE PROCESS AND REASSEMBLE IT.

11:07AM  25   Q.   COULD YOU BRIEFLY WALK US THROUGH THOSE STEPS?  WHAT DOES

SONNIER DIRECT BY MR. BRECHER                                                          6738

11:07AM  1     THAT ENTAIL?

11:07AM  2     A.   SO IN THE MATERIALS I REVIEWED, THEY SEPARATED THE HARD

11:07AM  3     DRIVES OUT AND THE EQUIPMENT IN DIFFERENT PLACES.  SO YOU WOULD

11:07AM  4     GO TO THE STORAGE LOCATIONS AND RETRIEVE THOSE PIECES, BRING

11:07AM  5     THEM BACK TO A COMMON LOCATION.  YOU WOULD UTILIZE THE

11:07AM  6     INVENTORY THAT I MENTIONED EARLIER, WHICH ESSENTIALLY TELLS YOU

11:07AM  7     WHAT SIZE AND WHAT SPEED, EVEN THE SERIAL NUMBERS OF THE DISK

11:07AM  8     DRIVES THAT GO INTO VARIOUS PIECES OF EQUIPMENT.

11:08AM  9         SO IT'S A BIT OF LIKE A PUZZLE.  YOU HAVE A BUNCH OF HOLES

11:08AM 10     IN THAT RACK DIAGRAM THAT WE TALKED ABOUT BEFORE WHERE THE DISK

11:08AM 11     DRIVES GO, AND YOU USE THE INVENTORY INFORMATION TO PUT IT BACK

11:08AM 12     TOGETHER, YOU KNOW, PLUG IT IN THE RIGHT SPOT.

11:08AM 13         IN SOME CASES YOU MAY NEED TO EXAMINE THE HARD DRIVE SORT

11:08AM 14     OF AT A LOW LEVEL FORENSICALLY JUST TO READ THE META DATA OFF

11:08AM 15     OF IT IN ORDER TO FIGURE OUT, YOU KNOW, WHERE IN THE JIGSAW

11:08AM 16     THAT THAT PARTICULAR PIECE PLUGS IN.

11:08AM 17     Q.   AND YOU USED A TERM JUST NOW, "META DATA."  WHAT ARE YOU

11:08AM 18     TALKING ABOUT NOW IN THIS CONTEXT, SIR?

11:08AM 19     A.   SO IN THESE ENTERPRISE SYSTEMS, THE DISK DRIVES ALL HAVE A

11:08AM 20     PORTION OF THEM RESERVED FOR SYSTEM INFORMATION ABOUT THAT

11:08AM 21     DRIVE'S PURPOSE AND FUNCTION.  IT'S DATA, BUT THAT NO USER

11:09AM 22     WOULD EVER LOOK AT.

11:09AM 23         AND IT'S STRICTLY HIDDEN, IF YOU WILL, ON THE DRIVE SO

11:09AM 24     THAT WHEN THE DRIVE IS FIRST ACCESSED BY THE SYSTEM, THE SYSTEM

11:09AM 25     CAN SAY WHAT THE PURPOSE OF THAT DRIVE IS FOR.

ER-4981

11:09AM 1     SO I CALL THAT META DATA.  IT'S NOT USER DATA, BUT IT'S

11:09AM 2  JUST SORT OF SYSTEM DATA ABOUT THAT DRIVE'S PURPOSE.

11:09AM 3  Q.   AND YOU WERE SAYING A BIT MORE ABOUT THE PROCESS OF

11:09AM 4  REASSEMBLING THE CONSTITUENT PARTS AND MAKING SURE THEY ALL

11:09AM 5  WENT IN THE RIGHT ORDER.  COULD YOU SAY MORE ABOUT THAT,

11:09AM 6  PLEASE.

11:09AM 7  A.   SURE.  SO THERE -- ACCORDING TO THE INVENTORY, THERE WERE

11:09AM 8  SERVER DISK DRIVES, AND THOSE WERE A PARTICULAR SIZE AND SPEED,

11:09AM 9  AND THEY WOULD HAVE BEEN IN A PARTICULAR CADDY FROM THE

11:09AM 10 MANUFACTURER THAT WOULD HAVE BEEN DISTINCT AND MATCHED UP WITH

11:09AM 11 THE EQUIPMENT.

11:09AM 12    AND THEN THE ACTUAL DATA STORAGE WOULD HAVE BEEN ON THE

11:10AM 13 DISK THAT WENT INTO THAT DISK ARRAY, AND THOSE WERE A DIFFERENT

11:10AM 14 TYPE OF EQUIPMENT, STILL FROM THE SAME COMPUTER MANUFACTURER,

11:10AM 15 AND THEY WOULD HAVE BEEN DIFFERENT CADDIES AND DIFFERENT SPEED

11:10AM 16 AND SIZES AND DIFFERENT TYPES OF DISK DRIVES.

11:10AM 17    AND SO ALTOGETHER YOU COULD THEN SAY, OKAY, THESE ARE

11:10AM 18 SERVERS, THESE ARE DATA DRIVES, AND YOU COULD PLUG THEM INTO

11:10AM 19 THE DATA ARRAY OR INTO THE SERVER ARRAY.

11:10AM 20 Q.   OKAY.  AND, MR. SONNIER, THE OTHER THOUGHT, WHAT ABOUT

11:10AM 21 THIS MISSING PASSWORD ISSUE?  WOULD THAT AFFECT YOUR ABILITY TO

11:10AM 22 RECOVER THE DATA?

11:10AM 23 A.   NO.  AS I KIND OF MENTIONED EARLIER, THE PASSWORD ISSUE IS

11:10AM 24 REALLY RELATED TO RECOVERING OF THE BACKUP OF THE SQL SERVER,

11:10AM 25 AND IT DOESN'T HAVE ANY ROLE IN THIS PROCESS.

SONNIER DIRECT BY MR. BRECHER                              6740

11:10AM  1    Q.  WHAT ABOUT OTHER FORMS OF ENCRYPTION THAT MAY BE IN PLACE?

11:10AM  2    A.  ACCORDING TO THE MATERIALS I REVIEWED, THE DATABASE ITSELF

11:11AM  3    WAS ENCRYPTED AT REST, AND SO THERE ARE ENCRYPTION KEYS, BUT

11:11AM  4    ALL OF THOSE KEYS WERE ON THE PRODUCTION SYSTEM ON THE SERVER

11:11AM  5    DISK DRIVES THAT I'VE JUST MENTIONED.

11:11AM  6    Q.  AND IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF A

11:11AM  7    TYPICAL ARCHITECTURE FOR A SYSTEM LIKE THIS?

11:11AM  8    A.  YEP, IT'S STRAIGHT DOWN MICROSOFT VENDORS TECHNICAL

11:11AM  9    DOCUMENTATION.  THAT'S EXACTLY HOW IT WOULD WORK.

11:11AM  10   Q.  OKAY.  BUT IN FAIRNESS, MR. SONNIER, YOU NEVER EXAMINED --

11:11AM  11   LET ME ASK IT THIS WAY:  DID YOU EVER EXAMINE THE PHYSICAL LIS

11:11AM  12   PRODUCTION?

11:11AM  13   A.  NO, I ONLY EXAMINED CERTAIN DOCUMENTS.

11:11AM  14   Q.  HOW THEN CAN YOU BE CONFIDENT THAT THERE'S NO OTHER

11:11AM  15   SOFTWARE OR ENCRYPTION THAT WOULD PREVENT OUR ABILITY TO ACCESS

11:11AM  16   THIS DATA?

11:11AM  17   A.  BECAUSE WE'RE USING STANDARD MICROSOFT SQL SERVER, THERE'S

11:12AM  18   REALLY -- AND A PARTICULAR FEATURE OF THAT STANDARD SOFTWARE,

11:12AM  19   THERE'S REALLY ONLY ONE WAY THAT THAT STANDARD FEATURE CAN

11:12AM  20   WORK.

11:12AM  21   Q.  AND WHAT ABOUT MODIFICATIONS TO, SAY, THE DEVELOPMENT

11:12AM  22   SOFTWARE FOR THE LIS?  HOW WOULD THAT AFFECT YOUR OPINIONS?

11:12AM  23   A.  SO THE DEVELOPMENT SOFTWARE IS REALLY INDEPENDENT OF THE

11:12AM  24   STANDARD SQL SERVER FOR MICROSOFT.

11:12AM  25        SO IT WAS -- THE TERM WE USE WAS THE APPLICATION PROGRAM,

SONNIER DIRECT BY MR. BRECHER 6741

11:12AM 1 AND IT WOULD HAVE USED THE DATABASE, BUT IT DOESN'T REALLY

11:12AM 2 CHANGE THE OPERATIONS OF THE SQL SERVER.

11:12AM 3 IT DEPENDS ON THOSE OPERATIONS, BUT IT DOESN'T, IT DOESN'T

11:12AM 4 MODIFY THEM, CERTAINLY NOT AT THE DATA STORAGE ENCRYPTION

11:12AM 5 LEVEL.

11:12AM 6 Q. AND IS THAT CONCLUSION BASED ON YOUR TRAINING AND

11:12AM 7 EXPERIENCE?

11:12AM 8 A. ABSOLUTELY.

11:12AM 9 Q. IS IT ALSO CONSISTENT WITH THE UNDERLYING MATERIALS THAT

11:12AM 10 YOU'VE REVIEWED IN THIS CASE?

11:12AM 11 A. YES, IT IS.

11:12AM 12 Q. I'M GOING TO ASK YOU TO TURN IN YOUR BINDER TO ANOTHER

11:13AM 13 TAB. THIS ONE IS MARKED 20832. LET ME KNOW WHEN YOU'RE THERE,

11:13AM 14 SIR.

11:13AM 15 A. 20832. OKAY.

11:13AM 16 Q. ARE YOU THERE, MR. SONNIER?

11:13AM 17 A. YES, I AM.

11:13AM 18 Q. GREAT.

11:13AM 19 AND I'M GOING TO ASK YOU TO LOOK AT PAGE 2 OF THAT

11:13AM 20 EXHIBIT.

11:13AM 21 DO YOU SEE THAT THIS IS AN EMAIL SENT OCTOBER 5TH, 2018?

11:13AM 22 A. YES.

11:13AM 23 Q. AND DO YOU SEE THAT THE SENDER IS SOMEONE NAMED

11:13AM 24 SUTTON PEIRCE?

11:13AM 25 A. YES.

11:13AM 1    Q.   AND THE RECIPIENTS ARE ON THE TO LINE, JEFF SCHENK,

11:13AM 2    ROBERT LEACH, AND JOHN BOSTIC?

11:13AM 3    A.   YES.

11:13AM 4    Q.   AND DO YOU UNDERSTAND THOSE TO BE THE PROSECUTORS IN THIS

11:13AM 5    CASE?

11:13AM 6    A.   THAT'S MY UNDERSTANDING.

11:13AM 7    Q.   OKAY.

11:13AM 8         YOUR HONOR, THE DEFENSE OFFERS EXHIBIT 20832 SOLELY FOR

11:13AM 9    NOTICE TO THE GOVERNMENT.

11:14AM 10             MR. BOSTIC:  401, YOUR HONOR.

11:14AM 11             THE COURT:  EACH PAGE?  WHAT ARE YOU OFFERING?

11:14AM 12             MR. BRECHER:  PAGES 2 THROUGH 4.

11:14AM 13             THE COURT:  AND THIS IS BEING OFFERED NOT FOR THE

11:14AM 14   TRUTH OF THE MATTER ASSERTED?

11:14AM 15             MR. BRECHER:  THAT'S CORRECT, YOUR HONOR, SOLELY AS

11:14AM 16   NOTICE TO THE GOVERNMENT.

11:14AM 17             THE COURT:  AS TO WHAT ISSUE?

11:14AM 18             MR. BRECHER:  AS TO THE METHODS OF RECOVERING --

11:14AM 19   POSSIBLE METHODS FOR RECOVERING THE LIS SYSTEM.

11:14AM 20             THE COURT:  AS TO POSSIBLE ROUTES FORWARD AS

11:14AM 21   INDICATED IN THE DOCUMENT?

11:14AM 22             MR. BRECHER:  THAT'S RIGHT, YOUR HONOR.

11:14AM 23             THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

11:14AM 24   DOCUMENT WILL BE ADMITTED NOT FOR THE TRUTH OF THE MATTER

11:14AM 25   ASSERTED IN THE EMAIL, BUT ONLY AS TO THE ISSUE OF NOTICE IN

SONNIER DIRECT BY MR. BRECHER                                6743

11:14AM  1    REGARDS TO POSSIBLE ROUTES FORWARD.

11:14AM  2         THE OTHER PAGES, PAGE 3 AND 4, ARE YOU OFFERING THOSE FOR

11:14AM  3    THE TRUTH OF THE MATTER ASSERTED?

11:14AM  4              MR. BRECHER:  NO, YOUR HONOR, JUST AS CONTEXT FOR

11:14AM  5    THE NOTICE TO SHOW -- I THINK IT'S THE ATTACHMENT TO THIS

11:15AM  6    EMAIL.

11:15AM  7              THE COURT:  ALL RIGHT.  SO PAGES 3 AND 4 LIKEWISE,

11:15AM  8    LADIES AND GENTLEMEN, ARE NOT OFFERED FOR THE TRUTH OF THE

11:15AM  9    MATTER ASSERTED.  THERE MAY BE TESTIMONY REGARDING THOSE PAGES,

11:15AM  10   BUT IT IS NOT RELATED TO THE TRUTH.  IT ONLY GOES, AS

11:15AM  11   MR. BRECHER SAYS, FOR CONTEXTUAL PURPOSES ONLY, AND IT WILL BE

11:15AM  12   ADMITTED WITH THOSE LIMITATIONS.

11:15AM  13        IT'S ADMITTED, AND IT MAY BE PUBLISHED.

11:15AM  14        (DEFENDANT'S EXHIBIT 20832 WAS RECEIVED IN EVIDENCE.)

11:15AM  15              MR. BRECHER:  THANK YOU, YOUR HONOR.

11:15AM  16        SO, MR. ALLEN, LET'S START ON THIS FIRST PAGE.

11:15AM  17   Q.   DO YOU SEE UP AT THE HEADING UNDER ATTACHMENTS IT SAYS

11:15AM  18   THERANOSSEAGATEDRIVE.PDF?

11:15AM  19   A.   YES.

11:15AM  20   Q.   OKAY.  AND LET ME ASK YOU TO TURN VERY BRIEFLY TO PAGE 4

11:15AM  21   OF THE DOCUMENT.

11:15AM  22   A.   UH-HUH.

11:15AM  23   Q.   AND IT WILL BE ON YOUR SCREEN AS WELL.  DO YOU RECOGNIZE

11:15AM  24   THIS?  HAVE YOU SEEN IT YOURSELF?

11:15AM  25   A.   WHEN I DID MY WORK WITH THE USB DRIVE AND RAN THE

11:16AM  1    DECRYPTION THE PASSWORD, THIS IS THE EXACT SAME FOLDER LISTING

11:16AM  2    THAT I SAW.

11:16AM  3    Q.   AND WHEN YOU SAY "THE USB DRIVE," YOU'RE REFERRING TO THIS

11:16AM  4    ENCRYPTED COPY OF THE BACKUP?

11:16AM  5    A.   YES.  IT WAS ONE OF THE ENCRYPTED COPIES THAT WE SPOKE OF

11:16AM  6    EARLIER.

11:16AM  7    Q.   AND IS THAT WHAT YOU UNDERSTAND TO BE THE SUBJECT OF THIS

11:16AM  8    EMAIL?

11:16AM  9    A.   YES.

11:16AM  10   Q.   OKAY.  LET'S GO BACK, MR. ALLEN, TO PAGE 2 ON THE SCREEN.

11:16AM  11        STARTING AT THE TOP, IT SAYS, "HELLO TEAM,

11:16AM  12        "I'M WRITING TO OUTLINE THE ISSUES SURROUNDING THIS DRIVE

11:16AM  13   AND TO PROPOSE SOME POSSIBLE PATHS TOWARD RESOLUTION."

11:16AM  14        DO YOU SEE THAT?

11:16AM  15   A.   YES.

11:16AM  16   Q.   AND THEN UNDER THE FIRST BOLDED HEADING, WHAT THE DRIVE

11:16AM  17   CONTAINS, YOU SEE THE FIRST BULLET, "IN THIS CIRCUMSTANCE IT'S

11:16AM  18   MOST LIKELY THAT THE .BAK EXTENSION INDICATES THAT THESE ARE

11:17AM  19   BACKUP FILES FOR A MICROSOFT SQL DATABASE."

11:17AM  20        DID I READ THAT RIGHT?

11:17AM  21   A.   YES.

11:17AM  22   Q.   OKAY.  AND THEN THE NEXT BULLET DOWN, "IF THAT'S CORRECT

11:17AM  23   THESE FILES WOULD BE USED TO RESTORE DATABASE BACKUPS ON A

11:17AM  24   MICROSOFT SQL SERVER."

11:17AM  25        DO YOU SEE THAT?

11:17AM   1     A.   YES.

11:17AM   2     Q.   OKAY.  LET'S LOOK DOWN TO THE THIRD AND FINAL BULLET

11:17AM   3     HEADING, "POSSIBLE ROUTES FORWARD."

11:17AM   4          ARE YOU THERE WITH ME, MR. SONNIER?

11:17AM   5     A.   YES.

11:17AM   6     Q.   AND THE FIRST BULLET SAYS, "PUSH BACK ON DEFENSE AND SEE

11:17AM   7     IF THEY CAN BE PERSUADED TO PRODUCE THIS IN A MANNER THAT CAN

11:17AM   8     BE VIEWED AND PROCESSED IN A STANDARD WAY RATHER THAN IN AN

11:17AM   9     UNSPECIFIED ARCHIVE FORMAT THAT WE CAN'T ACCESS."

11:17AM   10         DO YOU SEE THAT?

11:17AM   11    A.   YES.

11:17AM   12    Q.   AND THEN IT LOOKS LIKE THERE'S A SUBBULLET UNDER THAT.

11:17AM   13    "IF THEY CAN'T FIGURE OUT HOW TO PRODUCE THE CONTENTS OF THEIR

11:17AM   14    DATABASE IN A LEGITIMATE MANNER, PERHAPS THEY'LL CONSIDER

11:17AM   15    HANDING OVER THEIR PHYSICAL SQL SERVER AND WE CAN SET IT UP IN

11:18AM   16    A WORKROOM?"

11:18AM   17         DO YOU SEE THAT?

11:18AM   18    A.   YES.

11:18AM   19    Q.   AND THEN THE NEXT BULLET DOWN, "CHECK WITH THE FBI (OR

11:18AM   20    OTHER AGENCIES) TO SEE IF THEY HAVE A RESOURCE THAT CAN PROCESS

11:18AM   21    LARGE SQL DATABASE ARCHIVES."

11:18AM   22    A.   YES.

11:18AM   23    Q.   AND THEN THE FINAL MAIN BULLET, "IDENTIFY A VENDOR WHO

11:18AM   24    COULD PROCESS THE MATERIAL."

11:18AM   25         DO YOU SEE THAT?

11:18AM  1    A.   YES.

11:18AM  2    Q.   AND LET'S START WITH THAT "IDENTIFY A VENDOR" BULLET.

11:18AM  3         DO YOU AGREE WITH THAT AS A POSSIBLE ROUTE TO RECOVERING

11:18AM  4    THIS DATA?

11:18AM  5    A.   SURE, THAT'S REASONABLE.

11:18AM  6    Q.   ARE YOU SUCH A VENDOR?

11:18AM  7    A.   YES, I AM.

11:18AM  8    Q.   OKAY.  GIVEN THE CIRCUMSTANCES AS YOU UNDERSTOOD THEM,

11:18AM  9    WHAT KIND OF ADVICE WOULD YOU HAVE GIVEN IF YOU HAD BEEN

11:18AM  10   CONSULTED AT THIS TIME?

11:18AM  11             MR. BOSTIC:  RELEVANCE.  CALLS FOR SPECULATION.

11:18AM  12             THE COURT:  SUSTAINED.

11:18AM  13             MR. BRECHER:  ALL RIGHT.

11:18AM  14   Q.   MR. SONNIER, LET'S LOOK AT THE FIRST BULLET, "PUSH BACK ON

11:19AM  15   DEFENSE," AND THEN THE SUBBULLET AFTER THAT.

11:19AM  16        IF THEY CAN'T FIGURE OUT HOW TO PRODUCE THE CONTENTS OF

11:19AM  17   THEIR DATABASE, PERHAPS THEY CAN FIGURE OUT HOW TO HANDLE THEIR

11:19AM  18   SQL SERVER AND WE CAN SET IT UP IN A WORKROOM.

11:19AM  19        WOULD THAT HAVE WORKED?

11:19AM  20   A.   YES, THAT WOULD HAVE WORKED.

11:19AM  21   Q.   AND IS THAT KIND OF WHAT WE HAVE BEEN TALKING ABOUT HERE?

11:19AM  22   A.   YES.

11:19AM  23   Q.   AND SO, MR. SONNIER, KIND OF BOTTOM LINE, WHAT IS YOUR

11:19AM  24   CONCLUSION ABOUT THE RECOVERABILITY OF THE LIS SYSTEM IN THIS

11:19AM  25   2018 TIME PERIOD?

11:19AM 1    A.   THAT IT WOULD HAVE BEEN POSSIBLE TO GET PRODUCTION TO THE

11:19AM 2    SQL SERVER AND THEN EXTRACT THE DATA FROM THAT.

11:19AM 3    Q.   AND WHAT EFFECT, IF ANY, DOES THE DISASSEMBLY OF THE

11:19AM 4    SYSTEM HAVE ON YOUR OPINION?

11:19AM 5    A.   IT DOESN'T CHANGE IT.  IT MIGHT HAVE MADE IT A LITTLE MORE

11:19AM 6    TIME CONSUMING BECAUSE YOU HAVE TO PUT THE PIECES BACK

11:19AM 7    TOGETHER.

11:19AM 8    Q.   THANK YOU.

11:19AM 9         MAY I HAVE A MOMENT, YOUR HONOR?

11:19AM 10            THE COURT:  YES.

11:20AM 11         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

11:20AM 12            MR. BRECHER:  THANK YOU VERY MUCH, MR. SONNIER.

11:20AM 13         NO FURTHER QUESTIONS.

11:20AM 14            THE COURT:  CROSS-EXAMINATION?

11:20AM 15            MR. BOSTIC:  YES, YOUR HONOR.

11:20AM 16                      **CROSS-EXAMINATION**

11:20AM 17    BY MR. BOSTIC:

11:20AM 18    Q.   GOOD MORNING, MR. SONNIER.  I'M JOHN BOSTIC AND I

11:21AM 19    REPRESENT THE UNITED STATES IN THIS CASE.

11:21AM 20    A.   NICE TO MEET YOU.

11:21AM 21    Q.   I HAVE A FEW QUESTIONS FOR YOU FOLLOWING UP ON THE TOPICS

11:21AM 22    THAT YOU DISCUSSED IN YOUR DIRECT EXAMINATION.

11:21AM 23         I'D LIKE TO START WITH YOUR STATUS AT A RETAINED EXPERT.

11:21AM 24    LET'S TALK ABOUT THAT.

11:21AM 25         YOU'RE HERE TODAY BECAUSE YOU WERE HIRED BY THE

SONNIER CROSS BY MR. BOSTIC                                          6748

11:21AM  1    DEFENDANT'S LAWYERS TO DELIVER AN OPINION ABOUT SQL DATABASES;

11:21AM  2    IS THAT CORRECT?

11:21AM  3    A.   YES.

11:21AM  4    Q.   AND BEFORE BEING CONTACTED BY THE DEFENSE IN THIS CASE,

11:21AM  5    DID YOU HAVE ANY KNOWLEDGE ABOUT THE TECHNICAL SYSTEMS

11:21AM  6    OPERATING AT THERANOS?

11:21AM  7    A.   NO.

11:21AM  8    Q.   DID YOU EVEN KNOW, BEFORE YOU SPOKE TO THE DEFENSE

11:21AM  9    LAWYERS, THAT THERANOS HAD A SQL DATABASE AT ALL?

11:21AM 10    A.   NO, I DID NOT.

11:21AM 11    Q.   THE FACT THAT YOU'RE HIRED AS AN EXPERT WITNESS MEANS

11:21AM 12    THAT, UNLIKE A NORMAL FACT WITNESS, YOU'RE PAID FOR YOUR

11:21AM 13    SERVICES; IS THAT RIGHT?

11:21AM 14    A.   YES.

11:21AM 15    Q.   AND YOU TESTIFIED ON DIRECT THAT YOU'RE COMPENSATED AT A

11:21AM 16    RATE OF $300 PER HOUR FOR YOUR WORK ON THIS CASE?

11:22AM 17    A.   THAT'S WHAT MY TIME IS BILLED AT, YES.

11:22AM 18    Q.   AND WHEN WERE YOU FIRST RETAINED BY THE DEFENSE TO WORK ON

11:22AM 19    THIS MATTER?

11:22AM 20    A.   SEPTEMBER LAST YEAR, 2021.

11:22AM 21    Q.   AND SINCE THEN, CAN YOU ESTIMATE FOR US EITHER THE NUMBER

11:22AM 22    OF TOTAL HOURS THAT YOU SPENT WORKING ON THIS MATTER, OR THE

11:22AM 23    TOTAL AMOUNT THAT YOU BILLED, WHICHEVER IS EASIER?

11:22AM 24    A.   I THINK SOMEWHERE BETWEEN 30 AND 40 HOURS, OR AROUND THAT.

11:22AM 25    Q.   AND 40 HOURS WOULD EQUATE TO $12,000 IN BILLING FOR THIS

11:22AM 1    MATTER.  DOES THAT SOUND RIGHT TO YOU APPROXIMATELY?

11:22AM 2    A.   YEAH.  SO I THINK THAT I MENTIONED THAT WHAT I'M BILLING,

11:22AM 3    MY COMPENSATION IS ABOUT HALF OF THAT.

11:22AM 4        BUT, YES, I THINK THE MATH IS CORRECT.

11:22AM 5    Q.   SO THAT WOULD MAKE YOUR COMPENSATION APPROXIMATELY $6,000

11:22AM 6    SO FAR FOR THIS CASE?

11:22AM 7    A.   SOMETHING LIKE THAT, YES.

11:22AM 8    Q.   DO YOU HAVE AN UNDERSTANDING THAT THE DEFENSE LAWYERS IN

11:22AM 9    THIS CASE VIEW YOUR OPINION AS HELPFUL TO THEIR ARGUMENTS IN

11:23AM 10   THE CASE?

11:23AM 11       MR. BRECHER:  OBJECTION.  401, YOUR HONOR.

11:23AM 12       THE COURT:  SUSTAINED.

11:23AM 13   BY MR. BOSTIC:

11:23AM 14   Q.   MR. SONNIER, DO YOU HAVE AN UNDERSTANDING AS TO WHETHER

11:23AM 15   YOU VIEW YOUR OPINION AS HELPFUL TO THE DEFENSE IN THE CASE?

11:23AM 16       AND, YOUR HONOR, THIS GOES TO --

11:23AM 17       MR. BRECHER:  OBJECTION.  401.

11:23AM 18       THE COURT:  YOU CAN ANSWER THE QUESTION.

11:23AM 19       THE WITNESS:  I'M NOT EXACTLY SURE IF IT'S HELPFUL

11:23AM 20   OR NOT.

11:23AM 21   BY MR. BOSTIC:

11:23AM 22   Q.   AS PART OF THE MATERIALS THAT THE DEFENSE PROVIDED YOU,

11:23AM 23   THEY INCLUDED A NUMBER OF FILINGS MADE BY THE DEFENDANTS IN

11:23AM 24   THIS CASE; IS THAT RIGHT?

11:23AM 25   A.   YES.

SONNIER CROSS BY MR. BOSTIC                                            6750

11:23AM   1    Q.   AND THOSE FILINGS EXPLAIN HOW YOUR OPINION FITS INTO THEIR

11:23AM   2    ARGUMENTS IN THE CASE; ISN'T THAT RIGHT?

11:23AM   3    A.   YEAH, I THINK I'VE SEEN SOME FILINGS TO THAT EFFECT.

11:23AM   4    Q.   IS IT YOUR TESTIMONY THAT EVEN AFTER REVIEWING THOSE

11:24AM   5    FILINGS, YOU DON'T HAVE AN UNDERSTANDING, SITTING HERE TODAY,

11:24AM   6    AS TO WHETHER OR NOT YOUR OPINION IS HELPFUL TO THE DEFENSE?

11:24AM   7    A.   FROM THE FILINGS I WOULD ASSUME THAT THEY'RE MAKING THE

11:24AM   8    ARGUMENTS BECAUSE THEY THINK IT'S HELPFUL.

11:24AM   9    Q.   GOING BACK TO THE SUBJECT OF YOUR COMPENSATION, ARE YOU

11:24AM  10    BEING COMPENSATED FOR YOUR TIME IN TESTIFYING TODAY?

11:24AM  11    A.   YES, I AM.

11:24AM  12    Q.   AT THE SAME RATE WE DISCUSSED BEFORE?

11:24AM  13    A.   YES, IT'S THE SAME RATE.

11:24AM  14    Q.   WOULD YOU EXPECT TO BE TESTIFYING IN THIS CASE CALLED BY

11:24AM  15    THE DEFENSE IF YOUR OPINION WAS ULTIMATELY NOT HELPFUL TO THE

11:24AM  16    DEFENSE?

11:24AM  17         MR. BRECHER:  OBJECTION.  CALLS FOR SPECULATION.

11:24AM  18         THE COURT:  IS THIS RELATED TO HIS PRACTICE?

11:24AM  19         MR. BOSTIC:  YES, YOUR HONOR.  I'M ASKING SOLELY FOR

11:24AM  20    HIS UNDERSTANDING, AND THIS IS RELEVANT FOR BIAS.

11:24AM  21         THE COURT:  IT IS.

11:24AM  22    YOU MAY ANSWER THE QUESTION.

11:24AM  23         THE WITNESS:  SO JUST GENERALLY, I WOULD ASSUME THAT

11:24AM  24    I WOULDN'T BE TESTIFYING IF SOMEHOW MY TESTIMONY WOULDN'T BE

11:25AM  25    HELPFUL.

ER-4993

SONNIER CROSS BY MR. BOSTIC                                    6751

11:25AM  1    BY MR. BOSTIC:

11:25AM  2    Q.   AND SPECIFICALLY WHEN YOU SAY, "HELPFUL," THAT MEANS

11:25AM  3    HELPFUL TO THE PARTY WHO HIRED YOU AND WHO IS PAYING YOU;

11:25AM  4    RIGHT?

11:25AM  5    A.   YEAH, I SUPPOSE SO.

11:25AM  6    Q.   GENERALLY SPEAKING, YOUR OPINION RELATES TO STEPS THAT YOU

11:25AM  7    BELIEVE THE GOVERNMENT COULD HAVE TAKEN TO OBTAIN ACCESS TO THE

11:25AM  8    INFORMATION IN THE THERANOS LIS DATABASE; IS THAT FAIR TO SAY?

11:25AM  9    A.   IT WASN'T LIMITED TO JUST THE GOVERNMENT.  ANYONE THAT WAS

11:25AM 10    INTERESTED IN RECOVERING THIS COULD HAVE DONE THE STEPS.

11:25AM 11    Q.   OKAY.  AND IN PREPARING THAT OPINION, YOU REVIEWED A RANGE

11:25AM 12    OF MATERIALS THAT THE DEFENSE LAWYERS SUPPLIED YOU WITH; IS

11:25AM 13    THAT RIGHT?

11:25AM 14    A.   THAT'S CORRECT.

11:25AM 15    Q.   IN PREPARING YOUR TESTIMONY AND IN REACHING YOUR OPINION,

11:25AM 16    DID YOU COME TO UNDERSTAND THE GOVERNMENT MADE MULTIPLE

11:25AM 17    REQUESTS OF THERANOS FOR THE INFORMATION ON THE LIS DATABASE?

11:25AM 18    A.   SO IN THE MATERIALS THAT I REVIEWED, IT SEEMED LIKE THERE

11:26AM 19    WERE MANY REQUESTS AND FOLLOW-UP REQUESTS.  EVEN AFTER THERANOS

11:26AM 20    SORT OF WENT AWAY, THERE WERE FOLLOW-UP REQUESTS WITH THE

11:26AM 21    ASSIGNEE OF THOSE ASSETS.

11:26AM 22    Q.   OKAY.

11:26AM 23         MAY I APPROACH, YOUR HONOR?

11:26AM 24              THE COURT:  YES.

11:26AM 25              MR. BOSTIC:  (HANDING.)

ER-4994

11:26AM 1    Q.   MR. SONNIER, I'VE JUST HANDED YOU SOME DOCUMENTS, AND I'D

11:26AM 2    LIKE TO GO THROUGH SOME OF THEM WITH YOU.

11:26AM 3        CAN YOU START BY TURNING TO TAB 5915?  AND THAT WILL BE IN

11:26AM 4    THE FIRST BINDER?

11:26AM 5    A.   OKAY.  SO VOLUME 1?

11:26AM 6    Q.   UH-HUH.  IT'S 5915.

11:26AM 7    A.   15?

11:26AM 8    Q.   5915, UH-HUH.

11:26AM 9    A.   OKAY.

11:27AM 10   Q.   AND LET ME KNOW WHEN YOU'RE THERE.

11:27AM 11   A.   YES, I'M HERE.

11:27AM 12   Q.   AT 5915, DO YOU SEE A COVER LETTER AND A SUBPOENA SENT TO

11:27AM 13   THERANOS IN FEBRUARY OF 2018?

11:27AM 14   A.   YES, I SEE THAT.

11:27AM 15           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5915.

11:27AM 16           MR. BRECHER:  OBJECTION.  HEARSAY AND 403,

11:27AM 17   YOUR HONOR.  AND FOUNDATION AS TO THIS WITNESS.  I APOLOGIZE.

11:27AM 18           MR. BOSTIC:  SO, YOUR HONOR, THIS IS NOT FOR THE

11:27AM 19   TRUTH.  SO THIS IS A NONHEARSAY USE.

11:27AM 20       THIS WITNESS IS TESTIFYING ABOUT STEPS THAT THE GOVERNMENT

11:27AM 21   OR ANYONE COULD HAVE TAKEN TO OBTAIN THE LIS ACCORDING TO THIS

11:27AM 22   WITNESS.

11:27AM 23       IT IS RELEVANT WHAT STEPS WERE ACTUALLY TAKEN TO OBTAIN

11:27AM 24   THE LIS I WOULD SAY HIS RESPONSE TO THE DIRECT AND SATISFIES

11:27AM 25   RULE 403 FOR THAT REASON.

SONNIER CROSS BY MR. BOSTIC                                      6753

11:28AM  1              THE COURT:  YOU'RE OFFERING THE ENTIRETY OF THE

11:28AM  2    DOCUMENT, INCLUDING THE SUBPOENA?

11:28AM  3              MR. BOSTIC:  YES, YOUR HONOR.

11:28AM  4              THE COURT:  AND THE SUBPOENA IS NOT BEING OFFERED,

11:28AM  5    OR ANY OF THIS -- NONE OF THIS, I SHOULD SAY, IS BEING OFFERED

11:28AM  6    FOR THE TRUTH OF THE MATTER ASSERTED.

11:28AM  7              MR. BOSTIC:  CORRECT, YOUR HONOR.

11:28AM  8              THE COURT:  BUT TO INFORM AS TO --

11:28AM  9              MR. BOSTIC:  AS TO THE FACT THAT THE SUBPOENA WAS

11:28AM  10   SENT ON THE DATE INDICATED SHOWING EFFORTS THAT THE GOVERNMENT

11:28AM  11   TOOK TO OBTAIN THIS INFORMATION.

11:28AM  12             MR. BRECHER:  YOUR HONOR, I STILL HAVE SOME CONCERNS

11:28AM  13   ABOUT THE FOUNDATION OF THIS WITNESS.  THE GOVERNMENT

11:28AM  14   REPEATEDLY OBJECTED ON THAT BASIS DURING DIRECT.

11:28AM  15        HOW DOES MR. SONNIER KNOW WHAT THIS DOCUMENT IS?

11:28AM  16             THE COURT:  DO YOU WANT TO LAY A FOUNDATION IF YOU

11:28AM  17   CAN, OR ASK SOME ADDITIONAL QUESTIONS ABOUT THOSE?

11:28AM  18        I UNDERSTAND YOUR -- THE REASON FOR BRINGING THIS, AND I

11:28AM  19   THINK THERE IS SOME RELEVANCE BASED ON THE TESTIMONY, THE

11:28AM  20   DIRECT TESTIMONY ABOUT THIS.

11:28AM  21             MR. BRECHER:  YES, YOUR HONOR.  RELEVANCE IS NOT OUR

11:28AM  22   OBJECTION.  IT'S FOUNDATION AT THIS POINT.  THANK YOU.

11:28AM  23             MR. BOSTIC:  SO, YOUR HONOR, WE MIGHT BENEFIT FROM A

11:28AM  24   BRIEF SIDE-BAR DISCUSSION.  THE LIMITATION THAT THE DEFENSE IS

11:29AM  25   ADVOCATING FOR DIDN'T SEEM TO APPLY DURING THE DIRECT PORTION

SONNIER CROSS BY MR. BOSTIC                                    6754

11:29AM   1     OF THE EXAM.

11:29AM   2              THE COURT:  I'M GOING TO ADMIT THIS, NOT FOR THE

11:29AM   3     TRUTH OF THE MATTER ASSERTED, LADIES AND GENTLEMEN, BUT THIS

11:29AM   4     IS -- THIS WAS TOUCHED ON DURING THE DIRECT, THE BACKGROUND

11:29AM   5     REGARDING THE LIS AND THE INFORMATION IN IT.  THIS PROVIDES

11:29AM   6     CONTEXT FOR THAT POTENTIALLY.

11:29AM   7          SO IT'S ADMITTED, AND IT MAY BE PUBLISHED, AGAIN, NOT FOR

11:29AM   8     THE TRUTH OF THE MATTER ASSERTED IN THE DOCUMENT.

11:29AM   9          (GOVERNMENT'S EXHIBIT 5915 WAS RECEIVED IN EVIDENCE.)

11:29AM  10     BY MR. BOSTIC:

11:29AM  11     Q.   SO IN A MOMENT, MR. SONNIER, YOU'LL SEE EXHIBIT 5915 ON

11:29AM  12     THE SCREEN IN FRONT OF YOU.

11:29AM  13          TO START, DO YOU SEE THAT WE'RE LOOKING AT A COVER LETTER

11:29AM  14     DATED IN MID-FEBRUARY 2018?

11:29AM  15     A.   YES.

11:29AM  16     Q.   AND THAT'S ABOUT SIX MONTHS BEFORE THE AUGUST 2018 TIME

11:29AM  17     PERIOD THAT YOU WERE DISCUSSING ON DIRECT; IS THAT RIGHT?

11:29AM  18     A.   YES.

11:29AM  19     Q.   AND DO YOU SEE THAT THIS IS A LETTER ADDRESSED TO THERANOS

11:30AM  20     INCORPORATED, CUSTODIAN OF RECORDS?

11:30AM  21     A.   YES.

11:30AM  22     Q.   AND THE LETTER INFORMS THERANOS THAT IT HAS RECEIVED A

11:30AM  23     GRAND JURY SUBPOENA IN FURTHERANCE OF AN INVESTIGATION.

11:30AM  24          DO YOU SEE THAT?

11:30AM  25     A.   YES.

11:30AM   1    Q.   LET'S TURN TO PAGE 2 OF THIS EXHIBIT.  AND DO YOU SEE THAT

11:30AM   2    NOW WE'RE LOOKING AT THE SUBPOENA ITSELF?

11:30AM   3    A.   YES.

11:30AM   4    Q.   AND THE SUBPOENA IS DATED FEBRUARY 13TH, AND IT'S SIGNED

11:30AM   5    BY JEFF SCHENK, WHO YOU UNDERSTAND TO BE ONE OF THE PROSECUTORS

11:30AM   6    IN THE CASE YOU TESTIFIED?

11:30AM   7    A.   YES.

11:30AM   8    Q.   LET'S LOOK NOW AT PAGE 5 OF THE EXHIBIT.

11:30AM   9         DO YOU SEE HERE THAT THERE ARE SOME INSTRUCTIONS FOR

11:30AM  10    COMPLYING WITH THE SUBPOENA?

11:30AM  11    A.   THERE ARE INSTRUCTIONS TITLES HERE.

11:30AM  12    Q.   AND UNDER THE INSTRUCTIONS, PART A, IT INFORMS THERANOS

11:31AM  13    THAT IT'S TO PROVIDE DOCUMENTS FITTING BETWEEN TWO DATES, AND

11:31AM  14    THAT'S JULY 1ST, 2014, AND SEPTEMBER 1ST, 2014.

11:31AM  15         DO YOU SEE THAT?

11:31AM  16    A.   YES.

11:31AM  17    Q.   AND THEN LET'S LOOK AT THE DOCUMENTS THAT ARE ACTUALLY

11:31AM  18    BEING REQUIRED ON PAGE 12.

11:31AM  19         DO YOU SEE UNDER THERE, THERE'S A TITLE HEADING DOCUMENTS

11:31AM  20    TO BE PRODUCED?

11:31AM  21    A.   YES, I SEE THAT HEADING.

11:31AM  22    Q.   AND UNDER DOCUMENTS TO BE PRODUCED, THERANOS IS INSTRUCTED

11:31AM  23    UNDER THE SUBPOENA TO PRODUCE "THE ENTIRETY OF ALL BLOOD TEST

11:31AM  24    REPORTS, EXCEPT AS DESCRIBED BELOW."

11:31AM  25         DO YOU SEE THAT?

SONNIER CROSS BY MR. BOSTIC                                    6756

11:31AM   1       A.   YES.

11:31AM   2       Q.   OKAY.  WE CAN PUT THAT ASIDE.

11:31AM   3            DO YOU KNOW ANYTHING ABOUT WHAT THERANOS PRODUCED TO THE

11:32AM   4       GOVERNMENT IN RESPONSE TO THAT FEBRUARY SUBPOENA FOR LAB

11:32AM   5       REPORTS?

11:32AM   6       A.   I HAVE SEEN SOME MATERIALS THAT INDICATE THAT I THINK THAT

11:32AM   7       THE THERANOS ATTORNEY WAS REPRESENTING THAT THEY HAD PRODUCED

11:32AM   8       EVERYTHING ASKED FOR BY THE GOVERNMENT.

11:32AM   9            I DON'T KNOW THAT I CAN SAY IT WAS SPECIFIC FOR THIS

11:32AM  10       SUBPOENA, BUT THE MATERIAL THAT I SAW SEEMED TO BE ASKING FOR

11:32AM  11       THE SAME SET OF THINGS.

11:32AM  12       Q.   AMONG THE MATERIALS THAT THE DEFENSE LAWYERS PROVIDED YOU

11:32AM  13       FOR REVIEW, DID YOU SEE ANY OF THE MATERIALS FROM THAT

11:32AM  14       PRODUCTION?

11:32AM  15       A.   IF I DID, IT WASN'T LINKED UP THAT WAY FOR ME.

11:32AM  16       Q.   TURN, IF YOU WOULD, TO THE NEXT TAB IN THE BINDER, AND

11:32AM  17       THAT'S 5916.  AND AT 5916, DO YOU SEE ANOTHER SUBPOENA TO

11:33AM  18       THERANOS, THIS ONE DATED MAY 2018?

11:33AM  19       A.   YES.

11:33AM  20       Q.   OR SORRY, THIS ONE IS ACTUALLY DATED APRIL 2018.

11:33AM  21            DO YOU SEE THAT AT THE BOTTOM OF THE PAGE?

11:33AM  22       A.   AT THE BOTTOM?  RIGHT.  OKAY.

11:33AM  23            THERE'S A DATE AND TIME HIGHER UP, BUT THE DATE AT THE

11:33AM  24       BOTTOM NEXT TO THE SIGNATURE IS APRIL.

11:33AM  25                 MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5916

SONNIER CROSS BY MR. BOSTIC                                    6757

11:33AM  1    FOR THE SAME BASIS AS 5915.

11:33AM  2          THE COURT:  NOT FOR THE TRUTH OF THE MATTER

11:33AM  3    ASSERTED?

11:33AM  4          MR. BOSTIC:  CORRECT.

11:33AM  5          MR. BRECHER:  NO OBJECTION.

11:33AM  6          THE COURT:  IT'S ADMITTED.

11:33AM  7       AND IT IS ADMITTED, LADIES AND GENTLEMEN, AGAIN, NOT FOR

11:33AM  8    THE TRUTH OF THE MATTER ASSERTED IN HERE, BUT SOLELY AS TO

11:33AM  9    EXPLANATORY AND CONTEXTUAL DISCUSSION, AND IT MAY BE PUBLISHED.

11:33AM  10       (GOVERNMENT'S EXHIBIT 5916 WAS RECEIVED IN EVIDENCE.)

11:33AM  11   BY MR. BOSTIC:

11:33AM  12   Q.   FIRST LET'S LOOK AT PAGE 1 OF THIS DOCUMENT.  IS THIS THE

11:33AM  13   SECOND SUBPOENA THAT WE'RE REVIEWING NOW, MR. SONNIER?

11:34AM  14   A.   I DON'T KNOW IF IT'S FIRST OR SECOND, BUT IT'S ANOTHER

11:34AM  15   SUBPOENA.

11:34AM  16   Q.   SECOND ONE THAT WE HAVE LOOKED AT TODAY; CORRECT?

11:34AM  17   A.   SECOND ONE, CORRECT.

11:34AM  18   Q.   LET'S LOOK AT PAGE 4.  THIS, UNDER INSTRUCTIONS, CALLS FOR

11:34AM  19   A MUCH WIDER TIMEFRAME, 2006 THROUGH 2016.

11:34AM  20   A.   YES, I SEE THAT.

11:34AM  21   Q.   LET'S LOOK AT PAGE 11.  AND UNDER PAGE 11, DOCUMENTS TO BE

11:34AM  22   PRODUCED.

11:34AM  23       DO YOU SEE THAT THIS SUBPOENA CALLS FOR "THE ENTIRETY OF

11:34AM  24   ALL BLOOD TEST LAB REPORTS MAINTAINED IN THE LIS DATABASE,

11:34AM  25   EXCEPT AS DESCRIBED BELOW."

ER-5000

SONNIER CROSS BY MR. BOSTIC                                    6758

11:34AM   1            DO YOU SEE THAT?

11:34AM   2       A.   YES, I SEE THAT.

11:34AM   3       Q.   AND IT SAYS, "PLEASE PRODUCE THESE REPORTS IN THE SAME

11:34AM   4       FORMAT ORIGINALLY PROVIDED TO SUCH PATIENTS."

11:34AM   5            DO YOU SEE THAT LANGUAGE?

11:34AM   6       A.   YES, I SEE THAT.

11:35AM   7       Q.   AND LET'S LOOK AT THE NEXT PAGE, PAGE 12.

11:35AM   8            AND DO YOU SEE THERE THERE IS SOME LANGUAGE IN BOLD THAT

11:35AM   9       SAYS "NOTICE CONCERNING DOCUMENT DESTRUCTION AND OBSTRUCTION OF

11:35AM  10       JUSTICE"?

11:35AM  11       A.   I SEE THAT NOTICE.

11:35AM  12       Q.   AND THAT LANGUAGE READS, "ANY PERSON WHO WITHHOLDS,

11:35AM  13       ALTERS, DELETES, OR DESTROYS DOCUMENTS -- INCLUDING ELECTRONIC

11:35AM  14       DOCUMENTS -- DEMANDED BY THIS SUBPOENA, OR WHO REMOVES OR

11:35AM  15       TRANSFERS SUCH DOCUMENTS TO OUTSIDE THE JURISDICTION OF THE

11:35AM  16       UNITED STATES, MAY BE SUBJECT TO CRIMINAL PROSECUTION FOR

11:35AM  17       OBSTRUCTION OF JUSTICE," OR OTHER VIOLATIONS.

11:35AM  18            DO YOU SEE THAT?

11:35AM  19       A.   YES, I SEE THAT.

11:35AM  20       Q.   AND THERANOS WAS BEING INFORMED OF THIS IN APRIL OF 2018;

11:35AM  21       IS THAT YOUR UNDERSTANDING?

11:35AM  22       A.   YES.

11:35AM  23       Q.   WE CAN SET THAT ASIDE.

11:35AM  24            YOU TESTIFIED ON DIRECT THAT YOUR UNDERSTANDING IS THAT

11:35AM  25       THE GOVERNMENT DID EVENTUALLY RECEIVE A COPY OF LIS FROM

SONNIER CROSS BY MR. BOSTIC                                                6759

11:35AM  1    THERANOS; IS THAT RIGHT?

11:35AM  2    A.   IT RECEIVED AN LIS DATABASE BACKUP.

11:35AM  3    Q.   IS THAT THE SAME THING AS A COPY?

11:36AM  4    A.   IT'S ALL THE DATA THAT IS IN THE SYSTEM, SO IT'S A COPY OF

11:36AM  5    THAT DATA.  IT'S NOT THE SYSTEM THOUGH.

11:36AM  6    Q.   BUT IT SHOULD CONTAIN A COPY OF ALL OF THE INFORMATION ON

11:36AM  7    THE DATABASE?

11:36AM  8    A.   YES, ALL OF THE INFORMATION THAT WAS -- THAT LIVED INSIDE

11:36AM  9    OF THE DATABASE WOULD HAVE BEEN IN THAT BACKUP.

11:36AM  10   Q.   AND AS PART OF YOUR WORK IN THIS CASE, THE DEFENSE

11:36AM  11   PROVIDED YOU WITH A COPY OF WHAT THERANOS HAD PROVIDED THE

11:36AM  12   GOVERNMENT; IS THAT RIGHT?

11:36AM  13   A.   IT'S, IT'S -- THE COPY REMAINED IN THE ATTORNEY'S OFFICE.

11:36AM  14   I JUST ACCESSED IT REMOTELY, BUT I DID ACCESS IT.

11:36AM  15   Q.   AND YOU SAY YOU ACCESSED IT, BUT, IN FACT, YOU WERE NOT

11:36AM  16   ABLE TO GAIN ACCESS TO THE DATA IN THE DATABASE; ISN'T THAT

11:36AM  17   RIGHT?

11:36AM  18   A.   THAT'S CORRECT.  I JUST ACCESSED THE EXTERNAL DRIVE ON

11:36AM  19   WHICH THE BACKUP LIVED.  I WAS ABLE TO LOOK AT THE FILES, BUT I

11:36AM  20   WAS NOT ABLE TO ACTUALLY GO THROUGH AND RECOVER THAT DATA INTO

11:37AM  21   A WORKING SQL SERVER.

11:37AM  22   Q.   YOU TESTIFIED EARLIER ABOUT YOUR EXPERIENCE AND EXPERTISE

11:37AM  23   RELATING TO THE SQL SERVERS.

11:37AM  24        DID YOU BRING THAT EXPERIENCE AND EXPERTISE TO BEAR IN

11:37AM  25   TRYING TO GET INTO THAT HARD DRIVE?

ER-5002

SONNIER CROSS BY MR. BOSTIC                                    6760

11:37AM   1      A.   YES, I DID.

11:37AM   2      Q.   AND YOU WERE UNSUCCESSFUL?

11:37AM   3      A.   I WAS.

11:37AM   4      Q.   CAN YOU THINK OF ANYTHING ELSE THAT YOU COULD HAVE TRIED

11:37AM   5      TO GET INTO THAT HARD DRIVE THAT YOU DIDN'T TRY?

11:37AM   6      A.   THE LAST OPTION THAT WOULD HAVE BEEN AVAILABLE, WHICH IS A

11:37AM   7      REAL SORT OF LONG SHOT, WOULD BE TO TRY TO BRUTE FORCE BREAK

11:37AM   8      THE ENCRYPTION.  BUT IT'S A VERY INDUSTRY STANDARD ENCRYPTION,

11:37AM   9      AND IT WOULD TAKE, YOU KNOW, A VERY LONG PERIOD OF TIME TO TRY

11:37AM   10     TO DO SUCH A THING.

11:37AM   11     Q.   AND YOU DID NOT MAKE THAT ATTEMPT WHEN IT CAME TO --

11:38AM   12     A.   NO, I DID NOT.

11:38AM   13     Q.   YOU TESTIFIED ON DIRECT THAT THERE CAME A TIME WHEN

11:38AM   14     THERANOS DISASSEMBLED THE ORIGINAL HARDWARE THAT WAS RUNNING

11:38AM   15     THEIR VERSION OF THE LIS.

11:38AM   16          DO YOU RECALL THAT?

11:38AM   17     A.   YES.  THAT'S, THAT'S -- FROM THE INFORMATION THAT I

11:38AM   18     REVIEWED, THAT'S WHAT HAPPENED.

11:38AM   19     Q.   FROM THE INFORMATION THAT YOU REVIEWED, DO YOU HAVE AN

11:38AM   20     UNDERSTANDING AS TO THE TIMING THERE?  IN OTHER WORDS, HOW SOON

11:38AM   21     AFTER THERANOS GAVE THE GOVERNMENT A COPY DID IT TAKE APART THE

11:38AM   22     ORIGINAL?

11:38AM   23     A.   OH, AT LEAST FROM THE INFORMATION THAT I REVIEWED, THE

11:38AM   24     ACTUAL DELIVERY OF THE COPY SEEMED TO BE VERY CLOSE TO WHEN THE

11:38AM   25     EQUIPMENT WAS DISASSEMBLED.

ER-5003

SONNIER CROSS BY MR. BOSTIC                                                6761

11:38AM   1           BUT I COULDN'T SAY FOR SURE EXACTLY THE TIMING.

11:38AM   2           IT SEEMS THAT THE DISK DRIVES WERE SENT BY COURIER, SAY,

11:39AM   3      MAYBE A DAY OR SO BEFORE THE EQUIPMENT WAS DISASSEMBLED.

11:39AM   4      Q.   AND WHAT'S YOUR UNDERSTANDING, IF YOU HAVE ONE, AS TO THE

11:39AM   5      CURRENT LOCATION OF THE ORIGINAL HARD DRIVES CONTAINING THE

11:39AM   6      THERANOS LIS?

11:39AM   7      A.   NOTHING I HAVE SEEN SAYS THAT THEY'RE ANYWHERE OTHER THAN

11:39AM   8      THE STORAGE LOCKERS THAT THEY WERE ORIGINALLY PLACED INTO AFTER

11:39AM   9      DISASSEMBLY.

11:39AM  10      Q.   HAVE YOU MADE ANY EFFORT TO CONFIRM THAT THOSE DISK DRIVES

11:39AM  11      ARE STILL AVAILABLE?

11:39AM  12      A.   I BELIEVE I SORT OF ASKED ABOUT THAT, BUT NO ONE SEEMS TO

11:39AM  13      KNOW.

11:39AM  14      Q.   SO LET ME JUST BE CLEAR THEN.  DO YOU HAVE FIRST-HAND

11:39AM  15      KNOWLEDGE OF WHERE THOSE DISK DRIVES ARE, AND THAT IS, THE

11:39AM  16      ORIGINAL DISK DRIVES THAT WERE HOUSING THE THERANOS VERSION OF

11:39AM  17      THE LIS?

11:39AM  18      A.   NO.  ALL I KNOW IS WHAT WAS IN THE MATERIALS THAT I

11:39AM  19      REVIEWED, AND IT WAS JUST GENERALLY THAT THEY WERE TAKEN TO

11:40AM  20      STORAGE LOCATIONS.

11:40AM  21      Q.   AND, IN FACT, DURING THE COURSE OF YOUR WORK FOR

11:40AM  22      MR. BALWANI'S LAWYERS, THEY ASKED YOU WHETHER YOU HAD BEEN ABLE

11:40AM  23      TO DETERMINE THE LOCATION OF THOSE DRIVES.

11:40AM  24           DO YOU REMEMBER THAT?

11:40AM  25      A.   I DON'T SPECIFICALLY RECALL THAT, BUT PROBABLY.  I MEAN,

ER-5004

SONNIER CROSS BY MR. BOSTIC                                            6762

11:40AM  1    WE DID, WE DID TALK ABOUT WHERE THE EQUIPMENT WAS STORED AND

11:40AM  2    WHERE THE DISK DRIVES WERE STORED.

11:40AM  3    Q.   IF I COULD ASK YOU TO LOOK IN YOUR BINDER AT TAB 5924.

11:40AM  4    A.   4?  OKAY.  5924.

11:40AM  5    Q.   AND DO YOU SEE THERE AN EMAIL BETWEEN YOU AND

11:40AM  6    MR. COOPERSMITH, THE DEFENDANT'S LAWYER?

11:40AM  7    A.   YES.

11:40AM  8    Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT IN OCTOBER OF

11:40AM  9    LAST YEAR, MR. COOPERSMITH ASKED YOU WHERE THE DISK DRIVES WERE

11:41AM  10   STORED?

11:41AM  11   A.   YES, I SEE THAT.

11:41AM  12   Q.   AND DO YOU SEE YOUR RESPONSE ABOVE?

11:41AM  13   A.   YES.  IN THE RESPONSE ABOVE, I REFERENCED ONE OF THE

11:41AM  14   DOCUMENTS THAT I REVIEWED, MAKING IT SEEM THAT THE DISK DRIVES

11:41AM  15   WOULD HAVE BEEN STORED AT A STORAGE LOCATION, IN PARTICULAR,

11:41AM  16   ONE RUN BY IRON MOUNTAIN.

11:41AM  17   Q.   AND DO YOU SEE THAT YOUR RESPONSE INCLUDES SOME

11:41AM  18   CONFLICTING INFORMATION?

11:41AM  19        MR. BRECHER:  OBJECTION.  MISCHARACTERIZES THIS

11:41AM  20   EMAIL.

11:41AM  21        AND THE DOCUMENT IS NOT IN EVIDENCE, YOUR HONOR.

11:41AM  22        THE COURT:  WELL, HE CAN TESTIFY ABOUT WHAT HE

11:41AM  23   PERCEIVES FROM THE DOCUMENT, SO OVERRULED.

11:41AM  24        THE WITNESS:  YES.  I DON'T RECALL THAT RIGHT NOW.

11:41AM  25        BUT APPARENTLY AT THE TIME I WROTE THIS EMAIL, I HAD SEEN

11:42AM 1    OTHER MATERIALS THAT HAD SAID THIS WAS IN ANOTHER STORAGE

11:42AM 2    LOCATION, AND I CONCLUDED THAT THE OTHER STORAGE LOCATION BEING

11:42AM 3    REFERRED TO THERE WAS, IN FACT, IRON MOUNTAIN.

11:42AM 4    BY MR. BOSTIC:

11:42AM 5    Q.   I'M SORRY.  DID YOU SAY WAS OR WAS NOT IRON MOUNTAIN?

11:42AM 6    A.   WAS.

11:42AM 7    Q.   OKAY.  AND YOU CONCLUDED THAT BASED ON YOUR REVIEW OF

11:42AM 8    DOCUMENTS PROVIDED TO YOU BY THE DEFENSE LAWYERS?

11:42AM 9    A.   YES, THE SAME MATERIALS THAT I'VE BEEN REVIEWING THIS

11:42AM 10   WHOLE TIME.

11:42AM 11   Q.   SO SITTING HERE TODAY, YOU BELIEVE THAT THE ORIGINAL HARD

11:42AM 12   DRIVES CONTAINING THAT INFORMATION ARE STILL IN STORAGE AT IRON

11:42AM 13   MOUNTAIN?

11:42AM 14   A.   I HAVE SEEN NO MATERIALS TO SAY THAT THEY'RE NOT THERE,

11:42AM 15   BUT I HAVE NO -- YOU KNOW, I HAVE NEVER GONE TO THIS FACILITY

11:42AM 16   TO SEE FOR MYSELF.

11:42AM 17   Q.   ARE YOU AWARE OF ANYONE THAT YOU WORK WITH IN CONNECTION

11:42AM 18   WITH THIS CASE MAKING THAT EFFORT TO DETERMINE WHETHER THOSE

11:43AM 19   DRIVES WERE THERE?

11:43AM 20   A.   NO, I'M NOT AWARE OF ANY EFFORT LIKE THAT.

11:43AM 21   Q.   IF I COULD ASK YOU TO LOOK AT TAB 5927.

11:43AM 22        AND YOU TESTIFIED ON DIRECT THAT AMONG THE MATERIALS THAT

11:43AM 23   YOU REVIEWED TO HELP YOU REACH YOUR OPINION WERE SOME REPORTS

11:43AM 24   OF WITNESSES CONDUCTED BY THE FBI; IS THAT RIGHT?

11:43AM 25   A.   THAT'S CORRECT.

11:43AM  1    Q.   IF YOU WOULD LOOK AT 5927, DO YOU SEE ONE OF THOSE REPORTS

11:43AM  2    THAT YOU REVIEWED AND CONSIDERED?

11:43AM  3    A.   THIS APPEARS TO BE ONE OF THE FBI REPORTS, INTERVIEW

11:43AM  4    REPORTS.

11:43AM  5    Q.   I'LL ASK YOU TO LOOK AT PAGE 3 OF THAT DOCUMENT.  AND AT

11:44AM  6    THE TOP OF PAGE 3, DO YOU SEE THAT YOU WERE BEING PROVIDED WITH

11:44AM  7    INFORMATION INDICATING THAT A THERANOS EMPLOYEE DID NOT KNOW

11:44AM  8    WHERE THESE HARD DRIVES HAD BEEN TAKEN FOR STORAGE?

11:44AM  9    A.   SO WHERE ON PAGE 3 YOU SAID?

11:44AM 10    Q.   SURE.  AT THE TOP OF PAGE 3 IN THE TOP PARAGRAPH.  TAKE A

11:44AM 11    MOMENT AND READ THAT WHOLE PARAGRAPH IF YOU WOULD LIKE.

11:44AM 12         (PAUSE IN PROCEEDINGS.)

11:44AM 13    BY MR. BOSTIC:

11:44AM 14    Q.   JUST LET ME KNOW WHEN YOU'RE DONE.

11:44AM 15    A.   SURE.

11:44AM 16         (PAUSE IN PROCEEDINGS.)

11:44AM 17         THE WITNESS:  OKAY.  I'VE READ IT NOW.

11:44AM 18    BY MR. BOSTIC:

11:44AM 19    Q.   AND DOES THAT REFRESH YOUR MEMORY THAT YOU WERE PROVIDED

11:45AM 20    INFORMATION INDICATING THAT A THERANOS EMPLOYEE INVOLVED WITH

11:45AM 21    THESE EVENTS DID NOT KNOW WHERE THOSE HARD DRIVES HAD BEEN

11:45AM 22    STORED?

11:45AM 23         MR. BRECHER:  OBJECTION.  YOUR HONOR, THIS IS NOT AN

11:45AM 24    INTERVIEW WITH A THERANOS EMPLOYEE, FOR ONE.

11:45AM 25         THE COURT:  WELL, THIS IS JUST USED TO REFRESH THE

11:45AM  1    RECOLLECTION.  IT DOESN'T NECESSARILY HAVE TO BE A SPECIFIC

11:45AM  2    WITNESS.  IF IT REFRESHES HIS RECOLLECTION, IT ACCOMPLISHES

11:45AM  3    THAT.

11:45AM  4              MR. BOSTIC:  I'M HAPPY TO CORRECT THAT DETAIL,

11:45AM  5    YOUR HONOR.

11:45AM  6              THE COURT:  SURE, IF YOU'D LIKE.

11:45AM  7    BY MR. BOSTIC:

11:45AM  8    Q.   SO, MR. SONNIER, DOES WHAT YOU'VE JUST REVIEWED REFRESH

11:45AM  9    YOUR RECOLLECTION THAT AN I.T. PROFESSIONAL INVOLVED IN THESE

11:45AM  10   EVENTS WAS UNAWARE OF WHERE THE ORIGINAL HARD DRIVES WERE

11:45AM  11   STORED?

11:45AM  12   A.   SO THE I.T. PROFESSIONAL IN QUESTION WAS A CONTRACTOR WHO

11:45AM  13   ACTUALLY HAD DONE THE DISASSEMBLY IS MY UNDERSTANDING, AND I

11:46AM  14   THINK IT EVEN SAYS HERE THAT HE REMEMBERS WHEN HE TOOK THE HARD

11:46AM  15   DRIVES OUT THAT THEY WERE PACKED IN A BOX, AND HE DIDN'T KNOW

11:46AM  16   WHERE THAT BOX WAS DELIVERED BECAUSE IT WAS OUTSIDE OF HIS

11:46AM  17   SCOPE OF WORK.

11:46AM  18   Q.   AND IS IT ALSO YOUR UNDERSTANDING THAT THOSE HARD DRIVES

11:46AM  19   WERE TAKEN SOMEWHERE OTHER THAN WHERE THE REST OF THE LIS

11:46AM  20   EQUIPMENT WAS STORED?

11:46AM  21   A.   YES, IT -- MY UNDERSTANDING IS THAT THE EQUIPMENT WAS

11:46AM  22   STORED IN A DIFFERENT LOCATION THAN WHEREVER THE HARD DRIVES

11:46AM  23   ACTUALLY WENT TO.

11:46AM  24   Q.   OKAY.  YOU CAN SET THAT ASIDE.

11:46AM  25              IN CONNECTION WITH YOUR WORK IN THIS CASE, YOU PREPARED A

SONNIER CROSS BY MR. BOSTIC                                    6766

11:46AM  1    WRITTEN DECLARATION.

11:46AM  2        DO YOU REMEMBER THAT?

11:46AM  3    A.   YES.

11:46AM  4    Q.   AND IF YOU COULD LOOK IN THE SECOND BINDER AT TAB 5935.

11:46AM  5    A.   35?

11:46AM  6    Q.   5935.  AND DO YOU SEE -- OH, I'LL WAIT FOR YOU TO GET

11:47AM  7    THAT.

11:47AM  8    A.   YES, I'M LOOKING AT IT.

11:47AM  9    Q.   AND IS THAT A COPY OF THE DECLARATION THAT YOU PREPARED?

11:47AM  10   A.   I'M JUST GETTING -- IT'S GOT A LOT OF PIECES TO IT.

11:47AM  11   Q.   OF COURSE.

11:47AM  12   A.   I'LL JUST CHECK REAL QUICK.

11:47AM  13        YES.

11:47AM  14   Q.   AND THAT DECLARATION CONTAINS AND EXPLAINS THE OPINIONS

11:47AM  15   THAT YOU TESTIFIED ABOUT TODAY; IS THAT CORRECT?

11:47AM  16   A.   YES, IT DOES.

11:47AM  17   Q.   DID YOU PREPARE THAT DECLARATION INDEPENDENTLY OR DID YOU

11:47AM  18   WORK WITH DEFENSE COUNSEL IN CREATING IT?

11:47AM  19   A.   I DRAFTED THE FULL BODY OF THE OPINION MYSELF, AND THEN

11:47AM  20   DEFENSE COUNSEL HAD SOME SUGGESTIONS FOR EDITS.

11:47AM  21   Q.   AND DID YOU TAKE THOSE SUGGESTIONS AND MAKE SOME OF THE

11:47AM  22   REQUESTED EDITS?

11:47AM  23   A.   YEAH, THEY WERE ALL VERY MINOR SORT OF WORDSMITHING.

11:48AM  24   Q.   ULTIMATELY, THOUGH, YOU SIGNED OFF ON THAT DECLARATION

11:48AM  25   UNDER OATH; IS THAT CORRECT?

ER-5009

SONNIER CROSS BY MR. BOSTIC                                          6767

11:48AM  1    A.   YES.

11:48AM  2    Q.   SO THE LANGUAGE IN THAT DECLARATION ACCURATELY REFLECTS

11:48AM  3    YOUR OPINIONS IN THIS CASE; IS THAT RIGHT?

11:48AM  4    A.   YES, THIS DECLARATION REPRESENTS MY OPINIONS.

11:48AM  5    Q.   AND THERE'S MORE IN THE DECLARATION BESIDES YOUR OPINIONS.

11:48AM  6    YOU ALSO RELAYED THE BASES FOR YOUR OPINIONS; ISN'T THAT RIGHT?

11:48AM  7    A.   THAT IS CORRECT.

11:48AM  8    Q.   IF YOU DECIDED TO INCLUDE A FACT OR A STATEMENT IN THE

11:48AM  9    DECLARATION, IS IT FAIR TO ASSUME THAT THAT'S BECAUSE YOU

11:48AM  10   VIEWED THAT STATEMENT OR FACT AS RELEVANT TO YOUR ULTIMATE

11:48AM  11   OPINIONS?

11:48AM  12   A.   YES.  I WAS TRYING TO KIND OF LAY OUT THE SURROUNDING

11:48AM  13   CIRCUMSTANCES AT THE TIME OF THE EVENTS, AND THEN USE THAT AS

11:48AM  14   PART OF THE BASIS FOR MY OPINION.

11:48AM  15   Q.   ALL RIGHT.  YOU TESTIFIED ON DIRECT ABOUT YOUR BELIEF THAT

11:48AM  16   THE GOVERNMENT COULD HAVE REACQUIRED THE THERANOS LIS

11:49AM  17   INFORMATION EVEN AFTER THE ORIGINAL WAS DISASSEMBLED.

11:49AM  18        IS THAT A FAIR CHARACTERIZATION?

11:49AM  19   A.   THAT IS CORRECT.

11:49AM  20   Q.   JUST TO BE CLEAR, THOUGH, YOU'RE NOT HERE BECAUSE YOU HAVE

11:49AM  21   ANY SPECIAL KNOWLEDGE ABOUT THE SPECIFIC DATABASE USED AT

11:49AM  22   THERANOS; IS THAT RIGHT?

11:49AM  23   A.   NO, I HAVE NO KNOWLEDGE OF THE SPECIFIC DATABASE.

11:49AM  24   Q.   YOUR EXPERTISE IS IN SQL DATABASES GENERALLY?

11:49AM  25   A.   THAT IS CORRECT.

ER-5010

SONNIER CROSS BY MR. BOSTIC                                    6768

11:49AM   1    Q.   AND TO THE EXTENT THAT YOU HAD AN UNDERSTANDING OF THE

11:49AM   2    THERANOS DATABASE, IT IS SECOND OR THIRD HAND?  IS THAT FAIR TO

11:49AM   3    SAY?  IT COMES FROM THE MATERIALS THAT YOU'VE READ?

11:49AM   4    A.   YES, MY KNOWLEDGE OF THERANOS DATABASE IS ONLY FROM THE

11:49AM   5    MATERIALS THAT I REVIEWED, WHATEVER HANDEDNESS THOSE MATERIALS

11:49AM   6    MAY HAVE.

11:49AM   7    Q.   DID YOU COME TO UNDERSTAND FROM THOSE MATERIALS THAT THE

11:49AM   8    THERANOS LIS DATABASE WAS BESPOKE?

11:50AM   9    A.   THERE IS ONE OF THE FBI INTERVIEWS WHERE -- I DON'T

11:50AM  10    REMEMBER -- IT MIGHT BE WHERE MR. CHUNG USES THAT TERM.

11:50AM  11         BUT I DON'T THINK THAT THE DATABASE SOFTWARE ITSELF AND

11:50AM  12    ITS OPERATION WERE IN ANY WAY CUSTOM, WHICH IS WHAT I INTERPRET

11:50AM  13    BESPOKE TO MEAN.

11:50AM  14         I BELIEVE THAT WAS IN REFERENCE TO THE FACT THAT IT WAS A

11:50AM  15    PROPRIETARY SYSTEM DEVELOPED BY THERANOS FOR THERANOS'S USE,

11:50AM  16    NOT A GENERAL SYSTEM THAT MR. CHUNG WOULD HAVE ENCOUNTERED OUT

11:50AM  17    IN THE WORLD FROM A THIRD PARTY VENDOR.

11:50AM  18    Q.   LET ME ASK YOU TO TAKE A LOOK AT TAB 5929 IN YOUR BINDER.

11:50AM  19    A.   5929.  IS THAT IN THE FIRST VOLUME?

11:51AM  20    Q.   YES, IN THE FIRST VOLUME.

11:51AM  21    A.   OKAY.  OKAY, I'M THERE.

11:51AM  22    Q.   AND AT 5929, DO YOU SEE ANOTHER ONE OF THESE REPORTS THAT

11:51AM  23    YOU REVIEWED IN REACHING YOUR OPINION?

11:51AM  24    A.   YES, THIS IS ANOTHER FBI INTERVIEW REPORT.

11:51AM  25    Q.   AND AT THE TOP OF PAGE 2, DO YOU SEE THAT THESE MATERIALS

ER-5011

11:51AM  1   INFORMED YOU OR RELAYED TO YOU THE STATEMENT THAT THE LIS

11:51AM  2   DATABASE WAS A BESPOKE DATABASE DEVELOPED BY A GROUP OF

11:51AM  3   SOFTWARE ENGINEERS WHO PREVIOUSLY WORKED AT THERANOS?

11:51AM  4   A.   I DO SEE THAT, YES.

11:51AM  5   Q.   AND THE WORD "BESPOKE" MEANS CUSTOM OR UNIQUE; ISN'T THAT

11:52AM  6   RIGHT?

11:52AM  7   A.   THAT'S HOW I INTERPRETED IT, YES.

11:52AM  8   Q.   AND YOU EXPLAINED KIND OF WHAT YOU TOOK AWAY FROM THIS AND

11:52AM  9   WHAT YOU UNDERSTOOD IT TO MEAN A MOMENT AGO; RIGHT?

11:52AM  10  A.   YES.

11:52AM  11  Q.   IN INTERPRETING THAT, YOU WERE MAKING SOME ASSUMPTIONS

11:52AM  12  ABOUT WHAT THIS INDIVIDUAL MEANT WITH THAT LANGUAGE; IS THAT

11:52AM  13  RIGHT?

11:52AM  14  A.   WELL, I, I REVIEWED THE ENTIRE CONTEXT OF INTERVIEW, AS

11:52AM  15  WELL AS OTHER INFORMATION FROM MR. CHUNG, AND I BELIEVE I CAME

11:52AM  16  TO AN UNDERSTANDING OF WHAT HIS POSITION WAS OF THIS ITEM OF

11:52AM  17  LIS DATABASE AND SYSTEM BEING CUSTOM.

11:52AM  18  Q.   FROM YOUR EXPERIENCE WITH SQL DATABASES, DO YOU HAVE AN

11:52AM  19  UNDERSTANDING OF THE WAYS IN WHICH THE BESPOKE OR CUSTOM

11:52AM  20  DETAILS OF A DATABASE CAN MAKE IT IMPOSSIBLE TO MOVE OR

11:52AM  21  DECONSTRUCT?

11:53AM  22  A.   YEAH, THERE'S NO WAY THAT A CUSTOM DATABASE DESIGN, AND

11:53AM  23  THE CUSTOM DATABASE IMPLEMENTATION IN A STANDARD MICROSOFT SQL

11:53AM  24  SERVER SYSTEM WOULD PREVENT IT FROM BEING MOVED.

11:53AM  25  Q.   SORRY, I DIDN'T MEAN TO TALK OVER YOU.  FINISH YOUR

SONNIER CROSS BY MR. BOSTIC                                    6770

11:53AM   1    ANSWER.

11:53AM   2    A.   I'M FINISHED.

11:53AM   3    Q.   YOU SAID IN A STANDARD SQL SYSTEM.

11:53AM   4         ARE YOU ASSUMING THAT THERANOS WAS RUNNING A STANDARD SQL

11:53AM   5    SYSTEM?

11:53AM   6    A.   ALL OF THE INFORMATION THAT I JUST REVIEWED IS THAT

11:53AM   7    THEY'RE RUNNING A STANDARD MICROSOFT SQL SERVER ENVIRONMENT

11:53AM   8    CONFIGURED AND SET UP PER MICROSOFT'S GUIDELINE.

11:53AM   9    Q.   BUT, AGAIN, YOU NEVER ACTUALLY EXAMINED THE LIS SYSTEM IN

11:53AM  10    PERSON, DID YOU?

11:53AM  11    A.   NO, I DID NOT.

11:53AM  12    Q.   YOU'RE RELYING --

11:53AM  13    A.   IT WAS DISASSEMBLED IN SOME STORAGE LOCATION, SO --

11:53AM  14    Q.   SO YOU'RE RELYING ENTIRELY ON SECOND-HAND DESCRIPTIONS AND

11:54AM  15    THE MATERIALS THAT YOU REVIEWED TO UNDERSTAND IT; IS THAT FAIR?

11:54AM  16    A.   I'M RELYING ON THE FACT THAT AT THE LEVEL OF DATA

11:54AM  17    RECOVERY, THE SQL SERVER SYSTEM FOR MICROSOFT SORT OF ONLY

11:54AM  18    WORKS ONE WAY, AND IT DOESN'T REALLY MATTER IF IT'S A CUSTOM

11:54AM  19    DATABASE THAT THAT SYSTEM IS HOSTING OR, SAY, A STANDARD ERP

11:54AM  20    DATABASE FROM SOME BUSINESS VENDOR.

11:54AM  21         THE RECOVERABILITY REMAINS THE SAME, IRREGARDLESS IF IT'S

11:54AM  22    A STANDARD VENDOR SUPPLY DATABASE OR A CUSTOM IN-HOUSE

11:54AM  23    DATABASE.

11:54AM  24    Q.   AT LEAST THAT'S BEEN TRUE IN ALL OF THE DATABASES THAT YOU

11:54AM  25    HAD FIRST-HAND EXPERIENCE WITH; IS THAT RIGHT?

ER-5013

SONNIER CROSS BY MR. BOSTIC                                    6771

11:54AM  1    A.   THAT'S RIGHT.  OVER MY VAST EXPERIENCE IT'S ALWAYS BEEN

11:54AM  2    THE CASE.

11:54AM  3    Q.   BUT THAT FIRST-HAND EXPERIENCE DOES NOT INCLUDE THE

11:54AM  4    THERANOS LIS; IS THAT FAIR?

11:54AM  5    A.   THAT'S CORRECT, I HAVE NOT HAD ANY FIRST-HAND EXPERIENCE

11:55AM  6    WITH THE THERANOS DATABASE.

11:55AM  7    Q.   IF I COULD ASK YOU TO TURN TO 5927 IN YOUR BINDER.

11:55AM  8    A.   5927.

11:55AM  9    Q.   AND IF YOU LOOK AT PAGE 3 -- WELL, FIRST OF ALL, IS 5927

11:55AM 10    PART OF THE MATERIALS THAT YOU REVIEWED AND CONSIDERED IN

11:55AM 11    REACHING YOUR OPINION?

11:55AM 12    A.   YES, THIS IS ANOTHER FBI INTERVIEW REPORT.

11:55AM 13    Q.   OKAY.  AND ON PAGE 3 OF THIS REPORT AT THE TOP OF THE

11:55AM 14    PAGE, IT WAS RELAYED TO YOU VIA THIS DOCUMENT THAT AN I.T.

11:55AM 15    PROFESSIONAL TOLD SOMEONE AT THERANOS THAT THEY WOULD NOT BE

11:55AM 16    ABLE TO GET ANYTHING OFF OF THE HARD DRIVES.

11:55AM 17         DID YOU CONSIDER THAT INFORMATION IN REACHING YOUR

11:56AM 18    OPINION?

11:56AM 19    A.   SEVERAL OF THE INTERVIEWS, INCLUDING THIS ONE, SORT OF

11:56AM 20    MADE REFERENCE TO THAT.

11:56AM 21         AND SO I DID TAKE UP A PARTICULAR LINE OF INVESTIGATION TO

11:56AM 22    MAKE SURE THAT THAT WAS JUST SORT OF ORDINARY CONCERNS OF WHEN

11:56AM 23    YOU REMOVE HARD DRIVES FROM A SYSTEM AS OPPOSED TO SOME SORT OF

11:56AM 24    HARD BARRIER THAT WOULD PREVENT RECOVERY.

11:56AM 25    Q.   TURN TO TAB 5928 IF YOU WOULDN'T MIND.

11:56AM  1    A.   YES.

11:56AM  2    Q.   AND DO YOU SEE THERE ANOTHER ONE OF THESE REPORTS THAT YOU

11:56AM  3    REVIEWED AND CONSIDERED IN REACHING YOUR OPINION?

11:56AM  4    A.   YES.

11:56AM  5    Q.   AT THE TOP OF PAGE 3, DO YOU SEE INFORMATION THAT WAS

11:56AM  6    PROVIDED TO YOU INDICATING THAT IT WOULD NOT HAVE BEEN POSSIBLE

11:57AM  7    TO GET THE LIS DATABASE TO WORK AGAIN AFTER IT WAS TAKEN APART?

11:57AM  8    A.   SO AT THE VERY TOP OF PAGE 3?

11:57AM  9    Q.   YES.

11:57AM  10   A.   I SEE HERE THAT MR. CHUNG DIDN'T THINK THAT YOU WOULD BE

11:57AM  11   ABLE TO RECOVER THE LIS DATABASE OR GET IT WORKING AGAIN.

11:57AM  12   Q.   AND THAT CONFLICTS WITH YOUR OPINION; IS THAT CORRECT?

11:57AM  13   A.   THAT'S CORRECT.

11:57AM  14   Q.   DO YOU UNDERSTAND THAT MR. CHUNG WAS SOMEONE WHO HAD

11:57AM  15   FIRST-HAND EXPERIENCE WITH THE THERANOS LIS?

11:57AM  16        MR. BRECHER:  OBJECTION.  ASSUMES FACTS.  LACKS

11:57AM  17   FOUNDATION.

11:57AM  18        THE COURT:  DID YOU GAIN THAT KNOWLEDGE FROM THE --

11:57AM  19   I THINK, IS THAT YOUR QUESTION, WHETHER HE GAINED THAT

11:58AM  20   KNOWLEDGE THROUGH THE MATERIALS?

11:58AM  21        MR. BOSTIC:  YES, YOUR HONOR.  I'M ASKING SOLELY

11:58AM  22   ABOUT HIS UNDERSTANDING.

11:58AM  23        THE COURT:  RIGHT.

11:58AM  24      YOU CAN ANSWER THE QUESTION.

11:58AM  25        THE WITNESS:  MY UNDERSTANDING OF MR. CHUNG WAS THAT

SONNIER CROSS BY MR. BOSTIC                                   6773

11:58AM 1    HE WAS A CONTRACTOR BROUGHT IN TO DO A VERY SPECIFIC TASK, AND

11:58AM 2    WAS NOT THERE VERY LONG, AND HAD VERY, VERY LITTLE KNOWLEDGE OF

11:58AM 3    HOW THE LIS SYSTEM OR DATABASE WAS CONFIGURED OR WORKED.

11:58AM 4    BY MR. BOSTIC:

11:58AM 5    Q.   LET ME TRY ASKING MY QUESTION AGAIN THOUGH.

11:58AM 6    A.   SURE.

11:58AM 7    Q.   MY QUESTION WAS, DO YOU UNDERSTAND THAT MR. CHUNG HAD

11:58AM 8    FIRST-HAND EXPERIENCE WITH THE THERANOS LIS?

11:58AM 9    A.   I'M DISAGREEING WITH THE CHARACTERIZATION THAT HE HAD

11:58AM 10   FIRST-HAND EXPERIENCE.

11:58AM 11       HE WAS ON SITE.  HE TOUCHED THE HARDWARE.

11:58AM 12       BUT I DON'T THINK HE HAD VERY MUCH EXPERIENCE WITH THE

11:58AM 13   SYSTEM.

11:58AM 14   Q.   FAIR TO SAY HE HAD MORE FIRST-HAND EXPERIENCE WITH THE

11:58AM 15   SYSTEM THAN YOU DID; IS THAT CORRECT?

11:58AM 16   A.   HE HAD MORE HANDS ON THAN I DID, ABSOLUTELY.

11:58AM 17   Q.   IN REACHING YOUR ULTIMATE OPINION THAT THIS DATA COULD BE

11:58AM 18   RECOVERED, YOU ULTIMATELY DISAGREED WITH THIS INFORMATION FROM

11:59AM 19   MR. CHUNG; IS THAT FAIR?

11:59AM 20   A.   TO THE EXTENT THAT HE DIDN'T THINK THAT IT WOULD BE

11:59AM 21   POSSIBLE TO GET THE LIS DATABASE WORKING AGAIN, YES, I

11:59AM 22   DISAGREED WITH THAT OPINION.

11:59AM 23   Q.   YOU TESTIFIED EARLIER ABOUT YOUR UNDERSTANDING OF THE

11:59AM 24   HARDWARE THAT WOULD BE USED TO RUN A TYPICAL SQL DATABASE.

11:59AM 25       DO YOU RECALL THAT?

ER-5016

11:59AM  1    A.  YES.

11:59AM  2    Q.  IN THE SAME DOCUMENT THAT YOU'RE LOOKING AT, IF I COULD

11:59AM  3    ASK YOU TO LOOK AT PAGE 2 -- SO THAT'S 5928, PAGE 2.

11:59AM  4    A.  YES.

11:59AM  5    Q.  AND IN THE MIDDLE OF THE BOTTOM PARAGRAPH, DO YOU SEE THAT

11:59AM  6    YOU WERE PROVIDED INFORMATION INDICATING THAT THE LIS WAS ON A

11:59AM  7    COMPLETELY DIFFERENT INFRASTRUCTURE CONSISTING OF HUNDREDS OF

11:59AM  8    SERVERS?

11:59AM  9    A.  SO AT THE BOTTOM OF PAGE 2?

11:59AM  10   Q.  YES, BOTTOM PARAGRAPH IN THE MIDDLE OF THAT PARAGRAPH.

12:00PM  11   A.  SO BASED ON ALL OF THE MATERIAL THAT I REVIEWED --

12:00PM  12   Q.  I'M SORRY.  SIR, I'M JUST ASKING IF YOU WERE PROVIDED

12:00PM  13   INFORMATION INDICATING THAT --

12:00PM  14   A.  OH, PROVIDED INFORMATION?

12:00PM  15   Q.  YES.  WERE YOU PROVIDED WITH INFORMATION INDICATING THAT

12:00PM  16   THE LIS WAS ON A COMPLETELY DIFFERENT INFRASTRUCTURE CONSISTING

12:00PM  17   OF HUNDREDS OF SERVERS?

12:00PM  18   A.  I WAS PROVIDED INFORMATION THAT IT WAS ON A COMPLETELY

12:00PM  19   DIFFERENT INFRASTRUCTURE.  HOWEVER, THIS APPEARS TO BE THE ONLY

12:00PM  20   PART OF THAT INFORMATION THAT WOULD SAY HUNDREDS OF SERVERS.

12:00PM  21   Q.  AND THIS WAS PART OF THE INFORMATION THAT WAS PROVIDED TO

12:00PM  22   YOU SO YOU COULD REACH YOUR CONCLUSIONS; IS THAT CORRECT?

12:00PM  23   A.  THAT IS CORRECT.

12:00PM  24   Q.  IF I COULD ASK YOU TO TURN TO 5929, WHICH IS THE NEXT TAB.

12:01PM  25   A.  THE NEXT ONE, THE FBI REPORT?

SONNIER CROSS BY MR. BOSTIC                                    6775

12:01PM  1    Q.   YES.  DO YOU HAVE THAT ONE IN FRONT OF YOU?

12:01PM  2    A.   YES.

12:01PM  3    Q.   AND AT 5929, I'LL ASK YOU TO LOOK AT PAGE 5.  THERE'S A

12:01PM  4    PARAGRAPH TOWARDS THE TOP OF THE PAGE THAT BEGINS "THE LAST

12:01PM  5    DAY."

12:01PM  6         DO YOU SEE THAT?

12:01PM  7    A.   YES, ON THE LAST DAY.

12:01PM  8    Q.   YES.  AND HALFWAY DOWN THAT PARAGRAPH, YOU WERE PROVIDED

12:01PM  9    WITH INFORMATION THAT INDICATED THAT ONCE THE HARD DRIVES WERE

12:01PM 10    TAKEN OUT OF THE LIS SERVERS, IF THEY WERE NOT TRACKED AS TO

12:01PM 11    WHERE THEY CAME FROM, IT WOULD HAVE BEEN IMPOSSIBLE TO PUT THEM

12:01PM 12    BACK TOGETHER.

12:01PM 13         DID YOU RECEIVE THAT INFORMATION?

12:01PM 14    A.   I DID RECEIVE THAT INFORMATION, BUT I DISAGREE WITH IT.

12:01PM 15    Q.   DID YOU ALSO RECEIVE THE INFORMATION FOLLOWING THAT, THAT

12:02PM 16    EVEN IF THE HARD DRIVES WERE ALL LABELLED CORRECTLY, IT WOULD

12:02PM 17    HAVE BEEN EXTREMELY DIFFICULT TO RECONSTRUCT THE DATABASE,

12:02PM 18    BECAUSE IN ADDITION TO THE SERVERS, THERE ARE ALSO HUNDREDS OF

12:02PM 19    NETWORK DEVICES WHICH WOULD HAVE TO BE CONNECTED CORRECTLY?

12:02PM 20         DID YOU RECEIVE THAT INFORMATION?

12:02PM 21    A.   YES, I RECEIVED THAT INFORMATION.

12:02PM 22    Q.   AND YOU DISAGREED WITH THAT INFORMATION AS WELL; CORRECT?

12:02PM 23    A.   WELL, IN PARTICULAR, THE PART ABOUT NETWORK DEVICES IS NOT

12:02PM 24    A FACTOR IN THE RECOVERY OF THE DATABASE ITSELF.

12:02PM 25    Q.   SO AGAIN, JUST TO ANSWER MY QUESTION, YOU ULTIMATELY

ER-5018

12:02PM  1      DISAGREED WITH THE STATEMENT THAT WAS BEING RELAYED FROM THIS

12:02PM  2      I.T. PROFESSIONAL?

12:02PM  3      A.   THAT'S CORRECT.

12:02PM  4      Q.   AND IN THIS CASE WE'RE TALKING ABOUT THE SAME I.T.

12:02PM  5      PROFESSIONAL WHO HAD SOME HANDS-ON EXPERIENCE WITH THE LIS

12:02PM  6      SYSTEM; IS THAT YOUR UNDERSTANDING?

12:02PM  7      A.   SO, AGAIN, I DON'T THINK HE HAD HANDS-ON EXPERIENCE WITH

12:02PM  8      THE LIS SYSTEM.  I THINK HE TOUCHED THE HARDWARE, SO HE HAD

12:03PM  9      HANDS-ON EXPERIENCE WITH THE EQUIPMENT THAT RAN THE LIS SYSTEM.

12:03PM 10      Q.   AND TO BE CLEAR, WERE YOU PRESENT WHEN HE WAS DOING HIS

12:03PM 11      WORK AT THERANOS?

12:03PM 12      A.   NO, I WAS NOT.

12:03PM 13      Q.   SO CAN YOU CONFIDENTLY TESTIFY ABOUT WHAT HE DID AND WHAT

12:03PM 14      HE DIDN'T DO?

12:03PM 15      A.   I CAN ONLY TESTIFY ABOUT THE MATERIALS AND WHAT THE

12:03PM 16      MATERIALS THAT I REVIEWED DESCRIBE.

12:03PM 17          IN THOSE DESCRIPTIONS, THIS I.T. PROFESSIONAL WAS A

12:03PM 18      CONTRACTOR BROUGHT ON TO THERANOS, VERY LIMITED AMOUNT OF TIME,

12:03PM 19      TO DO A VERY SPECIFIC THING, WHICH WAS MOVE EQUIPMENT, AND HE

12:03PM 20      SEEMED TO HAVE DONE THAT WITH DISPATCH.

12:03PM 21          BUT I DON'T THINK HE GOT INTO THE RUNNING OF THE SYSTEM OR

12:03PM 22      HOW THEY WERE ORGANIZED.

12:03PM 23      Q.   SO IN DECIDING TO BELIEVE OR DISBELIEVE THE INFORMATION

12:03PM 24      THAT THIS I.T. SPECIALIST IS PROVIDING, YOU'RE WEIGHING -- OR

12:03PM 25      YOU'RE INCORPORATING YOUR VIEW OF HOW INVOLVED HE WAS IN THE

12:04PM   1    LIS WORK AT THERANOS?

12:04PM   2              MR. BRECHER:  OBJECTION.  MISSTATES PRIOR TESTIMONY.

12:04PM   3              THE COURT:  OVERRULED.

12:04PM   4         YOU CAN ANSWER THE QUESTION.

12:04PM   5              THE WITNESS:  YES, I AM FACTORING INTO THE VARIOUS

12:04PM   6    INTERVIEWEES WHAT THEIR SCOPE AND EXPERIENCE AT THERANOS WAS AS

12:04PM   7    DESCRIBED IN THOSE INTERVIEWS.

12:04PM   8    BY MR. BOSTIC:

12:04PM   9    Q.   TO THE EXTENT THAT YOU MIGHT BE WRONG ABOUT THOSE

12:04PM  10    ASSUMPTIONS, WOULD THAT CALL INTO QUESTION YOUR ULTIMATE

12:04PM  11    DECISION ABOUT WHETHER TO BELIEVE OR DISBELIEVE THESE OTHER

12:04PM  12    STATEMENTS?

12:04PM  13    A.   NO.  IT'S ALL A TECHNICAL MATTER FOR ME.  ONCE THE DISK

12:04PM  14    DRIVES ARE RECOVERED AND THE EQUIPMENT IS RECOVERED, THEN YOU

12:04PM  15    CAN RECOVER THE DATABASE.

12:04PM  16         AND SO I DID INVESTIGATE STATEMENTS THAT SEEMED TO BE AT

12:05PM  17    ODDS WITH THAT JUST TO SEE IF THERE WAS ANY TECHNICAL -- OR

12:05PM  18    THERE WAS ANY REASON WHY THE PROFESSIONAL MIGHT HAVE THAT

12:05PM  19    OPINION, AND I COULDN'T FIND ANY.

12:05PM  20    Q.   I'LL ASK YOU TO TURN TO PAGE 4 IN THAT SAME DOCUMENT,

12:05PM  21    5928, PAGE 4?

12:05PM  22    A.   PAGE 4.

12:05PM  23    Q.   AND YOU SEE THERE'S A SUBHEADING LABELLED NEETEK 746,

12:05PM  24    N-E-E-T-E-K?

12:05PM  25              MR. BRECHER:  I'M SORRY, COUNSEL.  WHICH EXHIBIT IS

SONNIER CROSS BY MR. BOSTIC                                    6778

12:05PM   1        THIS?

12:05PM   2                    MR. BOSTIC:  THIS IS 5928.

12:05PM   3                    THE COURT:  5928.

12:05PM   4                    THE WITNESS:  OH, THE PREVIOUS ONE.

12:05PM   5                    MR. BOSTIC:  YES.  SORRY.

12:05PM   6        Q.   BACK TO 5928.

12:05PM   7        A.   YES.  I WAS SAYING I DIDN'T SEE ANY HEADINGS.

12:05PM   8        Q.   SORRY.  I'M NOT CONFUSING YOU ON PURPOSE.

12:05PM   9        A.   AND WHICH PAGE?

12:05PM  10        Q.   PAGE 4.  AND DO YOU SEE THAT HEADING IN THE MIDDLE OF

12:06PM  11        PAGE 746?

12:06PM  12        A.   YES, 746, I'VE GOT IT.

12:06PM  13        Q.   AND BELOW THAT, DO YOU SEE THAT YOU WERE PROVIDED

12:06PM  14        INFORMATION FROM THE SAME SOURCE INDICATING THAT IT DID NOT

12:06PM  15        MATTER HOW MANY COPIES THEY MADE OF THIS LIS DATABASE BECAUSE

12:06PM  16        THEY WOULD NOT BE ABLE TO RESTORE THE DATA WITHOUT A KEY?

12:06PM  17             WERE YOU PROVIDED THAT INFORMATION?

12:06PM  18        A.   YES, I WAS PROVIDED THAT INFORMATION.

12:06PM  19             I THINK THIS IS REFERRING TO THAT ENCRYPTION KEY FOR THE

12:06PM  20        BACKUP, THOUGH, THAT WE DISCUSSED EARLIER.

12:06PM  21        Q.   LET'S GO TO 5938.

12:06PM  22        A.   5938.

12:06PM  23        Q.   AND AT 5938, DO YOU SEE ANOTHER REPORT FROM A DIFFERENT

12:06PM  24        I.T. PROFESSIONAL THAT YOU WOULD HAVE CONSIDERED AND REVIEWED

12:07PM  25        IN CONNECTION WITH YOUR OPINION?

SONNIER CROSS BY MR. BOSTIC                                    6779

12:07PM  1   A.    YES.

12:07PM  2   Q.    AND IF YOU LOOK AT PAGE 3 OF THAT DOCUMENT, DO YOU SEE IN

12:07PM  3   THE SECOND TO TOP PARAGRAPH, AT THE BOTTOM OF THAT PARAGRAPH,

12:07PM  4   THAT YOU RECEIVED INFORMATION INDICATING THAT IF THERANOS TOOK

12:07PM  5   THE LIS APART, THEY WOULD NOT BE ABLE TO ACCESS IT AGAIN

12:07PM  6   BECAUSE THEN THE ENCRYPTION KEY WOULD BE LOST?

12:07PM  7         WERE YOU PROVIDED THAT INFORMATION?

12:07PM  8   A.    YES, I WAS.

12:07PM  9   Q.    AND WERE YOU PROVIDED THE FOLLOW-UP INFORMATION THAT THE

12:07PM  10  ENCRYPTION KEY WAS LOCATED ON A DISK ARRAY WHICH HAD A LOT OF

12:07PM  11  PIECES, AND WHEN THEY TOOK THE DISK ARRAY APART, IT WOULD HAVE

12:07PM  12  DESTROYED THE ENCRYPTION KEY?  WERE YOU PROVIDED THAT

12:07PM  13  INFORMATION?

12:07PM  14  A.    YES, I WAS.

12:07PM  15  Q.    DID YOU DISAGREE WITH THAT INFORMATION FROM THAT OTHER

12:07PM  16  I.T. PROFESSIONAL?

12:07PM  17  A.    I TOOK THAT STATEMENT VERY SERIOUSLY AND INVESTIGATED THEM

12:07PM  18  EXTENSIVELY AND FOUND THAT THERE'S NO TECHNICAL BASIS FOR THAT

12:07PM  19  STATEMENT.

12:08PM  20        SO TO THE EXTENT THIS PROFESSIONAL IS REFERRING TO THE

12:08PM  21  FEASIBILITY OF THE RECOVERY OF THE LIS DATABASE, IT'S

12:08PM  22  INCORRECT.

12:08PM  23        HE MAY HAVE BEEN TALKING ABOUT SOMETHING ELSE.

12:08PM  24        BUT I TOOK THESE STATEMENTS VERY SERIOUSLY AND

12:08PM  25  INVESTIGATED THEM VERY EXTENSIVELY AND THERE'S NO TECHNICAL

ER-5022

SONNIER CROSS BY MR. BOSTIC                                        6780

12:08PM   1     BASIS FOR THEM.

12:08PM   2     Q.   YOU SAID YOU INVESTIGATED THEM THOROUGHLY.  YOUR

12:08PM   3     INVESTIGATION, THOUGH, DIDN'T INCLUDE ANY REVIEW OF THE LIS

12:08PM   4     ORIGINAL HARDWARE; IS THAT CORRECT?

12:08PM   5     A.   THAT'S RIGHT.  THE HARDWARE, WE HAVE THE INVENTORY SO YOU

12:08PM   6     CAN GO LOOK UP THE EXACT MODELS AND LOOK UP THE TECHNICAL

12:08PM   7     INFORMATION INDEPENDENT OF ACTUALLY INSPECTING THE PHYSICAL

12:08PM   8     UNITS THEMSELVES.

12:08PM   9     Q.   THAT THOROUGH INVESTIGATION YOU REFERENCED, DID IT INCLUDE

12:08PM  10     SPEAKING TO ANY OF THE I.T. PROFESSIONALS WHOSE STATEMENTS

12:08PM  11     YOU'VE READ?

12:08PM  12     A.   I DIDN'T SPEAK TO ANY, ANY OF THE PROFESSIONALS.

12:08PM  13     Q.   ULTIMATELY WHEN YOU READ THIS INFORMATION THAT WAS

12:09PM  14     PROVIDED FOR YOUR REVIEW, YOU DISREGARDED INFORMATION THAT WAS

12:09PM  15     INCONSISTENT WITH YOUR ULTIMATE CONCLUSION.

12:09PM  16          IS THAT FAIR TO SAY?

12:09PM  17     A.   NO.  I WAS PUTTING TOGETHER A JIGSAW PUZZLE FROM ALL OF

12:09PM  18     THE INFORMATION, SO I WAS CROSS-REFERENCING EVERYTHING.

12:09PM  19          BUT IF THE INFORMATION, AS IN THESE INTERVIEWS, OTHER

12:09PM  20     DOCUMENTS PROVIDED, AND THE PUBLIC INFORMATION AND DETERMINING

12:09PM  21     WHAT ACTUALLY HOOKS TOGETHER AND MAKES THE COMPLETE PICTURE.

12:09PM  22          SO I DIDN'T DISREGARD THEM WHERE THE STATEMENT SEEMED

12:09PM  23     IMPLAUSIBLE OR PROBABLY, YOU KNOW, CONSTRUCTED TECHNICALLY,

12:09PM  24     LIKE THAT DIDN'T SOUND RIGHT, I INVESTIGATED THEM EXTENSIVELY

12:09PM  25     TO SEE IF PERHAPS THERE WAS SOME BASIS.

ER-5023

SONNIER CROSS BY MR. BOSTIC                                    6781

12:09PM   1          AND TO THE EXTENT THAT I'M DISAGREEING WITH ANY OF THESE

12:10PM   2     MATERIALS IN THEIR INTERVIEW STATEMENTS, IT'S BECAUSE I FOUND

12:10PM   3     NO TECHNICAL BASIS TO SUPPORT THEM.

12:10PM   4     Q.   AND DO YOU FEEL THAT YOU INVESTIGATED THOSE STATEMENTS AS

12:10PM   5     THOROUGHLY AS YOU COULD GIVEN THE LIMITATIONS THAT YOU DIDN'T

12:10PM   6     HAVE ACCESS TO ANY OF THE ORIGINAL HARDWARE OR THE INDIVIDUALS

12:10PM   7     WHO HAD THAT KNOWLEDGE?

12:10PM   8     A.   YES.  SO I DIDN'T FEEL THAT ACCESS TO THE INDIVIDUALS OR

12:10PM   9     THE ACTUAL HARDWARE WAS NECESSARY IN ORDER TO REACH THE

12:10PM   10    CONCLUSIONS THAT I REACHED.

12:10PM   11    Q.   DID YOU CONCLUDE, AS PART OF YOUR REVIEW, THAT

12:10PM   12    RECONSTRUCTING THE LIS WOULD HAVE BEEN MORE DIFFICULT ONCE THE

12:10PM   13    LIS SYSTEM HARDWARE WAS RETURNED?

12:10PM   14    A.   SO THERE ARE TWO ASPECTS TO THAT FROM THE MATERIAL THAT I

12:10PM   15    REVIEWED.  THE MORE LIKELY SCENARIO IS THAT THE LIS PRODUCTION

12:10PM   16    HARDWARE WAS NEVER RETURNED, OR AT LEAST THERE'S NOTHING TO SAY

12:11PM   17    THAT IT EVER LEFT ITS STORAGE LOCATION.

12:11PM   18          THERE IS ANOTHER SCENARIO IN WHICH IT IS POSSIBLE THAT THE

12:11PM   19    EQUIPMENT WAS RETURNED TO THE PERSON HOLDING THE LEASE, THE

12:11PM   20    LEASE HOLDER, MAYBE A YEAR AFTER DISASSEMBLY, AND I DID

12:11PM   21    CONSIDER THAT SCENARIO AND CONCLUDED THAT IT'S EASY ENOUGH TO

12:11PM   22    GET REPLACEMENT EQUIPMENT ON THE REFURBISHED MARKET, STANDARD

12:11PM   23    PRACTICE.

12:11PM   24          AND SO IF THE EQUIPMENT WERE NOT AVAILABLE, YOU COULD

12:11PM   25    OBTAIN THE EXACT SAME MODELS AND EQUIPMENT FROM THE REFURBISHED

12:11PM   1        MARKET.

12:11PM   2             AND I ACTUALLY INVESTIGATED IT AT THE TIME, LAST FALL, TO

12:11PM   3        SEE IF SUCH -- THOSE TYPES OF EQUIPMENT APPEARED TO BE

12:11PM   4        AVAILABLE, AND THEY'RE GENERALLY AVAILABLE IN THAT MARKET.

12:11PM   5        Q.   OKAY.  SO A COUPLE OF THINGS.

12:12PM   6             FIRST, DO YOU HAVE ANY PERSONAL KNOWLEDGE AS TO WHETHER

12:12PM   7        THE ORIGINAL EQUIPMENT WAS ACTUALLY RETURNED FROM THERANOS OR

12:12PM   8        NOT?  DO YOU PERSONALLY KNOW THAT?

12:12PM   9        A.   ALL OF THE MATERIALS THAT I'VE REVIEWED DON'T INDICATE

12:12PM  10        THAT, AND I CERTAINLY HAVE NO PERSONAL KNOWLEDGE OF WHERE THAT

12:12PM  11        EQUIPMENT WENT PAST THE STORAGE LOCKER.

12:12PM  12        Q.   DO YOU BELIEVE, THOUGH, OR DO YOU AGREE THAT RECOVERING

12:12PM  13        THE LIS DATA WOULD BE MORE DIFFICULT IF THAT EQUIPMENT HAD BEEN

12:12PM  14        RETURNED?

12:12PM  15        A.   YES.  AS I JUST STATED, YOU WOULD HAVE TO GET --

12:12PM  16        POTENTIALLY YOU WOULD HAVE TO GET REPLACEMENT EQUIPMENT OR USE

12:12PM  17        MORE COMPUTER FORENSIC TECHNIQUES TO RECOVER IT IN THIS CASE.

12:12PM  18             MR. BOSTIC:  SO, YOUR HONOR, I'M ABOUT TO SWITCH

12:12PM  19        TOPICS.  I'M NOT SURE WHEN THE COURT WANTED TO TAKE A BREAK.

12:12PM  20             THE COURT:  I THOUGHT EARLIER WE WOULD BREAK AT NOON

12:13PM  21        FOR ABOUT -- I THINK WE'RE BREAKING TODAY AT 2:00 O'CLOCK, 2:00

12:13PM  22        P.M., LADIES AND GENTLEMEN.  I BELIEVE THAT'S STILL CORRECT.

12:13PM  23        MY RECOLLECTION IS THAT SOME JURORS HAD SOME APPOINTMENTS.

12:13PM  24             SO WHY DON'T WE TAKE A BREAK NOW?

12:13PM  25             COULD WE TAKE 20 MINUTES?  LET'S TAKE ABOUT 20,

12:13PM  1    25 MINUTES, AND THEN WE'LL RESUME.

12:13PM  2         YOU CAN STAND DOWN, SIR.  THANK YOU.

12:13PM  3         (RECESS FROM 12:13 P.M. UNTIL 12:40 P.M.)

12:40PM  4          THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

12:40PM  5    ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

12:40PM  6         MR. BOSTIC.

12:40PM  7          MR. BOSTIC:  THANK YOU, YOUR HONOR.

12:40PM  8    Q.   MR. SONNIER, WELCOME BACK.

12:40PM  9         CAN I ASK YOU TO LOOK AT TAB 5897 IN YOUR BINDER, PLEASE.

12:40PM  10   A.   DID YOU SAY 5857?

12:40PM  11   Q.   5897.

12:40PM  12   A.   OKAY.

12:40PM  13   Q.   AND YOU TESTIFIED EARLIER THAT YOU'RE AWARE THAT A COPY,

12:40PM  14   OR RATHER A BACKUP, OF THE THERANOS LIS WAS PROVIDED TO THE

12:40PM  15   GOVERNMENT?

12:40PM  16   A.   THAT IS CORRECT.

12:40PM  17   Q.   AND IS IT YOUR UNDERSTANDING THAT THAT HAPPENED IN LATE

12:40PM  18   AUGUST 2018?

12:41PM  19   A.   YES.

12:41PM  20   Q.   AND AT 5897, DO YOU SEE AN EMAIL BETWEEN INDIVIDUALS AT

12:41PM  21   THERANOS AND AN EMAIL BETWEEN INDIVIDUALS AT A LAW FIRM CALLED

12:41PM  22   WILMER HALE IN LATE AUGUST 2018?

12:41PM  23   A.   I DO SEE THE EMAIL, AND I DO RECOGNIZE THE FROM AS BEING

12:41PM  24   SOMEONE FROM WILMER HALE.

12:41PM  25         I'M NOT SURE I RECOGNIZE ANY OF THE NAMES ON THE TO LINE.

12:41PM  1    Q.   DO YOU SEE DOMAIN NAMES FROM THERANOS THERE AS WELL?

12:41PM  2    A.   I GUESS TO -- OKAY.  AS YOU GET THROUGH THE THREAD, I DO

12:41PM  3    SEE SOME THERANOS, SOME THERANOS DOMAIN NAMES.

12:41PM  4              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5897.

12:42PM  5              MR. BRECHER:  OBJECTION.  AUTHENTICITY.

12:42PM  6              THE COURT:  MR. BOSTIC.

12:42PM  7              MR. BOSTIC:  SO, YOUR HONOR, I BELIEVE THIS SHOULD

12:42PM  8    BE AUTHENTIC ON ITS FACE.  I'LL POINT OUT THE BATES NUMBER ON

12:42PM  9    THE BOTTOM INDICATING THAT THIS WAS PRODUCED BY WILMER HALE.

12:42PM  10        I ALSO HAVE THE COVER LETTERS FOR THAT PRODUCTION IF THE

12:42PM  11   COURT AND THE DEFENSE WOULD LIKE TO REVIEW THEM.

12:42PM  12             THE COURT:  HAVE YOU SEEN THE COVER LETTERS?

12:42PM  13             MR. BRECHER:  NOT RECENTLY.

12:42PM  14             THE COURT:  WOULD YOU LIKE TO LOOK AT THOSE NOW?

12:42PM  15             MR. BRECHER:  THAT WOULD BE HELPFUL.

12:42PM  16             THE COURT:  SURE.

12:42PM  17             MR. BOSTIC:  MAY I PASS UP A COPY, YOUR HONOR?

12:42PM  18             THE COURT:  THANK YOU.

12:42PM  19             MR. BOSTIC:  (HANDING.)

12:42PM  20        (PAUSE IN PROCEEDINGS.)

12:43PM  21             THE COURT:  ANYTHING FURTHER?

12:43PM  22             MR. BRECHER:  NO, YOUR HONOR.

12:43PM  23             THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:43PM  24        (GOVERNMENT'S EXHIBIT 5897 WAS RECEIVED IN EVIDENCE.)

12:43PM  25   BY MR. BOSTIC:

SONNIER CROSS BY MR. BOSTIC                                    6785

12:43PM  1    Q.   OKAY.  SO, MR. SONNIER, DO YOU SEE ON THE SCREEN IN FRONT

12:43PM  2    OF YOU THIS EMAIL CHAIN FROM LATE AUGUST OF 2018?

12:43PM  3    A.   YES.

12:43PM  4    Q.   AND LET'S LOOK AT THE FIRST EMAIL, AND IF WE CAN ZOOM IN

12:43PM  5    THERE.

12:43PM  6         DO YOU SEE THAT IT BEGINS WITH A MESSAGE FROM SOMEONE

12:43PM  7    NAMED DAVID TAYLOR?

12:43PM  8    A.   YES, I SEE THAT.

12:43PM  9    Q.   DO YOU HAVE AN UNDERSTANDING FROM YOUR REVIEW OF DOCUMENTS

12:43PM  10   THAT DAVID TAYLOR WAS THE CEO AT THERANOS AT THE TIME?

12:43PM  11   A.   I'M NOT SURE I KNEW HE WAS THE CEO, BUT I HAD A FEELING

12:43PM  12   THAT HE WAS THE ONE CALLING THE SHOTS AT THE TOP.

12:43PM  13   Q.   DO YOU SEE THAT HE EMAILS A GROUP OF PEOPLE, OTHERS AT

12:43PM  14   THERANOS, AND A LAWYER AT WILMER HALE, AND HE SAYS, "CAN THIS

12:43PM  15   GROUP CONVENE FOR A CALL AS SOON AS POSSIBLE, IDEALLY THIS

12:43PM  16   AFTERNOON."

12:44PM  17        DO YOU SEE THAT?

12:44PM  18   A.   YES, I SEE THAT.

12:44PM  19   Q.   AND HE SAYS, "TO HASH OUT WHAT WE STILL NEED FROM LIS AND

12:44PM  20   WHAT WE NEED TO DO TO GET IT, GIVEN THAT THE SYSTEM WILL BE PUT

12:44PM  21   INTO STORAGE THIS FRIDAY AND MAY THEREAFTER BE VERY DIFFICULT

12:44PM  22   TO RESUSCITATE?"

12:44PM  23        DO YOU SEE THAT?

12:44PM  24   A.   YES, I SEE THAT.

12:44PM  25   Q.   WHEN YOU WERE REACHING YOUR OPINION AND REVIEWING

SONNIER CROSS BY MR. BOSTIC                                          6786

12:44PM  1    DOCUMENTS, WERE YOU AWARE THAT MR. TAYLOR UNDERSTOOD IN LATE

12:44PM  2    AUGUST 2018 THAT PUTTING THE LIS INTO STORAGE WOULD MAKE IT

12:44PM  3    VERY DIFFICULT TO RESUSCITATE?

12:44PM  4    A.   I DON'T RECALL IF I SPECIFICALLY KNEW THAT MR. TAYLOR KNEW

12:44PM  5    THIS, BUT I CERTAINLY WAS AWARE THAT THERE WERE CERTAIN PEOPLE

12:44PM  6    AT THERANOS THAT WERE AWARE OF THAT.

12:44PM  7    Q.   OKAY.  WE CAN SET THAT ASIDE.

12:44PM  8         AND THIS WAS AROUND THE SAME TIME THAT YOU UNDERSTOOD THE

12:45PM  9    GOVERNMENT WAS PROVIDED WITH A BACKUP OF THE LIS; IS THAT

12:45PM 10    CORRECT?

12:45PM 11    A.   YEAH, THIS MAY HAVE BEEN A LITTLE BIT BEFORE THE BACKUP

12:45PM 12    ACTUALLY GOT TO THE GOVERNMENT, BUT --

12:45PM 13    Q.   IF I COULD ASK YOU TO JUST LOOK BRIEFLY AT 5895.

12:45PM 14    A.   5895.  OKAY, I'VE GOT THAT.

12:45PM 15    Q.   TAKE A MOMENT TO LOOK AT THAT AND LET ME KNOW IF THAT --

12:45PM 16    TAKE A MOMENT TO REVIEW IT, AND LET ME KNOW WHEN YOU'RE DONE

12:45PM 17    WITH THAT FIRST PAGE.

12:45PM 18    A.   OKAY.  I'VE READ THE FIRST PAGE.

12:45PM 19    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT THE GOVERNMENT

12:45PM 20    WAS PROVIDED WITH ITS COPY OF THE LIS JUST THE DAY BEFORE THE

12:45PM 21    EMAIL THAT WE JUST LOOKED AT?

12:46PM 22    A.   SO I HAD LOOKED AT THIS, AND IT DOES SAY THAT, LIKE, IT

12:46PM 23    WAS SENT THAT DAY.  BUT I DON'T GET -- I DIDN'T SEE ANY

12:46PM 24    CONFIRMATION UNTIL THE 29TH.

12:46PM 25    Q.   AS TO THE GOVERNMENT'S RECEIPT OF THE LIS?

12:46PM  1    A.    THAT'S CORRECT.

12:46PM  2    Q.    OKAY.  AND THAT WAS ALL WITHIN DAYS OF THE TIME WHEN,

12:46PM  3    ACCORDING TO THAT EMAIL THAT WE JUST SAW, THERANOS WAS GOING TO

12:46PM  4    PUT THE ORIGINAL IN STORAGE; IS THAT CORRECT?

12:46PM  5    A.    YES.  AFTER ALL OF THAT, AND EVEN THAT OTHER EMAIL, SORT

12:46PM  6    OF BASICALLY THE END OF THAT WEEK IS WHEN THE SYSTEM WAS

12:46PM  7    DISASSEMBLED AND PUT INTO STORAGE.

12:46PM  8    Q.    TURN NEXT IF YOU WOULD TO 5940.  IT SHOULD BE TOWARDS THE

12:46PM  9    BACK OF YOUR BINDER.

12:46PM  10   A.    5940.

12:46PM  11   Q.    ACTUALLY MAKE THAT 5943 AT THE VERY BACK.

12:47PM  12   A.    5943.

12:47PM  13   Q.    AND AT 5943, DO YOU SEE A CONTINUATION OF THE EMAIL AT THE

12:47PM  14   U.S. ATTORNEY'S OFFICE THAT YOU REVIEWED ON DIRECT WITH

12:47PM  15   MR. BRECHER?

12:47PM  16   A.    I BELIEVE THE EMAIL THAT WE PREVIOUSLY LOOKED AT IS THE

12:47PM  17   NEXT ONE IN THE THREAD, AND SO I GUESS THIS IS A FOLLOWUP TO

12:47PM  18   THAT.

12:47PM  19        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5943.

12:47PM  20        MR. BRECHER:  NO OBJECTION, YOUR HONOR.

12:47PM  21        THE COURT:  IT'S ADMITTED.

12:47PM  22        MR. BRECHER:  YOUR HONOR, IF THE WITNESS COULD MOVE

12:47PM  23   THE MICROPHONE A LITTLE BIT CLOSER, THAT WOULD BE HELPFUL.

12:47PM  24        THE WITNESS:  SORRY.  I KNOCKED IT OUT OF THE WAY

12:47PM  25   WITH THE BINDER.

12:47PM 1          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:47PM 2          (GOVERNMENT'S EXHIBIT 5943 WAS RECEIVED IN EVIDENCE.)

12:47PM 3     BY MR. BOSTIC:

12:47PM 4     Q.   LET'S ZOOM IN ON THE TOP HEAR.

12:48PM 5          AND DO YOU SEE THAT THIS IS COMMUNICATION BETWEEN THE SAME

12:48PM 6     INDIVIDUALS WHO WERE PREVIOUSLY DISCUSSING POSSIBLE WAYS TO

12:48PM 7     HANDLE THIS COPY OF THE LIS?

12:48PM 8     A.   I'M JUST CHECKING TO MAKE SURE.

12:48PM 9          YEAH, IT APPEARS TO BE THE SAME PEOPLE.

12:48PM 10    Q.   AND DO YOU SEE THAT THIS MESSAGE IS FROM SOMEONE NAMED

12:48PM 11    LAKISHA HOLLIMAN WHO WRITES BACK TO SUTTON PEIRCE AT THE U.S.

12:48PM 12    ATTORNEY'S OFFICE, AND CC'D ON THE EMAIL ARE THE PROSECUTORS IN

12:48PM 13    THE CASE, MYSELF, MR. SCHENK, AND MR. LEACH.

12:48PM 14         DO YOU SEE THAT?

12:48PM 15    A.   YES.

12:48PM 16    Q.   AND THIS READS, "I HAD A MEETING WITH THE AUSA'S ON THE

12:48PM 17    CASE REGARDING OUR OPTIONS AND WE ALL DECIDED TO DO THE

12:48PM 18    FOLLOWING."

12:48PM 19         DO YOU SEE THAT?

12:48PM 20    A.   YES, I DO.

12:48PM 21    Q.   AND THERE ARE TWO BULLET POINTS SELECTED THERE.

12:48PM 22         "PUSH BACK ON DEFENSE AND SEE IF THEY CAN BE PERSUADED TO

12:48PM 23    PRODUCE THIS IN A MANNER THAT CAN BE VIEWED AND PROCESSED IN A

12:48PM 24    STANDARD WAY RATHER THAN AN UNSPECIFIED ARCHIVE FORMAT THAT WE

12:49PM 25    CAN'T ACCESS."

12:49PM  1          DO YOU SEE THAT OPTION?

12:49PM  2     A.   YES.

12:49PM  3     Q.   AND THE OTHER OPTION, CHECK WITH THE FBI TO SEE IF THEY

12:49PM  4     CAN PROCESS THE DATABASE; CORRECT?

12:49PM  5     A.   YES.

12:49PM  6     Q.   AND DO YOU HAVE ANY FIRST-HAND KNOWLEDGE OF THE STEPS THAT

12:49PM  7     THE GOVERNMENT TEAM TOOK TO TRY TO GAIN ACCESS TO THIS DATABASE

12:49PM  8     AFTER THIS DATE?

12:49PM  9     A.   DO YOU MEAN THE COPY OR THE DATABASE ORIGINAL?

12:49PM  10    Q.   LET ME ASK JUST GENERALLY ABOUT THE DATABASE INFORMATION.

12:49PM  11    A.   OKAY.

12:49PM  12    Q.   DO YOU HAVE ANY KNOWLEDGE OF ANY EFFORTS THAT THE

12:49PM  13    GOVERNMENT TOOK TO TRY TO GAIN ACCESS TO THAT INFORMATION IN

12:49PM  14    OCTOBER OF 2018 OR LATER?

12:49PM  15    A.   I'VE SEEN SOME MATERIAL THAT INDICATES THAT THERE IS

12:49PM  16    FOLLOW-UP ABOUT GETTING THIS INFORMATION.  I'M NOT SURE HOW

12:50PM  17    MUCH PAST OCTOBER 30TH IT GOES, IF IT EVEN GOES PAST THAT,

12:50PM  18    BUT --

12:50PM  19    Q.   OKAY.  LET ME HAVE YOU LOOK AT 5917.

12:50PM  20    A.   OKAY.  5917.  I'VE GOT IT.

12:50PM  21    Q.   OKAY.  AND DO YOU SEE THAT'S AN EMAIL CHAIN BETWEEN MYSELF

12:50PM  22    AND SOMEONE NAMED STEPHEN O'NEILL AT A LAW FIRM CALLED DORSEY?

12:50PM  23    A.   OKAY.

12:50PM  24    Q.   DO YOU UNDERSTAND THAT THERANOS'S ASSETS WERE HANDED OFF

12:50PM  25    TO AN ASSIGNEE?

12:50PM   1     A.   YES, I UNDERSTAND THAT.

12:50PM   2     Q.   AND AS PART OF YOUR REVIEW, DID YOU COME TO UNDERSTAND

12:50PM   3     THAT STEPHEN O'NEILL AT DORSEY WAS A REPRESENTATIVE OF THAT

12:51PM   4     ASSIGNEE?

12:51PM   5     A.   I'M NOT FAMILIAR.  I DON'T KNOW STEPHEN O'NEILL EXACTLY.

12:51PM   6     I HAVE HEARD THE FIRM DORSEY BEING THE ASSIGNEE'S FIRM.

12:51PM   7     Q.   AND DO YOU SEE THAT THIS EMAIL IS FROM MARCH OF 2019?

12:51PM   8     A.   YES, MARCH 25TH.

12:51PM   9          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5917.

12:51PM  10          MR. BRECHER:  OBJECTION.  801, YOUR HONOR.  THERE

12:51PM  11     ARE MULTIPLE LAYERS OF HEARSAY IN HERE AND I'M SEEING

12:51PM  12     CONVERSATIONS WITHIN CONVERSATIONS.

12:51PM  13          I ALSO HAVE 403 CONCERNS ABOUT THE DOUBLE OR TRIPLE

12:51PM  14     HEARSAY IN THE SECOND EMAIL DOWN.

12:51PM  15          MR. BOSTIC:  SO, YOUR HONOR, EMAILS HAVE COME IN AND

12:51PM  16     EXHIBITS HAVE COME IN TO SHOW NOTICE TO THE GOVERNMENT ON THIS

12:51PM  17     SPECIFIC TOPIC, WHAT THE GOVERNMENT KNEW AND WHAT INFORMATION

12:51PM  18     WAS BEING PROVIDED.

12:51PM  19          THIS SHOULD BE ADMITTED FOR THE SAME REASON.  I'M NOT

12:51PM  20     COMING IN FOR THE TRUTH, BUT RATHER TO SHOW WHAT INFORMATION

12:51PM  21     WAS GIVEN TO THE GOVERNMENT AND WHEN.

12:51PM  22          THE COURT:  THANK YOU.

12:51PM  23          IT'S BEING ADMITTED THEN FOR NOTICE ONLY, NOT FOR THE

12:52PM  24     TRUTH OF THE MATTER ASSERTED.

12:52PM  25          MR. BRECHER:  YES, YOUR HONOR.  I'M SORRY.

ER-5033

SONNIER CROSS BY MR. BOSTIC                                    6791

12:52PM  1              THE COURT:  NO, GO AHEAD.

12:52PM  2              MR. BRECHER:  THAT CURES THE HEARSAY ISSUE, OR

12:52PM  3      MIGHT.

12:52PM  4          BUT I STILL HAVE THE 403 CONCERNS ABOUT THE SECOND EMAIL,

12:52PM  5      ESPECIALLY GIVEN THAT THERE'S NO FOLLOWUP ON THIS AND THERE'S

12:52PM  6      NO CONTEXT.  I THINK THAT WOULD BE MISLEADING HERE.  THERE'S NO

12:52PM  7      FOUNDATION FOR IT.

12:52PM  8          I'M REFERRING TO THE EMAIL, THURSDAY MARCH 21ST, 2019, AT

12:52PM  9      5:50 P.M.

12:52PM  10             (PAUSE IN PROCEEDINGS.)

12:52PM  11             THE COURT:  MR. BOSTIC.

12:52PM  12             MR. BOSTIC:  YOUR HONOR, I THINK THE ENTIRE EMAIL IS

12:52PM  13     ADMISSIBLE FOR NOTICE.  THAT PORTION THAT MR. BRECHER IS

12:52PM  14     REFERENCING STILL DOES CONSTITUTE NOTICE THAT THE GOVERNMENT

12:52PM  15     RECEIVED.

12:52PM  16         IF THE COURT DISAGREES, I COULD REDACT.

12:52PM  17             THE COURT:  ARE YOU ASKING -- THANK YOU.  THE LAST

12:53PM  18     PAGE IS PAGE 3.  IT SAYS PLACE HOLDER.

12:53PM  19         IS THAT PART OF YOUR ADMISSION AS WELL?

12:53PM  20             MR. BOSTIC:  NO, YOUR HONOR.  I CAN ADMIT JUST THE

12:53PM  21     FIRST TWO PAGES.

12:53PM  22             THE COURT:  ALL RIGHT.  THANK YOU.

12:53PM  23             MR. BRECHER:  AND, YOUR HONOR, IF WE CAN REDACT THE

12:53PM  24     FIRST PORTION OF THAT MIDDLE EMAIL UP TO "HERE'S HOW DAVID."

12:53PM  25     I'M FINE WITH "HERE'S HOW DAVID."  I'M FINE.

12:53PM  1          BUT I THINK THE REST OF IT THERE ARE 403 CONCERNS.

12:53PM  2                    THE COURT:  MR. BOSTIC.

12:53PM  3                    MR. BOSTIC:  I DISAGREE, YOUR HONOR.  I THINK THIS

12:53PM  4     IS INFORMATION THAT THE GOVERNMENT RECEIVED DURING THE

12:53PM  5     INVESTIGATION.  IT'S RELEVANT TO ITS INVESTIGATION AND THE

12:53PM  6     STEPS THAT IT TOOK SUBSEQUENTLY.

12:53PM  7                    MR. BRECHER:  RESPECTFULLY, THERE'S NO EVIDENCE THAT

12:53PM  8     THE GOVERNMENT TOOK STEPS BASED ON THAT INFORMATION.  THERE

12:53PM  9     CERTAINLY IS NO FOUNDATION FOR THAT.

12:53PM  10                   THE COURT:  WELL, THERE'S BEEN TESTIMONY ABOUT THE

12:54PM  11    LIS AND ENCRYPTION, AND UNDER THE 403 ANALYSIS, THIS IS

12:54PM  12    PROBATIVE AS TO THAT ANALYSIS AND THE ENCRYPTION AND ABOUT

12:54PM  13    THAT.

12:54PM  14                   MR. BRECHER:  WELL, YOUR HONOR, I THINK THAT WOULD

12:54PM  15    HAVE TO ASSUME THE DOCUMENT'S ADMISSIBLE FOR ITS TRUTH.

12:54PM  16                   THE COURT:  WELL, IT'S GOING FOR NOTICE ONLY, I

12:54PM  17    THINK.

12:54PM  18         IS THAT RIGHT, MR. BOSTIC?

12:54PM  19                   MR. BOSTIC:  YES, YOUR HONOR.

12:54PM  20                   THE COURT:  THAT'S RIGHT.  I'M GOING TO ADMIT IT.

12:54PM  21    THE OBJECTION IS OVERRULED.

12:54PM  22         BUT, LADIES AND GENTLEMEN, THIS IS NOT OFFERED FOR THE

12:54PM  23    TRUTH OF THE MATTER ASSERTED IN THIS EMAIL.  IT ONLY GOES AS TO

12:54PM  24    THE ISSUE OF NOTICE OR INFORMATION IN REGARDS TO THIS DATABASE

12:54PM  25    AND THE GOVERNMENT'S CONNECTION TO IT.

SONNIER CROSS BY MR. BOSTIC                                    6793

12:54PM   1        AND IT MAY BE PUBLISHED.

12:54PM   2             MR. BOSTIC:  THANK YOU, YOUR HONOR.

12:54PM   3             (GOVERNMENT'S EXHIBIT 5917 WAS RECEIVED IN EVIDENCE.)

12:54PM   4    BY MR. BOSTIC:

12:54PM   5    Q.   LET'S START WITH PAGE 2 OF THIS EMAIL.

12:54PM   6         MR. SONNIER, DO YOU SEE THAT THIS EMAIL STARTS WITH A

12:55PM   7    MESSAGE TO ME FROM MR. O'NEILL FROM THE DORSEY LAW FIRM?

12:55PM   8    A.   YES.

12:55PM   9    Q.   AND DO YOU SEE IN THAT IMAGINE I'M REQUESTING A BRIEF CALL

12:55PM  10    TO TOUCH BASE ON SOME ISSUES REGARDING THERANOS?

12:55PM  11    A.   YES.

12:55PM  12    Q.   LET'S GO TO PAGE 1.

12:55PM  13         DO YOU SEE ON THE BOTTOM HALF OF THE PAGE THERE'S A

12:55PM  14    MESSAGE FROM MR. O'NEILL AND HE REPORTS SOME INFORMATION ABOUT

12:55PM  15    THE LIS DATABASE.

12:55PM  16         DO YOU SEE THAT?

12:55PM  17    A.   THE MIDDLE PART OF THE EMAIL CHAIN?

12:55PM  18    Q.   YES.  IT'S ALSO ON THE SCREEN IF THAT'S EASIER.

12:55PM  19    A.   YES, YES, I SEE THAT.

12:55PM  20    Q.   AND HE'S REPORTING TO THE GOVERNMENT THAT THE LIS DATABASE

12:55PM  21    WAS ENCRYPTED BY SUNNY BALWANI AND SOMEONE NAMED

12:55PM  22    SHEKAR CHANDRASEKARAN.

12:55PM  23         DO YOU SEE THAT?

12:55PM  24    A.   YES.

12:55PM  25    Q.   AND THEN THERE'S SOME INFORMATION RELAYED FROM

SONNIER CROSS BY MR. BOSTIC                                    6794

12:55PM  1    DAVID TAYLOR, WHO IS IDENTIFIED AS THE FORMER THERANOS

12:55PM  2    PRESIDENT.

12:55PM  3        DO YOU SEE THAT?

12:55PM  4    A.   YES.

12:55PM  5    Q.   AND ACCORDING TO THE EMAIL, MR. TAYLOR SAYS BEFORE THE

12:56PM  6    COMPANY FORMALLY CLOSED, WE WERE ADVISED THAT IT WOULD BE A

12:56PM  7    HERCULEAN UNDERTAKING TO GET THE LIS UP AND RUNNING AGAIN.

12:56PM  8        DO YOU SEE THAT?

12:56PM  9    A.   YES.

12:56PM  10   Q.   AND LET'S GO UP IN THIS CHAIN FORWARD IN TIME AND LOOK AT

12:56PM  11   ANOTHER EMAIL FROM MR. O'NEILL TO THE GOVERNMENT.

12:56PM  12       DO YOU SEE THAT?

12:56PM  13   A.   YES.

12:56PM  14   Q.   AND HE REPORTS THE "ASSIGNEE DOES NOT KNOW WHO

12:56PM  15   DECOMMISSIONED THE LIS DATABASE."

12:56PM  16       DO YOU SEE THAT?

12:56PM  17   A.   YES.

12:56PM  18   Q.   AND THEN IN THE MIDDLE OF THAT PARAGRAPH IT SAYS, "ERIC

12:56PM  19   STATED THAT THE LIS DATABASE WAS NOT INCLUDED IN THE MIGRATION

12:56PM  20   OF THE CORPORATE SERVER EQUIPMENT OUT OF THE THERANOS FACILITY

12:56PM  21   AND INTO THE COLO ENVIRONMENT."

12:56PM  22       DO YOU SEE THAT?

12:56PM  23   A.   YES, I SEE THAT.

12:56PM  24   Q.   INSTEAD IT SAYS, "IT WAS DECOMMISSIONED SOMETIME EARLIER."

12:56PM  25       DO YOU SEE THAT?

12:56PM 1    A.   YEAH, I SEE THAT.  BUT I THINK THAT MIGHT BE MISTAKEN.

12:57PM 2    Q.   I APPRECIATE THAT, SIR.  BUT ALL I'M ASKING FOR NOW IS

12:57PM 3    WHETHER YOU SEE THE LANGUAGE IN THE EMAIL?

12:57PM 4    A.   YES.

12:57PM 5    Q.   AND DO YOU HAVE PERSONAL KNOWLEDGE OF WHEN THE LIS

12:57PM 6    DATABASE WAS DECOMMISSIONED?  WERE YOU PRESENT WHEN THESE

12:57PM 7    THINGS WERE HAPPENING?

12:57PM 8    A.   I ONLY KNOW THE SEQUENCE OF EVENTS FROM THE MATERIALS THAT

12:57PM 9    I REVIEWED, AND THAT WOULD HAVE BEEN WHEN IT WAS DISASSEMBLED

12:57PM 10   AT THE END OF AUGUST 2018.

12:57PM 11   Q.   AND DO YOU SEE AT THE BOTTOM OF THAT PARAGRAPH THE EMAIL

12:57PM 12   CONTINUES, "PRIOR TO THE ASSIGNMENT FOR THE BENEFIT OF

12:57PM 13   CREDITORS, THERANOS HAD BEEN TOLD THAT IT COULD NO LONGER BE

12:57PM 14   RECONSTRUCTED WITH THE EXISTING RESOURCES."

12:57PM 15       DO YOU SEE THAT REFERRING TO THE LIS?

12:57PM 16   A.   YES.

12:57PM 17   Q.   IS THIS MORE INFORMATION FROM PEOPLE ASSOCIATED WITH

12:58PM 18   THERANOS THAT YOU ULTIMATELY DISAGREED WITH?

12:58PM 19   A.   I FEEL LIKE THIS IS SORT OF TANGENTIAL BECAUSE I'M

12:58PM 20   FOCUSSED JUST ON THE LIS DATABASE AND THE FEASIBILITY OF

12:58PM 21   RECOVERING THAT DATABASE AND ITS DATA.

12:58PM 22       I HAVE A FEELING THAT THIS IS SAYING THE LIS GENERALLY,

12:58PM 23   LIKE THE LIS SYSTEM, WHICH IS A BIGGER, A BIGGER TASK.

12:58PM 24       EVEN SO, I DO DISAGREE WITH IT, THAT IT COULDN'T BE

12:58PM 25   RECONSTRUCTED AT ALL OR THAT IT WAS A HERCULEAN TASK.  IT WOULD

SONNIER CROSS BY MR. BOSTIC                    6796

12:58PM   1    JUST TAKE SOME EFFORT TO PUT IT BACK TOGETHER.

12:58PM   2    Q.   SO YOU SAY THAT THIS REFERENCES THE LIS SYSTEM AND NOT THE

12:58PM   3    DATABASE; IS THAT RIGHT?

12:58PM   4    A.   THAT, THAT -- THE SECOND STATEMENT WHERE IT COULD NO

12:59PM   5    LONGER BE CONSTRUCTED, I THINK THAT'S WHAT THEY WERE REFERRING

12:59PM   6    TO THERE.

12:59PM   7    Q.   ON ITS FACE, THOUGH, THIS EMAIL IS TALKING ABOUT THE LIS

12:59PM   8    DATABASE.

12:59PM   9         DO YOU SEE THE LANGUAGE AT THE TOP?

12:59PM  10    A.   THAT'S WHAT ERIC IS TALKING ABOUT.

12:59PM  11    Q.   SO YOU HAVE A DIFFERENT READ BASED ON YOUR ASSUMPTION

12:59PM  12    AFTER READING THE EMAIL?

12:59PM  13    A.   YEAH.  BASED ON MY TECHNICAL EXPERIENCE, KIND OF READING

12:59PM  14    IT FROM A TECHNICAL PERSPECTIVE, THAT'S MY INTERPRETATION.

12:59PM  15    Q.   AND YOU DISAGREED WITH THERANOS'S OWN UNDERSTANDING THAT

12:59PM  16    IT WOULD BE IMPOSSIBLE TO RECONSTRUCT THE LIS WITH EXISTING

12:59PM  17    RESOURCES; IS THAT CORRECT?

12:59PM  18         MR. BRECHER:  OBJECTION.  MISSTATES PRIOR TESTIMONY

12:59PM  19    AND THIS DOCUMENT.  THIS IS NOT THERANOS'S UNDERSTANDING.

12:59PM  20         THE COURT:  DO YOU WANT TO ASK THAT QUESTION AGAIN?

12:59PM  21         MR. BOSTIC:  SURE.

12:59PM  22    Q.   DO YOU SEE IN THIS EMAIL IT INDICATES THAT THERANOS HAD

12:59PM  23    BEEN TOLD THAT IT COULD NO LONGER RECONSTRUCT THE LIS DATABASE

12:59PM  24    WITH THE EXISTING RESOURCES?

12:59PM  25    A.   I DO SEE THAT, YES.

ER-5039

01:00PM   1      Q.   DO YOU BELIEVE THAT THAT INFORMATION PROVIDED TO THERANOS

01:00PM   2      WAS INCORRECT?

01:00PM   3              MR. BRECHER:  OBJECTION, YOUR HONOR.  THIS DOCUMENT

01:00PM   4      WAS ADMITTED FOR NOTICE TO THE GOVERNMENT, NOT FOR THE TRUTH OF

01:00PM   5      THE MULTIPLE LAYERS OF HEARSAY WITHIN.

01:00PM   6              THE COURT:  ARE YOU ASKING HIS OPINION NOW SEPARATE

01:00PM   7      FROM THE CONTEXT HERE, OR IS THIS A HYPOTHETICAL?

01:00PM   8              MR. BOSTIC:  YES, YOUR HONOR.  THIS WAS INFORMATION

01:00PM   9      PROVIDED TO THE GOVERNMENT.  I'M ASKING THIS WITNESS IF HE

01:00PM  10      AGREES OR DISAGREES WITH THE PICTURE THAT IS BEING PAINTED OF

01:00PM  11      THE GOVERNMENT AT THIS TIME.

01:00PM  12              MR. BRECHER:  AS PHRASED, I THINK THAT'S OKAY.  BUT

01:00PM  13      THE QUESTION WAS ABOUT INFORMATION PROVIDED TO THERANOS.

01:00PM  14              THE COURT:  WELL, I THINK MR. BOSTIC REPHRASED THE

01:00PM  15      QUESTION IN A DIFFERENT WAY.

01:00PM  16          DID YOU UNDERSTAND THE QUESTION NOW, SIR?

01:00PM  17              THE WITNESS:  I THINK I'VE LOST THE TRAIL.

01:00PM  18      BY MR. BOSTIC:

01:00PM  19      Q.   LET ME TRY TO WEAVE THAT BACK TOGETHER.

01:00PM  20              THE COURT:  WELL, THEN LET'S TRY TO REBOOT THEN,

01:00PM  21      SHALL WE?

01:00PM  22      BY MR. BOSTIC:

01:00PM  23      Q.   DO YOU SEE IN THIS EMAIL THAT THIS REPORTS TO THE

01:00PM  24      GOVERNMENT THAT THERANOS HAD BEEN TOLD THAT IT WOULD NOT BE

01:01PM  25      ABLE TO RECONSTRUCT THE LIS WITH EXISTING RESOURCES; IS THAT

01:01PM  1      CORRECT?

01:01PM  2      A.   YES.

01:01PM  3      Q.   AND YOU ULTIMATELY CONCLUDED SOMETHING DIFFERENT BASED ON

01:01PM  4      YOUR REVIEW; IS THAT FAIR?

01:01PM  5      A.   YES.

01:01PM  6      Q.   OKAY.  WE CAN SET THAT ASIDE.

01:01PM  7           YOU TESTIFIED EARLIER THAT YOU NEVER ACTUALLY ACCESSED THE

01:01PM  8      LIS DATABASE, SO YOU HAVE NO FIRST-HAND KNOWLEDGE OF ITS

01:01PM  9      CONTENTS; IS THAT FAIR?

01:01PM 10      A.   YES, I NEVER ACCESSED THE ACTUAL PRODUCTION DATABASE.

01:01PM 11      Q.   DO YOU ALSO AGREE THAT YOU DON'T HAVE ANY FIRST-HAND

01:01PM 12      KNOWLEDGE OF WHEN OR TO WHAT EXTENT LIS WAS USED TO STORE

01:01PM 13      THERANOS DATA?

01:01PM 14      A.   THE ONLY INFORMATION THAT I REVIEWED IS JUST GENERAL USER

01:01PM 15      GUIDE INFORMATION ABOUT SORT OF WHAT THEY WERE SHOWING THE USER

01:01PM 16      COULD DO IN THE SYSTEM.  THAT'S IT.

01:02PM 17      Q.   SO TO ANSWER MY QUESTION THEN, YOU DON'T HAVE ANY PERSONAL

01:02PM 18      KNOWLEDGE OF TO WHAT EXTENT THERANOS USED THE LIS DATABASE?

01:02PM 19      A.   THEY'RE IN THE MATERIALS.  THEY DISCUSS THAT -- IN VARIOUS

01:02PM 20      PLACES THEY SAY ALL, OR AT LEAST MOST, THERANOS LAB TEST

01:02PM 21      INFORMATION, PATIENT INFORMATION, STUFF LIKE THAT, IS STORED IN

01:02PM 22      THE DATABASE AFTER CERTAIN, AFTER A CERTAIN TIME.

01:02PM 23           I THINK THEY WERE USING A PREVIOUS SYSTEM, AND THEY MOVED

01:02PM 24      THAT DATA INTO THE NEW SYSTEM.

01:02PM 25      Q.   LET ME SEE IF I CAN CLARIFY MY QUESTIONS FOR YOU.

01:02PM  1          SO WHEN I USE THE TERM "FIRST-HAND KNOWLEDGE," I MEAN

01:02PM  2     KNOWLEDGE OF WHAT YOU'VE SEEN OF THE DATABASE AND NOT

01:02PM  3     INFORMATION THAT YOU'VE GATHERED FROM READING MATERIALS.

01:02PM  4          CAN WE USE THAT AS A SHORTHAND FOR THAT?

01:02PM  5     A.   OKAY.

01:03PM  6     Q.   SO TO ASK THAT QUESTION AGAIN, DO YOU HAVE ANY FIRST-HAND

01:03PM  7     PERSONAL KNOWLEDGE, NOT FROM WHAT YOU'VE READ, BUT FIRST-HAND

01:03PM  8     KNOWLEDGE ABOUT THE EXTENT TO WHICH THERANOS ACTUALLY USED THE

01:03PM  9     LIS?

01:03PM 10     A.   RIGHT.  SO AS I'VE SAID, I NEVER HAD MY HANDS ON THE

01:03PM 11     DATABASE ITSELF.

01:03PM 12     Q.   OKAY.  IF I COULD ASK YOU TO LOOK AT 5930.

01:03PM 13     A.   5930.

01:03PM 14     Q.   AND AT 5930, DO YOU SEE AN EMAIL CHAIN BETWEEN PEOPLE AT

01:03PM 15     THERANOS, INCLUDING MR. BALWANI?

01:03PM 16     A.   INCLUDING WHO?

01:03PM 17     Q.   MR. BALWANI, THE DEFENDANT.

01:03PM 18     A.   OH, OKAY.  YES.

01:03PM 19     Q.   DO YOU SEE THAT, SIR?

01:04PM 20     A.   I'M LOOKING.  MAYBE IT'S FURTHER DOWN.

01:04PM 21     Q.   ARE YOU LOOKING AT 5930?

01:04PM 22     A.   5930.  YES, I'M LOOKING AT 5930.

01:04PM 23     Q.   AT THE TOP OF THE PAGE, DO YOU SEE THAT THIS IS AN EMAIL

01:04PM 24     CHAIN INCLUDING MAX FOSQUE AND CHRISTIAN HOLMES AT THERANOS,

01:04PM 25     ALONG WITH SUNNY BALWANI?

SONNIER CROSS BY MR. BOSTIC                                    6800

01:04PM  1    A.  SOMEHOW 5930 THAT I HAVE COMES FROM MIKE ROMEO AND THEN I

01:04PM  2    SEE CHRIS DAVIES --

01:04PM  3            MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

01:04PM  4            THE COURT:  YES.

01:04PM  5        MR. BRECHER, DO YOU HAVE 5930?

01:04PM  6            MR. BRECHER:  I DO, YOUR HONOR, CONSISTENT WITH

01:04PM  7    MR. BOSTIC'S DESCRIPTION.

01:04PM  8            THE COURT:  OKAY.

01:04PM  9    BY MR. BOSTIC:

01:04PM 10    Q.  MR. SONNIER, I'VE JUST HANDED YOU A COPY OF 5930.

01:04PM 11        DO YOU SEE IT THERE?

01:04PM 12    A.  OKAY.

01:05PM 13    Q.  AND DO YOU SEE THAT THAT'S AN EMAIL CHAIN INCLUDING

01:05PM 14    MR. BALWANI?

01:05PM 15    A.  YES, I SEE HIS NAME ON THIS EMAIL.

01:05PM 16            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5930.

01:05PM 17            MR. BRECHER:  OBJECTION.  BEYOND THE SCOPE OF DIRECT

01:05PM 18    AND PRIOR RULINGS, YOUR HONOR.

01:05PM 19            THE COURT:  THIS IS THE TWO PAGES, MR. BOSTIC?

01:05PM 20            MR. BOSTIC:  YES, YOUR HONOR.

01:05PM 21            THE WITNESS:  IT SEEMS TO BE THREE PAGES.

01:05PM 22            MR. BOSTIC:  THE WITNESS, WHO HAS MY COPY, POINTS

01:05PM 23    OUT IT MAY BE THREE PAGES.

01:05PM 24            THE COURT:  YES.

01:05PM 25            MR. BRECHER:  AND I'LL TAKE THE TIME TO POINT OUT I

01:05PM 1    THINK IT MIGHT ACTUALLY BE FOUR.

01:05PM 2           THE COURT:  IT'S TWO PHYSICAL PAGES THAT ARE PRINTED

01:05PM 3    ON BOTH SIDES.  CAN WE ALL AGREE ON THAT?

01:05PM 4           MR. BRECHER:  YES.

01:05PM 5       (LAUGHTER.)

01:06PM 6           THE COURT:  MR. BOSTIC, I'M NOT CERTAIN ABOUT THE

01:06PM 7    ENTIRETY OF THIS CHAIN, WHAT IT ADDS TO THE EXAMINATION OF THIS

01:06PM 8    WITNESS.

01:06PM 9           MR. BOSTIC:  APOLOGIES, YOUR HONOR.

01:06PM 10      I THINK I COULD LIMIT THE EXHIBIT TO THE FIRST PAGE AND

01:07PM 11   PERHAPS THE VERY TOP PORTION OF THE SECOND PAGE.

01:07PM 12          (PAUSE IN PROCEEDINGS.)

01:07PM 13          MR. BRECHER:  SAME OBJECTIONS, YOUR HONOR, SCOPE AND

01:07PM 14   PRIOR RULINGS ON THE SCOPE OF THIS WITNESS'S TESTIMONY.

01:08PM 15          THE COURT:  MR. BOSTIC, I'M GOING TO -- WITHOUT A

01:08PM 16   FOUNDATION, I'M GOING TO SUSTAIN THE OBJECTION.

01:08PM 17          MR. BOSTIC:  OKAY.  THANK YOU, YOUR HONOR.

01:08PM 18   Q.   MR. SONNIER, DO YOU HAVE ANY FIRST-HAND KNOWLEDGE -- AND

01:08PM 19   AGAIN, THAT'S PERSONAL KNOWLEDGE -- OF ANY PROBLEMS WITH THE

01:08PM 20   LABORATORY INFORMATION SYSTEM THAT MIGHT HAVE AFFECTED ITS

01:08PM 21   STABILITY OR RELIABILITY?

01:08PM 22   A.   NO, I HAVE NO KNOWLEDGE OF THAT ASPECT.

01:08PM 23   Q.   CAN I ASK YOU TO TURN THE PAGE TO 5931, PLEASE.

01:08PM 24   A.   OKAY.  5931.

01:08PM 25   Q.   5931, DO YOU SEE ANOTHER EMAIL CHAIN INTERNALLY AT

01:08PM   1        THERANOS INCLUDING MR. BALWANI?

01:09PM   2        A.   MY 5931 SEEMS TO BE WHAT YOU JUST HANDED ME AS 5903.

01:09PM   3        Q.   OH, I SEE.

01:09PM   4        A.   OH, MAYBE I NEED TO GO TO THE NEXT PAGE.

01:09PM   5        Q.   AND IT SHOULD BE STAMPED AT THE BOTTOM OF THE PAGE 5931.

01:09PM   6        A.   OKAY.  SO 5931.  GOT IT.

01:09PM   7        Q.   DO YOU SEE A DECEMBER 2014 EMAIL CHAIN?

01:09PM   8        A.   MY 5931 IS THURSDAY, DECEMBER 18TH, 2014.

01:09PM   9        Q.   THAT'S CORRECT.

01:09PM  10        A.   OKAY.

01:09PM  11        Q.   AND DO YOU SEE THAT THAT EMAIL CHAIN INCLUDES MR. BALWANI?

01:09PM  12        A.   YES, THE SECOND PORTION AT LEAST.

01:09PM  13             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS --

01:09PM  14        I'M SORRY TO TALK OVER YOU.

01:10PM  15             THE GOVERNMENT OFFERS 5931.

01:10PM  16             MR. BRECHER:  SAME OBJECTIONS, YOUR HONOR,

01:10PM  17        PARTICULARLY AS TO THE FINAL EMAIL ON PAGE 2, I GUESS THE

01:10PM  18        EARLIEST IN THE CHAIN.  BEYOND THE SCOPE AND PRIOR RULINGS ON

01:10PM  19        THE SCOPE OF HIS TESTIMONY.

01:10PM  20             MR. BOSTIC:  SO YOUR HONOR -- I'LL LET THE COURT

01:10PM  21        REVIEW IT.

01:10PM  22             THE COURT:  GO AHEAD.

01:10PM  23             MR. BOSTIC:  THIS WITNESS IS TESTIFYING ABOUT THE

01:10PM  24        FEASIBILITY OF RECOVERING THIS DATABASE.

01:10PM  25             I SUBMIT THAT EVIDENCE REGARDING ITS STABILITY AND BUGS

01:10PM 1    WITH THE DATABASE IS RELEVANT TO THAT ISSUE, ESPECIALLY TO THE

01:10PM 2    EXTENT THAT THE WITNESS HAS OR HAS NOT CONSIDERED THIS EVIDENCE

01:10PM 3    BEFORE.

01:10PM 4            THE COURT:  WHY DON'T YOU LAY A FOUNDATION AS TO

01:10PM 5    THAT?  I THINK YOU ASKED THAT OF THE PREVIOUS DOCUMENT.

01:10PM 6    BY MR. BOSTIC:

01:10PM 7    Q.   MR. SONNIER, YOU REVIEWED A WIDE RANGE OF MATERIALS

01:10PM 8    PROVIDED TO YOU BY DEFENSE COUNSEL IN ORDER TO REACH YOUR

01:10PM 9    CONCLUSIONS; IS THAT RIGHT?

01:10PM 10   A.   YES, I DID.

01:10PM 11   Q.   AND DID THE INFORMATION PROVIDED BY DEFENSE COUNSEL

01:11PM 12   INCLUDE ANY EVIDENCE REGARDING STABILITY PROBLEMS OR BUGS WITH

01:11PM 13   THE THERANOS LIS DATABASE?

01:11PM 14   A.   I DON'T RECALL ANY SUCH INFORMATION, AND BASICALLY THAT

01:11PM 15   WOULDN'T HAVE MATTERED TO ME ANYWAY.

01:11PM 16   Q.   ARE YOU AWARE OF CIRCUMSTANCES WHERE STABILITY PROBLEMS OR

01:11PM 17   BUGS OR ERRORS IN THE DATABASE CAN CREATE CHALLENGES IN

01:11PM 18   ACCESSING OR RECOVERING THE DATABASE?

01:11PM 19   A.   NO, I AM NOT.

01:11PM 20   Q.   IT'S YOUR TESTIMONY TODAY THAT STABILITY PROBLEMS AND

01:11PM 21   ERRORS IN THE DATABASES NEVER HAVE AN EFFECT ON THE ABILITY TO

01:11PM 22   ACCESS A DATABASE?

01:11PM 23           MR. BRECHER:  OBJECTION.  MISSTATES PRIOR TESTIMONY.

01:11PM 24           THE COURT:  OVERRULED.  HE CAN ANSWER THE QUESTION.

01:11PM 25           THE WITNESS:  SO ONLY IF THE PHYSICAL EQUIPMENT IS

SONNIER CROSS BY MR. BOSTIC                                    6804

01:11PM  1    AT FAULT, SO LIKE THE HARD DRIVES THEMSELVES ARE FAILING.

01:11PM  2         TO THE EXTENT THAT THERE ARE SOME FLAWS OR OTHER PROBLEMS

01:12PM  3    WITH EITHER THE SOFTWARE OR THE DATABASE DESIGN, THAT WOULDN'T

01:12PM  4    AFFECT THE RECOVERY.  YOU WOULD SIMPLY RECOVER IT BUG FOR BUG

01:12PM  5    LIKE IT WAS.

01:12PM  6         SO IF IT HAS INTERNAL PROBLEMS IN ITS STRUCTURE, IT

01:12PM  7    WOULDN'T BE A PROBLEM RECOVERING.

01:12PM  8         IF THE HARD DRIVE, THE EQUIPMENT HAD FAILED, THEN YOU

01:12PM  9    WOULD HAVE A HARD TIME RECOVERING.

01:12PM  10   BY MR. BOSTIC:

01:12PM  11   Q.   IF YOU RECOVERED A DATABASE WITH BUGS, HOWEVER, COULDN'T

01:12PM  12   YOU STILL ENCOUNTER PROBLEMS ACTUALLY ACCESSING AND MAKING USE

01:12PM  13   OF THAT DATA?

01:12PM  14   A.   NOT IN THE CONTEXT OF A MICROSOFT SQL SERVER.  THE DATA

01:12PM  15   MAY INDEED HAVE LOGIC ERRORS IN IT AND BE SOMEHOW INCONSISTENT

01:12PM  16   AND RETURN AT A USER LEVEL BUGGY OR INCORRECT INFORMATION, BUT

01:12PM  17   THE DATA WOULD BE THE DATA AND IT WOULD STILL BE RECOVERABLE.

01:12PM  18   Q.   AND ONCE IT'S RECOVERABLE, IT'S YOUR TESTIMONY THAT THIS

01:12PM  19   COULD STILL BE ACCESSED AND MANIPULATED REGARDLESS OF THE BUGS?

01:12PM  20   A.   THAT'S CORRECT.

01:12PM  21   Q.   OKAY.  WE CAN SET THAT ASIDE.

01:13PM  22        YOU WERE QUALIFIED AS AN EXPERT IN SQL DATABASES DATA

01:13PM  23   RECOVERY AND DATA ENCRYPTION; IS THAT RIGHT?

01:13PM  24   A.   YES.

01:13PM  25   Q.   AND YOU ARE NOT HERE TO TESTIFY ABOUT SUBJECTS LIKE BEST

ER-5047

SONNIER CROSS BY MR. BOSTIC                                    6805

01:13PM  1    PRACTICES FOR A CRIMINAL INVESTIGATION; IS THAT RIGHT?

01:13PM  2    A.   NO, I'M NOT.

01:13PM  3    Q.   YOU DON'T HAVE A BASIS TO GIVE AN OPINION ON SOMETHING

01:13PM  4    LIKE THAT; IS THAT RIGHT?

01:13PM  5    A.   NO.  I DO COMPUTER FORENSICS FOR LEGAL CASES, BUT THAT'S

01:13PM  6    REALLY A DIFFERENT TOPIC.

01:13PM  7    Q.   SO YOU'RE NOT HERE TO GIVE ANY OPINION ABOUT, FOR EXAMPLE,

01:13PM  8    WHAT CONSTITUTES A GOOD CRIMINAL INVESTIGATION OR A BAD

01:13PM  9    CRIMINAL INVESTIGATION; RIGHT?

01:13PM  10   A.   I'M NOT HERE FOR THAT.

01:13PM  11   Q.   AND YOU'RE NOT HERE TO WEIGH IN ON SOMETHING LIKE HOW

01:13PM  12   PROSECUTORS PRIORITIZE INVESTIGATIVE STEPS IN A COMPLEX

01:13PM  13   CRIMINAL INVESTIGATION; IS THAT FAIR?

01:13PM  14   A.   THAT'S CORRECT.

01:14PM  15   Q.   AND ALTHOUGH YOU'RE AN EXPERT IN SQL DATABASES, YOUR

01:14PM  16   TESTIMONY HERE HAS BEEN ABOUT A PARTICULAR DATABASE; IS THAT

01:14PM  17   RIGHT?

01:14PM  18   A.   IT'S A PARTICULAR DATABASE IN THAT IT'S A PARTICULAR --

01:14PM  19   IT'S -- WE'RE TALKING ABOUT A PARTICULAR DATABASE IN THAT THE

01:14PM  20   SPECIFIC DATA THAT WOULD BE RECOVERED WOULD BE PARTICULAR.

01:14PM  21       BUT THE TECHNIQUES I'M DESCRIBING WOULD APPLY TO ANY SQL

01:14PM  22   SERVER DATABASE.

01:14PM  23   Q.   BUT THE SPECIFIC DATABASE THAT WE'RE TALKING ABOUT TODAY

01:14PM  24   IS THE THERANOS LIS DATABASE; RIGHT?

01:14PM  25   A.   THAT IS CORRECT.

ER-5048

SONNIER CROSS BY MR. BOSTIC                                    6806

01:14PM  1    Q.   AND WHEN IT COMES TO THAT DATABASE, YOU'RE TESTIFYING

01:14PM  2    ABOUT THE DATABASE THAT YOU HAD NO ROLE IN DESIGNING; IS THAT

01:14PM  3    RIGHT?

01:14PM  4    A.   THAT IS CORRECT.  BUT THE -- AGAIN, THE DESIGN WOULDN'T

01:14PM  5    IMPACT ANY OF MY OPINION BECAUSE IT OPERATES UNDERNEATH ALL OF

01:15PM  6    THAT.

01:15PM  7    Q.   YOU ALSO HAD NO ROLE IN INSTALLING OR SETTING UP THE

01:15PM  8    THERANOS LIS DATABASE; IS THAT RIGHT?

01:15PM  9    A.   THAT IS CORRECT.

01:15PM  10   Q.   YOU HAD NO ROLE IN MAINTAINING THE THERANOS LIS; IS THAT

01:15PM  11   CORRECT?

01:15PM  12   A.   THAT'S CORRECT.

01:15PM  13   Q.   AT NO POINT DID YOU EVER OPERATE OR ACCESS THE THERANOS

01:15PM  14   LIS; IS THAT CORRECT?

01:15PM  15   A.   THAT'S CORRECT.

01:15PM  16   Q.   AND, IN FACT, YOU NEVER SAW THE THERANOS LIS OR ANY

01:15PM  17   COMPONENT OF THE DATABASE IN PERSON; IS THAT CORRECT?

01:15PM  18   A.   OTHER THAN THE BACKUP THAT I LOOKED AT AND WAS UNABLE TO

01:15PM  19   RESTORE, THAT IS THE ONLY HANDS ON THAT I HAD WITH THE LIS

01:15PM  20   DATABASE.

01:15PM  21   Q.   AND THE PEOPLE WHO DID HAVE THAT FIRST-HAND KNOWLEDGE, THE

01:15PM  22   PEOPLE WHO SET UP, WHO OPERATED, WHO MAINTAINED THE DATABASE,

01:15PM  23   YOU NEVER HAVE SPOKEN TO A SINGLE ONE OF THEM; IS THAT CORRECT?

01:15PM  24   A.   THAT'S CORRECT, I'VE NEVER SPOKEN TO THOSE INDIVIDUALS.

01:15PM  25   Q.   YOU LEARNED ABOUT THE DATABASE PARTLY BY REVIEWING

01:16PM   1    STATEMENTS AND COMMUNICATIONS FROM SOME OF THOSE PEOPLE WITH

01:16PM   2    FIRST-HAND KNOWLEDGE?

01:16PM   3    A.   YES.

01:16PM   4    Q.   AND IN REVIEWING THAT INFORMATION FROM THOSE INDIVIDUALS,

01:16PM   5    YOU BECAME AWARE OF SOME INFORMATION FROM THEM THAT WAS

01:16PM   6    DIRECTLY CONTRARY TO YOUR ULTIMATE CONCLUSION IN THE CASE; IS

01:16PM   7    THAT CORRECT?

01:16PM   8    A.   I WENT THROUGH ALL OF THE STATEMENTS, AND IF THERE WAS

01:16PM   9    ANYTHING THAT SEEMED ODD OR INCONSISTENT, I INVESTIGATED IT.

01:16PM  10    Q.   DURING OUR CONVERSATION TODAY, HAVEN'T WE LOOKED AT SOME

01:16PM  11    SPECIFIC EXAMPLES WHERE YOU WERE PROVIDED STATEMENTS FROM

01:16PM  12    INDIVIDUALS THAT CONFLICTED WITH YOUR ULTIMATE CONCLUSION?

01:16PM  13    A.   THERE WERE STATEMENTS THAT DIDN'T MAKE SENSE TO ME AT THE

01:16PM  14    TIME AND I INVESTIGATED THOSE, AND, YES, I ARRIVED AT MY

01:17PM  15    OPINIONS THAT WOULD BE CONTRARY TO THAT STATEMENT.

01:17PM  16    Q.   IS THAT YES TO MY QUESTION, SIR?

01:17PM  17    A.   YES.

01:17PM  18    Q.   AND THE QUESTION OF WHETHER THE LIS COULD HAVE BEEN

01:17PM  19    RECOVERED FROM THE ORIGINAL IS SOMETHING OF A HYPOTHETICAL

01:17PM  20    BECAUSE YOU DON'T HAVE PERSONAL KNOWLEDGE OF WHERE THAT

01:17PM  21    HARDWARE ACTUALLY IS; IS THAT CORRECT?

01:17PM  22           MR. BRECHER:  OBJECTION.  COUNSEL IS TESTIFYING.

01:17PM  23    IT'S ARGUMENT.

01:17PM  24           THE COURT:  OVERRULED.

01:17PM  25           DO YOU UNDERSTAND THE QUESTION?

SONNIER CROSS BY MR. BOSTIC                                            6808

01:17PM  1                    THE WITNESS:  YES, I DO.

01:17PM  2                    THE COURT:  YOU CAN ANSWER IT.

01:17PM  3                    THE WITNESS:  NO, ABSOLUTELY NOT.  THIS IS A SQL

01:17PM  4       SERVER, IT'S A KNOWN PRODUCT, IT'S WELL DOCUMENTED BY

01:17PM  5       MICROSOFT, IT HAS WELL-KNOWN RECOVERY TECHNIQUES, AS ARE THE

01:17PM  6       EQUIPMENT WHICH IT OPERATES.

01:17PM  7            IT'S ALL WHAT WE CALL COMMERCIAL OFF-THE-SHELF EQUIPMENT,

01:17PM  8       AGAIN, WITH DEFINED AND WELL-KNOWN WAYS TO RECOVER THE DATA.

01:17PM  9       BY MR. BOSTIC:

01:17PM 10       Q.   AND YOU'RE ASSUMING THAT NOT BASED ON FIRST-HAND

01:17PM 11       INFORMATION, BUT BASED ON THE MATERIALS THAT YOU'VE REVIEWED;

01:17PM 12       IS THAT CORRECT?

01:17PM 13       A.   WELL, I'M GOING BY THE INFORMATION THAT SAYS WHAT THE

01:18PM 14       EQUIPMENT WAS AND WHAT THE SOFTWARE WAS AND THEN USING THAT

01:18PM 15       HARD TECHNICAL INFORMATION TO ARRIVE AT MY OPINION.

01:18PM 16       Q.   AND DO YOU HAVE THE ABILITY, AS OF TODAY, TO CONFIRM

01:18PM 17       WHETHER YOU'RE RIGHT OR WRONG, THAT IS, WHETHER TO ACTUALLY --

01:18PM 18       LET ME START THAT AGAIN.

01:18PM 19            DO YOU HAVE THE ABILITY TO TEST YOUR OPINION AND TO

01:18PM 20       ACTUALLY TRY TO RECONSTRUCT THE DATABASE FROM THE ORIGINAL

01:18PM 21       HARDWARE?

01:18PM 22       A.   I WOULD BE HAPPY TO DO THAT IF YOU PROVIDED ME THE DISK

01:18PM 23       DRIVES.

01:18PM 24       Q.   AND SITTING HERE TODAY, ARE YOU AWARE OF WHERE THOSE DISK

01:18PM 25       DRIVES ARE?  DO YOU HAVE THAT PERSONAL KNOWLEDGE?

01:18PM 1    A.   I DO NOT KNOW WHERE THE DISK DRIVES ARE.

01:18PM 2    Q.   THANK YOU.

01:18PM 3         NO FURTHER QUESTIONS.

01:18PM 4              THE COURT:   REDIRECT?

01:18PM 5              MR. BRECHER:   YES, YOUR HONOR.   THANK YOU.

01:18PM 6                    **REDIRECT EXAMINATION**

01:18PM 7    BY MR. BRECHER:

01:18PM 8    Q.   THANK YOU, MR. SONNIER.

01:19PM 9         I'M GOING TO ASK YOU A FEW QUESTIONS ABOUT YOUR

01:19PM 10   CONVERSATION JUST NOW WITH MR. BOSTIC.

01:19PM 11        IS THAT ALL RIGHT?

01:19PM 12   A.   CERTAINLY.

01:19PM 13   Q.   OKAY.  AND MR. BOSTIC ASKED YOU ABOUT SOME OF THE

01:19PM 14   MATERIALS THAT YOU REVIEWED.

01:19PM 15        DO YOU REMEMBER THAT?

01:19PM 16   A.   YES.

01:19PM 17   Q.   AND HE ASKED YOU WHETHER THOSE WERE PROVIDED BY THE

01:19PM 18   DEFENSE?

01:19PM 19   A.   YES.

01:19PM 20   Q.   DID YOU HAVE A CHANCE TO REQUEST ADDITIONAL MATERIALS THAT

01:19PM 21   YOU THOUGHT NECESSARY TO FORM YOUR OPINION?

01:19PM 22   A.   YES, AND I DID SO SEVERAL TIMES.

01:19PM 23   Q.   OKAY.  AND DID YOU RECEIVE MATERIALS THAT YOU THOUGHT WERE

01:19PM 24   SUFFICIENT TO FORM YOUR OPINIONS?

01:19PM 25   A.   YES, I DID.

SONNIER REDIRECT BY MR. BRECHER                                    6810

01:19PM   1      Q.   OKAY.  MR. BOSTIC SHOWED YOU A FEW INTERVIEW MEMOS I THINK

01:20PM   2      CONDUCTED BY THE FBI.

01:20PM   3           DO YOU REMEMBER THAT?

01:20PM   4      A.   YES.

01:20PM   5      Q.   AND HAD YOU SEEN THOSE BEFORE?

01:20PM   6      A.   YES, I HAD.

01:20PM   7      Q.   WHO PROVIDED THEM TO YOU?

01:20PM   8      A.   THE DEFENSE TEAM DID.

01:20PM   9      Q.   AND DID YOU CONSIDER THOSE MEMORANDA IN FORMING YOUR

01:20PM  10      OPINIONS?

01:20PM  11      A.   YES, I DID.

01:20PM  12      Q.   AND YOU MAY HAVE MR. BOSTIC'S BINDER STILL IN FRONT OF

01:20PM  13      YOU, AND I'M NOT GOING TO DWELL ON THIS, BUT LET'S START WITH

01:20PM  14      EXHIBIT 5929.

01:20PM  15           TAKE YOUR TIME, SIR.

01:20PM  16      A.   OKAY.  5929.  OKAY, I THINK I HAVE IT.

01:20PM  17      Q.   AND IS THIS ONE OF THOSE MEMORANDA THAT YOU REVIEWED?

01:20PM  18      A.   IT IS INDEED.

01:20PM  19      Q.   AND DO YOU HAVE AN UNDERSTANDING ABOUT WHEN THE INTERVIEW

01:20PM  20      REFERENCED WITHIN IT TOOK PLACE, WHAT YEAR?

01:21PM  21      A.   2020.

01:21PM  22      Q.   OKAY.  HOW ABOUT 5927.  LET ME KNOW WHEN YOU'RE THERE,

01:21PM  23      SIR?

01:21PM  24      A.   5927.  YES, I'VE GOT IT.

01:21PM  25      Q.   IS THIS ANOTHER ONE OF THOSE INTERVIEW MEMORANDA CONDUCTED

SONNIER REDIRECT BY MR. BRECHER                                    6811

01:21PM 1     BY THE GOVERNMENT?

01:21PM 2     A.   YES, IT IS.

01:21PM 3     Q.   AND DO YOU KNOW WHAT YEAR THIS INTERVIEW TOOK PLACE BASED

01:21PM 4     ON THE INFORMATION THAT YOU RECEIVED?

01:21PM 5     A.   YES, 2020.

01:21PM 6     Q.   AND IF YOU WOULD FLIP AHEAD ONE TAB TO EXHIBIT 5928.

01:21PM 7     A.   5928, YES.

01:21PM 8     Q.   IS THIS ANOTHER ONE OF THOSE MEMORANDA THAT WE'VE BEEN

01:21PM 9     TALKING ABOUT?

01:21PM 10    A.   YES, IT IS.

01:21PM 11    Q.   AND DO YOU HAVE AN UNDERSTANDING ABOUT WHICH YEAR THIS

01:21PM 12    INTERVIEW TOOK PLACE?

01:21PM 13    A.   YES.  AGAIN, 2020.

01:21PM 14    Q.   AND COULD WE LOOK AT EXHIBIT 5938?

01:21PM 15    A.   5938.  UH-HUH.

01:22PM 16    Q.   MR. SONNIER, IS THIS ANOTHER ONE OF THOSE INTERVIEW

01:22PM 17    MEMORANDA THAT WE'VE BEEN DISCUSSING?

01:22PM 18    A.   YES, IT IS.

01:22PM 19    Q.   AND DO YOU KNOW WHAT YEAR -- DO YOU HAVE AN UNDERSTANDING

01:22PM 20    OF WHAT YEAR THIS INTERVIEW TOOK PLACE?

01:22PM 21    A.   2020.

01:22PM 22    Q.   OKAY.  STICKING WITH THOSE MEMORANDA, MR. BOSTIC ASKED YOU

01:22PM 23    ABOUT INFORMATION YOU RECEIVED FROM VARIOUS I.T. PERSONS

01:22PM 24    WORKING AT OR NEAR THERANOS IN AUGUST 2018.

01:22PM 25         DO YOU REMEMBER THAT?

01:22PM   1      A.   I BELIEVE SO, YES.

01:22PM   2      Q.   OKAY.  AND ONE OF THE PEOPLE THAT HE SPOKE TO ABOUT -- I

01:22PM   3      THINK YOU SAW FOUR MEMORANDUM FROM HIM -- WAS MICHAEL CHUNG.

01:22PM   4      A.   YES.

01:22PM   5      Q.   AND I BELIEVE YOU STARTED TO TELL MR. BOSTIC ABOUT YOUR

01:22PM   6      UNDERSTANDING OF MR. CHUNG'S ROLE AT THE TIME.

01:22PM   7      A.   YES.

01:22PM   8      Q.   AND COULD YOU DESCRIBE THAT IN GREATER DEPTH, JUST YOUR

01:22PM   9      UNDERSTANDING, SIR?

01:22PM  10           MR. BOSTIC:  OBJECTION.  FOUNDATION.  CALLS FOR

01:22PM  11      SPECULATION.

01:22PM  12           MR. BRECHER:  YOUR HONOR, THE GOVERNMENT SQUARELY

01:23PM  13      OPENED THE DOOR TO THIS BY ASKING ABOUT MR. CHUNG'S RELATIVE

01:23PM  14      EXPERIENCE WITH LIS, AND I THINK IT'S FAIR TO CONTEXTUALIZE

01:23PM  15      THAT.

01:23PM  16           THE COURT:  THE WITNESS HAS ALREADY TESTIFIED

01:23PM  17      SEVERAL TIMES ABOUT HIS OPINION ABOUT MR. CHUNG BEING A

01:23PM  18      CONTRACT EMPLOYEE, I THINK.  IS THAT WHAT YOU'RE ASKING HIM TO

01:23PM  19      ELABORATE ON?

01:23PM  20           MR. BRECHER:  THAT, AND THE DATE AND EXTENT OF HIS

01:23PM  21      EXPOSURE TO LIS, WHICH WAS AN EXTENSIVE SUBJECT DURING CROSS.

01:23PM  22           THE COURT:  YOU CAN ASK THOSE QUESTIONS.

01:23PM  23           MR. BRECHER:  THANK YOU, YOUR HONOR.

01:23PM  24      Q.   MR. SONNIER, DO YOU HAVE A SENSE OF MR. CHUNG'S ROLE IN

01:23PM  25      THIS SUMMER 2018 PERIOD?

01:23PM  1    A.   YES.  MY UNDERSTANDING FROM THE MATERIALS THAT I REVIEWED

01:23PM  2    WAS THAT MR. CHUNG WAS RECOMMENDED AS A CONTRACTOR IN THE

01:23PM  3    SUMMER OF 2-18 TO COME IN AND MOVE SERVER EQUIPMENT AT THERANOS

01:23PM  4    TO OTHER LOCATIONS.  I BELIEVE CADDENHEAD, ERIC CADDENHEAD

01:23PM  5    ACTUALLY SET HIM UP AS THE CONTACT, OR REFERRED HIM TO

01:24PM  6    THERANOS.

01:24PM  7    Q.   AND YOU SAID SUMMER 2-18.  DOES THAT MEAN THE SUMMER 2018,

01:24PM  8    SIR?

01:24PM  9    A.   RIGHT, THE SUMMER OF 2018.

01:24PM  10   Q.   AND MR. BOSTIC ASKED YOU ABOUT YOUR UNDERSTANDING OF

01:24PM  11   MR. CHUNG'S FIRST-HAND EXPERIENCE WITH THE LIS SYSTEM; IS THAT

01:24PM  12   RIGHT?

01:24PM  13   A.   THAT'S CORRECT.

01:24PM  14   Q.   AND WHAT IS THAT UNDERSTANDING?

01:24PM  15   A.   MY UNDERSTANDING IS THAT MR. CHUNG QUITE UNDERSTANDABLY

01:24PM  16   KNEW VERY LITTLE ABOUT LIS.  IT WAS A CUSTOM SYSTEM.  HE NEVER

01:24PM  17   HAD SEEN IT AT ANY OF HIS OTHER CLIENTS, AND HE WAS VERY

01:24PM  18   CONCERNED BECAUSE THERE WERE VERY FEW PEOPLE --

01:24PM  19            MR. BOSTIC:  OBJECTION, YOUR HONOR.

01:24PM  20            THE COURT:  SUSTAINED.

01:24PM  21            MR. BOSTIC:  LACK OF FOUNDATION AND MOVE TO STRIKE.

01:24PM  22            THE COURT:  SUSTAINED.  THE LAST PORTION OF THE

01:24PM  23   ANSWER IS STRICKEN FOR LACK OF FOUNDATION.

01:24PM  24   BY MR. BRECHER:

01:24PM  25   Q.   MR. SONNIER, DID YOU SEE ANYTHING IN ALL OF THE MATERIALS

01:24PM   1    THAT SUGGESTED THAT MR. CHUNG'S CONCERNS THAT YOU DISCUSSED

01:25PM   2    WITH MR. BOSTIC WOULD UNDERMINE YOUR OPINION IN ANY WAY?

01:25PM   3    A.   NO, NONE OF HIS CONCERNS UNDERMINED MY OPINION IN ANY WAY.

01:25PM   4    Q.   WHAT ABOUT THAT OF THE OTHER I.T. PERSON, I DON'T THINK

01:25PM   5    HIS NAME CAME INTO EVIDENCE, BUT THE OTHER MEMORANDUM THAT YOU

01:25PM   6    LOOKED AT WITH MR. BOSTIC?

01:25PM   7    A.   AGAIN, IT DIDN'T ULTIMATELY AFFECT MY OPINION.

01:25PM   8    Q.   YOU TESTIFIED WHEN YOU WERE TALKING TO MR. BOSTIC THAT

01:25PM   9    THERE WERE SOME PIECES OF INFORMATION THAT YOU REVIEWED THAT

01:25PM   10   YOU ULTIMATELY DISAGREED WITH; IS THAT CORRECT?

01:25PM   11   A.   THAT'S CORRECT.

01:25PM   12   Q.   CAN YOU EXPLAIN WHY YOU ULTIMATELY DISAGREED?

01:25PM   13   A.   WELL, SOME OF THE STATEMENTS IMPLIED A CERTAIN

01:25PM   14   IMPLEMENTATION OF TECHNOLOGY, AND THEN BY THE TIME I WENT

01:25PM   15   THROUGH ALL OF THE MATERIAL, IT TURNS OUT THERE WAS NO

01:25PM   16   TECHNICAL BASIS FOR THAT OPINION.

01:26PM   17        SO I, I SIMPLY CONCLUDED THAT MAYBE THERE WAS SOME

01:26PM   18   MISUNDERSTANDING IN THAT REPORT BY THAT WITNESS OR THE

01:26PM   19   INTERVIEWEE OR THEY WERE SPEAKING OF SOME OTHER ASPECT OF

01:26PM   20   TECHNOLOGY OTHER THAN THE RECOVERY OF THE LIS DATABASE.

01:26PM   21   Q.   BUT IN FAIRNESS, SIR, MR. BOSTIC ASKED WHETHER YOU

01:26PM   22   PERSONALLY INTERVIEWED THESE PEOPLE.

01:26PM   23        DO YOU REMEMBER THAT TESTIMONY?

01:26PM   24   A.   THAT'S CORRECT.

01:26PM   25   Q.   YES.  AND YOU SAID THAT YOU HAD NOT?

SONNIER REDIRECT BY MR. BRECHER                                    6815

01:26PM   1      A.   I HAVE NOT.

01:26PM   2      Q.   WAS THAT NECESSARY FOR YOU TO FORM YOUR OPINIONS?

01:26PM   3      A.   NO.  ALL I REALLY NEEDED TO IDENTIFY WAS THE EXACT -- NOT

01:26PM   4      THE EXACT, BUT THE GENERAL HARDWARE AND SOFTWARE THAT WAS USED

01:26PM   5      FOR THE LIS DATABASE, AND ONCE I HAD THAT INFORMATION AND PUT

01:26PM   6      THE PUZZLE TOGETHER, THEN THAT WAS THE BASIS FOR MY OPINION.

01:26PM   7      Q.   IN YOUR OTHER WORK, DO YOU TYPICALLY FORM CONCLUSIONS

01:26PM   8      WITHOUT INTERVIEWING PERSONS WITH FIRST-HAND KNOWLEDGE?

01:27PM   9      A.   YES.  IT OFTEN HAPPENS THAT SUCH PERSONS ARE UNAVAILABLE.

01:27PM  10      Q.   COULD YOU GIVE US A SENSE OF WHY THAT MIGHT BE THE CASE?

01:27PM  11      A.   FOR EXAMPLE, ONE TIME THE PERSON WAS TRYING TO STEAL ALL

01:27PM  12      OF THE BUSINESS STUFF OF MY CLIENT, AND SO THEY WANTED NOTHING

01:27PM  13      MORE TO DO WITH THEM.

01:27PM  14      Q.   ANY OTHER CIRCUMSTANCES?

01:27PM  15      A.   SOMETIMES PEOPLE --

01:27PM  16           MR. BOSTIC:  OBJECTION.  RELEVANCE.

01:27PM  17           MR. BRECHER:  YOUR HONOR, MR. BOSTIC ASKED ABOUT THE

01:27PM  18      LIMITATIONS OF THE METHODOLOGY.  I THINK IT'S FAIR TO EXPLORE

01:27PM  19      THAT.

01:27PM  20           THE COURT:  YOU CAN ANSWER THE QUESTION.

01:27PM  21           MR. BRECHER:  THANK YOU.

01:27PM  22           THE WITNESS:  SOMETIMES PEOPLE HAVE JUST MOVED ON TO

01:27PM  23      OTHER COMPANIES AND THEY EITHER DON'T WANT OR CAN'T, MAYBE NOT

01:27PM  24      EVEN ALLOWED, TO ANSWER QUESTIONS ABOUT THEIR FORMER EMPLOYER.

01:27PM  25      BY MR. BRECHER:

SONNIER REDIRECT BY MR. BRECHER                                    6816

01:27PM 1    Q.   WHY DON'T WE JUST WRAP UP THIS LINE OF TESTIMONY,

01:27PM 2    MR. SONNIER.

01:27PM 3         WOULD YOU DESCRIBE IT AS TYPICAL IN YOUR WORK TO RELY ON

01:27PM 4    INTERVIEW SUMMARIES OR SECOND-HAND INFORMATION?

01:27PM 5    A.   IT'S VERY OFTEN.  IT PROBABLY ALWAYS IS A LITTLE BIT OF A

01:28PM 6    TIME SAVINGS IF YOU CAN GET SOME INFORMATION DIRECT FROM THE

01:28PM 7    PEOPLE THAT -- WHO ARE IN CHARGE OF THE SYSTEM PREVIOUSLY.

01:28PM 8         BUT IT OFTEN HAPPENS, LIKE I SAID, THAT THOSE PEOPLE

01:28PM 9    AREN'T AVAILABLE, AND SO YOU WORK FROM THE -- ULTIMATELY FROM

01:28PM 10   THE SYSTEM IN FRONT OF YOU OR FROM THE TECHNICAL INFORMATION

01:28PM 11   ABOUT THAT SYSTEM.

01:28PM 12   Q.   YOU TOLD MR. BOSTIC THAT YOU THOROUGHLY INVESTIGATED

01:28PM 13   STATEMENTS IN THE MATERIALS THAT YOU REVIEWED THAT YOU THOUGHT

01:28PM 14   WERE CONTRARY TO YOUR ULTIMATE OPINIONS.

01:28PM 15        DO YOU REMEMBER THAT?

01:28PM 16   A.   YES.

01:28PM 17   Q.   COULD YOU EXPLAIN HOW YOU INVESTIGATED THOSE STATEMENTS?

01:28PM 18   A.   WELL, I REVIEWED ALL OF THE MATERIAL, AND WHEN I CAME

01:28PM 19   ACROSS STATEMENTS THAT MIGHT APPEAR OR COULD POTENTIALLY CREATE

01:28PM 20   SOME BARRIER MAKING IT DIFFICULT, OR POSSIBLY REMOVE THE

01:28PM 21   POSSIBILITY OF RECOVERING THE LIS DATABASE, WHICH WAS, AS I'VE

01:29PM 22   STATED, MY TASK, THEN I INVESTIGATED THOSE ITEMS THOROUGHLY TO

01:29PM 23   SEE IF THERE'S ANY REAL TECHNICAL REASON WHY THOSE STATEMENTS

01:29PM 24   MIGHT HAVE BEEN MADE.

01:29PM 25        AND IN ALL CASES IT TURNED OUT NOT TO BE THE CASE.

01:29PM   1    Q.   OKAY.  AND LET'S TALK ABOUT A FEW OF THOSE STATEMENTS.

01:29PM   2         MR. BOSTIC ASKED YOU ABOUT A NUMBER OF PERSONS WHO SEEM TO

01:29PM   3    BELIEVE THAT IT WOULD HAVE BEEN EITHER IMPOSSIBLE OR VERY

01:29PM   4    DIFFICULT TO REASSEMBLE THE LIS SYSTEM.

01:29PM   5         DO YOU REMEMBER THAT TESTIMONY?

01:29PM   6    A.   YES.

01:29PM   7    Q.   WHY DO YOU CONCLUDE THAT THAT WAS NOT THE CASE?

01:29PM   8    A.   AGAIN, ONCE YOU ANALYZE THE SYSTEM, THE EQUIPMENT IT WAS

01:29PM   9    RUNNING ON, AND THE STANDARD OFF-THE-SHELF MICROSOFT SQL

01:29PM  10    SERVER, THEN YOU CAN DETERMINE THAT IT IS RECOVERABLE UNLESS

01:29PM  11    THERE'S SOME ACTIVE BLOCK, AND THERE WEREN'T -- AT A TECHNICAL

01:29PM  12    LEVEL, THERE WEREN'T ANY.

01:30PM  13         I CAN'T REALLY EXPLAIN WHY PERHAPS SOME STATEMENTS WERE

01:30PM  14    MADE THAT INDICATED THAT IT WASN'T.

01:30PM  15    Q.   AND WHEN YOU REVIEW MATERIALS -- ACTUALLY, LET'S START

01:30PM  16    WITH WHEN YOU REVIEWED MATERIALS IN THIS CASE, INCLUDING THOSE

01:30PM  17    STATEMENTS, DO YOU TAKE THE MATERIALS YOU REVIEW AT FACE VALUE?

01:30PM  18    A.   I ALWAYS RUN ALL OF THE INFORMATION BACKWARDS AND FORWARDS

01:30PM  19    TO MAKE SURE THAT THE WHOLE PUZZLE FITS TOGETHER BECAUSE, YOU

01:30PM  20    KNOW, ESPECIALLY TECHNICAL PEOPLE SOMETIMES SUMMARIZE

01:30PM  21    INFORMATION OR THEY DUMB IT DOWN FOR WHOEVER THEY'RE TALKING

01:30PM  22    TO, HOPING TO TAKE A HIGHLY TECHNICAL SUBJECT AND MAKE IT MORE

01:30PM  23    UNDERSTANDABLE, AND SO THEY MAY GLOSS OVER SOME OF THE DETAIL.

01:30PM  24         SO I DON'T THINK THEY DO IT WITH THE INTENT TO DECEIVE OR

01:30PM  25    ANYTHING.  IT'S JUST THE NATURE OF TECHNICAL WORK.

01:30PM  1          SO I ALWAYS CHECK THE TECHNICAL BASIS FOR EVERY STATEMENT

01:30PM  2     THAT IS RELEVANT.

01:30PM  3     Q.   AND IS THAT CONCLUSION CONSISTENT WITH YOUR TRAINING AND

01:31PM  4     EXPERIENCE?

01:31PM  5     A.   ABSOLUTELY.

01:31PM  6     Q.   AND IS THAT CONCLUSION CONSISTENT WITH THE MATERIALS THAT

01:31PM  7     YOU REVIEWED IN THIS CASE?

01:31PM  8     A.   YES.

01:31PM  9     Q.   MR. BOSTIC ASKED YOU ABOUT ANOTHER STATEMENT ABOUT THE

01:31PM  10    THERANOS LIS BEING A BESPOKE SYSTEM.

01:31PM  11         DO YOU REMEMBER THAT TESTIMONY?

01:31PM  12    A.   YES.

01:31PM  13    Q.   AND WHY DOESN'T THAT AFFECT YOUR ANALYSIS?

01:31PM  14    A.   BECAUSE IT'S IN THE NATURE OF SQL DATABASES IN GENERAL,

01:31PM  15    AND MICROSOFT SQL SERVER, THAT IF YOU DO ANY CUSTOM DATABASE,

01:31PM  16    THEN YOU CAN THINK OF IT AS BESPOKE.  I MEAN, CUSTOM, "BESPOKE"

01:31PM  17    IN MY INTERPRETATION IS SYNONYMOUS.

01:31PM  18         AND SO IT'S JUST A ROUTINE USAGE OF A MICROSOFT SQL SERVER

01:31PM  19    THAT A COMPANY, IF THEY'RE CREATING A DATABASE FOR THEIR OWN

01:31PM  20    IN-HOUSE USE, NOT FOR SALE TO THE PUBLIC, IT WOULD BE A CUSTOM

01:32PM  21    DATABASE.

01:32PM  22         SO THAT'S ROUTINE IN THE USE OF MICROSOFT SQL SERVER.

01:32PM  23    Q.   AND WHAT IS THE RELATIONSHIP, IF ANY, BETWEEN THAT KIND OF

01:32PM  24    CUSTOMIZATION ON THE ONE HAND AND THE RECOVERABILITY OF THE

01:32PM  25    UNDERLYING DATA ON THE OTHER?

01:32PM  1      A.   IT HAS NOTHING TO DO WITH EACH OTHER.

01:32PM  2      Q.   MR. ALLEN, I DON'T KNOW IF THIS IS POSSIBLE, BUT

01:32PM  3   MR. BOSTIC INTRODUCED AN EXHIBIT ON DIRECT -- EXCUSE ME, ON

01:32PM  4   CROSS, WHICH IS ALREADY IN EVIDENCE, EXHIBIT 5940.  I DON'T

01:32PM  5   KNOW IF WE HAVE THAT.  THAT'S FINE.

01:32PM  6        PERHAPS I COULD ASK THE INDULGENCE OF MS. WACHS TO PUT

01:32PM  7   THAT UP.

01:32PM  8        AND THAT WILL BE IN THE GOVERNMENT'S BINDER THAT YOU HAVE

01:32PM  9   AS WELL, SIR?

01:32PM 10           MR. BOSTIC:  DO YOU MEAN 5943, COUNSEL?

01:32PM 11           MR. BRECHER:  I DO.  EXHIBIT 5943.

01:32PM 12           THE WITNESS:  5943.

01:32PM 13   BY MR. BRECHER:

01:32PM 14      Q.   AND IT WILL ALSO BE UP ON THE SCREEN IN FRONT OF YOU.

01:33PM 15      A.   OH, OKAY.  I SEE IT, YES.

01:33PM 16      Q.   AND I BELIEVE YOU WERE TALKING TO MR. BOSTIC, THIS IS A

01:33PM 17   FOLLOW-UP EMAIL TO THE ONE THAT YOU AND I SPOKE ABOUT ON

01:33PM 18   DIRECT; IS THAT RIGHT?

01:33PM 19      A.   YES.

01:33PM 20      Q.   AND SO THIS IS AN EMAIL IN WHICH SOME SORT OF -- SOME

01:33PM 21   INTERNAL GOVERNMENT PERSON IS DISCUSSING THE VARIOUS OPTIONS

01:33PM 22   FOR RECOVERING THE LIS DATA; IS THAT RIGHT?

01:33PM 23      A.   YES.

01:33PM 24      Q.   OKAY.  AND I'M JUST LOOKING AT THE VERY TOP EMAIL UNDER

01:33PM 25   "POSSIBLE ROUTES FORWARD."

SONNIER REDIRECT BY MR. BRECHER                                    6820

01:33PM  1         AND JUST BEFORE THAT IT SAYS, "I HAD A MEETING WITH THE

01:33PM  2    AUSA'S ON THE CASE REGARDING OUR OPTIONS AND WE ALL DECIDED TO

01:33PM  3    DO THE FOLLOWING."

01:33PM  4    A.   YES, I SEE THAT.

01:33PM  5    Q.   AND YOU SEE THE FIRST BULLET SAYS, "PUSH BACK ON DEFENSE

01:33PM  6    AND SEE IF THEY CAN BE PERSUADED TO PRODUCE THIS IN A MANNER

01:33PM  7    THAT CAN BE VIEWED AND PROCESSED IN A STANDARD WAY"?

01:33PM  8         DO YOU SEE THAT?

01:33PM  9    A.   YES.

01:33PM  10   Q.   AND THE SECOND OPTION IS "CHECK WITH THE FBI."

01:33PM  11        DO YOU SEE THAT?

01:34PM  12   A.   YES.

01:34PM  13   Q.   BUT IN THE EMAIL BELOW, YOU SAW THAT THERE WERE TWO OTHER

01:34PM  14   OPTIONS LISTED; ISN'T THAT RIGHT?

01:34PM  15   A.   YEAH.  I BELIEVE THE EMAIL BELOW HAS LOTS OF OTHER OPTIONS

01:34PM  16   BEYOND THOSE TWO.

01:34PM  17   Q.   THANK YOU, MS. WACHS.

01:34PM  18        AND IF WE CAN TURN BACK, MR. ALLEN, TO EXHIBIT 20832.

01:34PM  19        IT WILL BE IN YOUR BINDER, BUT IT WILL ALSO COME UP ON THE

01:34PM  20   SCREEN.

01:34PM  21        AND IF WE LOOK -- THIS IS AN EMAIL THAT PRECEDED THE ONE

01:34PM  22   THAT WE WERE JUST LOOKING AT; IS THAT RIGHT?

01:34PM  23   A.   YES.

01:34PM  24   Q.   OKAY.  AND DO YOU SEE UNDER THE FIRST BULLET, THAT FIRST

01:34PM  25   SUBBULLET THAT SAYS, "IF THEY CAN'T FIGURE OUT HOW TO PRODUCE

01:34PM    1    THE CONTENTS OF THEIR DATABASE IN A LEGITIMATE MANNER, PERHAPS

01:34PM    2    THEY'LL CONSIDER HANDING OVER THEIR PHYSICAL SQL SERVER AND WE

01:34PM    3    CAN SET IT UP IN A WORKROOM."

01:34PM    4    A.   YES, I SEE THAT.

01:34PM    5    Q.   SO IT SEEMS THAT WAS NOT ONE OF THE OPTIONS THAT THE

01:34PM    6    GOVERNMENT DECIDED TO PURSUE?

01:34PM    7    A.   IF THEY FOLLOWED --

01:34PM    8            MR. BOSTIC:  OBJECTION.  CALLS FOR SPECULATION.

01:34PM    9            THE COURT:  SUSTAINED.

01:34PM   10            MR. BRECHER:  THANK YOU, YOUR HONOR.

01:34PM   11    Q.   BASED ON THE EMAIL THAT MR. BOSTIC SHOWED YOU ON

01:34PM   12    CROSS-EXAMINATION, WAS THAT LISTED AS ONE OF THE TWO OPTIONS

01:34PM   13    THAT THIS TEAM HAD DECIDED ON?

01:35PM   14    A.   IT WAS NOT.

01:35PM   15    Q.   OKAY.  AND THIS OPTION, WOULD THAT HAVE WORKED?

01:35PM   16    A.   THIS WOULD HAVE WORKED.

01:35PM   17    Q.   OKAY.  AND THE THIRD BULLET, "IDENTIFY A VENDOR."

01:35PM   18    A.   YES.

01:35PM   19    Q.   IS THAT ALSO AN OPTION THAT WAS NOT LISTED ON

01:35PM   20    EXHIBIT 5940?

01:35PM   21    A.   YES.

01:35PM   22    Q.   WOULD THAT HAVE ALSO WORKED?

01:35PM   23    A.   IT WOULD WORK, YES.

01:35PM   24    Q.   OKAY.  MR. SONNIER, MR. BOSTIC ASKED YOU SOME QUESTIONS

01:35PM   25    ABOUT YOUR UNDERSTANDING OF THE LOCATION OF THE DISK DRIVES

SONNIER REDIRECT BY MR. BRECHER                                    6822

01:35PM   1     UNDERLYING THE THERANOS LIS.

01:35PM   2          DO YOU REMEMBER THAT?

01:35PM   3     A.   YES.

01:35PM   4     Q.   AND YOU HAD A CONVERSATION WITH HIM ABOUT A FACILITY

01:35PM   5     CALLED IRON MOUNTAIN?

01:35PM   6     A.   YES.

01:35PM   7     Q.   OKAY.  AND MR. BOSTIC ASKED YOU WHETHER YOU WERE AWARE OF

01:35PM   8     ANYONE GOING AND PERSONALLY INSPECTING THE DISK DRIVES AT IRON

01:35PM   9     MOUNTAIN?

01:35PM  10     A.   IT WAS SOMETHING APPROXIMATING THAT.

01:35PM  11     Q.   HE DID ASK YOU WHETHER YOU PERSONALLY WENT OUT TO IRON

01:36PM  12     MOUNTAIN?

01:36PM  13     A.   RIGHT.

01:36PM  14     Q.   OKAY.  ARE YOU AWARE, BASED ON THE MATERIALS THAT YOU

01:36PM  15     REVIEWED, OF ANY EFFORT BY ANY GOVERNMENT AGENT TO GO TO IRON

01:36PM  16     MOUNTAIN?

01:36PM  17     A.   I HAVE SEEN NOTHING IN THE MATERIALS THAT I RECEIVED TO

01:36PM  18     THAT EFFECT.

01:36PM  19     Q.   ARE YOU AWARE OF ANY EFFORT BY ANY PROSECUTOR TO GO TO

01:36PM  20     IRON MOUNTAIN?

01:36PM  21     A.   THE SAME.  I HAVEN'T SEEN ANYTHING TO THAT EFFECT.

01:36PM  22     Q.   ARE YOU AWARE OF ANY EFFORT BY ANY GOVERNMENT I.T. EXPERT

01:36PM  23     TO GO TO IRON MOUNTAIN?

01:36PM  24     A.   I'M NOT.

01:36PM  25     Q.   OKAY.  MR. SONNIER, IN ANY OF THE MATERIALS THAT YOU

01:36PM  1    REVIEWED, ARE YOU AWARE OF ANY EFFORT BY THE GOVERNMENT TO TRY

01:36PM  2    TO GET THE SERVERS AND DRIVES AS YOU RECOMMEND?

01:36PM  3    A.   I AM NOT AWARE OF ANY SUCH EFFORT.

01:36PM  4    Q.   AND, MR. SONNIER, BASED ON ANYTHING THAT MR. BOSTIC SHOWED

01:36PM  5    YOU ON CROSS-EXAMINATION, ARE YOU AWARE OF ANY EFFORT BY THE

01:36PM  6    GOVERNMENT TO SECURE THE SERVERS AND DRIVES AS YOU RECOMMEND?

01:37PM  7            MR. BOSTIC:  I'LL OBJECT TO THAT.  401 AND 403 TO

01:37PM  8    THIS LINE.

01:37PM  9            THE COURT:  OVERRULED.

01:37PM 10        YOU CAN ANSWER THE QUESTION.

01:37PM 11            THE WITNESS:  NO, I'M NOT AWARE OF ANY SUCH EFFORT.

01:37PM 12    BY MR. BRECHER:

01:37PM 13    Q.   AND, MR. SONNIER, DID ANYTHING IN YOUR DISCUSSION WITH

01:37PM 14    MR. BOSTIC CAUSE YOU TO RECONSIDER THE OPINIONS YOU'VE OFFERED

01:37PM 15    HERE TODAY?

01:37PM 16    A.   NO, THEY DID NOT.

01:37PM 17            MR. BRECHER:  YOUR HONOR, IF I COULD HAVE A MOMENT?

01:37PM 18            THE COURT:  SURE.

01:37PM 19        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:37PM 20            MR. BRECHER:  MR. SONNIER, THANK YOU VERY MUCH, SIR.

01:37PM 21        NOTHING FURTHER.

01:37PM 22            MR. BOSTIC:  NOTHING FURTHER.

01:37PM 23            THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:37PM 24            MR. BOSTIC:  YES, YOUR HONOR.

01:37PM 25            MR. BRECHER:  YES, YOUR HONOR.

ER-5066

6824

01:38PM 1              THE COURT:  YOU'RE EXCUSED.  THANK YOU VERY MUCH.

01:38PM 2          DOES THE DEFENSE HAVE ADDITIONAL WITNESSES TO CALL?

01:38PM 3            MR. COOPERSMITH:  NO, YOUR HONOR.

01:38PM 4     BUT WE DO HAVE ADDITIONAL EXHIBITS TO ADMIT AS WE

01:38PM 5   DISCUSSED EARLIER.

01:38PM 6             THE COURT:  ALL RIGHT.  THANK YOU.

01:38PM 7     LET'S TURN TO THOSE EXHIBITS NOW.

01:38PM 8     LADIES AND GENTLEMEN, WHY DON'T YOU JUST TAKE A STANDING

01:38PM 9   BREAK WHILE WE ORGANIZE SOME EXHIBITS FOR YOU, IF YOU'D LIKE.

01:38PM 10  AND WE WILL -- WE WILL CONCLUDE TODAY IN ABOUT 20 MINUTES AT

01:38PM 11  2:00 O'CLOCK AS I INDICATED.

01:38PM 12     BUT LET'S SEE IF WE CAN RESOLVE THESE LAST EXHIBITS,

01:38PM 13  COUNSEL.

01:39PM 14     (PAUSE IN PROCEEDINGS.)

01:39PM 15          MR. COOPERSMITH:  YOUR HONOR, IF IT WOULD BE HELPFUL

01:39PM 16  FOR THE COURT, I HAVE A BINDER WITH EXHIBIT NUMBERS.

01:39PM 17           THE COURT:  ALL RIGHT.  THANK YOU.

01:39PM 18          MR. COOPERSMITH:  (HANDING.)

01:40PM 19     (PAUSE IN PROCEEDINGS.)

01:40PM 20          THE COURT:  ALL RIGHT.  MR. COOPERSMITH.

01:40PM 21          MR. COOPERSMITH:  YES, YOUR HONOR.

01:40PM 22     AS I SAID -- MAY I REMOVE MY MASK?

01:40PM 23          THE COURT:  YES, YES.

01:40PM 24          MR. COOPERSMITH:  WE HAVE A NUMBER OF EXHIBITS TO

01:40PM 25  ADMIT FOR THE RECORD, AND I CAN JUST START WITH THE FIRST ONE

ER-5067

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

6    UNITED STATES OF AMERICA,          )
                                        )  CR-18-00258-EJD
                   PLAINTIFF,           )
7                                       )  SAN JOSE, CALIFORNIA
           VS.                          )
8                                       )  JUNE 21, 2022
     RAMESH "SUNNY" BALWANI,            )
9                                       )  VOLUME 38
                   DEFENDANT.           )
10   _____   )  PAGES 6929 - 7156

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                    UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S :

15   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                            150 ALMADEN BOULEVARD, SUITE 900
17                          SAN JOSE, CALIFORNIA 95113

18                          BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                          1301 CLAY STREET, SUITE 340S
                            OAKLAND, CALIFORNIA 94612
20
                     (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTERS:
22                               IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
23                               LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

|  | 1 | SAN JOSE, CALIFORNIA                              JUNE 21, 2022 |
| 09:13AM | 2 | P R O C E E D I N G S |
| 09:13AM | 3 | (COURT CONVENED AT 9:13 A.M.) |
| 09:13AM | 4 | (JURY IN AT 9:13 A.M.) |
| 09:13AM | 5 | THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK YOU |
| 09:13AM | 6 | AGAIN FOR YOUR COURTESY. |
| 09:13AM | 7 | WE'RE BACK ON THE RECORD IN THE BALWANI MATTER.  ALL |
| 09:13AM | 8 | COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT AND OUR JURY IS |
| 09:14AM | 9 | PRESENT. |
| 09:14AM | 10 | THANK YOU.  GOOD MORNING, LADIES AND GENTLEMEN.  IT'S NICE |
| 09:14AM | 11 | TO SEE YOU AGAIN. |
| 09:14AM | 12 | LET ME -- BEFORE WE BEGIN THE PROCEEDINGS, LET ME TURN MY |
| 09:14AM | 13 | ATTENTION TO THE JURY AND ASK YOU AGAIN THAT QUESTION THAT |
| 09:14AM | 14 | YOU'RE SO FAMILIAR WITH. |
| 09:14AM | 15 | DURING THE LAST TIME, OR IN BETWEEN THE LAST TIME WE WERE |
| 09:14AM | 16 | ALL TOGETHER AND YOU WERE OUTSIDE OF THE COURTHOUSE, DID ANY OF |
| 09:14AM | 17 | YOU HAVE CAUSE OR WERE ANY OF YOU EXPOSED TO ANY MEDIA, |
| 09:14AM | 18 | WRITINGS, DISCUSSIONS, OR DID ANY OF YOU LEARN ANYTHING ABOUT |
| 09:14AM | 19 | THIS CASE OTHER THAN WHAT YOU'VE HEARD, SEEN, AND LISTENED TO |
| 09:14AM | 20 | HERE IN THE COURTROOM? |
| 09:14AM | 21 | ANYONE HAVE THAT EXPERIENCE?  IF SO, IF YOU WOULD PLEASE |
| 09:14AM | 22 | RAISE YOUR HAND NOW. |
| 09:14AM | 23 | I SEE NO HANDS. |
| 09:14AM | 24 | THANK YOU AGAIN FOR YOUR FIDELITY TO THE ADMONITION.  IT |
| 09:14AM | 25 | IS NICE TO SEE YOU AGAIN. |

09:14AM  1        LET ME TURN TO THE GOVERNMENT FIRST AND ASK THE

09:15AM  2   GOVERNMENT, DOES THE GOVERNMENT HAVE ANY REBUTTAL?

09:15AM  3            MR. SCHENK:  NO, YOUR HONOR, WE DO NOT.

09:15AM  4            THE COURT:  ALL RIGHT.  THANK YOU.

09:15AM  5        LADIES AND GENTLEMEN, WHAT THIS MEANS IS THAT ALL OF THE

09:15AM  6   EVIDENCE THAT YOU WILL NEED OR THAT THESE LAWYERS HAVE DECIDED

09:15AM  7   TO PUT IN FRONT OF YOU IS NOW IN EVIDENCE.

09:15AM  8        THE NEXT PART OF THE CASE WILL NOW BEGIN, AND THAT IS

09:15AM  9   ARGUMENTS.

09:15AM 10        AND LET ME TURN TO THE GOVERNMENT.  DOES THE GOVERNMENT

09:15AM 11   HAVE A CLOSING ARGUMENT?

09:15AM 12            MR. SCHENK:  YES, YOUR HONOR, WE DO.

09:15AM 13            THE COURT:  PLEASE PROCEED.  THANK YOU.

09:15AM 14            MR. SCHENK:  YOUR HONOR, MAY I REMOVE MY MASK?

09:15AM 15            THE COURT:  YES.

09:15AM 16            MR. SCHENK:  THANK YOU.

09:15AM 17        **(MR. SCHENK GAVE HIS CLOSING ARGUMENT ON BEHALF OF THE**

09:15AM 18   **GOVERNMENT.)**

09:15AM 19            MR. SCHENK:  GOOD MORNING.

09:15AM 20        SUNNY BALWANI AND ELIZABETH HOLMES AGREED TO COMMIT FRAUD

09:15AM 21   IN THE HOPES THAT THEY WOULD BUY MORE TIME FOR THERANOS.  ON

09:16AM 22   SEVERAL OCCASIONS, INCLUDING IN 2009, 2010, AND 2013, THERANOS

09:16AM 23   WAS RUNNING OUT OF MONEY, AND MR. BALWANI HAD A CHOICE TO MAKE.

09:16AM 24   HE COULD WATCH THERANOS FAIL, HE COULD WATCH HIS GIRLFRIEND'S

09:16AM 25   BUSINESS COLLAPSE, OR HE COULD PURSUE A DIFFERENT PATH.

CLOSING ARGUMENT BY MR. SCHENK                                    6934

09:16AM  1        MR. BALWANI AT THAT TIME KNEW THAT THERANOS WAS NOT

09:16AM  2   GENERATING AND WOULD NOT GENERATE ANY MEANINGFUL REVENUE BY

09:16AM  3   BEING HONEST WITH PEOPLE.  SO HE CHOSE A DIFFERENT PATH.

09:16AM  4        MR. BALWANI KNEW THAT THERE WERE TWO SOURCES OF POSSIBLE

09:16AM  5   REVENUE FOR THERANOS AND, TOGETHER WITH ELIZABETH HOLMES, THEY

09:17AM  6   CAME UP WITH TWO SCHEMES, TWO PLANS TO DEFRAUD THESE GROUPS OF

09:17AM  7   INDIVIDUALS.  THEY DECIDED TO DEFRAUD INVESTORS IN THERANOS,

09:17AM  8   AND THEY DECIDED TO DEFRAUD PATIENTS.

09:17AM  9        AND IT'S BECAUSE OF THOSE DECISIONS, IT'S BECAUSE OF THOSE

09:17AM 10   CHOICES THAT SUNNY BALWANI MADE THAT WE'VE BEEN TOGETHER SINCE

09:17AM 11   MARCH.

09:17AM 12        YOU KNOW, BECAUSE YOU'VE SEEN THE EVIDENCE, THAT THERANOS

09:17AM 13   WOULD NOT HAVE GENERATED REVENUE FROM EITHER OF THOSE GROUPS,

09:17AM 14   INVESTORS OR PATIENTS, IF IT WAS HONEST.

09:17AM 15        LET'S IMAGINE FOR A MOMENT WHAT HONEST PITCHES FROM

09:17AM 16   THERANOS, FROM MR. BALWANI, FIRST TO INVESTORS WOULD HAVE

09:17AM 17   SOUNDED LIKE.

09:17AM 18        IF MR. BALWANI WAS HONEST WITH INVESTORS, YOU KNOW THAT HE

09:18AM 19   WOULD HAVE TOLD THEM THAT THERANOS'S TECHNOLOGY WAS NOT

09:18AM 20   VALIDATED BY LARGE PHARMACEUTICAL COMPANIES; THAT THERANOS'S

09:18AM 21   TECHNOLOGY HAD NOT BEEN DEPLOYED BY THE MILITARY IN THE

09:18AM 22   BATTLEFIELD; THAT THERANOS DID NOT HAVE A HEALTHY AND EXPANDING

09:18AM 23   RELATIONSHIP WITH WALGREENS; THAT THERANOS DID NOT HAVE

09:18AM 24   MEANINGFUL REVENUE; THAT THERANOS'S TECHNOLOGY COULD NOT

09:18AM 25   GENERATE ACCURATE AND RELIABLE BLOOD TEST RESULTS.

CLOSING ARGUMENT BY MR. SCHENK                                    6935

09:18AM  1        NOW, THE IMPLICATIONS OF BEING HONEST WITH INVESTORS ARE

09:18AM  2   OBVIOUS.  YOU KNOW IT.  YOU'VE SAT THROUGH THE TRIAL AND HAVE

09:18AM  3   SEEN THE EVIDENCE, AND MR. BALWANI KNEW.

09:18AM  4        THE STATEMENTS, OR THE PITCH, TO PATIENTS WOULD HAVE

09:18AM  5   LIKEWISE RESULTED IN NO REVENUE.  IT WOULD HAVE BEEN SIMPLE AND

09:18AM  6   STRAIGHTFORWARD.  THERANOS WOULD HAVE TOLD PATIENTS THAT THEY

09:18AM  7   COULD NOT GENERATE ACCURATE AND RELIABLE BLOOD TEST RESULTS,

09:18AM  8   AND THAT, IN FACT, FOR THE MAJORITY OF THE TESTS THAT THERANOS

09:19AM  9   CONDUCTED, THEY NEEDED TO DRAW BLOOD FROM THE VEIN, NOT FROM A

09:19AM  10  FINGERSTICK.

09:19AM  11       AGAIN, IF THEY WERE HONEST WITH INVESTORS AND HONEST WITH

09:19AM  12  PATIENTS, THEY WOULD NOT HAVE GENERATED THE REVENUE THAT

09:19AM  13  MR. BALWANI KNEW THERANOS NEEDED.

09:19AM  14       I'M GOING TO TALK TO YOU FOR A FEW HOURS THIS MORNING, AND

09:19AM  15  MY GOAL IS TO COVER REALLY FOUR TOPICS.

09:19AM  16       AND WE'RE GOING TO GO THROUGH SOME SLIDES THAT I'VE

09:19AM  17  PREPARED, AND THOSE SLIDES ARE GOING TO TOUCH ON, FIRST, THE

09:19AM  18  WITNESSES THAT TESTIFIED IN THE TRIAL.

09:19AM  19       THIS TRIAL, AS I MENTIONED, BEGAN IN MARCH.  YOU'VE HEARD

09:19AM  20  FROM A LOT OF WITNESSES THAT THE GOVERNMENT HAS CALLED OVER

09:19AM  21  THOSE MONTHS, AND I WANT TO SPEND A LITTLE BIT OF TIME

09:19AM  22  REMINDING YOU WHO TESTIFIED AND WHERE THEY FIT INTO THE STORY.

09:19AM  23  NOW THAT YOU HAVE SEEN THE FULL STORY, YOU SEE WHERE WITNESSES

09:19AM  24  FIT IN, WHY THEY WERE CALLED AND WHAT PIECE TO THE PUZZLE THEY

09:20AM  25  PROVIDE.

CLOSING ARGUMENT BY MR. SCHENK                          6936

09:20AM   1      AFTER WE COVER THE WITNESSES, WE'RE GOING TO TALK ABOUT

09:20AM   2   THE CRIMES THAT THE GOVERNMENT CHARGED MR. BALWANI WITH

09:20AM   3   COMMITTING.  THE GOVERNMENT HAS CHARGED MR. BALWANI WITH

09:20AM   4   COMMITTING CERTAIN CRIMES, AND WE'LL TALK ABOUT WHAT THOSE

09:20AM   5   CRIMES ARE.

09:20AM   6      THIRD, WE'LL TALK ABOUT THE ELEMENTS.  EVERY FEDERAL CRIME

09:20AM   7   HAS CERTAIN ELEMENTS THAT THE GOVERNMENT MUST PROVE IN ORDER

09:20AM   8   FOR YOU TO CONVICT, AND WE'LL REVIEW WHAT THOSE ELEMENTS ARE

09:20AM   9   FOR THE SPECIFIC CRIMES.

09:20AM  10      AND FINALLY, WE'LL TALK ABOUT THE EVIDENCE.  WHAT EVIDENCE

09:20AM  11   HAVE YOU HEARD THAT WILL SUPPORT EACH OF THOSE ELEMENTS.

09:20AM  12      AND I'LL HAVE A FEW FINAL TOPICS TO DISCUSS WITH YOU

09:20AM  13   BEFORE I SIT DOWN.

09:20AM  14      LET'S BEGIN BY LOOKING AT SOME OF THESE SLIDES.

09:20AM  15      SO AS I MENTIONED, WE'RE GOING TO START BY REVIEWING THE

09:20AM  16   WITNESSES WHO TESTIFIED IN TRIAL.

09:20AM  17      THE FIRST WITNESS THAT THE GOVERNMENT CALLED WAS

09:20AM  18   ERIKA CHEUNG.

09:20AM  19      AND ONE WAY TO THINK OF THE WITNESSES THAT THE GOVERNMENT

09:20AM  20   CALLED IN THIS CASE IS THERANOS INSIDERS, OR FORMER EMPLOYEES,

09:21AM  21   AND EVERYBODY ELSE.  THERE WERE A NUMBER OF PEOPLE WHO USED TO

09:21AM  22   WORK AT THERANOS, AND IN LARGE PART, THAT'S WHERE THE TRIAL

09:21AM  23   BEGAN SO THAT YOU COULD SEE WHAT THE REALITY WAS, WHAT HONESTLY

09:21AM  24   WAS OCCURRING AT THERANOS, SO THAT LATER ON IN THE TRIAL WHEN

09:21AM  25   INVESTORS TESTIFIED OR WHEN PATIENTS TESTIFIED AND YOU GOT TO

CLOSING ARGUMENT BY MR. SCHENK                                    6937

09:21AM  1    HEAR WHAT THE INVESTORS THOUGHT, YOU ALREADY KNEW THE

09:21AM  2    DIFFERENCE.  YOU KNEW THE SIGNIFICANT DELTA BETWEEN WHAT THE

09:21AM  3    INSIDERS, WHAT THE THERANOS EMPLOYEES TOLD YOU WAS OCCURRING AT

09:21AM  4    THERANOS, VERSUS WHAT THE INVESTORS OR THE PATIENTS TOLD YOU

09:21AM  5    THEIR UNDERSTANDING, THEIR EXPECTATIONS, THEIR KNOWLEDGE, WHAT

09:21AM  6    THAT DIFFERENCE WAS.

09:21AM  7         AND MS. CHEUNG WAS THE FIRST WITNESS.  AND YOU RECALL THAT

09:21AM  8    ERIKA CHEUNG WORKED AT THERANOS.  SHE STARTED AT THERANOS JUST

09:21AM  9    AFTER SHE GRADUATED FROM CAL.  SHE WAS EXCITED ABOUT HER JOB.

09:21AM 10         AND ONE OF HER RESPONSIBILITIES AT THERANOS WAS TO PROCESS

09:21AM 11    PATIENT SAMPLES, WAS TO ACTUALLY DO THE BLOOD TESTS.  AND

09:22AM 12    MS. CHEUNG TOLD YOU THAT SHE HAD CONCERNS ABOUT THE RESULTS

09:22AM 13    THAT SHE WAS SEEING, THAT SHE DIDN'T THINK THAT THERANOS WAS

09:22AM 14    GENERATING ACCURATE RESULTS, AND YET THEY WERE STILL REPORTING

09:22AM 15    THOSE RESULTS TO PATIENTS.

09:22AM 16         AND SHE TOLD YOU THAT THAT REALLY CONCERNED HER, AND SHE

09:22AM 17    RAISED HER CONCERNS TO OTHER INDIVIDUALS, AND THEN QUIT BECAUSE

09:22AM 18    OF IT.

09:22AM 19         BUT SHE DIDN'T JUST QUIT.  WHEN SHE LEFT, SHE ALSO WENT TO

09:22AM 20    THE MEDIA AND SHE WENT TO REGULATORS BECAUSE OF HER CONCERNS.

09:22AM 21         LET ME PAUSE FOR A MOMENT AND JUST SAY ONE THING ABOUT THE

09:22AM 22    SLIDES.  WHEN YOU DELIBERATE, YOU WILL NOT HAVE THE SLIDES WITH

09:22AM 23    YOU IN THE DELIBERATION ROOM.

09:22AM 24         IN THE BOTTOM RIGHT CORNER, YOU SEE ON THIS SLIDE I HAVE

09:22AM 25    NOTED CITATIONS TO THE TRANSCRIPTS THAT WERE PRODUCED DURING

09:22AM  1    THE COURSE OF THE TRIAL.

09:22AM  2        YOU ALSO WILL NOT HAVE TRANSCRIPTS OF THE TRIAL, SO YOUR

09:22AM  3    MEMORY OF WHAT THE WITNESSES SAID SHOULD CONTROL.

09:22AM  4        THERE WILL BE INSTANCES ON THE SLIDES WHEN I'M SHOWING YOU

09:22AM  5    EXHIBITS, EMAILS, OR TEXT MESSAGES THAT YOU SAW DURING THE

09:23AM  6    COURSE OF THE TRIAL.  YOU WILL HAVE THOSE.  AND YOU MAY WANT TO

09:23AM  7    AT TIMES JOT DOWN EXHIBIT NUMBERS THAT YOU SEE ON THE SLIDES IF

09:23AM  8    THERE'S AN EXHIBIT YOU WANT TO GO BACK TO AND LOOK AT DURING

09:23AM  9    YOUR DELIBERATIONS.

09:23AM 10        FOR THIS ERIKA CHEUNG SLIDE, YOU SEE IT'S JUST

09:23AM 11    TRANSCRIPTS.

09:23AM 12        THE NEXT WITNESS THAT TESTIFIED WAS DR. PANDORI.  YOU

09:23AM 13    HEARD THAT OVER THE COURSE OF THERANOS'S LIFE IT HAD SEVERAL

09:23AM 14    LAB DIRECTORS, AND EVEN ON OCCASIONS IT HAD EVEN MORE THAN ONE

09:23AM 15    AT THE SAME TIME.

09:23AM 16        AND THAT WAS TRUE WHEN DR. PANDORI WORKED AT THERANOS.

09:23AM 17    DR. ROSENDORFF AND DR. PANDORI WERE CO-LAB DIRECTORS AT

09:23AM 18    THERANOS.

09:23AM 19        AND AT THE TIME WHEN THERANOS WENT LIVE WITH PATIENT

09:23AM 20    TESTING AT WALGREENS, YOU HEARD THAT DR. ROSENDORFF'S NAME WAS

09:23AM 21    ON WHAT WAS CALLED THE CLIA LICENSE, THE CERTIFICATE THAT GAVE

09:23AM 22    THERANOS THE ABILITY TO TEST BLOOD, AND WHILE DR. ROSENDORFF'S

09:24AM 23    NAME WAS ON THAT CERTIFICATE AND, THEREFORE, MANY PEOPLE CALLED

09:24AM 24    HIM LAB DIRECTOR, HE ACTUALLY SHARED THE TITLE AND SOME OF THE

09:24AM 25    RESPONSIBILITIES WITH DR. PANDORI.

09:24AM   1        DR. PANDORI TALKED TO YOU ABOUT HIS CONCERNS WHEN HE

09:24AM   2   WORKED AT THERANOS AND ABOUT RAISING THOSE CONCERNS REGARDING

09:24AM   3   THE ACCURACY AND RELIABILITY OF BLOOD TESTING.

09:24AM   4        YOU MAY RECALL THAT DR. PANDORI QUIT.  MANY THERANOS

09:24AM   5   EMPLOYEES QUIT.  ERIKA CHEUNG DID.  DR. PANDORI DID.

09:24AM   6   DR. ROSENDORFF DID.

09:24AM   7        AND WHEN DR. PANDORI QUIT, HE TOLD YOU HE PREPARED A

09:24AM   8   TRANSITION MEMO, A MEMO SO THAT THOSE WHO INHERITED HIS JOB

09:24AM   9   RESPONSIBILITIES COULD PICK UP ON THE WORK THAT HE HAD DONE,

09:24AM  10   AND THERE WAS AN ARGUMENT OR A DEBATE THROUGH WITNESS

09:24AM  11   QUESTIONING THAT OCCURRED HERE IN THE COURTROOM ABOUT THE

09:24AM  12   CONTENT OF THAT TRANSITION MEMO.

09:24AM  13        AND THROUGH QUESTIONING, THE DEFENSE WAS ELICITING THIS

09:24AM  14   POINT FROM DR. PANDORI, THAT IN HIS TRANSITION MEMO HE DIDN'T

09:25AM  15   WRITE HIS CONCERNS.  HE DIDN'T WRITE DOWN IN THE TRANSITION

09:25AM  16   MEMO THAT HE THOUGHT THAT THERE WERE PROBLEMS WITH THERANOS'S

09:25AM  17   TESTING DEVICE CALLED THE EDISON.

09:25AM  18        AND I WANT TO REMIND YOU WHAT DR. PANDORI SAID ABOUT THAT

09:25AM  19   POINT, WHY IT WAS MISSING FROM HIS TRANSITION MEMO.

09:25AM  20        WHAT HE TOLD YOU WAS THAT HE HAD RAISED THOSE CONCERNS.

09:25AM  21   HE RAISED THEM DIRECTLY TO MR. BALWANI.  THEY WERE NOT WELL

09:25AM  22   RECEIVED.  AND HE SAID TO PUT THOSE AGAIN IN THE TRANSITION

09:25AM  23   MEMO WAS AKIN TO HITTING YOUR HEAD AGAINST THE WALL.  THERE WAS

09:25AM  24   NO NEED TO WRITE SOMETHING IN THE MEMO SOMETHING THAT HE HAD

09:25AM  25   ALREADY RAISED DIRECTLY WITH THE PRESIDENT OF THE COMPANY AND

ER-5076

09:25AM  1    HE KNEW THERE WAS NO APPETITE AT THERANOS TO STOP TESTING ON

09:25AM  2    THE EDISON DEVICE.

09:25AM  3        THE NEXT WITNESS THAT TESTIFIED WAS SO HAN SPIVEY.  YOU

09:25AM  4    MAY RECALL WHEN SHE WORKED AT THERANOS, SHE WENT BY THE NAME OF

09:25AM  5    DANISE YAM.  AND MS. YAM WAS THE CONTROLLER AT THERANOS.

09:25AM  6        SO WE'RE STILL IN THIS WORLD OF FORMER EMPLOYEES WHO ARE

09:26AM  7    ON THE STAND EXPLAINING TO YOU WHAT THE REALITY AT THERANOS

09:26AM  8    WAS.

09:26AM  9        AND WHAT MS. SPIVEY TOLD YOU WAS THAT THERANOS WAS NOT

09:26AM 10    GENERATING MUCH REVENUE, THAT THAT WAS SOMETHING THAT WAS

09:26AM 11    TRACKED AT THERANOS.  SHE GATHERED THAT DATA, SHE SHARED THAT

09:26AM 12    DATA WITH MR. BALWANI, AND SHE WAS SHARING THAT INFORMATION AT

09:26AM 13    MR. BALWANI'S REQUEST.

09:26AM 14        YOU MAY RECALL THAT WHEN SHE WAS ON THE STAND, SHE WAS

09:26AM 15    SHOWN THIS DOCUMENT.  ON THE LEFT SIDE OF YOUR SCREEN IS

09:26AM 16    EXHIBIT 4859.  SHE SAID SHE DID NOT PREPARE THIS DOCUMENT.

09:26AM 17        LATER ON IN THE TRIAL YOU LEARNED WHAT THIS DOCUMENT

09:26AM 18    ACTUALLY WAS.  LISA PETERSON, AN INVESTOR, GOT ON THE STAND AND

09:26AM 19    TOLD YOU THAT SHE RECEIVED THIS DOCUMENT FROM THERANOS, AND

09:26AM 20    THAT'S HER HANDWRITING ON THE DOCUMENT.

09:26AM 21        AND YOU MAY RECALL, SHE RECEIVED THIS DOCUMENT IN AND

09:26AM 22    AROUND OCTOBER OF 2014.  AND IN OCTOBER OF 2014, MR. BALWANI

09:27AM 23    AND MS. HOLMES TOLD LISA PETERSON AND THE OTHER INVESTORS FROM

09:27AM 24    RDV THAT THEY EXPECTED TO HAVE $140 MILLION IN REVENUE BY THE

09:27AM 25    END OF THAT YEAR.

09:27AM  1         THEY EXPECTED BY THE END OF NEXT YEAR, 2015, TO HAVE

09:27AM  2    NEARLY $1 BILLION IN REVENUE, JUST UNDER $990 MILLION.

09:27AM  3         AND WHAT MS. SPIVEY TOLD YOU WAS THAT SHE DIDN'T PREPARE

09:27AM  4    THIS DOCUMENT, AND THOSE NUMBERS NEVER MATERIALIZED.  THERANOS

09:27AM  5    NEVER HAD REVENUE THAT APPROACHED EITHER OF THOSE NUMBERS.

09:27AM  6         DR. CULLEN WAS THE NEXT WITNESS WHO TESTIFIED.  DR. CULLEN

09:27AM  7    WAS THE FIRST WITNESS WHO SPOKE TO YOU WHO DID NOT WORK AT

09:27AM  8    THERANOS.  DR. CULLEN WORKED FOR A PHARMACEUTICAL COMPANY

09:27AM  9    CALLED SCHERING-PLOUGH.

09:27AM 10         AND YOU MAY RECALL THAT THERANOS TOLD INVESTORS THAT ITS

09:27AM 11    TECHNOLOGY HAD BEEN VALIDATED THROUGH ITS WORK WITH LARGE

09:27AM 12    PHARMACEUTICAL COMPANIES.

09:28AM 13         REPRESENTATIVES FROM TWO OF THOSE PHARMACEUTICAL COMPANIES

09:28AM 14    CAME HERE TO COURT TO TALK TO YOU ABOUT THE REALITY, THE TRUTH

09:28AM 15    OF THE RELATIONSHIP BETWEEN THERANOS AND SCHERING-PLOUGH, AND

09:28AM 16    DR. CULLEN IN HER TESTIMONY, AND LATER ON A GENTLEMAN NAMED

09:28AM 17    DR. WEBER FROM PFIZER CAME AND TESTIFIED TO YOU.

09:28AM 18         I WANT TO REMIND YOU THAT THERE ARE ESSENTIALLY THREE

09:28AM 19    POINTS THAT DR. CULLEN MADE ON THE STAND.  SHE TOLD YOU THAT

09:28AM 20    THERANOS AND SCHERING-PLOUGH DID NOT DO FURTHER WORK.

09:28AM 21    REMEMBER, SHE SAID SHE FLEW TO PALO ALTO, HAD A MEETING IN

09:28AM 22    PALO ALTO WHERE THEY WERE DISCUSSING SOME OF THE WORK THAT WAS

09:28AM 23    DONE, AND SHE FOUND SOME OF THE ANSWERS THAT THERANOS PROVIDED

09:28AM 24    LACKING.

09:28AM 25         SHE DIRECTED QUESTIONS AT INDIVIDUALS AROUND THE TABLE,

09:28AM   1    AND SHE WAS CONCERNED ABOUT THE TRANSPARENCY OF THE ANSWERS

09:28AM   2    THAT SHE WAS RECEIVING, AND THAT FROM HER PERSPECTIVE THERE

09:28AM   3    WASN'T AN INTEREST IN SCHERING-PLOUGH'S PART TO DO ANY FURTHER

09:29AM   4    WORK WITH THERANOS.

09:29AM   5         SHE TOLD YOU THAT SCHERING-PLOUGH DID NOT GIVE THERANOS

09:29AM   6    PERMISSION TO USE THE SCHERING-PLOUGH LOGO ON A DOCUMENT.

09:29AM   7         YOU'VE SEEN THIS DOCUMENT A FEW TIMES, AND WE'LL TALK

09:29AM   8    ABOUT IT LATER THIS MORNING, A DOCUMENT THAT SUGGESTED TO

09:29AM   9    INVESTORS THAT SCHERING-PLOUGH HAD VALIDATED THERANOS'S

09:29AM  10    TECHNOLOGY.

09:29AM  11         WELL, DR. CULLEN TOLD YOU SHE WAS THE POINT PERSON FOR

09:29AM  12    THIS WORK, AND SHE DID NOT AUTHORIZE THE USE OF THE

09:29AM  13    SCHERING-PLOUGH LOGO.

09:29AM  14         AND FINALLY, SHE TOLD YOU THAT SCHERING-PLOUGH DID NOT

09:29AM  15    VALIDATE THERANOS'S TECHNOLOGY.

09:29AM  16         THE NEXT WITNESS THAT TESTIFIED WAS DAN EDLIN.  YOU MAY

09:29AM  17    RECALL THAT MR. EDLIN WORE -- HE WAS ANOTHER INSIDER.  HE

09:29AM  18    WORKED AT THERANOS.  HE WORE SEVERAL HATS AT THERANOS.  AND

09:29AM  19    WHERE HE PHYSICALLY SAT AT THERANOS GAVE HIM HELPFUL

09:29AM  20    PERSPECTIVE IN THIS TRIAL BECAUSE HE SAT JUST OUTSIDE OF BOTH

09:29AM  21    MS. HOLMES AND MR. BALWANI'S OFFICES.  SO HE HAD THE

09:30AM  22    OPPORTUNITY TO COME AND TESTIFY TO YOU ABOUT WHAT HE OBSERVED

09:30AM  23    IN THEIR WORKING RELATIONSHIP.

09:30AM  24         HE ALSO TALKED TO YOU ABOUT JOB RESPONSIBILITIES, SORT OF

09:30AM  25    WHO DID WHAT AT THERANOS, AND HOW HOLMES AND BALWANI DIVIDED UP

CLOSING ARGUMENT BY MR. SCHENK                                    6943

09:30AM  1    WORK, BUT HE COULD, BECAUSE OF HIS, HIS PHYSICAL DESK, HE COULD

09:30AM  2    TELL YOU HOW THEY INTERACTED TOGETHER, WHETHER IT SEEMED THAT

09:30AM  3    THEY DISAGREED OR WHETHER THEY SPOKE WITH ONE VOICE.  AND HE

09:30AM  4    ALSO DESCRIBED TO YOU WHAT HE OBSERVED IN THAT RELATIONSHIP.

09:30AM  5        BUT HERE I'M HIGHLIGHTING FOR YOU WHAT HE TOLD YOU ABOUT

09:30AM  6    WHY HE LEFT THERANOS.  HE TOLD YOU THAT PART OF IT WAS A

09:30AM  7    PERSONAL REASON, HE WAS GOING TO GRAD SCHOOL.  BUT PART IT WAS

09:30AM  8    AFTER A NEGATIVE "WALL STREET JOURNAL" ARTICLE.

09:30AM  9        SO DURING THE COURSE OF THIS TRIAL, YOU'VE HEARD ABOUT A

09:30AM 10    FEW NEWSPAPER ARTICLES OR MAGAZINE ARTICLES, AND YOU'VE HEARD

09:30AM 11    ABOUT ESSENTIALLY TWO FROM "THE WALL STREET JOURNAL."  THERE

09:30AM 12    WAS ONE IN SEPTEMBER OF 2013 THAT WAS PUBLISHED TO BE RELEASED

09:30AM 13    SIMULTANEOUS TO THE PUBLIC LAUNCH WHEN THERANOS BEGAN TESTING

09:31AM 14    PATIENT BLOOD AT WALGREENS, AND THAT SEPTEMBER 2013 ARTICLE WAS

09:31AM 15    POSITIVE.

09:31AM 16        YOU ALSO HEARD ABOUT A 2015, OCTOBER 2015 ARTICLE FROM

09:31AM 17    "THE WALL STREET JOURNAL," THE ONE THAT HAS BEEN MENTIONED, YOU

09:31AM 18    HEARD IT CALLED THE NEGATIVE, "WALL STREET JOURNAL" ARTICLE.

09:31AM 19        AND WHAT MR. EDLIN TOLD YOU IS AFTER THAT ARTICLE WAS

09:31AM 20    PUBLISHED, THERANOS HAD OPPORTUNITIES TO DISPROVE SOME OF THE

09:31AM 21    CLAIMS TO SHOW ITS TECHNOLOGY WORKING, AND HE WAITED AROUND FOR

09:31AM 22    A WHILE.  HE DIDN'T LEAVE IN OCTOBER OF 2015.

09:31AM 23        BUT WHEN THEY JUST KEPT FALLING ON THEIR FACE, WHEN THEY

09:31AM 24    JUST COULDN'T, IN HIS WORDS AND HIS MIND, RESPOND TO THE

09:31AM 25    CLAIMS, HE DECIDED HE DIDN'T WANT TO BE A PART OF THE COMPANY

CLOSING ARGUMENT BY MR. SCHENK                                    6944

09:31AM   1    ANYMORE.  SO ONE MORE WITNESS THAT CAME IN AND TESTIFIED,

09:31AM   2    FORMER EMPLOYEE WHO QUIT BECAUSE OF THEIR CONCERNS AT THERANOS.

09:31AM   3        THE NEXT WITNESS WHO TESTIFIED WAS NIMESH JHAVERI.  YOU

09:31AM   4    MAY REMEMBER THAT MR. JHAVERI WORKED AT WALGREENS.  AND HIS JOB

09:32AM   5    WAS TO, IN HIS WORDS, OPERATIONALIZE THE LAUNCH.

09:32AM   6        AS I MENTIONED, IN SEPTEMBER OF 2013, THERANOS BEGAN

09:32AM   7    TESTING PATIENTS IN WALGREENS STORES, 1 IN PALO ALTO AND A

09:32AM   8    MAXIMUM OF 40, THEY EVENTUALLY OPENED 40 STORES IN THE PHOENIX

09:32AM   9    MARKET.

09:32AM   10       AND MR. JHAVERI WAS THE POINT PERSON AT WALGREENS TO

09:32AM   11   OBSERVE AND HELP DEVELOP AND LAUNCH OF WALGREENS-THERANOS

09:32AM   12   STORES.

09:32AM   13       AND MR. JHAVERI TOLD YOU THAT HE HAD A POINT PERSON AT

09:32AM   14   THERANOS, AND HIS POINT PERSON WAS MR. BALWANI.  AND THE TWO OF

09:32AM   15   THEM TALKED OFTEN.  THEY EVEN HAD REGULARLY SCHEDULED MEETINGS

09:32AM   16   TO DISCUSS HOW THE ROLLOUT, HOW THE LAUNCH WAS GOING.

09:32AM   17       AND THERE'S BEEN AN ISSUE THAT WE'LL COVER IN SOME DETAIL

09:32AM   18   TODAY, THIS IDEA OF WHETHER THERANOS WAS GOING TO GO NATIONAL

09:33AM   19   WITH WALGREENS OR WHETHER IT WAS CONTINGENT UPON SUCCESS IN THE

09:33AM   20   PILOT.

09:33AM   21       MR. JHAVERI TOLD YOU THAT A NATIONAL ROLLOUT WAS NEVER

09:33AM   22   GUARANTEED.  THAT WHAT MATTERED WAS SUCCESS IN THE PILOT.  AND

09:33AM   23   YOU MAY REMEMBER THAT MR. JHAVERI SHOWED YOU SOME SLIDES THAT

09:33AM   24   WERE DISCUSSED DURING THERANOS-WALGREENS MEETINGS THAT TRACKED

09:33AM   25   CERTAIN METRICS THAT MATTERED TO WALGREENS, LIKE THE PERCENT OF

ER-5081

09:33AM  1    VENOUS DRAWS, AND THAT NUMBER NEVER GOT TO A POINT THAT

09:33AM  2    WALGREENS WAS SATISFIED.

09:33AM  3         AND MR. JHAVERI TOLD YOU, AND YOU EVEN SAW MR. JHAVERI'S

09:33AM  4    COMMUNICATIONS DIRECTLY TO MR. BALWANI, EXPRESSING CONCERNS

09:33AM  5    ABOUT THE VENOUS DRAW NUMBERS AND WHETHER THEY WOULD EVER

09:33AM  6    EXPAND BEYOND ARIZONA IF THE VENOUS DRAW REMAINED WHERE IT WAS,

09:33AM  7    AROUND 40 PERCENT.

09:33AM  8         AND ONE REASON THAT IS IMPORTANT IS BECAUSE WHEN

09:34AM  9    MR. BALWANI COMMUNICATES FINANCIAL PROJECTIONS TO INVESTORS,

09:34AM 10    AND THESE ARE ASTRONOMICAL NUMBERS, A HUNDRED MILLION OR A

09:34AM 11    BILLION, THEY'RE CONTINGENT UPON THE NUMBER OF WALGREENS

09:34AM 12    STORES.

09:34AM 13         AND YOU REMEMBER LISA PETERSON'S HANDWRITING ON THAT

09:34AM 14    DOCUMENT THAT WE JUST LOOKED AT, 900 STORES.  SO WE'RE GOING TO

09:34AM 15    COVER THIS A LITTLE BIT MORE LATER, BUT MR. BALWANI IS TELLING

09:34AM 16    INVESTORS IT'S REASONABLE TO THINK IN 2015 WE MIGHT HAVE 900

09:34AM 17    WALGREENS LOCATIONS, AND IF WE DO, WE'LL HAVE A BILLION DOLLARS

09:34AM 18    IN REVENUE, WHEN THAT'S CONTRARY TO WHAT MR. JHAVERI IS TELLING

09:34AM 19    HIM.

09:34AM 20         THERE'S ONE MORE POINT I'M GOING TO MAKE ON THAT, AND,

09:34AM 21    THAT IS, MR. BALWANI DOESN'T NEED TO HEAR IT FROM WALGREENS.

09:34AM 22    WHEN YOU HAVE SEEN INTERNAL WALGREENS DOCUMENTS EXPRESSING

09:34AM 23    OPTIMISM ABOUT GOING NATIONAL, OR YOU HEAR NUMBERS FROM

09:34AM 24    WALGREENS REDUCING THE NUMBER OF STORES THROUGHOUT THE COUNTRY

09:35AM 25    THAT THEY ANTICIPATE GOING TO, THAT'S ONE WAY THAT MR. BALWANI

09:35AM   1    KNOWS IT'S UNLIKELY THAT THEY WILL GO NATIONAL WITH WALGREENS,

09:35AM   2    BUT THAT'S NOT THE ONLY WAY.

09:35AM   3         MR. BALWANI KNOWS THAT THE STATEMENTS THAT WERE MADE TO

09:35AM   4    WALGREENS TO GET THEM TO SIGN UP TO PARTNER UP WERE FRAUDULENT,

09:35AM   5    AND IT'S ONLY A MATTER OF TIME BEFORE WALGREENS DISCOVERS THAT

09:35AM   6    THERANOS CAN'T TEST ON FINGERSTICK TO THE EXTENT THAT THERANOS

09:35AM   7    REPRESENTED.

09:35AM   8         SO MR. BALWANI DOESN'T HAVE TO HEAR IT FROM WALGREENS TO

09:35AM   9    KNOW HIS FINANCIAL PROJECTIONS ARE WRONG.  HE KNOWS HE DUPED

09:35AM  10    WALGREENS INTO THE BUSINESS RELATIONSHIP, AND IT IS ONLY A

09:35AM  11    MATTER OF TIME BEFORE THAT HOUSE OF CARDS CRUMBLES AND THE

09:35AM  12    FINANCIAL PROJECTIONS NEVER BECOME TRUE.

09:35AM  13         THE NEXT WITNESS THAT TESTIFIED WAS DR. ROSENDORFF.  YOU

09:35AM  14    KNOW THAT HE WAS THE LAB DIRECTOR DURING THIS CRUCIAL ROUGHLY

09:35AM  15    YEAR FROM THE -- JUST IN ADVANCE OF THE LAUNCH WITH WALGREENS

09:35AM  16    THROUGH THAT FIRST YEAR WITH WALGREENS.

09:36AM  17         AND DR. ROSENDORFF TALKED TO YOU ABOUT THE DIFFERENCE

09:36AM  18    BETWEEN WHAT A LAB DIRECTOR IS SUPPOSED TO HAVE THE POWER TO DO

09:36AM  19    AND WHAT AT THERANOS HE COULD DO.

09:36AM  20         ORDINARILY, DR. ROSENDORFF TOLD YOU, THAT HIS

09:36AM  21    UNDERSTANDING IS THE BUCK STOPS WITH THE LAB DIRECTOR, THAT

09:36AM  22    THEY HAVE THE POWER TO MAKE MOST OF, IF NOT ALL, OF THE

09:36AM  23    DECISIONS IN THE LAB.

09:36AM  24         BUT ONE OF THE THINGS THAT FRUSTRATED HIM MORE THAN

09:36AM  25    ANYTHING WORKING AT THERANOS, WAS THAT THAT SIMPLY WASN'T TRUE.

09:36AM   1   THAT AT THERANOS, MR. BALWANI WAS MAKING THE DECISIONS IN THE

09:36AM   2   LAB.  THAT DR. ROSENDORFF DIDN'T DO THE HIRING OR THE FIRING;

09:36AM   3   DR. ROSENDORFF WAS LEFT OFF OF EMAILS; DR. ROSENDORFF HAD

09:36AM   4   TROUBLE EVEN DECIDING WHICH DEVICES THEY WOULD USE TO RUN

09:36AM   5   CERTAIN TESTS.  AND THAT FRUSTRATION, THE FACT THAT HE COULD

09:36AM   6   SEE PROBLEMS IN THE LAB BUT DIDN'T HAVE THE POWER TO FIX THEM,

09:36AM   7   CAUSED HIM ALSO TO QUIT.

09:37AM   8        THE NEXT WITNESS WAS LISA PETERSON.  SHE WAS THE FIRST OF

09:37AM   9   THE VICTIM INVESTORS THAT CAME AND TESTIFIED.  AND YOU MAY

09:37AM  10   REMEMBER THAT SHE WORKED FOR A FAMILY OFFICE CALLED RDV.

09:37AM  11        MS. PETERSON GOT ON THE STAND AND THEN AGAIN SAW THIS

09:37AM  12   DOCUMENT, EXHIBIT 1853.  SHE TOLD YOU THIS IS HER HANDWRITING

09:37AM  13   ON THE DOCUMENT.  AND SHE TOLD YOU THAT SHE RECEIVED A BINDER

09:37AM  14   OF DOCUMENTS BEFORE RDV INVESTED, AND SHE ALSO HAD IN-PERSON

09:37AM  15   MEETINGS AT THERANOS.

09:37AM  16        AND PART OF THE THINGS THAT SHE WAS TOLD THAT SHE RELIED

09:37AM  17   UPON IN MAKING AN INVESTMENT DECISION WAS FUTURE REVENUE, HOW

09:37AM  18   MUCH MONEY THERANOS EXPECTED TO GENERATE.  AND SHE RECEIVED

09:37AM  19   THIS DOCUMENT IN OCTOBER OF 2015 -- I'M SORRY, 2014.

09:37AM  20        WITH NINE OR TEN MONTHS OF A YEAR COMPLETE, SHE'S TOLD BY

09:38AM  21   MR. BALWANI THAT IN 2014, THERANOS EXPECTS TO HAVE $140 MILLION

09:38AM  22   OF REVENUE, AND IN THE NEXT YEAR, IN 2015, THEY EXPECT TO HAVE

09:38AM  23   A BILLION DOLLARS IN REVENUE.

09:38AM  24        YOU CAN ALSO NOTICE IN ADDITION TO THE 900 LOCATIONS, SHE

09:38AM  25   WROTE, THAT FIRST SET OF NUMBERS UNDER 2015, SOME ARE CROSSED

ER-5084

09:38AM   1    OUT, AND SHE WROTE IN REVISED NUMBERS.  SO THIS ISN'T A

09:38AM   2    DOCUMENT THAT MR. BALWANI SHARED WITH HER AND THEN IGNORED BUT

09:38AM   3    WAS BURIED IN A BINDER OF MATERIAL.

09:38AM   4         MR. BALWANI AND LISA PETERSON TOOK THE TIME TO GO THROUGH

09:38AM   5    THEM AND ACTUALLY REVISE IN SMALL AMOUNTS, BUT TO REVISE SOME

09:38AM   6    OF THE NUMBERS.  THERE'S AN IN-PERSON DOUBLING DOWN ON THESE

09:38AM   7    NUMBERS.

09:38AM   8         THE NEXT WITNESS WHO TESTIFIED WAS DR. DHAWAN.  YOU HEARD

09:38AM   9    THAT DR. DHAWAN WAS MR. BALWANI'S DERMATOLOGIST.

09:39AM  10         WHEN ADAM ROSENDORFF QUIT AND LEFT THERANOS, THERANOS

09:39AM  11    NEEDED A LAB DIRECTOR, AND MR. BALWANI TOOK THE TIME TO HIRE

09:39AM  12    THAT PERSON.  MR. BALWANI HIRED HIS DERMATOLOGIST TO RUN THE

09:39AM  13    LAB AT THERANOS.

09:39AM  14         AND WHAT YOU MAY HAVE FOUND SURPRISING DURING DR. DHAWAN'S

09:39AM  15    TESTIMONY WAS THAT IT'S POSSIBLE THE ENTIRE TIME DR. DHAWAN

09:39AM  16    WORKED THERE HE SPENT LESS TIME WORKING ON THERANOS THAN

09:39AM  17    ADAM ROSENDORFF DID IN ONE DAY.

09:39AM  18         WHEN DR. DHAWAN WORKED AT THERANOS, HE SPENT A FEW HOURS

09:39AM  19    TOTAL ON THERANOS.  HE VISITED THE LAB ONE OR TWO TIMES.  HE

09:39AM  20    WENT IN ON A SATURDAY AND SIGNED A STACK OF DOCUMENTS.

09:39AM  21         BUT THE LIST OF THINGS HE DID NOT DO IS A MILE LONG.  HE

09:39AM  22    NEVER COMMUNICATED WITH A DOCTOR OR A PATIENT.  HE NEVER

09:39AM  23    REVIEWED A LAB TEST.  HE NEVER REPORTED A CRITICAL VALUE.  THE

09:40AM  24    LIST GOES ON AND ON OF THINGS THAT MR. BALWANI'S LAB DIRECTOR

09:40AM  25    DID NOT DO AT THERANOS.

09:40AM  1      THE NEXT WITNESS WHO TESTIFIED WAS PAT MENDENHALL.

09:40AM  2  MR. MENDENHALL WAS ALSO AN INVESTOR.  ONE OF THE IMPORTANT

09:40AM  3  THINGS TO TAKE FROM HIS TESTIMONY IS A PHONE CALL THAT

09:40AM  4  MR. MENDENHALL HAD WITH MR. BALWANI.  THAT PHONE CALL, YOU CAN

09:40AM  5  TELL FROM THIS EMAIL, WAS ON SUNDAY, DECEMBER 22, 2013.

09:40AM  6      WE'LL GET TO THIS A LITTLE BIT LATER, BUT THERE'S SPECIFIC

09:40AM  7  INSTANCES OF INVESTMENTS THAT ARE CHARGED IN THIS CASE,

09:40AM  8  ELECTRONIC FUNDS TRANSFERS, WIRES OF MONEY TO INVEST IN

09:40AM  9  THERANOS.  THIS PHONE CALL IS BEFORE ALL OF THEM BY A WEEK OR

09:40AM 10  SO.

09:40AM 11      ON THE PHONE, MR. BALWANI AND MR. MENDENHALL ARE

09:40AM 12  DISCUSSING THERANOS OR DISCUSSING THIS INVESTMENT OPPORTUNITY

09:40AM 13  FOR MR. MENDENHALL.  AND A LITTLE BIT LATER I'M GOING TO SHOW

09:41AM 14  YOU THE EMAIL.  YOU MAY RECALL THE EMAIL SUMMARIZES WHAT

09:41AM 15  BALWANI TOLD MENDENHALL, BUT AS A PREVIEW, I'M GOING TO REMIND

09:41AM 16  YOU OF A QUESTION AND ANSWER THAT OCCURRED WITH MR. MENDENHALL

09:41AM 17  WHEN HE WAS ON THE STAND, BECAUSE YOU'LL SEE IN THE EMAIL, THE

09:41AM 18  SENTENCES ARE SORT OF TERSE, THEY'RE SHORT, THEY'RE DIRECT.

09:41AM 19      SO MR. MENDENHALL WAS ASKED, IS THAT YOUR WRITING STYLE?

09:41AM 20  ARE YOU SORT OF BEING EFFICIENT WITH WORDS AND JUST SUMMARIZING

09:41AM 21  WHAT MR. BALWANI SAID OR IS THAT ACTUALLY WHAT HE SAID?

09:41AM 22      AND MR. MENDENHALL SAID, NO, HE WAS 100 PERCENT CONFIDENT,

09:41AM 23  FACTUAL, PRECISE.

09:41AM 24      SO AGAIN, LATER WHEN WE GET TO THOSE SPECIFIC STATEMENTS,

09:41AM 25  KNOW THAT MR. MENDENHALL WAS ACTUALLY ASKED, BEFORE WE GET INTO

09:41AM  1    THE CONTENT OF THESE STATEMENTS, LET ME JUST MAKE SURE I

09:41AM  2    UNDERSTAND YOUR WRITING STYLE VERSUS BALWANI'S SPEAKING STYLE

09:41AM  3    AND WHICH ONE IS BEING CAPTURED IN YOUR EMAIL, AND

09:42AM  4    MR. MENDENHALL CLARIFIED FOR YOU.

09:42AM  5        THE NEXT WITNESS WHO TESTIFIED WAS BRYAN TOLBERT.  YOU MAY

09:42AM  6    REMEMBER THAT MR. TOLBERT WORKED FOR THE HALL INVESTMENT GROUP,

09:42AM  7    ANOTHER INVESTOR.  AND MR. TOLBERT TOLD YOU THAT HE THINKS HE

09:42AM  8    MAY HAVE NEVER IN HIS LIFE SEEN MR. BALWANI.  HE DIDN'T SPEAK

09:42AM  9    TO HIM BEFORE INVESTING, HE DIDN'T COMMUNICATE WITH HIM BEFORE

09:42AM  10   INVESTING.  AND HE DID TALK TO ELIZABETH HOLMES ON THE PHONE

09:42AM  11   DURING A CONFERENCE CALL.  AND HE DESCRIBED TO YOU SOME OF WHAT

09:42AM  12   HE LEARNED ON THAT CALL, AND WHAT I'VE HIGHLIGHTED HERE FOR YOU

09:42AM  13   ARE STATEMENTS ABOUT MILITARY WORK.

09:42AM  14       ELIZABETH HOLMES TOLD BRYAN TOLBERT THAT THE THERANOS

09:42AM  15   DEVICE HAD BEEN DEPLOYED BY THE MILITARY AND WAS BEING USED IN

09:42AM  16   THE TREATMENT OF SOLDIERS.

09:42AM  17       LATER WE'LL COVER THIS IDEA HOW MR. BALWANI CAN BE

09:42AM  18   RESPONSIBLE FOR AN INVESTMENT BY SOMEONE HE NEVER SPOKE TO.  I

09:42AM  19   GET THAT THAT'S A QUESTION, AND WE'RE GOING TO COVER THAT

09:43AM  20   DIRECTLY.  BUT FOR NOW, I WANT TO REMIND YOU OF THIS MILITARY

09:43AM  21   TESTIMONY, INVESTORS LIKE MR. TOLBERT HEARD FALSE STATEMENTS

09:43AM  22   ABOUT WHAT THERANOS HAD DONE WITH THE DOD, AND MR. TOLBERT

09:43AM  23   HEARD THAT ON A PHONE CALL WITH ELIZABETH HOLMES.

09:43AM  24       THE NEXT WITNESS WHO TESTIFIED WAS DR. WEBER.  AS I

09:43AM  25   MENTIONED, DR. WEBER WORKED AT PFIZER.  SO DR. WEBER SORT OF

09:43AM 1    PROVIDED FURTHER TESTIMONY SORT OF TO WHAT DR. CULLEN DID.  AND

09:43AM 2    DR. WEBER TOLD YOU SORT OF THE SAME THINGS, THAT PFIZER DIDN'T

09:43AM 3    AUTHORIZE THE USE OF THE THERANOS LOGO ON A THERANOS CREATED

09:43AM 4    DOCUMENT; PFIZER'S WORK WITH THERANOS ENDED, AT LEAST TO

09:43AM 5    DR. WEBER'S KNOWLEDGE, AFTER THE WORK THAT WEBER WAS INVOLVED

09:43AM 6    IN; AND, FINALLY, DR. WEBER TOLD YOU THAT THERANOS -- I'M

09:43AM 7    SORRY, THAT PFIZER DID NOT VALIDATE THERANOS'S TECHNOLOGY.

09:44AM 8        THE NEXT WITNESS WHO TESTIFIED WAS SARAH BENNETT.  YOU

09:44AM 9    HAVE HEARD IN THIS TRIAL THAT THERE'S AN AGENCY IN THE FEDERAL

09:44AM 10   GOVERNMENT CALLED HHS, HEALTH AND HUMAN SERVICES.  AND WITHIN

09:44AM 11   THAT AGENCY, WITHIN THAT DEPARTMENT THAT THERE ARE TWO AGENCIES

09:44AM 12   THAT YOU'VE HEARD ABOUT, THE FDA AND CMS.  CMS IS THE CENTER

09:44AM 13   FOR MEDICARE AND MEDICAID SERVICES.

09:44AM 14       AND PART OF CMS'S RESPONSIBILITY IS TO REGULATE THE LAB

09:44AM 15   INDUSTRY.  AND MS. BENNETT WORKS FOR THAT PART OF CMS.  AND SHE

09:44AM 16   WAS INVOLVED IN A SURVEY AT THERANOS.  SO SHE TRAVELLED TO

09:44AM 17   THERANOS AND REVIEWED DOCUMENTS AND INTERVIEWED WITNESSES.

09:44AM 18       AND SHE TALKED TO YOU ABOUT WHAT SHE LEARNED THROUGH THE

09:44AM 19   COURSE OF THAT SURVEY.  AND SHE TOLD YOU SEVERAL THINGS ABOUT

09:44AM 20   HER INTERACTIONS THAT SHE FOUND INTERESTING AT THE SURVEY, AND

09:45AM 21   SOME OF THEM WAS THE SURVEY THAT SHE FELT WAS OCCURRING, AND

09:45AM 22   SHE ASKED FOR DOCUMENTS AND SOMETIMES IT WOULD TAKE A WHILE AND

09:45AM 23   SOMETIMES THEY WOULD BRING BACK THE WRONG DOCUMENTS.

09:45AM 24       SHE ALSO TOLD YOU THAT THERE WERE MORE LAWYERS INVOLVED

09:45AM 25   THAT WERE USEFUL, THAT MR. BALWANI WAS LEADING THE SURVEY, AND

CLOSING ARGUMENT BY MR. SCHENK                                      6952

09:45AM   1    THAT HE WAS DEMANDING END-OF-THE DAY SUMMARIES.  AT THE END OF

09:45AM   2    EACH DAY HE WANTED TO KNOW WHAT BENNETT WAS FINDING, AND THAT

09:45AM   3    THERE EVEN CAME A POINT IN TIME WHEN SHE WAS GOING TO MAKE

09:45AM   4    CERTAIN FINDINGS, AND MR. BALWANI TRIED TO DISCOURAGE HER FROM

09:45AM   5    MAKING THOSE FINDINGS.

09:45AM   6        SO MS. BENNETT TOLD YOU ABOUT WHAT WAS LEARNED DURING THE

09:45AM   7    COURSE OF THAT CMS SURVEY.

09:45AM   8        THE NEXT WITNESS WHO TESTIFIED WAS DAN MOSLEY.  YOU MAY

09:45AM   9    RECALL MR. MOSLEY WAS A LAWYER IN NEW YORK AND AN INVESTOR IN

09:45AM  10    THERANOS.

09:45AM  11        MR. MOSLEY HAD AS A CLIENT OF HIS DR. HENRY KISSINGER.

09:46AM  12    AND YOU MAY REMEMBER DR. KISSINGER ASKED MR. MOSLEY TO SHARE

09:46AM  13    HIS OPINION ON THERANOS, TO REVIEW SOME DOCUMENTS AND PROVIDE

09:46AM  14    THAT TO DR. KISSINGER.

09:46AM  15        SO THAT'S WHAT MR. MOSLEY DID.  HE RECEIVED WHAT WE ARE

09:46AM  16    CALLING INVESTOR BINDERS, STACKS OF DOCUMENTS FROM THERANOS.

09:46AM  17    HE MET WITH -- HE WENT TO PALO ALTO ON TWO OCCASIONS, MET WITH

09:46AM  18    HOLMES AND BALWANI AND LEARNED INFORMATION ABOUT THERANOS.  AND

09:46AM  19    THAT HE PUT INFORMATION THAT HE LEARNED INTO A DOCUMENT THAT

09:46AM  20    WE'VE SOMETIMES CALLED "MOSLEY'S OUTLINE," AND HE PREPARED THAT

09:46AM  21    FOR DR. KISSINGER, BUT HE TOLD YOU THAT ALSO IT SUMMARIZED

09:46AM  22    INFORMATION THAT HE FOUND USEFUL WHEN HE MADE HIS OWN DECISION

09:46AM  23    TO INVEST.  WHILE THE PROJECT BEGAN AS AN EFFORT TO SHARE HIS

09:46AM  24    VIEWS WITH DR. KISSINGER, MOSLEY WAS EXCITED ABOUT WHAT HE WAS

09:46AM  25    HEARING AND PERSONALLY DECIDED TO INVEST.

09:46AM  1         AND ONE OF THE IMPORTANT THINGS THAT MOSLEY TOLD YOU WAS

09:47AM  2    THAT WITHIN THE INVESTMENT BINDERS, HE SAW THIS DOCUMENT THAT

09:47AM  3    IS ON THE LEFT SIDE OF YOUR SCREEN, THE PFIZER VALIDATION

09:47AM  4    REPORT.  AND MOSTLY WROTE IN HIS OUTLINE THAT I FOUND THIS

09:47AM  5    DOCUMENT TO BE THE MOST PERSUASIVE VALIDATION OF THERANOS'S

09:47AM  6    TECHNOLOGY.

09:47AM  7         YOU MAY RECALL IN HIS OUTLINE, HE EVEN CUT AND PASTE

09:47AM  8    SENTENCES FROM THIS PFIZER REPORT THAT HE FOUND AS USEFUL

09:47AM  9    PROOF, AS VALIDATION THAT THE TECHNOLOGY WORKED.  AND MOSLEY

09:47AM 10    TOLD YOU HE THOUGHT PFIZER PREPARED THIS DOCUMENT, HE THOUGHT

09:47AM 11    IT WAS THIRD PARTY OR EXTERNAL VALIDATION OF THERANOS'S

09:47AM 12    TECHNOLOGY, AND THAT MATTERED TO HIM.

09:47AM 13         HE SAID THAT HE WASN'T A SCIENTIST.  HE DIDN'T HAVE THAT

09:47AM 14    BACKGROUND.  AND WHEN HE WAS LOOKING THROUGH THE BINDERS OF

09:47AM 15    MATERIAL TO TRY TO FIGURE OUT WHETHER THE TECHNOLOGY WORKED,

09:47AM 16    THE THING HE FOUND MOST PERSUASIVE WAS THIS PFIZER REPORT.

09:47AM 17         YOU KNOW THAT PFIZER DIDN'T PREPARE THAT REPORT.  YOU KNOW

09:48AM 18    THAT THERANOS PREPARED THAT REPORT.

09:48AM 19         BUT MOSLEY DID NOT.  MOSLEY THOUGHT THESE WERE PFIZER'S

09:48AM 20    CONCLUSIONS AFTER PFIZER'S WORK.

09:48AM 21         BUT DR. WEBER TOLD YOU THAT WASN'T TRUE, THESE WERE NOT

09:48AM 22    PFIZER'S CONCLUSIONS, PFIZER DIDN'T PREPARE THIS REPORT, THIS

09:48AM 23    REPORT CAME FROM THERANOS.

09:48AM 24         THE NEXT WITNESS WHO TESTIFIED WAS ALAN EISENMAN.

09:48AM 25    ALAN EISENMAN WAS ALSO AN INVESTOR IN THERANOS.

09:48AM 1          THE INVESTMENT AT ISSUE FOR MR. EISENMAN CAME AT THE END

09:48AM 2     OF 2013.  I TOLD YOU THAT WE'RE GOING TO GET TO SOME SPECIFIC

09:48AM 3     WIRES, SOME SPECIFIC ELECTRONIC FUNDS TRANSFERS OF INVESTMENTS,

09:48AM 4     SIX OF THEM, AND THEY ALL OCCUR AT THE VERY END OF 2013,

09:48AM 5     DECEMBER OF 2013, AND THEN THROUGH SEVERAL MONTHS IN 2014.

09:48AM 6          EISENMAN'S INVESTMENT WAS AT THE END OF 2013.  WHAT I'M

09:48AM 7     SHOWING YOU HERE IS AN EMAIL THAT EISENMAN SENT TO HOLMES AND

09:48AM 8     BALWANI LATER IN '14, AFTER HE INVESTED.  AND WHAT IS SO

09:49AM 9     INTERESTING ABOUT IT, IS THAT EISENMAN IS GETTING INFORMATION

09:49AM 10    FROM PUBLIC SOURCES ABOUT THERANOS.

09:49AM 11         THIS ONE HAPPENS TO BE A UBS ANALYST REPORT ABOUT

09:49AM 12    THERANOS.  EISENMAN FINDS THIS, AND SENDS IT TO HOLMES AND

09:49AM 13    BALWANI.  AND YOU CAN TELL HE FINDS IT SURPRISING.  THE CONTENT

09:49AM 14    OF THE ANALYST REPORT IS NEWS TO EISENMAN.  IT ISN'T STUFF THAT

09:49AM 15    HE KNEW ABOUT THERANOS.

09:49AM 16         YOU KNEW, AND I'LL LOOK AT IT IN A MOMENT, YOU KNOW THE

09:49AM 17    STUFF THAT IS IN THE REPORT IS TRUE, BUT EISENMAN WOULDN'T FIND

09:49AM 18    IT SURPRISING IF HE KNEW THE TRUTH WHEN HE INVESTED.  IT'S ONLY

09:49AM 19    SURPRISING IF HE'S LEARNING SOMETHING IN THIS.

09:49AM 20         SO LOOK WHAT HE WRITES, "ELIZABETH AND SUNNY,

09:49AM 21         "THE LINK BELOW WILL ACCESS THE UBS REPORT ON THERANOS.

09:49AM 22    THEY CLAIM," UBS, "THAT THE BLOOD SAMPLES HAVE TO BE SENT TO

09:49AM 23    PALO ALTO, THEY ARE LESS RELIABLE THAN TRADITIONAL TESTS, AND

09:49AM 24    THE TURNAROUND TIME IS OVER 24 HOURS.  HOPE TO CATCH UP SOON."

09:49AM 25         AND THEN HE EVEN CUTS AND PASTES SOME OF THE ANALYST

09:50AM 1    REPORTS.  IT SAYS, "HOWEVER, THE MODEL AS SEEN IN A HANDFUL OF

09:50AM 2    WALGREENS'S LOCATIONS, HAS EVOLVED INTO A TRADITIONAL REFERENCE

09:50AM 3    LAB OFFERING WHERE BLOOD IS DRAWN MOSTLY THROUGH VENIPUNCTURE

09:50AM 4    AND SENT TO A REGIONAL LAB LOCATION WITH A 24-PLUS TURNAROUND.

09:50AM 5    OUR CONSULTANT BELIEVES IT IS HIGHLY UNLIKELY THAT ALL OF THESE

09:50AM 6    TESTS ARE BEING DONE ON ONE MACHINE."

09:50AM 7        AGAIN, ALL TRUE.  THE TESTS ARE DONE -- THE DRAW IS DONE

09:50AM 8    AT WALGREENS STORE, AND THE BLOOD IS SHIPPED TO PALO ALTO.  THE

09:50AM 9    BLOOD IS NOT BEING TESTED ALL ON ONE MACHINE.

09:50AM 10       SO EISENMAN SEES THIS AND THINKS THIS IS DIFFERENT, THIS

09:50AM 11   IS NOT WHAT I THOUGHT WAS GOING ON.  SO HE TAKES THE TIME TO

09:50AM 12   FORWARD THAT TO HOLMES AND BALWANI.

09:50AM 13       AND LOOK WHAT SUNNY BALWANI WRITES IN RESPONSE.  NOT "THIS

09:50AM 14   IS TRUE, I'M SORRY YOU'RE UNDER THE MISUNDERSTANDING, BUT ALL

09:50AM 15   OF THIS IS RIGHT."  NO.  "DOESN'T SURPRISE US.  SOUNDS LIKE AN

09:51AM 16   UNINFORMED CONSULTANT."

09:51AM 17       BECAUSE WHAT IS FATAL TO FRAUD?  THE TRUTH.

09:51AM 18       SO ANY TIME SOMEONE CONFRONTS SUNNY BALWANI WITH THE TRUTH

09:51AM 19   LIKE THIS, AND WE'RE GOING TO SEE MORE EXAMPLES OF THIS, HE HAS

09:51AM 20   TO SAY SOMETHING LIKE THIS.

09:51AM 21       THE NEXT WITNESS WHO TESTIFIED WAS DR. LYNETTE SAWYER.

09:51AM 22       WHEN DR. DHAWAN WAS ON THE STAND TALKING ABOUT HOW LITTLE

09:51AM 23   WORK HE DID AT THERANOS, THE DEFENSE ASKS SOME QUESTIONS DURING

09:51AM 24   CROSS-EXAMINATION THAT SUGGESTED, WELL, YOU MIGHT NOT HAVE BEEN

09:51AM 25   WORKING DURING THIS PERIOD OF TIME, BUT DID YOU KNOW THERANOS

09:51AM  1    HAD A CO-LAB DIRECTOR NAMED LYNETTE SAWYER, IS IT POSSIBLE THAT

09:51AM  2    SHE WAS DOING WORK?

09:51AM  3         AND THEN THE GOVERNMENT CALLED LYNETTE SAWYER.  AND THEN

09:51AM  4    YOU SAW, IF IT'S POSSIBLE, SHE MIGHT HAVE ACTUALLY DONE LESS

09:51AM  5    WORK THAN DR. DHAWAN.

09:51AM  6         DR. DHAWAN WENT INTO THERANOS.  LYNETTE SAWYER NEVER DID.

09:52AM  7         DR. DHAWAN SAW DOCUMENTS THAT SUGGESTED THEY WERE ACTUALLY

09:52AM  8    USING THE EDISON DEVICE, THEIR OWN DEVICE, FOR TESTING.

09:52AM  9         DR. SAWYER TOLD YOU SHE THOUGHT THAT WAS AN IDEA.  SHE

09:52AM  10   NEVER SAW ANY DOCUMENTS SUGGESTING THAT THERANOS WAS ACTUALLY

09:52AM  11   USING ITS OWN DEVICE FOR TESTING.

09:52AM  12        SO IF IT WAS POSSIBLE TO FIND A LAB DIRECTOR WHO DID LESS

09:52AM  13   WORK AT THERANOS THAN DR. DHAWAN, IT WAS HIS CO-LAB DIRECTOR,

09:52AM  14   DR. SAWYER.

09:52AM  15        THE NEXT WITNESS WHO TESTIFIED WAS ANOTHER INVESTOR,

09:52AM  16   CHRIS LUCAS.  BUT WHAT I WANT TO HIGHLIGHT FOR YOU HERE IS

09:52AM  17   ACTUALLY SOMETHING THAT CAME OUT DURING CROSS-EXAMINATION OF

09:52AM  18   LUCAS.

09:52AM  19        LATER ON WE'RE GOING TO TALK ABOUT SOME ARGUMENTS THAT THE

09:52AM  20   DEFENSE HAS MADE TO YOU IN OPENING OR AT OTHER TIMES.

09:52AM  21        WHAT I WANT TO HIGHLIGHT FOR YOU HERE IS A LINE OF

09:52AM  22   QUESTIONS THAT -- SUGGESTING THAT INSIDE THE FOUR WALLS OF

09:52AM  23   THERANOS, IT WAS MERELY A BUSINESS DECISION WHICH DEVICE THEY

09:53AM  24   USED FOR WHICH TEST.  IF THEY USED THE THERANOS EDISON DEVICE

09:53AM  25   FOR A CHOLESTEROL TEST OR A SIEMENS DEVICE FOR A CALCIUM TEST,

09:53AM  1    YOU, AS AN INVESTOR, MR. LUCAS, WOULD NOT HAVE EXPECTED TO HAVE

09:53AM  2    BEEN INVOLVED IN THOSE KIND OF DECISIONS, BUT THE INTERNAL

09:53AM  3    BUSINESS DECISION, RIGHT?

09:53AM  4         AND WHAT MR. LUCAS SAID IS, THAT WOULD HAVE BEEN SHOCKING

09:53AM  5    TO ME, NOT THAT I WASN'T INVOLVED IN THE DECISIONS, BUT THAT

09:53AM  6    THAT WAS EVEN AN OPTION, THAT PICKING AMONG DEVICES WAS THE

09:53AM  7    KIND OF BUSINESS DECISION THAT THERANOS WOULD NEED TO BE MAKING

09:53AM  8    BECAUSE LUCAS'S UNDERSTANDING AT INVESTMENT WAS THAT THERANOS

09:53AM  9    USED THERANOS DEVICES FOR BLOOD TESTING.

09:53AM 10         SO EVEN DURING CROSS-EXAMINATION OF WITNESSES, THEY'RE

09:53AM 11    STILL TELLING YOU MY UNDERSTANDING OF THERANOS, WHAT I THOUGHT

09:53AM 12    THIS COMPANY WAS WHEN I INVESTED IS SO COMPLETELY DIFFERENT

09:53AM 13    THAN WHAT THE REALITY WAS, THAT IF YOU'RE TELLING ME THAT THEY

09:53AM 14    WERE MAKING BUSINESS DECISIONS TO USE ONE DEVICE OVER ANOTHER,

09:54AM 15    I FIND THAT SHOCKING.

09:54AM 16         THE NEXT WITNESS WHO TESTIFIED IS DR. ZACHMAN.  WE NOW

09:54AM 17    HAVE MOVED INTO THE DOCTOR-PATIENT SIDE OF THE CASE.  YOU HAVE

09:54AM 18    HEARD THAT IN ADDITION TO DEFRAUDING INVESTORS, THERANOS HAS

09:54AM 19    ALSO DEFRAUDED PATIENTS.

09:54AM 20         AND THE FIRST DOCTOR TO TAKE THE STAND WAS DR. ZACHMAN.

09:54AM 21    SHE TALKED TO YOU ABOUT A TEST CALLED HCG.  SHE EXPLAINED TO

09:54AM 22    YOU WHAT THAT TEST IS, WHAT IT TESTS FOR, AND SHE TALKED TO YOU

09:54AM 23    ABOUT A PARTICULAR PATIENT OF HERS NAMED BRITTANY GOULD.

09:54AM 24         AND DR. ZACHMAN TOLD YOU THAT WHILE IN A HEALTHY PREGNANCY

09:54AM 25    YOU EXPECT HCG TO ROUGHLY DOUBLE EVERY 48 HOURS, THAT ISN'T

09:54AM  1    WHAT WAS HAPPENING IN BRITTANY GOULD'S TEST.

09:54AM  2         BRITTANY GOLD WENT TO THERANOS AND GOT SOME HCG TESTS, AND

09:54AM  3    THEY WERE NOT DOUBLING.  AND KNOWING WHAT SHE KNOWS NOW,

09:54AM  4    DR. ZACHMAN TOLD YOU THAT THERANOS'S TESTS WERE NOT ACCURATE.

09:55AM  5         MS. GOULD DID CARRY A HEALTHY PREGNANCY TO TERM, AND

09:55AM  6    THAT, WITH OTHER EVIDENCE, LEADS DR. ZACHMAN TO CONCLUDE THAT

09:55AM  7    THE THERANOS HCG TESTS WERE NOT ACCURATE.

09:55AM  8         THE NEXT WITNESS WHO TESTIFIED WAS MS. GOULD HERSELF.  AND

09:55AM  9    BETWEEN MS. GOULD AND DR. ZACHMAN, YOU SAW THE TESTS, THE HCG

09:55AM 10    TESTS THAT MS. GOULD HAD, AND THE SECOND AND THIRD WERE

09:55AM 11    THERANOS'S TESTS.  AND YOU SEE THAT THEY WERE NOT DOUBLING

09:55AM 12    EVERY 48 HOURS AS YOU WOULD EXPECT, SO THAT LED TO

09:55AM 13    DR. ZACHMAN'S CONCLUSION.

09:55AM 14         BUT YOU ALSO HEARD IF YOU REMOVE THE THREE THERANOS TESTS,

09:55AM 15    SO YOU'RE ONLY LOOKING AT THE FIRST AND THEN THE FIFTH AND

09:55AM 16    SIXTH TESTS, THE ONES BY QUEST, THEY ACTUALLY ARE DOUBLING,

09:55AM 17    ROUGHLY DOUBLING EVERY 48 HOURS OVER THAT PERIOD OF TIME,

09:55AM 18    FURTHER EVIDENCE TO DR. ZACHMAN THAT THERANOS HCG TESTING WAS

09:56AM 19    NOT ACCURATE.

09:56AM 20         DR. BURNES WAS THE NEXT WITNESS WHO TESTIFIED.  DR. BURNES

09:56AM 21    AND HIS PATIENTS TOLD YOU ABOUT THE PSA TESTS THAT

09:56AM 22    DR. ELLSWORTH HAD.  DR. BURNES TOLD YOU THAT HE HAS EXPERIENCE

09:56AM 23    WITH PSA TESTING, THAT IT IS USED TO DIAGNOSE PROSTATE CANCER,

09:56AM 24    AND THAT THE TREND DATA IS WHAT YOU LOOK FOR AS A PHYSICIAN, TO

09:56AM 25    SEE THE RISE, HOW QUICKLY THE PSA SCORES GO UP, AND THAT IN

CLOSING ARGUMENT BY MR. SCHENK                                    6959

09:56AM  1    DR. ELLSWORTH'S CASE, IN DR. BURNES'S PATIENT, THAT WASN'T

09:56AM  2    OCCURRING.  YOU WEREN'T SEEING WHAT YOU WOULD EXPECT TO SEE.

09:56AM  3    YOU SAW A GIANT JUMP FROM 2 TO IN THE 20'S.

09:56AM  4        AND DR. BURNES TOLD YOU THAT THE THERANOS TESTS FOR PSA

09:57AM  5    ALSO WEREN'T ACCURATE.

09:57AM  6        BUT I'LL SHOW YOU IN A MOMENT DR. ELLSWORTH TESTIFIED, AND

09:57AM  7    YOU CAN SEE BECAUSE OF AN INTERNAL THERANOS EMAIL, WHICH

09:57AM  8    SPECIFIC DEVICES WERE USED FOR EACH OF ELLSWORTH'S PSA TEST.

09:57AM  9        YOU KNOW THAT HIS FIRST AND THIRD PSA TEST WERE RUN ON THE

09:57AM 10    EDISON.  HIS SECOND AND FOURTH THERANOS PSA TEST WERE RUN AT

09:57AM 11    THERANOS BUT ON COMMERCIAL ANALYZERS.

09:57AM 12        RECALL AT THERANOS THERE WERE ESSENTIALLY THREE WAYS OR

09:57AM 13    THREE MACHINES THAT BLOOD COULD BE TESTED ON:

09:57AM 14        IT COULD BE TESTED ON AN EDISON DEVICE, THE THERANOS BOX;

09:57AM 15        IT COULD BE TESTED ON A COMMERCIAL DEVICE.  SIEMENS IS A

09:57AM 16    MANUFACTURER THAT YOU HEARD ABOUT DURING THE TRIAL.

09:57AM 17        AND THEN THERE WAS A THIRD WAY.  THEY TOOK A SIEMENS

09:57AM 18    DEVICE, A THIRD PARTY DEVICE, AND MODIFIED IT.  SO WE'VE BEEN

09:57AM 19    CALLING IT THE MODIFIED COMMERCIAL OR THE MODIFIED THIRD PARTY

09:58AM 20    DEVICE.

09:58AM 21        IN DR. ELLSWORTH'S CASE, THE FIRST AND THIRD TEST WERE

09:58AM 22    DONE ON AN EDISON DEVICE, AND THOSE WERE THE ONES THAT

09:58AM 23    GENERATED SCORES IN THE 20'S.

09:58AM 24        AND DR. BURNES TOLD YOU THAT AFTER THE FIRST TWO,

09:58AM 25    DR. ELLSWORTH WAS ABOUT TO TAKE SOME TRAVEL, AND BEFORE HE FELT

CLOSING ARGUMENT BY MR. SCHENK                              6960

09:58AM  1    COMFORTABLE LETTING ELLSWORTH TRAVEL, HE WANTED A TIEBREAKER,

09:58AM  2    HE WANTED A THIRD.  SO ONCE AGAIN, FOR A THIRD TIME,

09:58AM  3    DR. ELLSWORTH GOES INTO A WALGREENS, PAYS FOR THE TEST, GETS A

09:58AM  4    FINGERSTICK, AND THEN GETS THIS THIRD RESULT, THE THIRD ONE,

09:58AM  5    THE 22.

09:58AM  6        AND DR. BURNES SAYS, WELL, I THOUGHT THAT WAS GOING TO BE

09:58AM  7    THE TIEBREAKER, BUT I'M STILL CONCERNED.  WHY DON'T WE JUST

09:58AM  8    HAVE A TRADITIONAL VEIN DRAW.  NO MORE OF THIS FINGERSTICK

09:58AM  9    STUFF.

09:58AM 10        SO BURNES, IN COMMUNICATION WITH THERANOS, DECIDES TO SEND

09:58AM 11    A PHLEBOTOMIST TO DR. ELLSWORTH'S DENTIST OFFICE.  AND REMEMBER

09:58AM 12    ELLSWORTH SAID, HE SAT DOWN IN HIS OWN DENTIST CHAIR, PUT HIS

09:59AM 13    ARM OUT, GOT A VEIN DRAW, AND THAT'S WHAT RESULTED IN THE

09:59AM 14    FOURTH THERANOS TEST.  THE FOURTH SCORE WAS BELOW 1.

09:59AM 15        BURNES SAID, OKAY, NOW I'M COMFORTABLE.  YOU CAN GO ON

09:59AM 16    YOUR INTERNATIONAL TRAVEL.

09:59AM 17        AND THEN FOR GOOD MEASURE, YOU SAW A TEST TWO YEARS LATER

09:59AM 18    FROM A DIFFERENT LAB, STILL SHOWING A LOW PSA SCORE FOR

09:59AM 19    DR. ELLSWORTH.  SO BURNES CONCLUDED FOR YOU THAT THE THERANOS

09:59AM 20    PSA TESTS WERE NOT ACCURATE.

09:59AM 21        BRENT BINGHAM WAS THE NEXT WITNESS WHO TESTIFIED.  HE TOLD

09:59AM 22    YOU ABOUT A HEALTH CONDITION, A MEDICAL CONDITION THAT REQUIRES

09:59AM 23    HIM TO HAVE HIS PLATELETS TESTED QUITE OFTEN.

09:59AM 24        AND HE HAS THE TESTING DONE SO OFTEN, THAT BASED ON HOW HE

09:59AM 25    IS FEELING ON ANY CERTAIN DAY, HE CAN TELL YOU ROUGHLY WHERE

CLOSING ARGUMENT BY MR. SCHENK                                    6961

09:59AM   1    HIS PLATELET SCORE SHOULD BE BASED ON HOW HE'S FEELING AND SORT

09:59AM   2    OF THE SYMPTOMS HE IS FEELING IN HIS BODY.

09:59AM   3        SO HE DID SOMETHING INTERESTING.  MR. BINGHAM WENT TO

10:00AM   4    THERANOS AND ANOTHER LAB CALLED ACCESS ON THE SAME DAY.  HE

10:00AM   5    GETS HIS BLOOD TESTED SO FREQUENTLY THAT A LAB TESTING LIKE

10:00AM   6    THERANOS THAT COULD DO BLOOD TESTING LESS EXPENSIVE AND FROM A

10:00AM   7    FINGERSTICK WAS VERY APPEALING TO HIM, BUT ONLY IF IT IS

10:00AM   8    ACCURATE.  AND HE WAS HAVING SOME QUESTIONS, SO HE WANTED TO DO

10:00AM   9    HIS OWN TEST.

10:00AM  10        SO ON THE VERY SAME DAY HE DROVE TO TWO LABS AND HAD BLOOD

10:00AM  11    TAKEN FROM EACH ONE.  AND HE TOLD YOU HE GOT WILDLY DIFFERENT

10:00AM  12    SCORES FROM EACH OF THEM.  YOU CAN SEE ON THE DOCUMENT THAT HE

10:00AM  13    GOT IN THE 900'S AT THERANOS, IN THE 700'S AT ACCESS, AND THAT

10:00AM  14    HE KNOWS BASED ON HOW HE WAS FEELING THAT DAY THAT THE ONE IN

10:00AM  15    THE 700'S WAS THE ONE THAT WAS ACCURATE.

10:00AM  16        THE NEXT WITNESS WHO TESTIFIED WAS ERIN TOMPKINS.  YOU

10:00AM  17    WILL RECALL THAT MS. TOMPKINS HAD AN HIV TEST AT THERANOS.  AND

10:00AM  18    SHE TOLD YOU THAT STORY.  SHE TOLD YOU ABOUT THE CIRCUMSTANCES

10:00AM  19    OF THAT TEST, HOW THERANOS TOLD HER THAT SHE WAS REACTIVE FOR

10:01AM  20    HIV-1, 2 ANTIBODIES, AND THAT THERE WAS NO WAY THAT THAT WAS AN

10:01AM  21    ACCURATE RESULT.  SORT OF KNOWING WHAT SHE KNOWS, SHE KNOWS

10:01AM  22    THAT WAS NOT AN ACCURATE RESULT FROM THERANOS.

10:01AM  23        AND THE FINAL WITNESS THAT THE GOVERNMENT CALLED WAS

10:01AM  24    BRIAN GROSSMAN.  MR. GROSSMAN WAS AN INVESTOR.  HE WORKED FOR A

10:01AM  25    COMPANY CALLED PFM.  AND HE TOLD YOU ABOUT THE WORK THAT HE DID

CLOSING ARGUMENT BY MR. SCHENK                6962

10:01AM   1    TO LEARN ABOUT THERANOS BEFORE PFM MADE A DECISION TO INVEST.

10:01AM   2        AND YOU HEARD AND PROBABLY OBSERVED THAT MR. GROSSMAN WAS

10:01AM   3    A SOPHISTICATED INVESTOR.  HE CREATED LISTS OF DUE DILIGENCE

10:01AM   4    QUESTIONS BEFORE MEETING WITH HOLMES AND BALWANI, AND THEN

10:01AM   5    COVERED THOSE QUESTIONS IN MEETINGS, AND THEN SENT FOLLOW-UP

10:01AM   6    QUESTIONS.

10:01AM   7        AND RECALL THAT HE EVEN GOT GRANULAR TO THE POINT OF

10:02AM   8    TRYING TO CALCULATE THE SQUARE FOOTAGE THAT THERANOS WOULD NEED

10:02AM   9    FOR A LAB TO COVER A CERTAIN MARKET, SO HOW BIG DOES YOUR LAB

10:02AM  10    NEED TO BE IN PHOENIX OR IN OTHER MARKETS IN ORDER TO SERVICE

10:02AM  11    THAT POPULATION BECAUSE THAT AFFECTS HOW MUCH REVENUE YOU NEED

10:02AM  12    TO GENERATE, THAT AFFECTS THE LEASES, THE REAL ESTATE LEASES

10:02AM  13    THAT AS A BUSINESS YOU WILL NEED TO SIGN.

10:02AM  14        SO THERANOS, USING ITS OWN TESTING DEVICES, IT'S SMALL

10:02AM  15    EDISON BOXES, COMPARED TO THE LARGE COMMERCIALLY AVAILABLE

10:02AM  16    MACHINES REALLY MATTERED TO AN INVESTOR LIKE GROSSMAN BECAUSE

10:02AM  17    THE LARGE MACHINES TAKE UP MORE REAL ESTATE AND YOU NEED IT TO

10:02AM  18    GENERATE MORE REVENUE.  AND IF YOU'RE USING THOSE, YOU'RE JUST

10:02AM  19    LIKE QUEST OR LABCORP, COMPANIES THAT HE'S FAMILIAR WITH.

10:02AM  20        BUT THERANOS WAS TELLING HIM, AND YOU CAN SEE HERE, THAT

10:02AM  21    THEY WERE USING THEIR OWN DEVICES FOR LAB TESTING.  FOR HUGE

10:02AM  22    NUMBERS OF TESTS AVAILABLE, THEY WERE USING THEIR OWN DEVICES.

10:02AM  23    AND IT WASN'T JUST THE NOVELNESS OF THE TECHNOLOGY AS AN IDEA

10:03AM  24    THAT MATTERED TO GROSSMAN, BUT IT IS REALLY THIS GRANULAR

10:03AM  25    REVENUE, HOW MUCH YOU NEED TO EARN TO REMAIN PROFITABLE, HOW

ER-5099

10:03AM  1    YOUR DEVICES CAN THEN TAKE OVER MARKETS AND REALLY BE A COST

10:03AM  2    BENEFIT OVER THE CURRENT TECHNOLOGY, QUEST OR LABCORP.

10:03AM  3         AND HE TOLD YOU THAT -- YOU CAN SEE FROM THIS PORTION OF

10:03AM  4    THE TRANSCRIPT -- THAT THE REALITY, THE THINGS THAT HE LATER

10:03AM  5    LEARNED WERE SHOCKING.  HE DIDN'T KNOW ANYTHING OF WHAT

10:03AM  6    THERANOS WAS ACTUALLY DOING TO TEST BLOOD.

10:03AM  7         SO I TOLD YOU THE FIRST TOPIC WE WERE GOING TO COVER WAS A

10:03AM  8    SUMMARY OF THE PATIENTS.

10:03AM  9         AND THE NEXT TOPIC IS THE CRIMES, WHAT CRIMES THE

10:03AM 10    GOVERNMENT CHARGED MR. BALWANI WITH COMMITTING.  AND I TOLD YOU

10:03AM 11    AT THE VERY BEGINNING THAT THIS CASE REALLY INVOLVES TWO

10:03AM 12    SCHEMES TO DEFRAUD:  HOLMES AND BALWANI FIRST SCHEME TO DEFRAUD

10:03AM 13    INVESTORS AND THEN THEY SCHEMED TO DEFRAUD THE PATIENTS.  AND

10:04AM 14    THERE ARE STEPS INVOLVED IN THE SCHEME, AND YOU HAVE SEEN

10:04AM 15    EVIDENCE TO SUPPORT EACH STEP.

10:04AM 16         YOU KNOW THERANOS WAS RUNNING OUT OF MONEY BECAUSE YOU'VE

10:04AM 17    SEEN IT IN CASH BALANCES.  YOU'VE SEEN IT IN INCOME STATEMENTS.

10:04AM 18    YOU KNOW THEIR REVENUE WAS INSIGNIFICANT OVER MOST OF THE

10:04AM 19    YEARS.

10:04AM 20         THEY THEN MADE THE DECISION TO RECRUIT INVESTORS.  AND YOU

10:04AM 21    HEARD FROM THE INVESTORS THAT I'VE LISTED HERE.  YOU HEARD FROM

10:04AM 22    EVEN ANOTHER, PAT MENDENHALL.

10:04AM 23         THEY LURED INVESTORS THROUGH MISREPRESENTATIONS.  AND THIS

10:04AM 24    MORNING WE'RE GOING TO CALL THEM THE CATEGORIES OF FALSE

10:04AM 25    STATEMENTS.  THE CATEGORIES INCLUDED THINGS THAT WE TALKED

ER-5100

10:04AM  1    ABOUT AT THE BEGINNING THAT I TOLD YOU WHAT THEY WOULD HAVE HAD

10:04AM  2    TO SAY IF THEY WERE BEING HONEST.

10:04AM  3        HERE YOU SEE WHAT THEY WERE ACTUALLY TELLING INVESTORS:

10:04AM  4        WALGREENS EXPANSION -- THE RELATIONSHIP WITH WALGREENS WAS

10:04AM  5    GOING WELL, AND THEY WERE GOING TO FURTHER EXPAND; THE

10:04AM  6    CAPABILITIES OF THE THERANOS DEVICES; THAT THEY WEREN'T USING

10:05AM  7    THIRD PARTY DEVICES; THEY PROVIDED FALSE FINANCIAL PROJECTIONS,

10:05AM  8    AND THEY MADE FALSE STATEMENTS ABOUT PRIOR WORK THAT THEY HAD

10:05AM  9    DONE EITHER WITH PREVIOUS COMPANIES OR THE DEPARTMENT OF

10:05AM  10   DEFENSE.

10:05AM  11       THESE STATEMENTS REACHED INVESTORS.  THEY WERE

10:05AM  12   DISSEMINATED IN A FEW DIFFERENT WAYS.  SOME APPEARED ON THE

10:05AM  13   THERANOS WEBSITE, SOME WERE IN INVESTOR BINDERS, SOME WERE

10:05AM  14   COMMUNICATED DURING DEMONSTRATIONS, VIP DEMOS, AND SOME WERE IN

10:05AM  15   MEDIA ARTICLES.

10:05AM  16       AND WHEN I SAY THAT, I DON'T JUST MEAN -- AND I THINK YOU

10:05AM  17   HAVE HEARD THIS ARGUMENT DURING THE COURSE OF THE TRIAL -- THAT

10:05AM  18   SOMETIMES THERE CAN BE AN ARTICLE PUBLISHED THAT DOESN'T GET

10:05AM  19   EVERY FACT CORRECT.  SOMETIMES INCORRECT INFORMATION MAKES ITS

10:05AM  20   WAY INTO AN ARTICLE.  THAT'S NOT WHAT I MEAN HERE.

10:05AM  21       WHAT WAS OCCURRING HERE WAS EITHER THERANOS AT TIMES WAS

10:05AM  22   SENT THE QUOTES BEFORE THEY WERE PUBLISHED AND SAID OKAY, OR

10:05AM  23   SAW THE ARTICLES AFTER THEY WERE PUBLISHED AND STILL SENT THOSE

10:06AM  24   ARTICLES TO INVESTORS.

10:06AM  25       IT'S ONE THING IF THE INVESTOR STUMBLES UPON SOME ARTICLE

| | |
|---|---|
| 10:06AM | 1 |
| 10:06AM | 2 |
| 10:06AM | 3 |

THAT WASN'T SANCTIONED, THAT WASN'T PITCHED BY THERANOS AS A

SOURCE OF RELIABLE INFORMATION.  THAT'S NOT WHAT I'M TALKING

ABOUT HERE.

WHAT I'M TALKING ABOUT IS THERANOS IN THE INVESTOR BINDER

OR THERANOS IN EMAILS SENDING LINKS OR CUTTING AND PASTING THE

ACTUAL ARTICLE AND SENDING THEM TO INVESTORS WHEN THE ARTICLE

ITSELF CONTAINED FALSE STATEMENTS.  THAT'S THE KIND OF

DISSEMINATION THAT OCCURRED HERE.

AND THEN, FINALLY, RELYING UPON THESE FALSE STATEMENTS,

INVESTORS INVESTING.  WE'LL COVER THESE AMOUNTS, AND I'LL MATCH

THEM UP A LITTLE BIT LATER, BUT NOTICE THE AMOUNTS ARE ROUGHLY

BETWEEN $100,000 AND $100 MILLION JUST FROM THESE SIX

INVESTORS.

THERE WAS ALSO A SCHEME TO DEFRAUD PATIENTS.  HERE YOU

KNOW THAT MR. BALWANI EXERCISED CONTROL OVER THE CLIA LAB AT

THERANOS.  THEY HAD TWO DIFFERENT LABS.  WE'LL TALK MORE ABOUT

THIS IN A MOMENT.  THEY HAD A RESEARCH AND DEVELOPMENT AND THE

CLIA LAB.

THE CLIA LAB IS WHERE PATIENT'S BLOOD WAS TESTED.  AND

MR. BALWANI RAN THE CLIA LAB IN THE ORG CHART.  HE WAS ON TOP

OF IT.

AND YOU HEARD FROM WITNESS TESTIMONY THAT IN PRACTICE, HE

DID, TOO.  HE WASN'T JUST ON A PIECE OF PAPER ON TOP OF THE

CLIA LAB, BUT IN PRACTICE HE WAS THE ONE WHO WAS MAKING THE

DECISIONS.  YOU HEARD THAT FROM LAB DIRECTORS, YOU SEE IT IN

| | | |
|---|---|---|
| 10:07AM | 1 | TEXT MESSAGES, AND YOU'VE READ IT IN EMAILS. |
| 10:07AM | 2 | MR. BALWANI AND MS. HOLMES KNEW OF PROBLEMS IN THE CLIA |
| 10:07AM | 3 | LAB, AND YOU KNOW THAT BECAUSE YOU'VE READ IT IN TEXT MESSAGES, |
| 10:07AM | 4 | YOU'VE SEEN IT IN EMAILS.  LAB DIRECTORS GOT ON THE STAND AND |
| 10:07AM | 5 | TOLD YOU THERE WERE PROBLEMS AND TOLD YOU THEY COMMUNICATED |
| 10:07AM | 6 | THOSE PROBLEMS TO HOLMES AND BALWANI, AND EMPLOYEES WHO WEREN'T |
| 10:07AM | 7 | LAB DIRECTORS LIKE MS. CHEUNG ALSO TOLD YOU SHE SAW PROBLEMS |
| 10:07AM | 8 | AND SHE WENT DIRECTLY TO MR. BALWANI. |
| 10:08AM | 9 | THERANOS MARKETED ITS LAB TO PATIENTS WITH STATEMENTS THEY |
| 10:08AM | 10 | KNEW WEREN'T TRUE, THINGS LIKE THE "HIGHEST LEVELS OF |
| 10:08AM | 11 | ACCURACY," OR "HIGHEST QUALITY," THE "FULL RANGE OF TESTS," AND |
| 10:08AM | 12 | "ONE TINY DROP" TO SUGGEST THAT YOU GET YOUR BLOOD DRAWN BY |
| 10:08AM | 13 | FINGERSTICK. |
| 10:08AM | 14 | THEY THEN DISSEMINATED THESE FALSE STATEMENTS IN SIMILAR |
| 10:08AM | 15 | WAYS.  IT WAS SOMETIMES -- THESE WERE SOMETIMES ON THE THERANOS |
| 10:08AM | 16 | WEBSITE.  DURING THE TRIAL, YOU ACTUALLY SAW A PATIENT BROCHURE |
| 10:08AM | 17 | THAT CONTAINED FALSE STATEMENTS. |
| 10:08AM | 18 | THERE'S SOMETHING CALLED THE HORIZON MEDIA BUY.  A LITTLE |
| 10:08AM | 19 | BIT LATER I'LL SHOW YOU WHERE THERANOS ITSELF DOES A WIRE |
| 10:08AM | 20 | TRANSFER NOT RECEIVING MONEY, BUT SPENDING MONEY TO PURCHASE |
| 10:08AM | 21 | ADVERTISING IN THE ARIZONA MARKET AND IT'S IN MEDIA ARTICLES. |
| 10:08AM | 22 | SO JUST LIKE INVESTORS RECEIVED ARTICLES THAT BRAGGED |
| 10:08AM | 23 | ABOUT THE ACCURACY OF THERANOS'S TESTS, PATIENTS ALSO READ THAT |
| 10:08AM | 24 | IN ARTICLES RELIED UPON AND HAD PAID FOR THERANOS TESTS. |
| 10:09AM | 25 | AND THEN YOU HEARD FROM SPECIFIC PATIENTS WHO RELIED ON |

CLOSING ARGUMENT BY MR. SCHENK                                    6967

10:09AM 1    THESE REPRESENTATIONS, GOT BLOOD TESTS, AND THE TESTS WERE NOT

10:09AM 2    ACCURATE.

10:09AM 3         SO THE CHARGES.  THE GOVERNMENT CHARGED TWO CRIMES IN THIS

10:09AM 4    CASE.  THE FIRST CRIME IS CALLED CONSPIRACY TO COMMIT WIRE

10:09AM 5    FRAUD.  IT'S IN VIOLATION OF SECTION 1349.

10:09AM 6         THE SECOND CRIME IS WIRE FRAUD ITSELF.  THAT'S IN

10:09AM 7    VIOLATION OF SECTION 1343.  SO TWO CRIMES TOTAL:  CONSPIRACY TO

10:09AM 8    COMMIT WIRE FRAUD AND WIRE FRAUD.

10:09AM 9         BUT BECAUSE THERE ARE SEPARATE SCHEMES, THERE'S A SCHEME

10:09AM 10   TO DEFRAUD INVESTORS AND THERE'S A SCHEME TO DEFRAUD PATIENTS,

10:09AM 11   EACH OF THOSE CRIMES IS CHARGED MORE THAN ONCE.  SO THE

10:09AM 12   CONSPIRACY CRIME IS CHARGED AS TO INVESTORS, AND THE CONSPIRACY

10:09AM 13   CRIME IS CHARGED AS TO PATIENTS.

10:09AM 14        THEN THE SUBSTANTIVE WIRE FRAUD CHARGES ARE CHARGED AS TO

10:10AM 15   INVESTORS, AND THEY'RE CHARGED AS TO PATIENTS.  SO THEY

10:10AM 16   CONSPIRED TO DEFRAUD INVESTORS, AND EACH CONSPIRACY LASTS FOR A

10:10AM 17   PARTICULAR PERIOD OF TIME.  THE CONSPIRACY TO DEFRAUD

10:10AM 18   INVESTORS, WHICH IS COUNT ONE, RAN FROM 2010 TO 2015, ALL YEARS

10:10AM 19   MR. BALWANI WORKED AT THERANOS.

10:10AM 20        AND THEN THERE ARE SUBSTANTIVE WIRE FRAUD COUNTS FOR

10:10AM 21   INVESTORS, SPECIFIC INVESTORS SENDING MONEY VIA WIRE TO

10:10AM 22   THERANOS, THEIR INVESTMENTS WEREN'T SORT OF WRITTEN AND HANDED

10:10AM 23   OVER ON A CHECK.  THEY WIRED MONEY.  INSTANCES OF WIRE FRAUD.

10:10AM 24        AS TO PATIENTS, THE PATIENT CONSPIRACY ALSO LASTED FOR A

10:10AM 25   PARTICULAR PERIOD OF TIME.  THE PATIENT CONSPIRACY LASTED FROM

10:10AM 1    2013 THROUGH 2016.  THOSE ARE THE YEARS THAT THERANOS OPERATED

10:10AM 2    INSIDE OF WALGREENS STORES.

10:11AM 3         THERE ARE ALSO SPECIFIC WIRE FRAUD COUNTS RELATED TO

10:11AM 4    PATIENTS.  THERE ARE FOUR OF THEM.  THERE'S A PHONE CALL WE'LL

10:11AM 5    TALK ABOUT FROM MR. BINGHAM, THE PLATELETS TEST.  FORGIVE ME

10:11AM 6    FOR CALLING PATIENTS BY THEIR TEST.  AND THEN THERE'S THE TESTS

10:11AM 7    RELATED TO MR. ELLSWORTH, WHO GOT THE PSA TEST, AND

10:11AM 8    MS. TOMPKINS, WHO GOT THE HIV TEST.

10:11AM 9         AND THEN THERE'S A FINAL WIRE FRAUD COUNT FOR THE HORIZON

10:11AM 10   MEDIA.  PART OF THE SCHEME TO DEFRAUD PATIENTS WAS TO ADVERTISE

10:11AM 11   TO THEM.  SO THERANOS BOUGHT ADVERTISING IN ARIZONA, AND THAT,

10:11AM 12   TOO, IS A SPECIFIC WIRE FRAUD COUNT.

10:11AM 13        SO THE CASE INVOLVES TWO CRIMES, BUT THE CRIMES ARE

10:11AM 14   CHARGED MULTIPLE WAYS.  THERE ARE 12 TOTAL CRIMES.

10:11AM 15        SO WHEN YOU'RE DELIBERATING, YOU WILL BE GIVEN A VERDICT

10:11AM 16   FORM, AND YOU'RE GOING TO BE ASKED ON THE VERDICT FORM TO WRITE

10:11AM 17   GUILTY OR NOT GUILTY ON 12 LINES FOR EACH OF THE SEPARATE

10:11AM 18   COUNTS, AND WE'LL GO THROUGH EACH OF THOSE COUNTS, WHICH COUNT

10:12AM 19   RELATES TO WHICH INVESTOR OR WHICH PATIENT OR WHETHER IT'S A

10:12AM 20   CONSPIRACY COUNT.

10:12AM 21        SO I TOLD YOU WE'RE GOING TO TALK ABOUT WITNESSES, AND

10:12AM 22   THEN WE'RE GOING TO TALK ABOUT THE CRIMES, THE CHARGES.

10:12AM 23        AND THE FINAL TWO TOPICS THAT WE WILL COVER ARE THE

10:12AM 24   ELEMENTS, WHAT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE

10:12AM 25   DOUBT FOR YOU TO CONVICT MR. BALWANI AND THEN THE EVIDENCE,

10:12AM  1    WHAT THE EVIDENCE IS THAT SUPPORTS THOSE ELEMENTS.  I'M GOING

10:12AM  2    TO COMBINE THOSE LAST TWO, THE ELEMENTS AND THE EVIDENCE SO

10:12AM  3    THAT AS WE'RE GOING THROUGH THE ELEMENTS, I WILL BE SHOWING YOU

10:12AM  4    EVIDENCE THAT YOU HAVE SEEN DURING THE COURSE OF THE TRIAL THAT

10:12AM  5    SUPPORTS THAT CHARGE.

10:12AM  6        BECAUSE THE SAME CRIMES ARE CHARGED MULTIPLE TIMES, WE

10:12AM  7    DON'T HAVE TO GO THROUGH THE ELEMENTS QUITE AS SLOWLY LATER ON.

10:12AM  8    I'LL GO THROUGH THEM MORE SLOWLY AT THE BEGINNING SO YOU CAN

10:12AM  9    SEE THE ELEMENTS OF CONSPIRACY AND THE ELEMENTS OF WIRE FRAUD,

10:12AM 10    BUT LATER ON WHEN WE SEE THOSE ELEMENTS REPEAT, I WON'T TAKE AS

10:13AM 11    MUCH TIME WITH THEM.

10:13AM 12        AT THE END OF MY ARGUMENT, THE DEFENSE HAS THE

10:13AM 13    OPPORTUNITY, IF THEY CHOOSE, TO GIVE A CLOSING; THE GOVERNMENT

10:13AM 14    HAS THE FINAL ARGUMENT CALLED THE REBUTTAL; AND THEN THE JUDGE

10:13AM 15    READS YOU JURY INSTRUCTIONS.

10:13AM 16        IN THE JURY INSTRUCTIONS, INSTRUCTIONS TO GUIDE YOUR

10:13AM 17    DELIBERATIONS, THE JUDGE WILL READ YOU THE ELEMENTS, WHAT THE

10:13AM 18    ELEMENTS ARE FOR WIRE FRAUD, FOR CONSPIRACY.  WHAT THE JUDGE

10:13AM 19    SAYS CONTROLS.  THESE ARE WHAT I THINK THE JUDGE IS GOING TO

10:13AM 20    SAY THE ELEMENTS ARE.

10:13AM 21        SO THE ELEMENTS FOR CONSPIRACY ARE TWO:  THE GOVERNMENT

10:13AM 22    MUST PROVE THAT THERE WAS AN AGREEMENT BETWEEN TWO OR MORE

10:13AM 23    PEOPLE, THAT'S HOLMES AND BALWANI IN THIS CASE, TO COMMIT WIRE

10:13AM 24    FRAUD AS CHARGED IN THE INDICTMENT;

10:13AM 25        AND SECOND, THAT MR. BALWANI BECAME A MEMBER OF THE

CLOSING ARGUMENT BY MR. SCHENK                6970

10:13AM 1    CONSPIRACY KNOWING OF AT LEAST ONE OF ITS OBJECTS AND INTENDING

10:13AM 2    TO HELP ACCOMPLISH IT.

10:13AM 3         SO LET'S BREAK THOSE OUT.  THE FIRST ELEMENT IS THAT THERE

10:14AM 4    WAS AN AGREEMENT.

10:14AM 5         FIRST, WHAT WAS THE AGREEMENT AS TO INVESTORS?  WELL, IT

10:14AM 6    WAS TO MAKE FALSE STATEMENTS TO INVESTORS IN ORDER TO GET

10:14AM 7    MONEY; IT'S THE AGREEMENT TO COMMIT WIRE FRAUD, IT'S NOT THE

10:14AM 8    ACTUAL COMMISSION OF WIRE FRAUD.  THE MONEY THAT COMES BACK

10:14AM 9    FROM INVESTORS IS THE SUBSTANTIVE WIRE FRAUD COUNTS WHEN HALL

10:14AM 10   WIRES MONEY TO THERANOS OR TOLBERT OR EISENMAN, THAT'S THE

10:14AM 11   SUBSTANTIVE WIRE FRAUD COUNTS.

10:14AM 12        THE CONSPIRACY IS THE AGREEMENT TO COMMIT A CRIME, WIRE

10:14AM 13   FRAUD, AND HOLMES AND BALWANI AGREED TO DEFRAUD INVESTORS BY

10:14AM 14   FALSE STATEMENTS, AND THEY EACH HAD DIFFERENT ROLES IN THE

10:14AM 15   CONSPIRACY.

10:14AM 16        MS. HOLMES'S ROLE IN THE INVESTOR CONSPIRACY WAS TO

10:14AM 17   RECRUIT INVESTORS.  SHE COMMUNICATED FALSE STATEMENTS DIRECTLY

10:14AM 18   TO INVESTORS LIKE TOLBERT.  YOU HEARD THE TOLBERT PHONE CALL

10:14AM 19   WHEN HOLMES BRAGS ABOUT DOD OR MILITARY WORK THAT THERANOS DID.

10:14AM 20   THAT'S HOLMES FULFILLING HER ROLE IN THE CONSPIRACY.

10:15AM 21        MR. BALWANI ALSO HAD A ROLE IN THE INVESTOR CONSPIRACY.

10:15AM 22   THE FIRST THING HE DID WAS RUN THE LAB, THE CLIA LAB, BECAUSE

10:15AM 23   HAVING A CLIA LAB WAS VERY USEFUL IN RECRUITING INVESTORS.

10:15AM 24        YOU HEARD THAT INVESTORS THOUGHT THAT WAS PROOF THAT THE

10:15AM 25   TECHNOLOGY WORKED.  SO WHEN THEY'RE INVESTING IN THERANOS, THEY

10:15AM  1    HAVE CONFIDENCE IN THEIR INVESTMENT IN THE COMPANY BECAUSE THEY

10:15AM  2    HAVE THIS CLIA LAB, THEY SEE A COPY OF THE CLIA LICENSE IN SOME

10:15AM  3    OF THE DOCUMENTS, THEY SEE COPIES OF PROFICIENCY TESTING

10:15AM  4    SCORES.  SO BY RUNNING THE LAB, MR. BALWANI IS PLAYING A ROLE

10:15AM  5    IN THE INVESTOR CONSPIRACY BECAUSE THAT'S USEFUL TO RECRUIT

10:15AM  6    INVESTORS.

10:15AM  7         BUT THAT ISN'T THE ONLY ROLE HE PLAYED.  MR. BALWANI

10:15AM  8    HIMSELF COMMUNICATED WITH INVESTORS JUST LIKE ELIZABETH HOLMES

10:15AM  9    DID.  MR. BALWANI DIRECTLY COMMUNICATED WITH MENDENHALL.  DO

10:15AM 10    YOU REMEMBER THE SUNDAY PHONE CALL WITH A TERSE DIRECT

10:15AM 11    STATEMENT?

10:15AM 12         BALWANI ALSO DIRECTLY COMMUNICATED WITH GROSSMAN.

10:16AM 13    BRIAN GROSSMAN TRAVELLED TO PALO ALTO ON SEVERAL OCCASIONS AND

10:16AM 14    EMAILS BACK AND FORTH WITH MR. BALWANI.

10:16AM 15         SO IT ISN'T AS THOUGH HOLMES IS THE ONLY ONE COMMUNICATING

10:16AM 16    DIRECTLY WITH INVESTORS.  BALWANI IS DOING THAT, TOO.

10:16AM 17         AND NOTICE SOMETHING INTERESTING ABOUT THE FALSE

10:16AM 18    STATEMENTS WITH THE INVESTORS HERE.  THE FALSE STATEMENTS ARE

10:16AM 19    NOT DIFFERENT.  THEY HAVE LINKED UP.  HOLMES AND BALWANI KNOW

10:16AM 20    WHAT THEY'RE GOING TO SAY TO INVESTORS BECAUSE IT'S NOT

10:16AM 21    COINCIDENCE, IT'S NOT AN ACCIDENT THAT GROSSMAN THINKS THEY'RE

10:16AM 22    NOT USING THIRD PARTY DEVICES, AND MENDENHALL THINKS THAT

10:16AM 23    THEY'RE NOT USING THIRD PARTY DEVICES, AND EISENMAN THINKS

10:16AM 24    THEY'RE NOT USING THIRD PARTY DEVICES.  THEY ALL ARE HEARING

10:16AM 25    THIS RELATIVELY CONSISTENT STORY BECAUSE EVEN WHEN BALWANI IS

10:16AM 1    COMMUNICATING TO INVESTORS, OR EVEN WHEN HOLMES IS

10:16AM 2    COMMUNICATING TO INVESTORS, THEY KNOW WHAT EACH OTHER IS DOING,

10:16AM 3    AND THEY KNOW WHAT EACH OTHER IS SAYING.

10:16AM 4        MR. BALWANI'S ROLE IN THE INVESTOR FRAUD DOESN'T STOP JUST

10:16AM 5    WITH COMMUNICATING TO INVESTORS.  HE ALSO WAS THE POINT PERSON

10:17AM 6    FOR THE WALGREENS RELATIONSHIP.  AND YOU KNOW THE FALSE

10:17AM 7    STATEMENTS THAT WERE COMMUNICATED TO WALGREENS CAUSED WALGREENS

10:17AM 8    TO BELIEVE THAT THERANOS COULD ACTUALLY DO FINGERSTICK TESTING

10:17AM 9    AND HAVING THE RELATIONSHIP WITH WALGREENS WAS USEFUL TO

10:17AM 10   RECRUITING INVESTORS.

10:17AM 11       YOU HEARD MORE THAN ONE INVESTOR TELL YOU THAT THEY

10:17AM 12   THOUGHT THE RELATIONSHIP WITH WALGREENS WAS VERY IMPORTANT TO

10:17AM 13   THERANOS'S FUTURE AND BUSINESS SUCCESS.  IT WAS A REVENUE

10:17AM 14   GENERATING OPPORTUNITY.  AND IT MADE SENSE IF THERANOS WAS

10:17AM 15   GOING TO TEST BLOOD, INSTEAD OF BUILDING LOCATIONS TO TEST

10:17AM 16   BLOOD, GO INTO AN ALREADY ESTABLISHED BRAND, AND WALGREENS HAS

10:17AM 17   A GREAT BRAND, AND SO IT'S GOOD FOR THERANOS.

10:17AM 18       SO BY MR. BALWANI BEING THE POINT PERSON IN THE WALGREENS

10:17AM 19   RELATIONSHIP AND IN DECEIVING WALGREENS AND TELLING THEM THAT

10:17AM 20   THE VEIN DRAW IS GOING TO GET LOWER, JUST WAIT, EVEN THOUGH IT

10:17AM 21   NEVER DID, HE'S PLAYING A ROLE IN THE INVESTOR CONSPIRACY BY

10:18AM 22   DOING THAT.

10:18AM 23       HE ALSO COMMUNICATED FALSE STATEMENTS TO INVESTORS ON ONE

10:18AM 24   PARTICULAR TOPIC THAT WE'RE GOING TO TALK MORE ABOUT LATER:

10:18AM 25   FINANCIAL PROJECTIONS.  YOU KNOW, MR. BALWANI WAS INVOLVED IN

10:18AM 1      THE FINANCES AT THERANOS.  MS. YAM, MS. SPIVEY TOLD YOU THAT.

10:18AM 2      AND HE COMMUNICATED THESE TOPICS TO INVESTORS.  HE'S THE ONE

10:18AM 3      THAT PROVIDED THE FALSE FINANCIAL PROJECTIONS, THE OUTRAGEOUS

10:18AM 4      $140 MILLION IN REVENUE IN '14 AND A BILLION DOLLARS IN '15.

10:18AM 5          YOU KNOW THAT BALWANI HAD SEVERAL ROLES AT THERANOS

10:18AM 6      BECAUSE DAN EDLIN TOLD YOU SO.  DO YOU REMEMBER MR. EDLIN WORE

10:18AM 7      BEING HATS AT THERANOS, SO HE HAD THE OPPORTUNITY TO OBSERVE

10:18AM 8      THE WORK THAT BOTH HOLMES AND BALWANI DID.  AND HE TOLD YOU

10:18AM 9      THAT MR. BALWANI WAS INVOLVED IN THE SOFTWARE DEVELOPMENT.  SO

10:18AM 10     WHEN THEY'RE USING THINGS LIKE -- DO YOU REMEMBER THE NULL

10:19AM 11     PROTOCOL?  SOMETHING THEY USED TO SHIELD ERRORS DURING THE

10:19AM 12     DEMOS, MR. BALWANI RAN SOFTWARE.

10:19AM 13         HE WAS INVOLVED IN FINANCIAL MATTERS.  SO WHEN INVESTORS

10:19AM 14     HEAR THESE PROJECTIONS, THAT'S BALWANI.

10:19AM 15         HE WAS THE POINT PERSON IN THE WALGREENS RELATIONSHIP.

10:19AM 16     EDLIN AND JHAVERI TOLD YOU THAT.

10:19AM 17         HE RAN THE CLIA LAB.  BOTH BENNETT TOLD YOU THAT, AND

10:19AM 18     MR. EDLIN TOLD YOU THAT.

10:19AM 19         AND HE PLAYED A ROLE IN INVESTOR MEETINGS.  MR. EDLIN SAID

10:19AM 20     I WASN'T PRESENT FOR THE INVESTOR MEETINGS, I WASN'T SITTING IN

10:19AM 21     ON THEM, SO I CAN'T TELL YOU WHAT HE SAID DURING THEM, BUT I

10:19AM 22     KNOW HE WAS PRESENT DURING INVESTOR MEETINGS.

10:19AM 23         YOU HEARD WHAT HE SAID FROM THE INVESTORS.  YOU HEARD FROM

10:19AM 24     GROSSMAN, FOR INSTANCE, THE KIND OF STATEMENTS, OR

10:19AM 25     LISA PETERSON, THE KIND OF STATEMENTS THAT MR. BALWANI

ER-5110

10:19AM  1    DISCUSSED, THEY WERE FREQUENTLY ABOUT THE FINANCIALS.

10:19AM  2         YOU ALSO KNOW FROM THE TEXT MESSAGES THAT THEY BOTH PLAYED

10:20AM  3    A ROLE IN THE CONSPIRACY.  LOOK AT THIS FIRST ONE ON TOP THAT

10:20AM  4    WAS IN JULY 15, 2015, MR. BALWANI IS TELLING MS. HOLMES, "I AM

10:20AM  5    RESPONSIBLE FOR EVERYTHING AT THERANOS.  ALL HAVE BEEN MY

10:20AM  6    DECISIONS TOO."

10:20AM  7         IN THIS TEXT MESSAGE, MR. BALWANI ISN'T BRAGGING, HE'S NOT

10:20AM  8    TAKING CREDIT FOR ALL OF THE GREAT SUCCESS THAT THERANOS HAS.

10:20AM  9    HE'S ACKNOWLEDGING HIS ROLE IN THE FRAUD.

10:20AM  10        MR. BALWANI IS SAYING, I KNOW WE NEED REVENUE, I KNOW

10:20AM  11   WE'VE DECEIVED INVESTORS AND PATIENTS TO GET IT, AND THESE HAVE

10:20AM  12   BEEN MY DECISIONS ALSO.

10:20AM  13        AND THEN IN THIS CHAIN OF TEXT MESSAGES FROM 2012 THEY'RE

10:20AM  14   BOTH ACKNOWLEDGING THE NEED FOR REVENUE.  MR. BALWANI IS SAYING

10:20AM  15   THAT HE MISSES HER, BUT THE BUSINESS CANNOT BE BUILT BY HOLMES

10:20AM  16   OR BALWANI ALONE.  THAT'S WHY THE UNIVERSE BROUGHT THEM

10:20AM  17   TOGETHER.

10:20AM  18        THE FOURTH ONE DOWN.  "WE HAVE TO WORK TOGETHER ON THE

10:20AM  19   REV," OR REVENUE, "REVENUE PIECE."

10:21AM  20        MS. HOLMES IS SAYING -- IN 2012 MS. HOLMES IS SAYING WE

10:21AM  21   NEED REVENUE.  THE INVESTORS THAT ARE CHARGED IN THE CASE

10:21AM  22   INVEST AT THE END OF 2013.

10:21AM  23        AND THEN FURTHER DOWN MR. BALWANI RESPONDS, "YOU ARE THE

10:21AM  24   COMPANY.  WE NEED REVENUE."

10:21AM  25        THEY BOTH KNOW IN 2012, BEFORE THE CHARGED INVESTOR WIRES,

CLOSING ARGUMENT BY MR. SCHENK                              6975

10:21AM   1    THAT THERANOS NEEDS REVENUE.

10:21AM   2         YOU ALSO KNOW BECAUSE MANY WITNESSES TESTIFIED THAT THERE

10:21AM   3    WASN'T DISAGREEMENT BETWEEN HOLMES AND BALWANI.  SO EDLIN HAD

10:21AM   4    THE OPPORTUNITY TO OBSERVE THEM WORK TOGETHER, AND THERE

10:21AM   5    WEREN'T THESE INSTANCES WHEN BALWANI WAS SAYING I'M UNHAPPY

10:21AM   6    WITH THAT APPROACH OR I DON'T THINK YOU SHOULD MAKE THAT

10:21AM   7    STATEMENT OR I NEED TO CORRECT SOMETHING THAT YOU SAID.  THOSE

10:21AM   8    KIND OF THINGS DIDN'T HAPPEN.

10:21AM   9         IT WASN'T JUST EDLIN THOUGH.  PANDORI, PETERSON, AND

10:21AM  10    GROSSMAN ALL HAD THE OPPORTUNITY TO OBSERVE BOTH OF THEM

10:21AM  11    WORKING TOGETHER AND SAID THAT THEY SPOKE WITH ONE VOICE

10:21AM  12    ESSENTIALLY.  MORE EVIDENCE OF THE COLLABORATION BETWEEN THE

10:21AM  13    TWO OF THEM.

10:22AM  14         THERE WAS ALSO THIS PRACTICE AT THERANOS, WHEN ONE OF THEM

10:22AM  15    HANDLED AN ISSUE, TO FORWARD THE EMAIL AT THE END TO THE OTHER.

10:22AM  16    SOMETIMES AS A BLANK FORWARD, SOMETIMES WITH AN "FYI,"

10:22AM  17    SOMETIMES JUST WITH A STATEMENT, "WANTED TO MAKE SURE YOU SAW

10:22AM  18    THIS."

10:22AM  19         YOU SEE EMAIL AFTER EMAIL OF THIS OCCURRING.  SO EVEN WHEN

10:22AM  20    THEY CARVED OUT SEPARATE RESPONSIBILITIES LIKE BALWANI

10:22AM  21    COMMUNICATING WITH MENDENHALL OR BALWANI WORKING WITH

10:22AM  22    WALGREENS, HOLMES WASN'T KEPT IN THE DARK ABOUT IT AND VICE

10:22AM  23    VERSA.

10:22AM  24         AND WHEN ONE OF THEM IS DEALING WITH AN ISSUE, YOU CAN SEE

10:22AM  25    EXAMPLE AFTER EXAMPLE WHERE AT THE VERY TOP OF THE CHAIN, THE

ER-5112

10:22AM  1    LAST EMAIL IS JUST FORWARDED FROM THE ONE WHO HAS HANDLING THE

10:22AM  2    ISSUE AS AN "FYI" TO THE OTHER.

10:22AM  3        THE SECOND ELEMENT FOR INVESTOR CONSPIRACY IS THAT THE

10:22AM  4    DEFENDANT BECAME A MEMBER OF THE CONSPIRACY KNOWING OF AT LEAST

10:22AM  5    ONE OF ITS OBJECTS AND INTENDING TO HELP ACCOMPLISH IT.

10:22AM  6        SO, FIRST, WHAT IS THE OBJECTIVE OF THE INVESTOR

10:23AM  7    CONSPIRACY?  IT IS TO GET MONEY FROM INVESTORS THROUGH FRAUD.

10:23AM  8    HOW DO WE KNOW THAT SUNNY BALWANI HAD KNOWLEDGE OF THIS

10:23AM  9    OBJECTIVE?  WELL, THE TEXT MESSAGES REVEAL HIS KNOWLEDGE THAT

10:23AM  10   THERANOS HAS A NEED FOR MONEY.  YOU'VE SEEN IT IN A TEXT

10:23AM  11   MESSAGE I JUST SHOWED YOU, "WE NEED REVENUE IN 2012."

10:23AM  12       YOU ALSO KNOW IT BECAUSE MS. YAM WAS SHARING FINANCIALS

10:23AM  13   WITH SUNNY BALWANI.  SO IT'S NOT ONLY IN THE TEXT MESSAGES.

10:23AM  14   MS. YAM TOLD YOU AND YOU HAVE SEEN IT IN EMAILS, MR. BALWANI IS

10:23AM  15   RECEIVING UPDATED WEEKLY CASH BALANCES SO THAT HE KNOWS WHEN

10:23AM  16   THERANOS IS RUNNING OUT OF MONEY.

10:23AM  17       AND HOW DO YOU KNOW THAT MR. BALWANI HAS AN INTENT TO

10:23AM  18   ACCOMPLISH THAT OBJECTIVE?  WELL, AGAIN, THE OBJECTIVE IS TO

10:23AM  19   SHARE FALSE STATEMENTS WITH INVESTORS IN ORDER TO GET THEM TO

10:23AM  20   GIVE MONEY TO THERANOS.

10:23AM  21       YOU KNOW IT BECAUSE THERE'S AN INTENT THROUGHOUT THE

10:23AM  22   EMAILS.  AND WE'RE GOING TO GO THROUGH MANY OF THE EMAILS.

10:24AM  23       BUT I WANT TO MAKE A MORE BROAD ARGUMENT TO YOU RIGHT NOW,

10:24AM  24   AND THAT IS THAT MR. BALWANI COMMUNICATED FALSE STATEMENTS TO

10:24AM  25   INVESTORS.  THAT HAPPENED, AND YOU'VE SEEN THE EVIDENCE OF IT.

10:24AM   1        THE QUESTION OF INTENT IS A SEPARATE ONE.  WHY DID HE?

10:24AM   2   WHAT WAS THE PURPOSE BEHIND THOSE COMMUNICATIONS?

10:24AM   3        IF IT WAS AN ACCIDENT, IF HE WAS COMMUNICATING FALSE

10:24AM   4   STATEMENTS TO INVESTORS, BUT NOT INTENTIONALLY BY ACCIDENT, YOU

10:24AM   5   WOULD EXPECT THOSE FALSE STATEMENTS TO FALL ON BOTH SIDES OF

10:24AM   6   THE LINE, AND BY THAT I MEAN SOME FALSELY OPTIMISTIC ABOUT

10:24AM   7   THERANOS'S FUTURE AND SOME FALSELY PESSIMISTIC.  IF THESE WERE

10:24AM   8   NOT FALSE STATEMENTS COMMUNICATED WITH A PARTICULAR PURPOSE,

10:24AM   9   WITH AN INTENT IN MIND, BUT RATHER WERE COMMUNICATED

10:24AM  10   ACCIDENTALLY, YOU WOULD EXPECT SOME OF THEM TO DISCOURAGE

10:24AM  11   INVESTORS FROM INVESTING.

10:24AM  12        WELL, WHEN SUNNY BALWANI IS COMMUNICATING FALSE STATEMENTS

10:24AM  13   TO INVESTORS, THEY'RE ALWAYS FALLING ON ONE SIDE OF THE LINE.

10:24AM  14   THEY ALL HAPPEN TO BE THE KIND OF FALSE STATEMENTS THAT WOULD

10:24AM  15   CAUSE AN INVESTOR TO WANT TO INVEST IN THERANOS.

10:24AM  16        WHY IS THAT?  BECAUSE THEY WERE DONE INTENTIONALLY.

10:25AM  17   BECAUSE THERE WAS A GOAL OR A TARGET IN MIND, AND HE KNOWS THAT

10:25AM  18   IF HE COMMUNICATED FALSELY PESSIMISTIC STATEMENTS ABOUT

10:25AM  19   THERANOS'S TECHNOLOGY, INVESTORS WOULDN'T WANT TO INVEST.  IT'S

10:25AM  20   OBVIOUS.  SO HE COMMUNICATES THE FALSELY POSITIVE ONES.

10:25AM  21        IN ADDITION TO ALL OF THE SPECIFIC INSTANCES THAT WE'RE

10:25AM  22   GOING TO GO THROUGH WHERE HE KNOWS THE TRUTH, BUT THE INVESTOR

10:25AM  23   IS TOLD SOMETHING DIFFERENT, THERE'S THIS MORE MACRO IDEA, THIS

10:25AM  24   BROAD IDEA THAT OF COURSE HE'S COMMUNICATING THESE TYPE OF

10:25AM  25   FALSE STATEMENTS FOR A PARTICULAR REASON, BECAUSE HIS GOAL IS

CLOSING ARGUMENT BY MR. SCHENK                                    6978

10:25AM   1    TO SAVE THERANOS BECAUSE HE KNOWS THAT THEY CAN'T GENERATE

10:25AM   2    SUFFICIENT REVENUE THROUGH HONESTY.

10:25AM   3         IN THE TEXT MESSAGES YOU SEE HOLMES AND BALWANI

10:25AM   4    COMMUNICATE WHEN THEY LAND INVESTOR FUNDS.  IN HERE, HOLMES IS

10:25AM   5    TELLING BALWANI THAT FOLKS FROM THE WAL-MART FAMILY,

10:25AM   6    ALICE WALTON HAS JUST INVESTED $50 MILLION, GREG PENNER

10:25AM   7    INVESTED $100 MILLION, AND THEN RUPERT MURDOCH HAS INVESTED

10:26AM   8    OVER $100 MILLION.  AGAIN, THEY BOTH KNOW WHAT THE OBJECTIVE

10:26AM   9    IS, AND WHEN IT HAPPENS, THEY TALK ABOUT IT.

10:26AM  10         YOU ALSO KNOW ON SOME OCCASIONS BY BALWANI'S LACK OF

10:26AM  11    ACTION.  HE COMMUNICATES WITH MENDENHALL WHEN MENDENHALL IS

10:26AM  12    CONSIDERING MAKING AN INVESTMENT.

10:26AM  13         AFTER MENDENHALL MAKES HIS INVESTMENT AND REACHES OUT FOR

10:26AM  14    FURTHER COMMUNICATION, BALWANI DOESN'T COMMUNICATE WITH HIM.

10:26AM  15         WHEN BALWANI COMMUNICATES WITH AN INVESTOR, IT'S FOR A

10:26AM  16    PURPOSE, AND THAT PURPOSE IS TO DECEIVE THE INVESTOR IN ORDER

10:26AM  17    TO GET MONEY.

10:26AM  18         THE SAME THING HAPPENS WITH EISENMAN.  WHEN EISENMAN IS

10:26AM  19    COMMUNICATING WITH BALWANI ABOUT AN INVESTMENT, BALWANI WISHES

10:26AM  20    HIM HAPPY HOLIDAYS, A PROSPEROUS NEW YEAR, IS FRIENDLY AND

10:26AM  21    ENGAGING.

10:26AM  22         AFTER HE GETS EISENMAN'S MONEY, BALWANI SAYS ALL FUTURE

10:26AM  23    COMMUNICATIONS ARE GOING TO BE THROUGH COUNSEL.  AGAIN, BALWANI

10:26AM  24    IS COMMUNICATING WITH INVESTORS WHEN IT SUITS HIM, WHEN IT'S

10:27AM  25    NECESSARY FOR A PURPOSE AND WITH INTENT.

10:27AM   1        I HAVE SUMMARIZED FOR YOU THE TYPES OF INTERACTIONS

10:27AM   2   BALWANI AND HOLMES HAD WITH THE VARIOUS INVESTORS BECAUSE, AS I

10:27AM   3   MENTIONED, THERE ARE SOME INVESTORS LIKE TOLBERT, BALWANI NEVER

10:27AM   4   COMMUNICATED WITH, AND I WANT YOU TO SEE THAT, TOO.

10:27AM   5        WITH PETERSON, THERE WERE IN PERSON -- THERE WAS AN

10:27AM   6   IN-PERSON MEETING.  BOTH HOLMES AND BALWANI WERE PRESENT.  AND

10:27AM   7   THAT WAS IN OCTOBER OF 2014.

10:27AM   8        THERE WERE TWO IN-PERSON MEETINGS THAT BALWANI WAS PRESENT

10:27AM   9   FOR WITH MR. MOSLEY IN OCTOBER OF 2014.

10:27AM  10        EISENMAN COMMUNICATED WITH HOLMES AND THEN RECEIVED THE

10:27AM  11   MENDENHALL SUMMARY EMAIL.  SO REMEMBER, BALWANI TALKED TO

10:27AM  12   MENDENHALL, MENDENHALL SUMMARIZED THAT CONVERSATION, AND THEN

10:27AM  13   MENDENHALL EMAILED THAT SUMMARY, AND EISENMAN RECEIVES THAT

10:27AM  14   SUMMARY.

10:27AM  15        TOLBERT JUST COMMUNICATED WITH HOLMES.

10:27AM  16        LUCAS JUST COMMUNICATED WITH HOLMES.  MULTIPLE

10:28AM  17   COMMUNICATIONS WITH MS. HOLMES.

10:28AM  18        GROSSMAN, SEVERAL IN-PERSON MEETINGS, HOLMES AND BALWANI,

10:28AM  19   AND ALSO EMAILS WITH BALWANI, HE ALSO GOT THE INVESTOR BINDER.

10:28AM  20   HE GOT THAT.  GROSSMAN RECEIVED THAT DIRECTLY FROM BALWANI.

10:28AM  21        SO THAT WAS THE FIRST CONSPIRACY.

10:28AM  22        WE'RE NOW ON TO THE SECOND CONSPIRACY, THE CONSPIRACY TO

10:28AM  23   DEFRAUD PATIENTS.  THE SAME TWO ELEMENTS:  THE AGREEMENT AND

10:28AM  24   THEN KNOWLEDGE OF THE OBJECTIVE AND INTENT.

10:28AM  25        LET'S TALK ABOUT THE ROLES IN THE PATIENT CONSPIRACY.

CLOSING ARGUMENT BY MR. SCHENK                                6980

10:28AM  1         FIRST, THE AGREEMENT HERE WAS TO GET MONEY FROM PATIENTS,

10:28AM  2    A MUCH SMALLER AMOUNT PER PATIENT.  YOU KNOW, THEY'RE GETTING

10:28AM  3    MILLIONS OF DOLLARS FROM EACH INVESTOR.  THE PATIENT CONSPIRACY

10:28AM  4    IS BUILT ON NUMBERS.  THEY'RE GETTING MUCH SMALLER AMOUNTS.

10:28AM  5    THE GOAL IS TO GET, THE AMOUNT YOU WOULD GET JUST FROM AN

10:29AM  6    INDIVIDUAL BLOOD TEST, BUT HERE IS THE VOLUME, OF COURSE.

10:29AM  7    FALSE STATEMENTS BROADLY COMMUNICATED TO PATIENTS WITH THE GOAL

10:29AM  8    THAT A LARGE NUMBER OF PATIENTS WOULD PURCHASE BLOOD TESTING

10:29AM  9    FROM THERANOS, AND THEY EACH PLAYED DIFFERENT ROLES IN IT.

10:29AM 10         HOLMES RECRUITED PATIENTS BY MAKING FALSE STATEMENTS BOTH

10:29AM 11    IN THE PRESS, AND ON THE WEBSITE, AND INPATIENT BROCHURES.  AND

10:29AM 12    YOU'VE SEEN THOSE FALSE STATEMENTS, THINGS LIKE THERANOS'S

10:29AM 13    BLOOD TESTS HAVE THE HIGHEST LEVELS OF ACCURACY.

10:29AM 14         BALWANI ALSO PLAYED A ROLE IN THE PATIENT CONSPIRACY.  HE

10:29AM 15    RAN THE CLIA LAB.  THAT'S WHERE THE PATIENT BLOOD WAS TESTED.

10:29AM 16    HE ALSO REMOVED DISSENT WITHIN THE LAB, SO WHEN LAB DIRECTORS

10:29AM 17    LIKE ROSENDORFF COMPLAINED TOO MUCH, RAISED TOO MANY ISSUES,

10:29AM 18    BALWANI SUGGESTS FIRING DR. ROSENDORFF, AND THEN HE REPLACES

10:29AM 19    HIM, HE HIRED THESE ABSENTEE LAB DIRECTORS.

10:30AM 20         BALWANI KNOWS THAT THE WAY TO KEEP THE PATIENT FRAUD GOING

10:30AM 21    IS TO HAVE PEOPLE RUNNING THE LAB WHO DO NOT EXPRESS DISSENT,

10:30AM 22    WHO DO NOT QUESTION THE TESTING, WHO DO FIND RAISE ISSUES, AND

10:30AM 23    HE FINDS THAT IN THE ABSENTEE LAB DIRECTORS OF DHAWAN AND

10:30AM 24    SAWYER.

10:30AM 25         THE SECOND ELEMENT FOR PATIENT CONSPIRACY IS THE SAME

ER-5117