No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 19 OF 26 (PAGES ER-5118 – ER-5394)**

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

| | |
|---|---|
| 10:30AM 1 | IDEA, THE KNOWLEDGE OF THE OBJECTIVE, MEMBER ACTIVE IN THE |
| 10:30AM 2 | CONSPIRACY AND THE INTENT.  AND WE'RE GOING TO COVER A LOT OF |
| 10:30AM 3 | THESE TOPICS THROUGHOUT EVEN THE SUBSTANTIVE WIRE FRAUD COUNTS, |
| 10:30AM 4 | BUT HERE I WANT TO POINT OUT TO YOU THAT YOU KNOW THAT BALWANI |
| 10:30AM 5 | HAS KNOWLEDGE OF THIS OBJECTIVE, BECAUSE IT'S IN THE TEXT |
| 10:30AM 6 | MESSAGES.  HE KNOWS THAT THE LAB IS A DISASTER, AND IT'S IN THE |
| 10:30AM 7 | EMAILS.  HE KNOWS THAT THE TESTS IN THE LAB ARE NOT GENERATING |
| 10:30AM 8 | ACCURATE RESULTS, AND THEY'RE STILL RUNNING THEM, AND PEOPLE |
| 10:30AM 9 | ARE GOING TO -- WITNESS TESTIMONY, CHEUNG, ROSENDORFF, PANDORI |
| 10:31AM 10 | ARE ALL GOING TO BALWANI DIRECTLY AND SAYING OUR TESTING IS |
| 10:31AM 11 | INACCURATE.  SO HE KNOWS ABOUT THE PROBLEMS IN THE LAB. |
| 10:31AM 12 | HE KNOWS THAT THEY'RE COMMUNICATING THESE FALSE STATEMENTS |
| 10:31AM 13 | ABOUT ACCURACY.  IT'S OBVIOUS, IF THEY DIDN'T COMMUNICATE |
| 10:31AM 14 | STATEMENTS ABOUT ACCURACY, NO PATIENT IS GOING TO GET TESTING |
| 10:31AM 15 | AT THERANOS. |
| 10:31AM 16 | HERE IS THE TEXT ABOUT THE LAB BEING A DISASTER.  I'M SURE |
| 10:31AM 17 | YOU REMEMBER THIS ONE.  BUT YOU ALSO KNOW THAT FURTHER DOWN, |
| 10:31AM 18 | BALWANI'S KNOWLEDGE OF THE PROBLEMS IS EVEN MORE NUANCED.  IT |
| 10:31AM 19 | ISN'T SOME GENERAL STATEMENT ABOUT THE LAB BEING A DISASTER. |
| 10:31AM 20 | HE'S SAYING THAT WE WERE SUPPOSED TO HAVE BUILT THERANOS TO |
| 10:31AM 21 | REMOVE HUMAN JUDGMENT, THAT IN LAB TESTING SOME OF THE PROBLEMS |
| 10:31AM 22 | COME FROM HUMAN ERROR, AND THE GOAL WAS TO REMOVE THAT PART OF |
| 10:31AM 23 | THE PROBLEMS IN LAB TESTING.  BUT, IN FACT, AT THERANOS, IT |
| 10:31AM 24 | EXACERBATED THAT PROBLEM.  IT WAS EVEN WORSE.  THERE WAS MORE |
| 10:31AM 25 | HUMAN JUDGMENT BEING USED. |

10:31AM 1    REMEMBER THIS IDEA ABOUT REMOVING OUTLIERS.  YOU HEARD

10:32AM 2    TESTIMONY ABOUT THIS A FEW MONTHS AGO.  AT THERANOS, AN EDISON

10:32AM 3    DEVICE WOULD GENERATE TWO RESULTS.  SO IF YOU RAN A CHOLESTEROL

10:32AM 4    TEST ON AN EDISON DEVICE, THE BOX WOULD KICK OUT TWO NUMBERS.

10:32AM 5    AND DR. ROSENDORFF TOLD YOU THAT AT THERANOS IT WOULD RUN

10:32AM 6    EACH TEST THREE TIMES ON THREE DEVICES.  SO IF YOU WANTED TO

10:32AM 7    GET A CHOLESTEROL TEST ON AN EDISON DEVICE, YOU WOULD RUN IT ON

10:32AM 8    THREE DIFFERENT EDISONS TO GET SIX DIFFERENT CHOLESTEROL

10:32AM 9    SCORES.

10:32AM 10   AND THEN THEY APPLIED THIS MANUAL OUTLIER REMOVAL PROCESS,

10:32AM 11   WHICH MEANT THAT YOU COULD DELETE TWO OF THOSE SIX SCORES

10:32AM 12   LEAVING YOU WITH FOUR SCORES, AND THEN YOU COULD USE THOSE FOUR

10:32AM 13   SCORES TO COME UP WITH YOUR CHOLESTEROL RESULT, A THING YOU

10:32AM 14   WOULD REPORT TO A PATIENT.

10:32AM 15   BALWANI KNOWS THAT.  AND WHAT HE'S SAYING HERE IS THAT

10:32AM 16   WE'RE USING MORE HUMAN JUDGMENT IN THE PROCESS.

10:32AM 17   ROSENDORFF TOLD YOU THAT PROCESS THAT I JUST DESCRIBED,

10:33AM 18   THE OUTLIER REMOVAL PROCESS, IS NOT THE WAY THAT THE SIEMENS

10:33AM 19   MACHINE WORKS, AND THAT WAS A UNIQUELY THERANOS CREATION IN

10:33AM 20   RESPONSE TO UNIQUELY THERANOS PROBLEMS.

10:33AM 21   BALWANI ALSO KNOWS THAT PATIENTS WILL PAY CASH.  AGAIN, I

10:33AM 22   ACKNOWLEDGE TO YOU IT'S SMALL AMOUNTS OF CASH.  IT'S NOT THE

10:33AM 23   MILLIONS OF DOLLARS THAT INVESTORS ARE GIVING, BUT IT'S A

10:33AM 24   VOLUME BUSINESS.

10:33AM 25   AND BALWANI KNOWS THAT THE PLACE TO -- THE REASON TO PITCH

10:33AM  1    INVESTORS IS TO GET CASH FROM INVESTORS.  THERANOS IS

10:33AM  2    ADVERTISING TO INVESTORS -- I'M SORRY, TO PATIENTS IN ORDER TO

10:33AM  3    GET THEM TO GIVE THERANOS MONEY, AND THAT'S THROUGHOUT THOSE

10:33AM  4    DOCUMENTS.

10:33AM  5        YOU ALSO KNOW THAT THERANOS, HOLMES AND BALWANI, WERE

10:33AM  6    WARNED.  THEY WERE ADVISED THAT CERTAIN STATEMENTS ON THEIR

10:33AM  7    WEBSITE WERE INACCURATE, WERE MISLEADING, AND YOU SAW THAT

10:34AM  8    THOSE STATEMENTS, EVEN AFTER THE WARNING, ARE STILL APPEARING

10:34AM  9    ON THE WEBSITE.  THINGS LIKE THE "HIGHEST RANGE OF ACCURACY,"

10:34AM  10   THE "FULLEST RANGE OF TEST," "HIGHEST QUALITY," THESE

10:34AM  11   STATEMENTS ARE INACCURATE.  HOLMES AND BALWANI WERE TOLD AND

10:34AM  12   THEY STILL APPEARED.

10:34AM  13       AND DO YOU KNOW WHY THEY STILL APPEARED?  TO DUPE, TO

10:34AM  14   RECRUIT PATIENTS.

10:34AM  15       DAN EDLIN ALSO TOLD YOU THAT THERANOS HAD A COMPANY, A

10:34AM  16   MARKETING FIRM CALLED CHIAT/DAY THAT THEY HIRED TO CREATE THE

10:34AM  17   THERANOS ADVERTISING OR MARKETING MATERIALS.  AND THERE WERE

10:34AM  18   ONLY TWO PEOPLE IN THE COMPANY WHO WERE AUTHORIZED TO APPROVE A

10:34AM  19   COPY OF WHAT CHIAT/DAY CREATED AND THEN WOULD GET PUBLISHED.

10:34AM  20   THE ONLY TWO PEOPLE AT THERANOS WHO WERE AUTHORIZED TO APPROVE

10:34AM  21   THAT COPY WERE HOLMES AND BALWANI.

10:34AM  22       AND YOU SAW EVEN WITH WARNINGS LIKE REPLACE "HIGHEST

10:35AM  23   QUALITY" WITH "HIGH QUALITY," IT'S STILL APPEARING.

10:35AM  24       "HIGH LEVELS OF QUALITY" OR "HIGHEST LEVELS OF QUALITY ARE

10:35AM  25   STILL APPEARING IN THE THERANOS OUTWARD FACING, THIRD PARTY

10:35AM 1      FACING DOCUMENTS LIKE ON THE WEBSITE, EVEN THOUGH THEY WERE

10:35AM 2      WARNED NOT TO, BECAUSE THAT'S HOW THEY WOULD GET PATIENTS.

10:35AM 3          THAT'S THE CONSPIRACY COUNTS, COUNTS ONE AND TWO.

10:35AM 4          WE'RE NOW MOVING INTO THE WIRE FRAUD, THE SUBSTANTIVE WIRE

10:35AM 5      FRAUD COUNTS.  WE'LL START WITH THE SUBSTANTIVE WIRE FRAUD

10:35AM 6      COUNTS AS TO INVESTORS.

10:35AM 7          WIRE FRAUD HAS FOUR ELEMENTS THAT THE GOVERNMENT MUST

10:35AM 8      PROVE.  THE FIRST IS THAT MR. BALWANI KNOWINGLY PARTICIPATED IN

10:35AM 9      A SCHEME OR PLAN TO DEFRAUD OR A SCHEME OR PLAN FOR OBTAINING

10:35AM 10     MONEY OR PROPERTY BY FALSE REPRESENTATIONS.

10:35AM 11         AND WHEN I TALK TO YOU ABOUT THIS, I'M GOING TO ACTUALLY

10:35AM 12     DIVIDE THIS INTO TWO.  WE'LL TALK ABOUT THE EXISTENCE OF A

10:36AM 13     SCHEME OR PLAN, AND THEN SEPARATELY WE'LL TALK ABOUT THE

10:36AM 14     EVIDENCE SHOWING THAT MR. BALWANI HAS KNOWLEDGE OF THAT SCHEME

10:36AM 15     OR PLAN.

10:36AM 16         THE SECOND ELEMENT IS WHAT IS CALLED MATERIALITY, THE

10:36AM 17     FALSE STATEMENTS THAT WERE MADE TO INVESTORS NEEDED TO MATTER.

10:36AM 18     THEY NEEDED TO BE MATERIAL.

10:36AM 19         THE THIRD ELEMENT IS THAT MR. BALWANI ACTED WITH THE

10:36AM 20     INTENT TO DEFRAUD.

10:36AM 21         AND THE FINAL ELEMENT IS WHAT WE CALL INTERSTATE NEXUS,

10:36AM 22     THE WIRE ITSELF CROSSED STATE LINES.  SO WHEN AN INVESTOR

10:36AM 23     INVESTED MONEY BY AN ELECTRONIC WIRE, THAT WIRE ITSELF CROSSED

10:36AM 24     STATE LINES.  THAT'S ONE OF THE REASONS THAT YOU'VE COME TO

10:36AM 25     FEDERAL COURT FOR THE TRIAL.

10:36AM 1      AND AT THE END OF THE GOVERNMENT'S CASE WHEN THE

10:36AM 2   GOVERNMENT RESTED, YOU HEARD THE JUDGE READ TO YOU A

10:36AM 3   STIPULATION OF THE PARTIES.  WE'LL TALK ABOUT THAT LATER.  THE

10:36AM 4   PARTIES STIPULATED THAT CERTAIN WIRES IN THE CASE CROSSED STATE

10:36AM 5   LINES.  SO YOU CAN ACCEPT THAT AS TRUE.

10:36AM 6      THERE ARE SIX SPECIFIC WIRES THAT MAKE UP THE WIRE FRAUD

10:37AM 7   COUNTS IN THE INDICTMENT.  AND ON YOUR VERDICT FORM YOU WILL

10:37AM 8   SEE THE DOLLAR AMOUNT.  SO COUNT THREE ON THE VERDICT FORM WILL

10:37AM 9   INVOLVE A WIRE ON DECEMBER 30TH OF 2013, $99,000.  THE VERDICT

10:37AM 10  FORM WILL NOT SAY THE INVESTOR'S NAME.  SO I'M GOING TO ASK

10:37AM 11  YOU, AT LEAST ONE OF YOU, TO WRITE DOWN THE NAMES SO THAT WHEN

10:37AM 12  YOU'RE DELIBERATING, YOU RETURN THE VERDICT YOU MEAN TO REPORT.

10:37AM 13      IF YOU THINK BALWANI IS GUILTY OF THE EISENMAN COUNT, YOU

10:37AM 14  SHOULD KNOW THAT EISENMAN IS COUNT THREE.

10:37AM 15      IF YOU THINK HE'S NOT GUILTY OF THE LUCAS COUNT, YOU

10:37AM 16  SHOULD KNOW THAT LUCAS IS COUNT FOUR SO THAT YOU CAN WRITE DOWN

10:37AM 17  ON THE VERDICT FORM "GUILTY" OR "NOT GUILTY" NEXT TO THE LINE

10:37AM 18  THAT YOU MEAN TO RETURN THAT VERDICT.

10:37AM 19      AGAIN, THE COUNTS WILL APPEAR, THE DATES WILL APPEAR, THE

10:38AM 20  DOLLAR AMOUNTS WILL APPEAR, BUT NOT THE INVENTOR NAME.  I'LL

10:38AM 21  LEAVE IT UP JUST FOR A MOMENT.

10:38AM 22          THE COURT:  MR. SCHENK, MAYBE WE'LL ASK THE JURY TO

10:38AM 23  STAND.

10:38AM 24      IF YOU WOULD LIKE TO JUST STAND FOR JUST A MOMENT.

10:38AM 25          MR. SCHENK:  THANK YOU.

10:38AM   1                THE COURT:  WOULD YOU LIKE TO STAND FOR JUST A

10:38AM   2      MOMENT, FEEL FREE, LADIES AND GENTLEMEN, FOR 30 SECONDS.

10:38AM   3           (STRETCHING.)

10:38AM   4                THE COURT:  THANK YOU.

10:38AM   5                MR. SCHENK:  THANK YOU, YOUR HONOR.

10:38AM   6           LET ME ALSO SAY, I AM GOING TO DO MY BEST TO KEEP ANY EYE

10:39AM   7      ON THE CLOCK AND AROUND OUR NORMAL BREAK TIME, I'LL ASK THE

10:39AM   8      COURT IF THAT'S AN APPROPRIATE TIME.

10:39AM   9           BUT IF ANYBODY NEEDS A BREAK, DON'T FEEL LIKE BECAUSE THIS

10:39AM  10      IS CLOSING, YOU CAN'T RAISE YOUR HAND AND ASK FOR A BREAK.  THE

10:39AM  11      SAME RULES APPLY.  IF YOU NEED A BREAK, LET'S TAKE IT.  I'LL

10:39AM  12      KNOW WHAT YOU MEAN IF YOU RAISE YOUR HAND.

10:39AM  13           SO LET'S GO THROUGH STARTING WITH THE CATEGORIES OF FALSE

10:39AM  14      STATEMENTS.  INVESTORS INVESTED IN THERANOS BECAUSE THEY HEARD

10:39AM  15      FROM HOLMES AND BALWANI THINGS THAT WEREN'T TRUE, AND THESE

10:39AM  16      THINGS FIT INTO DIFFERENT CATEGORIES.  THERE WERE CATEGORIES OR

10:39AM  17      BUCKETS OF FALSE STATEMENTS THAT THE INVESTORS HEARD, AND FROM

10:39AM  18      THOSE THEY MADE THE DECISION, INVESTORS MADE THE DECISION TO

10:39AM  19      INVEST.

10:39AM  20           THERE'S A NUMBER OF DIFFERENT CATEGORIES OF FALSE

10:39AM  21      STATEMENTS.  AND THE FIRST ONE IS ABOUT THE CAPABILITIES OF THE

10:39AM  22      TECHNOLOGY, THAT IT WOULD TEST BLOOD BY FINGERSTICK, THAT IT

10:39AM  23      OFFERED THE FULL RANGE OF TESTS, STATEMENTS ABOUT ACCURACY AND

10:39AM  24      RELIABILITY, AND THAT THEY REMOVED HUMAN ERROR.  A LOT FITS

10:40AM  25      WITHIN THIS FIRST BUCKET, BUT BROADLY SPEAKING, INVESTORS

10:40AM 1  THOUGHT THAT THE THERANOS TECHNOLOGY, THE BLOOD TESTING

10:40AM 2  TECHNOLOGY, COULD DO ONE THING OR ANOTHER THAT IT COULD NOT DO.

10:40AM 3      BUT THE FALSE STATEMENTS THAT INVESTORS HEARD WERE NOT

10:40AM 4  LIMITED JUST TO THE CAPABILITIES OF THE THERANOS TECHNOLOGY.

10:40AM 5  INVESTORS ALSO HEARD AND INVESTED BECAUSE THEY THOUGHT THERANOS

10:40AM 6  WAS FINANCIALLY STABLE AND THOUGHT IT WAS GENERATING REVENUE.

10:40AM 7      INVESTORS HEARD DURING MISLEADING DEMOS, MANY OF THESE

10:40AM 8  FALSE STATEMENTS, BUT ALSO THINGS LIKE THIS BOX HERE THAT IS IN

10:40AM 9  THE ROOM IS THE WAY WE TEST OUR BLOOD.  OUR TECHNOLOGY INVOLVES

10:40AM 10  THIS DEVICE RIGHT HERE WHEN YOU HEARD THAT THEY RAN SOFTWARE ON

10:40AM 11  THAT DEVICE CALLED THE NULL PROTOCOL THAT WAS USED TO SHIELD

10:40AM 12  ERRORS.  WHEN THE BOX WOULDN'T WORK, THE PERSON IN THE ROOM,

10:40AM 13  THE INVESTOR IN THE ROOM WOULDN'T SEE IT FAIL, AND, THEREFORE,

10:40AM 14  THE DEMOS WERE USED TO DECEIVE.

10:40AM 15      THERE ARE ADDITIONAL CATEGORIES OF FALSE STATEMENTS.

10:41AM 16      INVESTORS THOUGHT THAT THE WALGREENS RELATIONSHIP WAS

10:41AM 17  GOING WELL.  YOU KNOW, BUT THERANOS WAS BEING TOLD WE'RE NOT

10:41AM 18  GOING TO EXPAND FURTHER OUTSIDE OF ARIZONA UNTIL YOU GET THESE

10:41AM 19  VENOUS DRAWS UNDER CONTROL.  THE INVESTORS DIDN'T KNOW THAT.

10:41AM 20      THE INVESTORS HEARD THAT THERANOS'S TECHNOLOGY HAD BEEN

10:41AM 21  DEPLOYED BY THE DEPARTMENT OF DEFENSE ON THE BATTLEFIELD, WAS

10:41AM 22  SAVING SOLDIERS' LIVES, WAS IN AFGHANISTAN, WAS ON MEDEVAC

10:41AM 23  HELICOPTERS, ALL KINDS OF THINGS.

10:41AM 24      YOU HEARD FROM DAN EDLIN THAT THAT WASN'T TRUE, THAT THAT

10:41AM 25  WAS NOT THE WORK THAT THERANOS WAS DOING WITH THE DEPARTMENT OF

10:41AM 1    DEFENSE, BUT INVESTORS DIDN'T KNOW THAT.

10:41AM 2         THE INVESTORS HEARD THAT THERANOS DID NOT BUY DEVICES FROM

10:41AM 3    THIRD PARTIES; THAT THEY VERTICALLY INTEGRATED THEIR

10:41AM 4    MANUFACTURING; THAT THERANOS WAS MAKING AND USING ITS OWN

10:41AM 5    TECHNOLOGY.  YOU KNOW THAT WASN'T TRUE.  THEY WEREN'T JUST

10:41AM 6    BUYING SIEMENS DEVICES OR DEVICES MANUFACTURED BY OTHER

10:42AM 7    COMPANIES, THEY WERE ALSO MODIFYING SOME OF THOSE DEVICES.

10:42AM 8    INVESTORS DIDN'T KNOW THAT.

10:42AM 9         INVESTORS HEARD THAT THERANOS'S TECHNOLOGY HAD BEEN

10:42AM 10   VALIDATED BY PHARMACEUTICAL COMPANIES.  WE'LL LOOK AT THAT

10:42AM 11   STATEMENT.  "TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL

10:42AM 12   COMPANIES."  INVESTORS THOUGHT I'M NOT A SCIENTIST, BUT IT SURE

10:42AM 13   SEEMS GOOD TO ME THAT IT'S BEEN VALUED BY ITS WORK WITH

10:42AM 14   PHARMACEUTICAL COMPANIES.

10:42AM 15        BUT YOU HEARD THAT THE PHARMACEUTICAL COMPANIES DID NOT

10:42AM 16   VALIDATE THERANOS'S TECHNOLOGY.

10:42AM 17        AND FINALLY, MANY OF THESE FALSE STATEMENTS OF THE

10:42AM 18   CATEGORIES THAT WE JUST TALKED ABOUT APPEARED IN ARTICLES IN

10:42AM 19   THE MEDIA AND THEN THERANOS TOOK THOSE ARTICLES AND SENT THEM

10:42AM 20   TO INVESTORS, EITHER DIRECTLY IN EMAILS OR PUT THEM INTO THE

10:42AM 21   INVESTOR BINDERS AND SENT THE BINDER TO INVESTORS.

10:42AM 22        AND INVESTORS NOT ONLY RELIED ON THE DIRECT FALSE

10:42AM 23   STATEMENTS THAT THEY HEARD FROM HOLMES AND BALWANI, BUT THEN

10:42AM 24   THEY RELIED ON THE CORROBORATION, THEY RELIED ON THE STATEMENT

10:43AM 25   ALSO APPEARING IN THE MEDIA THAT THEY HAD RECEIVED FROM

ER-5126

10:43AM  1    THERANOS.

10:43AM  2         THE SOURCES OF THESE FALSE STATEMENTS WERE VARIED.  SOME

10:43AM  3    INVESTORS HEARD THEM OR READ THEM IN INVESTOR BINDERS.  SOME

10:43AM  4    INVESTORS SAW THEM ON THERANOS'S WEBSITE.  SOME OF THEM READ

10:43AM  5    THEM OR HEARD OF THEM IN INTERVIEWS IN THE MEDIA AS I JUST

10:43AM  6    TALKED TO YOU ABOUT.  AND SOME OF THEM HEARD DIRECTLY FROM

10:43AM  7    BALWANI TO INVESTORS.

10:43AM  8         SO THERE ARE CATEGORIES OF FALSE STATEMENTS, AND IN THE

10:43AM  9    WAYS THAT INVESTORS HEARD THE FALSE STATEMENTS ITSELF WERE

10:43AM  10   VARIED.  THE INVESTORS HEARD THEM IN DIFFERENT WAYS.

10:43AM  11        LET'S LOOK AT SOME OF THE FALSE STATEMENTS.  HERE YOU SEE

10:43AM  12   IN THE INVESTOR BINDER, INVESTORS READING THAT "THERANOS'S

10:43AM  13   PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS

10:43AM  14   FROM A FINGERSTICK AND TESTS FROM MICRO-SAMPLES OF OTHER

10:44AM  15   MATRICES, AND GENERATES SIGNIFICANTLY HIGHER INTEGRITY DATA

10:44AM  16   THAN CURRENTLY POSSIBLE."

10:44AM  17        AND THE NOTICE IN THE LOWER RIGHT CORNER, I'VE PUT A

10:44AM  18   LITTLE CHART THAT SHOWS YOU IN WHICH INVESTOR BINDER YOU CAN

10:44AM  19   FIND THIS DOCUMENT, THIS SLIDE.

10:44AM  20        SO THIS SLIDE LANDED ON DAN MOSLEY'S DESK, IT LANDED ON

10:44AM  21   LISA PETERSON'S DESK, AND ON RUPERT MURDOCH'S DESK.  AND THE

10:44AM  22   REASON MURDOCH IS IMPORTANT IS I'M GOING TO SHOW YOU IN A

10:44AM  23   MOMENT A TEXT MESSAGE WHERE HOLMES AND BALWANI ARE TALKING

10:44AM  24   ABOUT THE CONTENT OF THE MURDOCH BINDER.

10:44AM  25        SO BALWANI IS NOT ONLY ON OCCASION SENDING THE INVESTOR

ER-5127

10:44AM  1    BINDERS LIKE TO PETERSON OR GROSSMAN, BUT ALSO IN THE TEXT

10:44AM  2    MESSAGES THEY'RE TALKING ABOUT THE CONTENT OF INVESTOR BINDERS.

10:44AM  3    SO THESE BINDERS ARE NOT GOING OUT THE DOOR BLIND TO OR BALWANI

10:44AM  4    IS BLIND OF THEIR CONTENT.

10:45AM  5        THE INVESTOR BINDERS ALSO SAY THINGS LIKE "THERANOS RUNS

10:45AM  6    ANY TESTS AVAILABLE IN CENTRAL LABORATORIES, AND PROCESSES ALL

10:45AM  7    SAMPLE TYPES," UNDER A PICTURE OF A FINGERSTICK, EVEN THE

10:45AM  8    PICTURE IS DESIGNED TO DEFRAUD.  "THERANOS PROVIDES THE HIGHEST

10:45AM  9    LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

10:45AM  10   AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

10:45AM  11   ACCURACY AND PRECISION."

10:45AM  12       AND THEN NOTICE THE THREE INVESTORS RECEIVE THIS, MOSLEY,

10:45AM  13   PETERSON, MURDOCH, AND ALSO BRIAN GROSSMAN, IT'S THIS SLIDE,

10:45AM  14   AND THE ONE ON THE RIGHT REFERENCES THE "HIGHEST LEVELS OF

10:45AM  15   ACCURACY."  AND THAT CONCEPT IS REPEATED FURTHER DOWN.

10:45AM  16       "HIGHEST LEVELS OF ACCURACY.  "IT DRAMATICALLY MINIMIZES

10:45AM  17   HUMAN PROCESSING, THE CAUSE OF MOST LAB ERRORS."  WELL, WE JUST

10:45AM  18   TALKED ABOUT THAT.

10:46AM  19       MANUAL OUTLIER REMOVAL PROCESS.  THEY'RE NOT REDUCING

10:46AM  20   HUMAN ERROR, THEY'RE ACTUALLY COMPOUNDING IT, DOING MORE THAN

10:46AM  21   WHAT EVEN THE STANDARD THIRD PARTY DEVICES.

10:46AM  22       SO THE FIRST CATEGORY WAS STATEMENTS ABOUT THE TECHNOLOGY,

10:46AM  23   THE CAPABILITIES OF THE TECHNOLOGY.  THERE ARE ALSO FALSE

10:46AM  24   STATEMENTS ABOUT FINANCIAL STABILITY.

10:46AM  25       IN THE BACKGROUND YOU SEE THE LISA PETERSON FINANCIAL

10:46AM 1    PROJECTIONS THAT SHE RECEIVED.  IN ADDITION TO JUST THE BOTTOM

10:46AM 2    LINE NUMBERS, 100 MILLION AND A BILLION DOLLARS IN REVENUE,

10:46AM 3    IT'S BROKEN OUT.  SO CERTAIN AMOUNT OF MILLIONS FROM VARIOUS

10:46AM 4    SOURCES, AND THE SOURCES ARE LISTED, RETAIL PHARMACY,

10:46AM 5    PHYSICIAN'S OFFICES, HOSPITALS.

10:46AM 6        BUT THEN WHEN YOU GO THROUGH AND ASK LISA PETERSON WHAT

10:46AM 7    SHE HEARD.  SHE NEVER HEARD THEY HAD NO REVENUE FROM THESE

10:46AM 8    SOURCES.

10:46AM 9        MS. YAM, MS. SPIVEY, WHEN SHE WAS ON THE STAND, WENT

10:46AM 10   THROUGH AND TOLD YOU WHAT THERANOS'S TRUE REVENUE WAS FROM

10:47AM 11   THESE SOURCES IN THOSE YEARS, BUT LISA PETERSON THOUGHT

10:47AM 12   THERANOS WAS GENERATING THIS REVENUE IN '14 AND EXPECTED TO IN

10:47AM 13   '15.

10:47AM 14       THERANOS DID MISLEADING DEMONSTRATIONS TO WALGREENS.  DO

10:47AM 15   YOU REMEMBER WHEN JHAVERI WAS ON THE STAND, HE TOLD YOU THAT IN

10:47AM 16   AUGUST OF 2013, SO JUST WEEKS BEFORE THE LAUNCH, THE FIRST

10:47AM 17   PATIENTS COMING TO THE WALGREENS STORE IN SEPTEMBER, JHAVERI

10:47AM 18   AND OTHERS FROM WALGREENS GO TO THERANOS AND GET A

10:47AM 19   DEMONSTRATION.  THEY GET A FINGERSTICK, AND THEY EXPECT THEIR

10:47AM 20   BLOOD IS GOING TO BE DRAWN ON THE EDISON DEVICE, BECAUSE THAT'S

10:47AM 21   WHAT THEY THINK THEY'VE SIGNED UP FOR.  THAT'S WHAT THEY THINK

10:47AM 22   THERANOS IS DOING.

10:47AM 23       AND THEN MR. BALWANI -- I'M SORRY, AND THEN MR. JHAVERI

10:47AM 24   SEES AN INTERNAL EMAIL, AND YOU SEE IT HERE, THAT SAYS THAT

10:47AM 25   THEY JUST STARTED TO DO THE ADVIA RUN.

10:47AM 1      SO THERANOS DID A DEMO FOR WALGREENS WHERE THE WALGREENS

10:48AM 2  FOLKS LIKE JHAVERI BELIEVE THEIR BLOOD IS BEING TESTED ON AN

10:48AM 3  EDISON DEVICE, BUT, IN FACT, IT'S BEING TESTED ON A SIEMENS

10:48AM 4  ADVIA DEVICE.

10:48AM 5      PETERSON RECEIVED THESE MISLEADING PROJECTIONS.  AND WHAT

10:48AM 6  IS MISLEADING HERE IS THE 900 LOCATIONS.  MR. BALWANI EXPLAINED

10:48AM 7  THAT IN MEETINGS WITH HOLMES -- I'M SORRY, IN MEETINGS WITH

10:48AM 8  MS. PETERSON, HE WAS TRANSPARENT.  YOU'VE HEARD THIS ARGUMENT

10:48AM 9  FROM THE DEFENSE.  ONE, THESE WERE PROJECTIONS, AND, TWO, THEY

10:48AM 10 REVEALED THE UNDERLYING ASSUMPTIONS BEHIND THE PROJECTIONS.  SO

10:48AM 11 HOW COULD THEY BE MISLEADING?

10:48AM 12     AND I WANT TO COVER THIS MORE FOR YOU A LITTLE BIT LATER,

10:48AM 13 BUT FOR NOW, THE UNDERLYING ASSUMPTION BEHIND THE $1 BILLION OF

10:48AM 14 REVENUE IS 900 LOCATIONS WITH WALGREENS.

10:48AM 15     MR. BALWANI KNOWS THAT ISN'T GOING TO HAPPEN BECAUSE

10:48AM 16 YOU'VE SEEN THE MONTHLY MEETING MINUTES BETWEEN WALGREENS AND

10:49AM 17 THERANOS WHERE THEY'RE TRACKING VENOUS DRAWS, WHERE MR. BALWANI

10:49AM 18 HAS TO TELL WALGREENS THAT HE HAS 90 PERCENT CONFIDENCE THAT

10:49AM 19 THEY'RE GOING TO GET THE VENOUS DRAW NUMBERS DOWN TO SINGLE

10:49AM 20 DIGITS BY THE END OF THE YEAR.

10:49AM 21     THAT NEVER HAPPENED.  BALWANI KNOWS IT'S NOT GOING TO

10:49AM 22 HAPPEN BECAUSE THEY DON'T HAVE THE TECHNOLOGY TO DO IT.

10:49AM 23     SO WHEN HE TELLS LISA PETERSON WE'RE GOING TO HAVE A

10:49AM 24 BILLION DOLLARS IN REVENUE BASED ON 900 WALGREENS STORES, HE'S

10:49AM 25 NOT BEING EXTRA TRANSPARENT.  HE'S BEING PARTICULARLY

CLOSING ARGUMENT BY MR. SCHENK                                    6993

10:49AM  1    MISLEADING BECAUSE THAT SUGGESTS THAT 900 IS REASONABLE, THAT

10:49AM  2    IT'S POSSIBLE THAT THEY WOULD EVER GET THERE WHEN WALGREENS IS

10:49AM  3    DIRECTLY TELLING THEM WE ARE REDUCING THE NUMBER OF LOCATIONS

10:49AM  4    WE EXPECT TO ROLL OUT TO.

10:49AM  5        THE DEPARTMENT OF DEFENSE IS ANOTHER CATEGORY OF FALSE

10:49AM  6    STATEMENTS.  LISA PETERSON TOLD YOU WHAT SHE HEARD, WHAT SHE

10:50AM  7    UNDERSTOOD THERANOS WAS DOING WITH THE DEPARTMENT OF DEFENSE,

10:50AM  8    THAT THE TECHNOLOGY WAS BEING USED ON MEDEVAC HELICOPTERS IN

10:50AM  9    THE TREATMENT OF SOLDIERS.

10:50AM 10        YOU KNOW FROM MR. EDLIN'S TESTIMONY THAT THAT'S NOT TRUE.

10:50AM 11    THAT NEVER HAPPENED.

10:50AM 12        BRIAN GROSSMAN ALSO TOLD YOU WHAT HE HEARD ABOUT THE USE

10:50AM 13    OF THE TECHNOLOGY IN THE BATTLEFIELD.  SAME THING.  HE

10:50AM 14    UNDERSTOOD THAT THE TECHNOLOGY WAS BEING USED IN THE

10:50AM 15    BATTLEFIELD TO HELP IDENTIFY VIRUSES OR BACTERIAS AHEAD OF TIME

10:50AM 16    TO SAVE LIVES.

10:50AM 17        AGAIN, EDLIN TOLD YOU WHO WORKED AT THERANOS ON DOD

10:50AM 18    PROJECTS, THAT THAT IS NOT WHAT THERANOS WAS DOING WITH THE

10:50AM 19    DEPARTMENT OF DEFENSE.

10:50AM 20        YOU ALSO HEARD ABOUT FALSE STATEMENTS CONCERNING THE USE

10:50AM 21    OF THIRD PARTY DEVICES.  REMEMBER, I TOLD YOU THAT

10:50AM 22    BRIAN GROSSMAN WAS PARTICULARLY INTERESTED IN THE AMOUNT OF

10:50AM 23    SQUARE FOOTAGE THAT THE THERANOS LAB WOULD REQUIRE IN ORDER FOR

10:50AM 24    FUTURE LEASE OR REAL ESTATE EXPENSES AND WHAT THAT SORT OF WAS

10:51AM 25    LINKED TO WAS WHETHER TO USE THIRD PARTY DEVICES, THE VERY

10:51AM  1    LARGE BLOOD TESTING MACHINES MADE BY SIEMENS OR THE MUCH

10:51AM  2    SMALLER MACHINES USED BY THERANOS.

10:51AM  3         AND GROSSMAN TOLD YOU THAT HIS UNDERSTANDING WAS THAT

10:51AM  4    THERANOS DID NOT USE THESE THIRD PARTY MACHINES, AND IF HE HAD

10:51AM  5    KNOWN THAT, HE WOULD HAVE BEEN INVESTING IN A VERY DIFFERENT

10:51AM  6    COMPANY THAN HE THOUGHT HE DID.

10:51AM  7         THERE WERE FALSE STATEMENTS MADE ABOUT VALIDATION WORK

10:51AM  8    THAT THERANOS DID WITH PHARMACEUTICAL COMPANIES.  I'M SHOWING

10:51AM  9    YOU HERE EXHIBIT 291.  I WANT TO MENTION SOMETHING ABOUT THIS

10:51AM 10    EXHIBIT.

10:51AM 11         YOU RECALL ON OCCASION AN EXHIBIT WOULD BE ADMITTED AND

10:51AM 12    THE JUDGE WOULD TURN TO YOU AND SAY, "THIS EXHIBIT IS ADMITTED

10:51AM 13    FOR A LIMITED PURPOSE.  IT'S NOT FOR THE TRUTH OF THE MATTER,

10:51AM 14    BUT IT'S ADMITTED FOR FALSITY OR KNOWLEDGE OF THE DEFENDANT,"

10:51AM 15    OR FILL IN THE BLANK FOR VARIOUS REASONS.  THIS IS ONE OF THOSE

10:51AM 16    EXHIBITS.  THIS EXHIBIT WAS ADMITTED FOR A LIMITED PURPOSE, AND

10:52AM 17    I WANT TO TALK TO YOU ABOUT THAT.

10:52AM 18         THIS EXHIBIT IS NOT COMING IN FOR THE TRUTH.

10:52AM 19         IN FACT, YOU'LL SEE WHEN WE LOOK AT THE EMAIL TOGETHER,

10:52AM 20    IT'S FALSE.  IT'S NOT TRUTH.  THE PURPOSE OF THE EMAIL, THOUGH,

10:52AM 21    IS THAT MR. BALWANI IS ON IT, MR. BALWANI RECEIVES THE

10:52AM 22    ATTACHMENTS, AND MR. BALWANI NOW BACK IN 2010 KNOWS ABOUT THE

10:52AM 23    COMMUNICATION OF THE FALSE STATEMENTS THAT ARE CONTAINED IN THE

10:52AM 24    EMAIL.

10:52AM 25         SO LET'S LOOK AT THE EMAIL.

10:52AM  1       ELIZABETH HOLMES IS WRITING TO FOLKS AT WALGREENS AND

10:52AM  2   SHE'S ATTACHING SOME DOCUMENTS.  AND IN THE BACKGROUND YOU CAN

10:52AM  3   SEE TWO DOCUMENTS THAT ARE ATTACHED.

10:52AM  4       AND MS. HOLMES WRITES, "DR. JAY, ALEX,

10:52AM  5       "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

10:52AM  6   DILIGENCE REPORTS ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL.

10:52AM  7   THESE REPORTS ARE FROM GLAXOSMITHKLINE, PFIZER, AND

10:53AM  8   SCHERING-PLOUGH AFTER THEIR OWN TECHNICAL VALIDATION AND

10:53AM  9   EXPERIENCE WITH THERANOS SYSTEMS IN THE FIELD."

10:53AM 10       SO PHARMA VALIDATION REPORTS ATTACHED TO AN EMAIL SENT TO

10:53AM 11   WALGREENS AND WALGREENS ARE BEING TOLD FIRST THEY'RE FROM,

10:53AM 12   NOTICE THAT WORD "FROM," GLAXOSMITHKLINE, PFIZER, AND

10:53AM 13   SCHERING-PLOUGH; AND, SECOND, AFTER THEIR OWN TECHNICAL

10:53AM 14   VALIDATION AND EXPERIENCE WITH THERANOS.  YOU KNOW BOTH OF

10:53AM 15   THOSE ARE FALSE.  YOU KNOW THEY'RE NOT FROM THE PHARMA

10:53AM 16   COMPANIES.  YOU KNOW BECAUSE SCHERING-PLOUGH AND PFIZER CAME

10:53AM 17   AND TOLD YOU THEY WERE NOT CREATED BY SCHERING-PLOUGH AND

10:53AM 18   PFIZER, SO YOU KNOW THEY'RE NOT FROM, AND YOU KNOW THEY'RE NOT

10:53AM 19   AFTER THE PHARMA COMPANY'S OWN TECHNICAL VALIDATION OF THE

10:53AM 20   THERANOS TECHNOLOGY.

10:53AM 21       AGAIN, WEBER AND CULLEN CAME AND TOLD YOU THAT THEY DID

10:53AM 22   NOT VALIDATE THE THERANOS TECHNOLOGY.  SO BACK IN APRIL OF

10:53AM 23   2010, BALWANI SEES THIS EMAIL WHERE HE SEES THESE FALSE

10:53AM 24   STATEMENTS BEING COMMUNICATED TO WALGREENS.  THIS IS ALSO PART

10:54AM 25   OF THE DECEPTION THAT HAPPENS TO WALGREENS.  WALGREENS SIGNS UP

10:54AM  1    FOR THIS RELATIONSHIP WITH THERANOS BECAUSE THEY'RE HEARING THE

10:54AM  2    SAME KINDS OF FALSE STATEMENTS THAT INVESTORS ARE HEARING.

10:54AM  3    THEY CAN DO THE FULL RANGE OF TESTS.  THEY'VE BEEN VALIDATED BY

10:54AM  4    PHARMA WORK.

10:54AM  5        SO WHEN MR. BALWANI TELLS AN INVESTOR THAT THERANOS IS

10:54AM  6    GOING TO BE IN 900 STORES NEXT YEAR, HE KNOWS THAT'S NOT TRUE,

10:54AM  7    BECAUSE HE KNOWS THE RELATIONSHIP WITH WALGREENS WAS BUILT ON

10:54AM  8    FRAUD, AND IT'S ONLY A MATTER OF TIME BEFORE THAT RELATIONSHIP

10:54AM  9    ALSO COLLAPSES.

10:54AM 10        THERE ARE CLAIMS REGARDING VALIDATION BY PHARMA COMPANIES

10:54AM 11    IN INVESTOR BINDERS.  THE EMAIL THAT I JUST SHOWED YOU WENT TO

10:54AM 12    WALGREENS, BUT THOSE SAME CLAIMS APPEAR IN THE INVESTOR

10:54AM 13    BINDERS.  THE INVESTORS ARE TOLD THAT "THERANOS HAS BEEN

10:54AM 14    COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST 7 YEARS

10:54AM 15    BY 10 OF THE 15 LARGEST PHARMACEUTICAL COMPANIES WITH HUNDREDS

10:55AM 16    OF THOUSANDS OF ASSAYS PROCESSED."

10:55AM 17        SO THE SAME FALSE STATEMENT THAT WALGREENS HEARS,

10:55AM 18    INVESTORS HEAR.

10:55AM 19        ARTICLES IN THE MEDIA.  I'M SHOWING YOU THREE OF THEM.

10:55AM 20    THE ONE ON THE LEFT IS "WIRED," THE ONE IN THE MIDDLE TOWARDS

10:55AM 21    THE BOTTOM IS "THE WALL STREET JOURNAL," AND THE ONE ON THE

10:55AM 22    RIGHT IS "FORTUNE."  THEY ALL CONTAIN FALSE STATEMENTS ABOUT

10:55AM 23    THERANOS TECHNOLOGY.  NOTICE THE "WIRED" ONE, THE ONE ON THE

10:55AM 24    LEFT SAYS, "WE'RE ABLE TO DO THE TESTING USING JUST A SINGLE

10:55AM 25    MICRO-SAMPLE RATHER THAN HAVING TO DRAW A DEDICATED TUBE FREE

10:55AM 1    TYPE OF TESTS."

10:55AM 2        YOU KNOW THAT'S FALSE.  LOOK AT THE BOTTOM, THE ONE FROM

10:55AM 3    "THE WALL STREET JOURNAL."  LET ME NOTE, THIS IS THE 2013

10:55AM 4    "WALL STREET JOURNAL" ARTICLE.

10:55AM 5        REMEMBER, I MENTIONED THERE'S TWO.  2013 IS THE POSITIVE

10:55AM 6    ONE AT THE WALGREENS LAUNCH.  2015 IS THE NEGATIVE ONE.  THIS

10:55AM 7    IS THE 2013 ONE WHERE IT SAYS, "THERANOS'S PROCESSES ARE

10:56AM 8    FASTER, CHEAPER, AND MORE ACCURATE THAN CONVENTIONAL METHODS

10:56AM 9    AND REQUIRE ONLY MICROSCOPIC BLOOD VOLUMES, NOT VIAL AFTER VIAL

10:56AM 10   OF THE STUFF."  AGAIN, A FALSE STATEMENT.

10:56AM 11       AND THEN LOOK TO THE RIGHT, THE "FORTUNE" ARTICLE WHERE

10:56AM 12   THE READER, THE INVESTORS IN THIS INSTANCE ARE TOLD, "THERANOS,

10:56AM 13   WHICH DOES NOT BUY ANY ANALYZERS FROM THIRD PARTIES."  AGAIN,

10:56AM 14   CONSISTENT WITH WHAT INVESTORS WERE TOLD.

10:56AM 15       IT ALSO APPEARS IN MEDIA ARTICLES, BUT HERE YOU CAN SEE

10:56AM 16   THE POINT I MADE EARLIER, THIS IS NOT AN INSTANCE OF AN ARTICLE

10:56AM 17   BEING WRITTEN AND AN INVESTOR STUMBLING UPON IT AND THERANOS

10:56AM 18   NOT HAVING ANY ROLE IN IT.

10:56AM 19       THERANOS TAKES THESE ARTICLES AND SHARES THEM WITH AN

10:56AM 20   INVESTOR.  THE ONE ON THE RIGHT IS AN EMAIL WHERE IT'S SENT TO

10:56AM 21   SHAREHOLDERS; THE ONE IN THE MIDDLE IS ON THE THERANOS WEBSITE

10:56AM 22   WHERE THEY LINK TO THE ARTICLES; AND THE ONE ON THE RIGHT IS

10:57AM 23   WITHIN AN INVESTOR BINDER.  THEY HAVE A SECTION CALLED "RECENT

10:57AM 24   PRESS," AND THEY INCLUDE THE NAMES OF THE ARTICLES AND EVEN

10:57AM 25   IMAGES FROM EITHER THE PERIODICAL OR THE COVER OF THE MAGAZINE.

10:57AM 1       SO THERANOS IS ENDORSING THE CONTENT OF THESE ARTICLES.

10:57AM 2       I TOLD YOU THAT THE FIRST ELEMENT WAS KNOWLEDGE.  AND WE

10:57AM 3   BROKE UP THE EXISTENCE OF A SCHEME TO DEFRAUD BASED ON FALSE

10:57AM 4   STATEMENTS FROM MR. BALWANI'S KNOWLEDGE OF THAT SCHEME TO

10:57AM 5   DEFRAUD.  IT'S ALL ONE ELEMENT IN THE INSTRUCTIONS, BUT I WANT

10:57AM 6   TO MAKE SURE THAT YOU SEE THE GOVERNMENT IS REQUIRED TO PROVE

10:57AM 7   MORE THAN ONE THING IN THAT ELEMENT, BOTH THE EXISTENCE OF A

10:57AM 8   SCHEME AND NOW MR. BALWANI'S KNOWLEDGE OF THAT SCHEME, THE SAME

10:57AM 9   CATEGORIES OF FALSE STATEMENTS.

10:57AM 10      SO I'M JUST SHOWING YOU AGAIN, THESE ARE THE SAME

10:57AM 11  CATEGORIES THAT WE TALKED ABOUT.

10:57AM 12      LET'S SHOW MR. BALWANI'S KNOWLEDGE OF THE SCHEME.

10:57AM 13      WELL, MR. BALWANI IS ON THIS EMAIL WHERE HE AND MS. HOLMES

10:57AM 14  ARE BEING TOLD THAT CERTAIN STATEMENTS ARE NOT TRUE, THEY'RE

10:58AM 15  MISLEADING, AND THEY SHOULD BE CHANGED.  STATEMENTS LIKE "ALL

10:58AM 16  TESTS" OR "FULL RANGE OF TESTS, HIGHEST QUALITY."

10:58AM 17      SO WHEN YOU SEE THOSE APPEARING IN A SCHEME, THAT'S THE

10:58AM 18  EXISTENCE OF A SCHEME, BUT EMAILS LIKE THIS PROVE KNOWLEDGE,

10:58AM 19  PROVE MR. BALWANI KNOWS OF THAT.

10:58AM 20      THEY ALSO PROVE INTENT BECAUSE IF THE DOCUMENTS CONTINUE

10:58AM 21  TO CONTAIN THESE FALSE STATEMENTS, THAT'S KNOWLEDGE OF THE

10:58AM 22  FALSITY OF THE STATEMENTS AND ALSO AN INTENT TO DEFRAUD BECAUSE

10:58AM 23  OF THE PURPOSE OF THESE FALSE STATEMENTS.

10:58AM 24      SO EMAILS LIKE THIS SERVE MULTIPLE PURPOSES.

10:58AM 25      AND THAT'S NOT THE ONLY ONE.  THERE ARE OTHER EMAILS WHERE

10:58AM 1    THEY'RE BEING WARNED THAT THEIR WEBSITE CONTAINS FALSE

10:58AM 2    STATEMENTS.

10:58AM 3        "A TINY DROP IS ALL IT TAKES" IS NOT ACCURATE BECAUSE

10:58AM 4    MR. BALWANI IS BEING TOLD THEY HAVE TO USE MORE THAN A TINY

10:58AM 5    DROP.  "A FEW DROPS," "AS LITTLE AS ONE DROP," OTHER PHRASES

10:59AM 6    ARE WHAT THEY WERE ENCOURAGED TO USE, BUT YOU'VE SEEN THEY

10:59AM 7    CONTINUE TO SAY "A TINY DROP."

10:59AM 8        THERE IS ALSO KNOWLEDGE EVIDENCE IN THE TEXT MESSAGES.

10:59AM 9    HERE'S THE TEXT THAT I MENTIONED TO YOU ABOUT THE MURDOCH

10:59AM 10   BINDERS WHERE ELIZABETH HOLMES IS WRITING TO MR. BALWANI, "ARE

10:59AM 11   THERE ANY MATERIALS IN THE BINDERS YOU THINK SHOULD BE REMOVED

10:59AM 12   FOR MURDOCH/NEWS CORP."

10:59AM 13       SO MR. BALWANI IS NOT ONLY SENDING THESE BINDERS TO

10:59AM 14   INVESTORS, HE'S NOT ONLY DISCUSSING THE CONTENT OF THE INVESTOR

10:59AM 15   BINDERS WITH INVESTORS, BUT HE'S ALSO COMMUNICATING WITH

10:59AM 16   ELIZABETH HOLMES BEFORE THE BINDERS EVEN GET SENT OUT ABOUT

10:59AM 17   WHAT SHOULD BE IN THE BINDER, WHAT THEY SHOULD CONTAIN.

10:59AM 18       THERE ARE ALSO FALSE STATEMENTS THAT INVESTORS HEARD ABOUT

10:59AM 19   THE CAPABILITIES OF THERANOS'S TECHNOLOGY RELATED TO

10:59AM 20   FINGERSTICK.  HOW MANY TESTS WERE DONE BY FINGERSTICK?

10:59AM 21       AND RECALL WHEN MS. BENNETT TESTIFIED, SHE WAS DESCRIBING

10:59AM 22   TO YOU THE CMS INSPECTION AND THE INFORMATION THAT SHE WAS

11:00AM 23   RECEIVING FROM MR. BALWANI DURING THAT CMS INSPECTION.

11:00AM 24       AND ONE OF THE THINGS THAT SHE RECEIVED IS THIS DOCUMENT

11:00AM 25   THAT DESCRIBED WHICH TESTS THERANOS WAS DOING ON FDA CLEARED

11:00AM   1     DEVICES AND WHICH IT WAS DOING VIA A PROCESS CALLED LDT'S, OR

11:00AM   2     LAB DEVELOPED TESTS.

11:00AM   3         AND YOU HEARD -- REMEMBER WE TALKED A MOMENT AGO ABOUT

11:00AM   4     THE THREE DIFFERENT WAYS THAT BLOOD GOT TESTED AT THERANOS.

11:00AM   5     ONE WAS ON A THERANOS DEVICE, AND THE SECOND WAS ON A MODIFIED

11:00AM   6     THIRD PARTY DEVICE.  THOSE TWO ARE LAB DEVELOPED TESTS.

11:00AM   7         THE THIRD WAY, ON A COMMERCIALLY AVAILABLE DEVICE WITH NO

11:00AM   8     CHANGES IS JUST THAT, IT'S AN FDA CLEARED OR OTHERWISE APPROVED

11:00AM   9     DEVICE.  AND THE VAST MAJORITY OF BLOOD TESTS THAT WERE OFFERED

11:00AM  10     AT THERANOS, ACCORDING TO THIS DOCUMENT THAT BALWANI PROVIDED

11:00AM  11     TO BENNETT, 256 OF THE 295 TESTS AT THERANOS WERE ON THE

11:00AM  12     COMMERCIALLY AVAILABLE DEVICES.

11:00AM  13         SO WHEN BALWANI IS COMMUNICATING TO INVESTORS THAT

11:01AM  14     THERANOS'S TECHNOLOGY OFFERS THE FULL RANGE OF TESTS.  THAT

11:01AM  15     ISN'T TRUE.  THIS MUCH SMALLER NUMBER, 39, INCLUDED EITHER THE

11:01AM  16     EDISON DEVICE OR A MODIFIED THIRD PARTY DEVICE.

11:01AM  17         WE CAN BREAK THAT NUMBER OUT EVEN FURTHER.  IF NOW WE'RE

11:01AM  18     JUST TALKING ABOUT THE LAB DEVELOPED TESTS AND YOU WANT TO

11:01AM  19     SEPARATE OUT ONLY THE EDISON TESTS, THAT WHICH THE INVESTORS

11:01AM  20     ACTUALLY THOUGHT THEY WERE INVESTING IN, THE THERANOS BOX

11:01AM  21     RUNNING THERANOS BLOOD TESTS, IT WAS 12.  AND THEY'VE PROVIDED

11:01AM  22     A DOCUMENT, MR. BALWANI TO MS. BENNETT, THAT LISTS THE START

11:01AM  23     DATE AND THE END DATE FOR THOSE 12 TESTS, THE 12 ASSAYS THAT

11:01AM  24     WERE ACTUALLY RUN ON THE THERANOS DEVICE DURING THESE DATES.

11:01AM  25         SO ALL OF THE INVESTORS THAT YOU HEARD FROM THOUGHT THEY

11:01AM   1    WERE INVESTING IN A COMPANY THAT CREATED A NEW BLOOD TESTING

11:01AM   2    TECHNOLOGY THAT WAS MORE ACCURATE, THAT WAS FAR SUPERIOR THAN

11:02AM   3    WHAT WAS CONVENTIONALLY AVAILABLE, AND IT COULD DO THESE 12

11:02AM   4    TESTS.  AND YOU HEARD WITNESS AFTER WITNESS TELL YOU IT

11:02AM   5    COULDN'T DO THESE 12 TESTS ACCURATELY.

11:02AM   6        YOU HEARD ABOUT ACCURACY PROBLEMS FROM WITNESSES.  AND TO

11:02AM   7    PROVE MR. BALWANI'S KNOWLEDGE OF THESE ACCURACY PROBLEMS, YOU

11:02AM   8    ONLY HAVE TO LOOK AT THE WITNESSES WHO TESTIFIED, BECAUSE THEY

11:02AM   9    TOLD YOU THEY COMMUNICATED THOSE PROBLEMS DIRECTLY TO

11:02AM  10    MR. BALWANI.

11:02AM  11        ERIKA CHEUNG TOLD YOU THAT SHE WAS CONCERNED ABOUT

11:02AM  12    ACCURACY PROBLEMS AT THERANOS, AND THAT SHE TALKED TO

11:02AM  13    MR. BALWANI DIRECTLY ABOUT THOSE PROBLEMS, THINGS LIKE FAILING

11:02AM  14    QUALITY CONTROL.

11:02AM  15        AND YOU SEE ON THE LEFT PART OF THIS SCREEN, EMAILS GOING

11:02AM  16    TO MR. BALWANI THAT ARE POINTING OUT QUALITY CONTROL FAILURES.

11:02AM  17        LET'S TALK ABOUT QUALITY CONTROL JUST FOR A MOMENT.  WHEN

11:03AM  18    MS. SAWYER, ONE OF THE CO-LAB DIRECTORS, WAS ON THE STAND SHE

11:03AM  19    TALKED TO YOU ABOUT THE IMPORTANCE OF QUALITY CONTROL.  SO ONCE

11:03AM  20    A LAB TEST MOVES FROM R&D, RESEARCH AND DEVELOPMENT, AND THEN

11:03AM  21    TO THE CLIA LAB, AND IT WAS BEING TESTED ACTUALLY ON PATIENTS,

11:03AM  22    THE LAB WAS REQUIRED TO DO PERIODIC, OFTEN EVERY DAY, QUALITY

11:03AM  23    CONTROL TO MAKE SURE THAT THE DEVICE WAS TESTING ACCURATELY.

11:03AM  24        AND SAWYER TOLD YOU, AND OTHER WITNESSES AS WELL, THAT

11:03AM  25    QUALITY CONTROL IS IMPORTANT FOR A LOT OF REASONS, AND ONE OF

11:03AM 1    THE REASONS IS IT CAN KIND OF BE A CANARY IN THE COAL MINE FOR

11:03AM 2    ACCURACY PROBLEM.  IF YOU'RE CONSTANTLY FAILING QUALITY

11:03AM 3    CONTROL, THAT SHOULD TELL YOU SOMETHING ABOUT WHETHER YOUR

11:03AM 4    TESTING IS ACCURATE, AND MR. BALWANI IS RECEIVING NOTICE

11:03AM 5    CONSTANTLY.

11:03AM 6        WE'LL LOOK AT MORE EXAMPLES WHERE THERANOS'S TESTS ARE

11:03AM 7    FAILING QUALITY CONTROL.  BUT THAT ISN'T THE ONLY WAY.  PEOPLE

11:03AM 8    ARE GOING TO HIM DIRECTLY, LIKE ERIKA CHEUNG, AND RAISING THOSE

11:04AM 9    CONCERNS.

11:04AM 10       MR. BALWANI ALSO KNOWS ABOUT THE FINANCIAL STABILITY

11:04AM 11   CHALLENGES.  MS. SPIVEY TOLD YOU THAT HER INTERACTIONS WITH

11:04AM 12   MR. BALWANI INCREASED OVER TIME AS SHE WAS THERE LONGER AND HE

11:04AM 13   WAS THERE LONGER THEY BEGAN TO COMMUNICATE MORE AND MORE OFTEN,

11:04AM 14   IN PARTICULAR IN THE 2013, 2014, AND 2015 TIMEFRAME.

11:04AM 15       AND THEN ON A WEEKLY BASIS SHE WOULD SEND HIM DOCUMENTS,

11:04AM 16   LIKE THE DOCUMENTS ON THE RIGHT.  AND THE FIRST ONE SHOWS YOU

11:04AM 17   THE AMOUNT OF REVENUE THAT THERANOS HAS, THE ACTUAL NUMBERS FOR

11:04AM 18   REVENUE.  SO NOTHING IN '13 OR '12, AND ACTUALLY IN DECREASING

11:04AM 19   AMOUNT OF REVENUE FROM 9 -- 2009 THROUGH 2010 THROUGH 2011.

11:04AM 20       AND ON THE SAME DOCUMENT YOU SEE THE LOSS, THE AMOUNT OF

11:04AM 21   MONEY THAT THERANOS IS ACTUALLY LOSING IN THOSE YEARS.  BUT

11:04AM 22   ALSO REMEMBER THIS CASH BALANCE SPREADSHEET, THE ONE ON THE

11:04AM 23   BOTTOM, THAT SHOWS YOU WEEK TO WEEK HOW MUCH CASH THERANOS HAS

11:05AM 24   ON HAND.

11:05AM 25       AND YOU MAY REMEMBER SOME TESTIMONY ABOUT THIS PARTICULAR

11:05AM  1    WEEK IN LATE SEPTEMBER OF 2013 WHEN THERANOS WAS DOWN TO

11:05AM  2    $14 MILLION.  YOU HEARD THAT, IN FACT, THAT ABOUT 7 MILLION OF

11:05AM  3    THAT WAS A LINE OF CREDIT.  SO IF YOU DON'T INCLUDE THAT,

11:05AM  4    THERANOS WAS DOWN TO $7 MILLION.

11:05AM  5         IN SEPTEMBER OF 2013 IT WAS RUNNING ON FUMES AND NEEDED AN

11:05AM  6    INFUSION OF CASH TO SURVIVE.

11:05AM  7         AFTER THAT, DECEMBER OF 2013, THE INVESTORS, THE FIRST

11:05AM  8    INVESTORS THAT YOU HEARD FROM ARE INVESTING, THE CHARGED WIRES.

11:05AM  9    SO THEY GET THE BIG INFUSION OF CASH, THE MEETINGS ARE ALL

11:05AM 10    OCCURRING AT THE END OF 2013, AND THAT'S WHEN ALL OF THE MONEY

11:05AM 11    COMES IN.

11:05AM 12         YOU HEARD ABOUT MR. BALWANI'S ROLE RUNNING SOFTWARE AND

11:05AM 13    THE ROLE THAT SOFTWARE PLAYED IN MISLEADING DEMOS AND SOMETHING

11:06AM 14    CALLED THE NULL PROTOCOL.  YOU HEARD THAT THE NULL PROTOCOL WAS

11:06AM 15    USED TO SHIELD ERRORS FROM PEOPLE WHO WERE IN THE ROOM

11:06AM 16    RECEIVING THE DEMO.

11:06AM 17         AND EDLIN EXPLAINED TO YOU THAT THE NULL PROTOCOL WAS

11:06AM 18    DEVELOPED BY THE SOFTWARE FOLKS AT THERANOS.  MR. BALWANI WAS

11:06AM 19    IN CHARGE OF THE SOFTWARE FOLKS.

11:06AM 20         YOU HEARD THAT IN ADDITION TO MISLEADING DEMOS LIKE WHAT

11:06AM 21    HAPPENED TO WALGREENS WHEN MR. JHAVERI THOUGHT HIS BLOOD WAS

11:06AM 22    BEING TESTED ON THE EDISON BUT THEN SAW THE INTERNAL EMAILS

11:06AM 23    SAYING THAT IT WAS TESTED ON THE ADVIA.  IT WASN'T JUST A

11:06AM 24    DIFFERENT DEVICE, BUT INTERNAL EMAILS SHOW THAT THERANOS IS

11:06AM 25    CORRECTING, IN QUOTES, "RESULTS BEFORE THEY SEND THEM OUT."

CLOSING ARGUMENT BY MR. SCHENK                                    7004

11:06AM   1         SO THEY'RE DOING A DEMONSTRATION, THEY GET SOME RESULTS,

11:06AM   2    BUT THEY DON'T JUST THEN COMMUNICATE THOSE RESULTS TO THE DEMO

11:06AM   3    RECIPIENTS, THEY CORRECT THE RESULTS.  THEY MAKE CHANGE TO THE

11:06AM   4    RESULTS BEFORE THEY SHARE THEM, FOR INSTANCE, IN THIS EMAIL "I

11:07AM   5    REMOVED THE THYROID RESULTS THAT I FELT WERE QUESTIONABLE."

11:07AM   6    THAT'S ALSO ON AN EMAIL TO MR. BALWANI.  HE KNOWS THAT'S

11:07AM   7    HAPPENING ALSO.

11:07AM   8         YOU KNOW THAT IN ORDER FOR WALGREENS TO ROLL OUT FURTHER,

11:07AM   9    WALGREENS IS PAYING ATTENTION TO THE FINGERSTICK DRAW PER SE.

11:07AM  10    THAT WAS COMMUNICATED IN MEETINGS BETWEEN BOTH MR. JHAVERI AND

11:07AM  11    MR. BALWANI DIRECTLY.  THEY WERE EACH OTHERS POINTS OF CONTACT.

11:07AM  12         ON THE RIGHT SIDE OF THIS SCREEN ON THE TOP, YOU SEE A

11:07AM  13    SLIDE THAT WAS PRESENTED DURING THESE PERIODIC MEETINGS WHERE

11:07AM  14    WALGREENS IS TRACKING AS A METRIC FOR HUGER EXPANSION THE

11:07AM  15    VENOUS DRAW PERCENT.  YOU SEE THAT IN FEBRUARY OF 2014

11:07AM  16    VENOUS DRAWS ARE AT 43 PERCENT AND IN MAY THEY'RE AT

11:07AM  17    39 PERCENT.  SO THEY'RE REMAINING AROUND 40 PERCENT.

11:07AM  18         AND REMEMBER, MR. JHAVERI TOLD YOU THAT HE COMMUNICATED

11:07AM  19    THOSE CONCERNS TO BALWANI AND BALWANI PRESENTED ON THIS TOPIC.

11:08AM  20    SUNNY BALWANI HIMSELF PRESENTED THIS SLIDE THAT YOU SEE BELOW

11:08AM  21    IT, THE ONE CALLED VENOUS DRAWS.

11:08AM  22         AND ON THIS SLIDE YOU SEE WHERE IT SAYS, "ORIGINALLY

11:08AM  23    ESTIMATED THAT BY THE END OF FEBRUARY 2014 WOULD BE BELOW

11:08AM  24    20 PERCENT OF TOTAL DRAWS AND BELOW 10 PERCENT BY END OF

11:08AM  25    AUGUST."  THIS WHOLE SLIDE IS CALLED VENOUS DRAW.

CLOSING ARGUMENT BY MR. SCHENK                    7005

11:08AM  1        SO BALWANI IS SAYING WE ORIGINALLY THOUGHT OUR

11:08AM  2    VENOUS DRAWS WERE GOING TO BE BELOW 20 PERCENT BY FEBRUARY OF

11:08AM  3    2014, AND YOU SAW FROM THAT SLIDE WE TALKED ABOUT A MOMENT AGO

11:08AM  4    IT WAS ACTUALLY 43 PERCENT.

11:08AM  5        THE SLIDE CONTINUES.  HERE ARE THE CURRENT PROJECTIONS.

11:08AM  6    BELOW 20 PERCENT BY THE END OF AUGUST.  HE EVEN GOES FURTHER TO

11:08AM  7    WRITE HIS CONFIDENCE LEVEL IN THAT ESTIMATE.  90 PERCENT

11:08AM  8    CONFIDENCE LEVEL;

11:08AM  9        BELOW 10 PERCENT BY THE END OF OCTOBER WITH A GREATER THAN

11:08AM 10    95 PERCENT CONFIDENCE LEVEL;

11:08AM 11        AND FINALLY, BELOW 5 PERCENT BY THE END OF THE YEAR, BY

11:09AM 12    THE END OF 2014, WITH A 90 PERCENT CONFIDENCE LEVEL.

11:09AM 13        BALWANI KNOWS THAT IN ORDER TO HAVE FURTHER EXPANSION WITH

11:09AM 14    WALGREENS, HE NEEDS TO GET THE VENOUS DRAW UNDER CONTROL, AND

11:09AM 15    SO HE'S TELLING THEM INCREDIBLY OPTIMISTIC PROJECTIONS ABOUT

11:09AM 16    THE LIKELIHOOD OF GETTING THOSE VENOUS DRAWS UNDER CONTROL.

11:09AM 17        HERE'S WHAT ACTUALLY HAPPENED.  YOU SAW IN FEBRUARY OF

11:09AM 18    '14, VENOUS DRAWS ARE AT 43 PERCENT; IN MAY, 39 PERCENT; BY

11:09AM 19    NOVEMBER, 40 PERCENT, AND ALL THROUGH 2015, STILL 40 PERCENT.

11:09AM 20        JHAVERI TOLD YOU THERANOS NEVER ADDRESSED THE VENOUS DRAW

11:09AM 21    NUMBERS, AND THAT WASN'T SURPRISING TO BALWANI.  HE KNEW THAT A

11:09AM 22    VERY SMALL PERCENTAGE OF THEIR TESTS WERE BEING DONE ON THE

11:09AM 23    EDISON DEVICE.  THAT'S WHY HE REACTED SO NEGATIVELY ANY TIME

11:09AM 24    ONE OF HIS LAB DIRECTORS SUGGESTED THAT THEY STOP USING THE

11:09AM 25    EDISON DEVICE, MOVE TESTING OR STOP USING THE EDISON DEVICE

ER-5143

11:10AM   1    COMPLETELY BECAUSE THAT WOULD PREVENT FURTHER EXPANSION WITH

11:10AM   2    WALGREENS.

11:10AM   3         WHEN BALWANI WAS GIVEN THESE PROJECTIONS REGARDING THE

11:10AM   4    NUMBER OF STORES THAT THESE WOULD GO INTO IN WALGREENS, HE

11:10AM   5    WOULD GIVEN THOSE NUMBERS EVEN AFTER RECEIVING NEGATIVE

11:10AM   6    FEEDBACK DIRECTLY FROM WALGREENS.

11:10AM   7         SO IN THIS EMAIL YOU SAW WALGREENS TELLING BALWANI THAT

11:10AM   8    THEY'RE REDUCING THE NUMBER OF STORES THEY'RE PROJECTING FOR

11:10AM   9    THE NEXT FISCAL YEAR FROM 500 TO 200, AND THAT WALGREENS WAS

11:10AM   10   DOING THAT BECAUSE THE PILOT WASN'T A SUCCESS.  THE PILOT

11:10AM   11   WASN'T SHOWING THE TECHNOLOGY WAS READY TO BE ROLLED OUT

11:10AM   12   FURTHER.

11:10AM   13        YOU HEARD SOME ARGUMENT ABOUT THIS 2,000 NUMBER IN THAT

11:10AM   14   CHART, AND THAT WAS ACTUALLY WHAT WALGREENS WAS PROJECTING,

11:10AM   15   THAT WALGREENS WAS SAYING IN THIS DOCUMENT THAT THEY WERE

11:10AM   16   ACTUALLY GOING TO GO TO 2,000 THERANOS LOCATIONS.

11:11AM   17        AND REMEMBER WHAT MR. JHAVERI TOLD YOU ABOUT THAT?  HE

11:11AM   18   SAID, NO, WALGREENS HAD A SEPARATE PROJECT CALLED THE WELL

11:11AM   19   EXPERIENCE, AND THAT REQUIRED US TO TOUCH 2,000 STORES.  AND WE

11:11AM   20   WANTED TO AT THE SAME TIME MAKE THOSE TOUCHES THERANOS STORES,

11:11AM   21   NOT 2,000 WELL EXPERIENCE STORES, AND THEN SEPARATELY 200

11:11AM   22   THERANOS STORES.  IT'S DISRUPTIVE TO THE STORE.  LET'S TOUCH

11:11AM   23   THEM ONCE.  LET'S DO THE CONSTRUCTION ONE TIME.

11:11AM   24        SO THE THERANOS STORES WOULD BE WITHIN THIS GROUP OF WELL

11:11AM   25   EXPERIENCE STORES THAT WOULD NOT HOUSE THERANOS TECHNOLOGY.

CLOSING ARGUMENT BY MR. SCHENK                                    7007

11:11AM  1    BUT I'M GOING TO TAKE A STEP BACK FROM THIS, BECAUSE THIS

11:11AM  2    WHOLE ARGUMENT, WHAT WALGREENS THOUGHT, WHETHER INTERNALLY

11:11AM  3    WALGREENS THOUGHT LET'S SAY THEY WERE GOING TO GO TO 2,000, IF

11:11AM  4    THERE'S AN INTERNAL WALGREENS DOCUMENTS SAYING WE'RE GOING TO

11:11AM  5    GO TO 8,000 WALGREENS STORES, LET'S TALK FOR A MOMENT ABOUT THE

11:11AM  6    SIGNIFICANCE OF THAT.

11:11AM  7    WHAT COUNSEL WANTS YOU TO THINK IS IF INTERNALLY WALGREENS

11:12AM  8    THINKS THAT THEY'RE GOING TO GO TO 2,000 STORES, IF YOU DON'T

11:12AM  9    THINK JHAVERI WAS RIGHT, INTERNALLY THEY'RE GOING TO GO TO

11:12AM  10   2,000 STORES, THEN HOW COULD IT BE WRONG FOR MR. BALWANI TO

11:12AM  11   WRITE 900 AS AN ASSUMPTION FOR THE $1 BILLION OF REVENUE?

11:12AM  12   IF INTERNALLY WALGREENS IS OPTIMISTIC ABOUT FUTURE

11:12AM  13   EXPANSION, THEN HOW COULD IT BE WRONG FOR MR. BALWANI TO BE

11:12AM  14   OPTIMISTIC ABOUT FUTURE WALGREENS EXPANSION?  AND THAT'S

11:12AM  15   BECAUSE WALGREENS DOESN'T KNOW THEY'VE BEEN DECEIVED.

11:12AM  16   WALGREENS THINKS THAT THEY'VE PARTNERED WITH A COMPANY THAT CAN

11:12AM  17   TEST BLOOD ACCURATELY AND CAN DO IT BY FINGERSTICK.

11:12AM  18   SO MR. BALWANI DOESN'T NEED TO HEAR FROM WALGREENS THAT

11:12AM  19   THEY'VE CAUGHT ON TO IT, THAT THEY'VE NOW DISCOVERED THAT

11:12AM  20   THERANOS CAN'T TEST ACCURATELY, THERANOS CAN'T DO THIS BY

11:12AM  21   FINGERSTICK.

11:12AM  22   WHAT IS IN THESE DOCUMENTS ACTUALLY DOES REVEAL THAT

11:12AM  23   WALGREENS IS DISCOVERING THAT THERANOS ISN'T WHAT THEY SAID

11:12AM  24   THEY WERE; THAT THEIR VENOUS DRAW PERCENTS ARE AT 40 PERCENT

11:13AM  25   WHEN JHAVERI WENT A COUPLE OF DAYS EARLIER BEFORE THE LAUNCH,

ER-5145

11:13AM  1      HAD A FINGERSTICK AND THERE WAS AN EDISON IN THE ROOM, HE

11:13AM  2      DIDN'T KNOW THAT WAS TESTED BEHIND THE SCENES ON AN ADVIA

11:13AM  3      DEVICE.

11:13AM  4          IT DOESN'T REQUIRE INTERNAL WALGREENS DOCUMENTS TO SHOW A

11:13AM  5      STOP TO THE ROLLOUT TO PROVE BALWANI IS MAKING FALSE STATEMENTS

11:13AM  6      TO INVESTORS WHEN HE'S SAYING THAT WE'RE GOING TO BE IN 900

11:13AM  7      STORES NEXT YEAR AND HAVE A BILLION DOLLARS IN REVENUE.  HE

11:13AM  8      KNOWS THAT BECAUSE HE KNOWS THAT WALGREENS WAS BROUGHT INTO THE

11:13AM  9      RELATIONSHIP WITH STATEMENTS LIKE WE'VE BEEN VALIDATED BY THESE

11:13AM  10     PHARMA COMPANIES AND THESE REPORTS AND WE CAN DO FINGERSTICK

11:13AM  11     TESTING.

11:13AM  12         BALWANI ALSO KNEW THAT FURTHER EXPANSION WITH WALGREENS

11:13AM  13     WASN'T GUARANTEED, THAT THE PILOT MATTERED, THAT THE SUCCESS OF

11:13AM  14     THE PILOT MATTERED BECAUSE IT WAS BOTH SOMETHING THAT WAS

11:13AM  15     DIRECTLY COMMUNICATED TO HIM BY JHAVERI BECAUSE IT WAS ALSO

11:14AM  16     SOMETHING ON THE RIGHT-HAND SIDE OF THE SCREEN YOU SEE THE

11:14AM  17     MASTER SERVICES AGREEMENT, THE AGREEMENT BETWEEN WALGREENS AND

11:14AM  18     THERANOS TO BEGIN TESTING HAS A SECTION ON CRITERIA FOR

11:14AM  19     NATIONAL ROLLOUT.

11:14AM  20         BUT IT ISN'T EVEN ONLY THOSE PLACES.  IN THE TEXT

11:14AM  21     MESSAGES, BALWANI IS TELLING HOLMES, WE CAN'T SCALE WITH WAG.

11:14AM  22     THEY'RE TERRIBLE, AND WE NEED SAFEWAY AND CVS.

11:14AM  23         BALWANI DOESN'T NEED TO HEAR IT FROM WALGREENS THAT

11:14AM  24     THEY'RE NOT GOING TO GO NATIONAL.  BALWANI KNOWS IT'S NOT

11:14AM  25     GUARANTEED.  BALWANI KNOWS THAT WALGREENS CARES ABOUT

CLOSING ARGUMENT BY MR. SCHENK                                          7009

11:14AM  1    FINGERSTICK PERCENT, AND BALWANI KNOWS THAT WALGREENS DOESN'T

11:14AM  2    UNDERSTAND WHAT COMPANY THERANOS ACTUALLY IS, WHAT THEIR

11:14AM  3    TECHNOLOGY IS ACTUALLY CAPABLE OF.

11:14AM  4        THE USE OF THIRD PARTY DEVICES.  I TOLD YOU THAT WAS A

11:14AM  5    CATEGORY OF FALSE STATEMENTS.  IT WAS PART OF THE SCHEME.

11:14AM  6    HERE'S THE EVIDENCE THAT BALWANI KNEW THOSE STATEMENTS WERE

11:14AM  7    FALSE.

11:14AM  8        BALWANI PRESENTED DURING THE CMS INSPECTION, THE CMS

11:15AM  9    SURVEY, AND THE TYPES OF DEVICES THAT THERANOS USED WERE

11:15AM  10   INCLUDED IN THE SLIDES.  IT WAS REVEALED THAT THERANOS USED

11:15AM  11   OTHER DEVICES WHEN THEY'RE COMMUNICATING WITH CMS, BUT THIS

11:15AM  12   ISN'T THE ONLY PLACE THAT YOU FIND THAT KNOWLEDGE FOR BALWANI.

11:15AM  13   IT'S ALL THROUGHOUT THE INTERNAL EMAILS, WHEN THEY'RE TALKING

11:15AM  14   ABOUT WHICH TEST IS BEING RUN ON WHICH DEVICE, THEY'RE SAYING

11:15AM  15   NAMES OF OTHER DEVICES LIKE IMMULITE OR ADVIA.

11:15AM  16       SO BALWANI KNOWS NOT JUST FALSE STATEMENTS ARE BEING MADE

11:15AM  17   TO INVESTORS, BUT ALSO ABOUT THIS SPECIFIC ISSUE, WHEN THEY'RE

11:15AM  18   USING THIRD PARTY DEVICES OR NOT.

11:15AM  19       BALWANI KNOWS THAT THE INVESTORS HAVE BEEN TOLD FALSE

11:15AM  20   INFORMATION REGARDING THERANOS'S VALIDATION BY PHARMACEUTICAL

11:15AM  21   COMPANIES.  SO ON THE LEFT YOU SEE A DOCUMENT THAT WAS SENT

11:15AM  22   FROM MS. HOLMES TO WAL-MART.  MR. BALWANI IS CC'D ON THIS ONE.

11:15AM  23   THIS IS SENT IN MARCH OF 2010, AND THIS DOCUMENT CONTAINS A

11:16AM  24   COPY OF THAT SCHERING-PLOUGH REPORT WITHOUT THE SCHERING-PLOUGH

11:16AM  25   LOGO.

ER-5147

11:16AM 1      A FEW WEEKS LATER IS EXHIBIT 291, THE ONE I SHOWED YOU A

11:16AM 2  FEW MOMENTS AGO.  THIS ONE IS SENT TO WALGREENS NOW IN APRIL,

11:16AM 3  THE NEXT MONTH, WITH THE SCHERING-PLOUGH LOGO.

11:16AM 4      BALWANI RECEIVES BOTH OF THEM.

11:16AM 5      BALWANI KNOWS THAT THERANOS IS ADDING THE SCHERING-PLOUGH

11:16AM 6  LOGO TO DOCUMENTS.

11:16AM 7      BALWANI KNOWS THAT THERANOS IS CLAIMING THAT

11:16AM 8  SCHERING-PLOUGH VALIDATED ITS TECHNOLOGY.

11:16AM 9      BALWANI KNOWS THAT INVESTORS ARE BEING TOLD THAT 10 OF THE

11:16AM 10  15 LARGEST PHARMACEUTICAL COMPANIES HAD VALIDATED THERANOS'S

11:16AM 11  TECHNOLOGY.

11:16AM 12      BALWANI KNOWS THAT THERANOS IS EMAILING ARTICLES THAT

11:16AM 13  APPEAR IN THE MEDIA TO INVESTORS; THAT IT'S SHARING THIS

11:16AM 14  INFORMATION.

11:16AM 15      BUT AFTER HAVING RECEIVED ADVANCE NOTICE PREPUBLICATION

11:16AM 16  WITH BOTH THE "WIRED" ARTICLE AND THAT 2013

11:17AM 17  "WALL STREET JOURNAL" ARTICLE YOU SEE IN EMAILS WHERE BALWANI

11:17AM 18  IS BEING TOLD AHEAD OF TIME THE "WIRED" ARTICLE IS GOING TO

11:17AM 19  COME OUT.  AND THEN AS TO THIS "WALL STREET JOURNAL" ARTICLE,

11:17AM 20  THE AUTHOR SENDS THE QUOTES AHEAD OF TIME.  THE QUOTES GET SENT

11:17AM 21  AHEAD OF TIME TO HOLMES AND BALWANI BEFORE "THE

11:17AM 22  WALL STREET JOURNAL" IS PUBLISHED.

11:17AM 23      AND YOU AND I JUST LOOKED A MOMENT AGO AT THE FALSE

11:17AM 24  INFORMATION THAT WAS CONTAINED IN "THE WALL STREET JOURNAL" IN

11:17AM 25  2013 THAT THEY THEN SHARED DIRECTLY WITH INVESTORS.

11:17AM 1      THE SECOND ELEMENT FOR THE INVESTOR COUNTS IS THIS CONCEPT

11:17AM 2   OF MATERIALITY, THAT IS, INVESTORS HEARD THAT THEY RECEIVED

11:17AM 3   FALSE STATEMENTS FROM HOLMES AND BALWANI, AND THOSE FALSE

11:17AM 4   STATEMENTS NEED TO BE OF A CERTAIN TYPE.  THE STATEMENTS NEED

11:17AM 5   TO BE MATERIAL, THAT IS, THEY HAVE TO HAVE THIS TENDENCY, THIS

11:17AM 6   NATURAL TENDENCY TO INFLUENCE OR BE CAPABLE OF INFLUENCING A

11:17AM 7   PERSON TO PART WITH MONEY.

11:18AM 8      AND THERE'S AN IMPORTANT DISTINCTION HERE BETWEEN ACTUAL

11:18AM 9   RELIANCE AND THE CAPABILITY OF INFLUENCING OR OBJECTIVE OR

11:18AM 10  SUBJECTIVE RELIANCE.

11:18AM 11     AND WHAT THAT MEANS IS THAT YOU DON'T HAVE TO TIE A

11:18AM 12  SPECIFIC FALSE STATEMENT MADE TO AN INVESTMENT TO BE THE

11:18AM 13  SPECIFIC FALSE STATEMENT THAT CAUSED THE INVESTOR TO INVEST.

11:18AM 14  THE KIND OF FALSE STATEMENTS NEED TO BE THE KIND OF FALSE

11:18AM 15  STATEMENTS THAT WOULD CAUSE AN INVESTOR TO INVEST, BUT YOU

11:18AM 16  DON'T NEED ACTUAL RELIANCE BY AN INVESTOR.

11:18AM 17     ONE REASON WHY THAT IS IMPORTANT IN THIS CASE IS BECAUSE

11:18AM 18  YOU HAVE HEARD ARGUMENTS THAT PEOPLE LIKE LISA PETERSON DID NOT

11:18AM 19  MAKE THE FINAL DECISION TO INVEST FOR RDV, OR BRYAN TOLBERT

11:18AM 20  WORKED AT HALL, BUT BRYAN TOLBERT DIDN'T MAKE THE DECISION TO

11:18AM 21  INVEST.  IT WAS CRAIG HALL.

11:18AM 22     AND THE REASON THIS ACTUAL RELIANCE ISSUE IS IMPORTANT IS

11:18AM 23  BECAUSE WHAT PETERSON AND TOLBERT TOLD YOU WAS HERE'S THE

11:19AM 24  BASKET OF FALSE STATEMENTS THAT WE RECEIVED, THAT WE USED TO

11:19AM 25  MAKE OUR INVESTMENT DECISION, AND THAT IS SUFFICIENT.  THESE

11:19AM  1    ARE THE KIND OF STATEMENTS THAT WOULD HAVE THE TENDENCY, WOULD

11:19AM  2    BE CAPABLE OF INFLUENCING A DECISION TO INVEST.

11:19AM  3        COMPARE THAT TO IF HOLMES WAS DESCRIBING THE WEATHER ON

11:19AM  4    THE DAY SHE CREATED THERANOS.  IT MIGHT BE FALSE.  MAYBE SHE

11:19AM  5    SAID IT WAS SUNNY AND IT WASN'T.  BUT THAT IS NOT THE KIND OF

11:19AM  6    FALSE STATEMENT THAT WOULD CAUSE SOMEONE TO INVEST, AND THAT IS

11:19AM  7    WHAT THE LAW WANTS TO PREVENT IS THESE INSIGNIFICANT FALSE

11:19AM  8    STATEMENTS BEING COMMUNICATED AND THEN SERVING AS THE BASIS OF

11:19AM  9    FRAUD CONVICTIONS.

11:19AM  10       IN THIS INSTANCE, THE FALSE STATEMENTS ARE OF THOSE

11:19AM  11   CATEGORIES THAT WE TALKED ABOUT.  THOSE ARE THE KINDS OF FALSE

11:19AM  12   STATEMENTS THAT WOULD CAUSE AN INVESTOR TO INVEST.

11:19AM  13       TIME FOR A BREAK?

11:19AM  14           THE COURT:  YES.  SHOULD WE TAKE A BREAK?

11:19AM  15           MR. SCHENK:  YES.

11:19AM  16           THE COURT:  MR. SCHENK, IS THIS A NATURAL BREAKING

11:20AM  17   POINT FOR YOU?

11:20AM  18           MR. SCHENK:  YES, THAT WOULD BE FINE.

11:20AM  19           THE COURT:  LET'S TAKE OUR LUNCH BREAK.  LET'S TAKE

11:20AM  20   40 MINUTES, PLEASE, 40 MINUTES.

11:20AM  21       LADIES AND GENTLEMEN, LET ME JUST TELL YOU, YOU ARE NOT TO

11:20AM  22   BEGIN DELIBERATIONS NOW DURING THIS BREAK.  YOU WILL NOT BEGIN

11:20AM  23   DELIBERATING THIS CASE IN ANY WAY UNTIL BOTH SIDES HAVE ARGUED

11:20AM  24   AND YOU RECEIVED THE FINAL INSTRUCTIONS FROM ME.  SO PLEASE DO

11:20AM  25   NOT BEGIN DISCUSSING THE CASE IN ANY WAY DURING ANY OF OUR

11:20AM   1    BREAKS IN THIS PROCEEDING.

11:20AM   2        SO LET'S TAKE OUR BREAK NOW, AND WE'LL COME BACK IN ABOUT

11:20AM   3    40 MINUTES.  THANK YOU.

11:20AM   4        (RECESS FROM 11:20 A.M. UNTIL 12:10 P.M.)

12:10PM   5        (JURY IN AT 12:10 P.M.)

12:10PM   6            THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

12:10PM   7    THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

12:10PM   8        OUR JURY IS PRESENT.  MR. BALWANI IS PRESENT.

12:11PM   9        MR. SCHENK, WOULD YOU LIKE TO CONTINUE WITH YOUR ARGUMENT?

12:11PM  10            MR. SCHENK:  YES.  THANK YOU, YOUR HONOR.

12:11PM  11    MAY I REMOVE MY MASK?

12:11PM  12            THE COURT:  YES.

12:11PM  13            MR. SCHENK:  GOOD AFTERNOON AGAIN.  WE WERE TALKING

12:11PM  14    ABOUT THE ELEMENTS FOR THE CRIME OF WIRE FRAUD AS WIRE FRAUD

12:11PM  15    RELATES TO THE INVESTOR COUNTS.

12:11PM  16        WE WERE ON THE SECOND ELEMENT, THE ELEMENT OF MATERIALITY,

12:11PM  17    AND THAT WAS THE ELEMENT THAT REQUIRED THE GOVERNMENT TO PROVE

12:11PM  18    THAT THE FALSE STATEMENTS THAT WERE COMMUNICATED WERE THE KIND

12:11PM  19    THAT HAVE A TENDENCY OR WERE CAPABLE OF INFLUENCING AN INVESTOR

12:11PM  20    TO PART WITH MONEY.

12:11PM  21        AND WHAT WE'RE ABOUT TO LOOK AT IS ONE SLIDE LIKE THIS FOR

12:11PM  22    EACH INVESTOR.

12:11PM  23        SO YOU'LL SEE LISA PETERSON HEARD CERTAIN STATEMENTS, THE

12:12PM  24    SOURCE OF THOSE STATEMENTS, WHETHER THEY WERE ON A PARTICULAR

12:12PM  25    PHONE CALL OR IN THE INVESTOR BINDERS OR ANOTHER PLACE, AND

12:12PM  1    THEN, IN FACT, THE WITNESS SAYING THAT THE STATEMENT MATTERED.

12:12PM  2         RECALL, MATERIALITY DOES NOT REQUIRE THE GOVERNMENT TO

12:12PM  3    PROVE ACTUAL RELIANCE.  IT'S ENOUGH TO LEAVE IT AS THE

12:12PM  4    STATEMENT BEING OF THE TYPE THAT IS CAPABLE OF INFLUENCING.

12:12PM  5         BUT YOU MAY REMEMBER IN THIS TRIAL, INSTANCES WHEN A

12:12PM  6    WITNESS, AN INVESTOR WAS ON THE STAND, AND THE GOVERNMENT WOULD

12:12PM  7    ASK DID MS. HOLMES OR MR. BALWANI TELL YOU ABOUT THE USE OF

12:12PM  8    THIRD PARTY DEVICES?

12:12PM  9         AND THE WITNESS WOULD SAY NO.

12:12PM 10         AND THEN THE GOVERNMENT WOULD FOLLOW UP WITH DID THAT

12:12PM 11    MATTER TO YOU?  THIS IS WHY THERE WAS THAT CONSTANT REFRAMING

12:12PM 12    OF THE DID THAT MATTER QUESTION, BECAUSE, IN FACT, FOR THESE

12:12PM 13    STATEMENTS YOU HAVE ACTUAL RELIANCE.

12:12PM 14         FOR THESE STATEMENTS, THE WITNESSES TOLD YOU THAT THESE

12:13PM 15    PARTICULAR STATEMENTS DID MATTER IN THEIR INVESTMENT DECISIONS,

12:13PM 16    AND THE STATEMENTS THAT I'M REFERRING TO ALL TRACE BACK TO

12:13PM 17    THOSE CATEGORIES OF FALSE STATEMENTS.

12:13PM 18         SO THOSE CATEGORIES ARE BROAD AND THE SPECIFIC STATEMENTS

12:13PM 19    THAT THE INVESTORS HEARD ARE WELL WITHIN THOSE CATEGORIES OF

12:13PM 20    FALSE STATEMENTS.

12:13PM 21         AND YOU CAN SEE FOR LISA PETERSON, OF COURSE, THE 900

12:13PM 22    STORES AT WALGREENS MATTERED TO YOU BECAUSE THAT FED INTO THE

12:13PM 23    $1 BILLION OF REVENUE PROJECTIONS THAT SHE HEARD, BUT IT WASN'T

12:13PM 24    LIMITED TO JUST THAT.  SHE HEARD ABOUT THE TECHNOLOGY, THAT IT

12:13PM 25    WAS FASTER, CHEAPER, MORE ACCURATE.

CLOSING ARGUMENT BY MR. SCHENK                    7015

12:13PM   1        BRYAN TOLBERT, ANOTHER COLLECTION OF FALSE STATEMENTS.

12:13PM   2   BRYAN TOLBERT HEARD ABOUT THE HIGHEST LEVELS OF ACCURACY, THE

12:13PM   3   ROLLOUT WITH WALGREENS, THE NUMBER OF TESTS, DOD WORK.  AND,

12:13PM   4   AGAIN, YOU SEE WHERE IT CAME FROM AND THAT IT WAS MATERIAL TO

12:13PM   5   HIM.

12:13PM   6        DAN MOSLEY.  I'LL REMIND YOU DAN MOSLEY WAS AN INVESTOR

12:14PM   7   WHO PAID PARTICULAR ATTENTION TO THE PFIZER PHARMA REPORT AND

12:14PM   8   WAS CUTTING AND PASTING QUOTES FROM THE PFIZER PHARMA REPORT

12:14PM   9   BECAUSE HE FOUND THAT TO BE THE MOST PERSUASIVE PIECE OF

12:14PM  10   EVIDENCE VALIDATING THE THERANOS TECHNOLOGY, BUT THAT WASN'T

12:14PM  11   THE ONLY FALSE STATEMENT THAT HE HEARD AND THAT HE RELIED UPON.

12:14PM  12   THERE WERE ADDITIONAL STATEMENTS THAT MR. MOSLEY HEARD.

12:14PM  13        ALAN EISENMAN HEARD OTHER STATEMENTS.  HE HEARD ABOUT THE

12:14PM  14   THERANOS TECHNOLOGY, ABOUT ITS ACCURACY, WHERE ITS

12:14PM  15   MANUFACTURING WAS DONE, AND THAT'S IMPORTANT BECAUSE YOU KNOW

12:14PM  16   THAT OTHER MANUFACTURERS, THIRD PARTY MANUFACTURERS MAKE THEIR

12:14PM  17   DEVICES OUTSIDE OF THE U.S.

12:14PM  18        SO NOT ONLY IS IT SORT OF FROM A PATRIOT PERSPECTIVE MAYBE

12:14PM  19   IT MATTERS, BUT IT ALSO SAYS SOMETHING ABOUT THERANOS'S ABILITY

12:14PM  20   TO MANUFACTURE ITS OWN DEVICES WHEN IT SAYS THAT ITS

12:14PM  21   MANUFACTURING IS DONE HERE IN THE U.S.

12:14PM  22        CHRIS LUCAS ALSO HEARD A COLLECTION OF FALSE STATEMENTS,

12:15PM  23   THE TECHNOLOGY BEING USED IN THE MIDDLE EAST, THE NUMBER OF

12:15PM  24   TESTS AND THINGS LIKE THAT.

12:15PM  25        AND FINALLY, BRIAN GROSSMAN.  HE ALSO HEARD A COLLECTION

12:15PM 1    OF FALSE STATEMENTS.  AGAIN, ALL OF THEM TRACE BACK TO A

12:15PM 2    CATEGORY OF FALSE STATEMENTS THAT WE'VE BEEN TALKING ABOUT

12:15PM 3    EARLIER THIS MORNING.

12:15PM 4         THE THIRD ELEMENT IN WIRE FRAUD IS AN INTENT TO DEFRAUD,

12:15PM 5    AND THIS IS DEFINED AS AN INTENT TO DECEIVE OR CHEAT.  THE

12:15PM 6    GOVERNMENT MUST PROVE THAT THE DEFENDANT ACTED WITH THE INTENT

12:15PM 7    TO DEFRAUD, IN OTHER WORDS, THIS THESE FALSE STATEMENTS WEREN'T

12:15PM 8    COMMUNICATED ACCIDENTALLY OR WITHOUT THE INTENT TO DEFRAUD BUT

12:15PM 9    WITH SOME OTHER INTENT.

12:15PM 10        SO THE INTENT EVIDENCE COMES FROM MUCH OF THE EVIDENCE

12:15PM 11   THAT WE'VE SPENT OUR TIME ALREADY REVIEWING TODAY.

12:15PM 12        THE INVESTOR BINDERS WERE REVIEWED AND APPROVED BY HOLMES

12:15PM 13   AND BALWANI.  EDLIN TOLD YOU THAT HE HAS A SPECIFIC MEMORY OF

12:15PM 14   MR. BALWANI REVIEWING THE FINANCIALS, THAT PORTION IN THE

12:16PM 15   BINDERS THAT RELATES TO FINANCIAL RECORDS.

12:16PM 16        BUT EDLIN DIDN'T SEE THE TEXT MESSAGES, SO EDLIN DID NOT

12:16PM 17   KNOW ABOUT THE CONTENT, THE MESSAGES THAT TALK ABOUT RE-DOING

12:16PM 18   THE MURDOCH BINDER OR INSTANCES WHEN BALWANI SENT THE BINDERS

12:16PM 19   THEMSELVES LIKE TO GROSSMAN OR TO PETERSON.

12:16PM 20        SO EDLIN TOLD YOU HE KNOWS SPECIFICALLY BALWANI PLAYED A

12:16PM 21   ROLE IN THE FINANCIAL PORTION OF THE BINDERS, BUT YOU'VE

12:16PM 22   ACTUALLY SEEN EVIDENCE THAT IS MORE BROAD THAN THAT.

12:16PM 23        YOU'VE SEEN BALWANI EMAIL THE BINDERS.  HERE'S AN EXAMPLE

12:16PM 24   OF HIM EMAILING THE BINDERS TO LISA PETERSON AT RDV, AND

12:16PM 25   LISA PETERSON CONFIRMING THAT WHAT SHE RECEIVED INCLUDED THE

12:16PM  1      INVESTMENT MATERIALS.

12:16PM  2           YOU HEARD MR. BALWANI MAKE DIRECT FALSE STATEMENTS TO

12:16PM  3      INVESTORS.  WHEN WE BEGAN THIS MORNING, I SHOWED YOU THE

12:16PM  4      PORTION OF MR. MENDENHALL'S TESTIMONY WHERE HE CLARIFIED THAT

12:16PM  5      THESE SHORT, DIRECT SENTENCES ARE NOT MENDENHALL'S WRITING

12:17PM  6      STYLE BUT RATHER ARE BALWANI'S SPEAKING STYLE.

12:17PM  7           NOW LET'S SPEND A LITTLE BIT OF TIME ON WHAT BALWANI

12:17PM  8      ACTUALLY SAID.  THIS IS BOTH KNOWLEDGE OF FALSE STATEMENTS,

12:17PM  9      MR. BALWANI COMMUNICATING FALSE STATEMENTS, BUT IT'S INTENT

12:17PM  10     EVIDENCE.  MR. BALWANI IS DOING IT WITH A PURPOSE, A GOAL OF

12:17PM  11     DECEIVING OR CHEATING MENDENHALL.  HELPFULLY, MR. MENDENHALL

12:17PM  12     REMEMBERS THESE FALSE STATEMENTS THAT HE RECEIVED.

12:17PM  13          NUMBERS 3, 4, AND 5 ARE "THE SCIENCE BEHIND THERANOS IS

12:17PM  14     COMPLETE; NO NEW SCIENCE NEEDED; NO NEW INVENTION NEEDED."

12:17PM  15          YOU AS THE JURY NOW HAVE SEEN THE EVIDENCE, AND YOU KNOW

12:17PM  16     ALL OF THAT IS FALSE.

12:17PM  17          6, 7, AND 8, "THEY ARE COMPLETELY VERTICALLY INTEGRATED

12:17PM  18     THEY OWN THE LAB AND THE MANUFACTURING; 100 PERCENT

12:17PM  19     MANUFACTURING IN U.S.A., NO SUBCONTRACTING; AND FULLY OWNED AND

12:17PM  20     PROTECTED MANUFACTURING ASSURES PRICING AND PROFIT STABILITY."

12:17PM  21          AGAIN, THIS ALL ASSUMES THAT THEY MANUFACTURED THE EDISON

12:18PM  22     DEVICE AND THEN USED THE EDISON DEVICE FOR THEIR BLOOD TESTING.

12:18PM  23     BUT YOU GUYS NOW KNOW THE TRUTH.  THE TRUTH IS THAT COULDN'T

12:18PM  24     TEST ACCURATELY, AND THEY ONLY USED IT FOR A SMALL PERCENTAGE

12:18PM  25     OF THEIR TESTS.

12:18PM  1          NUMBER 12 IS "CURRENT CLINICAL TRIALS TAKE 6 VIALS AND CAN

12:18PM  2     RUN 10 TO 12 TESTS.  THERANOS TAKES 3 DROPS AND CAN RUN 60 TO

12:18PM  3     70 TESTS."

12:18PM  4          YOU KNOW THIS IS A FALSE STATEMENT.  YOU'VE SEEN THE

12:18PM  5     EVIDENCE.

12:18PM  6          NUMBER 17, "THE COMPETITION IS YEARS BEHIND ON TECHNOLOGY

12:18PM  7     (MAYBE LONGER) AND WITH BLOATED OVERHEADS AND BUREAUCRACY WOULD

12:18PM  8     HAVE TO CHARGE THE SAME RATES THEY CURRENTLY CHARGE OR HIGHER

12:18PM  9     THEREFORE MAKING THEIR ABILITY TO COMPETE, LET ALONE CATCH UP,

12:18PM 10     VERY DIFFICULT IF NOT IMPOSSIBLE."

12:18PM 11          YOU KNOW THIS IS FALSE BECAUSE THERANOS, JUST LIKE LABCORP

12:18PM 12     AND JUST LIKE QUEST, IS BUYING SIEMENS EQUIPMENT AND TESTING

12:18PM 13     BLOOD ON SIEMENS EQUIPMENT.  SO THIS IDEA THAT THE COMPETITION

12:18PM 14     IS YEARS BEHIND WHEN FOR THE MAJORITY OF THERANOS'S TESTS

12:19PM 15     THEY'RE DOING IT THE SAME WAY THAT QUEST AND LABCORP, OTHER

12:19PM 16     LABS ARE DOING IT, AND YOU KNOW THAT IS A FALSE STATEMENT.  AND

12:19PM 17     FOR THE REMAINDER, FOR THE THERANOS TESTS ON THERANOS DEVICES,

12:19PM 18     YOU KNOW THAT'S THE SOURCE OF THEIR ACCURACY AND RELIABILITY

12:19PM 19     PROBLEMS.

12:19PM 20          AND NOW FINANCIALS.

12:19PM 21          NUMBER 2 AND 3 IS A LITTLE FURTHER DOWN ON THE SAME LINE.

12:19PM 22          "2 - THEY CAN FUND GROWTH THRU CURRENT OPERATIONS -- NO

12:19PM 23     NEED FOR CAPITAL.

12:19PM 24          "3 - THEY ARE CURRENTLY RAISING MONEY ONLY TO RAPIDLY

12:19PM 25     ACCELERATE THE BUSINESS."

CLOSING ARGUMENT BY MR. SCHENK                          7019

```
12:19PM   1        NOW, LET'S TALK ABOUT THE IMPORTANCE OF THIS FALSE
12:19PM   2   STATEMENT.  SO PEOPLE LIKE MENDENHALL ARE INVESTING IN LATE
12:19PM   3   DECEMBER OF 2013.
12:19PM   4        REMEMBER, EARLIER WE LOOKED AT THE CASH BALANCE.
12:19PM   5   SEPTEMBER OF 2013 THERANOS IS DOWN TO $7 MILLION.  THEY NEED
12:19PM   6   MONEY.  THEY CANNOT FUND THEIR CURRENT GROWTH THROUGH
12:19PM   7   OPERATIONS.  THAT'S FALSE, WHAT MR. BALWANI IS COMMUNICATING,
12:19PM   8   BUT HE GOES FURTHER.  MR. BALWANI EVEN GOES FURTHER AND SAYS
12:20PM   9   THAT THEY'RE RAISING MONEY TO RAPIDLY ACCELERATE.
12:20PM  10        NOW, THAT'S A FALSE STATEMENT THAT IS THE SAME KIND OF
12:20PM  11   FALSE STATEMENT THAT HOLMES TELLS TOLBERT IN THEIR PHONE CALL,
12:20PM  12   THE ONE THAT BALWANI IS NOT ON.  SO FURTHER EVIDENCE THAT
12:20PM  13   THEY'RE CORROBORATING, THAT THEY KNOW WHAT EACH OTHER IS SAYING
12:20PM  14   BECAUSE BOTH ARE COMMUNICATING THIS PARTICULAR FALSE STATEMENT,
12:20PM  15   THAT THE REASON INVESTORS SHOULD INVEST IS NOT SO THERANOS CAN
12:20PM  16   TAKE THIS MONEY AND THEN GO OUT AND INVENT NOVEL BLOOD TESTING
12:20PM  17   TECHNOLOGY.  THAT WOULD HAVE BEEN TRUE.
12:20PM  18        WHAT THEY TOLD INVESTORS, HOLMES WITH TOLBERT AND BALWANI
12:20PM  19   WITH MENDENHALL, IS WE'RE TAKING INVESTOR MONEY TO ACCELERATE
12:20PM  20   OUR GROWTH, SO WE CAN GROW MORE RAPIDLY WITH WALGREENS.
12:20PM  21        YOU KNOW THAT ISN'T WHAT THERANOS NEEDED THE MONEY FOR.
12:20PM  22        WHAT THERANOS NEEDED THE MONEY FOR WAS TO ACTUALLY NOW
12:20PM  23   INVEST, TO DEVELOP THE TECHNOLOGY, NOT TO MAKE EVOLUTIONS IN
12:20PM  24   THE TECHNOLOGY.
12:20PM  25        YOU KNOW, DURING THE TRIAL YOU HEARD IT COMPARED TO THE
```

12:21PM  1    APPLE IPHONE.  WHEN THE 13 COMES OUT AND IT REPLACES THE 12,

12:21PM  2    THAT'S NOT A REVOLUTIONARY ADVANCEMENT, IT'S AN EVOLUTION IN

12:21PM  3    TECHNOLOGICAL INVESTMENT.

12:21PM  4        WHAT THERANOS NEEDED WAS A REVOLUTION.  WHAT THERANOS

12:21PM  5    NEEDED WAS THE ACTUAL TECHNOLOGY TO ACCURATELY TEST PATIENT

12:21PM  6    BLOOD.  AND WHEN THEY'RE TELLING PEOPLE WHAT THEY NEEDED WAS

12:21PM  7    JUST MONEY TO ACCELERATE GROWTH, THEY'RE PITCHING IT IN THIS

12:21PM  8    SORT OF EVOLUTIONARY PERSPECTIVE.

12:21PM  9        THERE'S ALSO INTENT EVIDENCE ON THE CONCEPT OF

12:21PM  10   TECHNOLOGICAL CAPABILITIES.

12:21PM  11       IN THE INVESTOR MATERIALS, THE INVESTORS ARE RECEIVING

12:21PM  12   STATEMENTS THAT TALK ABOUT THE BENEFITS OF THE THERANOS BLOOD

12:21PM  13   TESTING TECHNOLOGY THAT IS FASTER, THAT IT IS MORE ACCURATE,

12:21PM  14   AND EVEN ISSUES, CONCEPTS LIKE SPEED.  YOU KNOW THAT WOULDN'T

12:21PM  15   BE TRUE BECAUSE THERANOS IS PERFORMING TESTING THE SAME WAY

12:21PM  16   OTHER LABS ARE THAT IS A CENTRAL LAB MODEL, SO THAT THE BLOOD

12:21PM  17   WOULD BE DRAWN AT A WALGREENS STORE BUT THEN SHIPPED BACK TO

12:22PM  18   PALO ALTO.

12:22PM  19       SO ALL OF THESE STATEMENTS ABOUT SPEED ASSUME THAT

12:22PM  20   THERANOS IS DOING SOMETHING THAT IT'S NOT DOING.  FURTHER

12:22PM  21   INTENT EVIDENCE.

12:22PM  22       WE TALKED ABOUT THIS CONCEPT A LITTLE BIT EARLIER THIS

12:22PM  23   MORNING, THE IDEA THAT INVESTORS THOUGHT THAT THERANOS WAS MORE

12:22PM  24   AUTOMATED THAN WHAT WAS CURRENTLY AVAILABLE.

12:22PM  25       BUT DR. ROSENDORFF DESCRIBED TO YOU THE MANUAL PROCESS TO

CLOSING ARGUMENT BY MR. SCHENK                                    7021

12:22PM  1    REMOVE OUTLIERS.  THAT IF THERANOS REALLY BELIEVED IN ITS

12:22PM  2    TECHNOLOGY, NO NEED FOR ONE EDISON TO RUN TWO TESTS TO TEST

12:22PM  3    CHOLESTEROL, FOR INSTANCE, TWICE.  AND CERTAINLY NO NEED TO

12:22PM  4    THEN TAKE THREE EDISON MACHINES AND RUN THE CHOLESTEROL TESTS

12:22PM  5    SIX TIMES AND DROP TWO OUTLIERS.  THAT'S THE MANUAL PROCESSING

12:22PM  6    THAT OCCURRED AT THERANOS BECAUSE EVEN AT THERANOS THEY DIDN'T

12:22PM  7    HAVE FAITH IN THEIR BLOOD TESTING TECHNOLOGY, AND THAT'S

12:22PM  8    COMPLETELY DIFFERENT THAN WHAT SOMEONE LIKED LISA PETERSON

12:22PM  9    UNDERSTOOD WHEN SHE RECEIVED THE INVESTOR SLIDE DECK THAT TALKS

12:23PM 10    ABOUT THE HIGHEST LEVELS OF STANDARDIZATION AND AUTOMATION TO

12:23PM 11    ELIMINATE ERRORS.

12:23PM 12        THE FINANCIAL STABILITY, ALSO FALSE STATEMENTS BUT SHARED

12:23PM 13    WITH THE INTENT TO DEFRAUD.  BECAUSE COMPARE WHAT LISA PETERSON

12:23PM 14    HEARD, THIS DOCUMENT I'VE SHOWN YOU SEVERAL TIMES THAT INCLUDES

12:23PM 15    SIGNIFICANT REVENUE PROJECTIONS, VERSUS THE REALITY, THE

12:23PM 16    REALITY THAT BALWANI RECEIVED, THAT HE WAS AWARE OF.

12:23PM 17        THE DOCUMENT ON THE RIGHT CAME FROM SPIVEY, AND THAT'S

12:23PM 18    INTERNAL THERANOS SPREADSHEETS TRACKING REVENUE FROM

12:23PM 19    PHARMACEUTICAL COMPANIES.  SO YOU SEE THE ONES THAT ARE

12:23PM 20    HIGHLIGHTED FROM ASTRAZENECA DOWN TO SCHERING-PLOUGH AND HOW

12:23PM 21    THERE'S ESSENTIALLY NO REVENUE AFTER 2011.  THERE'S THAT ONE

12:23PM 22    INSTANCE OF REVENUE FROM AMERICAN BURN ASSOCIATION IN '14, BUT

12:23PM 23    OTHER THAN THAT $38,000, THERE'S ESSENTIALLY NO REVENUE, AND

12:24PM 24    YET IN THE PROJECTIONS THAT ARE BEING SHARED WITH INVESTORS,

12:24PM 25    THEY'RE PROJECTING REVENUE FOR PHARMACEUTICAL SERVICES IN BOTH

12:24PM  1   2014 AND 2015, AND THEY'RE MAKING THIS PROJECTION IN OCTOBER OF

12:24PM  2   2014 WHEN THEY HAVEN'T HAD PHARMACEUTICAL REVENUE FOR YEARS.

12:24PM  3        THERE'S FURTHER FRAUD IN THOSE REVENUE NUMBERS.  IF YOU

12:24PM  4   LOOK ABOVE AT THE PHARMACEUTICAL PROJECTIONS, THERE'S OTHER

12:24PM  5   SOURCES.  LAB SERVICES REVENUE IN RETAIL AND PHYSICIANS

12:24PM  6   OFFICES, IN HOSPITALS.

12:24PM  7        AND WHEN MS. SPIVEY WAS ON THE STAND, SHE WENT THROUGH

12:24PM  8   EACH ONE OF THOSE AND TOLD YOU THERE WAS NO REVENUE FROM ANY OF

12:24PM  9   THOSE.  SO THERANOS NOT ONLY IS PROJECTING REVENUE, BUT

12:24PM  10  REMEMBER WHEN WE TALKED ABOUT THIS MORNING WHEN LISA PETERSON

12:24PM  11  WAS GOING OVER THIS DOCUMENT WITH MR. BALWANI, HE WAS MAKING

12:24PM  12  ADJUSTMENTS TO THE DOLLAR AMOUNT.  YOU KNOW, MARGINALLY

12:24PM  13  LOWERING SOME.  ONE OF THOSE IS FROM $161 MILLION TO $160

12:25PM  14  MILLION.

12:25PM  15       SO IT'S NOT A DOCUMENT THAT IS BURIED WITHIN A BINDER OF

12:25PM  16  MATERIAL AND IGNORED.  IT WAS ACTUALLY A DOCUMENT THAT HE

12:25PM  17  PULLED OUT AND REFINED SOME OF THOSE PROJECTIONS WHEN SPIVEY,

12:25PM  18  WHO WAS COMMUNICATING WITH BALWANI ABOUT FINANCES, TOLD YOU

12:25PM  19  THEY HAD NO REVENUE FROM THESE SOURCES.

12:25PM  20       THERE ARE OTHER INVESTORS, NOT JUST LISA PETERSON, WHO

12:25PM  21  RECEIVED THESE PROJECTIONS.

12:25PM  22       I'VE SHOWN YOU SEVERAL TIMES THE EXHIBIT THAT

12:25PM  23  LISA PETERSON RECEIVED, BUT MOSLEY RECEIVED THE SAME 2014 AND

12:25PM  24  2015 PROJECTIONS.

12:25PM  25       AND BRIAN GROSSMAN ALSO RECEIVED PROJECTIONS COVERING 2014

CLOSING ARGUMENT BY MR. SCHENK                                    7023

12:25PM 1    AND 2015, EXCEPT HIS NUMBERS WERE EVEN HIGHER.  HIS NUMBERS HAD

12:25PM 2    A LARGER EXPECTED REVENUE FOR '14 AND EVEN A LARGER ONE FOR

12:25PM 3    2015.

12:25PM 4        SO THESE FALSE FINANCIAL STATEMENTS WERE NOT PROVIDED JUST

12:25PM 5    TO LISA PETERSON.  THEY WERE GIVEN TO OTHER INVESTORS AS WELL.

12:26PM 6        THERE WAS ALSO MISLEADING DEMOS THAT WERE CONNECTED.  WE

12:26PM 7    TALKED ABOUT THAT AS A CATEGORY OF INFORMATION, BUT YOU KNOW

12:26PM 8    THAT MR. BALWANI KNOWS ABOUT THAT.  IT ISN'T THAT THEY WERE

12:26PM 9    JUST OCCURRING.

12:26PM 10   MR. BALWANI IS ON EMAILS WHERE THEY'RE TALKING ABOUT WHICH

12:26PM 11   DEVICES TO PUT IN THE ROOMS AND THEN WHICH APPS TO RUN ON THE

12:26PM 12   DEVICES, THE DEMO APP OR THE NULL PROTOCOL, SO THAT THEY COULD

12:26PM 13   HIDE THESE ERRORS FROM THE VIP'S IN THE ROOM SO THAT THE VIP'S

12:26PM 14   WOULDN'T SEE THE EDISON FAIL AS OFTEN AS THE EDISON WAS

12:26PM 15   FAILING.  FURTHER INTENT TO DECEIVE EVIDENCE.

12:26PM 16   YOU'VE SEEN EVIDENCE THAT THERANOS WAS CORRECTING LAB

12:26PM 17   REPORTS, BUT SEE THAT BALWANI IS ON THOSE EMAILS ALSO.  SO

12:26PM 18   THERE WERE INSTANCES WHEN AN INDIVIDUAL PATIENT, TWO SAMPLES

12:26PM 19   FROM THE SAME PATIENT OR THE SAME DONOR, PRODUCE DIFFERENT

12:27PM 20   RESULTS ON THERANOS'S DEVICES.  THAT COULDN'T HAPPEN AT

12:27PM 21   THERANOS, AND THEY HAD TO CORRECT IT SO YOU COULD SEE.

12:27PM 22   HERE BOTH MR. EDLIN'S TESTIMONY ABOUT THIS EVENT, AND THE

12:27PM 23   EMAIL INTERNALLY THAT TRACKS THIS EVENT, AND HOW MR. BALWANI IS

12:27PM 24   BEING INFORMED THAT THIS KIND OF DISCREPANCY, WHEN THE DEVICES

12:27PM 25   ARE PRODUCING DIFFERENT RESULTS FROM THE SAME DONOR'S BLOOD

12:27PM  1    TAKEN AT THE SAME TIME, AND THEY JUST HAVE TO CORRECT THE

12:27PM  2    RESULTS, THEY JUST HAVE TO CHANGE THE NUMBERS THAT THEY'RE

12:27PM  3    GETTING.

12:27PM  4        YOU ALSO HEARD ABOUT THIS INSTANCE WHEN INDIVIDUALS FROM A

12:27PM  5    COMPANY CALLED BDT WENT TO WALGREENS TO GET A BLOOD TEST.  AND

12:27PM  6    THIS IS ANOTHER INSTANCE WHEN THE EMAIL, WHEN THE EXHIBIT WAS

12:27PM  7    ADMITTED THE JUDGE TURNED TO YOU AND SAID IT'S NOT BEING

12:27PM  8    ADMITTED FOR THE TRUTH, IT'S BEING ADMITTED FOR A LIMITED

12:27PM  9    PURPOSE, FOR FALSITY FOR THE DEFENDANT'S KNOWLEDGE.

12:27PM 10        AND WHAT YOU'LL SEE HERE, NOTICE THAT A WITNESS FROM BDT

12:28PM 11    DIDN'T COME AND TESTIFY.  SO I DON'T WANT YOU TO READ OR LISTEN

12:28PM 12    TO WHAT I'M GOING TO READ TO YOU IN A MOMENT AND SAY THESE

12:28PM 13    EVENTS OCCURRED, BECAUSE SOMEONE FROM BDT DIDN'T COME INTO THE

12:28PM 14    COURTROOM AND TELL YOU I WORKED AT BDT AND I WENT TO WALGREENS

12:28PM 15    AND LET ME TELL YOU WHAT I OBSERVED.

12:28PM 16        THE POINT OF THIS EMAIL IS THE INCREDIBLY DECEPTIVE NATURE

12:28PM 17    OF THE CONTENT OF THE COMMUNICATION, AND IT'S FREELY DISCUSSED

12:28PM 18    WITH SUNNY BALWANI.

12:28PM 19        SO BDT IS GOING TO GO INTO A WALGREENS AND GET BLOOD

12:28PM 20    TESTS.  AND YOU CAN SEE MS. HOLMES'S BROTHER, CHRISTIAN HOLMES,

12:28PM 21    IS THE AUTHOR OF THIS EMAIL, AND HE'S COMMUNICATING WITH HOLMES

12:28PM 22    AND BALWANI.

12:28PM 23        AND WHAT HE WRITES IS, "ALSO WANTED TO SEND ALONG OUR

12:28PM 24    THOUGHTS FOR HOW TO ACCOMPLISH THE FINGERSTICK IN THE SCENARIO

12:28PM 25    THEIR ORDERS PROMPT VENOUS.  ASSUMPTIONS HERE FROM EAH,"

12:28PM  1    ELIZABETH HOLMES, "ARE THAT WE MUST NOT DO VENOUS DRAW, AND WE

12:28PM  2    CANNOT TELL THEM THEIR ORDER PROMPTS VENOUS IF IT DOES.  THE

12:29PM  3    FOLLOWING IS THE ACTION PLANNING TO ACCOMPLISH THIS."

12:29PM  4         SO IMAGINE THESE VIP VISITORS ARE GOING INTO WALGREENS

12:29PM  5    WALGREENS.  THERANOS DOES NOT KNOW WHAT TESTS THEY'RE GOING TO

12:29PM  6    BE ORDERING, SO THEY PRESENT A LAB ORDER FORM THAT HAS SIX

12:29PM  7    TESTS.  AND SOME OF THOSE TESTS ARE GOING TO REQUIRE A VEIN

12:29PM  8    DRAW AND SOME MAY REQUIRE A FINGERSTICK.

12:29PM  9         AND WHAT THEY'RE PLANNING FOR IS ALL WE CAN DO WITH THESE

12:29PM  10   PEOPLE IS A FINGERSTICK.  SO WHAT DO WE DO WHEN THEY WALK INTO

12:29PM  11   A WALGREENS AND THEIR ORDER PROMPTS SOMETHING ELSE?  IT

12:29PM  12   CONCLUDES TESTS THAT PROMPTED VENOUS DRAW, AND WHAT IS BEING

12:29PM  13   DISCUSSED INTERNALLY WITH MR. BALWANI IS WHAT TO DO IN THAT

12:29PM  14   SCENARIO.

12:29PM  15        AND LOOK AT WHAT IS SUGGESTED.

12:29PM  16        "IF THEY NOTICE MISSING TESTS ON THE RECEIPT, THEY MAY ASK

12:29PM  17   THE WAG," WALGREENS, "TECH ABOUT IT.  WORST CASE THEY WOULD

12:29PM  18   MAKE A CALL TO CS AND ANAM WOULD TELL THEM EVERYTHING IS FINE.

12:30PM  19   CIARA WILL ALSO BE ABLE TO COME OUT OF THE DRAW ROOM ONCE

12:30PM  20   CHECK-IN IS COMPLETE TO WELCOME THEM INTO THE ROOM AND DISTRACT

12:30PM  21   THEM FROM LOOKING AT THE RECEIPT."

12:30PM  22        SO IF THEY TAKE OUT THE VENOUS DRAWS AND THE PATIENTS COME

12:30PM  23   IN AND HAVE ONLY THE FINGERSTICK DONE, THEY'RE COMING UP WITH A

12:30PM  24   WAY TO ACTUALLY DISTRACT PEOPLE FROM LOOKING AT THE RECEIPT SO

12:30PM  25   THEY DON'T NOTICE THE MISSING TESTS.

12:30PM 1    IF THIS WAS AN HONEST COMPANY, IF THIS WAS A COMPANY THAT

12:30PM 2    WASN'T DOING WHAT THE GOVERNMENT IS ALLEGING THAT THEY DO AND

12:30PM 3    THEY DID, THIS KIND OF EMAIL WOULDN'T HAVE BEEN SENT.  THERE

12:30PM 4    WOULD HAVE BEEN SUCH A LACK OF COMFORT IN SENDING THIS EMAIL TO

12:30PM 5    HOLMES, TO BALWANI IF SOMEONE LIKE CHRISTIAN HOLMES DIDN'T KNOW

12:30PM 6    IT WAS GOING TO BE WELL RECEIVED.

12:30PM 7        YOU KNOW, YOU WOULDN'T SEND THIS KIND OF EMAIL UNLESS YOU

12:30PM 8    KNEW MR. BALWANI WAS GOING TO BE OKAY WITH IT.

12:30PM 9        THE DEPARTMENT OF DEFENSE WAS ALSO A SOURCE OF FALSE

12:30PM 10   STATEMENTS.  YOU KNOW THAT INVESTORS THOUGHT THAT THERANOS WAS

12:31PM 11   TESTING, ITS TECHNOLOGY WAS BEING USED BY THE MILITARY ON

12:31PM 12   DEPLOYED SOLDIERS ON MEDEVAC HELICOPTERS IN THE TREATMENT OF

12:31PM 13   SOLDIERS IN THE BATTLEFIELD.  AND LOOK AT SOME OF THE

12:31PM 14   STATEMENTS THAT WERE COMMUNICATED TO THE DEPARTMENT OF DEFENSE

12:31PM 15   AS PART OF THAT RELATIONSHIP.

12:31PM 16       THIS ONE YOU HEARD WENT TO SPECIAL OPERATIONS COMMAND.

12:31PM 17       "THERANOS HAS CREATED A POINT-OF-SERVICE LABORATORY

12:31PM 18   INFRASTRUCTURE THAT GENERATES REAL-TIME DATA FROM A FINGERSTICK

12:31PM 19   OF BLOOD OR OTHER MICRO-VOLUMES OF DIFFERENT SAMPLE TYPES

12:31PM 20   DELIVERING HIGHER QUALITY DATA THAN PREVIOUSLY POSSIBLE."

12:31PM 21       SO THAT WAS COMMUNICATED TO THE DOD.

12:31PM 22       AND THE FIRST BULLET, "EACH THERANOS DEVICE CAN RUN EVERY

12:31PM 23   TEST CURRENTLY AVAILABLE THROUGH THE TRADITIONAL CENTRALIZED OR

12:31PM 24   HOSPITAL LABORATORY INFRASTRUCTURE IT."

12:31PM 25       YOU KNOW THAT BULLET IS A FALSE STATEMENT.  YOU KNOW THAT

CLOSING ARGUMENT BY MR. SCHENK          7027

12:31PM 1    EACH THERANOS DEVICE COULD NOT RUN EACH TEST, THAT'S WHY THEY

12:31PM 2    USED THIRD PARTY DEVICES AND MODIFIED THIRD PARTY DEVICES.

12:32PM 3         SO, AGAIN, THE KINDS OF FALSE STATEMENTS THAT THE

12:32PM 4    DEPARTMENT OF DEFENSE ARE THE SAME KINDS OF FALSE STATEMENTS

12:32PM 5    THAT INVESTORS HEARD.  IT'S NO ACCIDENT THAT THEY WERE ABLE TO

12:32PM 6    GET THE DEPARTMENT OF DEFENSE TO ENGAGE IN SOME RELATIONSHIPS.

12:32PM 7    YOU'VE HEARD ABOUT THE AMERICAN BURN ASSOCIATION, FOR INSTANCE,

12:32PM 8    TO ENGAGE IN SOME BUSINESS RELATIONSHIP WITH THERANOS, BUT THEN

12:32PM 9    WHEN THERANOS, WHEN HOLMES AND BALWANI COMMUNICATED WITH

12:32PM 10   INVESTORS ABOUT THAT BUSINESS RELATIONSHIP, THEY MADE FALSE

12:32PM 11   STATEMENTS ABOUT IT.

12:32PM 12        INSTEAD OF THE VERY LIMITED WORK THAT THEY DID WITH THE

12:32PM 13   DEPARTMENT OF DEFENSE, THEY TOLD INVESTORS THAT THE TECHNOLOGY

12:32PM 14   WAS SAVING LIVES, THAT IT WAS DEPLOYED ON MEDEVAC HELICOPTERS

12:32PM 15   AND ON THE BATTLEFIELD.

12:32PM 16        EDLIN TOLD YOU ABOUT THE REALITY OF THE RELATIONSHIP,

12:32PM 17   WHAT, IN FACT, THERANOS DID WITH THE MILITARY, AND HE EXPLAINED

12:32PM 18   HOW THE TECHNOLOGY WAS NOT BEING USED TO CLINICALLY TREAT

12:33PM 19   DEPLOYED SOLDIERS, HOW THE DEVICES WERE NOT IN A WAR ZONE FOR

12:33PM 20   CLINICAL USE OR ON THE BATTLEFIELD, HOW IT DIDN'T SEND DEVICES

12:33PM 21   INTO THE MIDDLE EAST, SOMETHING THAT INVESTORS HEARD, AND IT

12:33PM 22   WAS NEVER ON A MEDEVAC HELICOPTER OR DIFFERENT MILITARY

12:33PM 23   HELICOPTER.

12:33PM 24        SO EDLIN PROVIDED THE OTHER SIDE OF THE STORY.  YOU HEARD

12:33PM 25   FROM INVESTORS WHAT THEY HEARD, WHAT THEY UNDERSTOOD, BUT EDLIN

ER-5165

12:33PM   1      TOLD YOU WHAT THE REALITY WAS.

12:33PM   2           AND HERE ARE THE INVESTORS THAT HEARD FALSE STATEMENTS

12:33PM   3      ABOUT THE MILITARY:  TOLBERT, LUCAS, PETERSON, AND GROSSMAN ALL

12:33PM   4      HEARD ONE FORM -- ONE VERSION OR ANOTHER OF THIS STORY THAT

12:33PM   5      THERANOS TECHNOLOGY WAS DEPLOYED ACTUALLY TREATING SOLDIERS IN

12:33PM   6      THE BATTLEFIELD, SOMETIMES ON MEDEVAC HELICOPTERS.

12:33PM   7           YOU HEARD THE THERANOS-WALGREENS BUSINESS RELATIONSHIP.

12:33PM   8      WALGREENS WAS EXPECTING THAT THE TEST WOULD BE DONE RAPIDLY ON

12:33PM   9      A FINGERSTICK AND HOW WHAT WAS COMMUNICATED TO WALGREENS WAS

12:34PM  10      UNTRUE, AND, THEREFORE, MR. BALWANI DID NOT NEED TO WAIT FOR

12:34PM  11      WALGREENS TO DISCOVER THAT IT WAS A FRAUD TO KNOW THAT 900

12:34PM  12      STORES WAS UNREASONABLE, BECAUSE THESE STATEMENTS, WHAT WAS

12:34PM  13      COMMUNICATED TO WALGREENS WAS NOT TRUE.

12:34PM  14           SO WALGREENS WAS TOLD IN THE DOCUMENT ON THE LEFT THAT

12:34PM  15      THERANOS HAD THE ABILITY TO RUN BLOOD TESTS FROM A FINGERSTICK

12:34PM  16      IN LESS THAN AN HOUR AT WALGREENS PHARMACIES, AND JHAVERI TOLD

12:34PM  17      YOU IN 2013 WHEN HE WAS OPERATIONALIZING THE RELATIONSHIP, THAT

12:34PM  18      WAS CONSISTENT WITH HIS UNDERSTANDING, THAT'S WHAT HE THOUGHT

12:34PM  19      THERANOS COULD DO.

12:34PM  20           AND YOU SEE IN THE SERVICES AGREEMENT, THE DOCUMENT

12:34PM  21      ITSELF, THAT THE TWO COMPANIES SIGNED, THE PHRASE "DEVICE" WAS

12:34PM  22      DEFINED, AND JHAVERI TOLD YOU THIS ALSO WAS CONSISTENT WITH HIS

12:34PM  23      UNDERSTANDING OF WHAT THE THERANOS TECHNOLOGY WAS, THAT IT WAS

12:34PM  24      THE THERANOS ANALYZER, THE PATIENT INTERFACE AND SAMPLE

12:34PM  25      COLLECTION TOOLS, NOT SOME THIRD PARTY DEVICES AND NOT SOME

12:35PM 1    MODIFIED THIRD PARTY DEVICES.

12:35PM 2        SO WALGREENS WAS ALSO DECEIVED.  AND IT WOULDN'T TAKE

12:35PM 3    WALGREENS FIGURING IT OUT FOR BALWANI TO KNOW THAT HIS

12:35PM 4    STATEMENTS TO INVESTORS ABOUT FUTURE REVENUE WERE ALSO FALSE

12:35PM 5    AND MISLEADING.

12:35PM 6        THERE'S THE USE OF THE MEDIA SPECIFICALLY BY MR. BALWANI

12:35PM 7    TO BE DECEITFUL.  THERE'S AN INSTANCE HERE WHERE MR. BALWANI

12:35PM 8    FOUND AN ARTICLE ONLINE THAT TALKED ABOUT THERANOS, AND HE

12:35PM 9    HIMSELF SENDS IT TO WALGREENS EXECUTIVES AND THE ARTICLE ITSELF

12:35PM 10   CONTAINS FALSE STATEMENTS ABOUT THERANOS'S TECHNOLOGY.

12:35PM 11       IN THAT SECOND HIGHLIGHTED SECTION DO YOU SEE, "BLOOD IS

12:35PM 12   DRAWN WITH A FINGERSTICK, RATHER THAN A NEEDLE IN THE ARM.

12:35PM 13   THERE ARE NO PHLEBOTOMISTS, ONLY MACHINES IN THERANOS LABS."

12:35PM 14       IT TALKS ABOUT HAVING LAB RESULTS FROM FRESH SAMPLES IN A

12:35PM 15   MATTER OF HOURS.  SO ALL OF THESE FALSE STATEMENTS THAT ARE

12:36PM 16   APPEARING IN THE MEDIA, MR. BALWANI IS SHARING WITH WALGREENS

12:36PM 17   BECAUSE HE KNOWS THIS IS CONSISTENT WITH WHAT WALGREENS THINKS

12:36PM 18   THAT THERANOS TECHNOLOGY CAN DO.

12:36PM 19       MR. BALWANI WAS TELLING DIFFERENT THINGS TO MR. JHAVERI

12:36PM 20   THAN HE WAS SAYING TO ELIZABETH HOLMES.  WHAT MR. BALWANI WAS

12:36PM 21   SAYING IN THE TEXT MESSAGES TO ELIZABETH HOLMES WAS THAT THERE

12:36PM 22   WERE PROBLEMS IN THE THERANOS LAB, THAT THERE WERE PROBLEMS IN

12:36PM 23   THE CALL CENTER, THAT CUSTOMER SERVICE IS HAVING PROBLEMS, AND

12:36PM 24   THAT NONE OF THIS INFORMATION IS COMMUNICATED TO MR. JHAVERI,

12:36PM 25   HIS POINT OF CONTACT AT WALGREENS.  AGAIN, IT'S NOT ABOUT

12:36PM   1    WALGREENS EVENTUALLY FINDING THIS OUT.  IT'S MR. BALWANI

12:36PM   2    HIMSELF KNOWS THAT HE'S BEEN DECEIVING WALGREENS, AND HE

12:36PM   3    EVENTUALLY EVEN HEARS THAT DIRECTLY FROM WALGREENS.

12:36PM   4        IN THIS TEXT MESSAGE ON OCTOBER 16TH, 2015, WHICH IS THE

12:37PM   5    DAY AFTER THE NEGATIVE "WALL STREET JOURNAL," MR. BALWANI

12:37PM   6    WRITES TO MS. HOLMES, "OK.  WAG FREAKING OUT.  LACK OF

12:37PM   7    TRANSPARENCY.

12:37PM   8        "WHY WE DIDN'T TELL THEM ABOUT TURNING OFF THE

12:37PM   9    NANOTAINER," THE SMALL COLLECTION DEVICE THAT THERANOS WAS

12:37PM  10    USING.

12:37PM  11        SO THE NEGATIVE "WALL STREET JOURNAL" COMES OUT.

12:37PM  12    WALGREENS IS LEARNING THINGS.  IN THAT ARTICLE AND IN

12:37PM  13    MR. BALWANI'S WORDS, "FREAKING OUT."

12:37PM  14        IT WAS ONLY A MATTER OF TIME FOR WALGREENS TO LEARN THE

12:37PM  15    TRUTH.  THEY DIDN'T LEARN IT FROM THERANOS.  THEY LEARNED IT

12:37PM  16    FROM THE MEDIA.  AND THAT WAS WHAT MR. BALWANI ALWAYS KNEW

12:37PM  17    WOULD OCCUR AND THAT THE RELATIONSHIP WITH WALGREENS WOULD END

12:37PM  18    WHEN THEY FOUND OUT THE TRUTH.

12:37PM  19        SO HIS ESTIMATES OF FINANCIAL REVENUE WERE ALL CONTINGENT

12:37PM  20    UPON SUCCESSFULLY CONTINUING TO ALSO DEFRAUD WALGREENS.

12:37PM  21        WHEN MR. BALWANI WAS MAKING THESE 900 STORE PROJECTIONS TO

12:37PM  22    PEOPLE LIKE PETERSON, HE WAS DOING THAT IN OCTOBER OF 2014

12:38PM  23    AFTER HE WAS ALREADY RECEIVING SIGNALS FROM WALGREENS THAT THEY

12:38PM  24    WERE DISSATISFIED.  THEY KNEW THAT -- MR. BALWANI KNEW THAT

12:38PM  25    WALGREENS WAS TRACKING VEIN DRAW PERCENT, HE KNEW THAT

12:38PM  1    EXPANSION OR NATIONAL ROLLOUT WAS NOT GUARANTEED.  THAT WAS IN

12:38PM  2    THE CONTRACTS.

12:38PM  3         BUT IN AUGUST OF 2014 HE'S TOLD THAT WALGREENS IS

12:38PM  4    SHRINKING THE NEXT ROLLOUT FROM 500 STORES TO 200 STORES, AND

12:38PM  5    HE WROTE IN A TEXT MESSAGE THAT THERANOS CAN'T SCALE WITH

12:38PM  6    WALGREENS.

12:38PM  7         SO MR. BALWANI IS STILL SHARING IN OCTOBER OF '14

12:38PM  8    PROJECTIONS THAT ASSUMES 900 WALGREENS STORES WHEN HE'S

12:38PM  9    RECEIVING DIRECT INFORMATION FROM WALGREENS THAT ARE SUGGESTING

12:38PM 10    EVERYTHING BUT, THAT THE RELATIONSHIP ISN'T WORKING, THAT THERE

12:38PM 11    ARE PROBLEMS THAT THEY'RE DISCOVERING DURING THE PILOT.

12:38PM 12         AND MR. BALWANI IS TEXTING THAT.  HE'S ACKNOWLEDGING THAT

12:38PM 13    IN TEXT MESSAGES TO HOLMES.  HE'S NOT ACKNOWLEDGING IT IN HIS

12:39PM 14    CONVERSATIONS WITH INVESTORS, BUT IN HIS TEXT MESSAGES WITH

12:39PM 15    HOLMES HE'S SAYING THAT THEY CANNOT SCALE WITH WAG.  THEY ARE

12:39PM 16    TERRIBLE, AND WE NEED SAFEWAY AND CVS.

12:39PM 17         THAT WALGREENS IS INFORMING THERANOS THAT THEY'RE NOT

12:39PM 18    GOING TO SCALE MORE.

12:39PM 19         AND THEN AT SOME POINT HE'S GOING THROUGH A CVS CONTRACT

12:39PM 20    AND HE WRITES, "WE CAN'T WORK WITH WAG OR CVS.  BOTH ARE THE

12:39PM 21    SAME."

12:39PM 22         SO MR. BALWANI IS RECEIVING FEEDBACK FROM WALGREENS THAT

12:39PM 23    THE RELATIONSHIP IS NOT GOING WELL.  MR. BALWANI IS

12:39PM 24    COMMUNICATING TO MS. HOLMES THAT THE RELATIONSHIP IS NOT GOING

12:39PM 25    WELL, BUT THE ONE GROUP WHO IS NOT INFORMED OF THAT ARE THE

12:39PM 1    INVESTORS. THE INVESTORS ARE STILL BEING TOLD THAT WE'RE GOING

12:39PM 2    TO HAVE A BILLION DOLLARS OF REVENUE NEXT YEAR BASED ON THE

12:39PM 3    SUCCESS OF THIS WALGREENS RELATIONSHIP.

12:39PM 4        THE INVESTORS ARE BEING TOLD, IN THIS CASE BRYAN TOLBERT,

12:39PM 5    EXPLICITLY THAT THERANOS WELLNESS CENTERS WILL SOON BE LOCATED

12:39PM 6    WITHIN WALGREENS STORES NATIONWIDE. SO EVEN INVESTORS ASIDE

12:40PM 7    FROM LISA PETERSON IN THE 900 STORE PROJECTIONS, OTHER

12:40PM 8    INVESTORS ARE RECEIVING DOCUMENTS THAT ARE MAKING

12:40PM 9    REPRESENTATIONS ABOUT A NATIONAL ROLLOUT WITH WALGREENS WHEN

12:40PM 10   MR. BALWANI IS RECEIVING EVERY INDICATION THAT THE RELATIONSHIP

12:40PM 11   IS NOT GOING WELL.

12:40PM 12       INVESTORS ALSO HEARD FALSE STATEMENTS ABOUT THE USE OF

12:40PM 13   THIRD PARTY DEVICES. REMEMBER THE INVESTORS THOUGHT THAT THEY

12:40PM 14   WERE INVESTING IN A COMPANY THAT HAD DEVELOPED ITS OWN BLOOD

12:40PM 15   TESTING DEVICE TO DO ITS OWN BLOOD TESTING. EACH OF THESE

12:40PM 16   INVESTORS ACROSS THE TOP, PETERSON, MENDENHALL, GROSSMAN, AND

12:40PM 17   THEN BELOW MOSLEY, EISENMAN, AND LUCAS, EACH OF THEM HEARD ONE

12:40PM 18   VERSION OR ANOTHER OF THERANOS LACK OF USE OF THIRD PARTY

12:40PM 19   DEVICES.

12:40PM 20       WE'VE TALKED A BIT TODAY ABOUT THE IMPORTANCE OF THAT FOR

12:40PM 21   MR. GROSSMAN IN MEASURING THE AMOUNT OF REAL ESTATE THAT

12:40PM 22   THERANOS WOULD NEED TO LEASE, BUT THE SAME FALSE STATEMENTS

12:41PM 23   WERE HEARD BY OTHER INVESTORS, AND THEY WERE COMMUNICATED FOR

12:41PM 24   THE SAME PURPOSE, WITH AN INTENT TO DEFRAUD, BECAUSE INVESTORS

12:41PM 25   THOUGHT THEY WERE INVESTING IN A COMPANY WITH MATURE

12:41PM  1    TECHNOLOGY, WITH A COMPANY THAT HAD ITS OWN DEVICE TO TEST

12:41PM  2    PATIENT BLOOD, NOT INVESTING IN A COMPANY THAT WOULDN'T PRODUCE

12:41PM  3    ACCURATE RESULTS AND THEN ON OTHER OCCASIONS JUST USED THIRD

12:41PM  4    PARTY DEVICES.

12:41PM  5        MR. BALWANI ALSO MADE STATEMENTS DIRECTLY TO INVESTORS

12:41PM  6    ABOUT THE USE OF THIRD PARTY DEVICES.  I WANT TO REMIND YOU

12:41PM  7    ABOUT SOME SPECIFIC STATEMENTS HE MADE TO MENDENHALL ON THIS

12:41PM  8    PRECISE TOPIC.

12:41PM  9        WHEN BALWANI TOLD MENDENHALL THAT THE SCIENCE WAS

12:41PM  10   COMPLETE, THAT NO NEW TECHNOLOGY WAS NEEDED, THAT WAS NOT

12:41PM  11   BECAUSE THERANOS WAS GOING TO USE THIRD PARTY DEVICES.  THAT

12:41PM  12   WAS BECAUSE THERANOS'S DEVICE WAS READY TO GO.  THAT'S WHAT

12:41PM  13   MENDENHALL UNDERSTOOD.

12:41PM  14       AND MR. BALWANI WENT FURTHER AND TALKED ABOUT THE

12:41PM  15   MANUFACTURING OF THERANOS DEVICES, HOW THERE WOULDN'T BE

12:41PM  16   THREATS, SUPPLY CHAIN ISSUES, BECAUSE THEY WERE HANDLING THEIR

12:42PM  17   OWN MANUFACTURING.  AGAIN, THAT WOULDN'T BE TRUE IF THERANOS

12:42PM  18   WAS USING THIRD PARTY DEVICES.

12:42PM  19       THERE WERE ALSO FALSE STATEMENTS COMMUNICATED TO INVESTORS

12:42PM  20   REGARDING PHARMA VALIDATION, THAT THERANOS WAS VALIDATED BY

12:42PM  21   PHARMACEUTICAL COMPANIES.  INSIDE OF THE INVESTOR BINDERS WERE

12:42PM  22   THESE REPORTS LIKE THIS ONE, FOR INSTANCE, WHICH IS THE ONE

12:42PM  23   THAT MR. MOSLEY RELIED UPON.  SO WHEN MR. BALWANI AND HOLMES

12:42PM  24   ARE TALKING ABOUT THE CONTENT OF INVESTOR BINDERS AND WHEN

12:42PM  25   MR. BALWANI IS SHARING INVESTOR BINDERS WITH INVESTORS AND

12:42PM  1    THOSE INVESTORS BINDERS CONTAIN THESE KIND OF STATEMENTS THAT

12:42PM  2    THERANOS'S TECHNOLOGY HAVE BEEN VALIDATED BY PHARMACEUTICAL

12:42PM  3    COMPANIES, AND THEN SPECIFICALLY REPORTS THAT ARE HELD OUT AS

12:42PM  4    HAVING BEEN PREPARED BY THE PHARMA COMPANIES VALIDATION OF

12:42PM  5    THERANOS'S TECHNOLOGY, THIS IS ALL DONE WITH THE INTENT TO

12:42PM  6    DECEIVE AND CHEAT THE INVESTORS.

12:43PM  7        THE SAME IS TRUE FOR THE MEDIA ARTICLES.  WE'VE LOOKED AT

12:43PM  8    THESE FALSE STATEMENTS IN MEDIA ARTICLES AND THESE ARTICLES

12:43PM  9    WERE COMMUNICATED FROM HOLMES AND BALWANI TO INVESTORS WITH THE

12:43PM 10    INTENT TO DECEIVE, WITH THE INTENT THAT THE INVESTORS WOULD GET

12:43PM 11    ADDITIONAL INFORMATION OR CORROBORATE INFORMATION THAT THEY

12:43PM 12    HEARD FROM HOLMES AND BALWANI THROUGH THESE SOURCES IN THE

12:43PM 13    MEDIA.

12:43PM 14        AND YOU SEE HERE, HERE IS WHERE THE INVESTORS RECEIVED

12:43PM 15    THAT INFORMATION, SOMETIMES IN EMAILS DIRECTLY FROM THERANOS,

12:43PM 16    AND SOMETIMES AS AN ARTICLE ON THE THERANOS WEBSITE, AND

12:43PM 17    SOMETIMES IN THE INVESTOR BINDERS.

12:43PM 18        THE FOURTH AND FINAL ELEMENT FOR THE WIRE FRAUD AS TO

12:43PM 19    INVESTORS IS THE ELECTRONIC WIRE CROSSING STATE LINES.

12:43PM 20        THE GOVERNMENT MUST PROVE THAT THE DEFENDANT USED OR

12:43PM 21    CAUSED TO BE USED AN INTERSTATE WIRE TO CARRY OUT OR ATTEMPT TO

12:43PM 22    CARRY OUT AN ESSENTIAL PART OF THE SCHEME AND WIRES INCLUDES

12:44PM 23    INTERNET, TELEPHONE, FAX, OTHER THINGS.

12:44PM 24        AND IN THIS CASE, AS I MENTIONED TO YOU, RIGHT AROUND THE

12:44PM 25    TIME THAT THE GOVERNMENT RESTED, THE JUDGE READ TO YOU A

12:44PM   1      STIPULATION OF THE PARTIES, AND I'M SHOWING IT TO YOU ON THE

12:44PM   2      SCREEN NOW.

12:44PM   3           AND WHAT THE PARTIES STIPULATED TO IS THAT CERTAIN WIRE

12:44PM   4      TRANSFERS, CERTAIN ELECTRONIC FUNDS TRANSFERS THAT OCCURRED IN

12:44PM   5      THIS CASE CROSSED STATE LINES.

12:44PM   6           AND ON THE SCREEN YOU SEE SEVEN OF THEM.  THE FIRST SIX

12:44PM   7      ARE ALL SIX OF THE INVESTOR COUNTS.  SO EACH INVESTOR WIRED

12:44PM   8      MONEY TO THERANOS.  AND YOU SEE HERE THE FIRST ONE IS FROM

12:44PM   9      ALAN EISENMAN'S BANK ACCOUNT AT CHARLES SCHWAB, AND THAT GOES

12:44PM  10      TO THERANOS'S ACCOUNT AT COMERICA BANK.

12:44PM  11           AND BASED ON THE INFORMATION HIGHLIGHTED ON THE RIGHT SIDE

12:44PM  12      OF THE SCREEN, THESE WIRES CROSSED STATE LINES, AND THAT

12:45PM  13      REPEATED SIX TIMES.  SO ALL SIX OF THE INVESTOR WIRES CREATED A

12:45PM  14      WIRE THAT CROSSED STATE LINES.

12:45PM  15           THE SEVENTH WIRE THAT IS LISTED THERE, IT'S IN AUGUST OF

12:45PM  16      2015 FOR A LITTLE OVER A MILLION DOLLARS WAS A WIRE OF THERANOS

12:45PM  17      SPENDING MONEY, THIS IS FROM THE THERANOS BANK ACCOUNT TO

12:45PM  18      HORIZON MEDIA.  AND THIS WIRE ALSO, BASED ON THIS STIPULATION,

12:45PM  19      CROSSED STATE LINES.  THIS IS COUNT 12 IN THE INDICTMENT.  SO

12:45PM  20      THIS BELONGS IN THE PATIENT COUNTS.

12:45PM  21           AND I'LL SHOW YOU LATER THE SPECIFIC EMAIL THAT DEALS WITH

12:45PM  22      THIS HORIZON MEDIA COUNT THAT TALKS ABOUT THE PURPOSE OF THE

12:45PM  23      WIRE.  BUT FOR RIGHT NOW I JUST WANT TO SHOW YOU THAT THIS IS

12:45PM  24      ALSO CAPTURED IN THAT STIPULATION OF THE PARTIES.  SO THIS WIRE

12:45PM  25      ALSO CROSSED STATE LINES, AND, THEREFORE, THE FOURTH ELEMENT

12:45PM  1    FOR THE TWELFTH COUNT, THE HORIZON MEDIA COUNT, THE INTERSTATE

12:46PM  2    NEXUS ELEMENT IS ALSO SATISFIED BASED ON THAT STIPULATION.

12:46PM  3         THAT'S THE INVESTOR COUNTS.

12:46PM  4         THE FINAL SET OF COUNTS THAT WE HAVE TO DISCUSS ARE THE

12:46PM  5    FOUR COUNTS RELATED TO PATIENTS.  AND I TOLD YOU THAT THE

12:46PM  6    ELEMENTS MIRROR -- THE ELEMENTS ARE THE SAME FOR WIRE FRAUD AS

12:46PM  7    TO INVESTORS AND WIRE FRAUD AS TO PATIENTS, SO IT'S THESE SAME

12:46PM  8    FOUR ELEMENTS, ALTHOUGH I'VE BROKEN OUT THAT FIRST ELEMENT TO

12:46PM  9    COVER WITH YOU BOTH THE EXISTENCE OF A SCHEME TO DEFRAUD AND

12:46PM  10   ALSO MR. BALWANI'S KNOWLEDGE OF THAT SCHEME, BUT THESE SAME

12:46PM  11   FOUR ELEMENTS APPLY TO THE PATIENT WIRE FRAUD COUNTS.

12:46PM  12        THESE ARE THE FOUR PATIENT WIRE FRAUD COUNTS.  YOUR

12:46PM  13   VERDICT FORM WILL HAVE THE PATIENT NAMES ON THERE.  SO YOU WILL

12:46PM  14   SEE THAT PATIENT -- I'M SORRY, FOR COUNT NINE, THE PATIENT IS

12:46PM  15   MR. BINGHAM, AND TEN IS MS. TOMPKINS, ELEVEN IS DR. ELLSWORTH,

12:47PM  16   AND TWELVE IS THE HORIZON MEDIA PURCHASE.

12:47PM  17        LET'S TALK ABOUT WHAT EACH OF THESE SPECIFIC WIRES

12:47PM  18   INVOLVES.  THE BINGHAM WIRE IS A PHONE CALL.  MR. BINGHAM HAD

12:47PM  19   QUESTIONS ABOUT HIS LAB TESTS SO HE CALLED CUSTOMER SERVICE IN

12:47PM  20   PALO ALTO, AND WE'LL TALK ABOUT THAT IN A MOMENT.

12:47PM  21        THE NEXT TWO WIRES ARE FAXES.  YOU HEARD THAT FOR BOTH

12:47PM  22   ELLSWORTH AND TOMPKINS'S BLOOD TESTS THEY WERE FAXED TO

12:47PM  23   THERANOS FROM THE DOCTOR'S OFFICE, AND I'LL SHOW YOU ON THE LAB

12:47PM  24   FORM IT LISTS THE FAXES.  SO THOSE FAXES CONTAINING THE LAB

12:47PM  25   TEST RESULTS WENT FROM CALIFORNIA TO ARIZONA.

CLOSING ARGUMENT BY MR. SCHENK                                    7037

12:47PM   1          AND THEN FINALLY WE JUST TALKED ABOUT THE HORIZON MEDIA

12:47PM   2     PURCHASE.

12:47PM   3          SO THERE WAS ALSO A SCHEME TO DEFRAUD PATIENTS, AND IT WAS

12:48PM   4     BASED ON SEVERAL THINGS:  ONE, USING ELECTRONIC WIRES TO

12:48PM   5     PURCHASE ADVERTISEMENTS TO INDUCE PATIENTS TO PURCHASE BLOOD

12:48PM   6     TESTS; TO USE THE THERANOS WEBSITE, BUT THEY ALSO RECRUITED

12:48PM   7     PATIENTS THROUGH THE THERANOS WEBSITE, THROUGH MARKETING

12:48PM   8     MATERIALS, PATIENT BROCHURES AND ALSO THROUGH THE MEDIA,

12:48PM   9     THROUGH THE USE OF THE MEDIA.

12:48PM  10          JUST LIKE AN ARTICLE IN THE MEDIA WOULD TALK ABOUT

12:48PM  11     THERANOS'S ACCURACY, AND THAT WOULD BE USEFUL FOR AN INVESTOR

12:48PM  12     TO HEAR, A PATIENT WOULD READ IN THE MEDIA THAT THERANOS'S

12:48PM  13     TESTING WAS ACCURATE AND ALSO MAKE A DECISION TO USE THERANOS

12:48PM  14     AS A LAB OR BLOOD TESTING SERVICE AND USE THAT AS WELL.

12:48PM  15          AND THEN FINALLY, THERANOS SENT OVER FAXED BLOOD TESTS

12:48PM  16     RESULTS THAT THEY KNEW WERE LIKELY TO CONTAIN INACCURATE OR

12:48PM  17     UNRELIABLE BLOOD TESTS THAT HAPPENED IN INSTANCES THAT YOU

12:48PM  18     HEARD TESTIMONY ABOUT FROM TOMPKINS AND ELLSWORTH.  WE'LL TALK

12:49PM  19     ABOUT THAT MORE IN A MOMENT.

12:49PM  20          FIRST, LET'S START BY IDENTIFYING WHO IS RESPONSIBLE FOR

12:49PM  21     THERANOS'S MARKETING MATERIALS.

12:49PM  22          DAN EDLIN TOLD YOU THAT PART OF HIS JOB AT THERANOS WAS TO

12:49PM  23     WORK WITH A COMPANY CALLED CHIAT/DAY, THAT'S WHO THERANOS HIRED

12:49PM  24     TO PERFORM, TO CREATE THEIR MARKETING MATERIALS.  AND THERE ARE

12:49PM  25     ONLY TWO PEOPLE AT THERANOS WHO COULD APPROVE THOSE KIND OF

12:49PM  1    MARKETING MATERIALS:  HOLMES AND BALWANI.

12:49PM  2          YOU'VE ALSO SEEN PATIENT BROCHURES THAT WERE USED TO

12:49PM  3    RECRUIT PATIENTS AT WALGREENS, AND THOSE PATIENT BROCHURES

12:49PM  4    CONTAINED PHRASES THAT IN OTHER DOCUMENTS THAT WE HAVE LOOKED

12:49PM  5    AT THIS MORNING WERE WARNED, HOLMES AND BALWANI WERE WARNED

12:49PM  6    AGAINST USING PHRASES LIKE "ONE TINY DROP," WHICH IS CONTAINED

12:49PM  7    HERE IN THE PATIENT BROCHURE THAT IS IN FRONT OF YOU.

12:49PM  8          SO THEY'RE PUTTING INFORMATION IN THE PATIENT BROCHURES

12:49PM  9    THAT THEY'VE BEEN TOLD IS MISLEADING, AND IT'S THE KIND OF

12:49PM 10    INFORMATION THAT WOULD GET A PATIENT TO DECIDE TO USE THERANOS

12:49PM 11    OVER A DIFFERENT LAB.

12:50PM 12          THESE SAME KIND OF FALSE STATEMENTS ALSO APPEARS ON THE

12:50PM 13    THERANOS WEBSITE, THE SAME KIND OF INFORMATION THAT WOULD

12:50PM 14    ENCOURAGE AN INVESTOR TO INVEST, AT TIMES WOULD ENCOURAGE A

12:50PM 15    PATIENT TO USE THERANOS BLOOD TESTING SERVICES, THINGS LIKE "A

12:50PM 16    FULL RANGE OF TESTS," OR "ONE TINY DROP," OR "HIGHEST LEVELS OF

12:50PM 17    ACCURACY," THE KINDS OF STATEMENTS THAT YOU'VE SEEN MR. BALWANI

12:50PM 18    ON EMAILS WHERE HE WAS WARNED AGAINST USING.

12:50PM 19          AND ARTICLES, AS I MENTIONED TO YOU, THE SAME KIND OF

12:50PM 20    ARTICLES THAT BRAG ABOUT ACCURACY AND HAVE AN EFFECT ON

12:50PM 21    INVESTORS ALSO HAVE AN EFFECT ON PATIENTS.

12:50PM 22          THERE'S ALSO TEXT MESSAGES WHERE HOLMES AND BALWANI

12:50PM 23    DISCUSS KNOWING THE VALUE OF THEIR ADVERTISING, THE EFFECT THAT

12:50PM 24    THE ADVERTISING HAS.

12:50PM 25          AND HERE YOU SEE MR. BALWANI SAYING, "WE CAN MARKET OUR

12:50PM  1    LAB AND EVERYTHING AND PEOPLE WILL TALK ABOUT OUR FINGERSTICK

12:50PM  2    WITHOUT US TALKING ABOUT IT."

12:50PM  3        SO HE'S ACKNOWLEDGING THAT YOU CAN SAY THINGS LIKE NOT

12:51PM  4    "ONE TINY DROP," YOU DON'T ACTUALLY HAVE TO SAY THE PHRASE

12:51PM  5    "FINGERSTICK," AND YOU'RE STILL GOING TO MAKE THIS SOUND

12:51PM  6    ATTRACTIVE TO PATIENTS.

12:51PM  7        IT'S SORT OF A SOPHISTICATED LEVEL OF UNDERSTANDING OF

12:51PM  8    THEIR DECEPTION, HOW THEY'RE GOING TO BE ABLE TO RECRUIT

12:51PM  9    PATIENTS THROUGH THE WORD CHOICE, THE WORDS THEY USE IN

12:51PM  10   ADVERTISING.

12:51PM  11       AND THEN HOLMES LATER WRITES, "I THINK WE SHOULD SHOW THEM

12:51PM  12   THE FIRST AD THAT'S GOING TO RUN IN ARIZONA.  IT DOESN'T

12:51PM  13   MENTION NANOTAINERS OR FINGERSTICK.  JUST LESS BLOOD, WHICH I

12:51PM  14   WILL MAKE A BIG DEAL ABOUT BEING ABOUT BUTTERFLY AND SMALLER

12:51PM  15   NEEDLES.  BETTER FOR US TO SHOW THAN NOT."

12:51PM  16       SO, AGAIN, WHAT EDLIN TOLD YOU IS CORRECT.  EDLIN TOLD YOU

12:51PM  17   THERE ARE ONLY TWO PEOPLE THAT COULD APPROVE ADVERTISING AND IN

12:51PM  18   THESE TEXT MESSAGES YOU SEE HOLMES AND BALWANI TALKING ABOUT AN

12:51PM  19   UNDERSTANDING OF THE CONTENT OF THAT ADVERTISING, AND NOT JUST

12:51PM  20   THE CONTENT OF IT, BUT THE EFFECT OF WHEN A PATIENT, WHEN A

12:52PM  21   FUTURE POTENTIAL PATIENT HEARS OUR ADVERTISING, WHAT ARE THEY

12:52PM  22   GOING TO THINK?  WHAT EFFECT IS THAT GOING TO HAVE ON THEM?

12:52PM  23   THIS IS ALL PART OF THE SCHEME TO ENCOURAGE PATIENTS TO COME

12:52PM  24   USE THERANOS BLOOD TESTING SERVICES.

12:52PM  25       LET'S TALK ABOUT HOW BALWANI CONTROLLED THE CLIA LAB.

12:52PM  1    RUNNING THE CLIA LAB WAS INSTRUMENTAL IN HAVING THE PATIENT

12:52PM  2    FRAUD, YOU KNOW, FROM SEVERAL SOURCES.  THE FIRST TWO DOCUMENTS

12:52PM  3    WERE SLIDES THAT WERE SHARED WITH CMS DURING THE INSPECTION IN

12:52PM  4    2015.

12:52PM  5         SO MR. BALWANI WAS INTERACTING WITH SARAH BENNETT, AND ON

12:52PM  6    THESE SLIDES YOU SEE MR. BALWANI BEING LISTED AS RESPONSIBLE

12:52PM  7    FOR ALL CLIA LAB OPERATIONS.

12:52PM  8         AND ON THE ORG CHART, MR. BALWANI ACTUALLY APPEARS TWICE.

12:52PM  9    MR. BALWANI'S NAME APPEARS AS PRESIDENT, SO ABOVE THE CLIA LAB.

12:52PM 10    BUT NOTICE HE'S ALSO LISTED UNDER THAT SECTION CALLED CLINICAL

12:52PM 11    LAB ASSISTANT.  THAT'S THE JOB THAT ERIKA CHEUNG HAD.

12:53PM 12         SO MR. BALWANI WAS WEARING TWO HATS IN THE CLIA LAB, AND

12:53PM 13    THE EMAILS AND THE TEXT MESSAGES THAT YOU'VE SEEN FURTHER

12:53PM 14    SUGGEST THAT THAT GAVE HIM MORE INSIGHT, A UNIQUE PERSPECTIVE

12:53PM 15    INTO THE LAB BECAUSE OF THESE MULTIPLE HATS.

12:53PM 16         YOU SEE IN THESE TEXT MESSAGES YOU SEE HE'S AT NEWARK, YOU

12:53PM 17    HEARD NEWARK WAS WHERE THE LAB WAS, DOING REVIEWS AND

12:53PM 18    TERMINATIONS.

12:53PM 19         COMPARE THAT TO WHAT DR. ROSENDORFF TOLD YOU ABOUT HIS

12:53PM 20    EXPERIENCE GENERALLY, THAT AS A LAB DIRECTOR HE THOUGHT HE

12:53PM 21    WOULD BE EMPOWERED TO MAKE THESE KIND OF DECISIONS, HE SHOULD

12:53PM 22    BE HIRED IN THE LAB.  BUT ONE OF THE FRUSTRATIONS WAS THAT'S

12:53PM 23    NOT ACTUALLY HOW IT WORKED.  IN PRACTICE, MR. BALWANI WAS DOING

12:53PM 24    THE HIRING AND THE FIRING, EVEN INCLUDING THE LAB DIRECTOR WHEN

12:53PM 25    HE HIRES DR. DHAWAN.

12:53PM  1          I'M GOING TO SPEND A MOMENT TALKING TO YOU ABOUT ALL OF

12:53PM  2     THE THINGS THAT DR. DHAWAN AND ALSO LYNETTE SAWYER, WHAT THEY

12:54PM  3     DID NOT KNOW.  THERE ARE SORT OF LARGE CATEGORIES OF

12:54PM  4     INFORMATION THAT BALWANI NEVER TOLD THEM WHEN THEY BEGAN

12:54PM  5     WORKING AT THERANOS.

12:54PM  6          AND THEN SEPARATELY, THE THINGS THAT THEY WERE NEVER ASKED

12:54PM  7     TO WEIGH IN ON.  AND WE'LL LOOK AT SLIDES LIKE THIS BOTH FOR

12:54PM  8     DR. DHAWAN AND FOR SAWYER, BECAUSE IT SHOWS EVEN MORE HOW MUCH

12:54PM  9     ACTUAL IN PRACTICE POWER MR. BALWANI HAD IN THE LAB.  SO THE

12:54PM 10     ATTEMPTS TO SUGGEST THAT THE BUCK STOPS WITH THE LAB DIRECTOR

12:54PM 11     ACCORDING TO THE REGULATIONS, REMEMBER YOU HAVE SEEN OR HEARD

12:54PM 12     TESTIMONY ABOUT THE CMS REGULATIONS, WELL, THAT IS NOT ACTUALLY

12:54PM 13     HOW IT WORKED.

12:54PM 14          AT THERANOS, THEY BRING IN MR. BALWANI'S DERMATOLOGIST,

12:54PM 15     AND THEN THEY DON'T TELL HIM A LIST OF INFORMATION.  YOU MAY

12:54PM 16     RECALL THIS FROM HIS TESTIMONY, HE DIDN'T KNOW WHICH ANALYZERS

12:54PM 17     WERE BEING USED.  HE DIDN'T KNOW WHAT A CTN WAS, THE CAPILLARY

12:54PM 18     TUBE AND NANOTAINER, THAT WAS USED TO COLLECT FINGERSTICK

12:55PM 19     BLOOD, AN INTEGRAL PART OF THERANOS'S TESTING SYSTEM.  HE

12:55PM 20     DIDN'T EVEN KNOW WHAT THAT WAS.

12:55PM 21          HE DIDN'T KNOW HOW THESE VALIDATED ASSAYS WERE PERFORMING

12:55PM 22     IN THE LAB.  HE DIDN'T KNOW ABOUT THE SHIPPING OF BLOOD.  THE

12:55PM 23     LIST GOES ON.  I WON'T READ IT TO YOU.  YOU REMEMBER THIS

12:55PM 24     TESTIMONY.

12:55PM 25          BUT THERE WAS MUCH INFORMATION THAT WHEN MR. BALWANI GETS

12:55PM   1    RID OF ROSENDORFF AND HIRES A NEW LAB DIRECTOR, THAT THAT LAB

12:55PM   2    DIRECTOR IS THEN KEPT IN THE DARK ON, BECAUSE IT'S EASIER --

12:55PM   3    IT'S ACTUALLY NECESSARY TO RUN THE LAB FRAUD, THE PATIENT FRAUD

12:55PM   4    WITHOUT A LAB DIRECTOR WHO ASKS QUESTIONS.

12:55PM   5        IF YOU HAVE A LAB DIRECTOR WHO IS AGGRESSIVE, WHO

12:55PM   6    DISSENTS, WHO MAKES SUGGESTIONS ABOUT WHICH DEVICES THEY SHOULD

12:55PM   7    USE AND WHEN, IT'S MUCH MORE DIFFICULT TO RUN THE FRAUD.  IT'S

12:55PM   8    MUCH EASIER IF YOU HAVE ONE LIKE DR. DHAWAN WHO HERE ALSO TOLD

12:55PM   9    YOU ALL OF THE THINGS THAT HE NEVER DID.  HE NEVER TALKED TO

12:55PM  10    PATIENTS OR DOCTORS.  HE NEVER TALKED ABOUT SPECIFIC TEST

12:55PM  11    RESULTS.  HE NEVER TALKED ABOUT DECISIONS REGARDING CRITICAL

12:56PM  12    VALUES.  HE NEVER WAS ASKED TO APPROVE THE CLINICAL LAB

12:56PM  13    ASSISTANTS OR INCLUDING MR. BALWANI.  REMEMBER, I JUST SHOWED

12:56PM  14    YOU ON THE ORG CHART MR. BALWANI HAD A ROLE AS A CLA, AND THAT

12:56PM  15    WAS SOMETHING THAT DR. DHAWAN SAID HE WAS NEVER ASKED ABOUT.

12:56PM  16        SO ALL KINDS OF INFORMATION IN THE LAB WAS OCCURRING WHEN

12:56PM  17    DHAWAN WAS RUNNING IT THAT HE DID NOT HAVE INFORMATION ABOUT.

12:56PM  18        AND NOW WE CAN SEE THE SAME THING FOR SAWYER.  YOU HEARD

12:56PM  19    THAT THEY WERE AT A TIME CO-LAB DIRECTORS.  AND DR. SAWYER WAS

12:56PM  20    UNAWARE OF A SIMILAR LIST OF INFORMATION.  SHE NEVER SAW AN

12:56PM  21    EDISON DEVICE.  SHE NEVER VISITED THE LAB.  SHE WAS UNSURE OF

12:56PM  22    THERANOS USING A DEVICE THAT IT MANUFACTURED, THE EDISON

12:56PM  23    DEVICE, IN ITS CLINICAL LAB.  SO SHE WAS ALSO KEPT IN THE DARK

12:56PM  24    JUST LIKE DHAWAN.

12:56PM  25        AND YOU SEE A SIMILAR LIST OF THINGS THAT SHE WAS NOT

12:56PM  1    CONSULTED ON WHEN SHE WAS RUNNING THE LAB, REPORTING PATIENT

12:57PM  2    RESULTS, COMMUNICATING WITH DOCTORS OR PATIENTS, SIGNING OFF ON

12:57PM  3    OPERATING PROCEDURES RELATED TO THE EDISON DEVICE, SORT OF A

12:57PM  4    SIMILAR LIST OF INFORMATION THAT THE DIRECTORS WHO REPLACED

12:57PM  5    ROSENDORFF ARE NOW COMPLETELY KEPT IN THE DARK ABOUT.

12:57PM  6         MR. BALWANI YOU HEARD HAD DR. DHAWAN COME TO THERANOS ON A

12:57PM  7    SATURDAY.  IT WAS SATURDAY, SEPTEMBER 19TH, 2015, JUST DAYS

12:57PM  8    BEFORE THE CMS SURVEY WHEN BENNETT CAME OUT TO THERANOS.

12:57PM  9         AND ON THAT SATURDAY, MR. BALWANI GAVE DHAWAN A STACK OF

12:57PM  10   DOCUMENTS TO SIGN, AND YOU SEE IN THE TEXT MESSAGES MR. BALWANI

12:57PM  11   SAYING, "OUR VALIDATION REPORTS ARE TERRIBLE.  REALLY PAINFUL

12:57PM  12   GOING THRU THIS PROCESS.  SAME ISSUES FDA POINTED OUT."

12:58PM  13        SO PREVIOUSLY YOU HEARD THE FDA CAME OUT AND LOOKED AT

12:58PM  14   THERANOS, AND WHAT MR. BALWANI HERE IS SAYING IS ON

12:58PM  15   SEPTEMBER 22ND, THE DATE OF THIS TEXT MESSAGE, WHICH IS ONE OF

12:58PM  16   THE DAYS OF THE CMS INSPECTION, HE'S GOING THROUGH THESE

12:58PM  17   TERRIBLE VALIDATION REPORTS AGAIN, HE'S GOING THROUGH THESE

12:58PM  18   TERRIBLE VALIDATION REPORTS.  THE SAME VALIDATION REPORTS THAT

12:58PM  19   JUST DAYS EARLIER DHAWAN TOLD YOU HE ASKED ME TO SIGN BUT

12:58PM  20   DIDN'T TELL ME WERE TERRIBLE.  HE HIRED, AND HE DIDN'T SAY

12:58PM  21   THIS, HE HIRED DHAWAN BECAUSE HE WASN'T ASKING THOSE KIND OF

12:58PM  22   QUESTIONS.

12:58PM  23        ADAM ROSENDORFF WAS THE KIND OF LAB DIRECTOR THAT MADE

12:58PM  24   THOSE KIND OF INQUIRIES, THAT ASKED HIM TO STOP USING THE

12:58PM  25   DEVICE, MADE STATEMENTS ABOUT THE ACCURACY AND RELIABILITY OF

12:58PM   1    THE TESTING.  NOT DR. DHAWAN.

12:58PM   2         AND BOTH PANDORI AND ROSENDORFF TALKED TO YOU ABOUT THEIR

12:58PM   3    FRUSTRATIONS AS LAB DIRECTORS, SUCH THAT THEY DIDN'T HAVE

12:58PM   4    AUTHORITY TO MAKE DECISIONS, WHILE THEY WOULD HAVE EXPECTED TO

12:59PM   5    IN PRACTICE.  THAT'S NOT HOW IT HAPPENED.  IN FACT, THE PERSON

12:59PM   6    WHO DID HAVE DECISION AUTHORITY, WHO COULD MAKE THE DECISIONS

12:59PM   7    ABOUT HIRING AND FIRING, ABOUT WHICH DEVICES TO USE, IT ALL

12:59PM   8    FLOWED THROUGH SUNNY BALWANI.

12:59PM   9         YOU SEE HERE A SPECIFIC EXAMPLE.  THIS IS ABOUT HCG.  YOU

12:59PM  10    MAY REMEMBER THIS FROM THE TRIAL.  AND IF YOU FOLLOW THROUGH IN

12:59PM  11    THE EMAILS, YOU CAN SEE ADAM ROSENDORFF'S FRUSTRATION, THE LAB

12:59PM  12    DIRECTOR'S FRUSTRATION WITH NOT BEING ABLE TO GET CLARITY, TO

12:59PM  13    NOT BEING ABLE TO STOP TESTING, HCG, ON AN EDISON DEVICE.

12:59PM  14         IN MAY OF 2014, THIS FIRST EMAIL DR. ROSENDORFF ATTEMPTS

12:59PM  15    TO HALT THE TESTING OF HCG ON THE THERANOS TECHNOLOGY AND

12:59PM  16    INSTEAD RUNS IT ON THE IMMULITE, A THIRD PARTY DEVICE.

12:59PM  17         AND THEN IN JUNE, THE EMAIL BELOW THAT -- AN EMAIL THAT

01:00PM  18    DR. ROSENDORFF IS NOT ON, YOU SEE DANIEL YOUNG SAYING, "BY THE

01:00PM  19    WAY, WE NEVER SWITCHED TO IMMULITE IN LIS.  IT WAS NOT CLEAR TO

01:00PM  20    ME THIS DECISION WAS MADE."

01:00PM  21         FURTHER DOWN ON THAT SIDE OF THE SLIDE YOU SEE AN EMAIL

01:00PM  22    WITH DR. ROSENDORFF -- I'M SORRY, FROM DR. ROSENDORFF WHERE HE

01:00PM  23    SAYS, "CHANGE HCG TO VACUTAINER AND RUN ON IMMULITE."

01:00PM  24         AGAIN, A COUPLE OF DAYS AFTER HE SENT THAT ON THE 30TH

01:00PM  25    HE'S AGAIN SAYING HCG SHOULD NOT BE RUN ON THE THERANOS

01:00PM   1    TECHNOLOGY, IT SHOULD BE RUN ON THE IMMULITE, ON A THIRD PARTY

01:00PM   2    DEVICE, AND THEN HE FURTHER INSTRUCTS TO HOLD ANY OF THE

01:00PM   3    RESULTS THAT CAME FROM CTN'S, FROM THE THERANOS TECHNOLOGY.

01:00PM   4        AND THEN IF YOU GO TO THE RIGHT SIDE OF THE SLIDE, YOU SEE

01:00PM   5    AN EMAIL IN 2016 BOTH FROM AND TO BALWANI AND ROSENDORFF.

01:00PM   6        ROSENDORFF SAYS, SO HCG IS BACK ON VACUTAINER.

01:00PM   7        AND BALWANI SAYS -- THAT'S THE THIRD PARTY VEIN DRAWS --

01:01PM   8    BALWANI SAYS, NO, IT IS ON NANOTAINER IS PER CHINMAY'S EMAIL

01:01PM   9    BELOW.

01:01PM  10        AND THEN IN THIS TESTIMONY YOU SEE AND HEAR ROSENDORFF'S

01:01PM  11    FRUSTRATION, JUST THE IDEA THAT I'M THE LAB DIRECTOR AT

01:01PM  12    THERANOS, I'M TRYING TO STOP THEM FROM TESTING ON A PARTICULAR

01:01PM  13    DEVICE, AND I'M UNCLEAR WHETHER MY INSTRUCTIONS ARE BEING

01:01PM  14    FOLLOWED.  I JUST DON'T HAVE THE AUTHORITY TO MAKE THOSE KINDS

01:01PM  15    OF DECISIONS BECAUSE I CAN'T GIVE AN INSTRUCTION AND HAVE

01:01PM  16    CONFIDENCE THAT IT'S GOING TO BE FOLLOWED.

01:01PM  17        YOU SEE HERE THAT LAB DIRECTORS, ACCORDING TO

01:01PM  18    DR. ROSENDORFF, DID NOT HAVE SPECIFIC AUTHORITY TO MAKE

01:01PM  19    DECISIONS LIKE DISCONTINUING THE TESTING ON THE EDISON DEVICE.

01:01PM  20    ROSENDORFF TESTIFIED TO YOU ABOUT THAT AND HOW LAB DIRECTORS

01:01PM  21    DID NOT HAVE THAT POWER.

01:01PM  22        ROSENDORFF TOLD YOU HOW HE WAS FRUSTRATED WITH HOW

01:01PM  23    THERANOS WAS CONDUCTING PROFICIENCY TESTING.  REMEMBER, THIS IS

01:01PM  24    THE IDEA OF TESTING THE TESTS.  THE LAB WOULD BE SENT SAMPLES

01:02PM  25    OF A KNOWN VALUE, AND THEN THERANOS WAS SUPPOSED TO RUN THOSE

01:02PM  1    SAMPLES AND SHARE THOSE RESULTS TO GET SCORED, TO TEST THEIR

01:02PM  2    TESTS.

01:02PM  3         AND DR. ROSENDORFF THOUGHT THAT THERANOS SHOULD BE DOING

01:02PM  4    ITS PROFICIENCY TESTING IN A CERTAIN WAY, AND THIS WAS ONE OF

01:02PM  5    THE REASONS THAT HE QUIT, HIS FRUSTRATIONS WITH THERANOS'S

01:02PM  6    INABILITY AND REFUSAL TO DO PROFICIENCY TESTING IN A WAY THAT

01:02PM  7    HE THOUGHT WAS NECESSARY.

01:02PM  8         AND THEN YOU ALSO SEE HERE WHERE DR. ROSENDORFF WAS

01:02PM  9    TELLING YOU ABOUT THERANOS REINSTITUTING OR USING THE EDISON

01:02PM  10   DEVICE FOR HCG TESTING AND HIS FRUSTRATION THAT HE JUST DIDN'T

01:02PM  11   HAVE THE POWER EVEN AS LAB DIRECTOR TO MAKE THE FINAL DECISION

01:02PM  12   WHICH TESTS WERE RUN ON WHICH DEVICES.

01:02PM  13        MS. BENNETT TOLD YOU THAT DURING THE CMS INSPECTION, HER

01:02PM  14   MAIN POINT OF CONTACT, THE ONE WHO WAS DOING THE PRESENTING,

01:02PM  15   WAS SUNNY BALWANI.  AND SHE RAN INTO FRUSTRATIONS DURING THIS

01:02PM  16   INSPECTION.

01:03PM  17        SHE WOULD ASK FOR DOCUMENTS AND SOMETIMES IT WOULD TAKE A

01:03PM  18   LONG TIME TO GET THEM.  SOMETIMES THE DOCUMENTS WOULDN'T BE THE

01:03PM  19   DOCUMENTS THAT SHE REQUESTED.  SHE WAS ASKING TO INTERVIEW

01:03PM  20   CERTAIN EMPLOYEES, AND SHE FELT THAT THOSE REQUESTS WERE

01:03PM  21   IMPEDED.

01:03PM  22        SHE TOLD YOU THAT THERE WAS MORE ATTORNEY INVOLVEMENT IN

01:03PM  23   THIS SURVEY THAN SHE HAD PREVIOUSLY EXPERIENCED, AND SHE EVEN

01:03PM  24   TOLD YOU THAT HOLMES AND BALWANI TRIED TO INFLUENCE HER

01:03PM  25   FINDINGS WHEN AT THE END SHE WAS CONCERNED AND SHE EXPRESSED

01:03PM 1 THOSE CONCERNS THAT HOLMES AND BALWANI TRIED TO TALK HER OUT OF

01:03PM 2 REACHING THOSE CONCLUSIONS.

01:03PM 3 SHE ALSO TOLD YOU SOMETHING ELSE THAT WAS INTERESTING.

01:03PM 4 RECALL THAT SHE TOLD YOU AFTER THE SURVEY SHE CONTINUED TO

01:03PM 5 COMMUNICATE WITH THERANOS, INCLUDING SOMEONE NAMED DR. DAS,

01:03PM 6 D-A-S. AND WHEN SHE WAS COMMUNICATING WITH DR. DAS, SHE TOLD

01:03PM 7 YOU THAT DR. DAS TOLD HER THAT THERANOS ITSELF HAD CONCLUDED

01:03PM 8 THAT THERE WAS A POSSIBLE PATIENT IMPACT FOR EVERY ONE OF ITS

01:03PM 9 TESTS ON THE 3.5 DEVICE.

01:04PM 10 AND THAT STATEMENT FROM DR. DAS TO MS. BENNETT WAS MADE

01:04PM 11 WHILE SUNNY BALWANI STILL WORKED AT THERANOS. SO THERANOS

01:04PM 12 ITSELF, AFTER THE 2015 CMS SURVEY, IS MAKING STATEMENTS ABOUT

01:04PM 13 ITS VIEW OF ITS TESTING.

01:04PM 14 THERE'S LOTS OF EVIDENCE ABOUT THE INACCURACY OF THERANOS

01:04PM 15 TESTING. WE'RE GOING TO GO THROUGH SOME OF THAT.

01:04PM 16 IT BEGINS, THOUGH, WITH THE QUALITY CONTROL FAILURES THAT

01:04PM 17 THEY WERE SEEING EVEN ON MODIFIED THIRD PARTY DEVICES. THEY

01:04PM 18 WERE HAVING TROUBLE TESTING ACCURATELY ON THE EDISON DEVICE,

01:04PM 19 THE THERANOS DEVICE.

01:04PM 20 BUT YOU ALSO HEARD THAT THEY WERE TESTING PATIENT'S BLOOD

01:04PM 21 ON THIRD PARTY DEVICES THAT THERANOS HAD MODIFIED AND IN THIS

01:04PM 22 EMAIL AND QUESTION AND ANSWER WITH DR. PANDORI, YOU SEE

01:04PM 23 DR. PANDORI EXPRESSING SOME CONCERNS ABOUT THE EFFECT THAT

01:05PM 24 CERTAIN PROTOCOLS THAT THEY'RE RUNNING ON THE MODIFIED DEVICES

01:05PM 25 ARE HAVING ON QUALITY CONTROL, THAT EVEN THESE MODIFIED DEVICES

CLOSING ARGUMENT BY MR. SCHENK                                    7048

01:05PM  1    WERE CREATING PROBLEMS IN THE LAB AND PANDORI WAS TALKING TO

01:05PM  2    YOU ABOUT HOW THOSE PROBLEMS WERE UNIQUE.

01:05PM  3         THE 3.5'S ALSO, NOT JUST THE MODIFIED DEVICES, THE 3.5'S

01:05PM  4    WERE ALSO FAILING QUALITY CONTROL.

01:05PM  5         REMEMBER THIS CHART THAT YOU SAW THAT LISTED QUALITY

01:05PM  6    CONTROL FAILURES FOR A PARTICULAR MONTH, THIS MONTH OF MARCH IN

01:05PM  7    2014.

01:05PM  8         BUT PANDORI AND ROSENDORFF TOLD YOU THAT THESE FAILURES

01:05PM  9    WERE NOT UNIQUE, THEY WERE TYPICAL.  IF YOU LOOK AT THE TEXT OF

01:05PM  10   THE QUESTION AND ANSWER, THEY BOTH SAY THAT MARCH WAS NOT A

01:05PM  11   UNIQUE MONTH, THAT THESE FAILURES WERE TYPICAL.  AND YOU ALSO

01:05PM  12   HEARD THE IMPLICATIONS OF QUALITY CONTROL FAILURES, WHAT IT

01:05PM  13   MEANS TO HAVE QUALITY CONTROL FAILURES WHEN LYNETTE SAWYER AND

01:05PM  14   OTHER WITNESSES TOLD YOU HOW IT'S IMPORTANT TO MONITOR HOW YOUR

01:06PM  15   TESTS ARE DOING ON A DAILY BASIS, EVEN IN THE CLIA LAB THROUGH

01:06PM  16   THE QUALITY CONTROL PROCESS BECAUSE THAT CAN SEND YOU SIGNALS

01:06PM  17   ABOUT THE ABILITY OR LACK OF ABILITY OF THE TESTING TO GENERATE

01:06PM  18   ACCURATE RESULTS.

01:06PM  19        THERE'S A SPECIFIC INSTANCE THAT DR. PANDORI TOLD YOU

01:06PM  20   ABOUT WHEN THERANOS HAD RECEIVED SOME PROFICIENCY TESTING

01:06PM  21   SAMPLES, AND IT TOOK THESE SAMPLES AND TESTED THEM ON DIFFERENT

01:06PM  22   DEVICES.  IT TOOK THE SAMPLES AND TESTED THEM ON THERANOS

01:06PM  23   DEVICES, AND ON PREDICATE DEVICES, AND IT EVEN RERAN THE

01:06PM  24   SAMPLES.  SO TWICE ON THE PREDICATE, TWICE ON THE THERANOS.

01:06PM  25        WHAT I HAVE CIRCLED HERE IN GREEN FOR YOU ARE THE RESULTS

CLOSING ARGUMENT BY MR. SCHENK                                    7049

```
01:06PM   1    FOR THE PSA, FOR THE PROSTATE TEST, WHERE YOU CAN SEE THAT WHEN
01:06PM   2    THEY RUN THESE SAMPLES TWICE ON THE PREDICATE DEVICES, NOTICE
01:06PM   3    THEY'RE GETTING THE SAME SCORE, SO THEY'RE GETTING A 3.1 AND
01:06PM   4    THEN A 3.1 WHEN THEY RERUN IT.  THEY'RE GETTING A 7.5 AND THEN
01:07PM   5    A 7.5 WHEN THEY RERUN THE PSA ON THE PREDICATE DEVICES, THE
01:07PM   6    THIRD PARTY TESTING DEVICES.
01:07PM   7         BUT WHEN THEY USE THE THERANOS DEVICES AND RERUN THESE
01:07PM   8    TESTS, THEY'RE GETTING WILDLY DIFFERENT RESULTS EACH TIME.
01:07PM   9    THEY'RE GETTING A 1.9 AND THEN A 2.6.
01:07PM  10         AND THEN WHEN THEY RUN THE SECOND ONE, A 4.9 AND A 7.2.
01:07PM  11         AND DR. PANDORI TOLD YOU THAT THIS KIND OF ACTIVITY, THIS
01:07PM  12    KIND OF STUDY WAS CONCERNING TO HIM.  IT IS SUGGESTIVE OF
01:07PM  13    FURTHER PROBLEMS, AND IT'S JUST ONE OF THE MANY PIECES OF
01:07PM  14    EVIDENCE THAT YOU'VE SEEN THAT CALL INTO QUESTION THE ACCURACY
01:07PM  15    OF THERANOS'S TESTING.
01:07PM  16         THERE'S A DOCUMENT THAT YOU SAW CALLED THE MASTER VALUE
01:07PM  17    LITIGATION PLAN FOR ELISA ASSAYS ON THE THERANOS DEVICES.
01:07PM  18         SO WHEN THERANOS WANTS TO PUT THESE ASSAYS THROUGH THE
01:07PM  19    RESEARCH AND DEVELOPMENT STAGE AND THEN VALIDATE THEM SO THEY
01:07PM  20    CAN MOVE THEM FROM THE R&D LAB INTO THE CLIA LAB TO RUN ON
01:08PM  21    PATIENTS, LOOK AT THE LANGUAGE THAT THEY USE IN THEIR OWN
01:08PM  22    DOCUMENT TO HELP MAKE THESE VALIDATION DETERMINATIONS.  "THE
01:08PM  23    SYSTEM ENABLES RESULTS IN UNDER AN HOUR WITH PRECISION AND
01:08PM  24    ACCURACY EQUIVALENT TO TRADITIONAL CLINICAL LABORATORY
01:08PM  25    ANALYZERS."
```

ER-5187

CLOSING ARGUMENT BY MR. SCHENK                                    7050

01:08PM 1          AND WHAT I'M FOCUSSING YOU ON IS THAT WORD "EQUIVALENT."

01:08PM 2          WHEN THEY'RE TALKING TO THIRD PARTIES, TO PATIENTS, TO

01:08PM 3     INVESTORS, THERANOS IS NEVER BRAGGING ABOUT ITS ABILITY TO RUN

01:08PM 4     TESTING THAT IS EQUIVALENT TO THE TECHNOLOGY THAT EXISTS IN THE

01:08PM 5     MARKET.  THEY'RE USING WORDS LIKE "HIGHEST LEVELS OF ACCURACY,"

01:08PM 6     THEY'RE TALKING ABOUT HOW THEIR TECHNOLOGY IS EVEN BETTER THAN

01:08PM 7     WHAT IS ALREADY IN THE MARKET.

01:08PM 8          BUT WHEN THERANOS ITSELF IS TALKING ABOUT HOW TO VALIDATE

01:08PM 9     ITS TESTING TECHNOLOGY, IT, IN THE INTERNAL DOCUMENTS,

01:08PM 10    ACKNOWLEDGES THAT HIGHER IS TOO HIGH A BAR FOR THERANOS AND

01:08PM 11    SETS THE BAR LOWER TO LOOK FOR EQUIVALENCY.

01:08PM 12         BUT EVEN THAT, YOU HEARD SOME USEFUL TESTIMONY FROM

01:09PM 13    DR. ROSENDORFF.  DR. ROSENDORFF, WHEN THIS SENTENCE WAS PICKED

01:09PM 14    OUT AND ASKED HIS THOUGHTS AFTER WORKING WITH THESE DEVICES AND

01:09PM 15    THESE SYSTEMS FOR MORE THAN A YEAR WAS THAT YOUR EXPERIENCE

01:09PM 16    WITH THEM, AND DR. ROSENDORFF IN STRONG LANGUAGE SAYS, THIS IS

01:09PM 17    A LIE, THAT IT WAS EVEN EQUIVALENT TO EXISTING TECHNOLOGY.

01:09PM 18         AND THEN THE CONVERSATION GOES ON.  DR. ROSENDORFF WAS

01:09PM 19    ASKED ABOUT THE SIEMENS ADVIA 1800 AND HOW THE 1800 PART OF

01:09PM 20    THAT MEANT THAT IT COULD RUN 1800 TESTS IN ONE HOUR.

01:09PM 21         AND DR. ROSENDORFF WAS ASKED HOW DOES THAT COMPARE TO THE

01:09PM 22    THERANOS DEVICE?  AND YOU MAY REMEMBER WHAT HE SAID ABOUT THE

01:09PM 23    THERANOS DEVICE COULD DO WAS RUN ONE IF YOU WERE LUCKY.

01:09PM 24         I WANT TO GO THROUGH SOME SPECIFIC TIMELINES FOR CERTAIN

01:09PM 25    ASSAYS TO SHOW YOU THERANOS WAS TESTING CERTAIN ASSAYS EVEN

01:09PM  1    AFTER RECEIVING KNOWLEDGE THAT THAT PARTICULAR ASSAY WAS

01:10PM  2    INACCURATE, WAS TROUBLESOME FOR THERANOS.

01:10PM  3        LET'S START WITH HCG.

01:10PM  4        THE THERANOS VALIDATION REPORT FOR HCG ON THE EDISON WAS

01:10PM  5    SIGNED IN MARCH OF 2014.  HERE'S THAT DOCUMENT, THE VALIDATION

01:10PM  6    REPORT.

01:10PM  7        AND NOTICE I MENTIONED THIS TO YOU EARLIER.  AT THE VERY

01:10PM  8    BOTTOM YOU SEE DR. DHAWAN'S SIGNATURE.  DR. DHAWAN SIGNED THIS

01:10PM  9    ON 9/19/15, SEPTEMBER 19TH, 2015.  THAT'S THE SATURDAY.  THAT'S

01:10PM 10    THE DAY THAT DR. DHAWAN WAS INVITED INTO THERANOS BY

01:10PM 11    MR. BALWANI TO SIGN A STACK OF DOCUMENTS.  SO THIS IS ONE OF

01:10PM 12    THOSE DOCUMENTS THAT DR. DHAWAN SIGNED THAT ONE SATURDAY JUST A

01:10PM 13    COUPLE OF DAYS IN ADVANCE OF THE CMS SURVEY.

01:10PM 14        SO THE THERANOS HCG ASSAY IS VALIDATED TO MOVE FROM THE

01:10PM 15    R&D LAB INTO THE CLIA LAB IN MARCH OF 2014.

01:10PM 16        IN MAY, IT BEGINS TESTING ON THE EDISON.  AND YOU KNOW

01:11PM 17    FROM THIS DOCUMENT IT SHOWS YOU THE 12 ASSAYS.  THERANOS IS

01:11PM 18    TESTING ON THE EDISON AND THE START AND END DATE FOR IT.  SO

01:11PM 19    THERANOS STARTED BEGIN TESTING ON HCG IN MAY OF 2014.

01:11PM 20        LATER IN MAY, A FEW WEEKS LATER, DR. ROSENDORFF HALTS THE

01:11PM 21    HCG TESTING ON THE EDISON DEVICE, AND I JUST SHOWED YOU THIS

01:11PM 22    EMAIL A FEW SLIDES BACK, OR IT HALTS TESTING ON THE HCG EDISON

01:11PM 23    DEVICE.

01:11PM 24        THEN ELIZABETH HOLMES RECEIVES EMAIL COMPLAINTS FROM

01:11PM 25    CUSTOMERS ABOUT HCG.  HERE'S ONE WHERE HER BROTHER IS TELLING

01:11PM   1    MS. HOLMES THAT HCG IS CAUSING THEM A LOT OF ISSUES RIGHT NOW

01:11PM   2    AND PATIENT COMPLAINTS.

01:11PM   3        MR. BALWANI ALSO RECEIVES EMAILS ABOUT THE EDISON FAILING

01:11PM   4    QUALITY CONTROLS.  THIS ONE IN JUNE GOES TO MR. BALWANI, AND

01:11PM   5    IT'S TALKING ABOUT QC FAILURES ON EDISON DEVICES, AND IT LISTS

01:12PM   6    ASSAYS, AND YOU SEE HCG IS ONE OF THE ASSAYS THAT IS LISTED

01:12PM   7    THERE.

01:12PM   8        THEN THERE'S EMAILS WITH ADDITIONAL CUSTOMER COMPLAINTS

01:12PM   9    THAT GO TO BOTH HOLMES AND BALWANI.  WE'RE NOW IN SEPTEMBER

01:12PM   10   WHERE HOLMES AND BALWANI ARE REVIEWING SPECIFIC EMAILS ABOUT

01:12PM   11   CUSTOMER COMPLAINTS REGARDING HCG.  AFTER ALL OF THAT,

01:12PM   12   BRITTANY GOULD GOES IN AND GETS HER HCG TEST.  THAT'S IN

01:12PM   13   OCTOBER OF 2014.  YOU HEARD HER TESTIMONY.

01:12PM   14       SO AFTER ROSENDORFF TRIES TO HALT IT, AFTER THEY GET

01:12PM   15   WARNED IN EMAILS, AFTER IT'S CAUSING THEM A LOT OF PAIN, THEN

01:12PM   16   BRITTANY GOULD GOES IN AND GETS HER HCG TEST.

01:12PM   17       AND AFTER ALL OF THAT THEY CEASE, THEY STOP TESTING HCG ON

01:12PM   18   THE EDISON.  YOU KNOW THAT FROM THIS SAME DOCUMENT THAT WAS

01:12PM   19   SHARED WITH CMS.

01:12PM   20       AND FINALLY, DR. ZACHMAN TOLD YOU AT LEAST AS TO

01:12PM   21   BRITTANY GOULD'S HCG TEST, DR. ZACHMAN DOES NOT THINK THAT THEY

01:12PM   22   WERE ACCURATE.  THEY SUGGESTS THAT THERE WAS A PROBLEM WITH THE

01:13PM   23   PREGNANCY, BUT, YOU KNOW, BRITTANY GOULD SUCCESSFULLY CARRIED

01:13PM   24   THE PREGNANCY TO TERM.

01:13PM   25       LET'S DO THE SAME THING FOR PSA.  FOR THE PSA TEST, IT WAS

01:13PM 1     VALIDATED ON THE EDISON DEVICE IN SEPTEMBER OF 2013.  AND

01:13PM 2     HERE'S THE DOCUMENT LIKE THIS THAT I SHOWED YOU FOR HCG.  HERE

01:13PM 3     IS THE VALIDATION DOCUMENT FOR PSA.

01:13PM 4         NOTICE AGAIN DHAWAN'S SIGNATURE ON SEPTEMBER 19TH, THE DAY

01:13PM 5     THAT HE WAS INVITED TO SIGN A BUNCH OF DOCUMENTS, AND THIS IS

01:13PM 6     ONE OF THOSE DOCUMENTS THAT HE SIGNS.

01:13PM 7         THE INTERNAL RESULTS COMPARISON, THE GREEN CIRCLE THAT WE

01:13PM 8     TALKED ABOUT A MOMENT AGO, SENDS WARNING SIGNS THAT THE

01:13PM 9     THERANOS DEVICE, UNLIKE THE PREDICATE DEVICE, IS NOT GENERATING

01:13PM 10    THIS REPEATABLE PSA TEST RESULT WHEN IT'S THE SAME SAMPLE, IT'S

01:13PM 11    NOT GENERATING THE SAME RESULT WHEN YOU RUN THAT TEST A SECOND

01:13PM 12    TIME.  THAT WAS IN FEBRUARY.

01:13PM 13        AND NOW IN MAY AND JUNE DR. ELLSWORTH GETS HIS PSA TEST.

01:14PM 14    SO AFTER THEY SEE THE WARNING SIGNS ABOUT PSA, IT'S AFTER THAT

01:14PM 15    THAT DR. ELLSWORTH GETS HIS PSA TESTS.  AND HERE'S THE FIRST

01:14PM 16    AND THIRD ELLSWORTH PSA TEST.  YOU KNOW THEY WERE RUN ON THE

01:14PM 17    EDISON BECAUSE YOU'VE SEEN THE INTERNAL EMAILS THAT IDENTIFY

01:14PM 18    WHICH DEVICE HIS SPECIFIC TESTS WERE RUN ON WHEN THERANOS IS

01:14PM 19    TRYING TO IDENTIFY THE PROBLEM.

01:14PM 20        AFTER THAT, THERANOS CEASES TESTING OF PSA ON THE EDISON.

01:14PM 21    YOU KNOW FROM THIS SAME CMS DOCUMENT THAT THERANOS ENDED ITS

01:14PM 22    PSA TESTING ON THE EDISON IN JUNE OF 2015.

01:14PM 23        AND AFTER THAT, DR. ELLSWORTH RECEIVED HIS VEIN DRAW TEST,

01:14PM 24    THE ONE THAT WAS DRAWN IN HIS DENTIST OFFICE.  AND THAT'S THIS

01:14PM 25    DOCUMENT THAT GAVE HIM THE SCORE THAT DR. BURNES WAS

01:14PM  1    COMFORTABLE AFTER THERANOS HAD HALTED TESTING OF PSA ON THE

01:14PM  2    EDISON DEVICE.

01:15PM  3         ALL OF THIS, ALL OF THE BLOOD TESTING THAT THERANOS WAS

01:15PM  4    DOING FOR PATIENTS WAS WHILE HOLMES AND BALWANI WERE TEXTING

01:15PM  5    ABOUT SOMETHING DIFFERENT, ABOUT KNOWLEDGE THAT THERE WERE

01:15PM  6    PROBLEMS IN THE LAB, THAT THE NORMANDY LAB WAS A DISASTER, THAT

01:15PM  7    THEY NEED TO STOP FIGHTING FIRES BY NOT CREATING THEM IN THE

01:15PM  8    LAB, BY NEEDING NEW LAB DIRECTORS AND MANAGERS, BY IDENTIFYING

01:15PM  9    THE ROOT CAUSES OF THEIR PROBLEMS.

01:15PM  10        IN THEIR TEXT MESSAGES, THEY'RE TALKING ABOUT THE PROBLEMS

01:15PM  11   WITH BLOOD TESTING WHILE AT THE SAME TIME THEY'RE ALLOWING THE

01:15PM  12   BRITTANY GOULDS, THE DR. ELLSWORTHS, THE OTHER PATIENTS THAT

01:15PM  13   YOU HAVE HEARD FROM COME IN AND GET BLOOD TESTS AT THERANOS.

01:15PM  14        THEY ARE ALSO, AND IN THIS INSTANCE YOU SEE MR. BALWANI,

01:15PM  15   HE'S RECEIVING CUSTOMER COMPLAINT LOGS.  WHEN CUSTOMERS ARE

01:15PM  16   CALLING THERANOS TO COMPLAIN ABOUT ISSUES WITH TESTING, THEY

01:15PM  17   GET PUT INTO A DOCUMENT, AND YOU'VE SEEN THESE DOCUMENTS AND

01:16PM  18   EMAILS TO MR. BALWANI.  SO HE'S SEEING IN REAL TIME PROBLEMS

01:16PM  19   WITH PSA TESTING OR HCG TESTING, OTHER PROBLEMS.

01:16PM  20        BUT HE'S NOT JUST SEEING IT IN THE TEXT MESSAGES, HE'S NOT

01:16PM  21   JUST SEEING IT IN CUSTOMER COMPLAINT LOGS, HIS OWN EMPLOYEES

01:16PM  22   ARE GOING TO HIM LIKE ERIKA CHEUNG AND DR. PANDORI, AND THEY'RE

01:16PM  23   BOTH DIRECTLY CONFRONTING SUNNY BALWANI AND SAYING THAT THEY

01:16PM  24   HAVE CONCERNS ABOUT THE ACCURACY OF THERANOS'S BLOOD TESTING

01:16PM  25   TECHNOLOGY.

CLOSING ARGUMENT BY MR. SCHENK                                        7055

01:16PM  1          AND YOU SEE HERE ERIKA CHEUNG SAYING SHE DISCUSSED THESE

01:16PM  2   POOR QUALITY CONTROL RESULTS WITH MR. BALWANI, AND DR. PANDORI

01:16PM  3   IS SAYING THAT HE ALSO COMMUNICATED DIRECTLY WITH MR. BALWANI

01:16PM  4   ABOUT IN THIS INSTANCE STOPPING TO USE THE EDISON DEVICE.

01:16PM  5          MR. BALWANI TOLD HIM THAT WOULD NEVER HAPPEN.

01:16PM  6          THOSE WERE THE ONLY EMPLOYEES, THOUGH, THAT WARNED ABOUT

01:17PM  7   PROBLEMS IN THE LAB.  THIS EMPLOYEE YOUR HEARD SOME TESTIMONY

01:17PM  8   ABOUT TYLER SHULTZ ALSO SENT AN EMAIL, AND YOU SAW THAT EMAIL

01:17PM  9   GET FORWARDED TO SUNNY BALWANI.  SO IT ISN'T JUST THE WITNESSES

01:17PM  10  THAT YOU HAVE HEARD FROM.  YOU'VE SEEN OTHER EMAILS WHERE

01:17PM  11  MR. BALWANI IS TOLD THAT OTHER EMPLOYEES ALSO HAVE CONCERNS

01:17PM  12  ABOUT THERANOS'S BLOOD TESTING.

01:17PM  13         EVEN BEFORE THE LAUNCH, EVEN BEFORE SEPTEMBER OF 2013 WHEN

01:17PM  14  THERANOS BEGAN OFFERING TESTING IN WALGREENS STORES,

01:17PM  15  DR. ROSENDORFF WROTE AN EMAIL CALLED CONCERNS ABOUT THE LAUNCH.

01:17PM  16  DR. ROSENDORFF IN THE EMAIL IDENTIFIED SPECIFIC ASSAYS THAT HE

01:17PM  17  WAS WORRIED ABOUT.

01:17PM  18         SO EVEN BEFORE THEY LAUNCHED WITH WALGREENS, EVEN BEFORE

01:17PM  19  THEY BEGAN TESTING A PATIENT'S BLOOD, MR. BALWANI IS SENT THIS

01:17PM  20  EMAIL THAT DR. ROSENDORFF WROTE WARNING ABOUT PROBLEMS WITH THE

01:17PM  21  LAUNCH.  WHAT HAPPENED WITH PATIENTS WASN'T A SURPRISE.  IT WAS

01:17PM  22  EXPECTED.

01:17PM  23         THERE WERE -- THE WAY THERANOS SOLVED THE PROBLEMS WAS TO

01:18PM  24  CONDUCT THESE AFTER-THE-STUDY, AFTER-THE-FACT STUDIES.  SO

01:18PM  25  THERANOS WOULD TRY TO FIGURE OUT WHAT SOME OF ITS PROBLEMS

CLOSING ARGUMENT BY MR. SCHENK                                    7056

01:18PM  1    WERE.

01:18PM  2         AND WHAT DR. ROSENDORFF TOLD YOU WAS THE FIRST TIME OR TWO

01:18PM  3    THAT THAT HAPPENED, I ACTUALLY WAS SATISFIED.  I THOUGHT WE HAD

01:18PM  4    A PROBLEM, AND THEN WE DID SOME KIND OF ROOT CAUSE ANALYSIS TO

01:18PM  5    FIGURE OUT WHAT THAT PROBLEM WAS, AND THEN THAT STUDY MADE ME

01:18PM  6    COMFORTABLE, AND MY COMFORT LEVEL QUICKLY EVAPORATED BECAUSE

01:18PM  7    THERE WASN'T EVER A PERMANENT FIX.  BECAUSE WE WOULD HAVE A

01:18PM  8    STUDY, AND WE WOULD COME UP WITH SOME SOLUTION, YOU WOULD PUT

01:18PM  9    THAT SOLUTION IN PLACE, AND THEN YOU WOULD HAVE MORE PROBLEMS

01:18PM 10    POP UP.

01:18PM 11         AND WHAT MR. BALWANI WRITES IN THIS EMAIL IS INSIGHTFUL.

01:18PM 12    HE ISN'T SURPRISED BY THE FACT THAT THEY'RE HAVING TO DO THESE

01:18PM 13    STUDIES.  WHAT HE'S ACKNOWLEDGING IS THAT THERE ARE ALL OF

01:18PM 14    THESE STUDIES ALWAYS AFTER THE FACT.  THAT WE AREN'T EVER ABLE

01:18PM 15    TO SORT OF GET AHEAD OF THE PROBLEM, TO GET THE TECHNOLOGY TO A

01:18PM 16    PLACE WHERE IT WILL JUST RELIABLY AND ACCURATELY TEST PATIENT

01:19PM 17    BLOOD.

01:19PM 18         WHAT THERANOS WAS LEFT DOING, AND WHAT MR. BALWANI KNEW

01:19PM 19    THAT THEY WERE LEFT TO DO WAS TO TEST PATIENT BLOOD, CREATE

01:19PM 20    PROBLEMS, AND THEN SCRAMBLE, AND THEN COME UP WITH A WAY TO TRY

01:19PM 21    TO JUSTIFY THOSE RESULTS OR FIX THE PROBLEMS AFTER THE PATIENTS

01:19PM 22    GET THESE INACCURATE TEST RESULTS.

01:19PM 23         MR. BALWANI WAS ALSO INFORMED OF THE NUMEROUS TIMES THAT

01:19PM 24    THERANOS'S TECHNOLOGY, ITS EDISONS, WERE FAILING QUALITY

01:19PM 25    CONTROL AND HOW THAT WAS A SIGNIFICANT PROBLEM AT THERANOS

ER-5194

01:19PM  1    BECAUSE OF WHAT QUALITY CONTROL TOLD YOU ABOUT THE VALUE OF THE

01:19PM  2    UTILITY OF THE THERANOS DEVICES.

01:19PM  3         AND YOU'VE SEEN EMAIL AFTER EMAIL WHERE MR. BALWANI IS

01:19PM  4    INFORMED OF THESE QUALITY CONTROL FAILURES.

01:19PM  5         YOU SAW THIS SPECIFIC EMAIL WHICH IS ABOUT ANOTHER HCG

01:19PM  6    PROBLEM WHERE HOLMES AND BALWANI ARE TOLD, AND I'M STARTING AT

01:19PM  7    THE LARGER BLOWUP AT THE BOTTOM FROM A PHYSICIAN.  "WE WILL

01:20PM  8    CALL THE SUPPORT LINE BUT ALSO WANTED TO GIVE YOU A HEADS UP ON

01:20PM  9    WHAT HAPPENED WITH THE LAB.  WE SENT A PATIENT OF OURS IN FOR

01:20PM  10   HER 48-HOUR REPEAT ON HER HCG.  HER INITIAL TEST CAME BACK AT

01:20PM  11   160 (RUN AT A DIFFERENT LAB), AND WHEN WE SENT HER BACK IN FOR

01:20PM  12   HER REPEAT WITH YOUR LAB, THE RESULTS CAME BACK AT BELOW 7.

01:20PM  13   BECAUSE HER TEST CAME BACK NEGATIVE, WE HAD HER DISCONTINUE HER

01:20PM  14   CURRENT MEDICATIONS AND BEGAN GETTING HER READY FOR HER NEXT

01:20PM  15   CYCLE.

01:20PM  16        "A FEW WEEKS LATER SHE WENT BACK IN FOR ANOTHER HCG AND IT

01:20PM  17   CAME BACK AT OVER 2,000.  WE BROUGHT HER IN AND I SCANNED HER,

01:20PM  18   AND THERE WAS IN FACT A BABY AND A HEARTBEAT.

01:20PM  19        "OUR CONCERN IS YOUR LAB TOLD US SHE HAD A NEGATIVE

01:20PM  20   PREGNANCY.  WE RELAYED THAT TO OUR PATIENT AND CONTINUED OUR

01:20PM  21   PROTOCOL AS SHE WASN'T PREGNANT."

01:20PM  22        AND THEN LOOK AT WHAT HOLMES AND BALWANI ARE LEFT TO SAY

01:20PM  23   TO EACH OTHER.  MS. HOLMES WRITES, "HOW DID THAT HAPPEN."

01:21PM  24        AND MR. BALWANI WRITES "FINDING OUT."

01:21PM  25        THEY KNEW THAT THERE WERE PROBLEMS WITH HCG, AND THEY KNEW

CLOSING ARGUMENT BY MR. SCHENK                                    7058

01:21PM   1      THERE WERE PROBLEMS WITH ALL OF THEIR TESTS EVEN BEFORE

01:21PM   2      LAUNCHING.  THEY STILL WENT FORWARD AND LAUNCHED.  AND ALL THEY

01:21PM   3      ARE LEFT TO DO WHEN THEY GET INFORMED OF THESE PROBLEMS IS

01:21PM   4      AFTER THE FACT COME UP WITH A JUSTIFICATION OR EXCUSES FOR

01:21PM   5      THOSE TESTS.

01:21PM   6          THERE ARE ADDITIONAL HCG EMAILS.  YOU'VE SEEN THESE

01:21PM   7      EXAMPLES, EXHIBIT 4840, 4836, AND 4145, ALL TALKING ABOUT

01:21PM   8      PROBLEMS WITH THE HCG TESTING AT THERANOS AND HOW HOLMES AND

01:21PM   9      BALWANI ARE SPENDING THEIR TIME TRYING TO FIGURE OUT WHAT THESE

01:21PM  10      RELATE TO, WHAT CAUSED THE PROBLEM AND HOW THEY CAN JUSTIFY

01:21PM  11      CONTINUING TO TEST.

01:21PM  12          HCG IS NOT THE ONLY ASSAY THAT YOU'VE HEARD ABOUT.  YOU'VE

01:21PM  13      SEEN EMAILS RELATED TO PT INR WHERE THEY'RE IDENTIFYING PATIENT

01:22PM  14      PROBLEMS RELATING TO PT INR, BUT HCG AND PT INR WEREN'T THE

01:22PM  15      ONLY ONES.

01:22PM  16          YOU'VE SEEN HDL EMAILS WHERE ROSENDORFF IS WARNING

01:22PM  17      MR. BALWANI THAT THEY SHOULD DISCONTINUE HDL TESTING.  AND LOOK

01:22PM  18      HOW HE PHRASES THE EMAIL, "I WOULD LIKE TO DISCONTINUE HCG

01:22PM  19      TESTING."

01:22PM  20          BUT WHAT ROSENDORFF TOLD YOU WAS, IF I WAS THE TRUE LAB

01:22PM  21      DIRECTOR, I WOULDN'T HAVE TO DO IT IN THIS WAY.  I WOULDN'T

01:22PM  22      HAVE TO ASK PERMISSION OR INFORM THE PERSON WHO REALLY OVERSEES

01:22PM  23      THE LAB, I COULD JUST MAKE THESE DECISIONS.

01:22PM  24          BUT LOOK AT WHAT MR. BALWANI RESPONDS, "WE CANNOT REVERT

01:22PM  25      BACK TO VENIPUNCTURE FOR HDL."  SO EVEN WHEN CONFRONTED WITH

CLOSING ARGUMENT BY MR. SCHENK                                    7059

01:22PM   1     PROBLEMS ON SPECIFIC ASSAYS AND ROSENDORFF IS ABIDING BY THE

01:22PM   2     STRUCTURE AT THERANOS WHERE THE LAB DIRECTOR DOESN'T HAVE THE

01:22PM   3     POWER TO MAKE THOSE DECISIONS, SO HE GOES TO BALWANI ABOUT IT

01:22PM   4     AND HE'S TOLD NO.

01:22PM   5         THERE'S ANOTHER ASSAY BICARB THAT HAS ISSUES THAT

01:22PM   6     DR. ROSENDORFF TOLD YOU THAT I THOUGHT WAS UNIQUE, WAS A

01:23PM   7     SPECIFIC PROBLEM TO THERANOS DEVICES, THE WAY THERANOS TESTED

01:23PM   8     THIS PARTICULAR ASSAY HE THOUGHT WAS CAUSING PROBLEMS.  AND

01:23PM   9     NOTICE IN THE EMAIL, THE ONE ON THE LEFT BOTTOM, 4189,

01:23PM  10     DR. ROSENDORFF TELLS MR. BALWANI THAT HE IS THINKING THAT SINCE

01:23PM  11     WE VOID ALL ABNORMAL BICARBONATE RESULTS, THE TEST HAS LOST ANY

01:23PM  12     DIAGNOSTIC VALUE AND PROBABLY ALSO RELIABILITY WHEN RESULTS ARE

01:23PM  13     REPORTED IN THE NORM RANGE.

01:23PM  14         AND THEN ABOVE THAT DR. ROSENDORFF FOLLOWS UP WITH FURTHER

01:23PM  15     CONCERNS ABOUT THIS ASSAY.  SO THE NUMBER OF ASSAYS IS JUST

01:23PM  16     GROWING.  THE NUMBER OF ASSAYS WITH PROBLEMS AND EMAILS

01:23PM  17     DIRECTLY TO MR. BALWANI IS ANOTHER GROUP OF ASSAYS CALLED ISE

01:23PM  18     ASSAYS.

01:23PM  19         AGAIN, MR. BALWANI IS ON THESE EMAILS WHERE THEY'RE

01:23PM  20     IDENTIFYING PROBLEMS WITH THIS SET OF ASSAYS, WITH ISE ASSAYS.

01:23PM  21         AND THIS EMAILS CONTAINS JUST A BUNCH OF DIFFERENT ASSAYS.

01:24PM  22     THIS ONE TALKS ABOUT VITAMIN B12, HCG, TESTOSTERONE, C02,

01:24PM  23     OTHERS.

01:24PM  24         SO SOMETIMES THERE ARE ASSAYS BEING DESCRIBED TO

01:24PM  25     MR. BALWANI AS PROBLEMATIC BY THEMSELVES IN AN EMAIL, AND

ER-5197

01:24PM   1    SOMETIMES THEY WRITE SEVERAL ASSAYS IN ONE EMAIL AND WARN

01:24PM   2    MR. BALWANI ABOUT THESE PROBLEMS.

01:24PM   3        THE SECOND ELEMENT FOR THE PATIENT COUNTS IS THIS SAME

01:24PM   4    CONCEPT OF MATERIALITY, THAT IS, THE FALSE STATEMENTS THAT THE

01:24PM   5    PATIENT HEARD NEEDED TO MATTER, NEEDED TO BE THE KIND OF FALSE

01:24PM   6    STATEMENTS THAT WOULD CAUSE A PATIENT TO SPEND MONEY ON THE

01:24PM   7    BLOOD TESTING, AND HERE EACH OF THE PATIENTS TOLD YOU BOTH THE

01:24PM   8    SOURCE WHERE THEY GOT STATEMENTS ABOUT THERANOS AND THEN WHAT

01:24PM   9    THOSE STATEMENTS WERE.

01:24PM  10        SO BRITTANY GOULD TOLD YOU SHE SAW PATIENT BROCHURES; AND

01:24PM  11    MR. BINGHAM TOLD YOU HE SAW STATEMENTS ON THE THERANOS WEBSITE;

01:24PM  12    MAGAZINE ARTICLES WERE REVIEWED BOTH BY TOMPKINS AND BINGHAM;

01:25PM  13    AND THEN TOMPKINS ALSO TOLD YOU SHE THOUGHT SHE REMEMBERS

01:25PM  14    SEEING OR HEARING A COMMERCIAL FOR THERANOS.

01:25PM  15        AND THE SPECIFIC REPRESENTATIONS THAT MATTERED TO THE

01:25PM  16    PATIENT, AS IT'S PROBABLY NOT A SURPRISE, ARE THE ONES THAT

01:25PM  17    RELATE TO ACCURACY.

01:25PM  18        SO BRITTANY GOULD TALKED ABOUT HOW SHE SAW AND EXPECTED --

01:25PM  19    SHE SAW STATEMENTS ABOUT ACCURACY, AND SHE EXPECTED HER BLOOD

01:25PM  20    TESTS TO BE ACCURATE.

01:25PM  21        SAME WITH DR. ELLSWORTH.  HE SAW STATEMENTS ABOUT ACCURACY

01:25PM  22    AND EXPECTED HIS BLOOD TESTS TO GENERATE ACCURATE RESULTS.

01:25PM  23        SAME FOR TOMPKINS, ACCURACY.  SHE TOLD YOU WHAT HER

01:25PM  24    EXPECTATIONS WERE.

01:25PM  25        SAME FOR BINGHAM.  HE ALSO SAW STATEMENTS ABOUT ACCURACY,

01:25PM   1    AND HE EXPECTED HIS BLOOD TESTS TO BE ACCURATE.

01:25PM   2         THE THIRD ELEMENT FOR WIRE FRAUD AS TO PATIENTS IS ALSO AN

01:25PM   3    INTENT TO DEFRAUD.  MUCH OF THE EVIDENCE THAT SUPPORTS THIS

01:25PM   4    ELEMENT WE HAVE REVIEWED.  WE HAVE TALKED A LOT ABOUT THE

01:25PM   5    EVIDENCE SUPPORTING THIS INTENT ELEMENT, BUT I WANT TO GO

01:26PM   6    THROUGH SOME OF THE SPECIFIC EVIDENCE.

01:26PM   7         YOU CAN COMPARE THE ADVICE THAT HOLMES AND BALWANI WERE

01:26PM   8    GIVEN ABOUT THE CERTAIN WORDING TO USE THE APPROPRIATENESS OF

01:26PM   9    CERTAIN PHRASES, WITH WHAT WAS ACTUALLY COMMUNICATED ON THE

01:26PM  10    THERANOS WEBSITE.

01:26PM  11         SO YOU SAW THEN HOLMES AND BALWANI WERE WARNED AGAINST

01:26PM  12    SAYING THINGS LIKE "ONE TINY DROP OF BLOOD," AND THAT APPEARS

01:26PM  13    ON THE WEBSITE.

01:26PM  14         YOU SEE THAT THEY WERE WARNED TO REPLACE "HIGHEST LEVELS

01:26PM  15    OF ACCURACY" AND "HIGHEST LEVELS OF ACCURACY" STILL APPEARS ON

01:26PM  16    THE WEBSITE.

01:26PM  17         "FULL RANGE OF TESTS" SHOULD BE REPLACED, BUT "FULL RANGE

01:26PM  18    OF TESTS" STILL APPEARS.

01:26PM  19         AND "HIGHEST QUALITY."  SAME THING, THAT STILL APPEARS.

01:26PM  20         WE TALKED ABOUT THIS A BIT WITH INVESTORS, BECAUSE

01:26PM  21    INVESTORS THOUGHT THEY WERE INVESTING IN A COMPANY THAT COULD

01:26PM  22    TEST ACCURATELY.  THE SAME APPLIES TO PATIENTS.  PATIENTS

01:26PM  23    THOUGHT THEY WERE GETTING THEIR BLOOD TESTED IN A COMPANY THAT

01:26PM  24    COULD TEST ACCURATELY.

01:26PM  25         YOU CAN DO THAT SAME EXERCISE WITH PATIENT BROCHURES.  THE

01:27PM  1    PATIENT BROCHURES REFERENCE THE "ONE TINY DROP" OR THINGS LIKE

01:27PM  2    "ALL TESTS," OR "HIGHEST LEVELS OF ACCURACY."  SO THE SAME SORT

01:27PM  3    OF DECEPTIVE INFORMATION THAT WAS COMMUNICATED ON THE WEBSITE

01:27PM  4    ALSO APPEARS IN SOME PATIENT BROCHURES.

01:27PM  5        YOU ALSO SEE INTENT TO DEFRAUD EVIDENCE IN THE TEXT

01:27PM  6    MESSAGES.  HOLMES AND BALWANI ARE TALKING ABOUT PROBLEMS IN THE

01:27PM  7    LAB, THAT THEY NEED THE CTN, THE CAPILLARY TUBE AND NANOTAINER,

01:27PM  8    THEY NEED THAT FIXED.  IT SEEMS THAT THEY'RE A MESS.

01:27PM  9        AND IN THIS TEXT MESSAGE IN SEPTEMBER OF 2015 YOU SEE

01:27PM 10    MR. BALWANI SAY, "WE CAN BUILD THIS BUSINESS THEY SOFTWARE AND

01:27PM 11    JP AND RUN CIRCLES AROUND OTHERS AND FDA BY MANIPULATING THEIR

01:27PM 12    GAME."

01:27PM 13        AND MS. HOLMES RESPONDS, "WE CAN DEFINITELY RUN CIRCLES."

01:27PM 14        YOU SEE THEY TALK ABOUT HOW TO MESSAGE THE INABILITY TO DO

01:28PM 15    CERTAIN TESTS OR THE PROBLEM AFTER THE FACT WITH CERTAIN TESTS

01:28PM 16    WHEN VIP'S ARE GETTING BLOOD DRAWS.  AND IN THIS INSTANCE YOU

01:28PM 17    SEE THAT HOLMES AND BALWANI ARE INFORMED THAT A PROBLEM WITH A

01:28PM 18    PARTICULAR TEST WAS NOT THE RESULT OF HUMAN ERROR.  THAT'S WHAT

01:28PM 19    YOU SEE AT THE VERY BOTTOM OF THE SCREEN.  THEY'RE TRYING TO

01:28PM 20    FIGURE OUT WHAT THE PROBLEM WAS.  AND HOLMES AND BALWANI ARE

01:28PM 21    TOLD, WELL, WE'RE DOING THIS ANALYSIS, IT IS NOT THAT THERE WAS

01:28PM 22    SOME HUMAN ERROR IN THE TESTING.

01:28PM 23        AND THEN LOOK AT WHAT MS. HOLMES AT THE TOP OF THE SCREEN

01:28PM 24    SUGGESTS MESSAGING NEVERTHELESS, "YOU CAN SAY WE DO RUN THOSE

01:28PM 25    ASSAYS, BUT WERE NOT ABLE TO RUN THEM ON THIS SAMPLE,

01:28PM 1     APPARENTLY DUE TO A HUMAN ERROR IN SAMPLE HANDLING."

01:28PM 2         DR. ROSENDORFF TOLD YOU THAT HE FELT PRESSURE TO EXPLAIN

01:28PM 3     AWAY RESULTS, THAT THAT PRESSURE CAME FROM HOLMES AND BALWANI,

01:28PM 4     BUT THAT HE FELT HIS JOB AT THERANOS EVOLVED INTO EXPLAINING

01:29PM 5     AWAY THESE INACCURATE RESULTS.  AND THAT'S STRONG INTENT

01:29PM 6     EVIDENCE.

01:29PM 7         YOU KNOW WHAT GOAL HOLMES AND BALWANI ARE SEEKING TO

01:29PM 8     ACHIEVE WHEN THEY'RE ASKING THEIR LAB DIRECTOR TO JUSTIFY, TO

01:29PM 9     EXPLAIN AWAY, TO COVER FOR THE INACCURATE TESTING THAT IS

01:29PM 10    OCCURRING AT THERANOS.

01:29PM 11        YOU SAW THIS LINE OF QUESTIONING AND EXHIBITS.  WHEN

01:29PM 12    INSPECTORS CAME TO THERANOS, THEY HAD INTERNALLY A LONG

01:29PM 13    DISCUSSION ABOUT THE ROUTE THAT THE INSPECTORS WOULD TAKE, THE

01:29PM 14    WALKING ROUTE.

01:29PM 15        AND DR. ROSENDORFF TOLD YOU THAT THERE WERE INSTRUCTIONS

01:29PM 16    GIVEN SO THAT PEOPLE WOULDN'T BE COMING IN AND OUT OF CERTAIN

01:29PM 17    LABS, LIKE THE R&D LAB.  AGAIN, STRONG INTENT EVIDENCE.

01:29PM 18        IS HE TRYING TO CREATE A LAB THAT PROVIDES ACCURATE AND

01:29PM 19    RELIABLE BLOOD TESTING OR IS HE TRYING TO GET PATIENT MONEY

01:29PM 20    WITH A LAB WHILE OPERATING A LAB THAT DOESN'T PROVIDE THOSE

01:29PM 21    THINGS?  YOU CAN SEE HIS INTENT BY THESE KINDS OF ACTIONS.

01:30PM 22        AND THERE'S MANY MORE EMAILS.  I'M SHOWING YOU HERE JUST A

01:30PM 23    SUMMARY OF THE ASSAY, THE TYPE OF PROBLEM THAT WAS REPORTED TO

01:30PM 24    MR. BALWANI AND THE EXHIBIT NUMBER.

01:30PM 25        I'VE SHOWN YOU SOME OF THE EXHIBIT, BUT YOU CERTAINLY HAVE

01:30PM  1      SEEN MORE HERE DURING THE COURSE OF THE TRIAL WHERE SPECIFIC

01:30PM  2      ISSUES WITH SPECIFIC ASSAYS WERE BROUGHT TO MR. BALWANI'S

01:30PM  3      ATTENTION.

01:30PM  4          THE FINAL ELEMENT FOR PATIENTS IS THE INTERSTATE NEXUS

01:30PM  5      ELEMENT.  AND THE MEHRL ELLSWORTH IS BASED ON THIS FAX.  SO

01:30PM  6      RECALL THAT MEHRL ELLSWORTH RECEIVED THIS PSA TEST ON OR AROUND

01:30PM  7      MAY 16TH, AND IT WAS FAXED FROM THE THERANOS FAX NUMBER THAT

01:30PM  8      WAS LISTED AS A 650 AREA CODE, AND IT GOES TO HIS DOCTOR,

01:30PM  9      DR. BURNES.

01:30PM  10         DR. BURNES TOLD YOU HIS OFFICE WAS IN ARIZONA.  SO THAT

01:30PM  11     FAX CROSSES INTERSTATE LINES.  THIS IS NOT A FACT WHERE THERE

01:31PM  12     WAS A STIPULATION BETWEEN THE PARTIES.  I TOLD YOU THERE WERE

01:31PM  13     STIPULATIONS BETWEEN THE PARTIES AND -- BUT ONLY SOME FOR THE

01:31PM  14     FOURTH ELEMENT, THE INTERSTATE NEXUS ELEMENT, FOR THE BANKING

01:31PM  15     ONES, BUT NOT FOR THESE, NOT FOR THE FAX ONES.  SO THAT'S WHY

01:31PM  16     I'M SPENDING THE TIME TO GO THROUGH WITH YOU THAT THIS ONE WAS

01:31PM  17     FAXED FROM THERANOS IN CALIFORNIA TO ELLSWORTH'S DOCTOR IN

01:31PM  18     ARIZONA AND THE SAME IS TRUE FOR TOMPKINS.  SHE ALSO GOT HER

01:31PM  19     LABS FAXED FROM 650 TO HER DOCTOR, DR. ASIN, A-S-I-N, AND YOU

01:31PM  20     SEE THE DATE HERE IS MAY 11TH, 2015.

01:31PM  21         THE BINGHAM INTERSTATE IS A PHONE CALL.  MR. BINGHAM TOLD

01:31PM  22     YOU HE WAS LIVING IN ARIZONA AT THE TIME THAT HE WAS CONCERNED

01:31PM  23     ABOUT SOME OF THE RESULTS THAT HE WAS SEEING FROM THERANOS

01:31PM  24     TESTS.  SO HE CALLED CUSTOMER SERVICE.

01:31PM  25         DAN EDLIN TOLD YOU THAT THERANOS WAS LOCATED IN PALO ALTO.

CLOSING ARGUMENT BY MR. SCHENK                                    7065

01:32PM    1    SO YOU KNOW THAT WAS AN INTERSTATE WIRE.  THAT WENT FROM

01:32PM    2    BINGHAM IN ARIZONA TO THERANOS CUSTOMER SERVICE IN CALIFORNIA.

01:32PM    3    YOU ALSO KNOW THE IMPORTANCE OF THAT PHONE CALL.  AS PART OF

01:32PM    4    THE SCHEME, THERANOS HAD A CUSTOMER SERVICE DEPARTMENT.

01:32PM    5        AS A LAB, THAT CUSTOMER SERVICE DEPARTMENT TOOK PHONE

01:32PM    6    CALLS FROM PATIENTS, AND IF DURING THOSE PHONE CALLS THE

01:32PM    7    CUSTOMER SERVICE LAB WAS TELLING PATIENTS THINGS LIKE, YOU'RE

01:32PM    8    RIGHT, OUR TESTING IS INACCURATE, THIS SCHEME ENDS.

01:32PM    9        SO FAR THE EXISTENCE OF THIS CUSTOMER SERVICE LAB IS

01:32PM   10    NECESSARY IN ORDER FOR THE SCHEME TO CONTINUE.  THE CUSTOMER

01:32PM   11    SERVICE LAB HAS TO EXIST AND HAS TO COMMUNICATE WITH

01:32PM   12    INDIVIDUALS LIKE BINGHAM.

01:32PM   13        SO NOT ONLY IS THIS AN INTERSTATE WIRE, A PHONE CALL FROM

01:32PM   14    ARIZONA TO PALO ALTO, IT'S ESSENTIAL, IT'S NECESSARY IN ORDER

01:32PM   15    FOR THE SCHEME TO CONTINUE.

01:32PM   16        AND THEN HERE'S THE FINAL INTERSTATE WIRE.  THIS IS THE

01:32PM   17    WIRE THAT THERANOS SENT TO PURCHASE ADVERTISING IN ARIZONA AND

01:33PM   18    IN THE EMAIL, IT'S EXHIBIT 5454, YOU CAN SEE DANISE YAM ASKING

01:33PM   19    FOR PERMISSION FROM HOLMES AND BALWANI TO INITIATE THIS WIRE.

01:33PM   20        AND EVEN FURTHER DOWN YOU CAN SEE THE PURPOSE OF THE

01:33PM   21    WIRE, THAT IS, WHAT THEY'RE INTENDING TO DO WITH THE FUNDS.

01:33PM   22    AND IT TALKS ABOUT ADVERTISING, BOTH STATIC AND DIGITAL AT

01:33PM   23    CERTAIN LOCATIONS, AIRPORT AND CINEMA.

01:33PM   24        SO YOU SEE THAT THERANOS, AS PART OF THE SCHEME, WE'VE

01:33PM   25    TALKED ABOUT ADVERTISING, CREATING PATIENT BROCHURES AND THE

ER-5203

01:33PM 1   WEBSITE, BUT ALSO SPENDING MONEY, THIS FINANCIAL TRANSFER FOR

01:33PM 2   THE PURPOSE OF FURTHER ADVERTISING IN THE ARIZONA MARKET.

01:33PM 3        AND FOLKS LIKE MS. TOMPKINS TOLD YOU THEY RECALL HEARING

01:33PM 4   SOME ADVERTISING OR COMMERCIALS FOR THERANOS IN THE ARIZONA

01:33PM 5   MARKET.

01:34PM 6        WE'VE TALKED ABOUT THE ELEMENTS FOR CONSPIRACY AND WIRE

01:34PM 7   FRAUD.  THERE'S ANOTHER CONCEPT THAT I WILL TO TALK TO YOU

01:34PM 8   ABOUT, YOU'LL HEAR AIDING AND ABETTING.  AND I TOLD YOU THERE

01:34PM 9   WERE INSTANCES WHEN MR. BALWANI CAN BE RESPONSIBLE FOR THE

01:34PM 10  INVESTMENTS BY INVESTORS THAT HE DID NOT COMMUNICATE WITH.  SO

01:34PM 11  TOLBERT IS THE CLASSIC EXAMPLE OF THAT IN THIS TRIAL OF THAT.

01:34PM 12       TOLBERT GOT ON THE STAND AND TOLD YOU THAT HE HAD NEVER

01:34PM 13  SEEN AND PROBABLY NEVER MET SUNNY BALWANI AND DIDN'T EVER THINK

01:34PM 14  HE TALKED TO HIM.  AND I TOLD YOU TODAY WE WILL TALK ABOUT HOW

01:34PM 15  MR. BALWANI CAN STILL BE HELD RESPONSIBLE FOR THOSE KIND OF

01:34PM 16  INVESTMENTS AND IT'S FOR THEORIES SUCH AS AIDING AND ABETTING.

01:34PM 17  IT IS SOMETHING THAT THE GOVERNMENT SEPARATELY, YOU'LL SEE IN

01:34PM 18  THE JURY INSTRUCTIONS THAT THE JUDGE READS TO YOU, THAT ALSO

01:34PM 19  HAS ELEMENTS THAT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE

01:34PM 20  DOUBT FOR YOU TO CONVICT MR. BALWANI ON THIS THEORY OF

01:34PM 21  LIABILITY.

01:34PM 22       AND MR. BALWANI CAN BE HELD RESPONSIBLE FOR ACTIONS EVEN

01:35PM 23  IF HE DID NOT PERSONALLY COMMIT THE ACT OR ACTS THAT

01:35PM 24  CONSTITUTES THE CRIME, THE CRIME OF WIRE FRAUD AS TO

01:35PM 25  MR. TOLBERT, AND THERE ARE FOUR ELEMENTS.

01:35PM  1      THE FIRST ELEMENT IS THAT SOMEONE ELSE COMMITTED THE

01:35PM  2  CONDUCT CHARGED IN THE SPECIFIC WIRE FRAUD COUNTS.  THE WIRE

01:35PM  3  FRAUD COUNTS ARE THREE THROUGH TWELVE IN THE INDICTMENT.  THAT

01:35PM  4  INCLUDES BOTH THE INVESTOR COUNTS AND THE PATIENT COUNTS.

01:35PM  5      AND HERE THAT SOMEONE ELSE IS ELIZABETH HOLMES.

01:35PM  6      I WANT TO FOCUS ON THREE COUNTS WITH YOU, THREE, FOUR, AND

01:35PM  7  FIVE:  EISENMAN, LUCAS, AND TOLBERT BECAUSE TO ONE EXTENT OR

01:35PM  8  ANOTHER THEY HAD LESS OR NO COMMUNICATIONS WITH MR. BALWANI,

01:35PM  9  AND WE'LL TALK ABOUT THE EFFECT THAT AIDING AND ABETTING HAS ON

01:35PM 10  THOSE PARTICULAR COUNTS.

01:35PM 11      BUT ONE THING THAT IMPORTANT IS THE DATE OF THE

01:35PM 12  INVESTMENT.  SO EISENMAN, LUCAS AND TOLBERT ALL INVESTED OVER

01:35PM 13  THE COURSE OF TWO DAYS, DECEMBER 30TH AND DECEMBER 31ST OF

01:36PM 14  2013.  AND I'VE PUT ON HERE THE INTERACTIONS THAT THEY HAD

01:36PM 15  BEFORE THE INVESTMENT.  EISENMAN TALKED TO HOLMES AND HE ALSO

01:36PM 16  RECEIVED THAT MENDENHALL SUMMARY EMAIL THAT SUMMARIZED

01:36PM 17  MENDENHALL'S CONVERSATION WITH BALWANI.

01:36PM 18      BUT LUCAS AND TOLBERT HAD PRE-INVESTMENT COMMUNICATIONS

01:36PM 19  WITH ELIZABETH HOLMES.

01:36PM 20      THE SECOND ELEMENT IS THAT THE DEFENDANT AIDED, OR

01:36PM 21  COUNSELLED, COMMANDED, INDUCED, OR PROCURED THAT PERSON, AGAIN

01:36PM 22  ELIZABETH HOLMES, WITH RESPECT TO AT LEAST ONE ELEMENT OF WIRE

01:36PM 23  FRAUD AS CHARGED IN COUNTS TWO -- I'M SORRY, COUNTS THREE

01:36PM 24  THROUGH TWELVE OF THE INDICTMENT.

01:36PM 25      THE THIRD ELEMENT IS THAT THE DEFENDANT ACTED WITH THE

01:36PM   1    INTENT TO FACILITATE WIRE FRAUD AS CHARGED IN THOSE COUNTS, AND

01:36PM   2    THE AIDING, THE ROLE THAT BALWANI PLAYED IN THE INTENT.

01:36PM   3        SO SECOND AND THIRD ELEMENTS INCLUDES EVIDENCE THAT WE

01:36PM   4    HAVE TALKED ABOUT ALREADY.  I'M NOT GOING TO RESHOW YOU THAT

01:36PM   5    EVIDENCE.

01:36PM   6        BUT THE ROLE THAT BALWANI PLAYED IN AIDING WIRE FRAUD AND

01:37PM   7    INTENDING TO DEFRAUD IS EVIDENCE THAT WE HAVE COVERED ALREADY.

01:37PM   8        BUT THIS FOURTH ELEMENT IS PARTICULARLY NEW.  LET'S LOOK

01:37PM   9    AT THAT.

01:37PM  10        THE DEFENDANT ACTED BEFORE THE CRIME WAS COMPLETED.  THAT

01:37PM  11    IS, THE AID THAT HE PROVIDED TO HOLMES HAS TO BE BEFORE THE

01:37PM  12    CRIME WAS COMMITTED, NOT AFTER.  AND IN THIS INSTANCE, I TOLD

01:37PM  13    YOU WHEN WE FIRST TALKED ABOUT, THE MENDENHALL PHONE CALL IS

01:37PM  14    IMPORTANT BECAUSE IT HAPPENED ON DECEMBER 22ND, 2013, AND

01:37PM  15    BEFORE THE END OF DECEMBER INVESTMENTS BY THE INVESTORS THAT WE

01:37PM  16    JUST TALKED ABOUT.

01:37PM  17        SO MR. BALWANI DID AID, HE DID PLAY A ROLE BEFORE THOSE

01:37PM  18    INVESTMENTS, COUNTS THREE, FOUR, AND FIVE.

01:37PM  19        I WANT TO TALK TO YOU ABOUT A FEW ADDITIONAL TOPICS BEFORE

01:37PM  20    I SIT DOWN.  AND THE FIRST TOPIC IS SOME ARGUMENTS THAT THE

01:37PM  21    DEFENSE MADE TO YOU DURING THE COURSE OF THE TRIAL.

01:37PM  22        KEEP IN MIND THE GOVERNMENT BEARS THE BURDEN OF PROOF

01:37PM  23    HERE.  THE DEFENSE DOESN'T HAVE TO SPEAK.  THEY DON'T HAVE TO

01:37PM  24    GIVE AN OPENING OR A CLOSING.  THEY DON'T HAVE TO QUESTION

01:38PM  25    WITNESSES.

01:38PM   1        BUT WHEN THEY DO, WHEN THEY DO CHOOSE TO MAKE ARGUMENTS,

01:38PM   2   WHEN THEY DO CHOOSE TO CALL WITNESSES, IT IS APPROPRIATE FOR

01:38PM   3   YOU TO THINK CRITICALLY ABOUT THE ARGUMENTS THAT THEY'RE MAKING

01:38PM   4   TO YOU JUST LIKE YOU THINK CRITICALLY ABOUT THE ARGUMENTS THAT

01:38PM   5   THE GOVERNMENT MAKES.

01:38PM   6        AND I WANT TO TALK ABOUT A FEW OF THEM WITH YOU TODAY.

01:38PM   7        THE FIRST ONE I WANT TO TALK TO YOU ABOUT IS AN ARGUMENT

01:38PM   8   THAT COUNSEL HAS MADE TO YOU THAT SORT OF TAKES A FEW DIFFERENT

01:38PM   9   FORMS.  THEY'VE ARGUED THAT THERE WERE REAL SCIENTISTS WORKING

01:38PM  10   AT THERANOS DOING REAL WORK, SIGNING VALIDATION REPORTS SO THAT

01:38PM  11   WHEN THE TESTS WERE IN THE LAB, IN THE CLIA LAB, NOT

01:38PM  12   PERFORMING, NOT ACCURATELY TESTING PATIENT BLOOD, WELL, IT'S

01:38PM  13   NOT BALWANI'S FAULT.  HE WAS RELYING ON THESE VALIDATION

01:38PM  14   REPORTS THAT HAD A BUNCH OF SIGNATURES ON THEM.

01:38PM  15        AND THE ARGUMENT GOES EVEN FURTHER.  AND THE DEFENSE HAS,

01:38PM  16   AND THEY MAY CONTINUE TO SHOW YOU, INTERNAL EMAILS AT THERANOS

01:38PM  17   WHERE OPTIMISTIC OR POSITIVE THINGS ABOUT THERANOS'S TECHNOLOGY

01:39PM  18   ARE BEING COMMUNICATED TO MR. BALWANI.

01:39PM  19        THE IDEA BEING THAT IF MR. BALWANI THEN COMMUNICATES

01:39PM  20   OPTIMISTIC THINGS TO THIRD PARTIES, TO INVESTORS OR PATIENTS

01:39PM  21   EXTERNAL TO THERANOS, IT'S NOT BECAUSE HE'S INTENDING TO

01:39PM  22   DEFRAUD THIS THIRD PARTY.  HE'S JUST A CONDUIT.  HE'S RECEIVING

01:39PM  23   INTERNAL OPTIMISTIC THINGS ABOUT THERANOS, AND HE'S SHARING

01:39PM  24   THOSE INTERNAL OPTIMISTIC THINGS TO OTHERS.

01:39PM  25        AND I WANT TO UNPACK THAT A LITTLE WITH YOU.

CLOSING ARGUMENT BY MR. SCHENK                                    7070

01:39PM   1          FIRST, LET'S SPEND A MOMENT TALKING ABOUT THE TWO

01:39PM   2    DIFFERENT LABS AT THERANOS.  THEY HAD A RESEARCH AND

01:39PM   3    DEVELOPMENT LAB AND A CLIA LAB.  YOU HEARD THAT IN THE RESEARCH

01:39PM   4    AND DEVELOPMENT LAB THEY WORKED ON THE ASSAYS, THE CHEMISTRIES

01:39PM   5    THAT WHEN YOU ADD THEM TO THE PATIENT BLOOD, IT GENERATES A

01:39PM   6    RESULT OR A REACTION, AND THAT'S TRANSLATED INTO A SCORE, A

01:39PM   7    BLOOD TEST RESULT.

01:39PM   8          AND THAT AFTER THE WORK WAS DONE IN THE R&D LAB, THERANOS

01:40PM   9    PREPARED A VALIDATION REPORT, A DOCUMENT, AND THAT WAS THE

01:40PM  10    THING THAT MOVED THE ASSAY FROM THE R&D LAB INTO THE CLIA LAB.

01:40PM  11          AND DR. ROSENDORFF TOLD YOU SOMETHING INTERESTING ABOUT

01:40PM  12    THAT WORK, THE WORK OF MOVING TESTS FROM THE R&D LAB INTO THE

01:40PM  13    CLIA LAB.

01:40PM  14          DR. ROSENDORFF TOLD YOU THAT IN THE RUNOFF TO THE

01:40PM  15    WALGREENS LAUNCH, IN SEPTEMBER OF 2013, HE FELT, IN HIS WORDS,

01:40PM  16    IMMENSE PRESSURE, THAT THERE WAS IMMENSE PRESSURE PLACED ON THE

01:40PM  17    SCIENTISTS AT THERANOS TO VALIDATE ASSAYS, THAT THE ASSAYS WERE

01:40PM  18    NOT BEING VALIDATED WHEN THEY WERE READY, BUT RATHER BECAUSE OF

01:40PM  19    THIS PRESSURE.

01:40PM  20          AND WHAT DR. ROSENDORFF TOLD YOU WAS ACTUALLY SUPPORTED BY

01:40PM  21    THE EVIDENCE.

01:40PM  22          IF YOU LOOK AT THE EVIDENCE, YOU SAW VALIDATION REPORTS IN

01:40PM  23    THIS CASE.  I WAS PUTTING OUT SOME OF THEM TO YOU WHEN

01:40PM  24    DR. DHAWAN WOULD SIGN THEM ALL ON SEPTEMBER 19TH, IF YOU LOOK

01:41PM  25    AT ALL OF THE VALIDATION REPORTS THAT WERE PRESENTED TO YOU AND

01:41PM   1    GRAPH THEM AGAINST THE DATE THEY WERE VALIDATED AGAINST

01:41PM   2    THERANOS'S CASH BALANCE, YOU SEE SOMETHING INTERESTING,

01:41PM   3    THERANOS WAS VALIDATING ITS ASSAYS WHEN THEY NEEDED MONEY, NOT

01:41PM   4    WHEN THE SCIENCE WAS READY.

01:41PM   5         REMEMBER WE TALKED ABOUT IN THAT PERIOD OF TIME IN LATE

01:41PM   6    SEPTEMBER OF 2013, WHEN THERANOS WAS DOWN TO ABOUT $7 MILLION,

01:41PM   7    THAT'S WHEN THERANOS IS VALIDATING MOST OF THOSE ASSAYS, AND

01:41PM   8    THEN ALL OF THE INVESTOR MONEY COMES IN IN LATE 2013, AND ON A

01:41PM   9    COUPLE OF OCCASIONS IN '14, ALL OF THE VALIDATION WORK PETERS

01:41PM  10    OUT.  THEY STOP VALIDATING AT THAT POINT.  THERANOS WAS

01:41PM  11    VALIDATING ASSAYS BECAUSE THEY NEEDED MONEY, NOT BECAUSE THE

01:41PM  12    SCIENCE WAS READY.

01:41PM  13         YOU KNOW THIS ALSO HAS AN APPLICATION TO THIS IDEA THAT

01:42PM  14    INTERNAL OPTIMISTIC EMAILS THAT GO TO BALWANI HELP YOU

01:42PM  15    UNDERSTAND THAT HE ACTUALLY HAD GOOD INTENT, THAT HE WAS JUST

01:42PM  16    COMMUNICATING WHAT HE HEARD, BUT THESE ARE THE SAME

01:42PM  17    INDIVIDUALS, THE SAME EMPLOYEES THAT ARE RECEIVING THE PRESSURE

01:42PM  18    FROM MR. BALWANI, THE SAME PRESSURE TO VALIDATE ASSAYS, NOT

01:42PM  19    BECAUSE THE SCIENCE IS READY, BUT BECAUSE THERANOS NEEDS MONEY.

01:42PM  20         SO WHEN AN INTERNAL EMPLOYEE WRITES AN EMAIL SAYING

01:42PM  21    SOMETHING POSITIVE, THEY'RE SAYING IT IN AN ENVIRONMENT WHERE

01:42PM  22    THEY'RE BEING PRESSURED TO VALIDATE NOT BASED ON SCIENTIFIC

01:42PM  23    READINESS BUT BASED ON FINANCIAL DESPERATION.

01:42PM  24         THE SECOND ARGUMENT THAT I WANT TO SPEND A MOMENT TALKING

01:42PM  25    TO YOU ABOUT IS THIS IDEA THAT MR. BALWANI COMMUNICATED

CLOSING ARGUMENT BY MR. SCHENK                        7072

01:42PM  1    FINANCIAL PROJECTIONS BUT THEY WERE JUST THAT, THEY WERE

01:42PM  2    PROJECTIONS, AND, THEREFORE, THEY DID NOT MISLEAD INVESTORS,

01:42PM  3    BECAUSE INVESTORS KNEW THAT THEY WERE PROJECTIONS, NOT ACTUAL.

01:42PM  4    AND IT EVEN GOES A LITTLE BIT FURTHER AND SAYS, NOT ONLY DID HE

01:42PM  5    COMMUNICATE PROJECTIONS, BUT HE REVEALED THE UNDERLYING

01:43PM  6    ASSUMPTIONS BEHIND THOSE PROJECTIONS SO THAT IT WASN'T, IT

01:43PM  7    WASN'T DECEPTIVE FOR AN INVESTOR TO RECEIVE THIS INFORMATION

01:43PM  8    BECAUSE THE INVESTOR, ONE, KNEW IT WAS A PROJECTION, AND, TWO,

01:43PM  9    EVEN KNEW, BECAUSE MR. BALWANI WAS TRANSPARENT, THE ASSUMPTIONS

01:43PM 10    BEHIND THAT.

01:43PM 11         BUT, AGAIN, YOU THINK CRITICALLY ABOUT THAT ARGUMENT

01:43PM 12    FAILS, AND IT FAILS FOR SEVERAL REASONS.  FIRST, LOOK AT HOW

01:43PM 13    WILDLY OFF THOSE PROJECTIONS ARE.  MOSLEY TALKED TO YOU A

01:43PM 14    LITTLE BIT ABOUT THIS.  MOSLEY RECEIVED THE PROJECTIONS, AND HE

01:43PM 15    THOUGHT THE 2014 NUMBERS SHOULD BE PRETTY ACCURATE BECAUSE HE

01:43PM 16    RECEIVED THEM IN OCTOBER, AND IF IN OCTOBER HE'S BEING TOLD

01:43PM 17    THAT BY THE END OF THE YEAR THERANOS EXPECTS TO RECEIVE

01:43PM 18    $140 MILLION IN REVENUE, MOSLEY THOUGHT THAT WOULD BE PRETTY

01:43PM 19    CLOSE TO ACCURATE.

01:43PM 20         BUT MOSLEY CUT THEM SOME SLACK FOR '15.  HE KNEW THAT '15

01:43PM 21    WASN'T ACTUAL.  BUT HE NEVER EXPECTED, NO INVESTOR WOULD EVER

01:43PM 22    EXPECT THAT THEY WOULD BE THIS WILDLY OFF.  WHEN YOU LOOK AT

01:44PM 23    WHAT THEIR ACTUAL REVENUE WAS COMPARED TO WHAT WAS PROJECTED,

01:44PM 24    IT IS OFF BY A HUGE MARGIN.  IN FACT, IF YOU TRACE BACK

01:44PM 25    THERANOS'S ACTUAL REVENUE NUMBERS TO 2 -- 2009, THEIR BEST YEAR

01:44PM   1        WAS 2009.

01:44PM   2             DO YOU REMEMBER YOU HEARD THE ARGUMENT THAT IN 2009, THE

01:44PM   3        GREAT RECESSION HAPPENED AND COMPANIES WERE ALL STRUGGLING.

01:44PM   4        THAT WAS ACTUALLY THE YEAR THAT THERANOS GENERATED THE MOST

01:44PM   5        REVENUE, ALMOST $3 MILLION IN REVENUE.

01:44PM   6             AND AFTER THAT THE REVENUE WENT DOWN.

01:44PM   7             IN 2010 AND '11, AND THEN THROUGH THE YEARS THAT THE

01:44PM   8        INVESTORS RECEIVED THESE FINANCIAL PROJECTIONS, AND THAT THE

01:44PM   9        SAME ARGUMENT THAT I MADE TO YOU A MOMENT AGO ABOUT THERANOS

01:44PM  10        VALIDATING ASSAYS BECAUSE THEY NEEDED MONEY, NOT BECAUSE OF

01:44PM  11        SCIENCE, EQUALLY APPLIES HERE.

01:44PM  12             YOU HEARD INVESTORS TELL YOU THAT THEY BELIEVED THAT

01:44PM  13        THERANOS OPERATED WHAT WAS CALLED STEALTH MODE FROM 2003 TO

01:45PM  14        2013, FOR THIS TEN YEAR PERIOD, AND THAT INVESTORS WERE UNDER

01:45PM  15        THE IMPRESSION THAT THAT WAS A GOOD THING, THAT THERANOS STAYED

01:45PM  16        UNDER THE RADAR UNTIL IT DEVELOPED TECHNOLOGY TO THE POINT THAT

01:45PM  17        IT WAS READY TO GO PUBLIC, TO RELEASE THIS ON REAL PATIENTS IN

01:45PM  18        WALGREENS STORES.

01:45PM  19             BUT WHAT YOU SEE HERE IS THAT THERANOS LEFT STEALTH MODE

01:45PM  20        NOT BECAUSE IT WAS READY, NOT BECAUSE THE TECHNOLOGY WAS READY,

01:45PM  21        BUT BECAUSE THEY COULDN'T AFFORD TO BE IN STEALTH MODE ANY

01:45PM  22        LONGER.

01:45PM  23             THERE'S A FEW OTHER ARGUMENTS THAT I WANT TO MAKE TO YOU

01:45PM  24        OR REMIND YOU THAT THE DEFENSE HAS MADE.  AND THE FIRST ONE IS

01:45PM  25        THAT MR. BALWANI GUARANTEED A LOAN.  DO YOU REMEMBER THIS

CLOSING ARGUMENT BY MR. SCHENK                                    7074

01:45PM  1    ARGUMENT THAT AROUND 2009 OR 2010 THERANOS WAS RUNNING OUT OF

01:45PM  2    MONEY, AND BECAUSE OF THE RECESSION, IT WAS DIFFICULT TO GET

01:45PM  3    FUNDING?  AND A FINANCIAL INSTITUTION LENT MONEY TO THERANOS,

01:45PM  4    AND MR. BALWANI SIGNED OFF ON THAT LOAN.  HE DIDN'T GIVE THE

01:45PM  5    MONEY TO THERANOS, BUT HE SIGNED OFF SO THAT IF THERANOS

01:46PM  6    DEFAULTED ON THAT LOAN, MR. BALWANI WOULD BE ON THE HOOK.  HE

01:46PM  7    WOULD ALSO BE RESPONSIBLE.

01:46PM  8         AND FROM THIS ARGUMENT, I THINK THAT COUNSEL WANTS YOU TO

01:46PM  9    BELIEVE THAT THIS IS PROOF THAT MR. BALWANI BELIEVED IN THE

01:46PM  10   COMPANY, BELIEVED IN THE TECHNOLOGY.

01:46PM  11        IN FACT, IN OPENING, THEY WENT AS FAR AS TO TELL YOU THAT

01:46PM  12   MR. BALWANI DID NOT GUARANTEE THIS LOAN BECAUSE HIS GIRLFRIEND,

01:46PM  13   ELIZABETH HOLMES, WAS RUNNING THE COMPANY, BUT RATHER BECAUSE

01:46PM  14   HE DID DUE DILIGENCE, BECAUSE HE LEARNED ABOUT THERANOS AND HE

01:46PM  15   REALLY BELIEVED IN IT.

01:46PM  16        THERE'S NO EVIDENCE OF THAT.

01:46PM  17        WHAT YOU KNOW IS THAT MR. BALWANI GUARANTEED A LOAN AND

01:46PM  18   FROM THAT YOU CAN REACH TWO CONCLUSIONS.  IT'S EVIDENCE OF

01:46PM  19   KNOWLEDGE, AND IT'S EVIDENCE OF MOTIVE.

01:46PM  20        WHEN I SAY "KNOWLEDGE," WHAT I MEAN IS THAT EVEN IN 2009

01:46PM  21   BEFORE MR. BALWANI STARTS WORKING AT THERANOS, HE KNOWS FIRST

01:46PM  22   IT'S RUNNING OUT OF MONEY AND IT NEEDS MONEY BECAUSE HE'S GOING

01:46PM  23   TO HELP GUARANTEE A LOAN; AND, SECOND, THAT WHATEVER THEY'RE

01:46PM  24   DOING TO GENERATE REVENUE UP UNTIL THAT POINT, IT'S NOT

01:47PM  25   WORKING.  THEY HAVE TO DO SOMETHING GOING FORWARD.  SO HIS

ER-5212

01:47PM   1    ACTION OF GUARANTEEING THIS LOAN IS EVIDENCE OF KNOWLEDGE.

01:47PM   2    IT'S ALSO MOTIVE EVIDENCE.

01:47PM   3        BEFORE HE GUARANTEES THE LOAN, MR. BALWANI CAN SIT ON THE

01:47PM   4    SIDELINES AND ROOT FOR THERANOS'S SUCCESS.  HIS GIRLFRIEND

01:47PM   5    WORKS THERE.  HE HOPES IT'S SUCCESSFUL.  IF IT IS, IT WILL

01:47PM   6    REVOLUTIONIZE BLOOD TESTING.

01:47PM   7        ONCE HE GUARANTEES A LOAN, HE HAS SKIN IN THE GAME.  NOW

01:47PM   8    IT'S IMPORTANT TO MR. BALWANI.  BOTTOM LINE, IT'S IMPORTANT TO

01:47PM   9    HIM THAT THERANOS BE A SUCCESS.

01:47PM  10        AND BECAUSE HE KNOWS THAT THERANOS NEEDS MONEY, AND

01:47PM  11    WHATEVER IT HAS BEEN DOING ISN'T WORKING, HE KNOWS THAT THEY

01:47PM  12    HAVE TO DO SOMETHING DIFFERENT IN THE FUTURE.

01:47PM  13        YOU ALSO HEARD THAT IT WAS ON THIS OCCASION THAT

01:47PM  14    MR. BALWANI BEGAN TO GET OPTIONS OR STOCK.  SO NOT ONLY DOES HE

01:47PM  15    HAVE SKIN IN THE GAME AND NOT ONLY IS HE ON THE LINE FOR

01:47PM  16    THERANOS'S FUTURE SUCCESS, BUT HE WILL PROFIT.  HE HAS OPTIONS

01:48PM  17    IN THERANOS'S STOCK.  SO HOW IT DOES IN THE FUTURE, AGAIN,

01:48PM  18    ISN'T SOMETHING THAT HE CAN SIT ON THE SIDELINES AND ROOT FOR

01:48PM  19    THE SUCCESS, BUT IT ACTUALLY NOW BENEFITS HIM PERSONALLY.

01:48PM  20        THE DEFENSE HAS ALSO MADE ARGUMENTS TO YOU ABOUT THIS IDEA

01:48PM  21    THAT THERANOS MISSPENT INVESTOR MONEY.  THAT WHEN BALWANI LEFT

01:48PM  22    THERANOS, THERE WAS STILL MONEY IN THE BANK, THAT THEY HAD REAL

01:48PM  23    SCIENTISTS, THAT THEY HAD PATENTS, THAT THERANOS WAS SPENDING

01:48PM  24    INVESTOR MONEY ON THERANOS EXPENSES.

01:48PM  25        AND I WANT TO THINK CRITICALLY FOR A MOMENT ABOUT THAT

01:48PM 1    ARGUMENT.  FIRST, YOU KNOW THAT THERE ARE DIFFERENT KINDS OF

01:48PM 2    FRAUD.  YOU CERTAINLY HAVE HEARD INSTANCES WHERE A FRAUDSTER

01:48PM 3    WILL SAY GIVE ME YOUR MONEY AND I'LL INVEST IT IN THE STOCK

01:48PM 4    MARKET, AND INSTEAD SPENDS IT ON A HOUSE OR A CAR OR

01:48PM 5    EXTRAVAGANT TRAVEL, JUST COMPLETE MISSPENDS INVESTOR MONEY.

01:48PM 6    THAT'S ONE FORM OF FRAUD.  THAT JUST DOESN'T HAPPEN TO BE THE

01:48PM 7    FRAUD THAT THE GOVERNMENT CHARGED MR. BALWANI WITH COMMITTING.

01:48PM 8        SO WHEN THEY TELL YOU THAT MR. BALWANI, OR THERANOS

01:49PM 9    GENERALLY, WERE SPENDING INVESTOR MONEY ON THERANOS EXPENSES,

01:49PM 10   ESSENTIALLY WHAT THEY'RE TELLING YOU IS THAT MR. BALWANI DIDN'T

01:49PM 11   COMMIT A CRIME BUT A CRIME THAT HE WASN'T CHARGED WITH.  YOU

01:49PM 12   KNOW THAT INVESTORS INVESTED BECAUSE THEY THOUGHT THERANOS WAS

01:49PM 13   ONE THING.

01:49PM 14       THEY THOUGHT THAT IT HAD BEEN VALIDATED BY PHARMA.  ALL OF

01:49PM 15   THE CATEGORIES OF FALSE STATEMENTS.  THEY INVESTED BECAUSE THEY

01:49PM 16   THOUGHT THAT THE STORY OF THERANOS WAS WHAT THEY HAD BEEN TOLD,

01:49PM 17   WHEN, IN FACT, IT WAS SOMETHING DIFFERENT.

01:49PM 18       WHEN MR. BALWANI SAYS WE SPENT THE INVESTOR MONEY ON

01:49PM 19   THERANOS EXPENSES, HE'S TELLING YOU BALWANI DIDN'T COMMIT SOME

01:49PM 20   OTHER FRAUD, SOME OTHER WAY OF MISSPENDING INVESTOR MONEY.

01:49PM 21       IT'S ACTUALLY A LITTLE MORE NUANCED THAN THAT BECAUSE YOU

01:49PM 22   HEARD SOME INVESTORS SAY THAT THEY INVESTED BECAUSE THEY

01:49PM 23   THOUGHT THAT THEIR MONEY WAS GOING TO GO TO THE WALGREENS

01:49PM 24   ROLLOUT, THAT THE TECHNOLOGY WAS DONE, AND THAT THERANOS JUST

01:49PM 25   NEEDED TO EXPAND QUICKLY.

CLOSING ARGUMENT BY MR. SCHENK                                    7077

01:49PM  1         AND YOU KNOW THAT WASN'T TRUE.  YOU'VE SEEN THE EVIDENCE

01:49PM  2    THAT ACTUALLY WHAT THERANOS NEEDED WAS TO CREATE THE TECHNOLOGY

01:50PM  3    TO PERFORM THIS BLOOD TESTING.

01:50PM  4         SO THERE IS EVEN A LITTLE BIT OF THE INVESTORS THINKING

01:50PM  5    THAT THEIR MONEY WOULD BE SPENT ONE WAY, BUT, IN FACT, IT

01:50PM  6    ACTUALLY WENT TO SOMETHING ELSE, BUT THAT IS NOT THE MAIN

01:50PM  7    POINT.

01:50PM  8         THE MAIN POINT ON THIS ISSUE IT IS NOT A CASE ABOUT

01:50PM  9    MR. BALWANI TAKING THE INVESTOR MONEY AND BUYING A CAR OR A

01:50PM 10    HOUSE.  THAT'S NOT WHAT THE CASE IS ABOUT.  IT'S ABOUT FALSE

01:50PM 11    STATEMENTS COMMUNICATED TO INVESTORS FOR THE PURPOSE OF

01:50PM 12    DECEIVING THEM.

01:50PM 13         THE FIFTH DEFENSE ARGUMENT THAT YOU HEARD DURING THE

01:50PM 14    COURSE OF THE CASE THAT I WANT TO SPEND A MOMENT TALKING TO YOU

01:50PM 15    ABOUT IS LIS.

01:50PM 16         YOU HEARD THAT THERANOS BEGAN TESTING PATIENT BLOOD IN

01:50PM 17    SEPTEMBER OF 2013 IN WALGREENS STORES.

01:50PM 18         YOU HEARD THAT THERANOS HAD A DATABASE WHERE IT STORED

01:50PM 19    PATIENT TESTING INFORMATION.

01:50PM 20         YOU HEARD THAT AT SOME POINT IT HAD A PRIOR VERSION OF A

01:50PM 21    DATABASE AND THEN IT CREATED WHAT WAS CALLED A BESPOKE, A NOVEL

01:51PM 22    VERSION OF LIS, LAB INFORMATION SYSTEMS.

01:51PM 23         AND YOU HEARD THAT THAT DATABASE WAS CREATED USING

01:51PM 24    SOFTWARE MADE BY MICROSOFT CALLED SQL OR SPELLED SQL.

01:51PM 25         AND THE DEFENSE CALLED A WITNESS CALLED RICHARD SONNIER ON

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. SCHENK                                    7078

01:51PM  1    THIS TOPIC.  AND HE NEVER WORKED AT THERANOS, AND HE HAD NEVER

01:51PM  2    SEEN LIS, BUT HE TOLD YOU HE HAD PRIOR EXPERIENCE WORKING WITH

01:51PM  3    THIS MICROSOFT PRODUCT WITH SQL.

01:51PM  4        AND MR. SONNIER TOLD YOU THAT HE UNDERSTOOD THAT BEFORE

01:51PM  5    THE INVESTIGATION STAGE, BEFORE MR. BALWANI WAS CHARGED WITH

01:51PM  6    CRIMES, THE GOVERNMENT TRIED TO GET A COPY OF THE LIS FROM

01:51PM  7    THERANOS.

01:51PM  8        MR. SONNIER TOLD YOU THAT HE HEARD THE GOVERNMENT RECEIVED

01:51PM  9    A COPY, AND HE HEARD THE GOVERNMENT SHARED OR GAVE A COPY TO

01:51PM  10   MR. BALWANI.

01:51PM  11       MR. SONNIER TOLD YOU THAT HE HEARD OR UNDERSTOOD THAT THE

01:51PM  12   GOVERNMENT COULD NOT OPEN THE COPY OF LIS THAT IT RECEIVED.

01:52PM  13   AND HE ALSO TOLD YOU THAT HE COULD NOT OPEN THE VERSION THAT

01:52PM  14   BALWANI HAD, THE LIS VERSION THAT BALWANI HAD.

01:52PM  15       THEN YOU EVEN SAW OUR EMAILS, THE PROSECUTORS IN THIS CASE

01:52PM  16   EMAILS, OUR ATTEMPTS TO GET ADDITIONAL COPIES FROM THERANOS,

01:52PM  17   THAT WHEN THE GOVERNMENT COULD NOT OPEN THE LIS VERSION THAT IT

01:52PM  18   RECEIVED, THE GOVERNMENT WENT BACK TO THERANOS AND TRIED TO GET

01:52PM  19   ANOTHER COPY, A WORKABLE COPY, AND IT DIDN'T JUST STOP WITH

01:52PM  20   THERANOS.

01:52PM  21       YOU HEARD THAT AFTER THERANOS CEASED TO EXIST, A DIFFERENT

01:52PM  22   ENTITY INTERCEPTED ITS ASSETS, AND YOU SAW THE GOVERNMENT WENT

01:52PM  23   TO THAT ENTITY ALSO AND TRIED TO GET LIS.

01:52PM  24       AND FINALLY, THERE WAS NO LIS IN THE COURTROOM.  YOU

01:52PM  25   DIDN'T SEE LIS.

01:52PM 1          NOW, FROM THIS I ANTICIPATE THE DEFENSE IS GOING TO TELL

01:52PM 2    YOU, YOU CANNOT CONVICT SUNNY BALWANI BECAUSE THE LIS IS NOT

01:52PM 3    HERE.  AND THAT'S THE ARGUMENT I WANT TO RESPOND TO.

01:52PM 4          FIRST, LIS IS LIMITED TO THE PATIENT COUNTS.  MR. BALWANI

01:53PM 5    IS CHARGED WITH DEFRAUDING INVESTORS WITH A WIDE VARIETY OF

01:53PM 6    FALSE STATEMENTS.  WE TALKED ABOUT THOSE CATEGORIES, AND THOSE

01:53PM 7    CATEGORIES GO WELL BEYOND THE ACCURACY OF THERANOS'S BLOOD

01:53PM 8    TESTING, THE HEALTH OF THE WALGREENS RELATIONSHIP DOD WORK,

01:53PM 9    PHARMA VALIDATION.  LIS IS NOT RELATED TO THE INVESTOR COUNTS.

01:53PM 10         BUT LET'S TALK ABOUT ITS RELATION TO THE PATIENT COUNTS.

01:53PM 11   MR. BALWANI WILL WANT YOU TO THINK THAT AT LEAST AS TO THE

01:53PM 12   PATIENT COUNTS, YOU CANNOT CONVICT MR. BALWANI OF THE PATIENT

01:53PM 13   COUNTS BECAUSE LIS IS NOT HERE IN THE COURTROOM.  THAT ARGUMENT

01:53PM 14   IS MAKING AN ASSUMPTION.  IT'S SPECULATING, IT'S ASKING YOU TO

01:53PM 15   ASSUME THAT THE EVIDENCE WITHIN LIS WOULD BE HELPFUL TO

01:53PM 16   MR. BALWANI, THAT THAT IS WHERE ALL OF THE EXCULPATORY

01:53PM 17   INFORMATION, ALL OF THE HELPFUL TO MR. BALWANI INFORMATION

01:53PM 18   REGARDING THERANOS BLOOD TESTING EXISTS.

01:54PM 19         PAUSE FOR A MOMENT AND JUST APPRECIATE THAT.  ARE YOU

01:54PM 20   SURPRISED THAT COUNSEL IS TELLING YOU THAT A PIECE OF EVIDENCE,

01:54PM 21   ANY PIECE OF EVIDENCE THAT ISN'T HERE IN COURT IS THE KEY PIECE

01:54PM 22   OF EVIDENCE?

01:54PM 23         OF COURSE NOT.

01:54PM 24         BUT LET'S UNPACK EVEN THAT STATEMENT.

01:54PM 25         IF LIS WAS HERE, YOU KNOW IT COULDN'T GET ON THE STAND AND

CLOSING ARGUMENT BY MR. SCHENK

01:54PM  1    TESTIFY TO YOU.  YOU KNOW LIS WOULD NEED TO BE BROUGHT TO LIFE

01:54PM  2    THROUGH A WITNESS.

01:54PM  3        LET'S TALK FOR A MOMENT WHAT THAT WITNESS WOULD LOOK LIKE

01:54PM  4    IDEALLY.  IDEALLY THE WITNESS WOULD BE A MEDICAL DOCTOR.  THE

01:54PM  5    CASE IS ABOUT BLOOD TESTING, AND THE LIS CONTAINED MEDICAL

01:54PM  6    INFORMATION.  SO IDEALLY THE WITNESS WOULD BE A MEDICAL DOCTOR,

01:54PM  7    BUT NOT JUST A MEDICAL DOCTOR, ONE WITH TRAINING IN PATHOLOGY,

01:54PM  8    SOMEONE WHO HAD PRIOR EXPERIENCE WITH LAB TESTING, BUT NOT JUST

01:54PM  9    A MEDICAL DOCTOR WITH TRAINING AND PATHOLOGY, MAYBE ONE WHO

01:54PM 10    WORKED AT THERANOS.

01:54PM 11        IF YOU'RE GOING TO BRING LIS TO LIFE ON THE STAND, YOU

01:54PM 12    WOULD WANT A PATHOLOGIST, TRAINED MEDICAL DOCTOR WHO WORKED AT

01:54PM 13    THERANOS, BUT MAYBE YOU WOULDN'T STOP THERE.  MAYBE YOU WOULD

01:55PM 14    ALSO WANT THE MEDICALLY TRAINED PATHOLOGIST WHO WORKED AT

01:55PM 15    THERANOS WHO ALSO WORKED WITH LIS.  THAT WOULD BE THE KIND OF

01:55PM 16    WITNESS WHO COULD PROVIDE YOU THE MOST INSIGHT INTO THE EFFECT

01:55PM 17    THAT LIS HAS ON THE ACCURACY OF BLOOD TESTING AT THERANOS.

01:55PM 18        WELL, YOU KNOW WHAT, THAT WITNESS DID TESTIFY IN THIS

01:55PM 19    TRIAL, AND HIS NAME IS DR. ROSENDORFF.  DR. ROSENDORFF GOT ON

01:55PM 20    THE STAND WITH THAT EXPERIENCE AND TOLD YOU THAT AS PART OF HIS

01:55PM 21    WORK AT THERANOS, INFORMATION FROM LIS WAS PULLED, WAS GATHERED

01:55PM 22    FOR HIM, THAT HE REVIEWED THAT AS PART OF HIS WORK AT THERANOS.

01:55PM 23        AND DR. ROSENDORFF DIDN'T PAUSE OR HESITATE ABOUT THE

01:55PM 24    EFFECT THAT LIS HAD ON HIS CONCLUSIONS THAT THERANOS BLOOD

01:55PM 25    TESTING WAS NOT ACCURATE.

ER-5218

01:55PM  1      DR. ROSENDORFF WASN'T THE ONLY ONE, THOUGH.  ERIKA CHEUNG

01:55PM  2  ALSO TESTIFIED AND TOLD YOU THAT AS PART OF HER JOB FROM TIME

01:55PM  3  TO TIME SHE INPUT INFORMATION INTO THE LIS.  AND SHE ALSO TOLD

01:56PM  4  YOU THAT HER CONCERNS REGARDING THE ACCURACY OF THERANOS

01:56PM  5  TESTING WERE SO SEVERE THAT NOT ONLY DID SHE QUIT OVER THEM,

01:56PM  6  BUT SHE WENT TO THE MEDIA AND REGULATORS AFTER THAT BECAUSE OF

01:56PM  7  IT.

01:56PM  8      SO WHILE THE DEFENSE'S ARGUMENT REGARDING LIS ASKS YOU TO

01:56PM  9  SPECULATE WHAT LIS WOULD SAY AND HOW IT WOULD CONTAIN

01:56PM  10  EXCULPATORY INFORMATION, THE GOVERNMENT ISN'T ASKING YOU TO DO

01:56PM  11  THAT.

01:56PM  12      YOU HAVE HEARD FROM PEOPLE WHO HAVE HAD EXPOSURE TO THE

01:56PM  13  CONTENT OF LIS, AND THEY DIDN'T HESITATE OR PAUSE OR BALK AT

01:56PM  14  THESE CONCLUSIONS THAT THERANOS'S TESTING WAS INACCURATE AND

01:56PM  15  UNRELIABLE.

01:56PM  16      MR. SONNIER WAS NOT THE ONLY WITNESS THAT THEY CALLED.

01:56PM  17  THEY ALSO CALLED DR. WOOTEN.  SHE DIDN'T TESTIFY THAT LONG AGO.

01:56PM  18  I DON'T HAVE A LOT TO SAY ABOUT DR. WOOTEN.  YOU LEARNED ABOUT

01:56PM  19  HER TESTIMONY.  AND THIS WASN'T THE FIRST TIME THAT THEY ASKED

01:57PM  20  HER TO SAY NICE THINGS AND POSITIVE THINGS ABOUT THERANOS.

01:57PM  21      YOU HEARD THAT AFTER THE NEGATIVE "WALL STREET JOURNAL"

01:57PM  22  ARTICLE IN 2015, THEY ASKED HER TO SIT FOR A VIDEO TO SAY

01:57PM  23  POSITIVE THINGS ABOUT THERANOS, BUT YOU LEARNED THAT THERE WAS

01:57PM  24  A LOT THAT SHE DIDN'T KNOW ABOUT THERANOS, A LOT THAT SHE

01:57PM  25  COULDN'T OR SHOULDN'T HAVE KNOWN, INTERNAL EMAILS AT THERANOS.

01:57PM  1      BUT WHAT SHE DID SAY, WHAT IS SURPRISING IS THAT EVEN THE

01:57PM  2   WITNESS THE DEFENSE CALLS WHO GETS ON THE STAND FOR THE PURPOSE

01:57PM  3   OF TELLING YOU THAT THERANOS TESTING WAS OKAY, TELLS YOU THAT

01:57PM  4   NOW KNOWING WHAT SHE NOW KNOWS, HAVING SEEN THE EVIDENCE THAT

01:57PM  5   SHE HAS SEEN, SHE, TOO, WOULD HAVE CONCERNS ABOUT SENDING HER

01:57PM  6   PATIENTS TO THERANOS AT LEAST AS TO SPECIFIC ASSAYS.

01:57PM  7      WHEN I FINISH, AND I TOLD YOU WHEN THE DEFENSE FINISHES,

01:57PM  8   THE GOVERNMENT GIVES THE FINAL REBUTTAL, AND THEN THE JUDGE

01:57PM  9   WILL READ YOU JURY INSTRUCTIONS.

01:57PM 10      AND IN THOSE INSTRUCTIONS, THE JUDGE WILL TALK TO YOU

01:57PM 11   ABOUT CONCEPTS THAT WE HAVE TALKED ABOUT, THINGS LIKE THE

01:58PM 12   ELEMENTS FOR WIRE FRAUD, AND THEN OTHER CONCEPTS LIKE WHAT IS

01:58PM 13   EVIDENCE.  THE JUDGE WILL READ YOU INSTRUCTIONS BOTH ON AIDING

01:58PM 14   AND ABETTING AND ALSO A CONCEPT CALLED VICARIOUS LIABILITY OR

01:58PM 15   RESPONSIBILITY FOR THE STATEMENTS OF COCONSPIRATORS.

01:58PM 16      AND WHAT I WANT TO SAY ABOUT THESE IS THESE ARE

01:58PM 17   ALTERNATIVE THEORIES OF LIABILITY.  THEY'RE WAYS THAT

01:58PM 18   MR. BALWANI CAN BE, IF THE GOVERNMENT MEETS THE ELEMENTS,

01:58PM 19   RESPONSIBILE FOR THE ACTIONS OF SOMEONE LIKE ELIZABETH HOLMES.

01:58PM 20   BUT THE GOVERNMENT DOESN'T HAVE TO PROVE ALL OF THEM.  THERE

01:58PM 21   ARE SEVERAL DIFFERENT OF THESE ALTERNATIVE THEORIES OF

01:58PM 22   LIABILITY.

01:58PM 23      AND WHEN YOU HEAR THEM, YOU SHOULD THINK THAT THERE'S AN

01:58PM 24   "OR" BETWEEN THEM.  THE GOVERNMENT DOESN'T HAVE TO PROVE ALL OF

01:58PM 25   THEM:  VICARIOUS LIABILITY, AND AIDING AND ABETTING, AND

01:58PM 1    RESPONSIBILITY FOR COCONSPIRATOR STATEMENTS.  THEY ARE, AS I

01:58PM 2    SAID, THEY'RE ALTERNATIVE THEORIES OF LIABILITY.

01:58PM 3        THE JUDGE WILL ALSO READ TO YOU AN INSTRUCTION ON THE

01:58PM 4    CONCEPT OF REASONABLE DOUBT, AND HE WILL TELL YOU THAT IT'S A

01:58PM 5    DOUBT BASED ON REASON AND COMMON SENSE, NOT A DOUBT BASED

01:59PM 6    PURELY ON SPECULATION.  THAT INFORMS YOU THAT WHEN YOU GO BACK

01:59PM 7    TO DELIBERATE, YOU BRING YOUR REASON AND COMMON SENSE WITH YOU

01:59PM 8    AND YOU DON'T SPECULATE, LIKE I ARGUED TO YOU A MOMENT AGO,

01:59PM 9    THAT THE DEFENSE IS ASKING YOU TO DO WITH WHAT LIS WOULD SHOW.

01:59PM 10       THE STORY OF THERANOS REALLY IS A TRAGEDY.  THE INVESTORS

01:59PM 11   WERE DEFRAUDED, AND THEY SHOULD NOT HAVE BEEN.  THE PATIENTS

01:59PM 12   WERE DEFRAUDED, AND THEY, TOO, SHOULD NOT HAVE BEEN.

01:59PM 13       BUT THE STORY OF THERANOS IS NOT ONLY A TRAGEDY.  IT IS

01:59PM 14   ALSO THE STORY OF SOME INDIVIDUALS ACTING WITH REMARKABLE

01:59PM 15   INTEGRITY.

01:59PM 16       YOU HEARD FROM INDIVIDUALS LIKE ERIKA CHEUNG WHO TOLD YOU

01:59PM 17   THAT THERANOS WAS HER FIRST JOB AFTER GRADUATING FROM CAL, AND

01:59PM 18   SHE DID SOMETHING VERY IMPORTANT WHEN SHE WAS THERE.  SHE HAD

01:59PM 19   AN OPEN MIND.  SHE WATCHED TO SEE WHAT THE TECHNOLOGY COULD DO,

01:59PM 20   WHETHER IT WAS TESTING ACCURATELY, OR WHETHER IT WASN'T.

01:59PM 21       AND WHEN SHE SAW THAT THERANOS WAS NOT TESTING ACCURATELY,

01:59PM 22   AND THEN REPORTING RESULTS TO PATIENTS, WHAT DID SHE DO?  SHE

02:00PM 23   WENT DIRECTLY TO SUNNY BALWANI.

02:00PM 24       NOW, MR. BALWANI WANTS YOU TO THINK THAT HE'S A VICTIM.

02:00PM 25   THAT MR. BALWANI HAD OPTIONS, STOCK OPTIONS THAT HE NEVER

ER-5221

02:00PM 1    EXERCISED, SO HE LEFT MONEY ON THE TABLE, STOCK THAT HE NEVER

02:00PM 2    SOLD.

02:00PM 3        HE ALSO WANTS YOU TO THINK THAT HE WASN'T HIGH ENOUGH IN

02:00PM 4    THE ORG CHART TO HAVE MEANINGFUL COMMUNICATIONS WITH THIRD

02:00PM 5    PARTIES LIKE INVESTORS AND PATIENTS.  THAT WAS THE CEO.  THAT

02:00PM 6    WAS ELIZABETH HOLMES.

02:00PM 7        BUT HE WASN'T LOW ENOUGH IN THE ORG CHART TO KNOW WHAT WAS

02:00PM 8    HAPPENING INSIDE OF THE CLIA LAB.  THAT WAS THE LAB DIRECTOR'S

02:00PM 9    RESPONSIBILITY.  BUT YOU KNOW THE EVIDENCE.  YOU KNOW THAT

02:00PM 10   ISN'T TRUE.

02:00PM 11       YOU KNOW THAT PEOPLE LIKE ERIKA CHEUNG WHO WENT DIRECTLY

02:00PM 12   TO MR. BALWANI AND EXPRESSED CONCERNS ABOUT THERANOS'S BLOOD

02:00PM 13   TESTING WERE MET FROM STATEMENTS FROM MR. BALWANI THAT WERE

02:00PM 14   TOLD NOT FROM THE PERSPECTIVE OF SOMEONE WHO IS A VICTIM, NOT

02:00PM 15   FROM THE PERSPECTIVE OF SOMEONE WHO IS SURPRISED AT WHAT HE WAS

02:01PM 16   HEARING.

02:01PM 17       WHAT HE TELLS ERIKA CHEUNG IS THAT HE QUESTIONS HER

02:01PM 18   EXPERIENCE, AND HE'S SICK OF PEOPLE WHO DON'T HAVE ENOUGH

02:01PM 19   EXPERIENCE QUESTIONING THERANOS'S BLOOD TESTING.  AND HE TELLS

02:01PM 20   HER THAT SHE HAS ONE JOB AT THERANOS, AND THAT IS TO PROCESS

02:01PM 21   PATIENT SAMPLES AND NOT ASK ANY QUESTIONS.

02:01PM 22       IT'S NOT ONLY ERIKA CHEUNG, THOUGH.

02:01PM 23       DR. ROSENDORFF, WHEN DR. ROSENDORFF SEES PROBLEMS AT

02:01PM 24   THERANOS, HE BRINGS THEM DIRECTLY TO HOLMES AND BALWANI.  IN

02:01PM 25   THIS INSTANCE, WHEN HE'S SAYING WE'RE GOING TO MISS CRITICAL

02:01PM  1     VALUES FOR THIS GROUP OF ASSAYS CALLED ISE'S, WHEN WE'RE

02:01PM  2     MISSING CRITICAL VALUES, HE'S ASKING HOLMES AND BALWANI IF

02:01PM  3     THEY'RE COMFORTABLE WITH THAT.

02:01PM  4          AND WHAT DOES MR. BALWANI RESPOND?

02:01PM  5          "WE NEED TO RESPOND TO HIM NOW AND CUT HIM MONDAY."

02:01PM  6          MR. BALWANI IS NOT A VICTIM.  HE'S A PERPETRATOR OF THE

02:01PM  7     FRAUD BECAUSE MR. BALWANI KNOWS THAT THE BIGGEST THREAT TO

02:01PM  8     FRAUD IS THE TRUTH.

02:01PM  9          YOU'VE HEARD THIS DESCRIBED IN OTHER CONTEXTS AS THE

02:01PM 10     DISINFECTING POWER OF SUNLIGHT.  WHEN YOU HAVE INTERNAL

02:02PM 11     EMPLOYEES LIKE CHEUNG, LIKE ROSENDORFF WHO COME FORWARD AND

02:02PM 12     COMMUNICATE DIRECTLY WITH MR. BALWANI AND SAY OUR TESTING IS

02:02PM 13     INACCURATE AND WE'RE GOING TO MISS VALUES WE'RE SHARING WITH

02:02PM 14     PATIENTS, THEY DON'T GET CONFRONTED WITH SURPRISE.

02:02PM 15          MR. BALWANI ISN'T RECEIVING BREAKING NEWS FROM THEM.  HE'S

02:02PM 16     RECEIVING THREATS TO THE CONTINUATION OF THE FRAUD, AND THAT'S

02:02PM 17     WHY HE HAS TO SAY THINGS LIKE, "WE SHOULD CUT HIM MONDAY," WHEN

02:02PM 18     REFERRING TO ROSENDORFF.

02:02PM 19          AND FINALLY DR. PANDORI.  HE ALSO HAD CONCERNS WITH

02:02PM 20     TESTING AT THERANOS.  SO WHAT DID HE DO?  HE WENT DIRECTLY TO

02:02PM 21     BALWANI AND SAID THEY SHOULD STOP ALL TESTING ON THE EDISON

02:02PM 22     DEVICES.

02:02PM 23          IF THIS WAS NEWS TO MR. BALWANI, HOW DO YOU THINK HE WOULD

02:02PM 24     REACT?  AND COMPARE THAT TO HOW HE ACTUALLY DID REACT?

02:02PM 25          REMEMBER THIS STORY, DR. PANDORI TOLD YOU THAT WHEN HE

02:02PM  1    TOLD MR. BALWANI THAT THEY SHOULD STOP ALL TESTING ON THE

02:03PM  2    EDISON DEVICES, MR. BALWANI WENT AND GRABBED TWO COMPLETELY

02:03PM  3    UNRELATED INDIVIDUALS, TWO PROJECT MANAGERS, AND THEN WENT, THE

02:03PM  4    THREE OF THEM, TO DR. PANDORI'S OFFICE, AND IN DR. PANDORI'S

02:03PM  5    WORDS, "HE LET ME HAVE IT."

02:03PM  6         AGAIN, MR. BALWANI WASN'T SURPRISED BY THE INFORMATION

02:03PM  7    THAT HE WAS HEARING FROM ERIKA CHEUNG, OR ROSENDORFF OR

02:03PM  8    PANDORI.  HE KNEW ALL OF THESE THINGS.

02:03PM  9         WHAT HE WAS BOTHERED BY, WHAT HE DID WORRY ABOUT WAS THIS

02:03PM  10   KIND OF INFORMATION OR THIS TRUTH GETTING OUT WAS THE BIGGEST

02:03PM  11   THREAT TO THE FRAUD.

02:03PM  12        AND THE ONE THING MR. BALWANI DIDN'T EXPECT WAS THAT HE

02:03PM  13   WOULD BE BEFORE YOU, OR A JURY LIKE YOU, ONE DAY WHERE YOU

02:03PM  14   WOULD HAVE THE ABILITY TO SEE HIS EMAILS, TO READ HIS TEXT

02:03PM  15   MESSAGES, TO PUT THE FULL STORY TOGETHER.

02:03PM  16        AND BECAUSE YOU'VE SEEN THAT NOW, BECAUSE YOU KNOW THE

02:03PM  17   EVIDENCE, YOU KNOW THERE IS ONE AND ONLY VERDICT THAT IS

02:03PM  18   SUPPORTED BY THE EVIDENCE AND THAT IS GUILTY ON ALL COUNTS.

02:03PM  19        THANK YOU.

02:03PM  20        THANK YOU, YOUR HONOR.

02:03PM  21             THE COURT:  THANK YOU, MR. SCHENK.

02:04PM  22        WILL THE DEFENSE HAVE A CLOSING ARGUMENT?

02:04PM  23             MR. COOPERSMITH:  YES, YOUR HONOR.

02:04PM  24             THE COURT:  WHY DON'T WE TAKE 15 MINUTES.  WE'LL

02:04PM  25   TAKE A 15 MINUTE BREAK, LADIES AND GENTLEMEN, AND THEN WE'LL

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,         )
6                                     )   CR-18-00258-EJD
                      PLAINTIFF,      )
7                                     )   SAN JOSE, CALIFORNIA
               VS.                    )
8                                     )   JUNE 24, 2022
    RAMESH "SUNNY" BALWANI,           )
9                                     )   VOLUME 41
                      DEFENDANT.      )
10   _____  )   PAGES 7557 - 7733

11

12                TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                            150 ALMADEN BOULEVARD, SUITE 900
17                          SAN JOSE, CALIFORNIA 95113

18                          BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                          1301 CLAY STREET, SUITE 340S
                            OAKLAND, CALIFORNIA 94612
20
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTER:
22                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
23

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER
25

09:21AM 1    THINK IT'S A GOOD JURY.  THEY'VE LISTENED ATTENDANTLY, AND

09:21AM 2    THEY'VE PUT PEN TO PAPER DURING THE TRIAL, AND THEY'VE TAKEN

09:21AM 3    NOTES, I'VE OBSERVED THAT.  I THINK THEY'RE UP TO THE TASK, AND

09:21AM 4    THEY'RE RESPONSIBLE, AND I HAVE GREAT CONFIDENCE THAT THEY'LL

09:21AM 5    CONTINUE TO CARRY OUT THEIR DUTIES AS JURORS IN THIS CASE.

09:21AM 6        SO I DON'T THINK IT'S NECESSARY TO PARSE THEM OUT AND MAKE

09:21AM 7    COMMENT LIKE YOU'RE SUGGESTING.  I JUST THINK THAT THAT

09:21AM 8    INTERFERES INTO THE DELIBERATIVE PROCESS IN AN INAPPROPRIATE

09:21AM 9    WAY FOR THE COURT.

09:21AM 10       BUT I APPRECIATE IT.  OKAY.

09:21AM 11       ANYTHING?

09:21AM 12           MR. COOPERSMITH:  NO, YOUR HONOR.

09:21AM 13           MR. SCHENK:  NOTHING FURTHER.

09:21AM 14           MR. COOPERSMITH:  NOTHING FURTHER.

09:21AM 15           THE COURT:  ALL RIGHT.  WE'LL BRING OUR JURY IN.

09:22AM 16       (JURY IN AT 9:22 A.M.)

09:22AM 17           THE COURT:  WE'RE BACK IN THE BALWANI MATTER.  ALL

09:22AM 18   COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

09:22AM 19       OUR JURORS AND ALTERNATES ARE PRESENT.  GOOD MORNING,

09:23AM 20   LADIES AND GENTLEMEN.

09:23AM 21       BEFORE I ASK MR. BOSTIC TO BEGIN ANY REBUTTAL ARGUMENT

09:23AM 22   THAT THE GOVERNMENT MAY HAVE, MAY I ASK YOU THAT QUESTION ONE

09:23AM 23   MORE TIME.

09:23AM 24       DURING OUR BREAK AND BETWEEN OUR BREAK AND TODAY, HAVE ANY

09:23AM 25   OF YOU HAD CAUSE TO LEARN ANYTHING ABOUT THIS CASE, DO ANY

09:23AM 1      RESEARCH, DISCUSS, READ, OR LISTEN TO ANYTHING THAT HAD

09:23AM 2      ANYTHING TO DO WITH THIS CASE OR ANYONE ATTACHED TO IT?

09:23AM 3          IF SO, WOULD YOU RAISE YOUR HAND, PLEASE.

09:23AM 4      I SEE NO HANDS.  THANK YOU AGAIN FOR FOLLOWING THE

09:23AM 5      ADMONITION.  I'M GRATEFUL FOR THAT AS ARE THE LAWYERS.

09:23AM 6          MR. BOSTIC, DOES THE GOVERNMENT HAVE A REBUTTAL?

09:23AM 7              MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

09:23AM 8              THE COURT:  PLEASE.

09:24AM 9          **(MR. BOSTIC ON BEHALF OF THE GOVERNMENT GAVE HIS REBUTTAL**

09:24AM 10     **ARGUMENT.)**

09:24AM 11             MR. BOSTIC:  MEMBERS OF THE JURY, GOOD MORNING.  IT

09:24AM 12     OCCURS TO ME THAT BEFORE I GET STARTED, THE FIRST THING ON YOUR

09:24AM 13     MIND MIGHT BE HOW LONG AM I GOING TO TAKE.

09:24AM 14         LET ME JUST LET YOU KNOW THAT THESE ARE THE MATERIALS THAT

09:24AM 15     I WILL DISCUSS WITH YOU TODAY.  WE WILL FINISH TODAY, AND I'M

09:24AM 16     GOING TO PROCEED AS EFFICIENTLY AS I CAN, ALTHOUGH THERE'S A

09:24AM 17     LOT TO COVER, SO PLEASE BEAR WITH ME.

09:24AM 18         AFTER MY REMARKS TODAY, THE COURT IS GOING TO INSTRUCT YOU

09:24AM 19     ON THE LAW THAT YOU SHOULD FOLLOW DURING YOUR DELIBERATIONS,

09:24AM 20     AND AT THAT POINT YOU'LL BE ABLE TO BEGIN DELIBERATING THE

09:24AM 21     VERDICT IN THIS CASE.  AND YOU'LL BE READY FOR THAT BECAUSE

09:24AM 22     YOU'VE BEEN SPENDING THE LAST FEW WEEKS LEARNING IN DEPTH ABOUT

09:24AM 23     A COMPANY CALLED THERANOS, WHICH WAS A BLOOD TESTING COMPANY

09:24AM 24     RUN BY THE DEFENDANT RAMESH BALWANI, AND HIS PARTNER,

09:24AM 25     ELIZABETH HOLMES.

ER-5227

09:24AM 1      IF YOU HAD BEEN LEARNING ABOUT THE COMPANY FROM THEM WHEN

09:24AM 2   THEY WERE RUNNING THE COMPANY, YOU WOULD HAVE HEARD A VERY

09:24AM 3   DIFFERENT PICTURE OF THINGS.

09:24AM 4      YOU WOULD HAVE HEARD THAT THIS WAS A COMPANY THAT HAD

09:24AM 5   DEVELOPED A TECHNOLOGY THAT COULD RUN THE FULL RANGE OF BLOOD

09:25AM 6   TESTS FROM A SINGLE DROP OF BLOOD FROM A FINGERTIP;

09:25AM 7      YOU WOULD HAVE HEARD THAT THE COMPANY'S TECHNOLOGY COULD

09:25AM 8   RUN MANY, MANY TESTS ALL AT ONCE FROM THAT TINY SINGLE SAMPLE;

09:25AM 9      THEY WOULD HAVE TOLD YOU THAT THE COMPANY'S ANALYZER WAS

09:25AM 10  FAR SMALLER THAN THE COMMERCIAL ANALYZERS THAT HAD PREVIOUSLY

09:25AM 11  USED, AND THAT IT COULD BE USED ALMOST ANYWHERE.

09:25AM 12     THEY WOULD HAVE TOLD YOU THAT THE SPEED AND ACCURACY OF

09:25AM 13  THEIR TECHNOLOGY WAS SUPERIOR TO WHAT ELSE WAS OUT THERE IN THE

09:25AM 14  INDUSTRY;

09:25AM 15     YOU WOULD HAVE HEARD FROM THEM THAT THE COMPANY'S

09:25AM 16  TECHNOLOGY HAD BEEN COMPREHENSIVELY VALIDATED BY MULTIPLE

09:25AM 17  PHARMACEUTICAL COMPANIES, INCLUDING GIANTS LIKE PFIZER AND

09:25AM 18  SCHERING-PLOUGH;

09:25AM 19     THEY WOULD HAVE TOLD YOU THAT THE WORLD'S MOST POWERFUL

09:25AM 20  AND WELL-EQUIPPED MILITARY HAD EVEN STARTED USING THE COMPANY'S

09:25AM 21  TECHNOLOGY, AND THAT THE TECHNOLOGY WAS BEING USED ON THE

09:25AM 22  BATTLEFIELD, AND THAT IT WAS ACTUALLY SAVING THE LIVES OF

09:25AM 23  SOLDIERS FIGHTING FOR THIS COUNTRY;

09:25AM 24     YOU WOULD HAVE HEARD THAT THE COMPANY GENERATED

09:25AM 25  SIGNIFICANT REVENUES EARLY ON, AND THAT IT WAS POISED TO GO

09:26AM  1    NATIONAL AND GENERATE EVEN LARGER NUMBERS;

09:26AM  2        THEY WOULD HAVE TOLD YOU THAT THE COMPANY WAS RAISING

09:26AM  3    MONEY NOT TO CONTINUE R&D WORK, BUT TO SCALE, TO TAKE THAT

09:26AM  4    INVENTION THAT WAS FINISHED AND TO BUILD A GIANT MONOPOLY OUT

09:26AM  5    OF IT.

09:26AM  6        SO THAT WAS THE THERANOS THAT MR. BALWANI AND MS. HOLMES

09:26AM  7    WERE DESCRIBING TO PEOPLE WHEN THEY WERE RUNNING THE COMPANY.

09:26AM  8    THE PROBLEM IS, YOU KNOW NOW AFTER LISTENING TO PEOPLE WITH

09:26AM  9    FIRST HAND KNOWLEDGE, THAT THAT VERSION OF THE COMPANY NEVER

09:26AM 10    EXISTED.

09:26AM 11        YOU KNOW THAT BECAUSE YOU HEARD FROM PEOPLE WHO WORKED AT

09:26AM 12    THE COMPANY.  YOU WILL HEARD FROM PEOPLE WHO PARTNERED WITH THE

09:26AM 13    COMPANY WORKING FROM OUTSIDE OF THE COMPANY.  AND YOU HEARD

09:26AM 14    ABOUT THE TRUTH OF THERANOS, NOT HAVING TO RELY ON MR. BALWANI

09:26AM 15    AND MS. HOLMES LIKE THE VICTIMS IN THIS CASE DID.

09:26AM 16        AT THIS POINT, AFTER HEARING ALL OF THAT TESTIMONY, IT

09:26AM 17    MIGHT HAVE BEEN SURPRISING FOR YOU OVER THE LAST FEW DAYS TO

09:26AM 18    HEAR A LAWYER FOR THE DEFENSE DISAGREE WITH A LOT OF WHAT THOSE

09:27AM 19    WITNESSES HAD SAID IN THEIR SWORN TESTIMONY ABOUT EVENTS AND

09:27AM 20    CONVERSATIONS THAT THEY PERSONALLY WITNESSED.

09:27AM 21        I'D LIKE TO START WITH A GUIDING PRINCIPLE THAT YOU SHOULD

09:27AM 22    KEEP IN MIND.  AND THIS ISN'T FROM ME.  THIS IS WHAT I

09:27AM 23    ANTICIPATE THE COURT WILL INSTRUCT YOU ABOUT THE LAW.

09:27AM 24        AND THIS WILL BE JURY INSTRUCTION NUMBER 7.  AND IT

09:27AM 25    CONCERNS WHAT IS NOT EVIDENCE?

09:27AM   1          AND NOTICE IT SAYS, "IN REACHING YOUR VERDICT, YOU MAY

09:27AM   2   CONSIDER ONLY THE TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE.

09:27AM   3   THE FOLLOWING THINGS ARE NOT EVIDENCE."

09:27AM   4          NUMBER 1 IS "QUESTIONS, STATEMENTS, OBJECTIONS, AND

09:27AM   5   ARGUMENTS BY THE LAWYERS, THOSE ARE NOT EVIDENCE."

09:27AM   6          IT ALSO SAYS, "WHAT THE LAWYERS HAVE SAID IN THEIR OPENING

09:27AM   7   STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED

09:27AM   8   TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE."

09:27AM   9          SO THIS GOES FOR WHAT I SAY AS WELL.  IT CERTAINLY GOES

09:27AM  10   FOR WHAT YOU HEARD IN THE DEFENSE CLOSING.  THAT WAS NOT

09:27AM  11   EVIDENCE.  WHAT THE WITNESSES SAID WAS EVIDENCE.

09:27AM  12          THE LAWYER'S JOB HERE IS TO POINT OUT THE SIGNIFICANT

09:28AM  13   EVIDENCE TO YOU AND EXPLAIN HOW IT FITS INTO THE LARGER

09:28AM  14   PICTURE, NOT TO SUBSTITUTE THEIR VERSION OF THINGS FOR THE

09:28AM  15   WITNESSES WHO ARE ACTUALLY TESTIFYING BASED ON THEIR KNOWLEDGE.

09:28AM  16          SO WHAT DOES THE ACTUAL EVIDENCE SHOW IN THIS CASE?

09:28AM  17          WELL, ONE THING YOU SAW PLENTY OF, WAS EVIDENCE OF VERY

09:28AM  18   SERIOUS PROBLEMS WITH THE ACCURACY AND RELIABILITY OF

09:28AM  19   THERANOS'S TESTING.

09:28AM  20          THE SIMPLEST EVIDENCE ON THIS TOPIC WAS TESTIMONY FROM AT

09:28AM  21   LEAST THREE INDIVIDUALS WHO WORKED WITHIN THERANOS WORKING IN

09:28AM  22   THE LAB.  THAT WAS, OF COURSE, ERIKA CHEUNG AND THEN

09:28AM  23   DRS.  MARK PANDORI AND ADAM ROSENDORFF.  THROUGH THEIR ROLES,

09:28AM  24   THEY HAD FIRST HAND KNOWLEDGE AND FIRST HAND EXPERIENCE WITH

09:28AM  25   THE THERANOS TESTING, AND THEY SAW THE SERIOUS PROBLEMS THAT

09:28AM   1    WERE PLAGUING THAT TECHNOLOGY AND THAT TESTING AT THAT TIME.

09:28AM   2         IN FACT, YOU HEARD THAT ALL OF THOSE EMPLOYEES ACTUALLY

09:28AM   3    QUIT THEIR JOBS AT THERANOS OVER THE CONCERNS THAT THEY HAD

09:28AM   4    WITH THE UNRELIABILITY OF THE RESULTS THAT THERANOS WAS

09:29AM   5    PROVIDING TO PATIENTS.

09:29AM   6         NOW, MR. COOPERSMITH HAD SOME REMARKS ABOUT ALL THREE OF

09:29AM   7    THESE WITNESSES.  WHEN IT CAME TO DR. ROSENDORFF,

09:29AM   8    MR. COOPERSMITH ACCUSED HIM OF BEING BIASSED.  HE SUGGESTED

09:29AM   9    THAT DR. ROSENDORFF'S COMPLAINTS ABOUT THERANOS HAD BEEN

09:29AM  10    MANUFACTURED AFTER THE FACT BECAUSE WE'RE HERE IN FEDERAL

09:29AM  11    CRIMINAL COURT.  THAT WAS A THEME THAT YOU HEARD MULTIPLE TIMES

09:29AM  12    DURING THE DEFENSE CLOSING.

09:29AM  13         BUT DOES THAT SQUARE WITH THE EVIDENCE?  IS THAT

09:29AM  14    CONSISTENT WITH THE ACTUAL EVIDENCE THAT YOU HEARD IN COURT?

09:29AM  15         AND I'LL REMIND YOU THAT DURING DR. ROSENDORFF'S

09:29AM  16    TESTIMONY, YOU SAW NUMEROUS EXAMPLES OF SITUATIONS WHERE HE

09:29AM  17    RAISED HIS GRAVE CONCERNS WHILE HE WAS LAB DIRECTOR AT

09:29AM  18    THERANOS.

09:29AM  19         YOU HEARD TESTIMONY ABOUT WHY HE LEFT HIS JOB THERE.  AND

09:29AM  20    YOU ALSO SAW, IN PARTICULAR, THAT HE HAD A PRACTICE FOR A

09:29AM  21    SIGNIFICANT PORTION OF HIS TIME AT THE COMPANY WHERE HE WOULD

09:29AM  22    ACTUALLY FORWARD EMAILS TO HIS PERSONAL GMAIL ACCOUNT.

09:30AM  23         NOW, THAT MAY BE SOMETHING THAT HE WAS NOT ALLOWED TO DO,

09:30AM  24    SHOULDN'T HAVE DONE PER COMPANY POLICY.  BUT HE TOLD YOU THE

09:30AM  25    REASON THAT HE WAS DOING THAT WAS BECAUSE HE WAS SO TROUBLED BY

09:30AM   1    WHAT HE WAS SEEING AT THE COMPANY, THE COMPANY WHERE HE WAS LAB

09:30AM   2    DIRECTOR, THAT HE WAS WORRIED ABOUT A FUTURE INVESTIGATION.  HE

09:30AM   3    FORWARDED INCRIMINATING EMAILS TO HIS PERSONAL EMAIL ACCOUNT SO

09:30AM   4    THAT HE WOULD HAVE ACCESS TO THOSE IN CASE HE NEEDED THEM TO

09:30AM   5    RESPOND TO AN INVESTIGATION IN THE FUTURE, AND SURE ENOUGH,

09:30AM   6    THERE WAS ONE RESULTING IN THIS TRIAL.

09:30AM   7        SO THERE IS NO REASON TO BELIEVE, AND EVERY REASON NOT TO

09:30AM   8    BELIEVE, THAT DR. ROSENDORFF'S CONCERNS ARE SOMETHING THAT HE

09:30AM   9    CAME UP WITH AFTER THE FACT.  YOU KNOW THAT THOSE ARE THINGS

09:30AM   10   THAT WEIGHED HEAVILY ON HIS MIND WHILE HE WAS AT THE COMPANY.

09:30AM   11       MR. COOPERSMITH DURING HIS REMARKS WAS ALSO QUICK TO POINT

09:30AM   12   OUT DR. ROSENDORFF'S TESTIMONY THAT HE NEVER KNOWINGLY RELEASED

09:30AM   13   AN INACCURATE RESULT, AND THAT HE WAS NEVER DIRECTED TO RELEASE

09:30AM   14   A RESULT THAT HE KNEW WAS INACCURATE.

09:31AM   15       I WANT YOU TO THINK ABOUT HOW THAT QUESTION IS PHRASED

09:31AM   16   BECAUSE YOU HEARD DR. ROSENDORFF'S TESTIMONY THAT WHEN A RESULT

09:31AM   17   COMES OUT, IT'S VERY DIFFICULT, AND OFTEN IMPOSSIBLE, TO JUST

09:31AM   18   LOOK AT IT AND KNOW WHETHER IT'S ACCURATE OR NOT.

09:31AM   19       FREQUENTLY YOU NEED TO KNOW OTHER INFORMATION ABOUT THE

09:31AM   20   WAY THE PATIENT IS PRESENTING, THEIR HEALTH RECORDS TO

09:31AM   21   UNDERSTAND WHETHER THAT RESULT IS ACCURATE OR NOT.  SO YOU

09:31AM   22   SHOULDN'T BE SURPRISED TO HEAR THAT IN THIS LAB THAT HAD MANY

09:31AM   23   ACCURACY PROBLEMS, THE LAB DIRECTOR NEVER KNOWINGLY SENT OUT A

09:31AM   24   FALSE RESULT.  THAT'S NOT TO SAY HE'S NOT AWARE THAT FALSE

09:31AM   25   RESULTS DID GET SENT OUT.  YOU SAW MANY EXAMPLES OF THAT.

09:31AM   1          HE ALSO SAID THAT BY THE TIME HE LEFT THE COMPANY, HE

09:31AM   2     DIDN'T HAVE FAITH IN THE ACCURACY AND RELIABILITY OF THE SYSTEM

09:31AM   3     THAT THERANOS WAS USING TO PERFORM ITS BLOOD TESTING, ITS HOME

09:31AM   4     GROWN EDISON SYSTEM.  AND HE TOLD YOU DIRECTLY THAT THE PERSON

09:32AM   5     WHO DECIDED WHAT SYSTEM THE COMPANY USED FOR TESTING WAS THE

09:32AM   6     DEFENDANT, SUNNY BALWANI.

09:32AM   7          SO WHILE MR. BALWANI MIGHT NOT HAVE EXPRESSLY REQUIRED HIM

09:32AM   8     TO SEND OUT AN INDIVIDUAL RESULT HE KNEW WAS INACCURATE, HE WAS

09:32AM   9     THE ONE WHO WAS FORCING THIS LAB DIRECTOR TO USE A SYSTEM THAT

09:32AM  10     HE DIDN'T HAVE CONFIDENCE IN.

09:32AM  11          DR. PANDORI SAID SOMETHING VERY SIMILAR TO WHAT

09:32AM  12     DR. ROSENDORFF SAID.

09:32AM  13          MR. COOPERSMITH'S RESPONSE TO THAT WAS EVEN STRONGER.  HE

09:32AM  14     SAID SOMETHING TO THE EFFECT OF THAT YOU AS THE JURY COULD NOT

09:32AM  15     BELIEVE A WORD THAT THIS MAN SAYS.  HE ACCUSED DR. PANDORI OF

09:32AM  16     LYING REPEATEDLY ON THE STAND.

09:32AM  17          IN SUPPORT OF THAT CLAIM, HE TALKED ABOUT SOME MEMORY

09:32AM  18     ISSUES THAT DR. PANDORI HAD WHEN HE WAS SHOWN DOCUMENTS ON

09:32AM  19     CROSS-EXAMINATION.  IT'S UP TO YOU AS THE JURY TO WEIGH WITNESS

09:32AM  20     CREDIBILITY AND DECIDE WHETHER YOU THINK THAT'S SUFFICIENT TO

09:32AM  21     CALL THIS PERSON A LIAR AND DISREGARD THEIR TESTIMONY.

09:33AM  22          BUT I WOULD JUST LIKE TO REMIND YOU OF A FEW THINGS.  YOU

09:33AM  23     HEARD OVER THE COURSE OF THE TRIAL ABOUT WITNESSES WHO HAD MET

09:33AM  24     WITH THE GOVERNMENT PRIOR TO THEIR TESTIMONY AND HAD BEEN SHOWN

09:33AM  25     DOCUMENTS.  YOU HAVE NOT HEARD EVIDENCE THAT DR. PANDORI MET

09:33AM   1    WITH THE DEFENSE.  SO YOU SHOULD ASK YOURSELVES WHETHER IT

09:33AM   2    REALLY IS SURPRISING THAT HE MIGHT NOT REMEMBER A GIVEN

09:33AM   3    DOCUMENT THAT HE'S BEING SHOWN FOR THE FIRST TIME ON THE STAND

09:33AM   4    BY THE DEFENSE HAVING NOT SEEN THAT DOCUMENT RECENTLY, HAVING

09:33AM   5    NOT SEEN IT SINCE 2013 OR 2014.  IS THAT REALLY SURPRISING?  IS

09:33AM   6    THAT A REASON TO DOUBT HIS VERACITY, HIS INTEGRITY?

09:33AM   7         AND IN PARTICULAR, YOU'LL REMEMBER THAT THE DOCUMENT THAT

09:33AM   8    MR. COOPERSMITH DISCUSSED A LOT WAS DR. PANDORI'S DEPARTURE

09:33AM   9    MEMO.  AND WHEN IT CAME TO THAT, YOU'LL RECALL THAT WHEN HE WAS

09:33AM  10    FIRST SHOWN THAT DOCUMENT, HE WAS SHOWN A VERSION OF IT THAT

09:33AM  11    HAD SOME MISSING HEADER INFORMATION.  ISN'T IT LIKELY THAT THAT

09:34AM  12    CONTRIBUTED TO HIS CONFUSION ABOUT THAT DOCUMENT?

09:34AM  13         THE DEFENSE'S THEORY IS THAT DR. PANDORI WAS SO TROUBLED

09:34AM  14    BY THE CONTENT OF THAT DOCUMENT, THAT HE WAS TRYING TO DISTANCE

09:34AM  15    HIMSELF FROM IT.  BUT WAS THE SUBSTANCE OF THAT DOCUMENT SO

09:34AM  16    DAMAGING TO DR. PANDORI'S TESTIMONY THAT HE WOULD EVEN HAVE A

09:34AM  17    MOTIVE TO DO THAT?

09:34AM  18         THE DEPARTURE MEMO, AS THE DEFENSE LIKES TO POINT OUT,

09:34AM  19    DISCUSSED DR. PANDORI'S OPINION THAT MORE EDISONS WERE NEEDED

09:34AM  20    TO RUN THE THERANOS TESTING.  AND THE DEFENSE SAYS THAT THAT

09:34AM  21    RECOMMENDATION IS INCONSISTENT WITH DR. PANDORI'S OPINION THAT

09:34AM  22    THE EDISON MACHINES SUFFERED FROM SERIOUS PROBLEMS.

09:34AM  23         THAT'S NOT TRUE AT ALL.  DR. PANDORI TOLD YOU THAT THE

09:34AM  24    REASON HE DIDN'T PUT THOSE COMPLAINTS IN HIS DEPARTURE MEMO, IS

09:34AM  25    BECAUSE IT WOULD HAVE FELT LIKE BANGING HIS HEAD AGAINST THE

09:34AM   1    WALL.  HE HAD RAISED THOSE CONCERNS MULTIPLE TIMES.

09:34AM   2         AND REMEMBER THAT THAT DEPARTURE MEMO WAS SENT TO

09:34AM   3    DR. ROSENDORFF WHO CERTAINLY ALREADY KNEW ABOUT DR. PANDORI'S

09:34AM   4    CONCERNS, ALONG WITH OTHERS AT THE COMPANY.

09:35AM   5         WHAT WOULD HAVE BEEN THE POINT IN INCLUDING THAT

09:35AM   6    INFORMATION JUST AS A PROTEST IN THAT DEPARTURE MEMORANDUM?

09:35AM   7         DR. PANDORI ALSO TOLD YOU THAT HIS ROLE AT THE COMPANY AS

09:35AM   8    CO-LAB DIRECTOR FOCUSSED ON THE OPERATIONAL SIDE OF THE LAB.

09:35AM   9    ONE OF HIS JOBS WAS TO LOOK AT THE PROCESS BY WHICH THERANOS

09:35AM  10    WAS TESTING ITS SAMPLES AND MAKE SURE THAT IT WAS RUNNING

09:35AM  11    SMOOTHLY, TO LOOK FOR WAYS THAT IT COULD BE IMPROVED.  AND IN

09:35AM  12    DOING THAT, HE BECAME VERY FAMILIAR WITH THE WAYS IN WHICH THE

09:35AM  13    EDISON DEVICES MALFUNCTIONED, PROVIDED UNRELIABLE RESULTS,

09:35AM  14    FAILED QUALITY CONTROL, AND HOW THAT IMPACTED THE LAB'S ABILITY

09:35AM  15    TO ACTUALLY DO ITS WORK, TO EVEN MOVE SAMPLES THROUGH THE LAB

09:35AM  16    IN THE FIRST PLACE.

09:35AM  17         SO THAT'S WHY HE WAS AWARE OF THAT.  AND THAT'S WHY IN

09:35AM  18    CRAFTING HIS DEPARTURE MEMO, PASSING ALONG THAT INFORMATION TO

09:35AM  19    WHOEVER WAS GOING TO TAKE HIS ROLE, HE FOCUSSED ON THE

09:35AM  20    OPERATIONAL SIDE OF THINGS.

09:35AM  21         WHEN IT CAME TO ERIKA CHEUNG, THE DEFENDANT'S MAIN

09:36AM  22    RESPONSE TO HER SEEMS TO BE THAT SHE WAS LESS EXPERIENCED THAN

09:36AM  23    OTHER PEOPLE IN THE LAB.  THINK ABOUT WHAT THAT MEANS, THOUGH.

09:36AM  24         ERIKA CHEUNG WAS AT THE COMPANY FOR A FEW SHORT MONTHS.

09:36AM  25    SHE DID NOT HAVE ADVANCED DEGREES.  SHE WAS A RECENT COLLEGE

09:36AM  1    GRADUATE, BUT SHE WORKED DIRECTLY WITH THE TECHNOLOGY.  SHE

09:36AM  2    ACTUALLY RAN PATIENT TEST SAMPLES.  SO THE FACT THAT SHE WAS

09:36AM  3    ABLE TO EASILY RECOGNIZE THE SERIOUS PROBLEMS WITH THERANOS'S

09:36AM  4    TESTING SHOULD REALLY TELL YOU SOMETHING, AND IT SHOULD REALLY

09:36AM  5    GIVE YOU ANY DOUBTS -- OR IT SHOULD GIVE YOU SERIOUS DOUBTS

09:36AM  6    ABOUT ANY ARGUMENT FROM THE DEFENSE THAT MR. BALWANI DIDN'T

09:36AM  7    UNDERSTAND THE PROBLEMS WITH THERANOS TESTING.

09:36AM  8         MS. CHEUNG, RIGHT OUT OF COLLEGE WORKING HER FIRST JOB

09:36AM  9    AFTER SCHOOL, WAS ABLE TO QUICKLY SEE THE SERIOUS PROBLEMS AND

09:36AM  10   NEEDED TO LEAVE THE COMPANY AS A RESULT OF IT.

09:36AM  11        YOU ALSO HEARD ABOUT WHAT SHE WENT THROUGH WHEN SHE BECAME

09:37AM  12   A WHISTLEBLOWER AND SPOKE TO REGULATORS ABOUT THE COMPANY.  YOU

09:37AM  13   HEARD WHAT THE COMPANY DID IN TERMS OF THREATENING HER, AND YOU

09:37AM  14   LISTENED TO HER TEARFULLY DESCRIBE THAT WHEN SHE WAS ON THE

09:37AM  15   STAND.

09:37AM  16        SO, AGAIN, THE IDEA THAT THESE EMPLOYEES HAVE THESE

09:37AM  17   NEGATIVE OPINIONS ABOUT THERANOS BECAUSE OF THE CONTEXT TODAY,

09:37AM  18   THE IDEA THAT THEY ARE ANTI-THERANOS OR COMPLAINING ABOUT THE

09:37AM  19   COMPANY BECAUSE WE'RE IN A FEDERAL CRIMINAL CASE IS EXACTLY

09:37AM  20   BACKWARDS.

09:37AM  21        WE'RE HERE TODAY BECAUSE THOSE COMPLAINTS CAME FORWARD,

09:37AM  22   BECAUSE THOSE EMPLOYEES WITH PERSONAL KNOWLEDGE WERE MOTIVATED

09:37AM  23   TO SPEAK UP BECAUSE THEY WERE SO TROUBLED BY THE THINGS THAT

09:37AM  24   THEY SAW.

09:37AM  25        AND CRITICALLY TO THE QUESTIONS THAT YOU NEED TO ANSWER IS

09:37AM   1    THE FACT THAT ALL THREE OF THOSE EMPLOYEES ACTUALLY RAISED

09:37AM   2    THEIR CONCERNS DIRECTLY TO THIS DEFENDANT, MR. BALWANI.  SO HE

09:37AM   3    KNEW HOW THEY FELT.  HE KNEW THAT THE SCIENTISTS WORKING AT

09:37AM   4    THERANOS, THE PEOPLE WHO WERE WORKING DIRECTLY WITH THIS

09:38AM   5    TECHNOLOGY WHO WERE RESPONSIBLE FOR PERFORMING AND OVERSEEING

09:38AM   6    THE LAB TESTING HAD SERIOUS CONCERNS, WERE WORRIED ABOUT THE

09:38AM   7    ACCURACY AND RELIABILITY OF THE TESTS THE COMPANY WAS SENDING

09:38AM   8    OUT.

09:38AM   9        HE HEARD.  HE JUST DIDN'T CARE.

09:38AM  10        OF ALL OF THE THERANOS LAB WORKERS WHO TESTIFIED AT TRIAL,

09:38AM  11    THE ONLY TWO WHO DIDN'T QUIT BECAUSE OF THOSE CONCERNS WERE

09:38AM  12    SUNIL DHAWAN AND LYNETTE SAWYER.  AND THE INTERESTING THING

09:38AM  13    ABOUT THEM, OBVIOUSLY, IS THAT THEY DIDN'T KNOW ENOUGH TO

09:38AM  14    REALIZE THAT THERE WERE THESE SERIOUS PROBLEMS AT THE COMPANY.

09:38AM  15        YOU HEARD ABOUT THE VERY LIMITED NATURE OF THE WORK THAT

09:38AM  16    THEY DID FOR THE COMPANY, AND HOW PURSUANT TO THE ASSIGNMENTS

09:38AM  17    THEY GOT FROM MR. BALWANI ABOUT THE SCOPE OF THEIR JOB, THEY

09:38AM  18    DIDN'T KNOW ANYTHING ABOUT THE ACCURACY AND RELIABILITY

09:38AM  19    PROBLEMS THAT THE COMPANY WAS FACING.

09:38AM  20        SO THAT WAS APPARENTLY MR. BALWANI'S LAB DIRECTOR

09:38AM  21    RETENTION PLAN AFTER 2014, KEEP THEM IN THE DARK, KEEP THEM

09:39AM  22    FROM KNOWING ABOUT THE PROBLEMS SO THAT THEY DON'T MAKE NOISE,

09:39AM  23    SO THAT THEY DON'T QUIT.  AND IT WORKED.

09:39AM  24        YOU HEARD TESTIMONY FROM THE THERANOS LAB EMPLOYEES WHO

09:39AM  25    QUIT ABOUT THE REASONS THAT THEY WERE EXCITED TO WORK FOR THE

09:39AM  1    COMPANY IN THE FIRST PLACE, WHY THEY WERE DRAWN TO THOSE ROLES

09:39AM  2    AND WHAT THEY MEANT TO THEM, SO YOU KNOW THAT THEY DIDN'T TAKE

09:39AM  3    THEIR DECISIONS TO LEAVE LIGHTLY.

09:39AM  4         SO THE QUESTION THAT YOU SHOULD ASK IS HOW DID IT GET TO

09:39AM  5    THAT POINT?  HOW DID IT GET SO BAD THAT THESE PEOPLE ALL MADE

09:39AM  6    THE SAME DECISION, THE DECISION THAT THEY COULD NO LONGER BE

09:39AM  7    ASSOCIATED WITH THIS COMPANY?

09:39AM  8         WELL, YOU SAW THAT IN EVIDENCE, TOO.

09:39AM  9         ONE THING YOU HEARD ABOUT WAS RUSHED ASSAY DEVELOPMENT.

09:39AM 10    IN THE TIME PERIOD LEADING UP TO THERANOS'S COMMERCIAL LAUNCH

09:39AM 11    IN LATE SUMMER OF 2013, DR. ROSENDORFF TESTIFIED THAT IN THOSE

09:39AM 12    TWO TO THREE MONTHS LEADING UP TO THE LAUNCH, IT WAS EXTREMELY

09:39AM 13    RUSHED AND HURRIED, HE SAID.  "THERE WAS IMMENSE PRESSURE PUT

09:40AM 14    ON R&D AND THE TECHS AND MYSELF TO GET THINGS VALIDATED AND

09:40AM 15    GENERATE DATA."

09:40AM 16         WHEN HE WAS ASKED WHERE THAT PRESSURE WAS COMING FROM, HE

09:40AM 17    QUICKLY ANSWERED SUNNY BALWANI.

09:40AM 18         THE DEFENSE NOW CLAIMS THAT THAT CAN'T BE TRUE BECAUSE THE

09:40AM 19    INITIAL LAUNCH IN SEPTEMBER OF 2013 WAS A SOFT LAUNCH AS

09:40AM 20    THEY'RE NOW CALLING IT, WHICH WAS TO FRIENDS AND FAMILY ONLY

09:40AM 21    WITH ONLY TWO ASSAYS OFFERED AT FIRST, CBC, THE COMPLETE BLOOD

09:40AM 22    COUNT, AND HBA1C.

09:40AM 23         FIRST OF ALL, THOUGH, I'LL ASK YOU TO THINK BACK TO THE

09:40AM 24    PRESS RELEASES AROUND THAT TIME, ALL OF THE FAVORABLE PUBLICITY

09:40AM 25    THAT THERANOS ENGINEERED IN THE PRESS.

REBUTTAL ARGUMENT BY MR. BOSTIC                                7585

09:40AM   1        DO YOU RECALL ANY OF THOSE MATERIALS, THE CONVERSATIONS

09:40AM   2   WITH THE INVESTORS, THE PROMOTIONAL MATERIALS, THE

09:40AM   3   PRESENTATIONS, THE PRESS RELEASE, DID ANY OF THAT MINIMIZE THIS

09:40AM   4   LAUNCH AS A SOFT LAUNCH?  DID ANY OF THAT DISCLOSE THAT THESE

09:41AM   5   TESTS WERE ONLY BEING OFFERED TO FRIENDS AND FAMILY?  DID ANY

09:41AM   6   OF THAT SAY THAT THIS LAUNCH WAS ONLY INCLUDING TWO ASSAYS,

09:41AM   7   NEITHER OF WHICH WAS EVER OFFERED ON THE THERANOS PROPRIETARY

09:41AM   8   ANALYZER?

09:41AM   9        OF COURSE NOT.  BECAUSE THE DEFENDANT'S GOAL BACK THEN WAS

09:41AM  10   TO MAXIMIZE THE IMPACT OF WHAT THEY WERE DOING.  THEY WANTED TO

09:41AM  11   IMPRESS INVESTORS, PATIENTS, AND THE PUBLIC, TO EXAGGERATE WHAT

09:41AM  12   THE COMPANY WAS DOING AT THAT TIME.

09:41AM  13        SO THE FACT THAT THEY'RE TRYING TO MINIMIZE IT NOW AND SAY

09:41AM  14   THAT THIS WAS JUST A SOFT LAUNCH, I THINK YOU SHOULD BE

09:41AM  15   SKEPTICAL OF THOSE TWO COMPETING MESSAGES.

09:41AM  16        MORE IMPORTANT THAN, DR. ROSENDORFF WAS ASKED ABOUT THIS,

09:41AM  17   AND HE TESTIFIED THAT TO A MEDICAL DOCTOR, TO A LAB DIRECTOR,

09:41AM  18   IT MAKES NO DIFFERENCE WHO WAS BEING TESTED OR WHY.  WHEN

09:41AM  19   YOU'RE PERFORMING CLINICAL TESTS ON PATIENTS, ACCURACY IS

09:41AM  20   PARAMOUNT, AND THAT IS TRUE REGARDLESS OF WHETHER THE PEOPLE

09:41AM  21   ARE PAYING FOR THE TESTS, REGARDLESS OF WHETHER THEY'RE

09:41AM  22   CONNECTED TO THE COMPANY DOING THE TESTS, AND REGARDLESS OF HOW

09:42AM  23   MANY TESTS ARE BEING CONDUCTED.  THAT'S HOW SOMEONE APPROACHES

09:42AM  24   THIS ISSUE WHEN THEY'RE PRIORITIZING FIDELITY TO PATIENTS AND

09:42AM  25   ACCURACY IN RESULTS.

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7586

09:42AM   1          THE DEFENSE ALSO TALKED ABOUT DR. ROSENDORFF'S SIGNING OF

09:42AM   2     VALIDATION REPORTS IN THERANOS AND WHAT THAT SAYS ABOUT THE

09:42AM   3     COMPANY'S TECHNOLOGY.

09:42AM   4          AND IT'S TRUE THAT DR. ROSENDORFF TESTIFIED THAT WHEN HE

09:42AM   5     SIGNED THOSE VALIDATION REPORTS, HE DID SO BECAUSE HE BELIEVED

09:42AM   6     THAT THE REQUIREMENTS HAD BEEN MET AT THE TIME.

09:42AM   7          TWO QUICK THINGS TO KEEP IN MIND WHEN IT COMES TO THAT,

09:42AM   8     THOUGH.

09:42AM   9          FIRST, YOU KNOW FROM YOUR COMMON SENSE THAT WHEN A PROCESS

09:42AM  10     IS RUSHED, IT CREATES ROOM FOR ERROR.  AND YOU ALSO KNOW FROM

09:42AM  11     YOUR COMMON SENSE THAT SOME PROCESSES ARE IMPORTANT ENOUGH THAT

09:42AM  12     THEY SHOULD NOT BE RUSHED.

09:42AM  13          YOU HEARD THAT THE VALIDATION PROCESS AT THERANOS, THAT

09:42AM  14     STAGE OF THINGS WAS CONDUCTED AT A VERY HURRIED PACE WITH A LOT

09:43AM  15     OF PRESSURE PLACED ON THE PEOPLE WHO WERE DOING THAT WORK.  IS

09:43AM  16     IT SURPRISING THAT THE RESULT OF IT LED TO UNRELIABLE TESTS?

09:43AM  17     OF COURSE NOT.

09:43AM  18          DR. ROSENDORFF ALSO TESTIFIED THAT ALTHOUGH ASSAYS APPEAR

09:43AM  19     TO PERFORM WELL ENOUGH DURING THE VALIDATION STAGE, THEIR

09:43AM  20     PERFORMANCE DEGRADED SIGNIFICANTLY ONCE THEY ACTUALLY STARTED

09:43AM  21     USING THOSE ASSAYS ON PATIENTS, ONCE THEY STARTED TESTING

09:43AM  22     PATIENTS, THE TEST PERFORMED SO MUCH WORSE.

09:43AM  23          AT THIS STAGE, IT APPEARS THAT MR. BALWANI IS ASKING YOU

09:43AM  24     TO IGNORE THOSE FACTS JUST LIKE HE DID BACK WHEN HE WAS RUNNING

09:43AM  25     THERANOS, BUT THAT MATTERS.  THE QUESTION OF WHETHER A TEST IS

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7587

```
09:43AM   1    ACCURATE OR NOT DOES NOT ANSWER ITSELF ONCE AND FOR ALL WHEN A
09:43AM   2    TEST IS VALIDATED.  YOU NEED TO CONTINUE TO MONITOR THAT TEST
09:43AM   3    PERFORMANCE, AND IF IT'S FAILING QUALITY CONTROL, WHICH WE'LL
09:43AM   4    TALK ABOUT IN A MINUTE, IF PATIENTS ARE GETTING INACCURATE
09:44AM   5    RESULTS, THEN YOU NEED TO MAKE A DECISION ABOUT WHETHER TO KEEP
09:44AM   6    OFFERING THAT TEST OR NOT.  AND MR. BALWANI CONSISTENTLY MADE
09:44AM   7    THE WRONG DECISION WHEN IT CAME TO THAT.
09:44AM   8        LET'S TALK ABOUT QUALITY CONTROL BECAUSE THIS IS AN
09:44AM   9    IMPORTANT TOPIC, AND IT'S ONE OF THE MAIN WAYS THAT YOU KNOW
09:44AM  10    THAT THERANOS'S TESTING WAS INACCURATE AND UNRELIABLE.
09:44AM  11        AND LET'S START BY TALKING ABOUT OUTLIER REMOVAL, WHICH IS
09:44AM  12    SOMETHING THAT MR. COOPERSMITH DISCUSSED.  YOU'LL RECALL THIS
09:44AM  13    EXHIBIT, THIS IS 1287, WHERE MS. CHEUNG RUNNING QUALITY CONTROL
09:44AM  14    IN NOVEMBER OF 2013 AFTER THE COMMERCIAL LAUNCH FELT THE NEED
09:44AM  15    TO EMAIL THIS GROUP NORMANDY 911.  YOU DIDN'T HEAR ANY EVIDENCE
09:44AM  16    THAT THERE WAS A SIMILAR 911 EMERGENCY EMAIL FOR THE SECTION OF
09:44AM  17    THE LAB THAT USED COMMERCIALLY STANDARD DEVICES BY THE WAY.
09:44AM  18        IN THIS EMAIL, MS. CHEUNG IS REPORTING THAT WHEN SHE DID A
09:44AM  19    QUALITY CONTROL CHECK, CHECKING TO SEE WHETHER A DEVICE IS
09:45AM  20    READY TO BE TESTED ON PATIENTS, WHETHER IT COULD ACCURATELY
09:45AM  21    IDENTIFY THE CONCENTRATIONS OF THE CONTROL SAMPLES.  BOTH
09:45AM  22    CONTROLS FAILED IN THIS CASE.
09:45AM  23        SHE NOTES THAT SHE USED ALL UNOPENED REAGENTS AND A NEW
09:45AM  24    PACKAGE OF CARTRIDGES.  SO THAT WAS NOT THE PROBLEM.  BUT SHE
09:45AM  25    SAYS THAT FAILED AS WELL.
```

ER-5241

REBUTTAL ARGUMENT BY MR. BOSTIC                    7588

09:45AM 1    MR. BALWANI RECOGNIZED THAT THIS WAS BEYOND UNACCEPTABLE

09:45AM 2    PERFORMANCE.  SO I WANT YOU TO REMEMBER THIS EMAIL AND OTHER

09:45AM 3    EMAILS LIKE IT.  YOU'VE SEEN OTHERS LIKE THIS.  WHENEVER YOU

09:45AM 4    THINK ABOUT THE DEFENSE'S CLAIM THAT MR. BALWANI THOUGHT

09:45AM 5    EVERYTHING WAS FINE WITH THE COMPANY'S TECHNOLOGY, IN HIS OWN

09:45AM 6    WORDS, HE'S TELLING YOU THAT THAT'S NOT TRUE.

09:45AM 7    MS. HOLMES THEN WEIGHS IN AND ASKS WHETHER THERE'S ENOUGH

09:45AM 8    SAMPLE IN THIS PARTICULAR PATIENT SAMPLE TO RUN THAT TEST ON

09:45AM 9    TRADITIONAL METHODS.

09:45AM 10    SO, AGAIN, AN ACKNOWLEDGEMENT BY MS. HOLMES AS ONE OF THE

09:45AM 11    TWO PEOPLE RUNNING THE COMPANY THAT TRADITIONAL METHODS WOULD

09:46AM 12    BE MORE RELIABLE, MORE DEPENDABLE.

09:46AM 13    FAST FORWARDING IN THIS EMAIL CHAIN.  THERE ENDS UP BEING

09:46AM 14    A RESOLUTION, AND MS. HOLMES ASKS WHAT IT IS AND IS TOLD THAT

09:46AM 15    TWO OUTLIERS HAD TO BE MANUALLY REMOVED IN ORDER TO PASS

09:46AM 16    QUALITY CONTROL.

09:46AM 17    AND YOU'LL RECALL THAT FOR A PORTION OF TIME AFTER THE

09:46AM 18    COMMERCIAL LAUNCH, THERANOS WAS USING THREE EDISON DEVICES AT A

09:46AM 19    TIME TO RUN A SINGLE PATIENT TEST.  THAT MEANT, BY THE WAY,

09:46AM 20    THAT IF A PATIENT NEEDED THREE DIFFERENT KINDS OF TESTS RUN ON

09:46AM 21    AN EDISON, NINE DEVICES WOULD BE REQUIRED JUST TO RETURN THAT

09:46AM 22    THE RESULT FOR THAT ONE PATIENT.

09:46AM 23    AND THE REASON THEY DID THAT WAS TO GENERATE ENOUGH DATA

09:46AM 24    TO BE ABLE TO AVERAGE OUT VARIANCE AND TO HAVE THE OPTION TO

09:46AM 25    REMOVE WHAT THEY CALLED "OUTLIERS."

ER-5242

09:46AM   1          SO, IN OTHER WORDS, IN ORDER TO PASS QUALITY CONTROL, IN

09:46AM   2    ORDER FOR THIS DEVICE TO BE DEEMED GOOD ENOUGH TO BE USED ON A

09:47AM   3    PATIENT, SOME OF THE DATA HAD TO BE IGNORED, SOME OF THE DATA

09:47AM   4    HAD TO BE THROWN OUT, BECAUSE IF YOU CONSIDERED ALL OF THE DATA

09:47AM   5    TOGETHER, IT WOULD NOT PASS QUALITY CONTROL.

09:47AM   6          NOW, THE DEFENSE POINTS OUT THAT MR. OR DR. ROSENDORFF

09:47AM   7    KNEW ABOUT THIS PRACTICE AND ALLOWED IT, AND THAT'S TRUE.  THEY

09:47AM   8    SHOWED AN EMAIL WHERE DR. ROSENDORFF SAYS THE REASON WE'RE

09:47AM   9    DOING THIS IS TO GENERATE ENOUGH DATA POINTS AND AVERAGE OUT

09:47AM  10    VARIATION.

09:47AM  11          THAT'S THE POINT THOUGH.  IT'S NOT THAT THIS AVERAGING

09:47AM  12    PRACTICE AND THE REMOVING THE OUTLIERS IS THE FRAUD, BUT THIS

09:47AM  13    DOES SHOW THAT THE COMPANY HAD A LACK OF CONFIDENCE IN ITS OWN

09:47AM  14    TECHNOLOGY, BECAUSE THERE'S NO REASON TO DO THIS IF YOU KNOW

09:47AM  15    THAT YOUR DEVICE CAN RUN A TEST AND RETURN AN ACCURATE RESULT.

09:47AM  16    THERE'S NO REASON TO GROUP THEM IN GROUPS OF THREE, HAVE THEM

09:47AM  17    COORDINATE WITH EACH OTHER, AND THEN IGNORE SOME OF THE DATA

09:47AM  18    AVERAGING OUT THE REST IF YOUR DEVICE IS RELIABLE AND CAN

09:47AM  19    RETURN THE RESULT IT NEEDS TO RETURN THE FIRST TIME.

09:48AM  20          AND YOU HEARD TESTIMONY THAT THIS PRACTICE, THIS PRACTICE

09:48AM  21    OF RUNNING A TEST MULTIPLE TIMES TO CHECK AN ANSWER, AVERAGING

09:48AM  22    THE RESULTS, DISCARDING SOME OF THE DATA, THAT'S NOT A PRACTICE

09:48AM  23    THAT NEEDS TO BE USED WITH THIRD PARTY DEVICES.  SO THE

09:48AM  24    COMMERCIAL DEVICES THAT THERANOS WAS ALSO USING DID NOT EMPLOY

09:48AM  25    THIS PRACTICE, AND THAT'S BECAUSE IT WAS NOT NECESSARY.  THOSE

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7590

09:48AM   1   DEVICES COULD RUN A TEST ONE TIME AND RETURN A RESULT THAT WAS

09:48AM   2   SUFFICIENTLY RELIABLE.

09:48AM   3       ONE REASON YOU KNOW THAT THERANOS WOULD NOT HAVE DONE THIS

09:48AM   4   UNLESS IT HAD TO IS THAT YOU KNOW THE COMPANY WAS CONSISTENTLY

09:48AM   5   RUNNING SHORT ON EDISON DEVICES BECAUSE THEY WOULD FAIL QUALITY

09:48AM   6   CONTROL SO FREQUENTLY, BECAUSE THEY WOULD BREAK DOWN AND

09:48AM   7   DISPLAY OTHER ERRORS SO FREQUENTLY.  YOU KNOW THAT A LACK OF

09:48AM   8   EDISONS WAS ONE OF THE REASONS WHY THE COMPANY WAS HAVING

09:48AM   9   PROBLEMS EVEN PROCESSING THE AMOUNT OF TESTS THAT IT WAS

09:49AM  10   GIVING.

09:49AM  11       AND THE PRACTICE THAT THEY HAD OF GROUPING THESE DEVICES

09:49AM  12   IN GROUPS OF THREE WOULD HAVE COMPOUNDED THAT PROBLEM.  THINK

09:49AM  13   ABOUT HOW MUCH WORSE IT WOULD HAVE BEEN BECAUSE EACH TEST HAD

09:49AM  14   TO BE THREE DEVICES AND NOT JUST ONE.  WHY WOULD THEY DO THAT

09:49AM  15   UNLESS THEY NEEDED TO DO THAT?  WHY WOULD THEY DO THAT IF ONE

09:49AM  16   DEVICE WAS CAPABLE OF RETURNING A RELIABLE RESULT?

09:49AM  17       WHEN IT COMES TO QUANTIFYING THIS PROBLEM OF QUALITY

09:49AM  18   CONTROL FAILURES, YOU SAW EXHIBITS LIKE THIS.  THIS IS 1633.

09:49AM  19   AND IT RELATES TO QUALITY CONTROL FAILURE RATES FOR THE MONTH

09:49AM  20   OF MARCH 2014.

09:49AM  21       AND YOU SEE HERE THAT FOR THESE ASSAYS, ALL OF WHICH WERE

09:49AM  22   RUN ON THE THERANOS ANALYZER, QUALITY CONTROL FAILED AT A RATE

09:49AM  23   FREQUENTLY OVER 20 PERCENT AND SOMETIMES APPROACHING 45 OR EVEN

09:49AM  24   EXCEEDING 50 PERCENT.

09:50AM  25       THINK ABOUT WHAT THAT MEANS FOR THAT TT3 ASSAY, MORE THAN

ER-5244

09:50AM 1    HALF OF THE TIME WHEN THERANOS RAN A CHECK TO SEE WHETHER THE

09:50AM 2    ASSAY COULD RETURN AN ACCURATE RESULT, IT FAILED.  MORE THAN

09:50AM 3    HALF OF THE TIME.

09:50AM 4        AND YOU SEE THAT THE OVERALL QUALITY CONTROL FAILURE RATE

09:50AM 5    WAS ABOUT 26 PERCENT.  DR. ROSENDORFF TOLD YOU THAT THIS FAR,

09:50AM 6    FAR EXCEEDED WHAT HE WAS USED TO SEEING WITH NONCONVENTIONAL

09:50AM 7    THERANOS MACHINES.

09:50AM 8        ALSO IN EVIDENCE IS A PRESENTATION FROM SOMEONE NAMED

09:50AM 9    LANGLY GEE AT THERANOS, WHICH PROVIDES SOME DIFFERENT NUMBERS.

09:50AM 10   I BELIEVE IT INDICATES A 2.9 PERCENT QUALITY CONTROL FAILURE

09:50AM 11   RATE FOR A CATEGORY OF DEVICES AT THERANOS AND A FAILURE RATE

09:50AM 12   SIGNIFICANTLY UNDER 1 PERCENT FOR THE CONVENTIONAL NON-THERANOS

09:50AM 13   ANALYZERS.  SO A COUPLE OF THINGS TO NOTE THERE.

09:50AM 14       FIRST OF ALL, IF YOU LOOK AT THAT EXHIBIT, YOU'LL NOTE

09:51AM 15   THAT THE CATEGORY WITH THE 2.9 PERCENT FAILURE RATE INCLUDES

09:51AM 16   NOT JUST EDISONS, BUT IT ALSO APPEARS TO INCLUDE THE THERANOS

09:51AM 17   MODIFIED CONVENTIONAL DEVICES.  SO IT'S NOT NECESSARILY

09:51AM 18   INCONSISTENT WITH THIS.

09:51AM 19       AND WHAT THAT WOULD MEAN SHOULD NOT SURPRISE YOU, WHICH IS

09:51AM 20   THAT THE COMMERCIAL DEVICES, EVEN THE THERANOS MODIFIED ONES,

09:51AM 21   WERE MORE RELIABLE THAN THE EDISONS WHEN IT CAME TO PASSING

09:51AM 22   QUALITY CONTROL.

09:51AM 23       WHAT THAT ALSO SHOWS YOU IS THE RATIO BETWEEN QUALITY

09:51AM 24   CONTROL FAILURE RATES FOR THE THERANOS-SPECIFIC DEVICES AND THE

09:51AM 25   NON-THERANOS-SPECIFIC DEVICES, WHICH ACCORDING TO THAT SHOW YOU

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7592

09:51AM  1    THAT THERANOS DEVICES FAILED QUALITY CONTROL MORE THAN THREE

09:51AM  2    TIMES AS OFTEN AS THE UNMODIFIED COMMERCIAL DEVICES.

09:51AM  3        WHAT DOES THIS MEAN, THOUGH?  DO FAILURES IN QUALITY

09:51AM  4    CONTROL ACTUALLY TRANSLATE TO PROBLEMS WITH PATIENT TEST

09:52AM  5    ACCURACY?  AND THERE SEEMS TO BE SOME DISPUTE ON THIS POINT,

09:52AM  6    BUT NOT ACCORDING TO WHAT THE WITNESSES SAID, NOT ACCORDING TO

09:52AM  7    THE ACTUAL EVIDENCE.

09:52AM  8        DR. ROSENDORFF WAS ASKED WERE QUALITY CONTROL FAILURE

09:52AM  9    RATES LIKE THESE CONCERNING TO YOU?

09:52AM  10        HE SAID YES.

09:52AM  11        HE EXPLAINED IF QUALITY CONTROL IS FAILING HALF OF THE

09:52AM  12    TIME, OR 50 PERCENT OF THE TIME, IT INDICATES THAT THE PATIENT

09:52AM  13    RESULT WOULD BE INACCURATE HALF OF THE TIME.

09:52AM  14        DURING HIS CLOSING MR. COOPERSMITH CALLED THIS IDEA

09:52AM  15    "BIZARRE" I THINK WAS THE WORD THAT HE USED, AND HE SAID THERE

09:52AM  16    IS NO LOGIC TO IT.

09:52AM  17        AND I WILL REMIND YOU IT IS UP TO YOU TO WEIGH WITNESS

09:52AM  18    CREDIBILITY, BUT I'D URGE YOU TO BE CAUTIOUS WHEN A LAWYER ASKS

09:52AM  19    YOU TO ACCEPT HIS JUDGMENT ON A TECHNICAL SPECIALIZED ISSUE AND

09:52AM  20    TO ACCEPT THAT JUDGMENT OVER THE TESTIMONY OF A WITNESS WHO

09:52AM  21    DOES THIS FOR A LIVING WHO IS A MEDICAL DOCTOR, WHO IS A

09:52AM  22    CLINICAL PATHOLOGIST AND A LAB DIRECTOR.

09:53AM  23        I'LL ALSO REMIND YOU THAT DR. ROSENDORFF WAS NOT THE ONLY

09:53AM  24    ONE WHO SAID THIS.  LET'S LOOK AT ONE MORE QUOTE FROM HIM.

09:53AM  25        HE WAS ASKED ABOUT WHETHER THE PRACTICE OF NOT USING A

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7593

09:53AM  1      DEVICE WHEN IT FAILED QUALITY CONTROL GOT RID OF HIS CONCERNS

09:53AM  2      ABOUT PATIENT TESTING ACCURACY?

09:53AM  3           HE SAID NO BECAUSE EVEN A BROKEN CLOCK IS CORRECT TWICE A

09:53AM  4      DAY.

09:53AM  5           THE POINT THERE IS THAT IF YOU ARE ABLE TO DETERMINE

09:53AM  6      SOMETIMES WHETHER A TEST IS PROVIDING RELIABLE RESULTS OR NOT,

09:53AM  7      AND IT'S FAILING HALF OF THE TIME, THAT SHOULD GIVE YOU

09:53AM  8      CONCERNS ABOUT WHEN YOU'RE TESTING PATIENTS AND YOU CAN'T KNOW,

09:53AM  9      AS WE DISCUSSED BEFORE, WHETHER A GIVEN RESULT IS ACCURATE OR

09:53AM 10      NOT.

09:53AM 11           AND DR. ROSENDORFF ALSO CONFIRMED THAT WHEN YOU RUN A

09:53AM 12      PATIENT SAMPLE, THERE'S NOT A WAY TO KNOW RIGHT AWAY WHETHER A

09:54AM 13      RESULT IS ACCURATE.

09:54AM 14           DR. PANDORI SAID SOMETHING SIMILAR.  HE SAID, WHEN QUALITY

09:54AM 15      CONTROL IS FAILING, THAT MEANS THAT THE TESTS ARE HAVING

09:54AM 16      DIFFICULTY ACCURATELY MEASURING SOMETHING ON A ROUTINE BASIS.

09:54AM 17      THE EQUIPMENT MIGHT NOT ONLY FAIL A LOT, BUT BE INACCURATE.

09:54AM 18           HE WAS ASKED WHETHER THAT POOR QUALITY CONTROL PERFORMANCE

09:54AM 19      CAUSED HIM CONCERNS ABOUT THE ACCURACY OF RESULTS THAT WERE

09:54AM 20      GOING OUT TO PATIENTS?

09:54AM 21           HE SAID, YOU ASKED ME IF IT LED TO MY CONCERN ABOUT THE

09:54AM 22      ACCURACY OF TEST RESULTS THAT WERE GOING OUT FROM THAT

09:54AM 23      EQUIPMENT?

09:54AM 24           AND THE ANSWER IS, YES, IT DID RESULT IN A CONCERN ON MY

09:54AM 25      PART.

ER-5247

09:54AM 1      SO WHILE DEFENSE COUNSEL MIGHT NOT BE WORRIED ABOUT THIS

09:54AM 2    QUALITY CONTROL DATA, THE PEOPLE WHOSE JOB IT WAS TO LOOK AT IT

09:54AM 3    AND DECIDE WHETHER THIS EQUIPMENT WAS GOOD ENOUGH TO USE ON

09:54AM 4    PATIENTS WERE VERY CONCERNED. THAT'S WHAT SHOULD COUNT IN YOUR

09:54AM 5    MINDS. BY THE WAY, YOUR COMMON SENSE SHOULD ALSO TELL YOU THAT

09:55AM 6    THE WITNESSES ARE RIGHT ON THIS ISSUE.

09:55AM 7      MR. COOPERSMITH'S THEORY SEEMS TO BE ONCE A BAD EDISON IS

09:55AM 8    IDENTIFIED, IT CAN SIMPLY BE TAKEN OUT OF USE ON PATIENTS AND

09:55AM 9    THAT SOLVES THE PROBLEM. THAT ASSUMES, THOUGH, THAT ALL YOU'RE

09:55AM 10    TRYING TO DO IS IDENTIFY THE GOOD EDISONS AND THE BAD EDISONS,

09:55AM 11    BUT THE EVIDENCE SHOWS THAT'S NOT HOW THIS WORKED. IT'S NOT

09:55AM 12    THE CASE THAT SOME OF THE DEVICES WERE SIMPLY BAD AND THEY

09:55AM 13    NEEDED TO BE REMOVED.

09:55AM 14      AND THE REASON YOU KNOW THAT IS THAT THE QUALITY CONTROL

09:55AM 15    PERFORMANCE STAYED POOR.

09:55AM 16      SO IF IT HAD BEEN THE CASE THAT THIS WAS JUST A QUESTION

09:55AM 17    OF IDENTIFYING, OKAY, WELL, EDISONS 3, 5, AND 10 DON'T APPEAR

09:55AM 18    TO BE WORKING, LET'S STOP USING THEM. IF THAT'S WHAT THIS IS

09:55AM 19    ABOUT, THE QUALITY PERFORMANCE WOULD HAVE IMPROVED OVER TIME.

09:56AM 20    BUT MULTIPLE WITNESSES TOLD YOU THAT THE QUALITY CONTROL

09:56AM 21    PERFORMANCE STAYED BAD. THAT MEANS THAT THIS PROBLEM DIDN'T

09:56AM 22    HAVE A SOLUTION, AT LEAST NOT ONE THAT INVOLVED CONTINUING TO

09:56AM 23    USE THIS FLAWED TECHNOLOGY.

09:56AM 24      YOU'LL ALSO RECALL THAT SARAH BENNETT FROM CMS TESTIFIED

09:56AM 25    THAT SHE FOUND THE COMPANY WAS NOT ALWAYS FOLLOWING THE QUALITY

09:56AM   1    CONTROL PROCESS, AND SHE WAS AWARE THAT THE COMPANY HAD

09:56AM   2    REPORTED PATIENT RESULTS AFTER QC FAILURE, AND THAT'S IN HER

09:56AM   3    TESTIMONY.

09:56AM   4         LET'S TALK ABOUT INACCURATE RESULTS AS WELL.  BECAUSE

09:56AM   5    THERE IS EVIDENCE OF THIS.  YOU HAVE SEEN MULTIPLE PATIENTS WHO

09:56AM   6    GOT INACCURATE RESULTS FROM THERANOS THAT COULD NOT BE TRUSTED.

09:56AM   7         THE DEFENSE HAS SAID MULTIPLE TIMES THAT ALL LABS HAVE

09:56AM   8    ERRORS, BUT THINK ABOUT THE NATURE OF THE ERRORS THAT YOU SAW

09:56AM   9    IN THIS CASE.

09:56AM  10         I'D LIKE TO START WITH BRITTANY GOULD AND HCG.  AND WHEN

09:57AM  11    IT CAME TO THIS DATA, THE BEST THE DEFENSE CAN OFFER YOU IS

09:57AM  12    THAT THIS MIGHT NOT HAVE BEEN A PROBLEM WITH THE TECHNOLOGY, IT

09:57AM  13    MIGHT HAVE BEEN CLERICAL ERRORS INSTEAD, AND IT WOULD TAKE

09:57AM  14    MULTIPLE CLERICAL ERRORS TO EXPLAIN THIS AS YOU'LL RECALL.

09:57AM  15         ONE ERROR WOULD BE REPORTING THE SAME VALUE TWICE, AND

09:57AM  16    THEN THE SECOND ERROR WOULD BE IN ONE OF THOSE TIMES MAKING A

09:57AM  17    DECIMAL POINT ERROR AND REPORTING SOMETHING THAT WAS 100 TIMES

09:57AM  18    LOWER THAN IT SHOULD HAVE BEEN.

09:57AM  19         SO A COUPLE OF THINGS TO KEEP IN MIND THERE BECAUSE THIS

09:57AM  20    IS ALL PART OF THE DEFENSE'S CLAIM THAT THERE WAS ACTUALLY NO

09:57AM  21    FUNDAMENTAL PROBLEM WITH HCG TESTING AT THERANOS, WHICH IS NOT

09:57AM  22    TRUE.  THE EVIDENCE SHOWS EXACTLY THE OPPOSITE.

09:57AM  23         ONE THING TO NOTE IS THAT EACH THAT VALUE OF 12,000,

09:57AM  24    DR. ZACHMAN TESTIFIED IT WOULD NOT MAKE SENSE ON EITHER DATE OF

09:58AM  25    OCTOBER 2ND OR OCTOBER 4TH.  AND THAT'S CONSISTENT WITH WHAT

09:58AM 1    YOU KNOW NOW ABOUT HCG VALUES, WHICH IS THAT THEY'RE SUPPOSED

09:58AM 2    TO DOUBLE APPROXIMATELY EVERY 48 HOURS.

09:58AM 3        SO IF YOU LOOK AT THESE NUMBERS, DR. ZACHMAN TOLD YOU THAT

09:58AM 4    IF YOU GET RID OF THE THERANOS RESULTS, ALL OF THEM, THE QUEST

09:58AM 5    DIAGNOSTIC RESULTS MAKE SENSE TOGETHER BECAUSE THEY GO FROM

09:58AM 6    1,000 AND THEN SIX DAYS LATER THEY'RE AT APPROXIMATELY 10,000.

09:58AM 7        SO YOU WOULD EXPECT THE VALUES TO BE ON OCTOBER 2ND ABOUT

09:58AM 8    2,000 OR 3,000; ON OCTOBER 4TH YOU WOULD WANT TO SEE 4,000 OR

09:58AM 9    5,000; AND THEN SURE ENOUGH ON OCTOBER 6TH, 9,000 PUTS IT IN

09:58AM 10   THAT ROUGH RANGE OF DOUBLING EVERY 48 HOURS.

09:58AM 11       SO EVEN IF THE THERANOS VALUE OF 12,000 WAS THE CORRECT

09:58AM 12   VALUE OR THAT COMPANY MEANT TO REPORT, IT WOULD STILL BE AN

09:59AM 13   OUTLIER.  IT WOULD STILL BE SOMETHING THAT DIDN'T MAKE SENSE IN

09:59AM 14   THE COURSE OF WHAT WOULD OTHERWISE BE THIS HEALTHY PREGNANCY.

09:59AM 15       YOU ALSO KNOW THAT THIS WAS NOT AN ISOLATED EXAMPLE, THAT

09:59AM 16   MS. GOULD WAS NOT THE ONLY ONE WHO GOT A TROUBLING OR

09:59AM 17   INACCURATE HCG RESULT.  YOU SAW MULTIPLE EXAMPLES OF THAT IN

09:59AM 18   THE EVIDENCE, AND NOT JUST FROM THE WITNESSES WHO TESTIFIED,

09:59AM 19   BUT YOU SAW WRITTEN RECORDS OF THAT AS WELL.

09:59AM 20       IT GOT TO THE POINT IN LATE MAY OF 2014 DR. ROSENDORFF

09:59AM 21   DECIDED TO REQUIRE OR DECREE THAT HCG TESTING NEEDED TO STOP ON

09:59AM 22   THE EDISON DEVICES.  AND THE DEFENSE CLAIMS THAT THAT PROBLEM

09:59AM 23   WAS LIMITED TO THAT TIME PERIOD, AND THEY ALSO CLAIM THAT

09:59AM 24   DR. ROSENDORFF SUBSEQUENTLY WENT BACK ON THAT DECISION AND

09:59AM 25   APPROVED HCG TESTING RESUMING.

09:59AM 1      YOU KNOW THAT'S NOT TRUE BECAUSE HE WAS ASKED ABOUT IT BY

09:59AM 2   BOTH SIDES WHEN HE WAS ON THE STAND.  THERE'S NO EVIDENCE THAT

10:00AM 3   HE APPROVED OR RESCINDED THAT DECISION.

10:00AM 4      AND EMAILS SHOW -- OR AN EMAIL SHOWS THAT HE HAD TO ASK

10:00AM 5   WEEKS AFTER THIS WHAT DEVICE WAS BEING USED TO TEST HCG.  IF IT

10:00AM 6   HAD BEEN HIS DECISION, HE WOULD HAVE NEVER NEEDED TO ASK.  AND

10:00AM 7   IT WAS MR. BALWANI WHO TOLD HIM AT THAT TIME AFTER

10:00AM 8   DR. ROSENDORFF HAD DECIDED TO STOP HCG TESTING ON EDISON, THAT

10:00AM 9   HCG TESTING WAS HAPPENING ON THE EDISON.  SO CERTAINLY HE KNEW.

10:00AM 10      BUT AS HE TESTIFIED TO YOU, HE UNDERSTOOD THAT HE HAD

10:00AM 11   LIMITED POWER AT THE COMPANY, THAT THESE DECISIONS WERE NOT

10:00AM 12   NECESSARILY HIS TO MAKE.  HE ANSWERED TO MR. BALWANI AS THE

10:00AM 13   PERSON RUNNING THE LAB.  SO HE KNEW THAT THE DECISION WAS OUT

10:00AM 14   OF HIS HANDS AT THIS POINT.

10:00AM 15      SPEAKING OF MS. GOULD, MR. COOPERSMITH ALSO TALKED ABOUT

10:01AM 16   THE PRACTICE OF WHERE DR. ZACHMAN WORKS AND THE EXTENT TO WHICH

10:01AM 17   THEIR PATIENTS KEPT RECEIVING RESULTS FROM THERANOS.

10:01AM 18      A COUPLE OF THINGS I WOULD LIKE YOU TO KEEP IN MIND THERE.

10:01AM 19      EXHIBIT 20073 IS THE CHART THAT THE DEFENSE REFERENCED

10:01AM 20   THERE, AND IT SHOWS THERANOS TEST RESULTS RECEIVED BY PATIENTS

10:01AM 21   OF THIS PRACTICE, SOUTHWEST.

10:01AM 22      ONE IMPORTANT THING TO NOTE IS THAT THAT SLIDE OR THAT

10:01AM 23   EXHIBIT OR THAT CHART IS LIMITED TO DATA AFTER AUGUST OF 2015.

10:01AM 24   WHY IS THAT IMPORTANT?

10:01AM 25      YOU'LL REMEMBER THIS, EXHIBIT 4533.  THIS SHOWS YOU THAT

10:01AM   1    FOR HCG IN PARTICULAR, THERANOS STOPPED USING THE EDISON TO

10:01AM   2    TEST IT, NOT WHEN DR. ROSENDORFF DECIDED TO, NOT WHEN HE SAID

10:01AM   3    THAT'S WHAT SHOULD HAPPEN, BUT IN JANUARY OF 2015.  SO SEVEN

10:01AM   4    MONTHS BEFORE THE DEFENSE'S EVIDENCE BEGINS ON THOSE SOUTHWEST

10:02AM   5    TESTS, THERANOS STOPPED USING THAT DEVICE AT ALL FOR HCG.

10:02AM   6         SO WHEN THEY SAY DR. ZACHMAN MUST HAVE REVIEWED ALL OF

10:02AM   7    THESE RESULTS AND SHE DIDN'T FIND ANY OTHER PROBLEMS TO NOTE,

10:02AM   8    YOU SHOULDN'T BE TOO SURPRISED BY THAT BECAUSE ALL OF THE HCG

10:02AM   9    RESULTS IN THAT CHART WOULD HAVE BEEN PERFORMED ON A DEVICE

10:02AM  10    OTHER THAN THE EDISON WHICH WAS CREATING ALL OF THE PROBLEMS

10:02AM  11    DURING THE TIME PERIOD THAT WE'RE TALKING ABOUT.  SO IT HAS

10:02AM  12    LIMITED VALUE FOR THAT PURPOSE.

10:02AM  13         TO THE EXTENT THAT THE DEFENSE WANTS YOU TO LOOK AT THAT

10:02AM  14    AND THINK THAT DR. ZACHMAN WASN'T SERIOUS ABOUT HER CONCERNS OR

10:02AM  15    THE PRACTICE DISAGREED WITH HER, YOU CAN'T RELY ON THAT FOR

10:02AM  16    THAT EITHER.

10:02AM  17         YOU HEARD DR. ZACHMAN'S TESTIMONY THAT IT'S NOT ALWAYS UP

10:02AM  18    TO THE DOCTOR WHERE THE PATIENT GOES, AND SOMETIMES PATIENTS

10:02AM  19    DECIDE WHERE TO GO.

10:02AM  20         SO WHILE SHE NEVER SENT ANOTHER PATIENT TO THERANOS AND

10:02AM  21    WHILE SHE, IN FACT, RECOMMENDED TO HER PATIENTS THAT THEY NOT

10:02AM  22    GO THERE, IT WAS ULTIMATELY UP TO THEM.

10:03AM  23         SO YOU HEARD THAT TESTIMONY.  YOU KNOW THAT EVERY LINE IN

10:03AM  24    THAT CHART DOESN'T NECESSARILY REPRESENT A CASE WHERE A

10:03AM  25    SOUTHWEST DOCTOR DECIDED TO USE THERANOS.  AND YOU KNOW FROM

REBUTTAL ARGUMENT BY MR. BOSTIC 7599

10:03AM 1    DR. ZACHMAN'S TESTIMONY THAT EVENTUALLY THE PRACTICE DID DECIDE

10:03AM 2    TO STOP USING THE LAB ALTOGETHER.

10:03AM 3        YOU ALSO KNOW THAT THE PROBLEMS WITH HCG WERE NOT LIMITED

10:03AM 4    TO LATE MAY OF 2014.

10:03AM 5        IF YOU NEED REMINDING, THERE WERE EXHIBITS SHOWING THAT IN

10:03AM 6    JUNE OF 2014, SPECIFICALLY EXHIBITS 5421 AND 5422, THERE

10:03AM 7    CONTINUED TO BE SERIOUS PROBLEMS WITH QC FAILING FOR HCG ON THE

10:03AM 8    EDISON.

10:03AM 9        5421 IS ABOUT QUALITY CONTROL FAILURES ON JUNE 25TH OF

10:03AM 10   2014, ALMOST A MONTH AFTER THE DEFENSE SAYS THIS PROBLEM WAS

10:04AM 11   RESOLVED.  AND IN THAT EMAIL IT'S NOTED THAT QUALITY CONTROL

10:04AM 12   TESTING ON 33 EDISONS RESULTED IN 20 PASSING AND 9 FAILING FOR

10:04AM 13   ASSAYS, INCLUDING HCG.

10:04AM 14       THAT SAME EMAIL NOTED THAT ALL QUALITY CONTROLS PASSED

10:04AM 15   UPSTAIRS.  AND YOU'LL RECALL THAT UPSTAIRS WAS THE PORTION OF

10:04AM 16   THE LAB WHERE THE NON-THERANOS DEVICES WERE USED.  SO, AGAIN,

10:04AM 17   NO SURPRISE THERE.

10:04AM 18       5422 IS A JUNE 28TH EMAIL THAT NOTES ON THAT DAY ONLY 17

10:04AM 19   OUT OF 35 EDISONS PASSED QUALITY CONTROL.  THAT'S LESS THAN

10:04AM 20   HALF.

10:04AM 21       AND AT THAT TIME, AS A RESULT OF THOSE QUALITY CONTROL

10:04AM 22   FAILURES, THE HCG WAS NOT EVEN AVAILABLE TO BE PERFORMED,

10:04AM 23   AGAIN, NOT BECAUSE THEY WERE HONORING DR. ROSENDORFF'S CHOICE

10:04AM 24   TO CEASE TESTING, BUT BECAUSE IT FAILED QUALITY CONTROL AGAIN.

10:04AM 25       MR. COOPERSMITH REFERENCED A FEW TIMES SOME PURPORTED

ER-5253

REBUTTAL ARGUMENT BY MR. BOSTIC                                      7600

10:05AM   1     PROFICIENCY TESTING OR ALTERNATIVE ASSESSMENT OF PROFICIENCY

10:05AM   2     TESTING THAT THERANOS CONDUCTED ON THE HCG ASSAY.  I JUST WANT

10:05AM   3     TO POINT OUT ONE THING HERE.  THE DEFENSE WAS HAPPY TO POINT

10:05AM   4     OUT THIS 100 PERCENT SCORE THAT THERANOS CLAIMED, BUT LOOK AT

10:05AM   5     THE INDIVIDUAL TESTS.  YOU'LL SEE THAT YOU HAVE TWO ROWS.  ONE

10:05AM   6     SHOWS THE PREDICATE OR NON-THERANOS RESULTS FOR THESE SAMPLES

10:05AM   7     AND THE ONE BELOW IT SHOWS THE THERANOS RESULTS.  AND THE

10:05AM   8     QUESTION IS HOW CLOSELY DO THEY MATCH WITH THE ASSUMPTION THAT

10:05AM   9     THE PREDICATE RESULT, THE NON-THERANOS RESULT IS RELIABLE?

10:05AM  10         ONLY ONE OF THESE RESULTS ACTUALLY HAS VALUES.  THE OTHERS

10:05AM  11     USE SAMPLES THAT ARE SO LOW IN CONCENTRATION THAT THE PREDICATE

10:05AM  12     DEVICE SIMPLY SAYS LESS THAN ONE, AND THE THERANOS RETURNS OR

10:05AM  13     THE THERANOS DEVICE RETURNS A RESULT JUST SAYING THAT IT'S

10:05AM  14     BELOW LLOQ, LOWER LIMIT OF QUANTIFICATION, YOU REMEMBER THAT'S

10:06AM  15     WHAT THAT STOOD FOR.

10:06AM  16         SO, IN OTHER WORDS, THE THERANOS DEVICE IS SAYING HERE THE

10:06AM  17     CONCENTRATION IS TOO FAINT FOR ME TO ASSIGN A NUMBER, AND

10:06AM  18     THAT'S WHAT IT'S SAYING FOR FOUR OF THE FIVE RESULTS, AND

10:06AM  19     THAT'S 100 PERCENT SCORE IN THERANOS'S VIEW.

10:06AM  20         YOU KNOW FROM THE TESTIMONY THAT WHEN A PATIENT IS

10:06AM  21     PREGNANT, IT'S CRITICAL TO BE ABLE TO DETERMINE THE STATUS AND

10:06AM  22     HEALTH OF THE PREGNANCY WHEN THE HCG VALUES ARE IN THE

10:06AM  23     THOUSANDS.  WE HEARD ABOUT SITUATIONS WHERE VALUES IN THE FOUR

10:06AM  24     AND FIVE FIGURES WERE RELIED UPON BY PRACTITIONERS TO ESTABLISH

10:06AM  25     THE STATUS OF A PREGNANCY.

10:06AM  1        THE ABILITY OF THERANOS'S TECHNOLOGY TO TEST IN THAT RANGE

10:06AM  2   IS NOT BEING MEASURED BY THIS TEST, SO YOU SHOULD VIEW THIS AS

10:06AM  3   HAVING VERY LIMITED VALUE.

10:06AM  4        HCG, OF COURSE, WASN'T THE ONLY TEST THAT THERANOS HAD

10:06AM  5   PROBLEMS WITH.  AND YOU ALSO HEARD ABOUT PSA AND SEVERAL OTHER

10:07AM  6   ASSAYS THAT THERANOS COULDN'T DO RELIABLY.

10:07AM  7        I JUST WANT TO REMIND YOU THAT WHEN IT COMES TO

10:07AM  8   DR. ELLSWORTH'S PSA RESULTS, HE DID NOT JUST GET ONE BAD RESULT

10:07AM  9   BUT TWO IN A ROW AND THESE WERE THE RESULTS THAT WERE PERFORMED

10:07AM 10   ON THE THERANOS TECHNOLOGY IN CONTRAST TO THE RESULTS THAT WERE

10:07AM 11   PERFORMED USING A NON-THERANOS DEVICE.

10:07AM 12        WHAT DOES THAT TELL YOU?  IT TELLS YOU SOMETHING ABOUT THE

10:07AM 13   DEFENSE'S ARGUMENT THAT EVERY LAB EXPERIENCE HAS ERRORS.  YOU

10:07AM 14   COULD TAKE THAT AND USE IT TO DISCOUNT SITUATIONS WHERE A

10:07AM 15   PATIENT ONLY HAS ONE ERRONEOUS RESULT FROM THE COMPANY, BUT IN

10:07AM 16   THIS CASE WHERE LIGHTNING STRIKES TWICE, YOU NEED TO START

10:07AM 17   THINKING ABOUT WHETHER THIS IS A COINCIDENCE, WHETHER THIS IS A

10:07AM 18   RARE OCCURRENCE, OR WHETHER THIS REALLY SAYS SOMETHING CLEAR

10:07AM 19   ABOUT FUNDAMENTAL PROBLEMS IN THE METHOD BEING USED TO PERFORM

10:07AM 20   THOSE TESTS.

10:07AM 21        BOTH MS. GOULD'S DOCTOR AND DR. ELLSWORTH'S DOCTOR ALSO

10:08AM 22   TOLD YOU THAT THEY HAD NEVER SEEN PROBLEMS WITH THESE

10:08AM 23   PARTICULAR TESTS LIKE THE ONES THAT THEY SAW WHEN THEY WENT TO

10:08AM 24   THERANOS.  THAT SHOULD MEAN SOMETHING TO YOU AS WELL.

10:08AM 25        YOU ALSO SAW NUMEROUS INSTANCES WHERE INACCURATE TEST

10:08AM   1    RESULTS WERE BEING BROUGHT TO THE ATTENTION OF THERANOS,

10:08AM   2    INCLUDING DIRECTLY TO MR. BALWANI.  AND YOU SAW THE INTERNAL

10:08AM   3    EMAILS WITH HOW THE COMPANY STRUGGLED WITH HOW TO DEAL WITH

10:08AM   4    THOSE.  YOU'VE SEEN THE RECORDS RELATING TO THOSE.

10:08AM   5         SO IT'S NOT THE CASE THAT THE GOVERNMENT HAS ONLY

10:08AM   6    PRESENTED FOUR EXAMPLES OF INACCURATE PATIENT TEST RESULTS.

10:08AM   7    YOU'VE SEEN MANY OF THEM.  AND IT'S ALSO NOTABLE THAT EVEN IN

10:08AM   8    THERANOS'S DEMOS, WHEN THEY WERE TRYING THEIR HARDEST TO

10:08AM   9    IMPRESS VIP'S OR OTHER INFLUENTIAL INVESTORS, EVEN IN THOSE

10:08AM  10    CASES THEY COULDN'T GET THEIR TESTS RIGHT.

10:08AM  11         YOU SAW INSTANCES WHERE DANIEL YOUNG HAD TO COME IN AND

10:08AM  12    CORRECT TESTS BEFORE THEY WERE READY TO GO TO THESE VIP'S.  YOU

10:09AM  13    SAW SITUATIONS WHERE RESULTS HAD TO BE REMOVED FROM THOSE

10:09AM  14    REPORTS BEFORE THEY COULD GO TO THESE PEOPLE WHO WERE TRYING

10:09AM  15    TO -- WHO THE COMPANY WAS TRYING TO IMPRESS.  SO EVEN IN THAT

10:09AM  16    SITUATION THE COMPANY FACED INCONSISTENCIES AND PROBLEMS IN ITS

10:09AM  17    TEST RESULTS.

10:09AM  18         THE DEFENSE CLAIMS THAT YOU HAVE NOT SEEN ENOUGH

10:09AM  19    INACCURATE RESULTS TO PROPERLY JUDGE WHETHER THERANOS HAD

10:09AM  20    ACCURACY PROBLEMS.  THEY HAVE IT EXACTLY BACKWARDS THOUGH.

10:09AM  21         YOU DON'T KNOW ABOUT ACCURACY PROBLEMS AT THERANOS SIMPLY

10:09AM  22    BECAUSE OF THE INACCURATE RESULTS, RATHER YOU KNOW ABOUT THEM

10:09AM  23    THE SAME WAY MR. BALWANI DID WHEN HE WAS AT THE COMPANY.  YOU

10:09AM  24    KNOW BECAUSE OF THE POOR QUALITY CONTROL PERFORMANCE, BECAUSE

10:09AM  25    OF THE LACK OF APPROPRIATE PROFICIENCY TESTING THAT WAS

10:09AM 1    HAPPENING, BECAUSE OF THE OTHER RELIABILITY ISSUES WITH THE

10:09AM 2    PRODUCT.

10:09AM 3        AND WHEN YOU THINK ABOUT THE INACCURATE RESULTS, THEY

10:10AM 4    SERVE REALLY ONLY AS CONFIRMATION THAT BECAUSE THE INGREDIENTS

10:10AM 5    GOING INTO THIS TESTING PROCESS WERE FLAWED, THAT WAS THE

10:10AM 6    UNAVOIDABLE RESULT.  SO YOU SHOULD NOT BE SURPRISED THAT

10:10AM 7    INACCURATE RESULTS RESULTED FROM THIS RECIPE BECAUSE WHAT WAS

10:10AM 8    GOING IN WAS A SERIOUSLY FLAWED TESTING METHOD AND PLATFORM.

10:10AM 9        THERE WERE OTHER PROBLEMS WITH THERANOS'S TECHNOLOGY

10:10AM 10   BESIDES POOR ACCURACY.  AND THE EVIDENCE SHOWED THAT THAT

10:10AM 11   RELATED TO THINGS LIKE THE LOW SPEED WITH WHICH THE DEVICE

10:10AM 12   COULD ACTUALLY PROCESS A SAMPLE AND THE LOW THROUGHPUT, THE

10:10AM 13   FACT THAT, IN ONE WITNESS'S WORDS, THE EDISON DEVICE COULD ONLY

10:10AM 14   RUN ONE TEST PER HOUR IF YOU WERE LUCKY, WHEREAS A COMPETING

10:10AM 15   DEVICE LIKE THE ADVIA 1800 COULD RUN A THOUSAND.

10:11AM 16       YOU ALSO HEARD THAT USING THE THERANOS METHOD, INCLUDING

10:11AM 17   ON THE EDISON, REQUIRED OTHER STEPS.  IT WASN'T A ONE STEP

10:11AM 18   PROCESS.  FOR EXAMPLE, IT REQUIRES DILUTION OF THE SAMPLE ON A

10:11AM 19   LARGE DEVICE CALLED A TECAN.  YOU SHOULD THINK ABOUT HOW THAT

10:11AM 20   NEED AFFECTS THE TRUTH OF CLAIMS THAT THE MILITARY WAS GOING TO

10:11AM 21   USE THIS ON THE BATTLEFIELD, OR THAT IT COULD BE USED IN A

10:11AM 22   HELICOPTER.

10:11AM 23       WHAT USE IS A SMALL PORTABLE DEVICE IF IT HAS TO BE USED

10:11AM 24   IN GROUPS OF THREE, IF IT HAS TO BE USED ALONG WITH A MUCH

10:11AM 25   LARGER DEVICE THAT DILUTES THE SAMPLE BEFOREHAND?  WAS THIS

10:11AM  1    REALLY A SELF-CONTAINED LAB IN A BOX THE WAY THE DEFENDANT WAS

10:11AM  2    REPRESENTING IT TO BE?

10:11AM  3         NO, IT WAS NOT.

10:11AM  4         YOU ALSO HEARD THE DEVICE BROKE DOWN FREQUENTLY AND HAD

10:11AM  5    FREQUENTLY MECHANICAL FAILURES.  AND YOU HEARD THE EDISON WAS

10:11AM  6    NEVER USED FOR MORE THAN 12 TESTS IN THE THERANOS CLINICAL LAB,

10:11AM  7    A NUMBER THAT WOULD HAVE SURPRISED ANY INVESTOR WHO GAVE MONEY

10:12AM  8    TO THERANOS DURING THE RELEVANT TIME PERIOD.

10:12AM  9         THE DEFENSE NOW CLAIMS THAT THE FACT THAT ONLY 12 TESTS

10:12AM  10   WERE RUN ON THE EDISON AT THERANOS WAS A BUSINESS DECISION,

10:12AM  11   THAT IT DIDN'T HAVE ANYTHING TO DO WITH THE LIMITATIONS OF THE

10:12AM  12   DEVICE, BUT RATHER THAT WAS A DECISION THAT THERANOS MADE AFTER

10:12AM  13   ANALYZING BUSINESS CONCERNS.

10:12AM  14        THINK ABOUT WHETHER THAT HOLDS WATER THOUGH.  FIRST OF

10:12AM  15   ALL, FROM A BUSINESS PERSPECTIVE, WHY USE THE EDISON AT ALL?

10:12AM  16   HAVE YOU HEARD A SINGLE THING THROUGHOUT THE TRIAL THAT THE

10:12AM  17   EDISON DID BETTER THAN COMPETING DEVICES?  DID THE EDISON HAVE

10:12AM  18   ANY ABILITY THAT A COMMERCIAL DEVICE, A NON-THERANOS DEVICE

10:12AM  19   COULDN'T MATCH?  OR DID THE EVIDENCE TELL YOU THAT THE EDISON

10:12AM  20   WAS INFERIOR TO COMMERCIAL DEVICES IN EVERY WAY EXCEPT

10:12AM  21   PORTABILITY, AND PORTABILITY, OF COURSE, DIDN'T MATTER WITH

10:12AM  22   THERANOS'S BUSINESS MODEL OF HAVING A CENTRAL LAB WHERE ALL OF

10:12AM  23   THE TESTING WAS DONE IN HOUSE.

10:13AM  24        SO WHY USE THE EDISON AT ALL?  WAS THAT A RATIONAL

10:13AM  25   DECISION?  WAS THAT MR. BALWANI USING HIS BUSINESS SENSE?  OR

| | | |
|---|---|---|
| 10:13AM | 1 | WAS HE BEING STUBBORN?  WAS HE INSISTING ON USING THE COMPANY'S |
| 10:13AM | 2 | TECHNOLOGY, DESPITE THE ADVICE FROM INTERNAL SCIENTISTS, AND |
| 10:13AM | 3 | DESPITE THE FACT THAT IT DIDN'T MAKE ANY SENSE TO USE THE |
| 10:13AM | 4 | TECHNOLOGY WHEN IT WOULD HAVE BEEN MORE EFFICIENT AND EASIER TO |
| 10:13AM | 5 | USE COMPETING TECHNOLOGY INSTEAD? |
| 10:13AM | 6 | AND YOU'VE SEEN EMAILS AND YOU'VE HEARD TESTIMONY SHOWING |
| 10:13AM | 7 | MR. BALWANI'S INSISTENCE ON USING THE EDISON AND HIS RETICENCE |
| 10:13AM | 8 | TO TAKE ANY TEST OFF OF THAT PLATFORM AND PUT IT BACK ON A |
| 10:13AM | 9 | NON-THERANOS DEVICE. |
| 10:13AM | 10 | THE UNCONTROVERTED TESTIMONY ALSO IS THAT THE EDISON COULD |
| 10:13AM | 11 | ONLY DO ONE CATEGORY OF ASSAYS.  IT COULD ONLY DO IMMUNOASSAYS. |
| 10:13AM | 12 | STILL THOUGH, THE DEFENSE SHOWED YOU THIS SLIDE IN ITS |
| 10:13AM | 13 | CLOSING WHICH IS A THERANOS 4S, NOT THE EDISON.  AND IT SHOWS |
| 10:14AM | 14 | THE COMPONENTS IN THIS DEVICE.  AND YOU'LL SEE IT INCLUDES |
| 10:14AM | 15 | THINGS LIKE A CYTOMETER, WHICH WOULD BE USED TO RUN A TEST LIKE |
| 10:14AM | 16 | A CBC, OR A COMPLETE BLOOD COUNT. |
| 10:14AM | 17 | YOU KNOW THAT THE EDISON, THE DEVICE ACTUALLY USED FOR |
| 10:14AM | 18 | PATIENT TESTING IN THE THERANOS LAB COULDN'T DO A CBC.  IT |
| 10:14AM | 19 | DIDN'T HAVE THAT PART IN IT.  SO WHY ARE WE TALKING ABOUT THIS |
| 10:14AM | 20 | DEVICE THAT THERANOS NEVER USED FOR PATIENT TESTING? |
| 10:14AM | 21 | THE EVIDENCE ALSO TOLD YOU THAT THERANOS NEVER VALIDATED A |
| 10:14AM | 22 | SINGLE TEST FOR USE ON THIS DEVICE WITHIN THE LAB. |
| 10:14AM | 23 | THE DEFENSE ALSO SHOWED YOU THIS EXHIBIT, 7286, WHICH IS |
| 10:14AM | 24 | AN EMAIL FROM DANIEL YOUNG TO MR. BALWANI BEFORE THE LAUNCH IN |
| 10:14AM | 25 | 2013 TALKING ABOUT TESTS THAT ARE BEING INTEGRATED ON THE |

10:14AM  1    DEVICE.  YOU SEE THAT LANGUAGE.

10:15AM  2         AND ONE OF THOSE TESTS IS CBC, COMPLETE BLOOD COUNT, OR

10:15AM  3    WHOLE BLOOD COUNT, WHICH YOU KNOW WOULD REQUIRE THAT CYTOMETER

10:15AM  4    DEVICE, WHICH THE EDISON DIDN'T HAVE.

10:15AM  5         THE EMAIL NOTES THAT THERE'S A GROUP AT THERANOS STILL

10:15AM  6    COMPLETING THE PRE-VALIDATION BEFORE MOVING THE TESTS TO CLIA

10:15AM  7    FOR VALIDATION.  AND IT ALSO TALKS ABOUT RUNNING TNAA, OR

10:15AM  8    NUCLEOTIDE AMPLIFICATION DNA TESTS ON THE 4S DEVICE NEXT WEEK.

10:15AM  9         SO MR. COOPERSMITH DIDN'T EXPLAIN THIS TO YOU, BUT THIS IS

10:15AM  10   TALKING ABOUT PREPARATIONS TO USE THE 4S DEVICE IN CONNECTION

10:15AM  11   WITH THE COMMERCIAL LAUNCH IN 2013.

10:15AM  12        YOU KNOW BASED ON THE OTHER EVIDENCE IN THIS CASE THAT

10:15AM  13   SOMETHING WENT WRONG WITH THAT PLAN.  THAT NEVER HAPPENED.  THE

10:15AM  14   COMPANY NEVER USED THE 4S TO RUN A SINGLE CLINICAL PATIENT

10:15AM  15   SAMPLE.

10:15AM  16        SO THIS EMAIL IS DISCUSSING A PLAN THAT NEVER ACTUALLY

10:15AM  17   CAME TO FRUITION, AND IT'S DISCUSSING THE HYPOTHETICAL OR

10:16AM  18   POSSIBLE ABILITIES OF A DEVICE THAT, AGAIN, THERANOS NEVER GOT

10:16AM  19   TO THE POINT WHERE IT COULD USE ON ACTUAL PATIENTS.  SO THAT'S

10:16AM  20   IMPORTANT TO REMEMBER.

10:16AM  21        REMEMBER AGAIN THAT ONLY ONE DOZEN TESTS WERE EVER USED ON

10:16AM  22   THE EDISON IN THE LAB DESPITE ANY CLAIMS THAT THE DEVICE WAS

10:16AM  23   ACTUALLY CAPABLE OF MUCH MORE.

10:16AM  24        AND THIS IS KEY AS WELL.  IT'S TIME TO START THINKING

10:16AM  25   ABOUT WHAT INVESTORS KNEW AT VARIOUS TIMES, AND IT'S IMPORTANT

10:16AM  1   TO REMEMBER THAT THESE THINGS THAT WE'VE BEEN TALKING ABOUT,

10:16AM  2   THE THINGS THAT YOU NOW KNOW ABOUT THERANOS, WERE NEVER

10:16AM  3   DISCLOSED TO INVESTORS.  THE IMAGES, THE PICTURES THAT THEY HAD

10:16AM  4   IN THEIR MINDS ABOUT WHAT THE EDISON COULD DO DIFFERED GREATLY

10:16AM  5   FROM THE REALITY.

10:16AM  6        SO ALL OF THE LIMITATIONS ON THE DEVICE, THE THINGS THAT

10:16AM  7   IT COULD NOT DO, THAT INFORMATION WOULD HAVE BEEN SO VALUABLE

10:16AM  8   TO THOSE INVESTORS, WOULDN'T IT HAVE, IN MAKING THEIR DECISION

10:17AM  9   ON WHETHER TO WRITE LARGE CHECKS TO THE COMPANY?  SHOULDN'T

10:17AM  10  THEY HAVE KNOWN WHAT THE DEVICE COULD NOT DO CONTRARY TO THE

10:17AM  11  CLAIMS THAT MR. BALWANI WAS MAKING?

10:17AM  12       YOU'VE ALSO HEARD EVIDENCE THAT MR. BALWANI AND MS. HOLMES

10:17AM  13  MISREPRESENTED TO INVESTORS THE NATURE OF THERANOS'S DEALING

10:17AM  14  WITH THE MILITARY.  AND YOU HEARD THAT PEOPLE WERE LEFT WITH

10:17AM  15  THE IMPRESSION BECAUSE THEY WERE TOLD THAT THE THERANOS DEVICES

10:17AM  16  WERE BEING USED CLINICALLY BY THE MILITARY, AND YOU KNOW THAT'S

10:17AM  17  NOT THE CASE.

10:17AM  18       LET'S JUST GO QUICKLY THROUGH THE FOUR CONTACTS THAT

10:17AM  19  THERANOS HAD WITH THE MILITARY.  WHEN IT CAME TO THE BURN

10:17AM  20  STUDY, EXHIBIT 7694 WILL SHOW YOU A FEW THINGS.  FIRST, THAT

10:17AM  21  WAS NOT EXCLUSIVE TO THE MILITARY, THAT THE INDIVIDUALS BEING

10:17AM  22  TREATED WERE AT A VARIETY OF FACILITIES, INCLUDING MANY

10:17AM  23  CIVILIAN HOSPITALS; IT WILL SHOW YOU THAT ALL OF THE LOCATIONS

10:18AM  24  WERE IN THE U.S., SO NONE OF THIS WAS HAPPENING ON THE

10:18AM  25  BATTLEFIELD OR IN COMBAT LOCATIONS; YOU WILL SEE FROM THAT

ER-5261

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7608

10:18AM   1    EXHIBIT THAT THE TEST RESULTS WERE NOT USED TO ACTUALLY MAKE

10:18AM   2    TREATMENT DECISIONS FOR THE PEOPLE INVOLVED IN THE STUDY.  SO

10:18AM   3    THIS WASN'T CLINICAL USE OF THE THERANOS TESTING.  YOU WILL

10:18AM   4    ALSO SEE THAT THAT INCLUDED NO EVALUATION OF THE ACCURACY OF

10:18AM   5    THE THERANOS SYSTEM.  THAT WASN'T THE POINT OF THIS.

10:18AM   6         THE POINT OF THIS TEST WAS TO TEST AN EXPERIMENTAL

10:18AM   7    TREATMENT NOT DEVELOPED BY THERANOS, NOT TO SEE WHETHER OR NOT

10:18AM   8    THE THERANOS DEVICE COULD RETURN A RELIABLE RESULT.

10:18AM   9         WHEN IT CAME TO SPECIAL OPERATIONS, YOU HEARD FROM

10:18AM  10    MR. EDLIN THAT THREE DEVICES WERE SENT TO KENTUCKY, BUT THEY

10:18AM  11    WERE NOT USED FOR TESTING.  SO THAT NEVER WENT ANYWHERE.

10:18AM  12         WHEN IT CAME TO AFRICOM, YOU HEARD AGAIN FROM MR. EDLIN

10:18AM  13    THAT NO CLINICAL TESTING WAS DONE.  IN THIS CASE THE POINT WAS

10:18AM  14    TO SEE WHETHER THE DEVICE COULD SURVIVE A TRIP THROUGH HARSH

10:19AM  15    CONDITIONS, NOT WHETHER IT COULD ACTUALLY RUN TESTS AND RETURN

10:19AM  16    RELIABLE RESULTS.

10:19AM  17         SO YOU SAW IN THE EVIDENCE THAT THAT WOULD HAVE BEEN THE

10:19AM  18    NEXT STEP WHEN IT CAME TO AFRICOM'S WORK WITH THE DEVICE, BUT

10:19AM  19    THEY NEVER GOT THERE.

10:19AM  20         YOU SAW EMAILS TALKING ABOUT THE POSSIBILITY OF RUNNING

10:19AM  21    ACTUAL CLINICAL SAMPLES AND GETTING CLINICAL RESULTS AT SOME

10:19AM  22    POINT IN THE FUTURE.  THAT NEVER CAME TO BE.

10:19AM  23         THERE'S ALSO AN EMAIL IN CONNECTION WITH AFRICOM THAT

10:19AM  24    DISCUSSES THE DEVICE BEING TRANSPORTED ON WHAT THE MILITARY

10:19AM  25    CALLS AN UNPRESSURIZED AIRCRAFT.

10:19AM 1       OVER THE COURSE OF THE DEFENSE'S CLOSING, THAT MORPHED

10:19AM 2  INTO THE DEVICE BEING TESTED ON AN AIRCRAFT.  THAT'S NOT WHAT

10:19AM 3  THE EVIDENCE SHOWS.  LET'S JUST BE CLEAR ABOUT THAT.

10:19AM 4       THE DEVICE TOOK A RIDE ON AN AIRPLANE.  AT NO POINT IS

10:19AM 5  THERE ANY EVIDENCE THAT IT WAS INSTALLED ON A HELICOPTER, USED

10:20AM 6  FOR TESTING ON A MEDEVAC HELICOPTER, OR ANYTHING LIKE WHAT THE

10:20AM 7  DEFENDANTS WERE TELLING INVESTORS WHAT WAS HAPPENING.

10:20AM 8       WHEN IT COMES TO CENTCOM OR CENTRAL COMMAND, THIS WOULD

10:20AM 9  HAVE BEEN THE COMPONENT OF THE MILITARY THAT COULD HAVE USED

10:20AM 10 THE DEVICE FOR TREATMENT OF SOLDIERS IN THE MIDDLE EAST WHERE

10:20AM 11 THERE WAS ACTIVE ENGAGEMENTS OCCURRING.

10:20AM 12      YOU KNOW, THOUGH, THAT WHAT WAS GOING TO HAPPEN HERE WAS A

10:20AM 13 LIMITED OBJECTIVE EXPERIMENT WHERE THE DEVICE WOULD BE

10:20AM 14 EVALUATED TO SEE IF POSSIBLY AT SOME POINT IN THE FUTURE IT

10:20AM 15 COULD BE USED TO TREAT SOLDIERS.

10:20AM 16      NOT ONLY DID THERANOS NEVER PASS THAT KIND OF EVALUATION,

10:20AM 17 THE EVALUATION NEVER EVEN HAPPENED.  NO DEVICE WAS EVER SENT

10:20AM 18 OVERSEAS, AND THIS LIMITED OBJECTIVE EXPERIMENT NEVER GOT OFF

10:20AM 19 THE GROUND.

10:20AM 20      SO MULTIPLE STEPS AWAY FROM BEING AT THE POINT WHERE THE

10:20AM 21 DEFENDANTS WERE SAYING IT WAS.

10:21AM 22      IN CONNECTION WITH THAT ENGAGEMENT OR THAT CONTACT WITH

10:21AM 23 THE MILITARY, YOU SAW EVIDENCE THAT MR. BALWANI WAS PERSONALLY

10:21AM 24 INVOLVED, THAT HE WAS WORKING SPECIFICALLY ON I.T. ISSUES.

10:21AM 25 THAT TELLS YOU SOMETHING.  IT TELLS YOU THAT HE WAS AWARE OF

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7610

10:21AM  1    WHERE THINGS STOOD WITH THESE MILITARY CONTRACTS.  SO YOU

10:21AM  2    SHOULDN'T HAVE ANY DOUBT THAT MR. BALWANI KNEW WHEN HE WAS IN

10:21AM  3    ROOMS WITH INVESTORS AND THEY WERE BEING TOLD THAT THE

10:21AM  4    COMPANY'S DEVICE WAS BEING USED ACTIVELY BY THE MILITARY.  HE

10:21AM  5    KNEW THAT WAS FALSE.  HE WAS UNDER NO FALSE IMPRESSION THAT

10:21AM  6    THIS PROGRAM WAS FURTHER ALONG THAN IT ACTUALLY WAS.

10:21AM  7         NOW, IN ITS CLOSING THE DEFENSE ARGUED THAT THESE

10:21AM  8    MISREPRESENTATIONS ABOUT THE MILITARY SHOULD BE CHALKED UP TO

10:21AM  9    SOME KIND OF MISUNDERSTANDING, AND MR. COOPERSMITH COMPARED

10:22AM  10   THIS TO A GAME OF TELEPHONE.  DO YOU REMEMBER THAT?

10:22AM  11        THIS IS NOTHING LIKE THAT.  IN THE GAME OF TELEPHONE, I'M

10:22AM  12   SURE YOU KNOW, ONE PERSON WHISPERS SOMETHING TO THE NEXT PERSON

10:22AM  13   WHO WILL THEN WHISPER IT TO THE NEXT, AND THEN A FEW LAYERS

10:22AM  14   LATER, YOU CHECK AND SEE WHETHER THE ORIGINAL MESSAGE WAS

10:22AM  15   PRESERVED, AND WHAT YOU END UP LEARNING IS THAT WHEN

10:22AM  16   INFORMATION IS PASSED THROUGH MULTIPLE PEOPLE, WHEN YOU GET

10:22AM  17   SOMETHING THIRD OR FOURTH HAND, YOU SOMETIMES CAN'T RELY ON

10:22AM  18   BELIEVING THAT THAT'S WHAT THE ORIGINAL PERSON ACTUALLY SAID.

10:22AM  19        HERE WE HAVE THE OPPOSITE SITUATION.  HERE WE HAVE

10:22AM  20   MULTIPLE PEOPLE WHO ALL HEARD THE SAME THING FROM THE SAME

10:22AM  21   SOURCE, THAT SOURCE BEING ELIZABETH HOLMES AND MR. BALWANI IN

10:22AM  22   MEETINGS THAT THEY HAD.

10:22AM  23        AND YOU'LL SEE HERE THAT AS EXAMPLES, THESE FOUR INVESTORS

10:22AM  24   ALL TESTIFIED ABOUT VERY SIMILAR THINGS THAT THEY HEARD FROM

10:22AM  25   THESE SAME DEFENDANTS.

ER-5264

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7611

10:22AM   1        SO INSTEAD OF BEING A SITUATION WHERE THE TRUTH GETS

10:22AM   2    DISTORTED BY PEOPLE ACTING IN GOOD FAITH BUT MAKING MISTAKES AS

10:23AM   3    INFORMATION IS PASSED ALONG, WE HAVE FOUR PEOPLE WHO ARE ALL

10:23AM   4    DELIBERATELY DECEIVED BY THE SAME PERSON AND BECAUSE THEY ALL

10:23AM   5    SAY CONSISTENTLY THE SAME THING, YOU CAN HAVE CONFIDENCE THAT

10:23AM   6    YOU'RE HEARING FROM THEM WHAT THEY HEARD FROM THE DEFENDANT.

10:23AM   7        ON OTHER TOPICS, YOU ALSO HEARD THAT THE COMPANY HAD NO

10:23AM   8    REVENUE FROM PHARMACEUTICAL COMPANIES AFTER 2011 DESPITE SOME

10:23AM   9    FRIENDLY EMAILS THAT PEOPLE AT THERANOS HAD WITH PEOPLE AT

10:23AM  10    THOSE PHARMACEUTICAL COMPANIES.  NOTHING ACTUALLY DEVELOPED OF

10:23AM  11    THAT.  AND YOU CAN CONFIRM THAT IN EXHIBIT 7753, WHICH ARE THE

10:23AM  12    THERANOS FINANCIAL RECORDS THAT SHOW A LACK OF ANY REVENUE FROM

10:23AM  13    PHARMA AFTER THE YEAR 2011.

10:23AM  14        SO THINK ABOUT THAT IN TERMS OF WHAT THE DEFENDANTS WERE

10:23AM  15    TELLING PEOPLE IN LATE 2013 ABOUT WHAT THEY WERE DOING WITH

10:23AM  16    PHARMA, WHAT WAS GOING TO HAPPEN WITH PHARMA, WHAT REVENUE THEY

10:24AM  17    WERE GOING TO GET.  WHEN THEY WERE SAYING THOSE THINGS, THEY

10:24AM  18    KNEW THAT THE COMPANY HAD NOT GENERATED ANY REVENUE FROM THAT

10:24AM  19    KIND OF BUSINESS FOR THE LAST COUPLE OF YEARS.

10:24AM  20        YOU KNOW THAT THE DEPARTMENT OF DEFENSE GAVE THEM NO

10:24AM  21    REVENUE EXCEPT FOR SOME MINIMAL MONEY FROM THE BURN STUDY.  AND

10:24AM  22    YOU KNOW THAT THE COMPANY HAD LIMITED REVENUE OVERALL AND WAS

10:24AM  23    IN DESPERATE NEED FOR CASH TO STAY AFLOAT IN 2013.

10:24AM  24        YOU ALSO KNOW THAT PFIZER AND SCHERING-PLOUGH DID NOT

10:24AM  25    ACTUALLY VALIDATE THE TECHNOLOGY AS THE DEFENDANTS CLAIM.

10:24AM   1          AGAIN, THINK HOW VALUABLE THAT INFORMATION WOULD HAVE BEEN

10:24AM   2     TO THE VICTIMS IN THIS CASE.  THAT INFORMATION, IF GIVEN TO THE

10:24AM   3     INVESTOR VICTIMS, WOULD HAVE SAVED THEM MILLIONS, TENS OF

10:24AM   4     MILLIONS, SOMETIMES A HUNDRED MILLION DOLLARS.  FOR PATIENTS,

10:24AM   5     THAT INFORMATION WOULD HAVE PROTECTED THEM FROM THE RISK OF

10:24AM   6     RELYING ON A COMPANY FOR THEIR BLOOD TESTING NEEDS THAT

10:24AM   7     COULDN'T GIVE THEM RELIABLE OR ACCURATE RESULTS.

10:25AM   8          SO AT THIS POINT YOU'VE HEARD FROM THOSE VICTIMS WHO WERE

10:25AM   9     DECEIVED.  LET'S TALK ABOUT SOME DEFENSE ARGUMENTS THAT ARE

10:25AM  10     URGING YOU TO IGNORE THAT EVIDENCE AND WHY YOU SHOULDN'T.

10:25AM  11          FIRST, THE DEFENSE ARGUES THAT MR. BALWANI COULD NOT HAVE

10:25AM  12     INTENDED TO DEFRAUD ANYONE BECAUSE HE HIMSELF BET ON THERANOS.

10:25AM  13     YOU HEARD THAT HE GUARANTEED A LOAN TO THE COMPANY OF $10 TO

10:25AM  14     $12 MILLION, BUT PAY ATTENTION TO THE TIMING HERE.  THIS

10:25AM  15     HAPPENED IN AUGUST OF 2009 AND APRIL OF 2010.  SO THAT DECISION

10:25AM  16     ITSELF DOESN'T TELL YOU MUCH ABOUT HIS STATE OF MIND AT TIME

10:25AM  17     PERIODS LIKE 2013, 2014 WHEN HE, OF COURSE, KNEW MORE ABOUT

10:25AM  18     WHAT WAS HAPPENING AT THE COMPANY.  EXCEPT THAT, OF COURSE, IT

10:25AM  19     GAVE HIM A MOTIVE TO DO WHATEVER HE COULD TO MAKE THE COMPANY

10:25AM  20     SUCCESSFUL BECAUSE HE ACTUALLY HAD SKIN IN THE GAME.  HIS MONEY

10:26AM  21     WAS AT STAKE AT THAT POINT.

10:26AM  22          WHAT DO YOU THINK ABOUT THE FACT THAT MR. BALWANI

10:26AM  23     GUARANTEED THAT LOAN FOR THE COMPANY?  BECAUSE IT IS HIM TAKING

10:26AM  24     ON SOME RISK.  AND WHY WOULD HE TAKE ON RISK FOR THE COMPANY IF

10:26AM  25     HE DIDN'T BELIEVE THAT IT WOULD ULTIMATELY BE SUCCESSFUL?

10:26AM 1          WELL, I WOULD LIKE YOU TO THINK ABOUT THAT RISK IN THE

10:26AM 2     CONTEXT OF THE OTHER RISK THAT MR. BALWANI TOOK WHEN IT CAME TO

10:26AM 3     THERANOS, WHICH IS COMMITTING MULTIPLE CRIMES.

10:26AM 4          IF MR. BALWANI WAS WILLING TO PUT THAT ON THE LINE TO

10:26AM 5     SERVE THE COMPANY AND TO TRY TO MAKE IT SUCCESSFUL, THEN IT'S

10:26AM 6     MUCH LESS SURPRISING THAT HE WOULD BE WILLING TO PUT HIS CASH

10:26AM 7     ON THE LINE AS WELL.

10:26AM 8          AND REMEMBER THAT THE PLAN HERE WAS NOT TO GET CAUGHT.

10:26AM 9     THE PLAN HERE WAS NOT FOR THE COMPANY TO FAIL.  THE PLAN WAS TO

10:26AM 10    GET AWAY WITH IT.  THE PLAN WAS TO HAVE THE LIES NEVER BE

10:26AM 11    DISCOVERED, POSSIBLY TO MAKE THEM TRUE BEFORE ANYONE FOUND OUT

10:27AM 12    ABOUT THEM, FOR THE COMPANY TO BECOME GENUINELY SUCCESSFUL, TO

10:27AM 13    NEVER PAY BACK THAT LOAN, TO NEVER HAVE TO EXPLAIN THE FALSE

10:27AM 14    STATEMENTS THAT MR. BALWANI AND MS. HOLMES MADE TO THE VICTIMS.

10:27AM 15         AND THAT PLAN WAS INITIALLY SUCCESSFUL.

10:27AM 16         THAT BRINGS US TO MR. BALWANI'S INVESTMENT IN THERANOS,

10:27AM 17    WHICH YOU SHOULD VIEW SIMILARLY.  THIS WAS IN 2010 AND 2011

10:27AM 18    WHEN HE INVESTED APPROXIMATELY $4.5 OR $4.6 MILLION.

10:27AM 19         FIRST, AS TO WHY HE BOUGHT STOCK INSTEAD OF KEEPING HIS

10:27AM 20    OPTIONS, YOU DON'T HAVE EVIDENCE EXPLAINING THAT.  YOU DON'T

10:27AM 21    KNOW ABOUT WHAT ELSE WAS HAPPENING WITH MR. BALWANI'S FINANCES

10:27AM 22    AT THE TIME, WHAT ADVICE HE MIGHT HAVE GOTTEN AT THAT TIME

10:27AM 23    ABOUT THAT DECISION, WHAT REQUESTS WERE MADE, SO THERE'S NO

10:27AM 24    POINT IN SPECULATING ABOUT THAT.

10:27AM 25         AS FAR AS WHY HE WANTED TO OWN STOCK IN THERANOS, THAT'S

10:27AM  1    SIMPLER TO UNDERSTAND.  PEOPLE BUY STOCK BECAUSE THEY BELIEVE

10:27AM  2    THE VALUE WAS GOING TO GO UP.  THERE'S NO REASON TO THINK THAT

10:27AM  3    MR. BALWANI HAD ANY OTHER PLAN HERE.

10:28AM  4        AND YOU HEARD TESTIMONY ABOUT HOW MUCH THE VALUE OF

10:28AM  5    THERANOS STOCK WENT UP DURING THE RELEVANT TIME PERIOD IN THE

10:28AM  6    YEARS LEADING UP TO 2014.

10:28AM  7        AT THERANOS'S PEAK, MR. BALWANI'S INVESTMENT IN THE

10:28AM  8    COMPANY WOULD HAVE BEEN WORTH A VERY, VERY LARGE AMOUNT OF

10:28AM  9    MONEY INDEED.

10:28AM 10        IT'S IMPORTANT TO REMEMBER, THOUGH, THAT THE REASON THE

10:28AM 11    COMPANY'S VALUE WENT UP, THE REASON THE SHARE PRICE INCREASED

10:28AM 12    WAS BECAUSE OF THE FRAUD.  IT WAS ONLY BECAUSE OF THE FALSE

10:28AM 13    IMPRESSION THAT PEOPLE HAD OF THE COMPANY, THE EXAGGERATED VIEW

10:28AM 14    THEY HAD OF ITS ACHIEVEMENTS, THAT THE STOCK ACHIEVED THOSE

10:28AM 15    HEIGHTS.

10:28AM 16        SO AGAIN, IT ALL COMES BACK TO MR. BALWANI'S INTENT

10:28AM 17    BECAUSE BY FULLING THOSE FALSE IMPRESSIONS, BY LYING TO PEOPLE

10:28AM 18    AND CREATING THOSE MISUNDERSTANDINGS AND INACCURATE VIEWS IN

10:28AM 19    THEIR MINDS, MR. BALWANI WAS ABLE TO INCREASE THE VALUE NOT

10:29AM 20    JUST OF THE COMPANY HE WORKED FOR, THE COMPANY THAT HIS

10:29AM 21    GIRLFRIEND FOUNDED, BUT ALSO INCREASE THE VALUE OF HIS SHARES

10:29AM 22    AS WELL.

10:29AM 23        OF COURSE, WE KNOW NOW THAT THE COMPANY'S SUCCESS DURING

10:29AM 24    THAT TIME PERIOD WAS AN ILLUSION.  IT WAS BASED ON A FOUNDATION

10:29AM 25    OF THE FRAUD THAT IS ALLEGED IN THIS CASE, AND THAT FOUNDATION

10:29AM  1     WAS ALREADY CRUMBLING BY THE TIME MR. BALWANI LEFT THE COMPANY

10:29AM  2     IN 2016.

10:29AM  3          WE SHOULD TALK ABOUT ANOTHER DEFENSE ARGUMENT WHICH IS

10:29AM  4     THAT MR. BALWANI APPEARS NOT TO HAVE MADE ANY EFFORT TO ENRICH

10:29AM  5     HIMSELF IN THE SHORT TERM, HE DIDN'T SELL HIS STOCK, HE WAS

10:29AM  6     SATISFIED WITH A RELATIVELY MODEST SALARY.  SO A FEW THINGS TO

10:29AM  7     KEEP IN MIND THERE.

10:29AM  8          FIRST OF ALL, WHEN THE COURT INSTRUCTS YOU ON THE LAW, YOU

10:29AM  9     WILL HEAR ABOUT WHETHER THE GOVERNMENT NEEDS TO PROVE THAT A

10:29AM 10     WIRE FRAUD SCHEME WAS SUCCESSFUL.  AND IT'S IMPORTANT TO NOTE

10:29AM 11     THAT THAT IS NOT A REQUIREMENT.  A WIRE FRAUD SCHEME DOES NOT

10:30AM 12     HAVE TO BE SUCCESSFUL TO RESULT IN A CONVICTION.

10:30AM 13          AND YOU SEE HERE SPECIFICALLY, YOU WILL BE TOLD THAT IT'S

10:30AM 14     NOT NECESSARY THAT MR. BALWANI MADE A PROFIT OR THAT ANYONE

10:30AM 15     SUFFERED A LOSS.

10:30AM 16          SO THE FACT THAT MR. BALWANI MAY NOT HAVE TAKEN AWAY A

10:30AM 17     STACK OF CASH FROM THESE SCHEMES TO DEFRAUD IS NO REASON NOT TO

10:30AM 18     CONVICT ACCORDING TO THE LAW THAT YOU'LL BE INSTRUCTED ON.

10:30AM 19          WHEN IT COMES TO MR. BALWANI'S SALARY, KEEP IN MIND THAT

10:30AM 20     YOU KNOW THAT HE HAD THE FINANCIAL RESOURCES TO GUARANTEE THAT

10:30AM 21     SIGNIFICANT LOAN AND INVEST MILLIONS OF DOLLARS IN THE COMPANY.

10:30AM 22          YOU CAN INFER FROM THAT, THAT IT WAS NO BIG SACRIFICE FOR

10:30AM 23     HIM TO MAKE A HUNDRED THOUSAND DOLLARS A YEAR AS OPPOSED TO TWO

10:30AM 24     OR THREE.

10:30AM 25          AND WHEN IT COMES TO NOT SELLING THERANOS STOCK, REMEMBER

10:30AM 1    MR. EISENMAN'S TESTIMONY?  REMEMBER HIS TESTIMONY ABOUT HOW

10:30AM 2    DIFFICULT IT WAS FOR HIM WHEN HE WAS TRYING TO SELL THE STOCK,

10:31AM 3    AND HOW, AS HE TOLD YOU, NO ACTUAL OFFERS MATERIALIZED.

10:31AM 4        YOU ALSO KNOW FROM THE INVESTOR RIGHTS AGREEMENT, THAT'S

10:31AM 5    EXHIBIT 3530, THAT THERE WAS NO PUBLIC MARKET FOR THERANOS

10:31AM 6    STOCK.  SO IT'S NOT CLEAR THAT MR. BALWANI ACTUALLY HAD THE

10:31AM 7    CHANCE TO SELL HIS STOCK.  YOU SHOULDN'T PLACE A LOT OF WEIGHT

10:31AM 8    ON THE FACT THAT HE DIDN'T.

10:31AM 9        SO, AGAIN, MR. BALWANI'S PLAN HERE WAS NOT A SHORT-TERM

10:31AM 10   PLAN.  THERE WAS NO ALLEGATION HERE THAT THIS WAS A GET RICH

10:31AM 11   SCHEME.  MR. BALWANI WAS IN IT FOR THE LONG HAUL.  HIS GOAL MAY

10:31AM 12   NOT HAVE BEEN FOR HIM TO CASH OUT EARLY.  THE EVIDENCE SHOWS

10:31AM 13   THAT HE SET HIS SIGHTS HIGHER FROM THAT, AND WE ACTUALLY KNOW

10:31AM 14   THAT FROM HIS OWN WORDS.

10:31AM 15       THIS IS A TEXT EXCHANGE BETWEEN MR. BALWANI AND MS. HOLMES

10:31AM 16   DURING NOVEMBER OF 2013.  AND AFTER EXPRESSING SOME AFFECTION

10:31AM 17   FOR EACH OTHER, KNOW WHAT MR. BALWANI SAYS, THE SECOND TO THE

10:31AM 18   BOTTOM THERE.  HE SAYS, "THEN LET'S BUILD THE TRUE AMERICAN

10:32AM 19   EMPIRE.  A MONOPOLY.  OUR OBLIGATION TO U.S.A."

10:32AM 20       MS. HOLMES AGREES, "THAT'S WHAT WE'RE DOING."

10:32AM 21       SO THIS IS WHAT THE DEFENDANT WANTED.  HE DIDN'T WANT TO

10:32AM 22   EARN A FEW MILLION DOLLARS AND THEN RUN AWAY.  HE WANTED

10:32AM 23   THERANOS TO BE A MONOPOLY, HE WANTED TO BUILD AN EMPIRE WITH

10:32AM 24   MS. HOLMES, AND IN SERVICE OF THAT GOAL, HE COMMITTED MULTIPLE

10:32AM 25   FRAUDS.  AND THAT EXPLAINS WHY HE DIDN'T MAKE AN EFFORT TO CASH

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7617

10:32AM 1    OUT SOON.  THIS WAS A LONG TERM PLAN.

10:32AM 2         AGAIN, IT WAS SUCCESSFUL FOR YEARS UNTIL IT WASN'T.

10:32AM 3         DURING THE TIME THAT MR. BALWANI WORKED AT THERANOS, YOU

10:32AM 4    SAW EVIDENCE THAT HE PUT EFFORT INTO ADDRESSING PROBLEMS AT THE

10:32AM 5    COMPANY.  SO HOW SHOULD YOU THINK ABOUT THAT?

10:32AM 6         WELL, THE GOVERNMENT IS NOT ASKING YOU TO BELIEVE THAT

10:32AM 7    MR. BALWANI DIDN'T WANT THE THERANOS TESTS TO WORK.  THAT'S

10:32AM 8    IMPORTANT TO UNDERSTAND.

10:33AM 9         HE AND MS. HOLMES WANTED THE TESTS TO WORK, AND MANY

10:33AM 10   PEOPLE AT THE COMPANY TRIED TO MAKE THAT HAPPEN.  AND OF COURSE

10:33AM 11   HE DID.

10:33AM 12        MR. BALWANI WOULD HAVE PREFERRED TO LIVE IN A WORLD WHERE

10:33AM 13   HE DIDN'T HAVE TO LIE ABOUT THE THINGS THAT HE WAS LYING ABOUT.

10:33AM 14   HE WOULD HAVE PREFERRED TO LIVE IN A WORLD WHERE THERANOS

10:33AM 15   TECHNOLOGY COULD DO WHAT HE SAID IT COULD DO.  THAT WORLD WOULD

10:33AM 16   HAVE BEEN BETTER.

10:33AM 17        IF THERANOS HAD ACTUALLY HAD THOSE CONTRACTS WITH THE

10:33AM 18   MILITARY, AND THE MILITARY WAS USING THE DEVICES THE WAY HE

10:33AM 19   SAID, THEN HE WOULDN'T HAVE HAD TO LIE ABOUT THAT.

10:33AM 20        IF THE COMPANY HAD BEEN GENERATING THE SIGNIFICANT

10:33AM 21   REVENUES THAT HE HAD CLAIMED, IF THE COMPANY WAS REALLY ON

10:33AM 22   TRACK TO GENERATE EVEN MORE, THAT WOULD HAVE BEEN A BETTER

10:33AM 23   WORLD FOR HIM.

10:33AM 24        SO OF COURSE ACTUAL SUCCESS WOULD HAVE BEEN BETTER THAN

10:33AM 25   FALSE SUCCESS, AND MR. BALWANI WAS PUTTING EFFORT INTO TRYING

10:33AM  1    TO ACHIEVE THAT ACTUAL SUCCESS.  AND OF COURSE THAT APPLIES TO

10:33AM  2    TEST ACCURACY, TOO.

10:33AM  3        THE EVIDENCE SHOWS THAT HE PUT PRESSURE ON OTHERS AT THE

10:33AM  4    COMPANY TO FIX PROBLEMS WITH THE TEST.  BUT WHAT MATTERS FOR

10:34AM  5    YOUR QUESTION, FOR THE DECISION THAT YOU NEED TO MAKE, IS NOT

10:34AM  6    WHETHER MR. BALWANI WISHED THE TESTS WOULD WORK.

10:34AM  7        WHAT MATTERS IS WHETHER HE KNEW THE TESTS WEREN'T WORKING

10:34AM  8    AND WHAT HE DID BASED ON THAT KNOWLEDGE.

10:34AM  9        AND THE EVIDENCE SHOWS YOU THAT HE WAS AWARE OF THE

10:34AM 10    PROBLEMS.  SO THAT CHOICE WASN'T ACTUALLY AVAILABLE TO HIM.  IT

10:34AM 11    WASN'T A REALISTIC CHOICE FOR HIM TO OFFER RELIABLE TESTING

10:34AM 12    USING THE THERANOS TECHNOLOGY.

10:34AM 13        THE CHOICE WAS EITHER TO STOP AND CEASE USING THE

10:34AM 14    UNRELIABLE THERANOS TECHNOLOGY OR TO MOVE FORWARD AND DEFRAUD

10:34AM 15    PATIENTS.  THOSE WERE THE ONLY TWO CHOICES AVAILABLE TO HIM.

10:34AM 16    YOU KNOW WHAT CHOICE HE MADE.  HE MADE THE WRONG CHOICE.  HE

10:34AM 17    MADE THE FRAUDULENT CHOICE CONSISTENTLY.

10:34AM 18        THERE'S BEEN SOME DISCUSSION BY THE DEFENSE ABOUT THIS

10:34AM 19    IDEA THAT A TECHNOLOGY COMPANY WILL ALWAYS BE DEVELOPING ITS

10:35AM 20    PRODUCT.  AND OF COURSE THAT'S TRUE.  AND OF COURSE NO ONE

10:35AM 21    WOULD TESTIFY OR HAS TESTIFIED THAT IT'S WRONG FOR A TECH

10:35AM 22    COMPANY TO CONTINUE MAKING IMPROVEMENTS TO ITS DEVICE.

10:35AM 23        AND THE DEFENSE IS FOND OF USING THE IPHONE AS AN EXAMPLE.

10:35AM 24    EVERY VERSION OF THE IPHONE IS SUPPOSED TO BE BETTER THAN THE

10:35AM 25    ONE BEFORE IT, AND THAT'S OKAY, THERE'S NO FRAUD THERE.

ER-5272

10:35AM   1        WHEN YOU GET INTO TROUBLE, THOUGH, AS WE SEE HERE, IS WHEN

10:35AM   2   YOU LIE ABOUT WHAT YOUR CURRENT GENERATION OF TECHNOLOGY CAN

10:35AM   3   DO.

10:35AM   4        SO IMAGINE AN IPHONE THAT WAS HELD OUT AS BEING A

10:35AM   5   REPLACEMENT FOR A TYPICAL SMARTPHONE, BUT IT TURNS OUT THAT IT

10:35AM   6   COULDN'T DO SIMPLE THINGS LIKE TAKE A PHOTO OR PLACE A CALL

10:35AM   7   OUTSIDE OF YOUR AREA CODE.

10:35AM   8        THAT WOULD LEAD TO A SITUATION WHERE YOU MIGHT CONCLUDE

10:35AM   9   THAT PEOPLE BUYING THAT PHONE HAVE BEEN DECEIVED.  AND THE FACT

10:35AM  10   THAT THE NEXT VERSION OF THE PHONE MIGHT BE CAPABLE OF DOING

10:35AM  11   THOSE THINGS DOES NOT ERASE THAT FRAUD.  IT DOESN'T GET RID OF

10:36AM  12   THAT DECEPTION.  AND THAT WAS THE CASE HERE.

10:36AM  13        THE THERANOS EDISON DEVICE YOU KNOW COULDN'T DO BASIC

10:36AM  14   THINGS LIKE A COMPLETE BLOOD COUNT, OR DNA TESTING, OR ANY

10:36AM  15   GENERAL CHEMISTRY LIKE A SIMPLE ELECTROLYTE TEST.  INITIALLY

10:36AM  16   THREE WERE NEEDED TO WORK TOGETHER TO RETURN ONE RESULT.  SO I

10:36AM  17   THINK THE IPHONE EXAMPLE BREAKS DOWN IN THAT WAY.

10:36AM  18        WHEN WE'RE TALKING ABOUT WORK AT THERANOS, WE'RE ALSO

10:36AM  19   TALKING ABOUT HOW INVESTOR MONEY WAS SPENT.  AND A FEW TIMES

10:36AM  20   THE DEFENSE HAS EMPHASIZED FOR YOU THAT THERE'S NO EVIDENCE IN

10:36AM  21   THE CASE THAT INVESTOR MONEY WAS MISSPENT, THAT IT WAS SPENT ON

10:36AM  22   ANYTHING OTHER THAN THE WORK OF THERANOS, THE TECHNOLOGY

10:36AM  23   COMPANY.  THAT'S TRUE, BUT IT MISSES THE POINT.

10:36AM  24        AS MR. SCHENK TOLD YOU, THIS IS NOT A CASE WHERE

10:36AM  25   MR. BALWANI IS ACCUSED OF MISAPPROPRIATING INVESTOR MONEY.

ER-5273

10:36AM  1      THIS ISN'T AN EMBEZZLEMENT CASE.

10:36AM  2          TO PUT IT SIMPLY, THIS CASE IS NOT ABOUT HOW MR. BALWANI

10:37AM  3      USED INVESTOR MONEY.  THIS CASE IS ABOUT HOW HE GOT IT IN THE

10:37AM  4      FIRST PLACE.  AND THE CRIME WAS COMPLETE BEFORE THE INVESTORS

10:37AM  5      EVEN -- BEFORE ANY OF THAT MONEY WAS SPENT BECAUSE THE CRIME

10:37AM  6      RELATES TO THE DECEPTION THAT THE DEFENDANTS ENGAGED IN IN

10:37AM  7      ORDER TO GET THAT MONEY IN THE FIRST PLACE.

10:37AM  8          THE DEFENSE ALSO MENTIONED GOOD FAITH, AND IT'S IMPORTANT

10:37AM  9      TO BE CLEAR ABOUT WHAT WE'RE TALKING ABOUT WHEN WE'RE TALKING

10:37AM  10     ABOUT GOOD FAITH IN THIS CASE.

10:37AM  11         JURY INSTRUCTION NUMBER 22 IS GOING TO TELL YOU THAT THE

10:37AM  12     KIND OF GOOD FAITH THAT MATTERS HERE, THE KIND OF GOOD FAITH

10:37AM  13     THAT MIGHT PREVENT A CONVICTION ON THE BASIS OF A CERTAIN KIND

10:37AM  14     OF MISREPRESENTATION WOULD NEED TO BE A GOOD FAITH BELIEF IN

10:37AM  15     THE TRUTH OF THE SPECIFIC MISREPRESENTATIONS ALLEGED.

10:37AM  16         SO WHAT DOES THAT MEAN?  WELL, WHAT THIS DOESN'T MEAN,

10:37AM  17     WHAT THIS ISN'T REFERRING TO IS A GENERAL GOOD FAITH BELIEF IN

10:38AM  18     THERANOS.  IT DOESN'T REFER TO A GENERAL HOPE THAT THE COMPANY

10:38AM  19     IS GOING TO DO WELL, A GENERAL BELIEF THAT EVERYTHING IS GOING

10:38AM  20     TO BE OKAY, IT DOESN'T REFER TO A GENERAL BELIEF OR PLAN THAT

10:38AM  21     INVESTORS ARE ULTIMATELY GOING TO MAKE MONEY.  THAT HAS NOTHING

10:38AM  22     TO DO WITH IT.

10:38AM  23         AND IT HAS NOTHING TO DO WITH GOOD FAITH WORK AT THE

10:38AM  24     COMPANY TO TRY TO MAKE THINGS BETTER.  THAT KIND OF GOOD FAITH

10:38AM  25     DOESN'T REGISTER WHEN IT COMES TO YOUR ANALYSIS HERE.

| | | |
|---|---|---|
| 10:38AM | 1 | WHAT MATTERS IS THAT DID MR. BALWANI ACTUALLY BELIEVE THAT |
| 10:38AM | 2 | SOME OF THE FALSE STATEMENTS WERE TRUE?  THERE'S NO EVIDENCE TO |
| 10:38AM | 3 | SUPPORT THAT.  IN FACT, THE EVIDENCE SHOWS THE OPPOSITE. |
| 10:38AM | 4 | WHEN INVESTORS AND PATIENTS WERE TOLD FALSE THINGS ABOUT |
| 10:38AM | 5 | THE COMPANY, MR. BALWANI KNEW THEY WERE FALSE. |
| 10:38AM | 6 | THE DEFENSE ALSO TALKS ABOUT THE EXTENT TO WHICH OTHER |
| 10:38AM | 7 | PEOPLE'S VIEWS MIGHT HAVE INFLUENCED MR. BALWANI'S.  SO LET'S |
| 10:39AM | 8 | TALK ABOUT THAT. |
| 10:39AM | 9 | THEY TALK ABOUT FAVORABLE REPORTS ON THE COMPANY'S |
| 10:39AM | 10 | TECHNOLOGY THAT CAME FROM IT OUTSIDE OF THE COMPANY. |
| 10:39AM | 11 | THE DEFENSE HAS EMPHASIZED A FEW SITUATIONS WHERE PEOPLE |
| 10:39AM | 12 | OUTSIDE OF THE COMPANY REPORTEDLY LOOKED AT THE COMPANY'S |
| 10:39AM | 13 | TECHNOLOGY AND SAID FAVORABLE THINGS. |
| 10:39AM | 14 | THE KEY HERE IS TO BE AWARE OF WHAT YOU DON'T KNOW ABOUT |
| 10:39AM | 15 | THE INFORMATION RELIED UPON BY THE PEOPLE IN THOSE SITUATIONS. |
| 10:39AM | 16 | YOU HEARD FROM WITNESSES AT PFIZER AND SCHERING-PLOUGH |
| 10:39AM | 17 | ABOUT HOW THEY DID NOT COMPREHENSIVELY VALIDATE THE TECHNOLOGY |
| 10:39AM | 18 | AND HOW, IN FACT, THEY DID NOT HAVE A FAVORABLE VIEW OF THE |
| 10:39AM | 19 | TECHNOLOGY IN SOME RESPECTS. |
| 10:39AM | 20 | WHEN IT COMES TO JOHNS HOPKINS, WHICH MR. COOPERSMITH |
| 10:39AM | 21 | DISCUSSED, THE EXHIBIT ITSELF TELLS YOU HOW LIMITED THIS REVIEW |
| 10:39AM | 22 | WAS AND GIVES YOU A REASON NOT TO PUT TOO MUCH WEIGHT ON IT. |
| 10:40AM | 23 | SO YOU'LL NOTE THAT IN APRIL OF 2010 THIS REFERENCES A |
| 10:40AM | 24 | ONE-DAY MEETING ON APRIL 27TH AND IT SAYS, "THE HOPKINS TEAM |
| 10:40AM | 25 | REVIEWED PROPRIETARY DATA ON TEST PERFORMANCE FOR ROUTINE TESTS |

10:40AM  1     AND SPECIAL TESTS."

10:40AM  2          IT SAYS, "THERANOS PRESENTED ADDITIONAL DATA ON

10:40AM  3     TECHNOLOGY, TEST PERFORMANCE, AND BUSINESS VISION, AND

10:40AM  4     DEMONSTRATED TECHNOLOGY ON SITE."

10:40AM  5          SO WHAT IS THIS SAYING?  THIS IS SAYING THAT JOHNS HOPKINS

10:40AM  6     GOT DATA THAT WAS SELECTED AND PROVIDED BY THERANOS ITSELF.

10:40AM  7     YOU'LL NOTE THAT THIS DOCUMENT IDENTIFIES THE ONLY THERANOS

10:40AM  8     ATTENDEES AT THAT MEETING AS ELIZABETH HOLMES AND

10:40AM  9     SUNNY BALWANI.  THERE ARE NO SCIENTISTS LISTED.

10:40AM 10          AND JOHNS HOPKINS WAS FORCED TO DETERMINE WHAT IT COULD

10:40AM 11     BASED ON THE INFORMATION AVAILABLE, WHICH WAS CONTROLLED AND

10:40AM 12     SUPPLIED BY THERANOS.

10:40AM 13               MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  THERE'S NO

10:40AM 14     EVIDENCE OF ANY PROBLEM WITH THE DATA THAT WAS SUPPLIED.  IT'S

10:41AM 15     NOT IN THE RECORD.

10:41AM 16               THE COURT:  THIS IS COMMENT ON THE EVIDENCE, AND

10:41AM 17     YOUR OBJECTION IS NOTED.  IT'S OVERRULED.

10:41AM 18          THIS IS COMMENT ON THE EVIDENCE.

10:41AM 19          AS YOU'VE HEARD, LADIES AND GENTLEMEN, I THINK I'VE

10:41AM 20     MENTIONED BEFORE, WHAT THE LAWYERS SAY IN THEIR ARGUMENTS IS

10:41AM 21     NOT EVIDENCE.  IT'S NOT EVIDENCE.

10:41AM 22          YOU CAN CONTINUE, MR. BOSTIC.

10:41AM 23               MR. BOSTIC:  MEMBERS OF THE JURY, WHAT I WOULD LIKE

10:41AM 24     YOU TO THINK ABOUT HERE AND WHAT I WOULD LIKE TO YOU RELY UPON,

10:41AM 25     AGAIN, IS NOT WHAT I'M SAYING, BUT THE EVIDENCE THAT IS ALREADY

10:41AM  1      IN THE RECORD ABOUT WHETHER THIS DEFENDANT AND HIS PARTNER,

10:41AM  2      MS. HOLMES, WERE RELIABLE SOURCES OF INFORMATION ABOUT THERANOS

10:41AM  3      OR NOT.

10:41AM  4          I THINK YOU HAVE A LOT OF EVIDENCE TO MAKE THAT

10:41AM  5      DETERMINATION.  AND I THINK IT'S IMPORTANT TO NOTE THAT

10:41AM  6      JOHNS HOPKINS'S DETERMINATION, THEIR OPINION, WOULD HAVE BEEN

10:41AM  7      SHAPED BY INFORMATION OF THAT SOURCE.

10:42AM  8          ONE OTHER THING TO NOTE ABOUT THIS REPORT IS ITS TIMING.

10:42AM  9      SO THIS WAS IN APRIL OF 2010.  OBVIOUSLY THAT'S LONG BEFORE THE

10:42AM 10      2013 AND 2014 TIME PERIOD WHEN MR. BALWANI AND MS. HOLMES WERE

10:42AM 11      MAKING FALSE REPRESENTATIONS TO INVESTORS, WHEN MR. BALWANI WAS

10:42AM 12      OVERSEEING A DISASTROUS ROLLOUT OF FLAWED PATIENT TESTING

10:42AM 13      THROUGH WALGREENS.  SO YOU SHOULD WONDER HOW MUCH WEIGHT YOU

10:42AM 14      SHOULD PLACE ON THIS IN TERMS OF MR. BALWANI'S MENTAL STATE AND

10:42AM 15      KNOWLEDGE AND INTENT DURING THOSE 2013 AND 2014 YEARS.

10:42AM 16          IN 2013 AND 2014, HE KNEW A LOT MORE ABOUT

10:42AM 17      THERANOS'S TECHNOLOGY AND A LOT MORE NEGATIVE INFORMATION THAN

10:42AM 18      HE WOULD HAVE KNOWN IN 2010.

10:42AM 19          THAT'S NOT TO SAY INSTANCES LIKE THIS WERE NOT INFORMATIVE

10:42AM 20      TO MR. BALWANI, THOUGH.  ALTHOUGH THIS MIGHT NOT HAVE BEEN

10:43AM 21      CONCLUSIVE PROOF THAT THE THERANOS TECHNOLOGY WORKED,

10:43AM 22      ESPECIALLY WHEN WEIGHED AGAINST ALL OF THE NEGATIVE INFORMATION

10:43AM 23      THAT HE WAS GETTING FROM SCIENTISTS AT HIS OWN COMPANY WHO

10:43AM 24      ACTUALLY DID WORK WITH THE TECHNOLOGY.  THIS DID TELL HIM

10:43AM 25      SOMETHING.  THIS WOULD HAVE TOLD MR. BALWANI THAT PEOPLE

10:43AM   1    OUTSIDE OF THE COMPANY COULD BE CONVINCED THAT THE TECHNOLOGY

10:43AM   2    WORKED.  IT WOULD HAVE TOLD HIM THAT AT A GLANCE THE THERANOS

10:43AM   3    TECHNOLOGY COULD BE IMPRESSIVE.  AND HE BEGAN TO LEARN THAT FOR

10:43AM   4    SOME PEOPLE, ALL IT TOOK WAS A GLANCE AND IN SOME CASES SOME

10:43AM   5    DECEPTIVE STATEMENTS BY HIM AND HIS PARTNER TO SELL THEM ON THE

10:43AM   6    COMPANY AND ITS TECH.

10:43AM   7         LET'S TALK NEXT ABOUT SCIENTISTS AT THE COMPANY.

10:43AM   8         THE DEFENSE'S ARGUMENTS WHEN IT COMES TO SCIENTISTS BOIL

10:43AM   9    DOWN TO EITHER BLAMING OTHER PEOPLE FOR THE PROBLEMS AT THE

10:43AM   10   COMPANY OR RELYING ON POSITIVE THINGS THAT OTHERS AT THE

10:44AM   11   COMPANY SAID ABOUT THE COMPANY'S TECHNOLOGY.

10:44AM   12        YOU'LL RECALL THAT A FEW TIMES THE DEFENSE HAS POINTED OUT

10:44AM   13   THAT THE LABORATORY DIRECTOR IS AN IMPORTANT ROLE IN A LAB;

10:44AM   14   THAT THE LAB DIRECTOR IS RESPONSIBLE FOR THE ACCURACY AND

10:44AM   15   RELIABILITY OF TESTING THAT HAPPENS WITHIN A LAB.  AND

10:44AM   16   MR. COOPERSMITH SHOWED YOU AN ATTESTATION THAT DR. ROSENDORFF

10:44AM   17   SIGNED WHEN HE BECAME A LAB DIRECTOR FOR THERANOS ACKNOWLEDGING

10:44AM   18   THAT ROLE.

10:44AM   19        WHAT THAT MEANS IS THAT DR. ROSENDORFF AS LAB DIRECTOR WAS

10:44AM   20   AGREEING TO TAKE ON THAT RESPONSIBILITY.  HE WAS AGREEING TO DO

10:44AM   21   WHAT WAS NECESSARY TO ENSURE THE ACCURACY AND RELIABILITY OF

10:44AM   22   THE ROLE.

10:44AM   23        WHAT THAT ATTESTATION DOES NOT SAY IS THAT AS LAB

10:44AM   24   DIRECTOR, DR. ROSENDORFF WAS AGREEING TO BE STYMIED IN HIS WORK

10:44AM   25   BY THE PRESIDENT OF THE COMPANY, MR. BALWANI.  THAT ATTESTATION

10:44AM   1    DOESN'T SAY I AGREE THAT WHEN THE PRESIDENT OF THE COMPANY

10:44AM   2    KEEPS ME FROM DOING WHAT IS NECESSARY TO ENSURE ACCURATE

10:45AM   3    TESTING, YOU CAN STILL BLAME ME AFTER THE FACT WHEN THINGS GO

10:45AM   4    WRONG.  YOU KNOW THAT'S NOT THE SPIRIT OF THAT LANGUAGE.

10:45AM   5         BEYOND THAT, THE DEFENSE MADE ARGUMENTS ABOUT HOW CERTAIN

10:45AM   6    SCIENTISTS AT THE COMPANY SAID POSITIVE THINGS ABOUT THERANOS

10:45AM   7    TECHNOLOGY AT VARIOUS POINTS OVER THE YEARS.  AND THEY SHOWED

10:45AM   8    YOU, FOR EXAMPLE, AN EMAIL FROM IAN GIBBONS WHO YOU DIDN'T HEAR

10:45AM   9    FROM, FROM 2010.  THAT EMAIL WAS SHOWN TO YOU WITHOUT MUCH

10:45AM   10   CONTEXT AND OBVIOUSLY YEARS BEFORE THIS MORE IMPORTANT 2013 AND

10:45AM   11   2014 TIME PERIOD.

10:45AM   12        YOU SHOULD DOUBT WHETHER MR. BALWANI WOULD HAVE STILL BEEN

10:45AM   13   RELYING ON THAT MESSAGE FROM YEARS AGO IN THE FACE OF ALL OF

10:45AM   14   THE CONCRETE NEGATIVE INFORMATION HE WAS GETTING FROM PEOPLE

10:45AM   15   WHO WERE OPERATING HIS TECHNOLOGY IN THE YEARS WHEN THE COMPANY

10:45AM   16   WENT LIVE.

10:45AM   17        YOU SHOULD ALSO THINK ABOUT HOW MR. BALWANI REACTED WHEN

10:46AM   18   HE GOT THAT NEGATIVE INFORMATION FROM PEOPLE.  WAS HE RECEPTIVE

10:46AM   19   TO BAD NEWS ABOUT THERANOS TECH?  DID HE THANK PEOPLE FOR

10:46AM   20   BRINGING THOSE ISSUES TO HIS ATTENTION, OR DID HE RESPOND BY

10:46AM   21   EITHER IGNORING THEM OR IN SOME CASES WITH OPEN HOSTILITY?  YOU

10:46AM   22   KNOW IT WAS THE LATTER.

10:46AM   23        SO DID MR. BALWANI RELY ON THERANOS SCIENTISTS OR NOT?

10:46AM   24   IT'S A COMPLICATED QUESTION BECAUSE WHAT THE EVIDENCE ACTUALLY

10:46AM   25   SHOWS IS THAT HE LISTENED SELECTIVELY.  HE DECIDED WHAT TO PAY

10:46AM 1    ATTENTION TO AND WHAT NOT TO, AND HE DECIDED TO PAY ATTENTION

10:46AM 2    TO THE THINGS THAT HE WANTED TO HEAR, IGNORING OR DISMISSING

10:46AM 3    THE THINGS THAT HE DIDN'T WANT TO.

10:46AM 4        SO OBVIOUSLY HIS ACTIONS SPEAK LOUDLY ON THAT TOPIC.

10:46AM 5        HOW ABOUT HIS WORDS THOUGH?  DID MR. BALWANI HAVE COMPLETE

10:46AM 6    FAITH IN THERANOS'S SCIENTISTS LIKE DANIEL YOUNG, FOR EXAMPLE?

10:47AM 7        WELL, WHAT DOES HE SAY?  IN AUGUST OF 2014, AGAIN, WELL

10:47AM 8    AFTER THE COMPANY HAS LAUNCHED, WHEN THE COMPANY IS HANDLING

10:47AM 9    PATIENT TESTING, DR. YOUNG EMAILS MR. BALWANI INDIVIDUALLY TO

10:47AM 10   TALK ABOUT SOME CONCERNS THAT HE HAD ABOUT THE PT INR TEST.

10:47AM 11   AND MR. BALWANI FORWARDS THAT MESSAGE TO MS. HOLMES, THIS IS

10:47AM 12   AUGUST OF 2014, AND HIS REMARK THERE IS "ALWAYS ANOTHER STUDY

10:47AM 13   AFTER THE FACT."

10:47AM 14       AND WE SHOWED THIS EMAIL TO DR. ROSENDORFF, AND

10:47AM 15   DR. ROSENDORFF TOLD YOU ABOUT HOW THIS WAS A PATTERN AT

10:47AM 16   THERANOS, WHERE PROBLEMS WOULD COME UP, SOMEONE LIKE DR. YOUNG

10:47AM 17   WOULD PUT A STUDY TOGETHER TO TRY TO ADDRESS IT.  AT FIRST IT

10:47AM 18   MIGHT SEEM LIKE THE PROBLEM HAD BEEN SOLVED, BUT THEN PROBLEMS

10:47AM 19   WOULD RESURFACE AGAIN AND AGAIN AND AGAIN.

10:47AM 20       MR. BALWANI SAW THAT PATTERN TOO.  THIS IS HIM REMARKING

10:47AM 21   ON IT, LAMENTING THAT PATTERN TO MS. HOLMES, HIS PARTNER,

10:48AM 22   "ALWAYS ANOTHER STUDY AFTER THE FACT."

10:48AM 23       DID THIS SOUND LIKE A COO WHO BELIEVES THAT EVERYTHING IS

10:48AM 24   ON TRACK WITH THE TECHNOLOGY AT HIS COMPANY?  DOES THIS SOUND

10:48AM 25   LIKE SOMEBODY WHO BELIEVES THAT THE ACCURACY OF THE TESTING IS

10:48AM 1    IN GOOD HANDS WITH SOMEONE LIKE DR. YOUNG?

10:48AM 2        NO.  THIS IS EXPRESSING FRUSTRATION WITH THAT TREND.

10:48AM 3        AND THIS ISN'T UNIQUE.  IN FRONT OF YOU HAS BEEN A LOT OF

10:48AM 4    EVIDENCE OF MR. BALWANI'S DISPLEASURE OF THINGS AT THE COMPANY

10:48AM 5    AND HIS AWARENESS OF THE PROBLEMS.  THE TEXT MESSAGES BETWEEN

10:48AM 6    HIM AND MS. HOLMES ARE IN EXHIBIT 5378H, AND THOSE ARE REPLETE

10:48AM 7    WITH EXAMPLES OF MR. BALWANI EXPRESSING FRUSTRATION AND

10:48AM 8    UNHAPPINESS WITH THE WAY THINGS ARE GOING.  SO YOU SHOULD NOT

10:48AM 9    BELIEVE FOR A SECOND THAT HE THOUGHT EVERYTHING WAS OKAY.

10:48AM 10       THAT SAME IDEA APPLIES TO CUSTOMER FEEDBACK AS WELL.  THE

10:48AM 11   DEFENSE HAS SUGGESTED THAT BECAUSE CUSTOMERS GENERALLY HAD

10:49AM 12   FAVORABLE IMPRESSIONS OF THEIR EXPERIENCE WITH THERANOS,

10:49AM 13   MR. BALWANI MUST HAVE THOUGHT EVERYTHING WAS FINE.

10:49AM 14       BUT YOU KNOW AND HE KNOWS THAT THOSE RATINGS HAD VERY

10:49AM 15   LITTLE, IF ANYTHING, TO DO WITH THE ACCURACY AND RELIABILITY OF

10:49AM 16   THE TESTS.  THE FACT THAT SOMEONE HAS A GOOD EXPERIENCE GETTING

10:49AM 17   THEIR BLOOD DRAWN HAS NOTHING TO DO WITH WHETHER THE RESULTS

10:49AM 18   THAT THEY'RE GETTING BACK ARE CORRECT OR NOT.  AND THAT'S A

10:49AM 19   CASE OF PATIENTS NOT KNOWING WHAT MR. BALWANI KNEW, NOT KNOWING

10:49AM 20   ABOUT THE PROBLEMS IN THE LAB.

10:49AM 21       AND YOU CAN THINK ABOUT HOW A RESTAURANT WITH A TERRIBLE

10:49AM 22   HEALTH SCORE RATING FROM THE HEALTH INSPECTOR MIGHT STILL HAVE

10:49AM 23   A HIGH RATING ON YELP IF THE CUSTOMERS DON'T KNOW ABOUT ALL OF

10:49AM 24   THE PROBLEMS IN THE KITCHEN.  THAT WAS THE CASE HERE.

10:49AM 25       THE PEOPLE GOING TO WALGREENS FOR BLOOD TESTING, THEY

ER-5281

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7628

10:49AM  1    DIDN'T HAVE THE INFORMATION THAT MR. BALWANI HAD.  THEY DIDN'T

10:49AM  2    KNOW THAT THE COMPANY HAD SERIOUS QUALITY CONTROL PROBLEMS,

10:49AM  3    RELIABILITY ISSUES, THAT THEY WERE REGULARLY GETTING INACCURATE

10:50AM  4    RESULTS ON THEIR TECHNOLOGY AND GETTING COMPLAINTS FROM DOCTORS

10:50AM  5    AND PATIENTS.

10:50AM  6        YOU SHOULD ALSO BE SUSPICIOUS OF ANY CLAIM THAT

10:50AM  7    MR. BALWANI WAS RELYING ON ADVICE FROM OTHERS BECAUSE YOU KNOW

10:50AM  8    THAT HE IGNORED CAUTIONARY ADVICE FROM LAWYERS ABOUT THE

10:50AM  9    CONTENT OF THERANOS'S MARKETING.  I WON'T SPEND A LOT OF TIME

10:50AM 10    ON THIS, BUT IT'S IMPORTANT TO REMEMBER THAT MR. BALWANI AND

10:50AM 11    MS. HOLMES WERE ADVISED THAT CERTAIN LANGUAGE MIGHT BE

10:50AM 12    PROBLEMATIC ON THE WEBSITE, IN PARTICULAR, LANGUAGE RELATING TO

10:50AM 13    CLAIMS OF "HIGHEST QUALITY" OR "HIGHEST ACCURACY," CLAIMS OF

10:50AM 14    THE TECHNOLOGY BEING FASTER AND EASIER.  THE LAWYERS WARNED THE

10:50AM 15    DEFENDANTS NOT TO USE THIS LANGUAGE ON THE WEBSITE.

10:50AM 16        WHAT HAPPENED?  WELL, YOU SEE THAT THAT LANGUAGE STAYED ON

10:50AM 17    THE WEBSITE.  IT WAS ALSO USED ELSEWHERE IN PATIENT BROCHURES

10:51AM 18    AND CRITICALLY IN INVESTOR PRESENTATIONS.

10:51AM 19        SO THE PRESENTATIONS THAT HOLMES AND BALWANI SUPPLIED TO

10:51AM 20    INVESTORS HAD THIS SAME LANGUAGE.

10:51AM 21        AND THE POINT HERE IS THAT AFTER BEING PUT ON NOTICE THAT

10:51AM 22    THESE KINDS OF CLAIMS MIGHT BE DUBIOUS OR PROBLEMATIC, THEY

10:51AM 23    DIDN'T STOP USING THEM.  THEY CONTINUED TO.  AND TO BE CANDID,

10:51AM 24    THEY SHOULDN'T HAVE NEEDED A LAWYER TO TELL THEM THAT THESE

10:51AM 25    THINGS WERE FALSE, AND SO MAYBE IT'S NO SURPRISE THAT THEY

10:51AM   1    CONTINUED TO USE THIS LANGUAGE EVEN AFTER BEING ADVISED AGAINST

10:51AM   2    IT.

10:51AM   3        REMEMBER THAT OTHER INDIVIDUALS AT THERANOS DID GET THE

10:51AM   4    MESSAGE.  EXHIBIT 1090.  I WON'T SHOW IT, BUT YOU'RE FREE TO

10:51AM   5    LOOK AT IT LATER.  1090 IS AN EMAIL WITH A DRAFT OF THE

10:51AM   6    SEPTEMBER 2013 "WALL STREET JOURNAL" ARTICLE, AND IT'S AN

10:51AM   7    INTERNAL EMAIL WHERE A THERANOS EMPLOYEE NAMED JEFF BLICKMAN

10:52AM   8    NOTES ISSUES WITH THE DRAFT ARTICLE.  AND ONE ISSUE HE NOTES IS

10:52AM   9    CLAIMS OF IMPROVED ACCURACY.

10:52AM  10        SO OTHER PEOPLE, BESIDES HOLMES AND BALWANI, UNDERSTOOD

10:52AM  11    THAT THAT WAS DANGEROUS TERRITORY, CLAIMS THAT THE COMPANY MAY

10:52AM  12    NOT WANT TO MAKE IF IT WAS CONCERNED WITH BEING HONEST.

10:52AM  13        MR. BALWANI AND MS. HOLMES FELT OTHERWISE.

10:52AM  14        LET'S TALK BRIEFLY ABOUT THE THERANOS BOARD OF DIRECTORS.

10:52AM  15    THE DEFENSE HAS SUGGESTED THAT THE THERANOS BOARD WOULD HAVE

10:52AM  16    BEEN A MODERATING INFLUENCE OR A POLICING INFLUENCE ON THE

10:52AM  17    ACTIONS OF THE COMPANY.  I THINK THERE'S A SUGGESTION BY THE

10:52AM  18    DEFENSE THAT BECAUSE THE BOARD WAS FULL OF SO MANY QUALIFIED

10:52AM  19    INDIVIDUALS, NOTHING UNTOWARD COULD HAVE HAPPENED THERE, THAT

10:52AM  20    THOSE WERE STEADY HANDS ON THE WHEEL.

10:52AM  21        THERE'S NO EVIDENCE OF THAT.

10:52AM  22        A FEW THINGS TO KEEP IN MIND.  FIRST OF ALL, WHEN IT COMES

10:53AM  23    TO THE MAKEUP AND THE STRUCTURE OF THE BOARD, REMEMBER THAT

10:53AM  24    MS. HOLMES HERSELF WAS THE CHAIR OF THE BOARD, AND MR. BALWANI

10:53AM  25    WAS ALSO A MEMBER.  THEY WERE THE ONLY TWO OFFICERS WHO WERE ON

10:53AM  1    THE BOARD, SO THEY HAD BOARD POWER AS MEMBERS AND THEY ALSO HAD

10:53AM  2    THE KNOWLEDGE AND AWARENESS OF THE PEOPLE WHO WERE OPERATING

10:53AM  3    THE COMPANY DAY-TO-DAY.

10:53AM  4        SO IS THERE ANYONE MORE POWERFUL AT THE COMPANY THAN THOSE

10:53AM  5    TWO?  THE ANSWER IS NO.

10:53AM  6        THINK ALSO ABOUT THE SOURCES OF INFORMATION THAT WOULD

10:53AM  7    HAVE BEEN AVAILABLE TO THE BOARD.

10:53AM  8        IN EVIDENCE ARE MINUTES OF MEETINGS OF THE BOARD WHERE THE

10:53AM  9    BOARD IS BRIEFED BY MS. HOLMES ON THE OPERATIONS OF THE

10:53AM  10   COMPANY.  IS THERE ANY EVIDENCE SHOWING THAT THE BOARD HAD

10:53AM  11   INDEPENDENT ABILITY TO KNOW WHAT WAS HAPPENING AT THE COMPANY,

10:53AM  12   OTHER THAN THROUGH THE DEFENDANTS?  I THINK THE ANSWER IS NO.

10:54AM  13       FINALLY, IS THERE ANY EVIDENCE OF THE BOARD ACTUALLY

10:54AM  14   TAKING A ROLE IN RUNNING THE COMPANY?  IN ALL OF THE EMAILS

10:54AM  15   THAT YOU'VE SEEN ABOUT PROBLEMS IN THE LAB, RELATIONSHIPS WITH

10:54AM  16   PHARMACEUTICAL COMPANIES, WERE BOARD MEMBERS ON THOSE EMAILS?

10:54AM  17   WHEN INACCURATE RESULTS CAME INTO THE LAB, DID STAFF MEMBERS

10:54AM  18   SAY WE NEED TO CONTACT THE BOARD ABOUT THIS AND SEE WHAT

10:54AM  19   THEY'LL SAY?  NO.

10:54AM  20       THE PEOPLE MAKING THOSE DECISIONS WERE MR. BALWANI AND

10:54AM  21   MS. HOLMES.  THEY WERE RUNNING THE COMPANY.  THEY WERE

10:54AM  22   ACCOUNTABLE TO THE BOARD IN THE DAILY OPERATION, THE DECISIONS

10:54AM  23   THAT MATTER FOR THIS CASE.

10:54AM  24       AND THERE'S NO EVIDENCE THAT THE BOARD WAS AWARE OF THE

10:54AM  25   FALSE STATEMENTS THAT WERE BEING MADE TO VICTIMS IN THIS CASE.

10:54AM   1    THAT'S IMPORTANT TO REMEMBER.

10:54AM   2         SO WAS THE BOARD REALLY A CHECK ON MR. BALWANI'S POWER AT

10:54AM   3    THE COMPANY?  WAS THIS ABOUT SUPERVISING THE COMPANY AND

10:54AM   4    ENSURING AGAINST WRONGDOING?  OR WAS THE BOARD JUST A GROUP OF

10:54AM   5    POWERFUL PEOPLE TO BE IMPRESSED, ANOTHER AUDIENCE FOR THE

10:54AM   6    DEFENDANTS TO PERFORM FOR?

10:54AM   7         THE EVIDENCE SHOWS YOU THAT MEMBERS OF THE BOARD

10:55AM   8    INFLUENCED -- I'M SORRY, INTRODUCED THE DEFENDANTS TO INVESTORS

10:55AM   9    IN THIS CASE.  SO THE CONNECTIONS CREATED BY THAT BOARD, THE

10:55AM  10    CONNECTIONS SUPPLIED BY THE BOARD ACTUALLY BENEFITTED THE

10:55AM  11    COMPANY IN THAT WAY.

10:55AM  12         AS IT FITS INTO THE DEFENDANT'S SCHEMES TO DEFRAUD, THAT

10:55AM  13    WAS THE ROLE OF THE BOARD.  NOT A MODERATING INFLUENCE, BUT A

10:55AM  14    TOOL TO BE USED.

10:55AM  15         THE DEFENSE HAS POINTED OUT A FEW TIMES INSTANCES WHERE

10:55AM  16    INFORMATION WAS SHARED WITH PEOPLE OTHER THAN VICTIMS, AND

10:55AM  17    THEY'VE SHOWN THAT TO YOU IN AN ATTEMPT TO CONVINCE YOU THAT

10:55AM  18    CERTAIN THINGS WERE NOT ACTUALLY SECRETS AT THERANOS, OR THAT

10:55AM  19    INFORMATION ACTUALLY WAS NOT WITHHELD INTENTIONALLY FROM THE

10:55AM  20    VICTIMS IN THIS CASE.

10:55AM  21         BUT I'D LIKE TO TALK TO YOU ABOUT THIS CONCEPT OF

10:56AM  22    SELECTIVE HONESTY.  IT IS AN IMPORTANT PART OF THIS CASE HOW

10:56AM  23    THE DEFENDANTS HID TRUTH FROM THE VICTIMS IN THE FRAUD WHILE

10:56AM  24    FEEDING THEM DECEPTIVE STATEMENTS THAT LEFT THEM WITH THE WRONG

10:56AM  25    IMPRESSION ABOUT THE COMPANY.

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7632

10:56AM   1        ONE EXAMPLE RELATES TO THE LIMITATIONS OF THE THERANOS

10:56AM   2   ANALYZER, WHICH WE'VE TALKED ABOUT, AND THE COMPANY'S RESULTANT

10:56AM   3   RELIANCE ON THIRD PARTY DEVICES.

10:56AM   4        IN ITS OPENING THE DEFENSE SAID THERANOS DID NOT HIDE ITS

10:56AM   5   USE OF COMMERCIAL DEVICES.  AND THEY CONTINUED TO SUGGEST

10:56AM   6   SOMETHING SIMILAR IN CLOSING.

10:56AM   7        IS THAT WHAT THE EVIDENCE SHOWS?  YOU HAVE HEARD FROM

10:56AM   8   SEVERAL INVESTORS WHO WOULD DISAGREE STRONGLY WITH THAT

10:56AM   9   STATEMENT.

10:56AM  10        FOR EXAMPLE, ONE OF THE EXHIBITS THAT THE DEFENSE ACTUALLY

10:56AM  11   SHOWED YOU ON CLOSING WAS 13720A.  THAT'S THE FINANCIAL MODEL

10:56AM  12   PROVIDED TO PFM.  THAT FINANCIAL MODEL TALKS ABOUT THERANOS'S

10:56AM  13   COSTS IN BUILDING AND MANUFACTURING ITS OWN MINILAB DEVICE, BUT

10:57AM  14   IT DOESN'T SAY ANYTHING ABOUT PURCHASING COMMERCIAL DEVICES.

10:57AM  15        MR. COOPERSMITH SUGGESTED TO YOU THAT THAT MIGHT NOT BE

10:57AM  16   MISLEADING BECAUSE YOU DON'T KNOW HOW MANY DEVICES THERANOS

10:57AM  17   ALREADY HAD OR WHETHER PURCHASING MORE DEVICES ACTUALLY WOULD

10:57AM  18   HAVE IMPACTED THEIR BOTTOM LINE.

10:57AM  19        BUT THINK ABOUT THE SCALE OF THE ROLLOUT THAT THERANOS WAS

10:57AM  20   CONTEMPLATING; THINK ABOUT THE FACTS THAT THE EDISON WAS ONLY

10:57AM  21   BEING USED FOR 12 OF THE HUNDREDS OF TESTS THAT THEY WERE

10:57AM  22   OFFERING; AND THINK ABOUT WHETHER THAT REALLY MAKES SENSE.

10:57AM  23        IS IT TRUE THAT THE COMPANY'S NEED TO PURCHASE ADDITIONAL

10:57AM  24   THIRD PARTY DEVICES WOULDN'T AFFECT ITS BOTTOM LINE, THAT IT

10:57AM  25   DIDN'T BELONG IN THAT MODEL?  THAT DOESN'T MAKE SENSE.

10:57AM  1      WHAT MAKES MORE SENSE IS THAT THIRD PARTY DEVICES WEREN'T

10:57AM  2   MENTIONED IN THAT FINANCIAL MODEL BECAUSE THE DEFENDANT DIDN'T

10:57AM  3   WANT THIS INVESTOR TO KNOW ABOUT THE COMPANY'S USE AND

10:57AM  4   RELIANCE, THE COMPANY'S DEPENDENCE ON OTHER COMPANY'S DEVICES.

10:58AM  5      MR. COOPERSMITH ALSO SHOWED YOU SOME DATA THAT WAS

10:58AM  6   PROVIDED TO INVESTORS THAT PURPORTED TO SHOW THE PERFORMANCE OF

10:58AM  7   THERANOS'S ANALYZERS VERSUS THIRD PARTY ANALYZERS.  AND HE

10:58AM  8   SUGGESTED BECAUSE THOSE CHARTS WERE GIVEN TO INVESTORS, THEY

10:58AM  9   SHOULD HAVE BEEN ABLE TO PIECE TOGETHER THAT THERANOS ACTUALLY

10:58AM 10   OWNED THESE THIRD PARTY DEVICES.

10:58AM 11      I THINK THE SUGGESTION IS THAT THAT'S AS GOOD AS

10:58AM 12   DISCLOSING TO THEM THAT THE COMPANY IS RELYING ON THESE THIRD

10:58AM 13   PARTY DEVICES.  THAT SHOULD NOT BE CONVINCING TO YOU.

10:58AM 14      THE IDEA THAT INVESTORS NEED TO BECOME DETECTIVES IN THAT

10:58AM 15   WAY AND MAKE ASSUMPTIONS ABOUT THE FACT THAT THERANOS HAD

10:58AM 16   ACCESS TO THIS THIRD PARTY DEVICE AT SOME POINT MUST MEAN THAT

10:59AM 17   THEY'RE USING THEM FOR THE MAJORITY OF THEIR TESTS, THAT'S TOO

10:59AM 18   GREAT A LEAP TO EXPECT FROM INVESTORS.  SO THAT ARGUMENT

10:59AM 19   DOESN'T HOLD WATER.

10:59AM 20      AND I THINK WITHOUT IMPUGNING THE MOTIVES OF MY

10:59AM 21   COUNTERPART, YOU SHOULD THINK ABOUT ARGUMENTS LIKE THAT WHEN

10:59AM 22   YOU CONSIDER MR. COOPERSMITH'S CLAIM THAT IT'S THE DEFENSE WHO

10:59AM 23   IS TRYING TO SHOW YOU THE TRUTH.

10:59AM 24      WHEN THE DEFENSE TRIES TO CONVINCE YOU THAT THERANOS WAS

10:59AM 25   OPEN AND TRANSPARENT ABOUT ITS USE OF OTHER METHODS, THEY SHOW

ER-5287

10:59AM  1   YOU LANGUAGE LIKE THIS.  THIS IS FROM THE SEPTEMBER 2013 PRESS

10:59AM  2   RELEASE.  AND YOU'LL NOTE THAT IT SAYS, "THE SAMPLES ARE EITHER

10:59AM  3   TAKEN FROM A TINY FINGERSTICK OR A MICRO-SAMPLE TAKEN FROM

10:59AM  4   TRADITIONAL METHODS."

10:59AM  5        SO THE DEFENSE POINTS TO THIS AND SAYS, THIS TELLS YOU

10:59AM  6   THAT THERANOS WAS ACTUALLY BEING OPEN ABOUT ITS USE OF VEIN

11:00AM  7   DRAWS, AND MAYBE THAT'S TRUE.  BUT LOOK AT WHAT THE LANGUAGE

11:00AM  8   ACTUALLY SAYS.  IT SIMPLY SAYS, "THE SAMPLES ARE TAKEN FROM

11:00AM  9   THIS METHOD OR THAT METHOD," BUT NOWHERE IN HERE, OR THE SOURCE

11:00AM 10   OF THE OTHER LANGUAGE THAT THE DEFENSE SHOWS YOU, DOES IT

11:00AM 11   DISCLOSE THAT THE COMPANY ACTUALLY NEEDS TO USE THESE

11:00AM 12   TRADITIONAL METHODS, NEEDS TO USE VEIN DRAWS, DOESN'T HAVE A

11:00AM 13   CHOICE BECAUSE OF LIMITATIONS WITH THE COMPANY'S OWN

11:00AM 14   TECHNOLOGY.

11:00AM 15        THERE'S AN IMPORTANT DIFFERENCE BETWEEN SAYING WE CAN DO

11:00AM 16   TESTING EITHER OF THESE WAYS AND SAYING SOMETIMES WE NEED TO DO

11:00AM 17   A VEIN DRAW OR FREQUENTLY WE NEED TO DO A VEIN DRAW.  AND THAT

11:00AM 18   WAS NOT DISCLOSED IN THIS CASE.  YOU KNOW THAT FROM THE

11:00AM 19   EVIDENCE.

11:00AM 20        AND YOU KNOW THAT INVESTORS DID NOT KNOW ABOUT THE

11:00AM 21   COMPANY'S USE, AND EXTENSIVE USE REALLY OF THIRD PARTY DEVICES.

11:00AM 22   YOU HEARD FROM MR. JHAVERI THAT HE WOULD HAVE BEEN VERY

11:00AM 23   SURPRISED TO LEARN THAT HIS OWN TEST, HIS DEMO TEST PERFORMED

11:01AM 24   AT THERANOS WAS NOT ACTUALLY RUN ON A THERANOS ANALYZER.  THAT

11:01AM 25   KIND OF INFORMATION WAS NOT DISCLOSED TO INVESTORS.  INSTEAD,

11:01AM  1    THEY WERE LED TO BELIEVE THAT THE IN-HOUSE DEVICE WAS WHAT WAS

11:01AM  2    BEING DEMONSTRATED TO THEM.

11:01AM  3        AND THE REASON THAT INFORMATION WASN'T SHARED, THE REASON

11:01AM  4    THEY WERE GIVEN THAT FALSE IMPRESSION, IS BECAUSE IT MADE THE

11:01AM  5    COMPANY LOOK BETTER.  IT'S FAR MORE IMPRESSIVE IF THE COMPANY

11:01AM  6    CAN DO ALL OF ITS OWN TESTING ON ITS OWN ANALYZER, AND THAT'S

11:01AM  7    WHY THAT LIE WAS TOLD.

11:01AM  8        BY THE WAY, THIS LANGUAGE TALKING ABOUT ELIMINATING THE

11:01AM  9    NEED FOR LARGER NEEDLES AND NUMEROUS VIALS OF BLOOD REQUIRED

11:01AM  10    FOR MOST DIAGNOSTIC LAB TESTING IS STILL MISLEADING GIVEN THE

11:01AM  11    FACT THAT THERANOS WAS USING THE EXACT SAME DEVICES THE EXACT

11:01AM  12    SAME WAY AS OTHER LABS.

11:01AM  13        SO THEY HADN'T ELIMINATED ANY NEED.  THERE WAS NOTHING

11:01AM  14    ABOUT THEIR TECHNOLOGY THAT MADE SOMETHING NEW POSSIBLE.  THINK

11:01AM  15    ABOUT THAT.

11:02AM  16        WE SHOULD ALSO TALK ABOUT INSTANCES WHERE THERANOS

11:02AM  17    REVEALED THINGS TO REGULATORS THAT WERE NOT REVEALED TO

11:02AM  18    INVESTORS.  I THINK THE DEFENSE WANTS YOU TO LOOK AT THOSE

11:02AM  19    EXAMPLES AND CONCLUDE THAT BECAUSE THERANOS WAS OKAY REVEALING

11:02AM  20    CERTAIN DETAILS TO, SAY, THE FDA OR CMS, YOU CANNOT BELIEVE

11:02AM  21    THAT THEY TRIED TO HIDE THOSE DETAILS FROM THE PEOPLE WHO WERE

11:02AM  22    INVESTING IN THE COMPANY.

11:02AM  23        BUT THINK ABOUT HOW DIFFERENT THOSE TWO SITUATIONS ARE.

11:02AM  24    ACTUALLY, BEFORE WE GET TO THAT, ASK YOURSELF WHETHER THERANOS

11:02AM  25    REALLY WAS ALWAYS HONEST WITH REGULATORS AND INSPECTORS?

| | | |
|---|---|---|
| 11:02AM | 1 | DISCUSSING THIS TOPIC IN HIS CLOSING, MR. COOPERSMITH |
| 11:02AM | 2 | CALLED THIS ACCUSATION IMAGINARY I THINK WAS THE WORD HE USED. |
| 11:02AM | 3 | BUT YOU SAW EVIDENCE WITH YOUR OWN EYES.  EXHIBIT 4047 IS AN |
| 11:02AM | 4 | EMAIL FROM MS. HOLMES TO DANIEL YOUNG AND OTHERS ABOUT THE PATH |
| 11:02AM | 5 | THAT AN INSPECTOR WAS GOING TO TAKE ON AN UPCOMING VISIT TO THE |
| 11:03AM | 6 | COMPANY. |
| 11:03AM | 7 | AFTER THAT, DANIEL YOUNG EMAILED DR. ROSENDORFF AND ASKED |
| 11:03AM | 8 | HIM NOT TO REMIND THE INSPECTOR ABOUT THE DOWNSTAIRS LAB WHERE |
| 11:03AM | 9 | THE THERANOS-SPECIFIC DEVICES WERE. |
| 11:03AM | 10 | AND THEN IN EXHIBIT 1295, MR. BALWANI EMAILS RELEVANT |
| 11:03AM | 11 | PEOPLE ABOUT AN AREA IN THE LAB THAT IS BLOCKED OFF DURING AN |
| 11:03AM | 12 | INSPECTION, AND HE DIRECTS STAFF WHAT TO TELL THE INSPECTOR |
| 11:03AM | 13 | ABOUT IT. |
| 11:03AM | 14 | DR. ROSENDORFF TESTIFIED THAT THAT WAS AN UNUSUAL STEP IN |
| 11:03AM | 15 | HIS EXPERIENCE AS A LAB DIRECTOR. |
| 11:03AM | 16 | TO THE EXTENT THAT THERANOS DID DISCLOSE THINGS TO FDA, |
| 11:03AM | 17 | CMS, OR SIMILAR ORGANIZATIONS, DON'T BE THROWN BY THAT.  LIKE I |
| 11:03AM | 18 | SAID, THINK ABOUT HOW DIFFERENT THAT CIRCUMSTANCE IS.  FIRST OF |
| 11:03AM | 19 | ALL, YOU KNOW THAT THOSE GOVERNMENT AGENCIES HAVE THE RIGHT TO |
| 11:03AM | 20 | INSPECT.  WE SAW THAT HAPPEN IN THE EVIDENCE.  THAT HAPPENED IN |
| 11:03AM | 21 | THE CASE OF THERANOS. |
| 11:03AM | 22 | SO YOU KNOW THAT LYING TO THOSE AGENCIES IS VERY RISKY |
| 11:03AM | 23 | BECAUSE THEY HAVE THE ABILITY TO SHOW UP AND CONFIRM THE TRUTH |
| 11:04AM | 24 | OR FALSITY OF WHAT YOU'RE SAYING, UNLIKE INVESTORS. |
| 11:04AM | 25 | YOU ALSO KNOW THAT WHEN IT COMES TO REGULATORS, OR YOU CAN |

ER-5290

11:04AM 1    INFER THAT WHEN IT COMES TO REGULATION AND THAT KIND OF

11:04AM 2    SUPERVISION, THERE'S AN INCENTIVE TO BE THE SAME AS OTHER PEER

11:04AM 3    LABORATORIES.  SO IT'S AN OPPOSITE INCENTIVE VERSUS WHEN YOU'RE

11:04AM 4    TALKING TO AN INVESTOR.

11:04AM 5         WHEN THE DEFENDANTS WERE TALKING TO INVESTORS, THEY WANTED

11:04AM 6    TO PAINT THERANOS AS NEW AND NOVEL, AS SPECIAL AND DIFFERENT.

11:04AM 7         IF A GOVERNMENT REGULATOR VIEWS YOUR LAB THAT WAY, THEY

11:04AM 8    MIGHT HAVE ADDITIONAL QUESTIONS, WOULDN'T THEY?

11:04AM 9         IN THAT CONTEXT WHEN YOU'RE TALKING TO A REGULATOR WHO IS

11:04AM 10   GOING TO SUPERVISE AND INSPECT THE LAB, ISN'T IT BETTER FOR THE

11:04AM 11   INSPECTOR TO KNOW THAT YOU'RE DOING EVERYTHING ELSE IS, THAT

11:04AM 12   YOU'RE USING THE DEVICES THAT ARE FDA APPROVED.

11:05AM 13        SO THERE WAS AN INCENTIVE FOR THE DEFENDANTS TO STRESS

11:05AM 14   OPPOSITE THINGS TO THESE TWO GROUPS OF PEOPLE.  WHEN IT CAME TO

11:05AM 15   REGULATORS, TO BE HONEST ABOUT THEIR USE OF FDA APPROVED

11:05AM 16   DEVICES, AND BECAUSE THAT WOULD RESULT IN LESS SCRUTINY, BUT

11:05AM 17   WHEN IT CAME TO INVESTORS, PEOPLE THEY WERE TRYING TO IMPRESS

11:05AM 18   OR GET MONEY FROM, TO EMPHASIZE AND OVERSTATE WHAT MADE

11:05AM 19   THERANOS NEW, DIFFERENT, AND SPECIAL.

11:05AM 20        THEY DIDN'T LIE TO REGULATORS BECAUSE THEY COULDN'T

11:05AM 21   DECEIVE THEM, AND THEY DIDN'T NEED TO.

11:05AM 22        REMEMBER ALSO THAT CMS AND FDA WERE NOT SITTING IN WITH

11:05AM 23   THEIR MEETINGS WITH INVESTORS AND VICTIMS IN THIS CASE, SO

11:05AM 24   THOSE REGULATORS DID NOT KNOW ABOUT THE FALSE STATEMENTS THAT

11:05AM 25   WERE BEING MADE TO OTHERS.

REBUTTAL ARGUMENT BY MR. BOSTIC                                  7638

11:05AM   1          MOVING ALONG HERE.

11:05AM   2          THERE'S ANOTHER DEFENSE THEME THAT SUGGESTS THAT INVESTORS

11:05AM   3   IN THIS CASE SHOULD HAVE OR DID KNOW BETTER.  YOU HEARD FROM A

11:05AM   4   SAMPLING OF THERANOS INVESTORS.  EACH OF THEM TOLD YOU ABOUT

11:06AM   5   THE FALSE AND MISLEADING INFORMATION THAT THEY GOT FROM THE

11:06AM   6   DEFENDANTS EITHER IN WRITTEN MATERIALS FROM THE DEFENDANTS AND

11:06AM   7   NEWS ARTICLES CITING ONE OR BOTH OF THEM AS SOURCES, OR IN

11:06AM   8   CONVERSATIONS DIRECTLY WITH THE PEOPLE RUNNING THE COMPANY.

11:06AM   9          THE DEFENSE ALSO EXPLORED THE DUE DILIGENCE AND RESEARCH

11:06AM  10   THAT WERE -- THAT THESE INVESTORS CONDUCTED, AND THERE MIGHT BE

11:06AM  11   THE INSINUATION OR SUGGESTION TO YOU THAT THEY SHOULD HAVE

11:06AM  12   NOTICED CERTAIN RED FLAGS, THAT THEY SHOULD HAVE BEEN MORE

11:06AM  13   CAREFUL, MORE SKEPTICAL, THAT THEY SHOULD HAVE DONE MORE TO

11:06AM  14   CONFIRM THE TRUTH OF THE THINGS THAT THEY WERE HEARING FROM THE

11:06AM  15   DEFENDANTS.

11:06AM  16          SOMETHING TO KEEP IN MIND WHEN IT COMES TO THAT, THOUGH.

11:06AM  17   THE COURT IS GOING TO INSTRUCT YOU AGAIN ON THE LAW, AND I

11:06AM  18   EXPECT THE COURT WILL TELL YOU THIS, THAT WHEN IT COMES TO AN

11:06AM  19   ALLEGED VICTIM'S CONDUCT, "AN ALLEGED VICTIM'S NEGLIGENCE IS

11:06AM  20   NOT A DEFENSE TO WIRE FRAUD."

11:06AM  21          THAT'S CRITICAL TO KEEP IN MIND.

11:06AM  22          YOUR JOB AS JURORS IS NOT TO WEIGH THE CONDUCT OF THE

11:07AM  23   PEOPLE WHO WERE TAKEN IN BY THIS FRAUD AND DECIDE WHETHER THEY

11:07AM  24   WERE CAREFUL ENOUGH, WHETHER THEY TOOK ENOUGH STEPS TO PROTECT

11:07AM  25   THEMSELVES BEFORE THEY COMMITTED TO INVESTING.  THAT'S NOT A

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7639

11:07AM  1    QUESTION THAT IS IN FRONT OF YOU.

11:07AM  2         THE FOCUS HERE IS ON THE DEFENDANT'S CONDUCT, HIS INTENT,

11:07AM  3    AND TO THE EXTENT ONE OF THESE VICTIMS, AN INVESTOR, FOR

11:07AM  4    EXAMPLE, MIGHT SEEM NEGLIGENT BECAUSE THEY MADE THE DECISION TO

11:07AM  5    INVEST IN THE COMPANY, THAT IS NOT RELEVANT TO YOUR FINDING OF

11:07AM  6    GUILT OR NOT GUILTY.

11:07AM  7         THE RANGE OF INVESTORS THAT YOU HEARD FROM, IT ALSO TELLS

11:07AM  8    YOU SOMETHING ABOUT THE IMPORTANCE OR NONIMPORTANCE OF THE

11:07AM  9    LEVEL OF DILIGENCE THAT WAS PUT IN HERE.  THINK ABOUT THE

11:07AM 10    DIFFERENT INVESTORS THAT YOU HEARD FROM.

11:07AM 11         THERE WAS CHRIS LUCAS, FOR EXAMPLE, WHO TRUSTED MS. HOLMES

11:08AM 12    BASED ON HER RELATIONSHIP WITH HIS UNCLE AND HIS LONG HISTORY

11:08AM 13    WITH THE COMPANY WHO INVESTED AFTER NOT HAVING THE KIND OF

11:08AM 14    INFORMATION FROM THE COMPANY THAT HE WOULD TYPICALLY HAVE;

11:08AM 15         THERE WAS BRIAN GROSSMAN, WHO WAS A VERY SOPHISTICATED

11:08AM 16    INVESTOR, WORKED WITH A TEAM TO EVALUATE THE OPPORTUNITY AT

11:08AM 17    THERANOS, INCLUDING SPECIALISTS, ASKED QUESTIONS, GOT OTHER

11:08AM 18    INFORMATION FROM OTHER PARTIES AS WELL;

11:08AM 19         THERE WAS PATRICK MENDENHALL, WHO GOT VERY DEFINITIVE

11:08AM 20    STATEMENTS FROM MR. BALWANI HIMSELF, BUT WHO DIDN'T SEE THE

11:08AM 21    KIND OF DETAILED PRESENTATIONS THAT OTHER INVESTORS GOT;

11:08AM 22         AND THEN THERE'S ALAN EISENMAN, WHO WAS NEVER HAPPY WITH

11:08AM 23    THE LIMITED AMOUNT OF INFORMATION THAT HE HAD, WHO DID

11:08AM 24    EVERYTHING HE COULD TO TRY TO FIND OUT MORE ABOUT THE COMPANY,

11:08AM 25    INCLUDING MR. BALWANI, BUT WAS SHUT DOWN, AND ULTIMATELY HE WAS

REBUTTAL ARGUMENT BY MR. BOSTIC 7640

11:08AM 1    FORCED TO RELY ON THE LIMITED INFORMATION THAT HE WAS GETTING

11:08AM 2    FROM THEM.

11:09AM 3        FROM THAT RANGE OF INVESTOR WITNESSES, YOU SEE CLEARLY

11:09AM 4    THAT IT DOESN'T MATTER WHAT APPROACH AN INVESTOR TOOK TO

11:09AM 5    EVALUATING THE OPPORTUNITY WITH THERANOS.  AT THE END OF THE

11:09AM 6    DAY, THEY ALL HAD TO RELY ON THE TRUTH OF THE INFORMATION THAT

11:09AM 7    THEY WERE GETTING FROM THE DEFENDANTS.

11:09AM 8        THEY DIDN'T KNOW THAT THEY WERE ACTUALLY GETTING FALSE

11:09AM 9    INFORMATION.  THE DEFENDANTS KNEW THAT.  THE INVESTORS DIDN'T

11:09AM 10   KNOW WHAT INFORMATION THEY LACKED.  THE DEFENDANTS KNEW THAT.

11:09AM 11   SO FAR IT'S EASY TO SAY THAT SOME OF THESE INVESTORS MIGHT HAVE

11:09AM 12   MADE THE WRONG DECISION IN HINDSIGHT.  THAT'S TRUE FOR ANYONE

11:09AM 13   WHO IS TAKEN IN BY A FRAUD IT, BUT THIS INSTRUCTION TELLS YOU

11:09AM 14   NOT TO FOCUS ON THEIR OVERSIGHTS, BUT ON THE DEFENDANT'S

11:09AM 15   ACTIONS AND INTENT.

11:09AM 16       IN THAT SAME VEIN, THE DEFENSE LIKES TO POINT TO

11:09AM 17   PROVISIONS IN THE CONTRACT THAT THE INVESTORS SIGNED THAT MAKE

11:09AM 18   STATEMENTS ABOUT INFORMATION AVAILABLE TO THE INVESTORS, THEIR

11:09AM 19   ABILITY TO TAKE A LOSS, THINGS LIKE THAT.

11:10AM 20       BUT DON'T BE CONFUSED BY THAT.  THOSE CONTRACTS ARE NOT

11:10AM 21   THE INVESTORS AGREEING TO BE DEFRAUDED.

11:10AM 22       NOWHERE IN THE LANGUAGE WILL YOU FIND ANYTHING THAT

11:10AM 23   PERMITS THE DEFENDANT OR MS. HOLMES TO LIE OR TO DECEIVE

11:10AM 24   INVESTORS.  SO THOSE CONTRACTS DON'T PROTECT MR. BALWANI HERE.

11:10AM 25       THE MAIN POINT HERE IS THAT EVEN WHEN PEOPLE KNOW THEY'RE

ER-5294

11:10AM  1    TAKING A RISK, THEY'RE STILL ENTITLED TO TRUE AND ACCURATE

11:10AM  2    INFORMATION UNDER THE LAW.

11:10AM  3        THE DEFENSE'S THEORY HERE THAT IF INVESTORS KNEW THEY

11:10AM  4    MIGHT LOSE THEIR MONEY, THEN MR. BALWANI CAN'T BE GUILTY WOULD

11:10AM  5    ELIMINATE THE POSSIBILITY OF ANY FRAUD IN CONNECTION WITH AN

11:10AM  6    INVESTMENT, AND THAT'S NOT THE LAW.

11:10AM  7        IT WAS STILL WRONG FOR MR. BALWANI TO DECEIVE PEOPLE WHO

11:10AM  8    KNEW THEY WERE TAKING A RISK BECAUSE HE WAS DECEIVING THEM INTO

11:10AM  9    TAKING ON MORE OF A RISK THAN THEY THOUGHT THEY WERE.

11:10AM 10        I'LL SAY THAT AGAIN.  MR. BALWANI WAS DECEIVING PEOPLE

11:11AM 11    INTO TAKING ON MORE OF A RISK THAN THEY THOUGHT THEY WERE.

11:11AM 12    THAT'S WHAT MAKES THIS A FRAUD, EVEN THOUGH EVERY INVESTOR WILL

11:11AM 13    ACKNOWLEDGE THAT WITH THE INVESTMENT COMES THE POSSIBILITY OF

11:11AM 14    LOSING THEIR MONEY.  THAT DOESN'T MEAN THAT THIS ISN'T A CRIME.

11:11AM 15        SIMILARLY, DON'T BE DISTRACTED BY DEFENSE ARGUMENTS THAT

11:11AM 16    OTHER THINGS BESIDES THE DEFENDANT'S STATEMENTS ALSO MATTERED

11:11AM 17    TO THE INVESTORS.  WHEN IT COMES TO WHETHER A STATEMENT IS

11:11AM 18    MATERIAL OR NOT, THE LAW DOES NOT REQUIRE YOU TO CHOOSE ONE

11:11AM 19    PRIMARY THING THAT THE INVESTORS RELIED UPON IN MAKING THEIR

11:11AM 20    DECISION.  MULTIPLE THINGS CAN BE MATERIAL.  AND THE INVESTORS

11:11AM 21    YOU HEARD FROM CONSISTENTLY TESTIFIED THAT THE INFORMATION THAT

11:11AM 22    THEY GOT FROM THE DEFENDANT MATTERED TO THEM, THAT IT AFFECTED

11:11AM 23    THEIR ANALYSIS.  THEY SAID THAT OVER AND OVER AGAIN.

11:11AM 24        THE FACT THAT OTHER THINGS ALSO MATTERED TO THEM DOESN'T

11:11AM 25    DETRACT FROM THAT AND DOESN'T PREVENT A GUILTY VERDICT.

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7642

11:12AM  1        FINALLY ON THAT, DON'T FORGET THAT ON THE PATIENT SIDE OF

11:12AM  2   THINGS, UNLIKE INVESTORS, PATIENTS WERE IN NO POSITION TO FACT

11:12AM  3   CHECK THE THINGS THAT THEY WERE HEARING FROM THERANOS.  THEY

11:12AM  4   WERE FORCED TO RELY ON THE TRUTH OF THE REPRESENTATIONS THAT

11:12AM  5   THERANOS COULD PROVIDE ACCURATE AND RELIABLE INFORMATION AND

11:12AM  6   TESTING FOR THEM.  THEY DIDN'T HAVE ACCESS TO MR. BALWANI OR

11:12AM  7   MS. HOLMES.  THEY HAD TO RELY ON THE PUBLIC INFORMATION THAT

11:12AM  8   THE COMPANY AND THE DEFENDANT HAD PUT OUT THERE.  SO THINK

11:12AM  9   ABOUT THAT DISADVANTAGE THAT THEY WERE IN AS A RESULT OF THAT.

11:12AM 10        THE DEFENSE ALSO TRIES TO DRAW A CONTRAST BETWEEN WHAT

11:12AM 11   MIGHT BE ALLEGED AS LIES VERSUS WHAT MIGHT BE FORWARD LOOKING

11:12AM 12   STATEMENTS.  AND I THINK THEY WANT YOU TO CONCLUDE THAT IF

11:12AM 13   SOMETHING IS A FORWARD LOOKING STATEMENT, IT CAN'T BE

11:13AM 14   DISHONEST, IT CAN'T BE FRAUDULENT.  THAT'S NOT TRUE.  NO

11:13AM 15   INSTRUCTION IS GOING TO SAY THAT.  THE COURT WON'T INSTRUCT YOU

11:13AM 16   THAT THAT'S THE LAW BECAUSE IT'S NOT.

11:13AM 17        THE QUESTION IS NOT ABOUT THE TENSE OF THE STATEMENT THAT

11:13AM 18   THE DEFENDANT MAKES.  THE QUESTION IS, IS A CLAIM FROM A

11:13AM 19   DEFENDANT A FALSE AND FRAUDULENT REPRESENTATION MADE WITH THE

11:13AM 20   INTENT TO DECEIVE AND CHEAT, AND THAT CAN BE A PRESENT TENSE

11:13AM 21   STATEMENT, A PAST TENSE STATEMENT, OR A FUTURE TENSE STATEMENT.

11:13AM 22        THIS CAME UP IN PARTICULAR IN CONNECTION WITH FINANCIAL

11:13AM 23   PROJECTIONS THAT WERE PROVIDED TO VICTIMS IN THIS CASE.  THIS

11:13AM 24   IS EXHIBIT 1853 IN EVIDENCE.

11:13AM 25        IN PARTICULAR, THESE ARE FINANCIAL PROJECTIONS PROVIDED BY

REBUTTAL ARGUMENT BY MR. BOSTIC                           7643

11:13AM  1   THE DEFENDANT TO MS. PETERSON AT RDV IN OCTOBER OF 2014.

11:13AM  2        AND I THINK THE QUESTION PRESENTED BY THE DEFENSE IS,

11:13AM  3   WELL, HOW CAN FORWARD LOOKING FINANCIAL PROJECTIONS BE

11:13AM  4   DECEPTIVE?  HOW CAN THIS BE A LIE IF IT'S JUST A PREDICTION

11:14AM  5   ABOUT WHAT MIGHT HAPPEN IN THE FUTURE?

11:14AM  6        CONSIDER A HYPOTHETICAL.  LET'S SAY I COME TO YOU AND TELL

11:14AM  7   YOU THAT OVER THE NEXT HOUR, I'M GOING TO RUN TEN MILES.  THE

11:14AM  8   QUESTION IS AM I LYING OR NOT?  I'LL TELL YOU I HAVE NEVER RUN

11:14AM  9   A SIX MINUTE MILE, AND I CERTAINLY COULDN'T DO TEN IN A ROW,

11:14AM 10   BUT MAYBE WITHOUT THAT INFORMATION, WITHOUT KNOWING THAT, YOU

11:14AM 11   WOULD NOT BE WILLING TO ASSUME THAT I'M BEING DISHONEST.  YOU

11:14AM 12   MIGHT WANT TO GIVE ME THE BENEFIT OF THE DOUBT.

11:14AM 13        SO LET'S CHANGE THE CIRCUMSTANCES A LITTLE.  LET'S ASSUME

11:14AM 14   THAT NOW INSTEAD OF BEING AT THE BEGINNING OF THAT HOUR, WE'RE

11:14AM 15   45 MINUTES, 50 MINUTES INTO THAT HOUR, AND I'M STILL CLAIMING

11:14AM 16   I'M GOING TO RUN 10 MILES IN THIS HOUR, BUT I KNOW THAT I HAVE

11:14AM 17   NOT EVEN MADE IT TO THE END OF MY DRIVEWAY YET.

11:14AM 18        AT THAT POINT I DO NOT RECEIVE THE BENEFIT OF THE DOUBT.

11:14AM 19   I KNOW THERE'S NO WAY THAT I'M GOING TO ACHIEVE WHAT I SAY I'M

11:15AM 20   GOING TO ACHIEVE AND I'M BEING DISHONEST.  THAT'S WHAT YOU'RE

11:15AM 21   LOOKING AT ON THE SCREEN.

11:15AM 22        WHEN MR. BALWANI PROVIDED THESE PROJECTIONS IN OCTOBER OF

11:15AM 23   2014, PROJECTING, FOR EXAMPLE, $140 MILLION OF REVENUE IN THAT

11:15AM 24   YEAR, THE YEAR THAT WAS ALMOST OVER, HE WOULD HAVE KNOWN THAT

11:15AM 25   THERE WAS NO CHANCE OF THAT HAPPENING.  HE COULD NOT HAVE HAD A

11:15AM  1    GOOD FAITH BELIEF THAT THAT WAS GOING TO OCCUR.

11:15AM  2         AND HERE'S HOW WE KNOW.

11:15AM  3         LOOK AT THE ACTUAL HISTORICAL INCOME OF THE COMPANY FOR

11:15AM  4    THOSE YEARS, INCLUDING 2014, VERSUS WHAT WAS PROJECTED ON WHAT

11:15AM  5    WE JUST SAW GIVEN TO THE INVESTOR VICTIMS.

11:15AM  6         IN 2014 YOU SEE THAT THE ACTUAL REVENUE FOR THE COMPANY

11:15AM  7    ENDED UP BEING A MERE $150,000.  SO IN OCTOBER OF 2014 ON THE

11:15AM  8    ROAD TO EARNING $140 MILLION THAT YEAR, THERANOS HADN'T EVEN

11:15AM  9    REACHED THE END OF ITS DRIVEWAY, IT HADN'T EVEN TIED ITS SHOES,

11:16AM  10   IT WAS SO FAR OFF THE MARK FOR THAT PROJECTION, THAT YOU CAN BE

11:16AM  11   CONFIDENT VIEWING THIS AS A DISHONEST PROJECTION.  AND THAT'S

11:16AM  12   AN EXAMPLE OF HOW EVEN A FORWARD LOOKING STATEMENT CAN BE

11:16AM  13   DISHONEST IF WHEN IT'S MADE, THE PERSON MAKING IT KNOWS THAT

11:16AM  14   IT'S NOT GOING TO HAPPEN.

11:16AM  15        BY THE WAY, WHEN IT COMES TO THOSE 2015 NUMBERS, BOTH

11:16AM  16   SIDES HAVE DISCUSSED AND WITNESSES HAVE DISCUSSED HOW THAT

11:16AM  17   RELATES TO OR WOULD DEPEND ON THE STATUS OF THE WALGREENS

11:16AM  18   ROLLOUT AT THAT TIME.

11:16AM  19        AND THE EVIDENCE HAS SHOWN IN THIS TRIAL THAT MR. BALWANI

11:16AM  20   KNEW AT THIS TIME THAT THE WALGREENS ROLLOUT WAS STALLING, THAT

11:16AM  21   HE HAD NO GOOD FAITH REASON TO BELIEVE THAT THIS MANY LOCATIONS

11:16AM  22   WOULD BE ACHIEVABLE AT THAT TIME, AND THAT MEANS THAT HE WOULD

11:16AM  23   HAVE NO GOOD FAITH BELIEF IN THE TRUTH OF THAT REVENUE

11:16AM  24   PROJECTION.

11:17AM  25        YOU'LL RECALL THE DEFENSE'S BACK AND FORTH WITH

11:17AM 1    MR. JHAVERI, THE WALGREENS REP, ABOUT 2,000 STORES VERSUS 200

11:17AM 2    STORES; THE DEFENSE'S INSISTENCE THAT MR. JHAVERI MUST HAVE

11:17AM 3    MEANT 2,000 STORES AND MR. JHAVERI STAYING FIRM THAT, NO, HE

11:17AM 4    WAS VERY CLEAR WITH MR. BALWANI THAT 200 WAS THE NUMBER.  AND

11:17AM 5    WHEN HE SAID WE ARE GOING TO TOUCH 200 STORES, HE DIDN'T MEAN

11:17AM 6    REACH THAT LEVEL AT THE THERANOS ROLLOUT, HE MEANT THAT THEY

11:17AM 7    ARE GOING TO BE RENOVATING OR MAKING CHANGES TO THOSE STORES SO

11:17AM 8    THAT'S A GOOD TIME TO SEE WHICH ONE OF THEM WOULD BE PART OF

11:17AM 9    THAT THERANOS PROJECT.

11:17AM 10       MR. COOPERSMITH CONTINUES TO DISAGREE WITH MR. JHAVERI

11:17AM 11   ABOUT WHAT MR. JHAVERI MEANT.

11:17AM 12       HE'S FORCING YOU TO MAKE A CHOICE BETWEEN THE TESTIMONY OF

11:17AM 13   THIS WITNESS WHO ACTUALLY LIVED THESE EVENTS, MADE THESE

11:17AM 14   COMMUNICATIONS, OR TO REJECT THAT AND ACCEPT THE LAWYER'S

11:18AM 15   CHARACTERIZATION INSTEAD.

11:18AM 16       WE TALKED EARLIER ABOUT HOW STATEMENTS MADE BY LAWYERS ON

11:18AM 17   EITHER SIDE ARE NOT EVIDENCE.  I WOULD JUST URGE YOU TO KEEP

11:18AM 18   THAT IN MIND IN MAKING THAT DECISION THAT MR. COOPERSMITH IS

11:18AM 19   ASKING YOU TO MAKE BETWEEN BELIEVING THE WITNESS OR BELIEVING

11:18AM 20   HIM.

11:18AM 21       SIMILARLY, WHEN THE DEFENSE SHOWED YOU DURING CLOSING

11:18AM 22   EXHIBIT 1896, THAT IS AN EMAIL FROM MR. JHAVERI FROM AUGUST OF

11:18AM 23   2014 REFERENCING THE NEED TO GET VENOUS DOWN TO

11:18AM 24   10 PERCENT.  THE SELECTION THE DEFENSE SHOWED YOU ACTUALLY

11:18AM 25   STOPPED JUST ABOVE A CRITICAL LINE IN THAT DOCUMENT, AND FEEL

11:18AM  1    FREE TO GO LOOK AT IT WHEN YOU'RE DELIBERATING.  IT'S

11:18AM  2    EXHIBIT 1896 WHERE MR. JHAVERI SAYS REFERENCE TO GET VENOUS

11:18AM  3    DOWN TO 10 PERCENT, WE NEED TO HAVE A DOCUMENTED DETAILED PLAN

11:18AM  4    ON BOTH OR IT WILL BE DIFFICULT FOR ME HAVE TO CONVINCE

11:18AM  5    EXPANSION BEYOND ARIZONA.

11:19AM  6         SO MR. JHAVERI PUTTING MR. BALWANI DIRECTLY ON NOTICE THAT

11:19AM  7    UNLESS VEINOUS DROPS, UNLESS THAT PERCENTAGE GOES DOWN, THE

11:19AM  8    WALGREENS ROLLOUT WITH THERANOS MIGHT BE LIMITED ONLY TO

11:19AM  9    ARIZONA, THAT IT MIGHT NOT GO NATIONWIDE AT ALL.

11:19AM 10         IT'S ALSO REALLY IMPORTANT NOT TO FORGET OTHER STATEMENTS

11:19AM 11    MADE BY MR. BALWANI AND MS. HOLMES THAT ARE NOT IN THE FUTURE

11:19AM 12    TENSE.  I'M SHOWING YOU A SLIDE FROM INVESTOR PRESENTATIONS

11:19AM 13    THAT WERE GIVEN TO MULTIPLE INVESTORS IN THIS CASE, AND LOOK AT

11:19AM 14    THE LANGUAGE USED HERE.  HERE'S THE CLAIM THAT "THERANOS RUNS

11:19AM 15    ANY TEST AVAILABLE IN CENTRAL LABORATORIES, AND PROCESSES ALL

11:19AM 16    SAMPLE TYPES."  RIGHT UNDERNEATH A PICTURE OF A FINGERSTICK

11:19AM 17    BLOOD DRAW.

11:19AM 18         WHAT WOULD AN INVESTOR TAKE AWAY FROM SEEING THAT

11:19AM 19    LANGUAGE?  WHAT ELSE COULD THEY TAKE AWAY EXCEPT THAT

11:19AM 20    THERANOS'S TECHNOLOGY COULD RUN ANY TEST USING THIS METHOD?

11:19AM 21         BELOW THAT IT SAYS, "THERANOS PROVIDES THE HIGHEST LEVEL

11:20AM 22    OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE- AND

11:20AM 23    POST-ANALYTIC PROCESSES ENSURING THE HIGHEST LEVELS OF ACCURACY

11:20AM 24    AND PRECISION."

11:20AM 25         WHAT ELSE COULD AN INVESTOR TAKE AWAY FROM THAT, EXCEPT

11:20AM  1     WHAT THAT LANGUAGE SAYS, THAT THERANOS IS CAPABLE OF THOSE

11:20AM  2     THINGS AT THAT TIME.

11:20AM  3         SIMILAR CLAIMS HERE ABOUT THE HIGHEST LEVELS OF ACCURACY.

11:20AM  4     THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF ACCURACY.

11:20AM  5     AGAIN, THIS WAS PRESENTED DURING THE TIME WHEN THERANOS HAD

11:20AM  6     BEGUN PATIENT TESTING.  THERE WOULD HAVE BEEN NO REASON FOR

11:20AM  7     ANYONE SEEING THIS PRESENTATION TO THINK THAT THIS WAS FUTURE

11:20AM  8     OR SPECULATIVE INFORMATION.  THERE WAS NO WAY IT WAS EXPLAINED

11:20AM  9     THAT WAY.

11:20AM 10         ON THE CONTRARY.  THE WITNESSES TOLD YOU WHEN THIS

11:20AM 11     INFORMATION WAS PRESENTED IN PERSON, WHAT MS. HOLMES AND

11:20AM 12     MR. BALWANI SAID WAS CONSISTENT WITH THIS; THAT THESE WERE

11:20AM 13     PRESENTED AS PRESENT TENSE OR PAST TENSE ACHIEVEMENTS, THINGS

11:20AM 14     THAT THE COMPANY WAS CAPABLE OF AT THAT TIME.

11:21AM 15         LOOKING AT THIS, YOU MIGHT DECIDE THAT THESE INVESTOR

11:21AM 16     PRESENTATIONS ARE THE MOST IMPORTANT EVIDENCE IN THE CASE.  AND

11:21AM 17     YOU SHOULD KEEP THAT IN MIND WHEN YOU THINK ABOUT THE

11:21AM 18     COMPLAINTS FROM THE DEFENSE ABOUT CERTAIN THINGS THAT ARE

11:21AM 19     MISSING.  FOR EXAMPLE, MR. COOPERSMITH MENTIONED OVER AND OVER

11:21AM 20     AGAIN THE FACT THAT YOU WERE NOT PLAYED A TAPE OF A SINGLE

11:21AM 21     CONVERSATION THAT MS. HOLMES HAD WITH SOME INVESTORS.

11:21AM 22         AND HE CRITICIZED THE GOVERNMENT FOR NOT PROVIDING YOU

11:21AM 23     THAT EXACT LANGUAGE THAT MS. HOLMES WOULD HAVE USED IN THAT

11:21AM 24     CALL.

11:21AM 25         WELL, THANKFULLY FOR THE DECISION THAT YOU NEED TO MAKE,

11:21AM  1    YOU HAVE HUNDREDS OF PAGES OF THE EXACT LANGUAGE THAT

11:21AM  2    MR. BALWANI AND MS. HOLMES PROVIDED TO INVESTORS IN THESE

11:21AM  3    MEETINGS WHERE THEY WERE SEEKING INVESTMENTS FROM THESE WEALTHY

11:21AM  4    INDIVIDUALS.

11:21AM  5        IN CLOSING MR. COOPERSMITH DESCRIBED THESE PRESENTATIONS

11:22AM  6    IN A WAY THAT MINIMIZED THEM I THINK YOU'LL RECALL.  I THINK

11:22AM  7    THE WORD HE USED WAS "HODGEPODGE."  HE EXPLAINED OR CLAIMED

11:22AM  8    THAT THIS WAS A COLLECTION OF MATERIALS PREPARED FOR DIFFERENT

11:22AM  9    REASONS, AND I JUST WANT TO MAKE SURE THAT WE'RE CLEAR ABOUT

11:22AM 10    WHAT THESE ARE.  THESE ARE THE WRITTEN MATERIALS THAT THE

11:22AM 11    DEFENDANTS WHO RAN THIS COMPANY WERE GIVING TO VERY WEALTHY

11:22AM 12    POTENTIAL INVESTORS, WHEN THEY WERE ASKING THOSE INVESTORS TO

11:22AM 13    MAKE THE DECISION TO INVEST TENS OF MILLIONS, SOMETIMES UPWARDS

11:22AM 14    OF A HUNDRED MILLION DOLLARS IN THE COMPANY.  YOU SHOULD NOT

11:22AM 15    BELIEVE ANY SUGGESTION THAT THESE WRITTEN MATERIALS WERE NOT

11:22AM 16    CLOSELY MONITORED AND PAID ATTENTION TO BY THE TOP TWO PEOPLE

11:22AM 17    AT THIS COMPANY.  THESE WERE VERY IMPORTANT.  THESE MATERIALS

11:22AM 18    HAD AN IMPORTANT ROLE TO PLAY.  MILLIONS AND MILLIONS, HUNDREDS

11:22AM 19    OF MILLIONS OF DOLLARS RODE ON THE ABILITY OF THESE WRITTEN

11:23AM 20    MATERIALS TO CONVINCE PEOPLE TO WRITE CHECKS TO THE COMPANY.

11:23AM 21        SO YOU SHOULD PAY ATTENTION TO THE LANGUAGE HERE JUST LIKE

11:23AM 22    THE INVESTOR VICTIMS DID.  THAT'S WHAT THE DEFENDANTS WANTED

11:23AM 23    THEM TO DO.

11:23AM 24        YOUR HONOR, I'M ABOUT TO SHIFT GEARS TO A DIFFERENT TOPIC.

11:23AM 25        I'M STILL ON TRACK -- I'M FAR MORE THAN HALF WAY DONE, BUT

| | | |
|---|---|---|
| 11:23AM | 1 | NOW MIGHT BE A GOOD TIME FOR A BREAK. |
| 11:23AM | 2 | THE COURT: OKAY. ALL RIGHT. LET'S DO THAT. |
| 11:23AM | 3 | SHOULD WE TAKE A 20 MINUTE BREAK? LET'S TAKE A 20 MINUTE |
| 11:23AM | 4 | BREAK, LADIES AND GENTLEMEN, AND THEN WE'LL RETURN. |
| 11:23AM | 5 | (RECESS FROM 11:23 A.M. UNTIL 12:00 P.M.) |
| 12:01PM | 6 | THE COURT: ALL RIGHT. THANK YOU. |
| 12:01PM | 7 | WE'RE BACK ON THE RECORD. OUR JURY AND ALTERNATES ARE |
| 12:01PM | 8 | PRESENT. ALL COUNSEL, MR. BALWANI IS PRESENT. |
| 12:01PM | 9 | MR. BOSTIC, WOULD YOU LIKE TO CONTINUE? |
| 12:01PM | 10 | MR. BOSTIC: YES, YOUR HONOR. THANK YOU. |
| 12:01PM | 11 | MEMBERS OF THE JURY, WELCOME BACK. I JUST HAVE A COUPLE |
| 12:01PM | 12 | MORE TOPICS TO DISCUSS WITH YOU. MAYBE A QUARTER LEFT IN OUR |
| 12:01PM | 13 | CONVERSATION FOR TODAY. |
| 12:01PM | 14 | LET'S TALK NEXT ABOUT ELIZABETH HOLMES AND HER ROLE HERE. |
| 12:01PM | 15 | THE DEFENSE MADE SOME MENTION OF MS. HOLMES IN THEIR CLOSING, |
| 12:02PM | 16 | AND THE SUGGESTION WAS THAT MR. BALWANI WOULD HAVE HAD THE SAME |
| 12:02PM | 17 | PERSPECTIVE ON MS. HOLMES AS EVERYONE ELSE THAT YOU HEARD ABOUT |
| 12:02PM | 18 | IN THIS CASE; THAT HE WOULD HAVE BEEN IMPRESSED BY HER |
| 12:02PM | 19 | CHARISMA, HER DEDICATION, HER INTELLIGENCE. |
| 12:02PM | 20 | AND THOSE THINGS MAY BE TRUE TO A CERTAIN EXTENT. BUT YOU |
| 12:02PM | 21 | SHOULD NOT BELIEVE THAT MR. BALWANI'S PERSPECTIVE ON MS. HOLMES |
| 12:02PM | 22 | WAS THE OUTSIDER'S PERSPECTIVE. HE WOULD NOT HAVE BEEN STAR |
| 12:02PM | 23 | STRUCK BY HER. HE KNEW HER VERY WELL. AS YOU KNOW, THEY WERE |
| 12:02PM | 24 | NOT JUST BUSINESS PARTNERS, THEY WERE ALSO ROMANTIC PARTNERS. |
| 12:02PM | 25 | THEY COLLABORATED TOGETHER ON MANY, IF NOT ALL, ASPECTS OF |

12:02PM   1    RUNNING THIS COMPANY TOGETHER.  SO THEY WERE PARTNERS IN EVERY

12:02PM   2    SENSE OF THE WORD.

12:02PM   3         IN THE FIRST MINUTE OF THE DEFENSE OPENING, YOU HEARD THE

12:02PM   4    CLAIM SUNNY BALWANI DID NOT START THERANOS, HE DID NOT CONTROL

12:03PM   5    THERANOS, HE DID NOT HAVE FINAL BUSINESS DECISION MAKING

12:03PM   6    AUTHORITY AT THERANOS.

12:03PM   7         AFTER THE TRIAL, THERE REMAINS NO DISPUTE AT LEAST ON THAT

12:03PM   8    FIRST POINT.  MR. BALWANI WAS NOT THERE AT THE INCEPTION OF THE

12:03PM   9    COMPANY.  MS. HOLMES FOUNDED IT, AND HE JOINED LATER.

12:03PM  10         BUT WHEN IT COMES TO HIS CONTROL AT THE COMPANY, HIS

12:03PM  11    DECISION MAKING POWER, THE EVIDENCE HAS SHOWN THAT HE HAD A LOT

12:03PM  12    AT THE COMPANY AND THAT HE WIELDED IT.

12:03PM  13         IN CLOSING, THE DEFENSE SAID SOMETHING A LITTLE DIFFERENT.

12:03PM  14    MR. COOPERSMITH SAID MR. BALWANI WAS THE COO AND PRESIDENT OF

12:03PM  15    THERANOS.  OF COURSE HE HAD A HAND IN MAKING DECISIONS AT

12:03PM  16    THERANOS.  DEFENSE HAS NEVER SAID OTHERWISE.

12:03PM  17         HE ALSO SAID THAT MR. BALWANI WAS A VERY SENIOR OFFICER AT

12:03PM  18    THERANOS, THAT THE DEFENSE WASN'T CLAIMING OTHERWISE, AND THAT

12:03PM  19    HE WAS RESPONSIBLE, ALONG WITH MS. HOLMES, FOR THE OPERATION OF

12:03PM  20    THERANOS.

12:04PM  21         THAT IS TRUE, AND THAT IS WHAT THE EVIDENCE HAS SHOWN.

12:04PM  22         THE EVIDENCE HAS SHOWN THAT MS. HOLMES AND MR. BALWANI

12:04PM  23    WERE REALLY IN THEIR OWN CATEGORY OF LEADERSHIP AT THE COMPANY.

12:04PM  24    SOME COMPANIES YOU MIGHT IMAGINE ARE A LADDER WITH PEOPLE AT

12:04PM  25    ALL DIFFERENT LEVELS OF LEADERSHIP, SOME COMPANIES MIGHT BE RUN

REBUTTAL ARGUMENT BY MR. BOSTIC                    7651

12:04PM   1    BY A SINGLE PERSON.  THIS WAS AN ORGANIZATION RUN AND

12:04PM   2    CONTROLLED BY TWO PEOPLE WHO WIELDED THAT POWER TOGETHER, AND

12:04PM   3    THAT'S WHAT THE EVIDENCE HAS SHOWN, THAT'S WHAT THE DOCUMENTS

12:04PM   4    SHOW, THAT'S WHAT THE WITNESSES HAVE TESTIFIED TO.

12:04PM   5         MR. BALWANI WAS WITH MS. HOLMES AT THE TOP OF THE ORG

12:04PM   6    CHART FOR THE COMPANY.  HE WAS THE CHIEF OPERATING OFFICER AND

12:04PM   7    PRESIDENT.

12:04PM   8         MS. HOLMES AND MR. BALWANI WERE ALSO THE ONLY TWO OFFICERS

12:04PM   9    OF THE COMPANY WHO WERE ON THE BOARD AS WELL.  SO THEY WERE THE

12:04PM  10    ONLY PEOPLE WHO HAD THAT BOARD AUTHORITY AND WERE ALSO INVOLVED

12:04PM  11    IN THE DAY-TO-DAY RUNNING OF THE COMPANY'S OPERATIONS.

12:04PM  12         WHEN MR. EDLIN WAS ON THE STAND, AND YOU RECALL THAT HE

12:04PM  13    WAS A LONG-TIME EMPLOYEE AT THERANOS WHO WAS FRIENDS WITH

12:05PM  14    MS. HOLMES'S BROTHER FROM COLLEGE, AND HE HAD A GOOD SENSE OF

12:05PM  15    MS. HOLMES AND MR. BALWANI'S WORKING RELATIONSHIP BECAUSE OF

12:05PM  16    WHERE HE SAT IN THE COMPANY AND HIS ROLE AT THE COMPANY.

12:05PM  17         AND HE TESTIFIED THAT THEY COLLABORATED ON MANY THINGS,

12:05PM  18    THAT HE SAW THEM HAVING CONVERSATIONS FREQUENTLY ABOUT THE

12:05PM  19    COMPANY, THAT THEY BOTH HAD A GREAT DEAL OF AUTHORITY IN THE

12:05PM  20    COMPANY, AND THAT THEY WERE IN THEIR OWN CATEGORY AT THE

12:05PM  21    COMPANY IN TERMS OF HAVING ACCESS TO ALL INFORMATION.

12:05PM  22         YOU HEARD WITNESSES TALK ABOUT HOW INFORMATION AT THE

12:05PM  23    COMPANY WAS SILOED, HOW THERE WERE RULES AND RESTRICTIONS ON

12:05PM  24    THE ABILITY OF EMPLOYEES TO SHARE INFORMATION, NOT JUST OUTSIDE

12:05PM  25    OF THE COMPANY BUT WITHIN THE COMPANY AS WELL.  THERE WERE

12:05PM  1    SECRETS THAT EMPLOYEES WERE REQUIRED TO KEEP FROM EACH OTHER.

12:05PM  2        NONE OF THAT APPLIED TO MR. BALWANI OR MS. HOLMES.  THAT'S

12:05PM  3    WHAT MR. EDLIN TOLD YOU.  THEY WERE THE ONLY PEOPLE WHO HAD

12:05PM  4    THAT STATUS, THE STATUS OF BEING ALLOWED TO KNOW EVERYTHING

12:05PM  5    THAT WAS HAPPENING IN THE COMPANY.

12:05PM  6        AND THE EVIDENCE SUGGESTS THAT THEY DID HAVE COMPLETE

12:06PM  7    COMPREHENSIVE KNOWLEDGE OF WHAT WAS HAPPENING AT THERANOS, AND

12:06PM  8    IMPORTANTLY FOR THIS CASE, WHAT WAS NOT HAPPENING AT THERANOS.

12:06PM  9        IT'S NO SURPRISE THAT MR. BALWANI HAD A LOT OF AUTHORITY.

12:06PM 10    BESIDES HIS POSITION THAT WE TALKED ABOUT, YOU CAN ALSO INFER

12:06PM 11    THAT HIS CLOSE RELATIONSHIP WITH MS. HOLMES WOULD HAVE GIVEN

12:06PM 12    HIM A LOT OF INFLUENCE OVER HER, MORE THAN JUST HIS TITLE ALONE

12:06PM 13    WOULD PROVIDE.

12:06PM 14        REMEMBER ALSO THAT MR. BALWANI WAS OLDER AND MORE

12:06PM 15    EXPERIENCED THAN MS. HOLMES.  SO IT WOULD BE NO SURPRISE THAT

12:06PM 16    HIS ADVISE, HIS INPUT WOULD CARRY A LOT OF WEIGHT WITH HER.

12:06PM 17    AND THAT'S WHAT SHOWED UP IN THE TEXT MESSAGES.

12:06PM 18        IF YOU LOOK AT 5387H, YOU'LL GET A SENSE OF HOW THEY

12:06PM 19    INTERACTED WITH EACH OTHER AND YOU WILL SEE THAT MR. BALWANI

12:06PM 20    WAS NOT SHY ABOUT EXPRESSING HIS OPINIONS AND THAT MS. HOLMES

12:06PM 21    WAS RECEPTIVE TO THAT INPUT FROM MR. BALWANI.

12:06PM 22        AND SPEAKING OF MR. BALWANI NOT BEING SHY, I THINK YOU

12:07PM 23    ALSO HAVE A SENSE FROM THE WITNESS TESTIMONY AND FROM THE

12:07PM 24    CORRESPONDENCE THAT YOU'VE SEEN THAT MR. BALWANI WAS NOT

12:07PM 25    HESITANT ABOUT THROWING HIS WEIGHT AROUND AT THE COMPANY.  HE

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7653

12:07PM  1    DIDN'T MINCE WORDS.  HE WAS VERY, I THINK, DIRECT WOULD BE A

12:07PM  2    CHARITABLE WAY TO PUT IT.  SO PEOPLE KNEW WHAT HIS WORDS WERE,

12:07PM  3    AND HE CERTAINLY DID NOT HOLD BACK IN USING HIS AUTHORITY ABOUT

12:07PM  4    WHAT WAS GOING TO HAPPEN AT THE COMPANY THAT HE WAS RUNNING.

12:07PM  5        NOWHERE WAS THIS MORE EVIDENT THAN IN THE LAB.  THE CLIA

12:07PM  6    LAB WAS THE CENTER OF THERANOS IN MANY WAYS.  IT WAS THE PLACE

12:07PM  7    WHERE PATIENT SAMPLES WERE ACTUALLY TESTED.  SO THE SERVICE

12:07PM  8    THAT THE COMPANY WAS OFFERING TO THE PUBLIC OF BLOOD TESTING

12:07PM  9    FOR CLINICAL USE, THIS ALL HAPPENED WITHIN THE CLIA LAB.

12:07PM  10       AND HERE YOU SEE THE ORG CHART FOR THAT PART OF THE

12:07PM  11   COMPANY WITH MR. BALWANI SITTING ON TOP OF EVERYONE WHO WORKED

12:07PM  12   IN THE LAB AND THE ONLY PERSON ABOVE HIM BEING MS. HOLMES.

12:08PM  13       ONE INTERESTING THING JUST TO REMIND YOU, MR. BALWANI WAS

12:08PM  14   ALSO LISTED AS A CLINICAL LAB ASSISTANT.  AND YOU CAN SEE THAT

12:08PM  15   WITH HIS MBA THAT HE REALLY STANDS OUT IN THAT LIST.

12:08PM  16       SO NOT ONLY WAS MR. BALWANI VERY INVOLVED IN THE LAB, BUT

12:08PM  17   HE WAS KIND OF SANDWICHING BOTH ENDS OF THE LAB IN TERMS OF THE

12:08PM  18   ORG CHART.

12:08PM  19       AND THE EVIDENCE SHOWED THAT THIS WASN'T JUST A POSITION

12:08PM  20   ON PAPER.  MR. BALWANI WAS VERY INVOLVED IN THE DAY-TO-DAY

12:08PM  21   RUNNING OF THE LAB.  WHEN ISSUES CAME UP, MR. BALWANI WAS TOLD.

12:08PM  22   HE MADE DECISIONS ABOUT HOW TO RESPOND TO ISSUES THAT CAME UP

12:08PM  23   IN THE LAB.

12:08PM  24       SO WHEN YOU -- KEEP IN MIND THAT THE LAB WAS REALLY GROUND

12:08PM  25   ZERO FOR ALL OF THE PROBLEMS THAT THERANOS HAD WITH TESTING

ER-5307

12:08PM 1 ACCURACY AND RELIABILITY.  THAT TELLS YOU THAT MR. BALWANI

12:08PM 2 WOULD HAVE BEEN AWARE OF THOSE PROBLEMS.  AND YOU SEE THE

12:08PM 3 DIRECT EVIDENCE THAT HE WAS AWARE OF THOSE PROBLEMS.  YOU DON'T

12:08PM 4 NEED TO INFER OR GUESS THAT.

12:09PM 5   NOT WAS MR. BALWANI IN A FRONT ROW SEAT FOR THOSE

12:09PM 6 PROBLEMS, BUT HE WAS ALSO IN THE DRIVER SEAT BECAUSE HE WAS THE

12:09PM 7 ONE WHO WAS RESPONSIBLE FOR THE OPERATIONS OF THE LAB.  AND YOU

12:09PM 8 SEE THAT EVEN BEYOND BEING RESPONSIBLE FOR THE BUSINESS

12:09PM 9 OPERATIONS, HE ALSO FREQUENTLY OVERRODE OR OVERRULED PEOPLE IN

12:09PM 10 THE LAB DIRECTOR POSITION WHO SHOULD HAVE BEEN MAKING DECISIONS

12:09PM 11 ABOUT WHETHER TESTS WERE APPROPRIATE FOR USE ON PATIENTS OR

12:09PM 12 NOT.

12:09PM 13   SO MR. BALWANI, VERY INVOLVED ON THE LAB SIDE OF THINGS,

12:09PM 14 VERY INVOLVED IN THE ASPECTS OF THE COMPANY THAT WERE FACING

12:09PM 15 PATIENTS, BUT HE WAS FAR FROM PASSIVE ON THE INVESTOR SIDE.

12:09PM 16   YOU HEARD TESTIMONY ABOUT MR. BALWANI AND MS. HOLMES

12:09PM 17 MAKING DECEPTIVE PITCHES TO INVESTORS TOGETHER, THEM BOTH BEING

12:10PM 18 IN THE ROOM WHILE INFORMATION WAS PRESENTED TO INVESTORS IN

12:10PM 19 ORDER TO GIVE THEM A FALSE IMPRESSION OF WHAT WAS HAPPENING AT

12:10PM 20 THE COMPANY.

12:10PM 21   YOU ALSO SAW THEIR TEXT MESSAGES AND WHERE THEY

12:10PM 22 COORDINATED ABOUT INCOMING INVESTMENTS.

12:10PM 23   SO MR. BALWANI WAS CERTAINLY NOT LEAVING THAT SIDE OF

12:10PM 24 THINGS TO MS. HOLMES, HE WAS AN ACTIVE PARTICIPANT IN THAT

12:10PM 25 SIDE, TOO.

ER-5308

12:10PM   1            AND THE BEST EXAMPLE, PERHAPS THE BEST ABOUT EXAMPLE OF

12:10PM   2   THIS THAT YOU HAVE SEEN IS IN A CONVERSATION THAT HE HAD WITH

12:10PM   3   AN INVESTOR NAMED PAT MENDENHALL.  AND THIS EMAIL WILL BE

12:10PM   4   FAMILIAR TO YOU.  THIS IS EXHIBIT 4059.  THIS IS A VERY

12:10PM   5   IMPORTANT EXHIBIT WHEN IT COMES TO SHOWING MR. BALWANI'S ACTIVE

12:10PM   6   PARTICIPATION, NOT JUST HIS SUPPORT FOR THE INVESTOR SIDE OF

12:10PM   7   THE FRAUD, BUT HIS ACTIVE PARTICIPATION, HELPING THAT SIDE OF

12:10PM   8   THINGS WHEN HE WAS AT THERANOS.

12:10PM   9            YOU'LL RECALL THAT IN DECEMBER 2013 THERANOS WAS PITCHING

12:10PM  10   TO A NUMBER OF DIFFERENT INVESTORS.  THEY NEEDED MONEY, THEY

12:11PM  11   WERE PERSUADING INDIVIDUALS TO WRITE CHECKS TO THE COMPANY SO

12:11PM  12   THAT THE COMPANY CAN CONTINUE OPERATIONS.

12:11PM  13            WHEN MR. MENDENHALL NEEDED INFORMATION, THE EVIDENCE SHOWS

12:11PM  14   THAT MS. HOLMES PUT HIM IN TOUCH WITH SUNNY BALWANI.  THAT'S

12:11PM  15   IMPORTANT.

12:11PM  16            AROUND THIS TIME YOU KNOW THAT MS. HOLMES WAS ESPECIALLY

12:11PM  17   ACTIVE IN DECEIVING MULTIPLE INVESTORS IN A VARIETY OF TOPICS,

12:11PM  18   AND MR. BALWANI WAS INVOLVED AS WELL AND HE WAS ASSISTING WITH

12:11PM  19   THAT.  THERE WERE SOME INVESTORS WHO MS. HOLMES SPOKE WITH ON

12:11PM  20   HER OWN.

12:11PM  21            WHEN MS. HOLMES PUT MR. MENDENHALL IN TOUCH WITH

12:11PM  22   MR. BALWANI, IT TELLS YOU SOMETHING IMPORTANT ABOUT THE NATURE

12:11PM  23   OF THEIR PARTNERSHIP AND HOW THEY WORKED TOGETHER HERE BECAUSE

12:11PM  24   THINK ABOUT WHAT WAS AT STAKE.  THE COMPANY WAS RAISING MONEY

12:11PM  25   FROM A SERIES OF VERY WEALTHY INDIVIDUALS, SO A LOT RODE ON

12:11PM    1    EACH ONE OF THESE CONVERSATIONS.

12:12PM    2        ANY ONE OF THESE CONVERSATIONS COULD HAVE RESULTED IN A

12:12PM    3    MULTIMILLION DOLLAR CHECK BEING WRITTEN TO THE COMPANY, PERHAPS

12:12PM    4    FOR TENS OF MILLIONS, PERHAPS FOR HUNDREDS OF MILLIONS OF

12:12PM    5    DOLLARS.

12:12PM    6        OR IF THE CONVERSATION DID NOT GO WELL, THAT COULD RESULT

12:12PM    7    IN ZERO MONEY COMING IN FOR THE COMPANY, IT COULD RESULT IN BAD

12:12PM    8    WORD OF MOUTH FOR THE COMPANY IN THE INVESTOR COMMUNITY,

12:12PM    9    BECAUSE THE DEFENDANTS WERE AWARE OF HOW THESE INVESTORS

12:12PM   10    COMMUNICATED WITH EACH OTHER AS WELL.

12:12PM   11        INFORMATION WAS SPREADING NOT JUST DIRECTLY FROM THE

12:12PM   12    DEFENDANTS BUT ALSO BETWEEN THE PEOPLE THAT THE DEFENDANTS WERE

12:12PM   13    TALKING TO.

12:12PM   14        SO WHEN MR. MENDENHALL WANTED TO ASK QUESTIONS ABOUT THE

12:12PM   15    COMPANY, WHAT DOES IT TELL YOU THAT MS. HOLMES PUT HIM IN TOUCH

12:12PM   16    WITH HER PARTNER, MR. BALWANI?

12:12PM   17        WELL, IT TELLS YOU JUST THAT, THAT THEY WERE PARTNERS ON

12:12PM   18    THIS SIDE OF THINGS BECAUSE YOU KNOW THAT IF INVESTORS HAD BEEN

12:12PM   19    TOLD THE TRUTH ABOUT THERANOS, IF INVESTORS WERE TOLD ABOUT THE

12:12PM   20    LIMITATIONS OF THE TECHNOLOGY, ABOUT THE ACCURACY PROBLEMS,

12:13PM   21    ABOUT WHAT THE EDISON COULDN'T DO, ABOUT THE COMPANY'S RELIANCE

12:13PM   22    ON THIRD PARTY DEVICES INSTEAD OF ITS OWN, IF INVESTORS KNEW

12:13PM   23    ALL OF THAT, I THINK IT'S FAIR FOR YOU TO INFER THAT THEY WOULD

12:13PM   24    HAVE BEEN FAR LESS INTERESTED IN INVESTING.  THAT MEANS THAT

12:13PM   25    MILLIONS OF DOLLARS, MILLIONS AND MILLIONS OF DOLLARS RODE ON

| | |
|---|---|
| 12:13PM | 1 |

INVESTORS RECEIVING THE SAME MESSAGE, THE SAME FRAUDULENT

MESSAGE FROM WHOEVER WAS PITCHING THEM FROM THERANOS.

SO BY ASSIGNING MR. BALWANI TO SPEAK TO MR. MENDENHALL,

MS. HOLMES WAS CONFIRMING THAT SHE HAD CONFIDENCE IN

MR. BALWANI TO DELIVER THOSE SAME FALSE STATEMENTS, THOSE SAME

MISLEADING REPRESENTATIONS THAT SHE HAD BEEN DELIVERING TO

INVESTORS.

IF SHE HADN'T BEEN CONFIDENT OF THAT, SHE WOULD HAVE

NEEDED TO HANDLE THIS CONVERSATION HERSELF, BECAUSE, AGAIN,

MILLIONS OF DOLLARS DEPENDED ON THIS INVESTOR HEARING THOSE

SAME LIES.

SURE ENOUGH, MR. BALWANI CAME THROUGH.  AND THIS EMAIL

MEMORIALIZES THE STATEMENTS, THE CLAIMS THAT MR. MENDENHALL

HEARD FROM MR. BALWANI.

AND YOU SEE HERE THOSE CLAIMS INCLUDE THINGS LIKE THE

SCIENCE BEHIND THERANOS BEING COMPLETE; NO NEW SCIENCE NEEDED;

NO NEW INVENTION NEEDED.

IT GOES ON TO CLAIM -- OR MR. BALWANI WENT ON TO CLAIM

THAT THERANOS IS COMPLETELY VERTICALLY INTEGRATED, THEY OWN THE

LAB AND THE MANUFACTURING; 100 PERCENT MANUFACTURING IN THE

U.S.A., NO SUBCONTRACTING; IT SAYS FULLY OWNED AND PROTECTED

MANUFACTURING ASSURES PRICING AND PROFIT STABILITY.

THOSE POINTS, 6, 7, AND 8, BY THE WAY, I DON'T BELIEVE

THAT MR. COOPERSMITH ADDRESSED DURING HIS CLOSING.

DURING HIS CLOSING HE DID REVIEW THIS EMAIL WITH YOU, AND

| | | |
|---|---|---|
| 12:14PM | 1 | HE PURPORTED TO EXPLAIN SOME OF THESE TO YOU.  YOU HEARD FROM |
| 12:14PM | 2 | THE WITNESS HIMSELF, MR. MENDENHALL, ABOUT THIS DOCUMENT, AND |
| 12:14PM | 3 | THE CONVERSATION THAT LED TO IT. |
| 12:14PM | 4 | AGAIN, I WOULD JUST REMIND YOU THAT WHAT IS EVIDENCE IS |
| 12:15PM | 5 | THE SWORN TESTIMONY OF THE WITNESSES TESTIFYING ABOUT THEIR |
| 12:15PM | 6 | FIRST HAND KNOWLEDGE.  WHAT OTHER LAWYERS SAY OR WHAT ANY |
| 12:15PM | 7 | LAWYER SAYS IN THIS CASE IS NOT EVIDENCE, SO PLEASE MAKE SURE |
| 12:15PM | 8 | YOU'RE RELYING ON THE RIGHT SOURCES TO HELP YOU UNDERSTAND THIS |
| 12:15PM | 9 | CONVERSATION. |
| 12:15PM | 10 | WHEN IT COMES TO THOSE POINTS ABOUT THERANOS'S |
| 12:15PM | 11 | MANUFACTURING, YOU KNOW THAT THE COMPANY WAS NOT MANUFACTURING |
| 12:15PM | 12 | ALL OF ITS OWN DEVICES, THAT ITS OPERATIONS WERE NOT INTEGRATED |
| 12:15PM | 13 | IN THAT WAY BECAUSE IT WAS, IN FACT, DEPENDENT UPON ITS ABILITY |
| 12:15PM | 14 | TO GET ANALYZERS AND EQUIPMENT FROM OTHER COMPANIES IN ORDER TO |
| 12:15PM | 15 | RUN THE MAJORITY OF ITS TESTS.  SO THESE CLAIMS THAT |
| 12:15PM | 16 | MR. BALWANI MADE ARE NOT TRUE. |
| 12:15PM | 17 | YOU CAN UNDERSTAND WHY THEY WOULD BE MADE.  IT'S MORE |
| 12:15PM | 18 | IMPRESSIVE IF A COMPANY IS INTEGRATED IN THIS WAY, IT MAKES |
| 12:15PM | 19 | THEM MORE SELF-SUFFICIENT, AND IT INCREASES THE VIEW OF THEIR |
| 12:15PM | 20 | TECHNOLOGY BEING SOMETHING NOVEL AND IMPRESSIVE. |
| 12:15PM | 21 | BUT WE KNOW THAT IS NOT TRUE, WHAT MR. BALWANI SAID. |
| 12:15PM | 22 | ITEM 12 ON THAT LIST TALKS ABOUT CURRENT CLINICAL TRIALS |
| 12:16PM | 23 | TAKING 6 VIALS OF BLOOD AND BEING ABLE TO RUN 10 TO 12 TESTS. |
| 12:16PM | 24 | IT SAYS THERANOS TAKES 3 DROPS AND CAN RUN 60 TO 70 TESTS. |
| 12:16PM | 25 | MR. COOPERSMITH SUGGESTED TO YOU THAT THAT WAS A TRUE |

12:16PM  1    STATEMENT, TALKING ABOUT THE TOTAL NUMBER OF FINGERSTICK TESTS

12:16PM  2    THAT THERANOS COULD DO.  THAT'S NOT WHAT THIS SAYS, THOUGH.

12:16PM  3    THIS IS TALKING ABOUT THE NUMBER OF TESTS THAT CAN BE PERFORMED

12:16PM  4    ON A SINGLE PATIENT SAMPLE, AND THAT'S CLEAR BASED ON THE FIRST

12:16PM  5    PART OF THAT BULLET.  YOU SEE THE FIRST PART IS ABOUT CURRENT

12:16PM  6    CLINICAL TRIALS BEING ABLE TO RUN 10 TO 12 TESTS ON 6 VIALS OF

12:16PM  7    BLOOD.  OBVIOUSLY CLINICAL TRIALS HAD THE ABILITY TO RUN MORE

12:16PM  8    THAN 10 TO 12 TESTS TOTALLY.  EXISTING TECHNOLOGY COULD RUN

12:16PM  9    HUNDREDS OF TESTS AS YOU KNOW.

12:16PM  10        SO DOING AN APPLES-TO-APPLES COMPARISON HERE, WHAT THIS IS

12:16PM  11   A CLAIM ABOUT IS THAT THERANOS CAN RUN 60 TO 70 TESTS ON A

12:16PM  12   SINGLE SAMPLE OF BLOOD.

12:17PM  13        YOU CAN UNDERSTAND THE REASON WHY MR. BALWANI WOULD WANT

12:17PM  14   AN INVESTOR TO BELIEVE THAT.

12:17PM  15        MORE MISREPRESENTATIONS WHEN IT COMES TO THE FINANCIAL

12:17PM  16   STATUS OF THE COMPANY.  THAT CLAIM THAT THE COMPANY COULD FUND

12:17PM  17   GROWTH THROUGH CURRENT OPERATIONS AND THEY HAD NO NEED FOR

12:17PM  18   CAPITAL.  YOU KNOW THAT'S NOT CORRECT FROM SEEING THE FINANCIAL

12:17PM  19   RECORDS.  YOU KNOW THAT THE COMPANY WAS GETTING MINIMAL REVENUE

12:17PM  20   AT THAT POINT, AND THAT IT WAS DEPENDENT ON INVESTORS FOR ITS

12:17PM  21   CONTINUED OPERATIONS.

12:17PM  22        YOU'LL RECALL THAT THIS EMAIL WAS ALSO FORWARDED TO

12:17PM  23   MR. EISENMAN WHO WAS AN INDICTED COUNT, SO PLEASE KEEP THAT IN

12:17PM  24   MIND WHEN YOU CONSIDER OR DELIBERATE ON THAT COUNT, THAT THIS

12:17PM  25   INFORMATION FROM MR. BALWANI DID FIND ITS WAY TO MR. EISENMAN

ER-5313

12:17PM  1    WHO WAS ABLE TO RELY ON IT IN MAKING HIS DECISION.

12:17PM  2         ALSO REMEMBER MR. BALWANI'S ROLE IN SPEAKING WITH

12:18PM  3    MR. EISENMAN ABOUT A 2014 REPORT THAT MR. EISENMAN SAW THAT HAD

12:18PM  4    SOME NEGATIVE INFORMATION ABOUT THERANOS, LIKE THE FACT THAT

12:18PM  5    THE LAB NEEDED TO TRANSPORT SAMPLES IN ORDER TO TEST THEM, AND

12:18PM  6    THE FACT THAT THE ANALYST WHO WROTE THAT REPORT WAS DOUBTFUL OR

12:18PM  7    SKEPTICAL THAT ALL OF THE TESTS COULD BE DONE ON THE SAME

12:18PM  8    DEVICE.

12:18PM  9         WHEN MR. EISENMAN ASKED MR. BALWANI ABOUT THAT, THE

12:18PM  10   RESPONSE HE GOT BACK FROM MR. BALWANI WAS SOUNDS LIKE AN

12:18PM  11   UNINFORMED CONSULTANT TO US.  THAT WAS DENYING THE TRUTH OF THE

12:18PM  12   STATEMENTS IN THAT ANALYST REPORT.  IN FACT, YOU KNOW THAT

12:18PM  13   THOSE STATEMENTS WERE TRUE.  AND THAT'S EXHIBIT 2057 IF YOU

12:18PM  14   WOULD LIKE TO LOOK AT IT LATER.  THAT WAS AN IMPORTANT CHANCE

12:18PM  15   FOR MR. BALWANI TO COME CLEAN AND BE HONEST ABOUT WHAT WAS

12:18PM  16   REALLY HAPPENING AT THERANOS.  AND INSTEAD, HE DOUBLED DOWN AND

12:18PM  17   DENIED A TRUE REPORT TO SOMEONE WHO HAD PREVIOUSLY TRUSTED

12:19PM  18   THERANOS WITH HIS INVESTMENT MONEY.

12:19PM  19        SO WE'VE TALKED ABOUT HOW MR. BALWANI WAS INFLUENTIAL AT

12:19PM  20   THERANOS.  HE WAS INFLUENTIAL OVER MS. HOLMES AS WELL.

12:19PM  21        WHAT KIND OF INFLUENCE WAS HE ON MS. HOLMES?  LET'S LOOK

12:19PM  22   AT AN EXAMPLE OF THAT.  THIS IS FROM OCTOBER OF 2015.  AND

12:19PM  23   YOU'LL RECALL THAT AROUND MID-2015 AN ARTICLE CAME OUT IN "THE

12:19PM  24   WALL STREET JOURNAL" THAT WAS VERY NEGATIVE ABOUT THERANOS, AND

12:19PM  25   THERE WERE A LOT OF RIPPLE EFFECTS THAT HAPPENED AFTER THAT.

12:19PM  1        AND YOU SEE HERE A TEXT CHAIN BETWEEN MR. BALWANI AND

12:19PM  2   MS. HOLMES IN THE AFTERMATH OF THAT.

12:19PM  3        MR. BALWANI TALKS ABOUT WAG OR WALGREENS FREAKING OUT.

12:19PM  4   LACK OF TRANSPARENCY.

12:19PM  5        APPARENTLY WALGREENS WAS WONDERING WHY THEY FOUND ALL OF

12:19PM  6   THIS OUT THROUGH MEDIA AND NOT THROUGH US.

12:19PM  7        AND THEN YOU SEE THERE WAS A CALL WITH NIM, REFERENCING

12:20PM  8   NIMESH JHAVERI.

12:20PM  9        MR. BALWANI WRITES, "I TOLD THEM WE WERE SURPRISED BY THE

12:20PM  10  ARTICLE AS MUCH AS THEY R."

12:20PM  11       DO YOU SEE THAT IN THE ABOUT THE MIDDLE OF THE PAGE AT

12:20PM  12  7:29?

12:20PM  13       FIRST OF ALL, YOU KNOW THAT THAT WAS A LIE.  WHEN

12:20PM  14  MR. BALWANI TOLD WALGREENS THAT THERANOS WAS AS SURPRISED BY

12:20PM  15  THE ARTICLE AS WALGREENS WAS, YOU KNEW FROM THIS VERY EXHIBIT

12:20PM  16  THAT THERANOS KNEW THIS NEGATIVE ARTICLE WAS COMING.  YOU KNOW

12:20PM  17  THAT FOR A LONG PERIOD OF TIME BEFORE THE ARTICLE CAME OUT,

12:20PM  18  MR. BALWANI ESPECIALLY WAS INTENT ON TRYING TO FIGURE OUT WHAT

12:20PM  19  THE SOURCES WERE FOR THE ARTICLE AND IDENTIFY THOSE PEOPLE

12:20PM  20  WITHIN OR OUTSIDE OF THERANOS.

12:20PM  21       SO WHEN HE TOLD WALGREENS THAT THIS WAS A SURPRISE TO

12:20PM  22  THERANOS, THAT WAS NOT TRUE.

12:20PM  23       LOOK WHAT COMES AFTER THAT, THOUGH.

12:20PM  24       MS. HOLMES SUGGESTS A WAY TO RESPOND TO WALGREENS.  SHE

12:20PM  25  SAYS, "LET'S SHOW THEM THAT THIS LITERALLY IS STILL UP IN AIR

12:20PM   1      SO WE LITERALLY JUST DECIDED SINCE THE DISCUSSION IS GETTING

12:21PM   2      AIRED OUT IN PRESS."

12:21PM   3           MR. BALWANI SAYS, "HOWEVER ISSUE IS WE DIDN'T TELL THEM IN

12:21PM   4      ADVANCE ABOUT SWITCHING."  AND THIS IS TALKING ABOUT SWITCHING

12:21PM   5      USE AWAY FROM THE THERANOS NANOTAINER.

12:21PM   6           MS. HOLMES SAYS, "WE'LL HAVE TO PRESENT WELL THAT WE

12:21PM   7      HADN'T DECIDED TO."

12:21PM   8           MR. BALWANI SAYS, "BAD IDEA.  AT THIS POINT THEY KNOW.  SO

12:21PM   9      NEED TO BE TRANSPARENT."

12:21PM  10           THINK ABOUT THAT.  THINK ABOUT THE REASON WHY MR. BALWANI

12:21PM  11      IN THIS CASE IS ADVISING MS. HOLMES TO BE TRANSPARENT.  HE

12:21PM  12      SAYS, "AT THIS POINT THEY KNOW."

12:21PM  13           SO HE'S NOT SAYING BEING TRUTHFUL IS THE RIGHT THING TO

12:21PM  14      DO, SO THAT'S WHY WE SHOULD DO IT.  HE'S NOT SAYING WE HAVE A

12:21PM  15      LEGAL OBLIGATION TO DEAL FAIRLY WITH OUR BUSINESS PARTNERS,

12:21PM  16      HE'S NOT SAYING THAT.

12:21PM  17           INSTEAD, HE'S ADVISING HIS PARTNER NOT TO BE UNTRUTHFUL IN

12:22PM  18      THIS CASE BECAUSE THEY WON'T GET AWAY WITH IT, BECAUSE AT THIS

12:22PM  19      POINT THE PARTY THAT THEY'RE GOING TO BE TALKING TO ALREADY

12:22PM  20      KNOWS THE TRUTH.  THAT'S WHY THERE'S A NEED TO BE TRANSPARENT.

12:22PM  21           THIS ISN'T HONESTY, THIS IS STRATEGY.

12:22PM  22           NOW, THE DEFENSE CONSIDERS ALL OF THE TEXT MESSAGES IN

12:22PM  23      EVIDENCE IN THIS CASE AND SUGGESTS TO YOU THAT BECAUSE THESE

12:22PM  24      WERE PRIVATE TEXT MESSAGES BETWEEN THESE TWO INDIVIDUALS, THERE

12:22PM  25      SHOULD BE MORE OF A SMOKING GUN, THERE SHOULD BE SOMETHING MORE

12:22PM  1    EXPLICIT WHERE THEY'RE AGREEING TO COMMIT FRAUD OR ENTER INTO

12:22PM  2    THIS VENTURE TOGETHER.

12:22PM  3         I'D LIKE TO SHOW YOU ONE OF THE COURT'S INSTRUCTIONS THAT

12:22PM  4    ADDRESSES THAT ISSUE.

12:22PM  5         THESE ARE THE INSTRUCTIONS FOR THE CONSPIRACY OFFENSE FOR

12:22PM  6    WHICH MR. BALWANI IS CHARGED.  AND NOTE THAT ABOUT HALF WAY

12:22PM  7    DOWN THAT PAGE THERE'S SOME LANGUAGE THAT SAYS, "FOR A

12:23PM  8    CONSPIRACY TO HAVE EXISTED, IT IS NOT NECESSARY THAT THE

12:23PM  9    CONSPIRATORS MAKE A FORMAL AGREEMENT OR THAT THEY AGREED ON

12:23PM 10    EVERY DETAIL OF THE CONSPIRACY."

12:23PM 11         AND AT THE BOTTOM IT SAYS, "ONE BECOMES A MEMBER OF A

12:23PM 12    CONSPIRACY BY WILLFULLY PARTICIPATING IN THE UNLAWFUL PLAN WITH

12:23PM 13    THE INTENT TO ADVANCE OR FURTHER SOME OBJECT OR PURPOSE OF THE

12:23PM 14    CONSPIRACY."

12:23PM 15         SO IT IS NOT REQUIRED IN ORDER FOR YOU TO FIND MR. BALWANI

12:23PM 16    GUILTY THAT THERE BE FORMAL LANGUAGE OR EVEN INFORMAL LANGUAGE

12:23PM 17    BETWEEN THE TWO COCONSPIRATORS AGREEING TO COMMIT THIS CRIME.

12:23PM 18         INSTEAD, YOU KNOW THIS CONSPIRACY EXISTED BY THE ACTIONS

12:23PM 19    TAKEN BY THE DEFENDANTS.  IT IS THE ACTIONS IN FURTHERANCE OF

12:23PM 20    THE CONSPIRACY THAT PROVE ITS EXISTENCE.

12:23PM 21         AND HERE YOU DID SEE THAT THERE WERE SOME AREAS OF THE

12:23PM 22    COMPANY AND SOME AREAS OF THE FRAUD WHERE ONE MIGHT HAVE BEEN

12:23PM 23    MORE ACTIVE THAN THE OTHER.  MS. HOLMES PROBABLY HAD MORE

12:23PM 24    CONVERSATIONS WITH INVESTORS.  MR. BALWANI WAS MORE INVOLVED ON

12:23PM 25    THE LABORATORY SIDE.

ER-5317

12:24PM 1      BUT THE FACT THAT THEY DIVVIED UP RESPONSIBILITIES THAT

12:24PM 2  WAY IN THE OPERATION OF THE COMPANY AND IN THE FURTHERANCE OF

12:24PM 3  THESE FRAUDULENT SCHEMES, THAT DOESN'T PREVENT YOU FROM

12:24PM 4  CONVICTING ON THE CONSPIRACY COUNTS.  IN FACT, IT PROVES THE

12:24PM 5  WAY THAT THEY COORDINATED TO ACCOMPLISH THESE ILLEGAL AIMS.

12:24PM 6      TO THE EXTENT THAT YOU BELIEVE THAT THERE WERE SOME

12:24PM 7  ASPECTS OF THE CRIMES HERE THAT MS. HOLMES COMMITTED WITHOUT

12:24PM 8  MR. BALWANI'S DIRECT PARTICIPATION, I WANT YOU TO KEEP IN MIND

12:24PM 9  THREE OF THE INSTRUCTIONS THAT I EXPECT YOU'LL RECEIVE FROM THE

12:24PM 10  COURT.  AND ALL THREE OF THESE RELATE TO WAYS IN WHICH

12:24PM 11  MR. BALWANI IS -- CANNOT ESCAPE RESPONSIBILITY FOR THINGS THAT

12:24PM 12  HIS PARTNER DID.

12:24PM 13      SO, FOR EXAMPLE, IN JURY INSTRUCTION 19 YOU HEAR THAT EACH

12:25PM 14  MEMBER OF A CONSPIRACY IS RESPONSIBLE FOR THE FORESEEABLE

12:25PM 15  ACTIONS OF THE OTHER CONSPIRATORS PERFORMED DURING THE COURSE

12:25PM 16  AND IN FURTHERANCE OF THE CONSPIRACY.  IF ONE MEMBER OF A

12:25PM 17  CONSPIRACY COMMIT A CRIME IN FURTHERANCE OF A CONSPIRACY, THE

12:25PM 18  OTHER MEMBERS HAVE ALSO, UNDER THE LAW, COMMITTED THAT CRIME.

12:25PM 19      AND I WANT YOU TO REVIEW THESE INSTRUCTIONS IN FULL IF

12:25PM 20  THEY BECOME RELEVANT TO YOUR DELIBERATIONS, BUT FOR RIGHT NOW

12:25PM 21  I'LL JUST HIGHLIGHT SOME OF THE KEY LANGUAGE.

12:25PM 22      UNDER AIDING AND ABETTING, NOTE THAT MR. BALWANI MAY BE

12:25PM 23  FOUND GUILTY OF WIRE FRAUD IT AS CHARGES IN COUNTS THREE

12:25PM 24  THROUGH TWELVE EVEN IF HE PERSONALLY DID NOT COMMIT THE ACT OR

12:25PM 25  ACTS CONSTITUTED IN THE CRIME BUT AIDED AND ABETTED IN ITS

12:25PM  1    COMMISSION.  IN OTHER WORDS, IF HE INTENTIONALLY HELPED SOMEONE

12:25PM  2    LIKE MS. HOLMES TO COMMIT A CRIME.  AND THERE ARE ELEMENTS

12:25PM  3    PROVIDED FOR THAT.

12:25PM  4        ANOTHER INSTRUCTION WILL TELL YOU THAT IF YOU FIND THAT

12:25PM  5    MR. BALWANI WAS A MEMBER OF A SCHEME TO DEFRAUD INVESTORS AND

12:26PM  6    THAT HE HAD THE INTENT TO DEFRAUD INVESTORS, HE MAY BE

12:26PM  7    RESPONSIBLE FOR OTHER CO-SCHEMERS' ACTIONS, FOR EXAMPLE,

12:26PM  8    MS. HOLMES'S ACTIONS, DURING THE COURSE OF AND IN FURTHERANCE

12:26PM  9    OF THE ALLEGED SCHEME, EVEN IF MR. BALWANI DID NOT KNOW WHAT

12:26PM  10   THEY SAID OR DID.

12:26PM  11       AND A SIMILAR INSTRUCTION EXISTS ON THE PATIENT SIDE OF

12:26PM  12   THINGS.  SO PLEASE KEEP THOSE IN MIND.  THAT'S 19, 24, AND 25.

12:26PM  13       I'D LIKE TO SWITCH GEARS AND TALK ABOUT SOMETHING THAT THE

12:26PM  14   DEFENSE HAS EMPHASIZED A LOT DURING THE TRIAL, AND THAT IS THE

12:26PM  15   FACT THAT THERE IS NO EVIDENCE BEFORE YOU RELATING TO THE

12:26PM  16   CONTENT OF THE THERANOS LIS DATABASE OR AT LEAST THAT CONTENT

12:26PM  17   ITSELF IS NOT IN EVIDENCE.

12:26PM  18       THE DEFENSE WANTS THIS TO BE IMPORTANT TO YOU.  AND THIS

12:26PM  19   IS CONSISTENT WITH A PATTERN IN THE DEFENSE'S ARGUMENT THAT

12:26PM  20   THEIR FAVORITE EVIDENCE, WHETHER IT'S THEIR FAVORITE DOCUMENT

12:26PM  21   OR RECORDING IS THE DOCUMENT THAT IS NOT PRESENT, THEIR

12:27PM  22   FAVORITE WITNESS, THE WITNESS THAT THEY SAY IS THE MOST

12:27PM  23   IMPORTANT TO YOUR CONSIDERATION IN THE CASE IS THE WITNESS WHO

12:27PM  24   DID NOT TESTIFY.

12:27PM  25       WHEN TESTIMONY OR EVIDENCE IS NOT AVAILABLE TO YOU, THE

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7666

```
12:27PM   1    DEFENSE IS ABLE TO INVITE YOU TO SPECULATE ABOUT WHAT IT MIGHT

12:27PM   2    SAY.  IT'S IMPORTANT TO THE PROCESS AND TO YOUR DELIBERATIONS

12:27PM   3    THAT YOU FOCUS ON WHAT ACTUALLY IS IN EVIDENCE AND NOT

12:27PM   4    SPECULATE ABOUT THINGS THAT ARE NOT BEFORE YOU.  THAT'S

12:27PM   5    ESPECIALLY TRUE WHEN IT COMES TO WITNESSES WHO DID NOT TESTIFY.

12:27PM   6    THROUGHOUT THE DEFENSE'S CLOSING THEY TALKED ABOUT WITNESSES

12:27PM   7    FROM WHOM YOU DIDN'T HEAR AND THEY LISTED MANY, MANY OF THOSE

12:27PM   8    INDIVIDUALS, WHILE AT THE SAME TIME TALKED ABOUT HOW LONG THIS

12:27PM   9    TRIAL HAD BEEN.

12:27PM  10        IMAGINE HOW LONG THE TRIAL WOULD HAVE BEEN HAD THE

12:27PM  11    GOVERNMENT CALLED AS A WITNESS EVERY PERSON THE DEFENSE

12:27PM  12    MENTIONED IN ITS CLOSING ARGUMENT.

12:28PM  13        THERE'S A RELEVANT INSTRUCTION ON THIS ISSUE AS WELL

12:28PM  14    RELATING TO WHAT REASONABLE DOUBT MEANS.  NOTE HERE THE SECOND

12:28PM  15    SENTENCE OF THIS INSTRUCTION TELLS YOU THAT IT IS NOT REQUIRED

12:28PM  16    THAT THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

12:28PM  17        KEEP IN MIND THE GOVERNMENT IS REQUIRED TO PROVIDE

12:28PM  18    SUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION.  THE GOVERNMENT

12:28PM  19    IS NOT REQUIRED TO PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

12:28PM  20        WHEN IT COMES TO THE LIS SPECIFICALLY, THE SUGGESTION IS

12:28PM  21    THAT IT'S IMPORTANT AND IT'S THE GOVERNMENT'S FAULT THAT WE

12:28PM  22    DON'T HAVE ACCESS TO THE LIS DATABASE.

12:28PM  23        THE EVIDENCE SUGGESTS OTHERWISE.

12:28PM  24        FIRST, YOU SAW EVIDENCE THAT THE GOVERNMENT TRIED TO

12:28PM  25    OBTAIN THE LIS FOR MONTHS.  THIS IS A SUBPOENA FROM APRIL OF
```

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7667

12:28PM  1     2018 SENT TO THERANOS.  THIS IS EXHIBIT 5916.  AND THIS

12:28PM  2     REQUESTS ALL OF THE LABORATORY REPORTS FROM THAT DATABASE, SO

12:29PM  3     YOU KNOW THE GOVERNMENT WAS REQUESTING THIS INFORMATION FROM

12:29PM  4     THERANOS, THE COMPANY.

12:29PM  5          YOU ALSO KNOW THAT IN LATE AUGUST OF 2018, AROUND THE TIME

12:29PM  6     THAT THE GOVERNMENT RECEIVED FROM THERANOS WHAT IT WAS TOLD WAS

12:29PM  7     A COPY OF THAT DATABASE, THE COMPANY WAS PLANNING TO PUT THE

12:29PM  8     SYSTEM INTO STORAGE AROUND THAT SAME TIME, AND THE COMPANY KNEW

12:29PM  9     THAT THE DATABASE MAY THEREAFTER BE VERY DIFFICULT TO

12:29PM  10    RESUSCITATE.

12:29PM  11         SO NO EVIDENCE THAT THE GOVERNMENT KNEW THAT WAS

12:29PM  12    HAPPENING, BUT IT IS ESTABLISHED THAT THE COMPANY ITSELF KNEW

12:29PM  13    THAT THAT WAS HAPPENING.

12:29PM  14         YOU ALSO KNOW THAT THE GOVERNMENT MADE CONTINUED EFFORTS

12:29PM  15    AFTER IT RECEIVED ITS COPY OF THE LIS THAT WAS INACCESSIBLE, TO

12:29PM  16    SALVAGE THAT INFORMATION OR OBTAIN A WORKING COPY.

12:29PM  17         HERE YOU SEE FROM MARCH OF 2019, SO MONTHS LATER, THIS

12:29PM  18    CONVERSATION IS STILL ONGOING WITH THE ASSIGNEE WHO HAS

12:29PM  19    INHERITED ALL OF THE ASSETS FROM THERANOS AFTER IT WENT OUT OF

12:30PM  20    BUSINESS.

12:30PM  21         AND HERE YOU HAVE THE GOVERNMENT BEING TOLD BY THE

12:30PM  22    ASSIGNEE THAT THE ASSIGNEE DOESN'T KNOW WHO DECOMMISSIONED THE

12:30PM  23    LIS.

12:30PM  24         YOU HAVE THE GOVERNMENT BEING TOLD THAT THE LIS DATABASE

12:30PM  25    WAS NOT INCLUDED IN THE MIGRATION OF THE CORPORATE SERVER

12:30PM 1     EQUIPMENT OUT OF THE THERANOS FACILITY.

12:30PM 2          AGAIN, YOU HAVE THE GOVERNMENT BEING TOLD THAT THERANOS IS

12:30PM 3     UNDERSTANDING, THERANOS ITSELF, ITS UNDERSTANDING THAT THE

12:30PM 4     DATABASE COULD NO LONGER BE RECONSTRUCTED WITH THE EXISTING

12:30PM 5     RESOURCES.

12:30PM 6          THAT BRINGS US TO THE TESTIMONY OF RICHARD SONNIER WHO WAS

12:30PM 7     AN EXPERT IN SQL DATABASES BUT NOT THIS PARTICULAR DATABASE.

12:30PM 8          YOU'LL RECALL THAT HE DIDN'T HAVE ANY FIRST HAND KNOWLEDGE

12:30PM 9     OR EXPERIENCE WITH THE ACTUAL THERANOS LIS.  HE'S TESTIFYING

12:30PM 10    ABOUT THE MICROSOFT PRODUCT IN GENERAL.

12:30PM 11         YOU ALSO HEARD THAT THIS WAS A BESPOKE DATABASE.

12:30PM 12         YOU HEARD DURING CROSS THAT MR. SONNIER, IN WORKING FOR

12:31PM 13    THE DEFENSE FOR WHICH HE WAS COMPENSATED, REACHED AN OPINION

12:31PM 14    THAT THE THERANOS LIS COULD HAVE BEEN RESTORED IF THE

12:31PM 15    GOVERNMENT HAD OBTAINED THE ORIGINAL HARDWARE THAT THE DATABASE

12:31PM 16    WAS RUN ON.

12:31PM 17         AGAIN, DESPITE THE FACT THAT MR. SONNIER HAD NEVER

12:31PM 18    ACTUALLY TOUCHED THIS DATABASE, AND DESPITE THE FACT THAT IN

12:31PM 19    REACHING THAT OPINION HE IGNORED CONTRARY INFORMATION THAT HE

12:31PM 20    WAS AWARE FROM PEOPLE WHO ACTUALLY HAD WORKED AT THE COMPANY

12:31PM 21    AND HAD HANDLED THAT DATABASE.

12:31PM 22         BY THE WAY, YOU RECALL THAT HE ALSO CLAIMED DURING HIS

12:31PM 23    TESTIMONY THAT BESIDES RESTORING THE DATABASE FROM THE ORIGINAL

12:31PM 24    HARDWARE, IT ALSO WOULD HAVE WORKED IF THE GOVERNMENT HAD HIRED

12:31PM 25    A VENDOR.

12:31PM  1      THAT TESTIMONY DOESN'T MAKE ANY SENSE GIVEN THAT

12:31PM  2    MR. SONNIER HIMSELF, A VENDOR HIRED BY THE DEFENSE, HAD ACCESS

12:31PM  3    TO A COPY OF THE LIS DATABASE AND WAS UNABLE TO ACCESS THE

12:32PM  4    DATABASE JUST LIKE THE GOVERNMENT WAS.

12:32PM  5      SO THERE ARE REASONS TO DISBELIEVE MR. SONNIER'S TESTIMONY

12:32PM  6    AND CERTAINLY REASONS TO QUESTION WHETHER IT'S RELEVANT IN THIS

12:32PM  7    CASE.

12:32PM  8      IT'S HELPFUL TO THE DEFENSE HERE TO ARGUE THAT THE LIS

12:32PM  9    WOULD BE PIVOTAL IN DETERMINING WHETHER THERE WERE ACCURACY OR

12:32PM 10    RELIABILITY PROBLEMS AT THERANOS, BUT THE TRUTH IS THAT IT MAY

12:32PM 11    NOT HAVE MADE A DIFFERENCE.

12:32PM 12      YOU HEARD TESTIMONY FROM DR. ROSENDORFF ABOUT HOW HE AS

12:32PM 13    LAB DIRECTOR AND A PATHOLOGIST EVALUATES TEST ACCURACY.  SO IF

12:32PM 14    HE'S PRESENTED WITH A TEST RESULT AND HE'S TRYING TO FIGURE OUT

12:32PM 15    WHETHER IT'S ACCURATE OR NOT, HE DOES THINGS LIKE LOOK INTO THE

12:32PM 16    PATIENT'S OTHER SYMPTOMS AND PRESENTATION FACTORS, FOR EXAMPLE,

12:32PM 17    WHETHER SOMEONE MIGHT HAVE AN OVERACTIVE THYROID HE SAID.  HE

12:32PM 18    CONFIRMED FOR YOU THAT INFORMATION LIKE THAT WOULD NOT BE

12:32PM 19    PRESENT IN THE LIS DATABASE.

12:32PM 20      HE SAID HE MIGHT ALSO LOOK AT CONTEMPORANEOUS TESTS FROM

12:33PM 21    OTHER LABS TO SEE IF, FOR EXAMPLE, OTHER LABS ARE DISAGREEING

12:33PM 22    WITH THERANOS ON WHAT THE TRUE VALUES FOR A CERTAIN TEST ARE.

12:33PM 23      HE CONFIRMED FOR YOU THAT INFORMATION LIKE THAT WOULD NOT

12:33PM 24    BE PRESENT IN THE THERANOS LIS.

12:33PM 25      HE CONFIRMED DIRECTLY THAT IT WAS NOT POSSIBLE TO LOOK AT

12:33PM  1    INDIVIDUAL RESULTS IN THE LIS LABORATORY SYSTEM AND DETERMINE

12:33PM  2    WHETHER THEY'RE ACCURATE OR NOT.

12:33PM  3        SO FAR THE DEFENSE SAYS WE NEED THIS INFORMATION, AND THEY

12:33PM  4    TALK ABOUT THE ABILITY TO RUN SOME KIND OF STATISTICAL

12:33PM  5    ANALYSIS.  THEY SPEAK ABOUT THAT IN PRETTY VAGUE TERMS.  IT'S

12:33PM  6    UNCLEAR EXACTLY WHAT KIND OF ANALYSIS THEY THINK WOULD BE

12:33PM  7    POSSIBLE, BUT THIS IS ALL HYPOTHETICAL.  AND AGAIN, IT'S

12:33PM  8    CONTRARY TO TESTIMONY FROM THE ACTUAL EXPERTS WHO KNOW ABOUT

12:33PM  9    HOW TO EVALUATE THE ACCURACY OF THE LAB TEST RESULT.

12:33PM  10       SO THE LABORATORY INFORMATION SYSTEM IS CERTAINLY A

12:33PM  11   QUESTION MARK BECAUSE WE DON'T HAVE IT.  LIKELY, THOUGH, IT

12:34PM  12   WOULD STILL BE A QUESTION MARK IF WE DID, IS BECAUSE IT'S

12:34PM  13   UNCLEAR HOW, IF AT ALL, WE WOULD BE ABLE TO USE THAT AND

12:34PM  14   DETERMINE THE OVERALL ACCURACY OR INACCURACY RATE AT THERANOS.

12:34PM  15       TO THE EXTENT THAT THAT DATABASE WOULD SHED MORE LIGHT ON

12:34PM  16   THERANOS TEST ACCURACY, THOUGH, IS THERE ANY REASON FOR YOU TO

12:34PM  17   BELIEVE THAT IT WOULD MAKE THERANOS LOOK BETTER?

12:34PM  18       THINK ABOUT ALL OF THE PROBLEMS THAT YOU'VE SEEN IN

12:34PM  19   INTERNAL CORRESPONDENCE, RECORDS OF THE COMPANY, THINK ABOUT

12:34PM  20   THINGS THAT WITNESSES HAVE TOLD YOU, WITNESSES WHO ACTUALLY

12:34PM  21   WORKED WITH THIS TECHNOLOGY AND SAW THE RESULTS THAT IT

12:34PM  22   PRODUCED, THINK ABOUT THE CMS FINDINGS BASED ON A HOLISTIC LOOK

12:34PM  23   AT THE THERANOS LAB, THINK ABOUT HOW SARAH BENNETT CALLED THE

12:34PM  24   PROBLEMS THAT SHE SAW AT THE THERANOS LAB SYSTEMIC.

12:34PM  25       CMS ALSO NOTED THAT THERANOS ADMITTED FOLLOWING THE CMS

REBUTTAL ARGUMENT BY MR. BOSTIC                    7671

12:34PM   1    INSPECTION THAT THERE WAS A POSSIBLE PATIENT IMPACT FOR EVERY

12:34PM   2    TEST REPORTED FROM THE LABORATORY'S TPS 3.5 INSTRUMENT.  THAT'S

12:35PM   3    THE EDISON.

12:35PM   4        SO IS IT REALLY IN DISPUTE THAT THERE WERE SERIOUS

12:35PM   5    ACCURACY AND RELIABILITY PROBLEMS AT THERANOS OR HAS THAT FACT

12:35PM   6    ALREADY BEEN ESTABLISHED?  IS THERE ANY CHANCE THAT MORE DATA

12:35PM   7    WOULD SIGNIFICANTLY CHANGE THE PICTURE, ESPECIALLY WHEN THAT

12:35PM   8    DATA DOESN'T INCLUDE THE KINDS OF FACTS NECESSARY TO EVALUATE

12:35PM   9    INDIVIDUAL RESULTS?

12:35PM  10        THE DEFENSE HAS CALLED THIS A SCIENTIFIC FRAUD CASE

12:35PM  11    MULTIPLE TIMES.  YOU SHOULD KNOW THAT'S NOT A LEGAL TERM.

12:35PM  12        THE DEFENSE POINT SEEMS TO BE THAT THERE SHOULD BE A

12:35PM  13    HEIGHTENED STANDARD OF PROOF IN CASES LIKE THIS INVOLVING

12:35PM  14    SCIENTIFIC SUBJECT MATTER.  THAT'S NOT THE LAW.

12:35PM  15        YOU'RE ABOUT TO HEAR INSTRUCTIONS ON THE LAW FROM THE

12:35PM  16    COURT, AND THERE WON'T BE ANYTHING TO THAT EFFECT.

12:35PM  17        THIS IS A WIRE FRAUD AND CONSPIRACY CASE AND THE STANDARDS

12:35PM  18    WILL COME FROM THE COURT.  YOU WON'T HEAR ANYTHING ABOUT

12:35PM  19    SPECIAL REQUIREMENTS FOR PROVING FRAUD IN A CASE INVOLVING THIS

12:35PM  20    SUBJECT MATTER.

12:35PM  21        IT IS CERTAINLY NOT RELEVANT TO YOUR DECISION WHAT KINDS

12:36PM  22    OF MATERIALS THERANOS SUBMITTED TO THE FDA TO GET CLEARANCE FOR

12:36PM  23    ITS HERPES TEST IN 2015.

12:36PM  24        WHAT THE INSTRUCTIONS WILL FOCUS ON IS THE DEFENDANT'S

12:36PM  25    STATE OF MIND AND THE NEED TO DETERMINE WHETHER HE KNEW HIS

12:36PM 1    STATEMENTS WERE FALSE AND MISLEADING AND WHETHER HE MADE THOSE

12:36PM 2    STATEMENTS WITH THE INTENT TO DEFRAUD.

12:36PM 3        THE RELEVANT EVIDENCE IS THE EVIDENCE THAT SHOWS THAT AND

12:36PM 4    THERE'S A LOT OF IT.

12:36PM 5        AND THE EVIDENCE SHOWED YOU THE SAME THING THAT IT SHOWED

12:36PM 6    MR. BALWANI, SO YOU KNOW ABOUT THE ACCURACY AND RELIABILITY

12:36PM 7    PROBLEMS AT THERANOS THE SAME WAY HE KNEW BECAUSE YOU KNOW

12:36PM 8    ABOUT THE QUALITY CONTROL PROBLEMS, YOU KNOW ABOUT THE NEGATIVE

12:36PM 9    REPORTS FROM EMPLOYEES AND WHAT THEY SAW, YOU KNOW ABOUT THE

12:36PM 10   INACCURATE RESULTS.

12:36PM 11       I'M GOING TO TALK BRIEFLY ABOUT SOME OF THE INDIVIDUAL

12:36PM 12   CHARGED COUNTS, AND THEN I'LL CONCLUDE MY REMARKS.

12:37PM 13       FIRST, LET'S HIGHLIGHT SOME OF THE KEY LANGUAGE IN THE

12:37PM 14   WIRE FRAUD INSTRUCTIONS.  SO YOU'LL BE ASKED TO RENDER VERDICTS

12:37PM 15   ON TWO CONSPIRACY COUNTS AND A NUMBER OF INDIVIDUAL WIRE FRAUD

12:37PM 16   COUNTS.  FOR THOSE WIRE FRAUD COUNTS, I'D LIKE YOU TO NOTE A

12:37PM 17   FEW THINGS.

12:37PM 18       FIRST, FOR WIRE FRAUD, DECEITFUL STATEMENTS OF HALF-TRUTHS

12:37PM 19   MAY CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS.

12:37PM 20       SO WHEN YOU THINK ABOUT THE THINGS THAT MR. BALWANI AND

12:37PM 21   MS. HOLMES SAID TO VICTIMS, DON'T JUST LOOK FOR BLACK AND WHITE

12:37PM 22   LIES.  LOOK FOR DECEITFUL STATEMENTS OF HALF-TRUTHS AS WELL,

12:37PM 23   THINGS DELIVERED IN A WAY WHERE THEY WERE INTENDING TO BE

12:37PM 24   MISLEADING, EVEN IF THEY MIGHT BE DIFFICULT TO IDENTIFY AS A

12:37PM 25   BLACK AND WHITE LIE.

REBUTTAL ARGUMENT BY MR. BOSTIC                    7673

12:37PM  1          NOTE ALSO THAT A STATEMENT IS MATERIAL IF IT HAS A NATURAL

12:37PM  2     TENDENCY TO INFLUENCE OR IS CAPABLE OF INFLUENCING A PERSON TO

12:37PM  3     PART WITH MONEY OR PROPERTY.

12:37PM  4          I THINK IT'S EASY TO CONCLUDE THAT ALL OF THE KINDS OF

12:38PM  5     STATEMENTS THAT WE'RE TALKING ABOUT IN THIS CASE FALL INTO THAT

12:38PM  6     CATEGORY.

12:38PM  7          NOTE ALSO THAT THE WIRE ITSELF, AND WE'RE GOING TO TALK

12:38PM  8     ABOUT THE KINDS OF WIRES THAT ARE INVOLVED IN THIS CASE, BUT

12:38PM  9     THE WIRE ITSELF NEED NOT BE FALSE OR MISLEADING.  THAT'S GOING

12:38PM 10     TO BE IMPORTANT FOR A COUPLE OF THESE.

12:38PM 11          FINALLY NOTE THAT IN ORDER FOR A WIRE TO SERVE AS A BASIS

12:38PM 12     FOR A WIRE FRAUD COUNT, IT MUST HAVE BEEN REASONABLY

12:38PM 13     FORESEEABLE TO THE DEFENDANT THAT SOME WIRE COMMUNICATION WOULD

12:38PM 14     OCCUR IN FURTHERANCE OF THE SCHEME AND AN INTERSTATE WIRE

12:38PM 15     COMMUNICATION MUST HAVE ACTUALLY OCCURRED IN FURTHERANCE OF THE

12:38PM 16     SCHEME.

12:38PM 17          SO LET'S TALK ABOUT COUNT NINE, WHICH IS BASED ON A

12:38PM 18     TELEPHONE CALL THAT A PATIENT NAMED BRENT BINGHAM MADE TO

12:38PM 19     THERANOS AFTER HE GOT INACCURATE TEST RESULTS.

12:38PM 20          FIRST, WHEN IT COMES TO THE TEST ITSELF, THE DEFENSE

12:39PM 21     CLAIMS THAT THIS TEST WAS NOT PERFORMED ON THERANOS EQUIPMENT.

12:39PM 22     I THINK IT'S UP TO YOU TO JUDGE THE EVIDENCE ON THAT AND

12:39PM 23     WHETHER THE EVIDENCE CLEARLY SHOWS THAT.  I WILL POINT OUT THAT

12:39PM 24     THE LABORATORY REPORT ITSELF INDICATES THAT ALL OF THE TESTS

12:39PM 25     WERE PERFORMED AT THERANOS LABS IN NEWARK, CALIFORNIA.

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7674

12:39PM  1        AND YOU KNOW FROM MR. BINGHAM'S TESTIMONY THAT HE WAS

12:39PM  2   LOCATED IN PHOENIX WHERE THERANOS ALSO HAD A LAB.  SO YOU MIGHT

12:39PM  3   ASK WHY HIS SAMPLE WOULD HAVE BEEN SENT FROM ARIZONA TO

12:39PM  4   CALIFORNIA IF ALL OF THOSE TESTS COULD HAVE BEEN RUN IN THE

12:39PM  5   ARIZONA LAB.

12:39PM  6        YOU KNOW FROM MS. BENNETT'S TESTIMONY THAT THE ARIZONA LAB

12:39PM  7   WAS NOT A LAB THAT COULD RUN LABORATORY DEVELOPED TESTS OR

12:39PM  8   LDT'S.  THAT MEANS THAT THE TESTS DONE IN ARIZONA WERE ALL DONE

12:39PM  9   AND THE SAME THAT ANY OTHER LAB WOULD DO THEM, ON FDA APPROVED

12:39PM  10  DEVICES, NOT THERANOS-SPECIFIC DEVICES.  ALL OF THE THERANOS

12:40PM  11  SPECIFIC DEVICES USED BY THE COMPANY WERE IN NEWARK, WHERE

12:40PM  12  MR. BINGHAM'S TEST WAS RUN.

12:40PM  13       WHEN IT COMES TO THE WIRE ITSELF, REMEMBER THAT

12:40PM  14  MR. BINGHAM PLACED A PHONE CALL TO THERANOS TO ASK ABOUT HIS

12:40PM  15  INACCURATE RESULT.

12:40PM  16       AND MR. EDLIN TESTIFIED THAT THE CUSTOMER SERVICE PEOPLE

12:40PM  17  WHO WERE DESIGNATED TO RECEIVE CALLS FROM PATIENTS OR DOCTORS

12:40PM  18  ABOUT INACCURATE RESULTS WERE IN PALO ALTO.

12:40PM  19       SO THE DEFENSE INVITES YOU TO SPECULATE ABOUT WHETHER THAT

12:40PM  20  CALL MIGHT HAVE BEEN TO ANOTHER LOCATION, BUT THERE'S NO

12:40PM  21  EVIDENCE SUGGESTING THAT.  AND YOU'LL RECALL FROM THE

12:40PM  22  INSTRUCTION ON REASONABLE DOUBT, THAT REASONABLE DOUBT IS NOT

12:40PM  23  SOMETHING BASED ON SPECULATION.

12:40PM  24       SO HOW DO YOU KNOW THAT THIS WIRE -- THIS PHONE CALL WAS

12:40PM  25  USED TO CARRY OUT AN ESSENTIAL PART IN THIS SCHEME TO DEFRAUD

| | | |
|---|---|---|
| 12:40PM | 1 | PATIENTS?  HOW DO YOU KNOW THAT IT OCCURRED IN FURTHERANCE OF |
| 12:41PM | 2 | THAT SCHEME AS THE ELEMENTS REQUIRE? |
| 12:41PM | 3 | WELL, I'D LIKE TO SHOW YOU JUST TWO SELECTIONS FROM |
| 12:41PM | 4 | EXHIBIT 4520, WHICH IS A LOG INTERNAL AT THERANOS OF CALLS |
| 12:41PM | 5 | RECEIVED FROM PATIENTS AND DOCTORS.  I'D LIKE TO SHOW YOU TWO |
| 12:41PM | 6 | EXAMPLES OF HOW THE DEFENDANT AND THERANOS USED THIS CUSTOMER |
| 12:41PM | 7 | SERVICE GROUP TO FURTHER THE FRAUD AGAINST PATIENTS. |
| 12:41PM | 8 | LET'S START WITH THIS EXAMPLE.  YOU SEE THIS BEGINS WITH A |
| 12:41PM | 9 | CALL FROM A DOCTOR'S OFFICE ABOUT TWO PATIENTS WITH ELECTROLYTE |
| 12:41PM | 10 | CONCERNS.  IN THE BOTTOM THERE'S A NOTE THAT SAYS, "PER SUNNY, |
| 12:41PM | 11 | WE HAVE FIXED ANY ISSUES WITH THESE REFERENCE RANGES, |
| 12:41PM | 12 | ET CETERA, SO GENNA CAN ASSURE HIM AND GIVE HIM TWO TO FOUR |
| 12:41PM | 13 | COUPONS SO HE CAN TEST US OUT." |
| 12:41PM | 14 | SO YOU SEE HERE AN EXAMPLE OF THE FUNCTION OF THE CUSTOMER |
| 12:42PM | 15 | SERVICE GROUP.  WHEN DOCTORS OR PATIENTS CALLED WITH QUESTIONS |
| 12:42PM | 16 | OR CONCERNS ABOUT INACCURATE TEST RESULTS, THE CUSTOMER SERVICE |
| 12:42PM | 17 | GROUP WAS TO ASSUAGE THEIR CONCERNS, PRESERVE THAT RELATIONSHIP |
| 12:42PM | 18 | WITH THAT PATIENT OR DOCTOR, AND KEEP THEM COMING BACK TO |
| 12:42PM | 19 | THERANOS FOR MORE. |
| 12:42PM | 20 | LET'S SEE A DIFFERENT EXAMPLE.  THIS INTERACTION BEGAN |
| 12:42PM | 21 | WITH A CALL REGARDING A PATIENT'S HBA1C RESULT AS INDICATED |
| 12:42PM | 22 | HERE.  NOTE THE RESPONSE HERE.  IT INDICATES THAT SOMEONE NAMED |
| 12:42PM | 23 | TAJUAN ASSURED THIS DOCTOR THAT ALL WERE WITHIN RANGE.  AND IT |
| 12:42PM | 24 | SAYS, "I BELIEVE OUR RESULTS TO BE ACCURATE AFTER ALL THREE |
| 12:42PM | 25 | RUNS WERE VERY CLOSE." |

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7676

12:42PM   1        SKIP DOWN A COUPLE OF LINES AND NOTE WHAT IT SAYS THERE.

12:42PM   2   IT SAYS, "WHEN I TALK TO PHYSICIANS OR GUESTS, I TRY TO OFFER

12:42PM   3   THEM DIFFERENT VARIABLES OR SCENARIOS TO CONSIDER WHEN THEY

12:42PM   4   QUESTION OUR RESULTS.  OF COURSE NONE OF THEM HAVE TO DO WITH

12:42PM   5   OUR TESTING METHODS.  I MENTIONED THAT THE GUEST'S DIET

12:43PM   6   POSSIBLY CHANGED WITHIN THE LAST FEW MONTHS, THAT THE GUEST MAY

12:43PM   7   NOT BE TAKING THE MEDICATION AS PRESCRIBED, ET CETERA.  I

12:43PM   8   BELIEVE THAT WHEN I DO THAT THE DOC/GUEST FEEL AS THOUGH I AM

12:43PM   9   CONCERNED AND I AM ALSO TRYING TO BE A PART OF THE SOLUTION."

12:43PM  10        SO ANOTHER PERFECT EXAMPLE OF WHY THERANOS HAD A CUSTOMER

12:43PM  11   SERVICE GROUP.  THESE ARE PEOPLE WHO WOULD HAVE A DIFFICULT JOB

12:43PM  12   AT A LAB LIKE THIS THAT WAS HAVING SO MANY ACCURACY PROBLEMS,

12:43PM  13   BUT IT WAS ESSENTIAL FOR THE FURTHERANCE OF THE SCHEME TO

12:43PM  14   DEFRAUD PATIENTS THAT THERE BE PEOPLE AVAILABLE WHO WOULD

12:43PM  15   SMOOTH THINGS OVER WITH PATIENTS AND DOCTORS WHEN PROBLEMS

12:43PM  16   AROSE, AND THE EVIDENCE SHOWS THAT THEY DID A GOOD JOB OF THAT.

12:43PM  17        LET'S TALK BRIEFLY ABOUT COUNT TEN, WHICH IS

12:43PM  18   ERIN TOMPKINS'S HIV RESULTS.  IT'S UNCLEAR FROM THE DEFENSE'S

12:43PM  19   ARGUMENT WHETHER THEY CONCEDE THAT MS. TOMPKINS ACTUALLY GOT

12:44PM  20   INACCURATE RESULTS FOR HER HIV TEST.  THE FACT REMAINS THAT THE

12:44PM  21   THERANOS TEST INDICATED THAT SHE WAS REACTIVE FOR HIV-1 AND 2

12:44PM  22   ANTIBODIES WHEN IN FACT SHE WASN'T.  SHE HAD NEVER BEEN

12:44PM  23   INFECTED WITH HIV, THERE WAS NOTHING ELSE IN HER HISTORY TO

12:44PM  24   SUGGEST THAT SHE HAD THAT INFECTION, AND SHE SUBSEQUENTLY

12:44PM  25   TESTED NEGATIVE.

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7677

12:44PM   1          SO I THINK THE DEFENSE WANTS TO HIGHLIGHT THE FACT THAT

12:44PM   2    SOME OF THE HIV TESTS OR THE COMPONENTS OF THE HIV TEST IN

12:44PM   3    MS. TOMPKINS'S LAB REPORT DID COME BACK NEGATIVE, BUT THE ONE

12:44PM   4    THAT SAYS POSITIVE IS ACTUALLY INCONSISTENT WITH THE ONES THAT

12:44PM   5    SAY NEGATIVE.  SO IT'S IMPOSSIBLE THAT ALL OF THOSE RESULTS

12:44PM   6    COULD BE CORRECT AT THE SAME TIME.  THIS IS AN EXAMPLE OF AN

12:44PM   7    INACCURATE RESULT PUT OUT BY THERANOS.

12:44PM   8          WHEN IT COMES TO COUNT TEN AND ELEVEN, THE DEFENSE ALSO

12:45PM   9    INVITES YOU TO SPECULATE ABOUT THE INTERSTATE NATURE OF THIS

12:45PM  10    WIRE COMMUNICATION.

12:45PM  11          AGAIN, REASONABLE DOUBT IS NOT BASED ON SPECULATION.  THIS

12:45PM  12    DOCUMENT ON ITS FACE, JUST LIKE THE ONE FOR COUNT ELEVEN,

12:45PM  13    INDICATES THAT IT WAS SENT FROM THE THERANOS FAX SERVER AND

12:45PM  14    THERANOS'S FAX NUMBER IS 650 IN CALIFORNIA, AND SO IF IT WAS

12:45PM  15    SENT TO PHOENIX, IT MUST HAVE NECESSARILY CROSSED STATE LINES.

12:45PM  16    IT DOESN'T NEED TO BE MORE COMPLICATED THAN THAT.

12:45PM  17          FINALLY, THE FACT THAT MS. TOMPKINS'S HIV TEST WAS

12:45PM  18    PERFORMED ON NON-THERANOS EQUIPMENT IS NOT A REASON TO FIND NOT

12:45PM  19    GUILTY ON THIS COUNT.  THIS IS STILL A WIRE COMMUNICATION IN

12:45PM  20    FURTHERANCE OF THE SCHEME TO DEFRAUD PATIENTS, AND IT'S TRUE

12:45PM  21    FOR TWO REASONS.

12:45PM  22          FIRST, YOU'LL RECALL THAT THE EVIDENCE SHOWS THAT PATIENTS

12:45PM  23    WERE PROMISED TESTS WITH SUPERIOR ACCURACY.  THAT APPEARS IN

12:46PM  24    PUBLIC INFORMATION THAT THE COMPANY KNEW ABOUT AND PROMOTED.

12:46PM  25          INSTEAD, WHAT PATIENTS GOT WERE TESTS OF INFERIOR ACCURACY

12:46PM  1    OR AT BEST THE SAME LEVEL OF ACCURACY THAT WOULD HAVE BEEN

12:46PM  2    PROVIDED AT ANY OTHER LAB.  THAT'S NOT LIVING UP TO THE PROMISE

12:46PM  3    THAT THE COMPANY MADE THE PATIENTS.

12:46PM  4         SO THIS IS AN EXAMPLE OF A BROKEN PROMISE TO THIS

12:46PM  5    PARTICULAR PATIENT.

12:46PM  6         DON'T FORGET ALSO THAT IN ADDITION TO HER HIV TEST, SHE

12:46PM  7    DID GET OTHER TESTS THAT WERE RUN ON THERANOS SPECIFIC METHODS.

12:46PM  8              MR. COOPERSMITH:  YOUR HONOR, OBJECTION.  THERE'S NO

12:46PM  9    EVIDENCE OF ANY GLUCOSE RESULT IN THIS EXHIBIT THAT WAS

12:46PM 10    ADMITTED INTO EVIDENCE.

12:46PM 11              THE COURT:  MR. BOSTIC, ARE YOU SPEAKING ABOUT

12:46PM 12    SOMETHING THAT WAS NOT IN EVIDENCE IN THIS CASE?

12:46PM 13              MR. BOSTIC:  I BELIEVE WHAT I'M SHOWING NOW IS IN

12:46PM 14    EVIDENCE, YOUR HONOR.

12:46PM 15              THE COURT:  THIS DOCUMENT?

12:46PM 16              MR. BOSTIC:  YES.

12:46PM 17              MR. COOPERSMITH:  YOUR HONOR, THE PROBLEM IS THERE'S

12:46PM 18    NO RESULT.  YOU CAN SEE RIGHT HERE THERE'S A RANGE, BUT THERE'S

12:46PM 19    NO GLUCOSE RESULT REPORTED TO MS. TOMPKINS.

12:46PM 20              THE COURT:  UNDERSTOOD.  BUT, MR. BOSTIC, THIS

12:47PM 21    DOCUMENT IS IN EVIDENCE?

12:47PM 22              MR. BOSTIC:  IT IS, YOUR HONOR, IN THIS CURRENT

12:47PM 23    FORM.

12:47PM 24              THE COURT:  YES.  YOU CAN COMMENT ON THE DOCUMENT

12:47PM 25    ITSELF, BUT NOT AS TO ANYTHING THAT IS NOT IN EVIDENCE OF

12:47PM 1    COURSE.

12:47PM 2            MR. BOSTIC: UNDERSTOOD. THANK YOU, YOUR HONOR.

12:47PM 3        YOU'LL RECALL THAT WHEN WE LOOKED AT THE ELEMENTS FOR WIRE

12:47PM 4    FRAUD, THERE WAS LANGUAGE SAYING THAT THE WIRE ITSELF NEED NOT

12:47PM 5    BE FRAUDULENT.

12:47PM 6        WHAT THAT MEANS IN THE CONTEXT OF THESE TRANSMITTED

12:47PM 7    PATIENT RESULTS IS THAT EVEN IF YOU FOUND CONTRARY TO THE

12:47PM 8    EVIDENCE THAT SOME OF THESE PATIENT TEST RESULTS WERE NOT

12:47PM 9    INACCURATE, THAT STILL WOULD NOT MEAN THAT THEY COULD NOT FORM

12:47PM 10   THE BASIS OF A WIRE FRAUD CONVICTION.

12:47PM 11       IF YOU FIND THAT THERE WAS A SCHEME TO DEFRAUD PATIENTS,

12:47PM 12   AND THAT THESE WIRES WERE IN FURTHERANCE OF THAT SCHEME, IT'S

12:47PM 13   NOT BARRIER TO A GUILTY VERDICT ON THESE COUNTS THAT THE WIRE

12:47PM 14   ITSELF DIDN'T CONTAIN ANY FRAUDULENT INFORMATION.

12:47PM 15       I'LL REFER YOU TO THE INSTRUCTION WE'VE REVIEWED IF YOU

12:47PM 16   WOULD LIKE TO UNDERSTAND THAT POINT BETTER.

12:48PM 17       LET'S TALK NEXT ABOUT COUNT TWELVE, WHICH IS A PAYMENT

12:48PM 18   MADE BY THERANOS TO A COMPANY CALLED HORIZON, AND IT RELATES TO

12:48PM 19   A MEDIA BUY.

12:48PM 20       MR. COOPERSMITH SUGGESTED THAT YOU SHOULD FIND NOT GUILTY

12:48PM 21   ON THIS COUNT BECAUSE YOU DON'T KNOW ENOUGH ABOUT IT. IN FACT,

12:48PM 22   ONE DOCUMENT TELLS YOU EVERYTHING YOU NEED TO KNOW ABOUT THIS

12:48PM 23   COUNT, AND THAT'S EXHIBIT 5454.

12:48PM 24       ON THE FACE OF THIS DOCUMENT, IT'S CLEAR THAT THIS PAYMENT

12:48PM 25   WAS FOR T.V., RADIO AND DJ AND TV HOSTS ON AIR SEGMENTS BUYS

REBUTTAL ARGUMENT BY MR. BOSTIC                    7680

12:48PM  1    FOR THE TIME PERIOD INDICATED.

12:48PM  2         SO THE QUESTION IS HOW DO WE KNOW THIS WAS IN FURTHERANCE

12:48PM  3    OF THE SCHEME TO DEFRAUD PATIENTS?

12:48PM  4         AGAIN, OTHER EVIDENCE IN THE CASE ESTABLISHES THE

12:48PM  5    EXISTENCE OF THAT SCHEME TO DEFRAUD.  OF COURSE, AS AN

12:49PM  6    ESSENTIAL PART OF THAT SCHEME TO DEFRAUD PATIENTS, THERANOS HAD

12:49PM  7    TO MARKET ITSELF TO PATIENTS.  THEY HAD TO ATTRACT CUSTOMERS

12:49PM  8    AND GET THEM IN THE DOOR AND GET THEIR ATTENTION.

12:49PM  9         IT'S CLEAR FROM THIS DOCUMENT THAT THIS WIRE TRANSFER,

12:49PM 10    THIS PAYMENT WAS IN FURTHERANCE OF THAT BECAUSE THIS WAS

12:49PM 11    PROMOTING THE COMPANY'S LAB TESTING TO PATIENTS.

12:49PM 12         MR. COOPERSMITH SAYS THAT YOU CANNOT CONVICT ON THIS COUNT

12:49PM 13    BECAUSE YOU DON'T KNOW THINGS LIKE THE CONTENT OF THE ADS, WHEN

12:49PM 14    THEY AIRED, WHO SAW THEM, THOSE THINGS AREN'T REQUIRED.  YOU

12:49PM 15    DON'T NEED TO KNOW THE EXACT CONTENT OF THE ADS, AGAIN, BECAUSE

12:49PM 16    THE CONTENT OF THE WIRE ITSELF NEED NOT BE FRAUDULENT.  YOU

12:49PM 17    DON'T KNOW NEED TO KNOW WHO SAW THEM OR WHETHER ANYBODY RELIED

12:49PM 18    ON THEM, BECAUSE AS THE COURT WILL INSTRUCT YOU, IT'S NOT

12:49PM 19    NECESSARY THAT A SCHEME TO DEFRAUD ACTUALLY BE SUCCESSFUL IN

12:49PM 20    ORDER FOR A CONVICTION TO RESULT.

12:49PM 21         SO THOSE THINGS ARE RED HERRINGS BY THE DEFENSE, AND I

12:50PM 22    WANT TO MAKE SURE THAT YOU'RE NOT DISTRACTED BY THEM.

12:50PM 23         I'LL ALSO POINT OUT THAT THAT SAME DOCUMENT INCLUDES AN

12:50PM 24    ATTACHMENT THAT IS LABELED DJ COPYING POINTS.  SO IT DOES

12:50PM 25    INCLUDE SOME OF THE CONTENT OF THIS ADVERTISING THAT THIS

ER-5334

12:50PM  1    PAYMENT WAS GOING TO PAY FOR.  AND YOU'LL SEE AS RELEVANT TO

12:50PM  2    THE SCHEME TO DEFRAUD HERE THAT CONTENT EMPHASIZES THERANOS'S

12:50PM  3    FINGERSTICK BLOOD TESTING METHOD.

12:50PM  4        SO HOW DID THIS SCHEME WORK?  BECAUSE THESE TWO SCHEMES

12:50PM  5    WERE SUCCESSFUL FOR A NUMBER OF YEARS, THE SCHEMES TO DEFRAUD

12:50PM  6    PATIENTS AND INVESTORS.

12:50PM  7        WELL, YOU SAW THAT THEY INVOLVED STOLEN CREDIBILITY.  THE

12:50PM  8    DEFENDANTS STOLE THE CREDIBILITY OF OTHER ORGANIZATIONS LIKE

12:50PM  9    PHARMACEUTICAL COMPANIES THAT THEY CLAIMED HAD VALIDATED THEIR

12:50PM  10   TECHNOLOGY;

12:51PM  11        WALGREENS, WHO THEY WERE PARTNERING WITH;

12:51PM  12        THE MEMBERS OF THE BOARD;

12:51PM  13        THEY STOLE THE CREDIBILITY OF THE PRESS ALSO BY

12:51PM  14   ENGINEERING FALSE INFORMATION TO APPEAR IN PRESS ARTICLES AND

12:51PM  15   THEN SPREADING THAT INFORMATION TO VICTIMS;

12:51PM  16        THEY BORROWED THE CREDIBILITY OF THE U.S. MILITARY BY

12:51PM  17   CLAIMING THAT ORGANIZATION WAS RELYING ON THE COMPANY'S

12:51PM  18   TECHNOLOGY; AND,

12:51PM  19        THEY EXPLOITED HOW FALSE INFORMATION SPREADS TO MAKE THEIR

12:51PM  20   JOB OF DECEIVING ALL OF THOSE PEOPLE EASIER AND MORE EFFICIENT.

12:51PM  21        BUT DON'T LET THE FACT THAT THOSE LIES TOOK ON A LIFE OF

12:51PM  22   THEIR OWN DISTRACT YOU FROM THE FACT THAT THIS IS ALL ABOUT

12:51PM  23   MR. BALWANI'S ACTIONS AND HIS CHOICES.

12:51PM  24        SO YOU SHOULD ASK HOW WOULD MR. BALWANI'S ACTIONS AND

12:51PM  25   CHOICES HAVE BEEN DIFFERENT OVER THE YEARS IF HE WAS NOT A

12:51PM  1      PARTICIPANT IN THESE TWO SCHEMES TO DEFRAUD INVESTORS AND

12:51PM  2      PATIENTS?

12:51PM  3          HERE ARE SOME EXAMPLES:

12:51PM  4          MR. BALWANI WOULD HAVE TAKEN SERIOUSLY CONCERNS OF

12:52PM  5      SCIENTISTS AT THERANOS ABOUT PROBLEMS WITH TESTING.  YOU'LL

12:52PM  6      RECALL THAT DR. PANDORI SUGGESTED THAT THEY NOT USE THE EDISON

12:52PM  7      FOR TESTING ANYMORE.

12:52PM  8          AND WHEN THE LAB DIRECTOR, ADAM ROSENDORFF, SPECIFICALLY

12:52PM  9      SAID NOT TO USE THE EDISON ON HCG, MR. BALWANI, AS THE PERSON

12:52PM 10      OVERSEEING THE LAB, WOULD HAVE RESPONDED TO THAT WITH CONCERN

12:52PM 11      AND WOULD HAVE KEPT THAT DECISION IN PLACE UNTIL DR. ROSENDORFF

12:52PM 12      WAS COMFORTABLE RESUMING TESTING ON THAT PLATFORM.

12:52PM 13          IF MR. BALWANI HAD NOT BEEN A PARTICIPANT IN THESE SCHEMES

12:52PM 14      WHEN MULTIPLE SCIENTISTS, INCLUDING LAB DIRECTORS, QUIT

12:52PM 15      THERANOS OVER THE CONCERNS ABOUT THE RELIABILITY AND ACCURACY

12:52PM 16      OF THE TESTING, MR. BALWANI WOULD HAVE MOVED QUICKLY TO HIRE

12:52PM 17      AND ASSIGN ANOTHER QUALIFIED LAB DIRECTOR TO OVERSEE THE

12:52PM 18      OPERATION OF THIS LAB THAT HAD SO MANY PROBLEMS.

12:52PM 19          IF HE REALLY CARED ABOUT FIXING THE PROBLEMS AT THERANOS,

12:52PM 20      THAT'S WHAT HE WOULD HAVE DONE INSTEAD OF HIRING HIS

12:53PM 21      DERMATOLOGIST AND ANOTHER CO-LABORATORY DIRECTOR WHO MAY AS

12:53PM 22      WELL HAVE BEEN CARDBOARD CUTOUTS FOR ALL OF THE IMPACT THEY HAD

12:53PM 23      ON THE ACCURACY AND RELIABILITY OF TESTING AT THE COMPANY.

12:53PM 24          AND THAT'S NOT A CRITICISM OF THEM.  THE EVIDENCE SHOWS

12:53PM 25      THAT THEY FULFILLED THEIR MANDATE.  THEIR ASSIGNMENT AS GIVEN

12:53PM  1    TO THEM BY MR. BALWANI DID NOT INCLUDE MEANINGFUL PARTICIPATION

12:53PM  2    OF THE RUNNING OF THE LAB.

12:53PM  3         IF MR. BALWANI WEREN'T A PARTICIPATE IN THESE SCHEMES, HE

12:53PM  4    WOULD HAVE BEEN TROUBLED BY FALSE CLAIMS ABOUT THERANOS IN THE

12:53PM  5    MEDIA, CITING MS. HOLMES AND HIM AS A SOURCE; AND HE WOULDN'T

12:53PM  6    HAVE REJECTED DR. PANDORI'S IDEA THAT MS. HOLMES SHOULD CONSULT

12:53PM  7    WITH TECHNICAL PEOPLE AT THE COMPANY SO SHE COULD DO A BETTER

12:53PM  8    JOB OF BEING ACCURATE IN THOSE INTERVIEWS, HE WOULD HAVE BEEN

12:53PM  9    EVEN MORE TROUBLED BY MISLEADING STATEMENTS ON HIS COMPANY'S

12:53PM  10   OWN WEBSITES.

12:53PM  11        WHEN INVESTORS WANTED TO MEET THE LEADERS OF THERANOS, HE

12:53PM  12   WOULD HAVE GIVEN HONEST INFORMATION ABOUT THE COMPANY'S STATUS

12:53PM  13   AND ACHIEVEMENTS, INSTEAD OF WORKING WITH MS. HOLMES TO DECEIVE

12:54PM  14   PEOPLE OVER AND OVER AGAIN.

12:54PM  15        HE WOULD HAVE TOLD INVESTORS, WALGREENS REPRESENTATIVES

12:54PM  16   AND OTHER VIP VISITORS TO THERANOS, THAT THE DEVICES THAT THEY

12:54PM  17   WERE SHOWING THEM IN CONFERENCE ROOMS WERE NOT ACTUALLY THE

12:54PM  18   DEVICES THAT WERE GOING TO BE USED TO RUN THOSE VIP'S SAMPLES

12:54PM  19   WHEN THEY HAD DEMOS DONE AT THE COMPANY.

12:54PM  20        WHEN MR. MENDENHALL ASKED MR. BALWANI TO TELL HIM ABOUT

12:54PM  21   THE STATE OF THE COMPANY, HE WOULDN'T HAVE REPEATED THE SAME

12:54PM  22   FALSE STATEMENTS WHEN MS. HOLMES WASN'T THERE.

12:54PM  23        LATER, WHEN MR. MENDENHALL WANTED TO INVEST MORE BUT

12:54PM  24   NEEDED MORE CONCRETE INFORMATION ABOUT THE COMPANY, MR. BALWANI

12:54PM  25   WOULD HAVE PROVIDED IT BECAUSE HE WOULD HAVE HAD NOTHING TO

12:54PM  1     HIDE INSTEAD OF GOING SILENT ON THAT INVESTOR.

12:54PM  2          WHEN MR. EISENMAN ASKED ABOUT REPORTS DETAILING THE ACTUAL

12:54PM  3     LIMITS OF THE THERANOS TECHNOLOGY, MR. BALWANI WOULD HAVE

12:54PM  4     ADMITTED THE TRUTH TO THAT INVESTOR, HE WOULD HAVE COME CLEAN

12:54PM  5     INSTEAD OF SAYING THAT THE SOURCE DIDN'T KNOW WHAT THEY WERE

12:55PM  6     TALKING ABOUT.

12:55PM  7          WHEN THE CMS INSPECTION FOUND SERIOUS PROBLEMS IN THE

12:55PM  8     THERANOS LAB, MR. BALWANI WOULD HAVE FOCUSSED ON SOLUTIONS

12:55PM  9     RATHER THAN TRYING TO PERSUADE SARAH BENNETT NOT TO CALL IT

12:55PM 10     WHAT SHE SAW IT.

12:55PM 11          TOWARD THE BEGINNING OF THE DEFENSE CLOSING, MR. BALWANI'S

12:55PM 12     LAWYER SAID THERE WAS NO EVIDENCE HE ALONE, OR WORKING WITH

12:55PM 13     MS. HOLMES, TRIED TO DECEIVE OR CHEAT ANYONE.  IF THAT WERE AT

12:55PM 14     ALL TRUE, MR. BALWANI WOULD HAVE MADE THE OPPOSITE CHOICE IN

12:55PM 15     EACH AND EVERY ONE OF THE SITUATIONS I'VE JUST DESCRIBED, AND

12:55PM 16     THAT IS HOW YOU AS THE JURY ARE ABLE TO JUDGE THE INTENT AND

12:55PM 17     STATE OF MIND OF THE DEFENDANT, NOT BECAUSE YOU'RE A MIND

12:55PM 18     READER AND NOT BECAUSE YOU'RE ABLE TO RELY ON WHAT THE LAWYERS

12:55PM 19     SAY IN INTERPRETING MR. BALWANI'S ACTIONS OR STATEMENTS, BUT

12:55PM 20     BECAUSE YOU KNOW WHAT HE DID AND YOU KNOW ABOUT THE CHOICES HE

12:55PM 21     MADE HIMSELF.  YOU'VE SEEN THAT EVIDENCE.

12:56PM 22          SO WHEN YOU DELIBERATE AND MAKE YOUR DECISION, YOU SHOULD

12:56PM 23     RELY ON THAT EVIDENCE.  YOU SHOULD REVIEW ALL OF THE EVIDENCE,

12:56PM 24     ASSIGN IT THE WEIGHT THAT YOU THINK IS APPROPRIATE.  AND

12:56PM 25     INSTEAD OF RELYING ON THE DEFENSE COUNSEL'S CHARACTERIZATION OR

REBUTTAL ARGUMENT BY MR. BOSTIC                                          7685

12:56PM   1     THE GOVERNMENT'S CHARACTERIZATION OF THINGS, TRUST YOUR OWN

12:56PM   2     COMMON SENSE, TRUST YOUR EYES, TRUST YOUR MEMORIES ABOUT WHAT

12:56PM   3     THE EVIDENCE IN THIS TRIAL HAS ACTUALLY SHOWN, AND WHEN YOU DO

12:56PM   4     THAT, THE ONLY RESULT THAT YOU'RE ABLE TO REACH THAT IS

12:56PM   5     SUPPORTED BY ALL OF THE EVIDENCE IN THIS CASE WILL BE A VERDICT

12:56PM   6     OF GUILTY ON EVERY COUNT IN THE INDICTMENT.

12:56PM   7           ON BEHALF OF THE UNITED STATES, THANK YOU FOR YOUR

12:56PM   8     ATTENTION THROUGHOUT THE TRIAL AND TODAY.

12:56PM   9                 THE COURT:  THANK YOU, MR. BOSTIC.

12:56PM  10           LADIES AND GENTLEMEN, THAT CONCLUDES THE ARGUMENTS IN THE

12:56PM  11     CASE.  THE ONLY THINGS PRIOR TO YOUR DELIBERATIONS ARE MY

12:56PM  12     INSTRUCTIONS.  LET'S TAKE ABOUT A 12 MINUTE BREAK.  THE

12:57PM  13     INSTRUCTIONS WILL TAKE A LITTLE LESS THAN AN HOUR TO READ TO

12:57PM  14     YOU I BELIEVE.  WHY DON'T WE TAKE A 10 OR 12 MINUTE BREAK NOW,

12:57PM  15     WE'LL RETURN AND I'LL READ THOSE INSTRUCTIONS TO YOU.

12:57PM  16           LET ME TELL YOU, YOU WILL, AND I THINK I TOLD YOU THIS

12:57PM  17     BEFORE IN OUR VOIR DIRE AND IN OUR PRELIMINARY INSTRUCTIONS,

12:57PM  18     EACH OF YOU, EACH OF THE 12 JURORS WILL HAVE A COPY OF THE

12:57PM  19     INSTRUCTIONS IN THE DELIBERATION ROOM.  YOU WON'T HAVE IT HERE

12:57PM  20     WHILE I READ THEM TO YOU, BUT YOU WILL HAVE THEM IN THE

12:57PM  21     DELIBERATION ROOM FOR YOU TO REFER TO.

12:57PM  22           SO LET'S TAKE ABOUT A 12 MINUTE BREAK NOW.  WE'LL COME

12:57PM  23     BACK, AND I'LL READ THE INSTRUCTIONS.  THANK YOU.

12:57PM  24           (RECESS FROM 12:57 P.M. UNTIL 1:18 P.M.)

01:18PM  25                 THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

**To:** 'Cook, Stephen D MAJ MIL USA USASOC'[stephen.d.cook@█████████
**Cc:** Elizabeth Holmes[eholmes@theranos.com]
**From:** Daniel Edlin
**Sent:** Thur 1/19/2012 7:28:23 AM
**Importance:** Normal
**Subject:** RE: Lab Set (UNCLASSIFIED)
**Received:** Thur 1/19/2012 7:28:24 AM
Theranos_USASOC Project CONFIDENTIAL - DO NOT CIRCULATE.PDF

Major Cook,

Thank you for the clarification and for outlining your proposal in detail. We understand your request and will provide you with follow up to confirm the testing feasibility and time lines you suggested below. In order that we may fully evaluate your inquiry, if you would, please provide a comprehensive list of all of the assays you plan to test.

Additionally, please see attached an overview of the Theranos - USASOC project and background information on Theranos. Given that the attached file is not encrypted and is highly confidential, we kindly ask that the disclosure and circulation be limited accordingly (military use only).

Thank you and please let us know if you have any questions. We very much look forward to working with you on this project.

Best regards,
Dan

-----Original Message-----
From: Cook, Stephen D MAJ MIL USA USASOC [mailto:stephen.d.cook@█████████
Sent: Tuesday, January 17, 2012 5:49 AM
To: Daniel Edlin
Cc: Elizabeth Holmes; michael.mcginnis@█████████
Subject: RE: Lab Set (UNCLASSIFIED)

UNCLASSIFIED
Dan,

Actually my verbal requests of last week changed from my written inquiry that you answered below. As you know, we're looking to evaluate your system to determine its utility across the operations and environments in which we'd like to deploy it. In order to do so we'd like to conduct an assessment period after which we'd likely move forward with a 12 month renewable service contract that is more in-line with your current billing system.

In the absence of background materials, I am proposing an evaluation period that looks like this:

3ea devices (GPS disabled) - running up to 400 assays each per month (base deficit, international normalized ratio, hematocrit, hemoglobin, complete blood count, and chem 7) from 01MAR through 31MAY12. The 3ea units will be assessed for performance of core function as well as operation from various mobility platforms (aircraft, ground vehicles, etc) as well as various environmental conditions.

If the above is successful, deliver 7ea additional devices (GPS disabled) - for a total of 10ea devices from 01JUN through 31AUG12. The original 3ea devices will likely continue to run up to 400 assays each per month. The 7ea devices will likely run up to 100 assays per month and be used across the globe to determine deployability.

We would like to accomplish the above with a firm-fixed price contract totalling $75K that includes assays as mentioned (even if less are performed) and shipping costs. We can distribute the funds between the two phases as $18K/$57K - or any ratio that makes sense from a Theranos standpoint.

We'd be looking at 2ea contract CLIN's of "Assessment Period 1" and "Assessment Period 2" (OPTION). Upon conclusion of "Period 1", our service contract representative would likely begin work with you to determine terms of contract to facilitate seamless transition of all 10ea devices upon successful performance of "Period 2". Likely that 8ea devices would be active at any given time with 2ea devices retained as spares to employ as required.

Please provide your input on the above. If you concur, we'd like to discuss in further detail and move to a quote and

FOIA Confidential Treatment Requested by Theranos                                    TS-0324734

ER-5340

contract at the earliest opportunity.

Thank you.

Regards,

Steve


Stephen Cook

MAJ, SF

APM Soldier Systems

          (comm.)


"I am not a Contracting Officer, I cannot direct work or initiate or modify contracts; I do not have the authority to commit the Government financially in any way. If the Government desires to alter your requirements as a result of the information obtained from this email discussion, changes will be issued in writing and signed by the appropriate contracting officer."

On 01/16/12, Daniel Edlin wrote:
> Major Cook,
>
> Please note that we are finalizing background materials on Theranos and will send them to you as soon as possible. I wanted to provide you with some other feedback per your questions during our conversation on Thursday. Theranos will in fact be able to provide GPS disabled devices, and we will be able to make modifications for you as well. With regard to the rough order of magnitude that would support a 12-month evaluation period, we kindly ask that you send a total list of assays you would like to test. With this information we will be able to confirm the feasibility of the timeline and magnitude of tests discussed last week.
>
> Thank you, and please indicate if you have any questions or would like to schedule a phone call to discuss further.
>
> Best regards,
> Dan
>
>
>
> -----Original Message-----
> From: Cook, Stephen D MAJ MIL USA USASOC
> [mailto:stephen.d.cook@███████████(javascript:main.compose()
> Sent: Thursday, January 12, 2012 9:12 AM
> To: Daniel Edlin
> Subject: RE: Lab Set (UNCLASSIFIED)
>
> UNCLASSIFIED
> Dan,
>
> Please send your phone number.
>
> Steve
>
> On 01/12/12, Daniel Edlin wrote:
> > Major Cook,

FOIA Confidential Treatment Requested by Theranos

TS-0324735

> >
> > Please note we have learned that our emails have not been going through your mail delivery system, and we will try again with our IT department tomorrow. In the meantime, please indicate your availability for a phone call to review in detail the questions and concerns in your email below.
> >
> > Thank you, I look forward to our next conversation.
> >
> > Best regards,
> > Dan
> >
> >
> > -----Original Message-----
> > From: Daniel Edlin
> > Sent: Friday, January 06, 2012 5:36 PM
> > To: 'Cook, Stephen D MAJ MIL USA USASOC'
> > Cc: Elizabeth Holmes; 'michael.mcginnis@█████████'
> > Subject: RE: Lab Set (UNCLASSIFIED)
> >
> > Thank you for your email, Steve. Hope you had a nice holiday. We are currently in the process of putting together feedback and will have it to you shortly.
> >
> > Best regards,
> > Dan
> >
> >
> > -----Original Message-----
> > From: Cook, Stephen D MAJ MIL USA USASOC
> > [mailto:stephen.d.cook@█████████](javascript:main.compose()(javasc
> > ript:main.compose()
> > Sent: Friday, January 06, 2012 6:57 AM
> > To: Elizabeth Holmes
> > Cc: michael.mcginnis@█████████ Daniel Edlin
> > Subject: RE: Lab Set (UNCLASSIFIED)
> >
> > UNCLASSIFIED
> > Elizabeth, Dan,
> >
> > Still waiting for feedback on the below inquiry. Based on your discussions with Kyle, trying to determine if our assessment will be in the form of approximately 3ea devices over a trial 12-month service contract or if you'll have to make mods or we'll have to make purchases to support an evaluation. I know Kyle had concerns with internal GPS tracking and our requirement is to have this disabled in any devices we evaluate.
> >
> > If you have any initial assessments in terms of rough order of magnitude that would support a 12-month evaluation period, please provide that as well.
> >
> > Thank you for any feedback.
> >
> > Regards,
> >
> > Steve
> >
> >
> > On 12/15/11, Elizabeth Holmes wrote:
> > > Thanks Steve. Dan Edlin, copied to this email, is the Theranos Product Manager who will be overseeing this work together. We will follow with feedback in line with your email below.
> > > We very much look forward to our coming conversations.
> > > Elizabeth.
> > >
> > > -----Original Message-----
> > > From: Cook, Stephen D MAJ MIL USA USASOC
> > > [mailto:stephen.d.cook@█████████
> > > script:main.compose()(javasc

FOIA Confidential Treatment Requested by Theranos                                    TS-0324736

ER-5342

> > > ript:main.compose()
> > > Sent: Thursday, December 15, 2011 5:31 AM
> > > To: Elizabeth Holmes
> > > Cc: michael.mcginnis@▮▮▮▮▮▮
> > > Subject: Lab Set
> > >
> > > Ms. Holmes,
> > >
> > > My name is Steve Cook, my partner is Mike McGinnis - cc'd above, and the two of us will be working with Kyle Sims through his requirement with you and Theranos. We were wondering if you could forward a summary of the existing technology, your impression of where Kyle Sims would like to take the technology, any challenges from your perspective, as well as your feedback on Kyle's initial comments below as they pertain to your current capabilities and further work/investment required:
> > >
> > > -More extensive environmental testing -Device function on board
> > > evacuation platforms -Communications integration (what is the best method possibly as simple as an iridium phone based on the bandwidth) -IT security considerations -Confidentiality. This system is considered disruptive technology and as such Theranos has serious concerns about the details of their system getting out before they are prepared.
> > >
> > >
> > > Your assessment and summary of the scope of the project as you understand it would be greatly appreciated.
> > >
> > >
> > > We look forward to working with you in the future.
> > >
> > >
> > > Regards,
> > >
> > >
> > > Steve
> > >
> > > Stephen Cook
> > > MAJ, SF
> > > APM Soldier Svstems
> > >                    (comm.)
> > >
> > > "I am not a Contracting Officer, I cannot direct work or initiate or modify contracts; I do not have the authority to commit the Government financially in any way. If the Government desires to alter your requirements as a result of the information obtained from this email discussion, changes will be issued in writing and signed by the appropriate contracting officer."
> > >
> >
> >
> >
> > UNCLASSIFIED
>
>
>
> UNCLASSIFIED


UNCLASSIFIED

FOIA Confidential Treatment Requested by Theranos



USASOC & Theranos, Inc.

**BACKGROUND**

Theranos has created a point-of-service laboratory infrastructure that generates real-time data from a finger-stick of blood or other micro-volumes of different sample types delivering higher quality data than previously possible. This technology is an industry first, with profound effects on the ability to triage and stabilize patients via quantitative reads from micro sample sizes in real-time in the field.

- Each Theranos device can run every test currently available through the traditional centralized or hospital laboratory infrastructure.
- Theranos' device can process multiple samples on a given cartridge. Sample types include blood, urine, feces, tissue and saliva, amongst others.
- The device can process individual cartridges, or up to six (6) cartridges simultaneously, with a turnaround time of 5 – 30 minutes on any combination of tests ordered.
- The cartridge can automatically perform follow-up tests when protocol dictates those additional tests are necessary.
- Theranos manufactures all of its technologies and systems within the United States.
- *Theranos has created the first CLIA-certified point-of-service laboratory technology, which is highly efficient in the provision of rapid information with a high level of accuracy for use in critical-need situations.*

**DIFFERENTIATION OF TECHNOLOGY**

- In today's market, the variability inherent across different "point-of-care" devices is so great that accurate decision making has not been possible; likewise all such point-of-care devices are waived tests which are not accurate enough to be used for clinical decision making under regulatory guidelines.
- Theranos' novel laboratory infrastructure generates data at unprecedented levels of quality and integrity by precisely automating the exact same laboratory processes run (manually) through central laboratories today.
- Devices can transmit data and video via satellite, short and long-wave radio, Ethernet, Wi-Fi, and cellular broadband to allow instant communication of test results to the necessary recipients.

**IMPROVED PATIENT OUTCOMES AND MATERIAL COST REDUCTIONS**

- Real-time data and decision support at the time of impact or injury
  - The Decision Support application gives real-time results and medical advice and instruction on patient laboratory values and how to stabilize, triage, and treat patients.
  - Upon communication of results, Theranos provides decision support for targeted interventions needed under specific conditions. This system enables doctors to make more informed decisions in complex scenarios and can facilitate the administration of basic care by untrained providers.

THERANOS CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos

TS-0324738

ER-5344



- Enabling significant cost savings
  - Theranos estimates fully loaded cost savings of 80% or more to USASOC by eliminating costs attributed to delayed triage and stabilization, prolonged hospital bed time, purchase of equipment and reagents, transportation of patients for testing in the field, laboratory personnel, and additional overhead expenses.

**PROJECT SCOPE**

- Military applications
  - <u>Medevac</u>: the ability to test and triage wounded soldiers at the time of impact and during evacuation (e.g. in a helicopter), and avoid delayed care due to unavailable medical information while the solider is in transit.
  - <u>Genetic testing</u>: real-time identification from small samples via DNA analysis at the point of service.
  - <u>Telecommunications</u>: device is equipped with software and hardware that enables live communication with offsite medical personnel, allowing the most qualified doctors and surgeons to assist in the stabilization, triage and initiation of treatment at the point-of-service. Theranos field systems' rugged, modular design with integrated communications capability and GPS enable full operability in the field.
  - <u>Role 1-4</u>: brings quick and accurate diagnostic capabilities to the field, performing basic health screenings for minor and severe illnesses (e.g. influenza), and sophisticated testing in real-time for infections, injuries, and more rapid transfusions. In addition, Theranos can collect longitudinal data to assist in infectious disease containment and identification of toxins and other infectious agents on the front-line as well as in more chronic disease management.
- Environmental Testing
  - Theranos hopes to work with USASOC to further develop environmental testing capabilities and looks forward to receiving guidance on any specifications needed to do so.
- IT Security
  - Theranos believes that interoperability with the USASOC system will not be difficult from either a connectivity or data interface standpoint based on feedback from previous interactions with DoD. Theranos will certainly integrate at the discretion of USASOC.
- Confidentiality
  - Given the disruptive and proprietary aspects of Theranos' technology, confidentiality is of the utmost importance. All details and procedures incorporated in this project must be strictly limited to USASOC and Theranos personnel on a need to know basis.

THERANOS CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos

TS-0324739



USASOC & Theranos, Inc.

**BACKGROUND**

Theranos has created a point-of-service laboratory infrastructure that generates real-time data from a finger-stick of blood or other micro-volumes of different sample types delivering higher quality data than previously possible.  This technology is an industry first, with profound effects on the ability to triage and stabilize patients via quantitative reads from micro sample sizes in real-time in the field.

- Each Theranos device can run every test currently available through the traditional centralized or hospital laboratory infrastructure.
- Theranos' device can process multiple samples on a given cartridge.  Sample types include blood, urine, feces, tissue and saliva, amongst others.
- The device can process individual cartridges, or up to six (6) cartridges simultaneously, with a turnaround time of 5 – 30 minutes on any combination of tests ordered.
- The cartridge can automatically perform follow-up tests when protocol dictates those additional tests are necessary.
- Theranos manufactures all of its technologies and systems within the United States.
- *Theranos has created the first CLIA-certified point-of-service laboratory technology, which is highly efficient in the provision of rapid information with a high level of accuracy for use in critical-need situations.*

**DIFFERENTIATION OF TECHNOLOGY**

- In today's market, the variability inherent across different "point-of-care" devices is so great that accurate decision making has not been possible; likewise all such point-of-care devices are waived tests which are not accurate enough to be used for clinical decision making under regulatory guidelines.
- Theranos' novel laboratory infrastructure generates data at unprecedented levels of quality and integrity by precisely automating the exact same laboratory processes run (manually) through central laboratories today.
- Devices can transmit data and video via satellite, short and long-wave radio, Ethernet, Wi-Fi, and cellular broadband to allow instant communication of test results to the necessary recipients.

**IMPROVED PATIENT OUTCOMES AND MATERIAL COST REDUCTIONS**

- Real-time data and decision support at the time of impact or injury
  - The Decision Support application gives real-time results and medical advice and instruction on patient laboratory values and how to stabilize, triage, and treat patients.
  - Upon communication of results, Theranos provides decision support for targeted interventions needed under specific conditions. This system enables doctors to make more informed decisions in complex scenarios and can facilitate the administration of basic care by untrained providers.

THERANOS CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos

TS-0324738

ER-5346



- Enabling significant cost savings
  - Theranos estimates fully loaded cost savings of 80% or more to USASOC by eliminating costs attributed to delayed triage and stabilization, prolonged hospital bed time, purchase of equipment and reagents, transportation of patients for testing in the field, laboratory personnel, and additional overhead expenses.

## PROJECT SCOPE

- Military applications
  - <u>Medevac</u>: the ability to test and triage wounded soldiers at the time of impact and during evacuation (e.g. in a helicopter), and avoid delayed care due to unavailable medical information while the solider is in transit.
  - <u>Genetic testing</u>: real-time identification from small samples via DNA analysis at the point of service.
  - <u>Telecommunications</u>: device is equipped with software and hardware that enables live communication with offsite medical personnel, allowing the most qualified doctors and surgeons to assist in the stabilization, triage and initiation of treatment at the point-of-service. Theranos field systems' rugged, modular design with integrated communications capability and GPS enable full operability in the field.
  - <u>Role 1-4</u>: brings quick and accurate diagnostic capabilities to the field, performing basic health screenings for minor and severe illnesses (e.g. influenza), and sophisticated testing in real-time for infections, injuries, and more rapid transfusions. In addition, Theranos can collect longitudinal data to assist in infectious disease containment and identification of toxins and other infectious agents on the front-line as well as in more chronic disease management.
- Environmental Testing
  - Theranos hopes to work with USASOC to further develop environmental testing capabilities and looks forward to receiving guidance on any specifications needed to do so.
- IT Security
  - Theranos believes that interoperability with the USASOC system will not be difficult from either a connectivity or data interface standpoint based on feedback from previous interactions with DoD. Theranos will certainly integrate at the discretion of USASOC.
- Confidentiality
  - Given the disruptive and proprietary aspects of Theranos' technology, confidentiality is of the utmost importance. All details and procedures incorporated in this project must be strictly limited to USASOC and Theranos personnel on a need to know basis.

THERANOS CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos

TS-0324739

ER-5347

# AMENDED AND RESTATED
# THERANOS MASTER SERVICES AGREEMENT

Whereas the parties entered into the Theranos Master Purchase Agreement ("Original Agreement") dated July 30, 2010;

Whereas the parties agree that because of certain changes in circumstances, it is necessary to terminate the Original Agreement and replace it with this Agreement (as defined below;

This Amended and Restated Master Services Agreement ("Agreement") dated June _5_, 2012 ("Effective Date") is by and between:

| WALGREENS | | | |
|---|---|---|---|
| Full Legal Name | Walgreen Co. | Client Signatory | Wade Miquelon |
| Jurisdiction of Incorporation | Illinois | Title | Executive Vice President & Chief Financial Officer |
| Principal Business Address | 200 Wilmot Road Deerfield, IL 60015 | Telephone | 847.315.3090 |
| Company Phone Number | 847.914.2500 | Email | wade.miquelon@walgreens.com |
| Company Fax Number | 847.914.2804 | | |
| **THERANOS** | | | |
| Full Legal Name | Theranos, Inc. | Theranos Signatory | Elizabeth Holmes |
| Jurisdiction of Incorporation | Delaware | Title | President and CEO |
| Principal Business Address | 3200 Hillview Avenue Palo Alto, CA 94304 | Telephone | 650-470-6111 |
| Company Phone Number | 650-838-9292 | Email | eholmes@theranos.com |
| Company Fax Number | 650-838-9165 | | |

This Agreement is comprised of:
Schedule A:  Program Overview
Schedule B:  Service Terms and Conditions
Schedule C:  Support and Maintenance Terms
Schedule D:  Walgreens Service Pricing
Schedule E:  Definitions
Schedule F:  Pilot
Schedule G: HIPAA Business Associate Agreement
Schedule H-1: Convertible Promissory Note
Schedule H-2: Certificate Evidencing Right to Purchase Convertible Promissory Note
Schedule I: Theranos Pharmaceutical Clinical Trials Infrastructure
Schedule J: Test Menu

The parties agree to the terms set forth in this Agreement, including each attached Schedule, each of which is fully incorporated herein by reference.  This Agreement may be signed in counterparts each of which will be deemed an original and together shall constitute one and the same Agreement.

Confidential Treatment Requested by Walgreen Co.
WAG-TH-00000050

ER-5348

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| | _Elizabeth Holmes_ |
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| | Elizabeth Holmes |
| (Authorized Representative -- Printed) | (Authorized Representative – Printed) |
| | CEO |
| (Title) | (Title) |

Theranos and Walgreens Confidential and Proprietary

-2-

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000051

ER-5349

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| _____ | _____ |
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| WADE D. MIQUELON | _____ |
| (Authorized Representative – Printed) | (Authorized Representative – Printed) |
| CFO | _____ |
| (Title) | (Title) |

CTK-LAW

Theranos and Walgreens Confidential and Proprietary

-2-

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000052

ER-5350

## SCHEDULE A

## PROGRAM OVERVIEW

This Schedule sets forth the Program, including the objectives of the Program and shall be used only for illustrative purposes. The terms and conditions governing this Schedule are set forth in Schedule B, attached. Schedule A is intended to be used for each parties understanding of the relationship and shall not govern nor bind either party's actions. If and to the extent this Schedule provides additional terms and/or conflicting terms to the terms and conditions set forth in Schedule B, the terms of Schedule B will prevail. The capitalized terms as used in this Agreement are defined in Schedule E, attached.

1. **Intentionally Deleted.**
2. **Program Objectives.** The objectives of this Program include:

   a. Make testing less invasive, faster and far more accessible, effective, and actionable by introducing a more cost-effective, blood testing service at Walgreens stores and Walgreens' other clinical operations nationwide (which, by example, include, but are not limited to infusion centers and CSG/ESG clinics). Other types of specimens collected will be nasal and throat swabs as well as urine samples.

   b. Empower Walgreens to play a more active role in patient health management and well-being. Theranos Systems include a decision support system, which will be accessible through the touch screens on the devices, including any on-site interface provided by Theranos, or through the web browser. This decision support system will deliver real-time, actionable information to the clinicians in the pharmacy and other Walgreens clinical locations by providing analysis, interpretations and recommendations based on patient test results.

   c. Generate health care cost savings by reducing direct out-of-pocket costs of lab tests and visits.

   d. Early intervention and reduced hospitalization through early detection of the onset of disease.

   e. Introduce a new revenue stream for Walgreens through this disruptive technology and associated services.

3. **Phased Disruption.** As Theranos continues to develop disruptive technology, the parties agree to discuss terms by which such innovations can be made commercially available through Walgreens. Notwithstanding the previous, the parties acknowledge the mutual desire to bring Theranos' technology to market as quickly as is reasonably possible. With that in mind, at the commencement of this Agreement, it is the parties' intention for Walgreens to act as a patient service center and collect blood samples via finger-stick technology, small samples of urine, saliva, feces, or swabs, with laboratory testing to be performed by Theranos at a CLIA certified offsite laboratory ("PSC Phase"). At such point that the Theranos System is approved for use in a retail setting by appropriate regulatory bodies, the parties will determine which Walgreens locations, if any, should deploy the Theranos System, with Theranos acting as the CLIA certified laboratory at the retail and/or employer setting ("Onsite Phase").

4. **Program Managers.** Each party will assign a program manager to this Program. The responsibilities of each party's program manager include: (i) serve as the interface between the other party; (ii) develop a mutually agreed upon detailed business plan including milestones, projections/forecasts and deliverables, and success/acceptance criteria for each milestone (details of the business plan and any applicable schedule shall be memorialized in an amendment to this Agreement); (iii) ensure that Theranos and Walgreens have committed the necessary resources necessary to meet the objectives and timeline of the Program; (iv) prepare regularly-scheduled status reports on the Program, on an agreed-upon time-frame; (v) identify, schedule and confirm availability of resources, including management, to provide agreed-upon services and deliverables; and (vi) assist in resolving issues, and escalate, as appropriate, within the other party. The parties acknowledge that the Program Plan is subject to change as the Program progresses. Notwithstanding anything to the contrary in this Schedule A, all terms of the relationship shall be detailed in Schedules B through J or by an amendment to this Agreement.

5. **Reviews.** The appropriate Program Managers and Representatives from each party will meet on at least a bi-weekly basis at least until the Pilot commences, to develop the project and review the entire status of the Program.

*[remainder of page intentionally left blank]*

Theranos and Walgreens Confidential and Proprietary                                          -3-

**Confidential Treatment Requested by Walgreen Co.**                     **WAG-TH-00000053**

**ER-5351**

## SCHEDULE B

### SERVICE TERMS AND CONDITIONS

1.  **Scope**. The terms and conditions set forth in this Schedule apply to this Agreement, including each attached Schedule or other attachment. To the extent a Schedule or other attachment provides additional terms and/or conflicting terms to the terms and conditions set forth in this Schedule B, the terms of this Schedule B will prevail.

2.  **Service Fee Guarantee.** During the PSC Phase, Theranos agrees that no other United States retail pharmacy, grocer, mass merchant, or physician office(s) will be able to procure the right to act as a PSC for Theranos or the right to obtain services from Theranos as they relate to the collection of specimens for service(s) for a compensation amount per Test that exceeds the compensation amount available to Walgreens for those services. Any promotional strategic contracts with thought leaders, physicians or charitable work shall not be subject to the Service Fee Guarantee, provided service fees paid for such services below the Walgreens fee, are not material to Theranos for any given twelve (12) month period.

    With respect to Predictive Tests, the parties agree that Theranos shall have an independent auditor, acceptable to Walgreens, certify to Walgreens that the service fee provided to Walgreens during the PSC Phase conforms with this Section 2. Should the result of such audit show that Walgreens was paid a lesser service fee than what is provided for in this Section, Theranos shall supplement such service fee within thirty (30) days of such certification. Said certification shall be made twice: Within sixty (60) days of the date that is six (6) months after the date Walgreens' exclusivity period on each new Predictive Test completes, and within sixty (60) days of the date that is twelve (12) months after the date Walgreens' exclusivity period on such Test completes.

3.  **Exclusivity**.

a.  **Central Labs and PBMs.** Theranos agrees not to make the Theranos System available for sale to, distribution to, or for use (through collection of blood samples, other specimens or otherwise) in delivering Tests to (a) any central lab company (including but not limited to Quest Diagnostics Inc., Laboratory Corporation of America Holdings, and all their related entities, as well as any other non-hospital company doing business as a centralized commercial laboratory), and (b) any pharmacy benefit manager (PBM) (including but not limited to Medco Health Solutions Inc., Express Scripts, Inc., and all their related entities, as well as any other company doing business as a pharmacy benefit manager). Notwithstanding the previous, the following exception shall apply: in geographic areas where Theranos has not yet launched through Walgreens stores, the above restriction around central lab companies shall not apply until Theranos launches through Walgreens stores in a given geography.

b.  **Retail Pharmacies, Grocers and Mass Merchants.** For all retail pharmacy companies (for purposes of this Agreement, the retail drug store division of CVS Caremark Corporation will be considered as a retail pharmacy), grocers, and retail mass merchants, including, but not limited to Wal-Mart Stores, Inc., and its related entities ("Wal-Mart"), Theranos may provide testing services as follows:

      i.  For Routine and Specialty Tests: For the PSC Phase, six (6) months after successful completion of the Pilot, and, if Walgreens commits to proceed with the Onsite Phase within sixty (60) days of notice by Theranos, along with written evidence that the FDA has no objections to the commercial use of the Theranos System in a retail pharmacy setting, six (6) months from that date of initiation of the Onsite Phase. Assuming Walgreens decides to proceed to the Onsite Phase, the parties shall work together to plan scale, provided that the parties agree that the initiation of the Onsite Phase shall take place at the end of the sixty (60) day notice period;

      ii. For Theranos Predictive Tests: Twelve (12) months after the date that each of the following new Tests are available: diabetes/pre-diabetes, congestive heart failure, women's cancer and men's cancer. For purposes of this Section, available shall mean the date upon which Theranos secures a major payor's reimbursement for such Test, provided that such Test is not available on a direct to consumer basis. For purposes of this Agreement, the term "major payor" shall mean one of any of the following companies: UnitedHealth Group, WellPoint, Inc., Kaiser Foundation Group, Aetna Group, Humana Group, HCSC, Coventry Corp., Highmark Group, Independence Blue Cross Group, and Blue Shield of CA Group. To illustrate this exclusivity, assume a women's cancer test is made available to Walgreens on 1/1/2011. Walgreens' exclusivity right to

secure and offer said test would expire on 1/1/2012.  Then if a men's cancer test is introduced on 1/1/2012, Walgreens' exclusivity right to secure and offer said test would expire on 1/1/2013.

Any tests developed after the execution of this Agreement that are not specifically listed in the definitions of Specialty and Predictive Tests/Cartridges and are subject to development or licensing agreements with pharmaceutical companies and/or United States or foreign government agencies will not be subject to the exclusivity terms listed above.

For purposes of this Agreement, one other United States retail grocer, but specifically excluding any mass merchant, selected by Theranos in its discretion, and its related entities will not be subject to Schedule B, Section 3.b.  During the time of exclusivity, Theranos retains the right to pilot with other companies. Such pilots shall be no greater in number of stores or locations than as defined in Schedule F.

c.  **Walgreens Exclusivity**        Provided that Theranos is able to perform all Routine and Specialty Tests and any other predictive test that are commercially available in a given jurisdiction with equivalent test quality, pricing and patient service as compared to existing laboratory service providers, Walgreens agrees that it shall not offer laboratory services in Walgreens stores.    Notwithstanding the previous, the following exceptions shall apply:  (i) To the extent Theranos is not able to offer Routine and Specialty Tests, and/or other commercially available predictive tests in a given jurisdiction, then Theranos shall have a period of three (3) months to secure necessary regulatory agency approvals to provide such Routine and Specialty Tests and/or predictive tests; (ii) sale of over the counter/point of care tests which are available without a clinician order, shall not be applicable to the exclusivity provided in this subsection (c).  Should Theranos fail to obtain such regulatory agency approvals, Theranos shall contract with a local provider of laboratory services, such provider to have obtained all necessary regulatory approvals necessary to provide laboratory services, to provide such test(s) at Walgreens. Should Theranos not be able to reach an agreement with a local provider of laboratory services, Walgreens shall have the right to work with other providers of laboratory services for all tests in that jurisdiction.  Notwithstanding the previous sentence, to the extent that Theranos can provide laboratory services in a given jurisdiction, Walgreens shall still rely on Theranos to provide laboratory services for the tests it is authorized to perform.    At such time that Theranos obtains the ability to provide services in the jurisdiction at issue, at equivalent levels of quality, pricing and services as compared to the existing laboratory service providers and provides notice to Walgreens of the same, Walgreens agrees that it will not renew its contract with the alternate service provider and will transition its lab offerings back to Theranos in a period of not greater than ninety (90) days; and (iii) To the extent any of Walgreens' employer clients direct Walgreens to contract with another laboratory service provider, the above exclusive shall not apply to the patients that Walgreens serves under that contract. During the term, Walgreens agrees that it shall not operate as a laboratory.   Except as otherwise provided for in this Agreement as it relates to over the counter/point of care tests available without a clinician order, or in instances in which Theranos cannot provide services, Walgreens agrees that it shall not direct patients of the Theranos laboratory to non-Theranos laboratory services.

4.  **First Announcement Rights.** Theranos will not authorize any other  United States retail pharmacy, grocer, or mass merchant to announce availability of the newly Available Cartridges  and/or Tests before Walgreens, in accordance with and as applicable under the Exclusivity terms described more fully in Schedule B, Section 3.

5.  **Theranos Pharmaceutical Clinical Trials Infrastructure.** As part of its ongoing business partnerships with pharmaceutical companies, Theranos will extend its clinical trials infrastructure to include Walgreens stores so that pharmaceutical clinical trial patients will have the option to have their specimens collected  at a Walgreens location. Following execution of this Agreement, Theranos and Walgreens will negotiate the terms and conditions between Theranos and Walgreens for the clinical trial work which will then be described and agreed upon in writing in Schedule I.

6.  **Innovation Fee**.

Theranos and Walgreens Confidential and Proprietary                                                                              -5-

**Confidential Treatment Requested by Walgreen Co.**                                        WAG-TH-00000055

ER-5353

(a) Walgreens agrees to pay to Theranos an Innovation Fee ("Innovation Fee") for up to $100 million dollars. The Innovation fee is being paid to Theranos in exchange for the following terms granted to Walgreens in this Agreement: (i) exclusivity; (ii) price protection; (iii) first announcement rights; infrastructure costs associated with building out the Theranos laboratory structure to support Walgreens' scale; and other good and valuable consideration. Distribution of the Innovation Fee shall be as follows:

> (i)  $25 million shall be distributed to Theranos within five (5) days of the due diligence items/visits detailed in 6(b) below, being completed;
> (ii)  $25 million shall be distributed to Theranos within five (5) days of reaching ten (10) patients per store per day on average during the pilot;

> (iii)  Upon successful Pilot completion and initiation of Program launch, Walgreens shall commit to a final distribution of $50 million.

(b) Within thirty (30) days of the Effective Date for items (i-iii and vi), and seventy-five (75) days for items (iv-v), Theranos shall make available or provide access to the following due diligence items for Walgreens' review. Upon receipt, and confirmation of these due diligence items, Walgreens will direct the escrow agent to release the initial $25 million distribution:

> (i)  <u>Covered Lives</u>-   Theranos shall provide written evidence of contracts with payors that provide coverage in the Pilot Market. Such written evidence shall demonstrate Theranos' ability to process claims, bill and reimburse Walgreens for its services within the Pilot Market;
> (ii)  <u>Test Menu</u>-   Theranos will provide Walgreens with a copy of the Test Menu (incorporated as Schedule J) and operations manual that the Theranos trained Walgreens technician will utilize during the PSC.
> (iii)  <u>Laboratory in Good Standing</u>-   Theranos shall provide to Walgreens copies of the CLIA inspection report and any interim exception reports, proficiency testing results for all tests on the Test Menu, and any correlation studies.
> (iv)  <u>PSC Expectations</u>-   Theranos shall provide Walgreens with a written copy of the standard operating procedures/protocol expectations for the PSC. Additionally, Theranos shall provide to Walgreens the front end IT requirements consisting of screen shots PSC personnel will use and/or required fields for patient data entry. After Walgreens' initial review of the materials, Walgreens shall provide its initial comments, and the parties shall work together to mutually revise the materials as is necessary.
> (v)  <u>Facilities Visit</u>-   Theranos shall permit Walgreens' staff to visit the following Theranos facilities: lab operations, call center, IT and billing. During the visit, Walgreens shall not have unfettered access to Theranos' facilities, but rather, the visit shall include opportunities for Walgreens to confirm for itself in a visual sense that Theranos has the capabilities to carry out its obligations under this Agreement. For purposes of clarity, such visit will not be for purposes of an audit, but rather to see the Theranos operations in action.
> (vi)  <u>Pricing/Fee/Collectability</u>-   The parties shall confirm the Pricing detailed in Section 11 below and the Innovation Fee are consistent with the fair market values for such Pricing and Innovation Fee. Walgreens will engage a third party consultant to determine the fair market value of the services provided by Walgreens to Theranos and the Innovation Fee provided to Theranos ("FMV Study"). Further, the parties shall agree upon the appropriate measure in order to measure collectability as it relates to the initial $25M payment.

(c) If Theranos realizes at least $1.75 billion in net revenue domestically from laboratory services it provides at all of its laboratory locations that utilize the Theranos System within twelve (12) months after the date that Theranos Tests are available in at least 1,000 Walgreens locations, Theranos will earn $50 million of the Innovation Fee. If the final $50 million distribution is made and Theranos realizes at least $2.5 billion in net revenue from laboratory locations

Trial Exh. 0617 Page 0007

**Confidential Treatment Requested by Walgreen Co.**                                                          WAG-TH-00000056

ER-5354

that utilize the Theranos System within eighteen (18) months after the date that Theranos Tests are available in at least 1,000 Walgreens locations, Theranos will earn the second $50 million of the Innovation Fee. If the aforementioned milestones are not realized, Theranos will refund the entire Innovation Fee dollar for dollar back to Walgreens on a per test consumed basis, with at least $50 million being credited in the first twelve (12) months after Program launch.  For purposes of clarity, the refund per patient shall be the Theranos Fee divided by the number of patients actually served during the applicable time period

7. **Ordering.**    All Theranos Tests will be ordered electronically using Theranos software and/or equipment in the stores or ESG location, and Theranos will be able to receive and process this electronic order.  As soon as is reasonably possible, and to the extent possible, the Walgreens' systems and Theranos' systems will be integrated in order to provide a seamless patient experience and optimizing operations by reduce dual entry for laboratory services as well as other Walgreens services (e.g. pharmacy, Take Care Clinics, etc.).

8. **Scheduling and Cancellation**.  Intentionally Deleted.

9. **Invoicing**.  Walgreens will issue invoices to Theranos as follows:

| Deliverable (as applicable) | Invoice |
|---|---|
| Services | At the beginning of each month, as may be amended from time to time based on mutual agreement of the parties in writing.  The invoice will specify by CPT code the number of successful Tests that generated a Result performed during prior calendar month, by store location, multiplied by the pricing for each such Test as set forth on Schedule D. |

10. **Payment**.  Commencing with the Pilot Phase through the first twelve (12) months post Pilot, Theranos shall compensate Walgreens Services as described in Section 15 of this Agreement, as follows: within seven (7) days of receipt of payment from the payor or patient.  After the first twelve (12) months post Pilot, Theranos shall compensate Walgreens for Walgreens Services no later than forty-five (45) days after Walgreens has collected said specimen.

If after ten (10) days written notice to Theranos that a payment is overdue and such Invoice remains unpaid,  late payments will be charged interest at 1% per month until paid in full (or, if less, the maximum allowed under applicable law).

11. **Pricing**.
The parties agree that Walgreens shall receive, a fair market value fee for the Walgreens Services, which the parties estimate will fall within a range of $10.00-$16.00/per patient ("the Pricing").  The price to be agreed upon by the parties will not include applicable taxes, or custom duties.  Based on the results of the FMV Study, Walgreens and Theranos shall amend this Agreement, upon terms to be mutually agreed upon, by including pricing based on the services provided by Walgreens in Schedule D, including a procedure to deal with any inability to realize pricing. Should the parties be unable to agree upon pricing, the parties shall engage in the process laid out in Section 24(b) of this Agreement.

12. **Discounts.**    The parties agree that any discounts or reductions in price offered or provided to Walgreens hereunder are intended to comply with all applicable federal, state and local laws, statutes, rules and regulations, as such are amended from time to time, including but not limited to the Federal Anti-Kickback Statute [42 U.S.C. 1320a-7b(b)], and specifically the Discount Safe Harbor under the Federal Anti-Kickback Statute and its implementing regulations (the "Discount Safe Harbor"), as well as similar State law exceptions.  Thus, with respect to the foregoing, the parties shall comply with all relevant obligations under the Discount Safe Harbor as well as all similar State law exceptions. The parties shall do nothing to impede the other party's ability to meet all of its obligations under the Discount Safe Harbor and any similar State law safe harbors and exceptions as contemplated herein.  The parties shall take all necessary steps to comply with the Discount Safe Harbor and any similar State law safe harbors and exceptions. The parties agree to timely produce any information or documentation requested or that is required for purposes of compliance with the Discount Safe Harbor and similar State law safe harbors and exceptions.

**Confidential Treatment Requested by Walgreen Co.**                                              WAG-TH-00000057

ER-5355

**13. Currency.** All prices and fees set forth in this Agreement are stated in U.S. dollars. Payment will be in U.S. dollars.

**14. Theranos Services.** Theranos shall provide Walgreens with the services set forth in this Section 14.

**a. Limitation.** Theranos will ensure that, with respect to Walgreens Customers, the Theranos System will only be utilized to perform Ordered Tests, provided that Theranos shall run calibration tests remotely on the Theranos System. At such time that direct to consumer testing is approved by the applicable regulatory body, Walgreens will collect samples ordered directly by patients and Theranos will provide laboratory services for such samples.

**b. Reports.**

    i. **Generation.** Theranos will use commercially reasonable efforts to generate a Result for each Ordered Test.

    ii. **Transmission.** Theranos will use commercially reasonable efforts to, within one (1) hour of generating a Result, transmit the Report to the Ordering Practitioner either by a secure website portal, secure electronic transmission or facsimile. In accordance with the relevant provisions in this Agreement, all Results provided to clinicians from samples collected at Walgreens, will be provided to Walgreens. Results from other Tests not performed at Walgreens Locations will only be provided to Walgreens upon receipt of patient consent and in compliance with HIPAA and all applicable federal and state regulations. Theranos agrees that any patient authorization or consent that it may seek to obtain from a potential Walgreens patient will not include any provision offering the patient the opportunity to block, prohibit or in any way restrict release of the Report to Walgreens. Theranos agrees that it will use commercially reasonable efforts to deliver Reports to authorized Ordering Practitioners within four (4) hours of the sample arriving at the laboratory.

    iii. **Critical Values.** In the event a Result reflects one or more values at such variance with normal as to be potentially life-threatening ("Critical Value"), Theranos will be solely responsible for notifying the appropriate personnel according to its obligations as a CLIA-certified lab under federal and state law and using commercially reasonable efforts to verify that the Ordering Practitioner received notification of the Critical Value. Should direct to consumer testing be made available under this Agreement, Theranos shall notify the patient directly of any Result that is classified as a Critical Value.

    iv. **Consultation.** Theranos will maintain a toll-free phone number and email address that Ordering Practitioners can contact with questions or requests for professional consultation regarding a Report. The toll-free number shall, at a minimum, be staffed 7 days per week from 5 am to 11 pm central. Theranos will ensure that all requests for professional consultation are responded to promptly by an appropriately licensed and qualified health care professional.

    v. **Public Health Reporting.** To the extent required by state or local law and/or regulations applicable to each Walgreens location utilizing the Theranos System, Theranos will prepare and submit any and all Reports, or other information or forms that may be required to disclose to a health department or other government agency as a result of performing certain Tests.

    vi. **Ownership and Retention.** For the duration of this Agreement and in accordance with: (a) the terms set forth in the HIPAA Business Associate Agreement attached hereto as Schedule G; (b) federal and state laws governing document retention by health care providers; and (c) Medicare, Medicaid and all other third-party payor document retention requirements, Theranos will electronically maintain and store all Reports.

    vii. **Walgreens' Retention Right**: Walgreens, without first obtaining patient consent, may maintain, use and disclose Reports for purposes of complying with applicable federal and state legal requirements including, but not limited, to: (i) licensure; (ii) record retention; (iii) patient privacy and confidentiality; (iv) Medicare, Medicaid and any other federal or state health care programs; (v) subpoena or court order.

**c. Billing.** The following shall apply during the PSC Phase. Should the parties agree to provide laboratory services in the Onsite Phase, the parties will agree on mutually acceptable billing terms.

    i. **Provider.** The parties acknowledge and agree that Theranos will be the provider of clinical laboratory services under this Agreement. Theranos acknowledges and agrees that Walgreens will be the provider of the specimen collection services performed at Walgreen's locations. As the provider of laboratory services, all claims for payment submitted to patients and/or third-party payors will be submitted by Theranos. Walgreens acknowledges and agrees that it will not submit under its name or tax id number any claims for

Theranos and Walgreens Confidential and Proprietary
-8-

**Confidential Treatment Requested by Walgreen Co.**

WAG-TH-00000058

ER-5356

payment to any customers or third-party payors for Tests. Walgreens shall look solely to Theranos for payment of the items and services it provides to patients pursuant to this Agreement.

d. **HIPAA.** The parties acknowledge that as a result of providing the services described above in Sections 14.b and c, each party will be acting as a Business Associate of the other party and will contemporaneously with this Agreement execute the HIPAA Business Associate Agreement attached hereto as Schedule G.

15. **Walgreens Services.** Walgreens will assign to Theranos specifically trained technicians ("Walgreen Technicians") utilizing a training and certification program provided by Theranos. These technicians will provide laboratory patient services, as directed by Theranos during such times that Walgreens is interacting with a patient in order to provide patient services. Walgreen Technicians will professionally handle the patients needing laboratory services. Walgreen Technicians will draw blood using the finger stick technique; Walgreen Technicians will collect the proper other specimens according to the directions provided by Theranos. Walgreen Technicians will also obtain the patient's demographic and insurance information, which will be entered into the system that is available. If applicable, the Walgreen Technician will collect any co-pay. In addition the Walgreen Technician will take the order that came from the practitioner and enter the information from that form into the system. The Walgreen Technician will then provide information to the patient about how the patient can obtain results of the testing. The Walgreen Technician will properly store and prepare the specimen for pick-up according to the directions provided by Theranos. At the completion of the patient interaction, the Walgreen Technician will prepare the area for the next patient.

    i. **Patient Service Centers.** Walgreens locations serving as Theranos Patient Service Centers will be patient service centers which provide for the collection and processing of human blood, urine, feces, or other matrices for analysis by Theranos' CLIA certified laboratory. The physical locations for Theranos Patient Service Centers must conform to Theranos standards, with the parties to agree upon any deviations on a site specific basis. The parties agree that they shall memorialize such deviations in writing. Theranos laboratory supervisors or designated supervisory qualified staff will oversee the sites and make monthly on-site visits to each Theranos Patient Service Center. Theranos laboratory personnel will perform on-site inspections of all Theranos Patient Service Centers on an ongoing basis.

    ii. **Patient Service Center Personnel.** Walgreens technicians selected by Theranos and Walgreens will act as operators of the Theranos CLIA laboratory. Said technicians will be certified by the Theranos CLIA laboratory for the performance of sample collection and processing. All certifications must be complete prior to launch of the Theranos infrastructure in Walgreens Locations. All Theranos trained and certified technicians in Walgreens Locations will be trained in Theranos Procedure Manuals and Accession Records for specimen collection stations. Only certified Theranos technicians following approved Theranos protocols may collect samples and interact with patients in Theranos Patient Service Centers. The Theranos Patient Service Centers may not be used to collect samples for any non-Theranos laboratory tests. For purposes of clarity, the parties acknowledge that as of the date of this Agreement, Walgreens is conducting health testing screening. Such screening shall not violate this subsection, provided that the testing activities are performed in a matter such that the patient will not perceive the service to be a Theranos service.

The parties agree and acknowledge, that when required by law, clinicians working at Walgreens' ESG/CSG locations will give patients the option to have their laboratory services performed at a lab/PSC of their choosing.

16. **Delivery.**
Theranos shall deliver sample tubes, lancets/blood collecting devices (finger stick devices), bandages and all other necessary supplies to Walgreens locations on an as needed basis. Walgreens will notify Theranos when it has 20% remaining stock of collection vessels/finger stick devices available for use. Theranos shall deliver replacement supplies within 1days of receipt of such notice.

17. **Shipment.** Theranos shall arrange for specimens to be picked up at least once per day, and in locations that collect at least 50 specimens per day before Noon local time, there shall be at least two pick-ups per day

With respect to the Onsite Phase, the following shall apply: In the absence of specific shipping instructions from Walgreens, Theranos will ship by the method it deems most advantageous. Transportation costs will be at Theranos' sole cost and expense, unless Walgreens requests special shipping instructions. If Walgreens requests special shipment, the associated costs will be collect, or, if prepaid, will be subsequently invoiced to Walgreens. Unless otherwise specified, the Cartridges will be shipped in Theranos' standard commercial packaging, with each cartridge and cartridge package properly labeled. When special packaging is, in the reasonable opinion of Theranos, required

**Confidential Treatment Requested by Walgreen Co.**    WAG-TH-00000059

ER-5357

under the circumstances, Theranos will issue an invoice to Walgreens for the cost of the same. In the event any of Theranos' production facilities are located in close proximity to Walgreens' distribution centers, special facilities can be provided for direct transfer of Cartridges into Walgreens' distribution centers.

**18. Devices.**

**a.** Any Devices, Cartridges and other Deliverable s provided by Theranos to Walgreens, including, but not limited to any finger stick collection devices, shall only be used by Walgreens' employees, contractors and/or agents for Walgreens' internal business purposes, solely for use at Walgreens' Locations. Walgreens agrees to take all reasonable steps to protect the Devices from theft or use contrary to the provisions of this Agreement. Walgreens agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. Walgreens is not authorized to sell, rent, transfer, license, or distribute the Devices or Cartridges or any other Deliverable, unless specifically authorized by Theranos in writing.

**b.** Theranos shall at all times retain ownership of the Devices; provided however that Walgreens assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of Walgreens and shall pay the full cost of any Devices not returned in good condition (ordinary wear and tear excepted). Prior to the commencement of the Onsite Phase, Theranos will provide Walgreens with a statement certifying the cost component value of the Device for Walgreens' insurance purposes. As Theranos develops upgrades and enhancements to the Devices, the parties will agree on a deployment schedule for such next-generation Devices. Walgreens shall permit any authorized representative of Theranos to inspect the Devices, during normal business hours after first sending written notice of such inspection prior to the return of such Devices to Theranos, at Walgreens' facilities or any other location at which the particular Program is being conducted. If Walgreens is unable to return the Devices in accordance with this Agreement, Walgreens will permit Theranos, on dates and times to be agreed upon, to access Walgreens' premises for the purposes of repossessing such Devices.

**c.** If Walgreens experiences any problems with the deployed Devices, then, subject to Walgreens' responsibilities in Section 17.b, Theranos will repair or replace the Device as soon as reasonably possible after being notified of the problem, in accordance with Schedule C.

**d.** Upon expiration or termination of this Agreement, Walgreens shall ensure that all Walgreens employees, contractors and/or agents cease using the Devices and Client Accessible Software, and Walgreens shall return to Theranos all authorization codes allowing users to access the Software, TheranOS, and all Devices as set forth in Section 23.d.

**19. Warranty.**

**a.** During the Onsite Phase the following shall apply: All Cartridges provided to Walgreens will be new and will contain the functionality, and will operate in accordance with, and conform to, the applicable specifications with shelf life of at least 90% of useful life as further specified in the procurement documentation. Walgreens will maintain the Cartridges in the environment specified in the Documentation that ships with the Cartridges or is otherwise made available to Walgreens.

**b.** Each party warrants that: (i) it has the legal authority to enter into this Agreement; and (ii) the execution, delivery, and performance of this Agreement by it and its obligations hereunder do no conflict with any agreement, instrument or understanding to which it is a party or by which it may be bound.

**c.** Each party will perform its obligations under this Agreement: (i) in a timely and professional manner; (ii) in conformance with that level of care and skill ordinarily exercised by other professional companies or a similar size and in similar circumstances; and (iii) in compliance in all material respects with all applicable laws.

**d. Disclaimer. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, THERANOS EXPRESSLY DISCLAIMS ALL OTHER EXPRESS, IMPLIED, OR OTHER WARRANTIES, INCLUDING THE WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

**20. Licenses.**

**a. Theranos License Grant.** Theranos hereby grants to Walgreens a non-exclusive, worldwide, multi-site, enterprise wide, royalty free, non-transferable license, without the right to sublicense, to use, in accordance with, and solely to perform its obligations in this Agreement and only for the term of this Agreement: (a) Software

Theranos and Walgreens Confidential and Proprietary

-10-

Trial Exh. 0617 Page 00011

**Confidential Treatment Requested by Walgreen Co.**

WAG-TH-00000060

ER-5358

installed on Ordering Devices, solely for use of the Device by Walgreens employees, contractors and agents who are obligated in writing by confidentiality obligation at least as protective of Theranos and its Confidential Information as this Agreement; and (b) Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software"). In this Agreement, "Software" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement. Without Walgreen's prior written approval, Theranos will not use in performing the Services, and the Deliverables will not incorporate, link to, call, or depend in any way upon, any software or other intellectual property that is subject to an Open Source or Copyleft license (including the GNU General Public License) or any other agreement that may give rise to any third party's right to use any Deliverables or to limit Walgreen's right to use, such software and other intellectual property in any respect.

b. **Ownership**. Theranos and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Theranos Confidential Information. Walgreens shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify Theranos promptly of any such unauthorized use. Walgreens shall not: (a) allow access to the Client Accessible Software by more than the number of concurrent users agreed upon in writing by the parties, (b) disassemble, decompile or otherwise reverse engineer the Software, (c) modify, copy (except for backup, archival, distribution of software to authorized users, disaster recovery, testing, training and other similar uses), sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in the Agreement, (d) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis, or (e) create Internet "links" to or from the Software, or "frame" or "mirror" any of Walgreens' content which forms part of the Software. Walgreens shall at all times comply with terms and conditions applicable to third party software provided with the Software. Theranos reserves all rights in the Software not expressly granted herein.

c. **Walgreens License Grant**. Walgreens hereby grants to Theranos a perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to integrate, use and disclose in TheranOS Walgreens' data provided under, related to or generated in connection with this Agreement for use in TheranOS' analytical engine to the extent permitted by law, provided that where applicable under federal and state law, Theranos obtain patient consent to use such data and that Theranos does not disclose, and any resulting analyses do not contain, any personally identifying information regarding individuals or any information identifying Walgreens or Walgreens compounds, except in connection with the provision of any Professional Services to Walgreens under this Agreement.

d. **Lab Certifications.** Prior to commencement of the Pilot, Theranos shall provide a copy of the full CLIA Inspection report and PT results to Walgreens for its review. Only, In the event the report is not made available to Walgreens, or should Walgreens, in its reasonable discretion, determine that such report contains information which calls into question any significant quality issues with the Theranos methodology. then Walgreens, at its cost, shall have the right to conduct an internal correlation study to verify the Theranos platform sensitivity and specificity with respect to the Test Menu offered by Theranos. A copy of the Test Menu is attached to this Agreement as Schedule J. Walgreens and Theranos will mutually agree upon the third party/research institution to assist Walgreens with this study if necessary. Prior to commencement of any work on Walgreens' behalf, such third party shall enter into a binding non-disclosure agreement with Theranos. Should Theranos receive notice of an inspection and/or the results of an inspection that could potentially impact Walgreens' ability to provide services under this Agreement, then Theranos agrees that it shall provide a copy of such inspection report and where relevant, PT results to Walgreens. If after written notice to Theranos, there exists any issue that impacts Walgreens' ability to provide services to Theranos under this Agreement, or that impacts the patient experience and such issue remains uncured after thirty days' written notice, then Walgreens shall have the right to visit the relevant portions of Theranos' facilities (including, but not limited to, laboratory facilities, call center, billing, logistics) in order to better understand the issue and the steps being taken to resolve such issue.

e. **Property Ownership/Use.**

(i) Walgreens will not use, disclose, share or sell Theranos Intellectual Property, including Processed Data, to other individuals or entities, except as otherwise specified in this Agreement;

(ii) Walgreens, will not, without first obtaining Theranos' consent, which consent shall not be unreasonably withheld, use the Theranos Systems, Results, Reports or Processed Data with, or for the benefit of, pharmaceutical companies or payors to design, and subsequently implement programs, which are directed and funded by the respective pharmaceutical company or payor, relating to programs for

**Confidential Treatment Requested by Walgreen Co.**                                                                          **WAG-TH-00000061**

ER-5359

approved or developing pharmaceuticals, including usage or new indications that have not been approved by the applicable regulatory body, provided that Walgreens shall not need consent from Theranos in order to administer Tests based on Federal requirements and/or drug labeling. Walgreens may use the Theranos System for its proprietary and internally administered Medication Compliance/Adherence, Medication Persistence, MTM or other clinical management programs that do not require consent as detailed above, provided that Walgreens will not give pharmaceutical companies possession of Results and Reports.

Subject to a Non-Disclosure agreement, pharmaceutical companies will have the right to receive summarized results and have the right to visually inspect the de-identified Results in order to verify the summarized results. Walgreens agrees that any disclosure of the summarized results shall restrict against any further use, sale or disclosure of such results to a third party. Walgreens shall, on a semi-annual basis, inform Theranos of the active Medication Compliance/Adherence, Medication Persistence, MTM programs and other clinical management programs that do not require Theranos' consent, or have been consented to by Theranos that Walgreens is currently engaged in. The parties agree and acknowledge that Theranos' consent shall not be necessary to enter into a program with a pharmaceutical company that necessitates that a Test be performed prior to any dispensation of medications based on Federal requirements or drug labeling.

Walgreens and Theranos agree that they shall engage in discussions during the Pilot to reach mutually acceptable terms and conditions by which Walgreens may share data with Theranos used in connection with the Medication Compliance/Adherence, Medication Persistence and MTM programs for the limited purpose of strengthening the overall accuracy and clinical quality of the algorithms used in the Theranos System. Theranos agrees that any information licensed to Theranos will be limited to use in Theranos' model.

(iii)   Subject to patient consent and with the exception of anonymous testing, Theranos hereby provides Walgreens a perpetual, irrevocable, worldwide license to use and add Results which are collected at Walgreens Locations to its clinical databases and use said Results to provide medical care to its customers, provided such Result is not disclosed and no access is provided for any purpose to another entity besides Walgreens except as specified below.

(iv)    With respect to pharmaceutical companies, provided Walgreens obtains the patient's consent, Walgreens will only use de-identified Results and Processed Data for marketing and selling clinical programs, research programs or as otherwise agreed. Walgreens will not give these entities possession of the de-identified Results or Processed Data. Subject to a Non-Disclosure agreement, pharmaceutical companies would have the ability to receive summarized results and could look over the de-identified Results so that they could verify the summarized results. Walgreens agrees that any disclosure of summarized results shall restrict against any further use, sale or disclosure of such results.

(v)     Notwithstanding anything to the contrary in Section 19(d)(ii), the parties agree that with respect to payors, including employers and the government who are not currently paying for tests, Walgreens may use de-identified Results and Processed Data for marketing and selling clinical programs, so long as Walgreens will not give these entities possession of the detailed de-identified Results and Processed Data.

(vi)    Intentionally Deleted.

(vii)   Provided Walgreens obtains the patient's consent, Walgreens may sublicense Results and Reports to employers for employee health screening, drug screening, and other similar employment related programs, provided that the use of these Results and Reports is restricted to assessing compliance with a company's human resource policies for each specific patient for whom such Results and Reports are provided in accordance with federal and state laws. Walgreens agrees that any disclosure of identified Results or Processed Data shall restrict against any further use, sale, disclosure or sublicensing of such Results or Reports, including any blinding, aggregating, or analysis of the Results and Reports.

(viii)  Provided Walgreens obtains the patient's consent to do so, any Results or Processed Data shared with academic researchers will be provided under a clear NDA that will not allow them to do data mining. For clarity, these Results or Processed Data cannot be used for developing or identifying new biomarkers, including without limitation for purposes of monitoring disease progression or regression. Any such biomarkers which are identified or other intellectual property developed in association with Theranos data are the sole and exclusive property of Theranos.

Confidential Treatment Requested by Walgreen Co.                            WAG-TH-00000062

ER-5360

(ix)   To the extent such Results or Processed Data have not been previously published, any publications around such Results or Processed Data shared in strategic clinical relationships must be approved in writing by Theranos and where required by Theranos must acknowledge Theranos as a contributor. Notwithstanding the previous, Theranos agrees, that to the extent such publication will not result in the disclosure of Theranos confidential information, that it shall not unreasonably withhold its consent to such publication.

(x)   As between Walgreens and Theranos:  (a) all data on Theranos Systems, including Results and Reports, and (b) all inventions and improvements developed in connection with the Deliverables or as a result of the services provided by Theranos to Walgreens during the term of this Agreement and thereafter, whether by Walgreens or Theranos, or by the parties jointly, if solely, directed to: (i) any part or the whole of the Theranos System or any improvements thereto, including, without limitation, the TheranOS analytical engine and the algorithms therein; or (ii) the generation of assays for use in conjunction with the Theranos System, shall be the sole and exclusive property of Theranos. Walgreens shall promptly disclose to Theranos in writing any inventions described in the preceding sentence, and Walgreens hereby assigns to Theranos any right, title or interest it may have in such inventions.

f.  **Confidentiality.**

i.  **Use and Protection.**  Each party will use a commercially reasonable degree of care to maintain all Confidential Information of the other in trust and confidence and will neither disclose to any third party nor use any Confidential Information of the other for any unauthorized purpose or without the other party's express prior written consent.  Each party may only disclose Confidential Information of the other to those of Recipient's employees and representatives on a need-to-know basis, and may use such Confidential Information only to the extent required to perform this Agreement.  Confidential Information may not be used for any purpose or in any manner that would constitute a violation of any laws or regulations, including, without limitation, the export control laws of the United States.  Unless otherwise stated in this Agreement, no rights or licenses to intellectual property in Confidential Information is granted by either party to the other under this Agreement, whether express, implied or otherwise.  Unless otherwise stated in this Agreement, all Confidential Information will remain the property of the Discloser (and its licensors, if any), including, but not limited to, any right to make, use or sell any product embodying any Confidential Information.  **All Confidential Information disclosed under this Agreement is provided on an "AS IS" basis, with no warranty, assurance, guarantee or inducement of any kind.**  In addition, Recipient shall be entitled to disclose Confidential Information to the extent required in response to a valid order of a court or other governmental body or is otherwise required by law to be disclosed, provided Recipient, as the responding party, gives sufficient notice to Discloser to enable it to take protective measures.

ii. **Terms of Agreement**.  Notwithstanding the foregoing, either party may disclose the terms or conditions of this Agreement only: (a) on a need-to-know and confidential basis to its legal, financial, and other professional advisors to the extent such disclosure is reasonably necessary, (b) as required by any court or other governmental body; (c) as otherwise required by law, including applicable securities and other law and regulation, including rules or regulations of any applicable securities exchange; (d) during the course of litigation so long as the disclosure of such terms and conditions are restricted in the same manner as is the confidential information of other litigating parties and so long as (1) the restrictions are embodied in a court-entered protective order limiting disclosure to outside counsel and (2) the disclosing party informs the other party in writing at least ten (10) business days in advance of the disclosure and discusses the nature and contents of the disclosure, in good faith, with the other party and (e) only on a need-to-know and confidential basis, to a third party in connection with an equity investment in such party, a merger, consolidation or similar transaction by such party, or the sale of all or substantially all of the assets of such party.  In addition, Walgreens shall not disclose any of the terms or conditions of Section 3.a or 3.b of this Schedule B except, and only to the extent, it must do so pursuant to one of the preceding exceptions and only after informing Theranos in writing at least ten (10) business days in advance of the disclosure and discussing the nature confidentiality, and contents of the disclosure, in good faith, with Theranos, provided that Walgreens shall not be prevented from making said disclosure if a judicial and/or governmental order demands production prior to such ten (10) business day notice period expiring.

Confidential Treatment Requested by Walgreen Co.                                         WAG-TH-00000063

ER-5361

    **iii.  Term of Confidentiality**.  The obligations imposed on Recipient shall survive until such time as Discloser's Confidential Information disclosed to Recipient under this Agreement becomes publicly available and/or made generally known through no action or inaction of Recipient or its Representatives.  Recipient and its Representatives will return or destroy/erase all of Discloser's Confidential Information, including any and all information in whatever form generated making use of or reflecting Discloser's Confidential Information, except one copy for archival purposes, within thirty (30) business days of request of Discloser, or thirty (30) business days from termination or expiration of this Agreement.

    **iv.  Confidentiality Protocol**. Should Walgreens desire to communicate with any third parties in order to cultivate a larger customer base as it relates to the Theranos System and/or Tests offered by Theranos, Walgreens, prior to engaging in such discussions shall do the following:  (i) Walgreens shall have the receiving party sign a Non-Disclosure Agreement (in a form to be approved by Theranos and Walgreens).  Theranos' identity will not be revealed until the agreement has been executed by both Walgreens and the receiving party; (ii) Walgreens will submit the form to Theranos, along with notations of any deviations from the agreed upon form;  (iii) Within ten (10) days of receiving the NDA, Theranos shall either provide Walgreens with a signed copy, or advise in writing as to why the NDA is unacceptable.  The parties shall separately agree on a set of materials that can be provided to third parties upon execution of a mutually acceptable NDA.

**21.  Convertible Note.**  In partial consideration for Walgreens' commitments set forth in this Agreement, within fourteen days of the Effective Date, Walgreens shall have the right to purchase, or cause its affiliate WVC Investments, LLC to purchase, a convertible promissory note in the principal amount of $40 million in substantially the form set forth in Schedule H-1 (the "Convertible Note").  The Convertible Note shall bear interest at the rate of 0.79% and shall mature on the Maturity Date (as such term is defined in the Convertible Note).  The outstanding principal on the Convertible Note will be convertible into Series C-1 preferred shares (the "Series C-1") of Theranos upon the occurrence of a Conversion Event (as such term is defined in the Convertible Note).  Upon conversion, Walgreens' preferred shares will have certain Dividend, Liquidation, and Conversion Rights as set forth in Theranos' charter in the form provided to Walgreens. To exercise its right to purchase the Convertible Note within the time period described above, Walgreens shall execute and deliver to the Company a certificate in the form set forth on Schedule H-2.

**22. Indemnification.**

    **22.1 Defense and Indemnification.**  (i)Theranos will defend, indemnify and hold harmless Walgreens and its Affiliates, and their respective personnel, successors and assigns ("Walgreens Indemnitees"), against any claims, demands, suits, or causes of action by third parties, (the "Claims"), to the extent resulting or claimed to result from (a) any act or omission of Theranos or its personnel under or in connection with this Agreement; (b) any breach of this Agreement (including any Procurement Document and/or inaccurate or improper claims submissions caused by the TheranOS billing software) by Theranos or its personnel; (c) the violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens' use of the Theranos System, Services, Devices or Deliverables; (d) any malpractice, misdiagnosis and/or wrongful diagnosis or any other claim caused by a Test; or (e) the violation by Theranos or its Personnel of any law or regulation, provided that Theranos shall have no liability or obligation with respect to such Claim to the extent the Claim results from (1) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverables or other items by or for Walgreens); (2) breach of this Agreement by Walgreens; (3) the violation by Walgreens of any law or regulation; or (4) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement.  Theranos will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction.  (ii) Walgreens will defend, indemnify and hold harmless Theranos and its Affiliates, and their respective personnel, successors and assigns ("Theranos Indemnitees") against all liabilities, damages, awards, losses, costs and expenses (including costs and attorney's fees) arising out of any claims, demands, suits or causes of action by third parties ("Claims"), which result or are claimed to result in whole or in part from (a) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverable or other items by or for Walgreens); (b) breach of this Agreement by Walgreens; (c) the violation by Walgreens of any law or regulation; or (d) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement.  However, Walgreens will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of

**Confidential Treatment Requested by Walgreen Co.**        **WAG-TH-00000064**

ER-5362

competent jurisdiction. (iii) Notwithstanding anything to the contrary, (a) to the extent that any Claim subject to Section 21.1(i) is brought by a Third Party against both parties, Theranos will have the duty to defend Walgreens, provided that Theranos will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction; and (b) to the extent that any Claim solely subject to Section 21.1(ii) is brought by a Third Party against both parties, Walgreens will have the duty to defend Theranos, provided that Walgreens will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.

22.2 **Infringement.** In the event the Theranos System is held to constitute an infringement, or if Walgreens is enjoined from using the Theranos System, Theranos, at its own expense, will first use reasonable and prompt efforts to: (a) procure for Walgreens the right to continue to use the Theranos System; (b) modify the Theranos System so that it is non-infringing and of at least equivalent performance and functionality; (c) provide functionally equivalent replacement product(s) to Walgreens; or (d) upon adequate showing to Walgreens that none of the foregoing options are commercially feasible pay to Walgreens a liquidated damage as follows: (i) Between the date this Agreement is fully executed and the end of the Pilot, Walgreens shall be entitled to $0.00 as a liquidated damage; (ii) Between the end of the Pilot, and as applicable, the refund of the payment of Walgreens first $50 million of the Innovation Fee commitment, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $20,000,0000; and (iii) After as applicable, the refund of the payment of Walgreen's second $50 million Innovation Feet, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $40,000,000. Walgreens's rights under this Section will be in addition to and will not limit Walgreens's rights under the Section regarding Defense and Indemnification above. Except as otherwise contemplated in this Agreement, this Section regarding Indemnity does not apply to any infringement caused by any combination of any Theranos System with any item not supplied by Theranos or any modification of any Theranos System other than by Theranos. For purposes of this section "actual damages incurred" shall not include indirect, incidental, or consequential damages of any kind or nature whatsoever. Actual damages shall include, but not be limited to, run-rate labor losses, capex, and investments made to individual Walgreens' locations to accommodate the Theranos System.

22.3 **Procedures.** The indemnifying party has the right to control the defense and settlement of any Claim; provided, however, that the other party will have the right to participate in such defense, at its expense, and in selection of counsel, and to approve any settlement proposed by the indemnifying party (such approval not to be unreasonably withheld or delayed). Upon the indemnifying party's' request, the other party will reasonably cooperate in such defense and the indemnifying party will reimburse the party for its reasonable out-of-pocket expenses in providing such cooperation. Each party will provide prompt notification of any Claim; provided, however, that any reasonable delay by such party in giving such notice will not relieve the indemnifying party of its obligations pursuant to this Section regarding Indemnity, except to the extent that the indemnifying party demonstrates actual damage caused by such delay.

22.4 **Independent Obligation.** The obligations of each party to defend, indemnify and hold harmless, their respective indemnified parties under this Section regarding Indemnity, will be independent of each other and any other obligation of the parties hereunder, provided that this Section 21 shall constitute Theranos' sole obligation and liability, and Walgreens' exclusive remedy, with respect to Third Party claims for violation of any intellectual property rights.

23. **Limitation of Liability.** In no event shall either party be liable to the other party or any other person or entity for any costs of substitute products or services or special, exemplary, indirect, incidental, consequential or punitive damages of any kind or nature whatsoever (including, without limitation, lost revenues, profits, savings or business, or contribution or indemnity in respect of any claim against the party) or loss of records or data, whether in an action based on contract, warranty, strict liability, tort (including, without limitation, negligence) or otherwise, even if such party has been informed in advance of the possibility of such damages or such damages could have been reasonably foreseen by such party. In no event shall Theranos' liability to Walgreens or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise. In no event shall Walgreen's liability to Theranos or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise. Notwithstanding the foregoing, the limitations of liability and disclaimers of damages set forth in this Section will not apply to claims: (i) resulting from fraud or willful or intentional conduct of, or bodily injury (including

Trial Exh. 0617 Page 00016

**Confidential Treatment Requested by Walgreen Co.**                                         WAG-TH-00000065

ER-5363

death) or property damage caused by, a party; (ii) that are the subject of indemnification under this Agreement; (iii) for breach of a Party's confidentiality obligations under this Agreement or (iv) for violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens' use of the Theranos System, Services or Deliverables.  Except as otherwise allowed under this Agreement, Walgreens liability to Theranos shall not be limited with respect to claims regarding Walgreen's use or misuse of Theranos Intellectual Property, trade secrets and/or Confidential Information.  Notwithstanding the foregoing, Walgreens shall not be liable to Theranos to the extent such damage was caused by the acts or omissions of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.  The limitations specified in this Section will survive and apply even if any limited remedy specified in this Agreement is found to have failed of its essential purpose.

24.  **Term and Termination.**

    a.  **Term.**  Assuming this Agreement is not terminated pursuant to Section 24(c) below, this Agreement will be in effect until three (3) years from  successful completion of the Pilot.  At the end each year of the Term, the Term of this Agreement shall automatically extend for one (1) additional year, unless either party provides written notice to the other of its intent not to renew at least ninety (90) days prior to the anniversary date of the day upon which the Pilot was completed.  For purposes of clarity, assume the following example:  The Pilot is successfully completed on January 1, 2013.  The term would then run through and including December 31, 2016.  Unless either party gives notice to the other 90 days prior to December 31, 2014, the Term would automatically extend to December 31, 2017.

    b.  **Termination due to unsatisfactory Pilot or inability to realize Pricing.**  Should Walgreens or Theranos determine that the success criteria for the Pilot has not been satisfied, Walgreens or Theranos shall have the right to terminate this Agreement.   Should Theranos terminate the Agreement, Theranos shall , within fourteen days of providing notice of termination, refund the Innovation Fee, and Theranos shall have the option to repurchase the Convertible Note detailed in Section 21 of this Agreement.  Should Walgreens terminate the Agreement, Walgreens shall forgive $25 million of the Innovation Fee, and Theranos shall pay off the remaining balance as detailed below in 24(d)(i).  Further, if Walgreens terminates the Agreement, Theranos shall have the option to repurchase the Convertible Note detailed in Section 21 of this Agreement.   In the event the parties fail to agree on either of the following issues:  (i) failure to agree on the fair market fee to be paid to Walgreens within fourteen (14) days of receipt of the FMV Report; and (ii) failure to agree to agree on revisions to Pricing within ninety (90) days after one party notifies the other in writing of a need to revise Pricing due to a governmental action, including, but not limited to, an audit, investigation, inquiry, change of law, issuance of new guidance or interpretation of law, then either party shall have the right to terminate this Agreement.

    c.  **Termination for Cause.**  If either party breaches a material provision of this Agreement and fails to cure such breach within thirty (30) calendar days after receiving written notice of the breach, the non-breaching party shall have the right to terminate this Agreement at any time until such cure; provided if a breach cannot be cured within thirty (30) calendar days but is capable of cure, the breaching party will not be in default if, within thirty (30) calendar days of receiving notice of breach, in good faith, it begins and continues to attempt to cure the breach.  In such case, the breaching party will have a reasonable time to cure the breach, but not to exceed sixty (60) days, before being in default.  Notwithstanding anything to the contrary herein, Walgreens' breach of payment obligation constitutes a default ten (10) business days after written notice from Theranos that the payment is due.  Should Walgreens fail to make such payment, or fail to respond in writing with its good faith objection to such invoice within such ten (10) day notice period, then Theranos shall have the right to terminate this Agreement immediately.

    d.  **Obligations upon Termination.**
        i.  Theranos' Obligations to Walgreens:
            1.  In the event Walgreens terminates this Agreement pursuant to Sections 24.b or 24.c or Theranos terminates this Agreement pursuant to Section 23.b, then within one hundred eighty (180) calendar days of the termination date Theranos will refund the Innovation Fee as detailed in subsections (b), as applicable, and (c).
        ii.  Walgreens' Obligations to Theranos:
            1.  In the event this Agreement is terminated by Theranos pursuant to Section 24.c Theranos shall retain the initial $25 million distribution of the Innovation Fee..
        iii.  Upon termination, Theranos may enter Walgreens' facilities, at a time and date to be reasonably agreed upon, and remove the Devices installed on Walgreens' premises.

**Confidential Treatment Requested by Walgreen Co.**        WAG-TH-00000066

ER-5364

      f.      **Survival of Provisions**.  Those Sections entitled "Reports," "Devices," "Warranty," "Licenses Sections b, c, d, and e," "Indemnification," "Limitation of Liability," "Term and Termination," "Miscellaneous" Schedule E ("Definitions") , and all accrued payment obligations of Walgreens, shall survive the expiration or termination of this Agreement for any reason.

**25.**      **Marketing/Sales**. The parties agree that during the term of the Agreement, Theranos shall be responsible for sales/marketing efforts with respect to physician sales.  Walgreens shall bear responsibility for sales/marketing efforts within/to Walgreens' locations.  The parties shall each be responsible for sales/marketing efforts with respect to consumer marketing.  The parties agree that prior to the commencement of the Pilot a sales/marketing playbook shall be developed and agreed upon.  Such playbook will lay out the framework by which each party will carry out its sales/marketing efforts and the messaging that will be used by each respective party. All Theranos locations will be branded with the Theranos name and meet Theranos service center standards.

**26.**      **Miscellaneous.**

**Governing Law/Venue.**  This Agreement will be interpreted and governed by the laws of the State of Delaware without reference to its conflict of laws principles.  The parties irrevocably consent to the sole and exclusive jurisdiction of and venue in the district court for Delaware.

a.    **Independent Contractor**.  Theranos is an independent contractor, and the relationship of the parties under this Agreement will not be construed to create any other relationship, as partners, joint venturers, principal and agent, or otherwise.  Neither party has the authority to represent the other as to any matters.

b.    **Entire Agreement.**  The terms and conditions contained in this Agreement, including all Schedules, constitute the entire agreement between the parties and supersede all previous agreements and understandings, whether oral or written, between the parties hereto with respect to the subject matter of this Agreement and no agreement or understanding varying or extending the same shall be binding upon either party unless in a written document signed by both parties.

c.    **Force Majeure.**  Non-performance of either party, except Walgreens' payment obligation, shall be excused to the extent that performance is rendered impossible by any other reason where failure to perform is beyond the reasonable control of the non-performing party.  Notwithstanding the previous, the parties acknowledge and agree that if non-performance due to a force majeure event exceeds ninety (90) days, then on written notice to the party suffering the force majeure event at any time prior to resumption of performance by such party, the other party shall be entitled to terminate this Agreement.

d.    **Assignment.**  Neither party may assign, delegate or otherwise transfer this Agreement or any of its rights or obligations under this Agreement without the other party's prior written approval, which approval will not be unreasonably withheld, delayed or conditioned.  Any such attempt to do so will be ineffective.  Notwithstanding the foregoing, either party may assign, delegate or otherwise transfer this Agreement by operation of law or otherwise, to: (i) any person or entity that becomes a successor entity, in connection with a change of control (which will include a direct or indirect transfer of all or substantially all of the party's' stock or assets to a third-party, a merger, reorganization or other such transaction) or (ii) a sister company or wholly-owned subsidiary.  Notwithstanding any Change of Control, the parties agree that any successor entity will comply with the terms of this Agreement.

e.    **Notices.**  All notices and other communications pertaining to this Agreement will be in writing and will be deemed delivered upon personal delivery, or refusal of delivery, via certified mail, return receipt requested, postage prepaid.  All notices of communications between Walgreens and Theranos pertaining to this Agreement will be directed to the address specified on cover page of this Agreement, or such other address as a party may specify.

f.    **Prevailing Party.**  In any suit or proceeding relating to this Agreement the prevailing party will have the right to recover from the other its costs and reasonable fees and expenses of attorneys, accountants, and other professionals incurred in connection with the suit of proceeding, including costs, fees and expenses upon appeal.

g.    **Amendment; Waiver.**  No modification to this Agreement, or any waiver of any rights shall be effective unless assented to in writing by the party to be charged and shall not constitute the waiver of any other right hereunder or any subsequent breach or default.

Trial Exh. 0617 Page 00018

**Confidential Treatment Requested by Walgreen Co.**        WAG-TH-00000067

ER-5365

h. **Severability.** If any portion of this Agreement is held invalid or to be out of compliance with federal or state law, the parties agree that such invalidity shall not affect the validity of the remaining portions of this Agreement, and the parties shall seek in good faith if possible to agree to substitute for the invalid provision a valid provision that most closely approximates the economic effect and intent of the invalid provision.

i. **Publicity.** Neither party will use the name(s), trademark(s) or trade name(s), whether registered or not, of the other party in publicity or press releases or advertising or in any manner (except as such disclosure may be required by applicable law or the rules or regulations of any applicable securities exchange or regulatory or governmental authority to which the relevant party is subject or submits, wherever situated), including customer lists, without that party's prior written consent. Consent of Walgreens shall not be valid unless obtained from Walgreen's Chief Information Officer and Director of Corporate Communications, which consent may be withheld in Walgreen's sole discretion.

j. **Export and Import Requirements.** Theranos will prepare, maintain and, to the extent required under applicable law, submit to the applicable customs authorities, all necessary information and documentation to comply with the applicable customs and export and import requirements of each country from which any software, products, or other materials developed under this Agreement will be exported and each country into which they will be imported. Theranos will comply with all other applicable customs, technical compliance and country of origin requirements of each country into which any software, products, or other materials are to be imported.

k. **Compliance With Laws.** Each party will comply with all applicable laws, ordinances, rules, and regulations governing its duties or responsibilities under this Agreement, including but not limited to, all United States and foreign export control laws or regulations. Without limiting the generality of the foregoing, each party represents that in the performance of its obligations under this Agreement, it will fully comply with the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") and the standards issued by the US Department of Health and Human Services at 45 C.F.R. Parts 160 and 164, to protect the security and privacy of individually identifiable health information generated by or received from the other party, whether such party is acting in the capacity of a covered entity, business associate, health care provider or any other capacity..

o. **EEOC Compliance.** In connection with its performance of the Agreement, Theranos shall comply with the **applicable** provisions of Executive Order 11246 and the regulations issued pursuant thereto (generally Part 60-1 of Title 41 of the Code of Federal Regulations), <u>unless exempted by said</u> <u>regulations,</u> particularly the provisions of the Equal Opportunity Clause (41 CFR Section 60-1.4(a)), which are incorporated herein by reference; the provisions and regulations pertaining to nondiscrimination and affirmative action in employment (41 CFR Sections 60-1.4, 1.40, 1.41 and 1.42), and the filing of Standard Form 100 (EEO-1). Theranos certifies, in accordance with the requirements of 41 CFR Section 60-1.8), that its facilities for employees are not segregated. In addition, unless exempted by said regulations, Theranos shall comply with the applicable provisions of the Affirmative Action Clause for Workers with Disabilities (41 CFR Section 60-741.5), and for Special Disabled Veterans and Veterans of the Vietnam Era (41 CFR Section 60-250.5), which are also incorporated herein by reference.

p. **Insurance.** Theranos will maintain at its expense the following insurance during the term of this Agreement:

(i) Workers' Compensation in the statutory limits required by the state or states in which work is performed under this Agreement (including all/other states endorsement) and Employers' Liability with minimum limits of $1,000,000;

(ii) Commercial General Liability with minimum limits of $2,000,000 per occurrence and $4,000,000 in the aggregate (to include bodily injury, property damage, products/completed operations, and contractual liability on a blanket basis for liability assumed hereunder); (iii) Excess liability insurance with minimum limits of $5,000,000 in the aggregate; and

(iv) Professional Liability (errors & omissions) with minimum limits of $2,000,000.

q. **Policy Requirements.** . All policies will be primary and at Theranos' sole expense. Walgreens will be included as an additional insured on all coverage listed above with the exception of Workers' Compensation and Professional Liability. All policies will include provisions that the insurers waive the rights of recovery or subrogation against Walgreens. Insurance coverage will be in a form and carrier acceptable to Walgreens with a minimum A.M. Best rating of A-/IX or higher. The insolvency, bankruptcy or failure of any insurance company shall not relieve Theranos of any of its obligations

**Confidential Treatment Requested by Walgreen Co.**

WAG-TH-00000068

ER-5366

herein.  Within fourteen (14) days of a request by Walgreens, Theranos shall provide certified copies of the actual policies of insurance including all endorsements and riders.  If any of the above policies are written on a "claims-made" basis, Theranos shall (i) ensure that continuous coverage is maintained or an extended coverage period will be exercised for a period of not less than three (3) years beyond the expiration or termination of this Agreement; and (ii) in the event a "claims-made" policy is not renewed or replaced, ensure that such policy must have an extended reporting period of three (3) years.

r.  **Theranos Data Security Reviews.**  Theranos will conduct its own periodic reviews or examinations of its data security procedures, consistent with prevailing industry good practices.  If any such review or examination indicates  that the procedures have or are likely to fail, Theranos will promptly notify Walgreens, providing pertinent details to the extent reasonable so that Walgreens can take steps to avoid or minimize the adverse impacts.  Theranos will also take reasonable steps to correct the errors or problems as soon as reasonably possible or otherwise cooperate reasonably with Walgreens to resolve the situation.  Furthermore, prior to and as a condition of Theranos bringing any hardware device onto Walgreen's premises to connect to Walgreen's internal computer network, Theranos shall provide Walgreens with a complete inventory of all such hardware devices, including manufacturer, model name and number, device type, and Media Access Control (MAC) address of each such device.  Walgreens shall at all times have the right to physically inspect any hardware device that is or has been connected to Walgreen's internal computer network in order to ensure compliance with provision of this Section 26.r.

*[remainder of page intentionally left blank]*

Theranos and Walgreens Confidential and Proprietary

-19-

Trial Exh. 0617 Page 00020

**Confidential Treatment Requested by Walgreen Co.**

WAG-TH-00000069

ER-5367

**SCHEDULE C**

**THERANOS SYSTEM SUPPORT AND MAINTENANCE TERMS**

1. **Support and Maintenance: Hardware and Software.** Theranos and Walgreens will work together prior to Pilot initiation to cement the workflow around implementation of these Services.

**1.1 Client Services.**

Theranos, at its cost, will use commercially reasonable efforts to provide Walgreens Users 24x7 Hardware and Software support and maintenance. Support and maintenance services include, but are not limited to, use of and access to the Software and TheranOS, and associated enhancements and updates; on-demand, interactive services; and diagnosis of problems or issues associated with the Hardware or Software and resolution of verifiable problems. Theranos will designate a dedicated Client Solutions manager to Walgreens. The Client Solutions manager will be responsible for assisting in the management of Walgreens' support and maintenance requests. Support and maintenance services will be available by telephone, email, and via TheranOS Real-Time Support online. In responding to Walgreens' support inquiries, Theranos will use the guidelines set forth in this Schedule.

**1.2 Reactive Incident Management Guidelines.**

Theranos, at its cost, will or will direct a service provider to use commercially reasonable efforts to respond to Walgreens' inquiry on a same-day basis via email or phone. Each inquiry will be assigned a priority level (set forth below), and Service Provider will use commercially reasonable efforts to resolve the request in accordance with the associated timelines:

- **Priority 1** – Use of the Theranos System, as that term is defined in this Agreement, is severely impacted. Important features/critical functions are not available, or system freezes or crashes. These situations will be treated as emergencies; reasonable efforts are made to respond to Priority 1 service requests within one (1) hour. Client Solutions will work 24x7 with Walgreens until the issue is resolved or as long as useful progress can be made and fixes can be applied.

- **Priority 2** – Walgreens experiences a minor loss of service or request information, an enhancement, or documentation clarification but there is no impact on the operation of the Software. Reasonable efforts are made to respond to Priority 2 service requests within 3 business hours. Examples of Priority 2 support inquiries include: help with web portal access, and instructions on using the TheranOS features. Service Provider will use commercially reasonable efforts to update Walgreens via email or phone (if email is not available) on the status of the inquiry and resolution within one business day.

3. **Deployment Services.**

At Walgreens' written request, as noted on a purchase order, Theranos, at its cost shall deploy and install the Devices on Walgreens' premises.

4. **Training.**

Theranos and Walgreens will mutually agree upon the scope of training that Theranos will offer to Walgreens at no cost to Walgreens.

*[remainder of page left intentionally blank]*

Trial Exh. 0617 Page 00021

**Confidential Treatment Requested by Walgreen Co.**

WAG-TH-00000070

ER-5368

**SCHEDULE D**

**WALGREENS SERVICE PRICING**

PRICING TO BE AGREED UPON

*[remainder of page intentionally left blank]*

Trial Exh. 0617 Page 00022

**Confidential Treatment Requested by Walgreen Co.**

**WAG-TH-00000071**

ER-5369

**SCHEDULE E**

**DEFINITIONS**

Capitalized terms, as used within this Agreement, including any Schedule or attachment, have the following meanings, unless otherwise indicated:

1.  "**Affiliate**" means any legal entity(ies) which is directly or indirectly controlled by or under common Control with a party or Controls a party to this Agreement but only so long as such control exists.

2.  "**Assay**" means any method used for the detection of an analyte (e.g., a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, but not limited to, human blood.

3.  "**Calibration**" means processes and controls for optimizing the performance of the Theranos System which do not require running of any Tests that are not ordered tests.

4.  "**Cartridge**" means Theranos' analytical chips containing biological fluid processing technology and Assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

5.  "**Change of Control**" means (i) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

6.  "**Client Accessible Software**" means Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software").

7.  "**Confidential Information**" means this Agreement, all information Discloser discloses to Recipient in connection with the performance of this Agreement. Confidential Information may not be marked as such at the time of disclosure and will still be considered Confidential Information so long as Discloser identified or designated the information as confidential at the time of disclosure (or like designation), or Discloser disclosed the information in circumstances of confidence, or the information would be understood by the parties exercising reasonable business judgment to be confidential. "Confidential Information" does not include information which: (a) is or becomes generally known through no fault of Recipient; (b) is known to Recipient without restriction on disclosure, at the time of disclosure, as evidenced by its records; (c) is hereafter furnished to Recipient by a third party as a matter of right and without restriction on disclosure; (d) is independently developed by Recipient without any breach of this Agreement or, (e) is otherwise necessary to establish rights or enforce obligations under this Agreement, but only to the extent that any such disclosure is necessary. Results and Reports shall be included in the definition of Theranos' Confidential Information, provided that such classification shall not reduce Walgreens' rights of use as described within this Agreement.

8.  "**Control, Controls** or **Controlled**" mean owning or controlling directly or indirectly more than 50% of shares, partnership interests, membership shares, ownership interests or voting rights of such controlling or controlled entity.

9.  "**Device**" means Theranos' analyzer, the Theranos patient interface and sample collection tools.

10. "**Deliverable**" means any Hardware, Software, Cartridge, Device, Theranos System, Support and Maintenance Services and/or training to be provided by Theranos to Walgreens under this Agreement.

11. "**Delivery Date**" means the date on which Theranos will ship the Cartridges to Walgreens, or otherwise make the Deliverable available to Walgreens at Theranos' manufacturing facilities.

12. "**Discloser**" means the party disclosing Confidential Information.

Trial Exh. 0617 Page 00023

**Confidential Treatment Requested by Walgreen Co.**                                      WAG-TH-00000072

ER-5370

13. **"Documentation"** means user manuals and technical notes for the Theranos System regarding the use and maintenance of the Theranos System.

14. "**Hardware**" means equipment and hardware Theranos is to deliver pursuant to this Agreement.

15. **"Medication Compliance/Adherence"** means the act of conforming to the recommendations made by the clinician with respect to timing, dosage, and frequency of medication taking within the guidelines approved by the FDA or as set forth in that medication's labeling.

16. **"Medication Persistence"** means the duration of time from initiation to discontinuation of administration of medications.

17. **"MTM"** or **"Medication Therapy Management"** means services provided by Walgreens in order to help consumers get the best results from medications through enhancing consumer understanding of medication therapy, increasing consumer adherence to medications, controlling costs, and preventing drug complications, conflicts, and interactions.

18. **"Ordered Tests"** means Tests that were: (i) ordered or authorized by an Ordering Practitioner or other individual permitted under federal and state law to order clinical laboratory tests; and (ii) initiated by a Walgreens employee or agent by entering the Tests specified on the order into the Device.

19. **"Ordering Practitioner"** means a licensed physician, osteopathic physician, physician assistant, nurse practitioner, or any other health care professional who is authorized under federal and state law to order clinical laboratory tests and who ordered one or more Tests.

20. **"Pilot"** means the pilot program as set forth in Schedule F.

21. "**Payment Refund Obligation**" means the conditional obligation to refund the pre-purchase payments if the pilot is not successful.

22. "**Payment Refund Obligation Termination**" means the earlier of (i) the date on which the success criteria for the pilot have been satisfied, or (ii) the date on which Theranos has refunded the amounts due under the Payment Refund Obligation.

23. "**Predictive Test**" means a test for diabetes/pre-diabetes, congestive heart failure, women's caner, men's cancer or other such Theranos proprietary test.

24. **"Processed Data"** means information generated by Theranos utilizing Theranos IP such as predictive modeling.

25. "**Program**" means the project outlined in Schedule A, but shall not include the Pilot for purposes of the Innovation Fee.

26. "**PSC**" means patient service center.

27. "**Recipient**" means the party receiving Confidential Information from Discloser.

28. **"Report(s)"** means the collective Routine Reports, Specialty Test Results and Predictive Results provided to Walgreens.

29. "**Representatives**" mean each party's employees, directors, officers, contractors, consultants, stockholders and agents.

30. **"Result(s)"** means the collective Routine and/or Specialty Results, and Predictive Results provided to Walgreens.

31. "**Routine "Test"** means a combination of one or more Assays that match existing Current Procedural Terminology (CPT) codes for laboratory analyses as defined by the American Medical Association.

**Confidential Treatment Requested by Walgreen Co.**                    **WAG-TH-00000073**

ER-5371

32. **"Services"** means all services related to the Cartridges, Tests, and Theranos System described in this Agreement including but not limited to the services described in Schedule B, Section 14 and Schedule C.

33. "**Software**" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. . The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement.

34. "**Specialty Test**" means laboratory tests, including, but not limited to, influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy and all available esoteric Tests (the parties agree that they will memorialize the CPT codes that are include all Specialty Tests as such codes become available).

35. **"Support and Maintenance Services(s)"** means support and maintenance services that Theranos will may provide Walgreens, as more fully set forth in Schedule C.

36. **"Test"** means a) in the context of routine laboratory analyses: a combination of one or more Assays that match existing Current Procedural Terminology (CPT) codes for laboratory analyses as defined by the American Medical Association and that have been granted CLIA-waived status by FDA or b) in the context of Predictive tests: a Cartridge, software program, information system or any other product necessary to perform a Predictive test that has been granted CLIA-waived status by FDA.

37. "**TheranOS**" means Theranos' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, web or device accessible Software, and related statistical and other analysis methods, data, data repositories and technologies.

38. **"Theranos Intellectual Property"** means all algorithms, analytical methodologies, data collection processes, software, hardware, Results, Reports, and Processed Data.

39. "**Theranos System**" means the system comprising the Assays, Cartridges, Device(s), and the TheranOS, and any other components developed by or for Theranos facilitating the operation of any of the foregoing, alone or in any combination.

40. **"Routine Results"** means the numerical outcome (raw data points) of a Routine laboratory Test originated at a Walgreens' Location.

41. **"Routine Report"** means the documentation provided to the ordering clinician and Walgreens for a laboratory test originated at a Walgreens Location. A Report for a Routine test is made up of the following three (3) components: (i) a Routine Result; (ii) trending information for that given patient and (iii) analysis, including, but not limited to, predictive modeling.

42. **"Specialty Result"** or **Predictive Result"** means the documentation provided to the ordering clinician and Walgreens for a Specialty Test or Predictive Test originated at a Walgreens Location. A Specialty or Predictive Result is made up of analysis only.

43. **"Walgreens"** means Walgreen Co. and its wholly owned subsidiaries.

44. **"Walgreens Location"** means a clinical or retail location including employer sites and academic research centers.

**Confidential Treatment Requested by Walgreen Co.**     **WAG-TH-00000074**

## SCHEDULE F
## PILOT

Theranos and Walgreens will enter into a written Pilot agreement on mutually acceptable terms. The terms of the Pilot agreement shall address the following objectives:

- Exceeding customer expectations for lab Services;
- Evaluating operating feasibility of delivering the Services within Walgreens locations;
- Evaluating the capacity/capability of supporting systems
- Ensuring payors will pay for lab Tests and that A/R will be collected.

The Pilot agreement will include, but not be limited to, the following provisions:
- The Pilot will include all Routine and Specialty tests as specified in Schedule B, Section 2 of the Agreement.
- The services will be offered in all stores (including 24 hour stores) in the pilot market to be mutually agreed upon between the parties ("Pilot Market"). The services will be available during normal store hours.
- The Pilot for store locations will commence no sooner than September 15, 2012, provided that the following three criteria must be met: (i) Theranos shall first obtain all necessary approvals to provide laboratory services in the State of California; (i) payor coverage that will be reasonably expected to produce the 15 patient average per day per store goal; and (ii) Theranos must show Walgreens, to its reasonable satisfaction, that the Theranos System is fully functional and operational, including, but not limited to, billing software necessary to support the Pilot markets, and that Theranos' ability to process Tests is adequate to support reaching the 15 patient average per store per day goal. While the Parties intend the Pilot to start no sooner than September 15, 2012 the actual start date of the Pilot will be agreed upon and memorialized by the parties once these three (3) requirements are satisfied. The Services will be offered for a period of 90 days unless extended in writing upon mutual agreement of both parties if the success criteria below have not yet been met. At such time as Theranos has satisfied the above requirements, Theranos shall provide written notice to Walgreens of the same. Walgreens shall commence the Pilot within forty-five (45) days of such notice. In order for Pilot to commence, Theranos must accredit the PSC locations and staff and all such locations must meet Theranos Lab Standards as defined in this Agreement. Both parties agree that they shall make commercially reasonable efforts to ensure that the Pilot will commence after September 15, 2012, but no later than February 1, 2013.
- The services will be offered in at least one (1) Employer Solutions Group ("ESG") locations. The Pilot for the ESG location will commence on a mutually agreeable date.
- Should Theranos fail to meet its requirements under this Schedule F prior to April 1, 2013, Walgreens shall have the option to terminate this Agreement pursuant to Schedule B, Section 24(c). Should Theranos comply with the requirements under this Schedule F and Walgreens fails to commence the Pilot, then Theranos shall have the option to terminate this Agreement.

The following criteria, among other criteria developed and agreed upon in writing by the parties, will be utilized to evaluate pilot success for purposes of Schedule B, Section 24(b) and 24(d)(i) of this Agreement. When the following criteria have been met, the pilot will be deemed successful. Both parties will confirm pilot success in writing and Walgreens will notify Theranos in writing of its intent to proceed with deployment at whatever pace Walgreens deems appropriate within thirty (30) calendar days from successful pilot completion:

- Walgreens Service Fee received during the pilot timeframe shall be at least $10.00 per patient, in accordance with the Pricing agreed upon per the terms of this Agreement.

- Other criteria mutually agreed to in writing by both parties prior to the commencement of the pilot.

National rollout criteria:
- Assuming adequate payor coverage, Theranos must demonstrate to Walgreens' reasonable satisfaction that it can support 100,000 Tests per day within three (3) months after successful completion of the Pilot to support full roll out of the program post Pilot. In a subsequent amendment, the parties shall document terms regarding national roll-out schedule, expectations, etc.
- Theranos and Walgreens mutually agree upon expansion criteria for nationwide rollout of the program post Pilot.

Confidential Treatment Requested by Walgreen Co.

Should the Pilot success criteria not be initially met within ninety (90) days of the Pilot commencement, the parties agree that they shall not terminate this Agreement, so long as at least three (3) patients per day have had laboratory services provided at Walgreens.  In good faith, the parties shall work together to identify the problems that prevented the Pilot from being successful.  If after twelve (12) months of continued efforts to address the issues identified in the Pilot, the parties are unable to resolve the Pilot issues, the parties will have the right to terminate this Agreement pursuant to Section 24(c) of this Agreement.

Theranos and Walgreens Confidential and Proprietary

-26-

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000076

ER-5374

**SCHEDULE G**
**HIPAA BUSINESS ASSOCIATE AGREEMENT**

TO COME.

**Confidential Treatment Requested by Walgreen Co.**

SCHEDULE H-1
CONVERTIBLE PROMISSORY NOTE

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THERANOS, INC.

CONVERTIBLE PROMISSORY NOTE

$40,000,000                                                                                                     [DATE]

FOR VALUE RECEIVED, Theranos, Inc., a Delaware corporation (the "Company") promises to pay to WVC Investments, LLC ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Forty Million Dollars ($40,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof. This Note is issued pursuant to that certain Amended and Restated Theranos Master Services Agreement by and between the Company and Investor dated [ 6/5/12 ] (the "Agreement"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

    1.    **Payments.**

        (a)  Interest. This Note shall bear interest at the rate of 0.79% per annum, which interest shall accrue annually. Accrued interest on this Note shall be payable on the Maturity Date.

        (b)  The "Maturity Date" shall be the earlier of:

            i.  the date of the Company's Initial Public Offering;

            ii.  the effective date of a Change of Control;

            iii.  one hundred eighty (180) calendar days from the date of receipt by the Company of Investor's written demand for repayment of this Note pursuant to this Section 1(b)(iii), which demand may be made only if the Company does not meet the mutually agreed-upon success criteria for the Pilot set forth in Schedule F of the Agreement; or

            iv.  the date that is ten years after the date of the Note .

        (c)  Prepayment. The Company shall not have the right to prepay any portion of principal or accrued interest under this Note except with the express written consent of Investor unless and only to the extent that the Company and/or the Investor have determined that the Pilot contemplated by the Agreement is unsuccessful.

    2.    **Conversion.**

Trial Exh. 0617 Page 00029

**Confidential Treatment Requested by Walgreen Co.**          **WAG-TH-00000078**

ER-5376

(a) Optional Conversion. At any time prior to repayment by the Company of the Note, if services are being offered in at least 1,000 Investor locations (as contemplated in the Agreement), Investor may elect to convert all or any party of the outstanding principal amount up to $20,000,000 of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price, provided, however, that upon conversion 50% of the converted amount must come from Tranche 1 and 50% from Tranche 2 until such time as Tranche 1 is exhausted. At any time prior to repayment by the Company of the Note, if services are being offered in at least 2,500 locations (as contemplated in the Agreement) Investor may elect to convert all or any part of the remaining outstanding principal amount of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price, provided, however, that upon conversion 50% of the converted amount must come from Tranche 1 and 50% from Tranche 2 until such time as Tranche 1 is exhausted. Investor's election to convert shall be evidenced by Investor's delivery to the Company of written notice of Investor's intention to convert. All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a conversion pursuant to a Company Event. If Investor elects to convert the Note following receipt by Investor of notice of a Company event pursuant to Section 2(b) hereof and for any reason the Company Event described in any such notice does not occur, such election to convert by Investor shall be rescinded and shall be null and void.

(b) Notice of Company Events. The Company shall give written notice to Investor of the anticipated occurrence of any Company Event. Such written notice of the anticipated occurrence of a Company Event shall be given not less than fifteen (15) days and not more than thirty (30) days prior to the actual occurrence of a Company Event

(c) Conversion Procedure.

  i. <u>Conversion Pursuant to Section 2(a)</u>. Before Investor shall be entitled to convert this Note into shares of Series C-1 Preferred Stock, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 2(a). Upon such conversion of this Note, the Company and the Investor hereby agree to execute and deliver to one another a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including, without limitation, the Amended and Restated Investors' Rights Agreement, the Amended and Restated Co-Sale Agreement and the Amended and Restated Voting Agreement). The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 2(c)(ii). Any conversion of this Note pursuant to Section 2(a) shall be deemed to be effective upon the earlier to occur of (i) the tenth day following the Company's receipt of Investor's written notice of its intention to convert, and (ii) immediately prior to the occurrence of the Company Event, and on and after such date the Persons entitled to receive the shares issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

  ii. <u>Fractional Shares; Interest; Effect of Conversion</u>. No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable conversion price by the fraction of a share not issued pursuant to the previous sentence. The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Company pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note. Upon conversion of this Note in full and the payment of the amounts specified in this paragraph, Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

Confidential Treatment Requested by Walgreen Co.     WAG-TH-00000079

3. **Definitions.** As used in this Note, the following capitalized terms have the following meanings:

"Amended and Restated Co-Sale Agreement" shall mean that certain Amended and Restated Co-Sale Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Investors' Rights Agreement" shall mean that certain Amended and Restated Investors' Rights Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Voting Agreement" shall mean that certain Amended and Restated Voting Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Change of Control" shall mean (i) any reorganization, merger or consolidation of the Company (excluding any sale of stock for capital raising purposes), other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, as a result of shares in the Company held by such holders prior to such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity; (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company

"Company Event" shall mean the Company's Initial Public Offering, a Change of Control, a dissolution of the Company, other event of liquidation, declaration of a Series C-1 Dividend or other events agreed upon in writing by the Company.

"Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Series C-1 Dividend" shall mean any dividend, whether in the form of cash, property or securities, payable or paid to the holders of the Company's Series C-1 Preferred Stock. For the avoidance of doubt, C-1 Dividends do not include any stock re-purchases.

"Tranche 1" shall mean $10,000,000 of the principal amount of this Note.

"Tranche 2" shall mean $30,000,000 of the principal amount of this Note.

"Tranche 1 Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Tranche 2 Conversion Price" shall mean $75.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

**Confidential Treatment Requested by Walgreen Co.**                    WAG-TH-00000080

4.   **Investor Representations.** Investor represents and warrant to the Company as follows:

(a)   Binding Obligation.  Investor has full legal capacity, power and authority to execute and deliver this Note and to perform its obligations hereunder. This Note constitutes a valid and binding obligation of Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)   Securities Law Compliance.  Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration, except as may be provided in the Amended and Restated Investors' Rights Agreement. Investor has not been formed solely for the purpose of making this investment and is purchasing the Note for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor has such knowledge and experience in financial and business matters that Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time. Investor is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company. The principal place of business of Investor is correctly set forth beneath Investor's name on the signature page hereto.

5.   **Miscellaneous.**

(a)   Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof.

   i.   Subject to the restrictions on transfer described in this Section 5(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

   ii.   Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by the Investor to any legal entity or person, other than a wholly-owned direct or indirect subsidiary of Investor.  In the event Investor intends to assign any rights, interests or obligations under this Note to a wholly-owned direct or indirect subsidiary, Investor shall give Company no less than thirty (30) calendar days' prior written notice.

   iii.   Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor.

(b)   Waiver and Amendment.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the Investor.

(c)   Notices.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(d)   Payment.  Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

Trial Exh. 0617 Page 00032

**Confidential Treatment Requested by Walgreen Co.**                                              **WAG-TH-00000081**

ER-5379

(e) Governing Law.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f) Counterparts.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By: _____
Name: _____ Elizabeth Holmes
Its: _____ CEO

Acknowledged and accepted by Investor:
WVC INVESTMENTS, LLC

By: _____
Name: _____
Its: _____

Theranos and Walgreens Confidential and Proprietary

-32-

Trial Exh. 0617 Page 00033

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000082

ER-5380

(e)  Governing Law.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f)  Counterparts.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____
Name:_____
Its:_____

Acknowledged and accepted by Investor:
WVC INVESTMENTS, LLC

By:_____
Name:_____
Its:_____

GEN - LAW

Trial Exh. 0617 Page 00034

Confidential Treatment Requested by Walgreen Co.                                        WAG-TH-00000083

ER-5381

**SCHEDULE H-2**
**CERTIFICATE EVIDENCING RIGHT TO PURCHASE CONVERTIBLE PROMISSORY NOTE**

|June 5|, 2012

PURSUANT to Section 21 of that certain Amended and Restated Theranos Master Services Agreement of even date herewith (the "**Agreement**"), by and between Walgreen Co. ("**Walgreens**") and Theranos, Inc. ("**Theranos**"), this Certificate evidences the right granted to Walgreens under the Agreement to purchase a convertible promissory note in the principal amount of $40 million in substantially the form set forth in Schedules H-1 of the Agreement (the "**Convertible Note**").

From the Effective Date (as defined in the Agreement) to fourteen (14) days after the Effective Date with respect to Schedule H-1, Walgreens shall have the right to purchase the Convertible Note, subject to the terms of the Agreement, by countersigning this Certificate, for the applicable Convertible Note, below.

THERANOS, INC.

By: _____

Name: ___Elizabeth Holmes___

Title: ___CEO___

**THE FOLLOWING IS TO BE EXECUTED ONLY UPON EXERCISE OF RIGHT TO PURCHASE NOTE:**

On this _____ day of _____, 201__, Walgreens hereby elects to purchase the Convertible Note pursuant to the terms of the Agreement, and tenders herewith the full purchase price of the Convertible Note.

WALGREEN CO.

By: _____

Name: _____

Title: _____

Trial Exh. 0617 Page 00035

Confidential Treatment Requested by Walgreen Co.

ER-5382

**SCHEDULE I**
**THERANOS PHARMACEUTICAL CLINICAL TRIALS INFRASTRUCTURE**

Final terms for extending Theranos' clinical trials infrastructure to Walgreens' stores shall be agreed upon following execution of this Agreement.  At that time, this Schedule will be completed accordingly, and this Agreement amended, if warranted.

Trial Exh. 0617 Page 00036

**Confidential Treatment Requested by Walgreen Co.**                                    WAG-TH-00000085

ER-5383

**SCHEDULE J**
**TEST MENU**

**TO COME**

Theranos and Walgreens Confidential and Proprietary

-35-

**Confidential Treatment Requested by Walgreen Co.**

WAG-TH-00000086

ER-5384

**Theranos Selects Walgreens as a Long-Term Partner Through Which to Offer Its New Clinical Laboratory Service**

*With first location launching this month in Silicon Valley, consumers can now complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours*

PALO ALTO, Calif., and DEERFIELD, Ill., Sept. 9, 2013 – Theranos, Inc. and Walgreens (NYSE: WAG) (Nasdaq: WAG) today announced a long-term partnership to bring access to Theranos' new lab testing service through Walgreens pharmacies nationwide. As the service becomes available through Theranos Wellness Centers inside Walgreens stores, consumers will be able to access less invasive and more affordable clinician-directed lab testing, from a blood sample as small as a few drops, or 1/1,000 the size of a typical blood draw. The samples are either taken from a tiny finger stick or a micro-sample taken from traditional methods, eliminating the need for larger needles and numerous vials of blood required for most diagnostic lab testing.

Theranos and Walgreens are taking the first step in making this service available to consumers with the first Theranos Wellness Center location opening this month at Walgreens drugstore at 300 University Ave. in Palo Alto, Calif., in the heart of Silicon Valley. The companies plan to offer the service at Walgreens locations nationwide.

For the first time, Theranos is introducing CLIA-certified laboratory services with the ability to run its tests on micro-samples. Theranos' proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results. Test results are available to physicians in a matter of hours, enabling fast diagnoses to help informed treatment choices. Theranos tests are low cost – always 50 percent of Medicare reimbursement rates or less – and are reimbursed by major insurance carriers, Medicare, and Medicaid. Developed to be accessible to everyone, Theranos tests cost the same amount for everyone, regardless of insurance plan or whether they are uninsured.

Confidential

THPFM0001815817

ER-5385

"For the past 10 years, Theranos has worked relentlessly to reach a point at which we could help make actionable information accessible to physicians and patients at the time it matters most. Clinicians can now see their patients having received lab results from fresh samples in a matter of hours," said Elizabeth Holmes, Chairman, CEO and Founder of Theranos. "This partnership will further our goal to bring high quality, affordable lab testing to people everywhere, with our new Wellness Centers in Walgreens retail locations closest to homes and workplaces."

By minimizing the volume of blood required from patient draws, Theranos helps clinicians provide a new standard of care across all specialties and treatment areas. Kind, minimally invasive collection has the potential to benefit everyone, including oncology, pediatric and geriatric patient populations that require frequent blood draws. Theranos seamlessly integrates with existing practice workflows and offers a full spectrum of laboratory tests, from the most common panels to highly specialized tests. Collection for Theranos tests will be performed in Theranos Wellness Centers by licensed phlebotomists or appropriately state certified personnel.

"Theranos' service offers affordable certified lab testing with quicker response times, and furthers our mission to provide a differentiated patient experience," said Kermit Crawford, Walgreens president of pharmacy, health and wellness. "This is the next step in Walgreens efforts to transform community pharmacy, giving our patients and customers convenient access to the comprehensive care they need, right in their communities."

As the nation's largest retail pharmacy chain with more than 8,100 neighborhood pharmacies, Walgreens has the infrastructure to help bring Theranos to consumers nationwide.

**About Theranos**

Headquartered in Palo Alto, Theranos, Inc. is working to shape the future of lab testing and the way health information is collected, analyzed, and communicated. Founded in 2003 by Elizabeth Holmes, Theranos is on a mission to make actionable health information accessible to people everywhere in the world at the time it matters, enabling early detection and intervention of

disease, and empowering individuals with information to live the lives they want to live. [ HYPERLINK "http://www.theranos.com/" ]

**About Walgreens**

As the nation's largest drugstore chain with fiscal 2012 sales of $72 billion, Walgreens ([ HYPERLINK "http://cts.businesswire.com/ct/CT?id=smartlink&url=http%3A%2F%2Fwww.walgreens.com&esheet=50683078&newsitemid=20130801006486&lan=en-US&anchor=www.walgreens.com&index=2&md5=d76441c4070440ef81a7b8b24c794409" ]) vision is to become America's first choice for health and daily living. Each day, Walgreens provides more than 6 million customers the most convenient, multichannel access to consumer goods and services and trusted, cost-effective pharmacy, health and wellness services and advice in communities across America. Walgreens scope of pharmacy services includes retail, specialty, infusion, medical facility and mail service, along with respiratory services. These services improve health outcomes and lower costs for payers including employers, managed care organizations, health systems, pharmacy benefit managers and the public sector. The company operates 8,117 drugstores in all 50 states, the District of Columbia and Puerto Rico. Take Care Health Systems is a Walgreens subsidiary that is the largest and most comprehensive manager of worksite health and wellness centers and in-store convenient care clinics, with more than 700 locations throughout the country.

*Cautionary Note Regarding Forward-Looking Statements: Statements in this release that are not historical are forward-looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Words such as "expect," "likely," "outlook," "forecast," "would," "could," "should," "can," "will," "project," "intend," "plan," "goal," "target," "continue," "sustain," "synergy," "on track," "believe," "seek," "estimate," "anticipate," "may," "possible," "assume," and variations of such words and similar expressions are intended to identify such forward-looking statements. These forward-looking statements are not guarantees of future performance and involve risks, assumptions and uncertainties, including, but not limited to, those relating to the speed, efficiency, cost, reliability and safety of lab testing services and results, the introduction of Theranos services at Walgreens locations including the timing, scope and financial ramifications thereof, and those described in Item 1A (Risk Factors) of our most recent Annual Report on Form 10-K and Quarterly Report on Form 10-Q, each of which is incorporated herein by reference, and in other documents that we file or furnish with the Securities and Exchange Commission. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those indicated or anticipated by such forward-looking statements. Accordingly, you are cautioned not to place undue reliance on*

Confidential

THPFM0001815819
ER-5387

*these forward-looking statements, which speak only as of the date they are made. Except to the extent required by law, Walgreens does not undertake, and expressly disclaims, any duty or obligation to update publicly any forward-looking statement after the date of this report, whether as a result of new information, future events, changes in assumptions or otherwise.*

**Contact**

Theranos
Jeffrey Blickman, (650) 470-0334
[ HYPERLINK "mailto:pr@theranos.com" ]

or

Walgreens
Jim Cohn, (847) 315-2950
[ HYPERLINK "mailto:Jim.Cohn@walgreens.com" ]

Confidential

THPFM0001815820

December 31, 2013

Theranos, Inc.
Attn: Elizabeth Holmes
1601 S. California Avenue
Palo Alto, CA 94304

Re:    Amended and Restated Theranos Master Services Agreement

Dear Ms. Holmes:

In reference to that certain Amended and Restated Theranos Master Services Agreement dated June 5, 2012, as amended by that letter agreement dated January 7, 2013 (collectively "Agreement"), by and between Theranos, Inc. ("Theranos"), and Walgreen Co. ("Walgreens"), the parties agree that it is necessary to revisit certain terms contained within the Agreement as the intentions of the parties regarding their business relationship have evolved since the Agreement was first executed.

It is the intention of the parties to develop a mutually beneficial strategic relationship that facilitates the successful deployment of Theranos nationally, establishes Walgreens as the national partner for laboratory services that Theranos is able to provide (the "Theranos Services"), and Theranos as Walgreens national partner for such Theranos Services, and protects the long-term strategic and competitive positioning of Theranos and Walgreens with respect to competitive technologies and services. Assuming appropriate coverage, quality and performance by Walgreens, it is the expectation that Walgreens will be Theranos' exclusive retail pharmacy and clinic partner. Assuming the ability to scale, acceptable quality and performance by Theranos, it is the expectation that Theranos will be Walgreens exclusive partner for the Services. The parties understand that this relationship may evolve, and their business relationship may change over time as a result of industry developments, competitive dynamics, regulations, technological advances, consumer acceptance, Theranos' desired store and patient experience, and other factors. The parties also understand that their economic relationship will similarly evolve, and as the market roll-out advances the capital investments, costs of healthcare professionals, marketing expense and Walgreens service fees related to new markets will be adjusted based on requirements existing at the time. The parties intend that this Agreement be structured in a manner that provides flexibility but also commits both parties to each other as "anchor" partners and provides adequate protections to justify the significant investment that both are expecting to make in reliance on their strategic relationship.

To that end, the parties agree to the following:

1

**Confidential Treatment Requested by Walgreen Co.**                    **WAG-TH-00000099**

ER-5389

1.   **National Roll-out; New Market Entry**. The parties shall work together to develop a forecast that details the anticipated roll-out dates for Theranos Services in individual U.S. States/territories (each, a "State"). The parties are committed to taking all steps reasonably necessary to ensure a successful national roll-out of the Theranos Services, and agree that a quality store and patient experience is an important component of this success as patient adoption and acceptance of Theranos' laboratory services will be highly impacted by the patient experience. To that end, the parties agree that, within sixty (60) days prior to entering a new State, they will develop a plan (the "New Market Entry Plan") that sets forth the material terms that will govern the parties' expectations as it relates to that new State. The New Market Entry Plan will describe the required coverage for Theranos within that State (i.e., how many outlets are required to serve patients within that market), the expectations regarding how to provide that coverage, including expected Geo-access and Branding Acceptability (and, whether the market will be exclusive [as further described below], specifically which Walgreens locations will be utilized and any non-Walgreens locations), expected mix of Walgreens store formats (i.e., Gold, Silver, Bronze) and associated capital investments, required health care professionals, marketing expenses, and similar items. The New Market Entry Plan will also include the expected allocation of costs among the parties, and the economic relationship that will exist between them as it relates to that new State (i.e., Walgreens' service fee).

2.   **Exclusivity**. As detailed below, Walgreens is willing to commit to a higher level of build out with respect to its stores in order to provide Services to Theranos. The parties' expectation is that the majority of Theranos spaces will be gold or silver spaces with no more than 20% bronze spaces and minimum 40% gold spaces. As such, the parties agree that increased exclusivity represents a fair market value exchange for such commitment. While the parties acknowledge the need to further document specifics concerning each party's performance, Branding Acceptability and Geo-access of Walgreens stores in respective markets, the parties agree to the following:

   a. In addition to the exclusivity provisions, and subject to the carve-outs related to pharmaceutical companies and United States and foreign government agencies, in Schedule B, Section 3(b) of the Agreement, with respect to California, Arizona and New York, the parties agree to the following exclusivity framework: For each state listed above, a period of eighteen (18) months commencing on the date on which 20 Walgreens stores (or other number the parties may agree) located such state are actively collecting samples for commercial patients, Theranos shall not provide testing services or have samples collected on its behalf through or at any of the following entities: Wal-Mart Stores, Inc., CVS Caremark Corporation, Rite Aid Corporation, and Target Corporation. Provided that Walgreens satisfies mutually agreed upon requirements regarding Geo-access, Branding Acceptability, and Walgreens performance, the parties will conduct an annual exclusivity extension review, with the presumption being that if Walgreens has satisfied the Geo-access, Branding Acceptability, and performance

2

**Confidential Treatment Requested by Walgreen Co.**                                                   WAG-TH-00000100

ER-5390

requirements, the parties will negotiate to extend the above exclusivity framework for an additional twelve (12) month period.

b. In connection with developing the New Market Entry Plan and at least sixty (60) days prior to the planned launch date for such State, the parties shall discuss and agree on Walgreens's proposed Geo-access and Branding Acceptability for such State and Walgreens's performance to date. Should Walgreens (a) elect to move forward with such State, (b) satisfy the Geo-access and Branding Acceptability negotiations for such State and (c) satisfy Theranos' reasonable expectations as to Walgreens's performance to date (consistent with the intention of the parties described above), the parties agree that the following exclusivity (subject to the carve-outs related to pharmaceutical companies and United States and foreign government agencies in Schedule B, Section 3(b) of the Agreement) shall apply with respect to each State: for a period of twelve (12) months commencing on the date on which the first Walgreens location in such State actively collects samples for commercial patients, Theranos shall not launch testing services or have samples collected on its behalf through or at locations owned or operated by CVS Caremark Corporation, Rite Aid Corporation or Target Corporation.

c. Theranos further agrees that it shall not launch testing services or have samples collected on its behalf through or at locations owned or operated by Wal-Mart at any time during 2014, except with Walgreens approval if needed to fill gaps in Walgreens coverage. After 2014, Theranos will have discretion to launch testing services or have samples collected on its behalf through or at locations owned or operated by Wal-Mart if, after good faith discussions with Walgreens, Theranos believes it is necessary to do so to advance Theranos' business or strategic objectives. For the avoidance of doubt, after 2014, such decision will be made in Theranos' sole discretion.

d. Notwithstanding anything to the contrary, Theranos agrees that it shall not, without Walgreens prior written consent, offer services or collect samples through CVS Caremark Corporation's Minute Clinics, or their equivalent in exclusive Walgreens markets. In the event Theranos desires to utilize such clinics in non-exclusive Walgreens markets it will inform Walgreens in advance and review their rationale for doing so, and consider reasonable alternatives that Walgreens may advance. Theranos further agrees to discuss with Walgreens the inclusion of Walgreens in-store and employer worksite clinics in the national roll-out, as may be appropriate.

e. Definitions.
    i. "Geo-access" shall include, but not be limited to, access to a store location within an acceptable mileage from every person in the relevant State (e.g., for urban markets, 5 miles from every household) and ability for individual stores and at a market level to handle the volume of patients. Further the parties shall work together in order to determine what other factors need to be considered in order to

3

**Confidential Treatment Requested by Walgreen Co.**                    **WAG-TH-00000101**

ER-5391

determine what saturation level of sample collection locations are necessary to satisfy a market's particular needs.

ii. "Branding Acceptability" shall include, but not be limited to, (i) the in-store patient experience and percentage of Gold, Silver and Bronze locations (with such designations being generally consistent with the parties discussions to date, and final commitments to be agreed upon in writing as part of the New Market Entry Plan) built out by Walgreens in the relevant State, (ii) prominent display of the Theranos wordmark, and the Theranos space within Walgreens locations. The parties shall take reasonable steps to work together in order to come to agreement in writing on these details/terms.

3. **Innovation Fee**. As detailed in Section 6 of Schedule B of the Agreement, Walgreens is to make an Innovation Fee payment of up to $100 million to Theranos. The parties acknowledge that in order to be better prepared for national roll-out of Theranos laboratory testing, there is a need to accelerate the Innovation Fee payment schedule. To that end (and subject to Section 7 below), the parties have agreed that Walgreens shall accelerate payment of the Innovation Fee so that $75M of the pre-purchase will become immediately due and payable at the close of business on 12/31/2013, and Walgreens commits to wire immediately available funds in such amount within five (5) business days after the date hereof to an account designated by Theranos.

3. **Service Levels/Training**. The parties agree that it is necessary to document their respective responsibilities and expectations with respect to performance and to training, among other items. In a separate document, the parties shall reduce to writing tangible performance levels with respect to all activities addressed under the Agreement as it relates to providing laboratory services to patients.

5. **Pricing**. Schedule B, Section 11 of the Agreement provides that the Pricing for Walgreens Services shall, on average, fall within a range of $10.00-$16.00/patient/visit. Walgreens has conducted a fair market value assessment of the Walgreens Services and the parties agree that the Pricing shall be $10.00/patient/visit during the Pilot. The parties shall further discuss and agree upon Pricing beyond the Pilot as part of the New Market Entry Plan.

6. With respect to Schedule F of the Agreement, the parties agree to the following terms with respect to the Pilot:

i. The "Pilot Stores" mean the stores mutually agreed upon by the parties as pilot locations.

ii. The parties soft launched the Pilot by first offering Tests at three (3) stores, with two in the Phoenix market and one in Palo Alto. The Pilot will run for a period of ninety (90) days after the last of the 20 Walgreens stores is actively collecting samples for commercial patients.

4

Trial Exh. 1387 Page 0004

iii.    Notwithstanding anything to the contrary, should the parties agree that the Pilot is successful prior to the end of the ninety (90) day period, the parties may move onto the national roll-out launch planning phase as detailed in Schedule F and end the Pilot early.

7.    **Additional Equity Rights**.  The parties agree that $50M of the $75M payment made by Walgreens pursuant to Section 3 above may be converted, at Walgreens option, into equity on such terms as are made available to investors in Theranos' planned equity financing in the first quarter of 2014.  The parties also agree that upon signing this Agreement, Walgreens will receive an option to purchase up to $50M in Theranos equity on the terms made available to investors who invested in the prior equity financing (e.g., $15/share).  Paperwork associated with these additional equity rights will be drafted by Theranos and delivered to Walgreens within 30 days of the date of this Agreement.

8.    **Good Faith Efforts**. The parties shall use good faith efforts to ensure that the intentions stated above are realized.  In order to enable the parties to open new markets as efficiently as possible, the parties agree that their teams will, within 90 days of the date of this Agreement, develop a short-form agreement that will include all terms required to convert a New Market Entry Plan into a binding agreement between the parties, and the terms governing exclusivity within the relevant State.  For the same reasons, as well as to provide as much certainty to the parties as possible regarding their expectations, these teams will define in writing what constitutes acceptable Geo-access and Branding Acceptability and Walgreens performance objectives before December 31, 2014.

9.    All other provisions of said Agreement shall remain in full force and effect.

**Confidential Treatment Requested by Walgreen Co.**    **WAG-TH-00000103**

Please indicate your agreement with the above by signing and returning one fully executed counterpart of this letter agreement to Greg Kunstman. If you have any questions, Mr. Kunstman may be reached at 847.315.4118.

Very truly yours,

Agreed to and accepted this 31 day of December, 2013 by:

WALGREEN CO.

THERANOS, INC.

By: _Mark Vainisi_

By: _____

Name: _Mark E. Vainisi_

Name: _Elizabeth Holmes_

Title: _Group Vice President, MJA_

Title: _CEO_

Confidential Treatment Requested by Walgreen Co.                    WAG-TH-00000104

ER-5394