No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

**APPELLANT'S EXCERPTS OF RECORD**
**VOLUME 22 OF 26 (PAGES ER-5877 – ER-6173)**

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

| **theranos** | LDT Validation Report | Theranos Potassium Assay | Rev: |
| | | **CL RPT-14039** | **1** |
| Description | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

## Validation of Modified Siemens Potassium Assay

**Author(s):**

| Signature: *[signature]* | Date: 3/24/14 |
| Name: Paul Patel, Ph.D. | Title: Team Lead, General Chemistry |

**Reviewer(s):**

| Signature: | Date: |
| Name: | Title: |

| Signature: *[signature]* | Date: 3/26/2014 |
| Name: Daniel Young, Ph.D. | Title: Vice President |

**Approver(s):**

| Signature: *[signature]* | Date: 3/24/14 |
| Name: Adam Rosendorff, M.D. | Title: Laboratory Director |

*[signature]* 9/19/15

Sunil S. Dhawan M.D.

| **Theranos Confidential** | Page **1** of 14 |

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009  Rev. A, Released 08/01/13

| **theran⊚s** | LDT Validation Report | Theranos Potassium Assay **CL RPT-14039** | Rev: **1** |
|---|---|---|---|
| Description | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

## Potassium Plasma Assay

**I. Overview**
**II. Method Principle**
**III. Definitions and Abbreviations**
**IV. Pre-clinical Validation**
   a. Analytical Measurement Range
      i. Limits of Blank, Detection and Quantitation
      ii. Linearity
   b. Analytical Specificity
   c. Precision
**V. Clinical Validation**
   a. Method Comparison with Predicate
   b. Transference and Verification of Reference Interval (Venous)
   c. Verification of Reference Interval with Finger Stick Samples
**VI. Stability**
   a. Reagent
   b. Sample
   c. Calibrators

Theranos Internal Only

| **Theranos Confidential** | Page **2** of **14** |
|---|---|

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009 Rev. A, Released 08/01/13

Confidential

| **theranos** | LDT Validation Report | Theranos Potassium Assay | Rev: |
|---|---|---|---|
| | | **CL RPT-14039** | **1** |
| Description | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

## I.  Overview

Potassium is the major cation of the intracellular fluid. Disturbance of potassium homeostasis (intra- and extracellular) can cause serious health effects.

Decreases in extracellular potassium are characterized by muscle weakness, irritability, and eventual paralysis. Cardiac effects include tachycardia, other cardiac conduction abnormalities that are apparent by electrocardiographic examination, and eventual cardiac arrest. Hypokalemia is common in vomiting, diarrhea, alcoholism, and folic acid deficiency. Additionally, >90% of hypertensive patients with aldosteronism have hypokalemia.

Abnormally high extracellular potassium levels produce symptoms of mental confusion; weakness, numbness and tingling of the extremities; weakness of the respiratory muscles; flaccid paralysis of the extremities; slowed heart rate; and eventually peripheral vascular collapse and cardiac arrest. Hyperkalemia may be seen in end-stage renal failure, hemolysis, trauma, Addison's disease, metabolic acidosis, acute starvation, dehydration, and with rapid potassium infusion.

## II.  Method Principle

The sample is mixed with ISE buffer, thereby providing a constant pH and a constantionic strength solution. As the buffered sample is moved through the ion-selective electrode, changes in the electrical potential take place. These electrical potential changes are measured against the potential of a reference electrode to derive the correct analog value for that sample. This assay has been modified from its original test method by pre-diluting the sample (3.5 fold) prior to performing the test. The pre-dilution occurs on the Tecan liquid handling robot. While the Tecan has very high precision, its accuracy can drift over time. Therefore, controls are run with each set of samples to correct for any volumetric drift. Namely, two low QC levels and two high QC levels also pre-diluted in parallel with the samples to be analyzed. A linear fit is applied to the QC control data and is used to correct the results from the sample analysis.

## III.  Definitions and Abbreviations

The following definitions and abbreviations are used in this document and related documents and attachments:

| **Theranos Confidential** | **Page 3 of 14** |
|---|---|

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009  Rev. A, Released 08/01/13

Confidential

THPFM0005704474

ER-5880

| theran⊛s | LDT Validation Report | Theranos Potassium Assay | Rev: |
| | | **CL RPT-14039** | **1** |
| Description | | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

a. **Accuracy:** Accuracy is defined by CLSI as the closeness of agreement between a test result and an accepted reference value. Method accuracy is used in a different sense by the American Association of Pharmaceutical Scientists where it is expressed as percent relative error (%RE). Trueness, a related CLSI term, is the closeness of agreement between the average of a number of replicate measured quantity values and a reference quantity value.

b. **Analyte:** Component represented in the name of a measurable quantity. The closely related term measurand is defined as the particular quantity subject to measurement.

c. **Analytical sensitivity:** There are several alternative uses of this term. Most commonly, and for the purposes of this Validation Plan, it is used interchangeably with limit of detection. It is also used to describe the ability of an analytical method to assess small variations of the concentration of an analyte, such as the slope of the calibration curve (IUPAC).

d. **Analytical specificity:** Ability of a test or procedure to correctly identify or quantify an entity, including in the presence of interfering substance(s) or phenomena.

e. **Calibration:** Set of operations that establish, under specified conditions, the relationship between values of quantities indicated by a measuring instrument or measuring system, or values represented by a material measure or a reference material, and the corresponding values realized by standards. Under CLIA, calibration refers to the process of testing and adjusting an instrument, kit, or test system, to provide a known relationship between the measurement response and the value of the substance being measured by the test procedure (42 CFR 493.1217).

f. **Calibrator:** A substance, material, or article intended to be used to establish the measurement relationships of a diagnostic medical device.

g. **CLIA:** Clinical Laboratory Improvement Amendments of 1988. Congressional legislation that defined and requires specific quality assurance practices in clinical laboratories.

h. **CLSI:** Clinical and Laboratory Standards Institute.

i. **Coefficient of Variation:** The ratio of the standard deviation to the average, often multiplied by 100 and expressed as a percentage, abbreviated as %CV .

| **Theranos Confidential** | **Page 4 of 14** |

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009 Rev. A, Released 08/01/13

Confidential

THPFM0005704475

ER-5881

| **theran⊚s** | LDT Validation Report | Theranos Potassium Assay **CL RPT-14039** | Rev: **1** |
|---|---|---|---|
| Description | | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

    j.  **Colorimetry:** A technique used to determine the concentration of colored compound(s) in solution.

    k.  **Interfering substance:** A substance or quantity thereof that is not the measurand but that affects the result of the measurement.

    l.  **IUPAC:** International Union of Pure and Applied Chemistry

    m.  **LDT:** Laboratory –developed Test.

    n.  **Linearity:** Linearity is the ability of a quantitative analytical method to provide results that are directly proportional to the concentrations of an analyte in test samples, within a given measuring interval. It is an important parameter to confirm when evaluating an analytical method because it verifies correct interpolation of results between points.

    o.  **LMR:** Lower end of the measuring range is the lowest level at which defined conditions, including all stated characteristic of the method, are met.

    p.  **LoB:** Limit of Blank is the highest value in a series of results on a sample that contains no analyte.

    q.  **LoD:** Limit of Detection is the lowest amount of analyte in a sample that can be detected with stated probability, although perhaps not quantified as an exact value.

    r.  **LoQ:** When used without a prefix, the Limit of Quantitation is the lowest actual concentration at which an analyte is reliably detected and at which uncertainty of the test result is less than or equal to the goal set by the manufacturer or laboratory. The term may also be used with prefixes L for lower (LLOQ) and U for upper (ULOQ), respectively. Note: LoB < LoD ≤ LoQ.

    s.  **Matrix:** All components of a material system, except the analyte. A specimen matrix is the biological milieu in which an analyte exists (e.g., plasma, serum, urine, or other body fluids).

| **Theranos Confidential** | Page 5 of 14 |
|---|---|

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009 Rev. A, Released 08/01/13

Confidential           THPFM0005704476

ER-5882

| **theranos** | LDT Validation Report | Theranos Potassium Assay | Rev: |
|---|---|---|---|
| | | **CL RPT-14039** | **1** |
| Description | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

t. **Measuring Interval (reportable range; analytical measurement range or AMR):** A measuring interval consists of all numeric values between the lower and upper numeric values for which a method can produce quantitative results suitable for clinical use. Where applicable, a linearity study is frequently used to establish or verify the measuring interval that can be reported for a measurement method. Alternatively, the lower limit of the measuring interval may be assigned as the LloQ (LLOQ).

u. **Precision:** Precision is the closeness of agreement between indications or measured quantity values obtained by replicate measurements on the same or similar objects under specified conditions. It is usually expressed numerically in terms of standard deviation (SD) or percent Coefficient of Variation (%CV).

v. **Reference interval:** The interval between and including two reference limits. It is common practice to define a reference limit so a stated fraction of the reference values is less than or equal, or greater than or equal, to the respective upper or lower limit.

w. **SOP:** Standard Operating Procedure.

x. **Spectrophotometry:** The quantitative measurement of the transmission (or reflection) properties of a material as a function of wavelength.

y. **Testing System:** The entirety of the testing process, including instrument, sample, reagents, supplies, and procedures. Personnel are sometimes included in the definition.

## IV. *Pre-clinical Validation*

### a. Analytical Measurement Range

#### i. Limits of Blank, Detection and Quantitation

The analytical range $1 - 10$ mmol/L L for Potassium in plasma has been determined by Siemens. The precision and bias verified at 2.7 mmol/L was 2.9 % and 3.8% (n=80) respectively.

#### ii. Linearity

The Analytical Measurement Range (AMR) including linear measurement interval has been determined for Potassium in plasma. This method is linear from $1.3 - 9.5$ mmol/L within the 10% allowable non-linearity in this interval.

| Theranos Confidential | Page 6 of 14 |
|---|---|

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009 Rev. A, Released 08/01/13

Confidential
THPFM0005704477

ER-5883

| theranos | LDT Validation Report | Theranos Potassium Assay CL RPT-14039 | Rev: 1 |
|---|---|---|---|
| Description | | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |



| Level | Mean | Linear fit | Nonlinear fit (2nd order polynomial) | Nonlinearity | Allowable nonlinearity |
|---|---|---|---|---|---|
| 1 | 1.30 | 1.28 | 1.31 | 0.03 | 0.13 |
| 2 | 3.30 | 3.28 | 3.27 | -0.01 | 0.33 |
| 3 | 5.30 | 5.38 | 5.35 | -0.03 | 0.54 |
| 4 | 7.40 | 7.38 | 7.36 | -0.01 | 0.74 |
| 5 | 9.50 | 9.48 | 9.51 | 0.03 | 0.95 |

Nonlinearity is less than allowable nonlinearity: 10%.
Performance requirement verified over the measuring interval.

**b. Analytical Specificity**

The analytical specificity for this assay was determined by testing the effect of hemoglobin (100 mg/dL), bilirubin (15 mg/dL) and triglycerides (438 mg/dL) on plasma samples spiked with the interferents and then compared with un-spiked controls. Potassium concentration at which the interference testing was performed was at 3.7 mM. Non-interference was defined as the mean result from testing of spiked samples within 10% of the mean of the un-spiked samples. Recoveries were within 94% to 96% (see table below).

Table 1. Interference Testing For Potassium

| Theranos Confidential | Page 7 of 14 |
|---|---|

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009 Rev. A, Released 08/01/13

Confidential

| **theran⬤s** | LDT Validation Report | Theranos Potassium Assay | Rev: |
|---|---|---|---|
| | | **CL RPT-14039** | **1** |
| Description | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

| Analyte (mM) | % Recovery | | |
|---|---|---|---|
| | Interferent | | |
| | Bilirubin (15 mg/dL) | Hemoglobin (100 mg/dL) | Triglycerides (438 mg/dL) |
| Potassium (3.75) | 94 | 96 | 95 |

No significant interference was observed.

**c. Precision**

The CV was determined at three levels using low, mid and high (level 3) QC controls (Liquid Assayed Multiquals) with 1 run per day over multiple days. The precision levels tested were at 2.6 mM (level 1), 4.1 mM (level 2), and 7.5 mM (level 3). The precision data for all levels are summarized below.

**Level = 1**

| | |
|---|---|
| Number of observations | 48 |
| Number of runs | 24 |
| Number of runs excluded | 1 |
| Number of days | 24 |
| Runs per day | 1 |
| Replicates per run | 2 |

CLSI guideline EP05-A2 section 10.4 recommends a minimum of 30 runs, with 2 replicates per run; or 20 runs, with 3 or more replicates per run.

Mean    2.6243460

| | SD | 95% CI | CV |
|---|---|---|---|
| Repeatability | 0.0387618 | 0.0302663 to 0.0539236 | 1.5% |
| Between-day | 0.0526675 | | 2.0% |
| Within-laboratory | 0.0653937 | 0.0526578 to 0.0863101 | 2.5% |

| **Theranos Confidential** | **Page 8 of 14** |
|---|---|

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009  Rev. A, Released 08/01/13

Confidential

THPFM0005704479

ER-5885

| theran⊕s | LDT Validation Report | Theranos Potassium Assay | Rev: |
|---|---|---|---|
| | | **CL RPT-14039** | **1** |
| Description | | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

**Level = 2**

| | |
|---|---|
| Number of observations | 48 |
| Number of runs | 24 |
| Number of runs excluded | 1 |
| Number of days | 24 |
| Runs per day | 1 |
| Replicates per run | 2 |

CLSI guideline EP05-A2 section 10.4 recommends a minimum of 30 runs, with 2 replicates per run; or 20 runs, with 3 or more replicates per run.

Mean    4.0772815

| | SD | 95% CI | CV |
|---|---|---|---|
| Repeatability | 0.0735415 | 0.0574233 to 0.1023074 | 1.8% |
| Between-day | 0.0291154 | | 0.7% |
| Within-laboratory | 0.0790953 | 0.0657108 to 0.0993777 | 1.9% |

**Level = 3**

| | |
|---|---|
| Number of observations | 50 |
| Number of runs | 25 |
| Number of days | 25 |
| Runs per day | 1 |
| Replicates per run | 2 |

CLSI guideline EP05-A2 section 10.4 recommends a minimum of 30 runs, with 2 replicates per run; or 20 runs, with 3 or more replicates per run.

Mean    7.5086285

| | SD | 95% CI | CV |
|---|---|---|---|
| Repeatability | 0.1100231 | 0.0862864 to 0.1518769 | 1.5% |
| Between-day | 0.0299881 | | 0.4% |
| Within-laboratory | 0.1140367 | 0.0951964 to 0.1422442 | 1.5% |

Where CV's are reported as zeros in the precision summary output this is most likely a consequence of rounding values in StatisPro.

## V.   *Clinical Validation*

### a.   **Method Comparison with Predicate (Accuracy/Comparability):**

| Theranos Confidential | Page **9** of **14** |
|---|---|

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009  Rev. A, Released 08/01/13

Confidential

THPFM0005704480

ER-5886

| **theran⊛s** | LDT Validation Report | Theranos Potassium Assay | Rev: |
| | | **CL RPT-14039** | **1** |
| Description | | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

To test the accuracy of the assay on the Theranos System, 50 unique patient samples were screened on the predicate method (Siemens, Advia) and on the Theranos method. One sample was excluded as outlier (mean absolute difference greater than 4). Using the predicate method twenty-six (26) values were within the reference range (3.6— 5.2 mM), twelve (12) were below the reference range, and eleven (11) were above the reference range. Based on the results of the data examination, either a simple linear regression or alternative procedures were used to estimate expected (average) bias and the confidence interval of expected bias at the desired medical decision level(s) as per CLSI guidance EP09-A2. StatisPro was used for bias calculations. These estimates were compared with internal criteria to judge the acceptability of the Theranos method. Each sample was run in duplicate on the predicate, and the average used for comparison to the Theranos method. Some samples were stored before analysis on both methods. If the confidence interval for the predicted bias includes the defined acceptable bias or if the acceptable bias is greater than the higher limit of the confidence interval of the predicted bias, then the data do not show that the bias of the Theranos method is different from the acceptable bias or there is a high probability (97%) that the predicated bias is acceptable, respectively. The acceptable bias at each medical decision level was determined based on the total allowable error (TEa) minus the measured precision at the level closest to that decision level. Total allowable error (TEa) was taken from American Proficiency Institute (API) peer proficiency testing criteria or CLIA proficiency testing criteria for acceptable analytical performance as printed in the Federal Register February 28, 1992;57(40):7002-186, when available. The TEa for Potassium is 0.5mM. The table below shows the allowable bias and precision at 3 levels (values shown in parentheses) and the corresponding closest medical decision limits.

Table 2. Allowable Bias and Precision at the Medical Decision Levels

| Medical Decision Levels (mM) | 3.0 (2.6) | 5.8 (4.1) | 7.5 (7.5) |
|---|---|---|---|
| Precision (%) | 5.0 | 3.8 | 3.0 |
| Allowable Bias (%) | 14.2 | 8.4 | 3.7 |

| **Theranos Confidential** | **Page 10 of 14** |
|---|---|

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009 Rev. A, Released 08/01/13

Confidential

THPFM0005704481

ER-5887

| **theranos** | LDT Validation Report | Theranos Potassium Assay | Rev: |
| | | **CL RPT-14039** | **1** |
| Description | | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |



CLSI guideline EP09-A2-IR section 4.2

**Figure 1.** Graph showing Theranos method versus Predicate Method (Siemens Advia). Simple linear regression was used to establish a slope, intercept and an r2. The slope, intercept and clinical correlation were determined to be 0.98, 0.09 and 1.00 respectively.

| **Theranos Confidential** | **Page 11 of 14** |

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009 Rev. A, Released 08/01/13

Confidential

THPFM0005704482

ER-5888

| **theran⊚s** | LDT Validation Report | Theranos Potassium Assay | Rev: |
| | | **CL RPT-14039** | **1** |
| Description | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | | |
| Originator: Curtis Schneider | Date: 09/26/2013 | | |

**Trueness**

*CLSI guideline EP09-A2-IR section 7*

| Level ID | Value | Bias | SE | 95% CI | Allowable bias |
|---|---|---|---|---|---|
| L | 3.00000000 | 0.02014392.0 | 0.01033065 | 0.00063674 to 0.04092 | 0.154500000 |
| M | 5.80000000 | -0.04093796 | 0.00829385 | 0.057623045 to -0.0242 | 0.298700000 |
| H | 7.50000000 | -0.07802339 | 0.011941514 | 0.102046633 to -0.0540 | 0.386250000 |

Bias is less than allowable bias: 5.15%.

The difference between the two methods is not greater than the allowable difference. The performance requirement is verified.

**b. Transference and Verification of Reference Interval (Venous)**

Reference ranges were modified by applying the regression equation to the lower and upper reference limits of existing reference interval to generate a new reference range. New reference ranges were verified with venous samples using twenty four (24) new normal subjects. For a reference range to pass verification, 95% of values should fall within the upper and lower reference limits and 5% or fewer values fall outside of the upper and lower reference limits. For lithium heparin venous verification 23 (95.5%) values fell within the new reference range and 1 (4.5%) values fell outside the new reference range. See graph below for venous samples verification.



**Figure 2.** Graph showing venous sample reference range verification.

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009 Rev. A, Released 08/01/13

Confidential

| **theran⊚s** | LDT Validation Report | Theranos Potassium Assay | Rev: |
|---|---|---|---|
| | | **CL RPT-14039** | **1** |
| Description | | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

### c. Verification of Reference Interval with Finger Stick Samples

Finger stick reference range was also verified with venous matched finger sticks (lithium heparin) samples from twenty three (23) new normal subjects. The finger stick samples were also collected in a Theranos blood collection devices (BCD) configured with Lithium heparin vessel only. For finger stick verification 22 (95.5%) values fell within the new reference range and 1 (4.5%) values fell outside the new reference range. See graphs below for finger stick samples verification.



**Figure 3.** Finger stick sample reference range verification.

The Lithium heparin finger stick reference interval for Potassium was determined to be 3.6 – 5.2 mM.

## VI.  Stability

### a.  Reagents

On-board Reagent Stability

| System | Stability |
|---|---|
| ADVIA 1200 | 30 days |
| ADVIA 1650/1800 | 30 days |
| ADVIA 2400 | 30 days |

| Theranos Confidential | Page **13** of 14 |
|---|---|

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009 Rev. A, Released 08/01/13

Confidential                                                                    THPFM0005704484

ER-5890

| theranos | LDT Validation Report | Theranos Potassium Assay | Rev: |
|---|---|---|---|
| | | **CL RPT-14039** | **1** |
| Description | | Validation Report for Modified Siemens Assay of Potassium in Lithium Heparin Plasma | |
| Originator: Curtis Schneider | | Date: 09/26/2013 | |

For all systems, unopened reagents are stable until the expiration date printed on the product label when stored at 5° - 25°C. Do not freeze reagents.

For complete details, refer to the Methods Introduction section of the system-specific Operator's Guide.

**b. Sample**

Plasma samples for Potassium analysis are stable for 2 weeks at 2-8 °C, or at least 90 days at -20 °C.

**c. Calibrators**

Potassium calibrator is stable at 2-8 °C for at least 6 months from date of manufacture.

## REVISION HISTORY

| Revision Level | Effective Date | Initiator | ECO Number |
|---|---|---|---|
| A | 11/06/2013 | A. Rosendorff | CL ECO-00117 |
| | | | |

| Section Number | Description and Justification of Changes |
|---|---|
| All | Initial Release |
| | |
| | |

Any retransmissions, reproductions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. This document supersedes all earlier or previous documents unless approved in writing.

TMP-00009 Rev. A, Released 08/01/13

Confidential

ER-5891

Message

| | |
|---|---|
| **From**: | Daniel Edlin [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL EDLIN] |
| **Sent**: | 7/28/2012 9:32:38 PM |
| **To**: | 'Givens, Melissa L. LTC' [Melissa.Givens@█████████ mgivens█████████ |
| **CC**: | Elizabeth Holmes [/O=THERANOS ORGANIZATION/OU=First Administrative Group/cn=Recipients/cn=eholmes]; Christian Holmes [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Christian Holmes] |
| **Subject**: | RE: SOCAFRICA update |

LTC Givens,

We are very happy to hear that the trip went well and that there were no issues with the travel and function of the device. As soon as we receive the device we will work on compiling the performance data for you.

Please note that we have developed a family of next generation systems which include a much more dynamic and sensitive touch screen. As we proceed we will work with you to get you these systems for our next deployment.

We look forward to seeing the report and pre-proposal and working towards our next deployment together.

Best regards,
Dan


-----Original Message-----
From: Givens, Melissa L. LTC [mailto:Melissa.Givens@████████████
Sent: Thursday, July 26, 2012 6:55 AM
To: Daniel Edlin; mgivens████████
Cc: Elizabeth Holmes; Christian Holmes
Subject: SOCAFRICA update

Theranos team,

I made it back from 2 trips to Africa and managed to work through all the cases in the protocol.

The machine travelled well and functioned well. My only complaint is the touch screen - very frustrating.

I will be preparing a full report and have several pictures of the machine being used in Cameroon, Uganda, and South Sudan. It would be helpful to have some data back from you when you receive the machine in regards to internal quality control on the samples that were run.

We will be sending the machine back via FedEx either tomorrow or early next week. I will let you know once I have a tracking number.


Because the machine seemed to function well in the environment, I am going to write a pre- proposal to submit to the USSOCOM BISC in hopes of gaining funding for a full proposal through the USSOCOM BAA for Extramural Biomedical Research and Development.

My goal will be to deploy 3-5 machines to Africa to use real time at locations where we have persistent presence and collect real laboratory data and compare it to the current standard of care. I will be writing the pre-proposal this weekend and will send you a copy next week to see if you think you can support. Funding would not be approved for several months so we have more lead time on this initiative.

Regards,
Missy

LTC Melissa L. Givens MD, MPH

Confidential

Command Surgeon
Special Operations Command AFRICA
DSN: 314.421.3339
Comm: 49(0)711.729.3339
Cell: ███████████
melissa.givens@██████████

Confidential

**10457**

| | |
|---|---|
| **To:** | Elizabeth Holmes[eholmes@theranos.com] |
| **From:** | Daniel Edlin |
| **Sent:** | Mon 12/3/2012 11:50:17 PM |
| **Importance:** | Normal |
| **Subject:** | FW: Approved IRB Protocol for Theranos LOE |
| **Received:** | Mon 12/3/2012 11:50:20 PM |

Theranos LOE_Protocol Application for Existing Data and Specimens V 2 2 (2).doc
M-10278 Approval Memo.pdf
follstad_thern_AOstartLetter_6NOV12.pdf

Hi Elizabeth,

Attached is the CENTCOM LOE protocol for your records. Note that this is being adjusted to include Vancomycin, Pre-albumin, Random Cortisol, and Factor Xa.

I'll send this to Daniel as well.

Thanks,

Dan

---

**From:** Murphy, Christine L Maj MIL USAF USCENTCOM CCSG-AA [mailto:christine.l.murphy███████]
**Sent:** Friday, November 16, 2012 12:45 PM
**To:** Daniel Edlin; Christian Holmes
**Subject:** Approved IRB Protocol for Theranos LOE

Sirs,

For your reference please find attached the Approved Version of the protocol. Lab tech Officer as mentioned will be Capt Blanco, she is the only authorized hands on at this time. We will be submitting shortly an addendum to include the bridging Sergeant and Capt Blanco's replacement once that name is available. This is a common occurrence if any updates as to who is participating or minor updates in procedure occur to submit an addendum. I have also attached the IRB approval memo and the Approval To Start Letter from the theater Approval Authority for your reference. If there are any questions, please let me know. Thanks.

V/R

Maj Christine Murphy, USAF, BSC

Director, Joint Theater Blood Program

Human Protections Administrator/HPA

Clinical Laboratory Consultant

HQ USCENTCOM/CCSG

███████████████████

MacDill AFB  FL  33621

DSN ████████████

Comm ███████████

christine.l.murphy@████████████

christine.l.murphy@█████████████

Confidential

Confidential

# U S Army Medical Research and Materiel Command
## Office of Research Protections
### Institutional Review Board Office

## Initial Application for Research
## Involving Use of Existing Human Data and/or Specimens

| Study Title: | Limited Objective Experiment (LOE) on the Theranos Point of Service Lab Device |
|---|---|

Date of application:  ___September 12, 2012_____

## PART A.

### 1. Study Contacts

| Principal Investigator: | Other Study Contact (if applicable) |
|---|---|
| Name and Degree: Eric Follstad, DAFC | Name and Degree: Maj Christine Murphy/MS/SBB |
| Title: Chief, Transformation & Concept Development | Title: Director, CENTCOM Theater Joint Blood Program Officer |
| Mailing Address: : HQ USCENTCOM/CCSG<br>7115 South Boundary Blvd<br>MacDill AFB FL 33621 | Mailing Address: HQ USCENTCOM/CCSG<br>7115 South Boundary Blvd<br>MacDill AFB FL 33621 |
| Phone Number:        or ▮▮▮▮ | Phone Number:       or ▮▮▮▮ |
| Email Address: eric.a.follstad▮▮▮▮▮il | Email Address: christine.l.murphy@▮▮▮▮ |
| Fax Number:  N/A | Fax Number:  N/A |

### 2. Key Study Personnel (if more space is needed attach additional pages to the end of the application)

List all key personnel **including the Principal Investigator (PI) and Other Study Contacts**, along with a brief statement of their study role(s) and responsibilities.  If more space is needed, attach an additional page to the end of this application.  NOTE: Key personnel are persons who have contact with <u>identifiable</u> data or specimens.

| Key Personnel | Study Roles and Responsibilities |
|---|---|
| Name:  Eric Follstad<br>Affiliated Institute: CENTCOM HQ, CCJ8-ST | Study Role(s):  Principal Investigator/Chief, Transformation & Concept Development<br>Responsibilities:  Lead S&T SME and coordinator for Theranos Limited Objective Experiment.  Oversight of project coordination including LOE team alignment, development of protocol/test packet, device delivery, training, analysis, and final product . |
| Name:  Maj Christine Murphy, USAF<br>Affiliated Institute:  CENTCOM HQ, CCSG | Study Role(s):  CCSG Liaison/Other Study Contact<br>Responsibilities:  Lead CCSG Laboratory SME and direct liaison with Theranos for coordination of technical aspects of device and cartridges and delivery for Information Technology evaluation, theater delivery, and S&T LOE. |
| Name: Humberto Ibarra<br>Affiliated Institute: USCENTCOM CCJ8-ST | Study Role(s): Lead Analyst<br>Responsibilities: Develop LOE Test Plan and Final Report |

Confidential          THPFM0000144538

ER-5896

| Name: Capt Katrina Blanco, USAF Officer in Charge of Laboratory Affiliated Institute: Combined Joint Theater Hospital, Bagram Air Base | Study Role(s): On-site Investigator<br>Responsibilities: Theater liaison to CCJ8 Analysis Team and Theranos. Coordination for initial setup of device, training of laboratory personnel in provision of de-identified specimens and results for the LOE, running of all samples on Theranos device, data collection, and entry of results. |
| --- | --- |
| Name:<br>Affiliated Institute: | Study Role(s):<br>Responsibilities: |
| Name:<br>Affiliated Institute: | Study Role(s):<br>Responsibilities: |

## 3. Study Facilities

| List all locations where study procedures will be performed | Briefly Describe Facility |
| --- | --- |
| Combined Joint Theater Hospital, Bagram Air Force Base, Afghanistan | Role III Military Treatment Facility. Testing will be performed in the clinical laboratory portion of the facility. |
| | |
| | |

## 4. Additional Approvals – *(Copies of approval memoranda are required before final IRB approval will be granted)*

Check all that are required by your institution:

☐ Institutional BioSafety Committee     ☐ Completed   ☐ Review Pending
☐ Human Stem Cell Use Committee     ☐ Completed   ☐ Review Pending
☐ Radiation Safety Committee     ☐ Completed   ☐ Review Pending
☐ Data Use Agreement     ☐ Completed   ☐ Review Pending
☐ Material Transfer Agreement     ☐ Completed   ☐ Review Pending
☐ Other: _____     ☐ Completed   ☐ Review Pending
☐ NA

## 5. Funding Information

    ☒ Internal Funding: __CENTCOM Research, Science, and Technology Development Funding through J8__
    ☐ External Funding *(List all sources that apply, including all Industry Sponsors; list award numbers. If more space is needed attach additional pages to the end of the application)*

| Agency / Sponsor | Award Number |
| --- | --- |
| | Award #: _____ |
| | Award #: _____ |

## 6. Target Population(s):

☐ Adults
☐ Children
☐ Pregnant Women
☐ Fetuses
☐ Active Duty Military
☐ Individuals Not Able to Provide Informed Consent
☐ Employees of the Performance Site
☐ Individuals/Legal Authorized Representative Not Able to Provide Advanced Informed Consent
☐ Prisoners
☒ Other: Pre-existing de-identified laboratory samples

Confidential

ER-5897

7. **Waiver of the Informed Consent Process**.  Ensure the protocol includes the supporting justification and/or information related to the waiver/alteration.

   ☐ **A.  Not applicable** > skip to #8 below

   ☒ **B.  Waiver of informed consent -** For the IRB to grant a waiver of informed consent, all of the following criteria must be addressed in the informed consent section of the protocol:

   a)  The research involves no more than minimal risk to the subject.
   b)  The waiver will not adversely affect the rights and welfare of the subjects.
   c)  The research could not be <u>practicably</u> carried out without the waiver of informed consent.
   d)  Subjects will be provided with additional pertinent information after participation, whenever appropriate.

8. **Documents Submitted**
   ☒  Protocol
   ☒  Request for waiver of HIPAA Authorization
   ☐  Data collection forms/CRFs
   ☐  Data Use Agreement
   ☐  Material Transfer Agreement

Confidential

THPFM0000144540

ER-5898

**Part B.  RESPONSIBILITIES OF THE PRINCIPAL INVESTIGATOR IN HUMAN SUBJECTS RESEARCH**

**The Principal Investigator is the individual who is primarily responsible for the execution of the research. He/she is responsible for the conduct of the study, obtaining subjects' consent, providing necessary reports, and maintaining study documents.  The Principal Investigator and Associate Investigators will be familiar with all applicable regulations governing human subjects research, and will adhere to all requirements outlined in his/her institution's DoD Assurance of Compliance with the Human Subjects Protection Regulations as granted by the DoD, and/or by the institution's Federalwide Assurance granted by the Office for Human Research Protections, Department of Health and Human Services.**

**A.  Initial Approval/Study Implementation**

Research activities involving human subjects, to include recruitment, screening and/or enrollment, may not commence until the study has been reviewed and approved by the HQ, USAMRMC IRB's (hereafter referred to as the IRB).  All study-related materials including, but not limited to, the protocol, informed consent form(s), recruitment materials, case report forms, etc., must be reviewed and approved by the IRB.

I acknowledge that I am responsible for assuring the quality of each subject's informed consent in accordance with current federal, DoD and Army regulations.  This responsibility includes ensuring that any designee who obtains consent on my behalf is completely conversant with the protocol and is qualified to perform this responsibility.

I acknowledge that I am responsible for ensuring that the protocol has adequate ongoing data and safety monitoring.

**B.  Modifications/Amendments to the Protocol**

I agree to submit all protocol amendments, changes, and/or modifications to the IRB for review and approval prior to implementation.  Any changes in approved research, during the period for which IRB approval has already been given, may not be initiated without IRB review and approval except when necessary to eliminate apparent immediate hazards to subjects or others.  If such protocol changes or modifications are required, I will notify the IRB immediately.

**C.  Reporting Requirements for Unanticipated Events, SAEs, Deaths, Other**

I agree that all unanticipated problems involving risk to subjects or others, all serious adverse events and all subject deaths related to participation will be promptly reported by phone (301-619-2165), by email (irboffice@amedd.army.mil), or by facsimile (301-619-4165) to the IRB.  A complete written report will follow the initial notification.  In addition to the methods above, the complete report can be sent to the U.S. Army Medical Research and Materiel Command, ATTN: MCMR-RP, 504 Scott Street, Fort Detrick, Maryland 21702-5012.

I will report immediately to the IRB the knowledge of a pending compliance inspection/visit by the FDA, OHRP, or other governmental agency concerning this DoD funded research; the issuance of Inspection Reports, FDA Form 483, warning letters or actions taken by any Regulatory Agencies (e.g. local, state, federal) including legal or medical actions; and any instance of serious or continuing noncompliance with the regulations or requirements.

Any significant findings that become known during the course of the research that might affect the willingness of subjects to enroll or to continue to take part, will be promptly reported to the IRB.

**D.  Deviations to the Protocol**

Any deviations to the protocol that may have an effect on the safety or rights of the subject and/or the integrity of the study will be reported to the IRB as soon as the deviation is identified.  I agree to report all deviations to the protocol in the continuing review report for the study and the final study report to the IRB.

**E.  Continuing Review Reports**

A continuing review report for the research study will be submitted to the IRB.  I will report progress of the approved research to the IRB as often as requested, but not less frequently than once per year.  Should the protocol not receive approval of continuation by its expiration date, all study activity, including subject recruitment, screening, enrollment, data collection and/or data analysis must be discontinued except where necessary to protect the safety of participants.

Confidential

THPFM0000144541

ER-5899

**F. Final Study Report**

I will notify the IRB upon completion of the research study and submit a final study report.

**G. Records Maintenance**

I will maintain a Study File that must be kept for three years following completion of the study (if no IND/IDE used [32 CFR 219.115 (b)]).  If IND products or IDE devices are used, the file must be kept for two years after Food and Drug Administration (FDA) approval of marketing application and can then be destroyed; or if no application is filed or approved, until 2 years after the study is discontinued and FDA notified [21 CFR 312.62 (c)].  This file may be inspected at any time by representatives of the IRB, the FDA (as applicable), and/or other regulatory agencies responsible for the oversight of research.  Documents maintained in the Study File may include:

- The approved protocol, supporting materials (e.g., study instruments, case report forms, recruitment materials), all protocol amendments, and all continuing review reports.
- All approval memoranda from the IRB (e.g., granting approval to initiate the study, protocol amendments, approval to continue the study).
- Correspondence with the IRB, FDA and/or other pertinent agencies.
- Other applicable committee documentation (e.g., Radiation Safety Committee).
- Study tracking logs.
- Each informed consent/assent document signed by the subject.
- Reports of unanticipated problems, adverse events (initial, follow-up, medical monitor's report), deviations.
- Reports of any significant new findings found during the course of the study.
- All study documents generated from study data.
- Publications, abstracts, reprints resulting from study data.
- All information pertaining to an investigational drug or device (as per FDA regulations).
- Final study report and IRB closure acknowledgment.


*I have read and agree to comply with the statements above which outline my responsibilities as a Principal Investigator.*

*As the Principal Investigator of this study, I assume full responsibility for the execution of this protocol.  I also assume full responsibility for the oversight of all research team members and their activities related to this study.*


**Principal Investigator Signature:**


**Printed Name:   Eric A. Follstad**                    **DATE: September 12, 2012**

Confidential                    THPFM0000144542

ER-5900

**PART C. PROTOCOL**

**1. PROTOCOL TITLE:** Limited Objective Experiment (LOE) on the Theranos Point of Service Lab Device

**2. ABSTRACT** This LOE will document the functionality of the Theranos Device in a field environment after deployment and transport from the United States. The LOE will also determine the Information Technology compatibility of the Theranos Device with pre-existing DoD network communications hardware and network security configurations. Also documented will be a direct comparison of user-friendly operability, turn-around-times, and lab results between the Theranos Devices and pre-existing laboratory instrumentation.

**3. RESEARCH HYPOTHESES/OBJECTIVES.** The objective of the LOE is to document the functionality of the Theranos in a deployed setting under field conditions and its operations on the DoD network. The comparison will provide information on if the Theranos device has potential to be an improvement over pre-existing lab technology through an improved user-friendly interface, faster turn-around-times, and an all inclusive lab testing device.

**4. BACKGROUND AND SIGNIFICANCE.** Current existing methodology utilized in theater provides many tests, but not all tests that are available in U.S. run laboratories. Several testing instruments are needed to complete the array of tests that doctors order for sick and injured Service members. Limitations on these instruments are based on the need for trained lab technicians who must troubleshoot, interpret results, quality control, and panic values, and manually enter results. The current methodology utilizes macro-sized technology and therefore requires a large amount of specimen to be collected from a patient. Depending on the test and if it needs to be sent to a referral laboratory, it may take hours to days before results are received so that doctors can treat their patients.
    The Theranos Device is an instrument that utilizes micro-sampling and consists of nano-technology in a plug and play format depending on the customization of the user requirements and specifications. The device not only tests and contains lab information, but has the capability to enter other patient unique information as well such as symptoms, diet, pharmacy, physician notes, as well as other applications such as capture of biometric data (BP, pulse). The device can run one to six samples at a time depending on unit size and configuration and can run blood, urine, stool, tissue, swabs, washes, and potentially other samples as well. Excess sample can be saved. The device is validated to perform in a wide range of temperature, humidity, and atmospheric pressure conditions.
    The cartridges contain all the required QC, calibrators, reagents, diluent that is required for the testing. The Cartridge can contain up to 60 assays with multiple areas of testing that can be performed in one cartridge with discrete testing and no cross reactivity. Test menus available includes drug testing, cytokine, hematology, chemistry, bacterial, viral testing, DNA technology as well as others. Tests that have not been developed yet can be developed in a short amount of time. Only actual tests run are charged for. Reflex testing is also available. Analysis run time can run from 10 to 40 minutes depending on the cartridge configuration, although faster run times may also be available. Cartridge storage includes room temperature and refrigeration storage.
    Results of testing can be forwarded to Theranos affiliated pathology for review, locally, or both. The manufacturer noted that potentially a lab technician would not be needed to run the Device. Results and information are communicated from the device to a "cloud" multiple–Server type storage that can be accessed via a website. The information can also be sent to the local medical site information systems. As per user configuration requirements, the instrument may also display the results of lab testing or other application information.
    Suggested areas of use could potentially be at Role III, II facilities (lab/patient care areas), MEDEVAC platforms, SOF units, and mortuary affairs for remains identification. The device has the potential to vastly improve the operations of the laboratory testing through user friendly operations, decreased need for trained lab techs, improving cost and turn-around-time, and enabling medical diagnoses with an all-inclusive device that can be used in multiple platforms on land, in the air, or at sea in a fixed or transportable mode including backpack configurations.

**5. RESEARCH DESIGN AND METHODS.**
- Limited Objective Experiment (Pilot Study)

- Two Theranos Devices will be sent from the U.S. to the CJTH Bagram Laboratory.

- Upon arrival, both Devices will be plugged into the existing DoD network as indicated by the pre-approved Interim Authority To Test (IATT). Once connected the Device will be able to communicate to the Theranos CLIA certified laboratory via a Theranos website.

- Capt Blanco will be provided training on the Devices by Theranos to the required level of expertise for independent operations and minor maintenance. Sample runs will be made to ensure proper operation, connectivity, end-to-end operation, and training objectives were met.

- For testing, Capt Blanco will start-up the Device. The Device will go through Start-up checks and provide screen readings that all start-up actions passed. During start-up the Theranos website will be accessed to determine that

Confidential                                                                 THPFM0000144543

ER-5901

Internet connections are on-line. Start-up and internet connection success will be recorded as per Device feedback.

- Theater configured cartridges will be used for the testing in the Device.

- Capt Blanco will receive specimens that have been de-identified per the standard operating procedures (SOP) in attachment 3 to prepare testing samples and record testing results.

- The LOE team and Capt Blanco will determine which tests will be run on each sample based on pre-existing clinical results (see SOP for procedures to keep sample de-indentified) and the matrix at Attachment 1.

- The matrix at Attachment 1 will be completed to the fullest extent possible based on sample availability, laboratory testing availability, and Theranos test funding.

- Device will perform analysis of the sample and electronically send preliminary results to Theranos. Theranos will review and finalize results sending back final results via Theranos website to Capt Blanco and on screen of Theranos Device.

- Results of turn-around time and laboratory results will be recorded from Theranos Device and pre-existing lab instrumentation. Turn-around-times will be measured in minutes and lab results will be measured according to the specific test. Recording vehicle will be on the LOE Analysis Team spreadsheet.

- Results provided by Capt Blanco will be analyzed by the LOE Analysis Team and findings will be recorded in the USCENTCOM Final Report.

- Capt Blanco will complete the Theranos LOE Questionnaire (see Attachment 2). These data will support findings documented in the USCENTCOM Final Report.

**6. TARGET POPULATION.** Samples will be selected from pre-existing laboratory specimens drawn for diagnostic related laboratory testing. No additional samples will be drawn from the patient for this LOE.

**6.1 Sample Characteristics**

**Subjects.** Samples will be selected from pre-existing, leftover laboratory specimens of active duty US service members (18 years of age or older) that will be de-identified prior to testing. These will be selected from leftover samples from physician ordered laboratory tests that are collected during the execution of the protocol. The testing will occur over a 28 day period and will consist of approximately 100 specimens, but may vary depending on the original sample and the type of testing performed on it. Depending on the test run the specimen may be required to be whole blood, serum, or plasma. The device test cartridges are capable of multiple tests per cartridge, so one specimen may have several tests run on it in one cartridge. The maximum expected number of tests/assays run will be 400 per device for a total of 800 tests. The maximum expected number of tests on the pre-existing instrumentation is half the number on the Theranos devices combined at 400 tests. Each sample will be run on each Theranos device and on the pre-existing instrumentation.

Attachment 1 lists the types of tests to be performed and the number of tests to be performed by each device for each type of test (8 to 12 tests per device for each type of test). On average, 4 to 6 samples will be tested per day during the 28 day period. Once on site, the actual number of tests per sample will be adjusted by the LOE Analysis Team and Capt Blanco based on sample availability; some samples will have less number of tests, some will have more. The specific types of tests to be tested for each sample will be selected to ensure that each type of test is performed at least once during the test period in the event that CJTH operational tempo (OPTEMPO) restricts lab analyses. (For example, tests 2 through 4 listed in Attachment 1 could be run on Sample 1, tests 5 through 8 listed in Attachment 1 could be run on Sample 2, and so on.)

The LOE Analysis Team and Capt Blanco will minimize the effect on lab resources by using pre-existing, de-identified clinical results. Priority will be given to selecting tests with known results first. Overall priority will be to ensure that each type of test is performed at least once during the test period.

The Protocol meets all requirements in 4.a through 4.g of the Guidance on Informed Consent for In Vitro Diagnostic Device Studies Using Leftover Human Specimens that are Not Individually Identifiable dated 26 April 2006. Specifically, the protocol:

a) Meets the IDE exemption criteria at 21 CFR 812.2(c) (3) since the samples will be selected from leftover samples from physician ordered laboratory tests that are collected during the execution of the protocol and therefore:
   (i) is noninvasive,

(ii) does not require an invasive sampling procedure that presents significant risk,
(iii) does not by design or intention introduce energy into a subject, and
(iv) is not used as a diagnostic procedure without confirmation of the diagnosis by another, medically established diagnostic product or procedure.

b) The study uses leftover specimens, that is, remnants of specimens collected for routine clinical care or analysis that would have been discarded.

c) The specimens are not individually identifiable, i.e., the identity of the subject is not known to and may not readily be ascertained by the investigator or any other individuals associated with the investigation, including the sponsor.  The CJTH SOP for de-identifying specimens (Attachment 3) will ensure that neither the investigator(s) nor any other individuals associated with the investigation or the sponsor can link the specimen to the subject from whom the specimen was collected, either directly or indirectly through coding systems. The LOE final report resulting from this investigation will not contain any patient identifiable information.

d) The specimens after de-identification will be accompanied by results of physician-ordered clinical tests.  These clinical results will only be included in the study if like tests are performed on the Theranos devices.  Clinical results not used in the study will be destroyed and not included in the study.

e) The individuals caring for the patients will be different from and do not share information about the patient with those conducting the investigation. The assessment team will use a dedicated laboratory technician, Capt Blanco, to participate in the LOE, who will not be involved in direct care of the patients from whom the specimens were taken.

f) The CJTH SOP for de-identifying samples will ensure specimens are provided to Capt Blanco without identifiers.  The CJTH has established policies and procedures to ensure compliance with HIPAA requirement to prevent the release of personal information.

g) The study will be reviewed by an IRB in accordance with 21 CFR Part 56, except as described in section 7 of this guidance document.

**6.2. Inclusion Criteria.** Specimens will be utilized that will be consistent with the requirements of the particular test.  This may include whole blood, serum, or plasma.  Amount needed for test will be considered although this technology utilizes micro-samples so should be a minimal restriction.  Specimen patient age should be 18 or older.

**6.3. Exclusion Criteria.** Specimens that do not meet testing criteria should not be used (example:  if test requires whole blood, serum should not be used and vice versa.)  Clotted, hemolyzed, lipemic, or other factors that could interfere with the test should not be used.  Specimen patient age under 18 should not be used.

**6.4. Informed Consent**.

We are requesting the IRB allow the samples to be used in this study without gaining informed consent, and affirm that we will abide by all the requirements in the FDA Guidance Document for use of leftover specimens whereby the FDA states they will utilize enforcement discretion regarding informed consent provided specific requirements are met.

**7.0. Data/Specimen Collection.**

**7.1  Collection Procedures**.
- Candidate specimens will be hand selected by laboratory technicians not associated with the investigation and separated out into appropriate collection tubes.  Selection of specimens will be based on quantity of specimen, age of patient (18 or older), and sample type required for the assay (whole blood, serum, plasma).  Specimen will also be examined for anything that would interfere with the test (clots, hemolysis, fibrin, etc.).  The de-identified samples tested on the Theranos devices and existing equipment for this research will be destroyed once testing is completed in accordance with the SOP.

- Data Elements To Be Collected:

| Variable | Source | Operational Specification |
|---|---|---|
| IT Compatibility | Network Communications | N/A |
| User Friendly Operability | Direct Observation and User Surveys | N/A |
| Task Elapsed Times | Recorded Start/Stop Times | N/A |
| Lab Result Comparison | Device/Instrument Printout | N/A |

Confidential                                                                                                THPFM0000144545

ER-5903

| Size, weight and floor space metrics | Direct measurement recorded on data logs | N/A |
| --- | --- | --- |

- •

The LOE members are civilian personnel operating under approved orders, travel documents, and theater clearances (as required). The LOE Analysis Team will be deployed for 28 days to the CJTH Bagram Laboratory to observe the tests on the devices. Laboratory staff not associated with the investigation will provide de-indentified specimens from to be used on the Theranos device IAW the SOP. Capt Blanco will provide input on user operability of Device. The LOE members will record the test results and turn-around times for the existing laboratory equipment and the Theranos device.

- LOE Analysis Team will not have direct access to the de-identified specimens for testing. LOE Analysis Team will only be observing Capt Blanco operate the device with specimens that were previously de-identified by laboratory staff not associated with the investigation.
- Data will be assembled into a final report that will be provided to the CDR, US Central Command, and the Office of the Secretary of Defense for Acquisition, Technology, and Logistics (OSD/AT&L).

**7.2 Data Management and Storage.**
- The data will be collected both electronically and by hard copy in the laboratory.
- Analyzer equipment data will be collected off data logs, if available, from the analyzer equipment. For analyzers which do not provide electronic data logs, the analysis team will record test results manually via a hard copy test results log (Attachment 4). Both electronic logs and hard copy test results will be transferred to spreadsheets on the analysis team laptops which will use PGP whole disc encryption" software on their laptops for data protection.
- All partial electronic data logs and hard copies will be deleted or destroyed once the data has been entered into the analysis team laptops.
- Capt Blanco and the LOE Analysis Team will have access to the study data. Due to the operational nature of the study and the rotating lab personnel, additional names and positions of these government personnel will be documented prior to the start of the study. Current names and organizations follow:
  - o Capt Katrina R. Blanco (CJTH)
- The following LOE Analysis Team will have access to the study data:
  - o Mr. Humberto Ibarra (AMERICAN SYSTEMS Analyst)
  - o Mr. Kenneth Sanchez (AMERICAN SYSTEMS Analyst)
  - o Mr. Jason Pagan (AMERICAN SYSTEMS Analyst)
- At the completion of this study, data will be stored using approved hard disk encryption software by the Principal Investigator at HQ, USCENTCOM
- Data will be stored for 90 days following submittal of the final report.
- Data will be assembled into a final report that will be provided to the CDR, US Central Command, and the Office of the Secretary of Defense for Acquisition, Technology, and Logistics (OSD/AT&L).

**7.3 Specimen Management and Storage.**
- Previously run specimens that are selected for the study will be aliquoted into separate tubes from the original specimen and labeled in a de-indentified manner. (Example: Sample 1, Sample 2, etc.). Samples will be stored in test tube racks or equivalent at temperatures in accordance with the type of sample and test that is required. For example, some specimens require room temperature storage and others require refrigerated. On-site lab technicians will maintain proper storage before testing is performed and following completion of testing. Once results are recorded, specimens are no longer required.
- Storage of specimens will occur within the Bagram CJTH Laboratory.
- De-identified specimens will be stored until time of testing on all Devices and pre-existing lab equipment is complete and recorded properly.
- Specimens will be disposed of in accordance with standard disposal processes once testing is completed and recorded information is determined to be complete.

**7.4 Confidentiality Protection.**
- All specimens and collected results run on either the Device or the pre-existing instruments will be de-identified prior to release to Capt Blanco.. There will be no coded identifiers to link specimen to patient.
- There will be no unique identifiers linking the sample to the patient from whom the specimen originated. Generic labeling (Sample 1, Sample 2) will be utilized so results will be connected to de-identified specimen only.
- The only master list will be the sample numbers to link the results of the de-identified specimens run on the existing laboratory equipment to the specimens run on the Theranos device.

**8.0 Statistical Analysis.** There are four categories of data to be collected for the LOE:

ER-5904

1. Analyzer results (existing lab equipment and Theranos analyzer): There will be no statistical analysis performed on these data. The report will list the tests performed and the results of the tests for the existing laboratory equipment and the Theranos analyzer for each specimen sample.
2. Timed events (e.g., sample preparation times, analyzer run times): Depending on the results, the data will be presented as mean times with standard deviations noted, or, if warranted, plotted to show distribution, identified learning curve, etc. Outliers will be identified during the testing and investigated to determine their cause.
3. Hard metrics (size and weight of the analyzers, floor space, etc.): Metrics will be recorded and findings included in the final report. No statistical analysis will be performed on these data.
4. Subjective data (user ratings on specific characteristics of the devices): Data will be captured by the use of questionnaires (see Attachment 2) using a Likert scale, requesting the users to rate the different aspects of the analyzers. Results will be presented as bar charts showing the distribution of responses. Outliers will be identified and investigated during the execution of the LOE and results presented in narrative format in the final report.

**8.1 Sample Size.**
Each test will be performed on pre-existing equipment and on each Theranos device. Approximately a maximum total of 400 tests will be performed on each set of equipment. Each specific test will be run approximately 8 to 12 times as per Attachment 1 matrix. At this small sample size, there will be no statistical analysis accomplished. This sample size was determined based on the planned availability of the existing laboratory equipment due to an expected OPTEMPO, duration of test (28 days), the expected number of tests/test specimens available, and budgetary considerations. The analyzer results will be a simple side-by-side data comparison. The report will list the tests performed and the results of the tests for the existing laboratory equipment and the Theranos analyzer for each specimen sample.

**9.0 Reporting Unexpected Problems to the IRB.**

Unanticipated problems involving risk to volunteers or others will be promptly reported by phone (301-619-2165), by e-mail (irboffice@amedd.army.mil), or by facsimile (301-619-4165) to the U.S. Army Medical Research and Materiel Command's Office of Research Protections, Institutional Review Board Office. A complete written report will follow the initial notification. In addition to the methods above, the complete report will be sent to the U.S. Army Medical Research and Materiel Command, ATTN: MCMR-RP, 504 Scott Street, Fort Detrick, Maryland 21702-5012.

**10.0  Risks/Benefits Assessment.**

**10.1  Risks.**
Utilization of pre-existing specimens can potentially have risks in relation to breaching privacy or confidentiality, and may apply to individuals or groups to which they belong. In order to minimize the potential risk, specimens will be selected and de-identified by laboratory staff before being introduced for LOE analysis. Samples will be labeled generically as Sample 1, Sample 2, etc. and carry no identifying data. Clinical results accompanying the de-identified sample will not carry no identifying data or coding.

Potential risk to laboratory staff who de-identify the laboratory specimens and Capt Blanco will be exposure to body fluid substances in the form of whole blood, serum, or plasma and exposure to reagents in the testing device or pre-existing instrumentation. The laboratory staff and Capt Blanco will follow appropriate Body Fluid Exposure and Safety measures to protect against these potential risks. The laboratory will have and the laboratory staff who de-identify and Capt Blanco will utilize personal protective equipment to protect against exposure, which will include lab coat, gloves, eye protection when appropriate to prevent splash, hood if transfer is needed, and any other PPE appropriate to the procedure. The laboratory will have a Material Safety Data Sheet (MSDS) book available for safety reference on applicable reagents and supplies.

Potential risk to the LOE Analysis Team will be exposure to body fluid substances in the form of whole blood, serum, or plasma and exposure to reagents in the testing Device or pre-existing instrumentation. This exposure is assessed to be minimal since the LOE Analysis Team will not be physically handling any samples. However, the laboratory will provide personal protective equipment to protect against exposure, which will include lab coat, gloves, eye protection when appropriate to prevent splash, hood if transfer is needed, and any other PPE appropriate to the procedure. Body Fluid Exposure and Safety measures will be maintained as required by functional laboratories. The laboratory MSDS will also be available for the LOE Analysis Team.

**10.2 Potential Benefits.**  The potential benefits is the determination that this new class of device technology works and provides benefits of nano-technology, micro-sampling, and one stop rapid turn-around-time testing in the treatment of ill and wounded military personnel both in the U.S. and deployment theater arenas. This technology could substantially improve the care and time to treatment of patients. The ultimate goal is to improve the chances of recovery and prevent unnecessary death.

Confidential                                                                                    THPFM0000144547

ER-5905

**11.0 REFERENCES.**
1. Theranos Website – October 2011
2. Theranos Site Visit and Briefing – October 2011
3. Theranos Information Paper – Assembled by CENTCOM Surgeons Office – October 2011
4. Theranos Quad Chart – Assembled by CENTCOM Surgeons Office – January 2012
5. Guidance on Informed Consent for In Vitro Diagnostic Device Studies Using Leftover Human Specimens that are Not Individually Identifiable - April 2006.

**12.0 TIME REQUIRED TO COMPLETE THE RESEARCH (INCLUDING DATA ANALYSIS).** Ninety Days.

Confidential

**Attachment 1**
**Proposed Types of Tests and the Number of Tests per Device**

| Theranos Suggested Test Numbers (Not Cartridges) | | | | |
|---|---|---|---|---|
| Test Breakdown | | | | |
| TEST TYPE | Specimen | Theranos Device 1 Test # | Theranos Device 2 Test # | Current Instrumentation |
| CBC | Whole Blood | 12 | 12 | 12 |
| Sodium | Plasma | 12 | 12 | 12 |
| Potassium | Plasma | 12 | 12 | 12 |
| Chloride | Plasma | 12 | 12 | 12 |
| Bicarb | Plasma | 12 | 12 | 12 |
| Blood Urea Nitrogen | Plasma | 12 | 12 | 12 |
| Creatinine | Plasma | 12 | 12 | 12 |
| Glucose | Plasma | 12 | 12 | 12 |
| Calcium | Plasma | 12 | 12 | 12 |
| Magnesium | Plasma | 12 | 12 | 12 |
| Phosphorus | Plasma | 12 | 12 | 12 |
| Anion Gap | Calculated | 8 | 8 | 8 |
| Total Protein | Plasma | 12 | 12 | 12 |
| Albumin | Plasma | 12 | 12 | 12 |
| Total Bilirubin | Plasma | 12 | 12 | 12 |
| Alkaline Phosphatase | Plasma | 12 | 12 | 12 |
| AST | Plasma | 12 | 12 | 12 |
| ALT | Plasma | 12 | 12 | 12 |
| Amylase | Plasma | 12 | 12 | 12 |
| Lipase | Plasma | 12 | 12 | 12 |
| PT | Whole Blood | 8 | 8 | 8 |
| PTT | Whole Blood | 8 | 8 | 8 |
| INR | Calculated | 8 | 8 | 8 |
| Creatinine Kinase | Plasma | 12 | 12 | 12 |
| Troponin I | Whole Blood | 12 | 12 | 12 |
| ABG | Whole Blood | 6 | 6 | 6 |
| Lactate | Plasma | 6 | 6 | 6 |
| Base Excess/Deficit | Whole Blood | 8 | 8 | 8 |
| ABO Blood Type | EDTA - RBC | 12 | 12 | 12 |
| Rh Blood Type | EDTA - RBC | 12 | 12 | 12 |
| Cholesterol | Plasma | 12 | 12 | 12 |
| Triglyceride | Plasma | 12 | 12 | 12 |
| HDL Chol | Plasma | 12 | 12 | 12 |
| LDL Chol | Plasma | 12 | 12 | 12 |
| VLDL Chol | Plasma | 12 | 12 | 12 |
| Chol/HDL Chol | Plasma | 12 | 12 | 12 |
| TOTAL for Current Instrumentation | | | | 400 |
| TOTAL per Theranos Device | | 400 | 400 | |
| TOTAL for Theranos Devices and Current Instrumentation | | 800 | | 400 |

Confidential

THPFM0000144549

ER-5907

**Attachment 2**
# Theranos LOE Questionnaire

*The information you provide will be on a __non-attribution__ basis. Therefore, full freedom of expression is encouraged being that others will not later attribute your statements to you. Your name will only be used by data collectors for follow-up interviews when additional information is needed.*

*Thank you for your participation.*

Respondent Name (Title, First, Last): _____ Date: _____

Job Position: _____ Years in this Position: _____

Telephone Contact: _____ Email: _____

> Please **circle** the most appropriate response and provide comments to amplify the response. Comments are highly encouraged as they provide the distinctions to qualify the answer. Comments are especially encouraged for "Highly Agree" or "Highly Disagree" responses.

| 1. The Theranos reporting file format was clear. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 2. The current laboratory systems reporting file format was clear. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 3. The Theranos reporting file format was clearer than the current laboratory systems reporting file format. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

THPFM0000144550

ER-5908

| 4. The Theranos reporting delivery mode was clear. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 5. The current laboratory systems reporting delivery mode was clear. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 6. The Theranos reporting delivery mode was clearer than the current laboratory systems reporting delivery mode. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 7. The Theranos screen menus were easy to read and understand. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

Confidential

THPFM0000144551

ER-5909

| 8.   It was easy to access the test results on the Theranos devices.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 9.   It was easy to access the test results from the current laboratory devices.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 10.  It was easier to access the test results on the Theranos devices than from the current laboratory devices.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 11.  It was easy to download results on the Theranos devices.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

| 12. It was easy to access past test results on the Theranos devices. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 13. It was easy to access past test results from the current laboratory devices. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 14. It was easier to access past test results on the Theranos devices than from the current laboratory devices. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 15. The Theranos device was easy to operate and program. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

| 16. It was easy to select the appropriate cartridge for each specific set of tests. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 17. The Theranos device was easier to operate than the current laboratory equipment. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 18. The Theranos device was easier to set-up than the current laboratory equipment. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 19. The Theranos device and procedures overall training was adequate. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

THPFM0000144554

ER-5912

| 20. The Theranos device hands-on training was adequate. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 21. The design of the Theranos device is adequate to allow a certified laboratory technician to operate it after initial training. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 22. The Theranos device manuals were adequate to support set-up of the system. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 23. The Theranos device manuals were adequate to support operation of the system. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

| 24. The Theranos device manuals were adequate to support trouble-shooting of the system. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 25. The Theranos device manuals were adequate to support maintenance of the system. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 26. The Theranos device operated on the Internet without incident. Please provide any examples. | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 27. The Theranos device **did not** interfere with other clinic equipment. Please provide examples. | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

THPFM0000144556

ER-5914

| 28.  The Theranos device **was not** interfered with by other clinic equipment.  Please provide examples. | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

THPFM0000144557

ER-5915

Attachment 3

BY ORDER OF THE CHIEF, LABORATORY SERVICES        SGSAL 44-AD-140
TASKFORCE MED
24 Sept 2012
Bagram AB, Afghanistan

*Administration*
## LABORATORY DE-IDENTIFICATION SOP

**1.    PURPOSE:**   This operating instruction outlines sample de-identification for Theranos research testing.

**2.    SCOPE:**  This OI applies to all TF Med laboratory staff members providing de-edentified specimens to Capt Blanco for the Theranos Limited Objective Experiment.

**3.    PRINCIPLES:**  Research projects conducted in CJTH are sometimes run in the laboratory. Samples (and their associated results) for research must be de-identified for research projects.

**4.    MATERIALS NEEDED:**  Patient samples and associated results.

**5.    PROCEDURE:**

5.1.    Samples previously run for patient care will be selected for de-identification. The selection of samples will be based on the types of tests to be performed for any particular day. Capt Blanco and the LOE team will select the tests to be performed from the tests listed in Attachment 1. The selected tests will determine the type of specimen required to perform the tests (e.g., whole blood or plasma). Based on the specimen type required, the laboratory staff will randomly select the samples from available patient samples that match the sample type requirements for the day. Active duty (age 18 or older) samples will be pulled from the existing sample storage areas for Theranos study.

5.2.    The results from testing already run on the patient sample will be pulled up in TC2.

5.3.    Results will have all patient identification removed from them prior to printing and labeled as described in 5.4. The results will be printed for research use.

5.4.    The sample will be aliquoted into a plastic pour off tube and labeled as Sample #1, etc. and provided to Capt Blanco along with the results from previous testing until enough samples are run for the study.

5.5.    The aliquoted sample will be run on current lab instrumentation if any testing required has not already been run.

5.6.    The aliquoted sample will be run on both Theranos analyzers and the results printed off.

---

**Supersedes:**  N/A                      **Certified by:**  Capt Blanco
**OPR:**  TASKFORCE MED (Capt Blanco)        **Number of printed pages:**  3

Confidential                      THPFM0000144558

ER-5916

SGSAL 44-AD-140                                              24 Sept 2012

5.7.   The results will be checked for completeness then the sample will be disposed of according to biohazard requirements.

5.8.   De-identified results from current lab techniques and lab results from both research analyzers will be provided to the LOE Analysis Team.

Confidential                                                THPFM0000144559

ER-5917

SGSAL 44-AD-140 24 Sept 2012

**Reviewed/Approved**

This instruction has undergone supervisory review and is approved for implementations

SHEILA M. HANLEY, MSgt, USAF

Flight Chief, Clinical Laboratory Services

**Annual Review**

Name & Title Signature Date

_____

_____

_____

_____

_____

_____

Confidential

THPFM0000144560

ER-5918

SGSAL 44-AD-140                                                    24 Sept 2012

**Document Control**

Number of Official Copies:

Location of Copies:  Z:\EMDSS\EMDSS_SGSL_(Laboratory)\Admin\Current OIs\Admin OIs

Date of Implementation:  _____

**Revision Documentation**:  The following revisions were made to the OI following implementation.
Training was accomplished prior to implementation of the revision.

| | | | | Initials/Date | | |
|---|---|---|---|---|---|---|
| # | Date | Summary of Revision | Training Completed | Trainer | OIC | Med Dir |
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |

Confidential                                                            THPFM0000144561

ER-5919

Attachment 4

Test Results Log

| Sample # | Type of Test Performed | Results Theranos Device #1 | Results Theranos Device #2 | Existing Laboratory Equipment Results | |
|---|---|---|---|---|---|
| | | | | Equipment Name | Results |
| Sample 1 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Sample 2 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Sample 3 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Sample 4 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Sample 5 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Samples 6-90 (Same as Sample 5) | | | | | |

Confidential



**DEPARTMENT OF THE ARMY**
US ARMY MEDICAL RESEARCH AND MATERIEL COMMAND
504 SCOTT STREET
FORT DETRICK, MD 21702-5012

MCMR-RPI                                                                                        2 November 2012

MEMORANDUM FOR THE RECORD

SUBJECT:  IRB Approval of the Protocol, "Limited Objective Experiment (LOE) on the Theranos Point of Service Lab Device," Principal Investigator:  Eric A. Follstad, MS, Headquarters, US Central Command (USCENTCOM), MacDill AFB, FL; Performance Site: Craig Joint Theater Hospital, Bagram Air Field, Afghanistan, IRB Office Log Number M-10278

1.  The Headquarters, US Army Medical Research and Materiel Command Institutional Review Board (HQ USAMRMC IRB) serves as the IRB for research conducted within the USCENTCOM Area of Operations.  The above-referenced protocol has been reviewed for compliance with applicable human subject protection regulations.  There are no outstanding human research protections issues to be resolved.

2.  In accordance with 21 CFR 56.110(a,b), the protocol may be approved by expedited review because it involves no more than minimal risk and is included in the categories of research listed in the 9 November 1998 Notice in the Federal Register (63 FR 60364-60367) that may be reviewed by the IRB through an expedited review procedure, specifically, research on medical devices for which (i) an investigational device exemption application (21 CFR Part 812) is not required (Category 1b); and research involving materials that have been collected, or will be collected solely for nonresearch purposes (Category 5).

3.  The protocol (V 2.2, 26 September 2012, received 22 October 2012) is approved for a one-year period, 2 November 2012 – 1 November 2013, pending approval of the USFOR-A Joint Operations Area Approving Official.

4.  This *in vitro* diagnostic device investigation is approved for the use of up to 100 leftover human specimens that are not individually identifiable.

5.  This protocol meets the criteria set forth in the April 25, 2006 "Guidance for Sponsors, Institutional Review Boards, Clinical Investigators and FDA Staff:  Guidance on Informed Consent for In Vitro Diagnostic Device Studies Using Leftover Human Specimens that are Not Individually Identifiable" for use of specimens in FDA-regulated *in vitro* device studies without informed consent.

6.  A waiver of the HIPAA Privacy Rule requirement to obtain authorization for the use of protected health information in research is approved as allowed under DOD 6025.18-R, C7.9.2.2.

Confidential                                                                    THPFM0000144563

ER-5921

MCMR-RPI
SUBJECT:  IRB Approval of the Protocol, "Limited Objective Experiment (LOE) on the
Theranos Point of Service Lab Device," Principal Investigator:  Eric A. Follstad, MS,
Headquarters, US Central Command (USCENTCOM), MacDill AFB, FL; Performance
Site: Craig Joint Theater Hospital, Bagram Air Field, Afghanistan, IRB Office Log
Number M-10278


7.  The protocol must be reviewed for continuation.  A continuing review report with a
copy of the current protocol and supporting documents must be submitted in sufficient
time for review and approval before the expiration date of 1 November 2013.

8.  Any modifications (including, but not limited to, changes in the principal investigator,
inclusion/exclusion criteria, number of specimens to be used, or procedures) must be
submitted as a written amendment for the IRB's review and approval prior to
implementation.

9.  Any deviation to the protocol that may affect the safety or rights of the patients
whose leftover specimens were used, or the integrity of the study must be reported to
the IRB as soon as the deviation is identified.

10.  Unanticipated problems involving risk to subjects or others must be promptly
reported by telephone (DSN 312-343-6240), by e-mail (irboffice@amedd.army.mil), or
by facsimile (DSN 312-343-4165) to the HQ USAMRMC IRB.  A complete written report
is to follow the initial notification.

11.  A final report must be submitted to the HQ USAMRMC IRB.

12.  The IRB Office point of contact for this protocol is Andrea Kline, MS, CIP at DSN
312-343-7801 or Andrea.Kline1@us.army.mil.

PHILLIP R. PITTMAN, MD, MPH
Chair
Headquarters, US Army Medical Research
    and Materiel Command
    Institutional Review Board

2

Confidential

THPFM0000144564

ER-5922



**DEPARTMENT OF THE ARMY**
TASK FORCE 44 MED
BAGRAM AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF:

TF44-MB-B                                                                    6 NOV 2012

MEMORANDUM FOR Eric Follstad (Research Site: Afghanistan)

SUBJECT: Protocol, "Limited Objective Experiment (LOE) on the Theranos Point of Service Lab Device"
M-10278, PI: Eric Follstad

1. Congratulations. The U.S. Army Medical Research and Materiel Command's (MRMC) Office of
Research Protections, Institutional Review Board has reviewed the above protocol and determined that it
qualified for expedited review because it involves no more than minimal risk and is included in the
categories of research listed in the 9 November 1998 Notice in the Federal Register (63 FR 60364-60367)
that may be reviewed by the IRB through an expedited review procedure. The protocol is approved for a
one-year period, 19 October 2012 – 18 October 2013.

2. As the USFOR-A Approving Official, I approve this research to be conducted within the Afghanistan
Theater. You may begin work on the protocol.

3. Please retain a copy of this memorandum in your study file.

Encl                                                        JON C. ALLISON
                                                            COL, MC, USA
                                                            Approving Official
                                                            US Forces-Afghanistan

CF:
US Army MRMC Office of Research Protections
JC2RT Study File

Confidential

**DX 12022**

**To:**      chris@bdventures.com[chris@bdventures.com]
**From:**   Elizabeth Holmes
**Sent:**    Thur 12/22/2005 3:49:38 PM
**Importance:**     Normal
**Subject:**   RE: Great to meet you!!!
**Received:**     Thur 12/22/2005 3:49:00 PM
The Theranos Industry Q4-05 PPT.pdf
Theranos Inc. Offering Memorandum 11-05.pdf
Appendix Financials A.xls.pdf
Appendix B2_CY2006 Forecast Revenue.xls.pdf
Appendix B1_CY2006 Forecast.xls.pdf
Appendix Financials D.xls.pdf
Appendix Financials C.xls.pdf

Got it! And got your voicemail. It was great to meet you as well. I have attached our PPT and a copy of a recent business plan. The information attached is of course strictly confidential. As you know, I am thrilled to get you and Don involved in Theranos as we scale and look forward to being in touch – and hopefully in person again --soon!

Elizabeth.

Elizabeth Holmes

President and CEO

Theranos, Inc.

(tel): 650.838.9292 x 111

(fax): 650.838.9165

1430 O'Brien Drive

Menlo Park, CA 94025

www.theranos.com

Trial Exh. 12022 Page 0001

HOLMES0018781

ER-5924

==================================

PRIVILEGED AND CONFIDENTIAL COMMUNICATION

This electronic transmission, and any documents attached hereto, contain confidential and/or legally privileged information. The information is intended only for use by the recipient named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution, or use of the contents of information received in error is strictly prohibited.

==================================

**From:** Christopher B. Lucas [mailto:chris@bdventures.com]
**Sent:** Wednesday, December 21, 2005 4:54 PM
**To:** Elizabeth Holmes
**Subject:** FW: Great to meet you!!!

**From:** Christopher B. Lucas [mailto:chris@bdventures.com]
**Sent:** Friday, December 16, 2005 5:15 PM
**To:** 'eholmes@theranos.com'
**Subject:** Great to meet you!!!

Elizabeth,

I really enjoyed meeting you and learning about your company.  You are clearly addressing a large market that needs your help.  Please email me any information you feel comfortable in sending.  Your PPT would be helpful, if you do leave that behind when you meet with people.

I know that Don is very excited about your future and sees how we can help make your company a huge success.  Thanks for spending your time with me and I will help any way that I can.

Trial Exh. 12022 Page 0002

HOLMES0018782

ER-5925

I listened to your interview that's posted on your website.  You have a very engaging informative style which helped me further understand your mission.

Congratulations on your great progress!

Regards,

Chris

Christopher B. Lucas

Managing Director

Black Diamond Ventures, LLC

450 North Brand Boulevard, Suite 600

Glendale, California 91203

T █████████

F █████████

HOLMES0018783

ER-5926

E: chris@bdventures.com

HOLMES0018784

ER-5927



# Theranos™

# Redefining Healthcare

December 22, 2005

Trial Exh. 12022 Page 0005

HOLMES0018785



Theranos™

# Theranos Product Pipeline



Theranos 0.5 .... 5-10ul 1 assay

Theranos 1.0................ 5-10ul, 3 assays

Theranos 2.0.......................... 0.3-1ul, 6 assays *Over The Counter Sales*

Theranos 3.0.................................. 0.3ul 10 assays

Theranos 4.0........................................ 0.3 ul 100 assays

Theranos 5.0.............................................. 0.3 ul, >1000 assays

Incremental Reader engineering, cost and size reductions, increasing number of assays

Theranos ID: ........Research ..........Development.........Productize...

Innovation Division: Nanowires, Nanotubes, electrochemistry, integrated sensor arrays (~ 5000 assay panels)

| 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |

Trial Exh. 12022 Page 00026

Confidential & Proprietary

22

ER-5929

Message

| | |
|---|---|
| **From:** | Elizabeth Holmes [/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=EHOLMES] |
| **Sent:** | 7/2/2015 4:52:27 PM |
| **To:** | All Theranos Employees [/O=THERANOS ORGANIZATION/OU=First Administrative Group/cn=Recipients/cn=AllTheranosEmployees] |

It is with incredible pride that I officially let you know we have received our first FDA clearance on our system, and the first Laboratory Developed Test we filed: HSV-1.

Join me in our meeting this afternoon to discuss and celebrate together. We will be live streaming with Arizona, Newark, and L.A..

Elizabeth

======================================
PRIVILEGED AND CONFIDENTIAL COMMUNICATION
IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 1701 Page Mill Road, Palo Alto, CA, 94304
650-838-9292    www.theranos.com
======================================

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-2422408

ER-5930

Message

| | |
|---|---|
| **From:** | Daniel Edlin [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL EDLIN] |
| **Sent:** | 6/8/2012 5:47:12 AM |
| **To:** | 'Givens, Melissa L. LTC' [█████████████████] |
| **CC:** | Christian Holmes [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Christian Holmes]; Elizabeth Holmes [/O=THERANOS ORGANIZATION/OU=First Administrative Group/cn=Recipients/cn=eholmes] |
| **Subject:** | RE: Theranos Demo Results |
| **Attachments:** | Theranos Confidential Background_DoD.DOCX |

LTC Givens,

Please see attached the literature for the research protocol.  Let us know if you would like to see Theranos' standard pricing schedule, or costs specific to this program. We can get those to you right away.

Best regards,
Dan


Daniel P. Edlin
Senior Product Manager
Theranos, Inc.
Office:   650.470.0322
Mobile:  ████████████
dedlin@theranos.com

PRIVILEGED AND CONFIDENTIAL COMMUNICATION
IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292      www.theranos.com




-----Original Message-----
From: Givens, Melissa L. LTC [█████████████████████]
Sent: Tuesday, June 05, 2012 1:08 AM
To: Daniel Edlin
Subject: RE: Theranos Demo Results

Dan,

Sounds good, right now I have some open time on my schedule on the 19, 20th and the afternoon of the 21st if you do make the Germany trip.

The equipment and cartridges will be flown commercial air with me on the 23rd and I will fly back to Germany on the 2nd of July (I can't give further detail on travel).  They will be stored in a hotel room with AC but taken out to the training site during the day.  The training site has an open air building with no AC and the temperature will be between 100-110 degrees F. I will be transporting/storing all in a hardened "pelican" case - equivalent of a hard suitcase.  This is what we usually use when we deploy for most equipment.

The power source in Africa is 220V but we have voltage convertors to convert
to 110V.
I intend to plug the device in when we are in the hotel and we will also try
to plug into generator power at the training site. We use surge protectors
when using generator power. When we fly the equipment from Uganda it will be
on a non-pressurized aircraft at altitudes less than 10,000 ft.
Temperatures will range from 100 degrees Fahrenheit with high humidity to 60
degrees in flight.
My time in Uganda will be 7 days but I cannot give out exact dates.

Hope this helps,
Missy

LTC Melissa L. Givens MD, MPH
Command Surgeon
Special Operations Command AFRICA
DSN: ▓
Comm: ▓
Cell: ▓

-----Original Message-----
From: Daniel Edlin [mailto:dedlin@theranos.com]
Sent: Tuesday, June 05, 2012 8:42 AM
To: Givens, Melissa L. LTC; 'Melissa Givens'
Cc: Christian Holmes
Subject: RE: Theranos Demo Results

LTC Givens,

Thank you for this. We will aim for a video conference, however due to the
specialized customization of this device we may need to come to Germany to
meet with you. As soon as we have more clarity around this we will let you
know.

Regarding the cartridges, it is likely that we will have one cartridge
configuration for each type (blood and urine), and we will confirm this
shortly as we operate to get the customization done in time. We are trying
to run as many tests as we can to gain experience with the testing
conditions while still managing our timelines to ensure that the device
customization meets your request for preloaded results. Having customized
this rapidly we also need to make sure that all of the necessary testing is
completed and that there are no issues.

I have been actively involved in gathering the literature for the research
protocol and calculating the test costs and will continue to do so going
forward. We will be able to have these materials to you in time to submit
the protocol this week, and you can continue to contact me with any issues.

Can you also please address the following questions as we work on preparing
the materials:
- How will the cartridges be stored in the field? We will need to prepare
the appropriate packaging.
- How long will the cartridges be stored in the field? You mentioned that
it would be "a little over a week" in Cameroon- do you have any addition
details? How long will you be in Uganda?
- How will the device be transported in the field? i.e., Do you plan on
keeping the device in its packaging in between use? What kind of conditions
might be on the medevac from Germany to Uganda?
- What kind of power outlets will be available when the device is being
used? When and for how long will the device be plugged into a compatible
outlet?

Thank you and best regards,
Dan

-----Original Message-----

Confidential

From: Givens, Melissa L. LTC [█████████████████████████]
Sent: Monday, June 04, 2012 5:00 AM
To: Daniel Edlin; 'Melissa Givens'
Cc: Christian Holmes
Subject: RE: Theranos Demo Results

Dan,

Anyone on the team is always welcome in Germany but it seems like a lot of jet
lag for training we can accomplish online.

Yes to UA on the 5 volunteers for the standard physical exam.  We will just
stick to the blood work on the others.  Sorry I probably confused you when I

added UA results in the scenarios.  Let's keep it simple and stick to just the
5 UA tests.

There will be 14 separate encounters so we will need that many cartridges.  It
may be a good idea to have 2-3 extra just in case so why don't you send 16.

Are all the cartridges going to be configured the same?  I know we will be
producing artificial results but I also know you wanted to test out the
equipment in the environment so if there are particular tests/cartridge
configurations that need to be tested in austere conditions we can do so.


Lastly,  I still have not received the literature to put into my background
discussion on the research protocol. It is an expedited protocol but I really
need to get it turned in by the end of this week.  Who is the best POC to help
me with this?


Regards,
Missy

LTC Melissa L. Givens MD, MPH
Command Surgeon
Special Operations Command AFRICA
DSN: █████████████████████
Comm: ███████████████████
Cell: ████████████████████████


-----Original Message-----
From: Daniel Edlin [mailto:dedlin@theranos.com]
Sent: Sunday, June 03, 2012 10:51 PM
To: Givens, Melissa L. LTC; 'Melissa Givens'
Cc: Christian Holmes
Subject: RE: Theranos Demo Results

LTC Givens,

Thank you.  We think it would be productive to have a video call on Skype to

make sure that we can answer any questions you may have and ensure that you
are fully comfortable with the equipment and procedures.  Note that we
received approval to travel to Germany to meet with you as well, and would be
happy to do so if you think it would be helpful.

With regards to the protocol, can you please confirm whether you plan to run

UA tests on just the five volunteers for the standard physical exam, or if the
other volunteers will require a urine test as well.  Please also let us know

THPFM0000691519

how many total cartridges you will need.  Note that the cartridges for blood

samples will all be identical, and there will be separate cartridges for the

UA tests.

Look forward to hearing from you.

Best regards,
Dan

-----Original Message-----
From: Givens, Melissa L. LTC ███████████████████████████
Sent: Thursday, May 31, 2012 4:37 AM
To: Daniel Edlin; 'Melissa Givens'
Cc: Christian Holmes
Subject: RE: Theranos Demo Results

Dan,

We should be able to do the training over the phone once I receive the
equipment.
If necessary we can do a video call on Skype but it seems pretty straight
forward.

Once you ship the equipment just let me know and we can then block a time on
the calendar to do the training.

Regards,
Missy

LTC Melissa L. Givens MD, MPH
Command Surgeon
Special Operations Command AFRICA
DSN: ████████████████
Comm█████████████████████
Cell:███████████████████

-----Original Message-----
From: Daniel Edlin [mailto:dedlin@theranos.com]
Sent: Thursday, May 31, 2012 7:16 AM
To: 'Melissa Givens'; Givens, Melissa L. LTC; Givens, Melissa L. LTC
Cc: Christian Holmes
Subject: RE: Theranos Demo Results

LTC Givens,


Thank you for this information.  We will review this internally and let you
know if we need any additional information.


On another note, one aspect of our deployment we haven't touched on yet is
the "train the trainer" session to review the operating procedures for the
devices and cartridges.  As you will assume this role, we'd like to meet
with you before you depart for Africa.  Please let us know your thoughts on
the best approach for this.


Best regards,

Dan

Confidential

Daniel P. Edlin
Senior Product Manager
Theranos, Inc.
Office:  650 470 0322
Mobile:  ████████████

dedlin@theranos.com <mailto:dedlin@theranos.com>


PRIVILEGED AND CONFIDENTIAL COMMUNICATION IMPORTANT - This electronic
transmission, and any files transmitted with it are confidential and/or
legally privileged information. This information is intended solely for the
use of the individual or entity to which they are addressed. Any disclosure,
retransmission, reproduction, dissemination or other use of the contents of
this information by persons or entities other than the intended recipient is
strictly prohibited. If you have received this email in error, please
contact us immediately and delete all copies. Please note that any views or
opinions presented in this email are solely those of the author and do not
necessarily represent those of Theranos, Inc. Finally, before opening or
using attachments the recipient should check this email and any attachments
for the presence of viruses. Theranos, Inc. accepts no liability for any
damage caused by any virus transmitted by this email. Our sole
responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292     www.theranos.com <http://www.theranos.com/>



From: Melissa Givens ████████████████████████
Sent: Wednesday, May 30, 2012 12:03 PM
To: Daniel Edlin
Cc: Christian Holmes
Subject: RE: Theranos Demo Results


Dan,


Attached is the updated protocol.  I have attached a study number to each
scenario and also included the lab results I would like to see reported for
each patient.


For the 5 patients who are just having physical exam tests - these can all
be normal results.

I specified values for the remaining patients.  Let me know if I need to
include units.


I am also attaching the CDC algorithm for malaria diagnosis and treatment to
be uploaded if time permits. No worries if not.


The mailing address for my office is:

USAG Stuttgart

Command Surgeon

Kelley Kaserne GEB 3304

THPFM0000691521

ER-5935

Plieningerstr. 289

70567 Stuttgart

phone ████████████████

Let me know if you need anything else or if I need to add any more details
regarding study numbers and lab results.


regards,

Missy

_____

From: dedlin@theranos.com
To: ████████████ Melissa.Givens ████████████████
CC: cholmes@theranos.com
Subject: RE: Theranos Demo Results
Date: Wed, 30 May 2012 03:55:37 +0000

LTC Givens,


It was good catching up with you today.  I had the chance to debrief on our
conversation with some of my colleagues assisting in the deployment, and
wanted to let you know that we are working to secure the additional
resources needed to meet your anticipated deadlines.  As for immediate next
steps, I am finalizing the cost summary and expect to have this breakdown
over to you very shortly, as well as the expected run time for DNA samples.


In parallel, we look forward to understanding more from you on the "blinded"
configuration for results communication on the device touchscreen.


Talk to you shortly.


Best regards,

Dan




Daniel P. Edlin
Senior Product Manager
Theranos, Inc.
Office:   650.470.0322
Mobile: ████████████████

dedlin@theranos.com <mailto:dedlin@theranos.com>


PRIVILEGED AND CONFIDENTIAL COMMUNICATION IMPORTANT - This electronic
transmission, and any files transmitted with it are confidential and/or

THPFM0000691522

legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments. Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304 650-838-9292      www.theranos.com <http://www.theranos.com/>

From: Melissa Givens ███████████████████████
Sent: Tuesday, May 29, 2012 10:24 AM
To: Daniel Edlin
Subject: RE: Theranos Demo Results

Dan,

1:30 is fine with me. Thanks for letting me know.

Missy

_____

From: dedlin@theranos.com
To: ██████████████ Melissa.Givens ███████████
Subject: RE: Theranos Demo Results
Date: Tue, 29 May 2012 16:24:54 +0000

LTC Givens,


We just had a meeting come up this afternoon; would you be able to move this call to 1:30pm PST today?

Please let me know.


Thank you,

Dan


From: Daniel Edlin
Sent: Monday, May 28, 2012 2:11 PM
To: Melissa Givens
Subject: RE: Theranos Demo Results


LTC Givens,

Thank you. 1pm PST will work for us. Please use the following dial in number:
████████████
Passcode: ██████

Hope you are having a nice Memorial Day.

Best regards,
Dan

Confidential

---

From: Melissa Givens
Sent: 5/28/2012 5:26 AM
To: Daniel Edlin
Subject: RE: Theranos Demo Results

Dan,


Sorry for the slow reply.  I am available for a call anytime between 12-2pm
your time on Tuesday.

Just let me know if that will work for you.



regards,

Missy


---

From: dedlin@theranos.com
To: ███████████████████ melissa.givens ██████████████
CC: cholmes@theranos.com
Subject: RE: Theranos Demo Results
Date: Fri, 25 May 2012 02:20:11 +0000

LTC Givens,


Thanks for this information.  Would you be available for a phone call on
Tuesday, May 29 to address some other questions we have about the scenarios
and testing frequency?  Please let us know what time would work for you.


Best regards,

Dan




Daniel P. Edlin
Senior Product Manager
Theranos, Inc.
Office:   650.470.0322
Mobile: ████████████████

dedlin@theranos.com <mailto:dedlin@theranos.com>


PRIVILEGED AND CONFIDENTIAL COMMUNICATION IMPORTANT - This electronic
transmission, and any files transmitted with it are confidential and/or
legally privileged information. This information is intended solely for the
use of the individual or entity to which they are addressed. Any disclosure,
retransmission, reproduction, dissemination or other use of the contents of
this information by persons or entities other than the intended recipient is
strictly prohibited. If you have received this email in error, please

THPFM0000691524

contact us immediately and delete all copies. Please note that any views or
opinions presented in this email are solely those of the author and do not
necessarily represent those of Theranos, Inc. Finally, before opening or
using attachments the recipient should check this email and any attachments
for the presence of viruses. Theranos, Inc. accepts no liability for any
damage caused by any virus transmitted by this email. Our sole
responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292      www.theranos.com <http://www.theranos.com/>

From: Melissa Givens [███████████████████]
Sent: Wednesday, May 23, 2012 12:09 PM
To: Daniel Edlin; melissa.givens@███████████  melissa.givens@██████████
Subject: RE: Theranos Demo Results

Dan,


Please plan on shipping device and cartridges to me in Germany.  I can send
you the office address from work tomorrow for Fed Ex or DHL.


I will be hand carrying everything with me to Cameroon for the first test.

I travel with my physician license and usually am able to clear customs
going to Africa with medical supplies and devices pretty easily so hopefully
this will not be too difficult.

If we run into problems I can put the cartridges on a military aircraft but
prefer that as last resort because I wont have control over how the
cartridges are handled.


Regards,

Missy

> From: dedlin@theranos.com
> To: Melissa.Givens█████████████████
> ████████████████████████████████████████
> Subject: RE: Theranos Demo Results
> Date: Wed, 23 May 2012 15:54:13 +0000
>
> Resending this to include both your other email address:
>
> LTC Givens,
>
> Thank you. Can you also please clarify how you envision the shipping
process for the device and the cartridges. Will we be sending them
separately to different locations? If so, can you please let us know where
they will be shipped? I recall your saying during our meeting that you would
carry the device with you; does this mean that we would first ship the
reader to you in Germany, and then ship the cartridges separately to the
location in theater? This information will help ensure that we have all of
the customs permits for shipping.
>
> Thanks again.
>
> Best regards,
> Dan
>
> -----Original Message-----

Confidential

> From: Givens, Melissa L. LTC [█████████████████████████
> <mailto:[█████████████████████████████>
> Sent: Wednesday, May 23, 2012 6:54 AM
> To: Daniel Edlin
> Subject: RE: Theranos Demo Results
>
> Sorry. Here it is
>
> -----Original Message-----
> From: Daniel Edlin [mailto:dedlin@theranos.com]
> Sent: Tuesday, May 22, 2012 3 PM
> To: Givens, Melissa L. LTC; 'Melissa Givens'
> Cc: Elizabeth Holmes; Christian Holmes
> Subject: RE: Theranos Demo Results
>
> LTC Givens,
>
> Thank you for the update and your continued work on the protocol; we
> are working in parallel to get your requested information to you as well.
> Not sure if there was supposed to be an attachment with the testing
> scenarios you mentioned, but I did not see one come through in your email.
> We'd be interested in seeing what scenarios you had in mind as soon as
> you can provide the information.
> We likewise do not want to miss the opportunity to showcase our system
> with you, and we will be in touch asap with updates.
>
> Best regards,
> Dan
>
> -----Original Message-----
> From: Givens, Melissa L. LTC [████████████████████████████
> <mailto:[██████████████████████████>
> Sent: Tuesday, May 22, 2012 8:16 AM
> To: Daniel Edlin; 'Melissa Givens'
> Cc: Elizabeth Holmes; Christian Holmes
> Subject: RE: Theranos Demo Results
>
> Dan,
>
> I finally got around to writing the scenarios so you have the
> specifics on which tests we plan to run. They are now attached at the
> end of the protocol.
> I still have not had time to flesh out the remainder of the protocol
> but want to keep feeding you what you need to drive forward with
> getting a system deployed with me in June.
> I have identified the volunteers and we are ready to roll.
>
> We just had an incident in the command that highlighted the need for
> this technology and I don't want to miss the opportunity to show how
> Theranos is the solution we are looking for.
>
> Please let me know what I can do to help make this happen.
>
> Regards,
> Missy
>
> LTC Melissa L. Givens MD, MPH
> Command Surgeon
> Special Operations Command AFRICA
> DSN: █████████████
> Comm: ████████████████
> Cell: ██████████████
> ██████████████████████████
>
>
>
> -----Original Message-----
> From: Daniel Edlin [mailto:dedlin@theranos.com]
> Sent: Wednesday, May 16, 2012 6:37 PM
> To: 'Melissa Givens'; Givens, Melissa L. LTC
> Cc: Elizabeth Holmes; Christian Holmes

Confidential

> Subject: RE: Theranos Demo Results
>
> LTC Givens,
>
>
>
> Thank you for sending this. We have a meeting later today to discuss
> the details outlined in the protocol draft and will follow up on your
> email below shortly.
>
>
> Best regards,
>
> Dan
>
>
> From: Melissa Givens [█████████████████████]
> Sent: Tuesday, May 15, 2012 8:12 AM
> To: Daniel Edlin; █████████████████
> CC: Elizabeth Holmes; Christian Holmes
> Subject: RE: Theranos Demo Results
>
>
> Greetings all,
>
> It has been an extremely busy week for me so I have not had much time
> to devote to protocol writing.
> I figured I can send you a shell of the protocol and let you work on
> filling
> in pertinent details while I flesh out the remainder of the protocol.
>
> File attached has some highlighted areas in red where I could use your
> input
> -
> please provide references. I still have to generate the clinical
> scenarios and survey instruments.
>
> How are things progressing in terms of customs clearance for shipping
> the cartridges?
>
> I'm excited to get the initial concept down on paper. Not a very
> sophisticated study but should at least be proof of concept to deploy
> further systems and collect more robust data.
>
> Regards,
> Missy Givens
>
>
> _____
>
> From: dedlin@theranos.com
> To: Melissa.Givens█████████████████████
> CC: eholmes@theranos.com; cholmes@theranos.com
> <mailto:cholmes@theranos.com>  <mailto:cholmes@theranos.com>
> Subject: Theranos Demo Results
> Date: Wed, 2 May 2012 06:41:30 +0000
>
> LTC Givens,
>
>
> It was great meeting you this afternoon. Attached to this note are the
> results from the blood sample we drew. We are happy to answer any
> questions you might have.
>
> We will be in touch soon with follow up from our conversation today,
> and we very much look forward to advancing our partnership.
>
>

Confidential

```
>
> Best regards,
>
> Dan
>
>
>
>
>
>
>
>
> Daniel P. Edlin
> Senior Product Manager
> Theranos, Inc.
> Office: 650.470.0322
> Mobile: ████████████
>
> dedlin@theranos.com <mailto:dedlin@theranos.com>
>
>
> PRIVILEGED AND CONFIDENTIAL COMMUNICATION IMPORTANT - This electronic
> transmission, and any files transmitted with it are confidential
> and/or legally privileged information. This information is intended
> solely for the use of the individual or entity to which they are
> addressed. Any disclosure,
>
> retransmission, reproduction, dissemination or other use of the
> contents of this information by persons or entities other than the
> intended recipient is
>
> strictly prohibited. If you have received this email in error, please
> contact us immediately and delete all copies. Please note that any
> views or opinions
>
> presented in this email are solely those of the author and do not
> necessarily represent those of Theranos, Inc. Finally, before opening
> or using attachments the recipient should check this email and any
> attachments for the presence of viruses. Theranos, Inc. accepts no
> liability for any damage caused by any virus transmitted by this
> email. Our sole responsibility is limited to resupplying any affected
> attachments.
> Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
> 650-838-9292 www.theranos.com <http://www.theranos.com/>
>
>
>
```

Confidential

THPFM0000691528

ER-5942

**13993A**



## Theranos, Inc. Confidential Information for AFRICOM Protocol

**Background: Overview and Cost Savings.**

Theranos is a high-complexity CLIA-certified laboratory headquartered in Palo Alto, California. Theranos manufactures proprietary clinical analyzers, assay reagents, and laboratory developed tests for the complete range of tests reimbursed by the Centers for Medicare and Medicaid Services.

Theranos tests are all validated with micro-liter sample volumes of the relevant biological matrices. For blood based assays, the assays are validated on micro-liter samples of serum, plasma, venous and finger-stick blood.

Part of Theranos' mission is to offer tests of unprecedented quality at unprecedented low costs. Costs per tests on Theranos systems are fractions of retail test or hospital test costs and in volume, very significantly discounted from US Medicare reimbursement thresholds. Theranos is working to offer laboratory services to Medicare and Medicaid programs in the US at rates far lower than current reimbursement thresholds to materially reduce federal and state healthcare spending.

Theranos manufactures all of its technologies and systems within the United States.

**Design: Deployment.**

Theranos' point-of-service laboratory infrastructure generates real-time data from a finger-stick of blood or other micro-volumes of different sample types delivering higher quality data than previously possible. This technology is an industry first, with profound effects on the ability to triage and stabilize patients via quantitative reads from micro sample sizes in real-time in the field.

Each Theranos device can process the complete range of tests currently available through the traditional centralized or hospital laboratory infrastructure. Theranos' device can process multiple samples on a given cartridge. Sample types include blood, urine, feces, tissue and saliva, amongst others. The cartridge can automatically perform follow-up tests when protocol dictates those additional tests are necessary.

For this program, the Theranos 3.0 system and accompanying cartridges will be deployable to designated sites in theatre. Devices can transmit data and video via satellite, short and long-wave radio, Ethernet, Wi-Fi, and cellular broadband to allow instant communication of test results to the necessary recipients.

The system is portable and designed to be able to be used at the point of sample acquisition. Theranos systems are highly automated with all pre-analytical, analytical, and post-analytical steps capable of being run by the system so that untrained operators can fully operate the system.

THERANOS CONFIDENTIAL AND PROPRIETARY

ER-5943



Embedded decision support on the device touchscreen allows for medical expertise to be provided to untrained operators in field.

**Theranos Clinical Analyzers.**

Theranos' clinical analyzers are capable of running the full spectrum of laboratory tests ranging from hematology to clinical chemistry, immunoassays, microscopy, and molecular based diagnostic tests.

The Theranos 3.0™ is a small, compact and portable analyzer that processes a single sample at one time.

Theranos clinical analyzers are capable of performing comprehensive pre-analytical and sample preparation procedures as well as analysis. In the context of placement of an analyzer in a Theranos CLIA laboratory, the device can automatically perform the pre-analytic and analytic procedures. The analyzers can also be used for sample preparation procedures only and transfer data remotely for analysis. Automation of many of the manual pre-analytic procedures contributes to acceleration of the total turnaround time of test results from the time of sample collection to analysis. Pre-analytic processing automation and integration also contributes to low coefficients of variation in system wide performance data.

Theranos clinical analyzers have integrated connectivity modes ranging from cellular connectivity to wired connectivity to radio for the purpose of transmitting comprehensive performance, quality, sample prep, and analytical information to a secure analytical infrastructure or into an EMR system.

Theranos clinical analyzers include touch screens with applications for clinical data entry. Test results are displayed as each assay is processed either on the touch screen and/or in an EMR as specified. The touch screen can also run training, support, and other applications to assist in ease of use and in data interpretation.

Theranos clinical analyzers are factory calibrated. Standardization of analyzers across Theranos locations has contributed to higher integrity data generation in past deployments. The ability to rapidly process fresh whole blood samples has further contributed to the integrity of Theranos test results.

Unlike waived devices, Theranos analyzers and the associated Theranos laboratory analytical software was designed to operate in a CLIA-certified laboratory framework with minimal human intervention. The level of integrated controls and oversight was introduced with the intent of operating in remote, scantily staffed, and/or rural environments.

**Theranos Tests.**

Theranos reagents are Analyte Specific Reagents. Theranos reagents are enclosed in the disposable reagent tray or cartridge into which the sample is deposited for analysis. While multiple reagents are contained in a single tray, all reactions are discrete. Reagent trays contain

THERANOS CONFIDENTIAL AND PROPRIETARY

THPFM0000691530



reagents for a range of assay types. The largest number of assays run simultaneously on a single tray to date is 72. Reagent trays are customizable. Each reagent tray can process a finger-stick sample of blood to perform any given set of tests. Reagent trays are also customized for the full range of clinical sample matrices.  The reagent tray is traced throughout its lifecycle through a unique bar code which is used for quality control purposes and monitoring reagent interactions.

Total test time of Theranos assays ranges from <1 minute for tests like PTT to <30 minutes depending on the analytes measured. Theranos has customized assay run times for prior deployments based on field requirements. Sample volume requirements range from <1 uL for a given assay to <50 uL for a given panel.

Theranos cartridges contain controls and calibrators for each assay. Assays are generally run in triplicates. All assays are validated under CLIA guidelines. Novel assays have been rapidly developed and validated on the Theranos platform for prior deployments. Representative data is attached.

**Certifications, Quality Control, Safety and Related Infrastructure.**

Theranos is a high complexity CLIA certified laboratory. Internationally, Theranos' model of operation is ISO certification of all CLIA laboratory facilities.

In all deployments, Theranos trains and certifies technicians operating in its sample collection sites and laboratory locations. Staff for Theranos laboratories can be assigned or contracted via existing (hospital) laboratory personnel. Theranos has been building a large distribution and support infrastructure which includes logistical hubs through which devices are replaced and serviced. Deployments always include additional back up devices for further modularity and redundancy; replaced devices are generally serviced offsite by Theranos personnel. As a CLIA lab, Theranos has not sold devices for deployments but rather provides a reference laboratory service. Theranos manages just in time inventory of reagent trays in its locations. Reagents are designed with minimum twelve month stability targets under the most robust conditions possible for a given assay. Theranos clinical analyzers are Class I medical devices classified under FDA 21 CFR Part 862.2160. In addition to its CLIA lab quality system standards, Theranos is QSR compliant.

While Theranos analyzers can be used for sample processing in the field, Theranos has also developed proprietary nanotainer™ (tiny vaccutainer that collects blood through a small capillary) which allow for micro volumes of sample to be stabilized in the appropriate anticoagulant and shipped to or processed in a clinical laboratory. Theranos nanotainer™s are classified as Capillary Blood Collection Tubes under 21 CFR Part 864.6150.

Theranos systems are Non-Invasive, Non-Significant Risk Devices.  Theranos validates each assay under FDA and ICH Guidelines and where applicable, under/to WHO guidelines and standards.

THERANOS CONFIDENTIAL AND PROPRIETARY



Theranos is GLP and GMP compliant. Theranos software is validated under 21 CFR part 11. Theranos clinical analyzers are Class I medical devices classified under FDA 21 CFR Part 862.2160. In addition to its CLIA lab quality system standards, Theranos is QSR compliant.

All controls, calibrators, replicates, and QC testing mechanisms are automatically run with each test that is processed on board the system.

As a CLIA-certified laboratory, Theranos is legally liable for the accuracy of every result that it reports. This means that in addition to the controls, standards, and practices (such as Good Manufacturing Practices) required by FDA for Class I devices, Theranos devices are also subject to the ongoing testing, oversight, and regulatory obligations under CLIA certification.

Theranos is HIPAA and 21 CFT Part 11 compliant, utilizes bank-level encryption, and operates in compliance with a broad range of security standards and accreditation programs.

Theranos systems have undergone EMC testing, Underwriter's Laboratory (UL) certification, passed loose cargo vibration and drop/shock tests and extensive environmental testing.

THERANOS CONFIDENTIAL AND PROPRIETARY

| | |
|---|---|
| **From:** | Brian Grossman |
| **To:** | Aleksandr Rabodzey; Vivek Khanna; Sriram Balasuryan |
| **Sent:** | 1/28/2014 7:39:24 PM |
| **Subject:** | Fwd: Open Items for PFM Investment |

real world

Begin forwarded message:

**From:** Sunny Balwani <sbalwani@theranos.com>
**Date:** January 28, 2014 at 9:32:35 PM EST
**To:** Brian Grossman <Brian@pfmlp.com>
**Subject: RE: Open Items for PFM Investment**

Sure.

On your tests. There was a control that failed on one of the assays and the lab reran the sample (as is the procedure) and they were holding back results for all of the other tests until the entire order was complete. I told them to release the partial (which they did) but then also notified me few minutes back that the last remaining test was completed successfully and the full result was released. Your doctor should have all the results.

Thanks for flagging it.


**From:** Brian Grossman [mailto:Brian@pfmlp.com]
**Sent:** Tuesday, January 28, 2014 3:11 PM
**To:** Sunny Balwani
**Subject:** RE: Open Items for PFM Investment

Thanks sunny.

By the way, my test results which I had taken at Wallgreens yesterday at 3:45 have not been delivered to my physician yet.


**From:** Sunny Balwani [mailto:sbalwani@theranos.com]
**Sent:** Tuesday, January 28, 2014 2:36 PM
**To:** Brian Grossman
**Subject:** RE: Open Items for PFM Investment

We can walk you through part of the lab where we have dozens of devices being used. However, as we chated before, if you can limit this to you and vikram, that would be appreciated. Thanks.

**From:** Brian Grossman [mailto:Brian@pfmlp.com]
**Sent:** Tuesday, January 28, 2014 2:35 PM
**To:** Sunny Balwani
**Subject:** RE: Open Items for PFM Investment

Ok thanks.  Is there a way we can see a part of the lab without compromising the patent pending or unfiled parts of it? This is more a perfunctory exercise to make sure there actually is a lab there.

**From:** Sunny Balwani [mailto:sbalwani@theranos.com]

**Sent:** Tuesday, January 28, 2014 2:26 PM
**To:** Brian Grossman
**Subject:** RE: Open Items for PFM Investment

Brian.

I am working on both. Newark has a lot of open devices and equipment so we are moving them aside but we can visit Newark on Friday morning. I am confirming 11am for Newark; will send you directions. Lab is going to be very difficult as large parts of it are patent pending and/or not filed yet.


Thanks.


**From:** Brian Grossman [mailto:Brian@pfmlp.com]
**Sent:** Tuesday, January 28, 2014 2:19 PM
**To:** Sunny Balwani
**Subject:** RE: Open Items for PFM Investment

Sunny, just to confirm we still would like to see the Newark and the Theranos Clia lab.

Friday works for us

Thanks

---

**From:** Sunny Balwani [mailto:sbalwani@theranos.com]
**Sent:** Monday, January 27, 2014 3:27 PM
**To:** Brian Grossman
**Subject:** RE: Open Items for PFM Investment

Great. I have blocked off 9-930 am tomorrow morning for a tentative call for now.

Assuming your conversations with Adam are productive and we continue to move forward, lets also tentatively block off Friday morning from 8-10 to go visit Newark.

Thanks
Sunny.

**From:** Brian Grossman [mailto:Brian@pfmlp.com]
**Sent:** Monday, January 27, 2014 3:23 PM
**To:** Sunny Balwani
**Subject:** Re: Open Items for PFM Investment

sunny

thanks. we should have more than enough time to talk to adam. i will send over questions on financial model when i'm back in office in front of a computer. thanks again. and my morning is open tomorrow so if we need a short follow up call i can work with you or your team on times.

thanks again

brian

On Jan 27, 2014, at 11:57 AM, "Sunny Balwani" <sbalwani@theranos.com> wrote:

Brian.

PFM-SEC v. Balwani-0010858

I sent the CDA for Adam to Kimberley a bit ago.  Hopefully you will get to spend time with Adam early in the week to get the feedback you need. In parallel, if possible you can send us the questions about the financial model and we will respond in real time. We can also do a call tomorrow if needed o answer these questions.  I am working on visit to Newark for Thursday or Friday - will confirm that tomorrow. Can you please ask Kimberly to send me her questions and I will direct them within our team based on nature of questions and will have the appropriate counsel work with her.

Regards,
Sunny.

**From:** Brian Grossman [mailto:Brian@pfmlp.com]
**Sent:** Sunday, January 26, 2014 6:13 PM
**To:** Sunny Balwani
**Subject:** Open Items for PFM Investment

Sunny

Everything looking good for next week's close.  We have a few open items that should be relatively straight forward.

1.  We'd like to tour the lab.
2.  We'd also like to see the Newark facility
3.  Would it be possible to speak to somebody for 20-30 minutes on the Theranos financial model.  I want to be sensitive to your time, as you've already been generous with us over last few weeks.  I was wondering if there was somebody else that might be able to answer some of our questions on the model you sent over.  Or maybe we could send you some questions in email form if that's easier.
4.  We'd like to get adam clammer, one of our outside consultants, under a CDA.  I think we are waiting to hear from your legal department on that.
5.  Ken Freeman – is this a no go or can we reach out to him?

Lastly, our GC Kimberly Summe, will have deal related questions having reviewed the term sheet you sent over at the end of the week.  Are her questions best directed to you?   And our plan is to come back to you with a hard number at the end of the week as we work through the above list.

Regards,

Brian

PFM-SEC v. Balwani-0010859

**To:**       Daniel Edlin[dedlin@theranos.com]; Sukdev Bainiwal[sbainiwal@theranos.com]
**From:**   Sunny Balwani[/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=SBALWANI]
**Sent:**     Fri 2/15/2013 8:48:59 PM (UTC)
**Subject:**  RE: 4s deployment to Afghanistan

Sukhdev.

What security sw are we buying?

I have not received ANY updates on red image since my last email on Friday. Can you please send me an update.

Thanks.



-----Original Message-----
From: Daniel Edlin
Sent: Friday, February 15, 2013 12:46 PM
To: Sunny Balwani
Subject: FW: 4s deployment to Afghanistan

Hi Sunny-
Should we plan on sending a 3rd device to bagram as a backup? Or will we just be sending the 2 for the study?
Thanks,
Dan
_____
From: Daniel Edlin
Sent: Friday, February 15, 2013 11:20 AM
To: Sukhdev Bainiwal
Cc: Tim Kemp
Subject: RE: 4s deployment to Afghanistan

We are deploying 2 but may also send a backup. Ill confirm this _____
From: Sukhdev Bainiwal
Sent: Friday, February 15, 2013 10:56 AM
To: Daniel Edlin
Cc: Tim Kemp
Subject: 4s deployment to Afghanistan

Dan, how many 4s are we deploying to Afghanistan. We need to buy a security sw license and need to know how many we should buy.

Sukhdev

**To:**       Daniel Edlin[dedlin@theranos.com]
**From:**     Daniel Young
**Sent:**     Thur 7/2/2015 9:39:28 PM
**Importance:**          Normal
**Subject:**  Fwd: company meeting slides
**Received:**            Thur 7/2/2015 9:39:31 PM
image001.jpg
ATT00001.htm
HSV Company Meeting Presentation Slides.pptx
ATT00002.htm

-Daniel

Begin forwarded message:

> **From:** Daniel Young <dyoung@theranos.com>
> **Date:** July 2, 2015 at 1:46:06 PM PDT
> **To:** Elizabeth Holmes <eholmes@theranos.com>
> **Cc:** Chinmay Pangarkar <cpangarkar@theranos.com>
> **Subject: company meeting slides**
>
>
>
> Hi Elizabeth,
>
>
>
> Please review the attached slides.  Hope this works.  Please let us know.
>
>
>
> Best regards,
>
>
>
> Daniel Young, PhD
>
>
>
> Vice President, Theranos Systems
>
>
>
> Laboratory Director, Theranos Arizona CLIA Laboratory
>
>
>
> Theranos, Inc

Confidential                              **Trial Exh. 20183 Page 001**                          THPFM0002798347

ER-5951

1701 Page Mill Rd.

Palo Alto, CA 94304

650-470-6119 (office)

650-804-8185 (mobile)

Confidential

Trial Exh. 20183 Page 002

THPFM0002798348

File Produced in Native Format



HSV-1 510k Approval Company Meeting

07.02.15

this presentation and its contents are theranos property and confidential.

1



# Major milestone for Theranos and national preventive health care landscape

PALO ALTO, Cal. (July 2, 2015) – Theranos, Inc. today announced that it has received the U.S. Food and Drug Administration's (FDA) clearance of its test system and test for herpes simplex 1 virus IgG.

2

theranos confidential

ER-5955



# Theranos receives FDA clearance and review and validation of revolutionary finger stick technology, test, and associated test system

# K143236

theranos confidential

theran⬤s

## Study Breakdown – Just the Numbers

- 13,754 cartridges run
- 17,208 man-hours worked (est.)
- 1,100,320 minutes of protocol run time
- 78 4s devices used
- 4,506 CTNs (Capillary Tubes and Nanotainer Tubes) collected
- 2,750 teaspoons of fluid pipetted
- 146 documents submitted to FDA
- 2,931 pages submitted to FDA

= 1 enormous FDA clearance !

theranos confidential

ER-5957



Studies Submitted for FDA Approval

- Precision and Reproducibility
- Cross-reactivity and Interference
- Reagent and Analyte Stability
- Matrix Comparison
- Clinical Performance
- Field Robustness Studies

5

theranos confidential

ER-5958



theran●s

Studies Submitted for FDA Approval

# Precision and Reproducibility

- CV within devices: 9%
- CV across devices: 12%
- CV across reagent lots: 11%
- CV across CTNs: 9%
- CV across CTN lots: 6%
- CV across operators: 10%

6

theranos confidential

ER-5959

theranos

Studies Submitted for FDA Approval

Demonstrated lack of cross-reactivity against the following types of samples:

## Cross-reactivity

CMV (IgG)

CMV (IgM)

Chlamydia trachomatis (IgG)

HCV/HBV (IgG)

VZV IgG

Measles IgG

HIV-1 (IgG)

Toxoplasma IgG

Candida albicans Ag

N. gonorrhea

Systemic Lupus

Epstein Barr Virus (IgG)

Epstein Barr Virus (IgM)

HPV

Rubella (IgG)

HSV-2 (IgG)

HAMA samples

Treponema pallidum

Rheumatoid Factor (RF)

Anti-nuclear antibody (ANA)

Sjorgens Syndrome

7

theranos confidential

ER-5960


theran●s

Studies Submitted for FDA Approval

Demonstrated lack of interference from following substances:

## Interference

Hemoglobin
Bilirubin
Intralipid
Acetylcysteine
Ampicillin-Na
Ascorbic acid
Ca-Dobesilate
Cyclosporine
Cefoxitin

Heparin
Levodopa
Methyldopa+1.5h20
Metronidazole
Phenylbutazone
Doxycycline
Acetylsalicylic acid
Rifampicin
Acetaminophen

8

theranos confidential

ER-5961

Studies Submitted for FDA Approval

## Matrix Comparison (venous plasma, serum, fingerstick plasma, fingerstick whole blood):



theranos confidential

ER-5962



Studies Submitted for FDA Approval

## Clinical Performance in Intended Use Population (adults)

| | | Reference | | | |
|---|---|---|---|---|---|
| | | POS | EQ | NEG | Total |
| Theranos | POS | 137 | 0 | 2 | 139 |
| | EQ | 1 | 0 | 1 | 2 |
| | NEG | 5 | 1 | 113 | 119 |
| | Total | 143 | 1 | 116 | 260 |

| | Estimate | 95% Confidence Interval |
|---|---|---|
| Sensitivity | 95.1% (137/144) | 90.3 – 97.6 |
| Specificity | 97.4% (113/116) | 92.7 – 99.1 |

10

theranos confidential

ER-5963



Studies Submitted for FDA Approval

# Clinical Performance in Intended Use Population (pregnant subjects)

|  |  | Reference | | | |
|---|---|---|---|---|---|
|  |  | POS | EQ | NEG | Total |
| Theranos | POS | 188 | 1 | 4 | 193 |
|  | EQ | 0 | 1 | 0 | 1 |
|  | NEG | 2 | 2 | 100 | 104 |
|  | Total | 190 | 4 | 104 | 298 |

|  | Estimate | 95% Confidence Interval |
|---|---|---|
| Sensitivity | 97.9% (188/192) | 94.8 - 99.2 |
| Specificity | 95.2% (100/105) | 89.3 - 98.0 |

11

theranos confidential

ER-5964



Studies Submitted for FDA Approval

## Clinical Performance in Intended Use Population (fingerstick samples)

|  | | Reference | | | |
|---|---|---|---|---|---|
| | | POS | EQ | NEG | Total |
| **Theranos** | POS | 105 | 0 | 2 | 107 |
| | EQ | 0 | 0 | 0 | 0 |
| | NEG | 3 | 0 | 68 | 71 |
| | Total | 108 | 0 | 70 | 178 |

| | Estimate | 95% Confidence Interval |
|---|---|---|
| Sensitivity | 97.2% (105/108) | 92.2–99.1 |
| Specificity | 97.1% (68/70) | 90.2–99.2 |

12

theranos confidential



Comparison of Theranos HSV-1 IgG assay performance with other cleared assays

| | Theranos | Bio-Rad | Roche | DiaSorin |
|---|---|---|---|---|
| Sensitivity (%) | 97.2 | 96.3 | 96.9 | 90.3 |
| Specificity (%) | 97.1 | 90.1 | 91.3 | 94.2 |

theranos confidential

13



Studies Submitted for FDA Approval

## Field Robustness Studies

- Ambient temperature and humidity

- Device placed on a titled table-top

- Sample integrity:
  - hemolysis, clotting, bubbles, short fills

- Cartridge handling:
  - dropped cartridge, expired cartridge, stored sideways, re-used etc

14

theranos confidential

ER-5967



**Took Contributions, Late Nights and Weekends from All Teams to Make this Happen:**

1. Regulatory
2. ELISA
3. Comp Bio
4. Supply Chain
5. CTN manufacturing
6. Systems Integration (SIV)
7. Device Engineering
8. Software
9. Device Manufacturing
10. Reagent Manufacturing
11. Cartridge Manufacturing
12. Phlebotomy and Field Operations

15

theranos confidential



theran●s

We especially congratulate these standout contributions:

- Laura Hyland: study lead
- Jessica Pfeilsticker: study lead
- Uyen Do: specimen lead
- Sani Hadziahmetovic: software and submission
- Aaron Lau: cartridges and tips
- Alphonso Nguyen: cartridges and tips
- Yiching Siwinski: protocol troubleshooting
- Tim Kemp: software and hazard analysis
- Tim Smith: hazard analysis
- Gina Catalano: regulatory filing
- Amy Ta: specimen sourcing
- Nick Menchel: field study coordination
- Ryan Karpel: field study coordination
- Tiffany Shu, Kelly Low, Ciara Miranda, Brianna Doyle, Amelia Cooke, Jose Arias,
- Diane Sosa, Serena Stewart, Benny Morel: sample collection

theranos confidential

ER-5969

**To:** Sunny Balwani[sbalwani@theranos.com]
**Cc:** Elizabeth Holmes[eholmes@theranos.com]
**From:** Fluegel, Bradley
**Sent:** Mon 12/15/2014 3:45:51 PM
**Importance:** Normal
**Subject:** Follow-up
**Received:** Mon 12/15/2014 3:44:57 PM

Thanks again for hosting us last week - we found it very productive and was great to spend time with you both. As Alex mentioned at the close of the meeting, we wanted to check in with Greg and Stefano on the revised roll-out approach we laid out the meeting. That happened this weekend and they are both in agreement with the approach we discussed last week.

Happy to talk this through further, as well as the news on Greg's departure. Let me know if you'd like to chat and when might work.

Brad Fluegel
 Senior Vice President, Chief Strategy
 and Business Development Officer
 108 Wilmot Road
 MS #1858
 Deerfield, IL  60015
 bradley.fluegel@walgreens.com

 Office:  847-315-3185
 Cell:  224

Confidential

THPFM0000787692

ER-5970

**THERANOS, INC.**

**MINUTES OF A MEETING**

**OF THE BOARD OF DIRECTORS**

**Friday, October 30, 2009**

Pursuant to notice duly given or waived, a regular meeting of the Board of Directors (the "***Board***") of Theranos, Inc., a Delaware corporation (the "***Company***"), was held on Friday, October 30, 2009 beginning at 9:15 a.m. (Pacific Time) at the Company Offices located at 3200 Hillview Avenue, Palo Alto, California. Present at all or parts of the meeting in person were directors Elizabeth Holmes, Donald L. Lucas, Channing Robertson, Robert Shapiro, and T. Peter Thomas. Ms. Holmes was appointed to act as secretary of the meeting.

After stating that a quorum of the Board was present and that the meeting had been duly noticed and convened, Mr. Lucas called the meeting to order.

***Approval of Minutes***

The board reviewed the minutes of the Board meeting held on June 2, 2009, the telephonic Board meeting held on June 26, 2009, the telephonic Board meeting held on June 30, 2009, and the Compensation Committee meeting held on August 12, 2009. After discussion and upon motion duly made and seconded, the following resolutions were adopted by all directors in attendance:

> **RESOLVED**: That the minutes of the Board meeting held on June 2, 2009 are hereby approved as presented at the meeting.

> **RESOLVED**: That the minutes of the telephonic Board meeting held on June 26, 2009 are hereby approved as presented at the meeting.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0933851

ER-5971

**RESOLVED**: That the minutes of the telephonic Board meeting held on June 30, 2009 are hereby approved as presented at the meeting.

**RESOLVED**: That the minutes of the Compensation Committee meeting held on August 12, 2009 are hereby approved as presented at the meeting.

## Determination of Fair Market Value

The Board reviewed the fair market value of a share of the Company's common stock. The Company had previously reviewed the independent valuation report by Aranca dated August 13, 2008, analysing the fair market value of a share of the Company's Common Stock pursuant to Section 409A of the Internal Revenue Code (the "***Independent Valuation Report***"). The Board, having considered all available information material to the valuation of the Company's common stock, including the Independent Valuation Report, determined in good faith that the fair market value of one share of the Company's Common Stock was to be $0.36 as of September 15, 2008 (the "***Valuation Date***"). In considering the current fair market value of the Company's common stock, the Board determined in good faith that no material events affecting the Company have occurred since the Valuation Date. The Board also considered all of the available information it considered to be relevant in valuing the common stock of the Company including, but not limited to, (i) the value of the Company's tangible and intangible assets, (ii) the present value of anticipated future cash flows, (iii) the market value of similar companies engaged in a substantially similar business, particularly those which are at similar stages of development, and (iv) recent arm's length transactions involving the Company's common stock (of which there have been none), and (v) all other factors and considerations the Board deemed relevant. Based on the above considerations, the Board determined that the fair market value of one share of the

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0933852

ER-5972

Company's common stock remained at $0.36 per share as of the date of the meeting. The Board agreed to continue reviewing the valuation at each upcoming meeting or upon any material business transactions.

**Approval of Option Grants and Change of Control Agreements**

The Board reviewed and approved the CEO-approved employee option grants, attached hereto as Exhibit A (the "***CEO-Approved Employee Option Grants***"). The Board also reviewed and approved the grant of options and the grant of a warrant to purchase shares of common stock (such warrant to be issued pursuant to terms set forth in a line of credit agreement) to the individuals listed on Exhibit B attached hereto in the amounts set forth next to each such individual's name, in each case effective as of the date of the meeting (the option grants on Exhibit B, the "*New Option Grants*"). The Board then reviewed the revised Change of Control Agreements that were approved by the Compensation Committee during its August 12, 2009 meeting. After further review and discussion, the Board agreed to revisit the revised Change of Control Agreements at the next meeting of the Board.

The CEO-Approved Employee Option Grants and New Option Grants are granted under the Company's Amended and Restated 2004 Stock Plan and subject to a stock option agreement in the form previously approved, are incentive stock options ("**ISOs**") to the maximum extent permitted by law or nonstatutory stock options ("**NSOs**") as indicated on Exhibit A and Exhibit B, as applicable, have a maximum term of ten (10) years, are scheduled to vest as set forth in Exhibit A and Exhibit B, as applicable, and otherwise are subject to the standard terms and conditions as set forth in the standard form of stock option agreement (regular, unless early exercise is indicated on Exhibit A

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0933853

or Exhibit B, as applicable). The CEO-Approved Employee Option Grants and New Option Grants shall have an exercise price per share equal to 100% of the fair market value as of the grant date of the option (as discussed and determined above).

### *Board Updates*

The Board discussed adding a new director to the Board and reviewed several candidates for consideration. After discussion, the Board unanimously agreed to elect Ramesh "Sunny" Balwani as Vice Chairman.

### *Board Compensation*

The Board discussed compensation for board and committee members and chairs. After discussing both cash and equity compensation, the board agreed to consider a Board Compensation matrix as outlined in Exhibit C (the "***Draft Director Compensation Matrix For Consideration***") for review at the next meeting. The Board further agreed that this matrix, once, approved, would be reviewed annually.

### *Committee Updates*

Ms. Holmes gave a brief update on the proceedings of the most recent Compensation Committee meeting, including the compensation matrix for new hires and employee performance adjustments, the 409A report and timing of next report, and goals and compensation. Ms. Holmes went on to provide an Audit Committee update, confirming that the 2008 Audit report had been issued. The Board discussed revenue recognition and plans for the next Audit Committee meeting and the 2009 Audit. Finally, the Board approved a change in auditors and authorized the CEO to engage KPMG.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

*Organization*

Ms. Holmes updated the Board on the Company's organizational structure and hiring focus areas. The Board then discussed the hires and the company's plans for growth. Questions were asked and a discussion regarding these matters ensued.

*Product Update*

Ms. Holmes presented updates on Theranos products and provided details about progress against 2009 goals, and product roadmap for Theranos Field Systems and TheranOS. Ms. Holmes went on to discuss progress against operations and manufacturing goals and ongoing plans. Questions were asked and a discussion ensued among the directors regarding this update.

*Commercial Overview*

Ms. Holmes provided the Board with an overview of the Company's commercial operations. Ms. Holmes outlined performance against goals for Sales and Service and updated the Board on strategy, pricing, growth plans, and success case studies. Questions were asked, and a full discussion ensued.

*Legal Overview*

Ms. Holmes reviewed with the Board the status of intellectual property filings and issuance, outside counsel, and corporate structure, including the international subsidiary. A discussion ensued among the directors regarding this legal update.

*Finance Overview*

Ms. Holmes reviewed with the Board the Company's finance operations, including the Company's cash management and planning. Questions were asked, and a full discussion ensued among the directors regarding this finance update.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0933855

ER-5975

_**Executive Session**_

Ms. Holmes excused was excused from the meeting while the remaining directors met in Executive Session, after which Ms. Holmes rejoined the meeting. The Board discussed director option grants.

_**Adjournment**_

There being no further business to come before the Board, the meeting was duly adjourned.

_____

Elizabeth Holmes, President

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0933856

ER-5976

## EXHIBIT A

### CEO-Approved Employee Option Grants

| Name | Reason for grant | Grant Type* | Vesting Commencement Date | Date of Approval | # of options | Notes |
|---|---|---|---|---|---|---|
| Arvind K. Jammalamadaka | New hire | ISO | 8/31/2009 | 6/17/2009 | 5,000 | (A) |
| George Welling | New hire | ISO | 9/8/2009 | 8/3/2009 | 1,000 | (A) |
| Christopher Scannell | New hire | ISO | 9/8/2009 | 8/4/2009 | 15,000 | (A), (B) |
| Chelsea Burkett | New hire | ISO | 9/28/2009 | 8/3/2009 | 35,000 | (A) |
| Aria Marinelli | New hire | ISO | 9/28/2009 | 9/2/2009 | 5,000 | (A) |
| Nahal Gharatti | New hire | ISO | 10/7/2009 | 9/28/2009 | 500 | (A) |
| So Han (Danise) Yam | Performance | ISO | 7/30/2009 | 10/30/2009 | 3,500 | (A), (B) |
| Carolyn Balkenhol | Performance | ISO | 10/20/2009 | 10/30/2009 | 50,000 | (A), (B), (C) |
| * Options designated as ISOs are intended to be ISOs to the maximum extent permitted by applicable U.S. law; the remainder shall be NSOs. | | | | | | |
| (A) - Twenty-five percent (25%) of the shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to the optionee continuing to be a "Service Provider" (as defined in the Amended and Restated 2004 Stock Plan) through each such date. | | | | | | |
| (B) – Includes Early Exercise Provision (this grant only) | | | | | | |
| (C) – Pursuant to her offer letter, Ms. Balkenhol was eligible to earn a cash bonus in an amount to be determined by the Company up to a specified limit if certain performance goals were met.  The Company did not implement a performance-based bonus program for Ms. Balkenhol and determined Ms. Balkenhol was not entitled to and would not receive such a bonus, and therefore no bonus was earned by Ms. Balkenhol. The Board instead determined to grant this option. | | | | | | |

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0933857

ER-5977

## EXHIBIT B

**Option Grants and Warrants for Approval**

### Option Grants for Approval

| Name | Reason for grant | Type of Option^ | Vesting Commencement Date | # of Shares subject to Option | Vesting Schedule | Early Exercisable |
|---|---|---|---|---|---|---|
| Ramesh "Sunny" Balwani | New employee | ISO | 9/1/2009 | 277,777 | Standard* | Yes |
| Ramesh "Sunny" Balwani | New employee | NSO | 9/1/2009 | 322,223 | Standard* | Yes |
| Donald L. Lucas | Board options | NSO | 1/1/2009 | 75,000 | Standard* | Yes |
| Pete Thomas | Board options | NSO | 1/1/2009 | 40,000 | Standard* | Yes |
| Robert Shapiro | Board options | NSO | 1/1/2009 | 25,000 | Standard* | Yes |

^ Options designated as ISOs are intended to be ISOs to the maximum extent permitted by applicable U.S. law; the remainder shall be NSOs.

* The "standard" vesting schedule shall be: twenty-five percent (25%) of the shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Participant continuing to be a "Service Provider" (as defined in the Amended and Restated 2004 Stock Plan) through each such date.

### Warrants for Approval

| Name | Reason | Warrant Price | # of Shares subject to Warrant |
|---|---|---|---|
| Ramesh "Sunny" Balwani | 8/13/2009 Line of Credit Agreement | $ 0.36 | 200,000 |

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0933858

ER-5978

**EXHIBIT C**

**Draft Director Compensation Matrix**
**For Consideration**

**Annual Equity Compensation**

| Position | Board/Committee | Type of Option | # of Shares subject to Option | Vesting Schedule | Early Exercisable |
|---|---|---|---|---|---|
| Chairman | Board | NSO | 50,000 | Standard* | Yes |
| Member | Board | NSO | 25,000 | Standard* | Yes |
| Chairman | Audit Committee | NSO | 10,000 | Standard* | Yes |
| Chairman | Compensation Committee | NSO | 10,000 | Standard* | Yes |
| Chairman | Nomination & Governance Committee | NSO | 5,000 | Standard* | Yes |

\* The "standard" vesting schedule shall be: twenty-five percent (25%) of the shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48[th]) of the shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Participant continuing to be a "Service Provider" (as defined in the Amended and Restated 2004 Stock Plan) through each such date.

**Annual Cash Compensation**

| Position | Board/Committee | Payment | Payment Frequency | Payable |
|---|---|---|---|---|
| Member | Board | $15,000 | per year | Quarterly |
| Chairman | Audit Committee | $15,000 | per year | Quarterly |
| Chairman | Compensation Committee | $10,000 | per year | Quarterly |
| Chairman | Nomination & Governance Committee | $5,000 | per year | Quarterly |
| Member | Board | $1,500 | per meeting | Annually |
| Member | Board | $1,000 | per call | Annually |
| Member | Board Committees | $1,000 | per meeting | Annually |

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0933859

ER-5979

**THERANOS, INC.**

**MINUTES OF A MEETING**

**OF THE BOARD OF DIRECTORS**

**Tuesday, August 10, 2010**

Pursuant to notice duly given or waived, a regular meeting of the Board of Directors (the "*Board*") of Theranos, Inc., a Delaware corporation (the "*Company*"), was held on Tuesday, August 10, 2010, beginning at 8:30 a.m. (Pacific Time) at the Company Offices located at 3200 Hillview Avenue, Palo Alto, California. Present at all or parts of the meeting in person were directors Sunny Balwani, Elizabeth Holmes, Donald L. Lucas, Robert Shapiro, and T. Peter Thomas. Director Channing Robertson participated telephonically. Ms. Holmes was appointed to act as secretary of the meeting.

After stating that a quorum of the Board was present and that the meeting had been duly noticed and convened, Mr. Lucas called the meeting to order.

*Approval of Minutes*

The Board reviewed the minutes of the Board meetings held on March 2nd, 2010 and May 31st, 2010. After discussion and upon motion duly made and seconded, the following resolutions were adopted by all directors in attendance:

**RESOLVED**: That the minutes of the Board meeting held on March 2nd, 2010 are hereby approved as presented at the meeting.

**FURTHER RESOLVED**: That the minutes of the Board meeting held on May 31st, 2010 are hereby approved as presented at the meeting.

*Review of Insurance Coverage*

**Theranos Confidential**

1

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336066

ER-5980

The Board then reviewed the Company's Insurance Policies and Coverage and discussed potential future increases in coverage over the course of the coming year.

**_Determination of Fair Market Value_**

The Board reviewed the fair market value of a share of the Company's common stock. The Company had previously reviewed the independent valuation report by Aranca dated June 21, 2010, analysing the fair market value of a share of the Company's Common Stock as of December 31, 2009 (the "**_Valuation Date_**") pursuant to Section 409A of the Internal Revenue Code, which fair market value was determined to be $0.34 per share (the "**_Independent Valuation Report_**"). At the meeting, the Independent Valuation Report was discussed by the Board and the Board, having considered all available information material to the valuation of the Company's common stock, including the Independent Valuation Report, determined in good faith that the fair market value of one share of the Company's Common Stock was $0.36 as of the Valuation Date, notwithstanding the $0.34 per share valuation set forth in the Independent Valuation Report. In considering the current fair market value of the Company's common stock as of the date of this meeting, the Board determined in good faith that no material events affecting the Company have occurred since the Valuation Date. The Board also considered all of the available information it considered to be relevant in valuing the common stock of the Company including, but not limited to, (i) the value of the Company's tangible and intangible assets, (ii) the present value of anticipated future cash flows, (iii) the market value of similar companies engaged in a substantially similar business, particularly those which are at similar stages of development, and (iv) recent arm's length transactions involving the Company's common stock (of which there have

**Theranos Confidential**                    2

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336067

ER-5981

been none), and (v) all other factors and considerations the Board deemed relevant. Based on the above considerations, the Board determined that the fair market value of one share of the Company's common stock remained at $0.36 per share as of the date of the meeting and since the Board's last determination of fair market value. The Board agreed to continue reviewing the valuation at each upcoming meeting or upon any material business transactions, and discussed doing another independent valuation.

*Acknowledgement of Approval of Option Grants*

The Board reviewed the CEO-approved employee option grants, attached hereto as Exhibit A (the "*CEO-Approved Employee Option Grants*"), and discussed the employee option grants granted by the CEO pursuant to her designated authority, as presented to the Board by the CEO, and acknowledged the grants of the CEO-Approved Employee Option Grants.

In accordance with the terms approved by the CEO, the CEO-Approved Employee Option Grants were granted under the Company's Amended and Restated 2004 Stock Plan (the "*Stock Plan*") and subject to a stock option agreement in the form previously approved, were granted as incentive stock options ("**ISOs**") to the maximum extent permitted by law or nonstatutory stock options ("**NSOs**") as indicated on Exhibit A, have a maximum term of ten (10) years, are scheduled to vest as set forth in Exhibit A, are early exercisable and subject to change of control provisions if so indicated on Exhibit A, and otherwise are subject to the standard terms and conditions as set forth in the standard form of stock option agreement (regular, unless early exercise is indicated on Exhibit A). The CEO-Approved Employee Option Grants were granted with an exercise price per

**Theranos Confidential** 3

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336068

ER-5982

share equal to 100% of the fair market value as of each such option's grant date (as discussed and determined above).

### *Board Updates*

The Board reviewed the Company's 2010 corporate goals and discussed performance against those goals.

### *Product Update*

Ms. Holmes presented updates on Theranos products, including an overview of the technology portfolio and developments and advancements in supply chain, regulatory filings, operations and manufacturing. A full discussion ensued regarding scale up, technology advancements to mitigate key supply chain risks, and the procurement of additional facilities to support growth.

### *Commercial Overview*

Ms. Holmes provided the Board with an overview of the Company's commercial operations. A full discussion ensued regarding a variety of topics, including the market opportunity, pricing, and commercial plans and partners. Ms. Holmes also provided the Board with an overview of the key deals in each business area and the magnitude and status of each. Questions were asked, and a full discussion ensued, including a detailed discussion around Theranos clients.

### *Finance Overview*

Ms. Holmes reviewed with the Board the Company's finance operations, including the Company's cash management and planning, financials and financial

**Theranos Confidential**                      4

**Trial Exh. 20512 Page 004**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336069

ER-5983

projections, staffing increases and a discussion around a potential share re-purchase, including review of a potential re-purchase and disclosure document. Questions were asked, and a full discussion ensued among the directors regarding this finance update.

### *Organization*

Ms. Holmes updated the Board on the Company's organizational structure and hiring focus areas. The Board then discussed the hires and the company's plans for growth and staffing. Questions were asked and a discussion regarding these matters ensued, including a detailed discussion on the company's rapid growth plans and policies.

### *Legal Overview*

Ms. Holmes reviewed with the Board the status of intellectual property filings and issuance, trademark status, and corporate structure. Ms. Holmes also reviewed the Company's confidentiality policy and policies around enforcement thereof. Finally, the Board further discussed Theranos' government affairs. A discussion ensued among the directors regarding this legal update.

### *Compensation*

Ms. Holmes then reviewed the Company's current compensation matrices and policies for new hires and existing employees. The Board agreed to continue using the New Hire and Annual Review Option Grant Compensation Matrix attached to these Minutes as Exhibit B for the issuance of options to employees.

The board discussed issuing additional shares to employees on a performance basis going forward in recognition of progress.

**Theranos Confidential**                         5

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336070

ER-5984

*Warrants*

The board then discussed and approved the issuance of warrants to BlueCross BlueShield Venture Partners and Sandbox in the forms attached hereto as Exhibit C, respectively. Director Robert Shapiro abstained from all discussions and decisions relating to the BlueCross BlueShield Venture Partners and Sandbox. Upon a motion duly made and seconded, the Board (with Mr. Shapiro abstaining) adopted the following resolutions:

RESOLVED: That the officers of the Company be, and each of them hereby is, individually authorized and empowered to execute and deliver in the name and on behalf of the Company, a warrant with each of BlueCross BlueShield Venture Partners and Sandbox in substantially the forms attached hereto as Exhibit C, respectively (each a "*Warrant*"), and that the terms and conditions of the Warrants are hereby approved, with such changes as may be approved by any authorized officer, such approval to be conclusively evidenced by the execution and delivery of any Warrant by any such authorized officer.

FURTHER RESOLVED: That the Company be and hereby is authorized to issue the Warrants to BlueCross BlueShield Venture Partners and Sandbox to purchase up to 133,333 shares of common stock in the aggregate (subject to the vesting terms set forth in the Warrants), at the per share exercise price of $0.36 and for the terms indicated therein, and that the authorized officers be, and each of them hereby is, individually authorized and directed to execute and deliver the Warrants.

FURTHER RESOLVED: That the Board hereby reserves 133,333 shares of common stock for issuance pursuant to the terms and conditions of the Warrants.

**Theranos Confidential**                        6

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0336071

ER-5985

**FURTHER RESOLVED:** That the authorized officers and each of the responsible attorneys, paralegals and corporate assistants of Wilson Sonsini Goodrich & Rosati, counsel for the Company be, and each of them hereby is, authorized and directed to execute and submit on behalf of the Company, (i) a form of exemption notice, which may be filed electronically, with the California Department of Corporations in connection with the issuance of the Warrants and the underlying securities, and further authorized and directed to irrevocably appoint the California Commissioner of Corporations as agent for service of process for the Company in connection with the issuance of the Warrants and the underlying securities and (ii) any additional filings which may be required under applicable state or federal securities laws in connection with the issuance of such securities.

**RESOLVED FURTHER:** That the shares of the common stock to be issued upon exercise of the Warrants shall be duly and validly issued, fully paid and nonassessable when issued in accordance with the terms of the Warrants.

*Additional Compensation Matters; Amendment of Bylaws*

The Board then approved the addition of an operational title of President and COO for Sunny Balwani after discussing his performance and contributions and operational role. In conjunction with the performance review, the board agreed to issue a performance based option grant of 2% of the Company on a fully diluted basis, equal to 1,351,121 shares of Company common stock, as detailed on Exhibit D (the "***Balwani Option***"). The Balwani Option is granted under the Stock Plan and subject to a stock option agreement in the form previously approved, is granted as an incentive stock option

**Theranos Confidential**                    7

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336072

ER-5986

("**_ISO_**") to the maximum extent permitted by law or nonstatutory stock option ("**_NSO_**") as indicated on Exhibit D, has a maximum term of ten years, is scheduled to vest as set forth in Exhibit D, shall be early exercisable and subject to change of control provisions if so indicated on Exhibit D, and otherwise is subject to the standard terms and conditions as set forth in the standard form of stock option agreement (regular, unless early exercise is indicated on Exhibit D). The Balwani Option shall have an exercise price per share equal to 100% of the fair market value as of the date of such option's grant, which is the date hereof (as discussed and determined above).

The Board then underscored that the Bylaws were to be updated to reflect the fact that the duties formally associated with the title of President would now be associated with Ms. Holmes' current title of Chief Executive Officer. Upon motion duly made and seconded, the Board approved the Amended and Restated Bylaws in the form attached hereto as Exhibit E.

The Board then discussed the issuance of a grant to Ms. Holmes to be cemented at a future date following this meeting in recognition of accomplishments to date.

### _Executive Session_

Ms. Holmes was excused from the meeting while the remaining directors met in Executive Session, after which Ms. Holmes rejoined the meeting.

### _Adjournment_

There being no further business to come before the Board, the meeting was duly adjourned.

_____
Elizabeth Holmes, President

**Theranos Confidential**                 8

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336073

ER-5987

**EXHIBIT A**

**CEO-Approved Option Grants**



**Theranos Confidential**                    9

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336074

ER-5988

## EXHIBIT B

**New Hire and Annual Review Option Grant Compensation Matrix**



**Theranos Confidential**

10

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336075

ER-5989

EXHIBIT A

**WRITTEN CONSENT OF THE PRESIDENT AND CEO OF THERANOS, INC.**

**Stock Option Grant under the Amended and Restated 2004 Stock Plan**

The undersigned, the President and Chief Executive Officer (the **"CEO"**) of Theranos, Inc., a Delaware corporation (the **"Company"**), hereby adopts the following resolutions:

**WHEREAS,** the Compensation Committee (the **"Committee"**) of the Board of Directors of the Company (the **"Board"**) authorized the President and CEO of the Company to grant stock options to employees and consultants under the Amended and Restated 2004 Stock Plan (the **"Plan"**) within the parameters set by the Committee;

**WHEREAS,** the CEO hereby determines it to be in the best interests of the Company and its stockholders to grant to each individual identified in Exhibit A (each an **"Optionee"**), an option to purchase shares of the common stock (**"Common Stock"**) of the Company (**"Option"**) pursuant to the terms of the Plan;

**WHEREAS,** the Committee last determined that the fair market value of a share of the Company's common stock on such date was $0.36; and

**WHEREAS,** the CEO is not aware of any material events affecting the Company since the date the Committee last determined the fair market value of a share of Common Stock, and therefore believes in good faith that the fair market value of a share of Company Common Stock remains $0.36 as of the date hereof.

**NOW THEREFORE BE IT RESOLVED:** That, effective as of date of this Consent, the CEO hereby grants to each Optionee identified in Exhibit A an Option under the Plan to purchase the number of shares of Common Stock of the Company indicated next to such Optionee's name, subject to the terms and conditions of the standard form of Stock Option Agreement previously approved for use in connection with the Plan, as appropriately modified to reflect the terms and conditions set forth herein

**RESOLVED FURTHER:** That, unless indicated otherwise in Exhibit A, the Option shall have a maximum term of ten (10) years (subject to earlier termination following the Optionee's ceasing to be a Service Provider or as otherwise provided by the Plan).

**RESOLVED FURTHER:** That the CEO hereby determines that the Options shall have the vesting commencement date and vesting schedule as shown on Exhibit A, and shall be early exercisable and subject to change of control provisions, if so indicated on Exhibit A.

**RESOLVED FURTHER:** That the Options granted shall be either incentive stock options (**"_ISO_"**) to the maximum extent permitted under Section 422 of the Internal Revenue Code of 1986, as amended, or nonstatutory stock options (**"_NSO_"**), as indicated on Exhibit A.

CEO Consent for Employee Performance (June 24 2010) (3)

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0336076

ER-5990

EXHIBIT

**RESOLVED FURTHER:** That the CEO hereby determines that each Option shall have a per share exercise price equal to the fair market value of a share of the Company's Common Stock as of the date hereof, which has been determined to be $0.36.

**RESOLVED FURTHER:** That any of the appropriate officers of the Company be, and each of them hereby is, authorized to take such other actions, in the name and on behalf of the Company, as each such officer, in his or her discretion, shall deem necessary or advisable to complete and effect the foregoing transactions or to carry out the intent and purposes of the foregoing resolutions and the transactions contemplated thereby, the preparation, execution, and delivery of any such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, the payment of any such costs or expenses and the performance of any such other acts shall be conclusive evidence of the approval of the Committee thereof and all matters relating thereto.

**RESOLVED FURTHER:** That all actions heretofore taken by the officers and directors of the Company with respect to the foregoing transactions and all other matters contemplated by the foregoing resolutions are hereby approved, adopted, ratified and confirmed.

**IN WITNESS WHEREOF,** the undersigned has executed this Consent as of the date set forth below.

Date: June 24, 2010

Name: Elizabeth Holmes
Title: President and CEO of the Company

CEO Consent for Employee Performance (June 24 2010) (3)          -2-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336077

ER-5991

**Exhibit A**

**CEO-Recommended Employee Option Grants**

| Optionee Name | Position | Number of Shares Subject to Option | Type of Option (NSO / ISO)* | Vesting Commencement Date | Vesting Schedule | Early Exercisable (Y/N) | Change of Control Provision (Y/N) | Maximum Term |
|---|---|---|---|---|---|---|---|---|
| Sukhdev Bainiwal | Employee | 5,000 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Paula Chaltas | Employee | 2,500 | ISO | 1/19/10 | Standard** | Y | N | 10 years |
| Sally Chan | Employee | 1,200 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Anthony Delacruz | Employee | 5,000 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Andrew Drake | Employee | 1,500 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Jeff Fenton | Employee | 1,000 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Ian Gibbons | Employee | 10,000 | ISO | 1/1/10 | Standard** | Y | Y | 10 years |
| Loren Hart | Employee | 2,500 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Arvind Jammalamadaka | Employee | 5,000 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Sandhiya Kaippa | Employee | 2,500 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Timothy Kemp | Employee | 25,000 | ISO | 1/1/10 | Standard** | Y | Y | 10 years |
| Medei Kitagaki | Employee | 4,000 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Nathan Lortz | Employee | 1,200 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| So Ngan Sarah Ly | Employee | 1,200 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Dave Nelson | Employee | 2,000 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Chinmay Pangarkar | Employee | 5,000 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Kenneth Quon | Employee | 5,000 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Michael Siegel | New Hire | 7,500 | ISO | 6/15/2010 | Standard** | N | N | 10 years |
| Viet Tuan Bach Tran | Employee | 3,000 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| Don Vu | Employee | 5,000 | ISO | 1/1/10 | Standard** | N | N | 10 years |
| So Han Danise Yam | Employee | 5,000 | ISO | 1/1/10 | Standard** | Y | Y | 10 years |

\* Options designated as ISOs are intended to be ISOs to the maximum extent permitted by applicable U.S. law; the remainder shall be NSOs.

\*\* The "standard" vesting schedule shall be: twenty-five percent (25%) of the shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Participant continuing to be a "Service Provider" (as defined in the Amended and Restated 2004 Stock Plan) through each such date.

CEO Consent for Employee Performance (June 24 2010) (3)

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336078

ER-5992

**EXHIBIT C**

**Form of BlueShield Venture Partners and Sandbox Warrants**



**Theranos Confidential**                    11

Trial Exh. 20512 Page 014

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336079

ER-5993

## EXHIBIT D

**Option Grants**



**Theranos Confidential**

12

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336080

ER-5994

*Exhibit D*

Option Grants
missing
(Belwani Option)

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336081

ER-5995

**EXHIBIT C**

**Trial Exh. 20512 Page 017**
FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336082

ER-5996

**THIS WARRANT AND THE SHARES OF EQUITY SECURITIES THAT MAY BE PURCHASED PURSUANT TO THE EXERCISE OF THIS WARRANT HAVE BEEN ACQUIRED SOLELY FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF SUCH REGISTRATION OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH SALE, OFFER, PLEDGE OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS UNLESS SOLD PURSUANT TO RULE 144 OF THE ACT.**

<div align="right">

**Dated as of August 10, 2010**
**Void after July 31, 2015**

</div>

## THERANOS, INC.

### COMMON STOCK PURCHASE WARRANT

THIS CERTIFIES THAT BlueCross Blue Shield Venture Partners, L.P. ("**BCBSVP**" and, together with its permitted assignees, the "**Holder**") is entitled, upon the terms and subject to the conditions hereinafter set forth, to subscribe for and purchase (subject to Section 1 and Section 10 hereof) up to a total of 113,333 (subject to adjustment pursuant to Section 4 hereof) of the fully paid and nonassessable Common Stock, par value $0.0001 per share (the "**Shares**"), of Theranos, Inc., a Delaware corporation (the "**Company**"), at the per share price of $0.36 (the "**Exercise Price**") (subject to adjustment pursuant to Section 4 hereof), subject to the provisions and upon the terms and conditions hereinafter set forth. For purposes of this Warrant, BCBSVP and Sandbox Co-Investment Fund I, L.P. ("**Sandbox**") are collectively referred to as the "**Consultants**."

This Common Stock Purchase Warrant (this "**Warrant**") is the compensation the Company agreed to provide to the Holder in the parties' July 30, 2010 Consulting Agreement (**"Consulting Agreement"**) in exchange for Holder's services rendered pursuant thereto ("**Services**"). The Services include, but are not limited to the following: Holder and the Company shall use good faith efforts to identify and target contracts between the company and BlueCross BlueShield Association ("**BCBSA**"), and or BlueCross BlueShield Association licensees ("**Plans**"), or their affiliates and/or subsidiaries (collectively with BCBSA and Plans, the "**Blue Plans**" and each a "**Blue Plan**"), on a preferred pricing basis, targeting signed contracts from the date of execution through December 31, 2011.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336083

ER-5997

1.     Vesting Schedule.  Only Shares which have vested ("**Vested Shares**") may be purchased pursuant to the exercise of this Warrant.  The purchase rights represented by this Warrant shall be exercisable, in whole or in part, according to the following vesting schedule (but shall in no event be exercisable after the expiration of the Warrant as provided in Section 10 hereof):

(a)     28,333 Shares will vest at the conclusion of three meetings between the Company and one or more of the Blue Plans to discuss claims adjudication and adoption of real-time billing and reimbursement software and services.  Such meetings shall be arranged by the Consultants,

(b)     28,333 Shares will vest upon the execution by the Company and either Consultant or BCBSA of a national preferred price laboratory contract (the "**National Agreement**") in which Blue Plans can participate on a voluntary basis;

(c)     28,333 Shares will vest, at the rate of ten percent (10%) of these 28,333 Shares per contract, upon each Blue Plan joining the National Agreement or otherwise executing a contract with the Company.  For example, if two Blue Plans join the National Agreement, twenty percent (20%) of these 28,333 will vest; and

(d)     The remaining 28,334 Shares will vest at the rate of fifty percent (50%) of these 28,334 Shares upon (i) establishment of as least two (2) contracts across as least two (2)  Plans for pilot and deployment of Theranos Systems in as least 250 physicians' offices per Plan by the end of 2011 and the remaining fifty percent (50%) upon (ii) establishment of at least ten (10) additional contracts across at least ten (10) plan for pilot and deployment of Theranos Systems in at least 250 physcians' offices per Plan by the end of 2012.

(e)     Upon the earliest "Acceleration Event," all Shares which have then not already vested in accordance with the terms set forth above shall immediately vest in full.  An "**Acceleration Event**" means any of the following:  (i) termination of the Consulting Agreement by the Company for reasons other than for breach of the Consulting Agreement; (ii) a "Reorganization," "Recapitalization," "Qualified IPO," or "Automatic Conversion Event" (each as defined in the Company's Amended and Restated Certificate of Incorporation in effect as of the effective date of the Consulting Agreement), or (iii) the Company's liquidation, dissolution or winding up.

2.     Method of Exercise; Payment.

(a)     Cash Exercise.  Subject to Section 10 hereof, the purchase rights represented by this Warrant may be exercised by the Holder from time to time, in whole or in part, with respect to Vested Shares by the surrender of this Warrant (with the Notice of Exercise form attached hereto as **Exhibit A** and the Investment Representation Statement attached hereto as **Exhibit B**, each duly executed) at the principal office of the Company, and by payment to the Company, by certified, cashier's or other check acceptable to the Company, by wire transfer in accordance with the Company's instructions, or by any other form of payment acceptable to the Company and Holder, of an amount equal to the aggregate Exercise Price of the Vested Shares being purchased.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

(b) <u>Net Issue Exercise</u>.

(i)    In lieu of exercising this Warrant with respect to Vested Shares pursuant to Section 2(a) above, and subject to Section 10 hereof, the Holder may elect to receive Shares equal to the value of the Vested Shares (or the portion thereof being cancelled) by surrender of this Warrant at the principal office of the Company together with notice of such election, in which event the Company shall issue to the Holder a number of Shares computed using the following formula:

$$X = \frac{Y (A-B)}{A}, \text{ where}$$

X = the number of Shares to be issued to the Holder.

Y = the number of Vested Shares purchasable under this Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being cancelled (at the date of such calculation).

A = the Fair Market Value of one Share (at the date of such calculation).

B = the Exercise Price (as adjusted to the date of such calculation).

(ii)    <u>Fair Market Value</u>.  For purposes of this Section 2, the Fair Market Value of one Share shall be determined by the Company's Board of Directors in good faith; *provided, however*, that where there exists a public market for the Company's Common Stock at the time of such exercise, the fair market value per Share shall be the average of the closing bid and asked prices of the Common Stock quoted in the Over-The-Counter Market Summary or the last reported sale price of the Common Stock or the closing price quoted on any exchange on which the Common Stock is listed, as published in *The Wall Street Journal* for the five (5) trading days prior to the date of determination of Fair Market Value or as reported by such other independent sources as the Company's Board of Directors agree may deem reliable with the consent of Holder, not to be unreasonably withheld. Notwithstanding the foregoing, in the event the Warrant is exercised in connection with the Company's initial public offering of Common Stock ("**IPO**") pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "**Securities Act**"), the Fair Market Value per Share shall be the per share offering price to the public of the Company's IPO.

(c)    <u>Stock Certificates; Tax Reporting</u>.  In the event of any exercise of the rights represented by this Warrant, certificates for the Shares so purchased shall be delivered to the Holder within a reasonable time and, unless the Warrant has been fully exercised or this Warrant has expired, a new Warrant representing the shares with respect to which this Warrant shall not have been exercised shall also be issued to the Holder within such time. The Company will report any income related to the Holder's exercise of the Warrant to the extent the Company determines that such reporting is required by applicable law.

3.    <u>Stock Fully Paid; Reservation of Shares</u>.  All of the Shares issuable upon the exercise of the rights represented by this Warrant will, upon issuance and receipt of the Exercise Price

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

therefor, be fully paid and nonassessable. During the period within which the rights represented by this Warrant may be exercised, the Company shall at all times have authorized and reserved for issuance sufficient Shares to provide for the exercise of the rights represented by this Warrant.

4.    Adjustment of Exercise Price and Number of Shares. The number and kind of securities purchasable upon the exercise of this Warrant and the Exercise Price therefor shall be subject to adjustment from time to time upon the occurrence as follows:

(a)    Merger. If at any time there shall be a merger or consolidation of the Company with or into another corporation where the Company is not the surviving corporation, then, as a part of such merger or consolidation, lawful provision shall be made so that the Holder of this Warrant shall thereafter be entitled to receive upon exercise of this Warrant, during the period specified herein and upon payment of the aggregate Exercise Price then in effect, the number of shares of stock or other securities or property of the successor corporation resulting from such merger or consolidation, to which a holder of the stock deliverable upon exercise of this Warrant would have been entitled in such merger or consolidation if this Warrant had been exercised immediately before such merger or consolidation. In any such case, appropriate adjustment shall be made in the application of the provisions of this Warrant with respect to the rights and interests of the Holder after the merger or consolidation.

(b)    Reclassification, etc. If the Company shall, at any time, by subdivision, combination, or reclassification of securities or otherwise, change any of the securities as to which purchase rights under this Warrant exist into the same or a different number of securities of any other class or classes, the Exercise Price shall be adjusted such that this Warrant shall thereafter represent the right to acquire such number and kind of securities as would have been issuable as the result of such change with respect to the securities which were subject to the purchase rights under this Warrant immediately prior to such subdivision, combination, reclassification or other change.

(c)    Split, Subdivision, Dividends or Combination of Shares. If the Company at any time while this Warrant remains outstanding and unexpired shall split, subdivide or combine the securities as to which purchase rights under this Warrant exist (including the issuance of additional shares of Common by way of a stock dividend), the number of Shares shall be proportionately increased and the Exercise Price shall be proportionately decreased in the case of a split or subdivision, and the number of Shares shall be proportionately decreased and the Exercise Price shall be proportionately increased in the case of a combination.

5.    Notices of Adjustments. Whenever the number of Shares or kind of securities purchasable hereunder or the Exercise Price thereof shall be adjusted pursuant to Section 4 hereof, the Company shall provide notice to the Holder of this Warrant setting forth, in reasonable detail, the event requiring the adjustment, the amount of the adjustment, the method by which such adjustment was calculated, and the number of Shares which may be purchased and the Exercise Price therefor after giving effect to such adjustment.

6.    Fractional Shares. No fractional shares or scrip representing fractional shares shall be issued upon the exercise of the Warrant. In lieu of any fractional share to which the Holder would otherwise be entitled, the Holder shall be entitled, at its option, to receive either (i) a cash payment

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

equal to the excess of the fair market value for such fractional share above the Exercise Price for such fractional share (as mutually determined by the Company and the Holder) or (ii) a whole share if the Holder tenders the Exercise Price for one whole share.

7.    Transfer, Exchange, Assignment, or Loss of Warrant.

(a)    This Warrant may not be assigned or transferred except as provided in this Section 7 and in accordance with and subject to the provisions of the Securities Act and the Rules and Regulations promulgated thereunder. Any purported transfer or assignment made other than in accordance with this Section 7 shall be null and void and of no force or effect.

(b)    Prior to any transfer of this Warrant, the Holder shall notify the Company of its intention to effect such transfer, indicating the circumstances of the proposed transfer and, upon request, furnish the Company with an opinion of its counsel, in form and substance reasonably satisfactory to counsel for the Company, to the effect that the proposed transfer may be made without registration under the Securities Act or qualification under any applicable state securities laws. The Company will promptly notify the Holder if the opinion of counsel furnished to the Company is reasonably satisfactory to counsel for the Company. Unless the Company notifies the Holder within ten (10) business days after its receipt of such opinion that such opinion is not reasonably satisfactory to counsel for the Company, the Holder may proceed to effect the transfer.

(c)    Unless a registration statement under the Securities Act is effective with respect to the Shares issued upon exercise of this Warrant, the certificate representing such Shares shall bear the following legends, in addition to any legend imposed by applicable state securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING.

(d)    Any assignment permitted hereunder shall be made by surrender of this Warrant to the Company at its principal office with the Assignment Form attached hereto as

**Trial Exh. 20512 Page 022**
FOIA Confidential Treatment Requested by Theranos                    THER-0336087
Fed. R. Crim. P. 6(e) material

ER-6001

**Exhibit C** duly executed. In such event, the Company shall, without charge for any issuance or transfer tax or other cost incurred by the Company with respect to such transfer, execute and deliver a new Warrant in the name of the assignee named in such instrument of assignment, and this Warrant shall be promptly cancelled.

        (e)   Upon receipt by the Company of satisfactory evidence of loss, theft, destruction, or mutilation of this Warrant and of indemnity satisfactory to the Company, and upon surrender and cancellation of this Warrant, if mutilated, the Company will execute and deliver a new Warrant of like tenor and date and any such lost, stolen, or destroyed Warrant shall thereupon become void.

        8.   <u>No Rights as Stockholders</u>. This Warrant does not entitle the Holder hereof to any voting rights, dividend rights, or other rights as a stockholder of the Company prior to the exercise hereof.

        9.   <u>Saturdays, Sundays, Holidays, etc.</u> If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a Saturday or a Sunday or shall be a legal holiday on which banks in the State of California are closed for business, then such action may be taken or such right may be exercised on the next succeeding day not a Saturday or a Sunday or a legal holiday.

        10.   <u>Exercisability; Expiration of Warrant</u>. This Warrant shall be exercisable at the option of the Holder at any time or from time to time, but shall expire and shall no longer be exercisable after 5:00 p.m., local time in Palo Alto, California, on July 31, 2015.

        11.   <u>Miscellaneous</u>.

        (a)   <u>Successors and Assigns.</u> This Warrant shall not be assignable by the Holder except in accordance with Section 7. This Warrant shall be binding upon any successors or assigns of the Company.

        (b)   <u>Governing Law</u>. This Warrant shall be governed by and construed in accordance with the laws of the State of California, without reference to the conflict of laws provisions thereof.

        (c)   <u>Attorney's Fees</u>. In any litigation, arbitration, or court proceeding between the Company and the Holder relating hereto, the prevailing party shall be entitled to reasonable attorneys' fees and expenses incurred in enforcing this Warrant.

        (d)   <u>Market Stand-off Agreement</u>. The Holder hereby agrees that, if requested by the managing underwriter of the initial underwritten public offering of the Company's securities filed under the Securities Act (the "**Company's IPO**"), such Holder shall enter an agreement not to sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any Common Stock (or other securities) of the Company held by such Holder (other than those included in the registration) during the one hundred eighty (180) day period following the effective date of the Company's IPO (or such other period up to an additional 35 days as may be requested by the Company or an

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The obligations described in this Section 11(d) shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with the second legend set forth in Section 7(c) hereof with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period (subject to extension as noted above).

(e)     Amendments.  This Warrant may be amended and the observance of any term of this Warrant may be waived only with the written consent of both parties.

(f)     Loss of Warrant.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of any such mutilation, upon surrender and cancellation of such Warrant, the Company at the Holder's expense will execute and deliver to the holder of record, in lieu thereof, a new Warrant of like date and tenor.

(g)     Notice.  Any notices required or permitted by this Warrant shall be made in writing and shall be deemed given if delivered personally, or by commercial messenger or courier service, or mailed by U.S. registered or certified mail (return receipt requested), or sent via facsimile (with receipt of confirmation of complete transmission) to a party at the party's address or facsimile number set forth below or at such other address or facsimile number as the party may have previously specified by like notice. If by mail, delivery shall be deemed effective four (4) business days after mailing in accordance with this Section 11(g).

**Theranos, Inc.**                      **BlueCross BlueShield Venture Partners, L.P.**
3200 Hillview Avenue                225 North Michigan Avenue
Palo Alto, CA  94304               Chicago, Illinois  60601
Tel: (650) 838-9292                  Tel: (312) 297-6025
Attn: Elizabeth Holmes            Attn: Paul Brown, Managing Director
President and CEO

(h)     Entire Agreement; Construction.  This Warrant constitutes the full and entire agreement between the parties with respect to the subject matter hereof and supersedes and cancels any and all prior agreements, undertakings, or understandings with respect to the subject matter hereof. Should any provision of this Warrant be held invalid or unenforceable, the remaining provisions shall be valid, and a valid provision shall be presumed agreed by the parties such that the rights and obligations set forth herein shall be enforceable to the maximum extent possible to preserve the intent of this Warrant.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

*[Signature page follows]*

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336090

ER-6004

IN WITNESS WHEREOF, the Company has caused this Common Stock Purchase Warrant to be executed by its officer thereunto duly authorized as of the date first above written.

**THERANOS, INC.**

By: _____

Name: _____

Title: _____


Acknowledged and Agreed:

**BLUECROSS BLUESHIELD VENTURE PARTNERS, L.P.**


By: _____

Name: _____

Title: _____


**[Signature Page to Theranos, Inc. Common Stock Purchase Warrant]**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336091

ER-6005

**EXHIBIT A**

**NOTICE OF EXERCISE**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336092

ER-6006

**NOTICE OF EXERCISE**

**COMMON STOCK PURCHASE WARRANT**

To:     THERANOS, INC.

        1.      The undersigned hereby elects to purchase _____ shares of Common Stock ("**Stock**") of Theranos, Inc. (the "**Company**") pursuant to the terms of the attached Common Stock Purchase Warrant (the "**Warrant**"), and tenders herewith payment of the aggregate exercise price therefor and any transfer taxes payable pursuant to the terms of the Warrant, together with an Investment Representation Statement in form and substance satisfactory to legal counsel to the Company.

        [or]

        1.      The undersigned hereby elects to convert the attached Common Stock Purchase Warrant (the "**Warrant**") into _____ shares of Common Stock ("**Stock**") of Theranos, Inc. (the "**Company**") in the manner specified in the Warrant and tenders herewith an Investment Representation Statement in form and substance satisfactory to legal counsel to the Company.

        [Strike paragraph that does not apply.]

        2.      The shares of Stock to be received by the undersigned upon exercise of the Warrant are being acquired for its own account, not as a nominee or agent, and not with a view to resale or distribution of any part thereof, and the undersigned has no present intention of selling, granting any participation in, or otherwise distributing the same. The undersigned further represents that it does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to the Stock. The undersigned believes it has received all the information it considers necessary or appropriate for deciding whether to purchase the Stock.

        3.      The undersigned understands that the shares of Stock are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in transactions not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Securities Act of 1933, as amended (the "**Securities Act**"), only in certain limited circumstances. In this connection, the undersigned represents that it is familiar with Rule 144 promulgated under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

        4.      The undersigned hereby agrees that, if requested by the managing underwriter of the initial underwritten public offering of the Company's securities filed under the Securities Act (the "**Company's IPO**"), the undersigned shall enter an agreement not to sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any Common Stock (or other securities) of the Company held by the undersigned (other than those included in the registration) during the one hundred eighty (180) day period

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

following the effective date of the Company's IPO (or such other period up to an additional 35 days as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The obligations described in this Section 4 shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with the second legend set forth in Section 5 hereof with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period (subject to extension as noted above).

     5.    The undersigned understands the instruments evidencing the Stock may bear the following legends, in addition to any legend required by applicable state securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.
>
> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING.

*[Signature page follows]*

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336094

**IN WITNESS WHEREOF,** the Warrantholder has executed this Notice of Exercise effective this ___ day of _____, 20___.

WARRANTHOLDER

_____

By: _____

Name: _____

Title: _____

[NOTICE OF EXERCISE OF THERANOS, INC. COMMON STOCK PURCHASE WARRANT]

Trial Exh. 20512 Page 030

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336095

ER-6009

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

**Trial Exh. 20512 Page 031**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336096

ER-6010

## INVESTMENT REPRESENTATION STATEMENT

PURCHASER : _____

COMPANY : THERANOS, INC.

SECURITIES : THE WARRANT ISSUED ON AUGUST 10, 2010 (THE **"WARRANT"**) AND THE SECURITIES ISSUED OR ISSUABLE UPON EXERCISE THEREOF

DATE : _____

In connection with the purchase of the above-listed Securities, the undersigned Purchaser represents to the Company the following:

(a) The undersigned is sufficiently aware of the Company's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the Securities. The undersigned is purchasing these Securities for its own account for investment purposes only and not with a view to, or for the resale in connection with, any "distribution" thereof for purposes of the Securities Act of 1933, as amended (the "**Securities Act**").

(b) The undersigned understands that the Securities have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of its investment intent as expressed herein.

(c) The undersigned further understands that the Securities must be held indefinitely unless subsequently registered under the Securities Act or unless an exemption from registration is otherwise available (such as Rule 144 under the Securities Act). Moreover, the undersigned understands that the Company is under no obligation to register the Securities. In addition, the undersigned understands that the certificate evidencing the Securities may be imprinted with a legend which prohibits the transfer of the Securities unless they are registered or such registration is not required in the opinion of counsel for the Company.

(d) The undersigned is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form

**Trial Exh. 20512 Page 032**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336097

144 notice, if applicable. There can be no assurances that the requirements of Rule 144 will be met, or that the Securities will ever be saleable.

(e)     The undersigned further understands that at the time the undersigned wishes to sell the Securities there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, the undersigned may be precluded from selling the Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied.

(f)     The undersigned further understands that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the SEC has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

Signature of Purchaser:

By: _____

Name: _____

Title: _____

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336098

ER-6012

**EXHIBIT C**

**ASSIGNMENT FORM**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336099

ER-6013

# ASSIGNMENT FORM

ASSIGNOR: _____

COMPANY: THERANOS, INC.

WARRANT: THE WARRANT TO PURCHASE SHARES OF COMMON STOCK ISSUED ON AUGUST 10, 2010 (THE "**WARRANT**")

DATE: _____

(1) **Assignment.** The undersigned registered holder of the Warrant ("**Assignor**") assigns and transfers to the assignee named below ("**Assignee**") all of the rights of Assignor under the Warrant, with respect to the number of shares set forth below:

     Name of Assignee: _____

     Address of Assignee:_____

     _____

     Number of Shares Assigned: _____

and does irrevocably constitute and appoint _____ as attorney to make such transfer on the books of Theranos, Inc., maintained for the purpose, with full power of substitution in the premises.

(2) **Obligations of Assignee.** Assignee agrees to take and hold the Warrant and any shares of stock to be issued upon exercise of the rights thereunder (the "**Securities**") subject to, and to be bound by, the terms and conditions set forth in the Warrant to the same extent as if Assignee were the original holder thereof.

(3) **Investment Intent.** Assignee represents and warrants that the Securities are being acquired for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and that Assignee has no present intention of selling, granting any participation in, or otherwise distributing the shares, nor does it have any contract, undertaking, agreement or arrangement for the same.

(4) **Investment Representation Statement.** Assignee has executed, and delivers herewith, an Investment Representation Statement in a form substantially similar to the form attached to the Warrant as Exhibit B.

(5) **Market Stand-Off Agreement.** The undersigned hereby agrees that, if requested by the managing underwriter of the initial underwritten public offering of the Company's securities filed under the Securities Act (the "**Company's IPO**"), the undersigned shall enter an agreement not to sell or otherwise transfer, make any short sale of, grant any option for the

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336100

ER-6014

purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any Common Stock (or other securities) of the Company held by the undersigned (other than those included in the registration) during the one hundred eighty (180) day period following the effective date of the Company's IPO (or such other period up to an additional 35 days as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The obligations described in this Section 5 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with the following with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period (subject to extension as noted above).

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING.

*[Signature page follows]*

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336101

ER-6015

Assignor and Assignee are signing this Assignment Form on the date first set forth above.

**ASSIGNOR**                                    **ASSIGNEE**

_____              _____
*(Print name of Assignor)*                        *(Print name of Assignee)*

_____              _____
*(Signature of Assignor)*                         *(Signature of Assignee)*

_____              _____
*(Print name of signatory, if applicable)*        *(Print name of signatory, if applicable)*

_____              _____
*(Print title of signatory, if applicable)*       *(Print title of signatory, if applicable)*

Address:                                        Address:

_____              _____

_____              _____

**Trial Exh. 20512 Page 037**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336102

ER-6016



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336103

ER-6017

**THIS WARRANT AND THE SHARES OF EQUITY SECURITIES THAT MAY BE PURCHASED PURSUANT TO THE EXERCISE OF THIS WARRANT HAVE BEEN ACQUIRED SOLELY FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF SUCH REGISTRATION OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH SALE, OFFER, PLEDGE OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS UNLESS SOLD PURSUANT TO RULE 144 OF THE ACT.**

**Dated as of August 10, 2010**
**Void after July 31, 2015**

<div align="center">

**THERANOS, INC.**

**COMMON STOCK PURCHASE WARRANT**

</div>

THIS CERTIFIES THAT Sandbox Co-Investment Fund I, L.P. ("**Sandbox**" and, together with its permitted assignees, the "**Holder**") is entitled, upon the terms and subject to the conditions hereinafter set forth, to subscribe for and purchase (subject to Section 1 and Section 10 hereof) up to a total of 20,000 (subject to adjustment pursuant to Section 4 hereof) of the fully paid and nonassessable Common Stock, par value $0.0001 per share (the "**Shares**"), of Theranos, Inc., a Delaware corporation (the "**Company**"), at the per share price of $0.36 (the "**Exercise Price**") (subject to adjustment pursuant to Section 4 hereof), subject to the provisions and upon the terms and conditions hereinafter set forth. For purposes of this Warrant, Sandbox and BlueCross Blue Shield Venture Partners, L.P. ("**BCBSVP**") are collectively referred to as the "**Consultants**."

This Common Stock Purchase Warrant (this "**Warrant**") is the compensation the Company agreed to provide to the Holder in the parties' July 30, 2010 Consulting Agreement (**"Consulting Agreement"**) in exchange for Holder's services rendered pursuant thereto ("**Services**"). The Services include, but are not limited to the following: Holder and the Company shall use good faith efforts to identify and target contracts between the company and BlueCross BlueShield Association ("**BCBSA**"), and or BlueCross BlueShield Association licensees ("**Plans**"), or their affiliates and/or subsidiaries (collectively with BCBSA and Plans, the "**Blue Plans**" and each a "**Blue Plan**"), on a preferred pricing basis, targeting signed contracts from the date of execution through December 31, 2011.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336104

ER-6018

1.   Vesting Schedule.   Only Shares which have vested ("**Vested Shares**") may be purchased pursuant to the exercise of this Warrant.  The purchase rights represented by this Warrant shall be exercisable, in whole or in part, according to the following vesting schedule (but shall in no event be exercisable after the expiration of the Warrant as provided in Section 10 hereof):

(a)   5,000 Shares will vest at the conclusion of three meetings between the Company and one or more of the Blue Plans to discuss claims adjudication and adoption of real-time billing and reimbursement software and services.  Such meetings shall be arranged by the Consultants.

(b)   5,000 Shares will vest upon the execution by the Company and either Consultant or BCBSA of a national preferred price laboratory contract (the "**National Agreement**") in which Blue Plans can participate on a voluntary basis;

(c)   5,000 Shares will vest, at the rate of ten percent (10%) of these 5,000 Shares per contract, upon each Blue Plan joining the National Agreement or otherwise executing a contract with the Company.  For example, if two Blue Plans join the National Agreement, twenty percent (20%) of these 5,000 will vest; and

(d)   The remaining 5,000 Shares will vest at the rate of fifty percent (50%) of these 5,000 Shares upon (i) establishment of as least two (2) contracts across as least two (2) Plans for pilot and deployment of Theranos Systems in as least 250 physicians' offices per Plan by the end of 2011 and the remaining fifty percent (50%) upon (ii) establishment of at least ten (10) additional contracts across at least ten (10) plan for pilot and deployment of Theranos Systems in at least 250 physcians' offices per Plan by the end of 2012.

(e)   Upon the earliest "Acceleration Event," all Shares which have then not already vested in accordance with the terms set forth above shall immediately vest in full.  An "**Acceleration Event**" means any of the following:  (i) termination of the Consulting Agreement by the Company for reasons other than for breach of the Consulting Agreement; (ii) a "Reorganization," "Recapitalization," "Qualified IPO," or "Automatic Conversion Event" (each as defined in the Company's Amended and Restated Certificate of Incorporation in effect as of the effective date of the Consulting Agreement), or (iii) the Company's liquidation, dissolution or winding up.

2.   Method of Exercise; Payment.

(a)   Cash Exercise.   Subject to Section 10 hereof, the purchase rights represented by this Warrant may be exercised by the Holder from time to time, in whole or in part, with respect to Vested Shares by the surrender of this Warrant (with the Notice of Exercise form attached hereto as **Exhibit A** and the Investment Representation Statement attached hereto as **Exhibit B**, each duly executed) at the principal office of the Company, and by payment to the Company, by certified, cashier's or other check acceptable to the Company, by wire transfer in accordance with the Company's instructions, or by any other form of payment acceptable to the Company and Holder, of an amount equal to the aggregate Exercise Price of the Vested Shares being purchased.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

    (b)   <u>Net Issue Exercise</u>.

    (i)   In lieu of exercising this Warrant with respect to Vested Shares pursuant to Section 2(a) above, and subject to Section 10 hereof, the Holder may elect to receive Shares equal to the value of the Vested Shares (or the portion thereof being cancelled) by surrender of this Warrant at the principal office of the Company together with notice of such election, in which event the Company shall issue to the Holder a number of Shares computed using the following formula:

$$X = \frac{Y(A-B)}{A}, \text{ where}$$

X    =    the number of Shares to be issued to the Holder.

Y    =    the number of Vested Shares purchasable under this Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being cancelled (at the date of such calculation).

A    =    the Fair Market Value of one Share (at the date of such calculation).

B    =    the Exercise Price (as adjusted to the date of such calculation).

    (ii)   <u>Fair Market Value</u>.  For purposes of this Section 2, the Fair Market Value of one Share shall be determined by the Company's Board of Directors in good faith; *provided, however*, that where there exists a public market for the Company's Common Stock at the time of such exercise, the fair market value per Share shall be the average of the closing bid and asked prices of the Common Stock quoted in the Over-The-Counter Market Summary or the last reported sale price of the Common Stock or the closing price quoted on any exchange on which the Common Stock is listed, as published in *The Wall Street Journal* for the five (5) trading days prior to the date of determination of Fair Market Value or as reported by such other independent sources as the Company's Board of Directors agree may deem reliable with the consent of Holder, not to be unreasonably withheld.  Notwithstanding the foregoing, in the event the Warrant is exercised in connection with the Company's initial public offering of Common Stock ("**IPO**") pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "**Securities Act**"), the Fair Market Value per Share shall be the per share offering price to the public of the Company's IPO.

    (c)   <u>Stock Certificates; Tax Reporting</u>.  In the event of any exercise of the rights represented by this Warrant, certificates for the Shares so purchased shall be delivered to the Holder within a reasonable time and, unless the Warrant has been fully exercised or this Warrant has expired, a new Warrant representing the shares with respect to which this Warrant shall not have been exercised shall also be issued to the Holder within such time. The Company will report any income related to the Holder's exercise of the Warrant to the extent the Company determines that such reporting is required by applicable law.

    **3.**   <u>Stock Fully Paid; Reservation of Shares</u>.  All of the Shares issuable upon the exercise of the rights represented by this Warrant will, upon issuance and receipt of the Exercise Price

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336106

ER-6020

therefor, be fully paid and nonassessable. During the period within which the rights represented by this Warrant may be exercised, the Company shall at all times have authorized and reserved for issuance sufficient Shares to provide for the exercise of the rights represented by this Warrant.

4. <u>Adjustment of Exercise Price and Number of Shares</u>. The number and kind of securities purchasable upon the exercise of this Warrant and the Exercise Price therefor shall be subject to adjustment from time to time upon the occurrence as follows:

(a) <u>Merger</u>. If at any time there shall be a merger or consolidation of the Company with or into another corporation where the Company is not the surviving corporation, then, as a part of such merger or consolidation, lawful provision shall be made so that the Holder of this Warrant shall thereafter be entitled to receive upon exercise of this Warrant, during the period specified herein and upon payment of the aggregate Exercise Price then in effect, the number of shares of stock or other securities or property of the successor corporation resulting from such merger or consolidation, to which a holder of the stock deliverable upon exercise of this Warrant would have been entitled in such merger or consolidation if this Warrant had been exercised immediately before such merger or consolidation. In any such case, appropriate adjustment shall be made in the application of the provisions of this Warrant with respect to the rights and interests of the Holder after the merger or consolidation.

(b) <u>Reclassification, etc</u>. If the Company shall, at any time, by subdivision, combination, or reclassification of securities or otherwise, change any of the securities as to which purchase rights under this Warrant exist into the same or a different number of securities of any other class or classes, the Exercise Price shall be adjusted such that this Warrant shall thereafter represent the right to acquire such number and kind of securities as would have been issuable as the result of such change with respect to the securities which were subject to the purchase rights under this Warrant immediately prior to such subdivision, combination, reclassification or other change.

(c) <u>Split, Subdivision, Dividends or Combination of Shares</u>. If the Company at any time while this Warrant remains outstanding and unexpired shall split, subdivide or combine the securities as to which purchase rights under this Warrant exist (including the issuance of additional shares of Common by way of a stock dividend), the number of Shares shall be proportionately increased and the Exercise Price shall be proportionately decreased in the case of a split or subdivision, and the number of Shares shall be proportionately decreased and the Exercise Price shall be proportionately increased in the case of a combination.

5. <u>Notices of Adjustments</u>. Whenever the number of Shares or kind of securities purchasable hereunder or the Exercise Price thereof shall be adjusted pursuant to Section 4 hereof, the Company shall provide notice to the Holder of this Warrant setting forth, in reasonable detail, the event requiring the adjustment, the amount of the adjustment, the method by which such adjustment was calculated, and the number of Shares which may be purchased and the Exercise Price therefor after giving effect to such adjustment.

6. <u>Fractional Shares</u>. No fractional shares or scrip representing fractional shares shall be issued upon the exercise of the Warrant. In lieu of any fractional share to which the Holder would otherwise be entitled, the Holder shall be entitled, at its option, to receive either (i) a cash payment

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336107

ER-6021

equal to the excess of the fair market value for such fractional share above the Exercise Price for such fractional share (as mutually determined by the Company and the Holder) or (ii) a whole share if the Holder tenders the Exercise Price for one whole share.

7. Transfer, Exchange, Assignment, or Loss of Warrant.

(a) This Warrant may not be assigned or transferred except as provided in this Section 7 and in accordance with and subject to the provisions of the Securities Act and the Rules and Regulations promulgated thereunder. Any purported transfer or assignment made other than in accordance with this Section 7 shall be null and void and of no force or effect.

(b) Prior to any transfer of this Warrant, the Holder shall notify the Company of its intention to effect such transfer, indicating the circumstances of the proposed transfer and, upon request, furnish the Company with an opinion of its counsel, in form and substance reasonably satisfactory to counsel for the Company, to the effect that the proposed transfer may be made without registration under the Securities Act or qualification under any applicable state securities laws. The Company will promptly notify the Holder if the opinion of counsel furnished to the Company is reasonably satisfactory to counsel for the Company. Unless the Company notifies the Holder within ten (10) business days after its receipt of such opinion that such opinion is not reasonably satisfactory to counsel for the Company, the Holder may proceed to effect the transfer.

(c) Unless a registration statement under the Securities Act is effective with respect to the Shares issued upon exercise of this Warrant, the certificate representing such Shares shall bear the following legends, in addition to any legend imposed by applicable state securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING.

(d) Any assignment permitted hereunder shall be made by surrender of this Warrant to the Company at its principal office with the Assignment Form attached hereto as

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336108

ER-6022

**Exhibit C** duly executed. In such event, the Company shall, without charge for any issuance or transfer tax or other cost incurred by the Company with respect to such transfer, execute and deliver a new Warrant in the name of the assignee named in such instrument of assignment, and this Warrant shall be promptly cancelled.

(e) Upon receipt by the Company of satisfactory evidence of loss, theft, destruction, or mutilation of this Warrant and of indemnity satisfactory to the Company, and upon surrender and cancellation of this Warrant, if mutilated, the Company will execute and deliver a new Warrant of like tenor and date and any such lost, stolen, or destroyed Warrant shall thereupon become void.

8. <u>No Rights as Stockholders</u>. This Warrant does not entitle the Holder hereof to any voting rights, dividend rights, or other rights as a stockholder of the Company prior to the exercise hereof.

9. <u>Saturdays, Sundays, Holidays, etc.</u> If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a Saturday or a Sunday or shall be a legal holiday on which banks in the State of California are closed for business, then such action may be taken or such right may be exercised on the next succeeding day not a Saturday or a Sunday or a legal holiday.

10. <u>Exercisability; Expiration of Warrant</u>. This Warrant shall be exercisable at the option of the Holder at any time or from time to time, but shall expire and shall no longer be exercisable after at 5:00 p.m., local time in Palo Alto, California, on July 31, 2015.

11. <u>Miscellaneous</u>.

(a) <u>Successors and Assigns.</u> This Warrant shall not be assignable by the Holder except in accordance with Section 7. This Warrant shall be binding upon any successors or assigns of the Company.

(b) <u>Governing Law</u>. This Warrant shall be governed by and construed in accordance with the laws of the State of California, without reference to the conflict of laws provisions thereof.

(c) <u>Attorney's Fees</u>. In any litigation, arbitration, or court proceeding between the Company and the Holder relating hereto, the prevailing party shall be entitled to reasonable attorneys' fees and expenses incurred in enforcing this Warrant.

(d) <u>Market Stand-off Agreement</u>. The Holder hereby agrees that, if requested by the managing underwriter of the initial underwritten public offering of the Company's securities filed under the Securities Act (the "**Company's IPO**"), such Holder shall enter an agreement not to sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any Common Stock (or other securities) of the Company held by such Holder (other than those included in the registration) during the one hundred eighty (180) day period following the effective date of the Company's IPO (or such other period up to an additional 35 days as may be requested by the Company or an

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336109

underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The obligations described in this Section 11(d) shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with the second legend set forth in Section 7(c) hereof with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period (subject to extension as noted above).

(e)     Amendments. This Warrant may be amended and the observance of any term of this Warrant may be waived only with the written consent of both parties.

(f)     Loss of Warrant. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of any such mutilation, upon surrender and cancellation of such Warrant, the Company at the Holder's expense will execute and deliver to the holder of record, in lieu thereof, a new Warrant of like date and tenor.

(g)     Notice. Any notices required or permitted by this Warrant shall be made in writing and shall be deemed given if delivered personally, or by commercial messenger or courier service, or mailed by U.S. registered or certified mail (return receipt requested), or sent via facsimile (with receipt of confirmation of complete transmission) to a party at the party's address or facsimile number set forth below or at such other address or facsimile number as the party may have previously specified by like notice. If by mail, delivery shall be deemed effective four (4) business days after mailing in accordance with this Section 11(g).

| | |
|---|---|
| **Theranos, Inc.** | **Sandbox Co-Investment Fund I., L.P.** |
| 3200 Hillview Avenue | 213 North Racine |
| Palo Alto, CA 94304 | Chicago, Illinois 60601 |
| Tel: (650) 838-9292 | Tel: (312) 243-4100 |
| Attn: Elizabeth Holmes | Attn: Matt Downs |
| President and CEO | |

(h)     Entire Agreement; Construction. This Warrant constitutes the full and entire agreement between the parties with respect to the subject matter hereof and supersedes and cancels any and all prior agreements, undertakings, or understandings with respect to the subject matter hereof. Should any provision of this Warrant be held invalid or unenforceable, the remaining provisions shall be valid, and a valid provision shall be presumed agreed by the parties such that the rights and obligations set forth herein shall be enforceable to the maximum extent possible to preserve the intent of this Warrant.

*[Signature page follows]*

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336110

ER-6024

IN WITNESS WHEREOF, the Company has caused this Common Stock Purchase Warrant to be executed by its officer thereunto duly authorized as of the date first above written.

**THERANOS, INC.**

By: _____

Name: _____

Title: _____

Acknowledged and Agreed:

**SANDBOX CO-INVESTMENT FUND I, L.P.**

By: _____

Name: _____

Title: _____

**[Signature Page to Theranos, Inc. Common Stock Purchase Warrant]**

**Trial Exh. 20512 Page 046**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336111

ER-6025

**EXHIBIT A**

**NOTICE OF EXERCISE**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336112

ER-6026

## NOTICE OF EXERCISE

## COMMON STOCK PURCHASE WARRANT

To:   THERANOS, INC.

1.     The undersigned hereby elects to purchase _____ shares of Common Stock ("**Stock**") of Theranos, Inc. (the "**Company**") pursuant to the terms of the attached Common Stock Purchase Warrant (the "**Warrant**"), and tenders herewith payment of the aggregate exercise price therefor and any transfer taxes payable pursuant to the terms of the Warrant, together with an Investment Representation Statement in form and substance satisfactory to legal counsel to the Company.

[or]

1.     The undersigned hereby elects to convert the attached Common Stock Purchase Warrant (the "**Warrant**") into _____ shares of Common Stock ("**Stock**") of Theranos, Inc. (the "**Company**") in the manner specified in the Warrant and tenders herewith an Investment Representation Statement in form and substance satisfactory to legal counsel to the Company.

[Strike paragraph that does not apply.]

2.     The shares of Stock to be received by the undersigned upon exercise of the Warrant are being acquired for its own account, not as a nominee or agent, and not with a view to resale or distribution of any part thereof, and the undersigned has no present intention of selling, granting any participation in, or otherwise distributing the same.  The undersigned further represents that it does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to the Stock.  The undersigned believes it has received all the information it considers necessary or appropriate for deciding whether to purchase the Stock.

3.     The undersigned understands that the shares of Stock are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in transactions not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Securities Act of 1933, as amended (the "**Securities Act**"), only in certain limited circumstances.  In this connection, the undersigned represents that it is familiar with Rule 144 promulgated under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

4.     The undersigned hereby agrees that, if requested by the managing underwriter of the initial underwritten public offering of the Company's securities filed under the Securities Act (the "**Company's IPO**"), the undersigned shall enter an agreement not to sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any Common Stock (or other securities) of the Company held by the undersigned (other than those included in the registration) during the one hundred eighty (180) day period

**Trial Exh. 20512 Page 048**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336113

ER-6027

following the effective date of the Company's IPO (or such other period up to an additional 35 days as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The obligations described in this Section 4 shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with the second legend set forth in Section 5 hereof with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period (subject to extension as noted above).

5.      The undersigned understands the instruments evidencing the Stock may bear the following legends, in addition to any legend required by applicable state securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING.

*[Signature page follows]*

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336114

ER-6028

**IN WITNESS WHEREOF,** the Warrantholder has executed this Notice of Exercise effective this ___ day of _____, 20___.

WARRANTHOLDER

_____

By: _____

Name: _____

Title: _____

[NOTICE OF EXERCISE OF THERANOS, INC. COMMON STOCK PURCHASE WARRANT]

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336115

ER-6029

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336116

ER-6030

# INVESTMENT REPRESENTATION STATEMENT

PURCHASER        :        _____

COMPANY          :        THERANOS, INC.

SECURITIES       :        THE WARRANT ISSUED ON AUGUST 10, 2010 (THE
                          "**WARRANT**") AND THE SECURITIES ISSUED OR ISSUABLE
                          UPON EXERCISE THEREOF

DATE             :        _____

In connection with the purchase of the above-listed Securities, the undersigned Purchaser represents to the Company the following:

(a)    The undersigned is sufficiently aware of the Company's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the Securities. The undersigned is purchasing these Securities for its own account for investment purposes only and not with a view to, or for the resale in connection with, any "distribution" thereof for purposes of the Securities Act of 1933, as amended (the "**Securities Act**").

(b)    The undersigned understands that the Securities have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of its investment intent as expressed herein.

(c)    The undersigned further understands that the Securities must be held indefinitely unless subsequently registered under the Securities Act or unless an exemption from registration is otherwise available (such as Rule 144 under the Securities Act). Moreover, the undersigned understands that the Company is under no obligation to register the Securities. In addition, the undersigned understands that the certificate evidencing the Securities may be imprinted with a legend which prohibits the transfer of the Securities unless they are registered or such registration is not required in the opinion of counsel for the Company.

(d)    The undersigned is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0336117

ER-6031

144 notice, if applicable. There can be no assurances that the requirements of Rule 144 will be met, or that the Securities will ever be saleable.

(e)     The undersigned further understands that at the time the undersigned wishes to sell the Securities there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, the undersigned may be precluded from selling the Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied.

(f)     The undersigned further understands that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the SEC has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

Signature of Purchaser:

By: _____

Name: _____

Title: _____

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336118

ER-6032

**EXHIBIT C**

**ASSIGNMENT FORM**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336119

ER-6033

## ASSIGNMENT FORM

ASSIGNOR: _____

COMPANY: THERANOS, INC.

WARRANT: THE WARRANT TO PURCHASE SHARES OF COMMON STOCK ISSUED ON AUGUST 10, 2010 (THE "**WARRANT**")

DATE: _____

(1) **Assignment.** The undersigned registered holder of the Warrant ("**Assignor**") assigns and transfers to the assignee named below ("**Assignee**") all of the rights of Assignor under the Warrant, with respect to the number of shares set forth below:

Name of Assignee: _____

Address of Assignee: _____

_____

Number of Shares Assigned: _____

and does irrevocably constitute and appoint _____ as attorney to make such transfer on the books of Theranos, Inc., maintained for the purpose, with full power of substitution in the premises.

(2) **Obligations of Assignee.** Assignee agrees to take and hold the Warrant and any shares of stock to be issued upon exercise of the rights thereunder (the "**Securities**") subject to, and to be bound by, the terms and conditions set forth in the Warrant to the same extent as if Assignee were the original holder thereof.

(3) **Investment Intent.** Assignee represents and warrants that the Securities are being acquired for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and that Assignee has no present intention of selling, granting any participation in, or otherwise distributing the shares, nor does it have any contract, undertaking, agreement or arrangement for the same.

(4) **Investment Representation Statement.** Assignee has executed, and delivers herewith, an Investment Representation Statement in a form substantially similar to the form attached to the Warrant as Exhibit B.

(5) **Market Stand-Off Agreement.** The undersigned hereby agrees that, if requested by the managing underwriter of the initial underwritten public offering of the Company's securities filed under the Securities Act (the "**Company's IPO**"), the undersigned shall enter an agreement not to sell or otherwise transfer, make any short sale of, grant any option for the

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336120

ER-6034

purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any Common Stock (or other securities) of the Company held by the undersigned (other than those included in the registration) during the one hundred eighty (180) day period following the effective date of the Company's IPO (or such other period up to an additional 35 days as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The obligations described in this Section 5 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with the following with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period (subject to extension as noted above).

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING.

*[Signature page follows]*

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336121

ER-6035

Assignor and Assignee are signing this Assignment Form on the date first set forth above.

**ASSIGNOR**                                        **ASSIGNEE**

_____          _____
(Print name of Assignor)                              (Print name of Assignee)

_____          _____
(Signature of Assignor)                                (Signature of Assignee)

_____          _____
(Print name of signatory, if applicable)          (Print name of signatory, if applicable)

_____          _____
(Print title of signatory, if applicable)           (Print title of signatory, if applicable)

Address:                                                  Address:

_____          _____

_____          _____

**Trial Exh. 20512 Page 057**
FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336122

ER-6036

# EXHIBIT E

## Amended and Restated Bylaws



**Theranos Confidential**

13

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336123

ER-6037

Amended +
Restated
Bylaws

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336124

ER-6038

# AMENDED AND RESTATED BYLAWS OF

# THERANOS, INC.

## ARTICLE I — MEETINGS OF STOCKHOLDERS

(last amended as of August 2010)

1.1 *Place of Meetings.*  Meetings of stockholders of Theranos, Inc. (the **"Company"**) shall be held at any place, within or outside the State of Delaware, designated by the Company's board of directors (the **"Board"**).  The Board may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211(a)(2) of the Delaware General Corporation Law (the **"DGCL"**).  In the absence of any such designation or determination, stockholders' meetings shall be held at the Company's principal executive office.

1.2 *Annual Meeting.*  An annual meeting of stockholders shall be held for the election of directors at such date and time as may be designated by resolution of the Board of Directors from time to time.  Any other proper business may be transacted at the annual meeting.  The Company shall not be required to hold an annual meeting of stockholders provided that (i) the stockholders are permitted to act by written consent under the Company's certificate of incorporation and these bylaws, (ii) the stockholders take action by written consent to elect directors and (iii) the stockholders unanimously consent to such action or, if such consent is less than unanimous, all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

1.3 *Special Meeting.*  A special meeting of the stockholders may be called at any time by the Board, chairperson of the Board, chief executive officer or president (in the absence of a chief executive officer) or by one or more stockholders holding shares in the aggregate entitled to cast not less than 25% of the votes at that meeting.

If any person(s) other than the Board calls a special meeting, the request shall:

  (i)  be in writing;

  (ii)  specify the time of such meeting and the general nature of the business proposed to be transacted; and

  (iii)  be delivered personally or sent by registered mail or by facsimile transmission to the chairperson of the Board, the chief executive officer, the president (in the absence of a chief executive officer) or the secretary of the Company.

The officer(s) receiving the request shall cause notice to be promptly given to the stockholders entitled to vote at such meeting, in accordance with the provisions of **Sections 1.4** and

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

**1.5** of these bylaws, that a meeting will be held at the time requested by the person or persons calling the meeting. No business may be transacted at such special meeting other than the business specified in such notice to stockholders. Nothing contained in this paragraph of this **Section 1.3** shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board may be held.

1.4 *Notice of Stockholders' Meetings.* All notices of meetings of stockholders shall be sent or otherwise given in accordance with either **Section 1.5** or **Section 7.1** of these bylaws not less than 10 or more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting. The notice shall specify the place, if any, date and hour of the meeting, the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

1.5 *Manner of Giving Notice; Affidavit of Notice.* Notice of any meeting of stockholders shall be given:

  (i)   if mailed, when deposited in the United States mail, postage prepaid, directed to the stockholder at his or her address as it appears on the Company's records; or

  (ii)   if electronically transmitted as provided in **Section 7.1** of these bylaws.

An affidavit of the secretary or an assistant secretary of the Company or of the transfer agent or any other agent of the Company that the notice has been given by mail or by a form of electronic transmission, as applicable, shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

1.6 *Quorum.* Except as otherwise provided by law, the certificate of incorporation or these bylaws, at each meeting of stockholders the presence in person or by proxy of the holders of shares of stock having a majority of the votes which could be cast by the holders of all outstanding shares of stock entitled to vote at the meeting shall be necessary and sufficient to constitute a quorum. If, however, such quorum is not present or represented at any meeting of the stockholders, then either (i) the chairperson of the meeting, or (ii) the stockholders entitled to vote at the meeting, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented.

1.7 *Adjourned Meeting; Notice.* Any meeting of stockholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, and notice need not be given of the adjourned meeting if the time, place if any thereof, and the means of remote communications if any by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the continuation of the adjourned meeting, the Company may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, or

**Trial Exh. 20512 Page 061**
FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                    THER-0336126

ER-6040

if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

1.8 *Conduct of Business*. Meetings of stockholders shall be presided over by the Chairman of the Board, if any, or in his or her absence by the Vice Chairman of the Board, if any, or in his or her absence by the Chief Executive Officer, or in his or her absence by the President, or in his or her absence by a Vice President, or in the absence of the foregoing persons by a chairperson designated by the Board of Directors, or in the absence of such designation by a chairperson chosen at the meeting. The Secretary shall act as secretary of the meeting, but in his or her absence the chairperson of the meeting may appoint any person to act as secretary of the meeting. The chairperson of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of business.

1.9 *Voting*. The stockholders entitled to vote at any meeting of stockholders shall be determined in accordance with the provisions of Section 1.11 of these bylaws, subject to Section 217 (relating to voting rights of fiduciaries, pledgors and joint owners of stock) and Section 218 (relating to voting trusts and other voting agreements) of the DGCL.

Except as may be otherwise provided in the certificate of incorporation or these bylaws, each stockholder shall be entitled to one vote for each share of capital stock held by such stockholder. Voting at meetings of stockholders need not be by written ballot and need not be conducted by inspectors of election unless so determined by the holders of shares of stock having a majority of the votes which could be cast by the holders of all outstanding shares of stock entitled to vote thereon which are present in person or by proxy at such meeting. At all meetings of stockholders for the election of directors a plurality of the votes cast shall be sufficient to elect. All other elections and questions shall, unless otherwise provided by law, the certificate of incorporation or these bylaws, be decided by the vote of the holders of shares of stock having a majority of the votes which could be cast by the holders of all shares of stock entitled to vote thereon which are present in person or represented by proxy at the meeting.

1.10 *Stockholder Action by Written Consent Without a Meeting*. Unless otherwise provided in the certificate of incorporation, any action required by the DGCL to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Company as provided in Section 228 of the DGCL.

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC

-3-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336127

ER-6041

In the event that the action which is consented to is such as would have required the filing of a certificate under any provision of the DGCL, if such action had been voted on by stockholders at a meeting thereof, the certificate filed under such provision shall state, in lieu of any statement required by such provision concerning any vote of stockholders, that written consent has been given in accordance with Section 228 of the DGCL.

**1.11 *Record Date for Stockholder Notice; Voting; Giving Consents.*** In order that the Company may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or entitled to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and which record date:

(i) in the case of determination of stockholders entitled to notice of or to vote at any meeting of stockholders or adjournment thereof, shall, unless otherwise required by law, not be more than sixty nor less than ten days before the date of such meeting;

(ii) in the case of determination of stockholders entitled to express consent to corporate action in writing without a meeting, shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the Board of Directors; and

(iii) in the case of determination of stockholders for any other action, shall not be more than sixty days prior to such other action.

If no record date is fixed by the Board of Directors:

(i) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held;

(ii) the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting when no prior action of the Board of Directors is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company in accordance with applicable law, or, if prior action by the Board of Directors is required by law, shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action; and

(iii) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

**Trial Exh. 20512 Page 063**
FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0336128

ER-6042

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting..

1.12. *Proxies*. Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy authorized by an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212 of the DGCL.

1.13 *List of Stockholders Entitled to Vote*. The officer who has charge of the stock ledger of the Company shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The Company shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the Company's principal executive office. In the event that the Company determines to make the list available on an electronic network, the Company may take reasonable steps to ensure that such information is available only to stockholders of the Company. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Such list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

## ARTICLE II — DIRECTORS

2.1 *Powers*. Subject to the provisions of the DGCL and any limitations in the certificate of incorporation or these bylaws relating to action required to be approved by the stockholders or by the outstanding shares, the business and affairs of the Company shall be managed and all corporate powers shall be exercised by or under the direction of the Board.

2.2 *Number of Directors*. The number of directors shall be determined from time to time by resolution of the Board, provided the Board shall consist of at least one member. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC                                    -5-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336129

ER-6043

2.3 *Election, Qualification and Term of Office of Directors*. Except as provided in **Section 2.4** of these bylaws, directors shall be elected at each annual meeting of stockholders to hold office until the next annual meeting. Directors need not be stockholders unless so required by the certificate of incorporation or these bylaws. The certificate of incorporation or these bylaws may prescribe other qualifications for directors. Each director, including a director elected to fill a vacancy, shall hold office until such director's successor is elected and qualified or until such director's earlier death, resignation or removal.

2.4 *Resignation and Vacancies*. Any director may resign at any time upon notice given in writing or by electronic transmission to the Company. When one or more directors so resigns and the resignation is effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in this Section in the filling of other vacancies.

Unless otherwise provided in the certificate of incorporation or these bylaws:

(i) Vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director.

(ii) Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the provisions of the certificate of incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.

If at any time, by reason of death or resignation or other cause, the Company should have no directors in office, then any officer or any stockholder or an executor, administrator, trustee or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in accordance with the provisions of the certificate of incorporation or these bylaws, or may apply to the Court of Chancery for a decree summarily ordering an election as provided in Section 211 of the DGCL.

If, at the time of filling any vacancy or any newly created directorship, the directors then in office constitute less than a majority of the whole Board (as constituted immediately prior to any such increase), then the Court of Chancery may, upon application of any stockholder or stockholders holding at least 10% of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office as aforesaid, which election shall be governed by the provisions of Section 211 of the DGCL as far as applicable.

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC                                    -6-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0336130

ER-6044

**2.5** *Place of Meetings; Meetings by Telephone.* The Board may hold meetings, both regular and special, either within or outside the State of Delaware.

Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

**2.6** *Regular Meetings.* Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.

**2.7** *Special Meetings; Notice.*

Special meetings of the Board for any purpose or purposes may be called at any time by the chairperson of the Board, the chief executive officer, the president (in the absence of a chief executive officer), the secretary or any two directors.

Notice of the time and place of special meetings shall be:

(i)     delivered personally by hand, by courier or by telephone;

(ii)    sent by United States first-class mail, postage prepaid;

(iii)   sent by facsimile; or

(iv)    sent by electronic mail,

directed to each director at that director's address, telephone number, facsimile number or electronic mail address, as the case may be, as shown on the Company's records.

If the notice is (i) delivered personally by hand, by courier or by telephone, (ii) sent by facsimile or (iii) sent by electronic mail, it shall be delivered or sent at least 24 hours before the time of the holding of the meeting. If the notice is sent by United States mail, it shall be deposited in the United States mail at least four days before the time of the holding of the meeting. Any oral notice may be communicated to the director. The notice need not specify the place of the meeting (if the meeting is to be held at the Company's principal executive office) nor the purpose of the meeting.

**2.8** *Quorum.* At all meetings of the Board, a majority of the total number of directors shall constitute a quorum for the transaction of business. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the certificate of incorporation or these bylaws. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                    THER-0336131

ER-6045

A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting.

2.9 *Board Action by Written Consent Without a Meeting*. Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

2.10 *Fees and Compensation of Directors*. Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board shall have the authority to fix the compensation of directors.

2.11 *Approval of Loans to Officers*. The Company may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Company or of its subsidiary, including any officer or employee who is a director of the Company or its subsidiary, whenever, in the judgment of the Board, such loan, guaranty or assistance may reasonably be expected to benefit the Company. The loan, guaranty or other assistance may be with or without interest and may be unsecured, or secured in such manner as the Board shall approve, including, without limitation, a pledge of shares of stock of the Company.

2.12 *Removal of Directors*. Unless otherwise restricted by statute, the certificate of incorporation or these bylaws, any director or the entire Board may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of such director's term of office.

## ARTICLE III — COMMITTEES

3.1 *Committees of Directors*. The Board may designate one or more committees, each committee to consist of one or more of the directors of the Company. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board or in these bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company, and may authorize the seal of the Company

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC

-8-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336132

ER-6046

to be affixed to all papers that may require it; but no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the Company,

3.2 *Committee Minutes.* Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

3.3 *Meetings and Action of Committees.* Meetings and actions of committees shall be governed by, and held and taken in accordance with the provisions of:

(i) **Section 2.5** (place of meetings and meetings by telephone);

(ii) **Section 2.6** (regular meetings);

(iii) **Section 2.7** (special meetings and notice);

(iv) **Section 2.8** (quorum);

(v) **Section 6.10** (waiver of notice); and

(vi) **Section 2.9** (action without a meeting),

with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board and its members. *However*:

(i) the time of regular meetings of committees may be determined either by resolution of the Board or by resolution of the committee;

(ii) special meetings of committees may also be called by resolution of the Board; and

(iii) notice of special meetings of committees shall also be given to all alternate members, who shall have the right to attend all meetings of the committee. The Board may adopt rules for the government of any committee not inconsistent with the provisions of these bylaws.

## ARTICLE IV — OFFICERS

4.1 *Officers.* The officers of the Company shall be a president and a secretary. The Company may also have, at the discretion of the Board, a chairperson of the Board, a vice chairperson of the Board, a chief executive officer, a chief financial officer or treasurer, one or more senior vice presidents, one or more assistant treasurers, one or more assistant secretaries, and any such other officers as may be appointed in accordance with the provisions of these bylaws. Any number of offices may be held by the same person.

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC ·9·

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336133

ER-6047

4.2 *Appointment of Officers*.  The Board shall appoint the officers of the Company, except such officers as may be appointed in accordance with the provisions of Sections **4.3** and **4.5** of these bylaws, subject to the rights, if any, of an officer under any contract of employment.

4.3 *Subordinate Officers*.  The Board may appoint, or empower the chief executive officer or, in the absence of a chief executive officer, the president, to appoint such other officers and agents as the business of the Company may require.  Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the Board may from time to time determine.

4.4 *Removal and Resignation of Officers*.  Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board at any regular or special meeting of the Board or, except in the case of an officer chosen by the Board, by any officer upon whom such power of removal may be conferred by the Board.

Any officer may resign at any time by giving written notice to the Company.  Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice.  Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective.  Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party.

4.5 *Vacancies in Offices*.  Any vacancy occurring in any office of the Company shall be filled by the Board or as provided in Section **4.2**.

4.6 *Representation of Shares of Other Corporations*.  The chairperson of the Board, the chief executive officer, the president, any vice president, the treasurer, the secretary or assistant secretary of the Company, or any other person authorized by the Board or the president or a vice president, is authorized to vote, represent, and exercise on behalf of the Company all rights incident to any and all shares of any other corporation or corporations standing in the name of the Company.  The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

4.7 *Authority and Duties of Officers*.  All officers of the Company shall respectively have such authority and perform such duties in the management of the business of the Company as may be designated from time to time by the Board or the stockholders and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board.  Subject to the foregoing, the chief executive officer (or in the absence of a chief executive officer, the president) of the Company shall have general supervision, direction, and control of the business and the officers of the Company.  All officers of the Company shall report to the chief executive officer (or in the absence of a chief executive officer, the president) or his or her designee.

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC                     -10-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

## ARTICLE V — RECORDS AND REPORTS

5.1 *Maintenance and Inspection of Records*. The Company shall, either at its principal executive office or at such place or places as designated by the Board, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these bylaws as amended to date, accounting books and other records.

5.2 *Inspection by Directors*. Any director shall have the right to examine the Company's stock ledger, a list of its stockholders, and its other books and records for a purpose reasonably related to his or her position as a director. The Court of Chancery is hereby vested with the exclusive jurisdiction to determine whether a director is entitled to the inspection sought. The Court may summarily order the Company to permit the director to inspect any and all books and records, the stock ledger, and the stock list and to make copies or extracts therefrom. The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other and further relief as the Court may deem just and proper.

5.3 *Annual Report*. The Company shall cause an annual report to be sent to the stockholders of the Company to the extent required by applicable law. If and so long as there are fewer than 100 holders of record of the Company's shares, the requirement of sending of an annual report to the stockholders of the Company is expressly waived (to the extent permitted under applicable law).

## ARTICLE VI — GENERAL MATTERS

6.1 *Stock Certificates; Partly Paid Shares*. The shares of the Company shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Company. Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate signed by, or in the name of the Company by the chairperson or vice-chairperson of the Board, or the president or vice-president, or by the treasurer or an assistant treasurer, or the secretary or an assistant secretary of the Company representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Company with the same effect as if he were such officer, transfer agent or registrar at the date of issue.

The Company may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor. Upon the face or back of each stock certificate issued to represent any such partly paid shares, upon the books and records of the Company in the case of uncertificated partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. Upon the declaration of any dividend on

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC

-11-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336135

ER-6049

fully paid shares, the Company shall declare a dividend upon partly paid shares of the same class, but only upon the basis of the percentage of the consideration actually paid thereon.

6.2 *Special Designation on Certificates*. If the Company is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the Company shall issue to represent such class or series of stock; *provided, however,* that, except as otherwise provided in Section 202 of the DGCL, in lieu of the foregoing requirements there may be set forth on the face or back of the certificate that the Company shall issue to represent such class or series of stock a statement that the Company will furnish without charge to each stockholder who so requests the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

6.3 *Lost Certificates*. Except as provided in this Section 6.3, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the Company and cancelled at the same time. The Company may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Company may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Company a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

6.4 *Construction; Definitions*. Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the DGCL shall govern the construction of these bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both a corporation and a natural person.

6.5 *Dividends*. The Board, subject to any restrictions contained in either (i) the DGCL, or (ii) the certificate of incorporation, may declare and pay dividends upon the construction of these bylaws. Dividends may be paid in cash, in property, or in shares of the Company's capital stock.

The Board may set apart out of any of the funds of the Company available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the Company, and meeting contingencies.

6.6 *Fiscal Year*. The fiscal year of the Company shall be fixed by resolution of the Board and may be changed by the Board.

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC                                -12-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336136

ER-6050

**6.7** *Seal.* The Company may adopt a corporate seal, which shall be adopted and which may be altered by the Board. The Company may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

**6.8** *Stock Transfer Agreements.* The Company shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the Company to restrict the transfer of shares of stock of the Company of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

**6.9** *Registered Stockholders.* The Company:

(i)      shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner;

(ii)      shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares; and

(iii)      shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

**6.10** *Waiver of Notice.* Whenever notice is required to be given under any provision of the DGCL, the certificate of incorporation or these bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the certificate of incorporation or these bylaws.

## ARTICLE VII — NOTICE BY ELECTRONIC TRANSMISSION

**7.1** *Notice by Electronic Transmission.* Without limiting the manner by which notice otherwise may be given effectively to stockholders pursuant to the DGCL, the certificate of incorporation or these bylaws, any notice to stockholders given by the Company under any provision of the DGCL, the certificate of incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice to the Company. Any such consent shall be deemed revoked if:

(i)      the Company is unable to deliver by electronic transmission two consecutive notices given by the Company in accordance with such consent; and

**Trial Exh. 20512 Page 072**
FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                          THER-0336137

ER-6051

(ii)     such inability becomes known to the secretary or an assistant secretary of the Company or to the transfer agent, or other person responsible for the giving of notice.

However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

Any notice given pursuant to the preceding paragraph shall be deemed given:

(i)     if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

(ii)     if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice;

(iii)     if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and

(iv)     if by any other form of electronic transmission, when directed to the stockholder.

An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the Company that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

7.2 *Definition of Electronic Transmission*. An "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

7.3 *Inapplicability*. Notice by a form of electronic transmission shall not apply to Sections 164, 296, 311, 312 or 324 of the DGCL.

## ARTICLE VIII — INDEMNIFICATION

8.1 *Indemnification of Directors and Officers*. The Company shall indemnify and hold harmless, to the fullest extent permitted by the DGCL as it presently exists or may hereafter be amended, any director or officer of the Company who was or is made or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**Proceeding**") by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director, officer, employee or agent of the Company or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC                    -14-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336138

ER-6052

expenses reasonably incurred by such person in connection with any such Proceeding. The Company shall be required to indemnify a person in connection with a Proceeding initiated by such person only if the Proceeding was authorized by the Board.

8.2 *Indemnification of Others*. The Company shall have the power to indemnify and hold harmless, to the extent permitted by applicable law as it presently exists or may hereafter be amended, any employee or agent of the Company who was or is made or is threatened to be made a party or is otherwise involved in any Proceeding by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was an employee or agent of the Company or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding.

8.3 *Prepayment of Expenses*. The Company shall pay the expenses incurred by any officer or director of the Company, and may pay the expenses incurred by any employee or agent of the Company, in defending any Proceeding in advance of its final disposition; *provided, however*, that the payment of expenses incurred by a person in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the person to repay all amounts advanced if it should be ultimately determined that the person is not entitled to be indemnified under this **Article VIII** or otherwise.

8.4 *Determination; Claim*. If a claim for indemnification or payment of expenses under this **Article VIII** is not paid in full within sixty days after a written claim therefor has been received by the Company the claimant may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Company shall have the burden of proving that the claimant was not entitled to the requested indemnification or payment of expenses under applicable law.

8.5 *Non-Exclusivity of Rights*. The rights conferred on any person by this **Article VIII** shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the certificate of incorporation, these bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

8.6 *Insurance*. The Company may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Company would have the power to indemnify him or her against such liability under the provisions of the DGCL.

8.7 *Other Indemnification*. The Company's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer, employee or agent of another corporation,

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC

-15-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

**Trial Exh. 20512 Page 074**

THER-0336139

ER-6053

partnership, joint venture, trust, enterprise or non-profit entity shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, joint venture, trust, enterprise or non-profit enterprise.

8.8 **Amendment Or Repeal**. Any repeal or modification of the foregoing provisions of this **Article VIII** shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.

## ARTICLE IX — RIGHT OF FIRST REFUSAL

9.1     Before any shares of the Company's capital stock may be sold or otherwise transferred, the Company or its assignee shall have a right of first refusal to purchase such securities on the terms and conditions set forth in this Article IX (the "Right of First Refusal").

(i)     Notice of Proposed Transfer. The stockholder proposing to make a sale or transfer (the "Seller") shall deliver to the corporation a binding written notice (the "Seller Notice") stating: (i) the Seller's bona fide intention to sell or otherwise transfer such securities; (ii) the name of each proposed purchaser or other transferee (the "Proposed Transferee"); (iii) the number of securities proposed to be transferred to each Proposed Transferee; and (iv) the terms and conditions of each proposed sale or transfer. The Seller shall offer the securities at the same price (the "Offered Price") and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee.

(ii)     Exercise of Right of First Refusal. At any time within thirty (30) business days after receipt of the Seller Notice, the Company or its assignee may, by giving written notice to the Seller, elect to purchase all of the securities proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (iii) below.

(iii)     Purchase. The purchase price ("Purchase Price") for the securities purchased by the Company or its assignee shall be the Offered Price. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith. Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Seller to the Company (or, in the case of purchase by an assignee, to the assignee), or by any combination thereof within 60 days after the Company or its assignee provides the written notice to the Seller as provided in subsection (ii) above.

(iv)     Seller's Right to Transfer. If the securities proposed in the Seller Notice to be transferred are not purchased by the Company or its assignee as provided in this Article IX, then the Seller may sell or otherwise transfer such securities to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 90 days after the date of the Seller Notice and provided further that any such sale or other transfer is effected in accordance with any applicable securities laws. If any securities described in the Seller Notice are not transferred to the Proposed Transferee within such period, or if the Seller proposes to change the price or other terms to

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC                     -16-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336140

ER-6054

make them more favorable to the Proposed Transferee, a new Seller Notice shall be given to the Company, and the Company and/or its assignee shall again be offered the Right of First Refusal before any securities held by the Seller may be sold or otherwise transferred.

(v)   Permitted Transactions.  The provisions of this Section 8.8 shall not pertain or apply to transfers by the initial holder of the securities to family members, transfers to trusts or other entities beneficially owned by family of the initial holder, or to any limited partnership of which the initial holder, members of such initial holder's immediate family or any trust for the account of such initial holder or such initial holder's immediate family, is the general or limited partner(s) of such partnership, transfer to partners or former partners of a limited or general partnership of which the initial holder is a partner, transfers of any or all of such initial holder's shares to the Company or any other initial holder of the Company, or bona fide gifts by the initial holder.

(vi)   Termination.  The provisions of this Article IX shall automatically terminate upon effectiveness of the Company's initial public offering of its common stock pursuant to the Securities Act of 1933.

## ARTICLE X — AMENDMENTS

These bylaws may be adopted, amended or repealed by the stockholders entitled to vote. However, the Company may, in its certificate of incorporation, confer the power to adopt, amend or repeal bylaws upon the directors.  The fact that such power has been so conferred upon the directors shall not divest the stockholders of the power, nor limit their power to adopt, amend or repeal bylaws.

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC                    -17-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336141

ER-6055

# THERANOS, INC.

## CERTIFICATE OF ADOPTION OF BYLAWS

The undersigned hereby certifies that he or she is the duly elected, qualified and acting Secretary or Assistant Secretary of Theranos, Inc., a Delaware corporation (the "**Company**"), and that the foregoing bylaws, comprising 16 pages, were adopted as the Company's bylaws on April 14, 2004 by the Company's board of directors.

The undersigned has executed this Certificate as of April 14, 2004.

_____
*Secretary*

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336142

ER-6056

**THERANOS, INC.**

**CERTIFICATE OF AMENDMENT OF BYLAWS**


      The undersigned hereby certifies that he or she is the duly elected, qualified, and acting Secretary or Assistant Secretary of Theranos, Inc., a Delaware corporation (the "**Company**"), and that the foregoing bylaws, comprising 16 pages, were amended and restated on [ _August 10_ , 20__ ] by the Company's board of directors.

      The undersigned has executed this Certificate as of [ _August 10_ , 20__ ].

                                    _____

                              *Secretary*

C:\NrPortbl\PALIB2\EQF\2767907_1.DOC

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0336143

ER-6057

**Thies, Kathy**

| | |
|---|---|
| **From:** | Fluegel, Bradley |
| **Sent:** | Saturday, January 02, 2016 4:42 PM |
| **To:** | Thies, Kathy |
| **Subject:** | Fwd: Attorney Client Priveledged |
| **Attachments:** | JHU-Theranos Meeting Minutes.pdf; ATT00001.htm |

To print.

Begin forwarded message:

> **From:** "Leider, Harry" <harry.leider@walgreens.com>
> **Date:** January 2, 2016 at 12:32:12 PM HST
> **To:** "Fluegel, Bradley" <Bradley.Fluegel@walgreens.com>, "Jhaveri, Nimesh"
> <nimesh.jhaveri@walgreens.com>, "Reed, Jan" <jan.reed@wba.com>
> **Subject: Attorney Client Priveledged**

# Attorney-Client Privileged

Best,

Harry

Harry L. Leider, MD, MBA
**Chief Medical Officer & Group Vice President**

1

CONFIDENTIAL TREATMENT REQUESTED PURSUANT TO
FED. R. CRIM. P. 6(e). This confidential document is provided
to the U.S. Department of Justice in response to a grand jury
subpoena, and neither the document nor its contents may be
disclosed to any other person or entity except as authorized
under Fed. R. Crim. P. 6(e).

WAG-TH-DOJ-00046583

ER-6058

**Walgreen Co.** | 108 Wilmot Road, MS 1833, Deerfield, IL 60045
Telephone 847 315 6233

**Member of Walgreens Boots Alliance**

This email message, including attachments, may contain information that is proprietary, confidential, privileged and/or exempt from disclosure. Please hold it in confidence to protect privilege and confidentiality. If you are not the intended recipient, then please notify the sender and delete this message. Any viewing, copying, publishing, disclosure, distribution of this information, or the taking of any action in reliance on the contents of this message by unintended recipients is prohibited and may constitute a violation of the Electronic Communications Privacy Act.

---

**From:** Mark Shaver <mshaver@jhmi.edu>
**Date:** Wednesday, December 23, 2015 at 4:36 PM
**To:** Microsoft Office User <harry.leider@walgreens.com>
**Cc:** Mark Cochran <mcochran@jhmi.edu>
**Subject:** Hopkins - Walgreens Follow Up

Harry

Great seeing you recently.  As you requested, please find the attached report on Theranos which as outlined was a review of their proprietary data shared during the discussion with our faculty.

Additionally, we have been working through our legal documents on the expansion of the collaboration agreement, lease for the clinic in the JV store and getting approval for the payment of funds related to our stake in the JV.  I anticipate final approvals in the coming week or so, followed by comments to the draft documents the first week in January.  Additionally, I am going to reach out to Pat Carroll to discuss the retail clinic opportunity that he presented post Rite Aid merger.   Our team would like to explore this opportunity with you.

We look forward to continuing to deepen our partnership with you and your team.   In addition, Mark C and I will be in San Francisco for the JP Morgan conference if you or your team would like to meet briefly.

Mark Shaver,
Vice President, Business Development & Strategic Alliances
Johns Hopkins Medicine
1300 Thames Street, Suite 200
Baltimore, MD 21231
410-464-6662

2

CONFIDENTIAL TREATMENT REQUESTED PURSUANT TO FED. R. CRIM. P. 6(e). This confidential document is provided to the U.S. Department of Justice in response to a grand jury subpoena, and neither the document nor its contents may be disclosed to any other person or entity except as authorized under Fed. R. Crim. P. 6(e).

WAG-TH-DOJ-00046584

Trial Exh. 20532 Page 002

ER-6059



**JOHNS HOPKINS**
M E D I C I N E

### Summary of Hopkins/Walgreens/Theranos Meeting
April 27th, 2010

#### Johns Hopkins Medicine Participants:

| | |
|---|---|
| Dr. Frederick Brancati | Professor of Medicine & Epidemiology, Director, Division of General Internal Medicine; Director, Diabetes Prevention & Control Core |
| Dr. Thomas Kicker | Professor of Medicine; Director of Hematology Laboratory |
| Dr. William Clark | Associate Professor of Pathology; Director of Clinical Pathology Laboratory |
| Mark Shaver | Head of Strategic Alliances, Johns Hopkins Medicine International |
| Bassam Sayad | Managing Director, Johns Hopkins Medicine International, Formerly Senior Staff, JH Clinical Pathology |

#### Walgreens Participants:

| | |
|---|---|
| Dr. Jay Rosan | Vice President, Health Innovation, Walgreens |

#### Theranos Participants:

| | |
|---|---|
| Elizabeth Holmes | President & CEO, Theranos |
| Sunny Balwani | Vice Chairman, Theranos |

#### Innosight Participants:

| | |
|---|---|
| Erika Johnson | Manager, Innosight |

#### Meeting Objectives:

- Hopkins team was asked to comment on validity and usefulness of Theranos product, specifically related to the science that supports the technology and the application of the technology in a variety of settings including hospital, clinic, laboratory and potentially within Walgreens as an add on to the clinical programs and retail pharmacy business that currently exists.

#### Methodology:

- The Hopkins Team reviewed proprietary data on test performance for routine tests (clinical pathology, hematology) and special tests (e.g. tumor markers)

- Theranos presented additional data on technology, test performance, and business vision— and demonstrated technology on site.

- Dr. Rosan commented on Walgreens preliminary strategy to explore expanding into the laboratory space, expanding its health services offerings to include lab and pathology testing within Walgreens retail space.

*Confidential Document*

CONFIDENTIAL TREATMENT REQUESTED PURSUANT TO FED. R. CRIM. P. 6(e). This confidential document is provided to the U.S. Department of Justice in response to a grand jury subpoena, and neither the document nor its contents may be disclosed to any other person or entity except as authorized under Fed. R. Crim. P. 6(e).

WAG-TH-DOJ-00046585

Trial Exh. 20532 Page 003

ER-6060

**Key Findings**:  Based on this evaluation, the consensus of the Hopkins team was as follows:

- The technology is novel and sound.  It can accurately run a wide range of routine and special assays.

- The technology is simple enough to be used by non-specialists in the field.

- Special strengths of the technology include:
  - Accuracy
  - Miniaturization (small footprint, portable, usable in the field)
  - Flexibility (can be tailored to needs of variety of clinical venues)
  - Connectivity (connection to centralized control via wireless/web enhances QC and population-based analysis)
  - Adaptability for Research (can be tailored for repeated measures of new targets, e.g. drugs)
  - Cost per study was stated to be significantly lower than currently available on the commercial market

- The Hopkins team thought that the technology would be useful in the retail clinic setting, with the proviso that the throughput for an individual sample (30-45 min) would require multiple units per site and impose an upper limit for group throughput.

- The Hopkins team also thought it would be attractive to consider JHU-Theranos research collaboration around individualized medicine, especially around drug kinetics and response.

- One observation: "The Theranos Technology is not really 'point of care' technology—it's really a traditional lab assay approach, with the attendant accuracy and validity---highly miniaturized.  Essentially a 'mini-lab'."

- No major weaknesses were identified.


**Additional Information**:

- Dr. Clark indicated that over the past two years he has had numerous conversations with Theranos about utilizing their technology at Johns Hopkins for research activities.  The conversations continue to be favorable and both parties will continue to explore opportunities for collaboration.

**Disclaimer**:

This information is being provided solely for the benefit of Walgreens and shall be used by Walgreens for its internal purposes only.  In addition, the materials provided in no way signify an endorsement by Johns Hopkins Medicine to any product or service.


*Confidential Document*

CONFIDENTIAL TREATMENT REQUESTED PURSUANT TO FED. R. CRIM. P. 6(e). This confidential document is provided to the U.S. Department of Justice in response to a grand jury subpoena, and neither the document nor its contents may be disclosed to any other person or entity except as authorized under Fed. R. Crim. P. 6(e).

WAG-TH-DOJ-00046586

Trial Exh. 20532 Page 004

ER-6061



U.S. Department of Health & Human Services

a A A

FDA U.S. FOOD & DRUG ADMINISTRATION

Follow FDA | En Español

SEARCH

Home | Food | Drugs | Medical Devices | Radiation-Emitting Products | Vaccines, Blood & Biologics | Animal & Veterinary | Cosmetics | Tobacco Products

# 510(k) Premarket Notification

FDA Home · Medical Devices · Databases

CDRH SuperSearch

510(k) | DeNovo | Registration & Listing | Adverse Events | Recalls | PMA | HDE | Classification | Standards
CFR Title 21 | Radiation-Emitting Products | X-Ray Assembler | Medsun Reports | CLIA | TPLC

New Search · Back To Search Results

| | |
|---|---|
| **Device Classification Name** | enzyme linked immunosorbent assay, herpes simplex virus, hsv-1 |
| **510(k) Number** | K143236 |
| **Device Name** | Theranos Herpes Simplex Virus-1 IgG Assay |
| **Applicant** | THERANOS, INC.<br>1701 PAGE MILL ROAD<br>PALO ALTO, CA 94304 |
| **Applicant Contact** | Brad Arington |
| **Correspondent** | THERANOS, INC.<br>1701 PAGE MILL ROAD<br>PALO ALTO, CA 94304 |
| **Correspondent Contact** | Brad Arington |
| **Regulation Number** | 866.3305 |
| **Classification Product Code** | MXJ |
| **Date Received** | 11/12/2014 |
| **Decision Date** | 07/02/2015 |
| **Decision** | Substantially Equivalent (SESE) |
| **Regulation Medical Specialty** | Microbiology |
| **510k Review Panel** | Microbiology |
| **Summary** | Summary |
| **FDA Review** | Decision Summary |
| **Type** | Traditional |
| **Reviewed by Third Party** | No |
| **Combination Product** | No |

Page Last Updated: 05/16/2022
Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.
Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

FDA
Accessibility | Contact FDA | Careers | FDA Basics | FOIA | No FEAR Act | Nondiscrimination | Website Policies / Privacy

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA

USA.gov

For Government | For Press

Combination Products
Advisory Committees
Science & Research
Regulatory Information
Safety
Emergency Preparedness
International Programs
News & Events
Training and Continuing Education
Inspections/Compliance

U.S. Department of Health & Human Services

510(k) Premarket Notification

State & Local Officials

Consumers

Industry

Health Professionals

FDA Archive

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center – WO66-G609
Silver Spring, MD 20993-0002

THERANOS, INC.
BRAD ARINGTON
ASSOCIATE DIRECTOR, REGULATORY
1701 PAGE MILL ROAD
PALO ALTO, CA 94304

July 7, 2015

Re: K143236
    Trade/Device Name: Theranos Herpes Simplex Virus-1 IgG Assay
    Regulation Number: 21 CFR 866.3305
    Regulation Name: Herpes simplex virus serological assays
    Regulatory Class: II
    Product Code: MXJ
    Dated: June 29, 2015
    Received: June 30, 2015

Dear Mr. Arington:

This letter corrects our substantially equivalent letter of July 2, 2015.

We have reviewed your Section 510(k) premarket notification of intent to market the device referenced above and have determined the device is substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA). You may, therefore, market the device, subject to the general controls provisions of the Act. The general controls provisions of the Act include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration. Please note: CDRH does not evaluate information related to contract liability warranties. We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it may be subject to additional controls. Existing major regulations affecting your device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Parts 801 and 809); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the

ER-6064

Page 2—Mr. Arington

electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulations (21 CFR Parts 801 and 809), please contact the Division of Industry and Consumer Education at its toll-free number (800) 638 2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.  Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97).  For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Sally A. Hojvat -S

Sally A. Hojvat, M.Sc., Ph.D.
Director
Division of Microbiology Devices
Office of In Vitro Diagnostics
   and Radiological Health
Center for Devices and Radiological Health

Enclosure

ER-6065

**To:**    Daniel Young[dyoung@theranos.com]
**From:**    Sunny Balwani
**Sent:**    Wed 7/15/2015 9:38:47 PM
**Subject:**    FW: CW150009 CLIA Waiver Granted Notification
CW150009.pdf

---

**From:** Brad Arington
**Sent:** Wednesday, July 15, 2015 2:37 PM
**To:** Elizabeth Holmes; Sunny Balwani; Heather King
**Subject:** FW: CW150009 CLIA Waiver Granted Notification

Just came in.


Brad Arington
Theranos, Inc.
Associate Director, Regulatory
Direct: (650) 856-7304
Cell: ███████████

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

---

**From:** Tobin, Peter [mailto:Peter.Tobin@fda.hhs.gov]
**Sent:** Wednesday, July 15, 2015 2:34 PM
**To:** Brad Arington
**Cc:** El Mubarak, Haja Sittana; Lovell, Stephen; Scherf, Uwe; Gutierrez, Alberto; CDRH CLIA Coordinator; official-CW150009@doc.fda.gov
**Subject:** CW150009 CLIA Waiver Granted Notification

Dear Mr. Brad Arington

Please find attached a CLIA Waiver Granted Notification regarding CW150009.

If you have any questions, please contact the lead reviewer, Haja Sittan El Mubarak.

Kind regards,

Peter

Peter Tobin, Ph.D.
Division of Program Operations and Management
Office of In Vitro Diagnostics and Radiological Health
FDA Center for Devices and Radiological Health
10903 New Hampshire Avenue
Building 66, Room 4529
Silver Spring, MD 20993
███████████████

Excellent customer service is important to us. Please take a moment to provide feedback regarding the customer service you have received: https://www.research.net/s/cdrhcustomerservice?O=500&D=520&B=521&E=&S=E.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-2464707



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**     Public Health Service

U.S. Food and Drug Administration
Center for Devices and Radiological Health
Document Mail Center - WO66-G609
10903 New Hampshire Ave.
Silver Spring, MD 20993-0002

July 15, 2015

Brad Arington, Associate Director, Regulatory
THERANOS, INC.
1701 PAGE MILL ROAD
PALO ALTO, CA 94304  US

Re: CW150009
CLIA Parent(s): k143236
Applicant: THERANOS, INC.
Device: Theranos Herpes Simplex Virus-1(HSV-1) IgG Assay
Dated: June 29, 2015
Received: June 30, 2015
CLIA Effective Date: July 15, 2015

**W a i v e r   G r a n t e d   N o t i f i c a t i o n**

The Center for Devices and Radiological Health (CDRH) of the Food and Drug Administration (FDA)
has completed its review of your application for waived status under the Clinical Laboratory Improvement
Amendments of 1988 (CLIA) regulations. We are pleased to inform you that your test system(s) as identified
below is waived:

**Test System/Analyte(s):**  (SEE ATTACHMENT)

Waived status is applicable to test systems and their instructions approved or cleared by the FDA. We recommend
that the test system instructions include a statement that the test system is waived under CLIA. Any modification
to the test system including test system instructions or a change in the test system name must be submitted to the
FDA for the evaluation of waiver. If you change the test system name or your company's name or if a distributor's
name replaces your name, you must request another categorization by sending in the revised labeling along with a
letter to FDA referencing the document number above.

This complexity categorization is effective as of the date of this notification and will be reported on FDA's
home page  http://www.fda.gov/cdrh/clia . This categorization information may be provided to the user of the
commercially marketed test system or assay as specified for the analyte indicated. FDA reserves the right to
re-evaluate and re-categorize this test based upon additional information received.

If you have any questions regarding this complexity categorization, please contact Stephen Lovell at
301-796-6968.

Sincerely yours,

Alberto Gutierrez, Ph.D.
Director
 Office of *In Vitro* Diagnostics and
   Radiological Health
Center for Devices and Radiological Health

**Trial Exh. 20826 Page 002**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-2464708

ER-6067

ATTACHMENT

**Parent Number : k143236**

| | |
|---|---|
| Test System | : Theranos anti-HSV-1 IgG Assay {Fingerstick Whole Blood Only} |
| Analyte | : Herpes simplex I and/or II antibodies |
| Complexity | : WAIVED |

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-2464709

ER-6068

Doc Code: **TR.PROV**
Document Description: Provisional Cover Sheet (SB16)

PTO/SB/16 (11-08)
Approved for use through 05/31/2015. OMB 0651-0032
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

## Provisional Application for Patent Cover Sheet
This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c)

## Inventor(s)

Inventor 1                                                                         Remove

| Given Name | Middle Name | Family Name | City | State | Country i |
|---|---|---|---|---|---|
| Xinwei | Sam | Gong | Palo Alto | CA | US |

Inventor 2                                                                         Remove

| Given Name | Middle Name | Family Name | City | State | Country i |
|---|---|---|---|---|---|
| Daniel | | Young | Palo Alto | CA | US |

Inventor 3                                                                         Remove

| Given Name | Middle Name | Family Name | City | State | Country i |
|---|---|---|---|---|---|
| William | | Westrick | Palo Alto | CA | US |

All Inventors Must Be Listed – Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.                    Add

| Title of Invention | Devices, Methods and Systems for Reducing Sample Volume |
|---|---|
| Attorney Docket Number (if applicable) | 3013.101 |

## Correspondence Address

Direct all correspondence to (select one):

| ⦿ The address corresponding to Customer Number | ◯ Firm or Individual Name |
|---|---|
| Customer Number | 107075 |

| The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government. | | |
|---|---|---|
| ⦿ No. | | |
| ◯ Yes, the invention was made by an agency of the United States Government. The U.S. Government agency name is: | | |
| ◯ Yes, the invention was under a contract with an agency of the United States Government. The name of the U.S. Government agency and Government contract number are: | | |

Trial Exh. 20830 Page 001

ER-6069

Doc Code: **TR.PROV**
Document Description: Provisional Cover Sheet (SB16)

PTO/SB/16 (11-08)
Approved for use through 05/31/2015. OMB 0651-0032
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

**Entity Status**
**Applicant asserts small entity status under 37 CFR 1.27 or applicant certifies micro entity status under 37 CFR 1.29**

○  Applicant asserts small entity status under 37 CFR 1.27

○  Applicant certifies micro entity status under 37 CFR 1.29. Applicant must attach form PTO/SB/15A or B or equivalent.

◉  No

## Warning

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft.  Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application.  If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to USPTO.  Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent.  Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR1.14).  Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

## Signature

Please see 37 CFR 1.4(d) for the form of the signature.

| Signature | /James Fox/ | | | Date (YYYY-MM-DD) | 2013-10-08 |
|---|---|---|---|---|---|
| First Name | James | Last Name | Fox | Registration Number (If appropriate) | 38455 |

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **This form can only be used when in conjunction with EFS-Web. If this form is mailed to the USPTO, it may cause delays in handling the provisional application.**

Trial Exh. 20830 Page 002

ER-6070

# Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or paten. Accordingly, pursuant to the requirements of the Act, please be advised that : (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, t o a n other federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

ER-6071

## ABSTRACT

**DEVICES, METHODS AND SYSTEMS FOR REDUCING SAMPLE VOLUME**

Devices, methods and systems are provided for reducing the sample volume required for analysis. Inserts placed within a sample container, and substitute sample containers having smaller volume sample chambers are provided. Methods are provided for detection and quantification of target substances in reduced volume samples. Methods include reducing the volume of sample, and: increasing illumination; increasing dye concentration or amount; increasing the amount of an enzyme substrate; increasing the amounts, concentration, or labeling of antibodies for detection; increasing optical detector sensitivity; increasing the path length of light passing through the sample; decreasing the separation between the sample and an optical detector; altering the wavelength, or polarization, or number of wavelengths, passing through the sample; increasing electronic amplification of electrical signals; altering assay temperature; and other alterations.

Attorney Docket No. 3013.101

Attorney Docket:     3013.101

# DEVICES, METHODS AND SYSTEMS FOR REDUCING SAMPLE VOLUME

## BACKGROUND

[0001]    Detection of analytes in a sample and determination of the chemical composition of a sample are useful in many clinical and scientific applications. Thus, methods, devices, and systems for analyzing samples and for detecting target substances within the samples are useful in many contexts. A method of testing for, or for detecting, a target substance in a sample may be termed an "assay." Some assays may be performed by devices or systems with little or no human intervention; such assays may be termed automated assays, and are performed by automatic devices or automatic systems.

[0002]    Clinical assays are often developed to identify target materials in samples taken from patients. For example, targets may include proteins, nucleic acids, lipids, organic molecules, inorganic molecules and ions. Such target materials may include drugs, drug metabolites, vitamins, hormones, growth factors, carrier proteins, cells, infectious agents, and other target materials that may be indicative of medical conditions or disorders. Other clinical assays may be directed to testing for levels of drugs, drug metabolites, hormones, vitamins, or other substances which may be of therapeutic or clinical interest.  In some instances, a sample may include multiple analytes, and multiple assays may be required to detect or quantify all of the analytes of interest in a sample.

[0003]    Clinical assays require samples to be obtained from a subject, such as a patient suffering from, or suspected of suffering from, a disease characterized by markers identifiable by the assay. However, providing samples is often uncomfortable, or difficult, or inconvenient for a subject; the discomfort, difficulty, and inconvenience is typically greater the larger the volume of sample that is required.

[0004]    Accordingly, methods and devices for reducing the volume of sample required to be obtained from a subject are desired, and assays, guidelines and methods for altering existing

ER-6073

Attorney Docket No. 3013.101

**DEVICES, METHODS AND SYSTEMS FOR REDUCING SAMPLE VOLUME**

machines and assays that may be performed on smaller volume samples than presently practiced are also desired.

## INCORPORATION BY REFERENCE

[0005]     All publications, patents, and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication, patent, or patent application was specifically and individually indicated to be incorporated by reference.

## SUMMARY

[0006]     Applicants provide methods and devices for modifying assays, and for modifying assay devices, to reduce the volume of sample required for the performance of assays for the detection of analytes. Devices and systems modified according to the methods disclosed herein, and using the devices disclosed herein, are able to perform analytical assays while requiring less sample, providing greater comfort to subjects since smaller samples are less painful to obtain; providing more cost-effective assays and analyses, since smaller sample volumes typically require less reagent volume, and so are less costly to assay; providing less waste pursuant to the assays; and providing other advantages as compared to original assays and methods which require greater sample volumes.

[0007]     Applicants provide methods for modifying a clinical analysis device comprising reducing the sample volume by including an insert into a sample container. Applicants provide methods for modifying a sample container used in a clinical analysis device comprising reducing the sample volume by including an insert into the sample container. Applicants provide methods for modifying sample analysis in a clinical analysis device comprising reducing the sample volume analyzed by the clinical analysis device by including an insert into the sample container. Applicants provide methods for modifying sample analysis in a clinical analysis device comprising reducing the sample volume analyzed by the clinical analysis device by providing a substitute sample container having a smaller volume than the original sample container.

[0008]     Methods for reducing the volume of sample used during, or required for, sample analysis include providing an insert which fits in a sample container effective to reduce the volume of sample held by the combined sample container and insert; or providing a substitute sample container which has a smaller volume than the original sample container. The sample

Trial Exh. 20830 Page 006

Attorney Docket No. 3013.101

**DEVICES, METHODS AND SYSTEMS FOR REDUCING SAMPLE VOLUME**

may be contained within a sample container during at least a portion of the performance of said original assay, said sample container comprising an internal cavity for holding said sample, said internal cavity having a volume, and wherein any of the foregoing methods comprise reducing said volume of said internal cavity. In embodiments, reducing the volume of said internal cavity comprises providing an alternative sample container. In embodiments, reducing the volume of said internal cavity comprises placing an insert into said internal cavity. In embodiments, an insert may comprise an insert cavity configured to hold said sample, wherein said insert cavity comprises a volume less than said internal cavity volume. In embodiments, an insert may be configured effective that optical signals indicative of the presence of, or quantification of, a target substance in a sample contained within said insert may be detected by said optical detector.

[0009]     Applicants further provide devices for reducing the volume of sample held within a sample container, wherein said sample container is configured to hold a first volume of sample effective to allow detection of a target substance in said sample by a detector disposed externally to said sample container, wherein said device comprises an insert configured to i) fit within said sample container, ii) hold a second volume of sample, wherein said second volume of sample is less than said first volume of sample, and iii) allow the detection of a signal indicative of the presence of, or quantification of, a target substance in a sample contained within said insert, wherein said detection comprises detection by a detector disposed externally to said sample container. In embodiments, the insert is configured to allow the passage of light effective that optical signals indicative of the presence of, or quantification of, a target substance in a sample contained within said insert may be detected by an optical detector disposed externally to the sample container.

[0010]     Applicants provide methods for modifying a clinical analysis device comprising reducing the sample volume by including an insert into a sample holder, and increasing the sensitivity of a detector. Applicants provide methods for modifying a clinical analysis device comprising reducing the sample volume by including an insert into a sample holder, and decreasing the distance between a sample and a detector. Applicants provide methods for modifying a clinical analysis device comprising reducing the sample volume by including an insert into a sample holder, and increasing the intensity of an illumination source providing illumination of a sample to be detected by a detector. Applicants provide methods for modifying

Trial Exh. 20830 Page 007

ER-6075

Attorney Docket No. 3013.101

**DEVICES, METHODS AND SYSTEMS FOR REDUCING SAMPLE VOLUME**

a clinical analysis device comprising reducing the volume of a sample container by placing an insert into said sample container; and increasing the concentration of a dye or of a substrate which is detected by, or which provides a signal detected by, a detector during operation of the device. Applicants provide methods for modifying a clinical analysis device comprising diluting a sample, and: increasing the sensitivity of a detector; or increasing the intensity of an illumination source providing illumination of a sample to be detected by a detector; or increasing the concentration of a dye/substrate which is detected by a detector during operation of the device.

[0011]    Accordingly, Applicants provide a method for reducing the volume of sample used in the performance of an assay as compared to an original volume of sample used for the original performance of said assay, wherein said assay comprises the detection of an optical signal for detection of the presence of, or quantification of, a target substance in a sample, the method comprising:

Reducing the volume of sample used in the assay from a first sample volume to a second sample volume, wherein said second sample volume is less than said first sample volume, and wherein the assay was originally performed using said first volume of sample; and

Increasing the intensity of illumination applied to said sample, as compared to the original intensity of illumination applied to the sample, wherein said illumination is used to detect the presence of said target substance in the sample, or to quantify the amount of said target substance in the sample.

[0012]    Applicants further provide a method for reducing the volume of sample used in the performance of an assay as compared to an original volume of sample used for the original performance of said assay, wherein said assay comprises the detection of a fluorescent label for detection of the presence of, or quantification of, a target substance in a sample, the method comprising:

Reducing the volume of sample used in the assay from a first sample volume to a second sample volume, wherein said second sample volume is less than said first sample volume, and wherein the assay was originally performed using said first volume of sample; and

ER-6076

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 16805722 |
| **Application Number:** | 61875678 |
| **International Application Number:** | |
| **Confirmation Number:** | 5007 |
| **Title of Invention:** | DEVICES, METHODS AND SYSTEMS FOR REDUCING SAMPLE VOLUME |
| **First Named Inventor/Applicant Name:** | . . |
| **Customer Number:** | 107075 |
| **Filer:** | James Fox |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | 3013.101 |
| **Receipt Date:** | 09-SEP-2013 |
| **Filing Date:** | |
| **Time Stamp:** | 23:35:42 |
| **Application Type:** | Provisional |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | 3013_101_APP_Reducing_Sample_Volume.pdf | 348085<br>34fd7cc806b236451a50c055557ca45cba33a29c | yes | 51 |

ER-6077

**Multipart Description/PDF files in .zip description**

| Document Description | Start | End |
|---|---|---|
| Specification | 1 | 39 |
| Claims | 40 | 47 |
| Abstract | 48 | 48 |
| Drawings-only black and white line drawings | 49 | 51 |

| | |
|---|---|
| **Warnings:** | |
| **Information:** | |
| **Total Files Size (in bytes):** | 348085 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

ER-6078

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

       UNITED STATES OF AMERICA,          )
6                                         )  CR-18-00258-EJD
                      PLAINTIFF,          )
7                                         )  SAN JOSE, CALIFORNIA
              VS.                         )
8                                         )  FEBRUARY 4, 2022
       RAMESH SUNNY BALWANI,              )
9                                         )  PAGES 1 - 192
                      DEFENDANT.          )
10     _____        )

11

12                 TRANSCRIPT OF ZOOM PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

       A P P E A R A N C E S:
14

15     FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                                JEFFREY B. SCHENK
                                  AMANI FLOYD
17                           150 ALMADEN BOULEVARD, SUITE 900
                             SAN JOSE, CALIFORNIA 95113
18
                             BY:  ROBERT S. LEACH
19                                KELLY VOLKAR
                             1301 CLAY STREET, SUITE 340S
20                           OAKLAND, CALIFORNIA 94612

21          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22     OFFICIAL COURT REPORTERS:
                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                           CERTIFICATE NUMBER 8074
                             LEE-ANNE SHORTRIDGE, CSR, CRR
24                           CERTIFICATE NUMBER 9595

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

12:15PM 1     ARRANGEMENT FOR VARIOUS PARTIES AND HOW THE I.T. WAS SET UP

12:15PM 2     BOTH FOR THE DEFENSE AND THE GOVERNMENT, AND I INTEND TO FOLLOW

12:15PM 3     THAT AGAIN.

12:15PM 4             MR. COOPERSMITH:  THANK YOU, YOUR HONOR.  YES, WE

12:15PM 5     LOOK FORWARD TO HAVING THAT CONVERSATION WITH MS. KRATZMANN.

12:15PM 6             THE COURT:  GREAT.  GREAT JOB.

12:15PM 7             MR. BOSTIC:  AND WE WILL MAKE OURSELVES AVAILABLE AS

12:15PM 8     WELL, YOUR HONOR.

12:15PM 9             THE COURT:  OKAY.  GREAT.  OKAY.

12:15PM 10        WELL, LET'S TALK ABOUT MOTIONS IN LIMINE AND GET THAT

12:16PM 11    DISCUSSION STARTED.

12:16PM 12        AGAIN, I'M REFERRING TO DOCUMENT 1316, WHICH WAS YOUR

12:16PM 13    JOINT STATEMENT IN ADVANCE OF A PRETRIAL CONFERENCE THAT

12:16PM 14    DISCUSSED -- AND THANKS FOR THIS -- YOUR MOTIONS, AS WELL AS

12:16PM 15    THE SUGGESTED ORDER OF DISCUSSING THEM.

12:16PM 16        AND I INTEND TO ADOPT YOUR SCHEDULE JUST FOR YOUR

12:16PM 17    INFORMATION.  SO LET'S GO THROUGH THESE BEARING THAT IN MIND.

12:16PM 18        THE FIRST IS MR. BALWANI'S MOTION IN LIMINE NUMBER 1.

12:16PM 19            MR. COOPERSMITH:  YOUR HONOR, MR. CAZARES WILL

12:16PM 20    ADDRESS THAT ON BEHALF OF MR. BALWANI.

12:16PM 21            THE COURT:  OKAY.  THIS IS A MOTION TO EXCLUDE

12:16PM 22    EVIDENCE OF ACCURACY AND RELIABILITY OF TESTS RUN ON UNMODIFIED

12:16PM 23    COMMERCIAL DEVICES, AND THIS IS DOCUMENT 1156.  IT'S PAGE 1,

12:17PM 24    ECF PAGE 12.

12:17PM 25            THE GOVERNMENT'S RESPONSE IS IN DOCUMENT 1181, AND THE

12:17PM 1      REPLY IS DOCUMENT 1193.

12:17PM 2            SO I'VE READ THAT.  MR. CAZARES?

12:17PM 3                  MR. CAZARES:  GOOD AFTERNOON, YOUR HONOR.

12:17PM 4      STEPHEN CAZARES FOR MR. BALWANI.

12:17PM 5            YOUR HONOR, MAY I REMOVE MY MASK?

12:17PM 6                  THE COURT:  YES.

12:17PM 7                  MR. CAZARES:  THANK YOU VERY MUCH.

12:17PM 8            WHAT MR. BALWANI IS ASKING FOR IN THIS MOTION IN LIMINE

12:17PM 9      NUMBER 1 IS FOR THE COURT TO REQUIRE THE GOVERNMENT TO

12:17PM 10     ESTABLISH SUFFICIENT FOUNDATION THAT ANY TESTING EVIDENCE,

12:17PM 11     WHETHER IT BE WITNESS TESTIMONY OR DOCUMENTATION THAT THE

12:17PM 12     GOVERNMENT INTENDS TO INTRODUCE, THAT THERE BE A FOUNDATION TO

12:17PM 13     ESTABLISH THAT THAT TESTING WAS RELATED TO OR WAS RUN ON EITHER

12:17PM 14     THERANOS'S PROPRIETARY EDISON DEVICE OR ON MODIFIED COMMERCIAL

12:17PM 15     DEVICES USING THE FINGERSTICK TECHNOLOGY.

12:17PM 16           AND THE REASON AND THE BASES FOR THE MOTION IS, FIRST, THE

12:17PM 17     FOUR CORNERS OF THE INDICTMENT AND THE TEXT.  I THINK READING

12:18PM 18     THE INDICTMENT JUST ON ITS FACE REFERENCES THERANOS'S

12:18PM 19     TECHNOLOGY, THERANOS'S PROPRIETARY TECHNOLOGY MORE THAN A DOZEN

12:18PM 20     TIMES IN RELATION TO ACCURACY AND RELIABILITY.

12:18PM 21           THERE IS NOT A SINGLE PLACE IN THE INDICTMENT THAT

12:18PM 22     REFERENCES ACCURACY AND RELIABILITY AND RELIABILITY PROBLEMS

12:18PM 23     WITH COMMERCIAL TESTING, AND INTERESTINGLY THE INDICTMENT DOES

12:18PM 24     IN MULTIPLE PLACES JUXTAPOSE THERANOS'S ALLEGEDLY INACCURATE

12:18PM 25     TESTING VERSUS WHAT HAPPENS WITH COMMERCIAL TESTING.

12:18PM 1    AND I THINK IT MAKES CLEAR JUST ON THE TEXT ALONE THAT THE

12:18PM 2    INDICTMENT ALLEGES INACCURACY ISSUES RELATED TO JUST THE

12:18PM 3    FINGERSTICK TECHNOLOGY.

12:18PM 4    AND IF THAT'S THE CASE, THE GOVERNMENT SHOULD NOT BE

12:18PM 5    PERMITTED TO INTRODUCE EVIDENCE RELATING TO ACCURACY AND

12:18PM 6    UNRELIABILITY PROBLEMS ON THE COMMERCIAL TESTING.  THAT IS

12:18PM 7    SIMPLY OUTSIDE OF THE INDICTMENT.

12:18PM 8    THE COURT:  ARE THERE ANY -- THANK YOU.

12:18PM 9    ARE THERE ANY GROUNDS OR ANY METHOD WHERE YOU THINK THAT

12:18PM 10   TYPE OF INFORMATION MIGHT BE RELEVANT?

12:19PM 11   I UNDERSTAND THAT HE'S NOT -- YOUR CLIENT IS NOT CHARGED

12:19PM 12   WITH DOING ANYTHING WITH COMMERCIAL MACHINES.  HE'S CERTAINLY

12:19PM 13   NOT CHARGED WITH THAT.

12:19PM 14   AND IF THAT IS THE ONLY EVIDENCE AND YOU ASKED THE COURT

12:19PM 15   TO GRANT A DIRECTED VERDICT, I WOULD PROBABLY GRANT THAT IF

12:19PM 16   THEY DIDN'T PUT ANYTHING IN ABOUT THE COMPANY'S MACHINES LIKE

12:19PM 17   THEY SAID IN THE INDICTMENT.

12:19PM 18   BUT ARE THERE ANY -- IS THERE ANY WAY THAT THAT WOULD BE

12:19PM 19   RELEVANT HERE?

12:19PM 20   MR. CAZARES:  WELL, YOUR HONOR HAS ALREADY ADDRESSED

12:19PM 21   THAT IN RESPONSE TO THE PARTIES' MOTIONS IN LIMINE ORDER NUMBER

12:19PM 22   798, AND I BELIEVE IN THAT ORDER THE COURT PRECLUDED THE

12:19PM 23   GOVERNMENT FROM INTRODUCING EVIDENCE OF ASSAYS OUTSIDE OF WHAT

12:19PM 24   WERE LISTED IN THE BILL OF PARTICULARS, WHICH WERE ALSO LISTED

12:19PM 25   IN THE ULTIMATE INDICTMENT AT ISSUE, THE THIRD SUPERSEDING

12:19PM 1    INDICTMENT, BUT DID PERMIT SOME REFERENCE TO OTHER TESTING,

12:19PM 2    OTHER ASSAYS FOR CONTEXTUAL REASONS I THINK IS KIND OF THE BEST

12:20PM 3    WAY TO PUT IT, BUT NOT ACCURACY AND RELIABILITY.

12:20PM 4        SO TO THE EXTENT A DOCUMENT, A PIECE OF EVIDENCE OR A

12:20PM 5    REPORT INCLUDED BOTH A FINGERSTICK TESTING AND MAYBE SOME

12:20PM 6    ISSUES WITH THE ACCURACY ON THAT FINGERSTICK TESTING, BUT ALSO

12:20PM 7    REFERENCES SOME OTHER TESTING, IF THAT REFERENCE TO THE OTHER

12:20PM 8    TESTING DIDN'T POINT TO INACCURACY ISSUES OR UNRELIABILITY

12:20PM 9    ISSUES, CONTEXTUALLY I DON'T THINK THAT WOULD NECESSARILY BE

12:20PM 10   IMPERMISSIBLE.

12:20PM 11       AND I THINK BECAUSE OF THE INVESTOR FRAUD CASE AND THE

12:20PM 12   JUXTAPOSITION OF, YOU KNOW, THE CONCEALMENT THEORETICALLY OF

12:20PM 13   THE USE OF COMMERCIAL TESTING FROM THE INVESTORS AS ALLEGED IN

12:20PM 14   THE INDICTMENT, WE DON'T THINK THAT THERE'S NO PLACE FOR

12:20PM 15   REFERENCE TO COMMERCIAL TESTING IN THE TRIAL, ITS ACCURACY AND

12:20PM 16   RELIABILITY.

12:20PM 17       COMMERCIAL TESTING, THAT'S NOT A PART OF THIS TEST AS FAR

12:20PM 18   AS ACCURACY AND RELIABILITY.

12:20PM 19       THE FINGERSTICK TESTING, YES, THAT'S FAIR ENOUGH, THAT'S

12:20PM 20   WHAT IS ALLEGED IN THE INDICTMENT AND THAT'S WHAT WE'RE

12:20PM 21   PREPARED TO DEFEND.

12:20PM 22       THE PROBLEM IS A LOT OF THE EVIDENCE THAT THE GOVERNMENT

12:20PM 23   WANTS TO INTRODUCE IN THE TRIAL, WHAT THEY TRIED TO INTRODUCE

12:20PM 24   AND DID IN THE HOLMES TRIAL, AND WHAT THEY WANT TO INTRODUCE

12:21PM 25   HERE RELATES TO ACCURACY AND RELIABILITY ISSUES ON TESTING THAT

12:21PM 1     WAS RUN ON COMMERCIAL DEVICES THAT WERE UNMODIFIED.  THAT WAS

12:21PM 2     NOT FINGERSTICK TESTING.

12:21PM 3          AND MR. BALWANI'S POSITION IS UNTIL THE GOVERNMENT CAN

12:21PM 4     ESTABLISH A FOUNDATION THAT THOSE TESTS WERE RUN ON THE

12:21PM 5     COMMERCIAL -- I MEAN, THE MODIFIED FINGERSTICK TESTING OR THE

12:21PM 6     EDISON, IT SHOULDN'T BE PERMITTED.

12:21PM 7          AND THAT INCLUDES, BY THE WAY, MOST OF THE CMS SURVEY

12:21PM 8     REPORT BECAUSE MOST OF THE CMS SURVEY REPORT DOES NOT RELATE TO

12:21PM 9     THERANOS'S PROPRIETARY FINGERSTICK TECHNOLOGY OR THE MODIFIED

12:21PM 10    PREDICATE TESTING.  IT SIMPLY DOESN'T.

12:21PM 11             THE COURT:  OKAY.

12:21PM 12             MR. CAZARES:  IT'S OTHER ISSUES.

12:21PM 13             THE COURT:  OKAY.

12:21PM 14        MR. BOSTIC?

12:21PM 15             MR. BOSTIC:  SO, YOUR HONOR, MY COLLEAGUE,

12:21PM 16    MS. VOLKAR, IS GOING TO ADDRESS THE ISSUES WITH THE CMS REPORT.

12:21PM 17          BUT GENERALLY SPEAKING, I JUST WANT TO CLARIFY A COUPLE

12:21PM 18    MUCH THINGS.

12:21PM 19          ONE IS THAT IT'S REALLY IMPORTANT NOT TO MISS THE FACT

12:21PM 20    THAT THE USE OF UNMODIFIED COMMERCIAL DEVICES BY THERANOS IS

12:21PM 21    REALLY CENTRAL TO THE FRAUD IN THIS CASE, AND I THINK

12:22PM 22    MR. CAZARES ACCOUNTED FOR THAT WHEN HE SAID THAT, YES, THE

12:22PM 23    ALLEGED CONCEALMENT OF THE USE OF THOSE THIRD PARTY DEVICES WAS

12:22PM 24    A BIG PART OF THE DECEPTION IN THIS CASE THAT AFFECTED VICTIMS.

12:22PM 25          BUT IT'S IMPOSSIBLE TO REALLY SEPARATE THE INVESTOR SIDE

12:22PM 1    FROM THE PATIENT SIDE WHEN IT COMES TO THAT FACT AS WELL.

12:22PM 2        SO THE USE OF UNMODIFIED DEVICES WAS RELEVANT ON THE

12:22PM 3    PATIENT SIDE AS WELL, AND I RESPECTFULLY DISAGREE WITH

12:22PM 4    MR. CAZARES'S READING OF THE INDICTMENT WHEN HE SAYS THAT THE

12:22PM 5    INDICTMENT LANGUAGE LIMITS THE GOVERNMENT'S CASE TO THE USE OF

12:22PM 6    THERANOS TECHNOLOGY ONLY.

12:22PM 7        TO BE SURE, THE INDICTMENT USES THE PHRASE THERANOS

12:22PM 8    TECHNOLOGY MULTIPLE TIMES, BUT IT ALSO HAS BROADER ALLEGATIONS

12:22PM 9    ABOUT THE COMPANY'S OVERALL ABILITY TO DELIVER ACCURATE

12:22PM 10   RESULTS, TO DELIVER FAST RESULTS.

12:22PM 11       AND THOSE REPRESENTATIONS THAT THE DEFENDANTS MADE, THE

12:22PM 12   REPRESENTATION THAT THERANOS'S TESTS WERE ACCURATE, THAT

12:22PM 13   THERANOS'S TESTS WERE RELIABLE, THEY WERE FAST, THEY WERE

12:22PM 14   CHEAP, THOSE REPRESENTATIONS WEREN'T BROKEN DOWN BY TEST TYPE,

12:23PM 15   BY ASSAY TYPE, OR BY THE KIND OF DEVICE USED.

12:23PM 16       THEY WERE BLANKET REPRESENTATIONS THAT THE DEFENDANTS USED

12:23PM 17   TO ATTRACT CUSTOMERS WHO WOULD MAKE USE OF THE ENTIRE RANGE OF

12:23PM 18   THERANOS'S TESTS.

12:23PM 19       AND THOSE CLAIMS OF ACCURACY WERE FALSE.  THEY WERE UNTRUE

12:23PM 20   FOR A FEW DIFFERENT REASONS.

12:23PM 21       WHEN IT CAME TO THE THERANOS TECHNOLOGY -- AND THE

12:23PM 22   INDICTMENT IS CLEAR ON THIS -- THOSE REPRESENTATIONS WERE FALSE

12:23PM 23   BECAUSE THE THERANOS TECHNOLOGY SUFFERED FROM ACCURACY PROBLEMS

12:23PM 24   SPECIFIC TO THAT TECHNOLOGY, AND THE COURT HEARD PLENTIFUL

12:23PM 25   EVIDENCE ON THAT DURING THE OTHER TRIAL.

12:23PM 1       THOSE REPRESENTATIONS WERE ALSO TRUE BECAUSE -- OR SO,

12:23PM 2  WERE ALSO UNTRUE BECAUSE THERANOS WAS FORCED TO USE UNMODIFIED

12:23PM 3  COMMERCIAL DEVICES FOR MANY OF ITS ASSAYS.

12:23PM 4       AND SO WHEN THE COMPANY HELD OUT ITS TESTS AS SUPERIOR TO

12:23PM 5  WHAT WAS OTHERWISE AVAILABLE, WHEN MS. HOLMES, FOR EXAMPLE, WAS

12:24PM 6  INTERVIEWED BY "THE WALL STREET JOURNAL" FOR A SEPTEMBER 2013

12:24PM 7  ARTICLE AND THEN, BASED ON HER REPRESENTATIONS, THE ARTICLE

12:24PM 8  PRINTED THAT THE ACCURACY OF THERANOS'S TESTS REPRESENTED AN

12:24PM 9  ADVANCE COMPARED TO WHAT HAD COME PREVIOUSLY, WHEN SHE APPROVED

12:24PM 10  THAT ARTICLE BEFORE IT WAS PUBLISHED, THAT CAUSED PATIENT

12:24PM 11  VICTIMS TO BELIEVE THAT WHEN THEY WENT TO THERANOS, THEY WOULD

12:24PM 12  BE RECEIVING A TEST THAT NOT ONLY WAS ACCURATE, BUT WAS MORE

12:24PM 13  ACCURATE THAN WHAT THEY COULD GET ELSEWHERE, AND THAT WAS FALSE

12:24PM 14  AS TO THERANOS TECHNOLOGY TESTS BECAUSE OF THE PROBLEMS THAT WE

12:24PM 15  JUST TALKED ABOUT.

12:24PM 16       BUT IT WAS ALSO FALSE AS TO TESTS RUN ON COMMERCIAL

12:24PM 17  DEVICES BECAUSE THOSE TESTS RUN ON COMMERCIAL DEVICES WERE NOT,

12:24PM 18  IN FACT, MORE ACCURATE THAN THE TESTS THAT THOSE SAME PATIENTS

12:24PM 19  COULD HAVE GOTTEN ELSEWHERE.

12:24PM 20       SO THOSE MISREPRESENTATIONS ABOUT BOTH KINDS OF TESTS WERE

12:24PM 21  PART OF THE OVERALL SCHEME TO DEFRAUD PATIENTS, AND THAT'S ONE

12:24PM 22  REASON WHY TESTIMONY FROM PATIENTS LIKE VICTIM E.T. WAS

12:25PM 23  ADMISSIBLE IN THE HOLMES CASE AND IS ADMISSIBLE HERE AS WELL.

12:25PM 24       WHEN IT COMES TO NOTICE TO THE DEFENSE ALSO, IT'S

12:25PM 25  IMPORTANT TO NOTE THAT THE HIV TEST, WHICH THE PARTIES BOTH

ER-6086

12:25PM 1    AGREE WAS RUN ON AN UNMODIFIED COMMERCIAL DEVICE, IS LISTED

12:25PM 2    EXPRESSLY IN THE INDICTMENT.  AND IT'S BEEN LISTED THERE, IN

12:25PM 3    FACT, SINCE SEPTEMBER 2018.

12:25PM 4        SO AS EARLY AS SEPTEMBER 2018, MORE THAN THREE YEARS AGO,

12:25PM 5    BOTH DEFENDANTS IN THIS CASE WERE ON WRITTEN NOTICE THAT THE

12:25PM 6    GOVERNMENT'S ALLEGATIONS INCLUDED THAT THERE WERE ACCURACY AND

12:25PM 7    RELIABILITY PROBLEMS WITH, FOR EXAMPLE, THAT ASSAY WHICH IS NOT

12:25PM 8    RUN ON A THERANOS-SPECIFIC DEVICE.

12:25PM 9        SO TO THE EXTENT SOME OF THE LANGUAGE IN THE INDICTMENT

12:25PM 10   MIGHT BE SUBJECT TO TWO COMPETING READINGS, EITHER THAT THE

12:25PM 11   INDICTMENT IS LIMITED TO ALLEGATIONS RELATING TO

12:25PM 12   THERANOS-SPECIFIC TECHNOLOGY AS THE DEFENSE WOULD HAVE THE

12:25PM 13   COURT READ IT, OR THAT IT'S NOT AND THAT IT ALSO INCLUDES

12:26PM 14   THERANOS'S BROADER CAPABILITIES, THE INCLUSION OF HIV ON THAT

12:26PM 15   LIST PRECLUDES THE DEFENSE'S READING.

12:26PM 16       THE INCLUSION OF HIV ON THAT LIST IS INCONSISTENT WITH AN

12:26PM 17   INTERPRETATION OF THE INDICTMENT THAT IT IS LIMITED ONLY TO

12:26PM 18   THERANOS TECHNOLOGY TESTS.

12:26PM 19            THE COURT:  OKAY.

12:26PM 20            MR. CAZARES:  CAN I ADDRESS THAT, YOUR HONOR?

12:26PM 21            THE COURT:  YES.

12:26PM 22            MR. CAZARES:  FIRST OF ALL, WITH RESPECT TO THE HIV

12:26PM 23   TESTING, YES, PATIENT E.T. RECEIVED AN HIV ON THE UNMODIFIED

12:26PM 24   COMMERCIAL DEVICE.

12:26PM 25       THE ISSUE WAS RAISED SLIGHTLY, VAGUELY, BY MS. TREFZ

12:26PM 1    BEFORE PATIENT E.T. TESTIFIED THAT HER TESTING IN FACT WASN'T

12:26PM 2    EVEN ON THERANOS TECHNOLOGY.

12:26PM 3        AND THE GOVERNMENT IGNORED THAT ARGUMENT AND PRESSED AHEAD

12:26PM 4    AND ADDRESSED OTHER ISSUES.

12:26PM 5        BUT THE PROBLEM HERE IS PATIENT E.T.'S TESTING IS SIMPLY A

12:26PM 6    PART OF THE -- THEORETICALLY THE ALLEGED SCHEME TO DEFRAUD.  TO

12:26PM 7    THE EXTENT THAT SHE RECEIVED THERANOS FINGERSTICK TESTING, OR

12:26PM 8    THE MODIFIED COMMERCIAL TESTING, AND THEN HER REPORT WAS

12:27PM 9    WIRED -- AND THAT'S THE GOVERNMENT'S THEORETICAL EXECUTION OF

12:27PM 10   THE SCHEME TO DEFRAUD -- THE EXECUTION OF THE SCHEME TO DEFRAUD

12:27PM 11   DOESN'T DEFINE THE SCHEME TO DEFRAUD.  THAT'S JUST A

12:27PM 12   JURISDICTIONAL HOOK.

12:27PM 13       THE WIRE TRANSMISSION THAT MAKES WHAT OTHERWISE CONDUCT IS

12:27PM 14   NOT FEDERALLY ILLEGAL SUDDENLY ILLEGAL.  I MEAN, THE

12:27PM 15   GOVERNMENT -- THE COURT KNOWS THIS AND I'M NOT TELLING YOU

12:27PM 16   ANYTHING YOU DON'T KNOW.

12:27PM 17       BUT THE PROBLEM IS THAT THE EXECUTION DOESN'T DEFINE THE

12:27PM 18   SCHEME.

12:27PM 19       AND THE GOVERNMENT ALSO IGNORES WHAT MR. BALWANI INCLUDED

12:27PM 20   IN OUR BRIEFING, THAT THE GOVERNMENT BELIEVED HIV WAS ON

12:27PM 21   FINGERSTICK TESTING BEFORE IT INDICTED.  THE GOVERNMENT

12:27PM 22   PRESENTED HIV TESTING ALONG WITH A LIST OF ASSAYS IT ASKED

12:27PM 23   DR. MASTER TO EVALUATE AND TO OPINE ON.

12:27PM 24       NOW, HE WASN'T ABLE TO DO THAT BECAUSE THEY DIDN'T HAVE

12:27PM 25   MUCH EFFORT OR MUCH INFORMATION TO PROVIDE TO HIM, BUT IN THEIR

12:27PM 1    EXCHANGES WITH DR. MASTER, THE GOVERNMENT BELIEVED HIV TESTING

12:27PM 2    WAS ON THERANOS PROPRIETARY FINGERSTICK TESTING.

12:27PM 3        AND I THINK THAT ALONE IS VERY TELLING BECAUSE NOW THE

12:27PM 4    GOVERNMENT IS REPRESENTING SOMETHING DIFFERENT THAN WHAT THEY

12:28PM 5    WERE REPRESENTING WITHIN THEIR OWN KIND OF DISCUSSIONS ON THEIR

12:28PM 6    TEAM AND DISCLOSED TO THE DEFENSE AS A PART OF THEIR OWN EXPERT

12:28PM 7    TESTIMONY DISCLOSURES IN THAT INSTANCE.

12:28PM 8        BUT I THINK IT'S ALSO REALLY IMPORTANT FOR THE COURT,

12:28PM 9    THERE ARE OTHER ELEMENTS THAT DEMONSTRATE AND SUPPORT THE

12:28PM 10   DEFENSE READING OF THE INDICTMENT, AND THAT'S THE COURT'S OWN

12:28PM 11   DESCRIPTION OF THE ALLEGATION IN THE ORDER RELATING TO THE

12:28PM 12   MOTIONS IN LIMINE IN THE HOLMES CASE AT DOCKET 798.

12:28PM 13       THIS COURT READ AND DESCRIBED AND CHARACTERIZED THE

12:28PM 14   ALLEGATIONS EXACTLY AS MR. BALWANI IS ASKING THIS COURT TO DO

12:28PM 15   TODAY.

12:28PM 16       AND, IN FACT, THE GOVERNMENT IN THEIR OWN MOTION IN LIMINE

12:28PM 17   NUMBER 12 ASKED THE COURT TO PRECLUDE MR. BALWANI FROM

12:28PM 18   INTRODUCING EVIDENCE OF HIS FAMILY'S TESTING UNLESS MR. BALWANI

12:28PM 19   COULD ESTABLISH THE VERY SAME FOUNDATION THAT WE'RE ASKING THE

12:28PM 20   COURT TO REQUIRE OF THE GOVERNMENT.

12:29PM 21       I DON'T SEE HOW THE GOVERNMENT CAN CONSISTENTLY ASK THE

12:29PM 22   COURT TO PRECLUDE US FROM INTRODUCING COMMERCIAL TESTING

12:29PM 23   WITHOUT A FOUNDATION THAT IT TOUCHES THERANOS TECHNOLOGY, YET

12:29PM 24   THE GOVERNMENT SOMEHOW DOES, IS PERMITTED?  THAT DOESN'T MAKE

12:29PM 25   SENSE.

ER-6089

```
12:29PM   1              THE COURT:  OKAY.

12:29PM   2              MR. BOSTIC:  SO, YOUR HONOR, ON THE FIRST POINT, AND

12:29PM   3     AS FAR AS IT RELATES TO THE SCOPE OF DR. MASTER'S WORK, I THINK

12:29PM   4     THAT MR. CAZARES IS RELYING ON SOME LANGUAGE THAT WAS CITED IN

12:29PM   5     THE DEFENSE'S BRIEFING INDICATING THAT THE GOVERNMENT BELIEVED

12:29PM   6     THAT TESTING WAS DONE ON FINGERSTICK.

12:29PM   7          THAT TESTING WAS DONE ON FINGERSTICK, HOWEVER.  IT WAS

12:29PM   8     DONE ON A COMMERCIAL UNMODIFIED DEVICE, BUT THE TEST METHOD WAS

12:29PM   9     FINGERSTICK.

12:29PM  10          SO I THINK IT WOULD BE AN IMPROPER CONCLUSION TO ASSUME

12:29PM  11     THAT FINGERSTICK IN THE GOVERNMENT'S MIND EQUATES IN EVERY CASE

12:29PM  12     TO THERANOS PROPRIETARY TECHNOLOGY.  WE KNOW THAT'S NOT THE

12:29PM  13     CASE.

12:29PM  14          AND AGAIN, THE EXPLICIT EXPRESS INCLUSION OF HIV ON THAT

12:30PM  15     LIST PUT THE DEFENSE ON NOTICE YEARS AGO THAT HIV TESTING

12:30PM  16     ACCURACY AND RELIABILITY WAS WITHIN THE SCOPE OF THESE

12:30PM  17     ALLEGATIONS.

12:30PM  18          WHEN IT COMES TO THE TENSION THAT THE DEFENSE SEES BETWEEN

12:30PM  19     THE GOVERNMENT'S POSITION HERE AND WITH RESPECT TO THE TESTING

12:30PM  20     PERFORMED FOR MR. BALWANI'S MOTHER, THERE WERE MULTIPLE REASONS

12:30PM  21     WHY, IN THE GOVERNMENT'S VIEW, THAT EVIDENCE WAS NOT

12:30PM  22     ADMISSIBLE, INCLUDING SOME LACK OF CLARITY AS TO WHETHER THE

12:30PM  23     DEFENDANT'S MOTHER RELIED ON THAT TESTING, HOW IT WAS USED,

12:30PM  24     WHAT TESTS WERE RUN, AND THE ULTIMATE PURPOSE.

12:30PM  25          AND THAT'S WHAT REALLY MATTERS WHEN IT COMES TO THE
```

41

12:30PM 1    DEFENDANT'S INTENT THERE, BUT I DON'T WANT TO GET INTO ARGUING

12:30PM 2    THAT MOTION UNTIL IT'S TIME.

12:30PM 3              THE COURT:  WHAT IS -- THANK YOU.

12:30PM 4         WHAT -- IF YOU DECIDE TO USE THIS TESTIMONY OR THIS

12:30PM 5    EVIDENCE ABOUT THESE OTHER MACHINES, WOULD IT BE IN A DIFFERENT

12:31PM 6    WAY THAN YOU USED IT OR ATTEMPTED TO USE IT IN THE OTHER CASE?

12:31PM 7         IS THERE A DIFFERENT THEORY OF ADMISSIBILITY, OR WILL YOU

12:31PM 8    BE USING IT FOR THE SAME PURPOSE?

12:31PM 9              MR. BOSTIC:  I BELIEVE IT'S ADMISSIBLE FOR THE SAME

12:31PM 10   PURPOSE AS IT PREVIOUSLY WAS, YOUR HONOR.

12:31PM 11        SO EVERY PATIENT WHO PAID FOR THERANOS TESTING WAS --

12:31PM 12   WELL, LET ME BACK UP ACTUALLY.

12:31PM 13        EVERY PATIENT WHO PATRONIZED THERANOS'S BLOOD TESTING WAS

12:31PM 14   AN INTENDED VICTIM OF THE CHARGED SCHEME TO DEFRAUD PATIENTS.

12:31PM 15   EVERY PATIENT WHO WALKED THROUGH THOSE DOORS AND GOT ANY KIND

12:31PM 16   OF BLOOD TESTING WAS AN INTENDED VICTIM OF THE ALLEGED SCHEME.

12:31PM 17        VICTIMS WHO PAID FOR THAT TESTING ENDED UP BEING ACTUAL

12:31PM 18   VICTIMS ACCORDING TO THE COURT'S DEFINITION FROM PREVIOUS

12:31PM 19   LITIGATION.  THEY ENDED UP BEING ACTUAL VICTIMS OF THAT SCHEME

12:31PM 20   TO DEFRAUD.

12:31PM 21        SO PATIENT E.T., WHO WAS ATTRACTED TO THERANOS BASED ON

12:32PM 22   THE THINGS THAT WERE IN THE PUBLIC RECORD ABOUT THE COMPANY,

12:32PM 23   FALSE INFORMATION THAT THE DEFENDANTS CONTRIBUTED TO, SHE WAS

12:32PM 24   ATTRACTED TO THERANOS, RELIED ON THOSE RESULTS TO BE ACCURATE,

12:32PM 25   AND SHE PAID FOR THOSE RESULTS.  THAT MAKES HER A VICTIM OF THE

12:32PM 1    SCHEME TO DEFRAUD, SO HER TESTIMONY SHOULD BE ADMISSIBLE.

12:32PM 2         IN CONNECTION WITH THAT TESTIMONY, THE GOVERNMENT SHOULD

12:32PM 3    BE ABLE TO BRING OUT THE FACT THAT ONE OF HER RESULTS AT LEAST

12:32PM 4    WAS DEMONSTRABLY INACCURATE.  THAT DEPRIVED HER OF THE BENEFIT

12:32PM 5    OF THE BARGAIN WITH THERANOS, BECAUSE WHEN SHE WENT TO THAT

12:32PM 6    COMPANY, AS SHE TESTIFIED, SHE WANTED ACCURATE RESULTS, SHE HAD

12:32PM 7    BEEN LED TO BELIEVE BY THE DEFENDANT'S STATEMENTS THAT SHE

12:32PM 8    WOULD RECEIVE ACCURATE RESULTS, AND SHE DID NOT.

12:32PM 9         SO THAT MAKES HER A VICTIM OF THE SCHEME TO DEFRAUD THAT

12:32PM 10   DIDN'T GET THE BENEFIT OF THE BARGAIN, AND HER TESTIMONY SHOULD

12:32PM 11   BE ADMISSIBLE IN THE SAME SCOPE AS IT PREVIOUSLY WAS.

12:32PM 12        MR. CAZARES:  THIS ISSUE REGARDING THE ADVERTISING

12:32PM 13   AS DISTINCT OR AS KIND OF INTERRELATED TO THE ACTUAL TESTING

12:33PM 14   THAT IS ALLEGED TO BE INACCURATE I THINK IS MISLEADING.

12:33PM 15        WHAT THE GOVERNMENT IS PROPOSING TO THIS COURT RIGHT NOW

12:33PM 16   IS THERANOS PROPOUNDED VERY BROADLY ADVERTISING ABOUT THERANOS

12:33PM 17   TESTING AT LARGE TO TRY TO ATTRACT PATIENTS TO COME TAKE THEIR

12:33PM 18   TESTING BECAUSE IT WAS MORE ACCURATE AND CHEAPER IS ESSENTIALLY

12:33PM 19   WHAT THE ALLEGATION IS.

12:33PM 20        BUT THE PROBLEM IS THAT THE INDICTMENT LIMITS THE ACTUAL

12:33PM 21   TESTING THAT IS ALLEGEDLY INACCURATE AND UNRELIABLE AND WITH

12:33PM 22   WHICH MS. HOLMES AND MR. BALWANI WERE MISLEADING THESE PATIENTS

12:33PM 23   TO THERANOS TECHNOLOGY.  THERE'S NOWHERE IN THE INDICTMENT

12:33PM 24   WHERE COMMERCIAL TESTING IS IDENTIFIED AS BEING INACCURATE AND

12:33PM 25   UNRELIABLE.

12:33PM 1        AND THE CASES THAT THE GOVERNMENT CITES TO ARE SIMPLY

12:33PM 2    INAPPLICABLE HERE.  THOSE CASES RELATE TO SITUATIONS WHERE THE

12:33PM 3    INDICTMENT ESSENTIALLY ALLEGED THE BARE BONES STATUTORY

12:33PM 4    LANGUAGE, SO THERE ARE GAPS, THERE ARE PLACES WHERE IMPLIED

12:33PM 5    ALLEGATIONS CAN FILL THOSE GAPS.

12:33PM 6        NOT THE CASE HERE.  WE HAVE VERY DETAILED, 12 PAGE

12:34PM 7    INDICTMENT.  SO I DON'T THINK THAT KIND OF THEORY STANDS HERE.

12:34PM 8    IT JUST DOESN'T WORK HERE.

12:34PM 9        THE ISSUE RELATING TO WHETHER OR NOT THIS COMMERCIAL

12:34PM 10   TESTING IS A PART OF THE ADVERTISING THAT THERANOS USED TO

12:34PM 11   ATTRACT PATIENTS, I THINK IT'S A RED HERRING AND IT'S

12:34PM 12   MISLEADING, YOUR HONOR, BECAUSE THAT'S NOT WHAT -- THE

12:34PM 13   INDICTMENT TETHERS THERANOS TESTING TO FINGERSTICK TESTING

12:34PM 14   THROUGHOUT THE INDICTMENT.

12:34PM 15       IT'S BEEN READ THAT WAY BY THE GOVERNMENT, BY THE COURT.

12:34PM 16       AND THIS ISSUE WASN'T RAISED IN THE HOLMES CASE.  IT

12:34PM 17   WASN'T RAISED SPECIFICALLY BEFORE THE HOLMES TRIAL.  I DON'T

12:34PM 18   KNOW WHY IT WASN'T.

12:34PM 19       BUT WHAT HAPPENED IN THE HOLMES TRIAL SHOULD NOT BE

12:34PM 20   APPLICABLE TO THE BALWANI CASE UNLESS THE COURT IS ABLE TO

12:34PM 21   RESOLVE THIS.

12:34PM 22       I THINK OUR READING OF THE INDICTMENT IS CORRECT.  I THINK

12:34PM 23   THE GOVERNMENT HAS TO LAY A FOUNDATION TYING THE TESTING THAT

12:34PM 24   THEY'RE GOING TO INTRODUCE INACCURATE AND UNRELIABLE

12:34PM 25   THEORETICAL RESULTS TO TO THE THERANOS PROPRIETARY TESTING,

44

```
12:34PM   1      YOUR HONOR.  I DON'T THINK THERE'S ANY OTHER READING.

12:35PM   2                  THE COURT:  OKAY.

12:35PM   3          MR. BOSTIC.

12:35PM   4                  MR. BOSTIC:  JUST VERY BRIEFLY, YOUR HONOR.

12:35PM   5      I DON'T SEE HOW THE DEFENSE CAN SAY THAT THE INDICTMENT IS

12:35PM   6      LIMITED TO THERANOS TECHNOLOGY ONLY WHEN IT EXPRESSLY INCLUDES

12:35PM   7      THE HIV TEST.

12:35PM   8          AND SIMILARLY, I DON'T KNOW HOW THE DEFENSE CAN SAY

12:35PM   9      THERE'S NO EVIDENCE OF COMMERCIAL TESTING IN THE INDICTMENT

12:35PM  10      WHEN, AGAIN, HIV, WHICH WAS RUN ON THAT COMMERCIAL DEVICE, IS

12:35PM  11      SITTING RIGHT THERE PROVIDING EXPRESS NOTICE TO THE DEFENSE ON

12:35PM  12      THAT.

12:35PM  13                  MR. CAZARES:  YOUR HONOR, CAN WE GO TO PARAGRAPH 16

12:35PM  14      OF THE INDICTMENT?

12:35PM  15                  THE COURT:  I'M SORRY.

12:35PM  16          MR. BOSTIC, HAD YOU FINISHED?

12:35PM  17                  MR. BOSTIC:  I'M FINISHED.  THANK YOU, YOUR HONOR.

12:35PM  18                  THE COURT:  MR. CAZARES, WHERE ARE YOU?

12:35PM  19                  MR. CAZARES:  PARAGRAPH 16 OF THE INDICTMENT AT

12:35PM  20      PAGES 6 AND 7, LINES 24 TO 28.  THIS FIRST SENTENCE, ONE

12:35PM  21      SENTENCE, LONG SENTENCE, BUT THIS IS HOW THE GOVERNMENT ALLEGED

12:35PM  22      THE INDICTMENT:  "DESPITE REPRESENTING TO DOCTORS AND PATIENTS

12:35PM  23      THAT THERANOS COULD PROVIDE ACCURATE, FAST, RELIABLE AND CHEAP

12:35PM  24      BLOOD TESTS AND TEST RESULTS, HOLMES AND BALWANI KNEW THROUGH,

12:36PM  25      AMONG OTHER MEANS, THEIR INVOLVEMENT IN THERANOS'S DAY-TO-DAY
```

12:36PM 1    OPERATIONS AND THEIR KNOWLEDGE OF COMPLAINTS RECEIVED FROM

12:36PM 2    DOCTORS AND PATIENTS THAT THERANOS'S TECHNOLOGY WAS, IN FACT,

12:36PM 3    NOT CAPABLE OF CONSISTENTLY PRODUCING ACCURATE AND UNRELIABLE

12:36PM 4    RESULTS."

12:36PM 5         THEN THE PARAGRAPHS CONTINUES.  "IN PARTICULAR," THAT'S

12:36PM 6    NOT EXPANDING THE SCOPE, THAT'S DEFINING WHAT IT MEANS FOR THIS

12:36PM 7    THERANOS TECHNOLOGY TO BE INACCURATE AND UNRELIABLE.  "IN

12:36PM 8    PARTICULAR, HOLMES AND BALWANI KNEW THAT THERANOS WAS NOT

12:36PM 9    CAPABILITY OF CONSISTENTLY PRODUCING ACCURATE AND RELIABLE

12:36PM 10   RESULTS FOR CERTAIN BLOOD TESTS, INCLUDING, BUT NOT LIMITED TO,

12:36PM 11   THE LIST, INCLUDING HIV."

12:36PM 12        I CAN'T SEE HOW THE GOVERNMENT COULD POSSIBLY UNTETHER THE

12:36PM 13   LIST OF TESTS IN THE INDICTMENT FROM THERANOS'S TECHNOLOGY.

12:36PM 14        THE LISTING OF HIV --

12:36PM 15             THE COURT:  EXCUSE ME, MR. CAZARES.

12:36PM 16        I'M SORRY.  MR. BOSTIC, IS THAT WHAT YOU'RE DOING?  YOU'RE

12:36PM 17   UNTETHERING THAT?

12:36PM 18             MR. BOSTIC:  SO, YOUR HONOR, I UNDERSTAND THE BASIS

12:37PM 19   FOR THE DEFENDANT'S READING AND THE REASON WHY THE DEFENSE

12:37PM 20   WANTS TO READ THE INDICTMENT THAT WAY.

12:37PM 21        THAT IS ONE POSSIBLE WAY TO READ THE INDICTMENT.

12:37PM 22        BUT AS I SAID BEFORE, IT'S INCOMPATIBLE.  THAT

12:37PM 23   INTERPRETATION IS INCOMPATIBLE WITH THE PRESENCE OF HIV ON THAT

12:37PM 24   LIST.

12:37PM 25        AND IT'S NOT STRICTLY CALLED FOR BY THE LANGUAGE ITSELF.

12:37PM 1    THE LANGUAGE ITSELF, AS I SAID BEFORE, DOES MENTION THERANOS'S

12:37PM 2    TECHNOLOGY.

12:37PM 3        THAT IS ONE OF THE REASONS WHY THE REPRESENTATIONS ABOUT

12:37PM 4    THERANOS'S ABILITY TO RETURN ACCURATE RESULTS WAS FALSE.  THOSE

12:37PM 5    RESULTS -- THOSE REPRESENTATIONS WERE FALSE PARTLY BECAUSE OF

12:37PM 6    THE PROBLEMS WITH THERANOS TECHNOLOGY, BUT THAT'S NOT THE ONLY

12:37PM 7    REASON WHY THEY WERE FALSE.

12:37PM 8        AND ANOTHER REASON WHY THEY WERE FALSE WAS BECAUSE

12:37PM 9    THERANOS HAD TO RELY ON COMMERCIAL UNMODIFIED DEVICES WHICH, BY

12:37PM 10   DEFINITION, COULD NOT HAVE BEEN ESPECIALLY OR EXCEPTIONALLY

12:37PM 11   ACCURATE.

12:37PM 12        MR. CAZARES:  YOUR HONOR, ON LINE 28, IF INSTEAD OF

12:38PM 13   "IN PARTICULAR" THE GOVERNMENT SAID "IN ADDITION TO," THEN THE

12:38PM 14   READING THAT THE GOVERNMENT IS PROFFERING HERE MIGHT BE

12:38PM 15   SOMEWHAT POSSIBLE OR PLAUSIBLE.

12:38PM 16        BUT "IN PARTICULAR" IS A LIMITATION, IT'S A TETHERING,

12:38PM 17   IT'S A DEFINITIONAL USE.

12:38PM 18        AND THE PROBLEM ALSO IS THAT THE GOVERNMENT DOES NOT ALSO

12:38PM 19   WANT TO ADMIT IT MAKES MISTAKES.  THEY BELIEVED HIV WAS ON

12:38PM 20   THERANOS PROPRIETARY TECHNOLOGY.

12:38PM 21        ONE OF THE OTHER ASSAYS LISTED HIGHER IS GONORRHEA.

12:38PM 22   GONORRHEA IS NOT A BLOOD TEST.  THE INDICTMENT THROUGHOUT LISTS

12:38PM 23   BLOOD TESTING.

12:38PM 24        GONORRHEA WAS A PELVIC SWAB TEST RUN ON AN UNMODIFIED FDA

12:38PM 25   COMMERCIAL DEVICE.

12:38PM  1          AND IF THE GOVERNMENT BELIEVES MY PROFFER IS INACCURATE,

12:38PM  2   THEY CAN SUBMIT SOMETHING TO THE COURT.

12:38PM  3          THE FACT IS THAT THE INDICTMENT HAS MISTAKES.  THEY

12:38PM  4   MISTAKENLY IDENTIFIED GONORRHEA AS A THERANOS PROPRIETARY TEST,

12:38PM  5   EVEN A BLOOD TEST, AND THEY MISTAKENLY IDENTIFIED HIV AS A

12:38PM  6   THERANOS PROPRIETARY BLOOD TEST AND IT SIMPLY WASN'T.

12:38PM  7          AND SO FOR THAT REASON THEY SHOULDN'T BE PERMITTED TO

12:38PM  8   INTRODUCE EVIDENCE OF THE INACCURACY AND UNRELIABILITY OF THAT

12:39PM  9   TESTING UNTIL THEY TETHER IT TO THERANOS FINGERSTICK.

12:39PM 10               THE COURT:  OKAY.  THANK YOU.

12:39PM 11               MR. BOSTIC:  YOUR HONOR, JUST ON THAT?

12:39PM 12               THE COURT:  YES.

12:39PM 13               MR. BOSTIC:  THE INDICTMENT ACTUALLY DOESN'T

12:39PM 14   EXPRESSLY IDENTIFY THOSE ASSAYS AS PROPRIETARY THERANOS TESTS.

12:39PM 15   IT DOESN'T DO THAT.

12:39PM 16          AND THE KIND OF LANGUAGE PARSING THAT THE DEFENSE IS

12:39PM 17   ASKING THE COURT TO DO I THINK WOULD BE MORE APPROPRIATE IF WE

12:39PM 18   WERE INTERPRETING A STATUTE OR A SET OF PATENT CLAIMS.

12:39PM 19          BUT WHEN WE'RE LOOKING AT AN INDICTMENT WHOSE PURPOSE IS

12:39PM 20   TO SIMPLY PROVIDE NOTICE TO THE DEFENSE OF THE SCOPE OF THE

12:39PM 21   CASE, I THINK THAT KIND OF HYPERTECHNICAL OR OVERLY ANALYTICAL

12:39PM 22   INTERPRETATION IS EXACTLY WHAT THE NINTH CIRCUIT CASE LAW CITED

12:39PM 23   BY THE GOVERNMENT WARNS AGAINST.

12:39PM 24              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

12:39PM 25          LET'S MOVE TO 2, WHICH IS GOVERNMENT'S MIL 7 TO ADMIT

12:39PM 1    EXHIBIT 4621, THAT'S THE EXHIBIT IN THE PREVIOUS TRIAL, THE CMS

12:39PM 2    LETTER, INCLUDING THE JANUARY 26TH LETTER AND THE CMS 2567

12:40PM 3    FORM.

12:40PM 4             MR. BOSTIC:  AND, YOUR HONOR, I'LL PASS THE MIKE TO

12:40PM 5    MY COLLEAGUE FOR THAT.

12:40PM 6             THE COURT:  GREAT.

12:40PM 7             MS. VOLKAR:  GOOD AFTERNOON, YOUR HONOR.

12:40PM 8       MS. VOLKAR ON BEHALF OF THE UNITED STATES.

12:40PM 9             THE COURT:  THANK YOU.

12:40PM 10            MS. VOLKAR:  I REPRESENT THAT I AM FULLY VACCINATED

12:40PM 11   AND HAVE MY BOOSTER SHOT.  MAY I PLEASE REMOVE MY MASK?

12:40PM 12            THE COURT:  YES.  THANK YOU.

12:40PM 13            MS. VOLKAR:  THANK YOU.

12:40PM 14            THE COURT:  THIS IS IN DOCUMENT 1155.  IT'S

12:40PM 15   MOTION -- EXCUSE ME.  DOCUMENT 1155, IT'S YOUR MIL 7.

12:41PM 16      I THINK IT'S AT PAGE 7, IS IT?  I THINK THAT'S RIGHT.  LET

12:41PM 17   ME SEE.

12:41PM 18      YES.  ALL RIGHT.

12:41PM 19      MS. VOLKAR.

12:41PM 20            MS. VOLKAR:  THANK YOU, YOUR HONOR.

12:41PM 21      I'D LIKE TO BEGIN WITH A THEME THAT YOU WILL HEAR

12:41PM 22   REPEATEDLY FROM THE GOVERNMENT TODAY, WHICH IS THE COURT

12:41PM 23   REACHED A WELL-REASONED RESULT IN ITS PRIOR ORDER IN THE PRIOR

12:41PM 24   CASE, ECF 798.

12:41PM 25            AND ALTHOUGH THAT ORDER DOES NOT BIND MR. BALWANI, THE

12:41PM 1    COURT IS ENTITLED TO UTILIZE ITS WELL REASONED ANALYSIS AND

12:41PM 2    REACH THE SAME CONCLUSION, AND THIS IS THE FIRST OF MANY TIMES

12:41PM 3    THAT THE GOVERNMENT WILL ASK THE COURT TO DO THAT.

12:41PM 4         THE COURT GRANTED THE GOVERNMENT'S MOTION TO ADMIT THE CMS

12:41PM 5    REPORT IN ECF 798 AT PAGES 16 TO 20, AND IT SHOULD DO SO HERE

12:41PM 6    FOR THE SAME REASONS.

12:41PM 7         MY UNDERSTANDING, AND I BELIEVE THE REASON WHY MR. BALWANI

12:41PM 8    WANTED TO LINK THIS ARGUMENT TO THE MOTION IN LIMINE NUMBER 1

12:42PM 9    FOR MR. BALWANI WAS THIS UNMODIFIED COMMERCIAL DEVICE, WHICH

12:42PM 10   IT'S MY UNDERSTANDING THE SOLE NEW ARGUMENT THAT MR. BALWANI'S

12:42PM 11   TEAM RAISES THAT HAS NOT ALREADY BEEN ADDRESSED BY THE COURT OR

12:42PM 12   THE PARTIES.

12:42PM 13        AND FOR THE REASONS EXPRESSED BY MY COLLEAGUE, MR. BOSTIC,

12:42PM 14   THE GOVERNMENT'S VIEW IS THAT MR. BALWANI'S TEAM READS THE

12:42PM 15   INDICTMENT TOO NARROWLY.

12:42PM 16        AND, AGAIN, THE MAIN ASSAY THAT THEY POINT TO AS A REASON

12:42PM 17   TO EXCLUDE LARGE SWATHS OF THE CMS REPORT, INCLUDING PORTIONS

12:42PM 18   THAT WERE ADMITTED IN THE PRIOR TRIAL, IS BECAUSE PT INR WAS

12:42PM 19   NOT IN THEIR VIEW RUN ON THERANOS'S TECHNOLOGY, EVEN THOUGH IT

12:42PM 20   IS EXPRESSLY LISTED IN THE ASSAYS LISTED IN PARAGRAPH 16 OF THE

12:42PM 21   COMPLAINT.

12:42PM 22        AND SO THE GOVERNMENT'S VIEW IS AS MR. BOSTIC ADDRESSED.

12:42PM 23   DUE TO IT EXPLICITLY BEING LISTED, THE DEFENDANT HAS BEEN ON

12:43PM 24   NOTICE AND THAT IS NOT A REASON TO EXCLUDE THE CMS REPORT.

12:43PM 25        AND WHILE I'M HAPPY TO ADDRESS THE ARGUMENTS THAT WE'VE

12:43PM 1    SPOKEN ABOUT MANY TIMES BEFORE YOUR HONOR WITH PRIOR COUNSEL, I

12:43PM 2    WILL REST ON OUR PRIOR ARGUMENTS IN OUR BRIEFING WITH RESPECT

12:43PM 3    TO THOSE UNLESS THE COURT HAS QUESTIONS.

12:43PM 4         THE COURT:  OKAY.  THANK YOU.

12:43PM 5      MR. CAZARES.

12:43PM 6         MR. CAZARES:  FIRST I'LL START WHERE MS. VOLKAR LEFT

12:43PM 7    OFF REGARDING THE NOTICE ISSUE.

12:43PM 8       THE GOVERNMENT REPEATEDLY STATES, BOTH IN RELATION TO THIS

12:43PM 9    MOTION IN NUMBER 7 FOR THE GOVERNMENT AND IN MR. BALWANI'S

12:43PM 10   MOTION NUMBER 1, THAT THE IDENTIFICATION OF AN ASSAY ITSELF

12:43PM 11   PROVIDES NOTICE TO MR. BALWANI THAT EVERYTHING RELATING TO THAT

12:43PM 12   ASSAY IS SOMEHOW NOW AT ISSUE IN THE TRIAL.

12:43PM 13      BUT THE PROBLEM IS THAT THAT NOTICE THEORY IGNORES THE

12:43PM 14   REST OF THE LANGUAGE IN THE INDICTMENT, INCLUDING WHAT I'VE

12:43PM 15   JUST ARGUED BEFORE IN RELATION TO MOTION IN LIMINE NUMBER 1,

12:43PM 16   THAT THERANOS TECHNOLOGY AND PROPRIETARY TESTING THAT IS

12:43PM 17   ALLEGED TO BE INACCURATE AND UNRELIABLE.

12:44PM 18      TO THE EXTENT THAT THERANOS USED MULTIPLE METHODS FOR

12:44PM 19   DIFFERENT ASSAYS, WHICH IS THE CASE FOR ALMOST ALL OF THE

12:44PM 20   ASSAYS IDENTIFIED IN THE INDICTMENT, THE NOTICE THAT THE

12:44PM 21   GOVERNMENT PROVIDED IN THIS INDICTMENT WAS THAT THE INACCURACY

12:44PM 22   AND UNRELIABILITY OF -- THE INDICTMENT PROVIDED NOTICE OF THE

12:44PM 23   INACCURACY AND UNRELIABILITY ISSUES RELATING TO PT INR, CBC,

12:44PM 24   HIV AND THE OTHER LISTED ASSAYS.

12:44PM 25      THERE IS NO NOTICE IN THIS INDICTMENT TO MR. BALWANI THAT

12:44PM 1     COMMERCIAL TESTING FOR THESE SAME ASSAYS IS AT ISSUE.

12:44PM 2         IF THAT IS NOW AT ISSUE, YOUR HONOR, WE'RE TALKING ABOUT

12:44PM 3     HUNDREDS OF THOUSANDS, MAYBE MILLIONS OF RESULTS RELATING TO

12:44PM 4     THESE MOST COMMONLY ISSUED TESTS, AND THAT'S NOW GOING TO BE A

12:44PM 5     PART OF THIS TRIAL THEORETICALLY ACCORDING TO THE GOVERNMENT

12:44PM 6     NOW.

12:44PM 7         IT WOULDN'T BE LIMITED TO JUST THE ONE OR TWO HIV TESTS OR

12:44PM 8     THE ONE OR TWO CBC TESTS.  SOME OF THESE TESTS ARE SOME OF THE

12:45PM 9     MOST COMMONLY RUN IN THE LAB, POTASSIUM, SODIUM.  I KNOW THE

12:45PM 10    COURT IS FAMILIAR WITH ALL OF THESE THINGS.

12:45PM 11       THAT'S NOT WHAT IS NOTICED IN THIS INDICTMENT.  WHAT IS

12:45PM 12    NOTICED IN THIS INDICTMENT IS ALLEGATIONS OF INACCURACY AND

12:45PM 13    UNRELIABILITY REGARDING THERANOS'S PROPRIETARY TECHNOLOGY.

12:45PM 14       NOW, WITH RESPECT TO THE CMS REPORT AND THE PT INR, THE

12:45PM 15    REPORT ITSELF IDENTIFIES THE 81 TESTS THAT ARE IDENTIFIED AS

12:45PM 16    POTENTIALLY INACCURATE BY THE CMS SURVEYOR, MS. BENNETT, WERE

12:45PM 17    RUN ON AN UNMODIFIED BCS-XP MACHINE THAT'S LISTED IN THE REPORT

12:45PM 18    THAT THE GOVERNMENT WANTS TO INTRODUCE.  THAT'S NOT THERANOS

12:45PM 19    PROPRIETARY TECHNOLOGY.

12:45PM 20       MS. HOLMES DID RAISE THIS ISSUE IN HER MOTION IN LIMINE TO

12:45PM 21    EXCLUDE THIS EVIDENCE.  SHE RAISED RELEVANCE ARGUMENTS, WHICH

12:45PM 22    WE RENEW.  SHE RAISED HEARSAY ARGUMENTS, WHICH WE RENEW.  BUT

12:45PM 23    THIS ISSUE WAS NEVER RAISED.

12:45PM 24       AND I DON'T THINK THE GOVERNMENT -- I DON'T THINK THE

12:45PM 25    GOVERNMENT DISPUTES THE FACT THAT MOST OF THE CMS REPORT AND

12:46PM 1    MOST OF THE FINDINGS RELATE TO THINGS OTHER THAN THERANOS

12:46PM 2    PROPRIETARY FINGERSTICK TESTING.

12:46PM 3              THE COURT:  SO THERE ARE SOME IN THE REPORT THAT DO

12:46PM 4    RELATE TO THIS?

12:46PM 5              MR. CAZARES:  THERE ARE SOME.  THERE ARE SOME.  ONE

12:46PM 6    OF THE ALLEGATIONS THAT WERE IN THE REDACTED VERSION OF THE

12:46PM 7    REPORT THAT MS. HOLMES AND THE GOVERNMENT AGREED TO INTRODUCE

12:46PM 8    RELATING TO SOME QUALITY CONTROL ISSUES WHERE THE DEVICE FAILED

12:46PM 9    QUALITY CONTROL AND THE LAB STILL, IN VIOLATION OF POLICIES,

12:46PM 10   RELEASED PATIENT RESULTS AND CMS IDENTIFIED THAT AND DINGED

12:46PM 11   THEM FOR THOSE VIOLATIONS.

12:46PM 12        THAT RELATED TO THE FINGERSTICK PROPRIETARY TESTING.  I

12:46PM 13   WOULD CONCEDE THAT.  THEORETICALLY THAT WOULD BE ADMISSIBLE.

12:46PM 14        WE STILL THINK IT MAY BE PRECLUDED FOR OTHER REASONS, BUT

12:46PM 15   AT A MINIMUM, SURE, THERE A FOUNDATION WOULD HAVE BEEN LAID AND

12:46PM 16   UNDER THE ARGUMENTS WE MADE IN MOTION IN LIMINE NUMBER 1,

12:46PM 17   THEORETICALLY THAT WOULD BE ADMISSIBLE.

12:46PM 18        BUT THAT WOULD BE ALMOST ALL THAT WOULD BE ADMISSIBLE FROM

12:46PM 19   THAT CMS REPORT.

12:46PM 20        THE IMMEDIATE JEOPARDY FINDING IS SPECIFICALLY TETHERED TO

12:46PM 21   THE HEMATOLOGY TESTING, AND THE HEMATOLOGY TESTING AT THAT TIME

12:47PM 22   WAS COMMERCIAL DEVICES.

12:47PM 23              THE COURT:  OKAY.

12:47PM 24        MS. VOLKAR.

12:47PM 25              MS. VOLKAR:  YOUR HONOR, I'D LIKE TO MAKE A FEW

12:47PM 1     POINTS IN RESPONSE TO THAT.

12:47PM 2          TWO, ON THE READING OF THE INDICTMENT -- SO FIRST, AS MY

12:47PM 3     COLLEAGUE, MR. BOSTIC, POINTED OUT, MY COLLEAGUE ACROSS THE

12:47PM 4     AISLE FOCUSSES ON THE LANGUAGE OF THE INDICTMENT.

12:47PM 5          BUT WE SHOULD NOT LOSE SIGHT OF THE FACT, AND YOUR HONOR

12:47PM 6     OF COURSE REFERENCED THIS IN ONE OF THE MORE RECENT RULINGS IN

12:47PM 7     THE OTHER TRIAL, THE INDICTMENT IS A TOOL TO PROVIDE NOTICE TO

12:47PM 8     THE DEFENDANT.

12:47PM 9          AND WHEN YOUR HONOR ORDERED THE GOVERNMENT TO PROVIDE A

12:47PM 10    BILL OF PARTICULARS, WHICH ALSO INCLUDES THESE ASSAYS THAT ARE

12:47PM 11    LISTED IN PARAGRAPH 16, THAT WAS TO PROVIDE FURTHER NOTICE

12:47PM 12    BECAUSE THERE ARE SO MANY DIFFERENT ASSAYS OUT THERE.  AND, OF

12:47PM 13    COURSE, WE HAD THAT DISCUSSION ON MULTIPLE OCCASIONS WITH

12:47PM 14    YOUR HONOR AND PRIOR COUNSEL.

12:47PM 15         AND THESE SAME ASSAYS THAT WE'RE REFERRING TO IN

12:47PM 16    PARAGRAPH 16 ARE ALSO ON THAT BILL OF PARTICULARS.  THESE HAVE

12:48PM 17    BEEN PROVIDED TO THE DEFENDANT FOR YEARS.

12:48PM 18         AND THE POINT THERE IS THAT NOTICE IS THE KEY REQUIREMENT

12:48PM 19    OF THE INDICTMENT.  SO THE SORT OF HYPERTECHNICAL PARSING MAY

12:48PM 20    HAVE A PLACE IN A STATUTE OR OTHER CONTRACTS OR TYPE DOCUMENTS,

12:48PM 21    BUT NOT NECESSARILY IN THE INDICTMENT.

12:48PM 22         NOW, REGARDLESS OF THAT PRIMARY POINT, TO TAKE

12:48PM 23    MR. BALWANI'S POSITION AND PARSE THE LANGUAGE IN THAT WAY, WE

12:48PM 24    ALSO KNOW THAT THERE ARE CANONS OF INTERPRETATIONS SUCH AS WE

12:48PM 25    SHOULDN'T READ PORTION OF THE DOCUMENT TO BE SURPLUS.

12:48PM 1      AND ESSENTIALLY WHAT MR. BALWANI'S TEAM IS ASSERTING HERE

12:48PM 2  IS THAT WE SHOULD JUST STRIKE SEVERAL OF THE ASSAYS FROM THIS

12:48PM 3  LIST THAT HAS BEEN PROVIDED SINCE SEPTEMBER OF 2018 TO THE

12:48PM 4  DEFENDANT AS SURPLUSAGE JUST BECAUSE OF THE WORDS "IN

12:48PM 5  PARTICULAR."

12:48PM 6      AND IF I'M ALSO NOT MISTAKEN, WE ALSO KNOW THERE ARE

12:48PM 7  CANONS THAT SAY WORDS THAT ARE ESSENTIALLY MODIFIERS OR

12:49PM 8  BEGINNING SENTENCES OR STARTING, WHILE WE CAN'T READ THEM OUT,

12:49PM 9  THEY OFTEN HAVE LESS, THEY HAVE LESS SIGNIFICANCE IN THE TEXT

12:49PM 10  THAN THE SUBSTANCE OF THE WORDS.

12:49PM 11      AND SO TO USE "IN PARTICULAR," A TRANSITIONAL PHRASE, TO

12:49PM 12  READ OUT MULTIPLE ASSAYS, WHICH WE KNOW THERE ARE HUNDREDS OF

12:49PM 13  ASSAYS AND THE IDEA OF THE GOVERNMENT PROVIDING THESE ASSAYS,

12:49PM 14  THESE 25 ASSAYS, WAS TO NARROW THAT FIELD, TO USE THE WORDS "IN

12:49PM 15  PARTICULAR" TO REMOVE CERTAIN OF THESE ASSAYS WOULD REACH AN

12:49PM 16  ABSURB RESULT THAT I DON'T THINK IS WARRANTED, AND I THINK

12:49PM 17  YOUR HONOR HAS SEEN THE TYPE OF EVIDENCE THAT THE GOVERNMENT

12:49PM 18  HAS PRESENTED THROUGH THE PRIOR TRIAL WITH RESPECT TO THESE

12:49PM 19  ASSAYS.

12:49PM 20      NOW, I WANTED TO MOVE TO MY OTHER POINT, WHICH IS A

12:49PM 21  FACTUAL ONE, RELATED SPECIFICALLY TO THE CMS REPORT.

12:49PM 22      SPECIFICALLY, ONE FACTUAL POINT THAT RELATES TO THE CMS

12:50PM 23  REPORT, BUT ALSO TO THESE ASSAYS LISTED IN THE INDICTMENT MORE

12:50PM 24  BROADLY IN PARAGRAPH 16, AT DIFFERENT TIMES THROUGHOUT THE

12:50PM 25  HISTORY OF THE COMPANY, SOME OF THESE ASSAYS WERE MOVED TO

12:50PM 1    THERANOS TECHNOLOGY, OR ATTEMPTED TO MOVE TO THERANOS

12:50PM 2    TECHNOLOGY.

12:50PM 3        WE HEARD FROM PRIOR COUNSEL HOW THERE WAS THE DEVICE

12:50PM 4    ITSELF, THERE WERE THE ASSAYS, THE CHEMISTRY, AND THEN THERE

12:50PM 5    WAS SORT OF THESE COMMERCIAL DEVICES.  THERE WERE MULTIPLE

12:50PM 6    DIFFERENT METHODS, AND SOMETIMES AN ASSAY WAS DEVELOPED FROM

12:50PM 7    THERANOS, BUT IT WASN'T NECESSARILY TRANSITIONED TO THE DEVICE.

12:50PM 8        AND SOMETIMES THERE WERE ATTEMPTS MADE IN RESEARCH AND

12:50PM 9    DEVELOPMENT TO TRY TO BRING THESE ASSAYS TO THE DEVICE OR TO

12:50PM 10   THE FINGERSTICK TECHNOLOGY, AND SOMETIMES THEY WERE ELEVATED

12:50PM 11   FOR A MONTH OR TWO OR LONGER, AND THEN MOVED BACK TO THE

12:50PM 12   COMMERCIAL DEVICE.

12:50PM 13       AND THE ONLY REASON I SAY THAT IS, FOR EXAMPLE, MY

12:50PM 14   UNDERSTANDING OF -- AND MY RECOLLECTION OF THE TESTIMONY IN THE

12:50PM 15   LAST TRIAL IS THAT THE CBC PANEL, WHILE A VERY COMMON TEST, WAS

12:51PM 16   AT SOME TIMES ON THERANOS DEVICES WITH THERANOS ASSAYS OR

12:51PM 17   CHEMISTRY, AND AT OTHER TIMES WAS RUN ON UNMODIFIED DEVICES.

12:51PM 18       SO ANOTHER FAULT IN MR. BALWANI'S ARGUMENT FROM A FACTUAL

12:51PM 19   PERSPECTIVE IS IT'S TRYING TO REMOVE SOME OF THESE ASSAYS

12:51PM 20   ALTOGETHER, WHEN SOME OF THEM HAVE A HISTORY THAT IS MORE

12:51PM 21   COMPLICATED THAN THAT AND WOULD REQUIRE MUCH MORE DETAILED

12:51PM 22   PARSING.

12:51PM 23       MOVING BACK TO SOMETHING THAT MY COLLEAGUE MENTIONED WITH

12:51PM 24   RESPECT TO THE CMS INSPECTOR SARAH BENNETT, SHE ALSO HAS SAID

12:51PM 25   TO THE GOVERNMENT ON MORE THAN ONE OCCASION THAT CMS INSPECTORS

| | | |
|---|---|---|
| 12:51PM | 1 | WERE LIKE BUILDING INSPECTORS.  THEY GO IN AND THEY'RE LOOKING |
| 12:51PM | 2 | FOR IRREGULARITIES AND DEFICIENCIES IN THE LAB PRACTICES. |
| 12:51PM | 3 | BECAUSE THAT IS THEIR ULTIMATE GOAL, THEY'RE NOT ALWAYS WRITING |
| 12:51PM | 4 | DOWN EVERY DEFICIENCY THAT THEY SEE, AND SOMETIMES IF THEY SEE |
| 12:51PM | 5 | A DEFICIENCY WITH ONE ASSAY, THEY MAY REMARK ON THAT IN THE |
| 12:52PM | 6 | REPORT EVEN IF IT APPLIES TO MULTIPLE ASSAYS THAT THEY HAVE |
| 12:52PM | 7 | SEEN. |
| 12:52PM | 8 | AND SO ANOTHER NEARLY IMPOSSIBLE PARSING THAT MR. BALWANI |
| 12:52PM | 9 | WOULD ASK US TO DO BASED ON THE FACTS IN THIS CASE IS BECAUSE |
| 12:52PM | 10 | THE CMS REPORT REFERS TO, FOR EXAMPLE, PT INR AND HEMATOLOGY, |
| 12:52PM | 11 | AN ASSAY LISTED IN THE INDICTMENT BUT NOT NECESSARILY RUN |
| 12:52PM | 12 | EXCLUSIVELY OR ON THE FINGERSTICK TECHNOLOGY, THAT THE |
| 12:52PM | 13 | IMMEDIATE JEOPARDY FINDING FOR THAT, WE MUST LIVE IN A WORLD |
| 12:52PM | 14 | WHERE THAT ONLY APPLIED TO THAT ASSAY AND NO OTHER ASSAYS. |
| 12:52PM | 15 | AND IF SARAH BENNETT WERE HERE, I THINK SHE WOULD TELL |
| 12:52PM | 16 | YOU, AND SHE WOULD TELL THE COURT IF NEED BE, OR THE JURY IF |
| 12:52PM | 17 | NEED BE, THAT THAT'S NOT HOW THE CMS REPORT WORKED.  THE CMS |
| 12:52PM | 18 | REPORT WAS A LIMITED SET OF DEFICIENCIES, BUT FREQUENTLY |
| 12:52PM | 19 | REPRESENTED A MUCH BROADER SET OF PROBLEMS THAT THE INSPECTORS |
| 12:52PM | 20 | SAW AND THE INSPECTORS TOLD THE DEFENDANTS ABOUT. |
| 12:52PM | 21 | THE COURT:  OKAY. |
| 12:52PM | 22 | MR. CAZARES:  YOUR HONOR, THE GOVERNMENT DIDN'T CALL |
| 12:52PM | 23 | MS. BENNETT IN MS. HOLMES'S TRIAL.  THEY DIDN'T FEEL HER |
| 12:53PM | 24 | TESTIMONY WAS IMPORTANT ENOUGH I GUESS TO PROVE THEIR CASE. |
| 12:53PM | 25 | WHAT COUNSEL IS DESCRIBING RIGHT NOW IS THAT THERE ARE A |

12:53PM 1    PENUMBRA, I GUESS, OF VIOLATIONS IN THE CMS REPORT THAT SHOULD

12:53PM 2    BE READ INTO IT AND THAT THE GOVERNMENT CAN NOW RELY ON HAS NO

12:53PM 3    BASIS IN LAW.

12:53PM 4        I MEAN, ESSENTIALLY IF THE GOVERNMENT CAN'T PARSE THIS

12:53PM 5    REPORT AND IDENTIFY WHAT IS AT ISSUE IN THEIR INDICTMENT, HOW

12:53PM 6    CAN A JURY BE PRESENTED WITH THIS MASSIVE REPORT THAT HAS

12:53PM 7    RELATIVELY DAMNING INFORMATION AND ALLEGATIONS, INCLUDING

12:53PM 8    IMMEDIATE JEOPARDY AND THREAT OF HARM TO PATIENTS, HOW IS A

12:53PM 9    JURY SUPPOSED TO PARSE IT?

12:53PM 10        AND THAT'S THE 403 ARGUMENT THAT WE ALSO RAISE.

12:53PM 11        BUT MORE IMPORTANTLY LASTLY WITH RESPECT TO THE CMS

12:53PM 12    REPORT, AS WE RECALL, IT WAS ADMITTED IN THE HOLMES TRIAL FOR

12:53PM 13    MS. HOLMES'S STATE OF MIND, HER INTENT.

12:53PM 14        AND THE GOVERNMENT'S ARGUMENT WAS THAT THE REPORT ITSELF,

12:53PM 15    WHEN IT WAS ISSUED, WAS, HEY, IT WAS RELEVANT TO ESTABLISHING

12:53PM 16    HER STATE OF MIND, INTENT TO DEFRAUD, BECAUSE THROUGHOUT 2016

12:53PM 17    MS. HOLMES CONTINUED TO DEFEND THE LAB AND MAKE PUBLIC

12:54PM 18    STATEMENTS, AND SO CONCURRENT WITH HER RECEIPT OF THESE

12:54PM 19    ALLEGATIONS BY CMS, DISCUSSIONS WITH DR. DAS, SHE CONTINUED TO

12:54PM 20    DEFEND THE LAB.

12:54PM 21        THE PROBLEM IS THAT THE CMS REPORT CAME OUT IN SEPTEMBER

12:54PM 22    OF 2015.  AS OF SEPTEMBER 21ST, 2015, THERANOS STOPPED

12:54PM 23    FINGERSTICK TESTING.  SO ANY ALLEGATIONS IN THE CMS REPORT

12:54PM 24    REGARDING FINGERSTICK TESTING DID NOT CONTINUE AFTER THAT.

12:54PM 25        SO THERE'S NO NOTICE TO MR. BALWANI REGARDING A CONTINUED

58

| | |
|---|---|
| 12:54PM | 1 |

USE OF INACCURATE AND UNRELIABLE FINGERSTICK TESTING.

BY APRIL/MAY, MR. BALWANI RESIGNED.  BY JULY OF 2016 HE
WAS GONE.  HE WASN'T MAKING PUBLIC STATEMENTS.  HE WASN'T DOING
NEWS REPORT AT THAT TIME.

SO I DON'T SEE WHERE THE GOVERNMENT'S THEORY THAT THE CMS
REPORT IS RELEVANT TO MR. BALWANI'S STATE OF MIND OR INTENT
FITS EITHER IN THE PATIENT TESTING OR IN PARTICULAR IN THE
INVESTOR CASE BECAUSE THE LAST INVESTORS WERE IN THE SPRING OF
2015, MONTHS BEFORE CMS EVER SHOWED UP.

SO IF THE THEORY OF ADMISSIBILITY IS FOR MR. BALWANI'S
STATE OF MIND, TEMPORALLY IT SIMPLY DOESN'T WORK.

THE COURT:  IS THERE ANY, IS THERE ANY CONNECTION?
I THINK THE EVIDENCE CAME OUT IN THE OTHER TRIAL, I DON'T KNOW
IF IT WILL IN THIS ONE, THAT YOUR CLIENT -- I THINK THERE WERE
MULTIPLE WITNESSES WHO SAID THAT YOUR CLIENT WAS, AND I'LL JUST
PUT IT IN THE VERNACULAR, THE LAB GUY, AND HE HAD ACCESS TO THE
LAB GUY -- EXCUSE ME -- TO THE LAB.

THERE MAY BE EVIDENCE IN THIS CASE THAT HE PARTICIPATED IN
THE HIRING OF LAB DIRECTORS, ET CETERA, THAT TYPE OF THING.

DOES THAT OVERLAP WITH THE TIMING OF THE CMS REPORT AS TO
THE ISSUE OF KNOWLEDGE AND INTENT AND NOTICE?

MR. CAZARES:  WELL, THERE ARE REFERENCES IN THE CMS
REPORT TO DEFICIENCIES IN THE HIRING OF, FOR EXAMPLE, THE LAB
DIRECTOR, DR. DHAWAN AT THE TIME.  THOSE FACTS TOOK PLACE IN
2014 AND '15.

ER-6108

```
12:56PM   1          THE REPORT DIDN'T COME OUT UNTIL JANUARY OF 2016.  SO THIS
12:56PM   2    REPORT NOTICE PROVIDED BY CMS AFTER THE FACTUAL EVENTS TOOK
12:56PM   3    PLACE, THAT'S NOTICE AND INTENT OF NOTHING.  IT'S AFTER THE
12:56PM   4    FACT.  IT'S TOO LATE.
12:56PM   5        YOU CAN'T USE THIS EVIDENCE OF CMS'S FINDINGS TO SOMEHOW
12:56PM   6    REACH BACK IN TIME AND SAY, OH, LOOK, WHAT DR. ROSENDORFF SAID
12:56PM   7    WAS TRUE, SO THIS PROVIDES NOTICE OF YOU OF THAT.  OR THIS
12:56PM   8    REPORT --
12:56PM   9              THE COURT:  IT'S NOTICE TO MR. BALWANI.
12:56PM  10              MR. CAZARES:  THAT'S WHAT I'M SAYING, NOTICE TO
12:56PM  11    MR. BALWANI.
12:56PM  12        WHAT THE GOVERNMENT IS TRYING TO SAY --
12:56PM  13              THE COURT:  WELL, ISN'T THAT SAYING, WELL, THIS
12:56PM  14    EVIDENCE SHOWS THAT AT THAT TIME, WITHIN THE TIMING OF THE
12:56PM  15    INDICTMENT, HE KNEW OR SHOULD HAVE KNOWN ABOUT THIS,
12:56PM  16    IRRESPECTIVE OF THE TIME THAT THE ULTIMATE REPORT CAME OUT?
12:56PM  17              MR. CAZARES:  THAT'S BOLSTERING.  THAT'S NOT NOTICE.
12:57PM  18        BECAUSE MR. BALWANI, AT THE TIME THAT THOSE EVENTS ARE
12:57PM  19    TAKING PLACE, HIS INTERACTIONS WITH DR. ROSENDORFF OR HIS
12:57PM  20    HIRING OF DR. DHAWAN, WHATEVER YOU WANT TO SAY ABOUT HIS STATE
12:57PM  21    OF MIND AT THE TIME, IT'S NOT INFORMED BY WHAT CMS BOTH FINDS
12:57PM  22    AND REPORTS TO HIM.
12:57PM  23        THEIR FINDING IS SIMPLY THEORETICALLY CONFIRMING,
12:57PM  24    CUMULATIVE AT SOME LEVEL, BUT IT'S NOT NOTICE.
12:57PM  25              THE COURT:  SO THE NOTICE BEGINS WHEN HE RECEIVES A
```

12:57PM 1    COPY OF THEIR DOCUMENT THAT INFORMS HIM?

12:57PM 2            MR. CAZARES:  THEIR REPORTS OF WHAT THEY'RE DOING.

12:57PM 3        AND I KNOW THE GOVERNMENT IS GOING TO SIT HERE AND SAY,

12:57PM 4    WELL, THEY HAD EXIT MEETINGS ON SEPTEMBER 22ND AND 23RD OF 2015

12:57PM 5    WITH MS. BENNETT AND MR. YAMAMOTO WHERE MS. HOLMES AND

12:57PM 6    MR. BALWANI WERE TOLD ABOUT SOME OF THE DEFICIENCIES THEY WERE

12:57PM 7    FINDING.

12:57PM 8        TRUE.

12:57PM 9        BUT YOU KNOW WHAT?  FINGERSTICK TESTING HAD ALREADY

12:57PM 10   STOPPED, SO THERE'S NO NOTICE OF PATIENT FRAUD GOING FORWARD

12:57PM 11   BECAUSE IT HAD ALREADY STOPPED.

12:57PM 12       THE INVESTOR CASE HAD ALREADY ENDED IN APRIL/MAY.  NO

12:57PM 13   FURTHER INVESTORS AT THAT TIME.

12:57PM 14       SO EVEN THE EXIT INTERVIEWS OR DISCUSSIONS WHICH TOOK

12:58PM 15   PLACE ON SEPTEMBER 22ND AND 23RD WOULDN'T THEMSELVES PROVIDE

12:58PM 16   NOTICE OF ANYTHING RELATING TO MR. BALWANI, BESIDES THE FACT

12:58PM 17   THAT THE GOVERNMENT NEVER BOTHERED TO CALL CMS WITNESSES IN THE

12:58PM 18   HOLMES TRIAL.  MAYBE THEY WILL IN OUR TRIAL AND WE'LL HAVE A

12:58PM 19   DIFFERENT SITUATION.

12:58PM 20       BUT NOTICE, CMS PROVIDES NOTHING.

12:58PM 21           THE COURT:  OKAY.

12:58PM 22           MR. CAZARES:  IT'S THEORETICALLY CUMULATIVE

12:58PM 23   AFFIRMATION.

12:58PM 24           THE COURT:  MS. VOLKAR.

12:58PM 25           MS. VOLKAR:  THANK YOU, YOUR HONOR.

61

12:58PM 1    AS MR. BALWANI AND HIS COUNSEL WELL KNOW, THE GOVERNMENT

12:58PM 2    IS NOT BOUND TO SEEK TO ADMIT THE SAME PORTIONS OF THE CMS

12:58PM 3    REPORT IN THAT TRIAL IN THIS COMING TRIAL, JUST AS MR. BALWANI

12:58PM 4    IS NOT BOUND BY THE RULINGS OF THAT PRIOR TRIAL OR ANY TRIAL

12:58PM 5    STRATEGY DECISIONS OF MS. HOLMES'S COUNSEL.

12:58PM 6    SO THAT'S IN PARTICULAR WITH RESPECT TO WHICH PORTIONS OF

12:58PM 7    THE REPORT THE GOVERNMENT CHOSE TO ULTIMATELY SEEK TO ADMIT.

12:58PM 8    THE GOVERNMENT'S POSITION HAS ALWAYS BEEN THE ENTIRETY OF

12:58PM 9    THE REPORT IS ADMISSIBLE, AND ADMISSIBLE FOR ITS TRUTH.  AND

12:58PM 10   THAT HAS NOT CHANGED, AND WE ARGUED THAT BEFORE YOUR HONOR

12:59PM 11   BEFORE ULTIMATELY SEEKING TO ADMIT IT FOR A LIMITED PURPOSE

12:59PM 12   THROUGH DR. DAS.

12:59PM 13   AND WE DID NOT CALL SARAH BENNETT OR A CMS INSPECTOR IN

12:59PM 14   THAT CASE, BUT OF COURSE THE GOVERNMENT IS FREE TO MAKE

12:59PM 15   DECISIONS IN THIS CASE AS THE TRIAL UNFOLDS.

12:59PM 16   AS TO IF THE GOVERNMENT -- I JUST WANT TO ADDRESS THE 403

12:59PM 17   AND IF THE GOVERNMENT CAN'T PARSE THROUGH, HOW COULD THE JURY?

12:59PM 18   OF COURSE THE GOVERNMENT IS WELL AWARE OF WHAT IS IN THE

12:59PM 19   REPORT AND IS VERY CAPABLE OF PARSING THROUGH IT AND HAS DONE

12:59PM 20   SO WITH THE BENEFIT OF MS. BENNETT AND MR. YAMAMOTO ON MANY

12:59PM 21   OCCASIONS.

12:59PM 22   THE DEFENSE, OF COURSE, HAS THE MEMORANDA OF THOSE

12:59PM 23   INTERVIEWS.

12:59PM 24   AND THEN AS FAR AS THE STATE OF MIND, AGAIN, MR. BALWANI'S

12:59PM 25   COUNSEL, MY COLLEAGUE REFERENCES THE ARGUMENTS WE MADE TO

ER-6111

12:59PM 1     CONNECT THE REPORT TO MS. HOLMES'S STATE OF MIND.

12:59PM 2         OF COURSE WE WOULD MAKE DIFFERENT ARGUMENTS BASED ON THE

12:59PM 3     FACTS AND EVIDENCE THAT COME IN AT THIS TRIAL TO CONNECT IT TO

12:59PM 4     MR. BALWANI.

12:59PM 5         ON ITS FACE, I WOULD LIKE TO START WHERE MR. CAZARES

01:00PM 6     ENDED, WHICH IS THOSE EXIT INTERVIEWS.  ALTHOUGH MR. BALWANI

01:00PM 7     WOULD LIKE TO DRAW A CLEAN, NEAT LINE BETWEEN THE CMS

01:00PM 8     INSPECTIONS WHEN THE CMS INSPECTORS WERE TELLING MR. BALWANI,

01:00PM 9     WHO WAS THE MAIN REPRESENTATIVE FROM THERANOS THEY DEALT WITH,

01:00PM 10    WHAT WAS HAPPENING, WHAT THEY WERE FINDING IN THE LAB IN REAL

01:00PM 11    TIME, THEY NEEDED TO COME BACK IN NOVEMBER BECAUSE THEY NEEDED

01:00PM 12    TO SEE IMMEDIATE CHANGES.

01:00PM 13        WHEN THEY CAME BACK IN NOVEMBER, THEY INFORMED MR. BALWANI

01:00PM 14    THAT SEVERAL OF THOSE DEFICIENCIES HAD NOT BEEN FIXED.

01:00PM 15        AND SO THE ONLY VERSION OF EVENTS WHERE THE PATIENT

01:00PM 16    TESTING FRAUD IS NOT AT ALL AT PLAY WITH RESPECT TO CMS'S

01:00PM 17    INTERACTIONS WITH MR. BALWANI IS IF YOU BUY THEIR VIEW THAT

01:00PM 18    ONLY TESTS RUN ON THE FINGERSTICK OR EDISON DEVICE ARE

01:00PM 19    RELEVANT.

01:00PM 20        AND AGAIN, WE GO BACK TO THAT IS SIMPLY NOT TRUE.  THAT'S

01:00PM 21    SIMPLY NOT THE WAY THAT THE INDICTMENT IS WRITTEN.  THE

01:00PM 22    INDICTMENT STATES THE PATIENT FRAUD IS 2013 TO 2016.  THAT IS

01:00PM 23    THE TIME PERIOD THAT PATIENTS WERE RECEIVING THERANOS TESTS AT

01:01PM 24    WALGREENS STORES, AND AT THE TIME PERIOD THAT THE PATIENTS WERE

01:01PM 25    BEING INFORMED THAT THEY WOULD RECEIVE AN ACCURATE AND RELIABLE

63

```
01:01PM   1    TEST WHEN THERANOS, AND PARTICULARLY DEFENDANTS, KNEW THAT THAT
01:01PM   2    WAS NOT TRUE.
01:01PM   3        AND ONE OF THE KEY PIECES OF EVIDENCE THAT THE GOVERNMENT
01:01PM   4    COULD PUT FORWARD TO SHOW THAT MR. BALWANI KNEW THAT WAS NOT
01:01PM   5    TRUE WAS IN SEPTEMBER OF 2015, THE CMS INSPECTORS TELL HIM,
01:01PM   6    THESE DEFICIENCIES PUT PATIENT TEST RESULTS AT RISK, OR
01:01PM   7    PATIENTS AT RISK.  PLEASE FIX THEM.
01:01PM   8        THEY COME BACK IN NOVEMBER, AND THEY SAY, YOU HAVEN'T
01:01PM   9    FIXED THEM.  THAT IS ONE OF THE WAYS THAT THE GOVERNMENT COULD
01:01PM  10    CHOOSE, IF IT DOES, TO SHOW THAT THE DEFENDANT WAS NOT
01:01PM  11    PROVIDING THE ACCURATE AND RELIABLE, AND KNEW HE WAS NOT
01:01PM  12    PROVIDING THE ACCURATE AND RELIABLE TESTS THAT HE PURPORTED TO.
01:01PM  13             THE COURT:  WOULD THAT -- I'M SORRY TO INTERRUPT
01:01PM  14    YOU.
01:01PM  15        WOULD THAT BE INDEPENDENT OF THE CMS LETTER THEN?
01:02PM  16             MS. VOLKAR:  I THINK THAT WOULD BE -- WELL, THE
01:02PM  17    FINDINGS --
01:02PM  18             THE COURT:  WHAT I MEAN IS, IT COULD BE INDEPENDENT
01:02PM  19    OF THE CMS LETTER?
01:02PM  20        IN OTHER WORDS, THE WITNESS COULD GET UP AND SAY, WE FOUND
01:02PM  21    DEFICIENCIES, WE TOLD HIM AT TIME 1 AND WE TOLD HIM AT TIME 2,
01:02PM  22    AND NOT EVEN HAVE TO DEAL WITH THE LETTER.  IS THAT A
01:02PM  23    POSSIBILITY?
01:02PM  24             MS. VOLKAR:  THAT WOULD NOT BE THE GOVERNMENT'S
01:02PM  25    PREFERENCE OBVIOUSLY, YOUR HONOR.
```

01:02PM 1    AND THE GOVERNMENT'S POINT IS THAT CMS TOLD MR. BALWANI

01:02PM 2    THE SUBSTANCE OF WHAT WAS IN THAT LETTER MONTHS BEFORE HE

01:02PM 3    RECEIVED THE LETTER.

01:02PM 4        SO MR. CAZARES -- AND I APOLOGIZE IF I WAS NOT CLEAR --

01:02PM 5    MR. CAZARES WAS POINTING OUT A TIMELINE, AND HE CORRECTLY NOTES

01:02PM 6    THAT THE LETTER ITSELF WAS NOT PROVIDED UNTIL JANUARY OF 2016.

01:02PM 7        AND NOW MS. HOLMES, MY RECOLLECTION, SAID THAT SHE DIDN'T

01:02PM 8    KNOW WHAT WAS GOING TO BE IN THAT LETTER UNTIL SHE RECEIVED IT.

01:02PM 9        THAT'S NOT TRUE FOR MR. BALWANI.

01:02PM 10        THE COURT:  I SEE.

01:02PM 11        MS. VOLKAR:  MR. BALWANI KNEW AS OF SEPTEMBER OF

01:02PM 12    2015 ESSENTIALLY WHAT WAS GOING TO GO IN THAT LETTER.

01:02PM 13        THE COURT:  THERE WAS AN INDEPENDENT SOURCE OF

01:02PM 14    INFORMATION I SUPPOSE.

01:02PM 15        MR. CAZARES:  AND JUST TO CORRECT THE RECORD ON

01:03PM 16    THAT, YOUR HONOR, BECAUSE I'M THE ONE WHO DEPOSED MS. BENNETT,

01:03PM 17    AT THE EXIT INTERVIEWS ON THE 22ND AND 23RD OF SEPTEMBER, 2015,

01:03PM 18    SHE TESTIFIED UNDER OATH THAT SHE NOTIFIED MS. HOLMES AND

01:03PM 19    MR. BALWANI THAT THEY, THE SURVEYORS, WERE CONSIDERING

01:03PM 20    CONDITION LEVEL DEFICIENCIES, WHICH ARE SERIOUS, CONDITION

01:03PM 21    LEVEL, BUT NO DETERMINATIONS HAD BEEN MADE YET ABOUT WHETHER

01:03PM 22    IMMEDIATE JEOPARDY, THE MOST SERIOUS OF THE DEFICIENCIES, HAD

01:03PM 23    BEEN FOUND OR DETERMINED.

01:03PM 24        AND SHE FURTHER TESTIFIED THAT THAT DECISION WAS NOT MADE

01:03PM 25    UNTIL MONTHS LATER.

01:03PM 1    SO THE IDEA THAT MR. BALWANI WAS TOLD, YOU'RE PUTTING

01:03PM 2    PATIENTS AT RISK RIGHT NOW AND YOU NEED TO STOP OR YOU NEED TO

01:03PM 3    DO SOMETHING ABOUT IT, THAT'S NOT WHAT TOOK PLACE.  THAT'S NOT

01:03PM 4    WHAT IS IN MS. BENNETT'S SWORN TESTIMONY.

01:03PM 5         AGAIN, IF THE GOVERNMENT IS GOING TO CALL HER, I GUESS SHE

01:03PM 6    CAN CLARIFY THE RECORD.  BUT THE GOVERNMENT HASN'T SUBMITTED

01:03PM 7    MOST OF THESE FACTUAL ARGUMENTS.

01:03PM 8         THE COURT:  SO IF HE WAS PUT ON NOTICE THAT THERE

01:04PM 9    WERE PROBLEMS, IS THAT ENOUGH?

01:04PM 10        MR. CAZARES:  NO, UNLESS IT WAS TIED TO THERANOS

01:04PM 11   FINGERSTICK TESTING.

01:04PM 12        IF THE GOVERNMENT WANTED TO CHARGE THE CASE THE WAY THAT

01:04PM 13   THEY SAY THEY HAVE CHARGED IT, PUTTING AT ISSUE ALL 9 MILLION

01:04PM 14   TEST RESULTS THROUGHOUT THE HISTORY OF THE LAB, ALL THEY HAD TO

01:04PM 15   DO WAS CHARGE THERANOS ITSELF WAS INCAPABLE OF PRODUCING

01:04PM 16   ACCURATE AND RELIABLE RESULTS.  THAT'S IT.

01:04PM 17        THERANOS:  INACCURATE.

01:04PM 18        THAT'S NOT WHAT THEY DID.

01:04PM 19        THEY SAID THERANOS ADVERTISED ITS TESTING, AND THEN GOT

01:04PM 20   SPECIFIC.  WHAT WAS IT ABOUT THERANOS TESTING?  IT'S

01:04PM 21   FINGERSTICK TESTING.

01:04PM 22        IT'S PLAIN AS DAY, YOUR HONOR, AND I'LL SUBMIT ON THAT

01:04PM 23   POINT.

01:04PM 24        THE COURT:  OKAY.

01:04PM 25        MS. VOLKAR.

01:04PM 1     MS. VOLKAR: YOUR HONOR, IF I MAY BE HEARD?

01:04PM 2     SO I THINK THERE'S TWO IMPORTANT THINGS TO PARSE OUT HERE.

01:04PM 3     ONE IS WE'VE CIRCLED BACK TO WHAT I UNDERSTAND

01:04PM 4     MR. BALWANI'S PRIMARY ARGUMENT TO BE, AND IT OF COURSE TIES

01:04PM 5     INTO WITH MR. BALWANI'S MOTION IN LIMINE NUMBER 1, AND THAT IS

01:04PM 6     THAT ONLY FINGERSTICK TESTS ARE RELEVANT BECAUSE OF THE

01:05PM 7     LANGUAGE IN THE INDICTMENT.

01:05PM 8     I'LL SUBMIT ON MY PRIOR ARGUMENTS. I DON'T THINK THAT'S

01:05PM 9     THE CORRECT READING OF THE INDICTMENT, AND MR. BOSTIC ALSO

01:05PM 10    DISCUSSED THAT.

01:05PM 11    SO THAT IS ONE ASPECT AND I THINK THE PRIMARY ASPECT THAT

01:05PM 12    THE BRIEFING TALKS ABOUT.

01:05PM 13    THERE IS ALSO THE RELEVANCE TO THE ELEMENTS THAT ARE BEING

01:05PM 14    CHARGED, AND WE'VE BEEN TALKING ABOUT MR. BALWANI'S KNOWLEDGE,

01:05PM 15    STATE OF MIND, INTENT. THAT WAS IN ECF 798.

01:05PM 16    YOUR HONOR FOUND THAT THAT WAS A KEY PART OF THE RELEVANCE

01:05PM 17    TO MS. HOLMES, AND SO THE GOVERNMENT SUBMITS IT STILL REMAINS A

01:05PM 18    KEY PART OF THE RELEVANCE FOR MR. BALWANI.

01:05PM 19    BUT THERE'S ALSO ANOTHER ASPECT THAT THE GOVERNMENT HASN'T

01:05PM 20    GOTTEN A CHANCE TO DISCUSS YET, BUT MENTIONED IN THE BRIEFING.

01:05PM 21    THE DOCUMENT, THE CMS REPORT, ALSO DEMONSTRATES FALSITY,

01:05PM 22    AN ELEMENT UNTETHERED TO MR. BALWANI'S INTENT AND STATE OF MIND

01:05PM 23    SPECIFICALLY.

01:05PM 24    BUT THE CMS REPORT CAN DEMONSTRATE, IT'S ONE PIECE OF

01:05PM 25    EVIDENCE THAT COULD DEMONSTRATE THAT THE TEST RESULTS AND WHAT

01:06PM 1   THE DEFENDANTS WERE PROMISING WAS, IN FACT, FALSE.

01:06PM 2       SO THAT'S ANOTHER -- AND I DON'T THINK THAT IS TETHERED BY

01:06PM 3   THE TIMELINE THAT MR. CAZARES HAS BEEN TALKING ABOUT AND

01:06PM 4   SEVERAL OF THE OTHER ITEMS, AND SO I WANT TO MAKE SURE THAT

01:06PM 5   THAT DOESN'T GET LOST IN THE SHUFFLE, WHICH IS THAT THERE ARE

01:06PM 6   MULTIPLE BASES WHY THE REPORT, IN ADDITION TO ANYTHING THAT THE

01:06PM 7   CMS INSPECTORS MAY OR MAY NOT TESTIFY ABOUT, BUT THE REPORT

01:06PM 8   ITSELF CAN BE A KEY PIECE OF EVIDENCE IF THE GOVERNMENT SEEKS

01:06PM 9   TO ADMIT IT, AND WE DO THINK THAT, AS YOUR HONOR DID

01:06PM 10  PREVIOUSLY, IT SHOULD GRANT THE GOVERNMENT'S MOTION IN LIMINE

01:06PM 11  NUMBER 7 AND FIND THE CMS REPORT AND COVER LETTER ADMISSIBLE.

01:06PM 12      MR. CAZARES:  YOUR HONOR, THAT LACKS --

01:06PM 13      THE COURT:  I WONDER IF THIS IS ALSO DEPENDENT ON

01:06PM 14  WHETHER THE GOVERNMENT MAKES A DECISION TO INTRODUCE THIS

01:06PM 15  DOCUMENT, AND I'M JUST SUGGESTING, SHOULD THE COURT DEFER THIS

01:06PM 16  UNTIL THE GOVERNMENT MAKES A DECISION AS TO WHAT IT WANTS TO

01:06PM 17  DO?

01:06PM 18      YOU'RE ASKING TODAY, THROUGH MIL 7, TO INTRODUCE IT

01:07PM 19  ENTIRELY?

01:07PM 20      MS. VOLKAR:  YES, YOUR HONOR.  AND THE REASON FOR

01:07PM 21  THAT IS SIMILAR TO LAST SUMMER WHEN WE WERE PREPARING.

01:07PM 22      KNOWING IF THE DOCUMENT WAS ADMISSIBLE, WHICH AGAIN GOING

01:07PM 23  BACK TO LAST MAY WE UNDERSTOOD IT WAS, IT HELPS US TO SET UP

01:07PM 24  OUR LIST OF WITNESSES, IT HELPS US DETERMINE HOW TO PROCEED AT

01:07PM 25  TRIAL.

01:07PM 1    THEN SHORTLY BEFORE TRIAL IN THE HOLMES CASE, IT CHANGED A

01:07PM 2    LITTLE BIT AND IT SORT OF WAS CHALLENGED MULTIPLE TIMES AGAIN

01:07PM 3    BY THE HOLMES COUNSEL, AND I KNOW YOUR HONOR IS VERY FAMILIAR

01:07PM 4    WITH THE BACK AND FORTH ON THAT.

01:07PM 5        BUT THE GOVERNMENT'S POSITION HAS NEVER CHANGED.  THE

01:07PM 6    DOCUMENT IS ADMISSIBLE.  KNOWING AHEAD OF TIME, RATHER THAN

01:07PM 7    HAVING IT DEFERRED, WOULD HELP US PREPARE OUR TRIAL STRATEGY.

01:07PM 8        OF COURSE IF YOUR HONOR WANTS TO DEFER, YOU'VE SEEN THAT

01:07PM 9    WE CAN PROVE OUR CASE, EVEN IF IT'S ADMITTED FOR A LIMITED

01:07PM 10   PURPOSE, BUT OUR FIRST PREFERENCE IS THAT THE DOCUMENT IS

01:07PM 11   ADMISSIBLE, IT'S RELEVANT, IT'S NOT HEARSAY, IT'S NOT 403 FOR

01:07PM 12   ALL OF THE REASONS YOUR HONOR PREVIOUSLY STATED, AND WE THINK

01:07PM 13   THAT THIS NEW THEORY THAT MR. BALWANI IS RAISING, PURPORTEDLY

01:08PM 14   THAT IT'S NOT COVERED BY THE ASSAYS IN THE INDICTMENT, IS

01:08PM 15   FLAWED FOR A NUMBER OF REASONS THAT WE HAVE ALREADY DISCUSSED.

01:08PM 16       THANK YOU.

01:08PM 17           MR. CAZARES:  YOUR HONOR, AS TO THE LAST COUPLE OF

01:08PM 18   POINTS, FIRST -- I WON'T BELABOR THIS -- AS TO FALSITY, WHETHER

01:08PM 19   OR NOT THE CMS REPORT IS RELEVANT TO FALSITY SO YOU DON'T HAVE

01:08PM 20   TO GO TO INTENT OR NOTICE TO MR. BALWANI, THAT FALSITY WOULD BE

01:08PM 21   ACCURACY AND RELIABILITY OF THE TESTS AT ISSUE.

01:08PM 22       MS. BENNETT HAS TESTIFIED UNDER OATH IT WAS NOT HER JOB TO

01:08PM 23   MEASURE OR DETERMINE ACCURACY OR UNRELIABILITY.

01:08PM 24       WITH RESPECT TO THE MOST SERIOUS VIOLATIONS SHE FOUND WITH

01:08PM 25   RESPECT TO PT INR, SHE COULD NOT TELL ME.  SHE OVER AND OVER

01:08PM 1    SAID THE RESULTS WERE DIFFERENT.  SHE COULD NOT SAY THEY WERE

01:08PM 2    INACCURATE.  AND THAT IS TRUE THROUGHOUT THE CMS REPORT.

01:08PM 3         WITH RESPECT TO THE TIMING OF THE COURT'S DECISION AND

01:08PM 4    WHETHER THE PARTIES NEED THAT INFORMATION NOW OR IT COULD BE

01:08PM 5    DEFERRED, IF THE GOVERNMENT JUST CALLS DR. DAS AND TRIES TO

01:09PM 6    INTRODUCE THE REPORT IN THE WAY THEY DID IN THE HOLMES TRIAL,

01:09PM 7    IT SIMPLY IS INAPPLICABLE.  IT'S NOT ADMISSIBLE BECAUSE IT'S

01:09PM 8    PURE NOTICE.

01:09PM 9         IF THEY'RE GOING TO TRY TO GO THIS FALSITY ROUTE AND CALL

01:09PM 10   MS. BENNETT OR MR. YAMAMOTO, OUR ARGUMENTS WITH RESPECT TO

01:09PM 11   THERANOS PROPRIETARY TESTING STILL APPLY, BUT THEN THERE WILL

01:09PM 12   BE OTHER ISSUES WHICH I GUESS WE WILL HAVE TO DEAL WITH AT THAT

01:09PM 13   TIME.

01:09PM 14        BUT WE BELIEVE THAT A FOUNDATION NEEDS TO BE ESTABLISHED

01:09PM 15   BY THE GOVERNMENT TETHERING THE TESTING TO THE CHARGES IN THE

01:09PM 16   INDICTMENT.

01:09PM 17             THE COURT:  OKAY.  THANK YOU.

01:09PM 18             MR. CAZARES:  THANK YOU.

01:09PM 19             THE COURT:  THANK YOU VERY MUCH.

01:09PM 20        NEXT ON OUR LIST IS BALWANI'S, MR. BALWANI'S MOTION IN

01:09PM 21   LIMINE NUMBER 3 TO EXCLUDE EVIDENCE OF VOIDING TEST RESULTS.

01:09PM 22             MR. BRECHER:  GOOD AFTERNOON.  AARON BRECHER FOR

01:10PM 23   MR. BALWANI.

01:10PM 24        CONSISTENT WITH MR. COOPERSMITH'S REPRESENTATIONS ABOUT

01:10PM 25   OUR TEAM'S VACCINATION STATUS AND THE COURT'S EARLIER COMMENTS,

02:34PM 1    I THINK THAT SHIP HAS SAILED.  I THINK THEY, THEY'VE

02:34PM 2    ESSENTIALLY CONCEDED THAT, BUT NOT QUITE, AND I THINK WE NEED

02:34PM 3    THAT EXTRA LITTLE BIT.

02:34PM 4            THE COURT:  WELL, I HEARD MS. VOLKAR, SHE TOLD US

02:34PM 5    WHAT SHE TOLD US TODAY, AND IF IT CHANGES, SHE'LL TELL US AGAIN

02:34PM 6    AND YOU'LL GET UP AND WAG YOUR FINGER, I GUESS.

02:34PM 7            MR. COOPERSMITH:  I AM SURE I WILL, YOUR HONOR.

02:34PM 8            THE COURT:  ALL RIGHT.  THANK YOU.

02:34PM 9            MS. VOLKAR:  THANK YOU, YOUR HONOR.

02:34PM 10           THE COURT:  LET'S TURN TO, LET'S SEE, I THINK IT'S

02:35PM 11   THE FIFTH MOTION.  IT'S MR. BALWANI'S MOTION IN LIMINE NUMBER 5

02:35PM 12   TO EXCLUDE EXPERT TESTIMONY OFFERED BY LAY WITNESSES, AND THIS

02:35PM 13   HAS A SIMILAR THEME TO THE LAST.

02:35PM 14           MS. WALSH:  YES, YOUR HONOR.

02:35PM 15       AMY WALSH FOR MR. BALWANI.  IT'S NICE TO APPEAR IN PERSON

02:35PM 16   FOR THE FIRST TIME.

02:35PM 17           THE COURT:  THANK YOU.

02:35PM 18           MS. WALSH:  MAY I ALSO REMOVE MY MASK?  I'M ALSO

02:35PM 19   VACCINATED.

02:35PM 20           THE COURT:  YES, PLEASE.

02:35PM 21           MS. WALSH:  SO THIS IS RELATED TO THE LAST MOTION,

02:35PM 22   YOUR HONOR, AND I THINK I WILL PICK UP ON SOMETHING MS. VOLKAR

02:35PM 23   MENTIONED, WHICH IS THAT COUNSEL MAY DISAGREE BETWEEN -- OR

02:35PM 24   DISAGREE ABOUT THE LINE BETWEEN EXPERT TESTIMONY AND PERCIPIENT

02:35PM 25   TESTIMONY, AND OUR MOTION NUMBER 5 REALLY FOCUSES ON ONE

| | |
|---|---|
| 02:35PM | 1 |
| 02:36PM | 2 |
| 02:36PM | 3 |
| 02:36PM | 4 |
| 02:36PM | 5 |
| 02:36PM | 6 |
| 02:36PM | 7 |
| 02:36PM | 8 |
| 02:36PM | 9 |

02:35PM 1 PARTICULAR WITNESS, THAT'S ERIKA CHEUNG, AND SHE IS A LAY

02:36PM 2 WITNESS WHO WAS CALLED TO GIVE PERCIPIENT TESTIMONY, AND DURING

02:36PM 3 HER TESTIMONY SHE DID CROSS THAT LINE FROM 701 TO 702.

02:36PM 4  AND WE CITED THREE DIFFERENT EXAMPLES OF INSTANCES WHERE

02:36PM 5 SHE DID THAT, AND THOSE THREE EXAMPLES I'D -- I'D LIKE TO TAKE

02:36PM 6 THE COURT THROUGH THOSE THREE BECAUSE I THINK THE WORDS SHE

02:36PM 7 USES IN THE CONTEXT OF NINTH CIRCUIT LAW ARE IMPORTANT.

02:36PM 8  THE FIRST EXAMPLE OCCURRED DURING THE HOLMES TRIAL AT

02:36PM 9 TRANSCRIPT PAGE 923.

02:36PM 10   THE COURT:  IS THIS IN AN EXHIBIT THAT YOU FILED?

02:36PM 11   MS. WALSH:  IT IS, YOUR HONOR, THE TESTIMONY IS.

02:36PM 12  AND I HAVE EXTRA COPIES OF THE TESTIMONY IF YOU WOULD LIKE

02:36PM 13 ME TO HAND THEM UP.

02:36PM 14   THE COURT:  WELL, I HAVE YOUR EXHIBIT.  IS IT 58?

02:36PM 15 WHAT EXHIBIT IS IT?

02:36PM 16   MS. WALSH:  SO THE EXCERPT OF HER TESTIMONY -- LET

02:37PM 17 ME SEE.  IT IS OUR EXHIBIT 1 WHICH CONTAINED EXCERPTS OF THE

02:37PM 18 TRIAL TRANSCRIPT.

02:38PM 19   THE COURT:  I DON'T SEE THAT IN MY BINDER, SO IF YOU

02:38PM 20 HAVE COPIES OF THAT, MAYBE YOU COULD SUPPLY THAT TO THE COURT.

02:38PM 21  (PAUSE IN PROCEEDINGS.)

02:38PM 22   MS. WALSH:  IF I COULD HAND UP OUR EXHIBIT 1,

02:38PM 23 YOUR HONOR?

02:38PM 24   THE COURT:  YES.  THANK YOU.  THANK YOU.

02:38PM 25   MS. WALSH:  (HANDING.)

02:38PM 1          THANK YOU.

02:38PM 2          DO YOU HAVE THIS, MR. BOSTIC?

02:38PM 3          MR. BOSTIC:  I HAVE IT.

02:38PM 4          MS. WALSH:  AND I HAVE EXTRA COPIES.

02:38PM 5          THE COURT:  IT SEEMS LIKE THE CONVERSATION THAT WE

02:38PM 6  HAD WITH YOUR COLLEAGUE.

02:38PM 7          MS. WALSH:  IT IS.

02:38PM 8          THE COURT:  IT IS ANTICIPATORY AS TO OBJECTIONABLE

02:38PM 9  QUESTIONS AND ANSWERS THAT YOU ANTICIPATE THAT THE GOVERNMENT

02:38PM 10 MAY PROFFER IN THEIR CASE.

02:38PM 11         MS. WALSH:  CORRECT.

02:39PM 12     AND I GUESS -- IN THE GOVERNMENT'S RESPONSE TO OUR MOTION,

02:39PM 13 THE GOVERNMENT DID NOT ADDRESS THESE THREE PASSAGES THAT WE

02:39PM 14 CULLED OUT WHICH REALLY -- WHERE MS. CHEUNG TESTIFIED ABOUT

02:39PM 15 INDUSTRY STANDARDS, SHE TESTIFIED ABOUT THE CAUSATION, THAT THE

02:39PM 16 REASON QC WAS FAILING WAS BECAUSE, IN HER WORDS, THE EDISON

02:39PM 17 DIDN'T WORK.

02:39PM 18     SHE TALKED ABOUT VITAMIN D TESTING AND WHY THAT'S

02:39PM 19 IMPORTANT TO A PATIENT AND WHAT IT COULD MEAN TO THAT PATIENT.

02:39PM 20         THE COURT:  AND THIS WAS ALL WITHOUT OBJECTION.

02:39PM 21         MS. WALSH:  WITHOUT OBJECTION.

02:39PM 22         THE COURT:  RIGHT.

02:39PM 23         MS. WALSH:  CORRECT.  AND I DON'T HAVE TO READ

02:39PM 24 THROUGH EVERY SINGLE QUOTE.  THAT'S THE GIST OF IT.

02:39PM 25     AND THE GOVERNMENT DID NOT RESPOND TO THOSE THREE

02:39PM 1    EXAMPLES.

02:39PM 2         THEY CITED OTHER EXAMPLES IN HER TESTIMONY THAT THEY WANT

02:39PM 3    TO ELICIT.  AND OF COURSE WE DON'T OBJECT TO HER TESTIMONY

02:39PM 4    COMING IN THAT IS TRULY PERCIPIENT.  SO SHE CAN TALK ABOUT HER

02:39PM 5    JOB AND WHAT SHE OBSERVED AND WHAT SHE DID.

02:40PM 6         BUT I THINK HER TESTIMONY WILL CROSS THE LINE IF SHE TALKS

02:40PM 7    ABOUT WHY QC WAS FAILING OR HER VIEW OF PROFICIENCY TESTING AND

02:40PM 8    WHAT THE INDUSTRY STANDARD IS FOR LABS.

02:40PM 9              THE COURT:  AND VITAMIN D.

02:40PM 10             MS. WALSH:  AND VITAMIN D.

02:40PM 11             THE COURT:  ABSENT A FOUNDATION?

02:40PM 12             MS. WALSH:  ABSENT A FOUNDATION.

02:40PM 13        BUT EVEN ABSENT QUALIFYING HER AS AN EXPERT.

02:40PM 14             THE COURT:  CAN'T SHE SAY THAT WHEN I WAS AT CAL --

02:40PM 15   I THINK SHE WENT TO CAL -- WHEN I WAS AT CAL, I WAS TAUGHT

02:40PM 16   VITAMIN D WAS IMPORTANT BECAUSE OF X.  CAN SHE THEN SAY, YEAH,

02:40PM 17   THIS IS WHAT MY PROFESSORS TAUGHT ME.

02:40PM 18             MS. WALSH:  SURE.  I THINK SHE CAN SAY VITAMIN D IS

02:40PM 19   IMPORTANT GENERALLY BECAUSE OF X.

02:40PM 20        I THINK WHAT SHE CAN'T GO ON TO SAY, THOUGH, IS THAT IF

02:40PM 21   THE VITAMIN D RESULT IS X, THAT MAY MEAN THAT A PATIENT HAS A

02:40PM 22   VITAMIN D DEFICIENCY OR HAS SOME OTHER ISSUE, SOME OTHER

02:40PM 23   MEDICAL ISSUE WRONG WITH THAT PATIENT.

02:41PM 24        I THINK HER TESTIMONY WENT BEYOND VITAMIN D MEANS THIS AND

02:41PM 25   IT'S IMPORTANT GENERALLY TO SOMEONE'S HEALTH BECAUSE OF X, Y,

```
02:41PM   1      OR Z.  SO IT'S THE GOING BEYOND THAT WE'RE OBJECTING TO.

02:41PM   2           AND AS FAR AS -- I KNOW YOUR HONOR RAISED THE NOTION OF

02:41PM   3      WAITING AND SEEING WITH BOTH OF THESE MOTIONS, WAITING AND NOT

02:41PM   4      MAKING A RULING, WAITING UNTIL THE TESTIMONY COMES OUT.

02:41PM   5           WE THINK IT IS APPROPRIATE RIGHT NOW FOR THE COURT TO

02:41PM   6      RULE.  THE COURT DOES SERVE AS A GATEKEEPER, HAS A GATEKEEPER

02:41PM   7      FUNCTION IN THE INTERPLAY BETWEEN RULE 701 AND 702, AND WE HAVE

02:41PM   8      HAD A WHOLE TRIAL WHERE TESTIMONY HAS COME IN AND IT WAS THE

02:41PM   9      SAME ISSUES DURING THAT TRIAL AND A LOT OF THE SAME WITNESSES

02:41PM  10      ARE GOING TO BE CALLED.  WE EXPECT MS. CHEUNG TO BE CALLED.

02:41PM  11           SO WHAT WE'RE ASKING FOR IS AN ORDER FROM THE COURT

02:42PM  12      PRECLUDING THE GOVERNMENT FROM ELICITING THESE THREE INSTANCES

02:42PM  13      OF TESTIMONY RELATED TO THE SUBJECTS THAT WE PUT IN OUR BRIEF.

02:42PM  14                THE COURT:  OKAY.

02:42PM  15           MR. BOSTIC.

02:42PM  16                MR. BOSTIC:  YES, YOUR HONOR.

02:42PM  17           I THINK THE GOVERNMENT'S POSITION, AS EXPRESSED IN THE

02:42PM  18      BRIEFING, IS THAT A BLANKET ORDER HERE WOULD BE UNNECESSARY,

02:42PM  19      PREMATURE, AND FRANKLY, DIFFICULT TO CRAFT.

02:42PM  20           PART OF THE REASON FOR THAT IS THAT SOME OF THE TESTIMONY

02:42PM  21      THAT THE DEFENSE IS OBJECTING TO WAS NOT DIRECTLY ELICITED BY

02:42PM  22      QUESTIONS FROM THE GOVERNMENT.

02:42PM  23           FOR EXAMPLE, THE FIRST QUOTE THAT THE DEFENSE IDENTIFIES

02:42PM  24      WHERE MS. CHEUNG STATES THAT IN A NORMAL LAB YOU WOULD WANT TO

02:42PM  25      SEE LESS THAN A 1 PERCENT I THINK FAILURE RATE, IF I'M
```

02:42PM  1    REMEMBERING CORRECTLY, THE GOVERNMENT DIDN'T ASK ANY KIND OF

02:42PM  2    QUESTION LIKE, WHAT WOULD YOU EXPECT TO SEE IN A NORMAL LAB IN

02:42PM  3    TERMS OF FAILURE RATES?

02:42PM  4         SO SOMETIMES WITNESSES WILL ANSWER A QUESTION AND ALSO

02:43PM  5    PROVIDE SOME ADDITIONAL INFORMATION THAT THEY FEEL IS PART OF A

02:43PM  6    COMPLETE ANSWER TO THAT QUESTION, BUT IT'S NOT NECESSARILY THE

02:43PM  7    CASE THAT EACH OF THESE STATEMENTS WAS DIRECTLY REQUESTED BY

02:43PM  8    GOVERNMENT QUESTIONING.  SO I JUST WANTED TO NOTE THAT.

02:43PM  9         THAT'S ONE REASON WHY, FOR EXAMPLE, AS TO THE VITAMIN D

02:43PM 10    EXPLANATION, THE GOVERNMENT'S BRIEF HIGHLIGHTED AND EXCERPTED

02:43PM 11    THE GOVERNMENT'S QUESTION ON THAT TOPIC, WHICH WAS FRAMED IN

02:43PM 12    TERMS OF HER EXPERIENCE AT THERANOS.

02:43PM 13         AND THAT'S AN IMPORTANT THING TO KEEP IN MIND HERE, THAT

02:43PM 14    THIS WITNESS, AS A PERCIPIENT WITNESS, CAN TESTIFY ABOUT HER

02:43PM 15    EXPERIENCE AT THE COMPANY, WHAT SHE LEARNED AT THE COMPANY,

02:43PM 16    WHAT SHE WAS AWARE OF IN THAT ROLE AS A MEMBER OF THE LAB STAFF

02:43PM 17    WHO WAS ACTUALLY OPERATING THESE DEVICES AND PERFORMING THESE

02:43PM 18    TESTS.  IN THAT ROLE, SHE BECAME FAMILIAR WITH HOW THOSE

02:43PM 19    MACHINES WORKED, HOW RELIABLE THEY WERE, HOW FREQUENTLY THEY

02:44PM 20    FAILED, WHAT KINDS OF FAILURES SHE SAW.

02:44PM 21         AND FROM HER TESTIMONY, IT'S CLEAR THAT SHE ALSO DEVELOPED

02:44PM 22    AN UNDERSTANDING, EITHER WHILE AT THERANOS OR FROM HER

02:44PM 23    EDUCATION, AS TO THE VERY BASICS OF WHAT THESE DIFFERENT TESTS

02:44PM 24    WERE.

02:44PM 25         IN THE LAST TRIAL THIS WAS WITNESS NUMBER 2 IN THE

02:44PM 1   SEQUENCE AND THIS WAS THE FIRST TIME THAT THE JURY WAS HEARING

02:44PM 2   ABOUT A VITAMIN D TEST OR A PSA TEST.

02:44PM 3       I THINK IT WAS ENTIRELY APPROPRIATE FOR THIS WITNESS TO BE

02:44PM 4   THE ONE WHO TOLD THEM WHAT PSA STOOD FOR, JUST AT A VERY BASIC

02:44PM 5   LEVEL WHAT IT WAS.

02:44PM 6       SHE WASN'T RENDERING MEDICAL DIAGNOSES, SHE WASN'T TALKING

02:44PM 7   ABOUT THE COMPLICATIONS THAT MIGHT FLOW FROM AN ERRONEOUS

02:44PM 8   RESULT.

02:44PM 9       AND EVEN THE QUOTE THE DEFENSE IDENTIFIES FOR VITAMIN D,

02:44PM 10  ALL MS. CHEUNG SAID IS THAT THAT TEST IS IMPORTANT BECAUSE

02:44PM 11  THERE COULD BE TWO DIFFERENT DIAGNOSES OF A PARTICULAR PATIENT,

02:45PM 12  IT COULD BE THE DIFFERENCE BETWEEN A PATIENT HAVING A VITAMIN D

02:45PM 13  DEFICIENCY VERSUS BEING IN THE NORMAL RANGE.

02:45PM 14      THAT'S NOT EXPERT TESTIMONY.  THAT'S JUST A FACT OF HOW

02:45PM 15  BLOOD TESTING WORKS.  THAT'S WELL WITHIN HER KNOWLEDGE, HER

02:45PM 16  PERCIPIENT KNOWLEDGE AS SOMEONE WHO RAN THESE TESTS, YOU KNOW,

02:45PM 17  THE FACT THAT A LEVEL WOULD COME BACK FROM THESE TESTS AND THAT

02:45PM 18  LEVEL MIGHT INDICATE EITHER A DEFICIENCY OR NOT.

02:45PM 19          THE COURT:  WELL, THAT'S WHAT -- PARDON ME FOR

02:45PM 20  STOPPING YOU THERE.

02:45PM 21      MS. WALSH, THAT'S ONE THING I WAS CURIOUS ABOUT.  CAN'T

02:45PM 22  SHE SAY, MY JOB WAS, AS THE LAB PERSON DOING TESTING AND THIS

02:45PM 23  AND THAT, I WAS TRAINED AND I WAS TAUGHT HERE'S WHAT -- THIS IS

02:45PM 24  THE RANGE THAT I LOOK FOR, THIS IS THE RANGE THAT EVIDENCES

02:45PM 25  SOMETHING ELSE, AND THAT SOMETHING ELSE COULD BE A HEALTH

02:45PM 1    ISSUE, WITHOUT DESCRIBING WHY OR WHATEVER?  CAN'T SHE DESCRIBE

02:45PM 2    THAT?

02:45PM 3        IS IT THE SAME THING AS SAYING, WELL, I TAKE PEOPLE'S

02:46PM 4    TEMPERATURES, AND IF THEY'RE AT 98.6, THAT'S GREAT.  BUT IF

02:46PM 5    THEY'RE AT 104, THAT'S A HIGH FEVER AND WE NEED TO GET SOME

02:46PM 6    MEDICAL ATTENTION ON THAT.

02:46PM 7            MS. WALSH:  RIGHT.  UNDERSTOOD, YOUR HONOR.

02:46PM 8        AND I THINK THE VITAMIN D EXAMPLE IS ONE OF THE MOST GREY

02:46PM 9    OF THE THREE THAT WE'VE CITED, AND IT WILL DEPEND ON

02:46PM 10   MS. CHEUNG -- HOW FAR MS. CHEUNG GOES IN HER EXPLANATION OF THE

02:46PM 11   SIGNIFICANCE OF A VITAMIN D RESULT.

02:46PM 12       WITH REGARD TO THE TWO OTHER EXAMPLES, THOUGH, I WANT TO

02:46PM 13   ADDRESS MR. BOSTIC'S ASSERTION THAT THE GOVERNMENT DID NOT

02:46PM 14   ELICIT THIS TESTIMONY, THAT IT JUST CAME OUT.

02:46PM 15       WITH REGARD TO ONE OF THEM -- THIS IS THAT THE EDISON

02:46PM 16   DEVICE DIDN'T WORK IN MS. CHEUNG'S OPINION.

02:46PM 17       THE QUESTION -- SHE HAD SAID, I TALKED TO MANY PEOPLE AT

02:46PM 18   THERANOS AND I WAS RAISING CONCERNS AND THEY WERE GIVING ME ALL

02:46PM 19   KINDS OF REASONS THAT THE DEVICES WERE NOT PERFORMING OR THE QC

02:47PM 20   WAS FAILING, THEY WERE GIVING ME ALL OF THESE OTHER REASONS.

02:47PM 21       AND THEN THE GOVERNMENT ASKED, DID YOU FEEL LIKE THERE WAS

02:47PM 22   A POSSIBLE EXPLANATION THAT WAS IGNORED OR NOT GIVEN ENOUGH

02:47PM 23   ATTENTION?

02:47PM 24       AND THE ANSWER SHE GAVE WAS, YEAH, THE EDISON DEVICES

02:47PM 25   DIDN'T WORK.  THEY WEREN'T PERFORMING RELIABLY OR EFFECTIVELY

02:47PM 1    TO THE STANDARDS THAT YOU WOULD TYPICALLY SEE FOR ANY OTHER

02:47PM 2    TYPE OF MEDICAL DIAGNOSTIC.

02:47PM 3        SO IN THAT ONE ANSWER, WHICH WAS ELICITED IN RESPONSE TO A

02:47PM 4    QUESTION BY THE GOVERNMENT, SHE BOTH OPINES ON CAUSATION, THAT

02:47PM 5    IS KIND OF THE ULTIMATE ISSUE IN THE CASE AT LEAST ON THE

02:47PM 6    FALSITY ELEMENT, AND SHE OPINES ON INDUSTRY STANDARDS.

02:47PM 7        AND I JUST THINK FOR A LAY WITNESS --

02:47PM 8            THE COURT:  NO OBJECTION?

02:47PM 9            MS. WALSH:  ABSOLUTELY, NO OBJECTION.

02:47PM 10           THE COURT:  IF YOU WERE THERE, YOU WOULD HAVE

02:47PM 11   OBJECTED AND ASKED THE COURT TO STRIKE THAT AS INAPPROPRIATE

02:47PM 12   EXPERT TESTIMONY, ASKED THE JURY TO DISREGARD IT, ORDER THEM TO

02:47PM 13   DISREGARD IT.

02:47PM 14           MS. WALSH:  RIGHT.  ABSOLUTELY, YOUR HONOR.

02:47PM 15       BUT I GUESS I'M RAISING THIS IN RESPONSE TO THE ASSERTION

02:48PM 16   BY THE GOVERNMENT THAT, WELL, YOU KNOW, I CAN'T -- WE CAN'T

02:48PM 17   TELL HOW THE WITNESS IS GOING TO TESTIFY, WE DIDN'T ELICIT

02:48PM 18   THIS.

02:48PM 19       WELL, IN FACT THEY DID.

02:48PM 20       AND WHAT WE'RE ASKING THE COURT TO DO IS TO AT LEAST GIVE

02:48PM 21   SOME GUIDANCE OR TO PRECLUDE THE GOVERNMENT FROM ELICITING THIS

02:48PM 22   TESTIMONY.

02:48PM 23           THE COURT:  SO IF I TELL MR. BOSTIC, YOU'RE NOT TO

02:48PM 24   ELICIT 702 TESTIMONY ABSENT THE FOUNDATION, A PROPER

02:48PM 25   FOUNDATION, THAT WOULD DO IT?

| | |
|---|---|
| 02:48PM | 1 |
| 02:48PM | 2 |
| 02:48PM | 3 |
| 02:48PM | 4 |
| 02:48PM | 5 |
| 02:48PM | 6 |
| 02:48PM | 7 |
| 02:48PM | 8 |
| 02:48PM | 9 |
| 02:49PM | 10 |
| 02:49PM | 11 |
| 02:49PM | 12 |
| 02:49PM | 13 |
| 02:49PM | 14 |
| 02:49PM | 15 |
| 02:49PM | 16 |
| 02:49PM | 17 |
| 02:49PM | 18 |
| 02:49PM | 19 |
| 02:49PM | 20 |
| 02:49PM | 21 |
| 02:49PM | 22 |
| 02:49PM | 23 |
| 02:49PM | 24 |
| 02:50PM | 25 |

1   MS. WALSH:  THAT WOULD HELP.

2   MR. BOSTIC:  SO, YOUR HONOR, JUST TO BE CLEAR, WHEN

3   I SAID SOME OF THIS TESTIMONY THE GOVERNMENT DIDN'T DIRECTLY

4   ASK FOR, I WASN'T TALKING ABOUT THAT.

5   THAT QUESTION I DID ASK, AND THAT WAS THE APPROPRIATE

6   ANSWER I BELIEVE TO THAT QUESTION.

7   THAT ANSWER, THOUGH, IS ADMISSIBLE.  THAT'S NOT 702

8   TESTIMONY.  THIS WAS SOMEONE WHOSE JOB IT WAS TO OPERATE THESE

9   DEVICES, AND IN THAT ROLE SHE'S QUALIFIED TO TESTIFY ABOUT THE

10  PERCEIVED RELIABILITY OF THOSE DEVICES THAT SHE OPERATED.

11  THE COURT:  CAN SHE -- WELL, CAN SHE TESTIFY,

12  MS. WALSH, THAT I KEPT USING THESE MACHINES AND I WAS GETTING

13  RESULTS THAT DIDN'T SEEM ACCURATE TO ME?  CAN SHE SAY THAT?

14  CAN SHE SAY I HAD CONCERNS, MAYBE IT WAS OE, MAYBE IT WAS

15  OPERATOR ERROR, BUT WHATEVER IT WAS, I WAS GETTING BAD RESULTS?

16  MS. WALSH:  SURE.  SHE CAN TESTIFY THAT THE QC WAS

17  FAILING, THAT THE DOOR KEPT POPPING OPEN, WHATEVER THE PROBLEM

18  WAS THAT SHE OBSERVED, I THINK THAT'S FAIR GAME.

19  IT GOES THEN INTO 702 IF SHE SAYS, THE REASON THAT THE QC

20  WAS FAILING OR THE REASON THAT THE RESULTS WERE NOT COMING OUT

21  RIGHT IS BECAUSE THE TECHNOLOGY DIDN'T WORK, OR THE MACHINE

22  DIDN'T WORK.  THAT IS EXPERT TESTIMONY.

23  THE COURT:  OKAY.

24  MS. WALSH:  AND THE FACT THAT MR. BOSTIC DOESN'T

25  AGREE ON THIS PASSAGE IS CONCERNING TO THE DEFENSE.

02:50PM 1     THE COURT:  OKAY.

02:50PM 2     MR. BOSTIC:  YOUR HONOR, WHAT SHE'S ACTUALLY

02:50PM 3 TESTIFYING ABOUT THERE, THOUGH, IS THE CONVERSATIONS THAT SHE

02:50PM 4 HAD WITHIN THERANOS AND HOW OTHERS AT THERANOS, PEOPLE IN

02:50PM 5 CHARGE, WERE INTERPRETING THAT PERFORMANCE.

02:50PM 6     AND SO THAT WAS PART OF A LINE OF QUESTIONING DEALING WITH

02:50PM 7 HER PERCEPTION THAT OTHERS AT THERANOS WERE LOOKING FOR ANY

02:50PM 8 EXPLANATION TO BLAME THIS BAD PERFORMANCE ON OTHER THAN THE

02:50PM 9 RELIABILITY OF THE DEVICE ITSELF.

02:50PM 10     SO THOSE WERE THE CONVERSATIONS THAT SHE WAS RELATING, AND

02:50PM 11 IT WAS HER IMPRESSION AS A PARTICIPANT IN THOSE MEETINGS AND AS

02:50PM 12 SOMEONE WHO HAD OPERATED THOSE DEVICES, THAT THERE WAS AN

02:50PM 13 EXPLANATION THAT WAS BEING OVERLOOKED, THAT PEOPLE WERE

02:50PM 14 DESPERATE TO FIND SOME OTHER WAY TO EXPLAIN THIS POOR QC

02:50PM 15 PERFORMANCE OTHER THAN TO SAY THAT THE DEVICE ITSELF WASN'T

02:50PM 16 WORKING.

02:50PM 17     SO IN GIVING THAT TESTIMONY, SHE WAS ACTUALLY TALKING

02:50PM 18 ABOUT HER PERCEPTION, HER LAY OPINION OF THE PRIORITIES AND

02:50PM 19 STATEMENTS OF OTHER PEOPLE AT THE COMPANY.

02:51PM 20     WHEN IT COMES TO THE RELIABILITY OF THE DEVICES

02:51PM 21 THEMSELVES, SHE'S ARGUABLY IN THE BEST POSITION TO TALK ABOUT

02:51PM 22 IT BECAUSE OF HER ROLE RUNNING QC OVER AND OVER AGAIN.  THE

02:51PM 23 VERY PURPOSE OF THAT IS TO DETERMINE HOW WELL THE DEVICE IS

02:51PM 24 WORKING.

02:51PM 25     AND IN COMPARING IT TO OTHER DEVICES, I'LL JUST REMIND THE

02:51PM 1    COURT THAT SHE ALSO TESTIFIED ABOUT HER EXPERIENCE THAT SHE HAD

02:51PM 2    AT THERANOS WORKING WITH THE UNMODIFIED COMMERCIAL DEVICES

02:51PM 3    WHICH SHE SAID PERFORMED SIGNIFICANTLY BETTER.

02:51PM 4         THE COURT:  MS. WALSH, MR. BOSTIC SUGGESTS IT'S ALL

02:51PM 5    CONTEXTUAL.

02:51PM 6         MS. WALSH:  WELL, SURE.  IF ANYTHING ANY WITNESS

02:51PM 7    TESTIFIES IS CONTEXTUAL, THEN I GUESS BY DEFINITION THAT MAY BE

02:51PM 8    TRUE.

02:51PM 9         BUT I THINK WHEN A WITNESS CROSSES OVER FROM WHAT SHE'S

02:51PM 10   SEEING AND ACTUALLY DOING, QC IS FAILING OVER AND OVER AGAIN,

02:51PM 11   FOR EXAMPLE, TO THEN CONCLUDE AND REALLY SPECULATE ON HER PART

02:51PM 12   THAT THE REASON QC IS FAILING IS BECAUSE THE DEVICE DOESN'T

02:51PM 13   WORK, THAT'S AN EXPERT OPINION THAT SHE'S NOT QUALIFIED TO

02:51PM 14   MAKE.

02:51PM 15        THE COURT:  OKAY.  THANK YOU.

02:52PM 16        NEXT IS MR. BALWANI'S NUMBER 6, AND I THINK CONCURRENT IS

02:52PM 17   THE GOVERNMENT'S 8.

02:52PM 18        MS. WALSH, YOU'RE GOING TO BE ARGUING THIS?

02:52PM 19        MS. WALSH:  YES, I'LL BE STANDING HERE FOR A COUPLE

02:52PM 20   OF THESE.

02:52PM 21        OKAY.  SO THIS IS MR. BALWANI'S MIL NUMBER 6 TO EXCLUDE A

02:52PM 22   TEXT CHAIN, AND THAT TEXT CHAIN WAS IN OUR EXHIBIT 31 TO THE

02:52PM 23   COOPERSMITH DECLARATION AT 313.  AND WHEN I SAY 313, I'M

02:53PM 24   REFERRING TO THE DOCKET PAGE AT THE TOP OF THE PAGE.

02:53PM 25        THE COURT:  OKAY.  THANK YOU.

1

2

3

4                  UNITED STATES DISTRICT COURT

5             NORTHERN DISTRICT OF CALIFORNIA

6                    SAN JOSE DIVISION

7

8    UNITED STATES OF AMERICA,       Case No.   5:18-cr-00258-EJD-1

9              Plaintiff,                **FINAL VERDICT FORM**

10          v.

11    ELIZABETH A. HOLMES,

12           Defendant.

13

14        We, the members of the Jury in the above-entitled case, unanimously find the defendant,

15 Elizabeth Holmes:

16

17     1.        _Guilty_          [GUILTY / NOT GUILTY] of the

18 charge of Conspiracy to Commit Wire Fraud against Theranos investors in violation of 18 U.S.C.

19 § 1349, as charged in Count One of the indictment.

20     2.        _Not Guilty_       [GUILTY / NOT GUILTY] of the

21 charge of Conspiracy to Commit Wire Fraud against Theranos paying patients in violation of 18

22 U.S.C. § 1349, as charged in Count Two of the indictment.

23     3.                                 [GUILTY / NOT GUILTY] of the

24 charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection

25 with a wire transfer of $99,990 on or about December 30, 2013, as charged in Count Three of the

26 indictment.

27

28 Case No.: 5:18-cr-00258-EJD-1
FINAL VERDICT FORM

United States District Court
Northern District of California

4.      _____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $5,349,900 on or about December 31, 2013, as charged in Count Four of the indictment.

5.      _____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $4,875,000 on or about December 31, 2013, as charged in Count Five of the indictment.

6.      _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $38,336,632 on or about February 6, 2014, as charged in Count Six of the indictment.

7.      _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $99,999,984 on or about October 31, 2014, as charged in Count Seven of the indictment.

8.      _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $5,999,997 on or about October 31, 2014, as charged in Count Eight of the indictment.

10.      _____Not Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos paying patients, in violation of 18 U.S.C. § 1343, in connection with a wire transmission of Patient E.T.'s laboratory blood test results on or about May 11, 2015, as charged in Count Ten of the indictment.

11.      _____Not Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos paying patients, in violation of 18 U.S.C. § 1343, in connection with a wire transmission of Patient M.E.'s laboratory blood test results on or about

Case No.: 5:18-cr-00258-EJD-1
FINAL VERDICT FORM

2

1  May 16, 2015, as charged in Count Eleven of the indictment.

2       12.      _Not Guilty_      [GUILTY / NOT GUILTY] of the

3  charge of Wire Fraud against Theranos paying patients, in violation of 18 U.S.C. § 1343, in

4  connection with a wire transfer of $1,126,661 on or about August 3, 2015, as charged in Count

5  Twelve of the indictment.

6  Dated: 1/3/22

7

8                                                             _____

                                                      Jury Foreperson

9

*United States District Court*
*Northern District of California*

Case No.: <u>5:18-cr-00258-EJD-1</u>
FINAL VERDICT FORM

3

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION
### Honorable Edward J. Davila
Courtroom 4 - 5th Floor

# TITLE:  USA v. ELIZABETH HOLMES
# CASE NUMBER:  18-cr-00258-EJD-1

## Minute Order

Date:  12/23/2021
Time in Court: 12:30-12:35pm,12:46-1:30pm
**TOTAL: 49 Mins.**
Courtroom Deputy Clerk: Adriana M. Kratzmann
Court Reporter:  Irene Rodriguez

---

**APPEARANCES:**
Plaintiff Attorney(s) present:  Jeffrey Schenk, John Bostic, Robert Leach, Kelly Volkar
Also present:  Agent: Adelaida Hernandez
Defendant Attorney(s) present:  Kevin Downey, Lance Wade, Katherine (Katie) Trefz, Andrew
Lemens, John Cline, Richard Cleary, Amy Saharia
Also present: Elizabeth Holmes (Out-custody) Not present

---

**PROCEEDINGS:  Jury Trial (Day 49)**

Further Jury Trial held. Jury resumes deliberations. Further Jury Trial (deliberations continue)
scheduled for Monday, December 27, 2021 at 8:30 a.m.

12:30pm Court in session. Counsel and Defendant present outside presence of Jury.
The Court receives Jury Note No. 2.  The Court reads the note on the record. Court and Counsel
confer agree upon response. Response signed, dated and submitted to jury.  Counsel to meet and
confer re the audio exhibits 1348 (1 through 7) and F and 1349 clip 1 and A.
12:35 pm Court takes recess
12:46pm Court in session Counsel and Defendant present outside presence of Jury. Court confers
with Counsel re the play back of the audio exhibit.  The Court summons the Jury to the
courtroom.
12:49 pm Jury present and seated.
12:50 pm Audio exhibits 1348 (1 through 7) and F and 1349 (clip 1 and A) played for jury
1:28 pm Audio play back is finished
1:28 pm Court excused the jury and jury returns to deliberation room to resume deliberations.
1:29 pm Court in session Counsel and Defendant outside presence of Jury
1:30 pm Court adjourns

*Adriana M. Kratzmann*
Adriana M. Kratzmann
Courtroom Deputy
Original: **E-Filed**

# Exhibit 52

*United States v. Elizabeth Holmes & Ramesh Balwani*, CR 18-258 EJD (N.D. Cal.),
Expert Report of Stephen Master, MD, PhD, FCAP, FAACC

March 6, 2020

I. Qualifications

I received my undergraduate degree in molecular biology from Princeton University and my MD and PhD (cell and molecular biology) from the University of Pennsylvania School of Medicine. I then did a residency in Clinical Pathology at the Hospital of the University of Pennsylvania, including time serving as Chief Resident in Clinical Pathology. After completing my residency, I spent a postdoctoral year as a research associate at Penn prior to joining the faculty as Assistant Professor of Pathology and Laboratory Medicine. During my time at Penn, I was appointed Medical Director of the Endocrinology Laboratory at the Hospital of the University of Pennsylvania, and I also spent 5 years as director of the University of Pennsylvania translational core laboratory. In 2015 I moved to Cornell as a faculty member at Weill Cornell Medical Center in New York City, where I was director of the Central Laboratory and Chief of Clinical Chemistry Laboratory Services at Weill Cornell Medicine / New York Presbyterian Hospital. In 2018 I returned to Philadelphia at the Children's Hospital of Philadelphia, where I currently serve as Chief of the Division of Laboratory Medicine, Medical Director of the Michael Palmieri Laboratory for Metabolic and Advanced Diagnostics, and Associate Professor of Pathology and Laboratory Medicine at the Perelman School of Medicine, University of Pennsylvania.

ER-6137

I am Board Certified by the American Board of Pathology (ABP) in Clinical Pathology, and I have additional subspecialty Board Certification from ABP in Clinical Informatics. I hold an active medical license in Pennsylvania. I am a Fellow of the College of American Pathologists as well as of the Academy of the American Association for Clinical Chemistry. I serve on the Board of Editors of the journal *Clinical Chemistry*, as well being an Associate Editor of *Clinical Proteomics* and Section Editor in Clinical Chemistry for the *Archives of Pathology and Laboratory Medicine*. I have been active professionally in the American Association for Clinical Chemistry, having served on their Board of Directors for five years. I serve as a member of the Harmonization Oversight Group of the International Council for the Harmonization of Clinical Laboratory Results. I currently have over 75 publications, including original research articles, reviews, and book chapters. In addition, I have lectured extensively at a national and international level on a variety of subjects related to Clinical Chemistry, including new paradigms for quality control. Of note, I was a member of the panel that facilitated questions and answers following the Theranos presentation at the 2016 annual meeting of the American Association for Clinical Chemistry.

My CV is attached as Appendix A.


II. Scope of Assignment

I have been retained by the United States Attorney's Office for the Northern District of California to testify as an expert witness in this matter. For purposes of this report, I was asked to provide opinions on whether Theranos was market ready and able to produce accurate and reliable fingerstick results for tests such as Vitamin D, chloride, potassium, bicarbonate, HIV,

ER-6138

HbA1c, hCG, cholesterol, and sodium, whether Theranos adhered to normal industry standards for clinical laboratory testing from 2013-2015, and whether any lack of adherence had the potential to adversely impact test accuracy and reliability. This report is intended to summarize my opinions and my anticipated testimony. I reserve the right to supplement or revise this report or to address additional questions if asked and based on additional information received and the evidence presented at trial. My compensation is $400 per hour. This report and the opinions contained herein are based on my training in clinical pathology and chemistry, my experience as a laboratory medical director, and my knowledge of standards and best practices as established by federal regulations and by the College of American Pathologists ("CAP"). I also considered publicly available information, scholarly research, and materials produced in discovery in this case, which are identified in Appendix B.

III. Background on Blood Testing

*Blood Testing: Samples*

Modern blood testing in the clinical laboratory begins with collection of a patient sample. Traditionally, this is performed using a needle that punctures a vein in the arm, and this process is called venipuncture. The blood that is collected from the vein in this way is called venous blood. A second way of collecting blood involves using a sharp lancet to puncture the end of a finger or (in the case of a newborn) the heel of a foot. The blood that is collected from these sources is known as capillary blood, because it comes from the very small blood vessels known as capillaries. In certain hospital settings, blood is collected from an artery ("arterial blood"). As oxygen-filled blood travels through arteries, then into capillaries, and

ER-6139

the assay is "out of control". An assay that fails quality control requires some sort of

intervention, whether that is recalibration of the assay, or something more significant. If an

assay is found to be out of control after continuously running samples, the lab would need to

determine whether the issues with the assay affected patient results that should be corrected

or cancelled.


IV. Summary of Opinions

*Preliminary comments*

Based on the documents that I reviewed, my understanding is that there were two

primary methods that Theranos employed to measure analytes from fingerstick blood samples

collected in small devices ("CTNs"). First, they had developed an instrument (often referred to

as "Edison", version 3.5) that performed immunoassays. Second, they used Tecan liquid

handlers to dilute small samples and run them on traditional clinical chemistry analyzers

obtained from other vendors (predominantly Siemens Diagnostics). Because neither of these

approaches used unmodified, FDA-cleared or approved assays in an unmodified form, they are

both considered laboratory-developed tests (note that I am not here taking a position on the

FDA's role in regulating these laboratory-developed test, simply pointing out their classification

under CLIA). There is a third class of testing that Theranos was performing using traditional

venous samples on FDA-approved or cleared instruments from third-party vendors. I will not

make many comments about this last class of testing, since it is identical to the testing

performed in most labs in the U.S.

ER-6140

1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  JEFF SCHENK (CABN 234355)
   JOHN C. BOSTIC (CABN 264367)
5  ROBERT S. LEACH (CABN 196191)
   KELLY I. VOLKAR (CABN 301377)
6  Assistant United States Attorneys

7       150 Almaden Boulevard, Suite 900
        San Jose, California 95113
8       Telephone: (408) 535-5061
        Fax: (408) 535-5066
9       Kelly.Volkar@usdoj.gov

10  Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                   SAN JOSE DIVISION

14
   UNITED STATES OF AMERICA,          )  Case No. 18-CR-00258 EJD
15                                     )
              Plaintiff,               )  UNITED STATES' RESPONSE TO DEFENDANT
16                                     )  RAMESH "SUNNY" BALWANI'S MOTIONS
        v.                             )  *IN LIMINE*
17                                     )
   RAMESH "SUNNY" BALWANI,             )  Date:  January 6, 2022
18                                     )  Time:  9:00 a.m.
              Defendant.               )  Court: Hon. Edward J. Davila
19                                     )
   _____)
20

21

22

23

24

25

26

27

28

U.S. RESPONSE TO BALWANI'S MOTIONS *IN LIMINE*,
CASE NO. 18-258 EJD                    1

ER-6141

1    The government respectfully submits the following omnibus response largely opposing

2    Defendant Ramesh "Sunny" Balwani's motions *in limine*.  ECF No. 1156 (Balwani MILs).  Throughout

3    the response, the government references the ongoing trial of co-Defendant Elizabeth Holmes in *United*

4    *States v. Holmes*, No. 5:18-CR-00258-EJD-1 ("*Holmes* trial"), with which the Court is familiar.

5    **I.    OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE
      EVIDENCE OF ACCURACY AND RELIABILITY OF TESTS RUN ON UNMODIFIED**

6    **COMMERCIAL DEVICES**

7    The government opposes Defendant Balwani's motion *in limine* to exclude evidence related to

8    tests run on unmodified commercial devices (ECF No. 1156 at 12–22), which relies on an overly

9    technical and improper reading of the operative Indictment as it has alleged Defendants' conspiracy to

10   defraud paying Theranos patients.

11   The Third Superseding Indictment ("TSI" or "Indictment") alleges that Defendant Ramesh

12   "Sunny" Balwani and co-Defendant Elizabeth Holmes devised a scheme to defraud patients between

13   approximately 2013—when Theranos began providing lab testing services to patients through certain

14   Walgreens stores in Palo Alto and Arizona—and 2016—when Theranos elected to shutter its lab

15   following interactions with CMS.  ECF No. 469 (TSI) ¶¶ 14–18.  Specifically, the TSI alleges that from

16   2013 to 2016, the entire time Theranos was providing testing services to patients, Theranos represented

17   to doctors and patients that Theranos could provide accurate, fast, reliable, and cheap blood tests and test

18   results at the same time that Defendants knew that Theranos was not, in fact, capable of consistently

19   producing accurate and reliable results.  *Id.*  Based on an order from the Court, the government provided

20   a Bill of Particulars and ultimately incorporated those 25 assays into the TSI for the patient-related

21   counts.  *Id.* ¶ 16.  The government has amended its Bill of Particulars to add CBC and its component

22   assays.  *See* ECF No. 1157 at 83 (Exh. 16).

23   **A.    Patient E.T. Should Not Be Precluded from Testifying**

24   Defendant Balwani's effort to exclude the testimony of patient-victim E.T. is both a motion to

25   reconsider the Court's evidentiary rulings in the ongoing *Holmes* trial and tantamount to a motion to

26   dismiss Count Ten of the operative Indictment.  The Court should deny Defendant's request because it

27   relies on an overly narrow and hyper-technical reading of the Indictment in this case.

28   Defendant argues that references in the Indictment to "Theranos's technology" should be read to

1    restrict the scope of the charges in this case solely to issues with tests performed on Theranos-

2    manufactured or Theranos-modified devices.  Defendants' scheme to defraud patients was broader than

3    that, however, and the Indictment puts them on notice of that fact.  Indeed, the language of the

4    Indictment makes this clear by going beyond statements about the abilities of "Theranos's technology"

5    and including allegations about Theranos' abilities as a whole.  *See* ECF No. 469 (TSI) ¶¶ 14–18.  In

6    connection with those allegations, the Indictment references assays that were not run on Theranos-

7    specific technology, explicitly including HIV—the very assay that Theranos conducted for patient-

8    victim E.T.  *Id.* ¶ 16.  Specifically, the TSI alleges Defendants Holmes and Balwani engaged in a

9    scheme to defraud patients who came to Theranos for blood testing services, representing to those

10   patients that "*Theranos* could provide accurate, fast, reliable, and cheap blood tests and test results"

11   despite their knowledge that "*Theranos* was not capable of consistently producing accurate and reliable

12   results for certain blood tests including . . . HIV."  *Id.* ¶¶ 16–17 (emphasis added).  Although the

13   government does not dispute that the relevant sections of the Indictment also make allegations about

14   problems with "Theranos's technology," the Indictment's use of broader statements—and the explicit

15   inclusion of assays like HIV not run on Theranos-specific devices—is inconsistent with Defendant's

16   argument that the case is limited to those devices.  Defendant's reading of the Indictment places too

17   much weight on the phrase "Theranos's technology" and attempts improperly to import that language

18   into other allegations in the Indictment.  Adopting that interpretation would be contrary to Ninth Circuit

19   guidance that "an indictment is not to be read in a technical manner, but is to be construed according to

20   common sense with an appreciation of existing realities."  *United States v. Anderson*, 532 F.2d 1218,

21   1222 (9th Cir.), *cert. denied*, 429 U.S. 839 (1976).  Other Circuits are generally in agreement that

22   "indictments are reviewed on a practical basis and in their entirety, rather than in a hypertechnical

23   manner."  *United States v. Miller*, 883 F.3d 998, 1002 (7th Cir. 2018) (quotation omitted).  In this case,

24   reading the operative Indictment as a whole demonstrates that E.T.'s testimony is admissible as relevant

25   to Count Ten and the charged scheme to defraud paying patients overall.

26          Excluding the testimony of E.T. regarding her inaccurate HIV antibody test would be especially

27   illogical given the evidence presented during the *Holmes* trial regarding Defendants' shared scheme to

28   defraud patients.  The evidence at trial has shown that Defendants made sweeping statements about the

U.S. RESPONSE TO BALWANI'S MOTIONS *IN LIMINE*,
CASE NO. 18-258 EJD                                        2

accuracy and reliability of Theranos' tests as a whole. Indeed, Defendants hid from the public (as well as investors) which tests were and were not performed on Theranos' technology, making it impossible for patients purchasing Theranos' services to know on what device their test would be performed. Moreover, they did not merely claim that Theranos' tests were accurate, they caused investors and patients to believe that Theranos' tests were *more* accurate than the conventional tests previously available through competing labs. For example, in September 2013, the *Wall Street Journal* published an article in its editorial pages—after conducting an interview of co-Defendant Holmes and providing her an opportunity to review the content—including the claim that Theranos' testing accuracy represented an "advance" in comparison to conventional tests that suffered from problematic levels of human error. *See United States v. Holmes*, 09/22/2021 Trial Transcript at 1549:7–1552:24 (admitting Trial Exhibit 1106). Claims like that were not limited to individual assays and were designed to attract investors and patients alike. It is readily apparent that claims of superior accuracy were material to patients' decisions to patronize the new lab.

The evidence in the *Holmes* trial has also shown that Defendants' claims of superior accuracy were false across the board—including as to the HIV assay. *See, e.g., United States v. Holmes*, 11/10/2021 Trial Transcript ("11/10 Tr.") at 5993:16–5996:11 (describing widespread issues in the "BUGS" or microbiology lab and Dr. Das specifically noted concerns with the HIV assay that may jeopardize patient care). In reality, Theranos' homegrown devices were not even capable of performing an HIV test in the company's clinical lab. This forced Theranos to rely on the same commercially available machines and methods used for HIV tests in other labs and thus made it impossible for the company to deliver on its promise of superior accuracy as to that test. Moreover, trial evidence also has established that Theranos' laboratory used deficient practices in connection with the HIV assay that would have had a detrimental effect on testing accuracy and reliability. *Id.; see also* Declaration of Kelly I. Volkar in support of the Government's Response to Defendant Balwani's Motions *In Limine* ("Volkar Decl."), Exhibit 1.

Because E.T.'s inaccurate HIV antibody test result is evidence of Theranos' broken promise to provide patients with tests of superior accuracy and reliability, and because the transmission of those test results was in furtherance of Defendants' scheme to defraud paying patients, the Court should admit

1    E.T.'s testimony against Defendant Balwani as it did against Holmes.

2        **B.    Patient B.B. Should Not Be Precluded from Testifying**

3        For similar reasons and others, Defendant's attempt to block testimony from patient-victim B.B.

4    must fail.  Even if Defendant could show that all of B.B.'s Theranos tests were run on commercially

5    available machines using FDA-approved methods, the reasoning above would still apply to render his

6    testimony admissible.  Because Defendants falsely promised patients that Theranos could deliver test

7    results with superior accuracy in an effort to lure patient customers, inaccurate test results derived from

8    conventional analyzers are evidence that patients did not receive the benefit of the bargain.  In the case

9    of B.B.'s results, however, the evidence suggests that Theranos-specific technology *was* used for his

10   CBC panel, contrary to Defendant's representations.

11       As Defendant notes, B.B. is expected to testify that he recalls his first test with Theranos being

12   run on a fingerstick sample.  Defendant asserts that B.B.'s fingerstick sample must have been processed

13   on one of two devices:  the BD Fortessa or the Drew 3.  ECF No. 1156 at 17–18.  Defendant concedes

14   that the BD Fortessa would qualify as "Theranos technology" in the context of its argument but argues

15   that the Drew 3 was an unmodified device.  Defendant's attached exhibits do not establish that fact.

16   Exhibits 11 and 12 to Defendant's motion are internal Theranos laboratory documents that share an

17   "effective date" of November 14, 2015.  *See* ECF No. 1156-2 at 293, 303.  It is unclear how probative

18   they are of Theranos' practices in August 2015 when B.B.'s samples were analyzed.  To the extent

19   Exhibit 11 can speak to the workflow in the Theranos clinical lab in August, it suggests that the Siemens

20   Advia 2120i and the Drew 3 analyzer were used to conduct *Theranos-specific LDTs*, not standard FDA-

21   approved tests.  *See* ECF No, 1156-2 at 295–96.  Theranos' Interrogatory Responses from the PFM

22   litigation confirm that the BD Fortessa *and* Drew Scientific Drew-3 were both modified, Theranos-

23   specific devices during the relevant time period.  Volkar Decl., Exhibit 2.  In those responses, Theranos

24   expressly names those devices in response to a request that they identify any commercially available

25   equipment the company modified to process blood tests on micro-samples.  *Id.*  Those responses also

26   confirm that those modified devices were in use by Theranos during Summer 2015.  *See id.* at PFM-

27   ROGS-00000300 and -304.  Thus, the evidence shows that B.B.'s first sample was processed using

28   Theranos-specific technology.

1    Defendant further asserts that, because B.B.'s subsequent tests involved venous samples, they

2    could only have been run on commercially available non-Theranos machines. Assuming B.B.'s

3    recollection is correct that his other Theranos tests were performed on venous samples, however, that

4    still would not establish that they were run on non-Theranos technology. As an initial matter, Defendant

5    mischaracterizes B.B.'s August 27, 2015 lab report as indicating that his test was processed in Theranos'

6    Arizona laboratory, which used only non-Theranos devices. *See* ECF No. 1156 at 17. In fact, the

7    opposite is true: B.B.'s Theranos lab report states on its face that the inaccurate PLT test and all his

8    other assays were "processed at Theranos Laboratories, 7373 Gateway Boulevard, *Newark, CA*."

9    Volkar Decl., Exhibit 3 (emphasis added). As the Court knows, the Newark, California lab was the

10   location where all of Theranos' company-specific laboratory developed tests, or LDTs, were performed.

11   The fact that B.B.'s August 27 sample was processed in California suggests that it was run on Theranos-

12   specific technology. Indeed, if those CBC tests were run on commercially available devices that could

13   have been operated in Theranos's medium-complexity Arizona lab, there would have been no reason to

14   ship his sample all the way from Phoenix to California for processing.

15   Moreover, there is evidence that, in some cases, Theranos apparently ran venous samples on its

16   proprietary technology by transferring venous blood from larger vacutainers to the company's

17   proprietary CTN containers used exclusively with its proprietary tests. Volkar Decl., Exhibit 4.

18   Theranos may have taken this approach with venous samples of B.B.'s blood in August 2015, which

19   would explain the processing location for his August 27 test.

20   Testimony from B.B. was excluded from the *Holmes* trial after defense counsel raised an

21   objection for the first time during trial that the assay in question—the CBC panel or individual PLT

22   assay—did not appear on the government's Bill of Particulars listing assays the government alleges to

23   be inaccurate. The government promptly corrected this oversight as to Defendant Balwani by providing

24   an Amended Bill of Particulars on November 5, 2021 including the CBC panel and its component

25   assays. *See* ECF No. 1157 at 83 (Exh. 16). That formal notice, in addition to previous notice in the

26   form of interview memoranda and records relating to B.B.'s inaccurate CBC/PLT test, are sufficient to

27   put Defendant on notice regarding the scope of the charges and avoid any risk of prejudice at trial.

28   And, on balance, the evidence supports an inference that one or all of B.B.'s tests were run on Theranos-

1  specific technology.  For those reasons and others as explained above, the Court should deny

2  Defendant's motion to exclude the testimony of this patient-victim.

3  **C.  The CMS Form 2567 and Cover Letter Should Not Be Excluded**

4         Defendant Balwani asks this Court to reconsider and reverse its prior ruling related to the same

5  regulatory deficiency report and cover letter—issued by the Centers for Medicare and Medicaid

6  Services' ("CMS") on January 25, 2016 ("CMS Report")—based upon the same arguments made

7  previously by his co-Defendant Holmes.  ECF No. 1156 at 20–22.  For the same thoroughly vetted

8  reasons the Court granted the government's motion earlier this year, the Court should reach the same

9  conclusion here.  *See* ECF No. 798 (Order re: Motions *In Limine* ("MIL Order")) at 16–20, 90; *see also*

10  ECF Nos. 574, 588, 659, 675, 717, 726, 810, 846, 850, 887, 897, 906, 989, 1086, 1133, 1134, 1155

11  (discussing admissibility of CMS Report and cover letter in co-Defendant Holmes' pretrial proceedings

12  and during her trial).[1]  Furthermore, there is no principled bases to limit the government to seeking to

13  admit only the portions it sought admission of during the *Holmes* trial, and the Court should grant the

14  CMS Report's wholesale admissibility as requested in the government's motion *in limine* No. 7.  ECF

15  No. 1155 at 14–18.

16         Defendant Balwani takes issue—as his co-Defendant did before him—with CMS' "immediate

17  jeopardy" finding and seeks to redact all reference to it under Federal Rule of Evidence 403.  ECF

18  No. 1156 at 20–22.  However, the Court addressed these exact same arguments in co-Defendant

19  Holmes' pretrial proceedings and held that "CMS's finding of 'immediate jeopardy'" did not raise unfair

20  prejudice concerns.  ECF No. 798 (MIL Order) at 19.  Nevertheless, a few weeks before her trial began,

21  co-Defendant moved the Court to reconsider its finding on the January 2016 CMS Report—based again

22  on relevance and hearsay grounds—and asserted that the Court's prior ruling did not encompass the

23  CMS cover letter accompanying Form CMS-2567.  ECF Nos. 897, 906.  The Court disagreed, holding

24

25  _____

[1] In response to Defendant adopting co-Defendant Holmes' relevant filings on this topic (ECF No. 1156
26  at 20 n.3), the government incorporates by reference its oppositions and briefs on the topic, including all
supporting memoranda of points and authorities, declarations, attachments, other supporting evidence,
27  and any oral arguments made in connection with the filings.  *See, e.g.*, ECF Nos. 588, 675, 726, 906,
1133.  The government also incorporates by reference its motion *in limine* to admit the CMS Report and
28  accompanying cover letter filed in this case.  ECF No. 1155 at 14–18.

1   that "no new arguments have been presented to justify the breadth of the redactions requested" by co-

2   Defendant Holmes and "reject[ing] Holmes's assertions that the cover letter is 'new' and not covered in

3   the MIL Order."  ECF No. 989 at 7–8 & n.1 (Order re: Pre-Trial Motions ("MIL Order 2")).  Defendant

4   Balwani does not provide any reason to depart from the Court's prior ruling in his case.

5        The Court should also reject Defendant Balwani's motion to redact portions of the CMS Report

6   because he incorrectly asserts those portions are outside the scope of allegations included in the TSI.  *Cf.*

7   ECF No. 1156 at 20–22.  The Indictment alleges that Defendant Balwani "knew that Theranos was not

8   capable of consistently producing accurate and reliable results for certain blood tests, including but not

9   limited to . . . PT/INR[.]"  ECF No. 469 (TSI) ¶ 16.  The Indictment continues:  "Despite their

10  knowledge of Theranos's accuracy and reliability problems, HOLMES and BALWANI used interstate

11  electronic wires to purchase advertisements intended to induce individuals to purchase Theranos blood

12  tests at Walgreens stores in California and Arizona" and specifically alleges that Defendant Balwani

13  "held Theranos's blood tests out to individuals as accurate and reliable."  *Id.* ¶ 17.

14       Defendants' interactions with CMS and the resulting CMS Report they receive relate directly to

15  these allegations in the Indictment.  Beginning in September 2015, CMS surveyors Sarah Bennett and

16  Gary Yamamoto conducted an in-person inspection of Theranos' Newark, California laboratory and

17  observed that Theranos' blood analyzer repeatedly failed quality control checks and repeatedly produced

18  values outside of ranges *Theranos* deemed acceptable—yet Theranos continued to report patient results.

19  *See* ECF No. 675 at 5–10.  Bennett told the government in an interview that "Sunny Balwani was the 'in

20  charge' person" during the inspection.  Volkar Decl., Exhibit 5 at 2.  Bennett also told the government

21  that CMS informed Theranos at the end of its survey that it was considering the "immediate jeopardy"

22  finding and Defendants Balwani and Holmes tried to negotiate with CMS not to reach that finding.  *See*

23  *id.*  Indeed, Bennett specifically called attention to the issues she observed with respect to PT/INR

24  because if Theranos "[did not] investigate problems of PT/INR, it could keep a systemic error hidden

25  and it would be impossible to know if patients were affected."  Volkar Decl., Exhibit 6 at 6.  Indeed,

26  Bennett concluded: "There is a systemic issue of quality.  Across the board, not just with the Edison but

27  also their other testing."  *Id.* at 7.  Nevertheless, Theranos continued to offer its blood testing services to

28  patients after September 2015, even though, as Defendant asserts, the deficiencies CMS uncovered went

1   beyond Theranos' proprietary blood analyzer device.  *See*, *e.g.*, *id.* at 4.

2         CMS ultimately memorialized its findings in the January 2016 CMS Report.  *See* ECF No. 675 at

3   5–10.  On information and belief from the government's interviews of Sarah Bennett, CMS reports often

4   make findings in the context of an individual assay, even though those identified deficiencies may have

5   also been present with respect to other assays at Theranos, which is what led Bennett to suspect

6   "systemic error[s]" in Theranos' laboratory.  *Id.* at 4–7.  Bennett informed the government during her

7   interview that "[a]ll these CLIA requirements are a means to make sure patient results are accurate and

8   reliable" and Bennett, on behalf of CMS, determined that "Theranos didn't meet the regulatory

9   requirements[.]"  *Id.*  Thus, the CMS Report and cover letter are directly relevant to allegations in the

10   Indictment, particularly with respect to the conspiracy to defraud paying Theranos patients during the

11   period of 2013 to 2016.  At the very least, the CMS Report and cover letter are admissible in their

12   entirety for the purpose of notice to Defendant Balwani that Theranos' blood testing services may have

13   been generating inaccurate and unreliable test results, at a time when the CLIA laboratory was still

14   processing patient blood samples.

15         For these reasons as well as the government's prior arguments on this same topic, the Court

16   should admit the January 2016 CMS Report and accompanying cover letter, and permit paying Theranos

17   patients B.B. and E.T. to testify at Defendant Balwani's trial.

18   **II.**     **OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* NO. 2 TO EXCLUDE EXPERT TESTIMONY OF DR. KINGSHUK DAS**

19

20         Defendant seeks to exclude Dr. Kingshuk Das as an expert witness for the same exact reasons

21   raised by co-Defendant Holmes and rejected by the Court in her trial, with purported additional support

22   regarding accessibility of the LIS database.  ECF No. 1156 at 23–30.  The Court should deny Defendant

23   Balwani's motion for the same reasons it denied co-Defendant Holmes' identical pretrial motion—

24   Dr. Das is a percipient witness the government may call to testify to describe what he observed while

25   performing the job Defendants hired him to do, namely, respond to the CMS deficiency findings.  ECF

26   No. 989 (MIL Order 2) at 3–4; *see also* ECF Nos. 906, 1133;[2] *see generally United States v. Holmes*,

27

28   [2] In response to Defendant adopting co-Defendant Holmes' relevant filings on this topic, the government incorporates by reference its oppositions and briefs on the topic, including all supporting memoranda of

1   JEFFREY B. COOPERSMITH (SBN 252819)
    AMY WALSH (Admitted Pro Hac Vice)
2   STEPHEN A. CAZARES (SBN 201864)
    ORRICK, HERRINGTON & SUTCLIFFE LLP
3   The Orrick Building
    405 Howard Street
4   San Francisco, CA 94105-2669
    Telephone:    (415) 773-5700
5   Facsimile:    (415) 773-5759

6   Email: jcoopersmith@orrick.com; awalsh@orrick.com;
    scazares@orrick.com
7
    Attorneys for Defendant
8   RAMESH "SUNNY" BALWANI

9

10          UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                                      SAN JOSE DIVISION

12

| | |
|---|---|
| 13   UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| 14        Plaintiff, | **DEFENDANT RAMESH "SUNNY" BALWANI'S OMNIBUS MOTIONS IN LIMINE** |
| 15        v. | |
| 16   RAMESH "SUNNY" BALWANI, | **Date:  December 16, 2021** |
| 17        Defendant. | **Time:  9:00 a.m.**  **CTRM.: 4, 5th Floor** |
| 18   | **Hon. Edward J. Davila** |

19

20

21

22

23

24

25

26

27

28

ER-6150

# MEMORANDUM OF POINTS AND AUTHORITIES

## MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE OF ACCURACY AND RELIABILITY OF TESTS RUN ON UNMODIFIED COMMERCIAL DEVICES

The government's conspiracy and wire-fraud case against Defendant Ramesh "Sunny" Balwani centers on the allegation that Mr. Balwani represented to patients and investors that Theranos' blood tests were accurate and reliable when "Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results." Third Superseding Indictment ("Indictment" or "TSI") ¶¶ 12(A), 12(C), 12(F), 12(H), 15, 16, 17(C). Mr. Balwani expects the government will attempt to prove that allegation through the testimony of Theranos patients, former Theranos employees, and regulators, as well as through exhibits, including the January 25, 2016 Centers for Medicare & Medicaid Services ("CMS") Form 2567 and cover letter.

The Indictment's allegations about accuracy and reliability relate solely to "Theranos's technology." The Indictment does not allege anything about the accuracy and reliability of non-Theranos technology, i.e., commercially available blood analyzers used by Theranos in its clinical laboratories that Theranos did not modify. Nor does the Indictment allege anything about the general practices of the Theranos clinical labs. Because the government's allegations are limited to the accuracy and reliability of Theranos' technology, any evidence the government offers related to accuracy or reliability must be tied to that technology, and the government must be able to lay the requisite foundation to establish that fact. Conversely, evidence regarding accuracy or reliability that relates to non-Theranos technology is not relevant and should not be admitted into evidence.

Accordingly, Mr. Balwani moves under Federal Rules of Evidence 104, 401, 402, and 403 to exclude evidence relating to the accuracy and reliability of blood tests offered by Theranos that were not run on "Theranos's technology," or for which the government cannot lay the requisite foundation establishing that the tests were run on "Theranos's technology." This evidence includes testimony from Patients E.T. and B.B., as well as portions of the CMS Form 2567 and

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

ER-6151

1  cover letter.[1] Unless and until the government can establish that a given piece of evidence is

2  related to the accuracy and reliability of "Theranos's technology," that evidence is not relevant to

3  the allegations in the Indictment, and therefore is inadmissible.

4  **I.     FACTUAL BACKGROUND**

5        As the Court is aware, the Indictment charges two fraudulent schemes—a scheme to

6  defraud investors and a scheme to defraud patients. Based on the language in the Indictment, both

7  alleged schemes to defraud turn on the allegation that Theranos' proprietary tests were not

8  capable of producing accurate and reliable results. As to the alleged scheme to defraud patients,

9  the Indictment alleges that Mr. Balwani made representations about the capability of Theranos'

10  technology that were false:

11

12        "BALWANI knew . . . that *Theranos's technology* was, in fact, not capable of consistently
         producing accurate and reliable results."

13

14  TSI ¶ 16 (emphasis added); *see also* TSI ¶ 15 (alleging misrepresentations and omissions about

15  "Theranos's technologies"); ¶ 17(C) (alleging transmission to patients of inaccurate and

16  unreliable tests results performed on "Theranos technology"). For the alleged scheme to defraud

17  investors, the Indictment similarly describes as false Mr. Balwani's representations about "the

18  TSPU, Edison, or Minilab," as well as Mr. Balwani's representations about "Theranos's

19  proprietary analyzer." *Id.* ¶¶ 12(A), 12(C), 12(F), and 12(H).

20        As the Court heard during Ms. Holmes' trial, Theranos began offering patient testing in

21  Walgreens pharmacies in the fall of 2013. Ex. 1 (9/24/21 Trial Tr. 1711:7–12). Once patient

22  testing began, Theranos ran the patient blood samples on three types of analyzers: (1) the

23  Theranos Sample Processing Unit ("TSPU"); (2) commercial analyzers that were modified by

24  Theranos to be able to analyze small quantities of blood ("modified commercial devices"); and

---

[1] This motion focuses on the evidence from Patients E.T., B.B., and the CMS Form 2567. The
defense does not know yet what other evidence unrelated to the accuracy and reliability of
"Theranos's technology" the government will offer at trial. If the government offers other
inadmissible evidence, and the government cannot lay sufficient foundation to link it to the
accuracy and reliability of "Theranos's technology," Mr. Balwani intends to object to its
admission at trial.

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

(3) commercial FDA-cleared or approved analyzers that were not modified ("unmodified commercial devices"). *Id.* (1712:5–1715:14; 1719:10–23). Theranos also sent samples to third-party reference laboratories when it could not perform the test itself. *Id.* (9/14/21 Trial Tr. 813:19–23). The TSPU and the modified commercial devices were Theranos's proprietary technology that the company developed and for which it held patents. Ex. 2 (DX 07709). The unmodified commercial devices (and third party send-outs) were not "Theranos's technology," as the government itself has emphasized throughout Ms. Holmes' trial. *See, e.g.*, Ex. 1 (9/14/21 Trial Tr. 800:6–10, 806:23–807:3, 813:11–814:4) (government asking Erika Cheung about "the devices that Theranos manufactured, [namely] the Edison" and "devices that were not invented or manufactured by Theranos").

## II. ARGUMENT

Evidence is relevant only if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. If evidence does not pass this standard, it is inadmissible. Fed. R. Evid. 402. Moreover, even if evidence meets the threshold relevance requirement, the Court may exclude the evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. Fed. R. Evid. 403. Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

On the question of accuracy and reliability, the Rule 401 "fact" that is of consequence is whether Theranos' technology was capable of producing accurate and reliable test results. The TSI only takes issue with Theranos' allegedly false representations regarding the accuracy, reliability, speed, and cost of blood tests conducted on Theranos technology. TSI ¶¶ 12(A), 12(C), 12(F), 12(H), 15, 16, 17(C). The TSI does not allege that Mr. Balwani committed any crime regarding the accuracy and reliability of non-Theranos technology, nor does the TSI comment on the general practices of the Theranos lab. Accordingly, the only evidence that is relevant to the alleged misrepresentations is evidence about the accuracy and reliability of tests that the

1   government can prove actually were run on "Theranos's technology."

2          What this means in concrete terms is that for every piece of evidence offered against

3   Mr. Balwani regarding the accuracy and reliability of Theranos' blood tests, Federal Rules of

4   Evidence 104 and 401 require the government to lay sufficient foundation linking that evidence to

5   the allegations in the Indictment—i.e., the accuracy and reliability of "Theranos's technology." If

6   the government cannot lay that foundation, the evidence must be excluded under Rules 104, 401,

7   402 and 403. If a given test offered by Theranos was run on an unmodified commercial device, or

8   if the government cannot establish that the test was run on Theranos technology, any evidence

9   about that test should be excluded as irrelevant and unfairly prejudicial because it does not

10  constitute evidence of the inaccuracy of Theranos' technology.

11         Accordingly, Mr. Balwani moves this Court to exclude evidence relating to the accuracy

12  and reliability of blood tests not run on "Theranos's technology." This includes the evidence

13  discussed below on Patients E.T. and B.B., and portions of the January 25, 2016 CMS Form 2567

14  and cover letter. Mr. Balwani reserves his right to move to exclude any other evidence offered by

15  the government related to the allegation of inaccuracy and unreliability where the government

16  cannot connect that evidence to a test run on a Theranos proprietary device.

17         **A.      Patient E.T. Must Be Excluded**

18         Patient E.T. received a blood test offered by Theranos during her annual physical with her

19  primary care physician. Ex. 3 (US-REPORTS-0015081 at 2–3). Patient E.T.'s blood test included

20  a screening for HIV. *Id.* Patient E.T. is the patient alleged in Count 10 of the Indictment and the

21  defense expects the government to call Patient E.T. to establish that Patient E.T.'s test results

22  were inaccurate. TSI ¶ 26.

23         Despite the implication in the Indictment that HIV tests were run on Theranos technology,

24  that is not the case. The HIV testing offered by Theranos was never run on Theranos technology.

25  Throughout the period of Theranos' patient testing, HIV tests offered by Theranos were run only

26  on unmodified commercial devices. *See* Ex. 5 (US-FDA-0015698). These non-Theranos devices

27  included the OraSure OraQuick Advance Rapid HIV 1/2 AB Test Kit, Bio-Rad Multispot HIV

28  1/HIV 2 Rapid Test, BioRad Evolis, Siemens Centaur XP, and Abbott M2000 Real Time PCR.

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

1    Exs. 6–10 (Government trial exhibits 0428, 0808, 1862, 1927, 5062). The government is aware of

2    this fact as its own proposed exhibit list for Mr. Balwani's trial reflects SOPs and package inserts

3    about these unmodified commercial devices used for HIV testing. *Id.*

4         As a result, Patient E.T.'s testimony does not relate to the accuracy and reliability of

5    "Theranos's technology" and is therefore inadmissible, as is any other evidence relating to HIV

6    testing offered by Theranos. The government cannot lay a foundation linking Patient E.T.'s

7    testimony about her HIV test result to "Theranos's technology." Fed. R. Evid. 104(b); *see also*

8    *Huddleston v. United States*, 485 U.S. 681, 690 (1988) ("In determining whether the Government

9    has introduced sufficient evidence to meet Rule 104(b), the trial court . . . examines all the

10   evidence in the case and decides whether the jury could reasonably find the conditional fact . . .

11   by a preponderance of the evidence."). The relevance of Patient E.T.'s testimony on the accuracy

12   and reliability of her HIV test "depends on whether a fact exists," namely that the tests were run

13   using "Theranos's technology." *See* Fed. R. Evid. 104(b). Since the government cannot lay that

14   required foundation, evidence regarding the accuracy and reliability of Patient E.T.'s HIV test

15   results from an unmodified commercial device makes no fact related to Mr. Balwani's guilt or

16   innocence more or less likely. *See* Fed. R. Evid. 401, 402.

17        Moreover, Patient E.T.'s testimony that she received an allegedly erroneous Theranos test

18   indicating that she was HIV-positive is highly prejudicial. Indeed, during the Holmes trial, the

19   government asked Patient E.T. whether she was had ever been diagnosed with "HIV or AIDS,"

20   whether she had experienced symptoms of "HIV or AIDS," and whether she had ever received

21   treatment for "HIV or AIDS." Ex. 1 (11/17/21 Trial Tr. 6756:19–6757:4). Her testimony should

22   be excluded because Patient E.T.'s testimony has no probative value whatsoever. Her test was a

23   non-Theranos test. It has nothing to do with the Indictment's allegations on the accuracy and

24   reliability of "Theranos's technology." Fed. R. Evid. 403; *United States v. McFayden-Snider*, 552

25   F.2d 1178, 1184 (6th Cir. 1977) (where "proffered evidence concerns misconduct other than that

26   charged in the indictment, it is inadmissible when the resulting prejudice would be too great").

27        There is no cross examination of this witness that could cure the unfair prejudice

28   cemented during the government's direct examination. Once the jury hears that this patient

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

ER-6155

1    received an allegedly inaccurate test from Theranos indicating that she might be positive for

2    HIV—even if the test was not run on Theranos technology—the irreversible damage is done.

3           In addition, testimony from a patient regarding the accuracy and reliability of non-

4    Theranos tests will be highly misleading and confusing. *See United States v. Robertson*, 875 F.3d

5    1281, 1296 (9th Cir. 2017) (affirming the district court's decision to exclude evidence that

6    confused the jury), *vacated on other grounds*, 139 S. Ct. 1543 (2019). The jury will likely assume

7    that since Patient E.T. was allowed to testify, Patient E.T.'s test must have been performed on

8    Theranos technology, when in fact that is not true. If Patient E.T.'s testimony comes in, the jury

9    will need to parse through the evidence to determine which evidence relates to the accuracy and

10   reliability of "Theranos's technology" (which is relevant to the allegations) and which evidence

11   relates to the accuracy and reliability of non-Theranos technology (which is not relevant to the

12   allegations). For these reasons, Patient E.T.'s testimony about her HIV test run on an unmodified

13   commercial device is inadmissible and must be excluded.

14          **B.      Patient B.B. Must Be Excluded**

15                 1.     *Patient B.B. Must be Excluded Because His Test Was Not Run on Theranos*
                          *Technology*
16
          Patient B.B. was a patient who had been diagnosed with essential thrombocythemia,
17
     which required him to regularly monitor his blood platelet count. Patient B.B. received four
18
     complete blood count ("CBC") tests, which included platelet counts, from Theranos on
19
     August 11, August 21, August 27, and December 11, 2015. Ex. 4 (US-REPORTS-0015058). The
20
     defense expects Patient B.B. to testify that his first test was run using a fingerstick draw and the
21
     platelet count result within the CBC test was suspiciously high. His other three CBC tests were
22
     run with venous draw. *Id.* The only test report the defense knows of for Patient B.B. is a test
23
     report for his August 27, 2015 visit, which suggests that this test was processed in Theranos'
24
     Arizona laboratory—a lab that used only unmodified commercial devices. "Theranos's
25
     technology" was not used in the Arizona lab. The defense knows of no test report or other
26
     document for Patient B.B. that establishes that the test that he is expected to testify about as
27
     inaccurate was run on a Theranos analyzer.
28

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

Theranos' CBC panel was run using three devices—only one of which was "Theranos's technology." Specifically, the lab processed traditional venous samples on an unmodified Siemens Advia 2120—not Theranos technology. Ex. 11 (THPFM0003814256). The lab also used two analyzers for processing fingerstick samples—the Drew3 and the BD Fortessa. The Drew3 was an unmodified commercially available hematology platform capable of processing fingerstick samples. Ex. 12 (THPFM0005699178). The Drew3 also was not Theranos technology. *Id.* The BD Fortessa was a commercial device running Theranos developed assays, and thus was Theranos technology. Exs. 13–15 (Government trial exhibits 1111, 2685, and THPFM0002267542).

Due in part to the loss of laboratory data in the Laboratory Information System ("LIS"), which included identification of the analyzer and blood collection device used for any test, the defense is unaware of evidence that would identify which device was used for Patient B.B.'s first test that he claims was processed from a fingerstick sample. As a result, Patient B.B.'s first test may have been run on the unmodified Drew3 or the modified Fortessa. In fact, the CMS survey report that has been the subject of much litigation in this case reflects that Theranos was using two Drew3 devices to process fingerstick samples for CBC testing in the July to September 2015 time frame. Ex. 20 (Holmes Tr. Ex. 4621B) (*see* tags D5437, D5469, D5779, D6178). Thus, the government well knows that Theranos was using the unmodified Drew3 analyzer to process fingerstick samples for CBC when Patient B.B. obtained his first fingerstick test in August 2015. Moreover, the fact that Patient B.B.'s three other CBC tests were venous draws clearly indicates that they were not run on Theranos technology.

For the same reasons articulated above for patient E.T., unless the government can lay a proper foundation linking evidence regarding the accuracy and reliability of patient B.B.'s test results to the accuracy and reliability of "Theranos's technology," it is inadmissible under Rules 104(b), 401, 402, and 403.

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

ER-6157

1

2.    *The Government's Amended Bill of Particulars Is No Cure*

2        On May 22, 2021, this Court granted Ms. Holmes' motion in limine to exclude accuracy

3   and reliability evidence for any assays not reflected in the government's March 23, 2020 Bill of

4   Particulars ("BoP") and the Indictment.[2] Dkts. 568, 798. On November 3, 2021, the Court also

5   granted Ms. Holmes' motion to exclude testimony by Patient B.B. because the assay at issue for

6   this patient, the platelet component of a CBC test, was not included in the BoP or Indictment and

7   was thus already excluded by the Court when it granted the motion in limine. Dkt. 1126; Ex. 1

8   (11/3/21 Trial Tr. 5213:20–5214:5).

9        Days later, on November 5, 2021, the government noticed its intent to file an amended

10  Bill of Particulars ("Amended BoP"). Ex. 16 (11/5/21 email from Kelly Volkar). The Amended

11  BoP added the CBC assay to the list of assays that "Theranos experienced accuracy and reliability

12  problems with." The government's amendment of the BoP is intended to facilitate the admission

13  of testimony by Patient B.B. in Mr. Balwani's trial, but it does not cure the issue that the

14  government cannot establish that Patient B.B.'s CBC test was performed on a Theranos

15  proprietary device. If the Court allows Patient B.B. to testify because the CBC assay is now in the

16  Amended BoP, the Court would be allowing the government to amend the Indictment with the

17  Amended BoP. The resulting testimony by Patient B.B. about the accuracy and reliability of his

18  first CBC test, without evidence clearly establishing that it was run on "Theranos's technology,"

19  would potentially expand the scope of the charges against Mr. Balwani to include allegations of

20  the accuracy and reliability of non-Theranos technology.

21       An indictment cannot be amended without resubmission to the grand jury (except as to

22  form). *Russell v. United States*, 369 U.S. 749, 770 (1962). The court may not "alter the material

23  and essential nature of an indictment or broaden the offense charged" via the BoP. *United States*

24  *v. Dawson*, 516 F.2d 796, 804 (9th Cir. 1975). The Ninth Circuit has held that where a BoP

25  broadens the charges in the indictment, it is an impermissible amendment to the indictment.

26  *United States v. Pazsint*, 703 F.2d 420, 423 (9th Cir. 1983). "Amending the indictment . . .

27

28  ---
    [2] Mr. Balwani also adopts, by reference, Ms. Holmes' motion insofar as the government later
    seeks to offer evidence regarding assays not listed in the Amended BoP. *See* Dkts. 568, 798.

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

1  constitutes a per se reversible error." *United States v. Davis*, 854 F.3d 601, 605 (9th Cir. 2017).

2      To amend the indictment without representation to the grand jury in order to include CBC

3  blood tests run on non-Theranos technology is improper. Evidence to suggest that non-Theranos

4  technology was inaccurate and unreliable as a basis to substantiate wire-fraud charges against Mr.

5  Balwani was not put before a grand jury, and as a result cannot be put before this petit jury.

6          **C.    Portions of the CMS Form 2567 and Cover Letter Must Be Excluded**

7      Mr. Balwani also moves to exclude evidence regarding the deficiency findings and

8  conclusions by the CMS surveyors not directly related to the accuracy and reliability of

9  "Theranos's technology." These include the finding that the "deficient practices of the laboratory

10  pose immediate jeopardy to patient health and safety" ("immediate jeopardy finding"), as well as

11  any corresponding language and findings related to the immediate jeopardy finding, because the

12  immediate jeopardy finding was based on tests run on unmodified commercial devices.[3] For the

13  Court's reference, Mr. Balwani has attached proposed redactions (in the form of highlighting) to

14  the CMS Survey report and cover letter that the government admitted in Ms. Holmes' trial.[4] Ex

15  17 (Holmes Tr. Ex. 4621A) (redacted); Ex. 18 (Holmes Tr. Ex. 4621B) (redacted). Mr. Balwani's

16  proposed redactions are designed to eliminate CMS findings that are unrelated to alleged issues

17  with Theranos technology and thus beyond the scope of the charges in this case.

18      On January 25, 2016, CMS sent a letter ("the cover letter") to Theranos documenting its

19  findings following its September to November 2015 inspection of the Theranos Newark lab for

20  compliance with regulations promulgated pursuant to the Clinical Laboratory Improvement

21  Amendments ("CLIA"). The letter attached a Form 2567 Statement of Deficiencies ("Form

22  2567"), listing all the deficiencies CMS found in the clinical lab during the inspection. During

23  Ms. Holmes' trial, the government admitted the cover letter and an excerpt of the Form 2567 into

24  

25  [3] Mr. Balwani also adopts, by reference, Ms. Holmes' Motion to Exclude Evidence of CMS Survey Findings and Sanctions under Rules 401–403 and 801–803, as well as her motion to partially redact certain government agency reports, including Form CMS-2567 and corresponding cover letter. *See* Dkts. 574, 897.

27  [4] Mr. Balwani has a good faith basis to believe that the government will seek to admit the same excerpts of the CMS Survey in his trial that it did in Ms. Holmes' trial through former lab director Dr. Kingshuk Das. To the extent the government seeks to admit any other portions of the CMS Survey during Mr. Balwani's trial, Mr. Balwani reserves his right to object.

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

ER-6159

1    evidence through the testimony of former lab director Dr. Kingshuk Das. Exs. 19–20 (Holmes Tr.

2    Ex. 4621A; Holmes Tr. Ex. 4621B).

3        More specifically, the government elicited through Dr. Das's testimony the conclusion

4    from CMS that "based on the condition-level requirement at 42 C.F.R. § 493.1215, Hematology,

5    it was determined that the deficient practices of the laboratory pose immediate jeopardy to patient

6    health and safety." Ex.19 (Holmes Tr. Ex. 4621A). The CMS finding in the excerpt of the Form

7    2567 that the government offered in Ms. Holmes' trial related to the non-compliance of

8    Hematology (labeled D5481) is centered on alleged issues with the PT/INR assay, a test run on

9    non-Theranos technology.[5] This is shown by the CMS survey report itself, which specifically

10   states that the agency's complaint related to the PT/INR test run on a device called the Siemens

11   BCS XP Instrument—a non-Theranos unmodified FDA-cleared commercial device running

12   assays purchased from Siemens. Ex. 20 (Holmes Tr. Ex. 4621B); *see also* Ex. 21 (Government

13   trial exhibit 4982) (PT/INR Patient Impact Assessment) ("Theranos uses the Siemens BCS-XP

14   instrument for running the PT/INR assay.").

15       Because the immediate jeopardy finding is based on the deficiencies related to the

16   accuracy and reliability of PT/INR, and PT/INR does not relate to the accuracy and reliability of

17   "Theranos's technology," the highlighted portions of the CMS cover letter and Form 2567 must

18   be excluded. For the same reasons as outlined above under Rules 104, 401, 402, and 403, this

19   evidence is inadmissible.

20       Unless the government can lay sufficient foundation linking the immediate jeopardy

21   finding and finding D5481 in the CMS cover letter and Form 2567 to the accuracy and reliability

22   of "Theranos's technology," the requirements of Rule 104(b) are not met, and the evidence is

23   inadmissible. *See* Fed. R. Evid. 104(b); *Huddleston*, 485 U.S. at 690. Moreover, evidence from

24   CMS regarding the accuracy and reliability of non-Theranos technology has no bearing on the

_____

25   [5] Dr. Das testified that the CMS immediate jeopardy finding is based on the alleged deficiencies
26   in the Theranos clinical lab related to Condition D5024: Hematology. Ex. 1 (11/9/21 Trial Tr.
     5804:12–17, Ex. 19 (Holmes Tr. Ex. 4621A). Because the government only offered an excerpt of
27   the Form 2567 which referenced Condition D5481 related to PT/INR, Mr. Balwani only moves to
     redact finding D5481. However, if the government seeks to admit a different or larger excerpt of
28   the Form 2567 in his trial, he reserves the right to object to other findings related to Hematology
     and otherwise on the same grounds.

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

ER-6160

1   accuracy and reliability of "Theranos's technology," as charged in the Indictment, which requires

2   its exclusion under Rules 401 and 402. *See* Fed. R. Evid. 401, 402.

3         Finally, evidence from a federal regulator that certain testing offered at Theranos that was

4   processed on unmodified commercial devices posed immediate jeopardy to patients is highly

5   prejudicial when used as evidence to support—albeit improperly—the wire-fraud case against

6   Mr. Balwani. *See* Fed. R. Evid. 403. That language is sensational enough that there is risk that a

7   jury could decide to convict Mr. Balwani based on that evidence alone. *See McFayden-Snider*,

8   552 F.2d at 1184. Moreover, if this evidence were admitted, the jury would again be required to

9   parse the findings in the CMS reports to determine what was relevant—that is, run on

10  "Theranos's technology"—and what was not. The evidence in the Form 2567 is highly technical

11  in nature for a lay jury to parse through. Evidence that works to confuse the jury is squarely

12  disallowed by Rule 403. *See* Fed. R. Evid. 403; *Robertson*, 875 F.3d at 1296. Cross examination

13  is not sufficient to cure the prejudice against Mr. Balwani. This Court should adopt Mr. Balwani's

14  proposed redactions and exclude the evidence from the CMS cover letter and Form 2567 related

15  to the accuracy and reliability of unmodified commercial devices.

16  **III.   CONCLUSION**

17        The government's allegations against Mr. Balwani regarding the accuracy and reliability

18  of testing at Theranos are squarely limited to testing on "Theranos's technology." Evidence about

19  the risk to patients posed by allegedly inaccurate and unreliable testing using non-Theranos

20  technology has no place in this trial. For these reasons, Mr. Balwani seeks to exclude testimony

21  from Patients E.T. and B.B., and the findings and conclusions reflected in the January 25, 2016

22  CMS Form 2567 and cover letter not directly tied to "Theranos's technology," including those

23  related to PT/INR testing, and any and all other evidence the government may offer that it cannot

24  link to the accuracy and reliability of Theranos technology.

25

26

27

28

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

ER-6161

1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  JEFF SCHENK (CABN 234355)
   JOHN C. BOSTIC (CABN 264367)
5  ROBERT S. LEACH (CABN 196191)
   KELLY I. VOLKAR (CABN 301377)
6  Assistant United States Attorneys

7       150 Almaden Boulevard, Suite 900
        San Jose, California 95113
8       Telephone: (408) 535-5061
        Fax: (408) 535-5066
9       Robert.Leach@usdoj.gov

10 Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                   SAN JOSE DIVISION

14

15 UNITED STATES OF AMERICA,            ) Case No. 18-CR-00258 EJD
                                        )
16         Plaintiff,                   ) UNITED STATES' MOTIONS *IN LIMINE*
                                        )
17    v.                                ) Date:   December 16, 2021
                                        ) Time:   9:00 a.m.
18 RAMESH "SUNNY" BALWANI,              ) Court:  Hon. Edward J. Davila
                                        )
19         Defendant.                   )
                                        )
20 _____ )

21

22

23

24

25

26

27

28

U.S. MOTIONS *IN LIMINE*,
CASE NO. 18-258 EJD                        1

ER-6162

**MEMORANDUM OF POINTS AND AUTHORITIES**

The Court has ruled on several of the below motions *in limine* with respect to co-Defendant Elizabeth Holmes in its detailed Order re: Motions *in Limine*, ECF No. 798 ("MIL Order") in the related *United States v. Holmes* trial. The trial against co-Defendant Holmes has demonstrated the necessity of these pretrial rulings. The government respectfully requests the Court adopt its prior rulings to apply with respect to Defendant Balwani, as well.

## I.  MOTION *IN LIMINE* NO. 1: THE COURT SHOULD PRECLUDE DEFENDANT FROM OFFERING AN IMPROPER DEFENSE OF BLAMING HIS VICTIMS

The government moved *in limine* in the related *Holmes* trial to preclude co-Defendant Holmes from blaming the victims in this case and the Court largely granted the government's motion. ECF Nos. 588 at 8–10, 798 at 80–82. Co-Defendant Holmes did, indeed, cross examine investor-witnesses along these lines, as the government anticipated. *See United States v. Holmes*, 10/27/2021 & 11/03/2021 Trial Transcript at 4878:25–4883:20, 5369:25–5370:10. The government requests the Court adopt its prior ruling in the *Holmes* MIL Order with respect to Defendant Balwani, as well. At trial, the government anticipates that Defendant may also attempt to justify his conduct by arguing that the victims in this case—in particular, relatively sophisticated investor victims—could have or should have exercised more diligence or skepticism in their dealings with Theranos, Inc. ("Theranos"). Defendant also may attempt to argue that the victims did not in fact rely on the materially false and misleading statements made by him and his coconspirators. Defendant should be precluded from pursuing this strategy, which would distract the jury from the central issues in this case: Defendant's intent to defraud and the falsity and materiality of his statements.

The Indictment in this case charges Defendant with multiple counts of wire fraud as well as conspiracy to commit wire fraud under two distinct schemes to defraud. As the Court previously held, "[i]t is well settled that a victim's negligence is not a defense to wire fraud." MIL Order, ECF No. 798 at 81 (citing *United States v. Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017)). Indeed, because reliance and damages are not elements of these crimes, it is no defense that the victim of the fraud was negligent or gullible. *See, e.g.*, MIL Order, ECF No. 798 at 81 (citing *Neder v. United States*, 527 U.S. 1, 25 (1999)); *United States v. Blixt*, 548 F.3d 882, 889 (9th Cir. 2008) (In a mail fraud case, "[w]hat is

ER-6163

1   important is the intent of the person making the statement that it be in furtherance of some fraudulent

2   purpose." (quotation omitted)); *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000) ("It is

3   immaterial whether only the most gullible would have been deceived by the defendants' scheme….

4   [T]he wire fraud statute protects the naive as well as the worldly-wise." (quotation omitted)).

5       Consistent with these principles, the Ninth Circuit recently held in a wire fraud case that the

6   defendant could not rely on a bank's negligence in verifying loan application information and affirmed

7   the district court's preclusion of evidence and argument on that topic. *Lindsey*, 850 F.3d at 1012–15

8   (rejecting defendant's attempt to argue mortgage lending in 2006–2007 functioned like the "Wild West,"

9   with banks not really caring about the quality of their mortgage lending). The Ninth Circuit

10  acknowledged it was in good keeping with other circuits in holding "that a fraud victim's negligence is

11  not a defense to criminal charges under the federal fraud statutes." *Id.* at 1014–15 (collecting circuit

12  cases on the topic); *see also United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The

13  susceptibility of the victim of the fraud, in this case a financial institution, is irrelevant to the analysis:  If

14  a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons

15  the schemers intended to defraud are gullible or skeptical, dull or bright." (internal quotation marks

16  omitted)).

17      Similarly, the Supreme Court has confirmed that, while materiality is an element of the wire

18  fraud offense, "the government does not have to prove actual reliance upon the defendant's

19  misrepresentations." *Neder*, 527 U.S. at 25 (quotation omitted).  Materiality "is an objective test."  MIL

20  Order, ECF No. 798 at 81 (citation omitted); *see also Lindsey*, 850 F.3d at 1015 (materiality standard is

21  objective and "is not concerned with a statement's subjective effect on the victim, but only the intrinsic

22  capabilities of the false statement itself." (internal quotation omitted)).  Since *Neder*, Courts of Appeal

23  have routinely affirmed district court rulings precluding testimony relating to the question of whether a

24  defendant's fraudulent statements actually misled the intended victim.  *See* ECF No. 588 at 9–10

25  (collecting sister circuit cases).  For example, it would be irrelevant if some bank or lender employee

26  had overlooked a "red flag" associated with a fraudulent loan application.  *United States v. Winkle*, 477

27  F.3d 407, 414 n.3 (6th Cir. 2003) ("[T]he victim of a bank fraud is the bank, not the CEO of the bank,

28  and approval of a bank officer does not relieve a defendant of liability for bank fraud.").  Similarly, in a

1  scheme to induce travel for a fraudulent purpose, the Second Circuit rejected the defendant's argument

2  that the "foolishness of the [victim] in [the defendant's] fraudulent scheme somehow vitiates [the

3  defendant's] fraudulent intent." *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (collecting

4  cases and upholding district court's exclusion of evidence and testimony relating to gullibility of

5  victim). Under the case law above, the Court should preclude the defense from arguing that the victims

6  were negligent, were not actually misled, or were otherwise at fault in this case.

7        The government also requests the Court adopt its prior ruling prohibiting any selective

8  prosecution claims. *See* MIL Order, ECF No. 798 at 82–83. Defendant might attempt to introduce an

9  improper defense focusing on the culture of Silicon Valley startups, arguing that founders in this area

10  frequently use exaggeration and dramatic promises to generate needed attention for their companies and

11  attract capital, and that Defendant was singled out for prosecution while other entrepreneurs were not.

12  This defense is simply a region-specific version of "other people committed the same crime." To be

13  sure, Defendant was not the first person to commit fraud in connection with investments into a Bay Area

14  startup. At trial, the defense may attempt to minimize Defendant's conduct by eliciting testimony

15  regarding other instances of similar fraudulent schemes, perhaps highlighting cases where no criminal

16  charges were brought. Such testimony would be improper, as there is no "other people did it too"

17  defense to wire fraud or conspiracy. Thus, reference to any wrongdoing committed by individuals other

18  than the Defendants or co-conspirators during *voir dire* or trial would be irrelevant and prejudicial.

19  Such evidence should be excluded pursuant to Federal Rules of Evidence 401–403. *See United States v.*

20  *King*, No. CR-08-002, 2009 U.S. Dist. LEXIS 32935, at *7-8 (D. Idaho Apr. 17, 2009) ("Evidence of

21  selective prosecution . . . would be irrelevant and unfairly prejudicial to present to the jury."); *see United*

22  *States v. DiStefano*, 129 F. Supp. 2d 342, 348 (S.D.N.Y. 2001) (rejecting defendant's selective

23  enforcement claim regarding the existence of uncharged co-workers engaging in the same conduct).

24        For these reasons, the Court should preclude Defendant from offering an improper defense of

25  blaming his victims.

26  **II.**    **MOTION *IN LIMINE* NO. 2: THE COURT SHOULD PRECLUDE THE DEFENSE**
          **FROM REFERENCING PUNISHMENT IN FRONT OF THE JURY.**

27

28        The government requests the Court adopt its prior ruling in the *Holmes* MIL Order precluding

subjecting [himself] to cross-examination.'" *Id.* (quoting *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000)). Nevertheless, during the *Holmes* trial, co-Defendant Holmes repeatedly sought (often unsuccessfully) to introduce her own self-serving statements and responses in emails, text messages, and video and audio recordings during cross examination in the government's case-in-chief. The government seeks to exclude Defendant Balwani from pursuing a similar strategy.

During the course of its investigation, the government has collected extensive evidence of previous statements by Defendant regarding Theranos's technology, business relationships, financial health, regulatory status, and other key topics. The government will make extensive use of Defendant's previous statements in proving that he engaged in schemes to defraud investors and patients. The Court, however, should reject any attempt by Defendant to improperly admit his own prior statements. Although Defendant may wish to introduce witness testimony or direct evidence of self-serving statements he has made to the press, to victims, in prior depositions, or his testimony to the SEC, such statements are inadmissible hearsay and must be excluded.

## XII. MOTION *IN LIMINE* NO. 12: THE COURT SHOULD PRECLUDE DEFENDANT FROM OFFERING EVIDENCE THAT HIS MOTHER RECEIVED A BLOOD TEST FROM THERANOS WITHOUT THE NECESSARY FOUNDATION

The government believes Defendant Balwani may seek to admit evidence during his trial that his mother received a test from Theranos—the Court should preclude any such evidence or testimony as lacking foundational relevance and hearsay under Federal Rules of Evidence 104(b), 401, 403, and 802. "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b); *see also* MIL Order, ECF No. 798 at 63–64. Defendant Balwani has not provided basic foundational evidence demonstrating whether his mother's blood test from Theranos would tend to prove the accuracy or reliability of Theranos's proprietary blood analyzer. Specifically, Defendant has not shown whether his mother received the test from Theranos for a medical purpose rather than to, for example, support her son and test out the Walgreens experience, in which case the actual results of the tests would be irrelevant. Nor has Defendant Balwani produced in discovery his mother's entire medical file, as he has received the benefit of in discovery by the government with respect to Theranos's patient-victims, sometimes over their objection. *See* ECF Nos. 922, 940, 952, 998 (granting Rule 17 motion for patient-victim E.T.'s entire

1  medical file over her objection as lodged by the government on her behalf). As a result, Defendant

2  Balwani has not provided basic foundational information such as whether his mother was requested by

3  her physician to get such a test, whether she provided the test results to her physician, whether she relied

4  on them for any medical judgments, and whether she had any other blood tests from competing lab

5  companies within a recent enough time to determine the accuracy or inaccuracy of such tests. If

6  Defendant were to produce the relevant material and were to meet the Rule 104(b) threshold to show

7  relevance, he would then also face the hurdle of any medical reports from his mother or her physician

8  being inadmissible hearsay.

9       Furthermore, Defendant Balwani has not even provided evidence to show whether his mother

10  received a fingerstick test rather than a venous draw blood test, and/or whether the test was run on

11  Theranos proprietary blood analyzer or a regular FDA-approved machine. The evidence in the *Holmes*

12  trial established that most people who received tests during the "friends and family launch" from

13  September to November 2013 did not have their blood tested on a Theranos Edison device. *United*

14  *States v. Holmes*, 09/28/2021 Trial Transcript at 2006:15–2026:9 & Trial Exhibit 7338

15  (Dr. Adam Rosendorff testifying that two tests performed during time period were not perormed on

16  Edison device). Relevance cannot be speculative. *See United States v. Alvarez*, 580 F. App'x 571, 573

17  (9th Cir. 2014) (holding that evidence about the general ability to obtain a fake birth certificate was not

18  relevant to whether the party's certificate was real, and any relationship was speculative). Defendant

19  Balwani cannot prove his mother's blood test at Theranos was relevant. Accordingly, any evidence or

20  argument relating to Defendant's belief the tests were accurate and reliable because his mother received

21  a Theranos test should be precluded under Rules 401 and 403. In sum, the Court should preclude

22  Defendant Balwani from offering evidence that his mother received a Theranos test given that he cannot

23  demonstrate foundational relevance to the charged conduct in the Third Superseding Indictment or

24  overcome the additional relevance or hearsay barriers.

25  **XIII.  MOTION *IN LIMINE* NO. 13:  THE COURT SHOULD ADMIT TESTIMONY FROM "NON-PAYING" PATIENTS**

26

27       The government requests the Court adopt its prior ruling in the *Holmes* MIL Order that

28  "[t]estimony from non-paying patient witnesses concerning their experience with Theranos testing is

1   STEPHANIE M. HINDS (CABN 154284)
    Acting United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   JEFFREY B. SCHENK (CABN 234355)
    JOHN C. BOSTIC (CABN 264367)
5   ROBERT S. LEACH (CABN 196191)
    KELLY I. VOLKAR (CABN 301377)
6   Assistant United States Attorneys

7        150 Almaden Boulevard, Suite 900
         San Jose, California 95113
8        Telephone: (408) 535-5061
         Fax: (408) 535-5066
9        Kelly.Volkar@usdoj.gov

10  Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                  SAN JOSE DIVISION

14  UNITED STATES OF AMERICA,            )  Case No. 18-CR-00258 EJD
                                          )
15          Plaintiff,                    )  UNITED STATES' OPPOSITION TO
                                          )  DEFENDANT'S MOTION TO RECONSIDER RE:
16      v.                                )  CUSTOMER FEEDBACK REPORTS
                                          )
17  ELIZABETH HOLMES,                     )
                                          )
18          Defendant.                    )  Court: Hon. Edward J. Davila
                                          )
19                                        )

20  _____

21

22

23

24

25

26

27

28

1  The government opposes Defendant Elizabeth Holmes's "Renewed Motion" to Admit Certain

2  Customer Feedback Reports—which is essentially a motion to reconsider the Court's prior oral ruling on

3  this exact same subject.  *See* ECF No. 1140 ("Motion to Reconsider"); 10/20/2021 Hearing Transcript

4  ("10/20 Tr.") at 4201:17–4213:2, 4262:4–4263:20 (sustaining government's objection to exhibits

5  identified in Defendant's Motion).  Typically, motions to reconsider are entertained by district courts in

6  this District only when new material facts or a change in law has occurred.  *See*, *e.g.*, N.D. Cal. Civil

7  L.R. 7-9; N.D. Cal. Crim. L.R. 2-1 (in criminal cases courts look to civil rules so long as consistent).

8  Indeed, the District's Civil Local Rules, which occasionally apply to criminal proceedings, expressly

9  prohibit "repeat[ing] any oral or written argument made by the applying party in support of or in

10  opposition to the interlocutory order which the party now seeks to have reconsidered."  N.D. Cal. Civil

11  L.R. 7-9(c).  Here, the Court provided Defendant with a path to move to reconsider by "pars[ing] out"

12  relevant portions of the largely irrelevant materials.  10/20 Tr. at 4262:4–4263:20.  None of the above

13  reasons are present in Defendant's Motion, which merely reiterates and adds more color to the oral

14  arguments raised by defense counsel before the Court and rejected by the Court.  *Id.*  The Court should

15  thus deny Defendant's Motion to Reconsider.

16  On October 20, 2021, on a break during the cross examination of former Theranos employee

17  Daniel Edlin, defense counsel handed binders of lengthy exhibits to the government and expressed its

18  intent to move their admission, to which the government timely raised its objections.  10/20 Tr. at

19  4201:17–4213:2.  First, the government noted that the reports seemed to be largely positive and

20  expressed concerns with the multiple layers of hearsay contained within the document and the

21  authenticity or foundation that the witness, Daniel Edlin, could provide for the actual preparation of the

22  reports or anything beyond receiving the email.  *Id.* at 4202:7–24.  Second, the government expressed

23  Rule 403 concerns with the "unbalanced view of what customer and patient feedback about Theranos

24  was" given Defendant had successfully—just the day prior—moved to exclude negative customer

25  complaint logs from Theranos.  *Id.* at 4202:25–4203:11.  Defendant sought to overcome these

26  foundational and hearsay challenges by offering the reports for Defendant's state of mind rather than for

27  the truth of the statements contained within.  *Id.* at 4203:22–4204:17.  The Court noted, and the

28  government agreed, that reviews of a patient's experience within Walgreens or with phlebotomists is

irrelevant to the accuracy and reliability of the technology.  *Id.* at 4204:18–4212:22.  Defendant insisted that repeat customers would counter that view.  *Id.* at 4205:7–11, 4209:22–4210:3.  Defense counsel also noted that most of the complaints are about adjacent *Walgreens* services, not the patients' experience with Theranos.  *Id.* at 4208:16–18.  The government pointed out both of those categories are still irrelevant, and any minimal probative value would be far outweighed by the prejudice if the jury were to receive these positive accounts without the negative feedback actually about the technology.  *Id.* at 4210:4–4211:4.  Furthermore, the government noted that "there's a lot of positive feedback about the prices and the convenience[,]" which "aren't issues in the case" and thus irrelevant.  *Id.* at 4210:20–24.  The Court ultimately agreed and held the reports were not relevant, noting Defendant could "parse out" excerpts that might be relevant if they were related to the actual Theranos technology.  *Id.* at 4211:22–4213:2, 4262:4–4263:20.

Rather than undertake the exercise of finding portions relevant to Theranos's technology as the Court suggested, Defendant now moves to admit the entirety of the customer feedback reports, exactly as she unsuccessfully attempted orally before the Court a few weeks ago.  ECF No. 1140 at 3 ("Ms. Holmes requests that the Court admit the reports in their entirety.").  No facts underpinning the Court's oral ruling have changed, and Defendant's reiterated arguments continue to fall flat.  Instead, Defendant concedes that the reports contain "generally favorable accounts" of Theranos patients at Walgreens locations.  *Id.* at 5.  And Defendant reiterates her argument that repeat customers could reflect positively on Theranos's technology "*even if the feedback itself does not discuss the technology*[.]"  *Id.* at 6 (emphasis added).  But this concession is critical given the Court's ruling that these reports are irrelevant because they do not relate to Theranos's technology.  10/20 Tr. at 4211:22–4213:2, 4262:4–4263:20.  Indeed, if these surveys were taken by phlebotomists or at the time of the patient's blood being drawn, there could be no connection to Theranos's technology as the test would not have even been run yet.  Nevertheless, Defendant continues to assert that these reports are important to demonstrate her state of mind regarding the accuracy and reliability of Theranos's tests, and that other types of errors may occur, when she lied to investors.  ECF No. 1140 at 4–6.

The Court should reject Defendant's expanded claims of relevance to the charges in the Third Superseding Indictment ("TSI") as incorrect.  First, Defendant inaccurately recounts the time period.

1     One exhibit that Defendant seeks to admit (Trial Exhibit 7476, *available at* ECF No. 1141-1) is from

2     October 1, 2014, but all remaining exhibits are sent to Defendant between May 31, 2015 and August 23,

3     2015 (*see* ECF No. 1141 at 2–3), after all investments to Theranos were made. *See* TSI, ECF No. 469

4     ¶ 24 (listing Counts 3-8 with the latest investment on October 31, 2014); 10/20/2021 Hearing Transcript

5     at 3948:25–3951:15 (testimony of Daniel Edlin discussing Rupert Murdoch as a potential investor in

6     January 2015). And the email summary of the single exhibit that was sent to Defendant before some

7     investors invested in Theranos in October 2014 underscores the Court's relevancy concern because it is

8     not related to Theranos's technology at all: a Theranos employee emails Defendant to say that the

9     "Check in process receiv[ed] the lowest star rating" and describing the "negative feedback is primarily

10     about long lines / wait times, slow check in, and a few bathroom cleanliness concerns" and noted that it

11     was "a small data set" but better signage and branding would be needed. ECF No. 1141-1 at 2.

12     By contrast, mere days earlier, Defendant was emailed by co-Defendant Balwani regarding inaccurate

13     hCG tests. *See* Trial Exhibit 4222. Thus, these customer reports are irrelevant to show Defendant's

14     state of mind as it relates to what she told investors regarding the accuracy and reliability of Theranos

15     tests because she would have received the majority of these reports after she pitched investors.[1]

16         Second, Defendant confuses the TSI's claims with respect to Walgreens. ECF No. 1140 at 4–5.

17     Defendant seems to assert that customer feedback reports based on their experience within the

18     Walgreens store could somehow inform Defendant's state of mind regarding how *Walgreens executives*

19     viewed the success—or lack thereof—of the Walgreens rollout. *Compare id.*, *with* TSI, ECF No. 469

20     ¶ 12(D) (asserting Holmes knew by late 2014 that the Walgreens rollout had stalled because

21     "Walgreens's executives had concerns with Theranos's performance"). These customer reports have no

22     bearing on whether Walgreens executives were satisfied with the amount of fingerstick versus venous

23     draws that Theranos was doing, and to the extent there is minimal relevance, Defendant already

24     explored that on cross-examination with Nimesh Jhaveri who agreed that customers were generally

25

---

[1] The vast majority of these reports were also sent to Defendant after Theranos had already ceased using

26   its proprietary Edison device to run patient samples. *See* Trial Exhibit 4533 (providing date ranges

27   during which the twelve assays run on Theranos's Edison devices were used for patient samples and only two were offered after May 31, 2015, with both ceasing on June 25, 2015). Thus, these reports are

28   also irrelevant to Defendant's state of mind regarding the state of Theranos's Edison device for the patient counts.

U.S.' OPP'N RE: DEF.'S MOT. TO RECONSIDER RE: CUSTOMER FEEDBACK REPORTS,
CASE NO. 18-CR-258 EJD         3

1  satisfied—these reports would merely be cumulative and unnecessary.  *See* 10/14/2021 Hearing

2  Transcript at 3668:10–16.

3        Third, Defendant asserts these patient reports regarding their experience within the Walgreens

4  store are relevant to demonstrate Theranos offered cheaper blood tests than conventional laboratories

5  (ECF No. 1140 at 6)—but that is not at issue in this case.  *See* TSI, ECF No. 469 ¶¶ 12(A), 15, 16 (not

6  including price among Defendant's knowing misrepresentations); 10/20 Tr. at 4210:20–24 (noting price

7  and convenience are not issues in the case).  For example, the TSI alleges that Defendants advertised

8  that Theranos could provide "accurate, fast, reliable, and cheap blood tests and test results" despite

9  Defendants knowing "that Theranos's technology was, in fact, *not capable of consistently producing*

10 *accurate and reliable results*" and "through omissions concerning the limits of and problems *with*

11 *Theranos's technologies.*"  *Id.* ¶¶ 15, 16.  Thus, the government has not alleged that Defendants lied

12 about Theranos's pricing as compared with other companies and that cannot serve as the basis for

13 rendering these reports relevant.

14       Finally, Defendant continues to assert these reports should be admitted to show her state of mind

15 with respect to the Theranos technology and relationship with Walgreens (ECF No. 1140 at 4, 7)—but

16 she cannot overcome the Federal Rules of Evidence 401 and 403 barriers that the Court previously

17 identified.  10/20 Tr. at 4211:22–4213:2, 4262:4–4263:20.  For the reasons discussed above, these

18 reports are irrelevant to the charged conduct in the TSI as they largely do not relate to the capabilities of

19 Theranos's technology—and Defendant failed to identify any specific relevant portions—nor do they

20 reflect on what Walgreens *executives* (rather than customers) thought about the state of the companies'

21 relationship in late 2014.  Whatever minimal relevance the reports have is significantly outweighed by

22 the prejudice under a Rule 403 analysis.  While Defendant suggests a limiting instruction that these

23 reports are not offered for their truth (ECF No. 1140 at 4), such an instruction would not correct the

24 unbalanced and misleading story that would be presented to the jury, as the government described in

25 person, since the Court excluded logs of patient complaints *about the blood test results that they*

26 *received from Theranos*.  10/20 Tr. at 4202:25–4203:11, 4210:4–4211:4; *contra* ECF No. 1140 at 7.

27 Defendant notes that some of the presentations to investors included positive testimonials from Theranos

28

1    patients at Walgreens stores—but that just further proves that these reports are cumulative and

2    unnecessary given their minimal (if any) relevance. *Id.* at 6–7 n.3.

3         For the reasons stated above, the government respectfully requests that the Court uphold its prior

4    ruling and deny Defendant's Motion to Reconsider.

5

6    DATED:  November 14, 2021                          Respectfully submitted,

7                                                        STEPHANIE M. HINDS
                                                         Acting United States Attorney
8

9                                                          */s/ Kelly I. Volkar*
                                                         JEFFREY B. SCHENK
10                                                       JOHN C. BOSTIC
                                                         ROBERT S. LEACH
11                                                       KELLY I. VOLKAR
                                                         Assistant United States Attorneys
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28