No. 22-10338

---

IN THE

# United States Court of Appeals for the Ninth Circuit

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

---

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

---

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 25 OF 26 (PAGES ER-6697 – ER-6944)**

---

Jeffrey B. Coopersmith
Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 47 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | DECEMBER 17, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 9111 - 9353 |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
                            LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

ER-6698

09:15AM   1          I SEE NO HANDS.

09:15AM   2          THANK YOU VERY MUCH.

09:15AM   3          MR. DOWNEY, WOULD YOU LIKE TO CONTINUE WITH YOUR ARGUMENT?

09:15AM   4              MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:15AM   5          **(MR. DOWNEY RESUMED HIS CLOSING ARGUMENT ON BEHALF OF**

09:15AM   6   **MS. HOLMES.)**

09:15AM   7              MR. DOWNEY:  GOOD MORNING, LADIES AND GENTLEMEN.

09:15AM   8          I WANT TO PICK UP WHERE I LEFT OFF AND I WANT TO GO

09:15AM   9   THROUGH WITH YOU SOME OF THE PARTICULAR COUNTS THAT ARE IN THE

09:15AM  10   INDICTMENT AND THAT MS. HOLMES IS CHARGED WITH.

09:15AM  11          BEFORE I DO THAT, I WANT TO CLARIFY ONE THING THAT I SAID

09:15AM  12   TO YOU YESTERDAY WITH REGARD TO THE STANDARDS OF PROOF THAT YOU

09:15AM  13   SHOULD CONSIDER AS YOU RETURN TO DELIBERATE.

09:15AM  14          IF YOU REMEMBER YESTERDAY, I USED THIS ILLUSTRATION WITH

09:15AM  15   YOU OF THE STEPS THAT YOU SHOULD GO UP TO TRY TO MAKE A

09:16AM  16   DETERMINATION OF WHETHER A CRIME HAS BEEN PROVEN BEYOND A

09:16AM  17   REASONABLE DOUBT, AND I WANT TO MAKE SURE THAT I'M CLEAR AS TO

09:16AM  18   THE DIFFERENCE BETWEEN THE CLEAR AND CONVINCING STANDARD AND

09:16AM  19   THE HIGHER STANDARD, WHICH IS THE BEYOND A REASONABLE DOUBT

09:16AM  20   STANDARD.

09:16AM  21          LET ME SHOW YOU A SLIDE IN CONNECTION WITH THAT.  THE

09:16AM  22   CLEAR AND CONVINCING STANDARD REQUIRES A "FIRM BELIEF OR

09:16AM  23   CONVICTION THAT IT IS HIGHLY PROBABLE THAT FACTUAL CONTENTIONS

09:16AM  24   ARE TRUE."  A FIRM BELIEF THAT IT IS HIGHLY PROBABLE.

09:16AM  25          BEYOND A REASONABLE DOUBT MEANS THAT YOU ARE "FIRMLY

ER-6699

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9137

09:16AM   1    CONVINCED" THAT THE DEFENDANT IS GUILTY.  THOSE ARE THE

09:16AM   2    DIFFERENT STANDARDS.

09:16AM   3         SO IF THE DEFENDANT IN YOUR MIND IS IN A PLACE WHERE SHE

09:16AM   4    IS -- YOU HAVE A FIRM BELIEF THAT IT IS HIGHLY PROBABLE THAT

09:16AM   5    THE CONTENTIONS THAT THE GOVERNMENT MAKES HERE ARE TRUE, THAT

09:17AM   6    DOES NOT MEET THE BEYOND A REASONABLE DOUBT STANDARD, AND YOU

09:17AM   7    SEE THERE THE BEYOND A REASONABLE DOUBT STANDARD.

09:17AM   8         SO WITH THAT IN MIND, LET'S LOOK AT SOME OF THE PARTICULAR

09:17AM   9    COUNTS THAT ARE IN THE INDICTMENT AND SOME OF THE PARTICULAR

09:17AM  10    INVESTORS.

09:17AM  11         LET ME TALK ABOUT SOMETHING THAT THE GOVERNMENT REALLY

09:17AM  12    DIDN'T TALK ABOUT YESTERDAY, WHICH IS WHEN MS. HOLMES ENTERED

09:17AM  13    CONVERSATIONS WITH INVESTORS, WHAT WAS SHE THINKING ABOUT?

09:17AM  14    WHAT TYPES OF INVESTORS DID SHE WANT TO HAVE INVEST IN THE

09:17AM  15    COMPANY AND WHAT DID SHE THEREFORE FOCUS ON AS PART OF HER

09:17AM  16    CONVERSATIONS WITH THEM?

09:17AM  17         WELL, AS YOU REMEMBER, SHE TESTIFIED DURING THE COURSE OF

09:17AM  18    HER DIRECT EXAMINATION THAT SHE WAS LOOKING FOR PEOPLE WHO WERE

09:17AM  19    LONG-TERM INVESTORS, AND SO SHE WAS TALKING ABOUT WHAT THE

09:17AM  20    COMPANY WOULD LOOK LIKE IN FIVE OR TEN YEARS, OR A YEAR, NOT

09:18AM  21    REPORTING, AS ANOTHER COMPANY MIGHT, ON THE PRESENT PERFORMANCE

09:18AM  22    OF THE COMPANY.

09:18AM  23         THAT'S IMPORTANT, LADIES AND GENTLEMEN, BECAUSE IT REALLY

09:18AM  24    REFLECTS A FUNDAMENTAL DISCONNECT BETWEEN THE GOVERNMENT'S

09:18AM  25    UNDERSTANDING OF THE FACTS AND OUR UNDERSTANDING OF THE FACTS.

09:18AM   1          IN THE GOVERNMENT'S VIEW, THE CASE IS REALLY ABOUT WHAT

09:18AM   2   THE TEST MENU WAS IN THE CLIA LABORATORY DURING THIS PHASE I

09:18AM   3   PERIOD, WHICH MS. HOLMES TOLD YOU SHE BELIEVED WOULD BE A BRIEF

09:18AM   4   PERIOD.

09:18AM   5          THAT WAS AN OLD DEVICE THAT WAS BEING USED FOR A PERIOD IN

09:18AM   6   THAT LAB.  IT WAS NOT THE PRIMARY MODE OF ANALYSIS FOR

09:18AM   7   FINGERSTICK TESTS.  THE MODIFIED MACHINES WERE.

09:18AM   8          BUT THE GOVERNMENT MAKES MUCH OF THE FACT THAT THIS WAS A

09:18AM   9   LIMITED DEVICE.  THAT'S, IN ESSENCE, THE THEORY OF THEIR CASE.

09:18AM  10          IF YOU GO BACK AND READ THE MATERIALS THAT MS. HOLMES

09:18AM  11   SHARED WITH INVESTORS AND YOU RECONSIDER WHAT SHE SAID TO

09:19AM  12   INVESTORS, YOU'LL SEE THAT SHE WAS TALKING ABOUT THE SERIES 4

09:19AM  13   DEVICE, THE SERIES 4 BEING THE DEVICE THAT SHE HAD FOCUSSED ON

09:19AM  14   IN CONNECTION WITH HER EFFORTS TO GET APPROVAL FROM THE FDA.

09:19AM  15          AND SHE WAS TALKING ABOUT PHASE II, FOR THE MOST PART, OF

09:19AM  16   THERANOS'S OPERATIONS.

09:19AM  17          THAT'S THE DISCONNECT.  SHE WAS NOT CONCEALING THE NUMBER

09:19AM  18   OF TESTS THAT WERE DONE ON THE PARTICULAR METHOD OF THE 3.5

09:19AM  19   DEVICE IN THE LAB.  SHE WAS NOT EVEN DISCLOSING THE MODIFIED

09:19AM  20   DEVICES FOR REASONS THAT WE DISCUSSED YESTERDAY.

09:19AM  21          SO THAT IS REALLY THE FUNDAMENTAL DISCONNECT THAT I THINK

09:19AM  22   EXISTS IN THE CASE AS TO HOW THE EVIDENCE IS PRESENTED.

09:19AM  23          AND WHEN YOU GO BACK, YOU HAVE TO ASK YOURSELF, HAS THE

09:19AM  24   GOVERNMENT PROVEN BEYOND A REASONABLE DOUBT THAT MS. HOLMES WAS

09:19AM  25   REALLY ATTEMPTING TO DECEIVE PEOPLE IN THE WAY THAT SHE TALKED

09:19AM   1    ABOUT THERANOS'S TECHNOLOGY BY NOT ACKNOWLEDGING THE 3 DEVICE

09:19AM   2    AT THAT TIME.

09:19AM   3        LET ME TALK NOW GENERALLY ABOUT THE PEOPLE WHO INVESTED IN

09:20AM   4    THERANOS.

09:20AM   5        AS YOU KNOW, YOU HEARD FROM SIX PEOPLE WHO HAD SOME

09:20AM   6    INVOLVEMENT WITH AN INVESTMENT IN THERANOS.  FOUR WERE ACTUALLY

09:20AM   7    INVESTORS, AND TWO WERE PEOPLE WHO WERE IN SOME WAY AFFILIATED

09:20AM   8    WITH INVESTORS:  MR. TOLBERT AND MS. PETERSON.

09:20AM   9        THERE WERE ACTUALLY MANY PEOPLE WHO INVESTED IN THERANOS

09:20AM  10    OVER TIME.  BY THE END OF THE TIME THAT THERANOS WAS AN

09:20AM  11    OPERATING COMPANY, THERE HAD BEEN ABOUT 275 PEOPLE OR ENTITIES

09:20AM  12    THAT INVESTED IN THERANOS.

09:20AM  13        NOW, PEOPLE LOST MONEY.  I DON'T MINCE WORDS ABOUT THAT.

09:20AM  14    MS. HOLMES CERTAINLY DID NOT INTEND FOR PEOPLE TO LOSE MONEY.

09:20AM  15    THAT'S A BAD EVENT AND A FAILURE ON HER PART.

09:20AM  16        IT SHOULD NOT BE SOMETHING THAT YOU HEAR AS US EXCUSING

09:20AM  17    ANYTHING IN HER BEHAVIOR WITH REGARD TO THAT ISSUE.

09:20AM  18        BUT THAT'S NOT THE ISSUE THAT WE'RE CONCERNED WITH IN THIS

09:21AM  19    TRIAL.

09:21AM  20        THE ISSUE WE'RE CONCERNED WITH IS, DID SHE INTENTIONALLY

09:21AM  21    MAKE MISREPRESENTATIONS TO PEOPLE FOR THE PURPOSE OF INDUCING

09:21AM  22    THEM TO INVEST IN HER COMPANY?

09:21AM  23        AND AS WE REVIEW THE EVIDENCE, I THINK THE EVIDENCE IS

09:21AM  24    FAIRLY CLEAR THAT SHE DID NOT, MUCH LESS SATISFY YOU BEYOND A

09:21AM  25    REASONABLE DOUBT, THAT SHE WAS ENGAGED IN THAT TYPE OF

09:21AM   1    DECEPTION THAT THE GOVERNMENT CLAIMS.

09:21AM   2        SO LET'S LOOK AT THE PEOPLE THAT WE HEARD FROM IN

09:21AM   3    CONNECTION WITH THE CASE.

09:21AM   4        AS YOU RECALL, THERE WERE TWO INVESTMENTS, C1 INVESTORS:

09:21AM   5    MR. EISENMAN, MR. TOLBERT, AND MR. LUCAS; AND THE C2 INVESTORS

09:21AM   6    THAT INVESTED IN 2014:  MR. GROSSMAN, MR. MOSLEY, AND

09:21AM   7    MS. PETERSON.

09:21AM   8        LET ME -- I'LL TALK ABOUT EACH OF THEM AND TALK ABOUT EACH

09:21AM   9    OF THEIR INVESTMENTS IN A MOMENT, BUT I WANT TO REVIEW WITH YOU

09:21AM  10    SOME THINGS THAT THEY ALL HAD IN COMMON.

09:22AM  11        FIRST, AND I THINK MOST IMPORTANTLY, ALL OF THE

09:22AM  12    RELATIONSHIPS BETWEEN THESE INVESTORS AND THERANOS WERE NOT

09:22AM  13    GOVERNED BY THE DISCUSSIONS THAT THE GOVERNMENT FOCUSES ON OR

09:22AM  14    NEWSPAPER ARTICLES.

09:22AM  15        THE RELATIONSHIPS BETWEEN THESE INVESTORS AND THERANOS

09:22AM  16    WERE GOVERNED BY A CONTRACT, THE STOCK PURCHASE AGREEMENT THAT

09:22AM  17    YOU SAW AS PART OF OUR CROSS-EXAMINATIONS OF EACH OF THE

09:22AM  18    INVESTOR WITNESSES.

09:22AM  19        AND THE STOCK PURCHASE AGREEMENT HAD A LOT OF PROVISIONS

09:22AM  20    THAT ARE RELEVANT TO THE CASE THAT THE GOVERNMENT PRESENTS

09:22AM  21    HERE.

09:22AM  22        WHAT WERE THOSE?

09:22AM  23        WELL, FIRST OF ALL, AS THE WITNESSES TESTIFIED, THIS IS

09:22AM  24    NOT LIKE AN INVESTMENT THAT WOULD BE MADE IN A STOCK IN A

09:22AM  25    PUBLIC COMPANY WHERE THE PUBLIC COMPANY IS ROUTINELY DISCLOSING

ER-6703

09:22AM   1        INFORMATION ABOUT ITS OPERATIONS.

09:22AM   2            THIS IS AN INVESTMENT IN A PRIVATE COMPANY WHERE THE

09:23AM   3        INFORMATION THAT IS PROVIDED IS LIMITED.  IT MAY BE

09:23AM   4        EPISODICALLY PROVIDED.  THERE MAY BE INFORMATION THAT THE

09:23AM   5        COMPANY KNOWS THAT IS NOT KNOWN TO THE INVESTORS IN THE

09:23AM   6        COMPANY.

09:23AM   7            SO WHAT DOES A COMPANY IN THAT CIRCUMSTANCE RELY ON TO

09:23AM   8        MAKE SURE THAT THE INVESTORS ARE CAPABLE OF MAKING THE

09:23AM   9        INVESTMENT?

09:23AM  10            WELL, THEY TELL THE INVESTORS THAT AND THEY SAY, WE WANT

09:23AM  11        YOU TO REPRESENT TO US THAT YOU ARE A SOPHISTICATED ENOUGH

09:23AM  12        INVESTOR AND YOU HAVE ENOUGH EXPERIENCE INVESTING IN THIS AREA

09:23AM  13        THAT YOU'RE CAPABLE OF EVALUATING THESE RISKS.

09:23AM  14            AND THERE WERE INVESTORS LIKE THAT IN CONNECTION WITH

09:23AM  15        THIS.  YOU SAW MR. LUCAS TESTIFY.  HE WAS NOT ONLY AN

09:23AM  16        EXPERIENCED TECHNOLOGY INVESTOR, BUT HE HAD INVESTED

09:23AM  17        SPECIFICALLY IN BIO MEDICAL DEVICES.

09:23AM  18            MANY OF THE INVESTOR WITNESSES WERE PEOPLE WHO WERE

09:23AM  19        PROFESSIONAL INVESTMENT ADVISORS, NOT THEMSELVES INVESTORS AT

09:23AM  20        ALL.

09:23AM  21            SEVERAL OF THE INVESTORS TESTIFIED TO CONCLUSIONS THAT

09:23AM  22        THEY DREW FROM MS. HOLMES'S TESTIMONY ABOUT THE STATE OF THE

09:24AM  23        TECHNOLOGY, HOW DEVELOPED IT WAS, WHAT CERTAIN EVENTS MEANT FOR

09:24AM  24        WHAT HAD BEEN PROVEN WITH REGARD TO THE TECHNOLOGY, AS IF THIS

09:24AM  25        CONTRACT DID NOT CONTAIN THE FOLLOWING PROVISION, WHICH IS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9142

09:24AM  1    PROVISION 4.4, SPECULATIVE NATURE OF THE INVESTMENT.

09:24AM  2         IN EVERY STOCK PURCHASE AGREEMENT, THE INVESTORS WERE

09:24AM  3    TOLD, THIS IS A COMPANY THAT HAS A VERY LIMITED AND FINANCIAL,

09:24AM  4    OPERATING AND FINANCIAL HISTORY.  THAT WAS OBVIOUS TO THE

09:24AM  5    INVESTORS ANYWAY.  THERANOS WAS BECOMING INVOLVED IN A RETAIL

09:24AM  6    BUSINESS THAT WAS BRAND NEW.

09:24AM  7         AT THE TIME THE C1 INVESTORS MADE THEIR INVESTMENT,

09:24AM  8    THERANOS HAD ONLY BEEN OPERATING IN THE RETAIL SECTOR FOR ONLY

09:24AM  9    ABOUT A MONTH, AND LESS THAN A YEAR WHEN ALL OF THE INVESTORS

09:24AM 10    INVESTED.  SO THEY KNEW THIS WAS A NEW VENTURE AND THEY KNEW IT

09:24AM 11    WAS SPECULATIVE AND THEY KNEW IT INVOLVED SUBSTANTIAL RISK.

09:25AM 12         THEY ALSO DISCLAIMED ANY REPRESENTATIONS THAT THERANOS WAS

09:25AM 13    MAKING AS THE BASIS FOR THEIR INVESTMENT.

09:25AM 14         IF YOU SEE SECTION 4.5, THE INVESTORS ACKNOWLEDGE THAT

09:25AM 15    THEY UNDERSTOOD THAT THE INFORMATION INVESTED -- PROVIDED BY

09:25AM 16    THE COMPANY WAS NOT INTENDED TO DESCRIBE EVERYTHING ABOUT THE

09:25AM 17    COMPANY.  IT WAS DESCRIBING CERTAIN ASPECTS ABOUT WHAT THE

09:25AM 18    COMPANY WAS DOING.

09:25AM 19         AND WHEN THEY TESTIFIED, YOU'LL RECALL THAT THE INVESTORS

09:25AM 20    ACKNOWLEDGED THAT THEY KNEW THIS.

09:25AM 21         MR. GROSSMAN, WHO WAS ONE OF THE MORE RECENT INVESTORS TO

09:25AM 22    TESTIFY, HE WAS ASKED, DID YOU KNOW THAT THERE WERE ASPECTS OF

09:25AM 23    THEIR OPERATIONS THAT THEY WERE NOT DISCLOSING TO YOU?

09:25AM 24         AND HE SAID, YES, THEY TOLD ME THAT AND I KNEW THAT, IN

09:25AM 25    ADDITION TO IT BEING A PROVISION OF THE CONTRACT.

ER-6705

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9143

```
09:25AM   1        THEY ALSO SPECIFICALLY, SPECIFICALLY WERE TOLD, WE ARE
09:26AM   2   TELLING YOU WHAT WE THINK AS THERANOS ABOUT THE BUSINESS, HOW
09:26AM   3   IT WILL PERFORM IN THE FUTURE, WHAT WE THINK WE WILL EARN, WHAT
09:26AM   4   BUSINESS LINES WE THINK WE WILL HAVE.  AND WE'RE TELLING THAT
09:26AM   5   TO YOU TO INFORM YOU.
09:26AM   6        BUT YOU SHOULD UNDERSTAND THAT BECAUSE WE'RE A NEW COMPANY
09:26AM   7   AND A SPECULATIVE COMPANY, BUSINESS PLANS MAY CHANGE.
09:26AM   8        AND THAT'S IN SECTION 4.5 OF EVERY STOCK PURCHASE
09:26AM   9   AGREEMENT WHERE EACH INVESTOR SAYS, I KNOW THAT THOSE BUSINESS
09:26AM  10   PLANS ARE SPECULATIVE, I KNOW THAT PROJECTIONS THAT YOU PROVIDE
09:26AM  11   ME MAY NOT MATERIALIZE, AND THAT WHAT I AM BEING TOLD AS TO
09:26AM  12   WHAT YOU PROJECT MAY ACTUALLY BE SIGNIFICANTLY DIFFERENT FROM
09:26AM  13   THE RESULTS THAT YOU'RE ACTUALLY ABLE TO GENERATE.
09:26AM  14        SO WHEN WE LOOK AT SOME OF THE ISSUES WITH SPECIFIC
09:26AM  15   INVESTORS AROUND FINANCIAL PROJECTIONS THEY RECEIVED AND
09:26AM  16   BUSINESSES THAT THERANOS THOUGHT IT WOULD BE ABLE TO DEVELOP,
09:26AM  17   BEAR THAT IN MIND.  THAT'S THE CONTRACT UNDER WHICH EVERY
09:27AM  18   INVESTOR MAKES THEIR INVESTMENT.
09:27AM  19        NOW, LET ME TALK ABOUT EACH INVESTOR INDIVIDUALLY JUST FOR
09:27AM  20   A FEW MOMENTS WITH EACH.
09:27AM  21        FIRST, YOU'LL RECALL THAT MR. EISENMAN, WHO TESTIFIED
09:27AM  22   ABOUT HIS INVESTMENT AS PART OF THE C1 ROUND OF INVESTMENTS.
09:27AM  23   MR. EISENMAN IS SOMEONE WHO HAS BEEN INVOLVED IN THE FINANCIAL
09:27AM  24   INDUSTRY AND MAKING INVESTMENTS ON BEHALF OF HIMSELF AND OTHERS
09:27AM  25   FOR ESSENTIALLY HIS WHOLE PROFESSIONAL CAREER, 35 YEARS OR SO.
```

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9144

09:27AM 1        HE WAS NOT ONLY INVOLVED IN ADVISING OTHERS, BUT HE WAS

09:27AM 2   SIGNIFICANTLY INVOLVED IN HIS WIFE'S FAMILY'S PRIVATE OFFICE

09:27AM 3   WHERE THEY MADE INVESTMENTS IN CONNECTION WITH PRIVATE

09:27AM 4   COMPANIES, MADE INVESTMENTS WITH COMPANIES LIKE THERANOS ALL OF

09:27AM 5   THE TIME, AND HE ACKNOWLEDGED THAT WHEN HE TESTIFIED.

09:27AM 6        HE ALSO ACKNOWLEDGED THAT HE WAS FAMILIAR WITH SPECULATIVE

09:27AM 7   INVESTMENTS AND THE RISKS THAT THEY BORE, AND FOR THAT REASON

09:27AM 8   HE SAID HE WOULD NEVER ADVISE ONE OF HIS OWN CLIENTS TO INVEST

09:28AM 9   IN A PRIVATE COMPANY LIKE THERANOS BECAUSE HE THOUGHT THE RISK

09:28AM 10  FOR THEM WOULD BE TOO HIGH.

09:28AM 11       SO IN MAKING THE INVESTMENT, HE UNDERSTOOD THE NATURE OF

09:28AM 12  THE COMPANY THAT THIS WAS.

09:28AM 13       NOW, WHAT DID HE TESTIFY ABOUT AND WHAT DID THE EVIDENCE

09:28AM 14  SHOW ABOUT HIS INVESTMENT IN THERANOS?

09:28AM 15       ALTHOUGH HE TESTIFIED ON DIRECT EXAMINATION FOR QUITE A

09:28AM 16  WHILE, THE EVIDENCE IS ACTUALLY FAIRLY CLEAR ABOUT HIS CONTACT

09:28AM 17  WITH MS. HOLMES IN CONNECTION WITH EACH INVESTMENT THAT HE

09:28AM 18  MADE.

09:28AM 19       YOU RECALL THAT HE INVESTED IN 2006, WHICH IS BEFORE THE

09:28AM 20  CONSPIRACY PERIOD, AND THEN HE INVESTED AGAIN IN 2013.  LET'S

09:28AM 21  LOOK AT EACH OF THOSE INDIVIDUAL INVESTMENTS.

09:28AM 22       IN CONNECTION WITH HIS 2006 INVESTMENT, AND YOU MAY RECALL

09:28AM 23  THIS EXCHANGE, HE INVESTED ON OCTOBER 13TH, 2006.  HE TESTIFIED

09:28AM 24  ABOUT A NUMBER OF CONVERSATIONS THAT HE RECALLED HAVING WITH

09:28AM 25  MS. HOLMES.

09:28AM  1          BUT, IN FACT, THE DOCUMENTS FROM THE TIME REFLECTED THAT

09:29AM  2     HE HAD ONLY SPOKEN TO HER ONCE.  HE HAD SPOKEN TO HER FOR ABOUT

09:29AM  3     FIVE MINUTES, AND THAT THE FOCUS OF THE CALL WAS A CHAT, AND

09:29AM  4     THAT HIS IMPRESSIONS WERE THAT SHE WAS A TERRIFIC PERSON, AND

09:29AM  5     THEY OBVIOUSLY CHATTED ABOUT THE FACT THAT THEY HAD A COMMON

09:29AM  6     BACKGROUND.

09:29AM  7          NOT MUCH WAS REFLECTED IN THE CONTEMPORANEOUS RECORD AS TO

09:29AM  8     WHAT HE WAS TOLD IN CONNECTION WITH HIS 2006 INVESTMENT BY

09:29AM  9     MS. HOLMES.

09:29AM  10          THEN THE INVESTMENT THAT IS THE SUBJECT OF OUR CHARGE HERE

09:29AM  11     IS THE INVESTMENT THAT HE MADE IN LATE DECEMBER OF 2013.  AND

09:29AM  12     MR. EISENMAN DID NOT SPEAK TO MS. HOLMES AT ALL IN CONNECTION

09:29AM  13     WITH THAT INVESTMENT.  HE TESTIFIED HE HAD NO CONTACT WITH HER

09:29AM  14     IN CONNECTION WITH THAT INVESTMENT.

09:29AM  15          AND, IN FACT, I THINK THE RECORD SHOWED HE HAD NOT HAD

09:29AM  16     CONTACT WITH HER PERSONALLY FOR A NUMBER OF YEARS BEFORE THAT

09:29AM  17     INVESTMENT.

09:29AM  18          HE ALSO TOLD YOU THAT HE HAD TALKED TO MS. HOLMES OVER A

09:30AM  19     NUMBER OF YEARS BETWEEN 2006 AND 2010, BUT THAT WHEN HE MADE

09:30AM  20     HIS INVESTMENT DECISION IN 2013, NONE OF THAT WAS RELEVANT TO

09:30AM  21     THE DECISION HE WAS MAKING.  HE TESTIFIED HE WAS RELYING ON THE

09:30AM  22     CURRENT INFORMATION THAT HE HAD.

09:30AM  23          SO MS. HOLMES AND ANY PERSONAL CONTACT BETWEEN HER AND

09:30AM  24     MR. EISENMAN WERE NOT PARTICULARLY RELEVANT TO HIS DECISION TO

09:30AM  25     INVEST.

ER-6708

09:30AM  1      NOW, WHAT WAS -- WHY WAS HE INVESTING?  WHAT CONTACT DID

09:30AM  2   HE HAVE?

09:30AM  3      WELL, YOU'LL REMEMBER THAT HE HAD CONTACT WITH MR. BALWANI

09:30AM  4   IN CONNECTION WITH MAKING HIS INVESTMENT IN 2013, AND HE

09:30AM  5   TESTIFIED THAT THOSE INTERACTIONS WERE PLEASANT AND THAT

09:30AM  6   MR. BALWANI WAS SOLICITOUS OF HIM AND MR. BALWANI HAD BEEN VERY

09:30AM  7   UNFRIENDLY WITH HIM IN CONNECTION WITH OTHER DEALINGS THAT THEY

09:30AM  8   HAD, AND I THINK THE RECORD WAS CERTAINLY CONSISTENT WITH THE

09:31AM  9   FACT THAT MR. BALWANI HAD BEEN UNFRIENDLY WITH HIM IN

09:31AM 10   CONNECTION WITH THEIR OTHER INTERACTIONS.

09:31AM 11      BUT WHAT DOES THE RECORD OF WHAT HAPPENED AT THE TIME SHOW

09:31AM 12   AS TO WHAT HAPPENED BETWEEN MR. BALWANI AND MR. EISENMAN?

09:31AM 13      WELL, WE KNOW THAT MR. EISENMAN ASKED FOR INFORMATION FROM

09:31AM 14   MR. BALWANI IN CONNECTION WITH HIS INVESTMENT, AND THAT IS HERE

09:31AM 15   IN EXHIBIT 1371.

09:31AM 16      AND THESE WERE HIS QUESTIONS:

09:31AM 17      WHAT IS THE SIZE OF THIS ROUND?

09:31AM 18      ARE DIRECTORS PARTICIPATING IN THIS ROUND?

09:31AM 19      IN OTHER WORDS, WHILE I'M INVESTING, IS THE OTHER BOARD OF

09:31AM 20   DIRECTORS INVESTING AT THE SAME TIME?

09:31AM 21      AND AM I CORRECT THAT THERE WILL BE ANOTHER ROUND OF

09:31AM 22   $200 MILLION IN JANUARY AT A HIGHER PRICE?

09:31AM 23      WAS MR. BALWANI'S RESPONSE FRIENDLY AS MR. EISENMAN

09:31AM 24   DESCRIBED?

09:31AM 25      IT WAS NOT.  HE SAID, "WE CAN'T ANSWER YOUR QUESTIONS

09:32AM  1    ABOUT DIRECTORS, OTHER INVESTORS, AND CERTAINLY NOT ABOUT ANY

09:32AM  2    FUTURE INVESTMENT ROUNDS AND SPECULATE ABOUT WHAT THOSE

09:32AM  3    VALUATIONS MAY BE."

09:32AM  4         NOW, THAT'S SIGNIFICANT IN PART BECAUSE IT SHOWS THAT

09:32AM  5    REALLY VERY FEW REPRESENTATIONS WERE MADE TO MR. EISENMAN IN

09:32AM  6    CONNECTION WITH HIS DECISION TO INVEST.

09:32AM  7         BUT MORE SIGNIFICANTLY, IT REALLY SUGGESTS TO YOU WHAT

09:32AM  8    MATTERED TO MR. EISENMAN IN CONNECTION WITH MAKING INVESTMENT

09:32AM  9    DECISIONS.

09:32AM 10         CONTRARY TO WHAT THE GOVERNMENT TRIED TO ELICIT FROM HIS

09:32AM 11    TESTIMONY NOW, WHAT MATTERED TO MR. EISENMAN, WHICH IS

09:32AM 12    PERFECTLY FAIR, IS, IS WHAT WERE OTHER SOPHISTICATED INVESTORS

09:32AM 13    DOING WITH RESPECT TO THIS ROUND OF INVESTMENT?

09:32AM 14         WERE DIRECTORS ALSO INVESTING?

09:32AM 15         WERE THERE OTHERS WHO WERE INTERESTED IN THE INVESTMENT

09:32AM 16    WHO WOULD INVEST AT A HIGHER PRICE SOON?

09:32AM 17         NOW, THE ANSWER TO THOSE QUESTIONS WERE KNOWN TO

09:33AM 18    MR. BALWANI, AND IT MIGHT HAVE BEEN FAVORABLE FOR HIM TO TELL

09:33AM 19    MR. EISENMAN.

09:33AM 20         WE KNOW THAT AFTER THE FIRST OF THE YEAR THERE WAS AN

09:33AM 21    ADDITIONAL ROUND, AND THAT WAS AT A HIGHER PRICE.

09:33AM 22         BUT HE DIDN'T PROVIDE THAT INFORMATION TO MR. EISENMAN

09:33AM 23    BECAUSE HE DIDN'T THINK IT WAS AN APPROPRIATE REQUEST ON

09:33AM 24    MR. EISENMAN'S PART, AND HE DIDN'T THINK THAT HE SHOULD PROVIDE

09:33AM 25    IT SIMPLY TO MR. EISENMAN AND NOT TO OTHER INVESTORS.

ER-6710

CLOSING ARGUMENT BY MR. DOWNEY (RES.)     9148

09:33AM   1          WHAT DOES THIS SHOW YOU?  IT SHOWS YOU THAT ALL OF THE

09:33AM   2     REPRESENTATIONS THAT THE GOVERNMENT HAS FOCUSSED ON WERE NOT ON

09:33AM   3     MR. EISENMAN'S MIND AT THE TIME.  HE WASN'T INTERESTED IN THE

09:33AM   4     TECHNOLOGY.  HE WASN'T INTERESTED IN THE RELATIONSHIP BETWEEN

09:33AM   5     THERANOS AND THE DEPARTMENT OF DEFENSE, HE WASN'T INTERESTED IN

09:33AM   6     THERANOS'S PHARMACEUTICAL COMPANY.

09:33AM   7          HE WAS INTERESTED IN KNOWING ABOUT THE FINANCIAL DETAILS

09:33AM   8     OF WHAT WAS HAPPENING AT THERANOS SO THAT HE COULD EVALUATE

09:33AM   9     WHETHER THIS IS A STOCK THAT HE COULD BUY AND POTENTIALLY

09:33AM  10     QUICKLY SELL.

09:33AM  11          THAT'S PERFECTLY FINE.  THAT'S A PERFECTLY FINE DECISION

09:34AM  12     AND A PERFECTLY FINE JUDGMENT ON HIS PART.

09:34AM  13          BUT IT DOESN'T RELATE TO WHAT IS CLAIMED BY THE GOVERNMENT

09:34AM  14     HERE, THAT HE WAS DEFRAUDED IN CONNECTION WITH REPRESENTATIONS

09:34AM  15     ON A NUMBER OF ISSUES THAT HE SHOWED NO INTEREST IN AT THE

09:34AM  16     TIME.

09:34AM  17          WHAT IS THE REAL GIST OF MR. EISENMAN'S CLAIM, AS WELL AS

09:34AM  18     THE ACCOUNT INVOLVING MR. EISENMAN, AS WELL AS MANY OF THE

09:34AM  19     OTHER INVESTORS?

09:34AM  20          WELL, IT'S REALLY THE EVIDENCE THAT I WENT OVER YESTERDAY.

09:34AM  21     HE SAYS HE READ "THE WALL STREET JOURNAL" ARTICLE, HE SAYS HE

09:34AM  22     LOOKED AT THE WEBSITE AND HE DREW CERTAIN INFORMATION FROM THAT

09:34AM  23     ABOUT WHERE THERANOS WAS.

09:34AM  24          AS I SHOWED YOU YESTERDAY, MANY OF THE THINGS THAT HE AND

09:34AM  25     OTHERS CLAIMED THAT THEY DIDN'T KNOW WAS KNOWN PUBLICLY.

ER-6711

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9149

09:34AM 1      MR. PARLOFF HAD BEEN TOLD, FOR EXAMPLE, ABOUT PHASE I AND

09:34AM 2   PHASE II AFTER MR. EISENMAN'S INVESTMENT, WHICH WAS THE SUBJECT

09:34AM 3   OF HIS QUESTION TO MR. BALWANI.

09:34AM 4      IT WAS PUBLICLY KNOWN THAT THERE WAS VENOUS TESTING, ET

09:34AM 5   CETERA, ET CETERA.

09:34AM 6      ALL OF THE ISSUES THAT WERE FREQUENTLY REHEARSED THROUGH

09:35AM 7   MEDIA ARTICLES WITH THE INVESTORS, THERE WAS OTHER INFORMATION

09:35AM 8   OUT THERE THAT WOULD HAVE PROVIDED MR. EISENMAN WITH WHAT HE

09:35AM 9   CLAIMED HE DIDN'T KNOW.

09:35AM 10     LET'S LOOK AT THE NEXT INVESTOR, MR. LUCAS.

09:35AM 11     MR. LUCAS WAS ALSO A PROFESSIONAL INVESTOR.  HE WAS A

09:35AM 12  VENTURE CAPITALIST WHO INVESTED FULL TIME IN TECHNOLOGY.

09:35AM 13     HE OPERATED HIS OWN VENTURE CAPITAL FIRM, BLACK DIAMOND

09:35AM 14  VENTURES, AND HE INVESTED IN TECHNOLOGY AND IN MEDICAL DEVICE

09:35AM 15  COMPANIES.

09:35AM 16     AND HE KNEW A LOT ABOUT THERANOS BECAUSE HE HAD BEEN

09:35AM 17  INVOLVED WITH THERANOS FOR A NUMBER OF YEARS, AND HIS UNCLE WAS

09:35AM 18  THE CHAIRMAN OF THE BOARD OF THERANOS.

09:35AM 19     BUT UNLIKE THE OTHER INVESTORS, LIKE MR. EISENMAN, FOR

09:35AM 20  EXAMPLE, HE WAS INTERESTED IN THERANOS'S TECHNOLOGY, AND HE DID

09:35AM 21  ASK QUESTIONS THAT WERE SPECIFIC TO THERANOS'S TECHNOLOGY.

09:36AM 22     AND WHAT DOES THE RECORD REFLECT?

09:36AM 23     WELL, THE RECORD REFLECTS WHEN HE ASKED THOSE QUESTIONS,

09:36AM 24  HE GOT ACCURATE ANSWERS THAT MATCH WHAT YOU KNOW ABOUT WHAT WAS

09:36AM 25  GOING ON AT THERANOS.

ER-6712

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                      9150

09:36AM   1          FIRST OF ALL, YEARS BEFORE HE MADE THIS 2013 INVESTMENT

09:36AM   2    THAT IS THE SUBJECT OF THE COUNT IN THE INDICTMENT, IT WAS

09:36AM   3    EXPLAINED TO HIM THAT THERE WOULD BE VARIOUS SERIES OF DEVICES

09:36AM   4    ON WHICH BLOOD TESTS WOULD BE RUN THAT THERANOS WAS INVENTING,

09:36AM   5    THAT THOSE WOULD GROW GRADUALLY MORE AND MORE SOPHISTICATED,

09:36AM   6    BUT THAT THIS WAS A PROCESS THAT WAS GOING TO DEVELOP OVER

09:36AM   7    TIME.

09:36AM   8          HE CERTAINLY WAS A SOPHISTICATED TECHNOLOGY INVESTOR.  HE

09:36AM   9    KNEW THAT.

09:36AM  10          HE ALSO TESTIFIED THAT HE KNEW ACCURATELY WHAT THE

09:36AM  11    GOVERNMENT CLAIMS NO ONE KNEW, WHICH IS HE WAS ASKED, DID YOU

09:36AM  12    KNOW HOW MANY FINGERSTICK SAMPLES THERANOS HAD ACTUALLY

09:36AM  13    DEVELOPED ASSAYS WITH?

09:36AM  14          AND HE SAID -- HIS ESTIMATE WAS THAT IT WAS DOZENS, AND AT

09:37AM  15    LEAST IT WOULD HAVE BEEN DOZENS OF TESTS BECAUSE IT COULD DO

09:37AM  16    THE MAJORITY OF THE MOST COMMON TESTS OUT THERE.

09:37AM  17          WELL, YOU KNEW WHAT THE DIALOGUE WAS INSIDE OF THERANOS

09:37AM  18    BECAUSE OF THE EVIDENCE THAT YOU HAVE SEEN.  THEY TRIED TO

09:37AM  19    FIGURE OUT, WHAT ARE THE 43 OR THE 60 OR THE 70 TESTS THAT

09:37AM  20    WOULD ALLOW US TO DO THE MOST COMMON BLOOD TESTS?  THAT'S WHAT

09:37AM  21    THEY DID, AND THAT'S WHAT THEY OFFERED OUT OF THEIR CLIA LAB,

09:37AM  22    AND THOSE DEVICES -- AND THOSE WERE ANALYZED EITHER ON THE

09:37AM  23    MODIFIED MACHINES OR ON THE DEVICES.

09:37AM  24          MR. LUCAS WAS CLEARLY TOLD, THAT'S THE AMOUNT OF

09:37AM  25    FINGERSTICK SAMPLES THAT WE HAVE.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9151

```
09:37AM   1           SO FOR INVESTORS WHO EVIDENCED AN INTEREST IN THE
09:37AM   2    TECHNOLOGY, THEY GOT ACCURATE INFORMATION.
09:37AM   3           AND THAT WAS TRUE OF MR. LUCAS AND IT REFLECTS, I THINK,
09:37AM   4    WHAT THE INTENT OF MS. HOLMES AND OTHERS WAS WITH RESPECT TO
09:37AM   5    INTERACTING WITH INVESTORS ON THESE ISSUES.
09:37AM   6           I THINK MR. LUCAS ALSO TESTIFIED ABOUT OTHER ELEMENTS OF
09:37AM   7    THERANOS THAT WERE IMPORTANT TO HIM, AND ONE OF THEM I THINK IS
09:38AM   8    QUITE IMPORTANT.
09:38AM   9           AND HE TESTIFIED I THINK PARTICULARLY POINTEDLY ABOUT IT.
09:38AM  10    WHEN INVESTORS WERE INVESTING, THIS WAS NOT A QUESTION OF THE
09:38AM  11    PRESENT TEST MENU OR A QUESTION OF THE PRESENT CAPACITY ON THE
09:38AM  12    NUMBER OF FINGERSTICK SAMPLES.  THEY WERE LOOKING AT WHAT IS --
09:38AM  13    WHERE IS MS. HOLMES TAKING THIS COMPANY?  IS THIS SOMETHING
09:38AM  14    WORTH INVESTING IN?
09:38AM  15           AND I THINK MR. LUCAS DESCRIBED THAT TO YOU IN SOME
09:38AM  16    DETAIL.
09:38AM  17           HE DESCRIBE MS. HOLMES'S PASSION, THAT HER INTEREST WAS
09:38AM  18    NOT IN MAKING MONEY, AND THAT SHE HAD A MISSION TO BRING THIS
09:38AM  19    TECHNOLOGY TO THE WORLD, AND THAT WAS ATTRACTIVE TO HIM.  HE
09:38AM  20    WANTED TO BE PART OF THAT INVESTMENT BECAUSE HE BELIEVED IT
09:38AM  21    WOULD SUCCEED, AND IF IT SUCCEEDED, IT WOULD NOT ONLY BE A
09:38AM  22    PROFITABLE VENTURE, BUT A VENTURE WORTH INVESTING IN.
09:38AM  23           LET ME ALSO MENTION ONE OTHER THING WITH MR. LUCAS, AND I
09:38AM  24    WON'T SAY THIS WITH RESPECT TO EVERY INVESTOR, BUT I THINK IT'S
09:39AM  25    TRUE ACROSS THEM.
```

09:39AM 1      WHEN INVESTORS WERE INVESTING IN 2013 OR 2014, WHY DID

09:39AM 2   THEY INVEST?

09:39AM 3      THE PRINCIPAL REASON THEY INVESTED WAS NOT ABOUT ANY

09:39AM 4   PARTICULAR TECHNOLOGY OR ANY PARTICULAR NUMBER OF FINGERSTICK

09:39AM 5   TESTS.

09:39AM 6      THE REASON THAT THEY INVESTED WAS THEY KNEW THAT WALGREENS

09:39AM 7   HAD AGREED TO PUT THERANOS'S TECHNOLOGY IN THEIR STORES

09:39AM 8   EVENTUALLY AND TO OPERATE THERANOS SERVICE CENTERS.

09:39AM 9      THAT JUDGMENT WAS ALL THEY NEEDED TO KNOW BECAUSE THAT

09:39AM 10  MEANT TWO THINGS TO THEM.  ONE, IT MEANT THAT A BIG NATIONAL

09:39AM 11  COMPANY HAD EVALUATED THERANOS AND MADE A DECISION TO BECOME A

09:39AM 12  PARTNER WITH THERANOS IN BRINGING ITS TECHNOLOGY TO THE PUBLIC

09:39AM 13  MARKET.

09:39AM 14     THAT'S A BIG DEAL.  THAT'S A MUCH BIGGER DEAL THAN THE

09:39AM 15  NUMBER OF PARTICULAR TESTS AT ANY GIVEN MOMENT.  IT'S A

09:39AM 16  STATEMENT THAT THIS TECHNOLOGY COMPANY IS GOING TO BE ABLE TO

09:39AM 17  MAKE ITS TECHNOLOGY WIDELY AVAILABLE.

09:40AM 18     SECOND, WHAT DID THEY ASSUME, WHICH WAS AN ACCURATE

09:40AM 19  ASSUMPTION?  THEY ASSUMED THAT A COMPANY LIKE WALGREENS WOULD

09:40AM 20  HAVE LOOKED AT THERANOS AND ITS TECHNOLOGY IN GREAT DETAIL.

09:40AM 21     AND YOU KNOW THAT'S TRUE.  YOU KNOW THAT THERE WAS A LOT

09:40AM 22  OF TECHNICAL DUE DILIGENCE THROUGH THE JOHNS HOPKINS STUDY, THE

09:40AM 23  JOHNS HOPKINS DUE DILIGENCE AND THE OTHER LAB CONSULTANTS THAT

09:40AM 24  WALGREENS WORKED WITH AS PART OF ITS EVALUATION OF THERANOS.

09:40AM 25     THAT'S WHAT WAS REALLY DRIVING THESE INVESTMENTS.  AND

09:40AM  1    MR. LUCAS DURING HIS TESTIMONY ACKNOWLEDGED THAT.

09:40AM  2        WHAT DID IT MEAN FINANCIALLY FOR THEM THAT THERE WAS THIS

09:40AM  3    WALGREENS PARTNERSHIP?

09:40AM  4        WELL, THAT WAS TALKED ABOUT WITH RESPECT TO WHAT THE

09:40AM  5    PRICING WAS OF THEIR SHARES AND HOW MUCH THEY RECOGNIZED IT AS

09:40AM  6    OF THE TIME THAT THEY WERE BEING OFFERED THE OPPORTUNITY TO

09:40AM  7    INVEST AT $15.

09:40AM  8        REMEMBER THAT MR. LUCAS, MR. EISENMAN, AND MR. TOLBERT, OR

09:40AM  9    MR. HALL WHO MR. TOLBERT WORKED FOR, THEY WERE ALL INDIVIDUALS

09:41AM 10    WHO EITHER DIRECTLY OR INDIRECTLY HAD INVESTED IN THERANOS

09:41AM 11    YEARS BEFORE THESE 2013 INVESTMENTS.

09:41AM 12        AND BY THE TIME THEY WERE BEING OFFERED THIS SECOND

09:41AM 13    OPPORTUNITY TO INVEST, THEY KNEW THAT WALGREENS, OR SOME

09:41AM 14    STRATEGIC PARTNER OF THERANOS, WAS NOW WILLING TO INVEST AT $15

09:41AM 15    A SHARE, WHICH WAS ACTUALLY $75 A SHARE BECAUSE IT WAS A SPLIT

09:41AM 16    SHARE.

09:41AM 17        THEY HAD INVESTED AT NUMBERS LIKE 2.82 A SHARE, AND IN

09:41AM 18    MR. LUCAS'S CASE, $0.92 A SHARE.

09:41AM 19        SO THEY ASSUMED, AT THE TIME THAT THEY WERE MAKING THIS

09:41AM 20    INVESTMENT DECISION, THAT THEY HAD ALREADY -- THEY ASSUMED

09:41AM 21    ACCURATELY THAT THEY HAD ALREADY REALIZED A SUBSTANTIAL RETURN

09:41AM 22    ON THEIR INVESTMENT WITH THERANOS.

09:41AM 23        THIS WAS REALLY A DECISION AS TO WHETHER THEY WANTED TO

09:41AM 24    INVEST AS WELL AT THIS INCREASED PRICE.  THAT'S HOW THEY WERE

09:41AM 25    EVALUATING THIS.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9154

09:41AM  1         THEY ALSO KNEW, AS YOU SAW, ALTHOUGH NOT TOLD BY

09:42AM  2   MR. BALWANI OR MS. HOLMES, THEY SUSPECTED THAT THERE WOULD BE

09:42AM  3   ANOTHER OFFERING IN THE NEW YEAR AND THE PRICE WOULD BE HIGHER.

09:42AM  4   THAT WAS, IN FACT, TRUE.  THE C2 ROUND WAS OFFERED AT $17 A

09:42AM  5   SHARE.

09:42AM  6         SO THEY WERE LOOKING AT AN OPPORTUNITY TO INVEST AT $15 A

09:42AM  7   SHARE, RECOGNIZING THAT THE PRICE OF THERANOS STOCK WAS LIKELY

09:42AM  8   TO GO TO $17 A SHARE, WHICH, IN FACT, NEW OFFERINGS WERE HELD

09:42AM  9   AT THAT PRICE.

09:42AM  10        AND THAT'S THE WAY THAT THEY WERE VIEWING THIS INVESTMENT.

09:42AM  11        THEY VIEWED THAT AS POSSIBLE BECAUSE OF THE WALGREENS

09:42AM  12   PARTNERSHIP, WHICH WAS ALSO ACCURATE.

09:42AM  13        THE ARGUMENT THAT THEY WERE REALLY LOOKING OR MAKING AN

09:42AM  14   INVESTMENT IN THERANOS BECAUSE THEY WERE RELYING ON WHAT WAS

09:42AM  15   SAID IN A NEWSPAPER ARTICLE WHEN, IN FACT, WE KNOW WHAT THE

09:42AM  16   RECORD REFLECTS THEY WERE LOOKING AT, WHICH IS THE EFFECT OF

09:42AM  17   OTHER INVESTMENTS, THE EFFECT OF FUTURE INVESTMENTS, THE EFFECT

09:42AM  18   OF THE WALGREENS PARTNERSHIP DOESN'T SUGGEST WHAT WAS, IN FACT,

09:43AM  19   MATERIAL TO THEM.

09:43AM  20        LET'S LOOK NOW AT MR. TOLBERT.

09:43AM  21        MR. TOLBERT WAS NOT HIMSELF AN INVESTOR.  AND MR. TOLBERT

09:43AM  22   WORKS FOR A GENTLEMAN NAMED CRAIG HALL, WHO IS A TEXAS REAL

09:43AM  23   ESTATE INVESTOR, AND MR. HALL DID NOT TESTIFY OR EXPLAIN THE

09:43AM  24   REASONS HIMSELF AS TO WHY HE WAS SUPPORTIVE OF MAKING AN

09:43AM  25   INVESTMENT IN THERANOS.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9155

09:43AM   1        IN 2006 THEY HAD INVESTED WITH MR. LUCAS, NOT DIRECTLY IN

09:43AM   2   THERANOS, BUT THEY HAD INVESTED THROUGH MR. LUCAS IN THERANOS.

09:43AM   3        I THINK IT'S FAIR TO SAY THAT BECAUSE THEIR ORIGINAL

09:43AM   4   INVESTMENT WAS THROUGH MR. LUCAS, IT WOULD HAVE BEEN REASONABLE

09:43AM   5   FOR THERANOS GENERALLY, AND FOR MS. HOLMES IN PARTICULAR, TO

09:44AM   6   ASSUME THAT INFORMATION THAT WAS BEING PASSED TO MR. LUCAS

09:44AM   7   WOULD BE PASSED ON TO MR. TOLBERT AND ULTIMATELY ON TO

09:44AM   8   MR. HALL.

09:44AM   9        BUT WHEN YOU HEARD THE EVIDENCE, IF YOU COMPARE WHAT

09:44AM  10   MR. LUCAS KNEW ABOUT THERANOS, THINGS LIKE THEY WERE OFFERING

09:44AM  11   NOT EVERY TEST ON FINGERSTICK BUT SOME DOZENS OF TESTS ON

09:44AM  12   FINGERSTICK, AND WHEN YOU COMPARE THAT TO WHAT MR. TOLBERT

09:44AM  13   KNEW, THEY DON'T MATCH, AND I ACKNOWLEDGE THAT.

09:44AM  14        AND I DON'T KNOW WHETHER THAT'S BECAUSE THERE WAS A GAP IN

09:44AM  15   INFORMATION BETWEEN MR. LUCAS AND MR. TOLBERT, OR WHETHER

09:44AM  16   MR. TOLBERT'S RECOLLECTION OF WHAT MR. LUCAS TOLD HIM HAS JUST

09:44AM  17   LEFT HIS MEMORY WITH THE PASSAGE OF TIME.

09:44AM  18        BUT IN ANY EVENT, ESSENTIALLY WHAT WAS PASSED ON TO

09:44AM  19   MR. LUCAS BY MS. HOLMES AND OTHERS, I THINK SHE PRESUMED WOULD

09:44AM  20   HAVE BEEN KNOWN BY MR. HALL AND BY MR. TOLBERT AS WELL.

09:45AM  21        MR. TOLBERT HAD NO DIRECT CONVERSATIONS WITH MS. HOLMES AT

09:45AM  22   ALL AFTER THE HALL GROUP'S FIRST INVESTMENT THROUGH MR. LUCAS

09:45AM  23   IN 2006.  NONE.  HE HAD NO CONTACT WITH HER AT ALL BETWEEN 2006

09:45AM  24   AND 2013.

09:45AM  25        NOR IN CONNECTION WITH HIS INVESTMENT IN 2013 DID HE HAVE

ER-6718

09:45AM  1    A DIRECT CONVERSATION WITH MS. HOLMES.

09:45AM  2        SO WE'RE NOT REALLY FOCUSSED ON DIRECT INTERPERSONAL

09:45AM  3    DEALINGS BETWEEN THEM.

09:45AM  4        WHAT THE GOVERNMENT FOCUSES ON HERE IS THE TAPE RECORDING

09:45AM  5    THAT YOU HEARD OF THE DECEMBER 20TH CALL, WHICH IS A TELEPHONE

09:45AM  6    CALL THAT MR. TOLBERT PARTICIPATED IN.  AS YOU RECALL, HE

09:45AM  7    TESTIFIED THAT THERE WERE MANY PARTICIPANTS IN THE CALL, THAT

09:45AM  8    HE SECRETLY TAPE RECORDED THAT INFORMATION FOR THE BENEFIT OF

09:45AM  9    MR. HALL, AND NO ONE ELSE BUT HE KNEW THAT HE WAS TAPING THE

09:46AM 10    CALL.

09:46AM 11        THE MAIN FOCUS, I THINK, REALLY OF THIS CALL, AND THE MAIN

09:46AM 12    FOCUS OF THE GOVERNMENT'S PRESENTATION OF EVIDENCE HERE IS THE

09:46AM 13    STATEMENT THAT MS. HOLMES MADE DURING THAT TAPE RECORDING ABOUT

09:46AM 14    THERANOS'S RELATIONSHIPS WITH THE MILITARY AND WHAT THE USE OF

09:46AM 15    THERANOS DEVICES WAS IN CONNECTION WITH MEDEVACS, ET CETERA.

09:46AM 16        I WANT TO GO THROUGH THAT WITH YOU IN A MOMENT, BUT I WANT

09:46AM 17    TO ALSO REMIND YOU THAT THE CONVERSATION THAT IS HAD ON THAT

09:46AM 18    TAPE WHERE MS. HOLMES IS DISCUSSING THE RELATIONSHIP BETWEEN

09:46AM 19    THERANOS AND THE DEPARTMENT OF DEFENSE IS NOT SOMETHING THAT

09:46AM 20    MS. HOLMES BROUGHT UP OR INTRODUCED INTO THE CONVERSATION.

09:46AM 21        THE COMMENTS SHE MADE WERE IN QUESTION -- WERE IN RESPONSE

09:46AM 22    TO A QUESTION BY ANOTHER INVESTOR WHO ASKED HER, IS THERE A

09:47AM 23    MILITARY ASPECT THAT THERANOS IS GOING TO PURSUE?

09:47AM 24        AND MS. HOLMES SAYS AS PART OF HER ANSWER THAT, WELL, YOU

09:47AM 25    KNOW, THE COMPANY DOES HAVE ACTIVITIES IN THAT REGARD, BUT THAT

09:47AM  1    THE COMPANY'S FOCUS GOING FORWARD IS GOING TO BE ON THE RETAIL

09:47AM  2    MARKET WITH WALGREENS AND HOPEFULLY WITH OTHER RETAIL PARTNERS.

09:47AM  3        BUT I WANT TO LOOK AT WHAT MS. HOLMES ACTUALLY SAYS ON

09:47AM  4    THAT TAPE, WHICH YOU HEARD AS PART OF THE TAPE, AND OF COURSE

09:47AM  5    YOU CAN HEAR AGAIN AS PART OF YOUR DELIBERATIONS.

09:47AM  6        AND I WANT TO BREAK IT DOWN AND COMPARE IT TO WHAT WAS

09:47AM  7    ACTUALLY GOING ON WITH THERANOS'S MILITARY PROGRAMS SO THAT YOU

09:47AM  8    UNDERSTAND WHAT WAS BEING CONVEYED AS PART OF THIS

09:47AM  9    CONVERSATION.

09:47AM  10        LET'S LOOK AT WHAT MS. HOLMES ACTUALLY SAYS.  THERE REALLY

09:47AM  11    ARE TWO PARTS TO THIS.  THERE'S A PART WHERE THERE'S A

09:47AM  12    DISCUSSION OF THE WORK THAT THERANOS WAS DOING IN CONNECTION

09:48AM  13    WITH AFGHANISTAN, AND THEN THERE'S A SEPARATE DISCUSSION ABOUT

09:48AM  14    THERANOS'S WORK WITH SPECIAL OPERATIONS.

09:48AM  15        SO WHAT DOES MS. HOLMES SAY ON THAT TAPE IF YOU ACTUALLY

09:48AM  16    RECALL WHAT SHE SAID?  IT'S REALLY BROKEN DOWN INTO THREE

09:48AM  17    PARTS.

09:48AM  18        FIRST, SHE SAYS THAT ONE PIECE OF WORK THAT THEY WERE

09:48AM  19    DOING IS IN THE CONTEXT OF WORK IN THE MIDDLE EAST, AND

09:48AM  20    SPECIFICALLY IN AFGHANISTAN.

09:48AM  21        AND THEN SHE GOES ON TO DESCRIBE A SIGNIFICANT MEDICAL

09:48AM  22    PROBLEM THAT EXISTED WITH GETTING MEDICAL TREATMENT FOR

09:48AM  23    SOLDIERS ON A TIMELY BASIS.

09:48AM  24        SHE THEN GOES ON TO SAY, WELL, THE ABILITY TO PLACE AND

09:48AM  25    TAKE A TECHNOLOGY LIKE THIS AND PUT IT IN FLIGHT HAS THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9158

09:48AM  1    POTENTIAL TO CHANGE SURVIVAL RATES.

09:48AM  2         SO THERE'S A POTENTIAL PLACEMENT THAT COULD SAVE LIVES.

09:48AM  3         THIRD, SHE SAYS WE'VE BEEN DOING A LOT OF WORK THERE.

09:48AM  4         NOW, WHY WOULD SHE SAY THAT?

09:49AM  5         WELL, LET'S LOOK AT THE WORK THAT THERANOS WAS ACTUALLY

09:49AM  6    DOING IN CONNECTION WITH THE PROGRAM IN AFGHANISTAN AT THAT

09:49AM  7    TIME.

09:49AM  8         FIRST, WAS THERE WORK THAT THERANOS WAS DOING IN

09:49AM  9    CONNECTION WITH DEPLOYING ITS DEVICES IN AFGHANISTAN?  YOU KNOW

09:49AM 10    THAT THERE WAS.  THERANOS HAD ENTERED A CONTRACT ABOUT A YEAR

09:49AM 11    BEFORE THIS CALL WITH CENTCOM, AND THE IDEA WAS THAT THE

09:49AM 12    DEVICES WOULD BE EVALUATED AT BAGRAM AIR FORCE BASE IN

09:49AM 13    AFGHANISTAN.

09:49AM 14         WHAT I'M SHOWING YOU NOW AS PART OF EXHIBIT 10457 IS THE

09:49AM 15    DOCUMENT THAT REFLECTED THE WORK THAT WAS TO BE DONE.

09:49AM 16         THEN WAS THERE GOING TO BE, AS PART OF THIS PROGRAM,

09:49AM 17    POTENTIAL PLACEMENT ON MEDEVAC HELICOPTERS THAT COULD SAVE

09:49AM 18    LIVES?  YES.  IF YOU READ THE LANGUAGE, THERE'S A NUMBER OF

09:49AM 19    DIFFERENT USES OF THERANOS DEVICES IN THIS CONTEXT THAT WERE

09:49AM 20    CONSIDERED AND WERE DESCRIBED AS PART OF THE PROCESS.

09:49AM 21         AS YOU SEE HERE, THERE'S A SUGGESTED USES COULD INCLUDE

09:50AM 22    MEDEVAC, BUT IT COULD INCLUDE MULTIPLE PLATFORMS ON LAND, AIR,

09:50AM 23    SEA, ET CETERA.

09:50AM 24         NOW, WAS THERANOS DOING ANY WORK TOWARDS THIS GOAL OR WAS

09:50AM 25    THIS, AS I THINK THE GOVERNMENT SUGGESTS, JUST A FANTASY OF

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9159

```
09:50AM   1        MS. HOLMES?

09:50AM   2             WELL, THE TRUTH IS, AND YOU'VE HEARD TESTIMONY DURING THE

09:50AM   3   CASE, THERANOS WAS DOING A LOT OF WORK TOWARDS THIS GOAL.

09:50AM   4             THERANOS WAS DEVELOPING A SPECIFIC DEVICE FOR PURPOSES OF

09:50AM   5   DEPLOYMENT WITH THE MILITARY, NOT ONLY IN AFGHANISTAN, BUT IN

09:50AM   6   OTHER LOCATIONS, CALLED A 4S DEVICE, A PROGRAM ON WHICH

09:50AM   7   THERANOS SPENT TENS OF MILLIONS OF DOLLARS AND WHICH IS PART

09:50AM   8   OF -- PART OF WHICH IS THIS WORK THAT IS DESCRIBED IN THE

09:50AM   9   CONTRACT THAT IS 10547, AND YOU CAN LOOK AT THAT AS PART OF

09:50AM  10   YOUR DELIBERATIONS.

09:50AM  11             NOW, LET'S GO ON TO THE SECOND PART OF WHAT SHE SAYS,

09:50AM  12   WHICH IS IN CONNECTION WITH SPECIAL OPERATIONS COMMAND.  SHE

09:51AM  13   SAYS, SEPARATELY, WE'VE BEEN DOING A LOT OF WORK WITH SPECIAL

09:51AM  14   OPERATIONS COMMAND IN THE CONTEXT OF MISSIONS IN REMOTE AREAS.

09:51AM  15             SHE TALKS ABOUT THE PROBLEM OF THERE BEING AN ABSENCE OF

09:51AM  16   MEDICAL CARE AND PEOPLE BEING EVACUATED GENERALLY OUT OF

09:51AM  17   CONTINENT.

09:51AM  18             AND THEN SHE GOES ON TO SAY WE, AS THERANOS, CREATED A

09:51AM  19   DISTRIBUTED SYSTEM THAT CAN BE REMOVED -- THAT CAN BE USED IN

09:51AM  20   REMOTE AREAS.

09:51AM  21             WHAT IS SHE TALKING ABOUT HERE?

09:51AM  22             WELL, HERE SHE'S TALKING ABOUT THE CONTRACT -- TWO

09:51AM  23   DIFFERENT CONTRACTS.  ONE IS THE PROGRAM THAT HAD ALREADY BEEN

09:51AM  24   DONE WITH SPECIAL OPERATIONS FORCES IN AFRICA.  YOU'LL REMEMBER

09:51AM  25   THAT THERE WAS A PROGRAM UNDER WHICH DEVICES WERE TAKEN TO
```

ER-6722

09:51AM   1    REMOTE LOCATIONS IN AFRICA AND THEY WERE EVALUATED AS TO

09:51AM   2    WHETHER THEY COULD SUSTAIN THE CONDITIONS OF REMOTE AREAS.

09:51AM   3    THOSE LOCATIONS ARE IDENTIFIED HERE IN EXHIBIT 12251.

09:52AM   4         AGAIN, THE DESCRIPTION SHE GIVES OF CURRENTLY AVAILABLE

09:52AM   5    TECHNOLOGIES BEING UNSUITABLE ON THE CALL IS EXACTLY MATCHED BY

09:52AM   6    SOME OF THE LANGUAGE THAT'S IN THE CONTRACT THAT THERANOS HAD

09:52AM   7    WITH AFRICOM AT THIS TIME.

09:52AM   8         WHAT ABOUT SPECIAL OPERATIONS COMMAND IN PARTICULAR?

09:52AM   9         SIMILARLY THERE WAS AN ARRANGEMENT WITH SPECIAL OPERATIONS

09:52AM  10    COMMAND, WHICH I'LL TALK ABOUT IN A MOMENT.

09:52AM  11         NOW, YOU HEARD FROM MR. EDLIN ABOUT THE SUBSTANTIAL WORK

09:52AM  12    THAT THERANOS WAS DOING IN CONNECTION WITH DEPLOYING THESE

09:52AM  13    DEVICES.  YOU ALSO HEARD ABOUT IT FROM MS. HOLMES.

09:52AM  14         AND YOU KNOW THAT THERANOS HAD DESIGNED DEVICES THAT COULD

09:52AM  15    BE USED IN AN EXTREME ENVIRONMENT.

09:52AM  16         SO WHEN MS. HOLMES WAS TALKING ABOUT THIS ON THIS CALL,

09:52AM  17    THIS IS WHAT SHE WAS TALKING ABOUT, THOSE POINTS.

09:52AM  18         MR. TOLBERT WAS ASKED DURING HIS TESTIMONY, WHAT DID YOU

09:53AM  19    UNDERSTAND, WHAT DID YOU TAKE AWAY FROM THIS CONVERSATION THAT

09:53AM  20    MS. HOLMES WAS TELLING YOU?

09:53AM  21         WELL, LET'S RECALL HIS TESTIMONY WHERE HE WAS ASKED THAT

09:53AM  22    QUESTION.  AND HE SAID, WELL, HE UNDERSTOOD FIRST THAT THERE

09:53AM  23    WAS SIGNIFICANT WORK BEING DONE TO DEPLOY THE THERANOS SYSTEM

09:53AM  24    IN THEATRE.

09:53AM  25         THAT WAS ACCURATE.  AS I SAY, THERANOS WAS SPENDING TENS

09:53AM   1    OF MILLIONS OF DOLLARS AND HAD A HIGH NUMBER OF PEOPLE WORKING

09:53AM   2    ON THIS PROJECT.

09:53AM   3        HE THEN WAS ASKED, WHAT DID YOU TAKE HER STATEMENTS ABOUT

09:53AM   4    SPECIAL OPERATIONS COMMAND?

09:53AM   5        AND HE SAYS THE UNDERSTANDING WAS THAT THEY HAD BEEN

09:53AM   6    WORKING WITH SPECIAL OPERATIONS COMMAND, AND IT CERTAINLY

09:53AM   7    REPRESENTED A CAPABILITY AND A BUSINESS THAT THE COMPANY HAD

09:53AM   8    PURSUED.

09:53AM   9        THAT IS ALSO ACCURATE.  YOU KNOW THAT FROM THE TESTIMONY

09:53AM  10    OF MR. EDLIN AND FROM MS. HOLMES'S TESTIMONY, AND FROM THE MANY

09:53AM  11    DOCUMENTS THAT HAVE BEEN PRODUCED DURING THE COURSE OF THE

09:53AM  12    CASE.

09:53AM  13        NOW, THIS TAPE, WHICH THE GOVERNMENT INTRODUCED, IS THE

09:54AM  14    BEST EVIDENCE, ALONG WITH THE TAPES FROM MR. PARLOFF, ABOUT HOW

09:54AM  15    MS. HOLMES TALKED ABOUT THERANOS'S RELATIONSHIPS WITH THE

09:54AM  16    DEPARTMENT OF DEFENSE AND HOW IT TALKED ABOUT ITS ASPIRATIONS,

09:54AM  17    HOW IT TALKED ABOUT PROGRAMS THAT IT HAD WITH SPECIAL

09:54AM  18    OPERATIONS COMMAND, HOW IT TALKED ABOUT THE WORK THAT IT WAS

09:54AM  19    DOING IN AFGHANISTAN.

09:54AM  20        BUT THESE PROJECTS WERE REAL PROJECTS.  THERE WAS A LOT OF

09:54AM  21    INVESTMENT THAT THE COMPANY MADE IN THIS.  THE COMPANY DEALT

09:54AM  22    WITH NUMEROUS PEOPLE IN THE DEPARTMENT OF DEFENSE.  YOU SAW

09:54AM  23    THAT IN EMAILS THAT WERE INTRODUCED DURING MR. EDLIN'S

09:54AM  24    TESTIMONY.

09:54AM  25        THESE PROGRAMS WENT ON FOR YEARS.  THERANOS HAD BEEN

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9162

09:54AM   1    TALKING WITH THE DEPARTMENT OF DEFENSE ABOUT THESE DEPLOYMENTS

09:54AM   2    SINCE 2011.

09:54AM   3         YOU KNOW, AS A RESULT OF HIS TESTIMONY, THAT THERANOS TOOK

09:54AM   4    ITS 4 SERIES DEVICES TO MACDILL AIR FORCE BASE FOR EVALUATION

09:55AM   5    BY CENTCOM AND THEY WERE FURTHER MODIFIED IN RESPONSE TO THAT

09:55AM   6    MEETING.

09:55AM   7         YOU KNOW THAT THERANOS ACTUALLY DELIVERED SERIES 4 DEVICES

09:55AM   8    TO SPECIAL OPERATIONS COMMAND, WHICH SPECIAL OPERATIONS COMMAND

09:55AM   9    ULTIMATELY DECIDED NOT TO USE, BUT THEY WERE BUILT.

09:55AM  10         AND DURING DECEMBER OF 2013 WHEN THIS CALL WAS HAPPENING,

09:55AM  11    MS. HOLMES WAS VERY MUCH AWARE THAT THESE PROGRAMS WERE

09:55AM  12    MIDSTREAM.  THE SOCOM DEVICES WOULD BE DELIVERED TO SPECIAL

09:55AM  13    OPERATIONS COMMAND ABOUT FOUR OR FIVE MONTHS AFTER THIS CALL.

09:55AM  14         THERANOS HAD AGREED WITH CENTCOM THAT IT WOULD DELIVER

09:55AM  15    DEVICES IN AFGHANISTAN ABOUT EIGHT MONTHS -- SCHEDULED TO BE

09:55AM  16    DELIVERED ABOUT EIGHT MONTHS AFTER THIS CALL.

09:55AM  17         THESE ARE THE CONTACTS -- THIS IS THE CONTEXT IN WHICH

09:55AM  18    THESE STATEMENTS WERE BEING MADE.  THERANOS WAS, IN FACT,

09:55AM  19    REALLY DOING THE WORK WHICH MS. HOLMES DESCRIBED.

09:56AM  20         AS YOU SEE FROM THE TAPE, SHE DID NOT SAY THESE DEVICES

09:56AM  21    ARE IN FLIGHT FOR CLINICAL USE, WHICH IS HOW MANY OF THE

09:56AM  22    WITNESSES HAVE BEEN QUESTIONED.

09:56AM  23         SHE TALKS ABOUT THE WORK THAT THERANOS WAS DOING IN

09:56AM  24    CONNECTION WITH THESE PROGRAMS.

09:56AM  25         SHE ALSO SAYS, THIS IS NOT GOING TO BE OUR BUSINESS.

ER-6725

09:56AM  1    WE'LL DO A LITTLE BIT HERE, BUT THIS IS NOT GOING TO BE OUR

09:56AM  2    BUSINESS.

09:56AM  3         SO FROM THE PERSPECTIVE OF INVESTORS, THEY ARE BEING TOLD,

09:56AM  4    I THINK ACCURATELY, WHAT THE STATE OF THERANOS'S BUSINESS WAS.

09:56AM  5         LET'S LOOK AT THE CONTRACTS THAT THERANOS HAD WITH THE

09:56AM  6    MILITARY OVER TIME.

09:56AM  7         THERE'S THE CENTCOM CONTRACT, WHICH I MENTIONED, WHICH

09:56AM  8    WAS, AS I SAY, ACTIVE DURING THIS PERIOD.

09:56AM  9         THERE WAS THE SPECIAL OPERATIONS COMMAND CONTRACT, WHICH

09:56AM 10    WAS ENTERED IN 2012, MODIFIED IN 2013.

09:56AM 11         AND THERE WAS THE PROGRAM WITH AFRICOM WHICH YOU WILL

09:56AM 12    RECALL SEEING TESTIMONY ABOUT DURING THE COURSE OF MR. EDLIN'S

09:57AM 13    TESTIMONY.

09:57AM 14         AND I WANT TO SHOW YOU SOME OF THE INTERACTIONS THAT

09:57AM 15    THERANOS HAD AS PART OF THAT PROGRAM, WHICH YOU'LL REMEMBER.

09:57AM 16         IF WE LOOK AT SLIDE 33, AND THIS IS EXHIBIT 13986 --

09:57AM 17    SORRY, 34.  THIS IS A REPORT FROM THE COMMAND SURGEON OF

09:57AM 18    AFRICOM ABOUT THERANOS'S DEVICES AND THEIR DEPLOYMENT TO

09:57AM 19    AFRICOM.

09:57AM 20         SHE WRITES IN DECEMBER OF -- OR JULY OF 2012 TO MR. EDLIN,

09:57AM 21    COPYING MS. HOLMES, THAT SHE HAS BEEN TO AFRICA AND SHE HAS

09:57AM 22    TAKEN THE DEVICE TO AFRICA WHERE THE DEVICE TRAVELLED WELL AND

09:57AM 23    IT FUNCTIONED WELL.

09:57AM 24         SHE TALKED ABOUT DIFFICULTIES WITH THE FUNCTIONALITY OF

09:57AM 25    THE SCREEN, BUT SHE REPORTED THAT SHE HAD TAKEN THE DEVICE AND

ER-6726

09:57AM 1    USED IT IN CAMEROON AND IN UGANDA AND SOUTH SUDAN.

09:58AM 2        THIS WAS NOT A FICTION THAT MS. HOLMES WAS MAKING UP AND

09:58AM 3    SHE WAS NOT INTENDING TO EXAGGERATE WHAT WORK HAD BEEN DONE.

09:58AM 4    THIS WAS VERY MUCH A PART OF THE WORK THAT THERANOS WAS DOING.

09:58AM 5        I THINK MR. TOLBERT'S TESTIMONY SHOWS YOU WHAT WAS REALLY

09:58AM 6    UNDERSTOOD AS PART OF THESE CONVERSATIONS WITH PEOPLE WHO HEARD

09:58AM 7    HER TALK ABOUT THESE DEVICES.

09:58AM 8        NOW, I WANT TO TALK ALSO ABOUT WHAT THE GOVERNMENT DID NOT

09:58AM 9    DO IN CONNECTION WITH ITS CASE ON THIS SUBJECT.

09:58AM 10        THEY INTRODUCED, AS MR. SCHENK DETAILED YESTERDAY,

09:58AM 11    TESTIMONY FROM, I DON'T KNOW, FIVE, SIX, SEVEN PEOPLE WHO SAID,

09:58AM 12    SHE TOLD ME THAT THERE WAS A DEVICE AND IT WAS IN FLIGHT AND

09:58AM 13    BEING CLINICALLY USED IN THAT CONTEXT, ET CETERA.

09:58AM 14        BUT THE GOVERNMENT DIDN'T CALL A SINGLE PERSON FROM THE

09:58AM 15    DEPARTMENT OF DEFENSE WHO WORKED ON THESE CONTRACTS WHO WOULD

09:59AM 16    HAVE BEEN ABLE TO GIVE ACCURATE DESCRIPTIONS OF THE STATE OF

09:59AM 17    THOSE PROGRAMS, WHAT THEY WERE TRYING TO DO IN CONNECTION WITH

09:59AM 18    THOSE PROGRAMS.  NOTHING.

09:59AM 19        THEY ASKED GENERAL MATTIS WHEN HE TESTIFIED WHETHER HE

09:59AM 20    KNEW THAT THOSE PROGRAMS HAD SUCCEEDED.  OF COURSE HE WAS NOT

09:59AM 21    INVOLVED IN THOSE PROJECTS BECAUSE, AS HE TOLD YOU, AFTER HE

09:59AM 22    CAME TO THERANOS, HE RECUSED HIMSELF FROM ALL ACTIVITIES WITH

09:59AM 23    THE DEPARTMENT OF DEFENSE.

09:59AM 24        THAT'S NOT THE ONLY TIME THAT MS. HOLMES TALKED ABOUT THIS

09:59AM 25    MEDEVAC ISSUE AND IT WAS CAPTURED ON TAPE.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9165

09:59AM  1        REMEMBER THAT MR. PARLOFF ALSO TALKED ABOUT THE MEDEVAC

09:59AM  2    ISSUE, AND THAT WAS CAPTURED ON A TAPE OF A CONVERSATION

09:59AM  3    BETWEEN MS. HOLMES AND MR. PARLOFF.

09:59AM  4        AND YOU CAN LOOK AT WHAT WAS SAID AS PART OF THAT

09:59AM  5    CONVERSATION.

09:59AM  6        MR. PARLOFF ASKED MS. HOLMES, ARE YOU DOING STUFF OVERSEAS

09:59AM  7    ALREADY?

09:59AM  8        AND MS. HOLMES SAID, WE HAVE DONE WORK OVERSEAS FOR

10:00AM  9    PHARMACEUTICAL COMPANIES AND A LITTLE BIT WITH FOREIGN

10:00AM  10   GOVERNMENTS IN THE PAST, BUT WE'VE GOT OUR WORK CUT OUT FOR US

10:00AM  11   HERE.

10:00AM  12       SHE DOESN'T MENTION WORK ABROAD IN CONNECTION WITH ANY

10:00AM  13   MILITARY PROGRAM.

10:00AM  14       BUT IN RESPONSE TO THEIR CONVERSATION AS IT CONTINUES,

10:00AM  15   TOWARDS THE END OF IT SHE DOES TALK ABOUT SOME POTENTIAL

10:00AM  16   APPLICATIONS WITH THE MILITARY.  AND REMEMBER, THIS IS IN 2014.

10:00AM  17       SHE SAYS TO HIM, THERE'S MILITARY-SPECIFIC APPLICATIONS,

10:00AM  18   TOO, THAT ARE QUITE PROMISING.  THAT ARE QUITE PROMISING.

10:00AM  19   SOMETHING THAT MIGHT HAPPEN IN THE FUTURE.

10:00AM  20       NOW, YOU SEE THAT THAT IS SORT OF SIMILAR LANGUAGE TO HOW

10:00AM  21   SHE TALKED ABOUT, YOU KNOW, THE POTENTIAL IMPLICATIONS, THERE

10:00AM  22   COULD BE SOME PROMISE IN THAT, ET CETERA.

10:00AM  23       BUT THEN SHE GOES ON TO TALK ABOUT IT MORE SPECIFICALLY.

10:00AM  24       COULD THERE BE A MILITARY USE FOR THIS?  COULD THERE BE A

10:01AM  25   MEDEVAC USE FOR IT, ET CETERA?

10:01AM 1      AND LET'S SEE WHAT SHE SAYS.  WELL, "I MEAN, AND -- AND

10:01AM 2   THAT -- THAT HAS IMPLICATIONS, BROADLY."  THIS IS 2014.  SHE'S

10:01AM 3   SAYING THAT THERE'S A POTENTIAL APPLICATION IN THE FUTURE WITH

10:01AM 4   THE MILITARY.

10:01AM 5      NOW, WE KNOW WHAT MR. PARLOFF UNDERSTOOD AS A RESULT OF

10:01AM 6   THIS CONVERSATION BECAUSE WE KNOW WHAT HE WROTE IN HIS ARTICLE,

10:01AM 7   WHICH IS IN EXHIBIT 1776.  AND HE SAYS, "THAT MAKES IT POSSIBLE

10:01AM 8   TO IMAGINE ONE DAY PLACING HOLMES'S LABS RIGHT BY THE OPERATING

10:01AM 9   ROOMS IN HOSPITALS OR IN MILITARY EVACUATION HELICOPTERS."

10:01AM 10      ONE DAY IN THE FUTURE.  THIS IS A CAPACITY THAT THERANOS

10:01AM 11   MIGHT BE CAPABLE OF ACHIEVING.

10:01AM 12      NOW, WHAT DID THE TESTIMONY IN THIS CASE LOOK LIKE

10:02AM 13   COMPARED TO THE TAPES?

10:02AM 14      WELL, IN BOTH OF THE TAPES YOU SEE SOME COMMONALITIES.

10:02AM 15   SHE NEVER SAYS THERANOS DEVICES ARE BEING CURRENTLY BEING USED.

10:02AM 16      SHE NEVER TALKS ABOUT THESE ACTUALLY BEING IN FLIGHT WITH

10:02AM 17   CLINICAL USE.

10:02AM 18      SHE TALKS ABOUT POTENTIAL APPLICATIONS.  SHE DESCRIBES

10:02AM 19   PROJECTS THAT YOU KNOW ARE REAL PROJECTS.

10:02AM 20      HER WORDS TRACK THE CONTRACT LANGUAGE VERY CLOSELY.  SHE

10:02AM 21   DESCRIBES USE IN REMOTE AREAS.  SHE DESCRIBES THE PROBLEMS THAT

10:02AM 22   THEY'RE TRYING TO SOLVE.

10:02AM 23      AND IN EVERY SITUATION SHE SAYS, THIS ISN'T OUR FOCUS.

10:02AM 24   OUR FOCUS IS ON WALGREENS AND OTHER ASPECTS OF THE RETAIL

10:02AM 25   MARKET.

10:02AM   1          NOW, YOU'LL RECALL THAT MR. PARLOFF TALKED ABOUT HAVING A

10:02AM   2   CONVERSATION WITH MS. HOLMES THAT WASN'T CAPTURED ON THE TAPE.

10:02AM   3   AND HE SAID IN CONNECTION WITH THAT CONVERSATION, WHICH WAS I

10:03AM   4   GUESS A THIRD CONVERSATION -- THE FIRST AND SECOND CONVERSATION

10:03AM   5   ARE REFLECTED ON TAPE AND YOU KNOW WHAT WAS SAID AS PART OF

10:03AM   6   THAT.

10:03AM   7          BUT HE TESTIFIED THAT HE WAS TOLD BY MS. HOLMES NOT ON

10:03AM   8   TAPE THAT A THERANOS DEVICE WAS BEING USED IN AFGHANISTAN.  HE

10:03AM   9   DIDN'T HAVE ANY NOTES OF THAT CONVERSATION THAT HE STILL

10:03AM  10   POSSESSED AT ALL.

10:03AM  11          NOW, THAT'S, THAT'S -- THAT WOULD BE ODD, HONESTLY,

10:03AM  12   BECAUSE HE INTERVIEWED HER, AS HE TESTIFIED, FOR ABOUT 13 HOURS

10:03AM  13   OVER 11 DAYS, HAD ABOUT 10 HOURS OF TAPED CONVERSATIONS WITH

10:03AM  14   HER, AND HE TAPED TWO CONVERSATIONS WITH HER THAT REFLECT

10:03AM  15   DISCUSSION OF THIS.

10:03AM  16          BUT HE SAYS IN A THIRD CONVERSATION SHE SAYS SOMETHING

10:03AM  17   DIFFERENT.

10:03AM  18          MR. SCHENK ON DIRECT EXAMINATION, AS HE QUOTED YESTERDAY,

10:03AM  19   ELICITED TESTIMONY FROM -- I'M SORRY, MR. BOSTIC DID, FROM

10:04AM  20   MR. PARLOFF WHERE HE SAID, NO, SHE TOLD ME THAT THIS IS IN USE

10:04AM  21   ON A MEDEVAC.

10:04AM  22          BUT THEN ON CROSS-EXAMINATION WHEN MR. CLINE ASKED HIM

10:04AM  23   ABOUT THAT, HE SAID, SHE NEVER ACTUALLY TOLD YOU THAT IT WAS --

10:04AM  24   THERE WAS USE IN AFGHANISTAN, DID SHE?

10:04AM  25          HE RESPONDED, "I THOUGHT SHE DID."

10:04AM  1          HE THEN WAS ASKED, "SO YOU THOUGHT YOU HAD MORE THAN JUST

10:04AM  2     THE IMPRESSION THAT YOU DESCRIBED TO THE GOVERNMENT IN THOSE

10:04AM  3     FIRST TWO MEETINGS?"

10:04AM  4          HE SAID, "WELL, IT IS SEVEN YEARS AGO.  IT MIGHT HAVE BEEN

10:04AM  5     A VERY STRONG IMPRESSION.  I, I -- I'M NOT CERTAIN."

10:04AM  6          NOW, I DON'T FAULT MR. PARLOFF FOR THAT.  THAT'S THE

10:04AM  7     EVOLUTION OF MEMORY IN THE CONTEXT OF EVERYTHING THAT HAS

10:04AM  8     HAPPENED.

10:04AM  9          BUT WE KNOW FROM THE CONTEMPORANEOUS RECORD WHAT WAS TOLD

10:04AM 10     ABOUT MEDEVACS.  WE KNOW THAT HE WAS TOLD THAT THESE WERE

10:04AM 11     APPLICATIONS THAT THERANOS WAS PURSUING AS A POTENTIAL IN THE

10:04AM 12     FUTURE.

10:04AM 13          AND I THINK THE COMMENTARY ON THIS SUBJECT, WITH THE

10:05AM 14     BENEFIT OF WHAT MS. HOLMES ACTUALLY SAID ON BOTH RECORDINGS,

10:05AM 15     YOU SHOULD HEAR ALL OF THAT, ALL OF THE TESTIMONY ABOUT THAT IN

10:05AM 16     CONNECTION WITH THAT THOUGHT.

10:05AM 17          IT SHOULD RAISE, I THINK IN YOUR MIND, SOME QUESTION ABOUT

10:05AM 18     TESTIMONY THAT WITNESSES HAVE OFFERED ON THIS MEDEVAC ISSUE.

10:05AM 19          IN ANY EVENT, YOU KNOW THAT IN EVERY ISSUE -- IN EVERY

10:05AM 20     CIRCUMSTANCE MS. HOLMES WAS SAYING TO INVESTORS, THIS SHOULDN'T

10:05AM 21     BE MATERIAL TO YOUR INVESTMENT DECISION.

10:05AM 22          SO THOSE ARE THE THREE INVESTORS IN THE C1 ROUND,

10:05AM 23     MR. EISENMAN, MR. LUCAS, AND MR. TOLBERT.

10:05AM 24          LET ME TALK NOW ABOUT THE C2 ROUND.

10:05AM 25          YOU HEARD FROM MR. GROSSMAN, WHO WAS ONE INVESTOR.  I

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9169

10:05AM  1    THINK THE POINTS WITH MR. GROSSMAN CAN BE SUMMARIZED FAIRLY

10:05AM  2    SUCCINCTLY.

10:05AM  3         FIRST, HE INVESTED WITH A LARGE TEAM OF PEOPLE.  THERE

10:05AM  4    WERE THREE PEOPLE WHO HAD A LOT OF EXPERIENCE IN THE AREAS THAT

10:06AM  5    HE WAS EVALUATING WITH THERANOS, INCLUDING DR. RABODZEY, WHO HE

10:06AM  6    TESTIFIED ABOUT WHO EVALUATED THERANOS'S TECHNOLOGY QUITE

10:06AM  7    CLOSELY.

10:06AM  8         MR. GROSSMAN'S INTERACTIONS WITH MS. HOLMES IN CONNECTION

10:06AM  9    WITH HIS INVESTMENT WERE, IN FACT, QUITE LIMITED.  HE HAD AN

10:06AM 10    HOUR INTRODUCTORY MEETING WITH MR. BALWANI AND MS. HOLMES IN

10:06AM 11    DECEMBER OF 2013.  HE TESTIFIED NOTHING REALLY CONFIDENTIAL WAS

10:06AM 12    DISCUSSED THERE BECAUSE HE HADN'T SIGNED A CONFIDENTIALITY

10:06AM 13    DISCLOSURE AGREEMENT.

10:06AM 14         HE HAD A MEETING ABOUT A MONTH LATER THAT LASTED ABOUT

10:06AM 15    90 MINUTES PERHAPS WITH MS. HOLMES, AND SHE LEFT.

10:06AM 16         AND THEN HE HAD A FOLLOW-ON MEETING WITH MR. BALWANI AND

10:06AM 17    OTHERS.

10:06AM 18         THOSE ARE THE ONLY TWO INTERACTIONS THAT MR. GROSSMAN HAD.

10:06AM 19         BUT IN THE PERIOD FOLLOWING THEREAFTER, MR. GROSSMAN'S

10:06AM 20    FIRM CONDUCTED NEARLY DAILY DUE DILIGENCE AND DAILY ANALYSIS AS

10:07AM 21    YOU WOULD EXPECT HIS BUSINESS, WHICH IS A HEDGE FUND, TO DO IN

10:07AM 22    CONNECTION WITH ITS INVESTMENT, AND THEN ULTIMATELY MADE THE

10:07AM 23    DECISION TO INVEST IN EARLY FEBRUARY OF 2014.

10:07AM 24         NOW, WHAT DID THEY LOOK AT IN THAT PERIOD AND WHAT DID

10:07AM 25    THEY KNOW ABOUT THERANOS?

CLOSING ARGUMENT BY MR. DOWNEY (RES.)        9170

10:07AM  1        WELL, THEY KNEW A LOT.  IN FACT, THEY REALLY KNEW ALMOST

10:07AM  2   EVERYTHING ABOUT THERANOS BEFORE THEY MADE A DECISION TO

10:07AM  3   INVEST.

10:07AM  4        YOU SAW THAT THEY LOOKED AT AND ANALYZED ALL OF THE

10:07AM  5   REGULATORY ISSUES, THEY LOOKED AT ALL OF THE ISSUES ABOUT THE

10:07AM  6   LAB INDUSTRY, THEY SPOKE TO MR. BALWANI ABOUT HOW MANUFACTURING

10:07AM  7   WOULD WORK, THEY TOURED THE CLIA LAB.

10:07AM  8        ALL OF THIS TOOK PLACE AFTER MS. HOLMES INTERACTED WITH

10:07AM  9   MR. GROSSMAN.  SHE DID NOT INTERACT WITH HIM AGAIN.  ALL OF

10:07AM 10   THAT KIND OF ANALYSIS.

10:07AM 11        AND THE OTHER THING THAT WE KNOW IS THAT DR. RABODZEY

10:07AM 12   ANALYZED THERANOS'S TECHNOLOGY.

10:08AM 13        HOW?  WITH THE INFORMATION THAT THERANOS GAVE HIM.  THEY

10:08AM 14   SAID, HERE IS OUR DATA IN CONNECTION WITH HOW OUR TESTS

10:08AM 15   PERFORM, AND HE LOOKED AT THAT AND DID THAT ANALYSIS IN DETAIL,

10:08AM 16   AND HE SAID, YOU KNOW, I THINK THIS DATA MAY NOT DEMONSTRATE AS

10:08AM 17   GOOD A PERFORMANCE AS YOU MIGHT EXPECT.

10:08AM 18        SO PFM, AS YOU RECALL, MR. GROSSMAN'S FIRM SAID, WELL,

10:08AM 19   WE'VE GOT TO FIND OUT MORE ABOUT THE TECHNOLOGY.

10:08AM 20        SO WITHOUT MS. HOLMES'S KNOWLEDGE, THEY REACHED OUT

10:08AM 21   THROUGH MR. GROSSMAN'S FATHER-IN-LAW TO TALK TO DR. ROBERTSON,

10:08AM 22   MS. HOLMES'S MENTOR FROM STANFORD WHO WAS A COLLEAGUE OF

10:08AM 23   MR. GROSSMAN'S FATHER-IN-LAW.

10:08AM 24        AND MR. GROSSMAN SPOKE WITH PROFESSOR ROBERTSON.  YOU SEE

10:08AM 25   HIM REPORTING HERE TO HIS COLLEAGUE THAT IN CONNECTION WITH

10:08AM   1    ASKING HIM ABOUT THE TECHNOLOGY, HE HAD A MIND BLOWING CALL

10:08AM   2    WITH ELIZABETH'S PROFESSOR WHO HELPED HER START THIS AND WHO

10:09AM   3    WAS AN ORIGINAL BOARD MEMBER.

10:09AM   4         AND THEN IF YOU LOOK AT THE NEXT SLIDE YOU SEE WHAT HE

10:09AM   5    REPORTS.

10:09AM   6         MR. ROBERTSON REPORTS THAT HE WAS TOLD -- I'M SORRY.

10:09AM   7         MR. GROSSMAN REPORTS THAT HE WAS TOLD BY DR. ROBERTSON

10:09AM   8    THAT THERE IS NO TECHNICAL RISK AT ALL IN THEIR CORE

10:09AM   9    TECHNOLOGY; THERE WERE ROUGHLY 300 DIFFERENT TYPES OF THINGS TO

10:09AM  10    MATCH A FULL MENU; THERE IS NOTHING THAT THE TECHNOLOGY CAN'T

10:09AM  11    DO.

10:09AM  12         MR. GROSSMAN OBVIOUSLY RELIED ON THAT INFORMATION AS HIS

10:09AM  13    EMAIL AND THE CONTEMPORANEOUS DOCUMENTS REFLECT.

10:09AM  14         BUT THAT IS NOT INFORMATION THAT CAME FROM MS. HOLMES OR

10:09AM  15    FROM ANYBODY THAT SHE DIRECTED TO PROVIDE THAT INFORMATION TO

10:09AM  16    HIM.

10:09AM  17         SO ONE ASSUMPTION THAT HE HAD WAS THIS TECHNOLOGY WAS VERY

10:09AM  18    GOOD, THE SAME ASSUMPTION THAT DR. ROBERTSON HAD AND THE SAME

10:09AM  19    ASSUMPTION THAT MS. HOLMES HAD.

10:09AM  20         HE ALSO MADE A BIG ASSUMPTION IN DECIDING TO INVEST, WHICH

10:10AM  21    WAS NOT UNCOMMON, HE ASSUMED THAT THERANOS WOULD BE THE NEXT

10:10AM  22    FACEBOOK OR THE NEXT TESLA OR THE NEXT GOOGLE.

10:10AM  23         THERANOS SAID, THIS IS HOW MUCH WE THINK WE'RE WORTH.  HE

10:10AM  24    VALUED THERANOS AT MANY TIMES WHAT THERANOS PERCEIVED ITSELF TO

10:10AM  25    BE WORTH.  AND THIS IS CLEARLY A BIG FACTOR AS YOU WILL RECALL

ER-6734

10:10AM   1    FROM HIS TESTIMONY.

10:10AM   2         HE ALSO, LIKE THE OTHER INVESTORS, FOCUSSED ON WALGREENS

10:10AM   3    AND THE WALGREENS RELATIONSHIP.

10:10AM   4         AND YOU KNOW THAT BECAUSE AS PART OF HIS INTERNAL

10:10AM   5    DISCUSSIONS WITH HIS HEDGE FUND, HE ENCOURAGED PARTNERS AND

10:10AM   6    FAMILY AND FRIENDS TO INVEST IN THERANOS, AND HE MADE THIS

10:10AM   7    PRESENTATION.

10:10AM   8         AND HOW THEY MADE THIS PRESENTATION TELLS YOU EVERYTHING

10:10AM   9    YOU NEED TO KNOW ABOUT WHAT WAS IMPORTANT TO PFM IN MAKING ITS

10:10AM  10    INVESTMENT.

10:10AM  11         HE DIDN'T TELL THE PEOPLE HE WAS ASKING TO INVEST ABOUT

10:10AM  12    WHAT THERANOS'S REVENUE WAS.  HE FOCUSSED ON WALGREENS AND THE

10:11AM  13    WALGREENS RELATIONSHIP.

10:11AM  14         AND HE TOLD THE INVESTORS THAT THERANOS WAS GOING TO ROLL

10:11AM  15    OUT IN WALGREENS STORES.

10:11AM  16         HE DIDN'T TELL THEM ABOUT THE NUMBER OF STORES THAT

10:11AM  17    THERANOS WAS IN, WHICH THERANOS HAD TOLD HIM.

10:11AM  18         HE DIDN'T TELL THEM ANYTHING ABOUT PFM'S INTERNAL DEBATE

10:11AM  19    REGARDING THE ACCURACY OF THE TECHNOLOGY.

10:11AM  20         AND HE DIDN'T MENTION ANYTHING ABOUT MILITARY PROGRAMS OR

10:11AM  21    PHARMACEUTICAL PROGRAMS AS A BASIS ON WHICH THEY SHOULD INVEST.

10:11AM  22         HE TOLD THEM ABOUT WALGREENS AND THE FACT THAT THERANOS

10:11AM  23    HAD A CONTRACT WITH WALGREENS BECAUSE THAT WAS WHAT MATTERED TO

10:11AM  24    HIM.

10:11AM  25         LET'S TALK NEXT ABOUT MR. MOSLEY WHO TESTIFIED.

10:11AM 1      MR. MOSLEY, AS YOU'LL RECALL, WAS A LAWYER AT A LARGE

10:11AM 2  NEW YORK LAW FIRM WHO REPRESENTED MANY OTHERS WHO INVESTED IN

10:11AM 3  THERANOS, MANY OF THE WEALTHY FAMILIES OF THE COUNTRY:  THE

10:12AM 4  WALTON FAMILY, THE DEVOS FAMILY, ET CETERA.

10:12AM 5      HE WAS INTRODUCED TO THERANOS BY DR. KISSINGER, AND AFTER

10:12AM 6  HIMSELF BECOMING INTERESTED IN THERANOS, HE RECOMMENDED THAT

10:12AM 7  MANY OTHER PEOPLE INVEST IN THERANOS AS HIS TESTIMONY

10:12AM 8  DEMONSTRATED.

10:12AM 9      NOW, HOW DID THE GOVERNMENT PRESENT MR. MOSLEY'S DECISION

10:12AM 10 TO INVEST?

10:12AM 11     WELL, THEY SAID, IN ESSENCE, THAT MS. HOLMES SENT A SLIDE

10:12AM 12 DECK TO MR. MOSLEY, AND IN CONNECTION WITH THAT SLIDE DECK AND

10:12AM 13 THE PFIZER STUDY WHICH THEY SENT TO HIM AT THAT TIME, WHICH WAS

10:12AM 14 IN LATE AUGUST, EARLY SEPTEMBER, 60 DAYS LATER HE DECIDED TO

10:12AM 15 INVEST, AND THEY FOCUSSED DURING HIS DIRECT EXAMINATION ON

10:12AM 16 STATEMENTS AS PART OF THAT SLIDE DECK.

10:12AM 17     BUT WHAT REALLY HAPPENED WITH RESPECT TO MR. MOSLEY'S

10:12AM 18 INVESTMENT DECISION?

10:12AM 19     WELL, THERE WAS A HUGE AMOUNT OF ACTIVITY IN BETWEEN THE

10:13AM 20 DATE THAT MS. HOLMES SENT HIM THAT SLIDE DECK AND THE DATE THAT

10:13AM 21 HE ULTIMATELY DECIDED TO INVEST IN LATE OCTOBER.

10:13AM 22     HE TALKED TO MANY OF HIS CLIENTS WHO WERE ALSO INVESTING

10:13AM 23 IN THERANOS.  HE TALKED TO OTHERS WHO WERE KNOWLEDGEABLE ABOUT

10:13AM 24 THERANOS.  FOR EXAMPLE, HE TALKED TO DR. KISSINGER, HIS CLIENT.

10:13AM 25 HE TALKED TO THE LAWYER FOR THERANOS, MR. BOIES, WHO WAS HIS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9174

10:13AM   1    LONG-TIME FRIEND AND HIS FORMER LAW PARTNER.  HE TALKED TO HIS

10:13AM   2    CLIENTS FROM THE WALTON FAMILY WHO WERE ALSO EVALUATING WHETHER

10:13AM   3    TO INVEST AT THAT TIME.

10:13AM   4         HE LOOKED AT MANY ASPECTS OF THERANOS THAT HAD NOTHING TO

10:13AM   5    DO WITH THE POWERPOINT THAT THERANOS SENT TO HIM.

10:13AM   6         HE LOOKED AT THERANOS'S RELATIONSHIP WITH WALGREENS, OF

10:13AM   7    COURSE.

10:13AM   8         BUT HE ALSO LOOKED AT THE PATENT PORTFOLIO.

10:13AM   9         HE LOOKED AT THE JOHNS HOPKINS REPORT.

10:13AM  10         HE DID ALL KINDS OF DILIGENCE IN CONNECTION WITH HIS

10:13AM  11    DECISION TO INVEST.  HE WAS DOING MORE THAN LOOKING AT THE

10:13AM  12    POWERPOINT AND READING ARTICLES IN THE NEWSPAPER.

10:14AM  13         AND HE TESTIFIED WHEN HE CAME, LADIES AND GENTLEMEN, THAT

10:14AM  14    HE KNEW THERANOS WAS ONLY IN A FEW DOZEN WALGREENS STORES.  HE

10:14AM  15    KNEW THAT THERANOS USED COMMERCIAL DEVICES AS PART OF WHAT IT

10:14AM  16    DID.

10:14AM  17         HE KNEW THAT THERE WAS A TWO-PHASE MODEL.  HE KNEW THERE

10:14AM  18    WAS A PHASE I, PHASE II MODEL.

10:14AM  19         HE KNEW THAT THE PROJECTIONS WERE BASED ON SPECIFIC

10:14AM  20    ASSUMPTIONS AND THAT THEY MIGHT CHANGE.

10:14AM  21         AND HE KNEW THERE WAS NOT GOING TO BE PHARMACEUTICAL AND

10:14AM  22    MILITARY WORK.

10:14AM  23         HE KNEW EVERYTHING.

10:14AM  24         AND HE KNEW THAT AS A RESULT OF HIS INTERACTIONS WITH ALL

10:14AM  25    THESE OTHERS WHO WERE LOOKING TO INVEST IN THERANOS AT THE SAME

10:14AM 1     TIME.

10:14AM 2          AND BASED ON THAT KNOWLEDGE, HE WAS ENTHUSIASTIC ABOUT

10:14AM 3     THERANOS.

10:14AM 4          AND WHAT DID HE DO IN RESPONSE TO WHAT HE DID?  WELL, HE

10:14AM 5     DID WHAT HE REPORTED AT THE TIME.

10:14AM 6          AS YOU SAW IN THIS EMAIL, EXHIBIT 14135, HE SAID THAT HE

10:14AM 7     WAS RECOMMENDING THE INVESTMENT TO HIS CLIENTS.

10:15AM 8          AND A NUMBER OF THEM DID INVEST.  IN FACT, MR. MOSLEY MAY

10:15AM 9     HAVE BEEN THE MOST SIGNIFICANT FACTOR IN THE INVESTMENTS THAT

10:15AM 10    CONSTITUTED THE MOST AMOUNT OF MONEY THAT WERE INVESTED IN

10:15AM 11    THERANOS.  IF YOU WERE TO AGGREGATE THE CLIENTS OF MR. MOSLEY

10:15AM 12    THAT INVESTED IN THERANOS, THEIR TOTAL INVESTMENTS TOTALLED

10:15AM 13    MORE THAN $400 MILLION, AND YOU'LL RECALL FROM HIS TESTIMONY

10:15AM 14    HIS DISCUSSION OF HIS MANY INTERACTIONS WITH THOSE FAMILIES.

10:15AM 15         REMEMBER THAT THERANOS KNEW HE WAS THE LAWYER FOR THOSE

10:15AM 16    FAMILIES AND THEY SHARED WITH HIM ALL OF THE INFORMATION THAT I

10:15AM 17    JUST DESCRIBED TO YOU.

10:15AM 18         ASK YOURSELF IF ALL OF THESE INVESTORS KNEW THAT SAME

10:15AM 19    INFORMATION AND WHETHER THE INVESTMENT OF MR. MOSLEY OR OF

10:15AM 20    OTHERS WAS REALLY BASED, AS THE GOVERNMENT SUGGESTS, ON

10:15AM 21    ISOLATED STATEMENTS IN POWERPOINTS.

10:16AM 22         NOW, ANOTHER FEATURE OF MR. MOSLEY'S TESTIMONY AND, IN

10:16AM 23    FACT, OF THE NEXT INVESTOR I'LL DISCUSS, OR THE NEXT INDIVIDUAL

10:16AM 24    I'LL DISCUSS, MS. PETERSON, IS THAT THEY READ THE PARLOFF

10:16AM 25    ARTICLE.

10:16AM 1      AND WE'VE TALKED ABOUT THE PARLOFF ARTICLE THUS FAR QUITE

10:16AM 2   A LOT, ABOUT MEDEVAC ISSUES, AND WE'VE TALKED ABOUT THE FACT

10:16AM 3   THAT MR. PARLOFF KNEW ABOUT THE PHASE I, PHASE II MODEL.  HE

10:16AM 4   KNEW ABOUT VENOUS TESTING.  HE KNEW THAT SMALL SAMPLES WERE

10:16AM 5   CURRENTLY BEING OFFERED, BUT THAT OTHER VENOUS TESTS WERE BEING

10:16AM 6   OFFERED IN THE CLIA LAB.  HE KNEW ALL OF THAT.

10:16AM 7      AND GIVEN ALL OF THOSE DISCLOSURES, IT'S HARD TO SAY THAT

10:16AM 8   MS. HOLMES WAS INTENDING TO DECEIVE MR. PARLOFF.  HE KNEW A LOT

10:16AM 9   ABOUT THERANOS'S BUSINESS.

10:16AM 10     BUT THE GOVERNMENT SAYS MS. HOLMES DID DECEIVE

10:16AM 11  MR. PARLOFF, AND THEY SUGGEST THIS BY FOCUSSING ON ONE SEGMENT

10:16AM 12  OF TAPE IN THE TEN HOURS OF TAPE THAT THERE ARE, WHICH WAS

10:17AM 13  PLAYED YESTERDAY BY MR. SCHENK.

10:17AM 14     AND THAT'S THE TAPE WHERE MR. PARLOFF AND MS. HOLMES HAVE

10:17AM 15  A CONVERSATION ABOUT WHAT THE LAP IS GOING TO LOOK LIKE IN

10:17AM 16  RESPONSE TO A REQUEST THAT HE MADE TO VISIT THE ARIZONA LAB.

10:17AM 17     WELL, I WANT TO TAKE A LOOK AT THAT BECAUSE THE

10:17AM 18  IMPLICATION OF THE GOVERNMENT IN CONNECTION WITH THE PARLOFF

10:17AM 19  TAPES IS THAT SHE DIDN'T TELL MR. PARLOFF THAT COMMERCIAL

10:17AM 20  DEVICES WERE BEING USED IN SOME CONTEXT IN CONNECTION WITH

10:17AM 21  THERANOS'S PROGRAM.

10:17AM 22     BUT SHE CLEARLY DID TELL HIM THAT BECAUSE WE SEE FROM THIS

10:17AM 23  SECTION OF TAPE THAT SHE SAYS TO HIM SOMETHING THAT I WILL

10:17AM 24  DECIPHER FOR YOU, WHICH SHE SAYS THAT THE LAB IN ARIZONA IS A

10:17AM 25  MODERATE, WILL BE A MODERATE COMPLEXITY LAB.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)     9177

```
10:17AM   1         A MODERATE COMPLEXITY LAB MEANS THAT IT DOESN'T USE THESE
10:18AM   2   PROPRIETARY DEVICES, OR THESE LDT'S.  IT NECESSARILY USES
10:18AM   3   DEVICES THAT COME FROM OTHER COMPANIES THAT ARE COMMERCIAL
10:18AM   4   DEVICES.
10:18AM   5         THAT DISCLOSURE TELLS MR. PARLOFF EVERYTHING THAT HE NEEDS
10:18AM   6   TO KNOW.
10:18AM   7         SO THIS DISCUSSION ABOUT VISITING THE LAB IN CALIFORNIA OR
10:18AM   8   ARIZONA, IF IT'S EVEN CLEAR WHAT THAT SNIPPET IS ABOUT, CLEARLY
10:18AM   9   ISN'T DESIGNED TO DECEIVE HIM ABOUT THE FACT THAT THERANOS WAS
10:18AM  10   USING COMMERCIAL MACHINES.
10:18AM  11         I ALSO SHOULD SAY THAT, YOU KNOW, ONE OF THE THEORIES THAT
10:18AM  12   I THINK THE GOVERNMENT HAS ABOUT THE PARLOFF ARTICLE IS THAT
10:18AM  13   MS. HOLMES HAD AN OBLIGATION TO TELL HIM EVERYTHING ABOUT THE
10:18AM  14   COMPANY SO THAT HE COULD WRITE A FULSOME DISCLOSURE OF ALL OF
10:18AM  15   THERANOS'S ACTIVITIES.
10:18AM  16         BUT HE TELLS READERS IN THE ARTICLE THAT THERE ARE THINGS
10:18AM  17   THAT THERANOS DID NOT DISCLOSE TO HIM.
10:19AM  18         AND WHEN THERANOS SENDS THAT ARTICLE AROUND, YOU'LL RECALL
10:19AM  19   THAT THE NOTE FROM THERANOS TO SHAREHOLDERS SAID THAT IT HAD
10:19AM  20   ONLY DISCLOSED A SELECTIVE AMOUNT OF INFORMATION TO HIM.
10:19AM  21         SO THIS IS NOT, THIS IS NOT A SITUATION WHERE THIS WAS
10:19AM  22   DESIGNED TO BE A FULSOME, FULSOME ARTICLE DESCRIBING ALL OF
10:19AM  23   THERANOS'S ACTIVITIES.
10:19AM  24         LET ME TALK ABOUT THE LAST INVESTOR, WHICH IS THE DEVOS
10:19AM  25   FAMILY.
```

ER-6740

10:19AM   1          LISA PETERSON FROM THE DEVOS FAMILY TESTIFIED.  THE DEVOS

10:19AM   2   FAMILY INVESTED THROUGH THE RDV INVESTMENT, AND THE DEVOS

10:19AM   3   FAMILY MEMBERS ARE DESIGNATED IN THE SLIDE THAT I'M SHOWING

10:19AM   4   YOU, AND I'VE ASTERISKED THOSE MEMBERS OF THE INVESTMENT

10:19AM   5   COMMITTEE, THOSE MEMBERS OF THE FAMILY WHO ARE THE MEMBERS OF

10:19AM   6   THE INVESTMENT COMMITTEES, THAT IS DOUG DEVOS, DAN DEVOS,

10:20AM   7   DICK DEVOS, AND RICK DEVOS.

10:20AM   8          MR. MOSLEY WAS THE LAWYER FOR THE FAMILY AND TALKING TO

10:20AM   9   THEM ABOUT THE INVESTMENT AT THAT TIME.

10:20AM  10          BUT NO MEMBER OF THIS INVESTMENT COMMITTEE, NONE, CAME TO

10:20AM  11   THIS COURT AND TESTIFIED ABOUT WHY THE DEVOS FAMILY, THROUGH

10:20AM  12   ITS INVESTMENT VEHICLE, DECIDED TO MAKE THIS INVESTMENT,

10:20AM  13   WHETHER IT WAS BASED ON INFORMATION THAT THEY LEARNED FROM

10:20AM  14   THERANOS DIRECTLY, WHETHER IT WAS BASED ON INFORMATION THAT

10:20AM  15   THEY LEARNED FROM OTHERS.

10:20AM  16          BUT THE ONE THING THAT WE DO KNOW IS MS. PETERSON, WHO DID

10:20AM  17   COME AND TESTIFY, DID NOT PLAY A ROLE WITH REGARD TO THEIR

10:20AM  18   DECISION TO INVEST.

10:20AM  19          SHE DID WORK IN THE INVESTMENT GROUP, AND SHE DID REPORT

10:20AM  20   TO HER BOSS, JERRY TUBERGEN.  BUT SHE TESTIFIED THAT SHE DIDN'T

10:20AM  21   HAVE ANY AUTHORITY TO MAKE AN INVESTMENT DECISION.

10:20AM  22          SHE SAID SHE WAS NOT PART OF MR. TUBERGEN'S CONVERSATIONS

10:20AM  23   WITH THE INVESTMENT COMMITTEE OR PART OF CONVERSATIONS WITH

10:20AM  24   THEM AT ALL.

10:20AM  25          AND, IN FACT, WHAT THE RECORD REFLECTS IS THAT THE DEVOS

10:21AM 1    FAMILY -- YOU KNOW, HER CONTENTION DURING HER DIRECT TESTIMONY

10:21AM 2    WAS THAT SHE HAD WRITTEN A MEMO, AND THIS MEMO REFLECTED WHAT

10:21AM 3    WAS IMPORTANT TO THE DEVOS FAMILY'S DECISION TO INVEST.

10:21AM 4         BUT WE KNOW THAT THE DEVOS FAMILY HAD DECIDED TO INVEST

10:21AM 5    BEFORE THAT MEMO WAS EVER REVIEWED.

10:21AM 6         JUST TO REMIND YOU OF THE CHRONOLOGY, THERE WAS A HIGH

10:21AM 7    LEVEL MEETING AT THERANOS IN THE MIDDLE OF OCTOBER 2014 AND IT

10:21AM 8    WAS DESIGNED FOR THE DEVOS FAMILY MEMBERS TO UNDERSTAND

10:21AM 9    THERANOS.

10:21AM 10        AND AT THAT MEETING THE FAMILY SAID THAT THEY WOULD

10:21AM 11   COMMUNICATE -- THEY WOULD INVEST $100 MILLION ON THE SPOT AT

10:21AM 12   THAT MEETING BASED ON THAT MEETING.

10:21AM 13        AND YOU SAW DOCUMENTS WHICH REFLECTED THAT DECISION MIGHT

10:21AM 14   HAVE EVEN BEEN MADE A WEEK BEFORE THAT MEETING.

10:21AM 15        MS. PETERSON'S MEMO, WHICH WAS DRAFTED FOR THE INVESTMENT

10:21AM 16   COMMITTEE, WAS NOT DRAFTED, WE KNOW, UNTIL AFTER OCTOBER 20TH,

10:22AM 17   AT THE VERY LEAST.

10:22AM 18        AS YOU SEE IN THESE EMAILS, SHE SAID ON OCTOBER 20TH THAT

10:22AM 19   SHE'LL DOCUMENT SOMETHING FOR THE FILE.

10:22AM 20        AND THEN IN NOVEMBER SHE NOTES THAT SHE WON'T HAVE A

10:22AM 21   SIGNATURE ON THAT FOR A WHILE, EVEN THOUGH THE INVESTMENT

10:22AM 22   DECISION WAS MADE AT LEAST A FEW WEEKS BEFORE.

10:22AM 23        SO LET'S REVIEW THE INVESTORS AND WHY THEY INVESTED.  I

10:22AM 24   THINK THEY HAVE A FEW THINGS IN COMMON.

10:22AM 25        FIRST, AS I MENTIONED, THEY ALL SIGNED CONTRACTS WITH

10:22AM  1    THERANOS.  THEY WERE ALL INVOLVED WITH OTHERS WHO INVESTED.

10:22AM  2         THEY WERE ALL HEAVILY INFLUENCED BY THE WALGREENS

10:22AM  3    RELATIONSHIP.

10:22AM  4         THE LAST ISSUE WITH INVESTORS THAT I WANT TO TALK ABOUT IS

10:22AM  5    THIS ISSUE REGARDING REVENUE THAT MR. SCHENK MENTIONED

10:22AM  6    YESTERDAY AND MR. LEACH EXAMINED MS. HOLMES ABOUT YESTERDAY.

10:22AM  7         WHAT DOES THE GOVERNMENT ALLEGE?

10:23AM  8         THEY ALLEGE THAT MS. HOLMES REPRESENTED THAT THERANOS

10:23AM  9    WOULD GENERATE $100 MILLION IN REVENUES IN 2014 AND $990

10:23AM 10    MILLION IN 2015.

10:23AM 11         NOW, THE GOVERNMENT SAYS, WELL, THAT CAN'T HAVE BEEN MADE

10:23AM 12    IN GOOD FAITH BECAUSE THERANOS ONLY GENERATED VERY MODEST

10:23AM 13    REVENUES, ABOUT A FEW HUNDRED THOUSAND DOLLARS IN BOTH 2014 AND

10:23AM 14    2015.

10:23AM 15         WELL, THAT'S REALLY NOT AN ACCURATE PICTURE OF WHAT WAS

10:23AM 16    GOING ON INSIDE OF THERANOS OR ITS ACTIVITIES.

10:23AM 17         THERE'S NO QUESTION THAT THERANOS GENERATED HUNDREDS OF

10:23AM 18    MILLIONS OF DOLLARS IN CASH DURING THE PERIOD THAT WE'RE

10:23AM 19    CONCERNED ABOUT, AND IT CAME FROM CUSTOMERS.

10:23AM 20         IT WASN'T RECOGNIZED AS ACTUAL REVENUE, IT WAS DEFERRED

10:23AM 21    REVENUE.

10:23AM 22         AND YOU SEE HERE IN EXHIBIT 10685 THAT IT TOTALLED MORE

10:23AM 23    THAN $200 MILLION.

10:23AM 24         SO MONEY WAS COMING INTO THE COMPANY.  THE COMPANY WAS NOT

10:24AM 25    ONLY EARNING A FEW HUNDRED THOUSAND DOLLARS A YEAR.  IN FACT,

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9181

10:24AM  1    IT WAS EARNING AN ENORMOUS AMOUNT OF CASH DURING THIS PERIOD.

10:24AM  2         THE QUESTION THAT THE GOVERNMENT IS REALLY FOCUSSING YOU

10:24AM  3    ON, BUT I THINK IT'S REALLY NOT CENTRALLY WHAT IS GOING ON, IS,

10:24AM  4    WAS THAT REVENUE ACTUAL REVENUE OR WAS IT DEFERRED REVENUE?

10:24AM  5         WELL, WE KNOW WHAT THE INVESTORS KNEW ABOUT THAT BECAUSE

10:24AM  6    THEY WERE GIVEN BOTH THE BALANCE SHEET, WHICH REFLECTED THE

10:24AM  7    DEFERRED REVENUE, AND THEY WERE GIVEN THE REVENUE PROJECTIONS

10:24AM  8    FOR BOTH 2014 AND 2015.

10:24AM  9         IF YOU LOOK HERE, AS THE GOVERNMENT ALLEGES, THERANOS DID

10:24AM  10   PROJECT THEY WOULD HAVE $140 MILLION IN REVENUE IN 2014.  AND

10:24AM  11   THIS WAS PROVIDED TO MR. MOSLEY, FOR EXAMPLE, IN THE SUMMER OF

10:24AM  12   2014.

10:24AM  13        BUT WHAT WAS MR. MOSLEY TOLD AT THE SAME TIME?

10:25AM  14        THIS IS THE BALANCE SHEET.  AND HE WAS TOLD THAT THERANOS

10:25AM  15   HAD DEFERRED REVENUE OF ABOUT $168 MILLION AS OF THAT TIME.

10:25AM  16        SO THE QUESTION, IF YOU REALLY COMPARE THESE TWO

10:25AM  17   DOCUMENTS, IS WOULD THIS DEFERRED REVENUE BECOME ACTUAL REVENUE

10:25AM  18   BY THE END OF 2014?

10:25AM  19        NOW, THAT DECISION IS A DECISION THAT MS. HOLMES WOULD NOT

10:25AM  20   MAKE, COULD NOT MAKE, DID NOT MAKE.

10:25AM  21        AS YOU RECALL, MS. SPIVEY TESTIFIED THIS WAS A VERY

10:25AM  22   COMPLEX ACCOUNTING JUDGMENT.  SHE WAS TALKING TO THE OUTSIDE

10:25AM  23   ACCOUNTANTS FOR THERANOS ABOUT WHETHER THERANOS COULD RECOGNIZE

10:25AM  24   THAT REVENUE DURING THE COURSE OF 2014.

10:25AM  25        BUT WE DO KNOW WHAT MS. HOLMES BELIEVED, BECAUSE AS LATE

ER-6744

10:25AM  1   AS DECEMBER OF 2014, MR. BALWANI TOLD MS. HOLMES THAT

10:25AM  2   $100 MILLION OF THAT AT LEAST WOULD BE -- $100 MILLION OF THIS

10:26AM  3   DEFERRED NUMBER WOULD BE RECOGNIZED AS ACTUAL REVENUE IN 2014.

10:26AM  4        NOW, IT WASN'T.  IT WASN'T FOR WHATEVER REASON, AND THE

10:26AM  5   RECORD IS NOT CLEAR ON THIS, THE ACCOUNTING JUDGMENT WAS MADE

10:26AM  6   THAT THIS CASH WHICH HAD COME INTO THE COMPANY IN TENS OF

10:26AM  7   MILLIONS OF DOLLARS SHOULD REMAIN DEFERRED REVENUE AND NOT BE

10:26AM  8   RECOGNIZED AS ACTUAL REVENUE IN 2014.

10:26AM  9        WE DON'T KNOW FROM THE RECORD WHY THAT IS.  WE DON'T KNOW

10:26AM  10  WHY MR. HOLMES -- OR WHY MR. BALWANI THOUGHT IT COULD BE

10:26AM  11  RECOGNIZED AS REVENUE IN 2014, AS LATE AS DECEMBER.

10:26AM  12       BUT WE DO KNOW THAT IT WAS NOT UNREASONABLE FOR

10:26AM  13  MS. HOLMES, WHEN SHE SAW THESE PROJECTIONS, TO BELIEVE THAT

10:26AM  14  THEY WERE AN ACCURATE STATEMENT OF WHAT WOULD HAPPEN IN 2014.

10:26AM  15       NOW, WHAT ABOUT THE 2015 NUMBER?

10:26AM  16       IN 2015 THE PROJECTION WAS THAT THE COMPANY WOULD MAKE

10:27AM  17  ABOUT $990 MILLION.

10:27AM  18       FIRST OF ALL, REMEMBER THE BACKDROP FOR THIS.  THE

10:27AM  19  BACKDROP FOR THIS IS THESE PROJECTIONS, WHICH WERE TALKING

10:27AM  20  ABOUT A FUTURE PERIOD, THE INVESTORS ARE TOLD THIS IS, THIS IS

10:27AM  21  SPECULATIVE, BUT WE'RE GIVING YOU AN ESTIMATE OF WHAT WE THINK

10:27AM  22  WOULD HAPPEN.  THAT WAS PART OF THE CONTRACT.

10:27AM  23       BUT AS WELL, THE INVESTORS WERE TOLD, HERE'S THE NUMBER OF

10:27AM  24  STORES WE'RE IN NOW, AND WE HAVE A BIG RISK, WHICH IS FOR THE

10:27AM  25  REVENUE NUMBERS TO BE ACHIEVED, WE'VE GOT TO EXPAND ACROSS

10:27AM 1    WALGREENS STORES ACROSS THE COUNTRY.  WE'RE ASSUMING THAT WE

10:27AM 2    WILL GET TO CERTAIN NUMBERS OF WALGREENS STORES.

10:27AM 3        NOW, MS. HOLMES INTERACTED WITH, FOR EXAMPLE, MS. PETERSON

10:27AM 4    ON A VERY LIMITED BASIS, BUT YOU COULD SEE FROM MS. PETERSON'S

10:27AM 5    OWN NOTES THAT MS. HOLMES IS SAYING TO HER, WE HAVE THESE

10:27AM 6    CONTRACTS TO BE IN WALGREENS STORES, BUT OUR RISK IS, CAN WE

10:28AM 7    EXECUTE ON THAT?

10:28AM 8        THERE WASN'T ANY SECRET ABOUT THAT AS PART OF THESE

10:28AM 9    CONVERSATIONS.  PEOPLE KNEW THAT.  AND THEY HAD TO EXPAND FROM

10:28AM 10   THE NUMBER OF STORES THAT THEY WERE IN CURRENTLY, WHICH WAS 30

10:28AM 11   OR SO, TO 900 STORES TO ACHIEVE THESE RESULTS.  THAT WAS ALL

10:28AM 12   KNOWN AND THEY KNEW THAT THERANOS WOULD HAVE TO EXECUTE TO DO

10:28AM 13   THAT.

10:28AM 14       TESTIMONY OF MR. MOSLEY ACKNOWLEDGED HE KNEW THAT,

10:28AM 15   MR. GROSSMAN ACKNOWLEDGED THAT HE KNEW THAT.  YOU KNOW, THERE

10:28AM 16   ARE A LOT OF FACTORS THAT GO INTO THIS.

10:28AM 17       BUT THE NUMBERS THAT WERE BEING GIVEN WERE BASED ON A

10:28AM 18   PROJECTION OF WHAT WOULD HAPPEN.  THOSE NUMBERS WERE BEING

10:28AM 19   PLACED IN A MODEL THAT MR. BALWANI PREPARED AND CONTROLLED.

10:28AM 20       IT'S VERY DIFFICULT TO SAY THAT MS. HOLMES HAD BAD INTENT

10:28AM 21   WITH REGARD TO THAT WHEN THE RISKS ASSOCIATED WITH IT ARE BEING

10:28AM 22   DISCLOSED.

10:28AM 23       AND WE ALSO KNOW THAT IN TERMS OF PREPARING THESE

10:29AM 24   FINANCIAL PROJECTIONS, THIS WAS NOT MS. HOLMES'S PROVINCE.

10:29AM 25   THIS WAS WORK THAT WAS DONE BY MR. BALWANI.

10:29AM  1      WE KNOW FROM CONTEMPORANEOUS EMAILS THAT WHEN THE COMPANY

10:29AM  2   NEEDED REVENUE PROJECTIONS, THAT MS. HOLMES GOT THEM FROM

10:29AM  3   MR. BALWANI, AND I THINK MR. SCHENK ACKNOWLEDGED THAT

10:29AM  4   YESTERDAY.

10:29AM  5      AND ONE LAST ISSUE, WHICH MR. LEACH ASKED MS. HOLMES ABOUT

10:29AM  6   ON CROSS-EXAMINATION, IS THERE WERE DIFFERENT REVENUES GIVEN IN

10:29AM  7   CONNECTION WITH A DIFFERENT ISSUE AT THERANOS, THE SO-CALLED

10:29AM  8   ARANCA ANALYSIS, WHICH THE REVENUE NUMBER WAS PROJECTED TO BE A

10:29AM  9   LOWER NUMBER.

10:29AM 10      THE GOVERNMENT MAY, IN ITS REBUTTAL TO ME, MAKE A BIG DEAL

10:29AM 11   ABOUT THAT.  I DON'T KNOW.

10:29AM 12      BUT I WOULD SAY TO YOU THAT MS. HOLMES TESTIFIED, AND THIS

10:29AM 13   WAS NOT EXPLORED WITH HER ON CROSS-EXAMINATION IN ANY DETAIL,

10:29AM 14   THAT THINGS WERE DONE FOR DIFFERENT PURPOSES.

10:29AM 15      THESE ANALYSES DID NOT HAVE THE SAME PURPOSES WITHIN THE

10:30AM 16   COMPANY, AND THAT THESE PROJECTIONS, BOTH PROJECTIONS AS TO

10:30AM 17   WHAT THE COMPANY WOULD EARN FOR THE NEXT YEAR, WHICH WERE

10:30AM 18   SHARED WITH THE BOARD, AS WAS THE OTHER NUMBER, AND SHE WAS

10:30AM 19   VERY TRANSPARENT WITH DIRECTORS ABOUT BOTH OF THOSE NUMBERS.

10:30AM 20      LET ME TALK LAST ON THE INVESTORS ABOUT THE ISSUE OF

10:30AM 21   DEMONSTRATIONS, AND I'LL REALLY ONLY TALK BRIEFLY ABOUT THIS

10:30AM 22   SUBJECT, AND I'LL ASK YOU TO KEEP A FEW THINGS IN MIND IN

10:30AM 23   CONNECTION WITH DEMONSTRATIONS.

10:30AM 24      OBVIOUSLY THERE WERE THOUSANDS OF DEMONSTRATIONS I THINK

10:30AM 25   MS. HOLMES TESTIFIED OVER TIME.

ER-6747

10:30AM  1      AND SOME OF THE MOST IMPORTANT CONCEPTS IN CONNECTION WITH

10:30AM  2  THOSE RELATE TO THE TESTIMONY OF MR. EDLIN AND MS. HOLMES'S OWN

10:30AM  3  TESTIMONY.

10:30AM  4      FIRST OF ALL, MR. EDLIN TESTIFIED THAT HE HAD COORDINATED

10:30AM  5  THE LOGISTICS; THAT ALL OF THE SCIENTIFIC WORK DONE IN

10:30AM  6  CONNECTION WITH DEMONSTRATIONS WAS DONE BY DR. YOUNG; THAT

10:31AM  7  MANY, MANY PEOPLE INSIDE OF THERANOS WERE INVOLVED IN THESE

10:31AM  8  DEMONSTRATIONS, WHICH ARE PORTRAYED AS BEING EFFORTS TO DECEIVE

10:31AM  9  PEOPLE.

10:31AM 10      MR. EDLIN THOUGHT OTHERWISE.  HE THOUGHT THE PURPOSE OF

10:31AM 11  THIS WAS TO SHOWCASE THERANOS'S TECHNOLOGY AND TO SHOW THIS IS

10:31AM 12  HOW THE DEVICE OR OTHER TECHNOLOGY AT THERANOS WORKS.

10:31AM 13      WHEN I, WHEN I ASKED HIM ON CROSS-EXAMINATION, WERE YOU

10:31AM 14  INVOLVED IN AN EFFORT TO DECEIVE PEOPLE?  HE SAID OF COURSE

10:31AM 15  NOT, THAT HE WAS -- AND HE DID NOT HAVE ANY IMPRESSION THAT

10:31AM 16  ANYBODY AT THERANOS WAS TRYING TO DECEIVE PEOPLE IN CONNECTION

10:31AM 17  WITH THESE DEMONSTRATIONS AND HOW THEY WERE CONDUCTED.

10:31AM 18      AND THERE REALLY WERE DIFFERENT KINDS OF DEMONSTRATIONS.

10:31AM 19  AS YOU KNOW, THERE WAS A PHASE I AND PHASE II AS PART OF

10:31AM 20  THERANOS'S RELATIONSHIP WITH WALGREENS.

10:31AM 21      SOME OF THE DEMONSTRATIONS SHOWED HOW PHASE I WORKED SO

10:32AM 22  THAT BLOOD WOULD BE DRAWN FROM THE PERSON GETTING THE

10:32AM 23  DEMONSTRATION.  IT WOULD BE PUT INTO A BOX AND TRANSPORTED BACK

10:32AM 24  TO THE CENTRAL LAB.

10:32AM 25      OTHER TIMES THE DEVICE WOULD BE PROCESSED -- THE SAMPLES

10:32AM  1    WOULD BE PROCESSED ON THE DEVICE IN THE ROOM.  SOMETIMES PEOPLE

10:32AM  2    WANTED TO GIVE THEIR BLOOD.  SOMETIMES PEOPLE DIDN'T.  THEY

10:32AM  3    JUST WANTED TO SEE HOW THE MACHINE WORKED.  THERE WERE ALL

10:32AM  4    SORTS OF PERMUTATIONS ABOUT THIS.

10:32AM  5         BUT YOU'VE SEEN FROM THE RECORD WHAT HAPPENED.

10:32AM  6         THERE'S BEEN TESTIMONY ABOUT MR. RAGO AND HIS

10:32AM  7    DEMONSTRATION.  IN CONNECTION WITH HIS DEMONSTRATION, HIS BLOOD

10:32AM  8    SAMPLE WAS TAKEN FROM HIM AND IT WAS TAKEN TO THE CENTRAL LAB.

10:32AM  9         THE GOVERNMENT IMPLIED THAT THAT WAS DECEPTIVE.  BUT, IN

10:32AM 10    FACT, HE REPORTED IN THE ARTICLE THAT BLOOD WAS ANALYZED AT

10:32AM 11    THERANOS IN A CENTRAL LAB.  HE DIDN'T WATCH IT BEING ANALYZED

10:32AM 12    ON THE DEVICE.

10:32AM 13         AND AS TO PEOPLE WHO DIDN'T WANT A BLOOD SAMPLE TAKEN FROM

10:32AM 14    THEM, WHICH HAPPENED, AND I THINK YOU SAW EVIDENCE ABOUT THAT,

10:33AM 15    A PROTOCOL WAS DEVELOPED SO THAT YOU COULD SEE HOW THE

10:33AM 16    TECHNOLOGY WORKED FROM THE BEGINNING TO THE END.

10:33AM 17         WHY?  BECAUSE IF YOU PUT A SAMPLE INTO THIS DEVICE AND IT

10:33AM 18    DIDN'T HAVE BLOOD IN IT, THE DEVICE FAILED AND THE PERSON

10:33AM 19    RECEIVING THE DEMONSTRATION WOULDN'T SEE HOW THE DEVICE WORKED.

10:33AM 20         SO WHY DID THERANOS DEVELOP A NULL PROTOCOL?  MR. EDLIN

10:33AM 21    TOLD YOU.  BECAUSE PEOPLE WANTED TO SEE A DEMONSTRATION WITHOUT

10:33AM 22    GIVING A BLOOD SAMPLE, AND THIS ALLOWED THE DEVICE TO FUNCTION

10:33AM 23    WITHOUT BLOOD BEING ACTUALLY DRAWN AND ANALYZED.

10:33AM 24         NOW, THE REPORTS THAT WERE DONE IN CONNECTION WITH

10:33AM 25    DEMONSTRATIONS, THEY MADE CLEAR THAT THEY WERE ONLY TECHNOLOGY

10:33AM  1    DEMONSTRATIONS.  THESE WEREN'T USED FOR CLINICAL TREATMENT OF

10:33AM  2    PATIENTS.  YOU SEE THAT ON EVERY FORM AT THE TOP WHERE THE

10:33AM  3    DEMONSTRATIONS WERE DESCRIBED AS TECHNOLOGY DEMONSTRATIONS.

10:33AM  4        SCIENTISTS WERE INVOLVED IN ALL OF THESE PROCESSES AND

10:34AM  5    THEY DETERMINED WHAT THE FINAL RESULTS WOULD BE.

10:34AM  6        YOU SAW EXTENSIVE TESTIMONY FROM MR. EDLIN AND FROM

10:34AM  7    MS. HOLMES ABOUT DR. YOUNG'S OVERSEEING THESE PROCESSES AND

10:34AM  8    MANAGING HOW THE RESULTS WERE REPORTED SO THAT THEY WOULD BE

10:34AM  9    CONSISTENT WITH ACCURATE VIEWS OF WHAT PATIENT'S BLOOD RESULTS

10:34AM 10    WERE.

10:34AM 11        ALL OF THAT, LADIES AND GENTLEMEN, IS THE CONTEXT AROUND

10:34AM 12    THESE DEMONSTRATIONS.  OBVIOUSLY THERE ARE THOUSANDS OF

10:34AM 13    DEMONSTRATIONS, BUT I WOULD ASK YOU TO BEAR IN MIND TESTIMONY

10:34AM 14    THAT NO ONE WAS TRYING TO DECEIVE PEOPLE, THAT THE PROCESS WAS

10:34AM 15    MANAGED BY SCIENTISTS, AND THAT THE DEMONSTRATIONS HAVE

10:34AM 16    DIFFERENT PURPOSES.

10:34AM 17        SO DON'T ASSUME THAT IF YOU SEE SOMETHING IN A

10:34AM 18    DEMONSTRATION WITH BLOOD BEING TAKEN OUT OF A ROOM, IT MEANS

10:34AM 19    THAT SOMETHING UNTOWARD IS HAPPENING.

10:34AM 20        NOW, I WANT TO MOVE FROM THERE TO TALKING ABOUT THE OTHER

10:34AM 21    CONSPIRACY THAT IS ALLEGED WHICH RELATES TO THERANOS PATIENTS.

10:35AM 22        AND THE ALLEGATIONS HERE, OF COURSE, AS YOU KNOW, IS THAT

10:35AM 23    THERANOS'S TECHNOLOGY WAS NOT CAPABLE OF CONSISTENTLY PRODUCING

10:35AM 24    ACCURATE AND RELIABLE RESULTS.

10:35AM 25        WELL, I WOULD ASK YOU, IN CONNECTION WITH THIS, TO JUST

10:35AM 1    BEAR IN MIND THAT THE LAB WAS MANAGED BY A LAB DIRECTOR, AND

10:35AM 2    THERE ARE PROCESSES THAT WERE ESTABLISHED IN THE LAB, AND THAT

10:35AM 3    THESE INFORM MS. HOLMES'S INTENT.

10:35AM 4        THE LENS THROUGH WHICH YOU REALLY WANT TO LOOK, I THINK,

10:35AM 5    AT THIS PATIENT CASE IS THAT THERE'S A PROCESS GOING ON IN THE

10:35AM 6    LAB.

10:35AM 7        AND ASK YOURSELF THE QUESTION, WAS MS. HOLMES'S INTENT

10:35AM 8    WITH RESPECT TO WHAT WAS GOING ON IN THE LAB, WAS IT IN GOOD

10:35AM 9    FAITH?  DID SHE BELIEVE THAT THE TESTS THAT WERE BEING OFFERED

10:35AM 10   WERE ACCURATE AND RELIABLE?

10:35AM 11       IF SHE DID, WHY DID SHE BELIEVE IT?

10:36AM 12       WELL, AS YOU COULD GLEAN FROM THE CROSS-EXAMINATION OF

10:36AM 13   DR. ROSENDORFF, SHE REALLY SAW SIX THINGS WHEN SHE LOOKED AT

10:36AM 14   THE LAB.

10:36AM 15       FIRST, SHE SAW THAT DR. ROSENDORFF WAS RESPONSIBLE FOR

10:36AM 16   DETERMINING WHAT TESTS AND WHAT METHODS WERE APPROPRIATE FOR

10:36AM 17   TESTING.

10:36AM 18       RECALL THAT DR. ROSENDORFF WAS THE LAB DIRECTOR AT

10:36AM 19   THERANOS FROM THE TIME THE LAB OPENED UNTIL ABOUT NOVEMBER OF

10:36AM 20   2014.  HE TESTIFIED LONGER THAN ANY OTHER WITNESS IN THE CASE

10:36AM 21   OTHER THAN MS. HOLMES.

10:36AM 22       HE WAS A HIGHLY QUALIFIED LAB DIRECTOR.  HE HAD BEEN IN A

10:36AM 23   SIMILAR POSITION AS PART OF THE CHILDREN'S HOSPITAL IN

10:36AM 24   PITTSBURGH, AND HE WAS A VERY IMPRESSIVE CANDIDATE.

10:37AM 25       THE FIRST THING HE DID WAS HE SAID WE, WE DETERMINED WHICH

10:37AM  1    TESTS WE SHOULD OFFER, WHETHER IT SHOULD BE ON A THERANOS

10:37AM  2    DEVICE OR SOME OTHER DEVICE.

10:37AM  3         THAT HAPPENED, IN FACT, AT THERANOS, AND IT WAS REQUIRED

10:37AM  4    BY LAW AS YOU SAW IN CONNECTION WITH SOME OF THE DOCUMENTS

10:37AM  5    INTRODUCED IN THE CASE.

10:37AM  6         THE LAB DIRECTOR DECIDES WHAT SYSTEMS ARE USED, WHAT TESTS

10:37AM  7    ARE USED IN CONNECTION.

10:37AM  8         HE TESTIFIED THAT THAT IS, IN FACT, WHAT HAPPENED.  IT WAS

10:37AM  9    NOT MS. HOLMES'S RESPONSIBILITY, IT WAS HIS RESPONSIBILITY.

10:37AM  10        SECOND, IN CONNECTION WITH EVERY TEST THAT WAS OFFERED IN

10:37AM  11   THE THERANOS LAB, IT WOULD NOT BE OFFERED, ACCORDING TO

10:37AM  12   DR. ROSENDORFF'S TESTIMONY, UNLESS HE SIGNED A VALIDATION

10:37AM  13   REPORT FOR IT.

10:37AM  14        AND WHAT DID THAT MEAN?  WELL, IT MEANT THAT HE WENT

10:37AM  15   THROUGH A PROCESS BEFORE THAT TEST WAS OFFERED OF DETERMINING

10:37AM  16   WHETHER THE TEST WAS ACCURATE AND RELIABLE FOR PURPOSES OF

10:37AM  17   PATIENT USE.  IT WAS A LONG PROCESS WITH MULTIPLE STEPS.  THE

10:38AM  18   REPORT WOULD BE SIGNED.  THERE WOULD BE PROCEDURES THAT WOULD

10:38AM  19   BE CREATED TO MAKE SURE THAT THE PROCESSES WERE BEING ADHERED

10:38AM  20   TO.  THERE WOULD BE TRAINING IN THE LAB, ET CETERA, THE THINGS

10:38AM  21   THAT YOU WOULD EXPECT.

10:38AM  22        DR. ROSENDORFF TESTIFIED THAT WITH REGARD TO EVERY TEST

10:38AM  23   OFFERED IN THE THERANOS LAB, HE SIGNED THESE VALIDATION

10:38AM  24   REPORTS.

10:38AM  25        YOU HEARD LENGTHY TESTIMONY ABOUT THAT AS PART OF BOTH OF

10:38AM   1    HIS EXAMINATIONS.

10:38AM   2         NOW, I WANT TO DIVERT FROM THIS DISCUSSION TO TALK ABOUT

10:38AM   3    ONE ISSUE, WHICH IS THAT SOME OF THE WITNESSES THAT THE

10:38AM   4    GOVERNMENT OFFERED, THEY TESTIFIED IN A MANNER THAT IN SOME

10:38AM   5    WAYS IS A LITTLE BIT IN TENSION WITH WHAT DR. ROSENDORFF

10:38AM   6    TESTIFIED, BECAUSE WHILE DR. ROSENDORFF TESTIFIED THAT HE

10:38AM   7    VALIDATED EVERY TEST THAT WAS OFFERED, YOU RECALL THAT

10:39AM   8    MS. GANGAKHEDKAR EARLIER IN THE CASE SAID THAT SHE HAD CONCERNS

10:39AM   9    ABOUT THE TESTS THAT WOULD BE OFFERED IN THERANOS'S CLINICAL

10:39AM  10    LAB, AND SHE LEFT IN RESPONSE TO THOSE.

10:39AM  11         SO I WANT TO GIVE YOU THE FULL PICTURE IN REGARD TO THAT

10:39AM  12    ISSUE.

10:39AM  13         MS. GANGAKHEDKAR LEFT THE COMPANY, AFTER WORKING THERE FOR

10:39AM  14    YEARS AND YEARS, IN SEPTEMBER OF 2013.  AND SHE SAID, YOU KNOW,

10:39AM  15    AT THE TIME I HAD CONCERNS ABOUT SOME OF THE ASSAYS.  SHE HAD

10:39AM  16    LED THE IMMUNOASSAY TEAM AND SHE WAS -- SHE TESTIFIED, I THINK,

10:39AM  17    AS WELL, AS YOU SAW ON CROSS-EXAMINATION, THAT SHE WAS PROUD OF

10:39AM  18    THE WORK, BUT SHE HAD SOME CONCERNS ABOUT THE ASSAY.

10:39AM  19         WELL, LET'S LOOK AT WHAT THE CONTEMPORANEOUS DOCUMENTS

10:39AM  20    REFLECT.

10:39AM  21         HER COMMUNICATIONS WITH MS. HOLMES WERE FRIENDLY.  SHE

10:39AM  22    WISHED THE COMPANY TREMENDOUS SUCCESS AS A RESULT OF HER

10:40AM  23    DEPARTURE AND SHE WAS PROUD OF THE WORK THAT SHE HAD DONE.

10:40AM  24         ALSO, WE KNOW THAT MS. HOLMES WAS TOLD THAT

10:40AM  25    MS. GANGAKHEDKAR WAS LEAVING BECAUSE OF HEALTH REASONS, FAMILY

10:40AM  1    REASONS, STRESS REASONS, ET CETERA.

10:40AM  2        SO THE CONTEMPORANEOUS RECORDS DIDN'T QUITE MATCH

10:40AM  3    MS. GANGAKHEDKAR'S TESTIMONY, BUT THAT REALLY IS A SIDE ISSUE

10:40AM  4    BECAUSE WHAT YOU SEE FROM MS. GANGAKHEDKAR'S REPORT IS ACTUALLY

10:40AM  5    MS. HOLMES'S GOOD FAITH.

10:40AM  6        MS. GANGAKHEDKAR TESTIFIED, I WENT TO MS. HOLMES AND SAID

10:40AM  7    I'M CONCERNED ABOUT ASSAYS BEING VALIDATED.  I'VE BEEN RAISING

10:40AM  8    THESE ISSUES TO MR. BALWANI.

10:40AM  9        YOU'LL RECALL THAT THERE WAS A VERY UNPLEASANT EXCHANGE

10:40AM 10    BETWEEN MR. BALWANI AND MS. GANGAKHEDKAR AS TO HER WORK ETHIC

10:40AM 11    WITH FAIRLY SERIOUS CRITICISM OF HER ON MR. BALWANI'S PART.

10:41AM 12    THAT WAS IN EXHIBIT 3961.

10:41AM 13        AND SHE WENT TO MS. HOLMES AND SAID, I'M CONCERNED, I'M

10:41AM 14    LEAVING THE COMPANY.

10:41AM 15        AND MS. HOLMES'S REACTION WAS NOT, IF YOU'RE EXPRESSING

10:41AM 16    CONCERNS, YOU'RE FIRED.  I HAVE A SIMILAR REACTION, I'M

10:41AM 17    CRITICAL OF YOU.

10:41AM 18        MS. HOLMES SAID, WELL, IF YOU'RE STRESSED AND IF YOU HAVE

10:41AM 19    HEALTH ISSUES, WHY DON'T YOU JUST TAKE A LEAVE OF ABSENCE?

10:41AM 20    DON'T LEAVE THE COMPANY.  TAKE TIME OFF UNTIL YOUR HEALTH

10:41AM 21    PROBLEMS HAVE BEEN RESOLVED AND THEN COME BACK WHEN YOU'RE

10:41AM 22    READY TO COME BACK.

10:41AM 23        WHAT DOES ALL OF THAT MEAN AS TO WHAT THE GOVERNMENT'S

10:41AM 24    EVIDENCE MEANS ON THAT?

10:41AM 25        WELL, FIRST OF ALL, IT MEANS THAT MS. HOLMES WAS NOT

ER-6754

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9192

10:41AM 1    TRYING TO SUPPRESS ANY CONCERNS THAT WERE BEING RAISED BY

10:41AM 2    MS. GANGAKHEDKAR.

10:41AM 3        MS. HOLMES WAS REACTING TO THAT IN A VERY HUMAN WAY AND

10:41AM 4    SAYING, COME BACK AND WORK WITH US.

10:41AM 5        BUT ALSO IN RESPONSE TO THE CONCERNS THAT MS. GANGAKHEDKAR

10:41AM 6    RAISED, WHAT WE KNOW IS THAT NO, NO ASSAY, NO TEST WAS EVER

10:42AM 7    OFFERED IN THE THERANOS CLIA LABORATORY IN 2013 AND 2014 THAT

10:42AM 8    DR. ROSENDORFF DIDN'T ULTIMATELY SIGN OFF ON.

10:42AM 9        THE EVIDENCE DURING HIS TESTIMONY SHOWED THAT THERE WERE

10:42AM 10   ASSAYS ON WHICH THERANOS DELAYED THE DECISION TO USE TESTS ON

10:42AM 11   EITHER THE EDISON OR ON THE MODIFIED MACHINES BECAUSE THERE

10:42AM 12   WERE CONCERNS.

10:42AM 13       BUT THE LAUNCH OF THOSE TESTS WAS DELAYED UNTIL AFTER

10:42AM 14   THOSE CONCERNS HAD BEEN RESOLVED TO DR. ROSENDORFF'S

10:42AM 15   SATISFACTION.

10:42AM 16       SO I'LL SAY TWO THINGS ABOUT MS. GANGAKHEDKAR'S TESTIMONY.

10:42AM 17       FIRST, NOTHING ABOUT IT SHOWS THAT MS. HOLMES WAS TRYING

10:42AM 18   TO EXPRESS CONCERNS OR DISMISS CONCERNS OR ANYTHING LIKE THAT.

10:42AM 19       BUT SECOND, ANY CONCERN SHE RAISED WAS, IN MS. HOLMES'S

10:43AM 20   MIND, RESOLVED BY DELAY OF ANY ASSAYS UNTIL THOSE CONCERNS

10:43AM 21   COULD BE EVALUATED AND RESOLVED BY DR. ROSENDORFF AND OTHERS

10:43AM 22   WORKING IN THE CLIA LAB.

10:43AM 23       NOW, THE IMPLICATION OF WHAT DR. ROSENDORFF ULTIMATELY

10:43AM 24   TESTIFIED TO WAS THAT HE WAS UNCOMFORTABLE WITH TESTS THAT WERE

10:43AM 25   BEING OFFERED BY THERANOS.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)      9193

10:43AM  1          BUT HE ACTUALLY TESTIFIED TO JUST THE OPPOSITE.  HE SAID

10:43AM  2     THAT HE COULDN'T RECALL EVER PUTTING A SIGNATURE ON A

10:43AM  3     VALIDATION REPORT WHERE HE THOUGHT THAT ASSAY WASN'T

10:43AM  4     APPROPRIATE FOR PATIENT USE.

10:43AM  5          SO I THINK THAT, YOU KNOW, THE THIRD FOUNDATIONAL POINT

10:43AM  6     HERE IS THAT NOT ONLY DID HE APPROVE ALL OF THE TESTS THAT WERE

10:43AM  7     OFFERED, BUT HE WAS COMFORTABLE SIGNING THE APPROVALS FOR THOSE

10:43AM  8     TESTS TO BE OFFERED IN THE CLIA LAB.

10:43AM  9          NEXT I THINK, AND IMPORTANTLY, REMEMBER THAT HE

10:44AM 10     ACKNOWLEDGED THAT HE NEVER CAME TO A CONCLUSION THAT THE 3.5

10:44AM 11     DEVICE THAT REFLECTED -- WAS TESTING ASSAYS IN THE THERANOS LAB

10:44AM 12     WAS ITSELF UNRELIABLE.  HE NEVER CAME TO THAT CONCLUSION.  AND

10:44AM 13     HIS BEHAVIOR AT THE TIME REFLECTED THAT.

10:44AM 14          HE CONTINUED TO APPROVE THE USE OF THAT DEVICE TO TEST

10:44AM 15     PATIENTS IN THE CLIA LAB UP UNTIL ALMOST HIS DEPARTURE.

10:44AM 16          YOU SEE THAT HE'S APPROVING THEM AS LATE AS SEPTEMBER OF

10:44AM 17     2014.  HE LEFT THE COMPANY WITHIN ABOUT 60 DAYS OF THAT.

10:44AM 18          SO THE SUGGESTION THAT HE IN SOME SENSE WAS FUNDAMENTALLY

10:44AM 19     UNCOMFORTABLE WITH THE EDISON DEVICE OR WITH OTHER ELEMENTS OF

10:44AM 20     THERANOS'S TECHNOLOGY IS NOT SUPPORTED BY THE RECORD.

10:44AM 21          FIFTH, HE TESTIFIED THAT IN EVERY INSTANCE HE FOLLOWED THE

10:44AM 22     CLIA REGULATIONS.  THERE WERE NO DEVIATIONS FROM WHAT WAS

10:45AM 23     REQUIRED.  HE SAID THAT DIRECTLY UNDER OATH.

10:45AM 24          AND LAST, AND THIS REALLY ADDRESSES MOST OF THE

10:45AM 25     GOVERNMENT'S CASE, HE SAYS THAT, YES, ISSUES CAME UP IN THE

10:45AM  1    CLIA LAB.

10:45AM  2          WE SAW SOME OF THOSE INSTANCES YESTERDAY IN EMAILS THAT

10:45AM  3    MR. SCHENK SHOWED YOU.

10:45AM  4          BUT HE SAID IN RESPONSE TO THAT, THERANOS THOROUGHLY

10:45AM  5    INVESTIGATED THOSE ISSUES.

10:45AM  6          AND I WANT TO RUN THROUGH A FEW OF THOSE WITHOUT GETTING

10:45AM  7    INTO THE PARTICULARS, BUT JUST GIVING YOU SOME GUIDEPOSTS TO

10:45AM  8    LOOK AT THOSE ISSUES IF THEY'RE OF CONCERN TO YOU IN CONNECTION

10:45AM  9    WITH DELIBERATING.

10:45AM  10         LET ME TALK ABOUT SOME OF THE INDIVIDUALS WHO YOU SAW WHO

10:45AM  11   RAISED CONCERNS, AND THEN I'LL TALK ABOUT SOME OF THE TESTS

10:45AM  12   THAT MR. SCHENK MENTIONED YESTERDAY.

10:45AM  13         FIRST, YOU HEARD TESTIMONY FROM MS. CHEUNG, WHO TESTIFIED

10:45AM  14   EARLIER IN THE CASE, THAT SHE HAD SOME CONCERNS AS THE RESULT

10:45AM  15   OF A QUALITY CONTROL EXPERIMENT THAT WAS UNDERTAKEN IN THE CLIA

10:46AM  16   LAB.

10:46AM  17         WELL, THE EVIDENCE IN THE CASE ON THIS IS VERY CLEAR.

10:46AM  18   MS. HOLMES WAS NOT SOMEONE WHO INTERACTED WITH MS. CHEUNG WHILE

10:46AM  19   SHE WAS AT THERANOS, MS. CHEUNG DIDN'T RAISE THOSE CONCERNS

10:46AM  20   WITH MS. HOLMES, AND MS. HOLMES WAS NOT TOLD BY ANYONE ELSE

10:46AM  21   THAT MS. CHEUNG HAD THOSE CONCERNS AT THE TIME THAT MS. CHEUNG

10:46AM  22   WAS WORKING AT THERANOS.

10:46AM  23         WHAT WE DO KNOW IS THAT DR. ROSENDORFF KNEW OF THOSE

10:46AM  24   CONCERNS AND THAT HE REACTED TO THOSE CONCERNS.  THE GIST OF

10:46AM  25   MS. CHEUNG'S TESTIMONY WAS THAT THERE WAS A PROFICIENCY TESTING

ER-6757

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9195

10:46AM  1    EXPERIMENT IN FEBRUARY OF 2014 AND THE RESULTS WERE VERY POOR.

10:46AM  2    YOU'LL RECALL HER TESTIFYING ABOUT THAT.

10:46AM  3        AND DR. ROSENDORFF SAID I LOOKED AT THAT AT THE TIME, AND

10:46AM  4    HE LOOKED AT IT AGAIN WHILE HE WAS SITTING UP HERE ON THE

10:46AM  5    STAND.  AND HE SAID THE WAY THAT THAT EXPERIMENT WAS DONE WAS

10:47AM  6    FLAWED, AND THE REASON THOSE RESULTS WERE BAD IS THAT IT WASN'T

10:47AM  7    DONE ACCORDING TO THE APPROPRIATE POLICY.

10:47AM  8        SO AS A RESULT OF DR. ROSENDORFF'S CONCLUSIONS,

10:47AM  9    DR. YOUNG'S CONCLUSIONS, ET CETERA, WHEN THIS ISSUE CAME UP

10:47AM 10    LATER TO MS. HOLMES, SHE WAS PRESENTED WITH THE BELIEF THAT THE

10:47AM 11    CONCERNS THAT MS. CHEUNG HAD RAISED WERE NOT JUSTIFIED.

10:47AM 12        NOW, THAT ONLY MAKES SENSE THAT DR. ROSENDORFF WOULD LOOK

10:47AM 13    AT THAT ISSUE AND RESOLVE THAT ISSUE BECAUSE, AS A MATTER OF

10:47AM 14    LAW AND AS A MATTER OF FACT, THAT WAS HIS RESPONSIBILITY.

10:47AM 15        WHAT WAS, WHAT WAS DONE AFTER MS. CHEUNG'S CONCERNS WERE

10:47AM 16    RAISED?  WELL, THEY UPDATED THE POLICY FOR HOW EXPERIMENTS

10:47AM 17    SHOULD BE RUN ON QUALITY CONTROL BECAUSE DR. ROSENDORFF SAID

10:47AM 18    MS. CHEUNG DIDN'T -- MS. CHEUNG AND MANY OTHERS INSIDE OF THE

10:47AM 19    LAB WHO WERE INVOLVED WITH THAT EXPERIMENT DIDN'T UNDERSTAND

10:47AM 20    HOW THESE QUALITY CONTROL EXPERIMENTS SHOULD BE RUN.

10:48AM 21        YOU HEARD A LOT OF TESTIMONY.  SO THAT'S ONE INDIVIDUAL

10:48AM 22    RAISING CONCERNS.

10:48AM 23        THE SECOND INDIVIDUAL THAT WE HEARD ABOUT, BUT DID NOT

10:48AM 24    SEE, WAS TYLER SHULTZ.  I WON'T GO THROUGH HIS CONCERNS IN

10:48AM 25    DETAIL BECAUSE YOU SAW SOME OF THOSE DOCUMENTS WHEN MS. HOLMES

10:48AM   1    TESTIFIED.

10:48AM   2        BUT SUFFICE IT TO SAY THAT THE GIST OF THAT TESTIMONY IS

10:48AM   3    MR. SHULTZ RAISED CONCERNS, MS. HOLMES TOOK THOSE CONCERNS VERY

10:48AM   4    SERIOUSLY.

10:48AM   5        HE RAISED THEM THREE SEPARATE TIMES.  IN EACH INSTANCE

10:48AM   6    MS. HOLMES ALMOST IMMEDIATELY BROUGHT THE FACT THAT MR. SHULTZ

10:48AM   7    HAD THESE CONCERNS TO THE ATTENTION OF DR. YOUNG, EFFECTIVELY

10:48AM   8    THE CHIEF TECHNICAL OFFICER, ASKED HIM TO EVALUATE THOSE

10:48AM   9    CONCERNS, ASKED HIM TO MEET WITH MR. SHULTZ, ASKED HIM TO

10:48AM  10    UNDERSTAND WHETHER THOSE CONCERNS HAD MERIT.

10:48AM  11        IF THEY DIDN'T HAVE MERIT, TO EXPLAIN TO MR. SHULTZ WHY

10:48AM  12    THEY DID NOT HAVE MERIT.

10:49AM  13        AND ALL OF THAT IS REFLECTED IN DOCUMENTS THAT HAVE BEEN

10:49AM  14    INTRODUCED IN THE CASE.  SO I'LL GIVE YOU THOSE EXHIBIT

10:49AM  15    NUMBERS.  THEY'RE EXHIBIT 1667, EXHIBIT 7421, AND EXHIBIT 7434.

10:49AM  16        I THINK IF YOU'LL GO BACK AND LOOK AT THOSE, YOU'LL SEE

10:49AM  17    THAT THE RECORD FROM THE TIME IS CONSISTENT WITH THAT

10:49AM  18    DESCRIPTION.

10:49AM  19        NOW, MORE EXTENSIVELY YESTERDAY MR. SCHENK JUST WENT

10:49AM  20    THROUGH JUST A BLITZ OF EMAILS WHERE THERE WOULD BE AN ISSUE IN

10:49AM  21    CONNECTION WITH A PARTICULAR ASSAY THAT WOULD ARISE FOR ONE

10:49AM  22    REASON OR ANOTHER.

10:49AM  23        AND MR. SCHENK SUGGESTED TO YOU THAT THE EXISTENCE OF

10:49AM  24    THOSE EMAILS, FRANKLY WHETHER MS. HOLMES WAS ON ALL OF THEM OR

10:49AM  25    NOT, SUGGESTED THAT MS. HOLMES SHOULD HAVE KNOWN THAT THE CLIA

10:50AM   1    LAB WAS NOT OFFERING ACCURATE AND RELIABLE RESULTS.

10:50AM   2         WHAT DO WE KNOW ABOUT HOW THERANOS APPROACHED THOSE ISSUES

10:50AM   3    WHEN THEY AROSE?

10:50AM   4         WELL, FIRST OF ALL, WE KNOW THAT DR. ROSENDORFF HAD PUT IN

10:50AM   5    PLACE, AS HE SHOULD HAVE, A STANDARD OPERATING PROCEDURE THAT

10:50AM   6    SAID EVERY TIME AN ISSUE IS RAISED ABOUT AN ASSAY, WE HAVE TO

10:50AM   7    DO AN INTERNAL REVIEW OF THAT CONCERN, WE HAVE TO EVALUATE

10:50AM   8    WHETHER THAT CONCERN GOES TO THE INTEGRITY OF THE ASSAY THAT WE

10:50AM   9    ARE OFFERING.

10:50AM  10         AND, IN FACT, IN EACH INSTANCE, INCLUDING EACH INSTANCE

10:50AM  11    RAISED BY MR. SCHENK YESTERDAY, THAT IS WHAT WAS DONE.

10:50AM  12         HOW DID THAT WORK?

10:50AM  13         THERE WAS -- THE ISSUE WOULD BE FLAGGED, LAB PERSONNEL AND

10:50AM  14    SCIENTISTS WOULD LOOK AT THE DATABASE THAT STORED THE

10:50AM  15    INFORMATION THAT RELATED TO TESTS ON THAT ASSAY, THEY WOULD

10:51AM  16    LOOK AS TO SEE WHETHER THERE WERE COMMON ISSUES AMONGST WHEN

10:51AM  17    THAT TEST WAS OFFERED, WHERE THAT TEST WAS OFFERED, THE LAB

10:51AM  18    TECHNICIAN WHO PROCESSED IT, THE PARTICULAR PERSON WHO WAS

10:51AM  19    DRAWING THE SAMPLES.  IS THERE SOMETHING HAPPENING WITH RESPECT

10:51AM  20    TO THIS ASSAY THAT IS LEADING TO INACCURATE RESULTS?

10:51AM  21         AND THEY WOULD COME TO A CONCLUSION.  AND IF THE

10:51AM  22    CONCLUSION WAS THERE'S A PROBLEM FUNDAMENTALLY WITH THIS TEST

10:51AM  23    OR WITH THIS DEVICE, THEY WOULD EITHER STOP OFFERING IT

10:51AM  24    COMPLETELY AS AN ASSAY OR THEY WOULD STOP OFFERING IT AND

10:51AM  25    TRANSFER IT TO ANOTHER DEVICE WHERE IT COULD BE OFFERED.

ER-6760

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9198

10:51AM    1            THAT WAS WHAT THE POLICY MR. ROSENDORFF PUT IN PLACE,

10:51AM    2    DR. ROSENDORFF PUT IN PLACE REQUIRED, AND THE EVIDENCE IN THE

10:51AM    3    CASE SUGGESTS THAT THAT WOULD HAPPEN.

10:51AM    4            LET'S TAKE AN EXAMPLE, AND IT'S ONLY ONE EXAMPLE, BUT

10:52AM    5    MR. SCHENK WENT THROUGH IT YESTERDAY, THE EXAMPLE OF HCG.

10:52AM    6            AND YOU'LL RECALL THAT THIS WAS THE SUBJECT OF A LOT OF

10:52AM    7    TESTIMONY IN DR. ROSENDORFF'S CROSS-EXAMINATION.

10:52AM    8            THE GOVERNMENT YESTERDAY PUT UP A -- SUGGESTED A

10:52AM    9    CHRONOLOGY TO YOU THAT LOOKS SOMETHING LIKE THIS WITH REGARD TO

10:52AM   10    BEGINNING OF ISSUES ON HCG AND SUGGESTED THAT THERE HAD BEEN A

10:52AM   11    VALIDATION REPORT WHERE DR. ROSENDORFF HAD DETERMINED TO PUT

10:52AM   12    HCG ON AN EDISON DEVICE IN MARCH, THAT TESTING HAD BEGUN IN

10:52AM   13    MAY, AND THAT IN LATE MAY DR. ROSENDORFF HAD STOPPED THAT

10:52AM   14    TESTING, AND THAT THIS WAS PRESENTED AS THIS WAS THE RESULT OF

10:52AM   15    A CONCERN THAT HAD BEEN RAISED AND REFLECTED A CONCERN ON

10:53AM   16    DR. ROSENDORFF'S PART.

10:53AM   17            BUT WHAT ACTUALLY HAPPENED WITH RESPECT TO THIS ISSUE?

10:53AM   18            THERE'S ACTUALLY A MUCH LARGER SERIES OF EVENTS INVOLVING

10:53AM   19    A MUCH LARGER SERIES OF EXHIBITS THAT WERE INTRODUCED IN THE

10:53AM   20    CASE.  AND THIS SHOWS YOU WHAT HAPPENED.

10:53AM   21            AFTER MAY 9TH, THE HCG ASSAY WAS OFFERED ON AN EDISON

10:53AM   22    DEVICE.

10:53AM   23            AS EXHIBIT 4145 DEMONSTRATES, THE QUESTION CAME IN.

10:53AM   24    DR. ROSENDORFF AND DR. YOUNG DISCUSSED IT.

10:53AM   25            ALMOST IMMEDIATELY MS. HOLMES ASKED TO MEET WITH THEM AS

10:53AM 1    SOON AS SHE KNEW ABOUT THE ISSUE.  AND LATER THAT DAY, THE

10:53AM 2    PHYSICIAN WHO HAD TREATED THE PATIENT WHERE THERE WAS AN ISSUE

10:53AM 3    WAS CONTACTED AND THERE WAS A PLAN OF ACTION FOR REACTING TO

10:53AM 4    THE POTENTIALLY ERRANT ISSUE.

10:53AM 5        WE KNOW FROM THE RECORD THAT MS. HOLMES WROTE, PERHAPS

10:53AM 6    EARLY THE NEXT MORNING, THAT SHE HAD DONE MANY MEETINGS ON IT

10:54AM 7    TODAY, REFERRING TO THAT SAME DAY, THE 2TH.  SHE MET WITH THE

10:54AM 8    STAFF OF THE CLIA LAB, INCLUDING DR. ROSENDORFF, THE NEXT DAY.

10:54AM 9        AND THEN JUST SHORTLY AFTER THAT MEETING ENDED,

10:54AM 10   DR. ROSENDORFF STOPPED TESTING ON THE EDISON DEVICE FOR THIS

10:54AM 11   HCG ASSAY.

10:54AM 12       THE SUGGESTION THAT A CONCERN BEING RAISED WITH MS. HOLMES

10:54AM 13   GAVE HER NOTICE OF INACCURATE AND UNRELIABLE RESULTS AND THAT

10:54AM 14   WASN'T IMMEDIATELY CORRECTED IS INCONSISTENT WITH WHAT THE

10:54AM 15   RECORD SHOWED ON THIS ISSUE.

10:54AM 16       NOW, THERE WAS A SUBSEQUENT SERIES OF EMAILS THAT DISCUSS

10:54AM 17   AN INVESTIGATION INTO THIS ISSUE, AND DR. ROSENDORFF'S

10:54AM 18   TESTIMONY REFLECTED THAT HE WAS AWARE BY THE MIDDLE OF JUNE

10:54AM 19   THAT THOSE QUESTIONS HAD BEEN RESOLVED AND THAT THE HCG ASSAY

10:54AM 20   WAS AGAIN BEING OFFERED ON THE EDISON DEVICE, AND THAT THAT

10:54AM 21   WAS, AS IT WAS THE TRUTH WITH RESPECT TO ALL ASSAYS, SOMETHING

10:55AM 22   THAT HE HAD SIGNED OFF ON AND APPROVED.

10:55AM 23       SO WHAT DOES THIS JUST ONE SCENARIO OF ALL THE OF THE

10:55AM 24   SCENARIOS MENTIONED YESTERDAY BY MR. SCHENK DEMONSTRATE?

10:55AM 25       FIRST OF ALL, IT DEMONSTRATES THAT WHEN A PROBLEM WAS

10:55AM 1    RAISED, THERE WERE IMMEDIATE MEETINGS ABOUT IT.  IT WAS NOT

10:55AM 2    TREATED CAVALIERLY.

10:55AM 3        SECOND, THERE WAS A DISCUSSION WITH THE PATIENT'S

10:55AM 4    PHYSICIAN.  IF A PATIENT HAD BEEN POTENTIALLY AFFECTED, THEY

10:55AM 5    TALKED TO THAT PHYSICIAN.

10:55AM 6        THIRD, THEY STOPPED THE TESTING, AS I TOLD YOU A FEW

10:55AM 7    MOMENTS AGO.  THEY WOULD EITHER OFFER IT ON ANOTHER PLATFORM OR

10:55AM 8    THEY WOULDN'T OFFER IT AT ALL.

10:55AM 9        THEY TRIED TO FIGURE OUT WHAT HAPPENED.

10:55AM 10       AND THEN DR. ROSENDORFF WOULD MAKE A DECISION BASED ON THE

10:55AM 11   INVESTIGATION, WAS THIS ACTUALLY AN ISSUE RELATED TO THE ASSAY?

10:55AM 12   WAS IT RELATED TO THE DEVICE?

10:55AM 13       AND DEPENDING ON THE RESULTS OF THAT DETERMINATION, HE

10:55AM 14   WOULD ALLOW THE TEST TO START OR CEASE OFFERING THAT TEST.

10:56AM 15       NOW, ANOTHER EMAIL WAS BROUGHT UP BY MR. SCHENK YESTERDAY,

10:56AM 16   AND IT WAS ALMOST AS IF DR. ROSENDORFF'S CROSS-EXAMINATION DID

10:56AM 17   NOT HAPPEN.

10:56AM 18       THIS IS AN EMAIL THAT DR. ROSENDORFF WAS SHOWN ON HIS

10:56AM 19   DIRECT.  YOU WILL RECALL IT WAS FROM CHRISTIAN HOLMES,

10:56AM 20   MS. HOLMES'S BROTHER, TO HER TALKING ABOUT HCG.

10:56AM 21       AND THE TEXT OF THAT EMAIL SAID, HCG HAS SOME SERIOUS

10:56AM 22   ISSUES AND PATIENT COMPLAINTS, AND IT WAS IMPLIED ON DIRECT

10:56AM 23   EXAMINATION AND YESTERDAY THAT THIS WAS FURTHER NOTICE TO

10:56AM 24   MS. HOLMES OF INACCURACY WITH REGARD TO THIS VERY SENSITIVE

10:56AM 25   ASSAY.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9201

10:56AM  1          BUT WHAT DID THE -- WHAT DOES THE BALANCE OF THAT EMAIL,

10:56AM  2     AS WELL AS OTHER EXHIBITS RELATED TO THIS, DEMONSTRATE?

10:56AM  3          FIRST OF ALL, THE ISSUE THAT CHRISTIAN HOLMES WAS TALKING

10:56AM  4     ABOUT HERE WAS NOT AT ALL ACCURACY OR RELIABILITY.

10:56AM  5          WHAT HE WAS TALKING ABOUT IS THAT THE NUMBER OF SAMPLES

10:57AM  6     THAT THE COMPANY WAS RECEIVING TO TEST HCG ON WAS BACKLOGGED

10:57AM  7     AND WOMEN WERE WAITING TO FIND OUT WHETHER THEY WERE PREGNANT

10:57AM  8     OR NOT, AND THAT'S OBVIOUSLY A SENSITIVE SITUATION.

10:57AM  9          WHY DID THAT HAPPEN?  BECAUSE THE REAGENTS HADN'T BEEN

10:57AM 10     ORDERED BY DR. ROSENDORFF OR THOSE WORKING FOR DR. ROSENDORFF

10:57AM 11     IN THE LAB.

10:57AM 12          THE EXCHANGE BETWEEN CHRISTIAN HOLMES AND HIS SISTER HERE

10:57AM 13     HAS NOTHING TO DO WITH ACCURACY OR RELIABILITY OF THE HCG TEST.

10:57AM 14          THAT'S A PATTERN THAT YOU SEE ACROSS THESE ASSAYS, EITHER

10:57AM 15     THE CONCERN IS NOT WHAT'S BEING RAISED WITH MS. HOLMES MAY LOOK

10:57AM 16     AMBIGUOUS BUT IT'S NOT A CONCERN ABOUT ACCURACY, IT'S A CONCERN

10:57AM 17     THAT WAS INVESTIGATED OR RESOLVED, OR IT'S A CONCERN THAT WAS

10:57AM 18     INVESTIGATED AND THEY CEASED OFFERING THE ASSAYS.

10:57AM 19          I'M NOT GOING TO GO THROUGH ALL OF THOSE, BUT FOR THE

10:57AM 20     RECORD I WILL SAY THAT WE HAVE DONE THAT WITH RESPECT TO HDL

10:58AM 21     MENTIONED YESTERDAY, EXHIBITS -- THE EXHIBITS OFFERED BY THE

10:58AM 22     GOVERNMENT, AND WE'LL PROVIDE YOU WITH THOSE FROM THE DEFENSE.

10:58AM 23          THE EXHIBITS WHICH GIVE FURTHER CONTEXT ON HDL FOR YOU TO

10:58AM 24     TAKE A LOOK AT ARE LISTED HERE.  THEY PROVIDE THE CONTEXT AS TO

10:58AM 25     WHAT REALLY HAPPENED WITH RESPECT TO THESE ASSAYS FOLLOWING THE

10:58AM  1    PATTERN THAT I'VE JUST DESCRIBED.

10:58AM  2        NOW, HOW DO YOU KNOW WHAT I'VE TOLD YOU IS JUST TRUE EVEN

10:58AM  3    WITHOUT DIGGING THROUGH ALL OF THE DOCUMENTS THAT I'VE LISTED

10:58AM  4    ON THIS SLIDE?

10:58AM  5        HOW DO YOU KNOW THAT THERANOS DID NOT BELIEVE, AND

10:58AM  6    THEREFORE MS. HOLMES DID NOT BELIEVE, THAT IT WAS OFFERING

10:58AM  7    INACCURATE OR UNRELIABLE TEST RESULTS?

10:58AM  8        WELL, RECALL DR. ROSENDORFF WAS ASKED SQUARELY ABOUT THIS.

10:58AM  9    HE SAID -- AFTER BEING SHOWN ALL OF THESE EMAILS AND AFTER

10:59AM  10   THESE ISSUES WERE DISCUSSED AT LENGTH WITH HIM, HE WAS ASKED

10:59AM  11   SQUARELY, "YOU NEVER OFFERED TESTS THAT YOU THOUGHT WERE

10:59AM  12   INACCURATE AND UNRELIABLE WHEN YOU WERE SERVING AS LAB DIRECTOR

10:59AM  13   AT THERANOS; CORRECT?

10:59AM  14       "CORRECT."

10:59AM  15       THE LAB DIRECTOR DID NOT BELIEVE THAT THE TESTS WERE

10:59AM  16   INACCURATE OR UNRELIABLE.

10:59AM  17       AND THEN HE WAS ASKED, "DID YOU EVER USE A TEST ON

10:59AM  18   PATIENTS THAT YOU BELIEVED WAS INACCURATE OR UNRELIABLE?"

10:59AM  19       AND HE SAID, "NO.  NO."

10:59AM  20       THE PERSON WHO WAS SUPPOSED TO MAKE THESE DETERMINATIONS

10:59AM  21   DID NOT BELIEVE THAT TESTS WERE INACCURATE OR UNRELIABLE.

10:59AM  22       WHAT THE GOVERNMENT HAS REALLY DONE WITH RESPECT TO THIS

10:59AM  23   ISSUE IS THAT THEY HAVE LOOKED AT ISSUES THAT ARE COMING UP AND

10:59AM  24   BEING INVESTIGATED AND RESOLVED AND CONFLATED THAT WITH THE

10:59AM  25   IDEA THAT MS. HOLMES SHOULD SOMEHOW STEP IN AND FILL IN FOR THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9203

10:59AM  1    LAB DIRECTOR AND REMOVE OR KNOW THINGS THAT THE LAB DIRECTOR

11:00AM  2    DOESN'T KNOW.

11:00AM  3         WELL, THAT WOULD BE ENTIRELY IMPROPER AS I THINK YOU HEARD

11:00AM  4    DR. ROSENDORFF TESTIFY.

11:00AM  5         AND HE SAID THAT NOT ONLY WITH REGARD TO THE TESTS THAT

11:00AM  6    WERE OFFERED, THE CLASSES OF TESTS, SAY HDL OR HCG.

11:00AM  7         HE SAID HE NEVER WAS AWARE OF A PATIENT GETTING A TEST

11:00AM  8    THAT AT THE TIME HE BELIEVED WAS INACCURATE OR UNRELIABLE AT

11:00AM  9    THE TIME THAT IT WAS OFFERED.  HE SAID THAT OVER AND OVER AND

11:00AM 10    OVER AGAIN.

11:00AM 11         HE SAID THAT HE NEVER ALLOWED FOR THE RELEASE OF

11:00AM 12    INACCURATE RESULTS, THAT HE NEVER DIRECTED, THAT MS. HOLMES

11:00AM 13    NEVER DIRECTED THAT A PARTICULAR MACHINE BE USED, THAT SHE

11:00AM 14    NEVER TOLD HIM TO RELEASE A RESULT THAT SHE THOUGHT HE

11:00AM 15    SHOULDN'T RELEASE.  THAT SHE NEVER DIRECTED HIM OR OVERRULED

11:00AM 16    HIM ON ANYTHING IN CONNECTION WITH THE LAB, NOTHING.

11:00AM 17         THE EMAIL THAT THE GOVERNMENT USES HERE TO SHOW INTENT, ET

11:00AM 18    CETERA, HAPPEN WITHIN THIS FRAMEWORK WHERE THERE'S A LAB

11:01AM 19    DIRECTOR FOR THE FIRST YEAR.

11:01AM 20         HE ALSO TOLD YOU, YOU KNOW, NO LAB IS PERFECT, THAT THERE

11:01AM 21    ARE POTENTIAL ISSUES IN EVERY LAB.

11:01AM 22         I THINK WE SHOWED YOU AN EMAIL WHICH REFLECTED HIM

11:01AM 23    ACTUALLY SAYING THAT AN ISSUE HAD COME UP AND BEEN RAISED BY A

11:01AM 24    DOCTOR AND THAT -- THIS WASN'T THE FAULT OF THE TEST OR OF

11:01AM 25    THERANOS; THAT THIS WAS A MISREADING OF THE SITUATION BY THE

ER-6766

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9204

11:01AM  1    DOCTOR.  HE ACKNOWLEDGED THAT THERE WERE LAB ERRORS IN EVERY

11:01AM  2    LAB.

11:01AM  3         I THINK IN THE INSTANCE WHERE HE TRIED TO CLAIM THAT THEY

11:01AM  4    WERE MORE FREQUENT THAT AT THERANOS THAN IN HIS PRIOR

11:01AM  5    EXPERIENCES, HE WAS THEN SHOWN AND ACKNOWLEDGED THAT HE HAD

11:01AM  6    TESTIFIED PREVIOUSLY TO THE OPPOSITE PROPOSITION.

11:01AM  7         NOW, LET'S TALK ABOUT HIS DEPARTURE FROM THERANOS BECAUSE

11:01AM  8    IT WAS PORTRAYED ON HIS DIRECT EXAMINATION AND AGAIN YESTERDAY

11:01AM  9    AS IF HIS DEPARTURE WAS MOTIVATED BY A CONCERN ON HIS PART THAT

11:02AM 10    SOMETHING UNTOWARD WAS HAPPENING AT THERANOS.

11:02AM 11         FIRST OF ALL, I WOULD JUST ASK YOU TO VIEW THIS THROUGH

11:02AM 12    THE LENS OF MS. HOLMES'S INTENT.

11:02AM 13         HE SENT AN EMAIL TO MS. HOLMES WHICH WAS A GRACIOUS EMAIL.

11:02AM 14    HE DID NOT IDENTIFY ANY OF THE CONCERNS THAT HE IS NOW

11:02AM 15    IDENTIFYING.

11:02AM 16         AS YOU'LL RECALL THIS STORY, WHAT HAPPENED WITH REGARD TO

11:02AM 17    DR. ROSENDORFF WAS THAT THERANOS WANTED HIM TO STAY FOR A

11:02AM 18    PERIOD OF 60 DAYS AFTER HIS DEPARTURE BECAUSE THEY WANTED TO

11:02AM 19    FIND A NEW LAB DIRECTOR TO REPLACE HIM BECAUSE HIS DEPARTURE

11:02AM 20    WAS UNEXPECTED.

11:02AM 21         AND SHORTLY AFTER THOSE DISCUSSIONS WITH DR. ROSENDORFF,

11:02AM 22    HE BEGAN TO SEND EMAILS WITH VARIOUS COMPLAINTS AND QUESTIONS

11:02AM 23    ABOUT THINGS AT THERANOS.

11:02AM 24         YOU'LL REMEMBER JUST RECENTLY DURING MS. HOLMES'S

11:03AM 25    TESTIMONY WE SAW AN EMAIL EXCHANGE WHERE HE HAD RAISED A

ER-6767

11:03AM  1    QUESTION ABOUT IS THERE EBOLA ON THE PREMISES OF WHERE THE CLIA

11:03AM  2    LAB IS?

11:03AM  3        AND, OF COURSE, THERE WAS NOT.  THE EVIDENCE SHOWED THAT

11:03AM  4    THERE WERE, IN CONNECTION WITH RESEARCH BEING DONE AT A

11:03AM  5    DIFFERENT FACILITY, EBOLA WAS BEING DISCUSSED.

11:03AM  6        BUT THE SAME WAS TRUE IN CONNECTION WITH CONCERNS ABOUT

11:03AM  7    THE CLIA LAB.  HE RAISED THIS EMAIL TO MS. HOLMES IN THE MIDDLE

11:03AM  8    OF NOVEMBER AND HE SAID THAT HE WAS UNCOMFORTABLE WITH WHAT WAS

11:03AM  9    HAPPENING IN THE COMPANY AND THAT HE WAS GETTING QUESTIONS THAT

11:03AM  10   HE DIDN'T WANT TO ANSWER, ET CETERA.

11:03AM  11       WELL, LET'S LOOK AT WHAT MS. HOLMES SAID IN RESPONSE TO

11:03AM  12   THAT EMAIL.

11:03AM  13       SHE SAID, OUTSIDE OF THE FACT THAT YOU'VE NEVER EMAILED ME

11:03AM  14   ON ANY CONCERNS, YOU KNOW FROM EVERY CONVERSATION HOW

11:04AM  15   FUNDAMENTAL IT IS FOR YOU NEVER TO DO ANYTHING YOU'RE NOT

11:04AM  16   COMPLETELY CONFIDENT IN.

11:04AM  17       SHE WAS SURPRISED ON THIS PRESENTATION FROM

11:04AM  18   DR. ROSENDORFF.

11:04AM  19       NOW, DR. ROSENDORFF TESTIFIED THAT HE HAD A NUMBER OF

11:04AM  20   CONCERNS ABOUT THE INTEGRITY OF ASSAYS THAT WERE BEING OFFERED,

11:04AM  21   BUT I'D ASK YOU TO KEEP THE FOLLOWING IN MIND IN CONNECTION

11:04AM  22   WITH THAT.

11:04AM  23       FIRST, HE'S GIVEN VERY UNRELIABLE AND INCONSISTENT

11:04AM  24   STATEMENTS OVER TIME.  AS YOU RECALL HE WAS SHOWN THOSE DURING

11:04AM  25   HIS EXAMINATION AND HE ACKNOWLEDGED MAKING PRIOR INCONSISTENT

11:04AM  1    STATEMENTS.

11:04AM  2         HE LEFT THERANOS BECAUSE HE HAD FOUND A NEW JOB AND HE

11:04AM  3    WANTED TO START THAT NEW JOB, AND HE DID NOT WANT TO STAY AT

11:04AM  4    THERANOS FOR THE 60 DAY PERIOD THAT THERANOS WAS TRYING TO GET

11:04AM  5    HIM TO STAY THERE.

11:04AM  6         IN THE MONTHS LEADING UP TO THIS, WE SHOWED YOU SEVERAL

11:04AM  7    EMAILS WHERE HE WAS ERRATIC AND UNRESPONSIVE.  YOU MAY RECALL

11:04AM  8    EMAILS FROM MS. HOLMES'S BROTHER IN WHICH THEY WERE TRYING TO

11:04AM  9    GET HIM TO RESPOND TO A DOCTOR'S CONCERN.

11:05AM 10         AND THEN WHILE HE'S BEEN UNDER INVESTIGATION IN CONNECTION

11:05AM 11    WITH HIS LAB LICENSE, HE'S GIVEN INCONSISTENT STATEMENTS ABOUT

11:05AM 12    THE REASONS THAT HE LEFT THERANOS.

11:05AM 13         SO I THINK WHEN YOU HEAR HIS ASSERTION ABOUT CONCERNS OF

11:05AM 14    THERANOS, YOU SHOULD VIEW THAT TESTIMONY THROUGH THAT LENS.

11:05AM 15         NOW, AFTER DR. ROSENDORFF LEFT, AS YOU KNOW, DR. DHAWAN

11:05AM 16    BECAME THE LAB DIRECTOR.  AND I THINK IT'S FAIR TO SHOW YOU

11:05AM 17    THAT THE GOVERNMENT SAID YESTERDAY, AS THEY'VE SAID THROUGHOUT

11:05AM 18    THE CASE, THAT MR. HOLMES AND MR. BALWANI CHOSE TO PICK

11:05AM 19    MR. BALWANI'S DERMATOLOGIST TO RUN THE LAB.  AND THEY SAID THAT

11:05AM 20    MS. HOLMES AND MR. BALWANI PUT DR. DHAWAN IN CHARGE.

11:05AM 21         THAT IS NOT A FAIR CHARACTERIZATION OF WHAT MS. HOLMES WAS

11:05AM 22    SEEING AT THE TIME.

11:05AM 23         LET'S LOOK AT WHAT MS. HOLMES WAS SEEING AT THE TIME AS TO

11:06AM 24    WHAT WAS HAPPENING AFTER DR. ROSENDORFF LEFT.

11:06AM 25         THIS IS THE GOVERNMENT'S PRESENTATION, WHICH IS THE

11:06AM   1    DERMATOLOGIST WAS IN CHARGE AND THERE WERE NO OTHER

11:06AM   2    PROTECTIONS.

11:06AM   3         BUT FIRST, AS YOU KNOW, DR. SAWYER, WHO THE GOVERNMENT

11:06AM   4    DIDN'T ACKNOWLEDGE OR MENTION IN ITS OPENING UNTIL DR. DHAWAN

11:06AM   5    WAS EXAMINED ABOUT IT, SHE CAME AT THE SAME TIME AND SHE

11:06AM   6    PROVIDED ADDITIONAL SERVICE.

11:06AM   7         BUT MORE FUNDAMENTALLY, THERE WAS LAB PERSONNEL WHOM

11:06AM   8    MS. HOLMES TESTIFIED MR. BALWANI HAD IDENTIFIED AS THESE ARE

11:06AM   9    THE INTERNAL PERSONNEL WHO ARE WORKING IN LIEU OF HAVING A

11:06AM  10    FULL-TIME LAB DIRECTOR, AND HE IDENTIFIES DR. SURAJ SAKSENA AS

11:06AM  11    THE INTERNAL CANDIDATE WHO HE EXPECTED TO BECOME THE LAB

11:06AM  12    DIRECTOR.

11:06AM  13         AND HE SAID THAT HE HAD WORKED IN THE CLIA LAB FOR A LONG

11:06AM  14    TIME.  HE WAS FULLY QUALIFIED, IN FACT, BUT THERE WERE

11:07AM  15    REQUIREMENTS ON PAPER THAT HE HAD TO MEET, AND HE WAS GETTING

11:07AM  16    THOSE, AND MR. BALWANI EXPECTED HE WOULD BECOME THE NEXT LAB

11:07AM  17    DIRECTOR.

11:07AM  18         NOW, THAT'S THE PICTURE THAT MS. HOLMES SAW, NOT THAT

11:07AM  19    MR. BALWANI'S DERMATOLOGIST WAS IN CHARGE, BUT RATHER THAT

11:07AM  20    THERE WAS THIS GROUP OF QUALIFIED PEOPLE:  DR. SAKSENA, THERE

11:07AM  21    WAS THE OUTSIDE CONSULTANT; MR. HURST, WHO HAD SET UP THE CLIA

11:07AM  22    LAB, WHO AGAIN WAS ENGAGED, AND HE WAS WORKING IN CONNECTION

11:07AM  23    WITH IT; THERE WAS QUALITY CONTROL PERSONNEL LIKE MR. GEE WHO

11:07AM  24    HAD BEEN WORKING WITH THE COMPANY FOR OVER A YEAR; AND THERE

11:07AM  25    WERE PEOPLE IMMEDIATELY UNDER THE LAB DIRECTOR, MS. ALAMDAR,

11:07AM   1    SIDHU, GODFRED MASINDE, A HUGE STAFF WORKING IN THE CLIA LAB

11:07AM   2    WHO HAD SUBSTANTIAL QUALIFICATIONS.

11:07AM   3        BUT FUNDALLY, WHAT THE GOVERNMENT WANTS TO SAY HERE IS

11:08AM   4    THAT MS. HOLMES RECEIVED NOTICE FROM MR. BALWANI THAT THIS LAB

11:08AM   5    WAS BEING -- WAS IN BAD SHAPE, AND THAT THAT WAS NOTICE TO

11:08AM   6    MS. HOLMES THAT SHE SHOULD HAVE KNOWN THINGS.

11:08AM   7        AND THEY SHOWED YOU THIS TEXT YESTERDAY.  ACTUALLY, I

11:08AM   8    THINK I HAVE IT HERE ON THE SLIDE.  THEY SHOWED YOU THIS TEXT,

11:08AM   9    AND THIS IS THE NOTICE THAT THE GOVERNMENT HAS AS TO THE

11:08AM  10    PROBLEMS IN THE CLIA LAB.

11:08AM  11        BUT NOBODY SAYS HERE -- HE SAYS THAT HE'S GOING TO WORK ON

11:08AM  12    FIXING THIS, AND HE WILL TAKE THE LAB OVER.

11:08AM  13        AND YOU KNOW WHAT HIS REPRESENTATIONS OF THAT TO

11:08AM  14    MS. HOLMES SOUNDED LIKE BECAUSE WE SAW HIS DESCRIPTION OF HIS

11:08AM  15    SITUATION IN AN EMAIL DURING THE COURSE OF THE CASE FROM A FEW

11:08AM  16    MONTHS BEFORE THIS.  HE PRESENTED HIMSELF, IN TAKING THE CLIA

11:08AM  17    LAB OPERATIONS, AS SOMEBODY WHO WAS UNIQUELY GIFTED AT

11:09AM  18    ORGANIZATIONAL STRUCTURES AND OPERATIONS, AND HE ASSURED

11:09AM  19    MS. HOLMES THAT HE WAS NOW GOING OUT TO THE CLIA LAB, WHICH WAS

11:09AM  20    IN A DIFFERENT FACILITY, AND TAKING IT OVER.

11:09AM  21        AND WHAT DOES THE RECORD SHOW FROM THIS MOMENT IN NOVEMBER

11:09AM  22    OF 2014 UNTIL CMS AND DR. DHAWAN AT THE END OF 2015?  WHAT

11:09AM  23    PROBLEMS DID MS. HOLMES LEARN ABOUT IN THE CLIA LAB DURING THIS

11:09AM  24    PERIOD FROM NOVEMBER OF 2014 UNTIL THE FALL OF 2015?

11:09AM  25        DO YOU KNOW THE NUMBER OF ISSUES THAT ARE IN THE RECORD OF

11:09AM  1    MS. HOLMES BEING TOLD ABOUT SOME ISSUE IN CONNECTION WITH AN

11:09AM  2    ASSAY DURING THAT PERIOD?  ONE, WHICH WAS PRESENTED AT THAT

11:09AM  3    TIME TO HER AS BEING RESOLVED.  THAT'S IT.  THAT IS WHAT THE

11:09AM  4    RECORD IN THIS MATTER SHOWS; THAT AFTER THE POINT AT WHICH

11:09AM  5    DR. ROSENDORFF DEPARTED, THIS LARGE STAFF OF INDIVIDUALS LED BY

11:10AM  6    MR. BALWANI, WITH SUPPLEMENTAL SUPPORT FROM QUALITY CONTROL

11:10AM  7    EXPERTS AND FROM OUTSIDE LAB DIRECTORS WITH THE CONSULTANT,

11:10AM  8    MR. HURST, THAT NO PROBLEMS WERE RESULTING IN THE CLIA LAB THAT

11:10AM  9    REQUIRED HER ATTENTION.  NONE.  NONE.

11:10AM  10        THE PRESENTATION OF THAT TO MS. HOLMES WAS THAT THE

11:10AM  11   PROBLEM IN THE CLIA LAB PRIOR TO DR. ROSENDORFF'S DEPARTURE,

11:10AM  12   WHAT WOULD BE REASONABLE TO INFER?  THAT IT WAS DR. ROSENDORFF.

11:10AM  13   THERE'S NO INDICATION THAT ANY ISSUE WAS RAISED THAT WAS NOT

11:10AM  14   ADDRESSED DURING THAT PERIOD.

11:10AM  15        WHEN IS THE FIRST TIME THAT MS. HOLMES STARTS TO HEAR

11:10AM  16   ABOUT THOSE ISSUES?  IN THE FALL OF 2015 AS SHE TESTIFIED

11:10AM  17   DURING HER DIRECT TESTIMONY.

11:10AM  18        NOW, WE KNOW THAT AFTER CMS CAME IN AND MADE THE FINDINGS

11:10AM  19   THAT IT MADE, DR. DAS WAS HIRED.  YOU KNOW THAT HE TESTIFIED

11:11AM  20   THAT HE WAS HIRED WITH A NUMBER OF OTHER LAB DIRECTORS; THAT HE

11:11AM  21   WAS GIVEN THE MISSION OF TURNING OVER ROCKS; THAT MS. HOLMES

11:11AM  22   WAS SUPPORTIVE OF THAT; AND THAT HE WAS PART OF A REFORM EFFORT

11:11AM  23   TO MAKE THE OPERATIONS OF THAT LAB PROFESSIONAL WITH

11:11AM  24   MS. HOLMES'S SUPPORT AND WITH THE FULL SUPPORT OF RESOURCES.

11:11AM  25        THAT SOUNDS LIKE A DEFENSE WITNESS.  SO WHY DID THE

11:11AM   1    GOVERNMENT OFFER DR. DAS'S TESTIMONY?

11:11AM   2         WELL, THEY OFFERED HIS TESTIMONY TO I THINK IMPLY THAT THE

11:11AM   3    TECHNOLOGY THAT WAS BEING USED IN THE LAB, THE EDISON DEVICE

11:11AM   4    THAT WAS BEING OFFERED WAS UNRELIABLE OR GENERATING INACCURATE

11:11AM   5    RESULTS OR WAS INHERENTLY DOOMED TO GENERATE INACCURATE AND

11:11AM   6    UNRELIABLE RESULTS.

11:12AM   7         WELL, FIRST OF ALL, I WOULD SAY TO YOU, LADIES AND

11:12AM   8    GENTLEMEN, ALL OF THAT, OF COURSE, IS AFTER THE CONSPIRACY

11:12AM   9    PERIOD HERE.  WE KNOW WHAT HAPPENED WHEN MS. HOLMES HEARD ABOUT

11:12AM  10    DR. DAS'S CONCERNS.

11:12AM  11         BUT SECOND AND MORE FUNDAMENTALLY, THE RECORD REFLECTS

11:12AM  12    THAT DR. DAS DID NOT THINK THAT THE CONCERNS THAT CMS HAD

11:12AM  13    RAISED WERE ABOUT FUNDAMENTALLY THE CAPABILITIES OF ANY OF

11:12AM  14    THERANOS'S TECHNOLOGY.

11:12AM  15         WE KNOW THAT HE WAS ASKED TO REVIEW A STATEMENT THAT

11:12AM  16    MS. BENNETT PROPOSED, THE GIST OF WHICH SAYS THAT THEY REFER TO

11:12AM  17    HOW TECHNOLOGIES WERE USED AND NOT TO THE FUNDAMENTAL INTEGRITY

11:12AM  18    OF THOSE TECHNOLOGIES.

11:12AM  19         HE WAS ASKED IF THAT WAS ACCURATE AND HE RESPONDED "IT'S

11:12AM  20    ACCURATE, IN MY OPINION."

11:12AM  21         NOW, WHAT DID DR. DAS IN FACT CONCLUDE?  HE CONCLUDED THAT

11:13AM  22    THE VALIDATION REPORTS THAT DR. ROSENDORFF HAD SIGNED HAD BEEN

11:13AM  23    DONE INCORRECTLY; THAT THERE WERE STANDARDS SET AS TO WHAT

11:13AM  24    SHOULD ALLOW THOSE TESTS TO BE OFFERED, AND THOSE STANDARDS

11:13AM  25    WERE ALL WRONG.

```
11:13AM  1        THAT DR. ROSENDORFF IN EFFECT, AS THE GATEKEEPER FOR

11:13AM  2   ASSAYS COMING INTO THE LAB, ALLOWED TESTS TO BE OFFERED WITH

11:13AM  3   INCORRECT ASSESSMENT AND THAT THOSE VALIDATION REPORTS NEVER

11:13AM  4   SHOULD HAVE BEEN SIGNED BY DR. ROSENDORFF.

11:13AM  5        SO IN ESSENCE, DR. DAS'S TESTIMONY IS REALLY A CRITICISM

11:13AM  6   OF THE JOB THAT DR. ROSENDORFF DID AS LAB DIRECTOR.

11:13AM  7        BUT THAT DOESN'T MEAN THAT AT THE TIME MS. HOLMES'S

11:13AM  8   TESTIMONY OR MS. HOLMES'S STATE OF MIND WAS NOT EVERYTHING THAT

11:13AM  9   WAS HAPPENING WITHIN THE CLIA LAB WAS BEING DONE IN A

11:14AM 10   REASONABLE, A RELIABLE, AND IN AN ACCURATE MANNER.

11:14AM 11        NOW, YOUR HONOR, I WOULD SUGGEST THAT WE JUST TAKE OUR

11:14AM 12   BREAK MAYBE NOW.  I JUST HAVE A BRIEF AMOUNT OF ADDITIONAL TIME

11:14AM 13   AND WE'LL FINISH UP AFTER THAT, BUT I PROBABLY HAVE 20 MINUTES.

11:14AM 14            THE COURT:  WOULD YOU PREFER THAT AS OPPOSED TO

11:14AM 15   PRESSING ON FOR 20 MINUTES?

11:14AM 16            MR. DOWNEY:  I THINK PERHAPS, YES.

11:14AM 17            THE COURT:  OKAY.  LET'S DO THAT.

11:14AM 18        LADIES AND GENTLEMEN, LET'S TAKE OUR BREAK NOW.  WE'LL

11:14AM 19   TAKE 30 MINUTES, PLEASE.

11:14AM 20            THE CLERK:  COURT IS IN RECESS.

11:15AM 21        (JURY OUT AT 11:15 A.M.)

11:15AM 22            THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

11:15AM 23   YOU.

11:15AM 24        THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR OUR

11:15AM 25   BREAK.
```

ER-6774

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9212

```
11:15AM   1           BEFORE WE DO BREAK, I WANT TO RAISE JUST ANOTHER COMMENT

11:15AM   2    JUST TO FOLLOW UP ON OUR CONVERSATION THIS MORNING, AND I THINK

11:15AM   3    IN THE COLLOQUY THAT I HAD WITH COUNSEL, PARTICULARLY WITH

11:15AM   4    MR. DOWNEY, I WAS ASKING QUESTIONS -- I'M TRYING TO FIND THE

11:15AM   5    TRANSCRIPT HERE -- BUT I THINK I WAS ASKING SOME QUESTIONS,

11:15AM   6    MR. DOWNEY, ABOUT WHAT A SOLUTION WOULD BE, OR IF A SOLUTION

11:15AM   7    WAS NEEDED IN REGARDS TO TRADE SECRETS AND IN REGARDS TO ADVICE

11:15AM   8    OF COUNSEL, AND I THINK YOU SAID I'M NOT GOING TO GO INTO THAT

11:15AM   9    ANY FURTHER.

11:15AM  10         AND THEN I MADE A COMMENT ABOUT, WELL, SHOULD I ENCOURAGE

11:15AM  11    THE GOVERNMENT TO, IN THEIR CLOSING, TO DO THIS AND DO THAT?

11:15AM  12         I JUST WANT TO BE CLEAR, THAT WAS A QUESTION.  AND YOU

11:15AM  13    ANSWERED THE QUESTION AFTER I THINK A COUPLE OF TIMES AS I SAID

11:16AM  14    SHOULD I ASK, SHOULD I ENCOURAGE THE GOVERNMENT, ARE YOU SAYING

11:16AM  15    I SHOULD ENCOURAGE THE GOVERNMENT TO COMMENT AS XXX, AND YOU

11:16AM  16    SAID RIGHT AS I KEPT GOING, RIGHT.

11:16AM  17              MR. DOWNEY:  RIGHT.

11:16AM  18              THE COURT:  AND THEN I SAID AT THE END, IS THAT WHAT

11:16AM  19    YOU'RE SAYING OR IS THAT WHAT I SHOULD DO?

11:16AM  20         AND I THINK YOU ANSWERED THAT AS A QUESTION.

11:16AM  21         I WANT TO BE CLEAR.  THAT WAS A QUESTION.  THE COURT WAS

11:16AM  22    NOT DIRECTING IN ANY WAY THAT THE GOVERNMENT SHOULD PROCEED IN

11:16AM  23    ANY MANNER AND I JUST WANT TO CONFIRM THAT THAT WAS YOUR

11:16AM  24    UNDERSTANDING.

11:16AM  25              MR. DOWNEY:  THAT IS MY UNDERSTANDING.
```

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9213

11:16AM   1          I THINK IT WAS -- NOR DID I MEAN TO ENCOURAGE IT BY THE

11:16AM   2     STATEMENT, RIGHT, RIGHT, YES.

11:16AM   3               THE COURT:  RIGHT.

11:16AM   4               MR. DOWNEY:  I DON'T RECALL THE SPECIFICS OF WHAT

11:16AM   5     YOUR HONOR SAID, BUT I DID NOT HEAR THAT AS ENCOURAGEMENT BY

11:16AM   6     THE COURT TO DO THAT.

11:16AM   7               THE COURT:  I JUST WANTED TO MAKE SURE THAT'S -- I

11:16AM   8     FOUND IT HERE.

11:17AM   9          (PAUSE IN PROCEEDINGS.)

11:17AM  10               THE COURT:  THAT'S RIGHT.  I DON'T HAVE A TIME

11:17AM  11     STAMP, I'M SORRY.

11:17AM  12          BUT MY COMMENT WAS, "SO ARE YOU -- AM I HEARING YOU SAY,

11:17AM  13     'JUDGE, I'M GOING TO STAY AWAY, I'M NOT GOING TO SAY "ADVICE OF

11:17AM  14     COUNSEL," I'M NOT GOING TO SAY THAT SHE RELIED ON HER

11:17AM  15     ATTORNEY'S ADVICE.'"

11:17AM  16          AND THEN YOU SAID, "I WASN'T REALLY PLANNING TO RETURN TO

11:17AM  17     THAT."

11:17AM  18          AND THEN I CONTINUED MY COLLOQUY.  "'I'M GOING TO AVOID

11:17AM  19     THAT AND I'M NOT GOING TO GO BACK TO THAT IN MY ARGUMENT.  MY

11:17AM  20     ARGUMENT IS WELL BEYOND THAT AND I HAVE OTHER THINGS TO TALK

11:17AM  21     ABOUT IN THE TIME REMAINING."

11:17AM  22          "YES."

11:17AM  23          "AND I WOULD EXPECT THAT AND I WOULD OTHERWISE ENCOURAGE,

11:17AM  24     IF THEY WISH, THE GOVERNMENT" -- AND WHEN I WAS SAYING "IF THEY

11:17AM  25     WISH," I WAS SPEAKING FOR YOU.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9214

11:17AM   1          IN OTHER WORDS, SAYING, IS THIS WHAT YOU'RE TELLING ME TO

11:17AM   2     DO?

11:17AM   3          -- "THE GOVERNMENT IN THEIR REBUTTAL TO SPEAK TO THIS

11:17AM   4     ISSUE IF THEY WISH AND TO SUGGEST THAT THERE'S A DEFICIT IN THE

11:17AM   5     EVIDENCE AS TO ADVICE OF COUNSEL AND THEY MAY NOT CONSIDER IT

11:17AM   6     AND IT'S ARGUMENT, AND IT'S NOT EVIDENCE, BUT IT'S ARGUMENT,

11:17AM   7     AND THAT WOULD SUFFICE TO INFORM THE JURY AS TO ANY CONCERNS

11:18AM   8     THAT THEY MIGHT HAVE ABOUT WHETHER OR NOT THEY SHOULD RELY ON

11:18AM   9     AN ADVICE OF COUNSEL," QUESTION MARK.

11:18AM  10          AND THEN YOU SAID, "WELL, I DON'T HAVE ANY BURDEN WITH

11:18AM  11     REGARD TO THE INTENT DEFENSE."

11:18AM  12          I THINK YOU TALKED ABOUT THAT.  I THINK THAT WOULD BE

11:18AM  13     APPROPRIATE.

11:18AM  14          AND THEN I -- AT THE END OF YOUR COMMENT, THE COURT SAID,

11:18AM  15     "SO MY QUESTION WAS, SHOULD WE JUST RELY ON THE GOVERNMENT

11:18AM  16     TO -- THEY KNOW WHAT THE ISSUE IS, AND IF THEY WANT TO TALK

11:18AM  17     ABOUT IT, THEY CAN ADDRESS IT IN THEIR REBUTTAL."

11:18AM  18          AND THEN YOU WENT ON AND SUGGESTED THAT.

11:18AM  19          THAT WAS THE TRANSCRIPT.  I WAS THINKING ABOUT THIS AND I

11:18AM  20     DIDN'T WANT TO SUGGEST THAT THE COURT WAS IN ANY WAY

11:18AM  21     DIRECTING -- AS I SAID EARLIER IN MY COMMENTS, I'M NOT GETTING

11:18AM  22     INTO EITHER OF YOUR CASES, I'M STAYING AWAY FROM THAT.

11:18AM  23          I WAS CONCERNED ABOUT INSTRUCTIONS AND WHETHER THERE WAS A

11:18AM  24     DEFICIT IN INSTRUCTIONS GIVEN THE COMMENTS THAT THE COURT

11:18AM  25     SHOULD ADVISE ON.

11:18AM 1          WE HAD THAT COLLOQUY, BUT I JUST WANT TO BE CLEAR, I WAS

11:18AM 2     NOT ENCOURAGING, DIRECTLY ENCOURAGING THE GOVERNMENT TO TAKE

11:19AM 3     ANY OBJECTION ON THIS.

11:19AM 4          WHAT I COMMENTED THERE IS IN REGARDS TO A QUESTION,

11:19AM 5     HYPOTHETICAL IF YOU WILL, AND I THINK YOU ANSWERED.

11:19AM 6          IS THAT YOUR UNDERSTANDING OF HOW IT TRANSPIRED?

11:19AM 7               MR. DOWNEY:  WELL, I THINK IF IT WASN'T, IT'S CLEAR

11:19AM 8     NOW.

11:19AM 9               THE COURT:  DOES THE GOVERNMENT WISH TO COMMENT ON

11:19AM 10    THIS?

11:19AM 11              MR. BOSTIC:  YOUR HONOR, ONLY TO SAY THAT I PARSED

11:19AM 12    THE COMMENTS THE SAME WAY THE COURT DID AND I THINK THE SAME

11:19AM 13    WAY THE COURT INTENDED.

11:19AM 14         I DIDN'T TAKE THEM AS DIRECTION OR ENCOURAGEMENT TO THE

11:19AM 15    GOVERNMENT AS FAR AS THE CONTENT OF THE REBUTTAL.

11:19AM 16              THE COURT:  WELL, THANK YOU.  AND THAT -- BECAUSE

11:19AM 17    THAT WOULD BE INAPPROPRIATE FOR THE COURT TO ADVISE EITHER OF

11:19AM 18    YOU HOW TO ARGUE YOUR CASE, AND THAT'S --

11:19AM 19              MR. DOWNEY:  OF COURSE, YOUR HONOR.

11:19AM 20              THE COURT:  AND THAT WAS NOT MY INTENT.  I JUST WANT

11:19AM 21    TO BE CLEAR ON THAT.

11:19AM 22         I THOUGHT ABOUT THAT AND I THOUGHT, WELL, I BETTER --

11:19AM 23    SOMETIMES IN DISCOURSE WE SAY THINGS, AND I JUST DIDN'T WANT

11:19AM 24    THERE TO BE ANY LACK OF CLARITY ON THAT.

11:19AM 25         ALL RIGHT.  THANK YOU VERY MUCH.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9216

11:19AM   1            MR. DOWNEY:  UNDERSTOOD.  I SHOULD SAY, YOUR HONOR,

11:19AM   2    THAT ON LACK OF CLARITY, I REALIZED ON REVIEW OF THE TRANSCRIPT

11:19AM   3    THAT I HAD MISSPOKEN ON THE ISSUE THAT I BEGAN WITH TODAY, SO

11:20AM   4    I'VE TRIED TO CORRECT THAT AS PART OF OUR DISCUSSION.

11:20AM   5            THE COURT:  THANK YOU.  AND THANK YOU FOR STEERING

11:20AM   6    AWAY FROM AGE AND FATIGUE.  THANK YOU.

11:20AM   7         ALL RIGHT.  WE'LL TAKE OUR BREAK.

11:20AM   8            THE CLERK:  COURT IS IN RECESS.

11:20AM   9         (RECESS FROM 11:20 A.M. UNTIL 11:56 A.M.)

11:56AM  10         (JURY IN AT 11:56 A.M.)

11:56AM  11            THE COURT:  THANK YOU.  PLEASE BE SEATED.

11:56AM  12         WE ARE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

11:56AM  13    ARE PRESENT AGAIN.  OUR JURY IS PRESENT.

11:56AM  14         MR. DOWNEY.

11:56AM  15            MR. DOWNEY:  I WANT TO SPEND JUST A FEW MINUTES

11:56AM  16    TALKING WITH YOU ABOUT THE PATIENT COUNTS OF THE INDICTMENT AND

11:56AM  17    GIVE YOU THE FRAMEWORK THAT I THINK WILL BE HELPFUL TO YOU IN

11:56AM  18    LOOKING AT THOSE COUNTS.

11:56AM  19         FIRST OF ALL, RECALL WHAT THE CHARGE IS IN CONNECTION WITH

11:56AM  20    THE SECOND CONSPIRACY, THE PATIENT CONSPIRACY, AND THE PATIENT

11:56AM  21    COUNTS.  IT'S NOT THAT ANY INDIVIDUAL PATIENT GOT AN ERRANT

11:57AM  22    TEST.  THAT'S OBVIOUSLY A RESULT THAT NO ONE WANTS AND IT'S

11:57AM  23    UNDERSTANDABLY FRUSTRATING AND UPSETTING FOR THEM AND WE SAW

11:57AM  24    SOME OF THAT DURING THE COURSE OF THIS CASE.

11:57AM  25         BUT THE QUESTION IS, DID MS. HOLMES KNOW, IN RUNNING

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9217

11:57AM   1    THERANOS, THAT THERANOS WAS NOT ABLE TO CONSISTENTLY PROVIDE

11:57AM   2    ACCURATE AND RELIABLE RESULTS?

11:57AM   3         SO I THINK THE PLACE TO START WITH RESPECT TO THIS

11:57AM   4    ANALYSIS IS, IS WHAT WE KNOW ABOUT THE NUMBER OF TESTS THAT

11:57AM   5    THERANOS OFFERED AND WHAT THE GOVERNMENT DID IN CONNECTION WITH

11:57AM   6    ITS CASE.

11:57AM   7         I WOULD HAVE TO SAY FIRST, LADIES AND GENTLEMEN, THE

11:57AM   8    GOVERNMENT DIDN'T OFFER YOU ANY OVERVIEW DURING ITS CASE OF

11:57AM   9    STATISTICAL EVIDENCE.

11:57AM  10         WE HAVE NO IDEA OTHER THAN BASED ON THE ANECDOTES THAT

11:57AM  11    WE'VE HEARD THROUGH EMAILS ON A FEW OCCASIONS AND THE

11:58AM  12    INDIVIDUAL CASES WE KNOW ABOUT FROM THE THREE PATIENTS WHO

11:58AM  13    TESTIFIED OF ERRORS OR POTENTIAL ERRORS.

11:58AM  14         THERE WAS NO PRESENTATION OF EVIDENCE AS TO THE RATE THAT

11:58AM  15    THOSE ERRORS WERE OCCURRING.  THERE WAS NO SAMPLING OF DATA.

11:58AM  16    THERE WAS NO PRESENTATION AT ALL OF ANY KIND OF A STATISTICAL

11:58AM  17    ANALYSIS.

11:58AM  18         I WOULD SAY TO YOU, LADIES AND GENTLEMEN, THAT THAT ALONE

11:58AM  19    IS A BASIS ON WHICH TO DECIDE THAT THIS CHARGE DOES NOT HAVE

11:58AM  20    MERIT.

11:58AM  21         WHY?

11:58AM  22         WELL, WE KNOW FROM TESTIMONY DURING THE COURSE OF THE CASE

11:58AM  23    HOW MANY TESTS THERANOS OFFERED WHEN IT WAS RUNNING A CLINICAL

11:58AM  24    LAB, AND IT'S SOMEWHERE IN THE NEIGHBORHOOD AT LEAST OF 8

11:58AM  25    MILLION PATIENTS WHO GOT TESTS.  IT MAY HAVE BEEN MORE.  THERE

ER-6780

| | | |
|---|---|---|
| 11:58AM | 1 | WERE SLIGHTLY DIFFERENT ESTIMATES AS TO THE NUMBER OF TESTS |
| 11:59AM | 2 | THAT WERE OFFERED. |
| 11:59AM | 3 | NOW, IN REALTIME, WHAT DID MS. HOLMES KNOW BETWEEN 2013 |
| 11:59AM | 4 | AND EARLY 2016?  WHAT DID MS. HOLMES KNOW ABOUT INACCURACY WITH |
| 11:59AM | 5 | RESPECT TO THOSE TESTS? |
| 11:59AM | 6 | SO WE'RE NOT TALKING ABOUT DR. DAS'S ANALYSIS, WHICH IS |
| 11:59AM | 7 | PERFORMED AFTER THESE EVENTS.  WE'RE TALKING ABOUT WHAT |
| 11:59AM | 8 | HAPPENED IN REALTIME THAT TOLD HER OF ERRANT RESULTS AMONGST |
| 11:59AM | 9 | THESE 8 MILLION TESTS? |
| 11:59AM | 10 | WELL, THE TRUTH IS THAT WE DON'T REALLY KNOW MUCH EXCEPT |
| 11:59AM | 11 | FOR THE PATIENTS WHO HAVE COME TO TESTIFY, AND THE GOVERNMENT |
| 11:59AM | 12 | IN THE COURSE OF ITS CASE WAS ABLE TO PRESENT TESTIMONY FROM |
| 11:59AM | 13 | THREE PATIENTS, AND THEY TESTIFIED THAT IN CONNECTION WITH |
| 11:59AM | 14 | THREE DIFFERENT ASSAYS THAT THERANOS OFFERED, THAT SEVEN OF THE |
| 12:00PM | 15 | RESULTS CONTAINED ERRORS OR SEEMED TO CONTAINED ERRORS. |
| 12:00PM | 16 | TWO OF THOSE DOCTORS FOR THOSE PATIENTS TESTIFIED, |
| 12:00PM | 17 | DR. ZACHMAN AND DR. BURNES. |
| 12:00PM | 18 | THERE WERE NO OTHER WITNESSES AND NO OTHER TESTIMONY FROM |
| 12:00PM | 19 | DOCTORS OR PATIENTS ABOUT ERRANT RESULTS. |
| 12:00PM | 20 | SO THAT'S OUT OF THE 8 MILLION TESTS THAT WE KNOW WERE |
| 12:00PM | 21 | OFFERED OVER TIME. |
| 12:00PM | 22 | AND THEN I DO WANT TO LOOK AT EACH OF THOSE COUNTS |
| 12:00PM | 23 | INDIVIDUALLY BECAUSE THEY'RE EACH IMPORTANT. |
| 12:00PM | 24 | BUT I THINK, AS YOU CONSIDER BOTH THE CONSPIRACY COUNT AND |
| 12:00PM | 25 | YOU CONSIDER EACH OF THESE INDIVIDUAL COUNTS, REMEMBER THAT THE |

12:00PM   1    CHARGE HERE IS THAT MS. HOLMES INTENTIONALLY DEFRAUDED PEOPLE

12:00PM   2    IN SUGGESTING THAT THERANOS'S TESTS WERE ACCURATE OR RELIABLE.

12:00PM   3         AND THE EVIDENCE THAT HAS BEEN SHOWN IS THAT SHE SHOULD

12:00PM   4    HAVE KNOWN THAT BASED ON THESE THREE RESULTS OUT OF 8 MILLION

12:01PM   5    TESTS, AND PERHAPS, EVEN IF ONE WERE TO ACCEPT THE GOVERNMENT'S

12:01PM   6    OFFERED IMPLICATIONS FROM EMAILS, MAYBE ANOTHER 20 EMAILS,

12:01PM   7    WHICH WE DON'T REALLY KNOW WHAT THE END OF THAT STORY WAS.

12:01PM   8         BUT LET ME DISCUSS EACH OF THE CASES BECAUSE I THINK EACH

12:01PM   9    OF THESE CASES IS ALSO INSTRUCTIVE STATISTICALLY.

12:01PM  10         YOU KNOW THAT MS. TOMPKINS TESTIFIED, AND SHE GOT AN HIV

12:01PM  11    RESULT WHICH SHE UNDERSTOOD TO BE AN HIV POSITIVE RESULT.

12:01PM  12         SHE WAS TREATED BY A PHYSICIAN NAMED DR. ASIN,

12:01PM  13    GERALD ASIN.

12:01PM  14         THE GOVERNMENT CHOSE NOT TO CALL DR. ASIN AS PART OF ITS

12:01PM  15    CASE-IN-CHIEF.

12:01PM  16         BUT WE KNOW WHAT DR. ASIN CONCLUDED WITH RESPECT TO

12:01PM  17    THERANOS'S TESTS OVER TIME BECAUSE WE INTRODUCED THROUGH OUR

12:01PM  18    SUMMARY WITNESS, MR. MIDDLETON, THE RESULTS OF THE STATISTICS

12:02PM  19    AS TO HOW MANY TESTS DR. ASIN ORDERED FROM THERANOS, AND IT'S

12:02PM  20    ABOUT 2,000 TESTS.

12:02PM  21         WE ONLY KNOW OF THE ONE ERRANT RESULT, EVEN FOR THAT ONE

12:02PM  22    PHYSICIAN WE KNOW HAD AN ERRANT TEST, WE KNOW HE ORDERED ABOUT

12:02PM  23    2,000 TESTS.

12:02PM  24         AND THEN WE HEARD FROM MR. ELLSWORTH WHO HAD THE ERRANT

12:02PM  25    PSA TEST, AND AS YOU RECALL, HE WAS DR. BURNES'S PATIENT AND HE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9220

12:02PM   1    DID TESTIFY, AND HE ACTUALLY TESTIFIED THAT HE HAD BEEN USING

12:02PM   2    THERANOS SERVICES FOR A YEAR, AND THAT IN CONNECTION WITH ALL

12:02PM   3    OF THE TEST RESULTS THAT WERE GENERATED OVER THE COURSE OF THAT

12:02PM   4    YEAR BY PATIENTS OF HIS WHO WENT TO THERANOS, THE GOVERNMENT

12:02PM   5    ACTUALLY DIDN'T EVEN ASK TO SEE THE OTHER RESULTS TO EVALUATE

12:03PM   6    WHETHER THEY WERE CORRECT OR NOT.

12:03PM   7          SO, AGAIN, WITH ONE DOCTOR WHO USED THE SERVICE OVER A

12:03PM   8    LONG PERIOD OF TIME, THERE APPEARS TO HAVE BEEN ONE TESTING

12:03PM   9    ERROR THAT THE GOVERNMENT COULD IDENTIFY.

12:03PM  10          THEN WE ALSO HAD TESTIMONY EARLIER IN THE CASE FROM

12:03PM  11    MS. GOULD, WHICH WAS OBVIOUSLY A SITUATION FOR HER THAT WAS A

12:03PM  12    HORRIBLE SITUATION, AND WE KNOW FROM THE TESTIMONY THAT HER

12:03PM  13    NURSE PRACTITIONER WAS DR. ZACHMAN, AND DR. ZACHMAN WORKED FOR

12:03PM  14    A CLINIC, AND SHE HAD SEVERAL OTHER PHYSICIANS AND

12:03PM  15    PRACTITIONERS WHO WERE PART OF THAT CLINIC WITH HER.

12:03PM  16          AND SHE WAS ASKED BY THE GOVERNMENT AS PART OF THIS

12:03PM  17    INVESTIGATION TO LOOK THROUGH THE RECORDS OF THAT CLINIC AND TO

12:03PM  18    IDENTIFY OTHER PROBLEMATIC RESULTS ON THE HCG ASSAY, AND SHE --

12:04PM  19    WE INTRODUCED THE EVIDENCE WHEN DR. ZACHMAN TESTIFIED THAT SHE,

12:04PM  20    SHE WASN'T ABLE TO IDENTIFY OTHER INSTANCES OF ERROR FOR -- IN

12:04PM  21    THOSE CASES.

12:04PM  22          MY POINT, LADIES AND GENTLEMEN, IS SIMPLY THIS:

12:04PM  23    DR. ROSENDORFF TESTIFIED THAT IT WAS WELL-KNOWN THAT THERE WERE

12:04PM  24    ERRORS IN CONNECTION WITH LAB TESTING.  IT DOESN'T MATTER WHAT

12:04PM  25    THE LAB IS, IT'S -- THERE ARE ERRORS, AND NO ONE IS EXCUSING

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9221

12:04PM   1    THAT OR DEFENDING IT.

12:04PM   2         BUT THE QUESTION IS WHETHER THE ERRORS HERE PUT MS. HOLMES

12:04PM   3    ON NOTICE THAT THERE WAS A PROBLEM, AND STATISTICALLY THERE'S

12:04PM   4    NO EVIDENCE THAT -- NO SUGGESTION THAT THE EVIDENCE THAT THE

12:04PM   5    GOVERNMENT HAS ADDUCED THAT THESE ERRORS WERE HAPPENING AT A

12:04PM   6    LEVEL THAT SHOULD HAVE PUT HER ON NOTICE THAT THERANOS'S TESTS

12:05PM   7    WERE INACCURATE OR UNRELIABLE.

12:05PM   8         LET ME LOOK AT THE INDIVIDUAL CASES IN A BIT MORE DETAIL,

12:05PM   9    BECAUSE EVEN WITHIN THE CASES I THINK THEY'RE INSTRUCTIVE AS TO

12:05PM  10    THE DATA THAT HAS BEEN PRESENTED TO YOU.

12:05PM  11         COUNT TEN CONCERNS MS. TOMPKINS, THE PATIENT WHO GOT AN

12:05PM  12    HIV RESULT THAT SHE INTERPRETED AS AN HIV POSITIVE REPORT.

12:05PM  13         I SHOULD SAY, FIRST OF ALL, THAT THAT WAS NOT ON A

12:05PM  14    THERANOS DEVICE.  THE HIV POSITIVE TEST THAT SHE UNDERSTOOD SHE

12:05PM  15    GOT WAS ON AN FDA APPROVED DEVICE, A COMMERCIAL DEVICE, SO THE

12:05PM  16    TEST WAS NOT RUN WITH THERANOS TECHNOLOGY.

12:05PM  17         BUT BE THAT AS IT MAY, THE LAB RESULTS ON THEIR FACE

12:05PM  18    ACTUALLY WOULD BE DIFFICULT FOR A LAYPERSON TO INTERPRET

12:05PM  19    BECAUSE THEY INTRODUCE SOMEWHAT CONTRADICTORY THINGS.

12:06PM  20         YOU CAN LOOK AT THIS EXCERPT FROM THE LAB RESULTS OF

12:06PM  21    MS. TOMPKINS, AND AS YOU SEE, ALTHOUGH THERE WERE SOME

12:06PM  22    INDICATIONS OF POSITIVE FINDINGS IN CONNECTION WITH THIS TEST,

12:06PM  23    THERE WAS ALSO A STATEMENT THAT SAID "NO LABORATORY EVIDENCE OF

12:06PM  24    AN HIV-1 INFECTION."

12:06PM  25         NOW, THE GOVERNMENT DIDN'T SHOW YOU ANY EVIDENCE THAT THIS

ER-6784

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9222

```
12:06PM   1    RESULT -- WHAT SENSE WAS TO BE MADE OF THIS RESULT AND WHETHER

12:06PM   2    IT ACTUALLY CONVEYED THAT THIS PATIENT WAS POSITIVE FOR HIV.

12:06PM   3         AND, IN FACT, I DON'T THINK THE GOVERNMENT INTRODUCED ANY

12:06PM   4    TESTIMONY FROM AN EXPERT, OR EVEN ANY TESTIMONY FROM THE DOCTOR

12:06PM   5    WITH WHOM MS. TOMPKINS HAD DEALT, DR. ASIN.

12:06PM   6         BUT WE KNOW BECAUSE OF A DOCUMENT THAT WE ADMITTED LATE IN

12:06PM   7    THE CASE WHAT HAPPENED INSIDE OF THERANOS WITH REGARD TO

12:07PM   8    MS. TOMPKINS'S TESTS.

12:07PM   9         AND THIS IS NOT A DOCUMENT THAT YOU SAW DURING THE COURSE

12:07PM  10    OF THE CASE, BUT THIS IS EXHIBIT 14259.  AND I WOULD ENCOURAGE

12:07PM  11    YOU, IN EVALUATING COUNT TEN, TO LOOK AT IT.

12:07PM  12         THERE'S A REPORT INTERNALLY FROM PERSONNEL THAT

12:07PM  13    MS. TOMPKINS HAD BEEN SPOKEN TO, AND DR. ASIN HAD BEEN SPOKEN

12:07PM  14    TO TO RECONCILE THIS SOMEWHAT CONFUSING REPORT OF RESULTS.

12:07PM  15         AND THE RECOMMENDATION WAS THAT THIS DID NOT INDICATE THAT

12:07PM  16    SHE WAS HIV POSITIVE, BUT THAT SHE NEEDED TO PURSUE FURTHER

12:07PM  17    TESTING IN LIGHT OF THE RESULTS WHICH HAD AN INCONSISTENCY.

12:07PM  18         THIS EMAIL CONVEYS THAT THAT HAD BEEN CONVEYED TO

12:07PM  19    DR. ASIN; THAT DR. ASIN SAID THAT HE COMPLETELY UNDERSTOOD THE

12:07PM  20    TESTING PROTOCOL, AND HE DIDN'T HAVE ANY ISSUES WITH THESE

12:07PM  21    RESULTS OR WITH THE WAY THAT THE PROTOCOLS WERE EXPLAINED TO

12:08PM  22    HIM.

12:08PM  23         THEN THE THERANOS PERSON GOES ON TO EXPLAIN THAT THEY ALSO

12:08PM  24    TALKED TO MS. TOMPKINS.  THEY EXPLAINED WHAT THE CDC

12:08PM  25    RECOMMENDED IN THIS SITUATION FOR FURTHER TESTING.
```

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9223

12:08PM  1          MS. TOMPKINS WAS UNDERSTANDABLY FRUSTRATED BY THE

12:08PM  2   CONFUSION, AND SHE SAID -- BUT SHE WAS ADVISED THIS IS WHY, IN

12:08PM  3   CONNECTION WITH THIS CIRCUMSTANCE, INITIAL TEST RESULTS HAVE TO

12:08PM  4   BE EITHER CONFIRMED OR DISPROVED BY FOLLOW-UP TESTS.

12:08PM  5          THEN THE UNDERSTANDING WAS, WELL, THIS IS REALLY FOR A

12:08PM  6   CONVERSATION BETWEEN HER AND HER PHYSICIAN, DR. ASIN.

12:08PM  7          NOW, WE DON'T KNOW WHAT HAPPENED THERE BECAUSE DR. ASIN

12:08PM  8   WASN'T CALLED BY THE GOVERNMENT.

12:08PM  9          BUT THE SUGGESTION THAT MS. TOMPKINS WAS GIVEN AN

12:08PM 10   INDICATION THAT SHE WAS HIV POSITIVE AND THAT THERE WAS NO

12:08PM 11   COMMUNICATION WITH HER TO CLARIFY POTENTIAL ADDITIONAL TESTING,

12:08PM 12   AND THAT THERE WAS NO ADDITIONAL COMMUNICATION WITH HER

12:09PM 13   PHYSICIAN TO MAKE SURE THAT THE LAB AND THE DOCTOR WERE ALIGNED

12:09PM 14   AS TO HOW THE PATIENT SHOULD BE TREATED IS JUST NOT FAIR AND

12:09PM 15   NOT CONSISTENT WITH WHAT THE DOCUMENTS SHOW.

12:09PM 16          SO I WOULD PARTICULARLY ASK YOU TO LOOK AT THAT EXHIBIT,

12:09PM 17   14259, BECAUSE I THINK IT GIVES YOU A WINDOW ON THE

12:09PM 18   PRESENTATION OF SOME OF THIS EVIDENCE.

12:09PM 19          LET ME TALK ABOUT COUNT ELEVEN, WHICH RELATES TO

12:09PM 20   MR. ELLSWORTH WHO HAD THE PSA TESTS WHERE THERE WERE RESULTS

12:09PM 21   THAT I THINK IT WAS FAIRLY OBVIOUS CONTAINED ERRORS ACROSS THE

12:09PM 22   TESTS.

12:09PM 23          WHAT HAPPENED WITH REGARD TO THE ASSAY THAT MR. ELLSWORTH

12:09PM 24   RECEIVED HIS TESTS ON?

12:09PM 25          WELL, MS. HOLMES DIDN'T FIND OUT ABOUT THIS ERRANT TEST

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9224

12:09PM  1    RESULT UNTIL WEEKS AFTER IT HAPPENED.  THERE'S NO EVIDENCE THAT

12:10PM  2    SHE KNEW OF THIS PARTICULAR PATIENT SITUATION UNTIL WEEKS AFTER

12:10PM  3    IT HAPPENED.

12:10PM  4         AND BY THE TIME THAT MS. HOLMES WAS TOLD ABOUT IT, SHE WAS

12:10PM  5    TOLD THE ISSUE HAD BEEN RESOLVED BECAUSE THE PSA TEST WAS NO

12:10PM  6    LONGER BEING OFFERED ON THE EDISON DEVICE.

12:10PM  7         THAT'S CONVEYED IN DOCUMENTS THAT YOU SEE IN THE CASE WITH

12:10PM  8    THE LISTING OF DATES AFTER THE LAST DATE OF MR. ELLSWORTH'S

12:10PM  9    MAY 16TH DATE, AND BY THE END OF JUNE THAT TEST WAS NO LONGER

12:10PM 10    BEING OFFERED ON THE THERANOS DEVICE.

12:10PM 11         LET'S TALK ABOUT THE -- MS. GOULD, WHO HAD THE SITUATION

12:10PM 12    WITH THE HCG TEST.

12:10PM 13         ALL INDICATIONS FROM THE RECORD HERE AGAIN ARE NOT THAT

12:10PM 14    SHE DIDN'T RECEIVE ERRONEOUS RESULTS IN THIS INSTANCE.  I THINK

12:11PM 15    THE RECORD INDICATES THAT THEY WERE VIEWED AS ERRONEOUS

12:11PM 16    RESULTS, AND THAT THERANOS TOOK THEM AS ERRONEOUS RESULTS, AND

12:11PM 17    THAT IT RESPONDED BY SUGGESTING TO HER THAT THE COMPANY HAD

12:11PM 18    MADE AN ERROR AND THAT THE COMPANY APOLOGIZED FOR THAT ERROR,

12:11PM 19    AND THAT IT WANTED TO TAKE STEPS WITH RESPECT TO HER AND WITH

12:11PM 20    RESPECT TO HER TREATING PHYSICIANS TO BOTH ACKNOWLEDGE THAT AND

12:11PM 21    TO TAKE STEPS TO CORRECT THE EFFECTS OF ANY ERROR ON HER.

12:11PM 22         AGAIN, THE ALLEGATION HERE IS THAT MS. HOLMES KNEW THAT

12:11PM 23    THE COMPANY COULD NOT CONSISTENTLY PROVIDE ACCURATE AND

12:11PM 24    RELIABLE RESULTS.

12:11PM 25         WHEN YOU HAVE A POOL OF MILLIONS OF TESTS, IT'S HARD TO

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9225

12:11PM  1    SEE HOW THESE THREE INSTANCES PROVE THAT KIND OF KNOWLEDGE ON

12:12PM  2    HER BEHALF WHEN, IN FACT, SHE MAY NOT HAVE KNOWN UNTIL THEY

12:12PM  3    WERE RESOLVED OF TWO OF THEM, AND IN THE THIRD INSTANCE THE

12:12PM  4    RESPONSE WAS TO TRY TO ADDRESS THE SITUATION.

12:12PM  5         WHAT DID MS. HOLMES HEAR ABOUT PATIENT EXPERIENCES THAT

12:12PM  6    YOU DIDN'T HEAR AS PART OF THE GOVERNMENT'S CASE?

12:12PM  7         WELL, WE INTRODUCED SEVERAL EXHIBITS DURING THE COURSE OF

12:12PM  8    THE CASE WHICH I WOULD ENCOURAGE YOU TO LOOK AT IN WHICH SHE

12:12PM  9    WAS GETTING POSITIVE FEEDBACK ABOUT WHAT THE TECHNOLOGY WAS

12:12PM 10    DOING TO EVALUATE PEOPLE'S HEALTH, NOT ONLY BECAUSE THE TESTS

12:12PM 11    WERE CONSIDERED ACCURATE AND RELIABLE.  THERE ARE EXAMPLES OF

12:12PM 12    THOSE.

12:12PM 13         BUT ALSO BECAUSE CERTAIN POPULATIONS THAT DID NOT HAVE AS

12:12PM 14    MUCH ACCESS TO BLOOD TESTING HAD ACCESS BECAUSE THERANOS'S

12:12PM 15    METHOD OF DRAWING BLOOD WAS MORE COMFORTABLE, AS IN THIS

12:12PM 16    EXHIBIT, 7623.  I'M SORRY.  IT'S IN EXHIBIT 7514.

12:13PM 17         BUT IN EXHIBIT 7623, THIS REALLY IS A COMMENT ON ACCURACY

12:13PM 18    BECAUSE THERANOS'S TECHNOLOGY ALLOWED THIS PATIENT TO RECEIVE

12:13PM 19    HER TEST RESULTS VERY QUICKLY BECAUSE OF THE TRANSMISSION

12:13PM 20    THROUGH SOFTWARE.

12:13PM 21         AND SHE WAS ABLE TO DISCOVER AHEAD, AHEAD OF HER DOCTOR,

12:13PM 22    AND UNLIKE THE EXPERIENCE THAT SHE HAD HAD WITH OTHER

12:13PM 23    COMPANIES, SHE WAS ABLE TO UNDERSTAND THAT SHE HAD A SERIOUS,

12:13PM 24    SERIOUS MEDICAL ISSUE.

12:13PM 25         SHE WAS VERY GRATEFUL, WHICH SHE CONVEYED BACK TO THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9226

12:13PM   1    COMPANY.

12:13PM   2         YOU'LL REMEMBER THE STANFORD PHYSICIAN IN EXHIBIT 7586A,

12:13PM   3    WHO REPORTED HE WAS A PHYSICIAN AND THAT TESTS THAT HE HAD GOT

12:13PM   4    FROM THERANOS WERE $25.  THEY WOULD HAVE BEEN 750 ELSEWHERE.

12:13PM   5         AND THAT HE, AS A PHYSICIAN, COMPARED THE RESULTS THAT HE

12:14PM   6    WAS GETTING TO THE RESULTS THAT WERE BEING OFFERED BY OTHER

12:14PM   7    LABS, AND THAT THEY WERE CONGRUENT.

12:14PM   8         THAT'S -- THIS IS THE KIND OF INFORMATION THAT MS. HOLMES

12:14PM   9    WAS RECEIVING IN REALTIME.

12:14PM  10         AND SOME OF THAT FEEDBACK WAS EXTRAORDINARY.  I MEAN,

12:14PM  11    PEOPLE TESTIFYING ABOUT -- THROUGH EMAIL TESTIFYING ABOUT

12:14PM  12    TRAVELLING LONG DISTANCES TO COME TO THERANOS TO BE TESTED

12:14PM  13    BECAUSE THE PRICES MADE IT ACCESSIBLE, AND THAT VERY MUCH

12:14PM  14    INFORMED HER VIEW OF WHAT THERANOS SERVICES WERE DOING FOR

12:14PM  15    PEOPLE'S HEALTH.

12:14PM  16         I WANT YOU TO LOOK FOR A MOMENT AT EXHIBIT 2214 AND NOTE

12:14PM  17    THIS COMMENT ABOUT SOMEBODY COMING ALL OF THE WAY FROM SOUTHERN

12:14PM  18    CALIFORNIA TO GET THESE TESTS BECAUSE THEY WERE, THEY WERE

12:14PM  19    CHEAPER IN ARIZONA THAN THEY WERE IN CALIFORNIA.

12:14PM  20         AND THE COST HAD BEEN KILLING THIS PATIENT BECAUSE AS A

12:15PM  21    CANCER PATIENT, THEY HAD TO GET FREQUENT TESTING AND AFFORDING

12:15PM  22    IT WAS DIFFICULT.

12:15PM  23         THIS IS THE LONGITUDINAL ISSUE THAT I MENTIONED YESTERDAY

12:15PM  24    IN CONNECTION WITH MS. HOLMES'S STATE OF MIND.

12:15PM  25         PEOPLE COULD CONTINUE TO GET THEIR BLOOD TESTED MORE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9227

12:15PM   1      FREQUENTLY SO THEY COULD GET MORE SNAPSHOTS OF THEIR HEALTH

12:15PM   2      WHICH WOULD GIVE THEM MORE ACCURATE INFORMATION ABOUT WHAT WAS

12:15PM   3      GOING ON WITH THEM.

12:15PM   4          THIS IS WHAT MS. HOLMES WAS SEEING IN REALTIME.

12:15PM   5          NOW, THERE'S ONE LAST COUNT IN CONNECTION WITH THE

12:15PM   6      INDICTMENT THAT I'LL JUST MENTION VERY BRIEFLY, AND THIS IS

12:15PM   7      COUNT 12 WHICH RELATED, IF YOU RECALL, TO MR. SCHENK'S

12:15PM   8      DISCUSSION YESTERDAY TO THE HORIZON ENTITY, WHICH WAS AN

12:15PM   9      ADVERTISING ENTITY.

12:15PM   10         MY COMMENTS ON THIS WILL BE VERY BRIEF BECAUSE YOU REALLY

12:16PM   11     HAVE NO EVIDENCE RELATING TO THIS COUNT.

12:16PM   12         WE DON'T KNOW -- WE DO KNOW THERE WAS A WIRE TRANSFER FROM

12:16PM   13     THERANOS TO HORIZON IN CONNECTION WITH THIS.  WE DON'T KNOW

12:16PM   14     WHETHER THAT WIRE WAS USED TO BUY ADVERTISEMENTS, WE DON'T KNOW

12:16PM   15     WHETHER ADVERTISEMENTS RAN, AND IF THEY DID, WHAT THEY SAID.

12:16PM   16         WE DON'T KNOW OF ANY RELATIONSHIP BETWEEN MS. HOLMES AND

12:16PM   17     THE CONTENT OF THOSE ADS.  SO THE GOVERNMENT HAS REALLY PROVED

12:16PM   18     NOTHING WITH RESPECT TO THIS OTHER THAN THAT THERE WAS A WIRE

12:16PM   19     TRANSFER.

12:16PM   20         THE OTHER WITNESS WHO TESTIFIED ABOUT THIS WAS MS. SPIVEY,

12:16PM   21     THE CONTROLLER, WHO SAID SHE DID IN FACT SEND THIS WIRE AND

12:16PM   22     THAT HORIZON WAS A MARKETING FIRM.

12:16PM   23         THE LAST SUBSTANTIVE ISSUE I WANT TO TALK TO YOU ABOUT,

12:16PM   24     LADIES AND GENTLEMEN, IS EACH SIDE'S VIEW OF WHAT MS. HOLMES'S

12:16PM   25     MOTIVES WERE.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9228

```
12:17PM   1          YOU RECALL THAT MR. LEACH SAID TO YOU IN OPENING STATEMENT

12:17PM   2    THAT THE REASON HE WOULD DEMONSTRATE TO YOU THAT MS. HOLMES

12:17PM   3    COMMITTED CRIMES WAS BECAUSE SHE FOUND HERSELF, SHORTLY BEFORE

12:17PM   4    SHE RAISED MONEY FROM INVESTORS, OUT OF TIME AND OUT OF MONEY.

12:17PM   5          AND MR. SCHENK BEGAN HIS REMARKS WITH THAT SAME THEME

12:17PM   6    YESTERDAY.

12:17PM   7          I WANT TO LOOK FIRST AT THE EVIDENCE IN SOME DETAIL, AND

12:17PM   8    THEN I WANT TO COMMENT A LITTLE FURTHER ON IT.

12:17PM   9          FIRST, THE GOVERNMENT'S THEORY HERE IS THAT IN 2009

12:17PM  10    MS. HOLMES RAN OUT OF MONEY, EARLY 2009.  WE DON'T KNOW THE

12:17PM  11    PRECISE DATE.

12:17PM  12          MS. SPIVEY TESTIFIED IT WAS SOMETIME IN EARLY 2009 THAT

12:17PM  13    THE COMPANY WAS RUNNING LOW ON CASH.

12:18PM  14          MS. SPIVEY ALSO TESTIFIED THAT AT SOME TIME LATER IN 2009,

12:18PM  15    THERANOS WAS NO LONGER LOW ON CASH, THAT THEY SECURED A LOAN

12:18PM  16    FROM FIDELITY AND THAT THE COMPANY WAS FINANCIALLY STABLE.

12:18PM  17          THE GOVERNMENT'S THEORY IS THAT MS. HOLMES ENGAGED WITH

12:18PM  18    WALGREENS AND SAFEWAY BEGINNING IN MARCH 2010, A YEAR AFTER

12:18PM  19    THIS PERIOD WHERE THE COMPANY WAS SHORT ON CASH, BECAUSE IT HAD

12:18PM  20    BEEN SHORT ON CASH IN THE EARLY PART OF 2009.

12:18PM  21          THERE'S JUST NO EVIDENCE TO SUPPORT THE GOVERNMENT'S

12:18PM  22    THEORY THAT MS. HOLMES WAS OUT OF MONEY IN CONNECTION WITH

12:18PM  23    THIS.  THE AGREEMENT WITH WALGREENS WAS NOT SIGNED UNTIL JULY

12:18PM  24    OF 2010 AND PAYMENTS UNDER THAT AGREEMENT WEREN'T MADE UNTIL

12:18PM  25    LATER.
```

ER-6791

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9229

12:18PM   1          THAT'S LITERALLY AFTER, 15 MONTHS AFTER MR. LEACH AND

12:19PM   2   MR. SCHENK TELL YOU THE COMPANY WAS DESPERATE FOR MONEY AND HAD

12:19PM   3   TO GO OUT AND DECEIVE PEOPLE.

12:19PM   4          THERE'S NO EVIDENCE AT ALL, NONE AT ALL, WHICH LINKS

12:19PM   5   THERANOS'S EFFORTS TO ENTER INTO PARTNERSHIPS WITH WALGREENS

12:19PM   6   AND SAFEWAY TO ANY DESPERATION FOR MONEY, ANY CONCERN ABOUT

12:19PM   7   MONEY.

12:19PM   8          WHAT DOES THE RECORD SHOW ABOUT THE PERIOD WHERE THOSE

12:19PM   9   PARTNERSHIPS WERE DISCUSSED?

12:19PM  10          EXACTLY THE OPPOSITE.  THERANOS WENT OUT TO RAISE MONEY

12:19PM  11   DURING THE HEIGHT OF ITS ACHIEVEMENT.  REMEMBER THAT IT WAS IN

12:19PM  12   EARLY 2010 THAT THERANOS BEGAN TO BELIEVE THAT IT HAD ACHIEVED

12:19PM  13   THE TECHNOLOGICAL BREAKTHROUGH THAT IT WOULD BE ABLE TO OFFER

12:19PM  14   ANY TEST ON ITS SMALL DEVICE AND TO ANALYZE ANY TEST, AND THEY

12:19PM  15   WANTED TO BRING THAT TECHNOLOGY OUT TO THE PUBLIC, AND THEY

12:20PM  16   TALKED TO RETAIL STORES, INCLUDING WALGREENS AND SAFEWAY, ABOUT

12:20PM  17   THAT AND THEY DECIDED TO ENTER INTO THOSE PARTNERSHIPS.  THAT'S

12:20PM  18   THE STORY THAT WE'VE TOLD YOU.

12:20PM  19          THE STORY THAT THE GOVERNMENT HAS TOLD YOU IS THAT THOSE

12:20PM  20   PARTNERSHIPS WERE CREATED BECAUSE 15 MONTHS BEFORE THERE HAD

12:20PM  21   BEEN A DESPERATION FOR CASH.

12:20PM  22          YOU HAVE TO WEIGH WHICH OF THOSE MOTIVES SEEMS MORE

12:20PM  23   PLAUSIBLE TO YOU.

12:20PM  24          NOW, IN 2013 THE GOVERNMENT SAYS THE CONSPIRACY WAS AGAIN

12:20PM  25   REINFORCED.  OF COURSE IT WAS ONGOING IN THE GOVERNMENT'S VIEW

ER-6792

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9230

12:20PM   1    FROM 2010 TO 2013, BUT THERE WAS ADDITIONAL ACTIVITY BECAUSE

12:20PM   2    THE GOVERNMENT WAS ABLE TO LOCATE A POINT IN 2013 WHEN THERANOS

12:20PM   3    WAS LOW ON CASH AND INVESTMENTS WERE TAKEN IN THEREAFTER.

12:20PM   4        BUT YOU KNOW THAT THAT THEORY ALSO HAS NO MERIT BECAUSE

12:20PM   5    YOU KNOW WHAT ELSE WAS HAPPENING IN CONNECTION WITH THAT

12:21PM   6    TIMEFRAME, WHICH IS THAT THERANOS WAS ABOUT TO ENTER INTO THE

12:21PM   7    AGREEMENT WITH WALGREENS WHERE THE ROLLOUT PLAN FOR ALL OF THE

12:21PM   8    STORES THAT THERANOS AND WALGREENS WERE GOING TO OFFER BLOOD

12:21PM   9    TESTING SERVICES IN WAS ABOUT TO BE SIGNED.  THEY HAD BEEN

12:21PM  10    DISCUSSING THAT SINCE SEPTEMBER.

12:21PM  11        ULTIMATELY THE C1 INVESTMENT CLOSES AT THE END OF

12:21PM  12    DECEMBER 2013.  THE GOVERNMENT SAYS BECAUSE SOME OF THOSE

12:21PM  13    INVESTORS SENT MONEY EARLIER THAN THAT, THAT THEY WERE

12:21PM  14    SOLICITED BECAUSE OF A DESPERATION FOR CASH.

12:21PM  15        YOU HAVEN'T HEARD FROM ANY OF THOSE INVESTORS ON THAT

12:21PM  16    WITNESS STAND.  THE GOVERNMENT HAS NO IDEA.  THIS RECORD SHOWS

12:21PM  17    NOTHING TO YOU ABOUT WHY THOSE TRANSACTIONS WERE ENTERED.

12:21PM  18        AND WE KNOW THAT WITH REGARD TO THE WITNESSES THAT THEY

12:21PM  19    DID BRING, WITH MR. EISENMAN, WITH MR. LUCAS, AND MR. TOLBERT

12:21PM  20    WHO INVESTED IN THAT PERIOD, WE KNOW FROM THE RECORD THAT

12:22PM  21    THERANOS -- THAT WALGREENS HAD AGREED TO AND DID MAKE A

12:22PM  22    SUBSTANTIAL PAYMENT TO THERANOS AT THE SAME TIME AS THOSE

12:22PM  23    INVESTMENTS.

12:22PM  24        WHAT IS THE STORY AS TO WHY THERANOS SOUGHT INVESTMENTS

12:22PM  25    THEN?

ER-6793

12:22PM  1     BECAUSE THEY SIGNED THAT CONTRACT WITH WALGREENS.  THEY

12:22PM  2   NEEDED TO BUILD UP THE CAPACITY TO OFFER THEIR BLOOD TESTING

12:22PM  3   SERVICES IN 3,000 STORES, TO TRAIN ALL OF THE PERSONNEL, TO

12:22PM  4   BUILD MANUFACTURING FACILITIES, TO BUILD UNITS, TO CONTINUE

12:22PM  5   WITH RESEARCH AND DEVELOPMENT, ALL OF THOSE THINGS.  THAT'S

12:22PM  6   WHAT THAT FUND RAISING WAS ABOUT DURING THAT TIME.

12:22PM  7     YOU DECIDE WHICH OF THOSE MOTIVES MAKES MORE SENSE TO YOU

12:22PM  8   IN LIGHT OF THE OVERALL RECORD OFFERED IN THIS CASE.

12:22PM  9     I ALSO SUGGESTED TO YOU WHEN WE WERE LOOKING AT THE ISSUE

12:22PM 10   OF REVENUE BEFORE THAT REALLY UNDERLYING ALL OF THIS -- AND IF

12:22PM 11   YOU THINK BACK TO MR. LEACH'S OPENING, AND EVEN MR. SCHENK'S

12:23PM 12   REMARKS YESTERDAY, IS THE NOTION THAT THERANOS WASN'T MAKING

12:23PM 13   ANY MONEY.  THERE WAS NO CASH COMING IN SO THEY HAD TO

12:23PM 14   CONTINUALLY RECRUIT INVESTORS.

12:23PM 15     YOU KNOW FROM THE DOCUMENT THAT I SHOWED YOU EARLIER

12:23PM 16   THAT'S NOT TRUE.  FROM INSURERS, FROM HOSPITALS, FROM OTHER

12:23PM 17   PLACES, THERANOS WAS GETTING TENS OF MILLIONS OF DOLLARS DURING

12:23PM 18   THIS PERIOD BECAUSE ALL OF THOSE PARTNERS BELIEVED THAT

12:23PM 19   THERANOS WOULD OFFER THESE SERVICES AND THAT THEY WOULD BE

12:23PM 20   SUCCESSFUL IN TREATING PATIENTS.

12:23PM 21     SO THEY WERE EAGER FOR PARTNERSHIPS WITH THERANOS AND

12:23PM 22   THERANOS WAS TAKING A GOOD DEAL OF MONEY IN.

12:23PM 23     NOW, I WOULD ASK YOU TO LOOK AT REALLY THE TWO STORIES

12:23PM 24   THAT ARE TOLD HERE IN LIGHT OF THE DOCUMENTS THAT YOU HAVE IN

12:23PM 25   FRONT OF YOU.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9232

12:23PM   1        OUR STORY IS THAT MS. HOLMES WAS VERY DEVOTED TO HER

12:23PM   2    MISSION, AND THAT SHE DID NOT, IN CONNECTION WITH HER WORK AT

12:24PM   3    THERANOS, SELL ANY STOCK.

12:24PM   4        THAT, LADIES AND GENTLEMEN, IS UNDISPUTED.  FROM THE TIME

12:24PM   5    SHE FOUNDED THIS COMPANY UNTIL THE TIME THAT THIS COMPANY

12:24PM   6    COLLAPSED, SHE DID NOT SELL A SINGLE SHARE OF STOCK DESPITE

12:24PM   7    REPEATED OPPORTUNITIES, ONE AFTER ANOTHER, TO SELL THAT STOCK.

12:24PM   8        WHAT IS THE GOVERNMENT'S THEORY AS TO WHY SHE DID NOT SELL

12:24PM   9    STOCK?

12:24PM  10        I THINK WE HEARD FOR THE FIRST TIME YESTERDAY, BUT NOT IN

12:24PM  11    THE EVIDENCE IN THE CASE, A THEORY, WHICH WAS THAT MS. HOLMES

12:24PM  12    HELD A FORM OF STOCK THAT SHE WOULD LOSE CONTROL OVER THE

12:24PM  13    COMPANY IF SHE SOLD STOCK.

12:24PM  14        THERE'S NO EVIDENCE IN THE RECORD TO THAT EFFECT.  NO

12:24PM  15    WITNESS TESTIFIED LIKE THAT.  THERE'S NO INDICATION TO YOU THAT

12:24PM  16    THAT'S, THAT THAT'S CORRECT, AND THERE'S CERTAINLY NO

12:24PM  17    INDICATION THAT SHE COULDN'T HAVE SOLD TENS OF MILLIONS OF

12:25PM  18    DOLLARS OF STOCK WHILE LOSING CONTROL OF THE COMPANY -- WITHOUT

12:25PM  19    LOSING CONTROL OF THE COMPANY.

12:25PM  20        JUST NO EVIDENCE THAT THAT'S A MOTIVE IN THE CASE.

12:25PM  21        AND YOU SHOULD CONSIDER, YOU SHOULD CONSIDER THE FACT THAT

12:25PM  22    THAT MOTIVE IS ARTICULATED FOR THE FIRST TIME IN THE

12:25PM  23    GOVERNMENT'S SUMMATION AS TO THE GOVERNMENT'S PERSUASIVENESS

12:25PM  24    WITH RESPECT TO ARTICULATING A MOTIVE FOR THESE CRIMES.

12:25PM  25        NOW, I HAVE TALKED TO YOU FOR HOURS, AND I'M SURE YOU'RE

ER-6795

12:25PM  1    READY TO BE RID OF ME, AND PROBABLY VERY FATIGUED AT THE END OF

12:25PM  2    ANOTHER WEEK OF TRIAL.

12:25PM  3        BUT I WANT TO SPEND ANOTHER MINUTE TALKING TO YOU ABOUT

12:25PM  4    SOME CONCEPTS THAT I THINK WILL BE IMPORTANT AND HELPFUL TO YOU

12:25PM  5    AS YOU UNDERTAKE YOUR DELIBERATIONS IN THIS CASE.

12:25PM  6        THE FIRST CONCEPT I WANT TO TALK TO YOU ABOUT IS THE

12:25PM  7    CONCEPT OF UNANIMITY.

12:25PM  8        WE TALKED ABOUT REASONABLE DOUBT YESTERDAY, AND I WANT YOU

12:26PM  9    TO BEAR THAT IN MIND.

12:26PM  10       BUT MOST THINGS THAT WE DO IN THIS COUNTRY, IMPORTANT

12:26PM  11   THINGS THAT WE DECIDE IN THE INSTITUTIONS THAT WE HAVE, WE DO

12:26PM  12   THOSE BY MAJORITY VOTE, AND WE ACCEPT THAT.  THE SUPREME COURT

12:26PM  13   DECIDES CASES FIVE TO FOUR.  CONGRESS PASSES OR DOESN'T PASS

12:26PM  14   LEGISLATION BY ONE VOTE SOMETIMES.  THE HEALTH CARE SYSTEM IN

12:26PM  15   THIS COUNTRY WAS CHANGED BY ONE VOTE.  THAT HAPPENS.

12:26PM  16       BUT YOU ARE IN A DIFFERENT INSTITUTION HERE.  YOU ARE IN

12:26PM  17   AN INSTITUTION WHERE, FOR MS. HOLMES TO BE CONVICTED OF A

12:26PM  18   FELONY OFFENSE, EVERY ONE OF YOU, EVERY ONE OF YOU HAS TO BE

12:26PM  19   PERSUADED BEYOND A REASONABLE DOUBT THAT SHE COMMITTED EVERY

12:26PM  20   ELEMENT OF THAT OFFENSE.

12:26PM  21       YOU'VE TAKEN THE OATH TO UPHOLD THAT DUTY, AND YOU'VE BEEN

12:27PM  22   AN INCREDIBLY ATTENTIVE JURY, AND I KNOW THAT EVERY ONE OF YOU

12:27PM  23   WILL UPHOLD THAT DUTY FOR YOURSELF AND IN YOUR DELIBERATIONS

12:27PM  24   WITH OTHERS.

12:27PM  25       AND I WOULD SAY TO YOU, AFTER ALL OF THE EVIDENCE THAT I

12:27PM  1    HAVE DISCUSSED, AFTER ALL OF THE EVIDENCE THAT MR. SCHENK HAS

12:27PM  2    DISCUSSED WITH YOU, WITH ALL OF WHAT MR. BOSTIC WILL DISCUSS

12:27PM  3    WITH YOU, AS IS APPROPRIATE, THAT YOU CAN LOOK THROUGH ALL OF

12:27PM  4    THAT EVIDENCE AND YOU CAN LOOK TO THE NARRATIVE THAT EACH SIDE

12:27PM  5    HAS TOLD YOU IN THIS CASE.

12:27PM  6         YOU KNOW WHAT MS. HOLMES DID IN HER LIFE.  YOU KNOW THAT

12:27PM  7    SHE LEFT SCHOOL.  SHE GAVE UP A COLLEGE EDUCATION THAT PEOPLE

12:27PM  8    WOULD GIVE THEIR RIGHT ARM FOR.  SHE GAVE UP HER YOUTH.  SHE

12:27PM  9    GAVE UP HER FRIENDS.  SHE GAVE UP HER CLOSE RELATIONSHIP WITH

12:27PM  10   HER FAMILY.

12:27PM  11        WHY?

12:27PM  12        BECAUSE SHE BELIEVED SHE WAS BUILDING A TECHNOLOGY THAT

12:27PM  13   WOULD CHANGE THE WORLD.  THAT'S OUR STORY.

12:28PM  14        WHAT IS THE GOVERNMENT'S STORY?

12:28PM  15        THE GOVERNMENT'S STORY IS THAT BEGINNING IN 2010 EVERY

12:28PM  16   DAY, EVERY DAY FROM 2010 TO 2016, SHE KNEW SHE WAS COMMITTING A

12:28PM  17   CRIME.  SHE WAS ROBBING INVESTORS AND THAT SHE -- IN 2013 SHE

12:28PM  18   BEGAN ROBBING PATIENTS.

12:28PM  19        AND THEN YOU KNOW WHAT HAPPENED?

12:28PM  20        ONE DAY IN MARCH OF 2016 DR. DAS WALKED INTO HER OFFICE.

12:28PM  21   AND YOU HEARD ABOUT THAT.  DR. DAS SAID TO HER, I THINK THAT

12:28PM  22   THERE ARE 60,000 RESULTS GENERATED ON YOUR PROPRIETARY DEVICE

12:28PM  23   THAT WE HAVE TO VOID.

12:28PM  24        THAT'S A TOUGH THING TO HEAR WHEN YOU'VE SPENT 11 YEARS

12:28PM  25   BUILDING A TECHNOLOGY.  YOU KNOW THAT.

12:28PM   1          NOW WE KNOW IN THE GOVERNMENT'S NARRATIVE WHO THIS WOMAN

12:29PM   2     WAS AND WHAT CRIMES SHE COMMITTED.  WE KNOW THAT WHEN SHE HEARD

12:29PM   3     THAT IN THE GOVERNMENT'S VIEW, SHE MUST HAVE THOUGHT THAT THERE

12:29PM   4     ARE A THOUSAND CRIMES HIDDEN UNDER THE ROCKS OF THIS COMPANY,

12:29PM   5     AND IT HAS NOW BEEN DISCOVERED AND I HAVE TO REACT

12:29PM   6     APPROPRIATELY.

12:29PM   7          YOU DON'T NEED TO KNOW WHAT AN ASSAY IS.  YOU DON'T NEED

12:29PM   8     TO KNOW WHAT CLIA IS.

12:29PM   9          YOU KNOW FROM YOUR OWN EXPERIENCE AND FROM YOUR OWN COMMON

12:29PM  10     SENSE HOW TO EVALUATE PEOPLE'S INTENT.  AND YOU KNOW THAT AT

12:29PM  11     THE FIRST SIGN OF TROUBLE, CROOKS CASH OUT, CRIMINALS COVER UP,

12:29PM  12     AND RATS LEAVE A FLEEING SHIP.

12:29PM  13          SHE DIDN'T DO ANY OF THOSE.  NONE.

12:29PM  14          DID SHE COVER UP?

12:29PM  15          WHAT DID SHE TELL DR. DAS?

12:29PM  16          TURN OVER EVERY ROCK, EVERY ROCK, UNDER WHICH THE

12:30PM  17     GOVERNMENT SAYS WAS HIDDEN A THOUSAND CRIMES.

12:30PM  18          DID SHE CASH OUT?  YOU KNOW THAT ALREADY.  SHE DIDN'T SELL

12:30PM  19     A SINGLE SHARE OF STOCK EVEN THOUGH SHE HAD THAT OPPORTUNITY

12:30PM  20     FOR SIX YEARS AND FOR TWO MORE YEARS THEREAFTER.  SHE DID NOT

12:30PM  21     SELL A SINGLE SHARE OF STOCK.  NOT A SINGLE ONE.

12:30PM  22          AND DID SHE LEAVE IN THE FACE OF THAT CRITICISM AND SAY,

12:30PM  23     YOU KNOW WHAT?  DR. BONANNI CAN RUN THIS.  SOMEBODY CAN RUN

12:30PM  24     THIS.  THEY CAN DO A BETTER JOB THAN I CAN.  LET ME JUST TAKE

12:30PM  25     MY MONEY AND I'LL GET OUT.

ER-6798

12:30PM 1          NO.  SHE STAYED.

12:30PM 2          WHY?  BECAUSE SHE BELIEVED IN THIS TECHNOLOGY.  SHE STAYED

12:30PM 3     THE WHOLE TIME, AND SHE WENT DOWN WITH THAT SHIP WHEN IT WENT

12:30PM 4     DOWN.

12:30PM 5          LADIES AND GENTLEMEN, THAT IS WHO THIS WOMAN IS, AND I AM

12:30PM 6     ASKING YOU TO ACQUIT HER ON ALL COUNTS IN THE INDICTMENT, AND

12:30PM 7     YOU DON'T NEED MORE FROM ME TO KNOW WHAT HER INTENT WAS.

12:31PM 8          THANK YOU, LADIES AND GENTLEMEN.

12:31PM 9               THE COURT:  THANK YOU, COUNSEL.

12:31PM 10         DOES THE GOVERNMENT HAVE A REBUTTAL?

12:31PM 11              MR. BOSTIC:  YES, YOUR HONOR.

12:31PM 12              THE COURT:  WOULD YOU LIKE A BREAK BEFORE WE BEGIN

12:31PM 13    THE REBUTTAL?

12:31PM 14              MR. BOSTIC:  JUST A BRIEF ONE, YOUR HONOR.

12:31PM 15              THE COURT:  LET'S DO THAT.  LET'S TAKE ABOUT

12:31PM 16    15 MINUTES.  LADIES AND GENTLEMEN, LET'S TAKE ABOUT 15 MINUTES,

12:31PM 17    AND THEN WE'LL COME BACK.

12:31PM 18              THE CLERK:  COURT IS IN RECESS.

12:31PM 19         (RECESS FROM 12:31 P.M. UNTIL 12:51 P.M.)

12:51PM 20         (JURY IN AT 12:51 P.M.)

12:52PM 21              THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

12:52PM 22    SEATED.

12:52PM 23         WE'RE BACK ON THE RECORD.  MS. HOLMES IS PRESENT.  OUR

12:52PM 24    JURY IS PRESENT.  THANK YOU.

12:52PM 25              MR. BOSTIC, YOU HAVE A REBUTTAL?

12:52PM  1            MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

12:52PM  2            THE COURT:  PLEASE PROCEED.  THANK YOU.

12:52PM  3        **(MR. BOSTIC GAVE HIS REBUTTAL CLOSING ARGUMENT ON BEHALF**

12:52PM  4   **OF THE GOVERNMENT.)**

12:52PM  5            MR. BOSTIC:  MEMBERS OF THE JURY, GOOD AFTERNOON.

12:52PM  6        OVER THE COURSE OF THIS TRIAL YOU'VE HEARD THE STORY OF

12:52PM  7   TWO DIFFERENT VERSION OF THE COMPANY CALLED "THERANOS."

12:52PM  8        THE FIRST VERSION OF THAT COMPANY IN APPROXIMATELY 2013

12:52PM  9   HAD INVENTED AND PERFECTED A NEW BLOOD TESTING TECHNOLOGY.  IT

12:52PM 10   WAS A NEW DEVICE THAT COULD RUN ANY BLOOD TEST ON A TINY SAMPLE

12:52PM 11   FROM A FINGERSTICK.  IT WAS UNLIKE ANYTHING THAT HAD COME

12:52PM 12   BEFORE.

12:52PM 13        EVEN BETTER, IT COULD PERFORM THE FULL RANGE OF BLOOD

12:52PM 14   TESTS, REPLACING LARGER DEVICES.

12:52PM 15        IT WAS FAR SMALLER THAN CONVENTIONAL ANALYZERS, AND THAT

12:52PM 16   MEANT IT COULD BE USED ANYWHERE.

12:52PM 17        THE TECHNOLOGY IN THIS DEVICE HAD BEEN VALIDATED AND

12:52PM 18   ENDORSED BY MAJOR PHARMACEUTICAL COMPANIES AND ACADEMIC

12:53PM 19   INSTITUTIONS.

12:53PM 20        THE MOST POWERFUL AND WELL EQUIPPED MILITARY FORCE IN THE

12:53PM 21   WORLD WAS EVEN USING THIS DEVICE, AND USING THIS TECHNOLOGY,

12:53PM 22   AND IT WAS SAVING THE LIVES OF SOLDIERS ON THE BATTLEFIELD.

12:53PM 23        THIS COMPANY HAD SIGNIFICANT REVENUES FROM EARLY ON, WHICH

12:53PM 24   MAY BE UNUSUAL FOR A COMPANY AT THAT STAGE, BUT IT WAS VERY

12:53PM 25   PROMISING AND IT WAS ON THE VERGE OF GOING NATIONAL AND

12:53PM  1    GENERATING HUNDREDS OF MILLIONS, IF NOT BILLIONS, OF DOLLARS.

12:53PM  2         THE VERSION OF THERANOS I JUST DESCRIBED WAS NEVER REAL.

12:53PM  3    IT NEVER EXISTED.

12:53PM  4         IT EXISTED ONLY IN THE WORDS OF THE DEFENDANT, MS. HOLMES,

12:53PM  5    AND HER COCONSPIRATOR, SUNNY BALWANI.  IT EXISTED IN THE

12:53PM  6    WRITTEN MATERIALS THAT SHE AND HER COCONSPIRATOR PROVIDED TO

12:53PM  7    INVESTORS AND TO OTHERS OUTSIDE OF THE COMPANY.

12:53PM  8         AND IT EXISTED IN THE MINDS OF THE PEOPLE WHO BELIEVED

12:53PM  9    HER, WHO BELIEVED THE CLAIMS THAT SHE WAS MAKING ABOUT WHAT THE

12:53PM 10    COMPANY HAD DONE, WHAT THE COMPANY WAS DOING, AND WHAT IT HAD

12:53PM 11    ACCOMPLISHED.  AND THOSE PEOPLE WERE, OF COURSE, THE INVESTORS

12:54PM 12    WHO THEN WENT ON TO RELY ON THOSE REPRESENTATIONS AND ENTRUST

12:54PM 13    THE COMPANY WITH THEIR MONEY OR, OF COURSE, WITH THE PATIENTS

12:54PM 14    WHO ENTRUSTED THE COMPANY TO TELL THEM WHAT WAS HAPPENING WITH

12:54PM 15    THEIR HEALTH.

12:54PM 16         THE REAL VERSION OF THERANOS WHERE THE DEFENDANT WENT TO

12:54PM 17    WORK EVERY DAY WAS DRAMATICALLY DIFFERENT FROM THE ROSY PICTURE

12:54PM 18    THAT SHE WAS PAINTING FOR OTHERS.

12:54PM 19         NOW, THE DEFENSE HAS EMPHASIZED THROUGHOUT TRIAL AND

12:54PM 20    DURING ITS CLOSING ARGUMENT THAT THERE WERE MANY PEOPLE AT

12:54PM 21    THERANOS WHO WERE WORKING HARD TO MAKE THE TECHNOLOGY WORK AND

12:54PM 22    TO DEVELOP THAT TECHNOLOGY AND THAT THEY HAD SOME SUCCESSES.

12:54PM 23         FOR THE MOST PART, THERE'S NO DISAGREEMENT THERE.  IT'S

12:54PM 24    NOT CLEAR THAT THE ACHIEVEMENTS THAT TOOK PLACE AT THERANOS

12:54PM 25    WERE THE MIRACULOUS BREAKTHROUGHS THAT THE DEFENSE DESCRIBES.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC          9239

12:54PM  1          BUT I'M NOT HERE TO CRITICIZE THE EFFORTS OF THE EMPLOYEES

12:54PM  2     WHO WORKED HARD TO TRY TO MAKE THAT TECHNOLOGY WORK.

12:54PM  3          THE DISEASE THAT PLAGUED THERANOS WASN'T A LACK OF EFFORT,

12:55PM  4     IT WAS A LACK OF HONESTY, AND IT WASN'T AT THE BOTTOM OF THE

12:55PM  5     GROUND LEVEL OF THE COMPANY, IT WAS AT THE TOP AS THE EVIDENCE

12:55PM  6     HAS SHOWN.

12:55PM  7          THE REASON WE'RE HERE STEMS BACK TO THE WAY THAT THERANOS

12:55PM  8     AND ITS WORK WERE DESCRIBED BY ITS CEO, THE DEFENDANT, AND THE

12:55PM  9     FOUNDER OF THE COMPANY.

12:55PM 10          NOT, FOR THE MOST PART, THE EFFORTS THAT WERE TAKING PLACE

12:55PM 11     AT THE COMPANY BY THE SCIENTISTS, ENGINEERS, AND OTHERS.

12:55PM 12          SO WHAT WAS THE DARKER TRUTH AT THERANOS?

12:55PM 13          WELL, FOR ONE THING, THE EVIDENCE AT TRIAL HAS AMPLY

12:55PM 14     DEMONSTRATED THAT THERE WERE VERY SERIOUS PROBLEMS WITH

12:55PM 15     THERANOS'S TECHNOLOGY.

12:55PM 16          MS. HOLMES'S LAWYER SAID IN HIS OPENING STATEMENT THAT,

12:55PM 17     QUOTE, THERE WERE PROBLEMS WITH THERANOS'S CLINICAL LABORATORY.

12:55PM 18          WELL, AS YOU SAW, THAT TURNED OUT TO BE QUITE THE

12:55PM 19     UNDERSTATEMENT.

12:55PM 20          HE ALSO SAID SOME OF THE TESTS THAT THERANOS OFFERED IN

12:55PM 21     HINDSIGHT WERE NOT PERFORMING AS WELL AS EXPECTED.

12:55PM 22          WELL, THAT WAS REALLY ANOTHER UNDERSTATEMENT, WASN'T IT?

12:56PM 23          AND THE EVIDENCE SHOWED THAT IT DIDN'T TAKE HINDSIGHT, IN

12:56PM 24     FACT, TO SEE THOSE PROBLEMS.  THOSE PROBLEMS WERE APPARENT WHEN

12:56PM 25     THEY WERE TAKING PLACE, AND THE COMPANY WENT ON OFFERING

12:56PM 1    UNRELIABLE AND INACCURATE BLOOD TESTS DESPITE THAT EVIDENCE.

12:56PM 2         LET'S TALK ABOUT SOME OF THE THINGS THAT YOU SAW THAT SHOW

12:56PM 3    YOU THAT THERE WERE SERIOUS PROBLEMS WITH THE THERANOS

12:56PM 4    TECHNOLOGY.

12:56PM 5         FIRST, DO YOU REMEMBER TESTIMONY ABOUT HOW MANY THERANOS

12:56PM 6    ANALYZERS IT TOOK AT THE TIME OF LAUNCH TO RUN A SINGLE PATIENT

12:56PM 7    SAMPLE?

12:56PM 8         YOU MIGHT RECALL THAT WHEN THERANOS FIRST STARTED OFFERING

12:56PM 9    BLOOD TESTING SERVICES TO THE PUBLIC, THERANOS DIDN'T TRUST A

12:56PM 10   SINGLE EDISON ANALYZER TO RUN A BLOOD TEST SAMPLE ON ITS OWN.

12:56PM 11   IT NEEDED TO GROUP THOSE ANALYZERS IN GROUPS OF THREE, HAVE ALL

12:56PM 12   THREE RUN THE SAME TEST, AND THEN THEY HAD A PRACTICE OF

12:56PM 13   COMBINING WHAT TURNED OUT TO BE SIX RESULTS, REMOVING TWO

12:56PM 14   OUTLIERS IF THEY DIDN'T LIKE THAT DATA, AND THEN AVERAGING THE

12:56PM 15   OTHER FOUR.

12:56PM 16        YOU'LL RECALL THE FACT THAT IT TOOK THREE DEVICES TO RUN

12:57PM 17   EVERY TEST MEANT THAT WHEN A PATIENT CAME IN AND NEEDED MORE

12:57PM 18   THAN ONE ASSAY RUN, IT WOULD TAKE A FLEET OF EDISONS TO

12:57PM 19   ACTUALLY PERFORM THAT TESTING.

12:57PM 20        SO YOU HEARD THE TESTIMONY OF ERIKA CHEUNG, WHO ACTUALLY

12:57PM 21   RAN THESE SAMPLES, THAT IF SOMEONE CAME IN AND, SAY, NEEDED

12:57PM 22   THREE ASSAYS RUN ON EDISON, THREE DIFFERENT KINDS OF BLOOD

12:57PM 23   TESTS, PLUS A CBC AND A GENERAL CHEMISTRY, FOR EXAMPLE, IT

12:57PM 24   WOULD TAKE I THINK 11 DEVICES SHE TESTIFIED TO TO PERFORM THE

12:57PM 25   TESTING ON THAT ONE PATIENT SAMPLE.

12:57PM  1          AND SO AS SHE DESCRIBED, THE SAMPLE WOULD COME DOWN TO THE

12:57PM  2     LAB AND THEN TEAMS OF TECHS WOULD SPRING INTO ACTION, AND THEY

12:57PM  3     WOULD DIVIDE THE SAMPLE UP, AND THEN THEY WOULD GO TO THIS

12:57PM  4     FLEET OF DEVICES THAT WAS NECESSARY TO RUN THAT SIMPLE TEST ON

12:57PM  5     THAT SINGLE PATIENT SAMPLE.

12:57PM  6          CONTRAST THAT WITH WHAT YOU KNOW MS. HOLMES WAS SAYING TO

12:58PM  7     THE PUBLIC, TO INVESTORS, TO JOURNALISTS, AND TO OTHERS ABOUT

12:58PM  8     THE CAPABILITIES OF THAT DEVICE.

12:58PM  9          YOU KNOW THAT SHE WAS PRESENTING THIS AS A DEVICE THAT ON

12:58PM 10     ITS OWN COULD RUN ANY COMBINATION OF TESTS, COULD DO IT ALL AT

12:58PM 11     ONCE FROM A SINGLE SAMPLE.

12:58PM 12          HOW DIFFERENT THE REALITY WAS FROM HOW SHE WAS PRESENTING

12:58PM 13     IT.

12:58PM 14          YOU'LL ALSO RECALL THAT ERIKA CHEUNG WHO, AGAIN, HAD

12:58PM 15     EXPERIENCE WORKING WITH THE THERANOS EDISON ANALYZERS AND ALSO

12:58PM 16     THE THIRD PARTY ANALYZERS AT THERANOS, TALKED ABOUT THE LEVEL

12:58PM 17     OF AUTOMATION INVOLVED IN THOSE TWO DIFFERENT KINDS OF DEVICES,

12:58PM 18     AND SHE TALKED ABOUT ALL OF THE MANUAL STEPS THAT WERE REQUIRED

12:58PM 19     TO USE THE EDISON ANALYZER.

12:58PM 20          SHE TALKED ABOUT THE NEED FOR DILUTION OF SAMPLES AND

12:58PM 21     OTHER STEPS THAT HAD TO BE DONE OUTSIDE OF THE MACHINE BEFORE

12:58PM 22     THE SAMPLE WAS EVEN READY TO BE PROCESSED ON THE ANALYZER.

12:58PM 23          SHE TOLD YOU THAT THE THIRD PARTY DEVICES ACTUALLY HAD A

12:58PM 24     HIGHER LEVEL OF AUTOMATION AND WERE EASIER TO USE IN THAT WAY.

12:59PM 25          AGAIN, CONTRAST THAT WITH WHAT MS. HOLMES SAID OVER AND

| | | |
|---|---|---|
| 12:59PM | 1 | OVER AGAIN, WHICH WAS THAT THE THERANOS ANALYZER HAD A SUPERIOR |
| 12:59PM | 2 | LEVEL OF AUTOMATION, AND THAT THAT WAS A BIG PART OF THE |
| 12:59PM | 3 | TECHNOLOGICAL BREAKTHROUGH, THAT THAT WAS ONE OF THE REASONS |
| 12:59PM | 4 | WHY THE DEVICE WAS ABLE TO ACHIEVE SUCH SUPERIOR ACCURACY. |
| 12:59PM | 5 | YOU KNOW FROM THE TESTIMONY OF THE SECOND WITNESS IN THE |
| 12:59PM | 6 | CASE, ERIKA CHEUNG, THAT THAT WAS ALSO FALSE. |
| 12:59PM | 7 | YOU ALSO SAW EVIDENCE AND HEARD TESTIMONY ABOUT QUALITY |
| 12:59PM | 8 | CONTROL PROBLEMS WITH THE THERANOS ANALYZERS DURING TRIAL. |
| 12:59PM | 9 | AND YOU'LL RECALL THAT QUALITY CONTROL WAS A STEP THAT HAD |
| 12:59PM | 10 | TO BE TAKEN IN THE LAB TO CONFIRM THAT AN ANALYZER WAS WORKING |
| 12:59PM | 11 | BEFORE IT COULD BE USED FOR PATIENT TESTING, AND HOW IT WORKED |
| 12:59PM | 12 | WAS A KNOWN SAMPLE WOULD BE TESTED ON THE ANALYZER, AND IT WAS |
| 12:59PM | 13 | REQUIRED TO RETURN THE RIGHT RESULT, THE RESULT THAT WAS KNOWN |
| 12:59PM | 14 | TO BE CORRECT, IN ORDER FOR IT TO BE USED ON PATIENT SAMPLES |
| 12:59PM | 15 | WHERE THE RESULT WOULD BE UNKNOWN. |
| 01:00PM | 16 | YOU'VE HEARD AMPLE TESTIMONY THAT THE THERANOS ANALYZERS |
| 01:00PM | 17 | PERFORMED VERY POORLY WHEN IT CAME TO THIS QC STEP. |
| 01:00PM | 18 | WE TALKED A COUPLE MINUTES AGO ABOUT THE PRACTICE AT |
| 01:00PM | 19 | THERANOS OF RUNNING EACH ASSAY SIX TIMES ESSENTIALLY AND THEN |
| 01:00PM | 20 | DISCARDING TWO OUTLIERS. |
| 01:00PM | 21 | WE'LL SEE THAT IN THIS EMAIL. THIS IS EXHIBIT 1287. |
| 01:00PM | 22 | YOU'LL RECALL THAT ON THIS OCCASION A COUPLE OF MONTHS AFTER |
| 01:00PM | 23 | THERANOS HAD LAUNCHED ITS TESTING SERVICES, MS. CHEUNG SENT AN |
| 01:00PM | 24 | EMAIL TO THIS NORMANDY 911 EMAIL ADDRESS. THIS WAS THE EMAIL |
| 01:00PM | 25 | ADDRESS THAT EXISTED TO HANDLE THE PROBLEMS IN THE NORMANDY |

01:00PM   1    LAB, THE PROBLEMS WITH THERANOS TECHNOLOGY THAT YOU HEARD CAME

01:00PM   2    UP FREQUENTLY.

01:00PM   3         MS. CHEUNG TESTIFIED THAT IN THIS CASE BOTH QC CONTROLS

01:00PM   4    THAT SHE WAS RUNNING AT THIS TIME HAD FAILED; THAT SHE HAD RUN

01:00PM   5    QC CONTROLS USING UNOPENED REAGENTS AND A NEW PACKAGE OF

01:01PM   6    CARTRIDGES, BUT THOSE HAD FAILED AS WELL.

01:01PM   7         MS. HOLMES WAS INFORMED OF THIS PROBLEM.  SUNNY BALWANI

01:01PM   8    TOLD HER ON THAT SAME DAY ABOUT WHAT WAS HAPPENING AND REPORTED

01:01PM   9    TO HER, "THIS IS BEYOND UNACCEPTABLE PERFORMANCE."

01:01PM  10         MS. HOLMES THEN GOT INVOLVED AND RESPONDED, "DO WE HAVE

01:01PM  11    ENOUGH SAMPLE TO RUN THIS ONE ON TRADITIONAL METHODS?"

01:01PM  12         THIS SHOWS MS. HOLMES'S KNOWLEDGE EVEN RELATIVELY EARLY IN

01:01PM  13    THE COMMERCIAL LAUNCH OF THE THERANOS TESTING THAT THE

01:01PM  14    TRADITIONAL METHODS, THE NON-THERANOS TECHNOLOGY, WAS A MORE

01:01PM  15    RELIABLE METHOD THAN THE THERANOS SPECIFIC DEVICES.

01:01PM  16         WHEN THE THERANOS SPECIFIC METHOD FAILED, WHEN QC COULD

01:01PM  17    NOT BE PASSED, AS WAS FREQUENTLY THE CASE, MS. HOLMES ASKED,

01:01PM  18    CAN WE GO BACK TO THE SAFE STANDARD?  CAN WE GO BACK TO THE

01:01PM  19    RELIABLE DEVICES THAT WE ALSO HAVE?

01:01PM  20         ULTIMATELY THIS SITUATION WAS RESOLVED, AND I SHOULD PUT

01:02PM  21    RESOLVED IN QUOTES, BECAUSE YOU SEE THAT THE ANSWER, AS

01:02PM  22    MS. HOLMES WAS TOLD, WAS THAT "TWO OUTLIERS HAD TO BE MANUALLY

01:02PM  23    REMOVED IN ORDER TO PASS QC."

01:02PM  24         SO YOU RECALL MS. CHEUNG'S TESTIMONY AND DR. ROSENDORFF'S

01:02PM  25    TESTIMONY ABOUT THIS PRACTICE WHERE MULTIPLE TEST RESULTS WOULD

ER-6806

01:02PM 1    BE GENERATED AND THE COMPANY WOULD SIMPLY IGNORE RESULTS THAT

01:02PM 2    CAUSED THE DEVICE NOT TO PASS QC.

01:02PM 3        THIS APPROACH YOU HEARD WAS NOT TAKEN WITH THE COMMERCIAL

01:02PM 4    ANALYZERS.  THE NON-THERANOS ANALYZERS DID NOT NEED TO USE THIS

01:02PM 5    PROCESS.  THEY DIDN'T NEED TO RELY ON THE PROCESS OF DISCARDING

01:02PM 6    THE DATA IN ORDER TO APPEAR MORE RELIABLE THAN THEY WERE.  YOU

01:02PM 7    HEARD THAT FROM MS. CHEUNG.

01:02PM 8        HIGH QUALITY CONTROL FAILURE RATES WERE A PERVASIVE

01:02PM 9    PROBLEM AT THERANOS AS YOU'VE HEARD.  BOTH MS. CHEUNG AND

01:02PM 10   DR. ROSENDORFF TESTIFIED ABOUT THE OVERALL RATES OF QUALITY

01:03PM 11   CONTROL FAILURE, AND YOU HEARD FROM THEM THAT, FOR EXAMPLE, IN

01:03PM 12   THE MONTH OF MARCH 2014, APPROXIMATELY 26 PERCENT OF EDISON

01:03PM 13   QUALITY CONTROL RUNS FAILED.

01:03PM 14       AND IF YOU LOOK AT THIS ON AN ASSAY BY ASSAY BASIS, YOU

01:03PM 15   SEE THAT IN SOME CASES IT'S MUCH WORSE.  I'LL DRAW YOUR

01:03PM 16   ATTENTION TO THE COLUMN FOR THE TT3 TEST, WHICH INDICATES THAT

01:03PM 17   MORE THAN 50 PERCENT OF THE QUALITY CONTROL RUNS FAILED DURING

01:03PM 18   THAT MONTH.

01:03PM 19       YOU HEARD TESTIMONY THAT MARCH WAS NOT AN ESPECIALLY BAD

01:03PM 20   MONTH FOR THERANOS, THAT THIS WAS TYPICAL.  THIS WAS TYPICAL OF

01:03PM 21   THE PERFORMANCE OF THESE MACHINES.

01:03PM 22       THINK ABOUT WHAT THAT MEANS.  IF HALF OF THE QUALITY

01:03PM 23   CONTROL SAMPLES RUN ON THIS DEVICE WERE FAILING, THINK ABOUT

01:03PM 24   WHAT THAT MEANS FOR THE PATIENT SAMPLES THAT WERE BEING RUN.

01:03PM 25       IF A TEST OR A DEVICE IS ONLY ACCURATE HALF OF THE TIME,

01:03PM 1    HOW CAN ANYONE, REGARDLESS OF THEIR LEVEL OF EXPERTISE OR

01:03PM 2    EDUCATION, HOW CAN ANYONE BE COMFORTABLE USING THAT IN THE

01:04PM 3    CLINICAL SETTING AND TRUSTING PATIENT CARE TO THAT KIND OF

01:04PM 4    DEVICE?

01:04PM 5         YOU ALSO SAW THAT THERE WAS AN INSTANCE WHERE THE THERANOS

01:04PM 6    ANALYZER WAS COMPARED TO PREDICATE NON-THERANOS ANALYZERS IN

01:04PM 7    THE CONTEXT OF PROFICIENCY TESTING SAMPLES.

01:04PM 8         AND YOU'LL RECALL THAT YOU SAW THIS DATA YESTERDAY SHOWING

01:04PM 9    THAT FOR TPSA, FOR EXAMPLE, THE PREDICATE DEVICE, THE

01:04PM 10   NON-THERANOS DEVICE, RELIABLY RETURNED THE SAME DEVICE -- OR

01:04PM 11   THE SAME RESULT, EXCUSE ME, TWICE IN A ROW WHEN THE SAME SAMPLE

01:04PM 12   WAS RERUN.

01:04PM 13        WHEN THE SAME THING WAS ATTEMPTED ON THE THERANOS DEVICE,

01:04PM 14   IT CAME NOWHERE CLOSE TO THAT SAME KIND OF CONSISTENCY.

01:04PM 15        THIS WAS A HUGE RED FLAG AS RECOGNIZED BY THE TECHNICAL

01:04PM 16   PEOPLE AT THERANOS.

01:04PM 17        IT WAS DISMISSED BY SOME AT THE TIME AS BEING INCONSISTENT

01:04PM 18   WITH THE ALTERNATIVE ASSESSMENT AND PROFICIENCY PROTOCOLS THAT

01:05PM 19   THE COMPANY HAD AT THAT TIME OR WAS WORKING ON DEVELOPING.

01:05PM 20        BUT YOU HEARD FROM DR. ROSENDORFF THAT HE STILL VIEWED

01:05PM 21   THIS AS A VALID AND A USEFUL SPOT-CHECK OF THE RELIABILITY OF

01:05PM 22   THE THERANOS SYSTEMS, AND THE THERANOS SYSTEMS FAILED THIS

01:05PM 23   SPOT-CHECK ABYSMALLY.

01:05PM 24        YOU ALSO HEARD AND SAW EVIDENCE THAT THE PROBLEMS WITH

01:05PM 25   THERANOS'S TECHNOLOGY WEREN'T JUST LIMITED TO THE EDISON.

01:05PM   1          SO, FOR EXAMPLE, DR. ROSENDORFF REVIEWED EVIDENCE

01:05PM   2     REGARDING A STUDY THAT WAS CONDUCTED AT THERANOS, AND HE

01:05PM   3     TESTIFIED THAT WHEN LOOKING AT THE VARIATIONS OBSERVED IN THAT

01:05PM   4     STUDY, THE VARIATION COMPARING VENOUS TO FINGERSTICK WAS MUCH

01:05PM   5     MORE PRONOUNCED WHEN FINGERSTICK SAMPLES WERE ASSAYED.

01:05PM   6          AND YOU'LL RECALL THAT FINGERSTICK WAS THE TYPE OF SAMPLE

01:05PM   7     THAT THERANOS RAN ON ITS MODIFIED THIRD PARTY DEVICES ALSO.

01:05PM   8          HE WAS THEN ASKED THE QUESTION, DOES THAT MEAN THAT USING

01:05PM   9     THE THERANOS APPROACH ON THESE DEVICES ACTUALLY MADE THE

01:06PM  10     DEVICES PERFORM WORSE THAN THEY DID IN THEIR UNMODIFIED FORM?

01:06PM  11          HIS ANSWER WAS, YES, IT INCREASED THE DIFFERENCES IN

01:06PM  12     RESULTS BETWEEN INSTRUMENTS.

01:06PM  13          SO NOT ONLY HAD THERANOS BUILT ITS OWN ANALYZER THAT WAS

01:06PM  14     NOT UP TO PAR AND WAS NOT WORKING WELL, BUT THE CHANGES THAT

01:06PM  15     THE COMPANY HAD MADE TO THIRD PARTY DEVICES THAT IT HAD

01:06PM  16     PURCHASED DECREASED THE ACCURACY AND RELIABILITY OF THOSE THIRD

01:06PM  17     PARTY DEVICES.

01:06PM  18          NOW, THERE WAS SOME DISCUSSION DURING THE DEFENSE'S

01:06PM  19     CLOSING ABOUT STATISTICS IN THIS CASE AND WHETHER YOU NEED TO

01:06PM  20     SEE FAILURE RATES ACROSS A PATIENT POPULATION TO UNDERSTAND

01:06PM  21     THAT THESE DEVICES WERE OR WERE NOT WORKING.

01:06PM  22          BASED ON THIS EVIDENCE, THE EVIDENCE AVAILABLE AT THE TIME

01:06PM  23     AT THERANOS, YOU KNOW THAT THESE PROBLEMS WERE OBVIOUS AND THAT

01:06PM  24     THEY WERE SERIOUS.

01:06PM  25          YOU ALSO HEARD TESTIMONY ABOUT THE DIFFICULTY IN

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9247

01:07PM   1      IDENTIFYING INACCURATE PATIENT RESULTS.  WHEN DR. ROSENDORFF

01:07PM   2      WAS ON THE STAND, HE TALKED ABOUT HOW AN INACCURATE PATIENT

01:07PM   3      RESULT MIGHT NOT STAND OUT FROM THE REST.  IT CAN BE DIFFICULT

01:07PM   4      TO IDENTIFY.  YOU NEED TO HAVE OTHER INFORMATION TO COMPARE THE

01:07PM   5      RESULT TO, WHETHER IT'S CLINICAL INFORMATION ABOUT HOW A

01:07PM   6      PATIENT IS PRESENTING OR CONTEMPORANEOUS RESULTS FROM ANOTHER

01:07PM   7      LAB.  YOU NEED TO HAVE SOMETHING ELSE TO HOLD THOSE RESULTS UP

01:07PM   8      TO.

01:07PM   9           SO THE KIND OF STATISTICAL ANALYSIS THAT THE DEFENSE IS

01:07PM  10      SAYING YOU NEED, FOR ONE THING, IT'S NOT CLEAR THAT THAT

01:07PM  11      ANALYSIS WOULD EVEN BE POSSIBLE.

01:07PM  12           BUT MORE IMPORTANTLY, YOU DON'T NEED IT.  YOU DON'T NEED

01:07PM  13      IT TO REACH THE CONCLUSION THAT THESE DEVICES WERE NOT WORKING

01:07PM  14      AS WELL AS THEY SHOULD HAVE BEEN, THAT IT WAS OBVIOUS TO

01:07PM  15      EVERYONE IN THE COMPANY, INCLUDING MS. HOLMES.

01:07PM  16           MR. DOWNEY ALSO TALKED ABOUT THE NATURE OF THE EVIDENCE OF

01:07PM  17      FAILURE IN THIS CASE, AND HE HIGHLIGHTED ONE CATEGORY OF THAT

01:08PM  18      EVIDENCE, WHICH WAS EXAMPLES OF INSTANCES WHERE THE DEVICE

01:08PM  19      RETURNED AN INACCURATE RESULT.

01:08PM  20           BUT THAT IS ONLY PART OF THE EVIDENCE IN THIS CASE.

01:08PM  21      THAT'S ONLY PART OF THE EVIDENCE SHOWING THAT THE ANALYZER WAS

01:08PM  22      NOT WORKING.

01:08PM  23           YOU SHOULD NOT FOCUS SOLELY ON THAT, ESPECIALLY IN LIGHT

01:08PM  24      OF THE EVIDENCE THAT SHOWED MUCH HIGHER FAILURE RATES FOR

01:08PM  25      QUALITY CONTROL FOR THE THERANOS ANALYZER VERSUS THE

01:08PM  1    NON-THERANOS TECHNOLOGY ALSO AT THE COMPANY.

01:08PM  2         FINALLY, JUST TO CLEAR UP THE RECORD ON THAT TOPIC,

01:08PM  3    MR. DOWNEY A COUPLE OF TIMES REFERENCED DR. ROSENDORFF'S

01:08PM  4    TESTIMONY COMPARING FAILURE RATES OR ERROR RATES AT THERANOS TO

01:08PM  5    ERROR RATES AT OTHER LABS, AND HE HAD PREVIOUSLY TESTIFIED THAT

01:08PM  6    I THINK HE HAD SEEN THE SAME NUMBER APPROXIMATELY OF ERRONEOUS

01:09PM  7    RESULTS AT THERANOS VERSUS HIS PREVIOUS LAB.

01:09PM  8         LATER IN HIS TESTIMONY, THOUGH, HE CLARIFIED THAT THAT

01:09PM  9    ACTUALLY CAUSED HIM TO BE FAR MORE CONCERNED ABOUT THE

01:09PM  10   RELIABILITY OF THERANOS'S TESTS GIVEN THE DIFFERENCE IN VOLUME

01:09PM  11   BETWEEN THOSE TWO LABS.

01:09PM  12        AS HE TESTIFIED, THE KEY QUESTION FOR HIM WAS, HOW

01:09PM  13   FREQUENTLY ARE THESE ERRORS POPPING UP IN RELATION TO THE TOTAL

01:09PM  14   NUMBER OF TESTS THAT ARE BEING PERFORMED?

01:09PM  15        AND YOU'LL RECALL THAT SOME OF HIS TESTIMONY FOCUSSED ON

01:09PM  16   THE EARLY DAYS OF THE THERANOS LAUNCH WHEN, AS BOTH PARTIES

01:09PM  17   AGREE, THE TESTING VOLUME WAS QUITE LOW.

01:09PM  18        SO A HIGH ERROR RATE DURING THAT TIME, ALL OF THESE

01:09PM  19   PROBLEMS CROPPING UP SO EARLY WHEN THE TEST VOLUME WAS LOW MADE

01:09PM  20   THIS EVEN MORE OF A RED FLAG FOR EVERYONE AT THE COMPANY.

01:09PM  21        LET'S KEEP TALKING ABOUT WHAT WAS TRUE AT THERANOS AND HOW

01:09PM  22   THINGS REALLY WERE.

01:09PM  23        YOU ALSO KNOW FROM THE EVIDENCE IN THIS CASE THAT ALTHOUGH

01:10PM  24   DEFENDANT WAS REPRESENTING THAT THE COMPANY HAD A RICH ONGOING

01:10PM  25   RELATIONSHIP WITH PHARMACEUTICAL COMPANIES AND WAS GENERATING A

ER-6811

01:10PM  1    SIGNIFICANT AMOUNT OF REVENUE FROM THOSE RELATIONSHIPS, THAT

01:10PM  2    WASN'T TRUE.  THOSE RELATIONSHIPS WERE FAR MORE LIMITED.

01:10PM  3        FOR ONE THING, YOU'LL RECALL, OR YOU'LL NOTICE IF YOU LOOK

01:10PM  4    AT THE RELEVANT EXHIBITS THAT THE ASSAYS INVOLVED IN THE

01:10PM  5    CONTRACTS WITH THE PHARMACEUTICAL COMPANIES WERE SPECIALIZED

01:10PM  6    ASSAYS THAT WERE GENERALLY NOT THE SAME AS THE ASSAYS THAT WERE

01:10PM  7    CRITICAL FOR CLINICAL CARE.

01:10PM  8        IN OTHER WORDS, THE ASSAYS THAT THERANOS WAS RUNNING FOR

01:10PM  9    THE PHARMA COMPANIES WERE GENERALLY NOT THE SAME ASSAYS THAT

01:10PM 10    MATTERED FOR PATIENT CARE AND THE CLINICAL LAUNCH.

01:10PM 11        SO THE FACT THAT THERANOS HAD EXPERIENCE IN THAT AREA IS

01:10PM 12    REALLY OF LIMITED RELEVANCE.

01:10PM 13        YOU ALSO HEARD TESTIMONY FROM EMPLOYEES AT THOSE

01:10PM 14    PHARMACEUTICAL COMPANIES WHO TOLD YOU THAT THEY ACTUALLY HAD

01:11PM 15    NEGATIVE IMPRESSIONS OF THERANOS'S TECHNOLOGY.  THEY HAD

01:11PM 16    CONCERNS ABOUT ITS PERFORMANCE.

01:11PM 17        IN GENERAL, THEY WERE NOT INTERESTED IN USING THE

01:11PM 18    COMPANY'S TECHNOLOGY FURTHER.

01:11PM 19        THE UNDISPUTED EVIDENCE ALSO SHOWS THAT THERANOS COLLECTED

01:11PM 20    NO REVENUE FROM PHARMACEUTICAL COMPANIES AFTER 2009.  YOU CAN

01:11PM 21    FIND THAT IN EXHIBIT 7753, AND THAT WAS A CHART THAT WAS

01:11PM 22    COVERED BY MS. YAM WHEN SHE WAS ON THE STAND.

01:11PM 23        AGAIN, DESPITE THE DEFENDANT'S REPRESENTATIONS GOING INTO

01:11PM 24    2012, 2013 AND FORWARD, THE COMPANY HAD NOT COLLECTED A DOLLAR

01:11PM 25    OF REVENUE FROM PHARMACEUTICAL WORK AFTER 2009.

01:11PM  1        MR. DOWNEY RECENTLY DISCUSSED WHETHER THERANOS WAS IN NEED

01:11PM  2   OF MONEY OR NOT.

01:11PM  3        ALTHOUGH MS. HOLMES REPRESENTED TO INVESTORS AND OTHERS

01:12PM  4   THAT THE COMPANY WAS FINANCIALLY PERFORMING WELL AND IT WAS

01:12PM  5   GENERATING SIGNIFICANT REVENUES AND IT WAS ABOUT TO GENERATE

01:12PM  6   EVEN MORE, SHE KNEW, BECAUSE SHE WAS CEO OF THE COMPANY,

01:12PM  7   BECAUSE SHE MONITORED THE CASH POSITION, THAT THAT WAS NOT

01:12PM  8   TRUE.

01:12PM  9        AND IF YOU LOOK AT EXHIBIT 5172, I WON'T DISPLAY IT NOW,

01:12PM 10   BUT IT'S AN ACCOUNTING RECORD THAT SHOWS THAT IN SEPTEMBER THE

01:12PM 11   COMPANY'S CASH BALANCE WAS DOWN TO LESS THAN 10 MILLION IF YOU

01:12PM 12   DON'T COUNT THE LINE OF CREDIT THAT WOULD HAVE BEEN DIFFICULT

01:12PM 13   FOR THERANOS TO ACCESS.

01:12PM 14        WHAT DID THAT MEAN?  WHAT DID $10 MILLION MEAN AT THAT

01:12PM 15   TIME?

01:12PM 16        THAT SAME EXHIBIT, 5172, SHOWS THAT AT THAT TIME, AND THIS

01:12PM 17   IS IN SEPTEMBER 2013, AT THAT TIME THE COMPANY'S BURN RATE OR

01:12PM 18   ITS SPEND RATE WAS APPROXIMATELY $1- TO $2 MILLION PER WEEK.

01:12PM 19        SO THAT MEANT THAT THE COMPANY WAS LESS THAN TWO MONTHS

01:12PM 20   FROM RUNNING OUT OF MONEY AND HAVING TO CLOSE ITS DOORS.

01:13PM 21        THAT WAS AROUND THE TIME WHEN THE COMPANY WAS PURSUING ITS

01:13PM 22   LAUNCH WITH WALGREENS BECAUSE IT DESPERATELY NEEDED THE CAPITAL

01:13PM 23   UNDER THAT CONTRACT.

01:13PM 24        IT WAS ALSO AGGRESSIVELY PURSUING INVESTMENT FROM

01:13PM 25   INVESTORS BECAUSE IT DESPERATELY NEEDED THE CAPITAL FROM THOSE

01:13PM   1        INVESTMENTS.

01:13PM   2            THAT IS ABSOLUTELY PART OF THE MOTIVE IN THIS CASE, AND

01:13PM   3    ALTHOUGH YOU'RE NOT REQUIRED TO FIND MOTIVE, IT'S NOT AN

01:13PM   4    ELEMENT OF ANY OF THE CHARGED CRIMES, IT'S IMPORTANT TO

01:13PM   5    UNDERSTAND THAT THAT WAS CERTAINLY ON THE MINDS OF BOTH

01:13PM   6    DEFENDANT, HOLMES AND BALWANI, IN THIS CASE AS THEY DECIDED HOW

01:13PM   7    TO APPROACH THEIR DEALINGS WITH WALGREENS AND THE

01:13PM   8    MISREPRESENTATIONS THEY MADE THERE, AND THEIR APPROACH TO

01:13PM   9    INVESTORS AND THE MISREPRESENTATIONS THEY MADE TO THEM.

01:13PM  10            ALTHOUGH MS. HOLMES WAS REPRESENTING TO THE PUBLIC THAT

01:13PM  11    THE COMPANY'S TECHNOLOGY WAS BEING ACTIVELY USED BY THE

01:13PM  12    MILITARY, YOU KNOW THAT THAT'S NOT TRUE.

01:14PM  13            DURING CLOSING MR. DOWNEY MADE SOME REFERENCE TO SOME OF

01:14PM  14    THE LIMITED ENGAGEMENTS THAT THE COMPANY HAD WITH THE MILITARY.

01:14PM  15            LET ME JUST GO THROUGH THEM TO MAKE SURE THAT WE'RE ALL ON

01:14PM  16    THE SAME PAGE ABOUT THE CRITICAL FACT THAT NONE OF THESE

01:14PM  17    ENGAGEMENTS INVOLVED ACTUAL CLINICAL USE OF THE ANALYZER.  NONE

01:14PM  18    OF THESE WERE USE OF THE THERANOS TECHNOLOGY FOR ITS INTENDED

01:14PM  19    PURPOSE.

01:14PM  20            SO, FOR EXAMPLE, FOR SOCOM, THAT'S SPECIAL OPERATIONS

01:14PM  21    COMMAND, MR. EDLIN TESTIFIED THAT TWO DEVICES WERE SENT TO A

01:14PM  22    BASE IN KENTUCKY.  HE TESTIFIED THAT THOSE DEVICES WERE NOT

01:14PM  23    EVEN CAPABLE OF RUNNING A CBC, A BASIC COMPLETE BLOOD COUNT,

01:14PM  24    THAT THEY WOULD HAVE HAD TO BE REPLACED LATER IN ORDER FOR THAT

01:14PM  25    TEST TO BE POSSIBLE.  AND AS FAR AS HE KNOWS, THOSE DEVICES

01:14PM   1    WERE NEVER USED FOR ANYTHING.

01:14PM   2         AGAIN, TWO DEVICES, SENT TO KENTUCKY, NEVER USED, AND THAT

01:14PM   3    WAS THE EXTENT OF THE SOCOM DEALING.

01:14PM   4         FOR AFRICOM, MR. DOWNEY REFERENCED THIS ONE AS WELL.

01:15PM   5         EXHIBIT 12251 TELLS YOU WHAT THIS WAS ACTUALLY ABOUT.  IT

01:15PM   6    WAS NOT CLINICAL USE OF THE ANALYZER.  IT WAS NOT USE OF THE

01:15PM   7    ANALYZER TO TEST ANY PATIENT SAMPLES.

01:15PM   8         INSTEAD, THIS WAS A TEST TO SEE WHETHER THE DEVICE WOULD

01:15PM   9    FUNCTION, WHETHER IT WOULD SUCCESSFULLY START UP, POWER DOWN,

01:15PM   10   THINGS LIKE THAT, IN THE ENVIRONMENT.

01:15PM   11        HERE'S A QUOTE FROM THAT DOCUMENT.  IT SAYS, "ALL

01:15PM   12   LABORATORY RESULTS WILL BE ARTIFICIALLY CREATED.  NO ACTUAL

01:15PM   13   LABORATORY DATA WILL BE COLLECTED ON VOLUNTEERS."

01:15PM   14        YOU'LL RECALL FROM MR. EDLIN'S TESTIMONY THAT THIS WAS AN

01:15PM   15   EXPERIMENT WHERE THE RESULTS FOR THE TESTS THAT WERE GOING TO

01:15PM   16   BE RUN HAD BEEN PREDETERMINED.  THEY DIDN'T ACTUALLY RELATE TO

01:15PM   17   WHAT WAS HAPPENING IN PATIENTS' BODIES, AND NO TREATMENT

01:15PM   18   DECISIONS WOULD HAVE BEEN MADE BASED ON THOSE TESTS EITHER.

01:15PM   19        HOW ABOUT CENTCOM?

01:15PM   20        THIS IS THE COMPONENT OF THE MILITARY THAT GENERAL MATTIS

01:16PM   21   WAS IN CHARGE OF.  BOTH HE AND MR. EDLIN TESTIFIED THAT

01:16PM   22   ALTHOUGH CENTCOM CONSIDERED AND WAS INTERESTED IN SIDE BY SIDE

01:16PM   23   TESTING OF THERANOS TECHNOLOGY TO SEE WHETHER THERANOS

01:16PM   24   ANALYZERS COULD RELIABLY PERFORM AS WELL AS CONVENTIONAL

01:16PM   25   ANALYZERS, ALTHOUGH CENTCOM WAS INTERESTED IN THAT, THAT NEVER

01:16PM 1    HAPPENED.

01:16PM 2         AND EXHIBIT 10457 IS A PROTOCOL FOR AN LOE, THAT'S LIMITED

01:16PM 3    OBJECTIVE EXPERIMENT, THAT NEVER HAPPENED.  THAT WAS GOING TO

01:16PM 4    INVOLVE SHIPPING DEVICES TO AFGHANISTAN.  THAT PROTOCOL, THAT

01:16PM 5    STUDY, NEVER GOT OFF THE GROUND.

01:16PM 6         AND THEN FINALLY THERE WAS THE BURN STUDY.

01:16PM 7         THIS WAS NOT EXCLUSIVELY A MILITARY OPERATION AS YOU SAW

01:16PM 8    FROM EXHIBIT 7694.  THAT'S THE PUBLISHED ARTICLE WITH THE STUDY

01:16PM 9    DETAILS.

01:16PM 10        YOU'LL RECALL FROM THAT ARTICLE THAT THIS WAS A STUDY OF A

01:17PM 11   TREATMENT TECHNIQUE THAT HAD NOTHING TO DO WITH THERANOS.  NO

01:17PM 12   TREATMENT DECISIONS WERE BASED ON THE USE OF THE THERANOS TEST

01:17PM 13   RESULTS.

01:17PM 14        AND THIS TESTING ALSO OCCURRED EXCLUSIVELY WITHIN THE U.S.

01:17PM 15   IT WAS NOT IN THE BATTLEFIELD.  IT DID NOT EXCLUSIVELY INVOLVE

01:17PM 16   SOLDIERS.

01:17PM 17        SO THIS ALSO WAS NOT ANYTHING LIKE WHAT MS. HOLMES WAS

01:17PM 18   REPRESENTING WAS HAPPENING.

01:17PM 19        IT'S IMPORTANT TO REMEMBER THAT IN NONE OF THESE CASES WAS

01:17PM 20   THERE EVEN COMPARATIVE TESTING TO SEE WHETHER THE THERANOS

01:17PM 21   DEVICE COULD PERFORM WELL ENOUGH FOR ACTUAL USE.  THAT WOULD

01:17PM 22   HAVE BEEN THE FIRST STEP BEFORE ANY SOLDIERS WERE ACTUALLY

01:17PM 23   TREATED BASED ON THERANOS TEST RESULTS, AND THAT PRECONDITION,

01:17PM 24   THAT TEST OF THE THERANOS TECHNOLOGY NEVER EVEN OCCURRED.

01:17PM 25        SO THAT SHOULD GIVE YOU AN IDEA OF HOW FAR AWAY

ER-6816

01:17PM 1     MS. HOLMES'S REPRESENTATIONS WERE FROM THE ACTUAL TRUTH ON THAT

01:17PM 2     TOPIC.

01:17PM 3         SO THAT WAS THE TRUTH AT THERANOS.

01:18PM 4         THE PEOPLE, THOUGH, AND THE ORGANIZATIONS THAT MS. HOLMES

01:18PM 5     WANTED TO DO BUSINESS WITH DIDN'T KNOW THOSE FACTS, AND THEY

01:18PM 6     COULD NOT BE ALLOWED TO KNOW THAT TRUTH.

01:18PM 7         IF INVESTORS HAD KNOWN THOSE FACTS, THEY NEVER WOULD HAVE

01:18PM 8     WRITTEN CHECKS TO THERANOS.  THEY NEVER WOULD HAVE INVESTED

01:18PM 9     THEIR MONEY.

01:18PM 10        IF WALGREENS HAD KNOWN THOSE FACTS, THEY WOULDN'T HAVE

01:18PM 11    PARTNERED WITH THERANOS AND AGREED TO PUT THERANOS'S TESTING

01:18PM 12    SERVICES IN WALGREENS STORES.

01:18PM 13        AND IF PATIENTS HAD KNOWN THOSE FACTS, THEY NEVER WOULD

01:18PM 14    HAVE TRUSTED THERANOS TO TELL THEM WHAT WAS HAPPENING WITH

01:18PM 15    THEIR HEALTH.

01:18PM 16        IN OTHER WORDS, THOSE FACTS, THE TRUTH, WERE FATAL TO

01:18PM 17    THERANOS, AND MS. HOLMES KNEW THAT.

01:18PM 18        SO, AS A RESULT, MS. HOLMES SET OUT TO MAKE SURE THAT THE

01:18PM 19    PEOPLE THAT SHE CARED ABOUT DOING BUSINESS WITH, THE PEOPLE

01:18PM 20    WHOSE MONEY SHE NEEDED, HAD A DISTORTED AND INACCURATE VIEW OF

01:19PM 21    THE COMPANY IN THEIR HEADS.

01:19PM 22        HER SCHEME TO DEFRAUD CAME TO ENCOMPASS INVESTORS IN THE

01:19PM 23    COMPANY AND PATIENTS WHO CAME TO THERANOS FOR BLOOD TESTS,

01:19PM 24    RESULTING IN THE CHARGES IN THIS CASE.

01:19PM 25        LET'S TALK NOW ABOUT SOME OF THE ARGUMENTS YOU'VE SEEN

ER-6817

01:19PM  1    FROM THE DEFENSE OVER THE COURSE OF TRIAL AND ESPECIALLY IN

01:19PM  2    CLOSING.

01:19PM  3         WE'LL LOOK AT THE MAIN THEMES THAT MS. HOLMES'S LAWYERS

01:19PM  4    HAVE OFFERED AND WALK THROUGH WHY NONE OF THEM GETS IN THE WAY

01:19PM  5    OF A CONVICTION ON ALL COUNTS IN THIS CASE.

01:19PM  6         FIRST, WE MENTIONED THIS BEFORE, THE DEFENSE HAS

01:19PM  7    HIGHLIGHTED THE HARD WORK THAT OCCURRED AT THERANOS, AND IN

01:19PM  8    PARTICULAR THE HARD WORK THAT THE DEFENDANT HERSELF DID.

01:19PM  9         AGAIN, THERE'S NO DISPUTE ON THAT FACT.  THE EVIDENCE

01:19PM  10   SHOWS THAT MS. HOLMES DEVOTED A LOT OF TIME AND ENERGY TO THIS

01:19PM  11   COMPANY.  THE COMPANY WAS VERY IMPORTANT TO HER.

01:19PM  12        THERE'S ALSO NO EVIDENCE THAT MS. HOLMES CREATED THE

01:19PM  13   COMPANY, THAT SHE ASSEMBLED THE BOARD, THAT SHE HIRED

01:20PM  14   SCIENTISTS FOR THE PURPOSE OF CONDUCTING A FRAUD.  THAT'S NOT

01:20PM  15   THE GOVERNMENT'S ALLEGATION.

01:20PM  16        FOR ONE THING, THE EVIDENCE SHOWS THAT SHE FOUNDED THE

01:20PM  17   COMPANY IN THE EARLY 2000'S, AND THE CHARGED CRIMES IN THIS

01:20PM  18   CASE DON'T START UNTIL 2010 ON THE INVESTOR SIDE AND 2013 FOR

01:20PM  19   THE PATIENT SIDE.

01:20PM  20        SO THE PARTIES AGREE THAT MS. HOLMES WORKED HARD, THAT SHE

01:20PM  21   WANTED THERANOS TO SUCCEED.  SHE WANTED HER COMPANY TO BE

01:20PM  22   SUCCESSFUL.

01:20PM  23        THE DEFENSE HOLDS THAT OUT AS A REASON TO DOUBT

01:20PM  24   MS. HOLMES'S INTENT TO DEFRAUD IN THIS CASE.

01:20PM  25        BUT, IN FACT, THAT WAS HER MOTIVE.  THAT WAS THE MOTIVE

01:20PM  1    FOR THE SCHEME TO DEFRAUD.  SHE DID THIS ON BEHALF OF THE

01:20PM  2    COMPANY.  SHE COMMITTED THESE CRIMES BECAUSE SHE WAS DESPERATE

01:20PM  3    FOR THE COMPANY TO SUCCEED, AND WE'LL TALK ABOUT SOME OF THE

01:20PM  4    EVIDENCE THAT SHOWS THAT.

01:20PM  5         THE DEFENSE ALSO MENTIONED GOOD FAITH A COUPLE OF TIMES,

01:21PM  6    AND I WANT TO BE CLEAR ABOUT WHAT THE INSTRUCTIONS IN THIS CASE

01:21PM  7    WILL SHOW.

01:21PM  8         SO AFTER I'M FINISHED WITH MY OPPORTUNITY TO ADDRESS YOU,

01:21PM  9    THE COURT IS GOING TO INSTRUCT YOU ON THE RELEVANT LAW IN THIS

01:21PM  10   CASE, AND THAT WILL BE THE LAW THAT YOU SHOULD FOLLOW IN YOUR

01:21PM  11   DELIBERATIONS.

01:21PM  12        I EXPECT THAT THE COURT IS GOING TO INSTRUCT YOU

01:21PM  13   SPECIFICALLY ON GOOD FAITH.  I THINK THAT WILL BE JURY

01:21PM  14   INSTRUCTION NUMBER 22.

01:21PM  15        HERE'S THE IMPORTANT THING TO KNOW HERE IN CONNECTION WITH

01:21PM  16   THE DEFENSE ARGUMENT.  GOOD FAITH THAT WOULD PREVENT A

01:21PM  17   CONVICTION IS GOOD FAITH BELIEF IN THE TRUTH OF THE SPECIFIC

01:21PM  18   MISREPRESENTATIONS ALLEGED.

01:21PM  19        I'LL SAY THAT AGAIN.  THE ONLY KIND OF GOOD FAITH THAT

01:21PM  20   PREVENTS A CONVICTION HERE IS GOOD FAITH BELIEF IN THE TRUTH OF

01:21PM  21   THE SPECIFIC MISREPRESENTATIONS ALLEGED.

01:21PM  22        THAT'S NOT THE SAME THING AS GENERAL GOOD FAITH BELIEF IN

01:21PM  23   THE COMPANY OVERALL.  IT'S NOT THE SAME THING AS A GENERAL GOOD

01:21PM  24   FAITH EFFORT TO MAKE THE COMPANY WORK.

01:22PM  25        IN ORDER TO FIND THAT GOOD FAITH PRECLUDES A CONVICTION

01:22PM  1    HERE, MS. HOLMES MUST HAVE BELIEVED IN THE FALSE THINGS THAT

01:22PM  2    SHE WAS SAYING.

01:22PM  3        IT'S IMPOSSIBLE TO CONCLUDE THAT, AND WE'LL TALK SOME MORE

01:22PM  4    ABOUT WHY.

01:22PM  5        MR. DOWNEY ALSO HAS HIGHLIGHTED THE THEME THAT THE FAILURE

01:22PM  6    OF A BUSINESS DOES NOT EQUAL A FRAUD.

01:22PM  7        AGAIN, THERE'S NO DISPUTE THERE.  THAT'S NOT THE NATURE OF

01:22PM  8    THE ALLEGATIONS IN THIS CASE.  THE ACHIEVEMENTS THAT NEVER

01:22PM  9    MATERIALIZED AT THERANOS ARE SOMETHING THAT WE DISCUSSED AND

01:22PM 10    SOMETHING THAT IS NOT CONTROVERSIAL.

01:22PM 11        BUT THEY'RE ALSO NOT A CRIME.  THAT DEGREE OF FAILURE AND

01:22PM 12    THE FACT THAT THOSE GOALS WERE NOT ACHIEVED DOES NOT BY ITSELF

01:22PM 13    MAKE A CRIME.

01:22PM 14        A VERSION OF MS. HOLMES THAT SET OUT TO ACHIEVE THE GOALS

01:22PM 15    THAT SHE SET OUT TO ACHIEVE AND WAS SUCCESSFUL WOULD HAVE BEEN

01:22PM 16    A HERO.

01:23PM 17        A VERSION WHO TRIED HER BEST AND FAILED, BUT WAS STILL

01:23PM 18    HONEST ABOUT IT, STILL WOULD HAVE BEEN SOMEONE DESERVING OF

01:23PM 19    RESPECT, EVEN ADMIRATION.

01:23PM 20        BUT THAT'S NOT THE VERSION THAT WE SEE IN THE EVIDENCE IN

01:23PM 21    THIS CASE.

01:23PM 22        INSTEAD, WE SEE A CEO OF A COMPANY WHO WAS SO DESPERATE

01:23PM 23    FOR THE COMPANY TO SUCCEED, SO AFRAID OF FAILURE, THAT SHE WAS

01:23PM 24    WILLING TO DO ANYTHING TO KEEP THAT COMPANY FROM FAILING, TO

01:23PM 25    BOLSTER THE REPRESENTATION OF THE COMPANY, AND TO ARTIFICIALLY

ER-6820

01:23PM 1    CREATE SUCCESS OF THE COMPANY.

01:23PM 2         SO BY CONVICTING MS. HOLMES, BY FINDING THAT ALL OF THE

01:23PM 3    ELEMENTS ARE MET IN THIS CASE, YOU'RE NOT PUNISHING THE

01:23PM 4    DEFENDANT FOR BEING AMBITIOUS AND FAILING.  WE ADMIRE PEOPLE

01:23PM 5    WHO SET AMBITIOUS GOALS AND SET OUT TO ACHIEVE THEM.

01:23PM 6         THIS CASE WENT BAD FOR THERANOS AND MS. HOLMES WHEN SHE

01:23PM 7    MADE THE OTHER CHOICE, WHEN SHE REFUSED TO ACCEPT FAILURE AND

01:24PM 8    TURNS TO BREAKING THE LAW INSTEAD.

01:24PM 9         THE DEFENSE HAS ALSO HIGHLIGHTED MS. HOLMES'S YOUTH AND

01:24PM 10   RELATIVE INEXPERIENCE AS A POSSIBLE EXCUSE IN THIS CASE.

01:24PM 11        YOU SHOULDN'T BE DISTRACTED BY THAT.  ALTHOUGH THE DEFENSE

01:24PM 12   HIGHLIGHTS THE AGE MS. HOLMES WAS WHEN SHE FOUNDED THE COMPANY,

01:24PM 13   IT'S IMPORTANT TO REMEMBER THAT THE PERSON ON TRIAL IS 37 YEARS

01:24PM 14   OLD TODAY.

01:24PM 15        IN 2013 AND 2014 WHEN SHE WAS DECIDING TO OFFER FLAWED

01:24PM 16   BLOOD TESTS TO THE PUBLIC, SHE WAS 29 AND 30.

01:24PM 17        IN 2010 WHEN THE FRAUD ON INVESTORS BEGAN, SHE WAS 26.

01:24PM 18        THAT IS CERTAINLY OLD ENOUGH TO KNOW THE DIFFERENCE

01:24PM 19   BETWEEN RIGHT AND WRONG.  IT'S OLD ENOUGH TO KNOW THE

01:24PM 20   DIFFERENCE BETWEEN HONESTY AND DISHONESTY.

01:24PM 21        AND LEST YOU THINK THERE'S SOMETHING ABOUT THIS SPECIFIC

01:24PM 22   SETTING THAT MADE IT DIFFICULT TO TELL THE DIFFERENCE BETWEEN

01:24PM 23   RIGHT AND WRONG OR TO KNOW WHAT THE RIGHT THING WAS, ASK

01:24PM 24   ERIKA CHEUNG.  ASK ERIKA CHEUNG HOW YOUNG IS TOO YOUNG TO KNOW

01:25PM 25   THAT OFFERING INACCURATE BLOOD TESTS IS A BAD THING.

01:25PM 1        YOU RECALL THAT MS. CHEUNG JOINED THERANOS JUST OUT OF

01:25PM 2    COLLEGE.  IT WAS HER FIRST JOB AFTER GRADUATING, AND IT ONLY

01:25PM 3    TOOK HER A HANDFUL OF MONTHS TO SEE THE PROBLEMS THAT WERE

01:25PM 4    OBVIOUS WITH THE THERANOS TECHNOLOGY AND TO DECIDE THAT SHE

01:25PM 5    DIDN'T WANT TO BE A PART OF IT.

01:25PM 6        BY THE WAY, SHE HAD NO IDEA ABOUT THE MISLEADING

01:25PM 7    STATEMENTS THAT MS. HOLMES WAS MAKING TO INVESTORS AND TO

01:25PM 8    OTHERS.  IMAGINE WHAT SHE WOULD HAVE DONE IF SHE HAD KNOWN

01:25PM 9    ABOUT THAT.

01:25PM 10       ANOTHER THEME THAT WE'VE SEEN IN MS. HOLMES'S LAWYERS'

01:25PM 11   ARGUMENTS IS THE THEME OF BLAMING OTHERS.  AND LET'S TALK FIRST

01:25PM 12   ABOUT THE BOARD OF DIRECTORS.

01:25PM 13       YOU'LL SEE THAT WITH A NUMBER OF THESE ARGUMENTS, THE

01:25PM 14   DEFENSE WOULD LIKE YOU TO BELIEVE THAT THERE WERE OTHER PEOPLE

01:25PM 15   AT THERANOS WHO SHOULD HAVE ADVISED HOLMES BETTER, PEOPLE WHO

01:26PM 16   SHOULD HAVE PREVENTED BAD THINGS FROM HAPPENING, PEOPLE WHO

01:26PM 17   WERE RESPONSIBLE FOR THE BAD THINGS, OR PEOPLE WHO GAVE

01:26PM 18   MS. HOLMES INACCURATE INFORMATION.

01:26PM 19       NONE OF THOSE ARGUMENTS HOLD WATER.

01:26PM 20       WHEN IT COMES TO THE BOARD, IT'S IMPOSSIBLE TO BLAME THE

01:26PM 21   BOARD OF DIRECTORS FOR WHAT HAPPENED HERE, MAINLY BECAUSE THE

01:26PM 22   BOARD WAS NOT GIVEN THE INFORMATION THAT IT NEEDED TO HELP THE

01:26PM 23   COMPANY NAVIGATE THE PROBLEMS THAT IT WAS FACING.

01:26PM 24       AND A GOOD EXAMPLE OF THAT IS MS. HOLMES'S DECISION NOT TO

01:26PM 25   SHARE WITH THE BOARD THE LIMITATIONS OF THE THERANOS ANALYZER.

01:26PM   1          MR. DOWNEY TALKED ABOUT THIS.

01:26PM   2          LET'S CLEAR UP THE RECORD HERE.

01:26PM   3          THE EVIDENCE IN THE CASE SHOWS THAT THERANOS'S RELIANCE ON

01:26PM   4     THIRD PARTY DEVICES WAS ABSOLUTELY CONCEALED FROM ITS BOARD OF

01:26PM   5     DIRECTORS.

01:26PM   6          ON DIRECT GENERAL MATTIS, A MEMBER OF THE BOARD, WAS ASKED

01:27PM   7     WHETHER THERANOS'S USE OF THIRD PARTY DEVICES, WHETHER THE

01:27PM   8     RELIANCE ON THIRD PARTY DEVICES WOULD HAVE STOOD OUT IN HIS

01:27PM   9     MIND, FOR EXAMPLE, IF A MAJORITY OF THE TESTS RUN WERE RUN ON

01:27PM  10     THIRD PARTY DEVICES?

01:27PM  11          HE ANSWERED, "AT THIS POINT IT WOULD HAVE LEAPED OUT AT ME

01:27PM  12     BECAUSE MY WHOLE EFFORT AT CENTCOM HAD BEEN TO TRY TO GET IT

01:27PM  13     INTO THEATRE BECAUSE IT WAS DIFFERENT AND IT COULD DO THIS OFF

01:27PM  14     OF THIS ONE SMALL MACHINE."

01:27PM  15          SO THIS WAS SOMETHING THAT ALTHOUGH GENERAL MATTIS DIDN'T

01:27PM  16     HAVE A BACKGROUND IN, HE WAS NO EXPERT IN BLOOD TESTING OR

01:27PM  17     MEDICAL DEVICES, HIS INTEREST IN THERANOS AND HIS INTEREST IN

01:27PM  18     POSSIBLE MILITARY USE WAS PREDICATED ON THE ABILITY OF THE

01:27PM  19     MACHINE, THIS ONE MACHINE, THIS ONE SMALL MACHINE, TO RUN A

01:27PM  20     WIDE RANGE OF BLOOD TESTS WITHOUT RELIANCE ON THE LARGE

01:27PM  21     CONVENTIONAL ANALYZERS THAT OTHER LABS USED.

01:27PM  22          NOW, WHEN MS. HOLMES TOOK THE STAND, SHE CLAIMED THAT IN A

01:28PM  23     LATE 2013 BOARD MEETING SHE TOLD THE BOARD ABOUT THE COMPANY'S

01:28PM  24     USE OF CONVENTIONAL MODIFIED MACHINES.

01:28PM  25          AND THERE'S BEEN A SUGGESTION BY THE DEFENSE THAT

ER-6823

01:28PM  1    GENERAL MATTIS DIDN'T RECALL THAT DISCUSSION BECAUSE HE WAS

01:28PM  2    TIRED.

01:28PM  3         MR. DOWNEY IN CLOSING SUGGESTED THAT IT'S POSSIBLE THAT

01:28PM  4    GENERAL MATTIS WAS NOT PRESENT AT THAT MEETING.

01:28PM  5         THE MINUTES FOR THAT MEETING CAN BE FOUND AT EXHIBIT 4005,

01:28PM  6    THAT'S 4-0-0-5.  THEY DON'T SHOW THE SUGGESTION THAT HOLMES

01:28PM  7    CLAIMS TOOK PLACE THERE.

01:28PM  8         THOSE MINUTES SHOWED A GENERAL DISCUSSION OF TRADE

01:28PM  9    SECRETS, BUT THEY DON'T DISCUSS DISCLOSURE OF THE COMPANY'S USE

01:28PM 10    OF MODIFIED THIRD PARTY MACHINES.

01:28PM 11         AND MORE IMPORTANTLY, THEY DON'T DISCLOSE THE DISCUSSION

01:28PM 12    OF THE COMPANY'S RELIANCE ON THIRD PARTY MACHINES, AND THAT'S

01:29PM 13    AN IMPORTANT DISTINCTION HERE.

01:29PM 14         WHEN MS. HOLMES WAS UNDER CROSS-EXAMINATION, SHE WAS

01:29PM 15    ASKED, "AM I RIGHT IT'S YOUR TESTIMONY THAT YOU TOLD THE BOARD

01:29PM 16    OF DIRECTORS THERANOS WAS USING MODIFIED COMMERCIAL ANALYZERS

01:29PM 17    TO DO THE PHASE I TESTING?"

01:29PM 18         SHE DIDN'T ANSWER "YES."

01:29PM 19         HER ANSWER HERE WAS, "I TOLD THE BOARD OF DIRECTORS THAT

01:29PM 20    WE HAD AN INVENTION AROUND MODIFIED COMMERCIAL ANALYZERS."

01:29PM 21         THAT'S CRITICAL.  IF MS. HOLMES ONLY TOLD THE BOARD THAT

01:29PM 22    THE COMPANY HAD AN INVENTION THAT INVOLVED MODIFIED THIRD PARTY

01:29PM 23    DEVICES, THE MEMBERS OF THE BOARD WOULD HAVE NO REASON TO

01:29PM 24    SUSPECT THAT THE COMPANY WAS RELYING ON THAT INVENTION, WAS

01:29PM 25    DEPENDENT ON THAT INVENTION BECAUSE ITS OWN HOME BUILT ANALYZER

ER-6824

01:29PM  1    COULDN'T DO THE RANGE OF TESTS THAT IT CLAIMED IT COULD DO.

01:29PM  2         THAT'S THE MISSING PIECE OF INFORMATION THAT WAS WITHHELD

01:29PM  3    FROM THE BOARD.

01:29PM  4         AND THE FACT THAT -- OR THE CLAIM THAT MS. HOLMES TOLD THE

01:30PM  5    BOARD ABOUT THIS INVENTION, ABOUT THE ABILITY TO USE MODIFIED

01:30PM  6    COMMERCIAL ANALYZERS IS THE KIND OF HALF-TRUTH THAT THIS

01:30PM  7    DEFENDANT WAS ESPECIALLY FOND OF USING, SOMETHING THAT ARGUABLY

01:30PM  8    TECHNICALLY CORRECT, BUT STILL LEAVES THE LISTENER WITH AN

01:30PM  9    UNMISTAKABLE INCORRECT UNDERSTANDING ABOUT WHAT THE TRUTH IS.

01:30PM 10         IN FACT, NOT ONLY DID MS. HOLMES NOT TELL THE BOARD ABOUT

01:30PM 11    THE COMPANY'S RELIANCE ON THIRD PARTY DEVICES IN 2013, SHE

01:30PM 12    DIDN'T TELL THEM IN 2014 OR UNTIL LATE 2015 WHEN SHE HAD TO.

01:30PM 13         YOU'LL RECALL THAT AFTER THE OCTOBER 2015

01:30PM 14    "WALL STREET JOURNAL" ARTICLE WAS PUBLISHED, THERE WAS A SERIES

01:30PM 15    OF EMAILS BETWEEN MS. HOLMES AND THE MEMBERS OF THE BOARD OF

01:30PM 16    DIRECTORS WHERE THE MEMBERS OF THE BOARD WERE INTERROGATING

01:30PM 17    HER, WERE ASKING HER ABOUT THE CLAIMS IN THE ARTICLE, AND

01:31PM 18    SPECIFICALLY ABOUT THE COMPANY'S USE OF VEIN DRAWS AND

01:31PM 19    CONVENTIONAL ANALYZERS.

01:31PM 20         HERE'S AN EMAIL FROM THE DAY AFTER THE ARTICLE WAS

01:31PM 21    PUBLISHED.  THIS IS EXHIBIT 4553.  AND THIS IS FROM

01:31PM 22    MR. KOVACEVICH WHO, BY THE WAY, THE MINUTES WILL SHOW WAS

01:31PM 23    PRESENT AT THE OCTOBER 2013 MEETING WHERE HOLMES CLAIMED SHE

01:31PM 24    PROVIDED THIS INFORMATION TO THE BOARD ABOUT MODIFIED THIRD

01:31PM 25    PARTY DEVICES.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC          9263

01:31PM   1        THE MINUTE ALSO SHOW THAT GENERAL MATTIS WAS PRESENT AT

01:31PM   2    THAT MEETING, BY THE WAY.

01:31PM   3        IN THIS EMAIL MR. KOVACEVICH ASKS, "SO WHEN BLOOD IS

01:31PM   4    WITHDRAWN IN VENOUS TUBES DO I UNDERSTAND CORRECTLY THAT THE

01:31PM   5    TESTS ARE THEN DONE ON LAB LIKE EQUIPMENT AND NOT EDISON?"

01:31PM   6        HE'S ASKING THIS QUESTION BECAUSE HE DIDN'T KNOW.  EVEN

01:31PM   7    AFTER BEING A MEMBER OF THE BOARD FOR TWO YEARS OR MORE,

01:31PM   8    MR. KOVACEVICH WAS NOT AWARE OF THE COMPANY'S RELIANCE ON, THE

01:32PM   9    COMPANY'S DEPENDENCE ON THIRD PARTY DEVICES INDEPENDENT OF ITS

01:32PM  10    OWN HOME GROWN MODIFIER OR ANALYZER.

01:32PM  11        A LITTLE WAYS UP IN THE SAME CHAIN, MR. KOVACEVICH HAS

01:32PM  12    RECEIVED SOME MORE INFORMATION, BUT HE SAID, "I AM STILL

01:32PM  13    CONFUSED, HOWEVER, REGARDING MY PREVIOUS EMAIL.  AT THIS

01:32PM  14    MOMENT, HOW MANY OF OUR CUSTOMER SUBMISSIONS ARE BEING TESTED

01:32PM  15    ON LAB EQUIPMENT VERSUS EDISON?"

01:32PM  16        MS. HOLMES'S ANSWER IS DECEPTIVE ON ITS FACE.  SHE SAYS,

01:32PM  17    "THAT'S CORRECT - WE ARE AT AN EXACT MOMENT IN TIME RIGHT NOW

01:32PM  18    WHERE WE'VE JUST TRANSITIONED FROM OPERATING UNDER THE

01:32PM  19    TRADITIONAL LABORATORY FRAMEWORK (GOVERNED BY A LAW CALLED

01:32PM  20    CLIA) TO THE FDA FRAMEWORK."

01:32PM  21        AND THEN IN THE PARAGRAPH BELOW SHE SAYS, "PART OF THIS

01:32PM  22    TRANSITION MEANS MOVING ALL OPERATIONS FROM THE CLIA QUALITY

01:32PM  23    SYSTEMS TO THE FDA QUALITY SYSTEMS."

01:32PM  24        SHE SAYS BELOW THAT, "WE VOLUNTARY DECIDED AND

01:33PM  25    COMMUNICATED TO THE FDA THAT WE WOULD TEMPORARILY NOT USE THE

ER-6826

01:33PM 1    NANOTAINER" -- THAT WAS THE PROPRIETARY BLOOD COLLECTION DEVICE

01:33PM 2    USED WITH ITS OWN ANALYZERS -- "UNDER THE CLIA LAB FRAMEWORK

01:33PM 3    UNTIL WE RECEIVED CLEARANCE."

01:33PM 4        SHE GOES ON TO SAY, "WE DO NOT HAVE A GOOD PERCENTAGE

01:33PM 5    NUMBER RIGHT NOW OF HOW MANY TESTS WILL BE DONE ON OUR

01:33PM 6    EQUIPMENT DURING THIS TEMPORARY PERIOD."

01:33PM 7        GENERAL MATTIS TESTIFIED THAT, UNDERSTANDABLY, THIS ANSWER

01:33PM 8    LED HIM TO BELIEVE THAT THE COMPANY' RELIANCE ON THIRD PARTY

01:33PM 9    DEVICES WAS A TEMPORARY THING, SOMETHING THAT HAD STARTED

01:33PM 10   SHORTLY BEFORE THIS EMAIL, SOMETHING THAT WOULDN'T LAST VERY

01:33PM 11   LONG.

01:33PM 12       THAT WASN'T TRUE.  THE COMPANY HAD BEEN DEPENDENT ON THIRD

01:33PM 13   PARTY NON-THERANOS ANALYZERS SINCE THE DAY IT FIRST LAUNCHED

01:33PM 14   IT'S TESTS TO THE PUBLIC.

01:33PM 15       AND THAT'S BECAUSE THE THERANOS EDISON COULD NOT PERFORM

01:33PM 16   THE WIDE RANGE OF TESTS THAT THE DEFENDANT CLAIMED AND THAT

01:34PM 17   THERANOS OFFERED.

01:34PM 18       SO IF MS. HOLMES DIDN'T TELL THE BOARD OF DIRECTORS ABOUT

01:34PM 19   HOW THE THERANOS TECHNOLOGY WORKED, WHAT IT COULD DO AND WHAT

01:34PM 20   IT COULDN'T DO, WHAT WAS THE POINT OF THE THERANOS BOARD?

01:34PM 21       WELL, THE EVIDENCE SHOWED THAT UNLIKE THE TYPICAL BOARD OF

01:34PM 22   DIRECTORS, THIS WAS NOT A GROUP OF PEOPLE MEANT TO STEER THE

01:34PM 23   COMPANY, TO ADVISE THE CEO.

01:34PM 24       INSTEAD, THE BOARD AT THERANOS WAS JUST ANOTHER AUDIENCE.

01:34PM 25   IT WAS A GROUP OF ILLUSTRIOUS AND CONNECTED PEOPLE WHO HOLMES

ER-6827

01:34PM 1    WANTED TO IMPRESS SO THAT THEY COULD THEN GO ON TO CONNECT

01:34PM 2    HOLMES AND THE COMPANY TO OTHER PEOPLE WHO COULD BENEFIT THE

01:34PM 3    COMPANY.

01:34PM 4        AND YOU SAW THAT THAT PLAN WORKED.

01:34PM 5        HENRY KISSINGER, WHO WAS ON THE THERANOS BOARD, CONNECTED

01:34PM 6    MS. HOLMES TO MR. MOSLEY, WHO THEN WENT ON, AS MR. DOWNEY

01:34PM 7    HIGHLIGHTED FOR YOU, TO CONNECT HOLMES WITH MULTIPLE INVESTORS.

01:34PM 8        SO HAVING THIS BOARD OF PROMINENT AND RESPECTED

01:35PM 9    INDIVIDUALS CERTAINLY PAID OFF FOR THE DEFENDANT.  WE'LL TALK

01:35PM 10   ABOUT ANOTHER WAY SHORTLY.

01:35PM 11       BUT THE EVIDENCE SHOWS THAT THAT WAS THE POINT.  THAT WAS

01:35PM 12   THE MOTIVATION IN HAVING THIS GROUP OF PEOPLE.  THEY WERE NOT

01:35PM 13   THERE FOR THEIR CONTRIBUTIONS TO THE STEERING OF THE COMPANY

01:35PM 14   AND THE DECISION MAKING OF THE MANAGEMENT.

01:35PM 15       INSTEAD, THEY WERE THERE TO BE IMPRESSED AND TO BOLSTER

01:35PM 16   THE REPUTATION OF THE COMPANY.

01:35PM 17       ANOTHER THEME OF THE DEFENSE IS THAT MS. HOLMES WAS MISLED

01:35PM 18   OR LET DOWN BY THE SCIENTISTS AND ENGINEERS AT THE COMPANY.

01:35PM 19       THE EVIDENCE DOESN'T SHOW THAT, EITHER.

01:35PM 20       FIRST, MS. HOLMES CLAIMS THAT THE SCIENTISTS AND ENGINEERS

01:35PM 21   WHO WORKED AT THERANOS LED HER TO BELIEVE THAT THE TECHNOLOGY

01:35PM 22   WAS GREAT AND THAT HER REPRESENTATIONS WERE TRUE.

01:36PM 23       WE'LL TALK SOME MORE ABOUT THEM WHEN WE TALK ABOUT THE 4.0

01:36PM 24   SERIES DEVICE, WHICH IS AN IMPORTANT TOPIC.

01:36PM 25       FOR NOW, YOU SHOULD RECALL THAT DURING HER TESTIMONY

ER-6828

01:36PM 1    MS. HOLMES, FOR EXAMPLE, MADE VAGUE REFERENCE TO SCIENTISTS AND

01:36PM 2    ENGINEERS IN THE COMPANY REVIEWING THE INVESTOR PRESENTATIONS

01:36PM 3    WHERE DRAMATIC CLAIMS WERE MADE ABOUT WHAT THE THERANOS

01:36PM 4    TECHNOLOGY COULD DO.

01:36PM 5        LET'S EXPLORE THAT A LITTLE BIT.

01:36PM 6        THROUGHOUT THE TRIAL, MS. HOLMES CLAIMS TO HAVE RELIED ON

01:36PM 7    ADVICE FROM DAN YOUNG, WHO WAS A SENIOR SCIENTIST AT THERANOS.

01:36PM 8        BUT THE EVIDENCE SHOWED CRITICALLY THAT HE WAS UNAWARE OF

01:36PM 9    THE CLAIMS THAT SHE WAS MAKING ABOUT THERANOS'S SUPERIOR

01:36PM 10   PERFORMANCE, OR SUPPOSEDLY SUPERIOR PERFORMANCE.

01:36PM 11       THIS IS EXHIBIT 7421, AND THIS IS AN EMAIL CHAIN RELATING

01:36PM 12   TO CONCERNS THAT TYLER SHULTZ HAD RAISED.

01:37PM 13       YOU SEE A FEW EMAIL CHAINS RELATING TO HIS LETTER WHERE HE

01:37PM 14   RAISED DIRECTLY TO MS. HOLMES A NUMBER OF SERIOUS CONCERNS

01:37PM 15   ABOUT PROBLEMS WITH THE COMPANY'S TECHNOLOGY.

01:37PM 16       IN THIS EMAIL RESPONDING TO PART OF THAT LETTER FROM

01:37PM 17   TYLER SHULTZ, MR. BALWANI WRITES TO DANIEL YOUNG AND

01:37PM 18   ELIZABETH HOLMES, "WHERE ARE WE CLAIMING THAT OUR TESTS ARE

01:37PM 19   BETTER ACROSS THE BOARD?"

01:37PM 20       NOW, THIS IS IN FEBRUARY OF 2014.  YOU KNOW THAT AT THIS

01:37PM 21   TIME MS. HOLMES KNEW EXACTLY WHERE THOSE CLAIMS WERE.  THEY

01:37PM 22   WERE IN THE ARTICLES FOR WHICH SHE HAD BEEN INTERVIEWED; THE

01:37PM 23   ARTICLES THAT SHE HAD APPROVED OR HAD AN OPPORTUNITY TO REVIEW

01:37PM 24   BEFORE THEY WERE PUBLISHED; THEY WERE IN THE INVESTOR

01:37PM 25   PRESENTATIONS THAT SHE HAD PERSONALLY GIVEN TO THE INVESTORS IN

01:37PM  1    THIS CASE AND THAT SHE HAD DISCUSSED WITH THEM.

01:37PM  2         AND SHE HAD ORALLY MADE THESE SAME REPRESENTATIONS TO

01:37PM  3    INVESTORS.  YOU'VE SEEN THAT NUMEROUS TIMES, THE CLAIM THAT

01:38PM  4    THERANOS TECHNOLOGY WAS BETTER, WAS MORE ACCURATE, HAD THE

01:38PM  5    HIGHEST LEVELS OF ACCURACY, AND THE LIKE.

01:38PM  6         DANIEL YOUNG, THOUGH, RESPONDS TO THAT EMAIL, "I DON'T

01:38PM  7    THINK WE MAKE SUCH A CLAIM.  NOT THAT I HAVE SEEN ON THE

01:38PM  8    WEBSITE AT LEAST."

01:38PM  9         NOW, YOU KNOW FROM MR. EDLIN'S TESTIMONY THAT SUCH CLAIMS

01:38PM  10   DID ACTUALLY APPEAR ON THE WEBSITE.

01:38PM  11        BUT THIS EMAIL FROM DANIEL YOUNG SUGGESTS THAT HE DIDN'T

01:38PM  12   KNOW ANYTHING ABOUT THE REPRESENTATIONS AND THE CLAIMS THAT

01:38PM  13   WERE BEING MADE TO INVESTORS.

01:38PM  14        THAT SAME EMAIL GOES ON WITH DANIEL YOUNG WRITING THAT

01:38PM  15   TYLER SHULTZ "SEEMED VERY SURPRISED THAT I ASKED HIM WHERE HE

01:38PM  16   THOUGHT WE CLAIMED SUPERIOR PERFORMANCE OVER OTHER TESTS."

01:38PM  17        HE MENTIONS THAT TYLER SHULTZ MENTIONS SOME ARTICLES, AND

01:38PM  18   DANIEL YOUNG SAYS, "I ASKED HIM TO FOLLOW-UP AND HIGHLIGHT

01:38PM  19   THESE SPECIFICALLY FOR ME."

01:39PM  20        AGAIN, DANIEL YOUNG TRYING TO TRACK DOWN MENTIONS OR

01:39PM  21   CLAIMS OF SUPERIOR PERFORMANCE, SUPERIOR ACCURACY ON THE PART

01:39PM  22   OF THERANOS.

01:39PM  23        UNBEKNOWNST TO HIM, HE WAS ON AN EMAIL CHAIN WITH THE VERY

01:39PM  24   PERSON WHO WAS PROPAGATING THOSE CLAIMS, THE SAME PERSON WHO

01:39PM  25   WAS SPREADING THOSE LIES.

ER-6830

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                9268

01:39PM  1       FOR THAT REASON YOU SHOULD VIEW WITH SERIOUS SKEPTICISM

01:39PM  2   ANY CLAIM THAT INDIVIDUALS LIKE DANIEL YOUNG WERE BEHIND THOSE

01:39PM  3   CLAIMS OR HAD BLESSED THEM OR APPROVED OF THEM IN ANY WAY.

01:39PM  4       YOU ALSO HEARD FROM SEVERAL OF THE COMPANY'S SCIENTISTS

01:39PM  5   WHO YOU KNOW FROM THEIR TESTIMONY WOULD NEVER HAVE SAID THOSE

01:39PM  6   POSITIVE SWEEPING THINGS ABOUT THERANOS'S TECHNOLOGY.

01:39PM  7       THE SCIENTISTS AT THE COMPANY WERE WELL AWARE OF THE

01:39PM  8   PROBLEMS WITH THE COMPANY'S TECHNOLOGY.  SEVERAL OF THEM, AS

01:40PM  9   YOU KNOW, RESIGNED BECAUSE OF THE SERIOUS PROBLEMS THAT THEY

01:40PM 10   SAW WITH THE THERANOS ANALYZER AND THE MODIFIED DEVICES.

01:40PM 11       SO THE IDEA THAT THOSE SAME INDIVIDUALS, THAT GROUP OF

01:40PM 12   PEOPLE WOULD HAVE BEEN SUPPORTING HOLMES'S CLAIMS OF SUPERIOR

01:40PM 13   ACCURACY OF UNPRECEDENTED QUALITY DOESN'T HOLD WATER, EITHER.

01:40PM 14       LAB DIRECTORS ARE AN ESPECIALLY IMPORTANT PART OF THIS

01:40PM 15   ANALYSIS, SO LET'S TALK ABOUT THEM A LITTLE BIT.

01:40PM 16       THE DEFENSE HAS GONE TO GREAT EFFORT IN THIS CASE TO PAINT

01:40PM 17   ADAM ROSENDORFF, THERANOS'S LAB DIRECTOR IN 2013 AND 2014, AS

01:40PM 18   BEING IN CHARGE OF ALL DECISIONS IN THE LAB.  THEY HAVE BLAMED

01:40PM 19   HIM FOR IMPROPER VALIDATION.  THEY HAVE ATTEMPTED TO SHOW THAT

01:40PM 20   HE WAS THE PERSON WHO WAS RESPONSIBLE FOR ALL OF THE ACCURACY

01:40PM 21   AND RELIABILITY PROBLEMS THAT HAPPENED AT THERANOS.

01:40PM 22       WHAT DOES THE EVIDENCE ACTUALLY SHOW ABOUT THAT THOUGH?

01:40PM 23       FIRST OF ALL, WHEN IT COMES TO VALIDATION, YOU WILL RECALL

01:41PM 24   THAT DR. ROSENDORFF TESTIFIED THAT THE VALIDATION PROCESS AT

01:41PM 25   THERANOS WAS VERY RUSHED, MORE RUSHED THAN HE WANTED IT TO BE.

ER-6831

01:41PM  1      WHEN HE WAS ASKED WHO WAS SETTING THE SCHEDULE, WHO WAS

01:41PM  2  RESPONSIBLE FOR THAT PACE, HE TESTIFIED THAT THAT WAS COMING

01:41PM  3  FROM MANAGEMENT.  THAT WAS MS. HOLMES AND MR. BALWANI.

01:41PM  4      HE ALSO TESTIFIED THAT ALTHOUGH THE ASSAYS PERFORMED WELL

01:41PM  5  ENOUGH DURING THE VALIDATION PHASE, THEIR PERFORMANCE DEGRADED

01:41PM  6  SIGNIFICANTLY ONCE THEY ACTUALLY STARTED USING THEM FOR PATIENT

01:41PM  7  TESTING.

01:41PM  8      AND HE SAID THAT AS SOON AS THE ASSAYS STARTING BEING USED

01:41PM  9  IN THE CLINICAL LAB, HE STARTED SEEING PROBLEMS, AND HE

01:41PM 10  TESTIFIED ABOUT MAKING EFFORTS TO MAKE THOSE PROBLEMS KNOWN TO

01:41PM 11  THE COMPANY'S MANAGEMENT IN WAYS IN WHICH HE WAS REBUFFED AND

01:41PM 12  UNSUCCESSFUL IN DOING THE RIGHT THING AT THE COMPANY.

01:41PM 13      ONE IMPORTANT QUESTION FOR YOU TO ASK YOURSELVES IN

01:41PM 14  CONSIDERING THE ARGUMENT THAT DR. ROSENDORFF WAS REALLY IN

01:42PM 15  CHARGE OF EVERYTHING IN THE LAB, IF THAT WAS REALLY TRUE, THEN

01:42PM 16  WHY DID HE QUIT OUT OF CONCERN FOR THE WAY THAT THE TECHNOLOGY

01:42PM 17  WAS PERFORMING?  WHY DID HE QUIT IN PROTEST OF THE PRACTICES IN

01:42PM 18  THE THERANOS LAB IF IT WAS WITHIN HIS POWER TO CHANGE THINGS?

01:42PM 19      SO WHO WAS ULTIMATELY IN CONTROL OF THE LAB AT THERANOS?

01:42PM 20      WELL, ONE RELATED QUESTION IS, WHY DIDN'T DR. ROSENDORFF

01:42PM 21  STOP ALL TESTING ON THE EDISON?

01:42PM 22      HE WAS ASKED ABOUT THIS WHEN HE WAS ON THE STAND.  HE WAS

01:42PM 23  ASKED THE QUESTION, "DID YOU EVER ASK MS. HOLMES WHETHER

01:42PM 24  THERANOS WOULD CONSIDER CEASING USE OF THE EDISON ALTOGETHER?"

01:42PM 25      HE SAID, "NO."

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9270

01:42PM   1          WHEN ASKED, "WHY NOT," HE SAID, "THERE WAS TREMENDOUS

01:42PM   2    PRESSURE AT THE COMPANY TO SHOW THAT THIS TECHNOLOGY WAS

01:42PM   3    SUCCESSFUL.  IT CAME FROM THE TOP.  IT PERMEATED R&D."

01:42PM   4          HE THEN SAID THAT THAT DISSUADED HIM FROM MAKING THE

01:43PM   5    SUGGESTION TO STOP USING THE EDISON BECAUSE HE SAID, "AT

01:43PM   6    VARIOUS POINTS I THOUGHT I MIGHT BE FIRED IF I TOOK TOO STRONG

01:43PM   7    A POSITION ON IT."

01:43PM   8          OF COURSE THAT WOULD HAPPEN.

01:43PM   9          WHAT DO YOU THINK WOULD HAPPEN IF, BASED ON ALL OF THE

01:43PM  10    INFORMATION YOU KNOW ABOUT HOW THIS COMPANY WAS RUN, SOMEONE

01:43PM  11    CAME FORWARD TO THE MANAGERS OF THE COMPANY, THE FOUNDER AND

01:43PM  12    THE COO, AND ASKED THE COMPANY TO STOP USING ITS OWN

01:43PM  13    PROPRIETARY TECHNOLOGY?

01:43PM  14          THE WHOLE POINT OF THE COMPANY WAS TO DEVELOP AND USE THIS

01:43PM  15    TECHNOLOGY.  HE KNEW THAT IDEA WAS A NONSTARTER.  HE FELT THE

01:43PM  16    PRESSURE THAT WAS BEING IMPOSED FROM THE TOP TO KEEP USING THE

01:43PM  17    TECHNOLOGY, AND THAT'S WHY HE LIMITED HIS SUGGESTIONS TO THE

01:43PM  18    THINGS THAT HE THOUGHT WOULD ACTUALLY HAVE A CHANCE OF

01:43PM  19    SUCCEEDING.

01:43PM  20          YOU'LL RECALL IN CONNECTION WITH THIS THE SEQUENCE OF

01:43PM  21    EVENTS AROUND HCG IN MAY OF 2014.

01:43PM  22          MR. DOWNEY ALLUDED TO THIS DURING HIS CLOSING, AND YOU'LL

01:43PM  23    RECALL THAT ON MAY 30TH, 2014, DR. ROSENDORFF, IN RESPONSE TO

01:44PM  24    SERIOUS PROBLEMS THAT HE WAS SEEING WITH HCG, ORDERED THAT THE

01:44PM  25    HCG ASSAY BE TAKEN OFF OF THE THERANOS PROPRIETARY SYSTEM, THAT

01:44PM  1     IT BE RUN ONLY ON NON-THERANOS DEVICES THAT HE VIEWED AS MORE

01:44PM  2     RELIABLE.

01:44PM  3          WHAT HAPPENED NEXT?

01:44PM  4          MR. DOWNEY CITED A NUMBER OF EXHIBITS TO YOU, BUT STILL

01:44PM  5     ONLY PRESENTED PART OF THE STORY.

01:44PM  6          I'LL CITE SOME EXHIBITS FOR YOU:  5418 INCLUDES THE

01:44PM  7     MAY 30TH EMAIL WITH DR. ROSENDORFF TAKING HCG OFF OF EDISON.

01:44PM  8          BUT ON THAT SAME EMAIL, DAYS LATER IN AN EMAIL THAT DOES

01:44PM  9     NOT INCLUDE DR. ROSENDORFF, YOU'LL RECALL THAT DANIEL YOUNG

01:44PM 10     WRITES TO COMPANY MANAGEMENT SAYING IT'S NOT CLEAR THAT THAT

01:44PM 11     DECISION HAD BEEN MADE.

01:44PM 12          DR. ROSENDORFF'S EMAIL WAS IN ALL CAPS YOU'LL REMEMBER.

01:44PM 13     HE HAD MADE THAT DECISION AS LAB DIRECTOR TO TAKE HCG OFF OF

01:45PM 14     THE EDISON.

01:45PM 15          DAYS LATER DANIEL YOUNG IS REPORTING THAT IT'S NOT CLEAR

01:45PM 16     THAT THAT DECISION HAD BEEN MADE.

01:45PM 17          A COUPLE WEEKS LATER, IN EXHIBIT 13876 WE SEE

01:45PM 18     DR. ROSENDORFF ASKING FOR A STATUS UPDATE ON THE ASSAY, AND

01:45PM 19     HE'S INFORMED AT THAT TIME BY MR. BALWANI THAT HCG IS STILL ON

01:45PM 20     NANOTAINERS; IN OTHER WORDS, THAT IT'S STILL BEING RUN ON THE

01:45PM 21     EDISON, THAT IT'S BACK ON THE EDISON.

01:45PM 22          MR. DOWNEY JUST CITED THAT SAME EMAIL TO YOU SUPPOSEDLY AS

01:45PM 23     EVIDENCE THAT DR. ROSENDORFF KNEW AND APPROVED THE CONTINUED

01:45PM 24     USE OF HCG ON EDISON.

01:45PM 25          WHAT DOES IT ACTUALLY SHOW?  IT ACTUALLY SHOWS THAT

ER-6834

01:45PM 1    DR. ROSENDORFF DIDN'T HAVE CONTROL OVER WHAT EQUIPMENT WAS USED

01:45PM 2    IN HIS OWN LAB.  HE WAS FORCED TO ASK QUESTIONS ABOUT HOW A

01:45PM 3    GIVEN ASSAY WAS BEING RUN BECAUSE IT WASN'T UP TO HIM.

01:45PM 4        IF IT HAD BEEN UP TO HIM AND IF HIS APPROVAL WOULD HAVE

01:46PM 5    BEEN REQUIRED, HE WOULDN'T HAVE TO ASK MR. BALWANI WHAT

01:46PM 6    DECISION HAD BEEN MADE AND WHAT PROCESS IS BEING USED.

01:46PM 7        HE ALSO TESTIFIED THAT DESPITE THE CONTINUED USE OF EDISON

01:46PM 8    FOR HCG, THAT THE PROBLEMS WITH THAT ASSAY WERE NEVER, EVER

01:46PM 9    SOLVED TO HIS SATISFACTION.

01:46PM 10       AND YOU CONTINUED TO SEE, WHEN DR. ROSENDORFF WAS ON THE

01:46PM 11   STAND, CONTINUED QUALITY CONTROL FAILURES AND OTHER PROBLEMS

01:46PM 12   RELATING TO THAT VERY, VERY IMPORTANT TEST.

01:46PM 13       NOW, WHEN DR. ROSENDORFF WAS ON THE STAND, THE DEFENSE

01:46PM 14   ATTACKED HIM.  YOU'LL RECALL THAT THE CROSS-EXAMINATION WAS

01:46PM 15   VERY LENGTHY AND SOMEWHAT HOSTILE.

01:46PM 16       DR. ROSENDORFF WAS ATTACKED FOR EVERYTHING FROM

01:46PM 17   COOPERATING WITH THE GOVERNMENT, THERE WERE QUESTIONS ABOUT HOW

01:46PM 18   MANY TIMES HE MET WITH THE GOVERNMENT AND WHO WAS PRESENT.

01:46PM 19       HE WAS ATTACKED FOR NOT BEING QUICK ENOUGH TO RESPOND TO

01:46PM 20   QUESTIONS FROM DOCTORS IN ONE OR TWO INSTANCES.

01:47PM 21       AND THE SUGGESTION WAS MADE THAT HE HAD BEEN ASLEEP AT THE

01:47PM 22   WHEEL AT THERANOS AND NOT DONE A GOOD ENOUGH JOB OF MONITORING

01:47PM 23   THE QUALITY OF TESTS, THAT THIS WAS HIS FAULT.

01:47PM 24       ASK YOURSELF WHETHER THAT IS ACTUALLY WHAT MS. HOLMES AND

01:47PM 25   MR. BALWANI BELIEVED ABOUT DR. ROSENDORFF IN 2014.

01:47PM    1          YOU CAN DETERMINE THAT BY WHAT THEY DID AFTER

01:47PM    2   DR. ROSENDORFF LEFT THE COMPANY.

01:47PM    3          DR. ROSENDORFF LEFT IN NOVEMBER 2014, AND AFTER THAT

01:47PM    4   SUNNY BALWANI HIRED HIS DERMATOLOGIST TO RUN THE LAB.

01:47PM    5          MS. HOLMES KNEW THAT SUNIL DHAWAN WAS MR. BALWANI'S

01:47PM    6   DERMATOLOGIST.

01:47PM    7          THERE'S TESTIMONY THAT NEITHER MR. BALWANI -- I'M SORRY,

01:47PM    8   NEITHER DR. DHAWAN NOR DR. SAWYER WERE EVER REALLY PRESENT IN

01:47PM    9   THE LAB, THAT THEY DIDN'T DO ANY REAL WORK OVERSEEING THE

01:47PM   10   TESTS, ESPECIALLY THE THERANOS SPECIFIC TESTS RUN ON THE EDISON

01:47PM   11   AND THE MODIFIED THIRD PARTY DEVICES.

01:48PM   12          AND THEIR LACK OF PRESENCE AT THE LAB, THEIR LACK OF

01:48PM   13   OVERSIGHT ACTIVITY, WAS NOT A LACK OF DILIGENCE ON THEIR PART.

01:48PM   14   THAT WAS THE AGREEMENT THAT THEY HAD WITH THERANOS.  THEY WERE

01:48PM   15   WORKING AS INTENDED.  THAT'S WHAT MR. BALWANI AND MS. HOLMES

01:48PM   16   WANTED THEM TO DO.

01:48PM   17          AND THAT CHOICE, THE CHOICE TO HIRE ABSENTEE LAB DIRECTORS

01:48PM   18   WHO WERE NOT MORE ENGAGED REALLY SHOWS THAT THEIR COMPLAINTS

01:48PM   19   WITH DR. ROSENDORFF WAS NOT ABOUT INATTENTION AND A LACK OF

01:48PM   20   DILIGENCE.

01:48PM   21          INSTEAD, IT WAS THE FACT THAT HE KEPT RAISING THESE

01:48PM   22   ISSUES.  HE WAS A PAIN TO THEM.

01:48PM   23          THE FACT THAT HE KEPT SOUNDING THE ALARM ABOUT THESE

01:48PM   24   UNRELIABLE TESTS MADE IT INCONVENIENT, AND WHEN HE LEFT, THEY

01:48PM   25   REPLACED HIM WITH PEOPLE WHO WOULD NOT PRESENT THAT KIND OF

01:48PM 1      PROBLEM.

01:48PM 2          NOTABLY, WHEN MS. HOLMES HIRED DR. DAS, IT'S NOT DISPUTED

01:48PM 3      THAT THAT WAS IN RESPONSE TO AN INSPECTION THAT HAD GONE VERY

01:49PM 4      BADLY FOR THERANOS.

01:49PM 5          SO THAT WAS WHEN THE PREVIOUS APPROACH TO HIRING LAB

01:49PM 6      DIRECTORS HAD ALREADY BACKFIRED AT THE COMPANY, AND THE COMPANY

01:49PM 7      WAS DESPERATE FOR A CHANGE IN COURSE.

01:49PM 8          WE'LL ALSO DISCUSS IN A FEW MINUTES THE FACT THAT WE CAN'T

01:49PM 9      BLAME SCIENTISTS FOR THE FALSE STATEMENTS THAT MS. HOLMES MADE

01:49PM 10     AT THERANOS BECAUSE SHE CONFIRMED FOR YOU UNDER OATH WHEN SHE

01:49PM 11     WAS ON THE STAND THAT SHE KNEW THE KEY FACTS ABOUT WHAT THE

01:49PM 12     TECHNOLOGY COULD AND COULD NOT DO.  THAT CONFIRMS THAT SHE KNEW

01:49PM 13     THAT THE STATEMENTS SHE WAS MAKING WERE FALSE AT THE TIME SHE

01:49PM 14     MADE THEM.

01:49PM 15         LET'S TALK BRIEFLY ABOUT LAWYERS WHO WORKED FOR MS. HOLMES

01:49PM 16     AND THE COMPANY.

01:49PM 17         THERE'S BEEN SOME MENTION OF GUIDANCE THAT MS. HOLMES GOT

01:49PM 18     FROM LAWYERS AROUND TRADE SECRETS AND OTHER ISSUES.

01:49PM 19         YOU SHOULDN'T PUT TOO MUCH STOCK INTO THAT BECAUSE YOU

01:49PM 20     KNOW THAT MS. HOLMES IGNORED CAUTIONARY ADVICE FROM LAWYERS,

01:50PM 21     ESPECIALLY WHEN IT CAME TO THE HONESTY OF CLAIMS ABOUT THE

01:50PM 22     THERANOS TECHNOLOGY.

01:50PM 23         YOU'LL RECALL THIS EXHIBIT, 3981, WHERE A LAWYER EMAILS

01:50PM 24     HOLMES DIRECTLY AND ADVISES THAT A LOT OF CLAIMS ON THE WEBSITE

01:50PM 25     NEED TO BE REPLACED OR TONED DOWN, CLAIMS ABOUT HIGHEST

01:50PM   1    QUALITY, OR THE HIGHEST LEVEL OF ACCURACY.  THESE CLAIMS,

01:50PM   2    ACCORDING TO THE LAWYER, WERE PROBLEMATIC.

01:50PM   3        AND YET YOU KNOW FROM THE EVIDENCE AND THE TESTIMONY THAT

01:50PM   4    THESE CLAIMS REMAINED ON THE WEBSITE.  AND, EVEN MORE,

01:50PM   5    MS. HOLMES CONTINUED TO DISTRIBUTE INVESTOR BINDERS IN

01:50PM   6    PRESENTATIONS THAT WERE PEPPERED WITH THESE SAME CLAIMS,

01:50PM   7    IGNORING THIS CAUTIONARY ADVICE FROM COUNSEL.

01:50PM   8        BY THE WAY, ON THAT LAST TOPIC, YOU MAY RECALL THAT WHEN

01:51PM   9    "THE WALL STREET JOURNAL" ARTICLE WAS ABOUT TO BE PUBLISHED,

01:51PM  10    THE ARTICLE WRITTEN BY A JOURNALIST NAMED JOE RAGO, MS. HOLMES

01:51PM  11    AND OTHERS AT THE COMPANY HAD AN OPPORTUNITY TO REVIEW THE TEXT

01:51PM  12    OF THAT ARTICLE.

01:51PM  13        I'LL GIVE YOU AN EXHIBIT NUMBER, WHICH IS 1090.  THAT IS

01:51PM  14    AN EMAIL THAT YOU MIGHT REMEMBER WHERE AN EMPLOYEE NAMED

01:51PM  15    JEFF BLICKMAN SENT MS. HOLMES DIRECTLY A LIST OF CONCERNING

01:51PM  16    ISSUES THAT HE SAW IN THAT ARTICLE, AND THAT LIST INCLUDED

01:51PM  17    MENTION OF IMPROVED ACCURACY IN THE DRAFT ARTICLE.  THAT WAS

01:51PM  18    SOMETHING THAT MR. BLICKMAN WAS CALLING OUT TO MS. HOLMES AS

01:51PM  19    SOMETHING THAT MIGHT BE CONCERNING.

01:51PM  20        THIS, COMBINED WITH THE EMAIL OF THE LAWYER, SHOWS YOU

01:51PM  21    THERE WERE PEOPLE AT THERANOS WHO CARED ABOUT BEING ACCURATE

01:51PM  22    AND TRUTHFUL IN REPRESENTATIONS ABOUT WHAT THE COMPANY CAN DO.

01:51PM  23        THE PROBLEM IS THAT MS. HOLMES WAS NOT ONE OF THOSE

01:51PM  24    PEOPLE, AND SHE WAS IN CHARGE.  SHE WAS THE DECISION-MAKER.

01:51PM  25        THE DEFENSE HAS ALSO RELIED MULTIPLE TIMES ON THE

01:52PM  1    EXISTENCE OF FAVORABLE PATIENT REVIEWS EITHER AS EVIDENCE THAT

01:52PM  2    THE TECHNOLOGY DIDN'T HAVE PROBLEMS OR THAT MS. HOLMES BELIEVED

01:52PM  3    THAT THE TECHNOLOGY DIDN'T HAVE PROBLEMS.

01:52PM  4        THE DEFENSE ASKS YOU TO BELIEVE THAT THESE FAVORABLE

01:52PM  5    PATIENT REVIEWS WHERE PATIENTS, FOR EXAMPLE, ARE GIVING

01:52PM  6    THERANOS AND WALGREENS FOUR OR FIVE STARS FOR THEIR EXPERIENCE

01:52PM  7    GAVE MS. HOLMES REASON TO BELIEVE THAT THERE WERE NO PROBLEMS

01:52PM  8    WITH THE TECHNOLOGY AND THAT EVERYTHING WAS FINE.

01:52PM  9        ASK YOURSELF WHETHER THAT'S CONVINCING.  ASK YOURSELF

01:52PM 10    WHETHER THE CEO OF A TECHNOLOGY COMPANY, SOMEONE WHO IS NAMED

01:52PM 11    ON MULTIPLE PATENTS, SOMEONE WHO TOOK THE LEAD ON THE INVENTION

01:52PM 12    SIDE AND THE TECHNOLOGY SIDE WOULD REALLY BELIEVE THAT CUSTOMER

01:52PM 13    SATISFACTION RATINGS RELATED TO THE RELIABILITY OF A DEVICE OR

01:53PM 14    THE APPROPRIATENESS OF THAT DEVICE FOR PATIENT CARE.

01:53PM 15        A RESTAURANT WITH AN F RATING FROM THE HEALTH INSPECTOR

01:53PM 16    CAN STILL HAVE A FOUR STAR YELP REVIEW IF THE CUSTOMERS DON'T

01:53PM 17    KNOW ABOUT THE PROBLEMS IN THE KITCHEN.

01:53PM 18        AND THAT'S EXACTLY WHAT WAS HAPPENING AT THERANOS.

01:53PM 19        IT'S NOT SURPRISING AT ALL THAT CUSTOMERS WHO HAD THE

01:53PM 20    FINGERSTICK EXPERIENCE AT WALGREENS HAD A FAVORABLE EXPERIENCE

01:53PM 21    AND WERE HAPPY WITH THAT EXPERIENCE.

01:53PM 22        THERANOS PUT A LOT OF EFFORT INTO WHAT ITS FACILITIES AT

01:53PM 23    WALGREENS LOOKED LIKE, HOW PEOPLE WERE TREATED.

01:53PM 24        YOU KNOW FROM THE EVIDENCE THAT THE PRICES WERE LOW.

01:53PM 25    THESE THINGS MADE PEOPLE HAPPY.

01:53PM 1      THAT HAS NOTHING TO DO WITH THE ACCURACY OR THE

01:53PM 2   RELIABILITY OF THE TESTS, AND YOU KNOW FROM THE OTHER EVIDENCE

01:53PM 3   IN THE CASE THAT THERE WERE SERIOUS PROBLEMS THERE.  AND

01:53PM 4   MS. HOLMES HAD ACCESS TO THAT SAME INFORMATION, SO SHE WAS

01:53PM 5   AWARE, TOO.

01:53PM 6      AND IN 2014 WALGREENS WAS STARTING TO SEE THESE PROBLEMS

01:53PM 7   AS WELL.  WALGREENS WAS STARTING TO UNDERSTAND THAT THERANOS

01:54PM 8   TECHNOLOGY COULDN'T DO EVERYTHING THAT IT HAD BEEN HELD OUT TO

01:54PM 9   DO AND FOR THOSE SAME REASONS THE WALGREENS RELATIONSHIP WAS IN

01:54PM 10  JEOPARDY.

01:54PM 11     SO YOU SHOULD NOT BELIEVE THAT MS. HOLMES WAS IGNORING

01:54PM 12  THOSE FACTS, WAS IGNORING THOSE OBVIOUS TRUTHS SIMPLY BECAUSE

01:54PM 13  PATIENTS WERE HAPPY WHEN THEY WERE WALKING OUT OF A WALGREENS

01:54PM 14  SERVICE CENTER.

01:54PM 15     YOU ALSO KNOW THAT THOSE CUSTOMER REVIEWS THAT WERE

01:54PM 16  FAVORABLE ARE ONLY PART OF THE PICTURE HERE.

01:54PM 17     YOU KNOW THAT IN MANY CASES PATIENTS OR DOCTORS CONTACTED

01:54PM 18  THERANOS TO TALK ABOUT PROBLEMATIC TEST RESULTS THAT THEY HAD

01:54PM 19  GOTTEN BACK, TEST RESULTS THAT WERE DEMONSTRABLY INACCURATE,

01:54PM 20  TEST RESULTS THAT WERE DIFFERENT FROM WHAT THEY HAD SEEN

01:54PM 21  BEFORE, TEST RESULTS THAT HAD GIVEN THEM CONCERNS ABOUT THE

01:54PM 22  RELIABILITY OF THE THERANOS TESTS.

01:54PM 23     LET'S TALK NEXT ABOUT THE WAY THE DEFENSE HAS RELIED ON

01:55PM 24  PATENTS IN THIS CASE.

01:55PM 25     AS YOU KNOW FROM THE TESTIMONY, SEVERAL PATENTS WERE

01:55PM 1    AWARDED TO MS. HOLMES AND TO THERANOS AS A RESULT OF THE WORK

01:55PM 2    DEVELOPING THE INTELLECTUAL PROPERTY OF THE COMPANY.

01:55PM 3        THERE'S BEEN A SUGGESTION BY THE DEFENSE THAT YOU SHOULD

01:55PM 4    CONCLUDE FROM THAT THAT THIS WAS REAL TECHNOLOGY, THAT THE

01:55PM 5    TECHNOLOGY MUST HAVE WORKED BECAUSE PATENTS WERE AWARDED

01:55PM 6    COVERING THAT TECHNOLOGY.

01:55PM 7        ALTERNATIVELY, YOU'RE ASKED TO BELIEVE THAT MS. HOLMES

01:55PM 8    UNDERSTOOD THAT THE TECHNOLOGY WORKED BECAUSE THESE PATENTS HAD

01:55PM 9    BEEN REWARDED, OR HAD BEEN AWARDED.

01:55PM 10       BUT YOU KNOW FROM MS. HOLMES'S TESTIMONY THAT THE PROCESS

01:55PM 11   FOR OBTAINING THESE PATENTS HAS NOTHING TO DO WITH THE

01:55PM 12   RELIABILITY OF THE TECHNOLOGY, WITH THE ACCURACY OF THE

01:55PM 13   ANALYZER.

01:55PM 14       YOU KNOW THAT FROM HER TESTIMONY, SHE APPLIED FOR HER

01:56PM 15   FIRST PATENT I THINK IT WAS A YEAR BEFORE SHE STARTED TO TRY TO

01:56PM 16   BUILD A PROTOTYPE OF THAT DEVICE.  THAT'S WHAT SHE TESTIFIED

01:56PM 17   TO.

01:56PM 18       EXHIBIT 9501 IS THAT FIRST PATENT.

01:56PM 19       SHE LATER STARTED WORKING ON A PROTOTYPE THAT COVERED PART

01:56PM 20   OF THAT PATENT, BUT IF YOU LOOK AT THAT EXHIBIT -- AGAIN,

01:56PM 21   THAT'S 9501 -- YOU'LL SEE THAT IT ALSO COVERS, BESIDES AN

01:56PM 22   ANALYZER, A PILL THAT COULD BE SWALLOWED AND WOULD CONDUCT

01:56PM 23   ANALYSIS WHILE IT WAS PASSING THROUGH THE SYSTEM.

01:56PM 24       IT ALSO COVERED A PATCH THAT COULD BE WORN AND WOULD

01:56PM 25   CONDUCT AN ANALYSIS WHEN IT WAS ATTACHED TO THE SKIN.

ER-6841

01:56PM   1          THOSE PRODUCTS WERE NEVER DEVELOPED BY THERANOS.  THEY

01:56PM   2     WERE NEVER TAKEN TO THE PROTOTYPE STAGE.  THEY WERE NEVER

01:56PM   3     TURNED INTO REAL WORKING TECHNOLOGY BASED ON THE RECORD IN THIS

01:56PM   4     CASE.

01:56PM   5          THAT'S HOW YOU KNOW THAT THE PATENT PROCESS IS TOTALLY

01:56PM   6     DIVORCED FROM THE IDEA OF A REAL WORKING DEVICE.

01:57PM   7          SO THE FACT THAT MS. HOLMES OBTAINED PATENTS, THE FACT

01:57PM   8     THAT THESE PIECES OF PAPER WERE ISSUED GIVING HER LEGAL RIGHTS

01:57PM   9     OVER THIS INTELLECTUAL PROPERTY, SHE KNEW BETTER THAN ANYONE

01:57PM  10     THAT THAT DID NOT MEAN THAT THE TECHNOLOGY ITSELF WAS VALID,

01:57PM  11     AND THAT CERTAINLY WOULD NOT HAVE BEEN REASON FOR HER TO

01:57PM  12     DISMISS THE NEGATIVE INFORMATION THAT SHE WAS HEARING ABOUT THE

01:57PM  13     THERANOS TECHNOLOGY.

01:57PM  14          YOUR HONOR, I'M ABOUT TO MOVE TO A DIFFERENT TOPIC, BUT

01:57PM  15     THIS MIGHT BE A GOOD TIME FOR A BREAK.

01:57PM  16               THE COURT:  ALL RIGHT.  LET'S DO THAT.  WE'LL TAKE A

01:57PM  17     30 MINUTE BREAK HERE, LADIES AND GENTLEMEN, 30 MINUTES.

01:57PM  18          THANK YOU.

01:58PM  19          (RECESS FROM 1:58 P.M. UNTIL IS 2:34 P.M.)

02:34PM  20               THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

02:34PM  21     SEATED.  WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT.

02:34PM  22     MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT.

02:34PM  23          MR. BOSTIC, YOU'D LIKE TO CONTINUE?

02:35PM  24               MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

02:35PM  25          MEMBERS OF THE JURY, WELCOME BACK.

ER-6842

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9280

02:35PM   1          LET'S TALK ABOUT NEXT GENERATION DEVICES AT THERANOS.

02:35PM   2          MUCH OF THE EVIDENCE IN THE CASE FOCUSSED ON THE ANALYZERS

02:35PM   3     THAT THERANOS WAS USING TO ACTUALLY CONDUCT ITS PATIENT TESTING

02:35PM   4     DURING THE RELEVANT YEARS, THE YEARS WHEN THE FRAUD WAS

02:35PM   5     ACTUALLY OCCURRING.

02:35PM   6          IN THE DEFENSE'S QUESTIONING AND IN THEIR CLOSING ARGUMENT

02:35PM   7     THEY'VE INTRODUCED A THEORY THAT DEPENDS ON BLURRING THE LINES

02:35PM   8     BETWEEN THE DEVICES THAT THERANOS WAS USING TO CONDUCT ITS

02:35PM   9     PATIENT TESTING AND THE NEXT GENERATION DEVICES THAT WERE IN

02:35PM   10    DEVELOPMENT, THE DEVICES THAT WERE ON THE HORIZON THAT WOULD

02:35PM   11    SOME DAY BE AVAILABLE.

02:35PM   12             JUROR:  WE DON'T HAVE SCREENS.

02:35PM   13             THE CLERK:  WHAT'S THE MATTER?  LET ME DO A RESET.

02:35PM   14    ONE MOMENT, PLEASE.

02:35PM   15          (PAUSE IN PROCEEDINGS.)

02:36PM   16             THE CLERK:  IS IT ON?

02:36PM   17             JUROR:  YES.

02:36PM   18             THE CLERK:  THANK YOU.

02:36PM   19             MR. BOSTIC:  WHAT DID THE EVIDENCE AT TRIAL SHOW

02:36PM   20    ABOUT THESE NEXT GENERATION DEVICES?

02:36PM   21          WELL, FOR ONE THING, YOU HEARD IN THE TESTIMONY AND SAW

02:36PM   22    FROM THE DOCUMENTS THE NEXT GENERATION DEVICES -- AND HERE

02:36PM   23    WE'RE TALKING ABOUT THE 4 SERIES, THE 4S, THE MINILAB, THE

02:36PM   24    MONOBAY -- THIS FAMILY OF NEXT GENERATION DEVICES WAS

02:36PM   25    PERPETUALLY NEXT GENERATION.  IT WAS ALWAYS IN THE FUTURE.  IT

02:36PM  1    WAS ALWAYS ON THE HORIZON.  IT NEVER BECAME THE CURRENT

02:37PM  2    THERANOS TECHNOLOGY.  IT WAS NEVER USED FOR PATIENT TESTING.

02:37PM  3         THAT IS NOT IN DISPUTE.

02:37PM  4         AND THE 4.0 AND THE 4 SERIES WAS NEVER USED FOR PATIENT

02:37PM  5    TESTING BECAUSE IT WAS NEVER READY FOR PATIENT TESTING.

02:37PM  6         THERANOS, INSTEAD, WAS USING THE PREVIOUS VERSION OF THE

02:37PM  7    EDISON, THE 3.5, IN ITS CLINICAL LAB.

02:37PM  8         NOW, AFTER THE FACT, THE DEFENSE IS ASKING YOU TO BELIEVE

02:37PM  9    THAT ALL OF THE FALSE CLAIMS MS. HOLMES MADE ABOUT THE

02:37PM 10    TECHNOLOGY IN THIS CASE ALL OF THE TIMES THAT SHE SPOKE ABOUT

02:37PM 11    WHAT THE THERANOS ANALYZER COULD DO, ALL OF THE TIMES SHE SPOKE

02:37PM 12    ABOUT THE COMPANY'S ACHIEVEMENT AND ITS CAPABILITIES, THOSE

02:37PM 13    WERE ACTUALLY REFERENCES TO A FUTURE DEVICE, NOT THE DEVICE

02:37PM 14    THAT THE COMPANY WAS USING FOR ITS ONGOING CLINICAL TESTING.

02:37PM 15         NOW, BEFORE YOU GIVE THIS VERSION OF EVENTS ANY CREDIT,

02:37PM 16    ASK YOURSELVES WHY NOT A SINGLE LISTENER WALKED AWAY WITH THAT

02:38PM 17    UNDERSTANDING.

02:38PM 18         OF ALL OF THE PEOPLE THAT MS. HOLMES MADE THIS CLAIM TO,

02:38PM 19    YOU HEARD FROM A VARIETY, PEOPLE WITH DIFFERENT BACKGROUNDS,

02:38PM 20    PEOPLE WHO HEARD THESE CLAIMS IN DIFFERENT CONTEXTS.

02:38PM 21         EACH OF THEM WALKED AWAY BELIEVING THAT MS. HOLMES WAS

02:38PM 22    TALKING ABOUT THE COMPANY'S PRESENT DAY CAPABILITIES, THE

02:38PM 23    ANALYZERS THAT THE COMPANY HAD DEVELOPED AND COMPLETED, THE

02:38PM 24    ANALYZERS THAT THE COMPANY WAS USING FOR ITS ONGOING PATIENT

02:38PM 25    TESTING.

02:38PM 1          AND WHY WAS THAT?

02:38PM 2          WELL, THINK ABOUT THE EVIDENCE IN TERMS OF WHAT MS. HOLMES

02:38PM 3   WAS ACTUALLY SAYING TO THOSE PEOPLE, WHAT THE WRITTEN MATERIALS

02:38PM 4   SAID, WHAT YOU HEARD SHE SAID IN IN-PERSON CONVERSATIONS.

02:38PM 5          IN CASES WHERE MS. HOLMES WAS TALKING ABOUT WHAT THE

02:38PM 6   TECHNOLOGY COULD DO AND WHAT THERANOS WAS CAPABLE OF, HER

02:38PM 7   CLAIMS WERE PRESENT TENSE CLAIMS.  THEY WERE ALWAYS ABOUT THE

02:38PM 8   ATTRIBUTES OF THE TECHNOLOGY, THE ABILITIES OF THE TECHNOLOGY

02:38PM 9   WITH NO FORWARD LOOKING LANGUAGE.

02:38PM 10         CLAIMS ABOUT THERANOS HAVING THE HIGHEST LEVELS OF

02:39PM 11  ACCURACY, NOT SOME DAY HAVING THE HIGHEST LEVEL OF ACCURACY.

02:39PM 12         CLAIMS ABOUT THERANOS TECHNOLOGY BEING ABLE TO DO THE

02:39PM 13  ENTIRE RANGE OF TESTS, NOT HAVING THE GOAL TO SOME DAY

02:39PM 14  HOPEFULLY BE ABLE TO DO THE ENTIRE RANGE OF TESTS.

02:39PM 15         IT'S BECAUSE OF THE WAY MS. HOLMES CHOSE TO COMMUNICATE

02:39PM 16  ABOUT THERANOS TECHNOLOGY THAT LISTENERS WALKED AWAY BELIEVING

02:39PM 17  THAT THEY WERE HEARING ABOUT WHAT THE COMPANY COULD DO AS OF

02:39PM 18  THE DAY THAT THEY WERE HEARING THESE STATEMENTS.

02:39PM 19         IN PARTICULAR, THINK ABOUT THE INVESTOR PRESENTATIONS IN

02:39PM 20  THIS REGARD.  YOU'VE SEEN THOSE NUMEROUS TIMES IN THIS CASE.  I

02:39PM 21  WON'T SHOW YOU THEM NOW AGAIN.

02:39PM 22         BUT THINK ABOUT THE CLAIMS IN THOSE SLIDES THAT WERE

02:39PM 23  FRAMED IN THE PRESENT TENSE, THE CLAIMS THAT I JUST MENTIONED

02:39PM 24  ABOUT THE NUMBER OF TESTS THAT COULD BE DONE, LANGUAGE LIKE

02:39PM 25  THERANOS CONDUCTS ANY TEST AVAILABLE IN CENTRAL LABORATORIES

02:39PM  1    AND CAN PROCESS ALL SAMPLE TYPES.  THINK ABOUT LANGUAGE LIKE

02:40PM  2    THERANOS HAS THE HIGHEST LEVELS OF ACCURACY, AND THINK ABOUT

02:40PM  3    WHETHER THERE'S ANYTHING ABOUT THAT LANGUAGE THAT WOULD GIVE

02:40PM  4    EVEN A HINT TO SOMEONE THAT MS. HOLMES ACTUALLY WASN'T TALKING

02:40PM  5    ABOUT PRESENT DAY CAPABILITY, THAT SHE WAS TALKING ABOUT SOME

02:40PM  6    SPECULATIVE FUTURE EVENT THAT SHE HOPED WOULD OCCUR.

02:40PM  7         THOSE INVESTOR PRESENTATIONS -- AND YOU WILL RECALL THAT

02:40PM  8    THERE WERE DOZENS AND SOMETIMES HUNDREDS OF PAGES LONG -- DID

02:40PM  9    SOMETIMES INCLUDE SOME FORWARD LOOKING STATEMENTS ABOUT THE

02:40PM 10    EVENTUAL FOOTPRINT IN WALGREENS OR THE AMOUNT OF REVENUE THAT

02:40PM 11    THERANOS HOPED TO GENERATE AT A CERTAIN POINT.

02:40PM 12         NOW, THOSE FORWARD LOOKING STATEMENTS ARE IN A DIFFERENT

02:40PM 13    CATEGORY, AND THEY CAN STILL BE FRAUDULENT IF THEY'RE MADE WITH

02:40PM 14    THE INTENT TO DECEIVE.

02:40PM 15         BUT WE'RE NOT TALKING ABOUT THOSE NOW.  WE'RE TALKING

02:40PM 16    ABOUT PRESENT TENSE STATEMENTS THAT CLEARLY WERE MEANT TO

02:40PM 17    CONVEY THE REALITY AS OF THAT DAY.

02:40PM 18         THOSE INVESTOR PRESENTATIONS WOULD HAVE NEEDED TO BE

02:41PM 19    COMPLETELY REWRITTEN IN ORDER TO BE HONEST IN LIGHT OF THE

02:41PM 20    DEFENSE'S THEORY ABOUT THESE NEXT GENERATION DEVICES.

02:41PM 21         ALL OF THAT LANGUAGE THAT IS IN THE PRESENT TENSE WOULD

02:41PM 22    HAVE NEEDED TO BE CHANGED.

02:41PM 23         I SUPPOSE THEY COULD HAVE ADDED A NOTE AT THE BEGINNING OF

02:41PM 24    THOSE INVESTOR SLIDE PRESENTATIONS SAYING, WARNING, ALL OF THE

02:41PM 25    CLAIMS YOU'RE ABOUT TO SEE IN THIS PRESENTATION ARE NOT ABOUT

02:41PM   1    THE COMPANY'S PRESENT DAY CAPABILITIES, BUT THEY'RE ABOUT A

02:41PM   2    FUTURE GENERATION THAT IS NOT YET FINALIZED.

02:41PM   3         THAT WOULD HAVE BEEN A WAY TO AVOID CONFUSION AND TO KEEP

02:41PM   4    FROM MISLEADING PEOPLE.

02:41PM   5         THAT WASN'T DONE.  THAT CRITICAL PIECE OF INFORMATION WAS

02:41PM   6    WITHHELD, AND AS A RESULT, EVERYONE LEFT THESE CONVERSATIONS,

02:41PM   7    THESE INTERACTIONS WITH MS. HOLMES, BELIEVING THAT THEY HAD

02:41PM   8    HEARD ABOUT WHAT THE COMPANY COULD DO THAT DAY.  WHY WOULD THEY

02:41PM   9    ASSUME ANYTHING ELSE?

02:41PM  10         MS. HOLMES ASKED YOU TO BELIEVE THAT REPORTS FROM THERANOS

02:41PM  11    EMPLOYEES SUPPORTED HER CLAIMS WITH RESPECT TO THE 4 SERIES AND

02:42PM  12    WHAT IT WAS GOING TO BE CAPABLE OF.

02:42PM  13         BUT WHAT WERE THOSE EMPLOYEES ACTUALLY TELLING HER?

02:42PM  14         IN HER TESTIMONY, SHE TOLD YOU, "BY 2009, 2010, WE HAD A

02:42PM  15    BREAKTHROUGH IN WHICH WE FIGURED OUT HOW TO APPLY THE FORMULA

02:42PM  16    NOT JUST TO ONE METHOD OF TESTS, BUT TO FOUR."

02:42PM  17         AND IN RESPONSE TO HER LAWYER'S QUESTION SHE SAID THAT

02:42PM  18    "THAT WORK THAT LED HER TO CONCLUDE THAT THE COMPANY WAS

02:42PM  19    CAPABLE OF PERFORMING ANY BLOOD TEST ESSENTIALLY."

02:42PM  20         LET'S LOOK AT AN IMPORTANT PIECE OF EVIDENCE THAT THAT

02:42PM  21    BELIEF WAS SUPPOSEDLY BASED ON.

02:42PM  22         THIS WAS INTRODUCED BY THE DEFENSE.  THIS IS EXHIBIT 7098.

02:42PM  23    THIS IS A PRESENTATION FROM FEBRUARY 2010 GIVEN BY A SCIENTIST

02:42PM  24    NAMED IAN GIBBONS AT THERANOS, AND MS. HOLMES SAYS THIS

02:42PM  25    INFORMATION WAS PART OF WHAT CONVINCED HER THAT SHE WAS NOW

02:42PM  1    CLEAR TO REPRESENT TO OTHERS THAT THERANOS TECHNOLOGY WAS

02:42PM  2    CAPABLE OF PERFORMING ANY TEST AND IN MAKING OTHER CLAIMS THAT

02:43PM  3    SHE MADE.

02:43PM  4         LET'S SEE WHAT THIS PRESENTATION ACTUALLY SAYS.

02:43PM  5         PAGE 2, RIGHT AFTER THE COVER PAGE, CONTAINS AN OVERVIEW.

02:43PM  6    AND NOTICE THAT IT REPEATEDLY USES FORWARD LOOKING LANGUAGE.

02:43PM  7    THIS IS WHAT THE SCIENTIST IS TELLING MS. HOLMES, "SYSTEM 4.0

02:43PM  8    WILL BE CAPABLE OF PERFORMING ANY MEASUREMENT REQUIRED," "IT IS

02:43PM  9    ENVISAGED THAT SEVERAL DISTINCT MEASUREMENT TECHNOLOGIES WILL

02:43PM  10   BE INCORPORATED," "THE SYSTEM WILL BE BROADLY BASED ON THE

02:43PM  11   EXISTING CARTRIDGE," "THE NUMBER OF TOTAL MEASUREMENTS PER

02:43PM  12   SAMPLE WILL BE INCREASED BY TWO TO THREE-FOLD."

02:43PM  13        THIS IS HOW YOU WRITE SENTENCES ABOUT WHAT HASN'T HAPPENED

02:43PM  14   YET.  EVERYBODY KNOWS THIS.

02:43PM  15        THIS WAS THE INFORMATION THAT MS. HOLMES WAS TAKING IN

02:43PM  16   ABOUT THE NEXT GENERATION TECHNOLOGY, AND IT'S ONLY WHEN IT

02:43PM  17   PASSED THROUGH KIND OF HER MIND AND WHEN SHE MADE A DECISION

02:43PM  18   ABOUT HOW TO EXPLAIN IT TO OTHERS THAT IT TOOK ON THIS PRESENT

02:43PM  19   TENSE CHARACTER, THAT IT BECAME AN EXAGGERATION IN THE FORM OF

02:44PM  20   CLAIMS ABOUT WHAT THE COMPANY'S CURRENT TECHNOLOGY COULD DO.

02:44PM  21        THAT'S NOT AN EXCEPTION IN THIS PRESENTATION.

02:44PM  22        IT GOES ON TO TALK ABOUT SYSTEM REQUIREMENTS.

02:44PM  23        NOTICE THAT SEVERAL KEY ASPECTS OF THE DEVICE ARE STILL

02:44PM  24   TBD, OR TO BE DECIDED, INCLUDING OTHER CAPABILITIES.

02:44PM  25        AND AT THE BOTTOM THERE, IT SAYS OTHER CAPABILITIES TO BE

ER-6848

02:44PM   1      DECIDED, BUT NOT LESS THAN SYSTEM 3.0.

02:44PM   2           IN OTHER WORDS, THE PLAN FOR THE 4.0 WAS THAT IT WAS GOING

02:44PM   3      TO BE BETTER THAN THE 3.0.

02:44PM   4           DOES THAT SEEM CONCRETE ENOUGH TO YOU TO SUPPORT A GOOD

02:44PM   5      FAITH BELIEF THAT THE COMPANY HAS TECHNOLOGY THAT CAN DO

02:44PM   6      EVERYTHING THAT MS. HOLMES WAS CLAIMING?

02:44PM   7           AND IMPORTANTLY, THIS PRESENTATION ALSO IDENTIFIED SOME

02:44PM   8      PROBLEMS WITH THE 4 SERIES PLAN THAT THE COMPANY HAD APPARENTLY

02:44PM   9      NOT YET SOLVED, THINGS THAT WERE GOING TO MAKE THIS PROJECT

02:45PM  10      ESPECIALLY COMPLEX AND HURDLES THAT THE COMPANY WOULD NEED TO

02:45PM  11      OVERCOME IN ORDER TO GET THERE.

02:45PM  12           NOW, MS. HOLMES CONTINUED TO HEAR SOME POSITIVE REPORTS

02:45PM  13      FROM SCIENTISTS AND ENGINEERS ABOUT THE DEVELOPMENT PROCESS FOR

02:45PM  14      THE 4 SERIES, BUT AT NO POINT DID THEY TELL HER THAT THE 4

02:45PM  15      SERIES WAS READY FOR PATIENT TESTING.  AT NO POINT DID --

02:45PM  16      DURING THE RELEVANT TIME PERIOD DID THERANOS ACTUALLY USE THE 4

02:45PM  17      SERIES FOR PATIENT TESTING, ALTHOUGH OBVIOUSLY THERE WOULD HAVE

02:45PM  18      BEEN A DESIRE TO DO SO HAD THE SYSTEM BEEN READY.

02:45PM  19           SO THESE REPRESENTATIONS OR THE INFORMATION THAT

02:45PM  20      MS. HOLMES GOT FROM EMPLOYEES COULD NOT HAVE GIVEN HER A GOOD

02:45PM  21      FAITH BASIS TO CLAIM THAT THE TECHNOLOGY WAS CURRENTLY CAPABLE

02:45PM  22      OF DOING EVERYTHING.

02:45PM  23           IF ANYTHING, THEY MADE HER OPTIMISTIC THAT THE LIES THAT

02:45PM  24      SHE WAS TELLING COULD BE MADE TRUE BEFORE THEY HAD BEEN

02:45PM  25      DETECTED.

02:46PM  1          SO YOU'RE REASONABLE TO INFER THAT THIS INFORMATION FROM

02:46PM  2     SCIENTISTS AND ENGINEERS AT THERANOS GAVE MS. HOLMES SOME

02:46PM  3     COMFORT IN SPREADING FALSE INFORMATION ABOUT WHAT THERANOS

02:46PM  4     COULD DO AND WHERE THE TECHNOLOGY WAS AT BECAUSE SHE HOPED THAT

02:46PM  5     BY THE TIME THAT ANYONE BECAME THE WISER, THE TECHNOLOGY WOULD

02:46PM  6     HAVE CAUGHT UP TO HER REPRESENTATIONS, AND NO ONE WOULD EVER

02:46PM  7     FIND OUT.

02:46PM  8          AS IT TURNS OUT, THAT'S NOT WHAT HAPPENED.

02:46PM  9          BUT FOR PURPOSES OF THE CHARGED OFFENSE AND HER INTENT TO

02:46PM  10    DEFRAUD, A LIE IS A LIE AT THE MOMENT THAT IT IS MADE.  IT DOES

02:46PM  11    NOT MATTER WHETHER MS. HOLMES HAD THE INTENT TO MAKE THE LIE

02:46PM  12    TRUE OR TO AVOID BEING FOUND OUT.  THE PROBLEM IS IN MAKING THE

02:46PM  13    MISREPRESENTATION ON THE DAY IT'S MADE.

02:46PM  14         ALSO, REMEMBER IN THIS CONTEXT THE GOOD FAITH INSTRUCTION.

02:46PM  15    WHEN THE COURT INSTRUCTS YOU ABOUT GOOD FAITH, AGAIN, THE COURT

02:47PM  16    IS GOING TO TELL YOU THAT A GOOD FAITH THAT PREVENTS A

02:47PM  17    CONVICTION IS A GOOD FAITH BELIEF IN THE TRUTH OF THE SPECIFIC

02:47PM  18    MISREPRESENTATION CHARGED.

02:47PM  19         HERE MS. HOLMES'S OWN TESTIMONY PRECLUDES THAT FINDING.

02:47PM  20    LET'S TAKE A LOOK AT THAT.

02:47PM  21         HER TESTIMONY TELLS YOU IN ADDITION TO ALL OF THE OTHER

02:47PM  22    EVIDENCE IN THE CASE, THAT SHE WAS AWARE DURING THE RELEVANT

02:47PM  23    TIME PERIOD OF WHAT THE ANALYZER COULD DO AND WHAT IT COULDN'T

02:47PM  24    DO.

02:47PM  25         FOR EXAMPLE, TOWARDS THE BEGINNING OF HER TESTIMONY,

02:47PM 1   MS. HOLMES WAS ASKED "HOW MANY SMALL SAMPLE ASSAYS DID THERANOS

02:47PM 2   OFFER IN ITS CLINICAL LAB?"

02:47PM 3       HER ANSWER WAS, "70 OR SO."

02:47PM 4       SHE WAS THEN ASKED, "HOW MANY OF THOSE ASSAYS WERE OFFERED

02:47PM 5   WHERE THE ANALYSIS WAS PERFORMED ON A MINIATURIZED THERANOS

02:47PM 6   DEVICE?"

02:47PM 7       SHE ANSWERED, "TWELVE."

02:47PM 8       SHE WAS ALSO ASKED WHETHER SHE UNDERSTOOD THAT THE MINILAB

02:47PM 9   WAS NEVER USED FOR PATIENT TESTING.

02:47PM 10      SHE SAID SHE DID.

02:47PM 11      SHE CONFIRMED ALSO THAT SHE WAS FAMILIAR WITH THE EDISON

02:48PM 12  3.5 DURING THE 2013 TIME PERIOD, AND IN 2014, AND IN 2015, AND

02:48PM 13  THAT SHE KNEW WHAT THE EDISON 3.5 COULD DO AND WHAT IT COULDN'T

02:48PM 14  DO.

02:48PM 15      SO WHAT DOES THAT MEAN?  THAT MEANS THAT WHENEVER

02:48PM 16  MS. HOLMES MADE A REPRESENTATION THAT WAS INCONSISTENT WITH

02:48PM 17  THIS, SHE'S ADMITTING THAT THAT WAS A KNOWING

02:48PM 18  MISREPRESENTATION.  SHE KNEW THE TRUTH.  SHE KNEW WHAT THE

02:48PM 19  MINILAB COULD DO.  SHE KNEW THE MINILAB WAS NEVER USED FOR

02:48PM 20  PATIENT TESTING, THAT NEXT GENERATION DEVICE.  SHE KNEW WHAT

02:48PM 21  THE 3.5 WAS CAPABLE OF AND WHAT IT WAS NOT CAPABLE OF.

02:48PM 22      SO WHEN SHE SAID THE THERANOS TECHNOLOGY CAN DO ANY TEST,

02:48PM 23  WHEN SHE BOASTED OF GREATER ACCURACY, WHEN SHE CAUSED PEOPLE TO

02:48PM 24  BELIEVE THAT THE EDISON WAS CAPABLE OF RUNNING THE ENTIRE RANGE

02:48PM 25  OF TESTS, HERE'S THE TESTIMONY THAT TELLS YOU THAT SHE KNEW

02:48PM 1    BETTER.  SHE KNEW BETTER.

02:48PM 2         AND OF COURSE SHE DID.  SHE WAS THE FOUNDER OF THE

02:49PM 3    COMPANY.  SHE WAS NAMED ON MULTIPLE PATENTS.  SHE DEVOTED SO

02:49PM 4    MUCH ENERGY AND TIME TO THIS.  OF COURSE SHE KNEW WHAT THE

02:49PM 5    TRUTH WAS REGARDING THAT TECHNOLOGY.

02:49PM 6         SO THIS THEME BY THE DEFENSE, THIS ARGUMENT THAT

02:49PM 7    MS. HOLMES WAS ACTUALLY TALKING ABOUT A FUTURE DEVICE AND NOT

02:49PM 8    CURRENT TECHNOLOGY IS ACTUALLY A SIGNIFICANT ADMISSION BY THE

02:49PM 9    DEFENDANT.

02:49PM 10        IT MEANS THAT MS. HOLMES WAS INTENTIONALLY REPRESENTING AS

02:49PM 11   A PRESENT ACCOMPLISHMENT SOMETHING THAT HAD NOT HAPPENED YET,

02:49PM 12   AND THAT SHE KNEW THAT.

02:49PM 13        THE DEFENSE IS PRESENTING IT AS IF IT EXCUSES MS. HOLMES'S

02:49PM 14   CRIMINAL CONDUCT.  BUT, IN FACT, THIS IS JUST A DESCRIPTION OF

02:49PM 15   HOW THE FRAUD ACTUALLY WORKED.

02:49PM 16        YOU HEARD FROM THE VICTIMS WHO TESTIFIED THAT MS. HOLMES'S

02:49PM 17   APPARENT TECHNIQUE OF SPEAKING ABOUT NEXT GENERATION DEVICES AS

02:49PM 18   IF THEY WERE ALREADY HERE WAS EFFECTIVE IN DECEIVING INVESTORS,

02:49PM 19   IN DECEIVING OTHER PEOPLE WHO HAD CONTACT WITH THERANOS.

02:50PM 20        IF THIS THEORY, IF THIS ARGUMENT IS LESS PERSUASIVE TO

02:50PM 21   YOU, IT'S BECAUSE YOU HAVE ACCESS TO INFORMATION THAT THOSE

02:50PM 22   VICTIMS DID NOT HAVE.

02:50PM 23        UNLIKE THOSE VICTIMS, YOU'RE NOT RELIANT ON MS. HOLMES AS

02:50PM 24   YOUR SOLE SOURCE OF INFORMATION ABOUT THE COMPANY.  YOU SAT

02:50PM 25   THROUGH A TRIAL WHERE YOU HEARD FROM THERANOS INSIDERS AND

02:50PM 1    PEOPLE WHO COULD TELL YOU ABOUT THE DIFFERENCES BETWEEN THE 3

02:50PM 2    SERIES THAT WAS ACTUALLY A FINAL PRODUCT USED FOR PATIENT

02:50PM 3    TESTING AND THE NEXT GENERATION DEVICES THAT WERE ALWAYS

02:50PM 4    SPECULATIVE, ALWAYS HYPOTHETICAL, NEVER FINISHED.

02:50PM 5        BECAUSE YOU HAVE THAT UNDERSTANDING, YOU HAVE A CLEAR

02:50PM 6    FOCUS ABOUT WHETHER THIS DEFENSE IS ACTUALLY VIABLE AND YOU ARE

02:50PM 7    ABLE TO SEE THROUGH IT.

02:50PM 8        WHAT'S MORE, YOU KNEW THAT THERE WERE SERIOUS ACCURACY AND

02:50PM 9    RELIABILITY PROBLEMS WITH THE 3 SERIES ANALYZERS THAT THERANOS

02:51PM 10   APPARENTLY DID NOT KNOW HOW TO SOLVE.

02:51PM 11       THAT SHOULD MAKE YOU VERY SKEPTICAL THAT THE COMPANY WAS

02:51PM 12   ON ITS WAY TO DEVELOPING A 4 SERIES DEVICE THAT WAS MORE

02:51PM 13   COMPLICATED, MORE AMBITIOUS, THAT WAS GOING TO OVERCOME THESE

02:51PM 14   PROBLEMS, AND IT SHOULD MAKE YOU SKEPTICAL OF ANY CLAIM THAT

02:51PM 15   MS. HOLMES HAD A GOOD FAITH BELIEF IN THAT.

02:51PM 16       THE COMPANY COULDN'T SOLVE THE ACCURACY AND RELIABILITY

02:51PM 17   PROBLEMS PLAGUING THE MUCH SIMPLER 3 SERIES DEVICE.

02:51PM 18       ANOTHER THEME THAT THE DEFENSE HAS RAISED RELATES TO

02:51PM 19   INFORMATION THAT WAS SHARED WITH PEOPLE OTHER THAN VICTIMS IN

02:51PM 20   THIS CASE.

02:51PM 21       LET ME START BY REMINDING YOU THAT THIS CASE IS ABOUT

02:51PM 22   DECEPTION OF THE SPECIFIC VICTIMS WHO FELL UNDER THE SCHEMES TO

02:51PM 23   DEFRAUD INVESTORS AND PATIENTS.

02:51PM 24       WE'RE TALKING ABOUT SCHEMES RELATING TO MULTIPLE INVESTORS

02:51PM 25   AND MANY, IF NOT ALL, PATIENTS WHO PAID FOR THERANOS DEVICES OR

02:51PM  1    PAID FOR THERANOS TESTS, AND THERE ARE SPECIFIC REPRESENTATIVES

02:52PM  2    OF THOSE CLASSES WHO KIND OF UNDERLIE THE COUNTS THAT YOU'LL BE

02:52PM  3    ASKED TO MAKE FINDINGS ABOUT.

02:52PM  4         THAT'S WHAT THIS CASE IS ABOUT.

02:52PM  5         THIS CASE IS NOT TURNING ON INFORMATION THAT WAS SHARED

02:52PM  6    WITH PEOPLE OTHER THAN THE VICTIMS OF THOSE SCHEMES TO DEFRAUD.

02:52PM  7         LET'S TALK FIRST ABOUT INFORMATION SHARED WITH REGULATORS.

02:52PM  8         THE DEFENSE HAS REMINDED YOU MULTIPLE TIMES THAT THERANOS

02:52PM  9    PROVIDED INFORMATION TO THE FDA AND TO INSPECTORS THAT IT DID

02:52PM  10   NOT PROVIDE TO THE VICTIMS IN THIS CASE, AND IT WOULD LIKE YOU

02:52PM  11   TO CONCLUDE THAT THERANOS'S WILLINGNESS TO PROVIDE THAT

02:52PM  12   INFORMATION TO THE AUTHORITIES SHOULD INDICATE TO YOU THAT THE

02:52PM  13   COMPANY WASN'T TRYING TO KEEP THAT INFORMATION SECRET AT ALL.

02:52PM  14        FIRST OF ALL, ASK YOURSELVES IF THAT'S WHAT THE EVIDENCE

02:53PM  15   SHOWS.

02:53PM  16        DOES THE EVIDENCE SHOW THAT THERANOS AND MS. HOLMES WERE

02:53PM  17   CONSISTENTLY HONEST WITH REGULATORS?

02:53PM  18        RECALL EXHIBIT 4047.  THAT'S AN EMAIL FROM MS. HOLMES TO

02:53PM  19   DANIEL YOUNG AND OTHERS ABOUT THE PATH THAT AN AUDITOR WAS

02:53PM  20   GOING TO TAKE THROUGH THE THERANOS LAB DURING AN INSPECTION.

02:53PM  21        SHORTLY AFTER THAT, IN CONNECTION WITH THAT SAME

02:53PM  22   INSPECTION, ON EXHIBIT 4316 DANIEL YOUNG EMAILS ADAM ROSENDORFF

02:53PM  23   AND TELLS HIM NOT TO REMIND THE INSPECTOR ABOUT THE DOWNSTAIRS

02:53PM  24   LAB.  THAT'S THE LAB WHERE THE THERANOS-SPECIFIC DEVICES WERE

02:53PM  25   KEPT.

02:53PM  1          AND IN THAT EMAIL DAN YOUNG SAYS THAT IT'S SIMPLER IF THE

02:53PM  2     INSPECTORS FOCUS ON THE UPSTAIRS LAB.

02:53PM  3          EXHIBIT 1295 IS AROUND THAT SAME TIME PERIOD IN CONNECTION

02:53PM  4     WITH THAT SAME INSPECTION, AND THAT'S AN EMAIL FROM

02:53PM  5     MR. BALWANI, THE CODEFENDANT HERE, TALKING ABOUT AN AREA IN THE

02:53PM  6     LAB THAT IS CORDONED OFF OR BLOCKED OFF DURING THIS INSPECTION.

02:54PM  7          AND HE PROVIDES SOME SCRIPTING FOR LAB PERSONNEL TO

02:54PM  8     RESPOND TO THE AUDITORS IF THEY'RE ASKED QUESTIONS ABOUT WHAT

02:54PM  9     IS BEHIND THAT BARRIER.

02:54PM 10          ONE IMPORTANT REASON WHY YOU SHOULD DISCOUNT THE FACT THAT

02:54PM 11     MS. HOLMES PROVIDED INFORMATION TO REGULATORS IS THAT THE

02:54PM 12     INCENTIVES ARE COMPLETELY DIFFERENT HERE.

02:54PM 13          OBVIOUSLY THE PURPOSE OF PROVIDING FALSE INFORMATION TO

02:54PM 14     INVESTORS WAS TO MAKE THE COMPANY SEEM SPECIAL AND UNIQUE AND

02:54PM 15     INNOVATIVE, TO ATTRACT THOSE INVESTORS AND MAKE THEM WANT TO

02:54PM 16     GET ON BOARD AND INVEST THEIR MONEY IN A NEW COMPANY.

02:54PM 17          WHEN IT COMES TO REGULATORS, HOWEVER, THE INCENTIVE IS THE

02:54PM 18     OPPOSITE.  SOMETHING NEW, SOMETHING INNOVATIVE, SOMETHING

02:54PM 19     DIFFERENT, IT'S REASONABLE TO INFER, WOULD CAUSE GREATER

02:54PM 20     SCRUTINY BY REGULATORS.

02:55PM 21          BECAUSE OF THAT, IT WAS ACTUALLY TO THERANOS'S ADVANTAGE

02:55PM 22     TO BE UP FRONT WITH THE REGULATORS ABOUT THE NORMAL SYSTEMS

02:55PM 23     THAT IT WAS USING, THE COMMERCIALLY AVAILABLE ANALYZERS, THE

02:55PM 24     FDA APPROVED PROCESSES, BY DISCLOSING THAT THERANOS WAS DOING

02:55PM 25     THE SAME THING THAT ANY LAB WOULD DO, THE SAME WAY THAT QUEST

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9293

02:55PM  1    WAS DOING IT, THE SAME WAY THAT LABCORP WAS DOING IT, THERANOS

02:55PM  2    COULD EXPECT THAT THE FDA WOULD BE COMFORTED BY THAT AND WOULD

02:55PM  3    NOT APPLY ADDITIONAL SCRUTINY.

02:55PM  4         THE OPPOSITE IS TRUE FOR INVESTORS.  INVESTORS WOULD HAVE

02:55PM  5    LITTLE INTEREST IN INVESTING IN A NEW LAB THAT WAS DOING THINGS

02:55PM  6    THE OLD WAY.

02:55PM  7         SO, AGAIN, YOU SHOULDN'T BE SURPRISED TO HEAR THAT

02:55PM  8    MS. HOLMES WAS MORE FORTHCOMING WITH THE FDA WHEN IT CAME TO

02:55PM  9    THINGS LIKE THE COMPANY'S USE OF THIRD PARTY DEVICES.

02:55PM  10        SHE DIDN'T LIE TO THE FDA BECAUSE SHE DIDN'T NEED TO, AND

02:55PM  11   ALSO BECAUSE HER CHANCES OF DECEIVING THEM WOULD HAVE BEEN

02:55PM  12   REDUCED.

02:55PM  13        RECALL FROM THE EVIDENCE DURING THE TRIAL THAT

02:55PM  14   ORGANIZATIONS LIKE FDA AND CMS CAN INSPECT LABORATORIES WITH OR

02:56PM  15   WITHOUT NOTICE, SO PROVIDING FALSE INFORMATION TO THEM ABOUT

02:56PM  16   WHAT WAS IN THE LAB WOULD CARRY A MUCH HIGHER RISK AS COMPARED

02:56PM  17   TO THE INVESTORS IN THIS CASE WHOSE ACCESS TO THE LAB WAS

02:56PM  18   CONTROLLED BY NONE OTHER THAN THE DEFENDANT.

02:56PM  19        LET'S TALK NEXT ABOUT SOME OF THE EVIDENCE IN THIS CASE

02:56PM  20   INVOLVING PHARMACEUTICAL REPORTS THAT WERE DOCTORED BY

02:56PM  21   MS. HOLMES AND SHARED BY WALGREENS AND OTHERS.

02:56PM  22        THE DEFENSE PRESENTED EVIDENCE THAT SOME OF THOSE REPORTS

02:56PM  23   WERE LATER SENT TO THE COMPANIES WHOSE LOGOS APPEARED AT THE

02:56PM  24   TOP, AND I THINK THE DEFENSE WANTS YOU TO CONCLUDE FROM THAT

02:56PM  25   THAT MS. HOLMES HAD NO INTENT TO DECEIVE ANYONE BECAUSE SHE

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9294

02:56PM  1    APPARENTLY WAS OKAY WITH CERTAIN INDIVIDUALS AT THOSE COMPANIES

02:57PM  2    KNOWING THAT THOSE LOGOS HAD BEEN PLACED THERE.

02:57PM  3         IT'S IMPORTANT TO KEEP IN MIND, THOUGH, THIS IS NOT A CASE

02:57PM  4    ABOUT THE MISUSE OF LOGOS.  THIS IS NOT A CASE ABOUT TRADEMARK

02:57PM  5    MISAPPROPRIATION WHERE THE VICTIM IS THE PHARMACEUTICAL

02:57PM  6    COMPANY.

02:57PM  7         THE WRONG THING THAT HAPPENED THERE IS THAT THE LOGOS WERE

02:57PM  8    USED TO DECEIVE A THIRD PARTY, WHETHER IT WAS A POTENTIAL

02:57PM  9    INVESTOR IN THERANOS, WHETHER IT WAS WALGREENS, A POTENTIAL

02:57PM 10    BUSINESS PARTNER.  THAT IS WHERE THOSE DOCUMENTS WERE USED AS

02:57PM 11    TOOLS.  THAT'S THE WRONGFUL CONDUCT THAT YOU SHOULD FOCUS ON.

02:57PM 12         SO SENDING REPORTS BACK TO THESE COMPANIES IS NOT THE SAME

02:57PM 13    THING AS REVEALING TO THE ACTUAL TARGETS OF THE DECEPTION,

02:57PM 14    WALGREENS OR INVESTORS, THAT THOSE REPORTS HAD BEEN CREATED BY

02:57PM 15    THERANOS AND THAT THE LOGOS HAD BEEN APPLIED BY MS. HOLMES

02:57PM 16    HERSELF.

02:57PM 17         AND SURE ENOUGH, WHEN MS. HOLMES WAS ASKED, "BEFORE GIVING

02:58PM 18    THE DOCUMENT TO WALGREENS," AND THIS IS RELATING TO THE PFIZER

02:58PM 19    REPORT, "YOU DID NOT TELL PFIZER YOU WERE ADDING ITS LOGO TO A

02:58PM 20    DOCUMENT THAT THERANOS PREPARED; AM I RIGHT?"

02:58PM 21         SHE SAYS, "I DON'T KNOW.  I DON'T REMEMBER THIS PROCESS."

02:58PM 22         THE FOLLOW-UP QUESTION IS, "AND YOU NEVER TOLD WALGREENS

02:58PM 23    THAT YOU PUT THE PFIZER LOGO ON THIS?"

02:58PM 24         "ANSWER:  I'M SURE WE DIDN'T."

02:58PM 25         LOOK AT THE CONTRAST BETWEEN THOSE TWO ANSWERS AND RECALL

ER-6857

02:58PM  1    DURING MS. HOLMES'S TESTIMONY THERE WERE A LOT OF THINGS THAT

02:58PM  2    SHE DIDN'T REMEMBER, THAT SHE WASN'T SURE ABOUT, THAT SHE

02:58PM  3    DIDN'T KNOW.

02:58PM  4         HERE IS SOMETHING THAT SHE IS SURE ABOUT.  WHEN ASKED

02:58PM  5    WHETHER THEY TOLD WALGREENS THAT SHE PUT THE PFIZER LOGO ON

02:58PM  6    THAT DOCUMENT, SHE ANSWERED THAT SHE'S SURE SHE DIDN'T.

02:58PM  7         AND THE REASON SHE KNOWS SHE DIDN'T TELL WALGREENS THIS

02:58PM  8    FACT IS BECAUSE IT WOULD HAVE REVEALED THE TRUTH THAT SHE WAS

02:58PM  9    TRYING TO CONCEAL.

02:58PM 10         LET'S LOOK AT THE METHOD THAT SHE USED THERE.

02:59PM 11         THIS IS EXHIBIT 291, AN APRIL 14TH, 2010 EMAIL FROM

02:59PM 12    MS. HOLMES TO REPRESENTATIVES OF WALGREENS ATTACHING THAT

02:59PM 13    PFIZER REPORT AND TWO OTHERS.

02:59PM 14         AND LOOK AT HOW SHE DESCRIBES THEM.  SHE SAYS "DR. JAY,

02:59PM 15    ALEX,

02:59PM 16         "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

02:59PM 17    DILIGENCE REPORTS ON THERANOS SYSTEMS."  SHE SAYS THEY ARE FROM

02:59PM 18    GLAXOSMITHKLINE, PFIZER, AND SCHERING-PLOUGH.

02:59PM 19         WHEN SHE WAS ON THE STAND SHE ADMITTED THAT, IN FACT, OF

02:59PM 20    COURSE THESE REPORTS WERE NOT FROM THOSE COMPANIES.  THEY WERE

02:59PM 21    FROM THERANOS.

02:59PM 22         SHE MAINTAINED, HOWEVER, THAT THEY WERE INDEPENDENT IN

02:59PM 23    SOME SENSE.  IT'S UNCLEAR HOW DOCUMENTS THAT WERE PREPARED OR

02:59PM 24    ALTERED BY THERANOS, AND THEN DOCTORED TO APPEAR LIKE THEY WERE

02:59PM 25    COMING FROM SOMEONE ELSE, COULD BE FAIRLY VIEWED AS

ER-6858

02:59PM  1    INDEPENDENT.

02:59PM  2         BUT I THINK YOU'RE IN A GOOD POSITION TO JUDGE WHETHER

02:59PM  3    THIS WAS AN HONEST EMAIL OR NOT AT THE TIME THAT MS. HOLMES

03:00PM  4    SENT IT, AND TO JUDGE HER INTENT IN MISCHARACTERIZING THESE

03:00PM  5    DOCUMENTS WHEN SHE SENT THEM TO WALGREENS.

03:00PM  6         THERE'S TRULY NO EXPLANATION HERE OTHER THAN AN INTENT TO

03:00PM  7    DECEIVE.  THERE'S NO REASON NOT TO BE UP FRONT ABOUT THE SOURCE

03:00PM  8    OF THESE DOCUMENTS.  THERE'S NO REASON TO SEND THEM IN THE

03:00PM  9    FIRST PLACE UNLESS YOUR INTENT IS FOR THE RECIPIENT TO BELIEVE

03:00PM  10   THAT THEY'RE READING THE OPINIONS OF THE COMPANIES' WHOSE LOGOS

03:00PM  11   YOU HAVE PLACED AT THE TOP OF THOSE DOCUMENTS.

03:00PM  12        LET'S TALK BRIEFLY ABOUT ANOTHER DEFENSE THEME, WHICH IS

03:00PM  13   BRINGING FOCUS ON THE ACTIONS OF THE VICTIMS IN THIS CASE,

03:00PM  14   SPECIFICALLY THE INVESTORS.

03:00PM  15        YOU'VE HEARD IN THIS CASE FROM A SAMPLING OF INVESTORS.

03:00PM  16   EACH OF THEM TOLD YOU ABOUT THE FALSE AND MISLEADING

03:00PM  17   INFORMATION THAT THEY RECEIVED FROM MS. HOLMES EITHER IN

03:00PM  18   WRITTEN MATERIALS THAT SHE GAVE THEM, IN-PERSON INTERACTIONS,

03:00PM  19   OR INDIRECTLY IN NEWS ARTICLES THAT MS. HOLMES HELPED SHAPE AND

03:00PM  20   APPROVE.

03:00PM  21        THE DEFENSE HAS FOCUSSED THROUGHOUT THE TRIAL ON THE DUE

03:01PM  22   DILIGENCE EFFORTS OF THOSE INVESTORS, SOMETIMES IMPLYING OR

03:01PM  23   INSINUATING THAT INVESTORS WEREN'T CAREFUL ENOUGH, THAT THEY

03:01PM  24   DIDN'T TAKE ENOUGH STEPS TO CONFIRM WHAT MS. HOLMES WAS SAYING,

03:01PM  25   THAT THEY WEREN'T SKEPTICAL ENOUGH.

03:01PM   1        WHAT DOES THE LAW SAY ON THAT?

03:01PM   2        HERE'S WHAT I EXPECT THE COURT TO INSTRUCT YOU ON THIS

03:01PM   3   TOPIC.

03:01PM   4        THIS IS JURY INSTRUCTION NUMBER 26 THAT I EXPECT YOU'LL

03:01PM   5   RECEIVE.  NOTE THAT IT SAYS, "AN ALLEGED VICTIM'S NEGLIGENCE IS

03:01PM   6   NOT A DEFENSE TO WIRE FRAUD."

03:01PM   7        SO IN CASES WHERE YOU MIGHT FEEL THAT A GIVEN INVESTOR

03:01PM   8   WASN'T CAREFUL ENOUGH, WASN'T SKEPTICAL ENOUGH, SHOULD HAVE

03:01PM   9   TAKEN MORE STEPS, SHOULD HAVE DONE MORE INDEPENDENT

03:01PM  10   INVESTIGATION, KNOW THAT THAT HAS NOTHING TO DO WITH YOUR

03:01PM  11   VERDICT.  KNOW THAT THE FOCUS, AS THE COURT WILL INSTRUCT YOU,

03:01PM  12   IS ON THE DEFENDANT'S INTENT, AND A SCHEME TO DEFRAUD IS STILL

03:01PM  13   A SCHEME TO DEFRAUD EVEN IF IT WOULD ONLY ENSNARE SOMEONE WHO

03:02PM  14   IS LESS CAREFUL THAN THEY SHOULD BE.

03:02PM  15        IT'S ALSO NOTABLE THAT IN THE COURSE OF THE TRIAL YOU ALSO

03:02PM  16   HEARD FROM INVESTORS EVERYWHERE ON THE SPECTRUM OF CAREFULNESS

03:02PM  17   AND SOPHISTICATION AND DUE DILIGENCE.

03:02PM  18        ON THE ONE HAND YOU HAD CHRIS LUCAS WHO TESTIFIED THAT HE

03:02PM  19   TRUSTED MS. HOLMES.  HE TOOK HER WORDS AT FACE VALUE.  HE HAD A

03:02PM  20   HIGH LEVEL UNDERSTANDING OF WHAT THE COMPANY HAD DONE AND WHAT

03:02PM  21   THE TECHNOLOGY COULD DO BASED ON CONVERSATIONS WITH HER.  AND

03:02PM  22   HE, BASED ON THAT TRUST AND BASED ON HER REPRESENTATIONS, MADE

03:02PM  23   THE DECISION TO INVEST.

03:02PM  24        ON THE OTHER END OF THE SPECTRUM THERE'S PFM AND SOMEONE

03:02PM  25   LIKE BRIAN GROSSMAN, A VERY SOPHISTICATED INVESTOR WHO TOOK

03:02PM  1    MULTIPLE STEPS TO INVESTIGATE, TRY TO FIND CORROBORATION, HIRE

03:03PM  2    EXPERTS AND GO THROUGH A PROCESS TO GET AS COMFORTABLE AS

03:03PM  3    POSSIBLE WITH THE INVESTMENT IN THERANOS.

03:03PM  4         AND THEN IN HIS OWN CATEGORY IS MR. EISENMAN WHO YOU HEARD

03:03PM  5    MADE HIS BEST EFFORTS TO GET MORE INFORMATION ABOUT THE

03:03PM  6    COMPANY, BUT WAS SHUT OUT BY MS. HOLMES AND MR. BALWANI DURING

03:03PM  7    A CERTAIN TIME PERIOD.

03:03PM  8         WHAT EFFECT DID THAT HAVE?  THAT FORCED HIM TO RELY ON

03:03PM  9    WHAT MS. HOLMES HAD TOLD HIM PREVIOUSLY, CONVERSATIONS LEADING

03:03PM  10   UP TO AND THROUGH 2010, CLAIMS THAT SHE HAD MADE ABOUT THE

03:03PM  11   TECHNOLOGY, AND CONTENT THAT HE SAW IN MEDIA THAT MS. HOLMES

03:03PM  12   HAD APPROVED.

03:03PM  13        REGARDING HIS FOCUS OF CERTAIN STATEMENTS OF HERS, I

03:03PM  14   SUBMIT THAT THE BALANCE OF HIS TESTIMONY TELLS YOU THAT WHAT

03:03PM  15   SHE TOLD HIM DID MATTER TO HIM.  HE TESTIFIED ABOUT HOW HE TOOK

03:03PM  16   NOTES ABOUT HER CLAIMS.  YOU SAW FOLLOW-UP EMAILS ASKING HER

03:03PM  17   QUESTIONS ABOUT CARTRIDGE MANUFACTURING NUMBERS AND

03:04PM  18   PROJECTIONS.  OBVIOUSLY THOSE THINGS MATTERED TO HIM.

03:04PM  19        I SHOULD ALSO POINT OUT, THOUGH, THAT YOU SHOULDN'T BE

03:04PM  20   DISTRACTED BY DEFENSE ARGUMENTS ABOUT WHAT MATTERED TO A

03:04PM  21   CERTAIN INVESTOR AT A CERTAIN TIME.

03:04PM  22        WHEN YOU'RE INSTRUCTED ABOUT THE LAW, YOU'RE GOING TO HEAR

03:04PM  23   ABOUT A CONCEPT CALLED MATERIALITY, WHICH RELATES TO THE KIND

03:04PM  24   OF MISREPRESENTATION THAT CAN FORM THE BASIS FOR A WIRE FRAUD

03:04PM  25   CONVICTION.

03:04PM 1      AND YOU'RE GOING TO HEAR THAT MATERIALITY RELATES TO THE

03:04PM 2    CAPACITY OF A CERTAIN STATEMENT TO INDUCE SOMEONE TO PART WITH

03:04PM 3    MONEY.  AND I'LL ASK YOU TO RELY ON THE COURT'S INSTRUCTION FOR

03:04PM 4    THAT.

03:04PM 5      BUT YOU'LL SEE THAT IT HAS NOTHING TO DO WITH WHAT WAS

03:04PM 6    SUBJECTIVELY IN A VICTIM'S MIND AT A GIVEN TIME.  IT'S AN

03:04PM 7    OBJECTIVE STANDARD.  IT RELATES TO THE TYPE OF CLAIM, THE TYPE

03:04PM 8    OF STATEMENT, NOT TO THE SPECIFIC PERSON THAT IT WAS MADE TO.

03:04PM 9      SO WHAT YOU SAW IN THE EVIDENCE IS THAT THE LEVEL OF DUE

03:05PM 10   DILIGENCE DOESN'T MATTER.  IN THE END, THE INVESTORS WHO

03:05PM 11   TESTIFIED WERE ALL ULTIMATELY FORCED TO RELY ON THE TRUTH OF

03:05PM 12   THE REPRESENTATIONS THAT THEY HEARD FROM MS. HOLMES.

03:05PM 13     THAT'S WHY YOU SHOULD ALSO DISCOUNT THE LANGUAGE IN THE

03:05PM 14   CONTRACTS THAT TALKS ABOUT THE SPECULATIVE NATURE OF THE

03:05PM 15   INVESTMENT OR INFORMATION RIGHTS AND THE LIKE.

03:05PM 16     OF COURSE THESE WERE RISKY INVESTMENTS.  THE INVESTORS

03:05PM 17   KNEW THAT.

03:05PM 18     AND, OF COURSE, THEY KNEW THAT THERE WAS SOME INFORMATION

03:05PM 19   THAT MAYBE THEY WEREN'T GETTING FROM THE COMPANY.

03:05PM 20     BUT YOU WON'T FIND ANY LANGUAGE IN THOSE CONTRACTS THAT

03:05PM 21   EXCUSES THE COMPANY FOR KNOWINGLY PROVIDING FALSE INFORMATION.

03:05PM 22     NOTHING IN THOSE CONTRACTS GAVE MS. HOLMES THE RIGHT TO

03:05PM 23   KNOWINGLY MISLEAD THOSE INVESTORS.

03:05PM 24     AT THE END OF THE DAY, THOSE INVESTORS WERE RELYING ON

03:05PM 25   RECEIVING ACCURATE INFORMATION FROM MS. HOLMES AND NOT BEING

03:05PM  1      INTENTIONALLY MISLED, AND THAT'S EXACTLY WHAT HAPPENED HERE.

03:06PM  2          KEEP IN MIND ALSO ON THIS TOPIC THAT PATIENTS WERE REALLY

03:06PM  3      AT A DISADVANTAGE HERE.

03:06PM  4          IF YOU THINK THAT SOME INVESTORS WERE AT A DISADVANTAGE IN

03:06PM  5      BEING ABLE TO COLLECT INFORMATION OR DO INDEPENDENT

03:06PM  6      INVESTIGATION, KNOW AND REALIZE THAT PATIENTS WERE FAR WORSE

03:06PM  7      OFF IN THEIR ABILITY TO FACT CHECK REPRESENTATIONS BY THE

03:06PM  8      DEFENDANT OR DO ANYTHING OTHER THAN JUST RELY ON INFORMATION

03:06PM  9      PUT OUT BY THE COMPANY.

03:06PM 10          LET'S TALK NEXT ABOUT ANOTHER DEFENSE THEME RELATING TO

03:06PM 11      CLAIMS OF TRADE SECRET PROTECTION.

03:06PM 12          YOU'VE HEARD EVIDENCE IN THE TRIAL ABOUT SECRETIVE

03:06PM 13      PRACTICES AT THERANOS AND A LOT OF THE EVIDENCE AND TESTIMONY

03:06PM 14      FROM VICTIMS HAS RELATED TO INFORMATION THAT WAS WITHHELD FROM

03:06PM 15      THEM, FACTS THAT THEY DID NOT GET, THINGS THAT MS. HOLMES DID

03:06PM 16      NOT TELL THEM.

03:06PM 17          THE DEFENSE WOULD LIKE YOU TO BELIEVE THAT IN EVERY CASE,

03:06PM 18      EVERY TIME INFORMATION WAS WITHHELD FROM A VICTIM, IT WAS

03:07PM 19      SIMPLY A GOOD FAITH EFFORT TO PROTECT THE COMPANY'S TRADE

03:07PM 20      SECRETS.

03:07PM 21          THAT DEFENSE DOESN'T HOLD WATER, AND HERE'S WHY:

03:07PM 22          FIRST OF ALL, THE EVIDENCE SHOWS YOU SOME CONTRADICTORY OR

03:07PM 23      IRRATIONAL PRACTICES HERE.  YOU SAW THAT THERANOS WAS QUITE

03:07PM 24      AGGRESSIVE IN GETTING EMPLOYEES AND OTHERS TO SIGN CDA'S, OR

03:07PM 25      CONFIDENTIAL DISCLOSURE AGREEMENTS.  THAT WAS THE PRIMARY

```
03:07PM   1    MECHANISM, OR A PRIMARY MECHANISM, THAT THE COMPANY USED TO

03:07PM   2    PROTECT ITS CONFIDENTIAL INFORMATION.

03:07PM   3         THE DRAFT POLICY THAT MS. HOLMES READ THAT WAS INTRODUCED

03:07PM   4    INTO EVIDENCE SPECIFICALLY HIGHLIGHTED THE USE OF CDA'S AND

03:07PM   5    NOTED THAT THAT WAS AN ACCEPTABLE APPROACH.

03:07PM   6         SO THERE WAS NO NEED TO DECEIVE INVESTORS OR ANYONE ELSE

03:07PM   7    WHEN SIMPLY HAVING THEM ENTER INTO THESE AGREEMENTS WOULD HAVE

03:07PM   8    BEEN ADEQUATE TO PROTECT THE COMPANY'S INTELLECTUAL PROPERTY.

03:07PM   9         YOU SAW IN THE EVIDENCE THAT CRITICAL EVIDENCE WAS

03:08PM  10    WITHHELD EVEN FROM THOSE UNDER CDA'S OR OTHER OBLIGATIONS TO

03:08PM  11    KEEP SECRETS.  FOR EXAMPLE, WALGREENS AND THE BOARD OF

03:08PM  12    DIRECTORS, WHO HAD A DUTY AND AN INCENTIVE TO KEEP THERANOS'S

03:08PM  13    SECRETS, STILL WERE NOT TOLD THE FULL EXTENT OF THE COMPANY'S

03:08PM  14    RELIANCE ON THIRD PARTY DEVICES.

03:08PM  15         THAT'S BECAUSE THIS WASN'T ABOUT PROTECTING TRADE SECRETS.

03:08PM  16         A TRADE SECRET, AS YOU'VE HEARD, IS ABOUT PROTECTING HOW A

03:08PM  17    BUSINESS DOES SOMETHING.  IT'S NOT ABOUT HIDING WHAT A BUSINESS

03:08PM  18    CANNOT DO.

03:08PM  19         YOU HEARD MS. HOLMES TALK ABOUT HEARING FROM SENATOR NUNN

03:08PM  20    ABOUT HIS EXPERIENCE ON THE BOARD OF COCA-COLA AND THE EFFORTS

03:08PM  21    THAT THAT COMPANY TOOK TO PROTECT THE SECRET FORMULA FOR COKE.

03:08PM  22         SO THE COKE FORMULA IS A CLASSIC EXAMPLE OF A TRADE

03:08PM  23    SECRET.  IT'S SOMETHING THAT A COMPANY CAN DO, KNOWLEDGE THAT

03:08PM  24    IT HAS THAT IT NEEDS TO PROTECT, OTHERWISE ITS COMPETITORS WILL

03:09PM  25    BE ABLE TO COPY IT.
```

ER-6864

03:09PM 1        THERANOS, THOUGH, WAS NO COCA-COLA.

03:09PM 2        IF THERANOS WERE A SODA COMPANY, IT WOULD BE A COMPANY

03:09PM 3    THAT COULD ONLY MAKE A FEW FLAVORS, AND FOR THE REST REPACKAGED

03:09PM 4    SODA FROM ANOTHER COMPANY AND SOLD IT AS ITS OWN.

03:09PM 5        THAT PRACTICE, THE PRACTICE OF TAKING A PRODUCT BY ANOTHER

03:09PM 6    AND PASSING IT OFF AS SOMETHING THAT YOU COULD DO, IS NO TRADE

03:09PM 7    SECRET.  THAT'S NOT THE KIND OF THING THAT NEEDS TO BE

03:09PM 8    PROTECTED BECAUSE IF A COMPETITOR FINDS OUT ABOUT IT, THEY'LL

03:09PM 9    START DOING IT.

03:09PM 10       IT'S A SECRET THAT NEEDS TO BE PROTECTED BECAUSE IF IT

03:09PM 11   GETS OUT, IT WILL MAKE THE COMPANY LOOK BAD, IT WILL EXPOSE THE

03:09PM 12   COMPANY AS A FRAUD, IT WILL MAKE THE COMPANY APPEAR LESS

03:09PM 13   SPECIAL, AND THAT WAS WHAT MS. HOLMES WAS TRYING TO AVOID.

03:09PM 14       AND THAT BRINGS US TO PROBABLY THE BIGGEST PROBLEM WITH

03:09PM 15   THIS DEFENSE THEORY.

03:09PM 16       THE DEFENSE WANTS YOU TO FOCUS ON THE MODIFICATIONS THAT

03:09PM 17   WERE MADE TO THIRD PARTY DEVICES AND VIEW THOSE AS TRADE

03:10PM 18   SECRETS.

03:10PM 19       BUT DON'T FORGET THAT MS. HOLMES ALSO WITHHELD INFORMATION

03:10PM 20   ABOUT THE NONMODIFIED THIRD PARTY DEVICES THAT WERE IN USE AT

03:10PM 21   THERANOS.

03:10PM 22       THERE IS NO ARGUMENT, THERE CAN BE NO ARGUMENT THAT THE

03:10PM 23   USE OF NONMODIFIED THIRD PARTY DEVICES WAS A TRADE SECRET.

03:10PM 24   THAT'S SOMETHING THAT ANY LAB COULD DO.  IT'S SOMETHING THAT

03:10PM 25   YOU KNOW THAT QUEST AND LABCORP WERE DOING.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                         9303

03:10PM   1        THE PRACTICE OF BUYING A SIEMENS ANALYZER AND USING IT TO

03:10PM   2   ANALYZE BLOOD IS NOT A TRADE SECRET.  THAT'S WHAT EVERY LAB

03:10PM   3   DOES.

03:10PM   4        THE FACT THAT MS. HOLMES TOOK STEPS TO HIDE THAT, THE FACT

03:10PM   5   THAT SHE DID NOT WANT INVESTORS AND THE PUBLIC TO KNOW THAT THE

03:10PM   6   COMPANY WAS RELYING ON ANY NON-THERANOS DEVICES SHOWS THAT THIS

03:10PM   7   IS NOT JUST ABOUT PROTECTING THOSE MODIFICATIONS.  THIS IS

03:10PM   8   ABOUT BUILDING UP THE EDISON.  THIS IS ABOUT LEAVING PEOPLE

03:10PM   9   WITH THE FALSE IMPRESSION THAT THE EDISON IS A DO-IT-ALL

03:10PM  10   DEVICE, AND THAT NOTHING ELSE IS NEEDED TO RUN THE LAB.

03:10PM  11        YOU ALSO HAVEN'T HEARD ANY EVIDENCE THAT TRADE SECRETS

03:11PM  12   CREATE A LICENSE TO LIE OR TO DECEIVE PEOPLE.

03:11PM  13        TO THE EXTENT MS. HOLMES FELT THAT THERE WERE TRADE

03:11PM  14   SECRETS THAT SHE NEEDED TO PROTECT, THERE WERE OBVIOUS, SIMPLE

03:11PM  15   WAYS TO DO THAT THAT DIDN'T INVOLVE DECEPTION.

03:11PM  16        FOR EXAMPLE, IN ANY CONVERSATION IF SHE WAS ASKED A

03:11PM  17   QUESTION THAT SHE COULDN'T ANSWER IN HER MIND BECAUSE OF TRADE

03:11PM  18   SECRET RESTRICTIONS, SHE COULD HAVE SIMPLY SAID, "I'M SORRY, I

03:11PM  19   CAN'T GET INTO THAT BECAUSE OF TRADE SECRET PURPOSES."  OR "I'M

03:11PM  20   NOT WILLING TO TALK ABOUT" FILL IN THE BLANK.

03:11PM  21        THAT WOULD HAVE BEEN AN APPROACH THAT WOULD HAVE PRESERVED

03:11PM  22   ANY TRADE SECRETS THAT SHE FELT NEEDED TO BE PRESERVED, WHILE

03:11PM  23   AT THE SAME TIME AVOIDING THE PROBLEM OF CREATING A FALSE

03:11PM  24   IMPRESSION IN SOMEONE'S MIND.

03:11PM  25        THE REASON SHE DIDN'T TAKE THAT SIMPLE APPROACH IS BECAUSE

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC          9304

03:11PM  1    CREATING THAT FALSE IMPRESSION WAS HER GOAL.  THAT'S WHAT SHE

03:11PM  2    WAS SETTING OUT TO DO.

03:12PM  3        MR. DOWNEY HIGHLIGHTED FOR YOU THE FACT THAT DURING THE

03:12PM  4    RELEVANT TIME PERIOD AND IN THE COURSE OF MS. HOLMES'S DEALINGS

03:12PM  5    WITH THERANOS, SHE NEVER SOLD ANY OF HER SHARES AND DIDN'T

03:12PM  6    OBTAIN ANY PERSONAL ENRICHMENT THAT WAY.

03:12PM  7        YOU ALSO HEARD THAT THERE WAS A REASON WHY SHE DIDN'T SELL

03:12PM  8    SHARES, AND IT RELATED TO HER CONTROL OF THE COMPANY.

03:12PM  9        WHEN SHE WAS ON THE STAND, SHE TESTIFIED THAT SHE OWNED

03:12PM  10   APPROXIMATELY 50 PERCENT OF THERANOS.  IT CAME OUT ON CROSS

03:12PM  11   THAT IT WAS SLIGHTLY MORE THAN 50 PERCENT, GIVING HER A

03:12PM  12   CONTROLLING SHARE OF THE COMPANY.

03:12PM  13       YOU HEARD ABOUT HOW THE NATURE OF THOSE SHARES GAVE HER

03:12PM  14   DISPROPORTIONATE VOTING POWER THAT ALLOWED HER TO DO WHAT SHE

03:12PM  15   WANTED ESSENTIALLY IN THE COMPANY, INCLUDING FIRING THE BOARD,

03:12PM  16   FIRING OTHERS, AND THAT POWER WAS DERIVED FROM THE SHARES THAT

03:12PM  17   SHE HELD.

03:12PM  18       SO IT IS REASONABLE FOR YOU TO INFER THAT ONE REASON WHY

03:13PM  19   SHE DIDN'T LET GO OF ANY OF THOSE SHARES IS THAT SHE NEEDED TO

03:13PM  20   HOLD ON TO THAT CONTROL OF THE COMPANY NOT ONLY SO THAT SHE

03:13PM  21   COULD RUN IT THE WAY SHE CHOSE, BUT ALSO SO THAT SHE COULD KEEP

03:13PM  22   CONTROL OF ACCESS TO INFORMATION THE WAY THAT THE EVIDENCE

03:13PM  23   SHOWS THAT SHE DID.

03:13PM  24       IN CONNECTION WITH THIS ARGUMENT, YOU SHOULD ALSO KEEP IN

03:13PM  25   MIND WHAT I EXPECT THE COURT WILL GIVE YOU AS JURY INSTRUCTION

03:13PM  1    NUMBER 27 THAT TELLS YOU IN CLEAR TERMS THAT IT IS NOT

03:13PM  2    NECESSARY THAT MS. HOLMES MADE A PROFIT OR THAT ANYONE ACTUALLY

03:13PM  3    SUFFERED A LOSS.

03:13PM  4         SO YOU ARE NOT REQUIRED TO FIND THAT MS. HOLMES ACTUALLY

03:13PM  5    MADE A FINANCIAL PROFIT FROM THIS FRAUD OR THAT IT WAS

03:13PM  6    SUCCESSFUL IN ORDER TO CONVICT.  THAT IS NOT AN ELEMENT THAT

03:13PM  7    THE GOVERNMENT HAS TO PROVE.

03:13PM  8         THERE WERE ALSO BENEFITS FLOWING TO MS. HOLMES OTHER THAN

03:14PM  9    MONEY.  SHE HAD A SUBSTANTIAL SALARY TO BE SURE.

03:14PM  10        BUT SHE ALSO BENEFITED FROM THE ATTENTION, THE ACCOLADES,

03:14PM  11   THE FAME AND THE PROMINENCE THAT BEING THE CEO OF THIS

03:14PM  12   SUCCESSFUL COMPANY BROUGHT HER.

03:14PM  13        AND THERE'S ANOTHER REASON WHY SHE DIDN'T CASH OUT, AND

03:14PM  14   THAT RELATES TO HER ULTIMATE VISION AND THE LEVEL OF WEALTH AND

03:14PM  15   SUCCESS THAT SHE WANTED TO ACHIEVE, AND WE CAN SEE THAT IN THIS

03:14PM  16   TEXT MESSAGE AT EXHIBIT 5387D, PAGE 19.

03:14PM  17        AND IN NOVEMBER OF 2013 SUNNY TEXTS MS. HOLMES, "THEN

03:14PM  18   LET'S BUILD THE TRUE AMERICAN EMPIRE.  A MONOPOLY.  OUR

03:14PM  19   OBLIGATION TO U.S.A."

03:14PM  20        AND MS. HOLMES RESPONDS, "THAT'S WHAT WE'RE DOING."

03:14PM  21        IT'S NOT DISPUTED.  MS. HOLMES APPARENTLY, EVIDENTLY, WAS

03:14PM  22   NOT IN THIS SIMPLY TO GET MONEY.

03:14PM  23        SHE WANTED TO BUILD THE TRUE AMERICAN EMPIRE.  SHE WANTED

03:14PM  24   HER COMPANY TO BE A MONOPOLY, AND THE SUCCESS OF THE COMPANY

03:15PM  25   TURNED OUT TO BE THE MOTIVE FOR THE CRIME THAT SHE COMMITTED,

03:15PM   1    AND THAT'S IMPORTANT FOR YOU TO REALIZE.

03:15PM   2        A FRAUD COMMITTED FOR THE SAKE OF A COMPANY'S SUCCESS IS

03:15PM   3    STILL A FRAUD.  IT DOES NOT NEED TO BE THE CASE THAT A

03:15PM   4    DEFENDANT IS MOTIVATED BY PERSONAL ENRICHMENT.  THAT'S NOT AN

03:15PM   5    ELEMENT.

03:15PM   6        AND WHAT'S MORE, YOU DON'T NEED TO MAKE ANY FINDINGS AS TO

03:15PM   7    MOTIVE IN THIS CASE.  WE TALK ABOUT MOTIVE BECAUSE IT'S HELPFUL

03:15PM   8    FOR YOU TO UNDERSTAND WHY CERTAIN DECISIONS WERE MADE BY THE

03:15PM   9    DEFENDANT, BUT YOU DON'T NEED TO MAKE ANY CONCLUSIONS ABOUT

03:15PM  10    MOTIVE, YOU DON'T NEED TO AGREE ON WHAT MS. HOLMES'S MOTIVE WAS

03:15PM  11    IN ORDER TO RENDER YOUR VERDICT.

03:15PM  12        LET'S TALK NOW ABOUT SUNNY BALWANI.

03:15PM  13        YOU HEARD IN MS. HOLMES'S TESTIMONY ABOUT HER EXPERIENCE

03:15PM  14    IN HER RELATIONSHIP WITH MR. BALWANI.

03:15PM  15        I WONDER IF ANY OF YOU FEEL LIKE THAT TESTIMONY MAKES YOUR

03:16PM  16    JOB MORE DIFFICULT OR MORE COMPLICATED?

03:16PM  17        IT'S UNDERSTANDABLE IF IT DOES FOR A COUPLE OF REASONS:

03:16PM  18        FIRST, WE KNOW THAT HEARING ABOUT SOMEONE HAVING GONE

03:16PM  19    THROUGH A PAINFUL EXPERIENCE IS DIFFICULT.  IT'S DIFFICULT FOR

03:16PM  20    US TO SIT AND LISTEN TO SOMEONE TALK ABOUT SOMETHING PAINFUL OR

03:16PM  21    HURTFUL THAT THEY HAVE BEEN THROUGH.  IT'S NATURAL TO HAVE A

03:16PM  22    REACTION TO HEARING SOMEONE TALK ABOUT SOMETHING LIKE THAT.

03:16PM  23    IT'S NATURAL TO HAVE A STRONG REACTION TO SOMETHING LIKE THAT.

03:16PM  24        SO THAT'S ONE WAY THAT HEARING THAT TESTIMONY MIGHT MAKE

03:16PM  25    YOUR JOB AS JURORS MORE DIFFICULT.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9307

03:16PM   1        THE SECOND WAY IT MIGHT MAKE YOU FEEL THAT IT MAKES YOUR

03:16PM   2   JOB MORE COMPLICATED IS THAT YOU MIGHT BE WONDERING HOW

03:16PM   3   MS. HOLMES'S CLAIMS OF ABUSE AFFECTS YOUR ANALYSIS OF THE FRAUD

03:16PM   4   IN THIS CASE, OR WHETHER IT AFFECTS THE ANALYSIS AT ALL.

03:17PM   5        A NATURAL STARTING POINT MIGHT BE TO TRY TO DETERMINE WHAT

03:17PM   6   THE ANSWER IS TO THE FACTUAL QUESTION OF WHAT REALLY HAPPENED

03:17PM   7   BETWEEN MS. HOLMES AND MR. BALWANI.

03:17PM   8        IN THAT RESPECT, I'LL DIRECT YOU TO TWO JURY INSTRUCTIONS.

03:17PM   9   THIS IS JURY INSTRUCTION NUMBER 4 THAT SAYS, "MS. HOLMES HAS

03:17PM  10   TESTIFIED."  AND IT DIRECTS YOU TO TREAT THIS TESTIMONY JUST AS

03:17PM  11   YOU WOULD THE TESTIMONY OF ANY OTHER WITNESS.

03:17PM  12        JURY INSTRUCTION NUMBER 9 MAKES IT CLEAR THAT YOUR JOB IS

03:17PM  13   TO JUDGE THE CREDIBILITY OF WITNESSES AND IT TELLS YOU THAT

03:17PM  14   "YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

03:17PM  15   NONE OF IT."

03:17PM  16        AND IT INSTRUCTS YOU TO CONSIDER THINGS LIKE "THE

03:17PM  17   WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, AND WHETHER

03:17PM  18   OTHER EVIDENCE CONTRADICTED THE WITNESS'S TESTIMONY."

03:17PM  19        IN CHOOSING WHETHER TO BELIEVE PART OR ALL OF MS. HOLMES'S

03:18PM  20   TESTIMONY, YOU SHOULD ADHERE TO THESE INSTRUCTIONS AND YOU

03:18PM  21   SHOULD TAKE INTO ACCOUNT EVERYTHING YOU KNOW ABOUT THE FACTS OF

03:18PM  22   THIS CASE.

03:18PM  23        THAT SAID, YOU NEED TO MAKE UP YOUR OWN MINDS ABOUT WHAT

03:18PM  24   HAPPENED HERE, AND WHEN ALL IS SAID AND DONE, YOU MAY END UP

03:18PM  25   FEELING LIKE YOU'RE NOT IN A POSITION TO MAKE CONCLUSIONS ABOUT

ER-6870

03:18PM  1   EXACTLY WHAT HAPPENED BETWEEN THE DEFENDANT AND MR. BALWANI.

03:18PM  2        THERE IS EXTENSIVE EVIDENCE IN THE RECORD OF THE CHARGED

03:18PM  3   FRAUD IN THIS CASE.  THERE IS MUCH LESS EVIDENCE ABOUT WHAT

03:18PM  4   HAPPENED BETWEEN MS. HOLMES AND MR. BALWANI IN THEIR PERSONAL

03:18PM  5   RELATIONSHIP.

03:18PM  6        SO THIS IS A CRITICAL THING TO UNDERSTAND.  YOU DO NOT

03:18PM  7   NEED TO REACH A CONCLUSION REGARDING WHAT HAPPENED WITH

03:18PM  8   MS. HOLMES AND MR. BALWANI IN ORDER TO RENDER YOUR VERDICT IN

03:18PM  9   THIS CASE.

03:18PM 10        IT'S IMPORTANT TO NOTE THAT THERE'S NO EVIDENCE HERE

03:18PM 11   CONNECTING THOSE ALLEGATIONS OF ABUSE WITH THE ACTUAL CHARGED

03:18PM 12   CONDUCT.

03:19PM 13        EVEN MS. HOLMES HERSELF WHEN SHE WAS ON THE STAND DIDN'T

03:19PM 14   MAKE THAT CONNECTION FOR YOU.  THERE'S NO EVIDENCE REGARDING A

03:19PM 15   LINK BETWEEN WHAT MR. BALWANI AND MS. HOLMES'S RELATIONSHIP WAS

03:19PM 16   LIKE AND THE CONDUCT THAT SHE'S CHARGED WITH COMMITTING.

03:19PM 17        ON THE SCREEN YOU'LL SEE A PORTION OF MS. HOLMES'S

03:19PM 18   TESTIMONY WHERE SHE WAS ASKED, "ARE YOU SAYING THAT MR. BALWANI

03:19PM 19   FORCED YOU TO MAKE THE STATEMENTS TO INVESTORS THAT YOU MADE

03:19PM 20   DURING THE COURSE OF THIS CASE?"

03:19PM 21        AND SHE SAYS "NO."

03:19PM 22        THIS IS HER LAWYER QUESTIONING HER.

03:19PM 23        SHE'S ASKED, "ARE YOU SAYING THAT HE FORCED YOU TO MAKE

03:19PM 24   CERTAIN STATEMENTS TO JOURNALISTS THAT WE'VE HEARD ABOUT DURING

03:19PM 25   THE COURSE OF THIS CASE?"

03:19PM    1          SHE ANSWERS, "NO."

03:19PM    2          SHE ALSO DENIED THAT MR. BALWANI CONTROLLED HER

03:19PM    3     INTERACTIONS WITH, FOR EXAMPLE, WALGREENS AND SAFEWAY

03:19PM    4     EXECUTIVES.

03:19PM    5          AND FINALLY, SHE DENIES THAT MR. BALWANI CONTROLLED HER

03:19PM    6     INTERACTIONS WITH MEMBERS OF THE THERANOS BOARD IN THE RELEVANT

03:19PM    7     TIME PERIOD.

03:20PM    8          WHEN ASKED WHAT IMPACT HER PERSONAL RELATIONSHIP WITH

03:20PM    9     MR. BALWANI HAD ON HER WORK AT THE COMPANY, SHE SAID SHE DIDN'T

03:20PM   10     KNOW AND THAT SHE FULLY DIDN'T UNDERSTAND THE IMPACT.

03:20PM   11          THAT WILL LEAVE YOU WONDERING WHY MS. HOLMES TESTIFIED

03:20PM   12     ABOUT THOSE ALLEGATIONS WHEN SHE WAS ON THE STAND.  BUT IN THE

03:20PM   13     ABSENCE OF EVIDENCE, IN THE ABSENCE OF ANY EVIDENCE LINKING

03:20PM   14     THAT EXPERIENCE TO THE CHARGED CONDUCT, YOU SHOULD PUT IT OUT

03:20PM   15     OF YOUR MIND, AND I'LL SHOW YOU AN INSTRUCTION THAT IS RELEVANT

03:20PM   16     TO THAT IN A MOMENT.

03:20PM   17          SO THE IMPORTANT QUESTION THEN IS, WHAT WAS MR. BALWANI'S

03:20PM   18     ROLE IN THE CHARGED CONDUCT?  HOW DID HIS INVOLVEMENT RELATE TO

03:20PM   19     THE CRIME THAT IS AT ISSUE HERE?

03:20PM   20          FIRST OF ALL, IT'S IMPORTANT TO NOTE THAT THE WITNESSES IN

03:20PM   21     THIS CASE, FROM FORMER EMPLOYEES TO OUTSIDERS WHO DEALT WITH

03:20PM   22     THERANOS, CONSISTENTLY TESTIFIED THAT THEY UNDERSTOOD

03:21PM   23     MS. HOLMES WAS IN CHARGE OF THE COMPANY AND EVEN HAD AUTHORITY

03:21PM   24     OVER MR. BALWANI.

03:21PM   25          MS. HOLMES ADMITTED THAT IN HER TESTIMONY, THAT THERE WERE

03:21PM   1    ASPECTS OF THE BUSINESS RELATIONSHIP WHERE MR. BALWANI DEFERRED

03:21PM   2    TO HER, AND SPECIFICALLY SHE CONFIRMED THAT MR. BALWANI

03:21PM   3    DEFERRED TO HER ON ASPECTS OF INVENTIONS AND DEVICES AT

03:21PM   4    THERANOS.

03:21PM   5        REMEMBER ESPECIALLY THAT THERE'S NO EVIDENCE IN THIS CASE

03:21PM   6    THAT MR. BALWANI EVER EXPRESSLY ORDERED MS. HOLMES TO BE

03:21PM   7    DISHONEST.

03:21PM   8        IN FACT, THERE ARE EXAMPLES CITED DURING THE GOVERNMENT'S

03:21PM   9    CLOSING OF INSTANCES WHERE MR. BALWANI EITHER CAUTIONED

03:21PM  10    MS. HOLMES AWAY FROM BEING DISHONEST ABOUT SOMETHING, OR

03:21PM  11    EXPRESSED CONCERN ABOUT AN UNTRUE STATEMENT THAT SHE HAD MADE.

03:21PM  12        NOW, NO ONE IS SAYING THAT MR. BALWANI WAS A GOOD

03:21PM  13    INFLUENCE IN THIS CASE.  HE'S THE COCONSPIRATOR.  HE WAS PART

03:22PM  14    OF THE SCHEME TO DEFRAUD.

03:22PM  15        BUT THE EVIDENCE SHOWED THAT MS. HOLMES DID NOT NEED

03:22PM  16    ENCOURAGEMENT FROM MR. BALWANI IN ORDER TO BE DISHONEST AND

03:22PM  17    DECEPTIVE.

03:22PM  18        THE EVIDENCE ALSO SHOWED THAT MR. BALWANI COMMUNICATED

03:22PM  19    COMPLAINTS TO MS. HOLMES ABOUT THERANOS PRACTICES AND

03:22PM  20    TECHNOLOGY.  FOR EXAMPLE, MR. BALWANI WAS EVEN CRITICAL OF

03:22PM  21    DAN YOUNG TO MS. HOLMES IN AUGUST 2014.  IN RESPONSE TO AN

03:22PM  22    EMAIL FROM DR. YOUNG ABOUT TRYING TO ADDRESS ANOTHER ONGOING

03:22PM  23    PROBLEM WITH THERANOS'S ACCURACY AND RELIABILITY, MR. BALWANI

03:22PM  24    REMARKS, "ALWAYS ANOTHER STUDY AFTER THE FACT."

03:22PM  25        THIS IS A COMMENT BY MR. BALWANI EXPRESSING SKEPTICISM AND

03:22PM  1    WEARINESS OF THE FACT THAT THEY KEEP HAVING THESE PROBLEMS AND

03:22PM  2    DR. YOUNG ALWAYS PROPOSES ANOTHER STUDY THAT PURPORTS TO ANSWER

03:23PM  3    IT.

03:23PM  4         THIS WAS A PATTERN THAT MS. HOLMES OBVIOUSLY SAW.  IT'S

03:23PM  5    SOMETHING THAT SHE SHOULD HAVE REALIZED MEANT THAT THERE WAS A

03:23PM  6    FUNDAMENTAL FLAW WITH THE TECHNOLOGY OF THE COMPANY.

03:23PM  7         CONSIDER ALSO THE REASON WHY MS. HOLMES AND MR. BALWANI

03:23PM  8    ULTIMATELY SEPARATED TIES.  THE REASON WAS BUSINESS RELATED.

03:23PM  9         WHEN MS. HOLMES REALIZED THAT MR. BALWANI WAS NOT THE

03:23PM 10    BUSINESS PERSON SHE THOUGHT, SHE ENDED THE RELATIONSHIP AND

03:23PM 11    THEY PARTED WAYS.

03:23PM 12         THE FACT THAT THAT RELATED TO SOMEBODY'S SKILLS AS A

03:23PM 13    BUSINESS PERSON AND THE EFFECT HE HAD ON THE COMPANY AGAIN JUST

03:23PM 14    SHOWS THAT MS. HOLMES WAS PRIORITIZING THERANOS.  THAT WAS THE

03:23PM 15    MOTIVE HERE FOR EVERYTHING SHE DID, INCLUDING THE FRAUD.

03:23PM 16         WHEN IT COMES TO MR. BALWANI'S ROLE AND THE THINGS THAT HE

03:24PM 17    DID, KEEP IN MIND THE FOLLOWING JURY INSTRUCTIONS:  NUMBERS 19,

03:24PM 18    24, AND 25.  THESE ALL RELATE TO WAYS THAT MS. HOLMES IS

03:24PM 19    ACCOUNTABLE UNDER CERTAIN CONDITIONS FOR ACTIONS TAKEN BY A

03:24PM 20    COCONSPIRATOR OR A PERSON WHO COMMIT THE CRIME AS A PRINCIPAL

03:24PM 21    OR A COSCHEMER.

03:24PM 22         SO AT THE END OF THE DAY, WHAT EFFECT SHOULD MS. HOLMES'S

03:24PM 23    TESTIMONY ABOUT THE RELATIONSHIP HAVE ON YOU?

03:24PM 24         WELL, AS I MENTIONED BEFORE, IT'S NATURAL IF, UPON HEARING

03:24PM 25    SOMETHING LIKE THAT, YOU FEEL SYMPATHY FOR MS. HOLMES.  IF YOU

03:25PM   1    BELIEVE THAT THAT'S WHAT HAPPENED, IT'S NATURAL AND MAYBE

03:25PM   2    UNAVOIDABLE FOR YOU TO FEEL THAT WAY.

03:25PM   3          THE MORE IMPORTANT QUESTION, THOUGH, IS WHAT DO YOU DO

03:25PM   4    WITH THAT SYMPATHY?  HOW SHOULD IT AFFECT YOUR DELIBERATIONS

03:25PM   5    AND YOUR EXAMINATION OF THIS CASE?

03:25PM   6          THE COURT'S INSTRUCTIONS HAVE AN ANSWER FOR YOU THERE.

03:25PM   7    JURY INSTRUCTION NUMBER 1 TELLS YOU THAT YOU SHOULD "NOT ALLOW

03:25PM   8    YOURSELF TO BE INFLUENCED BY PERSONAL LIKES OR DISLIKES,

03:25PM   9    SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION, OR BIASES, INCLUDING

03:25PM  10    UNCONSCIOUS BIASES."

03:25PM  11          SYMPATHY, ACCORDING TO THIS INSTRUCTION, HAS NO PART IN

03:25PM  12    YOUR DELIBERATIONS.

03:25PM  13          THE QUESTION FOR YOU IS A FACTUAL ONE OF WHETHER

03:25PM  14    MS. HOLMES COMMITTED THE CHARGED CRIMES, WHETHER THE ELEMENTS

03:25PM  15    ARE SATISFIED.  YOU SHOULD PUT ANYTHING BESIDES THAT ASIDE.

03:25PM  16          LET'S TALK ABOUT ONE MORE DEFENSE THEME, WHICH IS CONDUCT

03:25PM  17    THAT MS. HOLMES TOOK IN 2016 AND ONWARD.

03:26PM  18          THE DEFENSE WANTS TO POINT TO THIS CONDUCT AS EVIDENCE OF

03:26PM  19    MS. HOLMES'S MENTAL STATE DURING THE RELEVANT TIME PERIOD, WHEN

03:26PM  20    THE FRAUD WAS TAKING PLACE.  YOU SHOULD BE SKEPTICAL OF THAT.

03:26PM  21          THIS IS A TIME PERIOD AFTER "THE WALL STREET JOURNAL"

03:26PM  22    EXPOSED FALSE INFORMATION THAT THE COMPANY HAD PUT FORWARD.

03:26PM  23          EVERYTHING THAT MS. HOLMES AND THERANOS DID DURING THIS

03:26PM  24    TIME PERIOD WAS PR, ORCHESTRATED BY A MULTI-BILLION DOLLAR

03:26PM  25    COMPANY, IN CRISIS MODE.

```
03:26PM   1          THE COMPANY KNEW THAT EVERYONE WAS WATCHING AND THE

03:26PM   2    COMPANY WAS TAKING EFFORTS MOTIVATED BY THAT FACT WITH THE

03:26PM   3    AWARENESS THAT THE WORLD WAS WATCHING AND IT HAD TO TRY TO

03:26PM   4    REHABILITATE ITS REPUTATION AND GET ITSELF BACK ON TRACK.

03:26PM   5          OPTIONS WERE CERTAINLY NARROWED IN THAT 2016 TIME PERIOD.

03:26PM   6          BUT IF YOUR GOAL IS, AS IT SHOULD BE, TO JUDGE

03:26PM   7    MS. HOLMES'S INTENT, THE MOST INFORMATIVE EVIDENCE COMES FROM

03:26PM   8    THE RELEVANT TIME PERIOD BEFORE ALL OF THIS SCRUTINY WAS PLACED

03:27PM   9    ON THE COMPANY.  IT'S AXIOMATIC.  IT'S MOST TELLING WHAT A

03:27PM  10    PERSON DOES WHEN NOBODY IS WATCHING.

03:27PM  11          AFTER "THE WALL STREET JOURNAL" ARTICLE, ALL EYES WERE ON

03:27PM  12    THERANOS AND ACTIONS WERE TAKEN FOR APPEARANCES SAKE.

03:27PM  13          JUDGE MS. HOLMES'S INTENT INSTEAD BY WHAT SHE DID BEFORE

03:27PM  14    SHE KNEW THAT THAT SCRUTINY WAS COMING.

03:27PM  15          IN THIS CASE THE EVIDENCE IS STRONG THAT THE DECEPTION BY

03:27PM  16    MS. HOLMES WAS DELIBERATE.

03:27PM  17          IT'S HARD TO BELIEVE THAT THE FALSE STATEMENTS SHE MADE

03:27PM  18    WERE UNINTENTIONAL OR MISTAKEN WHEN IT HAPPENED AGAIN AND AGAIN

03:27PM  19    OVER YEARS AND WHEN THE RESULT WAS PUTTING HUNDREDS OF MILLIONS

03:27PM  20    OF DOLLARS IN THE ACCOUNT OF HER COMPANY.

03:27PM  21          YOU SAW AND HEARD THROUGHOUT TRIAL, LISTENING TO WITNESSES

03:27PM  22    WHO HAD DEALINGS WITH HER, AND WHEN SHE WAS ON THE STAND THAT

03:27PM  23    SHE IS AN INTELLIGENT, THOUGHTFUL, AND WELL SPOKEN PERSON.

03:28PM  24          AND INTELLIGENT PEOPLE UNDERSTAND THE DIFFERENCE BETWEEN

03:28PM  25    WHAT IS TRUE AND WHAT IS NOT, BETWEEN WHAT IS HAPPENING TODAY
```

03:28PM   1    AND WHAT MIGHT HAPPEN IN THE FUTURE.  THOUGHTFUL PEOPLE LIKE

03:28PM   2    MS. HOLMES THINK CAREFULLY BEFORE THEY SAY SOMETHING, AND WELL

03:28PM   3    SPOKEN PEOPLE LIKE MS. HOLMES HAVE NO TROUBLE COMMUNICATING

03:28PM   4    EXACTLY WHAT THEY MEAN TO COMMUNICATE.

03:28PM   5         BASED ON THAT, YOU KNOW THAT WHEN MS. HOLMES AGAIN AND

03:28PM   6    AGAIN INTENTIONALLY TOLD PEOPLE THAT THERANOS COULD DO

03:28PM   7    SOMETHING THAT IT COULD NOT, THAT THAT WAS ON PURPOSE, AND THAT

03:28PM   8    HER INTENT WAS TO DECEIVE AND TO CHEAT.

03:28PM   9         YOU SAW TWO VARIETIES OF FALSE STATEMENTS IN THIS CASE.

03:28PM  10    SOME WERE SIMPLE LIES.  THE FACT THAT, OR THE CLAIM THAT THE

03:28PM  11    THERANOS ANALYZER HAD BEEN USED IN THE BATTLEFIELD OR SENT TO

03:28PM  12    AFGHANISTAN, THOSE THINGS SIMPLY WERE NOT TRUE.

03:28PM  13         THERE WERE ALMOST MORE COMPLICATED HALF-TRUTHS THAT YOU

03:29PM  14    SAW, AND WE'LL TALK ABOUT THOSE IN A MOMENT, BUT THOSE ARE

03:29PM  15    PROPERLY PART OF YOUR EXAMINATION AS WELL.

03:29PM  16         LET'S TALK BRIEFLY ABOUT THE WIRE FRAUD ELEMENTS.

03:29PM  17         AND NOTICE THE LANGUAGE AT THE BOTTOM OF THAT FIRST

03:29PM  18    PARAGRAPH THAT SAYS "DECEITFUL STATEMENTS OF HALF-TRUTHS MAY

03:29PM  19    CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS."

03:29PM  20         THAT MEANS THAT WHEN MS. HOLMES SAYS SOMETHING THAT IS

03:29PM  21    ARGUABLY DEFENSIBLE AS TRUE, BUT STILL INTENDED TO GIVE A

03:29PM  22    MISLEADING OR FALSE IMPRESSION, THAT CAN STILL FORM THE BASIS

03:29PM  23    OF A WIRE FRAUD CONVICTION, AND YOU SAW MANY EXAMPLES OF THAT

03:29PM  24    IN THIS CASE.

03:29PM  25         NOTE ALSO THAT THE WIRE ITSELF, THE WIRE TRANSMITTAL NEED

03:29PM   1    NOT BE FALSE OR MISLEADING.  SO THE CONTENT OF THE WIRE NEED

03:29PM   2    NOT BE FALSE, IT ONLY NEEDS TO BE IN FURTHERANCE OF THE SCHEME

03:30PM   3    IN ORDER TO SATISFY THE ELEMENT.

03:30PM   4        SOME OF THE BEST EXAMPLES OF HALF-TRUTHS IN THIS CASE AND

03:30PM   5    INTENTIONALLY MISLEADING STATEMENTS WERE IN THE RECORDINGS THAT

03:30PM   6    ROGER PARLOFF MADE.  AND I'LL JUST REMIND YOU OF A COUPLE.

03:30PM   7        SPEAKING TO MR. PARLOFF ABOUT THE RANGE OF TESTS OFFERED

03:30PM   8    BY THERANOS, YOU'LL RECALL THAT IN ONE OF THE RECORDINGS

03:30PM   9    MR. PARLOFF TALKED ABOUT SEEING 600 TESTS AVAILABLE AT QUEST

03:30PM  10    AND HE ASKED MS. HOLMES WHETHER HER PLATFORM REPLACED ALL OF

03:30PM  11    THOSE, AND SHE SAID, "OUR PLATFORM CAN YIELD -- LET ME THINK OF

03:30PM  12    THE BEST WAY TO SAY THIS.  WE CAN DO ALL OF THOSE TESTS."

03:30PM  13        SHE LATER SAID, "THE REASON I DIDN'T SAY REPLACE IS JUST

03:30PM  14    BECAUSE OF THIS THEME OF -- WELL, YOU KNOW, WE ARE PROCESSING

03:30PM  15    THE SAMPLES A DIFFERENT WAY."

03:30PM  16        SHE'S SAYING THAT THERANOS HAS THE SAME CAPABILITIES AS

03:31PM  17    QUEST BUT THAT THEY'RE PROCESSING THE SAMPLES A DIFFERENT WAY.

03:31PM  18        THAT WAS NOT TRUE.

03:31PM  19        THE COMPANY'S OWN TECHNOLOGY COULD DO FAR LESS, FAR FEWER

03:31PM  20    THAN THE NUMBER OF TESTS THAT QUEST OFFERED, AND TO THE EXTENT

03:31PM  21    THAT IT COULD MATCH THAT QUEST RANGE OF TESTS, IT WAS USING THE

03:31PM  22    SAME METHODS, PROCESSING THE SAMPLES THE SAME WAY.

03:31PM  23        SHE MADE SIMILAR CLAIMS TO MR. PARLOFF SAYING THAT THE

03:31PM  24    COMPANY HAD THE ABILITY TO DO TESTS THAT ARE NOT ON THE

03:31PM  25    WEBSITE, EVEN BEYOND THE HUNDREDS OF TESTS THAT THE COMPANY

03:31PM   1    LISTED ON ITS WEBSITE, SHE CLAIMED THAT THERANOS COULD DO EVEN

03:31PM   2    MORE.

03:31PM   3         ONE OF THE BEST EXAMPLES OF FALSE STATEMENTS BY MS. HOLMES

03:31PM   4    WAS RELATED TO THE NEED FOR VENIPUNCTURE WHEN SHE WAS SPEAKING

03:31PM   5    TO MR. PARLOFF.  THIS IS IN EXHIBIT 5473B2, AND 5474AB2.

03:32PM   6         IN THAT RECORDING YOU HEARD MR. PARLOFF ASK WHY THERANOS

03:32PM   7    EVER DID VENIPUNCTURE?

03:32PM   8         AND MS. HOLMES REPEATEDLY ANSWERS SAMPLE VOLUME AND THE

03:32PM   9    NUMBER OF SAMPLES THAT THE COMPANY COULD PROCESS AT A GIVEN

03:32PM  10    TIME.

03:32PM  11         AT NO POINT DURING THAT CONVERSATION DID SHE TELL

03:32PM  12    MR. PARLOFF THAT THE REASON VENIPUNCTURE WAS NECESSARY WAS THAT

03:32PM  13    THE COMPANY'S OWN TECHNOLOGY COULD NOT DO THE RANGE OF TESTS

03:32PM  14    THAT SHE WAS OFFERING.

03:32PM  15         ONE EXAMPLE THAT YOU SAW DURING TRIAL RELATES TO THAT SAME

03:32PM  16    INTENT BY MS. HOLMES TO CONCEAL THE NEED FOR VENOUS DRAWS FROM

03:32PM  17    VIP'S.  AND THIS WAS IN OCTOBER OF 2014.  MS. HOLMES WAS SHOWN

03:32PM  18    THIS WHEN SHE WAS ON THE STAND.

03:32PM  19         THIS IS A SITUATION WHERE POTENTIAL INVESTORS WERE COMING

03:32PM  20    TO WALGREENS AND THERE WAS A CONVERSATION AT THERANOS,

03:33PM  21    INCLUDING MS. HOLMES, WHERE CHRISTIAN WRITES, "ASSUMPTIONS HERE

03:33PM  22    FROM EAH," MS. HOLMES, "ARE THAT WE MUST NOT DO VENOUS DRAW,

03:33PM  23    AND WE CANNOT TELL THEM THAT THEIR ORDER PROMPTS VENOUS IF IT

03:33PM  24    DOES."

03:33PM  25         THERE'S MORE DISCUSSION ABOUT THE PLAN TO MAKE SURE THAT

03:33PM  1    HAPPENS AND THAT THE NEED FOR VENOUS DRAW IS NOT DISCLOSED TO

03:33PM  2    THESE VIP'S.

03:33PM  3         AND NOTICE AT THE BOTTOM OF THE PAGE.  IT SAYS, "IF THEY

03:33PM  4    NOTICE MISSING TESTS ON THE RECEIPT, THEY MAY ASK THE WAG TECH

03:33PM  5    ABOUT IT."

03:33PM  6         AND IT SAYS, "CIARA WILL ALSO BE ABLE TO COME OUT OF THE

03:33PM  7    DRAW ROOM ONCE CHECK-IN IS COMPLETE AND WELCOME THEM INTO THE

03:33PM  8    ROOM AND DISTRACT FROM LOOKING AT THE RECEIPT."

03:33PM  9         THE EVIDENCE OF DECEPTION IN THIS EMAIL COULD NOT BE

03:33PM 10    CLEARER.  THIS IS OBVIOUSLY AN ATTEMPT BY MS. HOLMES AND OTHERS

03:33PM 11    AT THERANOS TO MAKE SURE THAT VIP'S DON'T FIND OUT ABOUT THE

03:33PM 12    COMPANY'S NEED TO DO VENOUS DRAWS.  THEY WANT THESE VIP'S TO

03:34PM 13    BELIEVE THAT THERANOS'S FINGERSTICK TECHNOLOGY CAN DO THE

03:34PM 14    ENTIRE RANGE OF TESTS, AND FOR THAT REASON THEY'RE READY TO

03:34PM 15    LAUNCH THIS ELABORATE SCHEME THAT INCLUDES A STAFF MEMBER

03:34PM 16    COMING OUT TO DISTRACT THEM FROM LOOKING AT THE RECORD THAT

03:34PM 17    WOULD REVEAL THE SECRET THAT THERANOS IS TRYING TO KEEP.

03:34PM 18         SHORTLY AFTER BEING SHOWN THIS DOCUMENT, MS. HOLMES WAS

03:34PM 19    ASKED BY HER LAWYER WHETHER SHE EVER TRIED TO CONCEAL VENOUS

03:34PM 20    DRAWS FROM VIP'S AND SHE ANSWERED IN THE NEGATIVE.

03:34PM 21         YOU SHOULD THINK STRONGLY ABOUT WHAT THAT ANSWER SAYS

03:34PM 22    ABOUT HER CREDIBILITY AND JUDGE HER STATEMENTS ON THAT BASIS.

03:34PM 23         WHY DID THIS FRAUD WORK?  HOW DID IT WORK?

03:34PM 24         A BIG PART OF IT WAS BORROWED CREDIBILITY.  YOU SAW THAT.

03:35PM 25         MS. HOLMES BORROWED THE CREDIBILITY OF PHARMACEUTICAL

ER-6880

03:35PM 1    COMPANIES, OF WALGREENS, OF THE BOARD AND THE ILLUSTRIOUS

03:35PM 2    MEMBERS OF THE BOARD, OF THE PRESS, AND NOTABLE PUBLICATIONS

03:35PM 3    LIKE "THE WALL STREET JOURNAL" AND "FORTUNE," AND THE MILITARY.

03:35PM 4        BY ATTACHING HERSELF TO THESE INDIVIDUALS AND

03:35PM 5    ORGANIZATIONS, SHE BOLSTERED THERANOS'S OWN CREDIBILITY, AND BY

03:35PM 6    EXAGGERATING THOSE CONTEXTS, SHE CAUSED OTHERS TO BELIEVE THAT

03:35PM 7    THERANOS MUST HAVE THE LEGITIMACY OF THESE OTHER ENTITIES.

03:35PM 8        JUST BRIEFLY TO RESPOND TO WHAT MR. DOWNEY SAID ABOUT SOME

03:35PM 9    OF THE CHARGED COUNTS IN THIS CASE.

03:35PM 10       MR. DOWNEY NOTED THAT COUNT TEN REGARDING ERIN TOMPKINS

03:35PM 11   INVOLVED A TEST THAT WAS NOT PERFORMED ON THERANOS TECHNOLOGY.

03:35PM 12   THIS WAS THE HIV TEST.

03:36PM 13       FIRST OF ALL, NOTE THAT THIS TEST, AS A REMINDER, DOES

03:36PM 14   STATE A REACTIVE RESULT FOR THE HIV ANTIBODY.

03:36PM 15       IN CONTRAST, YOU SAW THAT MS. TOMPKINS LATER HAD A TEST

03:36PM 16   THAT CAME BACK NEGATIVE FOR THE HIV ANTIBODY.

03:36PM 17       THERE'S NO WAY THAT THESE TWO RESULTS CAN BOTH BE CORRECT.

03:36PM 18       AND YOU HEARD MS. TOMPKINS TESTIFY THAT SHE'S NEVER BEEN

03:36PM 19   DIAGNOSED WITH HIV.  SHE'S NEVER BEEN TREATED FOR IT.  SO

03:36PM 20   THERE'S NO REASON THAT THE ANTIBODIES SHOULD BE PRESENT IN HER

03:36PM 21   SYSTEM.

03:36PM 22       THE THERANOS RESULT IS NOT ACCURATE.

03:36PM 23       I'LL REMIND YOU OF EXHIBIT 13333 WHICH RELATES

03:36PM 24   SPECIFICALLY TO PROBLEMS THAT THERANOS HAD WITH THE SECTION OF

03:36PM 25   THE LAB THAT WAS INVOLVED IN RUNNING THE HIV TEST.  SO THIS

ER-6881

03:36PM 1   SHOULD REDUCE YOUR SURPRISE THAT MS. TOMPKINS RECEIVED AN

03:36PM 2   INACCURATE RESULT.

03:36PM 3       I'LL ALSO REMIND YOU THAT THIS SET OF TESTS FROM

03:37PM 4   MS. TOMPKINS ALSO INCLUDED TESTS OTHER THAN HIV, INCLUDING

03:37PM 5   GLUCOSE AS PART OF THE COMPREHENSIVE METABOLIC PANEL, AND THAT

03:37PM 6   PANEL, MS. CHEUNG TESTIFIED, WAS RUN ON THERANOS TECHNOLOGY.

03:37PM 7       SO ANY WIRE THAT THERANOS ENGAGED IN THAT RELATED TO A

03:37PM 8   TEST RUN ON THERANOS TECHNOLOGY WAS IN FURTHERANCE OF THE

03:37PM 9   GENERAL SCHEME TO DEFRAUD PATIENTS BASED ON MS. HOLMES'S

03:37PM 10  KNOWLEDGE THAT THERANOS TECHNOLOGY WAS NOT SUFFICIENTLY

03:37PM 11  ACCURATE AND RELIABLE FOR PATIENT TESTING.

03:37PM 12      SO THERE'S NO REASON WHY THIS IS NOT A VIABLE WIRE FRAUD

03:37PM 13  COUNT ON WHICH YOU SHOULD RETURN A VERDICT OF GUILTY.

03:37PM 14      THIS IS THE LAST INSTRUCTION THAT I'LL HIGHLIGHT WITH YOU.

03:37PM 15  THIS IS THE STANDARD FOR REASONABLE DOUBT.

03:37PM 16      THE DEFENSE SHOWED YOU A DIAGRAM OF AN ASCENDING

03:37PM 17  STAIRCASE.  I'LL JUST REMIND YOU THAT IT'S THE COURT'S JOB TO

03:38PM 18  INSTRUCT YOU ON THE LAW.  THIS IS WHAT I EXPECT THE COURT WILL

03:38PM 19  GIVE YOU BY WAY OF INSTRUCTION.

03:38PM 20      IT TELLS YOU THAT "REASONABLE DOUBT IS PROOF THAT LEAVES

03:38PM 21  YOU FIRMLY CONVINCED THAT MS. HOLMES IS GUILTY."  NOTE THAT "IT

03:38PM 22  IS NOT REQUIRED THAT THE GOVERNMENT PROVE GUILT BEYOND ALL

03:38PM 23  POSSIBLE DOUBT."

03:38PM 24      IT ALSO SAYS THAT "A REASONABLE DOUBT IS A DOUBT BASED ON

03:38PM 25  REASON AND COMMON SENSE AND IS NOT BASED PURELY ON

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9320

03:38PM  1    SPECULATION."

03:38PM  2         ACCORDING TO THAT STANDARD, YOU SHOULD FIND THAT

03:38PM  3    MS. HOLMES COMMITTED THE CHARGED OFFENSES AND RETURN A VERDICT

03:38PM  4    OF GUILTY IN THIS CASE.

03:38PM  5         OVER THE YEARS OF THERANOS'S OPERATIONS, MS. HOLMES HAD

03:38PM  6    MULTIPLE CHANCES TO DO THE RIGHT THING.  BUT AT SO MANY OF THE

03:38PM  7    FORKS IN THE ROAD, SHE CHOSE THE DISHONEST PATH.

03:38PM  8         HOW WOULD THINGS HAVE BEEN DIFFERENT IF MS. HOLMES HAD NOT

03:38PM  9    HAD THE INTENT TO DECEIVE?

03:38PM 10         WELL, SHE WOULD HAVE TOLD INVESTORS, WALGREENS

03:38PM 11    REPRESENTATIVES, AND OTHER VIP VISITORS TO THERANOS THAT THE

03:38PM 12    DEVICES SHE WAS SHOWING THEM IN CONFERENCE ROOMS WEREN'T

03:39PM 13    ACTUALLY THE DEVICES THAT WERE GOING TO BE USED TO RUN THEIR

03:39PM 14    TESTS, THAT THEIR TESTS WOULD BE RUN ON THIRD PARTY DEVICES

03:39PM 15    FROM OTHER COMPANIES.

03:39PM 16         IN INTERVIEWS WITH JOURNALISTS, IN REVIEWING ARTICLES, AND

03:39PM 17    IN SENDING ARTICLES TO THIRD PARTIES LIKE INVESTORS, SHE WOULD

03:39PM 18    HAVE AVOIDED PASSING ALONG KNOWINGLY FALSE INFORMATION.

03:39PM 19         SHE WOULD HAVE GIVEN GOOD FAITH REALISTIC REVENUE

03:39PM 20    PROJECTIONS.

03:39PM 21         SHE WOULD HAVE LISTENED TO LAB DIRECTORS AND OTHER

03:39PM 22    EMPLOYEES ABOUT PROBLEMS WITH THERANOS TECHNOLOGY AND RESPONDED

03:39PM 23    ACCORDINGLY AND STOPPED MAKING REPRESENTATIONS ABOUT THERANOS

03:39PM 24    HAVING SUPERIOR ACCURACY OR THE HIGHEST LEVELS OF QUALITY.

03:39PM 25         SHE WOULD HAVE RESPONDED TO THE DEPARTURE OF

03:39PM  1    ADAM ROSENDORFF BY APPOINTING A COMPETENT AND ATTENTIVE LAB

03:39PM  2    DIRECTOR TO MAKE SURE THAT THOSE PROBLEMS IN THE LAB WERE

03:39PM  3    ADDRESSED.

03:39PM  4        SHE WOULD HAVE REACTED TO PATIENT AND DOCTOR INQUIRIES

03:39PM  5    ABOUT INACTION OR MISSING TEST RESULTS BY NOT WITHHOLDING

03:40PM  6    INFORMATION OR GIVING THEM SCRIPTED ANSWERS THAT AIMED ONLY TO

03:40PM  7    BOLSTER THE COMPANY'S REPUTATION, BUT BY BEING HONEST AND BY

03:40PM  8    DISCONTINUING TESTS WHEN THAT NEEDED TO HAPPEN, AND MUCH SOONER

03:40PM  9    THAT IT DID HAPPEN.

03:40PM 10        THE LIST GOES ON AND ON.

03:40PM 11        ON EACH OF THESE ISSUES MS. HOLMES HAD A CHOICE AND SHE

03:40PM 12    CONSISTENTLY PUT THE REPUTATION OF THE COMPANY OVER WHAT THE

03:40PM 13    LAW REQUIRES AND WHAT PATIENTS AND INVESTORS WERE ENTITLED TO.

03:40PM 14        YOU'VE HEARD HER SAY THAT SHE WISHES SHE HANDLED CERTAIN

03:40PM 15    ISSUES DIFFERENTLY DURING HER TIME AT THE COMPANY.

03:40PM 16        HOW SHOULD THAT AFFECT YOUR THINKING?

03:40PM 17        WELL, YOU SHOULD REALIZE THAT SOMEONE IN MS. HOLMES'S

03:40PM 18    POSITION NATURALLY MIGHT FEEL SOME REGRET ABOUT CHOICES THAT

03:40PM 19    SHE MADE.  IT WOULD BE STRANGE IF SHE DIDN'T GIVEN WHAT HAS

03:40PM 20    RESULTED FROM THOSE CHOICES.

03:40PM 21        BUT YOU SHOULD KEEP IN MIND THAT REGARDLESS OF HOW SHE

03:40PM 22    FEELS TODAY ABOUT HER PAST CHOICES, IT'S THOSE CHOICES

03:41PM 23    THEMSELVES THAT YOU NEED TO FOCUS ON IN DETERMINING WHETHER SHE

03:41PM 24    COMMITTED A CRIME BACK THEN.

03:41PM 25        BECAUSE MS. HOLMES MADE THE CHOICE TO DEFRAUD INVESTORS

03:41PM   1    AND PATIENTS, AND BECAUSE SHE CONSPIRED WITH SUNNY BALWANI TO

03:41PM   2    CARRY OUT THOSE SCHEMES, YOU SHOULD RETURN A VERDICT OF GUILTY

03:41PM   3    ON ALL COUNTS.  THAT'S THE ONLY VERDICT SUPPORTED BY THE

03:41PM   4    EVIDENCE IN THIS CASE.

03:41PM   5         THANK YOU.

03:41PM   6              THE COURT:  THANK YOU, MR. BOSTIC.

03:41PM   7         LADIES AND GENTLEMEN, THAT CONCLUDES THE ARGUMENTS IN THE

03:41PM   8    CASE.  THE ONLY THING REMAINING FOR YOU IS FOR THE COURT TO

03:41PM   9    INSTRUCT YOU, AND IT'S MY INTENT TO DO THAT NOW.

03:41PM  10         WE CAN TAKE A STANDING BREAK.

03:41PM  11         LET ME TELL YOU THAT I EXPECT AND ANTICIPATE THE

03:41PM  12    INSTRUCTIONS WILL REQUIRE PERHAPS 40, 45 MINUTES MAYBE TO

03:41PM  13    COMPLETE.

03:41PM  14         IF ANYONE ON THE JURY WOULD LIKE TO TAKE A BRIEF BREAK OF

03:41PM  15    FIVE TO SEVEN MINUTES, I'M HAPPY TO DO THAT.  IS THERE ANYONE

03:42PM  16    WHO WOULD LIKE TO DO THAT BEFORE I BEGIN?

03:42PM  17         LET'S DO THAT.  I SEE A HAND.  LET'S DO THAT.

03:42PM  18         WE'LL TAKE A BREAK OF ABOUT FIVE, SEVEN MINUTES, AND WE'LL

03:42PM  19    COME BACK.

03:42PM  20         CHELA, CAN YOU GET THIS, PLEASE?

03:42PM  21         AND WE'LL COME BACK AND I'LL INSTRUCT THE JURY.

03:45PM  22         (RECESS FROM 3:42 P.M. UNTIL 3:53 P.M.)

03:53PM  23              THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

03:53PM  24    SEATED.

03:53PM  25         WE ARE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

VENUE:  SAN JOSE

---

UNITED STATES OF AMERICA,

V.

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

CR 18-0258 EJD

<table>
<tr><td><strong>FILED</strong></td></tr>
<tr><td>Jul 28 2020</td></tr>
<tr><td>SUSAN Y. SOONG<br>CLERK, U.S. DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>SAN FRANCISCO</td></tr>
</table>

DEFENDANT(S).

---

# THIRD SUPERSEDING INDICTMENT

118 U.S.C. § 1349 – Conspiracy;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture

---

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

---

Filed in open court this __28th____ day of

___ July   , 2020 _____.

*M Jock*
Clerk

*Sallie Kim*
Magistrate Judge Sallie Kim

Bail, $ __No Process__

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

> **FILED**
>
> Jul 28 2020
>
> SUSAN Y. SOONG
> CLERK, U.S. DISTRICT COURT
> NORTHERN DISTRICT OF CALIFORNIA
> SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 18-258 EJD |
| Plaintiff, | |
| v. | <u>VIOLATIONS</u>: |
| | 18 U.S.C. § 1349 – Conspiracy; 18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture |
| ELIZABETH A. HOLMES and RAMESH "SUNNY" BALWANI, | |
| Defendants. | SAN JOSE VENUE |

**T H I R D   S U P E R S E D I N G   I N D I C T M E N T**

The Grand Jury charges that, at all relevant times:

<u>Introductory Allegations</u>

1.      The defendant Elizabeth A. Holmes ("HOLMES") resided in the Northern District of California, and owned and operated a health care and life sciences company called Theranos, Inc. ("Theranos" or "Company").  HOLMES founded Theranos in 2003, and served in the role of Chief Executive Officer from 2003 through 2018.

2.      The defendant Ramesh "Sunny" Balwani ("BALWANI") resided in the Northern District of California, and was employed by Theranos from September 2009 through 2016.  BALWANI served in various roles at Theranos: as a member of its Board of Directors, as its President, and as its Chief Operating Officer.

THIRD SUPERSEDING INDICTMENT

3.      Theranos was a corporation organized under the laws of the State of Delaware with its principal place of business in Palo Alto, California.  Theranos opened and maintained a corporate bank account in Palo Alto, California at Comerica Bank.  Comerica Bank is headquartered in Dallas, Texas. When Theranos solicited and received financial investments from investors, the money was deposited into its Comerica Bank account.  Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities.

<u>The Business of Theranos</u>

4.      Theranos was a private health care and life sciences company.  Its stated mission was to revolutionize medical laboratory testing through allegedly innovative methods for drawing blood, testing blood, and interpreting the resulting patient data—all for the purpose of improving outcomes and lowering health care costs.

5.      During its first ten years, from approximately 2003 to approximately 2013, Theranos operated in what HOLMES called "stealth mode," with little public attention.  While operating in "stealth mode," Theranos pursued the development of proprietary technology that could run clinical tests using only tiny drops of blood instead of the vials of blood typically drawn from an arm vein for traditional analysis.  Theranos also worked to develop a method for drawing only a few drops of capillary blood from a patient's finger using a small lancet, and collecting and storing that blood in a proprietary device called the "nanotainer."  Theranos's stated goal was to produce a second proprietary device that could quickly and accurately analyze blood samples collected in nanotainers.  Theranos referred to these devices using several terms, including "TSPU" (or "Theranos Sample Processing Unit"), "Edison," and "miniLab."

6.      In or around 2013, Theranos began to publicize its technological advances.  According to Theranos, its proprietary methods and technologies carried several advantages over conventional blood testing.  For example, Theranos claimed that its laboratory infrastructure yielded test results in less time than conventional labs—requiring hours instead of days.  Theranos claimed that its proprietary technology and methods would minimize the risk of human error and generate results with the highest accuracy.  According to Theranos, the small blood sample size required for Theranos's proprietary tests,

THIRD SUPERSEDING INDICTMENT          2

ER-6888

1   and its method of collecting blood by finger stick, would also benefit elderly individuals with collapsed

2   veins, individuals who required frequent blood tests due to chronic health conditions, and any individual

3   who feared needles.  In addition, Theranos claimed that its blood tests provided substantial cost savings,

4   advertising that it billed all of the tests on the Medicare Clinical Laboratory Fee Schedule at rates 50%

5   or more below the published reimbursement rate.

6          7.      Prior to its commercial launch, HOLMES heavily promoted Theranos's supposed

7   technological and operational capabilities.  In a September 2013 press release, Theranos claimed that it

8   had "eliminat[ed] the need for larger needles and numerous vials of blood" by relying instead on

9   samples "taken from a tiny finger stick or a micro-sample taken from traditional methods."  In another

10  press release, dated November 13, 2013, Theranos touted its use of "blood sample[s] as small as a few

11  drops—1/1000th the size of a typical blood draw."  In that same statement, the Company again declared

12  that it had "eliminat[ed] the need for large needles and numerous vials of blood typically required for

13  diagnostic lab testing."

14         8.      In addition to directing the actions of the Company, HOLMES also made statements to

15  the media advertising the capabilities of Theranos's technology.  In an interview for a *Wall Street*

16  *Journal* article published on September 9, 2013, HOLMES said that Theranos could "run any

17  combination of tests, including sets of follow-on tests" at once, very quickly, all from a single small

18  blood sample.

19         9.      Theranos also used its website to increase awareness of its technology.  On its website,

20  Theranos displayed a nanotainer of blood balanced on a fingertip along with the slogan, "one tiny drop

21  changes everything."  The website also assured visitors that "for the first time," Theranos's laboratory

22  could perform tests "quickly and accurately on samples as small as a single drop."

23                         Theranos's Partnership with Walgreens

24         10.     As part of its commercial launch, as early as 2010, Theranos pursued a partnership with

25  national pharmacy chain Walgreens.  On September 9, 2013, Theranos announced that it would be

26  rolling out Theranos "Wellness Centers" inside Walgreens retail locations.  In a press release on that

27  date, Theranos promoted its testing services by stating that "consumers can now complete any clinician-

28  directed lab test with as little as a few drops of blood and results available in a matter of hours."

THIRD SUPERSEDING INDICTMENT            3

Theranos offered tests to the public beginning in late 2013 through its Wellness Centers located in Walgreens stores in Palo Alto, California as well as in Phoenix, Arizona and surrounding areas.

The Scheme to Defraud Investors

11.     From a time unknown but no later than 2010 through 2015, HOLMES and BALWANI, and others known and unknown to the Grand Jury, through their company, Theranos, engaged in a scheme, plan, and artifice to defraud investors as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by making materially false and misleading statements, and failing to disclose material facts with a duty to disclose.

12.     Beginning in approximately 2010, HOLMES and BALWANI made materially false and misleading statements to investors and failed to disclose material facts, using, among other things: (1) false and misleading written and verbal communications; (2) marketing materials containing false and misleading statements; (3) false and misleading financial statements, models, and other information; and (4) false and misleading statements to the media.  HOLMES and BALWANI:

(A) represented to investors that, at the time the statement was made, Theranos's proprietary analyzer—the TSPU, Edison, or miniLab—was presently capable of accomplishing certain tasks, such as performing the full range of clinical tests using small blood samples drawn from a finger stick and producing results that were more accurate and reliable than those yielded by conventional methods—all at a faster speed than previously possible; when, in truth, HOLMES and BALWANI knew that Theranos's proprietary analyzer had accuracy and reliability problems, performed a limited number of tests, was slower than some competing devices, and could not compete with larger, conventional machines in high-throughput, or the simultaneous testing of blood from many patients, applications;

(B) represented to investors that Theranos was presently a financially strong and stable company, including that Theranos would generate over $100 million in revenues and break even in 2014, and that Theranos expected to generate approximately $1 billion in revenues in 2015; when, in truth, HOLMES and BALWANI knew that Theranos had and would generate only modest revenues, roughly a few hundred thousand dollars or so, in 2014 and 2015;

THIRD SUPERSEDING INDICTMENT          4

(C) deceived investors through misleading technology demonstrations intended to cause potential investors to believe that blood tests were being conducted on Theranos's proprietary analyzer; when, in truth, HOLMES and BALWANI knew that Theranos's proprietary analyzer was running a "null protocol" during the demonstration to make the analyzer appear to be operating, but was not testing the potential investor's blood, and yet failed to disclose that fact;

(D) represented to investors that Theranos presently had an expanding partnership with Walgreens, that is, Theranos would soon dramatically increase the number of Wellness Centers within Walgreens stores; when, in truth, HOLMES and BALWANI knew, by late 2014, that Theranos's retail Walgreens rollout had stalled because of several issues, including that Walgreens's executives had concerns with Theranos's performance;

(E) represented to investors that Theranos presently had a profitable and revenue-generating business relationship with the United States Department of Defense, and that Theranos's technology had deployed to the battlefield; when, in truth, HOLMES and BALWANI knew that Theranos had limited revenue from military contracts and its technology was not deployed in the battlefield;

(F) represented to investors that Theranos did not need the Food and Drug Administration ("FDA") to approve its proprietary analyzer and tests, but instead that Theranos was applying for FDA approval voluntarily because it was the "gold standard"; when, in truth, HOLMES and BALWANI knew that by late 2013 and throughout 2014, the FDA was requiring Theranos to apply for clearance or approval for its analyzer and tests;

(G) represented to investors that Theranos conducted its patients' tests using Theranos-manufactured analyzers; when, in truth, HOLMES and BALWANI knew that Theranos purchased and used for patient testing third party, commercially-available analyzers;

(H) represented to investors that Theranos's technology had been examined, used, and validated by several national or multinational pharmaceutical companies and research institutions; when, in truth, HOLMES and BALWANI knew that these pharmaceutical companies and research institutions had not examined, used, or validated Theranos's technology; and

ER-6891

(I) represented to members of the media for publication many of the false and misleading statements described above within paragraph 12(A) – 12(H), and shared the resulting articles with potential investors both directly and via the Theranos website, knowing their statements to members of the media were false and misleading.

13. After receiving false and misleading statements, misrepresentations, and omissions from HOLMES and BALWANI, persons known to the Grand Jury as Investors 1, 2, 3, 4, 5, and 6 initiated electronic wire transfers for the purpose of investing money in Theranos. These wires, specifically alleged in paragraph 24 of this Third Superseding Indictment, used a domestic electronic funds transfer system known as the Fedwire system, which is owned and operated by the United States Federal Reserve System. All Fedwire wire transfers alleged in this Third Superseding Indictment were electronically routed through Fedwire centers in East Rutherford, New Jersey, Dallas, Texas, or outside California and into Theranos's bank account in the Northern District of California. All of the wire transfers alleged in this Third Superseding Indictment travelled between one state and another state.

<u>The Scheme to Defraud Patients</u>

14. Between approximately 2013 and 2016, HOLMES and BALWANI, through advertisements and solicitations, encouraged and induced doctors and patients to use Theranos's blood testing laboratory services.

15. HOLMES and BALWANI devised a scheme to defraud patients, through advertisements and marketing materials, through explicit and implicit claims concerning Theranos's ability to provide accurate, fast, reliable, and cheap blood tests and test results, and through omissions concerning the limits of and problems with Theranos's technologies. Based on these representations, many hundreds of patients paid Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results, sometimes following referrals from their misled doctors.

16. Despite representing to doctors and patients that Theranos could provide accurate, fast, reliable, and cheap blood tests and test results, HOLMES and BALWANI knew—through, among other means, their involvement in Theranos's day-to-day operations and their knowledge of complaints received from doctors and patients—that Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results. In particular, HOLMES and BALWANI knew that Theranos

ER-6892

was not capable of consistently producing accurate and reliable results for certain blood tests, including but not limited to bicarbonate, calcium, chloride, cholesterol/HDL/LDL, gonorrhea, glucose, HbA1c, hCG, HIV, LDH, potassium, PSA, PT/INR, sodium, testosterone, TSH, vitamin D (25-OH), and all assays conducted on Theranos's TSPU version 3.5, including estradiol, prolactin, SHBG, thyroxine (T4/free T4), triiodothyronine, and vitamin B-12.

17.    Despite their knowledge of Theranos's accuracy and reliability problems, HOLMES and BALWANI used interstate electronic wires to purchase advertisements intended to induce individuals to purchase Theranos blood tests at Walgreens stores in California and Arizona.  Through these advertisements, HOLMES and BALWANI explicitly represented to individuals that Theranos's blood tests were cheaper than blood tests from conventional laboratories to induce individuals to purchase Theranos's blood tests.  HOLMES and BALWANI held Theranos's blood tests out to individuals as accurate and reliable.  HOLMES and BALWANI:

(A)    transmitted, caused to be transmitted, or otherwise delivered to doctors and patients, including in the form of marketing materials and advertisements, materially false and misleading information concerning the accuracy and reliability of Theranos's blood testing services;

(B)    posted on the Theranos website, or otherwise represented to a broad audience including doctors and patients, materially false and misleading information concerning the accuracy and reliability of Theranos's blood testing services;

(C)    transmitted, caused to be transmitted, or otherwise delivered to doctors and patients Theranos blood test results where HOLMES and BALWANI knew that the tests performed on Theranos technology contained or were likely to contain:

(1)    inaccurate and unreliable results;

(2)    improperly adjusted reference ranges;

(3)    improperly removed "critical" results; and

(4)    results generated from improperly validated assays.

18.    Knowing that the accuracy and reliability of Theranos test results was questionable and suspect, HOLMES and BALWANI oversaw the electronic wiring of test results to patients, including persons known to the Grand Jury as Patients B.B, E.T., and M.E. in paragraph 26 of this Third

1   Superseding Indictment.  These wires, specifically, the wires alleged in paragraph 26 of this Third

2   Superseding Indictment, travelled between one state and another.

3   COUNT ONE:  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos Investors)

4        19.    Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

5        20.    From a time unknown but no later than approximately 2010 through approximately 2015,

6   within the Northern District of California, and elsewhere, the defendants,

7                          ELIZABETH A. HOLMES and
                           RAMESH "SUNNY" BALWANI,
8

9   and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree

10  together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section

11  1343, by devising a scheme and artifice to defraud as to a material matter and to obtain money by means

12  of materially false and fraudulent representations, specifically by soliciting investments through making

13  the false and fraudulent representations as set forth in this Third Superseding Indictment.

14       All in violation of Title 18, United States Code, Section 1349.

15  COUNT TWO:  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos Patients)

16       21.    Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

17       22.    From in or about 2013 through 2016, within the Northern District of California, and

18  elsewhere, the defendants,

19                         ELIZABETH A. HOLMES and
                           RAMESH "SUNNY" BALWANI,
20

21  and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree

22  together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section

23  1343, by devising a scheme and artifice to defraud as to a material matter and to obtain money by means

24  of materially false and fraudulent representations, specifically by soliciting, encouraging, or otherwise

25  inducing doctors to refer and patients to pay for and use its laboratory and blood testing services under

26  the false and fraudulent pretense that Theranos technology produced reliable and accurate blood test

27  results.

28       All in violation of Title 18, United States Code, Section 1349.

THIRD SUPERSEDING INDICTMENT            8

ER-6894

COUNTS THREE THROUGH EIGHT: 18 U.S.C. § 1343 (Wire Fraud)

23. Paragraphs 1 through 22 are realleged and incorporated as if fully set forth herein.

24. On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

for the purpose of executing the material scheme and artifice to defraud investors, and for obtaining money and property from investors by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, electronic funds transfers and payments from investor bank accounts to Theranos, as further set forth below:

| COUNT | DATE | ITEM WIRED | WIRED FROM | WIRED TO |
|-------|------|-----------|------------|----------|
| 3 | 12/30/2013 | $99,990 | Investor #1's Charles Schwab/Wells Fargo Bank account | Theranos's Comerica Bank account |
| 4 | 12/31/2013 | $5,349,900 | Investor #6's Pacific Western Bank account | Theranos's Comerica Bank account |
| 5 | 12/31/2013 | $4,875,000 | Investor #2's Texas Capital Bank account | Theranos's Comerica Bank account |
| 6 | 2/6/2014 | $38,336,632 | Investor #3's Citibank account | Theranos's Comerica Bank account |
| 7 | 10/31/2014 | $99,999,984 | Investor #4's Northern Chicago Bank account | Theranos's Comerica Bank account |
| 8 | 10/31/2014 | $5,999,997 | Investor #5's JP Morgan Chase account | Theranos's Comerica Bank account |

Each in violation of Title 18, United States Code, Section 1343.

ER-6895

1  COUNTS NINE THROUGH TWELVE:  18 U.S.C. § 1343 (Wire Fraud)

2       25.    Paragraphs 1 through 24 are realleged and incorporated as if fully set forth herein.

3       26.    On or about the dates set forth below, within the Northern District of California, and

4  elsewhere, the defendants,

5  ELIZABETH A. HOLMES and<br>RAMESH "SUNNY" BALWANI,

6  

7  for the purpose of executing the material scheme and artifice to defraud patients, and for obtaining

8  money and property from patients by means of materially false and fraudulent pretenses,

9  representations, promises, and material omissions with a duty to disclose, did knowingly transmit and

10  cause to be transmitted by means of wire communication in interstate commerce certain writings, signs,

11  signals, and pictures, that is, laboratory and blood test results, telephonic communications regarding test

12  results, and payments for the purchase of advertisements soliciting patients and doctors for its laboratory

13  business, as further set forth below, in violation of Title 18, United States Code, Section 1343:

| COUNT | DATE | WIRED FROM | WIRED TO | DESCRIPTION |
|---|---|---|---|---|
| 9 | 10/12/2015 | Arizona | California | Telephone call from Patient B.B to Theranos regarding laboratory blood test results |
| 10 | 5/11/2015 | California | Arizona | Patient E.T.'s laboratory blood test results |
| 11 | 5/16/2015 | California | Arizona | Patient M.E.'s laboratory blood test results |
| 12 | 8/3/2015 | Theranos's Wells Fargo Bank account in California | Horizon Media, Inc.'s J.P. Morgan Chase Bank account in New York | Electronic Funds Transfer in the amount of $1,126,661.00 to purchase advertisements for Theranos Wellness Centers |

    Each in violation of Title 18, United States Code, Section 1343.

1   <u>FORFEITURE ALLEGATION</u>:    18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (Forfeiture of
Wire Fraud Proceeds)

2

3          27.    The allegations of paragraphs 1 through 26 of this Third Superseding Indictment are

4  realleged and by this reference fully incorporated herein for the purposes of alleging forfeiture pursuant

5  to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

6          28.    Upon a conviction for the offense alleged in Counts One through Twelve, the defendants,

7

ELIZABETH A. HOLMES and

8                RAMESH "SUNNY" BALWANI,

9  shall forfeit to the United States all property, constituting and derived from proceeds traceable to said

10  offenses, including but not limited to the following property:

11        (a)    a sum of money equal to the amount of proceeds obtained as a result of the offense.

12        If any of said property, as a result of any act or omission of the defendant-

13        (a)    cannot be located upon the exercise of due diligence;

14        (b)    has been transferred or sold to or deposited with a third person;

15        (c)    has been placed beyond the jurisdiction of the Court;

16        (d)    has been substantially diminished in value; or

17        (e)    has been commingled with other property which cannot be subdivided without difficulty;

18  Any and all interest defendant has in any other property (not to exceed the value of the above forfeitable

19  property) shall be forfeited to the United States pursuant to Title 21, United States Code, Section 853(p),

20  as incorporated by Title 18, United States Code, Section 982(b)(1).

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

THIRD SUPERSEDING INDICTMENT     11

ER-6897

1       The forfeiture is authorized by Title 18, United States Code, Section 981(a)(1)(C) and Title 28,

2   United States Code, Section 2461(c); Title 21, United States Code, Section 853(p) as incorporated by

3   Title 18, United States Code, Section 982(b)(1); and the Federal Rules of Criminal Procedure 32.2.

4   DATED: July 28, 2020               A TRUE BILL

5

6                                /s/

                                FOREPERSON

7   ADAM A. REEVES

8   Attorney for the United States,
   Acting Under Authority Conferred By 28 U.S.C. § 515

9   /s Robert S. Leach

10

11  JEFFREY SCHENK
   ROBERT S. LEACH
   JOHN C. BOSTIC

12  VANESSA BAEHR-JONES
   Assistant United States Attorneys

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD SUPERSEDING INDICTMENT      12

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT

Name of District Court, and/or Judge/Magistrate Location

☒ SUPERSEDING

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

### OFFENSE CHARGED

18 U.S.C. § 1349 – Conspiracy;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: All per count:
20 years imprisonment
$250,000 fine
3 years supervised release
$100 special assessment

⊞

**DEFENDANT - U.S**

▶ Elizabeth Holmes

DISTRICT COURT NUMBER

CR 18-00258 EJD

**FILED**

Jul 28 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI, USPS, FDA

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person
Furnishing Information on this form    ADAM A. REEVES

Acting ☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)    Robert Leach, AUSA

### DEFENDANT

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)

NDCA

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges

☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No

If "Yes" give date filed

**DATE OF ARREST** ▶    Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶    Month/Day/Year

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS ☒ NO PROCESS* ☐ WARRANT

Bail Amount: _____

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: _____    Before Judge: _____

Comments:

ER-6899

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

☒ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

### OFFENSE CHARGED

18 U.S.C. § 1349 – Conspiracy;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture

☐ Petty
☐ Minor
☐ Misde-
   meanor
☒ Felony

PENALTY:  All per count:
20 years imprisonment
$250,000 fine
3 years supervised release
$100 special assessment

⊞

DEFENDANT - U.S

▶ Ramesh "Sunny" Balwani

DISTRICT COURT NUMBER

CR 18-00258 EJD

**FILED**

Jul 28 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI, USPS, FDA

☐ person is awaiting trial in another Federal or State Court,
  give name of court

☐ this person/proceeding is transferred from another district
  per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of
  charges previously dismissed
  which were dismissed on motion
  of:

  ☐ U.S. ATTORNEY  ☐ DEFENSE

SHOW
DOCKET NO.

☐ this prosecution relates to a
  pending case involving this same
  defendant

MAGISTRATE
CASE NO.

☐ prior proceedings or appearance(s)
  before U.S. Magistrate regarding this
  defendant were recorded under

Name and Office of Person
Furnishing Information on this form     ADAM A. REEVES

Acting  ☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)     Robert Leach, AUSA

### DEFENDANT

**IS NOT IN CUSTODY**

1) ☐ Has not been arrested, pending outcome this proceeding.
       If not detained give date any prior
       summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)

NDCA

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction        } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

       If answer to (6) is "Yes", show name of institution

Has detainer  ☐ Yes   } If "Yes"
been filed?   ☐ No       give date
                         filed

**DATE OF
ARREST**                Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED
TO U.S. CUSTODY**       Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT     Bail Amount:

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or
warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time:                    Before Judge:

Comments:

ER-6900

1

2

3                    UNITED STATES DISTRICT COURT

4                  NORTHERN DISTRICT OF CALIFORNIA

5                          SAN JOSE DIVISION

6

7   UNITED STATES OF AMERICA,              Case No.  CR-18-00258 EJD

         Plaintiff,
8                                          **ORDER RE SEVERANCE OF**
         v.                                **TRIALS**
9
10  ELIZABETH A. HOLMES and RAMESH
    "SUNNY" BALWANI,
11        Defendants.

12          The court has found good cause to sever the trials of Ms. Holmes and Mr. Balwani.  Ms.

13  Holmes's trial will proceed as scheduled. Mr. Balwani's trial will begin after Ms. Holmes's trial

14  has concluded.  All parties shall meet and confer and file proposed revised schedules no later than

15  March 30, 2020.

16          Mr. Balwani's matter is continued to June 16, 2020 at 10:00 a.m. for a status conference.

17  The pretrial schedule as to Mr. Balwani is suspended pending further court order.

18          Ms. Holmes's matter is continued to 11:00 a.m. Pacific standard time on April 1, 2020 for

19  a status conference.  Because of the current Covid-19 crisis, this status conference will be

20  conducted via telephonic conference call which may be publicly accessed.  The dial-in number for

21  this telephonic conference is: 888-273-3658, access code 1096091.  Parties and members of the

22  public who wish to monitor this conference are requested to connect to the conference line five

23  minutes before the scheduled hearing.  The conference call line is limited to 200 lines.  Members

24  of the press and the public are expected to "mute" their end of the line and to not disrupt

25  proceedings in any way.

26          Counsel and members of the public are advised that General Order 58 of the Northern

27  District of California provides:

28  CASE NO.: 5:18-CR-00258-EJD
    ORDER RE SEVERANCE OF TRIALS
                                    1

1

2      Policy of the Judicial Conference of the United States prohibits, in
       both civil and criminal cases in all district courts, broadcasting,
3      televising, recording, or photographing courtroom proceedings for the
       purpose of public dissemination, subject to strictly-defined
       exceptions such as the Cameras in Courts pilot which concluded July
4      18, 2015.

5  General Order 58.  Further, Federal Rule of Criminal Procedure 53 bars broadcasting in criminal

6  proceedings.  Broadcasting of proceedings is prohibited by policy of the Judicial Conference of

7  the United States.  This encompasses the use of all audio or video recording devices of any kind.

8  **No member of the public may record any court proceeding under any circumstances.**

9       The court finds it appropriate to maintain sealing of documents in this matter at this time.

10      **IT IS SO ORDERED.**

11  Dated:  March 20, 2020

12

13                                          _____
                                            EDWARD J. DAVILA
14                                          United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28  CASE NO.: 5:18-CR-00258-EJD
    ORDER RE SEVERANCE OF TRIALS
                                      2

ER-6902

1  ADAM A. REEVES (NYBN 2363877)
   Attorney for the United States,
2  Acting Under Authority Conferred By 28 U.S.C. § 515

3  HALLIE HOFFMAN (CABN 210020)
   Chief, Criminal Division
4
   JEFF SCHENK (CABN 234355)
5  JOHN C. BOSTIC (CABN 264367)
   ROBERT S. LEACH (CABN 196191)
6  VANESSA BAEHR-JONES (CABN 281715)
   Assistant United States Attorneys
7
        150 Almaden Boulevard, Suite 900
8       San Jose, California 95113
        Telephone: (408) 535-5589
9       FAX: (408) 535-5066
        john.bostic@usdoj.gov
10
   Attorneys for United States of America
11
                   UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                         SAN JOSE DIVISION
14

15  UNITED STATES OF AMERICA,              )  **CASE NO. 18-CR-00258 EJD**
                                           )
16          Plaintiff,                     )  **UNITED STATES' OPPOSITION TO**
                                           )  **DEFENDANTS' MOTION TO DISMISS**
17       v.                                )  **COUNTS TWO AND NINE THROUGH**
                                           )  **ELEVEN OF SUPERSEDING INDICTMENT**
18  ELIZABETH HOLMES and RAMESH            )  **(ECF NO. 206)**
    "SUNNY" BALWANI,                       )
19                                         )  Date:   February 10, 2020
            Defendants.                    )  Time:   10:00 a.m.
20  _____)  Court:  Hon Edward J. Davila

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

3    I.      INTRODUCTION .................................................................................................1

4    II.     BACKGROUND ...................................................................................................2

5            A.      Defendants' Scheme to Defraud Doctors and Patients ............................2

6            B.      Harm Suffered by Patients as a Result of Defendants' Fraud .................3

7    III.    ARGUMENT .........................................................................................................4

8            A.      The Law Does Not Support Dismissal ....................................................4

9            B.      The Indictment Alleges Defendants' Intent to Defraud Patient Victims............................5

10           C.      The Indictment Alleges Defendants' Intent to Obtain Money from the Victims
                     of the Fraud ..........................................................................................9

11   IV.     CONCLUSION.....................................................................................................13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ER-6904

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

Cases

4

*Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Employees & Rest. Employees Union, AFL-CIO*,
   215 F.3d 923 (9th Cir. 2000) ......................................................................................... 12

5

*Neder v. United States*,
   527 U.S. 1 (1999).............................................................................................................. 8

6

*Russell v. United States*,
   369 U.S. 749 (1962)...................................................................................................... 4, 5

7

*United States v. Cleveland*,
   531 U.S. 12 (2000)......................................................................................................... 10

8

*United States v. Ali*,
   620 F.3d 1062 (9th Cir. 2010) ................................................................................ 6, 7, 10

9

*United States v. Bonallo*,
   858 F.2d 1427 (9th Cir. 1988) ................................................................................... 5, 11

10

*United States v. Bruchhausen*,
   977 F.2d 464 (9th Cir. 1992) ........................................................................................ 12

11

*United States v. Buckley*,
   689 F.2d 893 (9th Cir. 1982) .......................................................................................... 4

12

*United States v. Cecil*,
   608 F.2d 1294 (9th Cir. 1979) ........................................................................................ 4

13

*United States v. Ciccone*,
   219 F.3d 1078 (9th Cir. 2000) ...................................................................................... 12

14

*United States v. Crawford*,
   239 F.3d 1086 (9th Cir. 2001) ...................................................................................... 11

15

*United States v. Curtis*,
   506 F.2d 985 (10th Cir. 1974) ........................................................................................ 5

16

*United States v. Dowie*,
   411 Fed. Appx. 21 (9th Cir. Dec. 2, 2010) ................................................................... 10

17

*United States v. Giese*,
   597 F.2d 1170 (9th Cir. 1979) ..................................................................................... 4, 5

18

*United States v. Greenberg*,
   835 F.3d 295 (2d Cir. 2016)....................................................................................... 8, 11

19

*United States v. Harkonen*,
   510 Fed. Appx. 633 (9th Cir. Mar. 4, 2013) ............................................................. 7, 12

20

*United States v. Jinian*,
   725 F.3d 954 (9th Cir. 2013) .......................................................................................... 5

21

*United States v. Keith*,
   605 F.2d 462 (9th Cir. 1979) .......................................................................................... 4

22

*United States v. Keuylian*,
   23 F. Supp. 3d 1126 (C.D. Cal. 2014) ........................................................................... 5

23

*United States v. Lew*,
   875 F.2d 219 (9th Cir. 1989) ................................................................................ 9, 10, 11

24

*United States v. Lothian*,
   976 F.2d 1257 (9th Cir. 1992) ........................................................................................ 6

25

*United States v. McNally*,
   483 U.S. 350 (1987)....................................................................................................... 10

26

*United States v. Mitchell*,
   867 F.2d 1232 (9th Cir. 1989) ...................................................................................... 12

27

*United States v. Pheaster*,
   544 F.2d 353 (9th Cir. 1976) .......................................................................................... 4

28

ER-6905

*United States v. Plache*,
913 F.2d 1375 (9th Cir. 1990) .................................................................................. 6
*United States v. Regent Office Supply Co.*,
421 F.2d 1174 (2d Cir. 1970) ................................................................................... 7
*United States v. Rogers*,
321 F.3d 1226 (9th Cir. 2003) .................................................................................. 6
*United States v. Sadler*,
750 F.3d 585 (6th Cir. 2014) .................................................................................... 7
*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007) ....................................................................................... 7
*United States v. Takhalov*,
827 F.3d 1307 (11th Cir. 2016) ................................................................................ 7
*United States v. Utz*,
886 F.2d 1148 (9th Cir. 1989) ........................................................................... 8, 12
*United States v. Woods*,
335 F.3d 993 (9th Cir. 2003) .................................................................................... 6

Statutes

18 U.S.C. § 371 ............................................................................................................... 5
18 U.S.C. § 1343 ............................................................................................................. 5
18 U.S.C. § 1344 ........................................................................................................... 11
28 U.S.C. § 515 ....................................................................................................... 1, 13

ER-6906

I.       INTRODUCTION

        This case involves two defendants who committed fraud in connection with Theranos, a blood-testing company that they built and operated.  Defendants' fraud centered on misleading the public regarding the capabilities of Theranos's technology.  Defendants represented that their technology produced accurate and reliable results.  In reality, Defendants knew that their devices frequently yielded inaccurate results, rendering their tests unreliable.  As a result of Defendants' misrepresentations on this topic and several others, investors lost hundreds of millions of dollars.

        There is a second group of victims in this case, however, and it numbers into the thousands.  When Defendants marketed their blood testing services to doctors and patients, they knew they were offering a product that was not what it appeared to be.  Although they held out Theranos's tests as suitable for use in patient care, they were aware that the tests were not reliable enough for medical decision-making.  As a result of this fraud, thousands of patients received unreliable blood tests, depriving them of money or property, placing their health at risk and, in many cases, causing actual harm.  With the instant motion, Defendants ask the Court to ignore all of these victims and limit this case to the fraud targeting investors.  That motion should be denied for at least three reasons.

        First, the Indictment in this case meets constitutional standards in pleading the fraud against doctors and patients.  Those standards do not require a charging document to allege every detail that will be presented at trial, but instead provide that indictments should be read as a whole, including implied facts, and with the benefit of common sense.

        Second, the fraud alleged in the Indictment goes to the core of the bargain between Theranos and its customers.  The medical tests offered by Theranos had essentially no value if they could not be relied upon, and Defendants' decision to market those unreliable tests is the definition of intent to defraud.

        Third, the Indictment alleges that Defendants intended to deprive their victims of property—specifically, the money that Theranos's customers would pay for testing services.  The fact that not every victim paid directly for a Theranos test does not affect the viability of this charge.

        The Court should deny Defendants' motion to dismiss in its entirety.

/ /

ER-6907

II.    **BACKGROUND**

    A.    **Defendants' Scheme to Defraud Doctors and Patients**

As alleged in the Indictment, Theranos operated in "stealth mode" for the first ten years of its existence. Beginning in approximately 2013, however, Defendants began to promote the company and its technology. One of Defendants' goals was to attract investment. The other key goal was to promote Theranos's services to the doctors and patients who made up the company's potential customers once it started offering blood testing in September of that year.

In order to attract those customers and induce them to pay for Theranos's services, Defendants explicitly and implicitly represented that their tests were accurate and reliable in addition to being faster and cheaper than the competition. (See Indictment, ECF No. 39, at ¶¶ 14-16). For instance, Theranos's public website touted the company's purported ability to conduct tests using tiny blood samples, and expressly stated that its lab could perform tests "quickly and accurately on samples as small as a single drop." (*Id.* at ¶ 9).

In truth, Defendants knew that Theranos's technology suffered from recurring problems, and was not capable of consistently producing accurate and reliable results—in particular for certain analytes including calcium, chloride, potassium, sodium, and bicarbonate (each of which is relevant to the diagnosis of a variety of medical conditions), as well as HIV (the life-threatening autoimmune disease), Hba1C (indicative of the presence and severity of diabetes), and hCG (a hormone associated with pregnancy). (*Id.* at ¶ 16). Holmes and Balwani knew that the medical reports they were providing to patients contained or were likely to contain: (1) inaccurate and unreliable results; (2) improperly adjusted reference ranges defining a normal or healthy result for a given test; (3) improperly removed "critical" results, i.e., results suggesting that a patient needed medical attention; and (4) results generated from improperly validated assays, further decreasing the reliability of those tests. (*Id.* at ¶ 17).

When Arizona's Attorney General filed a lawsuit against Theranos alleging that its advertisements misrepresented the accuracy and reliability of its blood testing, Theranos entered into a settlement under which it refunded tens of thousands of patients the money they had paid for the company's testing services.[1] By that time, the company had already voided years of results previously

---

[1]  See Arizona Attorney General's Office Press Release (https://www.azag.gov/press-releases/ag-

1   provided to patients based on tests run on its proprietary analyzer.[2]

2        **B.     Harm Suffered by Patients as a Result of Defendants' Fraud**

3        The government is not required to plead or prove that every Theranos patient suffered harm in

4   order to sustain a conviction, let alone survive a motion to dismiss the indictment.  But when Defendants

5   put their fraudulent scheme into action, they placed patients' health at risk, and the evidence showing

6   that they ignored potential and actual patient harm will be integral proof of their intent to defraud.  It

7   goes without saying that, when a company provides unreliable medical testing services, severe patient

8   harm is an inevitable result.  Many of the patients interviewed by the government were affected in

9   serious ways by the inaccurate and unreliable tests they received from Theranos.

10       For example, one patient received a lab report from Theranos stating that he was HIV positive.

11  Experiencing shock and depression as a result of that life-changing diagnosis, he was planning to seek a

12  confirmatory test from another lab when a Theranos representative called him and discouraged him from

13  obtaining a second opinion, vouching for the reliability of the Theranos result.  After living with this

14  diagnosis for several days, that patient learned that the Theranos test had been inaccurate and that he was

15  healthy after all.

16       Defendants were also aware that the company was having problems with the accuracy of its hCG

17  (human chorionic gonadotrophin) test—used by doctors to determine whether a patient is pregnant.  The

18  government has interviewed multiple individuals who were traumatized or placed in medical danger as a

19  result of inaccurate hCG tests from Theranos.  One patient, who had been trying unsuccessfully to have

20  a child for a long time, became pregnant only to receive a Theranos blood test during the early stages of

21  her pregnancy indicating that she was miscarrying.  After being forced to live through the heartbreak

22  caused by that news, she obtained a test result from a conventional lab showing that, thankfully, her

23  pregnancy was still viable.  Another patient received a Theranos test result indicating that she was not

24  pregnant.  In reality, she was currently experiencing an ectopic pregnancy that would have threatened

25  her life had a test from another lab not revealed its presence.

26

27  _____
    brnovich-obtains-465-million-arizonans-who-purchased-theranos-blood-tests).

28      [2]  See "Theranos Has Thrown Out Two Years of Blood-Test Results," Fortune (May 19, 2016)
    (https://fortune.com/2016/05/19/theranos-void-edison-results/)

1      The evidence at trial will show that these patients, along with many others, were intended targets

2 of Defendants' scheme to defraud. Their experiences with Theranos are evidence of the inaccuracy of

3 the tests and of Defendants' knowledge of their technology's lack of reliability. That does not mean,

4 though, that such evidence needs to be described in the charging document. The Indictment adequately

5 alleges the existence of Defendants' fraudulent scheme under the standards discussed below.

6 **III.    ARGUMENT**

7     **A.     The Law Does Not Support Dismissal**

8      The main purposes of an indictment are (1) to contain the elements of the offense intended to be

9 charged and sufficiently apprise the defendant of what he or she must be prepared to meet; and (2) in

10 case any similar charges are later filed against the defendant, to allow the defendant to argue double

11 jeopardy. *Russell v. United States*, 369 U.S. 749, 763 (1962). Although an indictment should also be

12 detailed enough to allow a court to determine its sufficiency, the Ninth Circuit considers this a

13 "corollary purpose" of the document typically considered after trial, "when the theory on which the

14 Government has obtained a conviction is clear." *United States v. Buckley*, 689 F.2d 893, 896 n.3 (9th

15 Cir. 1982). At the pretrial stage, the indictment is usually deemed sufficient if it satisfies the two

16 objectives above. *Id.* It is well established that "an indictment need not be drafted in the most precise

17 form possible." *United States v. Pheaster*, 544 F.2d 353, 361 (9th Cir. 1976).

18      An indictment "is not to be read in a technical manner, but it is to be construed according to

19 common sense with an appreciation of existing realities." *United States v. Giese*, 597 F.2d 1170, 1178

20 (9th Cir. 1979) (quotation omitted). Additionally, an indictment should be "read as a whole" and "read

21 to include facts which are necessarily implied." *Buckley*, 689 F.2d at 899.

22      Courts applying these standards will not dismiss indictments or reverse convictions except in

23 extreme cases. *See, e.g.*, *Russell*, 369 U.S. at 753-55 (reversing conviction under statute criminalizing

24 refusal to answer question from congressional subcommittee where indictment failed to specify topic

25 under inquiry in proceedings); *United States v. Keith*, 605 F.2d 462 (9th Cir. 1979) (indictment charging

26 defendant with involuntary manslaughter failed to allege correct mental state required under that

27 statute); *United States v. Cecil*, 608 F.2d 1294, 1296-97 (9th Cir. 1979) ("barren" indictment charged

28 eleven defendants with drug conspiracy but only tracked statutory language and gave superficial details

GOVT. OPP TO MOT TO DISMISS PATIENT COUNTS
18-CR-00258 EJD                         4

1  about conspiracy, i.e., its location and objective); *United States v. Curtis*, 506 F.2d 985, 992 (10th Cir.

2  1974) (fraud indictment pleaded "little more than the statutory language without any fair indication of

3  the nature or character of the scheme" or the misrepresentations that were part of it); *United States v.*

4  *Keuylian*, 23 F. Supp. 3d 1126, 1128 (C.D. Cal. 2014) (dismissing indictment that adopted statutory

5  fraud language but "fail[ed] to describe any act of deception committed by [the defendant]").

6     The Supreme Court considers it a beneficial development in criminal law that it has "upheld

7  many convictions in the face of questions concerning the sufficiency of the charging papers" and that

8  convictions are no longer reversed because of deficiencies that do not prejudice the accused. *Russell*,

9  369 U.S. at 763-64.

10    An indictment charging conspiracy satisfies the applicable standards above if it alleges the three

11  elements which are the "gist of the offense." *Giese*, 597 F.2d at 1177.[3] Such an indictment need not

12  "allege with technical precision all the elements essential to the commission of the offense which is the

13  object of the conspiracy." *Id.* at 1178.

14    The wire fraud statute criminalizes the use of the wires by an individual "having devised or

15  intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of

16  false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. The elements of wire

17  fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the

18  scheme; and (3) a specific intent to defraud. *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013).

19  The Ninth Circuit recognizes that the fraud statute "reaches a wide range of fraudulent activity." *United*

20  *States v. Bonallo*, 858 F.2d 1427, 1433 (9th Cir. 1988); *see also* Rakoff, *The Federal Mail Fraud*

21  *Statute*, 18 Duquesne L.Rev. 772-73 (1980) (mail fraud statute has been characterized as the "'first line

22  of defense' against virtually every new area of fraud to develop in the United States in the past

23  century….").

24  **B.     The Indictment Alleges Defendants' Intent to Defraud Patient Victims**

25    The Indictment in this case clearly alleges that Holmes and Balwani, "through advertisements

26  and solicitations, encouraged and induced doctors and patients to use Theranos's blood testing

27

28        [3] Addressing charge under 18 U.S.C. § 371.

1    laboratory services." (Indictment at ¶ 14). Defendants' scheme to defraud included "soliciting,

2    encouraging, or otherwise inducing doctors to refer and patients to pay for and use its laboratory and

3    blood testing services under the false and fraudulent pretense that Theranos technology produced

4    reliable and accurate blood test results." (*Id.* at ¶ 22).

5          Defendants attempt to escape the allegations against them by misreading the Indictment and

6    misinterpreting the applicable case law. Remarkably, Defendants' motion argues that the Indictment

7    must be dismissed because there is no allegation that deceived patients "did not get what they paid for."

8    (Mot. at 6). In other words, Defendants assert that their misrepresentations about the accuracy and

9    reliability of Theranos's tests did not go to an essential element of the bargain between them and their

10    customers. Defendants are incorrect.

11         The key question, as Defendants admit, is whether the charging document alleges their intent to

12    defraud. "It is settled law that intent to defraud may be established by circumstantial evidence." *United*

13    *States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003). That intent may be inferred from

14    misrepresentations made by a defendant, *see United States v. Lothian*, 976 F.2d 1257, 1267-68 (9th Cir.

15    1992), and the scheme itself may be probative circumstantial evidence of an intent to defraud. *United*

16    *States v. Plache*, 913 F.2d 1375, 1381 (9th Cir. 1990).

17         Defendants accuse the Indictment of failing to allege misrepresentations because it states that

18    Defendants claimed their tests were accurate and reliable even though Theranos "was not capable of

19    *consistently* producing accurate and reliable results." (Indictment at ¶¶ 15-16) (emphasis added).

20    Defendants seem to argue that their alleged representations were not false because, even under the

21    Indictment's allegations, *some* of Theranos's test results may have been accurate. But the existence of

22    some accurate test results does not create a loophole in the charges. A scheme's fraudulent nature is

23    measured by a "non-technical" standard under which representations are viewed as fraudulent if they are

24    "misleading or deceptive" and need not be "literally false." *United States v. Woods*, 335 F.3d 993, 998

25    (9th Cir. 2003) (quotation omitted). Thus, Defendants cannot prevail based on an overly technical

26    reading of the misrepresentations alleged in the Indictment. Indeed, the government is not required to

27    prove that patients heard any particular misrepresentation, and the Ninth Circuit has upheld wire fraud

28    convictions even where no false statements were made directly to victims. *See, e.g.*, *United States v. Ali*,

620 F.3d 1062 (9th Cir. 2010). It was no barrier to conviction in that case that the defendants may not have made false statements directly to Microsoft, the owner of the software defendants fraudulently obtained, because a specific false statement was not required under a scheme-to-defraud theory. *Id*. at 1070-71. As that court observed, "there are alternative routes to a mail fraud conviction, one being proof of a scheme or artifice to defraud." *Id.*

In this case, Defendants engaged in a scheme to defraud whereby they used explicit and implicit representations to convince doctors and patients that Theranos's tests was accurate and reliable, inducing customers to pay for Theranos's services. *See, e.g.*, *United States v. Harkonen*, 510 Fed. Appx. 633, 635-36 (9th Cir. Mar. 4, 2013) (defendant convicted for issuing a fraudulent medical press release regarding a pharmaceutical product targeted at potential customers). Because Theranos's reports to patients contained or were likely to contain inaccurate results, they were unreliable. The prevalence of inaccurate results in Theranos's tests rendered all Theranos results unreliable, as they could not be trusted to convey correct information. And unreliable medical test results are worthless because they cannot provide a sound basis for medical treatment decisions. Indeed, Theranos voided years of results from its proprietary analyzer and refunded test fees to tens of thousands of patients after its misrepresentations were exposed. But Holmes and Balwani knew of the flaws in Theranos's technology from the beginning. In misrepresenting the ability of their technology to produce accurate and reliable results—and by holding out their services for use in clinical settings—Defendants intended that patients would pay for testing that was not actually suitable for patients' medical needs because it could not be relied upon. This kind of deception goes straight to the heart of "the value of the bargain" struck between Theranos and its customers. *See United States v. Takhalov*, 827 F.3d 1307, 1312-14 (11th Cir. 2016). It strains logic to argue otherwise. In sum, the nature of Defendants' misrepresentations places their scheme to defraud squarely within the scope of the wire fraud statute.[4]

---

[4] Thus, these facts bear little relation to the cases cited by Defendants in which a party was tricked into engaging in what the defendant intended to be a fair transaction. *See, e.g.*, *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) (defendants' actions in tricking customers into entering bar could not form the basis of fraud conviction if transactions inside bar were fair); *United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) (defendant lied to pharmaceutical distributors and concealed her identity to obtain product, but paid full price and so did not defraud the distributors); *United States v. Regent Office Supply Co*., 421 F.2d 1174, 1180 (2d Cir. 1970) (no evidence that company agents made any false representations regarding the quality or price of their merchandise); *United States v. Shellef*, 507 F.3d

1   Still, Defendants contend that the Indictment is deficient because it does not allege that any

2   patient *actually received* an inaccurate result from a Theranos test.  (Mot. at 1, 6).  First, this assertion is

3   simply incorrect.  The Indictment alleges that tests performed on Theranos technology "contained or

4   were likely to contain… inaccurate and unreliable results."  (Indictment at ¶ 17(C)).  A common-sense

5   reading of this allegation unavoidably leads to the inference that, over the course of providing test

6   results to thousands of people, Theranos gave many patients test results that were inaccurate.  The

7   government's investigation has confirmed that fact.

8   Second, and more important, Defendants' argument improperly shifts the inquiry away from the

9   *nature of the scheme* to defraud and focuses instead on its actual effect.  But while evidence of patient

10  harm is undoubtedly relevant to proving Defendants' intent, the government is not required to plead or

11  prove that the charged fraudulent scheme was ever completed.  Instead, it is enough that the government

12  charge "either that the victim was actually deprived of money or property *or* that the defendant intended

13  to defraud the victim of the same."  *United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989) (emphasis

14  in original).  "A scheme to defraud, whether successful or not, remains within the purview of section

15  1341."  *Id.*  Because the federal fraud statutes criminalize the "scheme to defraud," the common-law

16  requirements of reliance and damages have no relevance to these offenses.  *Neder v. United States*, 527

17  U.S. 1, 24-25 (1999).  "The gravamen of the offense is the scheme to defraud."  *United States v.*

18  *Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quotation omitted).  The government "need not prove that

19  the victims of the fraud were *actually* injured," "only that defendants *contemplated* some actual harm or

20  injury to their victims."  *Id.* at 305-06 (quotation omitted) (emphasis in original).

21  In this case, the victims' potential and actual harm is critical evidence of Defendants' deceptive

22  intent.  But the fact that the government may use such evidence at trial does not alter the pleading

23  requirements.  Read as a whole with the benefit of common sense, the Indictment clearly alleges that

24  Defendants intended to defraud Theranos's patients by obtaining their money in exchange for testing

25  services that were not what Defendants represented them to be.  The Indictment is therefore

26  constitutionally sufficient, and Defendant's motion should be denied to the extent it argues failure to

27

28  82, 107-09 (2d Cir. 2007) (defendant deceived victim company into selling product it otherwise would
    not have sold, but company obtained fair value).

allege intent to defraud.

### C. The Indictment Alleges Defendants' Intent to Obtain Money from the Victims of the Fraud

The Indictment alleges that Holmes and Balwani "held Theranos's blood tests out to individuals as accurate and reliable," and made representations to individuals "to induce individuals to purchase Theranos's blood tests." (Indictment at ¶ 17). As a result of the scheme, "many hundreds of patients paid, or caused their medical insurance companies to pay, Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results." (*Id.* at ¶ 15). Nevertheless, Defendants argue that the Indictment fails to allege that Defendants intended to obtain money from the victims described in the Indictment. Specifically, Defendants contend that portions of the Indictment should be dismissed because some victims did not pay Theranos directly. Defendants rely on the proposition that a criminal fraud must involve the intent to obtain money or property from the one who is deceived. (Mot. at 3) (citing *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989)). Because the Indictment in this case alleges just such a scheme, the Court should deny Defendants' motion on this ground.

As an initial matter, Defendants do not actually follow through on their claim that the Indictment does not allege a scheme to obtain money from victims. At best, they argue that there was no scheme to defraud *some* of the victims referenced in the Indictment. Defendants apparently concede that this argument does not apply to any patients who paid directly for the testing services they obtained from Theranos. Accordingly, Defendant's motion cannot seek dismissal of any complete counts in the Indictment on these grounds. Their argument is limited to (1) doctors and (2) patients whose Theranos tests were covered by medical insurance. But even if some victims did not pay Theranos directly, the Indictment still properly alleges Defendants' scheme to defraud all of Theranos's customers.

The rule stated in *Lew*—that a fraud scheme must be directed at obtaining money from the victim who is deceived—is not as rigid as Defendants would hope, and that case is distinguishable on its facts. In *Lew*, an attorney was convicted of mail fraud after lying to the Department of Labor regarding the employment status of immigrants. *Lew*, 875 F.2d at 220. The defendant in that case, however, did not obtain money or property from the government who had been deceived—only from his clients, and there was no evidence that the defendant ever deceived them. *Id.* at 221. The Ninth Circuit concluded that

ER-6915

1  this was a problem in light of the holding in *United States v. McNally*, 483 U.S. 350, 356 (1987).  In

2  dicta, the Ninth Circuit interpreted *McNally* to hold that a fraudster's intent must be to obtain money or

3  property from the one who is deceived.  *Lew*, 875 F.2d at 221.  In particular, the court in *Lew* took issue

4  with a jury instruction in that case stating that the charged scheme was "to make false statements to the

5  United States for the purpose of obtaining money from defendant's clients"—an instruction that

6  "permitted conviction for conduct not within the reach" of the statute.  *Id.* at 221-22; *see also United*

7  *States  v. Cleveland*, 531 U.S. 12, 15 (2000) (To qualify as property, "the thing obtained must be

8  property in the hands of the victim.").  Here, Defendants are charged with a scheme to deceive

9  Theranos's customers in order to deprive those same individuals of money or property.  There will be no

10  need for a jury instruction inconsistent with the holding in *Lew*.

11     Additionally, the Supreme Court acknowledges that the phrase "scheme or artifice to defraud"

12  should be "interpreted broadly insofar as property rights are concerned."  *McNally*, 483 U.S. at 356.  The

13  Ninth Circuit has taken a flexible approach to assessing the connection between the target of a fraud and

14  the property sought by the fraudster.  In *Ali*, discussed above, the Ninth Circuit upheld a wire fraud

15  conviction despite the fact that no false statements were made to the victim and the property obtained by

16  the defendants did not come directly from the victim but rather through third party distributors.  *United*

17  *States v. Ali*, 620 F.3d 1062 (9th Cir. 2010).  As that court noted, the victim of the fraud was Microsoft

18  even though the defendants acquired the property at issue—Microsoft's software—from third party

19  distributors.  *Id.* at 1067-68.  And the defendants in that case need not have to make a misrepresentation

20  directly to Microsoft to be guilty of wire fraud because the government was not required to prove any

21  particular false statement under a scheme-to-defraud theory.  *Id*. at 1070-71.

22     The Ninth Circuit similarly held in *Dowie* that the deprivation of money or property as a result of

23  a fraud may be accomplished "indirectly."  *United States v. Dowie*, 411 Fed. Appx. 21, 28 (9th Cir. Dec.

24  2, 2010).  The defendant in that case, found guilty of defrauding the Los Angeles County Department of

25  Water and Power, could not undo his conviction based on the fact that he actually received payment

26  from the City of Los Angeles, "a separate entity from DWP, which was the deceived party."  *Id.* at 27-

27  28.  Key to that decision was the lack of evidence that the defendant had sought to obtain money from

28  the city rather than from the DWP.  *Id.* at 28.

GOVT. OPP TO MOT TO DISMISS PATIENT COUNTS
18-CR-00258 EJD                                10

1    In another case, a defendant was convicted after engaging in a scheme to defraud a bank[5] and

2    challenged his conviction by arguing that the victims of the misrepresentation were actually the bank's

3    customers whose accounts were falsely charged and not the bank itself.  *United States v. Bonallo*, 858

4    F.2d 1427, 1434 n.9 (9th Cir. 1988).  The Ninth Circuit rejected that argument because banks commonly

5    reimburse the accounts of wrongly charged customers, so the defendant was ultimately harming the

6    bank.  *Id.*  Thus, the Ninth Circuit concluded, the misrepresentation in that case was directed toward the

7    bank, "and possibly toward the customers as well."  *Id.*  Notably, the Ninth Circuit in *Lew* confirmed

8    that *Bonallo* remains a valid interpretation of the requirements for a fraud conviction.  *See Lew*, 875 F.2d

9    at 221-22 (despite the indirect nature of the monetary loss in *Bonallo*, the fraud in that case still included

10   the intent to obtain money or property from the victim of the deceit).[6]

11   In fact, the Ninth Circuit has held that a fraud conviction does not even require the government

12   to prove the identity of the fraud victim or the victim's ownership of the property obtained by the

13   fraudster.  *See United States v. Crawford*, 239 F.3d 1086, 1092-93 (9th Cir. 2001) (defendant who

14   defrauded university in order to obtain a valuable piece of artwork could not obtain reversal because

15   government failed to prove the victim owned the property as long as the defendant knew she was not

16   entitled to it).  Such a holding is incompatible with Defendants' theory that fraud has occurred only if

17   the defendant has actually obtained property directly from the victim.  Rather, it is the nature of the

18   scheme to defraud and the defendant's intent that controls.

19   In this case, Defendants devised a scheme to defraud doctors and patients by misrepresenting the

20   accuracy and reliability of Theranos's blood tests.  Defendants' intent was to collect customers' money

21   while providing them with blood testing services that were of little to no value due to their lack of

22   accuracy and reliability.  It does not matter that, after successfully attracting patients to use their

23   services, some of those patients ended up having health insurance that paid for their blood tests.

24

25        [5]  The statute at issue in that case, 18 U.S.C. § 1344, has the same structure as the wire fraud

26   statute charged here.

          [6]  Other circuits have rejected outright the requirement that there be "convergence" between the

27   the fraud and the property at issue.  *See, e.g.*, *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir.
     2016) ("wire fraud does not require convergence between the parties intended to be deceived and those

28   whose property is sought in a fraudulent scheme," and collecting cases from First, Fifth, Seventh, and
     Eighth Circuits holding same).

1    Defendants targeted their misrepresentations and false pretenses at patients because their intent was to

2    separate those individuals from their money, and it is Defendants' intent that controls the analysis here.

3    *See Utz*, 886 F.2d at 1151.  Accordingly, Defendants cannot win dismissal based on the fact that

4    Theranos received some money from medical insurance providers.  Their argument on this point also

5    ignores the fact that patients with health insurance are required to pay premiums for that coverage.  That

6    means that the money health insurance companies use to pay medical service providers is ultimately

7    derived from, and indirectly reimbursed by, the covered patients.  An indirect connection between the

8    victims of the fraud and the funds obtained by the fraudster is acceptable under the case law discussed

9    above.[7]

10   Defendants are similarly misguided in their attempt to dismiss portions of the Indictment based

11   on the claim that Theranos never obtained property from any doctors.  The Court should reject this

12   conclusory factual argument, declining the defense's invitation to prejudge the evidence.  Moreover,

13   there is support in the case law for the proposition that doctors can be victims of this species of fraud.  In

14   *Harkonen*, the defendant was convicted of wire fraud after issuing a press release containing false

15   information about a recent trial of a pharmaceutical product.  *Harkonen*, 510 Fed. Appx. at 635-36.  On

16   appeal, the Ninth Circuit concluded that the jury found the press release fraudulent even if it was not

17   "literally false," and further held that the press release was material because it was "capable of

18   influencing the decision of *doctors to prescribe*, or *patients to seek*, prescriptions of [the product]."  *Id.*

19   at 636 (emphasis added).

20   Separately, misrepresentations to doctors are relevant to the scheme to the extent Defendants

21   intended doctors to pass along fraudulent information to their patients in recommending Theranos.  The

22   case law makes it clear that a scheme to defraud can encompass more than misleading statements made

23   by a defendant directly to a victim.  *See, e.g.*, *United States v. Ciccone*, 219 F.3d 1078, 1084 (9th Cir.

24

25   ───────────────

26   [7]  Because this case involves a scheme to obtain money from victims, it is nothing like the cases
     cited by Defendants where the item gained by the fraudster or lost by the victim did not qualify as actual
     property.  *See, e.g.*, *United States v. Bruchhausen*, 977 F.2d 464, 467-68 (9th Cir. 1992) (manufacturers'

27   interest in products not being shipped to Soviet Bloc was not property); *United States v. Mitchell*, 867
     F.2d 1232, 1234 (9th Cir. 1989) (citizens' intangible right to "good government" was not property);

28   *Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Employees & Rest. Employees Union, AFL-CIO*,
     215 F.3d 923, 926 (9th Cir. 2000) (hotel's goodwill was not property defendant sought to obtain).

2000) (defendant's wire fraud conviction would stand even if he himself had not made the fraudulent calls to victims, as he devised the scheme and was the source of misleading information).

Accordingly, the Court should reject Defendants' arguments about the property interest at issue in this case.

**IV.    CONCLUSION**

Defendants' motion to dismiss asks the Court to immunize them from a fraudulent scheme that targeted and impacted thousands of vulnerable victims.  For the foregoing reasons, the Court should deny Defendants' motion in its entirety.

DATED:  January 13, 2020          Respectfully submitted,

ADAM A. REEVES
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515

   /s/
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys

1   ADAM A. REEVES (NYBN 2363877)
    Attorney for the United States,
2   Acting Under Authority Conferred By 28 U.S.C. § 515

3   HALLIE HOFFMAN (CABN 210020)
    Chief, Criminal Division
4
    JEFF SCHENK (CABN 234355)
5   JOHN C. BOSTIC (CABN 264367)
    ROBERT S. LEACH (CABN 196191)
6   VANESSA BAEHR-JONES (CABN 281715)
    Assistant United States Attorneys
7
        150 Almaden Boulevard, Suite 900
8       San Jose, California 95113
        Telephone: (408) 535-5589
9       FAX: (408) 535-5066
        john.bostic@usdoj.gov
10
    Attorneys for United States of America
11
                        UNITED STATES DISTRICT COURT
12
                     NORTHERN DISTRICT OF CALIFORNIA
13
                              SAN JOSE DIVISION
14

15  UNITED STATES OF AMERICA,            )  **CASE NO. 18-CR-00258 EJD**
                                         )
16          Plaintiff,                   )  **UNITED STATES' OPPOSITION TO**
                                         )  **DEFENDANTS' MOTION TO DISMISS**
17      v.                               )  **SUPERSEDING INDICTMENT FOR LACK OF**
                                         )  **NOTICE AND, IN THE ALTERNATIVE, FOR A**
18  ELIZABETH HOLMES and RAMESH          )  **BILL OF PARTICULARS (ECF NO. 204)**
    "SUNNY" BALWANI,                     )
19                                       )  Date:    February 10, 2020
            Defendants.                  )  Time:    10:00 a.m.
20  _____  )  Court:   Hon Edward J. Davila

21

22

23

24

25

26

27

28

GOVT. OPP TO MOT FOR BILL OF PARTICULARS
18-CR-00258 EJD

1

## TABLE OF CONTENTS

2

3   I.    INTRODUCTION ................................................................................................1

4   II.   BACKGROUND ..................................................................................................2

5         A.    Defendants' Fraud as Alleged in the Indictment ................................2

6         B.    Additional Details Readily Apparent from the Government's Document
                Production ...............................................................................................4

7

    III.  ARGUMENT .......................................................................................................7
8
          A.    The Superseding Indictment Adequately Advises Defendants of the Charges ...................7
9
          B.    The Government is Not Required to Plead or Prove Specific False Statements ...............11
10
          C.    A Bill of Particulars is Unnecessary ....................................................13
11
                1.    Defendants Have Received Comprehensive Discovery Disclosing the
12                    Full Scope of the Evidence Against Them ...........................................15

13              2.    Defendants Are Not Entitled to the Categories of Information They
                      Demand .................................................................................................16
14
                3.    This Court Has Denied Similar Requests for a Bill of Particulars ........19
15
    IV.   CONCLUSION..................................................................................................21
16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2
                                                                                                    Page(s)

3      Cases

4      *Cleveland v. United States*,
          531 U.S. 12 (2000) ........................................................................................................ 12

5      *Costello v. United States*,
          350 U.S. 359 (1956) ...................................................................................................... 12

6      *Lustiger v. United States*,
          386 F.2d 132 (9th Cir. 1967) ........................................................................................ 12

7      *Neder v. United States*,
          527 U.S. 1 (1999) .................................................................................................... 11, 20

8      *United States v. Bazezew*,
          783 F. Supp. 2d 160 ...................................................................................................... 18

9      *United States v. Bortonovsky*,
          820 F.2d 572 (2d Cir. 1987) .............................................................................. 13, 14, 16

10     *United States v. Buckley*,
          689 F.2d 893 (9th Cir. 1982) ................................................................................ 7, 9, 11

11     *United States v. Caine*,
          270 F. Supp. 801 (S.D.N.Y. 1967) ............................................................................... 15

12     *United States v. Cecil*,
          608 F.2d 1294 (9th Cir. 1979) ........................................................................................ 7

13     *United States v. Clay*,
          476 F.2d 1211 (9th Cir. 1973) ................................................................................ 13, 16

14     *United States v. Crummer*,
          151 F.2d 958 (10th Cir. 1945) ........................................................................................ 7

15     *United States v. Curtis*,
          506 F.2d 985 (10th Cir. 1974) .................................................................................... 7, 8

16     *United States v. DiCesare*,
          765 F.2d 890 (9th Cir.) .................................................................................................. 18

17     *United States v. Du Bo*,
          186 F.3d 1177 (9th Cir. 1999) ........................................................................................ 8

18     *United States v. Feil*,
          No. CR 09-00863 JSW, 2010 WL 1525263 (N.D. Cal. Apr. 15, 2010) ........................ 18

19     *United States v. Giese*,
          597 F.2d 1170 (9th Cir. 1979) .............................................................................. 12, 13, 14, 16

20     *United States v. Halbert*,
          640 F.2d 1000 (9th Cir. 1981) ...................................................................................... 11

21     *United States v. Keuylian*,
          23 F. Supp. 3d 1126 (C.D. Cal. 2014) ........................................................................... 8

22     *United States v. Laurienti*,
          611 F.3d 530 (9th Cir. 2010) ........................................................................................ 19

23     *United States v. Long*,
          706 F.2d 1044 (9th Cir. 1983) ................................................................................ 13, 16

24     *United States v. Manarite*,
          44 F.3d 1407 (9th Cir. 1995) .................................................................................. 11, 12

25     *United States v. McDonald*,
          209 F. App'x 748 (10th Cir. 2006) ............................................................................... 10

26     *United States v. Morgenstern*,
          933 F.2d 1108 (2d Cir. 1991) ....................................................................................... 10

27     *United States v. Nachamie*,
          91 F. Supp. 2d 565 (S.D.N.Y. 2000) ............................................................................ 17

28

ER-6922

*United States v. Nance,*
    533 F.2d 699 (D.C. Cir. 1976) ..................................................................................... 8

*United States v. Pheaster,*
    544 F.2d 353 (9th Cir. 1976) ....................................................................................... 9

*United States v. Ryland,*
    806 F.2d 941 (9th Cir. 1986) ..................................................................................... 17

*United States v. Sampson,*
    448 F. Supp. 2d 692 (E.D. Va. 2006) ................................................................... 14, 15

*United States v. Smith,*
    776 F.2d 1104 (3d Cir. 1985)..................................................................................... 16

*United States v. Trie,*
    21 F. Supp. 2d 7 (D.D.C. 1998) ................................................................................. 18

*United States v. Trumpower,*
    546 F. Supp. 2d 849 (E.D. Cal. 2008)........................................................................ 14

*United States v. Whiteside,*
    285 F.3d 1345 (11th Cir. 2002) ................................................................................. 10

*United States v. Woods,*
    335 F.3d 993 (9th Cir. 2003) ........................................................................... 1, 12, 13

*Wilkins v. United States,*
    376 F.2d 552 (5th Cir. 1967) ..................................................................................... 18

*Yeargain v. United States,*
    314 F.2d 881 (9th Cir. 1963) ..................................................................................... 13

**Statutes**

18 U.S.C. § 1343 ................................................................................................................ 11
28 U.S.C. § 515 ............................................................................................................. 1, 21

**Rules**

F. R. Evid. 801(d)(2)(E)..................................................................................................... 19
Fed. R. Crim. P. 7(c)(1) ................................................................................................... 1, 7

## I.    INTRODUCTION

The Superseding Indictment contains all the information necessary for Defendants to understand the charges brought against them.  In their instant motion, Defendants speculate about additional details that could be included, but that is not the standard for a motion to dismiss or a request for a bill of particulars.  The sufficiency of an indictment is not determined by whether it could have been drafted with more detail.  Instead, an indictment is adequate if it informs the defendant of the charges in enough detail to avoid unfair surprise at trial and prevent double jeopardy.  A bill of particulars is inappropriate in cases where the charging document accomplishes these goals and allows a defendant to prepare a defense.  In such cases, a defendant's motion to dismiss or demand for a bill should be viewed for what it is:  a premature attack on the evidence or a strategic attempt to limit the government's proof at trial. The Court should permit neither.

Defendants' motion accuses the Indictment of being "short on details," "bare-bones," "skimpy," containing "paltry" factual allegations, "stingy in detail," and "enigmatic."  The Indictment is none of these things.  The eleven-page charging document easily satisfies the constitutional requirements for indictments because it contains a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  The Indictment's allegations are stated in sufficient detail to inform Defendants of the charges and allow them to argue double jeopardy.  This is all the Constitution requires, and Defendants cite no binding authority for the proposition that an indictment must quote a defendant's misrepresentations rather than describing them in substance.  In fact, the case law holds otherwise.  Defendants' arguments are particularly misplaced in this case, where the government has charged wire fraud under a theory that does not require it to ever prove—much less allege—any particular false statement.  *See United States v. Woods*, 335 F.3d 993, 1000 (9th Cir. 2003).

The Court should deny Defendants' request for a bill of particulars for similar reasons.  While Defendants take issue with some of the phrases the Indictment uses to describe their misrepresentations, the Indictment puts Defendants on notice regarding the particular false statements they must answer for at trial.  The government has also produced all the evidence currently in its possession relating to Defendants' false statements, and additional details regarding their fraudulent conduct are easily accessible in the discovery.  Under these circumstances, courts routinely deny requests for bills of

1    particulars.

2          Indeed, this Court has rejected similar attacks on indictments in recent fraud cases.  In *United*

3    *States v. Isaac Choi*, No. 17-cr-00308-EJD, and in *United States v. Christian Reimer Stukenbrock*, No.

4    15-cr-00034-EJD, this Court recognized that an indictment describing the substance of fraudulent

5    misrepresentations, combined with full discovery, is constitutionally sufficient and defeats a bill-of-

6    particulars motion.

7          For these reasons, discussed in more detail below, the Court should deny Defendants' motion in

8    its entirety.

9    **II.     BACKGROUND**

10         **A.       Defendants' Fraud as Alleged in the Indictment**

11         The Indictment in this case lays out the key events in the story of Defendants' company

12   Theranos, describing the fraudulent schemes that Holmes and Balwani devised and executed in order to

13   benefit themselves.  As detailed in the Indictment, one of Defendants' fraud schemes targeted investors

14   in Theranos—individuals and entities who entrusted Defendants with hundreds of millions of dollars

15   based on representations made by Defendants and at Defendants' direction.  In a separate but closely

16   related fraud, Defendants targeted doctors and patients who relied on Theranos's testing services to

17   diagnose health conditions and make high-stakes decisions about medical care.  In each of these

18   fraudulent schemes, Defendants misled victims regarding material facts about Theranos and the

19   capabilities of its blood-testing technology.  The effects of Defendants' fraudulent conduct were far-

20   reaching and severe:  investors lost hundreds of millions of dollars in total, and numerous patients

21   received unreliable or wholly inaccurate medical information from Theranos's flawed tests, placing

22   those patients' health at serious risk.

23         As alleged in the Indictment,[1] Theranos was founded by Holmes in approximately 2003, and

24   drew little public attention for its first ten years.  The company's stated goal was to develop innovative

25   methods for testing tiny blood samples obtained from a fingertip with a small lancet without the need for

26   traditional venous blood draws.  In 2013, Theranos began to publicize its technology and tout its

27   

28   ────────────

     [1]  All facts in the following summary correspond to the allegations in paragraphs 4 through 18 of
     the Superseding Indictment, ECF No. 39.

purported advantages, all while soliciting massive contributions from investors and gearing up toward the public launch of its testing services.  Beginning in September 2013, Theranos offered blood testing to patients at its "Wellness Centers" in various locations in California and Arizona.

Unbeknownst to those outside the company, Defendants were presenting investors with a deceptive picture of their business and its technology, overstating Theranos's achievements, promising unrealistically favorable developments on the horizon, and misrepresenting the abilities of its proprietary analyzer.  In dealing with doctors and patients, Defendants promoted the company's blood-testing services through explicit and implicit representations that Theranos's test results were reliable and accurate although they knew that was not the case.  Defendants' schemes to defraud involved the following representations, each of which Defendants knew to be false.

| Defendants' Specific False Representations | The Truth |
| --- | --- |
| Theranos's analyzer could perform the full range of clinical tests with small blood samples from a finger stick | The analyzer could perform only a limited number of tests |
| Theranos's analyzer produced results that were more accurate and reliable than those yielded by conventional methods | The analyzer had accuracy and reliability problems, and was not capable of consistently producing accurate and reliable results for certain blood tests including calcium, chloride, potassium, bicarbonate, HIV, Hba1C, hCG, and sodium<br><br>The information Theranos provided to patients included inaccurate results, improperly adjusted reference ranges, improperly removed "critical" results, and results generated from improperly validated assays |
| Theranos's analyzer allowed testing at a faster speed than previously possible | The analyzer was slower than some competing devices |
| Theranos conducted its patient sample testing using Theranos-manufactured analyzers | Theranos relied on commercially available, third-party-manufactured devices for patient testing |
| Theranos was financially stable and would generate more than $100 million in revenues in 2014 and approximately $1 billion in 2015 | Theranos was on track to generate—and did generate—only a few hundred thousand dollars in revenues in 2014 and 2015 |
| Theranos had an expanding partnership with Walgreens that would soon dramatically increase the number of locations where its testing was | The rollout in Walgreens stores had stalled for a variety of reasons including Walgreens's |

| provided | concerns regarding Theranos's performance |
|---|---|
| Theranos had a profitable business relationship with the Department of Defense under which Theranos analyzers had been deployed for use in the battlefield | The relationship with the Defense Department was limited, and Theranos's technology had not been used in the battlefield by the military |
| Theranos did not need FDA approval for its analyzer and tests, but intended to obtain such approval voluntarily | FDA was requiring Theranos to apply for clearance / approval for its analyzer and tests |
| Theranos's technology had been examined, used, and validated by major pharmaceutical companies and research institutions | Pharmaceutical companies and research institutions never examined, used, or validated Theranos's technology |

Besides repeating the above lies to multiple investors, Defendants also relayed them to members of the media, who then unknowingly published false information about Theranos's activities and technical capabilities. When potential investors visited Theranos's headquarters, they were shown technology demonstrations during which they were led to believe that blood tests were being conducted on a Theranos-manufactured analyzer when, in reality, the analyzer was running a protocol designed to give the appearance of full operation while no test was actually being run.

Defendants' fraud remained undetected until late 2015, when a journalist published an article exposing several of the misrepresentations discussed above. By that time, investors had already given Defendants the better part of one billion dollars and thousands of patients had put their trust in Theranos's technology for their blood testing needs.

Defendants were originally indicted in June 2018. On September 6, 2018, the grand jury returned a Superseding Indictment ("the Indictment') which lays out the above scheme and charges Defendants with two counts of conspiracy to commit wire fraud and nine substantive counts of wire fraud corresponding to specific wire transmittals in furtherance of their schemes to defraud.

### B. Additional Details Readily Apparent from the Government's Document Production

The government has conducted a thorough investigation in this case and has taken a liberal view of its discovery obligations, producing to the defense all of the evidence it has collected over the course of its ongoing investigation. The discovery production includes documents collected from Theranos

1    itself, from former employees of the company, from investors, from business partners of Theranos

2    including its most prominent partner Walgreens, from companies Theranos claimed had validated its

3    technology, from government agencies including FDA and DOD, from marketing companies who

4    worked with Theranos on advertising materials, from patients who had blood tests performed by

5    Theranos, from journalists who interviewed Holmes and Balwani, and from other sources.  Each

6    document in the government's production is bates stamped, with a prefix indicating the source of the

7    document.[2]

8            In addition to documentary evidence collected from relevant sources, the government's

9    investigation has included interviews of victims and others with relevant information about Defendants'

10   conduct, including representatives from the witness categories discussed above.  Each substantive

11   witness interview has been summarized in a report prepared by federal agents, and those reports have

12   been produced to the defense without exception.  Those reports attach—or reference by bates number—

13   the documents agents or prosecutors discussed with the witness during the interview.

14           Thus, a review of the discovery in this case yields additional details regarding the charged

15   conduct.  In particular, the interview reports associated with the victims in this case and the documents

16   attached to those reports disclose the misrepresentations they heard from Defendants and how they were

17   deceived.  For example, one Theranos investor told agents that, on a phone call on December 20, 2013,

18   Holmes claimed that Theranos's technology was being used on military medevac helicopters in

19   Afghanistan and was saving the lives of soldiers.[3]  Another investor representative reported that, based

20   on information from Theranos, she believed the company could perform over 100 tests using blood

21   drawn from a finger stick.[4]  That same witness discussed Theranos's financial health with Holmes and

22   Balwani, who told her in late 2014 that the company would break even that year and earn $1 billion in

23   revenue the following year.  These facts—along with all other statements made by investor victims to

24   government investigators—are easily located in the discovery production.

25

26   _____

          [2]  For example, "GSK-" denotes documents obtained from GlaxoSmithKline, "PFE-" denotes
27   documents obtained from Pfizer.

28           [3]  The report of this interview was produced to Defendants at "US-REPORTS-0007005."

          [4]  The report of this interview was produced to Defendants at "US-REPORTS-0004330."

GOVT. OPP TO MOT FOR BILL OF PARTICULARS
18-CR-00258 EJD                          5

Additionally, many of Theranos's investors were given a slide deck prepared by the company. Various versions of that presentation appear throughout the documents collected from the investors and produced to Defendants. That presentation is brimming with false statements, preserved in their final form approved by Defendants and delivered to victims. For example, in that presentation under an image depicting blood being collected from a finger stick, the text reads "Theranos runs any test available in central laboratories, and processes all sample types." That same page claimed that Theranos processes ensured "the highest levels of accuracy and precision." The presentation later claimed that "All 1000+ currently run tests/CPT codes are available through Theranos." It also boasted of an "unprecedented lack of variation" in Theranos's test results. Not one of these statements was true. Moreover, the presentation included a menu purporting to show a portion of the tests Theranos could perform. In reality many of the categories of tests on that menu were still in the research-and-development stage and could not be performed using a finger stick sample or were not available to patients at all.[5]

Details regarding Defendants' scheme to defraud doctors and patients are similarly accessible in the government's production. A doctor who had experience with Theranos reported that the company told him that their device was FDA-approved and that it had met all the national laboratory standards.[6] Shortly after that doctor began sending patients to Theranos, however, he began receiving erroneous lab results unlike anything he had seen from conventional labs. He discussed the inaccurate results with Theranos and eventually stopped using the company for blood testing.

In July 2019, to aid Defendants in navigating the document production, the government provided the defense with two detailed discovery indexes. The first index allows Defendants to locate documents from a given source in the production, specifying the bates prefix, production size, and date(s) of production for each source. The second index lists the bates number range for each report summarizing

---

[5] One of many copies of this presentation in the government's production can be found at bates TS-0315637, with the above-described false statements occurring on pages -651, -685, and -703. A senior scientist formerly employed by Theranos has confirmed the falsity of these representations along with many more found in that presentation and similar materials. Reports of his interviews are available to Defendants in the government's production at US-REPORTS-0007668, -7694, and -8040.

[6] The report of the interview summarizing this doctor's statements can be found at US-REPORTS-0008577.

GOVT. OPP TO MOT FOR BILL OF PARTICULARS
18-CR-00258 EJD                    6

ER-6929

1    a witness interview conducted by the government, allowing the defense to easily locate such reports and

2    the relevant documents discussed during interviews for any given witness with whom the government

3    has had substantive contact.  The defense has not requested updated versions of these indexes since they

4    were initially turned over, but the government is willing to update them periodically as its investigation

5    continues.

6    **III.    ARGUMENT**

7            **A.    The Superseding Indictment Adequately Advises Defendants of the Charges**

8            Federal Rule of Criminal Procedure 7 states that an indictment must be a "plain, concise, and

9    definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P.

10   7(c)(1).  Consistent with that standard, the Ninth Circuit has held that an indictment fulfills its purpose

11   as long as it "set[s] forth the elements of the offense charged" and "contain[s] a statement of the facts

12   and circumstances that will inform the accused of the specific offense with which he is charged."

13   *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979).  An indictment is acceptable "if it contains

14   the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable

15   him to plead double jeopardy."  *United States v. Buckley*, 689 F.2d 893, 896 (9th Cir. 1982).  Two

16   "corollary purposes" of an indictment are  (1) "to ensure that the defendants are being prosecuted on the

17   basis of the facts presented to the grand jury," and (2) "to allow the court to determine the sufficiency of

18   the indictment."  *Id.*  Before trial, those goals are deemed accomplished as long as the indictment

19   satisfies the primary requirements.  *Id.* at 896 n.3.  The corollary purposes become more important after

20   trial, "when the theory on which the Government has obtained a conviction is clear."  *Id.*

21           Although a fraud indictment must put a defendant on notice as explained above, the fraudulent

22   scheme itself "need not be pleaded with all the certainty in respect of time, place, and circumstance

23   requisite in charging the [jurisdictional element of the crime]."  *United States v. Curtis*, 506 F.2d 985,

24   990 (10th Cir. 1974) (quoting *United States v. Crummer*, 151 F.2d 958, 963 (10th Cir. 1945)).  The

25   government "need not allege its theory of the case or supporting evidence" in an indictment.  *Buckley*,

26   689 F.2d at 897.  In *Buckley*, the Ninth Circuit applied these principles and reversed the dismissal of a

27   criminal case, holding that the indictment provided the defendant with sufficient notice despite the

28   court's harsh criticism that the indictment was "lengthy, confusing, and largely irrelevant."  *Buckley*,

689 F.2d at 899.

Here, the Indictment outlines Defendants' overall schemes to defraud investors and patients, and goes on to describe at least nine particular false statements that Defendants repeated to victims throughout the relevant time period. Not only does the Indictment disclose those misrepresentations, it specifies the manner in which each one was false. (See chart in Section II.A above). That these misrepresentations may not be verbatim quotes does not hinder Defendants in understanding the charges or arguing double jeopardy in the future if needed. The substance of the misrepresentations and the identities of the targets are plainly sufficient for these purposes. Requiring more would go beyond the mere notice requirements contemplated by Rule 7 and would amount to compelling early disclosure of the government's trial evidence.

Because the Indictment informs Defendants of the charges in sufficient detail, and lays out the substance of their various misrepresentations, it stands in stark contrast to the indictments that other courts have held insufficient. For example, in *Curtis*, an out-of-circuit case cited by Defendants, the indictment referenced "false and misleading representations about the services of a computer matching service for single persons" but did not state what those false representations were, and otherwise "plead[ed] little more than the statutory language." *United States v. Curtis*, 506 F.2d 985, 988-89, 992 (10th Cir. 1974). The Tenth Circuit in that case cited favorably a form indictment appended to the Federal Rules of Criminal Procedure. *Id.* at 987. That form indictment alleges false statements in substance only and not by quotation, and discloses far less detail than the Indictment in this case. *Id.* at 987-88. Similarly, in *Keuylian*, a district court dismissed an indictment alleging that the defendant "executed a scheme to defraud" but completely failing to describe any misrepresentation or other act of deception beyond simple breach of contract. *United States v. Keuylian*, 23 F. Supp. 3d 1126, 1128 (C.D. Cal. 2014).[7] In *Du Bo*, the challenged indictment simply neglected to allege the mens rea element. *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). The indictment in *Nance* alleged that a defendant "made the following representations…" but mistakenly omitted any descriptions of those representations. *United States v. Nance*, 533 F.2d 699, 700-02 (D.C. Cir. 1976). Here, the Indictment

---

[7] The court in *Keuylian* favorably cited an Information previously filed in that case, which alleged the defendant's misrepresentations by substance rather than verbatim. *Id.* at 1127, 1129.

GOVT. OPP TO MOT FOR BILL OF PARTICULARS
18-CR-00258 EJD                                        8

1   does not include any such glaring defects.

2        Nonetheless, Defendants quibble with the language the Indictment uses to describe their

3   misrepresentations.  Despite their feigned confusion, the terms in the Indictment generally have their

4   usual meaning, and the allegations as a whole are more than sufficient to put Defendants on notice of the

5   charges against them as required by the cases discussed above.  The Ninth Circuit advises that an

6   indictment should be "read as a whole," "read to include facts which are necessarily implied," and

7   "construed according to common sense."  *Buckley*, 689 F.2d at 899.  "A challenge to the sufficiency of

8   an indictment is not a game in which the lawyer with the sharpest eye or the cleverest argument can gain

9   reversal for his client.".  *See United States v. Pheaster*, 544 F.2d 353, 360 (9th Cir. 1976).  Under these

10  principles, Defendants' arguments fail.  Common sense is all that is required for a full understanding of

11  the allegations in this case.

12       For example, Defendants object to the phrase "proprietary analyzer" in the Indictment, arguing

13  that Theranos's technology comprised many assays, devices, and protocols.  The Indictment itself

14  accounts for this fact, stating that Theranos referred to its proprietary devices using several terms

15  (paragraph 5) and using the term "proprietary analyzer" to describe those devices collectively

16  (paragraph 12(A)).  Similarly, Defendants complain that it is unclear what the Indictment means when it

17  repeats Defendants' claim that their analyzer could perform the full range of clinical tests.  Defendants

18  themselves used similar language when describing what their technology could do, as discussed above

19  in Section II.B.[8]  Defendants also complain that the Indictment does not specify the timing of their

20  claims about what their analyzer could do.  The Indictment does not attach dates to those

21  misrepresentations because Defendants repeated these misleading statements throughout the relevant

22  time period.  Moreover, despite Defendants' argument, the truth or falsity of a given statement in this

23  category does not depend on its precise timing; Theranos's devises were *never* capable of doing the

24  things Defendants claimed they could do.

25

26       [8]  Holmes also made this misrepresentation publicly.  For example, on July 9, 2014, in USA
    Today, Holmes was quoted as claiming that Theranos had "worked to redevelop *all of the tests run in a*
27  *traditional laboratory* to be able to take a tiny sample, a few droplets of blood."  [cite] (emphasis
    added).  During a TEDMED talk on March 17, 2015, Holmes said that Theranos had "made it possible
28  to run comprehensive laboratory tests from a tiny sample or a few drops of blood that could be taken
    from a finger."

GOVT. OPP TO MOT FOR BILL OF PARTICULARS
18-CR-00258 EJD                    9

ER-6932

1       Defendants take issue with the Indictment's allegations regarding false statements concerning

2  Theranos's expanding partnership with Walgreens and claims that the company was about to

3  dramatically increase the number of Theranos testing locations.  According to Defendants, it is

4  impossible to know the meaning of this allegation without the exact words Defendants used.  This

5  complaint is simply a repackaged version of Defendants' general argument that they cannot be charged

6  with fraud unless the Indictment discloses the exact words they used to deceive their victims.  The case

7  law requires the opposite conclusion.  An indictment is sufficient if it alleges the substance of a

8  defendant's fraudulent statements.

9       Defendants next argue that they could not have made fraudulent statements regarding the FDA's

10  oversight of Theranos because the regulatory requirements for LDTs (Laboratory Developed Tests) is

11  unclear.  Defendants are free to assert this defense at trial, but it misses the point of the charges.

12  Regardless of the state of the law on LDTs in general, the Indictment alleges that FDA "*was requiring*

13  Theranos to apply for clearance or approval for its analyzer and tests."  (Indictment at ¶ 12(F))

14  (emphasis added).  Defendants admit that the agency has discretion to make such an enforcement

15  decision.  The evidence at trial will show that the FDA informed Theranos of the agency's requirements,

16  which Defendants chose to misrepresent when speaking to victims.  This case is therefore different from

17  *Whiteside*, cited by Defendants, which involved no similar direction from a regulatory agency.  *United*

18  *States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002).

19       As to doctors and patients who relied on Theranos's test results, Defendants contend that the

20  Indictment's allegations are vague, leaving them to wonder whether the alleged misrepresentations were

21  implicit.  (Mot. at 7-8).[9]  A more careful reading of the Indictment answers Defendants' questions.

22  Paragraphs 15 and 16 allege that Defendants defrauded patients through "explicit and implicit claims"

23  about the company's ability to provide accurate and reliable blood tests—claims which were false

24  because Defendants knew that their technology could not consistently produce such results for certain

25

26       [9]  Defendants do not argue, because they cannot, that implicit misrepresentations are incapable of

27  forming the basis of a fraud conviction.  *See, e.g.*, *United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (affirming bank fraud conviction based on implicit misrepresentation); *United States v.*

28  *McDonald*, 209 F. App'x 748, 751 (10th Cir. 2006) (same, collecting cases re implicit misrepresentations).

GOVT. OPP TO MOT FOR BILL OF PARTICULARS
18-CR-00258 EJD          10

1   assays identified by name in the Indictment. Reading the Indictment "as a whole," including "facts

2   which are necessarily implied," *see Buckley*, 689 F.2d at 899, it is obvious that Defendants are charged

3   with implicitly and explicitly claiming that Theranos could consistently produce accurate and reliable

4   results when in fact it could not. Paragraph 9 of the Indictment includes an example of an explicit

5   statement, quoting a claim from Theranos's public website that the company's lab could perform tests

6   "quickly *and accurately* on samples as small as a single drop." (emphasis added). Defendants seem to

7   argue that such statements are too vague to be true or false. The evidence at trial will prove that they

8   were part of Defendants' scheme to defraud, and were intended to mislead potential investors and

9   customers.[10]

10      **B.    The Government is Not Required to Plead or Prove Specific False Statements**

11        Defendant's motion rests on the central argument that the government has failed to provide

12   Defendants with sufficient information concerning an essential element of the offense, specifically, the

13   precise wording of Defendants' false statements and the circumstances surrounding those statements.[11]

14   As explained above, the Indictment clearly discloses the substance of those statements in sufficient

15   detail. It is also worth noting, however, that Defendants are charged with engaging in a scheme to

16   defraud—an offense that does not require the government to allege or prove specific false statements.

17   An individual can commit wire fraud in violation of 18 U.S.C. § 1343 in two ways: (1) by participating

18   in "a scheme or artifice to defraud" or (2) by "obtaining money or property by means of false or

19   fraudulent pretenses, representations, or promises." *United States v. Halbert*, 640 F.2d 1000, 1007 (9th

20   Cir. 1981).[12] Significantly, a defendant's conduct can constitute a scheme or artifice to defraud

---

22     [10] Defendants' scheme to defraud patients is discussed in greater detail in the government's
23 opposition to Defendants' Motion to Dismiss Counts Two and Nine through Eleven of Superseding
Indictment, filed herewith.

24     [11] Defendants' citation to *Neder* and its progeny is inapposite. That case simply held that
materiality of falsehood was an element of the federal wire fraud statute. *Neder v. United States*, 527
25 U.S. 1, 25 (1999). *Neder* does not hold that an Indictment must reproduce a defendant's fraudulent
statements verbatim. The government does not contest that it must prove materiality, the Indictment
26 expressly alleges materiality, and the misrepresentations described in the Indictment are material on
their face. Of course, it will ultimately be up to the jury to find that this element is met.

27     [12] Although this language is actually addressing mail fraud under section 1341, "[t]he mail fraud
28 and wire fraud statutes share identical language regarding the scheme requirements, so the wire fraud
statute is read in light of the case law on mail fraud. *United States v. Manarite*, 44 F.3d 1407, 1412 (9th
Cir. 1995), as amended on denial of reh'g (Mar. 15, 1995) (quotation omitted).

GOVT. OPP TO MOT FOR BILL OF PARTICULARS
18-CR-00258 EJD         11

"whether or not any specific misrepresentations are involved." *Id.* (citing cases). Even when a defendant is charged under both the scheme and false statements theories of fraud, a wire fraud conviction does not require proof of a specific false statement. *United States v. Woods*, 335 F.3d 993, 1000 (9th Cir. 2003)[13]; *see also Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967) ("If a scheme is devised with the intent to defraud," and the jurisdictional element is met, "the fact that there is no misrepresentation of a single existing fact is immaterial.").

In this case, the Indictment charges Defendants with both engaging in a scheme to defraud and obtaining money by means of materially false representations. Accordingly, neither the Indictment, nor the discovery in this case, nor the eventual proof at trial needs to include details regarding the exact words Defendants used to defraud their victims or the times and places Defendants uttered those words. Because specific false statements are not an element of the offense in this case, Defendants cannot compel disclosure of additional details regarding specific false statements. *See United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979) (finding indictment legally sufficient, affirming denial of bill of particulars motion, and stating that the "information available to appellant was actually more than he had a right to demand, for there is no requirement in conspiracy cases that the government disclose even all the overt acts in furtherance of the conspiracy"). The purpose of a charging document or a bill of particulars is to inform the defendant of the nature of the charges against him, and that goal has already been accomplished by the Indictment here—especially in light of the fact that those charges do not require specific false statements by Defendants.

Given the detailed Indictment and comprehensive discovery in this case, Defendant's arguments boil down to a complaint that the government's evidence will be insufficient to establish that Defendants committed a fraud. A motion to dismiss is not the appropriate vehicle for such a complaint. And, of course, indictments are not subject to challenge "on the ground that there was inadequate or incompetent evidence before the grand jury." *Costello v. United States*, 350 U.S. 359, 363 (1956).

---

[13] The *Woods* opinion recognizes two forms that wire fraud can take: (1) a scheme or artifice to defraud, or (2) obtaining money or property by means of false or fraudulent pretenses, representations, or promises. *Id.* at 1000 n.4. *Woods* postdates the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000), cited by Defendants for the proposition that wire fraud does not encompass two distinct types of schemes to defraud. In fact, *Cleveland* merely states that the two theories should not be construed independently. *Cleveland*, 531 U.S. at 26.

1     Accordingly, the Court should deny Defendants' motion to dismiss the Indictment.

2     **C.    A Bill of Particulars is Unnecessary**

3     Rule 7(f) provides that a court may direct the government to file a bill of particulars. A motion

4 for a bill of particulars is appropriate where a defendant requires clarification in order to prepare a

5 defense. *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983). The bill of particulars itself is

6 "designed to apprise the defendant of the specific charges being presented to minimize danger of

7 surprise at trial, to aid in preparation and to protect against double jeopardy." *Id.* A court should order a

8 bill of particulars only when the indictment is "too vague and indefinite for such purposes." *United*

9 *States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979) (quotation omitted). A bill of particulars is not

10 meant to give the defense a preview of the government's proof at trial. "A defendant is not entitled to

11 know all the evidence the government intends to produce, but only the theory of the government's case."

12 *Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963). "[I]f the information sought by defendant

13 is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."

14 *United States v. Bortonovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

15     One important reason to limit the use of the bill is "to avoid freezing the government's case as a

16 result of the rule that evidence at trial must conform to the bill." Wright, 1 Fed. Prac. & Proc. Crim.

17 § 130 (4th ed.). The decision whether to grant a request for a bill of particulars is within the trial court's

18 discretion, and such decisions are disturbed only for abuse of discretion. *Long*, 706 F.2d at 1054; *United*

19 *States v. Clay*, 476 F.2d 1211, 1215 (9th Cir. 1973).

20     As discussed above, the Indictment satisfies the constitutional requirements of putting

21 Defendants on notice regarding the charges and enabling them to argue double jeopardy. Along with the

22 discovery in this case, the Indictment also contains enough detail to minimize the danger of surprise at

23 trial. Not only does the Indictment describe Defendants' schemes to defraud investors and patients, it

24 details the specific misrepresentations Defendants used to fool their victims, including allegations as to

25 why those representations were false. A bill of particulars cannot require additional detail about the

26 content of those false statements in a case where the government is not required to prove false

27 statements at all. *See Woods*, 335 F.3d at 1000 (discussed above). Nor is the government required to

28 determine and disclose the exact timing and surrounding circumstances of each misrepresentation. *See*

*Giese*, 597 F.2d at 1180 ("Appellant's request for the 'when, where, and how' of every act in furtherance of the conspiracy was equivalent to a request for complete discovery of the government's evidence, which is not a purpose of the bill of particulars.").

The cases cited by Defendants—in which courts ordered bills of particulars to supplement minimalist indictments—are easily distinguished. For example, in *Bortonovsky*, an out-of-circuit case, the indictment charged the defendants with submitting false claims for burglary losses, but did not specify which of fifteen burglaries the defendants had fabricated, requiring the defense to waste effort proving that many of the claimed burglaries actually had occurred. *United States v. Bortonovsky*, 820 F.2d 572, 574-75 (2d Cir. 1987). The prejudice to the defense in that case arose partly because defense counsel "had only four days within which to prepare a defense." *Id.* at 575. Here, in contrast, the Indictment gives notice of specific misrepresentations Defendants will need to address at trial, and defense counsel has had ample time to review the discovery detailing the misrepresentations and prepare defenses, if any, to these charges.

In *Trumpower*, the court required a bill of particulars in a money laundering case where the laundered funds were allegedly derived from a scheme involving fraud, although there were "no substantive mail or wire fraud charges alleged." *United States v. Trumpower*, 546 F. Supp. 2d 849, 851 (E.D. Cal. 2008). The indictment in that case did not contain any "pleading of the factual circumstances of the specific mail or wire fraud that produced [the allegedly laundered] funds," alleging the existence of a fraudulent scheme "only in completely generic terms." *Id.* at 851-52. In contrast, the Indictment in this case charges Defendants with nine substantive counts of wire fraud distinguished by date and other identifying details including, where applicable, wire transfer amount and bank information. The Indictment also pleads the factual circumstances of the schemes to defraud, explaining several categories of Defendants' false representations to investors and patients. This level of specificity goes far beyond the "completely generic terms" at issue in *Trumpower*.

In the *Sampson* case from the Eastern District of Virginia, an indictment alleged that the defendant committed mail fraud by "delivering fraudulent documents relating to a 2004 Yukon Denali through DHL Express Delivery Service." *United States v. Sampson*, 448 F. Supp. 2d 692, 696 (E.D. Va. 2006). The indictment in that case "fail[ed] to state which specific documents were fraudulent, and what

1  was allegedly fraudulent about the documents at issue." *Id.*  Here, the Indictment contains much more

2  than bare allegations about unspecified "fraudulent documents."  Instead, it alleges the actual substance

3  of Defendants' misrepresentations and how they fit into the larger schemes to defraud.

4  In *Caine*, a district court in the Southern District of New York ordered a bill of particulars setting

5  forth a defendant's fraudulent representations where the indictment merely referenced "false and

6  misleading representations as to the nature of the fish lures which would be supplied" in response to

7  mail orders  without explaining *how* those representations were false and misleading.  *United States v.*

8  *Caine*, 270 F. Supp. 801, 803 (S.D.N.Y. 1967).[14]  As shown above in Section II.A, the Indictment here

9  does not suffer from the same deficiency.

10  The timing of Defendants' motion also weighs against their arguments.  This case was originally

11  indicted in June of 2018—approximately eighteen months before Defendants got around to filing their

12  motion requesting a bill of particulars.  In the year and a half since the Indictment, Defendants have

13  conducted their own investigation of the charges and litigated the case, generating potential defenses and

14  raising disputes concerning the government's use of the grand jury and the scope of the government's

15  discovery obligations.  Such a delay in seeking a bill of particulars, and Defendants' active litigation of

16  this case in the meantime, are plainly inconsistent with Defendants' current claims that they do not

17  understand the charges in the Indictment.  If the Indictment were so unclear, one would expect

18  Defendants to have raised their complaints at the outset of this case.  Indeed, the Federal Rules of

19  Criminal Procedure contemplate a bill-of-particulars motion being filed immediately after the

20  indictment.  Rule 7 of the Federal Rules of Criminal Procedure provides that a defendant "may move for

21  a bill of particulars before or within 14 days after arraignment or at a later time if the court permits."

22  Fed. R. Crim. P. 7.

23  **1.    Defendants Have Received Comprehensive Discovery Disclosing the Full Scope of the Evidence Against Them**

24  The details of the charged offense that are not self-evident in the Indictment have already been

25  disclosed in the comprehensive discovery in this case.  The Ninth Circuit has stated in the clearest of

26  

27  _____

28  [14]  That court nonetheless held that the indictment in that case met the standard of informing the defendant with sufficient particularity of the scheme to defraud to enable his defense and prevent double jeopardy, and denied a motion to dismiss.  *Id.* at 803-04.

terms that "full discovery also obviates the need for a bill of particulars." *Giese*, 597 F.2d at 1180; *see also Long*, 706 F.2d at 1054 ("Full discovery will obviate the need for a bill of particulars"); *Clay*, 476 F.2d at 1215 (affirming denial of motion for a bill of particulars specifying the "day, time, and place of the commission of the offenses alleged in the indictment, and [defendant's] role or participation therein" in light of the fact that full discovery was permitted).

As discussed above, the government's discovery production in this case has supplied Defendants with all the information they need to prepare their defense and avoid unfair surprise at trial. Defendants are quick to complain about the volume of discovery—while simultaneously demanding additional documents from custodians like the FDA—but the facts sought by Defendants' motion are easily retrievable from the discovery. As illustrated in Section II.B above, the key evidence in this case relating to Defendants' fraudulent conduct is summarized in the reports of witness interviews, and those reports attach the documents discussed with those witnesses. Because the government has not withheld any such information, and has aided the defense in navigating it and locating specific items, Defendants are well-situated to answer their own questions by referring to the evidence itself.

The defense cites cases that deviate from the general rule that discovery obviates the need for a bill, but those cases are not instructive. For example, as discussed above, the *Bortonovsky* case involved unique facts and an extremely limited time period not present here, and that Second Circuit case is not binding on this Court. *Bortonovsky*, 820 F.2d at 574-75.

Not only do the Indictment and discovery satisfy the purpose of a bill of particulars, they also contain all the information concerning Defendants' criminal conduct known to the government. Thus, the defense is on equal footing with the government in its ability to review the evidence and locate relevant inculpatory and exculpatory items.

**2. Defendants Are Not Entitled to the Categories of Information They Demand**

A bill of particulars is not intended as a tool for "complete discovery of the government's evidence." *Giese*, 597 F.2d 1170, 1180; *see also United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985) (a bill of particulars is not the "equivalent of civil discovery" and "is not intended to provide the defendant with the fruits of the government's investigation"). But it is clear from Defendants' motion that they are attempting to use it as a discovery device. Below, the government addresses the specific

1  categories of information defendants improperly include in their request.

2      *Details Regarding False Representations* – As discussed above and as shown by the case law, it

3  is entirely proper for an indictment to describe a fraud defendant's misrepresentations in substance

4  without including verbatim quotes.  Moreover, the discovery in this case includes reports summarizing

5  all interviews of victim witnesses—the targets of Defendants' fraud.  Defendants need only review those

6  reports to learn what those witnesses told investigators about Defendants' misrepresentations.  The

7  Court should decline to order a bill of particulars on this topic.

8      *Names of Investor, Doctor, and Patient Victims Who May Testify as to Having Been Deceived* –

9  There is no need for the Court to order a bill of particulars informing the defense of which victims might

10  testify at trial.  Courts recognize that "the proper scope and function of a bill of particulars is not to

11  obtain disclosure of evidence or witnesses to be offered by the Government at trial." *United States v.*

12  *Nachamie*, 91 F. Supp. 2d 565, 570 (S.D.N.Y. 2000); *see also*, *United States v. Ryland*, 806 F.2d 941,

13  942 (9th Cir. 1986) (a defendant is "not entitled to know the contents of the testimony of each of the

14  government witnesses before trial").  Moreover, Defendants are already well aware of the victims whom

15  the government has interviewed as part of its investigation.  Although the Indictment protects the

16  identities of specific victims through anonymization, the government disclosed to the defense the

17  identities of victims referenced in the Indictment more than a year ago pursuant to its discovery

18  obligations.  The government has provided the defense with reports detailing the substance of those

19  interviews, so Defendants also are fully aware of the statements those victims made to government

20  investigators and any other information they provided.  Because they have those reports as well as agent

21  notes from those interviews and copies of any documents discussed with those witnesses, Defendants

22  have full access to all of the information in the government's possession concerning the victims and how

23  they might testify about Defendants' deception.  To the extent Defendants are seeking information as to

24  which of the many victims the prosecution intends to actually call at trial, this request is premature and

25  duplicative of other deadlines in the case.  The government is still interviewing and evaluating potential

26  witnesses, and has not yet made its final decisions as to whom it will call at trial.  The Court has set a

27  relatively early deadline of May 1, 2020 in this case for the government to disclose its trial witness list.

28  The government's witness list will be provided to Defendants at the time determined by the Court and,

GOVT. OPP TO MOT FOR BILL OF PARTICULARS
18-CR-00258 EJD                          17

1    combined with the interview reports and associated documents, will give Defendants the information

2    they need to continue preparing for trial.

3           *Names of Co-conspirators* – Although Defendants cite a handful of district court cases where

4    courts required the government to disclose the identities of coconspirators, the majority of these cases

5    are out of district, and all are distinguishable.  In *United States v. Bazezew*, for example, *sixteen*

6    defendants were charged with engaging in a bribery scheme, and the court ordered a limited bill of

7    particulars identifying coconspirators and describing overt acts because the indictment in that case

8    provided "very little information" regarding the actions of the various coconspirators during the key

9    time period.  *United States v. Bazezew*, 783 F. Supp. 2d 160, 168-69 (D.D.C. (May 11, 2011)

10   (recognizing, however, that a bill of particulars "is not a discovery device or a tool for allowing the

11   defense to preview the government's theories of the government's evidence"); *see also United States v.*

12   *Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998) (granting request where case involved 18 coconspirators and failed

13   to identify false statements).  In contrast to these opinions, the Ninth Circuit's view on this issue is

14   unambiguous and does not support Defendants' argument.  In *United States v. DiCesare*, the Ninth

15   Circuit acknowledged that a defendant was seeking a bill of particulars for three reasons, one of which

16   was "to obtain the names of any unknown coconspirators."  *United States v. DiCesare*, 765 F.2d 890,

17   897–98 (9th Cir.), *amended*, 777 F.2d 543 (9th Cir. 1985).  According to the Ninth Circuit, "these

18   reasons… *do not warrant a bill of particulars*."  *Id.* (emphasis added) (citing *Wilkins v. United States*,

19   376 F.2d 552, 562-63 (5th Cir. 1967), *cert. denied*, 389 U.S. 964 (1967)).[15]  There is no reason for the

20   Court to disregard the Ninth Circuit's guidance in this case.

21          Defendants say they are worried that, at trial, the government will offer statements from

22   unnamed coconspirators as evidence of the fraudulent schemes, and that the absence of coconspirator

23   names in the Indictment means that the group of potential speakers is "an unbounded set."  (Mot. at 12).

24   Defendants fear of surprise is unfounded.  The Local Criminal Rules in this District already require a

25   detailed pre-trial disclosure of any coconspirator statements the government intends to offer at trial.

26   Specifically, Rule 16-1(c)(4) provides that, pursuant to a schedule set by the Court, the government must

27

28          [15]  *See also United States v. Feil*, No. CR 09-00863 JSW, 2010 WL 1525263, *3 (N.D. Cal. Apr.
     15, 2010) ("In general, a bill of particulars is not warranted to obtain the names of co-conspirators….").

1    disclose a "summary of any statement the government intends to offer under F. R. Evid. 801(d)(2)(E) in
2    sufficient detail that the Court may rule on the admissibility of the statement."  The current deadline for
3    that disclosure in this case is May 1, 2020—well in advance of trial.  Accordingly, Defendants do not
4    need a bill of particulars addressing this issue, even if the law supported their request for one.

5         *Details Regarding Defendants' Duty to Disclose and Material Omissions* – Defendants ask for a
6    bill of particulars detailing their alleged duty to disclose and material omissions.  The Indictment,
7    though, already alleges the facts that Defendants withheld from victims, such as the facts that Theranos
8    relied on third-party analyzers for its tests and that its Walgreens rollout had stalled.  Further, the
9    government is not required to plead or prove the existence of a trust relationship creating a duty to
10   disclose when a defendant uses misleading half-truths in a scheme to defraud, as Defendants did here.
11   *See United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010).  These issues are discussed in greater
12   detail in the government's Opposition to Defendants' Motion to Dismiss Superseding Indictment in Part
13   for Failure to Allege Falsity and Motion to Strike (ECF No. 205), filed herewith.

14         **3.**     **This Court Has Denied Similar Requests for a Bill of Particulars**

15        Consistent with the principles discussed above, this Court has previously denied motions for a
16   bill of particulars in cases similar to this one.  In *United States v. Isaac Choi*, the defendant was indicted
17   for several counts of wire fraud after devising and executing a scheme to recruit employees and obtain
18   money "under false pretenses and promises regarding the financial support for and stability of" his
19   company.  Indictment (ECF. No. 1), *United States v. Isaac Choi*, No. 17-cr-00308-EJD (N.D. Cal. Jun.
20   1, 2017).  The government also alleged that the scheme included "maintain[ing] the employment of
21   various [company] employees by falsely claiming to have paid their earned salaries, bonuses, and other
22   compensation."  *Id.*  The indictment went on to generally describe the substance of that defendant's
23   misrepresentations.  For example, it alleged that, "[b]eginning in or around December 2015, while
24   speaking with investors and employees of [the company], Choi falsely claimed that he had access to
25   significant personal wealth and was investing significant amounts of money into the company."  *Id.* at
26   ¶ 5.  The indictment similarly alleged that "[o]n multiple occasions, Choi induced [company] employees
27   to loan money to or invest in [the company] by falsely claiming that the money he intended to invest
28   would shortly be forthcoming."  *Id.* at ¶ 7.  These misrepresentations and others were described in the

1    Choi indictment by general substance. The Choi indictment did not lay out the exact wording used, the

2    dates and times of the misrepresentations, or the precise identities of the listeners.

3          In denying Choi's motion for a bill of particulars as to the defendant's false statements, this

4    Court noted that discovery had been produced to the defendant. Order Denying Defendant's Motion for

5    Bill of Particulars (ECF. No. 32), *United States v. Isaac Choi*, No. 17-cr-00308-EJD (N.D. Cal. Dec. 29,

6    2017). The Court also relied on the government's representation that the statements described in the

7    paragraphs of the indictment cited above "form[ed] the core of its case" against the defendant. *Id.* On

8    those facts, the Court found that the defendant already had the information he needed to prepare for trial

9    and prevent double jeopardy. *Id.*

10         Similarly, in *United States v. Christian Reimer Stukenbrock*, this Court denied a defendant's

11    motion for a bill of particulars where a five-page indictment described the defendant's scheme to

12    defraud, listed the charges against the defendant, and identified specific financial transactions in

13    connection with the charged wire fraud counts. Order Denying Defendant's Motion for Bill of

14    Particulars (ECF No. 143), *United States v. Christian Reimer Stukenbrock*, No. 15-cr-00034-EJD (N.D.

15    Cal. Jun. 26, 2018). The indictment in that case alleged a scheme to defraud that spanned at least five

16    years, and charged the defendant with defrauding an investor "by promising to invest [the victim's]

17    money in specified companies on behalf of [the victim] and instead diverting a large share of the

18    investment monies to himself." Indictment (ECF No. 1), *Stukenbrock*, No. 15-cr-00034-EJD. That

19    indictment further alleged that the defendant "promised to invest all the money in the partner companies,

20    save for at most 5% of the investment funds, which he represented would be used for the operating

21    expenses of [his investment company]." *Id.* That indictment contained few additional details regarding

22    the defendant's representations or other statements to the victim. Nonetheless, this Court followed the

23    case law discussed above and rejected Stukenbrock's complaint that the indictment failed to identify any

24    specific fraudulent statements or the details surrounding such statements, including when and where the

25    statements were made and whether anyone was a witness to those statements. *Id.* at 3.

26         That same reasoning applies here and warrants denial of Defendants' motion. In this case, as in

27    *Choi* and *Stukenbrock*, the government has charged Defendants with schemes culminating in specific

28    instances of wire fraud. The Indictment lays out the nature and objective of the scheme, and also

GOVT. OPP TO MOT FOR BILL OF PARTICULARS
18-CR-00258 EJD                    20

describes in substance the misrepresentations Defendants made to the victims in furtherance of the scheme.  In fact, the Indictment in this case goes into significantly more detail regarding the alleged false statements than its counterparts in *Choi* and *Stukenbrock*.  As in those earlier cases, the misrepresentations described in the Indictment form the core of the government's case against Defendants.  Thus, the Indictment here accomplishes its purpose of providing notice of the charges.  The discovery, including detailed reports memorializing the government's interviews of victims and other witnesses, provides additional context regarding the charged conduct.  The law requires nothing more.

## IV.    CONCLUSION

The Indictment in this case satisfies constitutional standards and, along with the thorough discovery produced by the government, informs Defendants of the charges in enough detail for them to prepare for trial and avoid double jeopardy.  Accordingly, the Court should disregard Defendants' feigned confusion and deny their motion to dismiss or for a bill of particulars.

DATED:  January 13, 2020                          Respectfully submitted,

ADAM A. REEVES
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515

_/s/_____
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys