**Docket No. 22-10338**

_____

**United States Court of Appeals for the Ninth Circuit**

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant.*

_____

*Appeal from a Decision of the United States District Court for the Northern District of California, No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila*

_____

***AMICI CURIAE* BRIEF ON BEHALF OF THE AMERICAN BOARD OF CRIMINAL LAWYERS, CALIFORNIA ATTORNEYS FOR CRIMINAL JUSTICE, AND DUE PROCESS INSTITUTE IN SUPPORT OF APPELLANT**

_____

Paul N. Monnin
Danielle K. Goldstein
**ALSTON & BIRD LLP**
1201 W. Peachtree Street
Atlanta, Georgia 30309
Tel.: 404-881-7000
Paul.Monnin @alston.com
Danielle.Goldstein@alston.com

*Of Counsel*

Kim Chemerinsky
*Counsel of Record*
**ALSTON & BIRD LLP**
333 South Hope Street
Los Angeles, California 90071-3004
Tel: 213-576-1000
Kim.Chemerinsky@alston.com

*Counsel for Amici Curiae,*
*The American Board of Criminal Lawyers,*
*California Attorneys for Criminal Justice,*
*and Due Process Institute*

Paul Engh
**Paul Engh Law Office**
150 South Fifth Street, Suite 2860
Minneapolis, MN
engh4@aol.com
*Of Counsel for* **The American Board of Criminal Lawyers**


Stephen K. Dunkle
**California Attorneys for Criminal Justice**
1610 Arden Way, Suite 140
Sacramento, CA 95815
sdunkle@sangerdunkle.com


Shana-Tara O'Toole
**Due Process Institute**
700 Pennsylvania Ave, SE #560
Washington, DC 20003
(202) 558-6683
shana@idueprocess.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amici curiae*, the American Board of Criminal Lawyers, California Attorneys for Criminal Justice, and Due Process Institute, each certify that they have no parents, nor is any of them a publicly held entity.

Date: <u>May 19, 2023</u>

Paul N. Monnin
Danielle K. Goldstein

*Of Counsel*

<u>*s/ Kim Chemerinsky*</u>
Kim Chemerinsky

*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................... i

STATEMENTS OF INTEREST ............................................................1

SUMMARY OF ARGUMENT ................................................3

RECEIPT OF AUDIOTAPED STATEMENTS IN THE EARLIER TRIAL OF APPELLANT'S ALLEGED CO-CONSPIRATOR AND THEIR EXCLUSION FROM APPELLANT'S TRIAL ...........................................7

ARGUMENT ....................................................................................11

I.      An Audiotape of Alleged Co-Conspirator Statements is Not Hearsay ...............................................................................11

II.     Exclusion of the Holmes Audiotape from Appellant's Trial Misled His Jury .............................................................................15

III.    *Napue* Errors are Categorically Harmful ...........................................18

IV.     Receipt of Misleading Testimony Threatens the Integrity of the Judicial Process and the Fundamental Fairness of Criminal Proceedings .........................................................................20

CONCLUSION ..................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Brady v. Maryland*,
 373 U.S. 83 (1963) ...........................................................................19

*Conyers v. State*,
 790 A.2d 15 (Md. 2002) ...................................................................19

*Dow v. Virga*,
 729 F.3d 1041 (9th Cir. 2013) ..........................................................19

*Giglio v. United States*,
 405 U.S. 150 (1972)...........................................................................15

*Giles v. Maryland*,
 386 U.S. 66 (1967)............................................................................21

*Glossip v. State of Oklahoma*,
 No. 22A941 (U.S. 2023) ...................................................................17

*Hayes v. Brown*,
 399 F.3d 972 (9th Cir. 2005) ............................................................19

*Jackson v. Brown*,
 513 F.3d 1057 (9th Cir. 2008) ...............................................16, 18, 19

*Lisenba v. California*,
 314 U.S. 219 (1941)...........................................................................17

*Napue v. Illinois*,
 360 U.S. 264 (1959)...............................................1, 6, 15, 16, 21

*Panah v. Chappell*,
 935 F.3d 657 (9th Cir. 2019) ............................................................16

