**No. 22-10338**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

       v.

RAMESH "SUNNY" BALWANI,

    Defendant-Appellant.

---

**BRIEF FOR THE UNITED STATES AS APPELLEE**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 18-CR-00258-EJD-2

---

**THOMAS A. COLTHURST**
Attorney for the United States
Acting Under Authority Conferred By
28 U.S.C. § 515

**MATTHEW M. YELOVICH**
Chief, Appellate Section, Criminal Division

**KELLY I. VOLKAR**
Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7185

**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

September 20, 2023

# TABLE OF CONTENTS

JURISDICTION, TIMELINESS, AND BAIL STATUS ........................................2

ISSUES PRESENTED ............................................................................................2

STATEMENT OF THE CASE .................................................................................3

    I.    FACTUAL BACKGROUND ...........................................................3

        A.    In 2009, Balwani Joined His Girlfriend's Financially Struggling Company and Subsequently Lied About Its Historical Work ...........................................................................3

        B.    By Fall 2013, Theranos Was Out of Time and Money, But Balwani Projected Hundreds of Millions in Revenue ................5

        C.    Balwani Rushed the Launch of an Unproven Product with Walgreens in September 2013 .........................................7

        D.    Balwani Created Software to Hide Technology Failures During Demonstrations with Investors ....................................10

        E.    Balwani Lied to Investors About Theranos's Device's Capabilities ...............................................................................11

        F.    Balwani Lied to Patients About Receiving Accurate Blood-Testing Services from Theranos ...............................................14

        G.    Balwani Falsely Claimed that Theranos's Relationship with Walgreens Was Expanding When It Was Shrinking ................15

        H.    Media and Regulatory Agencies Exposed Theranos's Practices ................................................................................16

    II.    PROCEDURAL BACKGROUND ................................................18

        A.    Indictment and Pretrial Proceedings .........................................18

        B.    Trial and Post-Trial Proceedings ...............................................20

SUMMARY OF ARGUMENT ...............................................................................21

ARGUMENT .....................................................................................................24

    I.    THE DISTRICT COURT DID NOT CONSTRUCTIVELY AMEND THE INDICTMENT...............................................................24

        A.    Standard of Review...............................................................24

        B.    No Constructive Amendment Occurred ..................................25

            1.    The TSI Alleges Defrauding Patients About Theranos's Blood-Testing Services Regardless of Device Used.......................................................27

            2.    The Evidence Presented to the Grand Jury in Support of the TSI Matched the Evidence Presented at Trial and Jury Instructions.......................................................29

            3.    At Most, a Non-Prejudicial Variance Occurred .............31

        C.    Balwani's Substantial Rights Were Not Affected ....................32

    II.    THE DISTRICT COURT PROPERLY PERMITTED TESTIMONY FROM THREE FORMER THERANOS EMPLOYEES .........................................................................35

        A.    Standard of Review...............................................................35

        B.    The District Court Properly Admitted Testimony of Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff............36

            1.    These Witnesses' Testimony Was Percipient ................38

            2.    The District Court Did Not Violate Rules 701 and 702 ..............................................................................46

        C.    Any Error Was Harmless.......................................................48

III. NO FALSE TESTIMONY WAS ELICITED, THUS NO DUE PROCESS VIOLATION OCCURRED ....................................49

    A. Standard of Review.................................................................49

    B. Trial Testimony....................................................................50

    C. Plain-Error Review Applies.....................................................54

    D. The Government Did Not Knowingly Elicit False Testimony.................................................................................55

    E. The Testimony Was Not Material...............................................58

IV. THE DISTRICT COURT PROPERLY CALCULATED THE LOSS AMOUNT FOR SENTENCING..............................................63

    A. Standard of Review.................................................................63

    B. The District Court Correctly Employed a Preponderance-of-the-Evidence Standard ..............................................................63

CONCLUSION ........................................................................................65

STATEMENT OF RELATED CASES...................................................66

CERTIFICATE OF COMPLIANCE......................................................67

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Concepcion v. United States*, 142 S. Ct. 2389 (2022) ...............................65

*Dickey v. Davis*, 69 F.4th 624 (9th Cir. 2023) ......................................59

*Greenwood v. F.A.A.*, 28 F.3d 971 (9th Cir. 1994)..................................54

*Hayes v. Ayers*, 632 F.3d 500 (9th Cir. 2011) ......................................59

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) (*en banc*)..........................59

*Henry v. Ryan*, 720 F.3d 1073 (9th Cir. 2013) .................................. 55, 57

*Napue v. Illinois*, 360 U.S. 264 (1959) ............................................ *passim*

*Noguera v. Davis*, 5 F.4th 1020 (9th Cir. 2021) .................................. 40, 48

*Stirone v. United States*, 361 U.S. 212 (1960).....................................25

*United States v. Adamson*, 291 F.3d 606 (9th Cir. 2002) ............................. 26, 31

*United States v. Aguilar*, 782 F.3d 1101 (9th Cir. 2015).............................63

*United States v. Alli*, 344 F.3d 1002 (9th Cir. 2003) ......................... 60, 62

*United States v. Anderson*, 532 F.2d 1218 (9th Cir. 1976)...........................27

*United States v. Armstead*, 552 F.3d 769 (9th Cir. 2008)............................64

*United States v. Bingham*, 653 F.3d 983 (9th Cir. 2011)............................. *passim*

*United States v. Bourne*, 743 F.2d 1026 (4th Cir. 1984) ............................53

*United States v. Bush*, 944 F.3d 189 (4th Cir. 2019)...............................54

*United States v. Cardenas-Mendoza*, 579 F.3d 1024 (9th Cir. 2009) ...................48

*United States v. Carpenter*, 95 F.3d 773 (9th Cir. 1996)...........................................63

*United States v. Charley*, 1 F.4th 637 (9th Cir. 2021) .............................................48

*United States v. Chen*, No. 17-CR-00603-BLF-1, 2021 WL 2662116
  (N.D. Cal. June 29, 2021)............................................................. 46, 47

*United States v. Durham*, 464 F.3d 976 (9th Cir. 2006).................................. 37, 46

*United States v. Ellingford*, 499 F. App'x 671 (9th Cir. 2012) ..............................54

*United States v. Feldman*, 931 F.3d 1245 (11th Cir. 2019)....................................31

*United States v. Figueroa-Lopez*, 125 F.3d 1241 (9th Cir. 1997) ..........................49

*United States v. Gadson*, 763 F.3d 1189 (9th Cir. 2014)................................. 37, 46

*United States v. Garrido*, 596 F.3d 613 (9th Cir. 2010).........................................46

*United States v. Gasca-Ruiz*, 852 F.3d 1167 (9th Cir. 2017) (*en banc*).................63

*United States v. Gonzales-Benitez*, 537 F.2d 1051 (9th Cir. 1976).........................53

*United States v. Hartz*, 458 F.3d 1011 (9th Cir. 2006).............................. 24, 25, 26

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) (*en banc*) .......................36

*United States v. Holguin*, 51 F.4th 841 (9th Cir. 2022)...........................................37

*United States v. Houston*, 648 F.3d 806 (9th Cir. 2011) ............................ 58, 59, 62

*United States v. Hugs*, 384 F.3d 762 (9th Cir. 2004)................................. 24, 25, 32

*United States v. Kabov*, No. 19-50083, 2023 WL 4585957
  (9th Cir. July 18, 2023)...............................................................................58

*United States v. Kakkar*, 719 F. App'x 659 (9th Cir. 2018)....................................31

*United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010).......................................63

v

*United States v. Lonich*, 23 F.4th 881 (9th Cir. 2022)...................................... 63, 64

*United States v. Lopez*, 4 F.4th 706 (9th Cir. 2021) ........................................ 26, 32

*United States v. Lopez*, 762 F.3d 852 (9th Cir. 2014) ...................................... 37, 42

*United States v. Lynch*, 903 F.3d 1061 (9th Cir. 2018) ...........................................52

*United States v. Magdaleno*, 43 F.4th 1215 (9th Cir. 2022)............................ 44, 45

*United States v. O'Donnell*, 608 F.3d 546 (9th Cir. 2010)....................................27

*United States v. Perez*, 962 F.3d 420 (9th Cir. 2020)................................... *passim*

*United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014) .................................... *passim*

*United States v. Reyes-Alvarado*, 963 F.2d 1184 (9th Cir. 1992) .................... 45, 46

*United States v. Riley*, 335 F.3d 919 (9th Cir. 2003)................................................64

*United States v. Romero*, 282 F.3d 683 (9th Cir. 2002) .........................................31

*United States v. Romero-Avila*, 210 F.3d 1017 (9th Cir. 2000) .............................50

*United States v. Shih*, 73 F.4th 1077 (9th Cir. 2023)...............................................62

*United States v. Singh*, 995 F.3d 1069 (9th Cir. 2021)...........................................25

*United States v. Soto*, 915 F.3d 675 (9th Cir. 2019)...............................................32

*United States v. Torres*, 794 F.3d 1053 (9th Cir. 2015) .........................................36

*United States v. Tuan Ngoc Luong*, 965 F.3d 973 (9th Cir. 2020).........................26

*United States v. Ward*, 747 F.3d 1184 (9th Cir. 2014) ...........................................26

*United States v. Wells*, 879 F.3d 900 (9th Cir. 2018) .............................................36

*Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227 (9th Cir. 2017).........................36

## DOCKETED CASES

*United States v. Holmes*, No. 22-10312 (9th Cir. filed Dec. 2, 2022).............. 51, 63

*United States v. Lucas*, No. 22-50064 (9th Cir. filed Mar. 28, 2022) .....................64

## FEDERAL STATUTES

18 U.S.C. § 3231 .....................................................................................................2

28 U.S.C. § 1291 .....................................................................................................2

## FEDERAL RULES

Fed. R. App. P. 4 .....................................................................................................2

Fed. R. App. P. 28 ..................................................................................................63

Fed. R. Evid. 701 ........................................................................... 36, 37, 38, 46

Fed. R. Evid. 702 ........................................................................... 36, 38, 46, 47

Fed. R. Evid. 803 ...................................................................................................53

U.S.S.G. § 2B1.1 ...................................................................................................21

No. 22-10338

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

      v.

RAMESH "SUNNY" BALWANI,

    Defendant-Appellant.

---

### BRIEF FOR THE UNITED STATES AS APPELLEE

Defendant-Appellant Ramesh "Sunny" Balwani appeals following his conviction at jury trial for his role in defrauding investors and patients while helping run Theranos, a company founded by his co-defendant, Elizabeth Holmes. Publicly, Balwani touted Theranos's financial prowess and blood-testing technology; internally, Balwani oversaw Theranos's finances, which were abysmal, and the patient-testing laboratory, which he called a "disaster zone." The district court correctly declined to consider, *sua sponte*, Balwani's unpreserved constructive amendment and due process claims; did not abuse its discretion by permitting former Theranos employees to testify as percipient witnesses regarding their real-time observations; and did not err in conservatively calculating the loss as over $120 million—a fraction of what was proven. This Court should affirm.

## JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court (Hon. Edward J. Davila) had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291.  Balwani filed a timely notice of appeal.  Fed. R. App. P. 4(b)(1)(A)(i); 26-ER-6947.[1]  This Court denied Balwani's motion for bail pending appeal, raising the same issues pressed here, holding that Balwani had not shown that his "appeal raises a 'substantial question' of law or fact that is 'fairly debatable,'" nor that favorable resolution would result in "reversal, an order for a new trial on all counts resulting in imprisonment," or a meaningful change to his sentence.  Dkt. 14.  Balwani has a projected release date of March 12, 2034.  https://www.bop.gov/inmateloc/ (BOP Register No. 24966-111).

## ISSUES PRESENTED

1.      Whether the district court constructively amended the indictment by admitting evidence related to patient-victims and blood tests that were specifically listed in the Third Superseding Indictment.

2.      Whether the district court abused its discretion by permitting three former Theranos employees to testify as percipient rather than expert witnesses

---

[1]   ER refers to Appellant's Excerpts of Record, AOB to Appellant's Opening Brief, SER to the Government's Supplemental Excerpts of Record, PSR to the Presentence Investigation Report, CR to the district court clerk's record, and Dkt. to this Court's docket.

about their responsibilities at Theranos and contemporaneous observations that Theranos's proprietary device did not work properly.

