No. 22-10338

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAMESH "SUNNY" BALWANI,

Defendant-Appellant.

---

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 1 OF 9**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 18-CR-00258-EJD-2

---

**THOMAS A. COLTHURST**
Attorney for the United States
Acting Under Authority Conferred By
28 U.S.C. § 515

**MATTHEW M. YELOVICH**
Chief, Appellate Section, Criminal Division

**KELLY I. VOLKAR**
Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7185
**Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>    Defendant. | Case No. 18-CR-00258 EJD<br><br>**FINAL JURY INSTRUCTIONS** |

DATED:  June 24, 2022

EDWARD J. DAVILA
United States District Judge

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                 1

SER-2

**JURY INSTRUCTION NO. 1**

**DUTIES OF JURY TO FIND FACTS AND FOLLOW LAW**

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts.  It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law.  Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, profession, celebrity, economic circumstances, or position in life or in the community.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.  You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others; they are all important.  Please do not read into these instructions or into anything I may have said or done any suggestion as to what verdict you should return—that is a matter entirely up to you.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                                1

**SER-3**

## JURY INSTRUCTION NO. 2

## CHARGE AGAINST MR. BALWANI NOT EVIDENCE—PRESUMPTION OF INNOCENCE—BURDEN OF PROOF

The indictment is not evidence.  Mr. Balwani, the defendant, has pleaded not guilty to the charges.  Mr. Balwani is presumed to be innocent unless and until the government proves him guilty beyond a reasonable doubt.  In addition, Mr. Balwani does not have to testify or present any evidence.  Mr. Balwani does not have to prove innocence; the government has the burden of proving every element of the charges beyond a reasonable doubt.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    2

**SER-4**

**JURY INSTRUCTION NO. 3**

**ABSENCE OF CO-DEFENDANT**

For reasons that do not concern you, the case against Mr. Balwani's co-defendant, Ms. Elizabeth Holmes, is not before you.  Do not speculate why.  This fact should not influence your verdict with reference to Mr. Balwani.

You have heard evidence that Ms. Holmes has been tried before.  Keep in mind, however, that you must decide this case solely on the evidence presented to you in this trial.  You are not to consider the fact of or any other aspect of a previous trial involving Ms. Holmes in deciding this case.  You must base your verdict solely on the evidence received in this trial.

**JURY INSTRUCTION NO. 4**

**MR. BALWANI'S DECISION NOT TO TESTIFY**

A defendant in a criminal case has a constitutional right not to testify.  In arriving at your verdict, the law prohibits you from considering in any manner that Mr. Balwani did not testify.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    4

**SER-6**

## JURY INSTRUCTION NO. 5

### REASONABLE DOUBT—DEFINED

Proof beyond a reasonable doubt is proof that leaves you firmly convinced Mr. Balwani is guilty. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that Mr. Balwani is guilty, it is your duty to find Mr. Balwani not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that Mr. Balwani is guilty, it is your duty to find Mr. Balwani guilty.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    5

**SER-7**

**JURY INSTRUCTION NO. 6**

**WHAT IS EVIDENCE**

The evidence you are to consider in deciding what the facts are consists of:

(1) the sworn testimony of any witness;

(2) the exhibits that are received in evidence; and

(3) any facts to which the parties have agreed.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    6

**SER-8**

**JURY INSTRUCTION NO. 7**

**WHAT IS NOT EVIDENCE**

In reaching your verdict you may consider only the testimony and exhibits received in evidence. The following things are not evidence and you may not consider them in deciding what the facts are:

1) Questions, statements, objections, and arguments by the lawyers are not evidence. The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence. Similarly, what the lawyers have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

2) Any testimony that I have excluded, stricken, or instructed you to disregard is not evidence. In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence in a limited way, you must do so.

3) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                                    7

**SER-9**

**JURY INSTRUCTION NO. 8**

**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose, may provide an explanation for the water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    8

**JURY INSTRUCTION NO. 9**

**CREDIBILITY OF WITNESSES**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the witness's opportunity and ability to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

(5) the witness's bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

You should use the same standard in judging the credibility of every witness, regardless of what his or her occupation or background may be.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are, and how much weight you think their testimony deserves.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                              9

**JURY INSTRUCTION NO. 10**

**OPINION EVIDENCE, EXPERT WITNESS**

You have heard testimony from Richard Sonnier, who testified to his opinions and the reasons for his opinions.  This opinion testimony is allowed because of the education or experience of this witness.

Such opinion testimony should be judged like any other testimony.  You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    10

**SER-12**

**JURY INSTRUCTION NO. 11**

**DUAL ROLE TESTIMONY**

You have heard testimony from Dr. Audra Zachman and Dr. Mark Burnes, who testified to both facts and opinions and the reasons for their opinions.

Fact testimony is based on what the witness saw, heard, or did.  Opinion testimony is based on the education or experience of the witness.

As to the testimony about facts, it is your job to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.  You may take into account the factors discussed earlier in these instructions that were provided to assist you in weighing the credibility of witnesses.

As to the testimony about the witness's opinions, this opinion testimony is allowed because of the education or experience of this witness.  Opinion testimony should be judged like any other testimony.  You may accept all of it, part of it, or none of it.  You should give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                      11

**SER-13**

**JURY INSTRUCTION NO. 12**

**CHARTS AND SUMMARIES NOT ADMITTED INTO EVIDENCE**

During the trial, certain charts and summaries were shown to you in order to help explain the evidence in the case.  These charts and summaries were not admitted into evidence and will not go into the jury room with you.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    12

**SER-14**

## JURY INSTRUCTION NO. 13

## SEPARATE CONSIDERATION OF MULTIPLE COUNTS—SINGLE DEFENDANT

A separate crime is charged against Mr. Balwani in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on any other count.

**JURY INSTRUCTION NO. 14**

**ON OR ABOUT—DEFINED**

The indictment charges that the offenses alleged in Counts One through Twelve were committed "on or about" a certain date.

Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove that the offenses were committed precisely on the date charged.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                14

SER-16

**JURY INSTRUCTION NO. 15**

**ACTIVITIES NOT CHARGED**

You are here only to determine whether Mr. Balwani is guilty or not guilty of the charges in the indictment.  Mr. Balwani is not on trial for any conduct or offense not charged in the indictment.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    15

**SER-17**

**JURY INSTRUCTION NO. 16**

**CONSPIRACY—ELEMENTS**

Mr. Balwani is charged in Counts One and Two of the indictment with conspiring to commit wire fraud in violation of Section 1349 of Title 18 of the United States Code.

Mr. Balwani is charged in Count One of the indictment with conspiring to commit wire fraud against investors in Theranos during the period 2010 to 2015.

Mr. Balwani is charged in Count Two of the indictment with conspiring to commit wire fraud against patients who paid for Theranos' blood testing services during the period 2013 to 2016.

I will define wire fraud later in these instructions.

In order for Mr. Balwani to be found guilty of either count, you must all unanimously agree with respect to each Count that the government has proved each of the following elements beyond a reasonable doubt:

First, that there was an agreement between two or more persons to commit wire fraud as charged in the indictment; and

Second, that Mr. Balwani became a member of the alleged conspiracy knowing of at least one of its objects and intending to help accomplish it.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. Nor is it enough, standing alone, that they had a business or romantic relationship. You must find that there was a plan to commit wire fraud as alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                                  16

**SER-18**

existing conspiracy is as responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                          17

**JURY INSTRUCTION NO. 17**

**DEFINITION OF "WILLFULLY"**

"Willfully" means to act with knowledge that one's conduct is unlawful and with the intent to do something the law forbids.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    18

**SER-20**

**JURY INSTRUCTION NO. 18**

**CONSPIRACY—KNOWLEDGE OF AND ASSOCIATION WITH OTHER CONSPIRATORS**

A conspiracy may continue for a long period of time and may include the performance of many transactions.  It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even if Mr. Balwani did not directly conspire with other conspirators in the overall scheme, Mr. Balwani has, in effect, agreed to participate in an alleged conspiracy if the government proves each of the following beyond a reasonable doubt:

(1) First, that Mr. Balwani directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy;

(2) Second, that Mr. Balwani knew or had reason to know that other conspirators were involved with those with whom Mr. Balwani directly conspired; and

(3) Third, that Mr. Balwani had reason to believe that whatever benefits Mr. Balwani might get from the alleged conspiracy were probably dependent upon the success of the entire venture.

It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    19

**SER-21**

**JURY INSTRUCTION NO. 19**

**CONSPIRACY—LIABILITY FOR SUBSTANTIVE OFFENSE COMMITTED BY CO-CONSPIRATOR**

Each member of a conspiracy is responsible for the reasonably foreseeable actions of the other conspirators performed during the course and in furtherance of the conspiracy.  If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find Mr. Balwani guilty of wire fraud against investors in Theranos as charged in Counts Three through Eight of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a co-conspirator committed the crime of wire fraud as alleged in that count;

Second, the co-conspirator was a member of the conspiracy charged in Count One of the indictment;

Third, the co-conspirator committed the crime of wire fraud in furtherance of the conspiracy;

Fourth, Mr. Balwani was a member of the same conspiracy at the time the offense charged in Counts Three through Eight was committed by the co-conspirator; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen by Mr. Balwani to be a necessary or natural consequence of the unlawful agreement.

You may find Mr. Balwani guilty of wire fraud against patients who paid for Theranos' blood testing services as charged in Counts Nine through Twelve of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a co-conspirator committed the crime of wire fraud as alleged in that count;

Second, the co-conspirator was a member of the conspiracy charged in Count Two of the indictment;

Third, the co-conspirator committed the crime of wire fraud in furtherance of the conspiracy;

Fourth, Mr. Balwani was a member of the same conspiracy at the time the offense charged in Counts Nine through Twelve was committed by the co-conspirator; and

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                           20

**SER-22**

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen by Mr. Balwani to be a necessary or natural consequence of the unlawful agreement.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    21

SER-23

## JURY INSTRUCTION NO. 20

## WIRE FRAUD (18 U.S.C. § 1343)

Mr. Balwani is charged in Counts Three through Twelve of the indictment with wire fraud in violation of Section 1343 of Title 18 of the United States Code.

Mr. Balwani is charged in Counts Three through Eight of the indictment with wire fraud against investors in Theranos.  In particular:

Mr. Balwani is charged in Count Three with wire fraud in connection with a wire transfer of $99,990 on or about December 30, 2013.

Mr. Balwani is charged in Count Four with wire fraud in connection with a wire transfer of $5,349,900 on or about December 31, 2013.

Mr. Balwani is charged in Count Five with wire fraud in connection with a wire transfer of $4,875,000 on or about December 31, 2013.

Mr. Balwani is charged in Count Six with wire fraud in connection with a wire transfer of $38,336,632 on or about February 6, 2014.

Mr. Balwani is charged in Count Seven with wire fraud in connection with a wire transfer of $99,999,984 on or about October 31, 2014.

Mr. Balwani is charged in Count Eight with wire fraud in connection with a wire transfer of $5,999,997 on or about October 31, 2014.

Mr. Balwani is charged in Counts Nine through Twelve of the indictment with wire fraud against patients who paid for Theranos' blood testing services.  In particular:

Mr. Balwani is charged in Count Nine with wire fraud in connection with a telephone call from Patient B.B. to Theranos regarding B.B.'s laboratory blood test results on or about October 12, 2015.

Mr. Balwani is charged in Count Ten with wire fraud in connection with a wire transmission of Patient E.T.'s laboratory blood test results on or about May 11, 2015.

Mr. Balwani is charged in Count Eleven with wire fraud in connection with a wire transmission of Patient M.E.'s laboratory blood test results on or about May 16, 2015.

Mr. Balwani is charged in Count Twelve with wire fraud in connection with a wire transfer of $1,126,661 on or about August 3, 2015.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    22

**SER-24**

In order for Mr. Balwani to be found guilty of each count of wire fraud, you must all unanimously agree with respect to each count that the government has proved each of the following elements beyond a reasonable doubt:

First, Mr. Balwani knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.  A scheme to defraud is a deceptive scheme to deprive a person of money or property.  Deceitful statements of half-truths may constitute false or fraudulent representations;

Second, the statements made as part of the scheme were material.  Statements are material if they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, Mr. Balwani acted with the intent to defraud, that is, the intent to deceive and cheat.  The intent to deceive and cheat is the intent to deprive someone of money or property by means of deception; and

Fourth, Mr. Balwani used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.  The wire itself need not be false or misleading.

In determining whether a scheme to defraud exists, you may consider not only Mr. Balwani's words and statements, but also the circumstances in which they are used as a whole.

A wiring is caused when one knows that a wire will be used in the ordinary course of business or when one can reasonably foresee such use.

It need not have been reasonably foreseeable to Mr. Balwani that the wire communication would be interstate in nature.  Rather, it must have been reasonably foreseeable to Mr. Balwani that some wire communication would occur in furtherance of the scheme, and an interstate wire communication must have actually occurred in furtherance of the scheme.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                         23

**SER-25**

**JURY INSTRUCTION NO. 21**

**INTENT TO DEFRAUD—DEFINED**

An intent to defraud is an intent to deceive and cheat, that is, to deprive someone of money or property by means of deception.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    24

SER-26

**JURY INSTRUCTION NO. 22**

**GOOD FAITH**

You may consider whether Mr. Balwani had an honest, good faith belief in the truth of the specific misrepresentations alleged in the indictment in determining whether or not he acted with intent to defraud.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                25

**SER-27**

**JURY INSTRUCTION NO. 23**

**KNOWINGLY—DEFINED**

An act is done knowingly if Mr. Balwani was aware of the act and did not act through ignorance, mistake, or accident.  The government is not required to prove that Mr. Balwani knew that his acts were unlawful.  You may consider evidence of Mr. Balwani's words or acts, along with all the other evidence, in deciding whether Mr. Balwani acted knowingly.

To find that Mr. Balwani acted knowingly, you must find that he himself had knowledge of the fact at issue.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                26

**SER-28**

**JURY INSTRUCTION NO. 24**

**AIDING AND ABETTING**

Mr. Balwani may be found guilty of wire fraud as charged in Counts Three through Twelve of the indictment, even if Mr. Balwani personally did not commit the act or acts constituting the crime but aided and abetted in its commission. To "aid and abet" means intentionally to help someone else commit a crime. To prove Mr. Balwani guilty of wire fraud by aiding and abetting, the government must prove each of the following beyond a reasonable doubt:

First, someone else committed the conduct charged in Counts Three through Twelve of the indictment;

Second, Mr. Balwani aided, counseled, commanded, induced, or procured that person with respect to at least one element of wire fraud as charged in Counts Three through Twelve of the indictment;

Third, Mr. Balwani acted with the intent to facilitate wire fraud as charged in Counts Three through Twelve of the indictment; and

Fourth, Mr. Balwani acted before the crime was completed.

It is not enough that Mr. Balwani merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime. The evidence must show beyond a reasonable doubt that Mr. Balwani acted with the knowledge and intention of helping that person commit wire fraud as charged in Counts Three through Twelve of the indictment.

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime.

The government is not required to prove precisely which person actually committed the crime and which person aided and abetted.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    27

**SER-29**

## JURY INSTRUCTION NO. 25

### SCHEME TO DEFRAUD—VICARIOUS LIABILITY (18 U.S.C. § 1343)

If you find that Mr. Balwani was a member of the scheme to defraud investors in Theranos charged in Counts Three through Eight and that Mr. Balwani had the intent to defraud investors in Theranos, Mr. Balwani may be responsible for other co-schemers' actions during the course of and in furtherance of the alleged scheme, even if Mr. Balwani did not know what they said or did.

For Mr. Balwani to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the government must prove each of the following elements beyond a reasonable doubt:

First, the co-schemer was a member of the scheme to defraud investors charged in Counts Three through Eight of the indictment;

Second, the co-schemer committed the offense in furtherance of the scheme to defraud Theranos investors;

Third, Mr. Balwani was a member of the same scheme to defraud, and possessed the intent to defraud Theranos investors; and

Fourth, the offense committed by the co-schemer fell within the scope of the scheme to defraud and was one that Mr. Balwani could reasonably foresee as a necessary and natural consequence of the scheme to defraud.

If you find that Mr. Balwani was a member of the scheme to defraud patients who paid for Theranos' blood testing services charged in Counts Nine through Twelve and that Mr. Balwani had the intent to defraud Theranos paying patients, Mr. Balwani may be responsible for other co-schemers' actions during the course of and in furtherance of the alleged scheme, even if Mr. Balwani did not know what they said or did.

For Mr. Balwani to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the government must prove each of the following elements beyond a reasonable doubt:

First, the co-schemer was a member of the scheme to defraud patients who paid for Theranos' blood testing services charged in Counts Nine through Twelve of the indictment;

Second, the co-schemer committed the offense in furtherance of the scheme to defraud Theranos paying patients;

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    28

**SER-30**

Third, Mr. Balwani was a member of the same scheme to defraud, and possessed the intent to defraud Theranos paying patients; and

Fourth, the offense committed by the co-schemer fell within the scope of the scheme to defraud and was one that Mr. Balwani could reasonably foresee as a necessary and natural consequence of the scheme to defraud.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    29

**JURY INSTRUCTION NO. 26**

**WIRE FRAUD—ALLEGED VICTIM'S CONDUCT**

An alleged victim's negligence is not a defense to wire fraud.  You have heard evidence regarding investors' process for deciding whether to invest money in Theranos.  You are to consider this evidence to the extent that it helps you determine whether Mr. Balwani made false or fraudulent pretenses, representations, or promises as part of a scheme or plan to defraud (see prior Wire Fraud instruction).  You may also consider this evidence to the extent that it helps you determine whether the statements made as part of the alleged scheme were material; that is, whether they had a natural tendency to influence, or were capable of influencing, a person to part with money or property (see prior Wire Fraud instruction).

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    30

**SER-32**

**JURY INSTRUCTION NO. 27**

**SUCCESS OF A WIRE FRAUD SCHEME**

Success of a scheme to defraud is not necessary for purposes of determining whether wire fraud occurred.  For Counts Three through Twelve, it is not necessary that Mr. Balwani made a profit or that anyone actually suffered a loss.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    31

**JURY INSTRUCTION NO. 28**

**ALLEGED VIOLATIONS OF REGULATIONS AND INDUSTRY STANDARDS**

You have heard evidence regarding alleged violations of regulations and industry standards. You may consider such evidence, along with other evidence, limited to any purposes for which such evidence was admitted, in assessing whether the government has proved each of the counts charged in the indictment.  However, you may not find Mr. Balwani liable for any of the offenses alleged in the indictment merely because he or Theranos may have violated federal or state regulations or because Mr. Balwani or Theranos may have engaged in negligent practices or violated industry standards related to laboratory testing or medical devices.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    32

**SER-34**

## JURY INSTRUCTION NO. 29

### DUTY TO DELIBERATE

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially.  Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, profession, celebrity, economic circumstances, or position in life or in the community.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so.  During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    33

**SER-35**

**JURY INSTRUCTION NO. 30**

**CONSIDERATION OF EVIDENCE—CONDUCT OF THE JURY**

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.  Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This restriction includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, text messaging, or any Internet chat room, blog, website or other forms of social media.  This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet (through Google or otherwise) or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the court immediately.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                    34

**SER-36**

**JURY INSTRUCTION NO. 31**

**USE OF NOTES**

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                            35

**JURY INSTRUCTION NO. 32**

**JURY CONSIDERATION OF PUNISHMENT**

The punishment provided by law for the alleged offenses is for the court to decide.  You may not consider punishment in deciding whether the government has proved its case against Mr. Balwani beyond a reasonable doubt.

SER-38

**JURY INSTRUCTION NO. 33**

**VERDICT FORM**

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign, and date it, and advise the clerk that you are ready to return to the courtroom.

**SER-39**

**JURY INSTRUCTION NO. 34**

**COMMUNICATION WITH COURT**

If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk, signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, on any question submitted to you, including the question of the guilt of Mr. Balwani, until after you have reached a unanimous verdict or have been discharged.

FINAL JURY INSTRUCTIONS
CASE NO. CR 18-258 EJD                38

JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:     (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **RAMESH "SUNNY" BALWANI'S MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION OF ORDER AT DKT. 1483** |
| v. | |
| RAMESH "SUNNY" BALWANI, | |
| Defendant. | **Hon. Edward J. Davila** |

Mr. Balwani seeks leave under Criminal Local Rule 2-1 and Civil Local Rule 7-9(a) to file a motion for reconsideration of the Court's June 10, 2022 Order at Dkt. 1483. The basis for the proposed motion is described in Mr. Balwani's proposed motion for reconsideration, filed as Exhibit 1 to this motion.

DATED: June 11, 2022                    Respectfully submitted,

                                        ORRICK HERRINGTON & SUTCLIFFE LLP


                                        By:   */s/ Jeffrey B. Coopersmith*
                                              Jeffrey B. Coopersmith

                                              Attorney for Defendant
                                              RAMESH "SUNNY" BALWANI

**SER-42**

JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted *Pro Hac Vice*)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**[PROPOSED] ORDER GRANTING DEFENDANT RAMESH "SUNNY" BALWANI'S MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION AND SETTING HEARING DATE**<br><br>Hon. Edward J. Davila |

**[PROPOSED] ORDER**

On June 11, 2022, Defendant Ramesh "Sunny" Balwani submitted a motion for leave to file a motion for reconsideration of this Court's Order at Dkt. 1483.

The Court, having reviewed the motion, finds good cause and hereby **GRANTS** Mr. Balwani's motion. The Proposed Motion for Reconsideration filed as Exhibit 1 to Mr. Balwani's motion for leave shall be deemed filed and a hearing set for June 13, 2022, at 10:00 a.m.

**IT IS SO ORDERED.**

Dated: _____

_____
HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

# Exhibit 1

# TO RAMESH "SUNNY" BALWANI'S MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION OF ORDER AT DKT. 1483

JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:     (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**RAMESH "SUNNY" BALWANI'S [PROPOSED] MOTION FOR RECONSIDERATION OF ORDER AT DKT. 1483**<br><br>**Date:  June 13, 2022**<br>**Time:  10:00 a.m.**<br>**CTRM.: 4, 5th Floor**<br><br>**Hon. Edward J. Davila** |

**[PROPOSED] MOTION FOR RECONSIDERATION**
**OF ORDER AT DKT. 1483**

PLEASE TAKE NOTICE that on June 13, 2022, at 10:00 a.m. or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, located at 280 South First Street, San Jose, CA  95113, before the Honorable Edward J. Davila, Defendant Ramesh "Sunny" Balwani will and hereby does respectfully move the Court to reconsider a portion of its Order at Dkt. 1483. The Motion is based on the below Memorandum of Points and Authorities, the record in this case, and any other matters that the Court deems appropriate.

DATED: June 11, 2022                           Respectfully submitted,


                                              ORRICK HERRINGTON & SUTCLIFFE LLP


                                              By:   */s/ Jeffrey B. Coopersmith*
                                                    Jeffrey B. Coopersmith

                                                    Attorney for Defendant
                                                    RAMESH "SUNNY" BALWANI

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

On May 20, 2022, Mr. Balwani orally moved to strike the portion of testimony by CMS inspector Sarah Bennett stating that "Theranos said that the laboratory had concluded that there is possible patient impact for every test reported from the laboratory's TPS 3.5 instrument." 5/10/22 Trial Tr. at 5134 (testimony); 5/20/22 Trial Tr. at 6324–31 (oral motion). Mr. Balwani timely objected to this testimony when the question was presented. 5/10/22 Trial Tr. at 5094, 5130–34. Mr. Balwani argued that this testimony is inadmissible hearsay because it is an out-of-court statement made by Dr. Kingshuk Das (former Theranos lab director) and, if offered for the non-hearsay purpose of notice to CMS, is irrelevant. *Id.* at 5094–5106; 5/20/22 Trial Tr. at 6325–27.

On June 10, 2022, the Court denied Mr. Balwani's motion on two grounds: first, Dr. Das' out-of-court statement about a "possible patient impact" was "a party-admission" that is exempt from the rule against hearsay under Rule 801(d)(2); and second, the statement was offered for the non-hearsay purpose of "explaining" Ms. Bennett's actions and providing "context" for questions asked during her cross-examination. Dkt. 1483 at 1–2.

Mr. Balwani asks the Court to reconsider the first of these grounds, which was based on a misunderstanding of material facts about the timing of Dr. Das' statement in relation to Mr. Balwani's role at Theranos.[1] *See United States v. Mendez*, No. CR-07-00011 MMM, 2008 WL 2561962, at *2 (C.D. Cal. June 25, 2008) ("Courts have held that motions for reconsideration in criminal cases are governed by the rules that govern equivalent motions in civil proceedings."); Crim. L.R. 2-1 (applying Civil Local Rules to criminal actions); Civil L.R. 7-9(b)(3) (reconsideration is appropriate where, *inter alia*, court failed to "consider material facts").

The relevant facts rebut any possible theory that the out-of-court statement relayed by Ms. Bennett was "a party-admission" under Rule 801(d)(2). The statement was not made, adopted, or authorized by Mr. Balwani, nor was it made by his agent. *See* Fed. R. Evid. 802(d)(2).

---

[1] The portion of the Order that Mr. Balwani addresses in this motion appears at page 1, lines 17–20. Without waiving his prior arguments, Mr. Balwani does not move for reconsideration of the Court's second ground—that Ms. Bennett's testimony is admissible for a non-hearsay purpose.

Because this testimony does not satisfy Rule 802(d)(2), it should not be admitted for its truth. Mr. Balwani thus asks the Court to reconsider the first ground of its Order and instruct the jury that Ms. Bennett's testimony about a "possible patient impact" was admitted for only a limited purpose. *See* Fed. R. Evid. 105.

**III.    ARGUMENT**

The Court based its party-admission analysis on three facts: Mr. Balwani "was the Chief Operating Officer" (COO) of Theranos; he "had responsibility for the lab"; and he "provided CMS with a document in which he took responsibility for the lab." Dkt. 1483 at 1. In relying on these facts, however, the Court overlooked their timing in relation to Dr. Das' April 2016 "possible patient impact" statement. The facts instead disprove any suggestion that Mr. Balwani made, authorized, or adopted Dr. Das' statement, or that Dr. Das was acting as Mr. Balwani's agent. Thus, Rule 801(d)(2) does not exempt the statement from the rule against hearsay.

Mr. Balwani interacted with CMS during that agency's inspection at Theranos in September and November 2015. 5/3/22 Trial Tr. at 4620. Ms. Bennett testified that Mr. Balwani "took charge" when CMS arrived and presented a slide deck describing himself as "responsible for all CLIA lab business operations." *Id.* at 4631, 4638. But Mr. Balwani's role in Theranos' clinical lab changed significantly between the time he interacted with Ms. Bennett during the CMS inspection in 2015 and the time that Dr. Das made the "possible patient impact" statement about six months later in 2016. After learning about CMS's findings, Theranos hired Dr. Das to serve as the new California lab director starting in December 2015. *See* 11/9/21 Holmes Trial Tr. at 5781. As Dr. Das testified during the Holmes trial,[2] the lab management structure changed with his arrival: he was the first lab director to report directly to Ms. Holmes and "had very limited chances to interact" with Mr. Balwani, as "Sunny left the company not too long after I [Dr. Das] joined." *Id.* at 5794 (he had "quite [a] minimum number of interactions" with Mr. Balwani); 11/10/21 Holmes Trial Tr. at 5913–15. It was not until April 2016—several months after Dr. Das

---

[2] The Court is not bound by the rules of evidence or limited to the evidence admitted at Mr. Balwani's trial when deciding preliminary questions of admissibility. *See* Fed. R. Evid. 104(a).

[PROPOSED] MOTION FOR RECONSIDERATION
OF ORDER AT DKT. 1483
CASE NO. CR-18-00258-EJD

**SER-49**

joined Theranos and about six months after the CMS inspection—that Dr. Das sent CMS the letter with the attachment containing the "possible patient impact" statement. 5/10/22 Trial Tr. at 5093 (discussing TX 5471 (letter) and TX 4943 (attachment)). No evidence suggests that Mr. Balwani "took responsibility for the lab" when Dr. Das made that statement, let alone that he specifically authorized or adopted it. Dkt. 1483 at 1. And even if CMS perceived Mr. Balwani as still responsible for the lab at that time (he was not), his operational role at most establishes that Mr. Balwani was an agent of Theranos, not that Dr. Das was an agent of Mr. Balwani.

So the only remaining basis for the Court's Rule 801(d)(2) analysis is Mr. Balwani's role as the COO of Theranos. Dkt. 1483 at 1. But as the Court has previously acknowledged, Mr. Balwani's "position at the top of Theranos' organizational chart alone is insufficient to establish the admissibility of statements made by any of the 160-plus employees working in Theranos' lab." Dkt. 1326 at 48. That is precisely why the Court deferred ruling on the government's motion in limine to admit statements by Theranos and Theranos employees and agents. *Id.* Before admitting such statements, the Court explained, it would have to apply the Ninth Circuit's "fact-based inquiry applying common law principles of agency" to determine whether the "specific statement" made by the "particular employee" is admissible under Rule 801(d)(2). *Id.* (quoting in part *United States v. Bonds*, 608 F.3d 495, 504 (9th Cir. 2010)).

Here, the facts do not support a finding that Dr. Das was acting as Mr. Balwani's agent when he made the "possible patient impact" statement. Dr. Das reported directly to Ms. Holmes and, in his own words, he "had very limited chances to interact" with Mr. Balwani. 11/9/22 Holmes Trial Tr. at 5794. Dr. Das was not acting "on [Mr. Balwani's] behalf and subject to [Mr. Balwani's] control," as required for an agency relationship. Dkt. 798 at 96 (quoting *Bonds*, 608 F.3d at 506). Nor is there any evidence that Mr. Balwani adopted or authorized Dr. Das' statement.[3] Because the facts belie any theory that Dr. Das' "possible patient impact" statement

---

[3] The mention of Mr. Balwani in the subject line of Dr. Das' April 1, 2016 letter to CMS does not render the letter and its attachments "adopted" or "authorized" by Mr. Balwani. Fed. R. Evid. 801(d)(2)(b)–(c). The subject line reads: "Updated Response ***of Theranos, Inc.*** to the March 18, 2016 Letter From Karen Fuller To Dr. Sunil Dhawan, Elizabeth Holmes, and Sunny Balwani (CLIA Number 05D2025714)." TX 5471 at 1 (emphasis added). The body of the letter confirms that it "provides ***Theranos, Inc.'s*** response to [CMS's] letter of March 18, 2016." *Id.* (emphasis

[PROPOSED] MOTION FOR RECONSIDERATION
OF ORDER AT DKT. 1483
CASE NO. CR-18-00258-EJD

**SER-50**

was "a party-admission" under Rule 801(d)(2), it should not be admitted for its truth.

If the Court grants this motion and reconsiders the first ground for its ruling in Dkt. 1483, Mr. Balwani asks that the Court instruct the jury that Ms. Bennett's testimony about a "possible patient impact" was admitted not for its truth, but for the limited purpose of contextualizing Ms. Bennett's actions and her other testimony. *See* Fed. R. Evid. 105 (when evidence is admitted for a limited purpose, a court must, upon timely request, "restrict the evidence to its proper scope and instruct the jury accordingly").

## IV.    CONCLUSION

For all the above reasons, Mr. Balwani asks the Court to grant this motion.

DATED: June 11, 2022                          Respectfully submitted,

                                              ORRICK HERRINGTON & SUTCLIFFE LLP


                                              By:   */s/ Jeffrey B. Coopersmith*
                                                    Jeffrey B. Coopersmith

                                                    Attorney for Defendant
                                                    RAMESH "SUNNY" BALWANI

---

added). Thus, the letter on its face could only mean that *Theranos* adopted or authorized the response—and that Mr. Balwani specifically did not. *Cf.* Dkt. 798 at 95 ("Under general agency principles, Theranos employees were not Holmes' agents; they were Theranos' agents.").

