**No. 22-10338**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

       v.

RAMESH "SUNNY" BALWANI,

    Defendant-Appellant.

_____

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 2 OF 9**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 18-CR-00258-EJD-2

_____

**THOMAS A. COLTHURST**
Attorney for the United States
Acting Under Authority Conferred By
28 U.S.C. § 515

**MATTHEW M. YELOVICH**
Chief, Appellate Section, Criminal Division

**KELLY I. VOLKAR**
Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7185
**Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA**

Case 5:18-cr-00258-EJD   Document 887   Filed 08/04/21   Page 1 of 18

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH A. HOLMES,<br><br>Defendant. | Case No.  5:18-cr-00258-EJD-1<br><br>**ORDER DENYING MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 810 |

Defendant Elizabeth Holmes moves to suppress evidence of customer complaints and testing results, as well as findings in a January 25, 2016 report from the Centers for Medicare & Medicaid Studies ("the CMS Report"). Ms. Holmes' Mot. to Suppress Evid. of Customer Compls. and Testing Results as Well as Findings in CMS Report ("Mot."), Dkt. No. 810. Holmes requests (1) an evidentiary hearing, (2) suppression of evidence (including customer complaints, testing results, and the CMS Report findings), and (3) an order compelling additional production from the Government. *Id.* at 1–2, 5–7, 8. The Court heard oral argument on the motion on July 7, 2021. July 7, 2021 Tr. of Proceedings ("July 7 Tr."), Dkt. No. 866. Having considered the parties' moving papers, the record in this case, and the relevant legal authority, the Court DENIES the motion to suppress.

**I.   BACKGROUND[1]**

In 2003, Holmes founded Theranos, Inc. ("Theranos") a health care and life sciences

---

[1] Additional factual background is set forth in the Court's prior orders. *See, e.g.*, *United States v. Holmes*, No. 5:18-cr-00258-EJD, 2021 WL 2044470, at *1 (N.D. Cal. May 22, 2021).

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

1

United States District Court
Northern District of California

company offering blood testing technology, and she served as the company's Chief Executive Officer from its inception until mid-June 2018. Third Super. Indict., Dkt. No. 469 ¶ 1; United States' Opp'n to Mot. to Suppress ("Opp'n"), Dkt. No. 846, at 7. Theranos used a bespoke database called the Laboratory Information System ("LIS") that housed, among other things, all patient test results and all quality control data at Theranos. Dkt. No. 798 at 56.

In the fall of 2015, federal government agencies began investigating Theranos. Opp'n at 5. Over the next few years, the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") expressed interest in Theranos's databases, issuing multiple subpoenas and document requests. Decl. of John Bostic in Supp. of United States' Opp'n to Def.'s Mot. to Suppress ("Bostic Decl."), Ex. C, Dkt. No. 846-4 (Oct. 19, 2015 document preservation letter from SEC to Theranos instructing the company to preserve certain categories of evidence, including documents and data relating to Theranos's lab testing results and the accuracy of Theranos technology, electronically stored in databases or otherwise); Decl. of Amy Mason Saharia in Supp. of Holmes's Reply in Supp. of Mot. to Exclude Anecdotal Test Results ("Saharia Decl."), Ex. 87, Dkt. No. 732-1 (producing data from LIS and Labdaq databases in response to Nov. 23, 2015 and Sept. 6, 2016 SEC subpoenas and DOJ requests made at a Nov. 16, 2016 meeting); Bostic Decl., Ex. F, Dkt. No. 846-7 at GJS-000016 (Feb. 13, 2018 grand jury subpoena seeking "[t]he entirety of all blood test lab reports . . . Theranos provided to its patients" from July 1, 2014 through Sept. 1, 2014). In April and June 2018, the DOJ served grand jury subpoenas on Theranos for information specifically from the LIS database and requested a copy of the database itself, along with the necessary software to access and search it. Bostic Decl., Ex. G, Dkt. No. 846-8 (Apr. 20, 2018 grand jury subpoena expanding records request to include "[t]he entirety of all blood test lab reports maintained in the L.I.S. database"); Decl. of AUSA Robert S. Leach in Supp. of United States' Opp'ns to Def.'s Mots. in Lim. ("Leach Decl."), Ex. 63, Dkt. No. 681-27 (June 4, 2018 grand jury subpoena requesting "the entirety of all blood test lab reports maintained in the L.I.S. database that Theranos provided to its patients" and "[a] softcopy or proxy of the L.I.S. database, along with any other proprietary software required to access and search the

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

2

database").

During this period, outside counsel from Wilmer Cutler Pickering Hale and Dorr, LLP ("WilmerHale") represented Theranos in responding to government subpoenas and communicating with government attorneys. Decl. of Lance Wade in Supp. of Ms. Holmes' Mot. to Suppress ("Wade Decl."), Ex. 10, Dkt. No. 855-1 at 3–4, 5. According to David Taylor, Theranos's General Counsel who replaced Holmes as CEO following her indictment, ███████ ██████████████████████████████████████████████████████ ████████████████. *Id.* at 3–4, 5, 6. On June 5, 2018—one day after the grand jury subpoena seeking a copy of the LIS database issued—counsel from WilmerHale emailed Taylor "to touch base on LIS" and suggested that "we should just give DOJ the database and let them figure it out. . . . [T]hey won't know what to do with it and . . . the people who do are in India. Our experts are the only ones who understand it, and we don't want to make them percipient witnesses. Is there anyone left at the Company who could assist us in actually getting the database to the government?" Saharia Decl., Ex. 90, Dkt. No. 732-4 at WH000002107; *see also* Wade Decl., Ex. 10, Dkt. No. 855-1 at 3, 5–6. Subsequent emails between WilmerHale attorneys and Theranos in-house counsel discussed what was necessary to produce a copy of the LIS database to the Government. Saharia Decl., Ex. 112, Dkt. No. 736-7 (June 13, 2018 email from Xan White to two WilmerHale attorneys, discussing obligations regarding document preservation and the "ongoing litigation hold," in addition to the need to "potentially transfer the preserved material to counsel for the individual defendants whose actions may be unresolved at the moment the company ceases to exist"); Leach Decl., Ex. 64, Dkt. No. 681-28 (June 27, 2018 email from a WilmerHale attorney to an unknown recipient stating that "we think it is a better strategy to just dump the entire bespoke database on the Government"). Internal emails between Theranos employees revealed that the LIS database copy would be encrypted and require not only a password but also a private key to access the information in the database. Leach Decl., Ex. 70, Dkt. No. 681-34, at TheranosABC00042262; *see also* Saharia Decl., Ex. 101, Dkt. No. 735-2 at 2; Leach Decl., Ex. 72, Dkt. No. 681-36 at 3 (Sept. 28, 2020 expert witness report of Bruce W. Pixley stating that "[i]n

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

3

United States District Court
Northern District of California

**SER-230**

order to decrypt the [LIS database copy], a person would need to know the password and have a copy of the 'key' file" and that he has "not been able to access the contents of the encrypted . . . database backups" without the key).

On June 14, 2018, the federal grand jury returned the first indictment against Holmes.  Dkt. No. 1.  Holmes resigned from her position as Theranos CEO but remained the Chair of the Board of Directors.  Opp'n at 7.

On July 25, 2018, the Government requested WilmerHale attorneys produce the LIS database and any software necessary to access or query it by August 10, 2018.  Saharia Decl., Ex. 88 ("*Brady* Ltr."), Dkt. No. 732-2 at 14–16; Bostic Decl., Ex. H, Dkt. No. 846-9 at USAO-008587–88.  WilmerHale responded on July 30, 2018, describing the proprietary third-party software necessary to utilize the LIS database.  *Brady* Ltr. at 16–17; Leach Decl., Ex. 65, Dkt. No. 681-29 at 3.  WilmerHale's response did not mention the fact that the database copy would be encrypted and require an additional key to access.  That same day, a Theranos employee working on procuring the database copy emailed Theranos in-house counsel, stating: "[T]he other thing to understand is that it's not just a database.  It's a whole system with layers of applications and data. I'm not sure what functionality it is expected to have but if we are just handing over a database I'm not sure it will meet the needs[.]"  Leach Decl., Ex. 66, Dkt. No. 681-30 at TheranosABC00042201.  Theranos in-house counsel replied, "[I]t's ultimately not Theranos'[s] problem if our system of storing and accessing data is inconvenient for outsiders."  *Id.* at TheranosABC00042200.  In-house counsel informed WilmerHale that "[t]here might be one password" to the LIS database copy that only one person at Theranos knew, and that "IT is still working on that."  Leach Decl., Ex. 70, Dkt. No. 681-34, at TheranosABC00042260; *see also* Leach Decl., Exs. 68, 69, 73, Dkt. Nos. 681-32, 681-33, 681-37 (emails between Theranos's IT consultant and Theranos employees/agents regarding the password for the private key).  Theranos employees/agents were ultimately unable to obtain the private key.  Wade Decl., Ex. 13, Dkt. No. 855-3 at US-REPORTS-0019713 (███████████████████████████████████

████████████████████████████████████████████████████████████████

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS
4

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ).

On August 27, 2018, WilmerHale produced a copy of the LIS database to the Government. Leach Decl., Ex. 71, Dkt. No. 681-35; *see also Brady* Ltr. at 18–19; July 7 Tr. at 12:7-11, 19:1-2, 45:15-17.  WilmerHale's email to the Government attaching the transmittal letter included the password, but failed to mention that a private key would also be necessary to access the LIS database.  Leach Decl., Ex. 71, Dkt. No. 681-35.  In subsequent communications with the Government, WilmerHale confirmed that it was unaware of any additional information or software that would facilitate government access to the LIS database information.  Saharia Decl., Ex. 101, Dkt. No. 735-2 at 2; *Brady* Ltr. at 23.

Immediately after production of the LIS database copy, Theranos began moving to decommission the original LIS database at its Newark facility.  Leach Decl., Ex. 73, Dkt. No. 681-37 (Aug. 28, 2018 emails between WilmerHale, Theranos's IT consultant, Theranos employees, and Shekar Chandrasekaran from IncRev Corporation regarding phone conference "to hash out what we still need from LIS and what we need to do to get it, given that the system will be put into storage this Friday [(Aug. 31, 2018)] and may thereafter be very difficult to resuscitate?").  Theranos began to dismantle the physical server hardware housing the LIS database on August 29, 2018, with the "all clear to shutdown" arriving on August 30, 2018.  Leach Decl., Ex. 74, Dkt. No. 681-38 (Aug. 29–30, 2018 email exchange between Theranos employees, Theranos IT consultant, and Chandrasekaran).  On August 31, 2018, Theranos vacated the Newark facility.  Leach Decl., Exs. 73-75, Dkt. No. 681-37, 681-38, 681-39.  At that time, Theranos employees/agents knew that once the system was put into storage, it might be "very difficult to resuscitate."  Leach Decl., Ex. 73, Dkt. No. 681-37 at 2; *see also* Saharia Decl., Ex. 106, Dkt. No 736-1, at USAO-008626 (email stating that Taylor had reported "on several occasions that the LIS was decommissioned and that prior to ABC, Theranos, Inc. had been told it could no longer be reconstructed with the existing resources."); Wade Decl., Ex. 11, Dkt. No. 855-2 at US-REPORTS-0024257–59 (████████████

████████████████████████████████████████████████████████

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

███████████████████████████████████████████████

████████████████████████████████████████████ ).

Eric Caddenhead, a former Theranos IT employee who previously worked as the infrastructure architect for the LIS server informed Theranos's IT consultant in August 2018 that "if they took the LIS apart they would not be able to access it again because then the encryption key would be lost.  The encryption key was located on a disk array which had a lot of pieces and when they took the disk array apart it would have destroyed the encryption key."  Saharia Decl., Ex. 111, Dkt. No. 736-6 at US-REPORTS-0016253.  The disk array was dismantled when the LIS server equipment was removed. *Id.*

On or around September 12, 2018, WilmerHale informed the Government that Theranos "was probably dissolving that day." *Brady* Ltr. at 19.

In September and October 2018, the Government tried repeatedly and unsuccessfully to access the information from the copy of the LIS database. *Brady* Ltr. at 19–22.  DOJ attorneys were aware of difficulties accessing the copy at least as early as October 2018. *Id.* at 22, 23.  In March 2019, the Government reached out to the assignee of Theranos's assets, Sherwood Partners ("Sherwood"), and its counsel, Dorsey & Whitney LLP ("Dorsey"), with follow-up inquiries about how the LIS database came to be encrypted and decommissioned. *Brady* Ltr. at 23.  On March 21, 2019, Dorsey informed the Government that Sherwood's understanding was that the encrypted LIS database had since "been decommissioned, and before the company formally closed we were advised that it be a herculean undertaking to get it up and running again."  Saharia Decl., Ex. 106, Dkt. No. 736-1 at USAO-008626.  A follow-up email from Dorsey stated that Taylor had informed Sherwood "on several occasions 'that the LIS was decommissioned and that prior to ABC, Theranos, Inc. had been told that it could no longer be reconstructed with the existing resources.'" *Brady* Ltr. at 23.  The Government communicated with Dorsey again in October and November of 2020, with Dorsey ultimately informing the Government that the LIS database was encrypted, that Sherwood lacked the means to decrypt it, and that it had been unable to locate an alternative version of the LIS database. *Id.* at 22.

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

6

United States District Court
Northern District of California

The parties agree that, for all intents and purposes, the LIS database copy produced to the Government cannot be accessed without the private key, and the information on the LIS database is lost—perhaps irretrievably.  July 7 Tr. at 65:7-14.

## II.     LEGAL STANDARD

Motions to suppress evidence must be made prior to trial "if the basis for the motion is then reasonably available."  Fed. R. Crim. P. 12(b)(3)(C).

Holmes's motion is based on the Government's duty to preserve potentially exculpatory evidence.  *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011).  The Government's loss or destruction of such evidence may "rise[] to the level of a due process violation if a defendant can show that the Government acted in bad faith," which "requires more than mere negligence or recklessness."  *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

If, however, the Government's conduct does not rise to the level of a constitutional violation, "the court may still impose sanctions including suppression of secondary evidence."  *Id.* (citing *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring)).  In so doing, the court must balance "the quality of the Government's conduct and the degree of prejudice to the accused."  *Id.* (internal quotation marks omitted).  The Government bears the burden of justifying its actions, and the defendant bears the burden of demonstrating prejudice.  *Id.* (quoting *Loud Hawk*, 628 F.2d at 1152).  In evaluating the Government's conduct,

> the court should inquire whether the evidence was lost or destroyed while in [Government] custody, whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification.

*Loud Hawk*, 628 F.2d at 1152.  Also relevant to the analysis is "the nature and degree of federal participation" and "whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence."  *Id.*  In evaluating prejudice against the defendant, the court must consider, among other things,

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

7

SER-234

United States District Court
Northern District of California

the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence.

*Id.*

### III.   DISCUSSION

The Court considers each of Holmes's requests for relief in turn.

#### A.   Suppression of Evidence

First, Holmes seeks to suppress evidence of customer complaints, testing results, and the CMS Report based on the balancing test described in *Flyer* and *Loud Hawk*.[2]  Mot. at 5–6.  She contends that allowing the Government to use that evidence as "evidence of fraud" after it failed to gather and preserve the LIS database would violate her rights to present a complete defense and to receive due process, because the entirety of the LIS database was necessary to refute that evidence.  Mot. at 1; July 7 Tr. at 36:2–38:9.

##### 1.   Exculpatory value

The threshold question for the Court is whether the LIS database is potentially exculpatory. Holmes does not contend that the LIS database is materially exculpatory, but rather argues that it is potentially useful evidence.  Reply at 1.  "Potentially useful evidence, as defined in *Youngblood*, is 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'"  *United States v. Zaragoza-Moreira*, 780 F.3d 971, 978 (9th Cir. 2015).

The Government has, throughout this case, maintained its belief that the LIS was either

---

[2] Holmes's opening brief relies solely on the *Loud Hawk* balancing test, and at no point does she expressly assert that the government acted in bad faith in delaying examining the LIS database copy.  *See* Mot. at 5–7.  On reply, Holmes argues that bad faith is not necessary for suppression under *Flyer* and suggests her right to due process has been violated under *Youngblood*.  Ms. Holmes' Reply in Supp. of Mot. to Suppress ("Reply") at 7–8.

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

8

<div style="writing-mode: vertical-lr">United States District Court
Northern District of California</div>

highly inculpatory and could bolster its case against Holmes (as it would "corroborat[e] the information that the Government intends to present from witnesses"), or that it was useless to both sides because there is no indication it contained data reflecting the accuracy of Theranos test results. Opp'n at 2–3; July 7 Tr. at 61:6-19; May 4, 2021 Tr. of Proceedings, Dkt. No. 792 at 79:13-25, 80:14-21. At the hearing on this motion, defense counsel stated that "Ms. Holmes has always believed the database would be exculpatory in this case." July 7 Tr. at 25:5-6. However, there is no indication in the record that Holmes ever informed the Government of the database's purported exculpatory value either prior to filing the present motion or prior to the decommissioning of the original LIS database. *United States v. Robertson*, 895 F.3d 1206, 1212–13 (9th Cir. 2018) (distinguishing *Zaragoza-Moreira* in finding that the potential usefulness of the lost/unobtained evidence was "completely speculative," and neither Robertson nor the union "made any affirmative assertion that would have put [law enforcement] on notice of the relevance of the [evidence] to [establishing a] defense"). Nor is there any indication that Holmes attempted to rush the Government along in its efforts to access the database copy, despite now criticizing the Government for its "delay." July 7 Tr. at 48:8-21, 65:7-14.

Holmes argues that the LIS database could have been used to assess the accuracy of Theranos test results, which she asserts is central to the Government's wire fraud case against her.[3] *Id.* at 30:16-22. The Government contends that additional information outside the LIS database would be necessary to draw any firm conclusions about the accuracy of the test results and that, at

---

[3] The government disputes Holmes's contention that the LIS database information is central to its case against her. July 7 Tr. at 59:15–60:4 ("Certainly the government did not view this as the most critical evidence in the case at the time of indictment. If that had been the case, of course the government would have collected and examined that evidence prior to charging the case."). As the Court previously observed, the government has repeatedly asserted that large-scale statistical analysis of Theranos's test results is not necessary to prove the elements of wire fraud here. Dkt. No. 798 at 57; May 5, 2021 Hr'g Tr., Dkt. No. 793, at 82:15-16 (government counsel stating that "the LIS was not critical to the charging in this case nor is it critical to the proof at trial"); *id.* at 79:10–80:9 (government explaining that while the LIS database would have been a "powerful tool" to identify patient victims and identify which assays Theranos was running and when, "the Government has been able to capture that information in various other ways"); *id.* at 80:14–81:2 (stating that "this case is not about overall failure rate" nor about "determining what percentage of Theranos'[s] tests were inaccurate").

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS
9

United States District Court
Northern District of California

any rate, other evidence indicates that Theranos's test results were questionable.[4]  Opp'n at 3–4; July 7 Tr. at 72:1-10.  Holmes does not dispute the need for non-LIS information to draw such conclusions, focusing instead on what proportion of tests were accurate and suggesting that the LIS might contain information that would suggest reasons why a particular result was inaccurate. July 7 Tr. at 72:1-17.  At the hearing, she acknowledged that "[p]erhaps it's true" that no conclusions can be drawn about the accuracy of any particular individual test result but argued instead that statistical analyses could be performed that would show that a far vaster number of results were accurate.  *Id.* at 34:4-17.  For example, Holmes suggested that one could "identify the spread of test results that occurred over various references ranges and determine how many of them fell within the expected range" and whether there were "an extreme number of outliers," *id.*, but it is not clear how one would know what an "expected range" would be or what would constitute "an outlier" without additional contemporaneous information about the patient and their condition to serve as touchpoints or control data—information that the parties do not dispute would not be in the LIS database.

The LIS database information alone would not provide a conclusive determination of whether the Theranos blood tests were accurate, and it could just as likely contain incriminating evidence to the contrary.  Any exculpatory value is therefore speculative in nature.  *Robertson*, 895 F.3d at 1211–12 (affirming finding of no bad faith where although law enforcement officer was aware of contested video's existence, the record did not show he had knowledge of its exculpatory value or that he knew of the 30-day deletion process, and the exculpatory value was

---

[4] This other evidence is, of course, the very evidence Holmes now seeks to suppress.  *Compare* Mot. at 5 n.5 (seeking to suppress "testimony and exhibits offered by customers relating to their specific testing results; testimony and exhibits offered by doctors relating to customers' specific testing results; any aspect of Dr. Master's opinions that relates to specific testing results or quality control results; the CMS report's discussion of quality control results and other data that was maintained in the LIS; customer feedback spreadsheets; any other customer complaints or testing results offered by fact witnesses (by testimony or exhibit) other than doctors and customers; and *any other testimony or exhibits relating to quality control data or any other data residing in the LIS offered by fact witnesses*") (emphasis added) *and* July 7 Tr. at 36:2–38:9 (discussing evidence and testimony based on LIS data) *with* Opp'n at 3–4 (describing evidence concerning quality control issues).

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS
10

speculative because it only provided a partial view and could not have provided conclusive identification of the perpetrator); *see also United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (government did not act in bad faith in failing to preserve evidence when the exculpatory value of the evidence "was not obvious"); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (detective's failure to gather potentially exculpatory evidence was not in bad faith because the value of the untested evidence was "speculative" in that it could have exonerated defendant but also could have incriminated him); *United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) ("The exculpatory value of an item of evidence is not 'apparent' when the evidence merely '*could have*' exculpated the defendant.") (citing *Youngblood*, 488 U.S. at 56, emphasis original).

### 2.    The Government's conduct

"The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith." *Zaragoza-Moreira*, 780 F.3d at 977.  The exculpatory value of the LIS database was not apparent to the Government on August 31, 2018 for multiple reasons.

First, as explained above, the potential usefulness of the LIS data is speculative, and the Ninth Circuit has not found bad faith in situations involving speculative exculpatory value. *Robertson*, 895 F.3d at 1211–12; *Sivilla*, 714 F.3d at 1172; *Cunningham*, 345 F.3d at 812.

Second, the Ninth Circuit cases both parties cite appear to suggest that the Government must be the party ultimately responsible (whether through affirmative action or inaction) for the destruction or loss of the potentially exculpatory evidence.  *See, e.g.*, *Flyer*, 663 F.3d at 916 ("The government's failure to preserve potentially exculpatory evidence rises to the level of a due process violation if a defendant can show that *the government acted* in bad faith. . . . *If the government destroys* evidence under circumstances that do not violate a defendant's constitutional rights, the court may still impose sanctions including suppression of secondary evidence.") (internal citations omitted; emphases added); *Zaragoza-Moreira*, 780 F.3d at 979 ("[W]hen

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

11

United States District Court
Northern District of California

potentially useful evidence has been destroyed *by the government*, the bad faith inquiry initially turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed.") (internal quotation marks omitted; emphasis added).  Here, the Government did not lose or destroy evidence in its possession.  The Government sought the LIS database from third parties Theranos and WilmerHale.  Through WilmerHale, Theranos produced an encrypted copy of the LIS database in response to government subpoenas, but it did not inform the Government that the additional key was necessary to access the database, nor did it provide the key.  It is undisputed that the copy of the LIS database Theranos provided was not accessible; and the only entity in possession of the sole working version of the LIS database was Theranos—up until it dismantled the database hardware, destroying the key and rendering the original database unusable as well.  The Government thus never had true possession of the LIS database in the first instance, and there is no dispute that the Government played no role in the decommissioning and dismantling of the original LIS database.  July 7 Tr. at 18:2-5 ("THE COURT: . . . [C]an we agree that the Government did not decommission the database?  MS. SAHARIA: Of course, Your Honor.  The Government was not there at the time d[is]connecting the wires.").  Holmes has not cited to any cases suggesting that the Government can be held responsible for not acting before a third party destroys the potentially exculpatory evidence, when the Government has no knowledge of the destruction and has no control or influence over the third party.

