No. 22-10338

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAMESH "SUNNY" BALWANI,

Defendant-Appellant.

_____

**SUPPLEMENTAL EXCERPTS OF RECORD**
**VOLUME 3 OF 9**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 18-CR-00258-EJD-2

_____

**THOMAS A. COLTHURST**
Attorney for the United States
Acting Under Authority Conferred By
28 U.S.C. § 515

**MATTHEW M. YELOVICH**
Chief, Appellate Section, Criminal Division

**KELLY I. VOLKAR**
Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7185
**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA, )
                                    ) CR-18-00258-EJD
            PLAINTIFF, )
                                    ) SAN JOSE, CALIFORNIA
       VS. )
                                    ) MARCH 22, 2022
RAMESH "SUNNY" BALWANI, )
                                    ) VOLUME 8
            DEFENDANT. )
_____ ) PAGES 985 — 1154

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                        BY:  JOHN C. BOSTIC
                             JEFFREY B. SCHENK
                        150 ALMADEN BOULEVARD, SUITE 900
                        SAN JOSE, CALIFORNIA 95113

                        BY:  ROBERT S. LEACH
                             KELLY VOLKAR
                        1301 CLAY STREET, SUITE 340S
                        OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:
                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074


     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

SER-348

A P P E A R A N C E S: (CONT'D)

FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                        BY:  MOLLY MCCAFFERTY
                             SHAWN ESTRADA
                        THE ORRICK BUILDING
                        405 HOWARD STREET
                        SAN FRANCISCO, CALIFORNIA 94105

                        BY:  JEFFREY COOPERSMITH
                             AARON BRECHER
                             AMANDA MCDOWELL
                        701 FIFTH AVENUE, SUITE 5600
                        SEATTLE, WASHINGTON 98104

                        BY:  STEPHEN CAZARES
                        77 SOUTH FIGUEROA STREET, SUITE 3200
                        LOS ANGELES, CALIFORNIA 90017

                        BY:  AMY WALSH
                        51 W 52ND STREET
                        NEW YORK, NEW YORK 10019


ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                        BY:  MADDI WACHS, PARALEGAL
                             SARA SLATTERY, PARALEGAL

                        ORRICK, HERRINGTON & SUTCLIFFE
                        JENNIFER CYGNOR, PARALEGAL

                        PROLUMINA
                        BY:  COREY ALLEN
                        2200 SIXTH AVENUE, SUITE 425
                        SEATTLE, WASHINGTON 98121

                        UNITED STATES POSTAL INSPECTION SERVICE
                        BY:  CHRISTOPHER MCCOLLOW

                        FEDERAL BUREAU OF INVESTIGATION
                        BY:  MARIO C. SCUSSEL

                        UNITED STATES FOOD & DRUG
                        ADMINISTRATION
                        BY:  GEORGE SCAVDIS

INDEX OF PROCEEDINGS


GOVERNMENT'S OPENING STATEMENT          P. 1018

DEFENDANT'S OPENING STATEMENT          P. 1050


GOVERNMENT'S:


**ERIKA CHEUNG**
DIRECT EXAM BY MR. BOSTIC               P. 1116

I'LL JUST STEP DOWN.

ANYTHING BEFORE I STEP DOWN, COUNSEL?

MR. LEACH:  NO, YOUR HONOR.  THANK YOU.

MR. COOPERSMITH:  NO, YOUR HONOR.

THE COURT:  I APOLOGIZE, I'M SORRY.  WE'LL GET THROUGH THIS AS QUICK AS WE CAN.  THANK YOU.

(RECESS FROM 9:50 A.M. UNTIL 10:08 A.M.)

(JURY IN AT 10:08 A.M.)

THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

OUR JURORS AND ALTERNATES ARE PRESENT.  THANK YOU, LADIES AND GENTLEMEN.  I APOLOGIZE FOR THE INCONVENIENCE.

MR. LEACH, I THINK WE'VE SOLVED THE ISSUE.

IF YOU HAVE AN OPENING STATEMENT.

MR. LEACH:  YES, YOUR HONOR.

THANK YOU, MS. ROBINSON.

**(COUNSEL FOR GOVERNMENT GAVE THEIR OPENING STATEMENT.)**

MR. LEACH:  THANK YOU, LADIES AND GENTLEMEN, FOR YOUR PATIENCE THIS MORNING.  I THINK EVERYTHING IS WORKING NOW.

MAY IT PLEASE THE COURT.

LADIES AND GENTLEMEN OF THE JURY, THE DEFENDANT, RAMESH BALWANI, WAS THE PRESIDENT AND CHIEF OPERATING OFFICER OF THERANOS, A BLOOD TESTING COMPANY HEADQUARTERED IN SILICON VALLEY.

THE EVIDENCE WILL SHOW THAT THE DEFENDANT LIED TO

POTENTIAL INVESTORS IN THERANOS AND TO PATIENTS WHO USED THERANOS'S BLOOD TESTING SERVICES.

HE MISLED THEM INTO BELIEVING THAT THERANOS HAD DEVELOPED A MINI BLOOD ANALYZER THAT COULD RUN VIRTUALLY ANY BLOOD TEST FROM A DROP OF BLOOD DRAWN FROM THE FINGER, NOT FROM THE VEIN.

HE DID THIS TO GET MONEY FROM INVESTORS, AND HE DID THIS TO GET MONEY AND BUSINESS FROM PAYING PATIENTS WHO WERE COUNTING ON THERANOS TO DELIVER ACCURATE AND RELIABLE BLOOD TESTS SO THAT THEY COULD MAKE IMPORTANT MEDICAL DECISIONS.

THE MINI BLOOD ANALYZER THAT THE DEFENDANT TOUTED WAS NEVER ABLE TO DO MORE THAN 12 BLOOD TESTS, AND EVEN THOSE, IT DID BADLY FOR THE SHORT PERIOD OF TIME IT WAS IN USE.

DURING THESE SCHEMES TO DEFRAUD, THE DEFENDANT AND THERANOS MADE NUMEROUS FALSE AND MISLEADING CLAIMS ABOUT THE CAPABILITIES AND ACCOMPLISHMENTS OF THERANOS AND ITS TECHNOLOGY, INCLUDING THAT THE UNITED STATES MILITARY WAS ACTUALLY USING THERANOS'S MINI BLOOD ANALYZER ON HELICOPTERS AND IN THE BATTLEFIELD, THAT MAJOR PHARMACEUTICAL COMPANIES HAD ENDORSED THERANOS'S TECHNOLOGY AND WERE EFFECTIVELY FUNDING ITS OPERATIONS, AND THAT THERANOS HAD ACHIEVED AND WAS ON THE BRINK OF ACHIEVING HUNDREDS OF MILLIONS OF DOLLARS IN REVENUE.

BUT NONE OF THAT WAS TRUE.

THIS IS A CASE ABOUT FRAUD, ABOUT LYING AND CHEATING TO OBTAIN MONEY AND PROPERTY.

MR. BALWANI JOINED THERANOS IN THE FALL OF 2019 AS ITS

PRESIDENT AND CHIEF OPERATING OFFICER.

THE DEFENDANT HAD NO MEDICAL DEGREE.  HE HAD NO EXPERIENCE IN BLOOD TESTING.  HE HAD NO EXPERIENCE BUILDING MEDICAL DEVICES OR RUNNING A LABORATORY.

WHAT HE DID HAVE WAS A CONNECTION TO ELIZABETH HOLMES WHO FORMED THERANOS IN 2003 AFTER DROPPING OUT OF COLLEGE WHEN SHE WAS A TEENAGER.

HOLMES WAS THERANOS'S CHIEF EXECUTIVE OFFICER, OR ITS CEO, AND BALWANI WAS HER ROMANTIC PARTNER.  THE TWO HAD BEEN ROMANTICALLY INVOLVED SINCE THE EARLY 2000S, AND THE TWO CONTINUED TO BE ROMANTIC PARTNERS THROUGH THE MIDDLE OF 2016.

WITH NO MEDICAL EXPERIENCE AND NO BLOOD TESTING EXPERIENCE, THE DEFENDANT ASSUMED THE ROLE OF PRESIDENT AND CHIEF OPERATING OFFICER.

AT THE TIME, THERANOS WAS STRUGGLING FINANCIALLY.  IT WAS BARELY PAYING ITS EMPLOYEES.  EARLY CUSTOMERS, INCLUDING PFIZER AND SCHERING-PLOUGH, THE PHARMACEUTICAL COMPANIES, WERE DECLINING TO GO FORWARD WITH THERANOS AFTER BRIEF, UNSUCCESSFUL EXPERIENCES.

AND THE U.S. FOOD AND DRUG ADMINISTRATION, OR THE FDA, THE AGENCY THAT POLICES OR REGULATES BLOOD TESTING DEVICES, HAD NOT APPROVED THERANOS'S MINI BLOOD ANALYZER AND WAS NOWHERE NEAR DOING SO.

AFTER BALWANI JOINED THE COMPANY, HE AND ELIZABETH HOLMES BEGAN MAKING GRANDIOSE SPECTACULAR CLAIMS ABOUT THERANOS'S

SER-353

CAPABILITIES AND ITS ACCOMPLISHMENTS. THEY BEGAN TRYING TO CONVINCE RETAILERS LIKE SAFEWAY AND WALGREENS THAT THERANOS'S UNPROVEN TECHNOLOGY WAS READY FOR ACTUAL USE ON PATIENTS.

THEY TOLD SAFEWAY AND WALGREENS THAT THERANOS HAD DEVELOPED A DEVICE, A MINI BLOOD ANALYZER, THAT COULD TEST SMALL AMOUNTS OF BLOOD DRAWN FROM A FINGER, NOT FROM A VEIN, IN GROCERY STORES AND PHARMACIES.

I'VE PUT AN IMAGE OF THE DEVICE, THE MINI BLOOD ANALYZER, ON THE SCREEN.

BALWANI AND HOLMES STATED TO WALGREENS AND SAFEWAY THERANOS HAD DEVELOPED QUOTE, "GENERATIONS OF MINILAB DEVICES THAT CAN RUN ANY BLOOD TEST IN REALTIME FOR LESS THAN THE TRADITIONAL COST OF CENTRAL LAB TESTS."

THAT WAS UNTRUE.

THERANOS'S MINILAB ANALYZERS COULD NOT RUN ANY BLOOD TEST IN REALTIME FOR LESS THAN THE COST OF TRADITIONAL CENTRAL LABORATORIES. IT NEVER COULD.

AND ALTHOUGH PFIZER AND SCHERING-PLOUGH AND OTHER PHARMACEUTICAL COMPANIES WERE SAYING NO TO THERANOS, BALWANI AND ELIZABETH HOLMES SUGGESTED THAT THOSE RELATIONSHIPS WERE FLOURISHING, STATED TO WALGREENS AND SAFEWAY THAT THERANOS SYSTEMS HAD BEEN COMPREHENSIVELY VALIDATED BY 10 OF THE TOP 15 PHARMACEUTICAL COMPANIES.

BALWANI AND HOLMES AMAZED WALGREENS AND SAFEWAY WITH THESE AND OTHER FALSE AND MISLEADING STATEMENTS. WALGREENS AND

SER-354

SAFEWAY COMMITTED TO INVEST MILLIONS OF DOLLARS, AS DID OTHER INVESTORS IN 2010.

THE IDEA, AT LEAST INITIALLY, WAS TO PUT THE MINI BLOOD ANALYZER, THE DEVICE THAT YOU SEE HERE, IN SAFEWAY GROCERY STORES AND WALGREENS PHARMACIES, AND TO TEST BLOOD FROM THE FINGER, NOT THE VEIN.  THE HOPE WAS THAT THE PATIENTS WOULD GET THE RESULTS IN MINUTES WHILE THEY WERE DOING THEIR GROCERY SHOPPING OR PICKING UP THEIR PRESCRIPTIONS.  THAT WAS 2010.

THREE YEARS LATER, IN 2013, THE SPECTACULAR GRANDIOSE PROMISES THAT THE DEFENDANT AND HOLMES HAD MADE WERE NOT MATERIALIZING.  THERE WERE NO MINI BLOOD ANALYZERS IN SAFEWAY. THERE WERE NO MINI BLOOD ANALYZERS IN WALGREENS.

THE FDA WAS STILL NOWHERE NEAR APPROVING THE MINI BLOOD ANALYZER, AND THERANOS HAD YET TO VALIDATE A SINGLE TEST FOR USE ON THE MINI BLOOD ANALYZER FOR USE IN ACTUAL PATIENTS.

ON TOP OF ALL OF THIS, THERANOS WAS QUICKLY RUNNING OUT OF MONEY.

ONE POTENTIAL CUSTOMER WHO HAD GIVEN THERANOS NEARLY $20 MILLION IN 2011 WAS DEMANDING ITS MONEY BACK.  THERANOS WAS FORCED TO RETURN THAT MONEY IN AUGUST OF 2013.  THERANOS, YOU WILL SEE, WAS RUNNING OUT OF TIME AND RUNNING OUT OF OPTIONS.

SO WHAT DID HOLMES AND BALWANI DO?  THEY DECIDED TO DECEIVE AND TO CHEAT.

TO GET THEMSELVES OUT OF THE HOLE THEY DUG, THEY DID THREE THINGS:

SER-355

FIRST, ALTHOUGH THEY HAD PROMISED THE THERANOS DEVICE -- THE MINI BLOOD ANALYZER THAT I SHOWED YOU -- WOULD BE USED FOR THE WALGREENS AND SAFEWAY LAUNCHES, THEY DECIDED TO HAVE THERANOS USE MACHINES MADE BY OTHER MANUFACTURERS, THIRD PARTIES, NOT THERANOS, TO DO THE PATIENT TESTING IN ITS LABORATORY.

IN THE SUMMER OF 2013, IN WHAT YOU WILL HEAR WAS A RUSH AND A SCRAMBLE, BALWANI AND HOLMES ORDERED THEIR SUBORDINATES TO MODIFY THIRD PARTY MACHINES MANUFACTURED BY OTHERS SO THAT THE MACHINES COULD RUN BLOOD TESTS FROM TINY BLOOD SAMPLES. AND THEY DECIDED TO HAVE THOSE MACHINES, NOT SIMPLY THOSE MADE BY THERANOS, DO THE BLOOD TESTING FOR THE WALGREENS LAUNCH.

HERE'S AN IMAGE OF ONE OF THOSE THIRD PARTY MACHINES. THIS IS A DEVICE CALLED AN ADVIA 1800. IT'S MADE BY A COMPANY CALLED SIEMENS, NOT THERANOS. AND IT CAN COST HUNDREDS OF THOUSANDS OF DOLLARS.

IT'S A GOOD MACHINE, BUT IT'S BIG, AND IT'S BULKY. IT'S WHAT THEY USE IN CENTRAL LABS, THE CENTRAL LABS THAT BALWANI AND HOLMES DISDAINED. AND MOST IMPORTANTLY, IT'S NOT MADE BY THERANOS.

THIS WAS NOT THE MINI BLOOD ANALYZER THAT THE DEFENDANT AND HOLMES HAD PROMISED. THIS WAS NOT MINIATURIZING THE LAB AS BALWANI AND HOLMES HAD PROMISED. THIS WAS A WAY TO DECEIVE WALGREENS AND TO DECEIVE SAFEWAY, TO STALL, AND TO BUY TIME UNTIL HOLMES AND BALWANI COULD GET THE MINI BLOOD ANALYZER TO

SER-356

ACTUALLY WORK.

THE SECOND THING THAT BALWANI AND HOLMES DID WAS TO INDUCE A NEWS REPORTER NAMED JOE RAGO FROM "THE WALL STREET JOURNAL" TO WRITE A NEWS STORY ABOUT THERANOS FALSELY SUGGESTING THAT THERANOS HAD SUCCEEDED IN REVOLUTIONIZING BLOOD TESTING WITH A MINI BLOOD ANALYZER THAT COULD DO ANY BLOOD TEST FROM A FINGER DROP.

THERANOS, YOU WILL SEE, WORKED CLOSELY WITH MR. RAGO AND REVIEWED AND APPROVED HIS PIECE BEFORE IT WAS PUBLISHED.

HERE ARE SOME OF THE EXCERPTS OF THE ARTICLE WHICH YOU WILL SEE IN THIS CASE WERE FALSE AND MISLEADING AT THE TIME.

"THE SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW REFINING INVOLVES DEVICES THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000 LABORATORY TESTS, FROM ROUTINE BLOOD WORK TO ADVANCED GENETIC ANALYSES. THERANOS'S PROCESSES ARE FASTER, CHEAPER, AND MORE ACCURATE THAN THE CONVENTIONAL METHODS AND REQUIRE ONLY MICROSCOPIC BLOOD VOLUMES, NOT VIAL AFTER VIAL OF THE STUFF."

"THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE LAB TRIPS BECAUSE IT CAN RUN ANY COMBINATION OF TESTS, INCLUDING SETS OF FOLLOW-ON TESTS, AT ONCE VERY QUICKLY, ALL FROM A MICRO SAMPLE."

ANOTHER REPRESENTATION: "THERANOS CAN CONDUCT A BATTERY OF TESTS FOR TENS OF DOLLARS, A PHRASE THAT DOES NOT EXIST IN U.S. HEALTH CARE."

BALWANI AND HOLMES TIMED THIS "WALL STREET JOURNAL" PIECE

SER-357

WITH A PRESS RELEASE, WHICH YOU SEE HERE, WHERE THERANOS ANNOUNCED ITS BLOOD TESTS WOULD BE AVAILABLE IN WALGREENS, AND BOLDLY ASSERTED QUOTE, "WITH FIRST LOCATION LAUNCHING THIS MONTH IN SILICON VALLEY, CONSUMERS CAN NOW COMPLETE ANY CLINICIAN-DIRECTED LAB TEST WITH AS LITTLE AS A FEW DROPS OF BLOOD AND RESULTS AVAILABLE IN A MATTER OF HOURS."

THIS, LIKE THERANOS'S CLAIMS IN "THE WALL STREET JOURNAL" ARTICLE, WAS FALSE AND MISLEADING, AS THE EVIDENCE WILL SHOW.

AT THE TIME OF THIS PRESS RELEASE, THERANOS WAS NOT ABLE TO DO ANY OF ITS BLOOD TESTS ON ITS MINI ANALYZER ON PATIENTS IN ITS LABORATORY. NOT A SINGLE ONE AT THE TIME OF THIS ARTICLE.

THE THIRD THING THAT THE DEFENDANT AND HOLMES DID WAS TO RAISE MONEY, LOTS OF MONEY. WITH THE MEDIA SPLASH FROM THE RAGO ARTICLE AND THE PRESS RELEASE, THE DEFENDANT AND ELIZABETH HOLMES STARTED TO RAISE MORE MONEY FROM INVESTORS, AND BETWEEN THE END OF 2013 AND 2015 THEY RAISED HUNDREDS OF MILLIONS OF DOLLARS FROM INVESTORS BASED ON FALSE AND MISLEADING REPRESENTATIONS.

SOME OF THE FALSE AND MISLEADING REPRESENTATIONS WERE MADE ORALLY IN MEETINGS WITH PROSPECTIVE INVESTORS. SOME OF THEM WERE IN POWERPOINTS THAT BALWANI AND HOLMES DISTRIBUTED TO INVESTORS OR HAD THEIR SUBORDINATES TO DISTRIBUTE TO INVESTORS. SOME WERE IN NEWS ARTICLES THAT THERANOS ENGINEERS AND DIRECTED TO PROSPECTIVE INVESTORS. SOMETIMES BALWANI TOOK THE LEAD WITH

A PARTICULAR INVESTOR, OTHER TIMES ELIZABETH HOLMES DID.

THE EVIDENCE WILL SHOW THAT MR. BALWANI AND MS. HOLMES WERE PARTNERS IN VIRTUALLY EVERYTHING.

THE FALSE AND MISLEADING REPRESENTATIONS FELL PRIMARILY INTO A COUPLE OF DIFFERENT CATEGORIES.

FIRST, THE DEFENDANT DECEIVED INVESTORS ABOUT THE CAPABILITIES AND READINESS OF THERANOS'S MINI BLOOD ANALYZER.

THERANOS'S MINI BLOOD ANALYZER WENT BY A COUPLE OF DIFFERENT NAMES AND A COUPLE OF DIFFERENT ITERATIONS THROUGHOUT THE TIME PERIOD.  SOME OF THOSE NAMES INCLUDE 3.0, 3.5, EDISON, EDISON 3.5, 4.0, MINILAB.  IT'S ALSO CALLED THE THERANOS SAMPLE PROCESSING UNIT, OR TSPU.  THOSE ARE JUST SOME OF THE NAMES THAT YOU WILL HEAR THAT REFER TO THE MINI BLOOD ANALYZER.

AND THE DEFENDANT LED INVESTORS INTO BELIEVING THAT THERANOS HAD BEEN USING ITS MINI BLOOD ANALYZER IN ITS LAB FOR YEARS, AND THAT THE MINI BLOOD ANALYZER COULD ACCURATELY AND RELIABLY RUN ALL, OR NEARLY ALL, OF THE BLOOD TESTS FROM A FINGERSTICK ON PATIENTS IN A RECORD TIME AND AT A LOW COST.

HERE'S SOME OF THE CLAIMS IN THE PRESENTATION TO ONE OF THE INVESTORS THAT YOU WILL HEAR FROM.  THE DEFENDANT AND HOLMES INVOKED THE IMAGE OF A THERANOS SYSTEM WITH MINI ANALYZERS, LIKE THE TWO YOU SEE PICTURED HERE IN THE UPPER LEFT CORNER.

THEY DESCRIBED CARTRIDGES THAT YOU WOULD INSERT INTO THE MINI BLOOD ANALYZER SO IT COULD RUN TESTS.

SER-359

THEY DESCRIBED CARTRIDGES ON WHICH YOU WOULD PUT A DROP OF BLOOD DRAWN FROM A FINGER AND INSERT IT INTO THE ANALYZER.

THEY DESCRIBED MOBILE APPLICATIONS SO THAT YOU WOULD GET YOUR RESULTS IN A MATTER OF HOURS.

AND THEY DESCRIBED BACK END ANALYTICS THAT SOME DAY WOULD HELP PREDICT THE PROJECTION OF A DISEASE.

IN THIS INVESTOR POWERPOINT, THE DEFENDANT AND HOLMES CLAIMED THAT WITH THIS SYSTEM, THIS MINI BLOOD ANALYZER, THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL LABORATORIES AND PROCESSES ALL SAMPLE TYPES.

THEY CLAIMED THAT THERANOS PROVIDES THE HIGHEST LEVEL OF OVERSIGHT, AUTOMIZATION, AND STANDARDIZATION IN OUR PRE- AND POST-ANALYTIC PROCESSES ENSURING THE HIGHEST LEVELS OF ACCURACY AND PRECISION.

ON ANOTHER SLIDE THEY CLAIMED THAT THERANOS PROVIDED THE HIGHEST LEVELS OF ACCURACY, BRAGGING ABOUT A COEFFICIENT OF VARIATION -- THAT'S A TERM THAT YOU'LL HEAR FROM SOME WITNESSES IN THIS CASE -- OF LESS THAN 10 PERCENT, MEANING THEIR TESTS WERE MORE ACCURATE THAN PLACES LIKE QUEST, AND LABCORP, AND OTHER CENTRAL LABS.

ON ANOTHER SLIDE THEY CLAIMED THAT THERANOS PROVIDED A NEW STANDARD IN QUALITY AND THAT THEIR ANALYZERS WERE DESIGNED TO HELP MONITOR CHRONIC DISEASE STATES, PROVIDING ACCURACY AND PRECISION OVER TIME THROUGH THE STANDARDIZATION OF OUR SYSTEMS.

BALWANI HAS CLAIMED TO INVESTORS THAT THERANOS WAS

SER-360

VERTICALLY INTEGRATED, MEANING THAT THERANOS MADE EVERYTHING THAT WENT INTO ITS TESTING DEVICES, MEANING THAT THERANOS WAS NOT RELIANT ON COMPANIES LIKE SIEMENS OR MANUFACTURERS OF OTHER DEVICES OR PARTS.

HE TOLD AN INVESTOR THAT THERANOS NEEDED NO NEW SCIENCE; THAT THE SCIENCE BEHIND THERANOS WAS COMPLETE; AND THAT NO NEW INVENTION WAS NEEDED.

THAT, AS YOU WILL SEE, WAS NOT TRUE.

IN TRUTH, AS YOU WILL HEAR FROM SOME OF THE INSIDERS AT THERANOS, THE THERANOS MINI BLOOD ANALYZER, WHEN IT WAS ACTUALLY USED BY THERANOS, WAS PLAGUED WITH ISSUES AND WAS REPEATEDLY FAILING QUALITY CONTROL.  I'LL TELL YOU IN A MINUTE ABOUT QUALITY CONTROL AND WHAT THAT MEANS FOR A LAB LIKE THERANOS.

INDEED, YOU WILL HEAR THAT THE THERANOS MINI BLOOD ANALYZER WAS NEVER USED IN ITS CLINICAL LABORATORY FOR MORE THAN 12 ASSAYS OR TESTS.

AND BY SEPTEMBER OF 2015, WHEN THERANOS STARTED TO COME UNDER SCRUTINY BY REGULATORS, BY THE MEDIA AND INVESTORS, THERANOS WAS NOT USING THE MINI BLOOD ANALYZER IN ITS LAB AT ALL, NOT FOR ANY TEST.

THERANOS WAS USING ORDINARY THIRD PARTY MACHINES MADE BY OTHERS, NOT THERANOS, TO DO THE VAST MAJORITY OF ITS BLOOD TESTS, AND IT WAS DOING THEM BADLY.

THAT'S THE FIRST CATEGORY OF MISREPRESENTATIONS THAT

SER-361

YOU'LL HEAR ABOUT IN THIS CASE.

SECOND, YOU WILL HEAR ABOUT HOW THE DEFENDANT AND MS. HOLMES MISLED INVESTORS INTO BELIEVING THAT THERANOS HAD STRONG AND GROWING PARTNERSHIPS WITH PHARMACEUTICAL COMPANIES AND THE UNITED STATES MILITARY.

YOU WILL HEAR INVESTOR TESTIMONY THAT THE DEFENDANT AND MS. HOLMES SAID THERANOS DID NOT NEED INVESTMENTS BECAUSE ITS PHARMACEUTICAL AND MILITARY BUSINESS WAS SUSTAINING THE COMPANY.

YOU WILL HEAR INVESTOR TESTIMONY THAT THE DEFENDANT AND HOLMES SAID THERANOS'S MINI BLOOD ANALYZER WAS BEING USED ON MILITARY HELICOPTERS AND HAD BEEN USED ON THE BATTLEFIELD.

YOU WILL HEAR INVESTOR TESTIMONY THAT THE DEFENDANT AND HOLMES SAID THERANOS HAD HUNDREDS OF MILLIONS OF DOLLARS IN REVENUE FROM THE DEPARTMENT OF DEFENSE AND THAT PHARMACEUTICAL COMPANIES HAD COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY.

THE EVIDENCE WILL SHOW THAT THOSE WERE MISREPRESENTATIONS AND HALF-TRUTHS.  THERANOS DID HAVE RELATIONSHIPS WITH PHARMACEUTICAL COMPANIES IN THE EARLY DAYS, BUT THOSE WERE DYING OUT OR STARTING TO DIE OUT BY 2010 AND NEVER PRODUCED SIGNIFICANT REVENUE FOR THE COMPANY.

AND THERANOS WAS TRYING TO GET THE MILITARY TO ACTUALLY USE ITS MINI BLOOD ANALYZER, BUT THAT PROJECT NEVER WENT ANYWHERE, IT NEVER GOT OFF THE GROUND, AND THE DEVICE WAS NEVER USED ON THE BATTLEFIELD OR IN A MEDEVAC HELICOPTER.

SER-362

LET ME NOW TELL YOU ABOUT A THIRD CATEGORY OF MISREPRESENTATIONS THAT YOU'LL HEAR ABOUT IN THIS CASE. THE DEFENDANT MISLED POTENTIAL INVESTORS WITH FALSE AND MISLEADING INFORMATION ABOUT THERANOS'S FINANCIAL CONDITION AND PROJECTIONS.

YOU WILL HEAR FROM THERANOS'S CONTROLLER, THE FINANCE EMPLOYEE WHO WORKED CLOSELY WITH MR. BALWANI AND MANAGED THE COMPANY'S BOOKS. SHE WILL TELL YOU THAT THERANOS HAD APPROXIMATELY $500,000 OF REVENUE IN 2011; THAT IT HAD ZERO IN 2012; THAT IT HAD ZERO REVENUE IN 2013; THAT IT HAD $150,000 IN REVENUE IN 2014; AND LESS THAN 2 MILLION IN 2015.

THE DEFENDANT, HOWEVER, WAS TELLING INVESTORS THAT THERANOS COULD PERFORM ALL OF THE BLOOD TESTS AT A FRACTION OF THE COST OF ITS MINI BLOOD ANALYZER, AND HE WAS TELLING THEM AS LATE -- AS OF OCTOBER OF 2014 THAT THERANOS WOULD HAVE $140 MILLION IN REVENUE BY THE END OF 2014, INCLUDING $40 MILLION FROM PHARMACEUTICAL COMPANIES THAT WERE NO LONGER USING THERANOS'S SERVICES.

YOU WILL SEE THAT HE TOLD INVESTORS BY THE END OF 2015 THAT THERANOS WOULD HAVE NEARLY A BILLION DOLLARS IN REVENUE. IT HAD LESS THAN 2 MILLION BY THE END OF 2015.

I'VE PUT ON THE SCREEN A DOCUMENT I BELIEVE THAT WILL COME INTO EVIDENCE. THIS IS ONE OF THE PROJECTIONS AND FINANCIAL STATEMENTS THAT WERE PROVIDED TO ONE OF THE INVESTORS. YOU WILL SEE THAT THERE'S A LINE, WHICH WE'VE HIGHLIGHTED, FOR

TOTAL REVENUE IN 2014 AND FOR PROJECTED REVENUE IN 2015. IT INCLUDES A LINE FOR PHARMACEUTICAL REVENUE OF ABOUT $40 MILLION. YOU WILL HEAR THAT THERANOS HAD NONE AT THE TIME, AND IT HAD NONE BY THE END OF THE YEAR.

YOU WILL ALSO HEAR TESTIMONY FROM THERANOS'S CONTROLLER WHO WILL TELL YOU THAT SHE HAS NO IDEA WHERE THESE NUMBERS COME FROM, AND IT WAS NO RELATION TO WHAT THERANOS ACTUALLY ACHIEVED.

YOU WILL SEE THAT THESE ARE NOT CLOSE MISSES THAT THE DEFENDANT WAS GIVING TO INVESTORS.

ANOTHER CATEGORY OF MISREPRESENTATIONS THAT YOU WILL HEAR ABOUT IS THAT THE DEFENDANT LIED TO INVESTORS ABOUT THE STATUS OF THE WALGREENS ROLLOUT. REMEMBER, THAT THERANOS ANNOUNCED IN SEPTEMBER OF 2013 THAT ITS BLOOD TESTING SERVICES WERE GOING TO BE AVAILABLE IN WALGREENS.

WALGREENS BELIEVED THAT THERANOS WOULD BE DRAWING BLOOD FROM A FINGERSTICK AND USING ITS MINI BLOOD ANALYZER TO RUN THE TEST.

BUT THERANOS NEVER USED THAT MINI BLOOD ANALYZER FOR MORE THAN 12 TYPES OF BLOOD TESTS. AND UNBEKNOWNST TO WALGREENS OFFICIALS, THERANOS WAS SECRETLY USING THE BIG CLUNKY THIRD PARTY MACHINES THAT I SHOWED YOU TO DO THE VAST MAJORITY OF ITS TESTING. AS A RESULT, WHEN PATIENTS CAME INTO THE WALGREENS STORES, THEY HAD TO GET THEIR BLOOD DRAWN FROM THE VEIN, NOT FROM A FINGER.

SER-364

WALGREENS, YOU WILL LEARN, WAS SHOCKED BY THE HIGH PERCENTAGE OF VEIN DRAWS THAT THERANOS WAS PERFORMING, AND BY THE END OF AUGUST OF 2014 WAS DOUBTING THERANOS'S ABILITY TO DO WHAT THERANOS SAID IT COULD DO, WHAT THE DEFENDANT AND HOLMES SAID THAT IT COULD DO.

IN AUGUST OF 2014 WALGREENS WAS TELLING THE DEFENDANT THAT THERE WOULD BE NO FURTHER ROLLOUT BEYOND THE 40 STORES THAT IT HAD ALREADY OPENED FOR TESTING UNTIL THERANOS WAS ABLE TO DO MORE OF ITS TESTS FROM A FINGER INSTEAD OF THE VEIN.

AND DESPITE THE FACT THAT THE WALGREENS ROLLOUT WAS STALLING BECAUSE THERANOS HAD TO RELY ON VEIN DRAWS, THE DEFENDANT TOLD INVESTORS THAT THE WALGREENS RELATIONSHIP WAS THRIVING AND EXPANDING, AND BY THE END OF 2015 THERE WOULD BE HUNDREDS OF WALGREENS STORES USING THERANOS'S DEVICES.

I EXPECT YOU WILL HEAR FROM A WITNESS FROM WALGREENS WHO WILL EXPLAIN THAT BALWANI WAS HIS PRIMARILY CONTACT BETWEEN THERANOS AND WALGREENS. YOU WILL HEAR THE WALGREENS SURPRISE AT THE HIGH NUMBER OF VEIN DRAWS THAT WERE OCCURRING AT THERANOS, AND I EXPECT THAT YOU WILL SEE EMAILS LIKE THE ONE THAT I HAVE PUT ON THE SCREEN, AND OTHER EVIDENCE LIKE THIS, WHERE WALGREENS IS TELLING BALWANI FURTHER EXPANSION WILL BE DIFFICULT UNLESS THERANOS CAN GET ITS VEIN DRAW PERCENTAGE DOWN FROM APPROXIMATELY 40 PERCENT TO 10 PERCENT, OR LOWER, AS WALGREENS HAD EXPECTED ALL ALONG.

THE EVIDENCE WILL SHOW THAT THE DEFENDANT MISLED INVESTORS

SER-365

ABOUT THE PACE AND STATUS OF THE WALGREENS ROLLOUT IN 2014.

THOSE ARE SOME OF THE CATEGORIES OF MISREPRESENTATIONS THAT YOU WILL HEAR ABOUT IN THIS CASE.

YOU WILL SEE THAT SOME OF THESE MISREPRESENTATIONS WERE MADE DIRECTLY TO INVESTORS IN ONE-ON-ONE MEETINGS AND IN POWERPOINTS, AND YOU WILL ALSO SEE THAT SOME OF THE MISREPRESENTATIONS WERE MADE TO REPORTERS. ONE REPORTER IN PARTICULAR IS NAMED ROGER PARLOFF OF "FORTUNE" MAGAZINE WHO WROTE AN ARTICLE IN JUNE OF 2014 TITLED "THIS CEO IS OUT FOR BLOOD." THIS WAS PUBLISHED IN JUNE OF 2014, APPROXIMATELY EIGHT OR NINE MONTHS AFTER THE PRESS RELEASE ANNOUNCING THE WALGREENS PARTNERSHIP.

AFTER INTERVIEWING HOLMES, PARLOFF REPORTED, QUOTE, "IMPORTANTLY, IT'S NOT JUST THE BLOOD DRAWS THAT ARE TINY. IT'S ALSO THE ANALYTICAL SYSTEMS THERANOS USES TO PERFORM THE TESTS. THEY TAKE UP A SMALL FRACTION OF THE FOOTPRINT REQUIRED BY THE CONVENTIONAL LAB TODAY."

THAT WAS FALSE.

PARLOFF ALSO REPORTED, QUOTE, "THERANOS, WHICH DOES NOT BUY ANY ANALYZERS FROM THIRD PARTIES, IS THEREFORE IN A UNIQUE POSITION."

THAT, TOO, WAS FALSE.

THERANOS USED THE PARLOFF ARTICLE THAT YOU SEE HERE TO RECRUIT FURTHER INVESTMENTS AND TO DECEIVE INVESTORS, AND IT WAS AN IMPORTANT WAY IN WHICH THE DEFENDANT AND HOLMES EXECUTED

SER-366

THEIR FRAUD SCHEME.

THE DEFENDANT'S FALSE AND MISLEADING STATEMENTS WERE ENORMOUSLY SUCCESSFUL. BETWEEN SEPTEMBER OF 2013 WHEN THERANOS ISSUED THE FALSE AND MISLEADING PRESS RELEASE ABOUT THE WALGREENS LAUNCH AND THE END OF 2015, BALWANI AND HOLMES RAISED HUNDREDS OF MILLIONS OF DOLLARS FROM INVESTORS.

AND THE FRAUD SCHEME MADE BALWANI AND HOLMES BILLIONAIRES.

BALWANI OWNED 28 MILLION SHARES IN THERANOS, WHICH AT THE HEIGHT OF THE SCHEME EQUATED TO ABOUT HALF A BILLION DOLLARS.

HIS GIRLFRIEND, ELIZABETH HOLMES, OWNED EVEN MORE. SHE OWNED 250 MILLION SHARES, WHICH AT THE HEIGHT OF THE SCHEME EQUATED TO ABOUT $4.5 BILLION.

THE SCHEME ALSO BROUGHT THEM FAME AND ADORATION IN COMPARISON TO COMPANIES LIKE MICROSOFT, FACEBOOK, AND OTHER UNICORN TECHNOLOGY COMPANIES.

BUT THE EVIDENCE WILL SHOW THAT THE DEFENDANT AND HOLMES KNEW THE ROSY FALSEHOODS THAT THEY WERE TELLING INVESTORS WERE CONTRARY TO THE REALITY WITHIN THERANOS.

YOU WILL SEE THIS IN PART THROUGH THE TESTIMONY OF MULTIPLE INSIDERS AT THERANOS WHO KNEW WHAT ITS MINI BLOOD ANALYZER COULD DO, OR IN TRUTH COULDN'T DO, WHO KNEW WHAT WAS REALLY GOING ON INSIDE THERANOS, AND WHO WERE TROUBLED BY WHAT WAS GOING ON.

I ANTICIPATE THAT YOU WILL HEAR FROM AN INDIVIDUAL NAMED DR. ADAM ROSENDORFF WHO WAS THERANOS'S LABORATORY DIRECTOR IN

2013 AT THE TIME OF THE WALGREENS LAUNCH AND THROUGHOUT MOST OF 2014. YOU CAN SEE DR. ROSENDORFF PICTURED HERE AT THE BOTTOM OF THE SCREEN, SECOND FROM THE LEFT.

DR. ROSENDORFF CAME TO THERANOS FROM A CHILDREN'S HOSPITAL AT THE UNIVERSITY OF PITTSBURGH. AND HE WILL TELL YOU THAT HE WAS INITIALLY EXCITED ABOUT THE PROSPECT OF THERANOS, ABOUT THE IDEA OF A MACHINE, A MINI BLOOD ANALYZER, THAT COULD VIRTUALLY DO ANY TEST FROM A DROP OF BLOOD.

BUT THAT CHANGED. HE WILL TELL YOU IN SEPTEMBER OF 2013 HE URGED THERANOS TO DELAY ITS COMMERCIAL LAUNCH BECAUSE THEY WEREN'T READY.

HE WILL TELL YOU THAT THROUGHOUT 2014 HE WAS INCREASINGLY DEVELOPING CONCERNS ABOUT THE ACCURACY AND RELIABILITY OF THERANOS'S BLOOD TESTS.

YOU WILL HEAR THAT HE WAS REPEATEDLY OVERRULED IN THE LAB BY SENIOR MANAGEMENT AT THERANOS, AND HE WILL TELL YOU THAT HE FELT PRESSURED TO VOUCH FOR TESTS THAT HE DID NOT BELIEVE IN.

DR. ROSENDORFF ULTIMATELY LEFT THERANOS IN LATE 2014 WHEN HIS CONCERNS WENT UNADDRESSED, AND HE WAS SO WORRIED ABOUT WHAT WAS HAPPENING IN THERANOS THAT HE STARTED TO SHARE HIS CONCERNS WITH A REPORTER.

I ANTICIPATE THAT YOU WILL ALSO HEAR FROM DR. MARK PANDORI, WHO IS ONE OF THE MOST SENIOR OFFICERS IN THERANOS'S LABORATORY FROM LATE 2013 THROUGH MAY OF 2014. YOU CAN SEE DR. PANDORI PICTURED ON THE SCREEN HERE TO THE LEFT OF

SER-368

DR. ROSENDORFF.

DR. PANDORI CAME TO THERANOS AFTER WORKING AT THE SAN FRANCISCO DEPARTMENT OF PUBLIC HEALTH, AND HE WENT ON TO WORK AT THE ALAMEDA COUNTY OF PUBLIC HEALTH AND THE UNIVERSITY OF NEVADA.

HE WILL TELL YOU ABOUT THE PROBLEMS THAT HE OBSERVED IN THE THERANOS LAB.  YOU WILL HEAR ABOUT HOW THOSE CONCERNS WERE ESCALATED TO THE DEFENDANT, MR. BALWANI.

DR. PANDORI WILL ALSO TELL YOU THAT HE WAS TROUBLED TO SEE SENIOR MANAGEMENT AT THERANOS PUTTING OUT INACCURATE INFORMATION ABOUT THE COMPANY.  HE DID NOT THINK THAT THE PUBLIC PERCEPTION OF THERANOS MATCHED THE REALITY OF WHAT HE WAS SEEING ON THE INSIDE.

AND WHEN HE REPORTED THIS DIRECTLY TO MR. BALWANI, HE WAS GIVEN THE BACK OF THE HAND.  AND HE RESIGNED THAT DAY.

YOU WILL ALSO HEAR FROM A WOMAN NAMED ERIKA CHEUNG WHO WORKED INSIDE OF THERANOS'S CLINICAL LABORATORY AND OBSERVED FIRSTHAND HOW THE MINI BLOOD ANALYZER WAS WORKING, AND IN TRUTH NOT WORKING.  SHE'LL TELL YOU THAT THE MINI BLOOD ANALYZER WAS REPEATEDLY FAILING WHAT IS CALLED QUALITY CONTROL.

YOU WILL LEARN IN THIS CASE THAT LABORATORIES LIKE THERANOS REPEATEDLY RUN QUALITY CONTROL EACH DAY ON A REGULAR BASIS TO MAKE SURE THAT THEIR DEVICES ARE WORKING THE WAY THAT THEY SHOULD BE.  IT'S LIKE CHECKING THE SPEED ON A RADAR GUN BEFORE A BASEBALL GAME OR CALIBRATING A SCALE BEFORE YOU

ACTUALLY USE IT.

AND MS. CHEUNG WILL TELL YOU THAT THE THERANOS BLOOD ANALYZER WAS REPEATEDLY FAILING MUCH MORE SO THAN OTHER DEVICES.

SHE WILL TELL YOU THAT THERANOS TURNED A BLIND EYE WHEN SHE REPORTED HER CONCERNS, AND SHE WILL TELL YOU THAT WHAT SHE SAW WAS SO CONCERNING THAT SHE ULTIMATELY DECIDED TO BLOW THE WHISTLE AND REPORT HER CONCERNS TO THE CENTERS FOR MEDICARE AND MEDICAID SERVICES, OR CMS.

AT THIS POINT I SHOULD TELL YOU A LITTLE BIT ABOUT CMS.

CMS IS A FEDERAL AGENCY THAT REGULATES LABORATORIES.

REMEMBER HOW I SAID THE FDA IS RESPONSIBLE FOR MEDICAL DEVICES?

CMS REGULATES LABORATORIES.  IF YOU WANT TO RUN A LABORATORY WHERE YOU DO PATIENT TESTING, YOU NEED TO HAVE A LICENSE FROM CMS, AND YOU NEED TO SUBJECT YOURSELF TO INSPECTIONS BY CMS FROM TIME TO TIME.

YOU WILL SEE THAT THERANOS OPENED THE LAB IN 2011.  IT WAS USING ORDINARY MACHINES MADE BY OTHERS TO DO BLOOD TESTS DRAWN FROM A VEIN, AND BEGINNING IN 2013 IT STARTED TO USE THE MINI BLOOD ANALYZER, BUT IT ONLY USED IT FOR ONLY 12 TESTS.

AND YOU WILL LEARN THAT CMS CAME IN TO DO AN INSPECTION IN SEPTEMBER OF 2015 AND SAW FIRSTHAND THE ISSUES THAT DR. ROSENDORFF WAS REPORTING, THAT DR. PANDORI WAS REPORTING, AND THAT MS. CHEUNG WAS REPORTING.

SER-370

THE EVIDENCE WILL SHOW THAT WHILE CHEUNG AND PANDORI AND ROSENDORFF WERE RAISING ISSUES, THERANOS WAS PRODUCING DANGEROUSLY INACCURATE RESULTS TO PATIENTS WHO BOUGHT THERANOS'S BLOOD TESTS THINKING THAT THEY WERE ACCURATE AND RELIABLE.

YOU WILL HEAR FROM SOME OF THE PATIENTS WHO GOT THERANOS BLOOD TESTS IN THIS CASE.

YOU WILL HEAR FROM A PATIENT WHO THOUGHT -- WHO BOUGHT A THERANOS TEST BELIEVING IT WOULD BE ACCURATE AND RELIABLE AND WAS WRONGLY TOLD THAT HE HAD RESULTS CONSISTENT WITH PROSTATE CANCER.

YOU WILL HEAR ABOUT WOMEN WHO RECEIVED THE WRONG INFORMATION ABOUT WHETHER THEY WERE OR WERE NOT PREGNANT.

YOU WILL HEAR THAT THE DEFENDANT WAS WELL AWARE OF THE PROBLEMS WITH THERANOS'S TESTS AND THE WRONG RESULTS THAT PATIENTS WERE GETTING.

YOU WILL SEE EMAIL AFTER EMAIL WHERE ISSUES ARE BROUGHT TO HIS ATTENTION BECAUSE THE DEFENDANT WAS THE ONE OVERSEEING THE LAB.

BUT BALWANI CONTINUED TO PROVIDE THESE TESTS TO UNSUSPECTED PATIENTS FOR MONTHS AND SOMETIMES YEARS.

IN ADDITION, YOU WILL SEE THE PRIVATE MESSAGES BETWEEN THE DEFENDANT AND ELIZABETH HOLMES.  AS I MENTIONED, THE TWO WERE CEO AND COO, AND THEY WORKED TOGETHER THE WAY YOU WOULD EXPECT THE TWO TOP OFFICERS WITHIN A SMALL COMPANY TO WORK.  AND THEY

WORKED IN THE SAME WAY YOU WOULD EXPECT ROMANTIC PARTNERS TO SHARE INFORMATION.

YOU WILL SEE HOW REGULARLY AND HOW INTIMATELY THEY CONNECTED AND COMMUNICATED, AND YOU WILL SEE HOW THEY CANDIDLY EXPLAINED TO EACH OTHER HOW BAD THINGS WERE INSIDE THERANOS AT THE TIME THAT THEY WERE TOUTING THERANOS AS A REVOLUTION IN HEALTH CARE.

YOU WILL SEE THE DEFENDANT TOLD ELIZABETH HOLMES THERANOS'S LAB WAS A DISASTER ZONE WITH AN EXPLETIVE I CAN'T REPEAT HERE IN COURT.

YOU WILL SEE HOW THEY URGED EACH OTHER TO PLAY DURING THE CMS INSPECTION WHEN THINGS APPEARED TO BE GOING BADLY.

YOU WILL SEE THAT THE DEFENDANT TOLD MS. HOLMES THAT THERANOS WOULD BE WITH HYBRID SOLUTIONS, SOMETHING OTHER THAN THE MINI BLOOD ANALYZER, FOR A LONG TIME TO COME.

AND YOU WILL SEE THAT THE DEFENDANT BRAGGED TO MS. HOLMES ABOUT THERANOS'S ABILITY TO RUN CIRCLES AROUND THE REGULATORS.

BY MAKING THESE FALSE AND MISLEADING REPRESENTATIONS TO THERANOS INVESTORS AND THERANOS PATIENTS, THE DEFENDANT AND ELIZABETH HOLMES TOGETHER BECAME BILLIONAIRES.

BUT IN OCTOBER OF 2015, THAT FACADE BEGAN TO CRUMBLE.

AROUND THAT TIME AFTER SOME SKEPTICAL REPORTING ABOUT THERANOS, REMEMBER I TOLD YOU DR. ROSENDORFF AND OTHERS WENT TO A NEWS REPORTER, INVESTORS AND OTHERS STARTED TO ASK DIFFICULT QUESTIONS OF MS. HOLMES AND MR. BALWANI:

HOW MANY TESTS CAN YOU REALLY DO ON YOUR MINI BLOOD ANALYZER?

HOW MUCH REVENUE DO YOU REALLY HAVE?

ARE YOUR TESTS AS ACCURATE AS THEY SAY THEY ARE?

THOSE ARE THE QUESTIONS INVESTORS AND WALGREENS STARTED ASKING IN OCTOBER OF 2015, AND YOU'LL SEE HOW THE DEFENDANT AND HOLMES SCRAMBLED TO TRY TO COME UP WITH EXPLANATIONS AFTER THE FACT TO WALGREENS AND INVESTORS.

AND YOU WILL SEE THAT ONLY THROUGH THE MEDIA DID INVESTORS AND PARTNERS LEARN THAT THE DEFENDANT AND MS. HOLMES WERE SECRETLY ROMANTIC PARTNERS ALL THE TIME, THE ENTIRE TIME OF THE SCHEME.

AND I EXPECT YOU WILL HEAR THAT INVESTORS CONSIDER THAT AN IMPORTANT FACT GIVEN THE ROLE THAT A CEO AND A COO PLAY AT A SMALL COMPANY.

THERANOS WAS NEVER ABLE TO ADEQUATELY RESPOND TO CMS AFTER THE INSPECTION.

BALWANI LEFT THERANOS IN THE FIRST HALF OF 2016 AND THERANOS INVESTORS SUFFERED HUNDREDS OF MILLIONS OF DOLLARS IN LOSSES.

THE FRAUD THAT I HAVE JUST DESCRIBED TO YOU GIVES RISE TO A NUMBER OF THE DIFFERENT CHARGES WHICH THE COURT DESCRIBED IN THE PRELIMINARY INSTRUCTIONS.

THE FIRST ONE IS WIRE FRAUD. BALWANI USED INTERSTATE WIRES TO EXECUTE A SCHEME TO DEFRAUD THERANOS INVESTORS AND

THERANOS PATIENTS.

IT ALSO GIVES RISE TO CONSPIRACY. BALWANI ENTERED INTO AN AGREEMENT, A CRIMINAL PARTNERSHIP WITH HIS GIRLFRIEND, ELIZABETH HOLMES, TO COMMIT THE CRIME OF WIRE FRAUD AGAINST THERANOS INVESTORS.

AND BALWANI CONSPIRED TO COMMIT WIRE FRAUD AND TO DECEIVE AND CHEAT PATIENTS OUT OF MONEY, TO UNKNOWINGLY PAY OUT OF POCKET FOR FAULTY TESTS.

NOW, IN THE LAST FEW MINUTES I WANT TO GIVE YOU A BRIEF OVERVIEW OF THERANOS AND THE DIFFERENT TYPES OF WITNESSES THAT YOU WILL HEAR FROM IN THIS CASE WHO WILL PROVE TO YOU THAT RAMESH BALWANI, THE DEFENDANT, DEFRAUDED INVESTORS AND DEFRAUDED PATIENTS.

LET ME START WITH THERANOS.

AS I MENTIONED, ELIZABETH HOLMES FORMED THERANOS IN 2003. SHE WAS ITS FOUNDER AND ITS CHIEF EXECUTIVE OFFICER AND THE CHAIRMAN OF ITS BOARD OF DIRECTORS. AND SHE OWNED A MAJORITY OF THE VOTING RIGHTS AND WAS THE LARGEST SHAREHOLDER IN THE COMPANY.

FROM 2009 THROUGH 2016, BALWANI WAS THE CHIEF OPERATING OFFICER, THE COO, AND THE PRESIDENT. HE WAS ALSO ON THE BOARD. AND AS I MENTIONED, HE OWNED A SIGNIFICANT AMOUNT OF STOCK.

THE EVIDENCE WILL SHOW THAT THEY RAN THE COMPANY TOGETHER.

THE DEFENDANT AND HOLMES CONTROLLED THERANOS AS EQUALS AND MADE SIGNIFICANT DECISIONS IN CONSULTATION WITH EACH OTHER AS

PARTNERS.

YOU WILL SEE HOW THEY REGULARLY TALKED TO EACH OTHER. YOU WILL SEE HOW CLOSELY THEY COLLABORATED, AND YOU WILL SEE HOW THEY WERE PARTNERS IN EVERYTHING, INCLUDING THEIR CRIMES.

YOU WILL SEE THAT MR. BALWANI WAS VIEWED AS THE OPERATIONS LEADER. THAT HE HAD RESPONSIBILITY OVER THE LAB, OVER MANUFACTURING, OVER THE WALGREENS PARTNERSHIP, OVER THE COMPANY'S FINANCES, BUT THEY STILL SHARED RESPONSIBILITY THROUGHOUT THE COMPANY.

NOW, I TALKED A LOT ABOUT MS. HOLMES AND MR. BALWANI WHO WERE THE LEADERS OF THIS COMPANY, THE ONLY TWO REAL LEADERS OF THIS COMPANY, BUT I DON'T WANT TO GIVE YOU THE IMPRESSION THAT THERANOS WAS JUST A SHELL COMPANY. IT WAS A REAL COMPANY. THEY HAD EMPLOYEES. THEY HAD DOCTORS. THEY HAD OTHER PROFESSIONALS.

BUT THE EVIDENCE WILL SHOW THAT IT WAS THE DEFENDANT AND HOLMES WHO MADE ALL OF THE SIGNIFICANT DECISIONS ON BEHALF OF THERANOS.

I'VE PUT BACK ON THE SCREEN HERE SOME OF THE OTHER INSIDERS WITHIN THERANOS. I TOLD YOU ABOUT DR. ROSENDORFF, I TOLD YOU ABOUT DR. PANDORI, AND I TOLD YOU ABOUT ERIKA CHEUNG.

I WANT TO EXPLAIN THE OTHER INDIVIDUAL ON THE SCREEN, DR. SUNIL DHAWAN.

BUT FIRST I WANT TO TALK ABOUT ONE OF THE ACRONYMS ON THE SCREEN. YOU SEE THE TERM CLIA, WHERE IT SAYS CALIFORNIA CLIA

LABORATORY EMPLOYEES. YOU'RE GOING TO HEAR A LITTLE BIT ABOUT THIS ACRONYM, CLIA. IT STANDS FOR CLINICAL LABORATORY IMPROVEMENT AMENDMENTS ACT. I DON'T EXPECT YOU TO REMEMBER THAT. IT'S NOT IMPORTANT.

BUT WHAT IS IMPORTANT IS THAT IF YOU WANT TO BE IN THE LAB TESTING BUSINESS, IF YOU WANT TO GIVE RESULTS TO PATIENTS, YOU NEED TO BE LICENSED WITH CMS AND THE STATE, AND IT'S ESSENTIALLY HOW YOU BRING YOUR BLOOD TESTING SERVICES TO THE PUBLIC FOR USE ON PATIENTS.

THE CLIA LAB IS WHERE YOU DELIVER ON YOUR PROMISES, WHERE YOU GIVE YOUR RESULTS TO PATIENTS.

THERE'S R&D, WHERE YOU'RE MAKING SOMETHING, YOU'RE DEVELOPING SOMETHING, YOU HOPE IT WORKS.

BUT WHEN YOU WANT TO DELIVER SOMETHING TO A PATIENT, YOU NEED THAT LICENSE. YOU NEED TO HAVE A CLIA CERTIFICATE.

I ALSO TALKED EARLIER ABOUT A TERM CALLED "ASSAYS." YOU'RE GOING TO HEAR SOME SCIENCE IN THIS CASE. ASSAYS IS A FANCY NAME FOR BLOOD TEST. IT'S A FANCY NAME FOR A CHEMICAL REACTION. THIS GENERATES A RESULT THAT YOU CAN ANALYZE. THAT'S ANOTHER TERM THAT YOU'RE GOING TO HEAR THROUGHOUT THIS TRIAL.

AND WITH THOSE ACRONYMS I WANT TO TELL YOU ABOUT DR. DHAWAN, WHO I ALSO EXPECT YOU WILL HEAR FROM.

REMEMBER, I TOLD YOU THAT DR. ROSENDORFF LEFT THE COMPANY AT THE END OF 2014 WHEN HIS CONCERNS WERE NOT BEING ADDRESSED.

SER-376

AT THE TIME THAT THE THERANOS NEW BLOOD ANALYZER WAS BEING USED FOR ONLY 12 TESTS, BALWANI WAS DESCRIBING HIS OWN LAB AS A DISASTER ZONE.

AND WITH THE LAB FLOUNDERING, MR. BALWANI CHOSE TO BRING IN HIS DERMATOLOGIST, DR. DHAWAN.  A DERMATOLOGIST, AS SOME OF YOU MAY KNOW, IS SOMEONE WHO SPECIALIZES IN SKIN CONDITIONS.

THE DEFENDANT PUT DR. DHAWAN IN CHARGE OF ASSESSING WHETHER WOMEN WERE PREGNANT, ABOUT WHETHER INDIVIDUALS HAD CANCER, AND WHETHER THEY HAD OTHER DISEASES.

DR. DHAWAN HAD NEVER RUN A LAB OUTSIDE OF HIS DERMATOLOGY PRACTICE.  THE ONLY CONNECTION TO THERANOS HE HAD WAS HE WAS MR. BALWANI'S DERMATOLOGIST.

HE HAD NEVER SEEN OR USED THE THERANOS MINI BLOOD ANALYZER, AND HE HAD NEVER SEEN OR USED THE FINGERSTICK TEST THAT THERANOS WAS USING.

AND HE WILL TELL YOU THAT HE DID NO MEANINGFUL WORK AT THERANOS BETWEEN THE TIME HE WAS BROUGHT ON AT THE END OF 2014 AND SEPTEMBER OF 2015 WHEN THE CMS INSPECTORS STARTED ASKING HARD QUESTIONS ABOUT WHAT WAS GOING ON IN THE LABORATORY.

THESE ARE SOME OF THE INSIDERS WITHIN THE COMPANY THAT I EXPECT YOU WILL HEAR FROM.

IN ADDITION, YOU WILL HEAR FROM SOME OF THE OUTSIDERS THAT DEALT WITH THERANOS AND WHOSE GOOD WILL THE DEFENDANT EXPLOITED.

I EXPECT THAT YOU WILL HEAR FROM A WITNESS FROM PFIZER,

SER-377

FROM WALGREENS, FROM ONE OR MORE WITNESSES WITH KNOWLEDGE OF THERANOS'S RELATIONSHIP, OR LACK OF A MEANINGFUL RELATIONSHIP, WITH THE MILITARY. AND THESE FOLKS WERE TELL YOU EXACTLY WHAT THERANOS WAS DOING WITH THEM, WHAT THEY WERE DOING OR NOT DOING, AND YOU'LL BE ABLE TO LINE THAT UP WITH THE ROSY FALSEHOODS THAT THE DEFENDANT WAS GIVING TO INVESTORS.

THE THIRD CATEGORY OF WITNESSES THAT I EXPECT YOU WILL HEAR FROM ARE THE INVESTORS THEMSELVES WHO LOST MILLIONS INVESTING IN THERANOS.

I EXPECT THAT YOU WILL HEAR FROM A WOMAN NAMED LISA PETERSON WHO HELPED MAKE DECISIONS FOR A FIRM CALLED RDV.

I ALSO EXPECT THAT YOU WILL HEAR FROM SOMEONE NAMED BRIAN GROSSMAN WHO MANAGES INVESTMENTS FOR A FUND HERE IN THE BAY AREA.

THEY, AND OTHER INVESTORS, I EXPECT WILL TELL YOU WHAT THE DEFENDANT SAID REPEATEDLY TO MAKE THEM BELIEVE IN THERANOS AND INVEST THEIR MONEY.

YOU WILL SEE THE QUESTIONS THAT THEY POSED TO THE DEFENDANT AS PART OF THEIR INVESTMENT DECISION.

I'VE PUT UP A DOCUMENT THAT I ANTICIPATE WILL COME INTO EVIDENCE. THIS IS FROM BRIAN GROSSMAN, THE INDIVIDUAL WHO RUNS THE FUND HERE IN SAN FRANCISCO ON BEHALF OF OTHER INVESTORS.

AND YOU WILL SEE THAT BRIAN GROSSMAN AND OTHER INVESTORS WERE ASKING ALL OF THE RIGHT QUESTIONS OF THERANOS AND ULTIMATELY GOT WRONG, FALSE AND MISLEADING ANSWERS FROM THE

DEFENDANT.

WHAT ARE THE LIMITS OF YOUR EXISTING ANALYZER?

WHAT DOES IT COST TO PRODUCE?

WHAT IS THE CURRENT COST OF AN ANALYZER?

WHAT ARE GM, OR GROSS MARGIN, ON THE ANALYZERS?

YOU'RE GOING TO HEAR A LITTLE BIT ABOUT WHAT THAT TERM MEANS AND HOW MR. GROSSMAN WAS TRYING TO UNDERSTAND HOW MUCH DOES IT COST IS FOR YOU TO MAKE THAT MACHINE IN YOUR LAB? AND YOU WILL HEAR THAT MR. GROSSMAN AND OTHERS GOT WRONG AND FALSE AND MISLEADING ANSWERS FROM THE DEFENDANT.

FINALLY, YOU WILL HEAR FROM PATIENTS AND DOCTORS OF PATIENTS WHO PAID FOR OR RECEIVED THERANOS'S BLOOD RESULTS, RESULTS THAT THEY NEEDED AND WERE COUNTING ON TO MAKE THE RIGHT MEDICAL DECISIONS.

NOW, BEFORE I SIT DOWN I WANT TO MAKE A FEW COMMENTS ABOUT YOUR ROLES AS JURORS. OVER THE NEXT FEW WEEKS YOU'RE GOING TO HEAR A LOT OF EVIDENCE. SOME OF IT IS TECHNICAL. YOU'RE GOING TO HEAR ABOUT ASSAYS, LAB DIRECTORS, QUALITY CONTROL. SOME OF THIS EVIDENCE MAY BE TECHNICAL, AND HONESTLY, SOME OF IT MAY BE A LITTLE DRY. BUT NONE OF YOU WERE SELECTED AS JURORS BECAUSE YOU HAVE A MEDICAL DEGREE OR BECAUSE YOU HAVE EXPERTISE IN THE BLOOD TESTING BUSINESS.

YOU WERE SELECTED BECAUSE YOU HAVE THE ONE THING THAT ALL JURORS NEED, WHICH IS COMMON SENSE, BECAUSE IN THE END, THIS IS A CASE ABOUT FRAUD, ABOUT LYING AND DECEIVING TO GET MONEY,

ABOUT WHETHER THE STATEMENTS THAT THE DEFENDANT AND MS. HOLMES TOLD INVESTORS AND TOLD PATIENTS MATCHED THE REALITY THAT YOU WILL HEAR FROM THE INSIDERS.

THE EVIDENCE IN THIS CASE WILL SHOW THAT THE DEFENDANT TOLD HIS INVESTORS THERANOS HAD DEVELOPED A MINI BLOOD ANALYZER THAT COULD DO VIRTUALLY ANY TEST.

IT COULD NOT. IT NEVER DID MORE THAN 12 TESTS, AND IT DID THOSE 12 TESTS BADLY.

THE EVIDENCE WILL SHOW THAT THE DEFENDANT TOLD INVESTORS THE MILITARY WAS USING THE DEVICE IN THE FIELD.

IT WAS NOT.

THE EVIDENCE WILL SHOW THAT THE DEFENDANT TOLD INVESTORS THERANOS MADE ALL OF ITS TESTING DEVICES.

IT DID NOT. IT WAS USING SIEMENS MACHINES.

THE EVIDENCE WILL SHOW THAT THE DEFENDANT TOLD INVESTORS PHARMA AND THE MILITARY WERE GENERATING SUFFICIENT REVENUES TO FUND THERANOS'S OPERATIONS.

THEY WERE NOT.

THE EVIDENCE WILL SHOW THAT THE DEFENDANT GAVE INVESTORS FINANCIAL PROJECTIONS PURPORTEDLY REPRESENTING THE TRUE PROSPECTS OF THE COMPANY.

THEY DID NOT.

THE EVIDENCE WILL SHOW THAT THE DEFENDANT INDUCED INVESTMENTS ON THE PROMISE THAT THE WALGREENS ROLLOUT WAS A SPECTACULAR SUCCESS.

SER-380

IT WAS NOT.

FINALLY, THE EVIDENCE WILL SHOW THE DEFENDANT TOLD PATIENTS THAT THERANOS'S TESTS WERE ACCURATE AND RELIABLE.

THEY WERE NOT.  AND IN THE COURSE OF DOING SO, HE SKEWED THE MEDICAL DECISIONS PATIENTS WERE MAKING AND PUT THEM AT RISK.

THANK YOU, LADIES AND GENTLEMEN.  THANK YOU FOR YOUR PATIENCE WITH THE TECHNOLOGY.

THIS CONCLUDES THE GOVERNMENT'S OPENING STATEMENT.

AS I SAID, THIS IS A PREVIEW OF WHAT I ANTICIPATE THE EVIDENCE WILL SHOW.

AT THE END OF THE CASE THE GOVERNMENT WILL HAVE AN OPPORTUNITY TO SPEAK TO YOU AGAIN, AND AT THAT TIME WE WILL URGE YOU TO RETURN THE ONE VERDICT THAT IS SUPPORTED BY ALL OF THE EVIDENCE, WHICH IS THAT THE DEFENDANT IS GUILTY OF WIRE FRAUD AND CONSPIRACY AS ALLEGED IN THE INDICTMENT.

THANK YOU FOR YOUR TIME.

THE COURT:  THANK YOU, MR. LEACH.

DOES THE DEFENSE HAVE AN OPENING STATEMENT?

MR. CAZARES:  YES.  THANK YOU, YOUR HONOR.

YOUR HONOR, MAY I REQUEST A FEW MINUTES TO SET UP BEFORE WE GET STARTED?

THE COURT:  YES.  LADIES AND GENTLEMEN, LET'S TAKE A BRIEF RECESS.

WE'LL TAKE ABOUT A SEVEN MINUTE BREAK, AND THEN WE'LL COME

BACK, AND WE'LL LISTEN TO THE DEFENSE OPENING.

LADIES AND GENTLEMEN, LET ME TELL YOU, WE'RE GOING TO END TODAY AT 2:30.  WE'LL END TODAY AT 2:30.  THAT'S THE SCHEDULE FOR TODAY.

AND WE'LL -- DEPENDING ON THE LENGTH OF OPENINGS AND DURATION OF THE WITNESS'S TESTIMONY, WE'LL SCHEDULE MORE BREAKS FOR YOU THIS AFTERNOON.

BUT LET'S TAKE ABOUT A SEVEN, TEN MINUTE BREAK NOW, AND THEN WE'LL HEAR FROM THE DEFENSE.

(JURY OUT AT 11:04 A.M.)

THE COURT:  THANK YOU.  PLEASE BE SEATED.  THE RECORD SHOULD REFLECT THAT THE JURORS HAVE LEFT FOR A BREAK.

ANYTHING BEFORE I STEP DOWN?

MR. COOPERSMITH:  NO, YOUR HONOR.

MR. LEACH:  NO, YOUR HONOR.

(RECESS FROM 11:04 A.M. UNTIL 11:22 A.M.)

(JURY IN AT 11:22 A.M.)

THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK YOU FOR YOUR COURTESY.

WE'RE BACK ON THE RECORD.

ALL PARTIES AND JURY IS ONCE AGAIN PRESENT.  OUR ALTERNATES ARE PRESENT.

JUST A MOMENT, AND WE'LL TURN OUR EQUIPMENT ON.

(PAUSE IN PROCEEDINGS.)

THE COURT:  DOES THE DEFENSE HAVE AN OPENING

STATEMENT?

MR. CAZARES:  YES, YOUR HONOR.  THANK YOU VERY MUCH, YOUR HONOR.

THE COURT:  PLEASE PROCEED.  THANK YOU.

MR. CAZARES:  AND, YOUR HONOR, MAY I REMOVE MY MASK?

THE COURT:  YES.

**(COUNSEL FOR DEFENDANT GAVE THEIR OPENING STATEMENT.)**

MR. CAZARES:  MAY IT PLEASE THE COURT.

LADIES AND GENTLEMEN OF THE JURY, MY NAME IS STEPHEN CAZARES.  AND I, ALONG WITH JEFF COOPERSMITH, WHO YOU HAVE ALREADY MET, MY COCOUNSEL, AS WELL AS I'M GOING TO REINTRODUCE YOU TO AMY WALSH, IT IS OUR HONOR AND OUR PRIVILEGE TO REPRESENT SUNNY BALWANI IN THIS CASE.

AND WHAT I'M GOING TO DO IS TO TALK ABOUT SOME OF THE EVIDENCE THAT YOU'RE GOING TO HEAR IN THIS CASE AND YOU'RE GOING TO SEE IN THIS TRIAL THAT IS GOING TO DEMONSTRATE THAT SUNNY BALWANI COMMITTED NO CRIME, HE COMMITTED NO FRAUD, AND NEVER INTENDED TO DECEIVE OR CHEAT ANYBODY, NOT INVESTORS AND NOT PATIENTS.

WHAT YOU'RE GOING TO LEARN IN THIS TRIAL, AND I DON'T THINK IT'S GOING TO BE DISPUTED, SUNNY BALWANI DID NOT START THERANOS, HE DID NOT CONTROL THERANOS, HE DID NOT HAVE FINAL BUSINESS DECISION MAKING AUTHORITY AT THERANOS.

AND YOU'LL LEARN THAT IN MAY OF 2016 SUNNY LEFT THERANOS. AND WHEN SUNNY BALWANI LEFT THERANOS IN MAY OF 2016, THERANOS

HAD HUNDREDS OF MILLIONS OF DOLLARS, INVESTOR DOLLARS, SITTING IN THERANOS'S BANK ACCOUNT.

WHEN SUNNY BALWANI LEFT THERANOS IN MAY OF 2016, THERANOS HAD DEVELOPED VALUABLE INTELLECTUAL PROPERTY, THEY HAD PATENTS FOR THEIR FINGERSTICK TECHNOLOGY, THEY HAD INNOVATIVE FINGERSTICK TECHNOLOGY THAT THEY HAD DEVELOPED, AND THEY HAD TWO CLINICAL LABORATORIES, HUNDREDS OF LABORATORY SCIENTISTS, RESEARCH AND DEVELOPMENT LABORATORY AS WELL, ALL READY TO GROW AND CONTINUE TO DO BUSINESS BECAUSE THE COMPANY HAD HUNDREDS OF MILLIONS OF DOLLARS WHEN HE WALKED AWAY.  THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

NOW, THE GOVERNMENT ALLEGES THAT THERANOS'S FINGERSTICK TECHNOLOGY WAS NOT CAPABLE OF CONSISTENTLY PRODUCING ACCURATE AND RELIABLE RESULTS.  THAT'S REALLY THE ALLEGATION AT THE CORE OF THIS CASE.  THE GOVERNMENT CLAIMS THAT THE TECHNOLOGY DIDN'T WORK, COULD NEVER WORK.  YOU HEARD THE GOVERNMENT SUGGEST THAT ONLY 12 TESTS WERE EVER CREATED.

BUT WHAT THE EVIDENCE IS GOING TO SHOW AND WHAT YOU'RE GOING TO LEARN IN THIS TRIAL IS THAT THE GOVERNMENT ITSELF NEVER OBTAINED OVER THREE YEARS OF TESTING DATA PATIENT RESULTS AND RELATED RECORDS FROM THERANOS.

THE GOVERNMENT NEVER OBTAINED OVER THREE YEARS OF PATIENT TESTING RECORDS AND DATA AND ANALYZED IT BEFORE THEY CHARGED MR. BALWANI.

AND AS WE STAND HERE TODAY, THE GOVERNMENT HAS NEVER

OBTAINED THE THREE-PLUS YEARS OF TESTING RECORDS AND RELATED DATA AND ANALYZED IT TO TRY TO PROVE THE ALLEGATION THAT THE GOVERNMENT MAKES, THAT THERANOS'S TECHNOLOGY IS NOT CAPABLE OF CONSISTENTLY PRODUCING ACCURATE AND RELIABLE RESULTS.

THAT'S WHAT WE BELIEVE THE EVIDENCE IS GOING TO SHOW.

IN ADDITION, THE GOVERNMENT ALLEGES THAT SUNNY BALWANI TRIED TO CHEAT AND DECEIVE INVESTORS AND PATIENTS TO KIND OF TAKE THEIR MONEY.  THAT'S WHAT A WIRE FRAUD CHARGE IS.  THE GOVERNMENT HAS ALLEGED HE INTENDED TO CHEAT INVESTORS AND PATIENTS OUT OF THEIR MONEY.

BUT WHAT YOU'RE GOING TO LEARN IN THIS TRIAL IS THAT THE INVESTOR MONEY IN THERANOS WAS USED EXACTLY AS INVESTORS INTENDED IT TO BE USED.  IT WAS USED TO BUILD THE BUSINESS.  IT WAS USED TO DEVELOP THE FINGERSTICK TECHNOLOGY.

YOU'RE ALSO GOING TO LEARN THAT SUNNY WAS ONE OF THOSE INVESTORS IN THERANOS.  AND YOU'RE GOING TO LEARN THAT DURING THE COURSE OF SUNNY WORKING AT THERANOS, SUNNY NEVER TOOK A SINGLE DOLLAR FROM THERANOS.

YOU HEARD THE GOVERNMENT SUGGEST THAT SUNNY'S STOCK IN THERANOS WAS WORTH MAYBE HALF A BILLION DOLLARS AT ONE POINT IN TIME, AND I'LL TALK ABOUT THAT A LITTLE LATER.

BUT THERE'S NO EVIDENCE, AND THE GOVERNMENT DOESN'T EVEN ALLEGE, THAT SUNNY TOOK ANY INVESTOR MONEY OR USED IT IMPROPERLY.

IN FACT, WHAT YOU'RE GOING TO LEARN IS SUNNY INVESTED HIS

SER-385

OWN MONEY, ALMOST $5 MILLION, INTO THERANOS BECAUSE HE BELIEVED IN THE COMPANY, HE BELIEVED IN THE TECHNOLOGY, AND HE BELIEVED IN ITS FUTURE.

THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

NOW, REMEMBER WHAT THE COURT INSTRUCTED YOU.  YOU'RE THE JURY AND IT'S YOUR ROLE IN DECIDING THE FACTS IN THIS CASE.

YOU'RE GOING TO GET TOGETHER, 12 MEMBERS OF THE JURY, HEAR ALL OF THE EVIDENCE, DISCUSS IT, AND THEN YOU DECIDE WHAT THE TRUTH IS AND WHAT THE TRUTH IS NOT.

AND IN THE COURSE OF JURY SELECTION, YOU WILL RECALL SOME PROSPECTIVE JURORS, AND MAYBE EVEN SOME OF YOU, REPORTED TO THE COURT THAT YOU HEARD THINGS ABOUT THERANOS, YOU HEARD THINGS ABOUT ELIZABETH HOLMES IN THE NEWS, IN THE MEDIA, IN THE NEWSPAPERS, MAYBE EVEN T.V. SHOWS OR DOCUMENTARIES.

THE COURT INSTRUCTED YOU, AND IT'S REALLY IMPORTANT TO KEEP IN MIND, THE HEADLINES AND THE SENSATIONAL STORIES ABOUT THERANOS AND ELIZABETH HOLMES HAVE NO PLACE IN THIS TRIAL. YOU'RE SUPPOSED TO MAKE YOUR DECISIONS BASED ON THE EVIDENCE THAT YOU SEE AND HEAR IN THIS CASE.

AND BECAUSE OF THAT, WE ASK YOU TO KEEP AN OPEN MIND. RESIST THE URGE TO REACH A CONCLUSION RIGHT AWAY.

YOU'LL HEAR FROM A COUPLE OF GOVERNMENT WITNESSES. THEY'RE GOING TO POINT TO AN EMAIL, QUALITY CONTROL FAILED, MAYBE SOMEBODY HAD A COMPLAINT, A PATIENT HAS QUESTIONS ABOUT THEIR RESULTS.  THOSE KINDS OF COMPLAINTS AND ISSUES ARE ALMOST

SER-386

LIKE THOSE MEDIA HEADLINES, IT RAISES AN ISSUE, BUT UNTIL YOU DIG IN AND UNDERSTAND THE FACTS, WHY DID QUALITY CONTROL FAIL? WHAT WAS THE REAL CAUSE?  YOU'LL HAVE TO FIGURE OUT WHETHER OR NOT THE GOVERNMENT PRESENTS THAT TO YOU.

WHAT WAS THE ANSWER TO THAT PATIENT'S QUESTION ABOUT THE RESULTS THAT THEY RAISED TO THE LAB AND TO THE SCIENTISTS?

THAT'S WHY WE ASK YOU TO JUST WAIT UNTIL YOU HEAR ALL OF THE EVIDENCE AND HEAR FROM THE DEFENSE BEFORE YOU START REACHING CONCLUSIONS.  BECAUSE WE SUSPECT THAT ONCE YOU HEAR ALL OF THE EVIDENCE AND CONSIDER ALL OF THE EVIDENCE, THAT YOU WILL REACH THE SAME CONCLUSION THAT SUNNY BALWANI DID ABOUT THERANOS:  IT WAS A GREAT IDEA, IT WAS A TECHNOLOGY THAT COULD CHANGE BLOOD TESTING, AND THAT SUNNY WORKED 24 HOURS A DAY, 7 DAYS A WEEK FOR OVER 6 YEARS TO TRY TO MAKE IT A SUCCESS FOR INVESTORS AND FOR PATIENTS WHO USED THERANOS'S BLOOD TESTING SERVICES.

IN ADDITION, AS I SAID, YOU'RE GOING TO LEARN SUNNY NEVER MADE A DIME FROM THERANOS, AND YOU'LL SEE NO EVIDENCE OF THAT IN THIS CASE.

NOW, I'M GOING TO TRANSITION NOW, AND WE'RE GOING TO TALK ABOUT SOME OF THE EVIDENCE THAT YOU'RE GOING TO SEE AND HEAR IN THIS TRIAL THAT IS GOING TO DEMONSTRATE AND SHOW THAT SUNNY DID NOT DECEIVE OR CHEAT INVESTORS OR PATIENTS.

NOW, ON THE -- YOUR LEFT SIDE OF THE JURY ROOM YOU'LL SEE THERE'S LIKE A TIMELINE THAT YOU'LL SEE UP THERE.  AND I PUT IT

SER-387

UP THERE JUST AS A GUIDEPOST FOR YOU, BECAUSE THE TIME PERIOD THAT WE'RE TALKING ABOUT IN THIS CASE, THAT ACTUALLY SPANS SIX YEARS, SEVEN YEARS OR MORE.

YOU HEARD THE GOVERNMENT TALK A LITTLE BIT ABOUT THE BEGINNING, YOU HEARD THEM TALK ABOUT A LITTLE BIT AT THE END. WHAT WE ARE GOING TO TALK ABOUT IS RIGHT IN THE MIDDLE, AND THAT'S WHY I THINK IT'S IMPORTANT FOR YOU TO HAVE SOME POINTS TO KEEP YOUR FOCUS ON WHERE WE ARE AT.

AND THE TIMEFRAME STARTS IN 2009 FOR US WHEN SUNNY JOINED THERANOS.

BEFORE 2009 SUNNY HAD NOTHING TO DO WITH THERANOS.  IT WAS ELIZABETH'S COMPANY, AND WE'LL TALK ABOUT THE DETAILS.

AND THROUGH 2009 AND UNTIL MAY OF 2016, WHAT THE EVIDENCE IS GOING TO SHOW IS THAT SUNNY LEARNED ABOUT THE BUSINESS FROM THE SCIENTISTS, FROM ELIZABETH AND OTHERS INVOLVED IN THE COMPANY, AND HE BELIEVED IN THE TECHNOLOGY.

AS I SAID, THE EVIDENCE IS GOING TO SHOW THAT SUNNY DID NOT DEFRAUD INVESTORS OR PATIENTS ABOUT THERANOS'S TECHNOLOGY.

AND SOME OF THE EVIDENCE THAT YOU'RE GOING TO LEARN ABOUT AND HEAR AND SEE IN THIS TRIAL INCLUDES THE FACT THAT THERANOS SCIENTISTS, THEIR ENGINEERS AND SCIENTISTS IN THE LAB, CREATED HUNDREDS OF FINGERSTICK TESTS USING THERANOS'S TECHNOLOGY.

YOU HEARD THE GOVERNMENT TALK ABOUT 12 TESTS, 12 TESTS, THAT'S ALL IT COULD DO.

WELL, IN FACT, THOUGH, THE SCIENTISTS DEVELOPED HUNDREDS

OF TESTS USING THERANOS'S TECHNOLOGY.

YOU'RE ALSO GOING TO LEARN THAT THERANOS DID NOT HIDE ITS USE OF COMMERCIAL DEVICES.

YOU HEARD THE GOVERNMENT TALK ABOUT SIEMENS ANALYZERS, THE BIG CLUNKY ANALYZERS THAT WERE USED IN MOST COMMERCIAL LABS.

THERANOS DID USE SOME OF THOSE ANALYZERS.

AND YOU'RE ALSO GOING TO LEARN THAT THERANOS DID NOT HIDE THAT USE OF COMMERCIAL DEVICES OR TRADITIONAL VEIN DRAW TESTING.  THE PUBLIC KNEW.

AND YOU'RE ALSO GOING TO LEARN THAT THOSE FINANCIAL MODELS THAT THE GOVERNMENT SHOWED YOU THAT WERE GIVEN TO INVESTORS -- AND IT'S TRUE, INVESTORS WERE GIVEN FINANCIAL MODELS, NOT A FORECAST LIKE PUBLIC COMPANIES DO, LIKE APPLE MAYBE PROJECT BILLIONS OF DOLLARS OF REVENUE IN THE NEXT QUARTER.  THAT'S NOT WHAT INVESTORS WERE GIVEN.

THEY WERE GIVEN A MODEL, AND THOSE MODELS INCLUDED REFERENCES TO FACTS THAT WALGREENS WAS TELLING SUNNY ABOUT WALGREENS'S INTENT TO ROLL OUT THAT BUSINESS.  THAT'S WHAT THE MODELS REFLECTED, AND THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

NOW, AS I MENTIONED BEFORE, WE BELIEVE THAT ONCE YOU SEE AND HEAR ALL OF THE EVIDENCE IN THIS TRIAL, YOU WILL CONCLUDE THAT SUNNY BELIEVED IN THERANOS, HE BELIEVED IN ITS TECHNOLOGY, AND HE BELIEVED IN ITS MISSION.

FIRST, YOU'RE GOING TO LEARN A LITTLE BIT ABOUT SUNNY

SER-389

HIMSELF. SUNNY WAS BORN IN SOUTH ASIA TO A FAMILY OF THREE OLDER SISTERS, TWO BROTHERS. SUNNY'S BROTHERS ARE HERE IN THE COURTROOM WATCHING TRIAL HERE TODAY.

AND SUNNY COMES FROM A FAMILY OF SIX GENERATIONS OF ENTREPRENEURS, OF SUCCESSFUL FARMERS. THEY ALSO HAD FACTORIES IN THEIR BUSINESS WHERE THEY MADE PRODUCTS FROM THE FARMS.

THAT'S HOW SUNNY GREW UP. HE GREW UP IN A FAMILY OF BUSINESS PEOPLE, OF ENTREPRENEURS.

BUT BACK THEN SUNNY'S PARENTS DIDN'T GO TO COLLEGE. HE WANTED SOMETHING DIFFERENT. SO SUNNY WAS THE FIRST IN HIS FAMILY TO GO TO COLLEGE, AND TO DO THAT HE CAME TO THE UNITED STATES IN 1986.

AND WHEN HE CAME TO THE UNITED STATES ON A STUDENT VISA, SUNNY WENT TO COLLEGE AT THE UNIVERSITY OF TEXAS AT AUSTIN AND STUDIED INFORMATION SYSTEMS AND GOT HIS DEGREE IN 1990.

AFTER GETTING HIS DEGREE AT THE UNIVERSITY OF TEXAS, AUSTIN, AGAIN, INFORMATION SYSTEMS, SUNNY CAME HERE TO SILICON VALLEY AND JOINED A STARTUP AS AN ENGINEER.

AND SOON AFTER THAT STARTUP WAS ACQUIRED BY WHAT WAS THEN, IT'S AN OLD NAME NOW, BUT IT WAS THEN A GIANT IN SILICON VALLEY CALLED LOTUS DEVELOPMENT CORPORATION. AND SUNNY WAS AN ENGINEER AT LOTUS FOR A FEW YEARS, AGAIN, WORKING WITH COMPUTERS, WORKING WITH SOFTWARE. THAT'S WHAT SUNNY DID. THAT WAS HIS AREA OF EXPERTISE.

A FEW YEARS LATER SUNNY LEFT LOTUS AND JOINED MICROSOFT.

THIS IS IN THE MID '90S, THE DAWN OF THE INTERNET AGE.

AND AGAIN, SUNNY WAS AN ENGINEER, A MANAGER AT MICROSOFT, COMPUTERS, SOFTWARE, DATABASES. THAT WAS HIS AREA OF EXPERTISE.

BUT AT HEART SUNNY WAS AN ENTREPRENEUR LIKE HIS FATHER, LIKE HIS GRANDFATHER. YOU'LL LEARN HE PROBABLY REALLY DIDN'T LIKE TO BE AN EMPLOYEE OR SOMEONE ELSE'S EMPLOYEE.

BUT HE HAD AN IDEA. HE HAD AN IDEA FOR A BUSINESS.

AND THE IDEA THAT SUNNY HAD FOR A BUSINESS WAS WHAT WAS CALLED A BUSINESS-TO-BUSINESS PLATFORM THAT WOULD ALLOW BUSINESSES TO BUY AND SELL OBJECTS, KIND OF EQUIPMENT, THINGS THAT THEY NEEDED TO RUN THE BUSINESSES.

AT THE TIME IT WAS PRETTY INNOVATIVE. NOW IT'S A LITTLE DIFFERENT. BUT SUNNY STARTED THAT COMPANY, AND IT WAS CALLED COMMERCEBID, AND IT WAS IN THE E-COMMERCE BUSINESS-TO-BUSINESS ACTIVITY AND OPERATION, AND IT WAS A SUCCESS. HE FOUNDED THE BUSINESS WITH A COLLEAGUE. THEY DEVELOPED THE BUSINESS.

AT THE SAME TIME IN 1999 SUNNY BECAME A CITIZEN IN UNITED STATES REALIZING ONE OF HIS DREAMS.

NOW, THAT COMPANY THAT SUNNY STARTED, COMMERCEBID, WAS A SUCCESS. PEOPLE WERE INTERESTED IN IT. THIS WAS AN IMPORTANT TIME PERIOD IN SILICON VALLEY. AND ANOTHER COMPANY, A LARGER BUSINESS-TO-BUSINESS E-COMMERCE BUSINESS COMPANY ACQUIRED COMMERCEBID FROM SUNNY AND FROM HIS PARTNERS. THEY REALIZED A DREAM. THEY HAD A GREAT IDEA, STARTED A COMPANY, OTHER PEOPLE

SER-391

LIKED THAT IDEA, AND ACTUALLY BOUGHT IT FROM HIM.  SUNNY WAS A SUCCESS AT THAT POINT.

HE JOINED COMMERCE ONE AS A RESULT OF THAT TRANSACTION AND WORKED FOR COMMERCE ONE FOR A TIME PERIOD.

BUT ULTIMATELY SUNNY, AGAIN, HE'S AN ENTREPRENEUR, HE WASN'T REALLY INTERESTED IN STAYING WORKING FOR SOMEONE ELSE, AND HE LEFT BECAUSE AT THAT POINT HE WAS A SUCCESS.  HE MADE MONEY FROM THE SALE AND DIDN'T REALLY NEED TO WORK.

SO WHAT YOU'LL LEARN ABOUT IN THIS TRIAL, WHAT HAPPENED NEXT WAS THAT SUNNY, IN DECIDING WHAT HE WANTED TO DO NEXT, DECIDED TO GO BACK TO SCHOOL.

HE WENT TO SCHOOL AT THE UNIVERSITY OF CALIFORNIA BERKELEY TO GET HIS MBA.  AND WHILE AT BERKELEY EARNING HIS MBA, SUNNY DECIDED TO PARTICIPATE IN WHAT WAS CALLED A STUDY ABROAD PROGRAM WHERE IF YOU GO TO ANOTHER UNIVERSITY IN ANOTHER COUNTRY, AND SUNNY DID THAT.  HE WENT TO BEIJING UNIVERSITY TO LEARN MANDARIN.

AND IT WAS DURING THAT TIME PERIOD WHILE AT BEIJING UNIVERSITY LEARNING MANDARIN AT THAT STUDY ABROAD PROGRAM THAT SUNNY MET ELIZABETH HOLMES, WHO WAS ALSO IN THAT PROGRAM STUDYING MANDARIN OVERSEAS.

THEY GOT TO KNOW EACH OTHER, BECAME ACQUAINTED.

BUT ULTIMATELY THE PROGRAM ENDED.  THEY BOTH CAME BACK TO THE UNIVERSITY.

SUNNY GOT HIS MBA IN 2003.  BUT HE WAS STILL LOOKING FOR

SER-392

WHAT HE WANTED TO DO NEXT. HE HAD IDEAS WITH COMPANIES. HE WAS INVESTING IN OTHER COMPANIES, AND IN THE MEANTIME HE DECIDED TO ENROLL AT STANFORD UNIVERSITY IN THEIR COMPUTER SCIENCE GRADUATE COMPUTER PROGRAM. THIS IS IN 2004.

AND IN THAT TIME PERIOD WHEN SUNNY WAS BACK AT STANFORD, THAT'S WHEN HE REACQUAINTED WITH ELIZABETH HOLMES. THEY GOT TO KNOW EACH OTHER. THEY STARTED DATING. ULTIMATELY ELIZABETH ACTUALLY MOVED IN WITH SUNNY, AND THEY LIVED TOGETHER IN SUNNY'S CONDOMINIUM IN PALO ALTO.

WELL, WHAT YOU'RE GOING TO LEARN IN THIS TRIAL IS THAT FROM THAT POINT WHEN THEY RECONNECTED AND BECAME A COUPLE, THEY WERE A COUPLE ROMANTICALLY, BUT LIVED PARALLEL LIVES.

ELIZABETH HAD HER OWN BUSINESS IDEAS AND COMPANY THAT IS THE SUBJECT OF THIS TRIAL, AND WE'LL TALK ABOUT THAT. BUT AT THE TIME SUNNY WASN'T APART OF THOSE. SUNNY HAD HIS OWN IDEAS ABOUT NEW STARTUPS AND ABOUT INVESTING.

AND THAT'S WHAT YOU'RE GOING TO LEARN THAT FROM THAT TIME PERIOD, 2003, '04, '05 ALL OF THE WAY UNTIL 2009, ELIZABETH HOLMES, NOT SUNNY, FOUNDED THERANOS AND BUILT THERANOS.

AND WHAT THERANOS WAS, WAS A DIAGNOSTICS COMPANY STARTED BY ELIZABETH, AND HER INTENT WAS TO CREATE A COMPREHENSIVE BLOOD TESTING SYSTEM USING SMALL BLOOD SAMPLES ON A FINGERSTICK. AND ELIZABETH'S IDEA FOR THE COMPANY, BEFORE SUNNY HAD ANYTHING TO DO WITH IT, WAS TO REVOLUTIONIZE BLOOD

SER-393

TESTING. AND ELIZABETH'S REVOLUTION FOR BLOOD TESTING HAD THREE ELEMENTS THAT WERE REALLY IMPORTANT TO THE BUSINESS IDEA AND THE FUTURE OF THE COMPANY.

THE FIRST ELEMENT WAS TO MAKE THE BLOOD TESTING EXPERIENCE MORE COMFORTABLE BY USING THE FINGERSTICK TECHNOLOGY AND KIND OF MORE OF A HOLISTIC APPROACH SO THAT PEOPLE WOULDN'T BE AFRAID TO GO GET TESTED. THEY MIGHT GET TESTED MORE OFTEN. THAT WAS THE IDEA.

THE SECOND ELEMENT TO ELIZABETH'S VISION TO REVOLUTIONIZE BLOOD TESTING WAS TO MAKE IT CONVENIENT. PLACE THE TESTING NEAR WHERE PEOPLE LIVED THEIR EVERY DAY LIVES, AGAIN, TO ENCOURAGE THEM TO GET TESTED MORE OFTEN.

AND THE THIRD ELEMENT TO ELIZABETH'S VISION TO REVOLUTIONIZE BLOOD TESTING WAS TO MAKE IT AFFORDABLE SO EVERYBODY COULD AFFORD IT, EVEN PEOPLE WITHOUT INSURANCE, SO YOU WOULD BE ENCOURAGED TO GET TESTED MORE OFTEN, FIND PROBLEMS BEFORE IT WAS TOO LATE. THAT WAS THE BUSINESS PLAN. THAT WAS THE VISION THAT ELIZABETH HAD FOR THERANOS, AGAIN, ALL BEFORE SUNNY EVER HAD ANYTHING TO DO WITH THE COMPANY.

AND IN THIS TIME PERIOD BETWEEN 2006 AND 2009, ELIZABETH, NOT SUNNY, BUILT THERANOS INTO A SOPHISTICATED, SMALL, BUT SOPHISTICATED DIAGNOSTICS COMPANY.

AT THAT TIME IN THE 2009 TIME PERIOD -- OH, THERE WE GO.

IN THAT TIME PERIOD ELIZABETH ASSEMBLED SOME OF THE MOST SOPHISTICATED AND SUCCESSFUL INVESTORS IN SILICON VALLEY HAVING

SER-394

NOTHING TO DO WITH SUNNY.  THIS IS HER.  THIS IS WHAT SHE BUILT.

SOME OF THE PEOPLE WHO WERE EARLY INVESTORS IN ELIZABETH'S COMPANY WAS SOMEBODY NAMED LARRY ELLISON, WHO FOUNDED A SILICON VALLEY GIANT, ORACLE.  ONE OF THE MOST SUCCESSFUL BUSINESSMEN IN SILICON VALLEY HISTORY.  EARLY INVESTOR AND MEMBER OF ELIZABETH'S BOARD.

DON LUCAS, ALSO AN EARLY INVESTOR, FORMER CHAIRMAN OF ORACLE.  ONE OF ELIZABETH'S EARLY BOARD MEMBERS IN THE COMPANY.

TIM DRAPER, ONE OF THE MOST SUCCESSFUL INVESTORS IN SILICON VALLEY HISTORY.  EARLY INVESTOR IN TESLA, COINBASE, RING, AND TWITTER.  AN EARLY INVESTOR WITH ELIZABETH AND A MEMBER OF THE BOARD OF DIRECTORS, ALL BEFORE SUNNY HAD ANYTHING TO DO WITH THERANOS.

AND DR. CHANNING ROBERTSON, PROFESSOR AND HEAD OF CHEMICAL ENGINEERING AT STANFORD.  AN EARLY INVESTOR, A MEMBER OF ELIZABETH'S BOARD, AND A MENTOR TO ELIZABETH ON THE SCIENCE BEHIND THERANOS'S TECHNOLOGY.

THIS WAS THE TEAM THAT WAS BEHIND ELIZABETH BEFORE SUNNY HAD ANYTHING TO DO WITH THERANOS.

AND YOU'RE ALSO GOING TO LEARN ABOUT THE PARTNERSHIPS ELIZABETH HAD WITH PHARMACEUTICAL COMPANIES.  THE GOVERNMENT ALLUDED TO IT.  AGAIN, MOST OF THIS HAPPENED BEFORE SUNNY HAD ANYTHING TO DO WITH THE COMPANY.

THERANOS HAD A PARTNERSHIP WITH PFIZER.  MANY OF YOU ARE

FAMILIAR WITH PFIZER. MANY OF YOU HAD THEIR COVID VACCINE. THERANOS WAS DOING BUSINESS WITH PFIZER;

ALSO DOING BUSINESS WITH CELGENE, ANOTHER PHARMACEUTICAL COMPANY;

ASTRAZENECA;

NOVARTIS;

THE MAYO CLINIC, THE FOREMOST MEDICAL INSTITUTION IN THE WORLD;

GLAXOSMITHKLINE; CENTOCOR, SCHERING-PLOUGH; MERCK.

ELIZABETH AND HER COMPANY, BEFORE SUNNY HAD ANYTHING TO DO WITH THERANOS, WAS DOING BUSINESS WITH SOME OF THE LARGEST PHARMACEUTICAL COMPANIES IN THE WORLD.

WHAT THERANOS DID IS PROVIDE THEIR TESTING SYSTEM TO THE PHARMACEUTICAL COMPANIES TO USE IN CLINICAL STUDIES WHERE THE DRUG COMPANIES WERE TESTING OUT NEW DRUGS AND THERANOS'S TESTING SYSTEM WAS USED IN ORDER TO MEASURE THE IMPACT ON THE CLINICAL STUDIED PATIENTS.

THERANOS GOT PAID FOR THIS WORK. SOME OF THE PHARMACEUTICALS CAME BACK TO DO MORE. EVEN PFIZER. THEY CAME BACK. THEY WANTED TO DO MORE BUSINESS WITH THERANOS. THAT'S WHAT YOU'RE GOING TO LEARN HERE IN THIS TRIAL.

NOW, ULTIMATELY SUNNY DID JOIN THERANOS IN 2009, SEPTEMBER OF 2009 TO BE EXACT. BUT YOU'RE GOING TO LEARN HE JOINED THERANOS BECAUSE HE BELIEVED IN THERANOS'S TECHNOLOGY AND THE GROUNDBREAKING MISSION. HE DIDN'T JOIN THERANOS BECAUSE

ELIZABETH WAS HIS GIRLFRIEND.  THAT'S NOT HOW IT WORKED.

AND WHAT YOU'RE GOING TO LEARN IN THIS TRIAL IS THAT FIRST SUNNY'S CONNECTION AND RELATION WITH THERANOS STARTED IN AUGUST OF 2009.  THE COMPANY NEEDED MONEY, AND WHAT SUNNY DID IS SUNNY ULTIMATELY GUARANTEED A LOAN, A $10 MILLION LOAN TO START TO HELP THERANOS TO CONTINUE BUSINESS SO THEY COULD PAY THEIR EMPLOYEES, GET HEALTH INSURANCE FOR THEIR EMPLOYEES, AND CONTINUE TO GROW AND DEVELOP THE BUSINESS.  THAT'S HOW SUNNY GOT STARTED WITH THERANOS.

AND WHAT HAPPENED WAS BEFORE HE GUARANTEED THE LOAN FOR THERANOS, SUNNY DID HIS HOMEWORK.  HE DID HIS DUE DILIGENCE, INVESTIGATED THE COMPANY.  HE DIDN'T SET ASIDE $10 MILLION OF HIS OWN MONEY SO THERANOS COULD GET A LOAN BECAUSE ELIZABETH WAS HIS GIRLFRIEND.  THAT'S NOT WHAT HAPPENED.  THIS IS A BUSINESS TRANSACTION.

SUNNY IS AN ENTREPRENEUR AND A BUSINESSMAN.  SO HE DID HIS DUE DILIGENCE FIRST.

AND PART OF THAT DUE DILIGENCE WAS RECEIVING FROM ELIZABETH, FROM THE SCIENTISTS AT THERANOS, INFORMATION ABOUT THE COMPANY, ABOUT THE TECHNOLOGY, REPORTS ABOUT SUMMARIZING THE TECHNOLOGY, REPORTS FROM SOME OF THOSE PHARMACEUTICAL STUDIES THAT THERANOS HAD DONE, REPORTS REGARDING THE TESTS THAT HAD BEEN DEVELOPED ON THEIR PLATFORM, ALL PART OF SUNNY'S HOMEWORK SO HE COULD LEARN WHETHER HE WANTED TO GUARANTEE A LOAN FOR ELIZABETH'S COMPANY.

SER-397

AND SOME OF THAT WORK INCLUDED REVIEWING THE BACKGROUNDS, THE TEAM OF SCIENTISTS AND ENGINEERS THAT ELIZABETH ASSEMBLED AT THERANOS BEFORE SUNNY HAD ANYTHING TO DO WITH THE COMPANY.

PEOPLE LIKE DR. IAN GIBBONS.  YOU'RE GOING TO HEAR A LITTLE BIT ABOUT HIM THIS MORNING OR THIS AFTERNOON, PRETTY SOON.

DR. DANIEL YOUNG, M.I.T. TRAINED, PH.D., ALL RIGHT PART OF ELIZABETH'S TEAM BEFORE SUNNY HAD ANYTHING TO DO WITH THE COMPANY.

AS A RESULT OF THIS BACKGROUND WORK THAT SUNNY DID, AN INVESTIGATION, HE DID GUARANTEE THE LOAN.

IN AUGUST OF 2009 SUNNY GUARANTEED THE LOAN, A $10 MILLION LINE OF CREDIT SO THERANOS COULD PAY ITS BILLS, PAY ITS EMPLOYEES, PAY THEIR HEALTH CARE, AND CONTINUE IN OPERATION.

AND TO DO THAT, SUNNY HAD TO SET, SET $10 MILLION OF HIS OWN MONEY ASIDE AT THE BANK, KIND OF LIKE IN A LOCKBOX, AND THEN THE BANK LOANED THERANOS THE MONEY.

AND THE $10 MILLION LINE OF CREDIT WAS INCREASED TO $13 MILLION LATER ON SO THE COMPANY COULD CONTINUE IN OPERATION.

NOW, WHAT YOU'RE ALSO GOING TO LEARN IS THAT SUNNY HIMSELF PURCHASED ALMOST $5 MILLION OF HIS OWN MONEY IN THERANOS STOCK IN 2010 AND 2011.

AND YOU'RE GOING TO LEARN THAT SUNNY DID THAT BECAUSE HE BELIEVED IN THE TECHNOLOGY, IN THE COMPANY, IN THE VISION.

BETWEEN THE LOAN OF THE $13 MILLION AND THE INVESTMENT, SUNNY MADE AVAILABLE TO THERANOS ALMOST $18 MILLION TO KEEP IN BUSINESS, TO KEEP PAYING THEIR EMPLOYEES, AND TO GROW AND DEVELOP THE TECHNOLOGY. THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

AND AT SOME POINT IN TIME YOU HEARD THE GOVERNMENT REFERENCE SUNNY'S STOCK MAY HAVE BEEN WORTH HALF A BILLION DOLLARS. IT WAS WORTH A LOT OF MONEY.

BUT WHAT YOU'RE GOING TO LEARN DURING THIS TRIAL, SUNNY NEVER SOLD A SINGLE SHARE OF STOCK, EVEN THOUGH HE COULD HAVE. HE COULD HAVE MADE TENS OF MILLIONS, HUNDREDS OF MILLIONS OF DOLLARS AND STILL BEEN AN OWNER IN THERANOS, BUT HE NEVER DID BECAUSE HE BELIEVED IN THE COMPANY, HE BELIEVED IN THE TECHNOLOGY, AND HE BELIEVED IN THE FUTURE OF WHAT THERANOS COULD OFFER TO THE PUBLIC. THAT'S WHAT YOU'RE GOING TO LEARN IN THIS TRIAL.

NOW, ULTIMATELY, AS I SAID BEFORE, SUNNY DID JOIN THERANOS, AND HE JOINED THEM BECAUSE HE BELIEVED IN THE COMPANY AND ITS MISSION.

BUT SUNNY JOINED THERANOS IN SEPTEMBER OF 2009 NOT AS THE PRESIDENT, NOT AS THE CHIEF OPERATING OFFICER. HE WASN'T MADE PRESIDENT AND COO BECAUSE ELIZABETH WAS HIS GIRLFRIEND.

SUNNY JOINED THERANOS IN 2009 AS AN EMPLOYEE. AND WHEN HE JOINED THERANOS AS AN EMPLOYEE SERVING ON THE BOARD AND SERVING ELIZABETH, HE AGREED TO JUST WORK FOR A DOLLAR A YEAR. AND THE

SER-399

REASON THAT SUNNY AGREED TO THAT IS BECAUSE HE DIDN'T WANT INVESTOR MONEY GOING TO PAY EXECUTIVES LIKE HIM. HE WANTED INVESTOR MONEY TO GO TO PAY TO DEVELOP THE TECHNOLOGY AND THE BUSINESS. THAT'S WHAT YOU'RE GOING TO LEARN. BECAUSE HE BELIEVED IN THE TECHNOLOGY. THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

NOW, ULTIMATELY THE BOARD, THE BOARD OF DIRECTORS WHO CONTROLLED THE COMPANY DIDN'T AGREE TO THAT. THEY REQUIRED SUNNY TO TAKE A SALARY. SO, YES, HE MADE A SALARY OF $99,000 A YEAR FOR MOST OF THE TIME HE WAS AT THERANOS. THAT'S ALL HE EVER GOT FROM THERANOS. THAT'S WHAT THE EVIDENCE WILL SHOW.

SUNNY NEVER MISUSED OR TOOK A SINGLE DOLLAR OF INVESTOR FUNDS.

NOW, YOU'LL HEAR IN THIS TRIAL FROM SOME EMPLOYEES, SOME WITNESSES WHO WILL TALK ABOUT NONDISCLOSURE AGREEMENTS, THAT THEY WERE REQUIRED TO SIGN NONDISCLOSURE AGREEMENTS BY THERANOS.

AND WHAT YOU'LL LEARN ALSO IS THAT SUNNY SIGNED A NONDISCLOSURE AGREEMENT WHEN HE JOINED THERANOS. AND THE REASON THAT SUNNY SIGNED A NONDISCLOSURE AGREEMENT WHEN HE JOINED THERANOS WAS TO PROTECT THE COMPANY'S TRADE SECRETS AND ASSETS.

NOW, TRADE SECRET IS THE TECHNOLOGY, THE METHODS, THE SCIENCE, THE CHEMISTRY THAT THE COMPANY DEVELOPED TO DO THEIR FINGERSTICK BLOOD TESTING.

TRADE SECRETS ARE WHAT INVESTORS ACTUALLY OWNED. THAT'S THEIR PROPERTY. THAT'S THEIR ASSET, AND THERANOS REQUIRED EMPLOYEES TO SIGN NONDISCLOSURE AGREEMENTS SO EMPLOYEES WOULDN'T LEAK OUT TRADE SECRETS WHERE A COMPETITOR COULD TAKE THE INFORMATION AND USE IT AGAINST THERANOS AND DRIVE THEM OUT OF BUSINESS.

SO SUNNY, JUST LIKE EVERY OTHER EMPLOYEE, SIGNED A NONDISCLOSURE AGREEMENT TO PROTECT THERANOS, TO PROTECT THERANOS'S INVESTORS.

NOW, ULTIMATELY SUNNY DID BECOME PRESIDENT OF THERANOS, AND THAT HAPPENED AFTER JULY OF 2010.

ABOUT A YEAR LATER THERANOS PAID BACK THAT LOAN, SO SUNNY GOT HIS MONEY BACK FROM THE BANK, IT WAS FREED UP, AND HE COULD DO WHAT HE WANTED WITH IT AT THAT POINT.

AND THE NEXT MONTH THE BOARD OF DIRECTORS OFFERED SUNNY THE JOB OF PRESIDENT AND CHIEF OPERATING OFFICER OF THERANOS. AND THE BOARD OF DIRECTORS APPROVED SUNNY AS PRESIDENT AND CHIEF OPERATING OFFICER OF THERANOS.

SUNNY DID NOT BECOME PRESIDENT OF THERANOS BECAUSE ELIZABETH WAS HIS GIRLFRIEND. THAT'S NOT WHAT THE EVIDENCE WILL SHOW, AND THAT'S NOT WHAT YOU WILL LEARN IN THIS TRIAL.

IN FACT, IN 2010 ELIZABETH HOLMES, SHE WAS THE FOUNDER OF THERANOS, CORRECT. SHE DIDN'T CONTROL THE COMPANY.

THE PEOPLE I SHOWED YOU ON THE BOARD, THOSE EARLY INVESTORS WHO INVESTED ALL OF THEIR MONEY, THEY CONTROLLED THE

VOTING SHARES OF THERANOS STOCK AT THIS TIME. THEY ARE THE ONES WHO MADE SUNNY PRESIDENT OF THERANOS, NOT ELIZABETH. THAT'S WHAT YOU'RE GOING TO LEARN IN THIS TRIAL.

NOW, I'M GOING TO SHIFT GEARS A LITTLE BIT AND TALK ABOUT SOME OF THE EVIDENCE THAT WE BELIEVE IS GOING TO SHOW THAT SUNNY DID NOT MISLEAD INVESTORS, HE DID NOT MISLEAD PATIENTS OF THE CAPABILITIES OF THERANOS'S TECHNOLOGY.

AND SOME OF THE EVIDENCE THAT YOU'RE GOING TO HEAR AND SEE IS GOING TO INCLUDE FIRST, LIKE I SAID, THERANOS'S SCIENTISTS DEVELOPED HUNDREDS OF FINGERSTICK TESTS ON THERANOS'S TECHNOLOGY; THERANOS ALSO GAVE -- YOU HEARD FROM THE GOVERNMENT THE RELATIONSHIP BETWEEN THERANOS AND WALGREENS AND THE BUSINESS OF MAYBE ROLLING OUT THERANOS TESTING CENTERS IN WALGREENS NATIONWIDE.

AS A PART OF THAT RELATIONSHIP, THERANOS GAVE WALGREENS TESTING DEVICES, STARTING IN SEPTEMBER OF 2010. AND WALGREENS USED THEM BEFORE THEY EVER PAID A DIME TO THERANOS. WALGREENS KNEW EXACTLY WHAT THERANOS'S TECHNOLOGY COULD DO.

YOU'RE ALSO GOING TO LEARN THAT IN THE SUMMER OF 2015 THE FOOD AND DRUG ADMINISTRATION, THE FEDERAL GOVERNMENT AGENCY RESPONSIBLE FOR OVERSEEING THE SAFETY AND EFFICACY OF MEDICAL DEVICES, APPROVED A TEST OF HERPES SIMPLEX VIRUS TEST, RUN ON THERANOS'S OWN PRIORITY TECHNOLOGY, AND IT CONFIRMED THAT THE TECHNOLOGY MET THE FDA STANDARDS FOR ACCURACY AND SAFETY. THAT'S WHAT YOU'RE GOING TO HEAR AND LEARN IN THIS TRIAL.

IN ADDITION, YOU'RE GOING TO LEARN THAT, YES, THERANOS USED MODIFIED COMMERCIAL DEVICES TO DO FINGERSTICK TESTING JUST LIKE THEY COULD DO WITH THEIR OWN PROPRIETARY DEVICE.

BUT WHAT YOU'RE GOING TO LEARN IN THIS TRIAL IS THAT USE OF THE MODIFIED COMMERCIAL DEVICES CAME ABOUT AS A RESULT OF CHANGES IN THE RELATIONSHIP WITH WALGREENS, CHANGES IN THE CONTRACTS. YOU'RE GOING TO HEAR THERE ARE MULTIPLE CONTRACTS WITH WALGREENS, AND THAT WAS THE DECISION, A BUSINESS DECISION UNTIL THE FDA APPROVAL WAS OBTAINED SO THAT THEY COULD PUT ANALYZERS IN WALGREENS STORES.

THAT'S WHAT THE EVIDENCE IS GOING TO SHOW, AND THAT'S WHAT YOU'RE GOING TO LEARN.

NOW, AS I MENTIONED, SUNNY INVESTED ALMOST $5 MILLION OF ITS OWN MONEY IN THERANOS BECAUSE HE BELIEVED IN THE TECHNOLOGY, AND THAT BELIEF CAME FROM THE SCIENTISTS AND ENGINEERS, THE TEAM THAT ELIZABETH ASSEMBLED ALL BEFORE SUNNY HAD ANYTHING TO DO WITH THERANOS.

SUNNY WAS TAUGHT ABOUT THE TECHNOLOGY BY THE SCIENTISTS, AND THAT TIME PERIOD STARTED -- SUNNY JOINED IN SEPTEMBER OF 2009 -- SO IT WAS LATE 2009 INTO 2010 IS THE TIME PERIOD THAT I'M TALKING ABOUT.

FOR EXAMPLE, YOU SEE UP ON THE SCREEN AN EMAIL FROM ONE OF THOSE SCIENTISTS WHO WORKED AT THERANOS WHO DEVELOPED TESTS AND HER NAME WAS SUREKHA GANGADKHEDKAR.

AND HERE SHE SENDS AN EMAIL TO SUNNY REPORTING TO SUNNY AN

SER-403

ASSAY DEVELOPMENT STRATEGY -- YOU WERE TOLD BY THE GOVERNMENT "ASSAY" IS KIND OF EQUIVALENT TO A TEST -- AN ASSAY DEVELOPMENT STRATEGY FOR DEVELOPING NEW TESTS ON THERANOS'S TECHNOLOGY. THIS IS THE BEGINNING OF A NEW PROCESS AT THERANOS WHERE THEY ARE BUILDING UP, RAMPING UP, HIRING NEW EMPLOYEES, AND DEVELOPING NEW TESTS.

AND IN THIS TIME PERIOD IN 2010 THERANOS SCIENTISTS, NOT ELIZABETH, THE SCIENTISTS TOLD SUNNY THAT THERANOS'S TECHNOLOGY COULD DO ALL FOUR CATEGORIES OF COMMONLY USED BLOOD TESTING. THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

ONE OF THOSE SCIENTISTS WAS DR. IAN GIBBONS. HE WAS THE SENIOR CHIEF SCIENTIST AT THERANOS IN 2010 AND WAS A PART OF ELIZABETH'S TEAM BEFORE SUNNY HAD ANYTHING TO DO WITH THE COMPANY.

AND IN A COMMUNICATIONS FROM DR. GIBBONS AND THE SCIENTISTS AT THERANOS TO ELIZABETH AND SUNNY, DR. GIBBONS REPORTED THAT THEY, THE SCIENTISTS, FIGURED OUT HOW TO MAKE THERANOS'S 4.0 SYSTEM CAPABLE OF PERFORMING ANY MEASUREMENT IN A DISTRIBUTED SETTING.

NOW, WHAT DOES THAT MEAN, "ANY MEASUREMENT IN A DISTRIBUTED SETTING"?

IN PLAIN ENGLISH, WHAT DR. GIBBONS IS REPORTING TO SUNNY AND ELIZABETH IS THAT THEY, THE SCIENTISTS, HAVE FIGURED OUT HOW TO MAKE THE THERANOS'S TECHNOLOGY CAPABLE OF DOING ALL FOUR FAMILIES OF TESTS COMMONLY USED BECAUSE PRIOR TO THIS TIME,

SER-404

BACK IN 2009 AND EVEN BEFORE THEN WHEN THERANOS DID BUSINESS WITH THE PHARMACEUTICAL COMPANIES, THERANOS'S TECHNOLOGY, THE 3.0 SYSTEM, AND LATER THE 3.5, DID ONE FAMILY OR CATEGORY OF TESTS CALLED IMMUNOASSAYS.  IT'S ONE LANE.  THEY COULD DO A LOT OF TESTS IN THAT LANE, BUT IT'S JUST ONE LANE.

THE BREAKTHROUGH HERE THAT DR. GIBBONS IS REPORTING IS THERANOS'S NEW SYSTEM WAS GOING TO BE ABLE TO DO FOUR CATEGORIES OF TESTS:  THE IMMUNOASSAYS AND THREE OTHERS. THAT'S THE CHANGE GOING FORWARD.

AND THAT BREAKTHROUGH CONTINUED.  BY OCTOBER OF 2010 GIBBONS AND THE SCIENTISTS REPORTED TO SUNNY FURTHER DEVELOPMENTS IN THIS BREAKTHROUGH.

AND BY THAT TIME GIBBONS HAD REPORTED THAT THE SCIENTISTS HAD FIGURED OUT HOW THE NEW DEVICE, THE 4.0, HAD DEMONSTRATED FULLY EQUIVALENT TO LAB METHODS AND THAT HE BELIEVED WE HAVE ALSO SHOWN AN ABILITY TO WORK IN ALL ASSAY AREAS AND GAVE HIS VIEW THAT THEY COULD DO TESTING IN ALL FOUR CATEGORIES OF TESTING:  NUCLEIC ACID, CYTOMETRY, GENERAL CHEMISTRY, AND IMMUNOASSAY.  THAT WAS THE BREAKTHROUGH, AND I'LL EXPLAIN WHAT THAT MEANS IN A COUPLE OF MINUTES.

IT'S A NOT CHEMISTRY TEST, BUT I THINK IT'S IMPORTANT THAT YOU UNDERSTAND WHAT THE BREAKTHROUGH MEANT BECAUSE IT MEANT A LOT, AND IT WAS IMPORTANT TO SUNNY'S DECISION REGARDING HIS OWN INVESTMENTS IN THERANOS AND ALL OF THE WORK THAT THEY DID GOING FORWARD.

IN THE 2011 TO 2013 TIME PERIOD AFTER GIBBONS REPORTED THE BREAKTHROUGH TO SUNNY AND ELIZABETH ABOUT THE TECHNOLOGY, THERANOS'S SCIENTISTS, NOT SUNNY AND NOT ELIZABETH, THE SCIENTISTS DEVELOPED HUNDREDS OF NEW TESTS ON THERANOS'S FINGERSTICK TECHNOLOGY, THE 4.0 SYSTEM.

IN THAT TIME PERIOD THERANOS RAMPED UP HIRING MORE SCIENTISTS TO DO THIS WORK. FOUR TEAMS OF SCIENTISTS, ONE FOR EACH CATEGORY.

ONE OF THE CATEGORIES WAS CALLED NUCLEIC ACID AMPLIFICATION.

WHEN YOU THINK OF NUCLEIC ACID AMPLIFICATION, THINK ABOUT A COVID PCR TEST THAT MANY OF YOU HAVE BEEN TAKING FOR THE LAST TWO YEARS. THERANOS WAS DOING NUCLEIC ACID AMPLIFICATION TESTING TEN YEARS AGO. THAT WAS WHAT THE SCIENTISTS WERE WORKING ON A DEVELOPING AFTER GIBBONS REPORTED THE BREAKTHROUGH.

THERANOS ALSO HAD A CYTOMETRY TEAM OF SCIENTISTS DEVELOPING TESTS ON THE NEW DEVICE.

WHEN YOU HEAR "CYTOMETRY," THINK CELL, RED BLOOD CELL, WHITE BLOOD CELL. THOSE ARE THE TYPES OF TEST IN CYTOMETRY. THEY WERE DEVELOPING NEW TESTS ON THERANOS'S NEW SYSTEM.

THERE WAS ALSO A GENERAL CHEMISTRY TEAM DEVELOPING TESTS.

THIS IS A BIG FAMILY OF TESTS, SOME OF THE MOST COMMONLY USED TESTS FOR GENERAL CHEMISTRY. THINK POTASSIUM, SODIUM, CALCIUM TESTS.

A TEAM OF SCIENTISTS WHO WORKED AT THERANOS DEVELOPING THESE TESTS AS WELL, IN ADDITION TO THE IMMUNOCHEMISTRY OR IMMUNOASSAY TEAM THAT ALWAYS EXISTED AT THERANOS AND HAD BEEN DOING SOME OF THAT PHARMACEUTICAL WORK THAT THE GOVERNMENT REFERENCED PRIOR TO 2009.

THIS IS THE BREAKTHROUGH THAT WAS HAPPENING BETWEEN THE TIME PERIOD THAT SUNNY JOINED THERANOS AND THE ROLLOUT AND FURTHER BUSINESS WITH WALGREENS THAT TOOK PLACE.  AND IN THESE YEARS, IN THE 2011 TO 2013 TIME PERIOD, THOSE SCIENTISTS WERE REPORTING OUT TO SUNNY AND ELIZABETH THAT THEY COMPLETED ASSAYS, NEW TESTS, HUNDREDS OF NEW TESTS.

FOR EXAMPLE, THE GENERAL CHEMISTRY TEAM THAT I TALKED ABOUT, 55 NEW TESTS COMPLETED BY SEPTEMBER OF 2012.

THE ELISA TEAM, THAT'S THE IMMUNOCHEMISTRY TEAM, 68 TESTS DEVELOPED, COMPLETED BY NOVEMBER OF 2012.

THE NUCLEIC ACID AMPLIFICATION TEAM, 76 NEW TESTS BY DECEMBER OF 2013, ALL BEING REPORTED UP TO SUNNY, THE SCIENTISTS SAYING THEY COMPLETED AND DEVELOPED NEW TESTS.

THAT'S WHAT SUNNY WAS BEING TOLD, AND THAT'S WHAT HE UNDERSTOOD, AND THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

AND THIS TECHNOLOGY, THIS WAS GROUNDBREAKING STUFF.  NO ONE ELSE WAS DOING THIS AT THE TIME AND FOR THAT REASON THERANOS SOUGHT TO PROTECT THIS NEW TECHNOLOGY.

THERANOS OBTAINED 176 PATENTS PROTECTING THE HARDWARE, PROTECTING THE SOFTWARE, AND PROTECTING THE TESTING METHODS

SER-407

DEVELOPED FOR THERANOS'S FINGERSTICK TECHNOLOGY.

AS I MENTIONED, THERANOS DEVELOPED OVER 200 SMALL SAMPLE FINGERSTICK TESTS USING THE 4.0 SYSTEM IN THESE -- ALL FOUR CATEGORIES OF TESTING.

IN ADDITION TO THAT, THERANOS'S SCIENTISTS DEVELOPED 70 FINGERSTICK TESTS, SOME OF THE MOST COMMONLY USED FINGERSTICK TESTS THAT WERE VALIDATED BY MEDICAL DOCTORS AND SCIENTISTS IN THERANOS'S CLINICAL LAB TO USE ON PATIENTS.

IT WASN'T SUNNY WHO VALIDATED THOSE TESTS TO USE ON PATIENTS, AND NOT ELIZABETH. IT WAS THE SCIENTISTS. THAT'S WHAT YOU'RE GOING TO LEARN ABOUT IN THIS TRIAL.

AND THIS WAS TRANSFORMATIVE. NO OTHER LAB EVER OFFERED SUCH A BROAD MENU OF FINGERSTICK TESTS TO THE PUBLIC THAN THERANOS DID AT THIS TIME. THAT'S WHAT YOU'RE GOING TO LEARN IN THIS TRIAL.

NOW, THESE TECHNOLOGICAL BREAKTHROUGHS THAT I JUST DESCRIBED THAT HAPPENED AT THERANOS IN THIS 2011 TO 2013 TIME PERIOD ALSO LED TO DISCUSSIONS BETWEEN THERANOS AND RETAIL GIANTS WALGREENS AND SAFEWAY ABOUT POTENTIAL PARTNERSHIPS.

AND THE RELATIONSHIP WITH WALGREENS STARTED IN THE SPRING OF 2010 THERE WAS A GUY AT WALGREENS NAMED DR. JAY ROSAN. HE WAS THE VICE PRESIDENT OF INNOVATION AT WALGREENS, AND HE INVITED SUNNY AND ELIZABETH TO A MEETING AT WALGREENS HEADQUARTERS IN ILLINOIS.

AS A PART OF THESE DISCUSSIONS BETWEEN WALGREENS AND

SAFEWAY ABOUT A POTENTIAL PARTNERSHIP, WALGREENS RETAINED EXPERTS AT JOHNS HOPKINS MEDICINE TO EVALUATE THERANOS'S TECHNOLOGY, AND THOSE EXPERTS CONCLUDED THAT THERANOS HAD HAD A SPECIAL STRENGTH OF ACCURACY.  AND THIS HAPPENED IN APRIL OF 2010.

AGAIN, JOHNS HOPKINS WAS HIRED BY WALGREENS TO EVALUATE THE TECHNOLOGY.  AND JOHN HOPKINS REPORTED AND CONCLUDED THAT A SPECIAL STRENGTH OF THERANOS'S TECHNOLOGY WAS ACCURACY; FLEXIBILITY, IT CAN BE TAILORED TO A VARIETY OF NEEDS IN CLINICAL VENUES; AND THEY AGREED NO MAJOR WEAKNESSES IDENTIFIED.  THIS IS JOHNS HOPKINS REPORTING TO WALGREENS AND SUNNY AND ELIZABETH THEIR VIEWS OF THE TECHNOLOGY.

AND THESE DISCUSSIONS LED TO THE FIRST OF MANY AGREEMENTS BETWEEN THERANOS AND WALGREENS.  THIS IS JULY OF 2010.

AND THE FIRST CONTRACT, THE FIRST AGREEMENT WAS TO PUT THERANOS TESTING MACHINES IN WALGREENS STORES NATIONWIDE AFTER FDA APPROVAL.  THAT WAS THE INITIAL BUSINESS PLAN.

SO, AGAIN, THIS IS THE FIRST OF MANY AGREEMENTS THAT WOULD COME.

BUT THAT FIRST AGREEMENT IN JULY OF 2010 ALSO INCLUDED THE CLAUSE, A TERM THAT REQUIRED WALGREENS TO PAY THERANOS $30 MILLION UPON SIGNATURE OF THE CONTRACT.

BUT YOU KNOW WHAT HAPPENED?

THERANOS NEVER ASKED FOR THE MONEY.  SUNNY AND ELIZABETH COULD HAVE BILLED WALGREENS AND WALGREENS WOULD HAVE BEEN

REQUIRED TO PAY THERANOS $30 MILLION IN JULY OF 2010, BUT THEY NEVER DID THAT BECAUSE THE WHOLE POINT OF THE RELATIONSHIP WITH WALGREENS WAS NOT TO GET MONEY FROM WALGREENS.

THE POINT OF THE RELATIONSHIP WAS TO BUILD A PARTNERSHIP TO DEVELOP AND EXPAND THERANOS TESTING NATIONWIDE.

NOW, REMEMBER THE CHARGE HERE. THE CHARGE HERE IS WIRE FRAUD. THE ALLEGATION IS THAT SUNNY SCHEMED TO DECEIVE AND CHEAT INVESTORS AND PARTNERS OUT OF THEIR MONEY.

THERANOS SIGNED A CONTRACT WITH WALGREENS. WALGREENS IS OBLIGATED TO PAY THERANOS $30 MILLION ON SIGNATURE. SUNNY DIDN'T ASK FOR THE MONEY. THERANOS DIDN'T ASK FOR THE MONEY BECAUSE IT WASN'T MONEY THAT THEY WERE INTERESTED IN. THEY WERE INTERESTED IN THE PARTNERSHIP AND BUILDING A BUSINESS, THAT'S WHAT THE EVIDENCE WILL SHOW.

AND AFTER THAT CONTRACT WAS SIGNED, THERANOS GAVE WALGREENS THREE DEVICES, ANALYZERS. IN SEPTEMBER OF 2010 THEY GAVE THEM CARTRIDGES. THEY TAUGHT THEM HOW TO USE THE EQUIPMENT. AND AFTER THAT YOU'LL LEARN OVER THE NEXT COUPLE OF YEARS THAT DR. JAY ROSAN AND OTHERS AT WALGREENS USED THE TESTING EQUIPMENT. THEY USED IT ON THEMSELVES. THEY TESTED OTHER EXECUTIVES AT WALGREENS. THEY DID IT FOR YEARS ALL BEFORE WALGREENS EVER PAID ANY MONEY TO THERANOS.

SO THE EVIDENCE IS GOING TO SHOW NOT THAT WALGREENS WAS DECEIVED ABOUT WHAT THERANOS TECHNOLOGY COULD DO. WALGREENS HAD POSSESSION OF THERANOS TECHNOLOGY AND USED THERANOS

TECHNOLOGY BEFORE WALGREENS EVER GAVE A DIME TO THERANOS.

THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

NOW, I'M GOING TO SWITCH ISSUES A LITTLE BIT HERE AND TALK ABOUT THERANOS'S USE OF COMMERCIAL DEVICES. ABSOLUTELY TRUE.

THE EVIDENCE IS GOING TO SHOW THAT THERANOS USED COMMERCIAL DEVICES, TRADITIONALLY WHAT IS CALLED VENOUS DRAW, VENOUS DRAW TESTING IN IT'S LABORATORIES. THERE'S NO DOUBT ABOUT THAT AND NO DISPUTE ABOUT THAT.

BUT WHAT THE EVIDENCE IS ALSO GOING TO SHOW IS THAT INVESTORS WERE NOT MISLED ABOUT THAT FACT. THAT'S WHAT THE EVIDENCE WILL DEMONSTRATE.

AND SOME OF THAT EVIDENCE INCLUDES THE FACT THAT INVESTORS, SOME OF WHOM ARE GOING TO TESTIFY HERE, ARE GOING TO TELL YOU THAT THEY KNEW THERANOS USED VEIN DRAW TRADITIONAL TESTING IN THEIR LAB.

YOU'RE ALSO GOING TO LEARN THAT THERANOS DISCLOSED ON ITS WEBSITE THE FACT THAT IT USED VEIN DRAW COMMERCIAL TESTING IN ITS LAB.

AND YOU'RE ALSO GOING TO LEARN AND SEE THAT THERANOS'S TEST MENU WAS ON THE WEBSITE. SO ANYBODY AT ANY TIME COULD HAVE SEEN EXACTLY HOW MANY TESTS THERANOS OFFERED TO THE PUBLIC. INVESTORS COULD HAVE SEEN IT, PATIENTS COULD HAVE SEEN IT, DOCTORS COULD SEE IT. ANYONE. THAT'S WHAT THE EVIDENCE WILL DEMONSTRATE.

NOW, THE GOVERNMENT REFERENCED ONE CLASS OF WITNESSES THAT

**SER-411**

DEFENDANT'S OPENING STATEMENT                    1079

YOU'RE GOING TO HEAR FROM.  THOSE ARE INVESTORS, INCLUDING AN INVESTOR FROM A HEDGE FUND IN SAN FRANCISCO CALLED PFM.

PFM WAS HEADED BY A GUY NAMED BRIAN GROSSMAN WHO WAS THE CHIEF INVESTMENT OFFICER.

WE EXPECT GROSSMAN IS GOING TO TESTIFY, AND YOU'RE GOING TO HEAR OR LEARN THAT TWO OF HIS TEAM MEMBERS THAT HELPED HIM EVALUATE THE INVESTMENT DID GO AND GET TESTED.  THEY GOT THE FINGERSTICK FOR THE TEST THAT THEIR DOCTORS REQUESTED FROM THERANOS.

BUT YOU'RE ALSO GOING TO LEARN THAT BRIAN GROSSMAN WALKED INTO A WALGREENS STORE IN PALO ALTO IN JANUARY OF 2014 WITH A PRESCRIPTION FROM HIS DOCTOR FOR A BLOOD TEST.  HE GOT TESTED, AND HE GOT A TRADITIONAL VEIN DRAW TEST BEFORE PFM AND BEFORE GROSSMAN INVESTED.  AND HE GOT A TRADITIONAL VEIN DRAW TEST BECAUSE ONE OF THE TESTS HIS DOCTOR ORDERED WAS NOT ON THE FINGERSTICK.

SO BEFORE PFM INVESTED, BRIAN GROSSMAN KNEW THAT THERANOS USED COMMERCIAL DEVICES IN VEIN DRAW TESTING FOR SOME TESTS THAT THERANOS COULD NOT DO ON THE FINGERSTICK.  THAT'S WHAT YOU WILL LEARN IN THIS TRIAL.

YOU'LL ALSO LEARN THAT AFTER PFM AND GROSSMAN INVESTED IN FEBRUARY OF 2014, SUNNY HAD CONVERSATIONS WITH GROSSMAN ABOUT THERANOS'S BUSINESS.  THIS IS THE SAME TIME PERIOD THAT THE GOVERNMENT ALLEGES THAT SUNNY WAS MISLEADING INVESTORS ABOUT THE USE OF THE VEIN DRAW TESTING IN COMMERCIAL DEVICES.

IN THAT CONVERSATION SUNNY TOLD GROSSMAN THAT THE PERCENTAGE OF PATIENTS COMING THROUGH WALGREENS STORES WHO ARE GETTING VEIN DRAW TESTING AT WALGREENS STORES AND AT THERANOS. THAT WAS DISCLOSED TO GROSSMAN AT THE SAME TIME THAT THE GOVERNMENT CLAIMS THAT SUNNY WAS MISLEADING INVESTORS ABOUT THAT FACT.

YOU'RE ALSO GOING TO LEARN THAT THERANOS DISCLOSED IT'S USE OF VEIN DRAW TESTING AND COMMERCIAL DEVICES TO THE PUBLIC, TO REGULATORS, AND TO ITS PARTNERS LIKE WALGREENS.

AND SOME OF THE EVIDENCE THAT YOU'RE GOING TO SEE INCLUDES THE FACT THAT THE USE OF VEIN DRAW TESTING IN COMMERCIAL DEVICES WAS DISCLOSED ON THERANOS'S WEBSITE.

AND WHAT YOU SEE UP ON THE SCREEN RIGHT NOW IS A SCREEN SHOT FROM A PIECE OF THERANOS'S WEBSITE, AND IT DESCRIBES THE FACT THAT INSTEAD OF A BIG, INTIMIDATING NEEDLE, OUR CERTIFIED PHLEBOTOMIST CAN USE A TINY FINGERSTICK OR A MICRO SAMPLE FROM A VENOUS DRAW.

BUT THEN THE WEBSITE DISCLOSED, "OCCASIONALLY A VENIPUNCTURE MAY BE REQUIRED BASED ON THE LAB ORDER."

WHAT THAT MEANS AND WHAT'S THAT TELLING THE WORLD IS OCCASIONALLY A VEIN DRAW AND COMMERCIAL TEST WILL BE REQUIRED IF THE TEST THAT YOUR DOCTOR ORDERED IS NOT AVAILABLE ON THE FINGERSTICK.

THAT WAS PUBLICLY DISCLOSED ON THERANOS'S WEBSITE.

YOU'RE ALSO GOING TO LEARN IN THE FALL OF 2013 THERANOS

SER-413

AND SUNNY, THEY HAD A MEETING WITH THE FOOD AND DRUG ADMINISTRATION WHERE THEY DISCLOSED ALL OF THEIR TESTING METHODS, THE FINGERSTICK METHODS, THE VEIN DRAW TESTING METHODS, AND THE DEVICES USED FOR THOSE TESTING METHODS DISCLOSED TO REGULATORS.

YOU'RE ALSO GOING TO LEARN IN THE RELATIONSHIP WITH WALGREENS THAT LASTED YEARS, THERE ARE PERIODIC MEETINGS, SOMETIMES MONTHLY, SOMETIMES QUARTERLY, SUNNY WOULD PARTICIPATE IN THEM. WALGREENS WAS TOLD THE PERCENTAGE OF PATIENTS COMING THROUGH WALGREENS STORES WHO GOT VEIN DRAW TESTING RUN ON COMMERCIAL DEVICES.

SO NOT ONLY DID WALGREENS HAVE THERANOS MACHINES AND KNOW WHAT THEY COULD DO BEFORE THEY GAVE ANY MONEY TO THERANOS, THEY WERE REGULARLY GETTING REPORTS OF THE PERCENTAGE OF PATIENTS WHO WERE GETTING A VEIN DRAW TEST.

THE EVIDENCE IS GOING TO SHOW THAT WALGREENS WAS MISLED ABOUT NOTHING.

IN ADDITION, I MENTIONED THERANOS'S TEST MENU IS ACTUALLY PUBLISHED ON THE WEBSITE. YOU'LL SEE AN IMAGE OF THAT ON THE SCREEN RIGHT NOW.

THE NUMBER OF TESTS RANGE FROM 150 TESTS IN EARLY 2014 UP TO A MAXIMUM OF 269, AND IT VARIED JUST DEPENDING ON WHAT WAS HAPPENING IN THE LAB.

AND THE REASON I MENTION THIS IS THAT YOU'RE GOING TO HEAR FROM SOME INVESTORS WHO TALK ABOUT AND CLAIM THAT SUNNY TOLD

THEM THAT THERANOS COULD DO A THOUSAND TESTS ON ITS FINGERSTICK. AND SOME OF THEM WILL SAY, WELL, NO, I WAS TOLD A THOUSAND PCT CODES ON THE FINGERSTICK. AND THEY GO BACK AND FORTH.

FIRST, THE NUMBER OF TESTS THAT THERANOS COULD DO IN TOTAL WAS POSTED ON THE WEBSITE AT ALL TIMES, AND IT WAS NEVER MORE THAN 269.

SECOND, WHEN YOU HEAR INVESTORS OR SOMEONE TALK ABOUT CPT CODE IN THIS TRIAL, AND I THINK THEY MAY, A CPT CODE IS NOT A TEST. A CPT CODE IS A BILLING CODE USED TO GET PAYMENT FROM MEDICARE.

AND WHAT YOU'RE GOING TO LEARN IN THIS TRIAL, ONE TEST, LET'S SAY A POTASSIUM TEST, AND A LAB WANTED TO GET REIMBURSED FOR THAT POTASSIUM TEST, THERE MAY BE ONE CODE FOR POTASSIUM, BUT POTASSIUM MAY ALSO TOUCH TWO, THREE, FOUR, FIVE CODES. SO A THOUSAND CPT CODE CODES DOESN'T EQUAL A THOUSAND TESTS. EQUALS A FEW HUNDRED.

AND YOU'RE GOING TO LEARN, AS I MENTIONED, THERANOS DEVELOPED HUNDREDS OF TESTS ON ITS FINGERSTICK TECHNOLOGY. THAT'S WHAT IT WAS CAPABLE OF DOING, AND THAT'S WHAT WAS DEVELOPED BY THE SCIENTISTS.

SWITCHING GEARS AGAIN TO ADDRESS SOME OF THE ALLEGATIONS THAT THE GOVERNMENT PRESENTED, A SUMMARY OF WHAT THEY BELIEVE THE EVIDENCE IS GOING TO SHOW THAT PATIENTS AND INVESTORS WERE MISLED ABOUT THE CAPABILITIES OF THERANOS'S TECHNOLOGY.

NOW, WHAT THE ALLEGATION IN THIS CASE IS, IS THAT THERANOS'S TECHNOLOGY WAS NOT CAPABLE OF CONSISTENTLY PRODUCING ACCURATE AND RELIABLE RESULTS.  THAT'S THE ALLEGATION AT THE CORE OF THIS CASE.

AND WHAT YOU'RE GOING TO LEARN IS THAT THE FOOD AND DRUG ADMINISTRATION, THE AGENCY RESPONSIBLE FOR OVERSEEING THE SAFETY AND THE EFFICACY OF MEDICAL DEVICES, INCLUDING BLOOD TESTING MACHINES, FOUND THERANOS'S TECHNOLOGY MET THE FDA'S OWN STANDARDS, AND THAT HAPPENED IN JULY OF 2015.

ON JULY 7TH THE FDA ISSUED WHAT WAS CALLED A CLEARANCE, ALSO KNOWN AS AN APPROVAL OF AN HSV TEST, A HERPES SIMPLEX VIRUS TEST, RUN ON THERANOS'S 4.0 SYSTEM.  AND A WEEK LATER THE FDA WENT A STEP FURTHER AND GRANTED A WAIVER FOR THAT TEST RUN ON THAT TEST SYSTEM.

AND WHAT THAT MEANS IS THAT -- I PUT UP ON THE SCREEN, THIS IS A LETTER FROM THE FDA TO THERANOS IN JULY OF 2015, AFTER THERANOS SUBMITTED VOLUMINOUS DATA AND REPORTS TO FDA TO TRY TO GET THE CLEARANCE.

AND IN THE LETTER THERANOS REPORTED TO THERANOS THAT THE FDA DETERMINED THE DEVICE IS SUBSTANTIALLY EQUIVALENT TO LEGALLY MARKETED PREDICATE DEVICES.

NOW, WHAT DOES THAT MEAN IN PLAIN ENGLISH.  THAT'S THE FDA SAYING THAT THERANOS'S DEVICE IS SUBSTANTIALLY EQUIVALENT TO OTHER DEVICES RUNNING THAT BLOOD TEST THAT THE FDA ALREADY APPROVED.

THAT'S THE FDA TELLING THERANOS YOUR DEVICE MEETS OUR FDA STANDARDS FOR SAFETY AND EFFICACY THAT WE HAVE ALREADY PREVIOUSLY APPROVED FOR OTHER DEVICES. THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

A WEEK LATER THE FDA WENT EVEN FURTHER AND THEY GRANTED WHAT WAS CALLED A WAIVER, AND A WAIVER IS FOR THE WHOLE TEST SYSTEM: THAT'S FOR THE ANALYZER OR THE DEVICE, THAT'S THE SOFTWARE, AND THAT'S ALSO THE BLOOD COLLECTION DEVICES AND EQUIPMENT.

AND WHEN THE FDA GRANTED THE WAIVER, THAT WAS THE FDA TELLING THERANOS YOUR DATA LOOKS SO GOOD THAT WE, THE FDA, WE'RE SATISFIED THAT THERANOS'S DEVICE COULD BE PLACED IN A WALGREENS STORE AND A NON-LAB TRAINED TECHNICIAN COULD RUN IT ON A PATIENT, AND THE FDA BELIEVED THAT WAS SAFE AND THERE WAS A VERY LOW LIKELIHOOD OF INACCURACY. THAT'S THE FDA, THE FEDERAL GOVERNMENT'S OWN AGENCY RESPONSIBLE FOR MEDICAL DEVICES TELLING THERANOS THAT THE FDA CONCLUDED THAT THEY MET THE FDA STANDARDS.

AND AS APART OF THAT CLEARANCE AND WAIVER THAT WAS OBTAINED IN SUMMER OF 2015, THERANOS SUBMITTED ANALYSIS OF OVER 13,000 BLOOD SAMPLES TO THE FDA TO SATISFY THE FDA AND TO GET THE CLEARANCE AND APPROVAL.

13,754 SAMPLES, TO BE EXACT, RUN ON OVER 78 DEVICES TOOK A MILLION MINUTES PLUS OF RUN TIME, TESTING TIME, AND THERANOS GENERATED ALMOST 3,000 PAGES OF DOCUMENTATION AND REPORTS

PROVIDED TO THE FDA TO GET THE FDA TO GRANT THE APPROVAL AND CLEARANCE.

THAT'S WHAT YOU'LL LEARN IN THIS TRIAL.

AND THAT'S THE FDA'S CLEARANCE OF THERANOS'S TECHNOLOGY. NOT SIEMENS, NOT ANOTHER COMPANY'S, THAT'S THERANOS.

NOW, YOU'RE ALSO GOING TO LEARN THAT DURING THE TIME PERIOD THAT THE LAB WAS IN OPERATION, THERANOS USED MODIFIED COMMERCIAL DEVICES TO DO FINGERSTICK TESTING JUST LIKE THERANOS COULD DO ON ITS EDISON DEVICE, ON ITS PROPRIETARY TECHNOLOGY.

BUT SUNNY DID NOT DECEIVE THE INVESTORS ABOUT THE USE OF MODIFIED COMMERCIAL DEVICES.

THE USE OF MODIFIED COMMERCIAL DEVICES TO DO FINGERSTICK TESTING CAME ABOUT AS A RESULT OF CHANGES TO THE WALGREENS AGREEMENT AND BUSINESS MODEL AS YOU'LL SEE.

AND WHAT THOSE CHANGES WERE WAS IN THE SUMMER OF 2012, TWO YEARS AFTER THE FIRST AGREEMENT, A NEW AGREEMENT, A NEW CONTRACT, A NEW PLAN, A BUSINESS PLAN WAS DEVELOPED.  INSTEAD OF PUTTING THERANOS EQUIPMENT AND TESTING MACHINES IN WALGREENS STORES NATIONWIDE, THE NEW PLAN JUST COLLECTS SAMPLES IN THOSE STORES AND SHIP THEM ALL TO THE CENTRAL LAB AND PROCESS THEM ALL AT THE CENTRAL LAB.

THE WALGREENS BUSINESS MODEL WITH THERANOS CHANGED IN THIS TIME PERIOD.  LIKE I SAID, THE ORIGINAL AGREEMENT PUT MACHINES IN THE STORES.  THE NEW AGREEMENT JUST COLLECTED THE BLOOD IN THE STORES AND SHIPPED IT TO A CENTRAL LAB.

SER-418

BUT WHAT THIS MEANT, WAS THAT IN THAT CENTRAL LAB YOU HAD TO HAVE THE ABILITY TO PROCESS LOTS OF SAMPLES. AND AS YOU'RE GOING TO LEARN, THERANOS'S DEVICE WASN'T MADE TO DO HIGH VOLUME TESTING. IT WAS MADE TO BE PUT IN A STORE, IN A DOCTOR'S OFFICE, IN A PERSON'S HOME TO DO LOW VOLUME TESTING.

THE CHANGE IN THE WALGREENS BUSINESS MODEL IS WHAT BROUGHT ABOUT THE DECISION TO MODIFY COMMERCIAL DEVICES TO DO THE FINGERSTICK TESTING UNTIL THE FDA APPROVAL COULD BE OBTAINED FOR ALL OF THE TESTS TO PUT THE EQUIPMENT IN THE WALGREENS STORES. THAT'S HOW THE MODIFIED COMMERCIAL DEVICES CAME ABOUT, AND THAT STARTED IN THE SUMMER OF 2012 WITH THE NEW AGREEMENT.

AND LIKE I SAID, THE NEW AGREEMENT INCLUDED A NEW BUSINESS PLAN TO COLLECT SAMPLES IN THE STORES, DON'T TEST IN THE STORES, SHIP THEM TO A CENTRAL LAB AND DO THE TESTING THERE. HIGH VOLUME. THAT WAS PERMITTED UNDER THE FEDERAL REGULATIONS THAT GOVERNED LABORATORY TESTING.

THERE ARE TWO WAYS YOU CAN DO TESTING USING A PROPRIETARY TEST LIKE THERANOS'S EQUIPMENT. YOU CAN GET FDA APPROVAL WHICH WILL ALLOW YOU TO PUT IN THE LAB TO DO THE TESTING, OR YOU CAN GET A WAIVER AND EVEN PUT IT IN THE STORE, OR YOU COULD HAVE LAB EXPERTS VALIDATE THE TECHNOLOGY, VALIDATE THE TESTS, CONFIRM THAT THEY'RE ACCURATE AND RELIABLE, AND THEN YOU CAN USE YOUR OWN TECHNOLOGY WITHIN YOUR OWN LAB. IT'S CALLED AN LDT. THAT WAS THE NEW STRATEGY. COLLECT SAMPLES, SHIP THEM TO THE CENTRAL LAB, AND TEST THEM THERE USING THERANOS'S EQUIPMENT

AND USING OTHER COMPANY'S EQUIPMENT. THAT'S WHAT HAPPENED.

BUT AS I SAID BEFORE, THE CENTRAL LAB MODEL KIND OF CHANGED THERANOS'S ABILITY TO DO THE TESTING. THERANOS'S EQUIPMENT WAS CAPABLE OF DOING VOLUME IN A STORE, 10 SAMPLES, 20 SAMPLES, 30 A DAY. THAT'S WHAT IT WAS MADE TO DO.

WHEN THE AGREEMENT AND BUSINESS WITH WALGREENS CHANGED, ALL OF A SUDDEN THERANOS HAD TO SHIFT. CIRCUMSTANCES HAD TO CHANGE. THEY HAD TO CHANGE. HOW COULD THEY PROCESS THOUSANDS OF SAMPLES A DAY IN A CENTRAL LAB UNTIL THE FDA APPROVAL WAS OBTAINED TO PUT THE DEVICES IN STORES.

WELL, THE SOLUTION WAS MODIFIED COMMERCIAL DEVICES.

AND HOW THIS HAPPENED WAS -- REMEMBER, THIS IS THE SUMMER OF 2012 GOING INTO 2013, THERANOS HAD BEEN DOING FINGERSTICK TESTING BY THAT TIME PERIOD FOR YEARS. THEY HAD THE TECHNOLOGY, THE EQUIPMENT, THE CHEMISTRY, THE METHODS.

AND WHAT THEY DID IS THAT THEY APPLIED THAT KNOWLEDGE TO COMMERCIAL MACHINES THAT COULD DO HIGH VOLUME AND COMBINED THE TWO TO AN INNOVATIVE SOLUTION TO NOW DO FINGERSTICK TESTING AT A HIGH VOLUME UNTIL IT COULD GET THE FDA APPROVAL FOR THEIR OWN TECHNOLOGY. THAT'S HOW THE MODIFIED COMMERCIAL DEVICES CAME ABOUT.

AND THIS WAS INNOVATION. THERANOS SOUGHT TO PROTECT THE SCIENCE, THE EQUIPMENT DEVELOPED, THE CHEMISTRY DEVELOPED, AND THE SOFTWARE DEVELOPED BY OBTAINING PATENTS TO PROTECT IT SO THAT COMPETITORS COULDN'T STEAL IT.

SER-420

THEY OBTAINED PATENTS FOR SOME OF THE HARDWARE, SOME OF THE METHODS, AND FOR THE SOFTWARE THAT WENT INTO MODIFYING THESE COMMERCIAL DEVICES.  THAT'S HOW THAT CAME ABOUT.

INVESTORS WERE NOT MISLED ABOUT THAT FACT, AND THIS CAME ABOUT AS A RESULT OF WALGREENS'S BUSINESS RELATIONSHIP AND THE CHANGE WITH THE 2012 AGREEMENT.

NOW, YOU HEARD THE GOVERNMENT TALK ABOUT EVIDENCE RELATING TO THE WALGREENS RELATIONSHIP AND WALGREENS INTENTIONS TO PUT THERANOS TESTING IN WALGREENS STORES NATIONWIDE, AND THE GOVERNMENT SUGGESTED TO YOU THAT THE EVIDENCE IS GOING TO SHOW THAT WALGREENS WASN'T GOING TO DO IT UNTIL THE PERCENTAGE OF FINGERSTICK TESTING AT THERANOS WAS MORE THAN 90 PERCENT OR MORE.  THAT'S WHAT THE GOVERNMENT SUGGESTED IN THE OPENING.

AND WHAT I PROPOSE TO YOU THE EVIDENCE IS ACTUALLY GOING TO SHOW, IS THAT SUNNY DID NOT DECEIVE INVESTORS ABOUT THE WALGREENS ROLLOUT OR FINANCIAL MODELS BECAUSE, FIRST, WALGREENS REPRESENTED TO SUNNY OVER AND OVER AND OVER AGAIN THE FACT THAT WALGREENS INTENDED TO DO A NATIONAL ROLLOUT WITH THERANOS ALL OF THE WAY INTO 2014.

YOU'RE ALSO GOING TO LEARN THAT WHAT SUNNY TOLD INVESTORS ABOUT THE NATIONAL ROLLOUT MIRRORED WHAT WALGREENS WAS TELLING HIM AND WHAT HE BELIEVED.

IN ADDITION, THOSE MODELS THAT INVESTORS WERE GIVEN, SUNNY, WHEN HE PROVIDED THOSE MODELS TO INVENTORS, GAVE THEM THE VARIABLES, INCLUDING THE NUMBER OF STORES THAT WERE

EXPECTED TO BE NATIONWIDE IN WALGREENS STORES.  THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

AND I'LL START WITH WALGREENS, AND WALGREENS'S DECLARATION OF ITS INTENTION TO OPEN THERANOS TESTING IN WALGREENS STORES NATIONWIDE.

AND WHAT YOU'RE GOING TO SEE IS BETWEEN DECEMBER OF 2013 ALL OF THE WAY INTO 2015 WALGREENS REPORTED TO THE PUBLIC AND TO SUNNY AND ELIZABETH THAT WALGREENS INTENDED TO ROLL OUT TESTING NATIONWIDE, AND IT STARTED IN LATE DECEMBER OF 2013.

ON DECEMBER 20TH, WALGREENS ISSUED A PRESS RELEASE TO ITS OWN INVESTORS REPORTING WHAT WALGREENS BELIEVED WAS IMPORTANT FOR ITS INVESTORS TO KNOW, AND IT TOLD ITS INVESTORS THAT WITH THERANOS, THEY HAD COMPLETED THE FIRST STEP IN A, QUOTE, "NATIONAL ROLLOUT PLAN," END QUOTE.  THAT'S WALGREENS WORDS. NOT SUNNY'S, NOT ELIZABETH'S.

IT'S WALGREENS REPORTING TO THEIR INVESTORS AND THE PUBLIC THAT WALGREENS INTENDS TO GO NATIONAL.

ALMOST TWO WEEKS LATER, ON DECEMBER 31ST, 2013, THERE WAS ANOTHER CHANGE TO THE WALGREENS AGREEMENT AND CONTRACT, A LETTER AGREEMENT WAS ENTERED INTO AT THAT TIME.

AND AT THE TIME THERANOS AND WALGREENS WANTED TO SPEED UP THE NATIONAL ROLLOUT, AND WALGREENS AGREED TO PAY THERANOS AT THAT TIME $75 MILLION OUT OF $100 MILLION INNOVATION PAYMENT, AGAIN, TO SPEED THE NATIONAL ROLLOUT.

THESE TWO EVENTS ARE WALGREENS IS TELLING THE PUBLIC AND

TELLING SUNNY THAT THEY INTEND TO GO NATIONAL WITH THERANOS TESTING.

AND THROUGHOUT 2014 YOU'RE GOING TO SEE AND LEARN IN THESE MEETINGS BETWEEN WALGREENS EXECUTIVES AND THERANOS, INCLUDING SUNNY, WALGREENS CONFIRMED TO SUNNY THAT WALGREENS INTENDED TO OPEN AND CONFIRM THEIR GOAL TO OPEN 2,000 WALGREENS STORES NATIONWIDE IN 2015.  THAT WAS MAY OF 2014 WHEN THOSE REPRESENTATIONS HAPPENED.

A COUPLE OF MONTHS LATER, IN AUGUST OF 2014, AGAIN, IN THESE MEETINGS, WALGREENS EXECUTIVES CONFIRM 2,000 STORES IN 2015 WAS THEIR GOAL.

AND AGAIN, JUST TWO WEEKS LATER, MID-AUGUST 2014, WALGREENS EXECUTIVES TELLING SUNNY, WALGREENS WAS COMMITTED TO HIT 2,000 STORES IN 2015.

AGAIN, AND AGAIN, AND AGAIN WALGREENS IS TELLING SUNNY THAT THEY INTEND TO ROLL OUT THERANOS'S TESTING, AND THEY CONTINUE TO HAVE THESE DISCUSSIONS WITH SUNNY INTO 2015 TALKING ABOUT STORES IN SOUTHERN CALIFORNIA, ARIZONA, AND PENNSYLVANIA FOR THE NATIONAL ROLLOUT.

AND WHAT YOU'RE GOING TO LEARN IS CONCURRENT WITH WALGREENS TELLING SUNNY THAT WALGREENS INTENDED TO ROLL OUT NATIONALLY, SUNNY IS HAVING DISCUSSIONS WITH INVESTORS, AND SUNNY IS TELLING INVESTORS JUST WHAT WALGREENS IS TELLING SUNNY ABOUT THE NATIONAL ROLLOUT.

AND I PUT UP ON THE SCREEN A TIMELINE.  AT THE MIDPOINT --

BELOW THE MIDPOINT YOU'RE GOING TO SEE THE EVENTS THAT I JUST TALKED ABOUT WHEN WALGREENS WAS REPORTING TO THE PUBLIC AND TO SUNNY THAT THEY INTEND TO GO NATIONAL. FOR EXAMPLE, IN LATE DECEMBER 2013, THE PRESS RELEASE AND THE ROLLOUT.

CONCURRENT WITH THAT, THERANOS AND SUNNY ARE HAVING COMMUNICATIONS WITH INVESTORS, AND SOME OF THOSE INVESTORS WERE GIVEN MATERIALS ABOUT THERANOS'S PLANS WITH WALGREENS AND THE NATIONAL ROLLOUT, CONSISTENT WITH WHAT WALGREENS IS TELLING SUNNY AND ELIZABETH.

AND THEN FURTHER INTO THE YEAR, AS I MENTIONED, WALGREENS TELLING SUNNY OVER AND OVER AND OVER AGAIN THAT WALGREENS HAD THE GOAL AND INTENDED TO HIT 2,000 STORES IN 2015.

WITHIN DAYS OF WALGREENS MAKING THOSE REPRESENTATIONS TO SUNNY, SUNNY AND ELIZABETH ARE HAVING SOME DISCUSSIONS WITH INVESTORS IN THE FALL OF 2014, INCLUDING THAT MS. PETERSON, WHO YOU HEARD THE GOVERNMENT REFERENCE IN THEIR OPENING.

AT THAT TIME SUNNY SHARED WITH THEM INVESTOR MATERIALS ABOUT THE WALGREENS RELATIONSHIP AND THE NATIONAL ROLLOUT AND THE MODEL ABOUT THE POTENTIAL BUSINESS, ALL REFLECTING WHAT WALGREENS WAS TELLING SUNNY, THAT WALGREENS INTENDED TO ROLL OUT INTO 2,000 STORES NATIONWIDE. THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

SUNNY BELIEVED WALGREENS, AND THEN HE TOLD INVESTORS WHAT WALGREENS WAS TELLING HIM. THAT'S WHAT YOU'RE GOING TO LEARN IN THIS TRIAL.

SER-424

IN ADDITION, AS I MENTIONED, THE FINANCIAL MODEL THAT THE GOVERNMENT REFERENCED. SUNNY GAVE INVESTORS FINANCIAL MODELS. WHAT THOSE MODELS WERE NOT, THEY'RE NOT A FORECAST.

IT'S NOT LIKE YOU HEARD ON THE NEWS APPLE FORECASTS 2 BILLION DOLLARS NEXT QUARTER; MICROSOFT FORECASTS X BILLION DOLLARS NEXT YEAR.

THIS IS COMING FROM A STARTUP, A SMALL COMPANY LIKE THERANOS, IN A RELATIVELY NEW BUSINESS. THE INVESTORS WERE TOLD ALL OF THE VARIABLES THAT WENT INTO THOSE MODELS.

WHEN SUNNY PRESENTED THOSE MODELS TO INVESTORS, SOMETIMES HE WOULD DO IT, HE WOULD HAVE AN EXCEL SPREADSHEET, SHOOT IT UP ON THE WALL AND SHOW THE INVESTORS THE INPUTS AND THE VARIABLES INTO THE MODEL THAT WOULD CHANGE THE NUMBERS BECAUSE IT WASN'T A PROJECTION, IT WAS A MODEL.

WHEN YOU CHANGE THE INPUTS, THE NUMBERS WOULD CHANGE, AND THE INPUTS THE INVESTORS WERE TOLD WAS FIRST IN OCTOBER OF 2014 THERANOS'S TESTING WAS IN 41 STORES AT THAT POINT: 1 IN PALO ALTO AND 40 IN ARIZONA. AND THE NUMBER OF STORES, AGAIN, WAS PUBLISHED ON THERANOS'S WEBSITE.

NOW, THE INVESTORS WERE ALSO TOLD THAT THAT MODEL WAS BASED ON THE NUMBER OF STORES THAT THERANOS WOULD BE OPENING IN 2015, AGAIN, WHICH WAS REFLECTED BY WHAT WALGREENS WAS TELLING SUNNY.

IN ADDITION, THE MODEL STARTED, WITH RESPECT TO RETAIL INCOME FROM THE WALGREENS RELATIONSHIP, AT ZERO. THE MODEL

SER-425

REFLECTED NO INCOME FROM ANY WALGREENS BUSINESS UP UNTIL OCTOBER OF 2014. THERE WAS NO MISREPRESENTATION TO INVESTORS THAT THERANOS WAS GOING TO MAKE $240 MILLION OR $140 MILLION IN 2014.

THE MODEL IN OCTOBER OF 2014 STARTED AT ZERO RETAIL INCOME. THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

AND WHAT YOU'RE ALSO GOING TO LEARN IS THAT SUNNY BELIEVED WHAT WALGREENS WAS TELLING HIM ABOUT THE NATIONAL ROLLOUT, BUT HE TOOK STEPS TO MAKE IT HAPPEN. THAT'S HOW YOU'RE GOING TO KNOW WHAT WAS IN SUNNY'S MIND AT THE TIME.

IN LATE 2014 THERANOS HAD ITS LABORATORY IN NEWARK, CALIFORNIA AND ONE STATION CENTER IN PALO ALTO.

IN THE 2014 TIME PERIOD, WHEN THESE COMMUNICATIONS AND DISCUSSIONS ARE HAPPENING WITH WALGREENS ABOUT HITTING 2,000 STORES NATIONWIDE, IN THAT TIME PERIOD THERANOS DEVELOPED A STRATEGY OF TARGETING 1500 PATIENT OFFICES, A WHOLE SALES TEAM TO EXPAND THERANOS'S TESTING FOOTPRINT.

IN THIS TIME PERIOD THERANOS OPENED A SECOND LAB, A SECOND LAB. YOU DIDN'T HEAR THE GOVERNMENT TALK ABOUT THAT.

THERE WAS THE NEWARK LAB WHERE ADAM ROSENDORFF WAS THE LABORATORY DIRECTOR.

THERE WAS A SECOND LAB OPENED IN LATE 2014 BY THERANOS IN ANTICIPATION, AGAIN, OF THE NATIONAL ROLLOUT.

IN ADDITION, IN JANUARY OF 2015 THERANOS SIGNED A LEASE, A CONTRACT, AND STARTED BUILDING A THIRD LAB IN PENNSYLVANIA,

AGAIN, IN ANTICIPATION OF THE NATIONAL ROLLOUT AS WALGREENS WAS TELLING SUNNY.

SO YOU'LL SEE AND LEARN IN THIS TRIAL SUNNY'S ACTIONS SHOW YOU WHAT HE BELIEVED, AND HE BELIEVED WHAT WALGREENS WAS TELLING HIM.

I'M GOING TO SHIFT A LITTLE BIT AND SAY A FEW WORDS ABOUT THE DEPARTMENT OF DEFENSE. THE GOVERNMENT REFERENCED POTENTIAL OR ALLEGED MISREPRESENTATIONS TO INVESTORS ABOUT THERANOS'S BUSINESS WITH THE DEPARTMENT OF DEFENSE. THEY TALKED ABOUT HELICOPTERS AND OTHER THINGS.

FIRST, YOU'LL LEARN IN THIS TRIAL THAT THERANOS HAD RELATIONSHIPS WITH THE DEPARTMENT OF DEFENSE, WITH MULTIPLE ELEMENTS OF THE DEPARTMENT OF DEFENSE: THE U.S. ARMY BURN CENTER; THEY HAD A RELATIONSHIP WITH THE SPECIAL OPERATIONS COMMAND; THEY HAD A RELATIONSHIP WITH THE U.S. AFRICA COMMAND; AND A RELATIONSHIP WITH THE U.S. CENTRAL COMMAND. THAT WAS REAL. SOME OF THAT PREEXISTED SUNNY'S JOINING THERANOS.

BUT WHAT IS IMPORTANT FOR YOU TO KNOW IS THAT INVESTORS WERE TOLD ABOUT THOSE RELATIONSHIPS, THEY WERE TOLD THOSE RELATIONSHIPS WERE ON PAUSE. THERANOS WAS NOT INTENDING TO MAKE ANY MONEY FROM THOSE RELATIONSHIPS BECAUSE THE FOCUS WAS ON RETAIL. THE FOCUS WAS ON WALGREENS AND THE NATIONAL ROLLOUT.

AND THE WAY YOU KNOW THAT THERANOS TOLD AND SUNNY TOLD INVESTORS THAT THEY DIDN'T INTEND TO MAKE ANY MONEY FROM THE

DEPARTMENT OF DEFENSE RELATIONSHIPS IS THAT IN THOSE MODELS THAT THE GOVERNMENT POINTED TO IN THEIR OPENING, THERE WAS A LINE ITEM, THERE IS AN ENTRY FOR DEPARTMENT OF DEFENSE.

AND FOR 2014 AND 2015, THE MODEL GIVEN TO INVESTORS SHOWED ZERO. ZERO. IT WASN'T PROJECTING ANYTHING OR MODELING ANYTHING BECAUSE SUNNY TOLD THE INVESTORS THAT THEY HAD RELATIONSHIPS WITH THE DOD. THEY WERE INTERESTING RELATIONSHIPS THAT DEMONSTRATE HOW THERANOS'S TECHNOLOGY COULD BE USED, BUT THEY WEREN'T PLANNING TO MAKE MONEY FROM IT. IT WASN'T A FOCUS.

SO INVESTORS WERE TOLD "TO BE DECIDED" REGARDING THE DEPARTMENT OF DEFENSE.

NOW, ANOTHER ELEMENT IN THE CASE HERE, AND THE GOVERNMENT REFERENCED IT IN ITS OPENING, THE SUGGESTION THAT INVESTORS, BUT MOSTLY PATIENTS ON THIS FRONT, WERE DECEIVED ABOUT THE CAPABILITIES AND ACCURACY AND RELIABILITY OF THERANOS'S TESTS.

AND WHAT THE EVIDENCE IS GOING TO SHOW IS THAT SUNNY DID NOT DECEIVE PATIENTS ABOUT THE ACCURACY AND RELIABILITY OF TESTS. AND SO THE EVIDENCE THAT IS GOING TO SHOW THAT IS FIRST DR. ROSENDORFF, THAT YOU HEARD THE GOVERNMENT REFERENCE IN OPENING STATEMENT, WAS THE LAB DIRECTOR IN THE NEWARK LAB IN 2013 AND 2014.

DR. ROSENDORFF VALIDATED AND APPROVED THE USE OF ALL FINGERSTICK TESTS IN THERANOS'S LAB BECAUSE THAT WAS HIS JOB AS LAB DIRECTOR. HE WAS TRAINED. HE WAS A MEDICAL DOCTOR.

SER-428

SUNNY DID NOT APPROVE THE USE OF THOSE TESTS ON PATIENTS, AND ELIZABETH DIDN'T APPROVE THE USE OF THOSE TESTS ON PATIENTS. DR. ROSENDORFF DID. THAT'S WHAT YOU'LL LEARN IN THIS TRIAL.

IN ADDITION, AFTER ROSENDORFF QUIT, AND THAT'S WHAT HE DID IS QUIT IN NOVEMBER OF 2014, SUNNY IDENTIFIED A REPLACEMENT ONSITE LAB DIRECTOR FOR ROSENDORFF.

HE DIDN'T HIRE AM ABSENTEE LAB DIRECTOR WHO HE WANTED TO OVERSEE THE LAB. IT WAS IMPORTANT FOR SUNNY TO HAVE A PERMANENT ONSITE LAB DIRECTOR.

AND DURING THAT TIME PERIOD WHILE HE WAS WAITING FOR THE NEW LAB DIRECTOR TO BE ABLE TO TAKE OVER, HE HIRED DR. DHAWAN, WHO YOU HEARD THE GOVERNMENT REFERENCE.

HE ALSO HIRED ANOTHER LAB DIRECTOR, LYNETTE SAWYER.

NOW, DR. DHAWAN WAS QUALIFIED. HE WAS A MEDICAL DOCTOR. HE WENT TO MEDICAL SCHOOL. BUT HE WAS TEMPORARY, A TEMPORARY REPLACEMENT FOR ROSENDORFF IN THE NEWARK LAB WHILE SUNNY WAITED FOR THE PERMANENT LAB DIRECTOR TO BE READY TO TAKE OVER. THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

NOW, A LITTLE BIT ABOUT DR. ROSENDORFF, WHO SUNNY AND ELIZABETH RELIED UPON TO RUN THE LABORATORY.

ROSENDORFF WAS A WELL-QUALIFIED LAB DIRECTOR. HE WENT TO MEDICAL SCHOOL AT MOUNT SINAI SCHOOL OF MEDICINE IN NEW YORK; HE DID FIVE YEARS OF POST-DOCTORAL RESEARCH AT HARVARD; FORMER PROFESSOR OF PATHOLOGY AT UNIVERSITY OF PITTSBURGH; HE HAD FOUR

AND A HALF YEARS OF EXPERIENCE AS A MEDICAL DIRECTOR AT CHILDREN'S HOSPITAL AT PITTSBURGH.  WELL-QUALIFIED ACCORDING TO WHAT SUNNY SAW, AND THAT'S WHY DR. ROSENDORFF WAS HIRED.

AND DR. ROSENDORFF, AS I MENTIONED, REVIEWED AND APPROVED ALL FINGERSTICK TESTS USED ON PATIENTS.  I PUT UP ON THE SCREEN, THIS IS AN EXAMPLE, THIS IS THE FIRST PAGE OF ONE OF THOSE VALIDATION REPORTS.

AND WHAT A VALIDATION REPORT IS A STUDY DONE BY SCIENTISTS IN THE LAB THROUGH PATIENT SAMPLES TO VERIFY THE ACCURACY AND RELIABILITY OF THE TESTS BEFORE THE TEST WAS USED ON PATIENTS. AND THIS IS PREPARED BY TWO SCIENTISTS WHO SIGNED OFF, REVIEWED BY THREE PH.D.'S IN THE MIDDLE THAT YOU SEE THERE WHO REVIEWED THE TECHNOLOGY, REVIEWED THE DATA, AND THEN REVIEWED AND APPROVED BY ADAM ROSENDORFF BEFORE THE TESTS WERE EVER USED ON PATIENTS.  THAT'S WHAT THE EVIDENCE IS GOING TO SHOW.

SUNNY DID NOT VALIDATE AND APPROVE THOSE TESTS.  HE'S NOT QUALIFIED.  SUNNY IS A SOFTWARE COMPUTER GUY.  HE RELIED ON ROSENDORFF TO VALIDATE THOSE TESTS AND APPROVE THOSE TESTS AND MONITOR THE ACCURACY AND RELIABILITY OF THE TESTING FOR PATIENTS.

AND WE EXPECT ROSENDORFF WILL TESTIFY IN THIS TRIAL, AND HE'LL TELL YOU THAT THE VALIDATION STUDIES FOR THE FINGERSTICK TESTS MET HIS, ROSENDORFF'S, STANDARDS.  NOT SUNNY'S OR ELIZABETH'S, THEY'RE NOT REQUIRED TO DO THAT.

ROSENDORFF WILL TELL YOU THAT THE TESTS AND VALIDATION

REPORTS MET HIS STANDARDS.

WE ALSO BELIEVE THAT ROSENDORFF WILL ALSO TELL YOU THAT WHEN HE WAS RUNNING THE LAB, HE NEVER OFFERED A TEST THAT HE BELIEVED WAS UNRELIABLE. AGAIN, HE WAS THE LAB DIRECTOR, NOT SUNNY, NOT ELIZABETH. NEITHER OF THEM ARE QUALIFIED TO MAKE THOSE DETERMINATIONS.

ROSENDORFF WAS, AND HE WILL TELL YOU HE BELIEVED HE NEVER OFFERED A TEST THAT HE THOUGHT WAS UNRELIABLE AT THE TIME.

DURING THIS TIME PERIOD SUNNY HIRED HELP FOR ROSENDORFF. HE WASN'T LEFT ALONE IN THE LAB TO RUN THE LAB.

DR. PANDORI YOU HEARD THE GOVERNMENT REFERENCE. DR. PANDORI WILL TESTIFY HE WAS A CO-LAB DIRECTOR HIRED BY SUNNY AND ELIZABETH AT DR. ROSENDORFF'S AGREEMENT TO HELP HIM RUN THE LAB.

ANOTHER INDIVIDUAL HIRED BY SUNNY AND ELIZABETH AND AGREED UPON BY DR. ROSENDORFF, WAS A GUY NAMED LANGLY GEE WHO WAS IN CHARGE OF QUALITY CONTROL AT THERANOS. SUNNY WASN'T INVOLVED OF QUALITY CONTROL, AND ELIZABETH WASN'T INVOLVED OF QUALITY CONTROL. ROSENDORFF AND LANGLY GEE WERE IN CHARGE OF QUALITY CONTROL BECAUSE THEY KNEW HOW TO RUN A LAB. NOT SUNNY.

IN ADDITION, DR. ROSENDORFF QUIT IN NOVEMBER OF 2014 AFTER HE GOT ANOTHER JOB. AND WHEN HE QUIT, HE DIDN'T GO TO AUTHORITIES. HE DIDN'T GO TO THE FBI. HE DIDN'T GO TO CMS OR CALIFORNIA REGULATORS. HE TALKED TO A REPORTER ONCE LATER, THAT'S WHAT HE DID. THAT'S WHAT YOU'LL LEARN IN THIS TRIAL.

AND AS I MENTIONED, AFTER ROSENDORFF QUIT. SUNNY IDENTIFIED A PERMANENT ONSITE LAB DIRECTOR TO TAKE OVER BECAUSE HE BELIEVED IT WAS IMPORTANT TO HAVE A PERMANENT ONSITE LAB DIRECTOR. HE DIDN'T WANT AN ABSENTEE LAB DIRECTOR. AND THE PERSON HE IDENTIFIED WAS DR. SURAJ SAKSENA.

DR. SAKSENA WAS A PH.D. IN BIOCHEMISTRY. HE WORKED AT THERANOS SINCE 2011 IN THE LAB. SUNNY ASKED SAKSENA TO BECOME LAB DIRECTOR AS SOON AFTER ROSENDORFF QUIT.

AND BECAUSE IT WAS SO IMPORTANT TO SUNNY TO HAVE A PERMANENT ONSITE FULL-TIME LAB DIRECTOR, SUNNY PAID DR. SAKSENA TIME OFF. HE GAVE HIM PAID LEAVE TO STUDY FOR AN EXAM THAT SAKSENA NEEDED TO BECOME LAB DIRECTOR, AND SAKSENA DID JUST THAT. HE STUDIED FOR MONTHS AND TOOK THE EXAM IN MAY OF 2015 AND PASSED THE EXAM WITH HIGH SCORES.

AND ON MAY 21ST, DR. SAKSENA SUBMITTED HIS APPLICATION TO BECOME THE NEW LAB DIRECTOR OF THE NEWARK LAB, JUST AS SUNNY PLANNED.

AND THEN DR. SAKSENA AND SUNNY WAITED FOR CALIFORNIA AUTHORITIES TO RESPOND TO THE APPLICATION, AND THEY WAITED, AND THEY WAITED, AND THEY WAITED A LITTLE MORE UNTIL MARCH OF 2016. TEN MONTHS LATER CALIFORNIA AUTHORITIES RESPONDED TO THAT APPLICATION, BUT BY THEN IT WAS TOO LATE. IT DIDN'T MATTER. BY THAT TIME THERE WERE NEW CONSULTANTS RUNNING THE LAB, A NEW LAB DIRECTOR.

BUT THAT WASN'T SUNNY'S INTENT IN 2015 AFTER ROSENDORFF

QUIT.  SAKSENA WAS GOING TO BE THE NEXT PERMANENT ONSITE LAB DIRECTOR.

IN ADDITION, WHEN ROSENDORFF LEFT THERANOS, THINGS WERE CHANGING AT THE TIME.

AS I MENTIONED, A NEW LAB OPENED IN ARIZONA.  THAT LAB HAD ITS OWN LAB DIRECTOR, DR. DANIEL YOUNG.  AND SO THINGS WERE GOING TO BE CHANGING AT THERANOS DURING THAT TIME PERIOD.

SO ROSENDORFF QUIT IN NOVEMBER.

AT THE SAME TIME THE NEW LAB WAS OPENING.

SAKSENA WAS TOUTED TO BECOME THE NEW LAB DIRECTOR IN NEWARK.

DR. YOUNG WAS THE NEW LAB DIRECTOR IN ARIZONA AND WAS EXPECTING GOING FORWARD PATIENT VOLUME SAMPLES WERE GOING TO BE SPLIT BETWEEN THE TWO LABS, AND THAT'S WHEN SUNNY HIRED DHAWAN AND SAWYER TO BECOME THE TEMPORARY LAB DIRECTORS IN NEWARK.

NOW, AS I MENTIONED, YOU KNOW, ROSENDORFF QUIT IN NOVEMBER OF 2014.

DHAWAN AND SAWYER -- DR. DHAWAN -- WERE HIRED SOON AFTER TO BE TEMPORARY LAB DIRECTORS IN NEWARK.  THEY WERE BOTH QUALIFIED.

DR. DHAWAN WENT TO MEDICAL SCHOOL JUST LIKE DR. ROSENDORFF.  HE ACTUALLY WENT TO U.S.C.  HE TAUGHT AT MEDICAL SCHOOLS.  HE HAD HIS OWN LAB, SUPPORTING HIS OWN PRACTICE.  AND DERMATOLOGISTS ARE REAL DOCTORS.  THEY HANDLE REAL MEDICAL ISSUES LIKE SKIN CANCER.  THEY'RE NOT PRETEND.

AND THAT'S WHO SUNNY TAPPED TO BE A TEMPORARY LAB DIRECTOR, AS WELL AS DR. SAWYER WHO IS EXPERIENCED.

BUT YOU'RE GOING TO LEARN MORE ABOUT HOW LABS OPERATE IN THIS TRIAL THAN YOU EVER WANTED TO KNOW.

AND THE LAB DIRECTOR IS NOT THERE RUNNING THE TESTS. HE'S NOT EVEN OVERSEEING OR HE'S NOT EVEN PERSONALLY EVER MANAGED OR MANAGING THE TESTING.

THE LAB DIRECTOR IS LIKE A CEO. HE'S WAY UP HERE MAKING POLICY DECISIONS, GETTING QUESTIONS AND ISSUES, AND POLICY ISSUES FROM THE STAFF. HE'S NOT THERE RUNNING THE LAB DAY-TO-DAY DOING THE ACTUAL TESTING.

IN FACT, CALIFORNIA REGULATIONS AT THAT TIME PERMITTED ONE LAB DIRECTOR TO RUN UP TO FIVE LABS.

SO THE RULES AND REGULATIONS AT THE TIME PERMITTED PART-TIME LAB DIRECTORS.

SUNNY DIDN'T WANT A PART-TIME LAB DIRECTOR, BUT HE HIRED TWO OF THEM TEMPORARILY UNTIL DR. SAKSENA COULD GET APPROVED TO BE THE LAB DIRECTOR. THAT'S WHAT THE EVIDENCE WILL SHOW.

AND AGAIN, THEY'RE BOTH TEMPORARY. AND YOU KNOW THEY WERE TEMPORARY NOT BECAUSE YOU'RE GOING TO HEAR THAT. MAYBE THEY'LL SAY IT, MAYBE NOT. THE CONTRACTS THAT THEY SIGNED, SIX MONTH CONTRACTS, CONSULTING AGREEMENT. THEY WERE NEVER GOING TO BE THE PERMANENT ONSITE LAB DIRECTORS. THAT WASN'T THE INTENT.

NOW, LET ME SAY A FEW WORDS ABOUT THIS. THE GOVERNMENT REFERENCED CMS, CENTERS FOR MEDICARE AND MEDICAID SERVICES.

THEY'RE THE REGULATORS THAT OVERSEE LAB TESTING IN THE UNITED STATES.

IN SEPTEMBER OF 2015 CMS DID AN INSPECTION, AN AUDIT OF THERANOS'S LAB. BUT THAT INSPECTION, THAT AUDIT, IT WASN'T A SURPRISE. IT WASN'T LIKE A GOTCHA MOMENT. IT WAS AN EVERY-TWO-YEAR-SCHEDULED RECERTIFICATION OF THE LAB.

SUNNY KNEW THEY WERE COMING. HE SPOKE TO THE INSPECTORS BEFORE THEY CAME AND PROVIDED THEM DOCUMENTATION, DID SOME THINGS TO TRY TO PREPARE FOR THE INSPECTION, SO MOCK AUDITS AND INSPECTIONS TO GET READY.

THE INSPECTION HAPPENED BUT THE MOST IMPORTANT THING AND THE TAKEAWAY HERE THAT YOU'RE GOING TO LEARN IN THE TRIAL IS THAT CMS DID NOT EVALUATE THE ACCURACY AND RELIABILITY OF THERANOS'S TESTING TECHNOLOGY. THAT'S NOT WHAT CMS DOES.

IF THE GOVERNMENT CALLS A CMS WITNESS TO TESTIFY BEFORE YOU, THAT PERSON WILL TELL YOU CMS DOES NOT EVALUATE THE ACCURACY AND RELIABILITY OF THERANOS'S TECHNOLOGY OR ANY OTHER LAB'S TECHNOLOGY. THAT'S NOT WHAT CMS DOES.

AND THAT'S WHAT YOU'LL LEARN IN THIS TRIAL.

NOW, WE SPOKE A LOT ABOUT EVIDENCE THAT IS GOING TO SHOW THAT SUNNY HAD NO INTENT TO CHEAT INVESTORS OUT OF THEIR MONEY. AGAIN, THIS CASE IS ABOUT WIRE FRAUD. HE NEVER TOOK ANY MONEY INAPPROPRIATELY, NEVER MISDIRECTED THE USE OF INVESTOR MONEY.

AND YOU'RE GOING TO LEARN THAT THE INVESTOR MONEY WENT FOR ITS INTENDED PURPOSES, TO DO EXACTLY WHAT INVESTORS WANTED,

BUILD THE BUSINESS OF THERANOS.

YOU'RE GOING TO SEE UP ON THE SCREEN THERANOS'S MANUFACTURING FACILITIES WHERE THEY MADE THE ANALYZERS AND EQUIPMENT, THEIR RESEARCH AND DEVELOPMENT FACILITY, INVESTORS WANTING TO BUILD THE TWO LABS AND THE THIRD LAB. PAID THE HUNDREDS OF LABORATORY SCIENTISTS, THE RESEARCH AND DEVELOPMENT SCIENTISTS, AND THAT'S WHERE THE INVESTOR MONEY WENT. IT DID NOT GO INTO SUNNY'S POCKET.

THE GOVERNMENT SUGGESTED THAT SUNNY'S STOCK WAS WORTH HALF A BILLION DOLLARS. YEAH. AND HE COULD HAVE SOLD SOME, BUT HE DIDN'T. HE NEVER DID.

AGAIN, SUNNY LEFT THERANOS IN MAY OF 2016. AND WHEN SUNNY LEFT THERANOS, HE HAD HUNDREDS OF MILLIONS OF DOLLARS, INVESTOR MONEY, SITTING IN THE BANK. THAT'S WHEN HE LEFT.

WHEN SUNNY LEFT THERANOS, THERANOS HAD VALUABLE INTELLECTUAL PROPERTY, PATENTS, ITS FINGERSTICK TECHNOLOGY, IT HAD TWO OPERATING CLINICAL LABS AND ANOTHER LAB BUILT IN HARRISBURG, PENNSYLVANIA, ALL THERE IN MAY OF 2016 WHEN SUNNY LEFT. THE MONEY WAS THERE, THE BUSINESS WAS THERE THAT WAS BUILT WITH INVESTOR MONEY, AND SUNNY WALKED AWAY WITH NOT A DOLLAR IN HIS POCKET FROM THERANOS.

HE NEVER SOLD THE STOCK. HE NEVER TOOK ANY MONEY.

NOW, I'M GOING TO SHIFT AGAIN TO MY LAST SUBJECT. AND WHAT YOU'RE GOING TO LEARN IN THIS CASE IS, AS I MENTIONED, THE CORE ALLEGATIONS IN THE GOVERNMENT'S CHARGES IS THAT THERANOS'S

SER-436

TECHNOLOGY WAS NOT CAPABLE OF CONSISTENTLY PRODUCING ACCURATE AND RELIABLE RESULTS. THAT IS THE CORE ALLEGATION.

AND THE EVIDENCE IS GOING TO SHOW THAT THE GOVERNMENT, IN TRYING TO PROVE THAT, NEVER OBTAINED OVER THREE YEARS OF PATIENT TESTING DATA AND EVIDENCE, ESSENTIALLY PATIENT RECORDS, AND ANALYZED THAT TO PROVE THE GOVERNMENT'S CASE.

NOW, ONE THING YOU'RE GOING TO LEARN, BEFORE I TALK ABOUT THE DETAILS OF THAT, IS ALL CLINICAL LABORATORIES EXPERIENCE VARIABILITY AND ERROR RATES.

SOME OF THE GOVERNMENT'S WITNESSES WHO ARE GOING TO TESTIFY, THEY'RE GOING TO TELL YOU, ALL LABORATORIES EXPERIENCE VARIABILITY AND ERROR RATES. IT'S EVEN BUILT INTO THE SYSTEM.

AND IF THAT IS THE CASE, WHAT DOES ONE POTENTIAL ERROR OR QUESTION ABOUT A TEST OR AN EMAIL ABOUT QUALITY CONTROL THAT FAILED MEAN ABOUT THE ACCURACY AND RELIABILITY OF THE TECHNOLOGY AND EVERYTHING IT DOES?

BECAUSE YOU'LL ALSO LEARN THAT CLIA, THE CLINICAL LABORATORY IMPROVEMENT AMENDMENTS -- I KNOW THAT'S A MOUTHFUL. THE GOVERNMENT REFERENCED IT. YOU JUST NEED TO KNOW THAT THESE ARE THE REGULATIONS THAT GOVERN, OVERSEE CLINICAL LABS. THE REGULATIONS PERMIT VARIABILITY AND ERROR SOMETIMES 5 PERCENT, SOMETIMES 10, 15, 20 PERCENT, ALL UP TO 30 PERCENT FOR SOME TESTS.

AND AGAIN, IF THAT'S WHAT IS EXPECTED OR EVEN PERMITTED FOR SOME TESTS, NOT ALL, BUT SOME, WHAT DOES ANY ONE ERROR

SER-437

MEAN, TWO, THREE, FOUR, FIVE AMONGST TENS OF THOUSANDS, HUNDREDS OF THOUSANDS MAYBE BILLIONS OF PATIENT RESULTS?

AND I RAISE THAT BECAUSE, AS I MENTIONED BEFORE, WHEN THERANOS OBTAINED IT'S FDA APPROVAL AND CLEARANCE IN JULY OF 2015, THERANOS SUBMITTED TO FDA 13,754 PATIENT SAMPLES AND CARTRIDGES AND ANALYSIS AND DATA TO PROVE TO FDA SATISFACTION THAT THERANOS'S TECHNOLOGY MET FDA'S STANDARDS FOR SAFETY AND ACCURACY.

BUT WHAT YOU'RE GOING TO LEARN IS THAT IN TRYING TO PROVE THEIR CASE HERE, THE GOVERNMENT DIDN'T DO ANY OF THAT KIND OF ANALYSIS TO PROVE THERANOS'S TECHNOLOGY DOES NOT WORK, THAT MAYBE THE FDA GOT IT PRONG.  THEY DIDN'T DO THAT.

AND YOU'RE GOING TO LEARN ABOUT SOMETHING IN THIS CASE CALLED THE LABORATORY INFORMATION SYSTEM, THE LIS.

AND WHAT THE LIS WAS, IT WAS A DATABASE AT THERANOS, WHAT'S CALLED A MICROSOFT SQL SERVER DATA THAT WAS CREATED BY THERANOS.  AND THIS IS WHERE THERANOS ELECTRONICALLY STORED ALL OF THEIR PATIENT TESTING RESULTS, DATA AND RELATED RECORDS FOR THERANOS'S CLINICAL LABORATORY FOR OVER THREE YEARS.

AND WHEN I SAY THE LIS CONTAINED ALL OF THERANOS'S LAB TESTING DATA, I MEAN ALL, EVERY SHRED OF FACTS AND DETAILS ANYONE WOULD EVER WANT TO KNOW;

EVERYTHING ABOUT THE PATIENT, THEIR NAME, WHAT THEIR DOCTOR ORDERED, THEIR VISIT HISTORY, WHAT THEIR TESTS LOOK LIKE FOR AS LONG AS THEY TESTED AT THERANOS AND OTHER DETAILS;

SER-438

WHERE THE BLOOD COLLECTION WAS TAKEN, WHICH SITE, WHAT DATE AND TIME;

WHO WAS THE PERSON WHO DREW THE BLOOD OR TOOK THE FINGERSTICK SAMPLE. DID THAT PERSON HAVE PROBLEMS IN THEIR HISTORY? THE CONTAINER WAS MARKED WITH A SERIAL NUMBER, AND YOU COULD TRACK IT THROUGH THE SYSTEM;

IT INCLUDED THE TIME THE BLOOD WAS COLLECTED AND WHEN IT WAS RECEIVED AT THE LAB;

THE LIS CONTAINED INFORMATION ABOUT WHICH LAB RAN THE TEST. WAS IT IN NEWARK OR WAS IT IN ARIZONA?

WHO WAS THE TECHNICIAN THAT RAN THE TEST? THAT WAS IN THE LIS.

IF YOU WANTED TO SEE IF THERE WAS A SAMPLE OR WHETHER IT WAS CLOTTING OR SOMETHING WRONG WITH IT, THAT WAS IN LIS.

WHEN THE TEST WAS RUN, IF THERE WAS A REQUEST THAT THERE MIGHT HAVE BEEN A PROBLEM, MAYBE THEY WOULD RERUN THE TEST OR ASK THE PATIENT FOR A NEW SAMPLE, THAT WAS IN LIS.

WHICH DEVICE WAS USED TO RUN THE TEST? AND I DON'T MEAN THERANOS DEVICE OR COMMERCIAL DEVICE. I MEAN EXACTLY WHICH DEVICE BY SERIAL NUMBER WAS USED TO RUN THAT PATIENT TEST? THAT WAS IN LIS.

IF YOU WANTED TO CHECK WHAT QUALITY CONTROL LOOKED LIKE THAT DAY WHEN A PATIENT SAMPLE WAS RUN, THAT WEEK, THAT MONTH, THAT YEAR, THAT WAS IN LIS.

PROFICIENCY TESTING DATA, ALL IN LIS.

SER-439

THE ULTIMATE RESULTS, WHETHER THERE WERE ANY RED FLAGS, ALL OF THAT INFORMATION WAS IN THE LIS.

AND YOU'RE ALSO GOING TO LEARN IN THE COURSE OF THIS TRIAL HOW THE LIS WAS USED TO FOLLOW UP ON PATIENT QUESTIONS OR DOCTOR QUESTIONS.

IF A PATIENT CALLED UP AND HAD A QUESTION ABOUT A PREGNANCY TEST OR ANOTHER TEST THAT DIDN'T SEEM RIGHT, AND THE RESULT DOESN'T SEEM RIGHT, CAN YOU LOOK INTO IT?

SOMEONE IN THE LAB QUESTIONS A RESULT OR QUALITY CONTROL, HOW CAN WE FIGURE OUT WHAT WENT WRONG?

LIS IS WHERE THEY WENT. THEY WOULD PULL UP THE NAME OF THE CUSTOMER OR PATIENT; WHO THE DOCTOR WAS; YOU COULD LOOK AT THE PATIENT'S HISTORY AND COMPARE THE RESULTS; YOU COULD FIGURE OUT WHERE THE COLLECTION WAS TAKEN; WHO RAN THE TEST; WAS THAT PERSON GOOD AT THEIR JOB, MAYBE THEY MADE A MISTAKE IN DRAWING THE BLOOD; WHICH CONTAINER WAS USED, AGAIN, WHICH DEVICE; WHICH LAB RAN THAT TEST; WHAT QUALITY CONTROL THAT DAY, MONTH OR YEAR.

HOW ABOUT COMPARING THAT PREGNANCY TEST WITH EVERY OTHER ONE RAN THAT DAY, THAT MONTH OR YEAR TO SEE IF THERE WERE ISSUES WITH THAT DEVICE OR ALL OF THE DEVICES? THAT'S HOW LIS WAS USED.

BUT NONE OF THAT KIND OF ANALYSIS WAS DONE BY THE GOVERNMENT TO PROVE THEIR ALLEGATION THAT THERANOS'S TECHNOLOGY WAS NOT CAPABLE OF CONSISTENTLY PRODUCING ACCURATE AND RELIABLE

SER-440

RESULTS.

AND WHAT YOU'RE GOING TO LEARN IS AFTER TWO YEARS OF INVESTIGATING FROM 2016 INTO 2018, IN OR ABOUT MAY 23RD OF 2018, THE INVESTIGATORS AND PROSECUTORS IN THIS CASE HAD A COMMUNICATION WITH THERANOS'S LAWYERS.  AND THERE WAS A REQUEST FROM THERANOS OF A COPY OF THE LIS.

BUT TWO WEEKS LATER THE GOVERNMENT DIDN'T WAIT TO GET A COPY OF THE LIS.  THEY SUBPOENAED THE LIS.

AND THEN TEN DAYS AFTER THAT THEY INDICTED SUNNY BALWANI. THEY SUBPOENAED THE LIS BUT DIDN'T GET IT, DIDN'T DO ANY ANALYSIS, AND THEN INDICTED SUNNY WITH AN ALLEGATION THAT THERANOS'S TECHNOLOGY WAS NOT CAPABLE OF CONSISTENTLY PRODUCING ACCURATE AND RELIABLE RESULTS.

THE COPY FROM THERANOS'S LAWYERS ARRIVED TWO MONTHS LATER ON ONE OF THOSE LITTLE PORTABLE USB DRIVES.  BUT THE GOVERNMENT TECHNOLOGIST HAD PROBLEMS OPENING IT, AND THE DEPARTMENT OF JUSTICE LEARNED THAT THEY COULDN'T OPEN THE HARD DRIVE TO LOOK AT THE DATA.  AND THAT CONTINUED UNTIL OCTOBER 5TH.

AND ANOTHER TECHNOLOGY SPECIALIST AT THE GOVERNMENT TOLD THE INVESTIGATORS AND PROSECUTORS IN THIS CASE THAT THEY COULDN'T OPEN THE LIS, YOU SHOULD JUST GO GET THE SERVERS FROM THERANOS THAT HOUSED THE HARD DRIVES.  AND AT THAT TIME THE SERVERS WERE IN STORAGE.

BUT YOU'LL LEARN THAT THE GOVERNMENT NEVER OBTAINED THE LIS, AND THEY NEVER DID ANY OF THAT ANALYSIS, ANALYSIS KIND OF

SER-441

LIKE WHAT THERANOS DID TO SHOW THE FDA THAT THERANOS'S DEVICE MET FDA STANDARDS.

AND THE REASON I MENTION ALL OF THIS IS THAT YOU'RE GOING TO LEARN, AND AS I SHOWED YOU, THERANOS'S TEST MENU, THERANOS OFFERED UP TO 269 TESTS TO THE PUBLIC ON ITS MENU.

THE INDICTMENT IN THIS CASE REFERENCED THREE PATIENTS, THREE PATIENTS, THREE TESTS. AND 269 TESTS WERE OFFERED ON THERANOS'S MENU.

IN THE THREE-PLUS YEARS THAT THERANOS WAS IN OPERATION, THERANOS RESULTED, REPORTED 9 MILLION PATIENT RESULTS, 9 MILLION OVER THE THREE AND A HALF-PLUS YEARS.

THE GOVERNMENT ALLEGES, AGAIN, THREE PATIENTS IN THE INDICTMENT, THREE TESTS, THREE RESULTS.

BUT WHAT YOU'RE GOING TO LEARN EVEN ABOUT THOSE THREE PATIENTS WHO WILL COME AND TESTIFY BEFORE YOU, FOR ONE OF THOSE PATIENTS NOT ONLY DID THE GOVERNMENT DO AN ANALYSIS OF THE TESTING THAT THAT PATIENT UNDERWENT OR WHAT DATA LOOKED LIKE WITHIN THERANOS WHEN THAT PATIENT GOT TESTED, THE GOVERNMENT DOESN'T EVEN HAVE THAT PATIENT'S FIRST TEST RESULT, THE LITTLE REPORT THAT THE PATIENT CLAIMS WAS WRONG, WHICH THAT'S NO FAULT OF THE PATIENT, I MEAN, THEY THINK THERE'S AN ISSUE WITH THE TEST, THAT'S FINE.

AND YOU'LL LEARN THE THING TO DO TO FIGURE OUT WHETHER THERE'S A REAL PROBLEM WITH THAT TEST WOULD HAVE BEEN TO GO TO LIS AND INVESTIGATE. NONE OF THAT HAPPENED HERE.

SER-442

ANOTHER PATIENT YOU'RE GOING TO HEAR FROM IN THIS TRIAL GOT AN HIV TEST. BUT YOU KNOW WHAT? THE HIV TEST WAS ACCURATE. IT WAS NEGATIVE FOR HIV.

AND YOU'RE ALSO GOING TO LEARN THAT HIV TEST WAS NOT RUN ON THERANOS TECHNOLOGY. IT WAS RUN ON ANOTHER COMPANY'S FDA APPROVED TECHNOLOGY, BUT THE GOVERNMENT DIDN'T DO ANY ANALYSIS TO FIGURE OUT WHETHER THERANOS HAD A HISTORY OF HIV PROBLEMS IN THAT TEST PRIOR TO THAT PATIENT REPORTING OR VISITING THERANOS. AND YOU'RE CERTAINLY GOING TO SEE NO EVIDENCE THAT SUNNY KNEW ANYTHING WAS WRONG WITH THAT TEST.

YOU'RE GOING TO HEAR FROM A HANDFUL OF PATIENTS, THREE, FOUR, MAYBE FIVE WHO ARE GOING TO TALK ABOUT A FEW TESTS, BUT THE GOVERNMENT DID NO ANALYSIS OF ALL OF THERANOS'S PATIENT TESTING DATA AND THE RELATED QUALITY CONTROL DATA OR EFFICIENCY TESTING DATA TO FIGURE OUT WHETHER THE PROBLEM WAS A HUMAN ERROR IN THE COLLECTION, MAYBE THE FINGERSTICK SAMPLE WAS TAKEN WRONG, MAYBE THE VEIN DRAW WAS TAKEN WRONG, MAYBE THE TECHNICIAN WHO RAN THE TEST WAS VERY BAD --

MR. LEACH: YOUR HONOR, I'M SORRY.

THE COURT: COUNSEL, EXCUSE ME.

MR. CAZARES: I AM WRAPPING UP.

THE COURT: THIS IS OPENING STATEMENT, NOT CLOSING ARGUMENT.

EXCUSE ME. LET ME FINISH MY STATEMENT.

MR. CAZARES: I APOLOGIZE.

SER-443

THE COURT:  YOU CAN FINISH YOUR OPENING STATEMENT AND NOT MOVE INTO ARGUMENT.

MR. CAZARES:  YES.  THANK YOU.

THE COURT:  PLEASE PROCEED.

MR. CAZARES:  THE GOVERNMENT DIDN'T OBTAIN THE 9 MILLION PATIENT RESULTS, AND YOU ARE GOING TO SEE AND LEARN THEY DIDN'T ANALYZE THE TESTING DATA.  AND THAT IS WHY WE ASK YOU TO KEEP AN OPEN MIND WHEN YOU HEAR AND SEE THE EVIDENCE IN THIS CASE.  WAIT TO HEAR ALL OF THE EVIDENCE, NOT JUST THE HEADLINE OR WHEN AN EMAIL SHOWS A BAD QUALITY CONTROL.

A PATIENT IS RAISING A QUESTION ABOUT A TEST.  WAIT TO HEAR THE EVIDENCE.  WELL, DOES ANYONE REALLY KNOW WHAT HAPPENED TO THAT PATIENT'S TEST OR WHY THE QUALITY CONTROL FAILED?  WAIT FOR THAT EVIDENCE OR THE LACK OF IT BECAUSE WE THINK IF YOU WAIT AND KEEP AN OPEN MIND, LISTEN AND HEAR ALL OF THE EVIDENCE, YOU WILL CONCLUDE THAT THE GOVERNMENT CANNOT PROVE THEIR ALLEGATIONS.  THEY CANNOT PROVE THAT THERANOS'S TECHNOLOGY WAS NOT CAPABLE OF CONSISTENTLY PRODUCING ACCURATE AND RELIABLE RESULTS.

THAT'S WHY AT THE END OF THIS TRIAL MY COCOUNSEL, MR. COOPERSMITH, WILL HAVE A CHANCE TO TALK TO YOU ABOUT THE EVIDENCE, ALL OF THE EVIDENCE INTRODUCED IN THIS TRIAL, AND HE'LL CONNECT THE DOTS FOR YOU AND SHOW YOU HOW AND WHY THE EVIDENCE SHOWS THAT THE GOVERNMENT CANNOT PROVE THE ALLEGATIONS, EACH ELEMENT OF EACH CHARGE BEYOND A REASONABLE

SER-444

DOUBT.

AND THAT'S WHY WE WILL ASK YOU TO FIND SUNNY BALWANI NOT GUILTY OF EACH AND EVERY COUNT.

THANK YOU VERY MUCH FOR YOUR TIME AND ATTENTION.

THANK YOU VERY MUCH, YOUR HONOR.

THE COURT:  THANK YOU, COUNSEL.

LADIES AND GENTLEMEN, AS I TOLD YOU, WE WILL BREAK TODAY. TODAY WE'RE GOING TO FINISH AT 2:30.

WHAT I'D LIKE TO DO IS TO HAVE ABOUT A -- LET'S TAKE A 30 MINUTE BREAK NOW TO HOPEFULLY ALLOW YOU TO GET SOME REFRESHMENTS.

AND THE GOVERNMENT WILL HAVE A WITNESS AVAILABLE AT 1:30?

MR. BOSTIC:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.  LET'S TAKE OUR RECESS, PLEASE, AND WE'LL RECONVENE AT 1:30.  THANK YOU.

(JURY OUT AT 12:58 P.M.)

THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK YOU.

THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE BREAK.

ANYTHING EITHER PARTY WANTS TO PUT ON THE RECORD BEFORE WE BREAK, BEFORE I STEP DOWN?

MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

THE COURT:  YES, OF COURSE.

(DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

MR. LEACH: VERY BRIEFLY, YOUR HONOR.

IN MOTION PRACTICE THERE WAS SUBSTANTIAL DEBATE ABOUT WHETHER OR NOT THE DEFENSE WOULD OPEN THE DOOR TO ISSUES RELATING TO THE LIS.

I DON'T THINK THAT DOOR COULD HAVE BEEN MORE WIDELY OPEN THROUGH THE OPENING STATEMENT, AND I DID NOT OBJECT IN THE MOMENT. BUT I THINK IT'S OBVIOUS THAT DOOR IS OPEN, AND I WANT TO SAY THAT THAT'S THE GOVERNMENT'S POSITION AT THIS POINT.

THE COURT: ALL RIGHT. THANK YOU.

MR. COOPERSMITH: YOUR HONOR, AS I SAID IN OUR MOTION PRACTICE, I KNOW THAT WE HAVE OPENED THE DOOR TO SOMETHING, AND I THINK WE HAVE TO HAVE FURTHER DISCUSSIONS AS TO EXACTLY WHAT THAT IS.

I BELIEVE THE GOVERNMENT CAN DEFEND ITSELF AND ARGUE THAT IT WASN'T THEIR FAULT. THEY CAN PROBABLY ARGUE THAT IT'S THERANOS'S FAULT.

BEYOND THAT, I DON'T THINK SO.

SO I THINK THIS IS GOING TO NEED ADDITIONAL DISCUSSION AND BRIEFING, YOU KNOW, BEYOND WHAT WE HAVE TIME FOR RIGHT THIS MOMENT.

BUT THE QUESTION IS NOT WHETHER WE OPEN THE DOOR. I AGREE WITH MR. LEACH THAT WE HAVE.

THE QUESTION IS WHAT WE OPENED THE DOOR TO.

THE COURT: WELL, I SUPPOSE YOU'RE ASKING ME TO LOOK AT THE SIZE OF THE DOOR. SOMETIMES EVEN A SMALL DOOR CAN OPEN

SER-446

TO A WIDE PASTURE, CAN'T IT?

MR. COOPERSMITH: SOMETIMES THAT'S TRUE.

THE COURT: AND THAT'S WHAT WE'LL HAVE TO DISCOVER IS WHAT IS THE GEOGRAPHY OF THE OPENED DOOR.

SO THANK YOU FOR THAT. I DID NOTICE THAT. I'LL NEED TO REFRESH MYSELF WITH THE TRANSCRIPT ALSO TO SEE WHAT THE GEOGRAPHICAL LIMITS MIGHT BE.

SO ENJOY YOUR BREAK. WE'LL SEE YOU BACK AT 1:30.

MR. LEACH: THANK YOU.

(LUNCH RECESS TAKEN AT 1:00 P.M.)

SER-447

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,           )
                                    )   CR-18-00258-EJD
                    PLAINTIFF,      )
                                    )   SAN JOSE, CALIFORNIA
            VS.                     )
                                    )   APRIL 6, 2022
RAMESH "SUNNY" BALWANI,             )
                                    )   VOLUME 14
                    DEFENDANT.      )
_____ )   PAGES 2177 - 2443

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                          BY:  JOHN C. BOSTIC
                               JEFFREY B. SCHENK
                          150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113

                          BY:  ROBERT S. LEACH
                               KELLY VOLKAR
                          1301 CLAY STREET, SUITE 340S
                          OAKLAND, CALIFORNIA 94612

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074
                          LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER

SER-448

<u>INDEX OF PROCEEDINGS</u>

GOVERNMENT'S:

**MARK PANDORI**
CROSS-EXAM BY MR. CAZARES                    P. 2200
REDIRECT EXAM BY MR. BOSTIC                  P. 2269
RECROSS-EXAM BY MR. CAZARES                  P. 2299


**CONSTANCE CULLEN**
DIRECT EXAM BY MR. SCHENK                    P. 2306
CROSS-EXAM BY MS. WALSH                      P. 2338
REDIRECT EXAM BY MR. SCHENK                  P. 2351


**DANIEL EDLIN**
DIRECT EXAM BY MR. BOSTIC                    P. 2353

SER-449

LET ME INVITE YOU TO HAVE A SEAT HERE IN THIS CHAIR. FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED. I THINK THERE'S SOME REFRESHMENT THERE FOR YOU SHOULD YOU LIKE IT.

AND WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE.

THE WITNESS: YES. MY NAME IS CONSTANCE CULLEN. C-O-N-S-T-A-N-C-E, C-U-L-L-E-N.

THE COURT: THANK YOU. COUNSEL.

MR. SCHENK: THANK YOU, YOUR HONOR.

**DIRECT EXAMINATION**

BY MR. SCHENK:

Q. DR. CULLEN, IF YOU ARE FULLY VACCINATED, AND WITH THE COURT'S PERMISSION, I UNDERSTAND THAT YOU MAY TESTIFY WITHOUT A MASK.

A. YES.

THE COURT: YES. THANK YOU.

MR. SCHENK: AND I'LL DO THE SAME.

Q. DR. CULLEN, WAS THERE A TIME WHEN YOU WERE EMPLOYED BY A COMPANY THAT WENT BY THE NAME OF SCHERING-PLOUGH?

A. YES, I WAS.

Q. AND HOW LONG DID YOU WORK AT SCHERING-PLOUGH?

A. I WORKED THERE FROM 1996 UNTIL 2016.

Q. AND WHILE YOU WERE WORKING AT SCHERING-PLOUGH, DID YOU HAVE THE OPPORTUNITY TO BECOME FAMILIAR WITH ANOTHER COMPANY CALLED THERANOS?

A.   YES.

Q.   DO YOU REMEMBER WHEN THAT WAS?

A.   YES.  IT WAS IN 2009.

Q.   AND WHAT WORK WERE YOU DOING AT SCHERING-PLOUGH IN 2009?

A.   I WAS LEADING A GROUP THAT WAS KNOWN AS THE BIOANALYTICAL GROUP.  SO THE GROUP WAS RESPONSIBLE FOR DEVELOPING THE ASSAYS THAT ARE NEEDED TO TEST DRUGS AND THE RESPONSES TO DRUGS IN EITHER ANIMAL STUDIES OR HUMAN STUDIES.

Q.   OKAY.  WE'LL COME BACK TO THAT WORK IN A MOMENT.

     I'D LIKE TO HAVE YOU SUMMARIZE YOUR EDUCATIONAL BACKGROUND FOR THE JURY.

A.   YES.  I HAVE A PH.D. IN MOLECULAR IMMUNOLOGY AND A BACHELOR'S DEGREE IN MICROBIOLOGY.

Q.   OKAY.  AND WHEN YOU STARTED AT SCHERING-PLOUGH IN 1996, WHAT TYPE OF WORK WERE YOU DOING?

A.   IT WAS ESSENTIALLY THE SAME.  I HAD BEEN PROMOTED A NUMBER OF TIMES THROUGHOUT THE YEARS UNTIL I WAS ACTUALLY LEADING THE GROUP, SO --

Q.   AND WHEN YOU SAY "LEADING THE GROUP," WAS THAT IN 2009?

A.   YES, IT WAS.

Q.   OKAY.  DO YOU RECALL YOUR TITLE IN 2009?

A.   YES, DIRECTOR.

Q.   AND WHAT TYPE OF WORK WAS SCHERING-PLOUGH GOING TO DO AT THERANOS THAT LED YOU TO BECOME FAMILIAR WITH THAT COMPANY?

A.   SO THERANOS WAS DEVELOPING ASSAYS TO MEASURE A VARIETY OF

DIFFERENT COMPONENTS IN HUMAN SERUM SAMPLES, OR BLOOD SAMPLES, AND THAT MESHED VERY NICELY WITH THE WORK THAT WE WERE DOING IN MY LAB.

Q. AND WHAT TYPE OF WORK WERE YOU DOING IN YOUR LAB?

A. WE WERE DESIGNING AND DEVELOPING THE ASSAYS TO MEASURE DRUGS OR MARKERS OF EFFICACY OF THE DRUG IN PATIENT SAMPLES.

Q. AND WHAT DOES THAT MEAN, MARKERS OF THE EFFICACY OF THE DRUG?

A. SO IF YOU'RE TESTING A DRUG, FOR EXAMPLE, THAT IS INTENDED TO TREAT AN INFLAMMATORY AILMENT, THERE ARE WELL-KNOWN MARKERS OF INFLAMMATION, AND YOU MEASURE THE CHANGE IN THOSE MARKERS AS A RESULT OF A PATIENT BEING ADMINISTERED DRUG.

Q. AND WHY WAS MEASURING THOSE MARKERS SOMETHING THAT WAS INTERESTING OR VALUABLE TO YOUR WORK AT SCHERING-PLOUGH?

A. BECAUSE IT PROVED THE EFFICACY OF THE DRUG, WHICH IS REQUIRED AS PART OF OUR REGISTRATION OF THE DRUG WITH THE FOOD AND DRUG ADMINISTRATION OR OTHER HEALTH AUTHORITIES.

Q. DO YOU REMEMBER HOW YOU FIRST BECAME FAMILIAR WITH THERANOS?

A. MY BOSS HAD ASKED ME TO DO SOME WORK WITH THEM. THAT WAS -- HE ACTUALLY HAD RECEIVED THE REQUEST FROM THE HEAD OF OUR EARLY CLINICAL RESEARCH GROUP.

THE EARLY CLINICAL RESEARCH GROUP IS RESPONSIBLE FOR THOSE VERY FIRST HUMAN STUDIES, AND SO THAT GROUP IN PARTICULAR HAS AN INTEREST IN MEASURING THESE MARKERS OF DRUG EFFICACY.

SER-452

Q.   AM I FOLLOWING CORRECTLY, YOUR BOSS HEARD FROM SOMEBODY ELSE THAT --

A.   HIS COLLEAGUE, YES.

Q.   AND WHAT IS YOUR BOSS'S NAME?

A.   STEVE FARRAND.

Q.   COULD YOU SPELL THE LAST NAME?

A.   F-A-R-R-A-N-D.

Q.   OKAY.  AND IS IT DR., DR. FARRAND?

A.   YES.

Q.   AND DR. FARRAND LEARNED ABOUT THERANOS FROM ANOTHER EMPLOYEE AT SCHERING-PLOUGH?

A.   THAT'S RIGHT.  THAT PERSON'S NAME IS JIM MCLEOD, M-C-L-E-O-D.

Q.   AND DR. MCLEOD MAKE THIS REFERRAL OR RECOMMENDATION TO DR. FARRAND, WHO THEN BROUGHT YOU IN; IS THAT RIGHT?

A.   THAT'S RIGHT.

Q.   OKAY.  DO YOU REMEMBER WHAT YOUR FIRST INTRODUCTION OR INTERACTION WITH SOMEBODY AT THERANOS WAS?

A.   I BELIEVE THAT I HAD EITHER A PHONE CALL OR AN EMAIL CORRESPONDENCE, OR BOTH, WITH ELIZABETH HOLMES.

Q.   AND WAS MS. HOLMES THE INDIVIDUAL WHO YOU FIRST COMMUNICATED WITH AT THERANOS?

A.   YES.

Q.   THANK YOU.

YOUR HONOR, MAY I APPROACH?

SER-453

THE COURT: YES.

MR. SCHENK: (HANDING.)

Q. DR. CULLEN, I'VE HANDED YOU A BINDER OF DOCUMENTS, AND I'M GOING TO ASK YOU TO TURN TO WHAT IS THE FIRST TAB IN THAT BINDER. IT'S EXHIBIT 188.

DO YOU SEE THAT?

A. YES, I DO.

Q. AND I'LL ASK YOU TO LOOK AT IT, AND MY QUESTION IS, IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES AT THE BEGINNING OF THIS RELATIONSHIP?

A. YES.

MR. SCHENK: YOUR HONOR, THE GOVERNMENT OFFERS 188.

MS. WALSH: NO OBJECTION.

THE COURT: IT'S ADMITTED. IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 188 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q. DR. CULLEN, IF WE LOOK AT THE VERY BOTTOM OF THE EMAIL IN THE CHAIN, SO THE FIRST IN TIME, IT LOOKS LIKE MS. HOLMES WROTE TO YOU AT THE END OF FEBRUARY 2009.

DO YOU SEE THAT?

A. YES, I DO.

Q. AND SHE REFERENCED A GOOD CALL WITH JIM MCLEOD -- IS THAT THE INDIVIDUAL YOU MENTIONED A MOMENT AGO?

A. THAT'S CORRECT.

Q. -- AND IS LOOKING FOR A TIME TO FOLLOW UP WITH YOU,

DR. CULLEN; IS THAT RIGHT?

A.   THAT'S CORRECT.

Q.   AND THEN AT THE VERY TOP OF THIS DOCUMENT, THE FIRST EMAIL, THE BEGINNING OF MARCH 2009, MS. HOLMES WRITES AGAIN, "TAKE A LOOK AT THE ATTACHED PER OUR CONVERSATION -- IF WE GO DOWN THIS PATH, THERE ARE TWO SETS OF DOCUMENTS THAT WILL COMPLIMENT THIS SUMMARY -- ONE IS THE DETAILED PROTOCOL FOR RUNNING THESE EXPERIMENTS, THE OTHER IS THE CARTRIDGE INSERTS THAT DETAIL PERFORMANCE SPECIFICATIONS."

DO YOU SEE THAT?

A.   YES.

Q.   IT LOOKS LIKE AT THE BEGINNING OF THAT EMAIL MS. HOLMES SAYS, "TAKE A LOOK AT THE ATTACHED, IF WE GO DOWN THIS PATH." WHAT DID YOU UNDERSTAND THAT TO BE A REFERENCE TO?

A.   SO SCHERING-PLOUGH WAS CONSIDERING USING THERANOS TO VALIDATE SOME ASSAYS FOR THEM WITH THEIR INSTRUMENTS.

Q.   WHAT DOES THAT MEAN, SCHERING-PLOUGH WAS CONSIDERING USING THERANOS TO VALIDATE ASSAYS?

A.   SO THEY WOULD HAVE DONE THE WORK DEMONSTRATING THE UTILITY OF THEIR INSTRUMENT FOR THE USE THAT SCHERING-PLOUGH HAD INTENDED.

Q.   WHEN YOU SAY "THEY," IS THAT THERANOS?

A.   YES, THERANOS.

Q.   SO DESCRIBE TO ME MORE PRECISELY, WHAT IS THE WORK THAT THERANOS WOULD HAVE DONE?

SER-455

A.   SO IT'S REFERRED TO AS A VALIDATION.  IT'S REQUIRED IN ACCORDANCE WITH THE FDA GUIDANCE IN ORDER TO DEMONSTRATE THE REPRODUCIBILITY OF ANY GIVEN ASSAY THAT YOU'RE GOING TO USE TO SUPPORT SUBMISSION FOR YOUR DRUG.

Q.   SO IF THIS WORK WAS DONE, YOU DESCRIBED SOME VALIDATION WORK THAT THERANOS WOULD BE DOING.  WHAT WOULD SCHERING-PLOUGH, WHAT WOULD YOU OR YOUR LAB BE DOING?

A.   IN THIS CASE WE WERE NOT DOING ANYTHING.

Q.   OKAY.  IF YOU'LL TURN NOW TO PAGE 2 OF THIS EXHIBIT, AND THE REMAINING PAGE, I THINK IT GOES TO PAGE 3, COULD YOU LET THE JURY KNOW WHAT THESE ARE, WHAT THE ATTACHMENTS ARE TO THIS DOCUMENT?

A.   YES.  SO THIS IS A PROTOCOL FOR THE VALIDATION WORK THAT I'VE JUST MENTIONED, AND A PROTOCOL IS A DOCUMENT THAT DESCRIBES IN ADVANCE OF EXECUTING ANY LABORATORY WORK WHAT WORK IS ACTUALLY TO BE DONE.

Q.   SO WOULD THIS DOCUMENT HAVE LAID OUT SCHERING-PLOUGH AND THERANOS'S UNDERSTANDING OF WHAT THE PROTOCOL WOULD INVOLVE?

A.   THAT'S CORRECT.

Q.   AND UNDER THE FIRST LINE OF THE DOCUMENT, DO YOU SEE THE LETTERS HS IN PARENTHESES, AND THEN CRP, IL-6, AND TNF-A MULTIPLEX?

A.   YES.

Q.   AND COULD YOU TELL THE JURY WHAT THAT IS?

A.   YES.  THESE ARE THREE MARKERS OF INFLAMMATION.  SO CRP

SER-456

STANDS FOR C REACTIVE PROTEIN; IL-6 STANDS FOR INTERLEUKIN 6;

AND TNF-A STANDS FOR TUMOR NECROSIS FACTOR ALPHA.

Q.   AND THEN THE WORD MULTIPLEX, WHAT DOES THAT MEAN IN THIS

CONTEXT?

A.   SO MULTIPLEX IS A WAY OF MEASURING ALL THREE OF THESE

ANALYTES SIMULTANEOUSLY AS OPPOSED TO MEASURING THEM

INDIVIDUALLY.

Q.   I SEE.  AND IS ANOTHER WORD FOR THESE THREE ANALYTES

ASSAYS?

A.   YES, ONE COULD USE THAT WORD TO DESCRIBE THEM.

Q.   AND THEN IF YOU'LL TURN TO THE FINAL PAGE IN THIS, WHICH

IS PAGE 3.  THERE'S A SECTION TITLED ESTIMATED SCHEDULE.

     DO YOU SEE THAT?

A.   YES.

Q.   AND IT LOOKS LIKE THERE'S A LINE THAT BEGINS "TOTAL NUMBER

OF CARTRIDGES PROVIDED WILL BE 2,790 OF THE TNF-ALPHA, IL-6,

CRP MULTIPLEX.  UP TO 10 ADDITIONAL INSTRUMENTS WILL BE

SHIPPED.  THE TOTAL EXPECTED RUNTIME IS AROUND 1 MONTH.  THE

TOTAL HUMAN CAPITAL COMMITMENT WILL ONLY BE 5 DAYS OVER THE

ENTIRE PROGRAM DURATION AS IT ONLY TAKES UP TO 10 MINUTES TO

PREPARE AND LOAD A SAMPLE ON A SINGLE INSTRUMENT AFTER WHICH

THE INSTRUMENTS RUN ON THEIR OWN."

     DO YOU SEE THAT?

A.   I DO SEE THAT.

Q.   SO WHAT IS -- CAN YOU DESCRIBE FOR THE JURY, WHAT DOES

THAT MEAN?  WHAT IS ACTUALLY OCCURRING DURING THE SCHEDULE?

A.   SO THE CARTRIDGES ARE THE INSERTS OR THE DISPOSABLE PRODUCTS THAT ARE REQUIRED TO BE INSERTED INTO THE THERANOS INSTRUMENT IN ORDER TO GENERATE A RESULT.

IN THIS CASE THOSE CARTRIDGES WERE DESIGNED TO BE ABLE TO MEASURE ALL THREE, TNF-ALPHA, INTERLEUKIN-6, AND CRP SIMULTANEOUSLY.

SORRY.  DO YOU HAVE OTHER QUESTIONS ABOUT THE SECTION THAT YOU WANT ME TO DESCRIBE?

Q.   YES.  HOW ABOUT THE RUNTIME?

A.   OKAY.  SO THE RUNTIME PRESUMABLY IS THE AMOUNT OF TIME THAT IT WOULD TAKE FROM THE INITIATION OF THE PROTOCOL TO THE COMPLETION OF THE PROTOCOL, WHICH USUALLY REQUIRES A REPORT.

Q.   OKAY.  AND HOW LONG WOULD THE INITIATION OF THE PROTOCOL TO THE END, INCLUDING THE REPORT, TAKE ON THIS SCHEDULE?

A.   IT LOOKS LIKE THEY'RE INDICATING IT WOULD TAKE ONE MONTH.

Q.   OKAY.  IF YOU'LL NOW TURN TO EXHIBIT 200.

DO YOU RECOGNIZE EXHIBIT 200?

A.   I HAVE SEEN IT PREVIOUSLY, YES.

Q.   OKAY.  IS THIS AN AGREEMENT, A SERVICES AGREEMENT BETWEEN SCHERING-PLOUGH AND THERANOS INVOLVING THE PROTOCOL OR THE PROJECT THAT WE HAVE BEEN DISCUSSING?

A.   YES.

MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 200.

MS. WALSH:  NO OBJECTION.

THE COURT: IT'S ADMITTED. IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 200 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q. DR. CULLEN, IN THE FIRST PARAGRAPH, THE AGREEMENT REFERENCES A SERVICES AGREEMENT BETWEEN SCHERING CORPORATION IN NEW JERSEY AND THERANOS IN CALIFORNIA.

DO YOU SEE THAT?

A. YES.

Q. AND WHERE WERE YOU AND YOUR LAB WHILE THIS PROTOCOL WAS BEING RUN?

A. I WAS IN NEW JERSEY.

Q. OKAY. AND HOW ABOUT THERANOS?

A. THERANOS WAS IN CALIFORNIA.

Q. OKAY. IF WE CAN NOW GO DOWN TO THE TERM THAT IS IN PARAGRAPH NUMBERED 2. IT LOOKS LIKE THE ANTICIPATED START DATE WAS APRIL 15, 2009.

DO YOU SEE THAT?

A. YES.

Q. AND IT WOULD BE COMPLETED MAY 1ST, 2009?

A. YES.

Q. AND THEN LET'S LOOK AT THE PAYMENT TERMS. THAT'S THE LAST PARAGRAPH ON THIS PAGE, PARAGRAPH 4, SPRI.

WHAT IS SPRI?

A. THAT STANDS FOR SCHERING-PLOUGH RESEARCH INSTITUTE, WHICH IS A DIVISION THAT WAS WITHIN SCHERING CORPORATION.

Q.   "SPRI WILL PAY PROVIDER A ONE TIME PAYMENT OF $279,000 FOR THE PROJECT."

WHO IS THE PROVIDER?

A.   THERANOS IS THE PROVIDER.

Q.   WAS THAT THE TOTAL DOLLAR AMOUNT FOR THIS CONTRACT, THE TOTAL DOLLAR AMOUNT THAT SCHERING WAS GOING TO PAY THERANOS?

A.   AS FAR AS I KNOW.

Q.   COULD YOU NOW TURN TO TAB 201.

DO YOU RECOGNIZE THE EXHIBIT AT EXHIBIT NUMBER 201?

A.   NOT REALLY, NO.

Q.   IF YOU'LL TURN TO THE SECOND PAGE.

ON THE SECOND PAGE, DO YOU SEE AN EMAIL FROM MS. HOLMES TO YOU?

A.   YES.

Q.   AND WAS THAT SENT IN ABOUT APRIL OF 2009?

A.   YES.

Q.   AND THEN IF WE GO AND LOOK AT THE FIRST PAGE, DOES IT APPEAR THAT THAT COMMUNICATION WAS FORWARDED WITHIN THERANOS?

A.   YES, IT DOES.

Q.   AND IF YOU'LL LOOK AT PAGE 3 AND THE FOLLOWING PAGES WOULD APPEAR TO BE ATTACHED.

DO YOU RECOGNIZE THOSE AS AN INVOICE AND ALSO ANOTHER COPY OF THE PROTOCOL?

A.   YES TO BOTH, INVOICE AND PROTOCOL, I SEE THEM.

MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 201.

MS. WALSH:  NO OBJECTION.

THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 201 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.    IF WE CAN START WITH THE EMAIL ON PAGE 2 FROM MS. HOLMES TO YOU.

DO YOU SEE WHERE MS. HOLMES WRITES, "IN FOLLOW UP TO OUR DISCUSSIONS WITH CONNIE, WE HAVE CEMENTED A COMPREHENSIVE VALIDATION PROGRAM ON ONE OF OUR MULTIPLEXED CYTOKINE PANELS. I HAVE ATTACHED THE INVOICE AND PROGRAM OVERVIEW TO THIS EMAIL. THIS INVOICE SHOULD WORK IN LIEU OF A CONTRACT AS THIS ANALYSIS WILL BE DONE AT THERANOS AND THE SCOPE IS RESTRICTED TO VALIDATION."

DO YOU SEE THAT?

A.    YES.

Q.    AND THEN IN THE NEXT PARAGRAPH, MS. HOLMES CONTINUES, "WE DID OF COURSE WORK THROUGH THE VALIDATION PROGRAM WITH CONNIE IN GREAT DETAIL.  WE WILL PRESENT THE RESULTS OF THE VALIDATION BY YOUR VISIT IN MAY."

FIRST, DID YOU WORK THROUGH THIS VALIDATION WITH FOLKS AT THERANOS OR MS. HOLMES?

A.    THAT WOULD HAVE BEEN THE PROTOCOL THAT YOU SHOWED EARLIER.

Q.    OKAY.  YOU HAD A ROLE IN --

A.    REVIEWING.

Q.    REVIEWING -- OKAY.

SER-461

A.    CORRECT.

Q.    AND THEN MS. HOLMES SAYS THERE'S A REFERENCE TO YOUR VISIT IN MAY.

WHAT IS THAT A REFERENCE TO?

A.    SO SCHERING-PLOUGH SENT A DUE DILIGENCE TEAM TO THERANOS IN MAY OF 2009.

Q.    OKAY.  AND WHAT IS A DUE DILIGENCE TEAM?

A.    SO IT'S A GROUP OF PEOPLE WITHIN THE COMPANY FROM DIFFERENT DISCIPLINES THAT ARE SENT TO DO AN EVALUATION OF A COMPANY IN ORDER TO VERIFY THAT THEY WOULD BE APPROPRIATE TO WORK WITH AND COULD MEET THE, EXCUSE ME, THE NEEDS OF SCHERING WITH RESPECT TO COMPLIANCE AND FINANCIALS, ET CETERA.

Q.    OKAY.  WE'LL COME BACK TO THAT MEETING IN JUST A MOMENT.

WOULD YOU TURN TO PAGE 3.

ON PAGE 3, I'M JUST WONDERING IF THE DOLLAR AMOUNT CHANGED OR IF THERANOS IS INVOICING SCHERING-PLOUGH FOR THAT SAME DOLLAR AMOUNT THAT WE DISCUSSED EARLIER.

A.    THAT'S THE SAME DOLLAR AMOUNT.

Q.    AND WHAT IS THE AMOUNT?

A.    $279,000.

Q.    AND IF YOU'LL TURN TO PAGE 6 OF THIS EXHIBIT.

PAGE 6 INCLUDES AN ESTIMATED SCHEDULE.

DID THE SCHEDULE CHANGE, OR ARE WE STILL LOOKING AT ABOUT A ONE MONTH ESTIMATE?

A.    THE SCHEDULE IS THE SAME.

Q.   ALL RIGHT.  IF YOU'LL NOW TURN TO TAB 192 IN YOUR BINDER.

IS 192 A MEETING REMINDER FOR THE MEETING IN CALIFORNIA IN PALO ALTO THAT YOU WERE JUST TALKING ABOUT, AND ALSO AN AGENDA?

A.   THAT'S RIGHT.

MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 192.

MS. WALSH:  NO OBJECTION.

THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 192 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   THE MEETING START DATE LOOKS LIKE IT'S MAY 5TH, 2009.

DOES THAT SOUND ROUGHLY CORRECT TO YOU?

A.   YES.

Q.   AND UNDER PARTICIPANTS, THERE'S SOME INDIVIDUALS LISTED FROM -- IT LOOKS LIKE FROM SCHERING-PLOUGH.

DO YOU SEE YOUR NAME LISTED THERE?

A.   YES, I DO.

Q.   DID YOU, IN FACT, ATTEND THIS MEETING?

A.   YES, I DID.

Q.   WAS MS. HOLMES PRESENT?

A.   YES, SHE WAS.

Q.   WAS MR. BALWANI PRESENT?  DO YOU KNOW THAT NAME?

A.   I DID NOT KNOW THE NAME, AND I DO NOT RECALL IF THAT PERSON WAS PRESENT.

Q.   OKAY.  IT'S POSSIBLE THAT YOU HAVE NEVER MET SOMEONE NAMED MR. BALWANI?

A.   CORRECT.

Q.   OKAY.  IF YOU'LL NOW TURN TO THE SECOND PAGE, THE AGENDA, DO YOU RECALL WHAT WAS DISCUSSED DURING THIS -- YOU CALLED IT A DUE DILIGENCE MEETING?

A.   YES, I DO.

Q.   TELL THE JURY WHAT TOPICS WERE COVERED.

A.   SO WE WERE DISCUSSING THE TECHNOLOGY PREDOMINANTLY, WHAT THE CAPABILITIES WERE, WHAT SORTS OF TESTS COULD BE DEVELOPED ON THE PLATFORM.

Q.   AND DID YOU ASK QUESTIONS DURING THE MEETING?

A.   I DID.

Q.   AND WHO DID YOU DIRECT YOUR QUESTIONS TO?

A.   INITIALLY I DIRECTED MY QUESTIONS TO ELIZABETH HOLMES, AND THEN SUBSEQUENTLY I DIRECTED THEM TO OTHER THERANOS EMPLOYEES WHO WERE PARTICIPATING IN THE MEETING.

Q.   YOU SAID SUBSEQUENTLY YOU DIRECTED THEM TO OTHERS.  WHY THE CHANGE?  WHY DID YOU START WITH MS. HOLMES AND THEN DIRECT QUESTIONS TO OTHERS?

A.   I FELT AS THOUGH MS. HOLMES WAS NOT ANSWERING THE QUESTIONS ADEQUATELY OR DIRECTLY, AND I WANTED TO SEE IF I COULD GET MORE DIRECT ANSWERS FROM OTHER PARTICIPANTS FROM THERANOS.

Q.   WHAT MAKES YOU SAY THAT?  WHY DO YOU SAY THAT YOU DIDN'T THINK THAT MS. HOLMES WAS ANSWERING THEM ADEQUATELY?

A.   SO DURING THESE DUE DILIGENCE MEETINGS, THERE IS THE

EXPECTATION THAT A CERTAIN LEVEL OF TECHNICAL DETAIL WILL BE DISCLOSED. THAT'S IMPORTANT FOR SCHERING-PLOUGH IN THIS CASE BECAUSE THAT'S THE WAY THAT WE EVALUATE WHETHER OR NOT THIS INSTRUMENT COULD BE USED TO SUPPORT DRUG SUBMISSIONS TO THE FDA OR OTHER HEALTH AUTHORITIES.

SO IT'S INCUMBENT UPON US TO HAVE A GOOD UNDERSTANDING OF HOW THE INSTRUMENT WORKS.

AND WE WERE NOT ABLE TO GET THAT LEVEL OF DISCLOSURE OR UNDERSTANDING THROUGH THE QUESTIONS WITH MS. HOLMES.

Q. HOW ABOUT WHEN YOU PIVOTED AND STARTED ASKING QUESTIONS OF OTHER PARTICIPANTS?

A. NO.

Q. DID YOU RECEIVE --

A. NO. AND THE REASON FOR THAT WAS AT EACH ATTEMPT TO ASK OTHER INDIVIDUALS, MS. HOLMES INTERJECTED THE RESPONSE ON THEIR BEHALF.

Q. SO YOU DIDN'T GET RESPONSES FROM OTHER INDIVIDUALS EVEN WHEN YOU DIRECTED A QUESTION AT THEM?

A. THAT'S CORRECT.

Q. DID YOU SAY TO MS. HOLMES DURING THIS MEETING THAT YOU FELT THE ANSWERS WERE INSUFFICIENT OR INADEQUATE?

A. NO.

Q. WHY NOT?

A. IT SEEMED APPARENT TO ME, I GUESS, AND IT'S AWKWARD.

Q. OKAY. WOULD YOU NOW TURN TO TAB 223.

A.   I THINK MY BINDER IS EMPTY AT 223.

Q.   YOUR BINDER IS EMPTY AT 223?

A.   YES.

Q.   LET ME GIVE YOU MY COPY.

MAY I APPROACH?

THE COURT:  YES.

MR. SCHENK:  (HANDING.)

Q.   DR. CULLEN, DO YOU RECOGNIZE THE DOCUMENT AT 223 AS AN EMAIL FROM YOU TO SOMEONE AT THERANOS NAMED GARY FRENZEL?

A.   YES.

MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 223.

MS. WALSH:  NO OBJECTION.

THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 223 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   AND IF WE CAN START AT THE BOTTOM OF THIS EMAIL.

THIS EMAIL WAS SENT IN JUNE OF 2009.

DO YOU SEE THAT?

A.   YES.

Q.   SO WOULD THAT HAVE BEEN ABOUT A MONTH OR A MONTH AND A HALF AFTER YOUR MEETING IN PALO ALTO?

A.   THAT'S CORRECT.

Q.   AND IN THE EMAIL YOU ASK ABOUT AN UPDATE ON THE ASSAY DEVELOPMENT.

DO YOU SEE THAT?

SER-466

A.   YES.

Q.   AND WHAT WERE YOU LOOKING FOR?

A.   SO I WAS LOOKING FOR DATA ASSOCIATED WITH THE PROTOCOL THAT WE DISCUSSED EARLIER.

Q.   AND WHAT FORM WOULD THAT DATA HAVE TAKEN?  WHAT --

A.   IT WOULD HAVE BEEN PRESENTED IN A REPORT.

Q.   OKAY.  SO YOU WANTED A REPORT, BUT HAD NOT RECEIVED IT YET?

A.   THAT'S CORRECT.

Q.   OKAY.  YOU TOLD US THAT YOU FOUND THE ANSWERS FROM MS. HOLMES INADEQUATE OR LESS THAN FORTHCOMING.

     WHY THEN WERE YOU STILL ASKING FOR A DATA REPORT?

A.   I THINK BECAUSE WE CONSIDERED IT TO BE AN OUTSTANDING ITEM.  WE HAD PAID FOR THE WORK AND WANTED TO HAVE CLOSURE.

Q.   OKAY.  SCHERING-PLOUGH HAD PAID ABOUT $280,000 FOR THIS WORK?

A.   THAT'S CORRECT.

Q.   AND PART OF WHAT THERANOS AGREED TO PROVIDE WAS A REPORT?

A.   THAT'S RIGHT.

Q.   IF YOU WILL NOW TURN TO PAGE 2 -- I'M SORRY, EXHIBIT 259.

     DOES EXHIBIT 259 INCLUDE AN EMAIL NOW FROM GARY FRENZEL TO YOU AND THEN A REPORT ATTACHED?

A.   YES.

          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT --

          THE WITNESS:  SO DATED DECEMBER 3RD, 2009.

BY MR. SCHENK:

Q.   YES, FROM MR. FRENZEL, DECEMBER OF 2009?

A.   YES, I HAVE THAT.

          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 259, INCLUDING THE ATTACHMENT.

          MS. WALSH:  NO OBJECTION TO 259.

          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

          (GOVERNMENT'S EXHIBIT 259 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   THANK YOU.

     IF WE CAN LOOK AT THE EMAIL ON THE BOTTOM FROM GARY FRENZEL, AND IT LOOKS LIKE FROM THE SIGNATURE HE'S THE VP OF ASSAY SYSTEMS AT THERANOS.

     DO YOU SEE THAT?

A.   YES, I DO.

Q.   AND HE WRITES, "HI CONNIE, I WAS ASKED TO SEND THIS REPORT ON TO YOU, AND IF YOU CAN FORWARD TO THE PROPER PEOPLE.  AFTER YOU AND YOUR GROUP HAVE AN OPPORTUNITY TO GO THROUGH IT, LET US KNOW IF YOU WOULD LIKE TO ARRANGE A PHONE CONFERENCE TO DISCUSS THE RESULTS."

     DR. CULLEN, IS THIS THE REPORT THAT YOU WERE TALKING ABOUT IN JUNE OF 2009?

A.   YES.

Q.   AND YOU RECEIVED IT AT THE END OF THAT YEAR, IN DECEMBER OF 2009?

SER-468

A.   YES.

Q.   AND IF YOU TURN TO THE NEXT PAGE, IT'S ACTUALLY PAGE 3 OF THIS EXHIBIT, IS THIS WHERE THE REPORT BEGINS?

A.   YES.

          MR. SCHENK:  YOUR HONOR, I HAVE SOME QUESTIONS ABOUT THIS DOCUMENT, AND WITH A PENDING MOTION, I JUST WANT TO MAKE SURE THAT THE COURT HAS AN OPPORTUNITY TO PROVIDE GUIDANCE IF IT CHOOSES TO.

          THE COURT:  WELL, I THINK WE'LL PROCEED BY QUESTION AND OBJECTIONS IF THERE ARE ANY.

          MR. SCHENK:  THANK YOU.

Q.   AT THE VERY TOP OF THIS DOCUMENT, DR. CULLEN, ABOVE WHERE IT SAYS THERANOS MULTIPLEXED ASSAY PANEL VALIDATION REPORT, DO YOU SEE A LOGO AT THE VERY TOP ON THE LEFT?

A.   YES.

          MS. WALSH:  OBJECTION.

          THE COURT:  OVERRULED.

BY MR. SCHENK:

Q.   YOU CAN ANSWER THE QUESTION.

A.   YES, I DO SEE THE LOGO.

Q.   OKAY.  AND WHOSE LOGO IS THAT?

A.   IT'S THERANOS'S LOGOS.

Q.   DR. CULLEN -- WELL, FIRST OF ALL, ON WHICH SIDE OF THE DOCUMENT IS THE THERANOS LOGO?

A.   IT'S ON THE LEFT.

Q.   ON THE RIGHT SIDE OF THE DOCUMENT ACROSS FROM THE THERANOS

LOGO, DO YOU SEE ANY OTHER LOGOS?

A.   NO.

Q.   IF YOU COULD NOW TURN TO PAGE 5.

ON PAGE 5 OF THIS EXHIBIT, IT LOOKS LIKE THERE ARE THREE

GRAPHS.

DO YOU SEE THAT?

A.   YES.

Q.   AND WHOSE DATA IS THIS?

A.   THIS IS THERANOS'S.

Q.   AND DID SCHERING-PLOUGH GENERATE THIS DATA?

A.   NO.

Q.   WHO GENERATED THIS DATA?

A.   THERANOS.

Q.   IS THAT TRUE FOR THE ENTIRE CONTENT OF THIS DOCUMENT?

A.   THAT'S MY UNDERSTANDING, YES.

Q.   AND IF YOU'LL NOW TURN TO PAGE 19 OF THIS EXHIBIT, THERE'S

A SECTION CALLED CONCLUSIONS.

DO YOU SEE THAT?

A.   I DO.

Q.   AND WHOSE CONCLUSIONS WERE THESE?

A.   THESE WOULD HAVE BEEN THERANOS'S CONCLUSIONS SINCE IT WAS

THEIR REPORT.

Q.   WERE THESE YOUR CONCLUSIONS?

A.   NO.

Q.   WERE THESE THE CONCLUSIONS, TO YOUR KNOWLEDGE, OF ANYBODY AT SCHERING-PLOUGH?

A.   NO.

Q.   THE FIRST SENTENCE IN THE CONCLUSIONS SECTION READS, "THE THERANOS IL-6, TNF-A, CRP ASSAY MULTIPLEX HAS BEEN SHOWN TO GIVE ACCURATE AND PRECISE RESULTS FOR THREE INDEPENDENTLY CALIBRATED CARTRIDGE LOTS AND ALL THE MANY INSTRUMENTS USED."

DO YOU SEE THAT SENTENCE?

A.   YES.

Q.   WHEN THE CONCLUSION READS THAT THE ASSAY MULTIPLEX WAS SHOWN TO GIVE ACCURATE AND PRECISE RESULTS, WAS THAT A STATEMENT THAT SCHERING-PLOUGH WAS MAKING?

A.   NO.

Q.   DR. CULLEN, IF YOU WOULD NOW TURN TO TAB 262.

DO YOU SEE AN EMAIL EXCHANGE AGAIN IN DECEMBER OF 2009 BETWEEN GARY FRENZEL AND YOU?

A.   YES.

MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 262.

MS. WALSH:  NO OBJECTION.

THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 262 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   AT THE BOTTOM OF THIS FIRST PAGE, IT LOOKS LIKE MR. FRENZEL WRITES TO YOU THAT HE WANTS TO MAKE SURE THAT YOU

RECEIVED THE REPORT.

DO YOU SEE THAT?

A.    I DO.

Q.    AND THEN YOU FOLLOW UP THAT YOU'RE SORRY FOR THE SLOW RESPONSE, YOU DID RECEIVE THE REPORT, BUT YOU WANT TO DEFER DISCUSSIONS UNTIL JANUARY, YOU'RE SWAMPED WITH A MERGER WITH MERCK.

WHAT IS THAT A REFERENCE TO?

A.    SO SCHERING-PLOUGH WAS ACQUIRED BY MERCK IN NOVEMBER OF 2009.

Q.    AND HOW DID THAT AFFECT YOUR JOB?

A.    MY JOB GOT MUCH BIGGER.

Q.    OKAY.  YOU RECEIVED THE VALIDATION REPORT, I THINK WE JUST SAW, IN NOVEMBER; IS THAT RIGHT?

A.    THAT'S RIGHT.

Q.    AND DID YOU DO SOMETHING WITH THAT REPORT IN DECEMBER OF 2009?

A.    NO, OTHER THAN READ IT.

Q.    OKAY.  AND IT LOOKS LIKE GARY FRENZEL IS ASKING YOU ABOUT FURTHER DISCUSSIONS, AND YOU SAID YOU WANTED TO DEFER THEM UNTIL JANUARY; IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    DID YOU, IN FACT, HAVE FOLLOW-UP DISCUSSIONS WITH GARY FRENZEL OR ANYBODY AT THERANOS --

A.    NO.

Q.   -- IN JANUARY OF 2010?

A.   NO.

Q.   HOW ABOUT AT ANY POINT AFTER DECEMBER 2009?

A.   NOT TO MY RECOLLECTION, NO.

Q.   WHY NOT?

A.   WE WEREN'T INTERESTED IN PURSUING THE TECHNOLOGY, AND THERE WAS A LOT OF OTHER WORK THAT WAS HIGHER PRIORITY.

Q.   OKAY.  YOU SAID THAT YOU WERE NOT INTERESTED IN PURSUING THE TECHNOLOGY.  DO YOU MEAN THE THERANOS TECHNOLOGY?

A.   I DO.

Q.   AND WHY DO YOU SAY THAT?  WHY WERE YOU, OR WHY WAS SCHERING-PLOUGH NOT INTERESTED?

A.   I THINK IT WAS A COMBINATION OF THE DUE DILIGENCE VISIT, AS WELL AS THE RESULTS IN THE VALIDATION REPORT.

Q.   OKAY.  THANK YOU.

     WOULD YOU NOW TURN TO TAB 291.

     NOW, THE FIRST PAGE IN 291 CONTAINS TWO EMAILS.  YOU'RE NOT ON EITHER OF THE EMAILS; IS THAT RIGHT?

A.   THAT'S CORRECT.

          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT WILL OFFER THE TOP EMAIL, THAT IS WEDNESDAY APRIL 14TH, 2010, AND THE ATTACHMENTS, THE ATTACHMENTS ARE A TOTAL OF 55 PAGES, FOR A NONHEARSAY PURPOSE.

          THE COURT:  ARE THESE -- IS THIS SUBJECT TO THE STIPULATION?

MR. SCHENK: IT IS, BECAUSE THE BATES NUMBERS DEMONSTRATE AUTHENTICITY.

MS. WALSH: OBJECTION, YOUR HONOR. THE BASIS FOR THE OBJECTION IS OUR PENDING MOTION, 106, AND 403.

THE COURT: ALL RIGHT. THANK YOU.

AND, MR. SCHENK, YOU'RE ASKING THAT THE ATTACHMENTS BE ADMITTED AS THEY APPEAR IN THIS EXHIBIT?

MR. SCHENK: YES, YOUR HONOR.

THE COURT: AND TELL ME AGAIN THE RELEVANCE AND THE FOUNDATION FOR THESE COMING IN.

MR. SCHENK: YES, YOUR HONOR.

THE COURT: FOR WHAT PURPOSE?

MR. SCHENK: YES, YOUR HONOR.

THE EMAIL INCLUDES MR. BALWANI, THE DEFENDANT, ON THE CC LINE. IT IS THEREFORE RELEVANT TO DEMONSTRATE THE DEFENDANT'S STATE OF MIND AS TO TWO ISSUES, KNOWLEDGE AND INTENT; THAT IS, WHAT IS DONE WITH THE ATTACHMENTS.

AND THE COURT SEES THREE UNDERLINED ATTACHMENTS IN THE CAPTION OF THE EMAIL.

THE THIRD IS A VERSION OF THE DOCUMENT THAT WE HAVE JUST DISCUSSED WITH DR. CULLEN, AND THE OTHERS MAY COME UP DURING THE COURSE OF THE TRIAL.

THE COURT: SO THESE ARE NOT COMING IN FOR THE TRUTH OF ANYTHING ASSERTED, BUT RATHER THAT THEY WERE RECEIVED AT LEAST BY MR. BALWANI PER THE EMAIL ADDRESS?

SER-474

MR. SCHENK: PRECISELY.

THE COURT: ALL RIGHT. FOR THAT LIMITED PURPOSE --

I'LL OVERRULE THE OBJECTION.

AND FOR THAT LIMITED PURPOSE, LADIES AND GENTLEMEN, THESE

ARE BEING ADMITTED, THIS EMAIL IS BEING ADMITTED FOR THE

LIMITED PURPOSE OF KNOWLEDGE, THAT IS, KNOWLEDGE AS TO THE

RECIPIENT OF THE EMAIL, AND FOR THAT LIMITED PURPOSE ONLY.

MR. SCHENK: THANK YOU. PERMISSION TO PUBLISH JUST

THE TOP EMAIL?

THE COURT: YES.

(GOVERNMENT'S EXHIBIT 291, TOP EMAIL AND ATTACHMENT, WAS

RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q. DR. CULLEN, I'M SHOWING YOU AN EMAIL THAT SAYS FROM

ELIZABETH HOLMES IN THE CAPTION.

DO YOU SEE THAT?

A. I DO.

Q. AND IT'S TO SOMEONE THAT APPEARS TO BE ALEX.JUNG --

J-U-N-G -- @WALGREENS.COM.

DO YOU SEE THAT?

A. YES, I DO.

Q. AND THEN ON THE CC LINE SOMEONE NAMED JAY.ROSAN@WALGREENS,

AND THEN SUNNY BALWANI.

DO YOU SEE THAT?

A. I DO.

Q.   AND IN THE EMAIL IT APPEARS THAT THERE ARE THREE ATTACHMENTS.  DO YOU SEE THE ATTACHMENTS LISTED UNDERLINED?

A.   I DO.

Q.   AND THEN IN THE BODY, THE FIRST PARAGRAPH READS, "DR. JAY, ALEX,

     "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE DILIGENCE REPORTS ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL. THESE REPORTS ARE FROM GLAXOSMITHKLINE, PFIZER, AND SCHERING-PLOUGH AFTER THEIR OWN TECHNICAL VALIDATION AND EXPERIENCE WITH THERANOS SYSTEMS IN THE FIELD.  PLEASE NOTE THAT THESE DOCUMENTS ARE STRICTLY CONFIDENTIAL UNDER OUR CDA."

     DID I READ THAT CORRECTLY?

A.   YES.

Q.   DR. CULLEN, WOULD YOU NOW TURN TO PAGE 34 OF THIS EXHIBIT?

     EARLIER IN YOUR TESTIMONY WE TALKED ABOUT AN OCCASION WHEN YOU REACHED OUT TO THERANOS TO OBTAIN A REPORT.

     DO YOU REMEMBER THAT?

A.   YES.

Q.   WAS THAT AN ASSAY DEVELOPMENT REPORT?

A.   YES.

Q.   AND WAS THAT A REPORT INVOLVING THE IL-6, THE TNF-ALPHA, AND CRP ASSAYS?

A.   THAT'S CORRECT.

Q.   AND ARE WE NOW LOOKING AT A VERSION OF AN ASSAY DEVELOPMENT REPORT INVOLVING THOSE ASSAYS?

SER-476

A.   YES.

Q.   ON THIS PORTION OF THE REPORT, I'M GOING TO ASK YOU WHAT LOGO YOU SEE AT THE VERY TOP ON THE LEFT.

MS. WALSH:  OBJECTION.

THE COURT:  OVERRULED FOR THE REASONS PREVIOUSLY STATED AS TO THE ADMISSIBILITY OF THIS.

AGAIN, IT'S ONLY AS TO KNOWLEDGE OF THE RECIPIENT AND NOT FOR THE TRUTH OF ANY MATTERS ASSERTED IN THIS.

THE WITNESS:  THE LOGO IS SCHERING-PLOUGH.

BY MR. SCHENK:

Q.   AND AT THE VERY TOP ON THE RIGHT ACROSS FROM THAT LOGO, DO YOU SEE ANOTHER LOGO?

A.   YES, THERANOS.

Q.   DR. CULLEN, IF YOU'LL NOW TURN TO PAGE 51.

DO YOU SEE A CONCLUSIONS SECTION?

A.   I DO.

Q.   IN THE FIRST SENTENCE DOES IT NOW READ, "THE THERANOS IL-6, TNF-ALPHA, CRP ASSAY MULTIPLEX HAS BEEN SHOWN TO GIVE MORE ACCURATE AND PRECISE RESULTS FOR THREE INDEPENDENTLY CALIBRATED CARTRIDGE LOTS AND ALL THE MANY INSTRUMENTS USED THAN CURRENT 'GOLD STANDARD' REFERENCE METHODS"?

A.   YES.

Q.   DR. CULLEN, DID ANYBODY FROM THERANOS EVER ASK YOU PERMISSION TO AFFIX A SCHERING-PLOUGH LOGO TO THE THERANOS ASSAY DEVELOPMENT REPORT?

SER-477

MS. WALSH:  OBJECTION.  106.

THE COURT:  YOU'RE ASKING AGAIN THAT THIS COME IN SOLELY FOR THE KNOWLEDGE OF -- EXCUSE ME, KNOWLEDGE AS TO THE RECIPIENTS OF THE EMAIL?

MR. SCHENK:  YES.

THE COURT:  RIGHT.  OVERRULED.

YOU CAN ANSWER THE QUESTION.

THE WITNESS:  OKAY.  THANK YOU.

THERANOS DID NOT ASK PERMISSION TO USE THE SCHERING-PLOUGH LOGO ON ANY OF THE REPORTS.

MR. SCHENK:  YOUR HONOR, I HAVE -- MAY I APPROACH?

THE COURT:  YES.

MR. SCHENK:  (HANDING.)

Q.  DR. CULLEN, I'VE HANDED YOU ANOTHER TAB.  THIS ONE IS EXHIBIT 277.

DO YOU SEE THAT?

A.  YES.

Q.  AND AGAIN, IS THIS AN EMAIL THREAD -- YOU CAN TAKE A MOMENT TO LOOK THROUGH IT -- BUT YOU ARE NOT ON THIS EMAIL THREAD; IS THAT CORRECT?

A.  THAT'S CORRECT.

MR. SCHENK:  YOUR HONOR, ONCE AGAIN, THE GOVERNMENT INTENDS TO OFFER ONLY THE VERY TOP EMAIL AND THE ATTACHMENT IN LIGHT OF OUR DISCUSSION.

THE PURPOSE IS THE SAME, FOR THE KNOWLEDGE OF THE

SER-478

RECIPIENT ON THE CC LINE AS WE DISCUSSED ON THE MARCH 19TH EMAIL EARLIER.

THE COURT:  MS. WALSH.

MS. WALSH:  OBJECTION.  106, 403, AND OUR PENDING MOTION.

THE COURT:  ALL RIGHT.  THANK YOU.

YOU'RE STRIKING THE BOTTOM EMAIL AND WANT JUST THE TOP?

MR. SCHENK:  YES, YOUR HONOR.  SO ON PAGE 1, JUST THAT VERY TOP EMAIL, AND THEN WE'LL PICK BACK UP ON PAGE 4, WHICH IS WHERE THE ATTACHMENT BEGINS.

THE COURT:  ALL RIGHT.  THANK YOU.

I'LL OVERRULE THE OBJECTION.

THIS IS BEING ADMITTED, AGAIN, LADIES AND GENTLEMEN, NOT FOR THE TRUTH OF THE MATTER ASSERTED, BUT ONLY AS TO THE ISSUE OF KNOWLEDGE, KNOWLEDGE OF THE RECIPIENT OF THIS EMAIL, FOR THAT LIMITED PURPOSE ONLY.

AND YOU'LL STRIKE THE BOTTOM, AND IT'S OTHERWISE ADMITTED.

(GOVERNMENT'S EXHIBIT 277, TOP EMAIL AND ATTACHMENT, WAS RECEIVED IN EVIDENCE.)

MR. SCHENK:  THANK YOU.  AND OTHERWISE PERMISSION TO PUBLISH?

THE COURT:  YES.

BY MR. SCHENK:

Q.   DR. CULLEN, IF YOU'LL LOOK AT THE EMAIL EITHER IN FRONT OF YOU OR ON THE SCREEN, DOES IT APPEAR TO BE AN EMAIL FROM

SER-479

ELIZABETH HOLMES TO SOMEONE NAMED BRUCESHEPHERD@WAL-MART.COM.

DO YOU SEE THAT?

A.   YES.

Q.   AND THEN ON THE CC LINE, IS THERE SOMEONE NAMED SUNNY BALWANI?

A.   YES.

Q.   AND THEN DO YOU SEE AN ATTACHMENT TO THIS EMAIL?

A.   YES.

Q.   AND IF YOU'LL NOW TURN TO PAGE 4 OF THE DOCUMENT, THE FIRST PAGE OF THE ATTACHMENT.

DO YOU RECOGNIZE THIS DOCUMENT?

A.   YES.

Q.   AND WHAT IS THIS?

A.   IT'S THE SAME VALIDATION REPORT OR ASSAY DEVELOPMENT REPORT THAT WAS PROVIDED TO US, SCHERING-PLOUGH.

Q.   OKAY.  AT THE VERY TOP OF THIS VERSION OF THE DOCUMENT, ON THE LEFT-HAND SIDE IN THE HEADER, DO YOU SEE A LOGO?

A.   YES.

Q.   WHOSE LOGO?

A.   THERANOS.

Q.   I'M SORRY.  WHOSE LOGO?

A.   THERANOS.

Q.   ACROSS FROM THE THERANOS LOGO ON THIS VERSION, DO YOU SEE ANY OTHER LOGOS?

A.   NO OTHER LOGO.

**SER-480**

Q.   THANK YOU.

IN ADDITION TO TRAVELLING TO PALO ALTO AS PART OF YOUR DUE DILIGENCE, WAS THERE AN OCCASION WHEN THERANOS PROVIDED ITS TECHNOLOGY TO YOUR LAB IN NEW JERSEY?

A.   YES.  WE RECEIVED TWO INSTRUMENTS FROM THEM.

Q.   WAS THAT AT THE SAME TIME THAT THIS DUE DILIGENCE WORK WAS GOING ON?

A.   I BELIEVE IT WAS PRIOR, BUT CLOSE TO THE SAME TIME.

Q.   OKAY.  AND FOR WHAT PURPOSE DID SCHERING-PLOUGH RECEIVE THESE TWO DEVICES?

A.   JUST FOR BETA TESTING PURPOSES.

Q.   WHAT DOES THAT MEAN, BETA TESTING?

A.   JUST TO BE ABLE TO TEST THE TECHNOLOGY UNDER OUR CONDITIONS IN OUR LAB.

Q.   AND DID YOU OR YOUR LAB DO THAT TESTING?

A.   YES, WE DID.

Q.   HOW DID YOU DO THAT?  WHAT, IN FACT, DID YOU DO?

A.   SO WE SPIKE ONE OF THE ANALYTES, EITHER TNF OR INTERLEUKIN-6, OR C REACTIVE PROTEIN INTO HUMAN BLOOD SPECIMENS, AND THEN WE MEASURE THEM.

Q.   DID YOU SAY SPIKED?

A.   YES.  SPIKED JUST MEANS THAT YOU CAN PURCHASE PURIFIED REAGENTS AND PUT THEM INTO THE HUMAN SERUM SAMPLE SO THAT YOU KNOW THE EXACT AMOUNT IN EACH SAMPLE THAT YOU'RE GOING TO TEST.

Q.   DO YOU KNOW HOW MANY SAMPLES SCHERING-PLOUGH RAN ON THESE

SER-481

THERANOS DEVICES?

A.   I DON'T REMEMBER, NO.

Q.   WOULD YOU CALL THE WORK THAT SCHERING-PLOUGH DID ON THESE THERANOS DEVICES VALIDATION?

A.   NO.

Q.   WHY NOT?

A.   THEY WERE INSUFFICIENT DETERMINATIONS.  WE DIDN'T DO ENOUGH TESTS.  IT WAS SIMPLY A SUPERFICIAL LOOK AT THE CAPABILITY OF THE INSTRUMENT.

Q.   AFTER RUNNING THESE TESTS ON THE THERANOS DEVICES, DID YOU EVER TELL ANYBODY AT THERANOS THAT SCHERING-PLOUGH HAD NOW VALIDATED THERANOS'S TECHNOLOGY OR THERANOS'S DEVICES?

A.   NO.

Q.   TO YOUR KNOWLEDGE, DID ANYBODY FROM SCHERING-PLOUGH, AFTER TESTING THESE DEVICES AT SCHERING-PLOUGH, EVER TELL SOMEONE AT THERANOS THAT SCHERING-PLOUGH HAD VALIDATE THERANOS'S TECHNOLOGY?

A.   NO.

            MR. SCHENK:  MAY I HAVE ONE MOMENT, YOUR HONOR?

            THE COURT:  YES.

    (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

            MR. SCHENK:  THANK YOU, YOUR HONOR.

    NO FURTHER QUESTIONS.

            THE COURT:  CROSS-EXAMINATION?

            MS. WALSH:  YES, YOUR HONOR.

SER-482

MAY I APPROACH THE BENCH, YOUR HONOR?

THE COURT:  YES, YES.  THANK YOU.

MS. WALSH:  (HANDING.)

MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:  YES, YES, OF COURSE.

MS. WALSH:  THANK YOU.

(HANDING.)

**CROSS-EXAMINATION**

BY MS. WALSH:

Q.  GOOD AFTERNOON, DR. CULLEN.

LET ME REMOVE MY MASK.  MY NAME IS AMY WALSH AND I REPRESENT MR. BALWANI.

I'M GOING TO ASK YOU SOME QUESTIONS, AND I'M GOING TO ASK YOU SOME QUESTIONS ABOUT YOUR DIRECT TESTIMONY.  OKAY?

SO YOU WERE ASKED WHETHER -- ABOUT THAT MAY 2009 MEETING, WHETHER MR. BALWANI WAS PRESENT DURING THAT MEETING, AND YOU SAID YOU DON'T REMEMBER; IS THAT RIGHT?

A.  YES.

Q.  AND YOU SAID THAT YOU DID NOT KNOW HIS NAME; IS THAT CORRECT?

A.  THAT'S CORRECT.

Q.  AND MR. SCHENK ASKED YOU, IS IT POSSIBLE THAT YOU NEVER MET MR. BALWANI; RIGHT?

AND YOU SAID YES, THAT'S POSSIBLE; RIGHT?

A.  CORRECT.

SER-483

Q.   AND, IN FACT, YOU'VE NEVER MET MR. BALWANI; CORRECT?

A.   NOT TO MY RECOLLECTION.

Q.   WELL, YOU DON'T RECOGNIZE HIM IN THE COURTROOM TODAY?

A.   NO.

Q.   AND IN ALL OF YOUR COMMUNICATIONS WITH THERANOS, YOU DID NOT SPEAK WITH MR. BALWANI; IS THAT RIGHT?

A.   CORRECT.

Q.   YOU DIDN'T EMAIL WITH HIM; CORRECT?

A.   CORRECT.

Q.   AND IN ALL OF THE EMAILS THAT MR. SCHENK SHOWED YOU DURING YOUR DIRECT TESTIMONY, MR. BALWANI WAS NOT ON ANY OF THOSE EMAILS; RIGHT?

A.   CORRECT.

Q.   AND WERE YOU AWARE THAT DURING THE FIRST HALF OF 2009, MR. BALWANI DIDN'T EVEN WORK FOR THERANOS?  WERE YOU AWARE OF THAT?

A.   NO.

Q.   OKAY.  AND YOU JUST TESTIFIED ABOUT THE EARLY 2009 TIME PERIOD WHEN THERANOS PROVIDED SCHERING-PLOUGH WITH THE TWO DEVICES.

     DO YOU REMEMBER THAT TESTIMONY?

A.   YES.

Q.   AND YOU SAID THAT YOU SPIKED THE SAMPLE.  I GUESS IT WAS RUN IN THE MACHINE; IS THAT RIGHT?

A.   YES.

Q.   OKAY.  AND SO THERANOS SENT SCHERING-PLOUGH TWO OF ITS DEVICES; CORRECT?

A.   CORRECT.

Q.   AND SCHERING-PLOUGH HAD THOSE DEVICES INDEPENDENT OF THERANOS; RIGHT?

A.   I DON'T KNOW WHAT YOU MEAN BY INDEPENDENT OF THERANOS.

Q.   YEAH.  I'LL ASK A DIFFERENT QUESTION.  THANKS.

THERANOS DID NOT SUPERVISE SCHERING-PLOUGH WHEN SCHERING-PLOUGH SPIKED THE SAMPLES --

A.   CORRECT.

Q.   -- AND RAN THEM IN THE DEVICES?

THE COURT:  DR. CULLEN, I'M GOING TO ASK YOU TO WAIT UNTIL THE QUESTION IS FINISHED.

THE WITNESS:  OKAY.

THE COURT:  AND THEN ANSWER.  THAT WAY IT WILL MAKE OUR REPORTER MUCH HAPPIER AS WELL, SO THANK YOU.

BY MS. WALSH:

Q.   AND I'LL WAIT UNTIL YOUR ANSWER IS FINISHED, WHICH WILL HELP.

SO SCHERING-PLOUGH HAD THE DEVICES; CORRECT?

A.   CORRECT.

Q.   AND INDEPENDENT OF THERANOS, SCHERING-PLOUGH COULD RUN THE SAMPLES WHENEVER IT WANTED; RIGHT?

A.   CORRECT.

Q.   AND IT COULD EVALUATE THE RESULTS INDEPENDENT OF THERANOS;

SER-485

CORRECT?

A.   THAT'S NOT CORRECT, BECAUSE THE INSTRUMENT ITSELF DID NOT HAVE A READOUT FOR RESULTS.  THEY HAD TO BE SENT TO US.

Q.   THE RESULTS HAD TO BE SENT TO YOU?

A.   CORRECT.

Q.   FROM THERANOS?

A.   CORRECT.

Q.   OKAY.  BUT THE DEVICE ITSELF YOU HAD IN YOUR POSSESSION; RIGHT?

A.   CORRECT.

Q.   AND YOU COULD RUN THE DEVICE; CORRECT?

A.   CORRECT.

Q.   AND YOU DIDN'T HAVE SOMEONE FROM THERANOS SUPERVISING THAT PROCESS?

A.   ALL CORRECT.

Q.   OKAY.  AND YOU SAID THAT YOU TOOK A SUPERFICIAL LOOK AT THE CAPABILITY OF THE MACHINE; IS THAT RIGHT?

A.   YES.

Q.   JUST NOW?

BUT, IN FACT, WHEN YOU DID TAKE WHATEVER LOOK YOU DID TAKE AT THE MACHINE, YOU WERE -- YOUR TEAM WAS IMPRESSED WITH THE MACHINE'S SENSITIVITY; ISN'T THAT RIGHT?

A.   THAT IS CORRECT.

Q.   OKAY.  AND AS FAR AS YOU COULD TELL, THE MACHINE PROVIDED ACCURATE RESULTS; RIGHT?

A.   AS FAR AS WE COULD TELL, YES.

Q.   NOW, IN THE SPRING OF 2009, YOU SAID YOU WENT TO A MEETING AT THERANOS IN CALIFORNIA; RIGHT?

A.   THAT'S CORRECT.

Q.   AND YOU FLEW HERE FROM NEW JERSEY?

A.   CORRECT.

Q.   AND THE PURPOSE OF THAT MEETING WAS TO HAVE A DISCUSSION ABOUT THE THERANOS TECHNOLOGY; RIGHT?

A.   THAT'S CORRECT.

Q.   AND YOU WANTED TO TALK ABOUT THE CHEMISTRY IN THE ASSAYS; RIGHT?

A.   CORRECT.

Q.   AND, IN FACT, IT WAS -- IT WASN'T JUST ONE ASSAY, IT WAS THREE DIFFERENT ASSAYS; RIGHT?

A.   IT WAS THOSE THREE ASSAYS.  BUT IN ADDITION, WE WERE INTERESTED IN PURSUING IT FOR POTENTIALLY OTHER ANALYTES, INCLUDING PROPRIETARY.

Q.   OKAY.  BUT THE ASSAYS THAT YOU RAN, THERE WERE THREE DIFFERENT ASSAYS; CORRECT?

A.   CORRECT.

Q.   AND THOSE THREE DIFFERENT ASSAYS RAN ON ONE CARTRIDGE; IS THAT RIGHT?

A.   THAT IS CORRECT.

Q.   OKAY.  SO WHEN YOU CAME TO CALIFORNIA IN MAY OF 2009, THE MEETING, THE PURPOSE OF THE MEETING WAS TO DISCUSS THE SCIENCE

SER-487

OF THE ASSAYS; CORRECT?

A.    CORRECT.

Q.    OKAY.  AND IF WE CAN PULL UP WHAT IS IN EVIDENCE AS EXHIBIT 192.

AND THIS IS THE CALENDAR INVITE AND AGENDA FOR THAT MEETING; CORRECT?

A.    YES.

Q.    AND IF WE CAN GO TO THE SECOND PAGE, THAT'S THE AGENDA, AND I WANT TO FOCUS IN ON THE SCHERING-PLOUGH PARTICIPANTS IN THAT MEETING.

SO ONE OF THE PARTICIPANTS WAS DR. ABUTARIF; IS THAT RIGHT?

A.    YES.

Q.    AND HE WAS A PH.D. AND A SCIENTIST; CORRECT?

A.    CORRECT.

Q.    AND THERE WAS A DR. FICK, WHO WAS A MEDICAL DOCTOR; RIGHT?

A.    YES.

Q.    AND A DR. GHEYAS; CORRECT?

A.    CORRECT.

Q.    WITH A PH.D. IN STATISTICS?

A.    CORRECT.

Q.    AND A DR. VAN HOOGSTRATEN; CORRECT?

A.    CORRECT.

Q.    WHO IS BOTH A DOCTOR AND A PH.D.; RIGHT?

A.    THAT IS CORRECT.

SER-488

Q.   AND LET'S LOOK AT THE PEOPLE WHO ATTENDED ON BEHALF OF THERANOS.

THERE'S DR. IAN GIBBONS; CORRECT?

A.   YES.

Q.   AND HE'S A PH.D.?

A.   CORRECT.

Q.   AND DR. MICHELSON, ALSO A PH.D.; RIGHT?

A.   RIGHT.

Q.   AND DR. THIBONNIER; CORRECT?

A.   CORRECT.

Q.   AND ALSO HE WAS AN M.D.; RIGHT?

A.   CORRECT.

Q.   AND ACTUALLY THE CHIEF MEDICAL OFFICER OF THERANOS AT THE TIME; RIGHT?

A.   CORRECT.

Q.   AND THEN DR. YOUNG, WHO WAS A PH.D.

DO YOU SEE HIM?

A.   CORRECT.

Q.   AND SO THIS WAS A MEETING REALLY AMONG THE SCIENTISTS BETWEEN SCHERING-PLOUGH AND THERANOS; CORRECT?

A.   THAT IS CORRECT.

Q.   AND THIS IS A MEETING WHERE YOU FELT THAT, OR YOU TESTIFIED THAT YOU HAD SOME ISSUES WITH MS. HOLMES'S CANDOR; IS THAT RIGHT?

A.   THAT'S CORRECT.

Q.   AND YOU SAID ON DIRECT THAT YOU DIDN'T FEEL THAT SHE WAS ANSWERING THE QUESTIONS ADEQUATELY; IS THAT RIGHT?

A.   THAT'S CORRECT.

Q.   AND YOU FELT LIKE YOU COULDN'T GET A CERTAIN LEVEL OF DISCLOSURE FROM THERANOS AT THE TIME; CORRECT?

A.   CORRECT.

Q.   BUT YOU DID NOT SAY ANYTHING DURING THAT MEETING ABOUT NOT GETTING YOUR QUESTIONS ANSWERED; RIGHT?

A.   CORRECT.

Q.   YOU NEVER TOLD MS. HOLMES; CORRECT?

A.   CORRECT.

Q.   AND YOU NEVER TOLD ANY OF THE SCIENTISTS WHO PARTICIPATED IN THAT MEETING; CORRECT?

A.   THAT'S CORRECT.

Q.   AND YOU SAID YOU DIDN'T DO THAT BECAUSE IT FELT AWKWARD AT THE TIME; CORRECT?

A.   CORRECT.

Q.   BUT THE FACT IS THAT YOU NEVER EXPRESSED YOUR VIEWS?

A.   THAT IS CORRECT.

Q.   OKAY.  AND MR. BALWANI WAS NOT AT THIS MEETING; CORRECT?

A.   CORRECT.

Q.   OKAY.  AND MR. SCHENK SHOWED YOU EXHIBIT 223, WHICH WAS A JUNE 2009 EMAIL.

     YES, IF WE CAN PULL THAT UP.

     AND ON THE BOTTOM EMAIL, DR. CULLEN, IN JUNE OF 2009, YOU

ARE EMAILING GARY FRENZEL FROM THERANOS; RIGHT?

A.    CORRECT.

Q.    AND THE SUBJECT IS ASSAY DEVELOPMENT; RIGHT?

A.    YES.

Q.    AND YOU SAY, "HI GARY,

"WE HAD A TEAM MEETING TODAY AND JIM MCCLEOD ASKED ME TO CHECK IN AND GET AN ASSAY DEVELOPMENT UPDATE FOR THE TEAM. COULD YOU GIVE ME A SYNOPSIS OF WHERE THINGS ARE AT AND IF YOU NEED ANYTHING FROM OUR END?"

THAT'S WHAT YOU SAID; RIGHT?

A.    CORRECT.

Q.    AND YOU DIDN'T EXPRESS ANY OF THE VIEWS THAT YOU SAY YOU HAD IN THE MEETING IN THIS EMAIL EITHER; RIGHT?

A.    THAT IS CORRECT.

Q.    YOU DIDN'T RAISE ANY QUESTIONS ABOUT THE THERANOS TECHNOLOGY; RIGHT?

A.    THAT IS CORRECT.

Q.    AND YOU DIDN'T COMMENT ON MS. HOLMES'S CANDOR IN THIS EMAIL; CORRECT?

A.    CORRECT.

Q.    OKAY.  SO LET'S FAST FORWARD IN TIME TO DECEMBER 2009, AND LET'S PULL UP WHAT IS IN EVIDENCE AS EXHIBIT 262.

AND IF WE GO FROM THE BOTTOM EMAIL FROM MR. FRENZEL TO YOU AT 2:26 P.M., MR. FRENZEL EMAILS YOU SAYING, "HI CONNIE, I JUST WANTED TO MAKE SURE THAT YOU RECEIVED THIS REPORT."

SER-491

AND HE'S REFERRING TO THE REPORT THAT WE JUST LOOKED AT; CORRECT?

A.   THAT'S CORRECT.

Q.   AND "WE ARE LOOKING FORWARD TO DISCUSSING IT WITH YOU."

AND THEN IF WE CAN GO TO THE NEXT EMAIL UP.

AND WHAT YOU SAY TO HIM IS, "HI GARY,

"I'M SORRY FOR THE SLOW RESPONSE.  I DID RECEIVE THE REPORT, I'D ACTUALLY LIKE TO DEFER OUR DISCUSSIONS UNTIL JANUARY.  WE ARE TOTALLY SWAMPED WITH THE MERGER WITH MERCK."

IS THAT RIGHT?  IS THAT WHAT YOU WROTE?

A.   CORRECT.

Q.   OKAY.  AND YOU SAID ON DIRECT THAT YOU ACTUALLY READ THE REPORT AT THE TIME YOU SENT THIS EMAIL; IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   AND YOU AGAIN IN THIS EMAIL DID NOT VOICE ANY CONCERNS ABOUT THE THERANOS TECHNOLOGY; IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   AND YOU DID NOT VOICE THE CONCERNS THAT YOU SAID YOU HAD IN THE MEETING ABOUT MS. HOLMES'S CANDOR; RIGHT?

A.   THAT IS CORRECT.

Q.   OKAY.  AND IT DOESN'T -- YOUR EMAIL DIDN'T SAY REALLY ANYTHING ABOUT THE REPORT, WHETHER YOU THOUGHT IT WAS GOOD OR BAD OR IF YOU HAD ISSUES WITH IT; CORRECT?

A.   CORRECT.

Q.   NOW, MR. SCHENK ASKED YOU --

WE CAN TAKE THAT DOWN, MR. ALLEN.  THANK YOU.

YOU DEFERRED THE DISCUSSIONS IN THE EMAIL THAT WE JUST SAW WITH MR. FRENZEL BECAUSE OF THE MERGER; RIGHT?

A.    THAT'S CORRECT.

Q.    AND MR. FRENZEL ASKED YOU IF YOU HAD ANY OTHER DISCUSSIONS WITH THERANOS -- I'M SORRY, WITHDRAWN ON THAT.

MY QUESTION IS MR. SCHENK, DURING YOUR DIRECT EXAMINATION, ASKED YOU IF YOU HAD ANY FURTHER CONVERSATIONS WITH THERANOS AFTER DECEMBER 2009; CORRECT?

A.    THAT IS CORRECT.

Q.    AND YOU SAID NOT THAT I RECALL; RIGHT?

A.    THAT IS CORRECT.

Q.    BUT ISN'T IT TRUE, DR. CULLEN, THAT YOU RECONNECTED WITH THERANOS IN MARCH OF 2010?

A.    IF I DID, I DON'T REMEMBER IT.

Q.    OKAY.  AND I CAN SHOW YOU SOMETHING TO REFRESH YOUR RECOLLECTION IF YOU NEED IT.

A.    SURE.

Q.    BUT DO YOU RECALL WRITING TO THERANOS THAT YOU ASKED A SCIENTIST FROM YOUR GROUP TO REACH OUT TO GARY SO YOU COULD DISCUSS THE REPORT?

DO YOU REMEMBER THAT?

A.    YES.

Q.    OKAY.  SO CAN WE -- ACTUALLY, CAN YOU TURN IN YOUR EXHIBIT BINDER TO EXHIBIT 10574.  JUST LET ME KNOW WHEN YOU HAVE IT IN

FRONT OF YOU.

A.    I HAVE IT.

Q.    OKAY.  DO YOU SEE THE EMAIL FROM YOU TO MS. HOLMES?

DO YOU SEE THAT?

A.    YES.

Q.    AND THIS IS ON MARCH 6TH, 2010?

A.    YES.

Q.    IS THAT AN EMAIL THAT YOU SENT TO MS. HOLMES AT THE TIME THAT THE EMAIL SAYS YOU SENT IT?

A.    YES.

MS. WALSH:  YOUR HONOR, WE OFFER 10574.

MR. SCHENK:  NO OBJECTION.

THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

(DEFENDANT'S EXHIBIT 10574 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

Q.    OKAY.  DR. CULLEN, IN -- LET'S GO TO THE BOTTOM EMAIL FROM MS. HOLMES.

WHAT SHE SAYS TO YOU IS -- AND AGAIN, THIS IS MARCH 5TH, 2010, A FEW MONTHS AFTER DECEMBER 2009.  AND SHE SAYS, "CONNIE --

"CAROLYN LET ME KNOW THAT YOU TWO CONNECTED -- I AM REALLY LOOKING FORWARD TO OUR NEXT CONVERSATION.  PLEASE LET ME KNOW IF THERE IS ANYTHING WE CAN DO FROM OUR END TO HELP FACILITATE THINGS MOVING FORWARD IN THE MEANTIME.

"CONGRATULATIONS ON YOUR NEW ROLE -- I WAS SO HAPPY TO

HEAR ABOUT IT."

DO YOU SEE THAT?

A.   YES, I DO.

Q.   AND SHE'S CONGRATULATING YOU ON YOUR NEW ROLE IN THE MERGER; RIGHT?

A.   YES.

Q.   OKAY.  AND IF WE GO UP TO THE NEXT PART OF THE CHAIN, YOU RESPOND TO MS. HOLMES AND YOU SAY, "HI ELIZABETH,

"THANKS FOR THE NOTE BELOW.  THINGS WILL SETTLE DOWN EVENTUALLY.  IN THE MEANTIME, I'VE ASKED A SCIENTIST FROM MY GROUP (DON LEE) TO REACH OUT TO GARY TO DISCUSS THE SPECIFICS OF THE VALIDATION."

DO YOU SEE THAT?

A.   YES, I DO.

Q.   OKAY.  AND SO WHEN YOU TESTIFIED THAT YOU DIDN'T REMEMBER ANY OTHER INTERACTION WITH THERANOS AFTER DECEMBER 2009, DOES THIS REFRESH YOUR RECOLLECTION AS TO FURTHER COMMUNICATIONS WITH THERANOS AFTER THAT POINT?

A.   IT DOES.

Q.   OKAY.  AND AGAIN, IN THIS EMAIL IN MARCH OF 2010, YOU DON'T EXPRESS ANY MISGIVINGS ABOUT THE THERANOS TECHNOLOGY; CORRECT?

A.   CORRECT.

Q.   NOR ANY MISGIVINGS ABOUT MS. HOLMES'S CANDOR OR ABILITY TO ANSWER QUESTIONS ABOUT THE THERANOS TECHNOLOGY; RIGHT?

SER-495

A.   CORRECT.

MS. WALSH:  YOUR HONOR, MAY I HAVE A MOMENT?

THE COURT:  YES.

(DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

MS. WALSH:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  MR. SCHENK.

MR. SCHENK:  JUST BRIEFLY.

### REDIRECT EXAMINATION

BY MR. SCHENK:

Q.   DR. CULLEN, IN THIS FURTHER EMAIL THAT IS EXHIBIT 10574, THE ONE YOU WERE DISCUSSING WITH MS. WALSH --

A.   YES.

Q.   -- WHERE MS. HOLMES WROTE TO YOU AND CONGRATULATED ON YOU YOUR NEW ROLE AFTER THE MERGER, DID YOU RESPOND BY TELLING MS. HOLMES THAT SCHERING-PLOUGH COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

A.   NO.

Q.   DID YOU EVER SAY THAT TO MS. HOLMES?

A.   NO.

Q.   DID YOU EVER SAY THAT TO ANYBODY AT THERANOS?

A.   NO.

Q.   DID ANYBODY, TO YOUR KNOWLEDGE, FROM SCHERING-PLOUGH EVER SAY THAT TO ANYBODY AT THERANOS?

A.   NO.

Q.   THANK YOU.

SER-496

NO FURTHER QUESTIONS.

THE COURT:  MS. WALSH?

MS. WALSH:  NOTHING FURTHER.

THE COURT:  MAY THIS WITNESS BE EXCUSED?

MR. SCHENK:  YES.

THE COURT:  MS. WALSH, MAY THIS WITNESS BE EXCUSED?

MS. WALSH:  YES.

THE COURT:  THANK YOU.  DOCTOR, YOU'RE EXCUSED.
THANK YOU.

DOES THE GOVERNMENT HAVE ADDITIONAL WITNESSES AVAILABLE
TODAY?

MR. BOSTIC:  YES, YOUR HONOR, WE DO.

THE UNITED STATES CALLED DANIEL EDLIN.

THE COURT:  FOLKS, IF YOU WANT TO STAND AND STRETCH
FOR A MOMENT WHILE THE WITNESS COMES IN.

SIR, IF YOU WOULD COME AND STAND AND RAISE YOUR RIGHT
HAND.

**(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS SWORN.)**

THE WITNESS:  YES.

THE COURT:  PLEASE HAVE A SEAT HERE, SIR.

AND PLEASE BE SEATED EVERYONE.

THANK YOU.

MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST THAT
MICROPHONE AND THE CHAIR AS NEEDED FOR YOUR COMFORT.

WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

SER-497

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,              )
                                       )  CR-18-00258-EJD
                    PLAINTIFF,         )
                                       )  SAN JOSE, CALIFORNIA
          VS.                          )
                                       )  APRIL 27, 2022
RAMESH "SUNNY" BALWANI,                )
                                       )  VOLUME 23
                    DEFENDANT.         )
_____        )  PAGES 3960 - 4226


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                        BY:  JOHN C. BOSTIC
                             JEFFREY B. SCHENK
                        150 ALMADEN BOULEVARD, SUITE 900
                        SAN JOSE, CALIFORNIA 95113

                        BY:  ROBERT S. LEACH
                        1301 CLAY STREET, SUITE 340S
                        OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074
                        LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

SER-498

INDEX OF PROCEEDINGS

GOVERNMENT'S:


**LISA PETERSON**
CROSS-EXAM BY MR. COOPERSMITH (RES.)      P. 3965
REDIRECT EXAM BY MR. LEACH                P. 4051
RECROSS-EXAM BY MR. COOPERSMITH           P. 4062


**SUNIL DHAWAN**
DIRECT EXAM BY MR. SCHENK                  P. 4080
CROSS-EXAM BY MS. WALSH                    P. 4135
REDIRECT EXAM BY MR. SCHENK                P. 4202
RECROSS-EXAM BY MS. WALSH.                 P. 4212
FURTHER REDIRECT EXAM BY MR. SCHENK        P. 4216

SER-499

THE CLERK:  SIR.

THE WITNESS:  SORRY.

**(GOVERNMENT'S WITNESS, SUNIL DHAWAN, WAS SWORN.)**

THE WITNESS:  YES.

THE CLERK:  ALL RIGHT.  THANK YOU.

THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  MAKE YOURSELF COMFORTABLE.

FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE.

THE WITNESS:  MAY I REMOVE MY MASK, JUDGE?

THE COURT:  YOU'RE FULLY VACCINATED?

THE WITNESS:  YES.

THE COURT:  YES.

THE WITNESS:  SUNIL S. DHAWAN.

THE COURT:  AND SPELL IT, PLEASE.

THE WITNESS:  S-U-N-I-L, S, D-H-A-W-A-N.

THE COURT:  THANK YOU.

COUNSEL.

MR. SCHENK:  THANK YOU, YOUR HONOR.

**DIRECT EXAMINATION**

BY MR. SCHENK:

Q.   GOOD AFTERNOON, DR. DHAWAN.  HOW ARE YOU?

A.   GOOD, THANK YOU.

Q.   DR. DHAWAN, DO YOU KNOW SOMEONE NAMED SUNNY BALWANI?

DHAWAN DIRECT BY MR. SCHENK                                  4081

A.   YES.

Q.   HOW DID YOU MEET HIM?

A.   MANY YEARS AGO AS A PATIENT.

Q.   AS A PATIENT OF YOURS?

A.   YES.

Q.   ARE YOU A MEDICAL DOCTOR?

A.   YES, SIR.

Q.   AND DESCRIBE FOR THE JURY, PLEASE, YOUR MEDICAL TRAINING.

A.   I DID MY MEDICAL SCHOOL AND THEN INTERNAL MEDICINE
RESIDENCY, AND THEN I DID A DERMATOLOGY RESIDENCY AFTERWARDS.

Q.   AND DO YOU PRACTICE MEDICINE NOW?

A.   YES, I DO.

Q.   WHERE?

A.   IN FREMONT AND MILPITAS.

Q.   AND WHAT IS THE NAME OF YOUR PRACTICE?

A.   CENTER FOR DERMATOLOGY.

Q.   AND WHEN DID YOU MEET MR. BALWANI?  DO YOU KNOW THE YEAR?

A.   IT WOULD HAVE BEEN AT LEAST 15 -- PROBABLY EARLY 2000'S.

Q.   WERE YOU AT THAT TIME WORKING AT THE SAME DERMATOLOGY
CENTER?

A.   YES.

Q.   AND WHAT DO YOU DO THERE?

A.   I AM ONE OF THE PARTNERS THERE.  I MANAGE PATIENTS, AND
HAVE A CLINICAL RESEARCH OFFICE AS WELL THAT WE RUN.

Q.   ARE THOSE TWO SEPARATE THINGS, YOUR PATIENTS AND YOUR

SER-501

CLINICAL RESEARCH?

A.   THEY ARE SEPARATE, BUT THEY'RE INTERMINGLED.  THEY WORK TOGETHER.

Q.   WOULD YOU JUST SPEND A MOMENT DESCRIBING FOR THE JURY THE CLINICAL RESEARCH WORK THAT YOU DO?

A.   SO I WORK FOR BIOTECH PHARMACEUTICAL DEVICE MANUFACTURERS IN PART OF THE APPROVAL PROCESS IN FRONT OF THE FOOD AND DRUG ADMINISTRATION TO GET THEIR PRODUCT APPROVED, AND WE DO TRIALS ON PATIENTS ON A ROUTINE BASIS.

Q.   AND IF WE CAN THINK OF THEM AS TWO SIDES OF YOUR WORK, WHICH ONE WAS THE ONE WHERE YOU HAD THE OPPORTUNITY TO MEET MR. BALWANI?

A.   IN THE REGULAR PRACTICE.

Q.   AS A PATIENT IN YOUR REGULAR PRACTICE?

A.   YES.

Q.   THROUGH YOUR DISCUSSIONS WITH MR. BALWANI, DID HE EVER TELL YOU WHERE HE WORKED?

A.   INITIALLY MANY YEARS AGO, YES.  I DON'T RECALL WHERE THOSE PLACES WERE.

Q.   OKAY.  WAS THERE A POINT IN TIME WHEN HE DESCRIBED TO YOU A COMPANY CALLED THERANOS?

A.   HE DID.

Q.   AND DO YOU REMEMBER WHEN THAT WAS?

A.   I BELIEVE IT WAS 2014, PERHAPS 2013.

Q.   OKAY.  DID HE ASK YOU TO WORK AT THERANOS?

SER-502

A.   INITIALLY, NO.

BUT I BELIEVE AT THE END OF 2014 HE ASKED ME TO DO SOME WORK FOR THEM.

Q.   WHAT TYPE OF WORK WAS HE INTERESTED IN HAVING YOU DO FOR THERANOS?

A.   MEDICAL DIRECTOR FOR A SHORT PERIOD OF TIME.

Q.   MEDICAL DIRECTOR?

A.   OR DIRECTOR OF THE LAB ACTUALLY.

Q.   LAB DIRECTOR?

A.   YES, SIR.

Q.   OKAY.  DID YOU EVENTUALLY SAY YES?  DID YOU ACCEPT THAT JOB?

A.   YES.

Q.   WE'LL LOOK AT SOME DOCUMENTS IN A MOMENT, BUT FOR HOW LONG WERE YOU LAB DIRECTOR?  DO YOU RECALL?

A.   IT VARIED.

MY INITIAL IMPRESSION WAS THAT IT WAS ONLY GOING TO BE FOR A FEW MONTHS, LIKE TWO OR THREE MONTHS, AND THEN IT ENDED UP STRETCHING OUT TO I BELIEVE CLOSE TO EIGHT, NINE MONTHS.

Q.   OKAY.  WE'LL LOOK AT THAT ALSO.

LET'S START WHEN YOU BEGAN YOUR TIME AS LAB DIRECTOR.

A.   UH-HUH.

Q.   DO YOU KNOW THAT DATE, OR WOULD IT HELP IF I SHOWED YOU SOME DOCUMENTS?

A.   IT WOULD BE IN THE DOCUMENTS, CORRECT.

SER-503

MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

THE COURT:  PLEASE.

MR. SCHENK:  THANK YOU.  (HANDING.)

Q.  DR. DHAWAN, I'VE HANDED YOU A BINDER OF DOCUMENTS, AND I'M GOING TO ASK YOU TO START BY TURNING TO THE TAB MARKED 2537.

YOUR HONOR, I BELIEVE I CAN OFFER THIS BY STIPULATION OF THE PARTIES.

THE COURT:  MS. WALSH?

MS. WALSH:  YES, YOUR HONOR.

THERE IS ONE SMALL REDACTION THAT I REQUESTED.  MR. SCHENK MAY KNOW WHAT I'M TALKING ABOUT.

MR. SCHENK:  YES.  I DO NOT INTEND TO --

MS. WALSH:  ALL RIGHT.  THANK YOU.

NO OBJECTION, YOUR HONOR.

THE COURT:  THIS IS ADMITTED.  IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 2537 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.  DR. DHAWAN, IT WILL APPEAR ON THE SCREEN, AND IT WILL BE IN THE BINDER, SO TAKE YOUR PICK.

IF WE CAN START ON PAGE 6 OF THIS DOCUMENT.

SORT OF IN THE MIDDLE OF THE PAGE, DO YOU SEE AN EMAIL -- ACTUALLY MORE TOWARDS THE BOTTOM, THERE IS SOMETHING THAT SAYS, ON FRIDAY, NOVEMBER 14, 2014.

DO YOU SEE THAT?

A.  YES.

Q.   AND IS THAT AN EMAIL FROM MR. BALWANI TO YOU?

A.   YES.

Q.   IN THAT FIRST PARAGRAPH, MR. BALWANI THANKS YOU FOR TAKING HIS CALL.

AND HE THEN GOES ON TO SAY, "THE TIME COMMITMENT IS VERY MINIMAL.  THIS WILL BE MOSTLY AN ON CALL CONSULTING ROLE AND I AM EXTREMELY CONFIDENT THAT IT WON'T INTERFERE WITH YOUR WORK OR WITH YOUR FAMILY LIFE."

AND THEN TOWARDS THE BOTTOM OF THE SCREEN WE SEE, "THIS WILL BE 1-3 MONTHS," AND THEN IT CONTINUES ON THE NEXT PAGE, "ROLE."

DO YOU SEE THAT?

A.   YES.

Q.   AND WAS THIS THE BEGINNING OF A CONVERSATION BETWEEN YOU AND MR. BALWANI ABOUT YOU BECOMING A LAB DIRECTOR AT THERANOS?

A.   YES.

Q.   AND IS THAT CONSISTENT WITH YOUR MEMORY THAT IT WAS AROUND NOVEMBER OF 2014?

A.   YES.

Q.   DO YOU KNOW WHETHER THERANOS HAD A LAB DIRECTOR BEFORE YOU OR WHETHER YOU WERE GOING TO BE THE FIRST LAB DIRECTOR IN NOVEMBER OF 2014?

A.   MY RECOLLECTION IS THAT THERE WAS SOMEBODY BEFORE ME.

Q.   DID MR. BALWANI DESCRIBE TO YOU THE CIRCUMSTANCES OF THAT INDIVIDUAL'S DEPARTURE?

A.   NO.

Q.   YOU HAD NO KNOWLEDGE OF WHY THAT PERSON LEFT; IS THAT RIGHT?

A.   NO.

Q.   IF YOU'LL NOW GO UP ONE EMAIL ON PAGE 6, YOU RESPOND, IT LOOKS LIKE, "SUNNY,

"I CAN DO THIS -- WHAT IS NEXT STEP?"

DO YOU SEE THAT?

A.   YES.

Q.   AND SO IS THIS THE BEGINNING OF YOU ACCEPTING THE JOB AS LAB DIRECTOR?

A.   YES.

Q.   I'M GOING TO NOW ASK YOU TO TURN TO TAB 2248.

AND I BELIEVE THIS IS ALSO OFFERED BY STIPULATION, YOUR HONOR.

MS. WALSH:  YES.  NO OBJECTION.

THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. 2248?

MR. SCHENK:  YES, YOUR HONOR, 2248.

(GOVERNMENT'S EXHIBIT 2248 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   DR. DHAWAN, IS THIS AN EMAIL FROM AN INDIVIDUAL AT THERANOS TO YOU, NOW ATTACHING AN EMPLOYMENT AGREEMENT, OR WHAT IS CALLED A CONSULTING AGREEMENT?

A.   YES.

Q.   AND IS THIS A FEW WEEKS LATER NOW TOWARDS THE END OF NOVEMBER 2014?

A.   YES.

Q.   WOULD YOU TURN TO PAGE 2 OF THIS EXHIBIT?

     ACTUALLY, THAT'S FINE.  PAGE 2 AT THE VERY TOP, DO YOU SEE IT'S ENTERED INTO AND THERE'S A DATE.

     THE DATE IS NOVEMBER 19TH, 2014?

A.   YES.

Q.   SO IS THAT THE DATE THAT YOU BEGAN AS THERANOS LAB DIRECTOR?

A.   YES.

Q.   WOULD YOU NOW TURN TO PAGE 7 OF THIS EXHIBIT.

     DOES THIS EXHIBIT A LAY OUT YOUR COMPENSATION AND THE SERVICES THAT YOU WOULD PERFORM?

A.   YES.

Q.   FIRST, WHO WAS YOUR CONTACT AT THERANOS?

A.   IT WOULD HAVE BEEN SUNNY, MR. BALWANI.

Q.   OKAY.  AND HERE IT SAYS, "SUNNY BALWANI, PRESIDENT AND COO."

     TELL ME NOW IF IN REALITY THAT WAS TRUE.  I SEE THE DOCUMENT SAYS THAT YOUR PRINCIPAL CONTACT WAS MR. BALWANI, BUT HOW ABOUT IN PRACTICE?  ONCE YOU STARTED THERE, WAS MR. BALWANI YOUR PRIMARY CONTACT IN FACT?

A.   IN FACT, YES.

Q.   THE NEXT -- NUMBER 2 TALKS ABOUT SERVICES.

DOES IT SAY YOU WILL BE SERVING AS A LAB DIRECTOR AND CLINICAL CONSULTANT OF THERANOS'S CLIA LAB?

A.   YES.

Q.   IN YOUR PRACTICE THAT YOU DESCRIBED TO US A MOMENT AGO, YOUR DERMATOLOGY PRACTICE, DID YOU HAVE PRIOR EXPERIENCE BEING A LAB DIRECTOR?

A.   YES, IN MY OWN PRACTICE.

Q.   WERE THERE DIFFERENCES BETWEEN THE THERANOS LAB AND YOUR LAB?

A.   YES.  WE DID MORE HISTOPATHOLOGIC EXAMINATIONS, H-I-S-T-O-P-A-T-H-O-L-O-G-I-C, EXAMINATIONS OF SLIDES.

Q.   I'M SORRY.  IN WHICH ONE?

A.   IN MY OWN -- IN OUR PRACTICE.

Q.   OKAY.  SO IN YOUR PRACTICE, THE LAB WORK INVOLVED PUTTING A SUBSTANCE ON A SLIDE AND LOOKING AT IT?

A.   PROCESS SLIDES ACTUALLY.

Q.   AND HOW IS THAT DIFFERENT FROM WHAT YOU UNDERSTOOD THE WORK AT THERANOS TO BE?

A.   IT WOULD BE MORE LABORATORY VALUES, LABORATORY EXAMINATIONS OF BLOOD SAMPLES, ET CETERA.

Q.   IN NOVEMBER OF 2014 WHEN YOU AGREED TO TAKE ON THIS ROLE AT THERANOS, WHAT DID YOU UNDERSTAND THERANOS TO DO?

A.   USING A DEVICE TO ANALYZE BLOOD SPECIMENS.

Q.   AND WHERE DID YOU GET THAT UNDERSTANDING?

A.   MOSTLY FROM MY RESEARCH ON -- ON THE INTERNET AND ON

GOOGLE.

Q.   MR. BALWANI ASKED YOU TO BE LAB DIRECTOR AT THERANOS, AND THEN YOU LEARNED ABOUT THERANOS THROUGH GOOGLE?

A.   I PREVIOUSLY HAD BEEN RESEARCHING THE COMPANY THROUGH GOOGLE AND MY INTERNET --

Q.   WHAT DO YOU MEAN --

A.   -- SEARCHES.

Q.   I'M SORRY.

A.   I HEARD ABOUT THE COMPANY, AND THEN ONCE HE CONTACTED ME, I STARTED LOOKING IT UP.

Q.   SO WAS THIS GOOGLE RESEARCH, WAS THAT AT THE SAME TIME OR AROUND THE SAME TIME THAT MR. BALWANI OFFERED YOU THE JOB?

A.   I LOOKED AT IT PREVIOUSLY AND AT THE SAME TIME, YES.

Q.   AND YOU SAID IT WAS BLOOD TESTING USING A DEVICE; IS THAT RIGHT?

A.   YES.

Q.   AND DID YOU KNOW WHO MADE THE DEVICE?  WAS IT A DEVICE THAT THERANOS BOUGHT OR WHETHER IT A DEVICE THAT THERANOS MADE?

A.   I WAS NEVER TOLD OF ANY OF THAT, NO.

Q.   HOW ABOUT ONCE YOU STARTED WORKING THERE?  I WAS ORIGINALLY ASKING BEFORE YOU STARTED.

     NOW YOU'VE BEEN LAB DIRECTOR.  DID YOU GAIN KNOWLEDGE ON THAT SPECIFIC QUESTION, HOW THERANOS WAS TESTING THE BLOOD?

A.   NO.

Q.   I'M SORRY.  THE ANSWER?

A.   NO.

Q.   IF WE CAN NOW LOOK ON NUMBER 3, COMPENSATION.

IT SAYS THE COMPENSATION WAS $5,000 A MONTH.

DID THERE COME A POINT IN TIME WHEN YOU ASKED TO BE PAID A DIFFERENT WAY?

A.   YES.

Q.   AND DESCRIBE THAT TO THE JURY.

A.   I ELECTED TO GET PAID USING STOCK OPTIONS, OR RESTRICTED STOCK UNITS, WHATEVER THE COMPANY WAS ABLE TO DO.

Q.   WHY?

A.   I THOUGHT THAT THAT WOULD BE A BETTER WAY OF COMPENSATING ME FOR MY TIME.

Q.   I'D LIKE TO NOW TALK TO YOU ABOUT A PERIOD OF TIME OF ABOUT EIGHT MONTHS, SO NOVEMBER OF 2014 THROUGH JULY OF 2015.

I'M WONDERING WHAT KIND OF WORK YOU DID FOR THERANOS DURING THIS PERIOD OF TIME.

FIRST, CAN YOU ESTIMATE FOR THE JURY THE TOTAL NUMBER OF HOURS THAT YOU SPENT WORKING ON THERANOS RELATED PROJECTS DURING THIS EIGHT MONTH PERIOD OF TIME?

A.   IT WAS MINIMAL.  THERE WAS NO -- I WAS WAITING FOR THEM TO ASK ME TO DO THINGS AND WOULD NOT -- WAS NOT ASKED TO DO ANY FUNCTIONS.

SO INDEPENDENTLY, I WAS NOT ABLE TO DO ANYTHING.

Q.   AND WHEN YOU SAY "IT WAS MINIMAL," DO YOU HAVE AN ABILITY TO PUT A NUMBER?

DHAWAN DIRECT BY MR. SCHENK                                        4091

A.   A FEW HOURS, PERHAPS.

Q.   SO A TOTAL OF A FEW HOURS?

A.   YES.

Q.   DURING THIS EIGHT MONTH PERIOD OF TIME?

A.   YES.

Q.   HOW ABOUT PHYSICALLY GOING TO THERANOS.

YOU DESCRIBED TO US WHERE YOUR PRACTICE IS.

A.   YES.

Q.   DID -- DID YOU HAVE TO GO TO THERANOS DURING THIS EIGHT
MONTHS?

A.   ONCE OR TWICE IS MY RECOLLECTION.

Q.   AND FOR WHAT PURPOSE?

A.   FOR A TOUR.

Q.   DESCRIBE THAT.  WHAT DID YOU SEE ON THE TOUR?

A.   THE LAB, THE LAB FACILITIES.

Q.   WHO WAS PRESENT FROM THERANOS?

A.   SUNNY, MR. BALWANI, AND OTHER MEMBERS OF THE STAFF.

Q.   DO YOU REMEMBER THE BLOOD TESTING TECHNOLOGY BEING
DESCRIBED TO YOU?

A.   IT WAS DESCRIBED, AND I WAS SHOWN -- THIS IS GOING BACK
SEVEN YEARS NOW, SO MY RECOLLECTION IS NOT AS GOOD AS IT WOULD
HAVE BEEN -- BUT I WAS SHOWN MACHINES, YES.

Q.   CAN YOU DESCRIBE FOR THE JURY WHAT THE MACHINES LOOKED
LIKE?

A.   LARGE BLOOD ANALYZING MACHINES.  THEY'RE FAIRLY DECENT

DHAWAN DIRECT BY MR. SCHENK                    4092

SIZE, NOT VERY LARGE, BUT MACHINES BASICALLY.

Q.   AND WHEN YOU SAY "LARGE," DO YOU MEAN -- WHAT DO YOU MEAN

BY THAT?

A.   I MEAN, SITTING ON A DESKTOP.  THERE WERE OTHER MACHINES

THAT WERE THERE THAT WERE PROBABLY NOT FROM THERANOS.

BUT THAT WAS MY RECOLLECTION.

Q.   I WAS JUST GOING TO ASK THAT.

DO YOU HAVE A RECOLLECTION OF WHETHER THE MACHINES THAT

YOU SAW WERE MADE BY THERANOS OR WERE OFF-THE-SHELF BLOOD

ANALYZERS?

A.   MY RECOLLECTION IS NOT CLEAR AT THIS POINT, BUT I RECALL

SEEING WHAT LOOKED LIKE MACHINES THAT WERE NOT THERANOS

MACHINES THAT WERE IN THE LAB, YES.

Q.   HOW ABOUT DURING THIS TOUR, DID YOU LEARN WHAT -- WHICH

MACHINES THERANOS WAS ACTUALLY USING TO TEST BLOOD?

A.   NO, I DID NOT.

Q.   DURING THE -- THIS EIGHT MONTH PERIOD OF TIME, DID ANYBODY

FROM THE LAB EVER CALL YOU TO TALK ABOUT A PARTICULAR RESULT,

THEY WERE RUNNING BLOOD TESTS, THEY GOT A PARTICULAR RESULT,

AND THEY WANTED TO SPEAK TO YOU AS LAB DIRECTOR ABOUT THE

RESULT?  DID THAT EVER OCCUR?

A.   NO.

Q.   WAS THERE EVER AN OCCASION -- SO THAT QUESTION WAS WITH

REGARD TO A THERANOS EMPLOYEE.

A.   RIGHT.

UNITED STATES COURT REPORTERS

**SER-512**

DHAWAN DIRECT BY MR. SCHENK                                    4093

Q.   WAS THERE EVER A TIME WHEN A DOCTOR WHO HAD ORDERED LABS SPOKE TO YOU ABOUT A THERANOS TEST RESULT?

A.   NO.

Q.   WAS THERE EVER A TIME THAT A PATIENT, SOMEONE WHO RECEIVED THE RESULTS, WANTED TO SPEAK TO THE LAB DIRECTOR?  DID YOU EVER HAVE THAT EXPERIENCE?

A.   NO.

Q.   WAS THERE EVER A TIME WHEN SOMEONE AT THERANOS ASKED YOU WHETHER THEY SHOULD STOP RUNNING CERTAIN BLOOD TESTS ON CERTAIN MACHINES?

     SO, FOR INSTANCE, WERE RUNNING AN HCG TEST USING THIS MACHINE, DR. DHAWAN, SHOULD WE KEEP DOING IT OR SHOULD WE STOP?

     DID YOU EVER HAVE THAT EXPERIENCE?

A.   NO.

Q.   I'D LIKE TO BRING YOU UP UNTIL AUGUST OF 2015.

     IN AUGUST OF 2015, DID YOU -- DID YOU KNOW ABOUT AN FDA INSPECTION AT THERANOS?

A.   I WAS TOLD IT WAS COMING IN SEPTEMBER, I BELIEVE.

Q.   SO YOU KNEW ABOUT AN INSPECTION IN SEPTEMBER?

A.   YES.

Q.   AND WAS THAT INSPECTION BY CMS, THE CENTER FOR MEDICARE AND MEDICAID SERVICES?

A.   YES.

Q.   SO WHAT I'M WONDERING ABOUT IS A YEAR EARLIER, IN AUGUST, DID YOU HAVE ANY INVOLVEMENT IN THE FDA, A DIFFERENT GOVERNMENT

**SER-513**

AGENCY?

DO YOU REMEMBER THAT?

A.    I DON'T RECALL.

Q.    DURING YOUR TIME AS LAB DIRECTOR, DID YOU EVER HIRE AN EMPLOYEE IN THE LAB, MAKE A DECISION ABOUT WHO SHOULD BE HIRED INTO THE LAB?

A.    NO.

Q.    I'M SORRY?

A.    NO.

Q.    DID YOU EVER MAKE A DECISION ABOUT WHO SHOULD BE FIRED, AN EMPLOYEE WAS NOT WORKING OUT IN THE LAB, DID YOU EVER TERMINATE ANYBODY?

A.    NO.

Q.    HOW ABOUT REVIEWING PATIENT TEST RESULTS?  WAS THERE EVER AN OCCASION WHEN YOU WERE SENT A RESULT BECAUSE SOMEONE IN THE LAB WANTED TO KNOW WHETHER THIS SHOULD BE RELEASED TO A PATIENT?

DID THAT EVER HAPPEN?

A.    NO.

Q.    SO YOU DIDN'T REVIEW ONE PATIENT RESULT THE ENTIRE TIME?

A.    NO.

Q.    IF YOU NOW WOULD TURN IN YOUR BINDER TO 4520, 4520.

YOUR HONOR, 4520 HAS BEEN PREVIOUSLY ADMITTED.  PERMISSION TO PUBLISH?

THE COURT:  YES.

SER-514

BY MR. SCHENK:

Q.   IF IT'S EASIER, DR. DHAWAN, I'M SHOWING YOU ON THE SCREEN EXHIBIT 4520.

NOW, THIS IS AN EMAIL THAT YOU ARE NOT ON; IS THAT CORRECT?

A.   YES.

Q.   AND DOES IT APPEAR, THOUGH, THAT IT WAS SENT TO SUNNY BALWANI?

DO YOU SEE THAT?

A.   YES.

Q.   ON SEPTEMBER 14TH, 2015.

DO YOU SEE THAT?

A.   YES.

Q.   AND THERE'S TWO ATTACHMENTS.  I'M GOING TO DIRECT YOUR ATTENTION TO THE SECOND ATTACHMENT, THE ONE THAT IS AN EXCEL FILE.

AND IF YOU WOULD NOW TURN TO PAGE 37 OF EXHIBIT 4520, AND I'M GOING TO SHOW YOU -- FIRST THE COLUMN HEADINGS ARE APPEARING ON THE SCREEN.

DO YOU SEE THAT?

A.   YES.  YES.

Q.   AND WE HAVE NOW MATCHED UP THE COLUMN HEADINGS WITH THE CONTENT OF THE COLUMNS.

DO YOU SEE THAT?

A.   YES.

SER-515

Q.   AND IS IT EASIER FOR YOU LOOKING IN THE BINDER?

A.   YEAH, I THINK I'M GOING TO LOOK ON THE SCREEN HERE, YES.

Q.   OKAY.  I CAN GIVE YOU A MINUTE IF YOU WANT TO --

A.   NO, I'M GOOD.  THANK YOU.

Q.   SO I WANT TO DIRECT YOUR ATTENTION TO ONE THAT LOOKS LIKE THE DATE IS JANUARY 28, 2015.

DO YOU SEE THAT?

A.   I'M SORRY.  I SEE A JANUARY 26TH -- OH, I'M SORRY.

I SEE IT RIGHT NOW, YES, ON THE LEFT SIDE.

Q.   AND JUST TO CONFIRM, YOU WERE LAB DIRECTOR ON JANUARY 28TH, 2015; IS THAT CORRECT?

A.   YES.

Q.   AND THE NEXT COLUMN THAT HAS CONTENT LOOKS LIKE COLLECTION METHOD.

DO YOU SEE THAT?

A.   YES.

Q.   AND IT SAYS CTN.

DO YOU KNOW WHAT A CTN IS?

A.   THAT'S INITIALS, BUT I DON'T KNOW WHAT THAT STANDS FOR.

Q.   CTN DOESN'T HAVE MEANING TO YOU, WHAT THAT MEANS?

A.   COLLECTION METHOD?

NO, IT DOES NOT.

Q.   OKAY.  IF WE CAN NOW GO OVER TO THE SQUARE WITH THE MOST CONTENT, DO YOU SEE THAT SORT OF IN THE MIDDLE IT SAYS PATIENT, AND THEN A NAME IS REDACTED.

SER-516

DO YOU SEE THAT?

A. YES.

Q. AND IT TALKS ABOUT ON JANUARY 21ST, 2015, CERTAIN ASSAYS, "SODIUM, CHLORIDE, CALCIUM, WERE ALL ABNORMAL. NO REASON FOR THIS AS THEY HAVE NEVER BEEN ABNORMAL BEFORE, SO SHE SENT HER BACK ON 1/27 TO HAVE THEM REPEATED, AND THEY WERE ALL NORMAL."

DO YOU SEE THAT?

A. YES.

Q. SO I THINK I NEGLECTED TO TELL YOU, BUT THE TITLE OF THE FILE FOR THIS DOCUMENT INCLUDES THE WORD "COMPLAINTS."

DO YOU WANT TO FLIP BACK? MAYBE I SHOULD SHOW THAT TO YOU.

PAGE 1 OF THIS EXHIBIT, THE FILE IS ENTITLED FINAL LOG OF COMPLAINTS AND IRQ'S.

DO YOU SEE THAT?

A. WHAT IS THE PAGE NUMBER? I APOLOGIZE.

Q. PAGE 1.

A. OH, PAGE 1. I JUST SEE APPENDIX ON PAGE 1.

BUT PAGE 2 --

Q. PAGE 1 IS THE EMAIL. THE SECOND ATTACHMENT UNDER THE WORD "RECEIVED."

IT'S ALSO ON THE SCREEN NOW IN FRONT OF YOU.

A. OKAY. GOT IT. FINAL LOG. I SEE IT.

Q. SO IN JANUARY OF 2015, WERE YOU INFORMED OF THIS PARTICULAR PATIENT GETTING ABNORMAL SODIUM, CHLORIDE, AND

SER-517

CALCIUM RESULTS?

A.   NO.

Q.   WERE YOU INFORMED OF A DESIRE TO HAVE THE PATIENT RETESTED?

A.   NO.

Q.   DID YOU MAKE ANY DECISIONS ABOUT WHETHER THERANOS SHOULD STILL USE WHAT IS CALLED A COLLECTION METHOD OF CTN FOR THESE ASSAYS?

A.   NO.

Q.   WOULD YOU NOW TURN TO PAGE 38.  IT'S THE NEXT PAGE IN THIS CHART.

AND I'D LIKE TO NOW SHOW YOU THE ONE THAT IS NOT COLORED PINK.  IT IS THE ONE ZOOMED IN.

DO YOU SEE THAT?

A.   YES.

Q.   AND NOW THE DATE IS FEBRUARY 3RD, 2015.

DO YOU SEE THAT?

A.   YES.

Q.   AND WERE YOU LAB DIRECTOR ALSO AT THIS TIME?

A.   YES.

Q.   AND IS THE COLLECTION METHOD STILL CTN?

A.   YES.

Q.   AND THEN DO YOU SEE IN THE CONTENT, "DOCTOR," AND THEN THE NAME IS REDACTED, "IS CONCERNED WITH THE DIFFERENCE IN OUR RESULTS.  HE SAID THAT EACH HCG RESULTS SHOULD NOT VARY THAT

DHAWAN DIRECT BY MR. SCHENK                                    4099

MUCH FROM LAB TO LAB OR DAY-TO-DAY."

          DR. DHAWAN, ARE YOU FAMILIAR WITH THE HCG TEST?

A.   YES.

Q.   AND WHAT IS THAT IN YOUR EXPERIENCE?

A.   IT'S A PREGNANCY TEST.

Q.   DID SOMEONE IN THE THERANOS LAB INFORM YOU ABOUT THIS
DOCTOR'S CONCERNS REGARDING THE HCG TESTING?

A.   NO.

Q.   DID YOU MAKE ANY DECISIONS ABOUT WHICH DEVICE THERANOS
SHOULD BE TESTING HCG ON?

A.   NO.

Q.   DID ANYBODY ASK YOU WHETHER THEY SHOULD STILL USE THIS
COLLECTION METHOD OF CTN?

A.   NO.

Q.   WOULD YOU NOW TURN TO PAGE 44 OF THIS COMPLAINT DOCUMENT.
          I WOULD LIKE TO GO TO THE THIRD ONE DOWN, AND THIS ONE
LOOKS LIKE IT'S DATED MAY 19TH.
          DO YOU SEE THAT?

A.   YES.

Q.   WERE YOU LAB DIRECTOR AT THE TIME?

A.   YES.

Q.   AND DO YOU SEE CTN AND VENOUS NOW LISTED?

A.   YES.

Q.   AND IF WE GO TO THE CONTENT HERE, "PSA VERY HIGH ON MAY 14
THEN NORMAL ON MAY 18 -- HE IS NOT CONVINCED THAT THE RESULTS

**SER-519**

FROM MAY 14 ARE FOR HIS PATIENT -- POSSIBLY BELONG TO ANOTHER

PATIENT -- HE WANTS TO BE ASSURED THAT THE RESULTS FROM

MAY 18TH ARE CORRECT FOR HIS PATIENT AND POSSIBLE RERUN PSA

TOTAL."

Q.    ARE YOU FAMILIAR WITH THE ASSAY PSA?

A.    YES.

Q.    AND WHAT IS THAT?

A.    PROSTATE SPECIFIC ANTIGEN, AND IT'S USED IN ADULT MEN OVER

50.

Q.    AND WHEN THIS COMPLAINT CAME IN AROUND MAY OF 2015, DID

ANYBODY REACH OUT TO YOU ABOUT WHETHER THERANOS SHOULD CONTINUE

TESTING PSA ON CTN?

A.    NO.

Q.    HOW ABOUT THIS DOCTOR WHO HAS SOME CONCERNS THAT THE

RESULT DIDN'T EVEN BELONG TO HIS PATIENT?  DO YOU HAVE A

RECOLLECTION OF SPEAKING TO THIS DOCTOR?

A.    NO.

Q.    DID ANYBODY FROM THERANOS INFORM YOU THAT THIS DOCTOR HAD

CALLED WITH THAT CONCERN?

A.    NO.

Q.    WOULD YOU NOW PLEASE TURN TO EXHIBIT 10527.  I BELIEVE

IT'S THE LAST EXHIBIT IN YOUR BINDER.

      YOUR HONOR, THE GOVERNMENT OFFERS 10527 BY STIPULATION.

           MS. WALSH:  ONE MOMENT, YOUR HONOR.

      NO OBJECTION.

THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 10527 WAS RECEIVED IN EVIDENCE.)

MR. SCHENK:  THANK YOU.

Q.   DR. DHAWAN, DO YOU SEE EXHIBIT 10527 ON THE SCREEN IN FRONT IT OF YOU?

A.   YES.

Q.   OR IN THE BINDER?

A.   YES.

Q.   AND SO I WANT TO START WITH THE EMAIL THAT BEGINS ON TUESDAY, AUGUST 4TH, 2015.

     DO YOU SEE THAT?

A.   YES.

Q.   AN INDIVIDUAL NAMED LANGLY GEE WRITES YOU AN EMAIL; IS THAT CORRECT?

A.   YES.

Q.   AND IN IT HE WRITES, "HI DR. DHAWAN:

     "MY NAME IS LANGLY GEE AND I AM THE QA/QC MANAGER FOR THERANOS INC."

     WAS MR. GEE INTRODUCING HIMSELF TO YOU OR HAD YOU MET HIM BEFORE?

A.   I BELIEVE HE WAS INTRODUCING HIMSELF TO ME.

Q.   AND THEN TWO PARAGRAPHS DOWN HE WRITES, "MY FIRST SET OF SEVEN DOCUMENTS (VALIDATION, SOP'S AND EMPLOYEE TRAINING) HAS TO DO WITH THERANOS'S NEW LAUNCH OF," AND THEN IT LISTS ASSAYS.

     DO YOU SEE THAT?

A.   YES.

Q.   AND THEN IN THAT SENTENCE JUST BEFORE WHAT WE HIGHLIGHTED, DR. GEE SAYS HE'S GOING TO BEGIN SENDING DOCUMENTS TO YOU FOR YOUR SIGNATURE.

A.   YES.

Q.   DO YOU RECALL THIS OCCURRING, INDIVIDUALS FROM THERANOS SENDING DOCUMENTS TO YOU FOR YOU TO SIGN?

A.   YES.

Q.   IN THE PARAGRAPH THAT BEGINS, "ONCE," IT LOOKS LIKE HE WRITES, "GOING FORWARD THERE WILL BE AT LEAST ANOTHER 300-400 MORE DOCUMENTS FOR YOUR REVIEW."

     DR. DHAWAN, DO YOU HAVE A RECOLLECTION OF THAT, RECEIVING A NUMBER OF DOCUMENTS AT THAT VOLUME?

A.   I CAN'T RECALL THE EXACT VOLUME, BUT I DID RECEIVE DOCUMENTS.

Q.   OKAY.  MANY DOCUMENTS; IS THAT FAIR?

A.   YES.

Q.   AND THEN IF WE GO TO THE VERY TOP OF THIS EMAIL, IT LOOKS LIKE YOU RESPOND TO A QUESTION DR. GEE ASKS WITH "SEND 50 PER WEEK."

     IS THAT RIGHT?

A.   YES.

Q.   AND SO EXPLAIN TO THE JURY WHAT WAS HAPPENING THERE. WHAT, IN FACT, WERE YOU REQUESTING?

A.   I WAS REQUESTING THAT A LIMITED NUMBER OF THE DOCUMENTS BE

SER-522

DHAWAN DIRECT BY MR. SCHENK                                    4103

SENT TO ME SO THAT I WOULDN'T GET OVERWHELMED WITH TOO MANY

DOCUMENTS TO READ AND SIGN.

Q.   OKAY.  AND DO YOU HAVE A RECOLLECTION, WERE SOME DOCUMENTS

IN FACT SENT TO YOU ELECTRONICALLY?

A.   YES, I HAVE A RECOLLECTION THAT, YES, SOME DOCUMENTS WERE

SENT.

Q.   AND THEN HOW ABOUT WAS THERE AN INSTANCE WHEN YOU WENT TO

THERANOS AND PHYSICALLY SIGNED DOCUMENTS, NOT THAT YOU RECEIVED

ELECTRONICALLY, BUT ALSO?

A.   YES, ONCE.

Q.   OKAY.  LET'S TALK ABOUT THAT.

     WOULD YOU NOW TURN TO 2760 IN YOUR BINDER?

     YOUR HONOR, THE GOVERNMENT OFFERS 2760 BY STIPULATION.

          MS. WALSH:  NO OBJECTION, YOUR HONOR.

          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

     (GOVERNMENT'S EXHIBIT 2760 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   IF WE CAN START WITH PAGE 2 OF THIS EXHIBIT.

     DR. DHAWAN, ON PAGE 2, DO YOU SEE AN EMAIL FROM

MR. BALWANI TO YOU ON SEPTEMBER 9TH, 2015?

A.   YES.

Q.   A LITTLE EARLIER YOU DESCRIBED FOR THE JURY A RECOLLECTION

OF A CMS INSPECTION.  IS THAT RIGHT?

A.   YES.

Q.   WAS THAT INSPECTION IN SEPTEMBER OF 2015?

UNITED STATES COURT REPORTERS

A.   YES.

Q.   WAS THIS EMAIL DESCRIBING TO YOU SOME WORK IN ADVANCE OF THAT INSPECTION?

A.   YES.

Q.   SO THE FIRST -- ACTUALLY, THE PARAGRAPH THAT BEGINS "THE ISSUANCE OF," DO YOU SEE THAT?

A.   YES.

Q.   DOES THAT PARAGRAPH TALK ABOUT WHAT YOU DESCRIBED TO THE JURY EARLIER, SEEKING OPTIONS IN LIEU OF A SALARY?

A.   YES.

Q.   AND THEN THE NEXT PARAGRAPH THAT BEGINS, "I ALSO NEED," DO YOU SEE THAT?

A.   YES.

Q.   AND SO MR. BALWANI NEEDS YOUR HELP WITH AN ADDITIONAL MATTER.  "WE HAVE A LAB AUDIT COMING UP ON 9/22 AT 9:00 A.M."

     WAS THAT THE CMS INSPECTION?

A.   YES.

Q.   "(THESE HAPPEN ONCE EVERY TWO YEARS), AND WANTED TO SEE IF YOU CAN BE PRESENT FOR AT LEAST THE FIRST PART OF IT."

     WERE YOU, IN FACT, PRESENT FOR THE FIRST PART OF IT?

A.   YES.

Q.   "I HAVE A VERY CAPABLE TEAM THAT HAS TAKEN CARE OF ALL OF THE DETAILS AS ALWAYS, BUT WOULD LIKE TO HAVE YOU HERE FOR THE FIRST PART OR SO AND THE INTRODUCTION OF OUR TEAM.  IN PREPARATION FOR THE LAB AUDIT, I WILL PERSONALLY WALK YOU

THROUGH ALL OF THE LATEST UPDATES WITH OUR TEAM -- WE HAVE HIRED MANY EXPERTS FROM THE INDUSTRY TO MAKE SURE LAB IS FLAWLESS AND AUDIT READY, SO I DON'T ANTICIPATE ANY HICCUPS, BUT AS ALWAYS, WANT YOU TO BE FAMILIAR WITH IT."

GOING INTO THE AUDIT, SO THIS MONTH OF SEPTEMBER, DR. DHAWAN, DID YOU RELY ON STATEMENTS LIKE THIS FROM MR. BALWANI TO HELP IN THE PREPARATION?

A.   YES.

Q.   DID YOU BELIEVE THAT MR. BALWANI HAD THIS TEAM THAT HE DESCRIBED AND THAT THERE WOULDN'T BE HICCUPS?

A.   YES.

Q.   IF WE NOW COULD TURN TO THE FIRST PAGE.

THE FIRST PAGE OF 2760, ARE YOU JUST GENERALLY TALKING ABOUT WHEN YOU WOULD GO INTO THERANOS TO SIGN DOCUMENTS?

A.   YES.

Q.   DO YOU SEE WHERE HE SAYS "CAN WE DO TOMORROW AT 6:00 P.M. FOR SIGNING AND WALK THROUGH?"

IT'S TOWARDS THE BOTTOM.

A.   YES.

Q.   AND DID THAT, IN FACT, HAPPEN?  WAS THERE AN OCCASION WHEN YOU WENT TO THERANOS TO SIGN DOCUMENTS?

A.   YES.

Q.   WOULD YOU TURN TO 2772?

YOUR HONOR, THE GOVERNMENT OFFERS 2772 BY STIPULATION.

MS. WALSH:  NO OBJECTION.

THE COURT: IT'S ADMITTED. IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 2772 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q. IF WE COULD START WITH THE EMAIL ON THE BOTTOM.

ON MONDAY, SEPTEMBER 14TH, 2015, MR. BALWANI WRITES TO YOU, "THANKS FOR DROPPING BY.

"I NEED COUPLE OF HOURS FROM YOU THIS COMING WEEKEND. UNFORTUNATELY I HAVE CLOSE TO 300 SOP'S THAT NEED SIGNING. I CAN HAVE TEAM SEND THIS OUT 50 AT A TIME EACH DAY THIS WEEK ELECTRONICALLY AS THAT MIGHT BE EASIER. SORRY FOR THE LAST MINUTE ON THIS. I WAS TRYING TO FIND A WAY TO AVOID DOING THIS MANUALLY... THANKS IN ADVANCE."

AND THEN DO YOU SEE YOUR RESPONSE TO MR. BALWANI ON THE TOP OF THIS PAGE?

A. YES.

Q. AND DO YOU, IN FACT, DECLINE HIS INVITATION TO SIGN ELECTRONICALLY, BUT INSTEAD SAY YOU'LL COME IN ON SATURDAY?

A. YES.

Q. AND JUST BY DOING THE MATH, WAS SATURDAY SEPTEMBER 19TH THEN, IF THIS WAS TUESDAY, THE 15TH?

A. I WOULD THINK SO. I DON'T RECALL.

Q. DID YOU GO INTO THERANOS THAT SATURDAY TO SIGN SOME DOCUMENTS?

A. I WENT IN ON A SATURDAY, YES.

MR. SCHENK: YOUR HONOR, MAY I APPROACH?

THE COURT:  YES.

MR. SCHENK:  (HANDING.)

Q.   DR. DHAWAN, I'VE HANDED YOU A BINDER OF DOCUMENTS THAT HAVE BEEN PREVIOUSLY ADMITTED IN THIS TRIAL AND THEY CONTAIN VALIDATION REPORTS.

WHAT I WOULD ASK YOU TO DO, FIRST, IS LOOK AT A TAB IN THERE, 9086.

DO YOU SEE THAT DOCUMENT?

A.   YES.

Q.   AND DO YOU SEE YOUR SIGNATURE ON THAT DOCUMENT?

A.   I DO NOT.

Q.   OKAY.  OTHER THAN THAT DOCUMENT, I'M GOING TO ASK YOU TO LOOK AT THE REST OF THE DOCUMENTS IN THIS BINDER AND TELL ME IF THERE ARE ANY THAT YOU DID NOT SIGN ON 9-19-2015, ON SEPTEMBER 19TH, 2015?

A.   ARE YOU ASKING ME TO LOOK AT SECTION 9086, OR ALL OF THE WHOLE THING?

Q.   YEAH, EVERY OTHER DOCUMENT IN THE BINDER, OTHER THAN THAT ONE.

A.   YES, I'M NOTICING MY SIGNATURE ON ALL OF THE OTHER DOCUMENTS, YES.

(PAUSE IN PROCEEDINGS.)

THE WITNESS:  YES, IT APPEARS THAT MY SIGNATURE IS ON ALL OF THESE DOCUMENTS, YES.

BY MR. SCHENK:

DHAWAN DIRECT BY MR. SCHENK                          4108

Q.   SO IS IT TRUE THAT OTHER THAN EXHIBIT 9086, YOU SIGNED EVERY ONE OF THOSE ON SEPTEMBER 19TH?

A.   YES.

Q.   AND FOR THE RECORD, YOUR HONOR, I BELIEVE THIS WAS A DEFENSE EXHIBIT ADMITTED THROUGH DR. ROSENDORFF.

     WHEN YOU WERE SIGNING THESE DOCUMENTS -- I HAVE A FEW QUESTIONS ABOUT YOUR PROCESS.

A.   YES.

Q.   DID MR. BALWANI OR SOMEONE ELSE HAND THEM TO YOU, OR DO YOU HAVE A RECOLLECTION OF THAT?

A.   THEY WERE PLACED IN FRONT OF ME, YES.

Q.   DO YOU REMEMBER WHO PLACED THEM, OR YOU DON'T REMEMBER?

A.   I BELIEVE IT WAS MR. BALWANI, BUT IT MAY HAVE BEEN ONE OF HIS STAFF.  I JUST DON'T RECALL.

Q.   UM, WHEN YOU -- DID YOU READ THE DOCUMENTS WHEN YOU SIGNED THEM?

A.   I LOOKED THROUGH THEM, YES.

Q.   OKAY.  WHAT DO YOU MEAN, "LOOKED THROUGH THEM"?

A.   I LOOKED AND SAW THAT THEY HAD BEEN SIGNED BY ADAM ROSENDORFF APPROXIMATELY A YEAR EARLIER.

Q.   AND HELP ME UNDERSTAND THAT.

     DID THAT MATTER TO YOU THAT ADAM ROSENDORFF SIGNED IT A YEAR EARLIER?

A.   THAT WAS IMPORTANT BECAUSE HE WAS THE PREVIOUS DIRECTOR THAT HAD BEEN THERE, YES.

**SER-528**

Q.   AND WHY IS THAT IMPORTANT?  WHY DID THAT MATTER?

A.   THAT MEANS THAT SOMEBODY ELSE LOOKED AT IT BEFORE ME.

Q.   OKAY.  WHEN YOU WERE LOOKING THROUGH THE DOCUMENTS, WAS THERE ANY OCCASION WHEN YOU MADE A COMMENT?  AND BY THAT I MEAN DID YOU LOOK THROUGH THE DOCUMENTS AND SAY, YOU KNOW WHAT, I DON'T THINK THIS SHOULD BE HERE, I WANT THIS CHANGE MADE?

     DID YOU MAKE ANY EDITS OR HAVE ANY COMMENTS ON ANY DOCUMENT THAT YOU SIGNED THAT DAY?

A.   NO.

Q.   IN THE DOCUMENTS, DO YOU SEE REFERENCES TO SOMETHING CALLED AN EDISON?

A.   I'M LOOKING AT THE DOCUMENTS THEMSELVES.

     I DON'T SEE IT IN THE DOCUMENTS THAT I'M LOOKING AT RIGHT AT THIS POINT.

Q.   DO YOU KNOW WHAT AN EDISON IS?

A.   THAT IS THE DEVICE THAT THERANOS HAD.

Q.   AND HOW DID YOU KNOW THAT?

A.   I KNEW THAT BECAUSE I LOOKED ALL OF THIS STUFF UP.

Q.   AND WHEN YOU SAY YOU LOOKED IT UP, WHAT DO YOU MEAN?

A.   I RESEARCHED IT PREVIOUSLY.

Q.   AND IS THIS THE REFERENCE TO WHAT YOU WERE TELLING US EARLIER --

A.   YES.

Q.   -- ABOUT GOOGLE?

A.   YES.

SER-529

Q.   WHEN YOU WERE SIGNING THESE DOCUMENTS, DID YOU SEE ANY ACTUAL BLOOD TESTS RUN THAT DAY?

A.   NO.

Q.   WHEN YOU WERE SIGNING THE DOCUMENTS, DID YOU SPEAK TO ANYBODY ELSE WHOSE SIGNATURE APPEARED ON THE DOCUMENTS?

     YOU TOLD US ABOUT ADAM ROSENDORFF.  DID YOU TALK TO HIM WHEN YOU WERE SIGNING THE DOCUMENTS?

A.   HE WAS NOT THERE, SO I DIDN'T GET A CHANCE TO TALK TO HIM.

Q.   YOU UNDERSTOOD HE WAS NOT AT THERANOS?

A.   YES.

Q.   HOW ABOUT OTHER INDIVIDUALS THAT SIGNED THE DOCUMENTS? DID YOU HAVE AN OPPORTUNITY TO CONSULT WITH ANYBODY ELSE?

A.   NO.

Q.   WHEN YOU WERE SIGNING THE DOCUMENTS, DID YOU KNOW WHETHER THEY REFLECTED TESTS THAT WERE BEING RUN IN THE CLINICAL LAB?

A.   THAT WAS WHAT WAS SHOWN TO ME, YES.

Q.   AND DID YOU KNOW HOW THE TESTS WERE PERFORMING WHEN YOU SIGNED THE DOCUMENTS?

A.   IN GENERAL.  BUT SPECIFICALLY WITH EACH TEST, WHAT WAS SHOWN TO ME IS WHAT WAS SHOWN TO ME.  BUT --

Q.   SO WHEN YOU WERE SHOWN A DOCUMENT ABOUT AN ASSAY OR A TEST THAT WAS RUNNING IN THE CLINICAL LAB --

A.   YES.

Q.   -- I GUESS I'M WONDERING, DID YOU HAVE THE OPPORTUNITY TO SEE OR ASK ANYBODY QUESTIONS ABOUT WHETHER IN THE CLINICAL LAB

DHAWAN DIRECT BY MR. SCHENK                                        4111

THE ASSAY WAS ACTUALLY WORKING, TESTING ACCURATELY?

A.    I DIDN'T GET A CHANCE TO ASK HIM THAT QUESTION.

Q.    OKAY.  AND -- BUT YOU SIGNED IT.  IS THAT FAIR?

A.    YES.

Q.    IF WE CAN NOW TALK ABOUT THE CMS AUDIT.

      YOU SAID TO US A MOMENT AGO THAT YOU WENT TO THE AUDIT; IS THAT RIGHT?

A.    YES.

Q.    AND WHAT DO YOU REMEMBER ABOUT YOUR ATTENDANCE THERE?  HOW LONG WERE YOU THERE?

A.    I WAS THERE FROM APPROXIMATELY 8:00 OR 8:30 TO ABOUT 10:00 IN THE MORNING.

Q.    AND WHAT DID YOU DO DURING THE AUDIT?

A.    I WAS THERE -- I WAS INTRODUCED, AND THEN THE CMS AUDITOR, ALONG WITH A REPRESENTATIVE FROM THE STATE OF CALIFORNIA -- MY RECOLLECTION IS NOT 100 PERCENT CLEAR, BUT THERE WERE SEVERAL INDIVIDUALS FROM CMS AND I BELIEVE FROM THE STATE.

      AND THEY WERE INQUIRING -- YOU KNOW, DOING A CONVERSATION WITH THE THERANOS STAFF, INCLUDING MR. BALWANI AND OTHERS, AND I WAS SITTING IN THE BACK OF THE ROOM OR THE SIDE OF THE ROOM.

Q.    DID YOU MAKE ANY PRESENTATIONS?

A.    NO.

Q.    DO YOU REMEMBER IF ANYBODY FROM CMS OR THE STATE ASKED YOU QUESTIONS?

A.    THEY DIDN'T ASK ME ANYTHING, NO.

SER-531

Q.   THEY DID NOT ASK YOU?

A.   NO.

Q.   IF YOU'LL NOW TURN TO 2791.

     DO YOU HAVE THAT IN FRONT OF YOU?

A.   YES.

Q.   IS THIS AN EMAIL FROM SOMEONE NAMED MONA RAMAMURTHY TO YOU?

A.   YES.

Q.   AND DOES IT INCLUDE AN EMPLOYMENT AGREEMENT FROM THERANOS?

A.   YES.

          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2791.

          MS. WALSH:  IS THIS BEING OFFERED PURSUANT TO 803(6)?

          MR. SCHENK:  YES.

          MS. WALSH:  THEN NO OBJECTION.

          THE COURT:  IT'S ADMITTED PURSUANT TO 803(6) AS A BUSINESS RECORD, AND IT CAN BE PUBLISHED.

          MR. SCHENK:  THANK YOU, YOUR HONOR.

     (GOVERNMENT'S EXHIBIT 2791 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   DR. DHAWAN, IN THIS EMAIL, WHICH IS DATED SEPTEMBER 21ST, 2015, DO YOU SEE MS. RAMAMURTHY CONGRATULATING YOU ON YOUR TERMS OF EMPLOYMENT JOINING THERANOS?

A.   YES.

Q.   AND WAS SEPTEMBER 21ST THE DAY BEFORE THE CMS INSPECTION?

A.   I BELIEVE SO, YES.

THE CMS INSPECTION WAS THAT WEDNESDAY, I BELIEVE.  I BELIEVE IT WAS WEDNESDAY MORNING.  IT MAY HAVE BEEN EITHER THE 22ND OR THE -- IT WAS THE 22ND.  IT WAS THE DAY BEFORE, YES.

Q.   IT WAS EITHER ONE OR TWO DAYS BEFORE?

A.   YES, YES.

Q.   AND IN THE -- LET'S TURN TO PAGE 2 OF THE EXHIBIT.

DO YOU SEE AN AT WILL EMPLOYMENT AGREEMENT?

A.   YES.

Q.   HAD YOU BEEN THE THERANOS LAB DIRECTOR SINCE THE PRIOR NOVEMBER BY THIS TIME?

A.   YES.

Q.   WHY THEN DID YOU RECEIVE AN EMPLOYMENT AGREEMENT A DAY OR TWO DAYS BEFORE THE CMS INSPECTION IF YOU HAD BEEN WORKING AS LAB DIRECTOR SINCE THE PRIOR NOVEMBER?

A.   I'M NOT SURE WHY THEY SENT IT TO ME THAT LATE.

Q.   YOU DON'T KNOW WHY THEY DID?

A.   NO.

Q.   IF YOU'LL NOW TURN TO PAGE 12.

DO YOU SEE HERE A LETTER TO YOU THAT ANNOUNCES CONFIRMATION OF THE TERMS OF YOUR EMPLOYMENT AS LAB DIRECTOR REPORTING TO SUNNY BALWANI?

DO YOU SEE THAT IN THE VERY FIRST SENTENCE?

A.   YES.

Q.   AND AGAIN, IS THAT TRUE, DID YOU REPORT TO MR. BALWANI AS

SER-533

THE LAB DIRECTOR?

A.   HE WAS MY ONLY CONTACT AT THE COMPANY, YES.

Q.   AND DO YOU SEE, ABOUT HALFWAY DOWN THE PAGE, IT SAYS,

"YOUR START DATE WITH THE COMPANY IS JUNE 1ST, 2015"?

A.   YES.

Q.   HAD YOU BEEN, IN FACT, WORKING AS LAB DIRECTOR MUCH BEFORE

JUNE 1ST, 2015?

A.   YES.

Q.   SINCE THE PRIOR NOVEMBER?

A.   YES.

Q.   WOULD YOU NOW TURN TO TAB 4528.

     YOUR HONOR, THE GOVERNMENT OFFERS 4528 PURSUANT TO

STIPULATION.

          MS. WALSH:  NO OBJECTION.

          THE COURT:  IT'S ADMITTED AND MAY BE PUBLISHED.

     (GOVERNMENT'S EXHIBIT 4528 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   DR. DHAWAN, THIS IS CALLED A CLIA LABORATORY OVERVIEW AND

IT'S DATED SEPTEMBER 22ND, 2015.

     DO YOU SEE THAT?

A.   YES.

Q.   AND TAKE A MOMENT TO FLIP THROUGH IT.  I'M WONDERING IF

YOU RECALL THIS BEING A SLIDE DECK THAT WAS SHOWN DURING THE

CMS INSPECTION.

A.   I DON'T RECALL THIS, THIS SLIDE OR SLIDE DECK.

Q.   OKAY.  DO YOU REMEMBER WHETHER CMS WAS SHOWN ANY SLIDES?

A.   I DON'T RECALL THEM BEING SHOWN THE SLIDES WHEN I WAS THERE IN THE MEETING.

Q.   OKAY.  I'D LIKE TO SHOW YOU A FEW PAGES IN IT.  IF YOU COULD TURN TO PAGE 3.

WE SEE ON PAGE 3 COLLECTION SITES ON THIS MAP.

DO YOU SEE THAT IT LOOKS LIKE THERE'S ONE IN CALIFORNIA AND 42 IN ARIZONA.

DO YOU SEE THAT?

A.   YES.

Q.   AND THEN ONE IN PENNSYLVANIA.  DID YOU KNOW THAT THERANOS HAD A COLLECTION SITE IN PENNSYLVANIA?

A.   I DON'T RECALL THE PENNSYLVANIA SITE.  I KNEW ABOUT THE ONES IN ARIZONA AND CALIFORNIA.

Q.   YOU WERE FAMILIAR WITH --

A.   THAT THEY HAD COLLECTION SITES IN THESE TWO STATES.

Q.   IN ARIZONA AND CALIFORNIA?

A.   YES.

Q.   BUT NOT PENNSYLVANIA?

A.   I DON'T RECALL.

Q.   WOULD YOU NOW TURN TO THE SLIDE ON PAGE 5.

ON PAGE 5, IT'S TITLED NEWARK, CALIFORNIA CLIA LABORATORY.

IS THAT CONSISTENT WITH YOUR UNDERSTANDING?  WAS THERANOS'S CLIA LAB IN NEWARK, CALIFORNIA?

A.   YES.

SER-535

Q.   AND THEN IF YOU'LL LOOK AT THE LICENSE ON THE RIGHT, THE IMAGE, THERE ARE TWO NAMES ON THAT.

IS YOUR NAME ONE OF THE NAMES LISTED AS LAB DIRECTOR?

A.   YES.

Q.   AND THEN UNDER YOUR NAME THERE IS SOMEONE NAMED LYNETTE SAWYER.

DO YOU SEE THAT?

A.   YES.

Q.   AND DO YOU KNOW WHO THAT IS?

A.   SHE WAS ANOTHER LAB DIRECTOR.

Q.   AT THERANOS?

A.   YES.

Q.   DID YOU -- HAVE YOU EVER MET HER?

A.   NO.

Q.   DID YOU EVER CONSULT WITH HER AND TALK ABOUT LAB TESTING OR ANYTHING?

A.   NO.

Q.   HOW DO YOU KNOW SHE WAS A LAB DIRECTOR AT THERANOS?

A.   I FOUND OUT LATER.

Q.   AND WHEN YOU SAY "LATER," DO YOU MEAN AFTER YOU WERE NO LONGER LAB DIRECTOR AT THERANOS?

A.   YES.

Q.   AND SO WHILE YOU WERE LAB DIRECTOR, WE SAW THAT BEGINNING IN NOVEMBER OF 2014, YOU DIDN'T KNOW ABOUT LYNETTE SAWYER AT THAT POINT; IS THAT RIGHT?

SER-536

A.    YEAH, I DID NOT KNOW.

Q.    WOULD YOU TURN NOW TO PAGE 6.

      PAGE 6 SAYS THAT, "ALL HIGH-COMPLEXITY SAMPLES ARE SHIPPED TO THE NEWARK LAB."

      AND THEN IT LOOKS LIKE THE ARROWS ARE COMING FROM PENNSYLVANIA AND ARIZONA.

      I'M WONDERING IF YOU KNEW ABOUT THIS.  DID YOU KNOW THAT THERANOS WAS COLLECTING SAMPLES IN ARIZONA AND SENDING THEM TO THE CALIFORNIA LAB IN NEWARK?

A.    I KNEW THAT THE CALIFORNIA LAB IN NEWARK WAS DOING THE WORK, YES.

Q.    HOW ABOUT ANY LABS IN ARIZONA?  DID YOU KNOW WHETHER SOME TESTS THAT WERE DONE IN ARIZONA WERE BEING TESTED IN ARIZONA, OR DID YOU THINK THAT THEY WERE ALL BEING SHIPPED?

A.    I DID NOT KNOW WHAT PERCENTAGE WAS BEING DONE AT WHICH FACILITY.

Q.    AND WHEN YOU SAY YOU DIDN'T KNOW WHAT PERCENT, DOES THAT MEAN THAT YOU KNEW OF AT LEAST SOME?

A.    MY RECOLLECTION WAS THAT THERE WAS SOME BEING DONE IN ARIZONA, BUT I DON'T REMEMBER CLEARLY HOW MANY OR WHAT PERCENTAGE.

Q.    HOW ABOUT WHAT DISTINGUISHED BETWEEN THE TWO?  DID YOU KNOW WHAT CAUSED A SAMPLE THAT WAS COLLECTED IN ARIZONA TO BE TESTED IN ARIZONA VERSUS TESTED IN CALIFORNIA?

A.    I DID NOT.

SER-537

Q.   DID, DID MR. BALWANI OR ANYBODY AT THERANOS EVER TALK TO YOU ABOUT THAT DECISION, ABOUT SOME SAMPLES GOING TO ARIZONA VERSUS CALIFORNIA?

A.   THEY DID NOT.

Q.   WOULD YOU NOW TURN TO PAGE 9.

PAGE 9 IS A CLIA LAB ORG CHART.

DO YOU SEE THAT?

A.   YES.

Q.   SO IF WE COULD FIRST FOCUS ON THOSE -- THE THREE BOXES THAT INCLUDE MS. HOLMES, MR. BALWANI, AND YOU.

A.   YES.

Q.   DO YOU SEE THOSE?

A.   YES.

Q.   IS THAT ACCURATE IN YOUR EXPERIENCE?  DID -- WAS YOUR UNDERSTANDING THAT MS. HOLMES WAS CEO, MR. BALWANI WAS PRESIDENT AND COO, AND YOU WERE THE LABORATORY DIRECTOR?

A.   I'M SEEING IT IN THIS ORGANIZATIONAL CHART.  I DID NOT SEE THIS CHART PREVIOUSLY.

Q.   HOW ABOUT JUST YOUR EXPERIENCE AT THERANOS?  IS THIS CONSISTENT WITH WHAT YOU EXPERIENCED AT THERANOS?

A.   MY EXPERIENCE WAS THAT I WAS GOING TO BE A CONSULTANT FOR A LIMITED AMOUNT OF TIME.

Q.   OKAY.  WAS THAT DIFFERENT THAN WHAT -- THAN REALITY?

A.   I WAS SUPPOSED TO BE A CONSULTANT.  THIS IS A MUCH MORE EXTENSIVE ORGANIZATIONAL CHART THAN I WOULD HAVE PRESUMED.

SER-538

Q.   OKAY.  IF WE CAN NOW LOOK AT THE BOX TO THE RIGHT THAT'S CALLED CLINICAL LABORATORY ASSISTANT.

DO YOU SEE THAT?

A.   YES.

Q.   AND DO YOU KNOW WHAT CLINICAL LABORATORY ASSISTANTS, OR CLA'S, ARE?

A.   THEY'RE PEOPLE THAT WORK IN THE LABORATORY, YES, AND WE'VE SEEN THEM IN OTHER LABORATORIES THAT WE'VE INTERACTED WITH.

Q.   HOW ABOUT IN YOUR PRACTICE?  DO YOU HAVE CLA'S?

A.   NO.

Q.   IN THIS BOX, DO YOU SEE, ABOUT SIX OR SEVEN NAMES DOWN, DO YOU SEE MR. BALWANI'S NAME?

A.   SIX OR SEVEN?  YES.

Q.   DID YOU KNOW THAT MR. BALWANI WAS BOTH A CLA AND ALSO THE CHIEF OPERATING OFFICER AND PRESIDENT?

A.   I DID NOT.

Q.   DID MR. BALWANI -- DID YOU APPROVE ANY OF THE INDIVIDUALS WHO BECAME CLA'S AT THE THERANOS CLIA LAB?

A.   NO.

Q.   DID MR. BALWANI ASK YOU IF HE COULD BE A CLA IN THE LAB?

A.   NO, I NEVER WAS ASKED.

Q.   HOW ABOUT THE HIRING OF ANY INDIVIDUALS?  WE SEE A LIST OF NAMES HERE.  DID YOU MAKE ANY HIRING DECISIONS?

A.   NO.

Q.   HOW ABOUT SPEAKING WITH?  DID YOU SPEAK WITH -- OTHER THAN

SER-539

MR. BALWANI, WERE THERE INDIVIDUALS HERE THAT YOU HAD CONVERSATIONS WITH ABOUT PARTICULAR LAB TESTS, WHETHER A RESULT SHOULD BE REPORTED TO A PATIENT?

A.   NO.

Q.   JUST ONE FINAL QUESTION ON THIS.  WOULD YOU TURN TO PAGE 12.

ON PAGE 12 THERE'S A DESCRIPTION OF YOU AND THE TITLE LAB DIRECTOR.

DO YOU SEE THAT?

A.   YES.

Q.   AND I'M JUST WONDERING IF THIS IS ACCURATE.

A.   YES.

MR. SCHENK:  YOUR HONOR, NOW I'D LIKE PERMISSION TO PUBLISH 5 -- ONE LAST QUESTION.

Q.   SO DURING THE INSPECTION, YOU SAID THAT YOU WERE PRESENT FOR HOW LONG?

A.   APPROXIMATELY TWO HOURS.

Q.   AND DID YOU GET A SENSE IN THOSE TWO HOURS HOW THE INSPECTION WAS GOING?

BY THAT I MEAN, DID YOU FEEL A MEASURE OF CONCERN, OR DID YOU THINK THAT THE INSPECTION WAS GOING OKAY?  DID YOU HAVE AN OPINION.

A.   I DID NOT HAVE AN OPINION.

Q.   AT THE END OF TWO HOURS, DID YOU LEAVE THE BUILDING, OR LEAVE THERANOS?

SER-540

A.   I ASKED IF I WAS NEEDED FOR ANY FURTHER DUTIES, AND I WAS TOLD THAT THERE WAS NOTHING ELSE THAT I NEEDED TO BE THERE FOR.

Q.   WHO DID YOU ASK?

A.   I BELIEVE I ASKED MR. BALWANI.

Q.   HAVE YOU MET ELIZABETH HOLMES BEFORE?

A.   ONCE.

Q.   AND WHEN WAS THAT?

A.   THE DAY OF THE INSPECTION MY RECOLLECTION IS.

Q.   AND DESCRIBE THAT CIRCUMSTANCE TO THE JURY.  WHERE DID YOU MEET HER?

A.   I WAS SITTING OUTSIDE OF THE ROOM WHERE THE INSPECTION WAS BEING DONE, AND SHE WALKED BY AND SAID HELLO AND SAID THANK YOU FOR BEING HERE.

Q.   AND DID YOU HAVE FURTHER CONVERSATIONS WITH MS. HOLMES ON THAT DAY?

A.   NO.

Q.   AND HOW ABOUT BEFORE THAT DAY OR SINCE?

A.   NO.

Q.   THAT WAS THE ONE AND ONLY INTERACTION?

A.   YES.

        MR. SCHENK:  YOUR HONOR, PERMISSION TO PUBLISH 5387H.  IT HAS BEEN PREVIOUSLY ADMITTED.

        THE COURT:  YES.

BY MR. SCHENK:

Q.   DR. DHAWAN, I'M GOING TO ASK YOU SOME QUESTIONS ABOUT SOME

SER-541

TEXT MESSAGES.

YOU'RE NOT ON THESE TEXT MESSAGES, BUT THE FIRST ONE I WOULD LIKE TO FOCUS YOUR ATTENTION ON IS ON PAGE 61.

DO YOU SEE THAT?

A.   YES.

Q.   THIS EXCHANGE IS DATED APRIL 28TH, 2015.

DO YOU SEE THAT?

A.   YES.

Q.   WERE YOU THERANOS'S LAB DIRECTOR AT THE TIME?

A.   YES.

Q.   DO YOU SEE MR. BALWANI WRITING, "IT IS MOST MADDENING THERE IS NO FOCUS IN ANY CHEMICAL TEAMS AND NO PRODUCT COMING OUT."

AND THEN AT THE BOTTOM OF THIS SCREEN, "MOST DISAPPOINTING HOW BAD THESE PEOPLE ARE."

DO YOU SEE THAT?

A.   YES.

Q.   AND WOULD YOU NOW TURN TO PAGE 82.

WE'RE NOW LOOKING AT SOME MESSAGES FROM MAY 13TH, 2015.

DO YOU SEE THAT?

A.   YES.

Q.   DR. DHAWAN, WERE YOU LAB DIRECTOR OF THERANOS AROUND MAY 13TH OF 2015?

A.   YES.

Q.   DO YOU SEE AT THE VERY TOP WHERE MR. BALWANI WRITES,

"SECONDLY. WE NEED A BETTER STRATEGY FOR NORMANDY. FOR A LONG TIME" -- I'M SORRY. "FOR A LONG TIME TO COME WE WILL HAVE HYBRID SOLUTIONS."

DO YOU SEE THAT?

A. YES.

Q. AND ARE YOU FAMILIAR WITH THE TERM "NORMANDY"?

A. I AM NOT.

Q. YOU DON'T KNOW WHAT "NORMANDY" MEANS?

A. NOT IN THIS CONTEXT.

Q. IF YOU'LL NOW TURN TO PAGE 84.

AT THE VERY TOP OF PAGE 84, DO YOU SEE A MESSAGE FROM MR. BALWANI ON MAY 14TH, 2015?

A. YES.

Q. AND WERE YOU LAB DIRECTOR ON THAT DATE?

A. YES.

Q. AND DID YOU SEE MR. BALWANI WRITING, "AT NEWARK DOING REVIEWS AND TERMINATIONS"?

A. YES.

Q. AND DID WE LOOK AT A SLIDE A MOMENT AGO THAT SAID NEWARK WAS THE LOCATION OF THERANOS'S CLIA LAB?

A. YES.

Q. DID YOU KNOW WHO WAS -- WHEN YOU WERE LAB DIRECTOR, DID YOU KNOW WHO WAS MAKING THE HIRING AND FIRING DECISIONS IN THE LAB?

A. NOT DIRECTLY.

Q.   YOU DID NOT KNOW?

A.   NO.

Q.   WOULD YOU NOW TURN TO PAGE 85.

A.   YES.

Q.   ANOTHER MESSAGE FROM MAY 14TH, 2015.  DO YOU SEE WHERE
MR. BALWANI WRITES, "OUR PROBLEM HERE IS LACK OF MANAGEMENT NOT
PEOPLE."

     DO YOU SEE THAT?

A.   YES.

Q.   AND DID YOU SHARE THAT OPINION WHEN YOU WERE LAB DIRECTOR?
DID YOU THINK THAT THERE WAS A PROBLEM IN NEWARK THAT INVOLVED
MANAGEMENT OF THE LAB?

A.   I WAS NEVER GIVEN THE INFORMATION TO MAKE THAT OPINION.

Q.   WOULD YOU NOW TURN TO PAGE 87.

     DO YOU SEE MESSAGES ON PAGE 87 FROM JUNE 3RD, 2015?

A.   UH-HUH.

Q.   I'M SORRY.  WAS THAT A YES?

A.   YES.  I'M SORRY, YES.

Q.   AND WERE YOU LAB DIRECTOR AT THAT TIME, JUNE 2015?

A.   YES.

Q.   AND DO YOU SEE THE THIRD MESSAGE DOWN FROM MR. BALWANI
READS, "I DEAL WITH CLIA EVERY DAY AND I HATE THE LOW QUALITY
OF PEOPLE IN LAB INCLUDING WHAT YOU SAW YESTERDAY IN MAYO CEO."

     DO YOU SEE THAT?

A.   YES.

Q.   AND IN JUNE, DID YOU DEAL WITH THE FOLKS THAT WORKED IN CLIA AND AT THE THERANOS LAB IN NEWARK?

A.   NO.

Q.   WOULD YOU NOW TURN TO PAGE 103.

AT THE BOTTOM OF PAGE 103, DO YOU SEE SOME MESSAGES EXCHANGED ON SEPTEMBER 1ST, 2015?

A.   YES.

Q.   WERE YOU LAB DIRECTOR ON SEPTEMBER 1ST, 2015?

A.   YES.

Q.   DO YOU SEE WHERE MR. BALWANI WRITES, "WE NEED TO CHANGE DOT COM PROVIDER SECTION.  IT TALKS ABOUT MICRO SAMPLES AND REFLECT TESTING ON MICRO SAMPLES."

AND THEN ABOUT THREE LINES DOWN, "JUST SAYING IT IS A DISASTER."

DO YOU SEE THAT?

A.   YES.

Q.   AND, DR. DHAWAN, DO YOU KNOW WHAT THE THERANOS WEBSITE SAID REGARDING THE WAY BLOOD WAS DRAWN, WHETHER IT WAS FINGERSTICK OR VENOUS?  DID YOU LOOK INTO THAT?

A.   I DID NOT.

Q.   WOULD YOU TURN NOW TO PAGE 111.

DO YOU SEE SOME MESSAGES ON THIS PAGE ON SEPTEMBER 22ND, 2015?

A.   YES.

Q.   AND I THINK WE TALKED ABOUT THIS, BUT FIRST, WERE YOU LAB

DIRECTOR ON SEPTEMBER 22ND?

A.   YES.

Q.   AND WAS THIS ALSO DURING THE CMS INSPECTION?

A.   YES.

Q.   MR. BALWANI WRITES, "VERY HOSTILE SO FAR.  THEY HAVE COMPLAINTS."

AND THEN A FEW MESSAGES DOWN DO YOU SEE WHERE MS. HOLMES WRITES, "PRAYING LITERALLY NONSTOP"?

A.   YES.

Q.   DR. DHAWAN, DID YOU KNOW THAT CMS -- OR DID YOU SHARE THIS OPINION THAT THEY WERE VERY HOSTILE AND THEY HAVE COMPLAINTS?

A.   I DIDN'T HEAR ANYTHING TO THAT EFFECT WHEN I WAS THERE.

Q.   AND HOW ABOUT THIS COMMENT ABOUT PRAYING?  WAS THAT YOUR EXPERIENCE DURING THE CMS INSPECTION, THAT YOU FELT A NEED TO PRAY IT WAS GOING SO POORLY?

A.   I DIDN'T FEEL THAT NEED.

Q.   WOULD YOU NOW TURN TO THE NEXT PAGE, PAGE 112.

DO YOU SEE AT THE TOP ALSO ON SEPTEMBER 22ND WHERE MR. BALWANI WRITES, "OUR VALIDATION REPORTS ARE TERRIBLE. REALLY PAINFUL GOING THRU THIS PROCESS.  SAME ISSUES FDA POINTED OUT."

WE TALKED ABOUT A TIME WHEN YOU WENT TO VISIT THERANOS, DO YOU RECALL, ON SEPTEMBER 19TH?

A.   YES.

Q.   SO A FEW DAYS BEFORE THIS, WERE YOU BEING ASKED TO SIGN

VALIDATION REPORTS THAT DAY?

A.   COSIGN THEM, YES.

Q.   AND WHEN MR. BALWANI -- I THINK YOU SAID HE PUT THEM IN FRONT OF YOU AND ASKED YOU TO SIGN THEM.  DID HE TELL YOU THEY WERE TERRIBLE?

A.   NO.

Q.   IF YOU WOULD NOW LOOK A LITTLE BIT FURTHER DOWN, WE'VE MOVED INTO SEPTEMBER 23RD.  WE'RE STILL ON THE SAME PAGE, PAGE 112.

DO YOU SEE MS. HOLMES WRITING, "WILL MAKE SURE ALL TEAMS ARE REVIEWING REPORTS.  LET ME KNOW ANYTHING ELSE CAN DO TO SUPPORT."

AND THEN MR. BALWANI RESPONDS, "GOING BAD SO FAR.  PRAY.

"DANIEL HAS NOTHING READY.

"TOLD ME EVERYTHING IS IN THE BINDERS.

"NOT THERE.

"PRAYING."

DO YOU SEE THAT?

A.   YES.

Q.   AND THEN I'M JUST GOING TO ASK YOU ABOUT ONE FINAL MESSAGE, PAGE 113.

DO YOU SEE MS. HOLMES WRITES, "PRAYING CONTINUALLY"?

A.   YES.

Q.   AFTER THE INSPECTION COMPLETED, SO A DAY OR TWO AFTER YOU WERE THERE THAT MORNING --

SER-547

A.   YES.

Q.   -- SEPTEMBER 22ND, WHAT WAS YOUR IMPRESSION OF HOW THE INSPECTION WENT?  DID YOU HAVE AN IMPRESSION?  AND IF SO, WHAT WAS IT?

A.   I COULDN'T HAVE GENERATED AN IMPRESSION.  I WAS NOT THERE LONG ENOUGH, AND I WAS NOT AS DIRECTLY INVOLVED.

Q.   DID MR. BALWANI CALL YOU, OR ANYONE FROM THERANOS CALL YOU, AFTER THE INSPECTION TO LET YOU KNOW HOW IT WENT?

A.   I DON'T RECALL ANY CALLS TO ME.

Q.   I'D LIKE TO NOW ASK YOU TO LOOK AT 2548.

     DO YOU SEE THIS TWO-PAGE EXHIBIT AT 2548?

A.   YES.

Q.   IS THIS AN EMAIL EXCHANGE THAT INCLUDES AN EMAIL FROM SOMEONE OUTSIDE OF THERANOS, AND THEN YOU FORWARD THAT TO MR. BALWANI AND HAVE A DIALOGUE WITH HIM?

A.   YES.

Q.   AND, DR. DHAWAN, WHEN YOU WERE WORKING AT THERANOS, WAS EMAIL THE WAY YOU COMMUNICATED WITH MR. BALWANI ABOUT WORK MATTERS?

A.   YES, AND I WOULD OCCASIONALLY CALL ON THE CELL.

Q.   IF YOU HAD A QUESTION ABOUT HOW TO HANDLE SOMETHING, WOULD YOU USE EMAIL FROM TIME TO TIME TO COMMUNICATE WITH MR. BALWANI?

A.   YES.

          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2548.

MS. WALSH:  NO OBJECTION.

THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 2548 WAS RECEIVED IN EVIDENCE.)

MR. SCHENK:  THANK YOU.

Q.   IF WE COULD START AT THE VERY BOTTOM OF THAT FIRST PAGE.

DO YOU SEE AN EMAIL FROM SOMEONE NAMED DAVID CROWE?

A.   YES.

Q.   AND HIS EMAIL ADDRESS ENDS AT FT.COM.

DO YOU KNOW WHAT THAT IS?

A.   I LEARNED LATER IT WAS "THE FINANCIAL TIMES."

Q.   SO WAS A REPORTER REACHING OUT TO YOU?

A.   YES.

Q.   AND THE REPORTER REACHES OUT TO YOU IN OCTOBER OF 2015; IS THAT RIGHT?

A.   YES.

Q.   AND IN OCTOBER -- SO THIS IS THE NEXT MONTH, A MONTH AFTER THE INSPECTION?

A.   YES.

Q.   HE SAYS, "AS A MATTER OF URGENCY, OUR CONVERSATION WILL BE ON A BACKGROUND BASIS."

DO YOU SEE THAT?

A.   YES.

Q.   AND THEN YOU FORWARD THIS TO MR. BALWANI, AND YOU LET HIM KNOW THAT YOU TALKED TO THE REPORTER SUPERFICIALLY; IS THAT RIGHT?

SER-549

DHAWAN DIRECT BY MR. SCHENK                                        4130

A.   YES, UH-HUH.

Q.   AND YOU TOLD THE REPORTER TO CONTACT MR. BALWANI?

A.   YES.

Q.   AND THEN DO YOU SEE THE RESPONSE FROM MR. BALWANI AT THE VERY TOP?

A.   YES.

Q.   DOES MR. BALWANI SAY, "THANKS.  WILL SPEAK IN THE A.M. THANKS FOR THE HELP AND STICKING BY.  APPRECIATE IT."

DO YOU SEE WHERE HE WROTE "STICKING BY"?

A.   YES.

Q.   DO YOU KNOW WHAT HE MEANT BY THAT, OR WHAT DID THAT MEAN TO YOU?

A.   I'M NOT SURE WHAT THAT MEANT.

Q.   THE NEXT PARAGRAPH, "IN FUTURE, JUST DON'T ANSWER ANY QUESTIONS AS THEY WILL TRAP YOU OR MISQUOTE YOU.  WE ARE TRYING TO GET ON TOP OF THE SITUATION AND RELEASE OUR STATEMENTS TO REFUTE THE FALSEHOODS, BUT THIS STUFF TAKES TIME."

DO YOU SEE THAT?

A.   YES.

Q.   WHAT ABOUT THE REFERENCE TO "ON TOP OF THE SITUATION"? DID THAT MEAN ANYTHING TO YOU?

A.   AT THAT TIME, NO.

Q.   WOULD YOU NOW TURN TO EXHIBIT 2972.

DR. DHAWAN, IS 2972 AN EMAIL FROM DANIEL YOUNG TO YOU IN NOVEMBER OF 2015?

A.   YES.

MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2972.

MS. WALSH:  OBJECTION.  407.

THE COURT:  MR. SCHENK.

MR. SCHENK:  YOUR HONOR, REVIEWING QC DATA IS NOT A REMEDIAL MEASURE.  THAT'S SOMETHING THAT WE HAVE HEARD TESTIMONY ABOUT THAT LAB DIRECTORS DO.

THE COURT:  THE OBJECTION IS OVERRULED.  THIS WILL BE ADMITTED AND IT MAY BE PUBLISHED.

MR. SCHENK:  THANK YOU.

(GOVERNMENT'S EXHIBIT 2972 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   DR. DHAWAN, DO YOU SEE THIS EMAIL FROM SOMEONE NAMED DANIEL YOUNG AT THE BEGINNING OF NOVEMBER 2015?

A.   YES.

Q.   AND DID YOU KNOW DANIEL YOUNG?  DID THAT NAME SOUND FAMILIAR BEFORE NOVEMBER?

A.   I HAD MET HIM ONCE.

Q.   AND DO YOU REMEMBER WHEN THAT WAS?  WAS IT CMS INSPECTION OR A TOUR?

A.   I BELIEVE IT WAS AT THE CMS INSPECTION.

Q.   IN THIS EMAIL HE SAYS THAT HE'S GOING TO SCHEDULE A MEETING TO REVIEW MONTHLY QC DATA FOR THESE TWO MONTHS, SEPTEMBER AND OCTOBER.

A.   YES, YES.

DHAWAN DIRECT BY MR. SCHENK                                    4132

Q.   AND WHAT I'M WONDERING, IS THAT SOMETHING THAT YOU HAD DONE BEFORE?  YOU WERE THERANOS LAB DIRECTOR FOR ABOUT A YEAR NOW.  THIS IS NOVEMBER 2015, AND I THINK WE SAW YOU STARTED IN NOVEMBER OF 2014.

A.   YES.

Q.   HAD YOU REVIEWED QC DATA AT ALL IN THAT YEAR?

A.   I WAS NEVER SENT ANY QC DATA TO REVIEW.

Q.   I'M SORRY?

A.   I WAS NEVER SENT ANY QC DATA TO REVIEW.

Q.   SO WHEN DANIEL YOUNG REACHES OUT TO YOU, THIS IS THE FIRST TIME THAT SOMEONE SEEMED TO BE PRESENTING YOU WITH QC DATA?

A.   YES.

Q.   AND THERE'S REFERENCE TO SCHEDULING A MEETING.  I'M WONDERING IF EVEN THIS MEETING EVER HAPPENED?  DO YOU HAVE A RECOLLECTION OF THAT?

A.   I DON'T RECALL THIS MEETING EVER HAPPENING.

Q.   AFTER THIS TIME, NOVEMBER OF 2015, DID THERE COME A POINT IN TIME WHEN YOU STOPPED BEING THE THERANOS LAB DIRECTOR?

A.   THERE WAS NO DEFINITE DATE GIVEN TO ME.  I JUST -- PEOPLE -- I DID NOT HEAR BACK FROM THEM.

Q.   SO JUST AT SOME POINT YOU NO LONGER HEARD?

A.   YES.

Q.   BUT YOU DON'T HAVE AN END DATE IN YOUR MIND WHEN YOU WERE NO LONGER THE LAB DIRECTOR?

A.   MY RECOLLECTION IS THAT THEY HIRED SOMEONE ELSE ON A

DHAWAN DIRECT BY MR. SCHENK                                    4133

FULL-TIME BASIS, BECAUSE I WAS VERY PART-TIME WORK.  I WAS

SUPPOSED TO BE A CONSULTANT.

AND I BELIEVE THAT THAT WAS AROUND THIS TIME, BUT I DON'T

HAVE AN EXACT DATE.

Q.   OKAY.  DO YOU REMEMBER HOW YOU FOUND OUT THAT A NEW LAB

DIRECTOR WAS HIRED?

A.   I DON'T RECALL HOW I FOUND OUT, BUT IT WASN'T DIRECTLY

FROM THEM.

Q.   DID THERE COME A POINT IN TIME WHEN YOU -- WHEN YOUR

OPINION OF HOW THE CMS INSPECTION WENT, WHEN THAT CHANGED?  WAS

THERE A POINT IN TIME WHEN YOU THOUGHT YOUR IMPRESSION ON

SEPTEMBER 22ND MIGHT NOT BE ACCURATE, MAYBE IT WAS DIFFERENT?

A.   WHEN THE NOTIFICATION FROM CMS CAME.

Q.   OKAY.  AND WAS THAT IN JULY OF 2016?

A.   IT WAS SEVERAL -- SIX TO EIGHT MONTHS LATER, YES.

Q.   WOULD IT HELP YOU IF I SHOWED YOU A DOCUMENT TO REFRESH

YOUR RECOLLECTION?

A.   YES, YES.

Q.   AND WOULD YOU TURN TO 3217?

A.   YES.

Q.   SO A MOMENT AGO YOU SAID YOU RECEIVED SOME NOTIFICATION.

A.   YES.

Q.   IS THIS -- DOES THIS REFRESH YOUR RECOLLECTION --

A.   YES.

Q.   -- I'M SORRY, THAT IN JULY OF 2015 YOU LEARNED ADDITIONAL

INFORMATION ABOUT HOW THE CMS INSPECTION WENT?

A.   YES.

Q.   HOW ABOUT IN CONVERSATIONS WITH MR. BALWANI?  WAS THERE EVER A TIME WHEN MR. BALWANI TOLD YOU ABOUT THE RESULTS OF THE CMS INSPECTION?

A.   NO.

Q.   NOT IN THE IMMEDIATE DAYS AFTERWARDS, AND NOT EVEN YEARS AFTERWARDS; IS THAT RIGHT?

A.   I DON'T RECALL ANY CONVERSATIONS LIKE THAT.

Q.   YOU TOLD THE JURY EARLIER THAT DURING THAT EIGHT MONTH PERIOD OF TIME THAT I ASKED YOU TO FOCUS ON, NOVEMBER OF '14 WHEN YOU STARTED THROUGH ABOUT JULY OF '15, YOU WORKED A FEW HOURS, I THINK.

A.   YES.

Q.   A SMALL AMOUNT OF TIME?

A.   YES.

Q.   DOES THAT ESTIMATE CHANGE IF NOW WE ADD IN THE ADDITIONAL TIME THAT YOU SERVED AS LAB DIRECTOR?  SO NOW FROM JULY OF '15 ON UNTIL THIS DATE THAT YOU'RE UNCERTAIN OF WHEN A NEW LAB DIRECTOR WAS HIRED.  DID THE NUMBER OF HOURS THAT YOU EVER WORKED CHANGE SIGNIFICANTLY?

A.   IT WAS VERY LIMITED.

Q.   AND THAT WAS TRUE EVEN AFTER JULY OF '15; IS THAT RIGHT?

A.   YES.

        MR. SCHENK:  YOUR HONOR, MAY I HAVE A MOMENT?

THE COURT:  YES.

(DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

MR. SCHENK:  THANK YOU, YOUR HONOR.

NO FURTHER QUESTIONS.

THE COURT:  CROSS-EXAMINATION?

MS. WALSH:  YES, YOUR HONOR.

MAY I HAVE A MOMENT, YOUR HONOR?

THE COURT:  YES.

MS. WALSH:  JUST GETTING SOME BINDERS.  AH.

MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:  PLEASE.

MS. WALSH:  (HANDING.)

MAY I REMOVE MY MASK?

THE COURT:  YES.

MS. WALSH:  THANK YOU.

**CROSS-EXAMINATION**

BY MS. WALSH:

Q.   ALL RIGHT.  GOOD AFTERNOON, DR. DHAWAN.  MY NAME IS AMY WALSH AND I REPRESENT MR. BALWANI.

A.   HELLO.

Q.   I'M GOING TO ASK YOU SOME QUESTIONS ABOUT YOUR TESTIMONY ON DIRECT TODAY.

A.   YES.

Q.   OKAY.  SO LET'S START WITH YOUR BACKGROUND.  YOU ARE A MEDICAL DOCTOR; CORRECT?

A.   YES.

Q.   AND YOU WENT UNDERGRADUATE AT SAN FRANCISCO STATE UNIVERSITY; RIGHT?

A.   YES.

Q.   YOU GOT A BACHELOR'S IN CHEMISTRY?

A.   YES.

Q.   AND YOU GRADUATED SUMMA CUM LAUDE; CORRECT?

A.   YES.

Q.   AND YOU WERE ON THE DEAN'S LIST FOR ALL FOUR YEARS THERE?

A.   YES.

Q.   AND THEN YOU WENT TO THE MEDICAL SCHOOL AT THE UNIVERSITY OF SOUTHERN CALIFORNIA; IS THAT RIGHT?

A.   YES.

Q.   AND THEN FOLLOWING MEDICAL SCHOOL, YOU DID TWO DIFFERENT RESIDENCIES; IS THAT RIGHT?

A.   YES.

Q.   ONE WAS INTERNAL MEDICINE; CORRECT?

A.   YES.

Q.   AND THEN A RESIDENCY IN DERMATOLOGY; RIGHT?

A.   YES.

Q.   OKAY.  AND YOU ULTIMATELY BECAME THE CHIEF RESIDENT IN DERMATOLOGY; RIGHT?

A.   YES.

Q.   FOLLOWING THAT, YOU WERE AN ATTENDING PHYSICIAN AT MOUNT SINAI MEDICAL CENTER; IS THAT RIGHT?

A.   NOT MOUNT SINAI.  IT WAS MOUNT ZION.

Q.   MOUNT ZION, OKAY.

A.   YES.

Q.   AND THAT WAS IN THE DEPARTMENT OF INTERNAL MEDICINE AND EMERGENCY MEDICINE; IS THAT RIGHT?

A.   YES, YES.

Q.   AND YOU'RE ALSO, AND YOU WERE AT THE TIME, A PROFESSOR AT STANFORD UNIVERSITY MEDICAL SCHOOL; IS THAT RIGHT?

A.   I'M AN ADJUNCT CLINICAL ASSISTANT PROFESSOR, YES.

Q.   OKAY.  AND OF COURSE YOU'RE LICENSED TO PRACTICE MEDICINE IN THE STATE OF CALIFORNIA; RIGHT?

A.   YES.

Q.   AND YOU'RE CERTIFIED BY THE MEDICAL BOARD OF DERMATOLOGY; RIGHT?

A.   YES.

Q.   AND THE MEDICAL BOARD OF CALIFORNIA?

A.   YES.

Q.   OKAY.  AND YOU -- I THINK YOU SAID THIS ON DIRECT, YOU'VE PRACTICED MEDICINE FOR 32 YEARS; IS THAT RIGHT?

A.   YES.

Q.   AND YOU HAVE 18 YEARS OF CLINICAL RESEARCH EXPERIENCE; CORRECT?

A.   YES.  NINETEEN NOW.

Q.   NINETEEN NOW.

     OKAY.  AND YOU HAVE YOUR OWN MEDICAL PRACTICE; RIGHT?

DHAWAN CROSS BY MS. WALSH                                        4138

A.   I'M PART OF A GROUP.

Q.   OKAY.  SO YOU'RE PART OF A GROUP?

A.   YES.

Q.   AND THAT GROUP IS THE CALIFORNIA CENTER FOR DERMATOLOGY?

A.   IT'S THE CENTER FOR DERMATOLOGY, YES.

Q.   CENTER FOR DERMATOLOGY?

A.   YES.

Q.   AND IN ADDITION, YOU WERE A LAB DIRECTOR FOR YOUR OWN LAB; RIGHT?

A.   YES.

Q.   AND THAT LAB WAS EAST BAY DERMATOLOGY MEDICAL GROUP; CORRECT?

A.   YES, YES.

Q.   AND, OF COURSE, YOU WERE LISTED AS THE LAB DIRECTOR ON THE CLIA LICENSE FOR THAT LAB?

A.   YES.

Q.   AND EAST BAY, THAT LAB, EAST BAY --

A.   YES.

Q.   -- THAT WAS A HIGH COMPLEXITY LAB; IS THAT RIGHT?

A.   YES.

Q.   OKAY.  AND I THINK YOU SAID THIS ON DIRECT, IT SPECIALIZED IN HISTOPATHOLOGY; CORRECT?

A.   YES, AMONG OTHER THINGS, YES.

Q.   AND HISTOPATHOLOGY INVOLVES EXAMINING CELLS UNDER A MICROSCOPE; RIGHT?

UNITED STATES COURT REPORTERS

A.   YES.

Q.   AND THE PURPOSE IS TO DIAGNOSE DISEASES; RIGHT?

A.   YES.

Q.   AND INCLUDING CANCER AND SKIN DISEASES; CORRECT?

A.   YES.

Q.   OKAY.  SO LET'S TAKE A LOOK AT 2219, WHICH I THINK IS IN
EVIDENCE.

        ACTUALLY -- NO.  OKAY.  2219 IN YOUR BINDER, DR. DHAWAN.

A.   YES.

            THE CLERK:  MS. WALSH, IT IS.

            MS. WALSH:  OKAY.  YOUR HONOR, THIS EXHIBIT IS IN
EVIDENCE.  MAY IT BE PUBLISHED?

            THE COURT:  YES.

BY MS. WALSH:

Q.   AND TURNING TO PAGE 2 TO 3 OF THAT EXHIBIT --

A.   YES.

Q.   -- THIS IS WHERE MR. BALWANI REACHES OUT TO YOU IN
NOVEMBER OF 2014; RIGHT?

A.   YES.

Q.   OKAY.  AND HE SAYS, "SUNIL.

     "THANKS FOR TAKING MY CALL.

     "THE TIME COMMITMENT IS VERY MINIMAL.  THIS WILL BE MOSTLY
AN ON CALL CONSULTING ROLE."

     AND YOU TESTIFIED TO THAT; RIGHT?

A.   YES.

Q.   OKAY.  "AND I AM EXTREMELY CONFIDENT THAT IT WON'T INTERFERE WITH YOUR WORK OR WITH YOUR FAMILY LIFE.  I AM ATTACHING THE REQUIREMENTS HERE."

AND MR. BALWANI ATTACHES THE CLIA REQUIREMENTS?

A.   YES.

Q.   AND DO YOU SEE THOSE ON PAGE 3?

A.   YES.

Q.   AND THE CLIA REQUIREMENTS, IT SAYS FOR M.D.'S THERE ARE THE FOLLOWING ALTERNATIVES.

NUMBER 2 SAYS, "LICENSED TO PRACTICE MEDICINE IN THE STATE IN WHICH THE LABORATORY IS LOCATED AND EITHER HAVE AT LEAST ONE YEAR OF LABORATORY TRAINING DURING MEDICAL RESIDENCY OR" SKIPPING DOWN TO TWO, "HAVE AT LEAST 2 YEARS OF EXPERIENCE DIRECTING OR SUPERVISING HIGH COMPLEXITY TESTING."

DO YOU SEE THAT?

A.   YES.

Q.   AND THAT IS SOMETHING THAT YOU HAD DONE WHEN MR. BALWANI REACHED OUT TO YOU; RIGHT?

A.   YES.

Q.   AND SO YOU WERE FULLY QUALIFIED TO BE A LAB DIRECTOR FOR A HIGH COMPLEXITY LAB; CORRECT?

A.   YES.

Q.   OKAY.  AND YOU'RE AWARE THAT MR. BALWANI REACHED OUT TO YOU BECAUSE HE WAS LOOKING FOR A LAB DIRECTOR TO REPLACE THE PRIOR LAB DIRECTOR; RIGHT?

SER-560

A.   YES.

Q.   AND THAT WAS DR. ADAM ROSENDORFF; RIGHT?

A.   YES.

Q.   AND DR. ROSENDORFF CAME OFF THE CLIA LICENSE IN AROUND DECEMBER OF 2014.

DO YOU RECALL THAT?

A.   I DON'T HAVE THE EXACT DATE, BUT --

Q.   BUT WAS IT AROUND THAT TIME?

A.   I WOULD HAVE TO LOOK AT THE PAPERWORK, BUT YEAH, I WOULD ASSUME.

Q.   SURE, SURE.  SO LET'S -- IF YOU CAN IN YOUR BINDER, DR. DHAWAN, TURN TO 10567.  IT'S THE SECOND PAGE OF THAT EXHIBIT.

A.   YES.

Q.   DOES THAT REFRESH YOUR RECOLLECTION AS TO WHEN DR. ROSENDORFF CAME OFF THE THERANOS CLIA LICENSE?

A.   YES.

Q.   OKAY.  AND THAT WAS DECEMBER 17TH, 2014?

A.   YES.

Q.   OKAY.  AND IF WE CAN JUST PUT UP 2219 AGAIN ON PAGE 2.

MR. BALWANI DIDN'T JUST -- DR. DHAWAN, IF YOU COULD JUST LOOK AT THE SCREEN AT 2219.

A.   SURE.  YES.

Q.   WHEN MR. BALWANI CONTACTED YOU, HE WASN'T -- HE WAS REACHING OUT TO YOU; RIGHT?

A.   YES.

Q.   BUT HE ALSO SAYS IN HIS EMAIL, "PLEASE LET ME KNOW IF YOU WILL BE ABLE TO DO THIS OR PERHAPS SOMEONE ELSE YOU KNOW"; CORRECT?

A.   YES.

Q.   SO HE WAS LOOKING FOR A LAB DIRECTOR?

A.   YES.

Q.   OKAY.  AND BEFORE MR. BALWANI EMAILED YOU, YOU WERE AWARE, WEREN'T YOU, THAT HE WAS CONDUCTING A BROADER SEARCH FOR A NEW LAB DIRECTOR?

         MR. SCHENK:  OBJECTION.  SPECULATION.

         THE WITNESS:  I DID NOT KNOW THAT.

         THE COURT:  EXCUSE ME, SIR.

    WHY DON'T YOU LAY A FOUNDATION A LITTLE BIT MORE.

         MS. WALSH:  SURE.

Q.   SO, DR. DHAWAN, MR. BALWANI REACHED OUT TO YOU TO SEE IF YOU KNEW OF ANYONE ELSE WHO COULD BE A LAB DIRECTOR BESIDES YOU; RIGHT?

A.   YES.

Q.   THAT'S IN THE EMAIL; RIGHT?

A.   YES.

Q.   AND WERE YOU AWARE THAT HE WAS LOOKING FOR OTHER PEOPLE TO BECOME A LAB DIRECTOR?  JUST WERE YOU AWARE?

         MR. SCHENK:  OBJECTION.  LEADING.

         THE COURT:  SUSTAINED.

BY MS. WALSH:

Q.   OKAY.  DID YOU HAVE ANY MORE CONVERSATIONS WITH MR. BALWANI ABOUT SEARCHES FOR A LAB DIRECTOR?

A.   I DON'T RECALL ANY CONVERSATIONS WHERE I WAS TOLD THAT THERE WAS A SEARCH GOING ON SUCH AS, YOU KNOW, WHEN PEOPLE SEARCH FOR A POSITION, NO.

Q.   OKAY.  AND DID YOU HAVE ANY CONVERSATIONS WITH OTHER EMPLOYEES OF THERANOS ABOUT THE FACT THAT THEY WERE LOOKING FOR A LAB DIRECTOR?

A.   I DID NOT.

Q.   OKAY.  NOW, YOU TESTIFIED ON DIRECT THAT YOU TOOK A COUPLE OF TOURS OF THERANOS DURING THAT TIME PERIOD NOVEMBER 2014 THROUGH JUNE 2015?

     DO YOU REMEMBER THAT TESTIMONY?

A.   YES.

Q.   OKAY.  AND MR. BALWANI WAS ONE OF THE PEOPLE WHO TOOK YOU ON THAT TOUR; RIGHT?

A.   YES.

Q.   OKAY.  AND I THINK YOU SAID THAT THERE WERE OTHER THERANOS LAB PEOPLE WHO WERE ON THAT TOUR; RIGHT?

A.   YES.

Q.   AND THAT WAS AT THE NEWARK LAB; CORRECT?

A.   YES.

Q.   AND YOU GOT SHOWN AROUND DURING THE COURSE OF THE TOUR; RIGHT?

A.    YES.

Q.    AND AS YOU SAID, YOU MET OTHER THERANOS PERSONNEL; RIGHT?

A.    YES.

Q.    AND DO YOU REMEMBER MEETING A FELLOW NAMED MAX FOSQUE?

A.    I DON'T RECALL THAT NAME.

Q.    OKAY.  HOW ABOUT GURBIR SIDHU?

A.    I DON'T RECALL THAT NAME SPECIFICALLY, NO.

Q.    OKAY.  AND I'M GOING TO JUST GO THROUGH A COUPLE MORE
NAMES TO SEE IF IT JOGS YOUR RECOLLECTION, OKAY?

      MEREYDA BUENROSTRA, DO YOU REMEMBER MEETING HER?

A.    I DO NOT.

Q.    AND HOW ABOUT MELISSA MCCORMICK?  DO YOU REMEMBER MEETING
HER?

A.    I DO NOT.

Q.    OKAY.  DURING THE COURSE OF THE TOUR, THOUGH, YOU WERE
SHOWN THERANOS BLOOD TESTING DEVICES; RIGHT?

A.    I WAS SHOWN MULTIPLE BLOOD TESTING DEVICES, YES.

Q.    RIGHT.  AND YOU SAID YOU SAW ONE OF THEM WAS A LARGER
MACHINE?

A.    RIGHT.

Q.    CORRECT?

A.    YES.

Q.    IT LOOKED LIKE A COMMERCIALLY BOUGHT MACHINE PERHAPS;
RIGHT?

A.    YES.

Q.   BUT YOU WERE ALSO SHOWN THE EDISON, WEREN'T YOU?

A.   YES.

Q.   AND WHEN MR. BALWANI REACHED OUT TO YOU, HE TALKED TO YOU ABOUT THE WORKLOAD THAT WOULD BE INVOLVED IN YOUR BEING LAB DIRECTOR AT THERANOS; RIGHT?

A.   YES.

Q.   AND HE DIDN'T WANT IT TO IMPINGE TOO MUCH ON YOUR TIME; CORRECT?

A.   YES.

Q.   AND HE THOUGHT -- HE SAID IT WOULD BE TEMPORARY; RIGHT?

A.   YES.

Q.   AND LIMITED IN HOURS; CORRECT?

A.   YES.

Q.   AND YOU ALSO SAID THAT YOU WERE AWARE THAT THERANOS HAD OPENED UP THIS LABORATORY IN ARIZONA; RIGHT?

A.   YES.

Q.   AND WE SAW ON THE MAP THAT WAS SHOWN TO YOU ON YOUR DIRECT EXAMINATION THAT THERE WERE MANY PATIENT SERVICE CENTERS IN ARIZONA; CORRECT?

A.   YES.

Q.   AND MR. BALWANI TOLD YOU, DIDN'T HE, THAT ARIZONA WAS GOING TO PROCESS MANY OF THE SAMPLES THAT WERE COMING IN FROM THOSE PATIENT SERVICE CENTERS?

A.   I WAS TOLD THAT.  I'M TRYING TO REMEMBER WHEN AND WHO TOLD ME.

I BELIEVE IT WAS MR. BALWANI, BUT I DON'T RECALL NOW.

Q.   OKAY.  SO YOU DON'T REMEMBER WHEN, BUT YOU DO REMEMBER THAT HE TOLD YOU THAT?

A.   YES.

Q.   OKAY.  AND YOU WERE AWARE, WEREN'T YOU, THAT WHEN THE ARIZONA LAB OPENED, DR. DANIEL YOUNG WAS THE LAB DIRECTOR FOR THAT LAB; RIGHT?

A.   THAT I WAS AWARE OF, YES.

Q.   OKAY.  AND YOU, IN FACT, MET DR. YOUNG AT SOME POINT?

A.   YES.

Q.   AND YOU THINK IT MAY HAVE BEEN DURING THE CLIA INSPECTION; IS THAT RIGHT?

A.   YES.

Q.   AND DID YOU MEET HIM ON THE EARLIER TOURS THAT YOU WENT ON AT NEWARK?

A.   I DON'T RECALL MEETING HIM PRIOR TO THAT SEPTEMBER DATE, THE CLIA INSPECTION.

Q.   OKAY.  AND MR. BALWANI ALSO MENTIONED TO YOU, DIDN'T HE, THAT THERE WAS SOMEONE IN THE THERANOS LAB WHO WAS TRYING TO BECOME QUALIFIED TO BECOME A LAB DIRECTOR.

DO YOU REMEMBER THAT?

A.   I DO NOT.

Q.   DO YOU REMEMBER HEARING ABOUT A FELLOW NAMED SURAJ SAKSENA?

A.   I'M FAMILIAR WITH THE NAME --

Q. UH-HUH.

A. -- ONLY.

Q. OKAY. MAYBE I CAN SHOW YOU SOME DOCUMENTS.

A. SURE.

Q. TURN TO 20064 IN YOUR BINDER.

DO YOU SEE THAT EMAIL CHAIN?

A. YES.

Q. AND THAT'S AN EMAIL CHAIN BETWEEN YOU AND MR. -- I SHOULD SAY DR. SAKSENA; CORRECT?

A. YES.

Q. AND MR. BALWANI IS ON THAT EMAIL CHAIN?

A. YES.

Q. OKAY. AND THIS RELATES TO A LETTER THAT DR. SAKSENA IS REQUESTING FROM YOU; IS THAT RIGHT?

A. YES.

Q. AND THIS IS IN CONNECTION WITH THERANOS'S BUSINESS, IS THAT RIGHT, OF RUNNING THE LAB?

A. YES.

Q. AND AS YOU SAID ON DIRECT, PEOPLE FROM -- EMPLOYEES OF THERANOS WOULD EMAIL YOU FROM TIME TO TIME ABOUT THERANOS BUSINESS; RIGHT?

A. YES.

Q. AND THAT WAS WITHIN THE REGULAR COURSE OF THERANOS'S BUSINESS; CORRECT?

A. YES.

Q.    AND IN THOSE EMAILS, IT WAS IMPORTANT FOR YOU TO BE ACCURATE WHEN YOU RESPONDED TO THERANOS EMPLOYEES, WASN'T IT?

A.    YES.

Q.    OKAY.  AND VICE VERSA?  IT WAS IMPORTANT FOR THEM TO BE ACCURATE WITH YOU; CORRECT?

A.    YES.

Q.    OKAY.  AND AS FAR AS YOU KNOW, THE THERANOS EMAILS WERE PRESERVED SO THAT IF ANYONE WANTED TO COME BACK LATER AND LOOK AT THEM, THEY WOULD BE AVAILABLE, AS FAR AS YOU KNEW?

A.    YES.

          MS. WALSH:  YOUR HONOR, WE OFFER 20064.

          MR. SCHENK:  YOUR HONOR, WE HAVE AN AUTHENTICATION OBJECTION THAT MIGHT REQUIRE A MORE LENGTHY DISCUSSION.  I DON'T KNOW IF THERE IS A TIME THAT WOULD BE APPROPRIATE FOR THAT.

          MS. WALSH:  WELL, YOUR HONOR, DR. DHAWAN RECOGNIZES IT.  THAT'S HIS EMAIL, SO I DON'T THINK THERE'S AN AUTHENTICATION ISSUE.

          THE COURT:  IS IT THE CONTENTS OF THE EMAIL THAT YOU'RE CONCERNED ABOUT?

          MR. SCHENK:  NO.  NO.  THERE'S A 901 ISSUE.

          THE COURT:  I'LL OVERRULE THE OBJECTION.  IT CAN BE ADMITTED.

     (DEFENDANT'S EXHIBIT 20064 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

DHAWAN CROSS BY MS. WALSH                                      4149

Q.   OKAY.  SO LET'S PULL THAT UP.

     SO AT THE BOTTOM PORTION OF THE EMAIL, SURAJ SAKSENA IS
WRITING TO YOU, DR. DHAWAN, AND HE SAYS THAT -- AND THE DATE IS
OCTOBER 6TH; 2015; RIGHT?

A.   YES.

Q.   AND HE SAYS, "IT WAS A PLEASURE MEETING YOU A COUPLE WEEKS
BACK DURING THE LAB INSPECTION.

     "AS SUNNY MENTIONED TO YOU DURING OUR MEETING, I HAVE
APPLIED WITH THE CALIFORNIA LABORATORY FIELD SERVICES FOR A
CLINICAL CHEMIST LICENSE.  AS PART OF MY APPLICATION REVIEW, I
HAVE BEEN ASKED BY THE EXAMINER TO PROVIDE A LETTER FROM THE
LAB DIRECTOR CONFIRMING MY TRAINING AND WORK EXPERIENCE IN THE
CLIA LABORATORY."

     DO YOU SEE THAT?

A.   YES.

Q.   OKAY.  SO DR. SAKSENA WAS REACHING OUT TO YOU TELLING YOU
THAT HE WAS APPLYING FOR THIS LICENSE; RIGHT?

A.   YES.

Q.   BUT HE HAS TO PROVIDE A LETTER FROM THE LAB DIRECTOR;
CORRECT?

A.   YES.

Q.   OKAY.  AND THEN YOU AGREE TO PROVIDE THAT LETTER FOR HIM;
RIGHT?

A.   YES.

Q.   AND YOU ASK HIM, SHOULD I SIGN IT VIA DOCUSIGN OR SOME

UNITED STATES COURT REPORTERS

OTHER WAY?

A.   UH-HUH.

Q.   AND DR. SAKSENA SAYS, "THANK YOU SO MUCH FOR YOUR PROMPT ATTENTION TO THIS.  THE DOCUSIGN VERSION WILL BE ENOUGH."

     DO YOU SEE THAT?

A.   YES.

Q.   AND THEN YOU WENT ON TO WRITE THAT LETTER; CORRECT?

A.   YES.

Q.   OKAY.  IF YOU --

A.   I DON'T SEE A COPY OF IT.

Q.   RIGHT.  I'M GOING TO SHOW IT TO YOU NOW.

     IF YOU COULD TURN IN YOUR BINDER TO 20067.

     DO YOU WANT TO TAKE A MINUTE TO READ IT?

A.   I PERUSED IT, YES.

Q.   OKAY.  THIS IS THE LETTER THAT YOU SIGNED FOR DR. SAKSENA, ISN'T IT?

A.   YES.

Q.   OKAY.  AND YOU SENT THIS -- YOU WERE SIGNING AS THERANOS'S LAB DIRECTOR; RIGHT?

A.   YES.

Q.   OKAY.  AND THE THERANOS LOGO IS ON THE LETTERHEAD OF THERANOS; RIGHT?

A.   YES.

Q.   AND YOU SENT IT TO LABORATORY FIELD SERVICES FOR CALIFORNIA DEPARTMENT OF PUBLIC HEALTH; CORRECT?

A.   YES.

Q.   AND, OF COURSE, IT'S IMPORTANT TO BE ACCURATE IN A LETTER TO THE HEALTH AUTHORITIES; RIGHT?

A.   YES.

Q.   OKAY.  AND AS FAR AS YOU WERE AWARE, THE LETTER WAS PRESERVED SO WE CAN COME BACK AND LOOK AT IT LATER; RIGHT?

A.   YES.

MS. WALSH:  YOUR HONOR, I OFFER 20067.

MR. SCHENK:  NO OBJECTION.

THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

MS. WALSH:  THANK YOU.

(DEFENDANT'S EXHIBIT 20067 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

Q.   SO, DR. DHAWAN, TURNING TO PAGE 2 OF THE LETTER.

A.   UH-HUH, YES.

Q.   AND THAT'S YOUR SIGNATURE AT THE BOTTOM?

A.   YES.

Q.   AND LOOKING AT THE PARAGRAPH STARTING WITH "FURTHER."
     IT'S THE SECOND PARAGRAPH.

A.   YES.

Q.   AND THE SECOND SENTENCE SAYS, "DR. SAKSENA HAS HELPED PERFORM HIGH-COMPLEXITY LABORATORY DEVELOPED TESTS" -- THOSE ARE LDT'S; RIGHT?

A.   YES.

Q.   AND THOSE ARE TESTS THAT THERANOS DEVELOPED IN ITS LAB;

CORRECT?

A.   YES.

Q.   AS OPPOSED TO COMMERCIAL ONES; RIGHT?

A.   YES.

Q.   YES.  -- "DEVELOPED BY THERANOS IN THE SPECIALTIES OF CHEMISTRY, HEMATOLOGY, IMMUNOASSAYS (ENDOCRINOLOGY) FOR A PERIOD OF THREE YEARS (I HAVE ATTACHED A LIST OF THE HIGH COMPLEXITY LDT'S THAT ARE PERFORMED IN THE THERANOS CLIA-CERTIFIED LABORATORY TO THIS LETTER)."

     AND THEN IF YOU TURN TO THE FIRST PAGE OF THIS LETTER, YOU INTRODUCE YOURSELF AS THE CLIA LAB DIRECTOR FOR THE CLIA CERTIFIED HIGH COMPLEXITY LAB; CORRECT?

A.   YES.

Q.   AND YOU'RE WRITING IN SUPPORT OF DR. SURAJ SAKSENA'S APPLICATION FOR A CLINICAL CHEMIST LICENSE; RIGHT?

A.   YES.

Q.   I'LL GO SLOWER.

     AND YOU SAY, "I HAVE SERVED AS LABORATORY DIRECTOR SINCE DECEMBER 2014"; RIGHT?

A.   YES.

Q.   "PRIOR TO MY TENURE, ADAM ROSENDORFF, M.D., SERVED AS LABORATORY DIRECTOR OF THIS FACILITY."

     RIGHT?

A.   YES.

Q.   "UNDER OUR SUPERVISION, DR. SAKSENA HAS SATISFIED BOTH THE

TRAINING AND THE WORK EXPERIENCE REQUIREMENTS FOR THIS

LICENSE."

RIGHT?

A.   YES.

Q.   AND A COUPLE MORE SENTENCES.

"AS REQUIRED BY THIS CITATION, HE HAS COMPLETED THE

EQUIVALENT OF ONE YEAR OF TRAINING AS A LICENSED TRAINEE IN THE

FIELD OF CLINICAL CHEMISTRY."

RIGHT?

A.   YES.

Q.   "IN ADDITION, AS FURTHER REQUIRED BY THIS, DR. SAKSENA HAS

MORE THAN THREE YEARS EXPERIENCE IN CLINICAL CHEMISTRY IN A

HIGH COMPLEXITY CLINICAL LABORATORY."

RIGHT?

A.   YES.

Q.   AND SO DOES THIS HELP YOU REMEMBER THAT DR. SAKSENA WAS

TRYING TO GET CERTIFIED TO BECOME A LAB DIRECTOR IN A HIGH

COMPLEXITY LAB; RIGHT?

A.   YES.

Q.   IN THE STATE OF CALIFORNIA?

A.   YES.

Q.   AND THE INTENTION WAS THAT HE WAS GOING TO BE THE

FULL-TIME LAB DIRECTOR AT THERANOS'S CLIA LAB?

MR. SCHENK:  OBJECTION.  SPECULATION.

THE WITNESS:  I DIDN'T KNOW.

DHAWAN CROSS BY MS. WALSH                                                    4154

THE COURT:  SUSTAINED AS TO THE LAST PART AS SPECULATION.

IF YOU WANT TO BREAK THAT UP.

MS. WALSH:  SURE.

Q.  SO DR. SAKSENA WAS APPLYING FOR THIS LICENSE; RIGHT?

A.  YES.

Q.  AND HIS GOAL IN APPLYING FOR THIS, IF YOU KNOW, WAS TO BE CERTIFIED TO BE LAB DIRECTOR IN A HIGH COMPLEXITY LAB IN CALIFORNIA; RIGHT?

A.  IF THAT'S WHAT HE WAS TRYING TO DO, YES.

Q.  YEAH.  AND THERANOS'S LAB IN NEWARK, CALIFORNIA WAS A HIGH COMPLEXITY LAB; CORRECT?

A.  YES.

Q.  AND AS FAR AS YOU'RE AWARE, THERANOS DIDN'T HAVE ANOTHER CALIFORNIA LAB THAT WAS HIGH COMPLEXITY; RIGHT?

A.  AS FAR AS I'M AWARE, YES.

Q.  OKAY.  OKAY.

WE CAN TAKE THAT DOWN.

DID YOU EVER LEARN, DR. DHAWAN, HOW DR. SAKSENA DID ON HIS EXAM TO GET THAT LICENSE?

A.  I DON'T HAVE ACCESS TO THAT INFORMATION, NO.

Q.  WERE YOU EVER TOLD IT?

A.  I DON'T RECALL.

Q.  OKAY.  AND ARE YOU AWARE, DR. DHAWAN, THAT AT A CERTAIN POINT LATER IN TIME, CALIFORNIA LAW REGARDING THE

UNITED STATES COURT REPORTERS

**SER-574**

QUALIFICATIONS FOR LAB DIRECTORS CHANGED?  ARE YOU AWARE OF
THAT?

MR. SCHENK:  OBJECTION.  RELEVANCE.

THE COURT:  ARE YOU TIME STAMPING THIS TO HIS TIME
WITH THIS COMPANY OR -- I DON'T SEE THE RELEVANCE OTHERWISE, SO
YOU'LL HAVE TO LAY A BETTER FOUNDATION.

MS. WALSH:  SURE.  SURE.

Q.   SO YOU'RE AWARE THAT DR. SAKSENA WAS APPLYING TO BE A LAB
DIRECTOR AT A HIGH COMPLEXITY LAB; RIGHT?

A.   YES.

Q.   AND THERE WERE CERTAIN REQUIREMENTS UNDER CALIFORNIA LAW
FOR SOMEONE WHO WASN'T A MEDICAL DOCTOR; IS THAT RIGHT?

A.   YES.

Q.   AND THE REQUIREMENTS FOR A PH.D. WERE DIFFERENT FROM A
MEDICAL DOCTOR?  WERE YOU AWARE OF THAT?

A.   YES, I WAS.

Q.   OKAY.  AND A PH.D. COULD BECOME A LAB DIRECTOR FOR A HIGH
COMPLEXITY LAB IF HE HAD A CERTAIN AMOUNT OF TRAINING; RIGHT?

A.   YES.

Q.   IN A LAB; RIGHT?

A.   YES.

Q.   AND PASSED AN EXAM; CORRECT?

A.   I WOULD HAVE TO LOOK AT THE STATUTE.  I DON'T HAVE THAT
STATUTE IN FRONT OF ME.

Q.   OKAY.  ARE YOU AWARE THAT THAT WAS GENERALLY THE

REQUIREMENT, THAT IT WAS TRAINING PLUS THE EXAM?

A.   THERE ARE SPECIFIC REQUIREMENTS FOR THAT AND I'D HAVE TO

LOOK THEM UP.  I'M SORRY, I DON'T HAVE THEM IN FRONT OF ME.

Q.   AND I GUESS I COULD MOVE ON FROM THEM, BUT ARE YOU AWARE

THAT THOSE REQUIREMENTS CHANGED AT A CERTAIN POINT IN TIME?

         MR. SCHENK:  RELEVANCE.

         THE COURT:  SUSTAINED.

         MS. WALSH:  OKAY.  WELL, MAYBE WE'LL COME BACK TO

THAT.

     (PAUSE IN PROCEEDINGS.)

BY MS. WALSH:

Q.   OKAY.  SO, MR. SCHENK ASKED YOU ABOUT DR. LYNETTE SAWYER

ON DIRECT.

     DO YOU REMEMBER THAT?

A.   YES.

Q.   AND WHEN -- SO SHE WAS THE CO-LAB DIRECTOR WHILE YOU WERE

THE LAB DIRECTOR OF THERANOS; IS THAT RIGHT?

A.   YES.

Q.   AND SHE WAS ALSO HIRED IN NOVEMBER 2014 TO BE A

CO-LAB DIRECTOR; CORRECT?

A.   ACCORDING TO WHAT I'VE SEEN, YES.

Q.   OKAY.  AND SHE -- BEING A CO-LAB DIRECTOR, SHE WAS,

SIMILAR TO YOU, NOT A FULL-TIME LAB DIRECTOR; IS THAT RIGHT?

A.   I DON'T KNOW HOW MUCH TIME SHE SPENT.  I'M SORRY.

Q.   OKAY.  WERE YOU AWARE THAT SHE WAS A LAB DIRECTOR PURSUANT

TO A CONSULTING AGREEMENT LIKE YOU?

A.   I WAS NOT AWARE OF AN AGREEMENT.

Q.   OKAY.  BUT YOU ARE AWARE THAT YOU WERE BOTH LISTED ON THE CLIA LICENSE AGREEMENT AS LAB DIRECTORS; RIGHT?

A.   YES.

Q.   OKAY.  OKAY.  AND SO DURING THIS PERIOD, NOVEMBER 2014 TO JUNE -- THROUGH JUNE 2015, YOU TESTIFIED THAT YOU WERE ONLY WORKING A FEW HOURS AT THERANOS; CORRECT?

A.   YES.

Q.   OKAY.  AND WHILE YOU WERE ONLY WORKING A FEW HOURS, YOU WERE AWARE, WEREN'T YOU, THAT DR. SAWYER WAS SIGNING DOCUMENTS RELATED TO THE LAB?

A.   I WAS NEVER TOLD THAT, AND NOT -- NO INFORMATION LIKE THAT WAS GIVEN TO ME, SO I WAS NOT AWARE OF WHAT SHE WAS SIGNING.

Q.   OKAY.  SO YOU WEREN'T AWARE AT THE TIME THAT SHE WAS SIGNING A LOT OF DOCUMENTS?

A.   NO.  I WAS NEVER SHOWN THOSE DOCUMENTS, NO.

Q.   OKAY.  SO LET'S -- WHY DON'T YOU TURN IN YOUR BINDER TO 10525.

     DO YOU SEE THAT DOCUMENT?

A.   YES, I DO.

Q.   AND DO YOU SEE THAT THAT WAS SIGNED BY LYNETTE SAWYER?

A.   YES.

Q.   AND IT'S DATED JANUARY 11TH, 2015; IS THAT RIGHT?

A.   YES.

Q.   AND IT REFERS TO A VERIFICATION OF AN ADVIA 2400.

DO YOU SEE THAT?

A.   YES.

Q.   AND THAT'S A TESTING DEVICE; RIGHT?

A.   YES.

Q.   OKAY.

YOUR HONOR, WE OFFER 10525.

MR. SCHENK:  FOUNDATION.

THE COURT:  CAN YOU LAY A FOUNDATION THROUGH THIS WITNESS?

MS. WALSH:  YES, I CAN TRY.

Q.   DR. DHAWAN, DO YOU UNDERSTAND WHEN TESTS ARE BROUGHT ONLINE IN A LAB, THERE ARE REGULATIONS THAT ALLOW A LAB DIRECTOR TO VERIFY THAT IT'S APPROPRIATE TO BRING THAT TEST ONLINE; RIGHT?

A.   YES.

Q.   OKAY.  AND EITHER LAB -- IF THERE ARE TWO LAB DIRECTORS, EITHER LAB DIRECTOR CAN ATTEST TO THAT VERIFICATION AND CERTIFY THAT IT'S APPROPRIATE FOR THAT TEST TO BE OFFERED IN THE LAB; IS THAT RIGHT?

A.   YES.

Q.   AND SO YOUR CO-LAB DIRECTOR, DR. SAWYER, WOULD HAVE HAD THE ABILITY UNDER THE LAW TO SERVE THAT FUNCTION, TO VERIFY LAB TESTS; RIGHT?

A.   THAT'S PART OF THE STATUTE, YES.

SER-578

DHAWAN CROSS BY MS. WALSH                                4159

Q.   AND WHEN THAT IS DONE, THOSE RECORDS ARE MAINTAINED BY THE LAB; RIGHT?

A.   YES.

Q.   AND SO IF THERE'S EVER A QUESTION ABOUT WHEN THE TEST WAS VERIFIED, PEOPLE COULD GO BACK AND LOOK AT THAT DOCUMENTATION; RIGHT?

A.   YES.

Q.   AND DO YOU RECOGNIZE THIS DOCUMENT AS ONE OF THOSE DOCUMENTS VERIFYING THE TESTS WITHIN THE THERANOS LAB?

A.   YES.

          MS. WALSH:  YOUR HONOR, WE OFFER 10525.

          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

     (DEFENDANT'S EXHIBIT 10525 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

Q.   OKAY.  SO LOOKING AT THE TOP LEFT, THIS WAS PREPARED FOR THERANOS; RIGHT?

A.   YES.

Q.   AND IT RELATES TO THE ADVIA 2400?

A.   YES.

Q.   FOR A SPECIFIC BLOOD TEST; CORRECT?

A.   YES.

Q.   AND THE VERIFICATION DATE WAS NOVEMBER 21ST, 2014; RIGHT?

A.   YES.

Q.   AND THEN AT THE BOTTOM DR. SAWYER'S SIGNATURE APPEARS; RIGHT?

A.   YES.

Q.   AND THE DATE IS JANUARY 11TH, 2015; RIGHT?

A.   YES.

Q.   AND THAT'S IN THAT PERIOD THAT YOU WEREN'T DOING THAT MUCH WORK AT THERANOS; CORRECT?

A.   YES.

Q.   OKAY.  AND WHAT SHE SAYS IN SIGNING THIS DOCUMENT IS, "I HAVE REVIEWED THE MVP DATA" --

     DO YOU KNOW WHAT THAT IS?

A.   I'M NOT FAMILIAR WITH THAT SPECIFIC TERM.  I'D HAVE TO LOOK IT UP.

Q.   OKAY.  -- "FOR SERUM BARBITURATE ON THE ADVIA 2400 AND APPROVE THE USE OF THIS TEST IN OUR FACILITY."

     DO YOU SEE THAT?

A.   YES.

Q.   AND SO DR. SAWYER IS APPROVING THAT TEST; CORRECT?

A.   YES.

Q.   ALL RIGHT.  YOU CAN TAKE THAT DOWN.

     DR. DHAWAN, IF YOU CAN TURN IN YOUR BINDER TO 20575.

     AND DO YOU RECOGNIZE THIS AS A STANDARD OPERATING PROCEDURE AT THERANOS?

A.   IT SAYS SOP, YES.

Q.   SOP, OKAY.

     AND THIS WAS SIGNED BY DR. SAWYER ALSO; RIGHT?

A.   YES.

Q.   ON MAY 5TH, 2015?

A.   YES.

Q.   CORRECT?

YOUR HONOR, WE OFFER 20575.

MR. SCHENK:  FOUNDATION.

THE COURT:  DO YOU WANT TO JUST LAY A FOUNDATION?

MS. WALSH:  SURE.

Q.   DR. DHAWAN, YOU'RE AWARE THAT IN ORDER TO -- ONCE A TEST IS VERIFIED OR VALIDATED IN A LAB, THE LAB HAS TO ESTABLISH CERTAIN STANDARD OPERATING PROCEDURES THAT GOVERN THE STEPS FOR OPERATING THAT TEST; IS THAT RIGHT?

A.   YES.

Q.   OKAY.  AND A LAB DIRECTOR UNDER THE LAW IS AUTHORIZED TO APPROVE STANDARD OPERATING PROCEDURES FOR A LAB; CORRECT?

A.   YES.

Q.   AND DR. SAWYER DURING THIS TIME PERIOD WAS ONE OF THE LAB DIRECTORS AT THERANOS; RIGHT?

A.   YES.

Q.   AND SHE APPROVED THE STANDARD OPERATING PROCEDURE; RIGHT?

A.   YES.

MS. WALSH:  YOUR HONOR, WE OFFER 20575.

THE COURT:  AND HAS HE TESTIFIED IF HE'S SEEN THESE SOP'S BEFORE?

MAYBE YOU CAN JUST ASK HIM IF HE'S FAMILIAR WITH THIS.  IF YOU DID, I MISSED IT.  I APOLOGIZE.

SER-581

MS. WALSH: SURE.

Q. SO, DR. DHAWAN, HAVE YOU SEEN THE STANDARD OPERATING PROCEDURE BEFORE?

A. THIS ONE I DON'T RECALL.

Q. OKAY. IS THIS -- IS THERE ANYTHING UNUSUAL ABOUT THIS -- ABOUT WHAT APPEARS HERE THAT IS DIFFERENT FROM STANDARD OPERATING PROCEDURES YOU'VE SEEN IN YOUR WORK AT YOUR LAB AS A LAB DIRECTOR?

A. IT'S -- THIS IS A STANDARD, STANDARD OPERATING PROCEDURE, SO --

MS. WALSH: YOUR HONOR, WE OFFER THE EXHIBIT.

THE COURT: IT'S ADMITTED. IT MAY BE PUBLISHED.

(DEFENDANT'S EXHIBIT 20575 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

Q. OKAY. LET'S LOOK AT THE TOP. AGAIN, IT SAYS STANDARD OPERATING PROCEDURE.

DR. SAWYER SIGNED IT; CORRECT?

A. YES.

Q. AND THAT'S ON MAY 5TH, 2015; RIGHT?

A. YES.

Q. AND AGAIN, THIS IS DURING THAT PERIOD WHERE YOU WERE NOT DOING THAT MUCH WORK FOR THERANOS; RIGHT?

A. YES.

Q. OKAY. AND THERE ARE OTHER PEOPLE WHO SIGNED THIS BEFORE DR. SAWYER SIGNED IT; RIGHT?

A.   YES.

Q.   FOR EXAMPLE, LINDSAY MARSH IS THE FIRST PERSON, AND IT LOOKS LIKE SHE'S THE AUTHOR OF THE DOCUMENT; RIGHT?

A.   YES.

Q.   AND HER TITLE IS CLINICAL LABORATORY ASSOCIATE; RIGHT?

A.   YES.

Q.   AND THEN LINA CASTRO REVIEWED THE DOCUMENT; RIGHT?

A.   YES.

Q.   AND HER TITLE IS CLINICAL LABORATORY SCIENTIST; CORRECT?

A.   YES.

Q.   AND THEN THERE'S ANOTHER REVIEWER WHO IS GODFRED MASINDE.

     DO YOU SEE THAT?

A.   YES.

Q.   HE'S A PH.D.; RIGHT?

A.   YES.

Q.   AND HE'S A TECHNICAL SUPERVISOR; RIGHT?

A.   YES.

Q.   AND TECHNICAL SUPERVISORS ARE PRETTY HIGH RANKED WITHIN THE LAB; CORRECT?

A.   YES.

Q.   AND DID YOU MEET DR. MASINDE?

A.   ONCE.

Q.   OKAY.  AND THEN FINALLY, AFTER ALL OF THOSE PEOPLE HAVE REVIEWED THIS DOCUMENT, DR. SAWYER, YOUR CO-LAB DIRECTOR, SIGNS THE DOCUMENT; CORRECT?

SER-583

A.   YES.

Q.   OKAY.  WE CAN TAKE THAT DOWN.

I JUST HAVE ONE MORE.  IT'S 10526.

DO YOU SEE THAT?

A.   YES.

Q.   OKAY.  AND IS THAT ANOTHER STANDARD OPERATING PROCEDURE AT THERANOS?

A.   YES.

Q.   AND THIS WAS FOR THE CLIA LAB; RIGHT?

A.   YES.

Q.   AND THIS SOP WAS SIGNED BY A NUMBER OF DIFFERENT PEOPLE, INCLUDING DR. SAWYER AS THE LAB DIRECTOR; RIGHT?

A.   YES.

Q.   AND IT WAS SIGNED ON MARCH 30TH, 2015; CORRECT?

A.   YES.

          MS. WALSH:  YOUR HONOR, WE OFFER 10526.

          MR. SCHENK:  SAME OBJECTIONS, YOUR HONOR.

          THE COURT:  AS TO FOUNDATION, IS THAT THE OBJECTION?  I'M SORRY.

          MR. SCHENK:  YES.

          THE COURT:  OVERRULED.  THIS IS ADMITTED AND IT MAY BE PUBLISHED.

     (DEFENDANT'S EXHIBIT 10526 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

Q.   AND WE'LL JUST TAKE A QUICK LOOK AT THIS, DR. DHAWAN.

THE FIRST SIGNATORY IS BROOKE BIVENS.

DO YOU SEE THAT?

A.   YES.

Q.   AND TITLED CLA; RIGHT?

A.   YES.

Q.   AND WHAT DOES THAT STAND FOR?

A.   CLINICAL LABORATORY ASSOCIATE.

Q.   YES.  AND THAT'S IN MARCH OF 2015; RIGHT?

A.   YES.

Q.   AND THE NEXT ONE IS LINA CASTRO.  WE SAW HER FROM BEFORE; RIGHT?

A.   YES.

Q.   AND SHE'S A CLS; CORRECT?

A.   YES.

Q.   AND THEN AGAIN DR. MASINDE READS IT AND APPROVES IT AFTER THEM; RIGHT?

A.   YES, YES.

Q.   AND HE WAS THE TECHNICAL SUPERVISOR?

A.   YES.

Q.   AND THEN FINALLY, DR. SAWYER GIVES HER FINAL APPROVAL; CORRECT?

A.   YES.

Q.   AND SHE DOES THAT ON MARCH 30TH, 2015; RIGHT?

A.   YES.

Q.   AND AGAIN, THIS IS DURING THAT PERIOD WHERE YOU WERE NOT

REALLY WORKING TOO MUCH AT THERANOS?

A.   YES.

Q.   OKAY.  AND JUST ONE MORE THING I WANTED TO POINT OUT ON PAGE 4 OF THE EXHIBIT UNDER RESPONSIBILITIES, JUST 4.1.

     "IT IS THE RESPONSIBILITY OF THE LABORATORY DIRECTOR OR DESIGNEE THEREOF (I.E. TECHNICAL OR GENERAL SUPERVISOR) TO ENSURE TESTING PERSONNEL ARE ADEQUATELY TRAINED IN THESE METHODS."

     DO YOU SEE THAT?

A.   YES.

Q.   ON PAGE 4?

A.   YES.

Q.   AND IT IS YOUR UNDERSTANDING, ISN'T IT, THAT IT IS A LAB DIRECTOR'S RESPONSIBILITY TO MAKE SURE EVERYONE IN THE LAB IS TRAINED; RIGHT?

A.   YES.

Q.   EVEN IF THE LAB DIRECTOR DOESN'T DO IT HIM OR HERSELF AND DELEGATES THAT TO OTHERS, ULTIMATELY IT IS THE LAB DIRECTOR'S RESPONSIBILITY; CORRECT?

A.   AS IT SAYS HERE IN THE SOP, YES.

Q.   OKAY.  SO I WANT TO SWITCH GEARS AND TALK ABOUT YOUR COMPENSATION ARRANGEMENTS WITH THERANOS.  YOU SPOKE A LITTLE BIT ABOUT THAT ON DIRECT.

     YOU STARTED OUT WITH A CONSULTING AGREEMENT; RIGHT?

A.   YES.

SER-586

Q.    AND THE CONSULTING AGREEMENT CALLED FOR YOU BEING PAID IN CASH; RIGHT?

A.    YES.

Q.    BUT YOU EXPRESSED A DESIRE TO MR. BALWANI TO BE PAID BY STOCK OPTIONS; CORRECT?

A.    YES.

Q.    AND IT WAS EITHER STOCK OPTIONS OR RESTRICTED STOCK UNITS, WHICHEVER THERANOS WAS ISSUING AT THE TIME; RIGHT?

A.    YES.

Q.    OKAY.  AND THAT SWITCH FROM BEING A PAID CONSULTANT TO BEING PAID IN STOCK, THAT TOOK A WHILE TO WORK OUT, DIDN'T IT?

A.    I BELIEVE SO, YES.

Q.    OKAY.  THERE WAS A LOT OF BACK AND FORTH, NEGOTIATING WHAT IT WOULD BE; RIGHT?

A.    I THINK IT WAS JUST TIME.  THERE WAS NOT -- I DON'T RECALL NEGOTIATION.

Q.    OKAY.  BUT IT TOOK SOME TIME TO WORK THAT OUT?

A.    YES.

Q.    OKAY.  AND YOU KNOW, OR I GUESS DID YOU LEARN THAT THERANOS AT THE TIME WASN'T ISSUING STOCK OPTIONS TO ITS EMPLOYEES?

A.    I DID NOT KNOW THAT.

Q.    OKAY.  AND WHAT MR. BALWANI ENDED UP OFFERING YOU WERE RESTRICTED STOCK UNITS; RIGHT?

A.    YES.

DHAWAN CROSS BY MS. WALSH                                          4168

Q.   OKAY.  AND YOU WERE AWARE, WEREN'T YOU, THAT THE BOARD IS THE ONE WHO HAS TO APPROVE EITHER STOCK OPTIONS OR RESTRICTED STOCK UNITS; RIGHT?

A.   I'M AWARE NOW, YES.

Q.   OKAY.  AND ALL OF THAT TOOK TIME; CORRECT?

A.   IT TOOK TIME, YES.

Q.   OKAY.  AND YOU TESTIFIED ON DIRECT THAT YOU RECEIVED THIS EMPLOYMENT AGREEMENT FOR YOU TO BE AN AT WILL EMPLOYEE.

     DO YOU REMEMBER THAT?

A.   YES, IT WAS SHOWN TO ME, YES.

Q.   OKAY.  AND THAT WAS FROM MONA RAMAMURTHY.

     DO YOU REMEMBER THAT?

A.   YES, YES.

Q.   AND SHE SENT YOU THE EMPLOYMENT AGREEMENT; RIGHT?

A.   YES.

Q.   AND IN THE EMPLOYMENT AGREEMENT, IT ARTICULATES THE RESTRICTED STOCK UNIT THAT YOU'RE BEING ISSUED; RIGHT?

A.   YES.

Q.   OKAY.  AND YOU SAID YOU WEREN'T SURE WHY SHE SENT YOU THAT; RIGHT?

A.   I WASN'T SURE WHY IT WAS SENT ON THAT DATE.

Q.   YEAH.  OKAY.

     DID YOU THINK THE FACT THAT YOU WERE GETTING RESTRICTED STOCK UNITS MAY HAVE HAD SOMETHING TO DO WITH GETTING AN EMPLOYMENT AGREEMENT FROM THE COMPANY WITH THESE RESTRICTED

STOCK UNIT IN IT?

A.   YEAH, THAT MADE LOGICAL SENSE THAT THAT WAS MY COMPENSATION, YEAH.

Q.   RIGHT.  AND IT TOOK THAT LONG TO GET THE STOCK UNITS ISSUED TO YOU TO SEND YOU THE EMPLOYMENT AGREEMENT; RIGHT?

A.   I DON'T KNOW WHAT THE INNER WORKINGS IN THE COMPANY WERE TO GET ME THOSE.  I JUST KNEW IT TOOK TIME, SO IT TOOK TIME.

Q.   RIGHT.  AND EVEN THOUGH YOU DIDN'T KNOW THE INNER WORKINGS, YOU KNEW THAT IT TOOK THAT AMOUNT OF TIME TO FINALLY NAIL DOWN HOW MANY RESTRICTED STOCK UNITS YOU WERE GOING TO GET?

A.   AGAIN, I DON'T KNOW THE INNER WORKINGS OF THE COMPANY AND I CAN'T SAY WHY IT TOOK THAT LONG, BUT IT TOOK THAT LONG.

Q.   IT TOOK THAT LONG?

A.   I JUST DON'T KNOW WHY.

Q.   UNDERSTOOD.  OKAY.

     SO YOU'VE ALSO TESTIFIED, AND WE'VE BEEN THROUGH THIS SO I DON'T WANT TO DWELL ON IT TOO MUCH, BUT YOU WERE PART-TIME?

A.   UH-HUH.

Q.   AND YOU DIDN'T SPEND TOO MUCH TIME AT THERANOS; RIGHT?

A.   YES.

Q.   YOU DIDN'T SPEND MUCH TIME?

A.   YES.

Q.   AND AT THE TIME, THE CLIA REGULATIONS ALLOWED FOR YOU TO BE A PART-TIME LAB DIRECTOR, DIDN'T IT?

A.   I WOULD HAVE TO REVIEW THE CLIA REGULATIONS COMPLETELY, BUT I WOULD ASSUME YES.

Q.   OKAY.  WELL, LET'S TAKE A LOOK AT 7603DD, WHICH IS IN YOUR BINDER.

DO YOU HAVE THAT IN FRONT OF YOU?

A.   YES, I DO.

Q.   OKAY.  AND IF YOU WOULD TURN TO PAGE 2 ON THE BOTTOM OF THE EXHIBIT, YOU SEE THERE'S A SECTION IN THE RIGHT-HAND COLUMN, STANDARD LABORATORY DIRECTOR RESPONSIBILITIES?

A.   RIGHT.

Q.   AND IF YOU LOOK DOWN AT C AND D, TAKE A MINUTE AND JUST READ THOSE TWO PROVISIONS.

THE COURT:  TO HIMSELF?

MS. WALSH:  TO HIMSELF, YEAH.

(PAUSE IN PROCEEDINGS.)

THE WITNESS:  YES.

BY MS. WALSH:

Q.   OKAY.  DOES THAT HELP YOU REMEMBER WHETHER THE CLIA REGULATIONS ALLOWED YOU TO BE A PART-TIME LAB DIRECTOR?

A.   YES.

Q.   THEY DID; RIGHT?

A.   YES.

Q.   OKAY.  AND THEY ALLOWED TO BE, OR ANYONE WHO WAS QUALIFIED, TO BE A LAB DIRECTOR AT UP TO FIVE LABS; CORRECT?

A.   YES.

DHAWAN CROSS BY MS. WALSH                                    4171

Q.   OKAY.  AND YOU WERE A LAB DIRECTOR JUST FOR TWO; RIGHT?

A.   YES.

Q.   AT THE TIME?

A.   YES.

Q.   OKAY.  AND WHAT THE CLIA REGS ALSO REQUIRED WAS THAT YOU BE AVAILABLE BY TELEPHONE OR EMAIL; RIGHT?

A.   YES.

Q.   SO IF ANYONE HAD QUESTIONS, THEY COULD CALL YOU; RIGHT?

A.   YES.

Q.   AND YOU WERE AVAILABLE; RIGHT?

A.   YES.

Q.   YOU SAID THAT ON DIRECT, THAT YOU MADE SURE THAT THERANOS KNEW THAT YOU WERE AVAILABLE?

A.   YES.

Q.   SO THERE WAS NO -- YOU WERE ALLOWED TO BE THERE PART-TIME; RIGHT?

A.   YES.

Q.   AND YOU WERE ALLOWED TO WORK FOR UP TO FIVE DIFFERENT LABS AS A LAB DIRECTOR; RIGHT?

A.   YES.

Q.   AND SO NO ONE WAS PRETENDING THAT YOU WERE THERE EVERY SINGLE DAY AT THERANOS; RIGHT?

        MR. SCHENK:  OBJECTION.  SPECULATION, FOUNDATION, AND RELEVANCE.

        THE COURT:  SUSTAINED AS TO SPECULATION.

BY MS. WALSH:

Q.   SO, DR. DHAWAN, YOU DIDN'T COME INTO THERANOS EVERY SINGLE DAY; RIGHT?

A.   YES.

Q.   BUT YOU -- THAT WAS ALLOWED UNDER THE REGS; CORRECT?

        MR. SCHENK:  OBJECTION.  LACKS RELEVANCE.

        THE COURT:  SUSTAINED.

BY MS. WALSH:

Q.   OKAY.  DR. DHAWAN, YOU'VE TESTIFIED THAT THE REGULATIONS ALLOW YOU TO BE A PART-TIME LAB DIRECTOR; CORRECT?

A.   YES.

Q.   AND BEING A PART-TIME LAB DIRECTOR MEANS THAT YOU DON'T HAVE TO COME INTO THE LAB EVERY DAY; CORRECT?

A.   BASED ON WHAT IT SAYS HERE.

Q.   OKAY.

A.   IT SAYS YOU HAVE TO BE IN CONTACT.

Q.   OKAY.  NOW, WHILE YOU WERE NOT AT THE LAB, THERE WERE MANY SCIENTISTS WORKING AT THERANOS AT THE TIME; RIGHT?

A.   YES.

Q.   YOU MET SOME OF THEM; CORRECT?

A.   YES.

Q.   AND YOU INTERACTED WITH SOME OF THEM; RIGHT?

A.   YES.

Q.   YOU SAID YOU -- I THINK YOU JUST SAID THAT YOU MET DR. MASINDE?

A.   YES.

Q.   AND YOU HAD CONTACT WITH DR. SAKSENA REGARDING HIS APPLICATION TO BE A LAB DIRECTOR; RIGHT?

A.   YES.

Q.   AND YOU SAID YOU ALSO MET DANIEL YOUNG; RIGHT?

A.   YES.

Q.   DR. YOUNG.

A.   YES.

Q.   OKAY.  AND THESE WERE ALL PROFESSIONAL SCIENTISTS, WEREN'T THEY?

A.   YES, THEY ARE ALL PH.D.'S, YES.

Q.   OKAY.  AND IT WAS APPROPRIATE, WASN'T IT, FOR YOU TO RELY ON THE WORK THAT THEY WERE DOING?

A.   YES.

Q.   OKAY.  LET'S TAKE A LOOK AT EXHIBIT 4528, WHICH IS IN EVIDENCE.

     LET'S GO TO PAGE 7.

     DO YOU HAVE THAT IN FRONT OF YOU DR. DHAWAN?

A.   YES, YES.

Q.   OKAY.  AND THAT'S AN ORG CHART OF THE TOP LEVEL SCIENTISTS WITHIN THE LAB; RIGHT?

A.   YES.

Q.   AND IT SHOWS DR. MASINDE, THE TOP TECHNICAL SUPERVISOR; RIGHT?

A.   YES.

Q.   AND IT ALSO SHOWS LANGLY GEE.

DO YOU REMEMBER HIM?

A.   YES.

Q.   OKAY.  HE WAS THE QA/QC MANAGER; RIGHT?

A.   YES.

Q.   AND HE WORKED FULL TIME IN THE LAB; RIGHT?

A.   YES.

Q.   AND HODA ALAMDAR, DO YOU REMEMBER HER?

A.   YES.

Q.   AND SHE WAS THE TECHNICAL SUPERVISOR, OR A TECHNICAL SUPERVISOR; RIGHT?

A.   YES.

Q.   AND GURBIR SIDHU, DO YOU REMEMBER HIM?

A.   I RECALL MEETING HIM ONCE, YES.

Q.   AND HE WAS THE GENERAL SUPERVISOR; RIGHT?

A.   YES.

Q.   AND SO IN DOING YOUR WORK -- AND WE'RE GOING TO LOOK AT WHAT YOU DID IN A MINUTE -- BUT YOU RELIED ON THESE SCIENTISTS WHO WERE WORKING FULL TIME IN THE LAB; CORRECT?

A.   YES.

Q.   AND THEN LET'S TAKE A LOOK AT THIS EXHIBIT AT SLIDE 12.

THESE ARE THE CREDENTIALS OF DR. DANIEL YOUNG.

DO YOU SEE THAT?

A.   YES.

Q.   AND HE WAS CURRENTLY AT THE TIME A LAB DIRECTOR; RIGHT?

SER-594

A.   YES.

Q.   AND HE WAS THE LAB DIRECTOR OF ARIZONA?

A.   YES.

Q.   AND IT SAYS HE WAS INVOLVED AS AN EXECUTIVE AND SUPERVISOR IN THE RESEARCH AND DEVELOPMENT OF A WIDE VARIETY OF CLINICAL ASSAYS SPANNING MULTIPLE CATEGORIES OF TESTING.

DO YOU SEE THAT?

A.   YES.

Q.   AND THEN IT SAYS HE HAS AN ENGINEERING DOCTORATE FROM M.I.T.

DO YOU SEE THAT?

A.   YES.

Q.   OKAY.  AND THEN FURTHER DOWN IT DESCRIBES HIS DUTIES, AND IT COVERED OVERSIGHT OF CLINICAL LABORATORY TESTING, QUALITY AND PROFICIENCY TESTING.

DO YOU SEE THAT?

A.   YES.

Q.   IS IT SAYS, "HE HAS ALSO SUPERVISED VALIDATION OF TESTING FOR ASSAY METHODS IN THE CATEGORIES OF CLINICAL CHEMISTRY, HEMATOLOGY, IMMUNOASSAYS, AND MOLECULAR BIOLOGY INCLUDING VERIFICATION AND VALIDATION," AND IT GOES ON.

DO YOU SEE THAT?

A.   YES.

Q.   AND SO YOU RELIED ON DR. YOUNG AS WELL, WHO WAS A PROFESSIONAL SCIENTIST, IN YOUR WORK FOR THERANOS; RIGHT?

A.   YES.

Q.   OKAY.  OKAY.  LET'S TAKE A LOOK AT 10577.

DO YOU SEE THAT?

A.   YES.

Q.   OKAY.  AND THIS DOCUMENT IS -- THIS WAS SIGNED BY YOU; RIGHT?

A.   YES.

Q.   AND THIS IS A DELEGATION OF RESPONSIBILITIES BY YOU TO OTHERS IN THE LAB; IS THAT RIGHT?

A.   YES.

Q.   OKAY.  AND THIS IS ALLOWED UNDER THE CLIA REGULATIONS; RIGHT?

A.   YES.

Q.   BECAUSE, AGAIN, YOU CAN'T BE THERE EVERY DAY; CORRECT?

A.   YES.

Q.   AND SO YOU WERE ALLOWED TO DELEGATE TO OTHER SCIENTISTS SOME OF THE DUTIES THAT YOU HAVE AS THE LAB DIRECTOR; CORRECT?

A.   YES.

Q.   AND THIS IS ONE OF THOSE DOCUMENTS; RIGHT?

A.   YES.

Q.   OKAY.  AND IT IS DATED SEPTEMBER 5TH, 2015; RIGHT?

A.   YES.

MS. WALSH:  YOUR HONOR, WE OFFER 10577.

MR. SCHENK:  NO OBJECTION.

THE COURT:  THIS IS THREE PAGES?

MS. WALSH:  YES.

THE COURT:  AND THEY'RE -- ARE THEY -- YOU'LL DEVELOP THIS, BUT ARE THESE THREE SEPARATE DELEGATIONS? THERE'S THREE DIFFERENT DATES ON THERE.  I'LL ALLOW IT AND YOU CAN PUBLISH, BUT MAYBE YOU CAN FLESH THAT OUT.

(DEFENDANT'S EXHIBIT 10577 WAS RECEIVED IN EVIDENCE.)

MS. WALSH:  SURE.

THE COURT:  AND I THOUGHT WE WOULD TAKE OUR AFTERNOON BREAK IN ABOUT FIVE OR TEN MINUTES IF YOU WANT TO GO AHEAD WITH THIS DOCUMENT.

MS. WALSH:  OKAY.

Q.  SO, DR. DHAWAN, LET'S LOOK AT THE FIRST PAGE.

AND THIS PAGE DESCRIBES THE QUALIFICATIONS AND DUTIES AND RESPONSIBILITIES OF A LABORATORY SUPERVISOR/TECHNICAL SUPERVISOR.

DO YOU SEE THAT?

A.  YES.

Q.  AND IT ESTABLISHES THAT THAT PERSON REPORTS TO THE LAB DIRECTOR; RIGHT?

A.  YES.

Q.  OKAY.  AND IT DESCRIBES IN DETAIL THE DUTIES AND RESPONSIBILITIES OF THAT TECHNICAL SUPERVISOR.

DO YOU SEE THAT IN THE MIDDLE?

A.  YES, YES.

Q.  OKAY.  AND WHAT IT SAYS IS THAT THE TECHNICAL SUPERVISOR

SER-597

SHALL BE AVAILABLE TO LABORATORY TESTING PERSONNEL AT ALL TIMES

TO PROVIDE EITHER ON-SITE, TELEPHONE, OR ELECTRONIC

CONSULTATION.

        DO YOU SEE THAT?

A.   YES.

Q.   "THE TECHNICAL SUPERVISOR IS RESPONSIBLE FOR THE

FOLLOWING."

        AND I'M NOT GOING TO READ WORD FOR WORD EVERY ONE, BUT TO

SUMMARIZE, ONE IS THE DAY-TO-DAY SUPERVISION OF HIGH COMPLEXITY

TEST PERFORMANCE.

        DO YOU SEE THAT?

A.   YES.

Q.   AND TWO IS REVIEW OF ALL RELEVANT DOCUMENTS AND

PROCEDURES; RIGHT?

A.   YES.

Q.   AND THREE IS PROVIDE REGULATORY ADVICE FOR COMPLIANCE;

RIGHT?

A.   YES.

Q.   AND FOUR IS ACT AS A LIAISON WITH REGULATORS; CORRECT?

A.   YES.

Q.   OKAY.  SIX IS ATTEND ALL SCHEDULED QA MEETINGS TO PROVIDE

ADVICE ON COMPLIANCE AND QUALITY IMPROVEMENTS; RIGHT?

A.   YES.

Q.   SEVEN IS TRAIN, OBSERVE, AND DOCUMENT EMPLOYEES PERFORMING

WHAT GOES ON IN THE LAB; RIGHT?

A.   YES.

Q.   OKAY.  AND THEN LET'S TURN TO THE NEXT PAGE.

IT SAYS, "THE LABORATORY DIRECTOR DELEGATES THE FOLLOWING RESPONSIBILITIES TO THE TECHNICAL SUPERVISOR WHO HAS SPECIALTIES IN HEMATOLOGY."

AND THE DELEGATION IS TO HODA ALAMDAR; RIGHT?

A.   YES.

Q.   AND THE FIRST PAGE THAT DESCRIBED THE DUTIES AND RESPONSIBILITIES AND THE QUALIFICATIONS, THAT PAGE ALSO RELATED TO HODA ALAMDAR; CORRECT?

A.   YES.

Q.   OKAY.  AND WHAT IS BEING DELEGATED IS APPROPRIATE -- I'M ON PAGE 2 -- APPROPRIATE TEST METHOD SELECTION; RIGHT?

A.   YES.

Q.   AND VERIFICATION; CORRECT?

A.   YES.

Q.   TO DETERMINE THE ACCURACY AND PRECISION OF THE TEST; RIGHT?

A.   YES.

Q.   ENSURING THE DEVELOPMENT OF QUALITY ASSESSMENT AND QUALITY CONTROL PROGRAMS; RIGHT?

A.   YES.

Q.   DEVELOPING REMEDIAL ACTIONS; CORRECT?

A.   YES.

Q.   AND IT GOES ON?

SER-599

A.   YES, YES.

Q.   OKAY.  AND PAGE 3 IS THE SAME THING, EXCEPT RELATED TO IMMUNOLOGY AND CHEMISTRY.

ON PAGE 2 IT WAS IMMUNOLOGY.

DO YOU SEE THAT?

A.   YES.

Q.   AND FOR EACH ONE, HODA ALAMDAR SIGNS; RIGHT?

A.   YES.

Q.   AND YOU SIGNED AS THE LAB DIRECTOR; RIGHT?

A.   YES.

Q.   AND SO THOSE PROVISIONS ABOUT DOING QUALITY ASSURANCE AND QUALITY CONTROL AND MAKING SURE THAT THAT IS GOING ON AND REVIEWING IT, THAT WAS ALL DELEGATED TO HODA ALAMDAR, WASN'T IT?

A.   YES.

Q.   OKAY.  SO TO THE EXTENT THAT YOU DIDN'T REVIEW QC AND QA, YOU HAD DELEGATED THOSE RESPONSIBILITIES TO A HIGHLY QUALIFIED PERSON IN THE LAB; CORRECT?

A.   YES.

Q.   OKAY.

YOUR HONOR, THIS MIGHT BE A GOOD TIME TO BREAK.

THE COURT:  OKAY.  LET'S DO THAT, LADIES AND GENTLEMEN.  LET'S TAKE ABOUT 25, 30 MINUTES, LADIES AND GENTLEMEN, FOR OUR AFTERNOON BREAK.

WE'RE GOING TO END AT 4:00 TODAY, PLEASE, 4:00.  I'M

HOPING WE CAN END AT 4:00.

I JUST WANT TO GIVE YOU ADVANCED NOTICE, IF THE LAWYERS ARE VERY CLOSE TO FINISHING AND IT GOES A LITTLE PAST 4:00, I'D LIKE TO ACCOMPLISH THAT FOR ALL OF OUR CONVENIENCE, BUT I'M QUITE CONFIDENT THAT WON'T BE THE CASE.

SO WE'LL SEE.  HAVE A GOOD BREAK.  THANK YOU.

(RECESS FROM 2:12 P.M. UNTIL 2:39 P.M.)

THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

MS. WALSH.

MS. WALSH:  YES.  THANK YOU, YOUR HONOR.

ALL RIGHT.  MAY I INQUIRE, YOUR HONOR?

THE COURT:  YES.

MS. WALSH:  ALL RIGHT.  THANK YOU.

Q.   DR. DHAWAN, WELCOME BACK.

WE WERE JUST REVIEWING AN EXHIBIT 10577, AND THAT WAS THE DELEGATION DOCUMENT, DELEGATION OF AUTHORITY DOCUMENT THAT YOU AND I WERE JUST GOING OVER.

DO YOU REMEMBER THAT?

A.   YES.

Q.   OKAY.  AND THAT DOCUMENT SETS OUT THE DELEGATIONS THAT WE JUST WENT THROUGH IN DETAIL.

BUT YOU HAD BEEN DELEGATING YOUR AUTHORITY AS LAB DIRECTOR SINCE YOU STARTED AT THERANOS AND YOU WERE ON THE CLIA CERTIFICATE; IS THAT RIGHT?

A.   YES.

Q.   OKAY.  AND YOU WERE DELEGATING TO THE INDIVIDUALS THAT WERE LISTED IN THAT DOCUMENT 10577 THAT WE JUST LOOKED AT?

A.   YES.

Q.   OKAY.  NOW WE'RE GOING TO GO FORWARD TO THE SUMMER OF 2015.

     AND THIS IS WHEN LANGLY GEE, WHO WAS HEAD OF QUALITY CONTROL -- DO YOU REMEMBER THAT?

A.   YES.

Q.   AND HE REACHED OUT TO YOU AND SAID, DHAWAN, WE NEED YOU TO SIGN A FAIR NUMBER OF DOCUMENTS, AND YOU SUGGESTED, SEND THEM TO ME 50 AT A TIME.

     DO YOU REMEMBER THAT?

A.   YES.

Q.   OKAY.  AND THERE WAS NO LEGAL REQUIREMENT THAT YOU WERE AWARE THAT HE SEND YOU ALL OF THESE DOCUMENTS TO SIGN IN ADVANCE OF THE CMS AUDIT; CORRECT?

          MR. SCHENK:  OBJECTION.  RELEVANCE, AND CALLS FOR A LEGAL CONCLUSION.

          THE COURT:  SUSTAINED AS TO A CONCLUSION.

BY MS. WALSH:

Q.   OKAY.  DR. DHAWAN, ARE YOU AWARE OF ANY REGULATION REQUIRING YOU TO SIGN ALL OF THE DOCUMENTS THAT YOU DID?

          MR. SCHENK:  YOUR HONOR, SAME OBJECTION.

          THE COURT:  AS TO THE FORM OF THE QUESTION.

DO YOU WANT TO ASK HIM AS TO HIS JOB DESCRIPTION OR SOME OTHER WAY?

MS. WALSH:  OKAY.

Q.   SO WE'LL LOOK AT SOME OF THESE DOCUMENTS IN A MINUTE, BUT YOU RECEIVED A FAIRLY LARGE NUMBER OF DOCUMENTS; RIGHT?

A.   YES.

Q.   AND THIS WAS IN ADVANCE OF THE CMS AUDIT; CORRECT?

A.   YES.

Q.   AND YOU WERE ASKED TO REVIEW THOSE DOCUMENTS; RIGHT?

A.   YES.

Q.   OTHERS HAD SIGNED THE DOCUMENTS BEFORE YOU DID; CORRECT?

A.   YES.

Q.   AND AT THE TIME THAT THE DOCUMENTS WERE WRITTEN, YOU WERE NOT THE LAB DIRECTOR AT THERANOS; RIGHT?

A.   YES.

Q.   AND MANY OF THEM WERE SIGNED BY THE LAB DIRECTOR WHO WAS THERE AT THE TIME; RIGHT?

A.   YES.

Q.   AND THAT WAS ADAM ROSENDORFF; RIGHT?

A.   YES.

Q.   AND YOUR SIGNING THESE DOCUMENTS WAS NOT REQUIRED UNDER YOUR DUTIES AS A LAB DIRECTOR; IS THAT RIGHT?

MR. SCHENK:  SAME OBJECTION.

THE COURT:  SUSTAINED.

BY MS. WALSH:

SER-603

Q.   OKAY.  IN ANY EVENT, DR. DHAWAN, DR. ROSENDORFF HAD ALREADY APPROVED MANY OF THE DOCUMENTATION THAT YOU HAD REVIEWED; IS THAT RIGHT?

A.   YES.

Q.   AND HE WAS A LAB DIRECTOR THAT WORKED FULL TIME AT THERANOS; RIGHT?

A.   YES.

Q.   AND WHEN YOU REVIEWED AND SIGNED OFF ON THOSE DOCUMENTS BASED ON THE WORK THAT HE HAD DONE, THAT GAVE YOU SOME COMFORT IN PLACING YOUR SIGNATURE ON THOSE DOCUMENTS; CORRECT?

A.   IF THEY WERE SIGNED PREVIOUSLY BY MULTIPLE PEOPLE, YES, YOU'RE MORE CONFIDENT.  YES.

Q.   BECAUSE YOU'RE RELYING ON THE WORK THAT THEY HAD DONE; RIGHT?

A.   YES.

Q.   AND THOSE PEOPLE -- AND WE CAN LOOK AT THE DOCUMENTS, BUT YOUR RECOLLECTION IS THAT THOSE PEOPLE WERE SCIENTISTS; RIGHT?

A.   YES.

Q.   AND ONE OF THEM WAS DR. ADAM ROSENDORFF; CORRECT?

A.   YES.

Q.   WHO WAS A MEDICAL DOCTOR; RIGHT?

A.   YES.

Q.   AND HE WAS THE FULL-TIME LAB DIRECTOR AT THERANOS; CORRECT?

A.   YES.

SER-604

Q.   OKAY.  SO LET'S LOOK AT A COUPLE OF THE ONES THAT YOU DID SIGN DURING THAT SUMMER OF 2015.

     TAKE A LOOK IN YOUR BINDER AT 9387.

     AND 9387 IS IN EVIDENCE, YOUR HONOR.  IF WE COULD PUBLISH IT?

          THE COURT:  YES.

          MS. WALSH:  THANK YOU.

Q.   DO YOU SEE THAT, DR. DHAWAN?

A.   YES.

Q.   AND THIS IS A VALIDATION REPORT FOR THE TPSA ELISA ASSAY ON THE EDISON 3.X THERANOS SYSTEM; RIGHT?

A.   YES.

Q.   AND THAT REFERRED TO THERANOS TECHNOLOGY; RIGHT?

A.   YES.

Q.   AND THE VALIDATION REPORT WAS SIGNED BY MICHELLE JOHNSON; RIGHT?

A.   YES.

Q.   SHE WAS AN IMMUNOASSAY RESEARCH ASSOCIATE ACCORDING TO THE DOCUMENT?

A.   YES.

Q.   AND SHARADA SIVARAMAN, PH.D.

     DO YOU SEE THAT?

A.   YES.

Q.   IMMUNOASSAY TEAM LEADER; RIGHT?

A.   YES.

Q. AND DR. DANIEL YOUNG, WE'VE TALKED ABOUT HIM; RIGHT?

A. YES.

Q. AND DR. ADAM ROSENDORFF, WHO APPROVED -- WHO APPROVED THE VALIDATION REPORT ON SEPTEMBER 30TH, 2013; CORRECT?

A. YES.

Q. AND THEN YOU PLACED YOUR SIGNATURE AFTER DR. ROSENDORFF'S ON SEPTEMBER 19TH, 2015; CORRECT?

A. YES.

Q. OKAY. LET'S TURN TO 9941, DR. DHAWAN, IN YOUR BINDER.

A. YES.

Q. DO YOU SEE THAT YOU SIGNED THIS REPORT AS WELL?

A. YES.

Q. AND YOU SIGNED IT ON SEPTEMBER 19TH, 2015?

A. YES.

Q. AND THIS WAS AN SOP; CORRECT?

A. YES.

Q. AND WE'VE TALKED ABOUT SOP'S BEFORE IN THE LAB; RIGHT?

A. YES.

Q. AND THIS DIDN'T DIFFER FROM THE OTHERS THAT YOU SIGNED IN FORM; RIGHT?

A. NO.

MS. WALSH: YOUR HONOR, WE OFFER 9941.

MR. SCHENK: NO OBJECTION.

THE COURT: IT'S ADMITTED. IT MAY BE PUBLISHED.

(DEFENDANT'S EXHIBIT 9941 WAS RECEIVED IN EVIDENCE.)

SER-606

BY MS. WALSH:

Q.   OKAY.  SO LOOKING AT THE FIRST PAGE, THIS SOP WAS FOR PROFICIENCY TESTING FOR THERANOS LAB-DEVELOPED TESTS (IMMUNOASSAYS).

     DO YOU SEE THAT?

A.   YES.

Q.   AND AGAIN, LAB-DEVELOPED TESTS WERE TESTS THAT THERANOS DEVELOPED IN HOUSE; RIGHT?

A.   YES.

Q.   AND SO THIS WAS THE PROFICIENCY TESTING FOR THOSE ASSAYS; RIGHT?

A.   YES.

Q.   AND THE AUTHOR WAS DR. SAKSENA, WHO WE HAVE TALKED ABOUT; CORRECT?

A.   YES.

Q.   AND HE WAS THE DIRECTOR OF ASSAY SYSTEMS.

     THIS WAS THEN REVIEWED BY DANIEL YOUNG.

     DO YOU SEE THAT?

A.   YES.

Q.   AND THEN IT WAS FINALLY SIGNED BY YOU IN SEPTEMBER OF 2015.

     DO YOU SEE THAT?

A.   YES.

Q.   OKAY.  AND LET'S GO TO PAGE 3 OF THE EXHIBIT.

     AND THIS STATES THE PURPOSE OF THE SOP, AND IT SAYS, "THE

PURPOSE OF THIS PROPOSAL IS TO DEVISE AN ALTERNATIVE ASSESSMENT

PROTOCOL (AAP) FOR LABORATORY-DEVELOPED TESTS ON THE EDISON 3.5

IMMUNOASSAY INSTRUMENT."

    DO YOU SEE THAT?

A.   YES.

Q.   AND THEN IT GIVES A GUIDELINE, "FOR NON-CMS REGULATED

TESTS OR THOSE WHICH LACK FDA CLEARANCE, COMMERCIAL OR EXTERNAL

PT PROGRAMS MAY NOT BE AVAILABLE FOR CERTAIN ANALYTES."

    DO YOU SEE THAT?

A.   YES.

Q.   "IN SUCH INSTANCES, AN AAP WILL BE USED TO ENSURE ACCURACY

OF THE ONGOING TEST SYSTEM PERFORMANCE."

    DO YOU SEE THAT?

A.   YES.

Q.   AND THEN THE SCOPE SAYS UNDER 2.1, "THE ALTERNATIVE

ASSESSMENT PROTOCOL (AAP) APPLIES TO ALL LABORATORY DEVELOPED

TESTS ON THE EDISON 3.5 INSTRUMENT AND WILL BE CONDUCTED EVERY

SIX MONTHS."

    RIGHT?

A.   YES.

Q.   AND THIS WAS -- LET ME ASK IT AGAIN BECAUSE THAT WAS

CONFUSING.

    THIS IS THE ALTERNATIVE ASSESSMENT PROTOCOL THAT YOU

SIGNED -- IN THE SOP THAT YOU SIGNED?

A.   YES.

SER-608

Q.   OKAY.  LET'S TURN NOW TO PAGE 6 OF THE EXHIBIT, AND THIS IS THE REVISION HISTORY.

DO YOU SEE THAT?

SECTION 8 IS THE REVISION HISTORY?

A.   YES.

Q.   OKAY.  AND YOU SEE HOW THERE'S AN EFFECTIVE DATE OF NOVEMBER 26TH, 2013; RIGHT?

A.   YES.

Q.   AND THE INITIATOR OF THE DOCUMENT WAS ADAM ROSENDORFF.

DO YOU SEE THAT?

A.   YES.

Q.   OKAY.  WE CAN TAKE THAT DOWN.

OKAY.  IF YOU COULD, DR. DHAWAN, TURN TO 20467.

DO YOU SEE THAT?

A.   YES.

Q.   AND THIS IS A TEST PLAN FOR A VERIFICATION PLAN FOR THE DREW3.

DO YOU SEE THAT?

A.   YES.

Q.   AND YOU SIGNED THIS DOCUMENT; RIGHT?

A.   YES.

Q.   AND YOU SIGNED IT ON NOVEMBER 15TH, 2015; RIGHT?

A.   YES.

Q.   AND THIS IS SIMILAR TO THE OTHER DOCUMENTS THAT YOU SIGNED THAT WERE SENT TO YOU FROM THERANOS; IS THAT CORRECT?

DHAWAN CROSS BY MS. WALSH                                          4190

A.   YES.

Q.   AND THERE ARE OTHER SIGNATURES ABOVE YOURS REVIEWING AND AUTHORING THE DOCUMENT; IS THAT RIGHT?

A.   YES.

MS. WALSH:  OKAY.  YOUR HONOR, WE OFFER 20467.

MR. SCHENK:  NO OBJECTION.

THE COURT:  IT IS ADMITTED AND IT MAY BE PUBLISHED.

(DEFENDANT'S EXHIBIT 20467 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

Q.   SO ON THE FIRST PAGE YOU SEE IT'S A TEST PLAN.

DO YOU SEE THAT?

A.   YES.

Q.   AND UNDER THAT, IT SAYS VERIFICATION PLAN FOR DREW3, AN AUTOMATED HEMATOLOGY ANALYZER?

A.   YES.

Q.   OKAY.  SO LET'S TURN TO PAGE 3 OF THE EXHIBIT.

A.   YES.

Q.   AND PAGE 3.1.1 SAYS, "THE PURPOSE OF THIS TEST PLAN IS TO DEFINE THE EXPERIMENTS AND SELECTION CRITERIA FOR VERIFICATION OF THE COMPLETE BLOOD COUNT," THAT'S CBC, "WITHIN THE CLIA INFRASTRUCTURE, USING DREW3" -- THAT'S A DEVICE; RIGHT?

A.   YEAH.

Q.   -- "AN AUTOMATED HEMATOLOGY ANALYZER."

DO YOU SEE THAT?

A.   YES.

Q.    OKAY.  AND THEN IF WE LOOK AT THE SCOPE, 2.1.

      "THIS PLAN APPLIES TO RUNNING DREW3, AN AUTOMATED

HEMATOLOGY ANALYZER FDA 510 CLEARED METHODOLOGY PER CLSI

RECOMMENDATION IN THERANOS CLINICAL LABORATORY."

      DO YOU SEE THAT?

A.    YES.

Q.    OKAY.  AND THERE'S A LOT OF TECHNICAL INFORMATION IN HERE

THAT WE WON'T GO THROUGH, BUT I DO WANT YOU TO TURN TO PAGE 10.

      ARE YOU ON PAGE 10?

A.    YES.

Q.    AND AT THE TOP IT SAYS, "VERIFICATION REPORT, VERIFICATION

OF DREW3 FOR COMPLETE BLOOD COUNT."

      DO YOU SEE THAT?

A.    YES.

Q.    AND THE ORIGINATOR IS A PERSON NAMED POORNIMA KOLHAR.

      DO YOU SEE THAT?

A.    YES.

Q.    AND THE DATE THAT THIS ORIGINATED WAS AUGUST 30TH, 2014;

CORRECT?

A.    YES.

Q.    OKAY.  JUST A COUPLE MORE ON THESE.  IF YOU COULD TURN TO

9369.

      DO YOU SEE THAT?

A.    YES.

Q.    AND THIS IS ANOTHER VALIDATION DOCUMENT; RIGHT?

SER-611

A.   YES.

Q.   AND IT'S FOR TSH; RIGHT?

A.   YES.

Q.   YOU SIGNED THE DOCUMENT?

A.   YES.

Q.   AND THE DATE IS NOVEMBER 15TH, 2015; IS THAT CORRECT, DR. DHAWAN?

A.   YES.

Q.   AND YOUR SIGNATURE FOLLOWS A SERIES OF OTHER SIGNATURES BY THERANOS EMPLOYEES; CORRECT?

A.   YES.

          MS. WALSH:  YOUR HONOR, WE OFFER 9369.

          MR. SCHENK:  NO OBJECTION.

          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

     (DEFENDANT'S EXHIBIT 9369 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

Q.   OKAY.  AND JUST QUICKLY ON THIS ONE.

     DR. DHAWAN, ON THE TOP IT INDICATES IT'S A TSH ELISA ASSAY REPORT.

     DO YOU SEE THAT?

A.   YES.

Q.   AND IT'S A VALIDATION REPORT ON THE EDISON 3.5 THERANOS SYSTEM; RIGHT?

A.   YES.

Q.   AND THAT'S ONE OF THE THERANOS DEVICES; CORRECT?

DHAWAN CROSS BY MS. WALSH                                      4193

A.    YES.

Q.    AND THEN IT'S AUTHORED BY MICHELLE JOHNSON; RIGHT?

A.    YES.

Q.    APPROVED BY DR. SIVARAMAN; CORRECT?

A.    YES.

Q.    DR. YOUNG; RIGHT?

A.    YES.

Q.    AND GURBIR SIDHU; CORRECT?

A.    YES.

Q.    AND, OF COURSE, YOU APPROVED IT AS WELL AS THE LAB
DIRECTOR; CORRECT?

A.    YES.

Q.    OKAY.  AND JUST A COUPLE MORE THINGS I WANT TO POINT OUT.
      ON PAGE 2 UNDER SUMMARY, IT SAYS -- THE VALIDATION REPORT
SAYS, "THERANOS HAS EVALUATED THE USE OF THERANOS SYSTEM 3.5
PLATFORM FOR THYROID STIMULATING HORMONE, (TSH).  THE
VALIDATION REPORT WAS PREPARED BY MICHELLE JOHNSON ON
SEPTEMBER 23RD, 2013."
      DO YOU SEE THAT?

A.    YES.

Q.    AND IN THE CHART ON PAGE 2 IT SAYS, "THE ACCURACY WAS
DETERMINED BY TESTING 92 UNIQUE PATIENT SAMPLES USING THE
EDISON 3.5 METHOD AND THE PREDICATE METHOD," AND THEN IT GOES
THROUGH A COMPARISON.
      DO YOU SEE THAT?

A.   YES.

Q.   OKAY.   IF YOU COULD TURN TO 9962.

DO YOU SEE THAT?

A.   YES.

Q.   OKAY.   AND IS YOUR SIGNATURE ON 9962?

A.   IT'S AT THE BOTTOM, YES.

Q.   IT'S AT THE VERY BOTTOM?

A.   YES.

Q.   OKAY.   NEXT TO SEPTEMBER 19TH, 2015?

A.   UH-HUH.

Q.   OKAY.   AND YOU'RE SIGNING QUALITY SYSTEMS MANUAL.

DO YOU SEE THAT?

A.   YES.

Q.   AND THAT'S IN CONNECTION WITH THE OPERATION OF A LAB;
CORRECT?

A.   YES.

Q.   AND IT'S AFTER ALL OF THESE OTHER THERANOS EMPLOYEES HAVE
SIGNED; RIGHT?

A.   YES.

          MS. WALSH:   OKAY.   YOUR HONOR, WE OFFER 9962.

          MR. SCHENK:   NO OBJECTION.

          THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

     (DEFENDANT'S EXHIBIT 9962 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

Q.   OKAY.   AND AGAIN, WE'RE SEEING MORE OF THE SAME THING, BUT

A SERIES OF SCIENTISTS SIGNED THIS REPORT; CORRECT?

A.   YES.

Q.   AND THEN YOU SIGNED YOUR NAME AT THE END; RIGHT?

A.   YES.

Q.   AND YOU WERE RELYING ON THE WORK THAT THEY HAD PREVIOUSLY DONE?

A.   YES.

Q.   OKAY.  AND IF WE LOOK AT PAGE 35 OF THIS REPORT, YOU SEE ALL OF THAT REVISION HISTORY?

A.   YES.

Q.   OKAY.  IS IT FAIR TO SAY THAT, BASED ON YOUR EXPERIENCE IN SIGNING THESE REPORTS, THERE WERE MANY REVISIONS OF THE REPORTS BY VARIOUS DIFFERENT PEOPLE; CORRECT?

A.   WHATEVER IS LISTED, YES.

Q.   YEAH.  AND THESE WERE FULL-TIME THERANOS EMPLOYEES; RIGHT?

A.   YES.

Q.   AND THE REVISIONS JUST REPRESENT ITERATIONS OF THE REPORT OVER TIME; IS THAT FAIR?

A.   YES.

Q.   OKAY.  OKAY.  SO, DR. DHAWAN, YOU ALSO TESTIFIED ABOUT YOUR INVOLVEMENT IN THE CMS INSPECTION IN THE FALL OF 2015.

     DO YOU REMEMBER THAT?

A.   YES.

Q.   AND THAT TOOK PLACE AT THERANOS; RIGHT?

A.   YES.

Q.   AND YOU WERE INVOLVED FOR A COUPLE OF HOURS AT THE BEGINNING OF THE INSPECTION; CORRECT?

A.   YES.

Q.   BUT OTHER SCIENTISTS FROM THERANOS WERE THERE; RIGHT?

A.   YES.

Q.   MR. BALWANI WAS THERE; CORRECT?

A.   YES.

Q.   AND THERE WAS DISCUSSION BETWEEN CMS AND THE OTHER SCIENTISTS IN THE ROOM; RIGHT?

A.   YES.

Q.   OKAY.  AND LET'S TAKE A LOOK AT AN EXHIBIT THAT YOU LOOKED AT ON DIRECT.  IT'S 2760.  AND IF WE CAN TURN TO PAGE 2 OF THE EXHIBIT.

     THIS IS WHERE MR. BALWANI WAS TELLING YOU, WE HAVE A LAB AUDIT COMING UP ON 9/22?

A.   YES.

Q.   AND HE SAID HE HAD A VERY CAPABLE TEAM THAT IS TAKING CARE OF ALL OF THE DETAILS; RIGHT?

A.   YES.

Q.   AND TOWARDS THE BOTTOM OF THAT PARAGRAPH HE SAYS, "WE HAVE HIRED MANY EXPERTS FROM THE INDUSTRY TO MAKE SURE LAB IS FLAWLESS AND AUDIT READY, SO I DON'T ANTICIPATE ANY HICCUPS."

     DO YOU SEE THAT?

A.   YES.

Q.   OKAY.  AND DO YOU RECALL THAT IN ADVANCE OF THE CMS AUDIT,

Q.   THERANOS HAD BEEN WORKING WITH A CONSULTING FIRM TO PREPARE FOR IT?

A.   I DON'T SPECIFICALLY RECALL THAT.  I'D HAVE TO LOOK BACK AT THE RECORDS, BUT I DON'T RECALL THAT.

Q.   SURE.  SO WHY DON'T YOU TAKE A LOOK AT THE SMALLER BINDER THAT YOU HAVE.

     AND IF YOU WOULD LOOK AT 28408 AND TURN TO PAGE 3819, AND IF YOU COULD READ LINES 5 THROUGH 10 ON PAGE 3819 TO YOURSELF.

A.   YES.

Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT THERANOS WAS WORKING WITH A CONSULTING COMPANY?

A.   YES.

Q.   OKAY.  AND THAT WAS TO PREPARE FOR THE AUDIT; RIGHT?

A.   YES.

Q.   AND TO MAKE SURE EVERYTHING WAS IN PLACE FOR THE AUDITORS; CORRECT?

A.   YES.

Q.   OKAY.

          THE COURT:  DID YOU ANSWER THAT QUESTION?

          THE WITNESS:  YES.

BY MS. WALSH:

Q.   AND YOU YOURSELF HAD BEEN THROUGH THESE AUDITS BEFORE; RIGHT?

A.   YES.

Q.   AT YOUR OWN LAB?

DHAWAN CROSS BY MS. WALSH                               4198

A.   YES.

Q.   AND SO IN THE MONTHS LEADING UP TO THIS AUDIT, YOU MADE SOME TRIPS TO THERANOS; RIGHT?

A.   YES.

Q.   AND THE -- WHEN YOU ARRIVED AT THERANOS, THE SCIENTISTS SHOWED YOU -- DID A WALKTHROUGH WITH YOU OF THE LAB; CORRECT?

A.   YES.

Q.   AND MR. BALWANI WAS THERE; RIGHT?

A.   YES.

Q.   BUT OTHER SCIENTISTS WERE THERE?

A.   YES.

Q.   AND YOU FOUND THE WALKTHROUGH HELPFUL; RIGHT?

A.   INFORMATIVE, YES.

Q.   AND YOU ALSO TESTIFIED ABOUT A PRESENTATION THAT WAS SHOWN DURING THE CMS AUDIT.

     DO YOU REMEMBER THAT?

A.   I DON'T RECALL THE EXACT PRESENTATION.  I WAS THERE, BUT I'M NOT SURE WHETHER THERE WAS A SLIDE SHOW ON NOT, BUT THERE WAS SOME PRESENTATION MADE, YES.

Q.   OKAY.  SO LET'S TAKE A LOOK AT THE PRESENTATION, WHICH IS IN EVIDENCE, 4528.

     WE LOOKED AT THIS BEFORE.

     BUT I WANT TO DRAW YOUR ATTENTION TO PAGE 2.

     AND DO YOU SEE THAT MAP THERE?

A.   YES.

DHAWAN CROSS BY MS. WALSH                                      4199

Q.   OKAY.   AND THAT MAP -- WELL, WHAT IT SAYS, THE SLIDE SAYS -- AND THIS WAS PRESENTED TO CMS; RIGHT?

A.   YES.

Q.   OKAY.   WHAT THE SLIDE SAYS IS, "COLLECTION SITES.

     "THERANOS'S PATIENT SERVICE CENTERS ARE CURRENTLY LOCATED IN CALIFORNIA, ARIZONA, AND PENNSYLVANIA."

     RIGHT?

A.   YES.

Q.   AND THE MAP INDICATES THAT THERE'S ONE PATIENT SERVICE CENTER IN CALIFORNIA; RIGHT?

A.   YES.

Q.   AND 42 PATIENT SERVICE CENTERS IN ARIZONA; RIGHT?

A.   YES.

Q.   AND YOU KNEW THAT THERANOS OPENED A LAB IN ARIZONA TO SERVICE THOSE PATIENT SERVICE CENTERS; CORRECT?

A.   YES.

Q.   AND DR. YOUNG WAS THE LAB DIRECTOR OF THAT LAB; RIGHT?

A.   YES.

Q.   OKAY.   AND DURING THE COURSE OF THE CMS AUDIT, THE PART THAT YOU WERE THERE FOR --

A.   YES.

Q.   -- ONE OF THE REGULATORS MADE COMMENTS ABOUT HOW CMS WAS UNDER PRESSURE TO INSPECT THERANOS BECAUSE REPORTERS WERE MAKING INQUIRIES.

     DO YOU REMEMBER THAT?

MR. SCHENK: OBJECTION. HEARSAY.

THE COURT: SUSTAINED.

BY MS. WALSH:

Q. OKAY. LET ME TURN TO ANOTHER TOPIC THEN.

OKAY. SO YOU TESTIFIED ON DIRECT, DR. DHAWAN, TO -- ABOUT AN EXHIBIT THAT THE GOVERNMENT SHOWED YOU THAT HAD SOME COMPLAINTS, SOME PATIENT COMPLAINTS, AND A BIG SPREADSHEET.

DO YOU REMEMBER SEEING THAT?

A. YES.

Q. AND THE GOVERNMENT POINTED OUT THREE DIFFERENT COMPLAINTS IN THAT SPREADSHEET.

DO YOU REMEMBER THAT?

A. YES.

Q. OKAY. AND YOU DIDN'T SEE IN THAT SPREADSHEET WHETHER THERE WAS ANY INVESTIGATION OF THOSE COMPLAINTS, DID YOU?

A. I DON'T RECALL SEEING THAT IN THERE, NO, I DON'T.

Q. OKAY. THERE WASN'T A SUMMARY OF THE QC DATA THAT WAS REFERRED TO IN THAT SPREADSHEET; RIGHT?

A. I DON'T RECALL -- I DIDN'T SEE THAT, NO.

Q. OKAY. AND THERE WASN'T INVESTIGATIVE STEPS THAT WERE LAID OUT IN THAT SPREADSHEET; RIGHT?

A. YEAH, NO, I DIDN'T SEE THAT.

Q. IT WAS JUST THE COMPLAINTS THEMSELVES; CORRECT?

A. YES.

Q. AND THERE WAS ALSO NO INDICATION ONE WAY OR ANOTHER

SER-620

WHETHER THE COMPLAINTS HAD BEEN RESOLVED; RIGHT?

A.    I DIDN'T SEE ANY RESOLUTION IN THAT DOCUMENT, NO.

Q.    OKAY.  AND THE DOCUMENT DIDN'T CONTAIN ANY DATA FROM THE SYSTEMS WITHIN THERANOS; RIGHT?

A.    I DON'T RECALL.  NO, IT DIDN'T SEEM TO SHOW ANYTHING OTHER THAN THE COMPLAINT.

Q.    OKAY.

        MS. WALSH:  MAY I HAVE A MOMENT, YOUR HONOR?

        THE COURT:  YES.

    (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

BY MS. WALSH:

Q.    OKAY.  DR. DHAWAN, JUST ONE MORE QUESTION ABOUT THAT CMS AUDIT WHERE YOU WERE PRESENT.

    WAS THERE DISCUSSION ABOUT CMS BEING UNDER PRESSURE IN THE ROOM?

        MR. SCHENK:  YOUR HONOR, SAME OBJECTION.

        THE COURT:  SUSTAINED.

        MS. WALSH:  YOUR HONOR, THESE ARE STATEMENTS BY A PARTY OPPONENT.  THIS IS THE GOVERNMENT MAKING THOSE STATEMENTS, SO --

        THE COURT:  SUSTAINED.

        MS. WALSH:  OKAY.  I HAVE NOTHING FURTHER, YOUR HONOR.

        THE COURT:  REDIRECT?

///

SER-621

**REDIRECT EXAMINATION**

BY MR. SCHENK:

Q.   GOOD AFTERNOON, DR. DHAWAN.

A.   GOOD AFTERNOON.

Q.   I'D LIKE TO FOLLOW UP ON A FEW TOPICS THAT YOU DISCUSSED WITH MS. WALSH, AND THE FIRST IS TO GET SOME GENERAL CLARIFICATION REGARDING INSTANCES WHEN YOU WERE ANSWERING HER QUESTIONS, BUT MAKING ASSUMPTIONS.

AND BY THAT I MEAN, FOR INSTANCE, MS. WALSH ASKED YOU IF CERTAIN EMPLOYEES WERE FULL TIME, LIKE I THINK ONE OF THE EXAMPLES WAS ADAM ROSENDORFF, AND I THINK YOU TESTIFIED THAT HE WAS.

HOW DO YOU KNOW THAT?

A.   I ASSUME, WHEN I WAS TOLD THAT HE WAS A FULL-TIME EMPLOYEE, THAT MEANT HE WAS A FULL-TIME EMPLOYEE.  BUT I WASN'T -- I DIDN'T SEE HIS EMPLOYMENT RECORDS, SO --

Q.   AND HAVE YOU MEANT DR. ROSENDORFF?

A.   NO, I HAVE NOT.

Q.   THERE WERE INSTANCES WHEN MS. WALSH SAID YOU SIGNED VALIDATION REPORTS AND YOUR SIGNATURE WAS THE LAST SIGNATURE, SO YOU WERE RELYING ON THE WORK OF THE INDIVIDUALS WHO HAD SIGNED IT BEFORE YOU.

DO YOU RECALL THOSE QUESTIONS?

A.   YES.

Q.   OKAY.  AND I THINK SHE TALKED TO YOU ABOUT SOME OF THEIR

SER-622

EDUCATIONAL BACKGROUND, SOME WERE PH.D.'S.

DO YOU RECALL THAT?

A.   YES.

Q.   AND WHEN YOU SAY YOU WERE RELYING ON THEIR WORK, WERE YOU MAKING AN ASSUMPTION THAT THEY HAD DONE GOOD QUALITY WORK?

A.   YES, BECAUSE THEY HAD SIGNED THE DOCUMENTS.

Q.   BUT HAD YOU EVER SPOKEN TO THEM ABOUT THE UNDERLYING SUBSTANCE OF THE WORK THAT THEY DID OR THE DOCUMENT THAT YOU WERE SIGNING?

A.   I HAD NO WAY TO ANSWER THAT QUESTION.

THE COURT:  DOCTOR, COULD YOU BRING THAT MICROPHONE DOWN?

THE WITNESS:  SORRY.

THE COURT:  MAYBE BEND IT DOWN.  I WISH THEY WERE PARABOLIC.

THE WITNESS:  NO, THAT'S OKAY.

I DIDN'T HAVE AN OPPORTUNITY TO ASK THEM THOSE QUESTIONS.

BY MR. SCHENK:

Q.   YOU SAID THAT YOU HAD DELEGATED SOME RESPONSIBILITIES TO THE TECHNICAL SUPERVISOR AND OTHER INDIVIDUALS.

DO YOU RECALL THAT LINE OF QUESTIONING?

A.   YES.

Q.   AND I'M WONDERING IF YOU MADE AN ASSUMPTION THAT SOMEONE WOULD LET YOU KNOW IF THERE WERE PROBLEMS, IF THERE WERE QUALITY PROBLEMS, OR ACCURACY PROBLEMS.

SER-623

WHEN YOU WERE LAB DIRECTOR AT THERANOS, DID YOU ASSUME THAT SOMEONE WOULD LET YOU KNOW IF THERE WERE SUCH PROBLEMS?

A.   YES, THAT'S GENERALLY THEIR JOB.

Q.   AND WHO WAS YOUR POINT OF CONTACT AT THERANOS?

A.   SUNNY.  MR. BALWANI, I'M SORRY.

Q.   AND NOW I'D LIKE TO GO THROUGH A FEW OF THE DOCUMENTS THAT YOU TALKED TO MS. WALSH ABOUT.

CAN WE START WITH 20064.  THAT WAS ADMITTED.

THE COURT:  OH, WE NEED TO TURN THE MONITORS BACK ON I THINK.

THE WITNESS:  YES.

THE COURT:  THERE WE GO.

BY MR. SCHENK:

Q.   DOCTOR, DO YOU RECALL DISCUSSING THIS EMAIL WITH MS. WALSH?

A.   YES.

Q.   AND THERE'S AN EMAIL AT THE BOTTOM FROM DR. SAKSENA TO YOU ASKING IF YOU'LL WRITE A LETTER, OR SIGN A LETTER.

DO YOU RECALL THAT?

A.   YES.

Q.   AND WHAT'S THE DATE OF THIS REQUEST FROM DR. SAKSENA?

A.   10-7-2015.

Q.   I'M SORRY, THE --

A.   10-7-2015 -- OH, AT THE BOTTOM IT IS 10-6.  10-6.

Q.   SO THE EMAIL WAS WRITTEN TO YOU ON OCTOBER 6, 2015?

A.   YES.

Q.   WOULD YOU NOW TURN TO 20067?

A.   YES.

Q.   IS THIS THE LETTER THAT YOU WROTE?

A.   YES.

Q.   WHAT IS THE DATE?

A.   OCTOBER 6TH, 2015.

Q.   IS THAT THE SAME DATE THAT DR. SAKSENA MADE THE REQUEST?

A.   YES.

Q.   DID, IN FACT, SOMEONE GIVE YOU THIS LETTER AND ASK YOU TO SIGN IT?

A.   YES, THAT'S USUALLY THE WAY THIS IS DONE.

Q.   SO THIS WAS LIKE THE BIG STACK OF VALIDATION REPORTS, YOU WERE GIVEN THEM AND ASKED TO SIGN?

A.   YES, SOMEBODY CREATES THEM AND YOU REVIEW THEM AND SIGN THEM.

Q.   OKAY.  THERE ARE STATEMENTS IN THE CONTENT, IN THE BODY OF THIS LETTER.

A.   YES.

Q.   WERE YOU ASSUMING THAT THESE WERE ALL TRUE?

A.   YES.

Q.   THERE IS A -- I THINK THE QUESTIONS THAT MS. WALSH WAS ASKING YOU DURING THIS TIME WERE DID YOU UNDERSTAND THAT THERE WAS SOME HOPE THAT DR. SAKSENA MIGHT BECOME A LAB DIRECTOR.

     IS THAT RIGHT?  DO YOU REMEMBER THAT LINE OF QUESTIONING?

A.   YES.

Q.   AND IT TALKS ABOUT IN HERE AN APPLICATION TO BECOME A CLINICAL CHEMIST?

A.   YES.

Q.   IS THAT RIGHT?

A.   YES.

Q.   IN FACT, HAD YOU BEEN LAB DIRECTOR AT THERANOS SINCE NOVEMBER OR DECEMBER, DEPENDING ON WHICH DOCUMENT WE LOOK AT --

A.   YES.

Q.   -- FROM 2014?  IS THAT RIGHT?

A.   YES.

Q.   SO THIS WORK WITH SIGNING A LETTER ON DR. SAKSENA'S BEHALF WAS, IN FACT, TEN MONTHS AFTER YOU WERE THERE; IS THAT RIGHT?

A.   I WAS STILL -- THIS WAS RIGHT AFTER THE CMS AUDIT, SO IT'S AROUND THE SAME TIME.  THE CMS AUDIT WAS ABOUT THAT TIME.

Q.   AND YOU WERE EMAILING WITH MR. BALWANI TO BECOME LAB DIRECTOR IN NOVEMBER OF 2014; IS THAT RIGHT?

A.   '14, YES.

Q.   OKAY.  MS. WALSH SHOWED YOU SOME DOCUMENTS THAT HAD SOMEONE NAMED LYNETTE SAWYER'S SIGNATURE ON THEM?

A.   YES.

Q.   AND SHE SAID THAT THIS DOCUMENT, AND SHE SAID THAT FOR SEVERAL OF THEM, WAS AT A PERIOD OF TIME WHEN YOU WEREN'T DOING THAT MUCH WORK FOR THERANOS.

DO YOU RECALL THAT?

DHAWAN REDIRECT BY MR. SCHENK 4207

A. YES.

Q. AND I THINK ONE WAS IN JANUARY OF 2015, ONE WAS IN MARCH OF 2015.

AND MY QUESTION IS, WAS THERE ANY PERIOD WHEN YOU WERE ACTUALLY DOING A LOT OF WORK FOR THERANOS?

A. THERE WAS NEVER A PERIOD WHERE I WAS DOING A SIGNIFICANT AMOUNT OF WORK FOR THE COMPANY.

Q. WHEN YOU SAW ON THESE DOCUMENTS LYNETTE SAWYER'S SIGNATURE --

A. YES.

Q. -- DO YOU KNOW WHAT INFORMATION SHE WAS PROVIDED BEFORE SHE SIGNED THE DOCUMENTS?

A. NO.

Q. DO YOU KNOW IF YOU RECEIVED A CERTAIN KIND OF DOCUMENTS, LIKE LET'S SAY INVOLVING THERANOS LAB DEVELOPED TESTS --

A. RIGHT.

Q. -- BUT SHE RECEIVED A DIFFERENT KIND OF DOCUMENT, LIKE THE CMS DOCUMENT THAT YOU SAW?

A. I WAS NOT MADE AWARE OF ANY OF THAT.

Q. SO YOU DON'T KNOW WHETHER THERANOS GAVE HER ONE TYPE OF DOCUMENT AND YOU A DIFFERENT TYPE?

A. I DON'T KNOW.

Q. OKAY. AND YOU DON'T KNOW WHETHER SHE WAS GIVEN INFORMATION AT THE TIME THAT SHE WAS ASKED TO SIGN THE DOCUMENTS OR WHAT THAT INFORMATION WAS?

SER-627

A.   I DON'T KNOW.

Q.   THERE WAS A DOCUMENT, AND IT WAS 10577 IF YOU WANT TO LOOK IN THE BINDER.  IT WAS THE DELEGATION OF RESPONSIBILITIES DOCUMENT.

AND I THINK -- DO YOU RECALL THAT?

A.   I'M LOOKING FOR IT.  ONE SECOND, SIR.

YES.

Q.   AND AM I RIGHT THAT YOU SIGNED THAT ONE IN SEPTEMBER OF 2015?

A.   YES.

Q.   SO YOU HAD BEEN LAB DIRECTOR FOR QUITE SOME TIME BY THEN; IS THAT RIGHT?

A.   YES.

Q.   AND I THINK MS. WALSH GOT UP AFTER THE BREAK AND ASKED YOU, HAD YOU BEEN DELEGATING SINCE YOU STARTED AT THERANOS.

DO YOU REMEMBER THAT QUESTION?

A.   YES.

Q.   AND HOW DID YOU ANSWER?

A.   THE ASSUMPTION IS THAT YOU DELEGATE BECAUSE ALL OF THESE JOBS HAVE TO BE DONE BY THESE VARIOUS PEOPLE, SO IT'S AN ASSUMPTION THAT -- IT'S A NATURAL ASSUMPTION THAT YOU'RE GOING TO DELEGATE.

Q.   DR. DHAWAN, YOU READ MY MIND.  I WAS GOING TO ASK YOU IF YOU MADE AN ASSUMPTION.  I WAS GOING TO ASK YOU IF YOU WERE MAKING AN ASSUMPTION THAT YOU HAD, IN FACT, BEEN DELEGATING ALL

SER-628

DHAWAN REDIRECT BY MR. SCHENK                    4209

THAT TIME THAT YOU HAD WORKED THERE?

A.   BECAUSE THAT'S USUALLY WHAT YOU DO WHEN YOU'RE A LAB DIRECTOR.

Q.   AND THEN JUST A FEW MORE QUESTIONS.

MS. WALSH SHOWED YOU SOME VERIFICATION DOCUMENTS, ONE INVOLVING SOMETHING CALLED A DREW3?

A.   YES.

Q.   DO YOU REMEMBER THAT?

DO YOU KNOW WHAT DEVICE THERANOS WAS USING TO RUN OR TO TEST CBC, COMPLETE BLOOD COUNTS?

A.   TO VERIFY THE RESULTS?  I'M SORRY, I DIDN'T GET THE LINE OF QUESTIONING.

Q.   DO YOU KNOW IF THERANOS WAS DOING CBC TESTS FOR PATIENTS WHILE YOU WORKED THERE?

A.   I DON'T RECALL.

Q.   DO YOU KNOW WHAT DEVICE THEY WERE USING TO RUN CBC, IF THEY WERE?

A.   I DON'T RECALL AT THIS POINT.

Q.   HOW ABOUT FOR TSH?

A.   I DON'T RECALL.

Q.   DO YOU KNOW IF THERANOS WAS RUNNING TSH BLOOD TESTS FOR PATIENTS?

A.   I'D HAVE TO LOOK BACK AT THE RECORDS.  I DON'T RECALL.

Q.   YOU DON'T HAVE A RECOLLECTION OF IT?

A.   NO, I DO NOT.

SER-629

Q.   SO IS THE SAME TRUE THAT YOU DON'T KNOW WHICH DEVICE THEY WERE USING?

A.   I DO NOT KNOW.

Q.   AND HOW ABOUT WOULD -- WOULD THE SAME ANSWER BE FOR ANY ASSAY?  IF I ASKED YOU ABOUT ANY ASSAY, WOULD YOU SAY YOU DON'T RECALL?

A.   I DON'T RECALL BECAUSE I WAS NEVER TOLD THIS INFORMATION.

Q.   OKAY.  YOU -- MS. WALSH ASKED YOU ABOUT THE TOUR THAT YOU TOOK, AND I THINK YOU SAID THAT YOU FOUND IT INFORMATIVE.

A.   YES.

Q.   AND WHAT DID YOU FIND INFORMATIVE ABOUT IT?

A.   JUST THE VAST ARRAY OF MACHINES THAT THEY WERE USING.

Q.   AND TELL ME MORE ABOUT THAT.  DID THEY TELL YOU, THIS IS THE PARTICULAR MACHINE TO USE FOR THESE TESTS, OR WHAT WERE --

A.   THEY WEREN'T SPECIFIC.

Q.   SO --

A.   THEY JUST HAD A LARGE NUMBER OF MACHINES IN THE NEWARK FACILITY.

Q.   HELP ME UNDERSTAND THEN THE USE OF THE WORD "INFORMATIVE."
     WHAT DID YOU LEARN?

A.   I JUST LEARNED THAT THERE WERE A LARGE NUMBER OF MACHINES IN THE FACILITY AND THAT THEY WERE USING SOME SIEMENS MACHINES AND SOME OTHER DEVICES.

Q.   I SEE.  SO YOU WERE NOT CONNECTING THEM WITH ANY PARTICULAR BLOOD TEST, YOU JUST SAW THERANOS'S INVENTORY?

DHAWAN REDIRECT BY MR. SCHENK                                    4211

A.    EXACTLY.

Q.    GOT IT.

IF WE COULD BRING UP EXHIBIT 4528, AND THEN PAGE 6.

YOUR HONOR, THIS HAS BEEN PREVIOUSLY ADMITTED.

THE COURT:  YES.

BY MR. SCHENK:

Q.    I THINK MS. WALSH WAS ASKING YOU IF YOU RECALL THAT THERANOS HAD A LAB IN ARIZONA AND THAT DR. YOUNG WAS THE LAB DIRECTOR IN ARIZONA.

DO YOU RECALL THAT LINE OF QUESTIONING?

A.    YES.

Q.    AND I THINK SHE EVEN SAID THAT THEY OPENED A LAB IN ARIZONA TO SERVICE THE ARIZONA PATIENT SERVICE CENTERS.

DO YOU RECALL THAT?

A.    YES.

Q.    IN FACT, THOUGH, DOES THIS DOCUMENT SHOW YOU THAT SAMPLES THAT WERE TAKEN IN ARIZONA WERE SOMETIMES SHIPPED TO YOUR LAB IN CALIFORNIA?

A.    THAT'S WHAT THIS DOCUMENT SAYS, THAT ALL THE HIGH COMPLEXITY SAMPLES WERE SHIPPED OUT.

Q.    SO THE LAB THAT DR. YOUNG SUPERVISED IN ARIZONA --

A.    YES.

Q.    -- DID NOT TEST ALL OF THE SAMPLES THAT WERE TAKEN FROM PATIENTS IN ARIZONA; IS THAT RIGHT?

A.    THAT'S WHAT THIS DOCUMENT WOULD SAY, YES.

Q.   ALL RIGHT.  THANK YOU.

     NO FURTHER QUESTIONS, YOUR HONOR.

          THE COURT:  MS. WALSH?

          MS. WALSH:  YES.

                    **RECROSS-EXAMINATION**

BY MS. WALSH:

Q.   DR. DHAWAN, ON THE SUBJECT OF SURAJ SAKSENA --

A.   YES.

Q.   -- MR. SCHENK POINTED OUT THAT THE DATE OF THAT
RECOMMENDATION LETTER THAT YOU SIGNED -- YOU SIGNED THAT
LETTER; RIGHT?

A.   YES.  I HAVE TO LOOK AT IT AGAIN, BUT YES.

Q.   OKAY.  THAT WAS IN 2015; RIGHT?

A.   YES.

Q.   OKAY.  AND I'M GOING TO ASK YOU TO TURN IN YOUR BINDER TO
20466.

A.   YES.

Q.   TAKE A LOOK AT THAT EMAIL, WILL YOU?

A.   YES.

Q.   DOES THAT REFRESH YOUR RECOLLECTION AS TO WHEN DR. SAKSENA
WAS SEEKING TO BECOME QUALIFIED TO BECOME A LAB DIRECTOR?

          MR. SCHENK:  OBJECTION.  IMPROPER REFRESH.  THERE
WAS NO STATEMENT ABOUT A LACK OF KNOWLEDGE.

          THE COURT:  YOU NEED TO LAY A FOUNDATION.

          MS. WALSH:  OH.  SURE.  SURE.  OKAY.

Q.   DR. DHAWAN --

A.   YES.

Q.   -- DO YOU RECALL WHEN DR. SAKSENA BEGAN HIS PROCESS FOR BECOMING QUALIFIED TO BECOME A LAB DIRECTOR AT A HIGH COMPLEXITY LAB?

A.   I WOULD HAVE TO REVIEW THE LETTER TO GET THE DATES AND ALL OF THE INFORMATION THAT WAS ON THE LETTER, BUT, YES.  I'D HAVE TO LOOK AT THE LETTER AGAIN, YOU KNOW, THE LETTER THAT WAS CREATED AND I HAD TO SIGN FOR HIM.

Q.   OKAY.  WE CAN DO THAT.

A.   I MEAN, IT SAYS HERE 2014 IS WHEN HE STARTED SOME OF THE PROCESS.

Q.   OKAY.  IF YOU WANT TO LOOK AT THE LETTER, WE CAN TURN BACK TO THAT.

A.   SURE.  WHICH, WHICH ONE WAS THAT?

Q.   20064.

A.   20064.

Q.   AND 20067 IS THE LETTER ITSELF.

A.   SO IT'S APPARENTLY SINCE 2014 THAT HE WAS SEEKING TO DO THIS, AND HE HAS THE JOB DESCRIPTION SINCE 2013.

     SO HE'S HAD EXPERIENCE FOR THREE YEARS FROM 2013.  SO THOSE ARE THE DATES, 2013, 2014, 2015.

Q.   OKAY.  DOES THAT REFRESH YOUR RECOLLECTION AS TO WHEN HE BEGAN?

A.   YES, SO IT WAS THREE YEARS PRIOR.

SER-633

DHAWAN RECROSS BY MS. WALSH                                    4214

Q.   AND HE BEGAN IN 2014?

A.   UM, LET ME LOOK AT THE LETTER AGAIN.  I APOLOGIZE.

     (PAUSE IN PROCEEDINGS.)

          THE WITNESS:  HE BEGAN IN 2014, YES.

BY MS. WALSH:

Q.   OKAY.  AND THAT WAS TO START THE PROCESS --

A.   YES.

Q.   -- OF BECOMING QUALIFIED; CORRECT?

A.   YES, YES.

Q.   OKAY.  AND THEN MR. SCHENK ASKED YOU ABOUT THE STATEMENTS
IN THE LETTER THAT YOU WROTE -- THAT YOU SIGNED; RIGHT?

A.   YES.

Q.   AND YOU SAID YOU ASSUMED ALL OF THE STATEMENTS WERE TRUE;
CORRECT?

A.   YES.

Q.   AND THAT WAS -- YOU THOUGHT THAT WAS A REASONABLE
ASSUMPTION; RIGHT?

A.   YES.

Q.   YOU DIDN'T THINK DR. SAKSENA WAS LYING TO YOU ABOUT HIS
QUALIFICATIONS, DID YOU?

A.   NO.

Q.   OKAY.  AND MR. SCHENK ASKED YOU MORE ABOUT YOUR
ASSUMPTIONS, YOUR ASSUMPTION ABOUT DR. ROSENDORFF BEING A
FULL-TIME EMPLOYEE.

     DO YOU REMEMBER THAT?

                    UNITED STATES COURT REPORTERS

A.   YES.

Q.   AND YOU SAID YOU HADN'T LOOKED AT HIS EMPLOYMENT RECORDS; RIGHT?

A.   YES.

Q.   BUT IT WAS A REASONABLE ASSUMPTION FOR YOU TO BELIEVE HE WAS A FULL-TIME EMPLOYEE, WAS IT NOT?

A.   IT'S REASONABLE, YES.

Q.   OKAY.  AND THE ASSUMPTION THAT YOU WERE MAKING ABOUT DELEGATING TO EMPLOYEES THAT THEY WOULD BE DOING THEIR JOBS, DO YOU REMEMBER THAT?

A.   YES.

Q.   AND THAT WAS A REASONABLE ASSUMPTION; RIGHT?

A.   YES.

Q.   OKAY.  AND MR. SCHENK ALSO ASKED YOU ABOUT THE PEOPLE TO WHOM YOU DELEGATED.  IT WAS THEIR JOB TO RAISE ISSUES TO YOU IF THERE WERE ISSUES?  HE ASKED YOU THAT QUESTION; RIGHT?

A.   YES.

Q.   DO YOU HAVE ANY REASON TO BELIEVE THAT THEY WEREN'T DOING THEIR JOB IN THAT REGARD?

A.   THERE WAS -- I HAD NO EVIDENCE THAT THAT WAS HAPPENING, NO.

Q.   OKAY.

YOUR HONOR, I HAVE ONE ITEM THAT I WANT TO CONSULT WITH THE GOVERNMENT ON BEFORE I STEP DOWN.

THE COURT:  OF COURSE.

UNITED STATES COURT REPORTERS

SER-635

(DISCUSSION OFF THE RECORD.)

MS. WALSH:  YOUR HONOR, THERE WAS ONE EXHIBIT, 2219, THAT I NOW OFFER INTO EVIDENCE, AND I UNDERSTAND THE GOVERNMENT DOES NOT HAVE ANY OBJECTION.

MR. SCHENK:  NO OBJECTION.

THE COURT:  ALL RIGHT.  THAT WILL BE ADMITTED AND IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 2219 WAS RECEIVED IN EVIDENCE.)

MS. WALSH:  AND MAY I HAVE ONE MOMENT, YOUR HONOR?

THE COURT:  YES.

(DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

MS. WALSH:  THANK YOU, YOUR HONOR.  NO FURTHER QUESTIONS.

THE COURT:  OH, I'M LOOKING BEHIND YOU.  SORRY.

MR. SCHENK.

MR. SCHENK:  THANK YOU, YOUR HONOR.

**FURTHER REDIRECT EXAMINATION**

BY MR. SCHENK:

Q.   DR. DHAWAN, MS. WALSH JUST ASKED YOU IF YOU HAD ANY REASON TO DOUBT THAT INDIVIDUALS IN THE LAB WOULD RAISE ISSUES WITH YOU, WERE WORKING HARD AND DOING THEIR JOB; IS THAT RIGHT?

AND I THINK YOU ANSWERED THAT, NO, YOU DIDN'T HAVE ANY REASON TO DOUBT THAT; IS THAT CORRECT?

A.   YES.

Q.   WERE YOU SAYING THAT BASED ON JUST THE TIME THAT YOU WERE

WORKING AT THERANOS AS LAB DIRECTOR?

A.   YES.

Q.   I JUST WANT A YES OR NO TO THIS QUESTION.

AFTER YOU LEFT THERANOS, DOES THAT -- DID THAT CHANGE?  DO YOU NOW HAVE REASONS TO DOUBT?

MS. WALSH:  OBJECTION.

MR. SCHENK:  YOUR HONOR, THEY --

THE COURT:  I THINK IT'S -- I THINK IT'S FAIR GAME NOW.  I DO.

SO YOU CAN ANSWER THE QUESTION.

THE WITNESS:  CAN YOU REPHRASE?  I'M SORRY, I WANT TO MAKE SURE I GET THE PRECISE QUESTION.

BY MR. SCHENK:

Q.   YES.  YOU TOLD ME THAT YOU DIDN'T HAVE -- I THINK YOU TOLD MS. WALSH THAT YOU DIDN'T HAVE ANY REASON TO DOUBT THE WORK OF INDIVIDUALS WHO YOU DELEGATED TO, AND I JUST WANTED TO NAIL DOWN THE TIME OF WHEN YOU HELD THAT BELIEF.

A.   YES.

Q.   IT SOUNDED TO ME LIKE YOU WERE SAYING, WHEN I WORKED AT THERANOS, I DIDN'T HAVE ANY REASON TO DOUBT THAT.

AND I'M JUST WONDERING, YES OR NO, DID THAT OPINION CHANGE AFTER YOU LEFT?  SINCE YOU STOPPED BEING LAB DIRECTOR, DO YOU NOW ACTUALLY HAVE REASON TO DOUBT THAT?

A.   THE WORK OF THE INDIVIDUALS THAT WERE REPORTING UP, YOU MEAN THE INDIVIDUALS THAT WERE, LIKE, LANGLY GEE AND ALL OF

THOSE INDIVIDUALS?

Q.   YEAH.  I JUST WANT THE SAME QUESTION THAT MS. WALSH ASKED YOU.  SHE DIDN'T SPECIFY NAMES.

A.   THERE'S DOUBT NOW, YEAH.

Q.   THANK YOU.

NO FURTHER QUESTIONS.

MS. WALSH:  NOTHING FURTHER.

THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED?

MR. SCHENK:  YES, YOUR HONOR.

MS. WALSH:  YES, YOUR HONOR.

THE COURT:  YOU'RE EXCUSED.  THANK YOU, SIR.

DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL TODAY?

MR. SCHENK:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  SHOULD WE THEN TAKE OUR BREAK NOW AND THEN WE'LL RESUME AGAIN FRIDAY MORNING?

MR. SCHENK:  YES, YOUR HONOR.

THE COURT:  AND THE GOVERNMENT WILL HAVE A WITNESS.

ALL RIGHT.  WELL, I PROMISED YOU 4:00 O'CLOCK, AND I'M GOING TO DISAPPOINT YOU ONCE AGAIN.

WE'LL TAKE OUR EVENING BREAK NOW, LADIES AND GENTLEMEN. ENJOY YOUR EVENING.

WE'LL SEE YOU AGAIN FRIDAY, THIS FRIDAY, PLEASE.

AND AGAIN, I REMIND YOU OF THE ADMONISHMENT, PLEASE DON'T DO ANYTHING TO LEARN ANYTHING, DISCUSS, OR READ OR SEE ANYTHING ABOUT THIS CASE DURING THE BREAK.

SER-638

HAVE A GOOD BREAK, AND WE'LL SEE YOU FRIDAY MORNING.

THANK YOU.

(JURY OUT AT 3:28 P.M.)

THE COURT:  PLEASE BE SEATED.  THANK YOU.

THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE DAY.  ALL COUNSEL AND MR. BALWANI REMAIN.

JUST SCHEDULING FOR FRIDAY, IF I COULD JUST ASK THAT.

MR. SCHENK:  YOUR HONOR, I THINK THE GOVERNMENT HOPES TO CALL TWO INVESTORS ON FRIDAY.  WE'LL HAVE THE FIRST AVAILABLE AT 9:00 A.M.

THE COURT:  OKAY.

MR. SCHENK:  I'M NOT SURE WE'LL GET THROUGH BOTH INVESTORS, BUT I'M NOT SURE THAT ONE WOULD FILL THE DAY, SO WE'LL HAVE A SECOND TO AT LEAST START.

THE COURT:  RIGHT.  OKAY.  THAT SOUNDS GOOD.  OKAY.

ANYTHING FURTHER BEFORE WE BREAK FOR THE EVENING?

MR. SCHENK:  YOUR HONOR, I OBJECTED ON AUTHENTICITY GROUNDS, AND I DON'T WANT TO REVISIT THAT RULING, BUT I HAVE A CONCERN THAT THIS IS GOING TO COME UP AGAIN.

AND WE COULD EITHER ADDRESS IT NOW OR WE CAN ADDRESS IT LATER.

MY CONCERN IS THAT IT'S A LITTLE BIT TIME CONSUMING TO DO IT WHILE WE HAVE THE JURY HERE, IT MIGHT NOT BE THE BEST USE OF THEIR TIME.  I'M NOT GOING TO PROVIDE MORE DETAIL, BUT MAYBE SOME MORE DIRECTION FROM THE COURT IF THE COURT WOULD