**No. 22-10338**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

        v.

RAMESH "SUNNY" BALWANI,

    Defendant-Appellant.

---

**SUPPLEMENTAL EXCERPTS OF RECORD**
**VOLUME 4 OF 9**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 18-CR-00258-EJD-2

---

**THOMAS A. COLTHURST**
Attorney for the United States
Acting Under Authority Conferred By
28 U.S.C. § 515

**MATTHEW M. YELOVICH**
Chief, Appellate Section, Criminal Division

**KELLY I. VOLKAR**
Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7185
**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,        )
                                 )  CR-18-00258-EJD
              PLAINTIFF,         )
                                 )  SAN JOSE, CALIFORNIA
         VS.                     )
                                 )  MAY 3, 2022
RAMESH "SUNNY" BALWANI,          )
                                 )  VOLUME 25
              DEFENDANT.         )
_____)  PAGES 4481 - 4747


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                          BY:   JOHN C. BOSTIC
                                JEFFREY B. SCHENK
                          150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113

                          BY:  ROBERT S. LEACH
                          1301 CLAY STREET, SUITE 340S
                          OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074
                          LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

SER-641

4483

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**SHANE WEBER**
DIRECT EXAM BY MR. LEACH                    P. 4531
CROSS-EXAM BY MR. CAZARES                   P. 4570
REDIRECT EXAM BY MR. LEACH                  P. 4597


**SARAH BENNETT**
DIRECT EXAM BY MR. LEACH                    P. 4602
CROSS-EXAM BY MR. CAZARES                   P. 4693

**SER-642**

THERE MAY BE TIMES WHERE YOU EXPERIENCED THAT AND IT HAS HAPPENED AND I APPRECIATE YOUR PATIENCE IN THAT REGARD.

SO BEFORE WE START, LET ME ASK YOU, DURING THE BREAK, DID ANY OF YOU HAVE CAUSE TO READ, LISTEN, DISCUSS, OR IN ANY WAY LEARN ANYTHING ABOUT THIS CASE OUTSIDE OF THIS COURTROOM? PLEASE RAISE YOUR HAND IF THAT HAS HAPPENED.

I SEE NO HANDS. THANK YOU.

I SEE YOU HAVE REVERSED YOUR SEATING AGAIN.

OKAY. GOOD. I HOPE THAT'S WORKING WELL FOR YOU.

WITH THAT, LET ME CALL ON THE GOVERNMENT TO CALL ANOTHER WITNESS.

MR. LEACH: THANK YOU, YOUR HONOR.

THE UNITED STATES CALLS SHANE WEBER.

THE COURT: GOOD MORNING, SIR.

IF YOU WOULD STEP FORWARD AND FACE OUR COURTROOM DEPUTY WHILE YOU RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

**(GOVERNMENT'S WITNESS, SHANE WEBER, WAS SWORN.)**

THE WITNESS: I DO.

THE COURT: PLEASE HAVE A SEAT UP HERE, SIR.

LET ME INVITE YOU TO MAKE YOURSELF COMFORTABLE.

FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU NEED.

AND WHEN YOU ARE COMFORTABLE, I'LL ASK YOU TO PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE.

THE WITNESS: MY NAME IS SHANE WEBER. S-H-A-N-E,

W-E-B-E-R.

THE COURT:  THANK YOU.  COUNSEL.

MR. LEACH:  THANK YOU, YOUR HONOR.

**DIRECT EXAMINATION**

BY MR. LEACH:

Q.  GOOD MORNING, MR. WEBER.

A.  GOOD MORNING.

Q.  IF YOU ARE FULLY VACCINATED, SIR, AND COMFORTABLE, WITH THE COURT'S PERMISSION, YOU CAN TESTIFY WITHOUT A MASK.

A.  I'M FULLY VACCINATED.

Q.  AND I'VE REMOVED MY MASK AS WELL.

WAS THERE A TIME WHEN YOU WORKED FOR A COMPANY CALLED PFIZER?

A.  YES.

Q.  AND WHAT IS THE BUSINESS OF PFIZER?

A.  PFIZER IS A WORLDWIDE PHARMACEUTICAL DRUG COMPANY.

Q.  OKAY.  WHEN DID YOU WORK FOR PFIZER?

A.  I WORKED FOR PFIZER MID-2008 THROUGH MID-2014.

Q.  AT A HIGH LEVEL, WOULD YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL AND PROFESSIONAL BACKGROUND.

A.  YES.  EDUCATIONALLY, I DID AN UNDERGRADUATE IN MOLECULAR BIOLOGY AND BIOCHEMISTRY AT NORTHWESTERN UNIVERSITY.

THEN I DID A DOCTORAL IN BIOPHYSICS AT OREGON STATE UNIVERSITY.

AND FOLLOWING THAT, I DID A POST-DOCTORAL FELLOWSHIP IN

RADIATION BIOLOGY AND BIOPHYSICS AT THE UNIVERSITY OF ROCHESTER.

FOLLOWING MY ACADEMIC TRAINING, I WORKED AT A NUMBER OF CORPORATIONS. FIRST I WORKED AT EASTMAN KODAK IN ROCHESTER, NEW YORK FOR TEN YEARS AS A LIFE SCIENTIST.

FOLLOWING THAT, I WORKED AT CONNECTICUT AT AN EASTMAN KODAK COMPANY CALLED SCIENTIFIC IMAGING.

THEN I WORKED AT PACKARD BIOSCIENCES IN CONNECTICUT.

AND THEN I MOVED TO BOSTON, MASSACHUSETTS AND WORKED WITH MILLENNIUM PHARMACEUTICALS.

DURING THAT TIME, I ALSO DID SBIR, SMALL BUSINESS INNOVATION REVIEW GRANTS FOR THE NATIONAL INSTITUTE OF HEALTH, AND AT MILLENNIUM I WORKED AS A SCIENTIST.

FOLLOWING MILLENNIUM I MOVED TO NEW JERSEY AND WORKED AT ORTHO CLINICAL DIAGNOSTICS, A JOHNSON & JOHNSON DIAGNOSTIC COMPANY.

AND THEN AFTER THAT, I MOVED TO PFIZER TO WORK AS A DIRECTOR OF DIAGNOSTICS.

Q.   THANK YOU, MR. WEBER.

LET ME ASK SOME FOLLOW-UP QUESTIONS ABOUT THAT. WE APPRECIATE THE DETAIL.

YOU HAVE A PH.D.?

A.   I DO.

Q.   AND WHAT IS YOUR PH.D. IN?

A.   IT'S IN BIOPHYSICS.

Q.   AND WHAT IS BIOPHYSICS?

A.   BIOPHYSICS IS THE USE OF THE STUDY OF BIOLOGICAL PROCESSES USING PHYSICAL APPROACHES.

Q.   YOU ALSO DESCRIBED A NUMBER OF JOBS THAT YOU'VE HELD AT PLACES LIKE EASTMAN KODAK AND JOHNSON & JOHNSON.

AT A HIGH LEVEL, COULD YOU BRIEFLY DESCRIBE YOUR JOB RESPONSIBILITIES?  WHAT WERE YOUR AREAS OF FOCUS?

A.   AT EASTMAN KODAK I DEVELOPED MOLECULAR TECHNOLOGIES FOR ASSAYS FOR BIOPOLYMER, AND I ALSO DID IMAGING SYSTEMS THAT WERE COMMERCIALIZED FOR LABORATORY USE ACROSS THE COUNTRY AND THE WORLD.

AT JOHNSON & JOHNSON I WORKED AT AN ORTHO CLINICAL DIAGNOSTIC, WHICH IS A DIAGNOSTIC COMPANY THERE, AND I WAS A WORLDWIDE DIRECTOR OF DIAGNOSTICS IDENTIFYING NEW ASSAYS AND BUSINESS OPPORTUNITIES THAT COULD POTENTIALLY BE CONVERTED INTO A POTENTIAL PRODUCT.

Q.   THANK YOU.

AND YOU JOINED PFIZER IN 2008?

A.   YES.

Q.   WHAT WERE YOU HIRED TO DO?

A.   I WAS HIRED AS A DIRECTOR OF DIAGNOSTICS IN THE NEWLY FORMED DIAGNOSTIC GROUP OF PFIZER, AND I WAS HIRED TO IDENTIFY NEW DIAGNOSTIC TECHNOLOGIES THAT WOULD ENABLE CLINICAL TRIALS.

Q.   WHAT DO YOU MEAN BY "DIAGNOSTIC TECHNOLOGY"?

A.   DIAGNOSTIC TECHNOLOGIES, OR DIAGNOSTICS, ARE, ACCORDING TO

THE FDA, THOSE ASSAYS, REAGENTS, INSTRUMENTS AND SYSTEMS FOR THE USE OF THE DIAGNOSIS OF DISEASE OR CONDITIONS OF HEALTH FOR THE PURPOSE OF TREATING, MITIGATING, CURING, OR PREVENTING DISEASE.

Q.   AND YOU WERE LOOKING FOR A POTENTIAL DIAGNOSTIC TECHNOLOGY THAT MIGHT BE OF INTEREST TO PFIZER?

A.   YES.

Q.   AND WHO DID YOU REPORT TO IN THIS 2008 TIME PERIOD?

A.   I REPORTED TO HAKAN SAKUL, THE DIRECTOR OF DIAGNOSTICS.

Q.   OKAY.  ARE YOU FAMILIAR WITH A COMPANY CALLED THERANOS?

A.   YES.

Q.   HOW DID YOU BECOME FAMILIAR WITH THERANOS?

A.   A NEW YORK CITY COLLEAGUE OF MINE IN MOLECULAR MEDICINES ASKED ME TO EXAMINE SOME TECHNOLOGY OF A COMPANY CALLED THERANOS.

Q.   AND WHO WAS THE COLLEAGUE?

A.   HIS NAME IS CRAIG LIPSET.

Q.   AND YOU MENTIONED SOMETHING CALLED MOLECULAR MEDICINE. WHAT IS THAT?  CAN YOU DESCRIBE THAT PART AT PFIZER?

A.   YES.  MOLECULAR MEDICINE IS THE LARGER GROUP THAT HOUSED THE UNIT OF DIAGNOSTICS THAT I WAS HIRED INTO.  MOLECULAR MEDICINE, IT WAS A 140-PERSON UNIT IN THE RESEARCH UNIT OF PFIZER.

Q.   AND WHAT DID MR. LIPSET ASK YOU TO DO?

A.   HE ASKED ME TO REVIEW SOME PACKAGES OF INFORMATION ON THE

SER-647

THERANOS TECHNOLOGY THAT HE HAD RECEIVED.

Q.   TO WHAT END?

A.   I WAS ASKED TO ASSESS ITS CAPABILITY, ITS PLAUSIBILITY, HOW IT POTENTIALLY COULD BE UTILIZED, IF THERE WAS A WAY TO UTILIZE THAT AT PFIZER FOR ITS CLINICAL TRIALS.

Q.   AND WAS THIS PART OF YOUR JOB RESPONSIBILITIES AT PFIZER?

A.   YES.

Q.   AND OVER THE COURSE OF TIME, DID YOU DO THIS FOR OTHER TECHNOLOGIES?

A.   YES.

            MR. LEACH:  YOUR HONOR, MAY I APPROACH THE WITNESS?

            THE COURT:  YES.

            MR. LEACH:  (HANDING.)

Q.   MR. WEBER, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS AND I'D LIKE YOU TO LOOK AT WHAT WE HAVE MARKED FOR IDENTIFICATION PURPOSES AS TRIAL EXHIBIT 143, WHICH SHOULD BE THE FIRST TAB IN YOUR BINDER.

A.   YES, I SEE THIS.

Q.   DOES THIS APPEAR TO BE AN EMAIL FROM ELIZABETH HOLMES TO CRAIG LIPSET AND AIDAN POWER DATED OCTOBER 11TH, 2008?

A.   IT IS.

Q.   AND DO YOU RECOGNIZE MR. LIPSET'S EMAIL ADDRESS AT PFIZER?

A.   I DO.

Q.   AND WHO IS AIDAN POWER?

A.   AIDAN POWER WAS THE VICE PRESIDENT OF MOLECULAR MEDICINE.

Q.   SO WAS HE WITHIN MR. LIPSET AND MR. SAKUL'S ORGANIZATION?

A.   YES.  CRAIG LIPSET AND HAKAN SAKUL WERE PART OF THE TEAM THAT REPORTED TO AIDAN POWER.

Q.   OKAY.  AND THE SUBJECT OF THIS EMAIL IS FOLLOW UP TO OUR MEETING.

     DO YOU SEE THAT?

A.   YES, I SEE THAT.

Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 3.

     DO YOU SEE AN ATTACHMENT TO THE EMAIL?

A.   I SEE THE THERANOS ATTACHMENT STUDY REPORT.

Q.   OKAY.  IN THE COURSE OF YOUR WORK IN EVALUATING THERANOS TECHNOLOGY, WERE YOU ASKED TO REVIEW VARIOUS REPORTS PROVIDED BY THERANOS?

A.   YES.

Q.   OKAY.

     YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 143.

          MR. CAZARES:  OBJECTION.  801, 104, 403.

          MR. LEACH:  I'M NOT OFFERING THIS FOR THE TRUTH, YOUR HONOR.

          THE COURT:  IS THIS THE ENTIRETY OF THIS?  IT LOOKS LIKE MULTIPLE PAGES, MR. LEACH.

          MR. LEACH:  YES, YOUR HONOR, THE ENTIRE EXHIBIT.

          THE COURT:  IT'S 27 PAGES?  29 PAGES?

          MR. LEACH:  YES, YOUR HONOR.

          THE COURT:  AND YOU'RE OFFERING THIS NOT FOR THE

TRUTH OF THE MATTER ASSERTED IN THESE DOCUMENTS?

MR. LEACH: CORRECT, YOUR HONOR.

THE COURT: BUT ONLY AS TO WHAT ISSUE?

MR. LEACH: ONLY TO SHOW THE EXCHANGE OF INFORMATION BETWEEN THERANOS AND PFIZER, NOT FOR THE TRUTH OF THE MATTERS IN THE EMAIL OR THE REPORT, BUT SIMPLY WHAT WAS SAID AND WHEN IT WAS SAID TO PFIZER.

THE COURT: ALL RIGHT. THANK YOU.

LADIES AND GENTLEMEN, THIS WILL BE ADMITTED.

AGAIN, THIS IS NOT ADMITTED -- THIS DOCUMENT, THE PAGES, 29 PAGES, WILL BE ADMITTED, BUT NOT FOR THE TRUTH OF THE MATTER ASSERTED IN THE DOCUMENT, THE LETTER, THE REPORT, AND SOME OTHER INFORMATION THAT YOU MAY SEE. IT'S NOT OFFERED FOR THE TRUTH OF ANY OF THAT, BUT RATHER TO SHOW THAT THERE WAS COMMUNICATION BETWEEN THESE TWO PARTIES.

IT WILL BE ADMITTED FOR THAT LIMITED PURPOSE.

MR. LEACH: THANK YOU, YOUR HONOR.

THE COURT: AND IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 143 WAS RECEIVED IN EVIDENCE.)

BY MR. LEACH:

Q. MR. WEBER, JUST TO ORIENT EVERYBODY --

AND, MS. WACHS, IF WE CAN ZOOM IN ON THE TOP PART OF THIS EMAIL?

-- DO YOU SEE MS. HOLMES'S NAME IN THE FROM LINE?

A. I DO.

Q.   AND YOU'RE NOT ON THIS PARTICULAR EMAIL, ARE YOU, MR. WEBER?

A.   NO, I AM NOT.

Q.   BUT YOUR COLLEAGUES ARE?  MR. POWER AND MR. LIPSET ARE IN THE TO LINE?

A.   YES.

Q.   AND DO YOU SEE WHERE IT SAYS THE SUBJECT IS THE FOLLOW UP TO OUR MEETING?

A.   YES.

Q.   AND I DRAW YOUR ATTENTION TO THE SECOND PARAGRAPH, OR THE THIRD PARAGRAPH WHERE IT SAYS, "I AM VERY PLEASED TO PRESENT YOU WITH THE FINAL DATA -- SEE THE ATTACHED STUDY REPORT."

     DO YOU SEE THAT LANGUAGE?

A.   I DO.

Q.   AND NOW IF WE CAN ZOOM OUT, MS. WACHS.

     AND DO YOU SEE DOWN AT THE BOTTOM THIS IS SIGNED BY -- IT APPEARS TO BE SIGNED BY MS. HOLMES.

A.   YES, I SEE THAT.

Q.   OKAY.  LET'S GO TO PAGE 3, PLEASE.

     DO YOU SEE THE TITLE, "THERANOS ANGIOGENESIS STUDY REPORT"?

A.   I DO.

Q.   AND DO YOU SEE THE THERANOS LOGO IN THE TOP LEFT CORNER?

A.   YES.

Q.   AND TO THE RIGHT THE HEADING CONFIDENTIAL?

A.   YES.

Q.   AND IN THE COURSE OF YOUR WORK, YOU WERE ASKED TO READ MATERIALS AND UNDERSTAND INFORMATION ABOUT THIS ANGIOGENESIS STUDY REPORT BY THERANOS?

A.   YES.

Q.   AND THERE'S A DOCUMENT OUTLINE?  DO YOU SEE THAT IN THE TOP --

A.   YES, I SEE THE DOCUMENT OUTLINE.

Q.   AND THERE'S A BULLET, ANGIOGENESIS PROGRAM OVERVIEW.  WHAT IS ANGIOGENESIS?

A.   ANGIOGENESIS IS THE PROCESS IN CANCER, AS A TUMOR GROWS, IT EXTENDS OUT MICRO BLOOD VESSELS IN THE TUMOR TO FEED ITSELF.

Q.   AND IF WE CAN ZOOM OUT, MS. WACHS.

DO YOU SEE IN THE DOCUMENT OUTLINE THERE'S THREE BULLETS FOR CONCLUSIONS?

A.   YES.

Q.   OKAY.  CONCLUSIONS INCLUDING GENERAL, TECHNICAL, AND ECONOMIC?

A.   YES, I SEE THAT.

Q.   LET'S GO TO PAGE 5 OF THE EXHIBIT, MS. WACHS.  AND IF WE CAN ZOOM IN ON THE TOP HALF.

DO YOU SEE THE HEADING "ANGIOGENESIS PROGRAM OVERVIEW"?

A.   YES, I SEE THAT.

Q.   AND IN THE SECOND PARAGRAPH IT SAYS, "FOR THIS PROGRAM, THERANOS WAS ASKED TO DEVELOP MULTIPLEXED POINT-OF-CARE ASSAYS

SER-652

FOR VEGF AND PLGF FOR USE IN MONITORING PATIENT'S

PHARMACODYNAMIC RESPONSE TO ANGIOGENESIS THERAPIES."

DO YOU SEE THAT?

A.   I DO.

Q.   IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF WHAT

THERANOS WAS DOING IN CONNECTION WITH PFIZER?

A.   YES, IT IS AS I REMEMBER IT.

Q.   OKAY.  WHAT IS VEGF?

A.   VEGF IS A PROTEIN CALLED -- I'LL GO SLOWER.

VEGF IS A PROTEIN MOLECULE.  IT'S THE ABBREVIATION FOR

VASCULAR EPIDEMIAL GROWTH FACTOR, AND IT'S ONE OF THE GROWTH

FACTORS THAT BINDS A RECEPTOR AND STIMULATES A CELL TO

INITIATE, OR A GROUP OF CELLS TO INITIATE THE DEVELOPMENT OF AN

EXTENSION OF BLOOD VESSELS TO RECRUIT BLOOD INTO A TUMOR.

Q.   AND PLGF, WHAT IS THAT?

A.   THAT STANDS FOR PLACENTAL GROWTH FACTOR.  IT IS ALSO ONE

OF THE GROWTH FACTORS THAT BINDS A RECEPTOR TO STIMULATE THE

GROWTH -- OUTGROWTH OF BLOOD VESSELS TO RECRUIT BLOOD VESSELS

TO GROW INTO THE TUMOR TO FEED ITSELF.

Q.   AND WAS IT YOUR UNDERSTANDING THAT THERANOS WAS DEVELOPING

ASSAYS TO MEASURE VEGF AND PLGF?

A.   YES.

Q.   IF WE CAN ZOOM OUT, MS. WACHS.

FURTHER DOWN THERE ARE SOME GOALS OF STUDY IN ITALICS.

DO YOU SEE THAT, MR. WEBER?

A.   I DO.

Q.   AND THE FIRST IS "GENERATE PRELIMINARY DATA ON VEGF AND PLGF TRENDS IN CANCER PATIENTS WHILE ASSESSING THE USE OF THERANOS SYSTEM IN THE HANDS OF CLINICIANS AND PATIENTS."

DO YOU SEE THAT LANGUAGE?

A.   I DO.

Q.   IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF WHAT THE GOAL OF THE STUDY BY THERANOS WAS?

A.   YES, AS I REMEMBER IT, YES IT IS HERE.

Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 5.

A.   OKAY.  YES, I SEE PAGE 5 HERE.

Q.   I'M SORRY.

A.   WE WERE ON PAGE 5.

Q.   THIS IS PAGE 5 OF THE REPORT.  IT'S PAGE 7 OF THE TRIAL EXHIBIT.

MY APOLOGIES, MS. WACHS.

A.   OKAY.  ALL RIGHT.  I SEE PAGE 7 HERE.

Q.   OKAY.  THERE'S AN IMAGE ROUGHLY HALFWAY DOWN THE PAGE.

DO YOU RECOGNIZE THAT?

A.   I RECOGNIZE IT.

Q.   OKAY.  WHAT DID YOU UNDERSTAND IT TO BE?

A.   I UNDERSTOOD IT TO BE, FROM THIS REPORT, TO BE THE THERANOS ASSAY PLATFORM BOX.

Q.   AND WAS THAT THE ASSAY PLATFORM BOX THAT PFIZER WAS EVALUATING?

A.   IT IS AS I UNDERSTOOD IT FROM THIS REPORT.

Q.   OKAY.  LET'S GO TO PAGE 26 OF THE EXHIBIT.

DO YOU SEE THERE'S A LISTING OF CONCLUSIONS, GENERAL,

TECHNICAL, AND ECONOMIC.

DO YOU SEE THOSE?

A.   I DO.

Q.   AND THIS IS ATTACHED TO AN EMAIL FROM MS. HOLMES TO

MR. LIPSET AND DR. POWER.

MY QUESTION TO YOU, MR. WEBER, IS, ARE THESE CONCLUSIONS

THAT YOU EVER REACHED IN YOUR REPORT?

A.   NO, I DID NOT, IN MY ROLE AS A DIAGNOSTIC EXPERT FOR

PFIZER, COME TO THESE CONCLUSIONS.

Q.   THESE WERE BEING HELD OUT TO YOU AS CONCLUSIONS THAT

THERANOS HAD REACHED?

A.   YES.

Q.   THANK YOU, MR. WEBER.

LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS 159.

DO YOU HAVE THAT EXHIBIT?

A.   I HAVE EXHIBIT 159, PAGE 1, IN FRONT OF ME HERE.

Q.   DO YOU SEE THERE APPEARS TO BE AN EMAIL FROM YOU TO AN

INDIVIDUAL NAMED GARY FRENZEL?

A.   I DO, YES.

Q.   AND WHO IS GARY FRENZEL?

A.   GARY FRENZEL WAS THE ASSAY DEVELOPMENT POINT PERSON AT

THERANOS THAT I WAS INTRODUCED TO BY EMAIL.

Q.   OKAY.   AND WHY WERE YOU EMAILING MR. FRENZEL ON OR ABOUT NOVEMBER 10TH, 2008?

A.   AS CRAIG LIPSET HANDED ME THIS ASSESSMENT PROCESS, HE HAD INTRODUCED ME BY EMAIL TO GARY FRENZEL, AND GARY FRENZEL AND I WERE PICKING UP THE DIRECT INTERACTION TOGETHER.

Q.   AND WAS THIS PART OF YOUR EFFORT TO EVALUATE THERANOS TECHNOLOGY?

A.   IT WAS.

Q.   AND DID YOU SEND THIS EMAIL IN THE ORDINARY COURSE OF PFIZER'S BUSINESS?

A.   YES.

Q.   AND WAS IT KEPT IN THE ORDINARY COURSE OF PFIZER'S BUSINESS?

A.   YES.

          MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 159.

          MR. CAZARES:  802, 104, 403.

          THE COURT:  AND THIS IS THE ENTIRETY OF THIS EXHIBIT?  IT LOOKS LIKE IT'S MULTIPLE PAGES?

          MR. LEACH:  YES, YOUR HONOR.

          THE COURT:  THERE'S NO STIPULATION TO THIS I TAKE IT.

          MR. LEACH:  THERE'S A STIPULATION FOR 901, AND OBJECTIONS UNDER 802, 104, AND 403.

          THE COURT:  RIGHT.  I'LL ADMIT THIS.  IT MAY BE

ADMITTED AND IT MAY BE PUBLISHED OVER OBJECTION.

(GOVERNMENT'S EXHIBIT 159 WAS RECEIVED IN EVIDENCE.)

MR. LEACH:  THANK YOU.

MS. WACHS, IF WE CAN PLEASE ZOOM IN ON THE BOTTOM PORTION OF THE EMAIL.

Q.   MR. WEBER, DO YOU SEE YOUR NAME IN THE FROM LINE?

A.   YES, I DO.

Q.   AND THE DATE IS NOVEMBER 10TH, 2008?

A.   IT IS.

Q.   IS THAT CONSISTENT WITH YOUR MEMORY OF THE TIME PERIOD WHEN YOU WERE REVIEWING THERANOS TECHNOLOGY?

A.   IT IS AS I REMEMBER IT.

Q.   OKAY.  AND YOU WROTE TO -- AND I SEE THE SUBJECT OF THIS EMAIL IS FOLLOW UP TO OUR MEETING.

DO YOU SEE THAT?

A.   YES.

Q.   I'D LIKE TO GO TO PAGE 4, IF WE COULD, OR PAGE 3.

DO YOU SEE DOWN AT THE BOTTOM THERE'S AN EMAIL FROM MR. LIPSET TO ELIZABETH HOLMES, YOURSELF, AND GARY FRENZEL?

A.   I DO.

Q.   AND NOW IF WE CAN GO TO PAGE 4, MS. WACHS.

AT THE TOP IT SAYS, "GARY -- PLEASE COORDINATE WITH SHANE WEBER WHO LEADS OUR DIAGNOSTICS GROUP HERE IN NY."

AND THEN AT THE BOTTOM, "ALL THE BEST, CRAIG."

DO YOU SEE THAT?

A.   I DO.

Q.   AND IS THAT MR. LIPSET GIVING YOU AND MR. FRENZEL DIRECTION TO COORDINATE ABOUT THIS TECHNOLOGY?

A.   IT IS.

Q.   LET'S GO BACK TO PAGE 3.

DO YOU SEE IN THE MIDDLE THERE'S AN EMAIL FROM MR. FRENZEL TO THE SAME GROUP WHERE HE WROTE, "HELLO SHANE,

"DO YOU THINK YOUR TEAM WILL BE AVAILABLE MONDAY THE 10TH?"

DO YOU SEE THAT LANGUAGE?

A.   YES.

Q.   AND AT SOME POINT DID YOU PARTICIPATE IN A CONFERENCE CALL WITH FOLKS AT THERANOS ABOUT THE TECHNOLOGY?

A.   I DID.

Q.   WE'LL GET TO THAT IN A MINUTE, BUT LET'S COMPLETE OUR REVIEW OF THE EMAIL IF WE COULD, GOING BACK TO PAGE 1.

IF WE CAN ZOOM IN ON THE BOTTOM HALF OF THE PAGE.

YOU WROTE TO MR. FRENZEL ON NOVEMBER 10TH.

"THANKS FOR YOUR PROMPT PHONE CALL TO ME ON FRIDAY.  YES, THURSDAY," AND HE GOES ON, "WORKS FOR A TELECONF."

"I AM SORRY THAT THERE HAVE BEEN MULTIPLE PFIZER POINTS OF CONTACT OVER THE YEARS FOR THERANOS."

DO YOU SEE THAT LANGUAGE?

A.   YES.

Q.   AND WHAT DID YOU MEAN BY THAT?

A.   WHAT I MEANT BY THAT IS HAVING WORKED AT LARGE CORPORATIONS, AS WELL AS STARTUP COMPANIES, I'M SYMPATHETIC TO SMALL COMPANIES INTERACTING WITH LARGE COMPANIES WHERE, OVER TIME, THEIR POINTS OF CONTACTS CHANGE AND MOVE.

AND SO I'M JUST TRYING TO KIND OF SMOOTH THE WATER HERE AND SAY, YOU KNOW, I'M FRIENDLY AND LET'S PICK UP THE CONVERSATION AND SEE WHERE THIS GOES.

Q.   YOU THEN WROTE, "I AM INTERESTED MORE BROADLY AS TO WHAT THE INSTRUMENT IS AND PLANNED TO BE AND NOT JUST IN UNDERSTANDING THE PERFORMANCE AND UTILITY OF THE THERANOS SYSTEM IN THE ONCOLOGY STUDY."

DO YOU SEE THAT LANGUAGE?

A.   I DO.

Q.   FIRST OF ALL, "THE INSTRUMENT," WHAT DID YOU MEAN BY THAT?

A.   THE INSTRUMENT, WHAT I MEANT BY THAT IS THE ASSAY BOX THAT WAS SEEN IN THE EARLIER POWERPOINT SLIDE DECK OF THE REPORT THAT WAS SENT TO ME BY THURSDAY THAT WE LOOKED AT TODAY.

Q.   AND THERE'S A REFERENCE TO AN ONCOLOGY STUDY.  WHAT DID YOU MEAN BY THAT?

A.   THE ONCOLOGY STUDY WAS THE STUDY THAT HAD BEEN INITIATED BY PFIZER WITH THERANOS TO LOOK AT THOSE ANGIOGENESIS BIOMARKERS, THE PLGF AND VEGF.

Q.   AND BY ONCOLOGY STUDY, ARE YOU USING THAT SYNONYMOUSLY WITH THE ANGIOGENESIS STUDY?

A.   YES, THAT SPECIFIC STUDY.

Q.   OKAY.  YOU THEN WROTE, "I AM RESPONSIBLE FOR PLATFORMS FOR WHICH PFIZER HAS A DIAGNOSTIC INTEREST AND FOR WHICH THERE IS CLINICAL VALIDATION."

IS THAT A FAIR SUMMARY OF YOUR RESPONSIBILITIES AT THE TIME?

A.   IT IS.  IT WAS.

Q.   AND THEN YOU WROTE, "AS WE AGREED IN OUR DISCUSSION, I WAS TO PROVIDE COPIES OF THE DOCUMENTS THAT I AM WORKING OFF OF SO WE ARE ON THE SAME PAGE AND SOME QUESTIONS OF INTEREST TO START OUR CONVERSATION ON THURSDAY."

DO YOU SEE THAT?

A.   I DO.

Q.   AND WHY WERE YOU -- AND THE REFERENCE TO THE CONVERSATION ON THURSDAY, IS THAT THE PHONE CALL THAT YOU HAD WITH THE FOLKS FROM THERANOS?

A.   THAT WOULD BE -- I'M REFERRING TO THE CONVERSATION THAT WAS GOING TO FOLLOW THIS.

Q.   OKAY.  YOU THEN WROTE, "FOR ME, THE GOAL IS TO UNDERSTAND THE THERANOS SYSTEM."

WAS THAT YOUR GOAL IN DECEMBER OF 2008?

A.   IT WAS.

Q.   BENEATH YOUR SIGNATURE YOU WROTE, "I HAVE THE THERANOS SUMMARY TO AIDAN POWER, THE INTRODUCTION TO THERANOS SYSTEMS, THE INFORMED CONSENT AND THE IRB SUBMISSION.  I HAVE READ THEM. I ATTACH THESE SO WE ARE ALL WORKING OFF THE SAME VERSIONS OF

THE DOCUMENTS."

DO YOU SEE THAT LANGUAGE?

A.   I DO.

Q.   AND WHY WERE YOU ALERTING MR. FRENZEL TO THAT?

A.   WHAT I FOUND IN THE COURSE OF MY INITIAL INTERACTIONS WITH OUTSIDE COMPANIES, IT'S ACTUALLY GOOD TO CONFIRM THAT WE'RE ACTUALLY TALKING ABOUT THE SAME DOCUMENTS AND THE SAME DATA SETS.  IT CREATES EFFICIENCY IN THE FUTURE DISCUSSIONS.

Q.   AND DID YOU, IN FACT, ATTACH THOSE TO THE EMAIL THAT YOU SENT TO MR. FRENZEL?

A.   I DID AS I REMEMBER IT.

Q.   OKAY.  LET'S LOOK AT ONE OF THE ATTACHMENTS BEGINNING ON PAGE 5.

DO YOU SEE THE HEADING, "THERANOS ANGIOGENESIS STUDY: REPORT PREPARED FOR DR. AIDAN POWER"?

A.   I DO.

Q.   AND DOES THIS APPEAR TO BE SIMILAR TO THE REPORT THAT WE REVIEWED IN EXHIBIT 143?

A.   IT'S A LONG DOCUMENT, BUT AS I SEE IT HERE, IT APPEARS TO BE LIKE THE OTHER DOCUMENT THAT WE LOOKED AT, THE OTHER THERANOS ANGIOGENESIS STUDY DOCUMENT.

Q.   AND DID YOU REVIEW THE ATTACHMENT TO EXHIBIT 159, BEGINNING AT PAGE 5, WITH SOME CARE AT THE TIME?

A.   YES, I DID.  IT'S AN EXTENSIVE DOCUMENTATION.

Q.   OKAY.  AND WAS THIS PART OF YOUR REVIEW IN EVALUATING

THERANOS TECHNOLOGY?

A.   IT WAS.

Q.   LET ME DRAW YOUR ATTENTION TO PAGE 12 OF THE DOCUMENT.

DO YOU SEE AT THE BOTTOM THERE ARE A NUMBER OF CONCLUSIONS?

A.   I DO.

Q.   AND THE FIRST ONE SAYS, "THE THERANOS SYSTEM PERFORMED WITH EQUIVALENT OR SUPERIOR PERFORMANCE TO REFERENCE ASSAYS WHILE RUNNING IN AN EXTREMELY RUGGED AMBULATORY ENVIRONMENT."

DO YOU SEE THAT?

A.   I DO.

Q.   WAS THAT YOUR CONCLUSION, MR. WEBER?

A.   NO, IT WAS NOT.

Q.   DID YOU EVER TELL THERANOS THAT THE THERANOS SYSTEM PERFORMED WITH EQUIVALENT OR SUPERIOR PERFORMANCE?

A.   NO, I DID NOT.

Q.   IF WE CONTINUE ON THE -- ON PAGE 13, THERE'S A CONCLUSION, "INTER-SYSTEM ACCURACY IS EXCELLENT."

DO YOU SEE THAT NUMBER 4?

A.   I DO.

Q.   AND IS THAT A CONCLUSION THAT YOU EVER REACHED IN THE COURSE OF YOUR REVIEW?

A.   NO, I DID NOT.

Q.   IN NUMBER 5 IT SAYS, "VEGF ASSAY ACCURACY IS GOOD FOR SOME CANCER PATIENT SUBJECTS, BUT SINCE THE SYSTEM RESPONDS TO TOTAL

Q. VEGF BUT NOT FREE VEGF, WE WERE NOT ABLE TO VERIFY ACCURACY FOR THE TNONC SAMPLES."

DO YOU SEE THAT?

A. I DO.

Q. IS THIS A CONCLUSION THAT YOU EVER REACHED?

A. NO, I DID NOT.

Q. AND THEN IN NUMBER 6 IT SAYS, "VEGFR2 ASSAY ACCURACY IS QUITE GOOD FOR TNONC VENOUS SAMPLES."

DO YOU SEE THAT?

A. I DO.

Q. IS THAT A CONCLUSION THAT YOU EVER REACHED?

A. NO, I DID NOT.

Q. AT SOME POINT YOU HAD A PHONE CALL -- OR BEFORE WE GET TO THE PHONE CALL, LET ME DRAW YOUR ATTENTION TO EXHIBIT 162.

MR. WEBER, DOES THIS APPEAR TO BE AN EMAIL FROM YOU TO GARY FRENZEL WITH THE SUBJECT FINAL REPORT?

A. IT DOES.

Q. AND THE DATE OF THIS EMAIL IS NOVEMBER 13TH, 2008?

A. YES.

Q. THIS IS DURING THE TIME PERIOD WHERE YOU WERE REVIEWING THERANOS TECHNOLOGY?

A. YES.

Q. OKAY. AND DO YOU SEE THAT THERE'S AN ATTACHMENT BEGINNING ON PAGE 3?

A. YES, I SEE THIS.

Q.   DOES THIS APPEAR TO BE ANOTHER ITERATION OF A THERANOS ANGIOGENESIS REPORT?

A.   IT DOES.

Q.   SITTING HERE TODAY, DO YOU HAVE A MEMORY OF RECEIVING THIS EMAIL?

A.   NO, SITTING HERE TODAY, I DON'T REMEMBER RECEIVING THIS EMAIL.  BUT CLEARLY I'M ON THIS EMAIL, AND IN THE COURSE OF MY NORMAL PRACTICE, I WOULD HAVE LOOKED AT THIS.

Q.   DO YOU HAVE ANY REASON TO DOUBT THAT YOU LOOKED AT IT?

A.   NO.

Q.   AND DURING THE TIME PERIOD, DID YOU TAKE CARE TO REVIEW ANY INFORMATION YOU COULD FIND ABOUT THERANOS DURING THE COURSE OF YOUR REVIEW?

A.   YES.

          MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 162.

          MR. CAZARES:  OBJECTION.  104, 802 AND 403.

          THE COURT:  THE OBJECTION IS OVERRULED.  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

     (GOVERNMENT'S EXHIBIT 162 WAS RECEIVED IN EVIDENCE.)

BY MR. LEACH:

Q.   MR. WEBER, LET ME DRAW YOUR ATTENTION TO THE FIRST EMAIL DOWN THE CHAIN.

     IT SAYS, "HI SHANE, IT SEEMS THAT YOU DID NOT HAVE THE FINAL REPORT.  I HAVE ATTACHED IT AND THE NDA TO THIS EMAIL.

ELIZABETH IS WORKING ON SOME OF THE OTHER DOCUMENTS AND WE WILL BE GETTING THEM TO YOU SOON.  LOOKING FORWARD TO THE MEETING ON THURSDAY.  GARY."

DO YOU SEE THAT LANGUAGE?

A.   YES.

Q.   AND THIS WAS DURING THE TIME PERIOD THAT YOU WERE EVALUATING THERANOS TECHNOLOGY?

A.   YES.

Q.   AND THERE IS A REFERENCE TO AN NDA.  WHAT IS AN NDA?

A.   NDA STANDS FOR NONDISCLOSURE AGREEMENT.

Q.   OKAY.  AND IF WE CAN LOOK BRIEFLY AT PAGE 3.

I'M NOT GOING TO GO THROUGH THE ENTIRE DOCUMENT, MR. WEBER, BUT DO YOU SEE THE HEADING "THERANOS ANGIOGENESIS STUDY REPORT"?

A.   I DO.

Q.   AND DO YOU SEE "PREPARED BY DR. AIDAN POWER, PFIZER INC.?

A.   I DO.

Q.   AND THERE'S A LIST OF CONCLUSIONS IN THE DOCUMENT OUTLINE?

A.   YES, CONCLUSIONS.

Q.   LIKE WE HAVE SEEN IN SOME OF THE OTHER EXHIBITS?

A.   YES.

Q.   LET ME NOW ASK YOU ABOUT THE PHONE CALL THAT YOU HAD WITH FOLKS FROM THERANOS.

DID MS. HOLMES PARTICIPATE IN THAT CALL?

A.   YES, MS. HOLMES DID.

SER-665

Q.   OKAY.  WERE THERE OTHERS FROM THERANOS ON THE CALL?

A.   YES, THERE WERE OTHERS.

Q.   OKAY.  WAS MR. BALWANI ON THE CALL?

A.   I DON'T KNOW.

Q.   OKAY.  HAVE YOU EVER MET MR. BALWANI?

A.   NOT THAT I KNOW OF.

Q.   OKAY.  DURING THIS PHONE CALL WITH MS. HOLMES, DID YOU ASK
HER QUESTIONS ABOUT HER TECHNOLOGY AND WHAT IT COULD DO?

A.   I DID.

Q.   AND BRIEFLY DESCRIBE WHAT HAPPENED.

A.   IN A ONE HOUR CALL WHERE THERE WERE AT LEAST FIVE OR SIX
OTHER THERANOS ATTENDEES, ELIZABETH -- MS. ELIZABETH HOLMES
ONLY SPOKE AND NO ONE ELSE IN THE ROOM SPOKE.

     AND SHE ANSWERED -- MS. ELIZABETH HOLMES ANSWERED A NUMBER
OF QUESTIONS AND MADE A NUMBER OF STATEMENTS TO ME.

Q.   OKAY.  WHAT DID SHE SAY?

          MR. CAZARES:  OBJECTION.  HEARSAY.

          MR. LEACH:  I'M NOT OFFERING THESE FOR THE TRUTH,
YOUR HONOR.  I'M OFFERING THEM FOR THE REPRESENTATIONS DURING
THE COURSE OF HIS EVALUATION, BUT NOT FOR THE TRUTH.

          THE COURT:  SO THIS GOES AS TO HIS EVALUATIONS OF
THE REPORT THAT HE WAS TASKED TO ACCOMPLISH?

          MR. LEACH:  YES, YOUR HONOR.

          THE COURT:  ALL RIGHT.  SO I'LL ADMIT AND ALLOW
MR. WEBER, DR. WEBER TO TESTIFY AS TO THIS CONVERSATION.  THE

WORDS, HOWEVER, ARE NOT FOR THE TRUTH OF THE MATTER ASSERTED,

BUT ONLY AS TO INFORM THE DOCTOR AS TO HIS FINAL REPORT.

AND YOU CAN ASK THE QUESTION AGAIN.

BY MR. LEACH:

Q.   WHAT DO YOU RECALL MS. HOLMES SAYING ON THE CALL?

A.   SHE SAID MANY THINGS, YOU KNOW, MANY SWEEPING THINGS THAT

I DIDN'T FEEL WERE SUPPORTED BY THE DATA PACKAGES THAT HER AND

HER TEAM HAD SENT TO ME.

Q.   AND DID YOU USE THIS INFORMATION IN THE PHONE CALL IN THE

COURSE OF YOUR EVALUATION OF THERANOS'S TECHNOLOGY?

A.   I DID.   THERE WERE, LIKE, SIX BROAD QUESTIONS THAT I KEPT

REPEATEDLY ASKING TO INFORM MY ASSESSMENT.

Q.   OKAY.   DID YOU EVER RECEIVE SATISFACTORY ANSWERS?

A.   NO.

Q.   AT SOME POINT IN TIME, DID YOU PREPARE A REPORT FOR YOUR

COLLEAGUES AT PFIZER WITH RECOMMENDATIONS ABOUT WHAT TO DO

VIS-A-VIS THERANOS?

A.   I DID.

Q.   LET ME PLEASE DRAW YOUR ATTENTION TO EXHIBIT 167.

DO YOU RECOGNIZE THIS DOCUMENT?

A.   I DO RECOGNIZE THIS DOCUMENT.

Q.   WHAT IS IT?

A.   IT'S A SUMMARY REPORT THAT I PREPARED ON THE THERANOS

TECHNOLOGY TO SEND TO MY LINE MANAGERS, HAKAN SAKUL,

CRAIG LIPSET, AND DR. AIDAN POWER.

Q.   DID YOU PREPARE THIS IN THE ORDINARY COURSE OF PFIZER'S BUSINESS?

A.   YES.

Q.   DID YOU PREPARE IT AT -- OR FROM INFORMATION PROVIDED TO YOU BY THERANOS AT OR AROUND THE TIME OF THE REPORT?

A.   YES.

Q.   WAS THIS MAINTAINED IN THE ORDINARY COURSE OF PFIZER'S BUSINESS?

A.   YES.

Q.   AND WAS IT YOUR PRACTICE TO PREPARE REPORTS AND KEEP THEM IN THE COURSE OF YOUR TECHNOLOGY REVIEWS?

A.   YES.

MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 167.

MR. COOPERSMITH:  OBJECTION.  RELEVANCE.  702 AND 403 AS TO CONCLUSIONS, AND PEJORATIVE --

THE COURT:  SAY AGAIN.

MR. CAZARES:  403 AS TO CONCLUSIONS AND PEJORATIVE ASSERTIONS IN THE REPORT.

(PAUSE IN PROCEEDINGS.)

THE COURT:  ALL RIGHT.  THANK YOU.

I WILL ADMIT THIS OVER OBJECTION.  IT MAY BE PUBLISHED.

THE PROBATIVE VALUE OF THIS OUTWEIGHS ANY UNFAIR PREJUDICE, AND AS TO ANY PEJORATIVE NATURE, IT'S PART OF THE REPORT AND THE OPINION AND THE REVIEW OF THE DOCTOR.

SER-668

AND SO IT'S ADMITTED AND IT MAY BE PUBLISHED.

(GOVERNMENT'S EXHIBIT 167 WAS RECEIVED IN EVIDENCE.)

MR. LEACH:  THANK YOU, YOUR HONOR.

MAY I HAVE A MOMENT, YOUR HONOR?

THE COURT:  YES.

(DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

MR. LEACH:  YOUR HONOR, MAY I USE THE ELMO FOR THIS PARTICULAR EXHIBIT?

THE COURT:  YES.

MR. LEACH:  AND, MS. ROBINSON, MAY I RETRIEVE YOUR COPY?  MINE HAS MARKS THAT I DON'T THINK ARE APPROPRIATE FOR THE JURY.

THE CLERK:  (HANDING.)

MR. LEACH:  THANK YOU SO MUCH.

Q.  MR. WEBER, ARE YOU ABLE TO SEE THAT ON THE SCREEN?

A.  I AM.

Q.  OKAY.  AND DO YOU SEE THE HEADING "DIAGNOSTICS REVIEW OF THERANOS'S TECHNOLOGY AND FINAL RECOMMENDATIONS"?

A.  I DO.

Q.  AND IS THAT THE -- AND THIS IS SOMETHING THAT YOU AUTHORED?

A.  YES, I WROTE THIS.

Q.  OKAY.  YOU WROTE IN THE OVERVIEW, "THERANOS SYSTEMS PURPORTS TO HAVE A PATIENT HOME USE IMMUNOASSAY INVITRO DIAGNOSTIC PLATFORM."

DO YOU SEE THAT?

A.   I DO.

Q.   AND WAS THAT YOUR UNDERSTANDING OF WHAT THERANOS WAS OFFERING AT THE TIME?

A.   YES, IT WAS.

Q.   YOU THEN WROTE, "THE PURPOSE OF THIS REVIEW WAS TO CLOSE THE LOOP ON PREVIOUS EFFORTS FOR THERANOS TO LOOK FOR BUSINESS OPPORTUNITIES WITH PFIZER."

DO YOU SEE THAT LANGUAGE?

A.   I DO.

Q.   "AND TO MAKE FINAL RECOMMENDATIONS REGARDING POTENTIAL FUTURE ATTEMPT FOR THERANOS TO ENGAGE DIFFERENT PARTS OF PFIZER IN THEIR PLATFORM."

IS THAT THE SUMMARY OF THE PURPOSE OF YOUR WORK?

A.   YES.

Q.   OKAY.  YOU THEN HAVE A NUMBER OF RECOMMENDATIONS.

DO YOU SEE THAT?

A.   I DO.

Q.   YOU WROTE, "THERANOS DOES NOT AT THIS TIME HAVE ANY DIAGNOSTIC OR CLINICAL INTEREST TO PFIZER."

DO YOU SEE THAT LANGUAGE IN NUMBER 1?

A.   I DO.

Q.   WAS THAT YOUR RECOMMENDATION?

A.   IT WAS.

Q.   WHY WAS THAT YOUR RECOMMENDATION?

A.    IT WAS MY RECOMMENDATION THAT THEIR RESEARCH USE ONLY CAPABILITY DID NOT HAVE PERFORMANCE CAPABILITY AND IT WAS NOT A DIAGNOSTIC, AND IT WAS NOT ON THE CLINICAL INTEREST PATH FOR THE PFIZER STUDIES IN ONCOLOGY THAT WE WERE SEARCHING FOR DIAGNOSTICS FOR.

Q.    YOU THEN WROTE, "IT IS RECOMMENDED THAT NO FURTHER FINANCIAL INVESTMENT OR CLINICAL SAMPLE RESOURCES BE EXTENDED TO THERANOS."

DO YOU SEE THAT IN PARAGRAPH 2?

A.    I DO.

Q.    AND WAS THAT YOUR RECOMMENDATION?

A.    YES.

Q.    AND WHY WAS THAT YOUR RECOMMENDATION?

A.    IT WAS MY RECOMMENDATION BECAUSE IF THERE'S NO CLINICAL INTEREST USE, NO DIAGNOSTIC INTEREST USE, THERE'S NO POINT INVESTING FURTHER RESOURCES INTO A PLATFORM.

Q.    YOU THEN WROTE IN NUMBER 3, "GOING FORWARD, THERANOS SHOULD BE MONITORED BY MOLECULAR MEDICINE'S DIAGNOSTIC GROUP."

DO YOU SEE THAT?

A.    I DO.

Q.    AND WHAT IS THE MOLECULAR MEDICINE'S DIAGNOSTIC GROUP?

A.    THE MOLECULAR MEDICINE DIAGNOSTIC GROUP IS THE GROUP OF THE THREE OF US INSIDE OF MOLECULAR MEDICINE WHO HAD THE AUTHORITY AND RESPONSIBILITY TO ACT ON ALL DIAGNOSTICS FOR PFIZER.

Q. AND WHY WAS IT YOUR RECOMMENDATION THAT THERANOS SHOULD BE MONITORED BY MOLECULAR MEDICINE'S DIAGNOSTIC GROUP GOING FORWARD?

A. IN SMALL RESEARCH COMPANIES, AS THEY WORK ON THEIR PLATFORMS, THINGS EVOLVE, THINGS MIGHT CHANGE, SO WE WANT TO KEEP IN TOUCH.

Q. OKAY. FURTHER BELOW IN YOUR MEMO, THERE'S A HEADING, "REVIEW AND COMMENTS ON THERANOS PROVIDED INFORMATION."

DO YOU SEE THAT?

A. I DO.

Q. YOU THEN WROTE, "THE TECHNICAL ASSESSMENT REVIEW PROCESS CONSISTED OF EXAMINING THERANOS CONFIDENTIAL SUMMARY REPORTS, READING THEIR PUBLIC PATENT PUBLICATIONS, HEARING THEIR STORY IN A ONE HOUR TELECONFERENCE WITH QUESTIONS AND ANSWERS, READING THEIR ANSWERS TO A WRITTEN SET OF TECHNICAL DUE DILIGENCE QUESTIONS SUBMITTED TO THEM, SURVEYING THE WEB FOR PUBLIC INFORMATION," AND THEN IT CONTINUES.

DO YOU SEE THAT?

A. YES.

Q. IS THAT A FAIR SUMMARY OF THE INFORMATION THAT YOU REVIEWED?

A. YES.

Q. LET'S GO TO PAGE 2 OF YOUR MEMO.

DO YOU SEE WHERE YOU WROTE, "THE INTRODUCTION TO THERANOS SYSTEMS SLIDE DECK DOES NOT CONTAIN SUFFICIENT INFORMATION ON

SER-672

THEIR PLATFORM TO DEMONSTRATE INVITRO DIAGNOSTIC ASSAY OR

PLATFORM CAPABILITY."

    DO YOU SEE THAT?

A.   I DO.

Q.   WAS THAT YOUR ASSESSMENT AT THE TIME?

A.   YES.

Q.   YOU THEN WROTE, "THERANOS HAS PROVIDED A POORLY PREPARED

SUMMARY DOCUMENT OF THEIR PLATFORM FOR HOME PATIENT USE WITH

THE ANTI-ANTIGENIC THERAPIES."

    DO YOU SEE THAT?

A.   I DO.

Q.   IS THAT A REFERENCE TO THE ANGIOGENESIS STUDY REPORT THAT

WE LOOKED AT PREVIOUSLY?

A.   IT IS.  IT WAS.

Q.   IN THE BULLETS YOU WROTE, "THERANOS SYSTEMS IN THE SLIDE

DECK STATES 'HUGE VARIATION BETWEEN SUBJECTS, BOTH ABSOLUTE

LEVELS AND CHANGES OVER TIME VARY GREATLY.'  NO DISCUSSION OR

RIGOROUS GRAPHICAL MULTI-PARAMETER QUANTITATIVE ANALYSIS OF THE

PATIENT COHORT WAS DONE."

    DO YOU SEE THAT?

A.   I DO.

Q.   AND WAS THAT DONE?

A.   IT WAS.

Q.   AND YOU THEN WROTE, "THERANOS UNCONVINCINGLY ARGUES THE

CASE FOR HAVING ACCOMPLISHED TASKS OF INTEREST TO PFIZER."

DO YOU SEE THAT?

A.   I DO.

Q.   AND WAS THAT A RECOMMENDATION TO YOUR BOSSES AT THE TIME?

A.   IT WAS.

Q.   AND WHY WAS THAT?

A.   THE DATA AND INFORMATION PROVIDED IN THE SUMMARY REPORT DIDN'T SUPPORT THE LARGE CONCLUSIONS THAT THERANOS HAD LISTED IN THEIR REPORT IN MY PROFESSIONAL DIAGNOSTIC OPINION.

Q.   YOU THEN WROTE IN 3, "THE NINE CONCLUSIONS IN THEIR SUMMARY DOCUMENT ARE NOT BELIEVABLE BASED ON THE INFORMATION PROVIDED."

DO YOU SEE THAT?

A.   I DO.

Q.   IS THAT IN REFERENCE TO SOME OF THE CONCLUSIONS THAT WE HAVE REVIEWED PREVIOUSLY?

A.   YES, IT WAS.

Q.   LET ME DRAW YOUR ATTENTION TO THE THIRD PAGE.  DO YOU SEE THE HEADING "DUE DILIGENCE QUESTIONS VERBALLY ASKED TO THERANOS IN THE NOVEMBER 13TH TELECONFERENCE"?

A.   YES, I DO.

Q.   AND IS THAT IN REFERENCE TO THE TELEPHONE CALL THAT YOU HAD WITH MS. HOLMES AND OTHERS ON HER TEAM?

A.   YES.

Q.   AND WHY WERE YOU INCLUDING THIS INFORMATION IN THE REPORT?

A.   I WAS INCLUDING THIS INFORMATION IN THE REPORT TO DOCUMENT

WHAT INFORMATION WE WERE SEARCHING FOR AND WHAT WE WERE NOT GETTING IN THE INTERACTION.

Q.    FURTHER BELOW YOU WROTE, "DUE DILIGENCE QUESTIONS SENT NOVEMBER 17TH TO THERANOS AND THEIR NOVEMBER 27TH ANSWERS."

DO YOU SEE THAT?

A.    YES, I DO.

Q.    OKAY.  AND DOES THIS ACCURATELY SUMMARIZE QUESTIONS THAT YOU PUT TO FOLKS AT THERANOS ABOUT THEIR TECHNOLOGY?

A.    YES.  EACH QUESTION IS LISTED AS I SENT IT TO THEM, AND THEN IMMEDIATELY BEHIND IT IS THE RESPONSE THAT I RECEIVED FROM THERANOS.

Q.    SO USING THE FIRST QUESTION AS AN EXAMPLE, IN THE SUMMARY DOCUMENT YOU REFER TO MEETING WITH THE PFIZER TEAM.

WHO WAS THE PFIZER TEAM?

DO YOU SEE THAT?

A.    I DO.

Q.    AND WAS THAT YOUR QUESTION?

A.    THAT WAS MY QUESTION.

Q.    AND THEN IT SAYS ANGELIKI KOSTIANTI.

DO YOU SEE THAT?

A.    YES, I DO.

Q.    AND WAS THAT THE ANSWER THAT YOU GOT TO THE QUESTION?

A.    THAT WAS THE ANSWER I GOT -- RECEIVED FOR THE QUESTION.

Q.    OKAY.  AND THAT ITERATION WOULD HOLD TRUE FOR THE ADDITIONAL NUMBERS IN THIS REPORT?

A.   YES.

Q.   AFTER YOU SENT YOUR REPORT TO -- WELL, WHO DID YOU SEND THIS REPORT TO?

A.   I SENT THIS REPORT TO CRAIG LIPSET, HAKAN SAKUL, AND AIDAN POWER, THE HEAD OF MOLECULAR MEDICINE.

Q.   OKAY.  DID PFIZER FOLLOW YOUR RECOMMENDATION?

A.   YES, AS FAR AS I KNOW.

Q.   OKAY.  DID ANYBODY DISAGREE WITH THE CONCLUSIONS IN YOUR REPORT?

A.   I RECEIVED NO DISAGREEMENT FROM THE THREE PEOPLE I SENT IT TO.

Q.   LET ME DRAW YOUR ATTENTION, MR. WEBER, TO WHAT HAS BEEN MARKED AS EXHIBIT 174.

A.   YES, I SEE THIS.

Q.   OKAY.  IS THIS AN EMAIL BETWEEN YOU AND AIDAN POWER, WITH A COPY TO CRAIG LIPSET AND HAKAN SAKUL AT PFIZER?

A.   IT IS.

Q.   AND DO YOU SEE THE SUBJECT, THERANOS WRAP UP?

A.   YES.

Q.   AND ARE YOU REPORTING ON A CONVERSATION THAT YOU HAD WITH MS. HOLMES IN OR AROUND JANUARY OF 2009?

A.   YES.

Q.   OKAY.  DID YOU SEND THIS EMAIL IN THE ORDINARY COURSE OF PFIZER'S BUSINESS?

A.   YES.

Q.   DID YOU PREPARE IT AT OR FROM INFORMATION AVAILABLE TO YOU AT THE TIME?

A.   YES.

Q.   AND WAS IT PFIZER'S PRACTICE TO KEEP AND RETAIN EMAILS LIKE THIS IN THE ORDINARY COURSE OF ITS BUSINESS?

A.   YES, IT CLEARLY IS.

MR. LEACH:  OKAY.  YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 174.

MR. CAZARES:  OBJECTION.  DOUBLE HEARSAY AND 403, PARTICULARLY AS TO PARAGRAPH 2.

MR. LEACH:  I THINK WE'VE LAID THE FOUNDATION UNDER 803(6), YOUR HONOR.

THE COURT:  YES, IT'S ADMITTED UNDER 803(6).  AND IT MAY BE PUBLISHED.

MR. LEACH:  THANK YOU, YOUR HONOR.

(GOVERNMENT'S EXHIBIT 174 WAS RECEIVED IN EVIDENCE.)

BY MR. LEACH:

Q.   MR. WEBER, DO YOU SEE YOUR NAME IN THE FROM LINE?

A.   YES, I DO.

Q.   OKAY.  AND IF WE CAN ZOOM IN ON THE TOP HALF.  THAT'S GREAT, MS. WACHS.

AND THIS IS AN EMAIL THAT YOU SENT TO AIDAN POWER WITH A COPY TO MR. LIPSET AND A COPY TO HAKAN SAKUL?

A.   YES.

Q.   AND YOU WROTE, "HI AIDAN,

"TODAY I SPOKE WITH ELIZABETH HOLMES, CEO" --

IS THAT WHAT YOU DID?

A.   YES.

Q.   -- "CEO THERANOS AND EXPLAINED TO HER THAT PFIZER DID NOT HAVE AT THIS TIME A FORESEEABLE USE FOR THE THERANOS IMMUNOASSAY DEVICE FOR AT PATIENT SELF USE AT HOME BUT SHE AND I AGREED TO STAY IN TOUCH EVERY SIX MONTHS."

IS THAT A FAIR SUMMARY OF WHAT YOU CONVEYED TO MS. HOLMES?

A.   YES.

Q.   AND WAS MR. BALWANI ON THAT PHONE CALL?

A.   NOT AS FAR AS I KNOW, AND NOT AS FAR AS I REMEMBER.

Q.   OKAY.  AND YOU THEN WROTE, "I WAS POLITE, CLEAR, CRISP, AND PATIENTLY FIRM AS SHE PUSHED BACK.  SHE ASKED FOR OTHER NAMES AT PFIZER TO APPROACH AND I POLITELY DEFLECTED."

IS THAT A FAIR SUMMARY OF WHAT HAPPENED?

A.   YES.

Q.   "I DID RECEIVE HER CONFIRMATION THAT THERANOS HAD BEEN PAID IN FULL FOR THE PREVIOUS ALLIANCE CONTRACT."

DO YOU SEE THAT?

A.   YES.

Q.   AND WHAT DID YOU MEAN BY "THE PREVIOUS ALLIANCE CONTRACT"?

A.   WHAT I MEANT BY THAT WAS THE FUNDING FOR THE STUDY THAT THERANOS AND PFIZER HAD DONE WAS PAID BY A STRATEGIC ALLIANCE FUND POOL AND THAT IT DID NOT COME FROM THE MOLECULAR MEDICINE BUDGET.

Q.   AND YOU WROTE IN THE NEXT PARAGRAPH, "I HAD CONFIRMED THIS BEFOREHAND AND THAT IT CAME OUT OF STRATEGIC ALLIANCE BUDGE, AND NOT MM BUDGET."

WHY WAS THAT INFORMATION RELEVANT?

A.   WELL, ONCE AGAIN, HAVING WORKED AT SMALL COMPANIES, AS WELL AS LARGE COMPANIES, I'M SYMPATHETIC TO SMALL COMPANIES BEING PAID ON A TIMELY BASIS FOR THEIR WORK.

BUT I ALSO, IN A LARGE COMPANY WHERE MASSIVE REORGANIZATION WAS ONGOING AT THIS TIME AND BUDGET WAS BEING RESTRAINED, I WANTED TO BE RESPECTFUL OF MOLECULAR MEDICINE'S BUDGET AND AIDAN POWER'S DIRECTION OF THAT.

Q.   AFTER THIS -- TO YOUR KNOWLEDGE, AFTER SENDING THIS EMAIL IN OR AROUND JANUARY 3RD, 2009, PUTTING ASIDE THE ANGIOGENESIS STUDY, TO YOUR KNOWLEDGE, DID PFIZER EVER PAY THERANOS MONEY IN CONNECTION WITH ANY WORK?

A.   NOT TO MY KNOWLEDGE.

Q.   TO YOUR KNOWLEDGE, WERE THERE ANY OTHER STUDIES ANALOGOUS, EXCUSE ME, TO THE ANGIOGENESIS STUDY?

A.   NOT TO MY KNOWLEDGE.

Q.   OKAY.  LET ME DRAW -- OR IF WE COULD PLEASE, WITH THE COURT'S PERMISSION, DISPLAY WHAT IS IN EVIDENCE AS EXHIBIT 4858.

MR. WEBER, DO YOU SEE THE TITLE THERANOS CONFIDENTIAL OVERVIEW?

A.   UM --

Q.   IT'S NOT IN YOUR BINDER, SIR.  IT'S JUST ON THE SCREEN.

A.   OH, IT'S JUST ON THE SCREEN.

          MR. CAZARES:  YOUR HONOR, I WAS GOING TO RAISE A FOUNDATION ARGUMENT, OR OBJECTION, TO USE OF THIS EXHIBIT WITH THIS WITNESS REGARDING WHERE I HAD BELIEVE MR. LEACH IS GOING.

          THE COURT:  MR. LEACH, ARE YOU GOING TO ASK SOME FOUNDATIONAL QUESTIONS ABOUT THIS?

          MR. LEACH:  YES, YOUR HONOR.  I THINK THIS RELATES TO AN EARLIER DISCUSSION WE HAD.

          THE COURT:  YES.

          MR. LEACH:  THIS IS IN EVIDENCE.  I INTEND TO ASK HIM HIS KNOWLEDGE ABOUT PARTICULAR PORTIONS OF THIS.

          MR. CAZARES:  AND I WOULD REITERATE THIS MORNING'S OBJECTIONS, YOUR HONOR.

          THE COURT:  NOTED.

     YOU CAN CONTINUE.

          MR. LEACH:  THANK YOU.

     LET'S PLEASE GO TO PAGE 104.

     IF WE CAN ZOOM IN AT THE TOP HALF CAPTURING THE PORTION, CONCLUSIONS.

Q.   MR. WEBER, DO YOU SEE THE PFIZER LOGO IN THE TOP LEFT CORNER OF THIS?

A.   I DO.

Q.   OKAY.  AT ANY POINT DID YOU AUTHORIZE THERANOS TO PUT A PFIZER LOGO ON THE ANGIOGENESIS REPORT?

A.   NO, I DID NOT.

            MR. CAZARES:  OBJECTION.

            THE COURT:  I'M SORRY?

            MR. CAZARES:  OBJECTION.

            THE COURT:  OVERRULED.  THE ANSWER WILL REMAIN.

            THE WITNESS:  NO, I DID NOT APPROVE THE USE OF THE

PFIZER LOGO ON THIS DOCUMENT.

BY MR. LEACH:

Q.   OKAY.  AT ANY POINT DID YOU APPROVE PROVIDING A THERANOS

ANGIOGENESIS STUDY REPORT TO THERANOS INVESTORS?

            MR. CAZARES:  OBJECTION.

            THE COURT:  OVERRULED.

            THE WITNESS:  NO, I DID NOT.

BY MR. LEACH:

Q.   OKAY.  LET'S GO TO PAGE, ABOUT 20 PAGES FURTHER.  A LITTLE

MORE, PLEASE.  I THINK IT'S PAGE 26 OF THE REPORT.  A LITTLE

MORE.  THERE WE GO.

     DO YOU SEE THE HEADING CONCLUSIONS?

A.   I DO.

Q.   NUMBER 1 SAYS, "THE THERANOS SYSTEM PERFORMED WITH

SUPERIOR PERFORMANCE TO REFERENCE ASSAYS WHILE RUNNING A

COMPLEX AMBULATORY ENVIRONMENT."

     DO YOU SEE THAT?

A.   I DO.

Q.   WAS THAT A CONCLUSION THAT PFIZER REACHED?

A. NO.

Q. OKAY. IN FACT, DID YOU REACH THE OPPOSITE CONCLUSION?

A. I REACHED THE OPPOSITE CONCLUSION.

Q. OKAY. WERE ANY OF THE CONCLUSIONS LISTED HERE IN THIS DOCUMENT CONCLUSIONS THAT PFIZER REACHED?

A. NO.

Q. OKAY. DID YOU EVER TELL ANYBODY FROM THERANOS THAT IT HAD REACHED THESE CONCLUSIONS, OR THAT PFIZER HAD REACHED THESE CONCLUSIONS?

A. NO, I DID NOT.

Q. OKAY. THANK YOU, MS. WACHS. WE CAN TAKE THAT DOWN.

WE LOOKED EARLIER AT A REPORT THAT YOU PREPARED FOR MR. LIPSET, MR. SAKUL, THE WORK ON YOUR REPORT RELATING TO THERANOS TECHNOLOGY?

A. YES.

Q. AFTER YOUR REPORT, TO YOUR KNOWLEDGE, DID PFIZER EVER DO ANY WORK WITH THERANOS?

A. NOT TO MY KNOWLEDGE.

Q. DID PFIZER EVER PAY MONEY TO THERANOS AFTER THAT REPORT?

A. NOT THAT I WAS AWARE OF.

Q. TO YOUR KNOWLEDGE, DID PFIZER EVER ENTER INTO ANY REVENUE GENERATING ARRANGEMENTS WITH THERANOS?

A. NOT THAT I WAS AWARE OF.

Q. DID YOU EVER TELL ANYONE AT THERANOS THAT PFIZER VALIDATED THERANOS'S TECHNOLOGY?

A.   NO, I DID NOT.

Q.   DO YOU AGREE WITH THE STATEMENT THAT PFIZER VALIDATED THERANOS'S TECHNOLOGY?

A.   NO, I DO NOT.

Q.   OKAY.  IN FACT, DID YOU COME TO THE OPPOSITE CONCLUSION?

A.   I CONCLUDED THE OPPOSITE.

          MR. LEACH:  YOUR HONOR, MAY I HAVE A MOMENT?

          THE COURT:  YES.

     (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

          MR. LEACH:  I HAVE NO FURTHER QUESTIONS.

     THANK YOU, MR. WEBER.

          THE COURT:  CROSS-EXAMINATION?

          MR. CAZARES:  YES, YOUR HONOR.

     YOUR HONOR, MAY I REMOVE MY MASK?

          THE COURT:  YES.

          MR. CAZARES:  THANK YOU.

                    **CROSS-EXAMINATION**

BY MR. CAZARES:

Q.   GOOD MORNING, MR. WEBER.  MY NAME IS STEPHEN CAZARES AND I REPRESENT MR. BALWANI.  I JUST HAVE A FEW QUESTIONS FOR YOU THIS MORNING.  WOULD THAT BE OKAY?

A.   THAT WOULD BE OKAY.

     GOOD MORNING, STEVE.

Q.   SO JUST TO REVERT BACK TO YOUR TESTIMONY THIS MORNING EARLIER ABOUT YOUR ROLE AT PFIZER DURING THIS TIME PERIOD, AND

YOU INDICATED THAT YOU JOINED PFIZER IN MID-2008 OR SO; CORRECT?

A.   YES.

Q.   OKAY.  AND AT THE TIME THAT YOU JOINED PFIZER, WAS IT ALREADY IN THE PROCESS OF THIS KIND OF REORGANIZATION THAT I THINK YOU DESCRIBED ALREADY?

A.   IT WAS JUST INITIATING.

Q.   SO IT WAS JUST STARTING AT THAT POINT?

A.   YES.

Q.   SO YOU WERE KIND OF PART OF THIS REORGANIZATION; IS THAT RIGHT?

A.   YES.

Q.   OKAY.  AND THIS REORGANIZATION DIRECTLY RELATED TO I GUESS SOME OF THE CLINICAL STUDY WORK THAT PFIZER ENGAGED IN ON A KIND OF REGULAR BASIS; CORRECT?

A.   YES.

Q.   AND WHEN YOU JOINED THE COMPANY, YOU CAME AS THE DIRECTOR OF DIAGNOSTICS; IS THAT RIGHT?

A.   I CAME AS THE DIRECTOR OF DIAGNOSTICS TO A DIAGNOSTIC GROUP.

Q.   OKAY.  AND AT THE TIME THAT YOU JOINED, YOU REPORTED TO MR. SAKUL?

A.   I DID.

Q.   OKAY.  AND JUST SO I'M RIGHT, MR. SAKUL REPORTED TO MR. LIPSET?

SER-684

A.   NO.   HE REPORTED TO AIDAN POWER.   SO HAKAN SAKUL WAS A PEER OF CRAIG LIPSET.

Q.   GOT IT.   GOT IT.

NOW, WHEN YOU JOINED PFIZER, AS YOU CAME TO UNDERSTAND THE RELATIONSHIP WITH THERANOS, THE WORK THAT THERANOS DID WITH PFIZER TOOK PLACE A COUPLE OF YEARS BEFORE YOU JOINED; CORRECT?

A.   YES.

Q.   AND IN THE PROCESS OF DOING THAT WORK BETWEEN THERANOS AND PFIZER, THERE WERE OTHER PFIZER SCIENTISTS AND DIRECTORS THAT WERE INVOLVED IN THAT WORK; CORRECT?

A.   YES.

Q.   AND SO THOSE PERSONS ENGAGED IN CONTRACTS WITH THERANOS, TO RETAIN THERANOS FOR THE PURPOSES OF PERFORMING THIS STUDY; IS THAT CORRECT?

A.   YES, AS I UNDERSTOOD IT.   AS I REMEMBER IT.

Q.   I'M SORRY TO STEP OVER YOUR WORDS, SIR.   I'LL TRY NOT TO DO IT.

A.   THAT'S FINE.

Q.   AND THE PURPOSE FOR THE PFIZER'S PERSPECTIVE WAS TO DETERMINE WHETHER THERANOS TECHNOLOGY MIGHT BE USEFUL TO PFIZER GOING FORWARD IN SOME OF ITS CLINICAL STUDY WORK; CORRECT?

A.   YES, AS I UNDERSTAND IT, YES.

Q.   AND TO THE EXTENT THAT SOMETHING WAS DISCOVERED DURING THE COURSE OF THAT WORK AND PFIZER DEEMED THERANOS HAVING A TECHNOLOGY THAT WAS USEFUL TO PFIZER, PFIZER MAY HAVE ENGAGED

IN FURTHER WORK WITH THERANOS; IS THAT FAIR?

A.   IN TERMS OF SOMETHING BEING DISCOVERED AS USEFUL, I'M NOT SURE.

I DON'T REMEMBER ANYTHING ABOUT THE INTELLECTUAL PROPERTY RIGHTS ARRANGEMENTS THAT WOULD HAVE BEEN SET UP.

Q.   OKAY.  THE POINT OF THE WORK WITH THERANOS, FROM PFIZER'S PERSPECTIVE, WAS TO DETERMINE WHETHER THERANOS TECHNOLOGY MIGHT BE USEFUL TO PFIZER GOING FORWARD; CORRECT?

A.   YES, AS I UNDERSTAND THE STUDY DESIGN FROM MY MEMORY.

Q.   AND IS THAT A, IS THAT A KIND OF CORPORATE RELATIONSHIP, BUSINESS RELATIONSHIP THAT PFIZER WOULD HAVE ENGAGED WITH AT THAT TIME ON A REGULAR BASIS, MEANING PFIZER, A LARGE INTERNATIONAL PHARMACEUTICAL COMPANY, I THINK YOU MENTIONED IT'S NOT UNCOMMON FOR SMALLER DIAGNOSTIC COMPANIES WHO ARE DEVELOPING NEW TECHNOLOGY TO ENGAGE WITH COMPANIES LIKE PFIZER TO TRY AND GENERATE BUSINESS AND TRY TO FIND OUT IF THEY CAN WORK TOGETHER?

A.   YES, I THINK THAT WOULD BE A FAIR SUMMARY.

Q.   AND I THINK YOU DESCRIBED HAVING SOME SYMPATHY FOR THESE SMALLER PLAYERS IN THEIR WORK WITH A LARGE COMPANY, YOU KNOW, ONE, TO GET THE WORK, AND TWO, TO GET PAID; RIGHT?

A.   AND TO KEEP THE CONTACTS GOING.  YOU KNOW, I WAS, YOU KNOW, THE FIRST EMPLOYEE OF A SMALL COMPANY AT ONE TIME, A STARTUP.

Q.   FAIR ENOUGH.

AND SO YOU LEARNED ABOUT THIS RELATIONSHIP WITH THERANOS FROM MR. LIPSET; IS THAT RIGHT?

A.    YES.

Q.    OKAY.  AND I GUESS MR. LIPSET'S REQUEST WAS THAT YOU REVIEW SOME OF MATERIALS, ENGAGE IN DISCUSSION WITH THERANOS TO COME TO SOME SORT OF A DETERMINATION AS TO WHETHER THERE WAS A BUSINESS USE FOR PFIZER TO CONTINUE THIS RELATIONSHIP WITH THERANOS; CORRECT?

A.    YES, AS I UNDERSTAND IT, YES.

Q.    OKAY.  AND THEN I THINK YOU DESCRIBED THAT JUST A COUPLE OF MINUTES AGO, THIS KIND OF REORGANIZATION AT PFIZER INCLUDED SOME BUDGETARY CONSTRAINTS AS WELL; CORRECT?

A.    YES.  IT WAS JUST THE BEGINNING.

Q.    UNDERSTOOD.  AND BUDGETARY CONSTRAINTS IN A LARGE CORPORATION CAN INFLUENCE BUSINESS DECISIONS, WHETHER TO ENGAGE WITH COUNTER-PARTIES BECAUSE, YOU KNOW, MONEY MAY NOT BE AS AVAILABLE AS IT WAS AT OTHER TIMES; CORRECT?

A.    CORRECT.

Q.    AND THIS TIME PERIOD THAT WE'LL RECALL, 2008 LEADING INTO 2009, THIS WAS KIND OF A ROCKY TIME IN CORPORATE AMERICA.

DO YOU RECALL THAT?

A.    I DO.

Q.    AND THIS IS --

A.    THE CONTAINED DEPRESSION.

Q.    YES.  AND LIKE MANY IN CORPORATE AMERICA, PFIZER WAS

FEELING A LITTLE PRESSURE AS A RESULT OF THE FINANCIAL CRISIS

AS WELL; CORRECT?

A.    CORRECT.

Q.    AND BECAUSE OF THAT, THESE BUDGETARY ISSUES WERE IMPORTANT

TO PFIZER; CORRECT?

          MR. LEACH:  OBJECTION.  SPECULATION.

          THE COURT:  WITHIN YOUR PERSONAL KNOWLEDGE, YOU CAN

ANSWER THAT QUESTION, SIR.

          THE WITNESS:  IN TERMS OF A TECHNOLOGY ASSESSMENT

LIKE THIS, I WAS NOT PRIVY TO ANY FINANCIAL DOCUMENTATION OF

WHAT WAS BEING PAID AND SO FORTH.

     SO ACTUALLY FOR MY ASSESSMENT, FINANCES, MONEY WAS NOT A

RELEVANT INPUT.

     IT WAS WHETHER THE TECHNOLOGY WORKED AND WHETHER THE

TECHNOLOGY COULD BE UTILIZED, CONVERTED TO AN APPROVED

DIAGNOSTIC, AND THEN COULD IT ACTUALLY PLAY A ROLE IN ANY

CLINICAL TRIAL THAT WE NEEDED THAT KIND OF HELP.

     SO THE MONETARY ISSUE IS MOOT FOR ME.

BY MR. CAZARES:

Q.    FAIR ENOUGH.

     BUT AT THAT TIME I THINK YOU'VE DESCRIBED PFIZER'S NEED

WAS RELATING TO MOLECULAR NUCLEIC TESTING?  IS THAT --

A.    YES.

Q.    AND THAT'S A PARTICULAR CATEGORY OF TESTING; CORRECT?

A.    YES.

SER-688

Q.   NUCLEIC ACID AMPLIFICATION, IS THAT THE CORRECT DESCRIPTION?

A.   THERE'S A MULTITUDE OF PLATFORM TECHNOLOGIES, POLYMERASE CHAIN REACTION, SMALL NUCLEOTIDE POLYMORPHISM -- SO POLYMERASE CHAIN REACTION, ALSO KNOWN AS PCR, AND THEN SMALL NUCLEOTIDE POLYMORPHISMS, ALSO KNOWN AS SNP'S, SO THESE ARE SEVERAL DIFFERENT WAYS TO MEASURE GENETIC VARIATION AND THEN DETERMINE IF IT'S CORRELATED WITH A CLINICAL OUTCOME.

Q.   AND SO THAT'S REALLY THE SCIENCE WITH RESPECT TO THIS KIND OF TESTING THAT PFIZER WAS INTERESTED IN AT THE TIME?

A.   YES.

Q.   OKAY.  AND AS YOU MENTIONED ALREADY, THAT WASN'T THE TYPE OF TESTING THAT THE THERANOS DEVICE WAS PERFORMING AT THE TIME; CORRECT?

A.   YES.  AS I MENTIONED, AT THE TIME THAT WAS NOT THE -- IT'S AN IMMUNOASSAY AT HOME PLATFORM, BUT THAT'S WHY I HAD ASKED THE BROADER QUESTION OF, WHERE ARE YOU GOING?

Q.   BECAUSE THAT WAS ALWAYS OF INTEREST IF ULTIMATELY THE TECHNOLOGY WAS CAPABLE OF PERFORMING THIS NUCLEIC ACID AMPLIFICATION TESTING; CORRECT?

A.   BROADLY SO, YES.

Q.   AND THERANOS WERE ABLE TO ACHIEVE THAT, THERE MAY HAVE BEEN A REASON FOR PFIZER TO BE INTERESTED IN THERANOS?

A.   IT WOULD HAVE AT LEAST STARTED THE CONVERSATION OF, DO YOU HAVE A TECHNOLOGY THAT WORKS?  IS IT ACCURATE?  IS IT PRECISE?

**SER-689**

AND MANY OF THESE TECHNOLOGIES HAVE SIGNIFICANT INTELLECTUAL PROPERTY LANDSCAPES AROUND THEM, AND SO THERANOS WOULD ACTUALLY HAVE HAD TO ACCESS ALL OF THAT AS WELL.

Q.   NOW, IN THE COURSE OF DOING THIS EVALUATION, YOU'VE DESCRIBED USING SOME MATERIALS, AND I THINK ONE WAS THE ANGIOGENESIS REPORT OR REPORTS; CORRECT?

A.   YES.

Q.   AND THE OTHER WAS -- WAS IT KIND OF LIKE A PRESENTATION OR A POWERPOINT TYPE OF DECK?

A.   AS I REMEMBER IT, THERE WAS THIS LARGE, ONGOING VOLUMINOUS REPORT AND SLIDE DECK.

Q.   OKAY.

A.   MAYBE 100 PAGES.

Q.   AND THAT WAS PROVIDED BY PERSONS AT THERANOS AT THE TIME?

A.   YES, AFTER CRAIG HAD INTRODUCED ME TO THEM.

Q.   OKAY.  AND THE PERSONS YOU WERE INTRODUCED -- OH, GO AHEAD.

A.   YEAH, THAT WAS THE REPORT THAT WAS SENT TO ME INITIALLY BY CRAIG AS I REMEMBER IT.

Q.   SO YOU LOOKED AT THE ANGIOGENESIS REPORT, THIS PRESENTATION DECK I'LL CALL IT.

ANY OTHER DOCUMENTATION?

A.   IRB, WHICH IS THE INSTITUTIONAL REVIEW BOARD DOCUMENT THAT ALLOWS AN INSTITUTE, ALLOWS AN ENTITY TO TAKE PATIENTS INTO A STUDY.

AND THEN THERE WAS THE CLINICAL STUDY PROTOCOL AT THE TIME THAT HAD BEEN WRITTEN BEFORE I ARRIVED.

Q.   AND YOU ALSO SPOKE TO MR. FRENZEL?

A.   I DID, YES.

Q.   AND THEN YOU HAD THIS CONFERENCE CALL, I THINK YOU DESCRIBED IT AS BEING ALMOST AN HOUR --

A.   YES.

Q.   -- WITH PERSONS AT THERANOS, AS WELL AS MS. HOLMES?

A.   YES.

Q.   OKAY.  BUT YOU AGREE, I THINK YOU'VE CONCEDED, YOU'VE NEVER SPOKEN TO MR. BALWANI; CORRECT?

A.   AS FAR AS I KNOW, NO, I HAVE NOT SPOKEN WITH MR. BALWANI.

Q.   NOW, IN ALL OF THE WORK THAT THERANOS PERFORMED WITH PFIZER, THIS STUDY, THE ANGIOGENESIS STUDY I'LL CALL IT, AGAIN, THAT WAS PERFORMED BEFORE YOU JOINED PFIZER; CORRECT?

A.   YES.

Q.   AND IT INVOLVED OTHERS AT PFIZER, NOT YOURSELF?

A.   YES.

Q.   OKAY.  AND AS YOU MENTIONED, YOU CONFIRMED IN YOUR CONVERSATION WITH MS. HOLMES WHEN YOU WERE LETTING HER KNOW THAT PFIZER HAD NO FURTHER KIND OF BUSINESS NEED TO WORK WITH THERANOS, THAT YOU CONFIRMED THAT THERANOS WAS PAID FOR ITS PRIOR WORK; CORRECT?

A.   YES, I CONFIRMED THAT, AS I REMEMBER IT, TO HER, AND THEN ALSO TO AIDAN POWER AND HIS TEAM.

SER-691

Q.   BECAUSE LIKE YOU SAID, YOU WERE SYMPATHETIC TO SMALL COMPANIES.  YOU WANTED TO MAKE SURE THAT THEY GOT PAID FOR THE WORK THAT THEY DID, AT LEAST UP UNTIL THAT TIME?

A.   YES.

Q.   OKAY.  AND ULTIMATELY YOU LEARNED THAT THE AMOUNT OF MONEY THAT PFIZER PAID TO THERANOS WAS $900,000; CORRECT?

A.   I LEARNED THAT LATER FROM THE INTERACTION WITH THE FEDERAL GOVERNMENT HERE.

Q.   BUT AT SOME POINT IN TIME YOU DID CONFIRM THAT?

A.   I DIDN'T CONFIRM THE DOLLAR AMOUNT, BUT I CONFIRMED THAT IT HAD BEEN PAID.

AIDAN POWER AND THE MOLECULAR MEDICINE GROUP, BECAUSE IT'S SUCH A LARGE ORGANIZATION, 140 PEOPLE, WE HAVE AN EXTENSIVE MULTIMILLION DOLLAR BUDGET.  WE HAD AN IN-HOUSE, OR IN-DEPARTMENT PROJECT MANAGER WHO KEPT TRACK OF ALL OF OUR FUNDING AND STUDIES SO THAT WE DIDN'T GET CROSS BILLED BY OTHER PARTS OF THE COMPANY ACCIDENTALLY, WHICH CAN HAPPEN.

I DON'T REMEMBER HER NAME, BUT SHE CONFIRMED, YEP, IT'S ALL TAKEN CARE OF, IT'S NOT ON OUR BUDGET, IT CAME FROM THAT POOL OF MONEY.

BUT I NEVER KNEW THE DOLLAR AMOUNT INVOLVED.

Q.   VERY GOOD.

NOW, YOUR ULTIMATE CONCLUSION, THOUGH, WAS THAT AT THE TIME WHEN YOU WROTE THE REPORT, YOU DIDN'T BELIEVE THAT THERE WAS ANY FURTHER KIND OF REASON FOR PFIZER TO ENGAGE WITH

THERANOS BASED ON THE CURRENT, THEN-CURRENT STATUS OF ITS

TECHNOLOGY; CORRECT?

A.   I DID BASED ON MY DIAGNOSTIC EXPERTISE.

BUT I ALSO SPOKE WITH MY PEERS IN MOLECULAR MEDICINE, THE

SO-CALLED TAMMLS WHO ARE OUR MOLECULAR MEDICINE PEOPLE WHO SIT

ON EACH OF THE CLINICAL TEAMS WORLDWIDE FOR EVERY DISEASE AREA

AND WHO ARE INJECTING TECHNOLOGY INTO THE CLINICAL TRIALS AND

WOULD BE AWARE OF WHAT THE CLINICAL TRIAL NEEDS WERE, NOT ONLY

EXISTING, BUT GOING FORWARD, AND THERE WAS NO INTEREST IN THE

ONCOLOGY TAMMLS FOR THIS TYPE OF APPROACH.

Q.   FOR IMMUNOASSAYS?

A.   FOR IMMUNOASSAYS.

Q.   BUT AS YOU MENTIONED THIS MORNING, IN YOUR DISCUSSION WITH

MS. HOLMES, YOU LEFT OPEN THE POSSIBILITY OF MAINTAINING

COMMUNICATIONS IN THE EVENT THAT THERANOS FURTHER DEVELOPED ITS

TECHNOLOGY TO A POINT WHERE IT MIGHT BE USEFUL TO PFIZER;

CORRECT?

A.   YES.  I LEFT OPEN THAT DOOR, BUT IT WAS A TWO-WAY DOOR.

MS. ELIZABETH HOLMES COULD REACH OUT TO ME AT SIX MONTH

INTERVALS, OR IF THINGS CHANGED I COULD REACH OUT TO HER AT SIX

MONTH INTERVALS.

Q.   NOW, THE SUMMARY THAT YOU WROTE AT EXHIBIT 167 THAT WAS

DISCUSSED THIS MORNING -- WE DON'T NEED TO PUT IT UP ON THE

SCREEN -- THAT WAS SOMETHING PUT TOGETHER BY YOURSELF; CORRECT?

A.   YES.

Q.   OKAY.  BASED ON THE INPUTS THAT WE HAVE ALREADY DESCRIBED, YOUR REVIEW OF THE REPORT, THIS PRESENTATION DECK, CONVERSATIONS WITH THERANOS PERSONNEL, AND THEN YOUR OWN KIND OF REVIEW AND ANALYSIS?

A.   AND MY, YOU KNOW, OBTAINING PUBLIC INFORMATION, YOU KNOW, NOT ONLY ON THE INTERNET, BUT ISSUED PATENTS OR PATENT APPLICATIONS BY THERANOS.

Q.   AND THERE WERE PUBLICLY PUBLISHED PATENTS THAT THERANOS HAD AT THE TIME; CORRECT?

A.   THERE WAS ONE AT THE TIME, AND I DOCUMENTED THAT IN MY REPORT.

Q.   OKAY.  NOW, AND YOU TESTIFIED THAT THE REPORT WAS SHARED WITH MR. SAKUL, MR. LIPSET, AND MR. POWER; CORRECT?

A.   YES.

Q.   AND THE REPORT, THE SUMMARY WHERE YOU ESSENTIALLY STATE OUT YOUR OPINIONS REGARDING THERANOS AND ITS USEFULNESS TO PFIZER, WAS NOT SHARED WITH MS. HOLMES?

A.   NO, IT WAS NOT SHARED WITH MS. HOLMES.

Q.   IT WAS NOT SHARED WITH ANYONE ELSE AT THERANOS; CORRECT?

A.   NO, IT WAS NOT.

Q.   AND IT WAS NOT SHARED WITH MR. BALWANI; CORRECT?

A.   NO, IT WAS NOT.

     WELL, I HAD NEVER KNOWN MR. BALWANI AS FAR AS I'M AWARE OF, AND FOR MY INTERACTIONS I DON'T REMEMBER SEEING HIS NAME.

     SO AS FAR AS I KNOW IT WAS NOT SHARED WITH HIM.  I

SER-694

CERTAINLY DIDN'T.

Q.   FAIR ENOUGH.

AND IN THAT PHONE CALL THAT YOU HAD WITH MS. HOLMES THAT IS REPORTED BY YOURSELF TO YOUR COLLEAGUES, IN THAT PHONE CALL, YOU DIDN'T READ OR SUMMARIZE THE REPORT THAT YOU WROTE FOR YOUR SUPERVISORS TO MS. HOLMES; CORRECT?

A.   NO, I DID NOT, BECAUSE THE REPORT ACTUALLY DIDN'T EXIST YET.

Q.   SO IS IT CORRECT THEN THAT YOU ADVISED MS. HOLMES THAT PFIZER HAD NO KIND OF CURRENT NEED OR USE FOR THERANOS TECHNOLOGY PRIOR TO YOUR DRAFTING UP THE REPORT; CORRECT?

A.   PRIOR TO DRAFTING THE REPORT, I DID NOT COMMUNICATE ANY LACK OF INTEREST BY PFIZER TO MS. ELIZABETH HOLMES BECAUSE I WOULD NOT HAVE MADE THAT CONCLUSION UNTIL I GATHERED ALL OF THE INFORMATION, INCLUDING THE ONE HOUR INTERACTION WITH HER.

YOU KNOW, UNTIL I HAVE ALL OF MY INTAKE, I HAVE A VERY OPEN MIND ON THESE MATTERS.

Q.   I GUESS I MISUNDERSTOOD YOUR TESTIMONY.

SO YOU COMPLETED YOUR REPORT FIRST, AND THEN YOU SPOKE TO MS. HOLMES ON THE PHONE; CORRECT?

A.   NO.  I SPOKE TO MS. HOLMES FIRST IN THAT HOUR, AND THEN AFTER I RECEIVED -- I SPOKE WITH HER IN THAT ONE HOUR; THEN LATER I RECEIVED, AS I REMEMBER IT THEN, THE ANSWERS TO THE WRITTEN QUESTIONS THAT I HAD SENT DURING THE ONE HOUR THAT I PROBED FOR THE ANSWERS FOR THE SIX QUESTIONS THAT I LISTED IN

MY REPORT.

AND THEN AFTER REVIEWING ALL INFORMATION THAT I HAD GATHERED OVER A PERIOD OF A COUPLE OF WEEKS AFTER THAT ONE HOUR, THEN TOWARDS THE END OF DECEMBER THEN I WOULD HAVE DRAFTED THAT REPORT ONCE I HAD ALL INPUT.

Q.   AND THEN LATER -- I GUESS I'M NOT STATING MY QUESTION VERY CLEARLY.

THEN IN JANUARY OF 2009 YOU HAD THIS ULTIMATE CONVERSATION WITH MS. HOLMES WHERE YOU ADVISED HER THAT PFIZER HAD NO NEED FOR THERANOS'S TECHNOLOGY AT THAT TIME; CORRECT?

A.   YES, AS I UNDERSTOOD -- YES.

Q.   AND IN THAT CONVERSATION, THAT LAST CONVERSATION WITH MS. HOLMES --

A.   UH-HUH.

Q.   -- YOU DID NOT READ OR RECITE THE CONCLUSIONS FROM YOUR REPORT TO MS. HOLMES; CORRECT?

A.   NO, I DID NOT.

Q.   NOW, ONE OF YOUR -- I GUESS YOUR ULTIMATE CONCLUSION, I GUESS AT THE TIME YOU DIDN'T BELIEVE THAT PFIZER HAD ANY NEED FOR THERANOS'S TECHNOLOGY AS OF THAT MOMENT IN LATE 2008, EARLY 2009.

WERE YOU AWARE OF SUBSEQUENT CONTACTS, COMMUNICATIONS BY YOUR SUPERVISORS, MR. SAKUL, MR. LIPSET, WITH MS. HOLMES AND THERANOS SUBSEQUENT TO YOUR RECOMMENDATION?

A.   SUBSEQUENT?  NO, I'M NOT AWARE OF ANY CONTACTS.

SER-696

Q.   WOULD YOU HAVE EXPECTED TO BE NOTIFIED OF ANY CONTACTS?

A.   OFTEN, BUT NOT ALWAYS.

     IN AN ASSESSMENT LIKE THIS, OFTEN I WOULD BE INFORMED.

     BUT IF THERE'S ALSO, YOU KNOW, A NEED TO KNOW BASIS OF DOING BUSINESS INTERACTIONS, AT TIMES I MIGHT HAVE BEEN BLINDED.  BUT I WAS NOT SURPRISED THAT I WAS NOT CONTACTED FURTHER.

     THIS WAS MY FINAL SUMMARY RECOMMENDATION THAT BECAME THE PFIZER POSITION AT THAT POINT, AND --

Q.   FAIR ENOUGH.

     YOUR HONOR, MAY I HAVE A MOMENT TO GET SOME BINDERS?

     THE COURT:  YES.

     MR. CAZARES:   (HANDING.)

Q.   MR. WEBER, I'VE JUST HANDED YOU A BINDER WITH SOME DOCUMENTS IN THERE.

     I WOULD ASK YOU TO TURN TO THE TAB THAT IS MARKED 10561.

A.   10561?

Q.   YES.

A.   OKAY.  YES, I SEE 10561.

Q.   AND 10561 APPEARS TO BE AN EMAIL CHAIN, THE LATTER OF WHICH LOOKS LIKE IT'S FEBRUARY 21, 2009.

     DO YOU SEE THAT?

A.   YES.

Q.   NOW, THAT ONE DOESN'T INVOLVE YOURSELF, BUT BELOW THAT THERE'S AN EXCHANGE OF EMAILS BETWEEN YOURSELF AND MR. FRENZEL.

DO YOU SEE THAT?

A.   I DO.

Q.   AND IT RELATES TO MR. FRENZEL REACHING OUT TO YOU ABOUT I GUESS AN OPPORTUNITY FROM THERANOS'S PERSPECTIVE.

DO YOU SEE THAT?

A.   YES, I DO.

MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 10561.

MR. LEACH:  NO OBJECTION, YOUR HONOR.

THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

(DEFENDANT'S EXHIBIT 10561 WAS RECEIVED IN EVIDENCE.)

BY MR. CAZARES:

Q.   AND IF YOU FOCUS ON THE LOWER PORTION OF THE MESSAGE, AT LEAST AT THIS TIME YOU'LL SEE THE MESSAGE FROM MR. FRENZEL TO YOURSELF DATED FEBRUARY 20TH.

DO YOU SEE THAT?

A.   I DO.

Q.   AND THE SUBJECT SAYS FERTILITY ASSAYS.

DO YOU SEE THAT?

A.   I DO.

Q.   AND IN THE MESSAGE MR. FRENZEL WRITES, "HELLO SHANE,

"WE ARE IN THE PROCESS OF RELEASING OUR FERTILITY PANELS AND RECALLED OUR DISCUSSION ON PRE-ECLAMPSIA.  ARE YOU STILL INTERESTED IN PURSUING THIS?  IF YOU HAVE ANY FURTHER THOUGHTS AND WOULD LIKE TO DISCUSS, PLEASE LET ME KNOW.  THANKS, GARY."

DO YOU SEE THAT?

A.   I DO.

Q.   AND -- I APOLOGIZE.  LET ME SLOW DOWN.

MR. FRENZEL IS REACHING OUT TO YOU TO INQUIRE ABOUT WHETHER OR NOT THERE'S ANY INTEREST IN PFIZER; CORRECT?

A.   I.

Q.   AND THEN YOU RESPOND "HI GARY,

"THANKS FOR CONTACTING ME.

"PFIZER HAS NO INTEREST IN PREECLAMPSIA.

"BEST OF LUCK, YOU ARE ON TO SOMETHING GOOD."

DO YOU SEE THAT?

A.   YES.

Q.   AND YOU WERE SINCERE IN THAT?

A.   I DO.  I WAS.

Q.   AND I'M NOT QUESTIONING THAT.  I'M JUST CONFIRMING.

THE, I GUESS, VISION FOR THERANOS'S TECHNOLOGY, A SMALL DEVICE, THE IN VITRO DEVICE THAT COULD TEST BLOOD SAMPLES IN A REMOTE LOCATION, WHETHER IT'S A HOME, WHETHER IT'S A DOCTOR'S OFFICE, A PHYSICIAN'S OFFICE, A CLINIC, MAYBE EVEN A, YOU KNOW, A PHARMACY, THAT COULD HAVE SOME USE IN KIND OF CLINICAL STUDIES IF THE TECHNOLOGY ACTUALLY WORKED; CORRECT?

A.   IT COULD.

Q.   OKAY.  AND TECHNOLOGY LIKE THAT THAT COULD BE USED REMOTELY COULD HAVE SOME ADVANTAGES IN CLINICAL STUDIES AND RECRUITING PATIENTS FOR CLINICAL STUDIES TO MAKE THE PROCESS

KIND OF EASIER FOR THEM?

A.    FOR THIS PARTICULAR DISEASE OF PREECLAMPSIA.

I AM A WORLDWIDE EXPERT IN DIAGNOSTICS FOR PREECLAMPSIA, AND HERE I'M SIGNALLING THAT THEY HAD AN OPPORTUNITY, BUT NOT WITH PFIZER.

WHEN I WAS WITH ORTHO CLINICAL DIAGNOSTICS, I WAS INVOLVED IN THE IDENTIFICATION OF THE KEY BREAKING BIOMARKER ANALYTES FOR PREECLAMPSIA, WHICH ARE PLGF, VEGF AND SFLIP1 AND WAS INVOLVED IN THE LICENSING AND THE TECHNOLOGY ASSESSMENT FOR THAT, AND AT THIS TIME I WAS UNDER A CONFIDENTIALITY WITH JOHNSON & JOHNSON, SO I COULD NOT SPEAK FURTHER ON POINTING THEM TO WHERE THE WATER WAS.

BUT THIS HAD NO INTEREST AND NO CLINICAL UTILITY FOR PFIZER, BUT THERE COULD HAVE BEEN AN OPPORTUNITY, BUT I WAS NOT ALLOWED -- MY HANDS WERE BOUND.  I COULD NOT TELL THEM WHO TO TALK TO.

BUT IF THEY WERE WORKING IN FERTILITY, THEY KNEW WHO THEY SHOULD BE TALKING TO.

Q.    UNDERSTOOD.

SO YOU WERE AWARE OF WHERE THE UTILITY MIGHT RESIDE, BUT IT WASN'T WITH PFIZER?

A.    YES.

Q.    AND AGAIN, MR. FRENZEL WASN'T PROVIDED WITH A COPY OF THE REPORT THAT YOU SHARED WITH YOUR COLLEAGUES WITHIN PFIZER WHERE YOU REACHED YOUR CONCLUSIONS ABOUT THE IMMUNOASSAY DEVICE THAT

PFIZER WAS INTRODUCED TO BACK IN 2006 AND 2007; CORRECT?

A.   NO, I DID NOT COMMUNICATE MY DUE DILIGENCE REPORT TO GARY.

Q.   WITHIN THAT BINDER, IF YOU COULD TAKE A LOOK AT 15041?

A.   OKAY.  15041.  YES, I SEE THIS.

Q.   MAYBE YOU COULD TAKE A LOOK AT THE MESSAGES FOR A MOMENT TO FAMILIARIZE YOURSELF WITH THE CHAIN.

A.   OKAY.  I'VE SCANNED THIS.

Q.   AND OBVIOUSLY YOU'RE FAMILIAR WITH MR. LIPSET, AND YOU'VE ALREADY DESCRIBED HIM?

A.   YES.

Q.   HE WAS BY HIS NEW YORK OFFICE; CORRECT?

A.   YES.

Q.   AND ROOP UNNIKRISHNAN, DID I SAY THAT RIGHT?  DO YOU KNOW WHO THAT IS?

A.   NO, I DON'T.  I'M NOT ON THESE EMAILS, SO I'M NOT AWARE OF ANY OF THIS.

Q.   OKAY.  WERE YOU AWARE OF THE FACT, JUST TO CONFIRM, IN AUGUST OF 2009, MR. LIPSET PUTTING PERSONS WITHIN PFIZER IN CONNECTION WITH SETH MICHELSON AT THERANOS RELATING TO SOME STUDY WORK?

A.   NO, I WAS NOT AWARE OF THIS.

Q.   NOW, MR. LIPSET, JUST TO CONFIRM, IS A PARALLEL OF MR. SAKUL?

A.   YES.

Q.   SO THEY'RE LIKE ON THE SAME CORPORATE LEVEL?

A.   YES.

Q.   OKAY.  AND I DON'T SAY THIS IN ANY WAY TO INSULT YOU, BUT MR. LIPSET WASN'T REQUIRED TO GET YOUR PERMISSION IN ORDER TO REACH OUT TO COUNTER-PARTIES ABOUT POTENTIAL BUSINESS OPPORTUNITIES.

     WOULD THAT BE FAIR?

A.   YES, THAT WOULD BE FAIR.

Q.   OKAY.  IF YOU COULD STAY WITHIN THAT SAME BINDER, I APOLOGIZE, TAKE A LOOK AT THE TAB THAT IS MARKED 4018.

     ACTUALLY, 4018, YOUR HONOR, I BELIEVE IS ALREADY IN EVIDENCE.

          THE COURT:  IT IS, AND IT MAY BE PUBLISHED.

          THE WITNESS:  4018.

BY MR. CAZARES:

Q.   4018.  IT WILL ALSO BE UP ON THE SCREEN.

A.   OH, OKAY.

Q.   SO YOU SEE 4018 IS A SHORT -- I'LL CALL IT AN OUTLOOK INVITE FOR AN APPOINTMENT DATED OCTOBER 23TH, 2013.

     DO YOU SEE THAT AT THE TOP?

A.   I DO, YES.

Q.   AND THE SUBJECT LINE SAYS THERANOS SITE VISIT.

     DO YOU SEE THAT?

A.   YES, I SEE THAT.

Q.   AND THEN FOR THE APPOINTMENT THAT IS BEING SCHEDULED, IT'S INDICATED IT AS OCTOBER 28TH, 2013.

DO YOU SEE THAT?

A.   YES, I DO.

Q.   AND THE MESSAGE IS TO, ON THE TO LIST IS MORTEN SOGAARD.

DO YOU SEE THAT?

A.   I DO.

Q.   AND WHO IS MR. SOGAARD?

A.   I DON'T REMEMBER AT THIS TIME.  HE WAS SOME NEW VICE PRESIDENT THAT HAD COME INTO NEW YORK CITY' PFIZER OFFICE, BUT I DON'T REMEMBER.  THE NAME IS VAGUELY FAMILIAR.

Q.   AND WHAT ABOUT GREGORY NAEVE OR NAEVE?

A.   I HAVE NO IDEA WHO THIS IS.

Q.   AND CRAIG LIPSET WE'VE SPOKEN ABOUT IN NEW YORK.

AND THEN CHRISTIAN HOLMES, HAD YOU EVER SPOKEN TO CHRISTIAN HOLMES?

A.   NOT THAT I'M AWARE OF.

Q.   AND THEN THERE'S A LEONA GARRIOTT.

DO YOU SEE THAT?

A.   YES, I SEE THAT.

Q.   AND HAVE YOU EVER SPOKEN WITH GARRIOTT?

A.   NOT THAT I'M AWARE OF.

Q.   AND THEN FURTHER DOWN IN THE APPOINTMENT MESSAGE, IT SAYS "PLEASE CONTACT HAKAN IF YOU NEED FURTHER ASSISTANCE.  HIS CELL," AND THEN THERE'S A PHONE NUMBER.

AND THEN FOR THERANOS REPRESENTATIVES, IT'S ELIZABETH HOLMES, CHRISTIAN HOLMES, AND DAN EDLIN.

DO YOU SEE THAT?

A.   I DO.

Q.   AND THEN THE PFIZER PERSON, MR. SAKUL, WHO WE JUST TALKED ABOUT; THIS MORTEN SOGAARD WHO YOU JUST MENTIONED SOME FAMILIARITY WITH; AND THEN GREGORY NAEVE.

DO YOU SEE THAT?

A.   I DO.

Q.   AND THEN CRAIG LIPSET WAS GOING TO PARTICIPATE BY TELEPHONE CALL.

DO YOU SEE THAT?

A.   I SEE THAT.

Q.   WERE YOU AWARE OF THIS KIND OF MEETING BETWEEN THERANOS AND PFIZER IN 2013?

A.   NO, I WAS NOT.

Q.   BUT YOU WERE STILL AT PFIZER AT THE TIME; RIGHT?

A.   YES.

Q.   AND SO MR. SAKUL AND MR. LIPSET, IT APPEARS, HAVE REENGAGED WITH THERANOS, AT LEAST TO TALK, IN LATE 2013, BUT DIDN'T -- APPEAR NOT TO HAVE INCLUDED YOU IN THOSE CONVERSATIONS; CORRECT?

A.   I'M NOT INCLUDED IN THE CONVERSATION.  BUT I ACTUALLY DON'T KNOW IF THEY ENGAGED WITH THERANOS, IF THERANOS ENGAGED WITH THEM.

THE PURPOSE OF MY REPORT WAS TO CLOSE OFF THESE REPEATED DISTRACTIVE BUSINESS INEFFICIENCIES.

SER-704

Q.   AND THAT WAS INQUIRIES BY SMALL COMPANIES TO PFIZER.  WAS THAT THE GIST, SIR?

A.   NO, IT'S NOT BY SMALL COMPANIES.  IT WAS REPEATED, REPEATED CONTACTS LOOKING FOR A DOOR THAT IS WILLING TO PAY MONEY.

Q.   YOU CAN TAKE THAT DOWN.

I THINK THIS IS ALREADY IN EVIDENCE.  THIS IS 20546.

MAY I PUBLISH, YOUR HONOR?

THE COURT:  YES.

BY MR. CAZARES:

Q.   YOU'LL SEE IT UP ON THE SCREEN, MR. WEBER, AN EMAIL CHAIN, THE LATTER AT THE TOP WHICH IS NOVEMBER 25TH, 2013.  THAT'S NOT A MESSAGE THAT ANYONE FROM PFIZER IS ON.

YOU SEE THE SUBJECT LINE IS PFIZER/THERANOS DISCUSSIONS.

BUT IF WE MAYBE FOCUS AT THE START OF THE CHAIN IN THE LOWER PORTION.

DO YOU SEE THERE'S A MESSAGE FROM CHRISTIAN HOLMES TO MORTEN SOGAARD, COPYING MR. SAKUL AND MS. HOLMES?

DO YOU SEE THAT?

A.   I DO.

Q.   AND IN THE MESSAGE FROM MR. HOLMES TO MR. SOGAARD, HE WRITES, "MORTEN,

"THANK YOU FOR THIS NOTE.  WE CERTAINLY REMAIN VERY INTERESTED IN MOVING FORWARD WITH OUR WORK TOGETHER.

"I SENT SOME PROPOSED EDITS ON THE PFIZER CDA BACK TO TINA

SER-705

EARLY IN THE WEEK OF NOVEMBER 11TH, AND I JUST RESENT THAT NOTE (ATTACHED) TO ENSURE IT DIDN'T GET HELD UP FOR SOME REASON."

DO YOU SEE THAT?

A.    I DO.

Q.    AND YOU UNDERSTOOD THAT A CDA REFERS TO A CONFIDENTIALITY AGREEMENT; CORRECT?

A.    YES, CONFIDENTIALITY, CDA, NDA.

Q.    COMMONLY USED?

A.    COMMONLY USED.

Q.    AND THE REFERENCE IS TO A PFIZER CDA.

DO YOU SEE THAT?

A.    YES, I SEE THAT.

Q.    OKAY.  AND THEN THE MESSAGE IS, "I CHECKED THROUGH MY INBOX AGAIN AND HAVE NOT SEEN A RESPONSE.  IN PARALLEL TO EXECUTING THIS CDA, PERHAPS WE CAN LOOK TO SCHEDULE A DISCUSSION REGARDING NEXT STEPS AND OUTLINING A PROCESS TO MOVE FORWARD."

DO YOU SEE THAT?

A.    I DO.

Q.    AND AGAIN, AT THE TIME IN NOVEMBER OF 2013, WERE YOU AWARE THAT PFIZER WAS ENGAGING WITH THERANOS TO ENTER INTO A CONFIDENTIALITY AGREEMENT TO FACILITATE FURTHER DISCUSSIONS?

A.    NO, I WAS NOT.

Q.    AND IF WE CAN MOVE UP IN THE MESSAGE CHAIN.

IT APPEARS MR. SOGAARD RESPONDED TO MR. HOLMES, COPYING

MR. SAKUL AND MS. HOLMES.

"CHRISTIAN,

"MY SINCERE APOLOGIES.  I SHOULD HAVE CHECKED ON OUR SIDE FIRST.  I WILL FOLLOW UP TO MOVE THINGS ALONG ON OUR SIDE.

"PLEASE TAKE MY EMAIL AS AN EXPRESSION OF INTEREST AND EXCITEMENT WITH YOUR TECHNOLOGY AND ASPIRATIONS THAT WE CAN MOVE FORWARD WITH DISCUSSIONS AND HOPEFULLY A PARTNERSHIP."

DO YOU SEE THAT?

A.   I DO.

Q.   OKAY.  IN THE COURSE OF YOUR EVALUATION OF THERANOS TECHNOLOGY AND ITS USEFULNESS TO PFIZER, YOU DIDN'T ACTUALLY RECEIVE OR EXAMINE THERANOS TESTING TECHNOLOGY IN PERSON; CORRECT?

A.   I DID NOT PHYSICALLY TOUCH A TESTING BOX, BUT IT'S ACTUALLY ONLY THE DATA SET THAT I NEED TO SEE.

Q.   OKAY.  AND YOU NEVER ACTUALLY -- AND I GUESS BY THAT YOU MEAN YOU NEVER ACTUALLY USED THE DEVICE; CORRECT?

A.   NO, I HAVE NOT.

Q.   BUT YOU ARE AWARE OF THE FACT THAT THE UNDERLYING CLINICAL STUDIES AND DATA THAT YOU EVALUATED, THERANOS'S DEVICE WAS ACTUALLY PLACED IN CLINICAL PATIENTS' HOMES TO DO THE TESTING; CORRECT?

A.   THAT IS MY UNDERSTANDING FROM THE STUDY REPORTS SENT TO ME.

Q.   AND YOU HAVE NO REASON TO DISBELIEVE THAT THAT ACTUALLY

TOOK PLACE; CORRECT?

A.    NO, I DO NOT.

Q.    OKAY.

YOUR HONOR, MAY I HAVE A MOMENT?

THE COURT:  YES.

(DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

MR. CAZARES:  I APOLOGIZE, YOUR HONOR.  I WILL BE DONE VERY SOON.

THE COURT:  OF COURSE.

(PAUSE IN PROCEEDINGS.)

MR. CAZARES:  I APOLOGIZE, YOUR HONOR.

THE COURT:  WE CAN STAND UP AND STRETCH FOR A MOMENT, FOLKS.

YOU AS WELL, YES.

(STRETCHING.)

MR. CAZARES:  THANK YOU, YOUR HONOR.

Q.    MR. WEBER, IF YOU COULD TAKE A LOOK WITHIN THE BINDER THAT YOU HAVE, THERE'S AN EMAIL CHAIN AT EXHIBIT 15048, 15048.  TAKE A LOOK AT IT AND TAKE A LOOK AT THE ATTACHMENT.

A.    15048.

Q.    YES.

A.    15048.

Q.    YES.  AND DO YOU SEE THE EMAIL CHAIN, THE LATTER WHICH LOOKS TO BE JANUARY 9, 2014.

DO YOU SEE THAT?

SER-708

A.   I DO.

Q.   AND JANUARY 2014 YOU WERE STILL EMPLOYED AT PFIZER; CORRECT?

A.   YES.

Q.   AND I THINK YOU TESTIFIED -- CAN YOU TAKE A LOOK AT THE ATTACHMENT AS WELL.

DO YOU SEE THAT?

A.   I DO.

Q.   NOW, YOU'VE TESTIFIED THAT YOU, I GUESS YOURSELF, DIDN'T AUTHORIZE THERANOS TO IN ANY WAY PLACE A PFIZER LOGO ON ANY SORT OF DOCUMENTATION; CORRECT?

A.   CORRECT.  IT WOULD ONLY REALLY BE PFIZER LEGAL AND PFIZER COMMERCIAL WHO COULD DO THAT.

Q.   OKAY.  AND YOU SEE IN THIS EXCHANGE AT 15048, MR. SOGAARD AND MR. SAKUL ARE ENGAGED IN AN EMAIL EXCHANGE?

DO YOU SEE MR. SAKUL'S NAME AT THE TOP?

A.   THERE ARE THREE TO FOUR PAGES HERE OF EMAIL.  WHERE?

Q.   AT THE TOP OF THE FIRST PAGE.

A.   THE TOP OF THE FIRST PAGE.

Q.   THE CC LINE.

A.   THE CC LINE IS ELIZABETH HOLMES AND HAKAN SAKUL.

Q.   AND YOU SEE, WITH THE ATTACHMENT, IT LOOKS LIKE MR. SAKUL RECEIVED A COPY OF THE THERANOS STUDY REPORT WITH BOTH PFIZER'S LOGO AND THERANOS'S LOGO; CORRECT?

A.   IT APPEARS TO BE SO FROM THIS DOCUMENT.

MR. CAZARES:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  REDIRECT?

MR. LEACH:  THANK YOU, YOUR HONOR.

**REDIRECT EXAMINATION**

BY MR. LEACH:

Q.   GOOD MORNING AGAIN, MR. WEBER.  I JUST HAVE A FEW
FOLLOW-UP QUESTIONS.

YOU TESTIFIED ON EXAMINATION BY MR. CAZARES THAT MONEY
DIDN'T PLAY A ROLE IN YOUR EVALUATION OF THERANOS'S TECHNOLOGY.

DO YOU RECALL THAT TESTIMONY?

A.   YES.

Q.   WHAT DID YOU MEAN BY THAT?

A.   I MEANT THAT MY ASSESSMENT IS ALWAYS ABOUT THE ACTUAL
TECHNICAL CAPABILITY AND ITS UTILITY, AND THAT IF THERE WERE
LARGER OR SMALLER AMOUNTS OF MONEY, THAT THAT DID NOT SWAY MY
JUDGMENT IN ANY WAY.

Q.   MR. CAZARES ALSO ASKED YOU QUESTIONS ABOUT 15041.

I DON'T BELIEVE HE OFFERED IT INTO EVIDENCE.  I WOULD LIKE
TO OFFER IT INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. CAZARES:  NO, YOUR HONOR.

THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

(DEFENDANT'S EXHIBIT 15041 WAS RECEIVED IN EVIDENCE.)

BY MR. LEACH:

Q.   MR. WEBER, DO YOU SEE AT THE TOP THERE'S AN EMAIL FROM

ELIZABETH HOLMES TO MR. LIPSET, A DAVID LESTER AT THERANOS, SETH MICHELSON AT THERANOS, AND ANOTHER ONE OF YOUR COLLEAGUES AT PFIZER.

DO YOU SEE THAT?

A.   I DO.

Q.   OKAY.  AND THIS RELATES TO SOMETHING CALLED MOMENTUM IL-6.

DO YOU SEE THAT?

A.   I DO.

Q.   OKAY.  AND THERE'S REFERENCE IN HERE TO SETTING UP A PHONE CALL.

DO YOU SEE THAT?

A.   OH, IT'S ON THE SCREEN.  YES, I SEE THAT.  I APOLOGIZE.

Q.   OKAY.  DO YOU KNOW WHETHER ANYTHING EVER CAME OF THIS PHONE CALL?

A.   I HAVE NO AWARENESS.

Q.   OKAY.  AND YOU WERE ALSO SHOWN EXHIBITS 4018 AND 20546 FROM SOME POINT AFTER OCTOBER 28TH, 2013.

AND THESE WERE EMAILS THAT YOU WEREN'T ON.

DO YOU RECALL QUESTIONS ABOUT THOSE?

A.   I DO.

Q.   OKAY.  AND DO YOU KNOW WHETHER, IN SEPTEMBER OF 2013, THERANOS ANNOUNCED A PARTNERSHIP WITH WALGREENS?

A.   I HAVE A VAGUE AWARENESS OF THIS HAPPENING IN THE OUTSIDE WORLD.

Q.   OKAY.  DO YOU KNOW IF IN THE FALL AND WINTER OF 2013 THERE

WERE PRESS ARTICLES ABOUT THERANOS AND ITS TECHNOLOGY?

A.   I'M NOT AWARE OF THOSE.

Q.   OKAY.  DO YOU KNOW WHETHER ANYTHING CAME FROM THOSE EMAILS SETTING UP DISCUSSIONS?

A.   NO, I'M NOT AWARE OF ANYTHING HAPPENING.

Q.   OKAY.

     IF WE COULD DISPLAY, YOUR HONOR, WHAT IS IN EVIDENCE AS EXHIBIT 7753.

          THE COURT:  ALL RIGHT.

          MR. LEACH:  I BELIEVE IT'S ATTACHMENT 2, MS. WACHS.

Q.   ARE YOU ABLE TO SEE THE SPREADSHEET ON YOUR SCREEN, MR. WEBER?

A.   YES, I DO.

Q.   AND DO YOU SEE A REFERENCE TO PFIZER IN LINE 12?

A.   I DO.

Q.   AND DO YOU SEE, AS YOU MOVE TO THE RIGHT, THERE'S TWO AMOUNTS, 500,000 AND 400,000, WITH THE 400,000 NUMBER BEING IN NOVEMBER OF 2008?

A.   YES.

Q.   OKAY.  AND YOU RECALL VERIFYING BEFORE YOUR PHONE CALL WITH MS. HOLMES THAT PFIZER HAD PAID THERANOS FOR THE ANGIOGENESIS STUDY?

A.   YES, I RECALL THAT PFIZER -- YOU KNOW, WE HAD CONFIRMED THAT PFIZER HAD PAID FOR THE STUDY, BUT I WAS NOT EVER INFORMED OF THE DOLLAR AMOUNT INVOLVED.

Q.   OKAY.  BUT THE TIMING THERE FOR 2008 IS CONSISTENT WITH YOUR REVIEW AND THE ULTIMATE PHONE CALL WITH MS. HOLMES?

A.   YES.

Q.   OKAY.

A.   IT'S CONSISTENT TIME-WISE.

Q.   OKAY.  AND IF WE CAN MOVE FORWARD TO THE RIGHT, MS. WACHS, THROUGH 2009, 2010, 2011, ALL OF THE WAY THROUGH 2014.

     YOU DON'T SEE ANY OTHER AMOUNTS RELATING TO PFIZER, DO YOU?

A.   I DO NOT.

Q.   OKAY.  AND YOU, SITTING HERE TODAY, YOU HAVE NO KNOWLEDGE OF ANY REVENUE GENERATING CONTRACTS BETWEEN PFIZER AND THERANOS AFTER YOUR REVIEW?

A.   I'M NOT AWARE OF ANY FURTHER CONTRACTS.

Q.   OKAY.  AND YOU'VE SEEN SOME EMAILS ABOUT DISCUSSIONS, POSSIBILITIES.  YOU HAVE NO REASON, SITTING HERE TODAY, TO THINK THAT ANYTHING EVER CAME OF THOSE?

A.   NO, I DO NOT THINK -- I'M NOT AWARE OF ANYTHING THAT CAME FROM ANY OF THOSE DISCUSSIONS.

Q.   OKAY.

     NO FURTHER QUESTIONS, YOUR HONOR.

          THE COURT:  RECROSS?

          MR. CAZARES:  ACTUALLY, NO FURTHER QUESTIONS, YOUR HONOR.

          THE COURT:  ALL RIGHT.  THANK YOU.

MAY THIS WITNESS BE EXCUSED?

MR. LEACH:  YES, YOUR HONOR.

MR. CAZARES:  YES, YOUR HONOR.

THE COURT:  YOU'RE EXCUSED, SIR.  YOU CAN JUST LEAVE THOSE BINDERS THERE.  THANK YOU SO MUCH.

THE WITNESS:  THANK YOU.

THE COURT:  YOU'RE WELCOME.

DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL?

MR. LEACH:  YES, YOUR HONOR.

THE UNITED STATES CALLED SARAH BENNETT.

THE COURT:  LADIES AND GENTLEMEN, WE'LL TAKE OUR BREAK AROUND NOON, MAYBE A LITTLE THEREAFTER.  I'D LIKE TO GET THE WITNESS STARTED.

GOOD MORNING.  COME FORWARD, PLEASE.

I'LL ASK YOU TO STAND OVER HERE WHILE YOU FACE OUR COURTROOM DEPUTY.  AND IF YOU RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

**(GOVERNMENT'S WITNESS, SARAH BENNETT, WAS SWORN.)**

THE WITNESS:  I DO.

THE COURT:  PLEASE HAVE A SEAT UP HERE.

PLEASE ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME AND SPELL IT.

THE WITNESS:  SURE.  MY NAME IS SARAH BENNETT, S-A-R-A-H, B-E-N-N-E-T-T.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,        )
                                 )   CR-18-00258-EJD
                  PLAINTIFF,     )
                                 )   SAN JOSE, CALIFORNIA
            VS.                  )
                                 )   MAY 11, 2022
RAMESH "SUNNY" BALWANI,          )
                                 )   VOLUME 28
                  DEFENDANT.     )
_____)   PAGES 5287 - 5562


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:       UNITED STATES ATTORNEY'S OFFICE
                         BY:  JOHN C. BOSTIC
                              JEFFREY B. SCHENK
                         150 ALMADEN BOULEVARD, SUITE 900
                         SAN JOSE, CALIFORNIA 95113

                         BY:  ROBERT S. LEACH
                              KELLY VOLKAR
                         1301 CLAY STREET, SUITE 340S
                         OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                         CERTIFICATE NUMBER 8074
                         LEE-ANNE SHORTRIDGE, CSR, CRR
                         CERTIFICATE NUMBER 9595

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

SER-715

5289

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**DANIEL MOSLEY**
CROSS-EXAM BY MR. CAZARES (RES.)          P. 5336
REDIRECT EXAM BY MR. SCHENK               P. 5357


**ALAN EISENMAN**
DIRECT EXAM BY MR. BOSTIC                  P. 5362
CROSS-EXAM BY MS. WALSH                    P. 5425
REDIRECT EXAM BY MR. BOSTIC                P. 5502
RECROSS-EXAM BY MS. WALSH                  P. 5514
FURTHER REDIRECT EXAM BY MR. BOSTIC        P. 5527


**LYNETTE SAWYER**
DIRECT EXAM BY MR. LEACH                   P. 5531
CROSS-EXAM BY MS. WALSH                    P. 5547

**SER-716**

**(GOVERNMENT'S WITNESS, LYNETTE SAWYER, WAS SWORN.)**

THE WITNESS:  I DO.

THE COURT:  PLEASE HAVE A SEAT HERE AND MAKE YOURSELF COMFORTABLE.

FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

IF YOU'RE FULLY VACCINATED --

THE WITNESS:  I AM.

THE COURT:  -- WHICH MEANS BOOSTED AS WELL, YOU CAN REMOVE YOUR MASK.

WOULD YOU PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE.

THE WITNESS:  MY NAME IS LYNETTE SAWYER. L-Y-N-E-T-T-E, S-A-W-Y-E-R.

THE COURT:  THANK YOU.

COUNSEL.

MR. LEACH:  THANK YOU, YOUR HONOR.

**DIRECT EXAMINATION**

BY MR. LEACH:

Q.   GOOD AFTERNOON, MS. SAWYER.

A.   GOOD AFTERNOON.

Q.   EXCUSE ME, DR. SAWYER.

I'LL REMOVE MY MASK AS WELL?

IN THE FOURTH QUARTER OF 2014, DID SUNNY BALWANI ASK YOU TO SERVE AS THE CO-DIRECTOR OF THERANOS'S CALIFORNIA CLINICAL LAB?

A.   NOT DIRECTLY.  HE ASKED ME THROUGH LABORATORY CONSULTING SERVICES.

Q.   AND DID YOU ULTIMATELY AGREE TO BECOME THE CO-DIRECTOR OF THERANOS CLINICAL LAB?

A.   YES.

Q.   AND WERE YOU THE CO-DIRECTOR OF THERANOS'S CLINICAL LABORATORY FROM LATE 2014 UNTIL APPROXIMATELY JUNE OF 2015?

A.   YES.

Q.   WHY DID YOU STOP BEING A CO-DIRECTOR FOR THERANOS'S CALIFORNIA CLINICAL LABORATORY?

A.   BECAUSE I HAD SIGNED ON TO DO IT AS A VERY TEMPORARY POSITION.  IT WAS PROPOSED TO ME AS A TWO TO THREE MONTHS DIRECTORSHIP, AT WHICH POINT THEIR NEW DIRECTOR WOULD COME ON.

     WE MADE THE CONTRACT FOR SIX MONTHS SO THAT I WOULD BE A CO-DIRECTOR WITH THEIR NEW DIRECTOR.  WE WOULDN'T SWITCH OUT DIRECTORS TOO FREQUENTLY.  LAB FIELD SERVICES DOESN'T LIKE THAT.

Q.   OKAY.  AT THE TIME THAT YOU RESIGNED IN JUNE OF 2015, WERE YOU COMFORTABLE WITH THE LEVEL OF INFORMATION THAT YOU WERE GETTING FROM THERANOS?

A.   NO.

Q.   LET'S TALK A LITTLE BIT ABOUT YOUR EDUCATIONAL AND PROFESSIONAL BACKGROUND.

     DO YOU HAVE A COLLEGE DEGREE?

A.   I DO.  I HAVE A BACHELORS IN MICROBIOLOGY.

SAWYER DIRECT BY MR. LEACH                                    5533

Q.   AND WHERE IS THAT FROM?

A.   SAN DIEGO STATE UNIVERSITY.

Q.   AT SOME POINT DID YOU OBTAIN A MASTER DEGREE?

A.   I DID OBTAINED A MASTERS IN PUBLIC HEALTH FROM BERKELEY.

Q.   AND DID YOU ALSO OBTAIN A PH.D. IN PUBLIC HEALTH FROM
U.C. BERKELEY?

A.   TECHNICALLY IT'S A D.PH., BUT I DID.

Q.   THANK YOU FOR THAT PRECISION.

     CAN YOU TALK BRIEFLY ABOUT YOUR WORK HISTORY AFTER
OBTAINING YOUR LAST DEGREE FROM BERKELEY?

A.   SURE.  I WORKED AS A DIRECTOR FOR A BIOTECH COMPANY
LABORATORY FOR A FEW YEARS.

     THEN I WORKED AS A DIRECTOR FOR SEVERAL SMALL CLINICAL
LABORATORIES.  I'VE BEEN DOING THAT FOR -- SINCE THE EARLY
'90S.

     AND I ALSO WORKED AS A DIRECTOR OF DEVELOPMENT FOR A
BIOTECH COMPANY IN THE EAST BAY.

Q.   OKAY.  DID YOU WORK FOR A -- AS A LAB DIRECTOR AT A
COMPANY CALLED UNILAB?

A.   I DID.

Q.   AND WERE YOU THE LABORATORY DIRECTOR AT BAYER REFERENCE
TESTING IN THE LATE 1990S?

A.   YES.

Q.   AND DID YOU SERVE AS A LABORATORY DIRECTOR AT A COMPANY
CALL TETHYS BIOSCIENCES?

A.   I DID.

Q.   AND FROM 2000 TO 2015, DID YOU WORK AS A SENIOR DIRECTOR AT A COMPANY CALLED CERUS?

A.   I DID.

Q.   HOW DID YOU LEARN ABOUT THERANOS?

A.   I WAS ASKED BY JERRY HURST, WHO OWNS LABORATORY CONSULTING SERVICES, IF I WOULD BE INTERESTED IN DOING A DIRECTORSHIP FOR THEM.

Q.   AND AT SOME POINT DID YOU SPEAK WITH SOMEBODY FROM THERANOS ABOUT THAT OPPORTUNITY?

A.   I DID.

Q.   AND WHO DID YOU SPEAK WITH?

A.   I SPOKE WITH SUNNY.

Q.   OKAY.  TELL US ABOUT THAT CONVERSATION, PLEASE.

A.   IT WAS A LOT OF YEARS AGO AND I DON'T REMEMBER VERY CLEARLY, BUT BASICALLY HE DESCRIBED WHAT THEY WANTED IN THE WAY OF A LAB DIRECTOR AND THAT IT WAS A TEMPORARY POSITION.  THEY HAD SOMEONE IN MIND WHO WOULD BECOME DIRECTOR IN TWO TO THREE MONTHS.

Q.   AND WHAT DID HE SAY ABOUT WHAT THEY WERE LOOKING FOR IN A LAB DIRECTOR?

A.   IT WAS VERY PART-TIME.  IT WAS, LIKE I SAID, VERY TEMPORARY, VERY PART-TIME.

AS WITH ANY LAB DIRECTOR, I WOULD NEED TO GO THROUGH AND REVIEW AND APPROVE DOCUMENTS, ALL OF THE SOP'S, ET CETERA.

IT WAS LARGELY -- IF WAS NOT EVER BILLED TO BE AN IN-PERSON JOB.

Q.   OKAY.  DID HE MENTION ANYBODY NAMED ADAM ROSENDORFF?

A.   I DO NOT BELIEVE SO.

Q.   OKAY.  DID MR. BALWANI DESCRIBE ANYTHING ABOUT THE CIRCUMSTANCES OF DR. ROSENDORFF'S DEPARTURE FROM THERANOS?

A.   NO.

Q.   OKAY.  DID HE IN ANY WAY SUGGEST THAT DR. ROSENDORFF HAD CONCERNS ABOUT THERANOS'S LABORATORY TESTING OR THE PERFORMANCE OF ITS DEVICES?

A.   NO.

MS. WALSH:  OBJECTION.  LEADING.

THE COURT:  OVERRULED.

BY MR. LEACH:

Q.   YOUR ANSWER WAS NO?

A.   CORRECT.

Q.   OKAY.  AFTER SPEAKING WITH MR. BALWANI, DID YOU AGREE TO BECOME THE CO-DIRECTOR OF THERANOS'S LAB?

A.   YES.

Q.   AND DID THAT HAPPEN IN LATE 2014?

A.   YES.

Q.   WERE YOU EVER ASKED TO VISIT THE LAB?

A.   NO.

Q.   DID YOU EVER SET FOOT IN THE LABORATORY?

A.   NO.

SER-721

Q.   DID YOU EVER SEE SOMETHING CALLED AN EDISON DEVICE?

A.   NO.

Q.   DID YOU EVER REVIEW ANY DATA GENERATED BY AN EDISON DEVICE?

A.   NO.

Q.   DID YOU EVER SEE DATA GENERATED FROM A THERANOS MANUFACTURED BLOOD ANALYZER?

A.   NO.

Q.   DID YOU EVER REVIEW ANY DATA GENERATED FROM A THERANOS MANUFACTURED BLOOD ANALYZER?

A.   NO.

Q.   IN YOUR INITIAL CALL WITH MR. BALWANI, DID HE TELL YOU THAT THERANOS WAS USING AN ANALYZER THAT IT HAD MANUFACTURED?

A.   I DO NOT BELIEVE SO.

Q.   DID HE EVER TELL YOU THAT THEY WERE USING ANY THERANOS MANUFACTURED ANALYZER IN THE CLINICAL LAB?

A.   NOT THAT I RECALL, NO.

Q.   IN THIS TIME PERIOD, END OF 2014 THROUGH JUNE OF 2015 WHEN YOU RESIGNED, CAN YOU SUMMARIZE FOR US WHAT YOU WERE CALLED TO DO?

A.   ALMOST EXCLUSIVELY I WAS CALLED ON TO REVIEW AND APPROVE DOCUMENTS.

Q.   OKAY.  AND DID THOSE DOCUMENTS INCLUDE SOP'S?

A.   YES.

Q.   IS THAT STANDARD OPERATING PROCEDURES?

SER-722

A.    CORRECT.

Q.    AND DID YOU REVIEW ANY SOP'S RELATING TO THE EDISON?

A.    NO.

Q.    DID YOU REVIEW ANY SOP'S RELATING TO ANY OTHER THERANOS MANUFACTURED ANALYZER?

A.    NOT ANALYZER, NO.

Q.    DID YOU REVIEW ANY VALIDATION DOCUMENTS RELATING TO THE EDISON?

A.    NO.

Q.    DID YOU REVIEW ANY VERIFICATION DOCUMENTS RELATING TO THE EDISON?

A.    NO.

Q.    DID YOU REVIEW ANY VALIDATION OR VERIFICATION DOCUMENTS FOR ANY OTHER THERANOS MANUFACTURED ANALYZER?

A.    NO.

Q.    BASED ON THE SOP'S THAT YOU WERE GIVEN, DID THEY RELATE EXCLUSIVELY TO FDA APPROVED DEVICES?

A.    THE VAST MAJORITY OF THEM DID.  THERE WERE A FEW LAB DEVELOPED TESTS FOR MICROBIOLOGICAL THINGS, ID'ING BACTERIA IN STOOLS AND A SENSITIVITY ASSAY, I BELIEVE.

Q.    IS THAT A RELATIVELY SMALL CATEGORY THAT YOU'RE DESCRIBING?

A.    YES.

Q.    PUTTING ASIDE THAT RELATIVELY SMALL CATEGORY, DID YOU REVIEW ANY SOP'S RELATING TO -- WERE THE SOP'S THAT YOU

REVIEWED RELATED EXCLUSIVELY TO FDA APPROVED ANALYZERS?

A.   YES.

Q.   AND BASED ON THE SOP'S THAT YOU WERE GIVEN, DID YOU HAVE THE IMPRESSION THAT THERANOS WAS DOING ANYTHING OTHER THAN RUNNING BLOOD TESTS ON FDA APPROVED ANALYZERS?

A.   NO.

Q.   WHAT -- IN WHAT FORM DID YOU RECEIVE THE SOP'S?  HOW DID THEY COME TO YOU?

A.   ELECTRONICALLY VIA DOCUSIGN.

Q.   AND WERE YOU ABLE TO EDIT THEM?

A.   NO.

Q.   WAS IT ESSENTIALLY, HERE'S THE DOCUMENT, SIGN HERE?

A.   UH-HUH.

          THE COURT:  IS THAT YES?

          THE WITNESS:  YES.  SORRY.

          MR. LEACH:  THANK YOU, YOUR HONOR.

Q.   WE NEED AUDIBLE RESPONSES SO WE HAVE A GOOD RECORD.

A.   SORRY.

Q.   DID YOU EXERCISE ANY DECISION MAKING IN WHAT WAS SENT TO YOU?

A.   NO.

Q.   IN THIS TIME PERIOD, LATE 2014 THROUGH JUNE OF 2015, WHO AT THERANOS DID YOU HAVE CONTACT WITH?

A.   BASICALLY I HAD CONTACT WITH THE WOMAN WHO SENT ME THE DOCUMENTS, MICHELLE LEE.

Q. IS THAT YOUR MEMORY?

A. THAT'S MY MEMORY. IT MIGHT BE NOT EXACTLY CORRECT.

Q. OKAY. OTHER THAN MICHELLE LEE WHO SENT YOU THE DOCUMENTS, DID YOU HAVE --

A. NO.

Q. -- CONTACT WITH ANYBODY -- WE NEED TO SPEAK ONE AT A TIME.

A. NO.

Q. AND LET ME JUST GET MY FULL QUESTION OUT IF I COULD.

OTHER THAN MS. LEE, DID YOU SPEAK TO ANYBODY ELSE AT THERANOS?

A. NO.

Q. YOU HAD A PHONE CALL WITH MR. BALWANI BEFORE YOU TOOK THE POSITION?

A. YES.

Q. OKAY. AT SOME POINT DID YOU HAVE SOME ADDITIONAL CONTACT WITH HIM?

A. I DO NOT BELIEVE SO. NOT DIRECTLY.

Q. OKAY. DID HE EXPLAIN TO YOU ANY ISSUES THAT HAD COME UP IN THE CLINICAL LABORATORY BEFORE YOU HAD ARRIVED?

A. NO, JUST THAT THEY WERE IN TEMPORARY NEED OF A DIRECTOR.

Q. OKAY. BESIDES MR. BALWANI AND MS. LEE, DID YOU HAVE CONTACT WITH ANYBODY ELSE AT THERANOS?

A. NO.

Q. PRIOR TO RESIGNED IN JUNE OF 2015, DID YOU HAVE ANY CONTACT WITH SUNIL DHAWAN?

A.   NO.

Q.   DO YOU KNOW WHO HE IS?

A.   ONLY FROM HEARING HIS NAME PREVIOUSLY.

Q.   OKAY.   PRIOR TO, LET'S SAY ABOUT A YEAR AGO --

A.   NO.

Q.   -- HAD YOU HEARD OF SUNIL DHAWAN?

A.   NO.

Q.   OKAY.   DID YOU HAVE ANY CONTACT WITH YOUR CO-LABORATORY DIRECTOR?

A.   NO.

Q.   DID YOU HAVE ANY DISCUSSIONS ABOUT HOW TO DIVIDE RESPONSIBILITIES WITH YOUR CO-LAB DIRECTOR?

A.   NO.

Q.   DID YOU HAVE ANY CONTACT WITH ELIZABETH HOLMES?

A.   NO.

Q.   DID YOU EVER MEET ELIZABETH HOLMES?

A.   NO.

Q.   DID YOU HAVE ANY CONTACT WITH THE TECHNICAL SUPERVISOR?

A.   NO.

Q.   OKAY.   YOU'RE FAMILIAR WITH THE TERM "TECHNICAL SUPERVISOR"?

A.   YES.

Q.   OKAY.   BUT YOU DIDN'T HAVE ANY CONTACT WITH THE TECHNICAL SUPERVISOR AT THERANOS?

A.   NO, I DID NOT.

Q.   OKAY.  AND DID YOU HAVE ANY CONTACT WITH THE GENERAL SUPERVISOR?

A.   NO, I DID NOT.

Q.   OKAY.  DID YOU DELEGATE ANY RESPONSIBILITIES TO ANYBODY?

A.   I DID SIGN ONE DELEGATION OF RESPONSIBILITIES FOR A QUALITY MANAGER.

Q.   OKAY.  AND PUTTING ASIDE THAT ONE DELEGATION, DID YOU DELEGATE RESPONSIBILITIES TO ANYBODY ELSE?

A.   NO.

Q.   OKAY.  DID YOU EVER SPEAK TO ANY DOCTORS?

A.   NO.

Q.   DID YOU EVER SPEAK TO ANY PATIENTS?

A.   NO.

Q.   WERE YOU EVER ALERTED TO ANY CLINICAL OR CRITICAL VALUES?

A.   NO, I WAS NOT.

Q.   OKAY.  WHAT IS A CRITICAL VALUE?

A.   IT'S A VALUE THAT IS OUTSIDE OF THE NORMAL RANGE.

Q.   WERE YOU EVER ALERTED TO OR DID YOU REVIEW ANY QUALITY CONTROL DATA?

A.   NO.

Q.   DID YOU RECEIVE ANY REPORTS ABOUT THE ACTIVITIES OF THE LAB?

A.   NO.

Q.   DID YOU ORDER ANY TESTING BE BROUGHT UP ON A PARTICULAR THERANOS DEVICE?

A.   NO.

Q.   AND DID YOU EVER ORDER THAT TESTING BE DISCONTINUED ON A THERANOS MANUFACTURED DEVICE?

A.   NO.

Q.   DID YOU REVIEW ANY PROFICIENCY TESTING FOR LDT'S?

A.   NOT THAT I RECALL.

Q.   OKAY.  DID YOU REVIEW ANY PROFICIENCY TESTING FOR TESTS RUN ON THE THERANOS MANUFACTURED ANALYZER?

A.   NO.

Q.   DID YOU EVER DISCUSS THE CONCEPT OF ALTERNATIVE ASSESSMENT OF PROFICIENCY WITH ANYBODY AT THERANOS?

A.   NO.

Q.   DID YOU KNOW THAT THERANOS HAD AN AAP PROGRAM?

A.   NO, NOT THAT I RECALL SEEING.

Q.   I'D LIKE TO DISPLAY FOR YOU WHAT IS IN EVIDENCE, WITH THE COURT'S PERMISSION, AS EXHIBIT 4533.

        THE COURT:  YES.

BY MR. LEACH:

Q.   DO YOU SEE THIS APPEARS TO BE A MEMO DATED SEPTEMBER 23RD, 2015 --

A.   YES.

Q.   -- DR. SAWYER?

A.   YES.

Q.   AND THIS IS NOT SOMETHING THAT YOU REVIEWED DURING YOUR TIME AT THERANOS?

SER-728

A.   NO.  IT HAD TO BE AFTER MY TIME AT THERANOS.

Q.   OKAY.  SOMETIME WITHIN THE LAST YEAR IS THE FIRST TIME THAT YOU SAW THIS DOCUMENT?

A.   YES.

Q.   OKAY.  AND THERE'S A LINE AT THE TOP THAT SAYS, "ADDITIONALLY, THE FOLLOWING IS THE LIST OF THE LABORATORY DEVELOPED TESTS THAT THERANOS TESTED ON THERANOS DEVICE, ALSO CALLED THE THERANOS SAMPLE PROCESSING UNITS, ALONG WITH THE TIME PERIODS WHEN THOSE TESTS WERE RUN."

DO YOU SEE THAT LANGUAGE?

A.   I DO.

Q.   AND THEN THERE'S A LIST OF 12 ASSAYS DOWN AT THE BOTTOM.

DO YOU SEE THOSE?

A.   I DO.

Q.   AND THERE'S SOME DATES THAT COVER YOUR TENURE, AT LEAST IN THE END DATES.

DO YOU SEE THE FIRST ONE, VITAMIN D, THERE'S THE DATE MARCH 10TH, 2015 IN THE ROW AT THE TOP?

A.   I DO.

Q.   OKAY.  AND YOU HAD NO UNDERSTANDING THAT THERANOS WAS RUNNING AN LDT RELATING TO VITAMIN D; CORRECT?

A.   NO, I DID NOT.

Q.   AND YOU HAD NO UNDERSTANDING THAT THERANOS WAS USING ITS OWN MANUFACTURED ANALYZER FOR VITAMIN D DURING YOUR TENURE?

A.   CORRECT.

SER-729

Q.   AND WOULD THAT ALSO APPLY TO ALL OF THE OTHER ASSAYS LISTED IN THIS DOCUMENT?

A.   YES, IT WOULD.

Q.   OKAY.  AND DID ANYBODY CONSULT YOU ABOUT DISCONTINUING USE OF A THERANOS MANUFACTURED ANALYZER FOR THESE ASSAYS?

A.   NO.

Q.   LET ME DISPLAY FOR YOU WHAT IS IN EVIDENCE AS EXHIBIT 20575.

     WITH THE COURT'S PERMISSION?

          THE COURT:  YES.

BY MR. LEACH:

Q.   DO YOU SEE THE TITLE OF THIS DOCUMENT, DR. SAWYER, USE AND MAINTENANCE OF THE IDAHO TECHNOLOGY (BIOFIRE) FILM ARRAY SYSTEM FOR THE IDENTIFICATION OF MICROORGANISMS BY MULTIPLEX PCR."

     DO YOU SEE THAT LANGUAGE?

A.   I DO.

Q.   AND DO YOU SEE YOUR SIGNATURE HALFWAY DOWN THE PAGE?

A.   I DO.

Q.   AND THERE'S A DATE OF MAY 5TH, 2015?

A.   UH-HUH, YES.

Q.   AND DOES THIS HAVE ANYTHING TO DO WITH A THERANOS MANUFACTURED ANALYZER?

A.   I DO NOT BELIEVE SO.

Q.   OKAY.  LET ME DISPLAY FOR YOU WHAT IS IN EVIDENCE AS EXHIBIT 10525.

DO YOU SEE YOUR SIGNATURE DOWN AT THE BOTTOM, DR. SAWYER?

A.   I DO.

Q.   OKAY.  AND THE DATE IS JANUARY 11TH, 2015?

A.   YES.

Q.   AND DO YOU SEE THE TITLE IS MVP SUMMARY ADVIA 2400?

A.   YES.

Q.   IS THAT AN FDA APPROVED DEVICE?

A.   YES.

Q.   AND DO YOU BELIEVE THAT THIS DOCUMENT RELATES TO THERANOS'S USE OF TECHNOLOGY APPROVED BY THE FDA?

A.   YES.

Q.   LET'S LOOK BRIEFLY AT 10526, WHICH IS IN EVIDENCE.

DO YOU SEE YOUR SIGNATURE ON THIS DOCUMENT?

A.   YES.

Q.   AND DID YOU HAVE ANY CONVERSATIONS WITH DR. DHAWAN ABOUT THIS PARTICULAR DOCUMENT?

A.   NO.

Q.   OKAY.  YOU DIDN'T KNOW WHO DR. DHAWAN WAS AT THE TIME?

A.   CORRECT.

Q.   AND YOU HAD NO CONVERSATIONS WITH HIM ABOUT HOW TO DIVIDE RESPONSIBILITIES?

A.   CORRECT.

Q.   OKAY.  AND THE TITLE OF THIS IS ROCHE LIGHTCYCLER SIMPLIFIED PROTOCOL.

DO YOU SEE THAT?

SER-731

A.   YES.

Q.   AND IS THAT A DEVICE APPROVED BY THE FDA?

A.   YES.

Q.   AND DID YOU EVER --

WE CAN TAKE THAT DOWN, MS. WACHS.

DID YOU EVER ASK FOR A LIST OF LAB PERSONNEL WITHIN THERANOS?

A.   I DID.

Q.   OKAY.  DID YOU EVER GET THAT?

A.   NO.

Q.   WAS THAT A MATTER OF FRUSTRATION TO YOU?

A.   IT WAS, YES.

Q.   OKAY.  EXPLAIN THAT.

A.   I FELT THAT I NEEDED TO KNOW WHO -- IT WOULD BE HELPFUL TO KNOW WHO THE TECHNICAL SUPERVISOR WAS, WHO THE GENERAL SUPERVISOR WAS, ET CETERA.

Q.   AND YOU RESIGNED IN JUNE OF 2015?

A.   YES.

Q.   AT THE TIME THAT YOU RESIGNED, WERE YOU SATISFIED WITH THE LEVEL OF INFORMATION THAT YOU WERE GETTING?

A.   NO, I REALLY WASN'T.

Q.   OKAY.  EXPLAIN THAT.

A.   IF I WERE GOING TO CONTINUE -- THE LEVEL OF INFORMATION I WAS GETTING WAS FINE FOR SOMETHING THAT I WAS GOING TO DO FOR TWO MONTHS BASICALLY JUST TO KEEP THE LAB LEGAL.

BUT IF I WAS GOING TO CONTINUE DOING THIS, I NEEDED A MUCH BETTER CONNECTION TO THE PEOPLE WHO WERE ACTUALLY DOING THE LAB WORK.

Q.   AND THE INFORMATION THAT YOU WERE GETTING RELATED VIRTUALLY EXCLUSIVELY TO FDA APPROVED DEVICES?

A.   YES.

Q.   THANK YOU DR. SAWYER.

THANK YOU, YOUR HONOR.  I HAVE NO FURTHER QUESTIONS.

THE COURT:  MS. WALSH, DO YOU WANT TO START YOUR EXAMINATION?

MS. WALSH:  I CAN START, YOUR HONOR.

THE COURT:  SURE.

MS. WALSH:  MAY I APPROACH, YOUR HONOR?

THE COURT:  YES.

MS. WALSH:  (HANDING.)

MAY I APPROACH DR. SAWYER AS WELL?

THE COURT:  YES.  YES.  THANK YOU.

**CROSS-EXAMINATION**

BY MS. WALSH:

Q.   ALL RIGHT.  GOOD AFTERNOON, DR. SAWYER.

A.   GOOD AFTERNOON.

Q.   I JUST WANT TO FIRST START WITH YOUR PROFESSIONAL BACKGROUND.

A.   UH-HUH.

Q.   YOU ARE A PROFESSIONAL LAB DIRECTOR; RIGHT?

A.   YES.

Q.   AND BEFORE WORKING AT THERANOS, YOU SERVED AS A LAB DIRECTOR IN MULTIPLE LABS; RIGHT?

A.   CORRECT.

Q.   AND SOMETIMES YOU WERE A LAB DIRECTOR FOR SEVERAL DIFFERENT LABS AT ONCE; CORRECT?

A.   YES.

Q.   AND YOU SERVED -- I THINK MR. LEACH ASKED YOU ABOUT THIS. YOU SERVED AS A LAB DIRECTOR FOR SEVERAL SMALL CLINICAL LABS IN SAN JOSE AT SOME POINT IN YOUR CAREER; IS THAT RIGHT?

A.   CORRECT.

Q.   YEAH.  AND YOU WORKED AS A PUBLIC HEALTH MICROBIOLOGIST FOR CADPH; CORRECT?

A.   YES.

Q.   AND YOU SERVED AS A LAB DIRECTOR FOR BAYER DIAGNOSTICS; IS THAT RIGHT?

A.   YES.

Q.   AND YOU'RE QUALIFIED TO SERVE AS A LAB DIRECTOR; RIGHT?

A.   YES.

Q.   YOU HAVE A -- YOU SAID YOU HAVE A BACHELOR'S IN MICROBIOLOGY; RIGHT?

A.   YES.

Q.   AND A MASTERS IN PUBLIC HEALTH?

A.   YES.

Q.   AND A PH.D. PUBLIC HEALTH AS WELL?

SER-734

A.   YES.

Q.   AND YOU'RE LICENSED AS A CLINICAL LAB SCIENTIST; IS THAT RIGHT?

A.   ACTUALLY I'M LICENSED AS A BIOANALYST, WHICH SUPERSEDES A CLINICAL LABORATORY SCIENTIST LICENSE, AND WHICH IS WHAT ALLOWS ME TO DIRECT LABS.

Q.   OKAY.  AND YOU TESTIFIED DURING YOUR DIRECT EXAMINATION THAT YOU LEARNED ABOUT THERANOS THROUGH JERRY HURST; IS THAT RIGHT?

A.   YES.

Q.   AND YOU STARTED WORKING WITH MR. HURST IN 2013; IS THAT CORRECT?

A.   ACTUALLY, I STARTED WORKING WITH MR. HURST IN 1988.

Q.   OKAY.

A.   I STARTED DIRECTING LABS IN ASSOCIATION WITH HIM IN PROBABLY 2013, YEAH.

Q.   SO YOU'VE KNOWN HIM FOR A LONG TIME?

A.   YES.

Q.   AND MR. HURST RUNS A LAB CONSULTING COMPANY; RIGHT?

A.   YES.

Q.   AND THAT -- AND YOU MENTIONED THIS ON YOUR DIRECT AS WELL. THE NAME OF THAT COMPANY IS LABORATORY CONSULTING SERVICES; IS THAT RIGHT?

A.   YES.

Q.   AND SO COMPANIES HIRE MR. HURST TO HELP THEM SET UP THEIR

LAB SOMETIMES; RIGHT?

A.   YES.

Q.   AND HE CAN ALSO HELP THEM WITH THE LAB LICENSING PROCESS; CORRECT?

A.   YES.

Q.   AND HE ALSO PROVIDES CONSULTING SERVICES IN KEEPING LABS COMPLIANT WITH THE REGULATIONS; IS THAT RIGHT?

A.   YES.

Q.   AND HE'S BEEN DOING THAT CONSULTING WORK FOR QUITE A WHILE; IS THAT FAIR TO SAY?

A.   YES.  I DON'T REMEMBER WHEN HE STARTED EXACTLY.

Q.   OKAY.  AND IT'S BEEN FOR DECADES THOUGH, HASN'T IT?

A.   AT THIS POINT PROBABLY, YEAH.

Q.   OKAY. AND HE CONSULTS WITH A LOT OF DIFFERENT LABS IN THE AREA; RIGHT?

A.   TO THE BEST OF MY KNOWLEDGE.

Q.   OKAY. AND HE'S CONSIDERED AN EXPERT IN THE FIELD OF LAB CONSULTING SERVICES, ISN'T HE?

        MR. LEACH:  OBJECTION.  SPECULATION.

        MS. WALSH:  WELL, I CAN LAY SOME FOUNDATION IF YOU WANT.

        THE COURT:  SURE.

BY MS. WALSH:

Q.   YOU'VE WORKED CLOSELY WITH MR. HURST; RIGHT?

A.   I HAVE IN CERTAIN ASPECTS OF HIS BUSINESS, YES.

SER-736

Q.   AND HIS BUSINESS IS ADVISING LABS ON HOW TO BE COMPLIANT; RIGHT?

A.   YES.

Q.   HOW TO GET LICENSES; RIGHT?

A.   YES, THAT'S PART OF IT, YEAH.

Q.   YEAH.  AND HOW TO PREPARE FOR AUDITS; CORRECT?

A.   CORRECT.

Q.   AND YOU HAVE GREAT RESPECT FOR MR. HURST'S ABILITIES TO DO THAT; RIGHT?

A.   I DO.

Q.   HE HAS ENORMOUS EXPERIENCE IN THIS FIELD?

A.   YES.

Q.   AND IS IT FAIR TO SAY THAT YOU WOULD CONSIDER HIM AN EXPERT IN THAT AREA?

A.   I WOULD.

Q.   IN FACT, HE WAS -- BEFORE HE STARTED THIS BUSINESS, HE WAS PREVIOUSLY A CALIFORNIA DEPARTMENT OF HEALTH INSPECTOR, WASN'T HE?

A.   YES, HE WAS.

Q.   AND YOU BOTH WORKED TOGETHER AT THE CALIFORNIA DEPARTMENT OF HEALTH?

A.   YES, BUT NOT IN THE LABORATORY FIELD SERVICES DIVISION.  I HAVE NEVER WORKED FOR THEM.

Q.   OKAY.  AND PART OF WHAT MR. HURST ALSO DOES IS THAT HE HELPS LABS WHO HAVE A NEED FOR PART-TIME LAB DIRECTORS; IS THAT

RIGHT?

A.   HE DOES, YES.

Q.   AND HE IS SOMEONE THAT LABS CALL IF THEY NEED A LAB DIRECTOR ON A TEMPORARY BASIS; CORRECT?

A.   OR A PERMANENT BASIS, YES.

Q.   OR A PERMANENT.  OKAY.

     AND THAT'S HOW YOU GOT THE POSITION AT THERANOS; CORRECT?

A.   CORRECT.  CORRECT.

Q.   AND YOU KNEW, DIDN'T YOU, AT THE TIME THAT THERANOS HAD WORKED WITH MR. HURST'S COMPANY PRIOR TO YOUR JOINING THERANOS; IS THAT RIGHT?

A.   I DID.

Q.   MR. HURST HAD HELPED THERANOS IN THE PAST; CORRECT?

A.   I DID NOT KNOW WHAT HE DID, NO.

     I JUST KNEW THAT HE HAD WORKED WITH THEM.

Q.   IN THE, IN THE AREAS THAT YOU'VE DESCRIBED WERE HIS EXPERTISE; IS THAT FAIR?

A.   I SUPPOSE IT IS.  I REALLY DON'T HAVE ANY IDEA WHAT HE DID WITH THEM.

Q.   OKAY.  BUT YOU KNEW MR. HURST WORKED WITH THERANOS --

A.   YES.

Q.   -- AND MR. HURST'S LABORATORY CONSULTING SERVICES COMPANY; RIGHT?

A.   YEAH.

          MR. LEACH:  OBJECTION, YOUR HONOR.  602, 801.

UNITED STATES COURT REPORTERS

SER-738

THE COURT:  WELL, YOU'RE ASKING IF SHE JUST HAS KNOWLEDGE IF HE WAS CONNECTED OR WORKED WITH THEM?

MS. WALSH:  YES, YOUR HONOR.

THE COURT:  HER ANSWER WAS YES.  THAT CAN REMAIN.

YOU CAN ASK ANOTHER QUESTION.

WE'RE GOING TO BREAK AT A QUARTER PAST THE HOUR, LADIES AND GENTLEMEN.

BY MS. WALSH:

Q.   OKAY.  SO MR. HURST CONTACTED YOU; CORRECT?

A.   YES, HE DID.

Q.   AND HE SAID, IN ESSENCE, THAT THERE'S A PART-TIME POSITION THAT I WANT TO SEE IF YOU'RE INTERESTED IN; RIGHT?

A.   HE DID.  HE ACTUALLY CONTACTED TWO OF US AND ASKED IF EITHER ONE OF US WAS INTERESTED.

Q.   OKAY.  AND YOU SAID YOU WERE INTERESTED; RIGHT?

A.   I SAID I WOULD DO IT IF THE OTHER PERSON DIDN'T WANT TO.

Q.   OKAY.  OKAY.

SO WHEN YOU CAME ON BOARD TO THERANOS, YOU WERE HIRED PURSUANT TO A CONSULTING AGREEMENT; RIGHT?

A.   YES.

Q.   AND THAT AGREEMENT WAS BETWEEN THERANOS AND MR. HURST'S COMPANY; CORRECT?

A.   CORRECT.

Q.   AND SO YOU WERE A CONSULTANT, NOT A FULL-TIME EMPLOYEE; RIGHT?

A.   CORRECT.

Q.   AND THE DATE OF THE CONSULTING AGREEMENT WAS NOVEMBER 19TH, 2014.

DOES THAT SOUND RIGHT?

A.   THAT SOUNDS APPROXIMATELY CORRECT, YES.

Q.   OKAY.  AND YOU TESTIFIED ON DIRECT THAT YOU KNEW IT WAS A PART-TIME POSITION; RIGHT?

A.   CORRECT.

Q.   AND IT WAS GOING TO BE TEMPORARY FOR A FEW MONTHS; RIGHT?

A.   CORRECT.

Q.   OKAY.  OKAY.

SO YOU TESTIFIED ABOUT A CONVERSATION THAT YOU HAD WITH MR. BALWANI ABOUT THE POSITION BEFORE YOU TOOK THE POSITION; RIGHT?

A.   YES.

Q.   AND YOU SAID DURING THAT CONVERSATION -- YOU UNDERSTOOD FROM THE CONVERSATION THAT THE ROLE WAS VERY TEMPORARY; RIGHT?

A.   CORRECT.

Q.   AND IT WAS PART -- IT WAS TWO TO THREE MONTHS.  THAT'S WHAT YOU ANTICIPATED; RIGHT?

A.   YES.

Q.   AND ALSO THAT MR. BALWANI HAD A NEW LAB DIRECTOR WHO WAS GOING TO COME ON BOARD; RIGHT?

A.   CORRECT.

Q.   AND THAT NEW LAB DIRECTOR WAS GOING TO COME ON BOARD IN

SER-740

THE SPRING OF 2015; RIGHT?

A.   MY UNDERSTANDING WAS THAT THE NEW LAB DIRECTOR WOULD COME ON BOARD IN TWO TO THREE MONTHS.

Q.   OKAY.

A.   SO THAT WOULD --

Q.   TWO --

A.   TWO TO THREE MONTHS.  SO THAT WOULD MAKE IT LATE WINTER, EARLY SPRING.

Q.   OKAY.  AND MR. BALWANI SAID THAT NEW LAB DIRECTOR WAS A PERSON NAMED SURAJ SAKSENA; CORRECT?

A.   NO.  I DID NOT HAVE A NAME.

Q.   YOU JUST KNEW THERE WAS GOING TO BE A NEW LAB DIRECTOR?

A.   YES.

Q.   OKAY.  AND THE NUMBER OF HOURS YOU WERE GOING TO WORK WAS GOING TO BE ABOUT FIVE HOURS PER WEEK?

     DOES THAT SOUND RIGHT?

A.   IT COULD BE.  HOWEVER MANY IT TAKES TO GET THROUGH DOCUMENTS.  THAT'S PROBABLY WHAT I SPENT, FIVE TO TEN.

Q.   OKAY.  AND THAT WAS COMMUNICATED TO YOU BY MR. BALWANI IN THAT INITIAL CALL?

A.   I DON'T RECALL ONE WAY OR THE OTHER.

Q.   OKAY.  AND YOU KNEW THAT YOU WERE NOT GOING TO BE REQUIRED TO BE ON SITE AT THERANOS; RIGHT?

A.   CORRECT.

Q.   AND YOU HAD DONE THAT BEFORE, WORKED NOT ON SITE AT

DIFFERENT LABS; RIGHT?

A.   THIS WAS THE FIRST TIME THAT I HAD NOT EVER BEEN ON SITE.

I HAVE CERTAINLY WORKED NOT ON SITE.  MOST DOCUMENT REVIEW IS DONE OFF SITE.

BUT I AM GENERALLY ALSO ON SITE AT THE LABS PART-TIME.

Q.   OKAY.  AND YOU, AS YOU SAID, I THINK EARLIER, YOU HAD WORKED AT MULTIPLE LABS BEFORE; RIGHT?

A.   CORRECT.

Q.   AND YOU HAD WORKED PART-TIME AT DIFFERENT LABS; CORRECT?

A.   CORRECT.

Q.   AND THERE'S NOTHING WRONG WITH DOING THAT; RIGHT?

A.   TRUE.

Q.   THE REGULATIONS ALLOW LAB DIRECTORS TO DO THAT; RIGHT?

A.   YES.

Q.   OKAY.  OKAY.

AND THEN YOU MENTIONED A DELEGATION THAT YOU MADE.  YOU SAID THAT YOU, YOU MADE ONE DELEGATION DURING YOUR TIME AT THERANOS; IS THAT RIGHT?

A.   CORRECT.

Q.   AND A DELEGATION IS IMPORTANT FOR A LAB DIRECTOR BECAUSE -- ESPECIALLY IF YOU CAN'T BE THERE ALL OF THE TIME; IS THAT FAIR?

A.   YES.  IT'S EFFECTIVELY A JOB DESCRIPTION, DELEGATING THE AUTHORITIES WITHIN THAT JOB DESCRIPTION TO THE PERSON.

Q.   OKAY.  AND SO YOU, AS LAB DIRECTOR, DELEGATE WHATEVER IS

DESCRIBED TO ANOTHER INDIVIDUAL WHO WORKED AT THE LAB; CORRECT?

A.   YES.

Q.   AND YOU SAID THAT YOU DELEGATED TO A QC MANAGER; RIGHT?

A.   YES.

Q.   AND THAT PERSON'S NAME WAS LANGLY GEE, WAS IT NOT?

A.   YES.

Q.   OKAY.  AND SO MR. GEE WAS RESPONSIBLE FOR REVIEWING AND ANALYZING ALL OF THE QC WORK THAT WAS DONE WITHIN THE LAB; CORRECT?

A.   CORRECT.

Q.   AND AS A LAB DIRECTOR, YOU UNDERSTAND THE IMPORTANCE OF QC; RIGHT?

A.   YES.

Q.   QC IS PERFORMED TO MAKE SURE THAT THE INSTRUMENT IS OPERATING RELIABLY; RIGHT?

A.   YES.

Q.   AND QC TESTS THE PRECISION ON THE DEVICE; RIGHT?

A.   IT DEPENDS ON WHAT KIND OF TEST IT IS.  IT MIGHT.

Q.   OKAY.  BUT IT'S IMPORTANT IN THE OPERATION OF THE LAB; RIGHT?

A.   YES.

Q.   AND THAT WAS DELEGATED TO MR. GEE; CORRECT?

A.   YES.

        THE COURT:  SHOULD WE BREAK NOW?

        MS. WALSH:  PROBABLY, YEAH.

SER-743

5558

THE COURT: LET'S DO THAT. LET'S TAKE OUR AFTERNOON BREAK, LADIES AND GENTLEMEN.

WE'LL SEE YOU NEXT FRIDAY, PLEASE -- NOT NEXT FRIDAY, THIS COMING FRIDAY.

(LAUGHTER.)

THE COURT: LANGUAGE IS SO IMPORTANT, ISN'T IT?

WE'LL SEE YOU FRIDAY NEXT, WHICH MEANS THIS FRIDAY. AT 9:00 O'CLOCK WE'LL START, LADIES AND GENTLEMEN.

LET ME REMIND YOU OF THE ADMONITION. IT'S STILL IN PLACE. DO NOT DISCUSS OR IN ANY WAY ATTEMPT TO LEARN ANYTHING ABOUT THIS CASE.

HAVE A GOOD DAY OFF, AND WE'LL SEE YOU FRIDAY MORNING. THANK YOU.

AND WE'LL SEE YOU BACK FRIDAY MORNING, DOCTOR.

THANK YOU.

(JURY OUT AT 4:14 P.M.)

THE COURT: PLEASE BE SEATED. THANK YOU.

THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE DAY. DR. SAWYER HAS LEFT THE COURTROOM.

COUNSEL, SCHEDULING FOR FRIDAY?

MS. WALSH, I EXPECT THAT YOU'LL FINISH YOUR CROSS BY THE BREAK DO YOU THINK, OUR MORNING BREAK?

MS. WALSH: YES, I THINK SO.

THE COURT: RIGHT.

MR. SCHENK: YES. THANK YOU, YOUR HONOR.

SER-744

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,               )
                                        )  CR-18-00258-EJD
                      PLAINTIFF,        )
                                        )  SAN JOSE, CALIFORNIA
            VS.                         )
                                        )  MAY 13, 2022
RAMESH "SUNNY" BALWANI,                 )
                                        )  VOLUME 29
                      DEFENDANT.        )
_____        )  PAGES 5563 - 5837


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                          BY:  JOHN C. BOSTIC
                               JEFFREY B. SCHENK
                          150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113

                          BY:  ROBERT S. LEACH
                               KELLY VOLKAR
                          1301 CLAY STREET, SUITE 340S
                          OAKLAND, CALIFORNIA 94612

      (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:
                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

SER-745

5565

INDEX OF PROCEEDINGS

GOVERNMENT'S:


**LYNETTE SAWYER**
CROSS-EXAM BY MS. WALSH (RES.)            P. 5568
REDIRECT EXAM BY MR. LEACH                P. 5583
RECROSS-EXAM BY MS. WALSH                 P. 5586


**CHRISTOPHER LUCAS**
DIRECT EXAM BY MR. BOSTIC                  P. 5588
CROSS-EXAM BY MR. COOPERSMITH              P. 5635
REDIRECT EXAM BY MR. BOSTIC                P. 5721
RECROSS-EXAM BY MR. COOPERSMITH            P. 5735


**AUDRA ZACHMAN**
DIRECT EXAM BY MR. BOSTIC                  P. 5763
CROSS-EXAM BY MS. MCDOWELL                 P. 5793
REDIRECT EXAM BY MR. BOSTIC                P. 5817
RECROSS-EXAM BY MS. MCDOWELL               P. 5822


**BRITTANY GOULD**
DIRECT EXAM BY MR. LEACH                   P. 5825

**SER-746**

SAN JOSE, CALIFORNIA                           MAY 13, 2022

P R O C E E D I N G S

(COURT CONVENED AT 9:07 A.M.)

(JURY IN AT 9:07 A.M.)

THE COURT:  THANK YOU.  PLEASE BE SEATED.

ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

THE JURY AND ALTERNATES ARE PRESENT.

GOOD MORNING, LADIES AND GENTLEMEN.  NICE TO SEE YOU AGAIN ON THIS FRIDAY NEXT.

LET ME ASK YOU THAT QUESTION BEFORE WE BEGIN.

DURING THE BREAK, HAVE ANY OF YOU HAD CAUSE TO READ, LEARN, DISCUSS, OR IN ANY WAY DO ANY INVESTIGATION ABOUT THIS CASE?

IF SO, IF YOU WOULD PLEASE RAISE YOUR HAND.

I SEE NO HANDS.

THANK YOU FOR YOUR CONTINUED RECOGNITION OF THE ADMONITION.

WE'RE GOING TO CONTINUE.  I THINK MS. SAWYER IS ON THE STAND, DR. SAWYER.

MS. WALSH, YOU'RE READY TO CROSS-EXAMINE AGAIN?

MS. WALSH:  I AM, YOUR HONOR.  THANK YOU.

THE COURT:  GREAT.  GREAT.  LET'S BRING HER IN.

GOOD MORNING, DR. SAWYER.

PLEASE MAKE YOURSELF COMFORTABLE.

THE WITNESS:  THANK YOU.

THE COURT:  YOU CAN TAKE YOUR MASK OFF AGAIN IF YOU WOULD LIKE.

THE WITNESS:  THANK YOU.

THE COURT:  AND WHEN YOU ARE COMFORTABLE, WOULD YOU JUST STATE YOUR NAME AGAIN, PLEASE.

THE WITNESS:  LYNETTE SAWYER.

THE COURT:  THANK YOU.  I'LL REMIND YOU, YOU'RE STILL UNDER OATH.

**(GOVERNMENT'S WITNESS, LYNETTE SAWYER, WAS PREVIOUSLY SWORN.)**

THE COURT:  MS. WALSH.

MS. WALSH:  THANK YOU, YOUR HONOR.

**CROSS-EXAMINATION (RESUMED)**

BY MS. WALSH:

Q.   GOOD MORNING, DR. SAWYER.

A.   GOOD MORNING.

Q.   SO I WANTED TO ASK YOU SOME QUESTIONS ABOUT YOUR TESTIMONY ON WEDNESDAY.  AND I WANT TO START WITH YOUR UNDERSTANDING OF THERANOS'S USE OF ITS OWN LDT'S.

YOU TESTIFIED ON DIRECT THAT YOU BELIEVED WHILE YOU WERE WORKING AT THERANOS THAT THERANOS WAS RUNNING ALL OF ITS TESTS ON COMMERCIALLY AVAILABLE FDA APPROVED DEVICES; IS THAT RIGHT?

A.   ALL THE SOP'S I SAW AND REVIEWED WERE FOR COMMERCIAL DEVICES WITH A COUPLE OF EXCEPTIONS, WHICH HAD TO DO WITH BACTERIA IN STOOLS.

Q.   SO WAS IT YOUR BELIEF WHILE YOU WERE WORKING THERE, THAT THERANOS WAS RUNNING ALL OF ITS TESTS ON FDA APPROVED DEVICES?

A.   YES, BECAUSE IF THEY WEREN'T, I SHOULD HAVE SEEN THE SOP'S FOR SOMETHING ELSE.

Q.   OKAY.  AND YOU ALSO TESTIFIED THAT YOU HAD BEEN WORKING IN THE LAB INDUSTRY FOR A FEW DECADES; RIGHT?

A.   YEAH.

Q.   OKAY.  AND YOU UNDERSTOOD THAT THERANOS HAD DEVELOPED ITS OWN TECHNOLOGY AT THE TIME; RIGHT?

A.   NO.  I UNDERSTOOD THAT THEY WERE DEVELOPING SOMETHING.

Q.   OKAY.

A.   I DIDN'T KNOW ITS STATUS.

Q.   SO WERE YOU -- YOU WERE AWARE IN 2013 THERE WAS PUBLICITY ABOUT THERANOS'S ROLLOUT IN WALGREENS OF ITS TESTING SERVICES?

A.   VERY PERIPHERALLY.

Q.   ALL RIGHT.  LET'S, IF WE COULD, PULL UP WHAT IS ALREADY IN EVIDENCE --

     IF I COULD PUBLISH, YOUR HONOR, EXHIBIT 1113?

          THE COURT:  SURE.

     AND, DR. SAWYER, IF YOU COULD JUST PULL THAT MICROPHONE A LITTLE CLOSER TO YOU, THAT WOULD BE HELPFUL.

          THE WITNESS:  OKAY.

          THE COURT:  DOES IT MOVE?  I THINK IT --

          THE WITNESS:  YEAH.  I WAS JUST TRYING NOT TO HIT IT WITH THE PAGES.

THE COURT:  RIGHT.  THERE IS THAT.

BY MS. WALSH:

Q.  OKAY.  SO LOOKING AT EXHIBIT 1113, THIS IS THE JOINT PRESS RELEASE FOR THERANOS'S ROLLOUT IN WALGREENS.

DO YOU SEE THAT?

A.  UH-HUH.

Q.  AND THE TITLE OF THE PRESS RELEASE IS "THERANOS SELECTS WALGREENS AS A LONG-TERM PARTNER THROUGH WHICH TO OFFER ITS NEW CLINICAL LABORATORY SERVICE."

DO YOU SEE THAT?

A.  YES.

Q.  AND THE DATE OF THIS PRESS RELEASE IS SEPTEMBER 9TH, 2013; RIGHT?

A.  OKAY.

Q.  AND I JUST WANT TO READ THE FIRST PARAGRAPH, WHICH STATES THAT:  "THERANOS AND WALGREENS TODAY ANNOUNCED A LONG-TERM PARTNERSHIP TO BRING ACCESS TO THERANOS'S NEW LAB TESTING SERVICE THROUGH WALGREENS PHARMACIES NATIONWIDE.  AS THE SERVICE BECOMES AVAILABLE THROUGH WALGREENS" -- SORRY -- "THROUGH THERANOS WELLNESS CENTERS INSIDE WALGREENS STORES, CONSUMERS WILL BE ABLE TO ACCESS LESS INVASIVE AND MORE AFFORDABLE CLINICIAN-DIRECTED LAB TESTING, FROM A BLOOD SAMPLE AS SMALL AS A FEW DROPS, OR 1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW.  THE SAMPLES ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS."

Q.    SO MY QUESTION, DR. SAWYER, IS BEING IN THE LAB INDUSTRY AT THE TIME, DO YOU REMEMBER SEEING THIS ANNOUNCEMENT?

A.    NO.

Q.    OKAY.  WHEN YOU STARTED AT THERANOS, OR SHORTLY BEFORE YOU STARTED AT THERANOS, DID YOU GO TO THERANOS'S WEBSITE AT THE TIME?

A.    NO, I DID NOT.

Q.    OKAY.  LET'S PULL UP EXHIBIT 5805, WHICH IS IN EVIDENCE.

THIS IS THERANOS'S WEBSITE.

AND I JUST WANT TO READ ON PAGE 1.  "ONE TINY DROP CHANGES EVERYTHING."

DO YOU SEE THAT?

A.    I DO.

Q.    "NOW FOR THE FIRST TIME, OUR HIGH COMPLEXITY CLIA-CERTIFIED LABORATORY CAN PERFORM YOUR TESTS QUICKLY AND ACCURATE ON SAMPLES AS SMALL AS A SINGLE DROP."

DO YOU SEE THAT?

A.    I DO.

Q.    AND THEN IF WE CAN FLIP TO PAGE 3 UNDER "A FEW DROPS IS ALL IT TAKES."

IT SAYS, "THERANOS'S PATENTED TECHNOLOGY CAN ANALYZE SAMPLES AS SMALL AS 1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW."

DO YOU SEE THAT?

A.    I DO.

Q.    AND YOU DON'T HAVE ANY RECOLLECTION OF SEEING ANY OF THESE

STATEMENTS WHEN YOU STARTED WORKING AT THERANOS IN 2014?

A.   NO, I DID NOT GO TO THEIR WEBSITE.

AS I SAID BEFORE, I WAS ANTICIPATING IT TO BE A TWO TO THREE MONTH, VERY SHORT-TERM ASSIGNMENT.

Q.   OKAY.  AND EVEN THOUGH YOU DIDN'T GO TO THEIR WEBSITE, YOU DIDN'T HEAR ABOUT THERANOS'S NEW TECHNOLOGY KIND OF IN THE NEWS OR ANYTHING LIKE THAT?

A.   I HEARD, I HEARD THE NAME.  I KNEW THEY WERE DEVELOPING NEW TECHNOLOGY.

I DIDN'T KNOW THE STATUS OF ITS ACTUAL USE.

Q.   BUT YOU KNEW THEY WERE DEVELOPING NEW TECHNOLOGY?

A.   UH-HUH.

Q.   AND YOU KNEW THEY HAD A CLIA LAB?

A.   YES, I DID.

Q.   OKAY.  BUT YOU DIDN'T SEE ANYTHING IN THE NEWS ABOUT THEM USING THE NEW TECHNOLOGY IN THE CLIA LAB, IS THAT WHAT YOU'RE SAYING?

A.   CORRECT.

Q.   OKAY.  YOU ALSO TESTIFIED ON DIRECT THAT YOUR ONLY CONTACT THAT YOU HAD IN THE -- FROM THE LAB WAS A PERSON NAMED MICHELLE LEE; IS THAT RIGHT?

A.   I BELIEVE THAT WAS HER NAME.  MY RECOLLECTION IS THAT THAT'S HER NAME.  SOMETHING SIMILAR TO THAT AT LEAST.

Q.   OKAY.  COULD IT HAVE BEEN MOLLY LEE?

A.   YES, IT COULD HAVE BEEN.

SER-752

Q.   OKAY.  AND YOU SAID SHE WAS THE PERSON WHO SENT YOU THE SOP'S TO SIGN; IS THAT RIGHT?

A.   CORRECT.

Q.   AND YOU ALSO TESTIFIED THAT YOU HAD NO CONTACT WITH THE TECHNICAL SUPERVISOR IN THE LAB; RIGHT?

A.   CORRECT.

Q.   AND NO CONTACT WITH THE GENERAL SUPERVISOR IN THE LAB; RIGHT?

A.   CORRECT.

Q.   BUT YOU DID REVIEW SOP'S; CORRECT?

A.   I DID.

Q.   OKAY.  AND SO LET'S PULL SOME OF THE ONES THAT YOU DID REVIEW THAT ARE IN EVIDENCE UP FOR YOU TO LOOK AT AGAIN.

     AND WHY DON'T WE START WITH EXHIBIT 20575.  AND IF WE CAN LOOK AT THE FIRST PAGE OF THIS.

     SO YOU SEE YOUR SIGNATURE, DR. SAWYER, AT THE BOTTOM; CORRECT?

A.   YES.

Q.   AND IF WE GO UP, THE SIGNATURES AT THE BOTTOM, MR. ALLEN.

     THE ONE ABOVE YOUR SIGNATURE IS GODFRED MASINDE, PH.D.

     DO YOU SEE THAT?

A.   I DO.

Q.   AND HE WAS LISTED AS THE TECHNICAL SUPERVISOR; CORRECT?

A.   ON THAT DOCUMENT, YES.

Q.   RIGHT.  THAT'S HIS TITLE IN THE DOCUMENT, RIGHT, THE

DOCUMENT YOU SIGNED?

A.   YES.

Q.   OKAY.  AND SO YOU DIDN'T REACH OUT TO DR. MASINDE TO TALK ABOUT THE LAB?

A.   I DID NOT.

Q.   OKAY.  AND IF WE GO ONE UP.

LINA CASTRO, SHE'S LISTED AS THE CLINICAL LABORATORY SCIENTIST.

DO YOU SEE THAT?

A.   I DO.

Q.   AND I TAKE IT YOU DID NOT REACH OUT TO HER EITHER; RIGHT?

A.   I DID NOT.

Q.   AND THEN THE NEXT ONE IS LINDSAY MARSH.

DO YOU SEE THAT?

A.   UH-HUH, I DO.

Q.   AND HER TITLE IS CLINICAL LABORATORY ASSOCIATE; CORRECT?

A.   YES.

Q.   AND YOU DID NOT REACH OUT TO THAT PERSON TO TALK ABOUT THE LAB EITHER; RIGHT?

A.   I DID NOT.

Q.   OKAY.  LET'S NOW PULL UP 10526, WHICH IS ANOTHER SOP THAT YOU SIGNED IN EVIDENCE.

AGAIN, I JUST POINT YOU TO GODFRED MASINDE.

DO YOU SEE THAT?

A.   UH-HUH, I DO.

Q.   AND HE'S THE TECHNICAL SUPERVISOR.

AND THEN THERE ARE SOME OTHER NAMES ON THE SOP THAT IS SIGNED; RIGHT?

A.   YES.

Q.   AND YOU DIDN'T REACH OUT TO ANY OF THOSE PEOPLE; RIGHT?

A.   NO, I DID NOT.

Q.   OKAY.  AND IF YOU CAN TURN IN YOUR BINDER TO 20033.

DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

A.   YES, I DO.

Q.   AND THIS IS ANOTHER STANDARD OPERATING PROCEDURE; RIGHT?

A.   YES, IT IS.

Q.   AND THE EFFECTIVE DATE IS 12-2-2014; CORRECT?

A.   HUH --

Q.   ON THE TOP?

A.   THAT IS A DATE THAT THEY WERE SIGNED.

TECHNICALLY, ACTUALLY IT'S NOT EFFECTIVE UNTIL I SIGN IT.

Q.   OKAY.  AND YOU SIGNED IT ON 5-5-2015.

DO YOU SEE THAT?

A.   YES.

Q.   AND THAT'S YOUR SIGNATURE; RIGHT?

A.   CORRECT.

Q.   OKAY.

YOUR HONOR, WE OFFER 20033.

MR. LEACH:  NO OBJECTION, YOUR HONOR.

THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

(DEFENDANT'S EXHIBIT 20033 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

Q.   AND JUST LOOKING AT THE FIRST PAGE, THIS WAS ALSO SIGNED, BEFORE YOU SIGNED IT, BY HODA ALAMDAR.

DO YOU SEE THAT?

A.   I DO.

Q.   AND SHE -- HER TITLE WAS GENERAL SUPERVISOR; RIGHT?

A.   YES.

Q.   AND YOU DIDN'T REACH OUT TO HER TO TALK TO HER ABOUT THE LAB, DID YOU?

A.   NO.

Q.   AND THEN ABOVE THAT IS LANGLY GEE; RIGHT?

A.   YES.

Q.   AND HE IS THE -- OR WAS THE QA/QC MANAGER; RIGHT?

A.   YES.

Q.   AND I THINK YOU TESTIFIED ON WEDNESDAY THAT HE WAS SOMEONE WHO YOU SIGNED A DELEGATION FOR; IS THAT CORRECT?

A.   CORRECT.

Q.   BUT YOU DIDN'T REACH OUT TO HIM TO TALK ABOUT THE LAB; IS THAT RIGHT?

A.   NO, I DID NOT.

Q.   AND THEN JUST ONE MORE.  IF WE CAN TAKE THAT DOWN.

IF YOU CAN TURN IN YOUR BINDER TO 20651.

A.   YES.

Q.   OKAY.  JUST LOOKING AT THAT -- WELL, YOU CAN LOOK AT THE

WHOLE EXHIBIT, BUT FOCUSSING YOU ON THE FIRST PAGE. THIS IS ANOTHER SOP THAT YOU SIGNED; CORRECT?

A.   YES.

Q.   AND YOU SIGNED IT ON MAY 5TH, 2015; RIGHT?

A.   YES.

          MS. WALSH:  YOUR HONOR, WE OFFER 20651.

          MR. LEACH:  NO OBJECTION, YOUR HONOR.

          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

     (DEFENDANT'S EXHIBIT 20651 WAS RECEIVED IN EVIDENCE.)

BY MS. WALSH:

Q.   IF WE CAN TAKE A LOOK AT THE FIRST PAGE.  THIS RELATES TO THERANOS LIS APPLICATION USER GUIDE; RIGHT?

A.   YES.

Q.   AND LIS STANDS FOR LABORATORY INFORMATION SYSTEM?

A.   YES.

Q.   OKAY.  AND YOU SEE THAT ABOVE YOUR NAME THIS WAS SIGNED BY MONETTE ROCKYMORE; IS THAT RIGHT?

A.   YES, IT LOOKS THAT WAY, YES.

Q.   AND SHE WAS A CLINICAL LAB SCIENTIST; CORRECT?

A.   YES.

Q.   AND DID YOU REACH OUT TO HER ABOUT ANY BUSINESS IN THE LAB?

A.   NO, I DID NOT.

Q.   AND THEN MAX FOSQUE.

     DO YOU SEE THAT?

A.   I DO.

Q.   AND HE WAS A PRODUCT MANAGER; CORRECT?  OR ACCORDING TO THIS DOCUMENT.

A.   YES.

Q.   AND I TAKE IT YOU DID NOT REACH OUT TO HIM ABOUT THERANOS'S BUSINESS; RIGHT?

A.   CORRECT.

Q.   OKAY.  YOU CAN TAKE THAT DOWN, MR. ALLEN.

     OKAY.  SO THESE SOP'S THAT WE JUST LOOKED AT, THEY'RE NOT THE ONLY SOP'S THAT YOU SIGNED DURING YOUR TENURE; RIGHT?

A.   CORRECT.

Q.   AND YOU REVIEWED AND SIGNED OFF ON OTHER SOP'S AND OTHER DOCUMENTS RELATING TO THE CLIA LAB; CORRECT?

A.   YES.

Q.   AND YOU DID THAT THROUGHOUT YOUR TENURE AT THERANOS; RIGHT?

A.   YES.

Q.   AND YOU ENDED UP SIGNING HUNDREDS OF SOP'S, POLICIES AND DOCUMENTS; RIGHT?

A.   YES.

Q.   AND THOSE -- WE'RE NOT GOING TO GO THROUGH ALL OF THEM, BUT THOSE DOCUMENTS WERE SIMILAR TO THE ONES THAT WE SAW IN THAT THEY HAD SIGNATURES ABOVE YOURS BEFORE YOU SIGNED; IS THAT RIGHT?

A.   YES.

SER-758

Q. OKAY. AND I JUST WANT TO CONFIRM THAT YOU DIDN'T REACH OUT TO ANY OF THOSE PEOPLE ABOUT THE THERANOS LAB; IS THAT CORRECT?

A. THAT IS CORRECT.

IF I HAD SERIOUS QUESTIONS ABOUT THE SOP'S, I MIGHT HAVE. BUT THE SOP'S WERE ACTUALLY IN VERY GOOD SHAPE.

Q. OKAY. AND YOU TESTIFIED THAT YOU WANTED A LIST OF PERSONNEL; RIGHT?

A. YES.

Q. AND WE SAW MANY DIFFERENT NAMES THAT WERE PERSONNEL IN THE LAB; RIGHT?

A. YES.

Q. AND WE SAW THEIR TITLES; CORRECT?

A. YES.

Q. OKAY. YOU JUST DIDN'T HAVE THEM IN ONE PLACE ON A LIST; RIGHT?

A. CORRECT.

Q. OKAY. AND DID YOU -- YOU DIDN'T REACH OUT TO ANY OF THOSE PEOPLE TO GET THE LIST ALL IN ONE PLACE, DID YOU?

A. MOST OF THEM WOULDN'T HAVE HAD IT.

Q. WELL, DID YOU REACH OUT TO ANY OF THEM TO ASK?

A. NO, I DID NOT.

Q. OKAY. YOU ALSO TESTIFIED THAT YOU HAD NO CONTACT WITH YOUR CO-LAB DIRECTOR; RIGHT?

A. YES.

Q.   AND THERE WAS NO DISCUSSION, AS YOU TESTIFIED ON WEDNESDAY, ABOUT HOW TO DIVIDE UP YOUR RESPONSIBILITIES; RIGHT?

A.   CORRECT.

Q.   AND YOU ALSO TESTIFIED ABOUT, I THINK, YOU HADN'T HEARD OF SUNIL DHAWAN WHILE YOU WERE WORKING AT THERANOS; RIGHT?

A.   CORRECT.

Q.   IF YOU COULD WAIT UNTIL I FINISH THE QUESTION, IT WOULD BE EASIER FOR THE COURT REPORTER.

     BUT YOU DID KNOW THAT THERE WAS A CO-LAB DIRECTOR WHEN YOU STARTED WORKING AT THERANOS; RIGHT?

A.   I DID.

Q.   OKAY.  AND YOU DIDN'T ASK ANYONE WHO THE CO-LAB DIRECTOR WAS; IS THAT CORRECT?

A.   YES.

Q.   AND I TAKE IT YOU DIDN'T TAKE ANY STEPS TO REACH OUT TO WHOEVER THAT CO-LAB DIRECTOR WAS AT THE TIME; RIGHT?

A.   CORRECT.

Q.   YOU ALSO TESTIFIED ON WEDNESDAY THAT YOU NEVER -- YOU WERE NEVER ASKED TO VISIT THE LAB; CORRECT?

A.   CORRECT.

Q.   AND, IN FACT, YOU NEVER SET FOOT IN THE LAB; RIGHT?

A.   YES.

Q.   OKAY.  BUT YOU DIDN'T ASK ANYONE FOR A TOUR OF THE THERANOS LAB, DID YOU?

A.   NO, I DID NOT.

SER-760

Q.   OKAY.  AND YOU ALSO, AS BEING THE CO-LAB DIRECTOR, YOU HAD THE TELEPHONE NUMBER AND ADDRESS OF THE LAB; RIGHT?

A.   I DID HAVE THE ADDRESS, YES.

Q.   OKAY.  BUT YOU ALSO HAD THE TELEPHONE NUMBER, DIDN'T YOU?

A.   I PROBABLY DID.  I DON'T RECALL FOR SURE.

Q.   OKAY.  IF YOU CAN -- I JUST WANT TO SHOW YOU SOMETHING TO REFRESH YOUR RECOLLECTION ON THAT.

     IF YOU CAN TURN TO 10562 IN YOUR BINDER.

A.   YES.

Q.   IF YOU LOOK AT THE PAGE ENDING -- IT'S THE THIRD PAGE BUT THE PAGE ENDING IN 0437.

     DO YOU SEE THAT?

A.   YES.

Q.   AND THAT'S A FORM THAT YOU SIGNED; RIGHT?

A.   YES.

Q.   OKAY.  AND LOOKING AT THE TOP BOX OF INFORMATION, DOES THAT REFRESH YOUR RECOLLECTION AS TO WHETHER YOU HAD THE LAB'S TELEPHONE NUMBER?

A.   YES, I DEFINITELY HAVE SEEN IT.

Q.   SO YOU HAD THE PHONE NUMBER?

A.   I DID.

Q.   OKAY.  AND I JUST WANT TO CONFIRM, YOU, YOU NEVER CALLED THE LAB TO SCHEDULE AN APPOINTMENT TO GO SEE THE LAB; RIGHT?

A.   CORRECT.

Q.   AND YOU NEVER -- YOU KNEW THE ADDRESS OF THE LAB; CORRECT?

SER-761

A.   I DID.

Q.   AND YOU NEVER JUST TOOK A DRIVE OVER TO VISIT THE LAB ON YOUR OWN; IS THAT RIGHT?

A.   THAT IS TRUE.

Q.   OKAY.  AND SO YOU TESTIFIED ON WEDNESDAY THAT YOUR LEVEL OF COMMUNICATION WITH THE LAB WAS A MATTER OF FRUSTRATION TO YOU AND LED TO YOU DECIDING NOT TO RENEW YOUR CONTRACT; IS THAT FAIR?

A.   THAT'S PART OF IT.

     AND PART OF IT WAS JUST BECAUSE IT WAS SUPPOSED TO BE A VERY SHORT-TERM CONTRACT.

Q.   OKAY.  BUT THAT LEVEL OF COMMUNICATION WAS, AT LEAST YOU TESTIFIED TO ON WEDNESDAY, WAS A MATTER OF FRUSTRATION TO YOU?

A.   IT WAS.

Q.   OKAY.  BUT IT'S FAIR TO SAY, ISN'T IT, THAT YOU NEVER REACHED OUT TO ANY OF THE SCIENTISTS IN THE LAB TO TALK TO THEM; RIGHT?

A.   I DID NOT PUSH, I DID NOT PUSH IT FROM MY SIDE, NO.  THAT IS CORRECT.

Q.   AND YOU NEVER ASKED ANYONE, AS YOU JUST TESTIFIED, TO GET A TOUR; RIGHT?

A.   CORRECT.

Q.   AND YOU NEVER JUST DROVE UP AS THE LAB DIRECTOR TO SAY, HEY, I'M HERE, I WANT TO SEE THE LAB; RIGHT?

A.   THAT IS TRUE.

SER-762

I ALSO KNOW FROM EXPERIENCE THAT IN TODAY'S LABORATORY, THAT DOESN'T WORK VERY WELL IN GENERAL BECAUSE OF WORK SCHEDULES AND THE LIKE.

Q.   OKAY.  PUTTING LOGISTICS ASIDE, THOUGH, YOU NEVER TOOK ANY STEPS TO VISIT THE LAB?

A.   TRUE.

Q.   IS THAT FAIR?

A.   YEP.

MS. WALSH:  OKAY.  NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  REDIRECT?

MR. LEACH:  BRIEFLY, YOUR HONOR.  THANK YOU.

**REDIRECT EXAMINATION**

BY MR. LEACH:

Q.   GOOD MORNING, DR. SAWYER.

A.   GOOD MORNING.

Q.   ON WEDNESDAY YOU WERE ASKED SOME QUESTIONS ABOUT AN INDIVIDUAL NAMED JERRY HURST; CORRECT?

A.   YES.

Q.   AND MR. HURST NEVER TOLD YOU ANYTHING ABOUT THERANOS RUNNING LDT'S; IS THAT RIGHT?

A.   THAT IS TRUE.

Q.   HE NEVER TOLD YOU ANYTHING ABOUT THERANOS USING A DEVICE CALLED EDISON?

A.   NOT BY THAT NAME, NO.

Q.   HE NEVER TOLD YOU THAT THERANOS WAS USING, IN ITS CLINICAL

LAB, A DEVICE THAT THERANOS HAD MANUFACTURED?

A.   CORRECT.

Q.   OKAY.  YOU HAD NO DISCUSSIONS WITH HIM ABOUT LDT'S OR THERANOS MANUFACTURED ANALYZERS WITH MR. HURST?

MS. WALSH:  OBJECTION.  HEARSAY.

THE COURT:  YOU'RE JUST ASKING IF SHE HAD A CONVERSATION, NOT THE CONTENT?

MR. LEACH:  CORRECT.

THE COURT:  OVERRULED.

THE WITNESS:  CORRECT.

BY MR. LEACH:

Q.   OKAY.  YOU ALSO WERE ASKED -- YOU SAID AS THE LAB DIRECTOR YOU WERE AWARE THAT THERE WERE A SMALL NUMBER OF LDT'S RELATING TO BACTERIA IN STOOLS.

DO I HAVE THAT RIGHT?

A.   YES.

Q.   THAT'S NOT BLOOD TESTING?

A.   CORRECT.

Q.   YOU ALSO WERE ASKED SOME QUESTIONS OR SOME QUESTIONS ABOUT QUALITY CONTROL.

DO YOU RECALL QUESTIONS FROM MS. WALSH ABOUT THAT?

A.   YES.

Q.   SHE ASKED YOU ABOUT THE IMPORTANCE OF QUALITY CONTROL?

A.   YES.

Q.   AND WHY IS QUALITY CONTROL IMPORTANT?

SER-764

A.  BECAUSE THAT'S THE WAY IN WHICH YOU DEMONSTRATE THAT YOUR ASSAYS ARE WORKING.

Q.  OKAY.  SO IF YOU ARE REPEATEDLY FAILING QUALITY CONTROL, THAT CAN HAVE IMPLICATIONS FOR ACCURACY AND RELIABILITY?

A.  ABSOLUTELY.

Q.  YOU WERE ASKED QUESTIONS ABOUT SOP'S THAT YOU SIGNED?

A.  YES.

Q.  AND ALL OF THOSE SOP'S RELATED TO ORDINARY FDA APPROVED MACHINES?

A.  YES.

Q.  THE HUNDREDS OF SOP'S THAT YOU SIGNED WERE RELATED TO FDA APPROVED DEVICES?

A.  YES.

Q.  NOT THERANOS DEVICES?

A.  CORRECT.

Q.  YOU ALSO WERE SHOWN EXHIBIT 1107, THAT WALGREENS PRESS RELEASE?

A.  YES.

Q.  THAT'S NOT SOMETHING THAT YOU EVER SAW AT THE TIME; CORRECT?

A.  CORRECT.

        MR. LEACH:  MAY I HAVE ONE MOMENT, YOUR HONOR?

        THE COURT:  YES.

    (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

        MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

THANK YOU.

THANK YOU, DR. SAWYER.

MS. WALSH:  I HAVE A FEW FOLLOW-UP.

THE COURT:  SURE.

**RECROSS-EXAMINATION**

BY MS. WALSH:

Q.   MR. HURST AND YOU WERE UNAWARE THAT THERANOS WAS RUNNING ITS OWN LDT'S TO TEST BLOOD.

IS THAT WHAT YOU REMEMBER?

A.   I CAN ABSOLUTELY NOT SPEAK FOR WHAT JERRY HURST WAS OR WAS NOT AWARE OF.

Q.   BUT YOU WERE NOT AWARE OF IT?

A.   I WAS NOT AWARE OF THE FACT THAT THEY WERE ACTUALLY DOING IT.

I WAS AWARE OF THE FACT THAT THEY WERE DEVELOPING SOMETHING.

Q.   OKAY.  AND MR. LEACH JUST ASKED YOU ABOUT THE IMPORTANCE OF QUALITY CONTROL?

A.   YES.

Q.   DO YOU REMEMBER THAT?

AND THE PERSON, AS FAR AS YOU WERE AWARE, THE PERSON IN CHARGE OF QUALITY CONTROL IN THE THERANOS LAB WAS LANGLY GEE; IS THAT RIGHT?

A.   YES.

Q.   AND HE'S THE PERSON THAT YOU DELEGATED THAT RESPONSIBILITY

**SER-766**

TO; IS THAT RIGHT?

A.    YES.

MS. WALSH:  I HAVE NOTHING FURTHER, YOUR HONOR.

THE COURT:  MR. LEACH?

MR. LEACH:  NOTHING FURTHER.

THE COURT:  MAY THIS WITNESS BE EXCUSED?

MR. LEACH:  SHE MAY, YES.

MS. WALSH:  YES.

THE COURT:  YOU'RE EXCUSED.

THE WITNESS:  THANK YOU.

THE COURT:  YOU'RE WELCOME.

DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL?

MR. BOSTIC:  YES, YOUR HONOR.

THE UNITED STATES CALLS CHRIS LUCAS.

(PAUSE IN PROCEEDINGS.)

THE COURT:  GOOD MORNING, SIR.

THE WITNESS:  YES.

THE COURT:  IF YOU WOULD COME OVER TO THE SIDE AND FACE OUR COURTROOM DEPUTY, AND RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

THE WITNESS:  I'LL TAKE THE QUESTION.

**(GOVERNMENT'S WITNESS, CHRISTOPHER LUCAS, WAS SWORN.)**

THE WITNESS:  I DO.

THE COURT:  PLEASE HAVE A SEAT UP HERE, SIR, AND MAKE YOURSELF COMFORTABLE.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CR-18-00258-EJD |
| PLAINTIFF, | ) | |
| | ) | SAN JOSE, CALIFORNIA |
| VS. | ) | |
| | ) | JUNE 8, 2022 |
| RAMESH "SUNNY" BALWANI, | ) | |
| | ) | VOLUME 35 |
| DEFENDANT. | ) | |
| | ) | PAGES 6573 - 6668 |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:       UNITED STATES ATTORNEY'S OFFICE
                         BY:  JOHN C. BOSTIC
                              JEFFREY B. SCHENK
                         150 ALMADEN BOULEVARD, SUITE 900
                         SAN JOSE, CALIFORNIA 95113

                         BY:  ROBERT S. LEACH
                              KELLY VOLKAR
                         1301 CLAY STREET, SUITE 340S
                         OAKLAND, CALIFORNIA 94612

         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                         CERTIFICATE NUMBER 8074
                         LEE-ANNE SHORTRIDGE, CSR, CRR
                         CERTIFICATE NUMBER 9595

         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

SER-768

SAN JOSE, CALIFORNIA                    JUNE 8, 2022

P R O C E E D I N G S

(COURT CONVENED AT 10:10 A.M.)

(JURY OUT AT 10:10 A.M.)

THE COURT:  WE ARE ON THE RECORD IN THE BALWANI MATTER.

WHY DON'T I HAVE COUNSEL STATE THEIR APPEARANCES, PLEASE.

MS. VOLKAR:  GOOD MORNING, YOUR HONOR.

KELLY VOLKAR ON BEHALF OF THE UNITED STATES.

I'M JOINED BY MY COLLEAGUES, ROBERT LEACH, JOHN BOSTIC, JEFF SCHENK, OUR CASE AGENT, CHRISTOPHER MCCOLLOW, AND OUR WONDERFUL PARALEGALS, MADDI WACHS AND SARA SLATTERY.

THE COURT:  THANK YOU.  GOOD MORNING.

MR. COOPERSMITH:  GOOD MORNING.

JEFF COOPERSMITH FOR MR. BALWANI, WHO IS PRESENT, AND I'M JOINED BY MY COLLEAGUES AMY WALSH, STEPHEN CAZARES, AARON BRECHER, AND SACHI SCHURICHT.

THE COURT:  THANK YOU.  GOOD MORNING.

WE SET TODAY FOR OUR INITIAL CHARGING CONFERENCE TO DISCUSS JURY INSTRUCTIONS THAT THE COURT MIGHT GIVE IN THIS CASE.

I DID RECEIVE YESTERDAY SUBMISSIONS FROM THE GOVERNMENT REGARDING PROPOSED JURY INSTRUCTIONS.

I ALSO RECEIVED SUBMISSIONS FROM THE DEFENDANT ON PROPOSED JURY INSTRUCTIONS, SUPPLEMENTAL INSTRUCTIONS, AS WELL AS A

REFERENCE TO DOCUMENT 1210, EXCUSE ME, DOCUMENT 1210 FROM THE DEFENDANT.

I ALSO HAVE WITH ME, AS I'M SURE YOU DO, DOCUMENT 1206, WHICH ARE THE INSTRUCTIONS, THE FINAL INSTRUCTIONS THAT WERE GIVEN IN THE COMPANION CASE.

AND I DO HAVE THE MODEL NINTH CIRCUIT INSTRUCTIONS WITH ME, AND YOU SHOULD TOO IN SOME FORM.

ANYTHING ELSE THAT YOU THINK I SHOULD HAVE THIS MORNING THAT I HAVEN'T MENTIONED?

MS. VOLKAR:  NO, YOUR HONOR.

BUT I DO HAVE SOME PRELIMINARY REMARKS WHENEVER THE COURT IS READY.

THE COURT:  SURE.

LET ME ASK, ANYTHING ELSE?

MR. COOPERSMITH:  NO, YOUR HONOR.

BUT MY COLLEAGUE, MS. WALSH AND MS. SCHURICHT WILL HANDLE THE PROCEEDINGS THIS MORNING.  SO THANK YOU.

THE COURT:  SURE.  THANK YOU.

GOOD MORNING.

MS. WALSH:  GOOD MORNING, YOUR HONOR.

THE COURT:  MS. VOLKAR.

MS. VOLKAR:  THANK YOU, YOUR HONOR.

SO THE GOVERNMENT RECEIVED THE DEFENDANT'S FILINGS LAST NIGHT.  THE GOVERNMENT FILING THAT YOUR HONOR REFERENCED WAS 1211, THE GOVERNMENT'S PROPOSED JURY INSTRUCTIONS FILED BASED

ON THE PRETRIAL DEADLINE. THEY ARE BASED LARGELY ON THE MODEL INSTRUCTIONS, AND WE'LL GET TO THAT IN A MOMENT.

BUT I DON'T NEED TO REMIND THE COURT, I'M SURE YOU'RE WELL AWARE, THE JURY INSTRUCTIONS WERE WELL LITIGATED IN THE PRIOR TRIAL. THE HOLMES TEAM FILED A 120-PAGE INITIAL PROPOSED JURY INSTRUCTIONS. WE HAD A CHARGING CONFERENCE OVER THE COURSE OF THREE DAYS. THERE WAS QUITE A BIT OF VIGOROUS DEBATE ABOUT SEVERAL OF THE INSTRUCTIONS.

THERE WAS SORT OF NIT-PICKING OF THE VARIOUS WORDS IN THE MODEL INSTRUCTIONS FOR THINGS AS SIMPLE AS CHANGING "DEFENDANT" TO "MS. HOLMES" AND ADDING "ALLEGED" FOR CONSPIRACY TO SUBSTANTIVE COUNTS, TO MUCH MORE SUBSTANTIVE CHANGES. AND THERE IS PLENTY OF CASE LAW AND LEGAL CITATIONS.

I SAY ALL OF THIS TO SAY THERE WAS QUITE A BIT OF WORK DONE THERE, AND BASED ON THE DEFENDANT'S FILING LAST NIGHT, I CONFERRED BRIEFLY WITH MS. WALSH BEFORE OUR HEARING THIS MORNING, AND IT SEEMS THAT, I DON'T WANT TO SPEAK FOR HER, THAT THE PARTIES LARGELY AGREE THAT WE WOULD LIKE TO CAPTURE SOME OF THE WORK THAT WAS DONE IN THE LAST TRIAL.

SO THE GOVERNMENT THOUGHT WE WOULD BE STARTING WITH A CLEAN SLATE AND WE'RE PREPARED TO DO THAT IF NEED BE, BUT WE'RE ALSO HAPPY TO ACKNOWLEDGE THAT THERE WAS A LOT OF WORK THAT WAS DONE BEFORE.

AND WITH THAT, IF THAT IS OUR BASELINE AND THE DEFENDANT HAS INCORPORATED AND ADOPTED THE HOLMES OBJECTIONS AND

REQUESTS, ET CETERA, THE GOVERNMENT ON THE RECORD WOULD LIKE TO INCORPORATE ITS OBJECTIONS AND REQUESTS AND ARGUMENTS THAT WERE MADE AT THE CHARGING CONFERENCE IN THE HOLMES MATTER, AS WELL AS ANY FILINGS.

OF COURSE THERE WAS ALSO QUITE A BIT OF MEET AND CONFER BETWEEN THE PARTIES, MEANING THE GOVERNMENT AND THE HOLMES DEFENSE TEAM, THAT WAS OFF THE RECORD, AND SAME THING, WE MAINTAIN ALL OF OUR POSITIONS.

THE GOVERNMENT PARTICULARLY WANTS TO NOTE THE COURT WILL LIKELY REMEMBER THAT WE HAD A PARTICULARLY VIGOROUS DEBATE OVER THE MENS REA AND THE GIVING OF THE INSTRUCTION OF "WILLFULLY."

THE GOVERNMENT CONTINUES TO OBJECT TO THAT INSTRUCTION, IT WON'T SURPRISE THE TO HEAR, AS A HEIGHTENED MENS REA.

BUT WE ALSO UNDERSTAND IT WAS GIVEN IN THE HOLMES CASE, AND IT WILL LIKELY BE GIVEN HERE.

SO THE LAST THING I WANT TO SAY ON THAT POINT IS THAT IF WE ARE NOT RELITIGATING WHAT WAS SORT OF VIGOROUSLY DEBATED AND THE CONCLUSIONS REACHED IN THE HOLMES CASE, THEN THERE WAS A SIGNIFICANT AMOUNT OF CHANGES THAT WERE ALREADY MADE TO THE MODEL INSTRUCTIONS. THERE WAS A SIGNIFICANT AMOUNT OF DEBATE OVER VARIOUS WORDS AND LINES THAT WERE ULTIMATELY ADDED.

AND I DON'T WANT THAT TO BE FORGOTTEN IN OUR DISCUSSION TODAY WHEN, IN SOME INSTANCES, I WILL POINT TO VERY SIMILAR REQUESTS BY THIS DEFENDANT THAT WERE VIGOROUSLY DEBATED AND LOST.

AND WHAT I MEAN TO SAY THERE IS, OF COURSE, THE GOVERNMENT TAKES ITS LOSSES, FOR EXAMPLE, ON THE WILLFULLY, SPECIFIC UNANIMITY, ET CETERA; BUT THEN THE DEFENDANT WILL ALSO HAVE TO TAKE THE LOSSES, SO TO SPEAK, OF THE HOLMES TEAM IN THE COURT REACHING THE RIGHT CONCLUSION AND THE RIGHT RESULT THAT IT DID LAST GO-ROUND.

A CLEAR EXAMPLE, OR JUST ONE SORT OF SEPARATE EXAMPLE, IS THE VERDICT FORM.  I DON'T KNOW IF YOUR HONOR HAS HAD A CHANCE TO REVIEW IT.

BUT THE DEFENDANT HAS SUBMITTED THE EXACT SAME VERDICT FORM THAT THE HOLMES TEAM SUBMITTED, A LONGER LINE, NOT GUILTY BEFORE GUILTY.

THIS IS JUST ONE EXAMPLE THAT I WANT TO POINT TO AT THE OUTSET OF AN ATTEMPT TO RELITIGATE, BUT TO MAINTAIN, ALL OF THE FAVORABLE TO THE DEFENDANT WORK THAT WAS DONE IN THE HOLMES CASE.

SO THERE ARE GOING TO BE SOME TIMES TODAY WHERE I WILL SAY, "YOUR HONOR, WE DID ARGUE THIS BEFORE."

IT'S NOT THAT THE GOAL POST HAS SORT OF MOVED TO THE MIDDLE ALREADY AND WE SHOULD MOVE FATHER.  IN SOME INSTANCES WE SHOULD -- IF THE COURT REACHED THE RIGHT RESULT LAST TIME, WE SHOULD STICK WITH IT.

WITH THAT LONG PREAMBLE, I THINK IT MAKES SENSE TO WALK THROUGH THE DEFENDANT'S FILING FROM LAST NIGHT, 1476.

I ALSO MENTIONED TO MS. WALSH THAT I WOULD ADVOCATE FOR

THAT TO THE COURT.  THAT'S WHAT I'M PREPARED TO DO.

BUT I'M ALSO HAPPY TO TAKE THE COURT'S DIRECTION IF THERE'S AN EASIER, SMOOTHER WAY TO GO ABOUT IT.

AND ON THAT NOTE, I JUST HAD A MOMENT TO SAY TO MS. WALSH, THE GOVERNMENT IS NOT INTENDING TO SORT OF OBJECT FURTHER BEYOND ITS MAINTAINING ITS PRIOR OBJECTIONS TO INSTRUCTION NUMBER 6, NUMBER 12, NUMBER 15, NUMBER 19, NUMBER 24, NUMBER 25, AND NUMBER 27, AND THOSE ARE -- THEY ARE THE NUMBERS OF THE INSTRUCTIONS GIVEN IN THE HOLMES CASE, BUT THEY MATCH WHAT ARE THE NUMBERED INSTRUCTIONS IN ECF 1476.

I WILL REFERENCE THEM AGAIN AS WE GO THROUGH, BUT I THOUGHT IT WOULD HELP BOTH THE DEFENSE COUNSEL AND THE COURT TO HAVE THOSE AT THE OUTSET.

THANK YOU.

THE COURT:  THANK YOU VERY MUCH.

AND I DO NOTE, MS. WALSH, BEFORE I ASK YOU TO SPEAK TO THIS, THAT YOUR SUBMISSION SEEMED TO SAY THE SAME THINGS THAT MS. VOLKAR JUST INDICATED AS TO RESERVING OBJECTIONS AND ADOPTING THE OBJECTIONS, THE COMMENTS OF MS. HOLMES'S ATTORNEYS IN THAT DISCUSSION AND PRESERVING THOSE ARGUMENTS AS YOUR OWN. I THINK YOU SAID THAT IN YOUR PLEADINGS.

MS. WALSH:  WE DID, YOUR HONOR, YES.

THE COURT:  RIGHT.  AND SO I RECOGNIZE THAT.

IT SEEMS THAT YOU'RE BOTH IN ACCORD ON THAT.  YOU WANT TO RECOGNIZE THOSE OBJECTIONS.  THERE WERE FULSOME OBJECTIONS.

OF COURSE I'M NOT GOING TO PRECLUDE EITHER PARTY FROM SAYING ANYTHING FURTHER THAT YOU THINK WOULD BE HELPFUL IN REGARDS TO THE FINALITY OF THOSE INSTRUCTIONS.

I THINK YOU WOULD AGREE -- YOU MAY HAVE BEEN IN THE COURTROOM WHEN WE HAD THOSE DISCUSSIONS.  THERE WAS A LOT OF WORK.  IT WAS MORE THAN ONE DAY, TWO DAYS, AND WE REACHED A WORK PRODUCT THAT WAS, I THINK, 39 PAGES, SOMETHING LIKE THAT, THAT WERE THE FINAL INSTRUCTIONS.

I'M HAPPY TO TRY TO MAINTAIN SOME ECONOMIES OF SCALE FOR THAT, BUT I DON'T WANT TO PRECLUDE EITHER SIDE FROM A FULSOME OPPORTUNITY TO EXPRESS THEIR THOUGHTS AND VIEWS ON WHAT THE FINAL INSTRUCTIONS SHOULD BE IN THIS CASE.

BUT I'M GUIDED BY YOUR SUBMISSIONS, AND THAT'S HELPFUL.  I THINK THAT WOULD HELP OUR CONVERSATION.

AS I LOOKED AT THESE, BOTH YOUR SUBMISSIONS OVER THE EVENING AND THIS MORNING AGAIN, PERHAPS I'M PROJECTING TOO MUCH, BUT IT SEEMS TO ME THAT THERE WILL PROBABLY BE SOME VIGOROUS DISCUSSION ON MAYBE A HANDFUL OF INSTRUCTIONS, AND THAT'S REALLY ABOUT IT.  THAT'S MY SENSE OF IT.

BUT WE'LL SEE.

MS. WALSH.

MS. WALSH:  YES, YOUR HONOR.  AND THANK YOU FOR THAT.

WHAT MS. VOLKAR ARTICULATED I AGREED WITH AND IS EXACTLY THE REASON THAT WE FILED 1476 IN THE WAY THAT WE DID.  WE --

6582

AND IT'S THE SIMILAR APPROACH THAT WE TOOK WITH REGARD TO THE MOTIONS IN LIMINE THAT WE JOINED FROM THE HOLMES CASE THAT HAD BEEN FULLY ARGUED AND WERE DECIDED BY THE COURT, BUT WE DIDN'T HAVE ANYTHING FURTHER TO ADD.

LIKEWISE, THE JURY INSTRUCTIONS WERE FULLY LITIGATED. WE CERTAINLY WANT TO PRESERVE AND INTEND TO PRESERVE ALL OF OUR OBJECTIONS IN JOINING MS. HOLMES'S ARGUMENTS.

BUT THE COURT DECIDED ON A FINAL SET OF JURY INSTRUCTIONS IN THE HOLMES TRIAL. I THINK FOR EFFICIENCY'S SAKE, IT MAKES SENSE TO START FROM THAT POINT, AND SO THAT WAS THE BASIS FOR OUR FILING OF 1476.

THE COURT: OKAY. THANK YOU.

AND I BELIEVE -- I JUST WANT TO MAKE CERTAIN THAT I HAVE COPIES. WHAT I HAVE A COPY OF IN MY BINDER AND WHAT I'VE PREPARED DOES NOT HAVE A DOCKET NUMBER ON IT.

BUT IS 1476 -- DOES THAT -- IS THAT TITLED MR. BALWANI'S SUPPLEMENTAL PROPOSALS RE JURY INSTRUCTIONS AND VERDICT FORM?

MS. WALSH: IT IS, YOUR HONOR, OR IT DOES. AND I THINK YOU MAY HAVE THE WORD VERSION THAT DOESN'T HAVE THE DOCKET STAMP.

THE COURT: RIGHT.

MS. WALSH: SO I'M GOING TO HAND UP THE DOCKET STAMPED VERSION IF THAT HELPS THE COURT.

IT'S ALSO COLOR COPIED, SO IT MIGHT BE USEFUL.

THE COURT: OKAY. IT'S ONE MORE THING TO HAVE ME

UNITED STATES COURT REPORTERS

GET CONFUSED UP HERE.

MS. WALSH:  I HAVE A COLOR COPY.

MS. VOLKAR:  I HAVE IT.

THE COURT:  ALL RIGHT.  I THINK THIS IS THE SAME THING I HAVE IN MY BINDER.  THANK YOU.

MS. VOLKAR:  FOR CLARITY, YOUR HONOR, WOULD IT BE HELPFUL TO REFER TO THE ECF STAMP AT THE TOP, WHICH IS WHAT I WAS INTENDING TO DO.  BUT I COULD EASILY SWITCH TO THE NUMBER IN THE MIDDLE OF THE BOTTOM PAGE IF THAT'S MORE --

THE COURT:  I EXPECT THAT WE'RE GOING TO REFERENCE BOTH, WON'T WE?  I THINK THAT'S -- NOW THAT WE HAVE ALL OF THIS AT HAND.  THANK YOU.

ANYTHING FURTHER, MS. WALSH?

MS. WALSH:  NO, YOUR HONOR.

THE COURT:  HERE'S WHAT I THOUGHT WE WOULD DO, IS IT SEEMS TO ME TO MAKE SENSE TO START AND GO THROUGH EACH INSTRUCTION THAT THE COURT INTENDS TO GIVE, AND WE'LL START WITH 3.1, WHICH IS THE INTRODUCTORY INSTRUCTION.

AND I HAVE YOUR PAGE -- 1476, ECF 2, AND IT HAS THAT CHART THAT WAS NICELY PREPARED.

AND I HAVE THE GOVERNMENT'S FILING ALSO THAT I'M REFERENCING.

3.1, "DUTIES OF JURY TO FIND FACTS AND FOLLOW THE LAW."

WHEN I SAY 3.1 AND WHEN I GIVE THOSE INSTRUCTIONS, I'M TALKING ABOUT THE MODEL INSTRUCTIONS, THE NINTH CIRCUIT MODEL

INSTRUCTIONS JUST FOR THE RECORD.

I'LL JUST GO THROUGH THESE.

THE COURT WILL GIVE 3.1.

3.2 IS "PRESUMPTION OF INNOCENCE."

AND I BELIEVE --

MS. VOLKAR:  YOUR HONOR, IF I MAY?

THE COURT:  YES.

MS. VOLKAR:  NOT TO DERAIL US SO EARLY, BUT IN 3.1, THAT WOULD BE ONE OF THE FIRST EXAMPLES WHERE, IN THE HOLMES INSTRUCTIONS, THERE WERE ADDITIONAL WORDS ADDED.

IN THE VERSION -- I'VE CONFIRMED WITH THE COURTROOM DEPUTY THIS MORNING.  IN THE VERSION I SUBMITTED, IT JUST TRACKS THE MODEL LANGUAGE.

BUT I HAVE DONE THE WORK OF IDENTIFYING WHAT SHOULD BE ADDED IF THE COURT WANTED TO GIVE THE SAME INSTRUCTION IN THE HOLMES CASE.  IT'S SOMEWHAT EASY IN THAT 3.1 ADDED TO --

THE COURT:  IN DOCKET 1206?

MS. VOLKAR:  CORRECT, IN DOCKET 1206, LINES 10 THROUGH 12, THERE WERE ADDITIONAL CATEGORIES ADDED, SPECIFICALLY AFTER GENDER, THE COURT ADDED "PROFESSION, CELEBRITY," ECONOMIC CIRCUMSTANCES IS IN THE MODEL, BUT ALSO "OR POSITION IN LIFE OR IN THE COMMUNITY."

AND I ONLY -- I DON'T WANT TO DERAIL US THROUGHOUT THE MORNING, BUT I ONLY SAY THAT THE GOVERNMENT IS HAPPY TO ADD THAT LANGUAGE INTO A WORD DOCUMENT AND PREPARE IT FOR THE COURT

6585

IF, AS THE PARTIES HAVE AGREED THIS MORNING, WE'RE SORT OF STARTING FROM WHAT WAS GIVEN IN THE HOLMES MATTER.

THE COURT: SURE. AND THANK YOU FOR THAT CORRECTION. IT WAS VERY TIMELY, BECAUSE IT'S THE FIRST INSTRUCTION.

AND WHEN I SAID I'LL GIVE 3.1, I WILL GIVE THE 3.1 THAT WAS GIVEN IN THE HOLMES CASE, AND LET'S REFERENCE IT THAT WAY.

SO ANY OBJECTION TO THAT?

MS. WALSH: NO, YOUR HONOR.

THE COURT: ALL RIGHT. SO THAT WILL BE GIVEN.

NEXT IS 3.2, AND THAT IS "PRESUMPTION OF INNOCENCE."

3.2 IS THE DEFENSE ASKING THAT THE COURT CHANGE THE DEFENDANT TO MR. BALWANI?

MS. WALSH: YES, YOUR HONOR, THROUGHOUT IS OUR REQUEST, YES.

THE COURT: OKAY. SO THE COURT -- ANY COMMENT?

MS. VOLKAR: NO, YOUR HONOR. WE INCORPORATE OUR OBJECTIONS FROM LAST TIME, BUT WE'RE, AGAIN, HAPPY TO -- AND WE'RE ALSO HAPPY TO PROVIDE AN UPDATED WORD VERSION COPY THAT INCORPORATES THOSE CHANGES IF THAT WOULD BE HELPFUL.

THE COURT: THANK YOU. THANK YOU. IT WOULD BE HELPFUL. THANK YOU.

SO THE COURT WILL GIVE 3.2. IT WILL READ, "THE INDICTMENT IS NOT EVIDENCE. MR. BALWANI HAS PLEADED NOT GUILTY TO THE CHARGES. MR. BALWANI IS PRESUMED TO BE INNOCENT UNLESS AND

UNTIL THE GOVERNMENT PROVES HIS GUILT BEYOND A REASONABLE DOUBT."

"PROVES HIM GUILTY BEYOND A REASONABLE DOUBT." PARDON ME.

"IN ADDITION, MR. BALWANI DOES NOT HAVE TO TESTIFY OR PRESENT ANY EVIDENCE. MR. BALWANI DOES NOT HAVE TO PROVE INNOCENCE. THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT."

THAT'S WHAT THE COURT INTENDS TO READ.

MS. WALSH?

MS. WALSH: NO OBJECTION, YOUR HONOR.

MS. VOLKAR: NO OBJECTION.

THE COURT: THANK YOU.

WHAT I NOTE NEXT IN THE HOLMES INSTRUCTION, 1206, IS THE ABSENCE OF CODEFENDANT.

I NOTE IN YOUR FILING 1476, YOU ASK -- YOU PRESENT AN ABSENCE OF CODEFENDANT THAT IS MODIFIED FROM THAT THAT WAS GIVEN IN THE HOLMES CASE, I BELIEVE.

ANYTHING FURTHER ON THIS FROM THE GOVERNMENT?

MS. VOLKAR: YES, YOUR HONOR.

SO THE COURT MAY WELL REMEMBER THIS IS NOT BASED ON THE MODEL INSTRUCTION. THIS WAS AN INSTRUCTION PROVIDED AND GENERATED OUT OF WHOLE CLOTH FROM THE DEFENSE HOLMES TEAM.

WE ARE -- WE FIND THE EDITS PROPOSED BY THE BALWANI TEAM A LITTLE BIT SURPRISING, NOT NECESSARILY AS FAR AS OBJECTIONABLE, BUT THE LANGUAGE ABOUT THE OUTCOME IN THE HOLMES CASE IS

NARROWER THAN THE CLOSEST MODEL INSTRUCTION WE COULD FIND, WHICH IS MODEL 2.16.

THE MODEL 2.16 IS CLEARLY INTENDED WHEN ONE DEFENDANT HAS TO UNDERGO A NEW TRIAL, AND SO IT'S REFERRING TO THE SAME DEFENDANT, BUT THE LANGUAGE WOULD BE APPLICABLE IF WE SUBSTITUTED IN MS. HOLMES'S NAME FOR ANOTHER TRIAL.

AND I'M HAPPY TO READ IT FOR THE COURT AND EVERYONE'S BENEFIT IF THAT WOULD BE HELPFUL.

THE COURT: IS THIS SOMETHING THAT YOU WOULD LIKE TO OFFER AS OPPOSED TO THE COURT GIVING THE INSTRUCTION THAT IT GAVE IN 1206, OF COURSE CHANGING THE NAMES?

MS. VOLKAR: I'M SORRY. THE INSTRUCTION IN 1206 WE UNDERSTAND IS THE BASELINE, BUT I'M REFERRING TO ECF 1476, PAGE 5, WHERE MR. BALWANI --

THE COURT: YES.

MS. VOLKAR: -- IN LINES 4 TO 5 SUGGESTS -- AND LET ME, I GUESS, BACK UP TO THE EASIER POSITION OF THE GOVERNMENT.

LINE 6 CHANGING "AGAINST MR. BALWANI" TO "INTRODUCED DURING THIS TRIAL," WE THINK THIS IS A VERSION OF WORDSMITHING THAT WOULD BE INAPPROPRIATE, AND WE OBJECT TO THAT.

WE THINK WHAT WORKED IN THE HOLMES CASE SHOULD BE SUFFICIENT HERE.

BUT I'M SPECIFICALLY REFERRING TO LINES 4 TO 5 WHERE THEY WANT TO ADD, "NOR SHOULD ANYTHING YOU KNOW ABOUT THE OUTCOME OF THE CASE AGAINST MS. HOLMES AFFECT YOUR VERDICT AS TO

MR. BALWANI."

DO YOU SEE THAT LANGUAGE?

THE COURT: RIGHT.

MS. VOLKAR: AND THE ONLY COMMENT I GUESS THE GOVERNMENT HAS IS THAT WE FIND IT TO BE A TAD NARROWER. IT TELLS THE JURY NOT TO CONSIDER THE OUTCOME OF THE TRIAL AGAINST MS. HOLMES.

BUT WE THINK THE JURY SHOULD BE INSTRUCTED, IF AT ALL, NOT TO CONSIDER THE FACT OF A TRIAL, LET ALONE IF THERE WAS AN OUTCOME.

AND SO THAT'S WHY WHAT THE GOVERNMENT HAS IDENTIFIED IN AN ATTEMPT TO BE HELPFUL IS MODEL INSTRUCTION 2.16 WHICH READS, "YOU HAVE HEARD EVIDENCE THAT THE DEFENDANT HAS BEEN TRIED BEFORE."

WE WOULD SUGGEST, "YOU HAVE HEARD EVIDENCE THAT MS. HOLMES HAS BEEN TRIED BEFORE. KEEP IN MIND, HOWEVER, THAT YOU MUST DECIDE THIS CASE SOLELY ON THE EVIDENCE PRESENTED TO YOU IN THIS TRIAL. YOU ARE NOT TO CONSIDER THE FACT OF A PREVIOUS TRIAL AGAINST MS. HOLMES IN DECIDING THIS CASE."

AND AGAIN, WE ALWAYS ADVOCATE FOR THE MODEL INSTRUCTION WHEN ONE IS AVAILABLE, AND WE -- IF THE GOVERNMENT -- IF THE DEFENDANT FEELS STRONGLY ABOUT THIS LANGUAGE, WE WILL RELENT, BUT WE JUST WANTED TO FLAG THAT THERE IS A MODEL INSTRUCTION THAT WE COULD LOOK TO IN THIS INSTANCE.

THE COURT: THANK YOU.

SER-782

MS. WALSH: SO, YOUR HONOR, THIS IS THE FIRST TIME I'M HEARING ABOUT 2.16. IF I COULD SEE MS. VOLKAR'S COPY, THAT WOULD BE HELPFUL.

THE COURT: SURE. LET ME JUST SAY, I HAVE BRACKETED LINES 4 -- EXCUSE ME, THE SAME LINES THAT MS. VOLKAR MENTIONED FOR DISCUSSION. I -- LET ME JUST TELL YOU MY VISCERAL REACTION IS NOT TO GIVE THOSE, BUT GIVE SOMETHING, EITHER THE SAME INSTRUCTION THAT WE GAVE IN 1206 -- AND LET ME SAY, IN THIS TRIAL THERE HAVE BEEN SOME WITNESSES, ONE OR TWO PERHAPS, THAT HAVE MENTIONED INADVERTENTLY, NOT THROUGH A QUESTION DIRECTED BY COUNSEL, BUT INADVERTENTLY REFERENCED MS. HOLMES'S TRIAL.

I THINK, IF I RECALL CORRECTLY, IT MAY BE THAT ONE OR TWO JURORS, MAYBE NOT THE SITTING ONES, BUT HAD MENTIONED THAT THEY HAD HEARD SOMETHING ABOUT THE TRIAL, AND THERE'S SOME KNOWLEDGE ABOUT MS. HOLMES'S TRIAL I SHOULD SAY.

SO I DO THINK IT APPROPRIATE TO GIVE THE ABSENCE OF CODEFENDANT INSTRUCTION. I THOUGHT WHAT WE WOULD DO IS LOOK AND WORDSMITH IT TO SEE IF WE NEED TO ADD SOMETHING.

2.16 MIGHT BE, AND THE LANGUAGE THAT YOU SUGGEST, MS. VOLKAR, MIGHT BE APPROPRIATE TO EDIT THE 1206 INSTRUCTION NUMBER 3 THAT WAS PROVIDED IN PLACE, MS. WALSH, OF THE LANGUAGE THAT YOU SUGGEST IN YOUR 1476.

MS. WALSH: RIGHT.

AND SO I'M LOOKING AT 2.16, AND, AND I DON'T HAVE -- OR WE DON'T HAVE ANY OBJECTION TO IT.

BUT I DO THINK THERE WERE JURORS WHO HAD HEARD OF THE OUTCOME OF MS. HOLMES'S TRIAL, AND SO I THINK IT IS NECESSARY IN THESE CIRCUMSTANCES TO INSTRUCT THEM THAT THEY SHOULD CONSIDER NEITHER THE FACT THAT THERE WAS A PREVIOUS TRIAL NOR ANY OUTCOME THAT THEY MAY HAVE HEARD ABOUT.

I GUESS I DON'T SEE THE DOWNSIDE OF DOING THAT.  AND WE KNOW THAT SOME JURORS HEARD ABOUT THAT.

THE COURT:  WELL, LET ME DO THIS:  I'M GOING TO PASS THIS.  I'M GOING TO ALLOW YOU TO WORDSMITH IT WITH MS. VOLKAR AND MEET AND CONFER JUST IN THE INTEREST OF MOVING FORWARD.

WE'LL PROBABLY DO THIS ON A COUPLE.  AND I'LL INVITE YOU, THE TWO OF YOU, TO LOOK AT THIS, AND WE'LL REVISIT THIS EITHER TODAY OR AT SOME POINT IN TIME.

SO WE'LL PASS --

MS. VOLKAR:  YOUR HONOR --

THE COURT:  YES.

MS. VOLKAR:  IF I MAY, ONE MORE COMMENT FOR THE RECORD ON THAT.

I WILL SAY THAT DURING THE VOIR DIRE PROCESS, AS THE COURT IS AWARE, DEFENSE COUNSEL ASKED THE JURORS IF THEY HAD HEARD OF THE OUTCOME, AND MY RECOLLECTION IS THAT NONE OF THE CURRENT SITTING JURORS OR ALTERNATES HAD HEARD OF THE OUTCOME IN THE HOLMES CASE.

I'M STILL HAPPY TO WORK WITH MS. WALSH IN MEETING AND CONFERRING, BUT I DO WANT THE RECORD TO REFLECT, I DON'T THINK

UNITED STATES COURT REPORTERS

SER-784

THE SEATED JURORS HAD HEARD OF THE OUTCOME.

THE COURT: RIGHT. RIGHT.

THAT STRIKES ME AS ACCURATE, MS. WALSH.

MS. WALSH: RIGHT.

THE COURT: I KNOW THERE WAS TESTIMONY ABOUT -- FROM A COUPLE OF THE WITNESSES IN THE HOLMES TRIAL I THINK IS THE PHRASE THAT THEY USED.

BUT I'LL LET YOU LOOK AT THIS. WE'LL GET SOME COMPROMISE, I'M SURE, ON THIS.

ALL RIGHT. LET'S SEE. NEXT IS 3.4.

AND I THINK I SEE YOUR SUBMISSION, MS. WALSH.

GO AHEAD.

MS. WALSH: I JUST WANT TO MAKE SURE WE'RE REFERRING TO THE SAME PAGE. I'M LOOKING AT DOCKET 1476, INSTRUCTION 4, AND THAT'S BASED OFF OF DOCUMENT 1206, INSTRUCTION 4, AND THAT'S THE DECISION TO TESTIFY IN THE HOLMES CASE, NOT TO TESTIFY IN THIS CASE.

THE COURT: CORRECT.

MS. WALSH: OKAY. OKAY.

SO WE BASED THIS OFF OF THE INSTRUCTION THAT WAS GIVEN IN THE HOLMES CASE.

THE ADDED SENTENCE IS JUST TO EMPHASIZE TO THE JURY, WHICH I THINK IS IMPORTANT, THAT THE RIGHT TO NOT TESTIFY IS AN ABSOLUTE RIGHT UNDER THE CONSTITUTION.

THERE ARE MANY PEOPLE, AS SHOWN BY THE JUROR

QUESTIONNAIRES, WHO WOULD HOLD IT AGAINST A DEFENDANT IN A CRIMINAL TRIAL IF THEY DIDN'T HEAR FROM THAT PERSON UNDER OATH.

AND SO WE THINK, IN AN EXCESS OF CAUTION, TO MAKE SURE NO JUROR HAS THOSE THOUGHTS, OR THEY'RE INSTRUCTED NOT TO HAVE THOSE THOUGHTS, THAT THEY SHOULD BE INSTRUCTED THAT THE RIGHT TO NOT TESTIFY IS ABSOLUTE UNDER THE CONSTITUTION, AND IN ARRIVING AT THEIR VERDICT, THE LAW DOES NOT ALLOW THEM TO TAKE THAT INTO CONSIDERATION.

THE COURT: OKAY.

MS. VOLKAR: THE GOVERNMENT HAS NO OBJECTION TO GIVING AN INSTRUCTION ABOUT MR. BALWANI'S DECISION NOT TO TESTIFY.

BUT AS THE COURT FREQUENTLY SAYS, WE THINK THAT THE MODEL INSTRUCTION, WHICH IS USED IN CASES ACROSS THE NINTH CIRCUIT EVERY DAY, EVERY MONTH, WOULD SUFFICE.

AND IN THE GOVERNMENT'S FILING 1211 AT ECF PAGE 23, WE PROVIDED WHAT WAS 3.3, I THINK THAT MIGHT HAVE BEEN WHAT YOUR HONOR WAS REFERRING TO.

AND THE -- IN AN EFFORT TO CONFUSE EVERYONE, THE NINTH CIRCUIT MODEL JURY INSTRUCTIONS HAVE CHANGED DURING THE COURSE OF THIS TRIAL, AND IT IS NOW CURRENTLY NUMBER 6.3. SO -- AND THAT'S REFERENCED IN THE AUTHORITY THAT THE DEFENDANT CITES HERE.

DESPITE ALL OF THAT CONFUSION, IT'S NOT TOO FAR FROM THE LANGUAGE THAT THE DEFENDANT SUGGESTS, BUT I DO THINK IT DIFFERS

IN SOME KEY WAYS.  IT READS, "A DEFENDANT IN A CRIMINAL CASE HAS A CONSTITUTIONAL RIGHT NOT TO TESTIFY.  IN ARRIVING AT YOUR VERDICT, THE LAW PROHIBITS YOU FROM CONSIDERING IN ANY MANNER THAT THE DEFENDANT DID NOT TESTIFY."

I THINK THAT ADEQUATELY COVERS THE CONCERNS MS. WALSH RAISED, AND I DO NOT BELIEVE THAT THERE IS REASON TO FURTHER WORDSMITH SUCH AS ADDING "ABSOLUTE RIGHT" OR "THE UNITED STATES CONSTITUTION."

I THINK THE JURY WILL UNDERSTAND.

THE COURT:  ALL RIGHT.  THANK YOU.

MS. WALSH.

MS. WALSH:  THAT'S FINE, YOUR HONOR.  THANK YOU.

THE COURT:  ALL RIGHT.  THANK YOU.  I'LL GIVE THE MODEL INSTRUCTION AS INDICATED BY MS. VOLKAR.

AND YOU'LL RECALL IN THE VOIR DIRE, THE COURT REFERENCED THIS MANY TIMES AND MY VOIR DIRE INDICATED, I BELIEVE, THE DEFENDANT HAS AN ABSOLUTE RIGHT NOT TO TESTIFY, AND I EMPHASIZED THAT SEVERAL TIMES.  SO I THINK THE JURY HAS BEEN ADEQUATELY INFORMED ON THIS.

AND I'LL GIVE THE MODEL INSTRUCTIONS AS INDICATED.

MS. WALSH:  OKAY.  AND THAT'S MODEL INSTRUCTION 6.3?

THE COURT:  THE NEW REVISED, THAT'S RIGHT.

MS. WALSH:  YEAH.

THE COURT:  OKAY.  3.5 IS REASONABLE DOUBT.

I DON'T THINK THERE'S ANY QUARREL WITH THE MODEL

INSTRUCTION.

MS. WALSH:  THAT'S CORRECT, YOUR HONOR.

MS. VOLKAR:  THAT'S CORRECT, YOUR HONOR.

THE COURT:  THE COURT WILL GIVE THE MODEL 3.5.

3.6, "WHAT IS EVIDENCE."

MS. VOLKAR:  YOUR HONOR, LET ME JUMP IN TO SAY THIS IS ONE OF THE ALTERATIONS IN 1476 THAT THE GOVERNMENT HAS NO OBJECTION TO.  IT ACTUALLY MATCHES THE GOVERNMENT'S SUBMISSION. THERE HAVE BEEN FACTUAL STIPULATIONS IN THIS CASE.

THE COURT:  OKAY.  SO THE COURT WILL GIVE 3.6, AND THIS IS THE INSTRUCTION IN 1476, NUMBER 6, AND 1476.  I'LL GIVE THAT.

MS. VOLKAR:  THAT'S CORRECT.

MS. WALSH:  YES, YOUR HONOR.

THE COURT:  OKAY.  THEN LET'S MOVE TO, EXCUSE ME, 3.7, "WHAT IS NOT EVIDENCE."

THE COURT WOULD GIVE THE MODEL INSTRUCTION ON THIS.

MS. WALSH:  YES, YOUR HONOR.

MS. VOLKAR:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  3.8 IS "DIRECT AND CIRCUMSTANTIAL EVIDENCE."

THE COURT WOULD GIVE THE MODEL INSTRUCTION.

MS. WALSH:  SO, YOUR HONOR, WHEN THE COURT SAYS YOU'LL GIVE THE MODEL INSTRUCTION, IS THAT THE INSTRUCTION IN THE HOLMES TRIAL?  ONLY BECAUSE THERE'S THE GARDEN HOSE

METAPHOR.

THE COURT: RIGHT. I WAS JUST GOING TO ASK YOU IF YOU WANT ME TO GIVE THAT OR NOT.

MS. WALSH: YES, PLEASE.

THE COURT: ANY OBJECTION TO THAT?

MS. VOLKAR: NO OBJECTION OTHER THAN OUR PRIOR DISCUSSION. WE HAVE NO PROBLEM WITH THAT.

THE COURT: THEN I'LL GIVE THE HOLMES VERSION, WHICH WAS JURY INSTRUCTION NUMBER 8, WHICH INCLUDES THE GARDEN HOSE HYPOTHETICAL.

3.9 IS "CREDIBILITY OF WITNESSES."

AGAIN, LOOKING AT THE HOLMES INSTRUCTION, THE COURT WOULD BE INCLINED TO GIVE THIS.

I NOTE THAT, MS. WALSH, YOU HAVE RED LINED OUT IN YOUR DOCUMENT, 1476, LINES 11 THROUGH 19.

MS. WALSH: YES, YOUR HONOR, AND I CAN EXPLAIN.

THE COURT: SURE.

MS. WALSH: SO THE JOINTLY PROPOSED PRELIMINARY INSTRUCTION ON THE CREDIBILITY OF WITNESSES THAT THE COURT ACCEPTED AND GAVE TO THE JURY DOES NOT HAVE THESE PARAGRAPHS IN IT. I THINK IT HAS ONE ADDITIONAL PARAGRAPH ABOUT IMPLICIT BIAS, IF I'M RECALLING IT CORRECTLY.

AND WE THINK THE SAME INSTRUCTION SHOULD BE GIVEN AGAIN THAT WAS GIVEN IN THE BEGINNING OF THE CASE ON CREDIBILITY OF WITNESSES.

SER-789

6596

THESE TWO PARAGRAPHS I THINK LENGTHEN UNNECESSARILY THE INSTRUCTION. I THINK THEY ARE ACTUALLY SOMEWHAT CONFUSING AND SEEM TO SOMEWHAT UNDERMINE THE FIRST PARAGRAPH WHERE THE INSTRUCTION SAYS, "YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR NONE OF IT," AND THEN IT LAYS OUT THE FACTORS TO EVALUATE A WITNESS'S TESTIMONY.

WE THINK THOSE TWO PARAGRAPHS, THE FIRST AND SECOND, ARE SUFFICIENT TO GIVE THE JURORS GUIDANCE AS TO HOW TO WEIGH WITNESS'S CREDIBILITY.

THE COURT: OKAY.

MS. VOLKAR.

MS. VOLKAR: YOUR HONOR, THIS IS LANGUAGE DRAWN DIRECTLY FROM THE NINTH CIRCUIT'S MODEL INSTRUCTION. IN THE GOVERNMENT'S FILING, IT'S LISTED AT 3.9 IN THE REVAMPED, REVISED, NOT NINTH CIRCUIT MODEL INSTRUCTIONS. IT IS NOW 6.9, BUT THE LANGUAGE IS THE SAME.

IT WAS GIVEN IN THE HOLMES TRIAL.

THERE'S NO CITATION FROM THE DEFENDANT FOR AN APPROVED INSTRUCTION GIVEN WITHOUT THESE PARAGRAPHS, BUT WE KNOW IT'S GIVEN OVER AND OVER AGAIN IN CRIMINAL TRIALS.

AND WITH RESPECT TO THE PRELIMINARY INSTRUCTIONS, MY RECOLLECTION IS THAT THERE'S ALSO SOME PREAMBLE THAT THE PRELIMINARY INSTRUCTIONS ARE SORT OF A SHORT VERSION OF THE INSTRUCTIONS SO THAT THE JURY CAN HAVE SOME FRAMEWORK FOR HEARING THE EVIDENCE, BUT THAT THE SORT OF LENGTHIER AND MORE

6597

DETAILED INSTRUCTIONS WILL COME WITH THE FINAL INSTRUCTIONS.

AND, OF COURSE, ONE CLEAR EXAMPLE OF THAT IS THE DESCRIPTION OF THE ELEMENTS AND THE CHARGES WHICH ARE MORE FULLY DEFINED IN THE FINAL INSTRUCTIONS THAN THE PRELIMINARY INSTRUCTIONS.

IT'S IN THE MODEL. IT WAS GIVEN IN HOLMES. WE THINK THE PARAGRAPH SHOULD STAY.

MS. WALSH: SO, YOUR HONOR, I THINK -- I'M LOOKING AT THE STIPULATED PRELIMINARY JURY INSTRUCTIONS, WHICH IS DOCKET 1350, AND IT ADDRESSES THE CREDIBILITY OF WITNESSES. IT CONTAINS THE FIRST TWO PARAGRAPHS OF THE PATTERN INSTRUCTION.

THEN IT TALKS ABOUT YOU MUST AVOID BIAS, CONSCIOUS, UNCONSCIOUS, ET CETERA.

AND THEN THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT NECESSARILY DEPEND ON. THAT'S THE LAST PARAGRAPH.

I, I DO NOT THINK THAT THESE TWO MIDDLE PARAGRAPHS ARE NECESSARY. I THINK THAT THEY ARE INCREDIBLY CONFUSING BASED ON WHAT HAS COME BEFORE IT.

IT SAYS, "SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT CONSISTENT," AND AT THE END OF THAT PARAGRAPH IT SAYS, "YOU MAY CONSIDER THESE DIFFERENCES, BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT DIFFERS FROM OTHER TESTIMONY."

THAT'S REALLY UP TO THE JUROR TO DECIDE, IF THE TESTIMONY IS DIFFERENT, WHETHER IT'S BELIEVABLE. AND THIS INSTRUCTION

6598

KIND OF MANDATES THAT THEY CAN'T CONSIDER THOSE DIFFERENCES.

I THINK IT'S CONFUSING AND I THINK IT UNDERMINES THE CORE PARAGRAPH OF THIS INSTRUCTION.

THE COURT: OKAY.

MS. VOLKAR.

MS. VOLKAR: YOUR HONOR, I WOULD ONLY ADD THAT THE SENTENCE THAT MS. WALSH JUST READ I THINK UNDERCUTS THAT POINT. IT SAYS "YOU MAY CONSIDER," AND THEN LATER IT SAYS "BUT DO NOT DECIDE THAT THAT'S UNTRUE JUST BECAUSE."

I DON'T THINK IT MANDATES THE JURORS TO FIND ANYTHING.

MS. WALSH: YOUR HONOR, I JUST WANT TO ADDRESS THAT SECOND PARAGRAPH BECAUSE I DIDN'T ADDRESS IT.

IT SAYS, "IF YOU HAVE DECIDED THAT A WITNESS HAS DELIBERATELY TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY CHOOSE NOT TO BELIEVE ANYTHING THE WITNESS SAID."

SO THAT IMPLIES THAT IF A JUROR DECIDES THAT THERE WAS A DELIBERATE LIE ABOUT SOMETHING UNIMPORTANT, MAYBE THEY HAVE TO BELIEVE THE WITNESS.

AND THEN IT GOES ON TO SAY, "ON THE OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED UNTRUTHFULLY ABOUT SOME THINGS, BUT TOLD THE TRUTH ABOUT OTHERS, YOU MAY ACCEPT THE PART THAT YOU THINK IS TRUE AND IGNORE THE REST."

IT JUST -- THESE TWO PARAGRAPHS SUGGEST THAT IT'S ONLY IF A JUROR CONCLUDES A WITNESS HAS DELIBERATELY LIED THAT THEY CANNOT BELIEVE ANYTHING THAT THE WITNESS SAID.

SER-792

6599

I THINK THAT CREDIBILITY DETERMINATIONS MAY VARY FROM JUROR TO JUROR.  THEY WEIGH ALL OF THE FACTORS.  THEY EVALUATE THE TESTIMONY IN LIGHT OF COMMON SENSE AND THEIR LIFE EXPERIENCE, AND THESE TWO PARAGRAPHS SEEM TO HEM THE PURVIEW OF EACH JUROR ON CREDIBILITY INTO A BOX THAT I DON'T THINK APPLIES.

THE COURT:  ANYTHING FURTHER, MS. VOLKAR?

MS. VOLKAR:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.

I THINK -- I APPRECIATE YOUR COMMENTS, MS. WALSH.  YOU SUGGEST THAT THE MODEL INSTRUCTIONS SAY TOO MUCH AND PERHAPS DETRACT FROM THE JURY'S ABILITY TO WEIGH AND TO CONSIDER BY GIVING THEM TOO MANY PATHS TO FOLLOW.  I APPRECIATE THAT.

I DO THINK THAT THE INSTRUCTIONS DON'T LACK THE CLARITY THAT YOU SUGGEST.  I THINK IT DOES -- JURORS WOULD BE ABLE TO FOLLOW THE INSTRUCTIONS, PARTICULARLY THE LAST SENTENCE AND THE FIRST SENTENCE, AND THE FIRST AND SECOND PARAGRAPH WHERE THE INSTRUCTION READS, "YOU MAY CONSIDER, BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT DIFFERS."

I THINK IT TELLS THEM, GIVES THEM CAUTION THAT JUST BECAUSE SOMEBODY SAYS SOMETHING THAT IS NOT TRUE, YOU CAN STILL BELIEVE IT IF YOU THINK IT HAS MERIT, AND YOU SHOULDN'T DECIDE IT'S UNTRUE JUST BECAUSE IT DIFFERS FROM OTHER TESTIMONY.

I DO THINK IT ALLOWS THE JURY AN OPPORTUNITY TO PERHAPS BE MINDFUL OF A REFLUX THAT INDIVIDUALS MIGHT TAKE, WELL, THEY

6600

SAID SOMETHING AT ONE POINT, SO WHY SHOULD I BELIEVE ANYTHING THAT THEY SAY?

I THINK THAT CLARIFIES FOR THE JURORS TO GIVE THEM AN OPPORTUNITY TO FULLY LISTEN TO, UNDERSTAND, AND GIVES THEM DIRECTION AS TO THEIR THOUGHT PROCESS.

MAYBE IT'S TOO MUCH INFORMATION FOR THEM, BUT I DON'T FIND THAT IT, IT DETRACTS FROM THAT CREDIBILITY BALANCING AT ALL.

I DO THINK THAT IT ACTUALLY PROVIDES SOME GUIDANCE.

NOW, THE PRELIMINARY INSTRUCTIONS WERE JUST THAT, THEY WERE PRELIMINARY, AND AS YOU RECALL, WHEN THE COURT GAVE THE PRELIMINARY INSTRUCTIONS, AT THE CONCLUSION, THE COURT INDICATED THAT THEY WOULD, THE JURY WOULD RECEIVE FURTHER INSTRUCTIONS AND GUIDANCE IN THE FINAL INSTRUCTIONS.

THAT'S WHAT THIS IS AS I TAKE IT.  THIS IS ADDITIONAL SUPPLEMENTAL INFORMATION THAT ASSISTS THEM.

SO I'LL GIVE THE MODEL INSTRUCTION, WHICH IS THE INSTRUCTION THAT WAS GIVEN IN THE HOLMES CASE, INSTRUCTION NUMBER 9, AND I'LL GIVE THAT, NOTING THE OBJECTIONS, OF COURSE.

ALL RIGHT.  LET'S MOVE TO 3.10, "ACTIVITIES NOT CHARGED." THIS IS ON 1476.  LET'S SEE.  IS THAT -- PAGE 8.  YES.

MS. WALSH.

MS. WALSH:  YES, YOUR HONOR.

SO WE INCLUDED THIS EXTRA LANGUAGE TO ACCOUNT FOR WHAT I WOULD SAY WAS A FAIR AMOUNT OF EVIDENCE THAT CAME FROM WITNESSES ABOUT TIME PERIODS BEFORE MR. BALWANI WAS CHARGED AND

SER-794

STATEMENTS THAT WERE MADE NOT BY MR. BALWANI BUT BY MS. HOLMES DURING THOSE EARLIER TIME PERIODS.

I DO THINK THAT IT'S HELPFUL TO THE JURY AND IT'S IMPORTANT TO MAKE CLEAR THAT HE'S NOT ON TRIAL FOR CONDUCT THAT PREDATES THE TIME PERIODS IN THE INDICTMENT.

EVEN THOUGH THE JURORS HEARD LOTS OF EVIDENCE ABOUT STATEMENTS BY MS. HOLMES IN 2006 AND '07, AND '08, THOSE CANNOT FORM THE BASIS -- OR THE JURORS SHOULD BE INSTRUCTED THAT HE'S NOT ON TRIAL FOR THOSE TIME PERIODS.

AND I UNDERSTAND THAT I FEEL LIKE THIS IS GOING TO BE A REFRAIN FROM THE GOVERNMENT THAT WE'RE GOING TO STICK WITH THE PATTERN INSTRUCTIONS.

I THINK THAT JURY INSTRUCTIONS SHOULD ALSO TAKE INTO ACCOUNT THE EVIDENCE THAT HAS BEEN ELICITED IN THE CASE AND NOT JUST BE IN A VACUUM. AND I THINK THIS -- ADDING THIS TEXT WOULD HELP THEM UNDERSTAND THE INSTRUCTION AND CABIN WHAT WE ON THE DEFENSE TEAM WERE CONCERNED ABOUT, THAT THEY WOULD HEAR EVIDENCE IN EARLY PERIODS, EVIDENCE IN THE FORM OF STATEMENTS BY MS. HOLMES, AND CONCLUDE BASED ON THOSE THAT HE WAS GUILTY DURING THE CHARGED TIME PERIOD.

THE COURT: OKAY.

MS. VOLKAR: YOUR HONOR, NOT ONLY WILL IT BE A COMMON REFRAIN FROM THE GOVERNMENT TO STICK TO THE MODEL INSTRUCTION, HERE IT WAS 3.10, AND I BELIEVE IN THE REVISED MODEL INSTRUCTIONS IT'S NOW 6.10, BUT IT'S ALSO GOING TO BE A

COMMON REFRAIN FROM THE GOVERNMENT THAT THIS IS THE EXACT SAME ARGUMENT THAT WE HAD, THE GOVERNMENT VERSUS THE HOLMES DEFENSE TEAM, AND IT WAS REGARDING THE SAME 2006 TIME PERIOD CONDUCT BECAUSE THAT WAS ALSO OUTSIDE OF THE INDICTMENT AGAINST MS. HOLMES.

SO I'M GOING TO REPEAT SOME OF MY ARGUMENTS HERE, BUT I DID WANT TO IDENTIFY THAT WE HAVE HAD THIS ARGUMENT BEFORE.

IN THE HOLMES CASE, AND THE SAME IS TRUE HERE, IT'S THE GOVERNMENT'S POSITION THAT THIS INSTRUCTION MAY NOT NEED TO BE GIVEN AT ALL, AND THE REASON FOR THAT IS THE -- I'M GOING TO REFER TO IT AS 3.10 BECAUSE I'M STUCK IN THE PAST -- BUT THE 3.10 INSTRUCTION TYPICALLY IS ENVISIONING 404(B) CONDUCT OR TYPES OF CONDUCT WHERE IT COULD GENUINELY CONFUSE THE JURY ABOUT WHAT THE PERSON IS ON TRIAL FOR.

WHAT MS. WALSH IS TALKING ABOUT IS TIME PERIODS OUTSIDE OF THE INDICTMENT.

WE'RE GOING TO GET TO THE DEFINITION OF THE SUBSTANTIVE CHARGES IN JUST A MOMENT. THE TIME PERIODS ARE CLEARLY DEFINED THROUGHOUT. THEY WERE CLEARLY DEFINED BY THE COURT IN THE PRELIMINARY INSTRUCTIONS, IN PART BECAUSE OF THE DIALOGUE THE PARTIES HAVE HAD THROUGHOUT THIS TRIAL ABOUT THE PRE-2009 EVENTS THAT OCCURRED.

YOU HEARD THE GOVERNMENT'S ELICITING OF EVIDENCE FROM THOSE WITNESSES AS TYING THAT 2006 -- THOSE 2006 STATEMENTS TO WHAT THEIR BASE OF KNOWLEDGE WAS FOR WHEN THEY INVESTED IN 2013

DURING THE CHARGED PERIOD.

AND I DON'T BELIEVE THAT THERE WILL BE ANY CONFUSION ON THE PART OF THE JURORS OF WHAT IS INSIDE THE CHARGED PERIOD AND WHAT IS OUTSIDE THE CHARGED PERIOD BECAUSE IT WILL BE CLEARLY DEFINED IN MULTIPLE INSTRUCTIONS THROUGHOUT THIS PACKET.

NOW, THAT BEING SAID, A -- I WON'T CALL IT A COMPROMISE, BUT A MIDDLE GROUND THAT WAS REACHED IN THE LAST TRIAL WAS THERE WAS AN INSTRUCTION ON THIS TOPIC, 3.10, AGAIN NOW IT'S 6.10, AND THAT IS WHAT THE COURT ULTIMATELY GAVE.

AND WE WOULD ARGUE FOR THE SAME REASONS AND THE SAME RATIONALE, IF AN INSTRUCTION NEED BE GIVEN IF AT ALL, IT SHOULD BE THE MODEL INSTRUCTION FOR 3.10, WHICH COVERS AN EVEN BROADER ARRAY OF TOPICS IF THE JURY IS CONFUSED ABOUT ANY OTHER CONDUCT OR IF -- I DON'T KNOW IF MS. WALSH IS GOING TO SAY THAT THERE HAS BEEN 404(B) EVIDENCE IN THIS TRIAL, BUT IT CAN GO EVEN BEYOND JUST THE TIME PERIODS.

THE TIME PERIODS ARE CLEARLY COVERED LATER IN THE JURY INSTRUCTIONS AS WELL.

THE COURT: SO ARE YOU ADVOCATING THAT THE COURT GIVE JURY INSTRUCTION NUMBER 10 THAT WAS GIVEN IN THE HOLMES CASE?

MS. VOLKAR: GIVEN WHERE WE ARE, YOUR HONOR, AND BECAUSE THE PARTIES LARGELY AGREE WE SHOULD FOLLOW WHAT WAS DONE IN THE HOLMES CASE, THE GOVERNMENT'S POSITION RIGHT NOW IS IF AN INSTRUCTION IS GIVEN, GIVE WHAT WAS GIVEN IN THE HOLMES

CASE.

THE COURT: OKAY.

MS. WALSH: YES. SO PART OF THE PROBLEM IS THIS INSTRUCTION COMES BEFORE AN INSTRUCTION ON THE SUBSTANTIVE OFFENSES, AND SO THE JURORS HEARING THIS FOR THE FIRST TIME, I DON'T KNOW WHAT THE TIME PERIOD IS.

AND AS FAR AS WHETHER THE 6.10 IS APPROPRIATE ONLY FOR 404(B) OR NOT, WE'RE LAWYERS TALKING ABOUT THAT.

THE JURORS HAVE NO IDEA WHAT IS 404(B), WHAT CAME IN AS INEXTRICABLY INTERTWINED, WHAT CAME IN AS CONTEXT FOR EARLY INVESTORS INVESTING IN THERANOS.

ALL THEY KNOW IS THEY HEARD TESTIMONY ABOUT ELIZABETH HOLMES MAKING ALL KINDS OF STATEMENTS ABOUT THERANOS AND THE TECHNOLOGY BEFORE MR. BALWANI GOT TO THE COMPANY THAT I SUSPECT THE GOVERNMENT MAY ARGUE WERE UNTRUE OR AT LEAST PROVIDED THE GROUNDWORK THAT LED TO THE MISREPRESENTATIONS IN THE CHARGED PERIOD.

SO I THINK IT'S IMPORTANT TO INSTRUCT THE JURY IN THIS WAY SO THAT THERE'S NO LACK OF CLARITY.

AND I DON'T SEE ANY DOWNSIDE TO DOING IT. THERE'S NOTHING INACCURATE IN THIS ADDED TEXT. IT JUST MAKES IT CLEAR.

THE COURT: OKAY. THANK YOU.

WELL, TO YOUR POINT ABOUT THE LOCATION OF THE INSTRUCTION, IT MAY BE THAT WE MOVE THE LOCATION OF THIS INSTRUCTION TO LATER WHEN IT'S CLOSER TO THE ACTUAL CHARGES THAT ARE READ AND

THE DEFINITION OF THE OFFENSES, AND MAYBE THAT'S MORE APPROPRIATE.

I'M GOING TO GIVE THE INSTRUCTION THAT WAS GIVEN IN THE HOLMES CASE. I DON'T THINK THAT THE ADDITIONAL LANGUAGE THAT IS SUGGESTED, LINES 4 THROUGH 8 IN YOUR SUBMISSION, 1476, PAGE 8, ARE NECESSARY.

WHEN WE GET TO THE OTHER INSTRUCTIONS, THE JURY IS GOING TO BE INFORMED OF THE TIME PERIOD THAT THEY MUST CONSIDER. I BELIEVE THAT THOSE CHARGES WILL SO INSTRUCT.

THE GOVERNMENT IS NOT GOING TO BE PERMITTED TO ARGUE THAT THE JURY SHOULD CONVICT FOR ANY CONDUCT OUTSIDE OF THAT PERIOD.

AND, MS. VOLKAR, I'M TELLING YOUR TEAM THAT NOW, AND I THINK YOU'RE AWARE OF THAT.

MS. VOLKAR: UNDERSTOOD.

THE COURT: YOU'RE NOT PERMITTED TO ARGUE FOR ANYTHING ELSE. IT'S JUST THIS PARTICULAR TIME PERIOD.

SO THE OBJECTION IS NOTED. I'LL GIVE WHAT WAS GIVEN IN THE HOLMES CASE UNDER ACTIVITIES NOT CHARGED. THAT APPEARS ON PAGE 11 OF DOCUMENT 1206.

ALL RIGHT. NEXT IS 3.11, WHICH IS SEPARATE CONSIDERATION OF MULTIPLE COUNTS, SINGLE DEFENDANT.

I DON'T THINK THERE'S ANY OBJECTION TO THAT.

MS. WALSH: NO, YOUR HONOR.

MS. VOLKAR: NO, YOUR HONOR.

THE COURT: ALL RIGHT. THE COURT WILL GIVE THAT.

AND IT WILL CHANGE -- AGAIN, REFERENCING THE HOLMES INSTRUCTIONS, IT'S JURY INSTRUCTION NUMBER 11. AND IN 1206 WE'LL CHANGE THE NAME TO MR. BALWANI.

"ON OR ABOUT" IS NEXT, 3.18.

MS. WALSH.

MS. WALSH: YES. THE ONLY CHANGE ON THIS -- I'M LOOKING AT DOCUMENT -- AT DOCKET 1476 AT PAGE 10. OUR ONLY PROPOSED CHANGE RELATES TO THE COUNT NUMBERS THAT APPLY IN THIS CASE.

THE COURT: 1476, ECF 10.

MS. WALSH: CORRECT, 1476 AT ECF 10, ECF PAGE 10.

THE COURT: AND I THINK IT'S 9 OF THE DOCUMENT?

MS. WALSH: CORRECT, YES.

THE COURT: OKAY.

MS. VOLKAR: IT MAY BE BENEFICIAL TO INFORM THE COURT, WHEN I READ OFF A LIST OF NUMBERS EARLIER, THIS WAS ONE OF THEM, AND THERE ARE GOING TO BE SEVERAL IN THIS CATEGORY WHERE THE ONLY CHANGE TO THE HOLMES INSTRUCTIONS THAT MR. BALWANI RECOMMENDS IS TO ACCOUNT FOR THE FACT THAT IN THE HOLMES TRIAL, THE -- DUE TO AN ORDER OF THE COURT, THE GOVERNMENT DISMISSED COUNT NINE.

THAT IS STILL AT PLAY IN THIS TRIAL.

SO THE GOVERNMENT DOES NOT OBJECT TO THE EDITS TO THE INSTRUCTIONS GIVEN IN THE HOLMES CASE THAT APPEARS IN MR. BALWANI'S FILING, 1476, ECF PAGE 10, THE BOTTOM OF THE

6607

DOCUMENT, PAGE 9, AND SO THERE WILL BE SEVERAL IN THIS CATEGORY.

THE COURT: SURE.

MS. VOLKAR: AND THIS IS THE FIRST OF THEM.

THE COURT: OKAY. THANK YOU. THANKS FOR THAT.

AND THEN THANK YOU FOR THAT CLARIFICATION, THAT AGREEMENT.

THE COURT WILL GIVE THAT. THAT IS THE DIFFERENCE, THE DISTINCTION. THERE WAS A MISSING COUNT IN MS. HOLMES CASE.

ALL RIGHT. LET'S MOVE THEN ON TO WHAT I HAVE NEXT IN MR. BALWANI'S LIST IN 1476 IS THE DUAL ROLE TESTIMONY.

MS. VOLKAR: YOUR HONOR, THE GOVERNMENT HAS AN ADDITION BEFORE THIS.

THE COURT: IS THIS 4.14?

MS. VOLKAR: CORRECT, IN THE GOVERNMENT'S EDITION. YES, SORRY, IT'S 4.14. I JUST LOOKED AT THE NUMBER.

THE COURT: RIGHT.

AND HOW WOULD YOU HAVE THIS READ? I HAVE YOUR SUBMISSION HERE. IT READS, "YOU HAVE HEARD TESTIMONY FROM," AND THEN INSERT EXPERT NAMES, "WHO TESTIFIED TO THEIR OPINIONS AND THE REASONS FOR THEIR OPINIONS," AND IT GOES FURTHER.

IS THE CHANGE ADDING THE NAMES OF THE EXPERTS?

MS. VOLKAR: THAT'S CORRECT, YOUR HONOR. AND THE MAIN -- AND THIS TIES WITH WHERE I THINK WE WERE, WHICH WAS ECF 1476, ECF PAGE 11, BOTTOM OF THE LINE, PAGE 10, THE DEFENDANTS RECOMMENDS ADDING RICHARD SONNIER TO THE DUAL ROLE

TESTIMONY, AND THE GOVERNMENT STRENUOUSLY OBJECTS TO THAT CATEGORIZATION.

MR. SONNIER HAS BEEN PROFFERED AS AN EXPERT. I BELIEVE JUST TWO DAYS AGO MR. COOPERSMITH WAS SAYING HE HAS NO PERSONAL KNOWLEDGE OF THE FACTS AND, THEREFORE, HE DOES NOT FALL UNDER THE MODEL INSTRUCTIONS FOR DUAL ROLE TESTIMONY, HE FALLS UNDER THE MODEL INSTRUCTION FOR EXPERT TESTIMONY.

AND THAT IS 4.14. UNDER THE REVISED MODEL INSTRUCTIONS, IT'S NOW 3.14. AGAIN, THE TEXT IS THE SAME.

SO OUR SUBMISSION HAS 4.14 ON ECF 1211, PAGE 31, AND WE WOULD RECOMMEND INSERTING "RICHARD SONNIER, III" THERE AND HAVE THAT INSTRUCTION EITHER PRECEDE OR COME AFTER THE DUAL ROLE TESTIMONY. WE DON'T FEEL STRONGLY ABOUT REPLACEMENT.

BUT WE DO FEEL STRONGLY THAT HE IS NOT A FACT WITNESS, AND THAT IS IN STARK CONTRAST TO DR. ZACHMAN AND DR. BURNES WHO HAD PERCIPIENT KNOWLEDGE OF WORKING WITH THEIR PATIENTS AND RECEIVING RESULTS, AND THEN AT A CERTAIN TIME IN THEIR TESTIMONY, WERE QUALIFIED AS AN EXPERT TO DESCRIBE IN THEIR EXPERIENCE THEIR INTERPRETATION OF THOSE RESULTS AND WHAT THAT MEANT, AND THEY HAD TO BE QUALIFIED AS AN EXPERT TO DO THAT PORTION.

BUT OF COURSE THEY HAD PERCIPIENT KNOWLEDGE RELEVANT TO THIS CASE AND, THEREFORE, THEY ARE TRUE DUAL ROLES.

MS. WALSH: YOUR HONOR, WHAT I SUGGEST IS THAT WE DEFER THIS QUESTION UNTIL AFTER MR. SONNIER TESTIFIES AND WE

SEE WHAT HIS TESTIMONY IS.

MS. VOLKAR:  YOUR HONOR, THE GOVERNMENT'S REACTION TO THAT IS THAT THE EXPANSION OF MR. SONNIER'S TESTIMONY HAS ALREADY BEGUN.

WE HAVE HEARD OVER AND OVER AGAIN THAT HE IS TO TESTIFY AS AN EXPERT ON MICROSOFT SQL DATABASES.

WE WERE TOLD BY MR. COOPERSMITH ON MONDAY THAT HE HAS NO PERSONAL KNOWLEDGE OF THE FACTS.

BUT IF THEIR TRUE PURPOSE IS JUST TO GET IN FACTS THROUGH A WITNESS WHO HAS NO PERSONAL KNOWLEDGE OF THEM, I GUESS THE FIREWORKS ARE ALREADY STARTING.

MS. WALSH:  I SEE NO FIREWORKS.

I JUST THINK IT MAKES SENSE TO DEFER UNTIL AFTER WE HEAR HIS TESTIMONY.

HE CLEARLY WAS NOTICED AS AN EXPERT.  HE'S GOING TO GIVE EXPERT TESTIMONY.

I JUST DON'T KNOW -- I DON'T THINK WE SHOULD LAND ON AN ANSWER ON THIS UNTIL WE HEAR FROM HIM.

THE COURT:  WELL, WHAT FACTS WOULD HE TESTIFY TO?

MS. WALSH:  SO I'M NOT EXAMINING MR. SONNIER.  MAYBE I COULD ASK A COLLEAGUE OF MINE TO PROFFER TO THE COURT.

THE COURT:  I THINK MS. VOLKAR IS ACCURATE WHEN WE HEARD THAT HE'S GOING TO TESTIFY AS AN EXPERT.

MS. WALSH:  SURE, SURE.

THE COURT:  MR. BRECHER, WHO IS BEHIND YOU NOW, SAID

6610

"ALL HE'S GOING TO SAY IS I'M AN EXPERT AND YOU CAN'T DO IT, OR YOU COULD DO IT," AND THAT'S IT.

MS. WALSH: YES.

THE COURT: NOW, I DID ASK THE PARTIES A COUPLE OF DAYS AGO, I THINK IT WAS YESTERDAY, TO PROVIDE FOR ME, I ASKED MR. COOPERSMITH TO PROVIDE FOR ME THE DOCUMENT THAT WAS RECEIVED FROM THE GOVERNMENT, THAT EMAIL, WHATEVER IT WAS, AND IT WAS GOING TO BE LEFT WITH ME YESTERDAY.

I HAVEN'T RECEIVED IT YET, AND THAT MAYBE INFORMS ON THIS AS WELL.

MR. BRECHER, GOOD MORNING.

MR. BRECHER: GOOD MORNING, YOUR HONOR.

YES, IT'S THAT DOCUMENT AND ONE ADDITIONAL ITEM OF PERCIPIENT KNOWLEDGE, YOUR HONOR, AND THAT IS MR. SONNIER'S PERSONAL TESTING OF THE ENCRYPTED COPY TO ENSURE HIMSELF THAT IT COULD NOT, IN FACT, BE OPENED.

THAT IS A FACT WITNESS.

THE COURT: THIS IS THE FIRST I HEAR OF THIS.

MR. BRECHER: WELL, YOUR HONOR, I DON'T KNOW THAT IT'S NECESSARY TO NOTICE A FACT WITNESS IN ADVANCE OF CALLING -- FACT TESTIMONY IN ADVANCE OF CALLING A WITNESS.

THE COURT: WELL, I SAY THAT BECAUSE THE LAST TIME WE CHATTED, YOU SAID, "ALL HE'S GOING TO TESTIFY ABOUT, JUDGE, IS THIS."

MR. BRECHER: WELL, YOUR HONOR, I THINK MY

**SER-804**

6611

RECOLLECTION IS THAT I WAS DISCUSSING THE OPINIONS THAT HE WAS GOING TO OFFER.

THE COURT: I SEE.

MR. BRECHER: BUT IF THAT'S A DISTINCTION THAT MATTERS, I DON'T HAVE TO ELICIT THAT TESTIMONY.

BUT I THOUGHT IT MIGHT BE SOMETHING THAT THE GOVERNMENT WANTED CONFIRMED ON THE RECORD, BUT I MAY BE MISTAKEN ABOUT THAT.

THE COURT: OKAY.

MS. VOLKAR.

MS. VOLKAR: I'M HAPPY TO DEFER, YOUR HONOR.

I THINK WE ALL SEE THE STORM HEADING OUR WAY, AND I'M HAPPY TO DEFER ON THIS INSTRUCTION UNTIL A LATER POINT IN TIME. WE NEED NOT REARGUE A TOPIC THAT IS VERY FAMILIAR TO THE COURT, BUT THE GOVERNMENT DOES WANT TO STATE ITS POSITION THAT RICHARD SONNIER IS ONLY AN EXPERT, NOT A DUAL ROLE TESTIMONY, EXPERT/FACT WITNESS.

AND EVEN WHAT MR. BRECHER JUST SAID ABOUT TESTING THE DATABASE STILL SEEMS TO FALL UNDER THE BASES FOR HIS EXPERT OPINION.

BUT ANYWAY, I'M HAPPY TO DEFER UNTIL LATER.

MR. BRECHER: IF YOUR HONOR WOULD PREFER TESTIMONY OF THAT SORT OFFERED AS OPINION, I THINK IT'S -- I THINK IT'S WHAT HE ACTUALLY DID AND PERSONALLY OBSERVED, BUT I HAVE NO OBJECTION.

6612

BUT I DO THINK IT'S APPROPRIATE TO DEFER THIS QUESTION TO SEE HOW IT COMES INTO EVIDENCE, IF IT COMES INTO EVIDENCE AT ALL.

THE COURT: ALL RIGHT. WE'LL DEFER THIS.

MR. BRECHER: THANK YOU, YOUR HONOR.

THE COURT: OKAY.

MR. BRECHER: I APOLOGIZE, YOUR HONOR.

ONE MORE CLARIFICATION IN TERMS OF THE ISSUE OF MR. SONNIER'S EFFORTS TO OPEN AN ENCRYPTED COPY. I'LL JUST NOTE FOR THE RECORD THAT MR. SCHENK SENT AN EMAIL ABOUT THAT TOPIC FIVE DAYS AGO ON JUNE 3RD WITH NEW INFORMATION. SO IN RELATION TO --

THE COURT: IS THIS RELATED TO --

MR. BRECHER: -- TO THE FACTS.

THE COURT: I'M SORRY. IS THAT RELATED TO THE INSTRUCTIONS?

MR. BRECHER: NO. I'M SORRY, YOUR HONOR. I APOLOGIZE, YOUR HONOR.

THE ISSUE OF MR. SONNIER'S EFFORTS TO DECRYPT THE ENCRYPTED COPY OF THE LIS DATABASE.

MR. SCHENK PROVIDED SOME NEW INFORMATION IN AN EMAIL TO THE DEFENSE ON JUNE 3RD.

THE COURT: MR. SCHENK.

MR. SCHENK: YOUR HONOR, I KEEP WAITING FOR MR. BRECHER TO FINISH THAT SENTENCE. I'M NOT SURE I UNDERSTAND

THE EFFECT THAT HAS -- IT'S TRUE, I SENT AN EMAIL THAT PROVIDED INFORMATION THAT THE GOVERNMENT LEARNED IN AN ATTORNEY PROFFER TO THE DEFENSE.

MR. BRECHER TOLD THAT TO THE COURT IN THE CONTEXT OF WHETHER AN EXPERT WITNESS THAT THE DEFENSE IS CALLING IS GOING TO CROSS OVER INTO FACT WITNESS TESTIMONY.

THE INFORMATION THAT I PROVIDED HAS NOTHING TO DO WITH MR. SONNIER.  I'M NOT SURE -- IT SEEMS LIKE A NON SEQUITUR TO ME I GUESS IS WHAT I'M SAYING.

THE COURT:  THANK YOU FOR THE HEADS UP.  I'M NOT SURE WHAT TO DO WITH THAT, BUT I'M SURE IT WILL COME UP AT SOME POINT IN TIME.  SO THANK YOU.

MR. BRECHER:  THANK YOU, YOUR HONOR.

MS. VOLKAR:  AND, YOUR HONOR, ON THE JURY INSTRUCTIONS, IT MAY BE WELCOME NEWS TO HEAR THAT I THINK THE NEXT TWO ARE ONES THAT THE PARTIES LARGELY AGREE ON, WHICH IS 14 WAS GIVEN IN THE HOLMES CASE, ECF 1206, PAGE 15.  IT'S THE MODEL INSTRUCTION ABOUT CHARTS OR SUMMARIES NOT ADMITTED INTO EVIDENCE.

AND THE VERY NEXT INSTRUCTION IN 1206 WAS NUMBER 15, CHARTS AND EVIDENCE THAT WERE ADMITTED BECAUSE A PARALEGAL FOR WILLIAMS & CONNOLLY TESTIFIED ABOUT ADMITTED CHARTS IN EVIDENCE.

I UNDERSTAND FROM THE DEFENSE'S FILING LAST NIGHT, ECF 1476 AT 12, DELETING THE INSTRUCTION "CHARTS AND SUMMARIES

ADMITTED INTO EVIDENCE," THAT THE DEFENSE -- I'M SORRY, THAT MR. BALWANI IS NOT INTENDING, THROUGH THE PARALEGAL FROM ORRICK THAT THEY PLAN TO CALL, TO SIMILARLY ADMIT CHARTS AND SUMMARIES, AND IF THAT'S TRUE, THERE HAVE BEEN NO OTHER CHARTS OR SUMMARIES ADMITTED IN THIS TRIAL AND IT IS THEREFORE PROPER TO NOT GIVE THAT INSTRUCTION.

MS. WALSH: CORRECT, YOUR HONOR.

THE COURT: ALL RIGHT. SO WE WON'T GIVE 417, MODEL 417, WHICH ARE "CHARTS AND SUMMARIES ADMITTED INTO EVIDENCE."

I DON'T BELIEVE THERE WERE ANY ADMITTED INTO EVIDENCE YET.

THERE WERE CERTAINLY REFERENCES TO CHARTS AND SUMMARIES. SO THE 416 WILL BE GIVEN.

ANY OBJECTION TO THAT?

MS. VOLKAR: NO, YOUR HONOR. THAT'S CORRECT.

MS. WALSH: NO OBJECTION, YOUR HONOR.

THE COURT: ALL RIGHT. 416 WOULD BE GIVEN. THAT IS JURY INSTRUCTION NUMBER 14 IN DOCKET 1206, THAT WOULD BE GIVEN.

ALL RIGHT. NOW WE MOVE TO NEXT I SEE ON THE LIST THAT WAS PROVIDED IS NUMBER 16, THIS IS ON 1476 IN THE CHART, IT IS "CONSPIRACY ELEMENTS."

AND THIS IS 8.20 IN THE MODEL, I BELIEVE.

MS. WALSH.

MS. WALSH: YES, YOUR HONOR.

THE ONLY PROPOSED CHANGE THAT WE HAVE IS ON DOCKET 1476 AT DOCKET PAGE 14.

6615

WE REQUEST THAT THE ADDED TEXT BETWEEN "TWO OR MORE OTHER PEOPLE" BE INSERTED IN THAT SENTENCE. SO IT WOULD READ, "FURTHERMORE, ONE WHO WILLFULLY JOINS AN EXISTING CONSPIRACY BETWEEN TWO OR MORE OTHER PEOPLE IS AS RESPONSIBLE FOR IT AS THE ORIGINATORS."

IT'S REALLY JUST FOR CLARITY, YOUR HONOR. THAT'S WHY WE ADDED IT.

THE COURT: MS. VOLKAR.

MS. VOLKAR: IT WILL NOT SURPRISE THE COURT TO HEAR THE GOVERNMENT SAY THAT IT'S NOT IN THE MODEL, AND, THEREFORE, WE DON'T THINK IT NEEDS TO BE ADDED.

WE DO NOTE THAT THE SAME LANGUAGE IS REFERENCED BOTH EARLIER IN THE INSTRUCTION AND JUST A COUPLE OF LINES LATER AS WELL. SO I DO NOT THINK THAT THERE WILL BE ANY CONFUSION.

MORE IMPORTANTLY, I WANT TO TAKE THIS MOMENT TO SAY THAT THIS WOULD BE ONE OF THOSE INSTRUCTIONS WHERE THE GOVERNMENT STANDS BY ITS OBJECTIONS TO THE SPECIFIC UNANIMITY INSTRUCTION THAT IS GIVEN.

A GENERIC UNANIMITY INSTRUCTION IS DETERMINED TO BE PERFECTLY ACCEPTABLE IN THOSE CASES.

THIS IS AN INSTRUCTION IN THE HOLMES CASE THAT WE DID A LOT OF WORK ON, AND THE GOVERNMENT'S POSITION IS THAT NO FURTHER TWEAKING IS NECESSARY. THE INSTRUCTION THAT WAS GIVEN IN HOLMES SHOULD SUFFICE.

I WILL ALSO NOTE THAT THE MODEL INSTRUCTION AS REFERENCED

6616

IN THE GOVERNMENT'S FILING IS 8.20 AS THE COURT SAID.

IF YOU WERE TO LOOK FOR IT NOW ON THE NINTH CIRCUIT'S WEBSITE, IT IS 11.1. AGAIN, IT IS ADDING TO THE CONFUSION. BUT JUST FOR EVERYONE'S BENEFIT, I DID WANT TO REFERENCE THAT.

THE COURT: THANK YOU FOR THAT.

AND I'M REFERENCING THE PACKET THAT WAS FILED PREVIOUSLY BY THE GOVERNMENT AND IT DOESN'T HAVE THAT. OF COURSE IT WAS PREMODIFICATION. BUT JUST FOR CLARITY OF OUR CONVERSATION, THAT'S WHY I'M REFERENCING THAT. AND, OF COURSE, THINGS HAVE CHANGED.

MS. VOLKAR: I DID QUITE A BIT OF PARING UP LAST NIGHT, YOUR HONOR, SO I VERY MUCH UNDERSTAND.

THE COURT: I THINK WE ALL WOULD WELCOME THE NINTH CIRCUIT PUBLISHING ANOTHER HARD COPY. I THINK THE LAST HARD COPY THAT I THINK I HAVE IN MY LIBRARY WAS 2010. I THINK THAT'S THE LAST HARD COPY THAT WE HAVE RECEIVED.

MS. WALSH.

MS. WALSH: YES, YOUR HONOR.

SO WE REQUEST THAT THE COURT STICK WITH THE INSTRUCTION THAT WAS GIVEN IN THE HOLMES CASE, DOCKET 1206 AT DOCKET -- PAGE 17.

AGAIN, OUR ONLY REQUEST WAS TO ADD THAT LITTLE BIT OF LANGUAGE FOR CLARITY PURPOSES, AND SUBMIT IT ON THAT POINT.

THE COURT: OKAY. THANK YOU.

I SEE THE ADDITIONAL LANGUAGE THAT YOU'RE SUGGESTING. I

DON'T BELIEVE IT'S NECESSARY. I BELIEVE THAT THE INSTRUCTION AS TO THIS CONSPIRACY GIVEN IN THE HOLMES MATTER IN DOCKET 1206, PAGES 17 AND 18, IS SUFFICIENT, AND THE COURT WILL GIVE THAT.

ALL RIGHT. GOING DOWN YOUR CHART, MS. WALSH. YOUR NUMBER 17 IS "WILLFULLY," AND I KNOW THE GOVERNMENT HAS OPINIONS ABOUT THIS, AND THIS IS 5.5, I THINK FORMERLY NUMBER 5.5. I THINK IT'S STILL THE SAME.

DO YOU WANT TO AUGMENT ANY ARGUMENTS? I KNOW YOU'VE INCORPORATED YOUR STRENUOUS OBJECTIONS TO THE COURT.

MS. VOLKAR: AND I CERTAINLY WON'T REPEAT THEM AT LENGTH HERE, ONLY TO SAY, AS WE PREVIOUSLY SAID, THE BRYAN CASE IS INAPPLICABLE TO THESE STATUTES. WILLFULLY DOES NOT APPEAR IN SECTION 1343 OR 1349. IT IS A HEIGHTENED MENS REA.

KNOWINGLY IS THE PROPER STANDARD. WE'RE GOING TO GET THERE IN A MOMENT.

SO WITH THAT I WILL SUBMIT. I UNDERSTAND IT WAS GIVEN IN THE HOLMES CASE, AND I UNDERSTAND THAT THE COURT PLANS TO GIVE IT HERE.

MS. WALSH: YES, YOUR HONOR, WE ARE IN FAVOR OF THE COURT GIVING THIS INSTRUCTION AS IT DID IN THE HOLMES CASE.

THE COURT: ALL RIGHT. THANK YOU.

I'LL NOTE THAT I THINK MR. LEACH GAVE THE OBJECTIONS IN THE LAST -- IN THE HOLMES CASE, AND YOU'VE INCORPORATED THOSE OBJECTIONS AND I REMEMBER THEM VIVIDLY. I RECOGNIZE THEM.

UNITED STATES COURT REPORTERS

**SER-811**

AND I WILL GIVE JURY INSTRUCTION 17 THAT WAS GIVEN IN THE HOLMES CASE AT DOCUMENT 1206, AND RECOGNIZING THE GOVERNMENT'S OBJECTION, THE COURT WILL GIVE "WILLFULLY" IN THIS MATTER AS WELL.

NEXT THEN IS NUMBER 18 ON YOUR CHART, WHICH IS 8.23, "KNOWLEDGE AND ASSOCIATION WITH OTHER CONSPIRATORS."

MS. WALSH:  AND WE ARE NOT REQUESTING ANY FURTHER ARGUMENT ON THAT INSTRUCTION.

MS. VOLKAR:  YOUR HONOR, THERE WAS SOME MINOR TWEAKS MADE FOR THE INSTRUCTION GIVEN IN HOLMES.  THE GOVERNMENT HAS IDENTIFIED THEM AND WILL INCORPORATE THEM AND ASSUMES THE COURT INTENDS TO GIVE THE SAME INSTRUCTIONS AS IN HOLMES, AND WE HAVE NO FURTHER OBJECTION BESIDES THAT DISCUSSION.

THE COURT:  THANK YOU.  IF YOU WOULD MAKE THOSE CHANGES THEN.

MS. VOLKAR:  I WILL, YOUR HONOR.

THE COURT:  AND THEY DO INCLUDE THE CHANGING OF THE NAMES, OF COURSE, AND OTHERS.

BUT THE COURT WILL GIVE THEN THE INSTRUCTION THAT IT GAVE IN THE HOLMES CASE, 1206, IT'S INSTRUCTION NUMBER 18, WITH THOSE MODIFICATIONS.

NEXT IS 19, 8.25, "CONSPIRACY/LIABILITY FOR SUBSTANTIVE OFFENSE COMMITTED BY COCONSPIRATOR."

MS. WALSH:  YES, YOUR HONOR.

AND THE ONLY CHANGE PROPOSED FROM THE DEFENSE IS TO JUST

CHANGE THE NUMBER OF THE COUNTS, AND I SEE FROM MS. VOLKAR'S LIST THAT SHE GAVE AT THE OUTSET, THIS IS ONE OF THE ONES THAT SHE AGREES ON AS WELL.

THE COURT: RIGHT.

MS. VOLKAR: THAT'S CORRECT. WE HAVE NOTHING FURTHER BEYOND THE OBJECTIONS DISCUSSED IN THE HOLMES MATTER, SO WE AGREE WITH THE CHANGE THAT MR. BALWANI RECOMMENDS.

THE COURT: ALL RIGHT. THANK YOU.

THIS IS IN ESSENCE THE PINKERTON, I BELIEVE; IS THAT RIGHT?

MS. WALSH: YES.

MS. VOLKAR: YES. PARDON ME.

THE COURT: AND THEN YOU'LL MAKE THOSE CHANGES NEXT, AND THE COURT WILL GIVE THE INSTRUCTION AS GIVEN IN THE HOLMES CASE, WHICH WAS INSTRUCTION 19, I BELIEVE.

MS. WALSH: YES.

THE COURT: ALL RIGHT. NEXT IS "WIRE FRAUD," NUMBER 2824.

MS. WALSH.

MS. WALSH: YES, YOUR HONOR.

SO WE PROPOSED SOME ADDED LANGUAGE AT THE BOTTOM OF DOCKET 1476, DOCKET PAGE 17. AND WE PROPOSED THIS LANGUAGE LARGELY BECAUSE OF THE TESTIMONY OF MS. BENNETT AND THE CMS REPORT, WHICH BOTH CONTAINED FINDINGS RELATED TO REGULATORY VIOLATIONS, LAB PRACTICES THAT DON'T -- OR THAT ARE LARGELY BASED ON A

NEGLIGENCE STANDARD, AND WE THINK IT IS IMPORTANT TO CLARIFY FOR THE JURY AS TO WHAT MR. BALWANI IS ACCUSED OF WITH REGARD TO THE PATIENT FRAUD CASE.

AND SO WHAT THE ESSENCE OF IT IS, YOU KNOW, WHAT DOES MR. BALWANI HAVE TO KNOW TO BE GUILTY OF A PATIENT FRAUD COUNT?

THE COURT: IS THIS -- EXCUSE ME FOR INTERRUPTING YOU. IS THIS LINE 20?

MS. WALSH: YES, 20 THROUGH 23.

THE COURT: ALL RIGHT. THANK YOU.

MS. WALSH: YOU KNOW, IS IT ENOUGH THAT HE KNOWS THAT THERE MAY HAVE BEEN ISSUES IN THE OPERATIONS OF THE LAB?

MS. BENNETT TESTIFIED ABOUT EXPIRED REAGENTS NOT BEING NOTICED BY LAB STAFF, REFRIGERATION ISSUES, ALL -- YOU KNOW, THE GAMUT OF LAB ISSUES, THAT THERE WERE TEST ERRORS THAT -- OTHER WITNESSES TESTIFIED LABS HAVE ERRORS.

OR DOES HE NEED TO KNOW SOMETHING MORE, AND SPECIFICALLY, WHAT?

SO WHAT WE DID WAS WE TOOK THE LANGUAGE LARGELY FROM THE INDICTMENT, WHICH WE THINK IS THE CRUX OF THE CHARGE, AND WHAT WE PROPOSE IS, "THE GOVERNMENT HAS ALLEGED THAT MR. BALWANI ENGAGED IN A SCHEME TO DEFRAUD PATIENTS OUT OF THEIR MONEY THROUGH REPRESENTATIONS ABOUT THERANOS'S BLOOD TESTS AND THAT THOSE REPRESENTATIONS WERE FALSE BECAUSE THERANOS WAS NOT CAPABLE OF CONSISTENTLY PRODUCING ACCURATE AND RELIABLE BLOOD TEST RESULTS."

SO I THINK IT'S CRITICAL TO INFORM THE JURY AS TO WHAT THE ESSENCE OF THE CHARGE IS SO THAT THE JURORS DON'T REACH A VERDICT OF CRIMINAL LIABILITY BASED ON A NEGLIGENCE STANDARD OR BASED ON LAB PRACTICES THAT ARE NOT REALLY THE SUBJECT OF THIS CASE, AND MANY OF THOSE WERE IN THE TESTIMONY OF MS. BENNETT.

THE COURT: MS. VOLKAR.

MS. VOLKAR: THANK YOU, YOUR HONOR.

I HAVE THREE MAIN RESPONSES TO THAT. FIRST, I'LL START WITH MS. WALSH'S -- OR WHERE MS. WALSH ENDED, WHICH WAS THE CONCERN ABOUT MR. BALWANI BEING CONVICTED OF LAB PRACTICES.

YOU MAY RECALL, AND IT'S LATER IN THE PACKET, BUT MS. HOLMES ARGUED FOR AND, OVER THE GOVERNMENT'S OBJECTION, THE COURT GAVE A VIOLATION OF INDUSTRY STANDARDS AND REGULATIONS.

SO I WANT TO HIGHLIGHT, AND I KNOW WE'RE GOING TO GET TO THAT INSTRUCTION, THAT THERE'S ALREADY AN INSTRUCTION MEANT TO PUT UP GUARDRAILS ON THAT POINT.

THE SECOND THING I WANT TO MENTION IS THE FOUR LINE ADDITION HERE MAKES THE PORTION ABOUT THE PATIENT FRAUD MUCH LENGTHIER AND DIFFERENT THAN JUST THE TOP OF THE PAGE, THE TWO TO THREE LINES, ABOUT THE INVESTOR FRAUD.

AND SOME JUROR MAY LOOK AT THAT AND SAY, HUH, WHY IS ONE FRAUD DEFINED, AND THE OTHER FRAUD NOT?

SO I THINK IT CREATES AN INEQUITY IN THE VERY SAME INSTRUCTION BETWEEN THE TWO FRAUDS.

AND BEFORE I LEAVE THAT POINT, OF COURSE YOUR HONOR WILL

REMEMBER MS. HOLMES SUBMITTED WHAT I RECALL TO BE A THREE OR FOUR PAGE LENGTH VERSION OF THIS INSTRUCTION DETAILING AT GREAT LENGTH THE FRAUDS.

AND ONE OF THE DISCUSSIONS THAT WE HAD AT THAT POINT IN TIME IN THE LAST TRIAL WAS, DOES IT VARY FROM THE INDICTMENT?

AND THAT BRINGS ME TO MY THIRD POINT. YOUR HONOR OFFERED TO SEND THE INDICTMENT BACK WITH THE JURY IN THE LAST TRIAL, AND THE DEFENSE CHOSE TO PARE DOWN TO THIS VERSION RATHER THAN HAVE THE INDICTMENT GO BACK.

AND I WANT TO REITERATE WHY YOUR HONOR SUGGESTED THAT AND WHY THERE'S A CONCERN.

WHAT MS. WALSH SAID IS THAT THEY PULLED THIS LANGUAGE LARGELY FROM THE INDICTMENT.

BUT WHEN YOU LOOK AT THE INDICTMENT, ECF 469, THEY HAVE ATTEMPTED -- THEY, THE DEFENSE, HAVE ATTEMPTED TO SUMMARIZE FOUR PARAGRAPHS DESCRIBING THE SCHEME TO DEFRAUD PATIENTS, PARAGRAPHS 15, 16, AND 17, SORRY, AND 18, AND THEY'VE TRIED TO SUMMARIZE THAT INTO FOUR OR FIVE LINES.

I HAVE NO DOUBT THAT THESE LAWYERS ARE EXCELLENT AT SUMMARIZING. BUT ANY TIME WE ARE SUMMARIZING, PARAPHRASING, USING THE WORDS THAT THE LAWYERS THINK BEST, WE ARE AT RISK OF MOVING AWAY FROM WHAT THE GRAND JURY FOUND IN THE SUPERSEDING INDICTMENT.

AND I JUST WANT TO FLAG THAT I THINK THERE'S A RISK THERE.

NOW, I ALSO WANT TO GO BACK TO WHAT THE ACTUAL TEXT SAYS.

EVERYTHING THAT MS. WALSH JUST ARGUED I BELIEVE THE DEFENSE CAN ALSO ARGUE IN THEIR CLOSING ARGUMENT.

THE STANDARD OF WIRE FRAUD, THE ELEMENTS OF WIRE FRAUD, WHICH ARE DEFINED ON THE VERY NEXT PAGE, I THINK COULD NOT POSSIBLY LEAVE THE JURY WITH THE IMPRESSION THAT NEGLIGENT CONDUCT WOULD BE SUFFICIENT. THAT'S NOT WHAT THE ELEMENTS OF WIRE FRAUD ARE, AND THAT'S NOT WHAT THE ELEMENTS OF WIRE FRAUD REQUIRE.

SO I JUST WANT TO GO BACK TO I THINK THERE ARE GUARDRAILS THROUGHOUT THE INSTRUCTION. I THINK IT CREATES AN INEQUITY WITH THE INVESTOR FRAUD COUNTS.

I DON'T THINK THE SOLUTION IS ADDING MORE TEXT FOR THE SAME REASONS THAT WE ARGUED LAST GO-ROUND.

IF MORE EXPLANATION NEED BE GIVEN TO THE JURY, WE CAN CONSIDER PROVIDING THEM WITH THE INDICTMENT. THOSE ARE THE WORDS THAT THE GRAND JURY FOUND.

MS. WALSH: SO I THINK THERE'S A SERIOUS RISK OF JURORS REACHING A CONCLUSION OF CRIMINAL GUILT BASED ON A NEGLIGENCE STANDARD RELATING TO THE LAB.

THEY COULD RECALL TESTIMONY ABOUT PAPERWORK BEING SIGNED RIGHT BEFORE THE CMS INSPECTION AND THAT BEING IMPROPER, AND TESTIMONY ABOUT DR. DHAWAN SIGNING HUNDREDS OF SOP'S IN ADVANCE OF THE CMS INSPECTION, TESTIMONY ABOUT A PINK LABEL NOT BEING NOTICED BY LAB STAFF THAT WOULD PUT THEM ON NOTICE THAT REAGENT WOULD BE EXPIRED.

UNITED STATES COURT REPORTERS

**SER-817**

THERE WERE A LOT OF -- I DON'T WANT TO MINIMIZE THE VIOLATIONS -- BUT RELATIVELY SMALL COMPARED TO FRAUD VIOLATIONS THAT A JUROR COULD CONCLUDE THAT MR. BALWANI IS GUILTY BECAUSE IT WAS A SHODDY LAB.

THAT'S NOT WHAT THE INDICTMENT CHARGES.  THE INDICTMENT CHARGES FRAUD BASED ON MR. BALWANI'S UNDERSTANDING OF THE CAPABILITY OF THERANOS'S TECHNOLOGY.  THAT'S THE ESSENCE OF THE CASE, AND I THINK THE JURY SHOULD KNOW THAT.

THE COURT:  DOESN'T JURY INSTRUCTION NUMBER 28 IN DOCUMENT 1206 INFORM THE JURY OF THIS?  AND THIS WAS THE REASON THAT THE COURT GAVE THIS AS PROPHYLACTIC SUCH THAT THE JURY WOULD NOT VENTURE INTO A PINK LABEL, SIGNING LAB PROTOCOLS.  THAT'S WHY THE COURT GAVE THAT.

I'M AHEAD OF MYSELF NOW, BUT THE COURT INTENDS TO GIVE THIS AS WELL, "THIS" MEANING INSTRUCTION 28 IN DOCKET 1206 FOR THE VERY REASONS THAT YOU POINT OUT, MS. WALSH.

I -- DURING THE HOLMES TRIAL, I HAD EXPRESSED CONCERN OUTSIDE OF THE PRESENCE OF THE JURY TO COUNSEL THAT THE EVIDENCE REGARDING THE LAB AND ANY PROBLEMS WITH THE LAB WOULD NOT BE PERMITTED BY THE GOVERNMENT TO -- AS A BASIS FOR A CRIMINAL CONVICTION.  ANY CIVIL PROBLEMS WITH THE LAB WOULD NOT FORM THE BASIS FOR A CRIMINAL CONVICTION.

AND I'VE TOLD THE GOVERNMENT THAT THEY COULDN'T ARGUE THAT, THEY TOLD ME -- AND THEY DIDN'T ARGUE THAT.  THEY TOLD ME THEY WOULDN'T, AND THEY DIDN'T ARGUE THAT.

6625

THAT WAS THE CONCERN THAT I HAD, AND THAT'S WHY THE COURT GAVE THAT PARTICULAR INSTRUCTION.

I INTEND TO GIVE IT AGAIN IN THIS CASE FOR THE VERY REASONS THAT YOU MENTION. IT'S PROPHYLACTIC AS TO GIVING THE JURY GUIDANCE THAT THEY MAY NOT, THEY MAY NOT CONSIDER THAT.

IN LIGHT OF THAT, I DON'T BELIEVE IT IS NECESSARY TO GIVE THE ADDITIONAL INFORMATION IN THE WIRE FRAUD AS YOU SUGGEST.

AND I'M HAPPY TO MOVE THAT AROUND. IF YOU THINK YOU WOULD LIKE TO MOVE WHAT WAS INSTRUCTION 28 TO A DIFFERENT LOCATION FOLLOWING THESE, I'LL -- I'M HAPPY TO HEAR FROM YOU ABOUT THAT, AS WE'RE GOING TO DO WITH ANOTHER INSTRUCTION PERHAPS. THE ORDER MIGHT BE MORE TEMPORAL IF IT'S CLOSELY RELATED TO THE ACTUAL SUBSTANTIVE INSTRUCTIONS.

BUT I'M GOING TO RESPECTFULLY DECLINE YOUR INVITATION TO ADD THE ADDITIONAL LANGUAGE IN THE WIRE FRAUD, UNDERSTANDING THAT THE COURT WILL GIVE, AS I SAID, THE ALLEGED VIOLATIONS OF REGULATIONS AND INDUSTRY STANDARDS.

AND THE COURT FINDS THAT THAT -- THAT THAT GIVES THE JURY GUIDANCE, AND ALSO TELLS THEM WHAT THEY MAY NOT DO, THEY MAY NOT DO TO AVOID THE DANGER OF MIXING THE CIVIL VIOLATIONS IN ANY WAY, IN ANY WAY WITH A CRIMINAL -- OR ALLEGED CIVIL VIOLATIONS IN ANY WAY WITH ANY ALLEGED CRIMINAL CONDUCT.

MS. WALSH: YES, YOUR HONOR.

MAY I BE HEARD JUST ONE MORE TIME ON THIS?

THE COURT: SURE, OF COURSE.

UNITED STATES COURT REPORTERS

**SER-819**

MS. WALSH: I THINK THAT WOULD HELP TO MOVE THAT INSTRUCTION SO THAT IT IS BEFORE A DESCRIPTION OF THE WIRE FRAUD, SO I DO THINK THAT WOULD HELP.

I GUESS I -- THE INSTRUCTION ITSELF, I'M CONCERNED THAT THE JURORS WILL STILL EITHER NOT BE CLEAR, OR REACH A VERDICT BASED ON IMPROPER GROUNDS, AND THAT'S BECAUSE THE INSTRUCTION -- AND I'M LOOKING AT INSTRUCTION NUMBER 28 IN 1206 -- IT SAYS, "MS. HOLMES IS NOT LIABLE FOR ANY OF THE OFFENSES ALLEGED IN THE INDICTMENT MERELY BECAUSE SHE OR THERANOS MAY HAVE VIOLATED FEDERAL OR STATE REGULATIONS" OR ENGAGED IN NEGLIGENCE ESSENTIALLY.

FINE. THAT'S GREAT.

BUT THEN THE SECOND SENTENCE SAYS, "HOWEVER, YOU MAY CONSIDER SUCH EVIDENCE, ALONG WITH OTHER EVIDENCE, LIMITED TO ANY PURPOSE," AND "ANY PURPOSES FOR WHICH THE EVIDENCE WAS ADMITTED IN ASSESSING WHETHER THE GOVERNMENT HAS PROVED EACH OF THE COUNTS CHARGED IN THE INDICTMENT."

AND IT JUST SEEMS LIKE THAT LAST SENTENCE KIND OF UNDOES THE FIRST, AND I AM CONCERNED THAT IN ASSESSING WHETHER MR. BALWANI COMMITTED WIRE FRAUD, A JUROR MIGHT LOOK AT THIS LAST SENTENCE AND SAY, WELL, I CAN CONSIDER THE LAB'S NEGLIGENCE IN ASSESSING WHETHER THE GOVERNMENT PROVED THE COUNTS CHARGED IN THE INDICTMENT.

THE COURT: MS. VOLKAR.

MS. VOLKAR: YOUR HONOR, I'M NOT SURPRISED TO HEAR

MS. WALSH MAKE THAT ARGUMENT. IT'S THE EXACT SAME ARGUMENT THAT WE HAD WITH -- THAT THE GOVERNMENT HAD WITH THE HOLMES COUNSEL.

AND TO ADD A LITTLE BIT MORE COLOR TO THE HISTORY THAT THE COURT ACCURATELY GAVE, THE GOVERNMENT DID NOT INITIALLY SUGGEST THIS INSTRUCTION IN THE HOLMES CASE. THE HOLMES TEAM DID.

DURING THE COURSE OF THE TRIAL YOUR HONOR INDICATED, AS YOUR HONOR RECOUNTED, THAT SUCH AN INSTRUCTION WOULD LIKELY BE NECESSARY.

SO DURING THE MEET AND CONFER PROCESS, WHAT THE NEW SORT OF LAY OF THE LAND BECAME WAS THAT THE GOVERNMENT AND MS. HOLMES'S COUNSEL ARGUING ABOUT WHAT LANGUAGE SHOULD GO INTO THAT INSTRUCTION. THAT'S WHAT RESULTED HERE.

MS. HOLMES'S TEAM ALSO OBJECTED TO THAT SENTENCE THAT MS. WALSH JUST READ. I BELIEVE THEY HAD A MUCH LENGTHIER INSTRUCTION THAT THEY WANTED TO GIVE THAT WENT INTO MORE DETAIL.

THIS IS WHERE THE COURT LANDED.

AND I WANT TO SAY, WHY IS THAT LANGUAGE THERE?

MY RECOLLECTION IS BECAUSE, AS THE GOVERNMENT WAS ARGUING AT THE TIME, THE EVIDENCE CAN GO TO FALSITY.

SO ONE OF THE KEY REASONS THAT WE HAVE ALWAYS ARGUED THE CMS REPORT SHOULD COME IN IS THAT IT HELPS TO DEMONSTRATE THE FALSITY OF THE STATEMENTS REGARDING THE ACCURACY AND RELIABILITY OF THERANOS TESTS. AND THAT'S ONE -- I MAY BE

FORGETTING OTHERS -- AND THERE MAY HAVE BEEN OTHER ARGUMENTS THAT WE MADE LAST TIME THAT I WANT TO INCORPORATE, BUT THERE'S VERY SPECIFICALLY A REASON FOR THAT SENTENCE.

AND MY UNDERSTANDING FROM THE DEFENDANT'S FILING LAST NIGHT WAS THAT I THOUGHT THAT THEY WERE NOT GOING TO CHALLENGE ANY OF THAT LANGUAGE.

IF WE ARE REOPENING THAT, I'M HAPPY TO REFRESH MYSELF ON OTHER ARGUMENTS.

MS. WALSH:  YOUR HONOR, MAY I BE HEARD IN RESPONSE?

THE COURT:  YES.

MS. WALSH:  SO, FIRST OF ALL, THIS WAS THE INSTRUCTION IN THE HOLMES CASE WHERE MS. BENNETT DID NOT TESTIFY AND DID NOT GIVE ALL OF THE DETAILS SHE DID IN THIS CASE, SO I DO THINK IT'S A DIFFERENT SET OF CIRCUMSTANCES.

AND I UNDERSTAND WHAT MS. VOLKAR IS SAYING, THAT THE LAST SENTENCE CAN GO TO FALSITY, OR EVIDENCE OF NEGLIGENCE CAN GO TO FALSITY.

BUT I GUESS THAT'S THE WHOLE POINT.  FALSITY OF WHAT?

AND MS. VOLKAR JUST SAID FALSITY RELATING TO THE ACCURACY AND RELIABILITY OF THE THERANOS TESTS.

THAT'S EXACTLY WHAT I WANT TO PUT IN THE WIRE FRAUD INSTRUCTION.  WHAT FALSITY ARE WE TALKING ABOUT?

THE COURT:  SO LET ME GIVE YOU THIS OPPORTUNITY, IF YOU WISH TO AUGMENT LANGUAGE, PERHAPS THIS INSTRUCTION IS THE PLACE TO ADD A SENTENCE OR TWO AND NOT, AND NOT THE ACTUAL

SER-822

SUBSTANTIVE INSTRUCTION.

AND I'LL -- WHY DON'T I -- I'M AHEAD OF OURSELVES HERE, BUT WE'LL PASS ON THE ALLEGED VIOLATIONS REGULATIONS, WHICH IS YOUR NUMBER 28, WHICH WAS HOLMES 28, AND I'LL LET YOU WORDSMITH A SENTENCE OR TWO AND MEET AND CONFER WITH MS. VOLKAR IF YOU WOULD LIKE TO SEE IF YOUR ADDITIONS WOULD BE ACCEPTABLE IN THAT INSTRUCTION.

BUT I DON'T THINK IT'S APPROPRIATE TO GIVE THEM IN THE ACTUAL INSTRUCTION, SO -- FOR THE REASONS I'VE SAID.

MS. WALSH: THANK YOU, YOUR HONOR.

MS. VOLKAR: YOUR HONOR, BEFORE WE MOVE OFF OF THE FIRST PAGE OF THE WIRE FRAUD, THE GOVERNMENT HAS A REQUEST.

THE COURT: YES.

MS. VOLKAR: FIRST, JUST TO CLARIFY FOR THE RECORD, I'M LOOKING AT DOCUMENT 4 -- ECF 1476 AT 17, AND MR. BALWANI ALSO PROPOSED IN THE FIRST LINE THE CHANGES TO THE COUNTS THREE THROUGH TWELVE.

THE GOVERNMENT DOES NOT OBJECT AND AGREES WITH THAT. THAT WAS PROBABLY CLEAR, BUT I WANTED TO BE EXTRA CLEAR.

SIMILARLY ON LINE 19, THE SAME CHANGE IS MADE.

WHAT THE GOVERNMENT -- I HAVE NOT HEARD FROM THE DEFENSE, FROM MR. BALWANI HIS POSITION ON THE GOVERNMENT REQUEST FOR THE INVESTOR COUNTS TO ADD THE NAME OF THE INVESTOR IN A PARENTHETICAL FOLLOWING IT.

AND I DO APOLOGIZE TO MOVE US OFF OUR CORE DOCUMENT, BUT

UNITED STATES COURT REPORTERS

IN ECF 1211 AT PAGE 38, WHICH WE SUBMITTED BACK IN DECEMBER, WE MADE THAT OFFER. THE HOLMES DEFENSE TEAM OBJECTED.

I WOULD JUST LIKE TO KNOW THIS DEFENDANT'S POSITION. I THINK IT HELPS THE JURY.

THE COURT: WE DID HAVE THAT DISCUSSION, AND I -- MY RECOLLECTION IS THAT I THOUGHT IT WOULD BE HELPFUL ALSO.

WHAT ARE YOUR THOUGHTS, MS. WALSH?

MS. WALSH: SO MY THOUGHTS ARE IN LINE WITH MS. SAHARIA'S ARGUMENTS THAT SHE MADE TO THE COURT AND ULTIMATELY THE COURT ACCEPTED, WHICH IS THAT THE INVESTOR'S NAMES ARE NOT IN THE INDICTMENT.

AND FOR THE COURT TO THEN INCORPORATE THOSE NAMES, WHICH CAME INTO EVIDENCE THROUGH THE TRIAL, INTO THE JURY INSTRUCTIONS HELPS THE GOVERNMENT TO SOME EXTENT CONNECT THE DOTS FOR THE JURY THROUGH THE INSTRUCTIONS.

AND IT SEEMED TO WORK FINE IN THE HOLMES TRIAL. I THINK THAT --

THE COURT: FINE FOR THE GOVERNMENT.

MS. WALSH: WELL, THEY USED A CHART AND IT DID NOT SEEM UNCLEAR TO THE JURY, SO THAT'S OUR POSITION.

THE COURT: OKAY. WELL, UNDERSTOOD.

AND WE HAD THIS ARGUMENT, THIS DISCUSSION WITH THE HOLMES TEAM, AND I FELT IT WOULD GIVE SOME CLARITY, BUT THE GOVERNMENT -- AND I ULTIMATELY RULED AS I DID.

THE GOVERNMENT, AS YOU POINT OUT, WAS ABLE IN CLOSING

ARGUMENT TO MAKE THEIR CHART AND CONNECT THE DOTS, IF YOU WILL.

ALL RIGHT. SO I'LL GIVE THAT SAME INSTRUCTION IN THAT REGARD WITHOUT LISTING THE SPECIFIC VICTIMS, MS. VOLKAR.

MS. VOLKAR: UNDERSTOOD. THANK YOU, YOUR HONOR.

NOW I BELIEVE WE'RE ON THE SECOND PAGE OF THE WIRE FRAUD INSTRUCTION.

THE COURT: YES.

MS. VOLKAR: AND THE GOVERNMENT'S NEXT, I GUESS, LEAST REQUEST FOR DISCUSSION IS 1476, PAGE 18, BOTTOM OF THE PAGE OF 17, THE FIRST TWO LINES ADD COUNT NINE, WHICH IN ESSENCE WE AGREE WITH, BUT IT COPIES THE WORDING OF COUNT TEN AND ELEVEN, AND THE ONLY THING WE WANT TO POINT OUT IS THAT THE INDICTMENT REFERENCES SPECIFICALLY A PHONE CALL, A TELEPHONE CALL FROM PATIENT B.B. TO THERANOS REGARDING LABORATORY BLOOD TEST RESULTS, AND WE WOULD JUST REQUEST THAT THAT LANGUAGE BE ADDED IN.

THE COURT: ANY OBJECTION TO THAT?

MS. WALSH: NO, YOUR HONOR. AND I MEANT TO CATCH THAT AND I DID NOT, BUT NO OBJECTION.

THE COURT: OKAY. THANK YOU. THANK YOU, MS. VOLKAR.

MS. VOLKAR: THANK YOU.

THE COURT: ANYTHING FURTHER ON THIS PAGE?

MS. VOLKAR: YES. THE NEXT -- AND I DO THINK IT'S THE LAST ADDITION MR. BALWANI SUGGESTS IS TO THE "KNOWINGLY,"

THE FIRST ELEMENT.

AND THE -- I'M SORRY, LINES 14 TO 16 IF THAT'S BENEFICIAL.

THE COURT:  I SEE "KNOWINGLY" APPEARING ON LINE 12.

MS. VOLKAR:  CORRECT, YOUR HONOR.  THAT'S THE ELEMENT.

AND THERE'S BLUE TEXT, A SENTENCE THAT STARTS, "TO FIND" BETWEEN LINE 14 AND LINE 16 --

THE COURT:  OKAY.

MS. VOLKAR:  -- THAT I UNDERSTAND THAT MR. BALWANI IS ASKING TO BE ADDED TO WHAT WAS AN ALREADY AUGMENTED INSTRUCTION FROM THE MODEL GIVEN IN THE HOLMES CASE.

AND AS I'M SPEAKING, I'LL JUST ROLL INTO THE GOVERNMENT'S OBJECTION MAY NOT SURPRISE THE COURT.  I BELIEVE THIS IS BASED -- PERHAPS I'M SPECULATING HERE.  I BELIEVE THIS IS BASED ON THE PHILLIPS CASE.  I THINK WE'LL GET TO DISCUSSING THAT FURTHER IN JUST A MOMENT.

ADDING THIS LANGUAGE HERE, I THINK IT WAS ALSO ASKED FOR BY THE HOLMES TEAM.

IT'S UNNECESSARY.  IT'S A FURTHER DESCRIPTION.

AND, I'M SORRY, I'M GETTING AHEAD OF MYSELF, WE'RE GOING TO HAVE THE SAME ARGUMENT IN THE "KNOWINGLY DEFINED" INSTRUCTION, AND THERE'S ALREADY A SENTENCE THAT COVERS THIS CONCEPT.

I THINK IT'S UNNECESSARY VERBIAGE.  IT'S A FURTHER ADDITION FROM THE MODEL INSTRUCTION AND WHAT WAS GIVEN IN

HOLMES, AND THE GOVERNMENT WOULD OBJECT TO IT.

THE COURT: OKAY.

MS. WALSH: YES, YOUR HONOR.

I THINK THERE ARE TWO ISSUES. ONE MS. VOLKAR HAS IDENTIFIED, WHICH IS THE SUBSTANTIVE ONE, AND IT'S TRUE THAT THIS LANGUAGE IS BASED ON PHILLIPS.

AND WHEN WE GET TO THE "KNOWINGLY" INSTRUCTION, I'M GOING TO ASK MY COLLEAGUE, MS. SCHURICHT, TO COME UP AND ADDRESS THAT.

BUT THERE'S ALSO A FORM ISSUE THAT RELATES DIRECTLY TO THIS INSTRUCTION, AND WHAT I'M REFERRING TO IS THE OTHER TERMS IN THIS INSTRUCTION, NAMELY, SCHEME TO DEFRAUD ON PAGE 16, MATERIAL ON PAGE 18, INTENT TO DEFRAUD ON LINE 21, AND INTENT TO DECEIVE AND CHEAT ON LINE 22 ARE ALL DEFINED IN THIS INSTRUCTION AND EXPLAINED.

THE ONE ELEMENT OR TERM THAT IS NOT EXPLAINED IS KNOWINGLY.

AND SO I DO THINK IT'S APPROPRIATE TO EXPLAIN THAT TERM AS THE OTHERS ARE EXPLAINED WITH A SHORT SENTENCE CONTAINING THE ESSENCE OF WHAT KNOWINGLY MEANS.

MS. VOLKAR: YOUR HONOR, THE REASON THE OTHER THREE ELEMENTS ARE EXPLAINED -- I'D HAVE TO GLANCE BACK, BUT IT WAS NOT IN THE MODEL. THOSE WERE, AS FAR AS I CAN RECALL, ALL ADDITIONS THAT CAME ABOUT THROUGH DISCUSSIONS IN THE HOLMES CASE.

SER-827

I WOULD SAY THAT PART OF THE REASON WHY THERE WAS NOT FURTHER EXPLANATION OF KNOWINGLY IS BECAUSE THERE IS AN ENTIRELY SEPARATE INSTRUCTION WHICH, IF I'M NOT MIXING MYSELF UP, IS EITHER NEXT OR SHORTLY AFTER THIS INSTRUCTION THAT GIVES SEVERAL MORE SENTENCES DESCRIBING WHAT KNOWINGLY REQUIRES.

AND ALTHOUGH I THINK THERE IS ONE ON INTENT TO DEFRAUD AS WELL, MY RECOLLECTION IS THAT THAT JUST REPEATS WHAT IS HERE.

AND WHERE I'M GOING WITH ALL OF THIS IS THAT WE'RE ALREADY IN A WORLD WHERE WE'VE FURTHER AUGMENTED WHAT THE MODEL INSTRUCTION SUGGESTS, AND I DON'T THINK THAT WE NEED TO AUGMENT IT FURTHER FOR THIS ELEMENT WHEN THERE'S ANOTHER INSTRUCTION THAT COVERS THIS TOPIC.

THE COURT:  THAT'S -- THANK YOU.

THAT'S INSTRUCTION NUMBER 23 AT DOCUMENT 1206, "KNOWINGLY DEFINED."

THE COURT -- AGAIN, GETTING AHEAD OF OURSELVES -- I'M INCLINED TO GIVE THAT "KNOWINGLY" INSTRUCTION, OF COURSE, SUBSTITUTING MR. BALWANI FOR MS. HOLMES.

AND IT WOULD SEEM THAT THAT PROVIDES THE PROTECTION AND GUIDANCE THAT YOU'RE SEEKING, MS. WALSH.

AGAIN, I'M HAPPY TO MOVE THAT, IF YOU WANT TO SUGGEST TO MOVE THAT KNOWINGLY DEFINITION, TO A PLACE CLOSER TO THE INSTRUCTION.  YOU KNOW, I'LL HEAR FROM YOU ON THAT.

BUT I DO THINK THAT THE "KNOWINGLY" INSTRUCTION, AS I'VE SAID, I WILL GIVE IT.

6635

AND I WON'T GIVE -- I'LL DECLINE YOUR INVITATION TO GIVE THE KNOWINGLY IN THE INSTRUCTION AS YOU'VE PRESENTED IT, BUT I WILL -- I THINK IT'S APPROPRIATE TO INSTRUCT THE JURY AS TO WHAT KNOWINGLY IS. GIVING IT A SEPARATE INSTRUCTION ACTUALLY, I THINK, HIGHLIGHTS THAT ELEMENT FOR THE JURY, AS OPPOSED TO PUTTING IT IN THE MIDDLE OF THE ELEMENTS, AND IT SEEMS TO ME THAT GIVES IT SOME -- KNOWINGLY -- AN ELEVATED STATUS SUCH THAT THE JURY IS BETTER INFORMED ABOUT IT, AND IT APPLIES TO THE ACTS.

SO I'M NOT GOING TO GIVE IT, THE KNOWINGLY, AS YOU SUGGEST.

BUT I WILL GIVE THE "KNOWINGLY" INSTRUCTION SEPARATELY. IF YOU WANT TO SUGGEST A LOCATION FOR THAT THAT YOU THINK IS BETTER, I'LL CERTAINLY CONSIDER THAT WHEN WE PREPARE THE FINAL INSTRUCTIONS.

MS. WALSH: THANK YOU, YOUR HONOR.

THE COURT: YOU'RE WELCOME.

MS. VOLKAR: AND, YOUR HONOR, BEFORE WE MOVE ON FROM WIRE FRAUD, FOR THE SAME REASONS I ANTICIPATE I KNOW WHERE THE COURT WILL LAND, BUT LAST GO-ROUND, THE GOVERNMENT REQUESTED A LINE THAT IS -- AN ADDITION FROM THE MODEL THAT THE GOVERNMENT WAS UNSUCCESSFUL IN MOVING FOR LAST TIME AND PROBABLY WILL BE HERE, BUT FROM THE COMMENTARY THAT SAYS THAT THE JURORS DO NOT HAVE TO AGREE ON THE SPECIFIC MISREPRESENTATION, AND I'M GOING TO -- I HOPE I'M CLOSE ENOUGH TO IT, BUT SO LONG AS THEY FIND

**SER-829**

THE DECEPTIVE SCHEME, AND WE DID SUGGEST THAT IN OUR FILING ECF 1211 AT 39.

WE WILL JUST STAND ON OUR REQUEST THERE, AND WE UNDERSTAND THE COURT WILL DO AS IT DID IN THE HOLMES TRIAL AND NOT ADD THAT.

THE COURT: SHOULD I ADD THAT, MS. WALSH?

MS. WALSH: NO, YOUR HONOR. THANK YOU.

THE COURT: ALL RIGHT. THANK YOU.

I WILL GIVE THE INSTRUCTION AS GIVEN IN THE HOLMES CASE, BUT YOUR OBJECTION IS NOTED.

MS. VOLKAR: THANK YOU, YOUR HONOR.

THE COURT: ALL RIGHT. LET'S MOVE THEN, I THINK NEXT IS NUMBER 21 ON YOUR CHART, WHICH IS "INTENT TO DEFRAUD."

AND I SEE NO FURTHER DISCUSSION NEEDED ON THAT.

MS. WALSH: CORRECT, YOUR HONOR.

MS. VOLKAR: THAT'S CORRECT, YOUR HONOR.

THE COURT: ALL RIGHT. THEN I'LL GIVE THE "INTENT TO DEFRAUD" AS GIVEN IN HOLMES, INSTRUCTION NUMBER 21 IN DOCUMENT 1206.

GOOD FAITH IS WHAT YOU HAVE NEXT, MS. WALSH, AND THIS IS THE HOLMES 22, INSTRUCTION NUMBER 22 IN DOCUMENT 1206.

LET ME JUST SAY I HAVE A QUESTION ABOUT THIS. AND LET ME SAY, IN THE HOLMES MATTER, MS. HOLMES TESTIFIED, AND THERE MAY HAVE BEEN TESTIMONY FROM HER THAT REFERENCED HER BELIEFS FROM WHICH A GOOD FAITH INSTRUCTION WOULD ARISE, AND I BELIEVE WE

HAD CONVERSATION ABOUT THAT.

WHAT IS THE BASIS FOR A GOOD FAITH INSTRUCTION HERE?

MS. WALSH: MANY EMAILS AND TESTIMONY FROM OTHER WITNESSES ABOUT MR. BALWANI'S ACTIONS AND STATEMENTS THROUGHOUT THE COURSE OF HIS TENURE AT THERANOS.

I DON'T THINK IT'S A PREREQUISITE THAT A DEFENDANT HAS TO TESTIFY TO GET A GOOD FAITH INSTRUCTION.

THE COURT: RIGHT. NO, I'M NOT SUGGESTING THAT IT IS.

I'M JUST TRYING TO FIND OUT WHAT IS THE BASIS FOR IT, FOR THE INSTRUCTION.

MS. WALSH: YEAH, I THINK IT'S TESTIMONY FROM VARIOUS WITNESSES. IT'S NOT LIKE THEY LITERALLY SAID HE WAS ACTING IN GOOD FAITH.

BUT I RECALL TESTIMONY FROM MR. EDLIN WHEN MR. BALWANI WAS WORKING ON I.T. RELATED ISSUES WITH THE THERANOS DEVICES AND SENDING THEM TO AFGHANISTAN, THERE WERE EMAIL -- THERE WERE MANY, MANY EMAILS ABOUT THAT.

WE INTEND TO ARGUE THAT HE AT ALL TIMES WAS ACTING IN GOOD FAITH AND HE BELIEVED IN THE CAPABILITY OF THIS TECHNOLOGY. I THINK THAT'S AN APPROPRIATE ARGUMENT, AND IT'S AN ARGUMENT THAT NEEDS CORRESPONDING INSTRUCTIONS SO THAT THE JURORS UNDERSTAND WHAT THE LAW IS WHEN THEY'RE APPLYING THE LAW TO THE FACTS AND THINKING ABOUT THE EVIDENCE THAT CAME IN.

THE COURT: OKAY. IS THAT -- IT'S NOT DIRECT

EVIDENCE, BUT IT'S CIRCUMSTANTIAL EVIDENCE, OR IS IT BOTH?

MS. WALSH: WELL, NO WITNESS SAID "I BELIEVE MR. BALWANI WAS ACTING IN GOOD FAITH," SO IT -- I THINK IT IS CIRCUMSTANTIAL EVIDENCE. BUT.

THERE ARE A LOT OF CIRCUMSTANCES FROM WHICH WE WOULD ARGUE THAT, AND ONE -- ANOTHER ONE COMES TO MIND, WHICH IS HIS INVESTMENT IN THE COMPANY, THE LOAN TO THE COMPANY, ALL SHOWING A GOOD FAITH BELIEF IN THE BONA FIDES OF THE ENTERPRISE.

THE COURT: THE ARGUMENT BEING, WHY ELSE WOULD SOMEONE INVEST?

MS. WALSH: SURE. PUTTING $10 MILLION OF HIS OWN MONEY AT RISK SHOWS CONFIDENCE AND A GOOD FAITH BELIEF THAT THIS IS A WORTHY COMPANY THAT HAS TECHNOLOGY HE BELIEVES IS CAPABLE OF DOING WHAT, WHAT MS. HOLMES AND OTHERS SAYS IT COULD DO.

THE COURT: OKAY.

MS. VOLKAR: YOUR HONOR IS PROBABLY REMEMBERING THE HEATED DISCUSSION WE HAD ABOUT THIS IN THE LAST TRIAL.

THE GOVERNMENT, OF COURSE, OPPOSES A GOOD FAITH INSTRUCTION. NINTH CIRCUIT CASE LAW IS CLEAR THAT WHEN KNOWINGLY IS PROPERLY DEFINED, NO GOOD FAITH INSTRUCTION IS REQUIRED. THAT IS THE LAW OF THE CIRCUIT.

THAT BEING SAID, WE ALSO HAD A HEALTHY AMOUNT OF DEBATE ABOUT WHAT A GOOD FAITH BELIEF MUST BE, AND THE NINTH CIRCUIT IS CRYSTAL CLEAR THAT IT MUST BE, AS WAS ULTIMATELY IN THE

SER-832

COURT'S INSTRUCTION GIVEN, A GOOD FAITH BELIEF IN THE TRUTH OF THE SPECIFIC MISREPRESENTATIONS MADE.

SO IT'S THE GOVERNMENT'S POSITION THAT NO GOOD FAITH INSTRUCTION IS REQUIRED.

WE UNDERSTAND ONE WAS GIVEN IN THE HOLMES CASE. WE UNDERSTAND IF THE COURT CHOOSES TO GIVE IT HERE.

BUT WHAT WE WOULD STRENUOUSLY OBJECT TO IS ANY LANGUAGE THAT STRAYS FROM WHAT WE -- WHAT THE COURT LANDED ON IN THE HOLMES CASE BECAUSE IT IS VERY IMPORTANT THAT THE JURY KNOWS, GOOD FAITH IN WHAT?

AND THAT WAS ANOTHER SUBJECT OF HEALTHY DEBATE IN THE LAST TRIAL.

THE COURT: OKAY.

MS. WALSH: IF YOUR HONOR IS INCLINED NOT TO GIVE THE GOOD FAITH INSTRUCTION, I WOULD LIKE TO BE HEARD FURTHER ON IT.

THE COURT: NO. I JUST WANTED TO UNDERSTAND THE BASIS FOR IT IN A VACUUM.

THE BIG DISTINCTION IS MS. HOLMES TESTIFIED, AND SHE WAS ABLE TO GIVE HER TESTIMONY AS TO THE TECHNOLOGY, AS TO HER OPINIONS ON MANY THINGS FROM WHICH THE JURY -- THAT JURY COULD -- HAD DIRECT EVIDENCE FROM WHICH THEY COULD DRAW AN INFERENCE OF GOOD FAITH, OR NOT.

HERE, AS YOU'RE TELLING ME, MR. BALWANI MAY NOT TESTIFY, AND IF HE DOESN'T TESTIFY, WHAT I HEAR YOU SAYING IS THERE IS

6640

CIRCUMSTANTIAL EVIDENCE FROM EMAILS AND OTHER -- THERE WAS TESTIMONY FROM SOME WITNESSES, INVESTORS, ABOUT REPRESENTATIONS THAT -- REGARDING FINANCES THAT MR. BALWANI MADE TO THEM.

THAT WAS ADMITTED, AND IT SOUNDS LIKE THAT WOULD FORM THE BASIS OF AT LEAST AN ARGUMENT OF GOOD FAITH.

MS. WALSH: YES, YOUR HONOR.

THE COURT: ALL RIGHT. I'LL GIVE IT, NOTING THE GOVERNMENT'S OBJECTION.

WE'LL CHANGE, OF COURSE, THE PARTIES.

MS. VOLKAR: THANK YOU, YOUR HONOR.

THE COURT: LET'S SEE. NEXT IS "KNOWINGLY."

I THINK WE'VE TALKED ABOUT THAT.

MS. VOLKAR: SORRY, YOUR HONOR. I ACTUALLY DO HAVE A FEW POINTS ON "KNOWINGLY."

THE COURT: SURE.

MS. VOLKAR: SO THIS WOULD BE, THIS WOULD BE AN EXAMPLE OF SOMETHING THAT THE PARTIES VIGOROUSLY DEBATED IN THE HOLMES TRIAL.

THE GOVERNMENT IN HOLMES -- AND MR. BALWANI RECOMMENDS ALMOST THE EXACT SAME CHANGES THAT THE HOLMES TEAM DID, AND SO SOME OF THIS IS GOING TO BE REARGUMENT, BUT I ALSO UNDERSTAND THE COURT TO SAY THAT YOU'RE HAPPY TO HEAR IT.

SO THE FIRST IS, AS IN THE HOLMES CASE, THE GOVERNMENT -- SORRY.

AS IN THE HOLMES CASE, HERE THE GOVERNMENT HAS CHOSE --

UNITED STATES COURT REPORTERS

ELECTED NOT TO PURSUE AN OMISSIONS THEORY, AND THROUGHOUT THE INSTRUCTIONS IN THE HOLMES CASE THE REFERENCE TO THE OMISSIONS OF FACT WERE DROPPED WITH ONE EXCEPTION, THIS EXCEPTION ON THIS PAGE ON LINE 5.  AND BY "THIS PAGE," ECF 1476 AT 20, LINE 5.

AND THE REASON FOR THAT -- AND THIS WAS A SOURCE, AGAIN, OF GREAT DEBATE TOWARDS THE END OF THE CHARGING CONFERENCE IS BECAUSE WHEN WE ARE TALKING ABOUT WHAT MAKES UP A PERSON'S KNOWLEDGE, WE'RE NOT TALKING ABOUT A LEGAL OMISSIONS OF FACT THEORY ANYMORE.

WE'RE TALKING ABOUT WHAT ARE THE SOURCES AND INPUTS AND WHAT ALL MAKES UP THE WORLD OF A PERSON'S KNOWLEDGE.

AND THAT CAN INCLUDE OMISSIONS.

AND AS BUT ONE EXAMPLE I CAN THINK OF, HE, MR. BALWANI, WE HAVE HEARD TESTIMONY SAT IN THE ROOM DURING INVESTOR PRESENTATIONS AND, WE WOULD ARGUE, DID NOT SPEAK UP WHEN MS. HOLMES MADE FALSE STATEMENTS TO INVESTORS.

BUT WE WOULD SAY IN SOME WAYS THAT'S AN OMISSION THAT HE WAS AWARE OF THAT, FOR EXAMPLE, SHE WASN'T ADDING X, Y, Z FACT, OR WASN'T CLARIFYING, OR WASN'T PROPERLY HEDGING AS MAYBE A PERSON SHOULD THINK.

I'M GETTING OUT OVER MY SKIS HERE WITH THE FACTS, AND I DON'T WANT TO GO TO WHAT MAY SOUND LIKE CLOSING ARGUMENT.

THE BASELINE POINT I'M TRYING TO SAY IS THAT WORDS, ACTS, AND OMISSIONS ARE ALL, AS WEIRD AS THIS MAY SOUND TO SAY, SOURCES, OR THE ABSENCE OF SOURCES, THAT COULD MAKE UP A

SER-835

PERSON'S KNOWLEDGE.

AND THAT'S WHY THE COURT GAVE THAT INSTRUCTION IN HOLMES, AND THE GOVERNMENT SAYS THAT IT IS -- OR ARGUES THAT IT'S PROPER TO GIVE AGAIN HERE.

AND WHILE I HAVE THE MIKE, THE SECOND LINE IS THE -- SORRY, LINES 7 THROUGH 8, THE SECOND ADDITION THAT MR. BALWANI SUGGESTS IS ALMOST IDENTICAL TO WHAT MS. HOLMES ASKED FOR.

BOTH OF THOSE TWO SENTENCES IN LINES 6 TO 8 DO NOT APPEAR IN THE MODEL INSTRUCTION.

THERE'S ALREADY AN ADDITION TO THE HOLMES INSTRUCTION, AND IT WAS BASED ON THE PHILLIPS CASE, AND IT WAS THE EXACT SAME ARGUMENT THAT WE HAD THE LAST GO-ROUND.

AND WHAT THE COURT ULTIMATELY FOUND WAS REALLY THE FIRST SENTENCE REALLY COVERS THE CONCEPT THAT'S JUST EMPHASIZED AND ADDED ON TO AND ENUMERATED IN THE FOLLOWING SENTENCE, THE LINES 7 TO 8 THAT MR. BALWANI WANTS TO ADD, SO IT'S REDUNDANT.

AND SO THE GOVERNMENT WOULD ARGUE REALLY LINES 6 THROUGH 8 ARE UNNECESSARY.  THEY'RE NOT IN THE MODEL.  THEY'RE ALREADY IN ADDITION.

IF THE COURT IS GOING TO ADD ANYTHING, WHAT THE COURT ADDED, THAT FIRST SENTENCE, LINES 6 TO 7, SUFFICES TO COVER THE PHILLIPS ARGUMENT THAT I EXPECT MY COLLEAGUE IS ABOUT TO MAKE.

THANK YOU.

THE COURT:  THANK YOU.

MS. SCHURICHT:  GOOD MORNING, YOUR HONOR.

SACHI SCHURICHT FOR MR. BALWANI. I'M JUST GOING TO BE SPEAKING ABOUT THIS INSTRUCTION.

I'LL TAKE THOSE TWO IN REVERSE ORDER, SO I'LL START WITH THE ADDITIONAL SENTENCE WE'VE PROPOSED ON LINES 7 AND 8.

IT SOUNDED EARLIER LIKE YOUR HONOR IS PLANNING AS OF NOW TO GIVE THE SAME INSTRUCTION, THE "KNOWINGLY" INSTRUCTION FROM THE HOLMES TRIAL, WHICH WOULD INCLUDE THAT FIRST SENTENCE DRAWN FROM U ON LINES 6 THROUGH 7.

AS MS. VOLKAR ACKNOWLEDGED, THE SECOND SENTENCE THAT WE'RE PROPOSING IS SIMPLY APPLYING THAT PRINCIPLE FROM PHILLIPS TO THE FACTS OF THIS CASE.

I DON'T THINK THERE'S MUCH HARM THAT COMES FROM THAT ADDITIONAL CLARIFICATION FOR THE JURY, AND I THINK IT MAKES SENSE TO MAKE CLEAR THAT THIS PRINCIPLE DOES APPLY TO MS. HOLMES'S KNOWLEDGE AND THE KNOWLEDGE OF THERANOS AGENTS OR EMPLOYEES GIVEN THE OUTSIZED ROLE THAT SHE HAS PLAYED IN THIS TRIAL IN A WAY THAT MR. BALWANI DIDN'T HAVE AS FIGURATIVELY AS LARGE OF A ROLE IN HER TRIAL.

AS MS. WALSH MENTIONED EARLIER TODAY, THERE'S EVIDENCE THAT HAS COME IN HERE OF INTERACTIONS THAT MS. HOLMES HAD WITH INVESTORS AS FAR BACK AS 2006, LONG BEFORE MR. BALWANI WAS EVEN INVOLVED IN THERANOS.

AND THERE IS A RISK, I THINK, THAT THE JURY MAY THINK THAT THOSE INTERACTIONS AND DECISIONS SHE MADE AT THAT TIME AND WHATEVER INFORMED THOSE DECISIONS AND INTERACTIONS COULD BE

6644

IMPUTED TO HIM ABSENT AN INDEPENDENT FINDING THAT HE HAD PERSONAL KNOWLEDGE.

SO WE'RE SIMPLY ASKING TO APPLY THIS PRINCIPLE OF PHILLIPS TO THE FACTS HERE TO MAKE IT EXTRA CLEAR FOR THE JURY.

THE COURT:  THANK YOU.

DOES THE FIRST SENTENCE INSTRUCT THE -- INFORM THE JURY OF THAT?  THEY HAVE TO FIND THAT MR. BALWANI ACTED KNOWINGLY. "YOU MUST FIND THAT HE HIMSELF HAD KNOWLEDGE OF THE FACT AT ISSUE."

AND THAT, THAT DOESN'T PRECLUDE YOU OR YOUR COLLEAGUES FROM ARGUING THAT THEY CAN'T, THEY CAN'T RELY ON THE FACT THAT ANYONE ELSE HAD KNOWLEDGE, ONLY, ONLY -- IT'S ONLY AS TO HIM.

THIS IS THE SAME CONVERSATION THAT I HAD -- I DON'T THINK YOU WERE HERE DURING THE HOLMES DISCUSSION, BUT I RECALL IT IN THAT -- WHEN I SAID I WAS GOING TO GIVE "KNOWINGLY," I INTENDED TO GIVE, AND DO INTEND TO GIVE, THE FIRST SENTENCE, LINES 6 AND 7 AS YOU REFERENCE IT, BECAUSE I DO THINK THAT FULFILLS THE PHILLIPS OBLIGATION IN INFORMING THE JURY THAT THEY MUST, THEY MUST, IF THEY'RE GOING TO FIND THAT THERE WAS A KNOWINGLY ACTION, ACT BY MR. BALWANI, THEY MUST FIND THAT HE HIMSELF HAD KNOWLEDGE OF THE FACT AT ISSUE.

AND THAT SEEMS TO BE THE DIRECTIVE THAT THE PHILLIPS CASE TELLS US.

MS. SCHURICHT:  YOUR HONOR, I AGREE THAT THAT ENCAPSULATES PHILLIPS AND IS AN IMPORTANT PIECE TO INCLUDE

UNITED STATES COURT REPORTERS

**SER-838**

HERE. THE SECOND SENTENCE IS CERTAINLY NOT MEANT TO LIMIT -- I AGREE THAT WE WOULD NOT BE LIMITED IN THE ARGUMENTS THAT WE CAN MAKE FROM THAT FIRST SENTENCE. I JUST THINK THAT THERE'S REALLY NO REASON TO NOT PROVIDE FURTHER CLARITY FOR THE JURY.

THE COURT: OKAY.

MS. SCHURICHT: AND I'LL JUST POINT TO ONE PARTICULAR PIECE OF EVIDENCE THAT I THINK ILLUSTRATES THE CONCERN HERE.

SO WE HAVE DECISIONS, ACTIONS, THAT MS. HOLMES TOOK LONG BEFORE MR. BALWANI HAD JOINED THERANOS. THERE ARE, FOR INSTANCE, TEXT MESSAGES THAT HAVE BEEN ADMITTED INTO EVIDENCE HERE, INCLUDING ONE THAT I FRANKLY WOULD NOT BE SURPRISED IF WE HEAR IN THE CLOSING ARGUMENTS, WHERE MR. BALWANI SAYS TO MS. HOLMES, "I AM RESPONSIBLE FOR EVERYTHING AT THERANOS. ALL HAVE BEEN MY DECISIONS, TOO."

SO I THINK WHEN YOU PAIR THE EVIDENCE OF WHAT MS. HOLMES DID INDEPENDENTLY OF HIM WITH THE COMMUNICATION LIKE THAT, THERE IS A PARTICULARLY SEVERE RISK THAT THE JURY MAY THINK, OH, MR. BALWANI HAS ADOPTED ALL OF HER DECISIONS, EVERYTHING THAT INFORMED THOSE DECISIONS, HER KNOWLEDGE EVEN AT AN EARLIER TIME.

AND SO IT'S BECAUSE OF THE PARTICULAR EVIDENCE THAT WE'RE PRESENTED WITH HERE THAT WE THINK THE ADDITIONAL CLARIFICATION SPECIFYING MS. HOLMES IN PARTICULAR IN THIS SECOND SENTENCE WOULD BE HELPFUL TO THE JURY.

6646

THE COURT: OKAY. THANK YOU.

MS. VOLKAR.

MS. VOLKAR: YOUR HONOR, I THINK THE COURT -- WELL, TWO THINGS.

ONE, THE GOVERNMENT INCORPORATES ITS ARGUMENTS FROM LAST TIME THAT PHILLIPS DOES NOT ACTUALLY REQUIRE THE INSTRUCTION. THE GOVERNMENT UNDERSTANDS THE COURT -- WHERE WE ARE AND THAT THE COURT PLANS TO GIVE, AS IT DID IN HOLMES, THAT FIRST LINE.

AND KNOWING THAT THAT'S WHERE WE ARE, THE SECOND LINE IS REDUNDANT AND IS REALLY JUST A RESTATEMENT OF THE FIRST LINE AS YOUR HONOR POINTED OUT, AND NOTHING PRECLUDES THE DEFENDANT FROM ARGUING IN CLOSING ARGUMENT EXACTLY THAT FROM THAT LINE.

AND GOING TO THE EXAMPLE THAT MY COLLEAGUE JUST GAVE, "ALL HAVE BEEN MY DECISIONS," THAT'S NOT NECESSARILY SAYING "I KNOW EVERYTHING YOU KNOW ABOUT THE COMPANY."

SO I GUESS I'M NOT SEEING THE DIRECT CONNECTION THERE OF ONE IS -- MAYBE I'M GETTING TOO HUNG UP ON ONE PIECE OF EVIDENCE. I KNOW THAT MS. SCHURICHT SAID SHE HAD MULTIPLE EXAMPLES, BUT IT'S NOT SAYING THAT "I KNOW EVERYTHING THAT YOU KNOW." WE DON'T HAVE A STATEMENT LIKE THAT.

SO I DON'T THINK WE NEED THESE ADDITIONAL GUARDRAILS WHEN WE ALREADY HAVE AN ENHANCED, WHAT I WILL CALL AN ENHANCED GUARDRAIL ABOVE AND BEYOND WHAT THE MODEL SUGGESTS IS APPROPRIATE.

WE HAVE THE DEFINITION OF KNOWINGLY FOLLOWED BY A SPECIFIC

UNITED STATES COURT REPORTERS

**SER-840**

6647

STATEMENT THAT IT MUST BE BASED ON MR. BALWANI'S KNOWLEDGE THAT HE HIMSELF HAD.

I THINK THAT'S SUFFICIENT AND NOTHING MORE IS REQUIRED.

THE COURT:  OKAY.  THANK YOU.

MS. SCHURICHT:  I HAVE NOTHING MORE ON THE <u>PHILLIPS</u> ISSUE.

I'LL JUST BRIEFLY ADDRESS THE FIRST POINT THAT MS. VOLKAR MADE --

THE COURT:  YES.

MS. SCHURICHT:  -- ON LINE 5 ABOUT THE REFERENCE TO OMISSIONS AND THE LIST OF FACTORS THAT THE JURY CAN CONSIDER FOR DECIDING WHETHER MR. BALWANI ACTED KNOWINGLY.

SO THIS MENTAL STATE KNOWINGLY, IT QUALIFIES IN THE WIRE FRAUD INSTRUCTION, "WHETHER MR. BALWANI KNOWINGLY PARTICIPATED IN, DEVISED OR INTENDED TO DEVISE A SCHEME OR PLAN TO DEFRAUD."

AND SO MS. VOLKAR GAVE AN EXAMPLE OF MS. HOLMES BEING IN A ROOM WITH MR. BALWANI AND OMITTING CERTAIN THINGS IN CONVERSATIONS WITH I BELIEVE IT WAS INVESTORS, AND MR. BALWANI STANDING BY AND ALLOWING THOSE OMISSIONS TO HAPPEN.

THAT SOUNDS TO ME LIKE AN OMISSIONS THEORY OF FRAUD.

BUT WE KNOW THAT A FAILURE TO SPEAK IS NOT A PROPER BASIS FOR AN OMISSIONS THEORY WHEN THERE IS NOT EVIDENCE OF THE DUTY TO DISCLOSE.

AND SO I WORRY ABOUT THAT EXAMPLE THAT HAS BEEN GIVEN, AND I THINK IT HIGHLIGHTS THE RISK OF INCLUDING THOSE REFERENCES TO

6648

OMISSIONS HERE.

I DON'T DISPUTE THAT THE GOVERNMENT CAN ARGUE -- I DON'T THINK THAT EXAMPLE QUITE WORKS, AND NOTHING COMES TO MY MIND.

AND I DON'T DISPUTE THAT THEY COULD ARGUE THAT AN OMISSION COULD INFORM MR. BALWANI'S STATE OF MIND.

I JUST THINK THAT INCLUDING A REFERENCE TO OMISSION IN THIS INSTRUCTION GIVES RISE TO A RISK THAT THE JURY MIGHT THINK ABOUT OMISSIONS MORE BROADLY IN THE SCHEME TO DEFRAUD IN DECIDING WHETHER OR NOT MR. BALWANI IS GUILTY OF JOINING AND COMMITTING A DECEPTIVE SCHEME.

AND I'LL JUST POINT OUT AS WELL THAT IF YOU CONTINUE LOOKING AT THIS SENTENCE, IT SAYS, "YOU MAY CONSIDER EVIDENCE OF MR. BALWANI'S WORDS, ACTS OR OMISSIONS, ALONG WITH ALL OF THE OTHER EVIDENCE, IN DECIDING WHETHER HE ACTED KNOWINGLY."

SO THERE'S ALREADY A CATCH-ALL PHRASE THERE. AND SO I DON'T THINK, BY REMOVING THE REFERENCE TO OMISSIONS HERE, THAT WE'RE NECESSARILY LIMITING WHAT THE GOVERNMENT CAN ARGUE. I THINK WE'RE JUST AVOIDING A RISK OF CONFUSION HERE.

THE COURT: OKAY. WELL, THANK YOU. THAT WAS SOMETHING THAT I WAS GOING TO ASK YOU ABOUT.

IF OMISSIONS IS DELETED, AS YOU ARE REQUESTING, THEN WHAT I HEAR YOU SAYING IS THAT THE GOVERNMENT WOULD NOT BE PRECLUDED FROM RAISING THE HYPOTHETICAL THAT SHE DID, HE SAT IN A ROOM, HE HEARD NUMBERS THAT HE KNEW WERE NOT ACCURATE, AND HE DIDN'T INFORM, HE DIDN'T DO ANYTHING. THAT'S AN ACT, I SUPPOSE, THAT

SER-842

YOU'RE TELLING ME THAT THEY COULD COMMENT ON.

MS. SCHURICHT: I THINK IT COULD -- IT DEPENDS ON HOW THE ARGUMENT IS MADE. I THINK IF IT IS SPEAKING SOLELY TO HIS STATE OF MIND, YES, THAT WOULD BE PERMISSIBLE.

THERE'S JUST A DANGER OF IT BLEEDING INTO AN OMISSIONS THEORY OF FRAUD, WHICH IT SOUNDS LIKE THE GOVERNMENT IS NOT PURSUING.

THE COURT: WELL, IF I INSTRUCT THEM THAT THEY MAY NOT, THEY MAY NOT ARGUE AN OMISSIONS FRAUD THEORY, WOULD THAT GIVE YOU SOME SOLACE?

MS. SCHURICHT: CERTAINLY WE WOULD WELCOME THAT, YOUR HONOR.

MS. VOLKAR: YOUR HONOR, THE GOVERNMENT HAS -- WELL, ONE, I THINK MY COLLEAGUE HAS POINTED OUT WHY IT'S GOOD THAT I'M NOT GIVING THE CLOSING ARGUMENT.

BUT I WILL ALSO SAY THAT THE GOVERNMENT HAS DECIDED, AS IT DID IN THE HOLMES CASE -- OF COURSE, IT WAS NOT REQUIRED TO DO SO -- BUT THE GOVERNMENT HAS DECIDED AND ELECTED NOT TO PURSUE AN OMISSIONS THEORY, AND FOR THAT REASON IS WILLING TO DELETE IT FROM ALL OF THE PORTIONS OF THE JURY INSTRUCTIONS THAT IT PROFFERS, AS IT DID IN HOLMES.

AND I WANT TO GIVE AN EXAMPLE FROM THE MODEL. AND I'M TRYING TO GO OFF OF MY MEMORY OF WHAT WE ARGUED ABOUT THIS THE LAST TIME, BUT THE SENTENCE BEFORE IN THE MODEL READS, "THE GOVERNMENT IS NOT REQUIRED TO PROVE THAT THE DEFENDANT KNEW

UNITED STATES COURT REPORTERS

**SER-843**

THAT HIS ACTS OR OMISSIONS WERE UNLAWFUL."

AND THAT "OR OMISSIONS" WAS STRUCK WHEN WE ARGUED ABOUT THIS THE LAST GO-ROUND BECAUSE IT WAS TIED AND CONNECTED WITH ACTS, AND THAT GETS CLOSER TO THE OMISSIONS THEORY OF FRAUD THAT MY COLLEAGUE IS CONCERNED ABOUT.

AS WE ARGUED LAST TIME, THE SECOND SENTENCE, THE ONE THAT WE'RE CURRENTLY DEBATING -- AND IF YOU'RE LOOKING AT 1476, IT'S THE ONLY ONE YOU SEE -- BUT IT'S JUST WHAT GOES INTO THE MIX TO MAKE UP A PERSON'S KNOWLEDGE.

SO I PUT MY EXAMPLE TO THE SIDE IF THAT TROUBLES ANYONE, BUT I JUST WANT TO MAKE SURE THAT MY ARGUMENT IS CLEAR.  WE ARE WILLING TO FOREGO THE OMISSIONS OF FACT THEORY OF FRAUD, BUT THAT DOES NOT MEAN IT IS NOT A TYPE OF SOURCE THAT COULD ADD TO A PERSON'S KNOWLEDGE, AND THAT'S WHY THE COURT INCLUDED IT IN THE HOLMES CASE, AND WE THINK IT'S APPROPRIATE TO DO SO HERE AGAIN.

THE COURT:  THANK YOU FOR THAT.

AND I DO RECALL THAT'S WHY THE COURT STRUCK IT FROM THE ACTS.  I FELT THAT WAS TOO CONTIGUOUS TO GIVE THE JURY PERHAPS SOME GROUNDS TO SPECULATE, AGAIN, ON AN OMISSIONS THEORY WHEN THE GOVERNMENT SAID IT WAS NOT PURSUING THAT.

THE OMISSIONS AS IT STOOD AND AS IT WAS GIVEN IN THE HOLMES CASE, HOWEVER, WENT TO SPECIFIC CONDUCT OF THE PARTY AND WHETHER OR NOT THE JURY COULD CONSIDER THE WORDS, ACTS, OR OMISSIONS.

SER-844

NOW, IN MS. HOLMES'S CASE, THE OMISSIONS, MAYBE THAT WAS A LITTLE STRONGER BECAUSE SHE HAD AN OPPORTUNITY TO DO CERTAIN THINGS THAT PERHAPS MR. BALWANI DIDN'T HAVE. PERHAPS THE OMISSIONS IN HER CASE WERE ARGUABLY GREATER, IF THERE WERE ANY, OR CONDUCT REGARDING OMISSIONS MIGHT BE GREATER.

BUT I SEE THAT DISTINCTION, AND I THINK YOU DO TOO.

MS. SCHURICHT: I DO SEE THE DISTINCTION THAT MS. VOLKAR IS DRAWING.

BUT MY POINT IS SIMPLY THAT I THINK THIS REMAINING REFERENCE TO OMISSIONS JUST PRESENTS A DANGER THAT THE JURY MAY SPECULATE IN A WAY THAT WOULD BE IMPROPER GIVEN THE REMOVAL OF OMISSIONS ELSEWHERE IN THESE INSTRUCTIONS, AND I DON'T THINK ANYTHING IS LOST IN REMOVING IT WHEN THERE IS A CATCH-ALL PHRASE THAT FOLLOWS IMMEDIATELY AFTER.

THE COURT: SO IF IT IS REMOVED, THEN WHAT IS YOUR OPINION ON WHETHER OR NOT THE GOVERNMENT COULD ARGUE OMISSIONS AS PART OF HIS ACTS? COULD THEY DO THAT?

MS. SCHURICHT: SO I WANT TO BE CAREFUL HERE. I THINK THEY CAN ARGUE OMISSIONS AS RELEVANT TO HIS STATE OF MIND IF IT WAS CLEARLY NOT PURSUING THE OMISSIONS OF FACT THEORY THAT MS. VOLKAR SAYS THE GOVERNMENT DOES NOT INTEND TO PURSUE.

SO IT IS A FINE LINE. I THINK THAT'S PRECISELY WHY IT SHOULD BE REMOVED FROM THIS INSTRUCTION.

BUT IT'S DIFFICULT FOR ME TO KIND OF CONTEMPLATE EVERY WAY THAT THE GOVERNMENT MIGHT TRY TO ARGUE OMISSIONS AS RELEVANT TO

6652

MR. BALWANI'S KNOWLEDGE, WHICH I THINK WOULD BE PERMISSIBLE. I JUST WORRY ABOUT ENCOURAGING THE JURY TO SPECULATE BY REFERENCING IT HERE IN THE INSTRUCTION.

THE COURT: MS. VOLKAR.

MS. VOLKAR: I THINK AT LEAST MS. SCHURICHT AND I ARE BOTH ON THE SAME PAGE IN TERMS OF WHAT IS AND ISN'T IN BOUNDS, EVEN IF THIS WERE INCLUDED IN THE INSTRUCTIONS.

IT WAS INCLUDED IN HOLMES. THE COURT GOT TO SEE THE GOVERNMENT, I BELIEVE, FOLLOWING THE COURT'S INSTRUCTIONS. WE INTEND TO FOLLOW THE COURT'S INSTRUCTIONS HERE AS WELL.

WE DON'T THINK TAKING THAT WORD OUT, ESPECIALLY WHEN IT WAS GIVEN IN THE HOLMES INSTRUCTIONS, MOVES THE NEEDLE, AND WE DON'T INTEND TO TAKE FURTHER LIBERTIES IF IT REMAINS IN.

THE COURT: SO WHICH IS EASIER FOR THE JURY TO UNDERSTAND, LEAVING THE OMISSIONS IN, RECOGNIZING THAT THE GOVERNMENT WOULD BE LIMITED IN THEIR ARGUMENT ON THIS, NOT TO ARGUE AN OMISSIONS THEORY OF CULPABILITY, BUT RATHER LIMITED TO THE ACTS OF MR. BALWANI IN DETERMINING KNOWINGLY; OR TO STRIKE IT AND THEN RELY ON THE GOVERNMENT TO STILL ARGUE THAT, AND THEN TO ARGUE OMISSION AS TO ACTS, WORDS, WHEN CONSIDERING WHETHER OR NOT HE ACTED KNOWINGLY.

MS. SCHURICHT: THE DEFENSE PREFERS THE LATTER.

THE COURT: ALL RIGHT. THANK YOU.

ANYTHING FURTHER?

MS. VOLKAR: NO, YOUR HONOR.

SER-846

THE COURT: I SEE THE FACTS ARE DIFFERENT AND THE PARTIES ARE DIFFERENT IN THIS CASE.

I'LL STRIKE OMISSIONS FROM THIS, BUT THAT'S NOT TO SAY THAT THE GOVERNMENT IS -- LET ME NOT USE A DOUBLE NEGATIVE.

THE GOVERNMENT WOULD BE PERMITTED TO ARGUE OMISSIONS IN REGARDS TO MR. BALWANI'S -- IN THEIR CONSIDERATION OF THE EVIDENCE OF MR. BALWANI'S WORDS OR ACTS, THAT COULD INCLUDE OMISSIONS.

I'M NOT GOING TO PUT IT IN THE INSTRUCTIONS, BUT THEY WILL BE PERMITTED TO ARGUE THAT IN REGARDS TO WHETHER OR NOT MR. BALWANI ACTED KNOWINGLY. THEY WILL BE ABLE TO ARGUE THAT.

THEY'RE NOT GOING TO BE ABLE TO ARGUE AN OMISSIONS THEORY FOR CULPABILITY, HOWEVER.

IS THAT CLEAR?

MS. SCHURICHT: THAT'S FINE.

THE COURT: IS THAT CLEAR?

MS. VOLKAR: YES, YOUR HONOR. I DIDN'T KNOW IF YOU WERE GOING TO MOVE NEXT TO THE --

THE COURT: I AM. I AM.

AND I'M GOING TO OTHERWISE GIVE JURY INSTRUCTION NUMBER 23 AS GIVEN IN THE HOLMES CASE IN DOCUMENT 1206, WHICH DOES NOT INCLUDE THE LAST SENTENCE ON LINES 7 AND 8. I DON'T THINK THAT'S NECESSARY. I THINK THAT'S CUMULATIVE.

AND THAT DOESN'T PRECLUDE THE PARTIES FROM MAKING ANY ARGUMENT REGARDING THOSE CONCEPTS.

6654

MS. SCHURICHT:  UNDERSTOOD.

THE COURT:  OKAY.  THANK YOU.

MS. SCHURICHT:  THANK YOU.

THE COURT:  ANYTHING FURTHER ON KNOWINGLY?

MS. VOLKAR:  NO, YOUR HONOR.  THANK YOU.

THE COURT:  LET'S SEE.

MS. VOLKAR:  I'M HAPPY, IN CASE IT HELPS, I THINK THE NEXT FEW ARE GOING TO GO QUICKER BECAUSE I THINK THE PARTIES ARE LARGELY IN AGREEMENT.

THE COURT:  OKAY.  NEXT IS 24 ON THE CHART, "AIDING AND ABETTING."

MS. VOLKAR:  AND ACKNOWLEDGING THAT WE'RE ALL STARTING FROM WHAT WAS GIVEN IN THE HOLMES CASE, THE ONLY EDITS I SAW FOR MR. BALWANI WAS ACCOUNTING FOR COUNT NINE, AND THE GOVERNMENT IS FINE WITH THAT.

SO I THINK THAT WAS THE ONLY DISCUSSION FOR NUMBER 24.

MS. WALSH:  THAT'S CORRECT.

THE COURT:  WITH THOSE CHANGES THEN, MS. VOLKAR, YOU'LL PREPARE THAT.

MS. VOLKAR:  YES.  AND I UNDERSTAND THE SAME WILL BE TRUE FOR 25.

THE COURT:  THANK YOU.

MS. WALSH:  CORRECT.

THE COURT:  THANK YOU.  WITH THOSE CHANGES THEN, MS. VOLKAR.

6655

MS. VOLKAR:  YES, YOUR HONOR.

THE COURT:  NEXT IS 26.

MS. WALSH:  WITH REGARD TO 26, WE HAVE NO FURTHER ARGUMENT.

MS. VOLKAR:  YOUR HONOR.

THE COURT:  YES.

MS. VOLKAR:  LAST GO-ROUND THE GOVERNMENT HAD AN ADDITIONAL SENTENCE THAT IT WANTED IN 26.  IT WAS ULTIMATELY STRUCK.  WE DON'T NEED TO SEEK TO RELITIGATE THAT HERE.

WE'RE FINE WITH THE INSTRUCTION THAT WAS GIVEN IN HOLMES, BUT WE WANTED TO PRESERVE THAT.

THE COURT:  THANK YOU.  I'LL GIVE THE INSTRUCTION THAT WAS GIVEN IN THE HOLMES CASE AS GIVEN.

THANK YOU, MS. VOLKAR.

IS 27, "SUCCESS OF THE WIRE FRAUD SCHEME," NEXT?

MS. VOLKAR:  IT IS.  AND I'M HAPPY TO REPORT, IN THE SAME VEIN, THE PARTIES I BELIEVE ALSO AGREE ON NUMBER 27.

MS. WALSH:  CORRECT, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.

NEXT ON THE CHART IS 28, "VIOLATIONS, REGULATIONS."  I TOLD YOU I INTEND TO GIVE THAT.

ANYTHING FURTHER ON THAT?

MS. WALSH:  NO, YOUR HONOR, ONLY THAT WE MAY LOOK INTO PROPOSING TO MOVE THAT EARLIER.

THE COURT:  SURE.  OKAY.

SER-849

MS. VOLKAR: YOUR HONOR, IT WOULD BE HELPFUL TO KNOW THE GOVERNMENT REITERATES ITS PRIOR OBJECTIONS TO NUMBER 28.

BUT EARLIER I THINK WE WERE DISCUSSING WHETHER OR NOT ADDITIONAL LANGUAGE WOULD BE ADDED TO 28.

IF 28 IS GOING TO REMAIN AS IT WAS GIVEN IN THE HOLMES CASE, THE GOVERNMENT IS HAPPY TO JUST REST ON ITS PRIOR OBJECTIONS AND NOTHING FURTHER.

BUT IF THERE'S GOING TO BE FURTHER WORDSMITHING, MAYBE THAT SHOULD JUST BE PART OF OUR MEET AND CONFER.

THE COURT: THAT'S WHAT MY INTENT WAS --

MS. WALSH: YES.

THE COURT: -- THAT YOU MEET AND CONFER ON THAT AND YOU SEE BOTH WHETHER OR NOT A SENTENCE OR TWO, WHATEVER, WOULD BE ADDED, AND THEN LOCATION.

MS. WALSH: YES, YOUR HONOR.

MS. VOLKAR: UNDERSTOOD. THANK YOU.

THE COURT: I WILL GIVE THE FINAL INSTRUCTIONS. I THINK THAT'S THE 7 SERIES. I DON'T THINK THERE'S ANY DISPUTE ABOUT THE 7 SERIES, THAT IS, THE CONCLUDING INSTRUCTIONS, "DUTY TO DELIBERATE."

MS. VOLKAR: ONE MOMENT, YOUR HONOR. I BELIEVE THAT'S RIGHT.

THE COURT: SURE.

(PAUSE IN PROCEEDINGS.)

MS. VOLKAR: YOUR HONOR, IT IS THE SAME WHERE THERE

WAS SOME TWEAKS THAT WERE MADE IN THE HOLMES FILED VERSION THAT ARE NOT CURRENTLY REFLECTED IN THE GOVERNMENT'S VERSION.

WE'RE HAPPY TO ADD THOSE GIVEN THE DISCUSSION THIS MORNING, BUT WE PRESERVE OUR PRIOR ARGUMENTS ABOUT THEM.

THE COURT: OKAY. THANK YOU.

SO WHAT I'LL DO THEN, MS. VOLKAR, AND I'LL ACCEPT YOUR INVITATION TO PREPARE A DRAFT THAT CAN BE SHARED, AND THEN WE'LL HAVE ANOTHER FINAL CHARGING DISCUSSION ABOUT THAT AT SOME POINT WHEN WE HAVE TIME.

BUT LET'S TALK ABOUT -- I BELIEVE THERE ARE TWO THAT ARE LISTED IN 1476 ON THE BOTTOM OF PAGE 3, BALWANI PROPOSED INSTRUCTIONS, AND ONE IS A "GOVERNMENT AGENCY WITNESS" AND THE OTHER IS THE "ADVERSE INFERENCE FOR MISSING EVIDENCE."

LET ME TAKE THAT LAST ONE FIRST, "ADVERSE INFERENCE FOR MISSING EVIDENCE." I HAVE THE PROPOSED.

IT SEEMS TO ME THIS MIGHT BE DEFERRED UNTIL AFTER MR. SONNIER'S TESTIMONY.

MS. WALSH: YES, YOUR HONOR, THAT'S FINE WITH THE DEFENSE. IF THAT'S THE COURT'S PREFERENCE, WE CAN DO THAT.

THE COURT: IT SEEMS IF I'M GOING TO GO THROUGH -- AND I KNOW THE PARTIES REFERENCE LOUD HAWK AND SOME OTHER CASES, AND LOUD HAWK TALKS ABOUT A BALANCING, AND WHEN I LOOKED AT THIS, IF I -- I THINK IT APPROPRIATE TO LOOK AND BALANCE THE CONDUCT, THE FACTS, INCLUDING ANY PREJUDICE.

WE KNOW FROM OUR CONVERSATIONS AS TO WHAT THE STATE OF THE

EVIDENCE IS, OR THE FACTS ARE, I SHOULD SAY.

I'M NOT PREPARED TODAY, JUST BASED ON THAT DISCUSSION, WITHOUT HEARING THE TESTIMONY, TO MAKE A DECISION AS TO WHETHER OR NOT THIS INSTRUCTION SHOULD BE GIVEN EITHER AS PRESENTED OR MODIFIED WITH ADDITIONAL LANGUAGE BASED ON THE EVIDENCE.

AND THAT WOULD INCLUDE WHETHER OR NOT THE GOVERNMENT DECIDES, IF THIS WITNESS TESTIFIES, WHETHER OR NOT THE GOVERNMENT DECIDES TO ADD A REBUTTAL, BECAUSE THAT COULD CHANGE THE NATURE OF THE INSTRUCTIONS. THERE COULD BE ADDITIONS, DELETIONS BASED ON THAT.

AND MY SENSE IS THAT THE COURT SHOULD RECOGNIZE THE TOTALITY OF THE CIRCUMSTANCE, I SHOULD SAY THE TOTALITY OF THE EVIDENCE THAT IS PRESENTED TO THE JURY BEFORE IT DECIDES AND MAKES A FINAL DECISION ON WHETHER OR NOT THIS INSTRUCTION SHOULD BE GIVEN.

I'M HAPPY TO HEAR FROM YOU.

MS. WALSH: THAT MAKES SENSE TO THE DEFENSE, YOUR HONOR.

MS. VOLKAR: YOUR HONOR, I'M HAPPY TO DEFER.

IT WON'T SURPRISE THE COURT TO HEAR THAT THE GOVERNMENT STRENUOUSLY OBJECTS TO GIVING THIS INSTRUCTION AT ALL, AND IF IT WERE TO BE GIVEN, IT WOULD NEED TO BE SUBSTANTIALLY MODIFIED.

I WANT TO MAKE TWO POINTS ON THAT. ONE, THE MODEL INSTRUCTION THAT I ASSUME THIS IS BASED OFF OF, BUT IT IS

SOMEWHAT HARD TO RECOGNIZE, IS MODEL 3.19, WHICH HAS A DIFFERENT TITLE TO START WITH, LET ALONE SIGNIFICANTLY DIFFERENT LANGUAGE. "INTENTIONALLY" IS USED, NOT "NEGLIGENTLY" OR "RECKLESSLY."

THE COURT: RIGHT.

MS. VOLKAR: BUT MORE THAN THAT, I WANT TO MAKE SURE THE COURT IS AWARE AND HAS TIME TO PREPARE WHERE, AS DEFENDANT AND DEFENSE COUNSEL HAS ARGUED THE COURT'S PRIOR RULING ON THE MOTION TO SUPPRESS WAS IRRELEVANT WHEN WE WERE TALKING ABOUT MR. SONNIER, WE UNDERSTAND THE COURT'S ORDER.

THE COURT'S ANALYSIS IN THE MOTION TO SUPPRESS WAS ABSOLUTELY ON THE LOUD HAWK CASE, LINE OF CASES AND FACTORS, AND IT IS ABSOLUTELY RELEVANT TO THIS EXACT ISSUE.

SO I WOULD JUST INVITE THE COURT TO -- WE'RE GOING TO HAVE ECF 887 AND THE COURT'S INCORPORATION OF IT AT ECF 1326 AT OUR FINGERTIPS, AND SO AS NOT TO SURPRISE ANYBODY, I WANTED TO SAY THAT, AT THIS MOMENT IN TIME, WE THINK THOSE ARE HIGHLY RELEVANT TO THE COURT'S ULTIMATE BALANCING.

THANK YOU.

THE COURT: ALL RIGHT. THANK YOU.

MS. WALSH: NOTHING FURTHER FROM THE DEFENSE.

THE COURT: OKAY.

THEN "AGENCY WITNESS."

MS. WALSH.

MS. WALSH: YES, YOUR HONOR. WE PROPOSED THIS NEW

6660

INSTRUCTION BECAUSE MS. BENNETT TESTIFIED, WHO WORKS FOR CMS, AND WE THOUGHT THIS WAS AN APPROPRIATE INSTRUCTION TO INCLUDE.

I'LL ALSO NOTE THAT QUESTION 63 ON THE JUROR QUESTIONNAIRE TALKED ABOUT AND ASKED THE JURORS ABOUT THEIR VIEWS ON LAW ENFORCEMENT WITNESSES AND WHETHER THEY GIVE MORE CREDENCE TO LAW ENFORCEMENT WITNESSES, OR LESS CREDENCE.

SO I THINK IT IS AN APPROPRIATE INSTRUCTION UNDER THESE CIRCUMSTANCES.

THE COURT: OKAY.

MS. VOLKAR.

MS. VOLKAR: FIRST OF ALL, I WANT TO MAKE SURE THAT I RESPOND TO MS. WALSH'S POINT.

MS. BENNETT IS NOT A LAW ENFORCEMENT WITNESS. THE COURT HELD THAT SHE'S NOT A LAW ENFORCEMENT OFFICER WHEN IT COMES TO, FOR EXAMPLE, THE HEARSAY EXCEPTION FOR PUBLIC RECORDS. SO I THINK THAT'S A FALSE PREMISE.

BUT MORE IMPORTANTLY, I THINK THAT THE ENTIRE -- THE GOVERNMENT OBJECTS TO GIVING THIS INSTRUCTION IN THE ENTIRETY, IN LARGE PART BECAUSE IT'S REDUNDANT OF OTHER INSTRUCTIONS THAT THE COURT IS ALREADY GOING TO GIVE.

FIRST OF ALL, IT'S REDUNDANT OF THE CREDIBILITY INSTRUCTIONS, WHICH WAS NUMBER 9 IN ECF 1206, AND FOR THAT INSTRUCTION IT SAYS THE JURY CAN CONSIDER BIAS OR PREJUDICE OF A WITNESS.

AND, OF COURSE, THE DEFENSE IS ENTITLED TO ARGUE IN

SER-854

6661

CLOSING ARGUMENT THAT HER ROLE AS A GOVERNMENT EMPLOYEE BIASES OR PREJUDICES HER TESTIMONY IN SOME WAY.

ALSO, NUMBER 1, AND ALSO ONE OF THE 7 SERIES WE WERE JUST REFERENCING, BASED ON THE ADDITIONS IN THE HOLMES TRIAL, THERE IS AN ADDED LANGUAGE THAT THE JURY SHOULD NOT CONSIDER A PERSON'S PROFESSION IN ESSENTIALLY GIVING WEIGHT TO THEIR TESTIMONY OR WHEN CONSIDERING THEM -- I APOLOGIZE, I DON'T HAVE THE LANGUAGE IMMEDIATELY BEFORE ME -- BUT ADDED INTO THAT LANGUAGE WAS PROFESSION, POSITION IN THE COMMUNITY, AND THAT'S ANOTHER JURY INSTRUCTION THAT THE DEFENSE CAN POINT TO.

AND THIS INSTRUCTION UNNECESSARILY CALLS OUT A PIECE OF EVIDENCE OR A SPECIFIC PERSON'S TESTIMONY. IT ESSENTIALLY ELEVATES MS. BENNETT TO KIND OF LIKE THE ROLE OF AN EXPERT, AND WHY I SAY THAT IS BECAUSE THERE'S A SEPARATE INSTRUCTION ABOUT CREDIBILITY WHEN IT COMES TO EXPERTS, AND THERE'S A SEPARATE INSTRUCTION ABOUT DUAL ROLE TESTIMONY, AND TO HAVE AN INSTRUCTION LIKE THIS CALLS OUT AND ELEVATES ANOTHER TYPE OF TESTIMONY IN THAT VEIN AND GIVES, HONESTLY, MORE EMPHASIS TO IT.

THERE ARE NO -- IT'S -- SORRY. LET ME BACK UP.

ANOTHER POINT IS THAT GOVERNMENT AGENTS OR FEDERAL AGENTS TESTIFY IN CRIMINAL TRIALS ALL THE TIME, BUT THERE IS NO MODEL INSTRUCTION ON THIS POINT OTHER THAN UNDERCOVER AGENTS WAS WHAT I WAS ABLE TO FIND.

AND I POINT THAT OUT TO SAY, THIS IS SOMETHING THAT

SER-855

6662

HAPPENS ALL OF THE TIME, AND IF A SPECIAL INSTRUCTION WERE NEEDED, YOU WOULD HAVE -- ONE WOULD ASSUME THAT THE NINTH CIRCUIT WOULD HAVE PROMULGATED A MODEL INSTRUCTION FOR IT.

AND WHEN I LOOK AT THEIR LIST OF REFERENCES AND AUTHORITY FOR THIS, IT'S LARGELY OUT OF CIRCUIT OR MATTHEW BENDER OR VARIOUS OTHER SECONDARY SOURCES.

THE ONLY NINTH CIRCUIT CASE CITED IS THE LAST ONE, AND I'VE READ THAT CASE, YOUR HONOR, AND THAT COURT JUST APPROVED THE GIVING OF THE GENERIC CREDIBILITY INSTRUCTION WHICH AT THE TIME CONTAINED THE LANGUAGE THAT IS QUOTED.

SO I ACTUALLY THINK THE ONE NINTH CIRCUIT CASE CITED SUPPORTS THE GOVERNMENT'S POSITION THAT THE MODEL INSTRUCTION ON CREDIBILITY IS SUFFICIENT TO COVER THIS, AND PERHAPS WE NEED TO HAVE SOME TWEAKING TO ADD "OCCUPATION OR BACKGROUND" INTO THAT INSTRUCTION.

BUT I DON'T THINK A SECOND INSTRUCTION CALLING OUT ONE WITNESS IS NECESSARY IN THIS CASE.

MS. WALSH: SO, YOUR HONOR, LET ME ADDRESS AS MUCH AS I CAN OF THAT.

I THINK WHEN MS. VOLKAR WAS REFERRING TO MATTHEW BENDER, SHE WAS REFERRING TO JUDGE SANDS'S MODEL FEDERAL JURY INSTRUCTIONS WHICH ARE USED ALL OVER THE COUNTRY QUITE FREQUENTLY.

I UNDERSTAND THERE'S NOT A PATTERN INSTRUCTION IN THE

**SER-856**

NINTH CIRCUIT FOR LAW ENFORCEMENT WITNESSES, EXCEPT IF THEY'RE UNDERCOVER.

AND AS TO MS. BENNETT, I DON'T THINK I SAID SHE WAS LAW ENFORCEMENT.  I THINK I SAID SHE WORKED FOR CMS.

I WAS REFERRING TO THE JUROR QUESTIONNAIRE, WHICH -- IN WHICH THE COURT INCLUDED A QUESTION TO THE PANEL ABOUT WHETHER THEY GIVE MORE CREDENCE OR LESS CREDENCE TO LAW ENFORCEMENT WITNESSES.

SO I THINK THIS INSTRUCTION IS APPROPRIATE.  I DON'T THINK -- I THINK THE COURT HAS THE DISCRETION TO INCLUDE THIS.

SINCE MS. BENNETT IS AN AGENT OF THE GOVERNMENT, SHE'S A REGULATOR, SOME JURORS MAY GIVE THAT MORE WEIGHT THAN NOT, AND IT'S APPROPRIATE TO INSTRUCT THEM THAT THEY SHOULDN'T, JUST BASED ON HER STATUS AS A REGULATOR, GIVE HER TESTIMONY MORE WEIGHT.

THE COURT:  THANK YOU.

WELL, WHAT IF WE ADDED THAT LAST QUOTED SENTENCE IN YOUR PAGE 24, BOTTOM OF THE PAGE, "YOU'RE REQUIRED TO USE THE SAME STANDARD IN JUDGING THE CREDIBILITY OF EVERY WITNESS, REGARDLESS OF WHAT HIS OCCUPATION OR BACKGROUND MAY BE," "HIS OR HER OCCUPATION OR BACKGROUND MAY BE."

"OR" INSTEAD OF "YOUR."

"YOU SHOULD USE THE SAME STANDARD."

MS. WALSH:  I, I -- JUDGE -- YOUR HONOR, I THINK THIS IS TOO GENERIC, AND I THINK THE JURY SHOULD BE INSTRUCTED

6664

THAT SOMEONE WHO WORKS FOR A GOVERNMENT AGENCY, IN A CASE BROUGHT BY THE GOVERNMENT, SHOULD NOT GET MORE WEIGHT JUST FOR THE FACT THAT SHE WORKS FOR THE GOVERNMENT.

THE COURT: OKAY. WELL, IF YOU WOULD LIKE TO ADD THAT LAST SENTENCE, I'LL GIVE YOU THE OPPORTUNITY TO DO SO, INSTEAD OF GIVING YOU YOUR FULL INSTRUCTION, WHICH IS TO SAY I'M NOT GOING TO GIVE THE ONE THAT YOU'RE SUGGESTING. I WOULD GIVE THE LAST SENTENCE --

MS. WALSH: OKAY.

THE COURT: -- OR A MODIFICATION OF IT.

BUT IT'S GRAMMATICALLY MORE APPEALING.

AND THAT COULD BE INSERTED PERHAPS AS THE NEW NUMBER 8.

AND THEN THE CURRENT NUMBER 8, THIS IS ON THE CREDIBILITY INSTRUCTION, WOULD BE THE LAST -- NUMBER 9 THEN WOULD BE -- THE LAST BULLET WOULD BE, THE LAST NUMBER WOULD BE 9, "ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY."

AND THEN THIS INSERT COULD BE THE NEW NUMBER 8.

DOES THAT MAKE SENSE? HAVE I CONFUSED YOU?

MS. VOLKAR: LET ME CLARIFY THAT LAST PART, YOUR HONOR.

THE COURT: SURE.

MS. VOLKAR: THIS WOULD BE GRAMMATICALLY CORRECT --

THE COURT: YES.

MS. VOLKAR: SORRY, NOW I'M CONFUSED.

THIS SENTENCE, MADE GRAMMATICALLY CORRECT, WOULD BE

**SER-858**

6665

INSERTED AS 8 AND BUMP DOWN WHAT IS CURRENTLY NUMBER 8?

THE COURT: THAT'S CORRECT. AND CURRENT NUMBER 8 WOULD BE NUMBER 9.

MS. VOLKAR: UNDERSTOOD.

THE COURT: THE LAST, NUMBER 9, WOULD BE "ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY."

MS. VOLKAR: THAT'S FINE WITH THE GOVERNMENT, YOUR HONOR.

THE COURT: DID YOU GET THAT, MS. WALSH?

MS. WALSH: I DID, YOUR HONOR.

THE COURT: SO WITH THAT, I WON'T GIVE THE PROPOSED GOVERNMENT AGENCY WITNESS INSTRUCTION. I WILL, HOWEVER, ALLOW A GRAMMATICALLY CONFORMED LAST LINE TO APPEAR IN THE NUMERICAL ITEMS TO CONSIDER, AND THE LAST ITEM THEN WOULD BE "ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY."

AM I CORRECT THAT WE'VE EXHAUSTED ALL OF THE CONVERSATIONS THIS MORNING?

MS. WALSH: IF I COULD JUST CHECK WITH MY TEAM?

THE COURT: SURE. OF COURSE.

MS. VOLKAR: YOUR HONOR, I'D LIKE TO PASS THE MIKE TO MR. SCHENK.

THE COURT: YES.

(DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

MS. WALSH: YES, YOUR HONOR, NOTHING ELSE ON THE JURY INSTRUCTIONS.

UNITED STATES COURT REPORTERS

**SER-859**

THE COURT: OKAY. THANK YOU.

MR. SCHENK.

MR. SCHENK: YOUR HONOR, JUST AN ISSUE ON SCHEDULING, IF THE COURT WOULD LIKE TO TALK ABOUT THAT TOPIC.

THE COURT SUGGESTED THAT IT WAS GOING TO DEFER RULING ON THE MISSING EVIDENCE INSTRUCTION. I WONDER IF WE COULD SET A TIME FOR THAT.

I UNDERSTAND THAT THE JURY IS HERE UNTIL 2:00 P.M. TOMORROW.

THE COURT: RIGHT.

MR. SCHENK: AND I THINK 2:00 P.M. TOMORROW, ASSUMING THE DEFENSE HAS FINISHED THEIR DIRECT OF THEIR EXPERT, IS AN APPROPRIATE TIME TO TAKE UP THIS INSTRUCTION, BECAUSE THE COURT'S THOUGHTS ON WHETHER IT MIGHT GIVE THAT INSTRUCTION BASED ON WHAT IT HEARD WILL BE USEFUL IN GUIDING THE GOVERNMENT'S DECISION AND ANALYSIS OF WHETHER IT WOULD PUT ON A REBUTTAL CASE.

SO IF THAT WILL WORK?

THE COURT: SURE.

MR. COOPERSMITH?

MR. COOPERSMITH: THAT SOUNDS FINE, YOUR HONOR.

THE COURT: LET ME TELL YOU, WE -- I HAVE TO DISAPPOINT YOU TO START AT 2:00 O'CLOCK, THOUGH. APPARENTLY I HAVE A CHANGE OF PLEA HEARING AT 2:00 O'CLOCK.

BUT WE'LL TAKE IT UP AS SOON AS I'M FINISHED WITH THAT,

6667

WHICH WOULD PROBABLY BE 2:30, 2:45.

MR. COOPERSMITH:  YES.  WE CAN WAIT, OF COURSE, YOUR HONOR.

MR. SCHENK:  YES, YOUR HONOR.

THE COURT:  GREAT.

OKAY.  MS. VOLKAR.

MS. VOLKAR:  SORRY, YOUR HONOR.  IN PACKING UP, WE DIDN'T DISCUSS THE VERDICT FORM.

THE COURT:  NO, WE DIDN'T.

MS. VOLKAR:  IS THAT ON PURPOSE?

THE COURT:  IS THERE ANYTHING THAT WE NEED TO TALK ABOUT ON THE VERDICT FORM?

MS. VOLKAR:  WHAT I STARTED OFF IN MY OPENING SORT OF REMARKS WAS THAT THE VERDICT FORM I FEEL IS THE SAME DEBATE AS BETWEEN MS. HOLMES AND THE GOVERNMENT.

THE GOVERNMENT THINKS THE COURT SHOULD DO WHAT IT DID LAST TIME AND WHAT IT DOES IN MOST CASES, AND THAT'S REALLY THE ONLY THING THAT I HAVE TO SAY THERE.

MS. WALSH:  YES, YOUR HONOR.

I THINK THE ONLY REALLY SUBSTANTIVE CHANGE, I THINK, WAS THE ORDER OF THE NOT GUILTY, GUILTY.

THE COURT:  RIGHT.

MS. WALSH:  WE WOULD PREFER THAT SINCE MR. BALWANI IS PRESUMED INNOCENT.

BUT I UNDERSTAND IN THE HOLMES TRIAL THAT THE COURT

6668

DECIDED NOT TO DO IT THAT WAY.

AND THE OTHER ITEMS WERE CAPITALIZING INDICTMENT AND INSERTING "AGAINST THERANOS PAYING PATIENTS" --

THE COURT:  YES.

MS. WALSH:  -- AND, AGAIN, "THERANOS INVESTORS" AFTER WIRE FRAUD, AND THEN TAKING OUT THE NAMES OF THE INVESTORS.

I BELIEVE THAT WAS IT.

THE COURT:  MS. VOLKAR.

MS. VOLKAR:  MY NOTES ARE NOT AS CAREFUL ON THIS.  I APOLOGIZE.

BUT I ASSUME THAT'S CORRECT.

THE COURT:  WELL, I'LL HAVE YOU -- IT WOULD BE MY INTENT TO OTHERWISE GIVE THE SAME VERDICT FORM, USE THE SAME VERDICT FORM, PARDON ME, THAT I USED IN THE HOLMES CASE.

BUT I'LL LET YOU LOOK AND SEE IF THERE'S ANY SIGNIFICANT OTHER CHANGES THAT YOU WANT TO DRAW TO MY ATTENTION.  WE CAN TALK ABOUT THAT TOMORROW AFTERNOON AS WELL.

MS. WALSH:  SURE.

MS. VOLKAR:  THAT'S CORRECT.  THAT'S VERY HELPFUL.

THE COURT:  ALL RIGHT.  THANK YOU.

THE CLERK:  COURT IS ADJOURNED.

(COURT ADJOURNED AT 12:34 P.M.)

**SER-862**

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JUNE 8, 2022

SER-863

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CR-18-00258-EJD |
| PLAINTIFF, | ) | |
| | ) | SAN JOSE, CALIFORNIA |
| VS. | ) | |
| | ) | JUNE 10, 2022 |
| RAMESH "SUNNY" BALWANI, | ) | |
| | ) | VOLUME 37 |
| DEFENDANT. | ) | |
| | ) | PAGES 6894 - 6928 |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                       IRENE L. RODRIGUEZ, CSR, RMR, CRR
                       CERTIFICATE NUMBER 8074
                       LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

SER-864

SAN JOSE, CALIFORNIA                    JUNE 10, 2022

P R O C E E D I N G S

(COURT CONVENED AT 10:07 A.M.)

(JURY OUT AT 10:07 A.M.)

THE COURT:  THANK YOU.  PLEASE BE SEATED.

WE ARE BACK ON THE RECORD IN THE BALWANI MATTER.

COUNSEL ARE PRESENT.

WE ARE GOING TO CONTINUE OUR DISCUSSION REGARDING FINALIZING THE JURY INSTRUCTIONS.

THE JURY IS NOT PRESENT.  THEY ARE IN RECESS FOR THE DAY.

I DON'T SEE YOUR CLIENT, MR. COOPERSMITH, MS. WALSH.

DO YOU --

MS. WALSH:  YES.  WE FILED A WAIVER, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.

AND YOU AGREE TO WAIVE HIS APPEARANCE FOR PURPOSES OF TODAY'S PROCEEDING?

MS. WALSH:  WE DO.

THE COURT:  ALL RIGHT.  THANK YOU.

I DID RECEIVE YESTERDAY A -- AND THANK YOU FOR YOUR WORK, YOUR CONTINUED WORK ON THE INSTRUCTIONS.

I RECEIVED A PACKET, A DRAFT.  IT WASN'T FILED ON THE DOCKET.  I DIDN'T ASK IT TO BE FILED ON THE DOCKET, BUT IT WAS A WORKING DRAFT OF OUR WORK ON THE INSTRUCTIONS.  THERE'S A COUPLE OF ITEMS THAT I THINK WE SHOULD DISCUSS.

I HAVE A COLOR COPY HERE, AND I THINK, MS. VOLKAR, AND

UNITED STATES COURT REPORTERS

MS. WALSH, THANK YOU FOR PROVIDING ME THE COLOR COPY.

MS. VOLKAR:  YOU'RE WELCOME, YOUR HONOR.

THE COURT:  THEY SUGGEST THE REMAINING MATTERS WE SHOULD DISCUSS.

AND I SEE THE FIRST ONE HIGHLIGHTED HERE IS INSTRUCTION -- IS IT 16?  AND I'M GOING THROUGH OUR COPY.  EXCUSE ME. LET'S -- IT'S ACTUALLY INSTRUCTION 3, ISN'T IT, ON PAGE 5?

MS. VOLKAR:  YOUR HONOR, IT DEPENDS ON HOW YOU WANT TO HANDLE THE PLACEMENT AND LOCATION OF THE ALLEGED VIOLATIONS OF REGULATIONS AND INDUSTRY STANDARDS.

IT MAY MAKE SENSE TO TALK ABOUT THE PLACEMENT OF IT WHEN WE'RE ALSO SUBSTANTIVELY TALKING ABOUT THE OBJECTIONS TO THE LANGUAGE, IN WHICH CASE THE FIRST WOULD BE NUMBER 3, THE ABSENCE OF CODEFENDANT THAT YOU REFERENCED.

THE COURT:  RIGHT.

WHY DON'T WE JUST START WITH THAT, WITH NUMBER 3.

MS. WALSH:  THAT'S FINE, YOUR HONOR.

THE COURT:  AND THEN WE'LL JUST GO THROUGH, EXCUSE ME, THE STACK THAT I HAVE, AND THE PACKET THAT YOU SHOULD HAVE I SHOULD SAY.

THE CONVERSATION IS REGARDING THE LANGUAGE FOUND AT LINE 9, AND IT APPEARS THAT THE DISCUSSION IS, SHOULD THE SENTENCE READ, "YOU MUST BASE YOUR VERDICT SOLELY ON THE EVIDENCE AGAINST MR. BALWANI OR INTRODUCED DURING THIS TRIAL."

THOSE ARE THE TWO OPTIONS.

THE COURT WAS PROPOSING THE THIRD OPTION, WHICH WAS "RECEIVED IN THIS TRIAL," "ON THE EVIDENCE RECEIVED IN THIS TRIAL."

MS. WALSH:  THAT WOULD BE FINE WITH US, YOUR HONOR, "RECEIVED IN THIS TRIAL."

MS. VOLKAR:  YOUR HONOR, THE GOVERNMENT DOESN'T FEEL STRONGLY ABOUT THIS INSTRUCTION.

THE REASON THE GOVERNMENT SUGGESTS THE LANGUAGE AGAINST MR. BALWANI IS TO KEEP IT AS CLOSE TO THE INSTRUCTION GIVEN IN THE HOLMES TRIAL AS NOTED IN OUR FOOTNOTE.

THE ONLY OTHER THING I WANTED TO NOTE, AND I DID POINT THIS OUT TO MS. WALSH, BECAUSE WE ADDED THE LANGUAGE FROM MODEL 2.16, IF YOU READ THE SENTENCE THAT RUNS FROM 6 TO 7, IT SAYS, "KEEP IN MIND, HOWEVER, THAT YOU MUST DECIDE THIS CASE SOLELY ON THE EVIDENCE PRESENTED TO YOU IN THIS TRIAL."

AND I FELT THAT THAT MADE THIS LAST SENTENCE REDUNDANT.

THE COURT:  RIGHT.

MS. VOLKAR:  IT ESSENTIALLY SAYS THE SAME THING TWICE.

SO IN MY MIND, IF WE WERE TO KEEP THAT SENTENCE, THE ONLY THING THAT OCCURS BETWEEN IS SAYING "YOU'RE NOT TO CONSIDER ESSENTIALLY ANYTHING INVOLVING MS. HOLMES."

SO FROM THE GOVERNMENT'S PERSPECTIVE, THIS LAST LINE IS REALLY DISTINGUISHING THAT YOU MUST CONSIDER THE EVIDENCE AGAINST MR. BALWANI, OR I SUGGESTED TO MS. WALSH REGARDING

6899

MR. BALWANI IF WE DIDN'T WANT TO SAY AGAINST OR FOR AS THEIR FOOTNOTE INDICATED.

MS. WALSH: YES, YOUR HONOR.

SO I DON'T THINK THAT THE ISSUE OF REPEATING IN THIS TRIAL IS AN ISSUE AT ALL.

I THINK WHAT THE COURT HAS SUGGESTED, "YOU MUST BASE YOUR VERDICT SOLELY ON THE EVIDENCE RECEIVED IN THIS TRIAL," IS EXTREMELY CLEAR, AND WE THINK THAT'S WHAT THE COURT SHOULD GO WITH IN THIS INSTRUCTION.

THE COURT: ALL RIGHT. THANK YOU.

I'LL -- IT IS SOMEWHAT REDUNDANT, BUT I'LL READ "RECEIVED IN THIS TRIAL," PERIOD. AND IF YOU COULD MAKE THAT NOTE, MS. VOLKAR.

MS. VOLKAR: WILL DO, YOUR HONOR.

THE COURT: NEXT IN THE PACKET THAT I HAVE -- AND IF THERE'S ANYTHING NEW THAT HAS COME OUT, PLEASE SING OUT.

NEXT I HAVE IS INSTRUCTION 13. IT'S HIGHLIGHTED. AND THIS IS OPINION EVIDENCE, EXPERT WITNESS.

MS. WALSH: YES, YOUR HONOR.

SO THIS WOULD APPLY TO MR. SONNIER, AND I THINK THERE WAS SOME DISCUSSION BEFORE HE TESTIFIED AS TO WHETHER THIS INSTRUCTION, WHICH IS THE MODEL INSTRUCTION, SHOULD APPLY OR WHETHER HE SHOULD BE PUT INTO THE DUAL ROLE TESTIMONY.

WE DON'T HAVE A STRONG OPINION. I THINK IT'S FINE TO HAVE JURY INSTRUCTION NUMBER 13, WHICH IS THE OPINION EVIDENCE

INSTRUCTION, APPLY TO MR. SONNIER.

AND THE ONLY OTHER REQUEST WE WOULD MAKE IS TO TAKE OUT "III" AFTER HIS NAME ONLY BECAUSE HE WAS SWORN AS RICHARD SONNIER. SO I DON'T THINK "III" IS NECESSARY.

THE COURT: MS. VOLKAR.

MS. VOLKAR: WELL, IT SOUNDS LIKE THE PARTIES AGREE THAT MR. SONNIER SHOULD BE INCLUDED IN NUMBER 13 AND STRUCK FROM NUMBER 14.

THE GOVERNMENT OBVIOUSLY AGREES WITH THAT POSITION.

IF WHAT WE'RE DOWN TO IS WHETHER OR NOT TO STRIKE "III," I WOULD JUST POINT OUT THAT'S HIS NAME IN THE DECLARATION, BUT I DON'T FEEL STRONGLY ABOUT IT.

THE COURT: OKAY. SO I WANT TO TALK ABOUT THE DUAL ROLE, PARDON ME, INSTRUCTION NUMBER 15, DUAL ROLE INSTRUCTION.

I DO -- WHAT I HEAR THE PARTIES SAYING IS MR. SONNIER SHOULD NOT APPEAR IN THAT.

MS. WALSH: CORRECT, YOUR HONOR.

MS. VOLKAR: CORRECT, YOUR HONOR.

THE COURT: SO LET ME ASK ABOUT DOCTORS ZACHMAN AND BURNES. AND THEY DID TESTIFY REGARDING, AND THEY WERE FOUND, PURSUANT TO THE REQUESTS OF THE PARTIES, THEY WERE FOUND TO BE EXPERTS IN LIMITED AREAS, HCG WITH DR. ZACHMAN, AND I THINK ANY PROSTATE ISSUES, PSA REGARDING DR. BURNES.

THEY TESTIFIED ABOUT FACTS -- I WAS REVIEWING DR. ZACHMAN, AND THERE WAS A FACT COLLOQUY FOR SEVERAL PAGES BEFORE

6901

DR. ZACHMAN WAS QUALIFIED AS AN EXPERT, AND THEN AFTER SHE WAS QUALIFIED FOR HCG, THERE WERE QUESTIONS THEN POSED REGARDING HCG AND ITS MEANINGS AND THOSE TYPES OF THINGS.

DURING THEIR TESTIMONY, NEITHER PARTY REQUESTED, AND THE COURT DID NOT GIVE, ANY TYPE OF AN INSTRUCTION TO THE JURY ABOUT THE DISTINCTION BETWEEN FACT AND EXPERT TESTIMONY.

WHEN I REVIEWED THE TRANSCRIPT, IT APPEARED TO ME THAT, JUST LOOKING AT IT, THESE DOCTORS' TESTIMONIES, THESE -- OR THE JURY WOULD NOT HAVE BENEFITTED, I USE THAT WORD, WOULD NOT NEED THAT TYPE OF INSTRUCTION BECAUSE OF THE SPECIFICITY IN THE WAY THAT THEY WERE EXAMINED AND THE QUESTIONS THAT WERE POSED TO THEM REGARDING THEIR EXPERTISE.

THERE WERE QUESTIONS ABOUT FACT PATTERNS. DR. ZACHMAN, I THINK, WAS QUESTIONED, BUT DID YOU CALL THERANOS AND DID YOU SPEAK TO SOMEONE ABOUT A DOCUMENT AND GOT -- RECEIVED THEIR EXPLANATIONS. THAT'S FACT.

AND THE COURT DID NOT AT THAT TIME ADMONISH THE JURY THAT THEY SHOULD CONSIDER FACTS SEPARATELY FROM EXPERT TESTIMONY.

AND SAME THING WITH DR. -- WITH DR. BURNES. THERE WERE SIMILAR COLLOQUIES ABOUT HIS FINDINGS. HE TESTIFIED AS A FACT WITNESS THAT HE CONTACTED THERANOS, AND WE KNOW THE RESULT OF THAT, HE RECEIVED A FREE TEST, I GUESS, A FREE RETEST.

I'M INVITING THE PARTIES TO COMMENT AS TO YOUR POSITIONS AS TO WHETHER OR NOT YOU THINK THAT THERE WAS A DEFICIT IN THE RECORD OF NOT PROVIDING AN INSTRUCTION TO THE JURY AT THAT

POINT CLARIFYING FACT AND, EXCUSE ME, EXPERT TESTIMONY.

AND IF YOU FEEL IT APPROPRIATE, WHAT IS THE REMEDY? WE HAVE THE TRANSCRIPTS. IF YOU WANT, I CAN -- I'M HAPPY TO REOPEN EVIDENCE AND I CAN INSTRUCT BEFORE WE GIVE FINAL INSTRUCTIONS TO CLARIFY ANY AMBIGUITY THAT YOU FEEL MIGHT EXIST SUCH THAT WOULD RISE TO THE NECESSITY OF INSTRUCTING THE JURY ON THIS PART.

AND LET ME JUST STEP BACK FOR A MOMENT AND SAY, WE SEE THIS IN CRIMINAL CASES, IT COMES UP MOST FREQUENTLY WHEN LAW ENFORCEMENT OFFICERS -- AND IT'S USUALLY IN DRUG CASES, ISN'T IT? -- WHERE LAW ENFORCEMENT, UNDERCOVER OFFICERS OR OTHERS, TESTIFY ABOUT THEIR INVESTIGATION, THEIR OBSERVATIONS, WHY THEY MADE A -- THEY BELIEVED THERE WAS PROBABLE CAUSE TO MAKE A STOP, WHY THEY HAD REASONABLE SUSPICION, ET CETERA.

AND DURING THEIR TESTIMONY, SOMETIMES IF THEY ARE QUALIFIED AS AN EXPERT IN NARCOTICS INVESTIGATIONS, IDENTIFICATION OF NARCOTICS, ET CETERA, DURING THAT TESTIMONY THEY WILL SOMETIMES TALK ABOUT, WELL, I SAW THIS, AND BASED ON MY TRAINING AND EXPERIENCE IT CAUSED ME TO BELIEVE X, AND THEN THEY'LL SAY, I FOUND X, AND THEN TALK ABOUT THAT.

THAT'S USUALLY THE CASE WHERE THIS BLURS IN CRIMINAL CASES -- I KNOW YOU'RE ALL EXPERIENCED IN THIS -- AND THAT'S THE TYPICAL SCENARIO WHERE THE JURY MIGHT HAVE DIFFICULTY, AND COURTS, JUDGES WILL INSTRUCT, JUST BECAUSE THE OFFICER SAID THIS, IT'S NOT IN THEIR EXPERTISE, IT'S A FACT THAT THEY SAW A

FLAT TIRE, OR WHATEVER IT MIGHT BE.

I'M JUST CURIOUS AND, OUT OF AN ABUNDANCE OF CAUTION, I WANTED TO RAISE THIS TOPIC WITH US HERE TO SEE IF YOU, IN YOUR OPINIONS, FEEL THAT ANY OF THE EXPERT TESTIMONY REGARDING THE LIMITED, LIMITED DISCUSSION THAT THEY HAD AND EXAMINATION BY BOTH SIDES REQUIRES ANY FURTHER REFINEMENT TO THE JURY BEFORE WE GIVE THEM THE CASE.

AND IF YOU WANT TO TALK WITH YOUR TEAMS ABOUT THAT, THAT'S FINE.  THAT COMES UP IN THIS DUAL ROLE TESTIMONY.

SO WHY DON'T WE -- UNLESS WE HAVE ANY OTHER QUESTIONS, WHAT I THOUGHT WE WOULD DO IS PASS THIS WITH MY COMMENTS AND LET YOU THINK ABOUT IT.

MS. WALSH:  SURE.

MS. VOLKAR:  I'M HAPPY TO SPEAK TO IT NOW, YOUR HONOR, IF YOU --

THE COURT:  SURE.  YES, THAT'S FINE.

MS. VOLKAR:  I THINK YOUR HONOR HAS SET FORTH BOTH THE CASE LAW AND ALSO THE WAY THAT THE FACTS UNFOLDED IN THIS TRIAL ACCURATELY, AND IT'S THE GOVERNMENT'S POSITION BOTH THAT WE SET TO CONDUCT OUR DIRECT EXAMINATION IN A MANNER TO MAKE THAT DISTINCTION BETWEEN THE FACT TESTIMONY AND THE EXPERT TESTIMONY MORE CLEAR.

YOUR HONOR MAY RECALL THERE WAS SUBSTANTIAL DISCUSSION ABOUT THE CONTOURS OF THESE DOCTORS TESTIFYING AS EXPERTS WITH RESPECT TO THE HOLMES CASE, AND BEFORE THE HOLMES CASE, AND

ALTHOUGH I'M STRETCHING A LITTLE BIT HERE, I THINK IN BALWANI -- IN MR. BALWANI ADOPTING SOME OF THE PRETRIAL MOTIONS IN LIMINE OF HOLMES, HE MIGHT HAVE ALSO ADOPTED SOME OF THAT DISCUSSION IF MY MEMORY IS SERVING ME THERE.

BUT REGARDLESS, THIS WAS A SUBSTANTIAL TOPIC OF DISCUSSION IN THE HOLMES TRIAL, AND THAT'S PART OF WHY THE GOVERNMENT WAS VERY THOUGHTFUL IN HOW IT CONDUCTED ITS DIRECT EXAMINATION.

AND BEYOND THAT, HOW YOUR HONOR INSTRUCTED THE JURORS, AGAIN, IF MY MEMORY OF THE TRANSCRIPT IS CORRECT, WAS THAT THE EXPERTISE WAS IN INTERPRETING THE SPECIFIC RESULTS. FOR DR. ZACHMAN, IT WAS HCG. FOR DR. BURNES IT WAS PSA.

AND BECAUSE YOUR HONOR INSTRUCTED THAT THEY ARE AN EXPERT OF INTERPRETING THE RESULTS OF THIS TEST, I THINK THAT ALSO REALLY HELPS THE JURY IN TERMS OF IF THEY HAVE A PHONE CALL WITH THERANOS, THAT'S MORE FACT AND NOT NECESSARILY THEY DON'T HAVE SOME EXPERTISE IN HOW TO CONDUCT A PHONE CALL.

AND I THINK GIVEN THE WAY AND JUST THE NATURE OF THE FACTS IN THIS CASE, THEY ARE DIFFERENT THAN THE FEDERAL AGENT IN THE DRUG CASE, AND I THINK THAT THERE'S ENOUGH DISTINCTION THAT NO INSTRUCTION WAS NEEDED IN THE MOMENT.

AND, OF COURSE, WE EXPECTED AND SUBMITTED THIS DUAL ROLE INSTRUCTION IN OUR INITIAL PROPOSED INSTRUCTIONS. WE, ALL ALONG, EXPECTED THAT THIS INSTRUCTION WOULD BE GIVEN AT THE FINAL INSTRUCTION STAGE TO CLEAR UP ANY REMAINING MISUNDERSTANDING IF THERE WAS ANY.

BUT WE THINK THAT THE RECORD IS CLEAR AND YOUR HONOR DID -- THE COURT PUT ENOUGH GUARDRAILS IN THE MOMENT TO GIVE THE JURY WHAT IT NEEDED TO KNOW WHAT WAS FACT AND WHAT WAS EXPERT TESTIMONY.

THAT'S THE GOVERNMENT'S POSITION.

THE COURT: OKAY. THANK YOU.

MS. WALSH: YES, YOUR HONOR.

SO, FIRST, WE VERY MUCH APPRECIATE THE COURT GOING BACK AND READING THAT TESTIMONY AND RAISING THIS ISSUE.

WE DO NOT THINK IT'S NECESSARY TO REOPEN THE RECORD TO GIVE THAT INSTRUCTION, AND THAT THIS INSTRUCTION NUMBER 14 WILL BE SUFFICIENT.

THE COURT: OKAY. ALL RIGHT. WELL, THANK YOU FOR THE OPPORTUNITY TO AT LEAST LET ME DISCUSS IT WITH YOU, AND I APPRECIATE YOUR EXPRESSIONS.

ALL RIGHT. SO JUST TO RECAP THEN, WE'RE ON JURY INSTRUCTION 13, AND THE COURT WOULD READ OPINION EVIDENCE, EXPERT WITNESS, AND READ IN MR. SONNIER, STRIKING "III," AND WOULD OTHERWISE READ THOSE TWO PARAGRAPHS THEN.

ANY OBJECTION TO THAT?

MS. WALSH: NO, YOUR HONOR.

MS. VOLKAR: NO, YOUR HONOR.

THE COURT: ALL RIGHT. THEN TURNING TO 14, DUAL ROLE TESTIMONY, THE COURT WOULD READ THIS, BUT STRIKE RICHARD SONNIER.

6906

MS. WALSH:  YES, YOUR HONOR.

MS. VOLKAR:  YES, YOUR HONOR.

THE COURT:  NEXT IS INSTRUCTION NUMBER 28, WHICH IS ALLEGED VIOLATIONS OF INDUSTRY STANDARDS.

AND I THINK THE NOTE THAT I HAVE, IT LOOKS LIKE FOOTNOTE 6, SUGGESTS THAT MR. BALWANI WOULD LIKE THE LAST SENTENCE STRICKEN.  THAT'S ON LINE 7.

MS. WALSH:  YES, YOUR HONOR.

THE COURT:  THIS WAS GIVEN, I BELIEVE, IN THE HOLMES CASE.

MS. WALSH:  YES.

THE COURT:  RIGHT.

MS. WALSH:  AND THAT IS -- WE WOULD LIKE THAT SENTENCE STRICKEN.

IF THE COURT IS INCLINED TO NOT STRIKE THAT SENTENCE, I HAVE ANOTHER PROPOSAL.

THE COURT:  OKAY.  WHY DON'T WE HEAR THAT, SURE.

MS. WALSH:  SO THIS WAS GIVEN IN THE HOLMES CASE, AND AS I SAID WHATEVER DAY WE WERE TOGETHER TALKING ABOUT THIS, WE DO THINK THAT, I'M GOING TO CALL IT SENTENCE NUMBER 3 OF THIS INSTRUCTION, RUNS THE RISK, THE SERIOUS RISK OF UNDOING SENTENCE NUMBER 2.

SENTENCE NUMBER 2 IS THE ONE THAT SAYS, "MR. BALWANI IS NOT LIABLE FOR ANY OF THE OFFENSES JUST BASED ON REGULATORY VIOLATIONS."

AND WE DO THINK THAT SENTENCE NUMBER 3 RUNS THE RISK OF UNDOING THE IMPORT OF SENTENCE NUMBER 2.

WHAT WE WOULD PROPOSE, IF YOUR HONOR WANTS TO KEEP ALL THREE SENTENCES, IS TO SWITCH THE ORDER OF SENTENCE 3 AND 2 SO THAT THE INSTRUCTION WOULD READ FROM THE BEGINNING, "YOU HAVE HEARD EVIDENCE REGARDING ALLEGED VIOLATIONS OF REGULATIONS AND THE INDUSTRY STANDARDS.  YOU MAY CONSIDER SUCH EVIDENCE, ALONG WITH OTHER EVIDENCE LIMITED TO ANY PURPOSE FOR WHICH SUCH EVIDENCE WAS ADMITTED, IN ASSESSING WHETHER THE GOVERNMENT HAS PROVED EACH OF THE COUNTS CHARGED IN THE INDICTMENT.  HOWEVER, YOU MAY NOT FIND MR. BALWANI LIABLE FOR ANY OF THE OFFENSES," AND THEN THE REMAINING OF SENTENCE -- CURRENT SENTENCE 2.

AND THE REASON, YOUR HONOR, THAT I THINK THAT'S IMPORTANT IS THAT THE WHOLE PURPOSE OF THIS INSTRUCTION IS TO REDUCE THE RISK THAT JURORS WILL CONCLUDE CRIMINAL LIABILITY BASED ON A NEGLIGENCE STANDARD, AND PUTTING THE SENTENCE THAT PROHIBITS THEM FROM DOING THAT LAST I THINK EMPHASIZES THE POINT OF NOT DOING THAT.

AND I DON'T THINK, IF WE SWITCH THE ORDER, THAT SENTENCE WILL UNDO THE, "YOU MAY CONSIDER SUCH EVIDENCE IN ASSESSING WHETHER THE GOVERNMENT HAS PROVED."

THE COURT:  MS. VOLKAR.

MS. VOLKAR:  YOUR HONOR, I THINK WE'RE GOING TO LAND WITH THE GOVERNMENT WOULD BE FINE WITH SWAPPING THE ORDER OF THE SENTENCES.

BUT I DO WANT TO STATE FOR THE RECORD WHY THE GOVERNMENT THINKS IT'S CRITICALLY IMPORTANT TO KEEP BOTH SENTENCES.

THIS INSTRUMENTALITY WAS NOT OBJECTED -- SORRY.

THIS ENTIRE INSTRUCTION WAS NOT OBJECTED TO IN DEFENDANT'S FILING ECF 1476, AND I WAS NOT FULLY PREPARED TO DISCUSS IT ON WEDNESDAY.

AS A RESULT OF IT, I HAVE SINCE HAD TIME TO REFRESH MY MEMORY OF THE DEBATE IN THE HOLMES TRIAL AND HOW WE ARRIVED AT THIS LANGUAGE.

AND AS MS. WALSH HAS ARGUED, AND THE HOLMES DEFENSE TEAM ARGUED AS WELL, THE CONCERN DRIVING THIS INSTRUCTION IS THAT THE JURY MAY LOOK AT THE CMS REPORT OR OTHER EVIDENCE THAT'S BEEN INTRODUCED IN THIS CASE THAT HAS A REGULATORY SLANT TO IT AND PERHAPS REACH SOME CONCLUSION ON A LESSER STANDARD OR A CIVIL STANDARD, A LIABILITY STANDARD.

THAT'S WHY THE WORD "LIABILITY" IS IN THERE, AND WE -- EVERYONE, I THINK, WANTS TO ENSURE THAT THE JURY KNOWS THIS IS A CRIMINAL CASE, THE STANDARDS ARE WHAT THE COURT HAS LAID OUT IN THE EARLIER INSTRUCTIONS, NOT THIS INSTRUCTION.

THAT BEING SAID, WHAT THE GOVERNMENT WANTED TO -- SO THAT'S SORT OF WHY THE OTHER TWO SENTENCES WERE PROPOSED.

AND WHY THE GOVERNMENT WANTED THIS THIRD SENTENCE IS BECAUSE WHAT WE ALSO WANT TO AVOID IS THE DEFENSE BEING ABLE TO ARGUE, OR EVEN IMPLY, THAT THIS EVIDENCE IS WHOLLY IRRELEVANT AND THAT BECAUSE SOME PORTIONS OF THE CMS REPORT HAD TO DO WITH

6909

REFRIGERATION, I KNOW THEY BROUGHT THAT OUT ON CROSS-EXAMINATION, THAT THEY SHOULD THROW THE WHOLE REPORT OUT AND JUST IGNORE IT AS IRRELEVANT EVIDENCE TO THE CRIMINAL CHARGES AGAINST MR. BALWANI.

THAT, FROM THE GOVERNMENT'S PERSPECTIVE, WOULD BE ERROR, BECAUSE THE CMS REPORT IS RELEVANT. THE COURT FOUND THAT.

AND IT ALSO HAD KEY FINDINGS, SUCH AS THE EDISONS CONSISTENTLY FAILING QC CONTROL, WHICH, OF COURSE, CORRESPONDS WITH TESTIMONY FROM OTHER WITNESSES SUCH AS ERIKA CHEUNG, DR. MARK PANDORI AND DR. ADAM ROSENDORFF.

SO THE GOVERNMENT'S POSITION IS THAT THIS THIRD SENTENCE MUST BE IN TO TELL THE JURY THAT THEY MAY CONSIDER THAT EVIDENCE AS IT RELATES TO THE ACTUAL CHARGES OF WIRE FRAUD, NOT FOR THE CIVIL LIABILITY PURPOSES.

AND I'M JUST NOW HEARING MS. WALSH'S SUGGESTION OF SWAPPING THE ORDER. I DON'T HAVE STRONG FEELINGS ABOUT THAT, AS LONG AS BOTH CONCEPTS ARE INCLUDED IN THE INSTRUCTION, BECAUSE I THINK THAT THAT STRIKES THE BALANCE BETWEEN BOTH PARTIES' PERSPECTIVE.

THE COURT: SO DO YOU WANT TO -- DO YOU HAVE A PRINTED COPY OF THE SWAPPED LANGUAGE? LET ME SAY THAT I'M INCLINED TO SWAP THE PLACEMENT OF THOSE SENTENCES IF YOU WOULD LIKE.

AND IF YOU WANT TO PREPARE IT AS SUCH AND THEN SHARE THAT WITH MS. VOLKAR AND HAVE AGREEMENT ON IT --

**SER-878**

MS. WALSH:  YES, YOUR HONOR.

THE COURT:  -- YOU CAN SUBMIT THAT IN THE PROPOSED FINAL AND WE'LL LOOK AT IT.

MS. WALSH:  YES, YOUR HONOR.

THE COURT:  AND I HAVE NO OBJECTION TO THAT.

MS. WALSH:  GREAT.  WE WILL DO THAT.

THE COURT:  THANK YOU.

THE NEXT IN THE PACKET IS THE ADVERSE INFERENCE FOR MISSING EVIDENCE INSTRUCTION.  WE DISCUSSED THAT YESTERDAY. THE COURT IS NOT GOING TO GIVE THIS.

AND THEN I'M AT THE 7 SERIES.

DO YOU WANT TO TALK ABOUT -- AND I'LL GIVE THE 7 SERIES, THAT IS THE CONCLUDING INSTRUCTIONS, UNLESS THERE'S ANY CHANGES IN THOSE.

MS. WALSH:  NO CHANGES FROM THE DEFENSE, YOUR HONOR.

MS. VOLKAR:  NO CHANGES FROM THE GOVERNMENT, YOUR HONOR.

I THINK WHERE YOU WERE ABOUT TO LAND NEXT IS I THINK THE LAST REMAINING DISPUTE BETWEEN THE PARTIES IS THE PLACEMENT OF THIS INDUSTRY STANDARDS INSTRUCTION.

AS I INDICATED EARLIER, IT MAKES SENSE TO TALK ABOUT IT RIGHT AFTER TALKING ABOUT THE SUBSTANCE OF IT IN MY MIND.

THE COURT:  CORRECT.

SO WHERE SHOULD IT GO FROM THE GOVERNMENT'S PERSPECTIVE?

MS. VOLKAR:  FROM THE GOVERNMENT'S PERSPECTIVE,

SER-879

6911

DISCUSSING WHAT IS NOT THE CHARGES IN THIS CASE SHOULD NOT COME BEFORE DISCUSSING WHAT ARE THE CHARGES AND WHAT IS THE GOVERNMENT'S BURDEN IN THIS CASE.

AND THERE HAVE BEEN -- DURING THE MEET AND CONFER PROCESS, THERE WERE A COUPLE OF ITERATIONS OF WHERE THE DEFENSE WANTED THIS, AND IF YOU LOOK AT THE TABLE OF CONTENTS ON THE FIRST PAGE OF WHAT WE SUBMITTED, YOU'LL SEE THAT WHERE THEY LANDED IN THE VERSION THAT WE SENT TO THE COURT IS RIGHT AFTER -- I SHOULD TAKE A STEP BACK AND LET THE COURT KNOW, THE DEFENSE IS ALSO PROPOSING REARRANGING SEVERAL OF THE -- I HESITATE TO CATEGORIZE THEM, BUT IN THE MODEL INSTRUCTIONS, THEY WERE PART OF THE 3 SERIES, SO YOUR HONOR MIGHT BE FAMILIAR WITH THAT.

THE DEFENSE HAS SUGGESTED MOVING AROUND SEVERAL OF THE INSTRUCTIONS FROM THE ORDER WE JUST WALKED THROUGH.

THE GOVERNMENT LARGELY DOES NOT OBJECT TO THE MOVEMENT OF THOSE.

BUT WHAT THE GOVERNMENT DOES OBJECT TO, IF YOU'RE LOOKING AT THE TABLE OF CONTENTS, IS THEY'VE MOVED THE INDUSTRY STANDARDS INSTRUCTION TO NUMBER 16 BEFORE THE COURT EVEN DEFINES CONSPIRACY, LET ALONE WIRE FRAUD.

AND THE GOVERNMENT'S MAIN CONCERN THERE, WE UNDERSTAND THE LOGICAL CONNECTION BETWEEN THE INDUSTRY STANDARDS INSTRUCTION AND THE ACTIVITIES NOT CHARGED INSTRUCTION THAT IT CURRENTLY IS FOLLOWING IN THEIR FORMAT, BUT WHAT WE DON'T UNDERSTAND IS WHY WE WOULD TELL THE JURY WHAT THEY'RE NOT TO DO BEFORE

6912

INSTRUCTING THE JURY OF WHAT THEY ARE TO DO.

AND I ALSO WOULD POINT OUT FOR THE COURT THAT THE WAY THAT THE MODEL INSTRUCTIONS SUGGEST PROCEEDING AND HOW MOST OF THE REST OF THE INSTRUCTIONS PROCEED IS TO GIVE A DEFINITION AND THEN EITHER FURTHER DEFINE IT AND SUPPLEMENT IT, OR DESCRIBE WHAT IS THE OPPOSITE OR NOT PART OF THAT.

SO THE FIRST EXAMPLE THAT I SEE ON THE PAGE IS WHAT IS EVIDENCE IS FOLLOWED BY WHAT IS NOT EVIDENCE.

CREDIBILITY OF WITNESSES IS FOLLOWED BY SPECIFIC CATEGORY OF WITNESSES, AND SHOULD THAT OR SHOULD THAT NOT CHANGE THE JURY'S WEIGHING OF CREDIBILITY.

CONSPIRACY IS DEFINED -- SORRY.  THEN CONSPIRACY AND THEN THE DEFINITION OF A MENS REA.

I KNOW THE GOVERNMENT DISAGREES WITH "WILLFULLY," BUT I'M MAKING A DIFFERENT POINT HERE.

AND THEN LATER, WIRE FRAUD, FOLLOWED BY FURTHER DEFINITION OF THE MENS REA, INTENT TO DEFRAUD, GOOD FAITH, KNOWINGLY.

WHERE WE HAD IT AND WHERE THE PARTIES HAD IT IN THE HOLMES CASE IS WHAT MAKES THE MOST SENSE TO THE GOVERNMENT, WHICH IS WITH OTHER DESCRIPTIONS SORT OF FURTHER BUILDING OUT WHAT IS AND IS NOT PROPERLY CONSIDERED BY THE JURY GIVEN THE SPECIFIC FACTS OF THIS CASE, AND THAT'S WHAT IS ON THE TABLE OF CONTENTS NUMBER 27, NUMBER 28, THE VICTIM'S CONDUCT, NAMELY, THAT THE DEFENDANT CAN'T BLAME THE VICTIM, SUCCESS OF THE WIRE FRAUD SCHEME.

I THINK IT FALLS INTO THAT CATEGORY.

I'M NOT OPPOSED TO MOVING IT SOMEWHERE ELSE, BUT I AM OPPOSED TO HAVING IT BE DEFINED FOR THE JURY BEFORE THEY'RE EVEN TOLD WHAT ELEMENTS THEY HAVE TO FIND BEYOND A REASONABLE DOUBT.

THE COURT:  THANK YOU.

MS. WALSH.

MS. WALSH:  YES, YOUR HONOR, THANK YOU.

WE COMPLETELY DISAGREE.  IT MAKES PERFECT SENSE TO ME TO INSTRUCT THE JURY AFTER INSTRUCTIONS ABOUT TESTIMONY, CREDIBILITY OF WITNESSES, ON OR ABOUT, ET CETERA, THAT THE COURT THEN INSTRUCT ON ACTIVITIES NOT CHARGED, WHICH IS IN ESSENCE MR. BALWANI IS NOT CHARGED WITH ACTIONS AND STATEMENTS OUTSIDE OF THE TIME PERIOD OF THE INDICTMENT.

IT LOGICALLY FOLLOWS AFTER THAT THAT THE COURT WOULD ALSO INSTRUCT THE JURY THAT HE'S NOT CHARGED WITH CIVIL VIOLATIONS AND THE INSTRUCTION THAT RELATES TO HOW THEY CAN PROPER -- HOW THE JURY COULD PROPERLY CONSIDER POTENTIAL CIVIL VIOLATIONS IN DRAWING CONCLUSIONS ABOUT GUILT IN A CRIMINAL CASE.

THEN IT MAKES SENSE, AFTER WE'VE CARVED OUT WHAT HE'S NOT CHARGED WITH AND WHAT YOU CAN'T CONSIDER OR WHAT YOU CAN ONLY CONSIDER IN A LIMITED WAY, TO THEN GO THROUGH ALL OF THE ELEMENTS FOR EACH OF THE CRIMES HE IS CHARGED WITH, AND THAT'S A LENGTHY RECITATION OF COMPLICATED CONCEPTS AND DEFINITIONS THAT I THINK SHOULD COME AFTER THE JURY IS CLEAR ABOUT WHAT HE

IS NOT CHARGED WITH.

THE COURT: ALL RIGHT. THANK YOU.

I NOTICE IN THE HOLMES CASE IT WAS INSTRUCTION NUMBER 28, I BELIEVE, AND THAT WAS THE LAST INSTRUCTION BEFORE THE 7 SERIES, THAT IS, THE DUTY TO DELIBERATE INSTRUCTIONS. IT WAS THE FINAL INSTRUCTION THAT WAS GIVEN IN THAT CASE.

AND WHEN I LOOKED AT THIS EARLIER, MY VISCERAL REACTION WAS THE PLACE FOR IT WOULD BE, AS MS. VOLKAR SUGGESTED, IT SEEMED TO ME SHOULDN'T THIS FALL INTO THE CATEGORY WE'RE TALKING ABOUT, AND WHEN THE JURY IS BEING INFORMED ABOUT ALL OF THE ELEMENTS AND THE DEFINITIONS OF THE ELEMENTS, DOESN'T IT MAKE SENSE TO TELL THEM WHAT THEY CAN'T DO AND WHAT THEY SHOULDN'T DO?

ONE OF THE THOUGHTS I HAD WAS, WELL, IF YOU PUT IT EARLY, IT GETS DILUTED BY THE OTHER INSTRUCTIONS, DOESN'T IT?

MS. WALSH: I GUESS I THINK IT SERVES THE PURPOSE OF CABINING WHAT THE JURY CAN CONSIDER AND NOT CONSIDER WHEN THEY'RE LISTENING TO THE INSTRUCTIONS ABOUT THE LAW ON THE CRIMES THAT ARE CHARGED.

AND TO ME, THAT SEEMS TO BE HELPFUL THAT, OKAY, WE HEARD THIS TESTIMONY ABOUT THE CMS REPORT AND SARAH BENNETT, AND WE HEARD THE TESTIMONY ABOUT THE STATEMENTS IN 2006. OKAY, THE COURT HAS TOLD US THAT MR. BALWANI IS NOT CHARGED WITH THAT AND WE SHOULDN'T RELY ON NEGLIGENCE OR POTENTIAL REGULATORY VIOLATIONS IN ASSESSING OUR -- OR COMING TO OUR VERDICT.

AND THEN THE COURT WALKS THEM THROUGH, OKAY, HERE IS THE LAW ON WHAT IS CHARGED.

TO ME THAT MAKES CONCEPTUAL SENSE.

BUT I UNDERSTAND THE COURT -- THIS IS HOW IT WAS DONE IN THE HOLMES TRIAL. I JUST THINK IT MAKES MORE LOGICAL SENSE TO PUT THEM UP FRONT.

THE COURT: OKAY. SO WHAT IS HELPFUL FOR THE JURY -- I SUPPOSE WHEN I LOOK AT IT, AND THE WAY WE DID IT IN THE HOLMES CASE, THEY'RE GIVEN THE INSTRUCTIONS, HERE'S EVERYTHING THAT THE GOVERNMENT HAS TO PROVE, HERE'S WHAT THEY HAVE TO PROVE, LADIES AND GENTLEMEN, LISTEN TO THIS.

OH, AND BY THE WAY, AT THE CONCLUSION OF ALL THAT, BY THE WAY, YOU CAN'T CONSIDER -- WHEN YOU CONSIDER ALL OF THESE THINGS, YOU MAY NOT CONSIDER ANY REGULATIONS, ANY REGULATORY VIOLATIONS THAT, IN YOUR THOUGHT PROCESS AS YOU GO THROUGH ALL OF THE OTHER, THE WIRE FRAUD AND THE OTHER THINGS, YOU'RE NOT TO CONSIDER THAT.

IT JUST SEEMS LIKE THAT'S MORE LOGICAL THAN TO TELL THEM, YOU MAY NOT CONSIDER THE FOLLOWING AMONGST ALL OF THE INSTRUCTIONS THAT I'M ABOUT TO GIVE YOU.

AND SO THEY KEEP THAT IN THEIR MIND. LET ME REMEMBER. LET ME GO BACK.

THERE'S JUST SOMETHING THAT WE'RE ASKING THEM TO REMEMBER A NEGATIVE WHILE THEY LISTEN TO A POSITIVE, I SUPPOSE, IS A VERY BASIC WAY I'D PUT IT.

IT JUST SEEMS TO ME THAT ONCE WE TELL -- ONCE THEY'RE INFORMED, THIS IS THE BURDEN OF PROOF, AND THESE ARE THE ELEMENTS OF THE OFFENSE, AND THE LAST THING THAT THEY'LL HEAR, AT LEAST CONCLUDING THOSE ELEMENTS, ARE YOU MAY NOT CONSIDER THESE REGULATORY ISSUES AS YOU THINK ABOUT ALL OF THESE OTHER ELEMENTS THAT THE GOVERNMENT HAS TO PROVE.

THAT SEEMS TO HAVE SOME -- AND MAYBE I'M JUST, MAYBE I'M JUST OLD AND THAT'S THE WAY MY MIND WORKS. BUT IT SEEMS LIKE THAT HAS A BETTER FLOW TO IT.

MS. WALSH: I UNDERSTAND. AND, OF COURSE, WE WANT TO DO WHAT IS -- WHAT WILL MAKE THE INSTRUCTIONS MOST CLEAR FOR THE JURY. I THINK WE'RE ALL ON -- WE HAVE THE SAME GOAL.

I GUESS I THOUGHT IT WAS CLEAR TO CARVE OUT WHAT IS NOT CHARGED AND WHAT THEY SHOULDN'T CONSIDER FIRST.

BUT THE WAY THIS ALL STARTED, THE REORDERING EXERCISE, WAS THE CIVIL VIOLATIONS INSTRUCTION WAS SO FAR AWAY FROM THE INSTRUCTIONS ABOUT THE ELEMENTS THAT THE COURT SUGGESTED, WELL, MAYBE WE SHOULD MOVE IT UP, AND SO WE WENT THROUGH THE EFFORT OF MOVING IT UP.

THE COURT: RIGHT.

MS. WALSH: I THINK IF THE COURT IS INCLINED TO NOT ACCEPT THE DEFENSE'S RECOMMENDATION THAT IT COME AFTER ACTIVITIES NOT CHARGED, MORE TOWARD THE FRONT, THAT AT LEAST WE SHOULD MOVE IT TO AFTER THE INSTRUCTION REGARDING THE ELEMENTS OF WIRE FRAUD.

SO -- AND WHEREVER THE COURT THINKS THAT'S APPROPRIATE, EITHER AFTER 21 OR AFTER 22, SOMEWHERE IN THERE, SO THAT IT IS CLOSE IN PROXIMITY TO THE ELEMENTS.

(PAUSE IN PROCEEDINGS.)

THE COURT: SORRY. I'M PARSING THROUGH THEM AND TRYING TO SEE IF, AT LEAST IN MY MIND, THERE'S A LOGICAL PLACE.

MS. WALSH: SURE.

MS. VOLKAR: YOUR HONOR, MAY I BE HEARD ON THAT?

THE COURT: YES.

MS. VOLKAR: SO THE DEFENSE MADE THE SUGGESTION THAT MS. WALSH JUST MADE DURING OUR MEET AND CONFER, AND THE GOVERNMENT'S RESPONSE THERE IS THAT WE DON'T ACTUALLY OPPOSE MOVING THE INSTRUCTION UP FROM IT WHERE IT WAS GIVEN IN THE HOLMES CASE.

BUT AS I STATED INITIALLY, WE DO OBJECT TO SEPARATING THE DEFINITION OF ELEMENTS FROM WHAT WE CONSIDER KEY DEFINITIONS, AND THAT'S THE MENS REA.

SO THE DIFFICULTY OR THE PROBLEM THAT THE GOVERNMENT HAS WITH MS. WALSH'S SECONDARY SUGGESTION TO THE COURT IS WIRE FRAUD IS IMMEDIATELY FOLLOWED BY WHAT WE WOULD SAY ARE IMPORTANT INSTRUCTIONS ABOUT WHAT DOES INTENT TO DEFRAUD MEAN, WHAT DOES KNOWINGLY MEAN?

I IMAGINED THEY WOULD SAY THE GOOD FAITH INSTRUCTION WAS IMPORTANT TO THEM, AND IT WAS IMPORTANT TO THE HOLMES TEAM.

ALL OF THOSE ARE DEFINING WHAT THE ELEMENTS ARE IN WIRE

FRAUD.

AND OUR COUNTER-PROPOSAL WAS IF THE DEFENSE STILL WANTS TO MOVE IT UP, WE KNOW THAT THOSE MENS REA INSTRUCTIONS ARE NOT PARTICULARLY LENGTHY, THE INDUSTRY STANDARDS INSTRUCTION CAN BE MOVED AFTER KNOWINGLY IS DEFINED, BUT BEFORE GETTING INTO AIDING AND ABETTING OR VICARIOUS LIABILITY OR OTHER INSTRUCTIONS LIKE THAT.

THAT WAS THE GOVERNMENT'S COUNTER SUGGESTION.

THE COURT: HOW ABOUT THAT, MS. WALSH?

MS. WALSH: YES, AS A COUNTER THAT WOULD BE ACCEPTABLE.

I JUST WANT THE RECORD TO REFLECT THAT WE DID MAKE THE REQUEST TO MOVE IT UP, AND WE PREFER THAT. BUT AS AN ALTERNATIVE, THAT SEEMS REASONABLE TO US.

THE COURT: SO IT WOULD BE BETWEEN 24 AND 25 ON THE CHART THAT I HAVE?

MS. WALSH: CORRECT.

MS. VOLKAR: CORRECT, YOUR HONOR.

THE COURT: ALL RIGHT. I'LL ACCEPT YOUR REQUEST ON THAT, NOTING THAT I THINK IT FITS BETTER, AND IT HAS MORE EFFECT IF THE DEFENSE WANTS, FOR EFFECT, TO PUT IT AT THE END OF ALL OF THOSE ELEMENTS AS WE DID IN THE HOLMES CASE.

MY VIEW IS THAT HAVING THIS INSTRUCTION, AS IMPORTANT AS IT IS FROM THE DEFENSE, HAVING IT APPEAR EARLIER TENDS TO DILUTE ITS VALUE. THAT'S JUST MY HIGH LEVEL OBSERVATION.

SER-887

6919

IT WAS PLACED AT THE END, THE LAST THING, THE LAST FORMAL INSTRUCTION ON THE LAW REGARDING THE HOLMES CASE, THAT WAS THE LAST ONE THEY HEARD BEFORE THE CONCLUDING INSTRUCTIONS AS TO THEIR OBLIGATIONS AS THEY DECIDE THE CASE, AND I THOUGHT IT FIT PERFECTLY THERE AS A SEPARATE STAND ALONE THAT ALL COUNSEL COULD REFERENCE AND SAY THERE'S A SPECIAL INSTRUCTION ON THIS, IT'S SEPARATE, IT'S AT THE END, AND IT JUST SEEMED THAT THAT'S A BETTER PLACE FOR IT.

BUT I WILL ACCEPT YOUR REQUEST AND IT CAN BE PLACED BETWEEN KNOWINGLY AND AIDING AND ABETTING.

MS. WALSH: THANK YOU, YOUR HONOR.

MS. VOLKAR: THANK YOU, YOUR HONOR.

THE COURT: DOES THAT CONCLUDE OUR DISCUSSION ON THE INSTRUCTIONS?

MS. VOLKAR: I BELIEVE IT DOES.

MS. WALSH: I JUST WANT TO MAKE SURE -- THERE WAS SOME OTHER REORDERING THAT THE PARTIES AGREED ON THAT APPEARS IN THIS DOCUMENT ON PAGES 1 THROUGH 2. I JUST WANTED TO MAKE SURE THE COURT WAS OKAY WITH THAT.

THE COURT: SURE. I LOOK AT THE LIST HERE THAT I HAVE, IT'S 1 THROUGH 35?

MS. WALSH: CORRECT.

THE COURT: AND I DON'T HAVE ANY OBJECTION TO THIS, OTHER THAN WHAT WE'VE SAID TODAY. THOSE MODIFICATIONS, I'LL ACCEPT THOSE.

**SER-888**

MS. WALSH: OKAY.

MS. VOLKAR: THAT'S CORRECT, YOUR HONOR. THE GOVERNMENT DIDN'T OBJECT TO REARRANGING OF, I KNOW I COLLOQUIALLY REFERRED TO THEM AS THE 3 SERIES REFERRING TO THE MODEL INSTRUCTIONS. BUT THE GOVERNMENT DID NOT OBJECT TO THE DEFENSE'S PROPOSED REORDERING.

WE HAD NOT YET IMPLEMENTED THE CHANGES BECAUSE WE WANTED TO ENSURE THAT IT WAS -- THAT IT ALSO MADE SENSE TO THE COURT AND THE COURT APPROVED THE CHANGES.

BUT IN THE NEXT ITERATION OF THE DOCUMENT, WE WILL ACTUALLY REARRANGE THE INSTRUCTIONS THEMSELVES TO MATCH THIS PROPOSED TABLE OF CONTENTS.

THE COURT: THAT'S GREAT. THANK YOU.

CAN I ASK YOU THAT YOU PREPARE THEM, A FINAL SET, SHARE THAT, MAKE SURE I GET -- AND THEN YOU'LL SEND IT TO ME. BUT WHEN YOU DO SO, IF I CAN GET AGREEMENT FROM BOTH SIDES THAT THIS IS THE FINAL SET THAT YOU'VE REACHED AGREEMENT ON. I'LL ASK YOU ABOUT THAT AGAIN BEFORE I READ THEM NEXT WEEK SOMETIME.

MS. WALSH: YES, YOUR HONOR.

THE COURT: AND THAT WILL BE THE PACKET THAT THE COURT WILL GIVE.

MS. VOLKAR: YES, YOUR HONOR. TO CLARIFY, DO YOU WANT US TO THE FILE THE JOINT PROPOSED INSTRUCTIONS AND PROVIDE A WORD COPY?

THE COURT: YES. IF YOU HAVE AGREEMENT ON THAT SUCH

THAT YOU BELIEVE YOU CAN FILE AN AGREED UPON SET, THAT WOULD BE FINE, AND THEN I'LL RECEIVE A COPY.

MS. WALSH: VERY GOOD, YOUR HONOR.

MS. VOLKAR: THANK YOU, YOUR HONOR.

THE COURT: ONE LAST THING I WANT TO ASK YOU TO DO, BOTH SIDES TO DO, IS BEFORE I INSTRUCT, BEGIN INSTRUCTIONS -- I THINK I MENTIONED THIS IN OUR PRETRIAL CONFERENCE -- BUT I DO WANT YOU TO REVIEW EACH OF YOUR EXHIBIT LISTS TO MAKE CERTAIN THAT EVERY EXHIBIT THAT YOU SOUGHT TO BE INTRODUCED AND THAT YOU MOVED TO BE INTRODUCED WAS INTRODUCED.

IF THERE'S SOMETHING LACKING, BEFORE THE JURY GET THE CASE, I WOULD LIKE TO MAKE SURE THAT YOU GET CLARITY ON THAT.

THAT TYPICALLY MEANS A MEETING WITH MS. ROBINSON TO GO OVER YOUR LIST TO CONFIRM THE FINAL EXHIBIT LIST SO THE JURY WILL HAVE IT.

MS. WALSH: YES, YOUR HONOR.

THE COURT: AND I'LL INVITE YOUR TEAMS TO DO THAT.

MS. VOLKAR: YES, YOUR HONOR.

MY UNDERSTANDING IS THAT OUR WONDERFUL SUPPORT STAFF HAS STARTED THAT PROCESS, AND I -- BASED ON HEARSAY, I UNDERSTAND THAT THERE MIGHT BE SOME MEETING ON MONDAY. BUT I WILL QUICKLY GET OUT OVER MY SKIS ON THAT, BUT WE WILL MAKE SURE IT'S DONE.

THE COURT: THAT'S GREAT. I JUST WANT TO CONFIRM THAT THE JURY WILL HAVE EVERYTHING ON TUESDAY AND THAT, IF WE NEED TO AUGMENT THE RECORD, WE WILL DO THAT BEFORE THEY GET THE

SER-890

CASE.

OKAY?

MS. WALSH: YES, YOUR HONOR.

MS. VOLKAR: YES, YOUR HONOR.

MS. WALSH: MR. COOPERSMITH HAS A MATTER HE WOULD LIKE TO ADDRESS.

THE COURT: SURE. YES.

MR. COOPERSMITH: THANK YOU, YOUR HONOR. GOOD MORNING.

I JUST WANTED TO MENTION ONE, I GUESS, LOOSE END, FOR LACK OF A BETTER WORD, THAT WE WOULD NEED TO GET RESOLVED, NOT NECESSARILY TODAY, BUT BEFORE WE START CLOSING ARGUMENT, AND THAT IS THIS MOTION THAT WE MADE TO STRIKE A PORTION, A SMALL PORTION, OF MS. BENNETT'S TESTIMONY. AND I THINK I GAVE THE COURT THE TRANSCRIPT CITES ON THAT ONE.

I WOULD JUST NOTE ONE THING, AND THIS APPEARS AT PAGE 5132 OF THE TRANSCRIPT, AND IT'S DURING MS. BENNETT'S REDIRECT EXAMINATION WHERE THIS CAME UP.

AND THERE'S SOME AMBIGUITY, AND THE COURT MAYBE ALREADY LOOKED AT THIS WHEN I GAVE THE TRANSCRIPT CITE, BUT ON LINES 11 THROUGH 13 OF PAGE 5132 -- ACTUALLY, STARTING FROM LINE 9 OF THAT PAGE, THE COURT SAID, "I DON'T THINK IT'S 702, BUT ARE YOU OFFERING THIS FOR THE TRUTH?"

AND MR. LEACH RESPONDED, "I'M NOT OFFERING IT FOR THE TRUTH, YOUR HONOR. I WAS ASKING HER ABOUT THE DOCUMENTS. I

THINK IT'S A -- I'M OFFERING THE STATEMENT UNDER 801(D)(2), SO" AND THEN IT GETS CUT OFF BECAUSE UNFORTUNATELY MY COLLEAGUE SPOKE OVER HIM.

SO I DON'T KNOW, MAYBE MR. LEACH CAN FINISH HIS SENTENCE, BUT I DON'T KNOW, IT'S AMBIGUOUS.

IT LOOKS LIKE HE STARTED OFF SAYING IT'S NOT OFFERED FOR THE TRUTH, BUT WHAT ENDED UP HAPPENING IS THE DOCUMENT ITSELF THAT WAS BEING DISCUSSED, THIS PATIENT IMPACT DOCUMENT, WAS NOT ADMITTED.

BUT THERE WAS A QUESTION ASKED, AND THAT'S THE TESTIMONY AT PAGE 5133, LINE 21, THROUGH 5134 AT LINE 4.

AND THAT'S WHEN THE QUESTION WAS ASKED AND THE WITNESS RESPONDED, "THERANOS SAID," MEANING THERANOS TOLD CMS, "THAT THE LABORATORY CONCLUDED THAT THERE WAS A POSSIBLE PATIENT IMPACT FOR EVERY TEST REPORTED FROM THE LABORATORY'S TPS 3.5 INSTRUMENT."

SO OUR VIEW OF THAT IS THAT WAS -- AND I DON'T WANT TO REARGUE, BECAUSE WE ALREADY MADE THIS ARGUMENT, BUT THIS IS HEARSAY. THE PURPOSE OF NOTICE TO THE AGENCY IS NOT A RELEVANT PURPOSE.

BUT AT A MINIMUM, WE THINK THAT WAS NOT OFFERED FOR THE TRUTH AND SHOULD NOT COME IN FOR THE TRUTH IF IT WAS, IN FACT, NOTICE TO THE AGENCY, IF THAT WAS SOMETHING THAT THE COURT WOULD THINK WAS EVEN RELEVANT.

SO THAT'S THE GIST OF IT. AND, AGAIN, IT'S NOT SOMETHING

THAT WE NEED TO RESOLVE RIGHT NOW, BUT BEFORE CLOSING ARGUMENT.

THE COURT: SURE. OKAY. THANK YOU.

MS. VOLKAR.

MS. VOLKAR: YOUR HONOR, MR. LEACH HANDLED THAT BEFORE.

ONE THING I'LL SAY AS HE MAKES HIS WAY TO THE PODIUM IS MY RECOLLECTION IS THAT THERE WAS A LENGTHY DISCUSSION BETWEEN THE COURT AND THE PARTIES IN THE MORNING BEFORE THE PORTION THAT MR. COOPERSMITH IS REFERRING TO, AND I BELIEVE THAT WHEN MR. LEACH WAS ADDRESSING IT, HE WAS UNDERSTANDING THAT THE COURT WAS ONLY GOING TO ADMIT IT FOR A LIMITED PURPOSE, EVEN THOUGH IT'S THE GOVERNMENT'S PERSPECTIVE IT COULD BE AN 801(D)(2) STATEMENT.

BUT I'LL LET MR. LEACH TAKE IT FROM HERE.

THE COURT: THANK YOU, MR. LEACH.

MR. LEACH: I DON'T HAVE ANY FURTHER ARGUMENTS, YOUR HONOR. WE'LL SUBMIT ON OUR PRIOR STATEMENTS.

THE COURT: ALL RIGHT. THANK YOU.

MR. COOPERSMITH: BUT AT THE TIME THE QUESTION WAS ASKED AND IT CAME IN, THE COURT DID NOT GIVE ANY INSTRUCTION AS TO A LIMITED PURPOSE, SO THAT'S THE ESSENCE OF THE ISSUE.

SO THANK YOU, YOUR HONOR.

THE COURT: OKAY. GOT IT.

(PAUSE IN PROCEEDINGS.)

THE COURT: THANK YOU.

MR. LEACH: THANK YOU.

THE COURT: ANYTHING FURTHER TODAY? MR. SCHENK.

MR. SCHENK: NO, YOUR HONOR.

FOR CLOSING ARGUMENT IN THE HOLMES TRIAL, THE GOVERNMENT USED A LAPEL MICROPHONE. WE, BEFORE CLOSING, RAISED THAT WITH THE COURT JUST TO MAKE SURE THAT THAT WAS ACCEPTABLE TO THE COURT.

I WOULD DO THE SAME RIGHT NOW.

MY RECOLLECTION IS THAT WE REQUIRED ASSISTANCE FROM COURT STAFF TO DO SOMETHING UNDER THIS TABLE OR -- AND I DON'T KNOW WHAT WAS DONE, BUT I KNOW WHATEVER WAS DONE, WAS NECESSARY.

SO IF WE COULD -- IF THE COURT WOULD APPROVE THAT USE AGAIN, AND IF WE COULD RELY ON THE ASSISTANCE OF COURT STAFF TO MAKE THAT CHANGE, WE WOULD APPRECIATE IT.

OF COURSE, WE WOULD MAKE THE MICROPHONE AVAILABLE TO THE DEFENSE SHOULD THEY CHOOSE TO USE IT DURING THEIR CLOSING JUST LIKE LAST TIME.

THE COURT: THANK YOU FOR THAT HEADS UP.

I DON'T HAVE ANY OBJECTION TO THE LAPEL MIKE BEING USED, AND WE'LL CONTACT OUR I.T. PERSON TO GO INTO THE BOX AND DO THE MAGIC.

MR. SCHENK: THANK YOU.

MR. COOPERSMITH: THANK YOU, YOUR HONOR.

WE JOIN IN MR. SCHENK'S REQUEST, SO THANK YOU FOR THAT.

THE COURT: SURE. WOULD YOU LIKE A LAPEL MIKE?

WOULD YOU LIKE TO USE THIS MIKE AS WELL?

MR. COOPERSMITH: YES, YOUR HONOR. I THINK IT WOULD BE VERY HELPFUL.

THE COURT: SURE.

MR. COOPERSMITH: THE OTHER SORT OF RELATED TOPIC THAT WE WERE DISCUSSING WITH MS. ROBINSON EARLIER TODAY IS THAT WHEN THE PODIUM WAS MOVED SO I COULD FACE THE JURY AND MR. SCHENK COULD FACE THE JURY, IT'S HELPFUL TO BE ABLE TO ACTUALLY SEE A SCREEN BECAUSE THERE'S A SERIES OF THINGS ON THE SCREEN.

AND IT'S KIND OF AWKWARD TO USE THIS SCREEN RIGHT HERE IN THE MIDDLE BECAUSE THEN YOU HAVE TO SORT OF TURN.

AND I WAS WONDERING IF THERE COULD BE A SCREEN PLACED ON -- IF IT WAS PLACED JUST ON THE EDGE OF THE GOVERNMENT'S TABLE, OR EVEN FLIPPING THAT ONE AROUND, I DON'T WANT TO PRECLUDE THE GOVERNMENT FROM LOOKING AT THE PRESENTATION. BUT SOMEHOW SO THAT IF I'M STANDING, YOU KNOW, BASICALLY WHERE MR. SCHENK IS STANDING, BUT TURNED TOWARD THE JURY, THERE WOULD BE A WAY TO GLANCE OVER AT THE SCREEN SO I'M NOT BLIND AS TO WHAT IS BEING SHOWN.

THE COURT: SURE. SURE.

SO THE LECTERN WILL BE FACING THE JURY. WE'LL MOVE THE LECTERN OUT. AND THAT ONE -- I THINK WE'LL MOVE IT OUT.

I THINK, MR. SCHENK, IN THE HOLMES CASE YOU HAD A MONITOR AT THE CORNER OF THE TABLE THAT YOU COULD REFERENCE TO YOUR

6927

LEFT.  IS THAT SOMETHING THAT YOU CAN SHARE?

MR. SCHENK:  YES, YOUR HONOR.

I WOULD PREFER NOT TO USE A LECTERN DURING THE CLOSING, BUT, YES, THE SCREEN THAT THE GOVERNMENT -- ONE OF THE TWO SCREENS ON THE GOVERNMENT'S TABLE TURNS SO THAT IT'S AVAILABLE FOR THE SPEAKING, OR FOR THE ATTORNEY ADDRESSING THE JURY CAN LOOK AT.

I WILL TURN THAT FOR THE GOVERNMENT'S CLOSING, AND I WILL JUST LEAVE IT TURNED FOR THE DEFENSE CLOSING.

MR. COOPERSMITH:  THAT WOULD WORK JUST FINE.  I WOULD APPRECIATE THAT.  THANKS.

THE COURT:  GREAT.  THANK YOU.

BUT THE LECTERN WILL BE THERE FOR USE.  IF YOU WANT TO USE IT, OR NOT, OR WHATEVER.

DO YOU THINK THAT -- DOES EITHER SIDE HAVE ANY OTHER AUDIO/VISUAL NEEDS THAT WE SHOULD KNOW ABOUT SO WE CAN PREPARE ANYTHING?

MR. COOPERSMITH:  NOT THAT I'M AWARE OF, YOUR HONOR.

I THINK THE DISPLAY WOULD BE, YOU KNOW, SIMILAR TO WHAT WE HAVE SEEN DURING TRIAL WHERE OUR TECH PERSON WOULD BE DOING THAT.

THE COURT:  SURE.  OKAY.  GREAT.

MR. SCHENK:  THANK YOU.

THE COURT:  THANK YOU.

SO WE'RE NEXT TOGETHER TUESDAY NEXT, I THINK.

SER-896

BUT IF, IF YOU NEED TO COME OR YOU WANT TO COME AND SEE ME ABOUT ANY INTERVENING ISSUE, JUST SING OUT TO MS. ROBINSON AND I'M HAPPY TO BE HERE TO MEET.

MR. COOPERSMITH: THANK YOU, YOUR HONOR.

THE ONLY OTHER THING IS THAT I UNDERSTAND THE COURT IS BEING GRACIOUS IN SWEARING MY COLLEAGUE IN.

THE COURT: YES.

MR. COOPERSMITH: AND WHENEVER THE COURT COULD DO THAT, THAT WOULD BE VERY HELPFUL. WE WOULD APPRECIATE THAT.

THE COURT: ALL RIGHT. THANK YOU.

MR. SCHENK: THANK YOU, YOUR HONOR.

MR. COOPERSMITH: THANK YOU, YOUR HONOR.

THE COURT: WE'RE IN RECESS.

(COURT ADJOURNED AT 10:56 A.M.)

SER-897

CERTIFICATE OF REPORTERS

WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER 8076

_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  JUNE 10, 2022

UNITED STATES COURT REPORTERS

**SER-898**