**No. 22-10338**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAMESH "SUNNY" BALWANI,

Defendant-Appellant.

---

**SUPPLEMENTAL EXCERPTS OF RECORD**
**VOLUME 5 OF 9**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 18-CR-00258-EJD-2

---

**THOMAS A. COLTHURST**
Attorney for the United States
Acting Under Authority Conferred By
28 U.S.C. § 515

**MATTHEW M. YELOVICH**
Chief, Appellate Section, Criminal Division

**KELLY I. VOLKAR**
Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7185
**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

6929

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,       )
                                )  CR-18-00258-EJD
            PLAINTIFF,          )
                                )  SAN JOSE, CALIFORNIA
        VS.                     )
                                )  JUNE 21, 2022
RAMESH "SUNNY" BALWANI,         )
                                )  VOLUME 38
            DEFENDANT.          )
_____ )  PAGES 6929 - 7156


                TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE EDWARD J. DAVILA
                UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                        BY:  JOHN C. BOSTIC
                             JEFFREY B. SCHENK
                        150 ALMADEN BOULEVARD, SUITE 900
                        SAN JOSE, CALIFORNIA 95113

                        BY:  ROBERT S. LEACH
                             KELLY VOLKAR
                        1301 CLAY STREET, SUITE 340S
                        OAKLAND, CALIFORNIA 94612

                (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074
                        LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595

            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER

**SER-900**

6931

INDEX OF PROCEEDINGS

GOVERNMENT'S CLOSING STATEMENT BY MR. SCHENK          P. 6933

DEFENDANT'S CLOSING STATEMENT BY MR. COOPERSMITH       P. 7087

**SER-901**

ENGAGE THE DEFENSE CLOSING.

(RECESS FROM 2:04 P.M. UNTIL 2:29 P.M.)

THE COURT: THANK YOU. WE'RE BACK ON THE RECORD.

ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

MR. COOPERSMITH, YOU HAVE AN ARGUMENT?

MR. COOPERSMITH: YES, YOUR HONOR. THANK YOU.

THE COURT: PLEASE PROCEED. THANK YOU.

MR. COOPERSMITH: MAY I REMOVE MY MASK?

THE COURT: YES. OF COURSE.

IT'S QUITE AN INTRODUCTION.

(LAUGHTER.)

MR. COOPERSMITH: CAN YOU HEAR ME NOW?

**(MR. COOPERSMITH GAVE HIS CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT.)**

MR. COOPERSMITH: MAY IT PLEASE THE COURT, LADIES AND GENTLEMEN OF THE JURY, IT'S MY HONOR AND PRIVILEGE TO GIVE THE CLOSING ARGUMENT ON BEHALF OF MR. BALWANI.

MR. BALWANI, AS YOU'VE SEEN THROUGH THE COURSE OF THIS VERY LONG TRIAL, PUT HIS HEART AND SOUL INTO THERANOS. HE WORKED TIRELESSLY YEAR AFTER YEAR TO MAKE THE COMPANY A SUCCESS. HE DRANK FROM MULTIPLE, MULTIPLE FIREHOSES: MANUFACTURING, SOFTWARE, LABORATORY OPERATIONS, BUSINESS RELATIONSHIPS, INVESTORS, HIRING WORLD CLASS EMPLOYEES. THAT'S HOW MR. BALWANI SPENT HIS TIME.

MR. BALWANI NOT ONLY WORKED FOR THERANOS, HE ALSO PUT HIS

MONEY WHERE HIS MOUTH WAS, AND HE INVESTED IN THERANOS.

FIRST OF ALL, HE INVESTED 4.5 -- OVER $4.5 MILLION IN THERANOS STOCK BY PURCHASING STOCK OF THE COMPANY AND GIVING THAT MONEY TO THERANOS.  HE DID THAT IN 2010 AND 2011.

IN ADDITION, MR. BALWANI, AS YOU'VE HEARD, GUARANTEED A LOAN AT FIRST OF $10 MILLION AND ULTIMATELY $12 MILLION SO THAT THERANOS COULD MAKE ITS PAYROLL, PROVIDE ITS EMPLOYEES WITH HEALTH INSURANCE, AND CONTINUE TO BUILD A WORLD CLASS DIAGNOSTIC TESTING COMPANY.

WELL, THE REASON WHY MR. BALWANI GUARANTEED THAT LOAN IS NOT WHAT THE GOVERNMENT TOLD YOU.  IT'S BECAUSE MR. BALWANI SAW WHAT ELIZABETH HOLMES AND THERANOS HAD ACCOMPLISHED EVEN BEFORE HE GOT THERE, AND I'LL TALK ABOUT THAT A LITTLE MORE IN A MINUTE.

NOW, THERE'S NO EVIDENCE THAT EITHER ON HIS OWN OR IN AGREEMENT WITH MS. HOLMES, THAT MR. BALWANI TRIED TO DECEIVE OR CHEAT ANYBODY.  NOT INVESTORS.

THE MONEY THAT INVESTORS GAVE THERANOS WAS ALL PUT INTO THERANOS TO CONTINUE TO BUILD AND DEVELOP THERANOS'S TECHNOLOGY, RELATIONSHIPS, AND WE'LL SEE THAT IN THE TREMENDOUS R&D EXPENSE THAT INVESTORS WERE ACTUALLY INFORMED OF, AND WE'LL SEE THE DOCUMENTS ON THAT.

AND MR. BALWANI DID NOT INTEND TO DECEIVE, CHEAT, OR DEFRAUD PATIENTS.  IN FACT, AS MS. SPIVEY SAID, THERANOS NEVER EVEN ASKED WALGREENS FOR THE MONEY THAT PATIENTS WERE PAYING

FOR, PAYING FOR THEIR BLOOD TESTS. PATIENTS WERE PAYING WALGREENS. THERANOS NEVER EVEN ASKED FOR THAT MONEY. THERE IS NO INTENT TO DECEIVE, NO VIOLATION OF TRYING TO DEFRAUD PATIENTS OUT OF THEIR $35 OR $40 THAT THEY WERE PAYING FOR BLOOD TESTS.

WHAT THE EVIDENCE SHOWED IN THIS CASE WAS THAT AT ALL TIMES MR. BALWANI ACTED IN GOOD FAITH TO MAKE BLOOD TESTING MORE ACCESSIBLE, MORE CONVENIENT, AND MORE AFFORDABLE TO EVERYONE.

ONE CRITICAL ASPECT OF MR. BALWANI'S GOOD FAITH IS HIS UNWAVERING AND SINCERE BELIEF IN THE CAPABILITY OF THERANOS TECHNOLOGY. HE BELIEVED AND HE HAD EVERY REASON TO BELIEVE IN THE SCIENTIFIC TEAM, THE WORLD CLASS SCIENTIFIC TEAM AT THERANOS AND THE TECHNOLOGY THEY DEVELOPED.

AND WHY IS THAT? FROM AN EARLY POINT IN HIS TIME AT THERANOS HE SAW, BECAUSE HE WAS AT THE MEETING, THREE JOHNS HOPKINS PHYSICIANS LOOKING AT THE THERANOS TECHNOLOGY AND THE DATA AND GIVING THEIR OPINION. NO MAJOR WEAKNESSES WERE FOUND. THE STRENGTH OF THE THERANOS TECHNOLOGY IS ACCURACY. IT'S A MINILAB. THAT WASN'T MR. BALWANI'S OPINION, THOSE WERE NOT HIS WORDS. THOSE WERE THE WORDS OF THE JOHNS HOPKINS TEAM WHO EVALUATED THERANOS'S TECHNOLOGY.

WHY WOULD MR. BALWANI WANT TO INVEST IN A COMPANY LIKE THAT AFTER SEEING THAT? I THINK THAT QUESTION ANSWERS ITSELF.

THE GOVERNMENT NEVER MENTIONED IT, BUT THERANOS IN

NOVEMBER OF 2014, AFTER MR. BALWANI WAS MADE AWARE OF A LOT OF WORK THAT THERANOS DID, APPLIED FOR FDA APPROVAL.

NOW, THE GOVERNMENT MIGHT TELL YOU ON REBUTTAL, WELL, THAT WAS APPROVAL FOR ONE PARTICULAR ASSAY, IT WAS THE HSV-1 ASSAY, BUT THAT ASSAY WAS RUNNING ON THERANOS'S SYSTEM, WITH THERANOS'S TECHNOLOGY, WITH THERANOS'S BLOOD TESTING ANALYZER, AND WITH THERANOS'S CAPILLARY TUBE AND NANOTAINER, CTN.

AND WHEN THAT OCCURS AND THE FDA ULTIMATELY APPROVES IT AFTER MANY MONTHS, IS THAT SOMETHING THAT MR. BALWANI SHOULD TAKE AWAY AND SAY, WELL, THE TECHNOLOGY DOESN'T WORK?

THE OPPOSITE IS TRUE. THE TECHNOLOGY WORKED IN MR. BALWANI'S EYES AND IN THE EYES OF THE FDA BECAUSE MR. BALWANI WAS INFORMED OF THAT.

NOW, THERE'S MORE THAN THAT, OF COURSE. THE GOVERNMENT DIDN'T MENTION THIS EITHER, BUT WALGREENS, FROM 2011 TO 2013, THEY WEREN'T JUST TOLD, HEY, THERANOS HAS GREAT TECHNOLOGY. WALGREENS WAS PROVIDED WITH AN EDISON DEVICE THAT THEY HAD IN THEIR OWN OFFICE AND THAT THEY COULD USE BACK IN THEIR HEADQUARTERS IN CHICAGO TO DO BLOOD TESTING. THEY ACTUALLY DID BLOOD TESTING. THEY HAD THE DEVICE FOR TWO YEARS BEFORE THEY DECIDED TO AGREE WITH THERANOS TO LAUNCH IN WALGREENS STORES.

AND THE GOVERNMENT DIDN'T MENTION THIS EITHER, BUT MR. BALWANI PRESENTED -- THERANOS AND MR. BALWANI PRESENTED TO CMS WHEN THERE WAS AN INSPECTION PAGES AND PAGES OF ASSAY -- I'M SORRY, ALTERNATIVE ASSESSMENT PROCEDURES WHERE THERANOS'S

SER-905

TECHNOLOGY WAS RUN HEAD-TO-HEAD COMPARISONS WITH FDA APPROVED DEVICES AND CAME OUT 100 PERCENT EVERY TIME OR NEARLY EVERY TIME. THAT'S WHAT ACTUALLY HAPPENED.

THAT AAP TESTING AS WE'LL SEE, IT'S A FORM OF PROFICIENCY TESTING, AND I'LL TALK ABOUT THAT SOME MORE. THAT'S WHERE THE RUBBER HITS THE ROAD ON WHETHER THE TECHNOLOGY WORKS OR NOT. IT'S THE HEAD-TO-HEAD COMPARISONS WITH THE FDA APPROVED TECHNOLOGY. AND AS THE UNREBUTTED EVIDENCE SHOWS, IT CAME OUT LOOKING VERY GOOD.

THAT'S JUST A FEW REASONS. AND WE'LL TALK ABOUT A LOT MORE, ABOUT WHY MR. BALWANI BELIEVED IN THE TECHNOLOGY AS I GO THROUGH MY CLOSING REMARKS.

NOW, THE GOVERNMENT SHOWED YOU TEXT MESSAGE AFTER TEXT MESSAGE IN THIS CASE. THESE WERE PRIVATE TEXT MESSAGES BETWEEN MR. BALWANI AND MS. HOLMES, WHO, AS YOU'VE HEARD, WERE BUSINESS PARTNERS BUT ALSO IN A ROMANTIC RELATIONSHIP. SO NO ONE ELSE WAS PRIVY TO THESE TEXT MESSAGES.

AND NOT A SINGLE TEXT MESSAGE, THERE'S NOT A SINGLE TEXT MESSAGE WHERE MR. BALWANI TELLS ANYBODY TO DO THE WRONG THING OR TELLS MS. HOLMES THAT HE'S IN AGREEMENT WITH HER TO COMMIT FRAUD OR ANYTHING LIKE THAT.

IN FACT, AS WE'LL SEE AS I GO ON WITH MY REMARKS, THERE'S TEXT MESSAGES WHERE MR. BALWANI WANTS TO MAKE SURE THAT INFORMATION THAT IS BEING PROVIDED IS ACCURATE. AND THESE ARE PRIVATE TEXT MESSAGES WHERE IF THERE WAS A CONSPIRACY, YOU

WOULD THINK THERE WOULD BE ALL KINDS OF CONSPIRATORIAL SINISTER CONVERSATIONS, AND THERE JUST ISN'T.

THERE'S NOT A SINGLE EMAIL WHEN MR. BALWANI TELLS ANYBODY TO DO THE WRONG THING OR TO RELEASE BLOOD TESTS THAT AREN'T RIGHT.

IN FACT, EVERY TIME A PROBLEM AROSE, AND PROBLEMS DID ARISE, MR. BALWANI WANTS THOSE PROBLEMS FIXED.  HE WANTS HIS SCIENTIFIC TEAM TO GET ON IT.  AND IF THE SCIENTIFIC TEAM SAYS, FOR EXAMPLE, IN THE CASE OF HCG TESTING, STOP, IT DOES STOP UNTIL A PROPER STUDY IS DONE AND THE LAB DIRECTOR, IN THAT CASE DR. ROSENDORFF, AGREES THAT THE TESTING ON THE EDISON CAN CONTINUE, AND THAT IS WHAT HAPPENED.

NOW, THE GOVERNMENT OVER THESE MANY WEEKS OF TRIAL, HAS PRESENTED YOU WITH EVIDENCE THAT MISTAKES WERE MADE IN RUNNING THE LAB, THAT REGULATORY VIOLATIONS OCCURRED, AND THAT A HANDFUL OF PATIENTS GOT ERRONEOUS LAB RESULTS, AND THAT A GROUP OF RICH AND POWERFUL INVESTORS LOST MONEY BECAUSE THEY BET ON A RISKY STARTUP THAT WAS GOING TO BE POWERED BY THE WALGREENS ROLLOUT.

THOSE INVESTORS STOOD TO GET VERY RICH INDEED IF THE WALGREENS ROLLOUT HAD WORKED OUT, AS WOULD ANYONE WHO HAD SHARES IN THERANOS.

BUT WHAT THE GOVERNMENT HASN'T SHOWED YOU IS THAT MR. BALWANI TRIED TO DECEIVE OR CHEAT ANYBODY.  AND AT THE END OF OUR REMARKS, I'LL TALK TO YOU MORE ABOUT THIS.

THE ONLY VERDICT IN THIS CASE THAT IS SUPPORTED BY THE EVIDENCE OR THE LACK OF EVIDENCE IS GOING TO BE NOT GUILTY ON EVERY SINGLE COUNT, ALL 12 COUNTS.

BUT LET'S NOW TALK ABOUT ELIZABETH HOLMES FOR A MINUTE. OBVIOUSLY SHE LOOMS LARGE IN THIS CASE BECAUSE SHE WAS THE CEO OF THERANOS.

WITNESS AFTER WITNESS TESTIFIED THAT MS. HOLMES WAS BRILLIANT AND CHARISMATIC. AND SHE HAD TO BE BRILLIANT AND CHARISMATIC BECAUSE THINK ABOUT WHAT SHE ACCOMPLISHED EVEN BEFORE MR. BALWANI GOT TO THERANOS. SHE ATTRACTED INVESTORS LIKE LARRY ELLISON, THE FOUNDER OF ORACLE HERE IN SILICON VALLEY; AND A LEGENDARY SILICON VALLEY INVESTOR NAMED DON LUCAS WAS ON THE BOARD BEFORE MR. BALWANI GOT THERE. SHE ALSO ATTRACTED TO HER BOARD A PROFESSOR AND DEAN OF CHEMICAL ENGINEERING AT STANFORD NAMED CHANNING ROBERTSON.

AND AS YOU'VE HEARD DURING THE COURSE OF THE TRIAL, DR. ROBERTSON, PROFESSOR ROBERTSON TOLD INVESTORS THAT IN HIS VIEW THE TECHNOLOGY WORKED. THAT'S WHAT DR. ROBERTSON INFORMED INVESTORS.

AND MR. BALWANI KNEW PROFESSOR ROBERTSON WAS ON THE BOARD OF THERANOS EVEN BEFORE HE GOT THERE, AND HE WAS A STANFORD CHEMICAL ENGINEERING PROFESSOR.

LATER, MS. HOLMES ATTRACTED OTHER GIANTS OF INDUSTRY AND GOVERNMENT WHO JOINED THERANOS. THE FORMER HEAD OF THE CENTERS OF DISEASE CONTROL, WILLIAM FOEGE, WAS ON THE BOARD; FORMER

SER-908

SENATE MAJORITY LEADER AND HEART SURGEON, BILL FRIST, WAS ON THE BOARD; THE FORMER CHIEF EXECUTIVE OFFICER OF WELLS FARGO BANK, RICHARD KOVACEVICH; FORMER U.S. SENATOR SAM NUNN; FORMER MARINE CORPS GENERAL JAMES MATTIS, AND MANY OTHERS.

THESE ARE SOME OF THE MOST POWERFUL, SOPHISTICATED PEOPLE IN THE COUNTRY.  IN ADDITION, SOME OF THE MOST POWERFUL AND SOPHISTICATED AND WEALTHY PEOPLE IN THE COUNTRY INVESTED IN THERANOS.

MR. BALWANI WOULD HAVE SEEN THE SAME THING IN ELIZABETH HOLMES THAT THOSE PEOPLE SAW.  AND YOU WONDER WHY HE WAS ATTRACTED TO THERANOS?  WHY HE WAS ATTRACTED TO MS. HOLMES? WHY HE WOULD WANT TO PUT HIS MONEY WHERE HIS MOUTH IS AND INVEST IN THERANOS AND GUARANTEE A LOAN?

WELL, ALL OF THESE OTHER PEOPLE DID THE SAME THING BEFORE MR. BALWANI JOINED THE COMPANY.

NOW, YOU'VE SEEN A LOT OF EMAILS AND TEXT MESSAGES IN THIS CASE, BUT I WANT TO TALK ABOUT WHAT THE GOVERNMENT DIDN'T SHOW YOU AND WHAT THE DEFENSE HAD TO SHOW YOU.

SO LET'S THINK ABOUT SOMEONE'S LIFE OR CAREER.  LET'S TAKE A TEN-YEAR SECTION OF SOMEONE'S CAREER, AND LET'S SAY YOU GATHERED EVERY SINGLE TEXT MESSAGE AND EVERY SINGLE EMAIL THAT THAT PERSON EVER SENT OR RECEIVED, AND YOU SIFTED IT AND SORTED IT UNTIL WHAT YOU WERE LEFT WITH WAS ONLY THE TEXT MESSAGES OR EMAILS WHERE A PROBLEM WAS IDENTIFIED, BUT YOU NEVER ADD IN, WELL, HOW WAS THE PROBLEM RESOLVED?  JUST A PROBLEM WAS

SER-909

IDENTIFIED.

OR YOU ALSO ADD INTO THOSE -- THAT VERY SELECTIVE SET TIMES AT 3:00 IN THE MORNING WHEN THE PERSON IS FRUSTRATED OR HE'S VENTING ABOUT SOMETHING.  AND THOSE ARE THE ONLY TEXT MESSAGES THAT YOU GATHERED, AND YOU PRESENTED THAT AND SAID, WELL, THIS IS THE SUM TOTAL OF THIS PERSON'S TEN-YEAR CAREER.

WOULD THAT BE A FAIR PICTURE OF WHAT ACTUALLY HAPPENED? WOULD THAT BE AN ACCURATE PICTURE?

THAT'S WHAT THE GOVERNMENT TRIED TO DO HERE.

NOW, MR. BALWANI, AS JUDGE DAVILA WILL TELL YOU, HE'S PRESUMED INNOCENT.  HE HAS NO BURDEN OF PROOF.  HE DOESN'T HAVE TO PUT ON ANY EVIDENCE.  HE DOESN'T EVEN HAVE TO PUT IN A SINGLE EMAIL AS AN EXHIBIT.  HE CERTAINLY DOESN'T HAVE TO TESTIFY AS JUDGE DAVILA WILL ALSO INSTRUCT YOU.

BUT THANK GOODNESS, WE THE DEFENSE, DID PUT IN EVIDENCE BECAUSE WITHOUT THAT, YOU WOULD BE LEFT WITH THE GOVERNMENT'S HIGHLY MISLEADING PICTURE OF WHAT OCCURRED HERE.

OVER AND OVER AGAIN THE GOVERNMENT DECIDED NOT TO SHOW YOU THE WHOLE STORY BECAUSE IT WAS INCONSISTENT WITH THE STORY, WITH THE NARRATIVE THAT THEY WANT TO TELL.

WE'LL TALK IN DETAIL ABOUT THE MANY TIMES THAT THIS HAPPENED, BUT LET ME MENTION A FEW OF THEM NOW.

BRYAN TOLBERT, ONE OF THE INVESTORS -- ACTUALLY, THE INVESTOR WAS THE HALL GROUP.  WE DIDN'T HEAR FROM CRAIG HALL, BUT MR. TOLBERT CAME IN REPRESENTING THE HALL GROUP.  AND HE

SER-910

WAS ASKED A QUESTION ABOUT WHAT MS. HOLMES TOLD HIM IN A PARTICULAR CONVERSATION ON DECEMBER 20TH OF 2013, BEFORE HE INVESTED.

AND WE KNOW THAT CHRIS LUCAS, ANOTHER INVESTOR, WAS ALSO ON THAT CALL.

AND MR. TOLBERT TESTIFIED THAT ACTUALLY THERE WAS A TAPE RECORDING OF THAT CALL THAT HE HAD WITH MS. HOLMES. AND THAT WAS OUR CHANCE TO SEE EXACTLY, PRECISELY WHAT MS. HOLMES SAID TO THOSE INVESTORS. AND WE DID NOT HEAR THE TAPE.

WE LEARNED THAT THE GOVERNMENT HAD THE TAPE, THAT MR. TOLBERT PRODUCED IT TO THE GOVERNMENT, THAT HE REVIEWED IT WITH THEM, BUT WE DIDN'T HEAR IT. AND YOU HAVE TO WONDER WHY NOT? WHY DIDN'T THE GOVERNMENT WANT YOU TO HEAR EXACTLY WHAT ELIZABETH HOLMES SAID IN A SUPPOSEDLY FRAUDULENT INTERACTION WITH THESE INVESTORS?

IN ADDITION, THE GOVERNMENT DIDN'T SHOW YOU DOZENS, DOZENS OF EMAILS WE HAD TO OFFER THROUGH CROSS-EXAMINATION. FOR EXAMPLE, SOME OF THOSE EMAILS DIRECTLY CONTRADICTED ADAM ROSENDORFF, WHO THE GOVERNMENT TALKED A LOT ABOUT DURING THEIR CLOSING REMARKS.

FOR EXAMPLE, ON HCG, THEY SHOWED YOU THAT DR. ROSENDORFF SAID ON A PARTICULAR DAY, MAY 30TH, 2014, STOP HCG TESTING ON EDISON.

THEN WHAT THEY DIDN'T SHOW YOU IS A FEW DAYS LATER, DR. ROSENDORFF WAS INFORMED THAT THERE WAS A STUDY THAT WAS

SER-911

DONE, AND HE WAS INFORMED THAT THEY WERE READY TO RELEASE RESULTS. AND THEY DIDN'T SHOW YOU THAT DR. ROSENDORFF ACTUALLY SENT AN EMAIL APPROVING THE RELEASE OF THE RESULTS JUST A FEW DAYS AFTER HE SAID TO STOP.

WE HAD TO SHOW YOU THAT DOCUMENT. AND THE GOVERNMENT DIDN'T WANT YOU TO HEAR THAT, DIDN'T WANT TO PRODUCE THAT BECAUSE IT SHOWED WHAT REALLY HAPPENED, NOT THE GOVERNMENT'S NARRATIVE OF WHAT HAPPENED.

IN ADDITION, AS YOU'LL SEE, YOU'VE HEARD THE NAME DR. DANIEL YOUNG MANY TIMES IN THIS CASE. HE WAS BASICALLY THE CHIEF SCIENTIST DURING THE TIME WHEN THERANOS WAS LAUNCHING THEIR WALGREENS BLOOD TESTING. IN ADDITION, HE WAS THE ARIZONA LAB DIRECTOR.

THERE ARE ABOUT 78 EMAILS THAT WERE INTRODUCED INTO EVIDENCE IN THIS CASE WHERE DR. YOUNG IS ON THE EMAILS. WHY DIDN'T WE HEAR FROM DR. ROSENDORFF? I'M SORRY, DR. YOUNG? WHERE IS DR. YOUNG?

SAME GOES FOR LANGLY GEE, THE QUALITY CONTROL MANAGER THAT WAS HIRED WITH THE HELP OF DR. ROSENDORFF. WE HEARD A LOT ABOUT QUALITY CONTROL. WHY DIDN'T WE HEAR ABOUT THE PERSON WHO WAS RESPONSIBLE FOR QUALITY CONTROL? WHY DIDN'T THE GOVERNMENT WANT YOU TO HEAR THAT WITNESS?

ALSO BOARD MEMBERS. AS YOU SEE AS I GO THROUGH THIS, BOARD MEMBERS WERE INVOLVED IN RUNNING THE BUSINESS. THAT WAS THEIR JOB, AND WE DIDN'T HEAR FROM A SINGLE BOARD MEMBER. AND

SER-912

WE'LL TALK MORE ABOUT WHAT THE BOARD MEMBERS KNEW AND WHAT INFORMATION THEY HAD.

AND THEN, OF COURSE, AS MR. SCHENK SAID IN THE TAIL END OF HIS CLOSING REMARKS, THE GOVERNMENT DIDN'T FOLLOW THEIR OWN ADVICE FROM THEIR OWN EMPLOYEE, GO GET THE SERVERS THAT CONTAINED THE LABORATORY INFORMATION SYSTEM.  WHEN THEY GOT A COPY OF THAT SYSTEM FROM THERANOS, THEY COULDN'T OPEN, BUT THEY WERE TOLD, INTERNALLY THEY WERE INFORMED GO GET THE SERVERS.  AND THEY HAD A MEETING, AND THEY DECIDED NOT TO DO IT.

SO AS A RESULT, YOU DON'T HAVE THE LABORATORY INFORMATION SYSTEM EVIDENCE.  AND AS YOU'LL HEAR WHEN I GO THROUGH SOME OF THE TESTIMONY, DR. ROSENDORFF HIMSELF TESTIFIED THAT THAT WAS A TOOL THAT HE USED TO ASSESS THE TESTING WHEN THERE WAS AN INQUIRY OR EVEN A COMPLAINT, AND THAT DR. ROSENDORFF'S WORDS, THAT'S WHAT HE USED TO CONDUCT AN INVESTIGATION WHEN THAT SORT OF THING HAPPENED.

DOESN'T THE GOVERNMENT HAVE TO ABIDE BY THE SAME RULES HERE IF THEY'RE GOING TO PRESENT TO YOU A CASE OF SCIENTIFIC FRAUD?  DON'T THEY HAVE TO DO THE SAME THING THAT DR. ROSENDORFF WOULD DO AT THE LEAST, TO LOOK AT ACCURACY OF TESTING?  NOT ON ONE TEST.  ANY TEST THAT A PATIENT GETS THAT IS NOT ACCURATE IS EXTREMELY UNFORTUNATE, AND NOBODY WANTS THAT, LEAST OF ALL MR. BALWANI.

BUT THIS CASE IS ABOUT SYSTEMIC WIDESPREAD TESTING FAILURES, NOT A PATIENT GOT AN INACCURATE RESULT ON AN OCCASION

SER-913

HERE AND THERE.

AND AS YOU HEARD FROM WITNESS AFTER WITNESS, ALL LABS MAKE ERRORS. THAT'S A FACT OF LIFE. ALL HUMAN ENDEAVORS MAKE ERRORS. NOBODY WANTS THAT. EVERYONE STRIVES FOR PERFECTION. IT JUST DOESN'T HAPPEN.

HERE, THE GOVERNMENT'S BURDEN IS TO SHOW THIS IS A WIDESPREAD FAILURE, AND WE WILL TALK ABOUT THIS MORE, BUT YOU JUST CAN'T DO THAT WITHOUT THE CENTRAL DATABASE THAT CONTAINS ALL OF THE PATIENT'S TESTING, ALL OF THE QUALITY CONTROL INFORMATION FOR EVERY THERANOS PATIENT TEST.

AS I GO ON WITH MY CLOSING REMARKS, AND WHEN YOU HEAR THE GOVERNMENT IN REBUTTAL, YOU SHOULD KEEP IN MIND ALL OF THE EVIDENCE THAT THE GOVERNMENT DIDN'T SHOW AND ASK YOURSELF WHY THESE WITNESSES DIDN'T TESTIFY? WHY DID THEY HAVE TO TESTIFY FROM MEMORY ABOUT EVENTS SEVEN, EIGHT, NINE YEARS AGO WHEN THERE WERE DOCUMENTS, WHEN THERE WAS A TAPE IN THE CASE OF MR. TOLBERT AND MR. LUCAS.

ANOTHER THING JUST AS AN OVERALL CONCEPT I THINK THAT IS IMPORTANT HERE IS YOU REALLY HAVE TO LOOK AT THE FACTS IN THIS CASE AS MR. BALWANI WOULD HAVE BEEN EXPERIENCING THEM IN REAL TIME.

WITH THE BENEFIT OF HINDSIGHT YOU MIGHT CONCLUDE, WELL, MR. BALWANI COULD HAVE MADE A DIFFERENT JUDGMENT ON ONE POINT OR ANOTHER.

BUT THE ISSUE HERE AND TO ASSESS HIS INTENT AND GOOD

FAITH, YOU HAVE TO LOOK AT THE EVIDENCE AS IT'S UNFOLDING IN REAL TIME AS HE WOULD HAVE SEEN IT IN HIS OWN EYES, NOT WITH THE BENEFIT OF HINDSIGHT.

AND THE GOVERNMENT IN THEIR CLOSING, THERE WAS A LOT OF PLAYING AROUND WITH THE TIMELINE WHERE THINGS WEREN'T EXACTLY IN CHRONOLOGICAL ORDER, AND THEY'RE TRYING TO SAY, WELL, HE HAD CERTAIN KNOWLEDGE WHEN ACTUALLY THAT CAME MUCH LATER.

FOR EXAMPLE, THEY SHOWED YOU A PARTICULAR DOCUMENT WHERE HE AND A PROJECT MANAGER NAMED MAX FOSQUE WERE GOING OVER -- OR THERE WAS A SPREADSHEET THAT WAS COMPILED BY MR. FOSQUE AND IT HAD SOME PATIENT COMPLAINTS.

AND THE GOVERNMENT ARGUED, WELL, MR. BALWANI KNEW IN REAL TIME THAT THESE COMPLAINTS WERE COMING IN.  WELL, THERE WAS NO EVIDENCE OF THAT.  THIS WAS A SPREADSHEET THAT WAS COMPILED IN SEPTEMBER OF 2015 IN ADVANCE OF THE CMS INSPECTION THAT MONTH. THAT DOESN'T SHOW THAT MR. BALWANI HAD THAT KNOWLEDGE IN 2013 OR 2014, OR EVEN IN 2015 BEFORE THE SPREADSHEET WAS COMPILED.

SO THERE'S A LOT OF PLAYING AROUND WITH THE TIMELINE, BUT I THINK IT'S GOING TO BE IMPORTANT TO KEEP IN MIND THAT WE HAVE TO LOOK AT THINGS AS MR. BALWANI SAW THEM WITH HIS OWN EYES, NOT WITH THE BENEFIT OF HINDSIGHT.

LET ME GIVE YOU AN ANALOGY ABOUT THAT.  SO SOME PEOPLE ARE INTO SPORTS, BUT YOU MAY KNOW THAT WHEN SPORTS TEAMS ARE TRYING TO IMPROVE, THEY'LL OFTEN WATCH A VIDEOTAPE OF THE SPORTS EVENT.  AND THEN WHEN YOU WATCH THE VIDEOTAPE YOU MIGHT FIND,

WELL, THAT -- THERE SHOULD HAVE BEEN A PASS TO THE GUY ON THE WING BECAUSE HE WAS REALLY OPEN, OR SOME OTHER PLAY SHOULD HAVE BEEN MADE, EVEN THOUGH THE PLAYERS AT THE TIME WERE TRYING TO DO THEIR BEST TO MAKE THE RIGHT PASS, TO MAKE THE RIGHT THROW, THEY WERE DOING THAT IN GOOD FAITH, THEY WERE TRYING THEIR BEST.

BUT, YOU KNOW, WHEN YOU LOOK AT THE VIDEO YOU FIND, WELL, I SEE SOMETHING IN HINDSIGHT WITH THE USE OF THE VIDEO THAT, YOU KNOW, IT WOULD HAVE BEEN NICE IF THE PLAYERS HAD SEEN IT AT THE TIME.  THAT'S KIND HINDSIGHT, AND THAT WORKS WELL FOR SPORTS TEAMS BECAUSE IT HELPS THEM IMPROVE AND MAYBE MAKE A BETTER PASS THE NEXT TIME.  YOU KNOW, HINDSIGHT IS A VALUABLE TOOL FOR JUDGING PEOPLE.

BUT HERE'S THE KICKER.  IMAGINE TRYING TO DO THAT VIDEOTAPE REVIEW OF A SPORTS GAME OR A WHOLE SEASON OR THREE SEASONS FOR THAT MATTER, BUT YOU'RE DOING THAT WHEN THE VIDEO IS NOT EVEN AVAILABLE ANYMORE BECAUSE THE PEOPLE RESPONSIBLE FOR GETTING IT NEVER BOTHERED GETTING THE HARD DRIVES WHERE THE VIDEO WAS STORED, AND NOW WE'RE TRYING TO DO THIS ALL FROM MEMORY.  WOULD THAT BE A FAIR WAY TO CRITICIZE THE PLAYERS?

THIS IS NOT A GAME, OF COURSE.  THIS IS THE FEDERAL GOVERNMENT USING ALL OF ITS POWER TO PROSECUTE MR. BALWANI FOR CRIMES HE DIDN'T COMMIT AND DID NOT INTEND TO COMMIT AND TRYING TO OBTAIN A CONVICTION WITHOUT SHOWING YOU ALL OF THE FACTS.

NOW, THE GOVERNMENT'S BURDEN IS TO PROVE BEYOND A

**SER-916**

REASONABLE DOUBT, AMONG OTHER THINGS, THAT MR. BALWANI INTENDED AT THE TIME TO DECEIVE AND CHEAT PEOPLE TO GET THEIR MONEY, AND THE GOVERNMENT HAS FAILED.

WELL, THIS HAS BEEN A VERY LONG TRIAL. THERE'S BEEN A LOT OF EXHIBITS, A LOT OF TESTIMONY, A LOT OF DELAY UNFORTUNATELY. IT'S MY OBLIGATION TO TRY TO WALK YOU THROUGH THE EVIDENCE AS BEST I CAN SO THAT WHEN YOU DELIBERATE, YOU'LL HAVE ALL OF THE FACTS IN MIND, NOT JUST THE NARROW STORY THAT THE GOVERNMENT IS TRYING TO TELL YOU.

NOW, YOU'VE BEEN THROUGHOUT THIS TRIAL EXTREMELY PATIENT, EXTREMELY ATTENTIVE, AND I CAN ONLY ASK THAT YOU CONTINUE TO DO THAT DURING MY CLOSING REMARKS.

I JUST WANT TO TELL YOU UPFRONT, MY REMARKS WILL BE LENGTHY, NOT BECAUSE I WANT TO KEEP YOU EVEN ONE MINUTE LONGER THAN I HAVE TO, BUT JUST BECAUSE THERE'S A LOT OF EVIDENCE IN THIS CASE. AND THIS IS OBVIOUSLY AN EXTREMELY IMPORTANT MATTER. AND SO I'LL TRY TO GIVE YOU SIGN POSTS AND ROAD MAPS OF WHERE WE ARE, BUT IT IS GOING TO BE LENGTHY, AND IT WILL SPILL OVER INTO TOMORROW. I HOPE NOT LONGER THAN THAT, BUT WE'LL SEE.

SO THANK YOU. AND MR. BALWANI THANKS YOU IN ADVANCE FOR YOUR ATTENTIVENESS AND YOUR PARTICIPATION IN THIS REALLY IMPORTANT PROCESS.

OKAY. LET'S SORT OF GET TO THE CORE AND THE SUBSTANCE OF THIS.

SER-917

SO, MR. ALLEN, IF YOU COULD GO TO SLIDE 2.

THIS IS THE ROAD MAP OF WHAT I'M GOING TO BE TALKING ABOUT DURING MY CLOSING ARGUMENT.  SO I WANT TO TALK ABOUT MR. BALWANI AND HIS BACKGROUND AND HIS INTRODUCTION TO THERANOS; I'M GOING TO TALK ABOUT THERANOS'S BUSINESS AND TECHNOLOGY; I'M GOING TO TALK ABOUT THERANOS'S SCIENTIFIC TEAM AND THE CLIA LAB.  AS YOU'VE HEARD, CLIA IS THE CRITICAL LABORATORY IMPROVEMENTS ACT.  IT'S THE FEDERAL LAW THAT GOVERNS CLINICAL LABORATORY TESTING IN THE UNITED STATES.  IT'S REFERRED TO AS CLIA.

I'M GOING TO TALK ABOUT ELIZABETH HOLMES SOME MORE; I'M GOING TO TALK ABOUT THE LAW THAT GOVERNS YOUR DECISION, AND IN PARTICULAR SOME OF THE INSTRUCTIONS THAT JUDGE DAVILA WILL GIVE YOU AT THE CONCLUSION OF ALL OF THE CLOSING ARGUMENT; I'M GOING TO TALK ABOUT WHAT MATTERED TO INVESTORS AND IN PARTICULAR THE WALGREENS RELATIONSHIP; I'M GOING TO TALK ABOUT SPECIFIC THERANOS INVESTORS THAT YOU HEARD ABOUT, THERE ARE SIX OF THEM; THE THERANOS PATIENTS.  YOU HEARD TESTIMONY FROM FOUR DIFFERENT PATIENTS, AND I'M GOING TO TALK ABOUT THEM.

I'M GOING TO TALK ABOUT THE LABORATORY INFORMATION SYSTEM AND GO INTO DETAIL ABOUT WHY THAT WAS IMPORTANT AND WHY THE GOVERNMENT CAN'T PROVE ITS CASE NOT JUST ON THE PATIENT SIDE BUT ON THE INVESTOR SIDE AS WELL WITHOUT THE LIS.

AND THEN I'LL TALK ABOUT AT THE END YOUR DECISION AND SOME OF THE OTHER INSTRUCTIONS ABOUT DELIBERATION AND SO FORTH.  SO

SER-918

THAT'S THE ROAD MAP.

I'LL COME BACK TO THIS ROAD MAP FROM TIME TO TIME JUST SO YOU CAN SEE WHERE WE ARE.

IF YOU GO TO THE NEXT SLIDE.

THIS JUST -- RIGHT AT THE BEGINNING HERE, I WANT TO JUST TELL YOU ABOUT SOME OF THE IMPORTANT LANDMARKS THAT OCCURRED IN THIS CASE THAT IS USEFUL TO KEEP IN MIND. AND IT'S A BIT OF A TIMELINE.

SO ON AUGUST 13TH, 2009, MR. BALWANI GUARANTEED A LOAN TO THERANOS OF $10 MILLION;

ON OCTOBER 30TH, 2009, THE BOARD, NOT MS. HOLMES, THE BOARD APPOINTED MR. BALWANI AS VICE CHAIRMAN OF THE COMPANY. SO HE WAS ON THE BOARD AT THAT POINT.

BETWEEN APRIL 2010 AND DECEMBER 2011, MR. BALWANI INVESTED ABOUT $4.6 MILLION BY BUYING THERANOS STOCK AND GIVING THAT MONEY TO THE COMPANY.

ON APRIL 27TH OF 2010, THERE WAS THAT MEETING WITH THE JOHNS HOPKINS PHYSICIANS WHERE JOHNS HOPKINS EVALUATED THE THERANOS TECHNOLOGY, AND AMONG OTHER THINGS, SAID THAT SPECIAL STRENGTHS OF THE TECHNOLOGY WAS ACCURACY.

ON OCTOBER 19TH, 2010, DR. IAN GIBBONS, THEN THE CHIEF SCIENTIST AT THERANOS, TOLD MR. BALWANI ABOUT SCIENTIFIC BREAKTHROUGHS HE HAD ACHIEVED WITH THE THERANOS BLOOD TESTING ANALYZER.

BETWEEN 2010 AND 2013, THERE WAS A LOT OF ASSAY

SER-919

DEVELOPMENT WORK AT THERANOS. THIS IS INVENTING REALLY, AN ABILITY TO DO HUNDREDS OF ASSAYS ON VERY SMALL SAMPLES OF BLOOD AS OPPOSED TO THE VENOUS DRAW FROM THE ARM THAT YOU'VE HEARD ABOUT DURING THE COURSE OF THIS TRIAL. THAT IS THE ASSAY DEVELOPMENT WORK.

BETWEEN APRIL OF 2011 AND JULY OF 2013, AS I MENTIONED, WALGREENS HAD THE DEVICE, THE THERANOS ANALYZER, TO CONDUCT THEIR TESTING IN THEIR OWN TIME IN THEIR OWN WAY.

ON SEPTEMBER 11TH, 2013 AND THEN ON NOVEMBER 13TH, 2013, THERE WERE LAUNCHES OF THE TESTING SERVICE WITH WALGREENS.

LET ME JUST PAUSE THERE FOR A MINUTE. THE GOVERNMENT NEVER MENTIONED THIS, WE HAD TO DO THIS, BUT, IN FACT, THE FIRST LAUNCH IN SEPTEMBER, OR SEPTEMBER 11TH TO BE PRECISE, THIS WAS A LAUNCH TO WHAT IS CALLED FRIENDS AND FAMILY AT ONE PARTICULAR WALGREENS STORE IN DOWNTOWN PALO ALTO. AND, OF COURSE, FRIENDS AND FAMILY SHOULD GET ACCURATE BLOOD TESTING, AND THEY'RE FRIENDS AND FAMILY, AND WE WOULDN'T WANT MORE FOR THEM.

BUT AS THE EVIDENCE SHOWED, THERE WERE ONLY TWO ASSAYS THAT WERE LAUNCHED AT THAT TIME. THERE WAS TEST RUN. I THINK ONE OF THEM WAS CBC AND ONE OF THEM WAS HBA1C, WHICH IS A TEST USED TO MONITOR DIABETES. AND THAT WAS IT.

SO ALL OF THIS DISCUSSION ABOUT DR. ROSENDORFF NOT BEING READY AND HE HAD PROBLEMS WITH SODIUM, WE'LL TALK ABOUT THAT, THAT DOESN'T HAPPEN UNTIL NOVEMBER. SO DR. ROSENDORFF HAS THE

TIME THAT HE NEEDED.

AND THE GOVERNMENT DIDN'T WANT TO TELL YOU THAT OR DIDN'T TELL YOU THAT.

OKAY. SO ON DECEMBER 30TH, 31ST, 2013, WALGREENS COMMITTED TO A NATIONAL ROLLOUT. THERE'S AN AMENDMENT TO THE AGREEMENT THAT I'LL SHOW YOU AS I GO THROUGH THIS WHERE WALGREENS SAID, OKAY, WE'RE COMMITTING TO A NATIONAL ROLLOUT.

IS IT GUARANTEED? NOTHING IS GUARANTEED IN BUSINESS. PEOPLE CAN CHANGE THEIR MIND OF COURSE, BUT THAT'S WHAT WALGREENS SAID RIGHT AT THE SAME TIME THAT INVESTORS HALL, BDV, WHICH IS BLACK DIAMOND VENTURES, CHRIS LUCAS, AND ALAN EISENMAN WERE INVESTING. AND THAT'S, AS I'LL TALK ABOUT MORE, THE ESSENCE OF WHAT INVESTORS WERE INVESTING IN HERE, IS THE ABILITY TO MAKE A LOT OF MONEY BECAUSE OF THE WALGREENS LAUNCH AND THE WAY THAT THAT WOULD MAKE THERANOS, IN THE WORDS I USED WITH CHRIS LUCAS, A UNICORN.

IN FEBRUARY, FEBRUARY 6TH TO BE EXACT, PFM, THAT'S BRIAN GROSSMAN, THAT'S WHEN THEIR INVESTMENT CAME IN.

IN AUGUST OF 2014, WALGREENS DISCUSSES A MAJOR EXPANSION OF THE ROLLOUT. NOW, THIS IS A FUNDAMENTAL DISAGREEMENT BETWEEN THE GOVERNMENT AND THE DEFENSE ABOUT EXACTLY WHAT WALGREENS WAS COMMUNICATING IN THIS AUGUST 2014 TIMEFRAME.

AND AS WE SEE WHEN WE GO THROUGH THE EVIDENCE, WHAT WAS COMMUNICATED, AND MAYBE EVEN MORE IMPORTANTLY, WHAT MR. BALWANI WOULD VERY REASONABLY TOOK AWAY, WAS THAT WALGREENS WAS LOOKING

TO EXPAND THE ROLLOUT, NOT TO CONTRACT IT AS THE GOVERNMENT HAS TRIED TO CLAIM.

ON OCTOBER 31ST, 2014, IN LIGHT OF MR. BALWANI'S UNDERSTANDING OF THE NATIONAL ROLLOUT, RDV, WHICH IS THE DEVOS FAMILY, THEIR INVESTMENT CAME IN, AND DAN MOSLEY, WHO IS THE LAWYER AT CRAVATH, SWAINE & MOORE, A LAW FIRM IN NEW YORK.

IN NOVEMBER, NOVEMBER 12TH, AS I'VE SAID, THERANOS APPLIED FOR FDA CLEARANCE FOR HSV-1, THAT'S HERPES SIMPLEX, PUT THAT ASSAY RUNNING ON THE THERANOS SYSTEM.

AND THEN ON JULY 7TH, 2015, THERANOS GOT THAT FDA CLEARANCE FOR HSV-1 ON THE THERANOS SYSTEM.  AND MR. EDLIN TESTIFIED ABOUT THAT, AND WE'LL TALK ABOUT THAT SOME MORE.

SO THOSE ARE SOME OF THE LANDMARKS.

BEFORE I GET GOING INTO THE EVIDENCE, IF WE GO TO THE NEXT SLIDE, THIS IS ONE OF THE INSTRUCTIONS THAT JUDGE DAVILA WILL GIVE YOU.  AND THAT MR. BALWANI IS PRESUMED TO BE INNOCENT UNLESS AND UNTIL THE GOVERNMENT PROVES HIM GUILTY BEYOND A REASONABLE DOUBT.

IN ADDITION, MR. BALWANI DOES NOT HAVE TO TESTIFY OR PRESENT ANY EVIDENCE, HE DOES NOT HAVE TO PROVE INNOCENCE, AND THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT.

IT'S, OF COURSE, IMPORTANT TO KEEP IN MIND AS WE GO THROUGH THESE CLOSING ARGUMENTS AND AS YOU DELIBERATE, ALL OF THE INSTRUCTIONS ARE IMPORTANT, BUT THAT'S ONE THAT I WANTED TO

HIGHLIGHT AT THE BEGINNING.

ANOTHER ONE I WANTED TO MAKE SURE WE ALL HAD IN FRONT OF US BECAUSE IT'S A VERY IMPORTANT INSTRUCTION, THE GOVERNMENT HAS TO PROVE INTENT TO DEFRAUD. IT'S ONE OF THE ELEMENTS OF WIRE FRAUD, AND THAT MEANS AN INTENT TO DECEIVE AND CHEAT, THAT IS, TO DEPRIVE SOMEBODY OF MONEY OR PROPERTY BY MEANS OF DECEPTION. THAT'S THE INTENT BEYOND A REASONABLE DOUBT THAT MR. BALWANI WOULD HAVE TO HAVE FOR THE GOVERNMENT TO PROVE ITS CASE.

AGAIN, AS I SAID, YOU HAVE TO LOOK AT THIS IN REALTIME AS TO WHAT MR. BALWANI WAS SEEING, NOT WITH THE BENEFIT OF HINDSIGHT OR OUT OF PLACE TIMELINES.

AND THEN IN ADDITION, IT'S IMPORTANT TO UNDERSTAND THE GOOD FAITH INSTRUCTION. YOU CAN CONSIDER WHETHER MR. BALWANI HAD AN HONEST, GOOD FAITH BELIEF IN THE TRUTH OF SPECIFIC MISREPRESENTATIONS ALLEGED IN THE INDICTMENT IN DETERMINING WHETHER OR NOT HE ACTED WITH INTENT TO DEFRAUD.

FOR EXAMPLE, MR. BALWANI'S BELIEF BASED ON A LOT OF EVIDENCE THAT HE SAW OF THE THERANOS TECHNOLOGY WORKING AND BEING GREAT IS ONE OF THE ASPECTS OF GOOD FAITH THAT I'LL BE TALKING ABOUT.

OKAY. LET'S GO TO THE NEXT SLIDE, AND HERE'S THE ROAD MAP AGAIN. MR. BALWANI AND HIS BACKGROUND AND INTRODUCTION TO THERANOS.

WHO IS SUNNY BALWANI? THIS IS HIS BIO. THIS IS IN

SER-923

EVIDENCE.

I SHOULD MENTION IN THE BEGINNING, IN THE SLIDES I'M GOING TO SHOW YOU, YOU CAN SEE IN THE BOTTOM LEFT THERE'S A SOURCE, AND THAT'S JUST A CITATION AS TO WHERE THE MATERIAL COMES FROM.

AND AS MR. SCHENK TOLD YOU, YOU'RE NOT GOING TO HAVE MY SLIDES OR THE GOVERNMENT'S SLIDES. YOU'LL HAVE TO, YOU KNOW, JUST EITHER REMEMBER THIS OR WRITE IT DOWN IN YOUR NOTES.

SO I SEE A LOT OF YOU DO TAKE NOTES. AND IF SOMETHING OCCURS TO YOU THAT IS IMPORTANT, IT WOULD BE A GOOD IDEA TO WRITE THAT DOWN IN YOUR NOTEBOOKS SO THAT YOU'LL HAVE ACCESS TO THAT WHEN YOU DELIBERATE.

AND HERE THIS PARTICULAR BIO IS EXHIBIT -- TRIAL EXHIBIT 5805, AND IT'S AN EXHIBIT WHERE IT TALKS ABOUT, AMONG OTHER THINGS, MR. BALWANI'S BACKGROUND.

HE'S AN ENTREPRENEUR AND A COMPUTER SCIENTIST. HE JOINED THERANOS AFTER DROPPING OUT OF STANFORD UNIVERSITY COMPUTER SCIENCE PROGRAM.

HE RECEIVED A MASTER'S OF BUSINESS ADMINISTRATION, AN MBA, AT UNIVERSITY OF CALIFORNIA BERKELEY. HE RECEIVED AN UNDERGRADUATE DEGREE FROM THE UNIVERSITY OF TEXAS AT AUSTIN.

HE STARTED OUT WORKING AT LOTUS DEVELOPMENT CORPORATION, AFTER WHICH HE SERVED AT MICROSOFT IN VARIOUS ROLES. HE LATER STARTED HIS OWN COMPANY.

AND THEN IT GOES ON. HE ENDED UP SELLING THAT COMPANY TO A COMPANY CALLED COMMERCEONE.

SER-924

AND AT THE TIME THIS BIO WAS PUT FORWARD, HE WAS THE PRESIDENT AND CHIEF OPERATING OFFICER OF THERANOS.

SO THAT'S A LITTLE BIT ABOUT HIS BACKGROUND.

NOW, WHAT KIND OF COMPANY WAS MR. BALWANI JOINING WHEN HE JOINED THERANOS IN 2009?  WHAT HAD THERANOS ACCOMPLISHED?

SO THE GOVERNMENT HAS SPENT A FAIR AMOUNT OF TIME TALKING ABOUT PHARMACEUTICAL RELATIONSHIPS THAT THERANOS HAD, AND THEY'VE FOCUSSED ON TWO IN PARTICULAR.  ONE IS SCHERING-PLOUGH, A LARGE PHARMA COMPANY, AND THE OTHER ONE IS PFIZER.  BUT THEY NEVER TALK ABOUT ALL OF THE OTHER RELATIONSHIPS WITH PHARMA COMPANIES THAT THERANOS HAD.

AND IF YOU GO TO EXHIBIT 7753, WHICH IS NOTED THERE, YOU'LL SEE ALL OF THE CONTRACTS THAT THERANOS HAD WITH CELGENE; AND CENTOCOR; MAYO CLINIC, A LEADING HEALTH CARE INSTITUTION, NOT NECESSARILY A PHARMA COMPANY; MERCK, NOVARTIS; PFIZER; AND SCHERING-PLOUGH OF COURSE; ASTRAZENECA.  THE GOVERNMENT MENTIONED NONE OF THOSE.

BUT I WANT TO FOCUS ON ONE IN PARTICULAR, WHICH IS GLAXOSMITHKLINE, GSK.  SO IF WE GO TO THE NEXT SLIDE.

THIS IS AN EMAIL THAT WAS SENT FROM ELIZABETH HOLMES TO THOMAS BREUER AT GSK, GLAXOSMITHKLINE, ON DECEMBER 15TH, 2009.

AND THE CONSPIRACY THAT IS ALLEGED IN THIS CASE, BY THE WAY, ON THE INVESTOR SIDE IS FROM 2010 TO 2015.  THAT'S WHAT JUDGE DAVILA WILL TELL YOU DURING THE INSTRUCTIONS.  THIS IS BEFORE THAT, THIS IS IN DECEMBER OF 2009.

SER-925

IT'S JUST SHORTLY AFTER MR. BALWANI JOINED THE COMPANY. SO HE DIDN'T JOIN THE COMPANY FOR THE PURPOSE OF COMMITTING FRAUD. BUT IN DECEMBER OF 2009, HE'S INFORMED OF THIS, WHICH IS ELIZABETH HOLMES SENDING NOT TO JUST WALGREENS OR AN INVESTOR, BUT TO GSK ITSELF AN EMAIL WITH SOME DOCUMENTS ATTACHED.

AND WHAT DOES IT SAY? "IT WAS GREAT TO MEET YOU. FOLLOW UP TO OUR CONVERSATION I'VE ATTACHED THREE DOCUMENTS."

THERE'S A SUMMARY, AND "THE SECOND --" AND THAT'S WHAT I'VE HIGHLIGHTED HERE -- "IS A COPY OF THE VALIDATION REPORT FROM THE GSK STAFF WHO TESTED THERANOS TECHNOLOGIES IN RTP," RESEARCH TECHNOLOGY PARK.

"AS YOU CAN SEE IN THAT ATTACHMENT, GSK'S LAB DIRECTOR CONCLUDED THAT THERANOS SYSTEMS ELIMINATE THE NEED FOR A LAB. THE REPORT SHOWS THE ABILITY TO GET BETTER SENSITIVITY AND REAL TIME DATA USING THERANOS."

THIS IS NOT MS. HOLMES REPRESENTING THIS TO SOME INVESTOR. THIS IS MS. HOLMES SAYING THIS BACK TO GSK. AND IT SAYS, "THE SECOND IS A COPY OF THE VALIDATION REPORT FROM THE GSK STAFF."

NOW, THIS IS WHAT MR. BALWANI IS INFORMED OF IN DECEMBER OF 2009.

AND IF YOU GO TO THE NEXT PAGE, THIS IS A PAGE FROM ONE OF THE SOME OF THE MATERIALS ATTACHED TO THAT SAME EMAIL, AND THIS HAPPENS TO BE ON PAGE 6 OF THE EXHIBIT.

AND IT SAYS, "THERANOS AND GSK.

"GSK COMPLETED A COMPREHENSIVE VALIDATION OF THERANOS SYSTEMS IN 2008.

"VALIDATION WAS INDEPENDENTLY CONDUCTED RUN BY GSK STAFF AT RTP."

"VALIDATION CONCLUDED THERANOS SYSTEMS ELIMINATE THE NEED FOR A LAB."

AND THEN IT GOES ON LATER.

AND THEN IT SAYS, "THERANOS AND GSK HAVE FULLY EXECUTED MSA," AN AGREEMENT.

SO WHEN MR. BALWANI GETS THIS, WHAT WOULD HE TAKE AWAY FROM THIS?

WOULD HE TAKE AWAY WHAT THE GOVERNMENT IS TELLING YOU, WHICH IS, OH, YEAH, THIS IS SOME KIND OF FRAUDULENT OPERATION?

OR WHEN HE SEES THAT THERE'S AN EMAIL BEING SENT TO GSK WITH THIS INFORMATION, HE WOULD TAKE AWAY, YEAH, IT LOOKS LIKE GSK COMPREHENSIVELY VALIDATED THE THERANOS SYSTEM.

AND LET'S LOOK AT THAT IN PARTICULAR.  IF WE GO TO THE NEXT PAGE, THIS IS FROM THE SAME ATTACHMENTS TO THE EMAILS, EXCERPTS FROM THE GSK METABOLIC STUDY REPORT.

IT SAYS, "BACKGROUND INFORMATION:

"THE THERANOS SYSTEM WAS EVALUATED AT GSK TO PROFILE ACTIVE GLP-1 AND C-PEPTIDE VALUES AND THESE DATA WERE COMPARED TO GOLD STANDARD ELISA'S," AND IT GOES ON.

"THE KEY PROJECT OBJECTIVES FOUND IN THE ATTACHED STATEMENT WERE," AND AMONG OTHER THINGS, "TO ASSESS THE

CLOSING ARGUMENT BY MR. COOPERSMITH                    7113

FUNCTIONALITY, SPECIFICITY, REPRODUCIBILITY, ACCURACY, AND

PRECISION OF THE THERANOS SYSTEM AND TO ASSESS THE THERANOS

DATA REPORTING AND TRANSFER FUNCTIONS."

IT TALKS ABOUT 30 PLASMA SAMPLES BEING CHOSEN.

AND THEN THE "GSK METABOLIC BIOMARKER LAB COMMENTS:

"DATA SHOWED GOOD CORRELATION," WITH THE R2'S, WHICH WE'LL

TALK ABOUT MORE LATER, "INTER-INSTRUMENT PRECISION;

"MACHINES WORKED WELL;

"TOUCH-SCREEN INTERFACE WAS EASY TO USE;

"CARTRIDGES WERE PRETTY STRAIGHTFORWARD (EASY TO HANDLE

AND LOAD);

"ASSAYS TOOK APPROXIMATELY 1 HOUR AND 15 MINUTES PER

CARTRIDGE.

AND THE OVERALL CONCLUSION, "THE METABOLIC BIOMARKER LAB

HAS A FAVORABLE IMPRESSION OF THE TECHNOLOGY, SYSTEM AND

RECOMMENDS GSK CLINICAL GROUPS TO WORK WITH THERANOS."

IF YOU GO TO THE TOP OF THIS PAGE, YOU CAN SEE RIGHT THERE

THIS IS DOCUMENTS BEING SENT TO GSK, IT HAS A GSK,

GLAXOSMITHKLINE LOGO, AND THE THERANOS LOGO.

AND SO THE GOVERNMENT DIDN'T TALK ABOUT THIS EXHIBIT,

DIDN'T SHOW IT TO YOU, AND DIDN'T TALK ABOUT GSK, AND DIDN'T

TALK ABOUT ALL OF THE PHARMA RELATIONSHIPS.  WE HAVE TO SHOW

YOU THAT.

WHAT WOULD MR. BALWANI HAVE THOUGHT AFTER HE SEES THAT IN

TERMS OF THE TECHNOLOGY BEING GREAT.

SER-928

AND WE TALKED DURING THE TRIAL, AND I MENTIONED A FEW MOMENTS AGO ABOUT THE LOAN AGREEMENT. I JUST WANT TO SHOW YOU THOSE DOCUMENTS.

THIS IS IN AUGUST OF 2009, BEFORE ANY ALLEGED CONSPIRACY. MR. BALWANI GUARANTEED THE LOAN. THIS IS ONE OF THE DOCUMENTS THAT ACCOMPLISHES THAT.

AND AS YOU'VE HEARD FROM MS. SPIVEY, WHAT HE ACTUALLY DOES HERE, IT'S $10 MILLION. HE HAS TO PUT THAT ASIDE AND NOT USE IT. THAT'S THE COLLATERAL.

AND THEN IF THERANOS WERE TO DEFAULT ON THAT LOAN, THEN THE LENDER, WHICH WAS FIDELITY, JUST TAKES THE MONEY. SO IT'S THE SAME THING ECONOMICALLY AS IF MR. BALWANI WOULD HAVE LENT THE MONEY DIRECTLY TO THERANOS BECAUSE IN THE CASE OF A DIRECT LOAN, IF THERANOS DOESN'T REPAY THE MONEY, OF COURSE MR. BALWANI WOULD LOSE THE MONEY.

IN THIS CASE, IF THERANOS DOESN'T PAY BACK THE LOAN, FIDELITY TAKES THE MONEY FROM MR. BALWANI. SO IT'S ESSENTIALLY A LOAN TO THERANOS FROM MR. BALWANI AND THAT WAS $10 MILLION. NOT OF MONEY HE GOT FROM INVESTORS OR ANYTHING LIKE THAT. IT WAS MR. BALWANI'S OWN HARD EARNED MONEY THAT HE PUT UP.

NOW, LATER THAT LOAN WAS INCREASED TO $10 MILLION, AND THAT'S THE EMAIL THAT SHOWS THAT. HE HAS TO CONFIRM TO MR. BERMEL THAT HE'S OKAY WITH INCREASING THE LINES FROM 10 TO 12 MILLION. AND HE SAYS, YES, HE'S FINE.

AND SO ULTIMATELY, MR. BALWANI WAS ON THE HOOK FOR

$12 MILLION. HE DID THAT BECAUSE HE'S JOINING A COMPANY THAT HAS ACCOMPLISHED GREAT THINGS ALREADY WITH ITS BOARD, WITH ITS PHARMA RELATIONSHIPS. IT'S NOT JUST BECAUSE HE WANTS TO GIVE MONEY TO HIS GIRLFRIEND OR SOMETHING LIKE THIS. THIS IS WAY, WAY BEYOND THAT.

DID MR. BALWANI OBTAIN ANY GREAT RICHES OR ANY RICHES FROM THERANOS? NO.

HIS SALARY WAS SET AT $99,000 PER YEAR. THIS IS A COMPANY THAT AT THE HEIGHT OF IT, WHEN THE SHARES WERE $17, IT WAS VALUED AT ABOUT $9 BILLION. THAT IS A $9 BILLION COMPANY. MR. BALWANI WAS EARNING $99,000 A YEAR.

IT'S NOT BAD MONEY. IT'S PERFECTLY GOOD. BUT THIS ISN'T TRYING TO PROFIT IN ANY WAY FROM THERANOS OR ITS INVESTORS OR ITS PATIENTS.

OKAY. HOW DID MR. BALWANI END UP JOINING THERANOS?

WELL, THE GOVERNMENT HAS SUGGESTED THAT IT WAS MR. BALWANI'S GIRLFRIEND GIVING HIM A SPOT AT THE COMPANY.

WELL, AS WE SAW, IT WAS THE BOARD THAT APPOINTED MR. BALWANI TO THE BOARD. AND THE BOARD WAS CONSISTING AT THAT TIME OF PROFESSOR ROBERTSON FROM STANFORD; DON LUCAS; ROBERT SHAPIRO; PETER THOMAS; AND ELIZABETH HOLMES. SO MS. HOLMES HAD ONE VOTE.

AND HERE IS WHAT THE BOARD SAID IN THE MINUTES OR WHAT THE MINUTES REFLECT. THE BOARD DISCUSSED ADDING A NEW DIRECTOR TO THE BOARD AND REVIEWED SEVERAL CANDIDATES FOR CONSIDERATION.

SER-930

AFTER DISCUSSION, THE BOARD UNANIMOUSLY AGREED TO ELECT RAMESH "SUNNY" BALWANI AS VICE CHAIRMAN.

SO THAT'S THE EVIDENCE OF WHAT HAPPENED, NOT WHAT THE GOVERNMENT TOLD YOU IN OPENING OR IN CLOSING.

LATER, JUST TO ROUND OUT THAT PICTURE, MR. BALWANI WAS MADE FORMALLY PRESIDENT AND COO. AND AGAIN, THESE ARE THE BOARD MINUTES THAT REFLECT THIS CORPORATE ACTION.

THE BOARD THEN APPROVED THE ADDITION OF AN OPERATIONAL TITLE OF PRESIDENT AND COO OF SUNNY BALWANI AFTER DISCUSSING HIS PERFORMANCE AND CONTRIBUTIONS AND OPERATIONAL ROLE.

SO THIS IS ABOUT A YEAR OR SO INTO MR. BALWANI'S TIME AT THERANOS, AND AFTER DISCUSSING HIS PERFORMANCE AND CONTRIBUTIONS, THE BOARD DECIDED TO BESTOW THOSE TITLES ON HIM.

NOW, DURING THE COURSE OF THE TRIAL THE GOVERNMENT HAS SUGGESTED WITH INVESTORS THAT THE RELATIONSHIP BETWEEN MR. BALWANI AND MS. HOLMES WAS SOME KIND OF SECRET. I MEAN, IT SEEMS CLEAR FROM THE EVIDENCE THAT THEY DIDN'T COME TO THE OFFICE WEARING THEIR HEARTS ON THEIR SLEEVE OR ENGAGE IN PUBLIC DISPLAYS OF AFFECTION OR THINGS LIKE THAT. THAT WOULD HAVE BEEN INAPPROPRIATE AND NOT PROFESSIONAL.

AND THE FACT THAT THEY CONDUCTED THEMSELVES PROFESSIONALLY DOESN'T MEAN THAT INVESTORS WERE DECEIVED ON THIS. AND HERE IS CHRIS LUCAS WHO KNEW FULL WELL ABOUT THE ROMANTIC RELATIONSHIP. SO DID BRYAN TOLBERT, WHO HAD A LOT OF CONTACT WITH CHRIS LUCAS.

SER-931

AND THIS WASN'T A SECRET.  IT WASN'T A SECRET TO THE BOARD.  IN FACT, CHRIS LUCAS HEARD THIS FROM DON LUCAS WHO WAS ON THE BOARD.

SO HAS REALLY NOTHING TO DO WITH THIS CASE, ALTHOUGH IN THE COURSE OF THIS TRIAL YOU'VE HEARD SOME THINGS ABOUT THAT FROM THE GOVERNMENT.

I MENTIONED A FEW MINUTES AGO MR. BALWANI'S PURCHASES OF STOCK.  THIS IS IMPORTANT.  AND IT'S NOT WHAT THE GOVERNMENT SAID BECAUSE, OH, ONCE HE PURCHASED STOCK, HE HAD SKIN IN THE GAME.  HE DIDN'T HAVE TO DO THIS.  LET ME EXPLAIN HOW THIS WORKS, OKAY?

SO WHAT MR. BALWANI OBTAINED -- AND THIS COMES FROM MS. SPIVEY'S TESTIMONY.  SHE WENT IN THOSE TIMES AS DANISE YAM, BUT HER NAME IS SO HAN SPIVEY.

AS SHE TOLD YOU, THESE ARE STOCK OPTIONS.  SO WHAT MR. BALWANI HAD WAS THE RIGHT TO BUY STOCK AT A CERTAIN PRICE. HE DIDN'T HAVE THE STOCK.  AND HAVING THE STOCK OPTION DOESN'T MEAN YOU HAVE TO DO ANYTHING.  YOU DON'T HAVE TO PAY MONEY TO THE COMPANY.  THE SMART THING TO DO MIGHT BE TO JUST HOLD THE STOCK OPTION, WAIT TO SEE IF THE COMPANY IS SUCCESSFUL, AND THEN GIVE THE MONEY TO THE COMPANY IF IT'S GOING TO WORK OUT.

SO, FOR EXAMPLE, IF YOU HAD A STOCK OPTION THAT ALLOWED YOU TO BUY STOCK AT A DOLLAR PER SHARE, AND YOU JUST HELD ON TO THE STOCK OPTION, AND THEN A FEW YEARS LATER, THE STOCK WAS WORTH $20 A SHARE, WELL, YOU COULD BUY THAT STOCK AT $1 AND YOU

SER-932

WOULD HAVE SOMETHING WORTH $20, AND IF YOU HAD MANY SHARES, THAT COULD BE A LOT OF MONEY.  SO MR. BALWANI COULD HAVE JUST DONE THAT.

INSTEAD, WHAT HE DID WAS HE ACTUALLY BOUGHT THE STOCK ON THESE DAYS, APRIL 2010, AUGUST 2011, AND DECEMBER OF 2011.  HE ACTUALLY BOUGHT THE STOCK.  DIDN'T HOLD THE OPTIONS.  ONLY SOMEONE WHO BELIEVES IN THE COMPANY AND ITS TECHNOLOGY WOULD DO THAT BECAUSE OTHERWISE YOU COULD JUST HEDGE YOUR BETS, JUST WAIT, JUST HOLD THE STOCK OPTIONS AND SEE IF EVERYTHING WORKS OUT, AND THEN MAKE THE MONEY, AND THEN PAY THE MONEY TO GET EVEN MORE.

HERE, WHAT HE ACTUALLY DID WAS PAID THE COMPANY THESE DOLLARS, AND IT ENDED UP BEING $4,680,000.  THAT'S WHAT MR. BALWANI DID.  SO NOTHING IN THIS CASE SHOWS THAT ANYONE WAS FORCING HIM TO DO THAT.  HE COULD OF JUST WAITED.  HE DIDN'T HEDGE HIS BET.  HE WAS ALL IN, LITERALLY ALL IN.

OKAY.  LET'S TALK ABOUT THERANOS'S BUSINESS AND TECHNOLOGY AND BACK TO THE ROAD MAP THERE FOR A MINUTE.

SO THIS IS A PICTURE OF THE EDISON 3.5.  AND YOU CAN SEE THE TOUCHSCREEN, AND IT CAN SHOWS APPS ON THE TOUCHSCREEN, AND THIS WAS A BLOOD TESTING DEVICE THAT WAS IN USE, IN ACTUAL USE IN THE CLINICAL LAB THAT THERANOS HAD DEVELOPED.

THE NEXT PICTURE, THOUGH, IS WHAT IS KNOWN AS THE THERANOS 4S.  THIS WAS THE NEXT GENERATION DEVICE, THE DEVICE THAT THEY WERE USING GENERATING OR DEVELOPING FOR THE U.S. MILITARY, AND

SER-933

IT HAS THESE PARTS THAT ARE SHOWN HERE IN THE BLOWUP.

FOR EXAMPLE, THERE'S A SPECTROPHOTOMETER, THERE'S A CENTRIFUGE, THERE'S A CYTOMETER, THERE'S A CARTRIDGE, AND SLIGHTLY TO THE LEFT THERE'S A CARTRIDGE, AND THERE'S A PICTURE.

AND THEN IN THE FRONT OF THE MACHINE YOU CAN SEE THERE'S A LITTLE SLOT.  SO WHAT HAPPENS IS IN THE CARTRIDGE, THAT'S WHERE THE REAGENTS ARE, THE CHEMICALS THAT ARE INTERACTING WITH THE BLOOD TO CREATE A RESULT.  AND THEN THE BLOOD TEST, THE BLOOD SAMPLE RATHER WOULD GO IN THAT CARTRIDGE, AND ALL OF THAT GETS INSERTED INTO THE SLOT INSIDE OF THAT MACHINE.  AND INSIDE OF THE MACHINE, YOU CAN SEE ON THE TOP THERE'S A MATERIAL HANDLING ROBOT WHERE ROBOTIC ARMS IN A ROBOTIC WAY WOULD TAKE THE RIGHT AMOUNT OF CHEMICAL OR REAGENT FROM THE STORAGE MIXED WITH THE BLOOD SAMPLE AND SO FORTH TO EVENTUALLY GENERATE A RESULT.  SO THAT'S WHAT THE THERANOS TECHNOLOGY WAS.  THAT'S THE CONCEPT.

3.5 WAS ESSENTIALLY SIMILAR.  ALTHOUGH AS YOU HEARD, 3.5 WAS RUNNING, COULD RUN IMMUNOASSAYS, WHICH IS ONE TYPE OF BLOOD TESTING.  AS YOU'LL SEE IN A MINUTE, THIS DEVICE COULD RUN ALL OF THE DIFFERENT FORMS OF BLOOD TESTING, IMMUNOASSAYS, CYTOMETRY, NUCLEIC ACID AMPLIFICATION AND GENERAL CHEMISTRY.

FROM THE VERY BEGINNING, INVESTORS, IN THIS CASE CHRIS LUCAS, WERE TOLD THAT OVER TIME THERANOS WOULD CONTINUE TO REFINE ITS TECHNOLOGY AND THAT OVER TIME THE TECHNOLOGY WOULD BE ABLE TO DO MORE AND MORE.  THIS WAS ALL OF THE WAY

SER-934

BACK IN 2006 BEFORE MR. BALWANI'S TIME AT THERANOS, BUT THAT'S WHAT MS. HOLMES AND THERANOS HAD INFORMED MR. LUCAS AT THE TIME, THAT THERE WOULD BE PROGRESS.

AND, OF COURSE, WE KNOW FROM COMMON SENSE THAT'S ALWAYS THE CASE WITH A COMPANY. WHATEVER PRODUCT YOU DEVELOP, COMPANIES ARE ALWAYS LOOKING TO IMPROVE THEIR PRODUCT, ADD MORE FEATURES, MAKE IT MORE USER FRIENDLY AND SO FORTH.

STICKING WITH THE TOPIC OF THERANOS TECHNOLOGY, THIS IS A COMPARISON OF YOUR STANDARD BLOOD VIAL, WHICH ARE THE FOUR TUBES ON THE LEFT WITH THE SIZE OF THE NANOTAINER.

WHAT THIS PICTURE DOESN'T SHOW YOU IS THE CAPILLARY TUBE PART. SO THE NANOTAINER IS THE SMALL CONTAINER THAT WOULD HOLD THE SMALL AMOUNT OF BLOOD FOR THE THERANOS FINGERSTICK TEST, AND THEN IN PRACTICE THERE WOULD BE THE PART CALLED THE CAPILLARY TUBE THAT ACTUALLY PUNCTURES THE FINGER, AND THEN THE BLOOD WOULD, BY WHAT IS CALLED THE CAPILLARY ACTION, COME INTO THE TUBE, BE LOADED INTO THE NANOTAINER. ULTIMATELY, THIS NANOTAINER WOULD TAKE THE PLACE OF THE VIALS OF BLOOD. THAT WAS THE CONCEPT.

YOU ALSO HEARD A LOT ABOUT MODIFIED PREDICATES, AND BY NOW EVERYONE PROBABLY KNOWS WHEN WE SAY "PREDICATES" WE'RE TALKING ABOUT COMMERCIAL BLOOD TESTING EQUIPMENT. SOMETIMES WE REFER TO THEM AS FDA APPROVED DEVICES OR UNMODIFIED COMMERCIAL DEVICES.

THERANOS MODIFIED PREDICATE DEVICES LIKE THE DEVICE CALLED

SER-935

THE SIEMENS ADVIA, BUT OTHERS AS WELL, TO ALLOW THOSE DEVICES TO TEST VERY SMALL SAMPLES.  THAT'S NOT WHAT THEY WERE SOLD FOR, BUT THERANOS WITH ITS TEAM MODIFIED THESE FOR THAT REASON.

THIS WAS, WHAT I'M SHOWING YOU HERE, WAS THE PROVISIONAL PATENT APPLICATION WHAT THERANOS FILED WITH THE U.S. PATENT AND TRADEMARK OFFICE.

AS JUDGE DAVILA TOLD YOU WHEN THIS DOCUMENT WAS ADMITTED, THIS IS ADMITTED FOR SHOWING THAT THERE WAS SUCH A PATENT APPLICATION FILED.  AND I JUST WANT TO SHOW YOU WHAT IT ACTUALLY SAYS.

THE TITLE OF THE INVENTION HERE, DANIEL YOUNG IS ONE OF THE INVENTORS, YOU CAN SEE HIGHLIGHTED THERE.  IT'S DEVICES, METHODS AND SYSTEMS FOR REDUCING SAMPLE VOLUME.

IF YOU GO TO THE NEXT PAGE, THIS IS EXHIBIT 20830.  THIS SHOWS WHAT THE DESCRIPTION OF WHAT THOSE MODIFICATIONS REALLY WERE AS THERANOS REPORTED TO THE PATENT OFFICE.

AND IF YOU GO TO THE NEXT PAGE, IT SAYS THAT AT THE BOTTOM THERE, "APPLICANTS PROVIDE METHODS FOR MODIFYING A CLINICAL ANALYSIS DEVICE."

SO THERANOS NOT ONLY MODIFIED THE PREDICATE MACHINES OR THE COMMERCIAL MACHINES, BUT ALSO FILED A PATENT APPLICATION TO PRESERVE WHAT THEY BELIEVED OBVIOUSLY WAS IMPORTANT TECHNOLOGY THAT THE COMPANY WANTED TO PROTECT.

THE GOVERNMENT HAS SAID THAT WAS SOME KIND OF SECRET, THAT THEY WERE MODIFYING PREDICATES.  WELL, HERE'S THE PATENT

SER-936

APPLICATION THAT THEY FILED ABOUT THOSE MODIFIED PREDICATES.

THERANOS HAD, JUST CONTINUING ON AGAIN WITH THE TOPIC OF THERANOS'S TECHNOLOGY, THERANOS HAD SOFTWARE. YOU HEARD MR. BALWANI HAD A SOFTWARE BACKGROUND AND WAS INVOLVED WITH SOFTWARE.

YOU KIND OF HAVE TO REMEMBER AT THE TIME GOING BACK TO 2013 OR SO, HAVING APPS ON YOUR PHONE TO PROVIDE HEALTH CARE INFORMATION, THAT SEEMS MAYBE COMMONPLACE NOW, THAT WASN'T NECESSARILY THE CASE THEN, BUT THERANOS HAD DEVELOPED THAT, AND HERE'S SOME OF THE TECHNOLOGY SHOWN HERE ON THIS PICTURE, APPS ON THE PHONE AND TRYING TO MAKE THIS A VERY USER FRIENDLY EXPERIENCE. THAT WAS PART OF THERANOS'S MISSION.

ANOTHER PART OF THERANOS'S BUSINESS WAS THE LIS SYSTEM, THE LABORATORY INFORMATION SYSTEM. AS MR. SONNIER TOLD YOU, THIS IS WHAT A MICROSOFT SQL SERVER CONFIGURATION WOULD LOOK LIKE. THIS MAY NOT BE EXACTLY WHAT THERANOS'S LABORATORY INFORMATION SYSTEM CONFIGURATION LOOKED LIKE, BUT MR. SONNIER TESTIFIED THAT THIS WAS STANDARD ACCORDING TO ALL OF THE DOCUMENTATION HE LOOKED AT AS A BASIS FOR HIS OPINION, PRETTY STANDARD MICROSOFT SQL SERVER, AND THIS IS WHAT A MICROSOFT SQL SERVER LOOKS LIKE. THAT WAS ANOTHER THING THAT THERANOS, OF COURSE, DEVELOPED TO STORE ALL OF THE PATIENT DATA, THE QUALITY CONTROL INFORMATION, AND OTHER DATA ABOUT LABORATORY TESTING.

LET'S GO TO THE NEXT SLIDE.

THIS IS A PHOTO THAT YOU SAW WHEN MS. SPIVEY WAS

SER-937

TESTIFYING SOME MANY MONTHS AGO. IT IS PART OF THERANOS'S MANUFACTURING FACILITY. AND OBVIOUSLY THIS REPRESENTS A LOT OF INVESTMENT TO DEVELOP A MANUFACTURING FACILITY OF THIS KIND OF SCALE. AND YOU WOULD ONLY DO THAT IF YOU WERE EXPECTING TO HAVE A RAMP UP TO NEEDING A LOT OF THERANOS EQUIPMENT TO USE IN THE BUSINESS, OTHERWISE THERE'S NO POINT IN INVESTING IN THIS TYPE OF SCALE OF MANUFACTURING.

OKAY. I MENTIONED DR. GIBBONS. AND WE'RE STILL IN 2010 HERE. DR. GIBBONS WAS A CHIEF SCIENTIST. IT IS TESTIMONY FROM DAN EDLIN ABOUT WHO DR. GIBBONS WAS. HE WAS ONE OF THE CHIEF SCIENTISTS AT THERANOS.

IN 2010, DR. GIBBONS SENT AN EMAIL TO MR. BALWANI, AND HE'S ACTUALLY COPIED. IT'S TO ELIZABETH HOLMES AND OTHERS, AND HE'S COPIED. BUT THIS IS WHAT MR. BALWANI IS INFORMED IN OCTOBER OF 2010.

DR. GIBBONS, "I THINK WE HAVE DEMONSTRATED CAPABILITIES FULLY EQUIVALENT TO LAB METHODS IN AREAS WHERE WE HAVE DONE ASSAY DEVELOP. OUR IMMUNOASSAYS MATCH THE BEST THAT CAN BE DONE IN CLINICAL LABS AND WORK WITH SMALL BLOOD SAMPLES. GENERALLY OUR ASSAYS ARE FASTER BY A FACTOR OF THREE TO TEN THAN KITS. OUR DYNAMIC RANGE CAPABILITY IS MORE THAN TEN FOURTH FOLD BETTER THAN ANY OTHER SYSTEM. OUR SENSITIVITY IS STATE OF THE ART.

"WE HAVE ALSO SHOWN ABILITIES TO WORK IN ALL ASSAY AREAS (CYTOMETRY, NUCLEIC ACID, GENERAL CHEMISTRY, AND IMMUNOASSAY)."

SER-938

AND THEN IT GOES ON, "COST SAVINGS WILL ACCRUE FROM SMALL SAMPLE SIZE AND NO BLOOD DRAW REQUIREMENT."

SO MR. BALWANI IS INFORMED ABOUT THIS NOT BY MR. HOLMES BUT BY THE CHIEF SCIENTIST, AT THE TIME DR. GIBBONS.  THAT'S WHAT DR. GIBBONS SAYS THE TECHNOLOGY IS CAPABLE OF.

SO YOU WONDER WHY MR. BALWANI WOULD WANT TO PUT HIS MONEY INTO THIS COMPANY, AND HIS TIME, AND HIS YEARS, AND ALL OF HIS EFFORTS.

SO WHAT HAPPENS?  THERANOS HAS A MASSIVE RESEARCH AND DEVELOPMENT EFFORT.

WE MENTIONED BEFORE, THE PURPOSE OF THIS IS TO DEVELOP SMALL SAMPLE ASSAYS, THE ABILITY TO DO LOTS AND LOTS OF THESE BLOOD TESTS ON A VERY SMALL SAMPLE.  AND THEY HAVE A WORLD CLASS SCIENTIFIC TEAM TO DO THAT.

YES, MR. BALWANI OVERSAW THE CLINICAL LAB EVENTUALLY FROM AN OPERATIONAL STANDPOINT, BUT MR. BALWANI IS NOT THE SCIENTIST WHO IS DEVELOPING THESE ASSAYS.  THERE WERE PEOPLE WHO WERE VERY DEDICATED WHO WERE WORKING ON THAT PROJECT.

LET'S LOOK AT EVEN WHAT DR. ROSENDORFF SAID ABOUT THIS.  I THINK AT THE TIME I DIDN'T WANT TO LIFT ALL OF THESE BINDERS AGAIN BECAUSE I LIFTED THEM WITH MS. CHEUNG, BUT IT WOULD NOT SURPRISE DR. ROSENDORFF TO LEARN THAT THESE ASSAY DEVELOPMENT REPORTS FILLED SIX BINDERS, AND THAT WAS CONSISTENT WITH HIS MEMORY OF BEING AT THERANOS THAT HE WORKED ON.

SO DR. ROSENDORFF KNEW THERE WAS A LOT -- A TON OF ASSAY

DEVELOPMENT WORK DONE.

AND THEN THERE WERE PARTICULAR EMAILS THAT MR. BALWANI WAS INFORMED ABOUT.  SO THIS IS CHINMAY PANGARKAR, DR. PANGARKAR, ANOTHER PERSON WHO YOU DIDN'T HEAR FROM.

BUT HERE IN 2012 HE SAYS, "HI ELIZABETH.

"ASSAY DEVELOPMENT AND CLINICAL STUDY SUMMARY REPORTS FOR ALL CYTOMETRY ASSAYS ARE LOCATED IN THE FOLLOWING LOCATION."

AND THEN HE SAYS, "SOME COMMENTS TO GO WITH THESE REPORTS:

"REPORTS HAVE BEEN WRITTEN TO DEMONSTRATE.

"THAT THERE IS SOUND SCIENCE AND METHOD DEVELOPMENT BEHIND OUR ASSAYS.

"THAT OUR ASSAYS GIVE RESULTS THAT AGREE WITH PREDICATE METHODS WITHIN CLIA PRESCRIBED LIMITS."

SO THIS IS WHAT MR. BALWANI -- OR RATHER DR. PANGARKAR IS REPORTING AT THE TIME.

IN APRIL OF 2013 HERE'S ANOTHER EXHIBIT THAT MR. BALWANI GETS INFORMATION ABOUT THIS PROCESS.  THIS IS AN EMAIL FROM DR. YOUNG TO MR. BALWANI AND DR. YOUNG REPORTS, "FOR THE TOP 75 WHOLE BLOOD TESTS, ONLY THE FOLLOWING ARE STILL UNDER DEVELOPMENT," AND THEN HE LISTS A FEW THAT ARE UNDER DEVELOPMENT.

SO TROPONIN AND MALARIA ARE NOT QUITE READY, BUT THEN THERE ARE 75 OTHER WHOLE BLOOD TESTS THAT DR. YOUNG IS SAYING ARE READY.

AND THEN HE SAYS, "THE FOLLOWING STILL NEED FINAL

SER-940

INTEGRATION ON THE DEVICE."

SO WHENEVER THEY DEVELOP SMALL SAMPLE ASSAYS, NOW THEY HAVE TO INTEGRATE THEM ONTO THE DEVICE, AND THERE ARE JUST A FEW OF THOSE THAT ARE LISTED.

THEN DR. YOUNG GOES ON AND SAYS, "THE FLU TESTS AND STEP A ARE 95 PERCENT COMPLETED. THEY ARE STILL COMPLETING THE PRE-VALIDATION BEFORE MOVING THE TESTS TO CLIA FOR VALIDATION."

SO WHEN THE GOVERNMENT ASKS QUESTIONS OF WITNESSES ABOUT HOW THE THERANOS DEVICE CAN ONLY DO 12 TESTS, THAT'S SIMPLY NOT TRUE. IT CAN DO A LOT OF TESTS.

WHETHER THEY ACTUALLY PUT THOSE TESTS INTO THE CLIA LAB, AS I'LL TALK ABOUT SOME MORE, THERE ARE BUSINESS DECISIONS THAT GO INTO THAT.

BUT IN TERMS OF WHAT IT COULD DO, THE EVIDENCE IS THE OPPOSITE OF WHAT THE GOVERNMENT IS TRYING TO SUGGEST IN THIS CASE.

SO LET'S TALK SOME MORE ABOUT THE ASSAY DEVELOPMENT PROCESS.

SO THIS IS AN EMAIL FROM SUREKHA GANGADKHEDKAR. AND SHE WRITES ON AUGUST 24TH, 2013, TO DANIEL YOUNG AND ADAM ROSENDORFF.

"ATTACHED ARE THE DEVELOPMENT REPORTS FOR TSH AND TPSA AND THE VALIDATION PLAN FOR TSH."

SO THOSE ARE THE TWO ASSAYS THAT YOU HAVE HEARD ABOUT DURING THE COURSE OF THE TRIAL, THYROID SPECIFIC HORMONE AND

THERANOS PROSTATE SPECIFIC-ANTIGEN, PSA.

AND THEN SHE GOES ON TO SAY, "AS DISCUSSED IN THE MEETING WITH ELIZABETH, PLEASE REVIEW THE DATA IN THE DEVELOPMENT REPORTS FOR USABILITY TOWARDS VALIDATION AND PROPOSE WHAT WILL BE NEEDED FOR VERIFICATION FOR THE 3.5 SYSTEM AND THE PRE-DILUTIONS."

SO WHAT IS GOING ON HERE, AND YOU HEARD ABOUT THIS FROM DR. ROSENDORFF AMONG OTHERS, AND I THINK MS. CHEUNG AS WELL, THAT THERE'S A PROCESS OF DEVELOPMENT AND ASSAYS ARE DEVELOPED IN THE RESEARCH AND DEVELOPMENT LAB, BUT THAT'S NOT ENOUGH.  TO USE IT FOR PATIENT TESTING, YOU HAVE TO GO FURTHER AND DO THIS CLIA VALIDATION PROCESS.

AND THIS IS JUST AN EXAMPLE OF THAT TECHNOLOGY DEVELOPED IN R&D BEING -- STARTING TO BE TRANSFERRED TO THE CLINICAL LAB, AND THIS IS IN AUGUST OF 2013 BEFORE THE WALGREENS LAUNCH.

TO SHOW YOU WHAT ONE OF THESE LOOK LIKE, THIS IS THE ASSAY DEVELOPMENT REPORT FOR THE PSA ASSAY.

AND IF YOU GO TO THE NEXT PAGE, THE CONCLUSION IS THAT, "WE HAVE SUCCESSFULLY DEVELOPED AN IMMUNOASSAY TO DETECT TOTAL PROSTATE-SPECIFIC ANTIGEN (PSA) IN HUMAN SERUM AND PLASMA."

SO THIS IS JUST THE R&D SIDE.  IN ORDER TO PUT THAT PSA ASSAY INTO CLINICAL USE FOR PATIENTS, THERE HAS TO BE FURTHER PROCESS, AND WE'LL SEE SOME OF THAT IN A MINUTE WHERE DR. ROSENDORFF SIGNS OFF ON THESE VALIDATION REPORTS AND WHY HE DID THAT.

OKAY. THE NEXT SLIDE.

THIS IS AN EMAIL, AND I'M JUST GOING THROUGH THE DIFFERENT TYPES OF ASSAYS. YOU KNOW, WE'VE LOOKED AT CYTOMETRY, WE LOOKED AT IMMUNOASSAYS. THIS HAS TO DO WITH TNAA, THERANOS NUCLEIC ACID AMPLIFICATION. THIS IS LIKE YOUR PCR TEST BASICALLY.

AND THERE'S AN UPDATE FROM DR. PATEL TO MR. BALWANI, DR. YOUNG, AND DR. ROSENDORFF. AND HE'S GIVING A BRIEF UPDATE TOWARDS THE JANUARY 31ST GOAL. "ASSAY DEVELOPMENT 76 ASSAYS ARE COMPLETE AND 16 ARE IN PROGRESS. 5 OF 16 IN PROGRESS ARE 90 PERCENT COMPLETE. LDT VALIDATION, 13 ASSAYS, LDT VALIDATED WITH FURTHER 4 -- 90 PERCENT DONE."

AND THEN THERE'S MORE THAT GOES ON.

SO THIS IS ABOUT NUCLEIC ACID AMPLIFICATION ASSAYS THAT ARE BEING DEVELOPED AT THERANOS, RIGHT?

AND AGAIN, WE'LL TALK ABOUT THESE MORE. BUT WHY ARE THESE NOT BEING PUT INTO THE CLIA LAB?

WELL, THERE'S A LOT OF REASONS, AND IT HAS TO DO WITH WALGREENS'S RELATIONSHIP WITH THERANOS AND HOW THEY MUTUALLY DECIDED TO GO WITH WHAT IS CALLED A PHASE I WHERE THEY WOULD HAVE A CENTRAL LAB, THE BLOOD SAMPLES WOULD BE COLLECTED AT WALGREENS AND TRANSPORTED TO A CENTRAL LABORATORY THAT THERANOS RAN. AND IT WAS JUST NOT NECESSARY TO PUT ALL OF THESE ASSAYS ONTO THE THERANOS ANALYZERS BECAUSE THEY WERE DESIGNED TO BE IN THE FIELD. THEY WERE DESIGNED TO BE AT WALGREENS STORES,

SER-943

PHYSICIAN OFFICES, MILITARY FIELD OFFICES, WHATEVER.

AND RUNNING A CENTRAL LAB WHERE YOU'RE TRYING TO COLLECT A LOT OF SAMPLES FROM WALGREENS STORES AND BRINGING THEM TO A CENTRAL PLACE, YOU NEED HIGHER THROUGHPUT. THAT'S NOT REALLY WHAT THE THERANOS TECHNOLOGY WAS REALLY DESIGNED FOR.

AND ALTHOUGH THEY DID USE IT, ALL OF THE ASSAYS THAT THEY COULD HAVE PUT ON THE DEVICE, THEY DID NOT ACTUALLY PUT ON THE DEVICE BECAUSE THERE WAS GOING TO BE A PHASE II WHERE THEY TOOK THE ASSAYS OR DEVICES AND PUT THEM IN OTHER WALGREENS STORES OR OTHER FIELD LOCATIONS. AND THOSE ARE BUSINESS DECISIONS, AND WE'LL SEE MORE ABOUT THAT IN A MINUTE.

OKAY. LET'S TALK MORE ABOUT THE THERANOS SCIENTIFIC TEAM AND THE CLIA LAB.

SO THIS IS THE THERANOS SCIENTIFIC LEADERSHIP TEAM: DANIEL YOUNG, A PH.D.; SURAJ SAKSENA, ANOTHER PH.D.; CHINMAY PANGARKAR, ANOTHER PH.D.; NISHIT DOSHI, AGAIN ANOTHER PH.D.; SUREKHA GANGADKHEDKAR, MASTERS; PAUL PATEL, PH.D.; SHARADA SIVARAMAN, A PH.D.; AND GODFRED MASINDE, A PH.D.

THE GOVERNMENT DIDN'T CALL ANY OF THESE PEOPLE. SO IF YOU WANTED TO KNOW WHAT THEY WERE DOING, YOU HAVEN'T HEARD IT IN THIS CASE BECAUSE THE GOVERNMENT DIDN'T CALL THESE WITNESSES.

BUT THERE A LOT MORE SCIENTISTS. AND THESE ARE THE LEADERSHIP TEAM THAT YOU'VE SEEN IN EMAILS, EVEN IF YOU DIDN'T SEE THEM IN PERSON.

BUT THERE A LOT OF DEDICATED PEOPLE HERE AT THERANOS WHO

WERE WORKING ON THIS WHO ARE COMING TO WORK EVERY DAY DOING THEIR JOBS. THERE'S SOME BIOS IN EVIDENCE OF SOME OF THOSE PEOPLE JUST TO GO THROUGH THAT.

DR. YOUNG WORKED AT THERANOS. HE WAS AN ENGINEERING DOCTORATE FROM M.I.T. IN THE FIELD OF BIOMEDICAL SCIENCES. HE PUBLISHED OVER 20 SCIENTIFIC ARTICLES AND BOOK CHAPTERS. AND HE WAS A LAB DIRECTOR IT SAYS THERE IN THE SCOTTSDALE ARIZONA LAB.

IF YOU GO TO THE NEXT PAGE, IT GOES ON TO TALK ABOUT HOW HE RECEIVED HIS PH.D., M.S., AND B.S. IN MECHANICAL ENGINEERING FROM M.I.T.

THIS IS THE BIO FOR DR. SURAJ SAKSENA. AND IF YOU WANT TO WRITE THIS DOWN, THIS IS ALL IN EXHIBIT 4528.

DR. SAKSENA HAD EXPERIENCE WITH THE AMERICAN HEART ASSOCIATION AND POST-DOCTORAL FELLOW AT CORNELL, AND HE HAS A PH.D. IN BIOCHEMISTRY AND BIOPHYSICS. HE WAS THE TECHNICAL CONSULTANT AT THE ARIZONA LAB IT LISTS THERE.

DR. GODFRED MASINDE, TECHNICAL SUPERVISOR. AND I WON'T READ THIS, BUT IT HAS HIS QUALIFICATIONS AND HIS BIO, WHICH YOU CAN LOOK AT WHEN YOU HAVE THAT CHANCE LATER.

HODA ALAMDAR, TECHNICAL SUPERVISOR AND GENERAL SUPERVISOR IS HER BIO THERE.

HERE'S THE BIO FOR GURBIR SIDHU, GENERAL SUPERVISOR.

AND THEN, OF COURSE, LANGLY GEE, WHO AGAIN, YOU DIDN'T HEAR FROM. BUT HE'S THE QUALITY CONTROL MANAGER THAT WAS HIRED

WHO WAS RESPONSIBLE FOR QUALITY CONTROL OF THE LABORATORY AT THERANOS.

NOW, LET'S GO BACK TO DR. YOUNG FOR A MINUTE. SO DR. YOUNG, AS DR. ROSENDORFF TESTIFIED HERE, HE WAS THE VICE PRESIDENT OF THERANOS SYSTEMS, THAT WAS HIS TITLE, AND HE HAD A HAND IN EVERYTHING REALLY. THAT'S WHAT DR. ROSENDORFF SAID.

SO IT WOULD HAVE BEEN NICE TO KNOW WHAT DR. YOUNG HAD TO SAY, BUT WE DIDN'T HEAR FROM HIM. AND HE WAS ON, AS I SAID BEFORE, 78 EMAILS IN THIS CASE THAT CAME INTO EVIDENCE.

DR. YOUNG IS ON -- AND WE KNOW NOTHING ABOUT HOW HE WOULD EXPLAIN THOSE OR WHAT HE WOULD SAY BECAUSE HE WASN'T CALLED.

SAME WITH MR. GEE, LANGLY GEE.

AND YOU MIGHT REMEMBER -- GO TO THE NEXT SLIDE.

ON DR. ROSENDORFF, WHO BY THE WAY CLAIMED THAT HE DIDN'T HAVE ANY ABILITY TO HIRE PEOPLE, HE INTERVIEWED MR. GEE. HE SPOKE HIGHLY OF HIM. HE RECOMMENDED HIM.

WHEN YOU GO TO THIS EXHIBIT 20304, YOU WILL SEE THAT DR. ROSENDORFF THOUGHT THAT HE WOULD MAKE A VERY GOOD QUALITY CONTROL MANAGER. AND SURE ENOUGH, MR. GEE WAS HIRED TO OVERSEE THAT PROCESS.

AGAIN, WE DIDN'T HEAR FROM MR. GEE.

SO YOU HEARD ABOUT THE TITLE OF LAB DIRECTORS IN THIS CASE. AND WHAT DOES A LAB DIRECTOR AT A CLIA LAB LIKE THERANOS WAS RUNNING? WE DON'T HAVE TO GUESS AT THAT. THIS IS THE

ATTESTATION THAT DR. ROSENDORFF SIGNED ON NOVEMBER 25TH, 2013.

AND HE SAYS, "AS THE DIRECTOR OR CO-DIRECTOR," HE WAS THE DIRECTOR, "I ASSUME ALL DIRECTORSHIP RESPONSIBILITIES FOR CLIA AND STATE OF CALIFORNIA PURPOSES. I UNDERSTAND THAT AS A DIRECTOR OF THIS LABORATORY, I AM RESPONSIBLE FOR THE ACCURACY AND RELIABILITY OF ALL TESTING PERFORMED BY THE LABORATORY AND FOR ENSURING THAT THE LABORATORY MEETS ALL APPLICABLE CLIA AND STATE REQUIREMENTS AS STIPULATED IN BOTH FEDERAL AND CALIFORNIA LAWS."

THAT'S WHAT DR. ROSENDORFF SWORE TO WHEN HE FILLED OUT THIS ATTESTATION FOR THE THERANOS LAB.

AND AS YOU'LL SEE, HE TESTIFIED THAT HE FULFILLED THAT OATH. HE DID HIS BEST TO MAKE SURE THAT ACCURATE TESTING WAS BEING SENT OUT.

AND AS YOU'LL SEE WHEN WE GO THROUGH THIS, DR. ROSENDORFF SAID THAT HE NEVER BELIEVED THAT HE WAS SENDING OUT INACCURATE RESULTS AND THAT HE NEVER SIGNED VALIDATION REPORTS BECAUSE HE WAS BEING PRESSURED, AS THE GOVERNMENT SUGGESTED A FEW MINUTES AGO.

AND DR. ROSENDORFF, HE FOUGHT ME A LITTLE BIT ABOUT THIS AS I REMEMBER. BUT HE EVENTUALLY ADMITTED THAT A LAB DIRECTOR IS RESPONSIBILE FOR ABSOLUTELY EVERYTHING, AND THAT HE WAS, IN FACT, ATTESTING THAT HE WAS RESPONSIBLE FOR THE ACCURACY AND RELIABILITY OF ALL TESTING PERFORMED BY THE LABORATORY.

HE SAID YES.

SER-947

CLOSING ARGUMENT BY MR. COOPERSMITH                 7133

AND IN TERMS OF THE DUTIES OF THE LAB DIRECTOR, DR. PANDORI, WHO WAS CO-LABORATORY DIRECTOR FOR A WHILE, HE SAID THAT UNTIL THE CLINICAL LABORATORY SIGNS OFF ON THE DEVELOPED TESTS, LIKE THE THERANOS EDISON, THE TEST CANNOT BE USED IN THE LAB?

HE SAID CORRECT.

IF YOU GO TO THE NEXT SLIDE.

THE CLIA LAB DIRECTOR IS RESPONSIBLE FOR THE QUALITY OF THE LABORATORY TESTING PERFORMED WITHIN THAT LAB?

DR. PANDORI, OF COURSE, HAD TO AGREE TO THAT.

SO THAT IS WHAT A LAB DIRECTOR HAS TO DO. YOU CAN'T ALLOW TESTING THAT ISN'T CORRECT. AND WE'LL SEE MORE IN A FEW MINUTES OF WHAT DR. ROSENDORFF ACTUALLY SAID ABOUT WHY HE AUTHORIZED CERTAIN TESTS TO GO INTO USE IN THE CLINICAL LAB.

ERIKA CHEUNG. ERIKA CHEUNG WAS AN ENTRY LEVEL EMPLOYEE AT THERANOS. IT DOESN'T MEAN SHE SHOULDN'T BE LISTENED TO. IT DOESN'T MEAN SHE SHOULDN'T BE RESPECTED.

I THINK THAT AS YOU SAW, SHE WAS LISTENED TO. SHE AND HER FRIEND, TYLER SHULTZ, SENT AN EMAIL ABOUT SOME CONCERNS THAT THEY HAD.

AND AS SHE TESTIFIED, DR. YOUNG SPENT A LOT OF TIME WITH MR. SHULTZ EXPLAINING WHAT HE THOUGHT ABOUT THAT, NOT MR. BALWANI. SO THAT WAS MS. CHEUNG.

YOU KNOW, HOWEVER SINCERE THAT SHE MAY BE, SHE WAS IN FACT, AND I MEAN NO DISRESPECT, AN ENTRY LEVEL EMPLOYEE, DIDN'T

SER-948

HAVE A SCIENTIFIC BACKGROUND THAT OTHERS HAD IN THE LAB.

BUT WHAT SHE DID KNOW, JUST FROM HER OWN EXPERIENCE AT THERANOS, WAS THAT BEFORE AN ASSAY COULD BE PUT IN THE CLINICAL LAB, IT HAD TO GO THROUGH THIS VALIDATION REPORT PROCESS.  SO SHE, OF COURSE, KNEW THAT.

AND DR. ROSENDORFF TALKED MORE ABOUT THIS VALIDATION PROCESS.  HE TESTIFIED THAT WHEN HE SIGNED VALIDATION REPORTS, IT WAS NECESSARY FOR HIM TO REVIEW THE DATA THAT WAS PREPARED FOR THE PURPOSE OF VALIDATION.

HE SAID YES.

THE VALIDATION WOULD INCLUDE TESTS TO DETERMINE WHETHER THE DEVICE WAS ACCURATE, THE ASSAY WAS ACCURATE?

HE SAID YES.

WHETHER IT WAS PRECISE.

HE SAID YES.

WHETHER THERE WAS APPROPRIATE SENSITIVITY.

HE SAID YES.

SO THOSE WERE SOME OF THE THINGS THAT DR. ROSENDORFF TESTIFIED HE HAD TO REVIEW IN THE DATA BEFORE HE COULD SIGN ONE OF THOSE VALIDATION REPORTS.

AND DR. ROSENDORFF FURTHER TESTIFIED, AND YOU HAVE TO BE SATISFIED THAT ALL THOSE ARE MET BEFORE YOU PUT YOUR SIGNATURE ON THE DOCUMENT?

HE SAID YES.

BUT YOU SIGNED THEM BECAUSE THEY WERE VALID, NOT BECAUSE

SER-949

OF ANY PRESSURE THAT WAS PUT ON YOU; CORRECT?

AND DR. ROSENDORFF TESTIFIED UNDER OATH, YES.

NOW, LET'S TALK ABOUT THE PRESSURE FOR A MOMENT. OF COURSE, THERE IS PRESSURE. ANY COMPANY THAT IS TRYING TO LAUNCH A NEW SERVICE, IN THIS CASE THERANOS'S SERVICE AT WALGREENS, IS GOING TO WANT TO GET THAT LAUNCH DONE.

I MEAN, WE'VE HEARD -- USE YOUR COMMON SENSE. PEOPLE STAYING UP ALL NIGHT TO GET THE PRODUCT READY AND ALL OF THAT SORT OF THING. SO THERE'S ALWAYS GOING TO BE PRESSURE, HOPEFULLY ENTHUSIASM WHEN COMPANIES ARE LAUNCHING SOMETHING NEW.

BUT THIS IS BLOOD TESTING. AND IT'S IMPORTANT TO TRY TO GET IT RIGHT.

AND DR. ROSENDORFF TESTIFIED THAT HE WASN'T -- YES, HE FELT PRESSURE, BUT HE WAS NOT SIGNING THESE VALIDATION REPORTS BECAUSE OF PRESSURE.

HE TESTIFIED UNDER OATH RIGHT THERE IN FRONT OF YOU THAT HE DID THIS BECAUSE THEY WERE VALID, THAT'S WHY HE SIGNED THE REPORTS.

AND HE SIGNED A LOT OF REPORTS. SO DR. ROSENDORFF SIGNED 57 OF THESE REPORTS. THESE ARE CLIA VALIDATION REPORTS. EVERY SINGLE ONE OF THOSE HAVE QUITE A FEW SIGNATURES, BUT ONE OF THEM IS DR. ROSENDORFF'S WHERE HE'S SAYING, YES, THIS HAS GOT MY STAMP OF APPROVAL, THIS TEST CAN GO INTO USE IN THE PATIENT CLINICAL LAB.

SER-950

AND YOU CAN SEE HE SIGNS THEM. THESE ARE IN CHRONOLOGICAL ORDER. I'LL LEAVE THIS UP ON THE SCREEN FOR A MINUTE IF YOU WANT TO WRITE DOWN SOME OF THE EXHIBIT NUMBERS, BUT IT GOES FROM SEPTEMBER 30TH, 2013, WHEN THYROID STIMULATING HORMONE AND PSA AND VITAMIN D WERE SIGNED, ALL OF THE WAY THROUGH SEPTEMBER 18TH, 2014. SO IT'S ALMOST A YEAR. SO A FEW DAYS SHORT OF A YEAR.

AND IF DR. ROSENDORFF THOUGHT IN ALL OF THAT TIME THAT THERE WAS SOME FUNDAMENTAL PROBLEM WITH THE EDISON DEVICE, AND THE MODIFIED PREDICATES, THIS INCLUDES BOTH MODIFIED PREDICATES AND EDISON, IF DR. ROSENDORFF THOUGHT THERE WAS SOME FUNDAMENTAL PROBLEM, HE COULD NOT, WOULD NOT HAVE SIGNED THESE VALIDATION REPORTS ONE AFTER THE OTHER AFTER THE OTHER. THAT HAS TO BE THE CASE.

LET ME POINT OUT A FEW OF THEM TO YOU.

THERE'S PSA, WHICH WAS THE SUBJECT OF SOME DISCUSSION WITH DR. BURNES AND DR. ELLSWORTH. THAT'S THE EXHIBIT ON THE RIGHT, AND THAT'S EXHIBIT 9387, THAT IS THE PSA VALIDATION REPORT WITH DR. ROSENDORFF'S SIGNATURE, AND ALSO DR. YOUNG, AND ALSO EVENTUALLY DR. DHAWAN.

THE ONE ON THE LEFT IS THE ASSAY VALIDATION REPORT FOR HCG. THAT'S THE TEST THAT IS DESIGNED TO ASSESS PREGNANCY AND THE VIABILITY OF A PREGNANCY. THAT IS EXHIBIT 9196. THAT WAS SIGNED ON MARCH 19TH, 2014, AND WE'LL TALK ABOUT THAT SOME MORE.

SER-951

AND THEN THE MIDDLE ONE, BECAUSE YOU'VE HEARD ABOUT THE GROUP CALLED THE ISE ASSAYS, ISE.  POTASSIUM IS ONE OF THOSE ISE ASSAYS.  AND THAT'S THE VALIDATION REPORT SIGNED BY DR. ROSENDORFF AND OTHERS ON MARCH 24TH, 2014.  THAT'S EXHIBIT 9315.

OKAY.  I WAS SAYING A FEW MINUTES AGO, AND YOU'VE ALSO HEARD FROM THE GOVERNMENT, THAT THERE WAS THIS LAUNCH, AT LEAST THE INITIAL LAUNCH OF THERANOS BLOOD TESTING SERVICES AT WALGREENS IN SEPTEMBER OF 2013.

AND IT'S IMPORTANT JUST TO TALK ABOUT THIS FOR A MINUTE BECAUSE THIS IS, OF COURSE, THE BEGINNING OF THERANOS'S ACTUAL PATIENT TESTING THAT YOU'VE HEARD ABOUT IN THIS CASE.  I WANT TO JUST EXPLAIN TO YOU WITH THE EVIDENCE WHAT HATCHED AND WHAT DIDN'T HAPPEN.

SO THIS WAS THE INITIAL ANNOUNCEMENT.  IT'S A WALGREENS-THERANOS ANNOUNCEMENT.  NOT JUST A THERANOS ANNOUNCEMENT.

AND THE ANNOUNCEMENT IS THAT THERANOS AND WALGREENS ANNOUNCED A LONG-TERM PARTNERSHIP TO BRING ACCESS TO THERANOS'S NEW LAB TESTING SERVICE THROUGH WALGREENS PHARMACIES NATIONWIDE.

AND THEN IT SAYS, THE SAMPLES ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS.

AND WE HEARD ABOUT THIS TYPE OF VENOUS DRAW AND IT'S SOMETIMES CALLED A BUTTERFLY NEEDLE.  I THINK MR. JHAVERI

REFERRED TO IT AS A PEDIATRIC NEEDLE.  IT'S A SMALLER AMOUNT BUT IT'S STILL A VENOUS DRAW.

AND THERANOS RIGHT FROM THE BEGINNING WITH WALGREENS WAS TELLING THE WORLD IN THIS PRESS RELEASE THAT IT WOULDN'T JUST BE FINGERSTICK.  IT WOULD ALSO BE THESE TRADITIONAL METHODS, THESE VENOUS DRAWS.  SO THAT'S HOW IT STARTS.

NOW, DR. ROSENDORFF SAID THAT HE HAD SOME CONCERNS.  AND I THINK THE GOVERNMENT SHOWED YOU THIS DURING THE CLOSING EARLIER TODAY.

SO DR. ROSENDORFF AT THE BOTTOM THERE, IF WE GO TO THE RIGHT HE SAYS, "I WOULD LIKE US TO BE THE BEST THAT WE CAN BE.  A FEW MORE WEEKS TO SORT THROUGH THESE MEDICAL AND LOGISTICAL ISSUES, AND GETTING THE MORE LEVEL OF TRAINING AND STAFFING WOULD HELP US TREMENDOUSLY."

SO DR. ROSENDORFF SAYS HE NEEDS MORE TIME, AND HE WANTS TO GET IT RIGHT.  THAT SEEMS LIKE A PERFECTLY LEGITIMATE REASONABLE THING TO SAY.

AND THEN HE SAYS, IF YOU GO UP, WHAT WERE HIS CONCERNS?  HE HAD SOME MEDICAL CONCERNS AND SOME OPERATIONAL CONCERNS.

AND HERE ARE THE MEDICAL CONCERNS.  ONE IS ABOUT GLUCOSE, AND HE HAS SOME ISSUES WITH GLUCOSE.  AND THE NEXT ONE IS ABOUT SODIUM, AND HE HAS SOME ISSUES WITH SODIUM.

NOW, WHAT DOES MR. BALWANI DO IN THE FACE OF DR. ROSENDORFF'S CONCERNS?  DOES HE SAY, "TOO BAD, DR. ROSENDORFF, WE'RE GOING FORWARD ANYWAY?  YOU KNOW, I DON'T CARE ABOUT YOUR

SER-953

CONCERNS, WE'RE GOING TO OFFER THE SODIUM TEST ANYWAY?"

NO.  MR. BALWANI SAYS TO MS. HOLMES, "WE WILL TALK TO HIM.

"I ASSUME WE CAN USE SIEMENS CHEMISTRY FOR GLUCOSE AND SODIUM?  IF YES, THEN WE SHOULD."

SO MR. BALWANI'S INTEREST IS NOT TO PUT AN ASSAY ONLINE OR TO SOMEHOW FORCE THAT WHEN DR. ROSENDORFF IS SAYING IT'S NOT READY.  HE IS SAYING, OKAY, LET'S JUST USE COMMERCIAL DEVICES UNTIL WE FEEL LIKE WE'RE READY.

THEN AS FOR OPERATIONAL, HE ADDRESSES THAT, TOO.  HE SAID, WELL, WE'RE GOING TO LIMIT THE NUMBER OF SAMPLES UNTIL WE KIND OF GET OUR FEET WET HERE ON UNDERSTANDING HOW THIS PROCESS WORKS.  SO HE'S NOT GOING TO OVERLOAD THE LAB WITH LOTS OF SAMPLES.

SO MR. BALWANI CERTAINLY TAKES DR. ROSENDORFF SERIOUSLY AND DOESN'T TRY TO FORCE ANYTHING THERE.

BUT LET'S GO FURTHER.

THIS IS WHAT DR. ROSENDORFF SAID ABOUT THIS ON DIRECT WHEN THE GOVERNMENT QUESTIONED HIM.

HE SAID, "IT WAS EXTREMELY RUSHED AND HURRIED.  THERE WAS IMMENSE PRESSURE PUT ON R&D AND THE LAB TECHS AND MYSELF TO GET THINGS VALIDATED AND GENERATE DATA."

SO THAT'S IF WE HAD DONE NOTHING, WE HAD DONE NO CROSS, SHOWN NO EXHIBITS, THAT'S WHAT DR. ROSENDORFF'S TESTIMONY WAS.

AND THEN HE SAYS ABOUT THIS VERY EMAIL THAT I JUST SHOWED YOU, "I WAS ASKING FOR MORE TIME TO MAKE SURE THAT THE ASSAYS

SER-954

WERE MEDICALLY -- OF MEDICAL VALUE, AND THAT THERE WAS RIGHT LEVEL OF TRAINING AND STAFFING IN THE LABORATORY TO RUN THOSE TESTS.

"IN OTHER WORDS, WERE YOU ASKING TO DELAY THE COMMERCIAL LAUNCH OF THE COMPANY'S TESTING?

"CORRECT."

SO THE PICTURE THE GOVERNMENT WAS TRYING TO PAINT THERE IS DR. ROSENDORFF WAS RUSHED, HE'S PRESSURED, HE IS NOT READY, HE WANTS A DELAY, AND SOMEHOW HE'S NOT GETTING THAT, AND HE'S BEING FORCED TO DO THINGS AGAINST HIS WELL OR THAT HE'S NOT READY FOR.

WELL, NOTHING, NOTHING COULD BE FURTHER FROM THE TRUTH. AND LET'S LOOK AT THE EXHIBITS THAT THE GOVERNMENT DIDN'T SHOW YOU.

SO, FIRST OF ALL, WHAT HAPPENED IN SEPTEMBER? THERE WAS NO RUSH LAUNCH INCLUDING ASSAYS THAT DR. ROSENDORFF WASN'T HAPPY WITH.

ON SEPTEMBER 11TH, 2013, THERE'S AN EMAIL FROM THERANOS HUMAN RESOURCES TO ALL THERANOS EMPLOYEES. AND IT SAYS, "ALL,

"AS MENTIONED IN OUR ALL EMPLOYEE MEETING, WE ARE NOW OFFERING FREE SCREENINGS TO ALL THERANOS EMPLOYEES, FRIENDS, AND FAMILY."

AND THEN AT THE VERY BOTTOM PARAGRAPH IT SAYS, "STARTING TODAY, ALL EMPLOYEES, FRIENDS AND FAMILY WILL BE ABLE TO GO TO OUR WELLNESS CENTER AT THE DOWNTOWN PALO ALTO WALGREENS

SER-955

LOCATION AND RECEIVE A VARIETY OF TESTS SO EVERYONE GETS TO SEE OUR FIRST STORE. THE FIRST PANEL WE ARE OFFERING IS A COMPLETE BLOOD COUNT WITH HBA1C TEST. WE WILL BE OFFERING DIFFERENT PANELS OVER THE COMING DAYS AND WEEKS."

SO THERE'S NO SODIUM TEST, NO GLUCOSE TEST. NO ONE IS FORCING ROSENDORFF TO DO THAT WHEN HE'S NOT READY.

AND THE GOVERNMENT DIDN'T SHOW YOU THAT EXHIBIT BECAUSE THEY HAVE A STORY THEY WANT TO TELL YOU ABOUT ROSENDORFF BEING PRESSURED AND RUSHED, WHICH JUST IS NOT THE CASE.

AND THEN YOU CAN SEE IN THE NEXT DOCUMENT, THE FLYER THAT WENT OUT. FREE HEALTH SCREENING, AGAIN, COMPLETE BLOOD COUNT AND DIABETES, THAT IS THE HBAIC TEST AT THIS 300 UNIVERSITY WALGREENS.

IN FACT, AS THE GOVERNMENT SHOWED YOU THIS EXHIBIT, 4533, THE EARLIEST EDISON TEST THAT WENT ONLINE WAS NOVEMBER 6TH OF 2013.

SO THERE'S NO TESTING GOING ON WHERE DR. ROSENDORFF IS FEELING PRESSURED.

NOW, WHAT HAPPENED TO SODIUM IN PARTICULAR? THIS WAS IN THE EMAIL THAT I SHOWED YOU A FEW MINUTES AGO. DR. ROSENDORFF HAD A CONCERN ABOUT SODIUM.

HE DOESN'T SIGN THE SODIUM VALIDATION REPORT UNTIL MARCH, MARCH 24TH, 2014. ANOTHER EXHIBIT THAT THE DEFENSE WOULD HAVE TO SHOW YOU TO TAKE AWAY THE FALSE IMPRESSION THAT DR. ROSENDORFF WAS BEING FORCED TO PUT SODIUM ONLINE. HE

SER-956

DOESN'T SIGN THE VALIDATION REPORT UNTIL MARCH.

SO HE HAD MONTHS AND MONTHS TO BE READY, TO FEEL COMFORTABLE BEFORE HE PUT HIS SIGNATURE ON THIS VALIDATION REPORT ALLOWING THAT SODIUM TEST TO GO FORWARD.

AND YOU KNOW FROM VARIOUS WITNESSES THAT'S WHAT HAD TO HAPPEN BEFORE A TEST COULD GO FORWARD.

OKAY.  I WANT TO SHOW YOU MORE OF THIS TYPE OF MISLEADING TESTIMONY.  SO LET'S LOOK AT THIS SEQUENCE.

SO ON SEPTEMBER 7TH, 2013, ADAM ROSENDORFF WRITES AN EMAIL TO DR. YOUNG, DR. SIVARAMAN, TO ELIZABETH HOLMES, AND SUREKHA GANGADKHEDKAR, AND HE SAYS -- AND THIS IS WITH REGARD TO THE ASSAYS VITAMIN D AND TSH.

HE SAYS, "THANKS -- THE DATA LOOKS GREAT.  THE ACCURACY/BIAS PLOT COMPARING THE EDISON THE 3.5 WITH PREDICATE (VITAMIN D AND TSH) ARE EXCELLENT."

THAT'S WHAT DR. ROSENDORFF SAYS.

AND, IN FACT, AS WE SAW BEFORE, HE SIGNS THOSE TWO VALIDATION REPORTS ON SEPTEMBER 30TH, 2013, BUT THE EVIDENCE IS THAT THEY DIDN'T GO INTO CLINICAL USE RIGHT AT THAT TIME.

BUT DR. ROSENDORFF THINKS IT LOOKS GREAT.  OKAY.

BUT THEN A LITTLE BIT LATER DR. ROSENDORFF HAS SOME ISSUES.  AND HERE'S WHAT HAPPENS.  SO, MR. BALWANI WRITES AN EMAIL TO DR. ROSENDORFF ON NOVEMBER 7TH, 2013.

HE SAYS, "ADAM.

"WE WOULD LIKE TO OPEN OUR 300 UNIVERSITY AVENUE STORE TO

THE PUBLIC THIS COMING MONDAY.  WE FEEL CONFIDENT THAT WE CAN HANDLE ABOUT 30 SAMPLES/DAY FROM THIS LOCATION AT THIS POINT. AND IT HAS BEEN 2 MONTHS SINCE WE HAVE BEEN OUT IN WAG.  IT'S TIME TO GO LIVE."

AND DOCTOR -- I'M SORRY, MR. BALWANI SAYS, "I WOULD LIKE TO ASK AT THIS TIME IF YOU HAVE A REASON TO THINK WE NEED MORE TIME OR TEST OUT SOMETHING THAT WE HAVEN'T THOUGHT ABOUT."

SO MR. BALWANI IS NOT SAYING I DON'T CARE WHAT YOU THINK, DR. ROSENDORFF, LET'S GO FORWARD.

HE SAYS, TELL ME IF YOU NEED MORE TIME BECAUSE WE WOULD LIKE TO GET THIS GOING.

AND AS THE COO AND PRESIDENT OF THE COMPANY, OF COURSE HE WANTS TO GET THE PROJECT GOING, BUT HE'S ASKING DR. ROSENDORFF WHAT DO YOU THINK?

AND DR. ROSENDORFF RESPONDS.  HE SAYS, "SUNNY,

"THIS IS VERY EXCITING THAT WE ARE BROADENING OUR TESTING TO A WIDER BASE.

"THERE ARE A FEW ISSUES THAT NEED TO BE ADDRESSED."

AND LET ME GO TO THE MEDICAL SCIENTIFIC ISSUES.

WHAT DOES DR. ROSENDORFF SAY?  HE SAYS, "AS COMMUNICATED IN PREVIOUS EMAILS, THE SENSITIVITY OF VITAMIN D, TSH, AND POSSIBLY CTNI ASSAYS IS NOT WHERE WE WANT IT TO BE."

AND THEN HE EXPLAINS WHAT HE MEANS BY THAT.

SO DR. ROSENDORFF IS SPECIFICALLY SAYING, YOU KNOW, I HAVE SOME ISSUES WITH VITAMIN D, TSH, CTNI POSSIBLY.

SO WHAT HAPPENS?  DOES MR. BALWANI SAY I DON'T CARE, WE'RE DOING THIS ANY WAY?  NO.

DR. SIVARAMAN SENDS AN EMAIL TO DR. ROSENDORFF AND DR. YOUNG ABOUT TWO WEEKS LATER AND SAID, "HI ADAM,

"PLEASE FIND ATTACHED THE UPDATED/REVISED VITAMIN D AND TSH REPORT WITH THE REPEAT OF THE ANALYTICAL SENSITIVITY EXPERIMENTS, THE DATA OF WHICH WAS SHARED WITH YOU IN OUR LAST MEETING."

SO DR. ROSENDORFF COMPLAINED THAT THERE MIGHT BE A PROBLEM WITH SENSITIVITY FOR THESE ASSAYS, VITAMIN D AND TSH, AND THE SCIENTIFIC TEAM SPRINGS INTO ACTION AND GETS HIM THE DATA, NOT MR. BALWANI BUT DR. SIVARAMAN IN THIS CASE, GETS DR. ROSENDORFF THE DATA THAT HE WANTED.

AND THEN WHAT HAPPENS?

DR. ROSENDORFF SAYS, "HI SHARADA," THAT'S DR. SIVARAMAN, "THE NEW VITAMIN D REPORT LOOKS GOOD -- 2 MINOR POINTS."

SO DR. ROSENDORFF'S ISSUES WERE ADDRESSED.  NO ONE WAS FORCING HIM TO PUT ASSAYS ONLINE IN THE CLIA LAB THAT WEREN'T RIGHT.

THE THING IS, WE SHOWED YOU THESE DOCUMENTS.  THE GOVERNMENT JUST SHOWED YOU DR. ROSENDORFF RAISED A PROBLEM, BUT NEVER SHOWED YOU WHAT THE SOLUTION WAS WITH SODIUM OR TSH OR VITAMIN D.  THE DEFENSE HAD TO DO WITH IT NO BURDEN OF PROOF.

SO THEN WHAT ELSE HAPPENS?

MR. BALWANI WRITES, AND HE SENDS IT TO DR. ROSENDORFF ON

NOVEMBER 11TH, 2013, "PLEASE NOTE THAT SINCE THE LOCAL MARKET NOW ALREADY KNOWS THAT WE ARE IN ARIZONA, WE ARE ANNOUNCING PRESENCE OF 2 STORES IN PHOENIX TOMORROW. WE WILL STILL CONTINUE TO MODULATE THE NUMBER OF SAMPLES FROM THERE SO THAT THE TOTAL NUMBER OF SAMPLES THIS MONTH STILL STAYS BELOW 100 PER DAY." THAT IS TO ADDRESS THE OPERATIONAL CONCERNS AND NOT TO OVERWHELM ANYONE.

AND WHAT IS DR. ROSENDORFF'S RESPONSE? NOT I HAVE ADDITIONAL CONCERNS, I FEEL PRESSURED, I'M NOT READY. HE SAYS, "EXCELLENT."

SO WHAT HAPPENED NEXT?

NOW WE'RE TALKING ABOUT THE PUBLIC LAUNCH. SO WE HAVE TO SHOW YOU THAT THERE WAS A SOFT LAUNCH OF FRIENDS AND FAMILY WITH JUST A COUPLE OF ASSAYS AND THEN IN NOVEMBER THAT WAS WHEN THE PUBLIC LAUNCH ACTUALLY OCCURRED.

SO THIS BUSINESS THAT THE GOVERNMENT IS TRYING TO SELL YOU THAT HE WAS PRESSURED AND NEEDED MORE TIME AND DIDN'T GET IT.

NO. HE GOT THE TIME THAT HE NEEDED. AND THIS IS THE ANNOUNCEMENT OF THE PUBLIC LAUNCH, AND THIS IS CELEBRATING THE OPENING OF THE THERANOS WELLNESS CENTERS LOCATED AT WALGREENS STORES IN PHOENIX, AND AT THAT POINT THEY OPENED TWO STORES.

AGAIN, IT TALKS ABOUT MICRO SAMPLES COLLECTED BY CERTIFIED PHLEBOTOMISTS OR TRAINED WALGREENS TECHNICIANS ARE TAKEN FROM EITHER A TINY FINGERSTICK OR TRADITIONAL METHODS.

SO THERE'S NO PROMISE THAT IT'S ALWAYS GOING TO BE

FINGERSTICK. THERE'S ALSO THE TRADITIONAL METHODS.

AND WHEN YOU THINK ABOUT IT, THIS IDEA THAT PATIENTS WERE DEFRAUDED SOMEHOW BECAUSE THEY GOT VENOUS DRAW AND NOT FINGERSTICK, I THINK YOU KNOW IF YOU GET A VENOUS DRAW. IF YOU'RE IN THE WALGREENS STORE AND SOMEONE WANTS TO STICK A NEEDLE IN YOUR ARM, YOU COULD SAY NOT ME, I AM LEAVING, RIGHT?

SO THERE'S NO FRAUD THERE. AND IT'S ACTUALLY RIGHT IN THE PRESS RELEASE AS TO WHAT IS GOING ON HERE. THERANOS DIDN'T HAVE EVERY SINGLE ASSAY ON FINGERSTICK.

AND WHAT WE WILL TALK ABOUT MORE, THE GOAL HERE, AND THERE ARE SOME EMAILS WE WILL SEE LATER ON, WAS TO GET THE MOST COMMONLY ORDERED TESTS ONTO FINGERSTICK SO PEOPLE WOULD HAVE THAT EXPERIENCE. BUT NOT COST EFFECTIVE TO TRY TO PUT EVERY ASSAY, HOWEVER OBSCURE, THAT WEREN'T EVEN ORDERED THAT MUCH ONTO FINGERSTICK. SO THERE'S GOING TO BE VENOUS DRAWS.

JUST TO SUM UP. DR. ROSENDORFF WAS RUSHED, THE THEME THAT THE GOVERNMENT HAD. THE GOVERNMENT SHOWED YOU THIS EXHIBIT 1049 ABOUT DR. ROSENDORFF EXPRESSING CONCERNS ABOUT GLUCOSE AND SODIUM.

THE DEFENSE HAD TO SHOW YOU ALL OF THESE OTHER EXHIBITS THAT I'VE GONE THROUGH ABOUT WHAT REALLY HAPPENED.

THAT'S WHAT I MEAN WHEN I STARTED OUT, YOU KNOW, IF YOU JUST SHOW, OKAY, HERE'S A PROBLEM, AND YOU NEVER SHOW WHAT THE SOLUTION IS AND YOU DIDN'T KNOW ANYTHING ELSE, YOU GET THIS VERY DISTORTED PICTURE OF WHAT REALLY HAPPENED. AND IT'S

SER-961

REALLY IMPORTANT TO LOOK AT ALL OF THE EVIDENCE HERE AND NOT JUST THE NARROW STORY THAT THE GOVERNMENT WANTS TO TELL.

LET'S TALK ABOUT BRINGING ASSAYS INTO THE CLIA LAB A LITTLE BIT MORE.

SO THIS EXHIBIT SHOWS YOU WHAT IS BEING CONTEMPLATED BY DR. YOUNG IN AUGUST OF 2013, MID-AUGUST.  SO, AGAIN, YOU KNOW, THE GOVERNMENT TALKS ABOUT THEIR -- YOU KNOW, THE EDISON DEVICE IN PARTICULAR COULD ONLY DO 12 TESTS SUPPOSEDLY.

WELL, THIS IS DR. YOUNG'S EMAIL, NOT MR. BALWANI.

AND HE SAYS, "THE CURRENT LAUNCH LIST COVERS 200 TESTS. THE COLLECTION OF THESE REPORTABLES COVERS MORE THAN 97 PERCENT OF TEST FREQUENCY FOR THESE TWO MATRICES," THAT'S BLOOD AND URINE.

SO AGAIN, THE IDERE IS TO DEVELOP A MENU OF TESTS THAT ARE COVERING AS MUCH OF THE WATERFRONT OF COMMONLY ORDERED TESTS THAT YOU CAN.

BLOOD TESTS FOR LAUNCH INCLUDE GC, ELISA, AND CYTOMETRY, A TOTAL OF 158 TESTS/REPORTABLES.

THEN IT GOES ON ON THE BOTTOM, 92 ARE ELISA, THOSE ARE THE IMMUNOASSAYS, AND THEN 62 ON EDISON.

SO DR. YOUNG IS REPORTING, THERE'S QUITE A LOT THAT COULD BE PUT ON EDISON AT THIS TIME.

AND THEN DR. ROSENDORFF AGREED THAT THE DECISION TO PUT A PARTICULAR ASSAY ONLINE, IT'S NOT JUST ABOUT COULD YOU PUT IT ONLINE, COULD IT PASS THE VALIDATION PROCESS, BUT ALSO DOES IT

MAKE BUSINESS SENSE TO PUT THE ASSAY ONLINE.

IF YOU DON'T THINK YOU'RE GOING TO GET MANY ORDERS FOR IT, MAYBE YOU DON'T WANT TO DO THAT.

AS I'VE SAID, THERE WAS THIS PHASE I, PHASE II ISSUE, AND WE'LL TALK ABOUT IT MORE WHEN I TALK ABOUT WALGREENS, BUT WHEN YOU'RE IN A CENTRAL LAB AND YOU'RE COLLECTING SAMPLES FROM WALGREENS STORES, OR ANYWHERE, YOU WANT A MACHINE THAT DOES HIGHER THROUGHPUT. THAT'S THE MODIFIED PREDICATES OR THE PREDICATES AND NOT NECESSARILY THE EDISON DEVICE OR SOMETIMES WHAT IS CALLED THE TSPU, THE THERANOS SAMPLE PROCESSING UNITS.

AND THIS IS WHAT THE TESTIMONY THAT I'M GOING TO SHOW YOU IN A MINUTE, THAT DR. ROSENDORFF WAS GETTING AT.

SO I THINK THE GOVERNMENT SHOWED YOU THE ADVIA 1800 COULD DO 1800 TESTS PER HOUR. THIS IS ABOUT THE IMMULITE ALSO COULD DO MORE TESTS.

SO COMPARED TO THE EDISON, THESE TESTS, THESE DEVICES, THESE COMMERCIAL DEVICES WERE DESIGNED TO DO A LOT MORE TESTS. AND WHEN YOU'RE IN THIS PHASE I MODEL, CENTRAL LAB MODEL, YOU WANT A DEVICE THAT COULD DO MORE TESTS, AND THAT'S WHY THERANOS SPENT ALL OF THIS TIME AND EFFORT MODIFYING THE PREDICATE DEVICES, AND YOU CAN LOOK AT THAT PATENT APPLICATION THAT I WENT THROUGH BEFORE ABOUT WHAT WAS REPORTED TO THE PATENT OFFICE ABOUT THE MODIFICATIONS TO MAKE SURE THAT THEY COULD DO THIS HIGH THROUGHPUT TESTING WHILE THEY WERE IN THIS PHASE I CENTRAL LAB MODEL BEFORE THEY GOT TO A POINT WHERE THEY COULD

PUT DEVICES INTO THE STORES. AND THERE WAS NO SECRET ABOUT THAT. WALGREENS AND THERANOS HAD AGREED TO THAT PROCESS.

OKAY. I WANT TO SWITCH TOPICS HERE TO THE SUBJECT OF QUALITY CONTROL.

SO QUALITY CONTROL IS IMPORTANT WHEN YOU'RE DOING BLOOD TESTING, AND THERE'S BEEN A LOT OF DISCUSSION IN THIS TRIAL ABOUT QUALITY CONTROL. SO I WANT TO GO THROUGH THE EVIDENCE ABOUT HOW THAT WORKED AT THERANOS.

SO, FIRST OF ALL, EXHIBIT 1430, THIS IS DR. ROSENDORFF'S POLICY ON QUALITY CONTROL. THAT WAS HIS JOB TO PUT THESE POLICIES IN PLACE.

AND THE POLICIES HE'S PUTTING IN PLACE IS TO RUN AT LEAST TWO LEVELS, I THINK IT'S SAFE TO SAY, ENSURE QC MATERIALS IS NOT OUTDATED OR EXPIRED, AND THEN IT GOES THROUGH IF QC FAILS WHAT YOU'RE SUPPOSED TO DO.

AND IF A QC DOESN'T PASS, AND WE'LL SEE THE TESTIMONY ABOUT THIS IN A MINUTE, YOU CAN'T RUN THE PATIENT TEST IF THE QC FAILS.

AND IT'S NOT JUST ONE LEVEL OF QC. IT'S TWO LEVELS OF QC. SO IT'S GOT TO PASS ON THESE TWO LEVELS BEFORE YOU CAN USE ANY PARTICULAR DEVICE FOR PATIENT TESTING, AND THAT IS DONE EVERY SINGLE DAY. IN FACT, DR. ROSENDORFF TESTIFIED SOMETIMES IT'S DONE MORE THAN ONCE A DAY.

SO MS. CHEUNG WHO WAS INVOLVED IN ACTUALLY RUNNING THESE QC SAMPLES, SHE WASN'T INVOLVED IN PUTTING THE POLICY IN PLACE,

SER-964

BUT ONE OF HER JOBS WAS TO RUN THE SAMPLES, SHE SAID -- THE QUESTION WAS SO EVERY DAY, EVERY MACHINE THAT WAS RUNNING SAMPLES HAD TO BE SUBJECTED TO A QUALITY CONTROL PROCEDURE?

AND SHE SAID THAT IS CORRECT.

AND IF IT DID NOT PASS THE QUALITY CONTROL, THEN IT COULD NOT BE USED FOR THE PATIENT TESTING?

AND THAT IN FACT WAS HER UNDERSTANDING OF THE POLICY.

AND THEN IT GOES ON FURTHER.

IN ORDER FOR THE DEVICE TO BE CLEARED TO PASS THE QUALITY CONTROL TEST, IT WOULD HAVE TO PASS ON BOTH OF THE LEVELS.

SHE SAID THAT'S CORRECT.

AND IF IT FAILED ONE, IT COULD NOT BE USED IN PATIENT TESTING.  THAT WAS THE PROCEDURE.

SHE AGREED THAT WAS CORRECT.

SO JUST TO BE VERY CLEAR, THE QC TEST IS A TEST USING -- I THINK THE TESTIMONY AT TRIAL WAS ABOUT MATERIAL FROM A COMPANY CALLED BIORAD, MAYBE AMONG OTHERS, SOME QUALITY CONTROL MATERIAL THAT YOU'RE USING JUST TO SEE IF THE MACHINE IS WORKING.

AND BY DEFINITION, YOU'RE NOT RUNNING -- WHEN YOU'RE RUNNING A QUALITY CONTROL TEST, YOU'RE NOT GIVING A PATIENT A RESULT.  THIS IS BEFORE YOU COULD GIVE A PATIENT A RESULT.  AND IF THE MACHINE FAILS, YOU CAN'T EVEN USE THE MACHINE FOR THE PATIENT RESULT.

AND DR. ROSENDORFF, OF COURSE, SAID THE SAME THING.  CAN'T

USE IT FOR PATIENT TESTING IF IT FAILS QUALITY CONTROL.

AND THEN DR. ROSENDORFF -- IF WE GO TO THE NEXT SLIDE.
THE PREVIOUS ONE, SORRY.

IF YOU COULD GO TO SLIDE 82, MR. ALLEN.  THANK YOU.

AND FAILURE IS DEFINED AS A FAILURE OF ONE OR MORE LEVELS?

DR. ROSENDORFF SAYS THAT'S CORRECT.

AND AGAIN, AS I SAID BEFORE, HE AGREES IT COULD NOT BE
USED FOR PATIENT TESTING AT THAT POINT IF IT FAILED EVEN ONE OF
THE LEVELS.

SO I JUST WANT TO TAKE A MOMENT TO TALK ABOUT SOME OF THE
TESTIMONY THAT I THINK THE GOVERNMENT REFERENCED IN THEIR
CLOSING ABOUT QUALITY CONTROL.

AND DR. ROSENDORFF HAD A SUGGESTION, IT WAS A LITTLE
BIZARRE, ABOUT HOW IF YOU HAD A CERTAIN RATE OF QUALITY CONTROL
FAILURE, LET'S SAY IT WAS 20 PERCENT, JUST TO PICK A NUMBER,
THAT SOMEHOW THE MACHINES THAT PASSED QUALITY CONTROL, IT WAS
AT THAT POINT -- I THINK THE NUMBER HE ACTUALLY USED WAS
50 PERCENT.  SO IF YOU HAD A 50 PERCENT FAILURE, WHICH IS
HIGHER THAN WHAT WE'VE SEEN, BUT IF THERE WAS A 50 PERCENT
FAILURE OF QUALITY CONTROL, AND YOU COULDN'T USE THAT HALF OF
THE MACHINES, SO YOU LEFT WITH THE OTHER HALF, THAT SOMEHOW
THAT HALF THAT DID PASS WOULD STILL HAVE A 50 PERCENT CHANCE OF
BEING WRONG ON A PATIENT TEST, THERE'S NO LOGIC TO THAT.

FIRST OF ALL, THERE'S TWO LEVELS OF QUALITY CONTROL THAT
HAVE TO PASS.  SO BY DEFINITION, THE MACHINES THAT HAVE PASSED,

ARE MACHINES THAT HAVE PASSED THE TWO LEVELS.

SO IT'S SORT OF LIKE IF YOU'RE SHIPPING A PRODUCT, IF YOU HAVE A QUALITY CONTROL PROCESS AND YOU TAKE OUT THE ONES THAT DON'T LOOK RIGHT THAT WON'T WORK, THAT DOESN'T MEAN THAT THE REST OF THE PRODUCTS THAT YOU'RE SHIPPING WOULD SOMEHOW BE SUBJECT TO THE SAME FAILURE RATE.  THAT'S THE PURPOSE OF QUALITY CONTROL, TO WEED OUT THE ONES THAT SHOULDN'T BE USED. AND THAT'S WHAT WAS GOING ON HERE.

SO THERE WAS A PROCESS, NOT MR. BALWANI'S PROCESS.  IT WAS DR. ROSENDORFF'S PROCESS.  AS HE TESTIFIED, IF HE WANTED TO CHANGE THE PROCESS, IF HE THOUGHT HE SHOULD DO MORE LEVELS, WHATEVER HE WANTED, HE COULD PUT THE POLICY IN PLACE.  WE SAW HE'S THE PERSON UNDERSTANDABLY WHO PUT THE QUALITY CONTROL PROCESS IN PLACE.

NOW, YOU'VE HEARD SOME TALK ABOUT THIS SO-CALLED OUTLIERS ISSUE.  SO THIS IS -- AND THE GOVERNMENT MENTIONED THIS IN THEIR CLOSING, WHERE YOU HAVE THESE SIX DATA POINTS AND THEN YOU COULD DISREGARD TWO OF THEM, RIGHT?

SO, FIRST OF ALL, WHAT THE GOVERNMENT TOLD YOU IN CLOSING WAS THAT YOU WOULD NEED THREE THERANOS DEVICES TO GET THE SIX RESULTS, BECAUSE THERE WOULD BE TWO RESULTS ON EACH.  SO THREE TIMES TWO IS SIX.  BUT ACTUALLY DR. ROSENDORFF TESTIFIED THAT LATER THE EDISON DEVICE WAS IMPROVED WHERE IT COULD RUN AND GET SIX RESULTS.

IN ANY EVENT, YOU'VE GOT THESE SIX RESULTS, AND THE

QUESTION IS DO YOU HAVE TO AVERAGE ALL SIX RESULTS OR COULD YOU THROW OUT TWO OF THEM?

WHAT WE HEARD AT TRIAL WAS THAT THE SCIENTISTS THOUGHT YOU COULD DISREGARD TWO OF THE RESULTS. AND IT WASN'T MR. BALWANI MAKING THAT DECISION.

LET'S LOOK AT THIS EMAIL. THIS IS EXHIBIT 1525, WHICH, AGAIN, WE THE DEFENSE, HAD TO SHOW YOU. IF YOU GO TO THE EARLIEST ONE IN TIME ON THE SCREEN THERE.

DR. ROSENDORFF SAYS, "HI ERIKA," SPEAKING TO MS. CHEUNG, "YES, WE CAN DELETE AS MANY AS 2 OF THE 6 DATA POINTS."

DR. PANDORI SAYS, "ADAM,

"IS THIS SOMETHING THAT CLIA CAN STAND ON AS A POLICY OR DO YOU WANT THEM TO CHECK WITH US BEFORE DOING THIS."

DR. ROSENDORFF SAYS, "THIS RULE WILL BE PART OF AN ALGORITHM WHEN THE EDISON 3.5 CALCULATIONS ARE AUTOMATED."

SO THAT'S IN THE WORKS APPARENTLY.

DR. PANDORI SAYS, "OK, SO IT IS OK FOR THE CLA," THE CLINICAL LAB ASSISTANT OR ASSOCIATE LIKE MS. CHEUNG, "TO DO THIS AUTOMATICALLY UNTIL THEN I ASSUME?"

AND THEN DR. ROSENDORFF SAYS, "YES, IT'S OK IF THEY DO IT -- THAT IS WHY WE ARE RUNNING 3 EDISONS -- TO GET ENOUGH DATA POINTS AND TO AVERAGE OUT VARIABILITY."

AND DR. PANDORI RESPONDS, "THANK YOU."

SO IT'S DR. ROSENDORFF HIMSELF WHO IS APPROVING THIS POLICY OF DELETING TWO OF THE SIX DATA POINTS, THE OUTLIERS.

IT'S NOT MR. BALWANI. NO ONE IS FORCING DR. ROSENDORFF TO DO THAT. HE THINKS THAT'S A SCIENTIFICALLY VALID PROCESS TO AVERAGE OUT VARIABILITY. THAT'S WHAT HE SAYS IN A CONVERSATION WITH DR. PANDORI AND MS. CHEUNG.

SO DR. ROSENDORFF IS ASKED SPECIFICALLY ABOUT THAT IN CROSS-EXAMINATION, ABOUT THIS VERY DOCUMENT. "SO YOU'RE APPROVING OF THE PROCESS?"

HE SAYS, "YES." THAT'S HIS TESTIMONY UNDER OATH.

HE ALSO TESTIFIED THAT HE WAS WORKING ON AN ALGORITHM FOR THE PROCESS.

AND THAT'S NOT THE ONLY SCIENTIST. MS. CHEUNG ON THE STAND WAS ASKED ABOUT ANOTHER DOCUMENT WHERE DR. SIVARAMAN WAS APPROVING OUTLIER REMOVAL PROCESS, AND SHE SAID THAT'S WHAT SHE WAS DOING.

AND THE QUESTION WAS, "DO YOU THINK SHE WAS TRYING TO DO SOMETHING WRONG?"

SHE SAID, "NO. I THINK SHE WAS TRYING TO COMPLETE THE REPORT."

AND THEN GO THROUGH A LITTLE BIT DR. SIVARAMAN'S QUALIFICATIONS.

AND THE QUESTION TO MS. CHEUNG WAS "AND THAT'S WHAT SHE DECIDED THAT WOULD BE APPROPRIATE TO DELETE OUTLIERS."

THAT'S DR. SIVARAMAN.

AND MS. CHEUNG SAYS, "YES."

SO IF MS. CHEUNG AGREED WITH DR. ROSENDORFF AND

DR. SIVARAMAN ABOUT THIS, YOU KNOW, SHE HAS A RIGHT AND SHE COULD CERTAINLY RAISE THE ISSUE. AND SHE DID, AND SHE WAS LISTENED TO.

BUT ULTIMATELY YOU HAVE TO GO WITH YOUR LAB DIRECTOR AND YOUR PH.D. SCIENTIST ABOUT WHAT THE APPROPRIATE THING TO DO HERE WOULD BE.

AND MR. BALWANI WOULD HAVE NO OTHER GUIDANCE OTHER THAN THAT.

SO THIS OUTLIERS PROCESS IN TERMS OF THE CRIMINAL CHARGES IN THIS CASE IS -- YOU KNOW, IT WAS A RED HERRING, AND IT WAS, AGAIN, THE DEFENSE WHO HAD TO SHOW YOU THIS EVIDENCE BECAUSE THE GOVERNMENT WAS JUST TALKING ABOUT OUTLIERS LIKE THERE WAS SOMETHING NEFARIOUS WITHOUT SHOWING YOU EXACTLY WHAT HAPPENED.

THE COURT: WOULD THIS BE A GOOD TIME TO BREAK YOUR ARGUMENT?

MR. COOPERSMITH: IT WOULD BE, YOUR HONOR, YEAH.

THE COURT: PARDON ME FOR INTERRUPTING YOU, MR. COOPERSMITH.

LET'S TAKE OUR EVENING RECESS NOW LADIES AND GENTLEMEN. WE'LL BE BACK SUCH THAT WE CAN BEGIN AT 9:00 A.M. TOMORROW.

LET ME AGAIN REMIND YOU OF THE ADMONITION THAT IS STILL IN PLACE. PLEASE DO NOT READ, LISTEN, TRY TO DISCOVERY IN ANY WAY, DO ANYTHING TO LEARN ANYTHING ABOUT THIS CASE DURING OUR BREAK.

AND ALSO PLEASE RECALL THAT YOU ARE NOT TO BEGIN ANY

DELIBERATIONS OR ANY DISCUSSION AMONGST YOURSELVES OR ANYONE ELSE, OF COURSE, ABOUT THE CASE UNTIL THE MATTER HAS BEEN GIVEN TO YOU FOR YOUR DELIBERATIONS.  AND THAT WOULD ONLY OCCUR AFTER ALL ARGUMENTS AND THE COURT'S INSTRUCTIONS.

WITH THAT ADMONITION, HAVE A GOOD EVENING.

IT'S THE SUMMER SOLACE, SO THERE'S PLENTY OF LIGHT LEFT FOR YOU TO ENJOY TODAY.  THE LONGEST DAY OF THE YEAR.  ENJOY ALL OF IT.

WE'LL SEE YOU TOMORROW MORNING.  THANK YOU.

(JURY OUT AT 4:13 P.M.)

THE COURT:  PLEASE BE SEATED.  THANK YOU.  THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE EVENING.

BEFORE WE LEAVE, I WANTED TO ASK ARE THERE ANY THINGS THAT THE PARTIES WANTED TO DISCUSS BEFORE WE END FOR THE DAY?

MR. SCHENK:  NO, YOUR HONOR.

MR. COOPERSMITH:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW MORNING.  THANK YOU.

MR. COOPERSMITH:  THANK YOU.

(COURT ADJOURNED AT 4:13 P.M.)

SER-971

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CR-18-00258-EJD |
| PLAINTIFF, | ) | |
| | ) | SAN JOSE, CALIFORNIA |
| VS. | ) | |
| | ) | JUNE 22, 2022 |
| RAMESH "SUNNY" BALWANI, | ) | |
| | ) | VOLUME 39 |
| DEFENDANT. | ) | |
| | ) | PAGES 7157 - 7399 |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                        BY:  JOHN C. BOSTIC
                             JEFFREY B. SCHENK
                        150 ALMADEN BOULEVARD, SUITE 900
                        SAN JOSE, CALIFORNIA 95113

                        BY:  ROBERT S. LEACH
                             KELLY VOLKAR
                        1301 CLAY STREET, SUITE 340S
                        OAKLAND, CALIFORNIA 94612

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074
                        LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

SER-972

INDEX OF PROCEEDINGS

DEFENDANT'S CLOSING ARGUMENT BY MR. COOPERSMITH          P. 7160

SER-973

SAN JOSE, CALIFORNIA                      JUNE 22, 2022

P R O C E E D I N G S

(COURT CONVENED AT 9:12 A.M.)

(JURY IN AT 9:12 A.M.)

THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT.

MR. BALWANI IS PRESENT.  AND OUR JURY IS PRESENT.

GOOD MORNING, LADIES AND GENTLEMEN.

BEFORE WE BEGIN, LET ME ASK OUR JURY IF ANY OF YOU HAVE HAD OCCASION SINCE OUR BREAK TO READ OR LEARN OR DISCUSS ANYTHING ABOUT THIS CASE?  IF THAT HAS HAPPENED, WOULD YOU PLEASE RAISE YOUR HAND.

AGAIN, I SEE NO HANDS.  THANK YOU AGAIN FOR YOUR FIDELITY TO THE ADMONITION.

MR. COOPERSMITH, WOULD YOU LIKE TO CONTINUE WITH YOUR ARGUMENT, SIR?

MR. COOPERSMITH:  YES, YOUR HONOR.

THE COURT:  PLEASE CONTINUE.  THANK YOU.

MR. COOPERSMITH:  MAY I REMOVE MY MASK, YOUR HONOR?

THE COURT:  OF COURSE, YES.

**(MR. COOPERSMITH RESUMED HIS CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT.)**

MR. COOPERSMITH:  GOOD MORNING EVERYONE.

WE HAVE A LOT TO GET THROUGH TODAY, SO THANK YOU IN ADVANCE FOR YOUR CONTINUED PATIENCE AND ATTENTIVENESS.

I DIDN'T SAY THIS YESTERDAY, BUT IF YOU NEED A BREAK FOR SOME REASON, RAISE YOUR HAND AND JUDGE DAVILA CAN DECIDE WHETHER WE'LL GET A BREAK.

I'LL TRY TO TAKE, OR ASK JUDGE DAVILA FOR BREAKS AT CERTAIN TIMES, BUT IF THERE'S SOME REASON BEFORE THAT, JUST PLEASE GO AHEAD AND DON'T BE SHY ABOUT THAT.  THANK YOU.

I WANT TO START THIS MORNING WITH ONE ISSUE AND SHOW SOMETHING THAT YOU'VE SEEN YESTERDAY JUST TO ADDRESS SOMETHING THAT THE GOVERNMENT SAID IN THEIR CLOSING.

THIS IS, YOU MIGHT REMEMBER FROM YESTERDAY, IS THE START OF ALL OF THE VALIDATION REPORTS FOR THE CLIA LAB THAT DR. ROSENDORFF SIGNED DURING THE TIME HE WAS AT THERANOS.  YOU CAN SEE IT GOES FROM SEPTEMBER OF 2013 THROUGH SEPTEMBER OF 2014.

AND THE POINT I WANTED TO JUST ADDRESS REALLY QUICKLY IS DURING THE GOVERNMENT'S CLOSING, THEY SHOWED YOU A CHART THAT THEY CLAIMED SHOWED SOME TYPE OF CORRELATION BETWEEN THERANOS'S RAISING OF INVESTOR FUNDS AND VALIDATION OF ASSAYS IN THE CLIA LAB.

AND IT JUST DOESN'T WORK.  THEY CERTAINLY POINTED TO SOME OF THE VALIDATIONS ON THE LEFT SIDE OF THE CHART IN THE FALL OF 2013, BUT, OF COURSE, THAT'S WHEN THERANOS WAS GOING THROUGH THE LAUNCH WITH WALGREENS, SO OF COURSE THERE'S GOING TO BE A LOT OF VALIDATION WORK DONE AT THAT TIME.

BUT THEN WHEN YOU GO TO THE RIGHT SIDE OF THE CHART YOU

SER-975

CAN SEE ALL OF THE VALIDATION WORK THAT OCCURS IN FEBRUARY, MARCH, AND APRIL AND LATER.

AND JUST TO ORIENT EVERYONE IN TIME, AND WE'LL SEE THIS LATER, BUT MR. GROSSMAN INVESTED -- HIS INVESTMENT WAS FEBRUARY 6TH OF 2014.

AND THEN THE RDV INVESTMENT AND MR. MOSLEY'S INVESTIGATION WERE IN OCTOBER OF '14. SO ALL OF THESE VALIDATIONS IN FEBRUARY, THAT DOESN'T -- THEY DON'T CORRELATE WITH ANY NEED TO FUND RAISE.

SO I JUST WANTED TO POINT THAT OUT BECAUSE IT WAS SOMETHING THAT THE GOVERNMENT -- THEY HAD A CHART THAT THEY CONCOCTED ABOUT THAT, BUT IT'S JUST NOT CORRECT.

OKAY. WHEN WE LEFT OFF YESTERDAY, THOUGH, WE WERE TALKING ABOUT QUALITY CONTROL, AND I JUST HAVE A LITTLE BIT MORE TO SAY ABOUT THAT.

SO YOU MAY RECALL FROM THE TESTIMONY OF DR. ROSENDORFF THAT THIS WAS A QUALITY SYSTEMS PRESENTATION THAT WAS LANGLY GEE, WHO WAS THE QUALITY CONTROL MANAGER, PRESENTED AT THERANOS AND THE DATE OF IT IS JULY 10TH, 2014.

AND WHEN YOU LOOK AT THE PAGE THAT IS ON THE SCREEN NOW, IT'S PAGE 12 OF EXHIBIT 13809, THIS IS A QUALITY CONTROL GRAPH THAT MR. GEE PRESENTED SHOWING THAT THE Q1, THAT'S JANUARY, FEBRUARY, AND MARCH, THE FIRST QUARTER OF 2014, THAT AS YOU CAN SEE, 2.9 PERCENT OF THE CONTROLS, THE QUALITY CONTROLS FAILED.

NOW, THE GOVERNMENT SHOWED YOU A CHART YESTERDAY, AND YOU

SER-976

SAW THIS AT TRIAL, TOO, THAT HAD QUALITY CONTROL RESULTS IN THE MONTH OF MARCH OF 2014, JUST THAT MONTH. AND THERE WAS SOME TESTIMONY ABOUT WHETHER THAT WAS A TYPICAL MONTH OR NOT.

THIS IS WHAT MR. GEE PRESENTED.

NOW, THERE WAS SOME DEBATE, AND DR. ROSENDORFF HAD SOME EXPLANATION, AND IT INCLUDES THE THERANOS TECHNOLOGY, THE EDISONS AND THE MODIFIED PREDICATES, BUT THERE REALLY WOULD BE ONLY ONE WAY TO RESOLVE THAT DEBATE, IF THERE IS ONE, AS TO WHAT THE QUALITY CONTROL RATE OR THE FAILURE RATE IS. IS IT 2.9 PERCENT? IS IT HIGHER? IS IT MORE CONSISTENT WITH THE MARCH FIGURES THAT THE GOVERNMENT SHOWED YOU.

THE ONLY WAY TO RESOLVE THAT IS TO GO INTO THE LABORATORY INFORMATION SYSTEMS WHERE, AS DR. ROSENDORFF TESTIFIED, ALL OF THE QUALITY CONTROL INFORMATION IS STORED, AND YOU CAN LOOK AT EVERY SINGLE DAY, EVERY SINGLE MONTH, EVERY SINGLE WEEK, AND THEN YOU WOULD KNOW HOW TO RESOLVE THIS.

BUT THIS IS THE INFORMATION THAT MR. GEE PRESENTED.

AND I SHOULD NOTE IF YOU GO TO THE NEXT PAGE, THIS WAS MR. GEE PRESENTING THE MATERIAL ACCORDING TO DR. ROSENDORFF, NOT MR. BALWANI. THIS WAS THE QUALITY CONTROL MANAGER THAT MR. OR DR. ROSENDORFF HIRED, RECOMMENDED TO BE HIRED AND WORKED THERE, AND THAT YOU DIDN'T HEAR FROM.

WHICH BY THE WAY, IT MIGHT BE ANOTHER WAY TO RESOLVE THIS ISSUE. IF THE GOVERNMENT CALLED MR. GEE, HE COULD TELL YOU HIMSELF ABOUT THIS. BUT THE GOVERNMENT DECIDED NOT TO DO THAT.

SER-977

INSTEAD, THEY PRESENTED TO YOU A CHART SHOWING A MONTH.

AND AGAIN, IT DOESN'T SEEM TO REALLY RESOLVE ANYTHING WITHOUT KNOWING THE BACKGROUND AND THE DATA IN THE LIS.

OKAY. LET'S MOVE TO A DIFFERENT TOPIC. YOU'VE HEARD A LOT ABOUT THIS ASSAY, HCG. AS I SAID YESTERDAY, THIS IS DESIGNED TO DETERMINE PREGNANCY AND ALSO TO EVALUATE WHETHER THIS IS A VIABLE PREGNANCY.

SO HCG WAS AN ASSAY THAT THERANOS USED. AND THE PICTURE THAT THE GOVERNMENT PRESENTED OF HCG IS JUST INCORRECT AND INCOMPLETE, AND LET ME GO THROUGH THAT STEP BY STEP BECAUSE THE GOVERNMENT SPENT A LONG TIME ON THIS AND SO I THINK IT'S IMPORTANT TO GET ALL OF THE FACTS OUT.

SO, FIRST OF ALL, THIS IS THE VALIDATION REPORT THAT DR. ROSENDORFF SIGNED IN 2014. IT WAS MARCH 19TH, 2014.

YOU CAN SEE THAT IT ALSO HAS THE SIGNATURES OF DR. SIVARAMAN AND DR. YOUNG AS THE REVIEWERS, AND THEN THE APPROVAL OF DR. ROSENDORFF.

AND THEN LATER DR. DHAWAN SIGNED THAT AS WELL, THAT VERY LAST SIGNATURE.

SO THAT'S WHEN THE HCG ASSAY VALIDATION WAS COMPLETED, AND THAT MEANT, AS WE ALL KNOW NOW, THE ASSAY COULD GO INTO THE CLIA LAB FOR PATIENT USE.

NOW, THE GOVERNMENT SHOWED YOU THIS NEXT EXHIBIT WHERE ON MAY 30TH OF 2014 DR. ROSENDORFF WROTE THIS EMAIL TO THE WHOLE CLS TEAM, THE CLINICAL LAB SCIENTIST TEAM, AND HE SAID ALL

FURTHER HCG TESTING (CTN OR VACUTAINER) BOTH THE FINGERSTICKS AND VENOUS DRAWS, ARE TO BE RUN ON THE IMMULITE; HOLD ALL EDISON CTN RESULTS, DO NOT RELEASE, AND THEN ANAM CONTACT PENDING HCG FOR REDRAW.

AND SO THAT'S DR. ROSENDORFF'S EMAIL, AND THAT WAS HIS PREROGATIVE AS LAB DIRECTOR. IF HE SAW AN ISSUE, HE SHOULD DO WHAT HE THINKS IS THE RIGHT THING TO DO. IN THIS CASE HE DECIDED TO HALT HCG TESTING AND RUN IT ON A COMMERCIAL MACHINE CALLED THE IMMULITE AT THAT PARTICULAR TIME. THAT'S MAY 30TH.

OKAY. WE GO TO THE NEXT SLIDE. THIS IS THE TESTIMONY FROM DR. ROSENDORFF ON DIRECT EXAMINATION, AND HE MISSPOKE AT FIRST. HE SAID, "MY UNDERSTANDING WAS NO, THAT IT WENT BACK ON THE IMMULITE WITHOUT MY KNOWLEDGE."

BUT I THINK HE MEANT EDISONS, SO THEN HE CORRECTS IT. I'M SORRY. IT WENT BACK ON THE EDISON WITHOUT MY KNOWLEDGE.

SO DR. ROSENDORFF IS CLAIMING THAT EVEN THOUGH HE SAID ON MAY 30TH, STOP, THAT WAS SOMEHOW IGNORED AND IT WENT BACK ON THE EDISON DEVICE, THIS HCG ASSAY, WITHOUT HIS KNOWLEDGE.

NOTHING COULD BE FURTHER FROM THE TRUTH.

ON MAY 30TH, 2014, THAT SAME DAY, ELIZABETH HOLMES WRITES TO SUNNY BALWANI, "I'VE DONE MANY MEETINGS ON THIS DAY."

SO THEY'RE TAKING THIS SERIOUSLY. IT'S NOT, WELL, THAT'S TOO BAD HCG IS NOT WORKING, TOO BAD. LET'S GO FORWARD ANYWAY.

NO. THEY'RE TAKING THIS SERIOUSLY AND THEY'RE HAVING MEETINGS.

SER-979

SO THEN WHAT HAPPENS?

THIS EMAIL IS FOUR DAYS LATER ON JUNE 4TH.  AND DR. ROSENDORFF SAYS TO SUNNY BALWANI, "SUNNY,

"DANIEL, CHINMAY AND I HAVE DISCUSSED THE PLAN FOR HCG."

HE SAYS DETERMINE AN INVALID TIP COUNT CUT OFF.  THIS IS DR. ROSENDORFF.

GOING FORWARD.  CHANGE HCG TO VACUTAINER AND RUN ON IMMULITE.  OKAY, THAT'S GOING TO THE COMMERCIAL DEVICES.

NEXT, HE SAYS, HOLD CURRENT CTN ORDERS FOR HCG AND CALL FOR REDRAW ON VACUTAINER AS NEEDED.

SO HOLD THE ORDERS, STILL CONSISTENT WITH HIS MAY 30TH EMAILS.

AND THEN HE SAYS, NUMBER 3, WHICH THE GOVERNMENT DIDN'T TALK ABOUT, RESUME CTN HCG WHEN WE HAVE RESOLVED THESE ISSUES.

THE CTN IS THE CAPILLARY TO THE NANOTAINER, SO THAT'S THE FINGERSTICK TESTING.  THAT'S THE EDISON.  RESUME CTN HCG WHEN WE HAVE RESOLVED THESE ISSUES.

SO HE WANTS THESE ISSUES RESOLVED.  THAT MAKES SENSE.

BUT HE DIDN'T SAY HALT FOR ALL TIME.  HE SAYS LET'S SEE IF WE CAN RESOLVE THE ISSUES AND THEN WE CAN CONTINUE.

SO THEN WHAT HAPPENS?

HERE'S AN EMAIL THAT THE GOVERNMENT DIDN'T SHOW YOU ON EXAMINATION OF DR. ROSENDORFF OR DURING THEIR CLOSING.

SO DR. ROSENDORFF STARTS OUT AT THE BOTTOM HE SAYS, "PLEASE HOLD THE RESULT UNTIL CHINMAY IS DONE WITH HIS RLU

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                    7167

STUDY TODAY -- WE CAN RUN CTN HCG BUT NEED TO HOLD RESULTS

UNTIL WE KNOW WHAT THE INVALID CUTOFF IS."

          SO HE SAYS GO AHEAD AND COLLECT THE FINGERSTICK SAMPLES,

BUT WE STILL NEED THIS INFORMATION FROM DR. PANGARKAR BEFORE WE

CAN GO FORWARD.

          AND THEN MS. ALAMDAR WRITES, "ADAM/CHINMAY,

          "ANY UPDATES ON THE HCG?  WE HAVE MULTIPLE PATIENTS

PENDING TO BE RELEASED."

          THAT'S SIX DAYS AFTER DR. ROSENDORFF SAYS HALT.

          THEN DR. ROSENDORFF WRITES, "CHINMAY WILL BE IMPLEMENTING

A SCRIPT SHORTLY TO RE-QUALIFY VALID VERSUS INVALID HCG VALUES.

STAY TUNED."

          AND THEN ON THE TOP DR. PANGARKAR FOLLOWS THROUGH WITH

THAT AND HE WRITES TO DR. ROSENDORFF AND HE SAYS, AND

MS. ALAMDAR, HE SAYS, "HI HODA," AND HE HAS TWO SAMPLE NUMBERS,

AND HE SAYS "ARE READY TO BE RELEASED.  THE LATEST RESULTS THAT

YOU CAN RELEASE ARE IN," AND THERE'S A SHARED DRIVE THAT HE

PUTS FORWARD THERE.  "WE ARE WORKING ON ANOTHER SAMPLE AND WILL

LET YOU KNOW WHEN IT IS READY."

          SO DR. ROSENDORFF AGAIN IS SAYING HOLD OFF UNTIL WE DO THE

STUDY THAT CHINMAY PANGARKAR IS DOING AND CHINMAY PANGARKAR DID

HIS WORK AND HE'S NOW INFORMING DR. ROSENDORFF FOR RELEASING.

AND YOU SEE NOTHING THAT THERE'S ANY PUSHBACK FROM

DR. ROSENDORFF ON THAT AT ALL.

          AND IF THERE'S ANY DOUBT ABOUT THAT, LET'S GO TO THE NEXT

SER-981

DOCUMENT, WHICH IS ANOTHER EMAIL.  AND THIS IS JUNE 9TH.  THIS IS NINE DAYS AFTER DR. ROSENDORFF SAYS HALT HCG TESTING.

AT THE BOTTOM THERE TINA LIN SAID, "HI CLS'S," THOSE ARE THE CLINICAL LAB SCIENTISTS.

"CTN FOR A NUMBER, WAS CALCULATED NOT TO HAVE ENOUGH PLASMA TO RUN HCG USING THE AUTOMATED SOFTWARE AFTER RUNNING TSH AND SO IT WAS RUN OUTSIDE OF THE SOFTWARE.  THE INITIAL RUN RESULT WAS INVALID.  THE RERUN RESULT WAS OORH," OUT OF RANGE HIGH.

AND THEN WHAT HAPPENS?

MS. ALAMDAR TELLS DR. ROSENDORFF, "I BELIEVE I CAN REPORT THIS PATIENT AS GREATER THAN 4941."

AND DR. ROSENDORFF SAYS, "YES PLEASE REPORT AS GREATER THAN 4941, IF THAT IS THE LATEST OORH VALUE."

SO HERE DR. ROSENDORFF IS SPECIFICALLY SAYING THAT THIS CTN SAMPLE, THAT'S THE FINGERSTICK SAMPLE FOR EDISON, SHOULD BE RELEASED.

SO WHEN HE SAYS THAT HE NEVER AUTHORIZED IT TO GO BACK ON EDISON, THAT IS SIMPLY NOT TRUE, OKAY?

AND THAT'S WHY THESE CONTEMPORANEOUS DOCUMENTS ARE WHERE YOU SEE WHAT THE FACTS REALLY ARE.  IT'S NOT PEOPLE'S MEMORIES, YOU KNOW, LONG AFTER THE FACT WHEN THEY HAVE CERTAIN INCENTIVES, WHICH I'LL EXPLAIN IN A MINUTE.

LET'S GO TO THE NEXT SLIDE.

AND IF THERE'S ANY DOUBT ABOUT THAT, THIS IS TALKING ABOUT

SER-982

THE EMAIL THAT I JUST SHOWED YOU.

AND SO THE QUESTION ON RECROSS-EXAMINATION TO DR. ROSENDORFF WAS, "AND SO YOU WERE DIRECTING MS. ALAMDAR TO RELEASE THE RESULTS FOR THAT CTN SAMPLE; CORRECT?"

HE SAYS YES.

AND THIS IS FOR HCG?

YES.

DR. ROSENDORFF'S TESTIMONY, WHICH HE WAS FORCED TO GIVE AFTER LOOKING AT THE DOCUMENTS THAT WE SHOWED HIM ON CROSS-EXAMINATION.

SO WHY IS DR. ROSENDORFF DOING THIS?  LET'S JUST THINK ABOUT THIS FOR A MINUTE.  HE TESTIFIED THAT HE'S STILL IN THE LAB INDUSTRY.

AND SOMEONE LIKE THAT, AFTER ALL THAT HAS HAPPENED HERE WITH THERANOS, I MEAN, AFTER ALL, WE'RE IN A FEDERAL CRIMINAL TRIAL HERE, THE LAST THING THAT SOMEONE LIKE DR. ROSENDORFF WANTS TO SAY IS, OH, YES, WHEN I WAS AT THERANOS, I APPROVED THE TEST AND I RELEASED THE RESULT.

AT THIS POINT HE WANTS TO DISTANCE HIMSELF AND SAY, OH, I HAD NOTHING TO DO WITH THIS.  I DIDN'T DO ANYTHING.  THEY DID THIS WITHOUT MY KNOWLEDGE.  HE NEEDS TO DO THAT TO PLAY THE HERO AT THIS POINT BECAUSE HE'S STILL IN THE LAB INDUSTRY AND WE'RE NOW BASICALLY IN A FEDERAL CASE.

BUT REGARDLESS OF WHAT YOU THINK ABOUT DR. ROSENDORFF, THE FACTS ARE THAT WHEN HE SAID THAT HE NEVER ALLOWED HCG TO GO

SER-983

BACK ON TO THE EDISON DEVICE, THAT WAS SIMPLY UNTRUE.

NOW, I THINK THE GOVERNMENT KIND OF COMPOUNDED THE PROBLEM HERE BECAUSE EVEN AFTER THAT, DR. ZACHMAN TESTIFIED LATER THAN DR. ROSENDORFF, THEY ASKED HER THIS QUESTION ON REDIRECT: "DURING YOUR CONVERSATIONS WITH THERANOS, WERE YOU EVER TOLD AT ANY TIME THAT THERANOS'S LAB DIRECTOR MADE THE DECISION TO HALT ALL HCG TESTING ON THE COMPANY'S EDISON DEVICE IN MAY OF 2014?"

SHE SAID NO.

WELL, THE PROBLEM WITH THAT QUESTION AND ANSWER IS THAT IT'S NOT COMPLETE. AT THIS POINT THE GOVERNMENT KNEW ABOUT THE EMAILS THAT WE SHOWED DR. ROSENDORFF AND HIS ADMISSION THAT, YES, HE RELEASED -- AUTHORIZED THE RELEASE OF THE FINGERSTICK RESULT.

SO THAT'S A COMPLETELY INVALID QUESTION.

AND OF COURSE, YOU KNOW, DR. ZACHMAN DOESN'T KNOW ANYTHING ABOUT THIS, RIGHT? SHE'S JUST COMING IN. SHE WAS THE DOCTOR FOR BRITTANY GOULD.

AND THE SAME THING HAPPENED WITH DR. WOOTEN:

QUESTION. AND IF YOU HAD KNOWN IN 2015 THAT HCG TESTING AT THERANOS HAD BEEN HALTED BY THE LAB DIRECTOR, WOULD THAT HAVE AFFECTED YOUR DECISION TO YOURSELF TO GET HCG TESTING AT THERANOS?

AND SHE SAYS, IT WOULDN'T HAVE HALTED ME.

WHY IS THAT? YOU WOULD HAVE ASSUMED THEY FIXED THE PROBLEM?

CORRECT.

BUT IF THEY HADN'T, WOULD THAT HAVE AFFECTED YOUR OPINION?

CORRECT.

WELL, THE PROBLEM WITH THAT EXCHANGE IS THAT, AGAIN, THE CORRECT HYPOTHETICAL IS -- WELL, NOT EVEN A HYPOTHETICAL, THE REALITY IS THAT IF DR. WOOTEN, IF YOU KNEW THAT THEY HAD AN ISSUE WITH HCG AND THEY DID THE STUDY AND THEY FIXED IT, AND THE LAB DIRECTOR SAID PLEASE PROCEED, WOULD THAT HAVE AFFECTED YOUR OPINION?

THAT'S A VERY DIFFERENT QUESTION.

SO THIS CONTINUED SUGGESTION THAT DR. ROSENDORFF DIDN'T APPROVE THE RETURN TO EDISON IS JUST WRONG.  AND IT'S IN THE FACE OF INCONTROVERTIBLE EVIDENCE, WHICH IS PUZZLING.

OKAY.  LET'S TALK ABOUT ANOTHER TOPIC, PROFICIENCY TESTING AT THERANOS.  SO YOU'VE HEARD A LOT ABOUT THIS.  SOMETIMES IT'S CALLED PT.

SO JUST TO LEVEL SET HERE, WHAT THIS MEANS IS THAT CLINICAL LABORATORIES IN THE UNITED STATES HAVE TO DO THIS SORT OF EXAMINATION.  IT'S APPROXIMATELY EVERY SIX MONTHS.

AND WHAT HAPPENS IS TRADITIONAL PT IN THAT WORLD SAMPLES, PT SAMPLES, OFTEN THEY'RE SYNTHETIC MATERIAL, BUT THEY COME FROM DIFFERENT OUTSIDE GROUPS, LIKE THE COUNCIL OF AMERICAN PATHOLOGISTS, CAP, OR API, OR SOMETIMES -- NEW YORK STATE HAS A PROGRAM AND THEY SEND SAMPLES TO LABS.

SO LABS ARE SUPPOSED TO TAKE THOSE SAMPLES AND RUN THEM ON

THEIR EQUIPMENT AND THEN REPORT THE RESULTS BACK TO THE OUTSIDE TESTING AGENCY, LET'S SAY IT'S API.

AND THEN THE TRADITIONAL METHOD OF PT AS YOU HEARD AT TRIAL YOU MAY REMEMBER IS WHAT THEY CALL PEER GROUP TESTING.

SO LET'S SAY THAT YOU'RE RUNNING A SIEMENS ADVIA MACHINE. WELL, THERE ARE A LOT OF OTHER LABS IN THE COUNTRY THAT ARE RUNNING A SIEMENS ADVIA MACHINE.

SO WHAT HAPPENS IS YOU RETURN YOUR RESULT THAT YOU GET AT YOUR LAB TO API AND THEN THEY LOOK AT ALL THE OTHER RESULTS FROM OTHER LABS THAT RAN THE SAME SAMPLE BATCH AND THEY DECIDE, OKAY, WHERE DOES THE RESULT FROM ANY PARTICULAR LAB, SAY IT'S THERANOS, FALL COMPARE TO THE PEER GROUPS?  IT'S NOT LIKE IT'S THE EXACT VALUE.  IT'S LIKE ARE YOU WITHIN A RANGE THAT MAKES SENSE OR ARE YOU OUTSIDE OF THE STANDARD DEVIATION, THINGS LIKE THAT.

SO THERE'S A PEER GROUP COMPARISON, AND IT'S BASED ON THE FACT THAT MANY LABS ARE RUNNING THE SAME TECHNOLOGY, YOU KNOW, WHETHER IT'S A SIEMENS ADVIA OR SOME OTHER COMMERCIAL MACHINE.

THAT'S TRADITIONAL PT TESTING.

AND THERANOS DID THAT FOR ITS COMMERCIAL DEVICES, AND WE'LL SEE SOME MORE ABOUT THAT.

BUT FOR THE COMMERCIAL FDA APPROVED MACHINES THAT THEY WERE RUNNING IN THE LAB, THEY DID THAT, AND THAT WAS REQUIRED.

WELL, BECAUSE THIS WHOLE SYSTEM OF TRADITIONAL PT TESTING IS BASED ON THIS PEER GROUP CONCEPT, WHAT IF YOU'RE RUNNING A

SER-986

LAB THAT DOESN'T HAVE ANY PEERS? YOU'RE WORKING WITH YOUR OWN TECHNOLOGY, IN THIS CASE THE THERANOS EDISON, OR THE MODIFIED PREDICATE DEVICES THAT THERANOS WAS USING.

THERE'S NO OTHER PEERS. THERE'S NO OTHER LAB THAT IS RUNNING THAT EQUIPMENT. IT'S THERANOS'S PROPRIETARY TECHNOLOGY.

SO THAT'S TAKEN INTO ACCOUNT AND THE METHODOLOGY FOR THAT IS CALLED AAP, ALTERNATIVE ASSESSMENT PROCEDURE. IT SOUNDS COMPLICATED BUT IT'S REALLY NOT. IT'S REALLY JUST A HEAD-TO-HEAD COMPARISON USING REAL BLOOD SAMPLES OF THE PROPRIETARY EQUIPMENT, IN THIS CASE THE EDISON OR THE MODIFIED PREDICATES, WITH THE FDA COMMERCIAL DEVICES THAT THERANOS ALSO HAD.

SO IT'S JUST HEAD-TO-HEAD COMPARISON. AND YOU TAKE FIVE SAMPLES AND YOU GET THE BLOOD FROM EMPLOYEES OR SOME OTHER SOURCE WHO DONATE IT, YOU RUN THE REAL BLOOD SAMPLES AND YOU DO THIS HEAD-TO-HEAD COMPARISON, AND YOU SEE HOW YOUR TECHNOLOGY STACKS UP AGAINST THE COMMERCIAL TECHNOLOGY, THE SO-CALLED GOLD STANDARD TECHNOLOGY.

SO THAT'S THE AAP TECHNOLOGY. AND THERE'S A PROCEDURE FOR THAT.

SO WHAT HAPPENED HERE AT THERANOS?

SO FROM THE VERY EARLY TIME IN JULY OF 2013, AND THAT'S THE EMAIL THAT YOU'RE SEEING ON THE SCREEN, MR. BALWANI WAS SENT THIS EMAIL FROM SILVIA CHANG WITH A COPY TO DR. ROSENDORFF

SER-987

THAT SAID, "SUNNY,

"PER YOUR REQUEST, HERE ARE THE DETAILS FOR HANDLING, SCHEDULING, AND SUBMITTING PROFICIENCY SAMPLES.  I'VE ATTACHED THE SOP FOR REFERENCE."

SO THIS WAS AT MR. BALWANI'S REQUEST THAT THEY WANTED TO MAKE SURE THEY HAD THE RIGHT PT SYSTEM IN PLACE FROM AN EARLY TIME, EVEN BEFORE THE WALGREENS LAUNCH.

SO HERE'S THE NEXT PAGE.  THIS IS THE PROTOCOL OR THE SOP, STANDARD OPERATING PROCEDURE, THAT MS. CHANG SENT BACK IN JULY OF 2013.  AND IT DEFINES RESPONSIBILITIES.

THE LABORATORY TESTING PERSONNEL ARE RESPONSIBLE FOR THE FOLLOWING:

ON 4.2, THAT SECTION, IT SAYS THE LABORATORY TECHNICAL SUPERVISOR IS RESPONSIBLE FOR MAKING SURE THAT PROFICIENCY TESTING SAMPLES ARE IDENTIFIED AND PREPARED FOR THE LABORATORY.

AND THEN ENSURING THAT THE WORK IS DONE.

AND THEN AT THE BOTTOM, 4.3, THE LABORATORY DIRECTOR IS RESPONSIBLE FOR THE FOLLOWING:

REVIEWING AND APPROVING EACH PT TESTING EVENT DOCUMENTATION.

SO THAT'S THE RESPONSIBILITIES.

SO IT'S NOT ONLY RUNNING THE TESTS, BUT THEN THE LAB DIRECTOR IS SUPPOSED TO REVIEW AND APPROVE.  HOLD ON TO THAT THOUGHT, BECAUSE I'LL GET BACK TO THAT IN JUST A BIT.

OKAY.  AND THEN GOING ON WITH THIS SAME EXHIBIT, IT'S

SER-988

13905 IS THE EXHIBIT NUMBER, ALTERNATIVE ASSESSMENT PROCEDURE. AND IT DESCRIBES WHAT I JUST TOLD YOU.

FOR NON-CMS-REGULATED TESTS, FOR THOSE WHICH LACK FDA CLEARANCE, COMMERCIAL OR EXTERNAL PT PROGRAMS MAY NOT BE AVAILABLE FOR CERTAIN ANALYTES. IN SUCH INSTANCES, AN AAP MAY HELP VALIDATE THE QUALITY OF ONGOING TEST SYSTEM PERFORMANCE.

AND THEN IT TALKS ABOUT IN SECTION 5.3.2 IN MOST CASES BLIND RETESTING OF 3 TO 5 PATIENT SAMPLES BY A DIFFERENT OPERATOR EVERY 6 MONTHS.

SO THAT'S THE PROCEDURE THAT WAS DISCUSSED IN JULY 2013.

SO THEN LATER, IF WE GO TO THE NEXT EXHIBIT, AND THIS IS EXHIBIT 9939, DR. ROSENDORFF ACTUALLY PUTS THIS PROCEDURE IN PLACE AT THERANOS. PROFICIENCY TESTING FOR THERANOS LAB-DEVELOPED TESTS: EDISON 3.5.

SO THIS IS DR. ROSENDORFF'S PROCEDURE. AND YOU CAN SEE --

IF YOU GO BACK TO THE FIRST PAGE, MR. ALLEN.

-- IT'S SIGNED BY LI DING-CHIANG AND DR. YOUNG AND THEN IT'S APPROVED BY DR. ROSENDORFF ON DECEMBER 2ND, 2013.

OKAY, IF WE GO TO THE NEXT PAGE. THE PURPOSE OF THIS PROPOSAL IS TO DEVISE AN ALTERNATIVE ASSESSMENT PROTOCOL, AND THEN IT SAYS FOR NONCMS REGULATED TESTS. IT'S BASICALLY THE SAME THING THAT I JUST READ YOU, AND AAP WOULD BE APPROPRIATE FOR THOSE CERTAIN TYPES OF TESTS.

AND IF WE GO TO THE NEXT PAGE, IT EXPLAINS THE RESPONSIBILITIES OF THE TECHNICAL SUPERVISOR AND THE LAB

SER-989

PERSONNEL.

AND THEN IN 3.4, IT SAYS THAT THE LABORATORY DIRECTOR IS RESPONSIBLE FOR REVIEWING AND APPROVING EACH PT TESTING EVENT DOCUMENTATION.

SO THAT'S DR. ROSENDORFF'S OWN PROCEDURE HE IMPLEMENTS ON DECEMBER 2ND, 2013.

IF YOU GO TO THE NEXT PAGE, YOU CAN SEE THAT THIS IS THE PROCEDURE. OBTAIN FIVE VENOUS CLINICAL SAMPLES. YOU SPLIT THE SAMPLES INTO TWO ALIQUOTS, BASICALLY TWO CONTAINERS, AND THEN YOU RUN THE SIEMENS IMMULITE 2000 AND THERANOS LDT, THE LABORATORY DEVELOPED TEST, METHODS IN PARALLEL USING N EQUALS FIVE, SO FIVE SAMPLES.

SO THIS IS HEAD-TO-HEAD COMPARISON. SO YOU BASICALLY HAVE FIVE SAMPLES, YOU SPLIT THEM, RUN ONE HALF ON THE COMMERCIAL DEVICE, AND ONE HALF ON THE THERANOS TECHNOLOGY AND SEE WHAT HAPPENS, RIGHT.

AND THEN THE NEXT PAGE THERE'S CRITERIA FOR ACCEPTANCE.

AND YOU CAN SEE THAT IF AN ANALYTE FAILS GREATER THAN 20 PERCENT OF THE TIME, THAT'S 1 OUT OF 5, AND THEN THE PROFICIENCY WILL BE DEEMED TO HAVE FAILED. YOU HAVE TO GET ABOVE 80 BASICALLY. BELOW THAT IS A FAILURE. OKAY?

AND THIS IS A REFERENCE THAT YOU MIGHT REMEMBER FROM TRIAL, THE CLSI, THAT'S THE CLINICAL LABORATORY STANDARDS INSTITUTE. AND DR. ROSENDORFF TESTIFIED THIS WAS AN AUTHORITATIVE GROUP FROM PENNSYLVANIA THAT PUT OUT GUIDANCE FOR

SER-990

CLINICAL LABS. AND THAT WAS CITED IN DR. ROSENDORFF'S PROTOCOL.

SO THEY'RE NOT MAKING THIS STUFF UP FROM SCRATCH. YOU KNOW, THEY'RE RELYING ON SOURCES, AND THOSE WERE THE REFERENCES IN DR. ROSENDORFF'S PROTOCOL.

OKAY. JUST TO QUICKLY SHOW YOU, THERE WAS A PRETTY MUCH IDENTICAL PROCEDURE FOR THE MODIFIED PREDICATES, SO THAT IS EXHIBIT 9940. AND I WON'T GO THROUGH THIS, BUT IT IS REALLY THE SAME AS 9939 AND IT APPLIES TO THOSE MODIFIED PREDICATE DEVICES, WHEREAS 9939 APPLIED TO THE EDISON TESTS.

AND YOU CAN SEE THAT ONE WAS SIGNED, AGAIN, THE SAME DATE DR. ROSENDORFF APPROVED IT ON DECEMBER 2ND, 2013.

AND JUST ANOTHER WORD ABOUT THE CLINICAL LABORATORY STANDARDS INSTITUTE. DR. ROSENDORFF TESTIFIED THAT THEY PROVIDED GUIDANCE ON THE ALTERNATIVE ASSESSMENT PROCEDURE AND THAT HE REVIEWED THAT TO HELP DEVISE THE PROTOCOL.

SO, AGAIN, HE'S NOT JUST, YOU KNOW, FLAILING AROUND IN THE DARK. HE'S GOT GUIDANCE AND HE'S GOT STANDARDS AND HE'S USING THOSE TO DEVELOP HIS PROTOCOL.

OKAY. WITH THAT BACKGROUND, WHAT THE GOVERNMENT HAS SHOWN REPEATEDLY AT TRIAL, INCLUDING AT CLOSING -- AND GO TO THE NEXT SLIDE -- IS THIS EMAIL FROM FEBRUARY OF 2014 AND IT'S FROM ERIKA CHEUNG, SHE FORWARDS IT TO HER FRIEND TYLER SHULTZ.

BUT IF YOU GO TO THE NEXT PAGE, THIS IS THE RESULTS OF A PARTICULAR EXPERIMENT WE'LL CALL IT WHERE SOME LEFTOVER

PROFICIENCY TESTING SAMPLES FROM NEW YORK STATE AND API WERE RUN ON EDISON.

AND WE'LL SEE THIS IN A MINUTE, BUT DR. PANDORI TESTIFIED THAT THEY DID THE STANDARD PROFICIENCY TESTING YOU HAVE TO DO ON COMMERCIAL DEVICES, AND THEN THEY HAD SOME LEFTOVER SAMPLES, SO DR. PANDORI, HE TESTIFIED, WITHOUT KNOWING OR REALIZING THERE WAS A POLICY. I THINK HE JUST STARTED LIKE AROUND DECEMBER OF 2013.

SO WITHOUT KNOWING THAT THERE WAS THIS PROTOCOL THAT DR. ROSENDORFF PUT IN PLACE, THIS SOP, DR. PANDORI ARRANGED FOR THESE LEFTOVER SAMPLES TO BE RUN ON THE EDISON DEVICE, WHICH WAS TOTALLY AGAINST THE SOP. THERE WAS NO SOP FOR RUNNING LEFTOVER SAMPLES FROM API OR NEW YORK STATE ON THE EDISON DEVICE. BUT THAT'S WHAT THEY DID, RIGHT?

SO THE GOVERNMENT IS REALLY FOCUSSED ON THIS TPSA SECTION, AND YOU CAN SEE THERE'S PURPORTEDLY A RERUN. SO THIS SAMPLE 267 AND THE RERUN VALUE IS 3.1, AND THEN THERE'S ANOTHER RERUN FOR SAMPLE 268 AND IT LISTS IT AS 7.5.

SO THE GOVERNMENT'S POINT ON CLOSING WAS, WELL, BOY, ISN'T THAT WONDERFUL? THE PREDICATE DEVICE, THE COMMERCIAL DEVICE GOT 3.1 AND THEN A RERUN OF 3.1, AND THEN A 7.5 ON A DIFFERENT SAMPLE AND THEN A RERUN OF 7.5. SO IT'S IDENTICAL. IT'S AMAZING.

WELL, YOU HEARD AT TRIAL THAT THESE BLOOD TESTING SYSTEMS, WHATEVER IT IS, GETTING IDENTICAL NUMBERS I GUESS IS

THEORETICALLY POSSIBLE, BUT THAT'S NOT WHAT -- THAT'S NOT THE WORLD OF BLOOD TESTING.  THERE ARE STANDARD DEVIATIONS.  THEY HAVE TO BE WITHIN CERTAIN PARAMETERS, 5 PERCENT, 10 PERCENT OR EVEN 20 OR 30 PERCENT.

SO GETTING AN IDENTICAL VALUE WOULD BE VERY UNUSUAL BASED ON THE TESTIMONY AT TRIAL.

BUT THOSE BOXES ARE HIGHLIGHTED.  SO IT'S NOT EVEN CLEAR THAT THEY WERE RERUN.

DR. PANDORI TESTIFIED THAT HE WAS NOT AWARE, DIDN'T SUPERVISE IT PERSONALLY.

SO THERE'S A PRETTY GOOD CHANCE THAT THEY HAD A VALUE FROM RUNNING THE SAMPLE ON A PREDICATE DEVICE AND THEY DIDN'T RUN IT AGAIN, BUT THEY JUST PUT THAT IN SHADING AND THEN THEY RAN THE THERANOS TEST AGAIN.

SO I DON'T EVEN KNOW IF THERE WERE, I DON'T THINK ANYONE KNOWS WHETHER THERE IS A RERUN, BUT LET'S JUST ASSUME THAT THERE WAS, OKAY.

THE PROBLEM IS MUCH DEEPER THAN THAT WITH THE GOVERNMENT'S USE OF THIS CHART OR THIS DATA.

SO LET'S KIND OF GO THROUGH WHAT HAPPENED HERE.

DR. PANDORI, HE TESTIFIED THAT HE USED LEFTOVER PT MATERIAL, AS I JUST SAID, AND IT WASN'T A PROCEDURE SET FORTH IN THE SOP, REFLECTED IN THAT EXHIBIT 9939 THAT WE SAW A MINUTE AGO.

HE SAYS I WOULD HAVE TO READ THE WHOLE PROCEDURE.

SER-993

AND THE QUESTION WAS, AND YOU HADN'T DONE THAT AT THE TIME; CORRECT?

ME?  NO.

SO HE WENT FORWARD WITH THIS EXPERIMENT WITHOUT EVER READING THE PROTOCOL OR KNOWING WHAT IT IS.  THAT WAS HIS TESTIMONY.

NOW, DR. ROSENDORFF, ON CROSS-EXAMINATION I ASKED HIM THE FOLLOWING QUESTION:  AND THE EXPERIMENT THAT WAS RUN WITH THOSE SAMPLES, BECAUSE IT WASN'T IN THE PROTOCOL, WOULD YOU AGREE WITH ME THAT THAT EXPERIMENT RUNNING EDISON -- RUNNING PROFICIENCY TESTING SAMPLES FROM NEW YORK STATE AND API ON EDISON, THE RESULTS CANNOT BE DEEMED A FAILURE OF PROFICIENCY TESTING ON THE EDISON; CORRECT?

AND HE SAID NOT ACCORDING TO THE STANDARD OPERATING PROCEDURE, NO.

SO THAT'S WHAT LABS DO.  AND AS YOU HEARD, THERE'S STANDARD OPERATING PROCEDURES.  AND THAT'S -- YOU CAN CHANGE IT IF YOU WANT TO IF THERE'S A REASON TO CHANGE IT, AS YOU HEARD.

BUT YOU HAVE TO FOLLOW THESE SOP'S.  AND IT WAS NOT A FAILURE BECAUSE IT WASN'T AUTHORIZED.  THERE WAS A REASON, WE'RE GOING TO SEE IN A MINUTE, WHY THERANOS DECIDED ON THIS AAP METHOD RATHER THAN USING THESE PT SAMPLES FROM A SOURCE LIKE API OR NEW YORK STATE.

SO WHAT HAPPENS?

SO BECAUSE OF THIS CONFUSION -- AND YOU MIGHT REMEMBER,

YOU KNOW, MS. CHEUNG, YOU KNOW, SHE MIGHT HAVE BEEN PRETTY WORKED UP ABOUT THIS.  I MEAN, SHE WAS AN ENTRY LEVEL PERSON, AND IN FAIRNESS TO HER, SHE'S RAISING ISSUES, SHE TOOK THAT AS A FAILURE.  I MEAN, DR. ROSENDORFF DIDN'T THINK SO, BUT MS. CHEUNG THOUGHT SO.

SO THERE'S A LOT OF DISCUSSION, INCLUDING WITH MS. CHEUNG, ABOUT THIS ISSUE.

SO ULTIMATELY DR. PANDORI PUTS TOGETHER THIS POWERPOINT PRESENTATION ABOUT THIS QUESTION OF AAP VERSUS PT, OKAY?

AND I THINK IT'S IMPORTANT TO LOOK AT IT.

SO THIS IS DR. PANDORI'S POWERPOINT.  SO HE SAYS PT, AS I EXPLAINED A FEW MINUTES AGO, YOUR LAB IS COMPARED TO PEER GROUPS ON THE BASIS OF EQUIPMENT.  THAT'S STANDARD PT.

AND THEN HE RECITES THAT THERANOS TESTS HAVE NO PEER GROUPS BECAUSE IT'S GOT PROPRIETARY TECHNOLOGY.

AND THE NORMAL PROCESS OF PT IS THEREFORE NOT APPROPRIATE.

ADDITIONALLY, THE SYNTHETIC MATRIX OF MANY COMMERCIALLY AVAILABLE PT SAMPLES IS NOT AN APPROPRIATE ONE FOR MANY THERANOS TESTS.

SO THAT'S DR. PANDORI'S WORDS.

AND THEN IT GOES ON.

HOW IS PT PERFORMED THEN ON THERANOS TESTS?

AND HE CITES THE SAME SOURCE, THE CLINICAL AND LABORATORY STANDARDS INSTITUTE REFERS TO THE USE OF AN AAP, OR ALTERNATIVE ASSESSMENT PROTOCOL, SO HE'S DRAWING FROM THAT SAME SOURCE FOR

SER-995

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                    7182

GUIDANCE.

THIS IS AN ALTERNATIVE WAY TO ASSESS THE ONGOING PERFORMANCE OF A LABORATORY TEST WHEN STANDARD PT IS INAPPROPRIATE.

AND HE SAYS, PARTICULARLY IMPORTANT FOR LABORATORIES WHO HAVE NO PEERS SUCH AS US, EXCLAMATION POINT.

AND THEN HE TALKS ABOUT OUR AAP, THERANOS'S AAP, INCLUDES COMPARISON OF A PREDICATE, FDA APPROVED METHOD (FOR WHICH THERE IS AN EXTERNAL ASSESSMENT AVAILABLE) TO THE THERANOS METHODS.

SO IN OTHER WORDS, THERANOS IS DOING STANDARD PEER GROUP PT ON ITS PREDICATE METHODS AND THEN IT'S USING THOSE TO COMPARE THE EDISON WITH THESE REAL BLOOD SAMPLES WITH THIS AAP FEATURE, AND THAT'S WHAT DR. PANDORI IS SAYING HERE.

AND THEN HE SAYS, OUR AAP USES ACTUAL CLINICAL SPECIMENS, 5 OR MORE SPECIMENS ARE TESTED BY PREDICATE AND BY THE THERANOS METHOD.

AND THEN HE GOES ON.  INCLUDES MONTHLY OR GREATER FREQUENCY PERFORMANCE.

HE GOES ON.  THE THERANOS AAP IS SUPERIOR TO STANDARD PT AND WILL PROVIDE EVEN MORE QUALITY ASSURANCE.

THAT'S WHAT PANDORI WROTE.  THAT'S WHAT HE THOUGHT.

OKAY.  SO WE KNOW MORE ABOUT AAP AT THERANOS.  HERE'S AN EXAMPLE OF DR. ROSENDORFF USING AAP.

SO THIS IS AN ISSUE THAT CAME UP PRETTY LATE IN DR. ROSENDORFF'S TIME AT THERANOS, IN OCTOBER OF 2014, AND HE

SER-996

SENDS AN EMAIL ON OCTOBER 17TH, 2014, TO ANAM KHAN, AND IT'S ABOUT A PHYSICIAN INQUIRY FROM A DR. KRAL.

AND HE SAYS IN THE HIGHLIGHTED SECTION, "THE M.D. IS EXTREMELY POSITIVE AND EXCITED ABOUT THERANOS AND WANTS US TO 'CRUSH QUEST DIAGNOSTICS,'" A COMPETITOR YOU HAVE HEARD ABOUT.

AND DR. ROSENDORFF WRITES, "NOTE:  AAP PERFORMED ON 4/18/2014 INDICATES THAT THE THERANOS METHOD IS, ON AVERAGE, 10 PERCENT LOWER THAN THE PREDICATE, WHICH IS ACCEPTABLE."

SO THAT'S DR. ROSENDORFF'S VIEW AND HE WAS CLEARLY ABLE TO REFER TO THE AAP THAT WAS DONE TO LOOK AT THIS PARTICULAR ASSAY, IN THIS CASE I THINK IT'S FT4, AND USE THAT AS AN AID TO ANSWER A PHYSICIAN INQUIRY.

AND SO THE AAP IS GOING ON, AND WE'LL SEE MORE ABOUT THAT.

AND THAT'S THE METHOD THAT DR. PANDORI AND DR. ROSENDORFF PUT IN PLACE, NOT THE CHART THE GOVERNMENT SHOWED YOU WHERE IT'S AGAINST THE SOP, IT'S NOT A FAILURE, IT'S RUNNING PT SAMPLES WHICH DR. PANDORI SAID IS NOT APPROPRIATE BECAUSE THERE WERE SCIENTIFIC REASONS TO NOT DO THAT.

SO THAT CHART THAT THE GOVERNMENT SHOWED YOU WITH THE PT EXPERIMENT WITH NEW YORK STATE AND API, THAT IS MEANINGLESS IN THIS CASE.

BUT, AGAIN, THIS IS ANOTHER THING THAT WE HAD TO SHOW YOU, BECAUSE THE GOVERNMENT SHOWED YOU A CHART AND RELIED ON DATA THAT IS JUST NOT APPROPRIATE TO RELY ON, AND THIS IS BASICALLY A SCIENTIFIC FRAUD CASE, RIGHT?

SER-997

IF WE CAN GO, MR. ALLEN, TO SLIDE 110.

I JUST WANT TO COVER THIS TEXT MESSAGE STRING JUST FOR A MOMENT.

SO FAR THE GOVERNMENT HAS REPEATEDLY SHOWED THIS FIRST TEXT MESSAGE FROM SUNNY BALWANI TO ELIZABETH HOLMES ON NOVEMBER 28TH, 2014.  AND IT SAYS "NORMANDY IS A," AND I WON'T USE THE WORD HERE IN COURT, "DISASTER ZONE.  GLAD I CAME HERE. WILL WORK ON FIXING THIS."

SO THIS IS MR. BALWANI TEXTING IT LOOKS LIKE AT 11:12 P.M., LATE IN THE EVENING.

BUT IT GOES ON, RIGHT?

AND THE GOVERNMENT DOESN'T KNOW WHAT WAS REALLY GOING ON HERE.  AND PEOPLE LATE AT NIGHT USE ALL KINDS OF WORDS. THEY'RE FRUSTRATED WITH SOMETHING, THEY VENT.

BUT WE DO HAVE SOME INSIGHT INTO WHAT THIS WAS REALLY ABOUT.  AND THE GOVERNMENT WOULD HAVE YOU BELIEVE THAT THIS IS BASICALLY MR. BALWANI OPINING ABOUT THE ENTIRE LAB, LIKE I GOT HERE LATE AT NIGHT ON NOVEMBER 28TH, AND I'VE DETERMINED THAT THE LAB IS A DISASTER, MEANING LIKE ALL OF THE TESTS ARE INVALID.

THAT'S NOT EVEN POSSIBLE.  MR. BALWANI IS NOT A LAB SCIENTIST.  HE'S NOT QUALIFIED TO GO TO A LAB AND SPEND SOME TIME THERE AND LATE IN THE EVENING SAY I HAVE DETERMINED IT'S NOT FOUND.

HE'S GOT A SCIENTIFIC TEAM THAT YOU'VE SEEN REPEATEDLY

SER-998

THAT WHEN THERE'S AN ISSUE, THEY'RE THE PEOPLE WHO HELP DETERMINE WHETHER SOMETHING IS RIGHT OR NOT RIGHT.

AND SO MR. BALWANI HAS NO ABILITY TO BASICALLY OPINE ON THE ENTIRE LAB.

SO WHAT IS REALLY GOING ON HERE?  AGAIN, WE HAVE SOME INSIGHT INTO THIS.

SO LATER IN THIS HE SAYS AT 11:32, "I WILL GET TINA OUT. WE NEED A SOFTWARE PERSON RUNNING THIS.  BETWEEN TINA AND MAX WE HAVE A MESS."

SO THIS IS THE MESS THAT MR. BALWANI IS APPARENTLY REFERRING TO.

TINA AND MAX ARE PROJECT MANAGERS.  THEY'RE NOT LAB SCIENTISTS.  SO THE MESS SEEMS TO BE WITH SOMETHING OTHER THAN THE LAB SCIENTISTS.

AND THEN HE GOES ON TO SAY, "WE BUILT SOFTWARE TO REMOVE HUMAN ERROR AND HUMAN JUDGMENT.  ALL DAY I SAW THESE PEOPLE USE THEIR JUDGMENTS TO WORK AROUND OUR PROCESSES."

AND THEN HE SAYS, "THIS IS WHERE OUR PROBLEMS ARE.  WHICH MEANS WE CAN FIX IT.  THANK GOD."  THAT'S WHAT ELIZABETH HOLMES SAYS.

SO THIS HAS TO DO WITH PROCEDURES THAT ARE IN PLACE THAT ARE APPARENTLY NOT BEING FOLLOWED, TWO PROJECT MANAGERS.  HE'S NOT SAYING I'VE TALKED TO THE LAB STAFF LIKE DR. SAKSENA OR DR. PANGARKAR, PEOPLE LIKE THAT, AND THEY'RE TELLING ME THINGS ARE A DISASTER.

SER-999

SO THIS IS REALLY -- I MEAN, I UNDERSTAND WHY THE GOVERNMENT LIKES THE TEXT MESSAGE BECAUSE THE FIRST ONE LOOKS BAD. BUT WHEN YOU THINK ABOUT IT, IT REALLY DOESN'T MAKE SENSE THAT MR. BALWANI IS SAYING, YEAH, I PERSONALLY HAVE COME HERE AND DETERMINED ON MY OWN THAT THE LAB IS A DISASTER ZONE, AND THAT MEANS SOMEHOW ALL OF THE TESTING IS BAD, THROWING ASIDE ALL OF THE OTHER VALIDATION REPORTS AND AAP THAT IS BEING DONE AND EVERYTHING ELSE.

SO WE'LL TALK ABOUT THAT MORE, BUT THAT'S THE TEXT MESSAGE. I JUST WANTED TO ADDRESS THAT.

OKAY. THIS LEADS US TO DR. MARK PANDORI.

SO DR. PANDORI WAS INTERESTING. HE HAD A WAY, YOU MIGHT REMEMBER, DURING THE TRIAL OF TURNING TO YOU, THE JURY, AND EXPLAINING IT LIKE HE WAS A PROFESSOR EXPLAINING THINGS. AND HE DID VERY WELL WITH THAT ON DIRECT LIKE PRESENTING LIKE HE WAS IN A CLASS OR SOMETHING.

AND HE WAS VERY MUCH AT EASE WITH THE GOVERNMENT'S DIRECT EXAMINATION. HE REMEMBERED ALL 19 EMAILS THAT THEY SHOWED HIM, NO PROBLEM, HAD SOMETHING TO SAY TO EXPLAIN TO YOU.

AND THEN ALL OF A SUDDEN ON CROSS EVERYTHING CHANGED AND HE HAD MEMORY ISSUES, MAJOR MEMORY ISSUES WITH 13 EMAILS WE SHOWED HIM ON CROSS. ALL OF A SUDDEN HE HAD A FAILURE OF MEMORY AND COULDN'T REMEMBER THINGS. AND I WANT TO GO THROUGH THOSE THINGS ABOUT DR. PANDORI.

SO THE FIRST ISSUE HERE IS ABOUT A CONVERSATION HE CLAIMS

SER-1000

TO HAVE HAD WITH MR. BALWANI AND MS. HOLMES ABOUT READING AN ARTICLE IN THE PRESS, OKAY?

SO WHAT -- EXCUSE ME.

SO WHAT DR. PANDORI SAYS WAS THAT HE SAW THIS ARTICLE IN "WIRED" MAGAZINE, AND HE REMEMBERS IT WAS RIGHT AROUND HIS BIRTHDAY, HE SAID MAY 19TH, 2014, THAT WAS HIS BIRTHDAY, AND IT WAS WITHIN A DAY OR TWO OF MAY 19TH. THAT'S WHAT HE SAID. AND THAT'S HIS TESTIMONY, RIGHT?

SO IS HE REMEMBERS THAT HE SAYS.

AND THEN THERE'S THIS "WIRED" ARTICLE, THAT'S THE CATALYST, HIS WORDS, THAT HE HAD TO GO IN AND SEE MR. BALWANI AND MS. HOLMES AND SAY, HEY, THERE ARE THINGS IN THE PRESS, IN THIS CASE A "WIRED" ARTICLE, THAT AREN'T ACCURATE, SO YOU'VE GOT TO INVOLVE THE SCIENTIFIC TEAM HERE, YOU KNOW, TO MAKE SURE THAT THE PRESS IS GETTING ACCURATE INFORMATION.

AND HE CLAIMS THAT MR. BALWANI SAYS, THAT'S NEVER GOING TO HAPPEN.

AND THEN MR. -- OR DR. PANDORI SAYS HE QUIT FIVE MINUTES LATER. SO LET'S LOOK AT THAT.

HE SAID HE HAD THIS MEETING. WHAT WAS THE OUTCOME OF THE MEETING?

AND HE SAYS -- WHEN DID YOU QUIT THE COMPANY?

DR. PANDORI SAYS FIVE MINUTES LATER.

SO BASICALLY THE IMPRESSION THAT HE'S TRYING TO GIVE EVERYONE WAS THAT THE COMPANY WOULDN'T LISTEN TO ME ABOUT

ACCURACY AND MEDIA ARTICLES, AND I WAS OUT THE DOOR. FIVE MINUTES, RIGHT?

HERE'S THE PROBLEM WITH DR. PANDORI. IT'S JUST NOT TRUE, RIGHT?

SO FIRST OF ALL, THE SO-CALLED CATALYST FOR THE MAY 19TH CONFRONTATION WITH MS. HOLMES AND MR. BALWANI ABOUT THIS ISSUE, THE "WIRED" ARTICLE IS SENT TO HIM THREE MONTHS EARLIER, A LITTLE UNDER THREE MONTHS EARLIER, IN FEBRUARY OF 2014.

SO HE'S GOT THIS ARTICLE. HE'S DOING ALL KINDS OF THINGS BETWEEN FEBRUARY AND MAY. SO IT'S NOT THE CATALYST FOR A MEETING, OKAY?

SO THAT'S THE ARTICLE THAT IS SENT TO DR. PANDORI ON FEBRUARY 27TH OF 2014.

OKAY. SO THEN HE'S ASKED A QUESTION ABOUT THAT ON REDIRECT EXAMINATION. "AND DO YOU KNOW WHETHER THAT LINK WAS TO THE ACTUAL ARTICLE THAT WE HAVE BEEN TALKING ABOUT?"

SO LIKE A LIFELINE, DR. PANDORI SAYS "NO, I DON'T KNOW THE ANSWER TO THE QUESTION," HOPING MAYBE IT'S A DIFFERENT ARTICLE, RIGHT, SO MY STORY COULD STILL HOLD TOGETHER.

THE PROBLEM IS THAT'S NOT TRUE EITHER.

IT IS THE SAME ARTICLE. AND THE COURT READ YOU THE STIPULATION DURING TRIAL AFTER DR. PANDORI'S TESTIMONY. THE "WIRED" MAGAZINE ARTICLE INCLUDED AS A LINK IN THE EXHIBIT THAT I JUST SHOWED YOU FROM FEBRUARY AND DISCUSSED DURING DR. PANDORI'S TESTIMONY WAS PUBLISHED BY "WIRED" MAGAZINE

SER-1002

ONLINE ON FEBRUARY 18TH, 2014. SO THERE'S AN ONLINE VERSION OF IT THAT WAS SENT TO DR. PANDORI. SO IT IS THE SAME ARTICLE.

SO THIS WAS NOT THE CATALYST FOR A MEETING. IT DOESN'T MAKE ANY SENSE.

OKAY. BUT WITH DR. PANDORI IT GETS MUCH WORSE, OKAY?

SO LET'S LOOK AT THE NEXT SLIDE.

QUESTION TO HIM ON DIRECT: "DID YOU EVER DISCUSS OR WERE YOU EVER IN A CONVERSATION WITH MR. BALWANI ABOUT THE RECOMMENDATION THAT YOU HAD MADE TO STOP USING THE EDISONS?"

HE SAID, "YES."

SO THE GOVERNMENT TALKED ABOUT THIS A LITTLE BIT IN THEIR CLOSING YESTERDAY.

DR. PANDORI CLAIMS THAT HE MADE A RECOMMENDATION TO MR. BALWANI THAT THEY SHOULD JUST STOP USING THE EDISON DEVICE, IT WASN'T A DEVICE THAT SHOULD BE USED FOR PATIENT TESTING, THEY SHOULD DO MORE WORK WITH IT, BUT IT SHOULD NOT BE USED. THEY SHOULD JUST STOP, RIGHT? THAT'S WHAT DR. PANDORI CLAIMED.

AND BY THE WAY, THAT CLAIM THAT DR. PANDORI MADE, THERE'S NOT A SINGLE EMAIL, NOTE, DOCUMENT OF ANY SORT THAT SUPPORTS THAT CLAIM. HE JUST SAID THAT FROM HIS SUPPOSED MEMORY, BUT THAT'S WHAT HE SAYS.

AND HE FURTHER TESTIFIED THAT AFTER THAT DISCUSSION WITH MR. BALWANI, THAT MR. BALWANI VISITED DR. PANDORI IN HIS OFFICE WITH TWO PROJECT MANAGERS AND TOLD HIM THAT'S NOT GOING TO HAPPEN. THAT'S DR. PANDORI'S CLAIM, OKAY?

SER-1003

SO, AGAIN, NO NOTES, NO EMAILS, NOTHING THAT SUPPORTS THAT OTHER THAN DR. PANDORI'S STORY.

BUT THAT'S WHAT HE SAYS, STOP USING EDISON. AND HE TOLD THIS TO BALWANI, AND BALWANI SAID NOT GOING TO HAPPEN, RIGHT?

OKAY. WELL, WHAT ACTUALLY HAPPENED HERE?

THE TRANSITION MEMO.

SO MONA RAMAMURTHY, WHO IS THE HEAD OF HUMAN RESOURCES AND EMPLOYMENT COUNSEL AT THERANOS, SENDS AN EMAIL TO DR. PANDORI ON MAY 27TH, 2014.

AND MIND YOU, DO YOU REMEMBER DR. PANDORI SAID HE QUIT, YOU KNOW, FIVE MINUTES AFTER THAT DISCUSSION ON MAY 19TH OR IT COULD HAVE BEEN A DAY OR SO OF MAY 19TH, SO MAYBE IT'S MAY 20TH, BUT AROUND MAY 19TH, DR. PANDORI SAYS I QUIT, FIVE MINUTES.

THIS IS SEVEN DAYS LATER AND HE'S STILL THERE. OKAY? SO THAT'S ANOTHER UNTRUE STATEMENT BY DR. PANDORI.

SO MS. RAMAMURTHY SAYS, "HI MARK,

"SUNNY IS OUT TODAY SO HE WANTED ME TO CONNECT WITH YOU ON TRANSITION."

AND IT GOES ON, WANTS DR. PANDORI TO FOCUS ON DOCUMENTING THE FOLLOWING, AND IT HAS A LIST OF THINGS THAT DR. PANDORI SHOULD DO AS A TRANSITION BECAUSE HE'S GOING TO BE LEAVING THERANOS.

AND THE LAST ONE, WHICH IS HIGHLIGHTED THERE, SAYS "ANYTHING ELSE THAT YOU BELIEVE NEEDS TO BE DOCUMENTED FOR

SER-1004

EFFECTIVE TRANSITION PURPOSES."

SO DR. PANDORI IS GIVEN A COMPLETELY OPEN MIKE TO SAY WHATEVER HE WANTS ABOUT THERANOS, ANYTHING HE NEEDS TO BE DOCUMENTED, WHICH BY THE WAY THIS ISSUE ABOUT HIS CLAIM ABOUT THE EDISON, THAT HE TOLD SUNNY TO STOP USING THE EDISON, THAT'S NOT DOCUMENTED, RIGHT?  SO THIS IS HIS OPPORTUNITY, RIGHT?

SO WHAT HAPPENS?

HERE'S THE TRANSITION MEMO.  THREE DAYS LATER ON MAY 30TH, HE'S STILL THERE, HE SENDS MS. RAMAMURTHY, WITH A COPY TO MR. BALWANI, THE TRANSITION MEMO.  YOU CAN SEE THE ATTACHMENT THERE, TRANSITION MWP 05 2014.DOCX.

AND THEN HE WRITES "ATTACHED,

"A DOCUMENT DETAILING THE STATE OF VARIOUS PROJECTS OR WORKS IN THE CLIA/BUGS LABORATORIES.  IT CONTAINS ADDITIONAL TRANSITIONAL INFORMATION DETAILING THE ADMINISTRATIVE FUNCTIONS WHICH I HAVE BEEN PERFORMING AS NEW EMPLOYEES ARRIVE AND ON A DAILY BASIS.

"I WAS GOING TO SHARE THIS WITH ADAM," THAT'S DR. ROSENDORFF, "WITH YOUR PERMISSION."

SO THIS IS HIS EMAIL TO MS. RAMAMURTHY.

AND THEN LET'S LOOK AT THE CONTENT.  YOU CAN SEE THIS IS MAY 29TH, 30, SO IT'S 2014, IT'S M.W. PANDORI, THAT'S HIS NAME.

AND THEN YOU CAN SEE, IF YOU GO TO THE NEXT SLIDE, HERE'S HIS OTHER NOTES.  SO HERE'S THE OTHER SECTION WHERE HE'S ADDRESSING ANYTHING ELSE THAT NEEDS TO BE DOCUMENTED.

SER-1005

AND WHAT DOES HE WRITE?  "EDISONS:  THE PRIMARY CONCERN IN THIS SECTION IS THE AVAILABLE NUMBER OF DEVICES.  FOR FT4, VITAMIN D, AND TSH, AT LEAST THE DOUBLING OF THE NUMBER OF UNITS IS NECESSARY, IN MY OPINION."

SO THIS GUY, DR. PANDORI, WHO SAYS, I TOLD HIM TO STOP USING EDISON, HE SAYS IN HIS TRANSITION MEMO WHERE HE CAN SAY ANYTHING HE WANTS, HE SAYS THE PRIMARY CONCERN ABOUT EDISONS IS WE DON'T HAVE ENOUGH.  WE NEED TO MAKE MORE.

SO WHAT DOES DR. PANDORI DO NEXT?  HE SENDS THE MEMO TO DR. ROSENDORFF ON MAY 30TH, 2014.  THERE'S THE MEMO THAT DR. PANDORI SENDS TO DR. ROSENDORFF WITH THE SAME NOTE ABOUT NEEDING TO DOUBLE THE NUMBER OF EDISONS.

SO WHAT HAPPENED WHEN DR. PANDORI WAS CONFRONTED WITH THIS ISSUE?  HE'S ASKED ON CROSS-EXAMINATION, "AND THIS IS A MEMO YOU DRAFTED?

HE SAYS, "NO, I DON'T RECALL THIS.

"YOU SENT THE MEMO TO DR. ROSENDORFF?"

HE'S PANICKED.  HE'S NOW CONFRONTED WITH A DOCUMENT THAT IS COMPLETELY INCONSISTENT WITH HIS STORY, AND HE'S CLAIMING THAT HE DIDN'T EVEN WRITE HIS OWN TRANSITION MEMO THAT HE SENT NOT ONLY TO MS. RAMAMURTHY AND MR. BALWANI, BUT ALSO TO DR. ROSENDORFF.

SO THAT'S DR. PANDORI.  HE'S NOW CAUGHT IN A LIE, AND HE'S PANICKED, OKAY?

NOW, HE KEEPS ON GOING.

SER-1006

HE'S ASKED:  OKAY.  AND THE REPORT IS REFLECTING ISSUES IN THE BUGS LAB?

"I DON'T KNOW.  I'VE NEVER SEEN THIS REPORT BEFORE."

THIS IS HIS OWN TRANSITION MEMO THAT HE WROTE AND HE SAYS HE'S NEVER SEEN IT BEFORE.

AND HE'S ASKED, "AND YOU SENT A TRANSITION REPORT TO DR. ROSENDORFF ON MAY 30TH, 2014, AS REFLECTED ON EXHIBIT 20281; CORRECT?

"NO, I DON'T RECALL DOING SO."

REMEMBER, HE HAD NO SUCH MEMORY PROBLEMS WHEN THE GOVERNMENT WAS ASKING QUESTIONS.

HE GOES ON.  AND IT'S YOUR SWORN TESTIMONY TODAY THAT YOU DID NOT WRITE THE ATTACHMENT TO DR. ROSENDORFF REFLECTED IN EXHIBIT 20279; IS THAT YOUR TESTIMONY?

HE SAYS, "I DON'T -- I HAVE TO REVIEW THIS DOCUMENT.  I DON'T RECALL AUTHORING IT."

OKAY.  SO HE'S STILL IN PANIC MODE.

AND THEN ON THE NEXT DAY OF CROSS, APRIL 6TH, HE SAYS -- THE QUESTION IS, "AND YOU STILL DON'T RECALL AUTHORING THE DOCUMENT?  IS THAT YOUR TESTIMONY?

HE SAYS, "I DON'T RECALL."

SO THE GOVERNMENT TRIED TO CLAIM, WELL, MAYBE HE DIDN'T PUT EVERYTHING DOWN IN THE TRANSITION MEMO SO MAYBE WE CAN GIVE HIM A PASS.

ACTUALLY, THAT TRANSITION MEMO IS NOT THE ONLY TIME THAT

SER-1007

HE MADE THE SAME POINT.

LET'S LOOK AT EXHIBIT 20490, WHICH IS A MAY 20TH, 2014 EMAIL. THIS IS DR. PANDORI ON MAY 20TH, AND THIS IS THE DAY AFTER HE HAS THE SUPPOSED MEETING WHERE HE SUPPOSEDLY QUIT.

HE WRITES, "HI, CHINMAY, NISHIT," THAT'S DR. PANGARKAR AND MR. DOSHI.

"THERE REMAINS AN ISSUE IN NORMANDY WITH THE NUMBER OF EDISON READERS AVAILABLE FOR PATIENT TESTING. WE WILL SURELY NEED MORE READERS FOR THE FOLLOWING REASONS:

"THE NUMBER OF EDISONS TESTS IS ALREADY CHALLENGING THE NUMBER WE HAVE;

"MORE STORES ARE OPENING THIS WEEK (WE CANNOT ESTIMATE HOW MANY MORE SPECIMENS WILL BE COMING IN AS A RESULT)."

AND THEN HE GOES ON, "I'D LIKE TO DISCUSS A PLAN TO DOUBLE THE NUMBER OF READERS FOR THREE MAIN TESTS. THIS WILL BE NECESSARY AS MORE STORES WILL BE OPENING IN JUNE AND WE STILL DON'T KNOW THE IMPACT OF OPENINGS IN MAY."

SO HE'S SAYING THERE ARE GOING TO BE MORE STORES, THERE ARE GOING TO BE MORE PATIENTS, THERE ARE GOING TO BE MORE SAMPLES, AND WE ARE GOING TO NEED MORE OF THE EDISONS TO DO THE TESTS. AND THIS IS ON MAY 20TH.

SO, AGAIN, DR. PANDORI COMPLETELY INCONSISTENT WITH HIS CLAIM THAT HE SAID STOP USING EDISONS. HE'S ACTUALLY SAYING -- THE ONLY DOCUMENTED THING THAT DR. PANDORI SAYS IS MAKE MORE EDISONS BECAUSE WE NEED TO USE THEM FOR PATIENT TESTING.

AND THEN THAT'S NOT ALL.  THEN ON -- A COUPLE DAYS LATER, OR THE NEXT DAY RATHER, ON MAY 21ST, 2014, HE SENDS ANOTHER EMAIL.  THIS TIME HE SENDS IT TO MR. BALWANI AND A GROUP OF PEOPLE, INCLUDING DR. ROSENDORFF AND DR. YOUNG.

HE SAYS -- THIS IS NOW TWO DAYS AFTER THE SUPPOSED MEETING WHERE HE SUPPOSEDLY QUIT.

HE SAYS, "RELATEDLY I HAVE ON TWO OCCASIONS IN THE LAST 2 WEEKS REQUESTED MORE EDISON READERS TO BE MADE AVAILABLE IN NORMANDY.

"TESTING VOLUMES ARE GOING UP AND HAVING ONLY 2 TO 3 READERS PER TEST CAUSES SPECIMENS TO BACK UP AND FOR THE WORKFLOW TO GAIN COMPLEXITY.  I AM TOLD THAT MORE READERS ARE ON THEIR WAY, AT LEAST FOR THE MOST COMMON TESTS."

SO REPEATEDLY DR. PANDORI IS SAYING WE NEED MORE EDISONS.

JUDGE DAVILA WILL INSTRUCT YOU AFTER WE'RE DONE WITH OUR CLOSING AND THE GOVERNMENT IS DONE WITH THE REBUTTAL ABOUT THE LAW THAT YOU SHOULD APPLY, AND THIS ONE IS ABOUT THE CREDIBILITY OF WITNESSES.  "IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR NONE OF IT."

IN THE CASE OF DR. PANDORI, YOU CANNOT BELIEVE A WORD THIS MAN SAYS.  HE'S REPEATEDLY LIED ON THE STAND, AND IN PARTICULAR ABOUT THIS ISSUE OF THE CLAIM ABOUT MR. BALWANI BEING TOLD WE SHOULDN'T BE USING EDISONS.

AND WHEN YOU LOOK AT THOSE EMAILS, INCLUDING THE LAST ONE THAT WE SAW TO MR. BALWANI, "WE NEED MORE EDISONS," WHAT IS MR. BALWANI SUPPOSED TO THINK WITH HIS CO-LAB DIRECTOR, DR. PANDORI, WITH A COPY TO TWO OTHER LEAD SCIENTISTS, DR. ROSENDORFF AND DR. YOUNG, AND DR. PANDORI SAYING MAKE MORE EDISONS SO WE CAN USE THEM FOR PATIENT TESTING.

IS MR. BALWANI SUPPOSED TO THINK, OH, WE'VE GOT A PROBLEM WITH EDISONS?

OBVIOUSLY THE REASONABLE THING FOR MR. BALWANI TO THINK AT THAT POINT IS THE OPPOSITE OF THAT, IT LOOKS LIKE THE SCIENTIFIC TEAM IS ON TOP OF THIS.

BUT, AGAIN, DR. PANDORI IS NOT SOMEONE WHOSE TESTIMONY YOU CAN TRUST.

WHY, AGAIN, WOULD DR. PANDORI DO THAT?  WHY WOULD HE CLAIM NOT TO HAVE WRITTEN A DOCUMENT THAT HE WROTE?  I THINK YOU REMEMBER, HE SAYS, WELL, HE'S STILL IN THE LAB INDUSTRY, HE TALKED ABOUT THAT.  HE SAID HE WAS AT A PUBLIC HEALTH LABORATORY IN NEVADA SOMEWHERE.

AND AGAIN, HE DOESN'T WANT TO SAY THAT HE APPROVED OF ANYTHING AT THERANOS.  AT THIS POINT, LOOK AT WHERE WE ARE.  HE WANTS TO SAY I WAS THE HERO, I TOLD THEM TO STOP.

THAT IS SIMPLY NOT TRUE.

OKAY.  LET'S MOVE ON TO DR. ROSENDORFF'S DEPARTURE FROM THERANOS.

SO THE STORY OF DR. ROSENDORFF'S DEPARTURE IS VERY MUCH

TIED UP WITH A PARTICULAR ASSAY CALLED POTASSIUM.  YOU MAY HAVE HEARD THE TERM ISE, AND POTASSIUM IS ONE OF THE ISE ASSAYS. THE OTHERS ONES, BY THE WAY, ARE SODIUM AND CHLORIDE.

SO THE PROBLEM WITH DR. ROSENDORFF IS HE IMPLEMENTS PROCEDURES AND THEN STARTS COMPLAINING ABOUT HIS OWN PROCEDURES, AND BASICALLY THE COMPANY JUST LOST CONFIDENCE IN HIM.

SO LET'S LOOK AT THE POTASSIUM ISSUE HERE.

SO THE POTASSIUM ASSAY ON MODIFIED SIEMENS, MODIFIED PREDICATE IS APPROVED BY DR. ROSENDORFF ON MARCH 24TH, 2014. THAT'S EXHIBIT 9315.

AND THEN DR. ROSENDORFF ASKED SOME QUESTIONS ABOUT THE NATURE OF POTASSIUM.

AND THE ONE THING THAT COULD HAPPEN WITH REGARD TO POTASSIUM IN PARTICULAR IS SOMETHING CALLED HEMOLYSIS?

HE SAYS CORRECT.

AND AGAIN, AN ISSUE THAT IS PARTICULARLY AN ISSUE WITH THIS PARTICULAR ASSAY HEMOLYSIS, OR POTASSIUM RATHER.

AND THEN DR. ROSENDORFF WAS ASKED, AND THAT WOULD BE WHERE THE ACTUAL PROCESS OF COLLECTING THE SAMPLE RESULTS IN RED BLOOD CELLS BASICALLY BURSTING?

HE SAYS CORRECT.

SO TAKING A FINGERSTICK, THE COLLECTION ISN'T DONE CORRECTLY, AND THE RED BLOOD CELLS BURST AND IT CREATES THIS CONDITION CALLED HEMOLYSIS IN THE SAMPLE.  SO IT'S A SAMPLE

SER-1011

COLLECTION ISSUE.

QUESTION. THAT CREATES KIND OF ARTIFACTS THAT DON'T MAKE THE TEST WORK AS DESIGNED?

HE SAYS CORRECT.

AND THAT HAPPENED AT THERANOS FROM TIME TO TIME; RIGHT?

HE SAYS FREQUENTLY.

AND THAT HAPPENS IN OTHER LABS, TOO?

HE SAYS YES.

AND IN FACT ALL LABS MAKE ERRORS; RIGHT?

HE SAYS YES.

AND SO THAT'S THE HEMOLYSIS ISSUE AND THAT'S SOMETHING TO KEEP IN MIND AS WE GO THROUGH THE REST OF THE POTASSIUM STORY.

SO DR. ROSENDORFF EVENTUALLY COMPLAINED ABOUT THE ISSUE OF RELEASING WHAT ARE CALLED CRITICAL RESULTS, THOSE ARE ABNORMAL RESULTS WHERE IT COULD INDICATE THAT THE PERSON IS HAVING A MEDICAL CONDITION, AND THERE'S PARTICULAR CARE THAT NEEDS TO BE PAID OBVIOUSLY TO CRITICAL RESULTS BECAUSE IF SOMEONE IS HAVING A POTASSIUM ISSUE, THEY SHOULD KNOW THAT, AND IF THEY'RE NOT, YOU KNOW, YOU WOULDN'T WANT TO REPORT THAT INCORRECTLY.

SO THIS CARE TAKING WITH CRITICAL RESULTS.

BUT DR. ROSENDORFF CERTAINLY COULD RELEASE AND DID RELEASE CRITICAL RESULTS. HERE'S ONE FROM APRIL 2014 WHERE HE WRITES, "HODA, I AM ASSUMING YOU HAVE CONFIRMED WITH TINA LIN AND DANIEL YOUNG THAT THE CTN WAS NOT COMPROMISED IN ANY WAY? IF THIS IS THE CASE, THEN PLEASE CALL A CRITICAL FOR THIS

SER-1012

PATIENT."

SO THEY'RE CHECKING TO MAKE SURE THAT THE CAPILLARY TUBE AND NANOTAINER IS NOT COMPROMISED LIKE A SAMPLE COLLECTION ISSUE.

AND MS. ALAMDAR REPORTS, "HI ADAM,

"I LOOKED AT THE CTN IMAGE."  SO SHE IS LOOKING AT AN IMAGE OF THE ACTUAL CAPILLARY TUBE AND NANOTAINER.  SHE REPORTED IN THIS CASE, IT IS NOT HEMOLYSIZED.  "WE'RE GOING TO RELEASE ALL OF THE ISE'S INCLUDING THE CRITICAL K," A SYMBOL FOR POTASSIUM.

SO, IF THIS SAMPLE WASN'T COMPROMISED, THEN HE WOULD CALL THE CRITICAL RESULT.

AND NOW THERE IS MORE ABOUT POTASSIUM WE SHOULD DISCUSS.

SO HERE IS, ON MAY 23RD, 2014, DR. YOUNG SENDS AN EMAIL TO MS. HOLMES WITH A COPY TO MR. BALWANI.

AND HERE DR. YOUNG SAYS, "I WANTED TO UPDATE YOU ON THE ISE STUDIES."

AND THEN HE SAYS, "WITH OUR NEW APPROACH, WE HAVE NOW SHOWN THAT WE CAN PROCESS AND RUN ISE'S WITH DILUTED VENOUS SAMPLES WITH GREAT ACCURACY AND PRECISION (SHOWN NOW OVER 10 DAYS AND 48 SUBJECTS)."

SO DR. YOUNG IS RUNNING A STUDY AND HE'S TRYING TO OPTIMIZE THE POTASSIUM, WHICH IS ONE OF THE ISE ASSAYS, AND HE'S REPORTING TO MR. BALWANI THAT HE BELIEVES THAT THEY CAN RUN WITH GREAT ACCURACY AND PRECISION.

SER-1013

SO, AGAIN, WHAT IS MR. BALWANI SUPPOSED TO THINK WHEN HE GETS THAT FROM HIS LEAD SCIENTIST?  HE'S SUPPOSED TO THINK IT LOOKS LIKE THEY'VE GOT THIS, RIGHT?  I'VE ANSWERED MY OWN QUESTION.

LET'S GO TO THE NEXT DOCUMENT.

SO MR. BALWANI RESPONDS TO THE EMAIL WE JUST SAW AND HE SAYS, "THIS IS TRULY GREAT PROGRESS AND A BIG COMPETITIVE ADVANTAGE FOR US."

SO MR. BALWANI IS EXCITED ABOUT THE WORK THAT THE SCIENTISTS HAVE DONE.

HE SAYS "WE NEED TO KEEP THIS PROJECT, THE CODE, CALIBRATION AND EVERYTHING WE LEARNED HERE AS THERANOS TRADE SECRET."

HE SAYS, LOOK, WE HAVE SOLVED FOR DOING A SMALL SAMPLE, FINGERSTICK SAMPLES WITH POTASSIUM, AND AS FAR AS MR. BALWANI KNOWS, THAT'S SOMETHING THAT THERANOS WAS ABLE TO ACCOMPLISH SCIENTIFICALLY, THAT NOT SOMETHING OTHER COMPETITORS HAVE, AND HE WANTS TO MAKE SURE THAT THE TECHNOLOGY IS PROTECTED.  THAT'S HOW EXCITED MR. BALWANI IS ABOUT THE SCIENTIFIC WORK THAT IS GOING ON.

SO WHAT HAPPENS?  DR. YOUNG SAYS, "SOUNDS GOOD.  I'LL GET TOGETHER WITH MONA AND DRAFT THE STRATEGY."

AND DR. ROSENDORFF SAYS, "DANIEL,

"CONGRATULATIONS ON CRACKING THIS."

SO SOLVING THE POTASSIUM ISSUE THAT THEY WERE LOOKING AT.

SO AGAIN, I THINK I SAID THIS YESTERDAY AT THE BEGINNING, BUT WHEN THERE'S A PROBLEM, THE METHOD HERE THAT MR. BALWANI WANTS TO SEE IS DO THE STUDY, SOLVE THE PROBLEM, GET TO THE BOTTOM OF IT.

IT'S NOT, YEAH, WE'RE TAKING MONEY FROM PATIENTS SO LET'S JUST KEEP GOING, LIKE WHY DISTURB IT.

NO, THEY WANT TO KNOW WHAT IS GOING ON.  THEY WANT TO GET TO THE BOTTOM OF THINGS, THAT'S WHAT MR. BALWANI -- THAT'S WHAT ALL OF THE EMAILS SHOW THAT MR. BALWANI IS INTERESTED IN, AND THIS IS ONE OF THOSE EXAMPLES.

SO LET'S TALK ABOUT POTASSIUM SOME MORE.

DR. YOUNG REPORTS ON JUNE 28TH, "WE HAVE PLANNED A STUDY TO UNDERSTAND THESE FACTORS AND WILL THEN MAKE REFINEMENTS WHERE NEEDED.  I THINK WE ARE VERY CLOSE TO HAVING PERFECTED OUR POTASSIUM ASSAY, MAKING IT THE MOST ROBUST POTASSIUM ASSAY FROM FINGERSTICK SAMPLES IN THE WORLD."

AND MR. BALWANI WRITES, "I AGREE WITH THIS BUT WOULD LIKE TO MOVE RAPIDLY SO CAN HAVE THE RIGHT PERFECT SOLUTION IN PLACE ASAP."

THAT'S MR. BALWANI'S DIRECTION.  HE CAN'T DO THE SCIENTIFIC WORK HIMSELF BUT HE CAN DIRECT, OKAY, LET'S GET THE PERFECT SOLUTION IN PLACE.

AND THEN DR. YOUNG REPORTS, "INITIAL STUDY WAS RUN AND ANALYZED TODAY.

"WE ARE INITIATING THE MORE EXTENSIVE STUDY ACROSS TWO

SER-1015

DAYS WITH ANALYSIS AT TIME 0 AND 24 HOURS AFTER SAMPLE COLLECTION. THE GOAL OF THIS STUDY IS TO ESTABLISH AND DEMONSTRATE OPTIMAL PROCEDURES FOR SAMPLE PROCESSING TO ENSURE RELIABLE TEST RESULTS."

THAT'S WHAT THEY'RE TRYING TO DO, TO ENSURE RELIABLE RESULTS.

OKAY. LATER THERE'S A MEETING AMONG THE LAB STAFF, NOT MR. BALWANI, INCLUDING DR. ROSENDORFF, ABOUT POTASSIUM. AND THIS IS THE FLOW CHART THAT COMES OUT OF THIS MEETING. AND IF YOU JUST GO THROUGH IT, YOU CAN SEE THAT THE LIHEP CTN, IF IT'S NORMAL IT'S GOOD TO RELEASE THE RESULT.

IF THERE ARE ABNORMAL RESULTS FROM THE ASSAY, THE SAMPLE TEST, THEN YOU CHECK CTN IMAGE. WE SAW THAT BEFORE. THERE WAS A CHECK OF THE IMAGE BEFORE THEY CALLED THE CRITICAL RESULT.

IF THE CHECK OF THE IMAGE SHOWS BRIDGE OR INTERFERENCE OR COMPROMISE, IF THAT'S THE CASE, THEN YOU GO TO THE BOTTOM, YES, VOID ABNORMAL AND CRITICAL RESULTS.

SO, OF COURSE, IF IT WAS A COMPROMISED SAMPLE, WE DON'T WANT TO CALL IT CRITICAL FOR THE PATIENT IF THE SAMPLE COLLECTION HAD AN ISSUE.

THE SAMPLE COLLECTION IS OF COURSE THE WAY THE SAMPLE IS COLLECTED, THAT'S A HEMOLYSIS ISSUE, NOT, WELL, THE EDISON DEVICE DOESN'T WORK OR SOMETHING LIKE THAT, OR THE MODIFIED PREDICATE IN THIS CASE DOESN'T WORK. THIS IS A SAMPLE COLLECTION.

SER-1016

BUT, OF COURSE, IF THE CTN IS COMPROMISED AND THERE'S THAT ISSUE, THEN YOU WOULD NOT REPORT THE CRITICAL RESULTS.

BUT IF IT'S NOT COMPROMISED, THEN THE FLOW CHART THAT EMERGED FROM THIS MEETING OF THE SCIENCE TEAM IS, NO, THEN RELEASE THE RESULTS.

SO DR. ROSENDORFF IS NOT SAYING NEVER RELEASE CRITICAL RESULTS.  HE'S SAYING, WELL, DON'T RELEASE THEM IF THERE'S A COMPROMISED SAMPLE.

AND DR. ROSENDORFF MAKES THIS INTO THE OFFICIAL STANDARD OPERATING PROCEDURE.  THIS IS FROM EXHIBIT 20336.  SO RIGHT AFTER THAT MEETING DR. ROSENDORFF PUT THIS INTO THE STANDARD OPERATING PROCEDURE AND HE SENT THAT AROUND.

SO THAT'S THE PROCEDURE THAT DR. ROSENDORFF PUT IN PLACE.

AGAIN, IMPORTANT TO REMEMBER, NOT VOID ALL CRITICAL RESULTS, BUT VOID THEM IF THERE'S A COMPROMISED SAMPLE, LOOKING AT THE CTN IMAGE.

OKAY.  THE REASON I'M TELLING YOU ALL OF THIS IS BECAUSE THERE'S AN EMAIL THAT THE GOVERNMENT HAS SHOWED YOU THAT DR. ROSENDORFF EVENTUALLY SAYS, WELL, I DON'T UNDERSTAND THE CLINICAL VALUE OF THE TESTS FOR POTASSIUM WHEN, WHENEVER THERE'S A CRITICAL RESULT, WE JUST VOID IT.

WELL, THAT DOES SOUND LIKE A PROBLEM.

BUT THAT'S NOT WHAT THE PROCEDURE IS, SO THAT WAS AN OVERSTATEMENT OF WHAT WAS REALLY GOING ON.

AND SO DR. ROSENDORFF AGAIN PUT A PROCEDURE IN PLACE, AND

SER-1017

THEN HE'S CRITICIZING HIS OWN PROCEDURE IN A WAY THAT IS NOT EVEN REALLY CORRECT WHEN YOU LOOK AT THE SOP THAT HE WROTE.

SO THE COMPANY LOSES CONFIDENCE IN HIM.

BUT ANYWAY, IN ANY EVENT, DR. ROSENDORFF, HE'S ASKED THE QUESTION, AND, IN FACT ALL LABS MAKE ERRORS?

HE SAYS YES.

AND THEN HE TALKS ABOUT HIS EXPERIENCE -- WELL, THE QUESTION IS ABOUT HIS EXPERIENCE AT OTHER LABS, INCLUDING THE UNIVERSITY OF PITTSBURGH, THERE WERE ERRORS THAT WERE OCCASIONALLY MADE; RIGHT?

HE SAYS YES.

AND YOU DID YOUR BEST TO CORRECT THEM?

HE SAYS YES.

OKAY.  BUT THIS IS DR. ROSENDORFF'S OWN WORDS FROM JULY 18TH, 2014.  SO WHATEVER HE SAYS ON THE WITNESS STAND, THIS IS WHAT HE WROTE TO DR. PHILLIP CHEN WHEN HE WAS RESPONDING TO AN INQUIRY.

HE SAYS PHYSICIAN EXPRESSED DOUBTS REGARDING OUR TECHNOLOGY AND REPEATEDLY ASKED ME WHAT OUR METHOD IS, AND HOW WE ENSURE ACCURACY.

DR. ROSENDORFF REPLIED THAT THERANOS METHODS HAVE BEEN EXTENSIVELY VALIDATED AGAINST FDA APPROVED PREDICATE METHODS, I DIDN'T DESCRIBE THE THERANOS METHOD PER COMPANY'S NONDISCLOSURE AND CONFIDENTIALITY RULES.

AND DR. ROSENDORFF IS THE ONE WHO KNOWS THIS BECAUSE HE'S

THE ONE WHO SIGNED ALL OF THOSE VALIDATION REPORTS, SO HE KNOW ALL THE VALIDATION REPORTS ARE COMPARING SAMPLES WITH FDA APPROVED PREDICATE METHODS.

SO HE KNOWS THEY'VE BEEN EXTENSIVELY VALIDATED.  THAT WAS DR. ROSENDORFF'S OWN WORK, SO HE'S IN THE BEST POSITION TO SPEAK TO THAT AND THAT'S WHAT HE TELLS DR. CHEN.

AND HE GOES ON.

DR. ROSENDORFF SAYS, PHYSICIAN ASKED IF HE IS THE ONLY M.D. QUERYING LIPID RESULTS.

I ANSWERED THAT THE RATE OF PHYSICIAN QUERIES IS NOT HIGHER THAN MIGHT BE EXPECTED AND IS NOT HIGHER THAN IN MY PREVIOUS JOB AT THE UNIVERSITY OF PITTSBURGH.

SO HE'S NOT SEEING SOME SPIKE IN PHYSICIAN QUERIES AT THERANOS.

OKAY.  DR. ROSENDORFF IS ASKED THIS VERY IMPORTANT QUESTION.

"AND YOU NEVER PROVIDED PATIENT RESULTS THAT YOU KNEW WERE INACCURATE OR UNRELIABLE AT THE TIME YOU PROVIDED THEM; CORRECT?

HE SAYS CORRECT.

AND YOU WERE NEVER TOLD BY MR. BALWANI TO REPORT AN INACCURATE REPORT?

NO.

AND YOU WERE NEVER TOLD BY MS. HOLMES TO REPORT AN INACCURATE REPORT?

NO.

SO NO ONE IS DIRECTING HIM TO REPORT INACCURATE RESULTS AND HE DOESN'T EVER RELEASE RESULTS THAT HE THOUGHT, THAT HE BELIEVED WERE INACCURATE.

AND THEN THERE'S OTHER TESTIMONY.

THE QUESTION IS: OKAY. IS IT YOUR TESTIMONY UNDER OATH, DR. ROSENDORFF, THAT WHILE YOU WERE AT THERANOS, THAT YOU RELEASED OR ALLOWED THE RELEASE OF RESULTS TO PATIENTS THAT YOU DID NOT THINK WERE ACCURATE?

AND HIS ANSWER WAS, I NEVER RELEASED RESULTS THAT I THOUGHT WERE INACCURATE, NO.

SO IF DR. ROSENDORFF DOESN'T THINK THAT HE'S RELEASING INACCURATE RESULTS, HOW WOULD MR. BALWANI THINK THAT THERANOS WAS RELEASING INACCURATE RESULTS?

DR. ROSENDORFF IS THE LAB DIRECTOR. YES, HE REPORTED TO MR. BALWANI AND MR. BALWANI OVERSAW THE OPERATIONS OF THE CLINICAL LAB, BUT IF DR. ROSENDORFF DOESN'T THINK HE'S RELEASING INACCURATE RESULTS, THERE'S NO WAY THAT MR. BALWANI WOULD HAVE THAT KNOWLEDGE THAT THE GOVERNMENT IS TRYING TO CLAIM THAT HE HAS.

AND THAT'S WHAT THIS CASE IS ABOUT, RIGHT? LIKE, IS MR. BALWANI KNOWINGLY CHEATING PATIENTS OUT OF THEIR MONEY, THEIR $35 OR WHATEVER THEY ARE PAYING, IS MR. BALWANI KNOWINGLY AND INTENTIONALLY DOING THAT KNOWING THAT THE LAB IS INTENSIONALLY RELEASING INACCURATE RESULTS? THAT'S REASONABLE

SER-1020

DOUBT RIGHT THERE.

NOW, THE GOVERNMENT LIKES TO TALK ABOUT THE NEXT TOPIC, WHICH IS TEMPORARY LAB DIRECTORS. SO THIS IS DR. DHAWAN AND MS. SAWYER.

THE PICTURE THE GOVERNMENT IS TRYING TO PAINT IS THAT MR. BALWANI DOESN'T LIKE DR. ROSENDORFF ASKING QUESTIONS SO HE'S NOW GOING TO FIND PEOPLE THAT MAY NOT ASK SO MANY QUESTIONS.

THAT SOUNDS LIKE A NICE STORY FROM THE GOVERNMENT'S PERSPECTIVE, BUT IT'S JUST NOT TRUE.

HERE'S WHAT HAPPENS. FIRST OF ALL, JUST TO SET A BASELINE HERE, THE GOVERNMENT LIKES TO SAY, WELL DR. DHAWAN WAS MR. BALWANI'S DERMATOLOGIST.

WELL, YEAH, THAT'S TRUE. MR. BALWANI HAD BEEN A PATIENT OF DR. DHAWAN'S.

BUT DR. DHAWAN ALSO WAS A MEDICAL DOCTOR WHO RAN HIS OWN CLINICAL LAB AND HAD THE QUALIFICATIONS TO BE A LAB DIRECTOR.

AND AS YOU MIGHT REMEMBER, THE ORIGINAL REQUEST FROM MR. BALWANI IS, DR. DHAWAN, DO YOU WANT TO DO THIS OR DO YOU KNOW SOMEONE ELSE WHO COULD DO THIS? AND IT WASN'T ABOUT, OKAY, IT'S GOT TO BE DR. DHAWAN, I'M HAND PICKING THIS GUY.

SO DR. DHAWAN AGREED TO BECOME THE LAB DIRECTOR. THERE WAS A CO-LAB DIRECTOR NAMED DR. SAWYER. WE'LL TALK ABOUT THAT IN A MINUTE.

LET'S JUST TALK ABOUT THESE TEMPORARY LAB DIRECTORS AND

WHAT IS REQUIRED AND WHAT IS NOT REQUIRED.

SO WE GO TO THE NEXT SLIDE.

A LAB DIRECTOR DOES NOT HAVE TO BE IN THE LAB FULL TIME. THAT'S NOT THE REQUIREMENT.

A LAB DIRECTOR COULD BE A LAB DIRECTOR OF AS MANY AS FIVE LABS AT THE SAME TIME.

DR. DHAWAN SAID THE SAME THING AS DR. ROSENDORFF ABOUT THAT TOPIC.

AND DR. SAWYER SAID THE SAME THING AS WELL.

OKAY.  DR. SAWYER'S UNDERSTANDING WAS THAT HER POSITION WAS TEMPORARY AND THAT A NEW LAB DIRECTOR WOULD COME ON IN THREE MONTHS.  THAT WAS HER EXPECTATION AND THAT'S WHAT SHE BELIEVED BASED ON THE INFORMATION THAT SHE HAD WHEN SHE STARTED THIS JOB, RIGHT?

SO NO ONE WAS PICKING TEMPORARY LAB DIRECTORS TO BE THERE FOR ALL TIME.

NEXT SLIDE.

DR. DHAWAN WAS AWARE THAT DR. SURAJ SAKSENA BEGAN THE PROCESS TO BECOME QUALIFIED AS A LAB DIRECTOR AT THE HIGH COMPLEXITY LAB, WHICH WAS NEWARK, IN 2014, THAT HE HAD BEEN SEEKING TO DO THIS SINCE 2014.

DR. SAKSENA, YOU'VE SEEN MANY EMAILS WITH HIS NAME ON THEM, AND HE WAS SOMEONE WHO WORKED AT THE LAB AND CONTINUED TO WORK AT THE LAB, AND HE WAS QUALIFYING TO BE THE LAB DIRECTOR AT NEWARK IN 2014.

SER-1022

REMEMBER, DR. DHAWAN LEFT NEAR THE END OF NOVEMBER OF 2014. SO THE INTENTION WAS NOT TO HAVE ABSENTEE LAB DIRECTORS, AS THE GOVERNMENT CALLS THEM, BUT TO HAVE DR. SAKSENA IN PLACE AS THE LAB DIRECTOR, AND THAT'S WHAT DR. DHAWAN WAS AWARE OF AS WELL WAS GOING ON.

OKAY. THE NEXT DOCUMENT.

SO MR. BALWANI WAS INFORMED ABOUT THIS PROCESS. SO THIS IS DR. SAKSENA ACTUALLY FILING HIS ONLINE APPLICATION FOR CLINICAL LABORATORY DIRECTOR LICENSURE WITH THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH.

AND DR. SAKSENA IS REPORTING THIS. HE SAYS THAT HE APPLIED WITH THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH LABORATORY FIELD SERVICES FOR A CLINICAL LABORATORY DIRECTOR LICENSURE.

HE SAYS, I APPLIED ON MAY 20TH OF 2015, SUBMITTED A SIGNED COPY OF THE ATTESTATION FORM ON MAY 26TH, 2015. SEE BELOW MY CORRESPONDENCE.

HE SAYS, IT HAS BEEN CLOSE TO 9 WEEKS SINCE MY APPLICATION WAS SUBMITTED. CAN YOU PLEASE LET ME KNOW WHEN I CAN EXPECT TO HEAR FROM YOU REGARDING THE APPROVAL OF MY APPLICATION. PLEASE LET ME KNOW IF THERE'S ANYTHING I CAN DO TO HELP EXPEDITE THE PROCESS.

SO DR. SAKSENA IS TRYING TO MOVE THIS PROCESS ALONG. IT'S GOING SLOWLY WITH THE STATE REGULATORS.

THE POINT IS THAT MR. BALWANI IS TOLD WHEN HE GETS THIS

EMAIL, THAT'S WHAT DR. SAKSENA IS DOING IS TRYING TO BE THE LAB DIRECTOR. THERE'S NOT AN INTENTION TO KEEP DR. DHAWAN OR DR. SAWYER AS ABSENTEE LAB DIRECTORS.

BY THE WAY, DR. SAKSENA AND OTHER SCIENTISTS THAT WE'LL TALK ABOUT IN A FEW MINUTES, THEY'RE STILL THERE. THEY ARE SCIENTISTS WHO WERE RUNNING THE LAB. IT'S NOT LIKE NO ONE IS HOME AND SOMEHOW THE BLOOD TESTING IS GOING ON WITH UNQUALIFIED PEOPLE.

THIS EMAIL CHAIN GOES ON. YOU CAN SEE THAT MR. BALWANI IS COPIED ON THIS ONE.

DR. SAKSENA WRITES TO MR. BALWANI, HI SUNNY,

PLEASE SEE BELOW.

I AM VERY PLEASED TO SEE THAT NRCC IS NOW ON THEIR LIST OF APPROVED BOARDS FOR CLINICAL CHEMIST.

HE SAYS THEY ARE ASKING ME TO SUBMIT A HARD COPY OF MY PH.D. DISSERTATION AND ALSO MY TRANSCRIPTS. MY TRANSCRIPTS HAVE ALREADY BEEN SENT TO LFS, SO I DON'T UNDERSTAND WHAT THE ISSUE IS HERE.

SO THEY'RE TRYING TO PUSH THIS ALONG AND THAT'S WHAT MR. BALWANI IS INFORMED OF.

AS I SAID A FEW MINUTES AGO, THE SCIENTIFIC LEADERSHIP TEAM IS STILL THERE: DANIEL YOUNG, DR. YOUNG, DR. SAKSENA, DR. PANGARKAR, DR. MASINDE, HODA ALAMDAR, GURBIR SIDHU, LANGLY GEE, AND NOSHIT DOSHI.

SO THOSE REMAIN, THE SCIENTIFIC LEADERSHIP TEAM,

SER-1024

REGARDLESS OF WHO THE LAB DIRECTOR IS.

AND AS WE SAW FROM THE TESTIMONY OF DR. SAWYER, YOU CAN DELEGATE RESPONSIBILITIES TO OTHER SCIENTISTS IN THE LAB AND THAT'S WHAT DR. SAWYER IS TALKING ABOUT HERE.  SHE'S ACTUALLY TALKING ABOUT THE DELEGATION TO MR. GEE, THE QUALITY CONTROL MANAGER.

AND DR. DHAWAN ALSO TALKS ABOUT THE DELEGATION.  HE UNDERSTANDS HE'S ABLE TO DELEGATE DUTIES AND THERE WAS A DOCUMENT THAT HE SAW WHERE HE DID DELEGATE DUTIES.

IF YOU GO TO THE NEXT SLIDE.

AND HE BELIEVED THAT HE HAD BEEN DELEGATING ALL ALONG.

SO THE SCIENTIFIC TEAM IS STILL THERE.  IT'S NOT MR. BALWANI RUNNING THE LAB.

OKAY.  REGARDING DR. SAWYER, DR. SAWYER IS CO-LAB DIRECTOR AND SHE COMES IN BECAUSE THERE'S A CONSULTANT NAMED JERRY HURST WHO SHE WORKED FOR, AND SHE, THROUGH THAT CONSULTANT ARRANGEMENT THAT THERANOS HAD, WAS BROUGHT IN AS A CO-LAB DIRECTOR.  SO IT WASN'T JUST DR. DHAWAN.  IT WAS ALSO DR. SAWYER.

NOW, DR. SAWYER TESTIFIED THAT SHE DIDN'T REALLY DO VERY MUCH.  YOU KNOW, SHE SIGNED SOME SOP'S.  WE SAW SOME OF THOSE.

BUT WHY?  IT WASN'T MR. BALWANI WHO WAS STANDING IN HER WAY.  SHE SAYS SHE NEVER CALLED THE LAB TO SCHEDULE AN APPOINTMENT TO GO SEE THE LAB.

SHE KNEW THE ADDRESS OF THE LAB, BUT SHE NEVER TOOK A

DRIVE OVER THERE TO VISIT THE LAB.

GO TO THE NEXT SLIDE.

SHE KNEW WHO SOME OF THE PEOPLE WERE. IN THIS CASE SHE'S GOT THE NAMES OF THE PEOPLE THERE, GODFRED MASINDE, HODA ALAMDAR, LANGLY GEE, WHO SHE DELEGATED TO. SHE SEES BROOKE BIVENS. SHE HAS ALL OF THESE NAMES AND SHE'S FREE TO GIVE THEM A CALL OR STOP BY THE LAB AND CHAT WITH THEM.

AND SHE SAYS SHE DIDN'T REACH OUT TO ANY OF THESE PEOPLE ABOUT THE THERANOS LAB, THAT SHE SAW THE DIFFERENT NAMES THAT WERE LAB PERSONNEL, AND SHE SAW THEIR TITLES, AND SHE DIDN'T REACH OUT TO THEM.

AND SHE DOESN'T EXPLAIN WHY NOT.

AND SHE CERTAINLY DIDN'T SAY, WELL, MR. BALWANI TOLD ME NOT TO, OR SOMETHING LIKE THAT.

SO IT'S NOT CLEAR WHY DR. SAWYER WASN'T DOING HER JOB. IF SHE NEEDED TO TALK TO THE LAB STAFF, SHE WAS FREE TO DO THAT, AND SHE TESTIFIED THAT WAY.

NOW, MORE IMPORTANTLY, THE GOVERNMENT IS PAINTING A PICTURE HERE THAT THERE'S BASICALLY NO ONE HOME. LIKE THERE'S NO LAB DIRECTOR, THERE'S NO ONE TO TALK TO. IF A PHYSICIAN HAS AN INQUIRY, THERE'S NOTHING YOU CAN DO.

THAT'S THE OPPOSITE OF WHAT HAPPENED HERE.

AND WE HEARD FROM DR. BURNES. AND DR. BURNES SAYS -- AND THIS IS BECAUSE HE HAD A PATIENT DR. ELLSWORTH WHO YOU SAW AS WELL, AND THIS WAS AN ISSUE THAT AROSE REGARDING THE PSA TEST

SER-1026

THAT DR. ELLSWORTH HAD.

DR. BURNES SAYS -- QUESTION:  AND YOU HAD A CONVERSATION WITH THE LAB?

DR. BURNES SAYS YES.

OKAY.  I THINK YOU FOUND -- YOU SAID YOU FOUND THEM PLEASANT TO TALK TO?

HE SAYS YES.

AND THEN HE'S LOOKING AT AN EXHIBIT, 4415.

AND HE SAYS THIS TIME IN THIS CALL YOU SPOKE TO THE LAB DIRECTORS, AND THAT WAS DR. YOUNG?

AND HE SAYS I BELIEVE SO.  I ASKED FOR THE NATIONAL LAB DIRECTOR.

QUESTION.  AND YOU WERE CONNECTED WITH DR. YOUNG?

I BELIEVE SO.

HE DOESN'T REMEMBER THE NAME.

SO WE'LL CALL HIM THE LAB DIRECTOR IN THAT CASE.

SO THE LAB DIRECTOR THAT YOU TALKED TO, YOU UNDERSTAND THAT WAS HIS POSITION?

YES.

AND THE LAB DIRECTOR WAS ALSO PLEASANT AND RESPONSIVE TO YOUR CONCERNS?

YES.

SO HE WAS ABLE VERY EASILY TO GET AHOLD OF DR. YOUNG WHO WAS THE LAB DIRECTOR IN ARIZONA AND A QUALIFIED SCIENTIST TO TALK TO ABOUT WHAT HE WANTED TO TALK ABOUT.

SER-1027

SO THIS IMPRESSION THAT THE GOVERNMENT IS TRYING TO LEAVE YOU WITH IS THAT THERE'S NO ONE HOME, THERE'S NO ONE TO TALK TO, DR. DHAWAN IS NOT RESPONDING TO PHYSICIAN QUERIES.

WELL, DR. BURNES HAD NO TROUBLE, NO TROUBLE GETTING THROUGH TO DR. YOUNG TO ASK WHATEVER QUESTIONS HE WANTED TO ASK.  HE FOUND THE EXPERIENCE QUITE PLEASANT.

IT GOES FURTHER.

QUESTION.  YOU'VE HAD CONVERSATIONS WITH OTHER PEOPLE WHO WORK AT DIFFERENT LABORATORIES?

DR. BURNES SAYS, TO BE HONEST, VERY INFREQUENTLY, AND MOSTLY BECAUSE THEY WEREN'T AS EASY TO ANSWER THE PHONE AS THERANOS WAS.

OKAY.

IT'S VERY DIFFICULT TO GET AHOLD OF SOMEBODY AT, LIKE, LABCORP.

I SEE.  IN THE THERANOS CASE IT WAS EASY TO GET AHOLD OF SOMEONE?

YES, IT WAS.  THAT'S WHY I REMEMBER IT SO WELL.

SO NOT ONLY DID DR. BURNES TALK TO DR. YOUNG, HE ALSO FOUND IT EXTREMELY EASY, WHERE HE FOUND IT VERY DIFFICULT TO GET AHOLD OF SOMEONE AT A COMPETITIVE OF THERANOS CALLED LABCORP, WHICH YOU'VE HEARD SOME THINGS ABOUT.

AGAIN, THIS IDERE THAT NO ONE IS HOME AT THE LAB, IT'S JUST NOT TRUE.

AND, OF COURSE, THERANOS HAD THE HOURS IN THE LAB.  THE

SER-1028

GOVERNMENT HAS TALKED VERY LITTLE OR NOT AT ALL ABOUT THAT LAB.

YOU CAN SEE THAT, IF YOU GO TO THE NEXT SLIDE, THERE WERE 42 STORES OPEN, OR 42 COLLECTION CENTERS, INCLUDING THE WALGREENS STORES OPENED IN ARIZONA, AND THAT THERE WAS ONE IN CALIFORNIA.

DR. YOUNG WAS THE LAB DIRECTOR IN ARIZONA, AS I'VE SAID.

NEXT SLIDE.

DR. DHAWAN KNEW THAT THERANOS OPENED A LAB IN ARIZONA AND THAT DR. YOUNG WAS THE LAB DIRECTOR.

SO, AGAIN, THERE'S A REASON THAT THE GOVERNMENT IS NOT PRESENTING OR NOT TALKING TO ANYONE IN ARIZONA ABOUT THE LAB.

THERE'S A REASON WHY THE GOVERNMENT IS NOT PRESENTING DR. YOUNG, WHO, AGAIN, WAS ON SOMETHING LIKE 78 EMAILS IN THIS CASE.

BUT YOU DIDN'T HEAR FROM HIM BECAUSE THIS IS NOT CONSISTENT WITH THE GOVERNMENT'S STORY THAT THEY WANT TO TELL ABOUT ABSENTEE LAB DIRECTORS AND SORT OF CHAOS.

OKAY.  IT'S IMPORTANT TO SPEND JUST A LITTLE BIT OF TIME TALKING ABOUT SARAH BENNETT AND CMS.  AND AS YOU'VE HEARD, THE CENTERS FOR MEDICARE AND MEDICAID SERVICES, CMS, AMONG OTHER THINGS THAT AGENCY DOES, IT REGULATES CLINICAL LABORATORIES IN THE UNITED STATES.

AND MS. BENNETT WAS THE WITNESS WHO YOU HEARD FROM FROM CMS.  MS. BENNETT WAS AN INSPECTOR FROM THE HEADQUARTERS OFFICE.

SER-1029

THERE WAS ANOTHER INSPECTOR THAT YOU DID NOT HEAR FROM NAMED GARY YAMAMOTO.  MR. YAMAMOTO WAS AN INSPECTOR FROM THE LOCAL SAN FRANCISCO OFFICE OF CMS AND WAS ALSO INVOLVED IN THIS INSPECTION STARTING IN SEPTEMBER OF 2015, AND WE'LL TALK MORE ABOUT MR. YAMAMOTO IN A MINUTE.

SO BEFORE WE GET TO THE 2015 INFORMATION, I JUST WANT TO SPEND A MINUTE ON AN EARLIER INSPECTION.  AND YOU MIGHT REMEMBER THE TESTIMONY IN THIS CASE WAS THAT THESE ROUTINE INSPECTIONS HAPPENED ABOUT EVERY TWO YEARS.

SO THE PREVIOUS ONE OCCURRED IN ABOUT DECEMBER OF 2013. THERE WAS AN INSPECTOR FROM THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH WHO CAME AND INSPECTED THERANOS IN DECEMBER OF 2013.

AND DURING TRIAL AND ON CLOSING ARGUMENT, THE GOVERNMENT TRIED TO SUGGEST THAT THERE WAS SOME PLAN TO NOT ALLOW THIS 2013 INSPECTOR TO SEE WHAT WAS CALLED THE NORMANDY LAB, THE LAB THAT WAS PARTLY AN R&D LAB BUT IT WAS ALSO A CLINICAL LAB RUNNING THE THERANOS PROPRIETARY TESTING LIKE THE EDISONS AND THE MODIFIED PREDICATES.

AND THE GOVERNMENTS PAINTS THIS PICTURE THAT THIS INSPECTOR WAS SOMEHOW DENIED ACCESS.

FIRST OF ALL, DR. ROSENDORFF NEVER TESTIFIED TO THAT.  HE SAID -- AND YOU SAW THIS TESTIMONY YESTERDAY, I THINK MR. SCHENK PUT IT ON THE SCREEN -- THAT IT WAS SIMPLY A MATTER OF MR. BALWANI NOT WANTING THE PEOPLE GOING IN AND OUT OF THE LAB DURING THE TIME THAT THE LAB WAS INSPECTED.

SER-1030

DR. ROSENDORFF DID NOT TESTIFY THAT PEOPLE WERE DENIED ACCESS OR, YOU KNOW, MS. NORKIN WAS NOT ALLOWED THERE OR SOME DECEPTION WAS ORCHESTRATED.

BUT HERE'S WHAT DID HAPPEN, AND THIS IS WHAT WE, THE DEFENSE, HAVE TO SHOW YOU.

DR. ROSENDORFF IS ASKED A QUESTION, AND THEN YOU ALSO SAID IN YOUR DIRECT EXAMINATION THAT YOU SHOWED HER VALIDATION REPORTS?

HE SAID YES.

AND THE VALIDATION REPORTS WERE FOR THE EDISON DEVICE?

I BELIEVE SO, YES.

AND ALSO FOR THE MODIFIED PREDICATE DEVICE?

YES.

AND IT SAYS, I WAS INFORMING HER, MEANING THE INSPECTOR FROM THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH, I WAS INFORMING HER OF THE LDT'S THAT WE WERE RUNNING.

QUESTION.  RIGHT.  AND THE LDT'S WERE THE EDISON AND THE MODIFIED PREDICATE; RIGHT?

CORRECT.

AND THE LAST QUESTION THERE, AND IT'S HIGHLIGHTED, YOU WEREN'T TRYING TO HIDE ANYTHING FROM MS. NORKIN, THE CALIFORNIA INSPECTOR, WERE YOU?

I WAS NOT.

SO DR. ROSENDORFF TESTIFIED THAT HE SHOWED HER THE REPORTS FOR THE LABORATORY DEVELOPED TESTS FOR THE THERANOS PROPRIETARY

SER-1031

TECHNOLOGY. NOTHING WAS BEING HIDDEN FROM MS. NORKIN IN DECEMBER OF 2013.

AND, IN FACT, TALKING ABOUT MR. BALWANI FOR HIS PART, HE'S ASKED A QUESTION AND IT STARTS WITH THIS EMAIL FROM SCOTT MARMER TO DR. ROSENDORFF.

AND IT SAYS, "APPROVED CLA CLIA INSPECTORS" IS THE TOPIC AND IT'S DECEMBER 1ST, 2013, BEFORE THAT INSPECTION.

"APPROVED WITH ADAM TO ESCORT.

"EDGAR, THESE ARE GOVERNMENT INSPECTORS SO PLEASE CHECK WITH SUNNY WHETHER OR NOT HE WANTS SECURITY TO ESCORT FOR THIS ONE. THEY PROBABLY WON'T SIGN CDA'S," CONFIDENTIALITY AGREEMENTS, "SINCE THEY ARE GOVERNMENT INSPECTORS."

IT GOES ON. MR. PAZ WRITES TO MR. BALWANI. "HELLO SUNNY,

"PLEASE READ THE EMAIL BELOW AND LET ME KNOW HOW YOU WOULD LIKE US TO PROCEED WITH THE CLIA INSPECTOR VISIT."

AND SUNNY WRITES, "APPROVED.

"SCOTT CAN APPROVE SUCH VISITS."

SO HE DOESN'T EVEN NEED TO BE INVOLVED.

AND MR. PAZ WANTS TO BE REALLY SURE SO HE SAYS, "CORRECT, WOULD YOU LIKE FOR US TO PROVIDE SECURITY ESCORT DURING THE VISIT INTO BOTH CLIA AREAS?"

AND MR. BALWANI SIMPLY RESPONDS WITH A SIMPLE, "NO." HE DOESN'T NEED A SECURITY ESCORT FOR THIS CALIFORNIA INSPECTOR, HE'S NOT ARGUING WITH THAT, HE'S NOT ORCHESTRATING SPECIAL SECRECY PROCEDURES.

SER-1032

SO THE IDEA THAT SOMEHOW SOMETHING WAS HIDDEN FROM THIS CALIFORNIA INSPECTOR IS ANOTHER IMAGINARY TOPIC THAT THE GOVERNMENT HAS PUT BEFORE YOU.

AND WHAT HAPPENS AFTER THE INSPECTION?  CALIFORNIA AND CMS ISSUES A CERTIFICATE OF COMPLIANCE, AND THAT'S ISSUED ON JANUARY 9TH, 2014, JUST A FEW DAYS AFTER THAT INSPECTION.

SO I THINK THE GOVERNMENT SHOWED YOU DURING TRIAL AN EXHIBIT THAT SHOWED THERE WAS SOME ISSUES IDENTIFIED DURING THAT INSPECTION, AND I THINK IF YOU USE YOUR COMMON SENSE, I DON'T KNOW IF THERE'S EVER BEEN AN AUDIT OR INSPECTION IN THE HISTORY OF THE WORLD WHERE THE AUDITOR DIDN'T FIND SOME ISSUES.

BUT WHATEVER THOSE WERE, THEY WERE QUICKLY RESOLVED, AND ON JANUARY 9TH, 2014, CMS ISSUED A CERTIFICATE OF COMPLIANCE, ADAM ROSENDORFF, M.D., DIRECTOR.

SO LET'S GO TO THE 2015 INSPECTION.

SO, FIRST OF ALL, THE GOVERNMENT CALLED MS. BENNETT, BUT AS YOU MIGHT REMEMBER FROM HER CROSS-EXAMINATION, SHE REPEATEDLY CLAIMED NOT TO KNOW ANYTHING ABOUT THE FINGERSTICK ASSAY PART OF THE INSPECTION, AND THE REASON FOR THAT WAS SHE DID NOT SURVEY THE FINGERSTICK PART OF THE LABORATORY.  SHE DID NOT EXAMINE ANY OF THE FINGERSTICK TESTING ON THE MODIFIED PREDICATE DEVICES.

SO THEY CALLED MS. BENNETT WHO DIDN'T KNOW ABOUT WHAT SEEMS TO BE A KEY ISSUE IN THIS CASE WHICH WAS THE FINGERSTICK TESTING, BUT INSTEAD THEY CALLED SOMEONE WHO DIDN'T ACTUALLY DO

THAT, RATHER THAN MR. YAMAMOTO.

AND I THINK WE CAN SEE THE REASON WHY. IN THIS TEXT MESSAGE STRING, MR. BALWANI IS REPORTING THAT "GARY IS TRYING TO BE PRO THERANOS."

SO THE LAST THING THE GOVERNMENT WANTS IS A PRO THERANOS WITNESS ON THE STAND.

NOW, YOU SAW DURING TRIAL THERE WERE SOME TEXT MESSAGES THAT GO ON DURING THE INSPECTION. YOU KNOW, CLEARLY HAVING INSPECTORS COME IS GOING TO BE A LITTLE STRESSFUL, BUT HAVING INSPECTORS FINDING DEFICIENCIES IS EVEN GOING TO BE MORE STRESSFUL, SO NOT SURPRISINGLY THERE'S SOME TEXT MESSAGES THAT GO ON DURING THIS PROCESS. I THINK NATURALLY ANYBODY WOULD BE FOCUSSED ON THIS.

AND ON SEPTEMBER 22ND, ELIZABETH HOLMES WRITES, "CAN WE GET SOMEONE HERE TO SUPPLEMENT/UPDATE/HELP EXPLAIN?"

AND THEN LATER IN THE STRING ON SEPTEMBER 23RD, THIS IS DURING THE INSPECTION, MR. BALWANI WRITES, "DANIEL HAS NOTHING READY.

"TOLD ME EVERYTHING IS IN THE BINDERS.

"NOT THERE."

SO MR. BALWANI IS CLEARLY SURPRISED. HE THOUGHT HIS TEAM WAS READY, THEY HAD PREPARED FOR THIS, THEY HAD THE DOCUMENTATION ORGANIZED IN BINDERS.

INSTEAD, HE'S FINDING TO HIS CHAGRIN THAT IT'S NOT. SO HE'S DISAPPOINTED.

SER-1034

AND, YOU KNOW, THIS ISSUE ABOUT MS. BENNETT HAD TROUBLE GETTING DOCUMENTS. WELL, THAT MAY BE THE CASE.

BUT MR. BALWANI WAS SURPRISED AT THAT AND HE THOUGHT THAT THE TEAM HAD IT ORGANIZED.

BUT LET'S TALK ABOUT WHAT HAPPENED THAT SAME DAY.

SO, REMEMBER, THIS IS ANOTHER TEXT MESSAGE. SO THIS IS ELIZABETH HOLMES AND MR. BALWANI. THE GOVERNMENT CLAIMS THESE WERE CONSPIRATORS WHO WERE WORKING TOGETHER TO COMMIT FRAUD ON PATIENTS AND INVESTORS, AND THERE'S NO ONE ELSE LISTENING HERE AS FAR AS I KNOW. THESE ARE JUST TEXT MESSAGES THAT THEY'RE SENDING, RIGHT?

AND ELIZABETH HOLMES WRITES, "YOU MAY WANT TO WALK HIM THROUGH THE REPORTS WITH CHINMAY BEFORE HE LEAVES. I CAN QUICKLY BRIEF YOU ON THIS. YOU COULD GET THROUGH THEM AND GET IT DONE. DATA IS GOOD. FORMATTING MAY BE DIFFERENT THAN WHAT HE IS USED TO BUT SUBSTANCE IS THERE."

SO THAT'S WHAT MS. HOLMES IS TELLING MR. BALWANI IN A PRIVATE TEXT MESSAGE. NOT, BOY, THE JIG IS UP, INSPECTORS ARE HERE, THEY FOUND THE PROBLEMS WE ALWAYS KNEW ABOUT.

SHE SAYS, NO, THE DATA IS GOOD, THE SUBSTANCE IS THERE.

SO THIS IS -- THE GOVERNMENT CLAIMS THESE TEXT MESSAGES ARE EVIDENCE OF SOME KIND OF CONSPIRACY.

THIS IS THE OPPOSITE OF THAT. IN A PRIVATE TEXT MESSAGE, IF THAT WAS REALLY WHAT THEY WERE DOING, THIS WOULD NOT BE THE TEXT MESSAGE THAT THEY WOULD BE SENDING.

SER-1035

NOW, EARLIER IN SEPTEMBER, AND THE GOVERNMENT SHOWED THIS TO YOU, TOO, MR. BALWANI WRITES, "WE CAN BUILD THIS BUSINESS THEY SOFTWARE AND JP AND RUN CIRCLES AROUND OTHERS AND FDA BY MANIPULATING THEIR GAME."

OKAY. WHAT DOES THAT MEAN? ARE PEOPLE LOOKING FOR WAYS TO DEAL WITH REGULATORS? OF COURSE. I MEAN, THAT IS BUSINESS VERSUS REGULATORS. YOU KNOW, THERE'S ALWAYS ISSUES ABOUT HOW TO DEAL WITH REGULATORS.

BUT IN THIS CASE WHAT MR. BALWANI SAYS NEXT IS, "WE JUST NEED A FRESH START AND A GIANT STEP BACK. LIKE WE DISCUSSED," IT COULD BE LAST NIGHT.

AND IT SAYS, "DO CTN PMA ON OUR TERMS AND THEN GO INTELLIGENT ON MARKETING."

AND THEN LATER ON SEPTEMBER 2ND, ELIZABETH HOLMES WRITES, "WITH PMA YOU CAN MARKET WHATEVER YOU WANT."

SO MS. BENNETT EXPLAINED A LITTLE BIT ABOUT PMA, IT'S A PREMARKET APPROVAL. IT'S ANOTHER FILING YOU MAKE WITH THE FDA.

SO IF SOMEONE WANTS TO RUN CIRCLES AROUND THE FDA, IT SEEMS THAT MR. BALWANI'S PLAN IS TO SUBMIT ANOTHER APPROVAL DOCUMENT CALLED A PREMARKET APPROVAL FOR THE FDA FOR THERANOS'S TECHNOLOGY. AND I'M NOT SURE HOW THAT RUNS CIRCLES, BUT THAT SEEMS TO BE WHAT HE'S TALKING ABOUT.

AND IF YOU THINK THAT YOUR LABORATORY AND YOUR TECHNOLOGY IS TERRIBLE AND THAT IT'S NEVER GOING TO GO ANYWHERE, THE LAST THING YOU DO IS SUBMIT MORE APPROVAL DOCUMENTS.

REMEMBER A FEW MONTHS BEFORE THIS, THERANOS HAD GOTTEN APPROVAL FROM THE FDA FOR HSV-1 ASSAY RUNNING ON THE SYSTEM.

SO THE IDEA THAT THIS MEANS ANYTHING RELEVANT TO THIS CRIMINAL CASE IS OUTLANDISH.

OKAY. I WANT TO MOVE TO THE TOPIC THOUGH OF THE CMS SURVEY REPORT ITSELF, AND YOU MIGHT REMEMBER DURING THE EXAMINATION OF MS. BENNETT, THE GOVERNMENT SPENT SOME TIME ON THAT DOCUMENT. IT'S EXHIBIT 4621. IT'S A LENGTHY DOCUMENT. IT'S ALL OF THE DEFICIENCIES THAT MS. BENNETT AND HER COLLEAGUE, MR. YAMAMOTO, FOUND AT THERANOS.

AND I JUST WANT TO WALK YOU THROUGH SOME OF THEM SO THAT IT'S CLEAR WHAT ACTUALLY HAPPENED.

SO YOU MIGHT REMEMBER DURING THE EXAMINATION OF MS. BENNETT, SHE TALKED ABOUT SOMETHING CALLED AN IMMEDIATE JEOPARDY, AND MS. BENNETT TALKED ABOUT WHAT THAT WAS.

AND THERE ARE DIFFERENT SORT OF LEVELS OF VIOLATION THAT CMS COULD FIND. ONE IS THE HIGHEST LEVEL, THE MOST SERIOUS IS IMMEDIATE JEOPARDY.

ANOTHER LEVEL WOULD BE CONDITION LEVEL VIOLATIONS, AND THEN THERE'S SOMETHING CALLED STANDARD LEVEL VIOLATIONS. THAT'S THE CMS LINGO, IF YOU WILL, RIGHT?

SO THE GOVERNMENT POINTED TO THE IMMEDIATE JEOPARDY BECAUSE THAT'S KIND OF A SHINY OBJECT. LIKE, YOU KNOW, LOOK, IMMEDIATE JEOPARDY COULD MEAN THAT PEOPLE COULD BE POTENTIALLY BE SUBJECT TO DEATH OR SERIOUS BODILY INJURY, SO THAT'S REALLY

SERIOUS.

THE GOVERNMENT WANTED TO HIGHLIGHT THAT FOR YOU AT TRIAL BECAUSE IT SOUNDS REALLY BAD, AND IT IS BAD.  I MEAN, NO LAB WANTS TO GET AN IMMEDIATE JEOPARDY, AND THAT'S A REGULATORY VIOLATION THAT NOBODY WANTS AND IT'S SERIOUS AND IT SHOULD BE TAKEN SERIOUSLY.

BUT I WANT TO JUST MAKE SURE WE LEVEL SET HERE AND EXPLAIN EXACTLY WHAT THAT IMMEDIATE JEOPARDY WAS, OKAY?

SO THIS HAD TO DO WITH AN ASSAY CALLED PT INR, AND THAT IS AN ASSAY THAT IS USED TO MONITOR PEOPLE WHO ARE ON BLOOD THINNERS, LIKE WARFARIN AND THINGS LIKE THAT.

SO HERE'S WHAT ACTUALLY HAPPENED, AND THERE ARE TWO ASPECTS TO THE PT INR AND IMMEDIATE JEOPARDY THAT MS. BENNETT FOUND.

THE FIRST ONE IS THIS ISSUE WITH REFRIGERATION.

SO DADE INNOVIN, WHICH IS A COMPANY THAT SUPPLIED A PARTICULAR REAGENT, SENT A BATCH OR A LOT OF REAGENTS TO THERANOS, SO THIS COMPANY CALLED DADE.

AND USUALLY, AND YOU CAN SEE THAT IN SECTION B THAT IS ON THE SCREEN, THE GENERAL SUPERVISOR THAT MS. BENNETT TALKED TO STATED THAT THE PACKAGE INSERTS WITH THE LOT WERE USUALLY WHITE.  OKAY?

THE PACKAGE INSERT FOR THIS PARTICULAR LOT NUMBER, AND IT HAS THE LOT NUMBER THERE, WERE PINK.  IT INDICATED THAT THE MANUFACTURER HAD INCLUDED SPECIAL INSTRUCTIONS FOR THE SPECIFIC

LOT NUMBER OF THIS REAGENT CALLED INNOVIN.

SO THERE WAS SOMETHING DIFFERENT ABOUT THIS LOT, AND THE MANUFACTURER WAS TRYING TO BRING IT TO ITS CUSTOMER, THERANOS'S, ATTENTION WITH A PINK DOCUMENT, A PINK PACKAGE INSERT.

NEXT. REVIEW OF THE PACKAGE INSERT, THE PI, REVEALED AN IMPORTANT NOTE THAT THIS SPECIFIC LOT NUMBER WAS ONLY STABLE FOR TWO DAYS INSTEAD OF TEN DAYS AFTER RECONSTITUTION WHEN STORED AT 2-8 DEGREES CELSIUS.

SO THERE WAS SOMETHING DIFFERENT ABOUT THIS LOT. USUALLY THE MANUFACTURER, DADE, SAYS YOU CAN STORE THIS FOR TEN DAYS.

IN THIS CASE THERE WAS SOMETHING STRANGE ABOUT THE LOT THAT THEY MANUFACTURED -- NOT THERANOS, DADE -- WELL, IT LOOKS LIKE IT'S ONLY STABLE FOR TWO DAYS.

AND THEN IT SAYS IN PART E THERE, THE CURRENT VIAL OF INNOVIN REAGENT WAS OBSERVED IN THE 2 TO 8 DEGREE CELSIUS REFRIGERATOR WITH A FIVE-DAY EXPIRATION DATE.

SO THERANOS HAD PUT IT DOWN FOR A FIVE-DAY EXPIRATION. NORMALLY YOU COULD KEEP IT AS LONG AS TEN DAYS, AND THERANOS WOULD ONLY DO FIVE. BUT THIS PACKAGE INSERT SAID ONLY KEEP IT FOR TWO DAYS.

SO MS. BENNETT FOUND THIS IN THE FRIDGE. I THINK SHE ACTUALLY SAID THAT IT'S LIKE IF YOU HAVE SPILLED MILK THAT IS PAST THE EXPIRATION DATE, YOU WILL DON'T WANT TO DRINK THIS MILK.

SER-1039

BUT THEN SHE SAID SHE DID DRINK MILK PAST THIS EXPIRATION DATE. DO YOU REMEMBER THAT FROM MS. BENNETT?

ANYWAY, THAT'S WHAT THIS WAS ABOUT.

AND THEN IT SAYS THAT, IN PART G THERE, THE GENERAL SUPERVISOR CONFIRMED ON SEPTEMBER 23RD, 2015, THAT THE CHANGE IN STORAGE AND STABILITY OF THE INNOVIN REAGENT HAD NOT BEEN IDENTIFIED FROM MARCH 2015 THROUGH SEPTEMBER 2015.

SO THEY MISSED THE PACKAGE INSERT, AND THEIR JOB WAS TO CATCH THOSE THINGS. IT WAS PINK IT LOOKS LIKE.

BUT THE IDEA THAT MR. BALWANI KNOWS ANYTHING ABOUT A PACKAGE INSERT THAT'S PINK OR WHITE OR WHETHER IT'S IN THE FRIDGE FOR TWO DAYS OR TEN DAYS OR FIVE DAYS, THAT'S OUTLANDISH.

AND THAT'S ONE PART OF THE PT INR IMMEDIATE JEOPARDY THAT THE GOVERNMENT WAS PRESENTING TO YOU AS THIS MAJOR PROBLEM WITH THE LAB THAT SOMEHOW MR. BALWANI IS RESPONSIBLE FOR.

BUT THERE'S ANOTHER PART OF PT INR, TOO, JUST TO BE COMPLETE.

FIRST OF ALL, JUST TO MAKE CLEAR WHAT WE'RE TALKING ABOUT, THE PT INR TESTING THAT MS. BENNETT WAS TALKING ABOUT WAS NOT ON A THERANOS DEVICE.

THE GOVERNMENT SHOWED YOU AN EMAIL EARLIER ABOUT PT INR, AND AT ONE POINT IT HAD BEEN, BUT AT THIS POINT MS. BENNETT IS TALKING ABOUT PT INR, THAT ASSAY, RUNNING ON AN FDA APPROVED COMMERCIAL DEVICE.

SER-1040

AND SHE'S ASKED THE QUESTION, AND SHE SAYS YES.  AND THAT'S WHAT WAS GOING ON.

AND THERE'S BEEN NO EVIDENCE IN THIS CASE THAT THERE WAS ANYTHING WRONG WITH THAT DEVICE, OR IT'S NOT CAPABLE OF PRODUCING RESULTS OR ANYTHING LIKE THAT.

IF WE GO TO THE NEXT SLIDE.

SO THIS IS THE OTHER PART OF THE PT INR IMMEDIATE JEOPARDY STORY.  SO IT TURNS OUT THAT THE LAB STAFF IS SUPPOSED TO ENTER THIS PARTICULAR VALUE INTO, IN THIS CASE, THE FDA APPROVED COMMERCIAL DEVICE, AND IT'S CALLED AN INR VALUE.

SO THEY'RE SUPPOSED TO ENTER THIS VALUE, AND THAT IS BASED ON A STUDY.

AND ONCE THEY ENTER THAT VALUE, THEN THEY COULD GO FORWARD WITH THE PATIENT TESTING FOR THIS PARTICULAR ASSAY, PT INR.

WELL, WHAT MS. BENNETT FOUND IS THAT THERE'S NO DOCUMENTATION OF THAT VALUE AND WHETHER IT HAD BEEN ENTERED.

IT DOESN'T MEAN IT WASN'T ENTERED.  BUT AS MS. BENNETT SAID, YOU KNOW, IN A LAB WHEN YOU'RE DOING AN INSPECTION, IF SOMETHING IS NOT WRITTEN DOWN AND DOCUMENTED, THEN IT BASICALLY DOESN'T EXIST, RIGHT?  AS FAR AS AN INSPECTOR IS CONCERNED, THAT'S REASONABLE.

SO MS. BENNETT SAYS, WELL, THERE'S NO DOCUMENTATION OF THE VALUE HAVING BEEN ENTERED, SO SHE THEN TOOK THE MORE RECENT VALUE FROM SEPTEMBER AND REDID THE CALCULATIONS.

AND THAT'S THIS DOCUMENT THAT YOU'RE SEEING AS PART OF

SER-1041

EXHIBIT 20619. AND THIS IS THE RECALCULATIONS THAT MS. BENNETT DID.

SHE FOUND THAT THERE WERE SOME DIFFERENCES IF YOU USE THE MORE RECENT INR NUMBER VERSUS THE NUMBER THAT MAY HAVE BEEN USED BACK IN MARCH BUT HAD NOT BEEN DOCUMENTED.

SO MS. BENNETT, YOU KNOW, PERFECTLY FINE, SHE FOUND THIS ISSUE AND BROUGHT IT TO THE ATTENTION OF THERANOS.

AND AGAIN, THOUGH, SHOULD A LAB DOCUMENT THE VALUE THAT THEY ENTER? OF COURSE THEY SHOULD.

BUT IS THAT SOMETHING THAT MR. BALWANI IS LOOKING AT? HE'S NOT THE PERSON ENTERING THE VALUE. THEY'RE SOP'S. HE'S EXPECTING THE LAB STAFF TO DO THIS.

AND THIS LOOKS LIKE A PROBLEM, A REGULATORY PROBLEM, BUT NOT A CRIMINAL VIOLATION THAT MR. BALWANI IS SOMEHOW RESPONSIBLE FOR.

LET'S TALK ABOUT WHAT HAPPENED WITH PT INR. SO HERE'S THE QUESTION TO MS. BENNETT ON DIRECT: DID YOU ALERT MR. BALWANI TO THE PROBLEMS WITH PT INR IN THE SEPTEMBER PORTION OF THE EXAM?

YOU MIGHT REMEMBER THERE WAS A SEPTEMBER PORTION OF THE INSPECTION AND THEN CMS CAME BACK IN NOVEMBER.

AND SHE SAID YES, SHE ALERTED HIM.

AND WHEN YOU CAME BACK IN NOVEMBER, WHAT HAD HAPPENED?

SHE SAID NOTHING.

SO THAT WAS HER TESTIMONY ON DIRECT.

SER-1042

THAT WASN'T TRUE.

SO ON CROSS, SHE IS SHOWN A DOCUMENT TO REFRESH HER MEMORY, AND THEN SHE HAD TO SAY, YOU KNOW, SHE PROBABLY JUST FORGOT ABOUT THAT.

BUT THERANOS PAUSED IT'S TESTING ON PT INR.

SHE SAYS YES.

SO WHEN THIS PROBLEM WAS IDENTIFIED, THERANOS STOPPED THE TESTING UNTIL THEY COULD FIGURE THINGS OUT, AND EVEN THOUGH SHE INITIALLY SAID THEY DID NOTHING, ACTUALLY THEY DID TAKE ACTION IN RESPONSE TO CMS.

LET'S MOVE TO THE REPORT, PAST THE PT INR AND THE IMMEDIATE JEOPARDY, BUT JUST LOOKING AT THE REPORT AS A WHOLE, AND IT'S QUITE LONG.  IT'S EXHIBIT 4621.

WHAT I'VE DONE HERE IS ORGANIZED THE DIFFERENT REGULATORY VIOLATIONS INTO FOUR BUCKETS, AND I JUST WANT TO TALK ABOUT THEM ONE AT A TIME.

SO THESE ARE ALL OF THE REGULATORY VIOLATIONS THAT ARE DISCUSSED.  AND YOU MIGHT REMEMBER THIS, THEY ARE CALL D-TAGS, EACH LITTLE SECTION OF THE CMS REPORT.

THE FIRST ONE HAS TO DO WITH TRAINING DOCUMENTATION.

AND THIS VIOLATION, THIS GROUP OF VIOLATIONS, THIS BUCKET, RELATES TO TESTING PERSONNEL FILES WHERE THERE WAS MISSING DOCUMENTATION OF REQUIRED TRAINING.

SO LAB STAFF IS SUPPOSED TO UNDERGO PERIODIC TRAINING AND THAT IS SUPPOSED TO BE DOCUMENTED, AND THERE WAS SOME

SER-1043

DEFICIENCIES IN THE DOCUMENTATION FOR TRAINING.

AGAIN, THE LAB SHOULD KEEP IT AND DO IT RIGHT AND THERE ARE REGULATIONS HERE THAT SHOULD BE FOLLOWED. BUT AGAIN THIS IS A REGULATORY VIOLATION AND I'M GOING TO TALK MORE ABOUT THAT IN A MINUTE.

GENERAL AND TECHNICAL SUPERVISORS DOCUMENTATION. THIS IS RELATING TO MORE PARTICULAR TRAINING FOR GENERAL AND TECHNICAL SUPERVISORS THAT THEY NEED TO HAVE DOCUMENTED. AND AGAIN, WE DON'T KNOW WHETHER THEY DID THE TRAINING OR NOT, IT'S JUST THAT IT WASN'T DOCUMENTED.

SO AS FAR AS MS. BENNETT IS CONCERNED, THAT DIDN'T HAPPEN. SO THAT'S ANOTHER GROUP OF VIOLATIONS THAT SHE FOUND.

THE NEXT ONE IS LAB DIRECTORS. AND IT'S IMPORTANT TO NOTE THAT THE LAB DIRECTOR'S VIOLATION SPANS 2014 AND 2015. SO IT'S BOTH DR. ROSENDORFF AND DR. DHAWAN, WHO WAS THE LAB DIRECTOR ON THE LICENSE AFTER DR. ROSENDORFF LEFT.

AND SO THIS VIOLATION INVOLVING DR. ROSENDORFF AND DR. DHAWAN HAD TO DO WITH ESSENTIALLY THAT. BECAUSE THERE WERE OTHER VIOLATIONS FOUND, BY DEFINITION THE LAB DIRECTORS WERE NOT PROPERLY SUPERVISING THE STAFF AND THE TRAINING AND ALL OF THE OTHER REQUIREMENTS. SO THAT'S WHAT THIS GROUP IS.

AND THEN THE FINAL ONE WAS ANALYTIC SYSTEMS. LET'S SPEND A MOMENT ON THAT.

SO THE ANALYTIC SYSTEMS BUCKET HAS TO DO WITH QC PROCEDURES, INCLUDING ON EDISON.

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                    7231

AND WHAT MS. BENNETT FOUND WAS THAT IN SOME CASES, EVEN THOUGH THERE WAS A STANDARD OPERATING PROCEDURE FOR RUNNING QC, AND WE TALKED ABOUT THAT YESTERDAY ABOUT HOW IF A DEVICE FAILS QC THEN YOU'RE NOT SUPPOSED TO USE IT FOR PATIENT TESTING, THAT WAS THE PROCEDURE.

BUT IN SOME CASES MS. BENNETT FOUND THAT THAT DIDN'T -- THAT WASN'T FOLLOWED PROPERLY.  FOR EXAMPLE, IF YOU GO TO EXHIBIT 4621, YOU'LL SEE THAT THERE ARE TIMES WHEN THE QC RUN WITH A DEVICE THAT PASSES IS GOOD FOR 24 HOURS.

BUT THEN THEY DO ANOTHER QC RUN THE NEXT DAY, BUT THE TESTING IS DONE LIKE ON THE 24 AND A HALF HOUR, OR THE 25TH HOUR, SO IT'S NOT WITHIN THE 24 HOURS.

AND MS. BENNETT, YOU KNOW, FINDS THOSE VIOLATIONS, WHICH IS HER JOB, AND NOTES THOSE.

AND THEN THERE ARE OTHER VIOLATIONS INVOLVING DR. ROSENDORFF WHEN HE DID THE VALIDATION REPORTS.  THERE HAD BEEN AN EARLIER VALIDATION PLAN THAT LAID OUT HOW THE VALIDATION WAS SUPPOSED TO BE DONE, AND MS. BENNETT FOUND THAT DR. ROSENDORFF DIDN'T FOLLOW THOSE IN ALL RESPECTS.  SO THAT'S ANOTHER VIOLATION.

AND THERE WAS ALSO A VIOLATION THAT MS. BENNETT FOUND ABOUT QC TRENDING.  SO IT WASN'T JUST THE DAILY QC, BUT THE LAB IS SUPPOSED TO LOOK AT HOW QC IS TRENDING OVER TIME, AND SHE DIDN'T -- SHE FOUND THAT THERE WASN'T AN ADEQUATE PLAN TO DEAL WITH QC TRENDS OVER TIME.

SER-1045

SO, AGAIN, THESE ARE VIOLATIONS THAT ARE SERIOUS AND SHOULD BE TAKEN SERIOUSLY, BUT THEY'RE NOT THE STUFF OF FEDERAL CRIMINAL CHARGES.

AND JUDGE DAVILA IS GOING TO TALK TO YOU ABOUT THAT WHEN HE GIVES HIS INSTRUCTIONS, AND I WANT TO PUT THAT ON THE SCREEN.

SO THIS INSTRUCTION THAT JUDGE DAVILA WILL GIVE YOU IS THAT THERE IS EVIDENCE IN THIS CASE OF VIOLATIONS OF REGULATIONS AND INDUSTRY STANDARDS, AND YOU MAY CONSIDER THAT EVIDENCE IN ASSESSING WHETHER THE GOVERNMENT HAS PROVED EACH OF THE COUNTS.

HOWEVER, YOU MAY NOT FIND MR. BALWANI LIABLE FOR ANY OF THE OFFENSES ALLEGED IN THE INDICTMENT MERELY BECAUSE HE OR THERANOS MAY HAVE VIOLATED FEDERAL OR STATE REGULATIONS OR BECAUSE MR. BALWANI OR THERANOS MAY HAVE ENGAGED IN NEGLIGENT PRACTICES OR VIOLATED INDUSTRY STANDARDS RELATED TO LABORATORY TESTING OR MEDICAL DEVICES.

SO YOU CANNOT FIND GUILT IN THIS CASE BECAUSE THERE WAS SOME REGULATORY VIOLATIONS.

NOW, MIND YOU, THE REGULATORY VIOLATIONS THAT WE'RE TALKING ABOUT ARE NOT THINGS THAT WERE KNOWN TO MR. BALWANI. HE'S NOT IN THERE ENTERING VALUES INTO THE MACHINE OR DECIDING HOW LONG REAGENTS SHOULD STAY IN THE FRIDGE.

BUT IN ANY EVENT, REGARDLESS OF THE VIOLATIONS, EVEN IF MR. BALWANI WAS SOMEHOW KNOWLEDGEABLE, YOU WOULD NOT BE ABLE TO

SER-1046

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)          7233

FIND GUILT BASED MERELY ON THE FACT THAT THERE WERE REGULATORY VIOLATIONS.

THIS IS NOT A CASE ABOUT VIOLATIONS OF REGULATIONS. THOSE ARE IMPORTANT, BUT THAT'S NOT WHAT WE ARE DOING HERE.

THIS IS ABOUT INTENT TO DECEIVE, INTENT TO TAKE PATIENT'S MONEY THROUGH DECEPTION, KNOWINGLY RUNNING A LAB THAT WAS GIVING PATIENTS INACCURATE RESULTS AND TRYING TO TAKE THEIR MONEY THROUGH THAT PROCESS.

AND THAT'S NOT -- REGULATORY VIOLATIONS ARE A DIFFERENT SUBJECT. THAT IS WHAT JUDGE DAVILA WILL TELL YOU.

NOW, IF WE GO FURTHER, THOUGH, I WANT TO TALK ABOUT WHAT IS REALLY IMPORTANT IS THESE HEAD-TO-HEAD COMPARISONS OF THE THERANOS TECHNOLOGY AND AGAINST THE FDA COMMERCIAL TECHNOLOGY.

SO IF WE GO TO THE NEXT SLIDE.

THESE ARE THE AAP, ALTERNATIVE ASSESSMENT PROCEDURE, REPORTS THAT WERE PROVIDED TO CMS.

AS I SAID YESTERDAY, THIS IS REALLY WHERE THE RUBBER HITS THE ROAD. YOU KNOW, PROFICIENCY TESTING, DOES YOUR SYSTEM WORK? IS IT -- HOW IS IT DOING IN THESE HEAD-TO-HEAD COMPARISONS?

AND I JUST WANT TO WALK THROUGH THIS DOCUMENT. THIS IS EXHIBIT 20619, IF YOU WANT TO WRITE THAT DOWN.

SO WHAT THIS HAS IS THE DATES THAT THE AAP WAS PERFORMED AND THE RESULTS OF THAT AAP.

AND I JUST WANT TO JUMP TO AN ISSUE REAL QUICKLY.

UNITED STATES COURT REPORTERS

IF WE CAN GO TO THE BOTTOM OF THE DOCUMENT, MR. ALLEN.

YOU CAN SEE THAT THIS DOCUMENT IS SIGNED, NOT BY MR. BALWANI, BUT IT'S SIGNED BY DR. SAKSENA, VERIFIED BY GURBIR SIDHU, SIGNED BY DR. DHAWAN. AND THEY SIGNED IT IN NOVEMBER.

AND YOU MIGHT REMEMBER AN HOUR OR SO AGO I SHOWED YOU DR. ROSENDORFF'S PROTOCOL FOR AAP, THAT WAS EXHIBIT 9939 AND 9940. AND IN THOSE EXHIBITS IT SAYS THAT THE LABORATORY DIRECTOR IS RESPONSIBLE FOR REVIEWING THE AAP.

WHAT MS. BENNETT FOUND, AND SHE TESTIFIED ABOUT THIS, IS THAT SHE DIDN'T HAVE ANY REASON TO DOUBT THE TIMES THAT THE AAP TEST WAS PERFORMED, AND IN THIS CASE IT WAS AUGUST OF 2014.

BUT SHE ENFORCED THE REGULATION, THAT, WELL, YOU HAVE TO HAVE THE LAB DIRECTOR SIGN OFF, REVIEW IT AT THE TIME IT WAS DONE. SO THAT WAS THE VIOLATION THAT MS. BENNETT FOUND.

BUT PUTTING ASIDE THAT REGULATORY VIOLATION, THE EVIDENCE IN THIS CASE IS THESE AAP TESTS WERE TO BE -- THIS IS PART OF PROFICIENCY TESTING. YOU SAW A FEW MINUTES AGO, MAYBE IT'S AN HOUR NOW, DR. ROSENDORFF REFERRED TO AAP IN LOOKING AT A PHYSICIAN INQUIRY AND HOW TO RESPOND TO THAT.

SO WHEN YOU GO THROUGH THIS, YOU CAN SEE THEY'RE NOT 100 PERCENT IN ALL CASES. REMEMBER 80 PERCENT IS A PASS. 100 PERCENT IS OBVIOUSLY BETTER.

AND WHAT THIS DOES IS, IF WE JUST LOOK AT THE FIRST ONE, THIS HAPPENS TO BE FOR THYROXINE, AND THERE ARE FIVE SAMPLES,

JUST LIKE THE PROTOCOL SAID THERE HAD TO BE, AND THEN THERE'S A TEST ON THE PREDICATE AND THEY COMPARE THAT PREDICATE TEST WITH THE THERANOS TECHNOLOGY TEST, AND THEY COMPARE THE TWO NUMBERS, AND THEN THE TOTAL ALLOWABLE ERROR IS A RANGE IT HAS TO FALL WITHIN, IN THIS CASE FOR THIS PARTICULAR ASSAY, PLUS OR MINUS 20 PERCENT.

AND THEN THAT'S THE PERCENT DIFFERENCE BETWEEN IF YOU LOOK AT SAMPLE 1 BETWEEN 1.42 AND 1.19, 16 PERCENT, SO JUST USING THAT QUICK EXAMPLE, IT FALLS WITHIN THE TOTAL ALLOWABLE ERROR AND THAT'S A PASS FOR SAMPLE 1.

AND THEN YOU CAN GO THROUGH ALL OF THESE AND YOU CAN SEE THE COMPARISON AND THE VALUES ACHIEVED FOR THE PREDICATE VERSUS THERANOS AND THEY ARE WITHIN THE TOTAL ALLOWABLE ERROR.

AND THIS GOES ON FOR PAGES AND PAGES.

SO THIS HAS TSH.

PSA IS THE NEXT ONE, 8/17/2014 ON THAT FIRST PAGE.

IF WE ZOOM IN ON PSA, MR. ALLEN.

SO YOU CAN SEE THAT SECOND GROUP THERE, PSA, 8/17/2014. THERE WERE FIVE SAMPLES AND ALL OF THEM FELL WITHIN THE TOTAL ALLOWABLE ERROR.

AND AGAIN, THERE WERE PAGES AND PAGES ABOUT THIS. LET ME JUST SHOW YOU PAGE 3 OF THE EXHIBIT. AGAIN, IT'S 20619.

SO THE THIRD GROUP IS HUMAN CHORIONIC GONADOTROPIN -- I'M PROBABLY SAYING THAT WRONG. BUT THAT'S HCG. THAT'S THAT PREGNANCY TEST THAT YOU HEARD A LOT ABOUT, INCLUDING FROM

DR. ZACHMAN AND MS. GOULD, AND YOU CAN SEE THIS IS THE SAME MONTH THAT MS. GOULD GOT HER HCG TESTS AND THE COMPARISON OF THE PREDICATE AND THE THERANOS RESULTS SHOWED THAT IT PASSED 100 PERCENT.

YOU CAN SEE WITH SAMPLES 2 THROUGH 5, THE PREDICATE GOT LOWER THAN 1, AND THEN THE THERANOS GOT LOWER THAN -- THE LOW RANGE OF QUANTIFICATION BASICALLY, LLOQ.

SO THESE WERE PASSED WITH PT TESTING.  AND AGAIN, THIS GOES ON FOR PAGES AND PAGES.

IF YOU GO TO THE LAST PAGE, DR. ELLSWORTH, WHOSE DOCTOR IS MARK BURNES, GOT HIS PSA TESTS IN MAY AND JUNE OF 2015.

AND THEN IN MARCH OF 2015, THIS WAS THE PSA, THE RESULTS OF THE PROFICIENCY TESTING, THE AAP TYPE OF PROFICIENCY TESTING FOR PSA.

SO THIS IS THE RESULTS.  THERE'S NO EVIDENCE IN THIS CASE THAT THERE IS ANYTHING WRONG WITH THESE RESULTS, THAT THESE WEREN'T DONE.  AS I SAID, DR. ROSENDORFF REFERRED TO THESE HIMSELF.

AND IT SHOWS THAT THERANOS IS DOING THE AAP'S AND THEY'RE GETTING RESULTS THAT ARE 100 PERCENT ALMOST EVERY TIME.

SO THE IDEA THAT MR. BALWANI SOMEHOW THINKS THAT THIS TECHNOLOGY DOESN'T WORK WHEN THESE HEAD-TO-HEAD COMPARISONS SHOW THESE RESULTS, THAT DOESN'T MAKE SENSE.

SO LET'S GO TO THE NEXT EXHIBIT, WHICH IS MORE OF THIS.

SO THOSE WERE THE EDISON TESTS.

THERE IS ALSO A WHOLE GROUP OF MODIFIED PREDICATE TESTS.

THIS IS EXHIBIT 20620.

AND THIS WAS INFORMATION THAT CMS WAS NOTIFIED ABOUT, SO THEY HAD THIS INFORMATION FROM THERANOS. SO THEY WERE GIVEN THIS NOTICE.

AND YOU CAN SEE ALL OF THESE ARE MOSTLY 100 PERCENT. I WANT TO HIGHLIGHT JUST A FEW.

IF YOU GO TO PAGE 2, MR. ALLEN.

AND THERE'S -- IN THE MIDDLE THERE'S A, IT'S SORT OF FOURTH FROM THE BOTTOM, THERE'S A POTASSIUM TEST. YOU CAN SEE THAT THOSE POTASSIUM TESTS IN A HEAD-TO-HEAD COMPARISON CAME UP WITHIN THE TOTAL ALLOWABLE ERROR EVERY TIME WITH THE FIVE SAMPLES.

SAME WITH SODIUM. SAME WITH ALL OF THE OTHER ASSAYS ON THE PAGE.

AND THEN IF WE GO TO PAGE 4 OF THE DOCUMENT AND YOU LOOK AT THE SECOND TO THE LAST ENTRY, YOU SEE THERE'S ONE THAT IS 80 PERCENT; RIGHT?

SO THAT WAS STILL A PASS, BUT IT WAS ONE SAMPLE THAT WAS NOT. AND YOU CAN SEE WHAT IT IS. IT'S SAMPLE 4, THE TOTAL ALLOWABLE ERROR, TAE, IS PLUS OR MINUS 1, AND IT WAS 1.1. SO THAT WAS ONE THAT DIDN'T PASS.

BUT OVERALL THERE WERE FOUR OUT OF FIVE, SO THAT'S 80 PERCENT.

AND THEN THE SAME ON THE NEXT PAGE, PAGE 5 WITH AN ASSAY

SER-1051

CALLED FERRITIN.

SO THESE RESULTS ARE ALMOST PERFECT, BUT, YOU KNOW, NOT QUITE PERFECT.  THERE WERE A FEW THAT WERE STILL PASSING, BUT THAT WERE 80 PERCENT RATHER THAN 100 PERCENT.

OKAY.  SO JUST TO WRAP THAT TOPIC UP.

WHATEVER REGULATORY VIOLATIONS MS. BENNETT FOUND, AND SHE DID FIND THOSE, THESE WERE THE ACTUAL HEAD-TO-HEAD COMPARISONS THAT WERE DONE.

SO THE GOVERNMENT DIDN'T SHOW THIS TO YOU.  WE SHOWED THEM TO YOU.  THEY DIDN'T TALK ABOUT IT IN CLOSING.  I'M TALKING ABOUT IT.  AND I'M TALKING ABOUT IT BECAUSE IT'S WHERE THERANOS IS ACTUALLY DOING THE WORK TO SHOW THAT THEIR ASSAYS ARE WORKING AS FAR AS THE LABORATORY STAFF AND AS FAR AS MR. BALWANI KNOW.

YOUR HONOR, I'M GOING TO MOVE TO A DIFFERENT TOPIC.  WOULD THIS BE A GOOD TIME FOR A BREAK?

THE COURT:  IT COULD BE.

LADIES AND GENTLEMEN, SHOULD WE TAKE A BREAK NOW?  I'M GETTING HEADS NODDING.

SHOULD WE TAKE 40 MINUTES THEN, LADIES AND GENTLEMEN, 40 MINUTES.

THANK YOU, MR. COOPERSMITH.  WE'LL BE IN RECESS.

(RECESS FROM 11:07 A.M. UNTIL 12:00 P.M.)

THE COURT:  PLEASE BE SEATED.  THANK YOU.

WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

ARE PRESENT ONCE AGAIN.

MR. COOPERSMITH, WOULD YOU LIKE TO CONTINUE?

MR. COOPERSMITH: THANK YOU, YOUR HONOR.

ALL RIGHT. WELCOME BACK EVERYONE.

I'M GOING TO SWITCH TOPICS NOW AND TALK ABOUT ELIZABETH HOLMES. THIS SHOWS YOU WHERE WE ARE ON THE ROAD MAP.

AND LET'S TALK ABOUT HER. THIS IS A PICTURE OF HER. THIS IS FROM THE COVER OF "FORTUNE" MAGAZINE, WHICH YOU SAW DURING THE TRIAL.

MS. HOLMES CERTAINLY ASSEMBLED QUITE THE GROUP OF PEOPLE TO OVERSEE THERANOS. SO AS I SAID IN MY REMARKS YESTERDAY, IN THE BEGINNING THERE WAS LARRY ELLISON FROM ORACLE; DON LUCAS, AS I SAID A LEGENDARY INVESTOR HERE IN SILICON VALLEY; AND PROFESSOR ROBERTSON ON THE BOARD.

AND THEN THERANOS HAD ACCOMPLISHED A LOT BY THE TIME MR. BALWANI JOINED THE COMPANY WITH ITS CONTRACTS WITH PHARMACEUTICAL COMPANIES THAT WE TALKED ABOUT YESTERDAY.

AND SHE CERTAINLY HAS TO BE AS CHARISMATIC AS PEOPLE COULD POSSIBLY BE TO ATTRACT THIS GROUP AS A YOUNG AGE, A RELATIVELY YOUNG AGE.

IN FACT, INVESTORS WERE INFORMED THROUGH ROGER PARLOFF 'S PIECE IN "FORTUNE" MAGAZINE, THAT'S THE COVER, THAT PROFESSOR ROBERTSON THOUGHT THAT LOOKING AT HER WAS LIKE LOOKING AT -- STARING INTO THE EYES OF BILL GATES OR STEVE JOBS. THAT'S WHAT PEOPLE THOUGHT OF HER AT THE TIME.

SER-1053

LATER SHE ATTRACTED OTHER EXTREMELY NOTABLE PEOPLE FROM BUSINESS INDUSTRY, GOVERNMENT.

BILL FRIST, THE FORMER SENATE MAJORITY LEADER AND A HEART SURGEON, SO NOTABLY HE WAS A PHYSICIAN.

WILLIAM FOEGE, WHO AT WAS AT ONE TIME THE HEAD OF THE CENTERS OF DISEASE CONTROL, AND THAT WAS SOMEONE THAT SHE PUT ON THE BOARD.

AND YOU HAVE TO WONDER IF YOU'RE TRYING TO RUN A FRAUDULENT OPERATION, WHY WOULD YOU PUT THE FORMER HEAD OF THE CENTERS FOR DISEASE CONTROL ON YOUR BOARD.  THIS PERSON MIGHT KNOW SOMETHING ABOUT INFECTIOUS DISEASE AND TESTING FOR THAT.

SO OTHER PEOPLE.  FORMER SENATOR NUNN, FORMER MARINE GENERAL JAMES MATTIS; HENRY KISSINGER.  THE LIST GOES ON.

RICHARD KOVACEVICH, WHO IS THE FORMER CEO OF WELLS FARGO. AND THESE ARE THE PEOPLE ON THE BOARD.  AND WE'LL TALK MORE ABOUT THEIR ROLE IN JUST BIT, BUT THIS IS WHAT ELIZABETH WAS ABLE TO DO.

AND SUNNY BALWANI FROM HIS STANDPOINT, THERE'S NO REASON WHY HE WOULDN'T HAVE SEEN THE EXACT SAME THING, THE CHARISMA, THE DRIVE, THE VISION, THE GOAL TO CHANGE DIAGNOSTIC TESTING, AND HE BOUGHT INTO THAT VISION.  AND WE SAW YESTERDAY HE BOUGHT INTO THAT VISION NOT WITH HIS TIME BUT ALSO WITH HIS OWN MONEY.

SO WHAT WAS, WHAT WAS IT ABOUT HER THAT ATTRACTED THESE LEADING LIKES OF GOVERNMENT, BUSINESS, AND HIGH PROFILE WEALTHY INVESTORS?

SER-1054

AND IT WAS, AS I THINK WE'LL SEE FROM THE TESTIMONY I AM GOING TO GO OVER IN A MINUTE, HER CHARISMA, HER ABILITY TO HOLD THE ROOM, HER VISION, HER ABILITY TO SPEAK ON THE TOPICS THAT SHE WAS DEALING WITH AT THERANOS.

I THINK IT'S IMPORTANT TO THINK ABOUT THAT WHEN YOU THINK ABOUT SOMETHING LIKE THOSE PHARMACEUTICAL REPORTS THAT THE GOVERNMENT SAYS WERE SOMEHOW FRAUDULENT.

I SHOWED THE YESTERDAY THE PHARMACEUTICAL REPORT WHERE ELIZABETH SENT THE REPORT TO GLAXOSMITHKLINE, AND IT HAD THE CONFIDENTIAL VALIDATION INFORMATION IN IT. SO THAT WAS ELIZABETH SENDING IT TO GLAXOSMITHKLINE. IT HAD THE RESULTS OF GLAXOSMITHKLINE'S OWN TESTING, AND SUNNY SAW THAT. WHY WOULD MR. BALWANI DOUBT SOMETHING LIKE GIVEN WHAT HAPPENED AND WHO ELIZABETH HOLMES WAS?

AND I WANT TO JUST HAVE YOU KEEP IN MIND THAT, YOU KNOW, SHE'S NOT HERE, RIGHT? SHE'S NOT HERE. AND YOU DON'T EVEN HEAR FROM HER. AND SHE KIND OF LOOMS LARGE IN THE TRIAL. AND THERE'S BEEN A LOT OF DISCUSSION ABOUT HER.

AND I'M GOING TO SHOW YOU IN A MINUTE THE JURY INSTRUCTIONS THAT WHAT HER STORY IS AND PREVIOUS PROCEEDINGS INVOLVING HER HAVE NO PART IN THIS TRIAL. THIS IS NOT SOMETHING THAT YOU CAN CONSIDER, AND THAT'S WHAT JUDGE DAVILA WILL TELL YOU. I'LL SHOW YOU THE INSTRUCTION IN A MINUTE.

BUT LET'S STICK WITH ELIZABETH HOLMES FOR THE MOMENT.

AND, FIRST OF ALL, CHRIS LUCAS ON CROSS TALKED ABOUT HER.

SER-1055

AND HE TESTIFIED -- THE QUESTION WAS, AND THAT YOU BELIEVED THAT SHE HAD A WONDERFUL VISION FOR THE COMPANY THAT ULTIMATELY BECAME THERANOS?

HE SAID YES.

YOU WERE AWARE THAT HIS UNCLE, DON LUCAS, HAD A SIMILAR OPINION OF HER?

AND HE SAID YES.

AND THIS WAS A REASON WHY HE WAS COMFORTABLE WITH THE INVESTMENT?

PEOPLE TRUSTED HER.

IF YOU GO TO THE NEXT SLIDE.

ALAN EISENMAN WAS TOLD BY HIS COLLEAGUE, DAVID HARRIS, THAT SHE WAS A GENIUS. THAT IS WHAT MR. HARRIS THOUGHT APPARENTLY AND TOLD TO MR. EISENMAN.

GO ON.

AND THIS IS DAN EDLIN WHO YOU HEARD SPENT A LOT OF TIME WITH HER BOTH AT THERANOS, AND HE EVEN KNEW HER BEFORE THERANOS BECAUSE ELIZABETH'S BROTHER, CHRISTIAN HOLMES, HAD BEEN A CLASSMATE OF MR. EDLIN'S AT DUKE UNIVERSITY. AND HE KNEW ELIZABETH EVEN BEFORE. AND HE WAS IN A GOOD POSITION TO KNOW. SHE COULD REALLY HOLD THE ROOM. SHE WAS AN EXTREMELY ENGAGING SPEAKER. EVERYONE WAS LISTENING TO ELIZABETH HOLMES. SHE HAD A COMMANDING VOICE.

SO, YOU KNOW, MR. EDLIN, AGAIN, HE KNEW HER VERY WELL, AND HE WAS IN A GOOD POSITION TO TALK ABOUT THAT.

SER-1056

SO THIS IS WHAT ATTRACTED ALL OF THESE PEOPLE, INCLUDING MR. BALWANI, TO THERANOS AND TO THE VISION THAT SHE HAD.

YOU KNOW, WE HAD A CHANCE -- I'M GOING TO MENTION THIS NOW, BUT I'LL TALK ABOUT IT MORE LATER. WE HAD A CHANCE TO HEAR WHAT SHE REALLY SOUNDED LIKE WHEN SHE TALKED TO INVESTORS, AND THAT WAS WHEN BRYAN TOLBERT WAS ON THE STAND, AND HE EXPLAINED THERE WAS A TAPE RECORDING OF HER TALKING TO INVESTORS, AND THAT SHE WAS TALKING ABOUT THINGS RELATED TO THERANOS, INCLUDING THE MILITARY RELATIONSHIPS AND THE BLOOD TESTING.

AND THE GOVERNMENT HAD IT, BUT THEY DECIDED NOT TO PLAY IT FOR YOU. SO WE LOST THAT CHANCE FOR YOU TO HEAR DIRECTLY WHAT SHE WAS LIKE. SO WE CAN SEE WHAT MR. EDLIN SAID, BUT WE DON'T HAVE THAT. AND, YOU KNOW, THE GOVERNMENT DIDN'T WANT YOU TO HEAR THAT, WHAT SHE ACTUALLY SAID.

SO THIS IS THE INSTRUCTION I WAS TALKING ABOUT A MINUTE AGO.

SO JUDGE DAVILA WILL TELL YOU WHEN HE INSTRUCTS YOU AS A JURY THAT THE CASE AGAINST MS. HOLMES IS NOT BEFORE YOU. YOU SHOULD NOT SPECULATE WHY. IT SHOULDN'T INFLUENCE YOUR DECISION AS TO MR. BALWANI.

AND YOU HAVE ALSO HEARD EVIDENCE, BECAUSE SOME WITNESSES HAVE SAID THIS, THAT THERE WAS A PREVIOUS TRIAL. YOU HAVE TO DECIDE THIS CASE BASED ONLY ON THE EVIDENCE THAT IS BEFORE YOU IN THIS TRIAL, WHICH YOU HAVE SEEN AND HEARD WITH YOUR EYES AND

SER-1057

EARS OF THIS TRIAL, AND WHAT THE LAWYERS ARE TELLING YOU ABOUT THE EVIDENCE.  THAT'S THE EVIDENCE THAT YOU HAVE TO CONSIDER.

IT'S NOT ANYTHING THAT HAPPENED IN MS. HOLMES'S TRIAL. AND WHATEVER HAPPENED TO MS. HOLMES IS NOT SOMETHING THAT YOU NEED TO OR SHOULD OR CAN CONSIDER.  SO I JUST WANTED TO MENTION THAT.  IT'S IMPORTANT.  AND THIS TRIAL IS ABOUT MR. BALWANI AND THE EVIDENCE THAT HAS COME IN DURING THIS TRIAL ABOUT HIM.

OKAY.  WHICH LEADS ME TO A SUBJECT THAT IS IMPORTANT HERE, AND, THAT IS, SOME OF THE OTHER LAW THAT IS GOING TO BE APPLICABLE, AND I WANT TO JUST GO THROUGH SOME OF THE IMPORTANT THINGS THAT YOU SHOULD KEEP IN MIND.

AS A JURY WHEN YOU DELIBERATE -- AND THIS IS GOING TO BE PART OF THE INSTRUCTIONS.  SO LET'S TALK ABOUT WIRE FRAUD.

SO IN ORDER TO FIND MR. BALWANI GUILTY OF WIRE FRAUD BEYOND A REASONABLE DOUBT, YOU'D HAVE IT FIND THAT HE KNOWINGLY PARTICIPATED IN DEVISE OR INTENDED TO DEVISE A SCHEME OR PLAN TO DEFRAUD, OR SCHEME OR PLAN TO OBTAIN MONEY OR PROPERTY BY MEANS OF FALSE OR FRAUDULENT PRETENSES, REPRESENTATIONS, OR PROMISES.

SO THERE ARE SEVERAL PARTS TO THAT.

FIRST, YOU HAVE TO FIND THAT HE DID THIS KNOWINGLY.  IN OTHER WORDS, HE KNEW, FOR EXAMPLE, THAT A LAB TEST WAS, OR NOT EVEN JUST ONE LAB TEST, BUT, YOU KNOW, ON A WHOLESALE BASIS, A SYSTEMIC BASIS, LAB TESTING WAS INACCURATE, AND HE ALLOWED THEM TO GO FORWARD AND HAVE PATIENT RESULTS RELEASED ANYWAY.  NOT

SER-1058

THAT HE WAS TRYING TO FIX THE PROBLEM OR HE WAS RELYING ON A SCIENTIFIC TEAM OR ANYTHING LIKE THAT.  YOU HAVE TO FIND THAT HE KNOWINGLY DID THAT.  I KNOW THE LAB'S SYSTEMICALLY BAD, AND I DON'T CARE, I'M GOING TO RELEASE THOSE RESULTS ANYWAY.  YOU HAVE GOT TO FIND THAT.

IT'S ALSO, YOU'VE GOT TO --

MR. SCHENK:  YOUR HONOR, I'M GOING TO OBJECT.  THAT IS A MISSTATEMENT OF THE APPLICABLE LAW.

THE COURT:  WELL, WHAT COUNSEL SAY, LADIES AND GENTLEMEN, AGAIN, IS JUST ARGUMENT.  YOU WILL HAVE THE INSTRUCTIONS.  THE INSTRUCTION IS IN FRONT OF YOU HERE, AND COUNSEL CAN COMMENT ON THE INSTRUCTION, BUT THE LAW WILL BE GIVEN TO YOU BY ME.

SO, MR. COOPERSMITH, IF YOU COULD.

MR. COOPERSMITH:  YES, YOUR HONOR.

AND I THINK THAT'S EXACTLY RIGHT, WHAT JUDGE DAVILA TELLS YOU ABOUT THE LAW IS WHAT SHOULD GOVERN YOUR PROCEEDINGS.  AND IT'S GOING TO BE IN YOUR INSTRUCTIONS.  AND SO IT'S RIGHT ON THE SCREEN IN FRONT IT OF YOU.

AND THEN YOU WOULD HAVE TO FIND IN THAT HIGHLIGHTED SECTION BELOW THAT THE INTENT TO DEFRAUD, THAT MR. BALWANI HAD THE INTENT TO DECEIVE OR CHEAT.

SO, IN OTHER WORDS, ON THE PATIENT SIDE OF THIS CASE, HE ACTUALLY INTENDED TO CHEAT THE PATIENTS OUT OF THEIR MONEY THAT THEY WERE PAYING FOR A LAB TEST.  THE PEOPLE WHO ACTUALLY PAID

SER-1059

FOR THEIR OWN LAB TEST.

SO THAT WOULD BE IF THEY PAID $35, MR. BALWANI, ACCORDING TO THE GOVERNMENT, INTENDED TO DECEIVE OR CHEAT THOSE PEOPLE OUT OF THEIR $35, EVEN THOUGH, AS WE SAW FROM OR HEARD FROM MS. SPIVEY, THERANOS NEVER ASKED FOR ANY OF THAT MONEY FROM WALGREENS.  SO YOU KIND OF WONDER HOW COULD THAT BE THE INTENT?

BUT IN ANY EVENT, THOSE ARE THE ELEMENTS OF WIRE FRAUD.

THERE ALSO HAS TO BE AN INTERSTATE WIRE COMMUNICATION.  AS MR. SCHENK TOLD YOU, SOME OF THAT IS STIPULATED TO WITH THE INVESTMENT WIRES.  WE'RE NOT GOING TO ARGUE ABOUT THINGS THAT DON'T MAKE SENSE TO ARGUE.

IT IS TRUE THAT INVESTORS TRANSFERRED MONEY TO THERANOS, BECAUSE THEY WERE INVESTORS, BY WIRE TRANSFER.  SO THAT ELEMENT WOULD BE MET FOR THE INVESTOR WIRE TRANSFERS.

THERE WERE SOME OTHER COUNTS HERE INVOLVING PATIENTS WHERE THAT IS IN DISPUTE, AND I'LL TALK ABOUT THAT A LITTLE BIT LATER.

IF WE GO TO THE NEXT SLIDE.

THIS IS CONSPIRACY.  THERE HAS TO BE AN AGREEMENT BETWEEN TWO OR MORE PEOPLE, SUCH AS MR. BALWANI AND MS. HOLMES, TO COMMIT WIRE FRAUD.

AND THEY HAVE TO ENTER INTO THE AGREEMENT KNOWING THAT THE OBJECT IS TO COMMIT WIRE FRAUD.  THAT'S THE PURPOSE OF THIS AGREEMENT.  THAT'S WHAT THE GOVERNMENT HAS TO PROVE BEYOND A REASONABLE DOUBT.

AND I JUST WANT TO HIGHLIGHT A FEW OTHER THINGS HERE.  AS YOU CAN SEE SORT OF TOWARDS THE BOTTOM OF THE PAGE IN THE SECOND TO THE LAST PARAGRAPH, NOR IS IT ENOUGH, STANDING ALONE, THAT THEY HAD A BUSINESS OR ROMANTIC RELATIONSHIP.  YOU MUST FIND THAT THERE WAS A PLAN TO COMMIT WIRE FRAUD.

SO WE'VE HEARD, AND IT'S TRUE, MR. BALWANI AND MS. HOLMES WERE IN A ROMANTIC RELATIONSHIP.  YOU HAVE SEEN TEXT MESSAGES BETWEEN THEM.  BUT THE FACT THAT THEY ARE IN A RELATIONSHIP, EVEN A VERY CLOSE RELATIONSHIP, IS NOT ENOUGH TO FIND THAT THEY'RE IN A CONSPIRACY.  YOU HAVE TO FIND THAT THEY AGREED TO COMMIT A CRIME, IN THIS CASE WIRE FRAUD.

AS I'VE SAID YESTERDAY, WHEN YOU LOOK AT ALL OF THE TEXT MESSAGES AND THE EMAILS, THERE'S NOT A SINGLE TIME WHEN MR. BALWANI OR MS. HOLMES SAYS LET'S DO CRIME, LET'S CHEAT PEOPLE, LET'S DECEIVE PEOPLE.

WE SAW JUST A LITTLE BIT BEFORE THE BREAK.  THEY SAID, WELL, OUR DATA IS GOOD.  I MEAN, THAT'S THE OPPOSITE OF A CONSPIRACY TO CHEAT AND DECEIVE PEOPLE.

AND THEN YOU HAVE TO FIND BEYOND A REASONABLE DOUBT, TO FIND MR. BALWANI GUILTY OF CONSPIRACY, THAT HE BECAME A MEMBER OF THE CONSPIRACY BY WILLFULLY PARTICIPATING IN THE UNLAWFUL PLAN WITH THE INTENT TO ADVANCE SOME CRIMINAL OBJECT BASICALLY.

SO WHAT DOES WILLFULLY MEAN?

WILLFULLY MEANS THAT MR. BALWANI WOULD HAVE TO HAVE ACTED WITH THE KNOWLEDGE THAT HIS CONDUCT WAS UNLAWFUL AND WITH THE

SER-1061

INTENT TO DO SOMETHING THAT THE LAW FORBIDS. SO HE WOULD HAVE TO ENTER INTO THE CONSPIRATORIAL, ALLEGED CONSPIRATORIAL RELATIONSHIP KNOWING THAT I'M HERE DOING SOMETHING UNLAWFUL, HE'D HAVE TO BE THINKING, AND I HAVE THE INTENT TO DO SOMETHING THAT THE LAW FORBIDS. THAT WOULD HAVE TO BE --IT'S NOT THAT MR. BALWANI WAS IN GOOD FAITH TRYING TO FIX THE PROBLEMS AS THEY AROSE AND SO FORTH.

IT WOULD BE, I KNOW I'M DOING WRONG, AND I'M GOING TO DO IT ANYWAY. THAT'S WHAT THE GOVERNMENT WOULD HAVE TO PROVE UNDER THE WILLFULLY STANDARD OF CONSPIRACY.

OKAY. SO I WANT TO SHOW YOU SOME OF THE TEXT MESSAGES THAT GO TO THIS POINT. SO THERE'S A MAY 9TH TEXT MESSAGE, AND I'M NOT SHOWING YOU THAT ONE YET, BUT LET ME JUST TALK ABOUT IT.

SO THERE'S A MAY 9TH, 2012 TEXT MESSAGE THAT THE GOVERNMENT SHOWED YOU. AND THIS IS WHERE ELIZABETH HOLMES WROTE TO MR. BALWANI, "WE HAVE TO WORK TOGETHER ON THE REVENUE PIECE."

AND THEN IT GOES ON, ON MAY 9TH, 2012 TO SAY, "WE NEED REVENUE."

AND THE GOVERNMENT USED THAT IN ITS REMARKS YESTERDAY, POINTING TO THIS AS SOME KIND OF EVIDENCE OF CONSPIRACY.

WELL, EVERY COMPANY NEEDS REVENUE. THE FACT THAT THE COO AND THE CEO ARE SAYING "WE NEED REVENUE," I THINK THAT DISCUSSION WILL GO ON IN THE OFFICES OF EXECUTIVES ALL OVER THE

SER-1062

COUNTRY, ALL OVER THE WORLD EVERY SINGLE DAY. REVENUE IS IMPORTANT. NO QUESTION IN COMMERCE AND IN BUSINESS.

BUT THE GOVERNMENT MENTIONED THAT 2012 TEXT THAT I JUST MENTIONED FROM 2012 IN THE SAME BREADTH AS THE ONE I'M SHOWING YOU ON THE SCREEN NOW WHERE MR. BALWANI SAYS --

I'M SORRY. IF YOU COULD TAKE THAT DOWN, MR. ALLEN. I JUST WANT TO MAKE SURE I'M ON THE RIGHT TRACK.

I'M TALKING ABOUT A JULY 2015 TEXT WHERE YOU PROBABLY REMEMBER WHERE MR. BALWANI SAID HE'S RESPONSIBLE FOR EVERYTHING AT THERANOS, "ALL HAVE BEEN MY DECISIONS TOO."

AND THE GOVERNMENT MENTIONED THAT IN THE SAME BREADTH AS THIS TEXT MESSAGE FROM THREE YEARS BEFORE WHERE THEY TALKED ABOUT NEEDING REVENUE.

AND THEN MR. SCHENK SAID -- AND THEN MR. BALWANI SAID ALL HAVE BEEN HIS DECISIONS TOO.

AND THE GOVERNMENT POINTS TO "ALL HAVE BEEN MY DECISIONS TOO" AS SOME KIND OF INCRIMINATING EVIDENCE AGAINST MR. BALWANI. WELL, HE WAS THE CHIEF OPERATING OFFICER AND PRESIDENT OF THERANOS. OF COURSE, HE HAD A HAND IN MAKING THE DECISIONS AT THERANOS. THE DEFENSE HAS NEVER CLAIMED OTHERWISE.

MR. BALWANI MADE THE JUDGMENTS HE MADE.

AND AS I SAID YESTERDAY, IN HINDSIGHT MAYBE WE COULD FIND SOME INSTANCE WHERE HE SHOULD HAVE MADE A DIFFERENT JUDGMENT, BUT THAT'S NOT THE STANDARD. YOU LOOK AT THINGS IN REAL TIME

SER-1063

AS THEY ARE HAPPENING.

AND FOR THE GOVERNMENT TO SAY A TEXT THAT SAYS "I'M RESPONSIBLE FOR THINGS AT THERANOS" IS SOMEHOW INCRIMINATING, THAT ASSUMES THAT THEY'VE ALREADY PROVEN THEIR CASE. SO, SURE, IF THE GOVERNMENT HAD ALREADY PROVEN THEIR CASE BEYOND A REASONABLE DOUBT, THEN SOMEONE SAYING, "YES, I'M RESPONSIBLE FOR EVERYTHING AT THERANOS," THAT MIGHT BE INCRIMINATING OR A PROBLEM WILL, BUT THAT HAS NOT BEEN DETERMINED. THAT'S FOR YOU, THE JURY, TO DECIDE.

AND THERE'S NOTHING INCRIMINATING ABOUT WHAT MR. BALWANI IS SAYING, YEAH, I'M THE COO AND PRESIDENT OF THE COMPANY, I'VE MADE DECISIONS AT THERANOS, IT'S BEEN MY DECISIONS, TOO, I'M RESPONSIBLE.

HE WAS A VERY SENIOR OFFICER AT THERANOS, AND WE'RE NOT CLAIMING OTHERWISE, AND HE WAS RESPONSIBLE ALONG WITH MS. HOLMES FOR THE OPERATION OF THERANOS.

NOW, I WANT TO SHOW YOU THE TEXT I WAS GOING TO SHOW YOU, AND I GOT A LITTLE CONFUSED THERE FOR A MINUTE. BUT BASICALLY THIS IS THE TEXT MESSAGE THAT MR. BALWANI SENDS TO MS. HOLMES JUST THE DAY AFTER THIS "WALL STREET JOURNAL" -- THE NEGATIVE "WALL STREET JOURNAL" ARTICLE THAT YOU'VE HEARD ABOUT.

SO THE NEXT DAY HE SAYS, "I KNOW. I AM STRONG ON FACTS. THEY ALWAYS REACT TO ANYTHING BUT I WILL BE STRONG."

SO MR. BALWANI IS NOT SAYING, OH, "THE WALL STREET JOURNAL," THEY FOUND OUT SOME STUFF, AND WE'RE

CAUGHT. YOU KNOW, THE JIG IS UP, RIGHT?

HE SAYS I'M STRONG OPENING FACTS. HE'S GOING TO CALL AND EXPLAIN THE FACTS.

AND THIS IS, AGAIN, A TEXT MESSAGE BETWEEN TWO PEOPLE IN PRIVATE, NO ONE ELSE IS LISTENING, THIS IS THE TWO OF THEM, AND IT'S THE OPPOSITE OF SOME CONSPIRATORIAL AGREEMENT.

I WANT TO TALK A LITTLE BIT MORE ABOUT THE LAW.

AS YOU'VE SEEN, MR. BALWANI DECIDED NOT TO TESTIFY IN THIS CASE. THAT IS HIS CONSTITUTIONAL RIGHT. AND IN SORT OF NORMAL LIFE, YOU KNOW, YOU MIGHT THINK, WELL, SOMEONE MIGHT HAVE TO EXPLAIN THEMSELVES, LIKE THAT'S IMPORTANT, RIGHT?

AND I THINK YOU WERE ASKED THIS QUESTION IN YOUR JURY QUESTIONNAIRES ABOUT HOW YOU THOUGHT OF THIS PRINCIPLE, AND YOU ALL RESPONDED TO THAT.

BUT WHAT JUDGE DAVILA WILL TELL YOU IS THAT IT'S ABSOLUTELY PROHIBITED FOR YOU TO TAKE INTO ACCOUNT THAT MR. BALWANI DIDN'T TESTIFY. THAT IS HIS CONSTITUTIONAL RIGHT, AND IT CANNOT BE USED IN ANY WAY AGAINST HIM OR TO DETERMINE THAT HE'S GUILTY OF ANYTHING.

AND I SHOULD ALSO NOTE THAT IN THE COURSE OF THIS TRIAL, THE DEFENSE HAS PRESENTED A TON OF EVIDENCE THROUGH THE GOVERNMENT WITNESSES AND THROUGH SOME OF THE WITNESSES THAT WE CALLED, THE TWO WITNESSES THAT WE CALLED.

SO THERE IS EVIDENCE FROM THE DEFENSE, BUT IT'S NOT FROM MR. BALWANI, AND YOU DON'T HAVE TO -- YOU CANNOT TAKE THAT INTO

SER-1065

ACCOUNT IN DECIDING HOW TO VOTE ON THE VERDICTS IN THIS CASE.

SO I JUST THINK THAT'S IMPORTANT TO NOTE.

LET'S GO TO THE NEXT SLIDE.

OKAY.  THIS IS A REALLY IMPORTANT CONCEPT, REASONABLE DOUBT, AND THIS IS THE STANDARD OF PROOF THAT THE GOVERNMENT HAS, THE BURDEN OF PROOF.

SO THIS IS NOT A SITUATION WHERE, WELL, IF YOU THINK IT'S MORE LIKELY, A LITTLE MORE LIKELY THAT SOMETHING HAPPENED VERSUS DIDN'T HAPPEN, THAT'S NOT GOOD ENOUGH.

THE GOVERNMENT HAS TO PROVE EVERY ELEMENT OF THE OFFENSES THEY'VE CHARGED, WIRE FRAUD AND CONSPIRACY, BEYOND A REASONABLE DOUBT.  AND THIS IS THE INSTRUCTION THAT I PUT ON THE SCREEN THAT JUDGE DAVILA WILL GIVE YOU DEFINING THE CONCEPT OF REASONABLE DOUBT.

AND AS YOU CAN SEE, REASONABLE DOUBT MAY ARISE FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF THE EVIDENCE, OR FROM A LACK OF EVIDENCE.

SO IF YOU DON'T THINK THERE'S ENOUGH EVIDENCE, THAT'S ANOTHER REASON THAT YOU COULD FIND REASONABLE DOUBT, AND, THEREFORE, VOTE FOR ACQUITTAL.

IT GOES ON.  IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF THE EVIDENCE, YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT THAT MR. BALWANI IS GUILTY, IT IS YOUR DUTY TO FIND MR. BALWANI NOT GUILTY.  SO YOU'D HAVE TO BE CONVINCED BEYOND A REASONABLE DOUBT.

AND THEN I WANT TO SHOW YOU OUR VIEW OF REASONABLE DOUBT. THIS IS A STAIR STEPS, YOU KNOW, JUST TO USE THAT ANALOGY, OF VARIOUS STANDARDS THAT COULD APPLY.

YOU KNOW, THE BOTTOM STEP, AS YOU SEE, IS NO EVIDENCE. SO, OF COURSE, NOTHING HAPPENS.

SCINTILLA OF EVIDENCE. A VERY SMALL AMOUNT OF EVIDENCE MIGHT BE APPROPRIATE IN SOME CASES.

PROBABLE CAUSE LIKE TO GET A SEARCH WARRANT OR EVEN AN INDICTMENT.

PREPONDERANCE OF THE EVIDENCE I BRIEFLY MENTIONED A MINUTE AGO, BUT THAT'S WHERE ONE VERSION OF THE FACTS OR EVENTS IS SLIGHTLY MORE, EVEN JUST OVER 50 PERCENT, MORE LIKELY THAN THE OTHER, THAT WOULD BE PREPONDERANCE OF THE EVIDENCE. THAT'S THE KIND OF STANDARD THAT GOVERNS IN CIVIL TRIALS. THIS IS A CRIMINAL TRIAL. SO THAT'S NOT THE STANDARD THAT YOU HAVE TO USE.

CLEAR AND CONVINCING EVIDENCE AS WE UNDERSTAND IS IT IS SOMETIMES USED IN THE LAW.

REASONABLE DOUBT. IF YOU GOT TO THAT STEP, YOU WOULD STILL HAVE REASONABLE DOUBT, AND YOU WOULD HAVE TO VOTE FOR ACQUITTAL.

AND THEN, OF COURSE, BEYOND A REASONABLE DOUBT. THAT'S THE STANDARD, THE HIGH STEP THAT YOU WOULD NEED TO FIND, TO FIND MR. BALWANI GUILTY OF ANYTHING.

AND SOMETIMES IT'S A HARD CONCEPT BECAUSE IT'S NOT

SER-1067

NECESSARILY SOMETHING THAT YOU USE IN YOUR EVERY DAY LIFE, EXCEPT IT'S MAYBE WORTH TALKING ABOUT IT IN THIS WAY, THAT THINK ABOUT THE MOST IMPORTANT DECISION THAT YOU'VE EVER HAD TO MAKE IN YOUR LIFE, AND WHAT STANDARD WOULD YOU WANT TO HAVE? WHAT -- HOW MUCH, YOU KNOW, EVIDENCE? WHAT -- THE FACTS THAT YOU HAVE IN FRONT OF YOU IN ORDER TO MAKE THE BEST POSSIBLE DECISION THAT YOU CAN MAKE. NOT ABOUT SOME EVERY DAY THING, WHAT OUTFIT SHOULD I WEAR? THINGS LIKE THAT. BUT THE MOST IMPORTANT DECISION THAT YOU WOULD EVER HAVE TO MAKE AND WHAT STANDARD WOULD YOU WANT.

AND THINK ABOUT IF YOU FELT THAT WHEN YOU WERE TRYING TO MAKE THAT DECISION YOU JUST DIDN'T HAVE ENOUGH, YOU DIDN'T HAVE ENOUGH FACTS. YOU NEEDED MORE INFORMATION. YOU WOULD GO OUT AND SEEK THAT INFORMATION, RIGHT?

NOW, OF COURSE, YOU CAN'T SEEK IT HERE BECAUSE THE INFORMATION THAT YOU'RE GETTING IS WHAT HAS BEEN SAID AND PRESENTED TO YOU WITHIN THE WALLS OF THIS COURTROOM.

BUT IF YOU NEED MORE EVIDENCE, IF YOU FEEL LIKE YOU NEED MORE TO MAKE THAT REALLY IMPORTANT DECISION, AND THIS IS THE MOST IMPORTANT DECISION THAT MR. BALWANI WILL EVER FACE, YOU WOULD NEED TO, IF YOU DON'T THINK YOU HAVE ENOUGH EVIDENCE, THAT'S REASONABLE DOUBT. AND THAT'S WHY JUDGE DAVILA WILL TELL YOU WHEN HE INSTRUCTS YOU THAT A LACK OF EVIDENCE IS ALSO A REASON TO FIND REASONABLE DOUBT.

BUT IT'S NOT JUST A LACK OF EVIDENCE. WE HAVE PRESENTED A

SER-1068

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                    7255

LOT OF EVIDENCE, AND IT'S ALL OF THE EMAILS AND ALL OF THE THINGS THAT WE HAVE BEEN PRESENTING, MUCH OF WHICH THE GOVERNMENT HAS NOT SHOWN YOU, THAT LEADS TO THAT REASONABLE DOUBT DECISION.

AND I WANT TO MAKE SURE THAT THAT CONCEPT WAS AS CLEAR AS I CAN MAKE IT.  AGAIN, THE GOVERNMENT HASN'T PROVED MR. BALWANI GUILTY OF ANYTHING, ANY OF THE CHARGES.  BUT THEY HAVE TO PROVE EACH AND EVERY ELEMENT OF THOSE CHARGES BEYOND A REASONABLE DOUBT, AND THAT'S WHAT WE'RE DOING HERE.

OKAY.  LET'S SWITCH GEARS AND TALK ABOUT WHAT MATTERED TO INVESTORS AND IN PARTICULAR THE WALGREENS RELATIONSHIP.  OKAY. SO I'VE TALKED SOME ABOUT THE THERANOS BOARD, BUT I'M GOING TO TALK ABOUT IT A LITTLE BIT MORE.

SO INVESTORS TESTIFIED THAT THE COMPOSITION OF THE BOARD WAS IMPORTANT TO THEM.  AND THAT'S NOT SURPRISING.  THAT'S THE ULTIMATE AUTHORITY IN THE COMPANY.

WE SAW THE DOCUMENT YESTERDAY WHERE THE BOARD HAS THE ULTIMATE DECISION ON MATTERS FOR THE COMPANY.  AND THAT THERE WAS A BOARD OF DIRECTORS, OF COURSE.  WE DIDN'T HEAR FROM ANY OF THEM.  THE GOVERNMENT DIDN'T CALL THEM.  BUT WE HAVE SOME INFORMATION ABOUT THEM.

SO LET'S TALK ABOUT WHO THE BOARD WAS.  THIS IS THE EARLIER PERIOD, SO 2010.  AS OF AUGUST OF 2010, THE BOARD WAS SUNNY BALWANI, ELIZABETH HOLMES, DON LUCAS, ROBERT SHAPIRO, PETER THOMAS, AND CHANNING ROBERTSON.

SO THIS IS THE SET OF BOARD MINUTES.

AND THEN THIS IS ACTUALLY A DOCUMENT THAT I WAS JUST MENTIONING. I GUESS I'M SHOWING IT TO YOU NOW. THIS IS AUGUST 10TH, 2010, AND IT'S THE AMENDED AND RESTATED BYLAWS OF THERANOS. IT'S WHAT YOU CALL A CORPORATE GOVERNANCE DOCUMENT. IT'S A BASIC DOCUMENT THAT GOVERNS THE OPERATION OF THE COMPANY, AND IT WAS LAST AMENDED AS OF AUGUST 2010.

SO IF YOU LOOK AT THIS EXHIBIT, WHICH IS 20512, IT TALKS ABOUT THE POWERS OF THE DIRECTORS, AND THE HIGHLIGHTED PART THERE, "THE BUSINESS AND AFFAIRS OF THE COMPANY SHALL BE MANAGED AND ALL CORPORATE POWERS SHALL BE EXERCISED BY OR UNDER THE DIRECTION OF THE BOARD."

SO THAT'S THE BOARD'S ROLE, AND THAT'S WHAT THE CORPORATE DOCUMENTS PROVIDE.

OKAY. AND I JUST WANT TO GO INTO A LITTLE MORE DETAIL INTO WHO THE BOARD MEMBERS WERE.

AND, MR. ALLEN, IF YOU COULD ZOOM IN ON THESE ONE AT A TIME.

SO OBVIOUSLY MS. HOLMES WE KNOW WAS ON THE BOARD.

GEORGE SHULTZ WAS ON THE BOARD, AND HE WAS THE SECRETARY OF STATE IN THE REAGAN ADMINISTRATION. HE WAS THE RECIPIENT OF THE MEDAL OF FREEDOM, THE NATION'S HIGHEST CIVILIAN HONOR.

SAM NUNN WAS ON THE UNITED STATES SENATOR FROM GEORGIA FOR 24 YEARS. HE ALSO SERVED ON THE BOARDS AT VARIOUS TIMES OF CHEVRON CORPORATION, COCA-COLA COMPANY, DELL COMPUTER,

GENERAL ELECTRIC.

WILLIAM FRIST, WHO I'VE MENTIONED, NATIONALLY RECOGNIZED HEART AND LUNG TRANSPLANT SURGEON AND FORMER U.S. SENATE MAJORITY LEADER.

GARY ROUGHEAD WAS A RETIRED UNITED STATES NAVY ADMIRAL AND HE SERVED ON THE BOARD OF NORTHRUP GRUMMAN CORPORATION.

JAMES MATTIS.  RETIRED UNITED STATES MARINE CORPS GENERAL, WHO WAS THE COMMANDER OF THE UNITED STATES CENTRAL COMMAND ALSO KNOWN AS CENTCOM.

WILLIAM FOEGE I MENTIONED BEFORE.  HE WAS THE FORMER DIRECTOR OF THE CENTERS OF DISEASE CONTROL.  HE WAS ALSO SENIOR MEDICAL ADVISOR FOR THE BILL AND MELINDA GATES FOUNDATION FOR A NUMBER OF YEARS.

WILLIAM PERRY.  ENTREPRENEUR, MATHEMATICIAN, AND ENGINEER. HE SERVED AS SECRETARY OF DEFENSE IN THE CLINTON ADMINISTRATION.

RICHARD KOVACEVICH WAS THE CEO OF WELLS FARGO.  HE SERVED ON OTHER BOARDS AS WELL INCLUDING CARGILL, CLEARING HOUSE, AND CISCO.

RILEY BECHTEL.  HE WAS CHAIRMAN OF THE BOARD OR WAS CHAIRMAN OF THE BOARD AND DIRECTOR OF BECHTEL GROUP.

HENRY KISSINGER.  A FAMILIAR NAME.  HE WAS THE SECRETARY OF STATE DURING THE NIXON ADMINISTRATION AND THE FORD ADMINISTRATION, TOO, I BELIEVE.

AND THEN MR. BALWANI, WHO I SHOWED YOU THAT BIO EARLIER,

SER-1071

SO I WON'T REPEAT THAT.

BUT THAT WAS THE BOARD AT THERANOS THAT THE INVESTORS WERE UNDERSTANDABLY IMPRESSED WITH, AS WAS MR. BALWANI NO DOUBT.

IF YOU GO TO THE SET OF EXHIBITS HERE, IF YOU WANT TO WRITE THESE DOWN, THOSE ARE THE BOARD MINUTES THAT ACTUALLY CAME INTO EVIDENCE REFLECTING THE MEETINGS OF THE BOARD.  AND THOSE ARE THE EXHIBIT NUMBERS LISTED THERE ON THE LEFT.  AND THEY WOULD TELL YOU WHAT THE BOARD WAS DISCUSSING IN THOSE BOARD MINUTES.

I WANTED TO SHOW YOU ONE OF THOSE, AND THAT'S FROM JANUARY 20TH, 2015, WHICH IS EXHIBIT 20514.

THIS IS JUST SOME OF THE INFORMATION THAT THE BOARD WOULD HAVE DISCUSSED OR DID DISCUSS.

SO HERE YOU SEE THE BOARD RESOLVED TO APPROVE AMENDMENTS OF THE COMPANY'S SERIES C-2 STOCK PURCHASE AGREEMENT AND ARTICLES OF INCORPORATION TO ALLOW FOR THE ISSUANCE OF UP TO AN ADDITIONAL $800 MILLION OF SERIES C-2 SHARES.

SO C-2 SHARES, THESE WOULD BE INVESTORS LIKE MR. MOSLEY AND RDV WHO BOUGHT INTO THAT, WHAT THEY CALL THE C-2 ROUND, AND THE BOARD AUTHORIZED THAT.

AND THE BOARD ALSO HAD A DISCUSSION ABOUT CONTINUED FOCUS ON PROMOTING FROM WITHIN SCALING THE COMPANY'S OPERATIONS, CONTINUING TO DEVELOP AND IMPLEMENT THE COMPANY'S NEXT GENERATION TECHNOLOGIES, AND THEN THEY WOULD HAVE HAD A FULL DISCUSSION ABOUT THOSE TOPICS.

IF YOU GO TO THE NEXT COMMERCIAL AND OPERATIONS UPDATE.

MS. HOLMES GAVE THE BOARD AN UPDATE OF THE COMPANY'S COMMERCIAL OPERATIONS, INCLUDING ITS CONTRACTS AND FOCAL AREAS IN RETAIL AND HOSPITAL AND PHYSICIAN GROUPS.

MS. HOLMES PROVIDED THE BOARD WITH AN OVERVIEW OF THE COMPANY'S RETAIL PERFORMANCE.  THAT WOULD HAVE BEEN THE WALGREENS RELATIONSHIP.

MS. HOLMES DISCUSSED WITH THE BOARD THE COMPANY'S STRATEGIC ALLIANCE WITH THE CLEVELAND CLINIC AS WELL AS OTHER CONTRACTS.

MS. HOLMES DESCRIBED TO THE BOARD THE COMPANY'S COMMUNICATIONS INITIATIVES AND IN THAT CONTEXT DISCUSSED CERTAIN INFORMATION DISCLOSED TO THE DIRECTORS THE COMPANY NEEDED TO CONTINUE TO KEEP CONFIDENTIAL.

SO THE BOARD IS BEING KEPT ABREAST OF THE AFFAIRS AT THERANOS AND THAT IS WHAT THESE MEETING MINUTES REFLECT.  I'M JUST PICKING THE ONE FROM JANUARY 15TH.

OKAY.  YOU CAN SEE MS. HOLMES REVIEWED AT THE BOARD THE COMPANY'S HISTORICAL FINANCIAL STATEMENTS.  SO NOT THE PROJECTIONS BUT THE ACTUAL FINANCIAL STATEMENTS, AND THE BOARD WAS AWARE OF THAT.  WE'RE GOING TO SEE A LITTLE BIT MORE ABOUT THAT IN JUST A BIT.

AND THEN DURING THE EXAMINATION OF MS. SPIVEY, YOU HEARD SOME TALK ABOUT A COMPANY CALLED ARANCA, WHICH WAS AN OUTSIDE COMPANY THAT DID VALUATIONS OF THERANOS FOR THE PURPOSE OF THIS

SER-1073

I.R.S. CODE SECTION 409A.

AND THE BOARD REVIEWED THAT INDEPENDENT VALUATION REPORT BY ARANCA AS WELL AS THE INFORMATION THAT WE'RE DISCUSSING, AND WE'LL TALK MORE ABOUT THAT IN A MINUTE.

MS. HOLMES REVIEWED WITH THE BOARD THE COMPANY'S INTELLECTUAL PROPERTY PORTFOLIO AND THE STRATEGY FOR ITS CONTINUED DEVELOPMENT. THIS IS ALL OF THE PATENTS AND THE TRADEMARKS AND THOSE THINGS THAT PROTECTED THERANOS'S INTELLECTUAL PROPERTY, ITS INVENTIONS.

AND YOU CAN GO ON.

SO IN TERMS OF INVESTORS, THIS IS BRYAN TOLBERT. HE TESTIFIED THAT HE WAS FROM GEORGIA, AND HE GREW UP IN GEORGIA, AND THAT SAM NUNN WAS HIS SENATOR. SO THAT WAS MEANINGFUL TO HIM THAT SAM NUNN WAS ON THE BOARD OF THERANOS. AND SO THAT IS A FACTOR THAT ATTRACTED MR. TOLBERT.

LET'S TALK ABOUT SOME OF THE INFORMATION THAT THE BOARD HAD. SO IN PARTICULAR, SAM NUNN.

IF YOU CAN GO TO THE NEXT SLIDE.

SO JUDGE DAVILA READ YOU A STIPULATION DURING TRIAL, AND IT'S ABOUT CERTAIN EXHIBITS. AND THE EXHIBIT NUMBERS ARE ACTUALLY 20788 AND 20145, IF ANYONE WANTS TO WRITE THAT DOWN. AND THE STIPULATION, I WON'T READ IT, BUT THE STIPULATION IS THAT SAM NUNN WHO WAS ON THE BOARD, FORMER SENATOR, WAS PROVIDED WITH CERTAIN INFORMATION BY THERANOS, AND HE ACTUALLY PRODUCED IT IN RESPONSE TO A SUBPOENA, SO THAT'S WHY WE HAVE

IT.

IF YOU CAN GO TO THE NEXT PAGE. SO THIS IS AN EMAIL FROM TEMPE STEPHEN DATED JULY 15TH, 2014.

AND THE EMAIL SAYS, "SENATOR -- THE THERANOS FINANCIALS THAT VALERIA SENT YOU IS PASSWORD PROTECTED AND WILL PROBABLY BE CUMBERSOME TO GET INTO FROM YOUR IPAD SO I'M ATTACHING IT HERE FOR EASIER VIEWING. IT'S THREE PAGES LONG."

LET'S LOOK AT THE INFORMATION THAT MS. STEPHEN SENT. SO ON THE LEFT IS THE DOCUMENT THAT IS IN EVIDENCE THAT SAM NUNN WAS PROVIDED WITH THERANOS, AND THAT IS EXHIBIT 20788.

AND THEN ON THE RIGHT IS THE INFORMATION THAT MR. MOSLEY AND MS. PETERSON AT RDV HAD RECEIVED.

SO OTHER THAN THE HANDWRITING, WHICH IS MS. PETERSON'S HANDWRITING, IT'S IDENTICAL. SO THE BOARD HAD THE SAME EXACT INFORMATION THAT THE INVESTORS HAD. SO THEY WERE NOT HIDING THIS FROM THE BOARD. THIS WAS JUST AN ILLUSTRIOUS GROUP OF PEOPLE, INCLUDING IN THIS CASE A FORMER UNITED STATES SENATOR, SAM NUNN.

IF WE GO TO THE NEXT SLIDE.

THIS IS EXHIBIT 20145. THIS IS ADDITIONAL INFORMATION THAT SENATOR NUNN WAS PROVIDED BY THERANOS AND PRODUCED PURSUANT TO A SUBPOENA. SO THIS IS ANOTHER PROJECTED STATEMENT OF INCOME. YOU CAN SEE IT HAS THE SAME INFORMATION PROJECTING NOT A FINANCIAL STATEMENT, BUT A PROJECTION FOR 2014, 2015. AND THEN YOU CAN SEE THE HANDWRITING AS I READ IT, BUT YOU CAN

TRY TO MAKE IT OUT FOR YOURSELVES, WHICH IS OPTION VALUATION IS WHAT THE HANDWRITING LOOKS LIKE.

AND YOU CAN SEE THERE ARE PROJECTIONS FOR 2014 AND 2015 OF 126 MILLION AND 929 MILLION FOR 2015.

AND IF WE GO TO THE NEXT PAGE.

THIS IS INCLUDED IN THE MATERIALS THAT SAM NUNN PROVIDED. AND IT'S THE SAME PROJECTIONS THAT MS. SPIVEY WAS SHOWN. THIS IS PROJECTIONS FOR I.R.S. CODE 409A. SO SENATOR NUNN HAD THIS AS WELL.

IT PROJECTS REVENUE FOR 2014 OF $930,000, 110 IN 2015, AND 220 IN 2016.

SO SAM NUNN HAD THE SAME INFORMATION THAT THE GOVERNMENT WAS CLAIMING THAT WAS SOMEHOW FRAUDULENT BECAUSE THE PROJECTIONS ARE LOWER FOR THIS SPECIAL PURPOSE AT 409A, BUT SAM NUNN HAD THAT, TOO.

HE ALSO HAD, IF YOU GO TO THE NEXT PAGE, THE ACTUAL HISTORICAL FINANCIALS FOR THERANOS. THIS WAS IN THE MATERIALS THAT SENATOR NUNN WAS PROVIDED.

SO IT SHOWS THAT THE REVENUES, THE ACTUAL REVENUES FOR THESE YEARS 2011, 2012, 2013, 2014, UP TO SEPTEMBER, RIGHT, WHERE -- AND THIS IS IN THOUSANDS. SO THAT NUMBER FOR SEPTEMBER 14TH, SEPTEMBER 2014 RATHER, WAS -- IS $70,000.

SO SENATOR NUNN HAD INFORMATION FROM THERANOS THAT THERANOS'S ACTUAL REVENUES WERE $70,000. HE ALSO HAD IN HIS POSSESSION THAT THEY WERE PROJECTING MUCH GREATER REVENUES IN

SER-1076

THE HUNDREDS OF MILLIONS IF THINGS WENT RIGHT WITH WALGREENS AND OTHER BUSINESS THAT THERANOS HAD.

AND HE ALSO HAD PROJECTIONS THAT THE GOVERNMENT IS CLAIMING ARE DIFFERENT THAT WENT TO ARANCA FOR THIS I.R.S. CODE SECTION.

SO I DON'T KNOW IF THE GOVERNMENT IS CLAIMING THAT SENATOR NUNN IS IN ON THE CONSPIRACY, TOO, BUT NO EVIDENCE THAT THAT'S THE CASE. THESE ARE THE SORT OF LEADING LIKES IN OUR SOCIETY WHO ARE ON THE BOARD AND HAD THIS VERY SAME INFORMATION. SO THERE'S NO HIDING IT FROM THEM, AND THERE'S NO SECRET HERE, AND THERE'S NO FRAUD. THAT'S REASONABLE DOUBT.

SO THE BOARD KNEW, AS I SAID, THAT THERANOS HAD LITTLE REVENUE. THEY RECEIVED THE REVENUE PROJECTIONS PREPARED FOR ARANCA AND HAD THE SAME FINANCIAL MODELS BASED ON THE WALGREENS ROLLOUT THAT WAS SHARED WITH THE 2014 INVESTORS.

HOW DID THE BOARD CONTRIBUTE TO INVESTORS'S DECISION TO INVEST?

MR. MOSLEY TESTIFIED THAT HE'S FAMILIAR WITH SOME OF THE NAMES OF THE PEOPLE ON THE BOARD, EVEN APART FROM THERANOS, AT LEAST MOST OF THEM.

HE THOUGHT IT WAS A VERY IMPRESSIVE BOARD, AND IT CONTRIBUTED TO HIS DECISION TO INVEST. AND THAT'S UNDERSTANDABLE.

CHRIS LUCAS TESTIFIED THAT IT WAS THE MOST PRESTIGIOUS BOARD OF DIRECTORS OF A PRIVATE COMPANY AT THE TIME, AND IT

SER-1077

GAVE HIM A LOT OF CONFIDENCE IN WHAT WAS HAPPENING AT THE COMPANY.

BRIAN GROSSMAN, AN EMAIL WHERE IT SAYS, "ONE OF THE MOST IMPRESSIVE BOARDS I'VE EVER SEEN."

AND THEN MR. GROSSMAN'S PARTNER, CHRIS JAMES, WROTE "WOWZY." THAT WAS THEIR REACTION.

SO DR. ROBERTSON, HE WAS ON THE BOARD EARLIER. BUT HE HAD A CONVERSATION WITH MR. GROSSMAN, AND MR. GROSSMAN TESTIFIED DID DR. ROBERTSON TELL -- DR. ROBERTSON TOLD YOU DURING YOUR SECOND CALL WITH HIM THAT THERANOS WAS WAY BEYOND PROOF OF CONCEPT. DID HE TELL YOU THAT.

YES.

QUESTION: AND HE ALSO SAID THE TECHNOLOGY WORKS; RIGHT?

YES.

AND HE TOLD YOU THAT HIS VIEW WAS THE TECHNOLOGY WORKED; RIGHT?

THAT WAS HIS GENERAL MESSAGE, YES.

SO THIS WAS SOMETHING THAT MR. GROSSMAN WAS INFORMED OF BY CHANNING ROBERTSON, AND, OF COURSE, IT INFLUENCED MR. GROSSMAN'S DECISION TO INVEST WHEN THIS FORMER PROFESSOR AT STANFORD, CHEMICAL ENGINEERING PROFESSOR, IS TELLING HIM THE TECHNOLOGY WORKS. THAT WAS THE NOTICE THAT MR. GROSSMAN GOT.

MR. LUCAS, HE KNOWS OF CHANNING ROBERTSON. HE MET CHANNING ROBERTSON. HE KNOWS THAT HE HAD A DISTINGUISHED AND LONG CAREER AT STANFORD, AND HE KNEW HE WAS IN THE CHEMICAL

SER-1078

ENGINEERING DEPARTMENT. AND, IN FACT, HE WASN'T QUITE SURE IF HE WAS A DEAN AT STANFORD, BUT THAT WAS HIS ANSWER.

MR. GROSSMAN REPORTED TO HIS PARTNER, CHRIS JAMES, ON JANUARY 26TH, 2014, BEFORE HIS INVESTMENT, "I HAD A MIND BLOWING CALL WITH ELIZABETH'S PROFESSOR WHO HELPED HER START THIS. WAS THE ORIGINAL BOARD MEMBER."

SO THIS IS INFORMATION THAT PEOPLE ARE GETTING NOT FROM MS. HOLMES OR MR. BALWANI EVEN, BUT FROM MR. CHANNING ROBERTSON, THE STANFORD PROFESSOR.

AND MR. LUCAS WAS NOTIFIED THAT -- BY DR. ROBERTSON THAT THERANOS'S TECHNOLOGY WORKED GREAT?

HE SAID YES.

THAT WAS IMPORTANT TO HIM?

HE SAID YES, VALIDATING.

SO THAT WAS THE INFORMATION THAT THOSE INVESTORS HAD.

NOW, BEYOND THAT, WHAT INVESTORS WERE TOLD BY CHANNING ROBERTSON AND HOW THAT GAVE HIM COMFORT, MR. BALWANI ALSO HAD EVERY REASON TO BELIEVE THAT THIS TECHNOLOGY WORKED, AND I WANT TO GO THROUGH SOME OF THE REASONS WHY THAT'S TRUE.

BUT, FIRST, THIS IS ANOTHER INSTRUCTION THAT JUDGE DAVILA WILL GIVE YOU. IT'S THE GOOD FAITH INSTRUCTION. AND YOU CAN CONSIDER WHEN YOU'RE DELIBERATING WHETHER MR. BALWANI HAD AN HONEST GOOD FAITH BELIEF IN THE TRUTH OF THE SPECIFIC REPRESENTATIONS ALLEGED IN THE INDICTMENT IN DETERMINING WHETHER OR NOT HE ACTED WITH INTENT TO DEFRAUD. SO GOOD FAITH

SER-1079

IS IMPORTANT FACTOR HERE.  AND I WANT TO TALK ABOUT THAT SUBJECT IN TERMS OF WHY MR. BALWANI BELIEVED IN THE TECHNOLOGY.

SO HERE ARE JUST SOME OF THE FACTS, SOME OF WHICH WE REVIEWED AND SOME OF THESE WE WILL REVIEW, THAT LED MR. BALWANI TO THE BELIEF THAT THE TECHNOLOGY WORKED, THAT THIS WAS A COMPANY WORTHY OF HIS MULTIMILLION DOLLAR INVESTMENT, IT WAS A COMPANY WORTHY OF HIS TIME, IT WAS A COMPANY WORTHY OF HIM ASKING INVESTORS TO JOIN THE EFFORT TO MOVE THERANOS FORWARD, AND IT WAS A COMPANY WORTHY OF PROVIDING TESTS TO PATIENTS AS WELL BECAUSE THAT'S AN IMPORTANT PART OF THE TECHNOLOGY WORKING.

SO FIRST OF ALL, IN DECEMBER OF 2009, GLAXOSMITHKLINE COMPREHENSIVELY VALIDATED THE THERANOS SYSTEMS.  THAT'S WHAT MR. BALWANI WAS INFORMED.  AND WE'VE SEEN THAT EMAIL.  IT'S EXHIBIT 15058.

IN 2010 TO 2013, THE COMPANY ENGAGED IN ASSAY DEVELOPMENT WORK TO DEVELOP ALL OF THESE SMALL SAMPLE ASSAYS.

IN APRIL OF 2010, APRIL 27TH, JOHNS HOPKINS EVALUATED THE TECHNOLOGY AND CONCLUDED, AMONG OTHER THINGS, THAT A SPECIAL STRENGTH OF THE TECHNOLOGY WAS ACCURACY.  AND MR. BALWANI WAS IN THAT MEETING AT JOHNS HOPKINS.

IN SEPTEMBER OF 2010 THERANOS SENT ANALYZERS TO THE ARMY FOR A STUDY ABOUT HOW PATIENTS WHO WERE BURN VICTIMS COULD BE TREATED, AND THE THERANOS TECHNOLOGY WAS USED IN MONITORING THOSE PATIENTS WHEN THEY WERE UNDERGOING THAT STUDY.  SO THAT

WAS ANOTHER -- WE'LL TALK ABOUT THAT MORE, BUT THAT WAS ANOTHER MULTI-YEAR STUDY WHERE THE THERANOS TECHNOLOGY WAS BEING USED, AND IT ACTUALLY RESULTED IN A PEER REVIEW ARTICLE IN A MEDICAL JOURNAL.

IN OCTOBER 19TH, 2010, DR. GIBBONS INFORMED MR. BALWANI OF A SCIENTIFIC BREAKTHROUGH. WE'VE SEEN THAT EMAIL YESTERDAY WHERE DR. GIBBONS SAID AND DEMONSTRATED THIS TECHNOLOGY ACROSS ALL OF THE FOUR TYPES OF TECHNOLOGY, SO CYTOMETRY, GENERAL CHEMISTRY, IMMUNOASSAYS, AND NUCLEIC ACID AMPLIFICATION.

BETWEEN 2011 AND 2013, WALGREENS HAD A THERANOS DEVICE, AN ANALYZER FOR THEMSELVES TO CONDUCT TESTING WITH. SO THERE'S NO SECRET THERE. IF WALGREENS THOUGHT THE DEVICE DIDN'T WORK, THEY COULD HAVE SAID WE'RE PULLING THE PLUG ON THIS, WE'RE NOT GOING TO LAUNCH, WE'RE NOT GOING DOING ANYTHING. BUT THAT'S NOT WHAT HAPPENED. AND THAT WAS ALL BEFORE THE LAUNCH.

DR. ROSENDORFF, OF COURSE, SIGNED 57 VALIDATION REPORTS. THAT WOULD HAVE GIVEN MR. BALWANI GREAT CONFIDENCE IN THE TECHNOLOGY. THOSE ARE VALIDATION REPORTS DONE AFTER EARLIER ASSAY DEVELOPMENT WORK THAT ARE DESIGNED TO SHOW HEAD-TO-HEAD COMPARISONS WITH FDA PREDICATE MACHINES. DR. ROSENDORFF WAS COMFORTABLE PUTTING HIS NAME ON IT, AS WAS DR. YOUNG, THAT THESE WERE TESTS WORTHY OF USE IN THE CLINICAL SETTING.

THERANOS RECEIVED THAT CLIA CERTIFICATE OF COMPLIANCE. THAT'S AFTER THAT DECEMBER 2013 INSPECTION THAT I TALKED ABOUT EARLIER, THE LAB WAS GIVEN A CERTIFICATE OF COMPLIANCE. WE SAW

SER-1081

THAT DOCUMENT EARLIER.

DR. ROSENDORFF REPORTED THAT HE TOLD A PHYSICIAN THAT THERANOS HAD NO MORE ISSUES, PHYSICIAN INQUIRIES THAN THE UNIVERSITY OF PITTSBURGH WHEN HE WAS THERE.

AND THAT AS WE SAW JUST BEFORE THE BREAK, THE ALTERNATIVE ASSESSMENT PROCEDURE WAS CONSISTENTLY SCORING AT 100 PERCENT.

AND THEN, OF COURSE, ON JULY 7TH, 2015, MR. BALWANI WAS NOTIFIED THAT THERANOS RECEIVED FDA APPROVAL FOR THE HSV-1 ASSAY RUNNING ON THERANOS APPLICATIONS.  THAT APPLICATIONS WAS IN NOVEMBER 2014.  SO IT TOOK MANY MONTHS FOR THE FDA TO MAKE THAT APPROVAL.

BUT CERTAINLY IF NOTHING ELSE, IF YOU'RE SUBMITTING YOUR SYSTEM, EVEN IF IT'S ONLY ONE ASSAY, AND THE FDA APPROVES IT, THAT WOULD GIVE MR. BALWANI GREAT CONFIDENCE THAT THE TECHNOLOGY ACTUALLY WORKS.

BECAUSE IF IT CAN RUN AN HSV-1 ASSAY, WE HAVE SEEN THIS BEFORE, THERE ARE OTHER ASSAYS.  THE MACHINE IS THE SAME MACHINE.  SO THERE'S NO REASON FOR MR. BALWANI TO THINK, OH, IT CAN ONLY DO ONE ASSAY.  NO.  IT'S THE THERANOS SYSTEM, AND THAT IS WHAT WAS APPROVED BY THE FDA AND AGAIN AFTER MANY MONTHS.

AND HERE'S THE ACTUAL DOCUMENTS THAT GO TO THE FDA APPROVAL.

SO MS. HOLMES SENDS AN EMAIL ON JULY 2ND, 2015.  SHE SAYS, "IT IS WITH INCREDIBLE PRIDE THAT I OFFICIALLY LET YOU KNOW WE HAVE RECEIVED OUR FIRST FDA CLEARANCE IN OUR SYSTEM, AND THE

FIRST LABORATORY DEVELOPED TEST WE FILED:  HSV-1."

SO THAT WAS MS. HOLMES'S ANNOUNCEMENT TO THE EMPLOYEES AT THERANOS.

AND THEN THERE WAS A SLIDE PRESENTATION THAT MR. EDLIN TALKED ABOUT THAT MR. BALWANI WAS AWARE OF BECAUSE HE WAS THERE, AND MR. BALWANI RECEIVED THIS INFORMATION ABOUT WHAT WENT INTO THAT; RIGHT?

FIRST OF ALL, IT'S A MAJOR MILESTONE FOR THERANOS.  THIS IS THE ANNOUNCEMENT.  IT'S THE CLEARANCE GIVEN FOR THE TEST SYSTEM RUNNING HSV-1.  THIS IS -- THAT K NUMBER IS THE FDA CLEARANCE NUMBER.  THERANOS RECEIVED FDA CLEARANCE AND REVIEW AND VALIDATION OF REVOLUTIONARY FINGERSTICK TECHNOLOGY, TEST, AND ASSOCIATED TEST SYSTEM.

SO IT'S IMPORTANT THAT IT'S NOT JUST SOME ISOLATED ASSAYS. IT IS THAT HSV-1 ASSAY, BUT IT'S RUNNING ON THE THERANOS SYSTEM, AND IT'S RUNNING WITH THE NANOTAINER, THE WHOLE PACKAGE, AND THAT'S WHAT MR. BALWANI WAS MADE AWARE OF.

IF WE GO TO THE NEXT SLIDE.

SO THIS IS WHAT MR. BALWANI WAS INFORMED IT TOOK TO ACTUALLY GET TO THAT POINT OF FDA APPROVAL FOR THAT PARTICULAR TEST RUNNING ON THE THERANOS SYSTEM.  OVER 13,000 CARTRIDGES WERE RUN; 17,000 MAN HOURS; 1.1 MILLION PROTOCOL RUN TIME; 78 4S DEVICES, AND WE'VE SEEN A PICTURE OF THE 4S YESTERDAY; 4,506 CAPILLARY TUBES AND NANOTAINERS WERE COLLECTED BECAUSE OF THE SAMPLES; 2,750-PLUS PIECES OF FLUID PIPETTED; 146 DOCUMENTS

SER-1083

SUBMITTED; AND 2900 PAGES SUBMITTED TO THE FDA. THAT'S WHAT IT TOOK, MR. BALWANI WAS INFORMED, TO GET TO THE POINT OF FDA APPROVAL.

NOW, LET ME POSE THIS QUESTION. SO IF THAT'S, IN FACT, WHAT IT TAKES TO GET FDA APPROVAL, IN OTHER WORDS, FOR THE FDA TO LOOK AT THE DATA AND TO SAY, OKAY, AFTER MANY MONTHS WE'RE SATISFIED THAT THIS TECHNOLOGY WORKS, IF THAT'S WHAT IT TAKES, FOR THE GOVERNMENT TO PROVE IN A SCIENTIFIC FRAUD CASE THAT THE TECHNOLOGY DOESN'T WORK AND MR. BALWANI KNOWS THAT, AND THAT HE'S GOING FORWARD WITH PATIENT TESTING ANYWAY, AND HE'S GOING FORWARD WITH INVESTOR SOLICITATION ANYWAY, SHOULDN'T THE GOVERNMENT HAVE TO DO SOME TYPE OF RIGOROUS SCIENTIFIC ANALYSIS HERE?

AND THERE'S ONLY ONE WAY TO DO THAT, AND THAT'S THROUGH THE LABORATORY INFORMATION SYSTEM THAT HAD ALL OF THE DATA, THAT HAD ALL OF THE PATIENT'S TESTING.

AND IF THIS IS WHAT IT TAKES TO GET ANOTHER GOVERNMENT AGENCY, THE FDA, TO APPROVE SOMETHING, SHOULDN'T THE GOVERNMENT HAVE TO MEET EVEN SOME OF THAT SAME STANDARD AS OPPOSED TO PRESENTING A FEW PEOPLE WHO SAID I'VE GOT AN ACCURATE TEST, FOUR PEOPLE?

I THINK THAT'S AN IMPORTANT QUESTION TO KEEP IN MIND AS WE GO THROUGH THIS AND YOU START YOUR DELIBERATIONS IS WHY ISN'T THERE SOME SCIENTIFICALLY RIGOROUS PROOF HERE IF THE GOVERNMENT IS CLAIMING, AS THEY ARE, THAT THE TECHNOLOGY DOESN'T WORK AND

THAT MR. BALWANI KNEW THAT.

AS WE KNOW, THE FDA DID APPROVE.  AND THIS IS THE WEBSITE FROM THE FDA.  THIS IS EXHIBIT 20817.  YOU CAN SEE IN THE VERY BOTTOM THIS WEBSITE WAS RETRIEVED ON MAY 18TH, 2022.  SO IT'S STILL UP ON THE FDA WEBSITE.

YOU CAN SEE THE DATE RECEIVED FOR THE FDA IS NOVEMBER 12TH, 2014.  AND THAT WOULD MEAN THAT ALL OF THAT WORK HAD TO BE DONE BY NOVEMBER 2014 IN ORDER TO SUBMIT TO THE FDA THE APPLICATION THAT RESULTED IN THE JULY 2015 APPROVAL.

SO THAT'S THE FDA WEBSITE.

AND THEN IF YOU LOOK AT WHAT'S BEHIND THOSE LINKS, THIS IS THE LETTER FROM SALLY HOJVAT, WHO IS A DIRECTOR OF THE DIVISION OF MICROBIOLOGY DEVICES AT THE FDA, AND SHE WRITES, "WE HAVE REVIEWED YOUR SECTION 510(K) PREMARKET NOTIFICATION OF INTENT TO MARKET THE DEVICE REFERENCED ABOVE AND HAVE DETERMINED THE DEVICE IS SUBSTANTIALLY EQUIVALENT TO LEGALLY MARKETED PREDICATE DEVICES MARKETED IN INTERSTATE COMMERCE."

SO THIS IS THE 4S DEVICE, AND THAT IS WHAT THE FDA CONCLUDED AFTER A LENGTHY REVIEW.

IT'S NOT ONLY THE APPROVAL ITSELF, BUT THERE'S ALSO THIS OTHER DOCUMENT, WHICH IS CALLED A CLIA WAIVER LETTER.

SO YOU'LL SEE THAT MR. EDLIN TESTIFIED A LITTLE BIT ABOUT THIS.  THERE'S ANOTHER PROCEDURE IN ADDITION TO THE CLEARANCE THAT WE JUST LOOKED AT, WHICH IS THE WAIVER ALLOWS THE COMPANY LIKE THERANOS TO USE THE TECHNOLOGY OUTSIDE OF THE CLIA LAB,

LIKE IN A FIELD LOCATION, LIKE A WALGREENS STORE OR A MILITARY FIELD HOSPITAL, OR A PHYSICIAN'S OFFICE OR WHATEVER. AND THAT'S WHAT YOU WOULD NEED TO DO THAT. THAT'S WHAT MR. EDLIN SAID, IT'S THE CLIA WAIVER DOCUMENT. THERANOS ALSO GOT THAT FOR HSV.

AND AS YOU'VE HEARD DURING THE COURSE OF THE TRIAL, THE WALGREENS-THERANOS RELATIONSHIP HAD THIS PHASE I AND PHASE II APPROACH. PHASE I WAS I'M GOING TO COLLECT THE BLOOD SAMPLES IN THE WALGREENS STORES, SHIP THEM TO A CENTRAL LAB AT THERANOS, AND TEST THEM THERE.

THE PHASE II MODEL WOULD BE TO ACTUALLY PUT THE DEVICES IN THE WALGREENS STORES OR IN A PHYSICIAN'S OFFICE OR IN A HOSPITAL OR WHEREVER. AND THAT REQUIRED THE FDA APPROVAL.

SO THIS CLIA WAIVER, THAT WAS ON THE PATH, AND NOW IT WAS ONLY THAT ONE ASSAY, BUT THAT WAS THE FIRST ONE.

AND THAT WAS THE GOAL.

SO THIS IS THE CLIA WAIVER. AND IF YOU LOOK AT THE DOCUMENT, THAT WAS GRANTED. AND THAT'S THE SAME TEST SYSTEM THAT I JUST IDENTIFIED BEFORE.

AND THIS IS THE TESTIMONY OF MR. EDLIN. I WON'T READ IT, BUT HE TALKS ABOUT HOW THE CLIA WAIVER ALLOWS YOU TO PUT THE DEVICE IN SOME CLIA LOCATION, LIKE A WALGREENS STORE.

OKAY. I WANT TO TALK ABOUT THE WALGREENS RELATIONSHIP. THIS IS REALLY AT THE HEART OF THIS CASE FOR TWO REASONS. ONE, ON THE PATIENT SIDE, THESE WERE THE PATIENTS WHO WERE BEING

SER-1086

TESTED, HAVING THEIR BLOOD TESTED AT THERANOS. THEY WERE

PATIENTS WHO WENT TO THE WALGREENS STORES AND GOT TESTED. SO

IT'S IMPORTANT FOR THAT REASON.

IT'S ALSO IMPORTANT BECAUSE WALGREENS AND THAT

RELATIONSHIP WAS THE REALLY BIG DRIVER OF INVESTMENT IN

THERANOS THAT YOU'VE HEARD ABOUT.

SO WHEN YOU TALK ABOUT THE 2013 INVESTORS LIKE MR. LUCAS

OR MR. EISENMAN OR MR. TOLBERT AND THE HALL GROUP, OR EVEN JUST

A LITTLE LATER, A COUPLE MONTHS LATER, MR. GROSSMAN, IN EARLY

'14, THE BIG DRIVER HERE WAS WALGREENS. AND THAT'S, THAT'S --

THAT RELATIONSHIP AND ITS POSSIBILITY OF EXPANDING TO HUNDREDS

OR THOUSANDS OF STORES, THAT'S WHAT WAS THERE TO MAKE THERANOS

A UNICORN, TO USE THE LANGUAGE I USED WITH MR. LUCAS WHEN HE

WAS ON THE STAND. THAT'S HOW THESE ALREADY VERY WEALTHY,

POWERFUL PEOPLE GET EVEN MORE WEALTHY, IS FOR WALGREENS AND THE

THERANOS RELATIONSHIP TO REALLY THRIVE, THOUSANDS OF STORES.

THEY HAVE TO GO, BY THE WAY, FROM A FEW STORES IN 2013

WITH 3 STORES, AND IN 2014 WHEN RDV AND MOSLEY INVESTED IT WAS

BY 40 STORES. BUT YOU WOULD HAVE TO GO FROM THAT TO HUNDREDS

OR THOUSANDS OF STORES, AND WE ALL RECOGNIZE THAT'S A BIG

CHALLENGE.

BUT NONETHELESS, THIS WAS THE DRIVER. THIS WAS THE BIG

CARROT THAT WOULD HAVE MADE THIS RISKY INVESTMENT WORTHWHILE.

SO LET'S START OF TALK ABOUT THAT TOPIC.

SO MR. LUCAS, QUESTION: AND THAT'S WHAT YOU'RE HOPING FOR

IS THAT YOU'RE GOING TO BE INVESTING IN SOMETHING THAT TURNS OUT TO BE A UNICORN?

HE SAYS YES.  AND ONE WOULD THINK AT THE TIME, GIVEN THE ROLLOUT OF WALGREENS, THAT WOULD HAVE BEEN THE BEGINNING.

MR. LUCAS AGAIN.  IN ADDITION, YOU KNEW THAT WALGREENS WAS PARTNERING WITH THERANOS?

HE SAYS THANK YOU.  THAT PROBABLY WAS THE EXCLAMATION POINT, THAT THEY HAD A DEAL WITH WALGREENS, WE'RE ROLLING OUT AND NOW WE'RE GOING TO HAVE SOME REAL REVENUE.

MR. LUCAS AGAIN.

HE SAYS AND YOU WOULD HOPE AND DREAM A COMPANY THE SIZE OF WALGREENS WOULD WANT TO ROLL OUT YOUR TECHNOLOGY.  THAT WAS EXTREMELY VALIDATING.

MR. TOLBERT, AND ON THE INVESTMENT SIDE, IT WOULD HAVE MADE IT A VERY PROFITABLE INVESTMENT, REFERRING TO WALGREENS.

MR. LUCAS, AND WAS THE STATUS OF THAT PARTNERSHIP, THE WALGREENS PARTNERSHIP, RELEVANT TO YOUR VIEW OF THE COMPANY'S TECHNOLOGY?

PARAMOUNT.

WHY WAS THAT?

BECAUSE WALGREENS WAS GETTING READY TO ROLL IT OUT NATIONALLY, AND THAT WAS VERY EXCITING AND VALIDATING FOR THE COMPANY.

MS. PETERSON, SO YOU HAD A PARTICULAR INTEREST IN WHAT WAS GOING ON WITH WALGREENS?

SER-1088

YES.  THE CONTRACTS WERE PARAMOUNT TO OUR INVESTMENT DECISION.

THE WALGREENS PROGRAM WAS, LIKE, REALLY IMPORTANT TO MAKING THE DECISION; RIGHT?

YES.

HER WORD, "PARAMOUNT."

BRIAN GROSSMAN TALKED ABOUT WALGREENS AS A POWERFUL BRAND AND A LARGE NATIONAL FOOTPRINT, AND HAD SIGNIFICANT EXPERIENCE IN RETAIL OPERATIONS, AND IT WAS A FACTOR ULTIMATELY IN HIS DECISION TO INVEST.

MR. MOSLEY, WHEN YOU LEARNED ABOUT THE RELATIONSHIP WITH WALGREENS AND THE PUBLIC LAUNCH, THAT WAS IMPORTANT TO YOUR ULTIMATE DECISION?

IT WAS.

AND THE REASON THAT WAS IMPORTANT WAS BECAUSE, ONE, YOU KNEW THAT WALGREENS WAS A SIGNIFICANT NATIONAL AND EVEN INTERNATIONAL RETAILER?

THAT'S CORRECT.

IT WOULD HELP THERANOS TAKES ITS BUSINESS NATIONWIDE?

THAT'S CORRECT.

SO ALL OF THESE INVESTORS -- HERE'S BRIAN GROSSMAN.

"BEYOND THAT, THE WAG ENDORSEMENT OBVIOUSLY SPEAKS TO STRENGTH AND ROBUSTNESS OF THE TECHNOLOGY PLATFORM."

SO ALL OF THESE INVESTORS, JUST PAUSING HERE FOR A MINUTE, THEY UNDERSTOODD THAT WALGREENS WAS REALLY THE TICKET.  THAT

WAS THE MAIN DRIVER HERE.

AND I SHOWED YOU ALL OF THOSE SLIDES IN THAT TESTIMONY BECAUSE AGAIN AND AGAIN THESE INVESTORS UNDERSTOOD, THIS IS WHAT WOULD MAKE THIS INVESTMENT WORTHWHILE, THIS RISKY INVESTMENT, THIS IS WHY IT WAS WORTHWHILE.

AND THEY UNDERSTOOD THE RISKS.  MS. PETERSON SAID IT WAS EXECUTION RISK IN THE ABILITY TO ROLL OUT IN WALGREENS STORES; MR. MOSLEY SAID THE SAME THING; MR. TOLBERT SAID THE SAME THING.  EXECUTION RISK.

EXECUTION RISK MEANS THAT YOU'RE GOING TO HAVE TO GO FROM 3 STORES OR 40 STORES LATER AND TO HUNDREDS OF THOUSANDS OF STORES.  AND AS WE SAW, AND WE WILL GET INTO THIS SOME MORE, IN THE PARTNERSHIP MEETING MINUTES, ALL OF THOSE MEETINGS BETWEEN THERANOS AND WALGREENS THAT I WENT THROUGH WITH MR. JHAVERI WHEN HE WAS TESTIFYING, THERE'S A LOT OF PEOPLE INVOLVED, AND A LOT OF DISCUSSION, AND A LOT OF COMPLEXITY, AND THESE THINGS HAVE A LOT OF MOVING PARTS.  AND SO, OF COURSE, THESE SOPHISTICATED INVESTORS UNDERSTOOD THAT THERE WAS EXECUTION RISK, MEANING IT MIGHT NOT WORK OUT.

LET'S GO TO THE NEXT SLIDE.

DAN MOSLEY SAID, REGARDING THE JOHNS HOPKINS EVALUATION OF THERANOS, THAT HE UNDERSTOOD IT TO BE A VALIDATION OF THERANOS'S TECHNOLOGY BY JOHNS HOPKINS, AND IT WAS SIGNIFICANT TO HIS DECISION TO INVEST.

WELL, THAT REALLY HAPPENED.  THIS IS NOT SOMETHING THAT

MR. BALWANI MADE UP. JOHNS HOPKINS'S PHYSICIANS LOOKED AT THE TECHNOLOGY, AND THEY SAID IT HAD NO MAJOR WEAKNESSES AND AMONGST ITS STRENGTHS WAS ACCURACY. THAT WAS IMPORTANT TO MR. MOSLEY AND RIGHTFULLY SO.

PATRICK MENDENHALL, HE ASSUMED THAT THE COMPANY THE SIZE OF WALGREENS WOULD HAVE DONE THEIR HOMEWORK BEFORE PARTNERING WITH THERANOS. AND AS WE WILL SEE, THEY DID.

STARTING WITH JOHNS HOPKINS'S REPORT, HERE IT IS. THE JOHNS HOPKINS, THIS IS A REPORT OF A MEETING, SUMMARY, FROM APRIL 27TH, 2010. YOU CAN SEE THE ATTENDEES ARE DR. FREDERICK BRANCATI, PROFESSOR OF MEDICINE; DR. THOMAS KICKER, PROFESSOR OF MEDICINE; AND DR. WILLIAM CLARK, ASSOCIATE PROFESSOR OF PATHOLOGY.

AND FROM WALGREENS, DR. JAY ROSAN, ANOTHER WITNESS THE GOVERNMENT DIDN'T CALL, BUT THERE HE IS ATTENDING THE JOHNS HOPKINS MEETING; AND THEN ELIZABETH HOLMES AND SUNNY BALWANI ARE ATTENDING AS WELL; AND THEN THERE'S A PERSON FROM A COMPANY CALLED INNOSIGHT.

MEETING OBJECTIVES. THE "HOPKINS TEAM WAS ASKED TO COMMENT ON THE VALIDITY AND USEFULNESS OF THE THERANOS PRODUCT, SPECIFICALLY RELATED TO THE SCIENCE THAT SUPPORTS THE TECHNOLOGY AND THE APPLICATION OF THE TECHNOLOGY IN A VARIETY OF SETTINGS INCLUDING HOSPITAL, CLINIC, LABORATORY, AND POTENTIALLY WITHIN WALGREENS AS AN ADD ON TO THE CLINICAL PROGRAMS AND RETAIL PHARMACY BUSINESS THAT CURRENTLY EXISTS."

SER-1091

SO KEEP IN MIND, AND THIS IS WHAT MR. JHAVERI SAID, THERANOS DIDN'T HIRE JOHNS HOPKINS.  WALGREENS HAD A RELATIONSHIP WITH JOHNS HOPKINS.

AND WE SAW DURING MR. JHAVERI'S EXAMINATION, THEY WERE USING JOHNS HOPKINS FOR A LOT OF CONSULTING BECAUSE WALGREENS FUNDAMENTALLY IS IN THE HEALTH CARE BUSINESS.  THEY'RE A PHARMACY COMPANY.  THEY SELL OTHER THINGS, TOO.  BUT THEY WERE INTERESTED IN EXPANDING THEIR HEALTH CARE PRESENCE WITH CLINICS AND BLOOD TESTING, AND SO THEY RELIED ON JOHNS HOPKINS. WALGREENS HIRED THEM, NOT THERANOS.  THIS WAS WALGREENS CONSULTANT.

SO YOU TALK ABOUT THE INVESTORS'S VIEW THAT, WELL, A BIG COMPANY LIKE WALGREENS, THEY WOULD DO THEIR DUE DILIGENCE. WELL, THIS IS THE FIRST THING THAT THEY DID.  AND THIS WAS BEFORE WALGREENS SIGNED ANY AGREEMENT WITH THERANOS.  THAT AGREEMENT CAME LATER IN 2010.  THIS WAS IN APRIL OF 2010.

SO LET'S GO ON AND LOOK AT THE REST OF THE DOCUMENT.

SO HERE ARE THE KEY FINDINGS FROM THE JOHNS HOPKINS'S PHYSICIAN TEAM.

"BASED ON THIS EVALUATION, THE CONSENSUS OF THE HOPKINS TEAM WAS AS FOLLOWS:

"THE TECHNOLOGY IS NOVEL AND SOUND.  IT CAN ACCURATELY RUN A WIDE RANGE OF ROUTINE AND SPECIAL ASSAYS.

"THE TECHNOLOGY IS SIMILAR ENOUGH TO BE USED BY NONSPECIALISTS IN FIELD.

SER-1092

"SPECIAL STRENGTHS OF THE TECHNOLOGY INCLUDE:

"ACCURACY;

"MINIATURIZATION;

"FLEXIBILITY;

"CONNECTIVITY; AND

"ADAPTABILITY FOR RESEARCH."

IT GOES ON. THE SECOND TO LAST BULLET. ONE OBSERVATION THAT THERANOS TECHNOLOGY IS NOT REALLY POINT OF CARE TECHNOLOGY, IT'S REALLY A TRADITIONAL LAB ASSAY APPROACH, WITH THE ATTENDANT ACCURACY AND VALIDITY, HIGHLY MINIATURIZED, ESSENTIALLY A MINILAB. THAT'S JOHNS HOPKINS.

AND THEN THEY SAY, "NO MAJOR WEAKNESSES WERE IDENTIFIED."

SO BASED ON ATTENDING THAT MEETING AND HEARING THIS, WOULD MR. BALWANI HAVE A VIEW THAT THE TECHNOLOGY WORKED? WOULD INVESTORS? OF COURSE, THEY WOULD.

AND WOULD THIS LEAD MR. BALWANI TO INVEST HIS MONEY IN THERANOS? IT DID. HE INVESTED $4.6 MILLION IN THERANOS.

OKAY. I SAID BEFORE, AND I'LL SAY AGAIN, THAT WALGREENS DIDN'T JUST TAKE A FIRE TO THIS AND TRUST THERANOS, OH, YEAH, MAYBE THEIR DEVICE WORKS. THEY HAD THE DEVICE.

THIS WAS AN EMAIL FROM JULY OF 2013 FROM TIM KEMP TO MR. BALWANI AND OTHERS, INCLUDING MR. EDLIN. AND THIS PARTICULAR READER -- REMEMBER, THE READERS ARE THE EDISON DEVICES. THIS IS BEING REGISTERED AT WALGREENS. SO WALGREENS STILL HAD THE DEVICE EVEN AS LATE AS JULY OF 2013.

HERE'S WHAT THE GOVERNMENT TRIES TO SUGGEST TO MR. EDLIN:

DO YOU KNOW, FOR EXAMPLE, WHETHER THE DEVICE WAS CAPABLE OF RUNNING ASSAYS?

DAN EDLIN DIDN'T KNOW.  HE SAID NO.

DO YOU KNOW WHETHER THE THERANOS PROVIDED THE CARTRIDGES AND REAGENTS THAT WOULD BE NECESSARY TO ACTUALLY USE THE DEVICE AS AN ANALYZER?

HE SAID I DIDN'T.

SO THE SUGGESTION THERE IS, WELL, MAYBE WALGREENS HAD THE DEVICE, BUT MAYBE IT WAS KIND OF LIKE A BRICK SITTING IN THE CORNER, AND NO ONE COULD USE IT, AND NO ONE COULD DO ANYTHING WITH IT.  AND IT COULDN'T TEST IT BECAUSE, OF COURSE, YOU NEED REAGENTS AND YOU NEED CARTRIDGES IN ORDER TO USE THE DEVICE AS OPPOSED TO JUST LOOKING AT IT.

AND SO THAT'S NOT TRUE.

LET'S GO TO THE NEXT SLIDE.

AND THIS IS PATTY HAWORTH.  YOU MIGHT REMEMBER HER.  SHE WAS THE PERSON WHO KEPT ALL OF THE MEETING MINUTES IN THOSE THERANOS-WALGREENS PARTNERSHIP MEETINGS, AND THIS IS BACK IN 2011.  AND SHE'S TALKING TO JAY ROSAN, THE PHYSICIAN THAT WORKS FOR WALGREENS.  AND SHE SAYS, "DR. JAY, I JUST DID A TEST ON MYSELF TODAY TO MAKE SURE THE MACHINE IS STILL WORKING."  AND THERE'S THE I.D. AND A NUMBER.  IT WAS THE ASTHMA TEST.

SHE SAYS TO DAN YOUNG, DR. YOUNG -- I AM SORRY.

PATTY HAWORTH SAYS TO DR. YOUNG AND DR. ROSAN AND

SUNNY BALWANI, "NO FURTHER QUESTIONS, JUST WANTED TO MAKE SURE THE DEVICE WAS WORKING AS EXPECTED."

SO YOU'RE DARN RIGHT THAT THEY HAD THE REAGENTS AND CARTRIDGES, OTHERWISE PATTY HAWORTH COULD NOT CONDUCT THE TEST ON HERSELF.

SO WALGREENS HAD THE DEVICE, THEY HAD THE ABILITY TO DO THE TESTING, AND THEY DID THE WORK, THEY DID THE JOHNS HOPKINS REVIEW, THEY HAD THE DEVICE FOR TWO YEARS BEFORE THEY LAUNCHED.

SO TO SAY THAT THEY WERE -- WALGREENS WAS SOMEHOW DEFRAUDED? NO. LIKE, THEY'RE A BIG COMPANY, AND THEY DID WHAT YOU WOULD EXPECT THEY WOULD DO, EVALUATE IT BEFORE THEY WENT INTO THE BUSINESS WITH THERANOS.

THAT'S JUST A MAP SHOWING THAT THEY HAD THIS DEVICE FOR THESE TWO YEARS. WALGREENS IS HEADQUARTERED IN DEERFIELD, ILLINOIS.

AND THIS IS MR. JHAVERI ON THE STAND, THE SAME TOPIC.

QUESTION: AND THEN IN ADDITION, YOU ALSO SAID AT THE TIME THAT WALGREENS'S CHIEF MEDICAL OFFICER HAD REVIEWED THE TECHNOLOGY AND THE DATA BEFORE IT INTRODUCED THE SERVICE; CORRECT?

AND HE SAID CORRECT. THAT WAS A COMMENT THAT HE MADE.

OKAY. NOW LET'S GET INTO THE ACTUAL RELATIONSHIP BETWEEN WALGREENS AND THERANOS. SO THE INITIAL CONTRACT WAS IN 2010. THE SIGNER OF THE CONTRACT FROM THE WALGREENS SIDE WAS WADE MIQUELON, WHO YOU HEARD IN THIS CASE WAS LISTED AS

EXECUTIVE VICE PRESIDENT.  AND MR. JHAVERI ALSO TOLD YOU THAT HE WAS THE CHIEF FINANCIAL OFFICER, A VERY SENIOR MANAGER, CHIEF FINANCIAL OFFICER AT WALGREENS.  AGAIN, ANOTHER WITNESS YOU DIDN'T HEAR FROM.

SO THE GOVERNMENT HAD MR. JHAVERI TALK ABOUT THIS 2010 CONTRACT.  MR. JHAVERI WAS NOT INVOLVED IN THE THERANOS PROJECT AT THAT TIME.  HE BECAME INVOLVED REALLY IN 2014 TO MOVE THE PARTNERSHIP FORWARD, AND THAT'S WHAT HE TESTIFIED.  THIS EARLIER PERIOD, IT WOULD HAVE BEEN WADE MIQUELON WHO WOULD HAVE THAT KNOWLEDGE, AN ANOTHER WITNESS THE GOVERNMENT DIDN'T WANT TO CALL.

BUT MR. JHAVERI, AS I SAID, REALLY DIDN'T HAVE ANYTHING TO DO WITH THIS CONTRACT, BUT IT WAS SHOWN TO HIM.  AND IT IS THE INITIAL CONTRACT FROM JULY OF 2010, OKAY?

ONE IMPORTANT THING ABOUT THIS, IF YOU LOOK AT THIS EXHIBIT, AND THIS IS IMPORTANT AND YOU MIGHT WANT TO WRITE THIS DOWN, EXHIBIT 372, AND IT'S GOING TO BE ON EXHIBIT PAGE 8, AND THERE'S A SECTION 6.  AND IN THAT PROVISION IT SAYS THAT RIGHT AT THE MOMENT THAT THERANOS SIGNED THAT CONTRACT WITH WALGREENS IN JULY OF 2010, THERANOS HAD AN IMMEDIATE RIGHT TO $30 MILLION.  WALGREENS OWED THAT MONEY RIGHT AT THAT POINT. THAT'S WHAT THE CONTRACT SAYS.  IF YOU LOOK AT THAT SECTION, THAT'S WHAT YOU'LL SEE.

AND YOU KNOW WHAT, THERANOS DIDN'T GET THAT MONEY.  SO THE GOVERNMENT SAYS THAT THIS WAS SOME KIND OF FRAUD FROM THE VERY

SER-1096

BEGINNING WHERE THERANOS PULLED THE WOOL OVER WALGREENS'S EYES. AND WHAT KIND OF FRAUD IS THAT WHERE YOU FINALLY GET THEM TO SIGN A CONTRACT AND THEY OWE YOU $30 MILLION AND YOU SAY WE DON'T NEED THAT?

THIS WAS AN EVOLVING PARTNERSHIP. THEY SIGNED AMENDMENTS TO THE CONTRACT. THEY DID WORK ON THE TECHNOLOGY. THEY LAUNCHED WHEN THERANOS THOUGHT THEY WERE READY TO LAUNCH, AND WALGREENS THOUGHT THAT, TOO. NOT SOME SORT OF RUSH JOB TO GRAB $30 MILLION FROM WALGREENS THAT THE GOVERNMENT CLAIMS WAS A VICTIM, THIS BIG SOPHISTICATED COMPANY THAT DID ALL OF THIS WORK ON EVALUATING THE TECHNOLOGY AS I'VE JUST DESCRIBED.

OKAY. WALGREENS AND THERANOS SIGNED AN AMENDMENT TO THE CONTRACT IN 2012. AND AS YOU MIGHT REMEMBER, MR. JHAVERI SAID THAT THAT CONTRACT, THAT ELIMINATED THE 2010 CONTRACT.

SO MR. SCHENK HAD SHOWN YOU SOME PROVISIONS FROM THE 2010 CONTRACT WHERE THERE WAS SOME LANGUAGE ABOUT USING THE THERANOS ANALYZER, THERE WAS A DEFINITION OF THE ANALYZER, AND POINTS TO A PROVISION WHERE THEY WERE SUPPOSED TO USE IT.

THAT'S GONE. IN 2012 THAT DOESN'T EXIST ANYMORE. THERE'S NO PROVISION THAT SAYS WHAT DEVICE SHOULD BE USED OR THAT A FINGERSTICK HAS TO BE USED. IT'S NOT IN THE CONTRACT.

WHAT IS IN THE CONTRACT IS THIS PHASED DISRUPTION MODEL. AND THIS IS CONTRACTUAL LANGUAGE, BUT WHAT IT SAYS IS THAT THERE'S GOING TO BE THIS APPROACH, THERE'S GOING TO BE A COLLECTION OF THE SAMPLE AT WALGREENS.

THE INITIAL APPROACH IN 2010 WAS THAT WE'RE GOING TO PUT THE DEVICES IN THE WALGREENS STORES. THAT CHANGED TO THIS WHAT THEY CALL THIS PHASED I APPROACH WHERE THE BLOOD WOULD BE COLLECTED AT WALGREENS, BUT THEN SENT TO THE THERANOS CENTRAL LAB. THIS IS THE PROVISION THAT ACCOMPLISHES THAT.

AND THERANOS AND WALGREENS MUTUALLY AGREED TO THAT WAY OF DOING THINGS UNTIL THE FDA APPROVAL COULD BE OBTAINED THAT WOULD ALLOW THE DEVICE TO BE PUT INTO THE WALGREENS STORES.

AND THIS IS WHAT MR. JHAVERI SAID ABOUT THAT. QUESTION: AND WALGREENS AND THERANOS AGREED TOGETHER THAT THEY WOULD USE WHAT WAS CALLED A CENTRAL LAB MODEL RATHER THAN HAVING THE DEVICES IN THE STORES THEMSELVES?

HE SAID THAT'S CORRECT.

WHY USE THE MODIFIED PREDICATES IN THE COMMERCIAL DEVICES?

THE NEXT SLIDE.

SO DR. ROSENDORFF TESTIFIED A LITTLE BIT ABOUT THIS. SO AS I SAID YESTERDAY, THE THERANOS EDISON DEVICE OR THE 4S, WHICH IS PICTURED HERE, THESE WERE DEVICES THAT WERE DESIGNED FOR A FIELD LOCATION. SO IF YOU HAVE THE DEVICE SITTING IN A PHYSICIAN'S OFFICE, FOR EXAMPLE, PATIENTS WHO COME IN, THEIR TESTS COULD BE DONE. IF YOU'RE AT WALGREENS AND THE DEVICE IS THERE, THE PATIENT COULD GO SHOPPING AT WALGREENS, THEIR TEST COULD BE RUN. MAYBE THE PATIENT HAS TO WAIT A LITTLE BIT. HOPEFULLY NOT TOO LONG.

BUT THEY'RE DESIGNED FOR THEIR MORE -- WE'RE DEALING WITH

SER-1098

ONE TEST AT A TIME BASICALLY, RIGHT?

SO THAT MAKES PERFECT SENSE IF YOU'RE GOING TO HAVE A DEVICE IN A FIELD LOCATION.

BUT AS SOON AS YOU'RE USING AN ESSENTIAL LAB MODEL WHERE THE BLOOD IS BEING COLLECTED, IT'S BEING SHIPPED TO ONE LOCATION AT THERANOS, OR ACTUALLY TWO LOCATIONS WHEN THEY OPEN THE ARIZONA LAB, AT THAT POINT YOU NEED SOMETHING WITH HIGHER THROUGHPUT.  HIGHER THROUGHPUT JUST MEANS THAT THE MACHINES COULD DO MORE TESTS PER HOUR.

SO THAT'S THE ORIGINS OF THE PREDICATE USE AND THE MODIFIED PREDICATE USE, SO THAT IF YOU USE YOUR TECHNOLOGY AND YOUR SCIENTIFIC KNOW-HOW TO MODIFY ONE OF THESE COMMERCIAL MACHINES SO IT COULD RUN FINGERSTICK SAMPLES, THEN YOU CAN DO A LOT OF TESTS PER HOUR.  SO THAT WAS A BUSINESS DECISION THAT WAS MADE BASED ON THE MODEL IN THE PHASE I, PHASE II, IN THIS CASE THE PHASED I APPROACH.

2012 CONTRACT.  JUST TO GO BACK TO THAT.

AS I SAID, THERE WAS NO REQUIREMENT TO USE ANY PARTICULAR DEVICE.  THERE WAS NO REQUIREMENT TO ACHIEVE ANY PARTICULAR FINGERSTICK PERCENTAGE.  AND THEN THERE'S A CLAUSE IN HERE THAT THERE ARE NO OTHER PROMISES OR AGREEMENTS BETWEEN THERANOS AND WALGREENS OTHER THAN WHAT IS STATED IN THE CONTRACT.

NEXT SLIDE, PLEASE.

THIS IS THE PRESS RELEASE, I THINK YOU'VE SEEN BEFORE, FROM NOVEMBER 13TH, 2013.  THERANOS AND WALGREENS MUTUALLY

SER-1099

ANNOUNCE THE OPENING OF STORES IN THE PHOENIX METROPOLITAN AREA.

AND AS I SAID BEFORE, IT HAS A SECTION ABOUT THE SAMPLES WILL BE CONDUCTED BY EITHER FINGERSTICK OR TRADITIONAL METHODS. SO THAT WAS NOT A SECRET.

IT ALSO GOES ON TO SAY IN SEPTEMBER OF 2013, THERANOS AND WALGREENS ANNOUNCED A LONG-TERM PARTNERSHIP TO BRING THERANOS'S NEW LAB TESTING SERVICE NATIONWIDE. SO THAT'S WHAT WALGREENS HAD CONTEMPLATED.

AND THEN IF YOU GO TO THE NEXT PAGE, THIS IS A QUOTE FROM A WALGREENS EXECUTIVE, KERMIT CRAWFORD, AS WE WORK TO BRING THERANOS'S LAB TESTING SERVICES TO MORE OF OUR STORES AND COMMUNITIES NATIONWIDE, WE'RE EXCITED, AND SO FORTH.

AND THEN IN THE LAST SECTION IT SAYS, AS THE NATION'S LARGEST RETAIL PHARMACY CHAIN WITH MORE THAN 8,000 NEIGHBORHOOD PHARMACIES, INCLUDING 188 IN PHOENIX, WALGREENS HAS THE INFRASTRUCTURE TO ENABLE THERANOS TO BRING ITS SERVICE TO CONSUMERS NATIONWIDE.

SO THIS IS WALGREENS SAYING THIS ALONG WITH THERANOS. SO OF COURSE INVESTORS FELT LIKE WE HAVE A MAJOR RETAIL COMPANY WHO IS PARTNERING WITH THERANOS, WHO WE THINK AND THEY WERE RIGHT, CHECK OUT THE TECHNOLOGY AND THERANOS'S SERVICE. AND THEY'RE PARTNERING WITH THERANOS TO -- WITH THE INTENT TO MAKE THIS INTO A NATIONWIDE PROGRAM.

IS THERE A RISK IN DOING THAT? YOU BETCHA. TRYING TO GO

FROM A FEW STORES, THOUSANDS OF STORES, THAT'S TOUGH. BUT THAT WAS THE PROMISE, THAT WAS THE POTENTIAL, THAT WAS THE DRIVER OF WHY INVESTORS SAW SO MUCH POTENTIAL TO MAKE A LOT OF MONEY IN THERANOS.

WALGREENS SAID THIS IN OTHER PLACES, TOO.

IF WE GO TO THE NEXT SLIDE.

THIS IS A DOCUMENT CALLED A FORM 8-K THAT MS. PETERSON SAID SHE REVIEWED THAT WALGREENS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION.

DO YOU SEE ONE OF THE ITEMS IT SAYS TAKING THE NEXT STEP IN THERANOS AND WALGREENS PLANNED NATIONAL ROLLOUT OF THERANOS'S WELLNESS CENTERS BY OPENING TWO NEW CENTERS AT WALGREENS STORES IN THE PHOENIX AREA. AND IT ALSO SAYS THAT THERE'S A STORE IN PALO ALTO.

SO THIS IS THEIR REPORTING, WALGREENS, TO THE S.E.C. THIS IS A PLANNED NATIONAL ROLLOUT.

SO I'VE TALKED ABOUT THE 2010 CONTRACT THAT WAS INITIALLY THE DEAL BETWEEN THERANOS AND WALGREENS. I'VE TALKED ABOUT THE AMENDMENT IN 2012, BUT I WANT TO SHOW YOU THE LATER AMENDMENT THAT WAS DECEMBER 31ST, 2013.

SO THIS IS ANOTHER AMENDMENT TO THE CONTRACT IN THIS EVOLVING PARTNERSHIP BETWEEN THERANOS AND WALGREENS.

AND THIS, JUST TO SHOW YOU A FEW PROVISIONS, IT'S THE INTENTION OF THE PARTIES, MEANING WALGREENS AND THERANOS, TO DEVELOP A MUTUALLY BENEFIT INITIAL STRATEGIC RELATIONSHIP THAT

FACILITATES THE SUCCESSFUL DEPLOYMENT OF THERANOS NATIONALLY, ESTABLISHES WALGREENS AS A NATIONAL PARTNER FOR LABORATORY SERVICES THAT THERANOS IS ABLE TO PROVIDE AND THERANOS, AS WALGREENS NATIONAL PARTNER, FOR SUCH THERANOS SERVICES.

GOING ON.

THE PARTIES ARE COMMITTED TO TAKING ALL STEPS REASONABLY NECESSARY TO ENSURE A SUCCESSFUL NATIONAL ROLLOUT OF THERANOS SERVICES. THAT'S WHAT THE AGREEMENT WAS AS OF DECEMBER 31ST OF 2013.

AND YOU HEARD DISCUSSION ABOUT DISCUSSIONS WITH INVESTORS IN THIS TIME PERIOD IN LATE DECEMBER 2013. WELL, THIS WAS THE DRIVER. MR. BALWANI UNDERSTOOD THAT WALGREENS WAS COMMITTING TO THIS. IT HADN'T HAPPENED YET. THERE'S NO GUARANTEE, THERE'S NO GUARANTEE IN LIFE OR BUSINESS THAT IT COULD END UP NOT WORKING OUT, BUT THIS IS WHAT WALGREENS WAS SAYING. AND MR. BALWANI HAD EVERY REASON TO BELIEVE THIS COULD BE A SMASHING SUCCESS, AND THE INVESTORS THOUGHT SO TOO WHEN THEY INVESTED.

AND THEN WALGREENS WAS SO SUBMITTED TO THIS THAT NOT ONLY DID THEY SAY THEY WERE COMMITTED TO A NATIONAL ROLLOUT, THEY ALSO AGREED TO ACCELERATE $75 MILLION IN WHAT THEY CALLED AN INNOVATION FEE. SO WALGREENS WAS NOW FORWARDING TO THERANOS $75 MILLION.

YOU HEARD FROM THE GOVERNMENT THAT IN THAT PERIOD STARTING IN SEPTEMBER OF 2013 THAT THERANOS WAS OUT OF CASH AND NEEDED

TO RAISE INVESTMENT MONEY BECAUSE IT WAS DOWN TO, YOU KNOW, I THINK THEY SAID $14 MILLION, INCLUDING A LETTER OF CREDIT.

WELL, THIS NEGOTIATION THAT LED TO WALGREENS ADVANCING $75 MILLION, THIS DIDN'T HAPPEN ON DECEMBER 31ST. I MEAN, LET'S USE OUR COMMON SENSE HERE, RIGHT? THIS IS GOING TO BE A NEGOTIATION. SO THERANOS IS GETTING THIS MONEY, RIGHT?

AND EVEN THOUGH MS. SPIVEY, THE ACCOUNTANT, WOULD SAY, WELL, THIS IS DEFERRED REVENUE, THERANOS HAS THE CASH. THE PURPOSE OF THIS CASH WAS TO MOVE THE NATIONAL ROLLOUT FORWARD, THAT'S WHY WALGREENS WAS DOING THIS.

AND SO WALGREENS BELIEVED IN THIS SO MUCH THAT THEY NOT ONLY SAID THEY WOULD, THEY GAVE THERANOS $75 MILLION TO ACCOMPLISH THAT AFTER DOING THEIR DUE DILIGENCE, HAVING THE DEVICE WITH JOHNS HOPKINS, AND SO FORTH.

OKAY. LET'S GET INTO SOME OF THE MEETINGS BETWEEN WALGREENS AND THERANOS.

SO AS YOU SAW THROUGH MR. JHAVERI, THERE WERE THESE PERIODIC MEETINGS, AND THIS IS THE ONE FROM MAY 2014.

SO AT THIS POINT IN TIME, HERE'S SOME OF THE HIGHLIGHTS. MR. BALWANI OPENED THE MEETING, HOW TO MAKE SURE THE NEXT 10,000 PATIENTS HAVE A PERFECT CUSTOMER EXPERIENCE? CUSTOMER EXPERIENCE WAS IMPORTANT.

NIMESH, IT WAS MR. JHAVERI, REMINDED US OF HOW FAR WE HAVE COME SINCE JANUARY. WE WERE AT 21 STORES NOW.

AND THEN IF YOU GO ON, IT SAYS A PILOT SHOULD NOT BE

PERFECT. IT SHOULD BE SO WE CAN LEARN EVERYTHING WE NEED TO SCALE. SCALE MEANS OPENING MORE AND MORE STORES, RAMPING UP.

THE LAST PART THERE ON THE BOTTOM, GREG WASSON, HE WAS THE CHIEF EXECUTIVE OFFICER AT THE TIME AT WALGREENS. HE WAS SUPPORTIVE. SO THE HIGHEST LEVEL AT WALGREENS. TEAMS NEED TO BECOME TIGHTER. IF WE THINK 20 STORES ARE TOUGH, WAIT UNTIL WE GET TO 2500 STORES. AND THEN IT GOES ON.

SO THIS IS WHAT THEY'RE TALKING ABOUT IN MAY OF 2014 BETWEEN THERANOS AND WALGREENS.

NEXT. THAT SAME MEETING. PER NIMESH, 40, MEANING 40 STORES, IS IN THE BAG. WE NEED TO THINK ABOUT SCALE. SO THAT'S WHAT WALGREENS IS SAYING, LET'S THINK ABOUT SCALE, LET'S THINK ABOUT RAMPING UP.

PER NIMESH, THE TIMING IS RIGHT, BECAUSE THIS IS WHEN WE ARE SELECTING THE WELL EXPERIENCE STORES IN 2015, 2016, AND 2017.

YOU MIGHT REMEMBER FROM MR. JHAVERI THAT WALGREENS HAD THIS PROGRAM CALLED WELL EXPERIENCE, A TOTALLY SEPARATE PROGRAM FROM THERANOS, WHERE THEY WERE BUILDING OUT STORES IN A CERTAIN WAY TO HAVE A COMMUNITY ROOM. AND IT DAWNED ON EVERYONE HERE THAT YOU COULD USE THESE STORES FOR BLOOD TESTING HERE AS WELL. THAT'S WHAT MR. JHAVERI SAID, AND THAT'S WHAT THE WELL EXPERIENCE REFERS TO.

AND THEN IF YOU GO TO THE NEXT PAGE, THIS IS STILL IN THE MAY 2014 MEETING, THE GOAL AT THAT TIME AS OF MAY 2014, IT WAS

SER-1104

500 STORES IN FISCAL YEAR 2015. FISCAL YEAR 2015 MEANS THROUGH THE END OF AUGUST OF '15. SO IT WAS NOT THE WHOLE YEAR '15. IT WAS THE FISCAL YEAR. WE'LL SEE THE NOTATION ON THAT LATER.

SO FOR THAT PERIOD OF TIME THROUGH THE END OF AUGUST 2015, THE GOAL WAS 500 STORES. THAT'S WHAT THEY WERE TALKING ABOUT IN MAY OF '14. SO IT'S IMPORTANT TO KEEP THAT IN MIND AS WE TALK ABOUT WHAT HAPPENS IN THE NEXT COUPLE OF MONTHS.

SO NOW LET'S FAST FORWARD TO JULY, JULY 2014. THIS IS THE MEETING FROM THAT TIME PERIOD. THERANOS HIT THEIR FIRST 100-PLUS PATIENTS PER DAY ON JULY 2ND. SO THINGS ARE MOVING IN THE RIGHT DIRECTION ON THAT FRONT.

AND AT THIS POINT THEY'RE ON TRACK TO LAUNCH 40 STORES BY AUGUST 31ST. THEY HAD NOT GOT TO THE 40 STORES YET AT THIS POINT, BUT THAT WAS THE GOAL BY THE END OF AUGUST 2014.

NEXT SLIDE.

SUNNY ECHOED NIM JHAVERI'S COMMENTS, TEAM HAS GROWN FROM 10 TO 100, MOMENTUM IS BEGINNING. SO THAT'S WHAT MR. JHAVERI AND MR. BALWANI THOUGHT.

WE ARE BUILDING OUT PRIVATE HEALTH ROOMS CHAINWIDE AND WORKING WITH LEGAL TO GET THE GREEN LIGHT TO USE HCC ROOMS.

MR. JHAVERI TESTIFIED THAT THERE WERE ROOMS AT WALGREENS CALLED THE HEALTH CARE CLINICS, AND IT ALSO DAWNED ON EVERYONE THAT THEY COULD USE THOSE FOR BLOOD TESTING AS WELL. THERE WAS A CERTAIN NUMBER OF THESE HCC STORES THAT WALGREENS HAD THAT THEY WERE GOING TO BUILD OUT, AND WE'RE GOING TO SEE THAT WHEN

WE GET TO AUGUST. AT THIS POINT THEY'RE WORKING ON GETTING A GREEN LIGHT TO USE THE HCC ROOMS FOR THERANOS BLOOD TESTING.

AND THEN THOSE WERE GOING TO BE FOR A PARTICULAR TYPE OF TEST, THESE STD -- I THINK IT'S CALLED STI PANELS. AND THOSE WERE THE CONDITIONS: HIV, SYPHILIS, GONORRHEA. AND THE PRICE WAS CONTEMPLATED TO BE $59. IT'S IMPORTANT TO NOTE THAT THAT $59 FOR THAT PANEL WAS MORE LUCRATIVE THAN THE NORMAL $35 THAT PATIENTS WERE GOING TO PAY. SO THIS WAS ACTUALLY, EVEN THOUGH LESS TESTING, IT WOULD HAVE BEEN MORE LUCRATIVE TO THERANOS, THESE HCC TESTS.

AND, IN FACT, MR. JHAVERI TESTIFIED THAT WALGREENS WAS GOING TO GET $10 OF THAT UNDER THE DEAL THAT EXISTED, WHETHER IT WAS $35 THAT THE PATIENT PAID OR $59, WALGREENS WAS GOING TO GET 10 AND THERANOS WOULD GET THE REST.

SO LET'S GO ON.

THIS IS IN JULY. SO AT THIS POINT THERE'S A SECTION OF THESE MINUTES. AND JUST TO BE CLEAR, MR. JHAVERI TESTIFIED THAT PATTY HAWORTH, THE WALGREENS EMPLOYEE, DUTIFULLY TOOK THESE MINUTES AND TRIED TO GET EVERYTHING RIGHT SO THAT IT ACCURATELY REFLECTS WHAT HAPPENED AT THESE MEETINGS.

IN 2014 AND '15, THIS SECTION TALKS ABOUT THE CONTEMPLATED MARKET EXPANSION FOR THAT PERIOD. AND THE ONLY AREAS THAT THEY'RE TALKING ABOUT IN JULY ARE ARIZONA, WHERE THERE WERE SOME STORES ALREADY; CALIFORNIA, IS WHERE THERE WAS AT THAT POINT ONE STORE; AND THE TRI-STATE AREA, WHICH IS THE NEW

SER-1106

JERSEY, NEW YORK, CONNECTICUT AREA BACK EAST. SO THAT WAS THE MARKET, THOSE THREE, THAT THEY WERE TALKING ABOUT IN JULY.

IT'S GOOD TO KEEP THAT IN MIND WHEN WE GET TO AUGUST, BECAUSE THINGS CHANGE A LOT.

BUT BEFORE WE GET THERE, LET'S TALK ABOUT MR. JHAVERI'S EMAIL AT THE END OF JULY.

GO TO THE NEXT SLIDE. THANK YOU.

THIS IS EXHIBIT 20228. THIS IS THE END OF JULY. THIS IS CASEY KOZLOWSKI, ANOTHER WALGREENS EMPLOYEE. HE WRITES, "HI SUNNY,

"THANKS FOR THE NOTE -- THIS IS ALL GREAT NEWS. I ACTUALLY HAD A CALL REGARDING HCC STD TESTING TODAY -- MORE TO COME ON THAT, BUT THINGS ARE MOVING FORWARD."

SO THAT PROGRAM IS ADVANCING.

MR. BALWANI WRITES BACK, "WE BROKE THRU 20 CUSTOMERS PER DAY THRESHOLD IN OUR PALO ALTO STORE. 22 PATIENTS TODAY. 2 COUPONS, 20 PAID CUSTOMERS.

"SO PATIENT TRAFFIC IS INCREASING, GOING TO THE RIGHT DIRECTION."

AND THEN MR. JHAVERI SAYS, "THANK YOU, SUNNY. THIS IS TERRIFIC. WE ARE STARTING TO MOVE MOUNTAINS."

DOES THAT SOUND LIKE A PARTNERSHIP THAT IS WINDING DOWN AT THIS POINT? I DON'T THINK SO.

BUT LET'S GO TO THIS VERY KEY MEETING IN AUGUST 2014, AUGUST 6TH, 2014, THE NEXT EXHIBIT. THIS IS THE PARTNERSHIP

MEETING MINUTES FROM THAT AUGUST 6TH, 2014 MEETING.

AND JUST TO GO THROUGH SOME OF THE MATERIAL HERE. THIS IS THE THERANOS EXPERIENCE SURVEY SUMMARY. THIS WAS VERY IMPORTANT TO WALGREENS AND TO THERANOS. AND YOU CAN SEE THAT THE AVERAGE QUALITY EXPERIENCE ARE ALL VERY HIGH. THIS IS OUT OF 5. SO 4.85. THE LOWEST ONE IS 4.61 ON THE CHECK-IN PROCESS. THE SAMPLE COLLECTION PROCESS IS 4.86.

AND REMEMBER, PEOPLE WERE GETTING BOTH VENOUS DRAWS AND FINGERSTICK, RIGHT? ABOUT 40 PERCENT VENOUS DRAWS AND ABOUT 60 PERCENT FINGERSTICK, BUT PEOPLE WERE PLEASED WITH THE SAMPLE COLLECTION PROCESS.

AND THESE WERE VERY IMPORTANT METRICS FOR WALGREENS. WHERE DO YOU TYPICALLY GET YOUR PRESCRIPTIONS FILLED CUSTOMERS ARE ASKED?

53 PERCENT SAY WALGREENS. BUT ALL OF THE REST WERE OTHER COMPETITORS OF WALGREENS. SO THIS IS BRINGING PEOPLE INTO THE WALGREENS STORE THAT WOULDN'T NECESSARILY BE THERE OTHERWISE. SO THAT'S USEFUL TO WALGREENS, RIGHT? THEY WANT MORE CUSTOMERS, TOO.

BASED ON YOUR RECENT VISIT, WHAT IS THE LIKELIHOOD THAT YOU WILL RETURN TO A THERANOS WELLNESS CENTER?

AND YOU CAN SEE THAT OVERWHELMINGLY 82 PERCENT SAY THEY WILL DEFINITELY COME BACK, 17 PERCENT IN THE BLUE THERE ARE LIKELY TO RETURN, AND JUST 1 PERCENT SAYS NOT SURE IF I WILL RETURN. SO THAT IS PRETTY GOOD RESULTS.

THIS IS BEING DISCUSSED AT THE PARTNERSHIP MEETING IN AUGUST, AND IN ALL OF THE MEETINGS REALLY THERE ARE SIMILAR GRAPHS, BECAUSE THEY WANT TO TRACK HOW THIS CUSTOMER EXPERIENCE AND HOW THIS IS WORKING OUT, AND THAT'S PART OF WHAT THEY'RE DISCUSSING.

IT'S NOT JUST ABOUT FINGERSTICK.  WE'LL TALK ABOUT THAT.

THE GOVERNMENT REALLY WANTS YOU TO THINK THAT, WELL, THE FINGERSTICK PERCENTAGE IS REALLY HOVERING AROUND 40 PERCENT, SO WITHOUT MORE MOVEMENT THERE, THE WHOLE PARTNERSHIP IS DEAD BASICALLY.

THAT'S NOT THE CASE.  THAT IS ONE FACTOR, THE FINGERSTICK PERCENTAGE, AND I'M GOING TO ADDRESS THAT, AND THERE ARE OTHER FACTORS THAT WERE VERY IMPORTANT TO WALGREENS AND VERY IMPORTANT TO THERANOS THAT THE GOVERNMENT HAS IGNORED.  THESE ARE SOME OF THEM THAT WE'RE DISCUSSING NOW.

LET'S GO TO THE NEXT SLIDE.  LIKELY TO COME BACK BY 8/31/15.

THE SUCCESSFUL CRITERIA STATED WAS EQUAL TO OR GREATER THAN 90 PERCENT.  THEY WERE ALREADY THERE.

LET'S GO TO THE PARTNERSHIP MEETING MINUTES THEMSELVES. THE KICKOFF:  MOMENTUM IS BUILDING, PATIENT UPTICK IS OCCURRING; THEY ARE MEETING QUITE FREQUENTLY; MR. JHAVERI COMMENTED ON A BIG DAY FOR WALGREENS TO FOCUS US EVEN HARDER FOR WHAT IS NEXT TO FOCUS ON INITIATIVES TO DRIVE VALUE TO WALGREENS, OUR PARTNERS, AND U.S. HEALTH SYSTEM.

SER-1109

SO IT'S A BIG MEETING FOR WALGREENS.

KEEP GOING.

AS I JUST SHOWED YOU IN THE CHARTS, THERANOS EXPERIENCE SURVEY SUMMARY RESULTS ARE OFF THE CHARTS.  THAT'S WHAT WAS BEING REPORTED AT THIS MEETING.

OKAY.  NOW, THIS IS THE PLAN FOR FISCAL YEAR '15.  THAT'S THAT PERIOD GOING THROUGH AUGUST 31ST, 2015.

AND REMEMBER IN THE JULY MEETING MINUTES, SO JUST THE MONTH BEFORE, THE GOAL WAS 500.  BUT THAT WAS IN MAY RATHER.  SO THE GOAL WAS 500 STORES FOR THAT FISCAL YEAR, AND NOW THEY'RE TALKING ABOUT SOMETHING DIFFERENT.

AND REMEMBER THE GOAL FOR THAT PERIOD WAS TO HAVE ONLY THREE ADDITIONAL MARKETS.  ARIZONA WAS AN EXISTING MARKET, BUT THEY COULD EXPAND THAT; CALIFORNIA TO EXPAND BEYOND THE ONE STORE; AND TRI-STATE AREA, AND THAT WAS THE THREE MARKETS THAT THEY WERE TALKING ABOUT IN MAY OF 2014, AND IT WAS GOING TO BE 500 STORES FOR THIS FISCAL YEAR.

NOW LET'S LOOK AT WHAT IS GOING ON IN AUGUST.

SO THEY SAY THE NEXT MARKET IS NORTHERN CALIFORNIA.  AND THE NEXT MARKETS ARE -- AND NOW THEY'RE ADDING MORE MARKETS.  SO THE PRIORITY ONE MARKETS ARE CALIFORNIA, WHICH THEY TALKED ABOUT BEFORE, BUT IT'S STILL THERE, AND THAT'S APPROXIMATELY 90 STORES; ARIZONA, APPROXIMATELY 20 STORES.  REMEMBER, THEY ALREADY HAD AT THIS POINT ALMOST 40 STORES, SO THEY'RE GOING TO EXPAND TO AN ADDITIONAL 20, NEW YORK, NEW JERSEY TO

SER-1110

CONNECTICUT, THAT IS THE TRI-STATE AREA, THAT WAS GOING TO BE ABOUT 90 STORES.

SO WYOMING IS A QUESTION MARK.  BUT RIGHT THERE, 90, PLUS 20, PLUS 90, THAT'S 200 STORES RIGHT THERE BEFORE YOU EVEN GET TO THE REST OF THE MARKET THAT THEY WERE TALKING ABOUT.

SO LET'S GO ON TO THE REST OF THEM.  THESE ARE ADDITIONAL MARKETS THAT ARE IN DISCUSSION BETWEEN THERANOS AND WALGREENS THAT HAD NOT BEEN IN THE MAY MEETING.

SO NOW WE HAVE THE PRIORITY 2 MARKETS:  ILLINOIS, TEXAS, AND FLORIDA.  THREE VERY LARGE STATEMENTS.

PRIORITY 3 MARKETS:  INDIANA, NEW MEXICO, MISSOURI, AND EXCLUDED PENNSYLVANIA.

SO DOES THIS LOOK LIKE SOMETHING THAT IS CONTRACTING OR EXPANDING?  THEY'RE ADDING MORE MARKETS.  I'M SORRY.

THEY WERE AT -- WHEN THEY WERE AT A PROJECTION OF 500 STORES, THEY WERE TALKING ABOUT 3 MARKETS, AND NOW THEY HAVE 200 STORES WITH JUST THOSE 3 MARKETS, AND NOW THEY'RE ADDING MORE MARKETS.

AND WHEN YOU LOOK AT THIS, THEY'RE GOING -- THE GOVERNMENT CLAIMS THAT THIS WAS A SCALING BACK FROM 500 TO 200, BUT WE'VE GOT 200 JUST WITH THE THREE, ARIZONA, CALIFORNIA, AND THE TRI-STATE, AND NOW THEY'RE ADDING MORE MARKETS, ILLINOIS, TEXAS, FLORIDA.  IT'S GOING TO BE MORE THAN 200.  AND YOU CAN SEE THAT IN THE REST OF THE DOCUMENT.

PLAN FOR FISCAL YEAR '15 IS TO FOLLOW THE WELL EXPERIENCE

ROLLOUT AS MUCH AS POSSIBLE. MR. JHAVERI TESTIFIED TO THAT, THEY WERE BUILDING THIS WELL EXPERIENCE ANYWAY, AND IT TURNED OUT THEY HAD A ROOM THAT COULD BE USED FOR BLOOD TESTING, SO THEY COULD DO THERANOS BLOOD TESTING IN ALL OF THE STORES THAT WERE WELL EXPERIENCE STORES.

AND THIS IS, THIS NEXT BULLET. INITIAL GOAL FOR FISCAL YEAR '15, SEPTEMBER THROUGH AUGUST, THAT'S THE FISCAL YEAR. THE INITIAL GOAL WAS 500 SORES. SO WE'VE SEEN THAT BEFORE. NEED TO DEFINE THIS GOAL.

SO WHAT DOES IT SAY RIGHT AFTER THAT? DOES IT SAY WE NEED TO REDEFINE THIS GOAL DOWNWARD TO 200 STORES? NO.

IT SAYS THE NEXT THING WE NEED TO DO AFTER REDEFINING THIS GOAL, IT SAYS NATIONWIDE 2,000 TO 2500 STORES AND 25 TO 30 METROPOLITAN STATISTICAL AREAS. IT ASSUMES A LAUNCH IN PARALLEL MARKETS. THAT MEANS NOT JUST FOCUSSING ON ONE MARKET AT A TIME, LAUNCHING IN SEVERAL MARKETS AT ONCE, PARALLEL MARKETS.

NEED TO FIGURE OUT LAUNCH IN A BOX CONCEPT. MR. JHAVERI TESTIFIED THAT IF YOU'RE GOING TO EXPAND RAPIDLY, YOU'VE GOT TO HAVE A SYSTEM WHERE -- HOW YOU'RE GOING TO ROLL OUT ANY NEW STORES IS PRETTY MUCH PACKAGED IN A BOX SO YOU COULD NOT REINVENT THE WHEEL EVERY TIME AND JUST FORWARD WITH WHATEVER YOU HAVE PLANNED THAT YOU'VE DONE OVER AND OVER AGAIN, THAT'S PLAN TO LAUNCH IN A BOX.

PLAN TO BE IN EVERY HCC LOCATION. EVERY HCC LOCATION.

AND MR. JHAVERI CONFIRMED THAT IN HIS TESTIMONY.

AND BY THE WAY, THAT'S 430 EXISTING STORES, PLUS 50 NEW IN FISCAL YEAR 2015.

SO RIGHT THERE WE'VE GOT 480, RIGHT? PLUS WE HAVE THE 200 FOR CALIFORNIA, ARIZONA, AND THE TRI-STATE, PLUS THE EXISTING 40 STORES, AND OTHER STORES.

SO WE'RE VERY QUICKLY COMING TO THE 900 STORE NUMBER, AND I'M GOING TO SHOW YOU EVEN MORE THAN THAT, THAT THE GOVERNMENT CLAIMS THAT WHEN LISA PETERSON WAS TOLD, YEAH, WE'RE HOPING THEY ROLL OUT TO 900 STORES IN 2015, THE GOVERNMENT CLAIMS THAT THAT IS SOME KIND OF MISREPRESENTATION TO MS. PETERSON.

WELL, THIS IS WHAT MR. BALWANI WAS LEARNING VERY SHORTLY BEFORE HE WAS DEALING WITH THE DEVOS FAMILY AND MR. MOSLEY ABOUT WHAT WALGREENS WAS THINKING.

AND WHATEVER MR. JHAVERI SAYS ON THE STAND NOW DURING THIS TRIAL, THIS IS WHAT IS IN THE DOCUMENT. AND WHATEVER HE SAYS ON THE STAND, THIS IS WHAT MR. BALWANI WAS LEARNING IN REAL TIME SEEING IT THROUGH HIS EYES WHEN HE WAS DEALING WITH WALGREENS.

AGAIN, IT DOESN'T SAY WE'RE SCALING BACK. IT SAYS REDEFINE THIS GOAL. NATIONWIDE, 2,000 TO 2500 STORES, AND THE THEN REST OF THE MATERIAL THAT I JUST READ TO YOU.

NOW, LET'S GO DOWN THE PAGE A BIT BECAUSE THERE'S MORE TO THIS.

SO YOU CAN SEE FROM THE CHART THAT THE WELL EXPERIENCE IS

2,000 AND THEN THERANOS IS 200. SO WHAT MR. JHAVERI WANTS TO SAY NOW -- REMEMBER, EVERYBODY AT THIS POINT DOES NOT WANT TO SAY I WAS A CHEERLEADER FOR THERANOS, I LOVED THERANOS IN AUGUST OF 2014.

AT THIS POINT EVERYONE'S INCENTIVE IS TO SAY, NO, I WAS BACKING OFF, YOU KNOW, I DIDN'T WANT TO HAVE ANYTHING TO DO WITH IT.

SO HE'S NOW TRYING TO CLAIM THAT 200 STORES AND THERANOS STORES, THAT'S IT, THAT ONE BOX IS IT. IGNORING THE 430, PLUS 50 FOR HCC AND IGNORING THE WELLNESS EXPERIENCE OF 2,000.

AND THINK ABOUT THIS FOR A MINUTE. WHY WOULD THE PARTNERSHIP BETWEEN THERANOS AND WALGREENS, WHY WOULD MR. JHAVERI AND WALGREENS BE PUTTING IN A CHART 2,000 WELL EXPERIENCE STORES IF THAT HAD NOTHING TO DO WITH THERANOS? THAT'S JUST SOME INDEPENDENT PROGRAM. SO OBVIOUSLY SOME PORTION OF THE 2,000 WELL EXPERIENCE STORES HAVE EVERYTHING TO DO WITH THERANOS, AND IT CONFIRMS THAT IN THE REST OF THE DOCUMENT THAT WE'RE GOING TO DISCUSS IN A MINUTE.

SO THE NEXT STEPS. GET LIST OF 2,000 STORES WITH PRIVATE HEALTH ROOMS; GET LIST OF WELLNESS EXPERIENCE STORES WITHIN THOSE STATES. SO THAT'S THE LEGWORK THAT HAS TO BE DONE.

AND THEN THIS BULLET POINT REALLY NAILS IT. THE ONE THAT IS HIGHLIGHTED THERE, THERANOS, WELL EXPERIENCE, HSRX, AND CLINICS ARE TOP PRIORITIES FOR THE COMPANY; 3 OUT OF 4 ARE REPRESENTED ON THE THERANOS INITIATIVE.

SO MR. JHAVERI EXPLAINED THAT HSRX IS A TOTALLY SEPARATE PROGRAM. THERE'S NO DISPUTE THAT IT HAS NOTHING TO DO WITH THERANOS. SO THE 3 OUT OF THE 4 THAT ARE REPRESENTED ON THE THERANOS INITIATIVE ARE THERANOS, WELL EXPERIENCE, AND CLINICS.

THERANOS, THAT LABEL, THAT APPLIES TO THE THERANOS GOLD STORES. AND GO BACK TO THE DECEMBER 31ST CONTRACT AMENDMENT, IT DEFINES WHAT GOLD STORES ARE.

SO THERE WAS A CERTAIN AMOUNT OF STORES THAT THERANOS HAD AT WALGREENS OR THESE COLLECTION CENTERS THAT WOULD BE SEPARATELY BUILT OUT WITH THE THERANOS SIGN AND HAD A SEPARATE BATHROOM AND A SEPARATE ROOM. THOSE WERE THE SO-CALLED GOLD STORES, THAT LEVEL OF SERVICE.

AND SO THE THERANOS STORES REFERS TO THE THERANOS STORES, AND THEN THE BLOOD TESTING COULD ALSO GO ON AT THESE WELL EXPERIENCE STORES AND THESE HCC CLINIC STORES. AND THAT'S WHAT THAT BULLET IS SAYING, THERANOS, WELL EXPERIENCE, AND CLINICS, THOSE ARE THE THREE REPRESENTED ON THE THERANOS INITIATIVE.

BUT LET'S TALK ABOUT MR. JHAVERI A LITTLE BIT MORE.

GO TO THE NEXT SLIDE.

AND THAT'S JUST CONFIRMING THAT MS. HAWORTH TOOK ACCURATE NOTES AND MADE SURE SHE CAPTURED ALL OF THE DECISIONS THAT WERE BEING MADE AT THESE MEETINGS.

SO JUST ABOUT A WEEK AFTER THE PARTNERSHIP MEETING MINUTES, MR. JHAVERI SENT THIS EMAIL TO MR. BALWANI, AND JUST TO SHOW WHAT MR. BALWANI WAS ASKING. HE WROTE TO MR. JHAVERI

ON AUGUST 12TH. HE SAID, CAN WE TOUCH BASE OVER THE NEXT FEW DAYS TO CHAT ABOUT OUR GOLD, SILVER, AND BRONZE STORE LAYOUTS AND DISTRIBUTION. AS YOU MAY KNOW (MAY NOT KNOW ALSO) THAT IN ARIZONA AND CALIFORNIA, AT LEAST 40 PERCENT OF THE STORES ARE TO BE GOLD (DEDICATED THERANOS ROOMS) SO WE WANT TO MAKE SURE WE ARE TRACKING THAT.

SO MR. BALWANI IS JUST POINTING OUT, HEY, WHILE WE ARE EXPANDING, KEEP IN MIND WE HAVE A CONTRACT THAT SAYS 40 PERCENT OF THESE HAVE TO BE GOLD ROOM STORES, A SEPARATE BATH ROOM AND SEPARATE ROOM AND SO FORTH.

AND MR. JHAVERI RESPONDS. HE SAYS, "HI SUNNY, YES, FULLY AWARE OF THE TERMS -- WE ARE DETERMINING THE IMPLICATIONS OF THIS REQUIREMENT. THE BEST WAY TO MAKE THIS HAPPEN TO TRULY DETERMINE THE STORE SELECTION FOR THE ENTIRE CHAIN NOW, BASED ON THE CRITERIA. WE ARE GOING TO TOUCH 2,000 STORES IN 2015 AND WOULD LIKE TO MAKE SURE WE PLACE 2 ROOMS IN THE STORES THAT WE WANT TO SELECT FOR GOLD LEVEL. IF YOU CAN FINALIZE THE STORE SELECTION CRITERIA BY THE END OF THIS WEEK, IT WOULD BE A TREMENDOUS HELP."

SO MR. JHAVERI IS NOT SAYING WE'RE GOING TO TOUCH 2,000 STORES THAT ARE WELL EXPERIENCE STORES AND WE'RE GOING TO SELECT A CERTAIN NUMBER OF THOSE FOR IT TO BE THERANOS STORES AND THE REST ARE GOING TO BE COMPLETELY UNRELATED TO THERANOS, THAT'S WHAT MR. JHAVERI IS TRYING TO CLAIM NOW.

HE SAYS, WE'RE GOING TO TOUCH 2,000 STORES IN 2015, I WANT

TO MAKE SURE THAT THEY HAVE 2 ROOMS IN THE STORES THAT ARE SELECTED FOR THE GOLD LEVEL, OKAY? SO THOSE ARE JUST THE ONES THAT ARE GOING TO BE GOLD LEVEL. THERE ARE THE OTHER STORES THAT ARE NOT GOLD LEVEL, THAT DON'T HAVE THE SEPARATE BATHROOM AND THE SEPARATE ROOM.

SO IF YOU GO TO THE NEXT SLIDE, THOSE ARE THE THERANOS GOLD STORES. THAT'S WHAT MR. JHAVERI CONFIRMED. IT HAS THE THERANOS SIGNAGE. IT HAS THE PLEASANT WAITING AREA, AND IT HAS A SEPARATE BATHROOM, WHICH IS NOT IN THE PICTURE, BUT THAT WAS SHOWN TO MR. JHAVERI. SO THAT'S WHAT WAS GOING TO BE SELECTED.

AND SO FOR MR. JHAVERI TO CLAIM NOW THAT, OH, THIS IS TOUCHING 2,000 STORES, THAT WAS JUST SOME INDEPENDENT WALGREENS PROGRAM THAT WAS CALLED WELL EXPERIENCE AND HAS NOTHING TO DO WITH THERANOS. WHY WOULD HE BE REPORTING THAT TO MR. BALWANI? WHY WOULD MR. BALWANI CARE ABOUT SOME OTHER PROGRAM THAT WALGREENS HAD THAT HAS NOTHING TO DO WITH THERANOS?

AND WE KNOW THAT'S THE CASE BECAUSE OF THE WAY THAT MR. JHAVERI TESTIFIED. SO HE SAYS ON CROSS, IS YOUR TESTIMONY TODAY, MR. JHAVERI, THAT WHEN YOU SAID 2,000, YOU MEANT THESE ARE WELL EXPERIENCE STORES THAT HAD NOTHING TO DO WITH THERANOS?

AND HE SAYS NO. WHAT I WAS REFERRING TO WAS EXACTLY THE PREVIOUS DOCUMENTS THAT WE WERE LOOKING AT, WHICH WAS THAT WE'RE GOING TO TOUCH 2,000 STORES FOR WELL EXPERIENCE IN 2015.

OF THOSE 2,000 STORES, WE ARE PLANNING FOR 200 THERANOS

STORES, OR THERANOS SERVICES WITHIN THOSE STORES.

HE SAYS, I MAY NOT HAVE SAID WELL EXPERIENCE IN FRONT OF 2,000, BUT IT'S CONSISTENT WITH THE DOCUMENT THAT WE JUST REVIEWED.

HE DOESN'T TALK ABOUT HOW IT'S JUST THE WELL EXPERIENCE STORES.  BUT HE'S SAYING, OKAY, I JUST OMITTED THOSE WORDS.

WELL, FIRST OF ALL, EVEN IF THAT WERE TRUE, WHAT IS MR. BALWANI SUPPOSED TO TAKE AWAY FROM THE EMAIL WHEN HE'S TOLD BY WALGREENS EXECUTIVE NAMED NIM JHAVERI WE'RE GOING TO TOUCH 2,000 STORES IN SEPTEMBER OF 2015, AND LET'S TALK ABOUT THE ONES WHICH WILL BE SELECTED FOR THE GOLD LEVEL SERVICE.

MR. BALWANI WOULD TAKE AWAY THAT THIS PARTNERSHIP IS EXPANDING, THIS IS FULL SYSTEMS GO, ALL SYSTEMS GO, AND WE'RE GOING TO GO FORWARD.

AND SO WHAT HE TELLS MS. PETERSON, WHICH WE'LL GET TO, IT COULD BE 900 STORES IN 2015, THAT'S A CONSERVATIVE ESTIMATE, COMPARED TO WHAT MR. JHAVERI IS SAYING, NOT MR. BALWANI, MR. JHAVERI IS SAYING.

BUT THIS TESTIMONY, HERE'S THE REST OF THE PICTURE HERE. YOU NEVER TALK ABOUT WELL EXPERIENCE?

HE SAYS THAT'S CORRECT IN THAT EMAIL.  I'M SORRY, IN THE VIDEO CLIP.

SO YOU MIGHT REMEMBER AT TRIAL THERE WAS SOME PREVIOUS TESTIMONY THAT MR. JHAVERI GAVE WHERE HE HAD GIVEN TESTIMONY BEFORE, AND WE PLAYED FOR YOU, IT'S NOT IN EVIDENCE, BUT YOU

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                    7305

SAW IT AT THE TIME.  IT WAS PLAYED, SOME PRIOR TESTIMONY, WHERE HE HAD TALKED ABOUT THIS SAME EMAIL, AND HE DIDN'T TESTIFY ANYTHING ABOUT, WELL, THESE ARE JUST WELL EXPERIENCE STORES AND WE'RE ONLY GOING TO PICK 200.

HE SAID, YEAH, WE COULD, WE COULD GET THE 2,000 STORES AND OF COURSE EVERYTHING ELSE, CUSTOMER EXPERIENCE AND ALL OF THE OTHER METRICS, INCLUDING FINGERSTICK PERCENTAGE HAVE TO GET WHERE THEY NEED TO GET.  BUT, YEAH, WE WERE PLANNING FOR 2,000 STORES.  THAT IS WHAT HE SAID IN PREVIOUS TESTIMONY.  HE WAS SINGING A DIFFERENT TUNE ABOUT THIS PARTICULAR POINT ON THE STAND.

YOU KNOW, IT'S NOT THAT MR. JHAVERI IS A BAD PERSON, IT'S JUST THAT NOBODY WANTS TO BE A CHEERLEADER FOR THERANOS NOW. LOOK AT WHERE WE ARE, OKAY?

LET'S KEEP GOING.

HE ALSO HAD TO ADMIT IN PRIOR TESTIMONY, HE SAID HE AGREED AS OF AUGUST OF 2014 THIS 2500 WAS HIS PROJECTION.

AND THIS IS HIS TESTIMONY UNDER OATH IN A PRIVATE PROCEEDING.

SO HE SAID DIFFERENT THINGS AT DIFFERENT TIMES ABOUT THIS POINT.

BUT IF YOU HAD ANY DOUBT ABOUT THIS PARTNERSHIP BEING AN EXPANSIVE PROJECT AT THIS POINT IN TIME IN THE SUMMER, LATE SUMMER OF '14, LET'S LOOK AT THE REST OF THESE THINGS THAT WE HAD TO SHOW YOU, IS THE DEFENSE.

SER-1119

SO HERE'S MR. JHAVERI'S EXCHANGE WITH WADE MIQUELON. AT THIS POINT MR. MIQUELON WAS LEAVING WALGREENS. AND MR. JHAVERI WRITES TO MR. MIQUELON AND SAYS, "THANK YOU AND ABSOLUTELY WE WILL STAY IN TOUCH. ALSO, WANTED TO LET YOU KNOW WHAT WE ARE DOING WITH THERANOS. THE PROGRESS HAS BEEN GREAT SINCE WE PRESENTED TO YOU IN MARCH. I PROMISED YOU WE WILL GET THIS DONE -- SEE BELOW."

AND MR. MIQUELON SAYS, "WOW. KEEP ROCKIN IT. WADE."

SO IS THIS MR. JHAVERI REPORTING THINGS ARE NOT REALLY WORKING OUT AND WE'RE NOT GOING TO EXPAND CONTRACTING? HE IS GOING TO GET THIS DONE, AND HE PROMISED MR. MIQUELON, AND HE'S GOING TO GET THIS DONE. THAT'S EXHIBIT 20235.

LET'S GO TO THE NEXT SLIDE.

MR. JHAVERI HAD TO AGREE THAT IF THERANOS WAS IN EVERY HCC LOCATION, THAT WOULD BE RIGHT THERE, 480 STORES JUST WITH THE HCC PROGRAM.

AND I TALKED ABOUT THIS POINT BEFORE, BUT THAT'S THE $59 FOR THE HCC STD PANEL AND ON THE PROJECTION THAT WAS MADE FROM MR. GROSSMAN, THE NORMAL REQUISITION PER PATIENT WAS GOING TO BE $35.

SO AS I SAID, IT WAS GOING TO BE MORE LUCRATIVE FOR THE STD PANEL. SO EVEN THOUGH THERE WERE FEWER TESTS, THAT DIDN'T MATTER. THEY WERE GOING TO GET A LITTLE BIT HIGHER FEE.

OKAY. LET'S TALK ABOUT THE NEXT EXHIBIT WHICH THE GOVERNMENT SHOWED YOU. THIS IS AUGUST 15TH, MR. JHAVERI TO

MR. BALWANI.

HE SAYS, "THERE HAS BEEN A LOT OF DISCUSSION WITH THE NEW LEADERSHIP."

SO WHAT WAS GOING ON AT THIS POINT IN WALGREENS WAS THAT THEY WERE GOING THROUGH WITH A MERGER WITH ANOTHER COMPANY CALLED BOOTS ALLIANCE. AND MR. JHAVERI TALKED ABOUT THE BOOTS PHARMACY STORES IN EUROPE. AND THERE WERE OTHER LEADERSHIP COMING ON. MR. GREG WASSON WAS LEAVING. OTHER LEADERSHIP WAS COMING ON. SO UNDERSTANDABLY WALGREENS WAS TAKING A LOOK AT THIS.

AND HE SAYS, "AS YOU CAN IMAGINE, OUR PARTNERSHIP IS ONE AT THE CORE."

MR. JHAVERI WROTE, "AND WE HAVE MADE UNBELIEVABLE PROGRESS IN THE SHORT 5 MONTHS -- I RECEIVED EMAILS FROM SEVERAL LEADERS TELLING ME THIS."

SO THAT'S WHAT MR. JHAVERI IS REPORTING.

"HOWEVER, IT WILL BE IMPORTANT THAT WE DRIVE WITH A SINGLE FOCUS TOGETHER. THE 2 AREAS WHICH MUST BE FOCUSSED ON," AND HE SAYS TWO THINGS. PATIENTS PER DAY WITH A 4-PLUS EXPERIENCE. THEY ARE ALREADY THERE. WE SAW THE CHART.

VENOUS PERCENT IN THE 10 PERCENT RANGE.

SO AS I SAID, THAT WAS A METRIC. THAT WAS IMPORTANT. IT WASN'T THE ONLY THING, AS THE GOVERNMENT WANTS YOU TO BELIEVE THAT WITHOUT THAT THE WHOLE THING IS DEAD AND WALGREENS LIKED THE TRAFFIC IN THEIR STORES, THEY LIKED THE PATIENT EXPERIENCE,

THEY LIKED THE FACT THAT THEY WERE HAVING CUSTOMERS COME IN THAT WOULDN'T OTHERWISE VISIT WALGREENS STORES, ALL OF THAT.

BUT VENOUS PERCENTAGE IS, IN FACT, ONE OF THE METRICS.

BUT LET'S TALK ABOUT HOW IMPORTANT THAT WAS TO WALGREENS. THE GOVERNMENT SHOWED YOU A DOCUMENT WHERE MR. BALWANI EARLIER IN TIME HAD SAID, WELL, WE'RE HOPING TO BE, YOU KNOW, BELOW 5 PERCENT BY THE END OF THE YEAR, BUT THEN AT THIS POINT IN TIME, THIS IS AUGUST, THIS IS FROM THE AUGUST 2014 PARTNERSHIP MEETING, THE PERCENT OF VENOUS DRAWS SHOULD BE BELOW 10 PERCENT BY AUGUST 31ST, 2015. SO WALGREENS AND THERANOS, ACCORDING TO THE PARTNERSHIP MEETING MINUTES, AGREED THAT THAT WAS THE DEADLINE.

SO AT THIS POINT IN AUGUST, THERE WAS PLENTY OF TIME TO GET THAT VENOUS PERCENT DOWN. IT WASN'T SOMETHING IMMINENT, IT WASN'T SOMETHING PRESSING, IT WASN'T GOING TO INTERFERE WITH THE EXPANSION, AND THAT WAS ALL SYSTEMS GO. THAT WAS THE DEADLINE.

AND THE GOVERNMENT DIDN'T SHOW YOU THAT BECAUSE THEY LIKED THE EARLIER DEADLINE THAT WAS PROJECTED EARLIER. BUT THAT'S THE DEADLINE BETWEEN THE MEETING WITH WALGREENS AND THERANOS, AND AUGUST 31ST, 2015, ABOUT A YEAR AWAY.

SO THE RELATION BETWEEN THERANOS AND WALGREENS, IT DIDN'T STOP IN THE SUMMER OF 2014. THE GOVERNMENT WANTS YOU TO THINK THAT BY THE TIME THE FALL 2014 INVESTORS CAME IN, LIKE MR. MOSLEY AND RDV, THAT THIS WAS DEAD, AND ANYTHING

SER-1122

MR. BALWANI SAID ABOUT THE PROSPECTS FOR EXPANDING A PARTNERSHIP FOR WALGREENS WERE FRAUDULENT.  NO.

THE DATA, THE DOCUMENTS SHOW THAT THIS PARTNERSHIP WAS EXPANDING.  THAT'S WHAT MR. BALWANI WOULD HAVE REASONABLY BELIEVED.  AND IT DIDN'T STOP IN THE SUMMER.  IT KEPT GOING.

AND THIS IS IN OF NOVEMBER OF 2014.  SO THESE ARE JUST SOME COMMENTS FROM THAT MEETING, YOU KNOW, INPUT FROM PEOPLE WHO USED THE SERVICE.  THIS WAS AN RN, A NURSE, AND SHE WAS ALSO A PATIENT.

SHE SAID THAT IT WAS GREAT, FAST, AND PAINLESS.  ALL OF MY PHYSICIANS AND PATIENTS ARE GOING TO HEAR ABOUT THERANOS.

IF YOU GO TO THE EXHIBITS, THIS IS EXHIBIT 2214, AND YOU'LL SEE ALL OVER REALLY POSITIVE PATIENT REPORTS, AND SOME NEGATIVE ONES COMPLAINING ABOUT CERTAIN ASPECTS.  YOU KNOW, THE BATHROOM WAS TOO FAR AWAY OR SOMETHING LIKE THAT.  BUT THOSE ARE THE EXHIBITS.

IF YOU GO TO THE NEXT PAGE, NOVEMBER, THIS METRIC OF WHERE DO YOU TYPICALLY GET YOUR PRESCRIPTIONS FILLED?  IT WAS STILL SHOWING A LOT OF PEOPLE COMING INTO WALGREENS WHO WERE GETTING THEIR PRESCRIPTIONS FILLED, OTHERWISE AT OTHER PHARMACIES.  SO THEY WERE GETTING THAT FOOT TRAFFIC.

THE LIKELIHOOD TO RETURN METRIC.  STILL OFF THE CHARTS. NOW WE'RE DOWN TO 4 PERCENT WHO WOULD NOT RETURN.

AND THEN IN NOVEMBER OF 2014, THEY WERE EVEN DRAWING UP PLANS FOR THE PRIVATE HEALTH ROOM LAYOUT WITH SHARED SERVICES.

SER-1123

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.) 7310

SO THESE ARE NOT THE GOLD SERVICES, THESE ARE THE SHARED SERVICES. AND THERE'S GOING TO BE A CENTRIFUGE, AND THEY ARE ALREADY DRAWING UP THE PLANS FOR WHAT THESE STORES ARE GOING TO LOOK LIKE.

OKAY. SO I WANT TO TALK ABOUT --

IF YOU GO TO SLIDE 272, MR. ALLEN.

SO THIS IS AN EMAIL WHERE THE GOVERNMENT SHOWED YOU WHERE ON NOVEMBER 19TH, 2014 -- THIS IS, BY THE WAY, AFTER MR. MOSLEY'S INVESTMENT AND RDV'S INVESTMENT, WHERE MR. BALWANI WANTS TO MS. HOLMES "WE CAN'T SCALE WITH WAG."

AND THE GOVERNMENT HOLDS IT UP AND SAYS, "WELL, AHA-HAH, THEY REALIZE THEY ARE NOT GOING TO EXPAND."

LET'S TALK ABOUT WHAT THIS IS REALLY ABOUT.

SO ON THE LAST TEXT ON THAT MR. BALWANI SAYS, "THEY TOLD OUR TEAM IN WAG MEETING THAT THEY DON'T INTEND TO OPEN MORE PSC'S UNTIL JULY BECAUSE WE MISSED THE INTEGRATION DEADLINE.

THIS IS VERY FRUSTRATING TO MR. BALWANI BECAUSE THEY ARE TALKING ABOUT THIS I.T. INTEGRATION ISSUE.

YOU MIGHT REMEMBER WHEN MR. JHAVERI TESTIFIED, HE TALKED ABOUT THE DIFFICULTY BETWEEN THE WALGREENS I.T. DEPARTMENT, WHICH IS MOVING MORE SLOWLY THAN PEOPLE MIGHT LIKE, AND THEN THERANOS, AND THAT INTEGRATION WAS A BIGGER PROBLEM THAN YOU WOULD INITIALLY THINK. SO THEY'RE TALKING ABOUT INTEGRATION OF THE I.T., AND, OF COURSE, THAT WAS FRUSTRATING TO MR. BALWANI.

SO, YOU KNOW, YOU RATTLE OFF A TEXT TO YOUR BUSINESS

PARTNER AND ROMANTIC PARTNER AND YOU SAY WE CAN'T SCALE WITH WAG.  IS THAT THE SUM TOTAL OF WHAT MR. BALWANI WAS THINKING.

THE ANALOGY I THOUGHT OF WHEN I WAS THINKING ABOUT THIS TEST WAS, YOU KNOW, A CHEF IN A RESTAURANT HAS A TOUGH NIGHT, BUSY, THE SUPPLIES AREN'T RIGHT, THINGS ARE NOT GOING WELL, AND HE SAYS -- THROWS DOWN HIS APRON AND SAYS I CAN'T WORK HERE ANYMORE, I'M OUT OF HERE, AND I'M GOING TO OPEN MY OWN RESTAURANT, OR WHATEVER.  AND AN HOUR LATER, HE'S NOT DOING THAT, RIGHT?

THE NEXT DAY AFTER SLEEPING ON IT, HE'S NOT DOING THAT.  SO PEOPLE SAY ALL KINDS OF THINGS IN TEXT MESSAGES AND YOU CAN'T JUST HOLD THOSE THINGS UP.

BUT IT'S REALLY IMPORTANT TO UNDERSTAND WHAT IS REALLY GOING ON.  HE'S TALKING ABOUT THE INTEGRATION DEADLINE, AND IT'S RIGHT THERE IN THE TEXT.  AND MR. JHAVERI TESTIFIED ABOUT THAT.

SO LET'S LOOK AT THAT.  I WOULD SAY IT TAKES TIME TO INCORPORATE INTO A LARGE FORTUNE 30 CORPORATION AND THE SYSTEMS WE HAD, AND SO AT TIMES THAT WAS A LIMITING FACTOR IN HOW FAST WE COULD MOVE.  THAT WAS WHAT MR. JHAVERI SAID.

GO TO THE NEXT ONE.

ALL OVER THESE PARTNERSHIP MEETING SLIDES, AND THIS IS ABOUT INTEGRATION.  YOU CAN SEE TIMELINE 12/15/2014, JANUARY 31ST, 2015 DATES.  THIS IS NEEDING PROGRESS, AMONG OTHER THINGS, THE I.T. PART OF THIS.  AND THEN THERE'S THE

SECURITY ASSESSMENT.  AND THEN THIS TITLE OF THE SLIDE IS THERANOS INTEGRATION NEXT STEPS.

THEN THE NEXT SLIDE.

IF YOU GO TO THE PREVIOUS ONE, MR. ALLEN.  MR. ALLEN, IT WILL BE 22 -- THANK YOU.

THERE'S THE WALGREENS.COM INTEGRATION, AND THIS IS 11-14-14.  SO RIGHT AROUND THE SAME TIME AS THIS TEXT MESSAGE THAT MR. BALWANI IS SAYING "WE CAN'T SCALE WITH WAG," AND IT'S ABOUT INTEGRATION, THAT'S WHAT IS GOING ON.  THEY'RE HAVING SOME I.T. ISSUES WITH WALGREENS.  THAT'S ALL IT IS.

THE GOVERNMENT IS ACTING LIKE THIS IS SOME KIND OF INCRIMINATING SMOKING GUN, BUT IT'S NOT THAT WHEN YOU LOOK AT THE REST OF THE EVIDENCE, ALL OF THE EVIDENCE.

OKAY.  LET'S GO TO -- AND THIS WALGREENS SECTION IS A LONG SECTION, BUT WE'RE GETTING THERE.  SO LET'S TALK ABOUT WALGREENS INTERNAL CORRESPONDENCE.

SO THIS IS OUR MARCH 30TH, 2015.

NOW, I TOLD YOU THE MUSIC DIDN'T STOP IN AUGUST OF 2014.  THIS PARTNERSHIP KEPT GOING.  THIS IS WHEN THEY HAVE THE NEW LEADERSHIP.

SO A GENTLEMAN NAMED JONATHAN SPITZER IS WRITING TO A GROUP OF PEOPLE, INCLUDING MR. JHAVERI AND OTHER SENIOR PEOPLE AT WALGREENS, AND HE SAYS, PLEASE FIND ATTACHED A QUIT SNAPSHOT OF THE FINANCIAL AND OPERATIONAL PERFORMANCE OF THE THERANOS PILOT.

AND THEN YOU CAN SEE IN THE HIGHLIGHTED LANGUAGE HE SAYS, I HAVE NOT FORESTED -- I THINK THAT MIGHT BE FORECASTED -- THE CHANGE IN LABOR AT THIS TIME, BUT WE SHOULD EXPECT THE PROJECT OPERATIONAL EXPENSES TO GO FROM AROUND $100 A MONTH TO ABOUT $20 TO $40,000 PER MONTH.  THE NEW CONTRACT RENEGOTIATIONS ARE TAKING PLACE.

SO YOU MIGHT REMEMBER FROM MR. JHAVERI'S TESTIMONY THAT THERE WAS AN ISSUE OF PHLEBOTOMISTS, AND MR. JHAVERI TESTIFIED THAT AS LONG AS THERE WERE PHLEBOTOMISTS IN THE WALGREENS STORES -- PHLEBOTOMISTS ARE THE PEOPLE WHO TAKE THE VEIN DRAWS IN THE ARM, RIGHT?  AS LONG AS THERE WERE PHLEBOTOMISTS, THERE WAS A COST FOR PHLEBOTOMISTS.

AND FOR THE ARIZONA PROJECT OF THE 40 STORES, THERANOS IS PAYING FOR THOSE PHLEBOTOMISTS, BUT WHEN THIS WENT TO SCALE NATIONALLY, IT WAS GOING TO BE WALGREENS'S RESPONSIBILITY TO PAY A PHLEBOTOMIST.

SO ONE OF THE REASONS WHY WALGREENS THOUGHT THAT GETTING THE FINGERSTICK PERCENTAGE HIGHER AND THE VENOUS DRAW PERCENTAGE DOWN, WAS SO THAT THEY WOULD HAVE TO PAY LESS PHLEBOTOMISTS.  THAT WOULD BE A COST THAT THEY COULD ELIMINATE.

SO THIS NEW ARRANGEMENT THAT THEY'RE DISCUSSING AND YOU HEARD FROM MR. JHAVERI ABOUT A NEW BUSINESS RELATIONSHIP AND THEY'RE NEGOTIATING A NEW CONTRACT, THAT WAS GOING TO MEAN THAT THERANOS WOULD HAVE TO PAY FOR THE PHLEBOTOMISTS.

AND YOU CAN SEE, AND WE'LL GO THROUGH THESE IN A MINUTE,

WHEN THE PARTNERSHIP MEETING MINUTES CONTINUED, THE FINGERSTICK ISSUE WAS COMPLETELY DROPPED ONCE THE COST OF PHLEBOTOMISTS IS NO LONGER ON WALGREENS.

AND THAT'S WHAT THIS IS. SOME OF THE OPERATIONAL EXPENSES MAY GO DOWN BECAUSE WALGREENS IS NOT GOING TO BE PAYING FOR PHLEBOTOMISTS WITH THIS NEW BUSINESS MODEL.

AND THEN HE GOES ON. HE SAYS WITH THERANOS TAKING ON BUILD OUT CAPITAL COSTS AND STAFFING PHLEBOTOMISTS WITH WALGREENS BEING LIABLE FOR CHECK IN LABOR, OUR GOAL WOULD BE TO RECEIVE 3 TIMES RENT AND MINIMUM $8 PER PATIENT WHICH WOULD TRANSLATE TO AN EBIT OF $125 MILLION PER YEAR, BUT THIS IS THE KEY PART, AT SCALE. SO AT THIS POINT -- THIS IS MARCH OF 2015, WALGREENS IS SAYING THE SCALE WOULD BE 2,501 LOCATIONS AND 22.5 PATIENTS PER DAY.

SO WALGREENS IS STILL INTERNALLY TALKING ABOUT WHAT THIS WOULD LOOK LIKE AT SCALE, WHICH IS THAT NUMBER OF 2500, IT COULD HAVE BEEN A LITTLE MORE THAN THAT, LOCATIONS.

SO EVEN AT THIS LATER DATE, WELL AFTER THE INVESTORS FROM THERANOS CAME IN, THEY'RE STILL TALKING ABOUT SCALING TO THAT LEVEL INTERNALLY AT WALGREENS.

LET'S GO TO THE NEXT SLIDE.

THE COURT: CAN YOU FINISH ON THIS SLIDE QUICKLY OR SHOULD WE TAKE A BREAK?

MR. COOPERSMITH: I'M HAPPY TO TAKE THE BREAK NOW, YOUR HONOR.