No. 22-10338

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAMESH "SUNNY" BALWANI,

Defendant-Appellant.

_____

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 6 OF 9**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 18-CR-00258-EJD-2

_____

**THOMAS A. COLTHURST**
Attorney for the United States
Acting Under Authority Conferred By
28 U.S.C. § 515

**MATTHEW M. YELOVICH**
Chief, Appellate Section, Criminal Division

**KELLY I. VOLKAR**
Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7185
**Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA**

THE COURT: LET'S DO THAT. THANK YOU. I APPRECIATE THAT, MR. COOPERSMITH.

LADIES AND GENTLEMEN, LET'S TAKE OUR AFTERNOON BREAK NOW. SHOULD THAT BE ABOUT 20, 25 MINUTES. LET'S DO THAT. THANK YOU.

(JURY OUT AT 1:55 P.M.)

THE COURT: THANK YOU. PLEASE BE SEATED. WE'LL TAKE ABOUT 20, 25 MINUTES RIGHT NOW.

(RECESS FROM 1:55 P.M. UNTIL 2:25 P.M.)

THE COURT: THANK YOU. WE'RE BACK ON THE RECORD. OUR JURY IS PRESENT. ALL COUNSEL AND MR. BALWANI ARE PRESENT.

BEFORE, MR. COOPERSMITH, I INVITE YOU TO CONTINUE, I JUST WANT TO GO OVER SCHEDULING WITH THE JURY FOR JUST A MOMENT.

LET ME -- MY FIRST QUESTION IS ARE ANY OF YOU AVAILABLE TO GO UNTIL 5:00, OR JUST A LITTLE BIT BEFORE 5:00 THIS AFTERNOON? I SHOULD ASK THAT QUESTION. WOULD THAT CAUSE AN INCONVENIENCE FOR ANYONE?

JUROR NUMBER 3, YOU THINK THAT WILL CAUSE AN INCONVENIENCE FOR YOU? THAT'S FINE. THANK YOU. I JUST NEEDED TO KNOW THAT.

TOMORROW I BELIEVE WE'RE SCHEDULED TO START AT NOON, AND WE'LL GO UNTIL -- I THINK WE'RE SCHEDULED UNTIL 4 :30 TOMORROW.

CAN I PUSH THAT CLOSER TO 5:00? I WON'T KEEP YOU UNTIL 5:00, BUT I MIGHT -- EVEN AN EXTRA 10 OR 15 MINUTES MIGHT BE HELPFUL IF THAT WOULD WORK. IF YOU COULD PLAN YOUR SCHEDULES THAT WAY.

AND THEN FRIDAY, THIS FRIDAY I DON'T KNOW IF WE'LL BE FINISHED WITH OUR ARGUMENTS AND INSTRUCTIONS, BUT IF NEED BE, CAN FOLKS GO AGAIN UNTIL 4:30, CLOSE TO 5:00 ON FRIDAY?  IF YOU COULD MAYBE WORK ON YOUR SCHEDULES THIS AFTERNOON, AND I'LL CHECK WITH YOU TOMORROW AS TO THAT.

OKAY.  GREAT.

THANK YOU.  THANK YOU VERY MUCH.

MR. COOPERSMITH, WOULD YOU LIKE TO CONTINUE?

MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

OKAY.  WELCOME BACK EVERYONE AGAIN.

WHEN WE LEFT OFF, I WAS TALKING ABOUT THE WALGREENS PARTNERSHIP WITH THERANOS.

AND AS YOU SAW, THIS WAS EXTREMELY IMPORTANT FOR INVESTORS IN THERANOS BECAUSE THIS WAS REALLY THE TICKET TO BASICALLY A UNICORN SITUATION WHERE THERANOS WAS GOING TO BE AT THAT LEVEL OF COMPANY.

SO WE'VE BEEN GOING THROUGH THESE PARTNERSHIP MEETING MINUTES AND OTHER EMAILS, AND I JUST WANT TO CONTINUE WITH THAT FOR JUST A FEW MINUTES.

BASICALLY, AS I WAS SAYING, EVEN LATE INTO THE YEAR IN 2014, WELL AFTER THE GOVERNMENT CLAIMS THAT THIS PARTNERSHIP WAS GOING DOWNHILL OR SOUTH, THEY WERE STILL VERY MUCH TALKING ABOUT A MAJOR EXPANSION.  AND WE SAW THAT IN THE AUGUST 2014 PARTNERSHIP MEETING MINUTES IN PARTICULAR WHERE WALGREENS WAS TALKING ABOUT A MAJOR EXPANSION.

MR. JHAVERI TALKED ABOUT TOUCHING 2,000 STORES.

WE'RE NOW AT THIS EMAIL AT THE END OF THE YEAR.

AS I SAID, THERE WAS A NEW BUSINESS RELATIONSHIP BEING NEGOTIATED, AND THAT HAD HAPPENED FROM TIME TO TIME WITH WALGREENS AND THERANOS. THERE WAS THE ORIGINAL AGREEMENT IN 2010, THERE WAS THE AMENDMENT IN 2012, THERE WAS THE ADDITIONAL AMENDMENT AT THE END OF '13 WHEN WALGREENS COMMITTED TO THE $75 MILLION AND THE NATIONAL ROLLOUT, AND THEN THERE WAS A NEW DISCUSSION ABOUT A DIFFERENT MODEL WHERE THERANOS WOULD CAPTURE MORE OF THE FEE AND PAY FOR SOME OF THE PHLEBOTOMISTS AND IT WOULD REDUCE WALGREENS'S COST.

SO THIS EMAIL WE'RE NOW LOOKING AT ON THE SCREEN IS FROM DECEMBER 15TH, 2014. AND IT'S MR. FLUEGEL, WHO AS YOU CAN SEE FROM THE EMAIL IS SENIOR VICE PRESIDENT, CHIEF STRATEGY AND BUSINESS DEVELOPMENT OFFICER AT WALGREENS. AND HE'S REPORTING ABOUT A MEETING THAT OCCURRED.

AND HE SAYS, "THANKS AGAIN FOR HOSTING US LAST WEEK," AND HE'S WRITING TO MR. BALWANI. "WE FOUND IT VERY PRODUCTIVE AND IT WAS GREAT TO SPEND TIME WITH YOU BOTH," ELIZABETH AND SUNNY.

"AS ALEX MENTIONED AT THE CLOSE OF THE MEETING, WE WANTED TO CHECK IN WITH GREG AND STEFANO ON THE REVISED ROLLOUT APPROACH WE LAID OUT THE MEETING. THAT HAPPENED THIS WEEKEND AND THEY BOTH ARE IN AGREEMENT WITH THE APPROACH WE DISCUSSED LAST WEEK."

SO AS YOU CAN SEE FROM THE NEXT SLIDE, MR. JHAVERI'S

TESTIMONY, THIS WAS AT AS HIGH A LEVEL AT WALGREENS AS YOU COULD POSSIBLY GET.

STEFANO WAS THE NEW INCOMING CEO FROM THE BOOTS ALLIANCE SIDE, AND GREG WASSON WAS THE OUTGOING CEO. SO AT THE VERY HIGHEST LEVELS OF WALGREENS THEY WERE TALKING ABOUT BOTH BEING IN AGREEMENT WITH THE APPROACH AND MOVING FORWARD ON THE PARTNERSHIP WITH THIS NEW BUSINESS MODEL WHERE THERANOS WOULD TAKE SOME OF THE COSTS OVER FROM WALGREENS.

LATER, IF YOU GO TO THE NEXT SLIDE, THERE ARE SOME MORE TEXT MESSAGES.

SO BRAD WASSON TEXTED. AND THIS IS MR. BALWANI PASTING THAT INTO THE TEXT TO MS. HOLMES. IT SAYS, "HOPE CONVERSATION GOES WELL TOMORROW BETWEEN NIM AND I BELIEVE IN THE VISION WE HAVE TOGETHER, BELIEVE IN YOU AND ELIZABETH, SIGNED BRAD WASSON, ANOTHER EXECUTIVE AT WALGREENS AND THE BROTHER OF GREG WASSON.

AND THEN MR. BALWANI SAYS, "GOING THRU CVS CONTRACT. WE CAN'T WORK WERE WAG OR CVS. BOTH ARE SAME."

SO DO YOU REMEMBER THESE ARE THE TIMES THAT THE NEW CONTRACT NEGOTIATIONS WITH WALGREENS ARE GOING ON.

"AND SAFEWAY SAYS."

"WE NEED TO THINK THRU OUR DISCUSSION ON THIS TOPIC."

AND THEN MEANING TOMORROW'S?

AND THEN MR. BALWANI SAYS, "NO. OUR OWN STORES."

SO, AGAIN, THIS IS LIKE THE ANALOGY I GAVE YOU BEFORE THE

BREAK, OKAY?  I'M HAVING A HARD NIGHT AS A CHEF IN THE KITCHEN AND I'M THROWING DOWN MY APRON, I'M OUT OF HERE, AND I'M OPENING UP MY OWN RESTAURANT.

AND THEN IN THE LIGHT OF DAY, THE NEXT DAY, I'M GOING BACK TO WORK TO MY VERY GOOD JOB AS A CHEF.

THIS IS FRUSTRATIONS THAT ALWAYS OCCUR WITH NEGOTIATIONS AND NEW CONTRACTS, BUT YOU CAN SEE FROM THE TEXT FROM BRAD WASSON, WALGREENS IS STILL VERY SUPPORTIVE.

AND WE KNOW THAT'S THE CASE BECAUSE IF YOU GO TO THE NEXT SLIDE, THESE PARTNERSHIP MEETING MINUTES, AND IF YOU LOOK AT THE EXHIBITS, THEY'RE NUMBERED IN THE BOTTOM LEFT, THE PARTNERSHIP MEETINGS CONTINUE.  IN FACT, THEY CONTINUE ALL OF THE WAY TO OCTOBER 15TH, 2015, WHEN THE NEGATIVE "WALL STREET JOURNAL" ARTICLE COMES OUT.

SO ALL THROUGH 2015 AND WELL AFTER THE INVESTMENT MONEY COMES INTO THERANOS, THERE ARE STILL ACTIVE DISCUSSIONS ABOUT EXPANDING THE PARTNERSHIP.

ONE QUICK WORD ON THE NEXT SLIDE ABOUT RIGHT AFTER THAT "WALL STREET JOURNAL" ARTICLE, YOU CAN SEE THERE'S A QUESTION ABOUT HAVING THREE TO FOUR WEEKS BEFORE, IF YOU LOOK AT THAT TEXT MESSAGE AT 7:35 P.M., THREE TO FOUR WEEKS, SO THEY HAD STOPPED USING THE CTN.

DO YOU REMEMBER THIS IS THE TIME OF THE CMS INSPECTION, AND THAT THEY HADN'T TOLD WALGREENS YET.

AND ELIZABETH IS TALKING ABOUT THAT ISSUE.  AND

SER-1134

MR. BALWANI SAYS AT THIS POINT THEY KNOW.  SO NEED TO BE TRANSPARENT.

SO MR. BALWANI IS ENCOURAGING TRANSPARENCY WITH WALGREENS, NOT THE OTHER WAY AROUND.  IT'S MR. BALWANI WHO SAYS THAT.

AND YOU CAN SEE AT 7:42 MS. HOLMES SAYS, "I'M TRYING TO REMEMBER WHAT OUR THINKING WAS ON THAT."

AND MR. BALWANI SAYS, "NONE.  WE JUST DIDN'T TELL THEM THINKING UNDER OUR NEW MODEL THIS DOESN'T MATTER."

REMEMBER, AS I SAID BEFORE, THAT WITH THE NEW BUSINESS MODEL, THE WHOLE FINGERSTICK PERCENTAGE ISSUE WENT OUT THE WINDOW.  AND IT WAS NO LONGER -- AND IF YOU LOOK AT THOSE EXHIBITS WITH THOSE PARTNERSHIP MEETING MINUTES, IT'S NO LONGER DISCUSSED BECAUSE WALGREENS -- I'M SORRY, THERANOS WAS TAKING OVER THAT COST.  SO THAT WHETHER THEY DID CTN'S, FINGERSTICK, OR NOT, THEY NO LONGER MATTERED, AND SO THEY DIDN'T TELL THEM FOR THREE OR FOUR WEEKS, NOT THAT LONG A PERIOD OF TIME, BUT MR. BALWANI IS URGING TRANSPARENCY THERE.  THAT'S IN THE TEXT MESSAGES WITH MS. HOLMES.

IF YOU GO TO THE NEXT SLIDE.

THIS IS IN MARCH OF 2015.  SO THIS IS WHEN THE GOVERNMENT IS CLAIMING AT THIS POINT THE PARTNERSHIP MUST BE LONG DEAD.

BUT HERE'S WHAT MR. KOZLOWSKI FROM WALGREENS SAYS.  HE SAYS, "THANKS FOR YOUR TIME YESTERDAY.  ALTHOUGH THERE'S STILL A LOT TO DO, I THINK WE MADE SOME GREAT PROGRESS."

AND THEN HE SAYS HE WANTS TO PUT TOGETHER AN 18-MONTH

EXECUTION PLAN AND 3-YEAR LONG RANGE PLAN. THAT'S ASSIGNED TO SUNNY.

IDENTIFY ALL OF THE METROPOLITAN STATISTICAL AREAS AND INDEX VERSUS CHICAGO.

DEFINE I.T. REQUIREMENTS FOR SCALE. THAT'S SOMETHING THAT CASEY IS GOING TO TAKE ON.

AND MR. JHAVERI FORWARDS THAT EMAIL TO MR. BALWANI ON MARCH 11TH, 2015.

SO THIS IS NOT, OKAY, WE'RE DONE WITH THIS, THE PILOT DIDN'T WORK OUT, THE FINGERSTICK PERCENTAGE ISN'T GOOD ENOUGH. THERE'S STILL, EVEN IN MARCH OF 2015, STILL TALKING ABOUT SCALE AND LONG-RANGE PLANS IN IDENTIFYING ALL OF THE METROPOLITAN STATISTICAL AREAS. AND AGAIN, THE DOCUMENTS THAT THE DEFENSE HAD TO SHOW YOU, THE GOVERNMENT DID NOT.

MR. JHAVERI, IF YOU GO TO THE NEXT DOCUMENT, IN JUNE OF 2015. SO THIS IS VERY LATE IN THE GAME. MR. JHAVERI IS SAYING, "THANK YOU SUNNY. WE ARE VERY EXCITED TO MOVE OUR RELATIONSHIP TO THE NEXT LEVEL. I HAVE NO DOUBT THAT WE WILL DRIVE SUCCESS FOR BOTH OF OUR ORGANIZATIONS AND MORE IMPORTANTLY, OUR PATIENTS."

SO MR. JHAVERI AT THAT TIME IS A CHEERLEADER FOR THERANOS, EVEN IF HE DOESN'T WANT TO BE ON THE WITNESS STAND NOW.

THE NEXT THING, YOU MIGHT REMEMBER THIS FROM TRIAL, BUT THIS DIDN'T COME INTO EVIDENCE, BUT THERE WAS A SPREADSHEET WITH, AS YOU CAN SEE ON THE LEFT THERE, INFORMATION ABOUT EVERY

WALGREENS STORE IN THE DATABASE. EXTREMELY CONFIDENTIAL INFORMATION, SAYS MR. JHAVERI. AND THAT THIS DATA WAS SHARED WITH THERANOS PURSUANT TO THE NONDISCLOSURE AGREEMENT THAT THEY HAD.

SO IF THIS PARTNERSHIP WAS DYING OR DEAD AS THE GOVERNMENT WANTS TO MAKE YOU THINK, WOULD WALGREENS BE SHARING ITS SUPER SECRET CONFIDENTIAL INFORMATION ABOUT ALL OF ITS STORES WITH THERANOS? THAT DOESN'T MAKE ANY SENSE.

BUT THAT'S WHAT HAPPENED. THE PARTNERSHIP WAS GOING STRONG. THEY'RE EXPANDING. MR. BALWANI HAD EVERY REASON TO BELIEVE THAT THEY WERE EXPANDING. AND THE REASON WHY THAT IS REALLY IMPORTANT IS BECAUSE THE GOVERNMENT IS SAYING THAT WHEN MR. BALWANI INTERACTED WITH INVESTORS LIKE LISA PETERSON FROM IT RDV AND THE REST OF THE DEVOS FAMILY DECISION MAKERS, THAT MR. BALWANI KNEW AT THAT TIME THAT THIS PARTNERSHIP WAS DEAD.

SO WHEN HE SAID, LOOK, THERE COULD BE 900 STORES IF THE EXECUTION IS GOING RIGHT, THEY'RE SAYING THAT'S FRAUD BECAUSE MR. BALWANI KNEW 900 STORES WAS NO POSSIBILITY BECAUSE WALGREENS WAS TELLING HIM, WELL, AT MOST IT'S GOING TO BE 200 STORES. THAT IS NOT TRUE.

EVERYTHING -- ALL OF THE EVIDENCE, THE DOCUMENTARY EVIDENCE SHOWS THAT, IN FACT, MR. BALWANI HAD EVERY REASON TO BELIEVE, AND, IN FACT, IT WAS THE CASE THAT WALGREENS WANTED TO EXPAND THIS PARTNERSHIP TO THOUSANDS OF STORES IN AUGUST OF 2014 AND EVEN LATER AFTER THAT.

SER-1137

SO WHEN MR. BALWANI WENT TO HIS INVESTOR INTERACTIONS, THAT'S WHAT HE REASONABLY BELIEVED. SO THOSE STATEMENTS AND REPRESENTATIONS ABOUT WHAT WAS POSSIBLE, THE PROJECTIONS ON HOW MANY STORES, THOSE WERE TRUE. THOSE WERE GOOD FAITH PROJECTIONS. AS JUDGE DAVILA WILL TELL YOU, GOOD FAITH IS PART OF WHAT YOU HAVE TO CONSIDER HERE, AND THAT'S WHAT HAPPENED WITH MR. BALWANI.

I WANT TO SWITCH TO A DIFFERENT SUBJECT NOW. THIS IS THE TECHNOLOGY DEMONSTRATIONS THAT YOU HAVE HEARD SOME THINGS ABOUT. SOMETIMES THEY'RE REFERRED TO AS DEMOS.

THIS IS BRINGING PEOPLE IN WHO HAVE AN INTEREST, WHICH THEY'RE BUSINESS PARTNERS LIKE WALGREENS OR INVESTORS, AND SHOWING THEM A LITTLE BIT ABOUT WHAT THE TECHNOLOGY IS.

SO LET'S GO THROUGH THAT SUBJECT.

SO, FIRST OF ALL, MR. EDLIN KNEW A LOT ABOUT THE SUBJECT BECAUSE HE WAS INVOLVED IN SETTING THESE THINGS UP.

QUESTION: SOMETIMES DEMOS WERE JUST SO PEOPLE COULD SEE THE SOFTWARE AND THE TECHNOLOGY?

CORRECT.

THEY DIDN'T WANT TO GET THEIR BLOOD DRAWN?

RIGHT.

SO THEY WERE EXAMPLES, AND THEY JUST WANTED TO SEE WHAT THE SOFTWARE AND THE TECHNOLOGY LOOKED LIKE.

AND MR. EDLIN CONTINUED, THE WALGREENS DEMO IN AUGUST OF '13, WE'RE GOING TO TALK MORE ABOUT THAT, THAT INVOLVED NEXT

SER-1138

GENERATION DEVICES.

YES, MEANING THE 4S AND THE MINILAB WERE NEXT GENERATION DEVICES?

SO THEY'RE SHOWING WALGREENS NOT JUST WHAT WE'RE CURRENTLY USING IN THE CLIA LAB BUT ALSO WHAT THE FUTURE OF THE COMPANY IS, INCLUDING THE 4S DEVICE.

AND THERE'S NOTHING, NOTHING AT ALL THAT LIMITS THERANOS WHEN THEY'RE TALKING TO INVESTORS OR TALKING TO WALGREENS THAT THEY SOMEHOW HAVE TO LIMIT WHAT THEY'RE SHOWING PEOPLE.  IT'S JUST WHAT WE'RE OPERATING IN THE CLIA LAB AT THIS PARTICULAR MOMENT.  THEY'RE PERFECTLY ENTITLED TO SAY, WELL, THIS IS WHAT WE HAVE IN NEXT GENERATION DEVICES, THIS IS WHAT WE'RE PLANNING, THIS IS WHAT WE'RE GOING TO DO, THIS IS A DEVICE THAT CAN RUN ALL OF THE DIFFERENT CATEGORIES OF BLOOD TESTING.

SO IT DOESN'T MATTER IF IT'S ACTUALLY OPERATING IN THE CLIA LAB IN TERMS OF SHOWING PEOPLE, BECAUSE INVESTORS ARE INVESTING FOR THE LONG TERM.  WE HAVE HEARD FROM A NUMBER OF INVESTORS, INCLUDING LISA PETERSON, THAT THIS WAS A LONG TERM PARTNERSHIP THAT THEY WERE TALKING ABOUT.

SO OF COURSE IT WAS INTERESTING TO INVESTORS WHAT THE COMPANY WOULD BE DOING.  AFTER ALL, THE 4S WAS A DEVICE THAT THE COMPANY GOT ITS FDA APPROVAL FOR.  SO THIS WAS THE FUTURE OF THE COMPANY.

LET'S GO TO THE NEXT SLIDE.

SO IN AUGUST OF 2013, MR. JHAVERI AND OTHER WALGREENS

EXECUTIVES CAME TO THERANOS AND THEY HAD A MEETING AND A TOUR, BUT THEY ALSO HAD THEIR BLOOD TESTING DONE.

THE GOVERNMENT HAS TALKED ABOUT THAT DEMO, AND I WANT TO SPEND A LITTLE TIME ON THAT.

SO, FIRST OF ALL, THE GOVERNMENT SHOWED YOU THIS EMAIL ABOUT STARTING THE ADVIA RUN ON ALL SAMPLES.

AND THEY'RE TREATING THIS LIKE, WELL, MR. JHAVERI AND HIS COLLEAGUES, YOU KNOW, CAME THERE TO GET A THERANOS BLOOD TEST AND, IN FACT, THEIR SAMPLES ARE RUN ON AN ADVIA MACHINE, SO THIS IS SOME KIND OF BAIT AND SWITCH WHERE THEY'RE ACTUALLY, YOU KNOW, RUNNING ON THEIR COMMERCIAL DEVICE.

WHAT THE GOVERNMENT DIDN'T TELL YOU OR SHOW YOU IS THAT ACTUALLY THE FINGERSTICK COLLECTION IS WHAT HAPPENED.  SO IT WASN'T A VENOUS DRAW, IT WAS A COLLECTION FROM THE FINGER.

SO YOU CAN'T RUN THE FINGERSTICK AS WE ALL KNOW NOW, WE CAN'T RUN THAT FINGERSTICK ON A COMMERCIAL DEVICE THAT IS NOT MODIFIED.

SO FAR THIS HAS TO BE A MODIFIED ADVIA.  IT CAN'T BE A STANDARD COMMERCIAL ADVIA.  AND THAT WAS THE SUBJECT OF THERANOS PATENT I SHOWED YOU EARLIER AND ALL OF THE MODIFICATIONS THE SCIENTIFIC TEAM MADE TO ACHIEVE HIGH THROUGHPUT PERFORMANCE RUNNING A LOT OF BLOOD SAMPLES BUT ALSO JUST TO KEEP THE FINGERSTICK.

SO THIS WAS WHAT MR. EDLIN REPORTED ABOUT COLLECTING FINGERSTICK SAMPLES.  AND MR. JHAVERI CONFIRMED THAT.  HE SAID

WHEN HE WENT THERE TO THERANOS IN MID-AUGUST OF 2013, HE HAD A FINGERSTICK SAMPLE, NOT A VENOUS DRAW.

AND YOU CAN SEE IN MR. JHAVERI'S TESTIMONY, HE HAD A FINGERSTICK, AND HE ALSO IS AWARE THAT AN OFF-THE-SHELF ADVIA MACHINE IS NOT GOING TO BE ABLE TO DO FINGERSTICK TESTING.

MR. JHAVERI ALSO UNDERSTOOD FROM THIS DEMO IN AUGUST THAT THE MACHINES IN THE ROOM -- AND JUST TO STEP BACK FOR A MINUTE. THE GOVERNMENT HAS SAID, WELL, THERE ARE MACHINES IN THE ROOM LIKE A 4S OR AN EDISON. AND SOMEHOW THE GOVERNMENT IS TRYING TO CLAIM, WELL, THAT'S PART OF A FRAUDULENT SCHEME BECAUSE WHY WOULD THERE BE MACHINES IN THE ROOM IF THEY'RE NOT ACTUALLY USING THOSE PARTICULAR MACHINES FOR THE BLOOD TEST?

MR. JHAVERI KNEW THEY WEREN'T OPERATIONAL. IT WAS SIMPLY TO SHOW US WHAT THOSE MACHINES WOULD LOOK LIKE, BOTH THE CURRENT AND THE FUTURE OF THE COMPANY.

SO THIS WASN'T ANYTHING OTHER THAN, WELL, LET'S SHOW OUR BUSINESS PARTNER EVERYTHING WE'RE TRYING TO DO HERE, AND AT THAT TIME THEY WERE RUNNING TESTS ON MODIFIED ADVIA'S, SO IF THEY TEST WALGREENS THAT WAY, THAT'S CONSISTENT WITH WHAT THEY WERE DOING.

LET'S GO TO THE NEXT SLIDE.

SO MR. JHAVERI GOT LAB TEST RESULTS. AND YOU MIGHT REMEMBER DURING HIS TESTIMONY, HE TESTIFIED THAT ALL OF THOSE PATIENT RESULTS FIELDS THAT YOU ARE SEEING ON THE SCREEN WERE ALL FILLED IN. AND THE COPY HE WAS LOOKING AT, WE REDACTED

THOSE PATIENT RESULTS JUST TO PROTECT MR. JHAVERI'S PRIVACY. JUST LIKE ANY OTHER PERSON, HE'S ENTITLED TO NOT AIR HIS PRIVATE HEALTH INFORMATION IN PUBLIC, SO AS A COURTESY THOSE WERE REDACTED.

BUT HE TESTIFIED THAT EVERY SINGLE ONE OF THOSE RESULTS WERE FILLED IN ON THIS FORM.

AND HE GOT THOSE RESULTS.

NOW, THERE WAS AN EMAIL SHOWN THAT DR. YOUNG WAS CORRECTING SOME OF THOSE RESULTS. WHAT THAT EMAIL ACTUALLY SAID WAS THAT HE CORRECTED RESULTS BECAUSE OF WHAT HE VIEWED AS A BLOOD COLLECTION DEVICE, A BCD ISSUE. SO DR. YOUNG WAS THE SCIENTIST. IF HE THOUGHT THERE WAS A COLLECTION ISSUE WITH ONE OF THE TESTS AND IT HAS TO DO WITH ONE OF THE THYROID TESTS, DR. YOUNG WAS THE ONE ENTITLED TO DO THAT. IT WASN'T MR. BALWANI WHO WAS MAKING CORRECTIONS FOR THE RESULTS.

DR. YOUNG APPARENTLY PERCEIVED A BCD ISSUE AND HE CORRECTED THE RESULT.

BUT HERE'S WHAT IS IMPORTANT. MR. JHAVERI GOT THESE RESULTS, RIGHT? AND WHAT HAPPENED?

WELL, IT HAPPENED TO BE -- IT JUST SO HAPPENS THAT MR. JHAVERI IS MARRIED TO A NURSE PRACTITIONER. HER NAME WAS SAGE AND IT IS SAGE. AND THEY LOOKED AT THE RESULTS TOGETHER WHEN HE GOT THE FINGERSTICK RESULTS FROM THE THERANOS MODIFIED PREDICATES THAT THE GOVERNMENT SAYS ARE SO BAD.

THE RESULTS THAT THERANOS REPORTED WERE IDENTICAL TO THE

SER-1142

LAB TESTS THAT YOU HAD AT THE OTHER LAB.

MR. JHAVERI AGREED, YES, THEY WERE.

EVERY SINGLE ONE?

HE SAYS YES.

AND THEN I ASKED HIM THE QUESTION, TO YOUR KNOWLEDGE, DID THERANOS HAVE ANY INFORMATION ABOUT WHAT THE RESULTS WERE FROM THE OTHER LAB?  IN OTHER WORDS, WAS THERE ANY CHANCE THAT THERANOS COULD MANIPULATE THINGS SO THAT THEY CHANGED RESULTS OR DID SOMETHING TO MAKE IT APPEAR THAT THE RESULTS WERE IDENTICAL WHEN THEY REALLY WEREN'T?

AND MR. JHAVERI SAID, NO, HE DOESN'T BELIEVE SO.

SO THERANOS DIDN'T KNOW WHAT THE OTHER LAB RESULTS WERE. THERANOS DID THE TEST, THE FINGERSTICK TEST, AND THEY REPORTED THE RESULTS TO MR. JHAVERI, HE REVIEWED THEM WITH HIS LIFE WHO WAS A NURSE PRACTITIONER, AND THEY WERE IDENTICAL.

SO YET ANOTHER INDICATION THAT WHEN THE GOVERNMENT SAYS THE TEST DOESN'T WORK, WELL, THEY WORKED FOR MR. JHAVERI JUST FINE, THESE FINGERSTICK TESTS.

THIS NEXT SLIDE IS ABOUT THE ISSUE THAT I WAS JUST DISCUSSING WITH YOU, MR. EDLIN.

SO DR. YOUNG REVIEWED THE RESULTS, AND HE PARTICIPATED IN THE DEMO PROCESS, AND HE ULTIMATELY REVIEWED AND APPROVED TEST RESULTS?

MR. EDLIN SAID YES.

GO TO THE NEXT SLIDE.

OKAY. SO MR. EDLIN SAID -- QUESTION: THE GOAL OF THOSE DEMONSTRATIONS WAS TO PRESENT AN HONEST PICTURE OF WHAT WAS GOING ON?

MR. EDLIN SAID YES.

AND THE QUESTION PUT TO MR. EDLIN WAS, DID HE BELIEVE THAT DANIEL YOUNG, IN DOING WHAT HE WAS DOING, WAS BEING DISHONEST IN ANALYZING AND MAKING DECISIONS ABOUT THOSE TEST RESULTS, INCLUDING THAT CORRECTION OF THE RESULTS FOR THE THYROID, PARTICULAR THYROID TEST FOR MR. JHAVERI AND HIS COLLEAGUES?

AND MR. EDLIN SAID NO.

SO, AGAIN, IN REAL TIME, THIS IS WHAT MR. EDLIN, WHO WAS DEEPLY INVOLVED WITH THESE DEMOS, THAT'S WHAT HE WAS PERCEIVING. HE DIDN'T THINK HE WAS PART OF SOME SCHEME. HE THOUGHT THEY WERE DEMOING THE TECHNOLOGY, WHAT IT WOULD BE, WHAT IT WAS.

AND MR. JHAVERI AND HIS COLLEAGUES GOT THE TEST AND MR. JHAVERI'S RESULTS WERE IDENTICAL.

OKAY. LET'S GO TO THE NEXT SLIDE.

AND THIS IS AN EARLIER DEMO IN CHICAGO FROM 2012. AND AS YOU CAN SEE THIS IS AN EMAIL FROM MR. BALWANI. HE SAYS HE HEARD BACK FROM THE EXECUTIVE ON WHOM WE HAD PERFORMED THE DEMO ON JULY 16TH IN CHICAGO, AND HE SAID HIS RESULTS FROM THE CENTRAL LAB, THAT HE HAD DID ON HIS DOCTOR'S ORDER, WERE IDENTICAL TO THE RESULTS FROM OUR SYSTEM DURING THE DEMO.

AND MR. BALWANI SAYS, I HOPE THIS GIVES AN ADDITIONAL DOSE

OF CONFIDENCE (NOT THAT YOU NEEDED MORE OF IT) TO EVERYONE AS THESE WERE DIFFICULT ASSAYS, INCLUDED VITAMIN D, VITAMIN D(IFFICULT)."

BECAUSE I THINK AS WE SAW THROUGH DR. ROSENDORFF, VITAMIN D WAS A PARTICULARLY DIFFICULT ASSAY. YOU MAY REMEMBER THERE WAS TESTIMONY ABOUT A SCHOLARLY PAPER THAT TALKED ABOUT VITAMIN D. IT WAS REFERENCED IN AN EMAIL AND IT WAS A DIFFICULT ASSAY.

SO MR. BALWANI WAS AWARE THAT VITAMIN D WAS A DIFFICULT ASSAY, BUT IT CAME OUT WELL, AND THIS GAVE MR. BALWANI CONFIDENCE.

AND I TALKED BEFORE ABOUT ALL OF THOSE MARKERS THAT MR. BALWANI HAD TO MAKE HIM BELIEVE THAT THE TECHNOLOGY WORKED, THAT HE WAS CONFIDENT GOING FORWARD WITH PATIENT TESTING AND TALKING TO INVESTORS. AND THIS WAS JUST ONE OF THOSE DATA POINTS THAT MR. BALWANI HAD THAT THE TECHNOLOGY WAS WORKING JUST FINE, AS HE HAD BEEN TOLD FOR MANY -- IN MANY OTHER WAYS AND IN MANY OTHER SOURCES.

SAME THING WITH ONE OF BRIAN GROSSMAN'S COLLEAGUES. THIS IS WITH REGARD TO A TEST THAT WAS CONDUCTED FOR A MAN NAMED VIVEK KHANNA, WHO IS SOMEONE WHO WORKED FOR PFM WITH BRIAN GROSSMAN. AND AGAIN, DR. YOUNG REPORTS THE RESULTS LOOK FINE FOR THAT DEMONSTRATION.

THESE ARE MR. KHANNA'S RESULTS, OF COURSE, REDACTED.

AND YOU CAN SEE AT THE TOP THERANOS LAB REPORT TECHNOLOGY

DEMONSTRATION. THAT'S WHAT MR. JHAVERI'S RESULT SAID AS WELL.

SO THESE ARE NOT CLINICAL TESTS THAT ARE DESIGNED TO HAVE

PATIENTS MAKE DECISIONS ABOUT THEIR TECHNOLOGY DEMONSTRATIONS.

OKAY. LET ME TALK ABOUT AN EMAIL THAT THE GOVERNMENT

SHOWED YOU IN THEIR CLOSING REMARKS. THIS IS AN EMAIL FROM

CHRISTIAN HOLMES TO A GROUP OF PEOPLE, INCLUDING MR. BALWANI.

AND THIS IS AN EMAIL WHERE MR. HOLMES, CHRISTIAN HOLMES,

HAS A VERY SILLY IDEA. HE'S TALKING ABOUT A DEMO THAT IS GOING

TO BE SCHEDULED AT A WALGREENS WHERE A GROUP OF PEOPLE CALLED

BDT. THAT ACTUALLY STANDS FOR BYRON D. TROTT. YOU HEARD A

LITTLE BIT ABOUT HIM WHEN MS. PETERSON WAS ON THE STAND.

AND MR. TROTT OR PEOPLE FROM HIS OFFICE CAME TO DO A DEMO.

AND IN PREPARATION FOR THAT, THERE'S THIS EMAIL FROM

CHRISTIAN HOLMES. AND ONE OF THE THINGS THAT CHRISTIAN HOLMES

SAYS IS, OKAY, WE WANT THE PEOPLE TO GET THE FINGERSTICK

EXPERIENCE, BUT OBVIOUSLY EVERYBODY KNOWS AT WALGREENS IF YOU

GO IN THERE, YOU MIGHT GET A VENOUS DRAW FOR SOME OF THE TESTS

BECAUSE THAT IS PUBLICLY KNOWN.

BUT MR. HOLMES HAS A SILLY IDEA ABOUT LET'S SEE IF WE CAN

DISTRACT PEOPLE WHILE THEY GET THE RESULTS AND THEY DON'T

REALIZE THAT WE'VE REMOVED A TEST THAT WAS GOING TO BE ON

VENOUS.

WELL, THAT'S CHRISTIAN HOLMES SAYING THAT, NOT

MR. BALWANI. THERE'S NO EVIDENCE, NONE, THAT MR. BALWANI

CONDONED THAT, OR APPROVED IT, OR THOUGHT OF THAT.

HOW MANY TIMES -- LET'S USE OUR COMMON SENSE HERE. HOW MANY TIMES HAVE YOU HAD A BUSINESS MEETING OR A MEETING WITH FAMILY AND SOMEONE SAYS SOMETHING THAT MAYBE A LITTLE DUMB OR UNENLIGHTENED, OR YOU THINK MIGHT EVEN BE LIKE PROBLEMATIC, RIGHT?

AND JUST BECAUSE THAT SOMEONE SAYS THAT, DOESN'T MEAN YOU ENDORSE IT OR YOU DO IT.

AND HERE'S THE THING ABOUT THIS, IF THIS HAPPENED, IF THERE WAS SOME EFFORT TO DISTRACT THESE POTENTIAL INVESTORS AT A WALGREENS STORE, THE GOVERNMENT COULD HAVE CALLED BDT, OR ANYONE WHO WAS INVOLVED IN THIS DEMO, CHRISTIAN HOLMES, OR THE PEOPLE WHO HAD THE DEMO AND ASK THEM IF THIS IS WHAT HAPPENED IF THEY WERE DISTRACTED. WE HEARD NOTHING ABOUT THAT.

THE GOVERNMENT'S ARGUMENT ON CLOSING WAS THAT, WELL, THE SIGNIFICANCE OF THIS IS THAT CHRISTIAN HOLMES APPARENTLY FELT COMFORTABLE TO AIR THIS SILLY IDERE IN AN AUDIENCE OF MR. BALWANI AND OTHERS, SO, THEREFORE, HE MUST BE COMFORTABLE TALKING ABOUT DECEPTIVE THINGS, THEREFORE, SOMEHOW THIS STICKS TO MR. BALWANI.

WHAT CHRISTIAN HOLMES IS THINKING AND WHAT HE THINKS IS A GOOD IDEA AT THE TIME THAT THERE'S NO EVIDENCE THAT THAT WAS EVER CARRIED OUT, THAT'S NOT EVIDENCE OF MR. BALWANI'S INTENT TO DEFRAUD OR MR. BALWANI'S KNOWLEDGE OF ANYTHING.

AND CHRISTIAN HOLMES IS NOT ON TRIAL HERE, MR. BALWANI IS. AND HE DID NOT WRITE THIS EMAIL, HE DID NOT APPROVE THIS, HE

DID NOT CONDONE IT. THERE'S NO EVIDENCE ABOUT THIS WHATSOEVER. THIS IS MEANINGLESS. IT'S JUST A SILLY IDEA THAT THIS PERSON HAD, CHRISTIAN HOLMES, WHO YOU HAVE NOT HEARD FROM.

LET'S TALK ABOUT THIS OTHER ASPECT OF THE DEMOS THAT THE GOVERNMENT HAS POINTED TO AS SOMEHOW DECEPTIVE, AND THAT'S WHAT IS KNOWN AS THE NULL PROTOCOL.

SO THIS WAS A QUESTION PUT TO MR. EDLIN ON DIRECT EXAMINATION.

QUESTION: SO LET'S IMAGINE THAT WE'RE IN THE CONFERENCE ROOM, THE DEVICE IS THERE, IT'S SET UP TO RUN THIS NULL PROTOCOL.

IF A SAMPLE IS PUT INTO THE MACHINE, THEN CAN YOU DESCRIBE WHAT THE VISITOR WOULD SEE OR WHAT WOULD WE SEE IN THAT CASE?

AND THEN MR. EDLIN ANSWERS THE QUESTION.

THE PREMISE OF THE HYPOTHETICAL, THAT A SAMPLE IS PUT INTO THE DEVICE, AND THEN THIS NULL PROTOCOL IS RUNNING ON THE THERANOS DEVICE. THIS IS THE SORT OF IMPRESSION THAT THE GOVERNMENT WANTS TO LEAVE YOU WITH, THAT THERE IS KIND OF FAKERY GOING ON. THAT AT THESE DEMOS, THERE'S A FINGERSTICK SAMPLE TAKEN FROM THE INVESTOR, OR WHOEVER IT IS DOING THE DEMO.

AND THAT THERE'S SOME BIG SHOW OF TAKING THE SAMPLE, AND PUTTING IT IN THE CARTRIDGE, AND THEN PUTTING THE CARTRIDGE INTO THE MACHINE, AND RUNNING THE MACHINE, AND HAVING IT WHIRL AWAY AS IF IT'S REALLY RUNNING THE SAMPLE, BUT REALLY SECRETLY

THERE'S THIS THING CALLED THE NULL PROTOCOL THAT IS RUNNING AND IT'S DESIGNED TO HIDE ANY ERROR THAT, FROM THE GOVERNMENT'S STANDPOINT, INEVITABLY THE MACHINE IS GOING TO, I DON'T KNOW, BURST INTO CLAIMS OR SOMETHING OR AT LEAST SHOW AN ERROR CODE. AND IN ORDER TO HIDE ALL OF THAT, THERE'S GOING TO BE THIS NULL PROTOCOL. AND THE INVESTOR THINKS IT'S RUNNING FINE. BUT IT'S REALLY NOT.

THAT'S THE GOVERNMENT'S THEORY IT SEEMS LIKE, AND THAT'S THE IMPRESSION THEY WANT TO LEAVE YOU. THAT'S NOT WHAT HAPPENED.

THAT WHOLE HYPOTHETICAL, THAT WHOLE SCENARIO DEPENDS ON THIS SAMPLE BEING PUT INTO THE MACHINE AND MAKING THE INVESTOR OR THE VIP WHO IS DOING -- PARTICIPATING IN THIS DEMO THINK THAT THEIR BLOOD SAMPLE IS REALLY RUNNING. BUT THAT'S NOT WHAT IS HAPPENING.

LET'S GO TO THE NEXT.

SO THEN ON CROSS MR. EDLIN IS ASKED, IT WAS YOUR EXPERIENCE AT THERANOS, WASN'T IT, THAT IF THE NULL PROTOCOL WAS RUNNING ON THE MACHINE, A BLOOD SAMPLE WAS NOT PUT IN THAT MACHINE; IS THAT CORRECT?

THAT'S CORRECT.

SO IT'S NOT BEING PUT IN THE MACHINE. THE NULL PROTOCOL IS A WAY OF RUNNING THE MACHINE WITHOUT PUTTING THE SAMPLE IN. AND SOMETIMES PEOPLE JUST WANTED TO SEE WHAT THE HARDWARE WAS LIKE. AND THEY WEREN'T, AS MR. EDLIN SAID AND I POINTED OUT

EARLIER, SOMETIMES PEOPLE DIDN'T WANT THEIR BLOOD SAMPLE TAKEN.

SO THE IDEA THAT THE NULL PROTOCOL IS SOMETHING NEFARIOUS IS JUST NOT TRUE. AND THE HYPOTHETICAL THAT WAS PUT TO MR. EDLIN ABOUT RUNNING A SAMPLE IS JUST NOT WHAT IS GOING ON. THERE IS NO SAMPLE. THERE IS NO SHOW OF RUNNING A SAMPLE AND HAVING THIS NULL PROTOCOL HIDE ERRORS. THERE IS NO SAMPLE. THOSE ARE THE FACTS.

IN FACT, TO GO FURTHER ON THAT POINT, THE INTELLECTUAL PROPERTY WAS USED INTERNALLY FOR SOME PURPOSES, AND IT HAD NOTHING TO DO WITH INVESTORS.

SO IN THIS EMAIL MR. EDLIN WRITES TO DR. YOUNG, "HI DANIEL,

"SUNNY WOULD LIKE TO START STRESS TESTING THE DEPARTMENT OF DEFENSE APP ON THE 4S NEXT MONDAY -- WILL YOU BE ABLE TO PROVIDE A DUMMY CARTRIDGE FOR THE TESTING?"

AND THE RESPONSE FROM MR. EDLIN, "INITIALLY WE ONLY HAVE TO RUN A NULL PROTOCOL."

SO THIS IS JUST INTERNAL TESTING. IT'S NOT DEMOS FOR INVESTORS OR ANYTHING LIKE THAT. SO EVEN INTERNALLY THEY'RE RUNNING THE NULL PROTOCOL WHEN THEY JUST WANT TO RUN THE HARDWARE WITHOUT DOING A BLOOD SAMPLE. THAT'S ALL IT IS, AND THAT'S WHAT THE EVIDENCE SHOWS.

GO TO THE NEXT SLIDE.

THE QUESTION WAS PUT TO MR. EDLIN, AND THERE WAS NOTHING OR YOU DIDN'T BELIEVE YOU WERE DOING ANYTHING NEFARIOUS IN

RUNNING THESE DEMOS USING THE DEMO APP OR THE NULL PROTOCOL, DID YOU?

THE ANSWER IS NO.

YOU WEREN'T TRYING TO TRICK ANYONE?

RIGHT.

AND YOU HAD NO REASON TO BELIEVE AT THE TIME THAT ANYONE ELSE AT THERANOS WAS DOING THAT; RIGHT?

RIGHT.

AND HE WAS THE PERSON, MR. EDLIN, WHO WAS DEEPLY INVOLVED WITH THE DEMOS, AND HE KNEW WHAT THE NULL PROTOCOL WAS AND WHAT IT WASN'T. HE'S NOT THINKING HE'S DECEIVING ANYBODY.

OKAY. LET'S GO TO ANOTHER TOPIC THAT THE GOVERNMENT HAS POINTED OUT, AND THIS IS THE THERANOS WEBSITE. AND YOU HAVE HEARD SOMETHING ABOUT THIS WHERE ACCORDING TO THE GOVERNMENT, LAWYERS WERE INVOLVED IN ADVISING ABOUT THE WEBSITE, AND THEY HAD CERTAIN CHANGES THAT THEY WANTED MADE, THE LAWYERS, RIGHT?

SO THE FIRST THING IS THAT IF YOU'RE GOING TO RUN A FRAUDULENT SCHEME AND YOU'RE GOING TO PUT OUT A BUNCH OF FALSE STATEMENTS ON YOUR WEBSITE, WHY HAVE LAWYERS AT ALL? WHY GO THROUGH THE EXERCISE OF HAVING THEM LOOK AT IT?

WELL, THE REASON IS THAT THEY WERE SERIOUS ABOUT TAKING THE ADVICE.

SO HERE'S WHAT HAPPENED. IF YOU LOOK AT THESE EXHIBITS -- IF YOU WANT TO WRITE THESE DOWN, 3965, 3981, AND 5805 -- WHAT YOU WILL SEE IS THAT THERE WERE 49 CHANGES TO THE WEBSITE IN

RESPONSE TO THE ATTORNEY FEEDBACK. SO A GREAT MANY CHANGES WERE MADE BASED ON THE LAWYER'S ADVICE. AND THERE WERE FOUR ATTORNEYS FROM INSIDE THERANOS AND TWO LAW FIRMS PROVIDING THE FEEDBACK.

AND THERE'S NOT ANY EVIDENCE THAT IT WAS MR. BALWANI WHO WAS PERSONALLY TRYING TO MAKE THESE CHANGES. SO WHAT HAPPENS?

THIS IS JUST A FEW EXAMPLES. SO THE GOVERNMENT HAS PARTICULARLY FOCUSSED ON THIS "HIGHEST LEVELS OF ACCURACY" STATEMENT. AND HERE ARE EXAMPLES OF WHEN THOSE WERE CHANGED.

SO, FOR EXAMPLE, THERE WAS DRAFT WEBSITE LANGUAGE. AND THESE ARE THOSE SAME EXHIBITS IF YOU WANT TO LOOK AT THOSE DURING DELIBERATIONS. DRAFT WEBSITE LANGUAGE WAS "HIGHEST LEVELS OF ACCURACY," THAT WAS REPLACED -- THE ATTORNEY ADVICE RATHER WAS TO REPLACE IT WITH "HIGH LEVELS OF ACCURACY." AND THEN THE FINAL WEBSITE IS "HIGH LEVELS OF PRECISION," THAT'S IN THE HEADER OF THE DOCUMENT.

THERE WAS DRAFT WEBSITE LANGUAGE ABOUT "HIGHEST LEVELS OF ACCURACY," AND THE LAWYERS -- THE DRAFT WAS "HIGHEST LEVELS OF ACCURACY." THE ATTORNEY ADVICE WAS REPLACE THAT WITH "HIGH LEVELS OF ACCURACY." AND THEN THE FINAL WEBSITE LANGUAGE WAS IN THE TEXT "HIGH LEVELS OF PRECISION."

AND THEN ANOTHER EXAMPLE "A TINY DROP IS ALL IT TAKES," AND THEN THE ATTORNEY'S ADVICE WAS REVISE "ONE TINY DROP" TO "A FEW DROPS IS ALL IT TAKES." AND THEN THAT CHANGE WAS MADE. SO THOSE ARE AMONG THE 49 CHANGES THAT WERE MADE.

SER-1152

NOW, IT IS TRUE THAT IF YOU GO TO THE EXHIBIT, THERE WERE CERTAIN PLACES WHERE THE CHANGE ISN'T MADE.  BUT THE FACT THAT PEOPLE ACTUALLY FIXING THE WEBSITE DIDN'T CATCH ALL OF THE PLACES, ALL OF THE CHANGES, IS NOT INDICATIVE OF MR. BALWANI'S FRAUD.  THEY HAD LAWYERS, THEY FOLLOWED THE ADVICE MADE MANY TIMES OVER.  SO THAT'S THE ISSUE WITH THE WEBSITE.

AND THEN IF YOU GO TO THE NEXT ONE, MR. EDLIN TESTIFIED THAT THERE WERE MEETINGS WITH THE LAWYERS ABOUT THE MARKETING MATERIALS AND THE WEBSITE.

SO IT'S NOT JUST THE EMAIL THAT YOU SAW WHERE THE ATTORNEYS GAVE ADVICE IN THE EMAIL FORM.  THERE ARE ALSO MEETINGS ABOUT THE MARKETING MATERIALS IN THE WEBSITE ABOUT THE LAWYERS.  WE DON'T KNOW WHAT WAS SAID IN THE MEETINGS, WHAT DISCUSSIONS OCCURRED THAT WAS APPROPRIATE OR NOT APPROPRIATE ON THE WEBSITE.  WE JUST DON'T HAVE THAT INFORMATION.  BUT WE KNOW THERE WERE SUCH MEETINGS.

ANOTHER AREA WHERE THE GOVERNMENT HAS CLAIMED THERE WAS A PROBLEM WAS THE WALGREENS BROCHURE.

AND THEY SHOWED YOU A PARTICULAR DOCUMENT THAT WAS THE WALGREENS BROCHURE, BUT THAT -- AND THEY'RE CLAIMING THIS WAS AN EXAMPLE OF SOMETHING THAT PATIENTS WOULD HAVE HAD THAT WAS MISLEADING BECAUSE IT HAD THINGS THAT THE GOVERNMENT CLAIMS WEREN'T CORRECT.

WELL, LET'S LOOK AT WHAT MR. EDLIN SAID ABOUT THAT.

SO THE DOCUMENT THAT THE GOVERNMENT PUT INTO EVIDENCE

MR. EDLIN SAID IS A MECHANICAL FOR THE BROCHURE.

AND THE QUESTION WAS, WHAT DOES THAT MEAN, A MECHANICAL?

AND HE SAYS IT'S ESSENTIALLY A DRAFT OF THE BROCHURE BEFORE IT GETS PRINTED.

SO THE ONLY THING IN EVIDENCE IS A DRAFT. THE GOVERNMENT DID NOT SHOW YOU WHAT THE FINAL BROCHURE LOOKED LIKE. THAT'S NOT IN EVIDENCE.

SO TO TALK ABOUT A DRAFT WHEN YOU DON'T KNOW WHAT THE FINAL WAS, I DON'T KNOW THAT THAT MAKES SENSE. IT DOESN'T SEEM LIKE THE LEVEL OF PROOF YOU NEED TO FIND BEYOND A REASONABLE DOUBT THAT THIS WAS PART OF THE FRAUDULENT SCHEME.

LET'S TALK ABOUT THE MARKETING MATERIALS THAT INCLUDES THE INVESTOR POWERPOINT SLIDES THAT YOU HAVE SEEN.

IF WE CAN GO TO THE NEXT SLIDE.

SO THE ORIGIN OF THIS SLIDE DECK THAT YOU HAVE SEEN IN THE CASE OF THE INVESTORS IS THE MARKETING WITH CHIAT/DAY. THIS IS THE MARKETING FIRM THAT THERANOS HAD WORKING WITH THEM. THAT RELATIONSHIP ACTUALLY BEGAN IN 2012 ACCORDING TO MR. EDLIN. HE SAID THAT SOUNDED REASONABLE AT LEAST.

AND HE KNOWS THERE WAS A RELATIONSHIP WITH CHIAT/DAY BEFORE THE WALGREENS LAUNCH.

IF WE CAN GO TO THE NEXT SLIDE.

AND THIS IS THE CHIAT/DAY DOCUMENT THAT SHOWS WHAT THE SO-CALLED DELIVERABLES WERE, IN OTHER WORDS, THE WORK PRODUCT THAT THEY WERE GOING TO PUT OUT.

AND I HIGHLIGHTED THE PHYSICIAN SALES SLIDE DECK AND LEAVE BEHINDS, AND THAT IS BECAUSE EVERYTHING THAT OUR SALESPEOPLE WILL NEED TO BE EFFECTIVE IN A PHYSICIAN OFFICE TO COMMUNICATE OUR VALUE PROPOSITION. THAT'S FROM DECEMBER OF 2012.

WE'LL SEE THIS TESTIMONY IN A MINUTE -- IN FACT, LET'S GO TO IT RIGHT NOW. THE NEXT SLIDE.

SO, MS. PETERSON, THIS IS ONE OF THE SLIDES, AND THE HEADING OF THE SLIDE IS "EVERY THERANOS TEST BEGINS WITH YOU, THE PHYSICIAN."

AND I ASKED HER, A SLIDE THAT SAYS -- WITH THAT HEADING THE WAY IT'S WRITTEN, IT SEEMS TO BE DIRECTED TO AN AUDIENCE OF PHYSICIANS.

SHE SAID RIGHT, BECAUSE THIS WAS A MARKETING MATERIAL THAT CHIAT/DAY DEVELOPED. SO WHAT THESE SLIDES WERE IS A HODGEPODGE OF ALL KINDS OF THINGS THAT WERE DEVELOPED FOR MARKETING PURPOSES WITH CHIAT/DAY WELL BEFORE THE WALGREENS LAUNCH AND BEFORE THERANOS WAS DOING THAT TESTING WITH WALGREENS.

AND THEY WERE JUST THIS HODGEPODGE OF MATERIALS SHOWING INVESTORS, HERE'S WHAT OUR COMPANY IS OR COULD BECOME.

LET'S GO TO THE NEXT SLIDE.

MR. EDLIN TESTIFIED THAT THE PURPOSE OF THIS MEETING OR THESE MEETINGS WAS TO DEVELOP MATERIALS ABOUT WHAT THERANOS, THE GOALS THAT THERANOS WAS TRYING TO ACHIEVE. THOSE WERE THE ORIGINS OF THESE SLIDES.

AND WHEN THESE SLIDE DECKS CAME IN FRONT OF INVESTORS,

THEY WERE SLIDES, AS YOU MIGHT REMEMBER, THAT HAD ALL KINDS OF PRESENT TENSE STATEMENTS THAT OBVIOUSLY EVERYONE KNEW WASN'T TRUE, HAVING THE LARGEST LAB IN THE COUNTRY AND HAVING THE LARGEST FOOTPRINT IN CALIFORNIA.  THE INVESTORS TESTIFIED THAT THEY KNEW THOSE THINGS WERE NOT PRESENTLY TRUE, THOSE WERE GOALS.

SO THE SLIDE DECK HAS A MIX OF THINGS OF WHAT IS GOING ON NOW, WHAT IS GOING TO BE IN THE FUTURE.  I MEAN, YOU REALLY CAN'T KNOW MUCH ABOUT THESE SLIDE DECKS WITHOUT KNOWING EXACTLY WHAT THE NARRATIVE WAS, WHAT THE VOICEOVER WAS BECAUSE THESE SLIDE DECKS WERE NOT PRESENTED IN A VACUUM.  THEY WERE MEETINGS WITH THESE INVESTORS.

SO THE IDEA THAT THESE SLIDE DECKS ARE SOMEHOW, YOU KNOW, LITERAL AND IT'S ONLY ABOUT WHAT IS GOING ON IN THE CLIA LAB AT THE MOMENT, THAT'S NOT THE CASE.  THESE INVESTORS WERE IN LONG-TERM PARTNERSHIPS WITH THERANOS.  THEY WERE INTERESTED IN NOT ONLY WHAT THERANOS WAS DOING NOW, BUT WHAT THEY WERE GOING TO BE DOING IN THE FUTURE.  AND THAT'S WHAT THESE SLIDE DECKS WERE AND MANY OF THESE SLIDES WERE CLEAR TO INVESTORS THAT THEY WERE FUTURE FORWARD LOOKING STATEMENTS.

OKAY.  LET'S TALK ABOUT THE MEDIA AND COMMUNICATIONS WITH JOURNALISTS.  IT'S ANOTHER TOPIC THE GOVERNMENT HAS RAISED, AND THE GOVERNMENT'S THEORY, AS YOU'VE HEARD, IS THAT EVEN THOUGH THE ARTICLES THAT THEY HAVE SHOWN YOU ARE THE JOURNALIST'S WORDS, NOT MR. BALWANI, AND MR. BALWANI IS SOMEHOW RESPONSIBLE

FOR THAT, TOO, BECAUSE HE WAS AWARE THAT THESE MATERIALS WERE IN THE HANDS OF INVESTORS.

SO LET'S START WITH THE -- WHAT IS KNOWN AS THE RAGO ARTICLE, IT'S "THE WALL STREET JOURNAL" ARTICLE FROM SEPTEMBER 2013.

AND MR. LUCAS WAS SHOWN THAT.  YOU CAN SEE THE LANGUAGE, "THE SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW REFINING INVOLVES DEVICES THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000 LABORATORY TESTS, FROM ROUTINE BLOOD WORK TO ADVANCED GENETIC ANALYSIS."

THAT'S A TRUE STATEMENT.  MR. RAGO CHOSE THE WORD "REFINING."  AND YOU COULD USE THE WORD "DEVELOPING."  THERANOS WAS WORKING ON THAT IN THEIR RESEARCH AND DEVELOPMENT.  AND WE'LL SEE THERE'S A LOT OF RESEARCH AND DEVELOPMENT EXPENDITURE BEHIND WHAT THERANOS IS DOING.

BUT LET'S TALK ABOUT MR. LUCAS, HIS TESTIMONY.  HE'S ASKED A QUESTION ON DIRECT EXAMINATION BY THE GOVERNMENT.

WAS THE INFORMATION IN THIS ARTICLE CONSISTENT WITH MR. LUCAS'S UNDERSTANDING OF WHAT THE TECHNOLOGY COULD DO BASED ON CONVERSATIONS WITH MS. HOLMES?

AND MR. LUCAS SAYS, THAT CERTAINLY WAS THE HOPE THAT AT SOME TIME IT WOULD DO ALL OF THE TESTS.

AND MR. LUCAS GOES ON.  I DID NOT BELIEVE AT THE TIME THAT -- YOU KNOW, THIS IS MORE OF A MARKETING.  I CANNOT BELIEVE AT THE TIME THAT THE COMPANY COULD DO MORE THAN ONE

SER-1157

THOUSAND TESTS.

SO MR. LUCAS, AN INVESTOR, RECOGNIZES THIS FOR WHAT IT IS. IT'S JOURNALIST'S WORDS AND HE'S NOT PUTTING MUCH STOCK IN THAT.

LET'S TALK ABOUT ROGER PARLOFF. HE WAS THE WRITER FROM "FORTUNE" MAGAZINE AND THAT CAME OUT IN JULY OF 2014. THIS EMAIL THAT I'M SHOWING YOU FROM MAY OF 2014 IS THE WORK THAT THERANOS IS DOING TO GET MR. PARLOFF INFORMATION FOR HIS ARTICLE.

NOW, THE DATE IS IMPORTANT HERE BECAUSE LET'S GO BACK TO MR. PANDORI FOR A MINUTE. DR. PANDORI CLAIMS THAT HE HAD A MEETING WITH MS. HOLMES AND MR. BALWANI AROUND MAY 19TH OF 2014, AND REMEMBER HE SAID I KNOW THAT BECAUSE IT WAS AROUND HIS BIRTHDAY.

HE CLAIMED YOU'VE GOT TO INVOLVE THE SCIENTIFIC TEAM WITH THE DISCUSSIONS WITH JOURNALISTS OR THE INFORMATION PRESENTED TO JOURNALISTS BECAUSE WE WANT TO MAKE SURE IT'S ACCURATE, AND HE CLAIMS THAT MR. BALWANI SAID THAT'S NEVER GOING TO HAPPEN AND DR. PANDORI SAID HE QUIT FIVE MINUTES LATER.

AND WE ALREADY WENT THROUGH DR. PANDORI AND WHY THAT CAN'T BE TRUE, BUT THIS IS ANOTHER PIECE OF THAT.

SO ON MAY 27TH, 2014, DR. PANDORI IS STILL AT THE COMPANY. HE DOESN'T LEAVE FOR ANOTHER THREE DAYS.

AND THIS IS THE TEAM, NOT MR. BALWANI, HE'S NOT ON THIS, AND AS YOU'LL SEE, HE'S NOT ASSIGNED ANY ACTION ITEMS FROM

MR. PARLOFF.

BUT THIS IS THE TEAM BEING ASSIGNED TASKS TO GET THE JOURNALIST, MR. PARLOFF, INFORMATION FOR HIS ARTICLE, WHICH ENDS UP COMING OUT A COUPLE MONTHS LATER.

SO LET'S TALK ABOUT OUR ACTION ITEMS, SHOWING THE REFLEX TESTING CONFIGURATION WE WILL RELEASE IN THE FUTURE/ALL FUTURE FEATURES, THAT'S A TASK ASSIGNED TO DANIEL YOUNG. YOU CAN SEE THERE ARE OTHER TASKS ASSIGNED TO DR. YOUNG.

POINT 8 THERE, DATA ON ANY COMBINATION OF TESTS BEING ABLE TO BE DONE ON OUR FRAMEWORK, ALSO ASSIGNED TO DANIEL YOUNG.

LAB REPORT SHOWING TRENDING DATA, I BELIEVE THAT'S TO JEFF AND DANIEL YOUNG.

NUMBER 1, FOLLOW UP ON ALL OF OUR STATE CERTIFICATIONS. THAT'S ASSIGNED TO ADAM, MEANING DR. ROSENDORFF, MARK, DR. PANDORI HIMSELF, AND IT LOOKS LIKE BRAD, WHICH IS PROBABLY BRAD ARINGTON, WHO IS A LAWYER AT THERANOS.

SO IT LOOKS LIKE DR. PANDORI, NOT WITHSTANDING HIS TESTIMONY THAT HE WAS TOLD NEVER GOING TO HAPPEN AND NEVER GOING TO INVOLVE SCIENTIFIC TEAM IN ANY INFORMATION THAT YOU'RE GIVING TO JOURNALISTS, HE IS INVOLVED. HE IS INVOLVED A FEW DAYS LATER, AS IS DR. YOUNG.

SO ANOTHER REASON WHY DR. PANDORI'S TESTIMONY IS JUST COMPLETELY FALSE ON THAT SCORE AND MANY OTHER SCORES.

BUT THIS IS INFORMATION THAT THE TEAM, NOT MR. BALWANI, IS GATHERING FOR THE JOURNALISTS AND AS YOU CAN SEE MR. BALWANI IS

NOT EVEN ON THIS EMAIL AND HE HAS NO TASK ASSIGNED TO HIM.

IT'S THE TEAM, AND THAT'S ELIZABETH HOLMES, IT'S JEFF BLICKMAN, IT'S DR. YOUNG, IT'S MARK PANDORI, AND A LAWYER NAMED BRAD ARINGTON.

THIS NEXT DOCUMENT I WANT TO SHOW YOU ON THE TOPIC OF JOURNALISTS IS A DOCUMENT THAT MR. SCHENK SHOWED YOU DURING HIS CLOSING ARGUMENT YESTERDAY, AND HE'S POINTING TO THIS BECAUSE IT'S AN EMAIL DIRECTLY FROM MR. BALWANI TO A GROUP OF PEOPLE AT WALGREENS, INCLUDING JAY ROSAN AND BRAD WASSON, AND IT'S AN ARTICLE FROM A PUBLICATION CALLED "SINGULARITY HUB" AND THE HEADLINE IS SMALL, FAST, AND CHEAP, THERANOS IS THE POSTER CHILD OF MED TECH -- AND IT'S IN WALGREENS.  THIS IS FROM NOVEMBER 18TH, 2013.

SO THE GOVERNMENT POINTED TO THIS, SEE, HE'S PROVIDING INFORMATION IN ARTICLES FROM WALGREENS THAT HAS INFORMATION IN IT.  LET'S LOOK AT WHAT THAT IS.

THE FIRST STATEMENT THAT THE GOVERNMENT SAYS IS FALSE IS HENRY FORD WOULD RECOGNIZE THE PRINCIPLE THAT ALLOWS THERANOS TO COMPLETE ACCURATE LAB TESTS WITHIN FOUR HOURS.

LET'S PAUSE RIGHT THERE.

THESE BLOOD TESTS AT THIS TIME IN NOVEMBER OF 2013, THIS IS GOING ON IN WALGREENS'S OWN STORES.  THEY KNOW EXACTLY HOW LONG IT TAKES.  THEY KNOW THAT THE BLOOD SAMPLE IS BEING COLLECTED THERE AND TRANSPORTED TO A CENTRAL LAB.  THIS IS NOT INFORMATION THAT WALGREENS IS GOING TO LOOK AT AND SAY, OH YES,

SER-1160

IT MUST BE GOING ON IN FOUR HOURS. THEY KNOW EXACTLY WHAT'S GOING ON. IT'S THEIR OWN STORES WHERE THE BLOOD COLLECTION IS GOING ON.

BY THE WAY, IN THE EMAIL MR. BALWANI DOESN'T COMMENT ON THIS. HE DOESN'T SAY LOOK AT THIS ARTICLE AND LOOK AT WHAT WE'RE DOING. HE JUST SENDS IT WITHOUT EXPLANATION.

WALGREENS KNOWS THIS.

LET'S GO ON TO THE NEXT POINT.

BLOOD IS DRAWN WITH A FINGERSTICK, RATHER THAN A NEEDLE IN THE ARM. THERE ARE NO BOTCHED STICKS, OF COURSE, THERE ARE NO PHLEBOTOMISTS, ONLY MACHINES IN THE THERANOS LABS.

WALGREENS KNOW FULL WELL THAT THERE ARE VENOUS DRAWS GOING ON IN THEIR OWN STORES. AND IN 2014 TIME PERIOD, IT IS, LIKE 60 PERCENT. AND THIS IS 2013. NO REASON TO THINK IT'S ANY DIFFERENT.

SO THE IDEA THAT WALGREENS DOESN'T KNOW THAT WE HAVE PHLEBOTOMISTS AND WE HAVE VENOUS DRAWS, OF COURSE THEY DO.

SO MR. BALWANI IS SENDING THIS INFORMATION TO WALGREENS, HE'S FORWARDING AN ARTICLE. THERE'S NO BASIS TO SAY THAT MR. BALWANI IS TRYING TO DECEIVE WALGREENS INTO THINKING THESE THINGS WERE TRUE WHEN HE KNOWS, EVERYONE KNOWS, WALGREENS KNOWS THESE THINGS, THEY KNOW ABOUT THE PHLEBOTOMISTS, THEY KNOW ABOUT THE VENOUS DRAWS, IT WAS IN THEIR OWN PRESS RELEASE FOR GOODNESS SAKES.

AND THIS IS ANOTHER ONE OF THOSE RED HERRINGS WHERE THE

GOVERNMENT IS TRYING TO TAR MR. BALWANI WITH SOMETHING

DECEPTIVE THAT IS REALLY NOT.

BUT LET'S GO TO WHAT MR. BALWANI REALLY THOUGHT AND REALLY DID.

HERE'S AN INQUIRY FROM A MEDIA SOURCE CALLED G2 INTELLIGENCE AND THIS IS SEPTEMBER 10TH, 2013.

AND IF THERE'S ANY EVIDENCE OF WHAT MR. BALWANI REALLY INTENDED HERE, THIS IS ONE OF THE KEY THINGS BECAUSE WHAT HAPPENS IS -- LET'S GO TO THE NEXT SLIDE.

G2 INTELLIGENCE, AS MR. BLICKMAN SAYS HERE, THIS RON FROM G2 SENDS AN EMAIL TO MR. BLICKMAN AND CALLS HIS PHONE LINE. HIS VOICEMAIL REITERATED THAT HIS DEADLINE IS FRIDAY AND HE'S TRYING TO CONFIRM THE SAME SET OF QUESTIONS SENT YESTERDAY.

SO THAT'S WHAT MR. BLICKMAN IS REPORTING, THIS JOURNALIST HAS A DEADLINE, AND I NEED TO GET HIM THE INFORMATION AND HE POSES THE QUESTIONS.

SO LET'S LOOK AT WHAT THOSE ARE IN PART.  AND THIS IS EXHIBIT 20167.

SO MR. BALWANI RESPONDS SEPTEMBER 11TH, 2013.  I EDITED THE FOLLOWING.  ELIZABETH NEEDS TO DECIDE WHETHER TO SEND THIS AND IF SO, THEN PROVIDE HER THOUGHTS AND EDITS.

AND HERE IS ONE OF THE JOURNALIST'S QUESTIONS.  HOW MUCH BLOOD IS REQUIRED (IN NANOLITERS OR MICROGRAMS)?  ALTHOUGH IT IS MENTIONED IN THE RELEASE, HOW SPECIFICALLY WILL IT BE DRAWN?

AND THE ANSWER THAT IS DRAFTED THERE IS, THE BLOOD WILL BE

SER-1162

DRAWN IN A THREE STEP PROCESS, ONE, PLACE FINGER WARMER ON PATIENT'S FINGERTIP; TWO, CLEAN THE FINGERTIP AND DEPRESS TINY LANCET ON FINGER; THREE, TECHNICIAN COLLECTS BLOOD IN SMALL DISPOSABLE DEVICES TO FILL OR NANOTAINER TUBES WITH A FEW DROPS OF SAMPLE.

SO THAT'S THE ANSWER THAT'S DRAFTED.

BUT HERE'S MR. BALWANI'S SUGGESTED EDIT. HE WRITES, FIX THIS, FIX THIS TO ALSO INCLUDE VENIPUNCTURE.

SO MR. BALWANI WANTS THIS JOURNALIST TO BE TOLD THAT THERE IS VENIPUNCTURE GOING ON, AND THE GOVERNMENT SAYS, THIS IS SOME KIND OF INTENT THAT MR. BALWANI WANTS TO HIDE THESE TRADITIONAL METHODS FROM THE WORLD WHEN HE'S THE ONE WHO IS SAYING IN THIS RESPONSE TO THIS JOURNALIST AT G2 INTELLIGENCE, TELL THEM IT'S VENIPUNCTURE, LET'S MAKE SURE WE INCLUDE THAT BECAUSE WE'RE ALSO DOING THAT, AND THIS IS THE OPPOSITE.

LOOK AT ALL OF THE EVIDENCE. MR. BALWANI'S INTENT, HIS GOOD FAITH, THIS IS ONE OF THOSE PIECES OF EVIDENCE THAT SHOULD REALLY MAKE YOU GIVE PAUSE. TRANSLATE IT INTO REASONABLE DOUBT WHEN THE GOVERNMENT SAYS THAT MR. BALWANI WAS TRYING TO DECEIVE ANYBODY ABOUT THE METHODS BEING USED AT THERANOS'S LAB.

OKAY. HERE'S ANOTHER EXAMPLE. SO THIS IS ONE OF THOSE TEXT MESSAGES BETWEEN TWO PEOPLE THE GOVERNMENT CLAIMS ARE COCONSPIRATORS, AND HERE THEY ARE TALKING IN PRIVATE BY TEXT MESSAGE.

AND MR. BALWANI WRITES ON JULY 8TH, 2015, AND TELLS

MS. HOLMES, "THE HOME PAGE ANNOUNCEMENT FOR CBC," I BELIEVE THAT TO BE A REFERENCE TO CAPITAL BLUE CROSS, "IS TOO DRAMATIC. CHANGE THE FACE OF HEALTH CARE IN PENNSYLVANIA. CAN U CHANGE IT ONCE IN OFFICE. SOMETHING MORE HUMBLE AND ACCURATE."

THAT'S WHAT MR. BALWANI WANTS MS. HOLMES TO DO.

SO IT'S NOT, GREAT, ELIZABETH, FULL STEAM AHEAD, YOU KNOW, SAY SOMETHING REALLY DRAMATIC AND INACCURATE.

HE'S SAYING, NO, LET'S BE HUMBLE AND ACCURATE. THAT'S MR. BALWANI'S INTENT.

AND IF YOU WANT TO LOOK AT THE TEXT MESSAGES, YOU KNOW, THAT IS THE OPPOSITE OF, YOU KNOW, SOME KIND OF CONSPIRACY OR INTENT TO DEFRAUD.

LET'S SWITCH GEARS HERE FOR A MINUTE AND TALK ABOUT THE THERANOS IP PORTFOLIO.

SO WE TALKED ABOUT HOW IMPORTANT WALGREENS WAS TO INVESTORS. BUT THAT WASN'T THE ONLY THING THAT WAS IMPORTANT. WE ALSO TALKED ABOUT THE BOARD BEING IMPORTANT.

THE INVESTORS ALSO TESTIFIED ABOUT THE IP PORTFOLIO BEING IMPORTANT TO THEM AS WELL.

SO THIS NEXT ITEM HERE IS FROM LISA PETERSON'S BINDER. DO YOU REMEMBER -- I CALL IT LISA PETERSON'S BINDER. IT'S REALLY THE BINDER SENT TO THE DEVOS FAMILY OFFICE, RDV, AND IT'S SENT TO JERRY TUBERGEN, AND MS. PETERSON ENDED UP MAKING A COPY OF TWO BINDERS, AND ONE HAD A NUMBER OF MATERIALS, INCLUDING THIS LENGTHY LIST OF PATENTS AND OTHER IP, INTELLECTUAL PROPERTY.

SER-1164

SO ONE OF THEM, AND THIS IS ON PAGE 141 OF EXHIBIT 4858, IS THIS PARTICULAR ITEM DEVICES, METHODS, AND SYSTEMS FOR REDUCING SAMPLE VOLUME.  THAT'S A PATENT APPLICATION.

AND THEN IT HAS A NUMBER.  AND THE DATE IS 9/9/2013.

AND IF YOU GO TO THE NEXT SLIDE, MR. ALLEN.

I SHOWED YOU THIS YESTERDAY, BUT THIS IS THE PATENT APPLICATION THAT WAS FILED, AND YOU SEE IT'S THE SAME PATENT APPLICATION BEING REFERENCED.  AND IF YOU LOOK AT EXHIBIT 20830, IT HAS THE SAME NUMBER AND WITH THE SAME DATE.

THIS IS IN THE PATENT APPLICATION, AND I WON'T READ IT AND I'LL LEAVE IT ON THE SCREEN FOR A MINUTE, BUT IT DESCRIBES ALL OF THE EXTENSIVE MODIFICATIONS THAT THERANOS FILED WITH THE PATENT OFFICE THAT THEY WERE MAKING TO THE COMMERCIAL DEVICES IN ORDER TO MODIFY THEM FOR FINGERSTICK USE.

AND THEN ON THIS PAGE MORE OF THE PATENT APPLICATION TALKING ABOUT WHAT THEY WERE DOING.

SO THIS PATENT APPLICATION WAS SPECIFICALLY REFERENCED, THESE MODIFIED PREDICATE DEVICE, IN MS. PETERSON'S SLIDE DECK.

MORE ON DISCLOSURE OF COMMERCIAL DEVICES.  SO THIS IS AN EMAIL FROM MS. HOLMES TO SALLY HOJVAT WHO WE SAW BEFORE WAS AN OFFICIAL AT THE FDA.  THIS IS FROM OCTOBER 23RD, 2013.  YOU SEE IT HAS ATTACHMENTS, AND THEN THERE'S THIS NOTICE TRADE SECRET CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

SO THERANOS CONSIDERED THIS INFORMATION, MODIFIED

PREDICATE DEVICES, TO BE INTELLECTUAL PROPERTY, YOU KNOW, PROPRIETARY INFORMATION THAT WOULDN'T BE SHARED. IN FACT, AS YOU JUST SAW, THEY FILED A PATENT APPLICATION SO THAT THEY COULD PROTECT THIS INTELLECTUAL PROPERTY.

AND NOW THEY'RE SHARING THIS WITH THE FDA.

AND LET'S LOOK AT WHAT THEY SHARED.

SO THEY SHARED WITH THE GOVERNMENT AGENCY, THE FOOD AND DRUG ADMINISTRATION, THE TESTS RUN IN THERANOS'S CLIA LABORATORY FROM SAMPLES COLLECTED IN THERANOS WELLNESS CENTERS.

AND YOU CAN SEE THERE -- LET'S START WITH THE FOOTNOTE AT THE VERY BOTTOM DEFINING THE TERM THERANOS PROTOCOL MEANS FDA-CLEARED ASSAYS RUNNING A THERANOS PROTOCOL (IE, MODIFIED UNDER THE CLIA REGULATIONS). THESE ASSAYS ARE THUS VALIDATED AS LABORATORY DEVELOPED TESTS.

SO THESE WERE THE MODIFIED COMMERCIAL DEVICES, AND THEY'RE DISCLOSING IT TO THE FDA, AND YOU CAN SEE WHERE CMP, COMPLETE METABOLIC PANEL, THAT GROUP OF TESTS, YOU CAN SEE THE CHEMISTRY IS THERANOS PROTOCOL, WHICH IS DEFINED AS THE MODIFIED PREDICATE, AND THEN THE DEVICE IS AN FDA CLEARED DEVICE.

SO IT'S COMMERCIAL DEVICE, FDA APPROVED, RUNNING THE THERANOS PROTOCOL, SO IT'S MODIFIED.

AND THEN THE SAME THING WITH LIPIDS, WHICH IS CHOLESTEROL TESTING AND THINGS LIKE THAT.

SO THEY'RE DISCLOSING TO THE FDA EXACTLY WHAT THEY'RE DOING. SOME OF IT IS COMMERCIAL.

SER-1166

SO, FOR EXAMPLE, HBA1C IS FDA CLEARED AND APPROVED, AN FDA CLEARED AND APPROVED DEVICE, SO IT'S AN UNMODIFIED COMMERCIAL DEVICE.

AND THEN SOME OF THEM ARE TSPU, PSA, THAT'S THE EDISON, AND IT'S RUNNING THERANOS CHEMISTRY.

SO THEY'RE DISCLOSING ALL OF THE DIFFERENT METHODS THAT THEY'RE USING DIRECTLY TO THE U.S. GOVERNMENT, THE FOOD AND DRUG ADMINISTRATION.

MORE ABOUT DISCLOSURE OF USE OF TRADITIONAL METHODS. LET'S LOOK AT THAT, BECAUSE THE GOVERNMENT SAYS THIS WAS SOME KIND OF A SECRET.

SO THIS IS A DOCUMENT THAT WAS PROVIDED TO MS. BENNETT, SO SHE WAS NOTICED OF THIS.

AND IF WE GO -- THIS IS IN OCTOBER 25TH OF 2013. SO IT'S GOING TO -- IF YOU LOOK AT THE EMAIL STRING, ALBERTO GUTIERREZ HAS AN EMAIL ADDRESS AT THE FDA, SO HE'S AT THE FDA, AND THEN SARAH BENNETT WE KNOW TO BE A CMS EMPLOYEE, AND IT HAS SOME ATTACHMENTS.

AND IF YOU GO TO THE ATTACHMENT, IT TALKS ABOUT PHASE I. THAT'S THAT CENTRAL LAB MODEL I WAS TALKING ABOUT BEFORE.

AND YOU CAN SEE RIGHT IN THIS DOCUMENT IT SAYS, IF YOU LOOK AT THE BOX ON THE RIGHT, THE BIG GREEN ON THE RIGHT AT THE TOP OF THAT, IT SAYS "SAMPLES ARE PROCESSED AND RESULTS ARE GENERATED VIA CONVENTIONAL ANALYZERS."

AND THEN BELOW THAT IT SAYS, "OR THERANOS SAMPLE

PROCESSING UNIT PERFORMS AUTOMATED PREANALYTIC PROCESSING."

SO THEY'RE DISCLOSING RIGHT TO CMS AND THE FDA THAT THEY'RE USING CONVENTIONAL ANALYZERS.

SO THAT'S THE U.S. GOVERNMENT.

LET'S GO TO THE NEXT.

MORE ABOUT DISCLOSURE WRITING ON THE WEBSITE. IT SAYS, "INSTEAD OF A HUGE NEEDLE WE CAN USE A TINY FINGERSTICK OR COLLECT A MICRO-SAMPLE FROM A VENOUS DRAW."

SO THERE'S NO SECRET ABOUT VENOUS DRAWS. IT'S RIGHT ON THE THERANOS WEBSITE FOR THE WORLD TO SEE.

IT'S THE SAME THING IN THE PUBLIC PRESS RELEASE, WE LOOKED AT THAT BEFORE, TRADITIONAL METHODS AS WELL AS FINGERSTICK.

THE SAME WITH THE NOVEMBER PRESS RELEASE. WE LOOKED AT THAT EARLIER, TOO. THEY'RE DISCLOSING TRADITIONAL METHODS.

SO THERE'S NO HIDING THAT THERANOS IS DOING VENOUS DRAWS. ANYONE CAN LOOK AT THIS, THESE ARE PUBLIC DOCUMENTS, AND THEY'RE TELLING THE GOVERNMENT AS WELL.

MR. JHAVERI AGREED THAT THESE MICRO SAMPLES THAT ARE REFERRED TO IN SOME OF THE MATERIAL ARE ALSO VENOUS DRAWS. HE WAS WELL AWARE OF THAT. IT'S JUST A SMALLER VOLUME OF BLOOD TAKEN FROM A VENOUS DRAW, AND THAT'S WHAT MR. JHAVERI TESTIFIED HE KNEW.

LET'S TALK ABOUT MR. LUCAS FOR A MINUTE.

MR. LUCAS, YOU MIGHT REMEMBER -- WE WILL RETURN TO THIS A LITTLE LATER, BUT HE KNEW THAT THERANOS COULDN'T DO HUNDREDS OR

SER-1168

THOUSANDS OF TESTS ON ITS OWN TECHNOLOGY.  HE THOUGHT THERE WERE DOZENS OF TESTS, WHICH WAS TRUE.  WE SAW DR. ROSENDORFF HAD SIGNED 57 VALIDATION REPORTS.  SO DOZENS IS ACCURATE.

HERE THOUGH THE QUESTION PUT TO MR. LUCAS IS WHAT ABOUT THE ONES THAT THERANOS COULDN'T DO BEYOND THE DOZENS?

THE QUESTION WAS WOULD THEY HAVE TO BE DONE BY SOME OTHER METHOD?

AND HE SAYS YES.

AND THAT MIGHT BE TRADITIONAL METHODS.

AND HE SAID CORRECT.

AND THEN THE QUESTION, AND YOU KNEW THAT BEFORE YOU INVESTED IN 2013?

AND HE SAID YES.

SO MR. LUCAS KNEW FULL WELL THAT THERANOS WAS USING TRADITIONAL METHODS BEYOND THE DOZENS THAT THERANOS COULD DO ON THEIR OWN TECHNOLOGY.

NOW, LET'S TALK A LITTLE BIT MORE ABOUT MR. LUCAS.  LET'S GO TO THE NEXT SLIDE.

SO THE GOVERNMENT HIGHLIGHTED THIS TESTIMONY DURING CLOSING, BUT I WANT TO SHOW YOU THE REST OF THE TESTIMONY THAT THE GOVERNMENT DIDN'T SHOW YOU.

SO THE PART THAT THE GOVERNMENT BROUGHT TO YOUR ATTENTION WAS ON LINE 14, "BUT IF THERANOS HAD THE CAPABILITY TO RUN MANY BLOOD TESTS ON ITS ANALYZERS BUT DECIDED THAT IT WOULD NOT MAKE ECONOMIC SENSE TO DO THAT RIGHT AWAY AND INSTEAD USE A

SER-1169

COMMERCIAL ANALYZER, THAT'S NOT A BUSINESS DECISION THAT YOU WOULD EXPECT TO BE INVOLVED IN AS AN INVESTOR, IS IT?"

MR. LUCAS ANSWERED, "THAT WOULD HAVE BEEN SHOCKING TO ME TO KNOW THAT."

SO THE GOVERNMENT HIGHLIGHTED THAT THAT MR. LUCAS WOULD HAVE BEEN SHOCKED ABOUT THE USE OF COMMERCIAL DEVICES, ALTHOUGH AS I JUST SHOWED YOU, HE KNEW THAT BEFORE HE INVESTED, THAT THERE WERE TRADITIONAL METHODS BEING USED.

BUT THE QUESTION HERE WAS A LITTLE DIFFERENT.  IT WAS ABOUT THE BUSINESS DECISION, AND HE SAID IT WOULD HAVE BEEN SHOCKING.

BUT LET'S GO ON TO THE NEXT PAGE, THE NEXT QUESTION THAT THE GOVERNMENT DIDN'T SHOW YOU IN ITS CLOSING YESTERDAY.

"QUESTION:  BUT IF IT MADE BUSINESS SENSE TO DO IT DIFFERENTLY FOR SOME ASSAY OR CERTAIN ASSAYS, THE MANAGEMENT HAD A RIGHT TO MAKE THAT DECISION; RIGHT?

AND THEN MR. LUCAS ANSWERS, "THEY HAVE A RIGHT TO MAKE ANY DECISION.  AND --"

AND THEN HE GOES ON.  "AGAIN, I KNEW THAT SOME TESTS THERANOS COULD NOT DO ON THEIR OWN MACHINES, AND THEY'D HAVE TO BE RUN ON A COMMERCIAL ANALYZER."

SO THIS WAS NOT SHOCKING TO MR. LUCAS THAT THERANOS WAS USING COMMERCIAL ANALYZERS.  HE KNEW THAT BEFORE HE INVESTED, AND HE INVESTED ANYWAY.

SO WHAT I'M ALSO POINTING OUT HERE IS THAT THE GOVERNMENT

SHOWED YOU ONLY THAT PAGE BEFORE IT AND NOT HIS ADDITIONAL ANSWER. AND THAT'S JUST MISLEADING. THAT'S THE FULL TESTIMONY THAT MR. LUCAS GAVE.

LET'S TALK ABOUT THE PHARMACEUTICAL RELATIONSHIPS. SO THIS IS A REALLY PROMINENT EXAMPLE OF HOW THE GOVERNMENT IS TRYING TO TAR MR. BALWANI WITH SOMETHING THAT REALLY ISN'T RIGHT.

SO THERANOS, AS I POINTED OUT YESTERDAY, HAD QUITE A LOT OF PHARMACEUTICAL RELATIONSHIPS. IT HAD CONTRACTS WITH VARIOUS COMPANIES.

AND THE GOVERNMENT SPENT A LOT OF TIME TALKING ABOUT TWO, PFIZER AND SCHERING-PLOUGH, AS SOMEHOW FRAUDULENT BECAUSE THERE WERE SOME REPORTS WITH LOGOS ON THEM, AND THE GOVERNMENT'S THEORY IS THAT THESE WERE USED TO MISLEAD INVESTORS BECAUSE IT MADE IT LOOK LIKE THESE COMPANIES HAD DRAFTED REPORTS WHEN THEY HADN'T. THEY PRESENTED A COUPLE OF WITNESSES ABOUT THIS.

BUT I REALLY WANT TO UNPACK THIS SO WE UNDERSTAND WHAT MR. BALWANI'S ROLE WAS IN THIS WAS OR LACK OF ROLE.

SO, FIRST OF ALL, LET'S START OUT WITH MR. EDLIN'S TESTIMONY. "THOSE RELATIONSHIPS BETWEEN THE PHARMACEUTICAL COMPANIES AND THERANOS WERE LED BY ELIZABETH HOLMES; CORRECT?

"CORRECT.

"MR. BALWANI WAS NOT INVOLVED IN THOSE RELATIONSHIPS AS FAR AS YOU KNOW; RIGHT?

MR. EDLIN, WHO WAS THERE FOR A LONG TIME DURING THIS WHOLE

SER-1171

PERIOD, HE UNDERSTOOD THAT MR. BALWANI WAS NOT INVOLVED IN THOSE PHARMACEUTICAL RELATIONSHIPS.

AND THEN THE GOVERNMENT CALLED SHANE WEBER, WHO WAS A PERSON WHO WORKED FOR PFIZER, AND HE NEVER MET MR. BALWANI.

DR. CULLEN FROM SCHERING-PLOUGH DID NOT RECOGNIZE MR. BALWANI, DID NOT SPEAK WITH HIM, DID NOT EMAIL WITH HIM, HE'S NOT ON ANY OF THE EMAILS.

SO DR. CULLEN DOESN'T KNOW OR HAD NOT MET MR. BALWANI EITHER.  SO THERE WAS NO INTERACTION THERE.

AND THEN, AS I POINTED OUT TO YOU THE OTHER DAY, THERE WERE LOTS OF PHARMA RELATIONSHIPS.  THIS IS EXHIBIT 7753.  IT HAS ALL OF THESE CONTRACTS:  CELGENE, CENTOCOR, MERCK, NOVARTIS, AS WELL AS SCHERING-PLOUGH AND ASTRA-ZENECA.

SO LET'S GO BACK TO SHANE WEBER.

SO HE TESTIFIED THAT HE HAD CONCERNS AND HE HAD SOME OPINIONS ABOUT THERANOS, AND HE WASN'T DEALING WITH MR. BALWANI, BUT HE DIDN'T EVEN SHARE HIS VIEWS WITH MS. HOLMES.

SO WHATEVER MR. WEBER THOUGHT ABOUT THE TECHNOLOGY AND WHAT HE HAD SEEN, HE KEPT TO HIMSELF OR AT LEAST KEPT THEM INTERNALLY BECAUSE HE DIDN'T SHARE THEM WITH MS. HOLMES.

SO IF MS. HOLMES DOESN'T EVEN KNOW WHAT SHANE WEBER THINKS, HOW IS MR. BALWANI SUPPOSED TO KNOW ANYTHING WHEN HE NEVER INTERACTED WITH MR. WEBER AT ALL?

GO TO THE NEXT SLIDE.

SAME WITH DR. CULLEN FROM SCHERING-PLOUGH. SHE HAD SOME THOUGHTS ABOUT THE THERANOS TECHNOLOGY. SHE NEVER VOICED THEM WITH MS. HOLMES.

SO OF COURSE MR. BALWANI DOESN'T KNOW THAT EITHER, WHAT DR. CULLEN THOUGHT OR SHANE WEBER THOUGHT. IT'S BASICALLY IRRELEVANT TO MR. BALWANI'S KNOWLEDGE AND INTENT BECAUSE HE NEVER HEARD ANYTHING ABOUT IT.

BUT LET'S GO TO THE CORE OF THIS, WHICH IS THE PHARMACEUTICAL REPORT LOGOS.

SO TWO PEOPLE, MR. WEBER FROM PFIZER, AND DR. CULLEN FROM SCHERING-PLOUGH, SAID THAT THEY DIDN'T AUTHORIZE THE LOGOS. THERE WERE SOME CHANGES IN THE REPORT IN THE CASE OF SCHERING-PLOUGH THAT DR. CULLEN SAYS SHE DIDN'T AUTHORIZE, AND THAT THE GOVERNMENT PRESENTING THIS IS NOT ONLY SOMETHING THAT IS WRONG, BUT ALSO IT'S SOMETHING THAT MR. BALWANI IS RESPONSIBLE FOR.

LET'S TALK ABOUT WHAT MR. BALWANI KNOWS AND WHAT HE DOESN'T KNOW.

SO, FIRST OF ALL, JUDGE DAVILA WILL GIVE YOU AN INSTRUCTION ABOUT THE DEFINITION OF KNOWINGLY, AND THE THING I WANT TO HIGHLIGHT RIGHT NOW IS THAT LAST SENTENCE. TO FIND THAT MR. BALWANI ACTED KNOWINGLY, YOU MUST FIND THAT HE HIMSELF HAD KNOWLEDGE OF A FACT AT ISSUE.

SO WHETHER MS. HOLMES KNEW SOMETHING, I'M NOT SAYING SHE DID OR DIDN'T, BUT IF MS. HOLMES KNOWS SOMETHING, THAT DOESN'T

MEAN MR. BALWANI KNOWS IT. YOU CAN'T TAKE MS. HOLMES'S KNOWLEDGE, IF THE GOVERNMENT HAS EVEN PROVEN THAT, AND SOMEHOW SAY THAT MR. BALWANI ALSO HAS THAT KNOWLEDGE. THAT'S WHAT THE INSTRUCTION SAYS.

LET'S GO BACK TO SOMETHING THAT I TALKED ABOUT YESTERDAY, WHICH WAS GLAXOSMITHKLINE. SO THIS IS AN EMAIL THAT MS. HOLMES SENDS TO A PERSON AT GLAXOSMITHKLINE. SO SHE'S NOT TRYING TO HIDE ANYTHING FROM GLAXOSMITHKLINE, BECAUSE THAT'S THE PERSON, THOMAS BREUER, WHO IS GETTING THE EMAIL.

AND SHE ATTACHES THREE DOCUMENTS. THE SECOND IS A COPY OF THE VALIDATION REPORT FROM THE GLAXOSMITHKLINE STAFF WHO TESTED THERANOS TECHNOLOGIES AND RESEARCH AT TRIANGLE PARK.

LET'S LOOK AT WHAT THOSE DOCUMENTS ARE, AND I'LL QUICKLY GO THROUGH THESE BECAUSE I WENT THROUGH THEM YESTERDAY AS WELL.

GSK COMPLETED A COMPREHENSIVE VALIDATION OF THERANOS SYSTEMS IN 2008.

SO THE GOVERNMENT HAS PRESENTED NOTHING ABOUT GSK.

THIS IS IN DECEMBER OF 2009. MR. BALWANI GETS THIS EMAIL. HE IS ON NOTICE THAT THERE'S A RELATIONSHIP WITH GLAXOSMITHKLINE, THAT THEY DID SOME ANALYSIS OF THERANOS DEVICE, AND THEY COMPLETED A COMPREHENSIVE VALIDATION.

SO WHEN THE GOVERNMENT TURNS AROUND AND SAYS REPRESENTATIONS TO INVESTORS THAT THERE WAS NO COMPREHENSIVE VALIDATION BY GSK AND OTHER PHARMACEUTICAL COMPANIES WAS FALSE, THIS IS WHAT HAPPENED.

FIRST OF ALL, MR. BALWANI IS BEING TOLD THAT GSK DID THIS WORK AND THERE'S NO EVIDENCE THAT HE THINKS ANYTHING OTHER THAN THAT. AND THE REPORT IS BEING SENT TO A GSK PERSON. SO NOT TO AN INVESTOR. IT'S BEING SENT RIGHT BACK TO GSK BY MS. HOLMES.

LET'S GO TO THE NEXT PAGE.

THIS IS THE EXCERPTS FROM THE GSK METABOLIC STUDY.

AND THEN I WON'T READ THIS AGAIN BECAUSE WE WENT THROUGH THIS YESTERDAY, BUT IF YOU LOOK AT THAT EXHIBIT, WHICH IS 15058, IT'S VERY COMPLIMENTARY OF THERANOS'S TECHNOLOGY. THIS IS THE WORK THAT GSK DID.

AGAIN, THIS IS SOMETHING THAT THE DEFENSE HAD TO SHOW YOU, NOT -- THE GOVERNMENT DIDN'T SHOW IT TO YOU.

THAT'S WHAT MR. BALWANI KNOWS.

AND THE GOVERNMENT DIDN'T EVEN TALK ABOUT THE OTHER RELATIONSHIPS, LIKE CELGENE, CENTOCOR, AND ASTRA-ZENECA, BUT THIS IS IMPORTANT BECAUSE THIS IS WHAT MR. BALWANI UNDERSTANDS ABOUT GLAXOSMITHKLINE, AND IT'S THE OPPOSITE OF SOME FRAUDULENT KNOWLEDGE. THIS IS MR. BALWANI BEING TOLD THEY DID COMPREHENSIVELY VALIDATE THE TECHNOLOGY.

BUT HERE IS WHERE THE GOVERNMENT IS GOING OFF TRACK.

LET'S GO TO THE NEXT DOCUMENT.

SO THIS IS AN EMAIL FROM MS. HOLMES TO A PERSON NAMED BRUCE SHEPARD AT WAL-MART, NOT WALGREENS, BUT ANOTHER COMPANY WAL-MART, A BIG RETAILER.

AND IT SAYS "BRUCE,

GREAT TO TALK WITH YOU."

AND THERE'S AN ATTACHMENT.  AND IF YOU LOOK AT THE ATTACHMENT, IT'S THE SCHERING-PLOUGH REPORT.  AND IT'S A SCHERING-PLOUGH REPORT WITHOUT THE SCHERING-PLOUGH LOGO.  IT JUST HAS THE THERANOS LOGO.

SO THE GOVERNMENT SAYS, AH-HA, MR. BALWANI GOT THIS EMAIL COPIED TO HIM IN MARCH OF 2010 AND IT HAS A SCHERING-PLOUGH REPORT WITHOUT THE SCHERING-PLOUGH LOGO.  SO RIGHT AWAY MR. BALWANI HAS THAT DOCUMENT, RIGHT?

AND THEN IF YOU GO TO THE NEXT DOCUMENT, ABOUT A MONTH LATER IN APRIL OF 2010, MS. HOLMES SENDS DR. ROSAN AND ALEX JUNG FROM WALGREENS, WITH A COPY TO MR. BALWANI, THREE REPORTS.  ONE IS GSK, WHICH WE JUST LOOKED AT, ONE IS PFIZER, AND THE OTHER ONE IS SCHERING-PLOUGH, AND IS SAYING, "DEAR JAY AND ALEX,

"AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE DILIGENCE REPORTS."

SO MR. BALWANI GETS THAT, TOO, ABOUT A MONTH AFTER THE WAL-MART EMAIL.

LET'S GO TO THE NEXT PAGE.

AND YOU CAN SEE THAT THIS TIME THERE'S THAT REPORT WITH THE GLAXOSMITHKLINE LOGO.

AND IF YOU GO TO THE NEXT PAGE, THERE'S THE PFIZER LOGO.

AND IF YOU GO TO THE NEXT PAGE, THERE'S THE SCHERING-PLOUGH LOGO.

SO JUST COVERING GSK AND PFIZER FIRST.

MR. BALWANI GETS THE EMAIL WITH THE GSK DOCUMENT WITH THE GSK LOGO, SO MR. BALWANI HAS EVERY REASON TO BELIEVE THAT THE GSK IS TOTALLY LEGITIMATE, AND THERE'S NO EVIDENCE TO THE CONTRARY.

WITH REGARD TO THE PFIZER, THERE'S NO EVIDENCE IN THIS CASE THAT MR. BALWANI HAS ANY KNOWLEDGE OF ANYTHING WRONG WITH THE PFIZER REPORT WHETHER IT'S PUTTING A PFIZER LOGO ON IT OR ANYTHING ELSE.

THERE'S NO INFORMATION THAT MR. BALWANI HAS EVER SEEN A VERSION OF A PFIZER REPORT WITHOUT THE LOGO.  THERE'S NO DISCUSSION ABOUT PUTTING ANY LOGOS ON IT.  THERE'S NO DISCUSSION OF ANY CHANGES MADE TO THE REPORT BY ANYBODY.

SO THERE'S JUST NO EVIDENCE IN THE CASE THAT MR. BALWANI KNOWS ANYTHING OTHER THAN WHAT IS BEING REPRESENTED, THAT THERE IS COMPREHENSIVE VALIDATION BY NOT ONLY GSK BUT BY THESE OTHER COMPANIES.

BUT LET'S TALK ABOUT SCHERING-PLOUGH IN PARTICULAR. BECAUSE HERE'S THE GOVERNMENT'S THEORY.  THIS IS ALL THEY'VE GOT, OKAY?

THAT WHEN THE EMAIL WAS SENT FROM MS. HOLMES TO SCHERING-PLOUGH IN APRIL OF 2010, AND YOU CAN SEE THE DOCUMENT ON THE SCREEN THAT HAS THE SCHERING-PLOUGH LOGO, AND IF YOU LOOK DEEPER IN THE REPORT YOU CAN SEE THAT THERE ARE SOME CHANGES MADE TO THE CONCLUSION SECTION COMPARED TO THE ONE THAT

SER-1177

WAS SENT TO WAL-MART ABOUT A MONTH EARLIER, THAT THE GOVERNMENT'S THEORY IS THAT MR. BALWANI WAS SUPPOSED TO GET THIS EMAIL WITH SCHERING-PLOUGH, YOU KNOW, BURIED ON PAGE 34 OF THE EMAIL PACKAGE, AND MR. BALWANI WAS SUPPOSED TO SAY, HUH, I SEE THIS REPORT WITH THE SCHERING-PLOUGH LOGO, LET ME GO BACK TO THE EMAIL THAT I GOT A MONTH EARLIER AND COMPARE THAT, AND IT DIDN'T HAVE A LOGO, AND THEN HE'S ALSO SUPPOSED TO LIKE DO SOME KIND OF COMPARISON OF ALL OF THE TEXT TO FIGURE OUT IF IT'S EXACTLY THE SAME, AND THEN CONCLUDE FROM THAT, OH, THERE ARE SOME CHANGES IN THE REPORT, AND THERE'S A LOGO ON IT.

AND THEN MORE THAN THAT, THEN MR. BALWANI IS SUPPOSED TO CONCLUDE, WHEN PHARMA IS NOT EVEN HIS PROJECT, PHARMACEUTICAL, HE'S SUPPOSED TO CONCLUDE, OH, AND IT LOOKS LIKE MS. HOLMES MUST HAVE DONE THIS WITHOUT GETTING APPROVAL OF SCHERING-PLOUGH.

BUT HOW WOULD HE KNOW THAT?  THERE'S NO EVIDENCE THAT MR. BALWANI KNOWS ANYTHING.  IT COULD JUST AS WELL BE THAT MS. HOLMES GOT APPROVAL OR HAD SOME FURTHER CONVERSATIONS OR OTHER PEOPLE AT THERANOS DID.

SO THERE'S NO EVIDENCE THAT MR. BALWANI KNOWS ANYTHING ABOUT THE SCHERING-PLOUGH REPORT, HAVING A LOGO PUT ON IT THAT WASN'T AUTHORIZED, OR HAVING CHANGES MADE TO IT THAT WASN'T AUTHORIZED.

THERE'S NO EVIDENCE OF THAT IN THE CASE OF PFIZER, OR GSK, OR ANY OTHER PHARMACEUTICAL COMPANY.

SER-1178

BUT THAT'S ALL THE GOVERNMENT HAS IS THAT MR. BALWANI IS SOMEHOW SUPPOSED TO HAVE DONE THIS COMPARISON.

LET'S USE OUR COMMON SENSE HERE.  IF YOU GET AN EMAIL AT YOUR PLACE OF BUSINESS OR IN YOUR PERSONAL LIFE, AND YOU'VE GOT SOME SIMILAR EMAIL A MONTH EARLIER, ARE YOU, LIKE, DOING COMPARISONS AND PARSING EVERY WORD?  WHY WOULD YOU DO THAT? WHY WOULD MR. BALWANI DO THAT?  THERE'S NO REASON.  THIS IS IN APRIL OF 2010.

SO THAT'S THE GOVERNMENT'S SUM TOTAL OF THEIR THEORY ABOUT WHY MR. BALWANI KNOWS, ACTUALLY KNOWS THAT THERE'S SOMETHING WRONG WITH THE SCHERING-PLOUGH REPORT, AND IT JUST DOESN'T FLY.

AND THAT IS NOT SUFFICIENT EVIDENCE BY ANY STRETCH OF THE IMAGINATION TO CONVICT MR. BALWANI OF FEDERAL CRIMINAL OFFENSES FOR DEFRAUDING INVESTORS.  WHEN INVESTORS ARE TOLD THIS IS COMPREHENSIVE VALIDATION BY PHARMACEUTICAL COMPANIES OF THE THERANOS TECHNOLOGY, HE HAS EVERY REASON TO BELIEVE THAT IS TRUE, AND THERE'S REALLY NO EVIDENCE TO THE CONTRARY AT ALL IN THIS CASE.

AND THAT FLOWS INTO THE INSTRUCTION THAT JUDGE DAVILA WILL GIVE YOU:  GOOD FAITH.  SO THE MISREPRESENTATION AT ISSUE HERE, THE GOVERNMENT CLAIMS IS A MISREPRESENTATION, IS PHARMACEUTICAL COMPANIES WHO COMPREHENSIVELY VALIDATED.

THE QUESTION HERE IS, DID MR. BALWANI HAVE A GOOD FAITH BELIEF IN THE TRUTH OF THOSE MISREPRESENTATIONS?

AND THE EVIDENCE HERE SHOWS THAT YES, HE DID.

SER-1179

I WANT TO SWITCH GEARS HERE.

BY THE WAY, IF ANYONE NEEDS A BREAK, YOU CAN RAISE YOUR HAND. WE CAN TAKE A BRIEF BREAK. I HAVE JUST WANT TO MAKE SURE. OKAY. WE'LL JUST CONTINUE.

I WANT TO TALK ABOUT THE MILITARY RELATIONSHIPS THAT THERANOS HAD, BECAUSE THERE'S BEEN SOME TALK IN THIS CASE ABOUT SOME MISREPRESENTATIONS WHERE SUPPOSEDLY INVESTORS WERE TOLD THAT THERANOS TECHNOLOGY WAS ACTUALLY IN USE WITH THE MILITARY TREATING SOLDIERS, FLYING ON MEDEVAC HELICOPTERS, THINGS LIKE THAT.

LET ME START OUT BY JUST TALKING ABOUT THAT ISSUE. AND, YOU KNOW, THIS CAME UP WITH A NUMBER OF INVESTORS, BUT AS I'VE SAID A FEW TIMES NOW, MR. TOLBERT TESTIFIED, THERE WAS THIS TAPE RECORDING, AND THAT WAS OUR CHANCE TO HEAR EXACTLY WHAT MS. HOLMES WAS SAYING, IF ANYTHING, ABOUT THE RELATIONSHIP WITH THE MILITARY AND ANY USE OF THERANOS TECHNOLOGY ON MEDEVAC HELICOPTERS.

AND WE'LL SEE THIS TESTIMONY IN DETAIL WHEN I TALK ABOUT MR. TOLBERT, BUT THE GOVERNMENT COULD HAVE PLAYED THE TAPE AND WE WOULD HAVE KNOWN EXACTLY WHAT HAPPENED, INSTEAD OF RELYING ON MEMORIES THAT ARE NINE YEARS DISTANT IN SOME CASES.

BUT I WANT TO TALK ABOUT WHAT THERANOS ACTUALLY HAD IN TERMS OF RELATIONSHIPS WITH THE MILITARY.

AND YOU WILL SEE THAT THIS IS LIKE A TELEPHONE GAME. I DON'T KNOW IF YOU REMEMBER THE GAME CHILDREN PLAY WHERE YOU

SER-1180

PASS A MESSAGE ACROSS THE LINE OF PEOPLE AND BY THE END OF THE LINE THE MESSAGE IS A LITTLE GARBLED BECAUSE IT'S GONE THROUGH THE LINE OF TEN PEOPLE OR SOMETHING.

AND THIS IS LIKE THAT KIND OF TELEPHONE GAME BUT OVER A PERIOD OF YEARS WHERE OVER TIME YOU CAN SEE WHAT HAPPENED HERE, INVESTORS TOOK THE INFORMATION THAT DID EXIST AND MORPHED IT INTO, OH, I WAS REALLY TOLD THAT THEY WERE FLYING ON MEDEVAC HELICOPTERS.

THERE'S A STRONG RELATIONSHIP WITH THE MILITARY THAT EXISTED, AND I'M GOING TO GO THROUGH THAT, BUT THE IDERE THAT MR. BALWANI TOLD PEOPLE THAT IT WAS ACTUALLY FLYING AND TREATING SOLDIERS IS PREPOSTEROUS.

SO LET'S TALK ABOUT WHAT EXISTED. SO THIS IS THE MILITARY RELATIONSHIP THAT THERANOS HAD. IT HAD A RELATIONSHIP WITH THE U.S. ARMY BURN CENTER DATED IN 2009; IT HAD A RELATIONSHIP WITH THE SPECIAL OPERATIONS COMMAND OF THE U.S. ARMY; THE U.S. AFRICA COMMAND; AND THE U.S. CENTRAL COMMAND, AND I WANT TO GO THROUGH EACH OF THOSE.

MR. EDLIN TESTIFIED THAT IT WAS MS. HOLMES WHO HAD THIS RELATIONSHIP. SO PHARMACEUTICAL AND MILITARY WERE MS. HOLMES'S RESPONSIBILITIES. YOU MAY REMEMBER THAT THESE RELATIONSHIPS STARTED BEFORE MR. BALWANI GOT TO THERANOS SO IT MADE SENSE THAT MS. HOLMES HAD THE RELATIONSHIPS WITH PHARMA AND THE MILITARY. SO THAT'S WHAT MR. EDLIN KNEW, IT WAS MS. HOLMES'S RELATIONSHIPS.

SER-1181

BUT HERE'S THE ACTUAL RELATIONSHIP. SO HERE'S THE BURN STUDY. SO IN JULY OF 2013, THIS EMAIL, WHICH IS EXHIBIT 20550, THIS IS MR. EDLIN SENDING AN EMAIL ABOUT ALL OF THE EDISON READERS THAT ARE IN THE FIELD.

AND HE SAYS, THERE WERE 40 READERS IN THE FIELD FOR THE AMERICAN BURN ASSOCIATION TRIAL AT EIGHT SITES.

THIS IS THE SAME EMAIL WHERE HE ALSO TALKED ABOUT ONE WAS AT WALGREENS DURING THIS PERIOD. BUT THERE WERE 40.

SO THERANOS IS PUTTING THEIR TECHNOLOGY OUT THERE IN THE FIELD AT EIGHT DIFFERENT SITES FOR USE IN THIS BURN STUDY. THAT'S WHAT THIS EMAIL SAYS.

AND THE BURN STUDY CONDUCTED OVER SEVERAL YEARS RESULTED IN A PUBLISHED REPORT AND THAT'S THE TITLE OF IT, HIGH-VOLUME HEMOFILTRATION IN ADULT BURN PATIENTS WITH SEPTIC SHOCK AND ACUTE KIDNEY INJURY; A MULTICENTER RANDOMIZED CONTROLLED TRIAL.

SO THE THERANOS TECHNOLOGY, THE EDISON WAS USED IN A STUDY OVER A PERIOD OF YEARS, AND THE INVESTIGATORS WHO WERE CONDUCTING THE STUDY WERE ABLE TO PUBLISH A PEER REVIEWED STUDY AND USED THE THERANOS DEVICE TO MONITOR THE PATIENTS IN THE BURN STUDY.

SO IF SOMEONE WANTED TO SAY THAT, HEY, THE TECHNOLOGY IS NOT WORKING, WE CAN'T USE THIS, THEY CERTAINLY COULD HAVE SAID THAT.

INSTEAD, THEY COMPLETED THE STUDY AND PUBLISHED A PEER REVIEWED PAPER AND THAT CAME OUT IN 2017.

SER-1182

IN THE BURN STUDY, HERE ARE THE ACTUAL CYTOKINES. SO RIGHT AWAY YOU CAN SEE THESE PARTICULAR MARKERS WERE MEASURED BY A SANDWICH ELISA METHOD ON THE THERANOS 3.0 DEVICE.

SO THE GOVERNMENT HAS TRIED TO CLAIM IN THIS CASE, WELL, IT COULD ONLY DO 12 TESTS.

WELL, THAT'S NOT TRUE. IT COULD ADAPT THE 3.0 TO DO OTHER TESTS THAT WERE RELEVANT TO THE BURN STUDY THAT YOU SEE ON THE SCREEN RIGHT HERE (INDICATING).

AND THEN THE NEXT PAGE, THAT'S THE CONCLUSION, THE HVHF TREATMENT WAS EFFECTIVE IN REVERSING SHOCK AND IMPROVING ORGAN FUNCTION IN CRITICALLY ILL BURN PATIENTS WITH SEPTIC SHOCK AND AKI AND APPEARS SAFE.

SO IN ORDER TO GET TO THAT POINT OF CONCLUDING THAT THAT TREATMENT WAS EFFECTIVE, THEY USED THE THERANOS TECHNOLOGY TO MONITOR THOSE PATIENTS OVER A PERIOD OF YEARS, AND, AGAIN, RESULTED IN THIS PEER REVIEWED PUBLICATION.

LET'S SWITCH TO AFRICOM. THAT'S THE U.S. AFRICAN COMMAND.

SO MR. EDLIN HAD, YOU KNOW, DEEP INVOLVEMENT IN THESE RELATIONSHIPS. AND HE SAYS, THE FIRST STEP OF THAT RELATIONSHIP WITH AFRICOM WAS JUST TO SEE HOW THE DEVICE PERFORMED IN CONDITIONS IN AFRICA?

HE SAID RIGHT.

BECAUSE THERE ARE EXTREME TEMPERATURES IN AFRICA?

RIGHT.

AND AFRICOM HAD TO MAKE SURE THE DEVICE COULD WITHSTAND

SER-1183

THOSE CONDITIONS?

MR. EDLIN SAID CORRECT.

SO THAT'S THE FIRST STEP.  YOU'VE GOT TO MAKE SURE IT COULD WITHSTAND CERTAIN TEMPERATURES THAT EXIST IN OTHER COUNTRIES, IN AFRICA.

AND THEN WHAT DID THERANOS ACTUALLY DO?

SO IN JUNE OF 2012, DR. YOUNG REPORTS THAT THEY PERFORMED 48 HOURS OF CONTINUAL TESTING OF THE READER AT 110 DEGREES FAHRENHEIT THAT WAS COMPLETED SUCCESSFULLY TONIGHT.  WE RAN 100 PROTOCOLS SEQUENTIALLY.

SO DR. YOUNG FELT GOOD ABOUT RELIABILITY.

AND THEN HE SAYS AFTER REMOVING THE DEVICE FROM THE THERMAL TESTING CHAMBER, THE AFRICOM PROTOCOL WAS TESTED SUCCESSFULLY, SO IT IS GOOD TO GO FOR THE DEMO TOMORROW.  AND THEN HE TALK TALKS ABOUT A PARTICULAR READER.

THEY ARE ACTUALLY TESTING THE DEVICE BECAUSE THEY WANT TO DO WORK WITH AFRICOM.

AND YOU MIGHT REMEMBER, BY THE WAY -- JUST GO BACK TO THAT SLIDE FOR A MINUTE, MR. ALLEN, IF YOU CAN.  THANK YOU.

YOU MIGHT REMEMBER, MR. GROSSMAN TESTIFIED ABOUT HAVING SOME INFORMATION ABOUT THERANOS TESTING THE DEVICE IN EXTREME TEMPERATURES.

WELL, THEY DID TEST IT AND OVER THE COURSE OF MANY YEARS, YOU KNOW, COULD MR. GROSSMAN HAVE MORPHED, YOU KNOW, THIS TYPE OF TESTING WITH TESTING IN THE FIELD?  YOU KNOW, SURE.  YOU

KNOW, MEMORIES FADE AND GET DIFFERENT AFTER MANY YEARS, BUT THERANOS DID ACTUALLY TEST THE DEVICE.

WHAT HAPPENED IN AFRICA?

SO MR. EDLIN WAS DEALING WITH LIEUTENANT COLONEL MELISSA GIVENS, AND YOU CAN SEE HERE THAT MR. EDLIN ASKED SOME QUESTIONS ON THE RIGHT-HAND SIDE.  HE SAID HOW WOULD WILL THE DEVICE BE TRANSPORTED IN THE FIELD?  IE, DO YOU PLAN ON KEEPING THE DEVICE IN ITS PACKAGING IN BETWEEN USE?  WHAT KIND OF CONDITIONS MIGHT BE ON THE MEDEVAC FROM GERMANY TO UGANDA?

AND DR. GIVENS, OR LIEUTENANT COLONEL GIVENS RESPONDED, "THE EQUIPMENT AND CARTRIDGES WILL BE FLOWN COMMERCIAL AIR WITH ME ON THE 23RD AND I WILL FLY BACK TO GERMANY ON THE 2ND OF JULY (I CAN'T GIVE FURTHER DETAIL ON TRAVEL).  THEY WILL BE STORED IN A HOTEL ROOM WITH AC, BUT TAKEN OUT TO THE TRAINING SITE DURING THE DAY.  THE TRAINING SITE HAS AN OPEN AIR BUILDING WITH NO AC AND THE TEMPERATURE WILL BE BETWEEN 100-110 DEGREES FAHRENHEIT.  I WILL BE TRANSPORTING/STORING ALL IN A HARDENED PELICAN CASE -- THE EQUIVALENT OF A HARD SUITCASE. THIS IS WHAT WE USUALLY USE WHEN WE DEPLOY FOR MOST EQUIPMENT."

AND THEN SHE GOES ON, "WHEN WE FLY THE EQUIPMENT FROM UGANDA IT WILL BE ON A NON-PRESSURIZED AIR CRAFT AT ALTITUDES LESS THAN 10,000 FEET.  TEMPERATURES WILL RANGE FROM 100 DEGREES FAHRENHEIT WITH HIGH HUMIDITY TO 60 DEGREES IN FLIGHT."

SO AFRICAN IS TESTING THE DEVICE IN TERMS OF WHETHER IT

SER-1185

CAN WITHSTAND THESE CONDITIONS, INCLUDING ON A HELICOPTER IN AFRICA.  THAT'S EXHIBIT 1113.

SO WHAT HAPPENED AFTER THAT TESTING?  LIEUTENANT COLONEL GIVENS, SHE REPORTS BACK TO MR. EDLIN, ELIZABETH HOLMES, AND CHRISTIAN HOLMES.  MR. BALWANI WAS NOT ON THIS EMAIL BECAUSE THIS WAS A RELATIONSHIP THAT MS. HOLMES HAD.

BUT IT SAYS, "THERANOS TEAM.

"I MADE IT BACK FROM 2 TRIPS TO AFRICA AND MANAGED TO WORK THROUGH ALL OF THE CASES IN THE PROTOCOL."

LIEUTENANT COLONEL GIVENS REPORTS, "THE MACHINE TRAVELLED WELL AND FUNCTIONED WELL.  MY ONLY COMPLAINT IS THE TOUCHSCREEN -- VERY FRUSTRATING."

SHE SAID "I WILL BE PREPARING A FULL REPORT AND HAVE SEVERAL PICTURES OF THE MACHINE BEING USED IN CAMEROON, UGANDA AND SOUTH SUDAN."

SHE GOES ON.  "BECAUSE THE MACHINE SEEMED TO FUNCTION WELL IN THE ENVIRONMENT, I AM GOING TO WRITE A PREPROPOSAL TO SUBMIT TO THE USSOCOM BISC IN HOPES OF GAINING FUNDING FOR A FULL PROPOSAL THROUGH THE USSOCOM BAA FOR EXTRAMURAL BIOMEDICAL RESEARCH AND DEVELOPMENT.

"MY GOAL WILL BE TO DEPLOY 3-5 MACHINES IN AFRICA TO USE REAL TIME AT LOCATIONS WHERE WE HAVE PERSISTENT PRESENCE AND COLLECT REAL LABORATORY DATA AND COMPARE IT TO THE CURRENT STANDARD OF CARE."

SO THAT WOULD BE THE NEXT STEP THAT LIEUTENANT COLONEL

SER-1186

GIVENS AND HER TEAM WOULD TAKE AFTER THIS INITIAL TEST OF WHETHER THE DEVICE COULD WITHSTAND THE CONDITIONS.

AND DOCTOR -- I'M SORRY, MR. EDLIN RESPONDS "WE ARE VERY HAPPY TO HEAR THE TRIP WENT WELL AND THAT THERE WERE NO ISSUES WITH THE TRAVEL AND THE FUNCTION MUCH THE DEVICE.

"PLEASE NOTE THAT WE HAVE DEVELOPED A FAMILY OF NEXT GENERATION SYSTEMS WHICH INCLUDE A MUCH MORE DYNAMIC AND SENSITIVE TOUCHSCREEN."

SO THERANOS TOOK THE INFORMATION TO HEART AND WORKED ON THIS BECAUSE THEY WANT TO HAVE A RELATIONSHIP WITH THE MILITARY.

LET'S TALK ABOUT THE SPECIAL OPERATIONS COMMAND.

SO WHERE DID THIS CONCEPT OF USING A MEDEVAC -- OR THE DEVICE ON A MEDEVAC HELICOPTER FOR THE MILITARY COME FROM?

THIS IS THE PROJECT SCOPE WITH THE SPECIAL OPERATIONS COMMAND.

MILITARY APPLICATIONS.

"MEDEVAC:  THE ABILITY TO TEST AND TRIAGE WOUNDED SOLDIERS AT THE TIME OF IMPACT AND DURING EVACUATION (E.G., IN A HELICOPTER) AND AVOID DELAYED CARE DUE TO UNAVAILABLE MEDICAL INFORMATION WHILE THE SOLDIER IS IN TRANSIT."

SO THAT WAS THE PROJECT SCOPE THAT THERANOS WANTED TO DO WITH THE SPECIAL OPERATIONS COMMAND.

AND JUST LIKE IN THE CASE OF THE BURN STUDY, THERANOS SHIPPED THE DEVICES, AND JUST LIKE IN THE AFRICOM COMMAND,

THERANOS SHIPPED THE DEVICES TO SPECIAL OPERATIONS COMMAND, AND THAT'S WHAT MR. EDLIN CONFIRMED.

SO SOCOM HAD THE DEVICES IN THEIR POSSESSION?

AND HE SAID CORRECT.

SO LET'S TALK ABOUT THE CENTRAL COMMAND.

SO WHERE DID THE CONCEPT OF AFGHANISTAN COME FROM?

THE GOAL OF THE RELATIONSHIP WITH CENTCOM WHICH IS THE PART OF THE MILITARY THAT DEALS WITH THE MIDDLE EAST WAS TO DEPLOY THERANOS DEVICES TO AFGHANISTAN, AND THE ANSWER IS YES.

HERE'S THE EMAIL FROM LIEUTENANT MAJOR CHRISTINE MURPHY. SHE SAYS "FOR YOUR REFERENCE, PLEASE FIND ATTACHED THE APPROVED VERSION OF THE PROTOCOL."

AND IF WE LOOK AT THAT ON THE NEXT PAGE, THE STUDY FACILITIES ARE GOING TO BE THE COMBINED JOINT THEATER HOSPITAL, BAGRAM AIRFORCE BASE, AFGHANISTAN.

AND THEN THEY BRIEFLY DESCRIBE THE FACILITY. IT'S A ROLE 3 MILITARY TREATMENT FACILITY. TESTING WILL BE PERFORMED IN THE CLINICAL LABORATORY PORTION OF THE FACILITY.

SO THAT'S THE PROJECT THAT IS BEING DISCUSSED WITH THE CENTRAL COMMAND.

LET'S GO TO THE NEXT PAGE.

THE PLAN HERE -- LOE STANDS FOR LIMITED OBJECTIVE EXPERIMENT, IT'S A MILITARY TERM. "THIS LOE WILL DOCUMENT THE FUNCTIONALITY OF THE THERANOS DEVICE IN A FIELD ENVIRONMENT AFTER DEPLOYMENT AND TRANSPORT FROM THE UNITED STATES. THE LOE

SER-1188

WILL ALSO DETERMINE THE INFORMATION TECHNOLOGY CAPABILITY OF THE THERANOS DEVICE WITH PRE-EXISTING DEPARTMENT OF DEFENSE NETWORK COMMUNICATIONS HARDWARE AND NETWORK SECURITY CONFIGURATIONS."

SO THIS IS WHAT THE MILITARY AND THERANOS ARE AGREEING THEY'RE GOING TO DO.

AND THEN MR. EDLIN ACTUALLY TRAVELLED TO A CENTCOM MILITARY BASE IN TAMPA, FLORIDA, MACDILL AIRFORCE BASE, IN SEPTEMBER OF 2012.

AND THEN THERE WAS SOME SECURITY TESTS OF THE DEVICE AND IN RESPONSE TO INPUT FROM THE MILITARY, THERANOS ACTUALLY STARTED MODIFYING THE DEVICE TO MAKE IT SMALLER AND LIGHTER AND TRYING TO FULFILL THOSE STANDARDS.

SO THERANOS IS DOING REAL WORK WITH THE SCIENTIFIC TEAM ON PREPARING THE DEVICES FOR THE MILITARY.

SO WE SAW A MINUTE AGO ONE OF THE THINGS THAT HAD TO BE SOLVED WAS MILITARY AND PARTICULAR NETWORK SECURITY CONCERNS THAT ARE UNDERSTANDABLE FROM THE DEPARTMENT OF DEFENSE WITH COMPUTERS.

SO IF WE GO TO THE NEXT SLIDE, THIS IS MR. BALWANI'S ROLE IN THIS.  IT WASN'T HIS RELATIONSHIP BUT AS YOU HEARD HE HAS A BACKGROUND IN SOFTWARE AND HE WAS INVOLVED IN THAT TYPE OF TECHNOLOGY AT THERANOS.

SO WHAT HAPPENED?  MR. BAINIWAL WRITES, DAN, HOW MANY 4S ARE WE DEPLOYING TO AFGHANISTAN?

AND MR. EDLIN RESPONDS, WE ARE DEPLOYING 2 BUT MAY ALSO SEND A BACKUP. I'LL CONFIRM THIS.

AND THEN MR. EDLIN WRITES TO SUNNY BALWANI, SHOULD WE PLAN ON SENDING A THIRD DEVICE TO BAGRAM, THAT'S THE AIRFORCE BASE IN AFGHANISTAN, AS A BACK UP? SO THAT'S WHAT MR. BALWANI IS BEING ASKED IN FEBRUARY OF 2013.

SO THEN IF YOU GO TO THE NEXT SLIDE, MR. BALWANI SAYS ON FEBRUARY 15TH, 2013, "CAN YOU ASK THEM THE FOLLOWING OF THE TEAM IN AFGHANISTAN:

"WHAT IS YOUR NETWORK CONFIGURATION?"

HE'S ASKING QUESTIONS ABOUT HOW THE SECURITY FOR THE NETWORK IS GOING TO WORK FOR A DEVICE.

AND AS YOU'VE HEARD, THE THERANOS DEVICE NEEDS CONNECTIVITY. IT'S TESTING BLOOD SAMPLES, BUT IT'S GOT TO CONNECT TO THE CLOUD TO COMMUNICATE WITH THERANOS COMPUTERS AND ANALYZE BLOOD TESTS AND GIVE RESULTS.

SO THEY'RE TRYING TO FIGURE OUT HOW THEY'RE GOING TO SOLVE THIS I.T. PROBLEM AND MR. BALWANI IS ASKING THIS QUESTION AND HE'S ASKING A SERIES OF QUESTIONS ABOUT THAT SUBJECT.

MR. BALWANI WRITES ON FEBRUARY 8TH, "WE WILL NEED TO DEPLOY 4S IN AFGHANISTAN AT THE END OF THE MONTH AND NEED TO ABSOLUTE MAKE SURE THAT THE NETWORK UTILITY IN THE DEVICE WORKS FLAWLESSLY. BASICALLY, IN THE ADMIN MUST BE ABLE TO CONNECT TO WI-FI NETWORK AND ALSO CHANGE ANY OR ALL ETHERNET NETWORK SETTINGS."

SER-1190

SO MR. BALWANI WANTS TO MAKE SURE IT'S WORKING PROPERLY AND THE NETWORKING IS CORRECT.

IF YOU GO TO THE NEXT SLIDE.

HE WRITES TO ANTTI KORHONEN, "CAN YOU CREATE A SMALL NETWORK IN A SMALL ROOM DOWNSTAIRS (LIKE AN I.T. LAB) WHERE WE HAVE A ROUTER THAT CREATES AN ETHERNET NETWORK BUT BLOCKS ANY DEVICE FROM CONNECTING TO THE INTERNET USING DIFFERENT NETWORKING POLICIES AND ONLY LEGITIMATE DEVICE THAT CONNECT TO THE ETHERNET ARE ABLE TO CONNECT TO THE INTERNET.  WE SHOULD KEEP THIS ROOM TO SIMULATE ALL DIFFERENT CONNECTIVITY SCENARIOS WE WILL SEE IN AFGHANISTAN."

SO MR. BALWANI WANTS TO SET UP A LITTLE LAB TO MAKE SURE THAT THEY CAN TEST THE CONNECTIVITY AND MAKE SURE IT WILL FUNCTION CORRECTLY IN AFGHANISTAN.

SO THAT'S GOING ALONG.  THAT'S IN FEBRUARY OF 2013.  AND THE PLAN IS TO SEND THE DEVICE TO AFGHANISTAN.

BUT THEY RUN INTO A ROADBLOCK YOU TYPICALLY SEE IN GOVERNMENT AND THAT'S THE FUNDING WAS EXPIRING.

SO THIS IS ABOUT SEQUESTRATION, AND THAT'S A FANCY WORD FOR GOVERNMENT BUDGET PROBLEMS BASICALLY.

SO IF YOU GO TO THE NEXT PAGE.

THIS IS ON JULY 24TH AND THIS IS FROM MARTIN DRAKE, WHO IS A CIVILIAN FROM THE U.S. AIRFORCE U.S. CENTRAL COMMAND.  HE SAYS "FUNDING IS EXPIRING AND PERSONNEL ARE BEING RE-DIRECTED TO OTHER ONGOING PROJECTS."

SER-1191

IF YOU GO TO THE NEXT SLIDE.

THIS IS ON FEBRUARY 27TH, 2013, SO AS EARLY AS THAT.

SO REMEMBER, IN FEBRUARY OF 2013 THEY WERE TESTING THE DEVICES THAT THEY WERE SHIPPING TO AFGHANISTAN. THEY WERE GETTING READY TO SHIP THEM. MR. BALWANI WAS WORKING ON THE NETWORKING PIECE WITH OTHER PEOPLE.

THEN ON FEBRUARY 27TH, AT THE END OF THAT MONTH, JAMES SOMMER WHO IS A CIVILIAN EMPLOYEE WITH U.S. CENTRAL COMMAND SAYS TO MR. EDLIN, THINGS AT THE DEPARTMENT OF DEFENSE ARE REALLY GETTING MESSED UP WITH THE UPCOMING SEQUESTRATION. THIS WILL AFFECT HOW WE DO THE UPCOMING LOE, LIMITED OBJECTIVE EXPERIMENT.

AND THEN MR. EDLIN RESPONDS AND HE SAYS THAT HE HAD SENT AN UPDATE TO MAJOR MURPHY EARLIER THIS MORNING AND HE PASTED THAT IN RESPONSE TO MR. SOMMER.

HE SAYS "AS PER OUR PREVIOUS DISCUSSIONS, THE 4S DEVICES WE ARE SHIPPING HAVE BEEN SPECIALLY BUILT FOR THE PURPOSES OF OUR LOE. IN DOING SO WE HAVE HAD TO REVALIDATE AND RETEST EVERY ASPECT OF THE DEVICE CONFIGURATION TO ENSURE THAT THESE SYSTEMS MEET OUR STANDARDS AND EXPECTATIONS. WE HAVE SIGNIFICANTLY ACCELERATED THERANOS'S PREVIOUSLY PLANNED RELEASE OF 4S IN ORDER TO MEET OUR OBJECTIVES FOR THIS PROGRAM. FURTHER, WE HAVE ADDED ADDITIONAL FEATURES," AND IT GOES ON. THEY WANT TO MAKE SURE IT PERFORMS CORRECTLY IN THE THEATER.

SO MR. EDLIN IS TALKING ABOUT ALL OF THE WORK THAT

THERANOS DID, AND THE MILITARY IS TALKING ABOUT BUDGET PROBLEMS.  SO IT GOES WITH THE GOVERNMENT.

SO WHAT HAPPENED?  THERANOS HAD TO TURN TO OTHER MATTERS. MR. EDLIN CONFIRMED THAT HE WAS DOING EVERYTHING HE COULD DO TO MAKE SURE THE PROJECTS WERE GOING TO SUCCEED.  AND THEN HE'S ASKED, AND RESOURCES DID NEED TO BE ALLOCATED?

HE SAYS YES, THERANOS COULDN'T DO EVERYTHING ALL AT ONCE.

AND THERANOS HAD A CONTRACT WITH WALGREENS?

RIGHT.

AND IT HAD TO LIVE UP TO THAT CONTRACT?

SO THAT WAS ANOTHER EXTENSIVE LABOR INTENSIVE RETAIL ROLLOUT?

AND HE SAYS YES.

SO THERANOS HAD NOT UNLIMITED RESOURCES EITHER.  THE MILITARY WAS HAVING BUDGET PROBLEMS.  THEY WERE WORKING ON THIS REALLY HARD AND DEVELOPING THE TECHNOLOGY AND MAKING IMPROVEMENTS.  THEY WERE GETTING READY TO SHIP THESE TO BAGRAM AIRFORCE BASE IN AFGHANISTAN, AND THEN THE MILITARY SAID WE HAVE BUDGET PROBLEMS AND THEN THERANOS HAD TO TURN TO THE WALGREENS LAUNCH.

SO THAT'S THE STORY OF THE MILITARY RELATIONSHIPS, AND IT'S NOT WHAT THE GOVERNMENT WOULD HAVE YOU BELIEVE, THAT THERE'S BASICALLY NOTHING GOING ON AND THAT ANYTHING ABOUT THE MILITARY REPRESENTED TO INVESTORS IS FALSE.

IT IS TRUE THAT THERANOS NEVER HAD ITS DEVICES ACTUALLY

SER-1193

TREATING SOLDIERS ON THE BATTLEFIELD, AND IF INVESTORS SAID THAT OR THOUGHT THAT, THEY WERE MISTAKEN.

AND IF THEY REMEMBERED THAT AFTER MANY, MANY YEARS, THEY WERE MISTAKEN OR WORSE.

BUT AGAIN, AS I'LL TALK ABOUT AGAIN WITH MR. TOLBERT, WE HAD ONE CHANCE TO HEAR WHAT INVESTORS WERE REALLY TOLD ABOUT THAT BY MS. HOLMES, AND THE GOVERNMENT HAD THE TAPE AND WOULD NOT PLAY IT FOR YOU.

LET'S TALK ABOUT ANOTHER SUBJECT.

YOUR HONOR, I'M HAPPY TO CONTINUE, BUT I'M AWARE IT'S 4:00 O'CLOCK.

THE COURT:  I THINK OUR JURORS SAID THEY COULD EXTEND UNTIL 4:30 TODAY.

IS THAT CORRECT?  IS THAT INCORRECT FOR ANYONE?

I SEE NO HANDS, SO WHY DON'T YOU PRESS ON AND WE'LL STOP AT YOUR NEXT LOGICAL BREAK.

MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

OKAY.  I WANT TO SWITCH TOPICS NOW AND TALK ABOUT THE RISKS THAT INVESTORS ACCEPTED.

OKAY.  LET'S START WITH MR. LUCAS.  HE KNOWS AS A SAVVY INVESTOR THAT THERE ARE ALL SORTS OF RISKS ASSOCIATED WITH THE DEVELOPMENT OF THE COMPANY.  OF COURSE HE KNOWS THAT.

EVERY SINGLE ONE OF THESE INVESTORS, AND YOU SAW THIS SEVERAL TIMES DURING THE TESTIMONY IN THIS CASE, HAD TO SIGN THIS AGREEMENT.

SER-1194

AND IN THIS AGREEMENT, WHICH IS EXHIBIT 3530, IS A SERIES OF REPRESENTATIONS THAT THE INVESTORS HAD TO MAKE TO THERANOS ABOUT THEIR WHEREWITHAL, THEIR FINANCIAL ABILITY TO MAKE THIS TYPE OF INVESTMENT.

AND MR. LUCAS CERTAINLY TOOK THAT SERIOUSLY.

MR. EISENMAN SAID, WELL, HE SIGNED IT, A FORMER LAWYER SIGNED IT, BUT HE DIDN'T REALLY MEAN IT.

BUT THESE WERE THE RISKS THAT INVESTORS WERE ACKNOWLEDGING THAT THEY TOOK ON WHEN THEY INVESTED WITH THIS EARLY STAGE COMPANY CALLED THERANOS.

FIRST OF ALL, THEY HAD TO ACKNOWLEDGE THAT THEY UNDERSTOOD THAT THERANOS -- I'M SORRY, THEY UNDERSTOOD THAT EACH INVESTOR COULD BEAR THE ECONOMIC RISK OF THE INVESTMENT, COULD DO SO WITHOUT IMPAIRING THE INVESTOR'S FINANCIAL CONDITION, THAT IT COULD HOLD THE SHARES FOR AN INDEFINITE PERIOD AND IT COULD SUFFER, EACH OF THE INVESTORS COULD SUFFER A COMPLETE LOSS OF THE INVESTOR'S INVESTMENT.

SO THAT MEANS THAT WHETHER THEY INVESTED $99,000 IN THE CASE OF MR. EISENMAN IN 2013 OR THEY INVESTED $99 MILLION OR $100 MILLION LIKE THE DEVOS FAMILY, THEY WERE ACKNOWLEDGING, EACH ONE OF THEM, THAT THEY COULD AFFORD TO LOSE THAT ENTIRE AMOUNT OF MONEY BECAUSE THEY UNDERSTOOD THAT THIS WAS A SPECULATIVE INVESTMENT.

THEY ALSO REPRESENTED THAT THEY HAD ACCESS TO DATA. AND I'VE HIGHLIGHTED THE PART THAT I WANT TO POINT OUT TO YOU.

SER-1195

THE INVESTORS UNDERSTOOD THAT DISCUSSIONS THAT THEY HAD WITH THE COMPANY WERE INTENDED TO DESCRIBE CERTAIN ASPECTS OF THE COMPANY'S BUSINESS BUT WERE NOT NECESSARILY A THOROUGH OR EXHAUSTIVE DESCRIPTION.

THE INVESTORS ACKNOWLEDGED THAT ANY BUSINESS PLANS PREPARED BY THE COMPANY HAVE BEEN AND CONTINUE TO BE SUBJECT TO CHANGE AND THAT ANY PROJECTIONS, PROJECTIONS, INCLUDED IN SUCH BUSINESS PLANS OR OTHERWISE ARE NECESSARILY SPECULATIVE IN NATURE, AND IT CAN BE EXPECTED THAT SOME OR ALL OF THE ASSUMPTIONS UNDERLYING THE PROJECTIONS WILL NOT MATERIALIZE OR WILL VARY SIGNIFICANTLY FROM ACTUAL RESULTS.

SO IN THE CASE OF THE DEVOS FAMILY, IF THERANOS PROJECTED WE THINK IT'S POSSIBLE THAT WE'LL BE IN 900 STORES NEXT YEAR AND WE'RE WORKING TO ACHIEVE THAT, BUT THERE'S EXECUTION RISK, IT MAY NOT HAPPEN, AND THEY'RE ACKNOWLEDGING THAT THESE PROJECTIONS MAY NOT PAN OUT.

THAT'S THE NATURE OF THIS KIND OF RISK. AND IF YOU INVEST IN A COMPANY LIKE THERANOS AND YOU'RE TRYING TO MAKE A BOATLOAD OF MONEY, YOU'RE TAKING ON THE RISK, AND THE INVESTORS WERE ACKNOWLEDGING THAT THEY UNDERSTOOD THAT, AND THEY COULD AFFORD TO LOSE THEIR ENTIRE INVESTMENT.

GOING TO THE NEXT PAGE.

ALL OF THESE INVESTORS ACKNOWLEDGE THAT THIS AGREEMENT WAS THE ENTIRE AGREEMENT THAT THEY HAD WITH THERANOS.

LET'S TALK ABOUT SOME ADDITIONAL RISKS THAT INVESTORS

SER-1196

UNDERSTOOD.

MR. LUCAS, HE HAS HIS INVESTORS SIGN THE VERY SAME THINGS WHEN HE TOOK ON HIS OWN INVESTORS.

BECAUSE REMEMBER PEOPLE LIKE MR. LUCAS OR BRIAN GROSSMAN FROM PFM, THEY WEREN'T INVESTING JUST THEIR OWN MONEY, THEY MAY HAVE, BUT THEY ALSO TOOK IN MONEY FROM THEIR OWN INVESTORS TO FUND WHATEVER INVESTMENT THEY WERE MAKING.

SO IN THIS CASE MR. LUCAS IS SAYING YEAH, HE HAD HIS OWN INVESTORS SIGN THIS SAME SORT OF STUFF, AND HE WOULDN'T EXPECT THEM TO SIGN IT, HIS OWN INVESTORS, IF HE DIDN'T BELIEVE THAT THOSE REPRESENTATIONS WERE CORRECT.

YOUR HONOR, THAT'S THE END OF A TOPIC AND I'M ABOUT TO START A VERY DIFFERENT TOPIC ABOUT CERTAIN INVESTORS AND IT'S A SOMEWHAT LENGTHY SECTION, SO --

THE COURT: WELL, I'D LIKE TO TAKE ADVANTAGE OF THE TIME IF POSSIBLE. OUR JURORS HAVE BEEN VERY GENEROUS, SO WHY DON'T WE STOP AT THE BOTTOM OF THE HOUR SHARP.

MR. COOPERSMITH: I'M HAPPY TO CONTINUE.

THE COURT: THANK YOU.

MR. COOPERSMITH: OKAY. LET'S SWITCH TOPICS TO THE SPECIFIC THERANOS INVESTORS THAT YOU'VE SEEN IN THIS CASE ON THE WITNESS STAND.

AND THE FIRST ONE I'M GOING TO TALK ABOUT SPECIFICALLY IS BLACK DIAMOND VENTURES. THAT'S THE NAME OF THE COMPANY THAT INVESTED IN THERANOS, BUT THAT'S CHRIS LUCAS'S COMPANY. HE

SAID HE WAS THE MOST SENIOR PERSON.  HE FOUNDED THE COMPANY.

THIS IS AN INVESTMENT ON DECEMBER 31ST, 2013.

MR. LUCAS'S PRIMARY CONTACT WAS ELIZABETH HOLMES.  HE HAD NO CONTACT WITH MR. BALWANI.  HE NEVER MET MR. BALWANI.

AND AS HE TESTIFIED, NOTHING THAT MR. BALWANI EVER SAID OR DID INFLUENCED MR. LUCAS'S DECISIONS TO INVEST IN THERANOS.

SO LET'S START WITH THAT AS A BASELINE.

THEN AS I POINTED OUT TO YOU BEFORE, MR. LUCAS UNDERSTOOD FULL WELL THAT BEYOND THE DOZENS OF TESTS THAT THERANOS THOUGHT THEY COULD DO ON THEIR OWN TECHNOLOGY, WHICH WAS TRUE, THERE MIGHT BE TRADITIONAL METHODS BEYOND THAT, AND HE SAID HE KNEW THAT BEFORE HE INVESTED IN THERANOS.

SO HE DIDN'T THINK THIS WAS -- THAT EVERYTHING AT THERANOS WAS TOTALLY COMPLETED OR THERE WASN'T ANY MORE ROOM TO DO MORE RESEARCH AND DEVELOPMENT.

MR. LUCAS KNEW FROM EVEN AN EARLY TIME WHEN HE INITIALLY INVESTED BEFORE MR. BALWANI WAS AT THERANOS, BUT BACK IN 2006 HE KNEW THAT OVER TIME THERANOS WOULD HAVE DIFFERENT VERSIONS OF THE THERANOS DEVICE, AND THAT THE CONTEMPLATION BACK IN THAT EARLY TIME PERIOD WAS THAT EACH OF THE ITERATIONS WOULD HAVE ADDITIONAL ASSAYS AND DIFFERENT -- MORE BLOOD TESTS THAT THE DEVICES COULD DO.

AND THIS IS JUST A PROJECTION BACK IN 2006.  OBVIOUSLY IT TOOK LONGER THAN THAT.

BUT THAT'S WHAT MR. LUCAS UNDERSTOOD.  HE ALWAYS

SER-1198

UNDERSTOOD THERE WOULD BE THESE VERSIONS, WHICH IS NOT UNUSUAL, 1.0, 2.0, AND SO FORTH, RIGHT?

MR. LUCAS UNDERSTOOD, AS I POINTED OUT EARLIER, THAT THE RAGO ARTICLE IN "THE WALL STREET JOURNAL" WAS MARKETING.  HE DIDN'T THINK IT COULD DO A THOUSAND TESTS.  HE KNEW THAT FULL WELL.  THAT WASN'T SOMETHING THAT AFFECTED HIS INVESTMENT.

AND THEN MR. LUCAS DID SOMETHING VERY -- WELL, SAID SOMETHING INTERESTING, RIGHT?

SO THIS IS EXHIBIT 20698, AND IT'S AN INVESTORS' RIGHTS AGREEMENT FROM FEBRUARY 3RD, 2006.  SO THE NUMBER OF INVESTORS THAT YOU HEARD FROM, MR. LUCAS, MR. EISENMAN, PATRICK MENDENHALL, ALSO THE HALL GROUP, ALTHOUGH IN 2006 THEY INVESTED THROUGH MR. LUCAS'S FIRM, BUT THIS INVESTORS' RIGHTS AGREEMENT WAS WHAT THEY HAD TO SIGN BACK IN 2006.  SO THIS WAS BEFORE MR. BALWANI WAS AT THERANOS.  HE HAD NOTHING TO DO WITH THIS INVESTMENT.

BUT HERE'S WHY I'M SHOWING IT TO YOU.  SO REMEMBER THESE INVESTORS LIKE MR. LUCAS AND MR. EISENMAN, THESE 2013 INVESTORS, THEY WERE INVESTING AT THE END OF THE YEAR IN 2013.

AND AT TRIAL, THE GOVERNMENT TRIED TO PAINT THIS PICTURE THAT THERE WAS SOME KIND OF HIGH PRESSURE SALES TACTIC, THAT THEY WERE GIVEN A LIMITED AMOUNT OF TIME AND THEY HAD TO MAKE A DECISION BY THE END OF THE YEAR, AND IT WAS BASICALLY TRYING TO PAINT THIS PICTURE OF SOME KIND OF, AGAIN, I'LL CALL IT A HIGH PRESSURE SALES TACTIC.

SER-1199

THAT IS NOT WHAT HAPPENED. AND THIS INVESTORS' RIGHTS AGREEMENT, IF WE LOOK AT IT, GAVE THESE EARLIER INVESTORS THIS RIGHT OF FIRST REFUSAL WHERE THE COMPANY HAD TO OFFER THEM A CHANCE TO INVEST, AND MR. LUCAS TESTIFIED ABOUT THAT.

AND BY THE WAY, THAT'S EXHIBIT 20698 IF YOU WANT TO LOOK AT THAT.

MR. LUCAS TESTIFIED ABOUT THAT POINT, AND HE SAID IT GAVE THE INVESTORS THE RIGHT, BUT NOT THE OBLIGATION, TO INVEST IF THEY WANTED TO, AND THAT ANYONE WHO SIGNED THIS 2006 INVESTOR RIGHTS AGREEMENT WOULD BE IN THE SAME BOAT.

IN OTHER WORDS, YOU CAN SEE ON LINE 15 THERE, THERANOS WAS ENGAGING IN NEW FUNDRAISING, IT WOULD HAVE TO GO TO INVESTORS LIKE MR. LUCAS AND SAY, HEY, DO YOU WANT TO PARTICIPATE IN THIS NEW FUNDRAISING ROUND?

AND HE SAID YES.

SO THEY HAD TO GIVE THEM THE FIRST RIGHT. THEY DIDN'T HAVE TO DO IT. THEY COULD HAVE PASSED.

MR. LUCAS SAID, YOU KNOW, THAT HE HAD TO WORK REALLY HARD IN DECEMBER OF 2013 TO GET ALL OF THIS DONE BEFORE THE END OF THE YEAR. IN FACT, HE SAID HE DIDN'T SHAVE DURING THAT WHOLE TIME.

WELL, MR. LUCAS COULD HAVE SHAVED AND HE COULD HAVE NOT DONE IT, AND THEN HE WOULD HAVE HAD A MUCH NICER HOLIDAY SEASON I'M SURE THAN HE HAD.

BUT THAT'S WHAT IS GOING ON. IT'S NOT A HIGH PRESSURE

SALES TACTIC.  IT'S JUST THERANOS FULFILLING THEIR OBLIGATION FROM 2006 TO GIVE THESE PEOPLE THE OPPORTUNITY.

AND MR. LUCAS TESTIFIED ABOUT THIS SOME MORE.

WALGREENS HAD MADE THIS COMMITMENT TO DO THE NATIONAL ROLLOUT ON DECEMBER 31ST AND WAS GOING TO FUND AN ADDITIONAL $75 MILLION.

MR. LUCAS UNDERSTOOD THAT WHEN WALGREENS IS MAKING THAT KIND OF COMMITMENT AND PUTTING THAT KIND OF MONEY INTO THERANOS, THE SHARE PRICE, THE VALUE OF THERANOS IS LOGICALLY GOING TO GO UP.  SO HE WANTED TO GET THIS DONE SO HE COULD GET THE $15 A SHARE RATHER THAN $17 A SHARE.

MR. LUCAS WAS OFFERED AN OPPORTUNITY IN JANUARY OF 2014 TO BUY MORE SHARES AT THE HIGHER PRICE, AND HE DIDN'T DO THAT.

SO THAT'S WHAT WAS GOING ON HERE.  AGAIN, THERANOS JUST HONORING ITS COMMITMENT.

LET'S GO TO THE NEXT SLIDE.

MR. LUCAS DID SOMETHING VERY INTERESTING.  HE TESTIFIED HE NEVER HAD DONE THIS BEFORE WITH ALL OF THE INVESTMENTS HE'S BEEN DOING, HE'S A PROFESSIONAL INVESTOR AND HE'S BEEN WORKING AT THIS FOR MANY, MANY YEARS AND HE'S NEVER DONE THIS BEFORE, BUT THAT'S TO SEND A PARTICULAR LETTER TO HIS INVESTORS POINTING OUT THAT HE DOESN'T HAVE THE INFORMATION THAT YOU WOULD WANT TO SEE NORMALLY AND HE WANTED TO MAKE SURE HIS INVESTORS KNEW THAT.

AND WHAT DID HE TELL HIS OWN INVESTORS?  THEY DIDN'T HAVE

SER-1201

FINANCIAL STATEMENTS, THEY DIDN'T HAVE MATERIAL CONTRACTS, AND THERE WERE OTHER THINGS THAT THEY DIDN'T HAVE.

SO ALL OF THESE PEOPLE KNEW THIS. MR. LUCAS AND HIS OWN INVESTORS KNEW THAT THERE WAS INFORMATION THAT WAS LACKING. WHY WOULD THEY TAKE A FLYER ON THIS WHEN THEY DIDN'T HAVE IT?

WELL, BECAUSE IF THE WALGREENS ROLLOUT WAS SUCCESSFUL, THEY STOOD TO MAKE GAZILLIONS OF DOLLARS AND THAT WAS THE DRIVING FORCE.

SO WHEN YOU'RE DOING THIS AND MR. LUCAS IS DOING THIS AND HE'S TELLING THE INVENTORS, HEY, I WANT TO COVER MY OWN SELF HERE AND TELL YOU WE DON'T HAVE THE INFORMATION SO THE INVESTORS DON'T HOLD HIM RESPONSIBLE, THAT IS A COMMUNICATION THAT THIS IS A VERY, VERY RISKY INVESTMENT.

THE GOVERNMENT WILL WANT YOU TO BELIEVE THAT THE RISK WAS BACK IN 2006 AND THAT BY 2013 THIS INVESTMENT WAS SOMEHOW DERISKED. BUT THAT'S NOT TRUE. WE ALL KNOW THAT GOING FROM THREE STORES TO THOUSANDS OF STORES, USE YOUR COMMON SENSE, THAT'S NOT AN EASY TEST, AND THAT IS NOT A GUARANTEED TASK, AND THAT IS NOT SOMETHING THAT YOU CAN COUNT ON.

BUT CERTAINLY EVERYBODY WAS TRYING THEIR BEST TO MAKE THAT HAPPEN, INCLUDING THERANOS AND INCLUDING WALGREENS.

SO THAT'S MR. LUCAS.

LET'S SWITCH TO THE HALL GROUP. THAT'S THE INVESTOR. THIS IS A COMPANY LED BY CRAIG HALL, WHO WE DID NOT HEAR, AND HE WAS A DECISION-MAKER AT THE HALL GROUP. AS YOU HEARD, HE

WAS, AT ONE POINT, YOU THE LARGEST SHAREHOLDER IN AMERICAN AIRLINES, AND HE'S FROM TEXAS.

HIS CHIEF FINANCIAL OFFICER IS BRYAN TOLBERT. THAT'S THE PERSON THAT THE GOVERNMENT BROUGHT IN TO TESTIFY.

MR. TOLBERT HAD NO CONTACT WITH MR. BALWANI. MR. BALWANI HAD NO INFLUENCE ON THE DECISION BY THE HALL GROUP TO INVEST.

THEN MR. TOLBERT WAS GETTING PERIODIC UPDATES FROM MR. LUCAS. SO WHAT MR. LUCAS KNEW, MR. TOLBERT KNEW.

BUT THAT'S BECAUSE BACK IN 2006 AS YOU HEARD, THE HALL GROUP HAD INVESTED IN THERANOS ORIGINALLY, BEFORE MR. BALWANI'S TIME, THROUGH MR. LUCAS'S FIRM, BLACK DIAMOND VENTURES, AND THIS INVESTMENT ULTIMATELY THE HALL GROUP MAKES IN 2013 IS A DIRECT INVESTMENT IN THERANOS.

SO MR. TOLBERT AND MR. LUCAS WERE IN CONTACT.

AND LET'S GET TO THE THING I'VE BEEN TALKING ABOUT NOW FOR A COUPLE DAYS, AND THAT IS THIS TAPE. SO HERE'S WHAT HAPPENS, OKAY? DECEMBER 2013, AND IN PARTICULAR, THERE'S A DECEMBER 20TH, 2013 CALL WHERE MS. HOLMES IS ON THE LINE WITH INVESTORS. THOSE INVESTORS INCLUDED MR. LUCAS AND MR. TOLBERT, DECEMBER 20TH OF 2013. MR. BALWANI IS NOT ON THE CALL.

BUT THE GOVERNMENT ASKED THE QUESTION ON DIRECT EXAMINATION, DO YOU REMEMBER WHETHER MS. HOLMES TALKED ABOUT THE KIND OF TUBES OF BLOOD THAT THERANOS USED VERSUS WHAT TRADITIONAL LAB TESTING INVOLVED?

NOW, MR. TOLBERT SAYS IN HIS ANSWER, NOT BECAUSE HE WAS

ASKED THE QUESTION BUT HE JUST SAID THIS IN HIS ANSWER, "YOU KNOW, I WOULD HAVE TO LOOK BACK AT THE TRANSCRIPT OF THE CALL, BUT I THINK THERE WAS SOME DISCUSSION ABOUT, YOU KNOW, THE SMALL NANOTAINERS OR CONTAINERS, AND HE GOES ON.

AND THEN THE QUESTION FROM THE GOVERNMENT IS, YOU REFERENCED THE TRANSCRIPT OF THE CALL, WHAT DO YOU MEAN?  LIKE THEY NEVER HEARD OF THIS BEFORE.

WELL, AT SOME POINT THAT PHONE CALL WAS RECORDED, AND THERE WAS A TRANSCRIPTION MADE OF IT.

THE QUESTION THEN IS I SEE.  LIKE THE GOVERNMENT NEVER HEARD OF THIS.

ANSWER:  AND SO, YOU KNOW, I'VE -- SO I KNOW THERE'S A TRANSCRIPT OF THAT CALL, AND I JUST HAVEN'T REVIEWED IT.

SO OBVIOUSLY IT'S NINE YEARS EARLIER FOR MR. TOLBERT. HE'S TESTIFYING IN APRIL OF 2022, AND THE CALL IS IN DECEMBER OF 2013.

SO WHAT ACTUALLY HAPPENED HERE?  LET'S GO TO CROSS-EXAMINATION OF MR. TOLBERT.

QUESTION:  YOU'VE PRODUCED A COPY OF THAT RECORDING IN THE COURSE OF THESE INVESTIGATIONS, HAVEN'T YOU?

ANSWER:  THAT'S CORRECT.

QUESTION:  AND YOU'VE DISCUSSED THAT RECORDING WITH THE GOVERNMENT, HAVEN'T YOU?

ANSWER:  I HAVE.

YOU DON'T REMEMBER WORD FOR WORD WHAT MS. HOLMES SAID THAT

SER-1204

DAY?

I DO NOT.

THAT'S HARDLY SURPRISING AFTER NINE YEARS.

SO THIS IDEA THAT THE GOVERNMENT WAS SOMEHOW SURPRISED ABOUT THAT TAPE.  THEY KNEW ABOUT THE TAPE BECAUSE MR. TOLBERT PRODUCED IT AND DISCUSSED IT WITH THE GOVERNMENT.  AND THE GOVERNMENT HAD THAT OPPORTUNITY RIGHT THEN AND THERE TO PLAY YOU EXACTLY WHAT MS. HOLMES SAID.

AND WHEN YOU THINK ABOUT THIS CASE AND YOU DELIBERATE, AND YOU THINK ABOUT JUDGE DAVILA'S INSTRUCTIONS HE'S GOING TO GIVE YOU HAVE ABOUT THE LACK OF EVIDENCE, THINK ABOUT WHY THE GOVERNMENT IS NOT AND DID NOT PLAY YOU THAT TAPE OF EXACTLY THE BEST EVIDENCE OF WHAT MS. HOLMES SAID ON THAT DAY, DECEMBER 20TH, 2013, TEN DAYS OR SO BEFORE MR. LUCAS AND MR. TOLBERT INVESTED IN THERANOS.

LET'S GO ON.

I TOLD YOU MR. LUCAS WAS ON THAT PHONE CALL AS WELL.  OF COURSE HE DOESN'T REMEMBER THE EXACT WORDS EITHER.  SO WE COULD HAVE LEARNED EXACTLY WHAT THEY WERE TOLD, AND WE COULD HAVE LEARNED MORE THAN THAT.

WE COULD HAVE LEARNED HOW MS. HOLMES INTERACTED WITH INVESTORS, WHAT SORT OF STATEMENTS SHE MADE.  IF SHE WAS TALKING ABOUT THE MILITARY, WHAT DID SHE SAY IN THIS TIMEFRAME?

REMEMBER, MR. GROSSMAN HAD A MEETING JUST AROUND THAT SAME TIME IN DECEMBER OF 2013 WITH THERANOS.

SO WHAT IS MS. HOLMES SAYING ABOUT THE MILITARY RELATIONSHIP? THE TECHNOLOGY? ALL OF THAT IN THIS TIME PERIOD?

SHE'S GOING TO MEET WITH DIFFERENT INVESTORS. SHE'S TALKING TO DIFFERENT INVESTORS.

THAT TAPE WOULD HAVE BEEN VERY HELPFUL TO KNOW. AND THE FACT THAT THE GOVERNMENT DIDN'T PLAY IT JUST SPEAKS VOLUMES ABOUT WHAT THE GOVERNMENT IS TRYING TO DO HERE IN THIS CASE, WHICH IS TO GO WITH WITNESS'S MEMORIES FROM A LONG TIME AGO WITHOUT PLAYING YOU THE ACTUAL WORDS.

I WANT TO TALK ABOUT MR. GROSSMAN NEXT. HIS COMPANY WAS CALLED PARTNER FUND MANAGEMENT. THAT WAS AN INVESTMENT MADE BY PFM ON FEBRUARY 6TH, 2014.

SO PFM HAD PUT TOGETHER A VERY SOPHISTICATED DEAL TEAM.

MR. GROSSMAN, HE HAD DECADES OF EXPERIENCE INVESTING IN THE HEALTH CARE SPACE; MR. KHANNA, WE TALKED ABOUT A LITTLE BIT EARLIER BECAUSE HE HAD TESTS DONE AT THERANOS, A SIMILAR EXPERIENCE IN INVESTING; DR. RABODZEY, INVESTMENT EXPERIENCE. HE WAS ALSO A PH.D. IN BIOENGINEERING FROM M.I.T. SO THIS WAS MR. GROSSMAN'S TECHNICAL EXPERT TO LOOK AT DATA AND REALLY DIVE INTO IT, THAT'S WHAT MR. GROSSMAN SAID.

MR. BALASURYAN, HE FOCUSSED ON FINANCIAL MODELING.

SO MR. GROSSMAN PUT TOGETHER A SOPHISTICATED TEAM TO HELP EVALUATION THIS INVESTMENT.

AND WHEN WE TALK ABOUT MR. GROSSMAN, IT'S REALLY IMPORTANT

TO KEEP IN MIND, MR. GROSSMAN ON THE WITNESS STAND, HE TESTIFIED FROM DIRECT EXAMINATION MOSTLY FROM MEMORY.  THERE WERE A FEW DOCUMENTS.  MOSTLY HE JUST TALKED.

IT WAS THE DEFENSE WHO HAD TO SHOW HIM DOCUMENT AFTER DOCUMENT.  AND THE BEST EVIDENCE OF WHAT REALLY HAPPENED AND WHAT PFM KNEW, AND THE RISKS THAT THEY KNEW THEY WERE TAKING, AND THE FLYER THEY TOOK ON THERANOS AND ITS WALGREENS ROLLOUT ARE ALL IN THOSE DOCUMENTS, AND THAT'S WHAT I'M GOING TO GO THROUGH WITH YOU IN THE TIME WE HAVE REMAINING TODAY AND WHEN WE MEET AGAIN TOMORROW.

SO MR. GROSSMAN.

GO TO THE NEXT SLIDE, PLEASE, MR. ALLEN.

SO MR. BALWANI SENT MR. GROSSMAN THE EXCEL VERSION OF THE SPREADSHEET SO HE COULD SEE ALL OF THE ASSUMPTIONS BEHIND THE NUMBERS.  THAT'S WHAT MR. GROSSMAN WANTED.

AND MR. GROSSMAN SAID YES.

AND MR. BALWANI ANSWERED QUESTIONS FOR MR. GROSSMAN WHEN MR. GROSSMAN HAD QUESTIONS, AND MR. GROSSMAN AGREED WITH THAT.

SO WHAT THIS IS, IS MR. BALWANI IS NOT JUST SENDING A PIECE OF PAPER, HE'S GIVING MR. GROSSMAN AND PFM THE ACTUAL SOFT COPY, THE EXCEL VERSION OF THE FINANCIAL MODEL WITH ALL OF THE ASSUMPTIONS, AND WE'RE GOING TO TALK ABOUT THAT IN SOME DETAIL PROBABLY TOMORROW.

MR. GROSSMAN UNDERSTOOD THAT THERE WERE TWO PHASES, THAT'S WHAT I TALKED ABOUT BEFORE, THE PHASE I, THE CENTRAL LAB MODEL

SER-1207

WHERE BLOOD WAS COLLECTED AT WALGREENS AND THEN SHIPPED TO THERANOS'S CENTRAL LAB, AND THEN LATER THE PHASE II WHERE UPON FDA APPROVAL THEY COULD PUT DEVICES IN THE STORES.

MR. GROSSMAN KNEW FULL WELL THAT AT THE TIME HE WAS MEETING WITH THERANOS TO TALK ABOUT THE INVESTMENT, THEY HAD THREE PATIENT SERVICE CENTERS IN ALL OF WALGREENS, AND THERE'S NO MISTAKE ABOUT THAT.

THEY HAD THREE STORES. AND SO OF COURSE MR. GROSSMAN KNOWS. HE'S A VERY SOPHISTICATED, IVY-LEAGUE EDUCATED PROFESSIONAL. AND HE KNOWS GOING FROM THREE STORES TO WHAT HE HOPES TO BE HUNDREDS OF THOUSANDS OF STORES IS GOING TO BE A HUGE, MASSIVE, HEAVY LIFT.

EXACTLY AS YOU WOULD EXPECT. WE'VE SEEN THIS BEFORE, BUT WALGREENS WAS ONE OF THE LARGEST RETAILERS IN THE COUNTRY, AND IT HAD THE INFRASTRUCTURE TO ENABLE THERANOS TO DO THIS NATIONWIDE ROLLOUT, AND THAT'S RIGHT IN THE PRESS RELEASE.

WE'VE SEEN THIS LETTER BEFORE. WALGREENS WAS COMMITTED TO TAKE ALL STEPS TO A NATIONAL ROLLOUT AND COMMITTED $75 MILLION TO HELP MAKE THAT HAPPEN. THIS IS HAPPENING RIGHT AROUND THE SAME TIME THAT MR. BALWANI AND MS. HOLMES ARE MEETING WITH MR. GROSSMAN.

SO OBVIOUSLY AT THIS POINT THERE ARE VERY, VERY HIGH HOPES FOR THIS. WALGREENS IS MAKING A MAJOR COMMITMENT AND PUTTING IN MAJOR MONEY, AND OF COURSE INVESTORS -- MR. BALWANI IS EXCITED ABOUT THAT, AND HE'S REASONABLY COMMUNICATING THAT

SER-1208

EXCITEMENT TO INVESTORS.

AND THEN WE'VE SEEN THESE PAGES BEFORE, COMMITMENT TO THE NATIONAL ROLLOUT.  I WON'T READ IT AGAIN BECAUSE WE HAVE SEEN IT BEFORE

THIS WAS AN INTERESTING EXCHANGE WITH MR. GROSSMAN WHERE HE SAYS, I THINK WE ACTUALLY MADE THE MISTAKE OF CALLING IT A POINT OF CARE TESTING PLATFORM.  AND HE IS TALKING ABOUT THERANOS.

AND THEN HE IMMEDIATELY STOPPED NO, NO, NO, NO, NO.  THIS IS NOT A POINT OF CARE PRODUCT.  WE HAVE TAKEN THE ENTIRE LAB AND MINIATURIZED IT.  THIS IS A MINILAB.  MR. GROSSMAN IS REPORTING THAT.

BUT WHAT DID, BACK IN 2010, JOHNS HOPKINS SAY?  IT'S NOT REALLY A POINT OF CARE TECHNOLOGY, IT'S A MINILAB.  SO WHY WOULD MR. BALWANI THINK THAT IT'S NOT A POINT OF CARE DEVICE, IT'S A MINILAB?

WELL, THREE JOHNS HOPKINS'S PHYSICIANS SAID SO ABOUT THE THERANOS DEVICE.

OKAY.  SO NOW I'M GOING TO START TO TALK ABOUT THE RISKS THAT IT WAS WELL AWARE OF.  AND WE'RE NOT GOING TO FINISH, BUT I'LL START.  AND THIS IS IN DECEMBER OF 2013.  AND THIS WAS  AN EMAIL FROM VIVEK KHANNA, WHO WAS MR. GROSSMAN'S COLLEAGUE, TO MR. GROSSMAN, AND HE'S REPORTING ON WHAT HE'S LEARNED.

SO LH, YOU MIGHT REMEMBER FROM MR. GROSSMAN'S TESTIMONY, THAT'S A REFERENCE TO LABCORP.  THEY THINK THAT THE TECHNOLOGY

SER-1209

DOES NOT WORK. THE MENU IS VERY LIMITED COMPARED TO LABCORP AND DGX, WHICH IS QUEST DIAGNOSTICS. THE COST OF DISTRIBUTION TO TESTING CENTERS IS HIGH. HOW DO YOU GET PATIENT REFERRALS INTO THE WAG STORE TO GET BLOOD DRAWN? THE STORE IN PALO ALTO IS NOT FUNCTIONAL... NOT SURE IF THIS IS TRUE. MOST DOCS HAVE A PHLEBOTOMIST IN THEIR OFFICE AND ARE UNLIKELY TO ALLOW THIS REVENUE LEAKAGE.

NO OTHER COMPANY IN POINT OF CARE TESTING HAS BEEN SUCCESSFUL. LOOK AT QUEST, THEY SOLD HOMOCUE AT A SUBSTANTIAL LOSS AFTER PAYING TOP DOLLAR.

WAG THEY THINK IS VERY EXCITING AND WILL LIKELY BUNDLE WITH THEIR EXISTING PAYOR CONTRACTS.

SO THAT'S THE INFORMATION THAT MR. KHANNA IS REPORTING. SO RIGHT AWAY IN THIS EARLY CONSIDERATION, THERE'S INFORMATION THAT THEY'RE GETTING THAT THIS COULD BE RISKY, RIGHT?

OKAY. NEXT DOCUMENT, DECEMBER 24TH, SO A LITTLE LATER IN THAT MONTH.

DR. RABODZEY, THEIR TECHNICAL EXPERT, HE HAS QUESTIONS. HE HAS NOT SEEN MUCH OF AN ECONOMIC BENEFIT FOR THE HOSPITAL OR PRACTICE TO DRIVE VOLUME THROUGH THERANOS. THERANOS HAS A LIMITED MENU OF TESTS, AND DOCTORS WILL HAVE PROBLEMS SENDING PATIENTS TO LABCORP FOR ONE TEST AND TO THERANOS FOR ANOTHER.

SO THEY KNOW THERANOS HAS A LIMITED MENU AND THERE MIGHT BE PROBLEMS WITH THE BUSINESS MODEL. THAT'S EXHIBIT 4063.

THE NEXT DOCUMENT, THIS IS IN EARLY JANUARY, MID-JANUARY,

REALLY, JANUARY 12TH, 2014.

SO MR. KHANNA AGAIN REPORTS TO THE TEAM WITHIN PFM, THERANOS'S GREAT PARTNERS, WAG, SAFEWAY, DEPARTMENT OF DEFENSE STILL TO BE SIZED. AND THEN HE SAYS PRICING AT 50 PERCENT OF MEDICARE IS INTERESTING BUT OTHER COMMERCIAL PAYORS ARE ALREADY REIMBURSING AT 50 TO 70 PERCENT, SO NOT THAT MUCH OF A DISCOUNT.

SO MR. KHANNA KNOWS THAT, WELL, MAYBE THE THERANOS PRICING ISN'T SO SPECIAL AFTER ALL.

THE RISKS: INTELLECTUAL PROPERTY AS YOU MENTIONED, EXECUTION. WE TALKED ABOUT THAT WHEN YOU START COLLECTING SAMPLES AND RUNNING TESTS IN A REGIONAL CENTER, WHAT IS THE IMPACT ON RESULTS?

SO THEY IMMEDIATELY RECOGNIZE THAT TRYING TO SCALE UP AND RUN ALL OF THESE TESTS, THERE COULD BE EXECUTION RISKS WHEN YOU START ACTUALLY COLLECTING SAMPLES.

BUT IT'S ONE OF THE MOST INTERESTING COMPANIES THEY HAVE MET. IT ALL COMES DOWN TO EXECUTION. SO GOING FROM THREE STORES TO THOUSANDS.

JANUARY 24TH. NOW, THIS IS INTERESTING. SO WHAT HAPPENED HERE IS THAT DR. RABODZEY IS DIGGING INTO THE DATA, RIGHT? AND HE SAYS, "HERE IS SOMETHING TO DISCUSS WITH THERANOS: WHILE THERE IS NO CLEAR GUIDELINE ON COEFFICIENT OF VARIATION NEEDED FOR CLIA CERTIFICATION BY TEST, IT IS USUALLY UNDER 5 PERCENT."

HE SAYS, "BELOW IS A DESCRIPTION OF PARVOVIRUS,

P-A-R-V-O-V-I-R-U-S, TEST WITH A CV OF 4.5 PERCENT.

"SAME TEST FROM THERANOS HAS ABOUT 15 TO 20 PERCENT INTERCARTRIDGE VARIATION.

"SOME OF THEIR TESTS," THERANOS TESTS, "HAVE POOR R2, WHICH IS A BIT CONCERNING."

THAT'S THE CORRELATION BETWEEN THERANOS'S DEVICES AND THE COMMERCIAL DEVICES.

SO HERE'S THE QUESTION, RIGHT?  SO THIS DATA IS COMING FROM THERANOS, THIS DATA FROM WITHING THERANOS'S RESEARCH AND DEVELOPMENT IS NOT AVAILABLE.  SO THEY'RE GETTING THIS DATA FROM THERANOS.

SO THERANOS ISN'T SUGAR COATING THIS.  THEY'RE NOT GIVING PFM SOME KIND OF ROSY PICTURE, AND YOU'RE GOING TO WANT A FRAUD AND LET'S GIVE THEM ALL OF THE GOOD DATA AND HIDE ALL OF THE BAD DATA.

THEY'RE GIVING THEM THE GOOD AND THE BAD.  THEY ARE GIVING DATA SO THAT MR. -- OR DR. RABODZEY CAN DIG INTO THIS AND FIGURE OUT WHAT IS GOING ON AND HE CAN SEE WITH HIS OWN EYES THAT THERE ARE SOME ISSUES THAT HE'S RAISING.

AND I'LL LEAVE YOU WITH THIS BEFORE WE BREAK FOR THE DAY, IS THAT WHEN WE GET TO RDV, THE DEVOS FAMILY, THEY WERE GIVEN TWO BINDERS OF MATERIALS, AND HE'S TESTIFIED ONLY ABOUT ONE.  THAT SECOND BINDER IS THE DATA.  IT'S CHOCK-FULL OF ALL OF THE SCIENTIFIC DATA.  AND RDV DECIDED NOT TO LOOK AT THAT, BUT DR. RABODZEY DID, AND HE KNOWS FULL WELL.  AND IF MR. BALWANI

SER-1212

OR THERANOS HAD SOME KIND OF INTENT TO DEFRAUD MR. GROSSMAN, WHY WOULD THEY GIVE HIM THIS DATA TO ALLOW DR. RABODZEY TO MAKE THOSE CONCLUSIONS?

AND THAT RIGHT THERE IS REASONABLE DOUBT ON INTENT TO DEFRAUD.

THANK YOU FOR YOUR CAREFUL ATTENTION AND PATIENCE TODAY, AND I'LL SEE YOU TOMORROW WHERE I WILL RESUME MY REMARKS.

AGAIN, THANK YOU FOR YOUR PATIENCE AND HAVE A GOOD EVENING.

THE COURT: THANK YOU.

LADIES AND GENTLEMEN, WE'LL TAKE OUR BREAK. PLEASE REMEMBER TOMORROW WE'LL BEGIN AT 12:00. I'LL HOPE YOU'LL COLLECT YOURSELVES SO WE CAN BEGIN AT NOON.

AGAIN, I'LL REMIND YOU OF THE ADMONITION PLEASE. WHEN YOU LEAVE HERE IN BETWEEN THE TIME YOU RETURN, DO NOT DO ANYTHING IN ANY WAY TO LEARN ANYTHING ABOUT THE CASE, DISCUSS, LISTEN, OR IN ANY WAY LEARN ANYTHING ABOUT THIS CASE.

HAVE A GOOD EVENING.

THANK YOU FOR YOUR PATIENCE. I'LL ASK YOU TOMORROW WHETHER WE CAN STAY UNTIL PERHAPS TO THE SAME AMOUNT OF TIME TOMORROW OR EVEN CLOSER TO 5:00. I'M NOT TOO SORRY THAT I'M TRYING TO SQUEEZE OUT AS MUCH TIME AS WE CAN. WE'RE VERY CLOSE TO GETTING THE CASE TO YOU, AND ALL OF US WOULD LIKE TO HAVE THAT ACCOMPLISHED. I HAVE SOME CONFIDENCE WE'LL GET THAT DONE THIS WEEK AFTER TALKING WITH THE LAWYERS. SO HAVE A GOOD

SER-1213

EVENING.  WE'LL SEE YOU TOMORROW.  THANK YOU.

(JURY OUT AT 4:30 P.M.)

THE COURT:  THANK YOU.  PLEASE BE SEATED.  THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE DAY.

ANYTHING FURTHER BEFORE I STEP DOWN?

MR. SCHENK:  NO, YOUR HONOR.

MR. COOPERSMITH:  NO, YOUR HONOR.

THE COURT:  I'M GOING TO ASK MR. COOPERSMITH AND MR. SCHENK, IF YOU COULD JUST CHECK WITH OUR COURTROOM DEPUTY WHEN SHE RETURNS, SHE JUST HAS A LITTLE NOTE ABOUT SCHEDULING FOR YOU.

MR. SCHENK:  YES, YOUR HONOR.

THE COURT:  GREAT.  THANK YOU.  WE'LL SEE YOU TOMORROW.

(COURT ADJOURNED AT 4:30 P.M.)

SER-1214

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CR-18-00258-EJD |
| PLAINTIFF, | ) | |
| | ) | SAN JOSE, CALIFORNIA |
| VS. | ) | |
| | ) | JUNE 23, 2022 |
| RAMESH "SUNNY" BALWANI, | ) | |
| | ) | VOLUME 40 |
| DEFENDANT. | ) | |
| | ) | PAGES 7400 - 7556 |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:　　　UNITED STATES ATTORNEY'S OFFICE
　　　　　　　　　　　　BY:　JOHN C. BOSTIC
　　　　　　　　　　　　　　JEFFREY B. SCHENK
　　　　　　　　　　　　150 ALMADEN BOULEVARD, SUITE 900
　　　　　　　　　　　　SAN JOSE, CALIFORNIA 95113

　　　　　　　　　　　　BY:　ROBERT S. LEACH
　　　　　　　　　　　　　　KELLY VOLKAR
　　　　　　　　　　　　1301 CLAY STREET, SUITE 340S
　　　　　　　　　　　　OAKLAND, CALIFORNIA 94612

　　　(APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
　　　　　　　　　　　　　　IRENE L. RODRIGUEZ, CSR, RMR, CRR
　　　　　　　　　　　　　　CERTIFICATE NUMBER 8074
　　　　　　　　　　　　　　LEE-ANNE SHORTRIDGE, CSR, CRR
　　　　　　　　　　　　　　CERTIFICATE NUMBER 9595

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

INDEX OF PROCEEDINGS


DEFENDANT'S CLOSING ARGUMENT BY MR. COOPERSMITH        P.7411

SER-1216

SAN JOSE, CALIFORNIA                          JUNE 23, 2022

P R O C E E D I N G S

(COURT CONVENED AT 12:04 P.M.)

(JURY OUT AT 12:04 P.M.)

THE COURT:  LET'S GO ON THE RECORD IN THE BALWANI CASE.

ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

WE ARE OUTSIDE OF THE PRESENCE OF OUR JURY.  I JUST WANTED TO TALK WITH COUNSEL A LITTLE BIT ABOUT SCHEDULING, PLEASE, AND WHERE WE'RE AT.

MAYBE COUNSEL CAN COME TO THE LECTERN.

MR. COOPERSMITH, YOU'RE IN YOUR ARGUMENT.  I'M JUST CURIOUS IF YOU'RE ABLE TO TELL ME YOUR THOUGHTS ABOUT SCHEDULING.

MY NOTES REFLECT THAT YOU'VE ARGUED 7 HOURS AND 45 MINUTES, AND I JUST WANT TO FOLLOW UP WITH ANY SCHEDULE THAT YOU MIGHT HAVE TO OFFER.

MR. COOPERSMITH:  YES, YOUR HONOR, I CAN DO THAT.

SO I EXPECT TO FINISH MY ARGUMENTS TODAY.

THE COURT:  OKAY.

MR. COOPERSMITH:  I THINK THAT THE COURT SAID YESTERDAY WE MIGHT HAVE UNTIL AS LATE AS 5:00 O'CLOCK TODAY.

THE COURT:  I THINK I ASKED THE JURORS THAT, AND HOPEFULLY WE'LL HAVE THAT AVAILABLE TO US.

MR. COOPERSMITH:  RIGHT.  AND I MAY NOT NEED ALL OF

THAT TIME, BUT I'M GOING TO TRY VERY HARD TO FINISH THE ARGUMENTS TODAY.

AND IT COULD BE THERE'S A LITTLE TIME FOR THE GOVERNMENT'S REBUTTAL, OR MAYBE NOT, JUST DEPENDING ON HOW WAS IT GOES.

THE COURT: AND BY ASKING THAT, I'M NOT SUGGESTING IN ANY WAY, TO SUGGEST TO YOU IN ANY WAY WHAT YOUR SCHEDULE SHOULD BE. I'M TRYING TO INFORM MYSELF AS TO SCHEDULING.

MR. COOPERSMITH: I DON'T TAKE IT THAT WAY, YOUR HONOR.

THE COURT: RIGHT.

MR. BOSTIC.

MR. BOSTIC: THANK YOU, YOUR HONOR. FOR THE GOVERNMENT'S REBUTTAL, OBVIOUSLY WE NEED TO SEE WHAT ELSE IS COVERED IN THE DEFENSE'S CLOSING, BUT MY GOAL IS TO MAKE THAT SIGNIFICANTLY LESS THAN HALF A DAY, SO I WOULD HOPE THAT THAT CAN BE DONE IN TWO HOURS OR SO.

THE COURT: OKAY.

MR. BOSTIC: IF THE DEFENSE'S CLOSING TAKES THE VAST MAJORITY OF THIS AFTERNOON, I MIGHT ASK THE COURT WHETHER WE CAN BEGIN AND END THE REBUTTAL TOMORROW MORNING RATHER THAN STARTING IT TODAY, BUT WE'LL SEE HOW IT GOES.

THE COURT: SURE. THANK YOU FOR THAT. THAT'S HELPFUL.

THE OTHER QUESTION I HAD IS WE HAVE A JUROR WHO HAS -- WE KNOW FROM HER RESPONSE IS UNAVAILABLE JULY 26TH, I THINK,

THROUGH -- EXCUSE ME, JUNE 26TH THROUGH JULY 5TH, I BELIEVE. I THINK SHE'S AVAILABLE JULY 5TH.

AND SHOULD THE JURY GET THE CASE TOMORROW -- SHE'S STILL PART OF THE JURY NOW. SHOULD THE JURY GET THE CASE TOMORROW, MY THOUGHTS ARE THAT WE SHOULD SEE WHAT THEY DO WITH THE CASE AND THEN DECIDE ON A PROTOCOL AS TO WHAT TO DO WITH THIS JUROR. I BELIEVE IT'S JUROR NUMBER 10.

MR. COOPERSMITH: YOUR HONOR, I HAD A THOUGHT ABOUT THAT THAT I WOULD LIKE TO SUGGEST TO THE COURT. AND I DID HAVE A BRIEF CONVERSATION WITH MR. SCHENK AND MS. ROBINSON EARLIER ABOUT THIS.

I'M NOT REPRESENTING THAT I'VE RESEARCHED THIS, BUT I JUST WANTED TO THROW THIS OUT, THAT JUROR NUMBER 10 I THINK IT IS, SINCE SHE IS GOING ON A VACATION I BELIEVE ON THE 26TH, SHE WILL HAVE HEARD ALL OF THE CASE, AND INCLUDING ALL OF THE ARGUMENTS, RIGHT? AND THE INSTRUCTIONS OF THE COURT.

AND THEN IT SEEMS LIKE SHE'S LEAVING ON SUNDAY, THE JURY MIGHT HAVE A LITTLE TIME TO DELIBERATE TOMORROW.

BUT ASSUMING THE JURY DOESN'T REACH A VERDICT TOMORROW, THEN SHE WOULD NOT BE ABLE TO PARTICIPATE IN THE DELIBERATIONS PRESUMABLY MONDAY, RIGHT? SO SHE WOULD BE THEN RELEASED AS A JUROR.

BUT MY SUGGESTION IS THAT, INSTEAD OF RELEASING HER ALTOGETHER, IS TO CONTINUE TO HAVE HER UNDER THE COURT'S ADMONITION ABOUT LOOKING AT THE PRESS AND SO FORTH, AND THEN

7406

HAVING HER BASICALLY SWITCHED FROM A SEATED JUROR TO AN ALTERNATE.

THE ONLY REASON I SUGGEST THAT IS BECAUSE I THINK THERE MAY BE SOME OTHER DAYS WHERE ONE OR MORE JURORS AREN'T AVAILABLE FOR THE END OF NEXT WEEK, AND IF THERE'S NO VERDICT BY, SAY, THE 29TH, AND THERE MAY OR MAY NOT BE, THEN WE WOULD HAVE AN EXTRA ALTERNATE THAT COULD BE CALLED BACK. AND OBVIOUSLY THE JURY IN THAT SITUATION HAS TO START DELIBERATIONS ANEW.

BUT THAT WOULD GIVE US A LITTLE -- AN EXTRA SAFETY VALVE IN CASE COVID OR WHATEVER HAPPENS, WE COULD HAVE ANOTHER JUROR THAT COULD COME BACK WHEN SHE FINISHES WITH HER VACATION, WHICH MIGHT BE THE 5TH OR 6TH.

SO JUST THROWING IT OUT. AGAIN, MR. SCHENK AND I CHATTED AND I DON'T THINK EITHER OF US ARE SURE THAT THAT'S POSSIBLE. LIKE I DON'T HAVE ANY PRECEDENT TO CITE. BUT I THINK IT'S SOMETHING THAT I WANTED TO THROW OUT.

THE COURT: SURE. I THINK TO YOUR POINT, I BELIEVE THAT WE HAVE INFORMATION THAT ANOTHER JUROR HAS INDICATED TRAVEL PLANS FOR THE 30TH AND THEN RETURNING THE 5TH, I BELIEVE. I THINK IT'S THAT LONG WEEKEND.

THE CLERK: SHE'S RETURNING THE 4TH, BUT WE DO HAVE ANOTHER JUROR OUT ON THE 5TH.

THE COURT: I'M SORRY.

THE CLERK: WE HAVE A THIRD JUROR OUT ON THE 5TH FOR

THE LONG WEEKEND.

THE COURT: I SEE.

THE CLERK: AS WELL AS THAT ONE WHO DEPARTS.

THE COURT: SO WE MIGHT LOSE A JUROR ON THE 5TH, POTENTIALLY TWO.

MR. SCHENK.

MR. SCHENK: THANK YOU, YOUR HONOR. A FEW THOUGHTS ON THAT.

FIRST, I THINK THAT'S CORRECT. MY UNDERSTANDING IS THAT THE JURY COULD DELIBERATE WHEN THEY GET THE CASE TOMORROW, FRIDAY, AND THEN MONDAY THROUGH THURSDAY, AND WE WOULD LOSE OUR FIRST DELIBERATING JUROR ON THURSDAY.

AND THEN I BELIEVE THEY'RE UNABLE TO DELIBERATE THE ENTIRE WEEK OF THE 4TH BECAUSE OF VARIOUS TRAVEL ISSUES. I THINK ONE OF THE JURORS IS OUT FROM THE 30TH TO THE 4TH OR 5TH, AND THEN MY NOTES REFLECT A DIFFERENT JUROR OUT THROUGH THE 8TH. MAYBE I'M WRONG ABOUT THAT. I THOUGHT THERE WAS ANOTHER JUROR WHO HAD TRAVEL.

THE COURT: I DON'T THINK SO. AND I SHOULD GET MY GREEN SHEET OFF MY DESK.

THE CLERK: YOUR HONOR, THAT JUROR --

THE COURT: LET ME LOOK AT THE SHEET.

(PAUSE IN PROCEEDINGS.)

THE COURT: I SHOW ONE JUROR, 5, UNAVAILABLE JULY 5, AND THE REST MY BOXES ARE GREEN, IF YOU WILL.

UNITED STATES COURT REPORTERS

MR. COOPERSMITH: I THINK THERE'S SOME NOTATION ON THE BOTTOM WHERE JURORS ARE UNAVAILABLE ON THE 30TH OF JUNE AND THEN JULY 1ST. SO THOSE TWO DAYS NEXT WEEK IT LOOKS LIKE ONE OR MORE JURORS IS NOT AVAILABLE.

THE COURT: YES. JUROR NUMBER 9 LOOKS LIKE UNAVAILABILITY FROM THE 4TH THROUGH THE 8TH.

BUT THERE'S AN INDICATION THAT THAT JUROR COULD BE HERE, IF NECESSARY. SO SHOULD IT BE NECESSARY, IT SOUNDS LIKE THAT JUROR IS WILLING TO CHANGE THAT JUROR'S PLANS.

MR. COOPERSMITH: RIGHT. THAT'S HELPFUL.

BUT I THINK IF I'M RIGHT, YOUR HONOR, THERE'S NO -- THE JURY WON'T BE ABLE TO DELIBERATE ON JUNE 30TH, AND THEY WILL NOT BE ABLE TO DELIBERATE ON JULY 1ST OR JULY 5TH.

SO THAT WHAT WOULD HAPPEN IS THAT THE JURY COULD DELIBERATE WHATEVER TIME TOMORROW, MONDAY AND TUESDAY OF NEXT WEEK, WHICH IS THE 27TH AND 28TH, AND THEN ALSO WEDNESDAY, THE 29TH, BUT THEN IT WOULD GO DARK UNTIL JULY 6TH IS HOW I READ THAT CHART, ASSUMING THAT THE JUROR WHO IS UNAVAILABLE FROM THE 4TH THROUGH 8TH IS WILLING TO STAY.

THE COURT: RIGHT.

MR. SCHENK: YES, YOUR HONOR. THAT'S WHAT I WAS REFERRING TO WITH REGARD TO JUROR NUMBER 9 AS POTENTIALLY HAVING SOME CONFLICTS THAT WEEK.

WE DO STILL HAVE DELIBERATION TIME TOMORROW AND THE FIRST PART OF THE WEEK NEXT WEEK.

I APPRECIATE THE SUGGESTION THAT MR. COOPERSMITH MADE. I SAID I WOULD LIKE TO SPEND A LITTLE TIME LOOKING INTO THIS ISSUE. I DON'T KNOW IF WE CAN.

THE COURT: I DON'T, EITHER. IT'S A CASE OF FIRST IMPRESSION FOR ME. I'VE NEVER HAD THAT HAPPEN, AND I EXPECT IT WOULD, IF IT WERE TO HAPPEN, AT A MINIMUM I WOULD WANT A STIPULATION FROM ALL PARTIES, INCLUDING THE DEFENSE, INDICATING THAT YOU'VE THOROUGHLY DISCUSSED THIS WITH YOUR CLIENT AND YOU'RE WILLING TO PROCEED IN THAT FASHION.

MR. COOPERSMITH: YES. THAT MAKES SENSE, YOUR HONOR. WE'LL DISCUSS THAT.

IN ADDITION, I THINK MAYBE MR. SCHENK AND I ARE BOTH GOING TO LOOK INTO THIS FOR TODAY OR TONIGHT, AND THEN WE SHOULD BE ABLE TO HAVE AN ANSWER FOR THE COURT.

THE COURT: SURE.

MR. COOPERSMITH: THERE MAY NOT BE ANY PRECEDENT. IT MAY TRULY BE A CASE OF FIRST IMPRESSION, BUT IF THERE'S ANYTHING YEA OR NAY, WE CAN TELL YOUR HONOR.

THE COURT: ALL RIGHT. WELL, THEN THANK YOU FOR THE DISCUSSION.

WE'LL HAVE TO MAKE A DECISION TOMORROW AS TO JUROR NUMBER 10, AND RIGHT NOW THAT JUROR IS A SITTING JUROR AND WILL CONTINUE TO SIT. THAT JUROR'S UNAVAILABILITY IS -- PRESUMABLY WOULD BEGIN AFTER 5:00 P.M. TOMORROW. SO WE'LL CERTAINLY HAVE SOME INFORMATION, AND DEPENDING ON A DECISION, WE CAN CALL THAT

JUROR OUT AND SPEAK WITH THAT PERSON INDIVIDUALLY AND GET MORE INFORMATION.

MR. COOPERSMITH: YES, YOUR HONOR.

MR. SCHENK: AGREED.

THE COURT: OKAY. THANK YOU. THANKS.

ANYTHING FURTHER THEN ABOUT SCHEDULING?

MR. SCHENK: NO, YOUR HONOR.

THE COURT: THANK YOU. THANKS FOR THE HELP ON THAT. I APPRECIATE IT.

OKAY. WE CAN BRING THEM IN. I'M JUST GOING TO GET THAT SHEET.

(PAUSE IN PROCEEDINGS.)

(JURY IN AT 12:19 P.M.)

THE COURT: THANK YOU. YOU MAY BE SEATED. WE'RE BACK ON THE RECORD IN THE BALWANI MATTER.

OUR JURORS AND ALL COUNSEL ARE PRESENT. MR. BALWANI IS PRESENT.

BEFORE I ASK MR. COOPERSMITH TO CONTINUE WITH HIS ARGUMENT, LET ME ASK OUR JURY AND ALTERNATES, DURING OUR BREAK, HAVE ANY OF YOU HAD CAUSE TO LEARN, DISCUSS, READ, LISTEN TO, OR IN ANY WAY LEARN ANYTHING ABOUT THIS CASE?

IF SO, PLEASE RAISE YOUR HAND.

I SEE NO HANDS. THANK YOU AGAIN ON BEHALF OF COUNSEL AND THE COURT. THANK YOU FOR YOUR CONTINUED FIDELITY TO THE COURT'S ADMONITION. I APPRECIATE IT.

AND, MR. COOPERSMITH, IF YOU WOULD LIKE TO CONTINUE.

MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

**(MR. COOPERSMITH RESUMED HIS CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT.)**

MR. COOPERSMITH:  GOOD AFTERNOON EVERYONE.

WE'RE GOING TO CONTINUE WITH THE CLOSING ARGUMENT TODAY, DAY THREE AS THEY SAY.  I DO EXPECT TO BE FINISHED TODAY, SO HOPEFULLY I'LL BE ABLE TO DO THAT.

NOW, I JUST WANT TO ORIENT EVERYONE.  WHEN WE LEFT OFF TODAY -- I'M SORRY, YESTERDAY, WE WERE TALKING ABOUT THE SPECIFIC THERANOS INVESTORS, AND I'M JUST SHOWING THE ROAD MAP SLIDE SO EVERYONE SEES WHERE WE ARE AT THIS POINT.

AND I TALKED ABOUT SOME OF THE INVESTORS, MR. LUCAS AND MR. TOLBERT, BUT WE WERE TALKING ABOUT MR. GROSSMAN.  AND YOU ALL MIGHT REMEMBER, THIS IS THE GENTLEMAN WHO TESTIFIED WHO'S WITH A FIRM CALLED PFM, PARTNER FUND MANAGEMENT.

SO WHEN WE LEFT OFF YESTERDAY, I WAS TALKING ABOUT THE INTERNAL EMAILS WITHIN PFM THAT EXPLAINED THE RISKS THAT PFM WAS WELL AWARE OF GOING INTO THE INVESTMENT WITH THERANOS.

AND I WANT TO PICK UP WHERE WE LEFT OFF ON THAT.  AND I'LL SHOW YOU THIS EXHIBIT, WHICH IS 4088.  SO THIS IS AN EMAIL FROM BRIAN GROSSMAN TO ADAM CLAMMER, WHO IS A PERSON THAT MR. GROSSMAN HIRED TO ASSIST PFM WITH ITS INVESTMENT DECISION. AND THAT'S ON JANUARY 28TH, 2014.  SO THAT'S BEFORE THE INVESTMENT.

SER-1225

AND MR. GROSSMAN SAYS, "LOT OF DEBATE INTERNALLY ON ACCURACY. I THINK IT IS BASICALLY TRUE, BUT NOT NECESSARILY EVERY TEST TODAY. I THINK WITHIN 6-12 MONTHS THEY WILL BE THERE."

LET'S JUST PAUSE THERE FOR A MINUTE. SO MR. GROSSMAN KNOWS FULL WELL THAT THERE'S NOT NECESSARILY PERFECTION OR EVEN CLOSE TO THAT ON EVERY THERANOS TEST, AND THAT THE PROJECTION OR THE HOPE IS THAT WITHIN 6 TO 12 MONTHS THAT THEY WILL BE THERE.

IT GOES ON. IT SAYS, "THERE ARE 1300 TESTS ON THE CLINICAL FEE SCHEDULE," SO SORT OF THE UNIVERSE OF TESTS, AND THEN HE SAYS, "400 ARE 99 PERCENT OF VOLUME, AND 600 ARE 99.9 PERCENT."

SO MR. GROSSMAN ALSO UNDERSTANDS THAT THERE ARE A LOT OF TESTS THAT ARE NOT ORDERED VERY MUCH SO THAT YOU DON'T NEED TO HAVE 1300 TESTS IN ORDER TO COVER THE WATERFRONT OF, YOU KNOW, 99 PERCENT, OR OBVIOUSLY IF YOU WANTED TO GET TO 90 PERCENT, IT WOULD PRESUMABLY BE LESS THAN 600 OR LESS THAN 400. SO MR. GROSSMAN KNOWS ALL OF THAT.

AND THIS INFORMATION, THE WAY THAT MR. GROSSMAN IS GETTING HIS INFORMATION, AS HE TESTIFIED, IS FROM THERANOS.

SO THERANOS IS TALKING TO MR. GROSSMAN, AND HE'S TALKING TO HIS TEAM ABOUT THE RISKS THAT EXIST HERE.

LET'S GO TO THE NEXT SLIDE.

MORE DISCUSSION ABOUT RISK. THE FDA COULD CHOOSE TO SEND

A CEASE AND DESIST ORDER TO THERANOS ANY TIME BECAUSE THEIR TESTS ARE NOT CLEARED. THERANOS IS CORRECT THAT SUCH AN AGGRESSIVE SCENARIO WAS UNLIKELY BUT IT COULD HAPPEN.

CLIA, THAT'S THE CMS REGULATION, DOES NOT GUARANTEE THE COMPANY THAT THE FDA WILL NOT GO AFTER THEM. THERE ARE EXAMPLES OF LARGE CLIA LABS OPERATING WITHOUT FDA APPROVAL, AND THEY NAME SOME OF THOSE.

SO, AGAIN, HE KNOWS ABOUT THESE REGULATORY RISKS.

LET'S GO FURTHER. THIS IS IN EXHIBIT 4089 STILL.

AND HERE YOU CAN SEE IN THE FIRST HIGHLIGHTED PORTION UNDER THE NUMBER 4, "BASED ON THE DATA I HAVE SEEN SO FAR, I DO NOT BELIEVE THERANOS HAS ADEQUATE DATA FOR FDA APPROVAL FOR MANY OF ITS TESTS TODAY (THEY ARE CLEARLY WORKING ON THAT)."

SO MR. GROSSMAN KNOWS FULL WELL THEY ARE WORKING ON CONTINUED R&D WORK. "THE KEY LIMITATION IS SAMPLE SIZE, WHICH IS EASY TO RESOLVE, BUT FOR SOME TESTS THE PROBLEM MAY BE DEEPER (SEE BELOW TWO EXAMPLES WHERE IT IS JUST UNCLEAR WHETHER INCREASING THE N WOULD ACTUALLY LEAD THE TIGHTER R2)."

THAT R2 IS THE CORRELATION BETWEEN THE THERANOS TEST AND THE FDA APPROVED DEVICE.

SO THEY ARE NOT SUGAR COATING THIS, AS MR. SCHENK ARGUED IN THE GOVERNMENT'S CLOSING. I THINK MR. SCHENK SAID ANY TIME MR. BALWANI IS PROVIDING INFORMATION TO INVESTORS, INTERACTING WITH INVESTORS, HE'S ALWAYS ON THE SIDE OF MORE ENCOURAGING INFORMATION.

BUT HERE THERANOS IS GIVING PFM DATA THAT THEY'RE ABLE TO USE TO SHOW, WELL, YOU KNOW, THERE ARE SOME ISSUES HERE THAT WE HAVE TO BE AWARE OF. AND THAT'S THE OPPOSITE OF TRYING TO INTEND TO DEFRAUD SOMEONE WHERE YOU'RE JUST GIVING EVERYONE POSITIVE INFORMATION ALL OF THE TIME.

IT GOES ON. OF COURSE IN THE MIDDLE SECTION IT SAYS "I THINK THERE IS RISK HERE." OF COURSE THERE IS.

AND THEN IF YOU GO DOWN TO THE BOTTOM HIGHLIGHTING, IT SAYS, "IT IS NOT UNUSUAL TO SEE RISKS LIKE THESE IN EARLY STAGE INVESTMENTS."

I'LL JUST PAUSE THERE. SO MR. GROSSMAN UNDERSTANDS THIS IS AN EARLY STAGE INVESTMENT, AND OF COURSE IT IS BECAUSE AT THIS POINT THERE ARE THREE STORES AND THE GOAL IS TO GET TO HUNDREDS OR THOUSANDS OF STORES. SO THAT'S WHAT MR. GROSSMAN UNDERSTANDS.

AND YOU KNOW, I SHOULD SAY, AND I'VE BEEN SAYING THIS A LOT BECAUSE IT'S TRUE, THAT THESE ARE ALL DOCUMENTS THAT THE DEFENSE HAD TO SHOW ABOUT WHAT PFM REALLY UNDERSTANDS AND WHAT THEY'RE DISCUSSING, AND WHAT RISKS THEY'RE AWARE OF, AND WHAT THEY LEARN FROM THERANOS.

AND DURING MR. GROSSMAN'S TESTIMONY, HE BASICALLY JUST TESTIFIED FROM MEMORY FOR THE MOST PART WITHOUT ALL OF THESE DOCUMENTS.

AND IT'S THE DOCUMENTS, THE CONTEMPORANEOUS DOCUMENTS THAT EXISTED AT THE TIME THAT REALLY TELL THE STORY OF WHAT HAPPENED

AT THERANOS, NOT SOMEONE'S MEMORY, YOU KNOW, MANY, MANY YEARS AFTER THE FACT AS WAS THE CASE WITH MR. GROSSMAN.

LET'S GO FURTHER ON THIS SAME POINT OF RISK.

HERE'S ANOTHER ONE, AN INTERNAL EMAIL WITH MR. GROSSMAN AND HIS TEAM ON JANUARY 29TH, 2014. "WE HAD ONE MORE DILIGENCE CALL TODAY WITH A SCIENTIST WHO DEVELOPS LAB BASED TESTS, AND HE CONFIRMED EVERY POINT THAT THERANOS MADE WITH THE EXCEPTION OF PUTTING MACHINES AT WAG LOCATIONS."

SO PFM IS NOT JUST STANDING STILL EITHER. THEY'RE DOING WORK. THEY'RE TALKING TO OUTSIDE SCIENTISTS, AND THEY'RE CONFIRMING THINGS, OR IN SOME CASES NOT CONFIRMING THINGS.

"THERANOS MEETS CLIA REQUIREMENTS ON MOST OF THEIR TESTS AS WE KNOW.

"FDA STANDARDS ARE MUCH HIGHER THAN CLIA."

OF COURSE WE KNOW LATER THERANOS GOT APPROVAL FOR ONE OF ITS ASSAYS RUNNING ON THEIR SYSTEM.

AND THEN IF YOU GO DOWN TO THE BOTTOM WHERE IT'S UNDERLINED THERE IT SAYS, "I CONTINUE TO BELIEVE THAT THIS IS AN ACCEPTABLE RISK FOR A PRIVATE INVESTMENT AS LONG AS WE BELIEVE UPSIDE IN THE BASE CASE SCENARIO JUSTIFIES TAKING THE RISK OF AN FDA ACTION AND/OR ROLLOUT DELAY."

SO IT'S WHAT YOU WOULD THINK. THIS IS A COMPANY WHO IS GOING TO INVEST A LOT OF MONEY IN THERANOS AND IS LOOKING AT THE RISK AND REWARD, AND YES, THEY UNDERSTAND THE RISKS, BUT THEY ALSO UNDERSTAND THERE'S GREAT REWARD IF THE WALGREENS

SER-1229

ROLLOUT ISN'T DELAYED AND IT GOES FORWARD IN THE WAY THAT EVERYONE HOPES IT WILL AT THIS POINT IN TIME AND EVEN LATER IN 2014 AND '15.

GO TO THE NEXT SLIDE.

THIS IS AN EMAIL BETWEEN MR. BALWANI AND MR. GROSSMAN AND THIS IS ON JANUARY 28TH, 2014.

AND THIS IS ABOUT MR. GROSSMAN TOURING THE LAB. SO, FIRST OF ALL, MR. BALWANI WRITES THERE IN THE HIGHLIGHTED SECTION AT THE BOTTOM, "LAB IS GOING TO BE VERY DIFFICULT AS LARGE PARTS OF IT ARE PATENT PENDING AND/OR NOT FILED YET."

WELL, WHAT WE HAVE SEEN ON SEPTEMBER, I BELIEVE IT WAS SEPTEMBER 9TH, IT'S SEPTEMBER IN 2013, IN FACT, THERANOS FILED THAT PATENT FOR ITS MODIFIED PREDICATE DEVICES, WHICH THERANOS CONSIDERED ITS PROPRIETARY TECHNOLOGY. THAT PATENT WAS PENDING.

SO THAT IS A TRUE STATEMENT. AND THAT'S JUST THE ONE PATENT.

THEN MR. GROSSMAN RESPONDS, "OK THANKS. IS THERE A WAY WE CAN SEE A PART OF THE LAB WITHOUT COMPROMISING THE PATENT PENDING OR UNFILED PARTS OF IT?"

SO MR. GROSSMAN UNDERSTANDS THE PROPRIETARY TECHNOLOGY AND HE'S NOT REALLY PUSHING IT.

AND HE SAYS, "THIS IS MORE A PERFUNCTORY EXERCISE TO MAKE SURE THERE IS ACTUALLY A LAB THERE."

SO IT'S PERFUNCTORY. MR. GROSSMAN WANTS TO MAKE SURE THAT

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                7417

THERE'S ACTUALLY A LAB.  IT'S NOT JUST AN EMPTY BUILDING OR SOMETHING.

WELL, OF COURSE THERE'S A LAB.  WE ALL KNOW THAT.

WHAT ELSE DOES MR. GROSSMAN KNOW?

SO THIS IS ON JANUARY 28TH AS WELL.  AND MR. BALWANI IS EMAILING MR. GROSSMAN.  AND HE SAYS, "ON YOUR TESTS.  THERE WAS A CONTROL THAT FAILED ON ONE OF THE ASSAYS AND THE LAB RERAN THE SAMPLE."

SO THIS IS MR. BALWANI DIRECTLY TELLING MR. GROSSMAN, A CONTROL FAILED, SO WE RERAN IT.  HE'S NOT SUGAR COATING IT.  HE'S NOT TRYING TO HIDE THAT FROM MR. GROSSMAN.  HE'S TELLING HIM FLAT OUT BEFORE MR. GROSSMAN'S INVESTMENT, A CONTROL FAILED.

AND WHAT DOES MR. GROSSMAN RESPOND WHEN HE FORWARDS THAT EMAIL TO HIS TEAM, INCLUDING DR. RABODZEY, "REAL WORLD.  REAL WORLD."  SO HE KNOWS.

HERE'S DR. RABODZEY TALKING ABOUT TESTS HE GOT AT THERANOS.  SO OF COURSE THEY'RE GOING TO THERANOS AND TRYING OUT THE SERVICE.

AND BRIAN GROSSMAN SAYS, "STILL TOOK A LONG TIME."

AND DR. RABODZEY SAYS "GOT THE RESULTS.

"LOOKS CONSISTENT WITH PREVIOUS TESTS."

SO THE TEST RESULTS LOOKED GOOD IN TERMS OF THE ACCURACY OF THEM, BUT IT TOOK A LONG TIME.

AND I WANT TO TALK ABOUT THAT FOR A MINUTE, AND WE'LL SEE

SER-1231

THIS IN THE NEXT EXHIBIT AS WELL. AND THAT IS, YOU SAW, AND YOU MAY REMEMBER IN THE SLIDE DECK THAT PFM WAS SHOWN, THERE'S A REFERENCE TO FOUR HOUR TURN-AROUND TIME.

AND I THINK THE GOVERNMENT SAID, WELL, YOU KNOW, THIS IS ANOTHER AREA WHERE IT'S SOME KIND OF DECEPTIVE PRACTICE TO TELL INVESTORS THAT, WELL, WE HAVE A FOUR HOUR TURN-AROUND TIME AT THERANOS.

BUT ACTUALLY, AS I WAS SAYING YESTERDAY, THOSE SLIDES ARE A MIX, A HODGEPODGE OF THINGS THAT ARE HAPPENING AND THINGS THAT THE COMPANY IS HOPING, SOME OF THE PHASE II WHERE YOU'RE GOING TO HAVE DEVICES AT THE STORE, SOME OF THE PHASE I.

BUT HERE MR. GROSSMAN KNOWS FULL WELL, AND HIS TEAM AS WELL, THAT THERE'S NOT GOING TO BE A FOUR HOUR TURN-AROUND TIME WITH THERANOS IF YOU'RE DOING AN ESSENTIAL LAB MODEL. YOU'VE GOT TO GET THE SAMPLE COLLECTED, YOU'VE GOT TO SHIP IT TO THE LAB, AND THEN YOU'VE GOT TO DO THE TESTS AND GET THE RESULTS.

SO THEY'RE NOT HIDING THAT. THEY'RE NOT PUTTING OUT RESULTS QUICKER JUST TO PLEASE MR. GROSSMAN AND HIS TEAM. THEY'RE PUTTING RESULTS OUT WHEN THEY GET OUT, AND THE PFM PEOPLE UNDERSTAND THAT TOOK A LONG TIME.

SAME WITH THE NEXT EXHIBIT. THIS IS ABOUT HAVING DIRECT CONNECTIVITY TO PHYSICIANS' OFFICES.

AND DR. RABODZEY SAYS, "I THINK THIS IS SOMETHING THAT CAN BE RESOLVED IN THE FUTURE WHEN EVERYONE STARTS USING EMR," ELECTRONIC MEDICAL RECORD, "WHERE FOR THE NEXT FEW YEARS THIS

SER-1232

FOUR HOUR TURN AROUND TIME BENEFIT WILL BE MUTED BY THE FACT THAT IT STILL TAKES DAYS FOR THE DOCS TO ACTUALLY SEND THE RESULTS TO PATIENTS."

AGAIN, THEY KNOW. THIS IS ASPIRATIONAL AND THIS IS NOT SOMETHING THAT IS HAPPENING RIGHT NOW, AND THEY KNOW THAT FIRSTHAND BEFORE THEY ACTUALLY INVEST.

SO LET'S TALK ABOUT A DIFFERENT SUBJECT, WHICH IS THE VENOUS DRAW ISSUE.

SO AS I SAID YESTERDAY, THE FACT THAT THERANOS IS DOING VENOUS DRAWS AND TRADITIONAL METHODS IS RIGHT OUT THERE IN THE PRESS RELEASE AND ON THE WEBSITE. THERE'S NO HIDING FROM INVESTORS, OR THE PUBLIC FOR THAT MATTER, AS THE GOVERNMENT HAS SUGGESTED THAT THERE'S VENOUS DRAWS AT THERANOS.

MR. GROSSMAN HAD A SLIGHTLY DIFFERENT ANGLE ON THAT I GUESS. HE WAS TRYING TO SAY THAT HE DIDN'T -- HE THOUGHT THAT EVEN IF THERE WAS A VENOUS DRAW, THAT STILL WOULD BE TESTED ON THERANOS TECHNOLOGY. THAT WAS HIS STATEMENT. THAT WAS THE ONLY INVESTOR WHO SAID THAT.

BUT HERE'S THE DIALOGUE WITH HIM ON CROSS-EXAMINATION.

"QUESTION: SO YOU KNEW AT THIS POINT IN TIME IN JANUARY OF 2014 THAT THERANOS WAS DOING SOME VENOUS TESTING; IS THAT RIGHT?"

HIS ANSWER WAS YES.

AND OF COURSE HE KNOWS THAT BECAUSE IT WAS RIGHT OUT THERE IN THE PUBLIC DOCUMENTS.

AND THEN IF YOU LOOK AT THE REST OF THIS, "DURING YOUR CONVERSATIONS WITH THERANOS, YOU DON'T REMEMBER HAVING ANY DISCUSSIONS WITH ANYONE AT THERANOS ABOUT HOW THEY WERE TESTING THOSE VENOUS DRAWS, DO YOU?

"I DON'T RECALL SPECIFICALLY."

SO HE WAS NOT -- THERE WAS NO REPRESENTATION THAT HE WAS TESTIFYING ABOUT WHERE SOMEONE AT THERANOS, INCLUDING MR. BALWANI, TOLD HIM WE'RE DOING TESTING, EVEN IF IT'S VENOUS DRAW, WE'RE STILL TESTING ON OUR OWN TECHNOLOGY.  NOBODY REPRESENTED THAT TO HIM.

HE SAID THAT, BUT IT'S NOT BECAUSE OF ANYTHING THAT MR. BALWANI OR ANYONE ELSE SAID.

OKAY.  I WANT TO TURN TO A DIFFERENT SUBJECT BUT STILL REGARDING PFM ABOUT THE FINANCIAL MODELS SPREADSHEET.

OBVIOUSLY PFM IS A SOPHISTICATED INVESTOR.  THEY'RE LOOKING AT THE UPSIDE OF INVESTING HERE BECAUSE THEY KNOW THEY'RE TAKING A RISK AS WE JUST WENT THROUGH.

BUT IN ORDER TO JUSTIFY THAT, THEY ALSO HAVE TO UNDERSTAND WHAT THE UPSIDE IS.  SO THERE IS FINANCIAL MODELING THAT THERANOS, INCLUDING MR. BALWANI, GIVES THEM, AND THEN IN ADDITION THERE'S FINANCIAL MODELING THAT PFM DOES ON ITS OWN.

THIS IS THE MODELING THAT THERANOS PROVIDED.

SO WHAT HAPPENED HERE IS THAT MR. BALWANI, AT MR. GROSSMAN'S REQUEST, SENT MR. GROSSMAN AN ELECTRONIC COPY OF THE MODEL.  NOT JUST A PIECE OF PAPER BUT HERE'S THE MODEL AND

IT'S IN AN EXCEL SPREADSHEET FORMAT AND THAT'S WHAT IS ON THE SCREEN.

SO LET'S GO TO SOME OF THE ASPECTS OF THIS.

SO THERE'S TABS ON THE BOTTOM IN EXCEL AND HOW IT USUALLY WORKS. THE FIRST ONE IS CALLED MACRO ASSUMPTIONS AND YOU CAN SEE HERE RETAIL PHARMACY U.S. ONLY, THE REVENUE PER REQUISITION IS $35. SO EVERY PATIENT WOULD BE PAYING $35 IN THIS MODEL.

THEN IT HAS THE FULLY LOADED COST FOR A MINILAB IN 2015 IS ESTIMATED TO BE $50,000. AND WE'LL COME BACK TO THAT POINT ON THE COST. BUT THAT'S BASICALLY WHAT IT COSTS TO PRODUCE A MINILAB. BUT THAT'S THE PATIENT REVENUE.

AND THEN IF YOU GO TO THE NEXT TAB, WHICH IS CALLED THERANOS MARKET ASSUMPTIONS, THIS IS INFORMATION THAT THERANOS PROVIDED TO PFM.

SO ON THIS ONE, IF YOU LOOK RIGHT AWAY ON JANUARY 14TH, AND THAT'S WHERE THEY WERE AT THIS POINT WHEN PFM AND THERANOS WERE TALKING, IT SAYS THAT THE MODEL HAS 11 STORES.

WELL, MR. GROSSMAN KNEW RIGHT AWAY THAT THERE WEREN'T 11 STORES, THERE WERE 3, AND HE TALKED ABOUT THAT ON THE WITNESS STAND. SO IMMEDIATELY THIS WAS OUT OF DATE.

IT'S JUST A PROJECTION. IT'S NOT REFLECTING NECESSARILY WHAT THE REALITY IS. INCLUDING RIGHT FROM THE GET-GO, IT WAS 11 STORES AND THERE WERE ONLY 3. MR. GROSSMAN KNEW THAT.

SO IF YOU SCROLL THROUGH THAT SAME LINE, YOU SEE THAT THERE'S PROJECTIONS FOR HOW THE WALGREENS PROJECT WILL EXPAND

SER-1235

OVER TIME.  AND, YOU KNOW, IT KEEPS ON GOING ALL THROUGH 2015 UNTIL YOU GET TO, YOU KNOW, THOUSANDS OF STORES.

AND WE LOOKED AT THAT YESTERDAY, AND I WON'T REPEAT IT, BUT THIS IS IN JANUARY '14, THE WALGREENS PARTNERSHIP WAS REALLY JUST BEGINNING.  THE SKY WAS THE LIMIT.  AND THAT REMAINED TRUE ALL THROUGH '14 AND '15.

BUT THIS IS, TO ORIENT US IN TIME, THIS IS EARLY 2014. AND THIS IS A PROJECTION.

OBVIOUSLY MR. GROSSMAN AND HIS TEAM UNDERSTAND THAT MIGHT NOT HAPPEN.  THAT'S CALLED EXECUTION RISK.

OKAY.  LOOK AT ROW 7, THOUGH, OF THIS CHART.  AND THIS IS THE ROW THAT HAS THE NUMBER OF TESTS PER DAY PER LOCATION.

SO THAT'S IMPORTANT INFORMATION BECAUSE IF YOU'RE GOING TO TRY TO PROJECT WHAT THE REVENUE MIGHT LOOK LIKE, YOU WANT TO KNOW NOT ONLY THE NUMBER OF STORES, BUT HOW MANY TESTS PER DAY ARE YOU GOING TO DO, AND HOW MANY TESTS PER DAY ARE YOU GOING TO BE DOING AT EACH LOCATION?

AND YOU CAN SEE THE PROJECTION IS FOR JANUARY OF 2014 THERE'S GOING TO BE 10 PATIENTS PER STORE PER DAY, AND THEN THERE'S JUST A PROJECTION OF HOW THAT WOULD EXPAND GOING FORWARD.

IF YOU LOOK AT ROW 17, THAT'S THE TOTAL NUMBER OF RETAIL LOCATIONS.  SO THAT'S SIMILAR TO WHAT WE JUST LOOKED AT.

THERE IS OTHER RETAIL RELATIONSHIPS THAT YOU'VE HEARD SOME ABOUT, INCLUDING SAFEWAY.

THE GOVERNMENT DIDN'T PRESENT ANY EVIDENCE ON THAT.  BUT THIS IS THE TOTAL RETAIL LOCATIONS, INCLUDING WALGREENS.

ROW 22 HAS TO DO WITH PHYSICIANS' OFFICES, AND WE'LL TALK MORE ABOUT THAT, BUT THIS IS HOW MANY PHYSICIANS' OFFICES ARE GOING TO BE USING THERANOS FOR BLOOD TESTS.  LIKE, FOR EXAMPLE, WHEN WE GET TO DR. ZACHMAN AND HER CLINIC, THE SOUTHWEST CONTEMPORARY WOMEN'S CLINIC, THAT WAS ONE OF THE PHYSICIANS' OFFICES, BUT THERE WERE OTHERS, AND THAT'S WHAT THAT REPRESENTS, THAT ROW, AND ESTIMATING HOW MANY THAT THERE WOULD BE -- HOW MANY PHYSICIANS' OFFICES AND WHAT THE REVENUE WOULD BE FROM THAT.

YOU CAN SEE THAT DOESN'T EVEN START UNTIL MARCH, SO THEY'RE NOT ESTIMATING ANY PHYSICIANS' OFFICES IN JANUARY AND FEBRUARY.  THEY'RE HOPING TO START THAT PROGRAM IN MARCH, AT LEAST AS A PROJECTION.

HOSPITALS IS A ROW, HOSPITALS COURIER, PICKING UP SAMPLES FROM THE HOSPITALS.  SAME THING.  THERE'S NOTHING ESTIMATED UNTIL APRIL, AND THEN THERE'S TEN.

SO THIS IS JUST A PROJECTION THAT IS GIVEN TO MR. GROSSMAN AND HIS TEAM.

HOSPITAL ONSITE SERVICES.  THERE'S NO REVENUE PROJECTED THERE AT ALL UNTIL APRIL OF 2015 IF YOU SCROLL ALL OF THE WAY THROUGH.  SO THEY'RE NOT THINKING ABOUT THAT FOR OVER A YEAR.

AND THEN DEPARTMENT OF DEFENSE, WHICH IS ROW 35, YOU HEARD INVESTORS TALKING ABOUT THINKING THERE WAS A RELATIONSHIP WITH

SER-1237

DEPARTMENT OF DEFENSE, AND WE'LL TALK MORE ABOUT THAT.  WE DID GO THROUGH THE MILITARY RELATIONSHIP YESTERDAY.

BUT HERE THE IMPORTANT POINT IS THAT IT'S ALL TO BE DETERMINED.  THERE'S NO REVENUE PROJECTED AT ALL FOR THE DEPARTMENT OF DEFENSE.

SO MR. GROSSMAN IS NOT RELYING ON A PROJECTION THAT THE MILITARY IS GOING TO BE PAYING THERANOS MONEY BECAUSE IT'S ALL TO BE DETERMINED.  THERE'S NO NUMBERS THERE.

IF YOU GO TO THE NEXT TAB OF THE SPREADSHEET, IT'S CALLED A PRO FORMA INCOME STATEMENT.  AND THIS MAY LOOK FAMILIAR TO YOU BECAUSE THERE'S OTHER INVESTORS, INCLUDING RDV, WHERE THAT WAS MS. PETERSON WHO TESTIFIED, AND ALSO MR. MOSLEY WHO SAW A VERY SIMILAR DOCUMENT IN OCTOBER, ACTUALLY EARLIER THAN THAT WHEN IT GOT THOSE BINDERS.  AND IT LOOKS VERY SIMILAR.

BUT YOU'LL SEE, WHEN IT GETS TO THOSE INVESTORS, THAT THE 2013 COLUMN IS NO LONGER THERE, AND THEN THE 2014 AND '15 COLUMNS ARE, AND THE NUMBERS ARE DIFFERENT.

BUT HERE THIS IS THIS PROJECTION, IT'S PROJECTED STATEMENT OF INCOME, AND IT HAS WHAT THEY'RE THINKING.  IF YOU LOOK AT 2013, WE KNOW FROM MS. SPIVEY'S TESTIMONY THAT $25 MILLION FROM WALGREENS CAME IN IN 2013.

AND THEN FOR 2014 IT'S A PROJECTION.  AND THERE ARE DIFFERENT SECTORS.  SO RETAIL PHARMACIES, THAT'S WALGREENS, PHYSICIANS' OFFICES, HOSPITALS, ONSITE HOSPITALS, AND THEN PHARMACEUTICAL SERVICES.  AND I'M GOING TO TALK ABOUT EACH OF

THOSE.  AND DEPARTMENT OF DEFENSE.

I'M GOING TO TALK ABOUT EACH OF THOSE AS I GO FURTHER HERE.

JUST PAUSE ON THIS FOR A MINUTE.  THERE'S ALSO COST, AND IF YOU LOOK AT ROW 23, I THINK IT IS, RETAIL PHARMACY.  SO FAR THE COST IS, THAT'S THE COST OF REVENUE, AND EACH OF THOSE HAS A COST ASSOCIATED WITH IT.

NOW, MR. GROSSMAN UNDERSTOOD THAT THIS WAS JUST A MODEL. SO AS WITH ANY MODEL, IF YOU CHANGE THE ASSUMPTIONS, THEN THE NUMBERS, THE REVENUE NUMBERS, AND ALL OF THE OTHER NUMBERS, ARE GOING TO CHANGE, AND THAT'S THE WHOLE POINT OF THESE KINDS OF PROJECTIONS.  NO ONE CAN PREDICT THE FUTURE.  WE ALL WISH WE COULD, BUT WE CAN'T.

SO THE POINT IS LET'S MODEL THIS BASED ON THE INFORMATION THAT WE HAVE AND IN THIS CASE DISCLOSE TO MR. GROSSMAN.  HE UNDERSTOOD THAT THE SPREADSHEET ENABLED HIM TO SEE ALL OF THE ASSUMPTIONS, THE FORMULAS THAT WENT INTO THE MODEL.

AND IF YOU GO TO THE NEXT PAGE.

AND HE UNDERSTOOD, OF COURSE, THAT IF YOU CHANGE THE ASSUMPTIONS, THAT WILL CHANGE THE OUTPUT IN THE MODEL.  IT'S JUST MATH, RIGHT?

AS I SAID A MINUTE AGO, LET'S TALK ABOUT THE SOURCES OF INCOME IN THE MODEL.

SO THERE'S THE RETAIL PHARMACY SECTOR, THERE'S THE PHYSICIANS' OFFICES, THERE'S THE HOSPITALS, AND THERE'S THE

PHARMACEUTICAL COMPANIES IN THAT SPREADSHEET THAT WE JUST SAW.

I DON'T HAVE DEPARTMENT OF DEFENSE THERE, THE DOD, BECAUSE THOSE WERE ALL TO BE DETERMINED. THESE WERE THE ONES WITH NUMBERS WITH PROJECTIONS, SO LET'S GO THROUGH THOSE ONE AT A TIME.

SO THE FIRST ONE IS RETAIL. AND I WON'T REPEAT WHAT I HAD SAID YESTERDAY ABOUT WALGREENS, BUT WALGREENS WAS COMMITTED TO A NATIONAL ROLLOUT. THE EARLY PERIOD OF ROLLOUT REFLECTED BOTH PARTIES OPTIMISM, AND THE LATER WALGREENS PROJECTIONS GAVE SUNNY A REASON TO BELIEVE THAT THE ROLLOUT WOULD CONTINUE.

AND AS I SAID YESTERDAY, MR. BALWANI CERTAINLY BELIEVED THAT IN JANUARY 2014 WHEN HE'S TALKING TO MR. GROSSMAN, HE BELIEVED THAT IN OCTOBER OF 2014 WHEN HE'S TALKING TO MR. MOSLEY -- MS. PETERSON AND MR. MOSLEY, AND HE BELIEVES THAT INTO 2015 WHEN WALGREENS IS STILL TELLING THERANOS THEY'RE COMMITTED TO THE ROLLOUT, AND THEY WANT TO COME UP WITH PLANS TO DO THAT.

BUT THAT'S THE RETAIL ISSUE. SO THAT, THAT REVENUE PROJECTION THAT WAS GIVEN TO PFM IS ALL BASED ON THE WALGREENS PROGRAM AND OTHER RETAIL PROGRAMS THAT THERANOS HAS.

THE NEXT POINT IS PHYSICIANS' OFFICES THOUGH. AND HERE THE QUESTION IS LIKE WHAT IS THERANOS DOING TO TRY TO MAKE THAT A REALITY, RIGHT?

AND REMEMBER, THEY WEREN'T SAYING THAT'S GOING TO HAPPEN RIGHT AWAY. THEY WERE LOOKING TO ADD PHYSICIANS' OFFICES AS

THE MONTHS AND YEARS WENT BY.

AND THIS IS FROM THE WALGREENS PARTNERSHIP MEETING MINUTES FROM -- IT HAPPENS TO BE JANUARY OF 2015.  AND THE SOURCE IS EXHIBIT 20238.

AND HERE THERE'S A RECITATION THAT THERE'S 180 TO 200 PHYSICIANS THAT ARE USING THERANOS EXCLUSIVELY AT THAT POINT IN TIME.

SO THERANOS DID THE WORK.  I MEAN, AS YOU HEARD IN THE TRIAL, YOU'VE GOT TO GO TO THESE PHYSICIANS' OFFICES, YOU'VE GOT TO EXPLAIN TO THEM WHAT THE SERVICE IS.  BUT THERANOS WAS DOING THE HARD WORK OF LIKE UP PHYSICIANS.

SO THIS REVENUE WAS NOT MADE UP.  IT WAS SOMETHING THAT THEY WERE REALLY DOING, AND BY JANUARY OF 2015 THEY ACTUALLY HAD A COUPLE OF HUNDRED PHYSICIANS' OFFICES LINED UP.

HOSPITAL SECTOR.  ALSO THERANOS WAS DOING THE HARD WORK OF ADDING HOSPITALS.  THIS IS NOT SOMETHING THAT IS MADE UP EITHER.

AND MR. GROSSMAN HIMSELF TESTIFIED THAT AT A CONFERENCE, INTERMOUNTAIN HEALTH SYSTEMS, A VERY LARGE HEALTH SYSTEM, ANNOUNCED THE STRATEGIC PARTNERSHIP WITH THERANOS, ONE OF THE LARGEST HOSPITAL NETWORKS IN THE U.S.

SO THEY WERE LINING UP HOSPITALS TO USE THE THERANOS SERVICE.  SO, AGAIN, THESE PROJECTIONS THAT WERE MADE TO MR. GROSSMAN, THESE WERE NOT FRAUDULENT.  THESE WERE THINGS THAT THE COMPANY INTENDED TO DO, AND DID DO.

SER-1241

THE NEXT ONE IS PHARMA. AND THE GOVERNMENT SPENT A LITTLE TIME ON THIS IN CLOSING, I BELIEVE, SAYING THAT THEY HAD NOTHING GOING ON WITH PHARMACEUTICAL COMPANIES. THAT'S NOT TRUE, EITHER.

BUT LET'S START THIS TOPIC OF PHARMACEUTICAL -- PROJECTED REVENUE FROM PHARMACEUTICAL COMPANIES IN THIS TESTIMONY FROM MR. GROSSMAN.

AND HE SAYS THAT "THEY," MEANING THERANOS, "TOLD US IN THE FIRST MEETING THAT THERANOS WAS SHIFTING THEIR EMPHASIS IN THE NEAR TERM TO THE RETAIL ROLLOUT, BUT THEY STILL HAD A VERY, A VERY -- A BIG FOCUS ON CONTINUING TO WORK WITH PHARMA. IT WAS IN THE FINANCIAL MODEL THAT THEY SHOWED US."

SO THAT'S TRUE. IT WAS IN THE FINANCIAL MODEL THAT THERANOS SHOWED MR. GROSSMAN, AND IT'S ALSO TRUE THAT THERANOS WAS FOCUSSING AT THAT POINT ON RETAIL.

BUT IT'S ALSO TRUE THAT THEY DID HAVE A FOCUS ON CONTINUING TO WORK WITH PHARMA, AND I WANT TO SHOW YOU EXACTLY WHAT THAT LOOKED LIKE IN THE FOLLOWING EXHIBITS.

SO, FIRST OF ALL, THIS IS IN THE CONTRACT. THIS IS IN THE CONTRACT BETWEEN THERANOS AND WALGREENS IN 2012. AND RIGHT IN THE CONTRACT THOSE PARTIES CONTEMPLATED THERE WOULD BE POTENTIAL BUSINESS PARTNERSHIPS WITH PHARMACEUTICAL COMPANIES. THERANOS WILL EXTEND ITS CLINICAL TRIAL INFRASTRUCTURE TO INCLUDE WALGREENS STORES SO THAT PHARMACEUTICAL CLINICAL TRIAL PATIENTS WILL HAVE THE OPTION TO HAVE THEIR SPECIMENS COLLECTED

SER-1242

AT A WALGREENS LOCATION.

SO THE CONCEPT IS NOT VERY DIFFERENT FROM RETAIL.  JUST LIKE A RETAIL CUSTOMER WHO WANTS TO GET A BLOOD TEST CAN GO TO A WALGREENS STORE, HOPEFULLY VERY CONVENIENT FOR THEM, A PERSON WHO IS ENROLLED IN A CLINICAL TRIAL FOR A BIG PHARMA COMPANY CAN SIMPLY, YOU KNOW -- AND THEY HAVE TO BE MONITORED, THEIR BLOOD MARKERS ON WHATEVER ASSAY IT IS HAVE TO BE MONITORED, THAT PERSON CAN GO TO THE WALGREENS STORE AND GET THE TEST THERE AND THAT RESULT WILL GO TO THE CLINICAL TRIAL STUDY FOR THAT RESEARCH PURPOSE.

SO THAT'S WHAT WALGREENS AND THERANOS CONTEMPLATED, AND THAT WAS RIGHT IN THE CONTRACT.

AND THEN THERANOS WORKED ON TRYING TO MAKE THAT A REALITY.

SO OBVIOUSLY YOU PROJECT REVENUE.  THE KEY IS YOU'VE GOT TO DO SOMETHING TO TRY TO MAKE THAT REAL, AND THERANOS DID DO THAT.

SO HERE'S AN EMAIL FROM NOVEMBER 23RD, 2013.  IT'S FROM A PERSON AT PFIZER.  IT SAYS, "CHRISTIAN."

AND THEN THE HIGHLIGHTED PART, "PLEASE TAKE MY MAIL AS AN EXPRESSION OF INTEREST AND EXCITEMENT WITH YOUR TECHNOLOGY AND ASPIRATIONS THAT WE CAN MOVE FORWARD WITH DISCUSSIONS AND HOPEFULLY A PARTNERSHIP.  THIS WOULD BE AN EXCELLENT OPPORTUNITY TO FURTHER ENGAGE PFIZER SENIOR MANAGEMENT."

SO CONTRARY TO THE GOVERNMENT'S CLAIM WITH MR. WEBER ON THE STAND, THIS WAS NOT -- PFIZER WAS STILL INTERESTED EVEN IN

NOVEMBER OF 2013. BUT THAT WAS PART OF THE PHARMACEUTICAL REVENUE THAT THERANOS WAS HOPING FOR DOWN THE LINE.

AND THEN RESPONSE FROM MS. HOLMES, "WE ARE VERY INTERESTED IN PUTTING A LONG TERM, STRATEGIC PARTNERSHIP IN PLACE WITH PFIZER AND LOOK FORWARD TO THE OPPORTUNITY TO DISCUSS THAT."

THIS GOES ON WELL INTO '14, 2014. THIS IS AN EMAIL FROM A PERSON AT GENENTECH, ANOTHER PHARMACEUTICAL COMPANY. AND HE'S BACK FROM SABBATICAL AND WANTS TO PICK UP THE CONVERSATION ABOUT HOW GENENTECH, ROCHE AND WALGREENS CAN COLLABORATE IN THE CLINICAL TRIAL SPACE.

AND THEN IT SAYS, "WOULD YOU BE ABLE TO GET MYSELF AND SEVERAL SENIOR LEADERS FROM GENENTECH AN INTRO TO ELIZABETH HOLMES AND A VISIT TO THERANOS." SO THERE'S INTEREST FROM THAT PHARMACEUTICAL COMPANY AS WELL.

MORE ON GENENTECH. THIS IS FROM ANOTHER GENENTECH PERSON. "WE ARE LOOKING FORWARD TO AN EXPLORATORY MEETING TO DISCUSS A POTENTIAL PARTNERSHIP WHERE WE CAN WORK TOGETHER TO EVOLVE AND DECENTRALIZE THE CLINICAL TRIAL MODEL."

SO DECENTRALIZE MEANS THAT YOU CAN GO GET YOUR BLOOD TESTED AT WALGREENS RATHER THAN GOING TO SOME CENTER WHERE LIKE ALL OF THE PATIENTS HAVE TO GO.

MR. JHAVERI IS TRYING TO MOVE THIS FORWARD.

IF YOU GO TO SLIDE 20566.1.1, MR. ALLEN.

"HI SUNNY -- WOULD YOU BE AVAILABLE ON DECEMBER 4TH? THIS IS AN IMPORTANT MEETING WITH GENENTECH?"

AND IT CONTINUES, THIS IS ON OCTOBER 15TH, 2014, ABOUT THE INTRO TO THERANOS AND ELIZABETH HOLMES.

"HOWIE WILL BE GIVING A CLINICAL TRIALS OVERVIEW AND THEN WE'D LIKE TO SEE THE PALO ALTO STORE WITH THERANOS."

AND THEN IT TALKS ABOUT THEIR EXPRESSION OF INTEREST. SO THEY'RE TRYING TO LINE UP THESE MEETINGS TO MOVE THAT PROJECT FORWARD SO THAT PATIENTS CAN END UP GOING TO WALGREENS FOR THEIR CLINICAL TRIAL TESTS.

HERE'S THE NEXT ONE. THIS IS WITHIN WALGREENS, DR. GOLUB AT WALGREENS IS SAYING THAT ANOTHER ISSUE IS WHETHER THEY, GENENTECH, CAN WORK DIRECTLY WITHOUT WAG, WITHOUT WALGREENS. AS WE DISCUSSED, IT WAS MY IMPRESSION THAT THEY WERE CONSIDERING THIS DURING THE VISIT TO OUR STORE.

YOU CAN SEE THAT MR. JHAVERI IN THE NEXT EMAIL ON JANUARY 2ND, 2015, HE SAYS "THANKS HOWARD. WE SHOULD NOT HAVE THERANOS AND GENENTECH WORK WITHOUT US. THERE IS A REVENUE STREAM THAT WE WILL LOSE IF PATIENTS ARE NOT COMING TO THE STORES FOR THE THERANOS SERVICE."

SO MR. JHAVERI UNDERSTANDS THIS IS A REVENUE STREAM, AND THAT IS EXACTLY WHAT MR. BALWANI AND THERANOS PROJECTED WHEN THEY WERE TALKING TO MR. GROSSMAN AND OTHER INVESTORS, THAT THERE WOULD BE A POTENTIAL REVENUE STREAM.

NOW, IT TAKES A LOT OF WORK TO PUT THAT INTO ACTION. IT TAKES A LOT OF MEETINGS AND WORK. AND SOMETIMES THE TIMEFRAME OF THAT TAKES LONGER THAN YOU WANT, AND THAT'S THE WAY BUSINESS

SER-1245

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                7432

WORKS. BUT THEY ARE WORKING ON THIS, AND MR. JHAVERI CERTAINLY THINKS THIS IS A REVENUE STREAM, JUST LIKE MR. BALWANI THOUGHT.

AND THEN THERE ARE OTHER PHARMACEUTICAL COMPANIES. THIS ONE IS ABOUT ABBOTT. THEY WANT TO TALK ABOUT USING THERANOS STORES FOR A TEST TRIAL, ANOTHER BIG PHARMACEUTICAL COMPANY.

AND THEN IF WE GO TO THE NEXT ONE.

IT'S ABOUT A MEETING WITH -- ABOUT A PFIZER/WALGREENS/THERANOS RELATIONSHIP. "REVIEWING PFIZER'S PROPOSED SCOPE AND MODEL FOR THE WALGREENS PILOT."

"BRAINSTORM OF KEY METRICS TO BE CAPTURED AND MEASURED AS A BASIS FOR COMPARISON TO OUR TRADITIONAL CLINIC-BASED STUDY APPROACH."

SO MORE INTEREST FROM PFIZER.

AND HERE'S ANTHONY BROGNO FROM WALGREENS WHO WORKS CLOSELY WITH CASEY KOZLOWSKI, IMPLEMENTING CLINICAL TRIALS IN OUR STORES AND PFIZER IS INTERESTED IN CONDUCTING AN EXPERIMENT.

SO THIS IS IN FEBRUARY OF 2015 AND HE'S INVITING THE THERANOS TEAM TO HELP WITH THAT.

SO JUST PAUSING THERE TO SUM UP THAT TOPIC BEFORE WE MOVE ON. SO THE GOVERNMENT SPENT SOME TIME SAYING THAT THE PHARMACEUTICAL PROJECTION THAT WAS GIVEN TO MR. GROSSMAN AND OTHER INVESTORS, LIKE MR. MOSLEY AND RDV, THE DEVOS FAMILY, IS JUST NOT TRUE, THAT THERE'S NOTHING GOING ON, THERE'S NO POSSIBILITY, THIS IS DEAD.

NO. THERE'S ACTUALLY QUITE A LOT OF INTEREST IN MOVING

**SER-1246**

THAT FORWARD, AND YOU'RE MAKING A PROJECTION, AND THEN YOU'VE GOT TO POUND THE PAVEMENT AND HAVE MEETINGS, AND YOU'VE GOT TO PUT IT INTO MOTION.  SOMETIMES IT WORKS OUT, SOMETIMES IT DOESN'T.

BUT WHEN YOU START WITH THE PROJECTION, IT DOESN'T MEAN THE PROJECTION IS FRAUDULENT IF IT ENDS UP NOT ACTUALLY OCCURRING.  YOU ONLY CAN GO WITH THE INFORMATION THAT YOU HAVE.

AND THAT'S WHAT I MEANT A COUPLE OF DAYS AGO WHEN I TALKED ABOUT NOT LOOKING AT THIS CASE WITH THE BENEFIT OF HINDSIGHT.

SO WHAT YOU CAN'T DO IS SAY, WELL, WE KNOW NOW THAT THEY DIDN'T ACTUALLY HAVE CLINICAL TRIAL PATIENTS COMING TO THERANOS STORES.

AS IT TURNS OUT, THAT'S NOT RELEVANT.  WE HAVE TO LOOK AT WHAT MR. BALWANI WAS SEEING AT THE TIME, AND WAS HE REASONABLE IN PROJECTING REVENUE IN THE PHARMACEUTICAL SECTOR FROM THIS CLINICAL TRIAL WORK?

AND THE ANSWER IS YES BECAUSE THEY WERE TRYING TO MOVE THIS FORWARD.  AND THAT'S WHAT MR. BALWANI WAS SEEING THROUGH HIS EYES IN REAL TIME.

I WANT TO MOVE ON, THOUGH, TO ANOTHER TOPIC, BUT STILL REGARDING THE INVESTOR PFM AND MR. GROSSMAN.  AND THAT IS, MR. GROSSMAN MADE A BIG DEAL ON THE WITNESS STAND ABOUT THE COST OF COMMERCIAL DEVICES VERSUS THE COST OF THERANOS ANALYZERS.

AND HE SAID THAT HE DIDN'T KNOW ABOUT THE COMMERCIAL

ANALYZERS, AND THE REASON THIS WAS SO CONCERNING TO HIM IS BECAUSE HE THINKS COMMERCIAL ANALYZERS ARE REALLY EXPENSIVE. HE DIDN'T SAY WHAT THAT COST WAS. WE DIDN'T GET THAT EVIDENCE.

BUT HE THINKS THOSE ARE EXPENSIVE AND THAT YOU HAVE TO BUY A LOT OF COMMERCIAL ANALYZERS AS OPPOSED TO MAKING THESE SMALLER THERANOS EDISONS THAN, YOU KNOW, THAT'S GOING TO JUST -- I THINK HIS WORDS WERE, THERE'S NO INDUSTRIAL LOGIC TO THAT IS WHAT HE SAID. YOU CAN'T HAVE LOWER PRICES IF YOU'RE ALSO BUYING THESE COMMERCIAL MACHINES.

AND I JUST WANT TO TAKE A FEW MINUTES TO UNPACK THAT.

SO WHAT MR. GROSSMAN CAN'T TELL YOU AND DIDN'T TELL YOU IS HE DOESN'T KNOW WHAT THE THIRD PARTY MACHINES COST. HE DIDN'T SAY ANYTHING ABOUT THAT.

HE DIDN'T KNOW WHETHER THERANOS WAS PURCHASING OR LEASING THEM.

HE DOESN'T KNOW HOW MANY THERANOS HAS ALREADY IN THEIR POSSESSION, COMMERCIAL DEVICES.

HE DOESN'T KNOW WHEN THERANOS BOUGHT THE COMMERCIAL DEVICES THEY HAVE IN THEIR POSSESSION.

AND THERE REALLY ISN'T ANY EVIDENCE IN THIS CASE ABOUT HOW THE COST OF THIRD PARTY DEVICES WOULD AFFECT THE THERANOS FINANCIAL MODEL.

SO IF WE GO BACK TO THE SPREADSHEET THAT WE WERE LOOKING AT BEFORE, THIS IS EXHIBIT 13720 CAPITAL A. SO THERE'S THE MACRO ASSUMPTIONS TAB. AND AT THE TOP, 2014 DEVICE COST PLUS

INSTALLATION CONFIGURATION PLUS TRAINING IS ESTIMATED TO BE $70,000.

AND THEN 2015 COST, THE SAME COST IS ESTIMATED TO BE $50,000, PRESUMABLY BECAUSE AS YOU GET MORE EXPERIENCE, THERE'S WHAT IS CALLED ECONOMIES OF SCALE AND MAYBE YOU CAN MAKE THEM FOR LESS.

SO THAT'S THE COST PROJECTION.

IF WE GO TO THE MARKET ASSUMPTIONS TAB, AND IN PARTICULAR ROWS 53 AND 54, THEN WE SEE THERE THE TOTAL NUMBER OF MINILABS PRODUCED. AND IF YOU SCROLL THROUGH THAT, IT JUST HAS AN ESTIMATE OF OVER TIME HOW MANY MORE THEY'RE GOING TO HAVE TO ADD EACH MONTH AS TIME GOES ON TO MEET THE DEMAND THAT THEY'RE EXPECTING, THAT THEY'RE PROJECTING.

AND YOU CAN SEE BY THE END OF 2015 WHEN THE SPREADSHEET STOPS, THEY ARE INTO 2,000 DEVICES. SO YOU CAN DO THE MATH, BUT, YOU KNOW, 2,000 DEVICES AT $50 TO $70 PER DEVICE IS QUITE A LOT OF COST, AND THERE'S NO EVIDENCE IN THIS CASE ABOUT HOW THAT COMPARES TO THE COST OF BUYING COMMERCIAL MACHINES LIKE SIEMENS ADVIA.

SO MR. GROSSMAN IS SAYING THAT, THAT THIS WAS A HUGE BIG DEAL. BUT IF HE REALLY THOUGHT IT WAS A BIG DEAL AND HE REALLY WAS PREPARED, HE WOULD KNOW OR HE WOULD HAVE HAD THE INFORMATION ABOUT WHAT DOES IT COST TO BUY A COMMERCIAL DEVICE AND HOW IS THAT AFFECT THE BOTTOM LINE, AND HE'S JUST SAYING THAT, BUT HE REALLY DOESN'T REALLY HAVE ANY DATA.

SER-1249

SO AS IT TURNS OUT, THERE REALLY ISN'T ANY EVIDENCE THAT THAT IS TRUE, THAT SOMEHOW THIS WOULD WIPE OUT THERANOS'S BUSINESS MODEL IF THEY HAD TO BUY SOME COMMERCIAL DEVICES.

BUT IN ANY EVENT, EVEN PUTTING THAT ASIDE, PFM KNOWS FULL WELL THAT THERANOS HAS COMMERCIAL DEVICES.

SO LET'S LOOK AT SOME OF THE SLIDES ON EXHIBIT 4077. THIS IS ONE OF THE SLIDES IN THE PRESENTATION THAT WAS PROVIDED TO PFM. AND YOU CAN SEE RIGHT HERE THEY'RE DOING A COMPARISON. THIS IS THAT R2 NUMBER WHERE IT'S LOOKING AT THE CORRELATION BETWEEN THE THERANOS DEVICE AND THE COMMERCIAL DEVICE. YOU CAN SEE RIGHT THERE THEY'RE HAVING TO COMPARE THERANOS TO A SIEMENS IMMULITE.

SO THERE'S A DISCLOSURE THAT, YEAH, WE HAVE COMMERCIAL DEVICES. WE HAVE TO USE THEM TO DO THE COMPARISON, AND HERE YOU GO.

SAME WITH THE NEXT SLIDE.

YOU CAN SEE THERE'S A SIEMENS ADVIA NOTED THERE. THAT'S RIGHT IN MR. GROSSMAN'S MATERIALS THAT HE AND DR. RABODZEY AND HIS TEAM REVIEWED.

I JUST WANT TO RETURN TO THIS WHILE WE'RE ON THE SUBJECT OF R2 AND DATA.

IF YOU CAN GO TO THE NEXT SLIDE.

WE TALKED ABOUT THIS A LITTLE TODAY, BUT HERE'S ANOTHER EMAIL FROM JANUARY 24TH, 2014 WHERE DR. RABODZEY IS REPORTING THAT THE PARVOVIRUS IGG ASSAY, WITH 4 PERCENT CV, AND IT SAYS

SER-1250

VERSUS THE THERANOS AT 15 TO 20 PERCENT, AND HE NAMES PAGE 143.

SO HE'S LOOKING THROUGH THIS PRESENTATION AND HE SEES THAT THERE'S SOME COEFFICIENTS OF VARIATION THAT LOOKS HIGH.

AND HE GOES ON, BASICALLY MY CONCERN IS THAT THEIR METHODOLOGY IS STILL RAW AND/OR THEY MAY BE PUSHING LIMITS HERE.

AND HE GOES ON TO SAY IF THEY HAVE TO RERUN THESE TESTS QUARTERLY -- NOTE THAT THEY WILL HAVE TO RERUN THESE TESTS QUARTERLY AND LABCORP AND QUEST WILL EAT THEM ALIVE IF THERE'S ANY EVIDENCE OF 20 PERCENT CV HERE.

AND THEN HE SAYS RIGHT BELOW THAT, THEIR R2 IS PRETTY POOR AT .91. THERE ARE VERY FEW DATA POINTS AT THE VERY HIGHER END OF THE RANGE. THIS COMPARES TO .992 R2, THE LEINCO LABCORP TEST ON 110 SAMPLES VERSUS THEIR 20.

SO DR. RABODZEY AND MR. GROSSMAN, THEY KNOW FULL WELL. AND I WANT TO SAY THIS BECAUSE IT'S BEARS REPEATING THAT THIS IS THERANOS PROVIDING THE DATA. THAT'S THE OPPOSITE OF INTENT TO DEFRAUD. THEY'RE PUTTING THE DATA OUT THERE.

AND IF PFM WANTS TO LOOK AT THAT AND SAY, WELL, IT SEEMS LIKE THEY DON'T QUITE HAVE ALL OF THEIR TESTS WHERE THEY NEED TO BE, THEY DON'T HAVE TO INVEST. THEY UNDERSTAND THAT THEY'RE INVESTING IN AN EARLY STAGE COMPANY AND THERE ARE A LOT OF RISKS ASSOCIATED WITH THAT.

EVERYONE HOPES THAT THIS IS GOING TO WORK OUT AND THAT THOSE R2'S WILL GET BETTER AND THAT THERANOS'S ROLLOUT WILL GO

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.) 7438

VERY SMOOTHLY AND BE A SMASHING SUCCESS.

MR. BALWANI THINKS THAT AND MR. GROSSMAN IS WILLING TO TAKE THE RISK ON THAT.

AS I SAID EARLIER, MR. GROSSMAN DID HIS OWN MODEL, AND HE DID NOT JUST RELY ON THERANOS.

SO THAT'S THE NEXT SPREADSHEET I WANT TO SHOW YOU.

SO THIS IS EXHIBIT 4093. THIS IS A LOT OF FINANCIAL ANALYSIS THAT MR. GROSSMAN AND HIS TEAM DID. AND THEY HAVE THEIR OWN PROJECTIONS.

NOW, IF YOU LOOK AT THE TABS IN THE BOTTOM, THE ONES THAT ARE THE ORANGE ONES AND THE BLUE ONES ARE GENERATED BY PFM. OKAY.

BUT YOU CAN SEE IF YOU GO TO THE VALUATION TAB AND IF YOU LOOK AT THE ROW THAT SAYS 2015, AND THEN IT HAS THE PERCENT GROWTH FOR THERANOS NET REVENUE.

MR. ALLEN, IF YOU COULD JUST HIGHLIGHT THAT RIGHT THERE. THANK YOU.

THAT'S 525 PERCENT. SO AS A JUROR YOU DON'T HAVE TO CHECK YOUR COMMON SENSE AT THE DOOR OF THE COURTHOUSE. 525 PERCENT GROWTH IS EXTRAORDINARY. WE ALL HOPE FOR 525 PERCENT GROWTH IN ALL OF THE THINGS THAT WE DO. BUT THAT'S ENORMOUSLY SUCCESSFUL, AND THAT'S WHAT PFM THINKS COULD HAPPEN.

BUT WHEN YOU DO THAT, YOU KNOW THAT YOU'RE ALSO TAKING ON A LOT OF RISKS THAT IT WON'T HAPPEN. AND THAT'S THE WHOLE RISK/REWARD ANALYSIS THAT THESE INVESTORS ARE IN. YES, THEY

STAND TO GET A LOT WEALTHIER THAN THEY ALREADY ARE IF THE WALGREENS ROLLOUT GOES REALLY WELL, BUT AS YOU SAW YESTERDAY, THEY'RE ALSO ALL REPRESENTING THAT WE CAN AFFORD TO LOSE OUR ENTIRE INVESTMENT AND WE KNOW THAT COULD HAPPEN.

IN FACT -- IF YOU GO TO THE NEXT SLIDE.

MR. GROSSMAN AND HIS TEAM VALUED THERANOS AT 20.3 BILLION. AND THAT'S JUST FOR THE U.S. PORTION OF THE BUSINESS.

THERANOS DIDN'T VALUE THE BUSINESS EVEN THAT HIGH.

IF YOU GO TO THE NEXT SLIDE.

MR. GROSSMAN UNDERSTOOD THAT THERANOS WAS VALUING THE BUSINESS AT THAT TIME AT $17 A SHARE AT 9 BILLION.

SO THEY WERE MUCH MORE BULLISH ON THERANOS THAN EVEN THERANOS WAS.

OKAY.  I WANT TO TALK ABOUT ANOTHER ISSUE REGARDING MR. GROSSMAN, AND THAT IS, HE TESTIFIED ABOUT A NUMBER OF $220 MILLION.  AND YOU CAN SEE FROM THE TESTIMONY HERE THE QUESTION IS, AND THIS IS ON DIRECT EXAMINATION BY THE GOVERNMENT, "IN THIS MEETING IN DECEMBER OF 2013, DID MS. HOLMES OR MR. BALWANI MAKE ANY STATEMENTS ABOUT THE AMOUNT OF REVENUE BEING GENERATED BY THERANOS'S RELATIONSHIP WITH PHARMA AND THE MILITARY?"

THAT'S THE QUESTION.

AND THE ANSWER FROM MR. GROSSMAN IS, "I DON'T SPECIFICALLY RECALL."

AND THEN HE SAYS, "WELL, I DO REMEMBER AT THE END OF THE

MEETING THEY TOLD US THEY HAD RAISED," SO THE WORD "RAISED" SUGGESTS RAISING MONEY FROM INVESTORS.

BUT THEN HE GOES ON AND SAYS, "OH" -- SO HE CAUGHT HIMSELF, HE DIDN'T WANT TO SAY RAISE, "I WANT TO SAY IT WAS 220 MILLION OVER THE LAST TEN YEARS THROUGH WORKING WITH THE MILITARY AND PHARMA."

AND THEN THE QUESTION FROM THE GOVERNMENT WAS, "SO YOU WERE TOLD THAT THERANOS HAD 220 MILLION IN REVENUE?"

KIND OF A LEADING QUESTION CONFIRMING THAT.

AND HE WAS HAPPY TO SAY YES.

"IN SOME COMBINATION FROM PHARMACEUTICAL COMPANIES AND THE MILITARY?

"CORRECT."

SO THAT'S HIS TESTIMONY ON DIRECT.

BUT ON CROSS HERE'S WHAT HAPPENED -- SO THERE ARE THESE NUMBERS PROVIDED TO HIM ABOUT THE COMMON STOCK, THE AMOUNT OF COMMON STOCK OUT THERE AND THE AMOUNT OF PREFERRED STOCK.  SO THAT'S THE INVESTMENT.

GUESS WHAT?  IT'S 225,944,000 IF YOU ADD THAT UP.  SO ABOUT $225 MILLION.  SO IT'S ALMOST IDENTICAL TO THE 220 MILLION THAT MR. GROSSMAN REMEMBERED.

REMEMBER, HE SAID RAISED, AND THEN HE SAID, OH, AND THEN HE WENT ON AND CLAIMED THAT IT WAS SOMETHING HE THOUGHT WAS ACTUAL REVENUE THAT THERANOS EARNED, LIKE MILITARY AND PHARMACEUTICAL COMPANIES PAID 225 MILLION.

SER-1254

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                7441

THAT'S THE NUMBER THAT, AT THAT POINT IN TIME, THERANOS HAD RAISED SINCE ITS INCEPTION, SO GOING ALL OF THE WAY BACK TO WHEN MS. HOLMES FOUND THE COMPANY BEFORE MR. BALWANI WAS THERE. THAT'S THE NUMBER.

AND IF YOU GO TO THE NEXT SLIDE, HERE'S WHAT HAPPENED WHEN HE WAS ASKED ABOUT THAT FURTHER.

"AND THOSE TWO ROWS MEAN THAT THERANOS HAD RAISED ABOUT 225 MILLION BY ISSUING STOCK; CORRECT?"

AND THIS GUY, IVY LEAGUE EDUCATED HEDGE FUND MANAGER AT PFM, SAYS, "I'M NOT SURE. I'M NOT AN EXPERT ON BALANCE SHEET AND ACCOUNTING FOR THIS, SO I DON'T KNOW FOR SURE.

"DON'T YOU REVIEW BALANCE SHEETS AS PART OF YOUR DAILY BUSINESS?"

HE SAYS, WE DO, BUT HE CLAIMS IT'S COMPLICATED.

AND THEN ULTIMATELY THE ANSWER IS "I DO AGREE THAT IT REPRESENTS 225 MILLION BETWEEN THESE TWO LINES.

"AND THAT CORRESPONDS TO STOCK, THERANOS'S STOCK; RIGHT?

"YES."

SO HE WAS ABLE TO UNDERSTAND THAT ON THE WITNESS STAND, BUT HE WANTED TO SAY HE DOESN'T UNDERSTAND BALANCE SHEETS. BUT AGAIN, DOES THAT MAKE ANY SENSE FROM MR. GROSSMAN? HE DOESN'T UNDERSTAND BALANCE SHEETS? YOU ALL SAW HIM. YOU ALL HEARD HIM. WE ALL KNOW HIS BACKGROUND.

LET'S TURN TO ANOTHER TOPIC INVOLVING MR. GROSSMAN, AND THAT'S THE MILITARY.

SO HE CLAIMED THAT HE WAS TOLD, AND THERE'S NO DOCUMENTARY EVIDENCE OF THIS, BUT HE SAID HE WAS TOLD THAT THERANOS HAD USED ITS ANALYZER IN THE MILITARY IN BATTLE, OR ON THE BATTLEFIELD AT LEAST, TREATING SOLDIERS.

THERE'S NO NOTES OF THAT.  THERE'S NO EMAILS ABOUT THAT. THERE'S NOTHING FROM THERANOS.  THERE'S NOTHING INTERNALLY AT PFM.  WE HAVE SEEN ZERO ON THAT, OTHER THAN MR. GROSSMAN SAYING THAT.  THERE'S NO DEPARTMENT OF DEFENSE REVENUE ACCOUNTED FOR IN THE MODELS.

AND JUST A FEW DAYS AFTER THAT -- SO THE PFM MEETING WAS ABOUT 11 DAYS BEFORE THAT DECEMBER 20TH INVESTOR CALL AND THAT'S WHEN WE WOULD HAVE KNOWN EXACTLY WHAT IN THIS TIMEFRAME MS. HOLMES WAS SAYING ABOUT THE MILITARY RELATIONSHIP AND THE OTHER TOPICS.  I WON'T GO INTO THAT AGAIN BECAUSE WE TALKED ABOUT IT YESTERDAY, BUT THAT WAS OUR WINDOW TO UNDERSTAND IT, BUT THE GOVERNMENT DIDN'T PLAY IT.

BUT HERE MR. GROSSMAN IS GOING FROM MEMORY, NO NOTES, NO EVIDENCE, NO DOCUMENTARY EVIDENCE.

AND ISN'T IT POSSIBLE, RIGHT -- I MEAN, SURE, COULD THERE HAVE BEEN DISCUSSIONS ABOUT THE POSSIBLE USE OF THERANOS TECHNOLOGY WITH THE MILITARY?  SURE.  I MEAN THERANOS HAD BEEN TALKING ABOUT THAT WITH THE MILITARY AS YOU SAW YESTERDAY WITH A WHOLE LOT OF EMAILS WITH THE DIFFERENT MILITARY COMMANDS.

SO OVER THE COURSE OF NINE YEARS, CAN MR. GROSSMAN REMEMBER THE EXACT WORDS?  COULD THAT HAVE MORPHED FROM THEY

TALKED ABOUT THE POSSIBLE USE IN THE MILITARY AND HOW THEY WERE TRYING TO PUT THE THERANOS TECHNOLOGY IN USE WITH THE MILITARY, OR EVEN THAT THE THERANOS DEVICE WAS BEING TESTED ON AIRCRAFT IN AFRICA WITH TEMPERATURES ABOVE 100 DEGREES, WHICH ACTUALLY HAPPENED, COULD THAT HAVE MORPHED INTO THEY'RE ACTUALLY USING THAT TO TREAT SOLDIERS WHEN YOU COMBINE THAT WITH THE BURN STUDY WHERE THEY WERE DOING A STUDY TO SEE HOW IN THE FUTURE MILITARY PERSONNEL WHO UNFORTUNATELY SUFFERED BURN INJURIES COULD BE TREATED?  I THINK THAT WE CAN'T REALLY TRUST SOMEONE'S MEMORY FOR NINE YEARS, OR NINE YEARS LATER.

AND WE CERTAINLY CAN'T TRUST SOMEONE'S MEMORY BEYOND A REASONABLE DOUBT AT THIS POINT GIVEN EVERYTHING ELSE WE KNOW ABOUT THE MILITARY, EVERYTHING ELSE WE KNOW ABOUT THERANOS'S RELATIONSHIP WITH THE MILITARY, AND THE FACT THAT THE GOVERNMENT HAD THAT CHANCE, AS I SAID, TO LET US ALL HEAR EXACTLY WHAT HAPPENED AND THEY DIDN'T DO IT.

NOW, MR. GROSSMAN, AS YOU HEARD, AND YOU MIGHT REMEMBER THIS ON THE STAND, HE ACTUALLY SAID THAT HE HAD EMPLOYEES WITHIN HIS COMPANY THAT WERE ALSO GIVEN AN OPPORTUNITY TO INVEST.  THEY DIDN'T HAVE TO DO THAT.

BUT HE HAD THIS PRACTICE OF HE WOULD -- I THINK HE CALLED IT CO-INVESTMENT WHERE OTHER PEOPLE COULD MAKE THE SAME INVESTMENT IN PFM AS THE COMPANY WAS MAKING.  AND I WANT TO TALK ABOUT THAT IN A MINUTE.

THE SLIDE ON THE SCREEN THOUGH -- ACTUALLY, LET'S TALK

ABOUT THAT.

SO THE BUSINESS OUTLOOK, THIS IS THE INTERNAL MEMORANDUM FROM PFM TO ITS OWN EMPLOYEES EXPLAINING THE UPSIDE SCENARIO AND THE DOWNSIDE SCENARIO OF INVESTING IN THERANOS.

AGAIN, THERE'S NOTHING IN HERE ABOUT THE MILITARY OR FLYING ON HELICOPTERS OR TREATING SOLDIERS OR REVENUE FROM THE MILITARY OR ANYTHING LIKE THAT. IT'S ALL REALLY ABOUT THE RETAIL PROGRAM AND THE RISKS AND REWARDS OF THAT.

AND THAT'S EXHIBIT 7411 IF YOU WANT TO LOOK AT THAT.

SO THIS IS ALL ABOUT WALGREENS. THAT'S WHAT, THAT'S WHAT WAS THERE TO MAKE INVESTORS LIKE PFM VERY, VERY WEALTHY INDEED.

AND THERE'S NO REASON -- THERE'S NO EVIDENCE IN THIS CASE THAT MR. BALWANI DIDN'T UNDERSTAND AND BELIEVE THAT WALGREENS WAS GOING TO BE, AS I SAID, A SMASHING SUCCESS.

THE GOVERNMENT SPENT SOME TIME IN CLOSING TALKING ABOUT HOW, WELL, EVEN IF IT'S POSSIBLE THAT MR. BALWANI BELIEVED AND IT WAS TRUE THAT WALGREENS WAS PLANNING TO ROLL OUT A LOT OF STORES AND HAD A NATIONAL COMMITMENT, THE GOVERNMENT SAYS, WELL, THAT STILL DOESN'T MATTER BECAUSE THE WHOLE BUSINESS RELATIONSHIP WITH WALGREENS WAS BUILT ON SOME KIND OF FRAUD.

WELL, WE KNOW THAT'S NOT TRUE. SO RIGHT FROM THE BEGINNING BEFORE THEY EVER SIGN ANY CONTRACT WITH THERANOS, THEY GOT JOHNS HOPKINS TO EVALUATE THE TECHNOLOGY. THEY HAD THE DEVICE IN THEIR POSSESSION TO TEST FOR A COUPLE YEARS.

SO THERE'S NO BASIS TO SAY THAT THIS WHOLE RELATIONSHIP

WAS BUILT ON FRAUD.

MR. GROSSMAN WAS IN THE SAME POSITION AS MR. BALWANI AT THAT POINT. MR. BALWANI THOUGHT THEY WERE POTENTIALLY GOING TO HAVE GREAT SUCCESS WITH WALGREENS. HE WAS WORKING EVERY DAY WITH EVERYTHING HE HAD TO MAKE THAT A REALITY, AND MR. GROSSMAN WAS EXCITED ABOUT THAT, TOO, AND ENDED UP MAKING A DECISION TO INVEST DESPITE KNOWING, AS WE JUST REVIEWED, ALL OF THE RISKS ASSOCIATED WITH THAT.

THAT'S THE END OF MR. GROSSMAN, THAT TOPIC.

BUT I WANT TO TALK ABOUT THE NEXT INVESTOR, WHICH IS THE DEVOS FAMILY. AND THEIR FAMILY COMPANY, THEIR FAMILY OFFICE IS CALLED RDV. IT STANDS FOR RICHARD DEVOS WHO, AS YOU HEARD, WAS THE FOUNDER OF AMWAY, AND THAT WAS WHERE THE WEALTH CAME FROM.

SO LET'S TALK ABOUT RDV. SO THIS IS THE BASIC STRUCTURE THAT WE LEARNED FROM MS. PETERSON. SO YOU'VE GOT THE DEVOS FAMILY. THOSE ARE THE DECISION MAKERS. THOSE ARE THE PEOPLE WHO RUN THE FAMILY OFFICE. THERE'S AN INVESTMENT COMMITTEE AS WE HEARD. AND THAT'S A ROTATING GROUP OF WHAT THEY CALL GENERATION 2 AND GENERATION 3 PEOPLE WITHIN THE DEVOS FAMILY.

AND THEN THERE'S JERRY TUBERGEN, WHO IS SORT OF THE INVESTMENT PROFESSIONAL WHO LEADS THAT OFFICE. THERE'S A GUY NAMED RANDY DAMSTRA WHO REPORTS TO MR. TUBERGEN. WE DIDN'T HEAR FROM ANY OF THOSE PEOPLE ON THE TOP, EXCEPT FOR LISA PETERSON WHO IS PICTURED THERE. THAT WAS THE PERSON WHO WE HEARD FROM, AND SHE'S ONE OF THE PEOPLE WHO WORKS AT RDV ON

SER-1259

EVALUATING, ANALYZING INVESTMENTS.

SHE WANTED TO BE INVOLVED WITH THE THERANOS INVESTMENT. SHE HAD BEEN INTERESTED IN ELIZABETH HOLMES AND THERANOS AND SHE ASKED TO BE ON THE PROJECT, AND SHE ENDED UP BEING ON THE PROJECT. BUT THAT'S WHO WE HEARD FROM.

WE DIDN'T HEAR FROM THE DECISION MAKERS. WE DIDN'T HEAR FROM THE DEVOS FAMILY. WE DIDN'T EVEN HEAR FROM JERRY TUBERGEN OR RANDY DAMSTRA WHAT ABOUT WHAT THEY THOUGHT.

RICK DEVOS, DICK DEVOS, DAN DEVOS, DOUG DEVOS, THESE WERE THE FAMILY DECISION MAKERS ON THE INVESTMENT COMMITTEE. WE DIDN'T HEAR FROM ANY THEM. WE DON'T KNOW WHAT THEY THOUGHT, WHAT THEY HEARD, WHY THEY INVESTED IN THERANOS, WHAT RISKS THEY WERE TAKING, NOTHING.

AND AS YOU HEARD FROM MS. PETERSON, SHE CAN'T EVEN SAY THAT THESE DECISION MAKERS READ HER MEMOS. THEY CERTAINLY DIDN'T READ HER SECOND MEMO. SHE CLAIMED THE FIRST MEMO THEY REVIEWED ON THE PLANE, BUT SHE CAN'T SAY THAT ANYONE EVER READ HER MEMOS.

NOW, WHY DIDN'T WE HEAR FROM RICK, DICK, DAN, AND DOUG DEVOS? I DON'T KNOW. THE GOVERNMENT DIDN'T CALL THEM. THEY INVESTED $100 MILLION. YOU WOULD THINK THEY COULD BE BOTHERED TO COME AND TESTIFY. BUT WE DIDN'T HEAR FROM THEM. WE ONLY HEARD FROM MS. PETERSON.

THE CENTRAL ISSUE WITH RDV, IF WE GO TO THE NEXT SLIDE, IS ON THE LEFT, AND THAT IS 1853, AND THAT'S A HARD COPY OF THE

PART OF THE FINANCIAL MODEL THAT MR. BALWANI AND THERANOS PUT TOGETHER THAT WAS SENT IN A BINDER TO RDV IN AROUND JULY 2014.

THERE WERE TWO BINDERS. ONE HAD SOME SLIDES AND THIS DOCUMENT AND OTHER THINGS, AND THEN THERE WAS A SECOND BINDER THAT MS. PETERSON TESTIFIED ABOUT THAT WAS ALL FINANCIAL -- I'M SORRY, ALL SCIENTIFIC DATA THAT NO ONE EVER LOOKED AT AT RDV. THAT'S WHAT MS. PETERSON SAID.

BUT THIS WAS IN THE FIRST BINDER. AND IF YOU LOOK AT EXHIBIT 1853, YOU WILL SEE AS OF JULY -- MS. PETERSON KEPT TALKING ABOUT OCTOBER, BUT THE DATE ON IT, IT'S ON THE PAGE AFTER THIS, BUT IT'S DATED IN JULY OF 2014, NOT OCTOBER.

IN ANY EVENT, IT'S A PROJECTED STATEMENT OF INCOME.

THE DOCUMENT ON THE RIGHT THAT WE PUT UP THERE IS JUST THE SAME DOCUMENT THAT YOU SAW A FEW MINUTES AGO WHEN I WAS TALKING ABOUT MR. GROSSMAN. THAT'S MR. GROSSMAN'S -- THAT'S THE DATA, THE SOFT COPY OF THE MODEL THAT THERANOS SENT TO MR. GROSSMAN.

AND I'LL JUST PUT IT UP THERE SO YOU CAN SEE HOW SIMILAR IT IS. AND YOU CAN SEE, AS I SAID BEFORE, ON THE RDV VERSION THAT IS ON THE LEFT, THE COLUMN 12/31/2013 IS JUST CUT OFF AND THEY HAVE 2014 AND 2015.

SO IT'S BASICALLY THE SAME THING. IT HAS THE SAME SECTORS, RETAIL, PHYSICIANS, HOSPITALS, PHARMACEUTICAL, AND THEN DOD IS TO BE DETERMINED, JUST LIKE IT WAS FOR PFM. SO NO DOD REVENUE PROJECTED.

ON THE RETAIL SIDE, THOUGH, THIS WAS A LOT OF THE

DISCUSSION WITH MS. PETERSON WHEN SHE WAS ON THE STAND, THE PROJECTION WAS, AND SHE WROTE IN HANDWRITING YOU CAN SEE AT THE TOP OF THE PAGE ON THE LEFT, IT'S EXHIBIT 1853, 900 LOCATIONS.

NOW, THE GOVERNMENT CLAIMS THAT THAT'S SOME OF FRAUDULENT PROJECTION.  IF YOU'RE PROJECTING 900 LOCATIONS, WHICH COULD GENERATE 470 MILLION I THINK IT SAYS ON THE REVENUE SIDE, THAT'S SOMETHING FRAUDULENT BECAUSE THE GOVERNMENT CLAIMS THAT MR. BALWANI WOULD HAVE UNDERSTOOD FROM MR. JHAVERI AND WALGREENS THAT THEY WERE SCALING BACK IN THE MIDDLE OF 2014 AND THAT MR. BALWANI WOULD NOT HAVE HAD A BASIS FOR TALKING ABOUT THE POSSIBILITY, NOT THE GUARANTEE, BUT THE POSSIBILITY IN A PROJECTION OF 900 STORES.

WELL, WE KNOW THAT'S NOT THE CASE.  WE WENT THROUGH YESTERDAY ALL OF THE EMAILS, ALL OF THE PARTNERSHIP MEETING MINUTES WITH -- ABOUT MR. JHAVERI AND WALGREENS, AND THIS PARTNERSHIP WAS EXPANDING IN AUGUST AND AFTER AUGUST OF 2014. MR. JHAVERI WAS BRAGGING TO MR. MIQUELON ABOUT HOW HE'S GOING TO GET IT DONE.  AND MR. MIQUELON WAS SAYING ROCK ON.  AND MR. JHAVERI WAS TALKING ABOUT ADDITIONAL MARKETS BEYOND CALIFORNIA, ARIZONA, AND THE NEW YORK AREA.

AND THEN HE SENDS AN EMAIL TO MR. BALWANI IN THE MIDDLE OF AUGUST 2014 AND SAYS WE'RE GOING TO TOUCH 2,000 STORES AND LET ME KNOW WHICH ONES OUT OF THE 2,000 YOU WANT SELECTED AS GOLD STORES, THE DEDICATED THERANOS SPACE STORES.

TALKING ABOUT WE'RE GOING TO BE IN EVERY HEALTH CARE

CLINIC THAT WALGREENS IS GOING TO OPERATE.

SO THIS CONCEPT THAT THE 900 IS SOMEHOW FRAUDULENT, THAT IS SIMPLY NOT TRUE.

AND EVEN IF YOU EVALUATED THAT BY ANY STANDARD IT'S NOT TRUE, BUT CERTAINLY IN THIS CRIMINAL CASE WHEN THE STANDARD IS BEYOND A REASONABLE DOUBT, THERE IS NO WAY TO SAY THAT MR. BALWANI'S REPRESENTATION THAT WE COULD GET TO 900 STORES IN 2015 IS SOMEHOW A FRAUDULENT REPRESENTATION.  IT SIMPLY IS NOT.

GOING TO 2014, THERE'S REVENUE PROJECTED THERE.  THE DOCUMENT IS DATED IN JULY, BUT THE MEETING WITH MS. PETERSON AND THE DEVOS FAMILY DECISION MAKERS WE DIDN'T HEAR FROM WAS IN OCTOBER OF 2014, OCTOBER 14TH, TO BE PRECISE.

AND MS. PETERSON SAID, LOOK, I -- SHE WASN'T TOLD SPECIFICALLY THAT THERANOS HAD THAT REVENUE, $140 MILLION IN 2014, BUT SHE SAID, WELL, IT WAS GETTING LATER IN THE YEAR AND I WOULD ASSUME THAT THEY WERE GOING TO BE CLOSE.

BUT MS. PETERSON KNEW -- AND IT'S RIGHT IN HER MEMO.  IN HER FIRST MEMO SHE TALKS ABOUT SHE KNOWS THEY'RE IN 22 STORES. AND THEN BY OCTOBER, I THINK SHE KNOWS THAT THERE ARE ABOUT 40 STORES.

SO IT JUST DOESN'T ADD UP.  THEY KNOW HOW MANY STORES. THEY KNOW THAT -- AND SHE TESTIFIED TO THIS -- TO HAVE THE REVENUE THAT IS PROJECTED HERE, YOU HAVE TO HAVE A CERTAIN NUMBER OF STORES THAT ARE COLLECTING BLOOD AT WALGREENS AND YOU HAVE TO HAVE A CERTAIN NUMBER OF PHYSICIAN OFFICES.

AND THESE ARE THE ASSUMPTIONS THAT I WENT THROUGH WHEN I WAS TALKING ABOUT MR. GROSSMAN.

SO MS. PETERSON KNOWS THIS.

SO IT'S JUST MATH, AS MR. GROSSMAN SAID.

IF THEY HAVE MORE STORES, THEY'LL HAVE MORE REVENUE. THAT'S THE LONG AND SHORT OF IT.

SO THERE'S NO INTENTION TO MISLEAD RDV, AND IN ORDER TO DO THAT, YOU'D HAVE TO TELL THEM, NO, WE'VE REALLY GOT HUNDREDS AND HUNDREDS OF STORES. IF YOU DID THAT, THAT WOULD BE A PROBLEM.

BUT THIS IS WELL-KNOWN, AND WE KNOW THAT FROM MS. PETERSON'S OWN MOUTH THAT SHE KNOWS HOW MANY STORES THAT THERE ARE.

IF YOU CAN GO TO THE NEXT SLIDE.

THAT'S THE WE'RE GOING TO TOUCH 2,000 STORES IN 2015. THAT'S IN MID-AUGUST.

AGAIN, GETTING THIS EMAIL -- REGARDLESS OF WHAT YOU THINK ABOUT MR. JHAVERI OR HOW HE'S TRYING TO DISTANCE HIMSELF, WHEN MR. BALWANI GETS AN EMAIL LIKE THAT, WHAT IS HE SUPPOSED TO THINK? OBVIOUSLY, YEAH, THIS IS GOING TO BE AN EXPANDING PARTNERSHIP. SO IF ANYTHING, THE 900 STORES THAT MR. BALWANI TELLS RDV IS POSSIBLE IS CONSERVATIVE COMPARED TO THE 2,000.

HERE'S SOME TESTIMONY FROM MS. PETERSON. AND SHE UNDERSTANDS THAT THERE'S A RISK THAT THE COMPANY, DESPITE THE GOALS, WOULD NOT ACTUALLY BE ABLE TO OPEN ALL OF THE WALGREENS

STORES THAT THEY WANTED TO.

KIND OF AN OBVIOUS POINT, BUT IT WAS CONFIRMED WITH MS. PETERSON.

AND HERE'S HER DESCRIPTION OF THE MEETING. SHE SEEMED TO HAVE A POOR MEMORY ON CROSS IN A LOT OF WAYS, BUT SHE SAID THE MEETING WAS FOUR OR FOUR AND A HALF HOURS. SHE AGREED WITH THAT.

AND THEN SHE SAID, WE SPENT A FAIR AMOUNT OF TIME ON THE FINANCIALS AND WHAT MADE UP THE FINANCIALS. SO SHE'S AGREEING THAT THERE WAS A FINANCIAL DISCUSSION. MR. BALWANI LED THE DISCUSSION ACCORDING TO MS. PETERSON, AND SHE'S SAYS IT'S A FOUR, FOUR AND A HALF HOUR MEETING AND THERE'S A FAIR AMOUNT OF TIME SPENT ON THE FINANCIALS.

SO WHEN YOU THINK ABOUT THAT, IN THAT TIME, EVEN IF THE WHOLE TIME WASN'T SPENT ON FINANCIALS, THE DISCUSSION LOGICALLY, UNFORTUNATELY MS. PETERSON SAID SHE COULDN'T REMEMBER, BUT THE WHOLE TIME IS NOT GOING TO BE SPENT ON THE ONE PAGE THAT MS. PETERSON -- THAT WE JUST SAW, RIGHT, EXHIBIT 1853.

WE KNOW WHAT A FINANCIAL DISCUSSION LOOKS LIKE. WE KNOW WHAT MR. BALWANI WAS TALKING ABOUT WITH MR. GROSSMAN WHERE THERE'S ASSUMPTIONS, AND IF YOU'RE CHANGING THE ASSUMPTIONS, IT'S GOING TO BE DIFFERENT DEPENDING ON WHAT YOU THINK THE WORLD IS GOING TO LOOK LIKE IN THE FUTURE.

AND SO LOGICALLY, THAT'S THE DISCUSSION THAT MS. PETERSON

SER-1265

CAN'T REMEMBER. THEY WOULDN'T HAVE SPENT THIS TIME JUST LOOKING AT ONE PIECE OF PAPER.

UNFORTUNATELY, SHE COULDN'T REMEMBER.

IF WE LOOK AT THE NEXT SLIDE, QUESTION: MR. BALWANI, HIS PARTICULAR FOCUS AT THE MEETING WAS ON FINANCIAL INFORMATION?

SHE SAYS YES.

AND THEN HIGHLIGHTED DOWN ON THE BOTTOM OF THE PAGE, IF THERE WAS MORE INFORMATION PRESENTED ON THE SCREEN, YOU JUST CAN'T TELL US ABOUT THAT BECAUSE YOU DON'T REMEMBER IT TODAY?

CORRECT.

SO SHE'S CLAIMING SHE DOESN'T REMEMBER. WE KNOW THERE WAS A FINANCIAL DISCUSSION, AND WE KNOW IT TOOK SOME TIME, AND LOGICALLY IT'S GOING OVER THE ASSUMPTIONS, AND IF WE DON'T HAVE THE STORES, THE REVENUE IS NOT GOING TO BE THERE. IF WE DON'T HAVE THE PHYSICIANS' OFFICES, THE REVENUE IS NOT GOING TO BE THERE. BUT THAT'S WHAT EVERYONE IS HOPING FOR.

AND MR. GROSSMAN REMEMBERED THAT MR. BALWANI REVIEWED A FINANCIAL MODEL USING A LAPTOP, RIGHT? SO LOGICALLY THAT'S HOW IT'S GOING TO WORK. THIS SOFT COPY, THE EXCEL SPREADSHEET, WE KNOW WHAT THAT LOOKS LIKE, THE SAME PAGE THAT MS. PETERSON GOT IS EXACTLY THE SAME FORM THAT MR. GROSSMAN GOT, SO WE KNOW IT EXISTS IN EXCEL ELECTRONIC FORM. AND THAT WOULD BE LOGICALLY WHAT YOU WOULD SEE ON THE SCREEN. BUT AGAIN, MS. PETERSON CAN'T REMEMBER.

WHAT SHE DID DO, THOUGH, IS FILL OUT THIS INTERNAL FORM.

SER-1266

AND THIS IS, AS SHE EXPLAINED, JUST AN INTERNAL FORM THAT EXISTS WITHIN RDV AND THEY'VE GOT TO PUT DOWN SOME INFORMATION ABOUT THE PLANNED END OF THE INVESTMENT AND THE RATE OF RETURN THAT THEY'RE GOING TO EXPECT AND THINGS LIKE THAT.

AND ON THE PLANNED EXIT OR THE PLANNED END DATE OF THE INVESTMENT, SHE WROTE GUESS, AND THEN SHE PUT DOWN SEVEN YEARS.

THIS INFORMATION DID NOT COME FROM THERANOS.

SO AS YOU HEARD, AND YOU MIGHT REMEMBER FROM HER TESTIMONY, THIS WAS CONTEMPLATED TO BE A LONG TERM PARTNERSHIP BETWEEN THERANOS AND RDV. RDV WAS NOT GETTING INTO THIS BECAUSE THEY WERE TRYING TO MAKE A QUICK BUCK, SOME QUICK TURN AROUND AND SELL FOR A HIGHER PRICE IN A NEAR TERM. THIS WAS A LONG TERM PARTNERSHIP, AND THERANOS DID NOT EVEN PROVIDE AN END DATE.

AND IF YOU GO DOWN, YOU CAN SEE IN HANDWRITING THERE THAT MS. PETERSON SAID WAS HERS, IT SAYS "THE HOLD PERIOD IS INDEFINITE."

SO WHEN YOU THINK ABOUT THAT LOGICALLY, WHY WOULD THERANOS BE LIMITED TO TELLING THIS LONG TERM INVESTMENT THAT IS GOING TO HOLD THEIR SHARES INDEFINITELY, LET'S TELL YOU WHAT IS GOING ON IN THE CLIA LAB RIGHT NOW, AND SOMEHOW THEY CAN'T SAY ANYTHING MORE ABOUT WHAT THEIR HOPES AND PLANS AND RESEARCH IS TO TRY TO GO TO PHASE II AND WHAT THE DEVICES ARE GOING TO LOOK LIKE WHEN THE 4S IS GOING TO BE PUT INTO USE.

WHY CAN'T THEY DO THAT IN A LONG TERM INVESTMENT

RELATIONSHIP?  WHY ARE THEY LIMITED TO JUST WHAT IS GOING ON IN THE CLIA LAB RIGHT NOW AS THE GOVERNMENT IS CLAIMING?  AND THAT LOGICALLY DOESN'T MAKE ANY SENSE.

"NO RETURN ESTIMATES WERE PROVIDED.  THESE ARE RDV TARGETS."

SO SHE'S PUTTING DOWN SEVEN YEARS FIVE TIMES AT 30 PERCENT INITIAL RETURN ON INVESTMENT, INITIAL RATE OF RETURN RATHER.  THESE ARE NUMBERS SHE'S COMING UP WITH FOR INTERNAL PURPOSES.

BUT THERANOS IS NOT REPRESENTING TO RDV, YOU'RE GOING TO MAKE A CERTAIN AMOUNT OF MONEY OR WE'RE GUARANTEEING ANYTHING OR THIS IS GOING TO GO REALLY WELL FOR YOU.

IT'S WE'RE PROJECTING WHAT COULD HAPPEN.

AND AS I SAID BEFORE, EVERY ONE OF THESE INVESTORS SIGNED A DOCUMENT SAYING WE UNDERSTAND THAT THIS IS SPECULATIVE.  THE PROJECTIONS MIGHT NOT BE -- THEY MIGHT NOT COME TO PASS, AND WE'RE REPRESENTING THAT WE COULD LOSE EVERY SINGLE CENT OF OUR INVESTMENT EVEN, IN THE CASE OF RDV, IF IT'S $100 MILLION.

NOW, AS I MENTIONED EARLIER, THERANOS DID PROVIDE A SECOND BINDER TO RDV.

AND WE KNOW FROM PFM AND THE WORK THAT DR. RABODZEY DID AT PFM IN PARTICULAR, THAT THERE WAS DATA IN THIS BINDER THAT WASN'T ALL WINE AND ROSES.  AND PFM WAS FREE TO DO THAT.

BUT THE POINT I'M REALLY MAKING, EVEN IF PFM DIDN'T -- WHICH THEY DIDN'T, THEY DIDN'T EVEN LOOK AT THE SECOND BINDER, THAT'S WHAT MS. PETERSON SAID.  THEIR CHOICE I GUESS.

BUT THE POINT IS THAT ONCE THERANOS IS PROVIDING THIS SCIENTIFIC DATA, THEN, JUST LIKE WITH PFM, THERE WAS NO REASON TO SEE THAT THERE'S FRAUDULENT INTENT.

FRAUDULENT INTENT IS WHERE YOU DON'T PROVIDE DATA THAT IS NOT ALWAYS LOOKING TERRIFIC, RIGHT?  YOU WOULD ONLY PROVIDE CHERRY PICKED, YOU WOULD ONLY PROVIDE THE GOOD NUMBERS AND NOT ANYTHING THAT WOULD LEAD ANYONE TO QUESTION.

AND WE KNOW WHAT THAT DATA LOOKS LIKE BECAUSE WE KNOW WHAT DR. RABODZEY DID IN THE CASE OF PFM.

OKAY.  SO MS. PETERSON, IT LOOKED LIKE, WHEN YOU LOOK AT HER FIRST MEMO THAT SHE WROTE, AND THEN YOU LOOK AT THE ROGER PARLOFF ARTICLE, YOU CAN SEE IF YOU DO THAT COMPARISON THAT MOST OF WHAT MS. PETERSON PUT IN HER MEMO IS REALLY JUST CRIBBED FROM THE PARLOFF ARTICLE.

BUT SHE HAD THIS WAY ON THE WITNESS STAND OF ANYTHING THAT ANYBODY ASKED HER ABOUT THIS OCTOBER 14TH MEETING THAT SHE ATTENDED WITH THE DEVOS DECISION MAKERS, SHE WOULD READILY AGREE THAT ANYTHING THAT WAS SAID WAS ACTUALLY SAID, REGARDLESS OF THE TOPIC.

IF YOU HAD ASKED HER, I SUSPECT, ABOUT ANY OTHER THING THAT HAPPENED IN THE WORLD THAT WAS SAID AT THE MEETING, IF SHE THOUGHT IT WOULD HELP THE GOVERNMENT, SHE WOULD SAY, YEAH, THAT HAPPENED AT THE MEETING, TOO.  THAT WAS TOLD TO ME AS WELL, RIGHT?

BUT HERE, SHE'S ACTUALLY GOT A PROBLEM BECAUSE SHE'S

SER-1269

CLAIMING THERE'S A PARTICULAR STATEMENT, RIGHT?

SO THE QUESTION IS, ON CROSS, "SO IS IT YOUR TESTIMONY TODAY UNDER OATH THAT YOU RECEIVED A SPECIFIC STATEMENT FROM MR. BALWANI THAT EVERY SINGLE TEST THAT THEY WERE DOING WAS RUN ON A THERANOS ANALYZER?"

SHE SAYS, "I DON'T RECALL SPECIFICALLY WHO SAID IT, BUT THAT'S WHAT WE WERE TOLD."

RIGHT? SO THIS IS ONE OF THOSE EXAMPLES WHERE ANYTHING ABOUT THIS OCTOBER 14TH MEETING, IF IT LOOKS BAD FOR MR. BALWANI, SHE'S WILLING TO JUMP ON IT AND SAY, YEAH, THAT WAS SAID TO ME, TOO.

BUT THEN HERE'S WHAT HAPPENED. THERE WAS PRIOR TESTIMONY THAT SHE GAVE ACTUALLY TO THE GRAND JURY, AND ONE OF THE GRAND JURORS ASKED THIS QUESTION, AND THE QUESTION WAS: "WELL, I DON'T HEAR THAT THERE WAS EVER A STATEMENT THAT THE ACTUAL 150 OR 200 TESTS WERE ALL CONDUCTED USING THAT EQUIPMENT. I DON'T HEAR THAT STATEMENT."

THAT WAS A QUESTION THAT THE JUROR ASKED HER.

AND SHE SAID, "I DON'T RECALL A SPECIFIC, YOU KNOW, SHE SAID THIS ON THIS DATE."

AND THEN SHE GOES ON TO SAY, YEAH, BUT EVERYTHING ELSE WE WERE TOLD LED ME TO BELIEVE THAT.

BUT SHE WAS CLAIMING ON THE STAND, UNDER OATH, THAT THERE WAS A SPECIFIC STATEMENT MADE BY EITHER MR. BALWANI OR MS. HOLMES AT THIS OCTOBER 14TH MEETING THAT THEY WERE DOING

SER-1270

EVERY SINGLE TEST ON THE ANALYZER, BUT IN PRIOR TESTIMONY SHE AGREED THAT SHE DIDN'T RECALL A SPECIFIC STATEMENT THAT SOMEONE SAID THAT ON THAT DATE.

SO THAT'S WHY IT'S IMPORTANT TO REVIEW PRIOR TESTIMONY SOMETIMES. BUT THAT'S WHAT HAPPENED WITH MS. PETERSON.

SHE ALSO, IF YOU REMEMBER HER TESTIMONY, TALKED ABOUT THE MILITARY RELATIONSHIP, BUT SHE COULDN'T SAY THERE WAS A REPRESENTATION TO HER MADE ABOUT TREATING SOLDIERS ON THE BATTLEFIELD.

OKAY. IF YOU GO TO THE NEXT SLIDE.

SO HER TESTIMONY WAS THAT SHE WAS TRYING TO FIND ANYTHING SHE COULD IN THE PUBLIC REALM, RIGHT, WHEN SHE WAS WORKING ON THIS PROJECT ABOUT WHETHER RDV SHOULD INVEST IN THERANOS.

IT MAKES SENSE. YOU WOULD DO GOOGLE SEARCHES AND SO FORTH.

IF YOU WERE DOING THAT, IT WOULDN'T BE HARD TO FIND THE THERANOS WEBSITE OR THE THERANOS PRESS RELEASE WITH WALGREENS, RIGHT?

AND THE WEBSITE, AS YOU CAN SEE RIGHT THERE, SAYS "INSTEAD OF A HUGE NEEDLE, WE CAN USE A TINY FINGERSTICK OR COLLECT A MICRO-SAMPLE FROM A VENOUS DRAW."

SO THAT'S RIGHT OUT THERE. THERE'S NO HIDING THE FACT THAT THERE'S VENOUS DRAWS.

AND MS. PETERSON DOESN'T REMEMBER THAT. BUT IF SHE'S DOING A GOOGLE SEARCH, SHE'S DOING PUBLIC INFORMATION SEARCHES,

SER-1271

THERE'S NO REASON WHY SHE WOULDN'T COME ACROSS THAT.

IN ANY EVENT, IT'S RIGHT OUT THERE, SO THE INTENT IS TO MAKE SURE THAT'S KNOWN TO THE PUBLIC.

AND THE SAME WITH THE WALGREENS PRESS RELEASE THAT WE SAW BEFORE.

THIS IS THE ROGER PARLOFF ARTICLE.  THIS IS THE "FORTUNE" MAGAZINE ARTICLE THAT CAME OUT IN JULY OF 2014 THAT YOU'VE HEARD ABOUT.

AND RIGHT IN THE ARTICLE -- LET ME JUST STEP BACK FOR A MINUTE.

SO MS. PETERSON WAS CLAIMING THAT SHE DOESN'T KNOW THAT THE BLOOD IS BEING COLLECTED AT WALGREENS AND TRANSPORTED TO A CENTRAL LAB.  SHE THINKS THAT THE TESTING IS GOING ON RIGHT IN THE STORES WITH THE THERANOS TECHNOLOGY WITH THE EDISONS RIGHT IN THE WALGREENS STORE.  AND THERE'S NO EVIDENCE ABOUT WHY SHE THINKS THAT.

BUT RIGHT IN THE "FORTUNE" ARTICLE THAT SHE CLAIMS THAT SHE READ, IT SAYS RIGHT THERE, "THE SCALE OF THERANOS'S OPERATIONS AT THE MOMENT IS MODEST.  ITS PHLEBOTOMISTS CURRENTLY TAKE PHYSICIAN ORDERED BLOOD DRAWS (AND SALIVA, URINE, FECES, AND OTHER SAMPLES) AT COLLECTION CENTERS THE COMPANY OPERATES AT ITS HEADQUARTERS IN PALO ALTO AND AT 21 WALGREENS, ONE IN PALO ALTO AND THE REST IN PHOENIX."

SO THAT'S RIGHT IN THE ARTICLE.  THIS WAS INFORMATION THAT WAS PROVIDED THAT MS. PETERSON HAD, AND SO SHE WAS ON NOTICE OF

SER-1272

THAT IF SHE READ THE ARTICLE AS SHE CLAIMED.

BUT THEN SOMETHING INTERESTING THAT HAPPENED ON CROSS IS THAT THE OTHER PARTS OF THE ARTICLE THAT SHE ALSO WOULD HAVE HAD NOTICE OF, SHE CLAIMED NOT TO KNOW.

SO, FOR EXAMPLE -- LET'S GO TO SLIDE -- IT'S MARKED 1944.4.2, MR. ALLEN.  RIGHT.  THANK YOU.

SO HERE IN THE ARTICLE IT'S PROFESSOR ROBERTSON FROM STANFORD.  HE SAYS, "WHEN I FINALLY CONNECTED WITH WHAT ELIZABETH FUNDAMENTALLY IS, HE SAYS, I REALIZED THAT I COULD HAVE JUST AS WELL BEEN LOOKING INTO THE EYES OF A STEVE JOBS OR A BILL GATES."

SO THAT'S WHAT MS. PETERSON WAS INFORMED BY READING THIS ARTICLE ABOUT WHAT PROFESSOR ROBERTSON THOUGHT ABOUT ELIZABETH HOLMES.

IF YOU GO TO THE NEXT PAGE, THAT TOP ONE IS THE ONE WE JUST WENT OVER ABOUT THE COLLECTION CENTERS AND NOT HAVING THE DEVICES IN THE STORES.

AND THEN SHE WAS ALSO NOTIFIED THROUGH READING THIS ARTICLE THAT WALGREENS CEO GREG WASSON TOLD THE AUTHOR OF THE INTERVIEW THAT HE HOPES TO EVENTUALLY PUT THEM IN THE PHARMACIES OF THE COMPANY'S EUROPEAN PARTNER CHAIN.

AND THEN THERE'S A QUOTE FROM THE CEO OF THE UCSF CALIFORNIA MEDICAL CENTER, MARK LARET, I THINK THIS IS SO EXCITING.  I MEAN, HERE IT IS, THIS IS THE TRUE TRANSFORMATION OF HEALTH CARE RIGHT HERE IN FRONT OF US.

AND THEN IT GOES ON, THE FIRST TIME I HEARD ABOUT THIS, I THOUGHT IT WAS -- AND THEN GO TO THE NEXT PAGE -- SNAKE OIL AND MIRRORS SAYS DAVID HELFET, THE CHIEF OF ORTHOPEDIC TRAUMA AT THE HOSPITAL FOR SPECIAL SURGERY IN MANHATTAN.

AND THEN MS. PETERSON WAS INFORMED BY THIS ARTICLE THAT AFTER REVIEWING THE VOLUMINOUS VALIDATION STUDIES SUPPLIED TO HIM BY THE COMPANY, HE'S BECOME A BELIEVER AND HE'S URGING THE HOSPITAL TO CONSIDER ADOPTION.

IT'S REAL DATA, HE SAYS, IT'S NOT THEIR INTERPRETATION.

SO THAT'S WHAT MS. PETERSON WAS INFORMED OF AT THE TIME BEFORE THEY INVESTED.

AND THEN THE ARTICLE ALSO INFORMED MS. PETERSON -- IF WE GO, MR. ALLEN, TO 1944.7.2 -- THAT THERE WERE CHALLENGES, THAT QUEST DIAGNOSTICS HAD A HUGE INFRASTRUCTURE, 45,000 PEOPLE, 3,000 VEHICLES, 20 AIRPLANES, 8 REGIONAL HUBS, AND SO FORTH.

SO MS. PETERSON IS INFORMED IN THIS ARTICLE THAT THERE'S GOING TO BE A LOT OF WORK TO DO TO GET TO THE POINT OF COMPETING WITH QUEST DIAGNOSTICS THAT ALREADY HAS ALL OF THAT INFRASTRUCTURE.

REMEMBER, AT THE TIME SHE'S DEALING WITH THERANOS, THERE'S AT MOST ABOUT 30 STORES.

AND THEN SHE'S ALSO INFORMED THAT DAVID BOIES, THE ATTORNEY, IS ATTENDING THE BOARD MEETINGS.

SO MS. PETERSON, AS I SAID A MINUTE AGO -- IF YOU GO TO THE NEXT SLIDE, MR. ALLEN -- SHE'S WILLING TO SAY WHATEVER SHE

CAN THAT IS NEGATIVE. SO RIGHT HERE SHE'S ASKED "WHEN SOMEONE IS PROJECTING A FUTURE OF A BUSINESS, FOR EXAMPLE, OPENING UP HUNDREDS OF STORES AT WALGREENS, THERE'S NO GUARANTEES THAT THAT WILL ACTUALLY HAPPEN?"

SHE SAID "CORRECT. BUT THERE WERE FUNDAMENTAL THINGS THAT WE WERE RELYING ON THAT WEREN'T TRUE."

AND SHE SAYS, "THAT THE ANALYZER ACTUALLY WORKED, AND IT DIDN'T."

AND THE QUESTION WAS "YOU'VE NEVER TESTED THE THERANOS ANALYZER.

"NO.

"SO YOU DON'T HAVE ANY FIRST-HAND KNOWLEDGE AS TO WHETHER IT WORKS OR NOT; CORRECT?

"CORRECT."

AND SHE HAD TO AGREE WITH THAT. SO MS. PETERSON IS LIKE MORE THAN HAPPY TO SAY THE ANALYZER DOESN'T WORK. BUT SHE DOESN'T KNOW THAT. SHE'S NOT A SCIENTIST. SHE DOESN'T HAVE THE DATA.

WE ARE AT TRIAL AND WE DON'T HAVE THE DATA BECAUSE, AS I'LL TALK ABOUT IN A BIT, WE DON'T HAVE THE LABORATORY INFORMATION SYSTEM.

BUT MS. PETERSON CERTAINLY DOESN'T HAVE ANYTHING TO TELL HER WHETHER THE ANALYZER WORKS OR DOESN'T WORK. SO FOR HER TO MAKE THAT STATEMENT IS JUST SHOWING, YOU KNOW, SHE WANTS TO SAY WHAT SHE HAS TO SAY IN ORDER TO LOOK BETTER. YOU KNOW, SHE'S

WORKING FOR RDV, THAT'S HER EMPLOYER, AND, YOU KNOW, IT'S BETTER TO SAY, YEAH, YOU KNOW, WE DIDN'T JUST TAKE A FLYER ON WALGREENS LIKE EVERYONE ELSE, YOU KNOW, WE WERE FOOLED.  RIGHT?  SO SHE'S PRETTY MUCH WILLING TO SAY ANYTHING.

AND THEN THERE'S MORE ABOUT THAT.  SO IF YOU GO TO THE NEXT SLIDE.

THE QUESTION TO HER WAS, "BUT YOU WOULD HAVE BEEN HAPPY WITH ANYTHING OVER THE 40," 40 STORES, "RIGHT?"

SHE SAID "I THINK I SAID YESTERDAY, IF THEY HAD HIT HALF OF THESE STORES, WE WOULD HAVE CONSIDERED THAT A SUCCESS."

AND THEN THE QUESTION IS, "AND YOU WOULD HAVE BEEN HAPPY WITH EVEN 200 STORES IN 2015?"

AND THEN SHE FIGHTS ABOUT THIS AND SAYS "900."

BUT THEN SHE WAS REMINDED ON THE NEXT PAGE, "YOU TOLD THE GOVERNMENT DURING AN INTERVIEW THAT YOU THOUGHT 900 STORES MAY HAVE BEEN AMBITIOUS, BUT YOU WERE STILL COMFORTABLE WITH THE INVESTMENT EVEN IF THERANOS WAS ONLY LOCATED IN 200 STORES?"

AND SHE SAYS OKAY.

"AND THAT'S WHAT YOU TOLD THE GOVERNMENT?"

AND SHE SAYS YES.

AND THEN SHE GOES ON TO A DIFFERENT ANSWER, AND THEN COMES BACK TO IT ON LINE 9 THERE, "AND YOU WOULD HAVE STILL BEEN COMFORTABLE IF THEY HAD ONLY 200 STORES IN 2015?"

AND THE ANSWER IS YES.

AND THAT'S BECAUSE SHE HAD PREVIOUSLY TOLD THE GOVERNMENT

THAT IN AN INTERVIEW AND SHE EVENTUALLY HAD TO ADMIT THAT.

THE POINT IS THAT EVEN IF YOU SOMEHOW BELIEVE THE GOVERNMENT THAT THE WALGREENS PARTNERSHIP WAS SCALING BACK AND THEY WERE GOING DOWN FROM 500 TO 200 STORES, WHICH AS I EXPLAINED YESTERDAY IS NOT THE CASE, BUT EVEN IF IT WAS GOING DOWN TO 200, THAT'S STILL SOMETHING THAT WOULD HAVE SATISFIED MS. PETERSON AND THAT'S WHAT SHE SAID, AND AFTER A BIT OF A STRUGGLE SHE HAD TO ADMIT THAT DURING CROSS-EXAMINATION.

AND THEN IN TERMS OF THE DEVOS FAMILY, MS. PETERSON AGREED THAT BEFORE THE INVESTMENT MEMO, THE APPROVAL MEMO THAT SHE WROTE, THAT THE DEVOS FAMILY HAD ALREADY COMMITTED VERBALLY, AND SHE AGREED, YES, THEY DID COMMIT, THEY DID COMMIT VERBALLY THAT THEY WANTED TO DO 100 MILLION.  IT WAS UNDERSTOOD.

I THINK SHE DESCRIBED THEY HAD THAT MEETING AND THERE WAS A VERBAL COMMITMENT.

WE DON'T HAVE, AS I SAID BEFORE, RICK, DICK, DAN AND DOUG DEVOS TO TELL US WHY THEY DID THAT, OR CHERI DEVOS I THINK WAS ALSO THERE AT THAT MEETING.

BUT THAT'S WHAT HAPPENED.  SO THE REST OF IT WAS JUST PAPERING THE FILE IN TERMS OF LISA PETERSON'S MEMO.

AND THEN JUST TO SHOW YOU EVEN ON THE SMALL THINGS, MS. PETERSON, MAYBE YOU REMEMBER IT, MS. PETERSON, I WAS JUST ASKING WHETHER JERRY TUBERGEN, WHO WAS THE HEAD OF THAT RDV INVESTMENT GROUP, WAS AN EXPERT ON INVESTMENTS AND SHE, SHE WAS FIGHTING ON THAT.

SER-1277

BUT THEN I SHOWED HER HER PREVIOUS TESTIMONY WHERE SHE DID SAY HE WAS AN EXPERT ON INVESTMENTS AND SHE HAD TO AGREE.

AND I SAID "YOU AREN'T QUITE GETTING THERE WITH ME TODAY; RIGHT?"

SHE SAID YES.

SO SHE WAS HAPPY TO ANSWER THE GOVERNMENT'S QUESTIONS WITH NO PROBLEMS, BUT SHE JUST WASN'T GETTING THERE WITH THE DEFENSE EVEN WHEN SHE HAD SAID THAT BEFORE UNDER OATH.

OKAY.  LET'S TURN TO MR. MOSLEY.

DO YOU REMEMBER MR. MOSLEY WAS A LAWYER AT CRAVATH, SWAINE & MOORE IN NEW YORK AND HE SPECIALIZED IN TRUSTS AND ESTATES.  THAT WAS THE WORK THAT HE DID IN HIS CAREER THERE.

AND HE HAD A LOT OF VERY HIGH PROFILE CLIENTS LIKE HENRY KISSINGER AND OTHER WEALTHY FAMILIES, WHICH IS NOT SURPRISING FOR A TRUST AND ESTATES LAWYER IN NEW YORK TO HAVE WEALTHY PEOPLE AS CLIENTS.  SO THAT WAS MR. MOSLEY.

SO, FIRST OF ALL, JUST TO SET A BASELINE HERE.  HE HAD NOT MET AND HAD NO CONVERSATIONS WITH MR. BALWANI UNTIL AUGUST OF 2014.

AND THEN IN THE MEMO HE WROTE -- YOU MIGHT REMEMBER DR. KISSINGER ASKED HIM TO WRITE A MEMO AND HE WROTE THE MEMO, BUT HE DRAFTED IT WITHOUT EVER HAVING ANY CONTACT WITH MR. BALWANI OR ANY COMMUNICATIONS.

AND THIS IS JUST AN ILLUSTRATION OF THE MINDSET AT THIS POINT, RIGHT?  SO AFTER ALL THAT HAS HAPPENED WITH THERANOS,

SER-1278

PEOPLE DON'T WANT TO AGREE THAT THEY APPROVE OF ANYTHING OR THEY LIKE SOMETHING OR THEY DID ANYTHING THAT WAS HELPFUL TO THERANOS BECAUSE IT'S RADIOACTIVE TO THEM NOW.  WE'RE IN THIS FEDERAL CRIMINAL TRIAL AND THAT'S A HUGE BIG DEAL.

BUT HERE IT'S JUST A SMALL THING, BUT IT ILLUSTRATES THE MINDSET.

MR. MOSLEY IS ASKED THE QUESTION, DID YOU ENCOURAGE THESE INDIVIDUALS, THESE CLIENTS, HIS CLIENTS, TO INVEST IN THERANOS?

AND HE SAID NO, HE DIDN'T ENCOURAGE THEM.

BUT THEN YOU CAN SEE BACK IN REAL TIME -- AND THIS IS WHY IT'S IMPORTANT TO HAVE THE DOCUMENTS, NOT JUST THE MEMORIES -- HE SAYS TO CHRISTOPHER BOIES, "I AM MORE THAN OKAY WITHOUT IT AND HOPE ELIZABETH DOES NOT THINK IT NECESSARY.  IF I DID NOT HAVE DEEP TRUST AND FAITH IN ELIZABETH, I WOULD NOT BE INVOLVED WITH THERANOS AND RECOMMENDING AN INVESTMENT BY CLIENTS."

SO HE DID RECOMMEND THE INVESTMENT TO CLIENTS AND HE DIDN'T WANT TO SAY IT ON THE WITNESS STAND.

MR. MOSLEY RECEIVED THE SAME DOCUMENT THAT WE SAW EARLIER WITH MS. PETERSON.  AND HE ALSO HAD A MEETING OUT IN PALO ALTO AT THERANOS.

SO THE SAME DISCUSSION THAT I ALREADY HAD ABOUT THIS DOCUMENT APPLIES TO MR. MOSLEY.  IT WOULD HAVE BEEN A DISCUSSION OF THE UNDERLYING ASSUMPTIONS.  AND, AGAIN, IT'S PUBLIC THAT THERE ARE ONLY 40 STORES IN 2014 AND THAT THE BASIS FOR THE 2015 PROJECTION IS THE CONTINUED ROLLOUT OF WALGREENS

AND THE OTHER ROLLOUTS THAT I EXPLAINED EARLIER ABOUT PHYSICIAN OFFICES AND HOSPITALS AND SO FORTH.

SO MR. MOSLEY HAS THAT SAME INFORMATION.

BUT HE UNDERSTOOD THAT THESE WERE PROJECTIONS.  HE SAID YES, HE UNDERSTOOD THEY WERE PROJECTIONS.

THEY WERE NOT ACTUAL FINANCIAL STATEMENTS?

CORRECT.

HE UNDERSTOOD THAT.

SO SOPHISTICATED INVESTORS, I THINK USING OUR COMMON SENSE, KNOW THE DIFFERENCE BETWEEN PROJECTIONS AND FINANCIAL STATEMENTS WHICH REPORT WHAT THE COMPANY ACTUALLY EARNED.

THIS IS MR. MOSLEY ON TESTING CAPABILITIES.  HE WAS ASKED THE QUESTION, "YOU WERE TOLD BY MS. HOLMES THAT AT VARIOUS TIMES IT COULD NOT DO ALL OF THE TESTS; CORRECT?"

HE SAYS ON THE STAND AT TRIAL HERE, "I WAS NOT TOLD THAT."

AND THEN IT GOES ON.

"SO MR. MOSLEY, FROM YOUR DEPOSITION," SO HE HAD PRIOR TESTIMONY UNDER OATH IN A DEPOSITION, "FROM YOUR DEPOSITION YOU'LL SEE THE QUESTION PUT TO YOU AT THIS TIME WAS:  SO AT SOME POINT ELIZABETH TOLD YOU THAT THERANOS COULDN'T DO ALL OF THE TESTS THAT PATIENTS MIGHT ORDER; IS THAT RIGHT?

"DO YOU SEE THAT?

"ANSWER:  I DO SEE THAT.

"QUESTION:  AND THEN YOU ANSWER I BELIEVE I WAS TOLD THAT AT THAT -- AT VARIOUS TIMES IT COULD NOT DO ALL OF THE TESTS.

SER-1280

"DO YOU SEE THAT?

"YES, I DO.

"AND THOSE WERE YOUR WORDS?

"THOSE WERE MY WORDS."

SO HIS TESTIMONY AT TRIAL THAT HE WASN'T TOLD -- HIS TESTIMONY AT TRIAL THAT HE GAVE HERE IS DIFFERENT FROM HIS PRIOR SWORN TESTIMONY WHERE HE ADMITTED THAT HE DID KNOW THAT THERANOS COULDN'T DO ALL OF THE TESTS.

AND AGAIN, YOU KNOW, MEMORIES FADE. THE DEPOSITION WOULD HAVE BEEN BEFORE TRIAL, OBVIOUSLY, AND IS CLOSER IN TIME. SO THAT WAS UNDER OATH, AND I THINK THAT'S WHAT WE CAN RELY ON.

NOW, ONE THING THAT WAS VERY IMPORTANT TO MR. MOSLEY WAS THE PHARMACEUTICAL RELATIONSHIPS THAT THERANOS HAD, AND IN PARTICULAR THIS ISSUE OF PHARMACEUTICAL COMPANIES COMPREHENSIVELY VALIDATING THE THERANOS TECHNOLOGY.

SO MR. MOSLEY TESTIFIED ON DIRECT ABOUT SOMETHING IN WRITING THAT SAID THERANOS HAS BEEN COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES.

AND THEN THE QUESTION WAS, WAS THAT REPRESENTATION SIGNIFICANT IN YOUR DECISION TO INVEST?

IT WAS.

SO MR. MOSLEY SAID THAT WAS AN IMPORTANT FACTOR.

WELL, AS I WENT THROUGH YESTERDAY, THERE'S NO EVIDENCE IN THIS TRIAL THAT MR. BALWANI BELIEVED ANYTHING DIFFERENT OR HAD

SER-1281

ANY REASON TO BELIEVE ANYTHING DIFFERENT.  HE HAD A GLAXOSMITHKLINE -- AN EMAIL FROM MS. HOLMES TO A GLAXOSMITHKLINE PERSON IN DECEMBER OF 2009 THAT SAID THAT GLAXOSMITHKLINE HAD COMPREHENSIVELY VALIDATED.  THERE WAS A REPORT WITH A GLAXOSMITHKLINE LOGO.  IT EXPLAINED THE WORK THAT GLAXOSMITHKLINE HAD DONE LOOKING AT THE THERANOS TECHNOLOGY.

MR. BALWANI GOT THAT.  THERE'S NO EVIDENCE IN THIS CASE THAT HE HAD ANY REASON TO THINK THAT THERE WAS ANYTHING UNTRUE ABOUT THAT.  IN FACT, AS I SAID, MS. HOLMES SENT THAT TO A GLAXOSMITHKLINE EMPLOYEE NAMED THOMAS BREUER.

NOW GO AHEAD A FEW MONTHS IN APRIL OF 2010. ELIZABETH HOLMES SENDS ADDITIONAL REPORTS NOT ONLY TO GLAXOSMITHKLINE, BUT ALSO TO SCHERING-PLOUGH AND PFIZER TO WALGREENS AND THE GOVERNMENT CLAIMS THAT SOMEHOW MR. BALWANI SHOULD HAVE COMPARED A DOCUMENT THAT HE HAD A MONTH BEFORE IN HIS INBOX AND PARSED IT AND MAYBE DONE SOME KIND OF RED LINE COMPARISON AND FIGURED OUT THAT THERE WAS SOME DIFFERENCE, AND THAT DOESN'T MAKE ANY SENSE AND I EXPLAINED THAT YESTERDAY.

BUT, IN ADDITION, THE GOVERNMENT DIDN'T EVEN TALK ABOUT ALL OF THE OTHER PHARMACEUTICAL RELATIONSHIPS THAT THERANOS HAD AND WHAT WORK WAS DONE THERE.

SO, MR. MOSLEY SAID THAT HE DID RELY ON THIS COMPREHENSIVE VALIDATION.  IN FACT, IN THIS MEMO HE WROTE FOR DR. KISSINGER, IF YOU LOOK AT THAT, YOU'LL SEE THAT HE SPENDS QUITE A BIT OF TIME TALKING ABOUT PFIZER.

SER-1282

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                7469

THAT IS NOT MR. BALWANI'S ISSUE.  THERE'S NO REASON TO THINK THAT HE'S COMMITTING FRAUD, THERE'S NO EVIDENCE THAT HE'S COMMITTING FRAUD, MISREPRESENTING TO PEOPLE LIKE MR. MOSLEY THAT THERE ARE THESE PHARMACEUTICAL VALIDATIONS.

STARTING WITH GLAXOSMITHKLINE, MR. BALWANI HAD EVERY REASON TO THINK THAT WAS TRUE, JUST LIKE MR. MOSLEY THOUGHT THAT THAT WAS TRUE.

OKAY.  I WANT TO SWITCH TO ANOTHER INVESTOR NAMED PATRICK MENDENHALL.

MR. MENDENHALL TESTIFIED THAT HE'S NOT A SUBJECT OF A PARTICULAR COUNT IN THE INDICTMENT, BUT HE'S ANOTHER INVESTOR IN THERANOS AND YOU HEARD HIS TESTIMONY AT TRIAL.

AND THE THING THAT I WANT TO DISCUSS ABOUT MR. MENDENHALL IS THAT THERE'S A CERTAIN EMAIL THAT HE WROTE THAT IS SUPPOSED TO BE A RECITATION OF WHAT MR. MENDENHALL HEARD FROM MR. BALWANI DURING ABOUT A 45 MINUTE PHONE CALL.

SO THE GOVERNMENT SPENT SOME TIME ON THIS SO I WANT TO SPEND SOME TIME ON IT, TOO, TO EXPLAIN SOME OF THE STATEMENTS IN THERE.

SO THERE WAS A PHONE CALL IN DECEMBER OF 2013 WITH MR. BALWANI, BETWEEN MR. BALWANI AND MR. MENDENHALL, AND THEN MR. MENDENHALL WROTE THE MEMO.  AND THAT MEMO IS EXHIBIT 4059.

SO LET'S START WITH THE FIRST SET OF BULLET POINTS.

SO THESE ARE THINGS THAT ARE IN THE MEMO AND THEY'RE KIND OF CALLED OUT THERE IN THE SCREEN SO YOU CAN SEE THEM A LITTLE

UNITED STATES COURT REPORTERS

**SER-1283**

BIT BIGGER AND I WANT TO GO THROUGH THOSE STATEMENTS.

SO MR. MENDENHALL REPORTED ABOUT HIS CONVERSATION WITH MR. BALWANI THAT THE SCIENCE, QUOTE-UNQUOTE, BEHIND THERANOS IS COMPLETE; NO NEW SCIENCE IS NEEDED; AND NO NEW INVENTION IS NEEDED.

SO IF THAT IS SUPPOSED TO BE TAKEN AS WE'RE NOT DOING ANYTHING MORE, WE'RE NOT DOING ANYMORE RESEARCH AND DEVELOPMENT, IT'S SORT OF LIKE, YOU KNOW, AT SOME POINT IN THE 1800'S SOMEONE INVENTED THE RAILROAD TIE, RIGHT, THE THINGS THAT HOLD THE TRACKS TOGETHER FOR RAILROADS, AND THEY REALLY HAVEN'T CHANGED MUCH.  IF YOU GO TO THE TRAIN TRACKS AROUND TOWN, YOU WILL SEE BASICALLY THE SAME KIND OF RAILROAD TIE THAT'S EXISTED FOR ALMOST 200 YEARS.

THAT'S A DEVICE IS THAT IS FULLY SET AND THERE'S REALLY NOTHING YOU CAN DO TO IMPROVE IT.  MAYBE THERE IS.  BUT JUST THINK ABOUT THAT, STILL A WOODEN PIECE OF WOOD THAT YOU CAN NAIL A RAILROAD TRACK ON TO.

BUT WHEN YOU'RE TALKING ABOUT TECHNOLOGY, OF COURSE THERE'S GOING TO BE RESEARCH AND DEVELOPMENT.

WE USED THE ANALOGY OF THE IPHONE.  APPLE MADE AN IPHONE7 OR AN IPHONE8 AND EVENTUALLY THEY'RE WORKING ON THE IPHONE10.

SO NO NEW SCIENCE, IT CAN'T MEAN -- AND I'LL SHOW YOU THE TESTIMONY ABOUT THIS IN A MINUTE -- BUT IT CAN'T MEAN PENS DOWN, WE'RE NOT DOING ANYTHING ELSE.  WE DON'T NEED TO DO ANYTHING ELSE.

SER-1284

SO MR. MENDENHALL AGREED TO THAT WHEN YOU LOOK AT THE NEXT TRANSCRIPT. "AS A SOPHISTICATED INVESTOR, DO YOU UNDERSTAND COMPANIES ARE ALWAYS TRYING TO IMPROVE AND PERFECT THEIR PRODUCTS?"

HE SAID "I WOULD BELIEVE SO. I MEAN, I WOULD THINK THAT IF YOU CAN IMPROVE IT, YOU WOULD."

SO HE UNDERSTANDS THAT, AND THEN THERE'S THE IPHONE ANALOGY.

MR. LUCAS. "AND SO YOU UNDERSTAND THAT EVEN IF A COMPANY HAS DEVELOPED SOME TECHNOLOGY, IT'S GOING TO, IF IT'S SMART, CONTINUE TO IMPROVE AND WORK ON THE TECHNOLOGY; RIGHT?"

HE SAID CORRECT.

MR. MOSLEY, THE SAME THING. GOING TO FURTHER ADVANCE ITS TECHNOLOGY.

WHEN YOU GO TO THE RESEARCH AND DEVELOPMENT PROJECTIONS THAT WERE PROVIDED, YOU CAN SEE THERE'S AN ENORMOUS AMOUNT OF RESEARCH AND DEVELOPMENT EXPENSE THAT IS REVEALED TO INVESTORS, IN THIS CASE MR. GROSSMAN. SO THERE'S NO SECRET THAT THERANOS IS GOING TO DO MORE R&D WORK.

SO THE SCIENCE IS COMPLETE MEANS THAT MR. BALWANI THINKS THAT THEY HAVE A DEVICE.

AS YOU HEARD EARLIER, DR. GIBBONS NOTIFIED MR. BALWANI FROM AN EARLY TIME, THEY DEMONSTRATED THESE GREAT CAPABILITIES ON THE DEVICE. SO THEY HAD THE DEVICE. IT GOT ROBOTIC ARMS AND DETECTING MACHINES AND IT CAN ANALYZE BLOOD SAMPLES.

THEY'VE GOT THAT. THEY'RE USING THAT AT THE TIME THAT MR. BALWANI IS TALKING TO MR. MENDENHALL.

BUT IF THAT'S SUPPOSED TO BE TAKEN AS WE'RE NOT GOING TO DO ANYTHING ELSE EVER, THAT JUST CAN'T BE TRUE LOGICALLY, AND MR. MENDENHALL DIDN'T UNDERSTAND IT THAT WAY EITHER.

MS. PETERSON ALSO UNDERSTOOD THE ENORMOUS AMOUNT OF R&D EXPENSE THAT THERANOS WAS PROJECTING.

THIS IS PART OF AN EMAIL FROM MR. MENDENHALL, HIS POINT 10, THEY SAVED A PHARMA COMPANY $204 MILLION IN CLINICAL TRIAL COSTS OVER NINE MONTHS, RIGHT?

SO WHAT ABOUT THAT? WELL, HERE'S THE SLIDE, AND THIS IS THERANOS SAVINGS TO PHARMACEUTICAL COMPANIES. THIS COMES FROM EXHIBIT 4059, AND THERE'S THIS MCKINSEY REPORT, A CONSULTING COMPANY, AND IT EXPLAINS THERANOS'S IMPROVEMENT AND THE PROBABILITY OF SUCCESS IN POINT OF CARE AND 15 TO 80 PERCENT RESULTS, AND ESTIMATED NET PRESENT VALUE OF ABOUT $202 MILLION.

SO MR. BALWANI HAD A BASIS FOR TALKING ABOUT THE SAVINGS TO PHARMACEUTICAL COMPANIES. THAT WAS MR. MENDENHALL'S BULLET NUMBER 10.

LET'S GO TO THE NEXT ONE.

MR. MENDENHALL'S BULLET NUMBER 12. CURRENT CLINICAL TRIALS TAKE 6 VIALS AND CAN RUN 10 TO 12 TESTS. THERANOS TAKES 3 DROPS AND CAN RUN 60 TO 70 TESTS.

WELL, WE KNOW THAT ADAM ROSENDORFF ALONE SIGNED 57 VALIDATION REPORTS. WHAT DOES THIS MEAN? DID MR. MENDENHALL

SER-1286

WRITE THIS DOWN EXACTLY HOW MR. BALWANI SAID IT?

BUT WE KNOW THAT THERANOS CAN AT THIS POINT, NOT ONLY DID DR. ROSENDORFF SIGN 57 VALIDATION REPORTS OVER TIME, BUT THEY HAD DONE LOTS OF ASSAY DEVELOPMENT WORK AS WE HAVE HEARD. SO, YEAH, THEY CAN RUN 60 TO 70 TESTS.

LET'S GO TO BULLET 18 FROM MR. MENDENHALL. THERANOS IS HEAVILY PATENTED TECHNOLOGY AND INTELLECTUAL PROPERTY IS GEARED UP TO PROTECT IT. WE KNOW THAT'S TRUE. YOU'VE SEEN ONE OF THE PATENT APPLICATIONS ABOUT THEIR MODIFIED PREDICATES.

BULLET NUMBER 20. THEY ARE PUBLISHING THEIR PRICES AND RESULTS. THIS IS A DIRECT ATTACK ON COMPETITION.

WE KNOW THAT'S TRUE. WE SAW EVEN FROM THE FIRST WITNESS IN THIS TRIAL, ERIKA CHEUNG, THAT THERANOS WAS PUTTING THEIR PRICES OUT THERE, WHICH WAS UNUSUAL. WE'VE HEARD TESTIMONY AT TRIAL THAT LABS TYPICALLY DIDN'T DO THAT, BUT THAT'S WHAT THERANOS DID.

BULLET NUMBER 2 ON THE FINANCIAL SIDE. MR. MENDENHALL WROTE THEY, MEANING THERANOS, CAN FUND GROWTH THRU CURRENT OPERATIONS. NO NEED FOR CAPITAL.

WELL, WE KNOW IN DECEMBER OF 2013, WALGREENS AGREED TO ACCELERATE THE $75 MILLION INNOVATION FEE SO THAT THERANOS COULD EXPAND THAT PARTNERSHIP WITH WALGREENS. AND THAT AMENDMENT TO THE WALGREENS CONTRACT WITH THERANOS WAS ON DECEMBER 31ST OF 2013.

WE KNOW JUST FROM COMMON SENSE THAT THAT DIDN'T JUST

SPRING OUT OF NOTHING ON DECEMBER 31ST. BEFORE WALGREENS IS GOING TO COMMIT $75 MILLION, THERE'S GOING TO BE A DISCUSSION, AND THIS DISCUSSION WITH MENDENHALL WAS JUST A SHORT TIME BEFORE THAT SIGNED COMMITMENT TO $75 MILLION IN DECEMBER OF 2013.

SO, YEAH, THEY'RE GETTING $75 MILLION FROM WALGREENS. THAT'S WHAT IT WAS.

AND AS YOU KNOW, AND I EXPLAINED WHEN I WAS TALKING ABOUT CHRIS LUCAS, ALL OF THESE INVESTORS WHO HAD ORIGINALLY INVESTED IN 2006 HAD THE RIGHT, THEY DIDN'T HAVE TO INVEST AGAIN, BUT THERANOS HAD TO GIVE THEM THE OPPORTUNITY.

MR. JHAVERI, ABOUT THE INNOVATION FEE, WALGREENS AGREES TO PAY THE THERANOS INNOVATION FEE FOR UP TO 100 MILLION. SO HE'S JUST TALKING ABOUT THE DOCUMENT.

SO HAN SPIVEY, WHO WAS ONE OF THE EARLY WITNESSES, AND SHE SAID THAT THE MONEY FROM WALGREENS, THE INNOVATION FEE MONEY, WAS FROM AN ACCOUNTING PERSPECTIVE CALLED DEFERRED REVENUE. AND THEN SHE EXPLAINED THERE ARE SOME ACCOUNTING RULES ABOUT WHEN A COMPANY CAN RECOGNIZE THE REVENUE OR NOT.

AND THAT'S HER JOB. SHE'S AN ACCOUNTANT.

BUT I JUST WANT TO POINT OUT THAT THERANOS HAD THE CASH. WHETHER IT WAS DEFERRED REVENUE OR NOT, THE CASH CAME IN THE DOOR AND THEY HAD THAT.

SO IN EARLY JANUARY, THAT'S THE SPREADSHEET.

EXHIBIT 5172, THAT'S AT THE BOTTOM. THAT'S THE SPREADSHEET

SHOWING THE CASH BALANCE SPREADSHEET, 25 MILLION COMES IN THE DOOR IN EARLY JANUARY OF 2013.

AND IF YOU GO TO THE NEXT PAGE.

THE 75 MILLION ACTUALLY CAME IN IN EARLY JANUARY OF '14, RIGHT AFTER WALGREENS COMMITMENT.

GENETIC AND HUMAN GENOME WORK. SO THIS IS ANOTHER ONE OF THE BULLET POINTS, OR ANOTHER ONE OF THE PARAGRAPHS IN MR. MENDENHALL'S EMAIL. HE SAYS, "THEY ARE NOW DOING GENETIC AND HUMAN GENOME WORK THAT WILL PUSH HEALTH CARE INTO AREAS NOT CURRENTLY ATTAINABLE."

WELL, THAT'S ALSO TRUE. HERE'S THE EMAIL UPDATE ABOUT THE THERANOS NUCLEIC ACID AMPLIFICATION FROM PRANAV PATEL JUST A FEW DAYS REALLY BEFORE MR. BALWANI TALKS TO MR. MENDENHALL. AND THEY'RE WORKING TOWARDS THE GOAL OF ASSAY DEVELOPMENT, 76 ASSAYS ARE COMPLETE, 16 ARE IN PROGRESS AND SO FORTH. WE'VE SEEN THIS EMAIL BEFORE.

BUT THIS IS ABOUT THE NUCLEIC ACID AMPLIFICATION. SO THAT WAS THE BASIS FOR MR. BALWANI'S STATEMENT.

SO THESE WERE MR. BALWANI TRYING TO BE AS ACCURATE AS HE COULD. AND AS MR. MENDENHALL SAID, HE WAS TRYING TO BE PRECISE AND BRIEF, BUT HE EXPLAINED IT AS HE UNDERSTOOD IT.

AND THE THING THAT THE GOVERNMENT REALLY POINTS TO IS THIS NO NEW SCIENCE NEEDED, BUT I'VE ALREADY TALKED ABOUT THAT. THAT DOESN'T MAKE SENSE AS A FRAUDULENT MISREPRESENTATION WHEN YOU'RE DEALING WITH SOPHISTICATED INVESTORS WHO KNOW, AND

SER-1289

THERANOS HAD DISCLOSED TO INVESTORS, THAT THEY'RE GOING TO HAVE A LOT OF R&D. WHY WOULD YOU DO THAT IF IT WAS GOING TO BE PENS DOWN ON THE RESEARCH?

LET'S TALK ABOUT ALAN EISENMAN. SO I'M JUST GOING THROUGH THE INVESTORS NOW OBVIOUSLY.

MR. EISENMAN IS A SUBJECT OF THE COUNT IN THE INDICTMENT. AND HIS INVESTMENT WAS ON DECEMBER 30TH OF 2013.

AS MR. LUCAS TESTIFIED, EVERYONE WHO ORIGINALLY INVESTED IN 2006 WAS IN THE SAME BOAT. AND MR. EISENMAN, AS YOU MAY REMEMBER, WAS A VERY PERSISTENT INVESTOR WHO LIKED TO ASK A LOT OF QUESTIONS, AND IF HE WASN'T GETTING AN ANSWER, HE WOULD GO TO DIFFERENT PEOPLE TO GET THE ANSWER, AND HE WAS SOMETIMES FRUSTRATING TO DEAL WITH, AND WE CAN SEE THAT FROM THE EMAIL RECORD.

BUT THEY HAD TO GIVE HIM THE OPPORTUNITY TO INVEST, WHETHER THEY LIKED HIM OR NOT, AND HE WAS ONE OF THOSE INVESTORS WHO ORIGINALLY INVESTED IN 2006, SO HE HAD THE RIGHT TO GET IT. THERE WAS NOTHING MORE THAN THAT.

IF THEY COULD HAVE -- AND YOU'LL SEE IN A MINUTE, IF THEY COULD HAVE NOT HAD TO DEAL WITH MR. EISENMAN ANYMORE, I THINK THEY WOULD HAVE PREFERRED THAT. BUT MR. EISENMAN HAD THE RIGHT AND HE WANTED TO GET ON BOARD THE WALGREENS ROLLOUT TRAIN AS WELL, ALONG WITH THE OTHERS.

NOW, IN THE EARLIER INVESTMENT, THE ONLY PERSON THAT HE WAS INTERACTING WITH WAS ELIZABETH HOLMES INITIALLY.

SER-1290

IN 2010 MR. EISENMAN UNDERSTANDS THAT THERANOS IS AN EARLY STAGE LIFE SCIENCES STARTUP THAT HAS IMMENSE RISK AND UNPREDICTABILITY. THIS MAY NOT CHANGE FOR YEARS TO COME.

AND THEN THE NEXT SLIDE.

IF YOU LOOK AT THESE EXHIBIT NUMBERS, I'LL JUST LEAVE IT ON THE SCREEN FOR A MINUTE, 14103, 12285, 14224, AND SO FORTH, THOSE EXHIBIT NUMBERS ARE ALL OF MR. -- NOT ALL, BUT SOME OF MR. EISENMAN'S PERSISTENT COMMUNICATIONS WHERE HE UNDERSTANDS HE DOESN'T HAVE ANY RIGHT TO GET INFORMATION, BUT HE'S SAYING IT NONETHELESS.

AT ONE POINT HE'S TALKING ABOUT IPO'S, BUT HE'S BEING TOLD THERE'S NOT GOING TO BE AN IPO. SO HE'S JUST BADGERING NOT ONLY THERANOS, MS. HOLMES AND MR. BALWANI, BUT OTHERS, TOO, WHICH YOU'LL SEE.

IN FACT, WHEN YOU GO THROUGH THOSE EXHIBITS, IF YOU DO, YOU'LL SEE THAT THERE'S THIS ONE EMAIL WHERE HE PUTS IN ALL CAPS TO MS. HOLMES'S ADMINISTRATIVE ASSISTANT, HE PUTS IN ALL CAPS, CAN YOU PLEASE RESPOND TODAY IN ALL CAPS.

AND YOU MAY REMEMBER THE QUESTION THAT MY COLLEAGUE, MS. WALSH ASKED, ISN'T THAT YELLING IN AN EMAIL WHEN YOU PUT THAT IN ALL CAPS?

AND HE SAID NO, HE DIDN'T KNOW THAT.

BUT THAT'S WHAT HE DID.

IF YOU GO TO THE NEXT SLIDE.

NANCY MINNIG WAS AN ASSISTANT FOR DON LUCAS. THIS WAS THE

BOARD MEMBER.  DON LUCAS WAS ON THE BOARD.  AND HE WAS TRYING TO GET INFORMATION FROM DON LUCAS AS WELL.

LET'S GO TO THE NEXT SLIDE.

DON LUCAS DECLINED TO COMMUNICATE WITH HIM.

SO THEN HE REACHED OUT LATER TO BILL FRIST, THE FORMER SENATE MAJORITY LEADER AND HEART SURGEON, WHO IS ON THERANOS'S BOARD.  SO HE REACHED OUT TO SENATOR FRIST, AND ULTIMATELY SENATOR FRIST STOPPED COMMUNICATING WITH HIM AS WELL BECAUSE PEOPLE FOUND MR. EISENMAN FRUSTRATING.

LET'S GO TO THE NEXT SLIDE.

THAT'S THE DOCUMENT THAT I EXPLAINED A MINUTE AGO WHERE 2006 INVESTORS HAD THIS RIGHT TO PARTICIPATE.

GO TO THE NEXT ONE.

NOW, THIS IS AN INTERESTING EXCHANGE BECAUSE MR. EISENMAN WAS ASKED, DID YOU END UP SPEAKING TO MR. BALWANI ON THAT DATE?

THIS IS ABOUT A DECEMBER 2013 COMMUNICATION BETWEEN MR. EISENMAN AND MR. BALWANI.

AND THEN MR. EISENMAN SAYS, DO YOU HAVE A NOTE THAT I CAN --

AND THE QUESTION IS, NO.  I'M JUST ASKING YOU IF YOU REMEMBER RECEIVING ANY IMPORTANT FACTS ABOUT THE COMPANY DURING THAT PARTICULAR CALL?

THIS IS ON DIRECT, RIGHT?

ANSWER, MY RECOLLECTION IS THAT IT WAS A GENERAL CALL JUST RATIFYING ALL OF THESE THINGS THAT I HAD LEARNED FROM

SER-1292

PAT MENDENHALL AND FROM THE EMAIL THAT I GOT FROM THE COMPANY GENERALLY THAT THE TECHNOLOGY WORKED, THAT THIS WAS FOR GROWTH CAPITAL.

SO HE'S CLAIMING THAT HE HAD THIS CALL WITH MR. BALWANI AND MR. BALWANI TOLD HIM THAT THE TECHNOLOGY WORKED, RIGHT?

NOW, OF COURSE, AS I EXPLAINED BEFORE, IF MR. BALWANI SAID THAT, THAT WOULD BE, FROM MR. BALWANI'S PERSPECTIVE, A TRUE STATEMENT.

BUT LET'S GO TO WHAT HAPPENED WITH MR. EISENMAN.

SO THEN HE'S ASKED ON CROSS, DID HE TAKE NOTES OF PHONE CALLS?

AND HE SAID YES, RIGHT, HE DID.

AND TO MAKE SURE HE GETS THEIR WORDS DOWN?

AND HE SAYS CORRECT.

AND THEN THE QUESTION IS -- HE'S HANDED A DOCUMENT AND ASKED, DOES THIS CONTAIN ALL OF YOUR NOTES?

HE SAYS RIGHT.

THERE'S NOTHING MISSING FROM IT?

HE AGREES WITH THAT.

BECAUSE YOU TURNED ALL OF THESE OVER TO THE GOVERNMENT?

HE SAYS RIGHT.

AND THEN HE'S ASKED TO LOOK THROUGH THESE NOTES, THIS COMPLETE COLLECTION OF NOTES, TO SEE IF THERE'S ANY NOTE REFLECTING THIS TELEPHONE CALL WITH MR. BALWANI IN LATE DECEMBER 2013.

SER-1293

AND HE LOOKS THROUGH IT. THERE'S A PAUSE.

AND HE SAYS IT'S APPARENTLY NOT WRITTEN DOWN IN MY NOTES.

WELL, HE WAS SAYING IT ON THE STAND, BUT IT'S NOT IN HIS NOTES THAT ARE SUPPOSED TO BE COMPREHENSIVE.

GO TO THE NEXT SLIDE.

AND JUST TO MAKE SURE THAT THE QUESTION IS ANSWERED, DO YOU HAVE A SPECIFIC RECOLLECTION OF MR. BALWANI TELLING YOU IN THAT PHONE CALL IN DECEMBER OF 2013 ANYTHING ABOUT THERANOS TECHNOLOGY OR THERANOS ACTIVITIES?

DESPITE WHAT HE SAID ON DIRECT, HE HAD TO ADMIT THAT HE DOES NOT HAVE A SPECIFIC RECOLLECTION.

SO THIS IS JUST AN EXAMPLE OF HOW PEOPLE, MAYBE NATURALLY, YEARS AFTER THE FACT HAVE DIFFERENT MEMORIES THAN WHAT OCCURRED. THEY SAY THINGS ON THE STAND, AT THIS POINT THEY HAVE, YOU KNOW, A BIT OF A BIAS BECAUSE, YOU KNOW, SOMETIMES EVEN A LOT OF BIAS BECAUSE OF WHAT HAPPENED, THEY DID LOSE MONEY, MAYBE THEY'RE UPSET ABOUT THAT, AND HERE THEY'RE IN A FEDERAL CRIMINAL TRIAL AND IT'S LIKE A PILING ON EFFECT WHERE EVERYONE WANTS TO SAY I WAS FOOLED OR I DIDN'T PROVE ANYTHING OR I DIDN'T DO ANYTHING, AND MR. EISENMAN IS NO DIFFERENT.

BUT THAT'S WHY IT'S SO IMPORTANT TO LOOK AT THE CONTEMPORANEOUS DOCUMENTS IN THIS CASE, AND THAT'S WHY, YOU KNOW, WE'VE SPENT QUITE A LONG TIME NOT ONLY DURING TRIAL WITH THE TESTIMONY, BUT HERE AT CLOSING NOW FOR THE THIRD DAY GOING THROUGH THESE EMAILS TO SHOW YOU, THE JURY, WHAT REALLY

HAPPENED WITH ALL OF THE CONTEMPORANEOUS DOCUMENTS AND NOT JUST RELYING ON PEOPLE'S MEMORIES, PEOPLE WHO HAVE AGENDAS AND BIASES.

LET'S TALK A LITTLE BIT MORE ABOUT MR. EISENMAN.

SO HE SIGNED THE SAME AGREEMENT THAT I'VE BEEN TALKING ABOUT ABOUT THE INVESTMENT BEING SPECULATIVE AND HE COULD AFFORD TO LOSE EVERYTHING AND HE KNOWS THE BUSINESS MODEL MIGHT CHANGE AND THE PROJECTIONS MIGHT CHANGE.

HE SIGNS ALL OF THIS, BUT HE CLAIMS HE DIDN'T REALLY MEAN IT WHEN HE SIGNED IT.  HE THOUGHT IT WAS JUST SOMETHING THAT HE HAD TO SIGN, OR IT WAS BOILER PLATE OR SOMETHING OF THAT NATURE.

HE'S A LAWYER.  HE'S TRAINED AS A LAWYER.  HE DIDN'T PRACTICE LAW FOR AWHILE.  HE DID THAT EARLIER IN HIS LIFE.

BUT YOU DON'T SIGN THINGS FOR AN INVESTMENT.

AND THE OTHER THING ABOUT MR. EISENMAN, HE INVESTED $99,000 IN THIS 2013 ROUND.

THE 2006 INVESTMENT, THAT WAS MORE THAN THAT.  THAT HAS NOTHING TO DO WITH MR. BALWANI.  THAT'S NOT AT ISSUE IN THIS CASE.

BUT THE 2013 INVESTMENT WAS $99,000.  AND WHEN YOU THINK ABOUT HOW FRUSTRATING MR. EISENMAN WAS AND HOW DIFFICULT HE WAS TO DEAL WITH AND EVERYTHING YOU KNOW, DOES IT MAKE ANY SENSE THAT MR. BALWANI WAS TRYING TO DEFRAUD MR. EISENMAN OUT OF HIS $99,000 WHEN THEY HAVE $75 MILLION COMING IN FROM WALGREENS

JUST THAT SAME MONTH?

AGAIN, IT'S A MATTER OF USING COMMON SENSE.

MR. EISENMAN HAD AN OPPORTUNITY TO SELL HIS SHARES.  SO EARLY ON IN 2010, MS. HOLMES -- AND THIS IS BECAUSE MR. EISENMAN IS SO FRUSTRATED ABOUT HE WANTS INFORMATION AND HE KEEPS ASKING THESE QUESTIONS AND HE'S NOT GETTING EVERYTHING HE HAVE WANTS SO THERE WAS MAYBE MUTUAL FRUSTRATION.

MS. HOLMES SAYS "GIVEN YOUR FRUSTRATION LEVEL AND OUR FRUSTRATION LEVEL WITH THIS INTERACTION, I STRONGLY ENCOURAGE YOU TO RECONSIDER THE OPPORTUNITY I PRESENTED ON OUR LAST CALL TO REALIZE THE RETURN ON YOUR INVESTMENT.  WE RECOGNIZE YOU HAVE BEEN AN INVESTOR FOR SOME TIME, AND IF WE PROCEED WITH THE TRANSACTION WE ARE PROPOSING, WE CAN PROVIDE YOU WITH A GREATER THAN FIVE TIMES RETURN ON YOUR INVESTMENT IN THERANOS.  PLEASE LET ME KNOW.  ELIZABETH."

SO THEN IF YOU GO TO THE NEXT PAGE, MS. HOLMES TELLS HIM IN JUNE OF 2018 -- I'M SORRY, JUNE OF 2010, "WE ARE WORKING ON PROCESSING YOUR REQUEST TO GET YOU THE PAPERS ON THE TRANSACTION TO SELL YOUR SHARES."

AND THEN MR. EISENMAN CLAIMED ON THE STAND, WELL, MAYBE THIS WASN'T SERIOUS.

BUT HE SAYS IN JULY OF 2010, "I HAVEN'T MADE A DECISION WHETHER TO SELL STOCK."  AND HE WANT TO SCHEDULE QUARTERLY UPDATES.

SO HE IS WAS NOT SATISFIED.  HE WANTS MORE INFORMATION

SER-1296

BECAUSE HE THINGS, WELL, MAYBE I'M LEAVING MONEY ON THE TABLE, MAYBE I'LL MAKE EVEN MORE MONEY.

AND HE HAD TO ADMIT THAT IF HE HAD DONE THAT BACK IN 2010, HE WOULD HAVE MADE $25 MILLION.

IF YOU HAD SOLD YOUR STOCK PURSUANT TO THIS OFFER, YOU WOULD HAVE MADE ABOUT 25 MILLION?

AND HE FIGHTS AND HE SAYS MAYBE IT'S NOT RELEVANT, AND THEN EVENTUALLY AFTER A STRUGGLE HE SAYS, YES, THE MATH IS CORRECT, $25 MILLION.

THERE ARE OTHER OPPORTUNITIES LATER FOR MR. EISENMAN TO SELL HIS SHARES. I WON'T SPEND A LONG TIME ON THIS, BUT THIS IS JUST AN INTERACTION WITH PEOPLE WHO OPERATE LIKE SECONDARY MARKETS FOR PRIVATE COMPANIES LIKE THERANOS.

AS YOU HEARD DURING TRIAL, THERANOS WAS NOT A PUBLIC COMPANY SO YOU CANNOT JUST GO TO THE NEW YORK STOCK EXCHANGE, OR SOMETHING LIKE THAT, AND BUY SHARES.

BUT THERE ARE PEOPLE WHO HAVE SECONDARY MARKETS AND MR. EISENMAN WAS DEALING WITH SOME OF THEM. AND THAT'S WHAT THIS EMAIL IS ABOUT. HE WANTS TO SELL HIS SHARES IN SEPTEMBER OF 2015.

AND THEN HE'S HAVING DIFFICULTY WITH THE PEOPLE WHO RUN THE SECONDARY MARKET BECAUSE HE'S TALKING ABOUT NOT HAVING ENOUGH INFORMATION AND IT'S SORT OF THE SAME THING AGAIN WITH MR. EISENMAN. HE NEEDS ACCURATE INFORMATION, WHAT IS IN THAT PRICE, AND PEOPLE ARE TRYING TO HELP HIM, BUT HE'S PRETTY

DEMANDING.

LET'S GO TO THIS EMAIL.  SO THIS IS AN EMAIL BETWEEN MR. EISENMAN AND MR. BALWANI.

AND MR. EISENMAN -- IF YOU GO TO THE BOTTOM OF THE PAGE, MR. ALLEN -- HE SAYS, AMONG OTHER THINGS, WHAT IS THE SIZE OF THIS ROUND, THIS INVESTMENT ROUND?  ARE THERE ANY DIRECTORS PARTICIPATING?  AM I CORRECT THAT THERE WILL BE ANOTHER ROUND OF APPROXIMATELY 200 MILLION IN JANUARY?

AND MR. BALWANI SAYS ALAN -- THIS IS BEFORE MR. EISENMAN INVESTS -- "WE CAN'T ANSWER YOUR QUESTIONS ABOUT DIRECTORS, OTHER INVESTORS, AND CERTAINLY NOT ABOUT ANY FUTURE INVESTMENT ROUNDS AND SPECULATE ON WHAT THOSE VALUATIONS MAY BE.  THOSE MAY OR MAY NOT HAPPEN."

HE SAYS, "SECONDLY, MY PERSONAL ASSISTANTS ARE NOT PRIVY TO CONFIDENTIAL FINANCIAL INFORMATION SO PLEASE DON'T LEAVE MESSAGES WITH THEM ABOUT COMPANY'S FINANCIAL DETAILS AND ACTIVITIES.

"FINALLY, IF YOU CHOOSE TO INVEST, THE SIGNED DOCUMENTS HAVE TO BE IN BY 12/31."

SO THIS DOESN'T SOUND LIKE MR. BALWANI SAYING TO MR. EISENMAN, YEAH, PLEASE INVEST, YOU KNOW, HERE'S ALL OF THE GREAT INFORMATION AND LET ME MAKE UP STUFF.  YOU KNOW, IF YOU'RE NOT QUITE SATISFIED, I'LL JUST SAY WHATEVER.

HE'S SAY I CAN'T ANSWER THAT QUESTION, CAN'T PROVIDE THE INFORMATION.  IF YOU CHOOSE TO INVEST, HERE'S WHAT YOU HAVE TO

DO.

SO AS I SAID BEFORE, MR. EISENMAN IS JUST BEING GIVEN THIS OPPORTUNITY BECAUSE THERANOS HAS TO DO IT BASED ON THE PREVIOUS CONTRACTUAL COMMITMENT.

BUT WE KNOW THAT MR. EISENMAN SPECIFICALLY TOLD MR. BALWANI THAT HE WAS SPECIFICALLY DISCOURAGED FROM INVESTING.

IF YOU GO TO THE NEXT EMAIL, LET'S JUST READ THIS FROM THE BOTTOM.

SO THE EARLIEST EMAIL IN TIME HERE, MR. EISENMAN SAYS ON JANUARY 21ST, 2015, SO THIS IS A LITTLE OVER A YEAR LATER AFTER MR. EISENMAN'S INVESTMENT, AND MR. EISENMAN SAYS, ELIZABETH AND SUNNY, THIS IS THE SECOND GOOGLE ALERT I HAVE RECEIVED RECENTLY THAT CLAIMS THERANOS COULD BECOME OBSOLETE.  CAN WE HAVE A CATCH UP CALL?

AND THEN MR. BALWANI RESPONDS TO HIM THAT SAME DAY.  "I THINK THESE EMAILS ARE BEYOND RIDICULOUS.  YES, THERANOS, LIKE ANY OTHER COMPANY, CAN BECOME OBSOLETE."

AND THEN HE SAYS, "YOU CONTINUE TO BOMBARD US WITH EMAILS AND PHONE CALLS EVEN THOUGH JUST 12 SHORT MONTHS AGO I SPOKE WITH YOU IN DETAIL THAT YOU WILL NOT GET ANY UPDATES, THAT YOU SHOULDN'T INVEST, AND THAT MANAGEMENT WILL NOT BE SPENDING ANY TIME WITH YOU PROVIDING YOU UPDATES AND RESPONDING TO YOUR EMAILS ABOUT BUSINESS OPERATIONS, STRATEGY AND DETAILS."

SO MR. BALWANI IS SPECIFICALLY REMINDING MR. EISENMAN, I

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                      7486

TOLD YOU YOU SHOULD NOT TO INVEST.

AND LET'S SEE WHAT HAPPENS WHEN MR. EISENMAN RESPONDS.  HE SAYS "SUNNY,

"WHEN WE SPOKE SEVERAL MONTHS AGO YOU SAID WE COULD HAVE A SHORT QUARTERLY CALL.  I DON'T THINK THIS IS AN UNREASONABLE REQUEST.

"I HEARD THAT THERE WAS FINANCIAL INFORMATION DISSEMINATED ON THE JANUARY 2014 ROUND.  IF SO, IS THAT SOMETHING THAT YOU CAN SHARE."

NOWHERE IN THIS EMAIL RESPONSE DOES MR. EISENMAN SAY, WHAT ARE YOU TALKING ABOUT?  YOU DIDN'T TELL ME THAT I SHOULDN'T INVEST.  YOU TOLD ME TO INVEST.

HE'S GIVEN THAT OPPORTUNITY AND HE SAYS NOTHING ABOUT THAT.  HE DOESN'T DISAGREE WITH THAT.

AND IF IT WAS JUST THE ONE EXCHANGE, YOU MIGHT SAY, WELL, MAYBE HE MISSED THAT OR HE DIDN'T RESPOND TO THAT.

BUT HE'S GIVEN ANOTHER OPPORTUNITY.

LET'S GO UP THE CHAIN.

MR. BALWANI SAYS, "NO ONE FROM THIS COMPANY HAS EVER COMMITTED TO A SHORT QUARTERLY CALL WITH YOU OR ANY OTHER INVESTOR SELECTIVELY.  I WAS VERY EXPLICITLY DISCOURAGING YOU FROM INVESTING IN JANUARY OF 2014 AND NO INFORMATION HAS BEEN DISSEMINATED."

IT'S OBVIOUSLY DECEMBER OF '13 BECAUSE THAT'S WHEN MR. EISENMAN'S INVESTMENT WAS.

OKAY. AND THEN MR. EISENMAN HAS HIS SECOND OPPORTUNITY. HE WRITES, "IT WASN'T A FIRM COMMITMENT, ONLY A COURTESY," ABOUT GETTING INFORMATION. "I WOULD HOPE AFTER 9 YEARS THERE WOULD BE SOMETHING THERANOS COULD SHARE WITH US ON A REGULAR BASIS. WE HAVE BEEN MORE THAN PATIENT."

BUT AGAIN, SECOND OPPORTUNITY, MR. EISENMAN COULD SAY, WHAT ARE YOU TALKING ABOUT SUNNY? WHY ARE YOU SAYING YOU DISCOURAGED ME FROM INVESTING? THAT NEVER HAPPENED.

HE NEVER SAID THAT. NOT JUST ONCE, BUT TWICE HE HAD THE OPPORTUNITY.

SO WE KNOW THAT'S WHAT HAPPENED. MR. BALWANI SPECIFICALLY TOLD MR. EISENMAN, WHEN HE WAS INVESTING, DON'T INVEST.

AND YOU KNOW WHAT? LOGICALLY THAT MAKES A LOT OF SENSE. WHY WOULD ANYONE, MR. BALWANI INCLUDED, WANT TO GET MR. EISENMAN'S 99,000? THINK ABOUT THE TRADE-OFF. YOU GET $99,000 FOR AN INVESTMENT FROM EISENMAN, BUT YOU'VE GOT TO DEAL WITH ALAN EISENMAN FOREVER.

SO I DON'T UNDERSTAND LIKE HOW THAT CAN BE A REAL THING. AND IT MAKES SENSE THAT MR. BALWANI TOLD HIM NOT TO INVEST.

AND WHEN YOU THINK ABOUT IT FROM AN INTENT STANDPOINT, THIS IS THE OPPOSITE OF AN INTENT TO DEFRAUD ALAN EISENMAN OUT OF ANYTHING. THEY DIDN'T WANT HIS MONEY. THEY DIDN'T WANT HIS INVESTMENT.

HE WAS SIMPLY GIVING HIM AN OPPORTUNITY BECAUSE THEY HAD TO DO IT. THEY WERE HONORING THEIR CONTRACTUAL COMMITMENT.

SER-1301

THAT'S THE THERANOS INVESTORS.

AND I WANT TO MOVE TO A TOTALLY DIFFERENT SUBJECT OF THERANOS PATIENTS.

SO IF YOU GO TO SLIDE 506, MR. ALLEN.

THE COURT:  WHY DON'T WE DO THAT AFTER OUR BREAK?

MR. COOPERSMITH:  THAT SOUNDS GREAT.

JUROR:  YOUR HONOR, ONE THING.  THE MONITOR HERE IS NOT WORKING.

THE COURT: OKAY.  THANK YOU.  WE'LL CORRECT THAT DURING THE BREAK.  THANK YOU.

WE'LL TAKE 20 MINUTES, PLEASE.

(RECESS FROM 2:16 P.M. UNTIL 2:40 P.M.)

THE COURT:  THANK YOU.  PLEASE BE SEATED.

WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

OUR JURY IS PRESENT AND ALTERNATES.

MR. BALWANI IS PRESENT.

MR. COOPERSMITH.

MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

OKAY.  WELCOME BACK EVERYONE.  AS YOU CAN SEE WE'RE MOVING DOWN THE LIST OF TOPICS, MAYBE NOT QUICKLY, BUT WE ARE MOVING.

AND WE'RE NOW ON THE TOPIC OF THERANOS PATIENTS, SO I WANT TO JUST SPEND A LITTLE BIT OF TIME ON THAT.

SO THE FIRST THING, THOUGH, AND THIS RELATES TO THERANOS PATIENTS, THERE'S A COUNT OF THE INDICTMENT, I THINK IT'S

COUNT TWELVE, THAT DEALS WITH THE WIRE TRANSMISSION OF SOME MONEY TO BUY THE ADVERTISING IN THE PHOENIX, ARIZONA MARKET.

AND THE GOVERNMENT DURING THEIR CLOSING SHOWED YOU AN EMAIL ABOUT THAT, AND MS. SPIVEY TALKED ABOUT THAT EMAIL.

THE WIRE TRANSFER OF APPROXIMATELY $1.2 MILLION, THAT DID OCCUR, BUT HERE'S WHAT I WANT TO SAY ABOUT THAT COUNT.

WE JUST DON'T KNOW MUCH ABOUT IT.  SO THE ADVERTISING BUY, IT'S LIKE AUGUST OF 2015.  WE DON'T KNOW WHAT THE AD SAID, WE DON'T KNOW IF THERE WERE ADS THAT ACTUALLY RAN, WE DON'T KNOW WHEN AND IF THEY RAN, WE DON'T KNOW WHO LOOKED AT THEM, WE DON'T KNOW IF ANY OF THE PATIENTS THAT YOU'VE HEARD FROM DURING TRIAL LOOKED AT THEM.

MS. SPIVEY WAS THE ONLY PERSON WHO TESTIFIED ABOUT THEM. SO WE JUST DON'T KNOW.

IT'S PRETTY LATE IN THE DAY.  IT'S AT A POINT IN TIME WHERE THERANOS WAS NOT USING, FOR THE MOST PART, ITS PROPRIETARY TECHNOLOGY.  YOU KNOW, YOU SAW THE EXHIBIT ABOUT THAT.

SO IT'S JUST A COUNT THAT SORT OF DOESN'T HAVE A LOT OF FACTS BEHIND IT.

WHAT I WANT TO SAY ABOUT THAT, YOU KNOW, IN TERMS OF REASONABLE DOUBT PERSPECTIVE, WHEN YOU DON'T KNOW IF THE ADS RAN, WHEN THEY RAN, WHO SAW THEM, WHAT THE CONTENT WAS, IF THEY EVEN RAN AT ALL, FROM A REASONABLE DOUBT PERSPECTIVE, OR FROM ANY PERSPECTIVE, YOU CAN'T CONVICT ON THAT COUNT.

THE GOVERNMENT COULD HAVE BROUGHT IN DETAIL ABOUT WHAT THE ADS WERE, WHO SAW THEM, WHAT HAPPENED.  THAT EMAIL THAT THEY SHOWED YOU DOESN'T SUPPLY THAT.  IT LOOKS LIKE THERE'S SOME CONTEMPLATION OF RADIO ADVERTISING, SOME OTHER THINGS.

BUT THERE'S NOTHING BEYOND THAT.  AND SO THAT COUNT SHOULD BE A PRETTY QUICK DECISION I WOULD THINK WHEN YOU'RE DELIBERATING.

BUT I WANT TO TALK ABOUT THE ACTUAL PATIENTS, THE REAL SUBSTANCE.

AND THE FIRST ONE I WANT TO TALK ABOUT IS BRITTANY GOULD.  AND BRITTANY GOULD YOU HEARD FROM DURING TRIAL.  SHE'S NOT A COUNT IN THE INDICTMENT, BUT SHE WAS A PATIENT WHO GOT A TEST, A COUPLE OF TESTS AT THERANOS.

AND HER DOCTOR WAS DR. AUDRA ZACHMAN, AND THAT'S FROM THE SOUTHWEST CONTEMPORARY WOMEN'S CLINIC IN PHOENIX, IN THE PHOENIX AREA.

SO, FIRST OF ALL, LET'S JUST TALK ABOUT THE TEST THAT MS. GOULD GOT.  AND THAT'S A TEST -- THIS IS THE HCG ASSAY.  THIS IS THE PREGNANCY TEST THAT WE WERE TALKING ABOUT DURING TRIAL.  THAT TEST WAS ON OCTOBER 2ND OF 2014.

AND THEN THE SECOND TEST THAT MS. GOULD GOT WAS ON OCTOBER 4TH, 2014.  AND IT HAS THE EXHIBIT NUMBER IF YOU WANT TO LOOK AT THOSE REPORTS, THAT'S EXHIBIT 2044 AND EXHIBIT 4242.  SO THOSE WERE THE TWO TESTS.

AND YOU CAN SEE WHAT HAPPENED HERE.  TEST NUMBER 2 IS

REPORTED TO DR. ZACHMAN ON OCTOBER 6TH.  THAT'S THAT BLUE WRITING THAT YOU CAN SEE ON THAT OCTOBER 6TH DATE.

BUT TEST NUMBER 1 IS NOT REPORTED UNTIL OCTOBER 8TH.

THE TEST NUMBER 2 REPORT SHOWS A VALUE OF 125.58.  AND THAT, DR. ZACHMAN SAID, AND SHE'S RIGHT, THAT'S A VALUE THAT DOESN'T MAKE SENSE.  THAT 125.58 HAS GOT TO BE WRONG.

AND WE KNOW IT'S GOT TO BE WRONG BECAUSE WE KNOW THAT MS. GOULD HAD A VIABLE, SUCCESSFUL PREGNANCY LATER.  SO THE 125.58 WOULDN'T MAKE SENSE GIVEN THE PREVIOUS TESTING THAT MS. GOULD HAD GOTTEN.

BUT WHAT HAPPENED?  AND WE'LL SEE THIS IN A MINUTE. THERE'S A DECIMAL PLACE TRANSCRIPTION ERROR WHERE THE 125.58 SHOULD HAVE BEEN REPORTED AS 12,558.

AND THAT'S AN ERROR THAT SHOULD NEVER HAPPEN.  LABS SHOULD NEVER MAKE THOSE ERRORS.  I THINK EVERYONE SHOULD AGREE ON THAT.

BUT IN THIS TRIAL WE'RE NOT TALKING ABOUT TRANSCRIPTION ERRORS.  WE'RE TALKING ABOUT WHETHER THERE'S SOME FUNDAMENTAL PROBLEM WITH THE TESTING, NOT TRANSCRIPTION WHERE SOMEONE IN THE LAB MAKES AN UNFORTUNATE ERROR.  BUT IT HAPPENED.  THAT'S THE ERROR.

WE ALSO SAW YESTERDAY THAT IN THAT SAME MONTH OF OCTOBER OF 2014, THERE WAS AN ALTERNATIVE ASSESSMENT PROCEDURE HEAD-TO-HEAD COMPARISON BETWEEN THERANOS'S HCG TESTING ON EDISON AND THE FDA APPROVED COMMERCIAL DEVICES, AND THAT PASSED

100 PERCENT.

SO THERE'S NO REASON WHY -- THERE'S NOT ANY EVIDENCE AT THIS POINT IN TIME OR AT ANY POINT IN TIME THERE'S SOME FUNDAMENTAL PROBLEM WITH THE HCG TEST. THERE'S A TRANSCRIPTION ERROR IN THIS CASE.

NOW, AS YOU KNOW FROM YESTERDAY AND FROM HEARING THE TRIAL, THERE WAS A TIME AT THE END OF MAY OF 2014 WHERE DR. ROSENDORFF STOPPED HCG TESTING.

BUT THEN WE ALSO SAW, ALTHOUGH IT WAS THE DEFENSE THAT HAD TO SHOW IT TO YOU, THAT DR. ROSENDORFF QUICKLY APPROVED WITHIN A FEW DAYS HCG TESTING GOING BACK ON EDISON.

SO WHEN YOU HAVE THAT SITUATION, THERE'S NO REASON WHY MR. BALWANI WOULD THINK THAT THERE'S SOME FUNDAMENTAL PROBLEM WITH HCG TESTING ON EDISON AT THERANOS.

BUT IN ANY EVENT, GOING BACK TO THE CHART THAT IS ON THE SCREEN, MR. -- I'M SORRY, DR. ZACHMAN GOT THIS REPORT FROM THERANOS WITH THIS UNFORTUNATE DECIMAL PLACE ERROR, SO IT'S 125.58. RIGHTFULLY, SHE WAS CONFUSED ABOUT THAT. IT DIDN'T MAKE ANY SENSE.

WHEN SHE GETS THE SECOND REPORT, THOUGH -- SHE DOESN'T GET TEST NUMBER 1 UNTIL OCTOBER 8TH. SO A COUPLE OF DAYS LATER, DR. ZACHMAN GETS THE TEST NUMBER 1 FOR THE FIRST TIME, WHICH IS THE 12,558, AND THEN SHE GETS TEST NUMBER 2 CORRECTED. SO THEY'VE CORRECTED THE DECIMAL PLACE ERROR NOW A COUPLE OF DAYS AND IT'S 12,558.

SER-1306

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                  7493

OKAY.  DR. ZACHMAN ALSO TESTIFIED, WELL, OKAY, THAT'S GREAT THAT I GOT A CORRECTED REPORT, BUT IT STILL DOESN'T MAKE ANY SENSE, IT SHOULD BE DOUBLING.

SO FROM TEST NUMBER 1 TO TEST NUMBER 2, THOSE ARE TWO DAYS APART.  MS. GOULD GAVE HER FINGERSTICK SAMPLE ON OCTOBER 2ND AND THEN ON THE 4TH.

SO ON THOSE TWO DAYS, IF SHE WAS PREGNANT, WHICH SHE WAS, THE VALUE SHOULD HAVE DOUBLED.  AND DR. ZACHMAN IS SAYING, YEAH, BUT IT'S 12,558 AND IT'S 12,558, SO THAT'S NOT DOUBLING. THAT DOESN'T MAKE ANY SENSE.

SO WE HEARD DURING THE COURSE OF THIS TRIAL REPEATEDLY THAT IN BLOOD TESTING IT'S NOT WHAT YOU CALL AN EXACT SCIENCE. THESE ARE NOT LIKE DIGITAL RESULTS WHERE YOU GET A 1 OR A 0. THESE ARE BLOOD TESTING RESULTS THAT COME WITHIN RANGES OF 5 PERCENT, 10 PERCENT, 20 PERCENT, SOMETIMES 30 PERCENT.

SO THE CHANCES OF GETTING THE SAME EXACT VALUE FOR TWO DIFFERENT TESTS TWO DAYS APART ARE VERY, VERY SLIM.  I SUPPOSE IN THE SCHEME OF THE UNIVERSE IT'S POSSIBLE.

SO REALLY WHAT IT LOOKS LIKE PROBABLY HAPPENED HERE -- AGAIN, VERY UNFORTUNATELY -- IS NOT ONE, BUT TWO TRANSCRIPTION ERRORS WHERE SOMEBODY WROTE DOWN THE SAME VALUE IN THIS REPORT FOR TEST NUMBER 1.

AND THAT'S MORE LIKELY THAN NOT WHAT HAPPENED BECAUSE OF THAT IDENTICAL VALUE ISSUE.

BUT IN ANY EVENT, MOVING ON FROM THAT, THERANOS DID CATCH

SER-1307

THE DECIMAL PLACE ERROR, AND THEN IN AN EMAIL TO DR. ZACHMAN IT SAYS "WE IDENTIFIED ONE STEP IN POST PROCESSING THAT WAS CAUSE OF THIS ERROR.  IN ALL THREE CASES THE VALUES FOR ASSAY IN QUESTION REPORTED WERE 1/100TH OF THE TRUE CLINICAL VALUES THAT SHOULD HAVE BEEN REPORTED.  WE SINCERELY APOLOGIZE FOR THE ERROR."

SO THEY CAUGHT THE DECIMAL PLACE ERROR.

AND ON THE OTHER POINT, DR. ZACHMAN WAS ASKED THE QUESTION ON CROSS-EXAMINATION, "I UNDERSTAND THE VALUE DOESN'T MAKE SENSE," THIS IS TALKING ABOUT THE 12,558 BEING REPORTED TWICE. "I UNDERSTAND THE VALUE DOESN'T MAKE SENSE, BUT IF SOMEONE ACCIDENTALLY REPORTED THE SAME RESULT TWICE, THIS WOULD BE ONE EXPLANATION FOR THE IDENTICAL RESULT; CORRECT?"

SHE SAYS CORRECT.

DR. ZACHMAN DOESN'T KNOW THAT, BUT IT IS A POSSIBILITY THAT EXISTS.

AND IT'S, AGAIN, WITH THE IDENTICAL VALUE, WHAT YOU KNOW, WHAT YOU HAVE LEARNED AS A JURY ABOUT BLOOD TESTING, YOU KNOW, IDENTICAL RESULTS WHEN THEY'RE DOING PROFICIENCY TESTING OR QUALITY CONTROL OR ANY TYPE OF COMPARISON, IDENTICAL RESULTS. THAT'S WHY EVERYTHING WE HAVE SEEN AT TRIAL, THERE'S ALWAYS A COEFFICIENT OF VARIATION OR THERE'S A STANDARD DEVIATION RANGE, AND IT'S, AGAIN, CERTAIN PERCENTAGE POINTS, IT COULD BE 10 OR 20 PERCENT, SOMETHING LIKE THAT.

SO THERE'S A PRETTY GOOD CHANCE, CERTAINLY FROM A BEYOND A

SER-1308

REASONABLE DOUBT PERSPECTIVE, THAT THIS ERROR, OR SORT OF CASCADE OF ERRORS IN THE CASE OF MS. GOULD, IS NOT EVEN A PROBLEM WITH THE DEVICE BUT REALLY A PROBLEM WITH SOME PEOPLE WHO NEED SOME TRANSCRIPTION LESSONS AT THE THERANOS LAB.

LET'S MOVE ON FROM THAT THOUGH.  SHE WAS INFORMED ABOUT THE DECIMAL PLACE ERROR.

SO WAS MR. BALWANI.  HE'S ON THIS EMAIL FROM TINA LIN ON OCTOBER 7TH.  AND IT SAYS REGARDING BRITTANY GOULD, THIS SAME PATIENT, "HER VISIT ON OCTOBER 2ND WAS OORH.  HER VISIT ON OCTOBER 4TH WAS ALSO OORH INITIALLY BUT WE DID A DILUTED RERUN.  THE RESULT SHOULD BE MULTIPLIED BY 100."

YOU CAN SEE RIGHT THERE FROM THAT EMAIL, IT LOOKS LIKE THERE WAS NO RESULT, LIKE A NUMBER VALUE FOR THE OCTOBER 2ND TEST.  SO THAT SUPPORTS WHAT I'M SAYING IS THAT IF THERE WASN'T A VALUE, THE CHANCES ARE SOMEONE JUST WROTE DOWN A VALUE THAT WASN'T REALLY RIGHT, AND THAT'S NOT SOMETHING THAT MR. BALWANI KNOWS ABOUT, BUT THERE'S TRANSCRIPTION ERRORS GOING ON HERE THAT ARE UNFORTUNATELY GIVING THIS INFORMATION TO DR. ZACHMAN.

FORTUNATELY, IT DIDN'T AFFECT MS. GOULD ULTIMATELY, BUT OBVIOUSLY THIS IS OF CONCERN IF THERE ARE TRANSCRIPTION ERRORS GOING ON IN THE LAB.

BUT THEN THAT SECOND TEST ON OCTOBER 4TH, THAT'S THE DECIMAL PLACE ERROR.

SO WHAT MR. BALWANI UNDERSTANDS, BECAUSE HE'S BEING INFORMED OF THIS IN THIS EMAIL, WE MADE A DECIMAL PLACE ERROR.

SER-1309

AND HE WOULDN'T CONCLUDE AND SHOULDN'T CONCLUDE FROM THAT THAT WE'VE GOT A FUNDAMENTAL PROBLEM WITH THE EDISON TESTING. YOU KNOW, WE'RE GIVING INACCURATE RESULTS OUT TO PATIENTS.

THIS IS THIS ONE TEST AND IT'S A DECIMAL PLACE ERROR. SO THAT'S WHAT MR. BALWANI WOULD HAVE, SHOULD HAVE REASONABLY TAKEN AWAY FROM THIS EMAIL AND THIS EXPERIENCE WITH MS. GOULD.

NOW, AGAIN, ALL HUMAN ENDEAVORS, INCLUDING ESPECIALLY BLOOD TESTING LABS, STRIVE FOR PERFECTION. BUT DR. ZACHMAN KNOWS FROM HER EXPERIENCE THAT LABORATORIES MAKE ERRORS, AND SOMETIMES THERE'S A NEED TO REPEAT A TEST, AND IT'S NOT UNIQUE TO THERANOS.

NOW, THE GOVERNMENT SHOWED YOU A SPREADSHEET. THIS WAS IN SEPTEMBER OF 2015. MR. BALWANI AND A PROJECT MANAGER NAMED MAX FOSQUE WERE WORKING ON UNDERSTANDING SOME OF THE CUSTOMER SERVICE INQUIRIES AND COMPLAINTS THAT COME IN OVER TIME, AND THEY COMPILE IT IN THIS SPREADSHEET.

AND THERE'S AN ENTRY FOR THIS DR. ZACHMAN. AND YOU SEE IT'S TALKING ABOUT THE HCG TEST.

AND ON THE RIGHT SIDE WHERE THERE'S HIGHLIGHTING, THE NOTE, IN TERMS OF THE REMEDY NOTED IN THE CUSTOMER SERVICE LOG IS, HUMAN ERROR IDENTIFIED, SOFTWARE UPDATED AND DOC WAS CONTACTED FOR DISCUSSION.

SO THAT'S WHAT HAPPENED WITH DR. ZACHMAN.

SO ACCORDING TO THAT THERE'S SOME UPDATE IN THE SOFTWARE TO TRY TO FIX, YOU KNOW, THIS HUMAN ERROR OF THE DECIMAL PLACE.

AND THEN IT SAYS ON THE ENTRY FROM JANUARY 28TH, 2015, OFFICE, REFERRING IT LOOKS LIKE TO THE SOUTHWEST CONTEMPORARY WOMEN'S CLINIC, WILL NOT SEND UNTIL WE DO CLINICAL TRIAL. CHRISTIAN TO FOLLOW UP.

SO IT LOOKS LIKE BASED ON THAT NOTE THE SOUTHWEST CLINIC WANTS, YOU KNOW, SOME MORE TESTING IN THIS, YOU KNOW, IT'S A CLINICAL TRIAL, BEFORE THEY CAN RESUME TESTING.

AND JUST TO GO BACK FOR A MINUTE TO DR. ROSENDORFF, IN JUNE OF 2014 HE HAD APPROVED RELEASING FINGERSTICK RESULT ON EDISON. SO ANY CLAIM THE GOVERNMENT MIGHT TRY TO MAKE THAT DR. ROSENDORFF STOPPED HCG TESTING AND HE NEVER AUTHORIZED IT AND THIS WAS SOME BRAINCHILD OF MR. BALWANI TO FORCE HCG TESTING ON EDISON, THAT'S JUST NOT RIGHT.

BECAUSE DR. ROSENDORFF, DESPITE HIS TESTIMONY ON THE STAND, AGAIN, GOING BACK TO THE CONTEMPORANEOUS DOCUMENTS, HE WAS FORCED TO ADMIT THIS BECAUSE THERE WAS A DOCUMENT WHERE HE APPROVED THIS, AND HE KNOWS FULL WELL THAT HE ALLOWED HCG TESTING. HE THOUGHT IT WAS SATISFACTORY IN JUNE -- EARLY JUNE OF 2014. THAT WAS BEFORE BRITTANY GOULD.

SO SOUTHWEST CLINIC, I MENTIONED A MINUTE AGO THIS NOTE ABOUT THE CLINICAL TRIAL.

IF YOU GO TO THE NEXT SLIDE.

THEY CONTINUED TO USE THERANOS. SO FIRST OF ALL, EXHIBIT 20071. IN OCTOBER OF 2015, MOLLY JO RILEY, WHO IS AN EMPLOYEE OF THE SOUTHWEST CONTEMPORARY WOMEN'S CLINIC, IS

TALKING ABOUT THE BIDIRECTIONAL INTERFACE WITH THERANOS HAS BEEN SET UP. WE ARE NOW ABLE TO SEND LAB ORDERS TO AND RECEIVE RESULTS FROM THERANOS ELECTRONICALLY.

SO OBVIOUSLY YOU DON'T SET UP AN ELECTRONIC INTERFACE WITH THERANOS TO SEND LAB ORDERS IF YOU'RE NOT GOING TO USE THEIR SERVICE ANYMORE.

AND IT SAYS THE PROCESS IS THE SAME AS FOR SONORAQUEST, PROPATH, AND LABCORP.

20074 IS THE NEXT EXHIBIT.

SO IN THIS TRIAL WE KNOW THAT ALL LABS MAKE ERRORS. THEY CALLED ONE PATIENT WHO HAD AN ISSUE WITH HCG TESTING AT THERANOS, BUT THAT'S NOT WHAT THIS TRIAL IS ABOUT, BECAUSE IF THAT WAS WHAT THIS TRIAL WAS ABOUT, THEN ANY LAB COULD BE IN A FEDERAL CRIMINAL TRIAL ANY DAY BECAUSE WE KNOW ALL LABS MAKE ERRORS.

BUT THE ISSUE IS, IS THERE SOME SYSTEMIC, SOME WIDESPREAD PROBLEM THAT MR. BALWANI KNOWS ABOUT, OR EVEN AT ALL.

AND HERE IT'S DR. ZACHMAN WHO IS HAVING A COMMUNICATION WITH A FEDERAL AGENT NAMED GEORGE SCAVDIS, AND DR. ZACHMAN SAYS AT THE BOTTOM THAT SHE HAS REVIEWED ALL OF THE CHARTS AND DID NOT COME UP WITH MUCH THAT SEEMED OUT OF PLACE. I WILL RUN A COUPLE BY DR. LINNERSON TOMORROW TO MAKE SURE HE AGREES.

SO ANOTHER DOCTOR IN THE CLINIC, SHE WANTS TO RUN -- SHE'S NOT JUST CHECKING HER OWN PATIENTS. SHE'S ALSO TALKING TO DR. LINNERSON. AND SHE'S REVIEWING THE CHARTS AT THE REQUEST

SER-1312

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                    7499

OF THE GOVERNMENT TO SEE IF SHE CAN FIND MORE PROBLEMS.

AND THEN SHE REPORTS ON JANUARY 8TH, 2021.  "AFTER A THOROUGH REVIEW, IT HAS BEEN DETERMINED THAT THERE WERE NOT ANY QUANT RESULTS THAT, IF IN QUESTION, MADE ANY CLINICAL DIFFERENCE.

"THE CASE WITH B.G. AND HER INTERACTION WITH ME IS THE ONLY CIRCUMSTANCE THAT HAD QUANT VALUES THAT WERE OVERTLY ABNORMAL AND MADE A DIFFERENCE TO HER CARE."

AND THEN SHE SAYS, "SORRY I DO NOT HAVE MORE TO REPORT."

SO APPARENTLY SHE WAS DOING HER BEST TO HELP THE GOVERNMENT BECAUSE SHE'S SORRY SHE DIDN'T HAVE MORE TO REPORT.  AND THAT'S FINE.

BUT THOSE ARE THE FACTS, THAT IF THERE WAS SOME WIDESPREAD PROBLEM, YOU WOULD EXPECT THAT DR. ZACHMAN WOULD HAVE PLENTY OF ISSUES SHE COULD FIND.  AND SHE DID THE DIGGING AND SHE DIDN'T FIND ANYTHING EXCEPT BRITTANY GOULD AND THAT'S WHAT SHE TOLD AGENT SCAVDIS.

SO THEN YOU MIGHT REMEMBER THIS PIECE OF EVIDENCE CAME IN TOWARDS THE END OF THE TRIAL.  IT'S EXHIBIT 20073A, AND IT'S A NATIVE SPREADSHEET.  AND JUDGE DAVILA READ YOU A STIPULATION THAT WE REACHED WITH THE GOVERNMENT ABOUT HOW THAT'S AN AUTHENTIC SPREADSHEET PRODUCED BY SOUTHWEST CONTEMPORARY WOMEN'S CLINIC, REFLECTS ALL SWCWC PATIENTS WHO RECEIVED THERANOS BLOOD TESTING RESULTS AFTER AUGUST 2015.

AND THE SPREADSHEET -- THIS IS THE SPREADSHEET, AND IF YOU

SER-1313

WANT TO LOOK AT THAT YOU CAN LOOK AT IT DURING DELIBERATIONS, BUT I WANT TO POINT OUT A FEW THINGS THAT APPEAR FROM THAT SPREADSHEET, WHICH AGAIN IS EXHIBIT 20073A.

IF YOU GO TO THE NEXT SLIDE.

RIGHT.  SO ON THIS SPREADSHEET THERE'S 1,154 SOUTHWEST CLINIC PATIENT VISITS TO THERANOS; THERE'S -- OF THOSE PATIENTS, THERE ARE 277 HCG TESTS FROM THERANOS; AND THEN DR. ZACHMAN'S OWN PATIENTS, APART FROM OTHER PROVIDERS AT THE SOUTHWEST CLINIC, SHE HAD 21 PATIENT VISITS AFTER AUGUST OF 2015, AND THEN OF THOSE PATIENTS 12 RECEIVED HCG TESTS.

SO THERE WERE ALMOST 300, WE'LL CALL IT OVER 250, TESTS TO PICK FROM AND COULDN'T FIND ANY PROBLEMS, AT LEAST THE ONES AFTER AUGUST 15TH.  IT DOESN'T COUNT ANY TESTS BEFORE AUGUST OF 2015.

IF YOU GO TO THE NEXT SLIDE.

THAT'S THE ERROR RATE BASED ON WHAT WE KNOW.  WE KNOW ABOUT MS. GOULD.  NOT CLEAR IF IT'S REALLY A PROBLEM WITH THE THERANOS EDISON DEVICE OR JUST TRANSCRIPTION ERRORS.  BUT EVEN IF WE CALL IT A PROBLEM WITH THE THERANOS EDISON, THAT'S 1 OUT OF 277.

I SHOULD SAY THAT THERE'S TESTING THAT GOES ON AFTER OCTOBER THAT ARE NOT EDISON TESTS.  SO THERE'S COMMERCIAL TESTING THAT IS GOING ON AS WELL THAT THERANOS IS CONDUCTING FOR HCG.

BUT THE GOVERNMENT'S CLAIM IN THIS CASE IS THAT ALL OF THE

THERANOS TESTING IS BAD, NOT JUST ON THE EDISON.

SO THAT'S THE ERROR RATE THAT WE KNOW FROM THE FACTS THAT WERE INTRODUCED AT TRIAL.

LET'S GO TO BRENT BINGHAM, WHO WAS ANOTHER PATIENT.

MR. BINGHAM WAS THE GENTLEMAN WHO HAD A CONDITION INVOLVING A NEED TO MONITOR HIS PLATELET COUNT.  AND HE TALKED ABOUT HOW UNFORTUNATELY HE HAS THIS MEDICAL CONDITION AND THAT HE HAS A SENSE OF THE PLATELET COUNT NUMBER AND HOW HE FEELS AND WHEN THE PLATELET COUNT GETS TOO HIGH HE STARTS FEELING BAD, SO THERE'S A NEED FOR HIM, FOR HIS PERSONAL ISSUE, TO LOOK AT THOSE PLATELET COUNT NUMBERS.

BUT WHAT WE HAVE TO TALK ABOUT HERE IS THE LEVEL OF PROOF THAT EXISTS HERE.  OBVIOUSLY WE CAN FEEL BAD FOR MR. BINGHAM WHO UNFORTUNATELY HAS THIS CONDITION.

BUT LET'S GO TO THE NEXT SLIDE.

SO HE HAD FOUR TESTS AT THERANOS AND THE ONES THAT ARE BLANK THERE ARE COMPLETELY UNKNOWN.  WE HAVE NO IDEA WHAT THOSE REPORTS SAY BECAUSE WE DON'T HAVE THEM.  IF WE HAD THE LABORATORY INFORMATION SYSTEM, WHICH WE CAN TALK ABOUT IN JUST A BIT, WE WOULD HAVE THOSE, BUT WE DON'T.  SO WE DON'T.

SO WE DO HAVE ONE REPORT FROM AUGUST 27TH OF 2015, AND I'LL TALK ABOUT THAT REPORT.

BUT BECAUSE WE DON'T HAVE THE OTHER REPORTS, BECAUSE WE DON'T HAVE THE LIS, WE'RE LEFT, IN A FEDERAL CRIMINAL TRIAL WHERE THE STANDARD OF PROOF IS BEYOND A REASONABLE DOUBT, TO

JUST GO BY MR. BINGHAM'S FEEL, LIKE HE HAS A SENSE THAT, YEAH, HE REMEMBERS -- THIS IS SEVEN YEARS AGO, ALMOST SEVEN YEARS AGO -- THAT I GOT A THERANOS TEST AND THE NUMBER I GOT, WHATEVER IT WAS, BECAUSE WE DON'T KNOW WHAT IT WAS, IT DIDN'T CORRELATE WITH THE WAY I WAS FEELING THAT DAY.

AND SO WE'VE GOT TO GO BY, BECAUSE OF THE GOVERNMENT'S FAILURE TO GET THE LIS, AND I'LL TALK ABOUT THAT, WE'RE LEFT WITH, IN A FEDERAL CRIMINAL TRIAL, LET'S THINK ABOUT HOW MR. BINGHAM WAS FEELING THAT DAY OR IN THREE DAYS SEVEN YEARS AGO AND LET'S BASE THE ISSUE OF MR. BALWANI'S GUILT OR NOT GUILT ON THAT. AND THAT DOESN'T MAKE ANY SENSE, BUT THAT'S WHERE WE ARE.

AND I WANT TO TALK ABOUT THE 8/27/2015 RESULT.

LET'S GO TO THE NEXT SLIDE.

ONE MORE THING I GUESS BEFORE I DO. HE ACTUALLY TRIED TO RECOVER REPORTS FROM THE THERANOS SYSTEM AND HE COULDN'T DO THAT BECAUSE OBVIOUSLY THAT DOESN'T EXIST.

SO THE FIRST TEST THAT MR. BINGHAM GOT AT THERANOS WAS FINGERSTICK. THAT'S THE FIRST ONE. AND THE REMAINING VISITS WERE USED USING THE VEIN DRAW.

SO WHAT THAT TELLS YOU RIGHT AWAY -- I'M GOING TO TALK MORE ABOUT THAT FINGERSTICK TEST. BUT HIS MEMORY IS THAT THE FIRST TEST WAS FINGERSTICK, PINPRICK OF THE FINGER, AND THEN THE REST WERE FROM THE VEIN. THAT WAS HIS ANSWER.

SO WE KNOW THAT THE OTHER ONES FOR SURE, THE VEIN DRAWS,

SER-1316

WERE COMMERCIAL TRADITIONAL METHODS, RIGHT? SO IT'S NOT REALLY A PROBLEM WITH THERANOS'S TECHNOLOGY, WHATEVER THE PROBLEM MIGHT HAVE BEEN.

THE FIRST ONE WE DON'T HAVE THE ACTUAL LAB REPORT FOR, SO THE GOVERNMENT IS TRYING TO SECURE A CONVICTION OF MR. BALWANI ON THAT, BUT THEY DON'T EVEN HAVE A LAB REPORT FROM MR. BINGHAM.

LET'S GO TO THE NEXT SLIDE.

NOW, I WANT TO TALK ABOUT THAT FINGERSTICK TEST. SO WE KNOW WHAT HAPPENED WITH THE VEIN DRAWS. VEIN DRAWS MEAN TRADITIONAL METHODS, COMMERCIAL TESTING, FDA APPROVED.

BUT THERE'S AN INTERESTING THING ABOUT THIS PLATELET COUNT TEST, AND THIS IS ONE OF THOSE TESTS WHERE A COMMERCIAL DEVICE CAN BE USED TO TEST FINGERSTICK. SO THIS IS FROM THE CMS REPORT, THIS CALL OUT HERE, EXHIBIT 4621, AND THE PAGES I'M GOING TO SHOW YOU ARE PAGES 32, 33, AND 38 OF THAT REPORT.

SO IT SAYS RIGHT HERE, "IT WAS THE PRACTICE OF THE LABORATORY TO TEST PATIENT CAPILLARY CBC SPECIMENS USING TWO DREW3 INSTRUMENTS THE LABORATORY DESIGNATED AS DREW2 AND DREW3."

SO CAPILLARY SPECIMENS, THAT'S THE FINGERSTICK SAMPLE, THAT'S WHAT THE EVIDENCE IS IN THIS TRIAL, AND THAT IS THE CASE, AND THAT'S THE PRACTICE OF THE LABORATORY.

AND THE DREW3 IS NOT A THERANOS INSTRUMENT.

SO LET'S GO TO THE NEXT SLIDE. THIS IS ALSO FROM THE CMS

REPORT.

"ACCORDING TO LABORATORY PERSONNEL, BETWEEN JUNE 27TH, 2015, AND SEPTEMBER 24TH, 2015, THE LABORATORY USED ONE OF THE DREW3 INSTRUMENTS ON 30 DIFFERENT DAYS TO PERFORM AND REPORT PATIENT CBC SPECIMENS AND USED THE OTHER DREW3 INSTRUMENT ON 87 DIFFERENT DAYS TO PERFORM AND REPORT PATIENT CBC SPECIMENS."

SO WE KNOW THAT MR. BINGHAM'S FIRST TEST, WHICH WAS THE FINGERSTICK TEST, WAS AUGUST 11TH, 2015, SO IT'S IN THAT DATE RANGE OF JUNE 27TH TO SEPTEMBER 24TH, 2015.

SO IT LOOKS LIKE THE FINGERSTICK RESULT THAT MR. BINGHAM HAD, AND WE DON'T HAVE THE LAB REPORT, BUT IT LOOKS LIKE FROM THE EVIDENCE THAT WE DO HAVE, THIS WAS RUN ON A DREW3.

SO THERE'S NO EVIDENCE IN THIS CASE THAT THERE WAS ANYTHING WRONG WITH THE DREW3 OR THAT THESE COMMERCIAL TESTS ARE A PROBLEM.

SO WHATEVER HAPPENED TO MR. BINGHAM IN THAT FIRST TEST, THAT FINGERSTICK TEST, IT'S NOT A PROBLEM WITH THE THERANOS TECHNOLOGY.

YOU KNOW, THE GOVERNMENT HAS THIS DOCUMENT, JUST LIKE WE HAVE IT, BUT THEY HAVE NOT BROUGHT THIS OUT.  WE HAD TO GO DIG THIS OUT AND EXPLAIN WHAT REALLY HAPPENED, AND THAT'S ONE OF THE REASONS WHY I'M TALKING TO YOU FOR THREE DAYS, BECAUSE WE HAVE TO SHOW YOU ALL OF THESE DOCUMENTS TO SHOW YOU THE REAL FACTS.  THIS IS VERY DETAILED OBVIOUSLY.

BUT THAT'S WHAT HAPPENED ON HIS FIRST TEST.

SECOND, THIRD, FOURTH TEST FOR MR. BINGHAM WERE ALL ON VENOUS DRAW, TRADITIONAL METHODS, AND THERE'S NO EVIDENCE THAT THEY WERE RUN ON THERANOS TECHNOLOGY.

OKAY.  I WANT TO TALK ABOUT ONE OTHER ISSUE WITH REGARD TO MR. BINGHAM.  SO ONE OF THE ELEMENTS -- I DON'T WANT TO DWELL ON THIS, BUT THERE'S ACTUALLY AN ELEMENT OF THE FEDERAL CRIMES, WIRE FRAUD CRIMES THAT MR. BALWANI IS CHARGED WITH AS YOU HEARD THAT REQUIRES AN INTERSTATE WIRE COMMUNICATION.

I WOULD BE REMISS IN MY DUTIES IF I DIDN'T POINT THAT OUT TO YOU THAT THE GOVERNMENT HASN'T MEANT THAT ELEMENT IN THE CASE OF MR. BINGHAM.

AND THE COUNT OF THE INDICTMENT THAT RELATES TO MR. BINGHAM RELATES TO A PHONE CALL.  IT'S NOT A TRANSMISSION OF A REPORT OR SOMETHING LIKE THAT.  IT'S A PHONE CALL THAT HE MADE TO THERANOS.

AND THE ONLY EVIDENCE THAT YOU'VE HEARD FROM THE GOVERNMENT IS THAT, WELL, THE CUSTOMER SERVICE DEPARTMENT, ACCORDING TO MR. EDLIN, WAS IN PALO ALTO.

BUT THE QUESTION WAS PUT TO MR. BINGHAM, "WHEN YOU CALLED, YOU DON'T REMEMBER WHO THE OTHER SIDE OF THE LINE, WHETHER IT WAS A RECORDING OR A REAL PERSON, YOU DON'T KNOW WHERE THEY ACTUALLY WERE, DO YOU?"

HE SAYS, "NO, I DO NOT.

"AND SO THEY COULD HAVE BEEN IN ARIZONA FOR ALL YOU KNOW?"

HE SAYS YEAH.

SO WE DON'T HAVE IN THIS CASE A BEYOND A REASONABLE DOUBT PROOF EVEN ON THAT ONE ELEMENT OF WHETHER THERE WAS INTERSTATE COMMUNICATION.  MAYBE HE CALLED THERANOS CUSTOMER SERVICE.

WE KNOW OTHER PEOPLE CALLED AND GOT THROUGH TO ARIZONA. WE KNOW THERE WAS AN ARIZONA LAB.  WE KNOW MR. BINGHAM WAS IN ARIZONA.

SO THERE'S JUST NOT ENOUGH EVIDENCE HERE TO CONCLUDE THAT THAT ELEMENT IS MET.  AND AGAIN, I THINK IT'S IMPORTANT TO POINT THAT OUT BECAUSE THAT'S OBVIOUSLY MY JOB AS DEFENSE COUNSEL.  EVEN IF IT SEEMS LIKE A SMALL ISSUE, IT IS ONE OF THE ELEMENTS OF THE OFFENSE.  THAT'S WHY WE'RE IN FEDERAL COURT. AS MR. SCHENK TOLD YOU, YOU NEED THAT INTERSTATE COMMUNICATION ELEMENT TO BE MET.

LET'S TALK ABOUT ERIN TOMPKINS.  ERIN TOMPKINS IS A COUNT OF THE INDICTMENT AS WELL, AND SHE TESTIFIED ABOUT AN HIV TEST SHE GOT AT THERANOS.

SO LET'S JUST GO THROUGH THAT.

SO, FIRST OF ALL, THIS WAS A VEIN DRAW.  AND AS YOU'LL SEE IN A SECOND WITH THE TESTIMONY OF DR. ROSENDORFF, THERANOS RAN HIV TESTING ON COMMERCIAL EQUIPMENT, FDA APPROVED.  IT WASN'T THEIR OWN TECHNOLOGY.  THAT'S DR. ROSENDORFF.

HE SAID THERANOS OFFERED THAT ON FDA PREDICATE MACHINES?

HE SAID CORRECT.

SO THIS WAS ANOTHER COMMERCIAL TEST.

AND THE GOVERNMENT REALLY DIDN'T GO INTO THAT IN THEIR

PRESENTATION, BECAUSE EVEN THOUGH THERE'S NO EVIDENCE THAT THERE'S ANYTHING WRONG WITH THE COMMERCIAL HIV TESTING THAT THERANOS WAS DOING, THEY'VE GOT THIS ONE PATIENT WHO HAD AN HIV TEST THAT SHE THINKS WAS INACCURATE.

SO THAT SOUNDS BAD, RIGHT?  WE WOULD ALL WANT TO GET AN ACCURATE HIV TEST.  NO ONE WANTS TO BE TOLD THEY HAVE HIV IF THEY DON'T HAVE IT, OR EVEN IF THEY DO HAVE IT.

BUT I THINK THAT HERE, THIS WAS A SHINY OBJECT TO PUT IN FRONT OF YOU.  LOOK AT THE PATIENT WHO GOT AN INACCURATE HIV TEST.

THERE ARE MANY PROBLEMS WITH THAT, THE FIRST OF WHICH IS THAT IT WAS NOT EVEN ON A THERANOS DEVICE.  NO EVIDENCE THAT THERE'S ANYTHING WRONG WITH THE COMMERCIAL TEST.

SO LET'S MOVE ON TO MS. TOMPKINS'S REPORT.  SO THIS IS THE REPORT THAT SHE GOT FROM THERANOS.  ACTUALLY, TO BE ACCURATE, HER DOCTOR, DR. ASIN, GOT THIS REPORT.

SO YOU HAVE THIS PHYSICIAN.  THE GOVERNMENT DECIDED NOT TO CALLED DR. ASIN, SO WE DIDN'T HEAR FROM THE DOCTOR AND WHAT HIS INTERACTIONS WITH MS. TOMPKINS MIGHT HAVE BEEN.  YOU WOULD THINK AS A MATTER OF COMMON SENSE THAT A MEDICAL DOCTOR WOULD UNDERSTAND HOW THESE TESTS WORK AND HOW THE FOLLOW-UP TESTING IS DONE AND WHAT THE CENTERS FOR DISEASE CONTROL RECOMMEND.

BUT WE DIDN'T HEAR FROM DR. ASIN.  WE HEARD FROM MS. TOMPKINS.

SO THE FIRST TEST IS THIS HIV-1 PLUS 2 ANTIBODY TEST, AND

THAT WAS THE ONE THAT WAS REACTIVE.  SO THAT'S THE TEST, IT'S THE ONE THAT'S NOT HIGHLIGHTED AT THE TOP.  THAT'S THE ONE THAT MS. TOMPKINS IS COMPLAINING ABOUT REALLY.

BUT THESE OTHER TESTS, HIV-1 ANTIBODY AND THEN HIV-2 ANTIBODY SEPARATELY, THOSE ARE BOTH NONREACTIVE.  AND THEN THE HIV-1 RNA, THAT'S THE NUCLEIC ACID TEST, NOT DETECTED.

AND THERE'S A NOTE RIGHT IN THE LAB REPORT THAT MS. TOMPKINS GOT, "HIV ANTIBODIES WERE NOT CONFIRMED AND HIV-1 RNA WAS NOT DETECTED.  NO LABORATORY EVIDENCE OF HIV-1 INFECTION.  FOLLOW-UP TESTING FOR HIV-2 SHOULD BE PERFORMED IF CLINICALLY INDICATED."

SO SHE'S BEING TOLD THAT SHE DOESN'T HAVE HIV.  THAT'S THE BOTTOM LINE HERE.

BUT SHE'S UPSET, AND THAT'S HER RIGHT TO BE, ABOUT THE REACTIVE.  I'M NOT SURE WHY SHE CAN'T JUST GET THAT EXPLANATION FROM HER DOCTOR, BUT THAT WAS HER ISSUE.

IF YOU GO TO THE NEXT SLIDE.

THIS IS AN EXHIBIT THAT WE WENT OVER WITH MS. TOMPKINS ON CROSS, NOT BECAUSE SHE KNOWS ANYTHING ABOUT THIS, MAYBE HER DOCTOR WOULD, BUT IT WAS IMPORTANT TO SHOW YOU THAT THERANOS FOLLOWED THE CDC GUIDANCE EXACTLY IN THE CASE OF MS. TOMPKINS.

AND THE CDC GUIDANCE CONTEMPLATES THAT THERE'S GOING TO BE TIMES WHEN THERE'S A POSITIVE FOR HIV-1 AND 2 ANTIGEN TESTING. THAT'S GOING TO HAPPEN.  AND THE CDC HAS THAT TAKEN INTO ACCOUNT IN THE FLOW CHART.  AND IF YOU WANT TO LOOK AT THAT,

SER-1322

THAT'S EXHIBIT 20683, THE CDC RECOMMENDATION FOR HIV TESTING.

SO IF IT'S POSITIVE, THEN THE CDC DOESN'T SAY, STOP THERE AND TELL THE PATIENT THEY HAVE HIV.  NO.  IT SAYS GO THROUGH THE OTHER STEPS.

AND THE OTHER STEPS ARE TO DO THE HIV-1 AND THE HIV-2 SEPARATELY AS ANTIBODY TESTS, AND THAT'S WHAT THERANOS DID, THOSE WERE NONREACTIVE, AND SO THAT'S GOOD NEWS FOR MS. TOMPKINS.

AND THEN FINALLY, THEY'RE SUPPOSED TO CONFIRM WITH THE HIV-1 NUCLEIC ACID TEST, THAT'S THE NAT, SO AT THE VERY BOTTOM IT'S HIGHLIGHTED HIV-1 NAT, WHICH YOU CAN SEE IS DEFINED AS NUCLEIC ACID TEST, THAT WAS DONE, AND IF THAT'S WHAT THE LAB DOES AND IF IT'S NEGATIVE, THEN THE PERSON IS NEGATIVE FOR HIV-1.

THAT'S EXACTLY WHAT THERANOS DID AND THAT'S EXACTLY WHAT MS. TOMPKINS WAS TOLD.

SO THIS IS JUST, YOU KNOW, ONE OF THOSE TIMES THAT, FOR WHATEVER REASON, SHE WAS POSITIVE, AS THE CDC CONTEMPLATES, FOR THE ANTIGEN TEST, AND THEN THERANOS DID EXACTLY THE PROTOCOL, FOLLOWED THROUGH, AND SHE WAS TOLD IN THE LAB NOTE, YOU DON'T HAVE HIV.

AND THEN AS I SAID, IN ANY EVENT, SHE GOT A VENOUS DRAW AND HER TEST WAS ON A COMMERCIAL DEVICE, SO I'M NOT SURE WHAT THAT HAS TO DO WITH THIS TRIAL.

LET'S GO TO MEHRL ELLSWORTH, DR. ELLSWORTH.  HE'S A

DENTIST IN ARIZONA, AND HIS DOCTOR WAS DR. MARK BURNES. THIS IS A DIFFERENT ASSAY CALLED PSA, PROSTATE SPECIFIC ANTIGEN. AND IT LOOK LIKE THERE WAS AN ERROR IN THE CASE OF DR. ELLSWORTH.

SO LET'S LOOK AT THE LAB REPORTS. HE HAS THESE FOUR TESTS, MAY 14TH, MAY 18TH, JUNE 11TH, AND JUNE 30TH, ALL IN 2015.

SO LET'S LOOK FIRST AT WHAT WAS HAPPENING INTERNALLY AT THERANOS. SO THIS IS AN EMAIL FROM DAN FLOREY TO MR. BALWANI AND A COPY TO DR. YOUNG AND OTHERS.

AND WHAT IT SAYS -- THIS IS SUNNY BALWANI TALKING. "I DO NOT BELIEVE SAMPLE MIX UP IS POSSIBLE BY A REMOTE SHOT IN OUR SYSTEM."

SO MR. BALWANI IS NOT LATCHING ON TO THAT AS AN EXPLANATION. THAT WOULD BE A CONVENIENT EXPLANATION, BY THE WAY. IF THERE'S A SAMPLE MIXUP, THEN THAT'S BAD. BUT THEN YOU WOULDN'T HAVE TO WORRY ABOUT GETTING TO THE ROOT CAUSE OF ANYTHING BECAUSE YOU WOULD UNDERSTAND WHAT HAPPENED.

BUT MR. BALWANI IS NOT SEARCHING FOR THAT. HE WANTS TO KNOW WHAT REALLY HAPPENED.

SO HE SAID, "WE SHOULD START BY RERUNNING THE SAMPLE TO START AND THEN WORK BACKWARDS FROM THERE."

AND THEN HE SAYS, TINA CAN YOU PLEASE OWN THIS AND UPDATE ME IN REAL TIME. AND HE SAYS AGAIN PLEASE UPDATE ME IN REAL TIME.

SER-1324

THIS IS THE OPPOSITE OF MR. BALWANI SAYING I DON'T CARE, WE'RE MAKING MONEY FROM PATIENTS. THEY'RE PAYING THEIR 35 BUCKS. SO KEEP THE TESTING ROLLING. HE DOESN'T SAY THAT.

HE SAYS PLEASE UPDATE ME IN REAL TIME, I REALLY WANT TO KNOW WHAT IS GOING ON HERE.

CAN YOU GO BACK TO PAGE, MR. ALLEN, 4415.2.3.

SO INTERNALLY WITHIN THERANOS DR. YOUNG SAYS TO MR. BALWANI AND OTHERS, "THE MOST RECENT SAMPLE (EDTA, P CTN) WAS FLAGGED FOR HEMOLYSIS AND CLOTTING."

WE HEARD ABOUT THAT YESTERDAY WITH REGARD TO POTASSIUM AND DURING TRIAL WITH DR. ROSENDORFF AND OTHERS, THAT THIS WAS A SAMPLE COLLECTION PROBLEM, HEMOLYSIS AND CLOTTING.

IF THE LAB HAD THAT ISSUE AND RAN A SAMPLE ANYWAY, THEY SHOULDN'T HAVE DONE THAT.

BUT, AGAIN, NOT NECESSARILY A PROBLEM WITH THE UNDERLYING EDISON TESTS, WHICH AS WE KNOW MR. -- DR. ROSENDORFF VALIDATED AND WAS THE SUBJECT, AGAIN, OF ONE OF THOSE ALTERNATIVE ASSESSMENT PROCEDURE HEAD-TO-HEAD COMPARISONS WITH FDA APPROVED TECHNOLOGY AND CAME UP 100 PERCENT PERFECT.

AND THAT WAS JUST A COUPLE OF MONTHS, I THINK IT WAS IN MARCH, BEFORE THIS TEST.

SO LABS SHOULDN'T BE RUNNING SAMPLES UNDER HEMOLYSIZED AND CLOTTING, BUT THAT WOULD EXPLAIN THE RESULT, AND THAT'S WHAT DR. YOUNG WAS TALKING ABOUT.

LET'S GO TO SLIDE 538, MR. ALLEN.

OKAY. SO DR. BURNES ON CROSS, HE TESTIFIED THAT HE HAD BEEN USING OR IT'S PROBABLY THE CASE THAT HE HAD BEEN USING THERANOS FOR SOME PATIENTS FOR ABOUT A YEAR PRIOR TO DR. ELLSWORTH'S TEST.

AND THEN THE QUESTION PUT TO HIM WAS, AND FOR THOSE OTHER PATIENTS THAT YOU SENT TO THERANOS THERE WERE NO OTHER ISSUES; CORRECT?

HE SAID NO, NONE THAT I COULD FIND.

AND THE QUESTION WAS, AND YOU HAD FOUND THE OTHER RESULTS FROM THERANOS BEFORE THE ELLSWORTH RESULT THAT WE'LL TALK ABOUT IN A MINUTE, TO BE ACCURATE AND RELIABLE AS FAR AS YOU COULD TELL?

AND HE SAID I COULDN'T FIND ANY TESTS THAT WERE CONCERNING.

SO JUST LIKE DR. ZACHMAN, DR. BURNES DIDN'T HAVE ANY OTHER ISSUES WITH THERANOS FOR ANY OTHER PATIENT.

SO, AGAIN, WE'RE TALKING ABOUT AN UNFORTUNATE COUPLE OF ERRORS IN THE CASE OF DR. ELLSWORTH.

BUT THE LEVEL OF PROOF THAT YOU NEED TO SCIENTIFICALLY DECIDE THAT PSA IS A BAD TEST, IS A BAD ASSAY, YOU WOULD HAVE TO GET THE DATA, DO SOME KIND OF SCIENTIFIC METHODICAL OR RIGOROUS, AND THEN YOU COULD ANALYZE THAT AND YOU COULD MAKE A CONCLUSION.

AND I'LL JUST REMIND THE JURY OF WHAT I SAID YESTERDAY, THAT'S WHAT THERANOS HAD TO DO. THAT'S WHAT MR. BALWANI WAS

SER-1326

INFORMED THAT THERANOS HAD TO DO WHEN THEY WERE TRYING TO GET FDA APPROVAL TO PROVE THAT ONE ASSAYS WORKED, RIGHT?

AND THE GOVERNMENT IS PRESENTING DR. ELLSWORTH, WHICH WE SYMPATHIZE WITH THAT. NO ONE WANTS TO SEE ANYONE GET AN INACCURATE TEST.

BUT IN THIS TRIAL WE'RE NOT TALKING ABOUT THE LABORATORY MADE AN ERROR AND WE CAN FIND ONE PATIENT.

AND I'LL SAY THIS. IF THE THERANOS TESTING ON ITS DEVICES AND COMMERCIAL DEVICES WAS REALLY SO BAD LIKE THE GOVERNMENT SAID, WHY AREN'T THERE PATIENTS LINED UP AROUND THE BLOCK OF THE COURTHOUSE WAITING TO TESTIFY HERE? WHERE ARE THEY?

WHY IS THE GOVERNMENT, AFTER A LENGTHY INVESTIGATION, CALLING FOUR PEOPLE, TWO OF WHICH, MS. TOMPKINS AND MR. BINGHAM, HAD THEIR TESTING ON COMMERCIAL DEVICES AND THE OTHER TWO, MS. GOULD AND DR. ELLSWORTH, HAVING THEIR TESTS ON THERANOS DEVICES, BUT THEN WITH MS. GOULD THEY WERE NOT EVEN SURE THERE WAS A DEVICE PROBLEM, IT WAS A TRANSCRIPTION ERROR.

SO WHERE ARE THESE PATIENTS LINED UP AROUND THE BLOCK WAITING TO TESTIFY ABOUT THEIR INACCURATE RESULTS? THEY'RE NOT HERE.

DR. BURNES, ON THAT SAME POINT, TALKED ON REDIRECT EXAMINATION WHEN THE GOVERNMENT WAS EXAMINING HIM ABOUT LABORATORY ERRORS. AND THE QUESTION PUT TO HIM WAS, "I THINK YOU SAID YOU HAD AN EXPERIENCE WHERE THERE WERE RESULTS THAT YOU QUESTIONED THAT CAME FROM LABCORP; IS THAT RIGHT?"

AND HE SAID -- THIS IS WHEN THE GOVERNMENT WAS QUESTIONING HIM. "IT WAS MULTIPLE LABS.

"I'M SORRY. IT WAS MULTIPLE LABS?

"IT WAS ABOUT FOUR IN ONE WEEK."

SO HE HAD AN EXPERIENCE WITH LABCORP WITH AN ASSAY CALLED CREATINE WHERE HE HAD FOUR PROBLEMS IN ONE WEEK WITH LABCORP, FOUR IN ONE WEEK, AND WE HAD FOUR PATIENTS THAT CAME ON THE STAND HERE AT TRIAL IN THE WHOLE TWO YEARS OR SO THAT THERANOS WAS TESTING PATIENTS.

DR. ELLSWORTH ALSO TALKED ABOUT TO HIS KNOWLEDGE HOW AN ERROR OCCURRED AND THERE ARE DIFFERENT TYPES OF THINGS THAT COULD HAPPEN. HE UNDERSTOOD THAT THERE COULD BE AN ISSUE WITH SAMPLE INTEGRITY AND IT COULD BE A PROBLEM WITH HOW THE LABORATORY USES REAGENTS. IT COULD BE A MISTAKE USING EXPIRED REAGENTS, AND MANY OTHER THINGS.

SO THESE ARE JUST SOME OF THE THINGS THAT DR. BURNES TESTIFIED ABOUT THAT COULD CAUSE LAB ERROR. AND THAT'S, UNFORTUNATELY, A FACT OF LIFE IN THE LABORATORY INDUSTRY.

SO WHEN YOU BRING IN ONE PATIENT TO TESTIFY ABOUT PSA, YOU KNOW, THAT'S UNFORTUNATE, BUT THAT DOESN'T PROVE THE CASE, AND IT CERTAINLY DOESN'T PROVE THIS CASE BEYOND A REASONABLE DOUBT.

AGAIN, AS I SAID WITH MR. BINGHAM, I DO WANT TO PAUSE ON THIS ISSUE OF THE WIRE.

AND I SHOULD INCLUDE ERIN TOMPKINS. SO I DIDN'T MENTION

SER-1328

THIS A MINUTE AGO WHEN I WAS TALKING ABOUT ERIN TOMPKINS, BUT IT'S THE SAME ISSUE SO I'LL TALK ABOUT MS. TOMPKINS AND DR. ELLSWORTH TOGETHER.

SO BOTH OF THEIR COUNTS IN THE INDICTMENT HAVE TO DO WITH TRANSMISSION OF A LAB REPORT AND IT'S A FAXED LAB REPORT. SO THE INTERSTATE WIRE THAT THE GOVERNMENT IS CLAIMING EXISTS WOULD BE A FAX TRANSMISSION OF A LAB REPORT FROM THERANOS TO THESE PATIENTS.

THE PROBLEM IS THAT EVEN THOUGH ON THE THERANOS LAB REPORT THAT YOU'LL SEE WHEN YOU DELIBERATE, IT HAS THE ADDRESS OF THERANOS IN SCOTTSDALE, ARIZONA, AND THEN IT HAS A FAX NUMBER THAT IS A 650 NUMBER WHICH WE KNOW IS LOCAL HERE IN CALIFORNIA.

BUT THEN IT SAYS CUSTOMER SERVICE. IT HAS A CUSTOMER SERVICE WEBSITE TAG.

SO WE DON'T KNOW IF THAT WAS REALLY THE FAX NUMBER WHERE THE FAX CAME FROM. IT'S A LETTERHEAD AT THE VERY TOP OF THOSE REPORTS.

AND IT MIGHT MAKE SENSE TO BRING UP ONE SO IT'S MAYBE MORE CLEAR WHAT I'M TALKING ABOUT.

MR. ALLEN, CAN YOU BRING UP EXHIBIT 5483.

RIGHT. THANK YOU.

AND IF YOU LOOK AT THAT EXHIBIT, AND JUST SO IT'S CLEAR WHILE I'M DESCRIBING IT, IF YOU HIGHLIGHT THE VERY TOP.

THAT'S WHAT I WAS JUST SAYING. YOU'VE GOT THIS SCOTTSDALE ROAD, SCOTTSDALE, ARIZONA ADDRESS. THERE'S AN 855

SER-1329

NUMBER FOR THE LAB.

AND THEN THERE'S A 650 NUMBER FOR THE -- FOR SOMETHING THAT IS A FAX NUMBER.

BUT THEN IT SAYS CUSTOMER SUPPORT AT THERANOS, SO MAYBE THAT'S THE CUSTOMER SUPPORT NUMBER. I'M NOT SURE.

BUT THEN AT THE TOP IT SAYS THERANOS FAX SERVER AND THERE'S NO PHONE NUMBER.

SO IT COULD BE -- CERTAINLY IT'S POSSIBLE THAT THE FAX CAME FROM A 650 NUMBER, AND IF THAT WERE TRUE, THEN IT WOULD BE AN INTERSTATE WIRE BECAUSE IT WOULD GO FROM CALIFORNIA TO ARIZONA.

BUT IF IT'S NOT THAT 650 NUMBER THAT IS PRINTED ON THE LETTERHEAD, THEN WE JUST DON'T KNOW.

SO, AGAIN, WE'RE AT A CRIMINAL TRIAL AND IT'S MY JOB TO POINT THESE THINGS OUT. BUT THIS IS AN ELEMENT OF A FEDERAL CRIMINAL OFFENSE. SO I'VE GOT TO POINT OUT FOR MS. TOMPKINS, AND ALSO FOR DR. ELLSWORTH, IT'S THE SAME FAX TAG INFORMATION WHEN YOU LOOK AT HIS REPORT.

WE DON'T KNOW FOR SURE. AND WE DON'T KNOW BEYOND A REASONABLE DOUBT THAT THAT ELEMENT IS MET.

AND AS YOU'LL HEAR WHEN JUDGE DAVILA INSTRUCTS YOU, THE GOVERNMENT HAS TO MEET ITS BURDEN OF PROVING THIS CASE BEYOND A REASONABLE DOUBT ON EVERY SINGLE ELEMENT OF EVERY COUNT OF THIS INDICTMENT.

OKAY. IN TERMS OF PATIENTS IN GENERAL, THE QUESTION, OR

ONE OF THE QUESTIONS THAT YOU ULTIMATELY HAVE TO ANSWER, AGAIN BEYOND A REASONABLE DOUBT, IS DID MR. BALWANI INTEND TO DEFRAUD PATIENTS?  IN OTHER WORDS, DID HE INTEND TO DECEIVE AND CHEAT THEM OUT OF THEIR MONEY?

IT'S NOT JUST ABOUT DID THEY GET A BAD LAB TEST OR WAS THERE AN ERROR MADE OR WAS SOMEONE UNFORTUNATELY GIVEN INFORMATION THAT WASN'T QUITE RIGHT ABOUT THEIR BLOOD TEST RESULT?

IN ORDER TO BE GUILTY, IN ORDER FOR THE GOVERNMENT TO PROVE HIM GUILTY BEYOND A REASONABLE DOUBT, THE GOVERNMENT HAS TO SHOW THAT HE INTENDED TO CHEAT THESE PATIENTS, NOT JUST ANY PATIENT, BUT THE PATIENTS WHO ACTUALLY PAID THEIR OWN MONEY AT WALGREENS.  THEY HAVE TO SHOW THAT HE INTENDED TO DECEIVE OR CHEAT THEM OUT OF THEIR MONEY.

AND AS WE'VE SEEN, THE PRICE WAS AROUND $35.

SO IS THERE EVIDENCE IN THIS CASE THAT MR. BALWANI'S INTENT HERE WAS TO GET THAT $35?

AND FIRST OF ALL, AS YOU KNOW, THE THERANOS PRICE WAS PRETTY LOW COMPARED TO OTHER LABS.  THEY ACTUALLY PUBLISH THEIR LABS.

BUT IF YOU GO TO SLIDE 545, MR. ALLEN.

AS MS. SPIVEY TESTIFIED, MR. BALWANI DIDN'T EVEN -- I SHOULD SAY THERANOS DIDN'T EVEN ASK WALGREENS FOR THE MONEY, BECAUSE WHEN THE PATIENTS WENT TO WALGREENS, THEY PAID WALGREENS, AND WALGREENS OWED THERANOS SOME MONEY, BUT THERANOS

SER-1331

NEVER GOT IT.

SO WHAT KIND OF INTENT TO DEFRAUD, DECEIVE, OR CHEAT PATIENTS OUT OF THEIR MONEY IS THAT IF YOU DON'T EVEN BOTHER GETTING IT?  IT DOESN'T MAKE ANY SENSE.

SO JUST FROM AN INTENT STANDPOINT, EVEN IF YOU PUT ASIDE ALL OF THE OTHER ELEMENTS THAT HAVE TO BE PROVEN BEYOND A REASONABLE DOUBT, IT JUST DOESN'T FLY.

AND THAT'S THE DEFINITION OF INTENT TO DEFRAUD THAT I JUST TOLD YOU, BUT THAT'S THE WAY THAT IT WILL LOOK TO YOU IN THE JURY INSTRUCTION WHEN JUDGE DAVILA INSTRUCTS YOU AS THE JURY.

OKAY.  I WANT TO TURN TO A DIFFERENT TOPIC, AND THAT IS THE LABORATORY INFORMATION SYSTEM AT THERANOS.

AND YOU HEARD ABOUT THIS PRETTY LATE IN THE TESTIMONY. THIS WAS TESTIMONY FROM AN EXPERT WITNESS THAT WE CALLED NAMED RICHARD SONNIER.

BUT FIRST LET'S TALK ABOUT WHAT IS THE LABORATORY INFORMATION SYSTEM AND WHY IT IS IMPORTANT.

SO WE KNOW FROM THE EVIDENCE IN THIS CASE THAT THERE IS OVER A MILLION, WE DON'T KNOW HOW MUCH OVER A MILLION, IT COULD BE MANY MILLIONS, BUT THERE'S A MILLION PLUS RESULTS.  AND THAT'S ONLY IN THE NEWARK LAB.  IT DOESN'T EVEN INCLUDE THE ARIZONA LAB.

AND THERE ARE 269 UNIQUE TESTS THAT WERE DONE AT THERANOS, DIFFERENT BLOOD ASSAYS, AND THE GOVERNMENT CALLED FOUR PATIENTS.  SO THOSE ARE THE GENERAL STATISTICS.

WE KNOW THE GOVERNMENT NEVER OBTAINED THE MILLION PLUS PATIENT RESULTS TO DO ANY KIND OF ANALYSIS, OR ANY PART OF THAT, EVEN A STATISTICALLY SIGNIFICANT SAMPLE OF THAT.

THEY PRESENTED NO SCIENTIFIC ANALYSIS OF THE ACCURACY AND RELIABILITY OF THE TESTS BASED ON THAT.

AND THEY PRESENTED, AS I SAID BEFORE, THE FDA CLEARANCE THAT THERANOS GETS, AS MR. BALWANI WAS INFORMED, REQUIRED EXTENSIVE SCIENTIFIC ANALYSIS JUST TO PROVE ONE ASSAY RUNNING ON THE THERANOS SYSTEM WAS GOOD ENOUGH FOR THE FDA.

SO THAT'S THE BASELINE.

DR. ROSENDORFF TESTIFIED QUITE A BIT ABOUT LIS AND WHY IT WAS IMPORTANT.

SO THE QUESTION PUT TO HIM ON CROSS-EXAMINATION, SO IF YOU WANTED TO LOOK UP ANY PATIENT RESULT YOU COULD DO THAT FROM LIS?

HE SAID CORRECT, CORRECT.

AND IF YOU WANTED TO KNOW ALL OF THE, FOR EXAMPLE, HCG TESTS DONE IN A CERTAIN MONTH, YOU COULD DO THAT WITH LIS; RIGHT?

CORRECT.

LET ME PAUSE THERE FOR A MOMENT.

IF MS. GOULD DID IN FACT GET AN INACCURATE TEST BASED ON SOMETHING WITH THE THERANOS EDISON MACHINE, AS OPPOSED TO TRANSCRIPTION ERRORS, LET'S ASSUME THAT FOR A MINUTE, WITH LIS YOU COULD LOOK AT EVERY OTHER PATIENT WHO GOT HCG RESULTS IN

SER-1333

OCTOBER OF 2014 WHEN MS. GOULD HAD HERS.

WE KNOW THERE WAS A VERY GOOD AAP HEAD-TO-HEAD COMPARISON THAT MONTH, SO THAT SUGGESTS THE EDISON IS WORKING JUST FINE.

BUT IF WE REALLY WANTED TO ANALYZE THIS, WE CAN LOOK AT WHAT ABOUT ALL OF THE OTHER PATIENTS IN OCTOBER?  WHAT ABOUT SEPTEMBER?  WHAT ABOUT NOVEMBER?  AND WERE THOSE ISSUES?  WERE THERE MORE ISSUES?  WAS THIS A ONE-OFF OR IS IT MULTIPLE ISSUES WITH MULTIPLE PATIENTS?

AND THE GOVERNMENT HASN'T PRESENTED THAT BECAUSE THEY CAN'T BECAUSE THEY DIDN'T GET THE LIS.

BUT DR. ROSENDORFF ACKNOWLEDGES THAT THAT'S WHAT YOU COULD DO WITH THE LIS.

THE LIST GOES ON.  YOU WOULD DO A TECHNICAL REVIEW TO SEE IF THINGS HAD GONE WRONG AND TRY TO UNDERSTAND WHAT HAPPENED?

YES.

AND WHEN AN ISSUE AROSE, YOU YOURSELF OR SOMEBODY ELSE WOULD PULL INFORMATION FROM THE LIS TO PROVIDE DATA TO ADDRESS THE SITUATION?

HE SAID YES.

AND THAT TYPE OF DATA COULD INCLUDE THE SPECIFIC ASSAY THAT WAS USED?

YES.

AND THE MACHINE THAT IT WAS RUN ON?

SO IF HE WANTED TO KNOW, IF YOU HAVE SOME DOUBT ABOUT MR. BINGHAM, FOR EXAMPLE, WHAT TYPE OF MACHINE?  WAS IT DREW3?

WAS IT SOMETHING ELSE?  YOU CAN LOOK AT LIS AND YOU'D KNOW WHAT TYPE OF MACHINE MR. BINGHAM'S RESULT WAS RUN ON.

BUT WE DON'T HAVE THAT.

DR. ROSENDORFF GOES ON.

THE LIS WOULD TELL YOU THE REFERENCE RANGE, THE TIME OF ARRIVAL IN THE LAB, THE TIME THE REPORT WAS RELEASED, THE ACTUAL RESULTS, OF COURSE, THE QUALITY CONTROL INFORMATION.

AND THEN THE QUESTION PUT TO HIM WAS, YOU WERE ABLE TO LOG IN, AND YOU DID LOG INTO THE LIS SYSTEM TO REVIEW DATA ON YOUR OWN?

HE SAID YES I DID.

SO THIS WAS A TOOL THAT DR. ROSENDORFF USED WHEN HE WAS THE LAB DIRECTOR AT THERANOS.

AND THE QUALITY CONTROL INFORMATION IS WORTH PAUSING ON FOR A MINUTE.  AND THE GOVERNMENT HAS TOLD YOU IN QUITE A LOT OF TIME HERE THAT QUALITY CONTROL IS LIKE REALLY BAD AT THERANOS AND THIS IS IMPORTANT.

WELL, IF WE WANTED TO KNOW WHAT REALLY HAPPENED, IS MARCH REALLY A TYPICAL MONTH WHERE THEY SHOWED YOU THAT SPREADSHEET?  IS MR. GEE RIGHT ABOUT THE 2,9 PERCENT QUALITY CONTROL FAILURE AS OPPOSED TO SOME HIGHER NUMBER?  WHAT ABOUT OTHER MONTHS?

WHAT ABOUT SPECIFIC ASSAYS?  WHAT ABOUT THE QUALITY CONTROL FOR HCG?  WHAT ABOUT THE QUALITY CONTROL FOR PSA?  AND SO ON AND SO ON.

THIS IS THE TYPE OF INFORMATION THAT YOU WOULD HAVE IN LIS

SER-1335

THAT WE DON'T HAVE ACCESS TO, AND I'LL TALK ABOUT WHY THAT IS IN A MINUTE.

DR. ROSENDORFF GOES ON THOUGH.

SO THE QUESTION PUT TO HIM WAS, AND ESSENTIALLY, WHEN AN INQUIRY CAME IN, YOU WOULD USE LIS TO DO AN INVESTIGATION, TO DO AN INVESTIGATION?

HE SAYS YES.

SO DR. ROSENDORFF HIMSELF IS USING LIS TO INVESTIGATE.

WOULDN'T IT MAKE SENSE FOR THE GOVERNMENT TO DO THEIR INVESTIGATION USING THE DATA AS WELL?

THE QUESTION PUT TO DR. ROSENDORFF, AND ULTIMATELY DETERMINE WHETHER YOU COULD TELL THE PHYSICIAN THE TEST IS VALID OR, YOU KNOW, SOMETHING ELSE SHOULD BE DONE OR THAT SORT OF THING?

HE SAYS CORRECT.

AND THEN THE QUESTION PUT TO HIM ON THIS PAGE OF THE TRANSCRIPT IS, IF THERE WAS A PATIENT ON A PARTICULAR DAY WHERE THERE WAS AN INQUIRY, AND YOU WANTED TO KNOW ALL OF THE OTHER PATIENTS WHO HAD THAT SAME ASSAY RUN, COULD YOU LOOK AT LIS AND LEARN THAT INFORMATION; RIGHT?

HE SAYS YES I COULD.

OKAY.  AND YOU COULD COMBINE THE INFORMATION FROM LIS WITH OTHER INFORMATION ABOUT HOW THE PATIENT PRESENTED, AND SO FORTH, TO COME UP WITH SOME CONCLUSIONS ABOUT WHAT HAD OCCURRED?

SER-1336

HE SAID YES.

AND, IN FACT, YOU SAID THE OTHER DAY WHEN I WAS QUESTIONING YOU, THE QC DATA WAS ONE THE THINGS IN THE LIS; CORRECT?

YES.

AND IF WE WANTED TO KNOW EVERYTHING ABOUT THE QC DURING ANY TIME PERIOD, WE COULD GO TO THE LIS AND LOOK AT THAT; RIGHT?

HE SAYS YES.

ONE THING TO REMEMBER HERE, BECAUSE THE GOVERNMENT MAY TELL YOU THIS IN REBUTTAL, THEY MAY TRY TO SAY, WELL, THE LIS WILL TELL YOU THE PATIENT RESULT AND MIGHT TELL YOU SOMETHING ABOUT QC -- ACTUALLY, IT WILL TELL YOU EVERYTHING ABOUT QC -- BUT THEY'LL SAY, MAYBE IN THEIR REBUTTAL, WELL, BUT IF YOU JUST HAVE A PATIENT RESULT, HOW WOULD YOU KNOW IF IT WAS AN ACCURATE RESULT OR NOT, RIGHT?

AND SO IF SOMEONE HAS A VALUE OF 750 ON A PLATELET COUNT TEST, HOW DO YOU KNOW IF THAT'S CORRECT OR NOT?

WELL, DR. ROSENDORFF ACKNOWLEDGED THIS. OF COURSE YOU MIGHT NEED OTHER INFORMATION. YOU MIGHT HAVE TO GO TO THE PATIENT, YOU MIGHT HAVE TO GET OTHER RECORDS, BUT LIS IS AN IMPORTANT PART OF THAT INVESTIGATION WHICH EVEN DR. ROSENDORFF HAD TO DO WHEN HE GOT A PHYSICIAN INQUIRY.

SO IT'S EXTREMELY IMPORTANT THAT IN A SCIENTIFIC FRAUD CASE, WHAT THIS IS, YOU NEED TO HAVE THE SCIENTIFIC DATA.

AND IT ACTUALLY GOES BEYOND JUST THE PATIENT -- THE SET OF PATIENT COUNTS AND THE PATIENT CONSPIRACY COUNT. IT GOES TO THE INVESTOR COUNTS, THE CONSPIRACY AND THE WIRE FRAUD COUNTS, TOO.

AND THE REASON IS THAT FUNDAMENTALLY WHAT THE GOVERNMENT IS SAYING HERE, IS THAT MR. BALWANI REPRESENTED TO INVESTORS THAT THE TECHNOLOGY WORKED, AND THE GOVERNMENT IS CLAIMING IT DIDN'T, RIGHT?

WE'VE SHOWN YOU A LOT OF OTHER EVIDENCE WHY MR. BALWANI BELIEVED REASONABLY THAT IT DID WORK AND THAT, IN FACT, IT DID, BUT THE GOVERNMENT IS SAYING FUNDAMENTALLY IN THEIR REPRESENTATION FROM INVESTORS IS THAT THE TECHNOLOGY DIDN'T WORK AND THE INVESTORS WERE LURED INTO THIS THINKING THAT WAS THE CASE.

WELL, LIST WOULD BE VERY VALUABLE IF YOU WANTED TO DO AN ANALYSIS, DOES THE THERANOS TECHNOLOGY WORK? WE COULD DO THAT IN A RIGOROUS METHODICAL WAY, AND WE'VE LOST THAT OPPORTUNITY.

GO TO THE LAST SLIDE.

THIS IS WHEN MR. BALWANI WAS INFORMED. YOU'VE SEEN THIS BEFORE. ALL OF THE WORK IT TAKES TO PROVE THAT AN ASSAY WORKS IN THE EYES OF THE FDA, NOTHING EVEN APPROACHING THAT EVEN IF YOU DIDN'T HAVE TO DO ALL OF THAT, NOTHING EVEN APPROACHING THAT AT ALL WAS EVER DONE IN THIS CASE, IN A CASE WHERE THEY'RE PROSECUTING MR. BALWANI FOR FEDERAL CRIMINAL OFFENSES.

LET'S GO TO THE NEXT SLIDE.

SO JUST SUMMING UP WHY LIS MATTERS.

THERE'S THE ABILITY TO LOOK UP ANY PATIENT RESULTS;

THERE'S THE ABILITY TOO LOOK UP ALL TESTS IN A CERTAIN TIMEFRAME, FOR EXAMPLE, HCG IN OCTOBER OF 2014;

IT ENABLES A TECHNICAL REVIEW TO INVESTIGATE ISSUES AND REVIEW ALL DATA ACROSS THE ITEMS THAT ARE LISTED THERE, INCLUDING THE MACHINE THAT THE TEST WAS RUN ON.

AND, AS I SAID, DR. ROSENDORFF RELIED ON LIS FOR COMMUNICATING WITH PHYSICIANS ABOUT THE ACCURACY OF TESTING.

LET'S TURN TO MR. SONNIER.

WHAT HAPPENED HERE?  WHY DON'T WE HAVE LIS?

AS YOU HEARD -- AND THIS IS WHAT MR. SONNIER WAS EXPLAINING AS THE BASIS OF HIS OPINION.  HE WAS PROVIDED WITH A LOT OF MATERIALS, AS HE SAID, AND HE REVIEWED THOSE MATERIALS.

ONE OF THE THINGS THAT HE SAID OCCURRED IS THAT -- AND THERE'S NO DISPUTE ABOUT THIS I DON'T THINK -- THERANOS WAS REQUESTED BY THE GOVERNMENT WITH SUBPOENAS, GRAND JURY SUBPOENAS, THAT YOU SHOULD PRODUCE A COPY OF THE LIS.

AND ULTIMATELY NEAR THE END OF AUGUST, THEY PRODUCED A HARD DRIVE, A USB DRIVE I THINK IT WAS CALLED, THAT SUPPOSEDLY CONTAINED OR MAYBE DID CONTAIN A COPY OF THE LIS.

AS WE'LL SEE IN A MINUTE, THE GOVERNMENT'S TECHNICAL TEAM COULD NOT OPEN IT.

THE DEFENSE WAS ALSO INTERESTED IN ACCESSING THIS LIS DATA SO WE COULD SEE WHAT IT SAID.  AND WE HAD REQUESTED THAT

SER-1339

MR. SONNIER TRY TO ACCESS THAT SAME COPY. HE TRIED IT. HE COULD NOT ACCESS THE COPY EITHER.

SO, SO FAR THE GOVERNMENT HAS A COPY, THEY CAN'T ACCESS IT; THE DEFENSE HAS A COPY, WE CAN'T ACCESS IT, EITHER. AND THAT'S WHAT MR. SONNIER SAID HE UNDERSTOOD FROM ALL OF THE MATERIAL THAT HE REVIEWED.

LET'S GO TO THE NEXT SLIDE.

THE GOVERNMENT UNDERSTOOD THAT THEY COULDN'T ACCESS THIS COPY NO LATER THAN OCTOBER OF 2018. AND THIS IS THE EMAIL WHERE THE GOVERNMENT IS INFORMED BY THEIR OWN EMPLOYEE, SUTTON PEIRCE. AND IT'S AN EMAIL ON OCTOBER 5TH, 2018 TO MR. SCHENK, TO MR. LEACH, AND TO MR. BOSTIC WITH A COPY TO OTHER PEOPLE AT THE U.S. ATTORNEY'S OFFICE.

AND IT SAYS, "POSSIBLE ROUTES FORWARD."

WHAT ARE THE POSSIBLE ROUTES FORWARD?

PUSH BACK ON DEFENSE AND SEE IF THEY CAN BE PERSUADED TO PRODUCE THIS IN A MANNER THAT CAN BE VIEWED.

I'M GOING TO COME BACK TO THAT IN A MINUTE BECAUSE I WANT TO MAKE IT CLEAR THAT DEFENSE -- WE OBVIOUSLY CALL OURSELVES THE DEFENSE. I'M GOING TO EXPLAIN WHY THAT'S NOT A REFERENCE TO MR. BALWANI'S DEFENSE TEAM. THIS IS A REFERENCE TO THERANOS.

MR. BALWANI HAD LEFT THERANOS TWO YEARS -- MORE THAN TWO YEARS BEFORE. MR. BALWANI LEFT THERANOS, AND MS. SPIVEY TESTIFIED TO THIS, IN MAY OF 2016. HE HAD A CONSULTING

RELATIONSHIP UNTIL JULY OF 2016, BUT NO LATER THAN JULY OF 2016 MR. BALWANI WAS GONE FROM THERANOS.

SO HE WAS NOT AT THERANOS WHEN THIS COPY AND THIS DISMANTLING OF THE LIS SYSTEM WAS TAKING PLACE. AND THAT'S MS. SPIVEY'S TESTIMONY ON THAT POINT.

IF WE CAN GO BACK FOR A MINUTE, MR. ALLEN, JUST WHILE IT'S UP HERE.

DEPARTURE WAS MAY 11TH, 2016.

AND THEN SHE TESTIFIED, JUST WHILE WE HAVE THIS TRANSCRIPT UP, SHE WENT TO SAY GOODBYE. SHE SAID THAT SHE WISHED HIM WELL. AND MS. SPIVEY TEARED UP BECAUSE SHE WAS SORRY TO SEE HIM GO.

BUT LET'S GO BACK TO THE PREVIOUS SLIDE YOU HAD, MR. ALLEN.

SO THEN THERE WERE THESE FOUR POSSIBLE ROUTES FORWARD THAT THE U.S. ATTORNEY'S OFFICE OWN EMPLOYEE IS NOTIFYING THEM ABOUT.

ONE IS SEE IF YOU CAN GET THEM PRODUCED IN A DIFFERENT MANNER.

I'LL JUST GO TO THE THIRD ONE REAL QUICK. CHECK WITH THE FBI. THEY MIGHT HAVE THE RESOURCES.

BUT THEN THE OTHER TWO ARE, THAT IS WHAT IS HIGHLIGHTED HERE, PERHAPS THEY'LL CONSIDER HANDING OVER THEIR PHYSICAL SQL SERVER AND WE CAN SET IT UP IN A WORK ROOM.

GO GET THE SERVERS AND LET'S SEE IF THAT WORKS.

AND THEN THE OTHER ONE IS IDENTIFY A VENDOR WHO COULD PROCESS THE MATERIAL.

WELL, MR. SONNIER IS ONE SUCH VENDOR, BUT THERE ARE OTHERS.

SO LET'S GO TO THE NEXT SLIDE.

I JUST WANT TO SHOW YOU A LITTLE BIT OF THE MISDIRECTION THAT WAS GOING ON HERE.  THIS IS ON CROSS-EXAMINATION.

THE GOVERNMENT ASKED A QUESTION ABOUT -- TO MR. SONNIER. AND HE'S REPORTING TO THE GOVERNMENT THAT THE LIS DATABASE WAS ENCRYPTED BY SUNNY BALWANI AND SOMEONE NAMED SHEKAR CHANDRASEKARAN.

DO YOU SEE THAT?

YES.

SO THE GOVERNMENT IN THIS PARTICULAR EXCHANGE WAS POINTING OUT A DOCUMENT THAT THE -- THERE WAS A PERSON AT A FIRM CALLED DORSEY THAT WAS REPRESENTING WHAT REMAINED OF THERANOS AFTER IT NO LONGER EXISTED.  THEY WERE CALLED THE ASSIGNEE.

BUT IN ANY EVENT, THIS DORSEY LAWYER WAS TALKING ABOUT -- HIS KNOWLEDGE, THIS LAWYER, WAS THAT MR. BALWANI AND MR. CHANDRASEKARAN HAD ENCRYPTED THE DRIVE.

BUT LET'S JUST BE CLEAR WHAT IS GOING ON HERE.  THIS WAS A QUESTION PUT TO MR. SONNIER.  AND IF THE SUGGESTION WAS THAT MR. BALWANI HAD ANYTHING TO DO WITH THIS ENCRYPTION PROBLEM WHERE THE GOVERNMENT COULDN'T OPEN THE DRIVE AND THE DEFENSE COULDN'T EITHER, THAT IS NOT CORRECT.

SER-1342

MR. BALWANI LEFT THERANOS IN MAY OF 2016. AND SO THIS WAS GOING ON IN 2018. OF COURSE THE PATIENT DATABASE WITH ALL OF THE PATIENT INFORMATION WAS ENCRYPTED. OF COURSE MR. BALWANI, AS THE COO OF THE COMPANY, WOULD WANT THAT.

AT THIS TRIAL WE HAVE SEEN OVER AND OVER AGAIN, WHEN PATIENT RESULTS ARE BEING DISPLAYED, WE HAVE TO REDACT THEM BECAUSE WE DON'T WANT TO PUBLICLY DISPLAY FOR THE PUBLIC WATCHING THIS TRIAL, AND FOR EVEN YOU THE JURY, PEOPLE'S HEALTH INFORMATION.

SO, OF COURSE, THE DATABASE, WHILE IT EXISTED AT THERANOS WHILE MR. BALWANI WAS THERE, TWO YEARS LATER, OF COURSE, THIS WAS ENCRYPTED.

SO IF THIS QUESTION WAS MEANT TO SUGGEST THAT MR. BALWANI HAD ANYTHING TO DO WITH THIS ENCRYPTION PROBLEM THAT MR. SONNIER WAS TALKING ABOUT, THAT IS JUST MISDIRECTION.

LET'S GO TO THE NEXT SLIDE.

THIS IS THE POSSIBLE ROUTES FORWARD SLIDE THAT WE HAVE SEEN.

THIS IS THE EMAIL THAT THE GOVERNMENT PUT IN DURING THEIR CROSS-EXAMINATION OF MR. SONNIER.

IT SAYS, "HI SUTTON," THAT'S THE SAME EMPLOYEE WHO TOLD THEM TO GO GET THE SERVERS, SUTTON PEIRCE.

"I HAD A MEETING WITH THE AUSA'S," THAT'S MR. SCHENK, MR. BOSTIC, AND MR. LEACH. THOSE ARE THE ASSISTANT U.S. ATTORNEYS ASSIGNED TO THIS CASE, THE AUSA'S.

"I HAD A MEETING WITH THE AUSA'S ON THIS CASE REGARDING OUR OPTIONS AND WE ALL DECIDED TO DO THE FOLLOWING."

AND POSSIBLE ROUTES FORWARD ARE PUSH BACK ON DEFENSE AND SEE IF THEY CAN BE PRODUCE THIS IN A DIFFERENT MANNER AND THEN CHECK WITH THE FBI.

YOU CAN SEE AS A RESULT OF THIS MEETING THAT THEY ELIMINATED THE TWO OPTIONS OF GOING TO GET THE SERVERS OR GOING TO GET A VENDOR.  SO FOR SOME REASON, UNKNOWN TO US, THEY RULED THOSE OUT AND THEY DECIDED NOT TO PURSUE THOSE OPTIONS.

LET'S GO TO THE NEXT SLIDE.

NOW, WHAT ABOUT THOSE TWO OPTIONS?

MR. SONNIER TESTIFIED THAT BASED ON THE EMAIL, THE FIRST ONE THAT IS BEING TALKED ABOUT IN THAT PART OF THE TESTIMONY IS THE OPTION OF GETTING THE SERVERS.

MR. SONNIER SAID, THIS OPTION -- THE QUESTION PUT TO HIM WAS, AND THIS OPTION, WOULD THAT HAVE WORKED?

HE SAID THIS WOULD HAVE WORKED.

AND HOW ABOUT THE THIRD BULLET, IDENTIFY A VENDOR, IS THAT ALSO AN OPTION THAT WAS NOT LISTED ON THE EXHIBIT?

YES.

WOULD THAT HAVE WORKED?

IT WOULD HAVE WORKED, YES.

SO MR. SONNIER TESTIFIED THAT EITHER GETTING THE SERVERS OR HIRING A VENDOR WHO MIGHT HAVE SAID THE SAME THING, THOSE WERE THE WAYS THAT WOULD HAVE WORKED TO RECOVER THE LIS IF THE

GOVERNMENT HAD DECIDED TO PURSUE THOSE INSTEAD OF RULING OUT THOSE OPTIONS FOR UNKNOWN REASONS.

AND IF YOU'RE REALLY INTERESTED IN THE TRUTH IN A SCIENTIFIC CASE WHERE YOU'RE TRYING TO TALK ABOUT LAB TESTING AND WHETHER IT'S BAD ON A WIDESPREAD BASIS, WHY NOT DO WHATEVER YOU CAN IN A FEDERAL CRIMINAL PROSECUTION TO GET THE SERVERS, AND IF THAT IS GOING TO HELP YOU AND YOU CAN ANALYZE THE DATA, THAT'S WHAT YOU NEED TO DO.

LET'S TALK ABOUT -- A LITTLE BIT MORE ABOUT MR. SONNIER.

BY THE WAY, MR. SONNIER, THAT'S UNREBUTTED EXPERT TESTIMONY.  THE GOVERNMENT DID NOT CALL AN EXPERT.  THEY DID NOT HAVE ANY ANSWER TO MR. SONNIER'S TESTIMONY AS AN EXPERT ON MICROSOFT SQL SERVERS THAT THIS METHOD OF GETTING THE SERVERS WOULD HAVE WORKED IF THE GOVERNMENT HAD PURSUED IT.

WELL, LET'S TALK ABOUT SOME OF THE OTHER THINGS THAT HAPPENED WITH MR. SONNIER.  SO THERE WAS A SUGGESTION TO HIM THAT HE DIDN'T HAVE PERSONAL KNOWLEDGE AND IT WAS SOMEHOW JUST A HYPOTHETICAL THAT WAS PUT TO HIM.

HE SAID NO, ABSOLUTELY NOT.  THIS IS A SQL SERVER, IT'S A KNOWN PRODUCT, IT'S WELL DOCUMENTED BY MICROSOFT, IT HAS WELL-KNOWN RECOVERY TECHNIQUES, AS ALL OF THE EQUIPMENT WHICH IT OPERATES.

GO TO THE NEXT SLIDE.

THE QUESTION PUT TO HIM ON DIRECT WAS WHAT ABOUT THE MISSING PASSWORD ISSUE?  WOULD THAT AFFECT YOUR ABILITY TO

RECOVER THE DATA?

HE SAYS NO.

LET ME JUST PAUSE THERE FOR A MINUTE.  SO APPARENTLY THIS HARD DRIVE COPY THAT WAS PROVIDED TO THE GOVERNMENT, AND ALSO TO THE DEFENSE, THAT NO ONE COULD OPEN, THE PROBLEM WAS THIS ENCRYPTION KEY THAT WAS MISSING, THAT WITHOUT THE ENCRYPTION KEY YOU COULDN'T OPEN THE HARD DRIVE, AND NOBODY HAD THE ENCRYPTION KEY.

AND WHAT MR. SONNIER TESTIFIED ABOUT WAS, WOULD YOU NEED THE ENCRYPTION KEY?  AND HIS TESTIMONY WAS THAT IF YOU GOT THE ORIGINAL SERVERS, YOU WOULD NOT NEED THE ENCRYPTION KEY?

YOU WOULD TO OPEN THE COPY THAT NO ONE COULD OPEN, BUT IF YOU HAD GOTTEN THE SERVERS, YOU DIDN'T NEED THE ENCRYPTION KEY. THAT WAS THE TESTIMONY, AND IT IS NOT REBUTTED BY ANYTHING THE GOVERNMENT PUT ON.  BUT THAT'S WHAT HE'S TALKING ABOUT HERE.

WOULD THE MISSING PASSWORD OR ENCRYPTION KEY AFFECT HIS ABILITY TO RECOVER THE DATA?

HE SAYS NO.

QUESTION:  HOW CAN YOU THEN BE CONFIDENT THAT THERE'S NO OTHER SOFTWARE OR ENCRYPTION THAT WOULD PREVENT OUR ABILITY TO ACCESS THIS DATA?

AND HE SAYS BECAUSE WE'RE USING A STANDARD MICROSOFT SQL SERVER THERE'S REALLY -- AND A PARTICULAR FEATURE OF THAT STANDARD SOFTWARE, THERE'S REALLY ONLY ONE WAY THAT THAT STANDARD FEATURE CAN WORK.

SER-1346

AND WHAT IS THE RELATIONSHIP, IF ANY, BETWEEN THAT KIND OF CUSTOMIZATION ON THE ONE HAND AND THE RECOVERABILITY OF THE UNDERLYING DATA ON THE OTHER?

MR. SONNIER SAID IT HAD NOTHING TO DO WITH EACH OTHER.

AND WHAT WAS GOING ON HERE WAS THE GOVERNMENT WAS SUGGESTING ON CROSS THAT MAYBE BECAUSE THE DATABASE WAS CUSTOMIZED FOR A COMPANY LIKE THERANOS, THAT THAT WOULD MAKE IT SOMEHOW DIFFERENT WHERE YOU COULDN'T RECOVER THE LIS IF YOU GOT THE SERVERS.

MR. SONNIER TESTIFIED THAT ALL COMPANIES HAVE TO CUSTOMIZE THE MICROSOFT SQL SERVER PRODUCT TO SOME EXTENT TO RUN THEIR DATA FOR THEIR BUSINESS, WHATEVER THEIR BUSINESS HAPPENS TO BE.

AND THAT HE TESTIFIED REPEATEDLY THAT THAT DOES NOT AFFECT IN ANY WAY THE ABILITY TO RECOVER THE DATA IF YOU HAVE THE SERVERS AND THE HARD DRIVES.

IF WE GO TO THE NEXT.

SO THEN THERE WAS A QUESTION ABOUT, WELL, WHAT HAPPENED TO THE SERVERS AND THE HARD DRIVES?

AND THE BASIS OF MR. SONNIER'S OPINION FROM THE MATERIAL THAT HE REVIEWED WAS THAT AFTER THE LIS WAS DISASSEMBLED AT THERANOS AT THE END OF AUGUST OF 2018, THE HARD DRIVES WERE SENT TO ONE STORAGE LOCATION AND THE EQUIPMENT WENT TO A DIFFERENT STORAGE LOCATION.

GO TO THE NEXT SLIDE.

AND THEN THE QUESTION PUT TO HIM ON CROSS, WHAT IS YOUR

UNDERSTANDING, IF YOU HAVE ONE, AS TO THE CURRENT LOCATION OF THE ORIGINAL HARD DRIVES CONTAINING THE THERANOS LIS?

AND MR. SONNIER TESTIFIED, AGAIN FROM THE MATERIAL THAT HE REVIEWED, NOTHING THAT I HAVE SEEN SAYS THAT THEY'RE ANYWHERE OTHER THAN THE STORAGE LOCKERS THAT THEY WERE ORIGINALLY PLACED INTO AFTER DISASSEMBLY.

LET'S GO TO THE NEXT SLIDE.

THIS SERIES OF QUESTIONS IS IMPORTANT BECAUSE THERE'S NO EVIDENCE THAT ANYBODY FROM THE GOVERNMENT EVER TRIED TO RECOVER THOSE ITEMS FROM THE STORAGE LOCATIONS, NO FEDERAL AGENT, NO PROSECUTOR, NO ONE FROM THE GOVERNMENT.  IN THE MATERIALS THAT MR. SONNIER REVIEWED, THERE'S NO EVIDENCE THAT HE HAD FOR HIM THAT ANYONE FROM THE GOVERNMENT EVER TRIED TO GET THOSE SERVERS OR THE HARD DRIVES.

AND THE GOVERNMENT PRESENTED NO SUCH EVIDENCE EITHER.  AND YOU WOULD THINK THAT IF THEY HAD TRIED, THEY WOULD HAVE PRESENTED IT, AND THEY DID NOT.

JUST A WORD ABOUT MR. SONNIER.  THIS IS THE INSTRUCTION THAT JUDGE DAVILA WILL GIVE YOU.  "YOU HAVE HEARD TESTIMONY FROM RICHARD SONNIER WHO TESTIFIED TO HIS OPINIONS AND THE REASONS FOR HIS OPINIONS.  THIS OPINION TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR EXPERIENCE OF THIS WITNESS."

SO HE WAS QUALIFIED AS AN EXPERT WITNESS ON MICROSOFT SQL SERVER DATA RECOVERY AND DATA ENCRYPTION, AND THAT'S THE OPINION THAT HE'S ENTITLED TO GIVE AND YOU'RE ENTITLED TO RELY

ON AT THIS TRIAL.

OKAY. LET'S JUST SORT OF COMPARE RICHARD SONNIER TO THESE UNKNOWN PEOPLE THAT THE GOVERNMENT TALKED ABOUT.

SO RICHARD SONNIER IS AN EXPERT, AS I SAID, IN SQL DATA RECOVERY AND DATA ENCRYPTION. HE HAS OVER 35 YEARS OF EXPERIENCE. HE HAS USED MICROSOFT SQL SERVER DAILY FOR THE LAST 20 YEARS.

THE GOVERNMENT DIDN'T CALL THESE PEOPLE ON THE RIGHT, BUT THEY DID REFERENCE THEM IN THE CROSS-EXAMINATION THEY DID OF MR. SONNIER.

ONE OF THE PEOPLE THEY REFERENCED WAS DAVID TAYLOR, WHO WAS IDENTIFIED AS A THERANOS CEO IN 2018. TECHNICAL SKILLS UNKNOWN. WE HAVE NO INFORMATION ABOUT DAVID TAYLOR, WHATEVER HE SAID ABOUT MICROSOFT SQL SERVER OR THE ABILITY TO RECOVER IT, WE DON'T KNOW WHETHER HE HAD ANY BASIS OR ANY KNOWLEDGE OR WHETHER HE HAS A TECHNICAL SKILLS.

MICHAEL CHUNG WAS ANOTHER PERSON THAT THE GOVERNMENT IDENTIFIED WHO THEY DID NOT CALL. AS FAR AS MR. SONNIER KNEW FROM THE MATERIALS THAT HE LOOKED AT, HE WAS AN I.T. EQUIPMENT MOVER WHO WAS TASKED WITH MOVING THE EQUIPMENT. AGAIN, HIS TECHNICAL SKILLS ARE UNKNOWN. THERE'S NO INFORMATION ABOUT WHAT HE KNOWS AND WHAT HE HAS TO BRING TO BEAR ON THE QUESTION OF RECOVERY OF LIS.

ANOTHER PERSON REFERENCED WAS STEPHEN O'NEILL, A LAWYER AT DORSEY. IT'S A LAW FIRM. AGAIN, TECHNICAL SKILLS UNKNOWN. IN

ANY EVENT, HE'S A LAWYER.

UNKNOWN I.T. PERSON. THERE WAS A PERSON WHO WASN'T NAMED IN THE CROSS-EXAMINATION WHO HAD SOME KIND OF VIEW ABOUT HOW HARD OR EASY IT WOULD BE TO RECOVER LIS, AND WE DON'T KNOW WHO THAT PERSON IS OR WHAT THE PERSON'S TECHNICAL SKILLS ARE.

SO THAT'S WHAT WE HAVE FROM THE GOVERNMENT STACKED UP AGAINST MR. SONNIER.

AND IF YOU THINK THEY HAD A REBUTTAL TO MR. SONNIER, THAT HE WAS WRONG AND YOU COULDN'T RECOVER THIS AND GETTING THE SERVERS WOULDN'T WORK, YOU WOULD THINK THEY WOULD HAVE PRESENTED THAT BECAUSE IT'S IMPORTANT. AND THEY DIDN'T, AND THERE ISN'T.

AND WHAT HAS HAPPENED HERE IS THAT THE GOVERNMENT HAS BROUGHT A SCIENTIFIC FRAUD CASE, IS TRYING TO CONVICT MR. BALWANI OF WIRE FRAUD CRIMES, CONSPIRACY, WHERE HE'S SUPPOSEDLY GIVING OUT INACCURATE TESTING ON A WIDESPREAD BASIS, HE'S SUPPOSED TELLING INVESTORS THAT THE TECHNOLOGY WORKS WHEN IT DOESN'T, AND WE DON'T HAVE ANY SCIENTIFIC PROOF, CERTAINLY NOT BEYOND A REASONABLE DOUBT, THAT THAT'S THE CASE.

AND THE DEFENSE WANTED LIS. WE TRIED TO GET IT, WE COULDN'T GET IT. THE GOVERNMENT DIDN'T GET THE SERVERS. AND THAT'S WHERE THE FAULT LIES, AND THAT'S WHY WE DON'T HAVE THIS EVIDENCE.

AND LET'S GO TO THE NEXT SLIDE.

IT'S IMPOSSIBLE TO ASSESS LAB ERRORS WITHOUT LIS. AND I

TALKED ABOUT THE IMPORTANCE IN THE INVESTOR CASE AS WELL.

AS YOU KNOW FROM DR. ROSENDORFF, ALL LABS MAKE ERRORS. HE REFERENCES THE UNIVERSITY OF PITTSBURGH IN HIS TESTIMONY, AND AS WE SAW, HE TOLD A PHYSICIAN, DR. CHEN, IN AN EMAIL THAT THERE WERE NO MORE INQUIRIES TO THERANOS COMPARED TO WHAT HE EXPERIENCED AT THE UNIVERSITY OF PITTSBURGH.

DR. BURNES, WE SAW THIS JUST A FEW MINUTES AGO, HE HAD FOUR ERRORS IN ONE WEEK FROM LABCORP. SO LABORATORIES MAKE ERRORS.

DR. WOOTEN, WHO THE DEFENSE CALLED, SHE KNOWS THERE'S MISTAKES THAT OCCUR AT VARIOUS LABS.

I WANT TO SAY ONE OTHER -- WELL, I'LL DO THAT A LITTLE LATER.

SO FAR LET'S TALK ABOUT ANOTHER THING THAT THE GOVERNMENT PRESENTED, THE SO-CALLED FOSQUE SPREADSHEET. THIS IS THE SPREADSHEET FROM SEPTEMBER OF 2015. I SHOWED YOU ONE ENTRY FROM IT BEFORE, THAT WAS DR. ZACHMAN'S ENTRY. BUT IT'S BASICALLY CUSTOMER SERVICE INQUIRIES AND COMPLAINTS. AND THE GOVERNMENT PRESENTED THAT AND FROM TIME TO TIME DURING TRIAL WOULD READ FROM IT.

THESE WERE SORT OF A MIX OF THINGS. SOME INFORMATION ON THERE YOU COULD DISCERN WHAT HAPPENED AND SOMETIMES YOU COULDN'T, SOMETIMES THERE WAS INQUIRY, SOMETIMES YOU COULD SEE WHAT THE RESOLUTION WAS. AND IT'S ABOUT 230 OR SO ENTRIES ON THERE.

I JUST WANT TO TALK ABOUT WHY THAT SPREADSHEET IS NOT A SUBSTITUTE FOR LIS AND REALLY IS NOT THAT HELPFUL.

SO LET'S TALK ABOUT DR. BURNES'S ENTRY. THIS WAS DR. ELLSWORTH'S DOCTOR.

SO IN THAT SPREADSHEET, THIS IS EXHIBIT 4520, DR. BURNES HAS HIS INQUIRY ABOUT THE PSA BEING HIGH ON MAY 14TH, AND THEN NORMAL ON MAY 18TH, AND HE DOESN'T THINK THOSE THINGS ARE RIGHT.

AND THEN IT SAYS ON THE RIGHT, THE LAB RERAN THE SAMPLE AND DANIEL REACHED OUT TO THE PHYSICIAN.

SO THAT'S ALL THE NOTE SAYS.

WELL, THINK ABOUT WHAT WOULD HAPPEN IF THAT'S THE ONLY THING WE HAD?

NOW, IT JUST SO HAPPENED THAT DR. BURNES WAS ONE OF THE TWO PHYSICIANS THAT THE GOVERNMENT CALLED IN THIS CASE. FOUR PATIENTS, TWO PHYSICIANS.

DR. BURNES HAPPENED TO BE ONE OF THOSE, RIGHT? AND WE LEARNED A LOT FROM DR. BURNES WHEN HE TESTIFIED.

IF YOU WOULD GO TO THE NEXT SLIDE.

WE LEARNED THAT HE HAD BEEN USING THERANOS FOR A YEAR AND HE COULDN'T FIND ANY OTHER PROBLEMS. SO WE KNOW THAT ABOUT DR. BURNES ONLY BECAUSE THE GOVERNMENT CALLED HIM. BUT ALL OF THE OTHER ISSUES, WE DON'T HAVE THE BENEFIT OF THAT INFORMATION. WE DON'T KNOW WHAT WAS GOING ON BECAUSE THESE PATIENTS AND DOCTORS WEREN'T CALLED.

SER-1352

SO THAT SPREADSHEET IS NOT THE SAME AS THE LIS. AND IT HAS SOME INFORMATION ON IT, BUT IN ORDER TO PROVE THIS CASE, YOU NEED THE LABORATORY INFORMATION SYSTEM.

BUT I WANT TO ILLUSTRATE THIS A LITTLE MORE WITH DR. WOOTEN AGAIN. SO DR. WOOTEN IS A NATUROPATHIC PHYSICIAN. AND HER TREATMENT PHILOSOPHY IS TO DO A LOT BLOOD TESTS TO CONTINUALLY MONITOR A PATIENT'S HEALTH. SO SHE WAS IN A GOOD POSITION TO SEE WHAT WAS GOING ON.

AND THE QUESTION PUT TO HER WAS WHY WERE YOU COMFORTABLE SENDING YOUR PATIENTS TO THERANOS ALL OF THAT TIME? AND THAT GOES FROM 2014 TO 2016.

SHE SAYS DURING THE WHOLE TIME I SENT THEM?

YEAH. WHY WERE YOU COMFORTABLE.

AND HER ANSWER IS BECAUSE I REVIEWED THE LABS. I TEST QUITE OFTEN. I DO A COMPARISON WITH OTHER LABS AND THE RESULTS I WAS GETTING FOR MY PATIENTS -- WHAT IS THE WORD I'M LOOKING FOR? -- THEY WERE CONSISTENT WITH OTHER LABS AS WELL.

AND HOW ABOUT HOW MANY PATIENTS WAS THAT?

OVER 150.

SO SHE HAS 150 PATIENTS APPROXIMATELY, OVER 150. SHE IS TESTING THEM A LOT AND SHE DIDN'T SEE ANY ISSUES. SHE SAW THAT THEY WERE CONSISTENT.

SO THOSE WERE MORE TESTS WE'D HAVE IF WE HAD ACCESS TO LIS.

OKAY. WE'RE NOW DOWN TO THE LAST TOPIC IN THE ROAD MAP,

AND I'M SURE EVERYONE IS HAPPY ABOUT THAT, MOST OF ALL ME.

SO LET'S TALK ABOUT WHAT YOUR DECISION IS. IT'S OBVIOUSLY REALLY IMPORTANT. IT'S IMPORTANT TO THE PUBLIC. IT'S IMPORTANT TO MR. BALWANI OF ALL PEOPLE.

SO FIRST OF ALL, AFTER MY CLOSING REMARKS AND THE GOVERNMENT HAS A CHANCE TO TALK TO YOU ON REBUTTAL, JUDGE DAVILA WILL INSTRUCT YOU ON THE LAW OF THIS CASE THAT YOU SHOULD APPLY. YOU WILL GET A COPY OF THE JURY INSTRUCTIONS.

YOU WON'T GET A COPY OF MY SLIDES AND YOU WON'T GET THE TRANSCRIPT. YOU WILL HAVE THE EXHIBITS TO WORK WITH.

AND THEN IF WE GO TO THE NEXT PAGE.

SO OBVIOUSLY THERE WILL BE A NEED TO ELECT A FOREPERSON, AND YOU'LL DELIBERATE AND DISCUSS THE CASE. THAT WILL BE THE TIME WHEN YOU CAN DISCUSS THE CASE WHEN YOU'RE DELIBERATING. YOU HAVE NOT BEEN ABLE TO DO THAT UP TO THIS POINT.

AND THE VERDICT, WHETHER GUILTY OR NOT GUILTY, MUST BE UNANIMOUS. SO YOU HAVE TO REACH UNANIMOUS AGREEMENT WHETHER IT'S GUILTY OR NOT GUILTY ON EVERY ELEMENT OF EVERY OFFENSE IN ORDER TO RETURN A VERDICT ON ANY OF THE COUNTS -- ON EACH OF THE COUNTS.

AND THIS IS GOING TO BE -- IF YOU GO TO THE NEXT PAGE.

THIS IS GOING TO BE YOUR PREROGATIVE, NOT MINE, BUT YOU'RE GOING TO GET A VERDICT FORM THAT AFTER YOU DELIBERATE AND YOU MAKE A DECISION, IF YOU'RE ABLE TO REACH ONE, YOU WILL HAVE TO FILL IN THIS CHART.

AND THE FACT THAT GUILTY IS LISTED FIRST IN ALL OF THESE BOXES, THAT DOESN'T MATTER. MR. BALWANI IS PRESUMED INNOCENT UNTIL PROVEN BEYOND A REASONABLE DOUBT OTHERWISE. AND SO EACH OF THESE YOU'LL HAVE TO FILL IN, OR THE FOREPERSON WILL PROBABLY FILL IN.

WHAT WE'RE SUGGESTING OBVIOUSLY FROM THE DEFENSE STANDPOINT IS THAT ALL OF THOSE SHOULD BE FILLED IN WITH NOT GUILTIES, AND THAT'S YOUR PREROGATIVE, BUT OBVIOUSLY THAT'S WHAT WE'RE ASKING YOU TO DO.

LET'S GO TO THE NEXT PAGE.

AND THERE ARE GOING TO BE 12 OF THOSE BECAUSE THERE ARE 12 COUNTS.

OKAY. THE GOVERNMENT HAS THE BURDEN OF PROOF HERE. THEY HAVE THE BURDEN TO PROVE THAT MR. BALWANI IS GUILTY ON EVERY SINGLE ELEMENT OF EVERY COUNT BEYOND A REASONABLE DOUBT. IF YOU DON'T THINK THAT EVERY ELEMENT OF EVERY COUNT IS MET FOR EACH OF THE COUNTS, YOU DON'T THINK THAT, YOU HAVE TO RETURN A VERDICT OF NOT GUILTY.

MR. BALWANI DOES NOT HAVE TO PUT ON A CASE AS I'VE TOLD YOU. HE DOESN'T HAVE TO TESTIFY.

WE COULD HAVE SAT THERE THE WHOLE TIME AND DONE NOTHING. BUT AS I SAID AT THE BEGINNING OF MY OPENING REMARKS A COUPLE DAYS AGO, THANK GOODNESS WE DID BECAUSE WITHOUT THAT, YOU WOULD NOT HAVE ALL OF THE INFORMATION THAT YOU HAVE THAT THE DEFENSE HAD TO TELL YOU.

NOW, THE GOVERNMENT HAS TO PROVE, AMONG OTHER THINGS, THAT MR. BALWANI HAD ACTUAL KNOWLEDGE IN ORDER TO BE GUILTY OF THE OFFENSES, NOT THAT HE SHOULD HAVE KNOWN OR HE WAS NEGLIGENT OR HE SHOULD HAVE HAD A DIFFERENT JUDGMENT.  HE HAS TO HAVE ACTUAL KNOWLEDGE BEYOND A REASONABLE DOUBT.

YOU WOULD HAVE TO FIND BEYOND A REASONABLE DOUBT THAT THEY INTENDED TO DEFRAUD PATIENTS AND INTENDED TO DEFRAUD INVESTORS IN ORDER TO BE GUILTY OF THE COUNTS HE'S CHARGED WITH.

NOW, FROM THE GOVERNMENT'S STANDPOINT, THEY'VE PRESENTED AN UNFAIR AND COMPLETELY INCOMPLETE -- COMPLETELY INCOMPLETE PICTURE.

FIRST OF ALL, AS I SAID SEVERAL TIMES DURING MY CLOSING REMARKS, THERE'S NO TAPE FOR MR. TOLBERT, WHO RECORDED A CONVERSATION WITH INVESTORS.  THAT WOULD HAVE BEEN OUR CHANCE TO HEAR THE TRUTH, THE ACTUAL WORDS.

THE GOVERNMENT ACTED LIKE THEY WERE SURPRISED WHEN MR. TOLBERT SAID THAT HE PRODUCED IT TO THE GOVERNMENT, MR. TOLBERT DISCUSSED THAT TAPE WITH THE GOVERNMENT.  WE DIDN'T HEAR IT.  RIGHT THERE, REASONABLE DOUBT.  WHY AREN'T THEY PLAYING YOU THE WORDS THAT MS. HOLMES ACTUALLY SPOKE TO INVESTORS IF HER WORDS PROVE MISREPRESENTATIONS AND FRAUD?  WHY DIDN'T THEY PLAY IT?

I JUST TALKED ABOUT A FEW MINUTES AGO ABOUT THE LABORATORY INFORMATION SYSTEM.  THEY CALLED FOUR PATIENTS OUT OF A MILLION PLUS LABORATORY RESULTS, AND THEY'RE TRYING TO SAY THAT THIS IS

SER-1356

PROOF OF THE LABORATORY BEING BAD ON A WIDESPREAD BASIS AND THAT SOMEHOW MR. BALWANI KNOWS THAT.

THEY DIDN'T HAVE THREE OUT OF FOUR OF MR. BINGHAM'S REPORTS, AND WE ARE RELYING IN A CRIMINAL CASE OF THIS MAGNITUDE ON MR. BINGHAM'S -- HOW HE FELT ON PARTICULAR DAYS.

THE GOVERNMENT DIDN'T TELL YOU THAT TWO OUT OF THE FOUR PATIENTS THAT YOU HEARD FROM HAD THEIR TESTS ON COMMERCIAL DEVICES. THEY ARE JUST TRYING TO BLOW STUFF BY HERE WITHOUT THE GOING THROUGH FACTS. WE HAD TO TELL YOU WHAT WAS REALLY GOING ON WITH THE DEVICES THEY WERE BEING TESTED ON.

WHERE WAS DANIEL YOUNG? HE WAS ON 78 EMAILS. HE HAD HIS HANDS ON EVERYTHING. HE WAS THE PERSON WHO DID THE STUDIES AND WHO TRIED TO FIX ANY PROBLEMS THAT DEVELOPED IN THE LAB, WHO MR. BALWANI OBVIOUSLY FROM THE EMAIL RECORD HERE RELIED ON.

WHY ISN'T HE HERE? WHY DIDN'T THE GOVERNMENT CALL HIM AND TELL YOU WHAT HE THOUGHT? HE WAS AT THERANOS FOR A VERY LONG TIME.

WHY DIDN'T THE GOVERNMENT SHOW YOU THE CENTER FOR DISEASE CONTROL GUIDANCE WITH MS. TOMPKINS WHEN THEY WERE TRYING TO CLAIM THAT SHE GOT INACCURATE TESTS? WOULDN'T IT BE IMPORTANT TO LET YOU KNOW, WHICH WE DID, THAT THERANOS FOLLOWED THAT CDC GUIDANCE TO THE LETTER?

WHERE'S LANGLY GEE, THE QUALITY CONTROL MANAGER?

YOU HEARD A LOT ABOUT QUALITY CONTROL. THAT WAS THE PERSON IN CHARGE OF QUALITY CONTROL. HE WASN'T HERE. THE

SER-1357

GOVERNMENT DIDN'T CALL HIM BECAUSE HE MIGHT BE ABLE TO TELL YOU THE TRUTH.

NO OTHER KEY LEADERS IN THE SCIENTIFIC LEADERSHIP TEAM WERE CALLED.

DR. SAKSENA, WHO WAS SLATED TO BE THE NEXT LAB DIRECTOR AS EARLY AS 2014, THAT'S WHAT MR. BALWANI INTENDED, AND HE WASN'T CALLED EITHER.

HODA ALAMDAR THAT YOU'VE HEARD A LOT OF ABOUT; DR. NISHIT DOSHI, DR. CHINMAY PANGARKAR. NONE OF THESE PEOPLE WERE CALLED AS WITNESSES AT TRIAL TO TELL YOU WHAT WAS GOING ON IN THE LAB. DR. SIVARAMAN.

COMPLETELY MISLEADING PRESENTATIONS ABOUT ASSAYS LIKE HCG. THE GOVERNMENT WOULD HAVE HAD YOU BELIEVE THAT ROSENDORFF, DR. ROSENDORFF CALLED A STOP TO HCG AND HE NEVER ALLOWED IT TO GO BACK ON EDISON, AND IT DID ANYWAY WITHOUT HIS KNOWLEDGE.

WELL, WE HAD TO SHOW YOU THE EMAILS WHERE DR. ROSENDORFF ABSOLUTELY APPROVED TESTING GOING BACK ON EDISON.

THE GOVERNMENT CALLED MARK PANDORI WHO REPEATEDLY LIED ON THE STAND AND IS STILL TRYING TO RELY ON DR. PANDORI. YOU HEARD THE GOVERNMENT'S CLOSING REMARKS WHERE THEY'RE STILL TRYING TO RELY ON DR. PANDORI.

AS I SAID BEFORE, YOU CANNOT BELIEVE A SINGLE WORD THAT DR. PANDORI SAID GIVEN THAT HE DENIED WRITING HIS OWN MEMO THAT RECOMMENDED TO MR. BALWANI THAT THEY MAKE MORE EDISONS FOR PATIENT TESTING.

SER-1358

NO BOARD MEMBERS WERE CALLED. THEY WERE THE ULTIMATE AUTHORITY IN THE COMPANY. WE SAW THAT. NOT A SINGLE BOARD MEMBER.

WHERE IS WADE MIQUELON, THE CEO OF WALGREENS WHO INITIATED THE RELATIONSHIP?

MR. JHAVERI DIDN'T COME INTO THE PICTURE UNTIL 2014.

THE GOVERNMENT CLAIMS THAT WALGREENS WAS DEFRAUDED FROM THE VERY BEGINNING OF THE RELATIONSHIP, WHICH WENT BACK TO 2010.

WADE MIQUELON WAS THE PERSON. WHERE IS HE IF THEY'RE GOING TO TRY TO PROVE THAT?

WHERE IS DR. JAY ROSAN, THE MEDICAL DOCTOR AT WALGREENS WHO HAD THE DEVICE TO TEXT FOR A COUPLE OF YEARS? WHERE WAS HE?

WHERE ARE ALL OF THE OTHER WITNESSES FROM THE PHARMACEUTICAL COMPANIES? WHERE IS THE GLAXOSMITHKLINE WITNESS?

THE DOCUMENT THAT WE SAW THAT MR. BALWANI GOT SAYS THAT GLAXOSMITHKLINE COMPREHENSIVELY VALIDATED THE THERANOS TECHNOLOGY? WHERE ARE THEY? THE GOVERNMENT DIDN'T CALL THEM EITHER.

WHERE IS GARY YAMAMOTO, THE PERSON AT CMS WHO ACTUALLY DID THE FINGERSTICK TESTING ANALYSIS DURING THAT SEPTEMBER 2015 INSPECTION?

THEY CALLED MS. BENNETT.

WHERE IS GARY YAMAMOTO?  THE GOVERNMENT DIDN'T CALL HIM, EITHER.

WHERE IS ROGER PARLOFF, THE JOURNALIST WHO WROTE THE "FORTUNE" ARTICLE?  THE GOVERNMENT PUT FORWARD THE "FORTUNE" ARTICLE.  BUT WHAT WAS MR. PARLOFF ACTUALLY TOLD BY ELIZABETH HOLMES?  WHAT WERE HIS WORDS?  WHAT WERE MS. HOLMES'S WORDS?  HOW DID THAT WORK?

WE DIDN'T HEAR FROM MR. PARLOFF, EITHER.

WE HEARD NO WITNESSES RELATING TO THE ADVERTISING COUNT, COUNT TWELVE.

DID THE ADS RUN?  WHEN?  WHO SAW THEM?  WHAT DID THE ADS SAY?  WE HAVE NO IDERE BECAUSE THE GOVERNMENT DIDN'T BOTHER TO PROVE THAT.

WHERE IS CRAIG HALL?  HE IS AN INVESTOR WHO INVESTOR -- MR. TOLBERT WAS, CALLED BUT WHERE IS CRAIG HALL?

WHERE IS DAN, DOUG, RICK, AND DICK DEVOS, THE DECISION MAKERS AT RDV, THE DEVOS FAMILY?  WOULDN'T IT BE NICE TO HEAR FROM THAT DECISION MAKERS FROM THAT FAMILY AS TO WHAT THEY REALLY THOUGHT, WHAT THEY REALLY INTENDED?  WE DIDN'T HEAR FROM THEM, EITHER.

WE HAD TO PRESENT THE TRUTH THROUGH EMAILS AND DOCUMENTS, AND THAT IS WHAT IS IMPORTANT HERE.  WHAT DO THE CONTEMPORANEOUS DOCUMENTS REALLY SHOW, NOT THE WITNESS'S MEMORIES FROM YEARS AND YEARS LATER.

AND THE CONTEMPORANEOUS DOCUMENTS SHOW THAT THERE'S NOT A

SER-1360

SINGLE TIME THAT MR. BALWANI EVER TOLD ANYBODY TO DO THE WRONG THING, OR TO COMMIT FRAUD, AND THERE'S NOT A SINGLE TEXT MESSAGE OR EMAIL WHERE HE TOLD MS. HOLMES THAT WE'RE IN A CONSPIRACY OR LET'S CHEAT PEOPLE OR ANYTHING OF THAT NATURE.

NOW, AT THIS POINT, AS WE ALL KNOW, WE'RE IN A FEDERAL CRIMINAL TRIAL.  AND THERANOS IS RADIOACTIVE TO PEOPLE.  IF THERE ARE LAB PEOPLE LIKE DR. PANDORI AND DR. ROSENDORFF, THEY DON'T WANT TO SAY AT THIS POINT, UNLESS THEY HAVE TO BECAUSE THERE'S A DOCUMENT, THEY DON'T WANT TO SAY THAT THEY APPROVED ANYTHING, THAT THEY AGREED TO ANYTHING AT THERANOS.

THEY WANT TO JUST SAY THAT, THEY WERE JUST SAYING THERE WERE PROBLEMS AND THEY WERE THE HERO.  THAT'S WHAT LAB INDUSTRY PEOPLE WANT TO SAY NOW, NOW THAT WE'RE IN THE ENVIRONMENT THAT WE'RE IN.

BUSINESS PARTNERS LIKE WAG, WALGREENS, THEY WANT TO PLAY DOWN BEING A CHEERLEADER FOR THERANOS, THAT THEY WERE TRYING TO EXPAND THE PARTNERSHIP IN 2014 AND 2015.  THEY WANT TO SAY, OH, WE WERE JUST SCALING BACK WHEN THE CONTEMPORARY DOCUMENTS TELL EXACTLY THE OPPOSITE STORY.

THE WEALTHY, POWERFUL INVESTORS THAT WE HEARD FROM, THEY WANT TO SAY WE WERE FOOLED.  THEY DON'T WANT TO SAY, WELL, WE TOOK A FLYER ON GETTING REALLY RICH, EVEN RICHER BY LOOKING AT A GREAT OPPORTUNITY AND HAVE A UNICORN SITUATION WITH THERANOS WITH THE WALGREENS ROLLOUT.

INSTEAD, THEY WANT TO SAY, YOU KNOW, THEY WERE FOOLED.

SER-1361

THEY LOOK BETTER IN THE EYES OF THEIR INVESTORS, THEIR FUTURE INVESTORS, THEIR FAMILY OFFICES, AND THEIR EMPLOYERS.

NOW, THE GOVERNMENT IS GOING TO GET UP ON REBUTTAL. WE DON'T HAVE A CHANCE TO HAVE FURTHER REBUTTAL. THIS IS GOING TO BE THE LAST TIME THAT YOU HEAR FROM ME, BUT THE GOVERNMENT DOES GET TO GIVE YOU A REBUTTAL CLOSING ARGUMENT, AND THEY GET TO TAKE ONE MORE SHOT AT CONVINCING YOU THAT MR. BALWANI IS GUILTY OF SOMETHING BEYOND A REASONABLE DOUBT.

BUT WHATEVER THE GOVERNMENT SAYS IN THEIR REBUTTAL CLOSING, WHAT THEY CAN'T CHANGE IS THE BLACK AND WHITE TESTIMONY AND DOCUMENTS THAT WE, THE DEFENSE, SHARED WITH YOU;

THEY CAN'T CHANGE THE EMAIL WHERE MR. JHAVERI PROJECTS 2500 STORES IN MARCH OF 2015 IN AN INTERNAL EMAIL WITH WALGREENS;

THEY CAN'T CHANGE THE FACT THAT MR. JHAVERI AT WALGREENS TOLD SUNNY BALWANI THAT THEY WOULD TOUCH 2,000 STORES. HE SENT THAT EMAIL IN AUGUST OF 2014. THEY CAN'T CHANGE THAT.

THEY CAN'T CHANGE THE PARTNERSHIP MEETING MINUTES, EXHIBIT 1884, FROM AUGUST 6TH, 2014, SHOWING THE INTENTION OF WALGREENS TO EXPAND THE ROLLOUT, NOT TO CONTRACT IT;

THEY CAN'T CHANGE THE JOHNS HOPKINS REPORT WHERE JOHNS HOPKINS'S PHYSICIANS EVALUATED THERANOS' TECHNOLOGY AND STATED THAT IT HAD NO MAJOR WEAKNESSES AND ITS STRENGTH WAS ACCURACY;

THEY CAN'T CHANGE THE FACT THAT WALGREENS HAD THE DEVICE

SER-1362

TO TEST THEMSELVES;

THEY CAN'T CHANGE THE FACT THAT MR. BALWANI WAS INFORMED BY AN EMAIL FROM IT DR. IAN GIBBONS THAT HE HAD MADE A MAJOR BREAKTHROUGH AND DEMONSTRATED THE ABILITY TO DO SUPERIOR ASSAYS ACROSS ALL FOUR BLOOD TESTING CATEGORIES;

THEY CAN'T CHANGE THE FACT THAT THERANOS DEVELOPED HUNDREDS OF ASSAYS FOR SMALL BLOOD SAMPLES;

THEY CAN'T CHANGE THE FACT THAT THE ARMY BURN STUDY USED THE THERANOS DEVICES FOR YEARS AND CAME UP WITH A PEER REVIEWED PAPER BASED ON USING THE THERANOS TECHNOLOGY;

THEY CAN'T CHANGE THE FACT THAT MS. HOLMES SENT GLAXOSMITHKLINE A REPORT SHOWING THAT GLAXOSMITHKLINE COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY;

THEY CAN'T CHANGE THE FACT THAT CHANNING ROBERTSON TOLD INVESTORS THAT THE TECHNOLOGY WORKS;

THEY CAN'T CHANGE THE FACT THAT DESPITE THE GOVERNMENT'S CLAIMS, DR. ROSENDORFF GOT THE TIME HE NEEDED BEFORE THE WALGREENS LAUNCH AND THAT THE LAUNCH STARTED WITH TWO ASSAYS. NO ONE WAS PRESSURING DR. ROSENDORFF TO DO ANYTHING HE WASN'T READY TO DO.

THEY CAN'T CHANGE THE FACT THAT THERANOS GOT THAT FDA CLEARANCE ON ITS SYSTEM FOR THAT ASSAY HSV-1 ON ITS SYSTEM WITH A NANOTAINER.  THEY APPLIED FOR THAT APPROVAL WITH THE FDA IN NOVEMBER OF 2014.

THEY CAN'T CHANGE THE FACT THAT THERANOS FILED A PATENT

SER-1363

APPLICATION FOR ITS MODIFIED PREDICATE DEVICES THAT

MS. PETERSON, RDV, HAD IN THEIR MATERIALS A REFERENCE TO, THEY

CAN'T CHANGE THE FACT THAT THAT APPLICATION WAS FILED OR

INFORMING THE FDA ABOUT MODIFIED PREDICATES IN COMMERCIAL

DEVICES, DIRECTLY INFORMING THE FEDERAL GOVERNMENT.

THEY CAN'T CHANGE THE EXISTENCE OF THE PANDORI TRANSITION

MEMO WHERE HE SAYS TO MAKE MORE EDISONS OR THE OTHER TWO EMAILS

THAT DR. PANDORI SENT AFTER HE SUPPOSEDLY QUIT WHERE HE SAID

MAKE MORE EDISONS BECAUSE WE'RE GOING TO NEED THEM FOR PATIENT

TESTING.

DR. ROSENDORFF VALIDATING 57 ASSAYS ON EDISONS AND

MODIFIED PREDICATES OVER THE COURSE OF A YEAR;

DR. ROSENDORFF'S APPROVAL OF RESUMED TESTING FOR HCG ON

EDISONS;

THAT DR. SAKSENA INFORMED MR. BALWANI THAT HE WAS APPLYING

TO BE A LAB DIRECTOR, AND IT WAS TAKING LONGER THAN HE WAS

HOPING.  AND MR. BALWANI'S INTENT OBVIOUSLY BEING TO PUT A

PERMANENT LAB DIRECTOR IN PLACE SOONER RATHER THAN LATER.

DANIEL YOUNG, WHO IS THE LAB DIRECTOR IN ARIZONA, AND THE

FACT THAT HE WAS AVAILABLE TO SPEAK TO PEOPLE LIKE DR. BURNES

WHEN THERE WAS AN INQUIRY, THE GOVERNMENT WOULD HAVE YOU

BELIEVE THAT THERE WAS NO ONE HOME AT THE LAB WHEN WE KNOW THAT

DR. BURNES HAD NO TROUBLE GETTING THROUGH TO DR. YOUNG.

SOUTHWEST CONTEMPORARY WOMEN'S CLINIC, THOUSANDS OF

PATIENT'S TESTS AT THERANOS AFTER THE EXPERIENCE WITH

SER-1364

MS. GOULD;

THAT THE CMS INSPECTION REPORT HAD THIS IMMEDIATE JEOPARDY FINDING, AND THAT WAS BASED ON AN ASSAY CALLED PT INR, RUN ON A COMMERCIAL DEVICE. IT HAD TO DO WITH REAGENT EXPIRATION IN TWO DAYS RATHER THAN FIVE DAYS OR TEN DAYS AND THIS COMPLICATED CALCULATION THAT MR. BALWANI KNEW NOTHING ABOUT.

THEY CAN'T CHANGE THE AAP REPORTS SHOWING THAT ASSAY AFTER ASSAY WAS EVALUATED OVER AND OVER AGAIN, AND MR. BALWANI AND CMS WERE INFORMED THAT THESE ASSAYS WERE PASSING MOST OF THE TIME WITH 100 PERCENT SCORES AND SOMETIMES WITH 80 PERCENT SCORES.

THAT THE DOD RELATIONSHIPS, THE DEPARTMENT OF DEFENSE, WERE REAL. THAT THEY HAD DEEP RELATIONSHIPS WITH DOD AND THEY WERE ACTUALLY TESTING AN EDISON DEVICE IN AFRICA FLYING ON A NONFIXED WING AIRCRAFT FLYING UNDER 10,000 FEET AT TEMPERATURES OVER 100 DEGREES, AND THERE WAS LIEUTENANT GIVENS WHO WAS REPORTING ON HER SUCCESSFUL EXPERIENCE WITH THAT. YOU CAN'T CHANGE THAT.

THEY CAN'T CHANGE THAT BOARD MEMBER SAM NUNN HAD THE FINANCIAL INFORMATION IN HIS POSSESSION THAT THE GOVERNMENT CLAIMS NOW IS FRAUDULENT;

THEY CAN'T CHANGE THE DISCLOSURE OF VENOUS DRAWS AND TRADITIONAL METHODS TO THE WORLD AND TO INVESTORS;

THEY CAN'T CHANGE THAT THERANOS NEVER ASKED FOR THE PATIENT MONEY EVEN THOUGH THEY'RE ACCUSING MR. BALWANI OF

SER-1365

INTENDING TO DEFRAUD PATIENTS;

THEY CAN'T CHANGE THE FACT THAT WHEN MR. BALWANI LEFT THERANOS, THERE WAS $351 MILLION IN THE BANK AND INTELLECTUAL PROPERTY ASSETS WHEN HE LEFT;

AND THEY CAN'T CHANGE THE FACT THAT MR. BALWANI NEVER SOLD A SINGLE SHARE OF STOCK AT ANY TIME.

NOW, DURING ITS CLOSING THE GOVERNMENT DOUBLE DOWNED ON SHOWING YOU ONLY A SMALL PART OF THE STORY.

ONE OF THE REASONS THAT MY CLOSING TOOK SEVERAL DAYS HERE IS BECAUSE WE HAD TO SHOW YOU ALL OF THE EVIDENCE THAT THE GOVERNMENT DIDN'T AND GO THROUGH IT.

FORTUNATELY, IN OUR SYSTEM, WHEN THE FEDERAL GOVERNMENT BRINGS ITS AWESOME POWER TO BEAR TO PROSECUTE AN INDIVIDUAL CITIZEN, IT'S YOU THE JURY WHO GETS TO DECIDE WHETHER THE GOVERNMENT HAS PROVEN ITS CASE BEYOND A REASONABLE DOUBT.

AND YOU HAVE THIS CRUCIAL ROLE TO STAND BETWEEN THE AWESOME POWER OF THE FEDERAL GOVERNMENT AND AN INDIVIDUAL LIKE MR. BALWANI.  IT IS A WEIGHTY RESPONSIBILITY.

BUT YOU HAVE AN OPPORTUNITY HERE.  YOU CAN HOLD YOUR HEAD HIGH AND YOU CAN TELL THE FEDERAL GOVERNMENT THAT IF IT CHOOSES TO PROSECUTE SOMEONE LIKE MR. BALWANI, IT CAN'T GET AWAY WITH BRINGING AN INCOMPLETE AND MISLEADING CASE; PRETENDING TO BE SURPRISED ABOUT THE EXISTENCE OF A TAPE RECORDING OF THE ACTUAL WORDS THAT ELIZABETH HOLMES SPOKE AND THEN NOT PLAYING IT;

PUTTING SOMEONE LIKE DR. PANDORI ON THE STAND WHO REPEATEDLY

LIED, IGNORING FACTS, FOR EXAMPLE, DR. ROSENDORFF'S APPROVAL OF THE RESUMPTION OF HCG TESTING ON THE EDISON; NOT SHOWING YOU ALL OF THE EMAILS ABOUT WHAT INVESTORS REALLY KNEW AND THOUGHT LIKE PFM; NOT SHOWING YOU THE REAL TRUTH OF THE WALGREENS RELATIONSHIP; ITS USE AND EXPERIENCE WITH THE EDISON AND THE JOHNS HOPKINS EVALUATION; AND DECIDING NOT TO GET THE CRUCIAL LABORATORY INFORMATION SYSTEM DATABASE WITH ALL OF THE PATIENT TESTING DATA, ALL OF THE QUALITY CONTROL DATA, AND INSTEAD TRY TO PROVE THIS CASE WITH ANECDOTES FROM A HANDFUL OF WITNESSES.

WE THE DEFENSE HAD TO SHOW YOU THE TRUTH WHERE THE GOVERNMENT DID NOT.

IN MR. SCHENK'S CLOSING REMARKS HE SAID, AND I'M QUOTING, "TRUTH IS FATAL TO FRAUD." TRUTH IS FATAL TO THIS PROSECUTION OF MR. BALWANI.

I REALLY APPRECIATE YOUR ATTENTION OVER THE DAYS I'VE BEEN TALKING TO YOU. I'VE SEEN A LOT OF PEOPLE TAKING NOTES. IT'S A HARD THING TO DO, AND I DEEPLY APPRECIATE, AS DOES MR. BALWANI, YOUR CAREFUL ATTENTION NOT ONLY DURING MY CLOSING REMARKS BUT DURING THE WHOLE MONTH LONG PROCESS OF THIS TRIAL.

AS I SAID, I'M NOT GOING TO HAVE THE OPPORTUNITY TO TALK TO YOU AGAIN OR GET A FURTHER REBUTTAL CLOSING.

BUT WHEN YOU'RE LISTENING TO THE GOVERNMENT'S REBUTTAL AND WHEN YOU'RE IN THE JURY DELIBERATING, PLEASE REMEMBER THAT EVEN IF THEIR NARRATIVE SOUNDS TIDY AND NEAT, THE CONTEMPORANEOUS DOCUMENTS IN THIS CASE, THEY DON'T LIE, THE DOCUMENTS DON'T

EXAGGERATE, AND THEY DON'T HAVE HUMAN MOTIVATION.

IF YOU TAKE A HARD LOOK AT ALL OF THE EVIDENCE AND YOU LOOK AT THEM THROUGH SUNNY BALWANI'S EYES, NOT WITH THE BENEFIT OF HINDSIGHT, THE ONLY VERDICT SUPPORTED BY THE EVIDENCE AND THE LACK OF EVIDENCE IS NOT GUILTY ON ALL COUNTS OF THE INDICTMENT.

THANK YOU VERY MUCH.

THE COURT:  THANK YOU, COUNSEL.

LET ME TURN TO THE GOVERNMENT.  WILL THE GOVERNMENT HAVE A REBUTTAL ARGUMENT?

MR. BOSTIC:  WE WILL, YOUR HONOR.

THE COURT:  WILL YOU BE ABLE TO COMPLETE YOUR ARGUMENT WITH THE TIME WE HAVE LEFT IN THE DAY?

MR. BOSTIC:  NO, YOUR HONOR.  WE ARE PREPARED TO BEGIN TODAY IF THE COURT WISHES.  IF WE BEGIN TOMORROW MORNING, I'M CONFIDENT THAT WE CAN GET IT DONE IN THE FIRST HALF OF THE DAY.

THE COURT:  ALL RIGHT.  THANK YOU.

LET'S -- LADIES AND GENTLEMEN, WE'VE HAD A LONG DAY TODAY. I TOLD YOU -- I THINK I ASKED YOU TO PERHAPS GO UNTIL 5:00, BUT IT'S ABOUT A QUARTER PAST 4:00.  WE TYPICALLY BREAK AT 4:00. SO LET'S TAKE OUR EVENING RECESS NOW.  WE'LL START AT 9:00 A.M., 9:00 A.M. TOMORROW.

AND LET ME JUST -- I SEE NODS OF APPROVAL, AND I HAVE APPRECIATE THAT.  I APPRECIATE THAT.

SER-1368

CLOSING ARGUMENT BY MR. COOPERSMITH (RES.)                    7555

I THINK A BREAK NOW WOULD BENEFIT EVERYONE TO DIGEST WHAT YOU'VE HEARD AND ALSO PREPARE FOR TOMORROW.

BUT, HOWEVER, DURING THE BREAK, REMEMBER, YOU ARE NOT, YOU ARE NOT TO DELIBERATE THE CASE IN ANY WAY OR REACH ANY CONCLUSION DURING THIS BREAK AT ALL.

YOUR DELIBERATIONS AND YOUR THOUGHTS ABOUT THE EVIDENCE IN THIS CASE AND WHAT IT PROVES WILL NOT BEGIN AND SHOULD NOT BEGIN, YOU SHOULD NOT EVEN BEGIN THINKING ABOUT THAT UNTIL, UNTIL YOU HAVE HEARD THE REBUTTAL, AND UNTIL YOU HAVE HEARD MY INSTRUCTIONS, AND UNTIL, ONLY UNTIL YOU HAVE THEN BEEN CONSIGNED OR ASSIGNED RATHER TO THE JURY DELIBERATION ROOM WHERE THERE YOU MAY THEN BEGIN YOUR DELIBERATIONS AND YOUR THOUGHTS ABOUT THE EVIDENCE IN THIS CASE.  NOT BEFORE.

ALSO, LET ME REMIND YOU OF THE ADMONITION AGAIN.  PLEASE DO NOT LEARN OR ATTEMPT TO LEARN ANYTHING ABOUT THIS CASE, TO WATCH, LISTEN, OR DISCUSS THIS CASE IN ANY MANNER AT ALL.

WE WILL SEE YOU TOMORROW AT 9:00 O'CLOCK.

COUNSEL?

MR. BOSTIC:  YES, YOUR HONOR.

MR. COOPERSMITH:  YES, YOUR HONOR.

THE COURT:  9:00 O'CLOCK TOMORROW.  IF YOU WOULD COLLECT YOURSELVES SUCH THAT WE CAN BEGIN AT 9:00 O'CLOCK.  MY SENSE IS THAT ACCORDING TO THE GOVERNMENT, THEIR REBUTTAL SHOULD ALLOW US TO HAVE ME INSTRUCT YOU AND I THINK DELIBERATIONS CAN BEGIN EARLY AFTERNOON.  SO THAT'S MY SENSE.

SER-1369

SO HAVE A GOOD EVENING.  THANK YOU.

(JURY OUT AT 4:19 P.M.)

THE COURT:  PLEASE BE SEATED.  THANK YOU.

THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE DAY.  IT'S 4:20 IN THE AFTERNOON.

ANYTHING FURTHER BEFORE WE BREAK.

MR. SCHENK:  NO, YOUR HONOR.  THANK YOU.

MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

THE COURT:  ALL RIGHT.  THANK YOU.  HAVE A GOOD EVENING.

MR. COOPERSMITH:  YOU TOO, YOUR HONOR.

(COURT ADJOURNED AT 4:20 P.M.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,          )
                                   )  CR-18-00258-EJD
              PLAINTIFF,           )
                                   )  SAN JOSE, CALIFORNIA
         VS.                       )
                                   )  JUNE 24, 2022
RAMESH "SUNNY" BALWANI,            )
                                   )  VOLUME 41
              DEFENDANT.           )
_____     )  PAGES 7557 - 7733


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                          BY:  JOHN C. BOSTIC
                               JEFFREY B. SCHENK
                          150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113

                          BY:  ROBERT S. LEACH
                               KELLY VOLKAR
                          1301 CLAY STREET, SUITE 340S
                          OAKLAND, CALIFORNIA 94612

      (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:
                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

SER-1371

THE GOVERNMENT'S CHARACTERIZATION OF THINGS, TRUST YOUR OWN COMMON SENSE, TRUST YOUR EYES, TRUST YOUR MEMORIES ABOUT WHAT THE EVIDENCE IN THIS TRIAL HAS ACTUALLY SHOWN, AND WHEN YOU DO THAT, THE ONLY RESULT THAT YOU'RE ABLE TO REACH THAT IS SUPPORTED BY ALL OF THE EVIDENCE IN THIS CASE WILL BE A VERDICT OF GUILTY ON EVERY COUNT IN THE INDICTMENT.

ON BEHALF OF THE UNITED STATES, THANK YOU FOR YOUR ATTENTION THROUGHOUT THE TRIAL AND TODAY.

THE COURT:  THANK YOU, MR. BOSTIC.

LADIES AND GENTLEMEN, THAT CONCLUDES THE ARGUMENTS IN THE CASE.  THE ONLY THINGS PRIOR TO YOUR DELIBERATIONS ARE MY INSTRUCTIONS.  LET'S TAKE ABOUT A 12 MINUTE BREAK.  THE INSTRUCTIONS WILL TAKE A LITTLE LESS THAN AN HOUR TO READ TO YOU I BELIEVE.  WHY DON'T WE TAKE A 10 OR 12 MINUTE BREAK NOW, WE'LL RETURN AND I'LL READ THOSE INSTRUCTIONS TO YOU.

LET ME TELL YOU, YOU WILL, AND I THINK I TOLD YOU THIS BEFORE IN OUR VOIR DIRE AND IN OUR PRELIMINARY INSTRUCTIONS, EACH OF YOU, EACH OF THE 12 JURORS WILL HAVE A COPY OF THE INSTRUCTIONS IN THE DELIBERATION ROOM.  YOU WON'T HAVE IT HERE WHILE I READ THEM TO YOU, BUT YOU WILL HAVE THEM IN THE DELIBERATION ROOM FOR YOU TO REFER TO.

SO LET'S TAKE ABOUT A 12 MINUTE BREAK NOW.  WE'LL COME BACK, AND I'LL READ THE INSTRUCTIONS.  THANK YOU.

(RECESS FROM 12:57 P.M. UNTIL 1:18 P.M.)

THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

7686

ALL COUNSEL ARE PRESENT. MR. BALWANI IS PRESENT.

OUR JURY AND ALTERNATES ARE PRESENT. LADIES AND GENTLEMEN, I WILL NOW READ TO YOU THE FINAL INSTRUCTIONS. AS I INDICATED, EACH OF YOU WILL HAVE A COPY OF THESE INSTRUCTIONS FOR YOU TO REFERENCE IN THE JURY ROOM.

MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL OF THE EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT APPLIES TO THIS CASE. A COPY OF THESE INSTRUCTIONS WILL BE AVAILABLE IN THE JURY ROOM FOR YOU TO CONSULT.

IT IS YOUR DUTY TO WEIGH AND TO EVALUATE ALL OF THE EVIDENCE RECEIVED IN THE CASE AND IN THAT PROCESS TO DECIDE THE FACTS. IT IS ALSO YOUR DUTY TO APPLY THE LAW AS I GIVE IT TO YOU TO THE FACTS AS YOU FIND THEM WHETHER YOU AGREE WITH THE LAW OR NOT. YOU MUST DECIDE THIS CASE SOLELY ON THE EVIDENCE AND THE LAW. DO NOT ALLOW PERSONAL LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR OR PUBLIC OPINION TO INFLUENCE YOU.

YOU SHOULD ALSO NOT BE INFLUENCED BY ANY PERSON'S RACE, COLOR, RELIGIOUS BELIEFS, NATIONAL ANCESTRY, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER, PROFESSION, CELEBRITY, ECONOMIC CIRCUMSTANCES, POSITION IN LIFE OR POSITION IN THE COMMUNITY.

ALSO, DO NOT ALLOW YOURSELF TO BE INFLUENCED BY PERSONAL LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION, OR BIASES, INCLUDING UNCONSCIOUS BIASES. UNCONSCIOUS BIASES ARE STEREOTYPES, ATTITUDES, OR PREFERENCES THAT PEOPLE MAY

CONSCIOUSLY REJECT BUT MAY BE EXPRESSED WITHOUT CONSCIOUS AWARENESS, CONTROL, OR INTENTION.

YOU WILL RECALL THAT YOU TOOK AN OATH PROMISING TO DO SO AT THE BEGINNING OF THE CASE.

YOU MUST FOLLOW ALL OF THESE INSTRUCTIONS AND NOT SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL IMPORTANT.

PLEASE DO NOT READ INTO THESE INSTRUCTIONS OR INTO ANYTHING I MAY HAVE SAID OR DONE ANY SUGGESTION AS TO WHAT VERDICT YOU SHOULD RETURN -- THAT IS A MATTER ENTIRELY UP TO YOU.

THE INDICTMENT IS NOT EVIDENCE.  MR. BALWANI, THE DEFENDANT, HAS PLEADED NOT GUILTY TO THE CHARGES.  MR. BALWANI IS PRESUMED TO BE INNOCENT UNLESS AND UNTIL THE GOVERNMENT PROVES HIM GUILTY BEYOND A REASONABLE DOUBT.

IN ADDITION, MR. BALWANI DOES NOT HAVE TO TESTIFY OR PRESENT ANY EVIDENCE.  MR. BALWANI DOES NOT HAVE TO PROVE INNOCENCE; THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT.

FOR REASONS THAT DO NOT CONCERN YOU, THE CASE AGAINST MR. BALWANI'S CODEFENDANT, MS. ELIZABETH HOLMES, IS NOT BEFORE YOU.  DO NOT SPECULATE WHY.  THIS FACT SHOULD NOT INFLUENCE YOUR VERDICT WITH REFERENCE TO MR. BALWANI.

YOU HAVE HEARD EVIDENCE THAT MS. HOLMES HAS BEEN TRIED BEFORE.  KEEP IN MIND, HOWEVER, THAT YOU MUST DECIDE THIS CASE SOLELY ON THE EVIDENCE PRESENTED TO YOU IN THIS TRIAL.  YOU ARE

NOT TO CONSIDER THE FACT OF OR ANY OTHER ASPECT OF A PREVIOUS TRIAL INVOLVING MS. HOLMES IN DECIDING THIS CASE. YOU MUST BASE YOUR VERDICT SOLELY ON THE EVIDENCE RECEIVED IN THIS TRIAL.

A DEFENDANT IN A CRIMINAL CASE HAS A CONSTITUTIONAL RIGHT NOT TO TESTIFY. IN ARRIVING AT YOUR VERDICT, THE LAW PROHIBITS YOU FROM CONSIDERING IN ANY MANNER THAT MR. BALWANI DID NOT TESTIFY.

PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES YOU FIRMLY CONVINCED MR. BALWANI IS GUILTY. IT IS NOT REQUIRED THAT THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

A REASONABLE DOUBT IS A DOUBT BASED UPON REASON AND COMMON SENSE AND IS NOT BASED PURELY ON SPECULATION. IT MAY ARISE FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF THE EVIDENCE, OR FROM LACK OF EVIDENCE.

IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF THE EVIDENCE, YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT THAT MR. BALWANI IS GUILTY, IT IS YOUR DUTY TO FIND MR. BALWANI NOT GUILTY.

ON THE OTHER HAND, IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF THE EVIDENCE, YOU ARE CONVINCED BEYOND A REASONABLE DOUBT THAT MR. BALWANI IS GUILTY, IT IS YOUR DUTY TO FIND MR. BALWANI GUILTY.

THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE FACTS ARE CONSISTS OF:

7689

THE SWORN TESTIMONY OF ANY WITNESS;

THE EXHIBITS THAT ARE RECEIVED IN EVIDENCE; AND,

ANY FACTS TO WHICH THE PARTIES HAVE AGREED.

IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE. THE FOLLOWING THINGS ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE FACTS ARE:

QUESTIONS, STATEMENTS, OBJECTIONS, AND ARGUMENTS BY THE LAWYERS ARE NOT EVIDENCE. THE LAWYERS ARE NOT WITNESSES. ALTHOUGH YOU MUST CONSIDER A LAWYER'S QUESTIONS TO UNDERSTAND THE ANSWERS OF A WITNESS, THE LAWYER'S QUESTIONS ARE NOT EVIDENCE.

SIMILARLY, WHAT THE LAWYERS HAVE SAID IN THEIR OPENING STATEMENTS, CLOSING ARGUMENTS AND AT OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE. IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THE LAWYERS STATE THEM, YOUR MEMORY OF THEM CONTROLS.

ANY TESTIMONY THAT I HAVE EXCLUDED, STRICKEN, OR INSTRUCTED YOU TO DISREGARD IS NOT EVIDENCE. IN ADDITION, SOME EVIDENCE WAS RECEIVED ONLY FOR A LIMITED PURPOSE; WHEN I HAVE INSTRUCTED YOU TO CONSIDER CERTAIN EVIDENCE IN A LIMITED WAY, YOU MUST DO SO.

ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE COURT WAS NOT IN SESSION IS NOT EVIDENCE. YOU ARE TO DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

SER-1376

EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL. DIRECT EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID. CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS, IT IS PROOF OF ONE OR MORE FACTS FROM WHICH ONE CAN FIND ANOTHER FACT.

YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL EVIDENCE. EITHER CAN BE USED TO PROVE ANY FACT. THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE. IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

NOW, BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND SEE THAT THE SIDEWALK IS WET, YOU MAY FIND FROM THAT FACT THAT IT RAINED DURING THE NIGHT. HOWEVER, OTHER EVIDENCE SUCH AS A TURNED-ON GARDEN HOSE MAY PROVIDE AN EXPLANATION FOR WATER ON THE SIDEWALK. THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS BEEN PROVED BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL OF THE EVIDENCE IN LIGHT OF REASON, EXPERIENCE, AND COMMON SENSE.

IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE. YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR NONE OF IT.

IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE INTO ACCOUNT:

SER-1377

THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO;

THE WITNESS'S MEMORY;

THE WITNESS'S MANNER WHILE TESTIFYING;

THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF ANY;

THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S TESTIMONY;

THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF ALL OF THE EVIDENCE; AND,

ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

YOU SHOULD USE THE SAME STANDARD IN JUDGING THE CREDIBILITY OF EVERY WITNESS, REGARDLESS OF WHAT HIS OR HER OCCUPATION OR BACKGROUND MAY BE.

SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT THEY REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT, BUT REMEMBER IT DIFFERENTLY.  YOU MAY CONSIDER THESE DIFFERENCES, BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT DIFFERS FROM OTHER TESTIMONY.

HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAID.  ON THE OTHER

SER-1378

7692

HAND, IF YOU THINK THE WITNESS TESTIFIED UNTRUTHFULLY ABOUT SOME THINGS BUT TOLD THE TRUTH ABOUT OTHERS, YOU MAY ACCEPT THE PART YOU THINK IS TRUE AND IGNORE THE REST.

THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT IT.  WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES ARE AND HOW MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

YOU HAVE HEARD TESTIMONY FROM RICHARD SONNIER WHO TESTIFIED TO HIS OPINIONS AND THE REASONS FOR HIS OPINIONS. THIS OPINION TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR EXPERIENCE OF THIS WITNESS.

SUCH OPINION TESTIMONY SHOULD BE JUDGED LIKE ANY OTHER TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT, AND GIVE IT AS MUCH WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION, AND ALL OF THE OTHER EVIDENCE IN THE CASE.

YOU HAVE HEARD TESTIMONY FROM DR. AUDRA ZACHMAN AND DR. MARK BURNES WHO TESTIFIED TO BOTH FACTS AND OPINIONS AND THE REASONS FOR THEIR OPINIONS.

FACT TESTIMONY IS BASED ON WHAT THE WITNESS SAW, HEARD, OR DID.

OPINION TESTIMONY IS BASED ON THE EDUCATION OR EXPERIENCE OF THE WITNESS.

AS TO THE TESTIMONY ABOUT FACTS, IT IS YOUR JOB TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR NONE OF IT.  YOU MAY TAKE INTO ACCOUNT THE FACTORS DISCUSSED EARLIER IN THESE INSTRUCTIONS THAT WERE PROVIDED TO ASSIST YOU IN WEIGHING THE CREDIBILITY OF WITNESSES.

AS TO THE TESTIMONY ABOUT THE WITNESS'S OPINIONS, THIS OPINION TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR EXPERIENCE OF THIS WITNESS.  OPINION TESTIMONY SHOULD BE JUDGED LIKE ANY OTHER TESTIMONY.  YOU MAY ACCEPT ALL OF IT, PART OF IT, OR NONE OF IT.  YOU SHOULD GIVE IT AS MUCH WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION, AND ALL OF THE OTHER EVIDENCE IN THE CASE.

DURING THE TRIAL CERTAIN CHARTS AND SUMMARIES WERE SHOWN TO YOU IN ORDER TO HELP EXPLAIN THE EVIDENCE IN THE CASE. THESE CHARTS AND SUMMARIES WERE NOT ADMITTED INTO EVIDENCE AND WILL NOT GO INTO THE JURY ROOM WITH YOU.  THEY ARE NOT THEMSELVES EVIDENCE OR PROOF OF ANY FACTS.  IF THEY DO NOT CORRECTLY REFLECT THE FACTS OR FIGURES SHOWN BY THE EVIDENCE IN THE CASE, YOU SHOULD DISREGARD THESE CHARTS AND SUMMARIES AND DETERMINE THE FACTS FROM THE UNDERLYING EVIDENCE.

A SEPARATE CRIME IS CHARGED AGAINST MR. BALWANI IN EACH COUNT.  YOU MUST DECIDE EACH COUNT SEPARATELY.  YOUR VERDICT ON ONE COUNT SHOULD NOT CONTROL YOUR VERDICT ON ANY OTHER COUNT.

THE INDICTMENT CHARGES THAT THE OFFENSES ALLEGED IN COUNTS ONE THROUGH TWELVE WERE COMMITTED ON OR ABOUT A CERTAIN DATE.

ALTHOUGH IT IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE BEYOND A REASONABLE DOUBT THAT THE OFFENSES WERE COMMITTED ON A DATE REASONABLY NEAR THE DATE ALLEGED IN THE INDICTMENT, IT IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT THE OFFENSES WERE COMMITTED PRECISELY ON THE DATE CHARGED.

YOU ARE HERE ONLY TO DETERMINE WHETHER MR. BALWANI IS GUILTY OR NOT GUILTY OF THE CHARGES IN THE INDICTMENT. MR. BALWANI IS NOT ON TRIAL FOR ANY CONDUCT OR OFFENSE NOT CHARGED IN THE INDICTMENT.

MR. BALWANI IS CHARGED IN COUNTS ONE AND TWO OF THE INDICTMENT WITH CONSPIRING TO COMMIT WIRE FRAUD IN VIOLATION OF SECTION 1349 OF TITLE 18 OF THE UNITED STATES CODE.

MR. BALWANI IS CHARGED IN COUNT ONE OF THE INDICTMENT WITH CONSPIRING TO COMMIT WIRE FRAUD AGAINST INVESTORS IN THERANOS DURING THE PERIOD 2010 TO 2015.

MR. BALWANI IS CHARGED IN COUNT TWO OF THE INDICTMENT WITH CONSPIRING TO COMMIT WIRE FRAUD AGAINST PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES DURING THE PERIOD 2013 TO 2016.

I WILL DEFINE WIRE FRAUD LATER IN THESE INSTRUCTIONS.

IN ORDER FOR MR. BALWANI TO BE FOUND OF EITHER COUNT, YOU MUST ALL UNANIMOUSLY AGREE WITH RESPECT TO EACH COUNT THAT THE GOVERNMENT HAS PROVED EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

FIRST, THAT THERE WAS AN AGREEMENT BETWEEN TWO OR MORE

7695

PERSONS TO COMMIT WIRE FRAUD AS CHARGED IN THE INDICTMENT; AND,

SECOND, THAT MR. BALWANI BECAME A MEMBER OF THE ALLEGED CONSPIRACY KNOWING OF AT LEAST ONE OF ITS OBJECTS AND INTENDING TO HELP ACCOMPLISH IT.

A CONSPIRACY IS A KIND OF CRIMINAL PARTNERSHIP -- AN AGREEMENT OF TWO OR MORE PERSONS TO COMMIT ONE OR MORE CRIMES. THE CRIME OF CONSPIRACY IS THE AGREEMENT TO DO SOMETHING UNLAWFUL. IT DOES NOT MATTER WHETHER THE CRIME AGREED UPON WAS COMMITTED.

FOR A CONSPIRACY TO HAVE EXISTED, IT IS NOT NECESSARY THAT THE CONSPIRATORS MADE A FORMAL AGREEMENT OR THAT THEY AGREED ON EVERY DETAIL OF THE CONSPIRACY. IT IS NOT ENOUGH, HOWEVER, THAT THEY SIMPLY MET, DISCUSSED MATTERS OF COMMON INTEREST, ACTED IN SIMILAR WAYS, OR PERHAPS HELPED ONE ANOTHER. NOR IS IT ENOUGH, STANDING ALONE, THAT THEY HAD A BUSINESS OR ROMANTIC RELATIONSHIP. YOU MUST FIND THAT THERE WAS A PLAN TO COMMIT WIRE FRAUD AS ALLEGED IN THE INDICTMENT AS AN OBJECT OF THE CONSPIRACY WITH ALL OF YOU AGREEING AS TO THE PARTICULAR CRIME WHICH THE CONSPIRATORS AGREED TO COMMIT.

ONE BECOMES A MEMBER OF A CONSPIRACY BY WILLFULLY PARTICIPATING IN THE UNLAWFUL PLAN WITH THE INTENT TO ADVANCE OR FURTHER SOME OBJECT OR PURPOSE OF THE CONSPIRACY, EVEN THOUGH THE PERSON DOES NOT HAVE FULL KNOWLEDGE OF ALL THE DETAILS OF THE CONSPIRACY. FURTHERMORE, ONE WHO WILLFULLY JOINS AN EXISTING CONSPIRACY IS AS RESPONSIBLE FOR IT AS THE

ORIGINATORS.

ON THE OTHER HAND, ONE WHO HAS NO KNOWLEDGE OF A CONSPIRACY BUT HAPPENS TO ACT IN A WAY THAT FURTHERS SOME OBJECT OR PURPOSE OF THE CONSPIRACY DOES NOT THEREBY BECOME A CONSPIRATOR.

SIMILARLY, A PERSON DOES NOT BECOME A CONSPIRATOR MERELY BY ASSOCIATING WITH ONE OR MORE PERSONS WHO ARE CONSPIRATORS, NOR MERELY BY KNOWING THAT A CONSPIRACY EXISTS.

WILLFULLY MEANS TO ACT WITH KNOWLEDGE THAT ONE'S CONDUCT IS UNLAWFUL AND WITH THE INTENT TO DO SOMETHING THE LAW FORBIDS.

A CONSPIRACY MAY CONTINUE FOR A LONG PERIOD OF TIME AND MAY INCLUDE THE PERFORMANCE OF MANY TRANSACTIONS.  IT IS NOT NECESSARY THAT ALL MEMBERS OF THE CONSPIRACY JOIN IT AT THE SAME TIME, AND ONE MAY BECOME A MEMBER OF A CONSPIRACY WITHOUT FULL KNOWLEDGE OF ALL THE DETAILS OF THE UNLAWFUL SCHEME OR THE NAMES, IDENTITIES, OR LOCATIONS OF ALL OF THE OTHER MEMBERS.

EVEN IF MR. BALWANI DID NOT DIRECTLY CONSPIRE WITH OTHER CONSPIRATORS IN THE OVERALL SCHEME, MR. BALWANI HAS, IN EFFECT, AGREED TO PARTICIPATE IN AN ALLEGED CONSPIRACY IF THE GOVERNMENT PROVES EACH OF THE FOLLOWING BEYOND A REASONABLE DOUBT:

FIRST, THAT MR. BALWANI DIRECTLY CONSPIRED WITH ONE OR MORE CONSPIRATORS TO CARRY OUT AT LEAST ONE OF THE OBJECTS OF THE CONSPIRACY;

SECOND, THAT MR. BALWANI KNEW OR HAD REASON TO KNOW THAT OTHER CONSPIRATORS WERE INVOLVED WITH THOSE WITH WHOM MR. BALWANI DIRECTLY CONSPIRED; AND,

THIRD, THAT MR. BALWANI HAD REASON TO BELIEVE THAT WHATEVER BENEFITS MR. BALWANI MIGHT GET FROM THE ALLEGED CONSPIRACY WERE PROBABLY DEPENDENT UPON THE SUCCESS OF THE ENTIRE VENTURE.

IT IS NOT A DEFENSE THAT A PERSON'S PARTICIPATION IN A CONSPIRACY WAS MINOR OR FOR A SHORT PERIOD OF TIME.

EACH MEMBER OF A CONSPIRACY IS RESPONSIBLE FOR THE REASONABLY FORESEEABLE ACTIONS OF THE OTHER CONSPIRATORS PERFORMED DURING THE COURSE AND IN FURTHERANCE OF THE CONSPIRACY. IF ONE MEMBER OF A CONSPIRACY COMMITS A CRIME IN FURTHERANCE OF A CONSPIRACY, THE OTHER MEMBERS HAVE ALSO UNDER THE LAW COMMITTED THAT CRIME.

THEREFORE, YOU MAY FIND MR. BALWANI GUILTY OF WIRE FRAUD AGAINST INVESTORS IN THERANOS AS CHARGED IN COUNTS THREE THROUGH EIGHT OF THE INDICTMENT IF THE GOVERNMENT HAS PROVED EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

FIRST, A COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD AS ALLEGED IN THAT COUNT;

SECOND, THE COCONSPIRATOR WAS A MEMBER OF THE CONSPIRACY CHARGED IN COUNT ONE OF THE INDICTMENT;

THIRD, THE COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD IN FURTHERANCE OF THE CONSPIRACY;

FOURTH, MR. BALWANI WAS A MEMBER OF THE SAME CONSPIRACY AT THE TIME THE OFFENSE CHARGED IN COUNTS THREE THROUGH EIGHT WAS COMMITTED BY THE COCONSPIRATOR.

I'LL READ THAT ONE AGAIN.

FOURTH, MR. BALWANI WAS A MEMBER OF THE SAME CONSPIRACY AT THE TIME THE OFFENSE CHARGED IN COUNTS THREE THROUGH EIGHT WAS COMMITTED BY THE COCONSPIRATOR; AND,

FIFTH, THE OFFENSE FELL WITHIN THE SCOPE OF THE UNLAWFUL AGREEMENT AND COULD REASONABLY HAVE BEEN FORESEEN BY MR. BALWANI TO BE A NECESSARY OR NATURAL CONSEQUENCE OF THE UNLAWFUL AGREEMENT.

YOU MAY FIND MR. BALWANI GUILTY OF WIRE FRAUD AGAINST PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES AS CHARGED IN COUNTS NINE THROUGH TWELVE OF THE INDICTMENT IF THE GOVERNMENT HAS PROVED EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

FIRST, THE COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD AS ALLEGED IN THAT COUNT;

SECOND, THE COCONSPIRATOR WAS A MEMBER OF THE CONSPIRACY CHARGED IN COUNT TWO OF THE INDICTMENT;

THIRD, THE COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD IN FURTHERANCE OF THE CONSPIRACY;

FOURTH, MR. BALWANI WAS A MEMBER OF THE SAME CONSPIRACY AT THE TIME THE OFFENSE CHARGED IN COUNTS NINE THROUGH TWELVE WAS COMMITTED BY THE COCONSPIRATOR; AND,

FIFTH, THE OFFENSE FELL WITHIN THE SCOPE OF THE UNLAWFUL AGREEMENT AND COULD REASONABLY HAVE BEEN FORESEEN BY MR. BALWANI TO BE A NECESSARY OR NATURAL CONSEQUENCE OF THE UNLAWFUL AGREEMENT.

MR. BALWANI IS CHARGED IN COUNTS THREE THROUGH TWELVE OF THE INDICTMENT WITH WIRE FRAUD IN VIOLATION OF SECTION 1343 OF TITLE 18 OF THE UNITED STATES CODE.

MR. BALWANI IS CHARGED IN COUNTS THREE THROUGH EIGHT OF THE INDICTMENT WITH WIRE FRAUD AGAINST INVESTORS IN THERANOS. IN PARTICULAR:

MR. BALWANI IS CHARGED IN COUNT THREE WITH WIRE FRAUD IN CONNECTION WITH A WIRE TRANSFER OF $99,990 ON OR ABOUT DECEMBER 30, 2013.

MR. BALWANI IS CHARGED IN COUNT FOUR WITH WIRE FRAUD IN CONNECTION WITH A WIRE TRANSFER OF $5,349,900 ON OR ABOUT DECEMBER 31, 2013.

MR. BALWANI IS CHARGED IN COUNT FIVE WITH WIRE FRAUD IN CONNECTION WITH A WIRE TRANSFER OF $4,875,000 ON OR ABOUT DECEMBER 31, 2013.

MR. BALWANI IS CHARGED IN COUNT SIX WITH WIRE FRAUD IN CONNECTION WITH A WIRE TRANSFER OF $38,336,632 ON OR ABOUT FEBRUARY 6TH, 2014.

MR. BALWANI IS CHARGED IN COUNT SEVEN WITH WIRE FRAUD IN CONNECTION WITH A WIRE TRANSFER OF $99,999,984 ON OR ABOUT OCTOBER 31, 2014.

MR. BALWANI IS CHARGED IN COUNT EIGHT WITH WIRE FRAUD IN CONNECTION WITH A WIRE TRANSFER OF $5,999,997 ON OR ABOUT OCTOBER 31, 2014.

MR. BALWANI IS CHARGED IN COUNTS NINE THROUGH TWELVE OF THE INDICTMENT WITH WIRE FRAUD AGAINST PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES.  IN PARTICULAR:

MR. BALWANI IS CHARGED IN COUNT NINE WITH WIRE FRAUD IN CONNECTION WITH A TELEPHONE CALL FROM PATIENT INITIALS B.B. TO THERANOS REGARDING B.B.'S LABORATORY BLOOD TEST RESULTS ON OR ABOUT OCTOBER 12, 2015.

MR. BALWANI IS CHARGED IN COUNT TEN WITH WIRE FRAUD IN CONNECTION WITH A WIRE TRANSMISSION OF PATIENT INITIAL E.T.'S LABORATORY BLOOD TEST RESULTS ON OR ABOUT MAY 11, 2015.

MR. BALWANI IS CHARGED IN COUNT ELEVEN WITH WIRE FRAUD IN CONNECTION WITH A WIRE TRANSMISSION OF PATIENT INITIAL M.E.'S LABORATORY BLOOD TEST RESULTS ON OR ABOUT MAY 16TH, 2015.

MR. BALWANI IS CHARGED IN COUNT TWELVE WITH WIRE FRAUD IN CONNECTION WITH A WIRE TRANSFER OF 112-6661 ON OR ABOUT AUGUST 3, 2015.

IN ORDER FOR MR. BALWANI TO BE FOUND GUILTY OF EACH COUNT OF WIRE FRAUD, YOU MUST ALL UNANIMOUSLY AGREE WITH RESPECT TO EACH COUNT THAT THE GOVERNMENT HAS PROVED EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

FIRST, MR. BALWANI KNOWINGLY PARTICIPATED IN, DEVISED, OR INTENDED TO DEVISE A SCHEME OR PLAN TO DEFRAUD OR A SCHEME OR

PLAN FOR OBTAINING MONEY OR PROPERTY BY MEANS OF FALSE OR FRAUDULENT PRETENSES, REPRESENTATIONS, OR PROMISES. A SCHEME TO DEFRAUD IS A DECEPTIVE SCHEME TO DEPRIVE A PERSON OF MONEY OR PROPERTY. DECEITFUL STATEMENTS OF HALF-TRUTHS MAY CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS;

SECOND, THE STATEMENTS MADE AS PART OF THE SCHEME WERE MATERIAL. STATEMENTS ARE MATERIAL IF THEY HAD A NATURAL TENDENCY TO INFLUENCE OR WERE CAPABLE OF INFLUENCING A PERSON TO PART WITH MONEY OR PROPERTY;

THIRD, MR. BALWANI ACTED WITH THE INTENT TO DEFRAUD, THAT IS, THE INTENT TO DECEIVE AND CHEAT. THE INTENT TO DECEIVE AND CHEAT IS THE INTENT TO DEPRIVE SOMEONE OF MONEY OR PROPERTY BY MEANS OF DECEPTION; AND,

FOURTH, MR. BALWANI USED, OR CAUSED TO BE USED, AN INTERSTATE WIRE COMMUNICATION TO CARRY OUT OR ATTEMPT TO CARRY OUT AN ESSENTIAL PART OF THE SCHEME. THE WIRE ITSELF NEED NOT BE FALSE OR MISLEADING.

IN DETERMINING WHETHER A SCHEME TO DEFRAUD EXISTS, YOU MAY CONSIDER NOT ONLY MR. BALWANI'S WORDS AND STATEMENTS BUT ALSO THE CIRCUMSTANCES IN WHICH THEY ARE USED AS A WHOLE.

A WIRING IS CAUSED WHEN ONE KNOWS THAT A WIRE WILL BE USED IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN REASONABLY FORESEE SUCH USE.

IT NEED NOT HAVE BEEN REASONABLY FORESEEABLE TO MR. BALWANI THAT THE WIRE COMMUNICATION WOULD BE INTERSTATE IN

NATURE. RATHER, IT MUST HAVE BEEN REASONABLY FORESEEABLE TO MR. BALWANI THAT SOME WIRE COMMUNICATION WOULD OCCUR IN FURTHERANCE OF THE SCHEME, AND AN INTERSTATE WIRE COMMUNICATION MUST HAVE ACTUALLY OCCURRED IN FURTHERANCE OF THE SCHEME.

AN INTENT TO DEFRAUD IS AN INTENT TO DECEIVE AND CHEAT, THAT IS, TO DEPRIVE SOMEONE OF MONEY OR PROPERTY BY MEANS OF DECEPTION.

YOU MAY CONSIDER WHETHER MR. BALWANI HAD AN HONEST, GOOD FAITH BELIEF IN THE TRUTH OF THE SPECIFIC MISREPRESENTATIONS ALLEGED IN THE INDICTMENT IN DETERMINING WHETHER OR NOT HE ACTED WITH INTENT TO DEFRAUD.

AN ACT IS DONE KNOWINGLY IF MR. BALWANI WAS AWARE OF THE ACT AND DID NOT ACT THROUGH IGNORANCE, MISTAKE, OR ACCIDENT. THE GOVERNMENT IS NOT REQUIRED TO PROVE THAT MR. BALWANI KNEW THAT HIS ACTS WERE UNLAWFUL. YOU MAY CONSIDER EVIDENCE OF MR. BALWANI'S WORDS OR ACTS, ALONG WITH ALL OF THE OTHER EVIDENCE IN DECIDING WHETHER MR. BALWANI ACTED KNOWINGLY.

TO FIND THAT MR. BALWANI ACTED KNOWINGLY, YOU MUST FIND THAT HE HIMSELF HAD KNOWLEDGE OF THE FACT AT ISSUE.

MR. BALWANI MAY BE FOUND GUILTY OF WIRE FRAUD AS CHARGED IN COUNTS THREE THROUGH TWELVE OF THE INDICTMENT, EVEN IF MR. BALWANI PERSONALLY DID NOT COMMIT THE ACT OR ACTS CONSTITUTING THE CRIME BUT AIDED AND ABETTED IN ITS COMMISSION.

TO AID AND ABET MEANS INTENTIONALLY TO HELP SOMEONE ELSE COMMIT A CRIME. TO PROVE MR. BALWANI GUILTY OF WIRE FRAUD BY

7703

AIDING AND ABETTING, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING BEYOND A REASONABLE DOUBT:

FIRST, SOMEONE ELSE COMMITTED THE CONDUCT CHARGED IN COUNTS THREE THROUGH TWELVE OF THE INDICTMENT;

SECOND, MR. BALWANI AIDED, COUNSELLED, COMMANDED, INDUCED, OR PROCURED THAT PERSON WITH RESPECT TO AT LEAST ONE ELEMENT OF WIRE FRAUD AS CHARGED IN COUNTS THREE THROUGH TWELVE OF THE INDICTMENT;

THIRD, MR. BALWANI ACTED WITH THE INTENT TO FACILITATE WIRE FRAUD AS CHARGED IN COUNTS THREE THROUGH TWELVE OF THE INDICTMENT; AND,

FOURTH, MR. BALWANI ACTED BEFORE THE CRIME WAS COMPLETED.

IT IS NOT ENOUGH THAT MR. BALWANI MERELY ASSOCIATED WITH THE PERSON COMMITTING THE CRIME OR UNKNOWINGLY OR UNINTENTIONALLY DID THINGS THAT WERE HELPFUL TO THAT PERSON, OR WAS PRESENT AT THE SCENE OF THE CRIME. THE EVIDENCE MUST SHOW BEYOND A REASONABLE DOUBT THAT MR. BALWANI ACTED WITH THE KNOWLEDGE AND INTENTION OF HELPING THAT PERSON COMMIT WIRE FRAUD AS CHARGED IN COUNTS THREE THROUGH TWELVE OF THE INDICTMENT.

A DEFENDANT ACTS WITH THE INTENT TO FACILITATE THE CRIME WHEN THE DEFENDANT ACTIVELY PARTICIPATE IN A CRIMINAL VENTURE WITH ADVANCE KNOWLEDGE OF THE CRIME AND HAVING ACQUIRED THAT KNOWLEDGE WHEN THE DEFENDANT STILL HAD A REALISTIC OPPORTUNITY TO WITHDRAW FROM THE CRIME.

**SER-1390**

THE GOVERNMENT IS NOT REQUIRED TO PROVE PRECISELY WHICH PERSON ACTUALLY COMMITTED THE CRIME AND WHICH PERSON AIDED AND ABETTED IF YOU FIND.

IF YOU FIND THAT MR. BALWANI WAS A MEMBER OF THE SCHEME TO DEFRAUD INVESTORS IN THERANOS CHARGED IN COUNTS THREE THROUGH EIGHT, AND THAT MR. BALWANI HAD THE INTENT TO DEFRAUD INVESTORS IN THERANOS, MR. BALWANI MAY BE RESPONSIBLE FOR OTHER CO-SCHEMERS' ACTIONS DURING THE COURSE OF AND IN FURTHERANCE OF THE ALLEGED SCHEME, EVEN IF MR. BALWANI DID NOT KNOW WHAT THEY SAID OR DID.

FOR MR. BALWANI TO BE GUILTY OF AN OFFENSE COMMITTED BY A CO-SCHEMER IN FURTHERANCE OF THE SCHEME, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

FIRST, THE CO-SCHEMER WAS A MEMBER OF THE SCHEME TO DEFRAUD INVESTORS CHARGED IN COUNTS THREE THROUGH EIGHT OF THE INDICTMENT;

SECOND, THE COSCHEMER COMMITTED THE OFFENSE IN FURTHERANCE OF THE SCHEME TO DEFRAUD INVESTORS;

THIRD, MR. BALWANI WAS A MEMBER OF THE SAME SCHEME TO DEFRAUD AND POSSESSED THE INTENT TO DEFRAUD THERANOS INVESTORS; AND,

FOURTH, THE OFFENSE COMMITTED BY THE OTHER -- BY THE COSCHEMER FELL WITHIN THE SCOPE OF THE SCHEME TO DEFRAUD AND WAS ONE THAT MR. BALWANI COULD REASONABLY FORESEE AS A NECESSARY AND NATURAL SEQUENCE OF THE SCHEME TO DEFRAUD.

I'LL READ THAT AGAIN.

FOURTH, THE OFFENSE COMMITTED BY THE COSCHEMER FELL WITHIN THE SCOPE OF THE SCHEME TO DEFRAUD AND WAS ONE THAT MR. BALWANI COULD REASONABLY FORESEE AS A NECESSARY AND NATURAL CONSEQUENCE OF THE SCHEME TO DEFRAUD.

IF YOU FIND THAT MR. BALWANI WAS A MEMBER OF THE SCHEME TO DEFRAUD PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES CHARGED IN COUNTS NINE THROUGH TWELVE AND THAT MR. BALWANI HAD THE INTENT TO DEFRAUD THERANOS PAYING PATIENTS, MR. BALWANI MAY BE RESPONSIBLE FOR OTHER COSCHEMERS' ACTIONS DURING THE COURSE OF AND IN FURTHERANCE OF THE ALLEGED SCHEME, EVEN IF MR. BALWANI DID NOT KNOW WHAT THEY SAID OR DID.

FOR MR. BALWANI TO BE GUILTY OF AN OFFENSE COMMITTED BY A COSCHEMER IN FURTHERANCE OF THE SCHEME, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

FIRST, THE COSCHEMER WAS A MEMBER OF THE SCHEME TO DEFRAUD PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES CHARGED IN COUNTS NINE THROUGH TWELVE OF THE INDICTMENT;

SECOND, THE COSCHEMER COMMITTED THE OFFENSE IN FURTHERANCE OF THE SCHEME TO DEFRAUD THERANOS PAYING PATIENTS;

THIRD, MR. BALWANI WAS A MEMBER OF THE SAME SCHEME TO DEFRAUD, AND POSSESSED THE INTENT TO DEFRAUD THERANOS PAYING PATIENTS; AND,

FOURTH, THE OFFENSE COMMITTED BY THE COSCHEMER FELL WITHIN THE SCOPE OF THE SCHEME TO DEFRAUD AND WAS ONE THAT MR. BALWANI

SER-1392

COULD REASONABLY FORESEE AS A NECESSARY AND NATURAL CONSEQUENCE OF THE SCHEME TO DEFRAUD.

AN ALLEGED VICTIM'S NEGLIGENCE IS NOT A DEFENSE TO WIRE FRAUD. YOU HAVE HEARD EVIDENCE REGARDING INVESTORS' PROCESS FOR DECIDING WHETHER TO INVEST MONEY IN THERANOS. YOU ARE TO CONSIDER THIS EVIDENCE TO THE EXTENT THAT IT HELPS YOU DETERMINE WHETHER MR. BALWANI MADE FALSE OR FRAUDULENT PRETENSES, REPRESENTATIONS, OR PROMISES AS PART OF A SCHEME OR PLAN TO DEFRAUD. AND YOU CAN SEE THE PRIOR WIRE FRAUD INSTRUCTION.

YOU MAY ALSO CONSIDER THIS EVIDENCE TO THE EXTENT THAT IT HELPS YOU DETERMINE WHETHER THE STATEMENTS MADE AS PART OF THE ALLEGED SCHEME WERE MATERIAL; THAT IS, WHETHER THEY HAD A NATURAL TENDENCY OR WERE CAPABLE OF INFLUENCING A PERSON TO PART WITH MONEY OR PROPERTY. AND YOU MAY SEE THE PRIOR WIRE FRAUD INSTRUCTION.

SUCCESS OF A SCHEME TO DEFRAUD IS NOT NECESSARY FOR PURPOSES OF DETERMINING WHETHER WIRE FRAUD OCCURRED. FOR COUNTS THREE THROUGH TWELVE, IT IS NOT NECESSARY THAT MR. BALWANI MADE A PROFIT OR THAT ANYONE ACTUALLY SUFFERED A LOSS.

YOU HAVE HEARD EVIDENCE REGARDING ALLEGED VIOLATIONS AND REGULATIONS OF INDUSTRY STANDARDS. YOU MAY CONSIDER SUCH EVIDENCE, ALONG WITH OTHER EVIDENCE, LIMITED TO ANY PURPOSE FOR WHICH SUCH EVIDENCE WAS ADMITTED, IN ASSESSING WHETHER THE

**SER-1393**

GOVERNMENT HAS PROVED EACH OF THE COUNTS CHARGED IN THE INDICTMENT. HOWEVER, YOU MAY NOT FIND MR. BALWANI LIABLE FOR ANY OF THE OFFENSES ALLEGED IN THE INDICTMENT MERELY BECAUSE HE OR THERANOS MAY HAVE VIOLATED FEDERAL OR STATE REGULATIONS OR BECAUSE MR. BALWANI OR THERANOS MAY HAVE ENGAGED IN NEGLIGENT PRACTICES OR VIOLATED INDUSTRY STANDARDS RELATED TO LABORATORY TESTING OR MEDICAL DEVICES.

WHEN YOU BEGIN YOUR DELIBERATIONS, ELECT ONE MEMBER OF THE JURY AS YOUR FOREPERSON WHO WILL PRESIDE OVER THE DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.

YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO REACH AGREEMENT IF YOU CAN DO SO. YOUR VERDICT, WHETHER GUILTY OR NOT GUILTY, MUST BE UNANIMOUS.

EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF BUT YOU SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL OF THE EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.

DO NOT BE AFRAID TO CHANGE YOUR OPINION IF THE DISCUSSION PERSUADES YOU THAT YOU SHOULD. BUT DO NOT COME TO A DECISION SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT.

IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS VERDICT, BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER HAVING MADE YOUR OWN CONSCIENTIOUS DECISION. DO NOT CHANGE AN HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE SIMPLY TO REACH A VERDICT.

SER-1394

PERFORM THESE DUTIES FAIRLY AND IMPARTIALLY. DO NOT ALLOW PERSONAL LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, OR PUBLIC OPINION TO INFLUENCE YOU. YOU SHOULD ALSO NOT BE INFLUENCED BY ANY PERSON'S RACE, COLOR, RELIGIOUS BELIEFS, NATIONAL ANCESTRY, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER, PROFESSION, CELEBRITY, ECONOMIC CIRCUMSTANCES, OR POSITION IN LIFE OR IN THE COMMUNITY.

ALSO, DO NOT ALLOW YOURSELVES TO BE INFLUENCED BY PERSONAL LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION, OR BIASES, INCLUDING UNCONSCIOUS BIASES. UNCONSCIOUS BIASES ARE STEREOTYPES, ATTITUDES, OR PREFERENCES THAT PEOPLE MAY CONSCIOUSLY REJECT BUT MAY BE EXPRESSED WITHOUT CONSCIOUS AWARENESS, CONTROL, OR INTENTION.

IT IS YOUR DUTY AS JURORS TO CONSULT WITH ONE ANOTHER AND TO DELIBERATE WITH ONE ANOTHER WITH A VIEW TOWARD REACHING AGREEMENT IF YOU CAN DO SO. DURING YOUR DELIBERATIONS, YOU SHOULD NOT HESITATE TO REEXAMINE YOUR OWN VIEWS AND CHANGE YOUR OPINION IF YOU BECOME PERSUADED THAT IT IS WRONG.

BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES. EXCEPT FOR DISCUSSING THE CASE WITH YOUR FELLOW JURORS DURING DELIBERATIONS:

DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

SER-1395

THE CASE OR ANYTHING TO DO WITH IT. THIS RESTRICTION INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE, TABLET, COMPUTER, OR ANY OTHER MEANS, VIA EMAIL, TEXT MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE, OR OTHER FORMS OF SOCIAL MEDIA. THIS RESTRICTION APPLIES TO COMMUNICATING WITH YOUR FAMILY MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS, AND THE PEOPLE INVOLVED IN THE TRIAL. IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT YOU HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE CONTACT TO THE COURT.

DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT; DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES, SEARCHING THE INTERNET (THROUGH GOOGLE OR OTHERWISE) OR USING OTHER REFERENCE MATERIALS, AND DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT THE CASE ON YOUR OWN.

THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH PARTY HAS HAD AN OPPORTUNITY TO ADDRESS. A JUROR WHO VIOLATES THESE RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS, AND A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE ENTIRE TRIAL PROCESS TO START OVER.

IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE NOTIFY THE COURT IMMEDIATELY.

SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL. WHETHER OR

SER-1396

NOT YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF WHAT WAS SAID. NOTES ARE ONLY TO ASSIST YOUR MEMORY. YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR FELLOW JURORS.

THE PUNISHMENT PROVIDED BY LAW FOR THE ALLEGED OFFENSES IS FOR THE COURT TO DECIDE. YOU MAY NOT CONSIDER PUNISHMENT IN DECIDING WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST MR. BALWANI BEYOND A REASONABLE DOUBT.

A VERDICT FORM HAS BEEN PREPARED FOR YOU. AFTER YOU HAVE REACHED UNANIMOUS AGREEMENT ON A VERDICT, YOUR FOREPERSON SHOULD COMPLETE THE VERDICT FORM ACCORDING TO YOUR DELIBERATIONS, SIGN AND DATE IT, AND ADVISE THE CLERK THAT YOU ARE READY TO RETURN TO THE COURTROOM.

IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE CLERK, SIGNED BY ANY ONE OR MORE OF YOU. NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING, AND I WILL RESPOND TO THE JURY CONCERNING THE CASE ONLY IN WRITING OR HERE IN OPEN COURT.

IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE LAWYERS BEFORE ANSWERING, WHICH MAY TAKE SOME TIME. YOU MAY CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY QUESTION. REMEMBER THAT YOU ARE NOT TO TELL ANYONE, INCLUDING ME, HOW THE JURY STANDS NUMERICALLY OR OTHERWISE, ON ANY QUESTION SUBMITTED TO YOU, INCLUDING THE QUESTION OF THE GUILT

OF MR. BALWANI, UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR HAVE BEEN DISCHARGED.

THAT CONCLUDES THE COURT'S READING OF THE INSTRUCTIONS.

ANY OBJECTIONS TO THE INSTRUCTIONS?

MR. SCHENK:  NO, YOUR HONOR.  THANK YOU.

MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

LADIES AND GENTLEMEN, WE'LL NOW CALL UPON OUR COURTROOM DEPUTY TO SWEAR IN AN OFFICIAL WHO WILL TAKE CHARGE OF THE 12 MEMBERS OF THE JURY.

SIR, IF YOU WOULD COME FORWARD.

(COURT SECURITY OFFICER SWORN.)

COURT SECURITY OFFICER:  I AFFIRM.

THE COURT:  THANK YOU THEN.

LADIES AND GENTLEMEN, THE 12 SEATED JURORS WILL NOW PLEASE RETIRE TO THE DELIBERATION ROOM TO BEGIN YOUR DELIBERATIONS.

OUR TWO ALTERNATES, WOULD YOU PLEASE STAY AND REMAIN IN THE COURTROOM FOR JUST A MOMENT.

SO THOSE 12 JURORS MAY NOW RETIRE TO BEGIN YOUR DELIBERATIONS.

(JURORS 1 - 12 OUT AT 2:09 P.M.)

THE COURT:  THANK YOU.  PLEASE BE SEATED.

THE RECORD SHOULD REFLECT THAT OUR 12 SEATED JURORS HAVE LEFT TO BEGIN THEIR DELIBERATIONS.

ALTERNATE JUROR NUMBER 5 AND 6 REMAIN.  PLEASE REMEMBER A

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JUNE 25, 2022