*Pennsylvania v. Ritchie*,
 480 U.S. 39 (1987)............................................................................18

*Perry v. New Hampshire*,
565 U.S. 228 (2012) ........................................................................................17

*Smith v. Phillips*,
455 U.S. 209 (1982) ........................................................................................19

*United States v. Agurs*,
427 U.S. 97 (1976) ..........................................................................................19

*United States v. Alli*,
344 F.3d 1002 (9th Cir. 2003) ...................................................................19, 21

*United States v. Ausby*,
916 F.3d 1089 (2019) ......................................................................................16

*United States v. Bagley*,
473 U.S. 667 (1985) ...................................................................................19, 21

*United States v. Bowman*,
215 F.3d 951 (9th Cir. 2000) ..........................................................................13

*United States v. Havens*,
446 U.S. 620 (1980) ........................................................................................18

*United States v. Straker*,
800 F.3d 570 (D.C. Cir. 2015) ........................................................................16

**Statutes**

18 U.S.C. § 1343 ........................................................................................9

18 U.S.C. § 1349 ........................................................................................9

**Rules**

Fed. R. Evid. 801 ..................................................................................11, 13

Fed. R. Evid. 801(c) ...................................................................................13

Fed. R. Evid. 801(d) ...................................................................................13

Fed. R. Evid. 807 .......................................................................................14

**Other Authorities**

Kenneth B. Nunn, *The Trial as Text: Allegory, Myth and Symbol in the Adversarial Criminal Process—A Critique of the Role of the Public Defender and a Proposal for Reform,* 32 Am. Crim. L. Rev. 743, 786–88 (1995) ............................................................................................20

## STATEMENTS OF INTEREST[1]

This is not a traditional case implicating *Napue v. Illinois*, 360 U.S. 264 (1959), in which a prosecutor has withheld material evidence unknown to the defense. Rather, this is a case in which the government, following the unsuccessful prosecution of a severed, co-conspirator defendant, made an apparently calculated and strategic choice not to introduce a piece of material evidence— the exculpatory nature of which was established in the earlier proceeding—in Appellant's trial, and the District Court effectively ratified that decision. The government's cynical choice and the District Court's sponsorship of the government's strategy, however, fundamentally distorted the truth-seeking function of Appellant's trial. *Napue* and its progeny bar prosecutors from engaging in and courts from ratifying the strategic exclusion of material, exculpatory evidence—including through invocation and application of overly formalistic evidence rules—when such exclusion is of constitutional import.

*Amici* are criminal defense organizations that have a direct and substantial interest in this case. **The American Board of Criminal Lawyers** ("ABCL") was

---

[1] Pursuant to Ninth Circuit Rule 29(4)(E), *amici curiae* state that no counsel for any party authored this brief in whole or in part and that no entity or person made any monetary contribution toward the preparation or submission of this brief. Pursuant to Ninth Circuit Rule 29-3, *amici curiae* sought the parties' consent to the filing of the accompanying brief before moving the Court for permission to file the proposed brief.

founded in 1978 as a national legal honorary society for highly accomplished criminal defense trial lawyers. Admission is by invitation only and requires substantial major felony trial experience and exceptional recommendations from distinguished jurists and current Fellows. ABCL is committed to the preservation and free exercise of fundamental freedoms for all those accused of criminal conduct.

**California Attorneys for Criminal Justice** ("CACJ") is a non-profit California corporation founded in 1973 to support and protect the Constitution of the United States and the Constitution of California, and to preserve due process and equal protection of law for all persons. CACJ's members are criminal defense lawyers and associated professionals, most of whom practice in California. CACJ members regularly defend criminal cases in the state and federal trial courts within California and represent individuals in direct appeals and habeas challenges of convictions and judgments in criminal matters. CACJ has frequently appeared as an *amicus curiae* in this Court on matters of interest to its membership.

**Due Process Institute** is a bipartisan, non-profit, public-interest organization that works to honor, preserve, and restore principles of fairness in the criminal justice system. Formed in 2018, it creates and supports achievable, bipartisan solutions to challenging criminal legal policy concerns through advocacy, litigation, and education. Since its founding, Due Process Institute has participated as an *amicus curiae* in a host of state and federal cases presenting critically important criminal legal issues.