3.      Whether excluding a recording of Holmes speaking to select investors violated due process, where the relevant investor-witnesses—who participated in the recorded call—testified accurately and consistently about their recollections of Holmes's statements.

4.      Whether the district court erred in applying the preponderance of the evidence standard at sentencing to find a loss of $120,146,247, where Balwani was convicted of a conspiracy that included the relevant underlying conduct.

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

### A.    In 2009, Balwani Joined His Girlfriend's Financially Struggling Company and Subsequently Lied About Its Historical Work

Holmes founded Theranos around 2003 and served as Chief Executive Officer, but by 2009 the company was struggling to make payroll. *See* 6-ER-1295-98, 1412. Theranos had performed some work with pharmaceutical companies, but that work was dwindling. 6-ER-1293-98, 1338-43. Balwani—who was in a romantic relationship with Holmes from 2004 to 2016—extended credit to the company and joined in 2009 first as President and then Chief Operating Officer. 6-ER-1271-76, 1296-99, 1412; PSR ¶¶ 19, 98.

In 2010, Balwani and Holmes pivoted to targeting retail chains as potential

partners. They told Walgreen Co. ("Walgreens") that Theranos had developed a miniaturized proprietary blood analyzer ("Theranos's device") that could run any blood test that was run by conventional labs, all from a blood sample drawn from a fingerstick rather than a vein. 8-ER-2062-92; 13-ER-3599-611. They also told Walgreens (and subsequently other investors) that Theranos's device had been "comprehensively validated" "by ten of the fifteen largest pharmaceutical companies," when that was not true. *Id.*; *see* 17-ER-4643-44, 4657-58. Indeed, Holmes and Balwani emailed Walgreens executives favorable reports described as "three independent due diligence reports on Theranos systems" that were "from" Pfizer, GlaxoSmithKline, and Schering-Plough with their logos. 7-SER-1477-531. However, Pfizer and Schering-Plough did not validate Theranos's device, endorse the conclusions in the reports that Walgreens received, or authorize Theranos to affix their logos to those reports. 3-SER-450-82; 4-SER-643-83.[2]

Not knowing the truth, Walgreens ultimately invested in and partnered with Theranos to provide blood-testing services through certain Walgreens stores. *See* 19-ER-5348-84. As late as 2014, Balwani and Holmes continued to send the falsified reports to investors, including RDV Corporation ("RDV") (Count 7) and Daniel Mosley (Count 8), who considered the reports material to their investment

---

[2] Holmes admitted at her trial that she personally added the pharmaceutical logos to reports Theranos wrote before sending them to Walgreens. PSR ¶ 21; *see also* 7-SER-1456-76.

decisions. 11-ER-2887-90; 14-ER-3843-45, 3850-52, 3867-70; CR-1338.

Holmes also attempted to work with the U.S. military—to no avail. After several years, Theranos had earned minimal military revenue from a limited study conducted within the United States, had not used the device to treat soldiers, and had engaged in limited "use" abroad involving some basic testing of the device's capabilities by a military officer in Africa. 7-ER-1766-78; 8-ER-2029-39. Yet, Holmes told investors that the military was using Theranos's device on medevac helicopters, "in the battlefield," and to treat soldiers in Afghanistan and Iraq, when those statements were not true. *Compare id.*, *with* 11-ER-2866-67, 2874-75, 3003-04; 12-ER-3054-55, 3239-42; 15-ER-4205; 17-ER-4582-90, 4604, 4650-51; 18-ER-4836-39. Similarly, Balwani falsely told PFM HealthCare Master Fund LP ("PFM") (Count 6) that it was Theranos's historical work with the military in Afghanistan that allowed them to purportedly overcome temperature limitations with Theranos's device. 17-ER-4650-51; 18-ER-4836-39.

### B. By Fall 2013, Theranos Was Out of Time and Money, But Balwani Projected Hundreds of Millions in Revenue

Theranos never had, and could not reasonably expect to have, any meaningful revenue. Theranos earned approximately $500,000 in revenue in 2011 and zero revenue in 2012 and 2013. 6-ER-1311-22. Balwani knew this: Theranos's highest-ranking financial officer provided him with regular updates on Theranos's finances from 2013 through 2015. 6-ER-1271-76, 1315, 1362.

5

Balwani and Holmes also privately discussed Theranos's need to "break[] even" and lack of current revenue. 9-SER-1916-49, 1983; *see* 6-ER-1402-13. In November 2013, Balwani emphasized to Holmes that Theranos was down to approximately $15 million in cash (while spending up to $2 million weekly). 6-ER-1304-09, 1408-10.

Externally, Balwani presented Theranos as a financially stable company with projected revenue in the hundreds of millions of dollars. In December 2013, Balwani told one investor that Theranos was fully funded through "current operations" with "no need for capital[.]" 7-SER-1602-04; *see* 12-ER-3101-04. That same month, Balwani and Holmes told PFM that Theranos had historically earned over $200 million from projects with the military and pharmaceutical companies, when, in reality, Theranos had never earned more than $10 million from both sources combined. *Compare* 17-ER-4589, 4657-58, *with* 6-ER-1338-43, *and* 9-SER-2054-59. In January 2014, Balwani provided PFM with a financial model projecting Theranos would earn hundreds of millions of dollars in 2014 and 2015 revenue—based on assumptions that Balwani provided. 17-ER-4615-21, 4661-65; 18-ER-4840-49.

Theranos's revenue did not improve—earning just $150,000 in 2014 and less than $500,000 in 2015. 6-ER-1333-38. Yet Balwani and Holmes continued to provide substantially inflated financial projections to investors like RDV and

Mosley—three-quarters through 2014—predicting $140 million in 2014 revenue and nearly $1 billion in 2015. 11-ER-2859, 2889-98; 14-ER-3828, 3853-57, 3871-73, 3901-03; 7-SER-1558-59. Balwani was in charge of financial information provided to investors. 8-ER-2022-23; *see* 11-ER-2889.

### C. Balwani Rushed the Launch of an Unproven Product with Walgreens in September 2013

Balwani was the Theranos executive in charge of the Walgreens relationship and of Theranos's clinical laboratory, where patient-testing occurred. 5-ER-1000-04; 7-ER-1622-23; 8-ER-2022-24, 2066, 2075, 2092-102; 9-ER-2350-51; 11-ER-2766. Balwani committed to publicly "launch" Theranos's patient-testing services with Walgreens in September 2013. 8-ER-2053-102; 9-ER-2331-51; 11-ER-2730-32.

By fall 2013, Theranos could not get any iteration of its device ready for market and did not have approval to use its device from the U.S. Food and Drug Administration ("FDA") (the agency that approves medical devices). That summer, Balwani pressured company scientists to rush to validate blood tests (or "assays") for clinical ("patient") use on Theranos's device. 9-ER-2337-45, 2410. Theranos's device had multiple iterations and names—including the Edison, the 3.0, 3.5, 4.0, 4s, minilab, and TSPU. 3-ER-580-603, 612-23; 4-ER-933-37; 5-ER-994-99; 7-ER-1604-07; 9-ER-2331-37, 2388; 10-ER-2445; 11-ER-2760-63. The Edison (a.k.a. 3.0/3.5 device) was the only Theranos-manufactured device

7

ever used to test patient samples—and it was only designed to process a certain category of blood tests called immunoassays. *Id.*[3] However, by the September 2013 launch date, Theranos had not validated a single assay for patient use on any version of its device. 9-ER-2342-51; 11-ER-2759-63; 7-SER-1532-34, 1573-74. Theranos never used its heralded device for more than 12 types of blood tests and ceased using it altogether by July 2015 after repeated performance issues. 9-SER-1908.

Secretly, Balwani and Holmes pivoted to using commercially available, FDA-approved blood analyzers manufactured by third-party companies ("third-party devices") to fulfill the vast majority of Theranos's blood test menu offered to patients in certain Walgreens stores. 3-ER-578-603; 4-ER-933-37; 9-ER-2331-45; 10-ER-2436-48; 11-ER-2759-63; 12-ER-3294-97. Theranos even "modified" some third-party devices for specific assays so that they could process the smaller fingerstick blood samples Theranos was collecting from certain Walgreens patients. 3-ER-585-86, 597-603; *see* 9-ER-2331-45; 11-ER-2759-63. Both Theranos's device and the modified third-party devices that processed fingerstick samples required the use of a non-Theranos machine—the "Tecan"—to dilute the samples before analyzing. 3-ER-585-86, 597-603; 5-ER-1015-16.

---

[3] The 4.0/minilab was never used to test patient samples. *See* 3-ER-589-93; 4-ER-936; 7-ER-1648-49; 8-ER-2014-15; 9-ER-2332-33; 10-ER-2445; *contra* AOB-6.

Balwani pressured lab employees to use Theranos's device or the modified third-party machines (rather than FDA-approved unmodified third-party devices). *See*, *e.g.*, 10-ER-2385, 2410. But, as described further below, Theranos employees—from entry-level lab associates to co-laboratory directors occupying the highest positions in the clinical lab—repeatedly and increasingly raised to Balwani concerns with the frequency of quality control failures and the possibility of issuing inaccurate and unreliable patient results throughout 2014. *See infra* pp. 38-40. Balwani responded by berating them and dismissing their concerns. *Id.* Consequently, multiple employees resigned. *See* 4-ER-974-75; 9-SER-1905-07. Balwani responded by installing absentee lab directors—including Balwani's dermatologist—who were rarely onsite and were never shown Theranos's device nor told it was used for patient testing. 3-SER-500-54; 4-SER-717-33.

Externally, Balwani and Holmes told a different story, reinforcing the belief that Theranos was using its own miniaturized device. In September 2013, Theranos and Walgreens issued a joint press release announcing that Theranos would offer blood-testing services for patients at certain Walgreens. 19-ER-5385-88. The press release claimed patient testing would involve "a blood sample as small as a few drops, or 1/1000 the size of a typical blood draw" and would be "taken from a tiny fingerstick or micro-sample taken from traditional methods, eliminating the need for larger needles and numerous vials of blood required for

9

most diagnostic lab testing." *Id.* Shortly before the launch, Holmes and Balwani reviewed and approved a *Wall Street Journal* piece before publication. 7-SER-1535-44. The publication falsely claimed that Theranos "devices [] automate and miniaturize more than 1,000 laboratory tests" and that "Theranos's processes are faster, cheaper and more accurate than the conventional methods and require only microscopic blood volumes, not vial after vial of the stuff." *Id.* Theranos's website reiterated similar false claims. 21-ER-5771-76; *see* 7-ER-1708-35.

> **D.  Balwani Created Software to Hide Technology Failures During Demonstrations with Investors**

Balwani perpetuated the external belief that Theranos was using its own manufactured device to run blood tests through misleading technology demonstrations. *See* 7-ER-1651-708; 11-ER-2869-70. In August 2013, Balwani gave a demonstration to Walgreens executives, leading them to believe that their blood was being tested on Theranos's device displayed to them, when in reality it was tested on a third-party machine. *Id.*; 8-ER-2053-61, 2086-92; 13-ER-3611; *see also* 11-ER-2868-69. To help in these so-called "VIP demos," Balwani created software called the "null protocol"—meaning it "would not attempt to run a blood sample"—to shield Theranos's device's failure from investors during demonstrations. 7-ER-1662-72; 8-ER-2015-20. Balwani employed similarly misleading tactics with potential investors who visited Walgreens stores to use

10

Theranos's blood-testing services—providing false reassurances if they received a vein draw rather than fingerstick.  17-ER-4658-60; *see* 7-SER-1567-68.

### E.      Balwani Lied to Investors About Theranos's Device's Capabilities

Balwani and Holmes secured dozens of investors by falsely claiming that Theranos had manufactured a single, proprietary blood analyzer that could run any blood test that was run by conventional labs, all from a blood sample drawn from a fingerstick rather than a vein, with higher accuracy and less variability than traditional methods, due in part to superior automation.