- 4 -                    [PROPOSED] MOTION FOR RECONSIDERATION
                         OF ORDER AT DKT. 1483
                         CASE NO. CR-18-00258-EJD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  5:18-cr-00258-EJD-2 |
| Plaintiff, | |
| v. | **ORDER RE DEFENDANT'S MOTION TO STRIKE PORTIONS OF SARAH BENNETT'S TESTIMONY** |
| RAMESH "SUNNY" BALWANI, | |
| Defendant. | |

Defendant Ramesh "Sunny" Balwani moves to strike portions of Sarah Bennett's testimony.  Defendant argues that the testimony is inadmissible under the rule against hearsay. The Court disagrees.

First, Defendant was the Chief Operating Officer of Theranos and, as the evidence shows, had responsibility for the lab.  As relevant to Ms. Bennett's testimony, Defendant provided CMS with a document in which he took responsibility for the lab.  This is a party-admission and is thus exempt from the rule against hearsay under Federal Rule of Evidence 801 (d)(2).

Second, as the Government notes, the statements that Defendant seeks to strike were offered for the non-hearsay purpose of explaining why "Ms. Bennett did not put in her statement of deficiencies or any subsequent iteration of them a patient impact assessment with respect to the particular things she was finding."  Transcript of Trial Proceedings at 6328.  Further, the testimony sought to be struck is important to give context to some of the questions asked by the defense during cross-examination.

Accordingly, the Court finds that the testimony sought to be struck does not violate the rule against hearsay, either because it is non-hearsay under Federal Rule of Evidence 801(2) or because it was offered for a non-hearsay purpose.  Defendant's motion to strike is therefore **DENIED.**

**IT IS SO ORDERED.**

Dated: June 10, 2022

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

Case No.: 5:18-cr-00258-EJD-2
ORDER RE DEFENDANT'S MOTION TO STRIKE PORTIONS OF SARAH BENNETT'S TESTIMONY

2

**SER-53**

JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:      (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**MR. BALWANI'S SUPPLEMENTAL PROPOSAL RE: JURY INSTRUCTIONS AND VERDICT FORM**<br><br>**Hon. Edward J. Davila** |

**MR. BALWANI'S SUPPLEMENTAL PROPOSAL RE:
JURY INSTRUCTIONS AND VERDICT FORM**

Mr. Balwani previously adopted the proposed preliminary and final jury instructions submitted by Ms. Holmes, her objections to the jury instructions proposed by the government, and the arguments of Ms. Holmes' counsel regarding the same. *See* Dkt. 1210 at 1. Now that the government has concluded its case-in-chief in his case, Mr. Balwani reaffirms his adoption of Ms. Holmes' proposals and arguments, including her objections at Docket 1174.

In addition, based on the evidence introduced at his trial so far, Mr. Balwani hereby supplements these prior filings with the additional proposed jury instructions below. Because the Court has already considered and resolved many of the disagreements between Ms. Holmes' and the government's proposals, Mr. Balwani has used the final jury instructions given in Ms. Holmes' trial (at Dkt. 1206) (the "Holmes final instructions") as the baseline for the changes he has proposed below. For convenience, the Holmes final instructions are set forth below in a chart, which indicates (1) the Holmes final instructions for which Mr. Balwani is not seeking further argument, or (2) the Holmes final instructions for which Mr. Balwani has proposed redlined changes *infra* and will address during the charging conference. Mr. Balwani does not waive any objections or arguments already lodged to these or other instructions. Mr. Balwani also reserves the right to modify or seek additional instructions and to lodge additional objections at a later time.

| # | Holmes Final Instructions (Dkt. 1206) | |
|---|---|---|
| 1 | Duties of Jury to Find Facts and Follow Law | No further argument requested |
| 2 | Charge Against Defendant—Presumption of Innocence—Burden of Proof | No further argument requested |
| 3 | Absence of Co-Defendant | See *infra* at page 4 |
| 4 | Defendant's Decision to Testify | See *infra* at page 5 |
| 5 | Reasonable Doubt—Defined | No further argument requested |
| 6 | What Is Evidence | See *infra* at page 6 |

| 7 | What Is Not Evidence | No further argument requested |
|---|---|---|
| 8 | Direct and Circumstantial Evidence | No further argument requested |
| 9 | Credibility of Witnesses | See *infra* at page 7 |
| 10 | Activities Not Charged | See *infra* at page 8 |
| 11 | Separate Consideration of Multiple Counts—Single Defendant | No further argument requested |
| 12 | On or About—Defined | See *infra* at page 9 |
| 13 | Dual Role Testimony | See *infra* at page 10 |
| 14 | Charts and Summaries Not Admitted Into Evidence | No further argument requested |
| 15 | Charts and Summaries Admitted Into Evidence | See *infra* at page 11 |
| 16 | Conspiracy—Elements | See *infra* at page 12 |
| 17 | Definition of "Willfully" | No further argument requested |
| 18 | Conspiracy—Knowledge of and Association with Other Conspirators | No further argument requested |
| 19 | Conspiracy—Liability for Substantive Offense Committed by Co-Conspirator | See *infra* at page 14 |
| 20 | Wire Fraud (18 U.S.C. § 1343) | See *infra* at page 16 |
| 21 | Intent to Defraud—Defined | No further argument requested |
| 22 | Good Faith | No further argument requested |
| 23 | Knowingly—Defined | See *infra* at page 19 |
| 24 | Aiding and Abetting | See *infra* at page 20 |
| 25 | Scheme to Defraud—Vicarious Liability (18 U.S.C. § 1343) | See *infra* at page 21 |
| 26 | Wire Fraud—Alleged Victim's Conduct | No further argument requested |
| 27 | Success of a Wire Fraud Scheme | See *infra* at page 23 |
| 28 | Alleged Violations of Regulations and Industry Standards | No further argument requested |
| 29 | Duty to Deliberate | No further argument requested |

- 2 -

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-56**

| 30 | Consideration of Evidence—Conduct of the Jury | No further argument requested |
|---|---|---|
| 31 | Use of Notes | No further argument requested |
| 32 | Jury Consideration of Punishment | No further argument requested |
| 33 | Verdict Form | See *infra* at Ex. 1 |
| 34 | Communication with Court | No further argument requested |
| | **Balwani Proposed Instructions** | |
| | Government Agency Witness | See *infra* at page 24 |
| | Adverse Inference for Missing Evidence | See *infra* at page 25 |

- 3 -

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-57**

## 3.  ABSENCE OF CO-DEFENDANT

For reasons that do not concern you, the case against Mr. Balwani's[1] codefendant, Ms. Elizabeth Holmes, is not before you. Do not speculate why. This fact should not influence your verdict with reference to Mr. Balwani, nor should anything you know about the outcome of the case against Ms. Holmes affect your verdict as to Mr. Balwani and you. You must base your verdict solely on the evidence introduced during this trial. against Mr. Balwani.

---

[1] Throughout these supplemental proposals, Mr. Balwani has replaced "Ms. Holmes" with "Mr. Balwani," "her" with "his," and substituted Ms. Holmes' name for his name where the instructions refer to a co-defendant. He has not redlined those alterations.

- 4 -

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-58**

**4.  MR. BALWANI'S DECISION NOT TO TESTIFY**

Mr. Balwani did not testify in this case. ~~has not testified. You should treat this testimony just as you would the testimony of any other witness.~~ A defendant in a criminal case has an absolute right under the United States Constitution not to testify. In arriving at your verdict, the law prohibits you from considering in any manner that Mr. Balwani did not testify.

*Authority*: *See* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 6.3 & cmt. (Defendant's Decision Not to Testify) (2022 ed., last updated 3/2022) ("If this instruction is requested by the defendant, it must be given." (citing *Carter v. Kentucky*, 450 U.S. 288, 305 (1981))).

- 5 -

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-59**

## 6. WHAT IS EVIDENCE

The evidence you are to consider in deciding what the facts are consists of:

(1) the sworn testimony of any witness;

(2) the exhibits received in evidence; and

(3) any facts to which the parties have agreed.

*Authority:* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 6.6 (What is Evidence) (2022 ed., last updated 3/2022); *United States v. Houston*, 547 F.2d 104, 107 (9th Cir. 1976) (When the parties have entered into stipulations as to material facts, those facts will be deemed to have been conclusively established."); *see also United States v. Mikaelian*, 168 F.3d 380, 389 (9th Cir. 1999).

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-60**

## 9.  CREDIBILITY

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account: (1) the witness's opportunity and ability to see or hear or know the things testified to; (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case, if any; (5) the witness's bias or prejudice, if any; (6) whether other evidence contradicted the witness's testimony; (7) the reasonableness of the witness's testimony in light of all the evidence; and (8) any other factors that bear on believability.

~~Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.~~

~~However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.~~

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it. What is important is how believable the witnesses are, and how much weight you think their testimony deserves.

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-61**

## 10.  ACTIVITIES NOT CHARGED

You are here only to determine whether Mr. Balwani is guilty or not guilty of the charges in the indictment. Mr. Balwani is not on trial for any conduct or offense not charged in the indictment. Mr. Balwani is not on trial for any conduct that took place before the time periods of the alleged offenses, including any conduct by Ms. Holmes before those time periods. The government has alleged a conspiracy to commit wire fraud against Theranos investors during the period 2010 to 2015, and a conspiracy to commit wire fraud against patients who paid for Theranos' blood testing services during the period 2013 to 2016.

*Authority*: *See* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 6.10 cmt. (Activities Not Charged) (2022 ed., last updated 3/2022) ("When conduct necessary to satisfy an element of the offense is charged in the indictment and the government's proof at trial includes uncharged conduct that would satisfy the same element, the court should instruct the jury that it must find the conduct charged in the indictment before it may convict. *See United States v. Ward*, 747 F.3d 1184, 1191 (9th Cir. 2014) (reversible error to permit jury to convict on counts of aggravated identity theft against two victims named in indictment based on evidence presented at trial of uncharged conduct against identity-theft victims not named in indictment).").

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-62**

**12.  ON OR ABOUT—DEFINED**

The indictment charges that the offenses alleged in Counts One through ~~Eight and Ten through~~ Twelve[2] were committed "on or about" a certain date.

Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove that the offenses were committed precisely on the date charged.

---

[2] Mr. Balwani has incorporated Count Nine where appropriate throughout his proposed instructions and has redlined those alterations. Count Nine was absent from the final Holmes instructions because the government dismissed that count from her case.

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

- 9 -

**SER-63**

### 13.  DUAL ROLE TESTIMONY

You have heard testimony from Dr. Audra Zachman, ~~and~~ Dr. Mark Burnes, and Richard Sonnier III, who testified to both facts and opinions and the reasons for their opinions.

Fact testimony is based on what the witness saw, heard, or did. Opinion testimony is based on the education or experience of the witness.

As to the testimony about facts, it is your job to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. You may take into account the factors discussed earlier in these instructions that were provided to assist you in weighing the credibility of witnesses.

As to the testimony about the witness's opinions, this opinion testimony is allowed because of the education or experience of this witness. Opinion testimony should be judged like any other testimony. You may accept all of it, part of it, or none of it. You should give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

- 10 -

SER-64

**15.  CHARTS AND SUMMARIES ADMITTED INTO EVIDENCE**

Certain charts and summaries have been admitted into evidence. Charts and summaries are only as good as the underlying supporting material. You should, therefore, give them only such weight as you think the underlying material deserves.

- 11 -

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-65**

### 16. CONSPIRACY—ELEMENTS

Mr. Balwani is charged in Counts One and Two of the indictment with conspiring to commit wire fraud in violation of Section 1349 of Title 18 of the United States Code.

Mr. Balwani is charged in Count One of the indictment with conspiring to commit wire fraud against investors in Theranos during the period 2010 to 2015.

Mr. Balwani is charged in Count Two of the indictment with conspiring to commit wire fraud against patients who paid for Theranos' blood testing services during the period 2013 to 2016.

I will define wire fraud later in these instructions.

In order for Mr. Balwani to be found guilty of either count, you must all unanimously agree with respect to each Count that the government has proved each of the following elements beyond a reasonable doubt:

First, that there was an agreement between two or more persons to commit wire fraud as charged in the indictment; and

Second, that Mr. Balwani became a member of the alleged conspiracy knowing of at least one of its objects and intending to help accomplish it.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. Nor is it enough, standing alone, that they had a business or romantic relationship. You must find that there was a plan to commit wire fraud as alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY INSTRUCTIONS & VERDICT FORM CASE NO. CR-18-00258-EJD

**SER-66**

person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy between two or more other people is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

*Authority*: *United States v. Hussain*, No. 16-cr-00462-CRB-1, WL 4865562, at *5 (N.D. Cal. Oct. 27, 2017) (section 1349 conspiracy requires an agreement "among two or more persons that would satisfy the elements of the substantive offense").

- 13 -

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-67**

**19. CONSPIRACY—LIABILITY FOR SUBSTANTIVE OFFENSE COMMITTED BY CO-CONSPIRATOR**

Each member of a conspiracy is responsible for the reasonably foreseeable actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find Mr. Balwani guilty of wire fraud against investors in Theranos as charged in Counts Three through Eight of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a co-conspirator committed the crime of wire fraud as alleged in that count;

Second, the co-conspirator was a member of the conspiracy charged in Count One of the indictment;

Third, the co-conspirator committed the crime of wire fraud in furtherance of the conspiracy;

Fourth, Mr. Balwani was a member of the same conspiracy at the time the offense charged in Counts Three through Eight was committed by the co-conspirator; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen by Mr. Balwani to be a necessary or natural consequence of the unlawful agreement.

You may find Mr. Balwani guilty of wire fraud against patients who paid for Theranos' blood testing services as charged in Counts ~~Ten~~ Nine through Twelve of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a co-conspirator committed the crime of wire fraud as alleged in that count;

Second, the co-conspirator was a member of the conspiracy charged in Count Two of the indictment;

Third, the co-conspirator committed the crime of wire fraud in furtherance of the conspiracy;

- 14 -

**SER-68**

Fourth, Mr. Balwani was a member of the same conspiracy at the time the offense charged in Counts ~~Ten~~ Nine through Twelve was committed by the co-conspirator; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen by Mr. Balwani to be a necessary or natural consequence of the unlawful agreement.

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-69**

## 20.  WIRE FRAUD (18 U.S.C. §1343)

Mr. Balwani is charged in Counts Three through , Four, Five, Six, Seven, Eight, Ten, Eleven, and Twelve of the indictment with wire fraud in violation of Section 1343 of Title 18 of the United States Code.

Mr. Balwani is charged in Counts Three through Eight of the indictment with wire fraud against investors in Theranos. In particular:

Mr. Balwani is charged in Count Three with wire fraud in connection with a wire transfer of $99,990 on or about December 30, 2013.

Mr. Balwani is charged in Count Four with wire fraud in connection with a wire transfer of $5,349,900 on or about December 31, 2013.

Mr. Balwani is charged in Count Five with wire fraud in connection with a wire transfer of $4,875,000 on or about December 31, 2013.

Mr. Balwani is charged in Count Six with wire fraud in connection with a wire transfer of $38,336,632 on or about February 6, 2014.

Mr. Balwani is charged in Count Seven with wire fraud in connection with a wire transfer of $99,999,984 on or about October 31, 2014.

Mr. Balwani is charged in Count Eight with wire fraud in connection with a wire transfer of $5,999,997 on or about October 31, 2014.

Mr. Balwani is charged in Counts Nine Ten through Twelve of the indictment with wire fraud against patients who paid for Theranos' blood testing services. The government has alleged that Mr. Balwani engaged in a scheme to defraud patients out of their money through representations about Theranos' blood tests, and that those representations were false because Theranos was not capable of consistently producing accurate and reliable blood test results.[3] In particular:

---

[3] In proposing this amendment to the Holmes final instruction, Mr. Balwani does not waive the argument from his first motion in limine that the Third Superseding Indictment alleges fraud in connection with Theranos' proprietary technology, not in connection with non-Theranos technology (i.e., unmodified commercially available blood testing devices) or the general practices of Theranos' clinical laboratories. Dkt. 1156 at 1–11.

Mr. Balwani is charged in Count Nine with wire fraud in connection with a wire transmission regarding Patient B.B.'s laboratory blood test results on or about October 12, 2015.

Mr. Balwani is charged in Count Ten with wire fraud in connection with a wire transmission of Patient E.T.'s laboratory blood test results on or about May 11, 2015.

Mr. Balwani is charged in Count Eleven with wire fraud in connection with a wire transmission of Patient M.E.'s laboratory blood test results on or about May 16, 2015.

Mr. Balwani is charged in Count Twelve with wire fraud in connection with a wire transfer of $1,126,661 on or about August 3, 2015.

In order for Mr. Balwani to be found guilty of each count of wire fraud, you must all unanimously agree with respect to each count that the government has proved each of the following elements beyond a reasonable doubt:

First, Mr. Balwani knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. To find that Mr. Balwani did so knowingly, you must find that he himself had actual knowledge of the fraudulent nature of the scheme or plan. A scheme to defraud is a deceptive scheme to deprive a person of money or property. Deceitful statements of half-truths may constitute false or fraudulent representations;

Second, the statements made as part of the scheme were material. Statements are material if they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, Mr. Balwani acted with the intent to defraud, that is, the intent to deceive and cheat. The intent to deceive and cheat is the intent to deprive someone of money or property by means of deception; and

Fourth, Mr. Balwani used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme. The wire itself need not be false or misleading.

Defendant's Supplemental Proposal re Jury
Instructions & Verdict Form
Case No. CR-18-00258-EJD

**SER-71**

In determining whether a scheme to defraud exists, you may consider not only Mr. Balwani's words and statements, but also the circumstances in which they are used as a whole.

A wiring is caused when one knows that a wire will be used in the ordinary course of business or when one can reasonably foresee such use.

It need not have been reasonably foreseeable to Mr. Balwani that the wire communication would be interstate in nature. Rather, it must have been reasonably foreseeable to Mr. Balwani that some wire communication would occur in furtherance of the scheme, and an interstate wire communication must have actually occurred in furtherance of the scheme.

_Authority_: _See_ Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 6.10 & cmt. (Activities Not Charged) (noting risk that jury could convict for conduct not charged in the indictment—and corresponding need for jury instruction to mitigate such risk—when "the government's proof at trial includes uncharged conduct that would satisfy" an element of the charged offense); _see United States v. Wellington_, 754 F.2d 1457, 1463 (9th Cir. 1985), _abrogated on other grounds by United States v. Miller_, 471 U.S. 130 (1985) (when there could be a discrepancy between the evidence and the scheme alleged in the indictment, the jury should be instructed that: "(1) it must unanimously find the existence of a single scheme to defraud, and (2) the single scheme to defraud must not be substantially different from the scheme charged in the indictment"); _United States v. Rude_, 88 F.3d 1538, 1547 (9th Cir. 1996) (approving lower court's instruction that required "a specific finding that the scheme found matched that charged in the [operative] Indictment"); 2 Sand, Modern Federal Jury Instructions-Criminal ¶ 44.01 (Mail Fraud and Wire Fraud) (Matthew Bender ed. 2021) ("When there is the potential for variance based upon proof of … a scheme other than that charged in the indictment, the jury must be instructed that it must unanimously find that the defendant participated in a single scheme and that it is the scheme alleged in the indictment."); _id._ ("The Fifth Circuit has also approved the following similar language: '[W]hat must be proved beyond a reasonable doubt is that the Defendant knowingly and willfully devised … a scheme to defraud substantially the same as the one alleged in the indictment,' accompanied by an admonition that 'Defendant is not on trial for any act or conduct not alleged in the indictment.'"); _Phillips v. United States_, 356 F.2d 297 (9th Cir. 1965) (rejecting "constructive notice" theory imputing a co-conspirator's actual knowledge to another co-conspirator) .

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY INSTRUCTIONS & VERDICT FORM CASE NO. CR-18-00258-EJD

**SER-72**

### 23.  KNOWINGLY—DEFINED

An act is done knowingly if Mr. Balwani is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove that Mr. Balwani knew that his acts were unlawful. You may consider evidence of Mr. Balwani's words, or acts, or omissions, along with all the other evidence, in deciding whether Mr. Balwani acted knowingly.

To find that Mr. Balwani acted knowingly, you must find that he himself had knowledge of the fact at issue. Knowledge by Ms. Holmes or Theranos agents or employees does not prove Mr. Balwani's personal knowledge.

*Authority*: *Phillips v. United States*, 356 F.2d 297 (9th Cir. 1965) (rejecting "constructive notice" theory imputing a co-conspirator's actual knowledge of customer complaints to another co-conspirator).

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-73**

## 24.  AIDING AND ABETTING

Mr. Balwani may be found guilty of wire fraud as charged in Counts Three through ~~Eight and Ten through~~ Twelve of the indictment, even if Mr. Balwani personally did not commit the act or acts constituting the crime but aided and abetted in its commission. To "aid and abet" means intentionally to help someone else commit a crime. To prove Mr. Balwani guilty of wire fraud by aiding and abetting, the government must prove each of the following beyond a reasonable doubt:

First, someone else committed the conduct charged in Counts Three through ~~Eight and Ten through~~ Twelve of the indictment;

Second, Mr. Balwani aided, counseled, commanded, induced, or procured that person with respect to at least one element of wire fraud as charged in Counts Three through ~~Eight and Ten through~~ Twelve of the indictment;

Third, Mr. Balwani acted with the intent to facilitate wire fraud as charged in Counts Three through ~~Eight and Ten through~~ Twelve of the indictment; and

Fourth, Mr. Balwani acted before the crime was completed.

It is not enough that Mr. Balwani merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime. The evidence must show beyond a reasonable doubt that Mr. Balwani acted with the knowledge and intention of helping that person commit wire fraud as charged in Counts Three through ~~Eight and Ten through~~ Twelve of the indictment.

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime.

The government is not required to prove precisely which person actually committed the crime and which person aided and abetted.

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-74**

**25. SCHEME TO DEFRAUD—VICARIOUS LIABILITY (18 U.S.C. § 1343)**

If you find that Mr. Balwani was a member of the scheme to defraud investors in Theranos charged in Counts Three through Eight and that Mr. Balwani had the intent to defraud investors in Theranos, Mr. Balwani may be responsible for other co-schemers' actions during the course of and in furtherance of the alleged scheme, even if Mr. Balwani did not know what they said or did.

For Mr. Balwani to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the government must prove each of the following elements beyond a reasonable doubt:

First, the co-schemer was a member of the scheme to defraud investors charged in Counts Three through Eight of the indictment;

Second, the co-schemer committed the offense in furtherance of the scheme to defraud Theranos investors;

Third, Mr. Balwani was a member of the same scheme to defraud, and possessed the intent to defraud Theranos investors; and

Fourth, the offense committed by the co-schemer fell within the scope of the scheme to defraud and was one that Mr. Balwani could reasonably foresee as a necessary and natural consequence of the scheme to defraud.

If you find that Mr. Balwani was a member of the scheme to defraud patients who paid for Theranos' blood testing services charged in Counts Nine ~~Ten~~ through Twelve and that Mr. Balwani had the intent to defraud Theranos paying patients, Mr. Balwani may be responsible for other co-schemers' actions during the course of and in furtherance of the alleged scheme, even if Mr. Balwani did not know what they said or did.

For Mr. Balwani to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the government must prove each of the following elements beyond a reasonable doubt:

First, the co-schemer was a member of the scheme to defraud patients who paid for Theranos' blood testing services charged in Counts Nine ~~Ten~~ through Twelve of the indictment;

- 21 -

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

Second, the co-schemer committed the offense in furtherance of the scheme to defraud Theranos paying patients;

Third, Mr. Balwani was a member of the same scheme to defraud, and possessed the intent to defraud Theranos paying patients; and

Fourth, the offense committed by the co-schemer fell within the scope of the scheme to defraud and was one that Mr. Balwani could reasonably foresee as a necessary and natural consequence of the scheme to defraud.

- 22 -

**27.  SUCCESS OF A WIRE FRAUD SCHEME**

Success of a scheme to defraud is not necessary for purposes of determining whether wire fraud occurred. For Counts Three ~~through Eight and Ten~~ through Twelve, it is not necessary that Mr. Balwani made a profit or that anyone actually suffered a loss.

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-77**

**GOVERNMENT AGENCY WITNESS**

You have heard testimony from a witness who works for a government agency. The fact that a witness may be employed by the federal or state government as an official does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

*Authority:* 1 Sand, Modern Federal Jury Instructions-Criminal ¶ 7-16 (Law Enforcement Witness) (Matthew Bender ed. 2020); Third Circuit Model Criminal Jury Instructions 4.18; *United States v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995) ("[T]he government witnesses' testimony was not entitled to any greater consideration because of their federal employment."); *Bush v. United States*, 375 F.2d 602, 605 n.6 (D.C. Cir. 1967) (affirming lower court's instruction "to give an officer's testimony no weight different from that given any other witness simply because he was an officer."); *United States v. Powell*, 932 F.2d 1337, 1341 & n.3 (9th Cir. 1991) (approving lower court's instruction: "You're required to use the same standard in judging the credibility of every witness, regardless of what his occupation or background may be.").

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-78**

**ADVERSE INFERENCE FOR MISSING EVIDENCE**

If you find that the government negligently or recklessly failed to preserve the Theranos Laboratory Information System that the government knew or should have known would be evidence in this case, you may infer, but are not required to infer, that this evidence was unfavorable to the government.

Negligence is the failure to use reasonable care. Reasonable care is the degree of care that reasonably prudent persons would use under like circumstances to avoid injury to themselves or others. Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under like circumstances.

"Reckless" means highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of allowing evidence to be destroyed, which is either known to the government or so obvious that the government must have been aware of it.

_Authority_: _See_ Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 3.19 & cmt. (Lost or Destroyed Evidence) ("An instruction concerning evidence lost or destroyed by the government is appropriate when the balance 'between the quality of the Government's conduct and the degree of prejudice to the accused' weighs in favor of the defendant." (quoting _United States v. Loud Hawk_, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring), _overruled on other grounds by United States v. W.R. Grace_, 526 F.3d 499 (9th Cir. 2008))); _id._ ("While a showing of bad faith on the part of the government is required to warrant the dismissal of a case based on lost or destroyed evidence, it is not required for a remedial jury instruction." (citing _United States v. Sivilla_, 714 F.3d 1168, 1170 (9th Cir. 2013))); _United States v. Robertson_, 895 F.3d 1206, 1213 (9th Cir. 2018) ("In assessing the quality, or 'culpability,' of the government's conduct, we consider whether the evidence was lost or destroyed while in the government's custody, whether the government acted in disregard of the defendant's interests, whether the government was negligent, whether the prosecuting attorneys were involved, and, if the acts were deliberate, whether they were taking in good faith or with reasonable justification."); _United States v. Burns_, 790 F. App'x 93, 95 (9th Cir. 2020) (reaffirming that the _Loud Hawk_ test "has no bad faith requirement" and holding that lower court "abused its discretion by refusing to give an adverse-inference instruction absent a showing of bad faith by the government"); _see also_ Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit 6.3 (Federal Employer's Liability Act—Negligence Defined); Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit 7.3 (Jones Act Negligence Claim—Negligence Defined); Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 9.9 (Securities Fraud) (defining "reckless").

- 25 -

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-79**

DATED: June 7, 2022                    Respectfully submitted,

                                       ORRICK HERRINGTON & SUTCLIFFE LLP


                                       By:  */s/ Jeffrey B. Coopersmith*
                                            Jeffrey B. Coopersmith

                                            Attorney for Defendant
                                            RAMESH "SUNNY" BALWANI

- 26 -

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

**SER-80**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SJ

- - - - - - - - - - - - - - - - - -

UNITED STATES,                      )

               Plaintiff,     ) CASE NO.

V.                                  ) 18-cr-00258-EJD-1

ELIZABETH HOLMES,                   )

              Defendant.     )

- - - - - - - - - - - - - - - - - -


AUDIO TRANSCRIPTION OF

AUDIO RECORDINGS REFLECTING TAPED

CONVERSATIONS BETWEEN ROGER PARLOFF AND

ELIZABETH HOLMES IN PREPARATION FOR

PARLOFF'S JUNE 2014 FORTUNE ARTICLE

"THIS CEO IS OUT FOR BLOOD."

FILE NOS. 5473A, 5474AB2, 5475A, 5477A, 5478A2,

5480A, 5473B2, 5473D2, 5481A, 5481D, 5481B,

5481C, 1647A, 1657A, 1719A, and 5473C


BEHMKE REPORTING AND VIDEO SERVICES, INC.

BY: AMANDA OSTROWSKI, CSR NO. 13922

455 MARKET STREET, SUITE 970

SAN FRANCISCO, CALIFORNIA 94105

(415) 597-5600

TR-002409

SER-81

AUDIO TRANSCRIPTION OF: Trial Exh. 5473A

RECORDING DATE: May 12, 2014

DURATION: 2:12

(Begin transcription)

---oOo---

ROGER PARLOFF:  When I looked at Quest, you know, obviously they have many different kinds of chemistry going on.  They do about 600 tests in this -- in this regional hub lab.

ELIZABETH HOLMES:  Uh-huh.

ROGER PARLOFF:  Many different kinds of samples, you know, including tissue simples, biopsies.  So -- so they're preparing slides for examination under microscope, you know, among other things.

ELIZABETH HOLMES:  Uh-huh.

ROGER PARLOFF:  Now, do you -- does your platform replace all of those?

ELIZABETH HOLMES:  Our -- our platform can yield -- it -- it -- let me think of the best way to say this.  We can do all of those tests.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And so we can provide data back to clinicians for -- for all the same tests.

ROGER PARLOFF:  Okay.  And -- and you're --

TR-002410

SER-82

you're hesitant about saying "replace."

ELIZABETH HOLMES:  Well, I --

ROGER PARLOFF:  Does it -- does it subs -- I mean, could it substitute for those, or are there advantages to some -- for some reasons and to others for other reasons?

ELIZABETH HOLMES:  The reason I didn't say "replace" is just because of this theme of --

ROGER PARLOFF:  Oh, a dip -- a diplomatic matter?

ELIZABETH HOLMES:  Well, you know, we -- we're -- we're -- we're processing the samples a different way.  Let's put it that way.  But it -- it -- we believe very strongly that we're able to yield data at the highest levels and with the highest levels of -- of quality and -- and data integrity.  So this is a -- a -- another framework through which to -- to run the same types of tests, basically.

(End transcription of Trial Exh. 5473A)

---oOo---

BEHMKE REPORTING AND VIDEO SERVICES, INC.     3
(415) 597-5600

TR-002411

SER-83

AUDIO TRANSCRIPTION OF:  Trial Exh. 5474AB2

RECORDING DATE: May 21, 2014

DURATION: 6:07

(Begin transcription)

---oOo---

ROGER PARLOFF:  The difference between -- there -- there are now close to 200 -- or at least my -- the last I looked, there were close to 200 tests now on your website.  The difference between the ones that are on the website and the ones that aren't --

ELIZABETH HOLMES:  Yes.

ROGER PARLOFF:  -- because you said -- you said you have -- you -- you -- you feel comfortable about more than 1,000 CPTs --

ELIZABETH HOLMES:  Yes.

ROGER PARLOFF:  -- or --

ELIZABETH HOLMES:  Yes.  Yes.

ROGER PARLOFF:  Okay.  And is it -- is 1,000 the right, or -- or 1,200, is that a better number or --

ELIZABETH HOLMES:  Um --

ROGER PARLOFF:  Maybe 1,000 then?

ELIZABETH HOLMES:  Yeah.  I think -- I think if you say more than a thousand --

ROGER PARLOFF:  Yeah.