Third, the essence of Holmes's argument is that the Government should have looked at the LIS database copy immediately upon receipt, and that if it had, it would have realized that there was a problem.  The Government could then have raised the issue with Theranos or WilmerHale, and then either of those two parties would have informed the Government that an additional key was necessary and provided it.  July 7 Tr. at 20:12-24, 23:14–24:1. The Court does not find it reasonable to expect all of these measures to be accomplished within the four days before Theranos decommissioned the LIS database. There are no facts suggesting that the Government was aware that Theranos planned to decommission the LIS database and dismantle its hardware on August 30, 2018.  *See Brady* Ltr. at 19 (Sept. 12, 2018 email from WilmerHale informing the

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

12

United States District Court
Northern District of California

Government that Theranos "was probably dissolving that day"). There is no evidence the Government knew at the time of decommission that (1) a separate encryption key was necessary to access its LIS database copy, (2) dismantling the LIS database hardware would result in the permanent loss of the key, or (3) reconstituting the LIS database would be a very difficult undertaking—if not impossible. July 7 Tr. at 19:21-25 ("THE COURT: Did WilmerHale ever provide information to the Government that they would need the key, the missing key? Was that ever given to the Government? MS. SAHARIA: I have not seen that evidence in the record . . . ."). Holmes does not cite any case law to support the proposition that failure to look at a production within four days of receipt is per se unreasonable. The Ninth Circuit has rejected the argument that a failure to immediately obtain potentially exculpatory video evidence as soon as the law enforcement agent was put on notice of its existence is sufficient to compel a finding of bad faith. *Robertson*, 895 F.3d at 1212 ("At most, [the agent] was slow to obtain evidence of speculative value of which he had been indirectly put on notice. This is insufficient to establish that [the agent] made 'a conscious effort to suppress exculpatory evidence' such that bad faith can be inferred from his conduct alone."). A brief delay of four days hardly approaches even negligence, much less bad faith or a due process violation.

Holmes contends that there were other steps the Government could and should have taken, even after Theranos decommissioned the LIS database. She argues that the Government could have reconstructed the LIS database. *See, e.g.*, July 7 Tr. at 16:9-24 (citing Wade Decl., Ex. 10, 11, 13); Reply at 7 (same). But the evidence she cites either contradicts her proposition or is of low persuasive value. Wade Decl., Ex. 11, Dkt. No. 855-2 at US-REPORTS-0024256–58 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); Wade Decl., Ex. 13, Dkt. No. 855-3 at US-REPORTS-0019713 (███████████████████████████████████████████████████████████████████████); Wade Decl.,

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

13

Ex. 10, Dkt. No. 855-1 at US-REPORTS-0025515 (███████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████); *see also* Saharia Decl., Ex. 106, Dkt. No 736-1, at USAO-008626 (Taylor stating that the LIS database "could no longer be reconstructed with the existing resources"). Even if the Government had been able to resurrect the physical database hardware, it still would have lacked the encryption key, which the uncontroverted evidence suggests has been lost for all time. Wade Decl., Ex. 11, Dkt. No. 855-2 at US-REPORTS-0024256–58; Wade Decl., Ex. 13, Dkt. No. 855-3 at US-REPORTS-0019713; Saharia Decl., Ex. 111, Dkt. No. 736-6 at US-REPORTS-0016253 (describing destruction of disk array causing the loss of the encryption key). For this reason, the Government's conduct after August 31, 2018 is irrelevant.

Finally, to the extent Holmes contends that the Government failed to preserve evidence, that argument is also unpersuasive. The Government's duty to preserve already-collected evidence is well-established. *California v. Trombetta*, 467 U.S. 579, 481 (1984) ("[T]he question presented is whether the Due Process Clause requires law enforcement agencies to preserve breath samples of suspected drunken drivers"); *Youngblood*, 488 U.S. at 52 (due process challenge of police's failure to preserve biological samples); *Zaragoza-Moreira*, 780 F.3d at 974 (due process challenge of police's failure to preserve video footage). But "failure to preserve potentially useful evidence does not constitute a denial of due process of law" absent bad faith. *Youngblood*, 488 U.S. at 58; *see also Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989) ("[I]n the absence of bad faith, . . . failure to *preserve* evidence that is only potentially exculpatory does not violate due process, then a fortiori neither does the good faith failure to *collect* such evidence violate due process.") (emphases original). As discussed above, it is not clear the LIS database is potentially exculpatory. Here, the Government sought production of a (presumably) functioning LIS database, but Theranos knowingly and without comment produced an inaccessible copy. It appears the Government believed in good faith that Theranos had provided a working copy of the LIS database, with all necessary passwords and information on the additional software required to

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

14

SER-241

access it.  Thus, the Government has not failed to preserve evidence so much as it has preserved the unusable evidence Theranos produced.  The Government still has the nonfunctioning copy of the LIS, and it provided Holmes with a copy as well.  Holmes presumably has also been unsuccessful in accessing her copy of the LIS database.  July 7 Tr. at 48:8-21.

In sum, the potential usefulness of the LIS database is speculative, and no exculpatory value was apparent at the time Theranos decommissioned the LIS database, therefore the Court finds no bad faith on the part of the Government and no due process violation.  Because the Government never actually possessed a working accessible copy of the LIS database, and because the Government did not cause the destruction or loss of the database, the Court need not engage in the *Youngblood* three-factor analysis or reach the question of whether other sanctions are warranted under the *Loud Hawk* balancing test.  *See Flyer*, 633 F.3d at 916 ("*If the government destroys evidence* under circumstances that do not violate a defendant's constitutional rights, the court may still impose sanctions including suppression of secondary evidence.") (emphasis added).

Accordingly, the Court DENIES Holmes's request to suppress evidence of customer complaints, testing results, and the CMS Report.

### B.  Evidentiary Hearing

An evidentiary hearing on a motion to suppress is necessary "when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist."  *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000).

Holmes asserts that two factual disputes exist that necessitate an evidentiary hearing.  First, she argues that a factual dispute exists as to who bears responsibility for the loss of the LIS database.  Mot. at 7.  However, a review of the timeline of the events in this case does not support the existence of such a dispute.  The Government issued at least three subpoenas to Theranos seeking information relating to data stored in the LIS database in Theranos's possession, custody, and control.  The Government also repeatedly sought clarification from Theranos's counsel and third parties on whether any additional information was necessary to operate the LIS database

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

United States District Court
Northern District of California

copy.  It appears that Theranos and WilmerHale's actions frustrated the Government's efforts. Internal Theranos emails and email exchanges with WilmerHale demonstrate that neither Theranos nor WilmerHale were concerned about the actual functionality of the LIS database copy. Furthermore, Theranos knowingly produced an encrypted copy of the LIS database and did not inform the Government that an additional key was necessary to access it.  Four days later, Theranos decommissioned and dismantled the original functioning LIS database.  It was the deliberate actions of these third parties that resulted in the loss of the LIS database and its contents, not the Government's actions.  It is undisputed that the Government never possessed a functional copy of the LIS database in the first place.  As discussed above, resurrection of the LIS database would be impossible without the lost key, rendering the Government's conduct after the decommissioning a moot issue.

Holmes suggests someone might be able to reassemble the original LIS database, and argues that the Court should therefore hold an evidentiary hearing to explore whether that is a viable course of action.  However, according to Theranos's former IT employee, once the hardware was dismantled, the key was destroyed, and the LIS database became unrevivable. Saharia Decl., Ex. 111.

Second, Holmes alleges a factual dispute exists regarding "the degree of prejudice associated with the government's failure to collect and preserve the LIS," including "whether the LIS data could 'corroborate[] or disprove[]' the government's assertions about accuracy and reliability."  Mot. at 7; Reply at 8–9 (quoting *Zaragoza-Moreira*, 780 F.3d at 980).  Beyond the Court's conclusion that the Government did not, in fact, fail to collect and preserve the LIS database, there is no indication in the record that the LIS database contains accuracy data for all tests run.  As discussed above, no conclusions regarding accuracy could be drawn from the LIS data alone, suggesting that the database would not provide a fulsome record with which accuracy could be definitively determined.  The defense conceded as much at the hearing on this motion. *See* July 7 Tr. at 34:4–35:9.

The Court finds that no material factual disputes exist concerning responsibility for the

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

16

decommissioning and dismantling of the original LIS database or whether the LIS database contains all requisite information from which the accuracy of Theranos test results could be determined.  An evidentiary hearing therefore would be fruitless, and accordingly, the Court DENIES the request for one.

### C.    Further Production

Finally, Holmes requests the Court compel further production from the Government—specifically, the identities and documents relied upon in the Government's October 29, 2020 discovery letter provided as potential disclosures under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).  Reply at 1, 14–15; *Brady* Ltr. at 1.  To the extent Holmes seeks the identities of government employees and documents cited for the purpose of delving into the Government's actions with respect to the LIS database after August 31, 2018, that information is not relevant for the reasons described above.  Furthermore, "defendants cannot use *Brady* simply to search for *Brady* materials.  *Brady* is not a pretrial discovery tool." *United States v. Weld*, No. CR 08-0083 PJH, 2009 WL 901871, *2 (N.D. Cal. Apr. 1, 2009); *see also United States v. Grace*, 401 F. Supp. 2d 1069, 1077 (D. Mont. 2005) (noting that "*Brady* violations are generally raised and adjudicated post-trial, upon the revelation by the government or discovery by the defense of information favorable to the accused that should have been disclosed before trial, [and that it is] [o]nly after trial has concluded and a complete trial record exists may a court analyze whether information the government has not produced constitutes a *Brady* violation").

Additionally, Holmes has not indicated why any of the information or evidence she seeks is relevant, helpful in establishing her defense, not cumulative, or not exempt from disclosure due to deliberative privilege and/or work product protection.  She asserts that the evidence is material to her defense at trial because "[t]he government has noticed numerous LIS-related witnesses." Reply at 15.  But Holmes does not identify any of those individuals, and it is not clear that those individuals would be called specifically to testify about the LIS database as opposed to some other topic.  The Court has already granted Holmes's related motion in limine to preclude evidence of

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

17

Theranos's involvement in the destruction of the LIS database, unless and until the Government lays a proper foundation at trial or Holmes puts the factual dispute in issue.  Dkt. No. 798 at 56–59.  Holmes has provided no reason to deviate from that approach at this time, therefore the Court defers ruling on whether the Government must provide additional related documents unless and until the Government elicits testimony concerning the LIS database from those witnesses.  The Court expects the Government to comply with its *Brady* and Federal Rule of Criminal Procedure 16 obligations by providing sufficient advance notice of whether it plans to elicit testimony regarding the LIS database from its witnesses or to introduce documents referenced or relied upon in its *Brady* letter, and to supplement its production accordingly and promptly.

Accordingly, the Court DENIES the request to compel further production.

**IV.     CONCLUSION**

For the foregoing reasons, the Court DENIES Holmes's motion to suppress.  Pursuant to the Court's June 28, 2021 order granting Holmes's administrative motion to file certain exhibits under seal (Dkt. No. 853), an unredacted version of this order shall be filed under seal and a redacted version filed on the public docket.

**IT IS SO ORDERED.**

Dated: August 3, 2021

_____
EDWARD J. DAVILA
United States District Judge

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

18

SER-245

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH A. HOLMES and RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No.  18-cr-00258-EJD<br><br>**ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD SUPERSEDING INDICTMENTS**<br><br>Re: Dkt. Nos. 493, 496, 497, 498, 499, 500 |

Defendants Elizabeth A. Holmes and Ramesh "Sunny" Balwani have been charged with defrauding the investors and patients of a health care and life sciences company called Theranos, Inc. ("Theranos").  On July 14, 2020, a grand jury in the Northern District of California returned the Second Superseding Indictment ("2SI") in this case.  Dkt. No. 448.  Two weeks later, on July 28, 2020, the grand jury returned the Third Superseding Indictment ("3SI"), which is now the operative charging document.  Dkt. No. 469.

Defendants have filed six motions to dismiss the Second and Third Superseding Indictments, all which were heard on October 6, 2020.  This omnibus order addresses them all.

**I.     BACKGROUND**

Having set forth a comprehensive factual background in prior orders, *see, e.g.*, *United States v. Holmes*, No. 5:18-CR-00258-EJD, 2020 WL 666563, at *1 (N.D. Cal. Feb. 11, 2020), the Court focuses on the background relevant to the instant motions.

Prior to the 2SI and 3SI, the operative charging document had been the (First) Superseding

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

1

Indictment ("1SI").  The 1SI was returned on September 6, 2018 and was subsequently the subject of substantial litigation.  Dkt. No. 39 ("1SI").  As relevant here, Defendants previously moved to dismiss the 1SI on various grounds.  *See* Dkt. Nos. 204, 205, 206.  On February 11, 2020, the Court issued an Order Granting in Part & Denying in Part Defendants' Motions to Dismiss.  Dkt. No. 330.  Among other things, the Court dismissed counts "to the extent they rely on non-paying patients or doctors"; the Court also ordered the Government to produce a bill of particulars as to the specific misrepresentations underlying certain counts and to identify co-conspirators as to Count One.  *See id.* at 39.

As noted above, on July 14, 2020, the 2SI was returned by the grand jury.  Dkt. No. 448 ("2SI").  The 2SI was quickly superseded by the 3SI, which the grand jury returned on July 28, 2020 and is now the operative charging document.  Dkt. No. 469 ("3SI").  The 2SI differs from the 3SI only in that it is missing one count of wire fraud.  Defendants' present motions to dismiss therefore focus on the 3SI but apply equally to the 2SI.

Broadly, the 3SI alleges that Defendants Holmes and Balwani engaged in two schemes to defraud: a scheme to defraud Theranos investors and a scheme to defraud patients who used Theranos's services.  *Id.* ¶¶ 11-12, 14-15.  The 3SI charges Defendants with one count of conspiracy to commit wire fraud against Theranos investors in violation of 18 U.S.C. § 1349 (Count One); one count of conspiracy to commit wire fraud against Theranos patients in violation of 18 U.S.C. § 1349 (Count Two); six counts of wire fraud against Theranos investors in violation of 18 U.S.C. § 1343 (Counts Three through Eight); and four counts of wire fraud against Theranos patients in violation of 18 U.S.C. § 1343 (Counts Nine through Twelve).  Compared to the 1SI, the 3SI alleges three new substantive wire fraud counts relating to the patient scheme, Counts Nine, Ten, and Eleven, for Patients B.B., E.T., and M.E., respectively.  *See* 3SI at 10.  The 3SI also includes additional allegations about the investor fraud conspiracy.  *See id.* at 4–6.

Also relevant to the instant motion is the Superseding Information.  On March 16, 2020, grand jury proceedings were suspended in this District due to the COVID-19 national public

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

2

*United States District Court*
*Northern District of California*

health emergency. *See* General Order 72, IN RE: Coronavirus Disease Public Health Emergency (adopted Mar. 16, 2020). On April 30, 2020, the District ordered that grand jury proceedings would remain suspended until June 2020. General Order 72-2, IN RE: Coronavirus Disease Public Health Emergency (adopted April 30, 2020). During this period of suspension, on May 8, 2020, the Government filed the Superseding Information. Dkt. No. 391. The Superseding Information is nearly identical to the 3SI, with only marginal differences in wording. Defendants moved to dismiss the Superseding Information on the ground that it violates their Fifth Amendment right to be tried only upon "a presentment or indictment of a Grand Jury" and Federal Rule of Criminal Procedure 7(a)(1). Dkt. No. 399. The Court denied the motion, holding that although the Superseding Information does not "authorize the acceptance of a guilty plea or a trial" on the charges contained therein, dismissal was not warranted. *Id.* at 2. In so doing, the Court expressly withheld any decision on the "legal effect" of the Superseding Information, if any, with regard to the statute of limitations. *Id.* at 3.

On August 28, 2020, Defendants filed the instant motions to dismiss the 2SI and 3SI on various grounds. Dkt. Nos. 493, 496, 497, 498, 499, 500 ("Mot. No. 6"); *see also* Dkt. Nos. 495, 501-505 (joinders to the motions). The Government opposed the motions on September 18, 2020, Dkt. Nos. 514, 517-520, 522, and Defendants replied on October 2, 2020, Dkt. Nos. 541-46. Below, the Court address each of the motions *seriatim*.

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure 12(b)(1), a criminal defendant may move to dismiss an indictment in part or in whole without a trial on the merits. Fed. R. Crim. P. 12(b)(1). Generally, such a motion is "capable of determination" before trial if it "involves questions of law rather than fact." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986). As the issue of guilt is "the province of the ultimate finder of fact," *id.*, a court considering a motion to dismiss presumes the allegations in the indictment to be true and "analyz[e] whether a cognizable offense has been charged." *United States v. Boren*, 278 F.3d 911,

United States District Court
Northern District of California

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

3

914 (9th Cir. 2002).

### III.    MOTION TO DISMISS NO. 1 BASED ON PRE-INDICTMENT DELAY

Defendants' first motion to dismiss—filed by Defendant Balwani and joined by Defendant Holmes—is based on pre-indictment delay. *See* Dkt. No. 493 ("Mot. No. 1"); *see also* Dkt. No. 514 ("Opp. re Mot. No. 1"); Dkt. No. 546 ("Reply re Mot. No. 1"). That is, Defendants argue that the Government unreasonably delayed in filing the Second and Third Indictments, in violation of Defendants' Sixth Amendment right to a speedy trial and Federal Rule of Criminal Procedure 48(b).[1] Mot. No. 1 at 2. Below, the Court finds there has not been a violation of the Sixth Amendment and DENIES the motion.

#### A.    Relevant Background

To briefly review the relevant procedural history, the grand jury returned the first Indictment in this case on June 14, 2018. Dkt. No. 1. The Indictment charged Defendants with one count of conspiracy to commit wire fraud against Theranos investors, in violation of 18 U.S.C. § 1349 (Count One), one count of conspiracy to commit wire fraud against doctors and Theranos patients, in violation of 18 U.S.C. § 1349 (Count Two), and nine individual counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts Three through Eleven). *Id.* Defendants made initial appearances and were released on bail on June 15, 2018; they have remained out of custody throughout the proceedings. Dkt. No. 5, 7. Then, on September 6, 2018, a grand jury returned the 1SI, which modified the allegations regarding one of the individual wire fraud counts (Count Four). *See* Dkt. No. 39 ¶¶ 13, 24.

---

[1] The Supreme Court has also recognized a claim against undue pre-indictment delay under the Due Process Clause of the Fifth Amendment. *See, e.g.*, *Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016). Defendants have not asserted a Fifth Amendment claim in this case. In any event, Defendants cannot make out such a claim. As explained with regard to the Sixth Amendment claim, Defendants have not made the requisite showing of "actual, non-speculative prejudice"— "meaning proof that demonstrates exactly how the loss of evidence or witnesses was prejudicial"—as a result of the delay. *United States v. Barken*, 412 F.3d 1131, 1134 (9th Cir. 2005)); *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992) ("The task of establishing the requisite prejudice for a possible due process violation is 'so heavy' that we have found only two cases since 1975 in which any circuit has upheld a due process claim.").

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD SUPERSEDING INDICTMENTS

4

SER-249

The Court conducted the status hearing to set Defendants' original trial date on June 28, 2019. Dkt. No. 83. At that time, the 1SI remained operative and the Defendants were to be tried together. In the parties' joint status memorandum, the defense stated that "significant work remain[ed] before it will be prepared for trial" and therefore requested "a trial in September 2020, or as soon thereafter as would be convenient for the Court." Dkt. No. 80 at 1-2. "Although the government went into discussions with defense with a preference for a trial date during the first half of 2020," the Government did not oppose defendants' request for a later date. *Id.* The Court therefore set a joint trial date of July 28, 2020, without objection. Dkt. No. 83. The Court subsequently severed the Holmes and Balwani trials, with Holmes's trial to proceed on July 28, 2020 and Balwani's trial promptly to follow. Dkt. No. 362. The Holmes trial is estimated to last three months due to the complexity of the case.

Then, on March 16, 2020, this District issued a general order suspending all jury trials in light of the COVID-19 national emergency. *See* General Order No. 72, IN RE: Coronavirus Disease Public Health Emergency. This prohibition was repeatedly extended as the pandemic and associated public health response unfolded. *See* General Order No. 72-5, IN RE: Coronavirus Disease Public Health Emergency (issued July 23, 2020) ("No new jury trial will be conducted through September 30, 2020."). Accordingly, on April 15, 2020, the Court continued the Holmes trial to October 27, 2020. Dkt. No. 374.

On July 14, 2020, as noted above, the grand jury returned the 2SI. Dkt. No. 448.

Then, on July 20, 2020, the Court conducted a status conference to discuss whether the October 27, 2020 trial date remained viable in the face of the ongoing pandemic. *See* Dkt. No. 463 (Transcript). Defendant Holmes requested that the trial be further continued to April 2021, arguing that "a trial any time soon is just . . . not safe." *Id.* at 66. The defense described the many potential practical obstacles to conducting a trial, including: the length of the trial; the number of jurors needed; the number of witnesses (as many as 170, according to a recent Government witness list); that the witnesses would be coming from at least 15 different states; the need to

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

5

develop quarantine protocols; and constitutional ramifications. *Id.* at 63-65. The Government indicated its readiness to move forward in October 2020 but agreed that "many of the challenges" defense counsel raised "are real challenges and unique challenges to this case." *Id.* at 76. The Government expressed that, in the event the Court deemed a continuance necessary, an earlier trial date in February 2021 would be preferable. *Id.* The Court agreed with Defendant Holmes that the October 2020 trial date was no longer practicable given the public health situation. *Id.* at 77-80, 86. Accordingly, in an order dated August 11, 2020, the Court reset the Holmes trial to March 9, 2021. Dkt. No. 484.

Finally, on July 28, 2020, the grand jury returned the 3SI. Dkt. No. 469.

**B.   Discussion**

The Speedy Trial Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend VI. The speedy trial right homes in on the period "from arrest or indictment through conviction," as the right does not attach until that period begins. *Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016). Accordingly, most Sixth Amendment cases are based on *post-indictment* delay. *Id.* Nevertheless, the Ninth Circuit has applied the Sixth Amendment framework where, as here, the Government is alleged to have unreasonably delayed in issuing a superseding indictment. *See, e.g.*, *United States v. Gregory*, 322 F.3d 1157, 1162 (9th Cir. 2003); *United States v. Sperow*, 412 F. App'x 4, 7 (9th Cir. 2010). The U.S. Supreme Court has identified four factors (the "*Barker* factors*") to be considered in determining whether a delay between indictment and trial rises to the level of a Sixth Amendment violation: "(1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) the prejudice resulting from the delay." *United States v. King*, 483 F.3d 969, 976 (9th Cir. 2007) (citing *Barker v. Wingo*, 407 U.S. 514, 531-33 (1972)).