2

*Amici* submit this brief to emphasize the constitutional and prejudicial errors inherent in the proceeding below, and the threat such errors pose to the constitutional protections afforded to criminal defendants in federal criminal proceedings that *amici* seek to preserve. To ensure the jury's truth-seeking role and the essential principles of a fair trial, the government must avoid the introduction of false or misleading testimony and trial courts should be vigilant in policing whether a jury has been misled, particularly when evidence excluded from trial goes to whether witnesses have testified accurately.

## SUMMARY OF ARGUMENT

The District Court plainly erred in sustaining the government's objection to receipt in evidence of an audiotape containing the actual statements of a severed, co-conspirator defendant at Appellant's trial. Such error is of constitutional dimension because the jury at the severed co-conspirator's trial could not reach a verdict on the investor fraud counts for which the audiotape of the co-conspirator's statements had been offered. In other words, mistrial of the investor fraud counts in the co-conspirator defendant's earlier, severed trial established the exculpatory nature of the audiotape that the government and the District Court excluded from Appellant's trial. And while *amici* understand and respect that the government is generally free to try its cases as it so chooses, specifically including through introduction of less persuasive evidence than is otherwise available, courts need not defer to the

3

government's trial strategy when its evidentiary choices implicate notions of due process, fundamental fairness, and a defendant's right to confront the witnesses against him. Exclusion of exculpatory evidence from Appellant's trial materially prejudiced him in two separate, and separately dispositive, ways. First, to the extent the government elicited testimony from investor witnesses in Appellant's trial that his alleged co-conspirator had made concrete representations[2] about military procurement of her company's technology, the government knew that another jury presented with this same theory of prosecution had failed to convict her of having defrauded these investors when that jury heard her actual words. Simply put, the government had evidence in hand apparently discrediting the notion that Appellant's alleged co-conspirator had misrepresented her company's status as a government contractor, yet proceeded to elicit from investor witnesses at Appellant's trial that she had in fact done so.

Second, Appellant's jury heard only indirect investor recollections of the co-conspirator defendant's statements, which were in fact available to be played to

---

[2] *Amici* acknowledge that their role is not to litigate or argue the merits of the evidence introduced at Appellant's and his alleged co-conspirator's trial regarding their company's military procurement status. They acknowledge further that the government contests the probative value of the subject audiotape, specifically whether Appellant's alleged co-conspirator equivocated regarding her company's status as a government contractor. This brief presumes, as Appellant has argued, that the co-conspirator's recorded statements are in tension with the investor testimony elicited at Appellant's trial, and how such tension, again assuming it exists, should have been resolved by the trial court.

Appellant's jury—and indeed had in fact been played to the co-conspirator defendant's jury—through receipt of the excluded audiotape. As a result, Appellant's jury was deprived of highly material, exculpatory evidence of what investors were actually told by Appellant's alleged co-conspirator, which had the effect of misleading Appellant's jury in violation of longstanding, controlling authority prohibiting the government's introduction of false or misleading evidence—in this case through exclusion of the most authentic and probative evidence of what investors were actually told—to convict Appellant.

Notably, the tape itself was not hearsay and was plainly admissible if offered by the government as a co-conspirator statement under Federal Rule of Evidence 801(d)(2)(E), just as it had been offered by the government and received by the District Court as a party admission under Rule 801(d)(2)(A) in the severed co-defendant's earlier trial, which was prosecuted before the District Court by the same team of government lawyers that prosecuted Appellant. The government, however, nonetheless objected to receipt of the audiotape on hearsay grounds in the course of several, open court hearings during Appellant's trial directed to whether Appellant could publish the audiotape to the jury.

Rather than offer a tape whose admission in the severed co-defendant's trial had resulted in the mistrial of multiple investor fraud counts, the government instead introduced evidence of the co-conspirator's purported misstatements to investors,

which were made a decade before, solely through the testimony two investor witnesses, each of whom provided material, yet apparently misleading evidence that the government asserted was chargeable to Appellant as the admission of an alleged co-conspirator.