In December 2013, Balwani and Holmes shared the September 2013 *Journal* piece and joint Theranos-Walgreens press release with existing investors— including investor-victims Alan Eisenman (Count 3), Black Diamond Ventures ("BDV") (Count 4), and Hall Group (Count 5)—and offered them the opportunity to invest again before a new fundraising round.  12-ER-3075-84, 3137, 3232-34, 3268-70; 15-ER-4021-29, 4172-79, 4199; 7-SER-1539-40.  These investors understood Theranos's device to be more developed and the company's financial situation to be more stable than when they originally invested in 2006.  12-ER-3069-96, 3205-45; 15-ER-3994-4038, 4139-44, 4166-206.

One early investor, Patrick Mendenhall, spoke directly with Balwani in December 2013 before investing again.  12-ER-3085-105.  Balwani told Mendenhall that "the 'science' behind Theranos [was] complete"; that "no new

science [or] invention [was] needed"; and that Theranos "takes 3 drops and can run 60 to 70 tests"—none of which was true. *Id.*; 7-SER-1602-04. Balwani appeared "100 percent confident, factual, [and] precise" in providing these details to Mendenhall. 12-ER-3096, 3105. Mendenhall shared this information with other potential investors in that timeframe, including investor-victim Eisenman. 12-ER-3106-07; 15-ER-4029-38. Around December 2013, Eisenman, Mendenhall, BDV, and Hall Group all invested a total of more than $10 million in Theranos, along with several other investors. 12-ER-3069-70, 3105-13, 3123; 1-SER-148.

Balwani also repeatedly told investors—including PFM—that Theranos was "completely vertically integrated[,]" meaning it manufactured its own devices, with "100% manufacturing in USA- [sic] no subcontracting[.]" 7-SER-1602-04; *see* 12-ER-3097-99; 17-ER-4590-92, 4649. In reality, Theranos was not vertically integrated, it heavily relied on the use of third-party devices, and even Theranos's device required the use of the Tecan, a non-Theranos machine. 3-ER-578-603; 4-ER-933-37; 5-ER-1015-16; 9-ER-2331-45; 10-ER-2436-48; 11-ER-2759-63.

Balwani and Holmes touted Theranos's device to investors as one without limitations. Balwani and Holmes provided written materials to investors, including PFM, RDV, and Mosley, that claimed: "Theranos runs any test available in central laboratories" and "provides the highest level of oversight, automation, and standardization[,]" which "ensur[es] the highest level of accuracy and precision."

12

21-ER-5611; *see* 7-ER-1746-54; 14-ER-3845-46; 8-SER-1606-874; 9-SER-1885-86. Specifically, Balwani and Holmes heralded the "minilab" as Theranos's device that "[shrunk] the entire reference laboratory down into this PC sized container[] box." 17-ER-4629-46; *see* 8-SER-1671 (describing "800+ test menu" on "minilab and 4s" device). PFM sent two pages of due diligence questions to Balwani to ensure "no ambiguity" and "no confusion around what the technology" was capable of doing—and the answer was that "there were no limitations." 17-ER-4594-611; 7-SER-1545-48; *see* 11-ER-2844-918; 14-ER-3815-903.

Theranos received hundreds of millions of dollars in investments between late 2013 and early 2015. *See* 6-ER-1347-58; 1-SER-148.

Investors repeatedly testified at trial that they would have been shocked to learn Theranos was using modified or unmodified third-party machines—not Theranos's device as pitched—to run patient blood samples and that Theranos's device could never run more than 12 tests. *See, e.g.,* 11-ER-2865-68, 2878-83, 2916-17; 12-ER-3097-99, 3117, 3122, 3173-79, 3188-92, 3252-54; 14-ER-3842-48; 15-ER-4001-03, 4020-21, 4032-34, 4045, 4177-78, 4200-04; 16-ER-4302-08; 17-ER-4582-92, 4607-16, 4627-29, 4644-56, 4664-65; 18-ER-4851-52. If anyone expressed doubts, Balwani dismissed them. *See* 7-SER-1561-66 (Balwani, responding to investor-victim forwarding accurate information about Theranos's testing, stated that it "sound[ed] like an uninformed consultant").

**F.** **Balwani Lied to Patients About Receiving Accurate Blood-Testing Services from Theranos**

From 2013 to 2016, Balwani and Holmes also deceived patients who visited certain Walgreens stores and paid for Theranos's blood-testing services. *See* 8-ER-2093; 9-ER-2143. Ignoring the warnings of lawyers Theranos hired to review such materials, Balwani informed patients through Theranos's website and brochures that Theranos was capable of running the full range of tests on micro-samples, using advanced automation that ensured "the highest levels of accuracy" and precision. 21-ER-5771-804; 7-SER-1575-601; 9-SER-2050-53.

In truth, Theranos was incapable of accurately and reliably providing blood test results for certain assays. Representative patient testimony bore that out. Patient-victim M.E. (Count 11) received test results from Theranos indicating he had late-stage prostate cancer when, in fact, he did not. 16-ER-4415-77. B.G. received results from Theranos indicating she was going to have a miscarriage when, in fact, she carried a healthy baby to term. 16-ER-4337-410. B.B. (Count 9) had a chronic medical condition that required frequent blood tests, but Theranos's result would have required him to make dramatic changes to his treatment plan that did not correlate to his symptoms. 16-ER-4478-512. E.T. (Count 10) received an (incorrect) positive test result for HIV from Theranos. 16-ER-4514-17; 17-ER-4519-52; *see also* 7-SER-1569-74; 9-SER-1876-912, 2044-49 (providing additional examples of inaccurate results). The jury convicted

14

Balwani of four specific wire fraud counts on this basis. 13-ER-522-24.

Privately, Balwani texted Holmes about Theranos's dark reality: "[the] lab is a fucking disaster zone" and "fundamentally we need to stop fighting fires by not creating them[.]" 9-SER-1921-28, 1936-47, 1952-73, 1988-2008. Throughout their text messages, Balwani repeatedly took joint ownership of decisions at Theranos, stating in July 2015: "I am responsible for everything at Theranos. All have been my decisions too." *Id.*

### G. Balwani Falsely Claimed that Theranos's Relationship with Walgreens Was Expanding When It Was Shrinking

Meanwhile, Theranos's relationship with Walgreens was faltering because Theranos too frequently had to resort to traditional venous draws rather than the "new technology" of "complete blood tests" from a "fingerstick" on Theranos's device as promised. 8-ER-2062-92. Balwani falsely informed Walgreens executives in 2013 that Theranos could perform the Complete Blood Count (CBC) test on Theranos's device but that more esoteric tests were not yet available. *Id.*

Balwani oversaw Theranos's partnership with Walgreens. 8-ER-2022-23, 2066. Throughout 2014, Walgreens and Theranos had regular meetings to monitor certain metrics to determine whether the partnership would continue to expand, and one "key metric" was the percentage of vein draws versus fingerstick draws. 8-ER-2071-86. Balwani kept promising Walgreens executives that Theranos would reduce the percentage of patients receiving venous draws to less than 10%.

15

8-ER-2104-22; 9-ER-2124-42.  Yet Theranos never got below 40%.  *Id.*  Walgreens expressed to Balwani that it was never "satisfied[ or] happy with the venous precent[age.]"  8-ER-2077.

Consequently, Walgreens kept reducing the number of expected stores for expansion.  8-ER-2071-86; 9-ER-2128-37.  Walgreens never offered Theranos testing services to patients in more than 41 of its stores in California and Arizona.  8-ER-2076-77.  By August 2014, Walgreens grew frustrated and decreased its 2015 goal for stores with Theranos testing from 500 to 200.  9-ER-2128-37.  That month, Walgreens informed Balwani that "it will be difficult for [Walgreens] to convince expansion" until vein draws were "in the 10% range[.]"  7-SER-1560.

Balwani knew Theranos's relationship with Walgreens was shrinking rather than expanding—texting Holmes "we can't scale with wag [Walgreens.]"  9-ER-2144-60; 9-SER-1938-40, 1951-57, 1980, 1988-89.  Nevertheless, Balwani continued to provide investors, including RDV and Mosley, with financial projections assuming that Theranos would be in 900 Walgreens locations in 2015—rather than the 200 then-projected.  11-ER-2849-52, 2881-98; 14-ER-3838-40, 3853-57, 3871-73; 7-SER-1558-59.

### H.    Media and Regulatory Agencies Exposed Theranos's Practices

Throughout 2015, Balwani and Holmes knew that *Wall Street Journal* reporter John Carreyrou was investigating Theranos and speaking with former

Theranos lab employees.  9-SER-1965-70, 1975-79, 1992-2006, 2023.  Balwani took steps to quash any dissent (*id.*; 4-ER-717-28) while privately lamenting to Holmes that Theranos was overexposed and lacked "solid substance[.]"  9-SER-1956-63, 1969, 1979, 1994.  Ultimately, the *Journal* published articles exposing the severe limitations of Theranos's device and the company's reliance on third-party machines to do the bulk of its testing, among other things, which shocked investors.  *See*, *e.g.*, 9-ER-2142-44; 12-ER-3122, 3252-53; 13-ER-3609-10; 17-ER-4670-73; CR-586-2.

The fallout was immediate.  The day the first *Journal* article was published, Balwani spoke with Walgreens and privately messaged Holmes that Walgreens was "freaking out" due to "[l]ack of transparency"; Balwani stated that, now that "they know," he and Holmes "need[ed] to be transparent."  9-ER-2144-60; 9-SER-2027-33.  Balwani also privately expressed concern about Holmes's public statements—without ever correcting the record—texting that he was "[w]orried about your 'all fingersticks on our technology' comment."  9-SER-1971, 2034; *see* 1-SER-128-38.

Theranos also drew regulatory scrutiny via unannounced inspections in fall 2015 from Centers for Medicare and Medicaid Services ("CMS")—the agency that oversees blood-testing laboratories—and the FDA.  Balwani privately messaged Holmes that the CMS inspection was "[g]oing bad so far" and suggested that she

17

"[p]ray." 9-SER-2009-26. One of the CMS surveyors who inspected Theranos, Sarah Bennett, testified that she observed systemic issues with Theranos's device, including that Theranos continued to report patient results after quality-control failures. 20-ER-5458-582. Balwani requested that Bennett meet with him to review laboratory deficiencies each day of the inspection, and, ultimately, Bennett informed Balwani that CMS found that Theranos's lab deficiencies posed immediate jeopardy to patient health. 13-ER-3344-45. CMS memorialized its observations in a 121-page report and 4-page cover letter sent to Theranos on January 25, 2016 (hereinafter, "CMS Report"). 20-ER-5458-582. Theranos's response, after internal review, stated that "the laboratory had concluded that there [was] possible patient impact for every test reported from the laboratory's [Edison] instrument." 14-ER-3810.

Walgreens ceased providing Theranos testing services to patients in June 2016, and Balwani left Theranos shortly thereafter. 9-ER-2142-44; PSR ¶ 9.

## II. PROCEDURAL BACKGROUND

### A. Indictment and Pretrial Proceedings

On July 28, 2020, a federal grand jury returned the Third Superseding Indictment ("TSI"). 25-ER-6886-900. The TSI charged Balwani and Holmes with conspiracy to commit wire fraud against investors from 2010 to 2015 (Count 1); six counts of wire fraud against investor-victims, who invested in December 2013

18

(Counts 3-5) and in 2014 (Counts 6-8); conspiracy to commit wire fraud against patients from 2013 to 2016 (Count 2); and four counts of wire fraud related to patient-victims (Counts 9-12). *Id.* The TSI alleged—and the government ultimately proved—that Balwani made misrepresentations to investors about: (A) the capabilities of "Theranos's proprietary analyzer—the TSPU, Edison, or miniLab"; (B) Theranos's financial health; (C) technology demonstrations and the "null protocol"; (D) a purportedly expanding relationship with Walgreens; (E) Theranos's work with and purported revenue from the military; (F) the use of third-party devices rather than "Theranos-manufactured analyzers" to test patients; and (G) pharmaceutical companies' purported validation of "Theranos's technology[.]" *Id.*

The TSI alleged, and the government proved, a separate scheme to defraud patients "through advertisements and marketing materials[ and] through explicit and implicit [false] claims concerning Theranos's ability to provide accurate, fast, reliable, and cheap blood tests and test results," that caused patients to pay Theranos (or Walgreens on Theranos's behalf) for those blood tests. *Id.* The TSI further alleged that, despite "[k]nowing that the accuracy and reliability of Theranos test results was questionable and suspect, HOLMES and BALWANI oversaw the electronic wiring of test results to patients, including persons known to the Grand Jury as Patients B.B. [Count 9], E.T. [Count 10], and M.E. [Count 11] in

19

paragraph 26[.]" *Id.* The government provided Balwani with a bill of particulars, which further described the types of misrepresentations to patients that the government intended to prove, as well as the specific assays it would present to the jury. *See* 1-SER-201-26.