TR-002412

SER-84

ELIZABETH HOLMES:  -- that's -- that's a good reference point for it.

ROGER PARLOFF:  Okay.  And what is the difference then between the -- the 200 that are listed and the 1,000 you feel comfortable you can do?

ELIZABETH HOLMES:  Yeah, absolutely.  So this gets into some of what we were talking about before in terms of, you know, when we do venipunctures and those types of things.

ROGER PARLOFF:  Oh, uh-huh.

ELIZABETH HOLMES:  So it is more that we have operationalized a certain set of tests, expecting a certain set of ordering patterns with certain sets of inventory and work flows for those tests that are most commonly done.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And so those ones on the website are the ones that are most commonly done.

ROGER PARLOFF:  I see.  Okay.

ELIZABETH HOLMES:  And so those are the ones that -- that we've brought up first.

ROGER PARLOFF:  I see.

ELIZABETH HOLMES:  But we are adding to it, and in fact, before the article comes out, we may have a new batch that is going on the website -- and I'm going to

BEHMKE REPORTING AND VIDEO SERVICES, INC.          5
(415) 597-5600

TR-002413

**SER-85**

add this to my list here --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- yeah, which is a whole set of the infectious disease tests --

ROGER PARLOFF:  Oh, wow.

ELIZABETH HOLMES:  -- which are relevant in the context of the Helfet conversations.

ROGER PARLOFF:  Yes.  Yeah.

ELIZABETH HOLMES:  So as we, sort of, operationalize more areas like that, then that's when we add them to the website.

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  And the -- I should clarify the word "operationalize."  Effectively what I mean by that is, if someone sends a test to the lab, we can run it, even if the test is not on the website.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  However, we're not actively publishing that we have that test because we have focused on the core set that are on the website for how we've operationalized the laboratory today.  But we do have the ability to -- to do tests that are not on the website, and we do do that.  I mean, there's patients who come into our collection centers, and they have orders for tests that are not on the website.  And we do handle it.

TR-002414

**SER-86**

ROGER PARLOFF:  Okay.  And -- and not to -- not to belabor this too much, but I guess I -- I -- how -- how -- how does it help to not have -- you know, to have a small Vacutainer as opposed to a -- a nanotainer for the ones that aren't operationalized?  How would that help you?  I don't understand.

ELIZABETH HOLMES:  So off the record --

ROGER PARLOFF:  Yeah.

ELIZABETH HOLMES:  -- the way it helps is that if you remember those devices that you saw in the lab --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- they all have those cartridges that go into them --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- and we pre-configure those cartridges based on the ordering patterns that we see. So if, for example, someone orders one of those specialty tests and we've not built out all the inventory of cartridges -- because, ultimately, we're going to have thousands of cartridge types that we use --

ROGER PARLOFF:  Huh.

ELIZABETH HOLMES:  -- then we would need to get a second cartridge, which is dedicated just for that specialty type.

ROGER PARLOFF:  Huh.

TR-002415

**SER-87**

ELIZABETH HOLMES:  And so it is a little bit more blood.

ROGER PARLOFF:  I see.

ELIZABETH HOLMES:  Not a lot of blood, but it is a little bit more that we can use for a second cartridge.

Now, that gets into certain -- the whole thing about how the devices work, which we don't really want to get into, which is why --

ROGER PARLOFF:  I see.

ELIZABETH HOLMES:  -- when you asked me that question the first time --

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  -- I sort of answered it by saying, you know, the -- those core tests that we've "operationalized" the lab around, we have the ability to do other tests --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- but they're more specialty tests, and so we don't list them on our website, even though we can do them if they're sent in because our main focus and our volume right now is on those other tests.

ROGER PARLOFF:  I see.  And, eventually, those will be -- you'll be able to do --

ELIZABETH HOLMES:  Yes.

ROGER PARLOFF:  -- it the normal way?

TR-002416

**SER-88**

ELIZABETH HOLMES:  Yeah.  Because we're just building out, you know, huge permutations of all of those different ordering patterns.

ROGER PARLOFF:  Okay.  And then, also, I -- I -- I know this -- I think we've covered this, but I just -- you know, as I walked around the Quest Diagnostics lab, --

ELIZABETH HOLMES:  Yes.

ROGER PARLOFF:  -- you know, there were these -- there was automated chemistry.  There was hematology.  There was microbiology that was like petri dishes --

ELIZABETH HOLMES:  Yep.

ROGER PARLOFF:  -- TB, parasites, mycology, bacteriology.  Then there was vitamin D.  Then there was anatomical pathology, which I think was tissues.  They had slides.  There were precancerous lesions from -- you know, I guess, Pap smears --

ELIZABETH HOLMES:  Uh-huh.

ROGER PARLOFF:  -- testing for STD, HPV.  Then there was a histology lab.  All of this is stuff you can do?

ELIZABETH HOLMES:  Yes.

ROGER PARLOFF:  Okay.  It's -- it's so incredible.

ELIZABETH HOLMES:  Well, it's --

TR-002417

SER-89

ROGER PARLOFF:  Yeah?  Okay.

ELIZABETH HOLMES:  I mean, it's -- it's one of those -- those special things.  When you apply technology and software towards solving problems that humans otherwise did in a much --

(End transcription of Trial Exh. 5474AB2)

---oOo---

TR-002418

SER-90

AUDIO TRANSCRIPTION OF: Trial Exh. 5475A

RECORDING DATE: April 8, 2014

DURATION: 2:18

(Begin transcription)

---oOo---

ROGER PARLOFF:  You -- you were in the middle of saying that two other rev -- revolutionary --

ELIZABETH HOLMES:  Aspects --

ROGER PARLOFF:  -- films --

ELIZABETH HOLMES:  Yeah.  So -- so I always think about this in terms of the mission and the context of access to actionable information.  And so -- so we talked about some of the -- the potential for revolutionary impact in terms of the access points.  And the actionable information equally has the potential, we believe, to -- to have a revolutionary impact.

And so -- so the first element of that is being able to do all of these tests, not just from a microsample but at the highest level of quality.  So being a -- a certified lab that provides the oversight of pathologists and the infrastructure to ensure quality so that our coefficient of variation on those tests is very low.  And -- and we've talked about some of our initiatives with respect to --

ROGER PARLOFF:  How do they compare to the standards?

ELIZABETH HOLMES:  I can show you.  And I would be happy to give you any of this data, if you were interested in it.  Let's see.  The first step is turning the computer on.  There we go.

ROGER PARLOFF:  And how is it possible to have -- is it -- is this, again, just to have so much better eco -- is it -- is it the fact that there's less manual and --

ELIZABETH HOLMES:  It's a big piece --

ROGER PARLOFF:  -- there's more uniformity and --

ELIZABETH HOLMES:  It's automated.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  Yeah.  So less manual operator, less variabilities that are affecting the sample processing --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- because it is so controlled.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And -- and -- and then, also, the automation in and of itself allows for very repeatable, you know, high-performance --

TR-002420

SER-92

(End transcription of Trial Exh. 5475A)

---oOo---

TR-002421

SER-93

AUDIO TRANSCRIPTION OF: Trial Exh. 5477A

RECORDING DATE: February 2, 2015

DURATION: 0:43

(Begin transcription)

---oOo---

ELIZABETH HOLMES:  The -- the centralized lab model is more of our choice, and we did that because I believe that having the oversight of the pathologist is central in ensuring that we generate actionable information, which fundamentally means information of the highest quality.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And so -- so if the choice is either you have that oversight and these trained personnel responsible and accountable for the integrity of the results or not, we'd rather have it.

ROGER PARLOFF:  Huh-uh.

ELIZABETH HOLMES:  And so -- so we -- we want that in the context of the way in which we operate.

(End transcription of Trial Exh. 5477A)

---oOo---

BEHMKE REPORTING AND VIDEO SERVICES, INC.        14
(415) 597-5600

TR-002422

SER-94

AUDIO TRANSCRIPTION OF: Trial Exh. 5478A2

RECORDING DATE: April 7, 2014

DURATION: 3:06

(Begin transcription)

---oOo---

ROGER PARLOFF:  Are you doing stuff overseas or -- or -- already?

ELIZABETH HOLMES:  We have done --

ROGER PARLOFF:  In those --

ELIZABETH HOLMES:  -- work overseas for pharmaceutical companies and a little bit with foreign governments in the past.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  But, right now, we've got our work cut out for us here.

ROGER PARLOFF:  Obviously, you -- you have a number of military people on your board.  What's -- what types of things are they seeing in -- in what you're doing?

ELIZABETH HOLMES:  And you're also welcome to talk to them, if you would like to, any of these guys.

ROGER PARLOFF:  Yes.

ELIZABETH HOLMES:  I'm going to talk to Henry Kissinger also, and I might have him meet with you when you're back in New York --

TR-002423

SER-95

ROGER PARLOFF:  Oh, that would --

ELIZABETH HOLMES:  -- and talk about this, yeah.

ROGER PARLOFF:  Oh, that'd be fantastic.

ELIZABETH HOLMES:  Yeah.  The led -- it's a very similar application to the hospital application, both in terms of the emergency room and trauma --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- as well as just the cost of health care.  I mean, if you talk to these senior military leaders, they'll tell you that the cost of health care is a major problem for them in terms of their own budgets.  And -- and the way that we can facilitate savings both on a direct out-of-pocket basis as well as a fully-loaded basis in terms of what "realtime" data means with respect to being able to make better decisions around how you triage someone and then around the time it takes to triage them, the time they're in a bed, whether you give them the right intervention the first time or whether you have to go through this back-and-forth process, it adds up really fast.  And so -- so that's an element of it.

And then there's -- there's military-specific applications, too, that are -- that are quite promising when you think about what it means to be on a mission or in the middle of nowhere and need, you know, access to

TR-002424

SER-96

technology.

ROGER PARLOFF:  Huh.

ELIZABETH HOLMES:  And that -- that's something that, I mean, I'm personally very passionate about because I see it as our way to serve, you know, in whatever small way we can.

ROGER PARLOFF:  What would it -- like beyond what -- whatever you have in your centralized location in Phoenix, say with all the -- is that something that you can put out in the field, you know, when we're fighting in Iraq, or is that too -- too large?

ELIZABETH HOLMES:  Yeah, no, we can.  Yeah.

ROGER PARLOFF:  So that's the sort of thing --

ELIZABETH HOLMES:  Yep.

ROGER PARLOFF:  -- we're talking about?

ELIZABETH HOLMES:  Yep, exactly.

(End transcription of Trial Exh. 5478A2)

---oOo---

TR-002425

SER-97

AUDIO TRANSCRIPTION OF: Trial Exh. 5480A

RECORDING DATE: April 10, 2014

DURATION: 1:47

(Begin transcription)

---oOo---

ROGER PARLOFF:  In your case, would a -- I mean, I -- it doesn't seem like a human being would be pulling out the stopper of -- of this little tiny thing.

ELIZABETH HOLMES:  Yeah, no.  It's -- there's a lot of automation around it.

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  And that's -- and that's part of where we focused on making sure we minimized human error.

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  Yeah.

ROGER PARLOFF:  And as far as the fact that you -- it must be introduced into one of your devices --

ELIZABETH HOLMES:  Uh-huh.

ROGER PARLOFF:  -- can I say that?  I -- that --

ELIZABETH HOLMES:  That it's introduced into one of our -- yeah.  I mean, I think -- I think we don't want to get into how many devices we have or --

ROGER PARLOFF:  Okay.

TR-002426

SER-98

ELIZABETH HOLMES:  -- you know, any of that kind of stuff, but -- meaning, you know, types of devices or any of those types of things.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  But, yes, it is -- it is probably -- we call it an "analytical system," which is -- analytical system, which is -- which is basically, you know, a piece of hardware --

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  -- that's used for -- for processing the samples.

ROGER PARLOFF:  And I take it, though, that it takes a lot -- up a lot less space than what an ordinary lab test would entail.

ELIZABETH HOLMES:  It's a small -- much smaller footprint, yeah.

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  Yeah.

ROGER PARLOFF:  Do you know, currently do most labs have some sort of large machine, or is it more a matter of --

ELIZABETH HOLMES:  Yes.

ROGER PARLOFF:  -- you know, squirting it into various --

ELIZABETH HOLMES:  There's many machines, and

TR-002427

SER-99

they're very big.

ROGER PARLOFF:  I see.

ELIZABETH HOLMES:  They take up a huge footprint.

ROGER PARLOFF:  I see.

ELIZABETH HOLMES:  So there's a very significant amount of overhead that's associated with that.

(End transcription of Trial Exh. 5480A)

---oOo---

TR-002428

SER-100

AUDIO TRANSCRIPTION OF: Trial Exh. 5473B2

RECORDING DATE: May 12, 2014

DURATION: 4:53

(Begin transcription)

---oOo---

ROGER PARLOFF:  It -- can you tell me again, when you do perform venipunctures, why is that at the moment?

ELIZABETH HOLMES:  There's a variety of reasons. I think the --

ROGER PARLOFF:  Yeah.

ELIZABETH HOLMES:  -- the biggest reason is that we're scaling.  And as we're building out this infrastructure, we're also building out our inventory and our capacity in terms of the number of samples that we can handle at any given point in time.  And so we're supplementing venipuncture with our microsamples from capillary samples, or finger stick, to handle that volume.  And that's the -- the highest level.

But, you know, if you break that down, there's some situations in which we're doing venipuncture for physicians because they don't -- they're -- the cost is such a big deal for them that the sample type comes second.  There's some times where we're --

BEHMKE REPORTING AND VIDEO SERVICES, INC.      21
(415) 597-5600

TR-002429

SER-101

ROGER PARLOFF:  Does that mean -- you mean, they're doing it on premises and sending it to you, or they even -- even if they send a patient to Walgreens, they prefer that it be done by venipuncture?

ELIZABETH HOLMES:  It's -- it's rare that they prefer venipuncture, but that they will send large volumes of samples to us that are collected through venipuncture for the purposes of processing in our lab.

ROGER PARLOFF:  Oh, okay.  Because it's cheaper, they'll send you --

ELIZABETH HOLMES:  That's right.

ROGER PARLOFF:  Even though they've already done it by venipuncture?

ELIZABETH HOLMES:  That's right.

ROGER PARLOFF:  But I -- what would be the situation where you would have the phlebotomist at Walgreens use venipuncture?

ELIZABETH HOLMES:  Yeah.  Yeah.  So -- so at Walgreens, I think it's what I said before.  The biggest reason is just as we're bringing up more and more tests and building out inventory and capacity in our lab --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- depending on the volumes that we're handling and how fast we're opening new stores, we'll -- we'll use venipuncture in addition to

TR-002430

SER-102

the microsamples, just to handle the volume of samples that we're processing.

But it's -- I mean, there -- there are situations -- it is not common where we'll also, you know, for a physician demonstrate the correlation between venipuncture and finger stick and --

ROGER PARLOFF:  So --

ELIZABETH HOLMES:  -- and then, I mean --

ROGER PARLOFF:  For -- for a skeptical physician?

ELIZABETH HOLMES:  Yeah.  Or just to show our performance.

ROGER PARLOFF:  I see.

ELIZABETH HOLMES:  You asked the question about doing publications.  The main way we answer questions whenever we meet a physician is we tell them, "Send us some patients, and we'll show you the data."  And that's -- you know, the data -- the data talks.

ROGER PARLOFF:  Oh.

ELIZABETH HOLMES:  So -- so we do do that.  But -- but I think the number one reason is just as we're building out volume and capacity, supplementing our capacity with venipuncture.

ROGER PARLOFF:  So I -- I guess I don't -- I don't understand why that would save -- is it that you --

TR-002431

SER-103

you would not yet have that particular test available using your -- your platform or -- or --

ELIZABETH HOLMES:  It -- it's more how -- how we configure our own analytical systems and the -- the capacity that we have within those systems at any given point in time.  And it -- it evolves, and it's changing. You know, I mean, every week we have more and more capacity.  But -- but it's primarily a capacity question of how many samples we can handle and how many tests we can handle at any given point in time.

ROGER PARLOFF:  I see.  And if you can't handle them using the -- the nanotainer, how do you handle them? Or do you make a conventional sample from the -- or do you make a nanotainer sample from the conventional-sized?

ELIZABETH HOLMES:  Well, we -- we definitely make a smaller sample from the conventional-sized, and that was the point that I made earlier about the fact that, when we do collect venipuncture, we take a smaller sample than --

ROGER PARLOFF:  Oh, I see.

ELIZABETH HOLMES:  -- traditionally required. And we also use the smallest needle.

ROGER PARLOFF:  I see.

ELIZABETH HOLMES:  It is a -- a tiny butterfly needle that is the least painful.  And so -- so it is --

TR-002432

SER-104

it is a smaller volume.

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  It's -- I mean, I think our -- our biggest, sort of, point on that is our whole business is about eliminating the need for people to do venipuncture --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- unless they want to.  In which case, they can.  But -- but that -- this -- I mean, our -- everything we do is about eliminating that.

(End transcription of Trial Exh. 5473B2)

---oOo---

TR-002433

SER-105

AUDIO TRANSCRIPTION OF: Trial Exh. 5473C

RECORDING DATE: May 12, 2014

DURATION: 2:00

(Begin transcription)

---oOo---

ROGER PARLOFF:  -- are interested in, if -- if it would be possible, a Phoenix lab visit.

ELIZABETH HOLMES:  Yes.  So Phoenix's lab is not operational.

ROGER PARLOFF:  Oh.

ELIZABETH HOLMES:  All of those samples are still being processed here in Palo Alto.

ROGER PARLOFF:  Oh, uh-huh.

ELIZABETH HOLMES:  And -- and then we've been thinking about this in terms of -- and I guess, again, in line of this conversation, the best way to handle the whole device conversation and -- I mean, what the lab looks like -- remember you saw that bank of devices that we sort of went up to in the lab upstairs?

ROGER PARLOFF:  Yeah.

ELIZABETH HOLMES:  Well, I can -- it's literally -- and they were on sort of a -- a stack of shelves.

ROGER PARLOFF:  Uh-huh.

TR-002434

SER-106

ELIZABETH HOLMES:  So the lab is basically -- probably four of those stacks with devices on both sides. So you're -- if you'd like to see it -- and I was trying to remember whether I walked you through it or not.  It was downstairs -- you're welcome to come back out here and see it.  But --

ROGER PARLOFF:  I see.  But I've basically seen it.

ELIZABETH HOLMES:  You've seen it.

ROGER PARLOFF:  I see.

ELIZABETH HOLMES:  And it is basically just a bank of those devices.

ROGER PARLOFF:  Okay.  So it would be about how many of those devices in all?

ELIZABETH HOLMES:  There's probably -- I mean, it -- our -- so we have actually several labs here.  Our biggest one probably has, like, 50 of them.  And I -- I would put that off the record --

ROGER PARLOFF:  Yeah.

ELIZABETH HOLMES:  -- because we don't -- we don't want to publish that.  And then we have another bank of about 200 of them, but that is sort of split up across multiple facilities that we're starting -- we're going to be moving the lab here to Newark.  So some of them are going to go to 200 -- I'm sorry.  The 200 are

SER-107

going to go to Newark, and then some of the ones here are going to go to Phoenix.

ROGER PARLOFF:  I see.

(End transcription of Trial Exh. 5473C)

---oOo---

TR-002436

SER-108

AUDIO TRANSCRIPTION OF: Trial Exh. 5473D2

RECORDING DATE: May 12, 2014

DURATION: 2:16

(Begin transcription)

---oOo---

ROGER PARLOFF:  Okay.  We're recording again.

ELIZABETH HOLMES:  Yep.

ROGER PARLOFF:  Is the sensitivity around -- and this can be off the record, obviously.  Is the sensitivity around the word "device" the regulatory sensitivity around the word device?  Is that -- or is it that you -- you don't want -- is it more in the nature of a trade secret --

ELIZABETH HOLMES:  Yeah.

ROGER PARLOFF:  -- that you don't want them to know that you're at the --

ELIZABETH HOLMES:  Yeah.

ROGER PARLOFF:  -- analyzer phase yet?

ELIZABETH HOLMES:  That's right.  It -- it's more in the context of the trade secret.  We're still filing a lot of patents around it.  The fact that we have a single device that can perform any test --

ROGER PARLOFF:  Huh.

ELIZABETH HOLMES:  -- is a -- is a big deal.

TR-002437

And so, I mean, if we think about this in terms of, you know, this year's piece and next year's piece, if you will --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- the story that we're telling now is on all the elements of what we're doing with respect to the ability for the first time to do these tests from the -- what we call the "microsample" --

ROGER PARLOFF:  Yeah, uh-huh.

ELIZABETH HOLMES:  -- and it's impact to our system.  And then the next story would be the fact that it's done by this device that can do any test and that it's possible to decentralize that device while maintaining the quality along the lines that you -- you saw Resendorff talk about in that article.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  Which, hopefully, we have the opportunity at some point to tell that story with you. But -- but that -- those are the two -- those are, kind of, the two milestones.  And we want to have the rest of this year to be able to execute on this and then, in the same way as this announcement that we've made right is very disruptive, make another one --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- that's very disruptive.

TR-002438

Because, I mean, a -- a public company would probably, if they came up with a business like this with shipping these microsamples around, not completely cannibalize their own business in it; right?  But what we're going to do with that announcement is completely cannibalize this business of shipping microsamples.

ROGER PARLOFF:  Because -- because you'll be able to do so much at the location?

ELIZABETH HOLMES:  Exactly.

(End transcription of Trial Exh. 5473D2)

---oOo---

TR-002439

SER-111

AUDIO TRANSCRIPTION OF: Trial Exh. 5481A

RECORDING DATE: July 1, 2015

DURATION: 3:14

(Begin transcription)

---oOo---

ROGER PARLOFF:  You have a high-complexity lab now in Newark, California, and you have -- is it a medium-complexity lab in Scottsdale?

ELIZABETH HOLMES:  That's right.  Yeah.  It's a -- it's called a "moderate-complexity lab."

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  And the difference is that to run laboratory-developed tests --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- you need to be a high-complexity lab.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And that gives you the ability to run laboratory-developed tests.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And so in Newark, we are a high-complexity, which means that you have a series of requirements and processes that you have to follow, including quality controls and -- and -- and other

BEHMKE REPORTING AND VIDEO SERVICES, INC.          32
(415) 597-5600

TR-002440

SER-112

controls around how you ensure the integrity of the tests that we follow.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And we have all of our lab-developed tests in the Newark lab.

ROGER PARLOFF:  Okay.  Now, I thought all of your tests were, sort of, considered lab-developed tests.

ELIZABETH HOLMES:  We also -- one of the things that has happened this year is that we have gone live with what we were calling a reference lab service.  So what this is, is that when you think about what Theranos does, as important as the small sample has been the low cost, and it is what has really been transformative for a lot of people --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- in the context of access.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And it is also what seems to be getting the other laboratory companies most excited. The way this lab business works is that the people who either could not afford insurance or could not afford good insurance have been charged the most --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- for lab testing, which makes absolutely no sense to us.

TR-002441

SER-113

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And then the tests, which are considered specialty or esoteric or rare, have price tags that are many, many multiples of what a routine test would be.

ROGER PARLOFF:  Yeah.

ELIZABETH HOLMES:  So, for example, you'll see specialty tests that are thousands of dollars.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And as we've looked at this and our mission of access, it became clear to us that one of the most important things that we could do is make sure that we had an end-to-end comprehensive menu that took those $5,000 tests and brought them down to less than $100, for example.

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  And so we have.  And what we did is we've effectively included the full reference lab processing abilities, which means that we do run traditional venipunctures --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- sometimes on traditional reference equipment.  But, I mean, as a company, obviously our business and what we do here in 1701 every day, is work to get more and more and more tests running

TR-002442

**SER-114**

on capillary samples and --

(End transcription of Trial Exh. 5481A)

---oOo---

BEHMKE REPORTING AND VIDEO SERVICES, INC.      35
(415) 597-5600

TR-002443

SER-115

AUDIO TRANSCRIPTION OF: Trial Exh. 5481D

RECORDING DATE: JULY 1, 2015

DURATION: 1:15

(Begin transcription)

---oOo---


ELIZABETH HOLMES:  What you'll see -- for example, when Dan shows you these validation reports, when we hopefully get a little bit of your blood this afternoon -- or you can take Dan's blood.  It may not be a bad thing for him.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- is that we have these validation reports for these tests that go back many years.  So I think he'll show you one.  One of the tests they're going to do today is potassium, and the potassium report is from, I think, 2012; right?  And we have a lot of tests that we've validated on our system a long time ago --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- but we haven't brought up into the lab yet or we're continually bringing up into the lab.  And so, basically, when we developed our hardware, like this device that's gone through the clearance process, we developed each of the hardware

TR-002444

SER-116

systems that we have to be able to work on a very broad range of tests so the test -- the systems can run all these tests.  But the speed which -- with which we then bring up new and more fingerstick-based tests in our lab is something that basically we're constantly working to put more and more on the platform.  So the net is -- the technology is capable of running all these tests.  We --

            (End transcription of Trial Exh. 5481D)

                        ---oOo---

TR-002445

SER-117

AUDIO TRANSCRIPTION OF: Trial Exh. 5481B

RECORDING DATE: July 1, 2015

DURATION: 0:29

(Begin transcription)

---oOo---

ROGER PARLOFF:  So even when you use venipuncture, it's still a lot cheaper using your system?

ELIZABETH HOLMES:  Absolutely.

ROGER PARLOFF:  Yeah.

ELIZABETH HOLMES:  And, also, often when we're doing venipuncture, a lot less sample, too, because there's only a few tests that will actually run on the venipuncture.  So the venipuncture generally is about 10 to 30 times less blood than what would traditionally be required --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- for venipuncture.  And --

(End transcription of Trial Exh. 5481B)

---oOo---

TR-002446

SER-118

AUDIO TRANSCRIPTION OF: Trial Exh. 5481C

RECORDING DATE: July 1, 2015

DURATION: 2:48

(Begin transcription)

---oOo---

ROGER PARLOFF:  Can I say at this point that the machine runs some sort of pro -- proprietary method of examining DNA or RNA analogous to PCR?

ELIZABETH HOLMES:  Yes.  And we're -- obviously, we've never released that.

ROGER PARLOFF:  Yeah.

ELIZABETH HOLMES:  But I am okay with doing that in this piece.

ROGER PARLOFF:  Okay.  Great.

ELIZABETH HOLMES:  And you can also say that we, you know, created a lab in the last three hours at Boies Schiller to do your Ebola test.  And David -- and David will be proud.  The -- the -- the only thing that I want to not be explicit about in this piece -- and --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- I'll tell you how we did it.  What we're going to do for you today is we've brought multiple devices, and one of them is gonna run the chemical chemistry test, like the potassium, and the

TR-002447

SER-119

other one is gonna run your Ebola test.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And what we can go into in this piece is that Theranos has these systems.  These systems are capable of running fingerstick samples.  The system, like you just said about Ebola, is capable of running these DNA measurements.  It is capable of running the clinical chemistry measurements.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  It is capable of running all these other things.  I don't want to explicitly say that the exact same system is running both the clinical chemistry and the DNA and the immunochemistry and the other stuff, if that makes sense.

ROGER PARLOFF:  So you don't want people to know that it is really the exact same machine --

ELIZABETH HOLMES:  Right.

ROGER PARLOFF:  -- just with different reagents or whatever?

ELIZABETH HOLMES:  Exactly.  And we will release that, I mean, if we have a chance to do a follow-on piece with you.  It is just that there's one set of patent claims that we're still taking through the filing process that I just want to make sure get out before we make that explicit statement.  So you -- you will be able to say

TR-002448

SER-120

that you saw "systems," and as long as there's always an "S" next to that --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- it will be ambiguous as to whether it was one or multiple.  And that's fine.

ROGER PARLOFF:  Okay.  Somebody attentive, which we probably don't need to worry, but somebody attentive out there might -- might say, "Well, wait a minute.  What" -- "So what" -- "What machine was cleared today if there's multiple systems?"

ELIZABETH HOLMES:  Yeah.  I -- I think what we do is we don't speak to whether there's multiple systems or not.  You don't need to say there's multiple systems.  You just don't need to explicitly say that there's one.

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  And we say that this Theranos device was cleared today.  And then you can say, "I've seen, you know, Theranos devices running clinical chemistry.  I've seen Theranos devices running this DNA method"; right?

ROGER PARLOFF:  Okay.

(End transcription of Trial Exh. 5481C)

---oOo---

TR-002449

**SER-121**

AUDIO TRANSCRIPTION OF: Trial Exh. 1647A

RECORDING DATE: April 7, 2014

DURATION: 0:51

(Begin transcription)

---oOo---

ROGER PARLOFF:  The -- the blood never leaves the premises of -- you know, in Phoenix or -- or in -- it's just the data that comes here and is an -- analyzed, is it?

ELIZABETH HOLMES:  Well, there's both.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  The blood does get transported to a certified facility because we don't have --

ROGER PARLOFF:  Oh.

ELIZABETH HOLMES:  -- the certified facilities inside our collection centers.

ROGER PARLOFF:  Oh, okay.

ELIZABETH HOLMES:  They're in dedicated places where we have pathologists and other laboratory staff overseeing the testing process.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  And -- but there is also the transmission of data for remote oversight, and that is a

TR-002450

SER-122

piece of -- of what we do.  But we make sure that all of the testing is done under the oversight of certified laboratory personnel.

ROGER PARLOFF:  I see.

(End transcription of Trial Exh. 1647A)

---oOo---

TR-002451

SER-123

AUDIO TRANSCRIPTION OF: Trial Exh. 1657A

RECORDING DATE: April 10, 2014

DURATION: 0:45

(Begin transcription)

---oOo---

ROGER PARLOFF:  Part of what I'm getting at is like the military interest in this --

ELIZABETH HOLMES:  Yep.

ROGER PARLOFF:  -- that you could have -- that one of these machines on-site would be manageable whereas a conventional machine on-site would be a problem.

ELIZABETH HOLMES:  Yeah.  I mean, I think the best way --

ROGER PARLOFF:  Is that --

ELIZABETH HOLMES:  -- to say that is the ability to significantly decentralize the process; right?  And -- and that -- that has implications broadly.  And -- and the military could be one of them, yeah.  So instead of having all the centralized overhead, right, you can -- you can distribute the infrastructure.

(End transcription of Trial Exh. 1657A)

---oOo---

TR-002452

SER-124

AUDIO TRANSCRIPTION OF: Trial Exh. 1719A

RECORDING DATE: May 12, 2014

DURATION: 1:19

(Begin transcription)

---oOo---

ROGER PARLOFF:  Yeah.  So, for instance, you could in effect have the -- the -- the information on quality control and -- and so on would be continually going back to the lab from the device, and you would have the oversight from the central lab to how the device is being used, even though the device isn't physically on the premises of the lab.  Would it be something like that?

ELIZABETH HOLMES:  Well, so off the record, that's exactly right.

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  So that is -- and -- and we'll get into this when we --

ROGER PARLOFF:  Yeah.

ELIZABETH HOLMES:  -- touch on some of the points you reminded me of in the e-mail you sent over the weekend.  That -- that's our phase-two model, right --

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:   -- is to do exactly that.

TR-002453

SER-125

Our -- our phase-one model is to put these certified lab locations in hubs, like you were also describing earlier.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  We don't want to tell the world about our phase-two model that concisely because -- because we want to be able to execute on our phase-one model and then have the advantage of having figured that out --

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  -- for phase two and being able to make announcements around and, hopefully, maybe being able to do another article with you --

ROGER PARLOFF:  Okay.

ELIZABETH HOLMES:  -- around that when that comes out.

ROGER PARLOFF:  Uh-huh.

ELIZABETH HOLMES:  But -- but that's where we're going.