At the outset, it is worth noting that Defendants do not claim the Speedy Trial Act has been violated in this case. The Court is mindful that "it will be an unusual case in which the time limits

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

United States District Court
Northern District of California

of the Speedy Trial Act have been met but the sixth amendment right to speedy trial has been violated." *King*, 483 F.3d at 976 (internal quotation marks omitted). That is because, as a general matter, the "Speedy Trial Act affords greater protection to a defendant's right to a speedy trial than is guaranteed by the Sixth Amendment"; "therefore a trial which complies with the Act raises a strong presumption of compliance with the Constitution." *United States v. Baker*, 63 F.3d 1478, 1497 (9th Cir. 1995).

Moreover, the U.S. Supreme Court has emphasized that "statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide 'the primary guarantee, against bringing overly stale criminal charges.'" *United States v. Lovasco*, 431 U.S. 783, 789 (1977). The Sixth Amendment therefore plays a "limited role" in this area. *Cf. United States v. Mora*n, 759 F.2d 777, 782 (9th Cir. 1985) (quoting *Lovasco*, 431 U.S. at 789); *see also United States v. Nicholas*, 990 F.2d 1264 (9th Cir. 1993) ("We have repeatedly emphasized that protection from lost testimony, as well as other evidence, generally falls solely within the ambit of the statute of limitations.").

With these principles in mind, the Court turns to the four relevant factors.

Start with the length of the delay. Under the Sixth Amendment, delay is measured from "the time of the indictment to the time of trial." *United States v. Gregory*, 322 F.3d 1157, 1162 (9th Cir. 2003). The Ninth Circuit has said that the length of delay must be at least presumptively prejudicial—i.e., one year from the time of the indictment to the time of the trial—to trigger a court's consideration of the other *Barker* factors. *Id.* at 1161-62; *see also King*, 483 F.3d at 976. And even if the delay passes the one-year threshold, it "does not weigh heavily" in the defendant's favor if it is not "excessively long." *Id.* (22–month delay was not "excessively long"); *see also United States v. Beamon*, 992 F.2d 1009, 1014 (9th Cir. 1993) (17–month and 20–month delays were not "great"). For instance, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531; *see also King*, 483 F.3d at 976 (noting that the case was an "extraordinarily complex" conspiracy case

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD SUPERSEDING INDICTMENTS

7

United States District Court
Northern District of California

in finding no Sixth Amendment violation).

The Court notes that the Ninth Circuit has not clarified which indictment provides the starting point for measuring the relevant delay: the original Indictment, the 1SI, or the 2SI or 3SI. *See Gregory*, 322 F.3d at 1162 (assuming without deciding that the delay was measured from the 1SI rather than the challenged 3SI). Because the Government has opted for the original Indictment—as it first asserts the bulk of the charges—the Court will follow the Ninth Circuit's approach in *Gregory*, *see id.*, and assume that is correct. *Accord United States v. Cutting*, No. 14-CR-00139-SI-1, 2017 WL 66837, at *7 (N.D. Cal. Jan. 6, 2017). The Government concedes that 33 months will have elapsed between the date of the original Indictment and the Holmes trial date of March 9, 2021. Opp. re Mot. No. 2 at 11; *see* Dkt. No. 484. Defendant Balwani's trial date has not yet been set, but it will be no sooner. A 33-month delay is, of course, sufficient to trigger consideration of the other *Barker* factors. At the same time, this is a complex case, as the parties have repeatedly asserted and the Court has confirmed. *See, e.g.*, Dkt. Nos. 64, 80. The case involves two fraud conspiracies with multiple victims, two co-defendants, and voluminous discovery. The Court finds that the length of the delay was "not excessive" in light of this complexity. Accordingly, the length of delay factor does not "weigh heavily" in Defendants' favor. *See King*, 483 F.3d at 976; *Gregory*, 322 F.3d at 1162.

The next factor is the reason for the delay; it is "the focal point of the inquiry." *King*, 483 F.3d at 976. Defendants argue that the Government has failed to "offer any valid explanation" for the delay in filing the 2SI and 3SI. Mot. No. 1 at 10; Reply re Mot. No. 1 at 3-4. Defendants believe the Government "has had the information it needed to levy the new accusations" in the 2SI and 3SI "for years," yet has not explained why it omitted those allegations from the Indictment and the 1SI.

What Defendants' argument fails to recognize, however, is that the Sixth Amendment protects against an unreasonable delay in a defendant's *trial*. Defendants focus on the period between the filing of the 1SI in September 2018 and the filings of the 2SI and 3SI in July 2020.

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD SUPERSEDING INDICTMENTS

8

But Defendants acknowledge that, as explained above, the relevant delay for Sixth Amendment purposes is "between indictment and trial," Mot. No. 1 at 9, Reply re Mot. No. 1 at 2. As to the reason for that delay, the original July 2020 trial date accounts for 25 of the 33 months between the original Indictment and Defendant's current trial date. The July 2020 trial date was set at the Defendants' request, to allow for their adequate preparation. Thus, Defendants—not the Government—are the reason for the bulk of the delay. *See King*, 483 F.3d at 976 (district judge granted continuances at the request of King and his attorney).

Nor can the remaining 8 months between the original July 2020 trial date and the current March 2021 trial date be attributed to the Government. Regardless whether the Government may have possessed the information necessary to bring the new charges in the 2SI and 3SI earlier, the shift in Defendants' trial dates was not caused by the filing of those superseding indictments; it was necessitated by the COVID-19 pandemic. From March 2020 until September 2020, jury trials were prohibited in this District. And although the strict prohibition was lifted on September 16, 2020, *see* General Order No. 72-6, IN RE: Coronavirus Disease Public Health Emergency (issued September 16, 2020) ("Jury trials may proceed in accordance with the logistical considerations necessitated by the Court's safety protocols."), the COVID-19 pandemic continues to pose a significant hurdle to conducting a jury trial—especially for a case of this complexity. The parties laid out these hurdles at the July 2020 hearing, and the Court clearly stated that its decision to reset the trial was driven by those and other concerns related to the pandemic. *See* Dkt. No. 463 at 66-86.

Hence, because the Government did not cause the delay in trial, the second factor "weighs heavily against finding a Sixth Amendment violation." *King*, 483 F.3d at 976.

The third *Barker* factor also does not counsel in favor of finding a Sixth Amendment violation. Defendants concede that they have not asserted their rights to a speedy trial and have instead agreed to exclusions of time under the Speedy Trial Act on various occasions. Mot. No. 1 at 11-12. Although Defendants now say that they were forced to agree to time exclusions because

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

9

United States District Court
Northern District of California

of deficiencies in the Government's discovery productions, *see id.*, the fact remains that they never made such an argument at the time of the extensions. Consequently, Defendants' assertion of the speedy trial right remains retroactive. In any event, "[w]hile an improper or untimely assertion of speedy trial rights may weigh in favor of rejecting a defendant's motion to dismiss for violation of these rights, the mere fact of proper, timely assertion does not warrant dismissal." *United States v. Turner*, 926 F.2d 883, 889 (9th Cir. 1991).

The remaining and "critical" *Barker* factor is whether Defendants have been actually prejudiced as a result of the delay in trial. *Gregory*, 322 F.3d at 1162. "[N]o showing of prejudice is required when the delay is great and attributable to the government"; because that is not the case here, however, Defendants must "demonstrat[e] actual prejudice to prevail on [their] claim." *Id.* at 1162-63 (internal quotation marks omitted). "Actual prejudice is typically demonstrated in three ways: 'oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired.'" *Id.* at 1163 (quoting *Doggett v. United States*, 505 U.S. 647, 654 (1992)).

In this case, Defendants have not met their burden of showing actual, non-speculative prejudice. Defendants first raise "the prospect of witnesses' unavailability and fading memories." Mot. No. 1 at 13. But Defendants have not pointed to any specific evidence that has been or will be lost,[2] making this claim too vague and speculative to rise to the level of actual prejudice. Defendants also emphasize "the need to pivot after more than two years to meet the expanded charges," which will consume additional resources. *Id.* Although that may be so, Defendants do not claim that they will be unable to do so effectively by the time of trial. The alleged strain on Defendants' resources is unfortunate, to be sure, but does not constitute actual prejudice under the

---

[2] Defendants point out that "two members of the board have passed away since the September 2018 [1SI]." Mot. No. 1 at 13. But according to Defendants' own evidence, these individuals— Donald Lucas and Thomas Peter Thomas—passed away in November and December 2019, respectively. Thus, they would have been unavailable for the original trial July 2020 trial date. Furthermore, Defendants have not specified what evidence these witnesses would have offered or otherwise shown that their unavailability significantly affects their defenses.

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD SUPERSEDING INDICTMENTS

10

United States District Court
Northern District of California

present circumstances.

In sum, none of the four *Barker* factors supports a finding of a Sixth Amendment violation. The Court therefore DENIES Defendants' motion to dismiss the 2SI and 3SI on Sixth Amendment grounds.

## IV.   MOTION TO DISMISS NO. 2 BASED ON STATUTE OF LIMITATIONS

The Court turns next to Defendants' motion to dismiss portions of the 2SI and 3SI as time-barred. *See* Dkt. No. 498 ("Mot. No. 2"); Dkt. No. 518 ("Opp. re Mot. No. 2"); Dkt. No. 543 ("Reply re Mot. No. 2"). This motion was filed by Defendant Holmes and joined by Defendant Balwani.

Defendants' motion is divided into two arguments: one as to Counts Three through Eight and another as to Counts Ten and Eleven. The Court considers each in turn and, for the reasons below, DENIES the motion to dismiss.

### A.   Counts Three through Eight

The Court begins with Defendants' argument as to Counts Three through Eight, the individual counts of wire fraud in connection with the scheme to defraud investors. The parties agree that the five-year statute of limitations at 18 U.S.C. § 3282 applies to these counts. The parties also agree that a version of these counts was contained in the 1SI, and that the 1SI was timely as to those counts. The question at hand, then, is whether the return of the 1SI tolled the statute of limitations as to the version of Counts Three through Eight alleged in the 2SI and 3SI.

"Generally speaking, the return of an indictment tolls the statute of limitations with respect to the charges contained in the indictment." *United States v. Pacheco*, 912 F.2d 297, 305 (9th Cir. 1990). The tolling continues for a superseding indictment if it relates back to the original indictment—i.e., "if the allegations and charges are substantially the same in the old and new indictments." *Pacheco*, 912 F.2d at 305. On the other hand, if the superseding indictment "broadens or substantially amends" the charges, the statute of limitations would not be tolled. *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 778 (9th Cir. 1986) (internal quotations and

United States District Court
Northern District of California

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS
11

alterations omitted).  "The central concern in determining whether the counts in a superseding indictment should be tolled based on similar counts included in the earlier indictment is notice." *United States v. Liu*, 731 F.3d 982, 996–97 (9th Cir. 2013).  Accordingly, "[t]o determine whether a superseding indictment substantially broadens or amends a pending timely indictment, it is appropriate to consider whether the additional pleadings allege violations of a different statute, contain different elements, rely on different evidence, or expose the defendant to a potentially greater sentence."  *Liu*, 731 F.3d at 996–97 (internal quotation marks and alterations omitted).

Here, the Court finds that Counts Three through Eight are substantially the same in the old (1SI) and new (2SI and 3SI) indictments.  As "each use of the wires constitutes a separate violation of the wire fraud statute," *United States v. Garlick*, 240 F.3d 789, 793 (9th Cir. 2001), each of the challenged counts correspond to a wiring.  These wirings are specified in the 1SI, 2SI, and 3SI:

| COUNT | DATE | ITEM WIRED | WIRED FROM | WIRED TO |
|---|---|---|---|---|
| 3 | 12/30/2013 | $99,990 | Investor #1's Charles Schwab / Wells Fargo Bank account | Theranos's Comerica Bank account |
| 4 | 12/31/2013 | $5,349,900 | Investor #6's Pacific Western Bank account | Theranos's Comerica Bank account |
| 5 | 12/31/2013 | $4,875,000 | Investor #2's Texas Capital Bank account | Theranos's Comerica Bank account |
| 6 | 2/6/2014 | $38,336,632 | Investor #3's Citibank account | Theranos's Comerica Bank account |
| 7 | 10/31/2014 | $99,999,984 | Investor #4's Northern Chicago Bank account | Theranos's Comerica Bank account |
| 8 | 10/31/2014 | $5,999,997 | Investor #5's JP Morgan Chase account | Theranos's Comerica Bank account |

3SI at 9.  It is undisputed that all of these wirings were also charged in the 1SI, and that the 3SI

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

12

United States District Court
Northern District of California

SER-257

does not add any wires. The statutory violation (wire fraud) remains the same and Defendants are not subject to greater sentences for these counts. Indeed, the allegations in the 2SI and 3SI regarding Counts Three through Eight are "duplicated verbatim" from the 1SI. *Pacheco*, 912 F.2d at 305. All these factors weight heavily in favor of finding relation back.

Defendants nevertheless contend that the individual fraud counts have been broadened by the additional allegations in the 2SI and 3SI regarding the overarching scheme to defraud investors. *See* Mot. No. 2 at 7-8. In particular, the scheme to defraud is now alleged to span "2010 through 2015" instead of "2013 through 2015," and "certain business partners"— specifically, Walgreens and Safeway—are identified as other victims of Defendants' alleged conspiracy. *See* 3SI ¶¶ 3, 11, 24. In Defendants' view, these allegations render the scheme to defraud alleged in the 2SI and 3SI materially broader in length and scope than the one charged in the 1SI.

The Court disagrees. It is undeniably true that the existence of a "scheme to defraud" is an element of wire fraud, and that the alleged scheme to defraud investors purports to satisfy that element for Counts Three through Eight. But the new allegations in the 2SI and 3SI did not broaden the alleged scheme so substantially that Defendants lacked notice of the charges against them. First, as to the inclusion of the language "certain business partners" to describe some of the investor victims, the Court finds this amendment did not in fact alter the scheme. As explained below as to Motion to Dismiss No. 3, the Government has not redefined the term "investor"; the Government has simply clarified that "Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities." 3AC ¶ 3. These are simply "additional details" regarding the existing charges—not substantial amendments to them. *United States v. Spanier*, 744 F. App'x 351, 355 (9th Cir. 2018). Moreover, though evidence of other victims is certainly relevant to the overarching scheme to defraud, the specific victims charged in Counts Three through Eight are Investors #1-#6; these victims are

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS
13

unchanged across the charging documents at issue.  Under these circumstances, the Court sees no significant change to the challenged charges.

Defendants' argument regarding the change in the scheme's length fares no better.  It is true that the 2SI and 3SI, on their face, change the start date for the scheme from 2013 to 2010.  Importantly, however, the conduct alleged by the 2SI and 3SI remains the same—the content of the false and misleading statements, the means through which Defendants allegedly made those statements, the targets of the statements, and the wires.  That the Government now alleges Defendants' course of conduct to have begun three years earlier is a modest change, and does not defeat tolling.

With that, the Court finds that the versions of Counts Three through Eight in the 2SI and 3SI are substantially the same as the version alleged in the 1SI.  The 2SI and 3SI therefore relate back to the 1SI as to the relevant counts, making them timely under the statute of limitations.  Defendants' motion to dismiss Counts Three through Eight is DENIED.

### B.    Counts Ten and Eleven

Defendants argue that Counts Ten and Eleven are also time-barred.  These are two of the individual counts of wire fraud arising out of the scheme to defraud patients; they are based on new wirings not previously charged in the 1SI.

| COUNT | DATE | WIRED FROM | WIRED TO | DESCRIPTION |
|---|---|---|---|---|
| 10 | 5/11/2015 | California | Arizona | Patient E.T.'s laboratory blood test results |
| 11 | 5/16/2015 | California | Arizona | Patient M.E.'s laboratory blood test results |

3SI at 10.

Again, 18 U.S.C. § 3282 is the applicable statute of limitations.  It states, in pertinent part, that "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  18 U.S.C. § 3283(a).  The parties agree, and it is a matter of record, that

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

14

neither the 2SI nor the 3SI satisfies this requirement, as they were not filed within five years of the above wires. *See United States v. Beardslee*, 197 F.3d 378, 385 (9th Cir. 1999) ("A limitation period begins to run only when all the elements of the underlying offense have been committed."), *amended on denial of reh'g*, 204 F.3d 983 (9th Cir. 2000); *cf. United States v. Hymes*, 113 F. App'x 755, 756 (9th Cir. 2004) ("In the case of mail fraud, the crime is not complete until the defendant uses the mail or causes the mail to be used in execution of the scheme to defraud."). The parties also agree, however, that the Superseding Information filed on May 8, 2020 falls within five years of the wirings. Accordingly, the Government argues that the Superseding Information tolled the statute of limitations as to Counts Ten and Eleven and that the 2SI and 3SI relate back to the Superseding Information. Opp. re Mot. No. 2 at 6; *see, e.g.*, *United States v. Avery*, 747 F. App'x 482, 484 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1215 (2019) ("The Indictment was timely since it related back to the earlier Information.").

In response, Defendants do not contest that the Superseding Information contains all the allegations in the 2SI and 3SI, and that relation back would therefore be appropriate. Instead, Defendants contend that filing the Superseding Information was not enough to "institute" it within the meaning of 18 U.S.C. § 3283(a). In Defendants' view, "[a]n information is 'instituted' only when it is effective to 'get established' or 'commence' a federal criminal case" and, in the case of a felony, an information is "effective to do so only . . . when it is accompanied by a waiver of indictment." Mot. No. 2 at 10.

It is beyond dispute that, absent a waiver of indictment, the filing of an information in a felony case would not empower the Government to "prosecute" the defendant—i.e., to bring the defendant to trial or accept a guilty plea. *See* U.S. Const. amend. V; Fed. R. Crim. P. 7(a)(1) ("An offense (other than criminal contempt) must be prosecuted by an indictment if it is punishable . . . by imprisonment for more than one year."); Fed. R. Crim. P. 7(b) (allowing a defendant to waive prosecution by indictment). It does not follow, however, that an information must be effective for all prosecutorial actions in order for it to toll the statute of limitations. For the below reasons, the

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

15

SER-260

*United States District Court*
*Northern District of California*

Court holds that the filing of an information without an accompanying waiver is sufficient to toll the statute of limitations—even though it may not be effective for other purposes.

First, as to the plain language of the statute, 18 U.S.C. § 3282 requires only that the "information" be "instituted" in order to satisfy the statute of limitations; there is no suggestion that further requirements must be met. Defendants respond that the plain meaning of the word "institute" is "[t]o being or start; commence," or "to originate and get established." Mot. No. 2 at 9. That is true, as far as it goes. But as the Government points out, the object of the word "instituted" is the "information"; thus, what must be "commenced" is not the entire criminal prosecution, but merely the "information." 18 U.S.C. § 3282(a); *accord United States v. Burdix-Dana*, 149 F.3d 741, 743 (7th Cir. 1998) ("There is nothing in the statutory language of 18 U.S.C. § 3282 that suggests a prosecution must be instituted before the expiration of the five year period; instead the statute states that the information must be instituted."). In an existing criminal case like this one, an information may be "established" simply by filing it with the court. Separately, a waiver may be obtained under Rule 7(b), but one is not required for an information to come into being.

That "[n]otice to the defendant is the central policy underlying the statutes of limitations," *Pacheco*, 912 F.2d at 305, further supports the Court's reading of § 3283. Regardless whether the defendant has executed a waiver of indictment, a properly instituted information gives the defendant notice of the allegations of the charges contained therein. The circumstances of this case illustrate the point. In April 2020, the Government advised Defendants that it intended to supersede the indictment and provided a draft copy of the Superseding Information to Defendants. Dkt. No. 372. It was unable to obtain an indictment before the limitations period elapsed because grand jury proceedings were suspended in this District for the two months leading up to the deadline to assert Counts Ten and Eleven. Thus, in filing the Superseding Information in May 2020, the Government had done all it could to provide notice of the impending charges to Defendants. The Government then promptly sought and obtained the 2SI and 3SI in July 2020,

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

16

when grand jury proceedings had resumed.  The Court is therefore satisfied that allowing the Superseding Indictment to toll the limitations period is in keeping with the policy of notice to the defendant.

Third, contrary to Defendants' contention, the Supreme Court's holding in *Jaben v. United States*, 381 U.S. 214 (1965), does not dictate a different reading.  There, the Court interpreted the Internal Revenue Code's statute of limitations governing felony tax evasion, which provides that "[w]here a complaint is instituted before a commissioner of the United States within the period above limited, the time shall be extended until the date which is 9 months after the date of the making of the complaint before the commissioner of the United States." *Id.* at 215-16 (quoting I.R.C. § 6531).  The Supreme Court found that "the complaint, to initiate the time extension, . . . must satisfy the probable cause requirement of [Federal] Rule [of Criminal Procedure] 4." *Id.* at 220-21.  Rule 4 provided, in pertinent part, that "[i]f it appears from the complaint that there is probable cause to believe that an offense has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall issue . . . ." *Id.* at 217 n.1.

Defendants take this holding to mean that the word "institute" necessarily means "adequate to begin effectively the criminal process prescribed by the Federal Criminal Rules." Mot. No. 2 at 13.  But the term "institute" must be read in context, and *Jaben* involved statutory language that is materially different from that at hand.  To begin with, the *Jaben* Court considered when a *complaint* is instituted.  Critical to the Supreme Court's reasoning was that under Federal Rule of Criminal Procedure 3, a complaint must be "made upon oath before a commissioner or other officers empowered to commit persons charged with offenses against the United States." 381 U.S. at 217 (quoting the then-applicable version of Rule 3).  The statute of limitations at issue in *Jaben* also specified that the complaint must be "instituted *before a commissioner of the United States within the period above limited*" in order to trigger the extension.  Because "the Commissioner's basic functions under the Rules are to make the judgment that probable cause exists and to warn defendants of their rights," the Supreme Court explained, probable cause must be required for a

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

17

complaint to be "instituted" under I.R.C. § 6531; otherwise, the Commissioner's role would be a nullity. *Id.* at 218. By contrast, there are no analogous requirements for filing an information, and 18 U.S.C. § 3282 states only that an information must be "instituted." As a result, *Jaben* is confined to its statutory context and sheds no light on the meaning of "instituted" here.

Meanwhile, the majority of those courts which have addressed this precise issue have also held that the filing of an information is sufficient to satisfy 18 U.S.C. § 3282. *See United States v. Burdix-Dana*, 149 F.3d 741 (7th Cir. 1998) ("We hold that the filing of the information is sufficient to institute it within the meaning of 18 U.S.C. § 3282."); *United States v. Cooper*, 956 F.2d 960 (10th Cir. 1992) ("Rule 7(b) does not prohibit the filing of an information in the absence of waiver of indictment by the defendant. Instead, the rule proscribes prosecution without waiver. Therefore, the information could have been filed within the period of limitations, thus providing a valid basis for the prosecution."); *United States v. Briscoe*, No. CR RDB-20-0139, 2020 WL 5076053, at *2 (D. Md. Aug. 26, 2020) ("An information is 'instituted' when it is properly filed, regardless of the Defendant's waiver."); *United States v. Marifat*, WBS-17-0189, 2018 WL 1806690, at *2-3 (E.D. Cal. Apr. 17, 2018) (following *Burdix-Dana*); *United States v. Hsin–Yung*, 97 F.Supp.2d 24, 28 (D.D.C. 2000) (same); *United States v. Stewart*, 425 F. Supp. 2d 727, 731-35 (E.D. Va. 2006) (same); *United States v. Watson*, 941 F. Supp. 601, 603-04 (N.D.W. Va. 1996) (same). The Court sees no reason to part company with these courts.