Knowing introduction of misleading testimony—particularly when its knowingly misleading nature is established by an audiotape of what an alleged co-conspirator actually said to investors that the same prosecution team and trial court saw another jury act on in a severed trial to that defendant's benefit—runs afoul of longstanding Supreme Court and Ninth Circuit precedent, specifically *Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny. This precedent ensures the Constitution's guarantee of a fair trial, grounded in both the Fifth Amendment's Due Process Clause and Sixth Amendment's Criminal Jury Trial and Confrontation Clauses. Moreover, while the government in this case made the strategic choice not to offer the subject audiotape in evidence and, further, to object to its use by Appellant, the proffer of apparently misleading testimony plainly heightens the risk of wrongful convictions. These constitutional deprivations impair the adversarial process and the truth-seeking function of a criminal jury trial.

Because the government's strategic—and altogether cynical—decision to exclude exculpatory evidence in the form of the subject audiotape from Appellant's trial and the District Court's error in fostering its exclusion are of constitutional dimension, *amici*

respectfully submit that they not only have an interest in this case, but also that Appellant's conviction and sentence should be vacated in light the plainly prejudicial error infecting Appellant's trial.

## RECEIPT OF AUDIOTAPED STATEMENTS IN THE EARLIER TRIAL OF APPELLANT'S ALLEGED CO-CONSPIRATOR AND THEIR EXCLUSION FROM APPELLANT'S TRIAL

The constitutional and legal issues treated in this brief are anchored in an audiotape of certain statements made by Elizabeth Holmes, Appellant's co-defendant and alleged co-conspirator, whose jury trial was severed from that of Appellant and conducted first before the District Court by the same government lawyers that tried Appellant's case. Appellant's Br. 54, ECF No. 21. The audiotape was recorded by a prospective investor in Theranos, Inc. in December, 2013, and contained Holmes's statements concerning, among other things, whether Theranos's blood testing technology was in use by the U.S. military. Appellant's Opp'n Br. 18, ECF No. 8-1.

Specifically, Holmes spoke aspirationally about Theranos's military capabilities: "[T]he ability to take a technology like this and put it in flight, specifically on a medevac, has the potential to change survival rates." 23-ER-6247. Notably, the tape also contains Holmes's statement that the company's military opportunities were on hold, as Theranos "had to pause a large number of [its]

ongoing pharmaceutical and military programs so that [it] could focus" on retail opportunities. 23-ER-6247-48.

But in Appellant's trial, the investors recalled Holmes as having bragged that Theranos devices were "employed on the medevac helicopters," "being used to kind of improve survival rates of military personnel who had been injured in combat," and "being used in the Middle East and in particular in the—on the battlefield." 12-ER-3239; 12-ER-4205. One investor, Bryan Tolbert, also testified that Holmes had claimed that Theranos' military partnerships would "broaden[] . . . [the company's] business opportunities." 12-ER-3241-42. Had Appellant's jury heard Holmes's actual statements, it could have compared the investor testimony in Appellant's trial with Holmes's actual, recorded assessment of "what was actually going on with Theranos's military programs," an exercise afforded to Holmes and her jury but not to Appellant and his. 25-ER-6720.

In the Holmes trial, the government offered the audiotape as a party admission under Federal Rule of Evidence 801(d)(2)(A), meaning it was received by the District Court as substantive evidence of whether Holmes had defrauded Theranos investors by misrepresenting the degree to which, if any, the U.S. military worked with Theranos as a government contractor. Indeed, the parties played portions of the tape four times at trial—not only in connection with the testimony of investor witnesses during the government's case-in-chief, but also during its closing

8

argument. And the Holmes jury asked to listen to the audiotape again during its deliberations. Appellant's Opp'n Br. 19, ECF No. 8-1. After hearing the tape, the jury returned a mixed verdict on the investor fraud counts of which both Holmes and Appellant had been charged. Appellant's Opp'n Br. 19–20, ECF No. 8-1. In short, introduction of the audiotape at Holmes' trial established that the tape was a powerful piece of exculpatory evidence.