The district court granted Balwani's severance motion in March 2020 and ordered Holmes's trial to proceed first. CR-977.

Balwani joined Holmes's prior motions *in limine* and motion to suppress and filed seven additional motions *in limine*. CR-1156. The district court issued a comprehensive order addressing these motions. 1-SER-150-200.

### B. Trial and Post-Trial Proceedings

Balwani's trial spanned four months, during which over 500 exhibits were admitted and 26 witnesses testified. *See generally* CR-1514-1562.[4] During the trial, Balwani raised a stream of evidentiary challenges, in addition to filing another motion to dismiss for alleged discovery violations. *See* 26-ER-7070-84 (showing docket entries). At no point during the trial or in his post-trial motions did Balwani raise the constructive amendment or due process violation claims he now asserts before this Court. *See* 3-ER-485-97. The jury found Balwani guilty on all twelve counts. 3-ER-522-24.

---

[4] Previously, a jury found Holmes guilty on four investor-related counts (Counts 1 and 6-8), and she was ultimately sentenced to 135 months' imprisonment. 22-ER-6132-34; *see* 3-ER-398-99.

For sentencing, under U.S.S.G. § 2B1.1, Balwani argued that "no loss enhancement" should apply, whereas the government and Probation Office both calculated the loss as more than $730 million from at least 29 investor-victims. CR-1661-1662; PSR ¶¶ 70-88. Alternatively, the government submitted an expert report containing multiple options for ascribing some value to Theranos's stock at the time of investment. *See* CR-1645, 1674. The parties also disputed the applicable standard of proof for determining loss. *See* CR-1662 at 22-23. The district court accepted the government expert's Income Valuation Method to ascribe some value to Theranos stock, found at least 12 investors were victims, and determined that a reasonable estimate of their loss was $120,192,642—yielding a Guidelines range of 135 to 168 months. *See* 1-ER-2-191. It sentenced Balwani to a mid-range sentence of 155 months of imprisonment. *Id.*

## SUMMARY OF ARGUMENT

Despite extensive litigation below, Balwani never raised his constructive amendment or *Napue v. Illinois*, 360 U.S. 264 (1959), due process claims. Plain-error review thus applies, although Balwani's claims fail under any standard.

First, the district court did not constructively amend the indictment by admitting evidence that Theranos tested patient blood samples (inaccurately) on third-party devices, rather than limiting evidence to testing on Theranos's technology. Balwani's claim selectively reads the TSI and distorts its meaning.

21

Balwani focuses on isolated references to "Theranos technology," fails to read the indictment as a whole, and ignores the indictment's repeated allegations that Theranos misled patients about "Theranos's blood testing services," as well as allegations that put at issue testing specific assays he now claims were outside the indictment. The trial evidence matched the correlating evidence presented to the grand jury, and the district court instructed the jury at trial not to consider conduct beyond the charges in the indictment. Even if any variance existed, Balwani explicitly waived a claim of prejudicial variance. Regardless, Balwani cannot demonstrate that admitting the CMS Report and accompanying testimony, as well as testimony of two patient-victims named in the indictment, was prejudicial or material to the jury's verdict on all counts of conviction given the overwhelming evidence of Balwani's myriad and independent categories of fraudulent statements.

Second, the court did not abuse its discretion in permitting three former Theranos employees—Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff—to offer percipient or lay opinion testimony. These witnesses had firsthand knowledge of working in Theranos's lab. Each testified about their excitement upon joining a company with purportedly innovative technology, only to be disillusioned as persistent problems with Theranos's device remained unresolved. Each testified that third-party devices were used for patient testing, and about the limitations of Theranos's device. Each testified that third-party

22

devices performed superior to Theranos's device in terms of accuracy, automation, and the number of tests a single device could run simultaneously. These witnesses testified about what was happening contemporaneously at Theranos in 2013 and 2014. This was not expert testimony. Nevertheless, any error was harmless given the witnesses' qualifications, their overlapping uncontested testimony, and the multiple additional categories of misrepresentations Balwani made.

Third, the government did not violate Balwani's due process rights by offering participants' testimony about, rather than a recording of, Holmes's pitch to investors on a December 2013 conference call. Balwani fails to establish any of *Napue*'s requirements. The two investor-witnesses who testified about Holmes's pitch accurately recounted their recollections—and did so consistently with their testimony during Holmes's trial, where the recording was admitted. Neither witness testified falsely. There is no evidence that the witnesses intentionally lied, let alone that the government believed they had testified falsely or that it subscribed to Balwani's parsing of the recording's transcript. Regardless, Balwani cannot demonstrate that the testimony was material to the jury's verdict given that it related to at most two investor-related counts, it was only one of many misrepresentations made to investors, Balwani made virtually no effort to impeach the witnesses with the recording, and Balwani instead used the absence of the recording to criticize the government's case to the jury. No due process violation

23

occurred.

Finally, Balwani incorrectly attempts to rely on his severed co-defendant's appellate sentencing arguments and summarily argues the district court erred in its loss calculation at sentencing because the government did not establish reliance as an element of conviction. That is not the standard, and the court did not err.

ARGUMENT

## I.  THE DISTRICT COURT DID NOT CONSTRUCTIVELY AMEND THE INDICTMENT

Balwani asserts that the TSI permitted evidence related only to "Theranos technology," and thus admission of the CMS Report and Bennett's accompanying testimony, along with the testimony of two patient-victims (B.B. and E.T.), constructively amended the TSI because such evidence involved testing on commercially-available devices. AOB-26-35. Balwani's claim fails.

### A.  Standard of Review

"Where a defendant raises a constructive amendment claim before the district court, [this Court] review[s] the claim *de novo*." *United States v. Hartz*, 458 F.3d 1011, 1019 (9th Cir. 2006). But the Court "review[s] a variance or constructive amendment to an indictment that is not objected to at trial for plain error." *United States v. Hugs*, 384 F.3d 762, 766 (9th Cir. 2004). To overcome plain error, Balwani must demonstrate "(1) [an] error, (2) that is plain[,] (3) that affects substantial rights[,]" and (4) that "seriously affects the fairness, integrity[,]

24

or public reputation of the judicial proceedings." *Id.* at 767 (quotations omitted).

## B.     No Constructive Amendment Occurred

As an initial matter, plain-error review applies because Balwani did not object at trial to the constructive amendment he now claims occurred—not when the challenged evidence was admitted, in subsequent motions to strike, or when discussing jury instructions. *See* 13-ER-3347; 16-ER-4478-501, 4515-17; 17-ER-4519-30; 1-SER-2-80, 150-200; 2-SER-246-312; 4-SER-768-898; *see, e.g., Hartz,* 458 F.3d at 1019 (applying plain error where defendant did not object to jury instructions); *Hugs,* 384 F.3d at 765-68 (same where claim was not raised at trial); *see also United States v. Singh,* 995 F.3d 1069, 1078-79 (9th Cir. 2021).

Regardless, Balwani cannot prevail under any standard because his claim relies on a selective and distorted reading of the TSI, he challenges evidence that was presented to the grand jury, and the district court affirmatively instructed the jury not to consider conduct outside the indictment.

"The grand jury clause of the Fifth Amendment is designed to ensure that criminal defendants have fair notice of the charges that they will face and the theories that the government will present at trial." *Hartz,* 458 F.3d at 1022. "[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States,* 361 U.S. 212, 215-16 (1960). "An *amendment* of the indictment occurs when the charging

25

terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014) (quotation omitted). By contrast, "minor differences between an indictment and the proof offered at trial could be dismissed as nothing more than a variance." *Hartz*, 458 F.3d at 1020 (quotation omitted). "A *variance* … occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Ward*, 747 F.3d at 1189. The difference between the two "is at times difficult to draw[;]" but "significant" nonetheless because "a constructive amendment requires reversal, [while] a variance requires reversal only if it prejudices a defendant's substantial rights." *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002).

Whether an indictment has been constructively amended requires looking at whether any of the essential elements alleged in the indictment do not match the proof at trial or the jury instructions provided. *See*, *e.g.*, *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 985-86 (9th Cir. 2020); *Ward*, 747 F.3d at 1191 (collecting cases); *Hartz*, 458 F.3d at 1021-22 (collecting cases). Otherwise, any discrepancies between the indictment and proof at trial or instructions may be mere "surplusage" and at most constitute a variance. *United States v. Lopez*, 4 F.4th 706, 728-32 (9th Cir. 2021).

   1. *The TSI Alleges Defrauding Patients About Theranos's Blood-Testing Services Regardless of Device Used*

Balwani received fair notice of the charges he faced at trial—when the TSI is read in its entirety, it alleges that Balwani lied about the capabilities of Theranos's device and also lied about several other topics, including the accuracy of testing services provided to patients. "[A]n indictment should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. O'Donnell*, 608 F.3d 546, 555 (9th Cir. 2010); *see United States v. Anderson*, 532 F.2d 1218, 1222, 1227-28 (9th Cir. 1976).

Balwani's constructive amendment claim hinges on a distorted reading of the TSI, which he claims only alleged defrauding patients about the accuracy of blood tests run using "Theranos's technology." AOB-27-28. But that interpretation elides the many allegations in the TSI related to Theranos's services for patients, not just its device—and those services often ran on other technology, as part of the fraud. 25-ER-6890-93.[5] For example, Paragraph 14 refers to "Theranos's blood testing laboratory services[,]" Paragraph 17 refers to "Theranos's blood testing services[,]" and Paragraph 18 refers to "Theranos test results[.]" *Id.* Moreover, Paragraph 16 alleges that "Theranos was not capable of

---

[5] By contrast, the scheme to defraud *investors* involved false statements about Theranos's device and that Theranos was using third-party devices at all. *Id.*

consistently producing accurate and reliable results for certain blood tests"—and proceeds to list specific assays followed by "all assays conducted on Theranos's [device]." *Id.*

While Balwani points to stray references to "Theranos technology" (AOB-28), his interpretation elevates the general reference over the specific list of assays spelled out explicitly in the TSI (and bill of particulars), which by their terms includes multiple assays that may not have been run on "Theranos technology." 25-ER-6890-93; 1-SER-204 (identifying as misrepresentation "statements [that] falsely presented Theranos as an advanced laboratory offering superior testing services" when Balwani "knew that Theranos relied in part on conventional testing methods and that its tests suffered from accuracy [problems].").

Nevertheless, Balwani emphasizes statements by the district court and the government—taken out of context—to assert that his interpretation of the TSI is correct. AOB-14-16, 28-29. Such statements cannot change the plain meaning of the indictment. Indeed, Balwani cites no case holding that the government's "*thought*[s]" in pretrial statements can constructively amend an indictment. AOB-29. Regardless, Balwani misconstrues the record. In other contexts, the district court repeatedly referred to the patient-fraud scheme as involving *Theranos's services*—not any specific device. 2-SER-246-312. The government filings Balwani quotes as its "interpretation" *predate* the TSI or were made in opposition

28

to Balwani's argument that certain evidence be admitted to purportedly demonstrate that Theranos's technology worked when he had not supplied the premise that "Theranos technology" had been used.  AOB-29; 22-ER-6162-73; 25-ER-6903-44.[6]  Regardless, the government opposed Balwani's motion to exclude this evidence as irrelevant based on a reading of the TSI advanced here.  *See* 1-SER-156-57.

Balwani's constructive amendment claim cannot overcome the plain language of the TSI, which specifically lists the assays involved in the evidence he now challenges and names patient-victims B.B. and E.T. in specific counts.  25-ER-6892-96.