(End transcription of Trial Exh. 1719A)

---oOo---

TR-002454

SER-126

STATE OF CALIFORNIA    )

                       ) ss.

COUNTY OF SACRAMENTO   )


          I hereby certify that the foregoing transcript is a true record of the audiotaped recording as reported by me, a duly licensed Certified Shorthand Reporter in the State of California.

          I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

          IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of December, 2021.


                    AMANDA OSTROWSKI, CSR NO. 13922

                    STATE OF CALIFORNIA


BEHMKE REPORTING AND VIDEO SERVICES, INC.     47
                (415) 597-5600


TR-002455

**SER-127**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

- - - - - - - - - - - - - - -

UNITED STATES,                )

     Plaintiff,          )   CASE NO.

V.                            )   18-cr-00258-EJD-1

ELIZABETH HOLMES,             )

     Defendant.          )

- - - - - - - - - - - - - - -

AUDIO TRANSCRIPTION OF

CNBC:   COULD A BLOOD BATTLE BE BOILING?

CRAMER SITS DOWN WITH THE CEO OF THERANOS

TO GET THE ANSWERS (MAD MONEY)

FILE:   CNBC Mad Money 10-15-2015 Theranos CEO

     fires back at WSJ I was shocked

     THURSDAY, OCTOBER 15, 2015


BEHMKE REPORTING AND VIDEO SERVICES, INC.

BY:  JILL BAIONI, CSR NO. 8812

455 MARKET STREET, SUITE 970

SAN FRANCISCO, CALIFORNIA 94105

(415) 597-5600

TR-000297

SER-128

THURSDAY, OCTOBER 15, 2015

MR. CRAMER:  Lately one of the most exciting privately-held companies in Silicon Valley has come under fire.  I'm talking about Theranos.  That's the diagnostics company with the ultrafast fingerprick blood testing technology that's aiming to upend the entire traditional health care establishment by making it easier, less expensive, and much less uncomfortable for you to get tested for a whole range of conditions.

For the last few years Theranos has been viewed as a revolutionary company.  CEO's been powerless next Steve Jobs.  Company's been valued as much as $9 billion its most recent round of fundraising.

But Theranos also has its critics.  And just this morning The Wall Street Journal ran a pretty scathing article about the company alleging that the company's proprietary testing devices may be inaccurate and basically accusing Theranos of deceptive practices.

The Journal cites a former employee who claimed that of the 240 tests offered by Theranos, only 15 are actually performed on the company's proprietary Edison diagnostic machine.  Vast majority

TR-000298

**SER-129**

of the rest being done on traditional lab equipment.

The article was pretty brutal.  But here on Mad Money we know something.  We know that there are two sides to every single story, which is why I think it's important that we speak to Elizabeth Holmes, the founder and CEO of Theranos, who's coming to us this afternoon from Boston where she's attending a meeting of the board of fellows at Harvard Medical School to give her a chance to answer the charges raised in the article.

Ms. Holmes, welcome back to Mad Money.

MS. HOLMES:  It's great to be here.  Thank you.

MR. CRAMER:  Thank you.

Elizabeth, I have to tell you, in all my years I can't recall a private company that I think candidly many have never heard of getting this kind of attention and scrutiny.

What do you think's going on here?

MS. HOLMES:  This is what happens when you work to change things.  And first they think you're crazy, then they fight you, and then all of a sudden you change the world.

And I -- I have to say I -- I personally was shocked to see that The Journal would publish

TR-000299

SER-130

something like this when we had sent them over a thousand pages of documentation demonstrating that the statements in their piece were false.

But we're doing things differently and we're working to make a difference, and that means people raise questions.  And that's okay.  But in this case it was pretty disappointing to see that after every single one of the sources that we spoke with who The Journal had contacted told us that the statements that were being attributed to them were false or misleading and the only sources who were left were ones who wouldn't speak with us, who on their own website say that they now do business with Labcorp in their office or in the other case demanded in writing that we pay them in cash up front $2500 for an hour to talk to them about their statements to The Journal --

MR. CRAMER:  Did The Journal know --

MS. HOLMES:  -- that those things weren't referenced.

MR. CRAMER:  -- what you just said?  Did The Journal know everything that you just said before they wrote their article?

MS. HOLMES:  Of course.  Absolutely.

MR. CRAMER:  Okay.  At the same time, pretty negative article.

TR-000300

SER-131

So let me ask you. I know that you've talked to us about your partnership with Walgreens, one of the best retailers out there. Great drugstore chain. Cleveland Clinic, one of obviously the most admired health care facilities.

Did either call you today and say, you know what, we got to rethink our relationship?

MS. HOLMES: Absolutely not. We're incredibly blessed to have partners who have worked with us, have actually seen our technology. And unfortunately -- in this case we offered to bring our technology to The Journal offices to show them the technology they were questioning running firsthand, and they denied that request to show it to them.

But Cleveland Clinic, Walgreens, so many of the other partners that we have have seen our technology, they've worked with us, they've used our systems. And they understand what we're doing and they understand that when you try to change things people react to it.

MR. CRAMER: All right. So let me get this straight. You offered to bring the test to The Journal. So presumably you would have been comfortable with, say, a hundred different people at The Journal taking your test, matching them against

TR-000301

SER-132

Quest or Labcorp, and you were perfectly willing to have that happen.

MS. HOLMES:  Absolutely.  We offered to bring our devices to their offices.

MR. CRAMER:  And what did they say as a reason why they didn't want to do that?

MS. HOLMES:  Because the story needed to get out immediately.

MR. CRAMER:  Well, let's talk about that because --

MS. HOLMES:  Even though they had been reporting on it.

MR. CRAMER:  They said, again -- 'cause, first of all, it's The Wall Street Journal.  This is not the National Enquirer here.  But they did say that they after -- tried -- they pursued you for an interview for -- for five months.  You declined interview requests from The Journal for more than five months.  Last week the company said she would be available but her schedule didn't allow it before the publication of this article.

Why not just sit down with them?  It's a reputable outfit.  Why not just sit down with them months ago and explain your side of the story?

MS. HOLMES:  Sure, yeah.  The Journal

TR-000302

SER-133

actually had a member of their editorial board write the very first piece on Theranos.  And that person, Joe Rago, came out to our lab, saw our systems and really got insight into our work.  That was about a year ago.  I published my op-ed in The Journal.

And unfortunately in this case, the reporter focused on sources who we knew in 2004 and 2005 who were the people who had said to me that there was no way I was gonna succeed and be able to build this kind of company.  And focused on, you know, questions like asking whether I could prove that I actually invented the patents that my name were on.  And those are not very fruitful conversations in the context of engagement.

But when we had the opportunity to engage with more people in The Journal, we said we absolutely were ready to sit down and do that.  And unfortunately, they offered a three-day window in which we had told them I was not available before it was quote, unquote, necessary to get this published.

MR. CRAMER:  Well, let's talk about the substance of some of the charges they raise.  For instance, here's just a -- just an outright sentence, an assertion:  Theranos also hasn't disclosed publicly that it does the vast majority of its tests with

TR-000303

SER-134

traditional machines bought from -- from companies like Siemens AG.

True or false?

MS. HOLMES:  So this is taken completely out of context.  Starting when we launched our services in 2013 we put on our website that we do venous testing, so blood draws from the arm the traditional way.

And starting in 2015 we announced and it was published in San Francisco paper, in Fortune, I talked about it in an interview I did with Forbes, that we made a decision to expand our test menu to include all the specialty and esoteric tests that are traditionally run only very infrequently but cost a huge amount of money.

And we believe as part of what we do that one of our greatest innovations is making these tests available at extremely low cost.

MR. CRAMER:  Okay.

MS. HOLMES:  And so we expanded our test menu and made all these tests available through venous draws.  We updated our website to reflect that.

And so yes, now we have a huge number of tests that are available through our lab.  But instead of charging $10,000 for them, we're charging $2.99.

MR. CRAMER:  Okay.

TR-000304

SER-135

MS. HOLMES:  And this is listed on the Walgreens website.  We've put it in our own press and it's been out there.

MR. CRAMER:  How many tests can your device Edison do?  The Wall Street Journal says it can only do 15 out of 240.

MS. HOLMES:  Yeah.  So we had communicated to The Wall Street Journal that we have submitted over 130 presubmissions to FDA with tests running on our proprietary devices and have been taking those through the FDA submission process.  Every test that we offer in our laboratory can run on our proprietary devices. We bring tests up on our proprietary devices based on the frequency with which they're run.  So at any given point in time we're running the tests that are most commonly ordered.

But we've also done a lot of work as part of this commitment that we've made and it's been very controversial that we've actually become the first company advocating for FDA regulation of lab-developed tests.  And as part of that we have said that we think that every lab-developed test really should go through the FDA submission process.  And so we've been consistent with it.  And in fact, we even just recently took our nanotainers --

TR-000305

SER-136

MR. CRAMER:  Uh-huh.

MS. HOLMES:  -- through the FDA clearance process and sent submissions in for those.  And as part of that process we're not even using our nanotainers except for FDA-cleared assays so that every single thing that runs on our platform is getting to the point --

MR. CRAMER:  Okay.

MS. HOLMES:  -- that it's gonna be FDA cleared.

MR. CRAMER:  One last question.  Obviously there's some dispute here.  The Journal doesn't make stuff up.  Why not just have the study of hundreds of people, Theranos versus Quest/Labcorp.  Just say, listen, we're willing to do it.  We're willing to do it now.  Is Labcorp?  Is Quest Corp -- is Quest?  Just say it right now on air:  Quest, Labcorp, we want to do a head to head.  200 -- 200, 300, 400 patients. What do you say?

Yes?

MS. HOLMES:  We -- we've already done it. We've already done it.  Absolutely.  And it's actually even published in our FDA decision summary from this summer.

MR. CRAMER:  Okay.

TR-000306

**SER-137**

MS. HOLMES:  From a 900-patient study where we got FDA clearance of the exact system that The Journal is questioning and demonstrated venous versus fingerstick across a huge number of patients. It was 889, I think, for that test.  And we've done that over and over again for every single test.

MR. CRAMER:  Excellent.

Elizabeth Holmes, founder, chair and CEO of Theranos, thank you for coming on Mad Money from the -- from the Harvard Medical.  Good to see you.

MS. HOLMES:  Good to see you, too.

MR. CRAMER:  Read The Journal, listen to our interview.  You make up your mind.  Stick with Cramer.

ANNOUNCER:  Don't miss a second of Mad Money. Follow @JimCramer on Twitter.  Have a question?  Tweet Cramer:  #Madtweets.  Send Jim an email to MadMoney@CNBC.com.  Or give us a call at 1-800-743-CNBC.  Miss something?  Head to MadMoney.CNBC.com.

(End of transcription.)

TR-000307

SER-138

STATE OF CALIFORNIA        )

                          ) ss.

COUNTY OF SAN MATEO        )

       I hereby certify that the transcript is a true record of the audio recording as reported by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting by computer.

       I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

       IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of July, 2021.

*Jill Baioni*

JILL BAIONI, CSR NO. 8812

STATE OF CALIFORNIA

BEHMKE REPORTING AND VIDEO SERVICES, INC.        12
(415) 597-5600

TR-000308

SER-139

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

- - - - - - - - - - - - - - -

UNITED STATES,                    )

      Plaintiff,          )   CASE NO.

V.                                )   18-cr-00258-EJD-1

ELIZABETH HOLMES,                 )

      Defendant.          )

- - - - - - - - - - - - - - -


AUDIO TRANSCRIPTION OF

NBC:  TODAY SHOW:  BILLIONAIRE CEO UNDER FIRE

FILE:  EH Today Show April 18 2016

MONDAY, APRIL 18, 2016




BEHMKE REPORTING AND VIDEO SERVICES, INC.

BY:  JILL BAIONI, CSR NO. 8812

455 MARKET STREET, SUITE 970

SAN FRANCISCO, CALIFORNIA 94105

(415) 597-5600

TR-000480

SER-140

MONDAY, APRIL 18, 2016

MR. LAUER:  7:42 now on this Monday morning. We're back with a Today exclusive.

MS. GUTHRIE:  Elizabeth Holmes created a company to make blood tests more convenient and more affordable.  In the process she became a multibillionaire.  But now there are new questions about the accuracy of those tests.  Holmes talked about all of it with NBC special anchor Maria Shriver, who joins us now.

Maria, good morning.

MS. SHRIVER:  Good morning, Savannah.

Well, ever since she was a little girl Elizabeth Holmes dreamed of revolutionizing health care.  And up until a few months ago, she was well on her way.  But a recent government report has raised serious concerns about her company Theranos and its methods.

You're really fighting for the life of your company.  What have these last six months been like for you?

MS. HOLMES:  Well, I'm a better person for it and I'm a better leader.

Every single one of us --

BEHMKE REPORTING AND VIDEO SERVICES, INC.     2
(415) 597-5600

TR-000481

**SER-141**

MS. SHRIVER:  Six months ago, Elizabeth Holmes was the golden girl of Silicon Valley.  At just 32 years of age, the youngest female self-made billionaire in the world.  Hailed as the next Steve Jobs.  She dropped out of Stanford at 19 to create Theranos, a health care company that wants to revolutionize blood testing.

MS. HOLMES:  It's affordable.  That means it's transparent in terms of pricing.  That means that it's available to people as a basic right early, before they're sick.

MS. SHRIVER:  To achieve that dream, she partnered with Walgreens, offering quick in-store blood tests for two dozen diseases at a fraction of regular prices, thanks to her lab secret new blood testing technology.

This is the lab test reinvented.  In short, that's what you're doing.

MS. HOLMES:  That's the dream.

MS. SHRIVER:  Today, Theranos has performed more than six million blood tests and it's made Holmes rich.  Her company is now valued at $9 billion.

But now serious questions about the accuracy of those tests.  In November a federal inspection by CMS, the Centers for Medicare and Medicaid Services,

TR-000482

SER-142

found critical violations at one of her two labs, including failure to properly hire and train qualified staff to run the blood testing machines and allowing unlicensed workers to review patient test results.

According to regulators, the lab posed immediate jeopardy to patient safety.

MS. HOLMES:  I feel devastated that we did not catch and fix these issues faster.

MS. SHRIVER:  You hold yourself responsible for hiring the wrong people, not doing the proper oversight --

MS. HOLMES:  (Nods head up and down.)

MS. SHRIVER:  -- not giving the proper controls.  What do you hold yourself responsible for?

MS. HOLMES:  I'm the founder and CEO of this company.  Anything that happens in this company is my responsibility at the end of the day.

We stopped testing and have taken the approach of saying let's rebuild this entire laboratory from scratch so that we can ensure it never happens again.

MS. SHRIVER:  But in a scathing letter in March, CMS called her fixes insufficient and threatened not only to shut down her California lab but ban Holmes from the industry all together for at

TR-000483

SER-143

least two years.

MS. SHRIVER:  You're running a health care start-up.

MS. HOLMES:  Yeah.

MS. SHRIVER:  You're dealing with people's lives.  You're dealing with test results that doctors prescribe medicine based on that.  So one would think --

MS. HOLMES:  Yeah.

MS. SHRIVER:  -- that you would have had that in place from the get-go.

MS. HOLMES:  Absolutely.  And probably the most devastating part of this is that I thought we did.

MS. SHRIVER:  Holmes doesn't believe her faulty results put anyone's health in danger.  She's brought on a new lab director and expert medical board.

Do you think this company will survive?

MS. HOLMES:  Absolutely.

MS. SHRIVER:  No doubt?

MS. HOLMES:  No doubt.  I know what we've built and I know what we've created and I know what it means to people.  And it is a change that needs to happen in the world.

TR-000484

SER-144

SER-145

MS. SHRIVER:  Holmes believes her lab is now in compliance and she is awaiting response from CMS. Her other lab in Arizona, which does about 90 percent of her testing, passed its most recent inspection.

For the record, NBC News reached out to CMS and to Walgreens for this report and both declined to comment.

Savannah?

MS. GUTHRIE:  All right, Maria.  Thank you very much.

(End of transcription.)

BEHMKE REPORTING AND VIDEO SERVICES, INC.          6
(415) 597-5600

TR-000485

**SER-145**

STATE OF CALIFORNIA        )

                           ) ss.

COUNTY OF SAN MATEO        )

        I hereby certify that the transcript is a true record of the audio recording as reported by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting by computer.

        I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

        IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of July, 2021.

                        *Jill Baioni*

                JILL BAIONI, CSR NO. 8812
                STATE OF CALIFORNIA

TR-000486

SER-146

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 18-CR-00258 EJD |
| Plaintiff, | ) | TRIAL STIPULATION NO. 1 |
| v. | ) | |
| RAMESH BALWANI, | ) | |
| Defendant. | ) | |

TRIAL STIPULATION NO. 1
CASE NO. 18-CR-258 EJD

SER-147

The United States and Ramesh Balwani, through undersigned counsel, hereby stipulate and agree as follows:

1.      In 2013 and 2014, Theranos maintained a bank account at Comerica Bank.  During this time period, Theranos received money via the wire transfers listed below from the bank accounts listed below to Theranos's Comerica account.  These funds were transmitted by wires in interstate commerce, within the meaning of 18 U.S.C. § 1343, via the Fedwire Funds Service operated by the Federal Reserve Bank of New York.  Each wire is an interstate wire communication.

| Date | Amount of Wire Transfer | From | To |
| --- | --- | --- | --- |
| 12/30/2013 | $99,990 | Alan Eisenman's Charles Schwab / Wells Fargo Bank account | Theranos's Comerica Bank account |
| 12/31/2013 | $5,349,900 | Black Diamond Ventures' Pacific Western Bank account | Theranos's Comerica Bank account |
| 12/31/2013 | $4,875,000 | Hall Phoenix / Inwood Ltd's Texas Capital Bank account | Theranos's Comerica Bank account |
| 2/6/2014 | $38,336,632 | PFM Healthcare Master Fund, L.P.'s Citibank account | Theranos's Comerica Bank account |
| 10/31/2014 | $99,999,984 | Lakeshore Capital Management, LP's Northern Chicago Bank account | Theranos's Comerica Bank account |
| 10/31/2014 | $5,999,997 | Mosley Family Holdings LLC's JP Morgan Chase account | Theranos's Comerica Bank account |
| 8/3/15 | $1,126,661 | Theranos's Wells Fargo Bank account | Horizon Media's J.P. Morgan Chase Bank account |

TRIAL STIPULATION NO. 1
CASE NO. 18-CR-258 EJD                    1

DATED:  March 11, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

/s/ Robert S. Leach

ROBERT S. LEACH
JOHN C. BOSTIC
JEFF SCHENK
Assistant United States Attorneys

DATED:  March 11, 2022

ORRICK, HERRINGTON &
SUTCLIFFE LLP

/s/ Amy Walsh

JEFFREY B. COOPERSMITH
AMY WALSH
STEPHEN A. CAZARES
Counsel for Defendant
Ramesh "Sunny" Balwani

TRIAL STIPULATION NO. 1
CASE NO. 18-CR-258 EJD                    2

**SER-149**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No.  5:18-cr-00258-EJD-1<br><br>**ORDER RE: MOTIONS IN LIMINE**<br><br>Re: Dkt. Nos. 1155, 1156 |

On July 28, 2020, a federal grand jury returned a Third Superseding Indictment, charging Defendants Elizabeth Holmes and Ramesh "Sunny" Balwani with ten counts of wire fraud (Counts 3 through 12) in violation of 18 U.S.C. § 1343, and two counts of conspiracy to commit wire fraud (Counts 1 through 2) in violation of 18 U.S.C. § 1349.  Third Superseding Indictment ("TSI"), Dkt. No. 469.  The Defendants were charged with making deceptive representations about their company, Theranos, and its technology.

In anticipation of trial, Balwani and the Government each filed motions in limine ("MIL") and supporting declarations.  *See* United States' Mots. in Limine ("Govt. Mot."), Dkt. No. 1155; Decl. of Kelly I. Volkar in Supp. of United States' Mots. in Limine ("Volkar Decl."), Dkt. No. 1155-1; Def. Ramesh "Sunny" Balwani's Omnibus Mots. in Limine ("Balwani Mot."), Dkt. No. 1156; Decl. of Jeffrey B. Coopersmith in Supp. of Def. Ramesh Balwani's Mots. in Limine ("Coopersmith Decl."), Dkt. Nos. 1156-1, 1157; Decl. of Richard L. Sonnier III ("Sonnier Decl."), Dkt. No. 1158.  Both parties submitted timely responses and replies in support of their respective motions.  *See* Def. Ramesh "Sunny" Balwani's Responses to the Govt.'s Mots. in Limine

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

1

("Balwani Resp."), Dkt. No. 1179; Decl. of Jeffrey B. Coopersmith in Supp. of Mr. Balwani's Resp. to Govt.'s Mots. in Limine ("Coopersmith Resp. Decl."), Dkt. No. 1179-1, 1179-2; United States' Resp. to Def. Ramesh "Sunny" Balwani's Mots. in Limine ("Govt. Resp."), Dkt. No. 1181; Decl. of Kelly I. Volkar in Supp. of United States' Resp. to Def. Balwani's Mots. in Limine ("Volkar Resp. Decl."), Dkt. No. 1183; Def. Ramesh "Sunny" Balwani's Replies in Supp. of His Mots. in Limine ("Balwani Reply"), Dkt. No. 1193; Decl. of Jeffrey B. Coopersmith Re: Mr. Balwani's Replies in Supp. of His Mots. in Limine ("Coopersmith Reply Decl."), Dkt. No. 1193-1; and United States' Reply to Def. Ramesh "Sunny" Balwani's Resp. to United States' Mots. in Limine ("Govt. Reply"), Dkt. No. 1195.  The Court heard oral argument on February 4 and 8, 2022.  Dkt. Nos. 1318, 1319.  Having considered the parties' arguments, the relevant law, and the record in this case, the Court orders as follows.

## I.    BACKGROUND

### A.    The Indictment

Holmes founded Theranos, a health care and life sciences company, in 2003.  TSI ¶ 1. Holmes served as the company's Chief Executive Officer.  *Id.*  Balwani was a board member, President, and Chief Operating Officer of Theranos.  *Id*. ¶ 2.

Theranos' stated mission was to revolutionize medical laboratory testing through its allegedly innovative methods of drawing and testing blood and diagnosing patients.  *Id*. ¶ 4. During the company's first ten years, its scientists worked toward developing proprietary technology that could run clinical tests using only tiny drops of blood.  *Id*. ¶ 5.  Theranos also worked toward developing a method for drawing a few drops of capillary blood from a patient's finger using a small lancet.  *Id*.  The blood was then stored in a "nanotainer."  *Id*.  Theranos sought to develop a second device called the Theranos Sample Processing Unit ("the TSPU," "Edison," or "miniLab") that could quickly and accurately analyze blood samples stored in the nanotainer.  *Id*. The Government contends that the promises of these devices were never realized; the devices "consistently" produced inaccurate and unreliable results.  *Id*. ¶ 16.  Despite this, Defendants began a publicity campaign to promote the company and its devices.  *Id.* ¶¶ 6-9.  In September

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

2

2013, Theranos offered blood testing at Walgreens "Wellness Centers" in California and Arizona. *Id*. ¶ 10.

The Government argues that Defendants conspired to commit and committed fraud through two fraudulent schemes: one to defraud investors and another to defraud doctors and patients. The Court outlines these schemes below.

**Scheme to Defraud Investors.** Defendants allegedly made materially false and misleading statements and failed to disclose material facts to investors. Based on the false statements, investors invested money in Theranos. Specifically, from 2013 to 2015, Defendants allegedly made misstatements regarding:

1. Theranos' proprietary analyzer: Defendants allegedly made misstatements about Theranos' proprietary analyzer—the TSPU, Edison, or miniLab—when they claimed the analyzer was presently capable of accomplishing certain tasks, with more precision than other blood tests, and at a faster rate, when they knew these statements were false. *Id*. ¶ 12(A).

2. Theranos' financial health: Defendants allegedly misrepresented Theranos' financial well-being when they told investors the company was financially strong and stable and would make huge profits in 2014 and 2015 when, in fact, they knew Theranos would only generate modest revenue. *Id*. ¶ 12(B).

3. Technology demonstrations: Defendants allegedly deceived investors through misleading technology demonstrations intended to cause potential investors to believe blood tests were being conducted on Theranos' proprietary analyzer when Defendants knew the analyzer was operating in "null protocol." *Id*. ¶ 12(C).

4. Walgreens partnership: Defendants allegedly misled investors when they told them Theranos had an expanding partnership with Walgreens when the Walgreens rollout had stalled due to concerns with Theranos' performance. *Id*. ¶ 12(D).

5. United States Department of Defense ("DOD") relationship: Defendants allegedly told investors the company had a profitable and revenue-generating business relationship with the DOD and that Theranos technology was deployed on the battlefield. Defendants allegedly knew

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

3

that Theranos had limited revenue from military contracts and that its technology was not used in the battlefield. *Id*. ¶ 12(E).

6. Food and Drug Administration ("FDA") approval: Defendants allegedly misled investors when they told them that Theranos did not need the FDA to approve its proprietary analyzer and tests when Defendants knew this to be false. *Id*. ¶ 12(F).

7. Patient testing: Defendants allegedly told investors that patient tests were conducted using Theranos-manufactured analyzers. Defendants allegedly knew that Theranos used third-party, commercially available analyzers. *Id*. ¶ 12(G).

8. Peer review: Defendants allegedly falsely told investors that several national or multinational pharmaceutical companies and research institutions had examined, used, and validated Theranos technology. *Id*. ¶ 12(H).

9. Media representations: Defendants allegedly made the false and misleading statements described above to reporters and then shared the resulting articles directly with potential investors and via Theranos' website. *Id*. ¶ 12(I).

**Scheme to Defraud Doctors and Patients.** The Government alleges that from 2013 to 2016, Defendants advertised and marketed Theranos technology to doctors and patients, and falsely claimed that the tests were accurate and reliable. *Id*. ¶¶ 14-15. Their claims about Theranos technology were implicit and explicit. *Id*. ¶ 15. Despite knowing that Theranos' technology suffered from recurring accuracy and reliability problems, Defendants allegedly advertised the tests as accurate and reliable. *Id*. ¶¶ 16-17. Specifically, Defendants used materially false and misleading marketing materials and advertisements, and transmitted Theranos blood results that Defendants knew contained, or likely contained, inaccurate information. *Id*. ¶¶ 16-18. For instance, Theranos' public website touted its lab's ability to perform tests "quickly and accurately on samples as small as a single drop." *Id*. ¶ 9. Defendants also allegedly provided patients with reports that contained or were likely to contain: (1) inaccurate and unreliable results; (2) improperly adjusted reference ranges defining a normal or healthy result for a given test; (3) improperly removed "critical" results, i.e., results suggesting a patient needed medical attention;

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

4

and (4) results generated from improperly validated assays, further decreasing the reliability of those tests.  *Id.* ¶ 17(C).

**B.    Procedural History**

The Court ordered separate trials for Holmes and Balwani.  Dkt. No. 977.  In anticipation of trial, Holmes and the Government each filed motions in limine.  Dkt. Nos. 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 577,578, 588.  The Court addressed each motion in its May 22, 2021 Order Re: Motions in Limine ("Holmes MIL Order").  Dkt. No. 798.

Holmes' jury trial concluded on January 3, 2022.  The jury found Holmes guilty on Counts 1, 6, 7 and 8; not guilty on Counts 2, 10, 11 and 12; and did not reach a verdict on Counts 3, 4 and 5.[1]  Dkt. No. 1235.  Balwani's jury trial is scheduled to begin March 9, 2022.

## II.   LEGAL STANDARDS

Motions in limine are a "procedural mechanism to limit in advance testimony or evidence in a particular area."  *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009).  Like other pretrial motions, motions in limine are "useful tools to resolve issues which would otherwise clutter up the trial."  *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017).  Accordingly, "a ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court."  *Id.*; *see Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (explaining that a court may rule in limine "pursuant to the district court's inherent authority to manage the course of trials").

In many instances, however, rulings "should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context."  *United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016).  For example, in order to exclude evidence on a motion in limine, "the evidence must be inadmissible on all potential grounds."  *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1167 (D. Nev. 2014).

---

[1] The Government dismissed Count 9.  Dkt. No. 1152.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

5

Thus, denial of a motion in limine to exclude certain evidence does not mean that all evidence contemplated by the motion will be admitted, only that the court is unable to make a comprehensive ruling in advance of trial. *Id*. at 1168. Moreover, even if a district court does rule in limine, the court may "change its ruling at trial because testimony may bring facts to the district court's attention that it did not anticipate at the time of its initial ruling." *City of Pomona*, 866 F.3d at 1070; *see also Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) ("[I]n limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial.").

### C.   Federal Rule of Evidence 401

Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . and the fact is of consequence in determining the action." Fed. R. Evid. 401(a)-(b). "Relevancy simply requires that the evidence logically advance a material aspect of the party's case." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotations omitted).

### D.   Federal Rule of Evidence 403

Even if evidence is relevant, it must be excluded if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). "Unfair prejudice can result from evidence that makes it more likely for a juror 'to defer to findings and determinations relevant to credibility made by an authoritative, professional factfinder rather than determine those issues for themselves.'" *United States v. Sine*, 493 F.3d 1021 (9th Cir. 1992).

### E.   Federal Rule of Evidence 802

Hearsay evidence is inadmissible unless otherwise provided for under a federal statute, the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court." Fed. R. Evid. 802.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

6

Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing" and which "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801. "Hearsay within hearsay" is only admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

## III.   BALWANI'S MOTIONS IN LIMINE AND RELATED GOVERNMENT MOTIONS

### A.   Balwani's MIL No. 1 to Exclude Evidence of Accuracy and Reliability of Tests Run on Unmodified Commercial Devices

The TSI charges two fraudulent schemes—a scheme to defraud investors and a scheme to defraud patients. Balwani argues that under the TSI, the alleged scheme to defraud patients turns on allegations that Theranos' proprietary technology was not capable of producing accurate and reliable results. Balwani Mot. at 1–2. Balwani contends that because the TSI does not include allegations regarding the accuracy and reliability of non-Theranos technology—i.e., unmodified, commercially available blood analyzers used by Theranos in its clinical laboratories—or about the general practices of the Theranos clinical laboratories, evidence regarding the accuracy or reliability of blood tests is only relevant if the test was run on a Theranos-manufactured or Theranos-modified device. *Id.* at 1. On this ground, Balwani moves to exclude testimony from patients E.T. and B.B. and to exclude portions of the Centers for Medicare and Medicaid Services ("CMS") January 25, 2016, letter to Theranos' former lab director, Dr. Sunil Dhawan, and the attached Form CMS-2567, Statement of Deficiencies, for the Theranos Newark clinical laboratory (collectively, "the CMS Report").

"[A]n indictment is not to be read in a technical manner, but is to be construed according to common sense and with an appreciation of existing realities." *United States v. Anderson*, 532 F.2d 1218, 1222 (9th Cir. 1976) (citing *United States v. Pleasant*, 469 F.2d 1121 (8th Cir. 1972); *McKinney v. United States*, 172 F.2d 781 (9th Cir. 1949)). The indictment must be read to include facts which are "necessarily implied by the allegations made therein." *Id.* Further, even if an essential averment in an indictment is "faulty in form, if it may by fair construction be found within the text, it is sufficient." *Id.* This is because the purpose of an indictment is to furnish the

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

7

defendant with a sufficient description of the charges against him to enable him to prepare his defense, to enable him to plead double jeopardy against a second prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge. *Russell v. United States*, 369 U.S. 749, 763–64 (1962); *Williamson v. United States*, 310 F.2d 192, 195–96 (9th Cir. 1962).