In sum, then, the Court finds that the Superseding Information sufficed to toll the statute of limitations as to Counts Ten and Eleven, that the 2SI and 3SI relate back to the Superseding Information, and that Counts Ten and Eleven are thus timely. Defendants' motion to dismiss Counts Ten and Eleven is DENIED.

## V.    MOTION TO DISMISS NO. 3 BASED ON LACK OF NOTICE OR, IN THE ALTERNATIVE, FOR BILL OF PARTICULARS

Next, the Court considers Defendants' motion to dismiss the 3SI and 2SI in part on the ground that the indictments fail to provide fair notice of the charges. Dkt. No. 496 ("Mot. No. 3"); *see also* Dkt. No. 522 ("Opp. re Mot. No. 3"); Dkt. No. 541 ("Reply re Mot. No. 3"). As an

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

18

alternative to dismissal, Defendants move for an order requiring the Government to provide a bill of particulars pursuant to Federal Rule of Criminal Procedure Rule 7(f).

An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The purpose of this requirement is "to enable [the defendant] to prepare his defense, to ensure that the defendant is prosecuted on the basis of facts presented to the grand jury, to enable him to plead jeopardy against a later prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979). However, "the Government need not allege its theory of the case or supporting evidence, but only the essential facts necessary to apprise a defendant of the crime charged." *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982) (internal quotation marks omitted). "The test for sufficiency of the indictment is 'not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Holden*, 806 F.3d 1227, 1233 (9th Cir. 2015) (internal quotations omitted). And, the indictment stage "is not the appropriate time to require the Government to present its proof." *Buckley*, 689 F.2d at 900.

Defendants move to dismiss Count One (conspiracy to commit wire fraud against Theranos investors) and Counts Three through Eight (individual counts of wire fraud against Investors #1-#6) as insufficiently pleaded. As noted above, Defendants are alleged to have "engaged in a scheme, plan, and artifice to defraud investors." 3SI ¶ 11. Defendants say that prior to the 3SI and 2SI, they understood "investors" to mean the "finite set of individuals and entities that invested money in Theranos in return for company securities." Mot. No. 3 at 1. Defendants take no issue with this definition of the term "investor"; indeed, they concede that if the term "investor" is "limited to individuals and entities [that] purchased Theranos securities, they can be easily identified." *Id.* at 10. That is why, Defendants say, they did not move for disclosure of the names of alleged "investors" in the prior indictment. *Id.* at 12.

Instead, Defendants' motion centers on Paragraph 3 of the 2SI and 3SI, which describe the

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS
19

United States District Court
Northern District of California

entity Theranos at a high level.  The pertinent part of the paragraph reads:

> When Theranos solicited and received financial investments from investors, the money was deposited into its Comerica Bank account. Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities.

3SI ¶ 3.  Defendants argue that the 3SI and 2SI apply a "new," "broader" definition of "investors" by explaining that "Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities," 3SI ¶ 3.  Mot. No. 3 at 8.  "In light of the government's new, vague, definition of 'investors,'"—which now sweeps in "certain business partners" and "members of the Board of Directors,"—Defendants say, "the universe of potentially defrauded individual or entity 'investors' is unknowable." *Id.* at 9-10. Defendants believe the 3SI and 2SI must therefore be dismissed as impermissibly vague; alternatively, Defendants ask that the Government be required to disclose which investors they are alleged to have defrauded, the representations allegedly made to the new categories of investors, and the basis of any alleged duties to disclose as to those investors. *Id.* at 10-11; Reply re Mot. No. 3 at 6-9.

But the Court is not persuaded that there has been any expansion in the definition of "investors" by the 3SI and 2SI.  The Ninth Circuit has made clear that an indictment should be "read as a whole" and "construed according to common sense." *Buckley*, 689 F.2d at 899.  On their face, the new indictments do not disturb the prior, usual understanding of "investors" as meaning "individuals and entities that purchased Theranos securities."  Rather, read with common sense, the sentence at issue simply provides an additional description of the makeup of Theranos's investors.  That is, the sentence indicates that among the purchasers of Theranos securities are "certain business partners and "members of the Board of Directors."  Defendants do not dispute that a business partner or board member could also be an investor.  And to say that investors

United States District Court
Northern District of California

included "business partners" and "members of its board of directors" does not signify that *any* business partner or board member could be an investor—even if they did not purchase securities. Thus, the Court does not believe the 2SI and 3SI "redefine" the term "investor."

Moreover, the Government confirms in their briefing that they continue to use "investors" in the traditional sense, i.e., to refer to individuals and entities that "paid money to Theranos and in return received Theranos securities." Opp. re Mot. No. 3 at 5. To demonstrate that is the case, the Government points to evidence showing (1) that Safeway and Walgreens—business partners of Theranos—obtained and exercised rights to obtain promissory notes convertible to Theranos stock, *see* Opp. re Mot. No. 3 at 5-6; and (2) that "multiple members of Theranos's Board appear as stockholders on Theranos's Stock Certificate Ledger," which lists "the year when a given member obtained Theranos shares, how many shares were acquired, and how the Board member paid Theranos," *see id.* at 6. The Government has thus shown that there exist business partners and board members who acquired Theranos securities. Under these circumstances, the Court sees no basis for the Defendants' concern that the Government "intends to charge deception of Board members" or business partners who did not purchase Theranos securities. Mot. No. 3 at 7-9. And to the extent Defendants worry that the Government will later attempt to treat as investors "business partners" or "members of the Board of Directors" who did not purchase securities, the Government will be precluded from doing so by its representations here and the Court's holding in partial reliance thereon.

In Reply, Defendants pivot to argue that the common understanding of "investor" refers only to "outsiders who purchased equity shares in an arms-length transaction" as opposed to all purchasers of Theranos securities. Reply re Mot. No. 2 at 4. But to the extent Defendants previously assumed that "investors" were so limited, they have not justified that assumption. There is no suggestion in the 1SI that the defrauded investors were confined to those who purchased equity stocks in arms-length transactions. Nor is it commonsensical to exclude holders of securities other than equity stocks from "investors." In fact, Defendants' own opening motion

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

21

United States District Court
Northern District of California

brief repeatedly refers to investors as "individuals and entities that invested money in Theranos in return for company *securities*." Mot. No. 3 at 1; *see also id.* at 10. Thus, it is Defendants who now attempt to redefine the term "investor," arbitrarily narrowing it to exclude the convertible promissory notes allegedly acquired by Safeway and Walgreens. The 3SI and 2SI are fully consistent with the common sense definition of investors.

Having found no change in the meaning of "investors" in the 3SI and 2SI, the Court also rejects Defendants' request for a bill of particulars specifying the misrepresentations made and duty to disclose owed to the investors who are business partners or board members. The 3SI and 2SI contain the same allegations describing the specific misrepresentations as the 1SI, which this Court previously found to be sufficient to provide Defendants' notice. *Holmes*, 2020 WL 666563, at *9. The Government made clear at the hearing that those allegations apply also to the "business partner" investors and "board member" investors, and that it is not asserting any new or different misrepresentations as to those categories of investors. The same is true of the allegations regarding the Defendants' duty to disclose: The Government continues to rely on the same theory previously blessed by this Court, see *Holmes*, 2020 WL 666563, at *11, as to all investors. The Court affirms its prior holding that these allegations provide sufficient notice, and that a bill of particulars is not necessary.

Of course, should the Government attempt at trial to advance a distinct theory as to the business partners or board members that is not disclosed in the 3SI and 2SI, that will not be permitted. But this is not the stage to evaluate the Government's evidence. It is enough that the 3SI and 2SI provide sufficient notice of the charges against the Defendants, wherefore their motion to dismiss the 3SI and 2SI in part is DENIED.

## VI.   MOTION TO DISMISS NO. 4 BASED ON DUPLICITY

The Court must also DENY Defendants' fourth motion to dismiss, which relies on similar arguments as the third motion to dismiss. In their motion, Defendants argue that Counts One and Three through Eight of the 2SI and 3SI should be dismissed as duplicitous. *See* Dkt. No. 497

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

22

("Mot. No. 4"); *see also* Dkt No. 517 ("Opp. re Mot. No. 4"); Dkt. No. 542 ("Reply re Mot. No. 4"). "Duplicity is the joining in a single count of two or more distinct and separate offenses," *United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir. 1976), and it is barred by the Fifth and Sixth Amendments, *see United States v. King*, 200 F.3d 1207, 1212 (9th Cir. 1999). In this case, Defendants contend that the "scheme to defraud investors" alleged in the new indictments can no longer "fairly be read as a single scheme" because they "include a new definition of 'investors'" encompassing "individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities." *See* Mot. No. 4 at 1.

But as the Court has already found, the 2SI and 3SI do not "broaden" the realm of "investors" alleged to be victims of the scheme to defraud. Investors were, and are, the individuals and entities who purchased Theranos securities during the charged period. The 3SI and 2SI simply clarifies that some of those individuals and entities are also "business partners" or "members of its board of directors, and that some of those individuals and entities made their investments "through firms formed for the exclusive or primary purpose of investing in Theranos's securities." 3SI ¶ 3.

And though Defendants attempt to split these investors into "five separate categories," the 3SI and 2SI do not contain any new or "separate" allegations for individual "categories." For instance, although Theranos may have had special contractual obligations to Walgreens in connection with their business partnership, the Government's theory does not appear to rely upon those obligations. Mot. No. 4 at 7. The Government stated unequivocally that it is relying on the same alleged misrepresentations, the same methods and means for making those misrepresentations, and the same duty to disclose as to all relevant investors, as previously alleged in the 1SI. *See* 3AC ¶¶ 12-13. Hence, it is untrue that "the Indictments here provide no such connection among the disparate categories of so-called 'investors.'" Mot. No. 4 at 6.

Moreover, as the Government points out, the Ninth Circuit takes a "broad view" of what

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD SUPERSEDING INDICTMENTS
23

constitutes a "single scheme" to defraud.  As relevant here, "the defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme." *United States v. Morse*, 785 F.2d 771, 774 (9th Cir. 1986); *see also United States v. Bryan*, 868 F.2d 1032, 1037 (9th Cir. 1989) (scheme to defraud both taxpayers and the United States Treasury was not duplicitous).  In *Morse*, for instance, the Ninth Circuit held that an indictment charging a mail fraud scheme comprised of four separate investment programs—a program involving oil and gas drilling, a program placing video games in arcades, a program leasing heavy equipment to oil field operators, and a program reactivating old proven oil wells— was not duplicitous.  785 F.2d at 773-74.  Even though the victims were different and the companies through which the defendants operated were different, "the ventures comprising the scheme were of a similar nature in that all four were promoted as income producing tax shelters." *Id.* at 775.  Under this permissive standard, the instant scheme to defraud investors through similar misrepresentations and means easily qualifies.

Finally, Defendants are concerned that the Government may attempt to introduce evidence at trial of misrepresentations that were not made to obtain investments—for instance, "alleged misrepresentations . . . made to Walgreens and Safeway in pursuing and maintaining partnerships with the entities."  Mot. No. 4 at 7 (internal quotation marks omitted).  However, the admissibility of such evidence is properly raised in a motion in limine.  "A duplicity claim is directed at the face of the indictment," *United States v. Gordon*, 844 F.2d 1397, 1400 (9th Cir. 1988), and the 3SI and 2SI do not, on their face, charge multiple schemes to defraud.  The motion to dismiss for duplicity is therefore DENIED.

## VII.   MOTION TO DISMISS NO. 5 AND MOTION TO STRIKE FOR FAILURE TO STATE AN OFFENSE AGAINST DOCTORS

Defendants' fifth motion to dismiss claims that the 3SI and 2SI violate this Court's prior order holding that the 1SI had not sufficiently alleged a scheme to defraud doctors.  Dkt. No. 499 ("Mot. No. 5"); *see also* Dkt. No. 520 ("Opp. re Mot. No. 5"); Dkt. No. 544 ("Reply re Mot. No. 5").

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

24

**SER-269**

This Court previously granted Defendants' motion to dismiss the 1SI in part for failure to allege that Defendants intended to deprive doctors of money or property. *United States v. Holmes*, No. 5:18-CR-00258-EJD, 2020 WL 666563, at *19 (N.D. Cal. Feb. 11, 2020). As the Court explained, the specific intent element of wire fraud "must be the intent to obtain money or property from the one who is deceived." *Id.* at *16 (quoting *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (alterations omitted)); *see also United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (holding that "wire fraud requires the intent to deceive and cheat—in other words, to deprive the victim of money or property by means of deception"). This requirement is known as convergence. The Court found that the 1SI contained "no showing that the doctors lost money or property or that Defendants intended for them to lose money or property" and dismissed Counts Two and Nine through Eleven "to the extent they depend on doctor-victims." *United States v. Holmes*, No. 5:18-CR-00258-EJD, 2020 WL 666563, at *20 (N.D. Cal. Feb. 11, 2020).

Like the 1SI, the 2SI and 3SI contain no allegations suggesting that Defendants intended to deprive doctors of money or property. Yet—Defendants say—these new indictments continue to "depict both doctors and patients as independent victims of the alleged scheme to defraud." Mot. No. 5 at 3. Defendants therefore ask the Court to dismiss Counts Two and Nine through Twelve of the 3SI and Counts Two and Nine through Eleven of the 2SI because they continue to violate the convergence principle. Alternatively, Defendants ask for various references to "doctors" to be stricken.

In response, the Government disclaims any theory of liability based on doctors as victims, emphasizing that the 3SI "does away with any claim that doctors are fraud victims in this case." Opp. re Mot. No. 5 at 4. The Government says that they have significantly modified the allegations regarding the scheme—now referred to as "The Scheme to Defraud Patients," 3AC at 6, 8—to comply with the Court's ruling. The Government explains that the 3SI and 2SI still reference doctors, however, because "they fit into Defendants' fraud targeting patients." Opp. re Mot. No. 5 at 4. Specifically, the Government alleges that doctors served as one of the means

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

25

SER-270

through which Defendants deceived patients. *Id.* at 5. According to the Government's theory, "these allegations reflect the obvious fact that doctors advise their patients on laboratory selection when tests are needed, and act as representatives of their patients when communicating with labs about test results." *Id.*

Having reviewed the 3SI and 2SI, the Court finds that the Government has indeed amended many of the allegations to reflect that doctors cannot be considered victims of the scheme to defraud. Defendants are correct that some of the allegations remain ambiguous. In particular, Paragraph 14 alleges:

> Between approximately 2013 and 2016, HOLMES and BALWANI, through advertisements and solicitations, encouraged and *induced doctors* and patients to use Theranos's blood testing laboratory services.

3SI ¶ 14. Paragraph 22 similarly alleges that Defendants devised

> a scheme and artifice to defraud as to a material matter and to obtain money by means of materially false and fraudulent representations, specifically by soliciting, encouraging, or otherwise *inducing doctors to refer and patients to pay for* and use its laboratory and blood testing services under the false and fraudulent pretense that Theranos technology produced reliable and accurate blood test results.

3SI ¶ 22. These allegations could be construed as depicting doctors as victims. But read as whole, the 3SI and 2SI make sufficiently clear that they allege a scheme to defraud *patients*. *See id.* at 6 (section titled "The Scheme to Defraud Patients"), 8 ("Conspiracy to Commit Wire Fraud against Theranos Patients"), ¶ 15 ("HOLMES and BALWANI devised a scheme to defraud patients"). Moreover, the Government has confirmed its understanding of and compliance with the Court's prior ruling. Accordingly, although the Court agrees that Paragraphs 14 and 22 "could have been more artful," *Hinton*, 222 F.3d at 672, they do not warrant dismissal and need not be stricken.

Defendants respond that the convergence principle also bars the Government from arguing that "Defendants deceived one group of individuals (here, doctors) in order to deprive another group of individuals (here, patients) of money or property." Mot. No. 5 at 3-4. But that is not the

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD SUPERSEDING INDICTMENTS

26

**SER-271**

Government's theory.  The Government's theory is that Defendants intended to deceive patients, and that part of the scheme to deceive patients involved deceiving doctors.  *See, e.g.*, 3SI ¶ 15 ("Based on these representations, many hundreds of patients paid Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results, sometimes following referrals from their misled doctors.").  To the extent Defendants believe "allegations that a defendant deceived one party" cannot be "probative . . . of an intent to defraud another," the Court cannot agree.  There is no question that doctors may serve as conduits of information to their patients.  That there must be "at least some level of convergence between the fraud and the loss" does not make irrelevant all misrepresentations made to individuals other than those deprived of money or property.  *United States v. Ali*, 620 F.3d 1062, 1070 (9th Cir. 2010).

To be sure, there are issues still to be decided regarding what the Government must prove in order to succeed on its conduit theory.  These issues are best resolved through jury instructions.  And to the extent Defendants believe that evidence of misrepresentations to doctors would confuse the jury, that is the proper subject of a motion in limine.  As to the present motion, however, the Court reaffirms that doctors are not legally cognizable victims of Defendants' alleged fraud, and will hold the Government to its promise not to "argue at trial that the jury should convict Defendants of wire fraud based on a scheme to defraud doctors."  Opp. re Mot. No. 5 at 4.  The motion to dismiss or alternatively to strike is DENIED.

## VIII.   MOTION TO DISMISS NO. 6 BASED ON PRIOR MOTIONS TO DISMISS

Defendants' sixth and final motion to dismiss restates and incorporates all of the arguments previously made as to the 1SI, which apply with equal force to the 3SI and 2SI.  *See* Dkt. No. 500 ("Mot. No. 6"); *see also* Dkt. No. 519 ("Opp. re Mot. No. 6"); Dkt. No. 545 ("Reply re Mot. No. 6").  Defendants' arguments made at Docket Numbers 204, 205, and 206 are hereby preserved as to the 3SI and 2SI.  The Court reaffirms its rulings as to those prior arguments[3], wherefore the

---

[3] Defendants also seek reconsideration of the Court's holding that the Government had adequately alleged a duty to disclose.  The Court finds that Defendants have not set forth grounds justifying reconsideration.  *See Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD
SUPERSEDING INDICTMENTS

27

United States District Court
Northern District of California

motion to dismiss on those grounds is DENIED.  *See United States v. Holmes*, No. 5:18-CR-00258-EJD, 2020 WL 666563 (N.D. Cal. Feb. 11, 2020).

**IT IS SO ORDERED.**

Dated: October 13, 2020

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

Cir. 1989) ("[T]he major grounds that justify reconsideration involve an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.").  However, Defendants are free to raise the issue of what the Government must show to establish an informal fiduciary relationship for the purpose of jury instructions.

Case No.: 18-cr-00258-EJD
ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD SUPERSEDING INDICTMENTS

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ELIZABETH A. HOLMES and RAMESH "SUNNY" BALWANI,

Defendants.

Case No. 5:18-cr-00258-EJD

**ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT**

Re: Dkt. Nos. 204, 205, 206

Defendants Elizabeth Holmes and Ramesh "Sunny" Balwani are charged with nine counts of wire fraud in violation of 18 U.S.C. § 1343 and two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  The charges stem from Defendants' allegedly deceptive representations about their company, Theranos, and its technology.  Three motions are before the Court: (1) Defendants'[1] motion to dismiss the superseding indictment for lack of notice and, in the alternative, for a bill of particulars; (2) Defendants' motion to dismiss the superseding indictment in part for failure to allege falsity and motion to strike; and (3) Defendants' motion to dismiss

---

[1] While Defendant Holmes brought the three motions to dismiss, Defendant Balwani joined each motion and reply.  *See* Dkt. Nos. 207, 208, 209, 306, 307, 308.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

1

SER-274

United States District Court
Northern District of California

counts two and nine through eleven of superseding indictment.  Having had the benefit of oral argument on February 10, 2020 and having considered the Parties' papers, the Court **GRANTS in part** and **DENIES in part** Defendants' (1) motion to dismiss for lack of notice and (2) motion to dismiss counts two and nine through eleven and **DENIES** Defendants' motion to dismiss for failure to allege falsity.

## I.       BACKGROUND

### A.  Factual Background

Defendant Holmes founded Theranos, a health care and life sciences company, in 2003. Superseding Indictment ¶ 1 ("SI"), Dkt. 39.  Defendant Holmes served as the Chief Executive Officer of the company.  *Id.*  Defendant Balwani served as a board member, the President, and the Chief Operating Officer of Theranos.  *Id.* ¶ 2.

Theranos' stated mission was to revolutionize medical laboratory testing through its allegedly innovative methods of drawing blood, testing blood, and diagnosing patients.  *Id.* ¶ 5. During the company's first ten years, it pursued the development of proprietary technology that could run clinical tests using only tiny drops of blood.  *Id.*  Theranos also worked to develop a method for drawing only a few drops of capillary blood from a patient's finger using a small lancet.  *Id.*  That blood was then stored in a "nanotainer."  *Id.*  Theranos sought to develop a second device, termed the "TSPU" (Theranos Sample Processing Unit), "Edison," or "miniLab," that could quickly and accurately analyze blood samples collected in the nanotainer.  *Id.*  The Government contends that the promises of these devices were never realized; the devices "consistently" produced inaccurate and unreliable results.  *Id.*  Despite this, Defendants began a publicity campaign to promote the company.  And, in September 2013, Theranos offered blood testing at Walgreens' "Wellness Centers" in California and Arizona.  *Id.* ¶ 10.

The Government argues that Defendants conspired to commit and committed two fraudulent schemes: a scheme to defraud investors and a scheme to defraud doctors and patients.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
2

United States District Court
Northern District of California

The Court outlines these below.

**Scheme to Defraud Investors.**  Defendants allegedly made materially false and misleading statements to investors and failed to disclose material facts to investors.  Based on the false statements, investors invested money in Theranos.  Specifically, from 2013 to 2015, Defendants made misstatements regarding:

1. **Theranos' Proprietary Analyzer:** Defendants allegedly made misstatements about Theranos' proprietary analyzer—the TSPU, Edison, or miniLab—when they claimed the analyzer was presently capable of accomplishing certain tasks, with more precision than other blood tests, and at a faster rate, when, in fact, Defendants knew these statements were false.  *Id.* ¶ 12(A).

2. **Theranos' Financial Health:** Defendants allegedly misrepresented Theranos' financial well-being when they told investors the company was financially strong and stable and would make huge profits in 2014 and 2015 when, in fact, they knew Theranos would only generate modest revenue.  *Id.* ¶ 12(B).

3. **Technology Demonstrations:** Defendants allegedly deceived investors through misleading technology demonstrations where they intended to cause potential investors to believe blood tests were being conducted on Theranos' proprietary analyzer when, in fact, Defendants knew the analyzer was operating in "null protocol."  *Id.* ¶ 12(C).

4. **Walgreens' Partnership:** Defendants allegedly misled investors when they told them Theranos had an expanding partnership with Walgreens when, in fact, the Walgreens rollout had stalled due to concerns with Theranos' performance.  *Id.* ¶ 12(D).

5. **United States Department of Defense ("DOD") Relationship:** Defendants allegedly told investors the company had a profitable and revenue-generating business relationship with the DOD and that Theranos technology was deployed on the battlefield.  In fact, Defendants knew that Theranos had limited revenue from military contracts and that its

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
3

United States District Court
Northern District of California

**SER-276**

technology was not used in the battlefield.  *Id.* ¶ 12(E).

6. **Food and Drug Administration ("FDA") Approval:** Defendants allegedly misled investors when they told investors that Theranos did not need the FDA to approve its proprietary analyzer and tests when, in fact, Defendants knew this to be false.  *Id.* ¶ 12(F).