But unlike the Holmes jury, Appellant's jury did not hear the tape because the government, apparently recognizing the tape's exculpatory value, declined to offer it in evidence at Appellant's trial. This is despite the fact that Holmes and Appellant were charged not only as co-defendants in the same indictment, but also as co-conspirators with respect to the same investor fraud conspiracy and substantive investor-related wire fraud counts under 18 U.S.C. §§ 1349 and 1343. And they would have been tried together had the District Court not severed Holmes's trial from Appellant's trial.[3] Accordingly, but for Holmes's severance from Appellant,

---

[3] *Amici* know that Appellant moved to sever his trial from Holmes's trial. They do not assert that such severance was erroneous. Rather, they point to the fact that the government benefitted from severance insofar as it relied heavily on the subject audiotape during Holmes's trial yet actively sought to exclude the tape from Appellant's trial. Appellant may have moved for severance, but the prejudicial result was to afford the government a second bite at the evidentiary apple in deciding how to present Holmes's putative misrepresentations regarding military procurement of Theranos technology.

the audiotape that resulted in a mistrial of Holmes's investor fraud counts would have been offered and received in their joint trial.

Moreover, the District Court erroneously ratified the government's strategy of excluding the audiotape from Appellant's trial (apparently after the government came to appreciate its exculpatory value in connection with Holmes's trial) by indicating that it would sustain the government's hearsay objection. The District Court further indicated that it was disinclined to receive the audiotape as substantive evidence regardless of the introducing party. 2-ER-352-59. The government's stratagem in declining to offer the tape in its case-in-chief and objecting to Appellant's use of the tape as substantive evidence, coupled with the District Court's plain error in failing to recognize the government's cynicism and the misleading effect of its evidentiary strategy, left Appellant with having to contest the government's investor testimony—which reduced to mere recollection of what Holmes may have said nearly a decade before—with both hands tied behind his back.

Without access to what Holmes actually said, which, again, led to a mistrial of her investor fraud counts, Appellant's jury convicted him of a conspiracy to defraud Theranos investors based on statements by Holmes that were imputed to him as an alleged co-conspirator. Plus, his custodial guideline range and resulting

10

custodial sentence were based primarily on the loss to investors associated with the charged conspiracy.

## ARGUMENT

### I.   An Audiotape of Alleged Co-Conspirator Statements is Not Hearsay

Put simply, the Holmes tape could and should have been received in evidence in Appellant's trial, just as it was received in the Holmes trial, as a party admission—and, therefore, definitionally not hearsay—under Federal Rule of Evidence 801. *Amici* acknowledge that party admissions and co-conspirator statements are inadmissible when offered in the first instance by the party declarant or an alleged co-conspirator, rather than by the government.  But this misses the point of their argument.  While party admissions and co-conspirator statements must be offered by an opposing party, here, the government in fact offered Holmes's statements at her trial as her own admissions under Federal Rule of Evidence 801(d)(2)(A).  Had Appellant been tried with Holmes, the government would have moved to admit the Holmes tape as the inculpatory statements of Appellant's alleged co-conspirator under Federal Rule of Evidence 801(d)(2)(E).

But Appellant wasn't tried with Holmes, which afforded the government the chance to withhold the tape from Appellant's prosecution.  As noted above, this meant the government could present testimony from investor witnesses that Holmes had made concrete misrepresentations about Theranos's status as a government

contractor, when the tape apparently proved her to have been more equivocal. The government's decision to withhold the audiotape also should have prompted the District Court to inquire about why a tape containing party admissions in Holmes's trial wasn't offered as a tape containing co-conspirator statements at Appellant's trial, particularly when Holmes's jury apparently assessed what was said on the tape to her benefit.