> 2. *The Evidence Presented to the Grand Jury in Support of the TSI Matched the Evidence Presented at Trial and Jury Instructions*

Here, the TSI alleged that "Theranos was not capable of consistently producing accurate and reliable results for certain blood tests, including but not limited to … HIV, … PT/INR," and nevertheless Balwani sent inaccurate test results to "Patients B.B., E.T., and M.E."  25-ER-6890-93.  The evidence presented

---

[6]  The confusion over which device was used to test patient samples was Balwani's design.  *See, e.g.*, 3-ER-674-75; 4-ER-477-78 (seeking to run Hepatitis C test on Theranos's Edison device); 10-ER-2446-52 (PT/INR analyzed using "Theranos specific method" in August 2014); 13-ER-3327-28 (providing breakdown of testing to CMS).  Balwani pressured laboratory employees to perform as many tests as possible using Theranos's fingerstick technology, and it was "taboo" to suggest switching to unmodified third-party devices.  10-ER-2385, 2410.

at trial matched these allegations. Balwani first challenges admission of the CMS

Report and Bennett's accompanying testimony because it involved PT/INR, which

Balwani asserts "was run on conventional technology." AOB-30. But

indistinguishable evidence was presented to the grand jury. 2-SER-313-31

(discussing PT/INR test run on third-party device). Moreover, the CMS Report

and Bennett's testimony also discussed quality control failures of Theranos's

Edison device and Theranos's use of third-party devices (unbeknownst to

investors)—which would remain highly relevant and admissible even under

Balwani's narrowed interpretation of the TSI. 13-ER-3329-72.

Balwani next claims that the testimony of two patient-victims—B.B., who

received an inaccurate CBC test underlying Count 9 of the TSI, and E.T., who

received an inaccurate HIV test underlying Count 10—was outside the scope of the

TSI. AOB-31. But B.B. and E.T. were explicitly named in the TSI, and the

evidence presented to the grand jury matched the trial testimony of these patient-

victims. 25-ER-6892-96; *compare* 2-SER-332-46, *with* 16-ER-4478-501, 4515-

17; 17-ER-4519-30. Therefore, no amendment of (or variance from) the TSI

occurred.

Moreover, the district court explicitly instructed the jury not to consider any

conduct not charged in the indictment *and* included a special instruction proposed

by the defense cautioning that alleged violations of regulations and industry

standards could not form the basis of the jury's verdict. 3-ER-384; 1-SER-17, 34, 56, 62; *see United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002) ("[A] cautionary instruction to the jury is ordinarily presumed to have cured prejudicial impact."). While Balwani laments that a jury could have convicted him based on "ordinary lab mismanagement" (AOB-32), he has no response to how this jury instruction did not prevent the very divergence he now claims occurred. 1-SER-34, 56; 6-SER-1381, 1393-94; *see also* 4-SER-768-898. In sum, the district court did not constructively amend the TSI by admitting the challenged evidence.

### 3. At Most, a Non-Prejudicial Variance Occurred

Even if Balwani were right, at most a non-prejudicial variance occurred. *See, e.g., Adamson*, 291 F.3d at 615-16 (challenge to proof supporting alleged misrepresentation in fraud case constituted "a variance rather than a constructive amendment"); *United States v. Kakkar*, 719 F. App'x 659, 660 (9th Cir. 2018); *accord United States v. Feldman*, 931 F.3d 1245, 1259-61 (11th Cir. 2019) (holding that discrepancies between allegations in indictment and proof at trial for tactics defendant used in wire fraud conspiracy were minor, so constituted only a variance, rather than constructive amendment).

Balwani has waived any argument that a prejudicial variance—rather than a constructive amendment—occurred. He expressly disclaimed relying on a variance theory below (3-ER-387 n.2) and has not raised a variance claim in his

31

opening brief. AOB-26-35. The argument is thus waived. *See United States v. Soto*, 915 F.3d 675, 681 (9th Cir. 2019) ("We review only issues which are argued specifically and distinctly in a party's opening brief." (quotation omitted)).

Even absent waiver, any variance was non-fatal given that Balwani had fair notice of the charges against him and what evidence the government would produce at trial. *See, e.g., Lopez*, 4 F.4th at 728-32; *Hugs*, 384 F.3d at 767-68 (finding no plain error where indictment provided fair notice, evidence at trial matched each element contained in the indictment, jury was instructed not to convict on uncharged conduct, and defendant did not object to jury instructions).

In sum, the evidence presented at trial matched the essential elements described in the TSI and, even if minor discrepancies existed, the district court's unchallenged jury instructions provided affirmative guardrails. No constructive amendment occurred.

### C.    Balwani's Substantial Rights Were Not Affected

Even if the Court finds that the district court clearly or obviously erred in admitting portions of the CMS Report and the testimony of two patient-victims, Balwani still must demonstrate that his substantial rights were affected. *Hugs*, 384 F.3d at 768. He cannot do so. Any alleged error was non-prejudicial, harmless, and immaterial to the jury's verdict.

Balwani concedes that the challenged evidence relates to only one category of misrepresentations—Theranos's ability to provide accurate and reliable results—but asserts that any error so infected the trial that all counts must be vacated. AOB-34. In support, he misquotes the government's argument below identifying the logical fallacy Balwani perpetuates—confusing a sufficient condition for the investor-related counts with a necessary one. 3-ER-408. While Theranos's accuracy problems are one category of misrepresentations that would alone be sufficient to support the jury's verdict convicting Balwani of all 12 counts alleged in the TSI, it is far from a necessary finding for upholding the jury's verdict. *Id.*

To demonstrate, the below lies would be wholly unaffected by any error alleged:

- Investors repeatedly testified at trial that they would have been shocked to learn Theranos was using third-party machines—not Theranos's device as pitched—to run patient blood samples. *See supra* pp. 7-13.

- Balwani knew Theranos had never generated more than $1 million in revenue since he joined the company (by personally guaranteeing a loan to keep it afloat), and yet he provided projections to investors projecting $140 million of revenue in 2014 and nearly $1 billion in 2015. *See supra* pp. 3-7.

33

- Balwani gave misleading technology demonstrations to Walgreens executives, RDV, and other investors where they believed their blood was being tested on Theranos's device as shown to them, when in reality it was tested on a third-party device. *See supra* pp. 10-11.

- Balwani created the "null protocol" software to shield device failure from investors during demonstrations. *Id.*

- Balwani repeatedly told investors that Theranos was vertically integrated and manufactured 100% in the United States, while knowing that Theranos used third-party devices, including some manufactured abroad, and even Theranos's device required an interim step reliant on the non-Theranos-manufactured Tecan machine. *See supra* p. 12.

- In August 2014, Walgreens told Balwani that Walgreens would not expand their relationship with Theranos beyond a few dozen stores if the percentage of venous draws remained around 40% as it had that entire year, yet Balwani falsely represented to investors that it was reasonable to estimate that Theranos would be in 900 Walgreens locations by 2015. *See supra* pp. 15-16.

- Balwani and Holmes told PFM in December 2013 that Theranos had historically earned over $200 million from its work with the military and pharmaceutical companies, when, in reality, Theranos had never earned more than $10 million from both sources combined. *See supra* pp. 5-7.

34

• Balwani and Holmes sent reports that were actually written by Theranos yet emblazoned with logos of large pharmaceutical companies—without those companies' authorization—to investors in 2010, 2013, and 2014, as purported validation of Theranos's device. *See supra* pp. 3-5.

Investor-victims found the above misrepresentations material to their decisions to invest. *See, e.g.*, 11-ER-2857-900; 12-ER-3210-51; 14-ER-3840-87; 15-ER-4000-45, 4177-205; 17-ER-4580-644; 18-ER-4836-52.

For the patient-related counts, Balwani also made multiple false statements to patient-victims—as forecast in the bill of particulars—although the accuracy and reliability of Theranos's blood-testing services were naturally more important to those victims. *See* 1-SER-201-26. Even there, Balwani's claimed error leaves entirely intact Count 11—involving a patient-victim who indisputably received an inaccurate blood test from a Theranos device. 5-SER-1050; *see* 16-ER-4445-47. Balwani's constructive amendment claim fails and, regardless, does not warrant reversal on all counts of conviction.

## II.  THE DISTRICT COURT PROPERLY PERMITTED TESTIMONY FROM THREE FORMER THERANOS EMPLOYEES

### A.  Standard of Review

This Court reviews challenges to the district court's evidentiary rulings, including whether to permit witnesses to testify as lay rather than expert witnesses, for abuse of discretion. *United States v. Perez*, 962 F.3d 420, 434-35 (9th Cir.

35

2020).[7] To find an abuse of discretion, the district court's decision must be "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (*en banc*) (quotation omitted).

### B. The District Court Properly Admitted Testimony of Erika Cheung, Dr. Mark Pandori, and Dr. Adam Rosendorff

Under Federal Rule of Evidence 701, a witness not testifying as an expert may offer testimony in the form of an opinion if it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify" if a district court determines his or her testimony to be "both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citation omitted).

"[W]hether evidence is more properly offered by an expert or a lay witness 'depends on the basis of the opinion, not its subject matter.'" *Perez*, 962 F.3d at

---

[7] Balwani asserts *de novo* review applies under *United States v. Wells*, 879 F.3d 900, 924 (9th Cir. 2018), AOB-25-26, 37, but that runs counter to the general rule that this Court reviews evidentiary rulings for abuse of discretion. *See*, *e.g.*, *United States v. Torres*, 794 F.3d 1053, 1059 (9th Cir. 2015). The district court did not err under any standard.

436 (quotation omitted); *see United States v. Gadson*, 763 F.3d 1189, 1206-14 (9th Cir. 2014); *United States v. Lopez*, 762 F.3d 852, 863-65 (9th Cir. 2014) (testimony violated Rule 701 because agent did not personally witness defendant's prior deportation); *United States v. Durham,* 464 F.3d 976, 982-83 (9th Cir. 2006) (witness familiar with marijuana could testify substance appeared to be marijuana). "The gatekeeping inquiry [as to whether opinion is expert or lay] is always case-specific." *United States v. Holguin*, 51 F.4th 841, 857 (9th Cir. 2022).

Rule 701 encompasses the principle that "[a] lay witness's opinion testimony necessarily draws on the witness's own understanding, including a wealth of personal information, experience, and education, that cannot be placed before the jury." *Gadson*, 763 F.3d at 1208. In *Gadson*, this Court "examine[d] the scope of Rule 701" and noted that the promulgators rejected the notion that witnesses should be required "to limit their testimony just to the facts they perceived and avoid opinions or inferences based on those facts"—in part because that distinction "proved to be unworkable in practice." *Id.* at 1206 (quotations omitted). Furthermore, the promulgators rejected the notion that lay opinion would mislead juries given that "the natural characteristics of the adversarial system will generally lead to an acceptable result, and any weaknesses in the lay witness's testimony can be emphasized through cross-examination and argument." *Id.* (quotation omitted).

37

Here, the testimony of three former Theranos employees—Cheung, Pandori, and Rosendorff—squarely constituted percipient or lay opinion testimony under Rule 701, rather than expert testimony under Rule 702. The court properly discharged its gatekeeping function in admitting their testimony. *See* 2-ER-249-77.[8]

### 1. These Witnesses' Testimony Was Percipient

Cheung worked at Theranos as a laboratory associate from October 2013 until April 2014, when she resigned. 3-ER-570-675; 4-ER-677-728, 932-75. Pandori worked at Theranos as a co-laboratory director (alongside Rosendorff) from December 2013 until May 2014, when he resigned. 5-ER-979-1102; 7-ER-1595-623. Rosendorff worked as the laboratory director at Theranos from April 2013 until November 2014, when he resigned. 9-ER-2317-422; 10-ER-2424-82; 11-ER-2730-90. Each resigned because "the frequency and severity of complaints that [they were] getting from clinicians really reached a crescendo" and patients' blood was tested using inaccurate and unreliable devices. 3-ER-572; 5-ER-1084-102; 9-ER-2318.

Each of the three witnesses testified on overlapping topics describing their experiences and observations working in Theranos's patient-testing laboratory,

---

[8] Because these witnesses testified as percipient rather than expert witnesses, as described further below, the brief by *Amicus Curiae* National Association of Criminal Defense Lawyers (Dkt. 26) is inapposite.

including:

- Their initial excitement to work at Theranos based on publicly-available information describing Theranos's purported "groundbreaking" and "novel" fingerstick technology. 3-ER-571-603, 612-23; 4-ER-933-34; 5-ER-985-99, 1003, 1012-16, 1089; 7-ER-1600-08; 9-ER-2318, 2327-88; 10-ER-2481; 11-ER-2760-63; 9-SER-1908.