The TSI meets this burden. Fairly read, the scheme to defraud patients includes Theranos' use of unmodified, commercially available blood analyzers. The language of the TSI makes this clear by going beyond statements about the abilities of "Theranos's technology" and including allegations about Theranos' abilities generally. *See* TSI ¶¶ 14–18. First, the TSI alleges that Holmes and Balwani engaged in a scheme to defraud patients who came to Theranos for blood testing services by representing to those patients that "*Theranos* could provide accurate, fast, reliable, and cheap blood tests and test results" despite their knowledge that "*Theranos* was not capable of consistently producing accurate and reliable results for certain blood tests." *Id.* ¶¶ 16–17 (emphases added). Second, while the TSI does at times focus exclusively on "Theranos technology," the TSI also makes clear that the alleged scheme to defraud patients includes all blood tests run by Theranos. *See id.* ¶ 18 ("Knowing that the accuracy and reliability of *Theranos test results* was questionable and suspect, Holmes and Balwani oversaw the electronic wiring of test results to patients, including . . . B.B. [and] E.T." (emphasis added)). Indeed, the TSI's inclusion of assays (like HIV, the test that E.T. received) not run on Theranos-specific devices confirms this. *See id.* at ¶ 16. Finally, even accepting Balwani's argument, evidence that patients received inaccurate tests from unmodified conventional analyzers is relevant evidence that Holmes and Balwani falsely promised patients that *Theranos* could deliver test results with superior accuracy. The TSI puts Balwani on notice that the scheme to defraud patients includes Theranos' use of unmodified conventional analyzers. Accordingly, the Court **DENIES** Balwani's motion to exclude evidence about the accuracy and reliability of tests run on unmodified commercial devices**.**

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

8

United States District Court
Northern District of California

**B.      Balwani's MIL No. 2 to Exclude Expert Testimony of Dr. Das**

Balwani moves to exclude Dr. Kingshuk Das, a former Theranos lab director, as an expert witness.  In the Holmes trial, the Court determined that Dr. Das was a percipient witness and could testify about what he observed while working at Theranos.  *See* Order re Pre-Trial Motions ("Holmes MIL Order 2"), Dkt. No. 989.  Like Holmes, Balwani argues that Dr. Das' testimony will be based in part on scientific, technical, or other specialized knowledge that makes him an expert witness.  Balwani Mot. at 13.  The Court disagrees.  Balwani does not raise any new arguments as to why Dr. Das' testimony should be considered expert testimony.  Additionally, the Government's opposition makes clear that the testimony it seeks to elicit from Dr. Das is fact testimony.  *See* Govt. Resp. at 10 ("[T]he government should be able to call Dr. Das to testify about his job, what he was hired by Defendant to do, what he discovered while performing the tasks that Defendants asked him to do . . . , and his perspective of the resulting discussion of what he discovered with senior management.").  However, the Court again notes that specific details of particular scientific procedures or analyses that would require specialized knowledge to understand and interpret would move Dr. Das' testimony from percipient to expert.  If expert testimony is introduced, Balwani may object at that time.  Accordingly, the Court **DEFERS** ruling on Balwani's motion to exclude unless and until Dr. Das offers expert witness testimony at trial.[2]

**C.      Balwani's MIL No. 3 to Exclude Evidence of Theranos' Voiding Test Results**

The CMS report sent in late January 2016 detailed deficiencies CMS found in Theranos' CLIA lab.  *See* Coopersmith Decl., Ex. 17.  CMS determined that Theranos' lab was "not in compliance with all of the Conditions required for certification in the CLIA program" and that "the deficient practices of the laboratory pose immediate jeopardy to patient health and safety." *Id.* at 1.  CMS directed Theranos to "take immediate action to remove the jeopardy and come into

---

[2] Because the Court concludes that Dr. Das may testify as a percipient witness, it does not address Balwani's argument that the destruction of the Laboratory Information System ("LIS") prevents Dr. Das from testifying at this time.  However, the Court notes that Dr. Das' reliance on the LIS may present other constitutional issues.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE
9

Condition-level compliance." *Id.* at 2. CMS told Theranos it had ten calendar days to provide CMS "with a credible allegation of compliance and acceptable evidence of correction documenting that the immediate jeopardy has been removed and that action has been taken to correct all of the condition-level deficiencies in question." *Id.* In response to the CMS Report, Theranos hired a new laboratory director, Dr. Das. Dr. Das determined that to comply with the CMS directive, Theranos would need to void all test results that the identified deficiencies may have impacted. Balwani moves under Federal Rule of Evidence 407 for an order excluding evidence of Theranos' decision to void test results. Balwani Mot. at 20.

Under Rule 407, evidence of subsequent remedial measures is not admissible to prove culpable conduct by the party taking those measures or to prove "a defect in a product or its design." The purpose of Rule 407 is to encourage parties to improve safety conditions "without fear that subsequent measures will be used as evidence against them." *Gauthier v. AMF, Inc.*, 788 F.2d 634, 637 (9th Cir. 1986). "An exception to Rule 407 is recognized for evidence of remedial action mandated by superior governmental authority . . . because the policy goal of encouraging remediation would not necessarily be furthered by exclusion of such evidence." *O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1204 (8th Cir. 1990); *see also In re Aircrash in Bali, Indonesia*, 871 F.2d 812, 817 (9th Cir. 1989) ("The purpose of Rule 407 is not implicated in cases involving subsequent measures in which the defendant did not voluntarily participate. . . . In this case, Pan Am's management, although to be commended for its cooperation, nonetheless, was legally obligated to cooperate with the FAA's investigation.").

Balwani argues that because Theranos voluntarily decided to void test results, evidence about the voiding cannot be introduced to prove culpability. *See* Fed. R. Evid. 407. Specifically, Balwani contends that because CMS inspectors Sarah Bennett and Gary Yamamoto did not require Theranos to void the test results, the decision to do so was voluntary. *But see* Dkt. No. 1157, Ex. 34 (noting that voiding tests was "an unusual remediation for deficient practices" and that laboratories were only required to contact affected clients and take corrective action, like issuing a corrected test). *See* Coopersmith Decl., Ex. 34 (noting that voiding tests was "an unusual

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

10

remediation for deficient practices" and that laboratories were only required to contact affected clients and take corrective action, like issuing a corrected test).  However, this argument misunderstands the inquiry.  CMS identified various deficiencies and directed Theranos to cure these deficiencies.  CMS did not specify how Theranos should cure the deficiencies.  Instead, CMS permitted Theranos (through its laboratory director) to remedy the identified deficiencies.  *See* Coopersmith Decl., Ex. 36 at 6 ("CMS tells the laboratory they must fix a deficiency and *the laboratory decides how they're going to fix it*." (emphasis added)); *id.*, Ex. 35 ("Again, CMS does not determine what those corrective actions must be.  It's the laboratory and the laboratory director's responsibility to determine how those patients were affected or have been affected by the deficient practice and what they believe the corrective action should be.").  The question is whether Theranos found it necessary to void the test results to cure the deficiencies.

The CMS inspection uncovered issues with patient test results.  Under 42 C.F.R. § 493.1291(k), once a laboratory uncovers errors in a patient's test results, the laboratory must notify the person and issue corrective results.  During the Holmes trial,[3] Dr. Das testified that he prepared a patient impact assessment in response to the CMS's deficiency findings.  *See* Tr. of Nov. 9, 2021 Trial Proceedings, Dkt. No. 1285, at 5824–35.  During this process, Dr. Das discovered that there was a possible patient impact for every test reported from Theranos' proprietary 3.5 series devices.  *Id.* at 5832.  Given the extent of the deficiencies, Dr. Das was unable to determine "the exact nature and magnitude" of the effect of the deficiencies on patient results.  *Id.*  Thus, Theranos could not comply with § 493.1291(k) by contacting the affected clients and issuing corrected results.  The only option available to Dr. Das to comply with his regulatory obligations was to void the impacted tests results.  Accordingly, Theranos' decision to

---

[3] Balwani argues that the Government did not lay the proper foundation for Dr. Das' conclusion because it turned on a question that was both leading and compound.  *See* Balwani Reply at 17 n.13.  Balwani argues a Rule 104(c) hearing is necessary to address this issue.  The Court disagrees.  While the Government may have asked a leading question during direct examination, the information solicited demonstrates that Theranos did not voluntarily void the test results but did so because of a perceived obligation to do so.  However, Balwani is certainly able to object to the form of questioning during his trial.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

11

void all tests performed on Edison or 3-series devices was involuntary and not a remedial measure under Rule 407.

Balwani's use of *Auer v. Robbins*, 519 U.S. 452 (1997) misses the point.  The issue is not whether CMS believed voiding was necessary, but whether *Theranos* believed voiding was necessary to comply with the various regulations.  As discussed, Theranos believed voiding was necessary to comply with its regulatory obligations.  The decision to void the test results was therefore involuntary.  Moreover, this is not a situation where an agency requires a specific result.  Instead, CMS and the governing regulations allowed Theranos to decide how to correct the identified deficiencies.  Thus, CMS's interpretation of what usually occurs is not relevant.  *Cf. Auer*, 519 U.S. 452 (analyzing an agency interpretation that required a specific outcome).

Finally, Balwani argues that the lack of evidence tying him to the decision to void test results requires exclusion.  In the Holmes trial, the Court required the Government to tie the events in 2016 to the charged conduct.  The same requirement applies to Balwani.  Accordingly, the Court **DEFERS** ruling on the admissibility of Theranos' decision to void test results until the Government makes a proffer of evidence that clearly ties the events in 2016 to the charged conduct.

### D.   Balwani's MIL No. 4 to Exclude Co-Conspirator Statements

Balwani moves for an order excluding certain alleged coconspirator statements on the ground that the statements fall outside the conspiracy time frames alleged in the TSI, i.e., statements from before September 2009 or after July 7, 2016.  Balwani Mot. at 30.

For a statement to be admissible under Federal Rule of Evidence 801(d)(2)(E) (the coconspirator exception), the Government must prove the existence of a conspiracy at the time the statement was made.  *See United States v. Larson*, 460 F.3d 1200, 1212 (9th Cir. 2006), *adopted in relevant part on reh'g en banc*, 495 F.3d 1094, 1096 n.4 (9th Cir. 2007).  Balwani contends that the Government cannot use Rule 801(d)(2)(E) to introduce statements made by alleged coconspirator Holmes before Balwani joined Theranos in September 2009 or after he left Theranos in July 2016, nor can the Government use statements made after both charged

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

12

conspiracies ended.  Balwani Mot. at 30.

In opposition, the Government notes that during the Holmes trial, most exhibits were admissible as business records or statements of agents, or for other non-hearsay purposes.  Govt. Resp. at 19.  Indeed, it appears that the Court did not admit any exhibit or portion of testimony based solely on Rule 801(d)(2)(E) during the Holmes trial.  Based on this, the Government informed Balwani that it did not anticipate offering exhibits based solely on the coconspirator exception because such exhibits or testimony would be admissible under other hearsay exceptions (or for a non-hearsay purpose).  Govt. Resp. at 19.  The Government also does not plan to use Holmes' pre-2009 statements for the truth of the matter asserted and agrees with Balwani that post-July 2016 statements are likely irrelevant.  *Id.*

Considering the Government's response, the Court **DEFERS** ruling on this motion unless and until the Government attempts to use Rule 801(d)(2)(E) to admit pre-2009 statements or post-July 2016 statements.

**E.**   **Balwani's MIL No. 5 to Exclude Expert Testimony Offered by Law Witnesses**

Balwani moves for an order precluding improper expert opinion from lay witnesses. Balwani Mot. at 36.  The motion focuses primarily on the trial testimony of Erica Cheung, a former Theranos employee who worked in the company's clinical laboratory for several months. In the Holmes trial, Ms. Cheung testified about her understanding of the significance of certain tests and events based on her experience working in the Theranos lab.  She testified about her experiences running quality control checks and about the overall reliability and performance of Theranos technology.  This testimony was proper percipient witness testimony.  *See United States v. Chen*, No. 17-cr-00603-BLF-1, 2021 WL 2662116, at *9–10 (N.D. Cal. June 29, 2021) (finding that proffered witnesses appeared to be lay witnesses, based on "their personal knowledge and positions in the day-to-day affairs of [the Company]").  The testimony that the Government seeks to elicit is permissible factual testimony based on Ms. Cheung's personal knowledge.  The defense may object to statements during trial that it believes cross into expert testimony.  Accordingly, the Court **DEFERS** ruling on this motion unless and until a lay witness attempts to offer expert

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

13

SER-162

United States District Court
Northern District of California

testimony.[4]

### F.    Balwani's MIL No. 6 to Exclude Irrelevant and Inflammatory Text Messages

The Court considers this motion concurrently with the Government's Motion in Limine No. 8 to admit text messages between Holmes and Balwani offered by the Government. *See infra* Section IV.H.3.

### G.    Balwani's MIL No. 7 to Exclude Evidence of Balwani's License Plate

The Government does not intend to offer evidence of Balwani's automobile license plate and does not oppose this motion. Govt. Resp. at 24–25. Accordingly, the Court **GRANTS** the motion to exclude evidence of Balwani's automobile license plate.

### H.    Balwani's MIL No. 8 Adopting Certain Motions Previously Filed by Elizabeth Holmes

Balwani asks the Court to adopt pretrial rulings from the Holmes case as to seven motions in limine. Balwani Mot. at 48. The Government requests the Court remain open to reconsidering those pretrial rulings with respect to Balwani subject to how the evidence is introduced at his trial. Govt. Resp. at 26. The Government incorporates by reference its prior oppositions and arguments on the associated topics. *Id.*

#### 1.    Balwani's Request to Extend Certain Pretrial Rulings from Holmes' Trial to His Trial

##### a.    Balwani Adopts Holmes' MIL to Exclude Evidence Concerning Wealth, Spending, And Lifestyle (Dkt. No. 567)

Balwani adopts Holmes' Motion to Exclude Evidence Concerning Wealth, Spending, and Lifestyle Under Rules 401–403 (Dkt. No. 567), and asks the Court to apply its ruling on Holmes' motion to his trial. Balwani Mot. at 50-51. The Court previously ruled as follows:

---

[4] Balwani also argues that physician witnesses should not be able to attribute inaccurate Theranos test results to "laboratory error." Balwani Mot. at 39. In opposition, the Government states that it does not plan to elicit such testimony, but instead, as in the Holmes trial, will elicit testimony that certain Theranos results were incorrect. Balwani does not respond to this in his reply brief. The Court concludes that physician witnesses should be permitted to discuss conclusions they reached regarding the accuracy of relevant Theranos test results.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

14

United States District Court
Northern District of California

> The Government may introduce evidence that Holmes enjoyed a lifestyle as Theranos CEO that is comparable to those of other tech company CEOs.  This includes salary, travel, celebrity, and other perks and benefits commensurate with the position.  However, references to specific purchases or details reflecting branding of clothing, hotels, or other personal items is not relevant, and the prejudicial effect of that evidence outweighs any probative value.
>
> Based on the foregoing, the Court **GRANTS IN PART** Holmes' MIL to exclude evidence referencing her wealth, spending, and lifestyle that is outside the general nature of her position as Theranos CEO.

Holmes MIL Order at 9.

The Government agrees that the Court's ruling should apply to Balwani.  Govt. Resp. at 26.  However, in response to Balwani's concerns about appealing to class prejudice, the Government asks for the ruling to be extended to exclude any evidence of Balwani's wealth or financial status before he joined Theranos or outside of his spending associated with his salary and perks received as an executive of Theranos.  *Id*.

In light of the parties' agreement, Balwani's motion is **GRANTED**: the Court will apply the ruling on Holmes' motion to Balwani's trial.  The Government is precluded from introducing evidence of Holmes' and Balwani's wealth, spending, and lifestyle that is outside the general nature of their positions at Theranos.  The Government's request to exclude evidence of Balwani's pre-Theranos wealth is **DENIED**.  The Government has not shown that Balwani's own use of evidence of his pre-Theranos wealth would appeal to class prejudice in a manner that would be unfairly prejudicial.  If, however, Balwani presents evidence of his pre-Theranos wealth (e.g., his loan to the company), the Government may present rebuttal evidence.

### b. Balwani Adopts Holmes' MIL to Exclude Evidence of Remedial Measures and Settlements (Dkt. No. 572)

In Holmes' Motion in Limine to Exclude Evidence of Remedial Measures and Settlements Under Rules 401-403, 407, and 408, she requested among other things, an "order precluding the [G]overnment from introducing any evidence of  . . . the settlements with CMS and the Arizona Attorney General['s] Office."  Dkt. No. 572, at 10.  The Court granted as unopposed Holmes' motion to exclude the CMS Settlement and the Arizona Settlement (including the refunds

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE
15

associated with the Arizona Settlement).  Holmes MIL Order at 39.  The Court deferred ruling on the admissibility of statements by Theranos and Holmes to the Arizona Attorney General's Office in the course of its investigation and to CMS in the course of its survey and subsequent proceedings.  *Id.*

Balwani adopts Holmes' motion and asks the Court to apply its ruling regarding the two settlements to his trial.  Balwani Mot. at 51.  The Government agrees to abide by the Court's ruling regarding the two settlements.

In light of the parties' agreement, Balwani's motion is **GRANTED.**  The Court's prior ruling regarding the two settlements applies to Balwani's trial.

### c. Balwani Adopts Holmes' MIL to Exclude Certain News Articles (Dkt. No. 578)

Holmes moved to exclude certain news articles under Federal Rules of Evidence 403 and 802.  Dkt. No. 578.  She sought a blanket order excluding over fifty articles by journalists not testifying at trial.  *Id.* at 1.  The Court denied the motion without prejudice as to all the articles not specifically identified and filed with the motion and its accompanying declarations and exhibits; denied the motion as to the "Blood, Simpler" article by Ken Auletta; and granted the motion as to the following six articles: "Craving Growth, Walgreens Dismissed Its Doubts About Theranos" by John Carreyrou and Christopher Weaver, *Wall Street Journal* (May 25, 2016); "Hot Startup Theranos Has Struggled With Its Blood-Test Technology" by John Carreyrou, *Wall Street Journal* (Oct. 16, 2015); "Walgreens Scrutinizes Theranos Testing" by John Carreyrou, Michael Siconolfi, and Christopher Weaver, *Wall Street Journal* (Oct. 23, 2015); "Safeway, Theranos Split After $350 Million Deal Fizzles" by John Carreyrou, *Dow Jones* (Nov. 10, 2015); "Blood Lab that Boasts Breakthrough Goes on Defense Against its Doubters" by Katie Benner and Andrew Pollack, *New York Times* (October 2015); and "Can Elizabeth Holmes Save Her Unicorn?" by Sheelah Kolhatkar and Carolina Chen, *Business Week* (December 2015).  Holmes MIL Order at 44.

Balwani adopts Holmes' motion and asks the Court to adopt its prior decision: (1) to

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

16

provide a limiting instruction to ensure the jury considers the "Blood, Simpler" article by Ken Auletta solely for its effect on readers; (2) to exclude the six articles listed above as inadmissible hearsay; and (3) to allow the defense to request at trial that the Court exclude other news articles the Government has not yet identified.  Balwani Mot. at 52.

The Government asks the Court "to remain open to reconsidering whether to admit some of the previously excluded articles for a limited purpose—such as effect on the readers—as it initially did for the "Blood, Simpler" article.  Govt. Resp. at 27.  In particular, the Government suggests the October 16, 2015 Wall Street Journal article by John Carreyrou ("the WSJ article") may provide helpful context to the jury for Balwani's trial.  *Id*.

Balwani's motion is **GRANTED**: the Court will apply the ruling on Holmes' motion regarding news articles to Balwani's trial.  The Government's request to "remain open to reconsidering whether to admit some of the previously excluded articles for a limited purpose" is **DEFERRED**.

### d.   Balwani Adopts Holmes' MIL to Exclude Evidence of Customer Impact (Dkt. No. 562)

Holmes sought to exclude evidence of collateral emotional effects suffered by Theranos customers who believe that they received erroneous results as well as hypothetical harms that can result from medical decisions based on erroneous results.  Dkt. No. 562.  The Court granted Holmes' motion to the extent it sought to exclude emotional, graphic, or otherwise inflammatory evidence relating to the impact or potential impact on customers of inaccurate test results.  Holmes MIL Order at 47–54.

Balwani adopts Holmes' motion and asks the Court to apply its ruling to his trial. Balwani Mot. at 53.  Balwani also asks the Court to extend its ruling to specific testimony introduced at Holmes' trial.  Specifically, Balwani asks the Court to preclude the Government from "inviting" Dr. Zachman to testify about: (1) the "surprise" and "sadness" reported by her patient, B.G., on receiving an inaccurate hCG test; (2) the "very impactful" effect that B.G.'s test had on Dr. Zachman, given that she "was empathizing to [B.G.] as a woman"; and (3) her

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

17

United States District Court
Northern District of California

discussion with B.G. about "ways to terminate a pregnancy." *Id.* (citations omitted).  Balwani also asks the Court to bar the Government from eliciting testimony from Dr. Rosendorff that "an abnormally high potassium result" "could indicate that the patient is at risk for a heart rhythm problem," i.e., "arrythmia." *Id.* (citations omitted).  Balwani views this testimony as falling within the Court's prior ruling and thus argues it should be excluded.

The Government asks the Court to at least adopt the same parameters that it set during the Holmes trial.  The Government also contends that, contrary to Balwani's assertion, it complied with the Court's Holmes MIL Order.  Further, the Government contends that there is no basis to exclude the testimony of Dr. Zachman and Dr. Rosendorff outlined above because (1) there is no guarantee that the witnesses will testify in exactly the same manner at both trials and (2) the words and phrases Bawlani takes issue describe "next steps," which the Court held was permissible.

The Court **GRANTS** Balwani's motion to the extent he asks the Court to apply the ruling on Holmes' motion to his trial.  The Court **DENIES** Balwani's motion to exclude the excerpts of Dr. Rosendorff's and Dr. Zachman's testimony outlined above.  Dr. Rosendorff's testimony is relevant, not unduly prejudicial, and is not "emotional, graphic, or otherwise inflammatory evidence."  Dr. Zachman's testimony is also relevant, not unduly prejudicial, and does not violate the Holmes MIL Order.  Although Dr. Zachman expressed emotions, her testimony was not "emotional, graphic, or otherwise inflammatory."

### e. Balwani Adopts Holmes' MIL to Exclude Evidence of Alleged Blaming and Vilifying of Competing Companies and Journalists (Dkt. No. 577)

Holmes' Motion in Limine to Exclude Evidence of Alleged Blaming and Vilifying of Competing Companies and Journalists Under Rules 401-403 and 404 (Dkt. No. 577) sought to exclude the following evidence:

1) A Theranos employee will testify that Holmes and Balwani led a group of employees in a chant of "Fuck you, Sonora Quest," with the implication that competitors such as Sonora Quest and Quest were "behind the questioning of Theranos."  Dkt. No. 580-2 at 59.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE
18

2) A Walgreens employee will testify that Holmes stated that "Theranos' competitors were sending people into Walgreens to order esoteric blood tests in order to throw off the blood draw percentages." *Id.* at 61.

3) Another Walgreens employee will testify that "Balwani advised Walgreens that the reasons for the high number of venous blood draws included the cartridges not being ready for tests that were being ordered, LabCorp and Quest sending people in to order tests which required venous blood draws, and doctors ordering esoteric tests." *Id.* at 61–62.

4) A Theranos employee will testify that he learned at "an all-hands meeting" of an impending WSJ article by John Carreyrou. At that meeting, "the attendees were told the article made several allegations that were false, and that this story was being pushed by LabCorp and Quest." *Id.* at 62.

5) A Theranos employee will testify that Holmes and Balwani led a group of employees in a chant of "Fuck you, Carreyrou." *Id.* at 59.

The Court granted Holmes' motion as to the chants. Holmes MIL Order at 68–70. The Court deferred ruling on the statements to Walgreens employees and the all-hands meeting statements, noting the Government's inability to point to any evidence showing that these two categories of statements were false. *Id.*

Balwani adopts Holmes' motion and asks the Court to apply its ruling to his trial. Balwani Mot. at 53. The Government maintains its position as stated in its opposition to Holmes' motion and asks the Court to at least adopt the same parameters that it set during the Holmes trial.

In light of the parties' agreement and in the absence of any new arguments on the issues raised in Holmes' motion, Balwani's motion is **GRANTED**. The Court's prior ruling applies to Balwani's trial.

**f. Balwani Adopts Holmes' MIL to Exclude Evidence and Argument as to the Purported Inaccuracy or Unreliability of Tests Not Identified in the Bill of Particulars (Dkt. No. 568)**

Holmes moved to preclude the Government from introducing at trial evidence and argument regarding the purported inaccuracy and unreliability of tests not identified in the Government's Bill of Particulars. Dkt. No. 568. The Court granted the motion as follows:

> The Government is precluded from introducing any evidence or argument regarding the purported inaccuracy and unreliability of tests not identified in the Government's Bill of Particulars. The

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

19

United States District Court
Northern District of California

Government may still introduce evidence or testimony about tests not listed in the Bill of Particulars for purposes unrelated to the accuracy and reliability of those tests.  The Government shall provide notice of exhibits or testimony that may involve tests not identified in the Bill of Particulars prior to their introduction so that the parties and Court can address any issues, in the context of specific evidence, outside the presence of the jury.

Holmes MIL Order at 80.

Balwani adopts Holmes' motion and maintains that the Court should exclude evidence of tests that are outside the scope of the assays listed in the Bill of Particulars.  Balwani Mot. at 54. Balwani also requests that, at a minimum, the Court compel the Government to give notice of exhibits or testimony that may involve tests not identified in the Bill of Particulars before their introduction.  *Id*. at 55.

The Government requests the Court reconsider its prior ruling because it excludes "too large of a swath of otherwise relevant evidence."  Govt. Resp. at 29.  The Government anticipates that based on the Holmes trial, evidence at Balwani's trial is likely to reference tests beyond those identified in the Amended Bill of Particulars[5] because Defendants and Theranos employees did not treat each assay on an individual basis.  Govt. Resp. at 28.  For example, the Government indicates that CMS inspector Sarah Bennett may testify that the issues CMS found and reported as a deficiency with respect to one assay were often present with respect to multiple assays beyond the one listed in the CMS Report.  *See, e.g.*, Volkar Decl., Ex. 6 at 4–7 ("There is a systemic issue of quality.  Across the board, not just with the Edison but also their other testing.").  As another example, the Government cites to internal Balwani text messages to Holmes describing problems with Theranos' CLIA lab.  Govt. Resp. at 29.

The Court is inclined to reconsider its prior ruling, but defer any rulings on specific evidence until trial.  The Court finds that evidence of "a systemic issue of quality" and Balwani's text messages describing problems with Theranos' CLIA lab are relevant.  The Ninth Circuit has

---

[5] On November 5, 2021, the Government served an Amended Bill of Particulars to add another blood test—"the CBC panel including each of its component assays"—to the list of assays.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE
20

observed that there is a low bar for relevancy under Federal Rule of Evidence 401. *See Sandoval v. Cty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021). Balwani counters that there is no need for the Court to reconsider the prior ruling because evidence on the accuracy and reliability of tests run on unmodified commercial machines goes beyond what is charged in the TSI. The Court already rejected this argument. *See supra* Section III.A. Balwani also argues that the evidence is prejudicial and will confuse the jury. However, the Court's reconsideration of the prior ruling does not mean the evidence is admissible, only that it may be admissible. The Court **DEFERS** ruling on the issue until trial. The Government shall provide notice of exhibits or testimony that may involve tests not identified in the Bill of Particulars prior to their introduction so that the parties and Court can address any issues, in the context of specific evidence, outside the presence of the jury.

### g. Evidence of Fault for the Loss of Theranos' LIS (Dkt. No. 561)

Theranos used a Laboratory Information System ("LIS") database to store patient results and quality control data. Holmes MIL Order at 56. While the Government sought and received a grand jury subpoena to access the database, the Government has been unable to review its copy of the LIS database because it was encrypted, and Theranos never provided the encryption key to the Government, rendering the LIS database copy inaccessible. Order Denying Mot. to Suppress ("Holmes Suppression Order"), Dkt. No. 887, at 6–7.

Holmes and the Government litigated the loss of the LIS extensively. While the Court did not conclusively determine who was at fault for its destruction in the Holmes MIL Order, the Government presented evidence that Theranos and its counsel at WilmerHale played a significant role in the Government's inability to access the data stored on the LIS. Holmes MIL Order at 56; *see also* Holmes Suppression Order at 4–7, 12, 14–16. Balwani re-raises arguments that the Government mishandled the collection of the LIS and suggests that certain testimony should be limited as a result. Citing the Holmes MIL Order, Balwani argues that, at minimum, evidence regarding fault for the loss of the LIS is not admissible. Balwani Mot. at 55. In the Holmes MIL Order, the Court held that (1) evidence about Theranos' destruction of the LIS is "not relevant

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

21

under Rules 401 and 404(b)," and (2) the defense could make arguments regarding the significance of the LIS data to the Government's case. Holmes MIL Order at 57–58. However, the Court deferred ruling on whether an argument at trial that "the LIS database is unavailable because of the Government's failure to obtain it" opened the door to the Government presenting evidence of Theranos' culpability in the loss of the LIS. *Id.*

The Court adopts those holdings in this case, with some clarification. The Court will allow Balwani to argue there is insufficient evidence or lack of proof. He may argue that individual patient or physician testimony is insignificant without broader comparative data. However, raising the unavailability of the LIS or implying fault or responsibility for its unavailability may lead to the admission of additional evidence, including evidence of the circumstances surrounding the dismantling of the LIS. This does not preclude Balwani from presenting the defense of his choosing. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000). Balwani may still present his defense, but it may open the door to the introduction of evidence regarding the circumstances, including fault, for the loss of the LIS. Because this issue depends on what arguments Balwani raises at trial, the Court **DEFERS** ruling.

### 2. Balwani's Request to Reconsider Rulings from Holmes' Trial

Balwani adopts and incorporates the arguments in the eleven Holmes motions discussed below, for which he offers no new arguments. Balwani Mot. at 48. The Government incorporates its prior oppositions and arguments on the associated issues. Govt. Resp. at 25. Further, the Government asserts that there is no basis for the Court to reconsider at this time its prior rulings on the eleven motions. *Id.*

#### a. Balwani Adopts Holmes' MIL to Exclude Anecdotal Evidence (Dkt. No. 563)

Holmes sought to exclude "anecdotal" patient or physician testimony about inaccurate test results under Federal Rules of Evidence 401-403. Dkt. No. 563. The Court held that "[e]vidence of even one inaccurate result tends to show that Theranos was producing inaccurate results, even if it does not fully prove the point," and accordingly denied the motion. Holmes MIL Order at 48–

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE
22

United States District Court
Northern District of California

49.

Because there has been no change in circumstance and the parties' arguments remain the same, the Court applies the ruling on Holmes' motion to Balwani's trial.

### b. Balwani Adopts Holmes' MIL to Exclude FDA Inspection Evidence (Dkt. No. 573)

Holmes moved to exclude "evidence of or reference to, [the FDA's] 2015 inspections of Theranos." Dkt. No. 573 at 1. Holmes' motion referred specifically to 27 exhibits that "relate to [the] FDA's inspections," and that were "identified by the Government . . . as proposed exhibits." *Id*. at 3. These exhibits ("the FDA inspection evidence") encompass the FDA's documented observations (Forms 483), internal emails among FDA agents, and records of communications between Holmes and Balwani made during and about the FDA inspection. *Id*. at 1–4. Holmes argued that "[t]hese documents should be excluded along with any corresponding testimony offered by the government." *Id*. at 3–4.