7. **Patient Testing:** Defendants allegedly told investors that patient tests were conducted using Theranos manufactured analyzers.  In fact, Defendants knew that Theranos used third-party, commercially available analyzers.  *Id.* ¶ 12(G).

8. **Peer Review:** Defendants allegedly falsely told investors that Theranos technology had been examined, used, and validated by several national or multinational pharmaceutical companies and research institutions.  *Id.* ¶ 12(H).

9. **Media Representations:** Defendants allegedly made the false and misleading statements described above to reporters and then shared the resulting articles directly with potential investors and via the Theranos website.  *Id.* ¶ 12(I).

**Scheme to Defraud Doctors and Patients.**  The Government argues from 2013 to 2016, Defendants advertised and marketed Theranos technology to doctors and patients and falsely claimed that the tests were accurate and reliable.  *Id.* ¶¶ 15–16.  Claims about Theranos technology were implicit and explicit.  *Id.* ¶ 15.  Despite knowing that Theranos' technology[2] suffered from recurring accuracy and reliability problems, Defendants allegedly advertised the tests as accurate and reliable.  *Id.* ¶ 17.  Specifically, Defendants used materially false and misleading marketing materials and advertisements and transmitted Theranos blood results that Defendants knew contained, or likely contained, inaccurate information.  *Id.*  For instance, Theranos' public website touted its labs ability to perform tests "quickly and accurately on samples as small as a single

---

[2] The SI names specific blood tests—"calcium, chloride, potassium, bicarbonate, HIV, HbA1C, hCG, and sodium"—but also notes that the list of known, inaccurate blood tests is not limited to this list.  SI ¶ 16.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
4

United States District Court
Northern District of California

drop." *Id.* ¶ 9.  Defendants also allegedly provided reports to patients that contained or were likely to contain: (1) inaccurate and unreliable results; (2) improperly adjusted reference ranges defining a normal or healthy result for a given test; (3) improperly removed "critical" results, *i.e.* results suggesting a patient needed medical attention; and (4) results generated from improperly validated assays, further decreasing the reliability of those tests.  *Id.* ¶ 17.

### B.  Procedural History

Defendants filed three motions to dismiss.  The first motion argues the SI must be dismissed because it is unconstitutionally vague.  Motion to Dismiss Superseding Indictment for Lack of Notice and, in the Alternative, for a Bill of Particulars ("Notice Mot."), Dkt. 204.  The Government opposes this motion and argues that the SI is not vague because it gives Defendants sufficient information to understand their charges.  United States' Opposition to Defendants' Motion to Dismiss Superseding Indictment for Lack of Notice, and, in the Alternative, for a Bill of Particulars ("Notice Opp."), Dkt. 265.  Defendants maintain that the SI fails to provide adequate notice.  Reply in Support of Motion to Dismiss Superseding Indictment for Lack of Notice ("Notice Reply"), Dkt. 296.

The second motion argues that the SI must be dismissed because it does not support a conclusion that Defendants' alleged statements and omissions were materially false.  Motion to Dismiss Superseding Indictment in Part for Failure to Allege Falsity ("Falsity Mot."), Dkt. 205.  The Government opposes this.  United States' Opposition to Defendants' Motion to Dismiss the Superseding Indictment in Part for Failure to Allege Falsity and Motion to Strike ("Falsity Opp."), Dkt. 266.  In their Reply, Defendants maintain that material falsity is not shown in the SI.  Reply in Support of Motion to Dismiss in Part for Failure to Allege Falsity ("Falsity Reply"), Dkt. 297.

The third motion argues that the counts in the SI (counts two and nine through eleven) must be dismissed because they fail to allege the required element of specific intent to commit wire fraud.  Motion to Dismiss Counts Two and Nine Through Eleven of Superseding Indictment

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

5

SER-278

United States District Court
Northern District of California

("Counts Mot."), Dkt. 206. The Government opposes this. United States' Opposition to Defendants' Motion to Dismiss Counts Two and Nine Through Eleven of Superseding Indictment ("Counts Opp."), Dkt. 267. Defendants maintain that these counts fail to allege intent to defraud. Reply in Support of Motion to Dismiss Counts Two and Nine Through Eleven of Superseding Indictment ("Counts Reply"), Dkt. 298.

The Court addresses each motion in turn.

## II. DEFENDANTS' MOTION TO DISMISS FOR LACK OF NOTICE AND, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS

### A. Lack of Notice

#### 1. Legal Standard

Federal Rule of Criminal Procedure 7 requires that an indictment contain a "plain, concise, and definite written statements of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). To pass constitutional muster, an indictment must

> furnish the defendant with a sufficient description of the charges against him to enable him to prepare his defense, to ensure that the defendant is prosecuted on the basis of facts presented to the grand jury, to enable him to plead jeopardy against a later prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge.

*United States v. Cecil*, 608 F.3d 1294, 1297 (9th Cir. 1979); *but see Russell v. United States*, 369 U.S. 749, 763 (1962)) ("[W]here the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars." (quotation mark and citation omitted)).

At the motion to dismiss stage, "the issue in judging the sufficiency of the indictment is whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge, not whether the Government can prove its case." *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982). So long as the indictment contains the "essential facts

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

6

United States District Court
Northern District of California

necessary to apprise a defendant of the crime charged," the indictment must stand. *Id.* "Because the requirement of a sufficient indictment serves these important purposes, the indictment must be considered as it was actually drawn, not as it might have been drawn." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000); *see also United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) ("In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment.").[3]

### 2. Analysis

The essential elements of wire fraud are: (1) a scheme to defraud; (2) the use of a wire, radio, or television to further the scheme; and (3) a specific intent to defraud. *United States v. Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017).[4]

Defendants argue that because wire fraud is "generic in nature," the SI must contain factual particularity above and beyond the generic statutory language. Notice Mot. at 3. In Defendant's view, because materially false or fraudulent representations are "part and parcel" of wire fraud, an indictment must go beyond the "generic" requirements of wire fraud and specify, in detail, the particular fraudulent representations and pretenses that make up an alleged scheme to defraud. *Id.* at 4. The Government rebuts this and argues that Defendants are on "fair notice" of what they will face at trial. Notice Opp. at 7. In the Government's view, the SI outlines Defendants' overall schemes to defraud investors, patients, and doctors, and provides details about those schemes. *Id.* at 3–4. The Government contends that an indictment need not allege verbatim quotes to adequately provide notice. *Id.* at 11. The Government argues the SI is constitutionally sound because it provides details about the "substance" of the allegations and so Defendants have "fair

---

[3] For this reason, the Court does not consider Defendants' arguments about what the Government's motions assert. *See, e.g.*, Notice Reply at 1.

[4] Conspiracy requires an agreement "among two or more persons that would satisfy the elements of the substantive offense of wire fraud." *United States v. Hussain*, 2017 WL 4865562, at *5 (N.D. Cal. Oct. 27, 2017). Hence, to state a charge of conspiracy, the indictment must adequately specify the underlying fraud.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
7

notice" about what they will face at trial. *Id.* at 8.

Defendants rely primarily on *Russell v. United States*, 369 U.S. 749 (1962), *United States v. Cecil*, 608 F.2d 1294 (9th Cir. 1979), *United States v. Curtis*, 506 F.2d 985 (10th Cir. 1974), and *United States v. Keuylian*, 23 F. Supp. 3d 1126 (C.D. Cal. 2014). In *Russell*, the Supreme Court held that the indictment was unconstitutionally vague. 369 U.S. 754–55. There, the defendants were convicted of refusing to answer certain questions posed by a congressional subcommittee. *Id.* at 752. The indictment, however, failed to identify the subject matter under congressional subcommittee inquiry. *Id.* This, the Supreme Court concluded, was a constitutional violation because the underlying charge depended on the subject-matter of the questions. *Id.* at 764, 768. The indictment's failure to contain the subject-matter that was under inquiry resulted in two main problems: (1) the defendant would be forced to proceed to trial with a "cryptic" indictment that leaves the "chief issue[s] undefined" and (2) the prosecution could fill in the gaps of an indictment by "surmise or conjecture." *Id.* at 766. The Supreme Court thus held that the indictment failed the constitutional requirement of fair notice. *Id.*

In *Cecil*, the Ninth Circuit held that the indictment's "glaring lack of factual particularity" ran afoul of the fair notice requirement. 608 F.2d at 1294. There, the "rather barren" indictment mostly tracked the text of the relevant conspiracy statutes. *Id.* at 1296. It only made "two specific allegations concerning the conspiracies:" (1) it identified the locations of the conspiracy and (2) it stated the names of the alleged conspirators. *Id.* at 1297. The indictment, however, failed to place the conspiracies within any timeframe or provide any facts or circumstance about the conspiracy. *Id.* The complete lack of factual allegations prevented the defendants from understanding the charges and preparing a defense.

Likewise, in *Curtis*, the Tenth Circuit held that the indictment was so vague that "the grand jury may have had a concept of the scheme essentially different from that relied upon by the government before the trial jury." 506 F.2d at 989. There, the defendant founded a dating service.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

8

United States District Court
Northern District of California

*Id.* at 986–87.  All the indictment alleged was that the service was a sham, it provided no detail as to why it was a sham.  *Id.*  Thus, on appeal, the court concluded that the indictment was unconstitutionally vague because it contained no language about *what* conduct formed the scheme.  *Id.* at 992

Finally, in *Keuylian*, the court held that the indictment had to be dismissed because it tracked the statutory language.  23 F. Supp. 3d at 1129.  The indictment never stated the alleged false statements, misrepresentations, or false pretenses that constituted the scheme to defraud.  *Id.*

Defendants admitted at oral argument that the SI contains more detail than the indictments at issue in the above cases.  Nevertheless, they argue that this case is analogous to those cases.  Defendants argue that because this case focuses on two complex, immense, and vast schemes, the above cases support the requirement of an indictment with more specificity.  The SI's factual and temporal span makes the omission of details like the names of speaker(s) and the targets, dates, context, and verbatim wording of misstatements unconstitutional.

But Defendants misread *Russell*, *Cecil*, *Curtis*, and *Keuylian*.  Admittedly, none of these cases require an indictment to contain such extensive detail.  The vastness of the schemes alleged do not change this conclusion—the Government need not allege in the indictment its case theory or the evidence underlying the charges.  The Government must only provide enough facts to apprise a defendant of what defense should be prepared for trial.  Hence, the Government need not allege specific misstatements to meet the "fair notice" requirement.  This is confirmed by *United States v. Buckley*, 689 F.2d 893 (9th Cir. 1982).  "[A]n indictment should be: (1) read as a whole; (2) read to include facts which are necessarily implied; and (3) construed according to common sense."  *Id.* at 899.  Common sense, not specific allegations is the standard.  *See Curtis*, 506 F.2d at 990 ("While the particulars of the scheme . . . must be described with a degree of certainty sufficient to . . . fairly to acquaint the defendant will [sic] the particular fraudulent scheme charged against him, still the scheme itself need not be pleaded with all the certainty in respect of *time*,

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
9

United States District Court
Northern District of California

*place, and circumstance . . . .*" (emphasis added)).

Reading the indictment as a whole and with common sense, the Court holds that the SI is constitutionally sound because it:

- **Establishes a Particular Factual Universe.**  The SI establishes the "universe" of facts giving rise to the charges.  For instance, paragraphs four through nine adequately apprise Defendants that Theranos' statements promising "quick" and "accurate" diagnostic blood testing using "a single drop [of blood]" are at issue and underlie the wire fraud and conspiracy charges.  *Compare* SI ¶¶ 4–9, *id.* § 10 (describing Theranos' partnership with Walgreens, their alleged fraudulent promises, and other facts giving rise to the charges), *with Keuylian*, 23 F. Supp. 3d at 1129 (dismissing indictment because it failed to describe any of the deceptive acts underlying the alleged scheme to defraud and thus only showed willful breach of contract).

- **States the Acts Underlying the Investor Scheme.**  After establishing that Theranos' representations about their blood tests form the basis of the SI, the indictment informs Defendants *what* misrepresentations underlie the scheme to defraud investors.  *See* SI ¶¶ 11–12 (establishing relevant time period as 2013–2015); *cf. Cecil*, 608 F.2d at 1297 (noting indictment's failure to establish a relevant timeframe).  The SI informs Defendants that nine misrepresentations form the basis of the scheme and thus that Defendants should focus their defense on these nine areas.  *Compare* SI ¶ 12 (claiming Theranos misrepresented its "proprietary analyzer," financial strength, use and examination of technology, partnership with Walgreens, U.S. Department of Defense, and FDA), *with Curtis*, 506 F.2d at 992 (holding indictment failed to provide notice because it lacked any detail as to what conduct formed scheme).

- **States the Acts Underlying the Doctor/Patient Scheme.**  The SI also informs Defendants what conduct underlies the scheme to defraud doctors and patients.  *See* SI ¶ 14 (establishing relevant time period as 2013–2016); *cf. Cecil*, 608 F.2d at 1297 (noting indictment's failure to establish a relevant timeframe).  The SI apprises Defendants that the conduct underlying this scheme is Theranos' allegedly deceptive "advertisements and marketing materials" that stated Theranos could provide "accurate, fast, reliable, and cheap blood tests and test results."  SI ¶ 15; *see also id.* ¶ 12(C) (alleging Defendants transmitted false blood tests).  Hence, unlike *Russell*, where the Supreme Court held the indictment invalid because it failed to specify the subject-matter underlying the charges, the SI tells Defendants the alleged misconduct forming the indictment.  369 U.S. at 754–55.

Defendants argue that even while the SI informs them of the events underlying the charges, it nonetheless remains vague because it raises more questions and thus fails to provide fair notice.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

10

United States District Court
Northern District of California

For instance, Defendants point to Paragraph 12(A), which alleges that Defendants misrepresented the capabilities of their proprietary analyzers.  Defendants argue the term "proprietary analyzer" is vague since Theranos had many "proprietary analyzers."  But, read as a whole, the SI defines "proprietary analyzers" as the Edison, miniLab, or TSPU.  Next, Defendants contend that no timeframe is given as to the misrepresentations and that the range of statements the SI could cover is too vast.  But the indictment expressly confines the investor scheme timeframe to 2013–2015 and informs Defendants about the subject-matter of the alleged misstatements.  SI ¶¶ 11, 12.

Defendants next argue that the FDA claim is vague because FDA guidance documents indicated that Theranos did not need to obtain clearance.  Notice Mot. at 6.  The Government argues they have contrary evidence.  Notice Opp. at 10.  This amounts to an evidentiary dispute. The indictment stage, however, "is not the appropriate time to require the Government to present its proof."  *Buckley*, 689 F.2d at 900.  Ironically, the fact that Defendants can pick apart the truth of the events in the indictment indicates that the SI is constitutionally sound—it means Defendants *know* what they will face at trial.  *Cf.* Notice Mot. at 6 (arguing the *substance* of the Walgreens allegation); *see also Curtis*, 506 F.2d at 987–88 (citing Form 3 of the Appendix of Forms annexed to the Federal Rules of Criminal Procedure which requires false statements be alleged in substance only and not by quotation).

Finally, Defendants argue Count Two is similarly vague because the Government fails to define "reliable and accurate" or the meaning of "held out."  Notice Mot. at 8.  But, Count Two expressly limits its factual universe to "advertisements and marketing materials" and "test results." *See* SI ¶¶ 16–17.  The indictment, read as a whole, clarifies that Defendants are charged with implicitly[5] and explicitly claiming that Theranos' tests could consistently produce accurate and

---

[5] Because the Court determines that the SI contains sufficient factual particularity to inform Defendants what events underlie the charged counts, the Court finds that Defendants' arguments about what conduct constitutes a misrepresentation and what "implicit" means better suited for the Bill of Particulars analysis.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
11

reliable results when, in fact, it could not. *See Buckley*, 689 F.2d at 899. Indeed, as Paragraph 9 of the SI states, the company's public website stated that Theranos' lab could perform tests "quickly and accurately on samples as small as a single drop." Because Defendants know both the statutes they allegedly violated and the conduct underlying those alleged violations, the SI is particularized enough to provide fair notice and Defendants' motion to dismiss for lack of fair notice is **DENIED**.[6]

## B.  Bill of Particulars

Rule 7(f) of the Federal Rules of Criminal Procedure provides that "[t]he court may direct the government to file a bill of particulars." A bill of particulars is appropriate where a defendant requires clarification in order to prepare a defense and is "designed to apprise the defendant of the specific charges being presented to minimize danger of surprise at trial, to aid in preparation and to protect against double jeopardy." *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983); *United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984); *Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963) ("The purpose of a bill of particulars is to protect a defendant against a second prosecution for an inadequately described offense, and enable him to prepare an intelligent defense."). A defendant, however, is not entitled to "know all the evidence the government intends to produce, but *only the theory* of the government's case." *Yeargain*, 314 F.2d at 882 (emphasis added). The decision to require a bill of particulars is within a trial court's broad discretion. *Long*, 706 F.2d at 1054.

Defendants seek an order compelling the Government to identify (1) the details concerning the alleged false or fraudulent representations or omissions, (2) the names of persons who may testify about being deceived, (3) the names of all known coconspirators, and (4) the facts giving rise to an alleged duty to disclose and any material omissions that are alleged to have violated that

---

[6] The Court does not reach the Government's *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) argument.

United States District Court
Northern District of California

SER-285

duty.  The Court addresses each in turn.

**1.  Details Concerning the Alleged False or Fraudulent Representations**

Defendants contend that for Counts One and Two, the Government must specify the false and fraudulent representations allegedly made by Defendants and any coconspirator(s) during the course of the two frauds.  Defendants further argue that the Government must identify (1) who made the representation, (2) the precise content of the representation, (3) the form of the representation, *i.e.* oral or written, (4) the date of the representation, (5) to whom the representation is alleged to have been made, and (6) the manner in which the representation is claimed to be false or fraudulent.  *Id.* at 10.

Defendants contend that "[i]n cases less substantial than this one in scope and complexity, courts have ordered the government to identify the specific false or misleading statements." Notice Reply at 7.  As support, Defendants cite to *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987), *United States v. Caine*, 270 F. Supp. 801 (S.D.N.Y. 1967) (holding bill of particulars required because indictment had no explanation about why the representations were false and misleading), and *United States v. Trie*, 21 F. Supp.2d 7 (D.D.C. 1998).

In *Bortnovsky*, the Second Circuit held that the district court erred in denying the defendants' motion for a bill of particulars.  820 F.2d at 573.  There, the defendants were indicted for engaging in a scheme to defraud a federal agency.  *Id.*  The indictment alleged that defendants "submit[ted] false claims for burglary losses to the Federal Insurance Administration" and "the New York Property Insurance Underwriting Association."  *Id.* at 574.  While the indictment provided a list of suspect pieces of mail along with their approximate dates of mailing and addresses, it failed to specify the dates of the staged burglaries or enumerate which of the numerous documents were falsified.  *Id.*  Thus, the "relevance of the key events was shrouded in mystery at the commencement of and throughout the trial" meaning the defendants were "forced to explain . . . events . . . unrelated to the charges pending.  *Id.* at 574–75.  The defendants' ability

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
13

United States District Court
Northern District of California

**SER-286**

to view the 4,000 pages of documents at issue before trial was unhelpful because they had to assess the "mountains of documents" without guidance as to which documents were relevant and only had four days to complete the task. *Id.* Hence, without a bill of particulars as to which documents and burglaries were fraudulent, the defendants could not adequately prepare a defense for trial. *Id.*

Likewise, in *Trie*, the court granted the defendant's motion for a bill of particulars and ordered the government to provide information as to "exactly what the false statements [were], what about them [was] false, who made them, and how [the defendant] caused them to be made." 21 F. Supp. 2d at 22. There, the defendant was indicted for, among other things, making false statements to the government. *Id.* at 13. The government provided the defendant with 45 pages of excerpts in which the statements were contained. *Id.* at 21. The pages contained "175 names" and "a variety of information about each person or entity listed." *Id.* This, the court held, rendered the disclosure insufficient because "a defendant faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against or which contributor may be witnesses against him." *Id.*

Defendants argue this case is more complex than *Bortnovsky*, *Caine*, and *Trie* and thus a bill of particulars is required. Notice Reply at 7. First, Defendants highlight that in the Government's three recently filed oppositions, it offers a new theory of its case. *Id.* at 8 ("[T]he government now claims to base its case in part on supposed 'implicit' representations without identifying a basis for implying such representations."). They argue that they cannot determine the "implicit representations" at issue when the SI provides no further detail as to this theory. *Id.* Second, Defendants argue the conspiracy and schemes to defraud are vast—they span at least three years and implicate the operations of a company that employed many hundreds of persons. *Id.*; *cf. United States v. Stukenbrock*, No. 5:15-cr-00034-EJD at , Dkt. 143 (N.D. Cal. filed June 26, 2018) (denying bill of particulars after noting that scheme was "not particularly complex or

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
14

difficult to comprehend").

The Government argues that here, in contrast to *Bortnovsky*, *Caine*, and *Trie*, the SI gives "notice of specific misrepresentations Defendants will need to address at trial" and thus goes beyond the "generic" indictments at issue in three discussed cases. Notice Opp. at 14; *see also United States v. Bidloff*, 82 F. Supp. 2d 78, 84–85 (W.D.N.Y. 1999) ("[A]lthough the court in *Caine* granted further particulars as to the specific pretenses . . . the indictment . . . failed to provide any indication as to the substance of the falsehoods. . . . [It does not] establish[] a general rule that particularization of specific false pretenses is required in every mail fraud prosecution."). The Government also contends that Defendants have received extensive discovery that discloses the scope of the evidence against them.[7] Notice Opp. at 14–15. In light of this discovery, the Government argues a bill of particulars is unnecessary. *Id.* at 16 (citing *United States v. Giese*, 597 F.2d 1170, 1180 ("[T]he government provided appellant with a large volume of information, including physical evidence offered at trial, grand jury testimony, and memoranda which revealed the government's theory of the case. Full discovery also obviates the need for a bill of particulars.")).

While the Government has provided Defendants with witness interviews, as demonstrated by *Trie* this is not always specific enough to overcome the need for a bill of particulars. Indeed, the witness interviews do not identify the alleged misrepresentations. Further, the universe of potential misrepresentations is vast—the Government claims that Defendants made misrepresentations to the media, on the Theranos website, and in advertisements and marketing materials. This is especially true for the doctor/patient fraud. *See* SI ¶¶ 14–17 (confining the scheme to "implicit and explicit" false claims made in Theranos "advertisements and marketing

---

[7] Additionally, the Government argues that Defendants delay in bringing this motion for a bill of particulars and their ability to litigate the case without a bill shows a bill of particulars is unnecessary. Notice Opp. at 15.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

15

United States District Court
Northern District of California

materials" but not labeling specific types of materials or the type of implicit conduct at issue); *cf. Caine*, 270 F.3d at 806. The Government's theory of "implicit" representations only expands the scope of possible misrepresentations and the SI lacks any clear explanation of the Government's implicit misrepresentation case theory. In contrast, the investor fraud describes the specific type of misrepresentations at issue. *See id.* ¶ 12. Defendants thus are not left to guess about the Government's investor-fraud case theory.