In particular, the District Court should have aligned the government's non-hearsay introduction of the audiotape in Holmes's trial with the notion that introducing the tape in Appellant's trial also did not present a hearsay issue, insofar as the government had alleged that Holmes was Appellant's co-conspirator and had made her putative investor misrepresentations in furtherance of their conspiracy. And while Appellant could not have offered the tape himself under 801(d)(2)(E), the District Court erred by not linking the government's non-hearsay use of the tape in Holmes's trial with potential non-hearsay use of the tape in Appellant's trial, especially when the government otherwise planned to offer Holmes's statements through live witnesses who were asked to recall things that were said nearly a decade before. In sum, the District Court should have asked the government why it did not intend to offer the tape in Appellant's trial when it otherwise intended to elicit Holmes's statements through less reliable sources. Moreover, the District Court should have ordered the government's introduction of the tape in Appellant's trial to

correct the record, given its non-hearsay status and exculpatory value, as established by Holmes's trial on the same theory of investor liability.

Rule 801 of the Federal Rules of Evidence defines hearsay as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). But an opposing party's statement is by definition not hearsay under Rule 801. *See* Fed. R. Evid. 801(d)(2)(A) ("A statement that meets the following conditions is not hearsay: The statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity[.]"). The same is true of admissions made by a party opponent's co-conspirators. *See* Fed. R. Evid. 801(d)(2)(E) (providing that statements made by an opposing party's "coconspirator during and in furtherance of the conspiracy" is not hearsay); *United States v. Bowman*, 215 F.3d 951, 960–61 (9th Cir. 2000) (noting that statements of co-conspirators are admissible "if the government shows by a preponderance of the evidence that a conspiracy existed at the time the statement was made; the defendant had knowledge of, and participated in, the conspiracy; and the statement was made in furtherance of the conspiracy.").

Instead of assessing the tape's admissibility at Appellant's trial as non-hearsay evidence under Rule 801, the District Court appears to have operated on the premise that the audiotape is hearsay, which prompted argument of the residual hearsay

13

exception under Federal Rule of Evidence 807, the Best Evidence Rule, the Rule of Completeness, and concepts of fundamental fairness as potential safety valves. 2-ER-326-39; 2-ER-352-59. Even more importantly, the District Court's admonition that Appellant would have to assess whether he could argue the truth of Holmes' audiotaped statements in closing (thereby reflecting that the trial court conceived of the audiotape's contents to indeed constitute hearsay), resulted in the presentation of evidence concerning Appellant's liability for investor fraud that was erroneously confined to the recollection of certain investors who witnessed Holmes' long-ago comments. In short, the government offered Holmes's out-of-court statements through the memories of Tolbert and a second investor named Chris Lucas but objected to Appellant's efforts to rebut with "the actual words [Holmes] said." 2-ER-327-29.

This was highly prejudicial. Indeed, it should not be an artifact of severance that the government is able to discern the exculpatory value of evidence in a severed co-conspirator defendant's trial and then seek to exclude that evidence from another alleged co-conspirator's later trial. This is especially true when Holmes and Appellant were charged in the same investor fraud conspiracy, and the government sought to hold Appellant accountable for Holmes' statements to investors as part of that conspiracy count. Moreover, when Tolbert and Lucas testified that Holmes had misrepresented Theranos's military procurement status, the prejudice to Appellant

14

from this misleading testimony was particularly acute in that the best evidence of what Holmes in fact said was both available and definitionally not hearsay.

While Appellant could not offer the audiotape himself under Rule 801(d)(2)(E), the District Court should have required the government to do so. But for severance of Holmes' trial from Appellant's trial, the government would have offered the audiotape of Holmes' statements against her as an opposing party admission under Federal Rule of Evidence 801(d)(2)(A) and a co-conspirator statement against Appellant under Federal Rule of Evidence 801(d)(2)(C). Severance of Holmes' liability from Appellant's, however, allowed the government to avoid offering the audiotape at Appellant's trial after a mistrial of Holmes' liability to investors. Under *Napue* and other Due Process authority, the District Court was required to step into the breach to prevent this unjust result.

## II. Exclusion of the Holmes Audiotape from Appellant's Trial Misled His Jury

Even if the tape is hearsay, excluding it from Appellant's trial distorted the truth-seeking function of Appellant's jury. The Supreme Court has held repeatedly that the government may not knowingly offer false or misleading testimony to obtain a conviction. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972). And "knowing" use in this context includes when the government either actually knows or "should have known" that evidence is false or

misleading.  *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008) 1076 (quoting *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc)).