- Their observations that Theranos's device was significantly more limited in capabilities than publicly touted, including that the Edison was the only iteration ever used to test patient samples, it could only test one subset of blood tests, and even within that subset it never processed more than 12 types of blood tests. *Id.*

- Their realization that Theranos heavily relied on third-party devices to fulfill blood tests ordered by patients at Walgreens stores, and that those third-party devices performed significantly better than Theranos's device. *Id.*

- Their observations that Theranos's device and Theranos-modified third-party devices were less automated than unmodified third-party devices because they required the use of the Tecan to dilute patient blood samples before analyzing. *Id.*; 10-ER-2560-64; 11-ER-2780-81.

- Their observations that Theranos's Edison device failed quality control with alarming frequency. 3-ER-612-30, 644-75; 4-ER-677-87, 690-717,

39

938-53; 5-ER-984-1032, 1058-62, 1084-102; 7-ER-1600-08, 1618; 9-ER-2324-99; 11-ER-2736-67; 7-SER-1552-53.  For example, in one month alone, one-quarter of the Edison devices failed quality control and some failed more than 50% of the time as compared with 3% or less as was typical for unmodified third-party devices.  *Id.*  Theranos developed a practice of manually removing two out of six results—deemed "outliers"—in an attempt to reduce this variability.  *Id.*

• Their growing concerns about the accuracy and reliability of patient test results given their observations in Theranos's lab and the differential treatment of "VIP guests" such as investors.  *Id.*

• Their experiences when they attempted to escalate these concerns to Balwani, who responded by dismissing their concerns, berating the employees, or both.  4-ER-705-17; 5-ER-1060-62, 1073-84, 1096-102; 9-ER-2330-2351, 2374, 2385, 2390; 10-ER-2424; 11-ER-2766.

Balwani challenges eleven topics discussed by Cheung, Pandori, and Rosendorff, spanning less than 40 out of more than 1,250 transcript pages of their combined trial testimony.  AOB-18-20, 37-40.[9]  As described below, each of these topics was properly admitted as percipient or lay testimony or was introduced via

---

[9]  Balwani references in footnotes two additional challenges to Rosendorff's testimony that he made below.  AOB-19 n.7, 22-23 n.8.  Balwani has waived these claims because "[t]he summary mention of an issue in a footnote, without reasoning in support of the [party's] argument, is insufficient to raise the issue on appeal."  *Noguera v. Davis*, 5 F.4th 1020, 1029 n.3 (9th Cir. 2021).

invited error through cross-examination, and, regardless, was harmless given overlapping unchallenged testimony.

**Cheung.** Balwani asserts that five topics of Cheung's testimony strayed into expert territory—two of which were topics introduced by him through cross-examination. AOB-18-19, 37-38. For the first three, Balwani challenges Cheung's testimony about diluting samples with the Tecan device before processing them on the Edison and modified third-party devices; which tests could be run on which of Theranos's devices; and the purpose of and concerns arising from Theranos's quality-control testing. *Id.* However, Cheung repeatedly testified that the basis of her knowledge was her training at Theranos and the policies (or "SOPs") in place at Theranos. 3-ER-578-603, 628-30, 654-57, 674; 4-ER-695-705. For example, Cheung testified that she learned at Theranos which tests Theranos's device could and could not run; she did not have that knowledge before she joined the company. 3-ER-573, 592-93, 615, 619-24; *see* 7-ER-1596.

Cheung described her daily role in Theranos's lab as being "in charge of running quality controls, [which is] essentially a check that you have to do before you run the patient samples." 3-ER-625-30; *see* 3-ER-578-603. "[T]hen [she] would actively process the patient samples" on Theranos's device, modified machines, and unmodified third-party devices. *Id.* Thus, Cheung described to the jury the steps required in those processes—based on her firsthand knowledge and

41

observations—to fulfill her job responsibilities.  *Id.*

The district court did not abuse its discretion in permitting Cheung to testify that the purpose of running quality controls—as she was trained at Theranos—was to determine if the device was performing accurately before processing patient samples.  *See, e.g.*, 3-ER-654-57; 4-ER-695-705, 949-53.  Cheung testified that quality-control failures *could* indicate accuracy and reliability problems and lead to potentially inaccurate patient tests.  *Id.*  Cheung also reported her concerns to CMS in case "[she] was wrong" and so that CMS "could conduct an investigation to see if Theranos was of the standard that it needed to be in order to test patient[s]."  4-ER-726-28, 957-58.  Indeed, where Balwani quotes Cheung describing the complexity of Theranos's in-house studies (AOB-38), contextually she was describing unclear internal protocols that were changing to obfuscate the true severity of issues with Theranos's device.  *See* 3-ER-663-65, 672; 4-ER-677, 695-709.[10]  This testimony was grounded in her daily observations and training received while at Theranos, and was properly permitted as percipient or lay testimony.

---

[10]  Balwani did not object in the moment to each of these passages, some of which would be subject to a stricter standard of review.  *See Lopez*, 762 F.3d at 859, 863-66 ("Because [defendant] failed to object to [witness's] opinion testimony at trial, we review its admission for plain error.").

***Pandori.*** Similar reasoning undermines Balwani's challenge to three topics in Pandori's testimony: whether Theranos's technology was "groundbreaking" and more accurate than conventional methods, as externally marketed, and whether quality-control failures and lack of proficiency testing called into question the accuracy and reliability of Theranos's device. AOB-19-20, 39-40. Again, Pandori's testimony was grounded in his observations while working at Theranos. Pandori discussed "groundbreaking" and "novel" technology in the context of "the company['s] representations [that] Pandori had read" prior to his employment, which was percipient testimony. 2-ER-253; 5-ER-985-99. Pandori was comparing what he read in the media—claiming that Theranos's device was more accurate than third-party devices—with what he had observed internally that had shown him the opposite. 5-ER-1089-102. Indeed, Pandori repeatedly observed that quality control failure rates were much higher with Theranos's Edison device than with third-party machines. *See*, *e.g.*, 5-ER-1008-32. The district court did not abuse its discretion in permitting Pandori to offer percipient or lay testimony on these topics.

Contrary to Balwani's assertion that Pandori relied on literature and industry knowledge to make these observations (AOB-39-40), Pandori repeatedly testified that he had firsthand experience overseeing laboratories using third-party devices and compared that prior experience with what he observed at Theranos with its manufactured and modified devices. *See*, *e.g.*, 5-ER-980-99. Such statements are

43

squarely within the bounds of percipient or lay testimony despite relating to a technical subject. *See* 2-ER-256.

***Rosendorff.*** Balwani next challenges three topics—spanning only 7 out of almost 500 total trial transcript pages of Rosendorff's testimony—as purportedly expert testimony. AOB-19, 38-39. Putting aside the fact that Rosendorff's testimony was largely unobjected-to at trial, Balwani focuses on Rosendorff's discussion during redirect of problems with diluting small samples to run on Theranos's device or modified third-party machines. *Id.* As with Cheung and Pandori, Rosendorff described his observations while employed at Theranos, using Theranos-created standards, performing his job. To the extent that Balwani takes issue with Rosendorff's explanation about dilution on redirect, it was invited error—as described below—in response to technical topics that Balwani elicited during cross-examination. *See*, *e.g.*, 10-ER-2560-64; 11-ER-2780-81.

***Cross-Examination.*** The remaining topics Balwani challenges—regarding Cheung's testimony about industry-standards and government regulations and Rosendorff's testimony about diluting samples—were introduced on cross-examination and are invited error. *See United States v. Magdaleno*, 43 F.4th 1215, 1219-20 (9th Cir. 2022). When "the defendant himself introduced, or directly set in motion, the error of which he [now] complain[s]," he has invited the error, including "where [defendant's] own attorney had elicited a statement on cross-

examination that he later argued should have been excluded." *Id.* (citing *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1186-87 (9th Cir. 1992)).

Here, Balwani introduced a manual from the College of American Pathologists on cross-examination of Cheung, confirmed that she had never seen it before, and then questioned her about the manual's statements on removing outliers. 4-ER-867-68, 938-42, 969-72. The government responded on redirect by asking whether what Cheung read for the first time in the manual was what she had observed while working at Theranos, and she said "no[.]" *Id.* On re-cross, Balwani successfully sought admission of portions of the manual into evidence and confirmed that Cheung did not know the origin of Theranos's outlier removal practice. *Id.*

Similarly, Balwani introduced—and over government objection the court admitted—federal regulations governing laboratories, and he questioned Cheung about her familiarity with them. 4-ER-749-53, 873-81, 944-47. Balwani queried whether variability up to thirty percent was acceptable in certain contexts, and Cheung responded that those regulations related to assays that were never run on the Edison. *Id.* On redirect, Cheung expanded on her response and confirmed that some Edison results were outside even the thirty-percent range. *Id.*

Balwani is not entitled to reversal on the grounds that these responses strayed into expert testimony because he is "complaining of an error that was his

45

own fault." *Reyes-Alvarado*, 963 F.2d at 1186-87 ("[A]ppellants may not seek reversal on the basis of their own evidentiary errors." (quotation omitted)). Balwani may have believed that "his pursuit of this line of questioning might benefit" him and, even if "[h]is tactics backfired, and [he] was convicted[,]" he "cannot have it both ways." *Id.* This Court should find Balwani invited any error on the topics that he introduced on cross-examination of Cheung and Rosendorff.

> 2.  *The District Court Did Not Violate Rules 701 and 702*

As described above, these three witnesses testified as percipient witnesses about their daily observations at Theranos.

To the extent any of their testimony was lay opinion, it was akin to testimony that this Court has upheld as properly admitted under Rule 701 because it was "predicated upon concrete facts within [their] own observation and recollection." *United States v. Garrido*, 596 F.3d 613, 616-17 (9th Cir. 2010) (quotation omitted) (witness who observed gun could testify without qualifying as weapons expert). For example, this Court has held that a person familiar with a narcotic can testify as a lay person that a substance appears to be that narcotic. *Durham*, 464 F.3d at 982-83. Similarly, this Court has held that a case agent familiar with an investigation or an organization may testify as a lay witness about recorded conversations even if he or she was not an original participant on the call. *See Perez*, 962 F.3d at 434-39; *Gadson*, 763 F.3d at 1206-14; *accord United States*

46

*v. Chen*, No. 17-CR-00603-BLF-1, 2021 WL 2662116, at \*9-10 (N.D. Cal.

June 29, 2021).

The same rationale applies here. As the district court aptly described in

denying Balwani's motion to strike testimony from Cheung and Pandori:

> It seemed to me the questions were: This is a toaster, and
> can you toast[] rye bread in this toaster? Can you toast
> wheat bread [in the] toaster? Can you toast French bread
> in this toaster?

> And then the next question would be can you poach an
> egg in this toaster? Can you make spaghetti in this
> toaster?

2-ER-252; *see* 2-ER-249-77. The court did not abuse its discretion because it

"didn't require expertise to talk about what could be run in that particular

machine," in part because "that's what [the witness] was trained to do" and "just

because it's science doesn't mean it requires expertise." 2-ER-252, 256.

Otherwise, every witness who worked in a technical or specialized field would be

required to be designated an expert under Rule 702 simply to testify to what they

observed while performing their daily tasks. Balwani chose to commit fraud using

a patient-testing lab. The fact that he operated in a technical field should not mean

that insiders who witnessed the criminal conduct need to qualify as experts before

they can testify about what they contemporaneously observed. To hold otherwise

would preclude direct contemporaneous observations of criminal conduct absent

every insider's qualification under *Daubert*. The rules and cases do not require

47

that result. *See Perez*, 962 F.3d at 434-39.

### C.     Any Error Was Harmless

Evidentiary errors are harmless if "it is more probable than not that the erroneous admission of the evidence did not affect the jury's verdict." *United States v. Charley*, 1 F.4th 637, 651 (9th Cir. 2021) (quotation omitted); *see Perez*, 962 F.3d at 435.