The Court found that evidence arising out of the FDA inspection of the Theranos lab in California was relevant to Holmes' state of mind, intent, and knowledge regarding the alleged misrepresentations about the accuracy and reliability of Theranos' blood tests. Holmes MIL Order at 11. The Court also held that two FDA inspection reports referred to as Form FDA-483s, were admissible under Federal Rule of Evidence 803(8)(A)(ii). *Id*. at 14. The Court deferred ruling on Holmes' motion, acknowledging the possibility for further side bar discussions on the matter, should Holmes wish to specify certain exhibits within this collection of evidence and make new arguments as to why these particular exhibits should still be excluded. *Id*. at 16. Holmes later moved to partially redact certain government agency reports, including Form FDA-483 for the Palo Alto facility and Form FDA-483 for the Newark facility. The Court provisionally approved Holmes' proposed redactions under the "Observation 1" heading of the Form FDA-483 for the Newark facility and denied the motion for partial redactions in all other respects. Order Re Pre-Trial Motions, Dkt. No. 989.

Balwani adopts Holmes' motion, as well as Holmes' proposed redactions to the two FDA

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

23

SER-172

forms and her supporting arguments.  Specifically, Balwani requests the same redactions under the "Observation 1" heading of the Form FDA-483 for the Newark facility if the Court admits it into evidence.

Because there has been no change in circumstance and the parties' arguments remain the same, the Court applies the ruling on Holmes' motion and the ruling on the redactions to the two FDA forms to Balwani's trial.

### c. Balwani Adopts Holmes' MIL to Exclude Evidence of Alleged Violations of Industry Standards and Regulations (Dkt. No. 569)

Holmes moved to exclude evidence regarding Theranos' purported "[v]iolations of industry standards and government regulations or rules regarding research and development procedures, medical devices and clinical laboratory practices."  Dkt. No. 569, at 1–2 (citing Dkt. No. 580 at 7).  Holmes argued that (1) the Government's evidence of alleged violations of industry standards and government regulations requires impermissible legal opinions and (2) alleged violations of industry standards and government regulations are irrelevant and prejudicial.  The Court denied Holmes' motion.  Holmes MIL Order at 72.  The Court held that the Government cannot offer evidence detailing violations of industry standards or government regulations solely to support an element of the charged offense, but that statements made to Holmes concerning perceived violations of industry standards and government regulations were admissible.  *Id*. at 72.  The Court also indicated that a curative instruction would be given to the jury stating that this evidence was offered only to show notice was given to Holmes and her state of mind.  *Id*.

Balwani adopts Holmes' motion and asks the Court to grant the motion in full.  Balwani also contends that the Court should at least limit the jury's consideration of this evidence to assessing notice to him and his state of mind.

Because there has been no change in circumstance and the parties' arguments remain the same, the Court applies the ruling on Holmes' motion to Balwani's trial.  The admissibility of the evidence at issue is subject to limitations such as relevancy and *Phillips v. United States*, 356 F.2d 297 (9th Cir. 1966), where the Ninth Circuit rejected a "constructive notice" theory imputing a co-

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

24

conspirator's actual notice of prospective or actual customer complaints against another co-conspirator.

### d. Balwani Adopts Holmes' MIL to Exclude Theranos' Customer Service Spreadsheets (Dkt. No. 570)

Holmes moved on hearsay, prejudice, and improper character evidence grounds to preclude the Government from introducing Theranos' customer-service spreadsheets, which purportedly contain summaries of various customer-service communications. Dkt. No. 570. The Court ruled that the Government could introduce the contents of the spreadsheets to show Holmes knew of customer complaints about accuracy and reliability. However, the Court deferred deciding whether the spreadsheets were admissible under the business records exception. Holmes MIL Order at 74. The Court also ruled that evidence of the specific details of the customer complaints that address Theranos' tests would consume excessive time, could confuse and mislead the jury, and prejudice Holmes. Accordingly, the Court allowed the Government to present evidence that customer complaints focusing on Theranos' tests exist, but precluded evidence of the specific details of the complaints. *Id*. The Court also agreed to give the jury a limiting instruction that such evidence is admissible only for the purpose of establishing Holmes' notice of those complaints and not to establish there were actual issues with Theranos' technology. *Id*. at 74–75.

Balwani adopts Holmes' motion. If the Court allows the Government to introduce portions of the spreadsheets to show notice, Balwani asks the Court to, at a minimum, adopt the ruling from Holmes' trial. Balwani also adopts the arguments in Holmes' Renewed Motion to Admit Certain Customer Feedback Reports (Dkt. 1140) as to specific customer feedback reports shared directly with him. Holmes argued that the customer feedback reports were relevant to four issues in the case: Holmes' alleged representation to investors that Theranos presently had an expanding partnership with Walgreens; the accuracy and reliability allegations; allegations concerning price and the role of price and the representations that Holmes allegedly made to customers; and Holmes' vision and understanding that the Theranos business was working. The Court observed that the customer comments were not about test results, but a host of other subjects such as

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

25

convenience, pricing, the Theranos app, and customer experiences at the Walgreens test site, including the facilities' cleanliness and waiting times. Tr. of Nov. 16, 2021 Trial Proceedings, Dkt. No. 1288, at 6330:8-17, 6344:18-25, 6345:22-25. A significant majority of comments were about pricing—customers were happy that they could find affordable testing. *Id.* at 6330:01–6331:23, 6344:20–6345:1. The Court concluded that the customer feedback reports were not relevant to the issues in the indictment and denied the motion orally. *Id.* at 6349:25–6351:13. Balwani argues that there is a "mismatch" between allowing the Government to present customer complaints for a defendant's state of mind but barring evidence of positive customer feedback for the same purpose. Balwani Mot. at 58.

Again, because there has been no change in circumstance and the parties' arguments remain the same, the Court applies the ruling on Holmes' motion to Balwani's trial. The admissibility of the evidence at issue is subject to limitations such as relevancy and *Phillips v. United States*, 356 F.2d 297 (9th Cir. 1966), ), where the Ninth Circuit rejected a "constructive notice" theory imputing a co-conspirator's actual notice of prospective or actual customer complaints against another co-conspirator. Balwani's "mismatch" argument is unpersuasive. For the reasons stated above, the customer feedback reports are not relevant to the issues in the indictment. Moreover, the minimal probative value the customer feedback reports may have is substantially outweighed by a danger of unfair prejudice and excessive consumption of time.

### e. Balwani Adopts Holmes' MIL to Exclude Bad Acts of Theranos Agents and Employees (Dkt. No. 565)

Balwani also adopts Holmes' Motion to Exclude Alleged Bad Acts and False or Misleading Statements of Theranos Agents and Employees (Dkt. No. 565), including related memoranda points and authorities, and any declarations, attachments, or other supporting evidence. Holmes provided examples of anticipated evidence and arguments regarding Theranos agents and employees that she contended the Government had not connected to any knowledge or conduct on her part. The Court deferred ruling on Holmes' motion, noting that it was incumbent upon the Government to come forward with proof of a sufficient connection between Holmes and

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

26

United States District Court
Northern District of California

Case 5:18-cr-00258-EJD   Document 1326   Filed 02/28/22   Page 27 of 51

each "bad act" so that the Court may assess the relevance and potential prejudice of each bad act. Holmes MIL Order at 63–64.  The Court also noted that Federal Rule of Evidence 104(c)(3) requires a hearing out of the presence of the jury to consider whether the Government has presented sufficient evidence of a connection to justify admissibility of any particular bad act, to avoid Rule 403 issues.  Fed. R. Evid. 104(c)(3) ("The court must conduct any hearing on a preliminary question so that the jury cannot hear it if . . . (3) justice so requires.").  Balwani maintains that the evidence identified in Holmes' motion should be excluded, but asks at a minimum for the Court's ruling to apply to his trial.

Once again, because there has been no change in circumstance and the parties' arguments remain the same, the Court applies the ruling on Holmes' motion to Balwani's trial.[6]  The Court will **DEFER** ruling on the admissibility of any particular bad act pending the Government's establishment of the necessary foundation for the evidence it seeks to introduce.

### f.   Balwani Adopts Holmes' MIL to Exclude Evidence of Civil or Regulatory Settlements (Dkt.  No. 571)

Holmes moved to exclude evidence regarding civil or regulatory settlements Theranos, Holmes, or Balwani entered into, including evidence regarding the negotiation of those settlements and any evidence pertaining to Theranos' ongoing civil litigation.  Dkt. No. 571.  The Court deferred ruling on Holmes' Motion, noting that the evidence could be used for certain purposes under Federal Rule of Evidence 408 and further, that the evidence could be used for impeachment purposes.  Holmes MIL Order at 44–47.

Balwani adopts Holmes' motion and maintains that evidence of civil or regulatory settlement should be excluded outright.  However, he acknowledges the Court's prior ruling and asks the Court to adopt, at a minimum, the same approach for his trial.

---

[6] At February 4, 2022 hearing, Balwani's counsel argued that certain actions taken by David Boies (or at his direction) should be excluded.  The parties did not raise this issue in their briefs and the Court therefore does not consider it here.  Balwani is free to raise an objection to the evidence at the appropriate time during trial.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

27

Case 5:18-cr-00258-EJD   Document 1326   Filed 02/28/22   Page 28 of 51

Once again, there has been no change in circumstance and the parties' arguments remain the same.  Accordingly, the Court applies the ruling on Holmes' motion to Balwani's trial.

### g.  Balwani Adopts Holmes' MIL to Exclude Evidence on Interactions with Regulatory Agencies (Dkt. No. 575)

Holmes moved to exclude certain evidence relating to Theranos' interactions with government regulatory agencies under Federal Rules of Evidence 401–403 and 801–803.  Dkt. No. 575.  The Court declined to issue a broad exclusion of evidence relating to unidentified regulatory agencies.  Holmes MIL Order at 30.  Instead, the Court directed the Government to provide notice before seeking to introduce evidence not yet disclosed and to include its reasons for late disclosure.  *Id*.

Balwani adopts Holmes' motion and "reserves the right, as afforded to Ms. Holmes, to raise 'further discussions on these matters, should the parties wish to specify certain exhibits . . . and offer new arguments as to why those particular exhibits should still be excluded.'" Balwani Mot. at 60 (quoting Holmes MIL Order at 30).

Again, there has been no change in circumstance and the parties' arguments remain the same.  Accordingly, the Court applies the ruling on Holmes' motion to Balwani's trial.

### h.  Balwani Adopts Holmes' MIL to Exclude Evidence of Trade Secrets Practices (Dkt. No. 566)

Holmes moved to exclude evidence of Theranos' trade secret practices under Federal Rules of Evidence 401–404.  Dkt. No. 566.  The motion primarily concerned three categories of evidence relating to Holmes playing a role in: (1) fostering a culture of secrecy and forcing employees and others to sign non-disclosure agreements; (2) restricting access to laboratory areas within Theranos; and (3) threatening or intimidating employees or former employees (collectively, "trade secret practices").  The Court denied the motion and indicated that Holmes may raise pertinent objections at trial if the Government failed to establish a sufficient connection between Holmes and Theranos' trade secrets practices.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

28

United States District Court
Northern District of California

**SER-177**

Balwani adopts Holmes' motion.  Balwani Mot. at 60.  Recognizing that the Court denied the Motion, he asks the Court to at least acknowledge that it is "incumbent upon the Government to come forward with a sufficient connection between [Mr. Balwani] and Theranos' implementation of particular trade secrets practices, including threatening and intimidating employees or former employees of the company." *Id.*  Balwani argues that without this foundation, evidence of the Theranos' trade secret practices should be excluded.

There has been no change in circumstance and the parties' arguments remain the same.  Accordingly, the Court applies the ruling on Holmes' motion to Balwani's trial.

### i.   Balwani Adopts Holmes' MIL to Exclude Evidence on Third-Party Testing Platforms (Dkt. No. 576)

Holmes moved to exclude evidence and argument that Theranos "tampered with" and "concealed" commercially available third-party diagnostic testing platforms.  Dkt. No. 576.  The Court granted in part and denied in part Holmes' motion.  Holmes MIL Order at 67–68.  The Court ruled that the Government may introduce evidence related to the modifications or the tests run on third-party platforms, but was precluded from framing its evidence and argument in a way to suggest the third-party platforms were "tampered" with until and unless that has been proven by appropriate evidence.  *Id.* at 67.  The Court also ruled that the Government may introduce evidence relating to what was or was not "concealed" or shared with manufacturers of the third-party testing platforms.  *Id*. at 67–68.

There has been no change in circumstance and the parties' arguments remain the same.  Accordingly, the Court applies the ruling on Holmes' motion to Balwani's trial.

### j.   Balwani Adopts Holmes' MIL to Exclude Rule 404(b) Evidence for Lack of Expert Support

Holmes moved to exclude certain Rule 404(b) evidence.  Dkt. No. 564.  Specifically, Holmes sought to exclude three subcategories of evidence disclosed in the Government's Rule 404(b) notice dealing with aspects of Theranos' laboratory practices: (1) multiplexing test results and disregarding outliers to mask inconsistency; (2) improperly setting and altering reference

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

29

ranges; and (3) withholding important information from doctors and patients.  The Court found that the majority of evidence at issue was fact evidence not necessitating evaluation under Rule 404(b); that the evidence did not require an expert opinion to be introduced at trial; and that a blanket exclusion of evidence was not warranted.  Holmes MIL Order at 76–78.

Balwani adopts Holmes' motion, acknowledging that the Court denied Holmes' motion. Because there has been no change in circumstance and the parties' arguments remain the same, the Court applies the ruling on Holmes' motion to Balwani's trial.

> **k.   Balwani Adopts Holmes' MIL to Exclude Expert Testimony of Dr. Stephen Master**

Holmes previously moved to exclude the opinion testimony of the Government's expert witness, Dr. Stephen Master, under Federal Rules of Evidence 401-403 and 702.  Dkt. No. 560. The Court denied in part and deferred in part Holmes' motion.  Dkt. No. 797.  Specifically, the Court declined to exclude Dr. Master's opinions regarding industry standards and the Vitamin D assay, and deferred ruling on the balance of the motion to exclude pending a *Daubert* hearing.

Balwani adopts Holmes' motion to exclude and "requests at least that same relief if the government intends to call Dr. Master at his trial."  Balwani Mot. at 61–62.  The Government incorporates its previous arguments and filings on the motion.  Govt. Resp. at 25.  Because there has been no change in circumstance and the parties' arguments remain the same, the Court applies the same ruling to Balwani's motion.  Dkt. No. 797.

Accordingly, the Court adopts its prior ruling and **DENIES** the motion to exclude Dr. Master's opinions regarding industry standards and the Vitamin D assay.  The Court will **DEFER** ruling on the balance of Balwani's motion to exclude pending a *Daubert* hearing.  The Government shall determine Dr. Master's availability for a *Daubert* hearing, meet and confer with Balwani's counsel regarding scheduling, and shall notify the deputy clerk of the parties' proposed schedule for a *Daubert* hearing.

> **3.   Balwani Adopts Holmes' Motion to Suppress**

Holmes previously moved to suppress evidence of customer complaints and testing results,

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

30

United States District Court
Northern District of California

as well as the CMS Report based on the balancing test described in *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) and *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc). Dkt. No. 810. She argued that the Government should not be permitted to use this evidence as "evidence of fraud" after it failed to gather and preserve the LIS database. Holmes also requested an evidentiary hearing and further production from the Government.

The Court denied Holmes' motion to suppress, holding that the exculpatory value of the LIS database was speculative. Holmes Suppression Order. The Court determined that the Government never had true possession of a working copy of the LIS database and played no part in the decommissioning and dismantling of the original database equipment that resulted in the permanent loss of the necessary encryption key. Accordingly, the Court found no bad faith on the part of the Government and no due process violation. Because the Government never actually possessed an accessible working copy of the LIS database, and because the Government did not cause the destruction or loss of the LIS, the Court did not engage in the three-factor analysis under *Arizona v. Youngblood*, 488 U.S. 51 (1988), or reach the question of whether other sanctions are warranted under the *Loud Hawk* balancing test.

Balwani adopts Holmes' unsuccessful motion to suppress. Balwani Mot. at 62–63. He argues that the Court should now come to a different conclusion based on the opinion of Richard L. Sonnier III, Balwani's Microsoft SQL expert witness. Balwani asserts that the Court's previous ruling relied on inaccurate information from the Government. Specifically, according to Mr. Sonnier: no private encryption key was necessary for the Government to access the LIS database; the Government would not have needed such a key if it had obtained the original LIS equipment; and disassembling the LIS in August 2018 did not destroy the LIS database. *Id.* at 62 (citing Sonnier Decl. ¶¶ 10-13). He opines that the Government could have either obtained the LIS database equipment or the disk drives for the LIS. *Id.* ¶ 4.

This new evidence does not alter the Court's original analysis. First, as to the threshold question of whether the LIS database contained exculpatory evidence, Balwani offers no new evidence or arguments. He simply assumes that the evidence is exculpatory. At the hearing, he

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE
31

described other exculpatory evidence demonstrating that Theranos did provide accurate and reliable test results, and then went on to conclude that the LIS database must therefore contain "millions of exculpatory results." Tr. of Feb. 8, 2022 Proceedings at 47:5–50:10. The LIS database could contain millions of exculpatory results, but as the Court explained in its previous order, it is equally likely that it also contain millions of *inculpatory* results. The exculpatory value of the LIS database was and remains speculative.

As to the question of whether the Government's conduct constituted bad faith, Balwani takes no issue with the Court's prior ruling concerning events up to August 31, 2018, but instead focuses on the Government's actions after that date. Specifically, he points to a Government Automated Litigation Specialist ("ALS") Supervisor who suggested obtaining the original LIS database hardware, arguing that the Government ignored the advice of "its own expert." *Id.* at 33:14–43:19. Balwani contends that suppression is warranted because the Government did not attempt to obtain the original LIS hardware despite its own employee's suggestion.

This argument is unpersuasive for multiple reasons. First, while the ALS Supervisor did suggest obtaining the original LIS hardware, that was only one proposal among several: (1) asking Theranos for a production that could be viewed and processed in a standard way; (2) "encouraging [Theranos] to consider handing over its physical SQL server and setting it up in a workroom"; (3) checking with the FBI or other government agencies to see if they would be able to process large SQL database archives; and (4) identifying a vendor who could process the copy of the LIS database (which could be cost-prohibitive). Sonnier Decl., Ex. C ("*Brady* Ltr.") ¶ 46. The Government apparently elected to pursue the first and third options, albeit unsuccessfully. *Id.*, Ex. C ¶ 48. The Court cannot say that the Government's choice was made in bad faith, particularly when ubsequent interviews with persons possessing direct, personal knowledge of the LIS revealed that attempting to reconstruct the system using the original equipment would not have been feasible post-decommission. *See, e.g.*, *id.*, Ex. H at US-REPORTS-000016264 ("[O]nce the servers were turned off, then a forensic team would be needed to recover the data on the LIS, but nobody on [Theranos' IT consultant's] team knew how to do this or if it would even be possible. .

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

32

**SER-181**

United States District Court
Northern District of California

. . Moving hundreds of devices with thousands of connections would be nearly impossible, which is why the percent chance of getting everything back up and running was so low. They discussed trying to move the LIS without taking it apart, but that was not possible. Additionally, a lot of the connectivity was virtual, located in the software. . . . T]he LIS would be lost once they moved it."); *id.*, Ex. J at TheranosABC00039050 ("*As long as the physical servers stay intact*, the data on them is preserved, and can be accessed by someone with the proper password." (emphasis added)); *id.*, Ex. M at US-REPORTS-0025154 ("[T]he LIS database was a bespoke database developed by a group of software engineers who no longer worked at Theranos and they would be needed in order to help move the database."); *id.*, Ex. M at US-REPORTS-0025157 ("MCCHESNEY took the hard drives out of the servers to save them and took them to a different storage unit. . . . However, once the hard drives were taken out of the servers, if they were not tracked as to where they came from, it would have been impossible to put them back together. Even if the hard drives were all labeled correctly, it would have been extremely difficult to reconstruct the database because in addition to the servers there are also hundreds of network devices which would have to be connected correctly. Accordingly, retaining these hard drives would not necessarily have meant the data on them had been retained."); *id.*, Ex. N at US-REPORTS-0019325 ("The LIS was on completely different infrastructure consisting of hundreds of servers. Since [Theranos' IT consultant] did not know the system inside and out, the way they would know a Microsoft and VMware system, there was no way to be able to move it since it was a customized system."); *id.*, Ex. M at US-REPORTS-0019325–26 ("If one had the data and knew how to understand it and query the data then simply having the database might be enough. However, if you want the application to be usable again by people you will have to reconstruct the whole application [to] restore it. CHUNG did not think [it would] have been possible to get the LIS database to work again after it was taken apart, and thought he had told people that it could not be reconstructed as there were a lot of conversations about feasibility. . . . [O]nce you take the hard drive out of the system it would be almost impossible to get it working again."); *id.*, Ex. N at US-REPORTS-0019329 ("The four things necessary to try to rebuild the LIS database would have been the

United States District Court
Northern District of California

Case 5:18-cr-00258-EJD   Document 1326   Filed 02/28/22   Page 34 of 51

encryption keys, binary, database, and the build production documents. It would have been a gargantuan effort to rebuild this system from scratch. However, they would need the encryption key, so it would be impossible to rebuild it without this, and they did not have it. Even if they had everything [including] the encryption key it would take a team of engineers and project managers to put the LIS database back together."). Mr. Sonnier's declaration does not address these statements.

Second, Holmes made a similar argument concerning the Government's post-August 31, 2018 actions or lack thereof. Holmes Suppression Order at 13–14. The Court ultimately found that the Government's post-August 31, 2018 conduct to be irrelevant because the encryption key necessary to decrypt the LIS database or its copy was lost when the equipment was dismantled, destroying the disk array. *Id.* Balwani offers Mr. Sonnier's opinion that this was not actually the case.

The Court has reviewed Mr. Sonnier's declaration and finds it unconvincing in this regard. While the Court does not doubt Mr. Sonnier's qualifications as an expert, his opinion appears to be based solely on his review of a selection of documents produced in discovery. Although it was not possible for Mr. Sonnier to personally examine the LIS, he appears not to have spoken with any Theranos employees/agents with personal knowledge of the LIS to confirm his understanding of how it was set up or functioned. *See* Sonnier Decl. ¶ 4. As the Government noted, the LIS was a bespoke database system. *See, e.g.*, *id.*, Ex. N at US-REPORTS-0019325. Thus, while Mr. Sonnier may have an excellent understanding of SQL databases in general, it is not clear that he has an equally excellent understanding of the LIS's unique features.

Furthermore, Mr. Sonnier's opinion is inconsistent with the documentary evidence and statements from Theranos employees/agents that the Court previously considered. Mr. Sonnier opines that the encryption key was only necessary for the copy of the LIS database that the Government received from Theranos, and that no key was necessary for the original LIS database. *Id.* ¶ 11 ("[T]his password for the private encryption key would have been necessary only for accessing data from the LIS database backup that Theranos produced to the government in August

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE
34

2018.  The missing password for the private encryption key **would not** have been necessary had the government obtained possession of the equipment running the LIS database either before or after August 31, 2018.  Unlike with the LIS database backup produced by Theranos, possessing this equipment would have allowed access without any password for the private encryption key." (emphasis original)).  But multiple Theranos employees/agents with actual knowledge and experience with the LIS very unambiguously stated otherwise.  *See, e.g.*, *id.*, Ex. E at US-REPORTS-0016252 ("The LIS was a completely separate network which was connected to the Internet, but encrypted by a software based encryption key."); *id.*, Ex. G at US-REPORTS-0019712–13 ("CADDENHEAD never had access to the information on the LIS database because this information was encrypted and he did not have the encryption key. . . . CADDENHEAD could copy the LIS database without the private key needed to access the data in the database. . . . MCCHESNEY wanted the whole package which would include the copy and the password so they could decrypt the database. . . . CADDENHEAD advised that without the private encryption key one would not be able to get into the documents."); *id.*, Ex. J at TheranosABC00039050 ("As long as the physical servers stay intact, the data on them is preserved, and can be accessed by someone with the proper password."); *id.*, Ex. G at US-REPORTS-0019713 ("CADDENHEAD only cared about where the LIS database was so that he could copy the files onto the hard drives. One could only decrypt the database with the master key, but once RMS was shutdown they would not be able to decrypt the database."); *id.*, Ex. G at US-REPORTS-0019714 ("CHANDRASEKARAN's group [was] responsible for the software portion of the LIS database and should have had all the encryption keys for the database."); *id.*, Ex. M at US-REPORTS-0019326 ("In SQL server technology in regards to encryption, just because you have made a backup you can put a password on the backup and restore the data with the password you specified, but that does not mean you know the password on the database."); *id.*, Ex. M at US-REPORTS-0019327 ("CHUNG reminded MCCHESNEY that just because they made a backup of the database that does not mean that they would be able to look at this data because there was still an encryption key that they did not know.  Accordingly, it did not matter how many copies they

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

35

made, because they would not be able to restore the data without a key."); *id.*, Ex. M at US-REPORTS-0019329 ("The four things necessary to try to rebuild the LIS database would have been the encryption keys, binary, database, and the build production documents. It would have been a gargantuan effort to rebuild this system from scratch. However, they would need the encryption key, so it would be impossible to rebuild it without this, and they did not have it."); *Brady* Ltr. ¶¶ 48, 50 (stating that assignee counsel informed the Government that the LIS database was encrypted, that the assignee did not have the means to decrypt it, that Balwani would likely be able to decrypt the database, and that Balwani and Sekhar Chandrasekaran were responsible for encrypting the LIS database); Dkt. No. 681-34 at TheranosABC00042262 ("The password for restoring the private key should be in a document that Antti had in his possession . . . ."); Dkt. No. 681-36 at 3 (Sept. 28, 2020 expert witness report of Bruce W. Pixley differentiating between the Veracrypt whole-disk encryption of the hard drive containing the LIS database copy and the second separate encryption of the SQL backup files themselves). While the Government agents and attorneys might not have fully understood the LIS, Mr. Sonnier's conclusion that relevant Theranos employees/agents that created and used the system also did not understand it is not well-founded. Sonnier Decl. ¶ 9.

Finally, as discussed in the Court's previous order denying the motion to suppress, "if [Theranos] took the LIS apart they would not be able to access it again because then the encryption key would be lost. The encryption key was located on a disk array which had a lot of pieces and when they took the disk array apart it would have destroyed the encryption key." *Id.*, Ex. E at US-REPORTS-0016253; *see also id.*, Ex. H at US-REPORTS-0016264 (noting that "there was no way of recovering the data from" the LIS hard drives). The disk array was destroyed when the LIS equipment was dismantled and removed. *Id.* Mr. Sonnier acknowledges this statement but does not address the physical destruction of the disk array resulting in loss of the encryption key. *See id.* ¶¶ 9-11. He describes other methods of encrypting the LIS database but does not explain the relation—if any—to the disk array or otherwise rebut the facts the Government has put forward. In the end, whether the Government had retrieved the original LIS

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

36

hardware is irrelevant because the encryption key was permanently lost with the dismantling of the disk array.  Balwani offers nothing to refute that specific fact.

Ultimately, Mr. Sonnier's opinion does not change any of the numerous facts recited above, or at least he does not provide sufficient information to suggest that the factual situation is materially different from what the Court previously understood it to be.  At worst, the Government was negligent in the route it chose to take, but negligence is insufficient under the law for the relief Balwani seeks.  *Flyer*, 633 F.3d at 916 (citing *Youngblood*, 488 U.S. at 58).  The Court finds that Balwani has provided no additional evidence or arguments that would warrant departing from its earlier ruling denying the motion to suppress, the request for an evidentiary hearing, and further production.

Accordingly, for the reasons stated above and in the Court's previous order denying Holmes' motion to suppress, the Court **DENIES** Balwani's motion to suppress.  During the hearing, defense counsel proposed a jury instruction on this issue.  The Court will consider the proposed instruction and all other instructions at the charging conference.

## IV.    GOVERNMENT'S MOTIONS IN LIMINE AND RELATED DEFENSE MOTIONS

### A.    Government's MIL No. 1 to Preclude Defendant from Offering an Improper Defense of Blaming Her Victims and Selective Prosecution

The Government previously moved to preclude Holmes from blaming victims for failing to exercise greater diligence in their dealings with Theranos and to introduce a related defense regarding the Government's selective prosecution of Holmes and Theranos amongst a range of similar abuses perpetuated by other Silicon Valley startups.  Holmes MIL Order at 80.  The Government now requests that the Court adopt its prior ruling in the Holmes MIL Order as to both defenses.  Govt. Mot. at 1–3.  Balwani does not object to the Government's request for the same ruling as to the selective prosecution defense, but he argues that precluding him from victim-blaming is unnecessary because he does not intend to argue that victims were at fault.  Balwani Resp. at 1–2.  Balwani notes that the Government did not object to lines of examination during the Holmes trial and only raised the issue after, and he says that he must be able to question victims

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE
37

concerning materiality. *Id.*

Because there has been no change in circumstance and the parties do not raise any new arguments, the Court adopts its prior ruling. Holmes MIL Order at 80–83. Accordingly, the Court **GRANTS** the Government's motion to the extent Balwani attempts to utilize victim blaming as a defense. As to the selective prosecution issue, the Court understands that Balwani does not intend to introduce a selective prosecution defense, and the Court takes him at his word. The Court recognizes that evidence in this case will undoubtably touch on the nature of startup companies, including financing, funding, industry protocols, and other issues common to the technology industry in Silicon Valley. The Court will permit general fair comment on the marketing of new ventures, including statements concerning investment and the nature of the firm, product, or technology.

**B.**   **Government's MIL No. 2 to Preclude the Defense from Referencing Punishment in Front of The Jury**

The Government previously moved to preclude Holmes from referencing punishment in front of the jury. Holmes MIL Order at 83–84. The Government now requests that the Court adopt its prior ruling in the Holmes MIL Order. Govt. Mot. at 3–4. Balwani represents that he will not make any overt references to punishment before the jury, and he concurs in requesting the same ruling the Court made before. Balwani Resp. at 2.

Accordingly, the Court adopts its prior ruling and **GRANTS** the motion to preclude the defense from referencing punishment in front of the jury.

**C.**   **Government's MIL No. 3 to Preclude an Improper Advice-Of-Counsel Defense**

The Government previously moved to preclude Holmes from asserting "an improper advice-of-counsel defense"—specifically, to preclude (1) testimony suggesting that attorneys made statements to Holmes or that she relied upon such statements to negate intent, and (2) a formal advice-of-counsel defense and the associated jury instruction. Holmes MIL Order at 84–86. The Government now requests that the Court adopt its prior ruling in the Holmes MIL Order. Govt. Mot. at 4–5. Balwani does not object to the Court adopting its prior ruling. Balwani Resp.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

38

**SER-187**

at 2–3.

Accordingly, the Court adopts its prior ruling and **DEFERS** ruling on the motion as premature at this time.  Prior to invoking an advice-of-counsel defense, Balwani must establish the foundational prerequisites for the advice-of-counsel defense, namely: (1) waiver of the applicable attorney-client privilege, (2) demonstrating that there was a full disclosure to his attorney of all material facts, (3) and that he relied in good faith on the specific course of conduct the attorney recommended.

**D.     Government's MIL No. 4 to Preclude a Defense Argument That the Government's Charging Decisions Were Influenced by Coordination with Journalists or Competitors**

The Government previously moved to preclude Holmes from arguing that its charging decisions were influenced by "coordination" with journalists or competitors.  Holmes MIL Order at 86–88.  The Government now requests that the Court adopt its prior ruling in the Holmes MIL Order.  Govt. Mot. at 5.  Balwani does not object to the Court adopting its prior ruling.  Balwani Resp. at 3.