Finally, much like in *Bortnovsky*, the discovery in this case is immense. *See* Notice Reply at 9 ("The government has produced more than 20 million pages of documents."); *cf. Trie*, 21 F. Supp. 2d at 21 (finding 45 pages of excerpt testimony with 175 names prohibitive). These realities create a substantial risk that Defendants may be unfairly surprised at trial. Accordingly, the Government must provide Defendants information as to the **doctor/patient fraud**. The Government shall identify (1) the specific implicit and explicit false and fraudulent misrepresentations in the advertisements and marketing materials, (2) what about them is false, (3) who made them, and (4) how Defendants caused them to be made. This includes the particular tests that the Government claims Theranos was not capable of consistently producing. *See Bortnovsky*, 820 F.2d at 574 (noting that a defendant should not be forced to prepare unnecessary defenses); *Trie*, 21 F. Supp. 2d at 21 (noting that a defendant should not have to guess about what statements he will have to defend against).

### 2. Names of Investors, Doctors, or Patients Who May Testify

"It is not uncommon for the Government to be required to disclose the names of some potential witnesses in a bill of particulars, where the information is necessary or useful in the defendant's preparation for trial." *Will v. United States*, 389 U.S. 90, 99 (1967). This must be balanced against the proposition that a bill of particulars is "not to obtain disclosure of evidence or witnesses to be offered by the Government at trial." *United States v. Nachamie*, 91 F. Supp. 2d 565, 570 (S.D.N.Y. 2000).

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

16

United States District Court
Northern District of California

Defendants argue they need a list of victims who may testify so that they can prepare to confront those witnesses. Notice Mot. at 11. They argue this is necessary to "help the defense attempt to identify the statements at issue." Notice Reply at 11. At present, however, the Government has already disclosed to Defendants the names of alleged victims. Notice Opp. at 17 ("Defendants have full access to all of the information in the government's possession concerning the victims and how they might testify . . . ."); *see also* Notice Reply at 11 ("The government has interviewed more than 120 witnesses and continues to interview more."). Defendants, thus, already have the names of people who may testify. Accordingly, the request for names of victims who may testify is **denied**.

### 3. Names of All Known Conspirators

Courts regularly employ a six-factor test to evaluate whether the Government should identify unnamed coconspirators. *United States v. Barrett*, 153 F. Supp. 3d 552, 572 (E.D.N.Y. 2015). They look to: (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to coconspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation. *Id.*; *see also United States v. Feil*, 2010 WL 1525263, at *3 (N.D. Cal. Apr. 15, 2010) (granting bill of particulars requiring the government to name unnamed coconspirators due to lengthy duration and scope of conspiracy and the heavy volume of discovery); *cf. United States v. DiCesare* 765 F.2d 890, 897 (9th Cir. 1985) (holding that it was not an abuse of discretion to deny the defendant's request for a bill of particulars as to the names of coconspirators).

Defendants argue that the Government should identify all known coconspirators charged in counts one and two. *See* SI ¶¶ 20, 22 (alleging conspiracies among Defendants and "other known and unknown to the Grand Jury"). They contend that in cases with sprawling indictments that allege complex schemes, like this, courts regularly require the names of coconspirators to be

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

17

United States District Court
Northern District of California

disclosed. They further argue that because the SI does not identify the speaker of the alleged misrepresentations, an "unbounded set" of possible coconspirators exists and Defendants may be unfairly surprised at trial by such coconspirator testimony. Notice Mot. at 12. Hence, they argue, the universe of speakers must be limited.

The Government opposes this request and contends that it need not identify unnamed coconspirators because Defendants fear of unfair surprise is unfounded. Notice Opp. at 18. The Northern District of California's Criminal Local Rules already requires detailed pre-trial disclosure of any co-conspirator statements intended to be offered under Fed. R. Evid. 801(d)(2)(E). The Government also argues that the case law does not support the Defendants' request. Other cases that required a bill of particulars as to the unnamed coconspirators had more defendants. *Id.* at 18 (citing *United States v. Bazezew*, 783 F. Supp. 2d 160 (D.D.C. 2011)).

The Government's argument as to mandatory disclosures misses the mark. There is no guarantee the Criminal Local Rules will ameliorate the alleged lack of notice. Coconspirator statements could be offered for something other than "the truth of the matter asserted." Moreover, the number of named defendants in a case is irrelevant; it does not bear on the unfair surprise inquiry. Here, the relevant factors counsel towards requiring the Government to name all known coconspirators. First, the number of co-conspirators is vast. Second, while the alleged conspiracies only spanned three years, the scope of the alleged conspiracies is broad—they cover a vast range of alleged misrepresentations made to investors, doctors, and patients about Theranos' products and productivity. Third, the SI is vague as to who else (beyond the Defendants) may be a coconspirator. Fourth, the volume of discovery is immense—millions of pages of documents have been produced. *Cf. Feil*, 2010 WL 1525263, at *3 (noting that the 70,000 plus pages of discovery counseled in favor of granting bill of particulars as to request for coconspirator names). Fifth, the danger of harm to the coconspirators is not present in this case. *See Nachamie*, 91 F. Supp. 2d at 573 ("[T]here is no legitimate concern that disclosing the names of unindicted coconspirators will

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

18

United States District Court
Northern District of California

endanger those individuals or compromise the Government's investigation. . . . [T]his case charges Medicare fraud—not narcotics trafficking or murder . . . .").

While these factors may counsel in favor of granting Defendants' request, the fear of unfair surprise is obviated by the Court granting Defendants' first request for a bill of particulars as to the specific misrepresentations pertaining to the doctor-patient fraud. This requires the Government to provide the names of speakers. *Cf.* Notice Mot. at 12 (discussing how it is impracticable for Defendants to guess at the "universe of speakers"). Accordingly, this request is **denied** as to count two but **granted** as to count one.

### 4. Facts Giving Rise to an Alleged Duty to Disclose/Material Omissions

Defendants seek a bill of particulars about what facts underlie the Defendants' material omissions and their duty to disclose. *See* SI ¶¶ 13, 15, 24. They argue that the SI lacks a description of the alleged material omissions and fails to describe the basis of the alleged duty to disclose. Thus, they contend, the Government must identify (a) who made the alleged omission, (b) precisely what is alleged to have been omitted, (c) when that omission is alleged to have occurred, (d) the nature of the alleged duty to disclose, (e) to whom the duty allegedly was owed and to whom the omission is alleged to have been directed, and (f) the manner in which the omission is claimed to be fraudulent. Notice Mot. at 13. The Government argues in response the SI already alleges the facts that Defendants withheld from their victims, like that Theranos relied on third-party analyzers for its tests and that its Walgreens rollout had stalled.

The SI only alleges that Defendants had a "duty to disclose" "material facts." It says nothing about the *type* of duty or *what* facts must be disclosed. *See, e.g.*, SI ¶ 11. In another opposition, however, the Government argues a "duty of trust" existed between Defendants and investors and that Defendants' alleged "half-truths" gave rise to a duty to correct. *See* Falsity Opp. at 9. Likewise, the Government grounds its omissions theory in the already-alleged material misrepresentation—for instance, the Government argues that by telling investors the Walgreens

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
19

relationship was growing, when in fact it had stalled, Defendants omitted material information that they had a duty to disclose.  Hence, Defendants can infer the Government's case-theory and there is no need for a bill of particulars.  *See Yergain*, 314 F.2d at 882 (noting that a bill of particulars is permissible to understand the Government's "theory of the . . .case").  Accordingly, this request is **denied.**

### III.   DEFENDANTS' MOTION TO DISMISS SUPERSEDING INDICTMENT IN PART FOR FAILURE TO ALLEGE FALSITY AND MOTION TO STRIKE

Defendants argue the SI fails to state an offense for conspiracy to commit wire fraud because it fails to allege material falsity in Paragraphs 12(D), 12(E), and 16.  Falsity Mot. at 3–4.  They contend that the SI must be dismissed insofar as it relies on these allegations and that the allegations should be struck to avoid prejudice.  *Id.* at 4.  Defendants further argue that the SI fails to allege facts sufficient to support a fraud-by-omission theory because it alleges no duty to disclose and identifies no material omissions.  *Id.* at 6.

#### A.  Legal Standard

Rule 7 requires that an indictment contain "a plain, concise, and definite written statements of the essential facts constituting the offense charged."  Fed. R. Crim P. 7(c)(1).  An indictment's failure to detail each element of the charged offense generally constitutes a "fatal defect."  *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979); *see also United States v. Carroll*, 2015 WL 2251206, at *1 (N.D. Cal. May 13, 2015) ("An indictment fails to state an offense if it does not allege facts which, if proven, would constitute a violation of 'the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.'" (quoting Fed. R. Crim P. 7(c)(1))).

The Government argues that an indictment must be "liberally construed in favor of validity."  Falsity Opp. at 4 (quoting *United States v. Holden*, 806 F.3d 1227, 1233 (9th Cir. 2015)).  This is the standard for post-trial review.  *Compare United States v. James*, 980 F.2d

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
20

1314, 1317 (9th Cir. 1970) ("When the sufficiency of the indictment is challenged *after trial*, it is only required that the necessary facts appear in *any form* or *by fair construction* can be found within the terms of the indictment." (quotation marks and citation omitted) (first emphasis added)), *with United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("The timing of the defendant's objection is important to the level of scrutiny employed; a defendant who objects to the indictment *before* trial . . . is entitled to *a more exacting review* of the indictment than one who waits until after trial to object." (emphasis added)). Hence, because this is a pretrial challenge to the indictment, the "liberal construction" standard advocated by the Government is misplaced. The relevant inquiry is whether the SI contains sufficient detail to state an offense for wire fraud or conspiracy to commit wire fraud. *See, e.g.*, *Carroll*, 2015 WL 2251206 at *1.

**B. Analysis**

**1. Wire Fraud/Conspiracy to Commit Wire Fraud**

Wire fraud requires: "(1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud." *Lindsey*, 850 F.3d at 1013. It is well-settled that materiality is an element of a "scheme or artifice to defraud" under the federal wire fraud statute. *Neder v. United States*, 527 U.S. 1, 21–25 (1999). Material falsehood may be proven by means other than a specific false statement. *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005). *Neder*, however, makes clear that in order to prove fraud, the Government must prove the materiality of the falsehoods. 527 U.S. at 20–25. An indictment's failure to recite an essential element of the charged offense, namely materiality, is a fatal flaw that requires dismissal of the indictment. *Omer*, 395 F.3d at 1089.

The Government argues that, under this standard, it need not allege specific misrepresentations because a scheme to defraud may rest on something other than false statements. Falsity Opp. at 4–5. But this misses the point—the SI explicitly alleges that Defendants made "materially false and misleading *statements* . . . and failed to disclose material

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
21

facts." SI ¶ 12. The issue, thus, is not whether an indictment must plead specific misrepresentations, but whether the indictment sufficiently alleges materiality as to the misstatements at issue.[8]

"[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 U.S. at 16 (internal quotations and alterations omitted). An indictment need not explain all factual evidence to be proved at trial. *United States v. Blinder,* 10 F.3d 1468, 1476 (9th Cir.1993).

Three alleged false statements are at issue: (1) the statements made to investors concerning the Walgreens contract, see SI ¶ 12(D); (2) the statements made to investors concerning the profitability of military contracts, see SI ¶ 12(E); and (3) the statements made to doctors and patients concerning the accuracy and reliability of the blood tests, see SI ¶ 16. Specifically, the SI alleges:

- Defendants told investors that Theranos had an "expanding partnership" with Walgreens when, in fact, the partnership "had stalled" by late 2014. SI ¶ 12(D).

- Defendants told investors they had a profitable relationship with the U.S. Department of Defense, and that Theranos technology had been deployed to the battlefield when, in fact, Defendants knew Theranos had limited revenue from its military contracts and that Theranos technology had not been deployed to the battlefield. *Id.* ¶ 12(E).

- Defendants told doctors and patients that their devices could provide "accurate, fast,

---

[8] There is some tension between *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) and *Omer*, 395 F.3d 1087. *Woods* seems to require that materiality be shown as to *each* alleged misstatement. *See* 335 F.3d at 1000 ("*All* deceptive or misleading statements, false statements and half-truths, which are generally referred to as statements, and concealed, omitted and nondisclosed facts . . . *must be material to form the basis* of mail or wire fraud charges." (emphasis added)); *see also* Falsity Opp. at 5 (arguing alleged misstatements can be considered as material evidence of the fraud); *United States v. Hossain*, 2014 WL 4354125, at *3 (D. Nev. Sept. 2, 2014) (analyzing the four alleged false statements and finding that each was material). In contrast, *Omer* states only the "materiality of the scheme or artifice must be alleged" and that "the materiality of the specific statement need not be pleaded." 395 F.3d at 1089. This begs the question—pursuant to *Omer*, may the Court assess the statement's materiality in light of the whole indictment, *or* must the Court assess each statement's materiality individually? Because *Omer* did not concern alleged misstatements, while *Woods* did, the Court follows *Woods*' instruction that each misstatement must be "material" to form the basis of the wire fraud charges.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

22

reliable, and cheap blood tests and test results," when, in fact, they knew that these tests could not "consistently produc[e] accurate and reliable results." *Id.* ¶ 16.

Defendants fixate on the minute details in the indictment, like what the meaning of "consistently" is. *See* Falsity Reply at 4–5. They also argue with semantics and point out that Theranos could have an "expanding partnership" with Walgreens, even if it, at one point, had "stalled." This misunderstands the relevant standard at a motion to dismiss phase. *See Buckley*, 689 F.2d at 897 (noting that at the motion to dismiss stage, "the issue in judging the sufficiency of the indictment is whether the indictment adequately alleges the elements of the offense . . . not whether the Government can prove its case." At trial, the defense may argue about the meaning of Defendants' Walgreens representations. But, *at this stage*, such arguments are not appropriate; the relevant inquiry is whether the indictment adequately alleges the elements of the offense. Materiality does not require alleged misstatements to be accurate—it only requires the alleged misstatements to have a "natural tendency to influence." The three above statements exceed this standard; the first two tend to give the false impression to an investor that Theranos' business was growing, that it was a profitable company, and that it was a good investment. Likewise, the third, tends to give a false impression to the doctor and patient that Theranos' technology would provide accurate results. The SI thus sufficiently alleges a factual basis for its claim that the alleged misrepresentations were material.

### 2. Fraud-by-Omission Theory

"It is settled in this Circuit that a scheme to defraud need not be an active misrepresentation. A nondisclosure or concealment may serve as a basis for the fraudulent scheme." *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*, 473 U.S. 207 (1985). The ability to use an omission to form the basis of a scheme to defraud is narrow. *Id.* at 1450. It may only be used "when there exists an independent duty (either fiduciary or derived from an explicit and independent statutory requirement) and such a duty has been breached." *Id.* A contrary rule would bring "almost any illegal act within the province of

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
23

United States District Court
Northern District of California

the . . . fraud statute." *Id.* Hence, an indictment must allege facts giving rise to a duty to disclose. *See United States v. Lonich*, 2016 WL 324039, at *8 (N.D. Cal. Jan. 27, 2016) (holding that if the government wishes to prosecute based on an omissions theory, the indictment must allege that defendant owed a duty to disclose); *see also United States v. DuBo*, 186 F.3d 1177, 1179 (9th Cir. 1999) ("Implied, necessary elements, not present in the statutory language, must be included in an indictment.").

The SI alleges that Defendants omitted material facts that they had a "duty to disclose." *See* SI ¶¶ 11, 12, 15. Defendants argue that the Government may not proceed with its fraud-by-omission theory because the Government has not sufficiently alleged that they had a duty to disclose information to investors, doctors, or patients. Falsity Mot. at 6. The Government rebuts this and contends that Defendants had a duty to disclose omitted, material information pursuant to a "duty of trust" and a "duty to correct" half-truths. Falsity Opp. at 8.

Half-truths and omissions are distinct concepts. *See, e.g.*, *United States v. Sumeru*, 449 F. App'x 617, 621–22 (9th Cir. 2011) (noting that half-truths and omissions are different legal theories); *United States v. Petrossi*, 786 F. App'x 286, 288–89 (2d Cir. 2019). An actionable omission occurs when the defendant *fails* to speak despite the existence of a duty requiring him to speak. In contrast, in a half-truths case, the duty to disclose arises because critical qualifying information was omitted from speech. While half-truths create a "duty to correct" speech, omissions trigger an independent duty to speak. Both, however, create a "duty to disclose." *See* SI ¶ 11, 12, 15. Because omissions and half-truths are distinct theories, the Court addresses each in turn.

Regarding omissions, the Government argues that an independent "duty of trust" existed between Defendants and their investors. "Fiduciary" is a broad term; it encompasses "informal" trusting relationships where one party "acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." *United States v. Shields*,

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
24

United States District Court
Northern District of California

844 F.3d 819, 822–23 (9th Cir. 2016).  The Government argues that by making misrepresentations to investors, Defendants induced investors to relax their ordinary care and vigilance and thus entered into a "trusting relationship" with the investors.  Falsity Opp. at 9.  In other words, because the misrepresentations led investors to trust Defendants, Defendants owed investors a duty of trust and were required to disclose all material omitted information, *i.e.* information about Theranos' financial status, technological ability, etc. *Id.*  Defendants argue rooting a duty of trust in the representation itself threatens to "swallow[s] the *Shields* rule . . . by permitting juries to convict on the basis of omissions whenever the government also alleges false statements, without any independent duty to disclose."  Falsity Reply at 8–9; *see also Dowling*, 739 F.2d at 1449 (noting that omissions-liability is narrow).

Defendants fear is misplaced.  Simply alleging that a defendant misrepresented something to an investor does not create a duty of trust.  Rather, the inquiry is whether the facts alleged in the indictment show that a defendant, acting for the benefit of an investor, induced the investor to relax the care and vigilance they would ordinarily exercise. *See Shields*, 844 F.3d at 822–23. Here, the SI does this—as shown in Paragraph 12(C), Defendants used deceptive technology demonstrations to reassure investors that Theranos' proprietary technology worked.  Likewise, as shown in Paragraphs 12(F) and 12(H), Defendants induced investors to trust Theranos technology by misrepresenting that *others*, like the FDA, concluded that the technology worked.  Moreover, Defendants, were both officers of Theranos; their position indicated that they knew about Theranos' technology.  Accordingly, Defendants alleged misrepresentations were sufficient to relax an investors ordinary duty of care because they purposefully caused an investor to believe that Theranos was successful, profitable, and a secure investment.  The SI thus sufficiently alleges that Defendants "duty to disclose" material omissions to investors was rooted in a duty of trust. *See* SI ¶ 11, 12.

Regarding half-truths, "even in the absence of a trust relationship," one "cannot

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
25

affirmatively tell a misleading half-truth about a material fact." *See United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010); *see also United States v. Harder*, 116 F. Supp. 3d 1197, 1206 (D. Or. 2015) ("Omissions of material fact and half-truths may be used to establish a scheme to defraud."); *United States v. Montgomery*, 384 F.3d 1050, 1063–64 (9th Cir. 2004) (holding the defendant's half-truths and concealment of material facts was actionable fraud).  Half-truths and concealment may be premised on verbalized words, the arrangement of words, or the circumstances in which they are conveyed. *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967).

In the alternative to a duty of trust, once Defendants made inflated representations about Theranos' success and profitability, they needed to tell the "whole truth," *i.e.*, that Theranos' profitability was declining and that its partnership with Walgreens was stalling.  Likewise, by representing their tests as "accurate" and "reliable," Defendants had a duty to disclose to doctors and patients that their tests "consistently" produced wrong results.  Defendants argument that the Government is "transforming" the duty to correct asserted half-truths into an independent duty to disclose is thus misplaced.  Falsity Reply at 9.

The SI alleges that Defendants "omitted" information that they had a duty to disclose.  SI ¶¶ 11, 12, 15–17, 26.  Hence, read as a whole, see *Buckley*, 689 F.2d at 899, the SI alleges that Defendants had (1) a duty of trust with investors and, pursuant to that duty, had a duty to disclose material information about Theranos' technology and profitability to investors, (2) a duty to disclose to investors the "whole truth" about Theranos' technology and profitability based on their "half-truths," and (3) a duty to disclose to doctors and patients the "whole truth" about Theranos blood tests' accuracy and reliability based on their "half-truths."  *Cf.* Falsity Mot. at 7 (arguing certain paragraphs contain only "boilerplate allegations of unspecified omissions).  Accordingly, Defendants motion to dismiss for failure to allege falsity is **DENIED.**

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

26

## IV.    DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

Defendants argue that counts two and nine through eleven, which relate to the scheme to defraud doctors and patients, must be dismissed because they do not allege that Defendants acted with the specific intent to obtain money or property from any doctors or patients through deceit. Counts Mot. at ECF 7.  Defendants contend that the SI's shortcomings are twofold: first, counts two and nine through eleven fail to allege that Defendants intended to deprive non-paying patients and doctors of their money or property.  *Id.*  Second, the counts fail to allege that Defendants intended to deprive patients of the benefit of the bargain.  *Id.*  The Court addresses each in turn.

### A.  Scheme to Obtain Money or Property from Victims

As noted, to prevail on a charge of wire fraud, the Government must prove: (1) a scheme to defraud; (2) the use of a wire, radio, or television to further the scheme; and (3) a specific intent to defraud.  *United States v. Lindsey*, 850 F.3d at 1013.[9]  On a motion under Federal Rule of Criminal Procedure 12, the failure to allege facts that, if proven, would satisfy the intent element of the offense is a fatal defect requiring dismissal of the indictment.  *See United States v. Mitchell*, 867 F.2d 1232, 1233 (9th Cir. 1989) ("To charge a scheme to defraud under section 1341, *McNally* requires an allegation that Mitchell intended to deprive the city of money or property. The indictment in this case is devoid of any such allegation." (citations omitted)).

"[F]or purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim."  *Cleveland v. United States*, 531 U.S. 12, 15 (2000); *see also Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here.").  The

[9] A conspiracy under Section 1349 "requires an agreement among two or more persons that would satisfy the elements of the substantive offense" of wire fraud.  *Hussain*, 2017 WL 4865562, at *5. Accordingly, an indictment charging conspiracy to commit wire fraud must specify the underlying fraud.  *See supra* n.3.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

27

specific intent element of wire fraud, thus, "must be [the intent] to obtain money or property from the one who is deceived." *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989); *see also United States v. Ali*, 620 F.3d 1062, 1071 (9th Cir. 2010) ("[U]nder *Lew*, Microsoft must be the victim from whom property was taken."); *Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Emps. & Rest. Emps. Union*, 215 F.3d 923, 927 (9th Cir. 2000) ("The purpose of the mail fraud and wire fraud proscriptions is to punish wrongful transfers of property from the victim to the wrongdoer, not to salve wounded feelings.").

### 1. "Non-Paying" Patients[10]

The SI acknowledges that many of the alleged patient victims did not pay for Theranos tests and so Defendants argue that these patients are not "victims" under *Lew*. Counts Mot. at ECF 9; *see also* SI ¶ 15 ("Based on [Defendants'] representations, [about Theranos's ability to provide accurate, fast, reliable, and cheap blood tests and test results] many hundreds of patients, paid, *or caused their medical insurance companies to pay*, Theranos, or *Walgreens acting on behalf of Theranos*, for blood tests and tests results . . . ." (emphasis added)). Defendants thus argue that portions of the SI that rely on "non-paying" patient victims must be dismissed.

In *Lew*, the Ninth Circuit held that the defendant could not be convicted of mail fraud because the government failed to allege and prove that the defendant had the specific intent to deprive the alleged victim of property or money. 875 F.2d at 222. There, the defendant, an immigration attorney, allegedly misrepresented his immigrant-client's employment status to the Department of Labor. *Id.* at 220–21. The government argued that defendant intended to defraud his immigrant-clients of money because he made them pay a fee and deceived them into believing that they could lawfully become permanent residents. *Id.* at 220. The court, however, disagreed and found that there was no evidence that the defendant intended to deceive his clients. *Id.*

[10] This class of patients refers to patients who did not pay for the blood-tests because their insurance provider paid in full for the test.