Under *Napue* and its progeny, the use of false or misleading testimony deprives a defendant of due process under the Fifth Amendment and the right to confront witnesses under the Sixth Amendment.  *United States v. Ausby*, 916 F.3d 1089, 1092 (2019); *see United States v. Straker*, 800 F.3d 570, 602 (D.C. Cir. 2015) (explaining that "[t]he Constitution's 'fair trial guarantee,'" grounded in in the Fifth and Sixth Amendments, "forbids the prosecution's introduction of false testimony") (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)).

This Circuit has also recognized that a defendant's due process rights are violated when the government knowingly uses false or misleading testimony. *Ausby*, 916 F.3d at 1092 (quoting *Straker*, 800 F.3d at 603); *see Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (citing *Napue*, 360 U.S. at 269) ("[T]he Supreme Court held 'that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.'"). This is true because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence."  *Napue*, 360 U.S. at 269.

More recently, the Supreme Court has explained that the "constraint" on knowingly false or misleading evidence under the Due Process Clause exists because admission of such evidence "is so extremely unfair" that it "violates fundamental

16

[concepts] of justice." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (quotation marks and citation omitted); *see also* Response to Unopposed Application for Stay of Execution at 6–11, *Glossip v. State of Oklahoma*, No. 22A941 (U.S. 2023), https://www.supremecourt.gov/DocketPDF/22/22A941/265824/20230501154508421_2 023.05.01%20Response%20Stay-Final.pdf (the government conceded a *Napue* error and the Supreme Court subsequently stayed the execution, showing that such an error is a constitutional violation that warrants court interference).

Here, the government invoked formalities to exclude the Holmes audiotape from Appellant's trial after apparently appreciating its effect on her jury. Although the government is typically free to present its case-in-chief how it pleases, that autonomy is constrained by the obligation to present only truthful evidence and to exclude misleading or false evidence. In this case, Appellant was deprived of due process because his jury was denied access to the best and most direct evidence of what Holmes actually said to investors, statements for which the government sought to hold Appellant accountable. This was fundamentally unfair. *See generally Lisenba v. California*, 314 U.S. 219, 236 (1941) (holding that knowing use of false evidence to convict a defendant implicates notions of "fundamental fairness essential to the very concept of justice").

The government's cynicism also implicates Appellant's Sixth Amendment confrontation right, which is violated when the government artificially constrains the means of cross examination available to a defendant. The Sixth Amendment

favors broad, encompassing cross examination, and "traditional evidentiary principles accord parties fairly considerable latitude in cross-examining opposing witnesses." *United States v. Havens*, 446 U.S. 620, 631–32 (1980) (Brennan, J., dissenting). The Supreme Court has said that "the right to confrontation is . . . designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987).

Here, however, the government limited Appellant's cross-examination of Tolbert and Lucas by withholding substantive evidence going to whether Holmes in fact lied to these investors—nearly ten years before Appellant's trial, no less—about Theranos's putative success in securing military contracts. The government had both possession and an understanding of the exculpatory value of the tape, yet stood on form to block the jury's access to demonstrably exculpatory evidence. Investor testimony was therefore admitted unconstrained by effective, constitutionally protected cross-examination aimed at ensuring the jury's ability to find the truth.

## III. *Napue* Errors are Categorically Harmful

Because they sound in constitutional harm, *Napue* violations are almost always harmful. Reversal is "virtually automatic" if "it is established that the government knowingly permitted the introduction of false testimony." *Jackson*, 513 F.3d at 1076 (quoting *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc));

*see also United States v. Alli*, 344 F.3d 1002, 1008 (9th Cir. 2003) (explaining it to be "rare" that "the government's failure to correct false testimony" does not "affect[] the defendant's substantial rights").

While violations of *Brady v. Maryland*, 373 U.S. 83 (1963), also sound in a deprivation of due process, *Brady* and *Napue* violations are subject to different standards of appellate review. Courts have recognized that the "analysis proceeds differently for *Brady* and *Napue* claims," *Jackson*, 513 F.3d at 1076, and that *Napue* is "more defendant-friendly" than *Brady*. *Conyers v. State*, 790 A.2d 15, 38 (Md. 2002). *Brady* violations result in new trials "only if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (quotation marks and citation omitted). Conversely, courts apply a far less demanding standard to *Napue* violations, assessing whether "there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added); *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).