Any error here was harmless given that the portions of testimony that Balwani alleges were improperly admitted are but a few lines of testimony (less than 40 out of more than 7,000 trial transcript pages) among abundant trial evidence demonstrating Balwani's fraudulent schemes. While these numbers are not dispositive, they do have something to say. *See United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1032-33 (9th Cir. 2009). The testimony Balwani contests relates to only one of multiple categories of misrepresentations—the inability of Theranos to consistently provide accurate and reliable test results. *See supra* pp. 32-35.[11] Furthermore, within that one category, the unchallenged testimony of these witnesses overlaps with the challenged testimony. *Compare*

---

[11] Balwani references a Theranos database, called the Laboratory Information System ("LIS") (AOB-16-17 & n.6, 35), which was extensively litigated below but is not at issue on appeal. *See* 1-SER-150-200; 2-SER-228-45; CR-1586; *Noguera*, 5 F.4th at 1029 n.3 (waiver). Nevertheless, Balwani cannot demonstrate how an inaccessible, incomplete database would materially undermine these witnesses' real-time observations. *Cf.* 18-ER-5002-03 (Balwani's expert attempted unsuccessfully to resuscitate LIS).

AOB-19-20, *with* 5-ER-1055, 10-ER-2436-37 (diluting patient samples), *and* 5-ER-1027-30, 9-ER-2365-69 (quality control failure rates), *and* 9-ER-2377-78 (reference ranges), *and* 9-ER-2327-28, 10-ER-2481 ("groundbreaking" or "novel" nature of technology).[12]

Contrary to Balwani's claim that this was a scientific and technical case with no expert (AOB-35)—this was a fraud case. Even if the court had struck all the testimony that Balwani challenges, these witnesses still would have been permitted to testify to their observation that Theranos used unmodified third-party devices to test patients (unbeknownst to investors). *See* 7-ER-1647-51, 1691-93 (Theranos's use of third-party devices was information not freely shared before 2016). Any error was immaterial to the verdict.

## III. NO FALSE TESTIMONY WAS ELICITED, THUS NO DUE PROCESS VIOLATION OCCURRED

### A. Standard of Review

When preserved, this Court reviews *de novo* claims that a defendant's due process rights were violated under *Napue*, and it reviews any factual determinations by the district court for clear error. *United States v. Renzi*, 769 F.3d 731, 751-52 (9th Cir. 2014); *see* AOB-26, 57 n.17, 60 n.19. But where, as here,

---

[12] Furthermore, Rosendorff and Pandori would have qualified as experts, if necessary, rendering any error harmless under *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246-47 (9th Cir. 1997). *See* 5-ER-980-84; 9-ER-2318-21.

the defendant did not object at trial, plain-error review applies. *See United States v. Bingham*, 653 F.3d 983, 995 (9th Cir. 2011); *United States v. Romero-Avila*, 210 F.3d 1017, 1021-22 (9th Cir. 2000).

## B. Trial Testimony

At both co-defendants' trials, Bryan Tolbert testified as a representative of Hall Group (Count 5) (12-ER-3205-78; 23-ER-6175-312), and Chris Lucas testified as a representative of BDV (Count 4) (15-ER-4160-217; 16-ER-4219-312; 23-ER-6324-473; 24-ER-6475-93). Both investor-victims invested in Theranos in 2006 and again on December 31, 2013. 1-SER-148. On December 20, 2013, Holmes held a conference call with Theranos investors considering an additional investment. 23-ER-6209-14. Tolbert joined and recorded that call (without Holmes knowing). *Id.* Lucas also participated in the call and had additional interactions with Holmes. 23-ER-6352-57.

At Holmes's trial, during Tolbert's testimony, the government offered, and the district court admitted, portions of Tolbert's recording. 23-ER-6209-60. The recording demonstrated that Holmes made multiple false and misleading statements to existing investors, including about Theranos's purported "ongoing" relationships with pharmaceutical companies and the military. *Id.* After playing certain clips, the government questioned Tolbert about his understanding based upon Holmes's statements made on the call. *Id.* Holmes secured admission of

50

additional portions of the recording over the government's objection. 23-ER-6284-90. As relevant here, Holmes stated on the conference call:

> In terms of the military aspect of this, military *is* a big deal for us and I can tell you confidentially a couple of the areas which we have been focussed [sic] there. *One is in the context of work in the Middle East and specifically Afghanistan.* The survival rate of our men and women in the field when they're hit is 98 percent if they get through the doors of an emergency room within 60 minutes from the point of injury. And if we miss that window that's where the bulk of our fatalities occur. And so *the ability* to take a technology like this and put it in flight, specifically on a medevac, has the potential to change survival rates. And what it does is it makes it possible to begin transfusion and stabilization in place. And so *we're [sic] been doing a lot of work there*.

23-ER-6246-47 (emphasis added).[13]

During Balwani's trial, the government did not seek to admit the recording. Balwani did not speak or participate during the conference call, and his counsel represented that he was not present on the call. 2-ER-335; 12-ER-3210, 3274-75.[14] Instead, the government again called both Tolbert and Lucas to testify to their recollections of Holmes's statements—and their recollections were consistent with their testimony at Holmes's trial. *Compare* 12-ER-3205-55, *with* 23-ER-6175-

---

[13] This quotation is from the trial transcript as transcribed by the court reporter in Holmes's trial. 23-ER-6216-17. Holmes has provided a copy of the recording in her appeal. *United States v. Holmes*, No. 22-10312, Dkt. 28.

[14] Balwani led similar calls with investors. 12-ER-3085-105; 7-SER-1602-04.

265, *and* 15-ER-4160-208, *with* 23-ER-6324-82.  Tolbert consistently summarized his recollection and understanding of Holmes's statements, including that "Theranos had done work in Afghanistan" and "that Theranos devices were employed on the medevac helicopters and being used to kind of improve survival rates of military personnel who had been injured in combat."  12-ER-3233-44; 23-ER-6255-58.  Lucas also testified consistently to his recollection that Holmes said "that the technology was being used in the Middle East and in particular [on] the battlefield" and "it was important for the survivor rate for folks who had been wounded in the field."  15-ER-4204-05; 23-ER-6378-79.  Lucas testified that Holmes described Theranos's purported work with the military to him "[m]ultiple times."  15-ER-4204-05.  Tolbert and Lucas both also testified that they had never met or spoken with Balwani.  12-ER-3210, 3274-75; 15-ER-4200.

At trial, Balwani never suggested that Tolbert's or Lucas's testimony violated *Napue* and neither objected to nor moved to strike the military-related testimony that he now challenges.  2-ER-325-41, 352-59; 12-ER-3233-44; 15-ER-4204-05.  Before Tolbert testified, Balwani sought admission of the recording for its truth but did not provide a viable hearsay exception to the court.  2-ER-325-41, 352-59.  He argued it was admissible under "the rule[s] of completeness and [] fairness," as well as the best evidence rule, none of which applied.  *Id.*; *see, e.g.,* *United States v. Lynch*, 903 F.3d 1061, 1069-71 (9th Cir. 2018) (affirming district

52

court's exclusion of recorded call because defendant did not proffer hearsay exception and other arguments were "not a permissible basis for admitting that evidence"); *United States v. Gonzales-Benitez*, 537 F.2d 1051, 1053-54 (9th Cir. 1976) ("[T]estimony by the participants was equally admissible [as recording] and was sufficient to establish what was said."); *accord United States v. Bourne*, 743 F.2d 1026, 1032 (4th Cir. 1984) (same). Before Tolbert testified, the court stated that it had not heard an "exception to the hearsay rule" and thus did not "see grounds to allow the defense *at this time* to [play the recording]," which did not bar Balwani from subsequently seeking admission. 2-ER-356-59 (emphasis added).

After Tolbert testified on direct, Balwani dropped the matter. He could have sought to admit the recording while Tolbert was testifying, but he did not do so. Balwani did not cross-examine Tolbert about the military portion of the recording. *See* 12-ER-3255-78. Nor did he seek to use the recording to impeach or refresh either Tolbert's or Lucas's recollections. *See id.*; 16-ER-4259-60. Balwani never raised *Napue*, asserted that the government was eliciting false testimony, or alleged prosecutorial misconduct despite lengthy argument regarding the recording. *See* 2-ER-325-41, 352-59; 12-ER-3205-78.

53

### C.     Plain-Error Review Applies

On appeal, Balwani asserts that Tolbert and Lucas testified falsely about their memory of what Holmes said on the recording with respect to Theranos's work with the military, and the government failed to correct it by not playing the recording.  AOB-53-66.  Plain-error review applies because Balwani did not object contemporaneously to the testimony he now challenges.  *See* 12-ER-3239-45 (Tolbert); 15-ER-4204-05 (Lucas).  Balwani first raised this claim in his bail motion, and, even then, only challenged Tolbert's testimony.  3-ER-389-90, 415-16.  Therefore, plain-error review applies.  *See Bingham*, 653 F.3d at 995.

Balwani asserts that his request to introduce the recording sufficiently preserved his *Napue* challenge such that he should be entitled to *de novo* review.  AOB-57 n.17.  But "judges are not like pigs, hunting for truffles" and "will not manufacture arguments" for litigants.  *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (quotation omitted); *see, e.g., United States v. Ellingford*, 499 F. App'x 671, 672 (9th Cir. 2012) ("Because he did not raise these claims [including *Napue* violation] in the district court, we review them for plain error."); *accord United States v. Bush*, 944 F.3d 189, 197-98 (4th Cir. 2019) (rejecting under plain-error standard a *Napue* claim that was "an afterthought that was not preserved in the trial proceedings").

**D.    The Government Did Not Knowingly Elicit False Testimony**

The government did not violate *Napue* by eliciting false testimony.  To establish a *Napue* violation, Balwani must show:  "(1) that the testimony was actually false, (2) that the government knew or should have known that it was false, and (3) that the testimony was material, meaning there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Renzi*, 769 F.3d at 751-52 (quotation omitted).  "Mere inconsistencies or honestly mistaken recollections generally do not satisfy the falsehood requirement." *Id.* Testimony is not "actually false" merely because the witness's recollection is "mistaken, inaccurate[,] or rebuttable." *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013).

Here, Balwani cannot meet any of the prongs.  Neither Tolbert's nor Lucas's testimony was actually false.  There is no evidence that the witnesses intentionally lied, let alone that the government knowingly elicited false testimony from them. Nor was the testimony on this point material to the jury's verdict.

Balwani first asserts that Holmes's statements on the recorded conference call demonstrate that she referred to Theranos's work with the military "in a strictly forward-looking sense[.]"  AOB-54-55.  But Holmes repeatedly used the past and present tense to describe Theranos's work with the military.  23-ER-6220 ("we thus *built a business around* our partnerships with pharmaceutical companies

55

and *our contracts with the military*"), 6246-47 ("military *is* a big deal for us"; "we have been focussed [sic] … *[on] the Middle East and specifically Afghanistan*"; "*we're [sic] been doing a lot of work there*" (emphasis added)).  Lucas's testimony further confirmed that Holmes described military work as current, given that he had multiple conversations directly with Holmes on this topic.  15-ER-4204-05; 23-ER-6378-79.  While Balwani elicited on cross-examination that Holmes also described Theranos's purported work with the military on the recorded conference call (AOB-55; 16-ER-4259-60), Lucas never said that that call was the exclusive source of this information.  Balwani cannot demonstrate that the recorded call is even the sole basis for Lucas's knowledge, let alone that his testimony was actually false.

Balwani seizes on the words "the ability to take a technology like this and put it in flight, specifically on a medevac, has the potential to change survival rates."  23-ER-6246-47.  While Balwani now reads "potential" to modify the device's capability (AOB-55), investors in the moment understood that "potential" modified changing survival rates.  Indeed, Tolbert captured that sentiment when he testified that Holmes told the investors "that Theranos devices were employed on the medevac helicopters and being used to *kind of* improve survival rates of military personnel who had been injured in combat."  12-ER-3239-42 (emphasis added).  Tolbert and Lucas testified truthfully to their recollections, which, even

56

under Balwani's interpretation, showed Holmes's intent to deceive.  Balwani fails

to show that any testimony was even "mistaken, inaccurate[,] or rebuttable[,]"

let alone "actually false," as required.  *Henry*, 720 F.3d at 1084.