Accordingly, the Court adopts its prior ruling and **GRANTS** the motion to exclude the defense's argument that the charging decisions were influenced by "coordination" with journalists or competitors.  Nothing in this Order is intended to preclude Balwani from presenting evidence or argument regarding the details, thoroughness, or good faith of the criminal investigation.

**E.     Government's MIL No. 5 to Preclude Defendant from Presenting an Improper Good Faith Defense**

The Government previously moved to preclude Holmes from "presenting an improper good faith defense" that she intended to make victims' investments profitable or repay them, such that they would suffer no loss in the end.  Holmes MIL Order at 88–90.  The Government now requests that the Court adopt its prior ruling in the Holmes MIL Order.  Govt. Mot. at 5–6.  Balwani does not object to the Court adopting its prior ruling, but argues that that ruling should not be extended to preclude him from offering a defense concerning his good faith belief in the "legitimacy, value, and prospects of Theranos."  Balwani Resp. at 3–4.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

39

United States District Court
Northern District of California

Accordingly, the Court adopts its prior ruling and **GRANTS** the motion to preclude Balwani from presenting an improper good faith defense outside of Ninth Circuit precedent. Specifically, the Court precludes the argument that Balwani knowingly made misrepresentations but had a good-faith belief that his alleged victims would be repaid or otherwise suffer no harm.

### F.   Government's MIL No. 6 to Preclude Defendant from Offering Evidence of Actions Taken by Theranos After Defendant Left the Company

The Government moves under Federal Rules of Evidence 401 and 403 to preclude any reference to actions Theranos took after Balwani left the company in July 2016. The Government argues that actions the company took after Balwani departed are irrelevant and risk confusing the jury. However, the Government notes that post-employment evidence would be relevant if Balwani can demonstrate a "non-speculative connection between those actions and directives made by [Balwani]." Govt.'s Mot. at 6–7. In the alternative, the Government urges the Court to exclude post-employment evidence because the risk of jury confusion outweighs its probative value.

Balwani does not dispute that actions taken by Theranos or Theranos executives after his departure "must be tied in some way to him before they are relevant." Balwani Resp. at 5. Instead, he argues that post-employment evidence may be relevant if it bears on events that occurred while he worked at Theranos. The Parties thus appear to agree that post-employment evidence is only relevant if it relates to Balwani's conduct while at Theranos. It is premature to say that Balwani will be unable to demonstrate a nexus between his time at Theranos and post-employment evidence. It is also premature to say that the evidence, which has not yet been presented or identified, is unduly prejudicial. Accordingly, the Court **DEFERS** ruling on the admissibility of post-employment evidence until Balwani makes a proffer of evidence regarding actions Theranos took after July 2016.

### G.   Government's MIL No. 7 to Admit Trial Exhibit 4621 (CMS Letter and The Accompanying January 26, 2016 Form CMS-2567, Statement Of Deficiencies)

This Court previously found admissible the CMS Report, as captured in Trial Exhibit 4621. *See* Holmes MIL Order at 16–20. In the prior trial, the Government moved *in limine* to

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

40

seek admission of the CMS Report, and Holmes moved *in limine* for a blanket exclusion of the CMS Report.  This Court denied Holmes' motion and granted the Government's motion, finding the CMS survey findings and sanctions relevant, "more probative then prejudicial," and excepted from the rule against hearsay under Federal Rule of Evidence 803(8)(A)(ii).  Holmes MIL Order at 18–20.

As in the Holmes trial, the Government moves to include the CMS Report and argues that the CMS findings are relevant to show Balwani's state of mind, intent, and knowledge regarding the alleged misrepresentations about the accuracy and reliability of Theranos' blood tests.  Govt. Mot. at 10.  The Government also contends that the CMS findings are relevant evidence that Theranos, despite representations to the contrary, was not a "new standard in quality" with the "highest levels of accuracy" because it was not capable of consistently producing accurate and reliable blood test results, and that Theranos' proprietary blood analyzer had accuracy and reliability problems, as alleged in the TSI.  *Id.* at 10.  The Government further argues that the CMS Report can be admitted for its truth under Rule 803(8)(A)(ii).

Balwani opposes the Government's motion to admit the full CMS Report on the same grounds as Holmes, namely that the CMS Report is irrelevant, unduly prejudicial, and hearsay.  *See* Balwani Resp. at 6.  The Court disagrees.  As explained in the Holmes MIL Order and this Order, the CMS Report is relevant and probative, and is not unduly prejudicial.  *See* Holmes MIL Order at 16–20.  Additionally, the CMS Report is excepted from the rule against hearsay by Rule 803(8)(A)(ii).[7]  *See id.* at 13–16, 20.

Balwani argues that if the CMS Report is admitted, it should be subject to the same redactions as in the Holmes trial because it contains information about non-relevant regulatory compliance issues, such as Theranos' non-compliance with regulations about laboratory practices, documentation and training issues, and laboratory management issues.  *See id.* at 6–7.  Balwani

---

[7] As in the Holmes MIL Order, the Court defers ruling on whether portions of the Report are non-hearsay under Federal Rule of Evidence 801(d)(2)(D) until the Government establishes the necessary foundation for the evidence it seeks to introduce.  *See* Holmes MIL Order at 97.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE
41

contends that these portions of the CMS Report are not relevant because they do not go to the allegations at issue, namely that Theranos could not consistently produce accurate and reliable results. He next argues that the CMS Report's "immediate jeopardy" finding is irrelevant to anything alleged in the TSI because the finding turned on tests run on unmodified commercial devices, not Theranos' own technology. *See id.* at 7; *see also supra* Section III.A. Finally, Balwani argues that the Report is not relevant for state of mind purposes because the CMS Report was issued long after he made the alleged misrepresentations regarding Theranos' technology. *See* Balwani Resp. at 7.

The Court disagrees with Balwani's arguments in opposition. First, neither the Government nor Balwani are bound by the trial strategy decisions Holmes made in her trial. *See United States v. Guy*, 903 F.2d 1240, 1242 (9th Cir. 1990) (holding "law of the case" does not apply to severed co-defendants but reaching the same well-reasoned result as a prior panel). Indeed, there are important differences between the co-defendants. Balwani ran Theranos' Newark clinical laboratory and was thus closer to the issues raised in the CMS Report. However, the Court finds it more appropriate to handle objections to specific portions of the CMS Report during the trial. Second, as the Court explains below, Balwani is relying on an overly narrow and hyper-technical reading of the charges against him. The TSI charges Holmes and Balwani with a scheme to defraud patients that goes beyond the abilities of just "Theranos devices." As alleged in the TSI, Holmes and Balwani engaged in a scheme to defraud patients who came to Theranos for blood testing services by representing to those patients that "*Theranos* could provide accurate, fast, reliable, and cheap blood tests and test results," despite knowing that Theranos was not capable of consistently producing accurate and reliable results for certain blood tests." TSI ¶¶ 16-17 (emphasis added). The portions of the CMS Report that discuss accuracy and reliability problems with Theranos blood tests run on unmodified, third-party devices are thus relevant to the alleged scheme to defraud patients. Finally, the Court continues to find the CMS Report relevant for state of mind, intent, and knowledge purposes. While Theranos received the CMS Report in January 2016, CMS inspectors told Balwani about the key findings after the CMS inspection in

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

42

United States District Court
Northern District of California

Case 5:18-cr-00258-EJD   Document 1326   Filed 02/28/22   Page 43 of 51

the fall of 2015, well before he left the company.  The CMS findings are therefore relevant evidence of Balwani's state of mind and knowledge.

For these reasons, the Court **GRANTS** the Government's motion to admit the CMS Report.

**H.      Government's MIL No. 8 to Admit Text Messages Between Holmes and Balwani Offered by The Government**

The Government previously sought to admit portions of certain text messages between Holmes and Balwani obtained through SEC and grand jury subpoenas.  Holmes MIL Order at 90–94.  The Government now requests that the Court adopt its prior rulings in the Holmes MIL Order and during the Holmes trial that excerpts of texts between Holmes and Balwani are relevant, non-hearsay, and authentic.  Govt. Mot. at 12–14.  Specifically, the Government seeks to admit—as relevant, non-hearsay, and authentic—Trial Exhibit 5387A or, alternatively, Trial Exhibit 5387D (consisting of Trial Exhibit 5387A and Holmes' additions under Federal Rule of Evidence 106). *Id.* at 12.

Balwani does not challenge the texts in Trial Exhibit 5387A as to authenticity, thus the Court will not adopt its prior ruling denying the Government's motion without prejudice based on authenticity.  Holmes MIL Order at 93–94; Tr. of Feb. 4, 2022 Proceedings at 137:20-21, 138:23-24 ("MS. WALSH: . . . We are not going to be objecting to the texts based on authenticity. . . . We're not going to object on authenticity, or we don't anticipate doing that.").  Nor did Balwani raise any hearsay objections in his moving papers or at the hearing. *See id.* at 132:25–138:25; Balwani Resp. at 8–9.  However, he raises multiple other objections to the Government's request.

First, Balwani argues that the Government has not laid the requisite foundation for all of the texts contained in Trial Exhibit 5387A and therefore a blanket order admitting the entire exhibit is inappropriate.  Balwani Resp. at 8–9.  He contends that texts are irrelevant unless the Government can tie them to the capability of Theranos' technology to consistently produce accurate and reliable results "or to some other issue relevant in the case." *Id.* at 8.  The Court agrees that a blanket admission is not appropriate at this time, particularly since its previous ruling

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

43

in the Holmes MIL Order concerned not the entirety of Trial Exhibit 5387A, but rather six specific excerpts, which the Court found relevant to the key events in this case or Holmes' knowledge. Holmes MIL Order at 91–92. The Court adopts the portion of the Holmes MIL Order concerning the relevance of those six excerpts.

Balwani rejects the Government's alternative proposal of Trial Exhibit 5387D, consisting of Holmes' Rule 106 additions. Instead, he proposes his own Rule 106 additions in proposed Trial Exhibit 5387H. At the February 4, 2022 hearing, the parties agreed to meet and confer further concerning those proposed additions. Tr. of Feb. 4, 2022 Proceedings at 134:14–135:8. The Court **DEFERS** ruling on Balwani's Rule 106 objections at this time pending further discussions between the parties.

Balwani further objects to three specific excerpts from Trial Exhibit 5387A under Rules 401, 403, and 404. Balwani Resp. at 8 (referring to highlighted portions in Coopersmith Resp. Decl., Ex. 49). The Court addresses each in turn.

### 1. Women above 40

The first excerpt Balwani finds objectionable concerns his views on women over the age of 40. Coopersmith Resp. Decl., Ex. 49 at PRH_0000016. At the hearing, the Government represented that it did not intend to seek admission of this text at this time, but it reserved the possibility depending on Balwani's opening or other arguments. Tr. of Feb. 4, 2022 Proceedings at 133:15-22; *see also* Gov't Reply at 7 (withdrawing request as to the "women above 40" text). Accordingly, the Court **DENIES** the Government's motion to admit this text without prejudice to renewal should other evidence introduced at trial shed light on the text's relevance.

### 2. John Carreyrou's heritage

The second excerpt Balwani finds objectionable is an exchange concerning Wall Street Journal reporter John Carreyrou's French heritage. Coopersmith Resp. Decl., Ex. 49 at PHR_0000195. The Government asserts that this excerpt is relevant to the charged schemes and is intertwined with the charged conduct because it occurred days after texts showing that Holmes and Balwani were concerned that Carreyrou would write a negative article. At the hearing, the

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

44

Government argued that this exchange demonstrates that Holmes and Balwani were unable to refute Carreyrou's potential criticism on the merits and thus had to resort to attacking him personally.

In response, Balwani contends that this text exchange is not directly related to Carreyrou's visit to Walgreens, Theranos' technology generally, or investors.  He disputes the Government's characterization of this exchange as inextricably intertwined with the charged conduct and argues that it has little to no probative value and could prejudice the jury against him.

The Court is inclined to agree with Balwani.  While the Government may be correct that a reasonable inference from Balwani and Holmes' texts concerning their response to Carreyrou's investigation and impending article is that they did not want their schemes to defraud to be exposed, this particular exchange concerning Carreyrou's French heritage does not clearly demonstrate that.  This exchange appears more akin to private offhand comments, as opposed to Balwani and Holmes' thoughts or plans on how to publicly respond to Carreyrou's article.  The probative value of the exchange in relation to the charged conduct appears low, and the Government has other evidence at its disposal through which it may express its theory that Balwani and Holmes could not respond to Carreyrou's article by directly addressing the facts.  The potential for prejudice likewise seems quite low, but on balance, the Court finds that it outweighs the even lower probative value of the exchange on the record currently before the Court.  Accordingly, the Court **DENIES** without prejudice the Government's motion to admit this text absent a foundation demonstrating additional probative value.

### 3.  Death and sex

The third excerpt Balwani finds objectionable is an exchange concerning an email Holmes wished to send to "Rupert" (presumably, Rupert Murdoch) following publication of Carreyrou's article in the Wall Street Journal the previous day.  Balwani also separately moves to exclude this excerpt in his Motion in Limine No. 6.  Balwani argues that this excerpt's use of the words "death and sex," "murder," and "filth" is inflammatory, prejudicial, confusing, and misleading.  Balwani also argues that these terms have "no discernable meaning in the context of this case" and are thus

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

45

SER-194

irrelevant. The Government contends that this excerpt is probative of knowledge and intent to defraud because it demonstrates Holmes and Balwani's efforts to distract from the content of the Carreyrou article as opposed to refuting it.

The relevance of this text exchange is difficult to assess without knowing exactly what the draft email to Murdoch said. The Court disagrees with Balwani's assertion that the exchange lacks any probative value. These texts tend to reflect Holmes and Balwani's attempts at damage control immediately following the publication of Carreyrou's article, and Balwani himself states that "[a]ll our partners are bailing one at a time and same with investors." Coopersmith Resp. Decl., Ex. 49 at PRH_000035. The exchange therefore provides some insight into Holmes and Balwani's efforts to maintain the alleged conspiracy and scheme to defraud.

As to the prejudicial nature of the texts, the Court is not prepared to say that use of the words "death," "sex," "murder," and "filth" are so prejudicial as to warrant exclusion. Balwani's argument that the texts would lead a jury to believe that Holmes and Balwani were engaged in "some violent criminal activity" gives the jury far too little credit. Even without a full understanding of what, for example, "the death and sex thing" means, a plain reading of the texts suggests that Holmes and Balwani were using these terms figuratively, not literally, as evidenced by Balwani's suggestion not to discuss "personal life or murder because enough people on Twitter will assume there is something there." *Id.* As Balwani observes, "[t]his is a wire fraud case." Balwani Mot. at 43. It is not a murder case, and a jury will be able to appreciate that distinction. Simply using those words in conversation does not mean the speaker literally did those things.

Accordingly, the Court **DENIES** Balwani's Motion in Limine No. 6 to exclude this exchange.

The Court **DEFERS** ruling on the remainder of the text messages in Trial Exhibit 5387A, with the exception of the six excerpts discussed in the Holmes MIL Order, which are admitted.

### I.   Government's MIL No. 9 to Admit Theranos Emails as Business Records

The Government moves to admit internal Theranos emails as authentic and business records under Rule of Evidence 803(6)—specifically, emails to or from email addresses with the

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

46

domain @theranos.com sent or received by Theranos personnel and bearing the Bates prefixes THER-, THERDOJ-, THPFM, THER-AZ-, TS-, and TS2-.  Govt. Mot. at 14–16.  The Government cites to numerous instances in the transcript for the Holmes trial where Theranos employees testified that they regularly used email to conduct work in the usual course of business, that it was their regular practice to send emails at or near the time of events and to do so accurately, and to share relevant information to create reliable records.  Theranos employees also testified that Theranos used specific email groups to respond to particular issues.

Balwani states that he does not object to a ruling that, as a general matter, emails can serve as business records, but he points out that some emails may not satisfy the requirement of Rule 803(6), and he reserves the right to object if the Government is unable to lay a proper foundation.  At the hearing, the Government made clear that it seeks admission of emails to improve trial efficiency, particularly as to emails that were previously admitted as business records in the Holmes trial.  However, Holmes' objections or lack thereof during her trial are not binding on Balwani, who may feel differently about certain exhibits.

At the hearing, Balwani represented that he did not intend to needlessly challenge emails for which the Government already laid a solid foundation, and that counsel would meet and confer in advance of introduction of any emails at issue to attempt to resolve the dispute early on.  The parties appear to be largely in accord.  To the extent the Government seeks a ruling that, as a general principle, emails can serve as business records, the Court agrees.  The Court **DEFERS** ruling on the admission of any specific emails pending objections from Balwani.

**J.     Government's MIL No. 10 to Admit Statements by Theranos and Theranos Employees and Agents Offered by The Government**

The Government moves to admit statements by Theranos employees, particularly employees within the clinical lab, as non-hearsay under Rule 801(d)(2)(D).  Rule 801(d)(2)(D) provides that a statement made by the party's agent or employee on a matter within the scope of that relationship and while it existed is not hearsay.  The Government relies on a Theranos organizational chart to establish the requisite relationship.

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

47

**SER-196**

Balwani responds that as in the Holmes case, "it is premature for the Court to issue a categorical ruling admitting any and all testimony of Theranos agents and employees on matters within the scope of that relationship and while it existed." Balwani Resp. at 10 (quoting Holmes MIL Order at 95).

The Court agrees that it is premature to issue a categorical ruling pretrial. , The Ninth Circuit has stated that to determine whether statements are admissible under Rule 801(d)(2)(D), a court must "'undertake a fact-based inquiry applying common law principles of agency.'" *United States v. Bonds*, 608 F.3d 495, 504 (9th Cir. 2010) (quoting *NLRB v. Friendly Cab Co., Inc.*, 512 F.3d 1090, 1096 (9th Cir. 2008)); *see also United States v. Agne*, 214 F.3d 47, 54–55 (1st Cir. 2000) ("Whether the statements of a corporate employee may be admitted against a corporate officer depends upon the relationship between the employee and the officer; 'if the factors which normally make up an agency relationship are present the evidence should not be excluded simply because the statement is offered against a corporate officer, rather than the corporation.'"). At present, the Government has not identified any particular employee or any specific statement it seeks to admit. Balwani's position at the top of Theranos' organizational chart alone is insufficient to establish the admissibility of statements made by any of the 160-plus employees working in Theranos' lab.

The Government's MIL No. 10 is **DEFERRED** pending the Government's establishment of the necessary foundation for the evidence it seeks to introduce.

### K.   Government's MIL No. 11 to Exclude Self-Serving Hearsay Statements Made and Offered by Holmes

The Government previously moved to prevent Holmes from introducing witness testimony or direct evidence of self-serving statements she made to the press, to victims, or in her testimony to the SEC. MIL Order at 98. The Court granted the Government's motion to the extent that Holmes' out-of-court statements are inadmissible for the reasons stated in Rule 801 and *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000).

The Government now asks the Court to adopt its prior ruling in the Holmes MIL Order to

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

48

United States District Court
Northern District of California

Balwani. Specifically, the Government requests an order that Balwani "is not permitted to introduce exculpatory statements without testifying in court." Govt. Mot. at 18. In response, Balwani asserts that the Government's motion is not ripe for adjudication. Balwani reasons that the Government has not identified any particular statement of concern, and the admissibility of any statement will depend on the context and purpose at trial. Moreover, Balwani has not yet decided whether to testify.

The Court **GRANTS** the Government's motion to the extent that Balwani's out-of-court statements are inadmissible for the reasons stated in Rule 801 and *Ortega.* However, a blanket ruling excluding all out-of-court statements is premature. The admissibility of a particular statement will depend on the content of the statement and the purpose for which the party seeks to introduce the statement. Without additional context, the Court cannot say that a currently unidentified out-of-court-statement by Balwani would be hearsay, let alone that an exception to hearsay does not apply. The Government may object in due course to specific evidence submitted at trial. Balwani shall provide the Government and the Court with fair notice when he believes the issue is about to arise during trial so that the Court may address it outside the presence of the jury.

L.     **Government's MIL No. 12 to Preclude Defendant from Offering Evidence That His Mother Received a Blood Test From Theranos Without the Necessary Foundation**

The Government believes Balwani may seek to admit evidence during his trial that his mother received a test from Theranos. The Government moves to preclude any such evidence or testimony as lacking foundational relevance and hearsay under Federal Rules of Evidence 401, 403, and 802. In response, Balwani asserts that it would be improper and untimely to preclude him from offering any piece of evidence before his trial has begun. Nevertheless, he acknowledges that whether he will be able to admit evidence of his mother's blood tests will depend whether he can lay a proper foundation. During the February 4, 2022 hearing, both sides requested the Court defer ruling on the motion.

The Government's motion to preclude Balwani from offering evidence of his mother's blood test(s) is **DEFERRED** until Balwani has an opportunity to lay a foundation for the evidence

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

49

at the appropriate juncture in the trial.

**M.    Government's MIL No. 13 to Admit Relevant Testimony from 'Non-Paying' Patient Witnesses**

The Government requests the Court adopt its prior ruling in the Holmes MIL Order that "[t]estimony from non-paying patient witnesses concerning their experience with Theranos testing relevant and admissible[.]" Holmes MIL Order at 47–50, 53, 99. The Government's motion is **GRANTED**. Although a non-paying patient is not an actual victim of the alleged fraud, that witness may have experienced events and actions relevant to the charges in the case. For example, a non-paying patient may have seen marketing materials or news articles about Theranos and the testing it provides. A non-paying patient may have received an inaccurate test result, which was then brought to Balwani's attention. "Evidence of even one inaccurate result [whether received by a paying or non-paying patient] tends to show that Theranos was producing inaccurate results, even if it does not fully prove the point." Holmes MIL Order at 48-49. Further, Balwani has not shown that the probative value of testimony from a non-paying witness is substantially outweighed by the risks of unfair prejudice, confusing the issues or misleading the jury.

**N.    Government's MIL No. 14 to Order Defendant to Produce Reverse *Jencks* Including Any *in Camera* Proffers**

The Government requests that the Court issue an order precluding Balwani from introducing evidence at trial that should have been produced under the reciprocal discovery obligations of Federal Rules of Criminal Procedure 16(b) and 26.2. Further, the Government seeks an order precluding Balwani from using documents stamped with the Bates prefix "HOLMES-", unless Defendant informs the Government how he received such documents from Holmes. The Government also requests an order directing Balwani to produce all Rule 26.2 material in his possession, including documents without Bates stamps or with the Bates stamp prefix HOLMES, within ten days of the hearing on this motion.

Balwani opposes the Government's motion, asserting that (1) he understands his obligations under Rules 16(b) and 26.2 and will comply with them; (2) the request for Rule 26.2

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

50

United States District Court
Northern District of California

material is premature given that his trial has not begun; and (3) he is under no obligation to disclose how he received documents bearing the Bates prefix "HOLMES-."

To the extent the Government is requesting the Court set a date for compliance, the motion is **DENIED**. However, as stated during the February 4, 2022 hearing, the Court expects counsel's compliance with Rules 16(b) and 26.2 in a timely manner such that it does not interrupt the flow of the trial or undermine the Government's ability to present its case.

**O. Government's MIL No. 15 to Exclude Defendant's Three Purported Experts Due to Insufficient Disclosure**

The Government moves to exclude three expert witnesses that Balwani identified in its November 12, 2021 expert disclosure: (1) Xavier Oustalniol; (2) Richard L. Sonnier, III; and (3) Scott Weingust. Balwani provided the Government a declaration from Richard Sonnier in his November 19, 2021 filing (Dkt. No. 1158), and a supplemental disclosure containing information about the other two experts on December 3, 2021. The Government acknowledges its motion is moot based on Balwani's supplemental disclosures. Accordingly, the Government's MIL No. 15 is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Dated: February 28, 2022

EDWARD J. DAVILA
United States District Judge

Case No.: 5:18-cr-00258-EJD-1
ORDER RE: MOTIONS IN LIMINE

51

**SER-200**

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    FAX: (408) 535-5066
    john.bostic@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' AMENDED BILL OF PARTICULARS |
| v. | |
| RAMESH "SUNNY" BALWANI, | **(PROPOSED REDACTED VERSION – LODGED WITH COURT)** |
| Defendant. | |

    The United States hereby provides its Amended Bill of Particulars in response to the Court's February 11, 2020 Order. (ECF No. 330). Consistent with the Court's Order, this bill identifies the specific explicit false and fraudulent misrepresentations as well as half-truths put forward by Defendants in advertisements and marketing materials in connection with their scheme to defraud patients as alleged in the Superseding Indictment. (*Id*. at 16). The bill also identifies specific Theranos assays that the government contends suffered from accuracy and consistency problems. (*Id*.). Finally, the bill discloses the names of known coconspirators as to Count One in the Superseding Indictment. (*Id*. at 19).

/ /

UNITED STATES' AMENDED BILL OF PARTICULARS
18-CR-00258 EJD

1

**SER-201**

This Bill of Particulars reflects the government's current understanding of the evidence collected to date. The government's investigation in this matter is ongoing. Accordingly, the government reserves the right to supplement and amend this Bill of Particulars as necessary based on its continuing investigation and trial preparation.

## I. False and Misleading Representations Directed at Patients

As part of Defendants' scheme to defraud patients, Defendants directed false and misleading statements to patients as well as to doctors and other health professionals as patient representatives—all with the goal of obtaining money from patients in exchange for blood tests that Defendants knew were not accurate or reliable and sufficient for use in a clinical setting. Those false and misleading statements were made by Defendants themselves and by their agents, Theranos employees and representatives, in response to general and specific direction from Defendants as the persons controlling the messaging and operations of the company. Some of the examples below may be paraphrased from the exact statements referenced. Although the Court's Order called only for the false and misleading statements in Theranos's "advertisements and marketing materials," the government is voluntarily disclosing examples of false and misleading statements made on Theranos's website and social media accounts, statements made by Defendants to journalists and in other public settings, and statements made directly to individual doctors and patients. Similarly, the government is including in the Bill of Particulars details regarding specific false and misleading statements underlying the allegations in the Superseding Indictment as well as examples of the evidence supporting those allegations that the government intends to introduce in its case in chief. At trial, the government reserves the right to introduce the statements below and/or equivalent statements made by Defendants and their agents.

### A. Statements in Marketing Materials and Advertisements

In its effort to attract customers, Theranos released marketing materials and advertisements throughout the time period of its operation. Those materials contained false and misleading statements intended to falsely present Theranos's testing services as accurate, reliable, and equivalent or even superior to conventional laboratory testing. As the CEO and COO of Theranos, Defendants had knowledge of and control over the company's public statements, including its marketing and advertising releases. Indeed, those materials were regularly submitted for Defendants' approval before they could

UNITED STATES' AMENDED BILL OF PARTICULARS 2
18-CR-00258 EJD

be released to the public and directed at Theranos's potential customers. *See, e.g.*, THPFM0000316267. Holmes testified before the SEC that she, defendant Balwani, and others as a team generally reviewed content before releasing it. She testified she "tried to stay involved with all of the creative aspects in terms of the creative through invention side of the technology and the creative side of the way we were trying to change the way people thought about their right to access lab results along the line of the Arizona law that we passed." She testified: "I'm the CEO. I'm the ultimate decision maker for the company." She testified that Theranos' chief marketing officer reported to her and she generally knew what the chief marketing officer was doing in marketing. In addition, in prior litigation, Theranos, though its agents, stated under oath that Holmes was involved in making updates to the company's website since January 2013 and that Balwani and Holmes were involved in reviewing and/or signing off on some of the periodic updates to the Theranos website and/or social media accounts. Holmes and Balwani were apprised of social media protocol points and reviewed messages distributed on Twitter. *See, e.g.*, HM-003296. On this basis, and others, the government alleges that Defendants caused the following marketing and advertising statements to be made by Theranos by creating or approving these statements or similar statements and directing that they be released.

- A September 9, 2013 press release by Theranos stated: "Consumers can now complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours. . . . For the first time, Theranos is introducing CLIA-certified laboratory services with the ability to run its tests on micro-samples. Theranos's proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results. Test results are available to physicians in a matter of hours, enabling fast diagnoses to help informed treatment choices. . . . For the past 10 years, Theranos has worked relentlessly to reach a point at which we could help make actionable information accessible to physicians and patients at the time it matters most." The release also stated Theranos offered consumers access to "less invasive and more affordable clinician-directed lab testing, from blood samples as small as a few drops, or 1/1000 the size of a typical blood draw." These statements presented Theranos's technology as mature and ready for use in the clinical setting, when Defendants knew that Theranos's tests were not ready for launch and suffered

UNITED STATES' AMENDED BILL OF PARTICULARS 3
18-CR-00258 EJD

from accuracy and consistency problems that made them unreliable.