United States District Court
Northern District of California

Rather, the evidence showed that the defendant intended to deceive the Department of Labor. *Id.* at 221. The jury instructions permitted the defendant to be convicted for wire fraud even though the money was not received from the party deceived. *Id.* at 221, 222. This, the court held, was improper because it failed to instruct the jury about the requisite convergence between the intent to defraud and the intent to deprive a victim of money or property. *Id.* at 222. Due to this, the wire fraud convictions were reversed. *Id.* at 222.

*Ali* maintains *Lew*'s requirement of convergence. In *Ali*, the defendants devised a scheme in which they fraudulently obtained software and then resold the software for a profit. 620 F.3d at 1064. Microsoft sells Academic Edition ("AE") software through its Authorized Education Reseller ("AER") program. *Id.* Only authorized distributors could sell AE software and they could only sell it to AERs. *Id.* at 1064–65. The defendants fraudulently attained AER status by creating new companies under false names to purchase existing AER companies. *Id.* at 1065. This allowed the defendants to acquire and distribute AE software without ever becoming an authorized distributor, thus diverting potential profits from Microsoft. *Id.* The Ninth Circuit first determined that the diversion of profits qualified as "money or property" because it ultimately denied Microsoft their right to full payment for AE software. *Id.* at 1067. The court next concluded that there was convergence—the alleged victim, Microsoft, lost money. *Id.* at 1068. Accordingly, the defendants had the "intent to defraud" Microsoft.

Pursuant to *Lew* and *Ali*, the indictment must show that the defendant intended to deprive the alleged victim of their money or property. The Government does not allege that the patient-victims had a property interest in receiving accurate test results or not being medically harmed. *But see* Counts Opp. at 3–4 (discussing the trauma experienced by patients who received false results); *cf. United States v. Slay*, 717 F. Supp. 689, 692 (E.D. Mo. 1989) (finding that while *Carpenter* holds certain intangible property rights are within the scope of the wire fraud statute, the right to accurate information is not a cognizable property interest); *United States v. Sadler*, 750

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
29

F.3d 585, 591 (6th Cir. 2014) ("[E]thereal right to accurate information doesn't fit within [limited property rights protected by wire fraud statute]."); *Cleveland*, 531 U.S. at 27 ("Absent clear statement by Congress, we will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by the States."); *McNally v. United States*, 483 U.S. 350, 359–60 (1987), *overruled on other grounds by Skilling v. United States*, 561 U.S. 358 (2010) ("The Court has often stated that when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher one only when Congress has spoken in clear and definite language.").

Instead, the Government argues the SI sufficiently alleges that Defendants deprived patient-victims of "the money that Theranos's customers would pay for testing services." Counts Opp. at 1. But there is a fundamental issue with the Government's theory—some customers did not pay for their blood tests. Indeed, the SI specifically contemplates that not all patient-victims paid for the test.

- **Paragraph 15:** HOLMES and BALWANI devised a scheme to defraud doctors and patients, through advertisements and marketing materials, through explicit and implicit claims concerning Theranos's ability to provide accurate, fast, reliable, and cheap blood tests and test results, and through omissions concerning the limits of and problems with Theranos's technologies. Based on these representations, many hundreds of patients paid, *or caused their medical insurance companies to pay*, Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results, sometimes following referrals from their defrauded doctors.

- **Paragraph 26:** On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants, for the purpose of executing the material scheme and artifice to defraud doctors and patients, and for obtaining money and property from patients, doctors, *and insurance companies* by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, laboratory and blood test results and payments for the purchase of advertisements soliciting patients and doctors for its laboratory business, as further set forth below, in violation of Title 18, United States Code, Section 1343.

These paragraphs of the SI highlight the problem; the SI acknowledges that two types of patient victims exist—ones who paid and ones whose insurance paid. Much like in *Lew*, there is

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
30

divergence between the intent to defraud and the harm suffered. Pursuant to the SI, the non-paying patients did not suffer a monetary harm. At first glance, this seems like the same scenario as *United States v. Utz*, 886 F.2d 1148 (9th Cir. 1989). There, the Ninth Circuit noted that it is enough for "the government [to] charge and the jury [to] find either that the victim was actually deprived of money or property *or* that the defendant intended to defraud the victim of the same. *Utz*, 886 F.2d at 1151. Closer review, however, shows that this case is unlike *Utz*. The "intent to defraud" still requires convergence; the defendant must intend to deprive the alleged victim of money or property. *Utz* does not eradicate this requirement. Under the SI, non-paying patients were not deprived of any money *and* because of their insurance-status, the SI contemplates that Defendants did not intend to deprive them of money. *Boren*, 278 F.3d at 914 ("[D]istrict court is bound by the four corners of the indictment."). Indeed, insured customers are more like the third-party distributors in *Ali*. There, the third-party distributors, like the insured customers, were not victims of the scheme because there was no showing that the defendants intended to deprive them of money or property. *Ali*, 320 F.3d at 1068; *cf. United States v. Bonallo*, 858 F.2d 1427, 1434 n.9 (9th Cir. 1988) (holding that "intent to defraud" met as to bank because bank was a victim of the scheme).

In the alternative, the Government argues that insured patients were deprived money because they paid premiums. Counts Opp. at 12 ("[P]remiums . . . mean[] that the money health insurance companies use to pay medical service providers is ultimately derived from, and indirectly reimbursed by, the covered patients. An indirect connection between the victim of the fraud and funds obtained by the fraudster is acceptable . . . ."). But, even in "indirect connection" cases, the victim must still be deprived of their property or money. *See, e.g.*, *Bonallo*, 858 F.2d at 1434 n.9 (noting that indirect victim, the bank, still was deprived of money); *Ali*, 620 F.3d at 1062 (affirming wire fraud conviction even where Microsoft was not the target of the scheme because Microsoft lost money from the scheme). Here, in contrast to *Bonallo* and *Ali*, the patients would

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
31

United States District Court
Northern District of California

have paid their premiums *regardless* of Theranos' blood tests.  There is no showing or argument by the Government that patients were required to pay a higher premium because of Theranos tests or that premiums were specific for Theranos testing.  Hence, this case is not an "indirect connection" case because insured victims did not lose money.

Finally, the Government's reliance on *United States v. Crawford* is misplaced.  *Crawford* holds that a fraud conviction does not require the government to prove the identity of the fraud victim.  239 F.3d 1086, 1092 (9th Cir. 2001).  There, the defendant sold a painting that did not belong to her.  *Id.* at 1089.  The defendant argued on appeal that because ownership of the painting had not yet been established, there was no identifiable victim and the government could not prove she had the specific intent to defraud someone.  *Id.* at 1092.  The court disagreed and held that because she knew she did not own the painting, she intended to deprive the owner, whoever that may be, of its use.  *Id.* at 1093.

*Crawford* does not eradicate the requirement that a defendant's "intent must be to obtain money or property from the one who is deceived."  *Lew*, 875 F.2d at 221.  The SI alleges that Defendants intended to defraud two types of patients—ones who paid and ones whose insurance paid for the blood tests.  Indeed, comparative to *Crawford*, where there was only *one possible owner* of the painting, here, there are two sources of money.  Thus, even if the Government need not prove specific patients' identities, it still must prove that Defendants intended to deprive the *class* of victims of their money or property.  A contrary finding would make the wire fraud statue limitless; any vague recitation of a class of persons would satisfy the statute.  But this would contravene *McNally* and *Lew* because it would allow distinct sets of victims to be clumped into one group, which would erode any type of convergence requirement.

There are four types of possible victims in the doctor/patient scheme: paying patients, non-paying patients, doctors, and insurance companies.  The SI does not allege insurance companies were defrauded.  It does, however, allege that insured patients were defrauded.  But it fails to

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
32

SER-305

connect a specific intent to defraud to such patients because it does not show Defendants intended to deprive them of money. Rather, the SI indicates that the money flowed from the insurance company. Hence, the SI does not show that Defendants intended to obtain money from the non-paying patient-victims, *i.e.*, the one who was allegedly deceived. *See id.*

For these reasons, the Court **GRANTS** Defendants' motion to dismiss counts two and nine through eleven to the extent they depend on insured and non-paying patient-victims.[11]

### 2. Doctors

Defendants next argue that the SI fails to allege that Defendants intended to deprive doctors of money or property. Counts Mot. at ECF 9.

The Government points the Court towards *United States v. Harkonen*, 510 F. App'x 633 (9th Cir. 2013). In *Harkonen*, the Ninth Circuit held that there was sufficient evidence for the jury to find that the defendant knowingly participated in a scheme to defraud and possessed the specific intent to deceive or defraud. 510 F. App'x at 636. There, the defendant issued a fraudulent press release that overstated a pharmaceutical product's success and was "at least 'capable' of influencing the decision of doctors to prescribe, or patients to seek, prescriptions of [the drug]." *Id.* Based on this, the jury convicted the defendant of wire fraud and the Ninth Circuit upheld the conviction. *Id.*

*Harkonen* is unhelpful to the Government's case. It says *nothing* about (1) who the defendant intended to defraud or (2) whether or not a property or money interest was alleged in the indictment. These are the issues before this Court. Hence, *Harkonen* is unhelpful in answering the question: can the Government maintain its allegation that Defendants had the specific intent to defraud doctors of property or money? *See Lew*, 875 F.2d at 222 (requiring a showing of intent to

---

[11] The Court does not view the presence of Walgreens as significant. Theranos sponsored the tests and ran the results. Defendants collected money from paying patients through Walgreens. Hence, Walgreens presence in the action is irrelevant. Accordingly, this class of patients includes patients, with insurance, who either visited their doctors directly or used Walgreens.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
33

United States District Court
Northern District of California

defraud a victim of money or property).

The Court holds that the SI fails to allege that Defendants intended to deprive doctors of their money or property.  The SI alleges that Defendants "induc[ed] doctors to refer and patients to pay for and use its laboratory and blood testing services under the false and fraudulent pretense that Theranos technology produced reliable and accurate blood test results."  SI ¶ 22; *see also id.* ¶ 26 (alleging Defendants intended to defraud doctors of money and property).  The contrast between doctors and patients is plain; the SI alleges patients *paid* while doctors *referred.* Paragraph 26 does not save this conclusion—its bare-bones recitation that Defendants intended to deprive doctors of money or property does not provide the "meat on the bones" sufficient to satisfy the fair notice requirement discussed above.  Moreover, the Government's argument at trial that a specific doctor lost property is unconvincing.  The Court is bound by the four-corners of the indictment which fail to allege that Defendants intended to deprive doctors of their money or property.  *See Boren*, 278 F.3d at 914 (noting that court is bound by four-corners of the indictment).

In the alternative, the Government argues that the doctors were unwilling participants in the alleged scheme and passed along fraudulent information to their patients in recommending Theranos.  Counts Opp. at 12.  The Government relies on *United States v. Ciccone*, 219 F.3d 1078, 1084 (9th Cir. 2000) for support.  But this case is equally unhelpful.

*Ciccone* involved a telemarketing scheme where the defendant's employees made misrepresentations to victims.  219 F.3d at 1083–85.  Specifically, the defendant paid solicitors to telephone people as part of a scheme to get callers to send money to Feed America (the defendant's organization).  *Id.* at 1080.  The solicitors told people that they had won money, a fabulous prize, and the opportunity to donate to charitable causes.  *Id.*  But, first people had to pay a sum to Feed America, who only returned 10% of their donation.  *Id.*  The defendant argued on appeal that he could not be convicted of mail fraud because he did not personally make the calls.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

34

SER-307

*Id.* at 1083.  The Ninth Circuit rejected this argument and held that, even if he did not make the calls, he directed his solicitor-employees to perpetrate the scheme by (1) providing solicitors with lists identifying victims of other telemarketing schemes and (2) crafting the sales pitch that was "rich with misrepresentations." *Id.* at 1084.  The defendant's criminal liability was thus premised on his own fraudulent behavior and his own intent to defraud the alleged victims.

This case differs from *Ciccone*.  First, there is no showing that Defendants directed doctors to make misrepresentations to their patients.  Indeed, the defrauded doctors were not Theranos employees (at least, pursuant to the SI).  The contrary is alleged.  The SI maintains that the "defrauded doctors" referred patients to Theranos.  SI ¶ 15.  This shows that the doctors were *not* operating at the direction of Defendants.  Second, in *Ciccone*, the alleged victims of the fraud lost money and the defendant intended to defraud those victims.  There was thus convergence.  In contrast, here, there is no showing that the doctors lost money or property or that Defendants intended for them to lose money or property.

Furthermore, any similarity between *Ciccone* and this case is unhelpful to the Government.  The doctors can be compared to the telemarketer-employees who placed the calls, while the recipients of the calls (the victims) can be compared to the paying patients.  There was no argument that the defendant's telemarketer-employees were victims of the scheme. *Ciccone*, 219 F.3d at 1080.  Thus, any comparison between the cases favors Defendants' argument that the SI does not allege that the doctors were victims of the scheme to defraud.  Accordingly, *Ciccone* is unpersuasive and the Court **GRANTS** Defendants request to dismiss counts two and nine through eleven to the extent they depend on doctor-victims.

### B.  Benefit of the Bargain

Defendants next argue that the SI must be dismissed as it relates to *all* patients because it fails to allege that Defendants mispresented the "nature of the deal."  Counts Mot. at ECF 10.  In Defendants view, the patient-victims got "what they paid for." *Id.* at ECF 11.  The SI alleges that

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
35

Defendants claimed, through advertisements and marketing materials, that Theranos could produce accurate, fast, reliable, and cheap blood tests and results. SI ¶ 15. While the SI alleges these claims were false, it does not explicitly allege that Theranos could *not* provide accurate, fast, reliable, and cheap blood tests and test results. Counts Mot. at ECF 10. This is where Defendants hang their hat. In their view, because the SI does not explicitly claim that Defendants promised patients a certain result, the SI fails to allege that Defendants misrepresented the nature of the deal.

The wire-fraud statute makes criminal any "scheme or artifice to defraud." 18 U.S.C. § 1343. As established above, the statute punishes schemes intended to "deprive [people] of their money or property." *Cleveland*, 531 U.S. at 19. In this instance, that means the indictment must allege that Defendants knowingly used an interstate wire communication to further a scheme to defraud paying[12] patient-victims of their money or property. "Money or property" at first glance seems clear. Indeed, as analyzed above, in the classic scenario, the relevant question is whether a defendant intended to take a victim's money or property? *See, e.g. Ali*, 620 F.3d at 1067 (Microsoft deprived of money); *Crawford*, 239 F.3d at 1088 (defendant took property of another).

This question can become harder to answer in the commercial setting. In this case, Defendants transacted with patients to provide a blood testing (a service). There is no dispute that some patients paid Theranos for this service. *See* SI ¶ 15. There is, however, a dispute as to whether or not the patients *got what they paid for*. Hence, the relevant inquiry is whether Defendants misrepresented the nature of the bargain. *See United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016) ("[A] schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick. And

---

[12] Because the Court held above that the SI did not allege that Defendants had the SI to deprive non-paying patient-victims of their money, this portion of the Order only addresses paying patient-victims, *i.e.* patients who either paid in full for the blood tests or paid a co-pay for the blood test. *See supra* IV.A.1. Defendants do not argue that the "benefit of the bargain" theory applies to the doctor-victims and so the Court does not discuss the doctor-victims in this portion of the Order. *But see supra* IV.A.2.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
36

**SER-309**

United States District Court
Northern District of California

this is so even if the transaction would not have occurred but for the trick."); *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ("Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.").

In *Takhalov*, the Eleventh Circuit held that, in the commercial context, a "scheme to defraud" refers only to schemes in which a defendant "lies about the nature of the bargain itself." 827 F.3d at 1313. There, the defendants were tried and convicted of wire fraud. *Id.* at 1310. The defendants operated clubs and hired Eastern European women to pose as tourists, locate visiting businessmen, and lure them into the defendants' clubs.[13] *Id.* The defendants asked for a jury instruction that "[f]ailure to disclose the financial arrangement between the [Eastern European women] and the Bar, in and of itself, is not sufficient to convict a defendant of any offense[.]" *Id.* at 1311 (first alteration in original). The Eleventh Circuit held that the district court erred in denying this instruction because the proposed instruction was an accurate statement of law. The presence of the women was irrelevant ; the victims still got what they "bargained" for. *Id.* at 1315–16. Hence, a defendant's lie about the nature of the bargain is actionable in two primary forms. First, the defendant might lie about the price of a good, *i.e.* represent that a good is $5 when it is in fact $10. *Id.* at 1313–14. Or, the defendant might lie about the characteristics of the good, *i.e.* represent that a product is designer when it is in fact a knock-off. *Id.* at 1314.

The following hypotheticals are instructive. Imagine you go to the doctor's office for a blood test. The nurse tells you that before test, he will bring you apple juice. Instead, because he dislikes you, he brings you cranberry juice. He takes your blood and you get your (accurate)

---

[13] Part of the scheme involved swindling the men once they were inside the club. That part of the scheme was not at issue on appeal and is not discussed herein.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
37

United States District Court
Northern District of California

results. Did you get what you bargained for? Yes. You still got your blood test and received the correct results. The fact that you got cranberry juice is irrelevant; you did not ask for juice; it was secondary to the core transaction. Next imagine, you go to the doctor's office for the same blood test. The nurse comes to your patient-room and tells you about a new type of blood test. He says this new test only requires a couple drops of blood but remains just as accurate and reliable as a classic blood test. You agree to use the new test, only to discover later that the test was neither accurate nor reliable. Have, you been defrauded? Yes. Why? Because the misrepresentation went to the value of the bargain. You paid for something that you did not receive. You paid for an accurate and reliable test and, because you did not receive that, you have been deceived about the characteristics of the good. *See id.* at 1314.

The SI accords with the second scenario. It alleges that Defendants used advertisements and marketing materials to misrepresent Theranos' ability to provide accurate, reliable, fast, and cheap blood tests. SI ¶ 15. It further alleges that Defendants knew that their technology was not capable of producing "accurate and reliable results." *Id.* ¶ 16. And, despite knowing about the problems with their technology, Defendants sent out inaccurate test results. *Id.* ¶ 17. Part of the bargain struck with consumers was thus that the tests and results would be accurate and reliable. The accuracy and reliability guarantees were "characteristics" of the good. *See Takhalov*, 827 F.3d at 1314. Viewing the indictment as a whole and with common sense, it is plain that it sufficiently alleges that patients did not receive the benefit of the bargain. *See Giese*, 597 F.2d at 1178 (noting that an indictment must be read with common sense). They did not receive the accurate and reliable test that they were promised. Accordingly, this is not the "sweeping expansion" Defendants claim it to be, see Counts Opp. at ECF 12, and the Court **DENIES** Defendants' request to dismiss Counts Two and Nine through Eleven as to paying patient-victims.

United States District Court
Northern District of California

## V.      CONCLUSION

For the foregoing reasons, the Court:

1. **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss the SI for lack of fair notice.  The Court holds the SI provides Defendants fair notice of the charges they face but orders the Government to produce a bill of particulars as to the specific misrepresentations underlying the doctor-patient fraud and the names of any co-conspirators supporting count one.

2. **DENIES** Defendants' Motion to Dismiss the SI for failure to allege falsity.

3. **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss Counts Two and Nine through Eleven.  These counts remain as to paying patients, but to the extent they rely on non-paying patients or doctors, they must be dismissed.

**IT IS SO ORDERED.**

Dated: February 11, 2020

EDWARD J. DAVILA
United States District Judge

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
39

United States District Court
Northern District of California

**SER-312**

GRAND JURY 20-1

NORTHERN DISTRICT OF CALIFORNIA

ORIGINAL

GJ INVESTIGATION NO. 2016R00024

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TESTIMONY OF CHRISTOPHER McCOLLOW

AT 450 GOLDEN GATE AVENUE

SAN FRANCISCO, CALIFORNIA 94102

TUESDAY, JULY 14, 2020

FOR THE GOVERNMENT:

DAVID L. ANDERSON,

UNITED STATES ATTORNEY

BY:  ROBERT LEACH, AUSA

UNITED STATES DEPARTMENT OF JUSTICE

450 GOLDEN GATE AVENUE

SAN FRANCISCO, CALIFORNIA 94102

SER-313

A.   Yes.

Q.   Okay.  And in his prior testimony was Mr. Rosendorff asked what devices Theranos used to test blood count, CMP, lipid panel, and glycated hemoglobin?

A.   He was.

Q.   And what did he say?

A.   That they were run on devices such as the Siemens ADVIA device.

Q.   So Theranos was testing these particular assays on modified Siemens machines that weren't displayed in the demos.  Is that fair?

A.   Yes.

Q.   And Mr. Rosendorff told the prior grand jury that the CMP and lipid panel were run on ADVIA, "that was the only way we could have done it," those tests could not be run on Theranos-created devices.  Is that fair?

A.   Yes.

Q.   Okay.  And did he also testify despite the fact that these were bread-and-butter tests, at Theranos it required three different devices to run the tests that were listed in Mr. Edlin's email?

A.   Correct.

Q.   I'd like to move to the next category of

three years later in 2018?

A.   He was.

Q.   And did he say in substance that he now believes Holmes did lie to him?

A.   Yes.

Q.   Did he say in substance when he asked Holmes about the lab where Theranos conducted patient tests, Holmes told him he had basically already seen it, because he was shown a room containing rows of Theranos analyzers?

A.   Yes.

Q.   Did he tell the government in substance when Parloff asked her directly whether Theranos kept any third-party machines, like Siemens ADVIAs in the lab, she falsely answered "no"?

A.   That's correct.

Q.   Okay.  In that last bullet there's a reference to one of Theranos' interrogatory responses in some related litigation.  Do you see that?

A.   I do.

Q.   And what is meant by that bullet?

A.   Again, a response by Theranos made under oath that the 3.5 device was used to run 12 tests, and that they stopped using that in June of 2015.

49

SER-315

different platforms?

A.    Yes.

Q.    And what did he say there?

A.    He said:

"A    No, because then they would know that the CMP was run on the ADVIA third-party instrument and not run on a secret box, and the cat would have been out of the hat so to speak."

* * * * * *

Q.    BY MR. LEACH:  So, in other words, he was asked whether Theranos ever reported either in conversations with doctors or on the test results themselves that this was run on an Edison, this was run on a Siemens, this was run on an X, and he said, no, that was never done, that would let the cat out of the bag?

A.    Yes.

Q.    And was he asked and did he answer:

"Q    Do you remember a conversation with Mr. Balwani where he was resistant to the idea of disclosing this information to doctors?

"A    Yes"?

* * * * * *

76

SER-316

summary of his testimony?

A. It is.

Q. And did Dr. Rosendorff want to start reporting... You can see this in the underlying language of the email. ...$CO_2$ voided by lab due to stability issues? Is that what Dr. Rosendorff wanted to do?

A. It is. Yes.

Q. Is that ultimately what Theranos did?

A. I'm sorry. Can you go back to that, please?

Q. Yes.

A. The proposed alternative messaging was "$CO_2$ results are not available due to temporary unavailability of the test. We apologize for the inconvenience."