*Napue* violations thus implicate a lesser showing of harm than is required by ordinary harmless error review. *Smith v. Phillips*, 455 U.S. 209, 220 n.10 (1982); *Hayes v. Brown*, 399 F.3d at 984 (en banc). While ordinary harmless error review requires a determination of whether the error *would* have affected the judgment of

19

the jury, appellate consideration of a *Napue* violation requires only a determination of whether the error *could* have done so. This distinction acknowledges the particularly harmful nature of a *Napue* violation and reinforces the level of protection it affords.

## IV.  Receipt of Misleading Testimony Threatens the Integrity of the Judicial Process and the Fundamental Fairness of Criminal Proceedings

Finally, introduction of false or misleading evidence weakens our criminal justice system by increasing the risk of wrongful convictions. This is in part because jurors often credit lay witness testimony on direct examination in the government's case-in-chief more substantially than cross-examination of the government's lay witnesses, which jurors appreciate is argumentative.

Jurors may also believe that prosecutors are public servants responsible for ensuring truth and justice. *See generally* Kenneth B. Nunn, *The Trial as Text: Allegory, Myth and Symbol in the Adversarial Criminal Process—A Critique of the Role of the Public Defender and a Proposal for Reform,* 32 Am. Crim. L. Rev. 743, 786–88 (1995) (noting that this impression is often fostered by prosecutors' open court invocation of their status as counsel for "the United States," "the State," or "the People"). This "permits a prosecutor to position himself and the jury as 'us' and the defendant and his attorney as 'them.'" *Id.* This dynamic means that prosecutors may be able to influence juries simply by sponsoring the introduction of evidence, particularly from lay witnesses on direct examination, even if it is misleading.

20

Moreover, the law is clear that the government "ha[s] an independent obligation immediately to take steps to correct known misstatements of its witnesses." *United States v. Alli*, 344 F.3d at 1007; *Napue*, 360 U.S. at 270 (citing *People v. Savvides*, 136 N.E.2d 853, 854 (N.Y. 1956)) ( "[T]he district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth."); *United States v. Bagley*, 473 U.S. 667, 692 (1985) (Marshall, J., dissenting) (citing *Application of Kapatos*, 208 F. Supp. 883, 888 (S.D.N.Y. 1962)) ("[The] purpose of a trial is as much the acquittal of an innocent person as it is the conviction of a guilty one."); *see also Giles v. Maryland*, 386 U.S. 66, 98 (1967) (Fortas, J., concurring) ("The State's obligation is not to convict, but to see that, so far as possible, truth emerges.").

## CONCLUSION

For the foregoing reasons, the judgment and sentence of the district court should be vacated, and the case remanded for trial.

Date: <u>May 19, 2023</u>                              Respectfully submitted,


Paul N. Monnin                                   *s/ Kim Chemerinsky*
Danielle K. Goldstein                            Kim Chemerinsky
**ALSTON & BIRD LLP**                            **ALSTON & BIRD LLP**
1201 W. Peachtree Street                         333 South Hope Street
Atlanta, Georgia 30309                           Los Angeles, California 90071
Tel.: 404-881-7000                               Tel.: 213-576-1000
Paul.Monnin@alston.com                           Kim.Chemerinsky@alston.com
Danielle Goldstein@alston.com

*Of Counsel*                                     *Counsel for Amici Curiae,*
                                                 *The American Board of Criminal*
                                                 *Lawyers, California Attorneys for*
                                                 *Criminal Justice, and Due Process*
                                                 *Institute*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-10338

     I am the attorney or self-represented party.

**This brief contains <u>4,816</u> words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

     I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** *s/ Kim Chemerinsky*         **Date:** May 19, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 11, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: <u>May 19, 2023</u>

<u>*s/ Kim Chemerinsky*</u>
Kim Chemerinsky