Balwani next asserts that Tolbert referred to Theranos's purported work with

the military as "broadening" business opportunities when Holmes stated on the

recorded call that Theranos would need to "pause a large number of [its] ongoing

pharmaceutical and military programs" to focus on its retail partnerships.  AOB-

55-56.  But that takes Tolbert's comment out of context.  12-ER-3239-42.  Tolbert

was responding to the question of how Holmes's statements on the call

"compare[d] with [his] understanding of what Theranos was doing in 2006" when

he stated that the military work "represented a broadening of [the company's]

business opportunities[.]"  *Id.*  Even if Theranos were "paus[ing]" purported

"ongoing" work in December 2013, it could be simultaneously true that such work

was "broad[er]" than what the company had been capable of when investor-victim

Hall Group had last invested in 2006.

At most, Tolbert's and Lucas's testimony represented "honestly mistaken

recollections" that do not meet the first two requirements to establish a *Napue*

violation.  *See Renzi*, 769 F.3d at 752; *Bingham*, 653 F.3d at 995 ("inconsistent

statements … [are] not enough for a *Napue* violation").  This Court recently

reviewed a similar claim of error where a witness testified about her interpretation

57

of a recorded call and held that the "*Napue* claim fails because the government is under no obligation to correct [a witness's] qualified testimony about her own reasonably held belief, because it was not actually false." *United States v. Kabov*, No. 19-50083, 2023 WL 4585957, at *1-4 (9th Cir. July 18, 2023) (quotation omitted).

The same is true here. Neither Tolbert nor Lucas testified in a false manner where they testified to their recollections, and thus the government had no obligation to correct them. Both witnesses testified similarly in both trials—with and without playing the recording. There is no evidence that the government believed Balwani's nuanced alternative interpretation, particularly given that Balwani did not raise this issue in the moment. At bottom, Balwani seeks to challenge the government's decision not to seek admission of two exhibits admitted in his co-defendant's trial. But he cannot challenge that evidentiary choice via *Napue*. *See*, *e.g.*, *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (finding no falsity where allegations "at most point to evidence creating an inference of falsity" and the "inconsistencies were fully explored and argued to the jury"). There was no error, let alone plain error.

## E. The Testimony Was Not Material

Even if Balwani could meet the first two requirements, he cannot meet the third prong of a *Napue* violation—showing the testimony was material to the jury's

verdict. "False testimony is material in this context if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes v. Ayers*, 632 F.3d 500, 520 (9th Cir. 2011) (quotation omitted). The Court asks whether the defendant received "a [fair] trial resulting in a verdict worthy of confidence." *Houston*, 648 F.3d at 814 (quotation omitted). "[T]here is no need to conduct a separate harmless error analysis" apart from the *Napue* materiality analysis. *Dickey v. Davis*, 69 F.4th 624, 645 n.11 (9th Cir. 2023) (quoting *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (*en banc*)).

Any inconsistencies between Tolbert's and Lucas's recollections and what Holmes said on the recording are slight and immaterial. Balwani cannot demonstrate materiality here because there is no reasonable likelihood that false testimony affected the jury, particularly where "defense counsel effectively attacked the credibility of [Tolbert and Lucas] on cross-examination." *Renzi*, 769 F.3d at 752 (quotation omitted); *see also Bingham*, 653 F.3d at 995.

Balwani asserts that the credibility of the prosecution's case could have been called into question only if the recording had been played. AOB-64-65. But that is exactly the strategy Balwani employed during cross-examination and closing argument. On cross-examination of both Tolbert and Lucas, Balwani confirmed that the witnesses did not remember the exact words that Holmes used on the conference call and that there was a recording and transcript of the call. 12-ER-

3271-74; 16-ER-4259-60.  Despite laying the foundation for it, Balwani did not seek to refresh either witness's recollection with the transcript, nor did he attempt to impeach either of their testimony with the transcript or recording.  *Id.*  Balwani did not even ask questions on cross-examination of Tolbert about the military portion of the recording.  *See* 12-ER-3255-78.  Instead, Balwani criticized the government in closing argument for failing to play the recording for the jury.  5-SER-910-14, 1057; 6-SER-1180-206, 1356, 1367.

This Court should reject Balwani's due process claim, particularly under plain-error review.  "[T]he defense attorney had the [relevant document]; used [it] to cross-examine the witnesses; decided not to introduce [it] into evidence; and neglected to object to the misstatements of the witnesses."  *United States v. Alli*, 344 F.3d 1002, 1008 (9th Cir. 2003).  Here, Balwani's decision to drop the matter after Tolbert began testifying could have been a "tactical judgment" about what was "worth more to the defense[.]"  *Id.*

Furthermore, Balwani cannot demonstrate materiality given how minimal this point was in the context of a lengthy trial demonstrating multifaceted misrepresentations.  Lucas testified for over an hour on direct examination, yet his discussion of Holmes's statements regarding the military spanned approximately two minutes of his testimony.  *Compare* 15-ER-4204-05, *with* 15-ER-4160-208. Tolbert testified about the military for approximately five minutes.  12-ER-3239-

42. Both witnesses also testified to many other false statements Holmes made, including about the financial health of Theranos, the state of Theranos's technology, and the likelihood of a national rollout with Walgreens. 12-ER-3217-32; 15-ER-4199-206. Balwani highlighted during cross-examination that neither witness ever interacted with him directly. 12-ER-3210, 3273-75; 15-ER-4209-10.

Balwani asserts that the alleged false testimony could have affected the verdict with respect to all investor-related (not patient-related) counts of conviction. AOB-59-66. But that assertion ignores: (1) the remainder of the recorded call, where Holmes talked about Theranos's purported work with the military in the present tense (23-ER-6220, 6246-47); (2) the number of witnesses who were *not* present on the recorded conference call who heard similar false statements from Holmes (12-ER-3054-55; 17-ER-4582-90, 4604, 4650-51 (Holmes described work with military as present or historical, not aspirational)); and (3) the multiple additional and unrelated false statements that investors heard from Balwani and Holmes (*see supra* pp. 32-35). The jury also heard from investor-victim Mendenhall—who did not participate on the conference call with Holmes, but instead had a call directly with Balwani—who testified that Balwani made several of the same false statements that Holmes had told other investors. 12-ER-3067-192; 7-SER-1602-04. And investors in 2014 and 2015 received written materials containing false statements. *See supra* pp. 11-13. While Balwani

61

asserts that Tolbert's and Lucas's testimony "artificially bolstered" the testimony of these other investors (AOB-62-66), his argument ignores the fact that the recording he asserts was "material" to *all* investor counts was played before the jury in the Holmes trial and that jury *still* convicted Holmes on four investor-related counts. *See* 22-ER-6132-34.

In sum, the overwhelming evidence presented at trial demonstrates that the jury's "verdict [is] worthy of confidence." *See Houston*, 648 F.3d at 814; *see also* 19-ER-5125-34, 5257-71 (describing categories of misrepresentations for jury). Balwani cannot establish the allegedly false statements were material, particularly when viewed through the lens of plain-error review. *See, e.g., Renzi*, 769 F.3d at 751-52; *Bingham*, 653 F.3d at 995; *Houston*, 648 F.3d at 814-15; *Alli*, 344 F.3d at 1006-09.[15]

*    *    *

Contrary to Balwani's assertion (AOB-68), there was no cumulative error where "many of [his] alleged errors are not errors at all[,]" and he has "not established that any errors made his defense far less persuasive than it might otherwise have been." *United States v. Shih*, 73 F.4th 1077, 1102 (9th Cir. 2023) (quotations omitted).

---

[15] *Amici Curiae* American Board of Criminal Lawyers, California Attorneys for Criminal Justice, and Due Process Institute press the same arguments raised by Balwani (Dkt. 34), which fail for the same reasons.

62

## IV. THE DISTRICT COURT PROPERLY CALCULATED THE LOSS AMOUNT FOR SENTENCING

### A. Standard of Review

This Court "review[s] the district court's identification of the correct legal standard *de novo* and the district court's factual findings for clear error." *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (*en banc*).

### B. The District Court Correctly Employed a Preponderance-of-the-Evidence Standard

Balwani summarily asserts that the district court applied the wrong standard of proof to calculate the loss amount. AOB-66-68.[16] The district court did not err.

The court correctly held that preponderance of the evidence rather than the clear-and-convincing standard should apply given that Balwani was convicted of a conspiracy to defraud investors from 2010 to 2015. 1-ER-10. "Because [Balwani] was convicted of conspiracy, and because the losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard applies." *United States v. Laurienti*, 611 F.3d 530, 556-57 (9th Cir. 2010); *see also United States v.*

---

[16] Balwani seeks to adopt Holmes's sentencing arguments made in her separate appeal (*id.* n.21), despite the district court granting *Balwani's* severance motion (CR-977). But this Court has held that "[Federal Rule of Appellate Procedure] 28(i) does not apply to cases which are not consolidated." *United States v. Carpenter*, 95 F.3d 773, 774 n.1 (9th Cir. 1996). Any additional arguments should be deemed waived. *See United States v. Aguilar*, 782 F.3d 1101, 1108 (9th Cir. 2015). If the Court permits Balwani's adoption, then the Court should also adopt the government's response to Holmes's sentencing arguments. *United States v. Holmes*, No. 22-10312, Dkt. 65 at 83-92 (filed Aug. 17, 2023).

*Lonich*, 23 F.4th 881, 910 (9th Cir. 2022) ("We have declined to apply the clear and convincing standard of proof [when] the enhancement at issue was based entirely on the extent of the conspiracy." (quotations omitted)); *Perez*, 962 F.3d at 447-49.[17]  Regardless, the evidence met the higher clear-and-convincing standard as well.  3-ER-392 (district court's noting in denying bail pending appeal that it could "not say that this body of evidence [presented at trial] would be likely to fail the 'clear and convincing' standard" such that the sentence would be reduced to "imprisonment for [only] a few years"); *see also United States v. Riley*, 335 F.3d 919, 925-27 (9th Cir. 2003) (increased Guidelines sentence "was based on the magnitude of the conspiracy" and "was not disproportionate relative to the offense of conviction").

The sole argument Balwani raises in response is that the loss to investors cannot have "resulted from" his convictions because reliance is not an element of wire fraud that the government had to prove at trial.  AOB-67-68.  But this Court does not require a conviction to include, as an element, reliance for the preponderance burden to apply.  *See, e.g.*, *United States v. Armstead*, 552 F.3d 769, 776-77 (9th Cir. 2008); *cf. Lonich*, 23 F.4th at 915 (preponderance standard may have been appropriate if loss amount was tethered to amount lost in fraudulent

---

[17]  The government maintains that the preponderance standard should govern all factfinding under the advisory Guidelines.  *See United States v. Lucas*, No. 22-50064, Dkts. 48-49 (9th Cir. Aug. 16, 2023).

bank loans rather than ultimate collapse of bank). Furthermore, this case was replete with evidence of causation: investors repeatedly testified that Balwani's false statements were material to their (lost) investments. *See supra* pp. 32-35.[18]

## CONCLUSION

For the reasons set forth above, this Court should affirm.

Dated: September 20, 2023

Respectfully submitted,

THOMAS A. COLTHURST
Attorney for the United States
Acting Under Authority Conferred By
28 U.S.C. § 515

MATTHEW M. YELOVICH
Chief, Appellate Section, Criminal Division

*/s/ Kelly I. Volkar*
KELLY I. VOLKAR
Assistant United States Attorney

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

---

[18] Furthermore, to the extent the district court relied on materials beyond trial testimony (1-ER-12-29), it did not clearly err. *See Concepcion v. United States*, 142 S. Ct. 2389, 2399-400 (2022) (federal judges may conduct an inquiry broad in scope for sentencing).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**   22-10338

The undersigned attorney or self-represented party states the following:

[ ]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[X] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

- *United States v. Holmes*, No. 22-10312:  Co-defendant's appeal from the same district court matter

- *United States v. Holmes*, Nos. 23-1040, 23-1167, consolidated with *United States v. Balwani*, No. 23-1166: Defendants' appeals from the district court's restitution order

**Signature**        s/ Kelly I. Volkar            **Date**  September 20, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

66

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**    22-10338

I am the attorney or self-represented party.

**This brief contains** __13,865__ **words,** including __0__ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____*s/ Kelly I. Volkar*_____    **Date** _September 20, 2023_
*(use "*s/[typed name]*" to sign electronically-filed documents)*

67