- In a Theranos flyer apparently from 2015, the company invited patients to "[b]ring any lab order from your clinician to your nearest Theranos Wellness Center location" to obtain a Theranos test. This statement suggested to patients that Theranos tests were sufficiently accurate and reliable for use in the clinical setting, when in fact Defendants knew that Theranos tests suffered from accuracy and consistency problems that rendered them unreliable and unsuitable for medical decision-making. [*See, e.g.*, US-FDA-0037983]

- In one flyer, Theranos stated that it "offers affordable STI tests, so it's easier to know." This statement suggested that Theranos's STI tests were sufficiently accurate for patients to rely on them to "know" whether they had a given infection, when in fact Defendants knew that Theranos tests—including the assays for HIV and gonorrhea—suffered from accuracy and consistency problems rendering them unreliable. [*See, e.g.*, US-FDA-0037996]

- One Theranos flyer claimed that Theranos was "revolutionizing every aspect of laboratory testing" (or "reinventing every aspect of laboratory testing") and invited patients to get a lab order from their physician. These statements falsely presented Theranos as an advanced laboratory offering superior testing services accurate and reliable enough for use by physicians in making medical treatment decisions. In fact, Defendants knew that Theranos relied in part on conventional testing methods and that its tests suffered from accuracy and consistency problems. [*See, e.g.*, US-FDA-0038001; THPFM0005547680]

- In one piece of promotional material, Theranos stated, "We believe everyone has the right to information about their own health" and offered to provide such information through its lab tests, "[m]eaning now you can find out where you stand, and find out what's going on inside your body," "get the information you need," and "detect potential problems early." All of these claims falsely suggested to patients that Theranos's test results could be relied upon to reflect the state of a patient's health and whether that patient was suffering from medical problems, when in fact Defendants knew that Theranos's tests suffered from accuracy and consistency problems that made them unreliable and unsuitable for use in the clinical setting. [*See, e.g.*, US-FDA-0038006; THPFM0005547542; ]

UNITED STATES' AMENDED BILL OF PARTICULARS
18-CR-00258 EJD

4

- Theranos advertised its hCG assay as a "Pregnancy Test" despite the fact that this assay suffered from accuracy and consistency problems that rendered it unsuitable for detecting pregnancy. Additionally, Theranos advised patients not to change their medical treatment before reviewing their test results with a physician, necessarily representing that physicians could rely on its tests for that purpose despite Defendants' knowledge of the prevalent accuracy problems with Theranos's tests. [*See, e.g.*, US-FDA-0038011]

- In a press release dated July 2, 2015, Theranos claimed that FDA had validated Theranos's approach for FDA review of its LDTs (Laboratory Developed Tests), and Holmes was quoted as saying that Theranos was committed to ensuring that its systems and LDTs "are of the highest quality, and that patients and their physicians have access to the most accurate information about their health." In fact, Defendants knew that FDA disagreed with Theranos's arguments regarding regulation of LDTs, and were aware that Theranos's tests suffered from accuracy and consistency problems that prevented them from offering patients "the most accurate information about their health." [*See, e.g.*, THPFM0000021148-50]

- In a press release dated July 16, 2015, Theranos claimed that a CLIA waiver for its HSV test meant that "FDA determined the Theranos test and technology is reliable and accurate and can be used in a broader set of locations outside of a traditional CLIA certified laboratory, including Theranos Wellness Centers." Holmes was quoted as saying that the company was continually innovating "to provide the best laboratory testing services in the world." In fact, Defendants knew that FDA prohibited Theranos from operating its analyzers outside of the lab setting, and were aware that their tests suffered from accuracy and reliability problems that made them inferior to conventional tests and unsuitable for use in the clinical context. [*See, e.g.*, THPFM0005548113]

- In a letter sent to a University in March 2016 pitching Theranos's immunity testing, Theranos's market access manager Jennifer Hanson wrote that Theranos was a diagnostic company with the goal of providing access to "accurate, affordable, real-time diagnostic information." In fact, Defendants knew that Theranos's tests were not sufficiently accurate and consistent to be relied upon in a medical setting. [*See, e.g.*, THPFM0005548324]

UNITED STATES' AMENDED BILL OF PARTICULARS                                                     5
18-CR-00258 EJD

- In one print ad, Theranos recited its slogan, "one tiny drop changes everything" next to an image of a nanotainer, and claimed that "[n]ow it's easier to find out what's going on with your body." Defendants knew, however, that Theranos's tests suffered from accuracy and consistency problems that rendered them unreliable indicators of what was happening inside a patient's body. [*See, e.g.*, THPFM0000314831]

- In Theranos's Guide to Direct Testing for Arizona, the company touted patients' ability to obtain blood testing without a doctor's order, claiming that patients were now "free to engage with your physician and your health like never before." The guide also claimed that this would allow patients to "get a read on their health," "become more informed earlier," and work with doctors to "address potential problems sooner." A different version of the guide celebrated that it was now easier for patients to get "vital information about their health when it matters most," and specifically promoted Theranos's ability to help monitor thyroid, blood glucose, and sexual health. These statements suggested to patients that Theranos's tests were accurate reflections of their actual health status and that they were therefore suitable to be relied upon by doctors in diagnosing problems and making treatment decisions, when in fact Defendants knew that Theranos's tests—including assays targeting TSH, glucose, and certain STIs—suffered from accuracy and consistency problems that made them unreliable. [*See, e.g.*, SEC-USAO-EPROD-000699159; SEC-USAO-EPROD-000037181-82]

- In advertising used in connection with its partnership with Walgreens, Theranos claimed that it was "changing lab testing forever" with its ability to run all of its tests via micro-samples, and that its services made it "easy to know more about your own health," suggesting that Theranos tests provided accurate information about a patient's physical condition. Similarly, those same materials claimed that Theranos automated pre- and post-analytic process to minimize lab errors, and that the company "offer[ed] tests with the highest levels of accuracy." Defendants knew that Theranos's tests did not have the highest levels of accuracy but suffered from accuracy and consistency problems that made them inferior to conventional laboratory tests and unreliable for this purpose. [*See, e.g.*, WAG-TH-DOJ-00069577-78]

//

UNITED STATES' AMENDED BILL OF PARTICULARS
18-CR-00258 EJD

6

**B.      Statements on Theranos's Public Website and in Social Media**

Theranos maintained a public corporate website in order to further publicize its business and promote its blood testing services to potential customers and their representatives.  As CEO and COO of the company, Defendants had knowledge of and control over the content of Theranos's website (for, among other reasons, those stated above).  Defendants used that website in furtherance of their scheme to defraud patients, causing the following false and misleading statements to be made.

- Theranos's website claimed that the company was "enabling providers, physicians, patients, and consumers alike with better health information," and stated that the company's products "empower people to take control of their health and to extract better information from healthcare tests and information systems than is possible using today's conventional infrastructure," suggesting that Theranos's technology provided accurate results superior to conventional labs' testing services.  In fact, Defendants knew that Theranos's technology had significant disadvantages relative to conventional labs and that it was not capable of producing consistently accurate results. [*See, e.g.*, US-FBI-0000060; US-FBI-0000067; US-FBI-0000110; US-FBI-0000135-45]

- Similarly, Theranos's website stated elsewhere that the company's products "empower providers, physicians, and consumers alike with better health information," suggesting that Theranos's tests offered superior accuracy and reliability compared to competing tests and that they were suitably reliable for use in the clinical setting.  In fact, Defendants knew that Theranos's tests suffered from accuracy problems that rendered them unreliable. [*See, e.g.*, US-FBI-0000112; US-FBI-0000118; US-FBI-0000153]

- Theranos's website claimed that its tests "made it easier to get access to the tests [patients] need" so that they and their physicians "can better track small changes that emerge over time" to "help provide insight into where your health is headed, and the early detection of disease."  These statements suggested that Theranos's tests were accurate, precise, and consistent enough for doctors and patients to rely upon in tracking changes in their health and diagnosing medical conditions.  In fact, Defendants knew that Theranos's tests were not accurate or reliable enough for these purposes. [*See, e.g.*, US-FBI-0000347]

UNITED STATES' AMENDED BILL OF PARTICULARS                                                    7
18-CR-00258 EJD

- In approximately August 2015, Theranos's website stated that the company was "pioneering a new era where people can engage with their health, and their physician, like never before." The website also claimed that Theranos's ability to "run a full range of assays on a single micro-sample" allowed it to conduct auto-reflex testing to "properly diagnose conditions." The website claimed that Theranos's rapid processing allowed analysis of "key markers before their analyte decay rates materially affect result integrity," this providing "insight into subtle trends in important analytes." In fact, Defendants knew that Theranos's assays suffered from accuracy and consistency problems that rendered them unreliable for providing insight into health conditions, properly diagnosing conditions, and tracking subtle trends in analytes. [*See, e.g.*, TS-000003]

- In approximately August 2015, Theranos's website included a bio for Holmes stating that she had led the company to "enabl[e] a new paradigm of consumer health and prevention," making real the mission "to make actionable health information accessible to people everywhere… enabling early detection and intervention of disease." The bio also claimed that Theranos's breakthrough advancements had made it possible "to quickly process the full range of laboratory tests from a few drops of blood." Defendants knew, however, that Theranos relied on third-party devices for many of its tests, and that its assays suffered from accuracy and consistency problems that prevented them from reliably yielding actionable health information suitable for clinical use. [*See, e.g.*, TS-000003]

- Theranos, with Defendants' direction and approval, also used its Twitter social media account to promote its blood testing services and attract customers. In its Twitter posts, Theranos linked to the press releases and news articles discussed herein, and made similar false and misleading statements concerning its technology and blood testing services. Specifically, Theranos's posts stated or suggested that Theranos could perform the entire range of laboratory tests using a fingerstick sample processed on its novel and advanced proprietary analyzers although Defendants knew Theranos relied on venous draws and third-party devices for many of its tests. The posts also stated or suggested that Theranos's tests were accurate and reliable enough to be suitable for use in a clinical setting by doctors and

UNITED STATES' AMENDED BILL OF PARTICULARS
18-CR-00258 EJD

8

patients—including by mentioning specific assays and medical conditions as well as by promoting Theranos's association with Walgreens—although Defendants knew that Theranos's tests suffered from accuracy problems that rendered them unreliable for this purpose. The following posts are examples of such false and misleading statements:

- o On November 17, 2013, Theranos retweeted "@theranosinc can test for almost anything with the 1/1,000 the amount of blood than a reg. test #science" with this image:



    See https://twitter.com/BradTonoff/status/402210940327702528, available at https://twitter.com/theranos.

- o On November 20, 2013, Theranos tweeted: "Empowering patients and speeding accurate diagnosis." See https://twitter.com/theranos/status/403284724623216640.

- o On or about November 20, 2013, Theranos retweeted: "Walgreens/Theranos deal brings rapid, accurate, low-cost blood testing to the local pharmacy . . . with results in 4 hours." See https://twitter.com/PosseList/status/403215950394433536.

UNITED STATES' AMENDED BILL OF PARTICULARS                    9
18-CR-00258 EJD

- On December 4, 2013, Theranos tweeted: "The lab test. Reinvented." with the following image:



  *See* https://twitter.com/theranos/status/408297103593447424

- On December 4, 2013, Theranos tweeted: "One tiny drop changes everything." *See* https://twitter.com/theranos/status/408327320823283712

- On December 10, 2013, Theranos tweeted: "Say goodbye, big bad needle" with the following image:



  *See* https://twitter.com/theranos/status/41048281089429944

UNITED STATES' AMENDED BILL OF PARTICULARS    10
18-CR-00258 EJD

**SER-210**

o   On January 28, 2014. Theranos tweeted: "Not a big fan of needles?  Neither were we.  So we got rid of them."  Theranos included the following image:



No big needles.          Just a tiny sample.          Into our nanotainer™ tube.

*See* https://twitter.com/theranos/status/428272143969701888

o   On March 11, 2014, Theranos retweeted:  "Elizabeth Holmes built technology that can perform hundreds of tests on only one drop of blood."  *See* https://twitter.com/socialcitizen/status/443397183791181824

o   On February 3, 2015, Theranos retweeted the following image:



*See* https://twitter.com/brandchannel/status/562665880115744768

UNITED STATES' AMENDED BILL OF PARTICULARS                              11
18-CR-00258 EJD

o On April 20, 2015, Theranos retweeted the following image:



See https://twitter.com/tbutani/status/590280397692358656

o On May 14, 2015, Theranos tweeted: "Find out how we're making actionable health information more accessible." *See*

https://twitter.com/theranos/status/599001739220529152

UNITED STATES' AMENDED BILL OF PARTICULARS                    12
18-CR-00258 EJD

o On June 2, 2015, Theranos tweeted: "Know the facts when it comes to your health. We offer glucose tests for as low as $2.70." Theranos included the following image:



*See* https://twitter.com/theranos/status/605769761885032450

o On June 6, 2015, Theranos tweeted: "A glucose test can help diagnose & monitor high/low blood glucose, diabetes, and pre-diabetes." Theranos included the following image:



*See* https://twitter.com/theranos/status/607222726286114816

UNITED STATES' AMENDED BILL OF PARTICULARS                                    13
18-CR-00258 EJD

o On June 27, 2015, Theranos tweeted: "Now it's easy and affordable to get tested, know for sure, and #ownyourhealth." Theranos included the following image:



See https://twitter.com/theranos/status/614826256480104448

o On July 13, 2015, Theranos tweeted: "The lab tests you need at prices you'll love." Theranos included the following image:



See https://twitter.com/theranos/status/620710104061493248

UNITED STATES' AMENDED BILL OF PARTICULARS 14
18-CR-00258 EJD

o On September 4, 2015, Theranos posted a short film by Errol Morris "about the fear of a typical blood draw" and stated, "We're changing the whole experience." The video ended with the words: "small samples, less blood. Theranos. The lab test. Reinvented. hundreds of tests." *See* https://twitter.com/theranos/status/639845415307743232.

C. **Other Public Statements by Defendants**

In addition, Defendants were interviewed by journalists and spoke at conferences and other public events, making statements about Theranos's technological capabilities and intending that those statements be received by Theranos's potential customers. As described above, those statements were frequently false or misleading. The articles and videos recording and reporting on the following statements are publicly available.

- In a September 8, 2013 article in the Wall Street Journal titled "Elizabeth Holmes: The Breakthrough of Instant Diagnosis," a journalist wrote, based on information supplied by Holmes and other Theranos representatives: "Theranos's processes are faster, cheaper, and more accurate than conventional methods and require only microscopic blood volumes, not vial after vial of the stuff." The article also stated that Theranos's technology could "run any combination of tests, including sets of follow-on tests, at once, very quickly, all from a single microsample." According to the article, Theranos's technology could achieve much lower variance ranges for a given test, with Holmes claiming that the company's tests have margins of "allowable error" targets less than 10%. These statements suggested that Theranos's tests were advanced and accurate, although Defendants knew that Theranos's assays experienced frequent accuracy and reliability problems.

- In an interview for a November 18, 2013 article in Medscape titled, "Creative Disruption? She's 29 and Set to Reboot Lab Medicine - Elizabeth Holmes Plans to revolutionize testing by using tiny blood draws and offering near-instantaneous results," Holmes stated that after "redeveloping every test that is recognized by Medicare in the form of a CPT (Current Procedural Terminology) code to be able to run it on a tiny sample," Theranos "focused a great deal on these tests and validated and verified them over the years, building an

UNITED STATES' AMENDED BILL OF PARTICULARS 15
18-CR-00258 EJD

infrastructure that was highly automated and standardized such that the quality of the data that we generate could be used in an actionable manner by clinicians," minimizing variability. Holmes also stated that Theranos was capable of automatically rerunning samples in response to out-of-range tests to provide additional information to doctors and patients. These statements suggested that Theranos's tests were highly accurate and reliable, when Defendants knew that Theranos had not properly validated its assays and that its assays suffered from accuracy and consistency problems that made them unreliable for clinical use.

- In an interview for a February 18, 2014 article in Wired titled "This Woman Invented a Way to Run 30 Lab Tests on Only One Drop of Blood," Holmes touted Theranos's ability to provide test results quickly allowing for adaptive clinical trials where pharmaceutical companies could "change the dosing for a patient in real time or in a premeditated way, as opposed to waiting a long period and then deciding to change a dose." These statements suggested that Theranos's tests were accurate and reliable enough to support real-time dosing adjustments in clinical trials, although Defendants knew that Theranos's assays suffered from serious accuracy and consistency problems.

- In an interview for a March 1, 2014 article in Wired titled "One Drop, Infinite Data: How Elizabeth Holmes Built a Better Blood Test," Holmes stated: "We built the first laboratory capable of processing any of our laboratory tests from a tiny droplet of blood, or what we call a microsample. So that, for the first time, people can get any of the laboratory tests that we do from a fingerstick, instead of having to do phlebotomy." Holmes also discussed minimizing variability, and claimed: "93% of error in the laboratory process is associated with what's called pre-analytic processing. So this is generally where humans do things - and it could be manually centrifuging a sample, it could be transport, temperature, all these different variances that can affect the analyte… And we have invested over the course of the last ten years in automating these processes so we could minimize variability and standardize the framework." These statements suggested that Theranos's tests were accurate and consistent, with low variability. Defendants knew that Theranos relied on venous draws for many of its tests, that it did not use a high level of automation, and that the company's assays

UNITED STATES' AMENDED BILL OF PARTICULARS
18-CR-00258 EJD

16

experienced repeated accuracy and consistency problems.

- During his March 12, 2014 testimony before the Arizona Senate Health and Human Services Committee, Balwani stated: "We want to show by comparison here, we draw 1/1,000th the size of the normal draw today. So today when you go to a laboratory when they draw out two or three or four or five vials of blood, we are able to provide majority of the testing from only two to three drops of blood. You can take those drops of blood using usual venipuncture, but most likely patients would prefer a simple finger stick. And we are able to do that." These statements presented Theranos's technology as advanced and novel, and therefore reliable. Defendants knew, however, that Theranos depended on vein draws and third-party analyzers for many of its tests, and that the company's assays experienced frequent accuracy problems.

- In a June 14, 2014 article in Fortune titled "This CEO is Out for Blood," based on interviews with Holmes, a journalist wrote that Theranos offered more than 200—and was ramping up to offer more than 1000—of the "most commonly ordered blood diagnostic tests, all without the need for a syringe." The article also discussed the small size of Theranos's proprietary analyzers and claimed that Theranos did not buy analyzers from third parties. The article attributed to Holmes a claim that Theranos was submitting all of its tests for FDA approval though it was not obligated to do so. These claims, which Holmes originated and approved prior to the article's publication, presented Theranos's technology as mature and advanced, and therefore reliable. In fact, Defendants knew that Theranos relied on venous draws and large, third-party analyzers for many of its tests, and experienced frequent accuracy problems.

- In an interview in connection with a July 8, 2014 article in USA Today titled "Change Agents: Elizabeth Holmes Wants your Blood," Holmes stated: "Over the last 10 years, Theranos has worked to redevelop all the tests run in a traditional laboratory to be able to take a tiny sample, a few droplets of blood, instead of the big tubes, that are traditionally drawn from an arm." This statement suggested that Theranos's technology was advanced and as reliable as traditional laboratory tests, but Defendants knew that Theranos's assays suffered from regular accuracy and consistency problems.

UNITED STATES' AMENDED BILL OF PARTICULARS                                                                17
18-CR-00258 EJD

- In a video published on approximately October 8, 2014 by Fortune, Holmes touted the company's ability to run "every laboratory test" "on a tiny droplet of blood," and claimed that the company's tests were "highly automated to ensure the integrity of the process and integrity of the data." Holmes also addressed the role of automation in minimizing variability. These statements presented Theranos's tests as accurate and reliable due to their advanced nature and use of automation, but Defendants knew that Theranos did not heavily automate its testing procedures and that its assays suffered from regular accuracy and variability problems.

- During a TEDMED speech in approximately November 2014, Holmes stated that Theranos had "made it possible to run comprehensive laboratory tests from a tiny sample, or a few drops of blood, that could be taken from a finger." In fact, Defendants knew that Theranos could not run all laboratory tests from a fingerstick sample, and were aware that Theranos's assays suffered from accuracy and consistency problems that rendered them unreliable as clinical laboratory tests.

- During an appearance in connection with a December 5, 2014 article in The New Yorker titled "Blood, Simpler," Holmes stated that Theranos's blood tests "can help detect dozens of medical conditions, from high cholesterol to cancer, based on a drop or two of blood drawn with a pinprick from your finger." Balwani is quoted in that article as saying, "Our platform is all about automation… we have automated the process from start to finish." Holmes also claimed that Theranos had data showing "a perfect correlation between a fingerstick and a venipuncture for every test that we run," and that there had been "tens" of audits and "external third-party comparisons" of Theranos's tests. In fact, Defendants knew that Theranos had not significantly automated its testing protocols, that there were important differences between capillary and vein blood in the context of several of its assays, that third parties had not conducted comprehensive comparisons of Theranos's tests, and that the company's tests suffered from accuracy problems that made them unreliable for medical diagnoses.

- During an April 16, 2015 appearance on CBS This Morning with a segment title "Blood

UNITED STATES' AMENDED BILL OF PARTICULARS 18
18-CR-00258 EJD

Sweat and No Fear," Holmes stated: "First we've created these little tiny tubes, which we call the nanotainers. Which are designed to replace the big traditional tubes that come from your arm. And instead allow for all the testing to be done from a tiny drop from a finger." This statement presented Theranos's technology as novel, advanced, and reliable. Defendants knew that Theranos's assays suffered from repeated accuracy problems that rendered them unreliable.

- During a June 3, 2015 appearance on PBS / Charlie Rose, Holmes stated that Theranos produces the same results from its fingerstick tests that one would get if he or she went to a doctor and had them draw a vial of venous blood, claiming "effectively equivalent or identical results." Holmes also addressed the purported chemistry, hardware, and software advances that allowed Theranos to work with small samples, and stated that Theranos was going through the FDA approval process because FDA was the "gold standard" and that was "the way to do this for lab testing because the data is so important." Holmes also claimed that the FDA approval process would present an opportunity for Theranos to show "our performance, and the accuracy of our tests." These statements presented Theranos's tests as advanced, valid, and accurate. Defendants knew, however, that FDA was requiring Theranos to seek approval, and that Theranos's assays experienced frequent accuracy and consistency problems.

- During a September 10, 2015 interview at the Commonwealth Club, Holmes stated that Theranos's job was "to ensure that we provide the highest quality service, for every person, person by person," noting that the stakes in the industry were high: "… you can't compromise on quality here. It's not a website, where if you know, oops, we didn't QA that thing, that's just not going to fly, right." These statements suggest that Theranos was committed to providing the highest quality test results, but Defendants knew that Theranos's tests suffered from regular accuracy and consistency problems that rendered them unreliable.

- During the October 8, 2015 Forbes 30 Under 30 Summit, Holmes claimed that Theranos relied on venous draws for "specialty tests" (like the Russell viper venom assay)to give patients an alternative to more expensive labs that would charge them thousands of dollars.

**SER-219**

- In an October 8, 2015 video published by Vanity Fair, Holmes stated: "I think about it all the time in the context of my mom, and the information that we're generating, she does all of her tests through us, knowing that we're right every single time, and knowing that we're not compromising on quality, and knowing that we're, in every action that we take, approaching this with the seriousness that it deserves".... "because it's not just building a glucose meter or cholesterol test, it's redeveloping 3,000 tests. And that is, that's a very long-term project. So we knew what we were getting into, but this is a space in which there aren't shortcuts." These statements represented that Theranos's tests were 100% accurate and that the company had taken the time it needed to perfect its technology. Defendants knew, however, that Theranos had failed to conduct proper validation studies, and that its tests experienced regular accuracy and consistency problems.

- During an October 15, 2015 appearance on Mad Money, Holmes claimed that Theranos had sent the Wall Street Journal "over a thousand pages of documentation demonstrating that the statements in their piece were false," and that partners like Cleveland Clinic and Walgreens had "seen our technology, worked with us, they've used our systems, and they understand what we're doing." These statements suggested that the facts in that day's Wall Street Journal story were inaccurate and that Theranos could prove through documentation and qualified third-party confirmation that its technology was valid. Defendants knew, however, that the facts in the WSJ article were true, that Theranos's tests had regular accuracy and consistency problems, and that third parties had not used and validated Theranos's technology. In this same appearance, Holmes also repeated the false statement that Theranos relied on venous draws primarily for specialty tests.

- In an October 21, 2015 video published by Wall Street Journal Live, Holmes claimed that Theranos had "never used commercially available lab equipment for fingerstick-based tests." Holmes further stated that Theranos's decision to collect fingerstick samples only for HSV had nothing to do with the tests, methodology, or accuracy of performance of Theranos's technology. These statements suggested that Theranos's technology was mature and capable of producing accurate and reliable results, but Defendants knew that problems with

UNITED STATES' AMENDED BILL OF PARTICULARS 20
18-CR-00258 EJD

Theranos's tests required reliance on third-party devices for fingerstick and venous samples and that Theranos's assays were not sufficiently reliable for clinical use.

### D. Statements Made by Theranos Representatives to Doctors and Patients

Defendants, primarily through Theranos representatives, also directed false and misleading statements to individual doctors and patients in the context of promoting Theranos's services to customers and in responding to questions and complaints about Theranos test results. In the case of statements by Theranos representatives, unless otherwise noted, the government alleges that Defendants caused these statements to be made by giving Theranos representatives general and specific direction to promote the validity, accuracy, and other supposed benefits of Theranos's tests, to emphasize Theranos's fingerstick method of drawing blood, and to conceal any shortcomings of Theranos's technology or malfunctions of its devices.

- A Theranos representative told ▇▇▇▇▇▇ that Theranos would conduct micro-testing on blood samples drawn from the fingertip; that Theranos was equivalent to other major labs like LabCorp and Sonora Quest, and that when Theranos lost its lab license, it was merely a "slap on the wrist" that would have a temporary effect on the company. In fact, Defendants knew that Theranos depended on venous blood for many of its tests; that Theranos used different and unapproved methods for many of its tests that were not the equivalent of conventional laboratory tests; and that regulatory penalties imposed on Theranos were significant punitive measures. [*See, e.g.*, ▇▇▇▇▇▇ 302 Report]

- Theranos representative Kimberly Alfonzo told ▇▇▇▇▇▇ that Theranos could do all blood tests with a fingerstick draw, although Defendants knew that Theranos relied on venous blood for many of its tests. [*See, e.g.*, ▇▇▇▇▇▇ 302 Report]

- A Theranos sales representative told ▇▇▇▇▇▇ that Theranos's testing was accurate, although Defendants knew that Theranos's tests were plagued by accuracy and consistency problems. On a conference call with Theranos representatives, those representatives told ▇▇▇▇▇▇ that Theranos went through all the necessary steps in their testing to make sure that it was done accurately, although Defendants knew that Theranos had inadequate proficiency testing and quality control protocols and that its tests suffered

UNITED STATES' AMENDED BILL OF PARTICULARS
18-CR-00258 EJD

21

from accuracy problems. [*See, e.g.,* ████████ MOI dated 2/28/18]

- A Theranos phlebotomist told patient ████████ on several occasions that Theranos's testing was state of the art, when in fact Defendants knew that Theranos relied on modified and unmodified third-party devices and had significant disadvantages relative to conventional testing methods. [*See, e.g.,* ████████ MOI dated 2/28/18]

- Theranos representatives told ████████ that the company's device was FDA-approved and that it had met all the national laboratory standards. In fact, Defendants knew that Theranos had not obtained the required FDA approvals and that the company's laboratory practices did not meet applicable standards. In response to inaccurate test results, Theranos representatives told ████████ that the company was having some equipment problems. Defendants knew, however, that problems with Theranos's tests stemmed from fundamental deficiencies in the test methodology rather than isolated mechanical problems. [*See, e.g.,* ████████ MOI dated 3/1/18]

- Theranos representatives told ████████ that the company's tests were more accurate than competing tests. As a technician working with Theranos patients at Walgreens, ████████ ████████ in turn told patients that Theranos tests were accurate, consistent with her training and printed materials provided by Theranos. In reality, Defendants knew that Theranos's tests suffered from accuracy and consistency problems. [*See, e.g.,* ████████ MOI dated 6/12/19]

- Theranos representatives told nurse practitioner ████████ that the company's testing was valid and that all Theranos's testing could be done via fingerstick. In fact, Defendants knew that Theranos tests suffered from accuracy problems and had not been properly validated, and that many of the company's tests could not be performed by fingerstick. In discussing an inaccurate blood test, Theranos representatives falsely told ████████ that the problem had resulted from a misplaced decimal point although that was not a plausible result for the test results in question. [*See, e.g.,* ████████ MOI dated 6/14/19]

- A Theranos representative pitching the company's testing services told ████████ that the company had quality control and that its tests would be accurate, although

Defendants knew that Theranos's tests had accuracy problems. [*See, e.g.*, ████████ MOI dated 3/3/20]

- Theranos representatives told ████████████████████ that its fingerstick technology had been validated, and emphasized its fingerstick testing method. In fact, Defendants knew that Theranos's validation processes were insufficient, that its tests had accuracy problems, and that many of its tests could not be performed on fingerstick samples. [*See, e.g.*, ████████████████████ MOI dated 3/3/20]

- In a meeting with ████████, Holmes talked about microvolume testing and mentioned that Theranos was able to run every laboratory test, although Theranos relied on venous draws for many of its tests and was not capable of running every laboratory test on its proprietary devices. [*See, e.g.*, ████████ MOI dated 3/9/20]

- When Theranos obtained invalid bicarbonate results due to sample stability issues or other problems, it would withhold the result from doctors and patients with no explanation. Holmes directed that, if customers called to inquire about such withheld results, Theranos representatives should respond that "CO2 results were not reported due to temporary unavailability of this test for this sample" and note that the company was growing as fast as it could. This statement was misleading because it deceptively concealed problems with Theranos's tests. [*See, e.g.*, TS-1078095, TS-1076614-16]

- When Theranos obtained critical test values for chloride, it conducted a redraw and/or rerun rather than reporting the critical value. This approach misled doctors and patients by masking potential accuracy problems with Theranos's tests. [*See, e.g.*, TS-1078326]

- After experiencing problems with its hCG test, Allison Hsieh informed Balwani that Theranos had removed the "pregnancy test" description from its hCG blood quant assay description because the company's test was not able to confirm a pregnancy. However, Theranos continued to offer the hCG blood test knowing that doctors and patients would rely on the assay to determine pregnancy status. [*See, e.g.*, THPFM0004228061]

- After experiencing problems with its hCG test, Theranos switched the assay from fingerstick to venous draw. Rather than inform patients that the switch was necessitated by a problem

UNITED STATES' AMENDED BILL OF PARTICULARS                                      23
18-CR-00258 EJD

with the assay, Christian Holmes directed that doctors and patients be told that it was a "temporary" "routine quality check" related to Theranos's expanding patient population. [*See, e.g.*, THPFM0000555315, THPFM0000958955]

- After experiencing problems with its PT/INR test, Theranos switched the assay from fingerstick to venous draw, telling patients only that it was a temporary switch. Christian Holmes directed Theranos customer service representatives to adhere to a script that deceptively omitted information about problems with the assay's accuracy. [*See, e.g.*, THPFM0000018472]

- After experiencing problems with its complete metabolic panel assays, Theranos switched CMP from fingerstick to venous draw. Christian Holmes suggested to Balwani that Theranos tell patients that the switch was related to an ongoing sample stability study. When Balwani rejected that proposal, Christian Holmes reported that he had previously used language consistent with Holmes's direction stating that Theranos required larger samples because it was running each test in more than triplicate. This explanation deceptively masked the true reason for the switch to venous draws. [*See, e.g.*, THPFM0000147443]

- When Theranos switched PT/INR from fingerstick to venous after experiencing problems with the assay, Theranos representatives including Kimberly Alfonso explained the change by telling doctors and/or patients that Theranos had confidence in its testing and the switch to venous draws was intended simply to give the doctor the experience he or she was more accustomed to. This explanation deceptively masked the true reason for the switch. [*See, e.g.*, THPFM0000204033]

## II. Specific Theranos Assays that Were Inaccurate / Unreliable

As alleged in the Superseding Indictment and further described above, Defendants defrauded patients by making misrepresentations concerning the accuracy and reliability of Theranos's test results. Contrary to their misrepresentations, Defendants knew that Theranos's tests were plagued by accuracy and consistency problems that rendered them unreliable. At this time, the government contends that Theranos experienced accuracy and reliability problems with at least the following assays:

UNITED STATES' AMENDED BILL OF PARTICULARS 24
18-CR-00258 EJD

**SER-224**

- Bicarbonate
- Calcium
- CBC panel including each of its component assays
- Chloride
- Cholesterol / HDL / LDL
- Gonorrhea
- Glucose
- HbA1c
- hCG
- HIV
- LDH
- Potassium
- PSA
- PT/INR
- Sodium
- Testosterone
- TSH
- Vitamin D (25-OH)

In addition, the government contends that Theranos experienced regular, non-assay-specific problems in connection with its methods of testing blood samples, including: (1) lack of equivalence between fingerstick / capillary samples and venous samples; (2) hemolysis in fingerstick samples; (3) sample leakage, evaporation, or coagulation; (4) flaws in CTN / nanotainer performance; and (5) malfunctions of Theranos-manufactured or –modified analyzers and other equipment. These problems negatively impacted the accuracy and reliability of Theranos's assays conducted using Theranos's proprietary methods and equipment—including in particular the TSPU version 3.5, which Theranos used to conduct the following additional assays: Estradiol, Prolactin, SHBG, Thyroxine (T4 / Free T4), Triiodothyronine, and Vitamin B-12.

The government contends that there also were deficiencies in Theranos's laboratory practices

UNITED STATES' AMENDED BILL OF PARTICULARS
18-CR-00258 EJD

25

relating to assay validation, proficiency testing, quality control, and establishing and adjusting reference ranges. These issues negatively impacted the accuracy and reliability of Theranos's assays conducted in its CLIA laboratory.

**III.     Unnamed Coconspirators as to Count One**

The Superseding Indictment alleges that Defendants engaged in a scheme to defraud investors by means of false and misleading representations on a variety of topics including the capabilities of Theranos's proprietary analyzer, the financial health of the company, the company's relationship with Walgreens, and other material matters. Count One of the Superseding Indictment alleges that Defendants, along with others known and unknown to the grand jury, conspired and agreed to commit wire fraud by soliciting investments through the false and fraudulent representations described elsewhere in the Indictment. The government's investigation into the roles of Defendants and others associated with Theranos is ongoing. Presently, the government views the following individuals as unnamed coconspirators as to Count One:

- 
- 
- 

DATED:  January 3, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

 /s/ *John C. Bostic* 
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
KELLY I. VOLKAR

UNITED STATES' AMENDED BILL OF PARTICULARS                                                                26
18-CR-00258 EJD

**SER-226**