Q. Okay. Let me draw your attention to the next slide. Do you see at the top where it says "8/27/2014 (CO2)"?

A. Yes.

Q. And is this a further dialogue between Ms. Holmes and Mr. Balwani about voided $CO_2$ results?

A. It is.

Q. I draw your attention to the middle

104

SER-317

portion of this slide where there's an email from Adam Rosendorff to Sunny where he wrote: "I am thinking that since we void all abnormal bicarbonate results, the test has lost any diagnostic value, and probably also reliability when results are reported in the normal range. We should discontinue this method." Does this ultimately get reported to Ms. Holmes?

A.   Yes.

Q.   Let me draw your attention to Grand Jury Exhibit 83. Is this an excerpt of an email from Christian Holmes to Elizabeth Holmes about certain Theranos tests?

A.   It is.

Q.   And down at the bottom did... And these are excerpts; right?

A.   Yes. Excerpts.

Q.   Did Mr. Holmes write: "Are there any findings we can relay about high trends in calcium reporting?" Do you see that language?

A.   I do.

Q.   When he's talking about relaying that, Mr. Holmes had responsibility for interacting with doctors who had questions or doubts about Theranos' tests?

105

SER-318

A.    Yes.  He did.

Q.    Okay.  And would you please read the further email from Christian Holmes to his sister on September 23rd, 2014?

A.    Of course.  Mr. Holmes writes to Ms. Elizabeth Holmes:  "Hey --- wanted to have just a more candid conversation about this with you.  I am always confident in our technology, but it's pretty obvious we have issues with calcium, potassium and sodium specifically.

Sunny is on these emails, but wanted to get your thoughts specifically on considering to stop reporting these tests until we find the reason we are reporting as we are.  I'm 1000% confident this is an easily solvable issue and one that we will fix, but just more a question around the cost/benefit of continuing to send these results to docs when there seem to be issues with their accuracy.

I am also bringing this up because I haven't heard any reason/root cause for why these tests are off.  I just get a response from Daniel that 'we are aware of the issues and are conducting a study.'  Leaves me a bit hands tied with the docs -- obviously I can't tell them we are wrong,

106

SER-319

but they continue to send patients to Quest after we report high, and the patients results come back normal.

I know have sales reps, docs, and patients without answers as to why their quest report says normal, and Theranos' doesn't.  I'll definitely manage theses things, but just seems to be worth considering a hiatus in reporting these values until we have finished whatever studies Daniel is referring to."

Q.    Let me move forward seven days in time to in time to Grand Jury Exhibit 126.  Is this excerpts of an email between Mr. Balwani and Ms. Holmes relating to another hCG issue?

A.    Yes.

(The document referred to was pre-marked as Grand Jury Exhibit No. 126 for identification and is attached hereto.)

Q.    And does it get forwarded up to Mr. Balwani and Ms. Holmes an incident where a patient of ours came back with a test of 160 and we sent her back in for a report with your lab.  The results came back less than 7.82.  Because her tests came back negative, we had her discontinue her medications and began getting her ready for her

107

SER-320

next cycle?

So, in other words, the results were looking like she wasn't pregnant and they were saying keep up with the medications that you're, you're taking. Is that your read of this?

A.    Yes, that she... Yeah.  Her initial test came back and then an additional test came back and she was no longer pregnant.

Q.    And does the writer go on to report that "A few weeks later she went back in for another QBhcg and it came back over 2000.  We brought her in and I scanned her, and there was in fact a baby, and a heartbeat.  Our concern is that your lab told us she had a negative pregnancy, we relayed that to our patient and continued our protocol as she wasn't pregnant"?  Is that what gets reported to Mr. Balwani and Ms. Holmes?

A.    Yes.

Q.    And later in this email chain did Ms. Holmes report "How did that happen?" to Mr. Balwani?

A.    Yes.

(The document referred to was pre-marked as Grand Jury Exhibit No. 127 for identification and is attached hereto.)

108

SER-321

Q.    Let me draw your attention to the next slide.  Does this relate to HbA1c?

A.    Yes.

Q.    Is that a test for glucose?

A.    Yes.  It is.

Q.    And does it appear, based on this email exchange, that Dr. Rosendorff is surprised at how HbA1c is being tested with two different methods within the lab?

A.    You see that at the bottom of the email. Yes.

Q.    Okay.  And did he write to Christian Holmes his, his dissatisfaction with this practice?

A.    Yes.

Q.    Did he write:  "If my authority as lab director is counteracted again in this way, there will be serious consequences...."?

A.    He did.  Yes.

Q.    Did he go on to suggest to Mr. Holmes that "We should contact all physicians who had patients with A1c measured on the ADVIA to inform them of when we started using both methods, and of the potential for unreliable results"?

A.    At the top of the screen, yes.  That's

SER-322

what he says.

Q.   Let me draw your attention to Grand Jury Exhibit 128.   Does this appear to be excerpts of an email initially from Dr. Rosendorff and some commentary from Ms. Holmes and Mr. Balwani relating to ISEs?

A.   It is.

(The document referred to was pre-marked as Grand Jury Exhibit No. 128 for identification and is attached hereto.)

Q.   Okay.   And does this appear at the bottom to have been initiated by a doctor asking why ISEs weren't included in a final report?

A.   Yes.

Q.   And did Dr. Rosendorff write to Sunny Balwani and Ms. Holmes "I wanted to bring this important issue to your attention"?

A.   He wrote that.

Q.   Did he say "We have no way of knowing for sure whether the result is truly abnormal or artificial to the assay, or related to specimen integrity"?

A.   Yes.

Q.   And did he say "I am not sure of the clinical value of a sodium assay, in which the only

110

SER-323

time we can report it is when it is not critical, and the very situations that require accurate measurement and reporting of abnormal of sodium results are voided"?  Is that what he reported?

A.   Yes, he did.

Q.   And can you Mr. Balwani's comment to Ms. Holmes?

A.   Sure.  It's up at the top of the screen. It says:  "we need to prioritize this asap, as this is causing us a lot of issues.  we need CTN issue solved."

Q.   Is the next slide relating to Grand Jury Exhibits 33 and 34, which Dr. Rosendorff testified about previously?

A.   Yes.

Q.   Does this relate to the cholesterol test?

A.   Yes.

Q.   And is he -- was he -- based on his testimony, did you understand Dr. Rosendorff felt like he was being asked by Christian Holmes to defend the results of a particular cholesterol test that essentially weren't defensible to him?

A.   That's correct.

Q.   And did he write:

"(1)  This is not a question of interpreting

SER-324

results- this is a question of the reliability and accuracy of the result.

(2)   The most constructive thing at this point is to offer reliable and robust assays, not to spin.

(3)   Further, 100% honesty and transparency to the patient is essential.

(4)   My first duty is not to Theranos, but to the patient as per my Hippocratic oath"?

Is that what Dr. Rosendorff was reporting to Christian Holmes and Daniel Young?

A.   Yes.

Q.   And this was one of the emails he forwarded to himself towards the end of 2014?

A.   Correct.

Q.   I draw your attention to the next slide. Are these true and correct excerpts from Dr. Rosendorff's testimony?

A.   They are.

Q.   Let me draw your attention to the next slide relating to Grand Jury Exhibit 35.   Does this appear to be an excerpt of a November 21st, 2014 email where Dr. Rosendorff is raising issues with ISE results?

A.   They are.   Yes.

SER-325

Q.   And on the next slide do we have excerpts of how Mr. Balwani responded and how Dr. Rosendorff took what Mr. Balwani was suggesting?

A.   Yes.

Q.   Essentially that Sunny's response was offensive and disingenuous?

A.   Correct.

Q.   Can we read responsively, please, for what Dr. Rosendorff had to say about this?

A.   Of course.

Q.   And this is on the next slide.

                    * * * * * *

"Q   What is your opinion of Mr. Balwani responding in this way, responding to your concerns about the accuracy of the tests by saying, No, no, we have very high confidence in every result we are releasing?

"A   Well, it's just verbiage to say that you have very high confidence in the result.  I mean, if it's not backed up by science, then it's just words.  I mean we certainly didn't see all the ISE results being critical or -- I mean, I think the dilution protocol was particularly

                                                      113

SER-326

problematic for the ion-selective electrode.  And to this day, I don't believe you can get accurate results with an ion-selective electrode using a dilution protocol.

"Q   So, these are challenges that Theranos certainly did not overcome during your time at the company?

"A   Correct."

          * * * * * *

Q.   BY MR. LEACH:  And after Dr. Rosendorff said he found Mr. Balwani's response disingenuous and insulting, what was Mr. Balwani's response?

A.   His response to Ms. Holmes was:  "we need to respond to him now and cut him Monday."

Q.   "Cut him," you took that to mean "fire"?

A.   Yes.

Q.   Last document on this topic, Inspector McCollow.  I draw your attention to the next slide that says "Grand Jury Exhibit 129."  Is this another email relating to ISEs?

A.   It is.

          (The document referred to was pre-marked as Grand Jury Exhibit No. 129 for identification and is attached hereto.)

                                                      114

SER-327

Q.   And did Mr. Balwani say:   "why do we have so many ISE short sampling. this is a MAJOR issue we must fix and seems like we are making no progress"?

A.   That's correct.

Q.   And did he go on to say:   "this is really bad.  this is discouraging progress"?

A.   Yes.  Up at the top.  Yes.

Q.   I want to move forward in time to 2015, Inspector McCollow, and I've displayed for you a slide titled "CMS Inspection"?  Do you see that?

A.   I do.

Q.   After Dr. Rosendorff left the company, did Theranos hire another lab director?

A.   They did.

Q.   Is that Sunil Dhawan?

A.   Yes, it is.

Q.   Was he Sunny Balwani's dermatologist?

A.   Yes, he was.

Q.   Has the government interviewed Dr. Dhawan?

A.   We have.

Q.   And based on his statements, does it appear that Dr. Dhawan did any meaningful work for Theranos between the end of 2014 and August or September of 2015?

115

A.    It doesn't appear that he did.

Q.    In fact, did he first come in roughly one month before an inspection by CMS?

A.    Yes, which was about eight months after he took over the job.

Q.    Okay.  And did CMS actually conduct an inspection of Theranos beginning in, in or around September 22nd, 2013?

A.    Yes.

Q.    And you've excerpted some texts from Ms. Holmes and Mr. Balwani here:

"EH: Praying literally non stop"?

A.    Yes.

Q.    "SB," is SB a reference to Mr. Balwani?

A.    It is.

Q.    Okay.  Did he write to Ms. Holmes "Our validation reports are terrible.  Really painful going thru this process.  Same issues fda pointed out"?

A.    Yes.

Q.    Okay.  Did he say "Going bad so far. Pray"?

A.    Correct.  Yes.

Q.    Do you believe that to be a reference to how the CMS investigation was going?

116

BEHMKE REPORTING and VIDEO SERVICES, INC.
(415) 597-5600

**SER-329**

A.   Yes.

MR. LEACH:  And just for the record, one of the grand jurors has...

THE FOREPERSON:  Left for the day.

MR. LEACH:  ...left for I believe the rest of the day.

THE FOREPERSON:  Yeah.

MR. LEACH:  We still have a quorum.

THE FOREPERSON:  Yeah.

MR. LEACH:  And we're fine.

THE FOREPERSON:  Yeah.

Q.   BY MR. LEACH:  There's a bullet here, "1/25/2016 report."  Do you see that, Inspector McCollow?

A.   I do.

Q.   And is that a reference to a report issued by CMS about Theranos's Newark lab?

A.   Yes.

Q.   And did CMS conclude the Theranos facility is not in compliance with all of the conditions required for certification?

A.   Yes.

Q.   Did it also determine that the deficient practices of the lab posed an immediate jeopardy to patient health and safety?

117

SER-330

A.   Yes.

Q.   Ultimately, did Theranos close its Newark lab?

A.   They did.

Q.   And did Theranos void all results reported for the assays run on the Edison 3.5 in 2014 and 2015 and all PT/INR tests run on the ADVIA that went into use in October 2014 through September of 2015?

A.   They did.

Q.   I draw your attention to the next slide. The title is "Dr. Stephen Master Report."  Do you see that?

A.   I do.

Q.   And are Dr. Master's qualifications summarized in the first bullet?

A.   They are.

Q.   He's a lab director for Children's Hospital in Philadelphia?

A.   Yes, he is.

Q.   And he's also an associate professor of pathology and a fellow of the College of American Pathologists and the American Association for Clinical Chemistry?

A.   Correct.

SER-331

Q.   Did they generally deny their responsibility for securities violations?

A.   Yes.

Q.   I displayed on the screen proposed Count One of the superseding indictment.  Do you have that in front of you, Mr. Inspector McCollow?

A.   I see it.

Q.   Could you please read that for us?

A.   All right.   "COUNT ONE" is "18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos Investors.)

19.   Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

20.   From a time unknown but no later than approximately 2010 through approximately 2015, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and

RAMESH 'SUNNY' BALWANI,

and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, by devising a scheme and artifice to defraud as to a material matter and to obtain money

126

SER-332

by means of materially false and fraudulent representations, specifically by soliciting investments through making the false and fraudulent representations as set forth in this Second Superseding Indictment.

All in violation of Title 18, United States Code, Section 1349."

Q.   Do you believe there to be probable cause for this allegation?

A.   I do.

Q.   And the timing of the conspiracy goes back to 2010; is that right?

A.   Yes.

Q.   Is that in or around the time of the... when the Walgreens relationship was initiated?

A.   Yes, it is.

Q.   Let me draw your attention to the next slide.

A.   Okay.

Q.   Is this Count Two of the proposed superseding indictment?

A.   Yes.

Q.   Would you please read this for us.

A.   Of course.   "COUNT TWO:   18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos

127

SER-333

Patients).

21.   Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

22.   From in or around 2013 through 2016, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and

RAMESH 'SUNNY' BALWANI,

and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, by devising a scheme and artifice to defraud as to a material matter and to obtain money by means of materially false and fraudulent representations, specifically by soliciting, encouraging, or otherwise inducing doctors to refer and patients to pay for and use its laboratory and blood testing services under the false and fraudulent pretense that Theranos technology produced reliable and accurate blood"... I believe that word is "test results.

All in violation of Title 18, United States Code, Section 1349."

Q.   Do you believe there is probable cause for

SER-334

these allegations?

A.   I do.

Q.   And this is a conspiracy count relating to conspiracy to commit wire fraud against Theranos patients?

A.   Correct.

Q.   Essentially to induce them to purchase faulty blood tests?

A.   Yes.

Q.   Let me draw your attention to Counts Three through Eight.

A.   Okay.

Q.   Do you see paragraphs 23 and 24 of the proposed indictment displayed on the screen?

A.   I do.

Q.   And do these allege individual counts of wire fraud against Elizabeth Holmes and Ramesh "Sunny" Balwani?

A.   Yes.

Q.   And I've now displayed a chart with a column for "Count" on the left.  Do you see that? Is this an excerpt of the superseding indictment?

A.   Yes.

Q.   And are the individual counts alleged on the, listed on the left side in counts?

129

SER-335

A.   Yes.

Q.   And then in the "Date," do those columns relate to the date on which a particular wiring took place?

A.   It does.

Q.   The "ITEM WIRED," is this essentially the transfer of money from one bank to another bank?

A.   It is.

Q.   And are the destinations and... is the destination and the place of origin listed in the two right columns?

A.   They are.  Yes.

Q.   So these wires spanned a time from December of 2013 through October of 2014?

A.   Correct.

Q.   Let's look at these individually, if we could.  Is Count Three relating to a wire by Alan Eisenman to Theranos' bank account on or about December 30th, 2013?

A.   Yes.

Q.   And is this supported by Grand Jury Exhibit 71?

A.   Yes.

Q.   Count Four, is this a wire between Black Diamond Ventures to Theranos' Comerica account on

130

SER-336

or about December 13th, 2013 in the amount of $5,349,900?

A.   Yes.

Q.   And is this supported by Grand Jury Exhibit 72?

A.   Yes.

Q.   Count Five, is this a wire on or about December 31st, 2013 from Hall Phoenix to Theranos in the amount of $4,875,000?

A.   Yes.

Q.   Okay.  From an account in Texas to an account here at Theranos' Comerica Bank?

A.   Correct.  Yes.

Q.   And "Hall Phoenix," do you believe that to be Craig Hall?

A.   Yes.

Q.   He's the individual who heard Ms. Holmes say that the Theranos device was on medevac helicopters?

A.   Yes.

Q.   I draw your attention to the next slide, Count Six.  Does this relate to a wire on or about February 6th, 2014 by PFM Healthcare Master Fund, L.P.?

A.   It is.  Yes.

131

SER-337

Q.   That's PFM, that's the entity Mr. Grossman works for?

A.   Yes.

Q.   And you've seen excerpts of Mr. Grossman's testimony about what he was told and what he believed in going into the Theranos investment?

A.   Yes.

Q.   Did PFM bring a lawsuit against Theranos?

A.   They did.

Q.   And they were alleging, and that case was ultimately settled?

A.   It was.

Q.   Okay.  But his, his motive there could be something that Mr. Balwani thinks is relevant to assessment of the charges?

A.   Yes.

Q.   The amount here is $38,336,632?  Do you see that?

A.   I do.

Q.   And this is from a Citibank account to Theranos' Comerica account?

A.   Correct.

Q.   And this is supported by Grand Jury Exhibit 74?

A.   Yes.

132

SER-338

Q.   I draw your attention to the next slide. Does this relate to Count Seven?

A.   It does.  Yes.

Q.   And does this relate to a wire from Lakeshore Capital Management LP?

A.   Yes.

Q.   I'm sorry.  From a bank account there. Does this relate to RDV's investment?

A.   It is.  Yes.

Q.   RDV is...  The two people involved in the decision making process were Jerry Tubergen and Lisa Peterson?

A.   Correct.

Q.   And Ms. Peterson testified before the prior grand jury and you've summarized much of her or some of her testimony?

A.   Yes.

Q.   And this was an essentially $100,000,000 wire?

A.   Correct.

Q.   And a bank account at... in Illinois to Theranos in California?

A.   Yes.

Q.   And this is supported by Grand Jury Exhibit 75?

133

BEHMKE REPORTING and VIDEO SERVICES, INC.
(415) 597-5600

**SER-339**

A.    It is.

Q.    Count Eight, is this supported by Grand Jury Exhibit 76?

A.    Yes, it is.

Q.    And is this a wire by Dan Mosley to Theranos in the amount of almost $6,000,000?

A.    Yes, it is.

Q.    On or about October 31st, 2014?

A.    Yes.

Q.    I'll draw your attention to the next slide, which quotes paragraphs 25 and 26.  Are you able to see that?

A.    I am.

Q.    Okay.  Are these individual wire fraud counts relating to patients who paid for faulty Theranos tests?

A.    Yes, they are.

Q.    And I'll just read paragraph 26.  "On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and

RAMESH 'SUNNY' BALWANI,

for the purpose of executing the material scheme and artifice to defraud doctors and patients, and

134

BEHMKE REPORTING and VIDEO SERVICES, INC.
(415) 597-5600

SER-340

for obtaining money and property from patients by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, laboratory and blood test results and payments for the purchase of advertisements soliciting patients and doctors for its laboratory business, as further set forth below, in violation of Title 18, United States Code, Section 1343."

I draw your attention to the next slide.  Does this summarize the individual wire fraud counts relating to the patients?

A.   Yes, they do.

Q.   And does Count Nine relate to a phone call from Brent Bingham to Theranos regarding his lab blood tests on or about October 12th, 2015?

A.   Yes.

Q.   And that was a phone call from Arizona to California?

A.   Correct.

Q.   Count Ten, does that relate to the faxing or Erin Tompkins' blood test results from

SER-341

California to Arizona on or about May 11th, 2015?

A.    Yes.

Q.    And the final wire fraud count, does that relate to a purchase of advertising time or space in the amount of $1.1 million from Theranos' bank account to Horizon Media's bank account?

A.    Correct.

Q.    I draw your attention to the next slide, which is titled "Count Nine."  Is this an excerpt from a document relating to the phone call that Brent Bingham made to Theranos?

A.    Yes, it is.

Q.    And can you read for us what was reported on the far right?

A.    Yes.  In the yellow section:  "A patient who came in for direct testing has been getting his CBC done with us for a while and said he does have a condition where he produces too many platelets. They have been coming back higher than normal so he had testing done at another lab and on the same day went to a Theranos center to be drawn.  When comparing the results, the other lab had platelets of around 700 and our results came back as 909.  He wanted to speak to someone that could explain why there might be a discrepancy so he can continue to

SER-342

use us with confidence."

Q.   So Mr. Bingham felt like he was getting faulty results outside of the norm of what he got from other providers?

A.   Correct.

Q.   And he gets frequent blood tests in order maintain his health?

A.   Yes.

Q.   Okay.  On the next slide have we summarized statements that Mr. Bingham made to the government?

A.   Yes.

Q.   And this wasn't an interview that you performed.  This was by one of your colleagues within the FBI?

A.   Correct.

Q.   And do you believe these to be a fair and accurate description of statements made by Mr. Bingham to the government?

A.   I do.

Q.   On the next slide I draw your attention up to the top where it says **Brent Bingham**."  Do you see that?

A.   I do.

Q.   Are these further descriptions of what

SER-343

Mr. Bingham told the government?

A.   Yes.

Q.   That he compared his Theranos blood test on August 27th, 2015 with a result he received from a competing major lab an hour later; that he used Theranos because they were supposed to only use a tiny sample of blood.  There were also reports of positive technology breakthrough and that he paid for the tests with his own money, most likely a credit card.  Is that a fair summary?

A.   Yes.

Q.   Does Count Ten relate to Erin Tompkins?

A.   Yes.

Q.   And on this slide have we summarized what Ms. Tompkins told the government in an interview with the FBI?

A.   Yes.

Q.   Okay.  She learned of Theranos on Facebook?

A.   Correct.

Q.   And can you summarize those last two bullets for us?

A.   Sure.  That Ms. Tompkins had her blood drawn at her physician's office as part of an annual checkup, and that annual checkup also

138

included an HIV/AIDS screening.  And then after the test was done, someone from the office informs Ms. Tompkins that her HIV test was positive.  She felt terrible and awful and thought that she was dying, felt very emotional around that fact as well.

She remembered receiving assurance from Dr. Asin that the test results could not be accurate, but that didn't make her feel any better.

Q.   And did she get retested by another lab with the result coming back negative?

A.   She did.

Q.   And did Ms. Tompkins report paying for her Theranos test?

A.   She did.  Yes.

Q.   Is this an excerpt...  Grand Jury Exhibit 132, is this, and we've displayed portions of it, an excerpt of the test?

A.   Yes.

Q.   And this appears to have been faxed on May 11th, 2015?

A.   Correct.

Q.   All right.  I draw your attention to the next slide, which relates to Count Eleven, Grand Jury Exhibit 79.  Is this a copy of the wire

139

SER-345

transmittal form between Theranos' bank account and Horizon Media's bank account?

A. Yes, it is.

Q. And the date of this is August 3rd of 2015?

A. Uh-huh. Yes.

Q. And the amount is $1,126,661?

A. Correct. Yes.

Q. I've displayed on the screen a slide titled "Paragraph 27." Is this a Forfeiture Allegation in the proposed indictment?

A. It is.

Q. And is paragraph 28 an additional Forfeiture Allegation?

A. It is.

Q. The government's not seeking to forfeit particular property. It's seeking a money judgment in the amount of any money that Ms. Holmes and Mr. Balwani received as part of their scheme?

A. Correct.

MR. LEACH: It's now about 2:24. Do any of the grand jurors have questions for Inspector McCollow?

(No response from the grand jurors.)

MR. LEACH: I'm not seeing any hands.

THE FOREPERSON: Well, I'm just wondering.

SER-346