No. 22-10338

In The

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

## APPELLANT'S FURTHER EXCERPTS OF RECORD
## VOLUME 1 OF 1 (PAGES FER-1 – FER-133)

Jeffrey B. Coopersmith
CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98101

Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant*

# TABLE OF CONTENTS

Defendant Ramesh "Sunny" Balwani's Reply in Support of
    Motion for Release Pending Appeal,
    Dkt. No. 1729, filed February 10, 2023 ............................................. FER-3

Defendant Ramesh "Sunny" Balwani's Motion for Release
    Pending Appeal,
    Dkt. No. 1711, filed January 9, 2023 ................................................ FER-23

Mr. Balwani's Supplemental Proposal re: Jury Instructions and
    Verdict Form,
    Dkt. No. 1476, filed June 7, 2022 .................................................... FER-48

Motion to Exclude Evidence and Argument that Pharmaceutical
    Reports were Altered,
    Dkt. No. 1327, filed February 28, 2022 ............................................. FER-75

Declaration of Amy Walsh re Defendant Ramesh Balwani's
    Motion to Exclude Evidence and Argument that
    Pharmaceutical Reports were Altered,
    Dkt. No. 1327-2, filed February 28, 2022 ......................................... FER-87

Exhibit 5 to Declaration of Amy Walsh re Defendant Ramesh
    Balwani's Motion to Exclude Evidence and Argument that
    Pharmaceutical Reports were Altered: Report on Theranos Systems,
    Dkt. No. 1327-3, filed February 28, 2022 ......................................... FER-90

Defendant Ramesh "Sunny" Balwani's Reply in Support of
    Motions for Limine Nos. 2 & 5,
    Dkt. No. 1193, filed December 13, 2021 ........................................... FER-95

Exhibit 52 to Defendant's Replies in Support of his Motions in
    Limine: Excerpts of Trial Testimony of Dr. Kingshuk Das,
    Dkt. No. 1193-2, filed December 13, 2021 ..................................... FER-105

Defendant Ramesh "Sunny" Balwani's Response to Government's
    Motion in Limine No. 12,
    Dkt. No. 1179, filed December 6, 2021 .......................................... FER-116

Defendant Ramesh "Sunny" Balwani's Motions in Limine Nos. 2 & 5,
    Dkt. No. 1156, filed November 19, 2021 ...................................... FER-120

MARK S. DAVIES (Admitted Pro Hac Vice)
JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    (415) 773-5700
Facsimile:     (415) 773-5759

Email: mark.davies@orrick.com; jcoopersmith@orrick.com;
awalsh@orrick.com; scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **DEFENDANT RAMESH "SUNNY" BALWANI'S REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL** |
| v. | |
| RAMESH "SUNNY" BALWANI, | **Date:  February 17, 2023** |
| Defendant. | **Time:  9:30 a.m.** |
| | **CTRM.: 4, 5th Floor** |
| | **Hon. Edward J. Davila** |

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-3

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ............................................................................................................. 1

II.  ARGUMENT .................................................................................................................... 2

   A.  Mr. Balwani Is Not Likely To Flee Or Pose Any Danger. ................................... 2

   B.  Mr. Balwani's Appeal Presents Eight Substantial Questions Warranting A
      New Trial Or A Substantially Reduced Sentence. ................................................ 3

     1.  The Constructive Amendment Of The Indictment Is A Substantial
        Question. ...................................................................................................... 3

     2.  The Admissibility Of Specialized Testimony By Non-Experts Is A
        Substantial Question. ................................................................................... 6

     3.  The Use Of False Testimony Is A Substantial Question. ............................. 8

     4.  The Denial Of The Motion To Suppress And An Instruction On Missing
        Evidence Is A Substantial Question. ......................................................... 12

     5.  The Admissibility Of Evidence On Dr. Rosendorff's Bias Is A
        Substantial Question. ................................................................................. 13

     6.  The Denial Of A New Trial Or Evidentiary Hearing Based On
        Dr. Rosendorff's Post-Trial Conduct Is A Substantial Question. ............. 14

     7.  The Admissibility Of Evidence On Alleged Misrepresentations To The
        Department Of Defense Is A Substantial Question. ................................... 14

     8.  The Standard Of Proof For Proving Loss At Sentencing, And Whether
        The Government Met That Burden, Is A Substantial Question. ................. 15

   C.  Any One Of The Substantial Questions Would Result In Dismissal, A New
      Trial, Or A Substantially Reduced Substance. .................................................... 15

III.  CONCLUSION ............................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arizona v. Youngblood,*
   488 U.S. 51 (1988)............................................................................................................12

*Brown v. Borg,*
   951 F.2d 1011 (9th Cir. 1991)........................................................................................10

*Dow v. Virga,*
   729 F.3d 1041 (9th Cir. 2013)..........................................................................................9

*Hayes v. Brown,*
   399 F.3d 972 (9th Cir. 2005)....................................................................................10, 11

*Napue v. Illinois,*
   360 U.S. 264 (1959)..............................................................................................9, 10, 11

*Panah v. Chappell,*
   935 F.3d 657 (9th Cir. 2019)............................................................................................9

*United States v. Adamson,*
   291 F.3d 606 (9th Cir. 2002)........................................................................................4, 6

*United States v. Alli,*
   344 F.3d 1002 (9th Cir. 2003)..........................................................................................8

*United States v. Chen,*
   No. 17-cr-00603, 2021 WL 2662116 (N.D. Cal. June 29, 2021) ..................................7, 8

*United States v. Cuong Cau Dang,*
   No. 13-cr-486-EJD, 2013 WL 4119426 (N.D. Cal. Aug. 9, 2013)...................................2

*United States v. Figueroa-Lopez,*
   125 F.3d 1241 (9th Cir. 1997)..........................................................................................7

*United States v. Garcia,*
   340 F.3d 1013 (9th Cir. 2003)..........................................................................................3

*United States v. Job,*
   871 F.3d 852 (9th Cir. 2017)..........................................................................................15

*United States v. Kakkar,*
   No. 5:13-cr-00736, 2017 WL 4163291 (N.D. Cal. Sept. 20, 2017).............................1, 2

*United States v. Kearns,*
   5 F.3d 1251 (9th Cir. 1993).............................................................................................12

*United States v. Kohring,*
637 F.3d 895 (9th Cir. 2011)....................................................................................................5

*United States v. Kojayan,*
8 F.3d 1315 (9th Cir. 1993)....................................................................................................12

*United States v. Lonich,*
23 F.4th 881 (9th Cir. 2022)....................................................................................................15

*United States v. McDill,*
871 F.3d 628 (8th Cir. 2017)....................................................................................................5

*United States v. Mendez,*
619 F. App'x 644 (9th Cir. 2015) ...........................................................................................14

*United States v. Oaxaca,*
233 F.3d 1154 (9th Cir. 2000)..............................................................................................3, 15

*United States v. Pablo Varela-Rivera,*
279 F.3d 1174 (9th Cir. 2002)....................................................................................................4

*United States v. Robertson,*
895 F.3d 1206 (9th Cir. 2018)....................................................................................................12

*United States v. Schoneberg,*
396 F.3d 1036 (9th Cir. 2004)....................................................................................................14

*United States v. Shipsey,*
190 F.3d 1081 (9th Cir. 1999)....................................................................................................5

*United States v. Sivilla,*
714 F.3d 1168 (9th Cir. 2013)....................................................................................................12

*United States v. Vizcarra-Martinez,*
66 F.3d 1006 (9th Cir. 1995)....................................................................................................14

*United States v. Yates,*
16 F.4th 256 (9th Cir. 2021)....................................................................................................5

*United v. Handy,*
761 F.2d 1279 (9th Cir. 1985)....................................................................................................1

**Statutes**

18 U.S.C. § 3143(b) ....................................................................................................1

18 U.S.C. § 3143(b)(1)....................................................................................................15

**Constitutional Provisions**

Sixth Amendment ..............................................................................................................3, 14

**Rules and Regulations**

Fed. R. Civ. Proc. 29 ....................................................................................................1, 3, 15

Fed. R. Evid. 401 ........................................................................................................................4

Fed. R. Evid. 403 ........................................................................................................................4

Fed. R. Evid. 404(a) ..................................................................................................................13

Fed. R. Evid. 404(b) ..................................................................................................................14

Fed. R. Evid. 701 ..............................................................................................................1, 6, 7

Fed. R. Evid. 701(a) ....................................................................................................................6

Fed. R. Evid. 701(c) ....................................................................................................................6

Fed. R. Evid. 702 ........................................................................................................1, 6, 7, 8

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

## I.    INTRODUCTION

The government has filed a brief that should be offensive to every American. Its claim that Mr. Balwani is a flight risk rests on nothing more than his being a naturalized rather than a native-born U.S. citizen. Under the government's discriminatory logic, immigrants to our country, even those like Mr. Balwani who are exclusively U.S. citizens, would be ineligible for release pending appeal, because they typically have some family abroad. The government's attempt to tether its reasoning to the Court's ruling in *United States v. Kakkar*, No. 5:13-cr-00736, 2017 WL 4163291 (N.D. Cal. Sept. 20, 2017), is meritless. There is no risk of flight or danger, as Probation concluded and as evidenced by Mr. Balwani's perfect track record on supervision.[1]

As for whether Mr. Balwani has shown a substantial question of law or fact, the government conveniently ignores the applicable standard under § 3143(b), which asks whether reasonable judges could have ruled differently—not whether this Court correctly decided each issue on the merits. And it sidesteps the standard for harmless error, instead emphasizing the supposed sufficiency of the evidence, as if this were a Rule 29 motion. The government's responses to the eight legal and factual errors shown by Mr. Balwani simply confirm that each presents a substantial question.

As Mr. Balwani's motion also explained, the government's constructive amendment of the indictment invalidates all counts because whether Theranos' testing was reliable and accurate was at the heart of all counts as argued to the jury. So too, the violation of Rules 701 and 702 allowed improper expert testimony that the jury should not have relied on to convict on all counts. And the government's failure to correct false testimony likewise warrants reversal across the board. The remaining issues likewise go to either all counts or all the investor counts (which were the primary drivers of his sentence through loss enhancement). In any event, Mr. Balwani need not prove that each error reaches all of the counts so long as a combination of those questions would likely result in reversal, a new trial, or a substantially reduced sentence.

Because Mr. Balwani has satisfied all the § 3143(b) factors, the Court should grant him release. *See United v. Handy*, 761 F.2d 1279 (9th Cir. 1985) (granting release pending appeal).

---

[1] The government does not argue that Mr. Balwani is pursuing an appeal for purposes of delay.

- 1 -

## II. ARGUMENT

### A. Mr. Balwani Is Not Likely To Flee Or Pose Any Danger.

The government preaches that "[t]here are not two systems of justice." Dkt. 1725 at 1. But in labeling Mr. Balwani a flight-risk, the government advocates for precisely that: one system of justice for American-born U.S. citizens and one for defendants born abroad (regardless of citizenship). As evidence that this U.S. citizen will flee, the government asserts that Mr. Balwani was "born in Pakistan" and "appears to maintain close ties" with his family in India. *Id.* at 6. His siblings, nieces, and nephews "are very important to him." *Id.* And he has performed "community service work" "in India and Pakistan." *Id.* at 6. The Court is told that these facts "[w]eigh[] against" release, *id.*, but what they really do is paint a picture of an immigrant who cares about his family and his community. And Mr. Balwani does so both at home and abroad—as the government concedes, describing his "close ties within the United States." *Id.* These facts make Mr. Balwani a typical American. They do not "weigh against" his release. It is disturbing that representatives of the United States would invoke these facts to support their position.

The government's xenophobic approach to the flight analysis finds no support in this Court's decision in *United States v. Kakkar*, 2017 WL 4163291. This Court denied Mr. Kakkar's motion not because that defendant was an immigrant, but because Kakkar: (1) was a non-citizen who faced immigration proceedings as a result of his conviction; (2) failed to "provide specific examples" of his community ties; (3) "transferred assets and placed them out of the reach of potential creditors"; and (4) according to the government continued to engage in fraud while on release. *Id.* at *2. Mr. Balwani's case shares none of these characteristics. The Court should reject the government's attempt to use *Kakkar* as a bludgeon to be wielded indiscriminately against immigrants who, like Mr. Balwani, are citizens with perfect supervision records.[2]

As for danger to the community, the government's argument is a rehashing of the purported facts of this case, meant to establish that Mr. Balwani caused harm to patients and

---

[2] The government ignores *Cuong Cau Dang*, in which this Court concluded that a defendant has domestic ties that "clearly run deep" even while at the same time "perform[ing] charitable work" abroad. No. 13-cr-486-EJD, 2013 WL 4119426, at *4 (N.D. Cal. Aug. 9, 2013), *cited at* Dkt. 1711 at 3 n.1. Mr. Balwani's life reflects this immigrant experience—including ties to communities domestic and abroad—while nevertheless being "tethered to the United States." *Id.*

investors from 2013 to 2016. Dkt. 1725 at 6-10. But nowhere does the government address the risk of any danger from Mr. Balwani *now*, in 2023. That's because there is no evidence that any such risks exist. The government's additional arguments about lack of acceptance of responsibility (Dkt. 1725 at 7), and using assets to mount a defense (Dkt. 1725 at 6), also cannot be taken seriously. Under those theories, all defendants who go to trial and appeal are dangerous and ineligible for release because they have not accepted responsibility. Under the government's logic, any defendant who uses his resources to retain counsel of his choice to defend himself is ineligible for release. These remarkable arguments treat the Sixth Amendment as meaningless, and they seek to disadvantage Mr. Balwani merely for exercising his constitutional rights.

**B.      Mr. Balwani's Appeal Presents Eight Substantial Questions Warranting A New Trial Or A Substantially Reduced Sentence.**

The government rehashes its arguments on the merits, but ignores the applicable standard for release pending appeal and the underlying standard for prejudicial error. Mr. Balwani need not now win his appeal on the merits, months in advance, in order to warrant release. He needs to show only "a non-frivolous issue" that reasonable judges could fairly debate. Dkt. 1711 at 5 (citing *United States v. Garcia*, 340 F.3d 1013, 1020 n.5 (9th Cir. 2003)). At the very most, the government establishes a fair debate on each of these issues—exactly what is required for this Court to grant this motion. In addition, by attempting to defend the convictions by arguing the sufficiency of the evidence, the government relies on the wrong standard for reversal. *E.g.*, Dkt. 1725 at 28 (citing Rule 29 context). "[T]he harmlessness of an error is distinct from evaluating whether there is substantial evidence to support a verdict," *United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000), and as explained below, certain of the errors are subject to even lower standards favoring reversal. The centrality of the errors here and the hotly contested nature of the remaining evidence reinforce the substantial questions warranting a new trial.

**1.      The Constructive Amendment Of The Indictment Is A Substantial Question.**

The government's opposition, like its evidence at trial, overlooks the Grand Jury's vital role. The Third Superseding Indictment ("TSI," Dkt. 469) alleges 9 categories of misrepresentations to investors and one type of misrepresentation to patients, none of which

- 3 -

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

involve showing systemic flaws in commercial technology. Allowing the government to introduce a complex of facts outside the TSI's allegations constructively amended the indictment without the Grand Jury's blessing. There is at least a substantial question whether this error tainted all counts of conviction. The government's arguments miss the mark in several ways.

First, it is *the government's* cramped reading of the TSI that is hypertechnical. The TSI refers expressly to Theranos' proprietary technology over and over. *See, e.g.*, TSI ¶¶ 5-10, 12(A), 12(A), 12(C), 12(F), 12(H). In quoting Paragraph 16, the government again omits the critical language confirming that Mr. Balwani's alleged knowledge of systemic problems was a subset of the allegation that *Theranos' technology* could not deliver consistently accurate results. *Compare* TSI ¶ 16, *with* Dkt. 1725 at 19; *see also* Dkt. 1193 at 6. The government plucks stray phrases from the TSI to contort its common-sense meaning, shared by all parties and the Court until the government's opposition to Mr. Balwani's evidentiary motion—a point to which the government still has never responded. *Compare* Dkt. 1181 at 4-5, *with* Dkt. 1155 at 26-27; Dkt. 668 at 6; Dkt. 664 at 4; Dkt. 330 at 3-4, 22-23. Nor does the TSI's inclusion of HIV affect the analysis: the government's filings make plain that it believed that HIV was tested on proprietary technology, despite the government's pretending otherwise once it realized its mistake.[3] *See, e.g.*, Dkt. 267 at 6; Dkt. 265 at 7; 2/4/22 Hr'g Tr. 47. If the interpretation of the TSI were resolved in Mr. Balwani's favor, the government nowhere disputes that the "complex of facts" surrounding the CMS evidence, Bingham testimony, and Tompkins testimony would constitute a constructive amendment. *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002).

Mr. Balwani preserved this error. When "the substance of an objection has been thoroughly explored and the trial court's ruling was explicit and definitive, the issue is preserved for appeal." *United States v. Pablo Varela-Rivera*, 279 F.3d 1174, 1177 (9th Cir. 2002). Mr. Balwani sought to exclude evidence of inaccurate commercial technology precisely because the TSI's "allegations about accuracy and reliability relate solely to 'Theranos's technology.'" Dkt. 1156 at 12. While the *in limine* motion sought exclusion under Rules 401 and 403, the metric

---

[3] The government's gripe that the defendants somehow complicated their efforts to determine which technology was used to test Brent Bingham's blood has no legal basis and would not be an issue if the government had secured the LIS data.

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-11

for relevance Mr. Balwani argued turned entirely on the TSI's meaning. Mr. Balwani expressly noted that denying the motion based on the amended Bill of Particulars would impermissibly amend the indictment. *Id.* at 19-20. As Mr. Balwani explained in seeking the exclusion, "[e]vidence to suggest that non-Theranos technology was inaccurate and unreliable as a basis to substantiate wire-fraud charges against Mr. Balwani was not put before a grand jury, and as a result cannot be put before this petit jury." *Id.* at 20. In the opposition and reply, both parties focused almost exclusively on the meaning of the TSI and whether the challenged evidence tracked the grand jury's charges. *See* Dkt. 1181 at 4-11; Dkt. 1193 at 5-14. So too with the lengthy oral argument and the Court's Order, which discussed whether the TSI's language put Mr. Balwani on notice of accuracy issues connected to third-party devices. *See* Dkt. 1326 at 7-8; 2/4/22 Tr. at 30-69. Whether the indictment alleged inaccuracies in commercial technology was extensively explored and definitively ruled on.[4]

The government is also wrong that this error affected just two counts. Dkt. 1725 at 16. To the contrary, whether Theranos' testing was accurate and reliable was at the heart of all counts. Mr. Balwani's motion pointed to repeated statements in the government's closing tying the evidence on CMS's findings to the investor counts. *See* Tr. 7670, 7681-84. Indeed, each time the government returned to its core theme that Theranos' testing was inaccurate, it exacerbated the risk of confusing the jury on what was at issue. Because there was a general verdict here, an appellate court would conclude that this affected all counts. *See United States v. McDill*, 871 F.3d 628, 633 (8th Cir. 2017) (holding that defendant subjected to a constructive amendment required vacatur of all counts, since general verdict prevented court from knowing whether verdict rested on an invalid constitutional ground). *Cf. United States v. Yates*, 16 F.4th 256, 269 (9th Cir. 2021) (holding government must prove harmlessness beyond a reasonable doubt in the face of constitutional error when jury returns general verdict that "may rest on a legally invalid theory"); *United States v. Kohring*, 637 F.3d 895, 902 n.2 (9th Cir. 2011). Reversal would then be

---

[4] In any event, there would still be a substantial question whether a constructive amendment that prejudiced the convictions is plain error. *See United States v. Shipsey*, 190 F.3d 1081, 1087-88 (9th Cir. 1999) (vacating theft and money laundering convictions because constructive amendment constituted plain error).

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-12

automatic, *Adamson*, 291 F.3d at 615—a principle the government does not dispute, *see* Dkt. 1725 at 14-16. Given the centrality of accuracy and reliability to the government's case, whether the government constructively amended the TSI is a substantial question on all counts.

### 2. The Admissibility Of Specialized Testimony By Non-Experts Is A Substantial Question.

Mr. Balwani's motion reviewed in detail his objections to the improper specialized testimony of Erika Cheung, Mark Pandori, and Adam Rosendorff. The government's response commits two basic errors. First, the government defends the wrong testimony. Take Ms. Cheung for example: Mr. Balwani challenged the admission of specialized testimony at the following pages: Tr. 1132-33, 1135-38, 1202-03, 1245-48, 1552-54, and 1557-58, *cited at* Dkt. 1711 at 11-12. The government defends Ms. Cheung by pointing to *different portions* of her testimony: Tr. 1117, 1201, 1251, *cited at* Dkt. 1725 at 17. There is not a single page of overlap.

No one disputes that Ms. Cheung gave some admissible testimony. No one disputes that she could testify as a lay witness about the details of her job at Theranos, the events she witnessed, and the things she said or did. But this is not an all-or-nothing proposition: Just because some testimony was admissible does not establish that all of it was. The government cannot launder six instances of inadmissible testimony by pointing to three *other*, admissible excerpts and then argue that all the testimony was therefore proper. By failing to address it, the government effectively concedes the error as to the testimony Mr. Balwani actually challenged.

Second, the government conflates the distinct requirements of Rules 701 and 702. As relevant here, Rule 701 imposes two requirements on lay testimony: It must be "rationally based on the witness's perception." Fed. R. Evid. 701(a). *And* it must "not [be] based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). The counterpart to that requirement in Rule 701(c) is in Rule 702, which applies the expert-witness rules to testimony that is "scientific, technical, or other[wise] specialized."

Each of these two Rule 701 requirements is a necessary condition for lay testimony, but neither on its own is sufficient. The government attempts to collapse these two requirements into a single "percipience" rule, arguing that if a witness perceived the matter in question, the

witness's testimony on that matter is lay testimony—no matter how specialized. Dkt. 1725 at 18 ("Such statements are squarely within the bounds of percipient testimony despite the fact that it relates to a technical topic."). Of course, the government does not cite a single Ninth Circuit case for that proposition—or, for that matter, anywhere else in this section of its opposition.

That's because the government has made this exact argument to the Ninth Circuit before and it lost in spectacular fashion, spurring a canonical (and binding) decision that was later codified as Rule 701(c). In *Figueroa-Lopez*, the government articulated the same theory as here: namely, that the rules are satisfied by the "percipience of a witness to the facts on which he wishes to tender an opinion." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997). The Ninth Circuit squarely condemned the government's theory: "[M]ere percipience … does not trump Rule 702." *Id.* "The Government's argument," the Court explained, "simply blurs the distinction between Federal Rules of Evidence 701 and 702." *Id.* Based on rational perception, a lay observer could testify about watching an autopsy and about "the removal of a bullet from a heart"—but not about "the cause of the decedent's death." *Id.* That last conclusion would require expertise. Similarly, Ms. Cheung could testify in her lay capacity about loading a cartridge into a blood analyzer, about running a blood test, and about what result she obtained— but not about whether that result bore on the accuracy and reliability of the underlying technology.[5] Whether or not based on her rational perceptions, that last conclusion requires specialized knowledge that Ms. Cheung plainly lacks.

The government's tendency to blur Rules 701 and 702 also explains its misplaced reliance on *United States v. Chen*, No. 17-cr-00603, 2021 WL 2662116 (N.D. Cal. June 29, 2021). *Chen* stands for the unremarkable proposition that lay witnesses may properly testify "based on their personal knowledge and positions in the day-to-day affairs" of a company. *Id.* at *9. But nothing about the testimony in *Chen* was scientific, technical, or specialized. The witnesses were to be

---

[5] *E.g.*, Tr. 1204 ("[T]he correct value for vitamin D is 10. So it was an indication that there was some issue in the accuracy of the actual device, because, again, you know it equals 10 or in some acceptable range of 10."); Tr. 1248 ("It was concerning because if you just extrapolate out essentially the percentage of failures that are happening across the system, even if we change the device, there's something still going on that is causing one out of four failures of every single test that we do on this Edison system, right? Even if you change the device, it seems likely that maybe there's some issue with the chemistry….").

examined merely about whether they kept certain information secret at work. *Id.* at \*9-10.

The testimony challenged here went far beyond the who, what, when, and where of the witnesses' day jobs. It required them to apply specialized knowledge, to describe scientific concepts to the jury, and to opine on the accuracy and reliability of novel medical technology. Whether or not there was a nugget of percipience at the core of that testimony is irrelevant, because "mere percipience … does not trump Rule 702."

The government admits that the alleged misrepresentations about accuracy and reliability are the ones that "mattered" to the patient counts. Dkt. 1725 at 11 (citing Tr. 7060). In other words, the asserted error prejudiced those counts. But it infected the investor counts, too. The government points to other alleged misrepresentations to investors, *id.* at 11-12, but given the centrality of accuracy and reliability to the government's case—even as to investors—and the hotly disputed evidence as to those other allegations, they do not negate prejudice. Indeed, the government's closing asked the jury to render a verdict of "guilty on *all counts*" by looking to the testimony of three witnesses: "Erika Cheung, or Rosendorff[,] or Pandori." Tr. 7086 (emphasis added). The admission of their specialized testimony raises a substantial question as to all counts.

### 3. The Use Of False Testimony Is A Substantial Question.

The government mistakenly contends that Mr. Balwani argues for reversal "because the government did not seek to admit as exhibits in [his] trial tape recordings of [Ms. Holmes] on a call with investors … and instead have" Bryan Tolbert "testify to what he was told …." Dkt. 1725 at 18; *see also id.* at 19 (claiming Mr. Balwani asserts prosecutorial misconduct based on "not call[ing] every witness the government had called" in Ms. Holmes' trial).[6] That is plainly not Mr. Balwani's argument. Mr. Balwani's motion is based on the government's decision to "elicit …

---

[6] In support of this misguided characterization, the government argues that "[i]f [Mr. Balwani] believed the tapes [made by Tolbert] were so critical," he should have "s[ought] to admit" them. Dkt. 1725 at 19. But as to the *Napue* error Mr. Balwani actually argues in his motion, it is the government's "independent obligation," not Mr. Balwani's, to "immediately … take steps to correct known misstatements of its witnesses." *United States v. Alli*, 344 F.3d 1002, 1007 (9th Cir. 2003). In any event, the government forgets that as soon as the defense learned that the government would not admit the tape on Tolbert's direct examination, Tr. 4248, it offered the tape to cross-examine Tolbert on "the actual words [Holmes] said" that "influenced his decision" so that the jury could hear the true facts and "not just [Tolbert's] recollection of what she said." Tr. 4249. The government vigorously opposed this request, *see, e.g.*, Tr. 4248-61, 4389-96, and the Court ruled it "would not permit [admission]," Tr. 4396.

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-15

inaccurate testimony from Mr. Tolbert" despite that it "knew all too well from its experience at the Holmes trial that Mr. Tolbert's testimony did not match the truth" of what Ms. Holmes said on the December 2013 investor call. Dkt. 1711 at 15. While "no rule … says the government is required to try the case in the exact same manner in severed trials," Dkt. 1725 at 19, longstanding Supreme Court precedent (that the government's brief fails to address) forbids the government from changing its strategy by "'soliciting false evidence'" or "'allow[ing] it to go uncorrected when it appears,'" as the government did here. *Dow v. Virga*, 729 F.3d 1041, 1042-43 (9th Cir. 2013) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

The government's decision to rely on false evidence requires reversal if "(1) the testimony was actually false" or misleading, "(2) the prosecutor knew it was false, and (3) the false testimony was material (i.e., there is a reasonable likelihood that the false testimony could have affected the judgment)." *Id.* at 1048; *see also Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019); Dkt. 1711 at 14. Thus in *Dow*, the Ninth Circuit reversed denial of habeas where the prosecutor—dissatisfied with a mistrial in the first trial—failed to correct false evidence more favorable to it in the second trial. 729 F.3d at 1044-46. The court held that this violated Dow's due process rights under *Napue* and required reversal because "the jury rendered a guilty verdict after hearing the false testimony while the first jury, which did not hear that testimony, failed to do so." *Id.* at 1050. Here, the disparate outcomes between Ms. Holmes' trial—where the jury learned and focused on what she *actually* stated during the December 2013 investor call, Dkt. 1711 at 15—and Mr. Balwani's trial—where the government presented a false version of the call—well clears the minimal materiality standard necessary for reversal under *Napue*.

The government makes no attempt to explain why the specific Tolbert testimony quoted in Mr. Balwani's motion, Dkt. 1711 at 15, was not false or misleading. It therefore forfeits any argument that these statements do not present at least a substantial question as to whether the government's failure to correct Tolbert meets the first two prongs of *Napue*. To the extent the government's brief could be read to suggest that, as a general principle, a discrepancy between facts it knows to be true—the recording—and a witness's "memory" of those facts cannot form the basis of a *Napue* error, Dkt. 1725 at 19, that is not the law. "The fact that [a] witness is not

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-16

complicit in the falsehood is what gives the false testimony the ring of truth, and makes it all the more likely to affect the judgment of the jury. That the witness is unaware of the falsehood of his testimony makes it more dangerous, not less so." *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005). Tolbert mistakenly recalled Ms. Holmes to have claimed "that Theranos devices *were employed* on the medevac helicopters" and "*being used* to kind of improve survival rates of military personnel who had been injured in combat," Tr. 4435 (emphasis added)—a mistaken recollection that Chris Lucas also shared, Tr. 5631. The government knew they were wrong: It knew from Tolbert's tape recording that Ms. Holmes only ever used aspirational language on the call, stating that "the ability to take a technology like this and put it in flight, specifically on a medevac, has the *potential* to change survival rates." Holmes Tr. 4504 (emphasis added). This issue therefore presents a substantial question on *Napue*'s first two prongs. And this was not a mistake in the heat of the moment—the government knew from Ms. Holmes' trial, as well as from the Holmes jury's request to replay the Tolbert tape, that the words on the tape were contrary to Tolbert's and Lucas' testimony elicited by the government.

As to the third prong (materiality), the government's assertion that Tolbert's false testimony "could not possibly affect *all counts* of conviction," Dkt. 1725 at 19, is belied by its own closing argument. The government made Ms. Holmes' statements about the military—and Tolbert's recitation of those statements in particular—a "centerpiece" of its closing argument as to all investor counts, *Hayes*, 399 F.3d at 985, "enhanc[ing] immeasurably the impact [on all counts] of [the] false … evidence," *Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991); *see also* Dkt. 1711 at 15 (explaining that government made this testimony "central to … its case"). It argued to the jury that "Holmes's role in the investor conspiracy was to recruit investors" and that "[s]he communicated false statements directly to investors like Tolbert." Tr. 6970. It told the jury, "You *heard* the Tolbert phone call when Holmes brags about DOD or military work that Theranos did." *Id.* (emphasis added). "That's Holmes fulfilling her role in the conspiracy." *Id*. Yet the government had not allowed the jury to "hear" that call directly—only Tolbert and Lucas' inaccurate rendition of it. Furthermore, it asserted that the jury could trust the recitations of *all* investors regarding Holmes' military statements because they "all heard one form—one version

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-17

or another of this story that Theranos technology was deployed actually treating soldiers in the battlefield, sometimes on medevac helicopters." Tr. 7028 (emphasis added). The problem, of course, was that as the government knew, in investor conversations critical to this argument Ms. Holmes never told investors that the devices were being used in this way. By manufacturing consistency between its witnesses with Tolbert and Lucas' false testimony, "the [government] achieved the desired effect of artificially bolstering [its witnesses' collective] credibility"—as to misrepresentations allegedly made almost a decade earlier—through an "unconstitutional step." *Hayes*, 399 F.3d at 987. Indeed, the government elicited the same "consistent" testimony from Brian Grossman of PFM and Lisa Peterson of RDV, knowing that there was a recording of Ms. Holmes' actual words that did not match that testimony.

Illustrating this precise point, the government relies on Patrick Mendenhall, a witness relevant to Count 1, Dkt. 1725 at 19 (citing Tr. 4283-4302 & TX 4059), whose testimony was premised in part on his "independent memory" of a conversation with Mr. Balwani in December 2013, Tr. 4290. The government argued to the jury that it could believe "all" investors' testimony because of alignment with Tolbert's. Tr. 7028. It follows that "[i]f the jury had been informed" that at least two of these investors were wrong about what Ms. Holmes had said during the December 2013 time period, Mendenhall and other investors' "credibility would have been affected." *Id.* The jury "might well have concluded" that the demonstrably false accounts of investors who swore they had heard the same statements as other investors created reasonable doubt as to whether any investor's account should be credited. *Napue*, 360 U.S. at 270.

Under Ninth Circuit precedent, (1) the different outcomes on Counts 4 and 5 across Ms. Holmes' and Mr. Balwani's trials, and (2) the government's decision to knowingly make false testimony a "centerpiece" of its closing argument for all investor counts, both strongly support the conclusion that the false testimony was material to all investor counts. At a minimum, a court must reverse all counts affected by *Napue* error, but the flagrant nature of the prosecutorial misconduct here—where the government not only failed to correct false testimony but resisted the defense's attempts to reveal its deception to the jury—would also warrant reversal on all counts under the courts' "supervisory power to make it clear that the misconduct was

- 11 -

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-18

serious, … and that steps must be taken to avoid a recurrence of this chain of events." *United States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir. 1993); *see also United States v. Kearns*, 5 F.3d 1251, 1254 (9th Cir. 1993) (suggesting that sanctions such as "dismissal of an indictment" may be "appropriate" for "intentional deception"); Dkt. 1711 at 15. This error therefore presents a substantial question likely to result in outright dismissal of—or, at the very least, a new trial on— all counts, including patient and investor.

### 4. The Denial Of The Motion To Suppress And An Instruction On Missing Evidence Is A Substantial Question.

Unrebutted expert testimony shows that the government could have secured the comprehensive patient data from LIS long after Theranos disassembled the system. *See* Tr. 6807-08, 6821. The government has never had a good-faith basis for its insinuation that Mr. Balwani was somehow to blame for the data's unavailability—incorporated into its opposition despite the government's eleventh-hour concession that Mr. Balwani was not responsible. *See* Tr. 6872.

As for the rejected missing evidence instruction, no case holds that missing evidence must have been in the government's custody to warrant the instruction. The Ninth Circuit has described that issue as one of many factors—none dispositive. *See United States v. Robertson*, 895 F.3d 1206, 1213 (9th Cir. 2018). Other factors, including the government's negligence or recklessness in ignoring an option that would have secured this data and the personal involvement of the prosecuting attorneys who tried this case, point squarely the other way. *See id.*; TX 5943. Government negligence, even when the exculpatory value of the missing evidence is unknown, can justify reversing a conviction when the district court fails to give the requested instruction. *See United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013). It is fairly debatable whether it was error to deny the instruction. A jury so charged would likely have rejected the core allegation underpinning *all* counts of conviction—that Theranos' clinical testing was inaccurate.

Turning to the denial of the suppression motion itself, it is fairly debatable whether the Court misapplied *Arizona v. Youngblood*, 488 U.S. 51 (1988). Any absence of bad faith on the government's part is of no moment when the missing evidence at issue is exculpatory. Here, when the Court has heard from three clinicians (Drs. Burnes, Wooten, and Zachman) who ordered

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-19

many hundreds of Theranos tests with concerns about the accuracy of testing for just two patients, the comprehensive testing data in LIS would likely have been exculpatory. Had the motion been granted and anecdotal evidence suppressed, the government's overwhelmingly anecdotal case would not have led to a conviction on any count.

### 5.     The Admissibility Of Evidence On Dr. Rosendorff's Bias Is A Substantial Question.

The government and Mr. Balwani agree on a lot when it comes to Dr. Rosendorff's bias. They agree the question of bias revolves around whether Rosendorff had a "special motive to lie" based on an "interest in the outcome of the trial or personal animosity or favoritism" toward the prosecution. Dkt. 1725 at 22. And they agree that at least some of the government investigations into Dr. Rosendorff's workplaces "concerned time periods" when Rosendorff worked at the relevant companies and were related to "his role in the company." *Id.* (arguing only that "[s]ome of that scrutiny" was outside those parameters (emphasis added)).

Those basic facts, which were withheld from the jury, would have devastated Dr. Rosendorff's credibility. It would not have done so, as the government argues, by proving anything impermissible about Rosendorff's character. *See* Fed. R. Evid. 404(a). It might have incidentally demonstrated that Rosendorff was an error-prone lab director, for example, but that was not the purpose for which Mr. Balwani offered the evidence nor the argument he would have made based on it. Evidence of the government investigations of labs where Dr. Rosendorff worked after he left Theranos would have demonstrated that Rosendorff was motivated to blame others for the decisions he made at Theranos, in order to avoid questions (including questions from government investigators and prosecutors) about whether his own conduct was the reason so many labs where he worked were under government scrutiny. That's why Mr. Balwani sought to offer evidence of *the investigations*, not whether there were in fact laboratory fraud or errors.

The government constructs a straw man, positing that Mr. Balwani "cannot show—that subsequent investigations … give[] rise to a motive for Dr. Rosendorff to lie or slant his testimony." But all Mr. Balwani had to do was offer evidence of bias; he did not have to prove bias to the Court in order to present evidence of it to the jury. He had a robust Sixth Amendment

- 13 -

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

right to do so. *E.g.*, *United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2004).

Nor does it matter that Rosendorff gave prior statements consistent with his trial testimony. *See* Dkt. 1725 at 22-23. All that shows is that he was consistent in his bias—consistently motivated to cater to the government and avoid its scrutiny.

There is at least a substantial question whether the jury should have heard this evidence of bias from a key witness. And for the reasons described above, Dr. Rosendorff's testimony was an essential component of the convictions on "all counts." *Supra* at 8 (citing Tr. 7086).

### 6. The Denial Of A New Trial Or Evidentiary Hearing Based On Dr. Rosendorff's Post-Trial Conduct Is A Substantial Question.

The government tries to brush off as harmless the erroneous *denial* of an evidentiary hearing on Dr. Rosendorff's post-trial conduct by pointing to what Rosendorff said at the hearing that was *granted* to Ms. Holmes. As explained in Mr. Balwani's motion (at 17-18), there was no basis for distinguishing between the defendants in this regard, and the government musters none.

Second, the government asks Mr. Balwani and the Court to be content with the answers Rosendorff gave in response to questioning from the government and Ms. Holmes. But neither of those parties had an interest in probing Rosendorff's testimony at Mr. Balwani's trial. The arbitrary, erroneous denial of Mr. Balwani's request for a hearing raises a substantial question warranting release pending appeal. Dkt. 1711 at 18 (citing *United States v. Mendez*, 619 F. App'x 644, 646 (9th Cir. 2015)). For the reasons stated just above, an error affecting Rosendorff's testimony affects all counts of conviction.

### 7. The Admissibility Of Evidence On Alleged Misrepresentations To The Department Of Defense Is A Substantial Question.

The government claims that evidence of misrepresentations *to* the military was "important to show Defendant's intent and knowledge that the statements Defendant made to investor victims about Theranos' work with the Department of Defense were, in fact, false." Dkt. 1725 at 28. Federal Rule of Evidence 404(b) governs the introduction of other acts to show "intent" and "knowledge," but the government ignores its own failure to provide notice under Rule 404(b). Nor does the government even attempt to show that this evidence satisfies the test for admission as "inextricably intertwined" with the charged offenses. *United States v. Vizcarra-Martinez*, 66

DEFENDANT BALWANI'S REPLY IN SUPPORT OF
MOTION FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-21

F.3d 1006, 1012 (9th Cir. 1995). By not bothering to address the relevant legal standard, the government impliedly concedes the substantial question.

As for the likely effect of the error, the government fails to even recite the appropriate standard. The government points to the Court's Order on *Ms. Holmes*' Rule 29 motion, *see* Dkt. 1725 at 28 (citing Dkt. 1575 at 4 n.1), in which evidence is viewed in the light most favorable to the government. But when assessing whether an evidentiary error is harmless, courts look to both the other evidence in the record and to "the most perceptive reflections as to the probabilities of the effect of error on a reasonable trier of fact." *United States v. Job*, 871 F.3d 852, 865 (9th Cir. 2017); *see also Oaxaca*, 233 F.3d at 1158. As discussed above, the government made representations about the military a core theme of its opening and closing, and its conflating representations to the military with those to investors casts doubt on all investor counts.

**8.      The Standard Of Proof For Proving Loss At Sentencing, And Whether The Government Met That Burden, Is A Substantial Question.**

The government fails to cite—much less address—the Ninth Circuit's latest word on the standard that governs loss in this case: *United States v. Lonich*, 23 F.4th 881, 915 (9th Cir. 2022).

**C.      Any One Of The Substantial Questions Would Result In Dismissal, A New Trial, Or A Substantially Reduced Substance.**

For the reasons described above and in the motion, each of the errors undermined all of the counts for which imprisonment was imposed or else are likely to result in a substantially reduced sentence. *Supra* §§ III.C.1-8. These errors, individually or in combination, therefore satisfy the fourth prong of § 3143(b)(1).

**III.      CONCLUSION**

Mr. Balwani respectfully requests that the Court grant his motion.

DATED: February 10, 2023               Respectfully submitted,

                                                          ORRICK, HERRINGTON & SUTCLIFFE LLP


                                                          By:  */s/ Mark S. Davies*
                                                                 Mark S. Davies

                                                          Attorney for Defendant
                                                          RAMESH "SUNNY" BALWANI

- 15 -

MARK S. DAVIES (Admitted Pro Hac Vice)
JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

Email: mark.davies@orrick.com; jcoopersmith@orrick.com;
awalsh@orrick.com; scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**DEFENDANT RAMESH "SUNNY" BALWANI'S MOTION FOR RELEASE PENDING APPEAL**<br><br>**Date: February 17, 2023**<br>**Time: 9:30 a.m.**<br>**CTRM.: 4, 5th Floor**<br><br>**Hon. Edward J. Davila** |

## NOTICE OF MOTION AND MOTION FOR RELEASE PENDING APPEAL

PLEASE TAKE NOTICE that on February 17, 2023, at 9:30 a.m. or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, located at 280 South First Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Ramesh "Sunny" Balwani will and hereby does respectfully move the Court for release pending the resolution of all appellate proceedings in this case. The Motion is based on the below Memorandum of Points and Authorities, the Declaration of Mark S. Davies and attached exhibits, the record in this case, and any other matters that the Court deems appropriate.

## TABLE OF CONTENTS

                                                                                      Page

I.   INTRODUCTION ....................................................................................................... 1

II.  BACKGROUND ......................................................................................................... 1

III. ARGUMENT .............................................................................................................. 2

   A.   Mr. Balwani Is Not Likely To Flee Or Pose Any Danger. .............................................. 3
   B.   Mr. Balwani's Appeal Is Not For Purpose Of Delay. ..................................................... 4
   C.   Mr. Balwani's Appeal Presents Substantial Questions.................................................... 5
      1.   The Constructive Amendment Of The Indictment Is A Substantial Question.................... 6
      2.   The Admissibility Of Specialized Testimony By Non-Experts Is A Substantial
      Question. ....................................................................................................................... 11
      3.   The Prosecutor's Solicitation Of And Failure To Correct Mr. Tolbert's False Testimony
      Raises A Substantial Question. ....................................................................................... 14
      4.   The Denial Of The Motion To Suppress And An Instruction On Missing Evidence
      Poses A Substantial Question. ........................................................................................ 16
      5.   The Admissibility Of Evidence On Dr. Rosendorff's Bias Is a Substantial Question. ... 17
      6.   The Denial Of A New Trial Or Evidentiary Hearing Based On Dr. Rosendorff's Post-
      Trial Conduct Poses A Substantial Question. ................................................................ 17
      7.   The Admissibility Of Evidence On Alleged Misrepresentations To The Department Of
      Defense Is A Substantial Question. ................................................................................ 18
      8.   The Standard Of Proof For Proving Loss At Sentencing, And Whether The Government
      Met That Burden, Is A Substantial Question. ................................................................ 19
   D.   The Substantial Questions Would Result In A New Trial Or A Substantially Reduced
   Sentence. ......................................................................................................................... 19
   E.   The Court Should Stay Surrender Pending Resolution Of This Motion And Any Appellate
   Motion, If Necessary. ..................................................................................................... 20

IV.  CONCLUSION ........................................................................................................ 20

FER-24

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ..........................................................................16

*Blassingame v. United States*, 242 F.2d 313 (9th Cir. 1957) .................................................4

*D'Aquino v. United States*, 180 F.2d 271 (9th Cir. 1950)........................................................6

*Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013) ...............................................................14, 15

*Giglio v. United States*, 405 U.S. 150 (1972) ......................................................................14

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) ...............................................................14, 15

*Herzog v. United States*, 75 S. Ct. 349 (1955) ..................................................................5, 6

*Leigh v. United States*, 82 S. Ct. 994 (1962)........................................................................5

*Mooney v. Holohan*, 294 U.S. 103 (1935) ..........................................................................14

*Napue v. Illinois*, 360 U.S. 264 (1959) ..............................................................................14

*Rodriguez v. Gen. Dynamics*, 510 F. App'x 675 (9th Cir. 2013) ..........................................12

*Russell v. United States*, 369 U.S. 749 (1962) .....................................................................9

*Stirone v. United States*, 361 U.S. 212 (1960) ..................................................................6, 9

*Strickler v. Greene*, 527 U.S. 263 (1999)..........................................................................14

*United States v. Abad*, No. CR 12-54 4 JSW, 2014 WL 12708710 (N.D. Cal. Aug.
6, 2014) ....................................................................................................................6

*United States v. Adamson*, 291 F.3d 606 (9th Cir. 2002) ...................................................7, 9

*United States v. Alvarez-Lopez*, 559 F.2d 1155 (9th Cir. 1977) ..........................................17

*United States v. Anderson*, 532 F.2d 1218 (9th Cir. 1976) .................................................7, 9

*United States v. Baras*,
No. CR 11-00523-YGR, 2014 WL 4728992 (N.D. Cal. Sept. 18, 2014) ...................................5

*United States v. Bhagat*, 436 F.3d 1140 (9th Cir. 2006)........................................................6

*United States v. Brooke*, 4 F.3d 1480 (9th Cir. 1993)..........................................................17

*United States v. Conn*, 297 F.3d 548 (7th Cir. 2002)...........................................................12

- ii -

*United States v. Cuong Cau Dang*, No. 13-cr-486-EJD (PSG), 2013 WL 4119426 (N.D. Cal. Aug. 9, 2013).............................................................................................3

*United States v. Davis*, 854 F.3d 601 (9th Cir. 2017) ...............................................................9

*United States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001) ......................................................9

*United States v. Figueroa-Lopez*, 125 F.3d 1241 (9th Cir. 1997).......................................11, 12, 13

*United States v. Fisher*, No. SACR 14-00110-JLS-2, 2015 WL 13122782 (C.D. Cal. Aug. 17, 2015).............................................................................................6

*United States v. Floresca*, 38 F.3d 706 (4th Cir. 1994) ...........................................................9

*United States v. Fuentes*, 946 F.2d 621 (9th Cir. 1991).........................................................20

*United States v. Garcia*, 340 F.3d 1013 (9th Cir. 2003) .........................................................5

*United States v. Geringer*, No. 5:12-cr-00888-EJD, 2016 WL 4791815 (N.D. Cal. Sept. 14, 2016) ........................................................................................6

*United States v. Handy*, 761 F.2d 1279 (9th Cir. 1985)...............................................3, 5, 6, 19

*United States v. Hill*, 953 F.2d 452 (9th Cir. 1991) ...............................................................18

*United States v. Kakkar*, No. 5:13-cr-00736-EJD, 2017 WL 4163291 (N.D. Cal. Sept. 20, 2017) ........................................................................................20

*United States v. Lonich*, 23 F.4th 881 (9th Cir. 2022) ...........................................................19

*United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979).................................................16

*United States v. Martin*, No. 1:13-cr-00065-BLW, 2014 WL 2155187 (D. Idaho May 22, 2014) ...........................................................................................6

*United States v. Mendez*, 619 F. App'x 644 (9th Cir. 2015)...................................................18

*United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985) ...................................................4

*United States v. Ohayon*, No. CR 10-00105 CRB, 2014 WL 2159256 (N.D. Cal. May 23, 2014) ...........................................................................................5

*United States v. Peoples*, 250 F.3d 630 (8th Cir. 2001)..........................................................12

*United States v. Pollock*, No. 3:14-cr-00186-BR, 2016 WL 8730144 (D. Or. Sept. 16, 2016) ...............................................................................................6

*United States v. Robertson*, 895 F.3d 1206 (9th Cir. 2018).....................................................16

*United States v. Shipsey*, 190 F.3d 1081 (9th Cir. 1999)..........................................................9

- iii -

FER-26

*United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013) .................................................................16

*United States v. Vizcarra-Martinez*, 66 F.3d 1006 (9th Cir. 1995)..............................................18

*United States v. Von Stoll*, 726 F.2d 584 (9th Cir. 1984)................................................................7

*United States v. Wells*, 879 F.3d 900 (9th Cir. 2018) ...................................................................11

*United States v. William*, 504 U.S. 36 (1992) ................................................................................9

*United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010)..............................................................12

**Statutes**

18 U.S.C. § 3143 ....................................................................................................1, 2, 3, 4, 19

U.S.S.G. § 2B1.1(b) .......................................................................................................................19

**Other Authorities**

Doug Keller, *Resolving a "Substantial Question,"* 60 Fla. L. Rev. (2008) ....................................5

Fed. R. App. P. 9(b) .......................................................................................................................20

Fed. R. Evid. 404 ...........................................................................................................................18

Fed. R. Evid. 701 .....................................................................................................................11, 13

Fed. R. Evid. 702 .................................................................................................................11, 12, 13

U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal
    Offenders* 3 (2017), https://perma.cc/375D-BVJR.....................................................................4

## I.    INTRODUCTION

Mr. Balwani has now promptly appealed the judgment of conviction, Dkt. 1702, and the Court should grant him release until the conclusion of the appellate process. This Court has twice previously concluded that Mr. Balwani does not pose a danger to the safety of any other person or the community and that, with appropriate conditions, his appearance in these proceedings can be assured. *See* Dkt. 7, 8 (van Keulen, J.); Dkt. 1511 (Davila, J.). Nothing has changed in this regard; indeed, Mr. Balwani's consistent appearances and compliance with the conditions of his release underscore the correctness of the Court's prior findings. *See* 18 U.S.C. § 3143(b)(1)(A).

Moreover, Mr. Balwani's appeal will raise substantial questions that, if resolved in his favor, would likely lead to a new trial or a substantially reduced sentence. *See id.* § 3143(b)(1)(B). At least eight appellate issues in particular warrant release pending appeal:

1. The constructive amendment of the indictment concerning non-Theranos technology.
2. The admission of specialized testimony by lay witnesses never qualified as experts.
3. The solicitation of and failure to correct false testimony from Bryan Tolbert.
4. The denial of the motion to suppress and adverse instruction concerning LIS.
5. The refusal of questioning concerning the bias of Adam Rosendorff.
6. The denial of a hearing and new trial concerning Dr. Rosendorff's post-trial conduct.
7. The admission of evidence of alleged misrepresentations to the Department of Defense.
8. The application of the wrong standard of proof in calculating loss at sentencing.

Because each of the governing factors is satisfied, the Court should grant this motion and order Mr. Balwani's release pending resolution of all appellate proceedings in this case. If the Court does not issue a ruling on this motion before Mr. Balwani's Bureau of Prisons reporting date of March 15, 2023, the Court should also stay that reporting date until this Court is able to rule—or, if the motion is denied, until the Court of Appeals can rule.

## II.    BACKGROUND

Mr. Balwani and his co-defendant, Elizabeth Holmes, were originally charged by indictment on June 14, 2018. Dkt. 1. Mr. Balwani was arraigned the following day. Dkts. 7, 12. At the arraignment, on the government's recommendation, Judge van Keulen granted

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-28

Mr. Balwani pretrial release on an unsecured $500,000 bond with usual conditions. Dkts. 7, 8, 12.

On May 20, 2020, the government stipulated that Mr. Balwani had "been in full compliance with the conditions of his release." Dkt. 402, at 1. On that basis, the parties stipulated, Pretrial Services approved, and Judge van Keulen ordered the release of Mr. Balwani's passport for international travel. *Id.* at 2-5. When those travel plans were cancelled because of COVID-19 pandemic travel restrictions in the foreign country, Mr. Balwani returned his passport to Pretrial Services pursuant to a stipulation with the government. Dkt. 557.

Following trial, the jury found Mr. Balwani guilty on all counts on July 7, 2022. Dkt. 1507. On July 14, the Court maintained Mr. Balwani's release pending sentencing and modified the conditions to include a $750,000 secured bond. Dkt. 1511. Mr. Balwani satisfied the modified bond condition on July 19. Dkt. 1513. As the government stated while discussing release pending sentencing, Mr. Balwani has demonstrated a "history of compliance" "during the multiple years under pretrial supervision." Tr. 7785. The Court likewise approved of Mr. Balwani's "satisfactory performance on pretrial services." Tr. 7787. Mr. Balwani's perfect compliance has continued "at all times" throughout his release pretrial and pending sentencing. Dkt. 1647 (PSR), ¶ 6; *accord id.* Sentencing Recommendation, at 3.

On December 7, 2022, the Court sentenced Mr. Balwani to a 155-month term of imprisonment and three years of supervised release on each count of conviction, to be served concurrently. Dkt. 1682, at 1. The Court determined that the terms of Mr. Balwani's release would "remain in effect until" his surrender date—March 15, 2023. *Id.* On December 20, 2022, Mr. Balwani filed his notice of appeal to the Ninth Circuit. Dkt. 1702.

## III. ARGUMENT

Section 3143 is mandatory: the Court "shall order the release" of a defendant pending appeal so long as four factors are satisfied. 18 U.S.C. § 3143(b)(1). Here, they are satisfied:

1. The defendant is not likely to flee or pose a danger to the safety of any other person or the community if released.
2. The appeal is not for purpose of delay.
3. The appeal raises a substantial question of law or fact.

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-29

4. If the determination of the substantial question is favorable to the defendant, it is likely to result in reversal, a new trial, a non-custodial sentence, or a reduced sentence shorter than the expected duration of the appellate process.

*See* 18 U.S.C. § 3143(b)(1)(A)-(B); *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985).

## A. Mr. Balwani Is Not Likely To Flee Or Pose Any Danger.

There is no risk that Mr. Balwani will flee while pursuing his appeal, much less a *likelihood* of it as required to deny release on that basis. 18 U.S.C. § 3143(b)(1)(A). The Probation Officer reached the same conclusion. PSR Sentencing Recommendation, at 3 ("The defendant has kept all court appearances, complied with conditions of pretrial release, and is not viewed as a flight risk….").

Mr. Balwani is a U.S. citizen and does not hold citizenship in any other nation. PSR, at 3. His passport is currently in the custody of Pretrial Services. Tr. 7786; Dkt. 558. He has complied strictly with the travel conditions of his current release, including making the appropriate motions in this Court when seeking adjustments to those conditions. *See, e.g.*, Dkts. 398, 401, 1693. Mr. Balwani has substantial ties to the United States, including two brothers, nieces, and nephews who reside in California, Maryland, and Ohio and who have consistently provided him with support during these proceedings and will continue to do so. *See* PSR, ¶¶ 88, 100; Dkt. 1622-2, at 1; 12/7/22 Sentencing Tr. 141-42, 151. And as described in a letter of support submitted at sentencing, Mr. Balwani is a cherished member of local religious communities, volunteering "every weekend" with an "unshakable commitment" to the families in these communities. Dkt. 1667-1, at 151; *see also* PSR, ¶ 98; 12/7/22 Sentencing Tr. 142. There is, accordingly, no risk he will flee if granted release pending appeal.[1] Any possible concern about Mr. Balwani's foreign birth and familial ties is far outweighed by his perfect compliance with the Court's release

---

[1] *E.g.*, *United States v. Cuong Cau Dang*, No. 13-cr-486-EJD (PSG), 2013 WL 4119426, at *3 (N.D. Cal. Aug. 9, 2013) ("[I]f Dang did not run and cannot be shown to have harmed anyone, especially Cisco, even months after he learned he was the target of an investigation, how can the court say now that there is an undue risk that Dang suddenly would change course despite the explicit court order to refrain from doing so?").

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-30

orders to date and his long-established roots in the United States, including his stateside family.[2]

There is similarly no likelihood that Mr. Balwani will pose a danger to the safety of any person or the community. 18 U.S.C. § 3143(b)(1)(A). The Probation Officer reached the same conclusion. PSR, Sentencing Recommendation, at 3 ("The defendant … is not viewed as a … danger to the community."); *see also* 12/7/22 Sentencing Tr. 150 ("[T]his was a nonviolent offense, and … Mr. Balwani presents no history of violence."); Dkt. 1682, at 1. Mr. Balwani has never been accused of or arrested for any other crime, much less a dangerous one. 12/7/22 Sentencing Tr. 150; Dkt. 1682, at 1; PSR, ¶¶ 81-86. Defendants of Mr. Balwani's age have dramatically decreased recidivism rates, as do defendants convicted of fraud. U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 3 (2017), https://perma.cc/375D-BVJR. Indeed, in granting release pending trial and sentencing, the Court and government have now twice agreed that Mr. Balwani poses no danger. The imposition of a sentence does not change the outcome of that analysis, as the Court recognized in maintaining release pending surrender. Dkt. 1682, at 1.

### B. Mr. Balwani's Appeal Is Not For Purpose Of Delay.

Mr. Balwani intends to pursue a variety of errors on appeal, including but not necessarily limited to the substantial legal questions described below. Counsel for Mr. Balwani has attested to the good faith of the appeal, Davies Decl. ¶ 2, which can be enough to "satisf[y]" the Court's delay inquiry, *Blassingame v. United States*, 242 F.2d 313, 314 (9th Cir. 1957) (per curiam).

Mr. Balwani is pursuing his appeal in good faith and not for delay. Indeed, at Mr. Balwani's election, his notice of appeal was submitted before judgment has even been entered, in advance of the deadline, which commences briefing in the Court of Appeals weeks earlier than required—the opposite of a delay tactic. *See* Dkt. 1705-1 (Time Schedule Order). The vast majority of the delays in this case to date have been the direct result of delays in and the length of Ms. Holmes' trial, as well as the COVID-19 pandemic, not decisions by Mr. Balwani.

---

[2] *Id.* at *4 ("Since his arrival in this country decades ago, Dang has spent his entire life with his immediate family in the San Jose Division of this district. … [B]ecause his life is tethered to the United States, and not Vietnam, this factor still weighs against detention."); *see also United States v. Motamedi*, 767 F.2d 1403, 1408-09 (9th Cir. 1985) (reversing denial of pretrial release despite foreign connections in light of ties to the United States).

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

*See, e.g.*, Dkt. 514, at 6-8; Dkt. 1198; *Leigh v. United States*, 82 S. Ct. 994, 997 (1962) (Warren, C.J., in chambers) (considering whether "such delays as have occurred can … be attributed to applicant"). In fact, if the trials had proceeded as Mr. Balwani requested, he would have been tried before Ms. Holmes, months earlier than transpired. *See* Dkt. 189. There is, accordingly, no evidence that Mr. Balwani is engaging in delay tactics rather than pursuing a good-faith appeal.[3]

### C.  Mr. Balwani's Appeal Presents Substantial Questions.

Mr. Balwani's conviction is a result of numerous legal and factual errors warranting acquittal or a new trial. This motion discusses eight of the substantial questions presented by this matter that Mr. Balwani may raise on appeal. This Court should grant release pending appeal in light of those substantial questions. In the Ninth Circuit, "a 'substantial question' is one that is 'fairly debatable.'" *Handy*, 761 F.2d at 1281. To satisfy this prong, a defendant need show "only a non-frivolous issue." *United States v. Garcia*, 340 F.3d 1013, 1020 n.5 (9th Cir. 2003).

The Court's task is to "decide whether there is a school of thought, a philosophical view, a technical argument, an analogy, an appeal to precedent or to reason commanding respect that *might possibly* prevail." *Herzog v. United States*, 75 S. Ct. 349, 351 (1955) (Douglas, J., in chambers) (emphasis added), *quoted in Handy*, 761 F.2d at 1281.[4] The Ninth Circuit has set this bar intentionally lower than the "close question" standard adopted by other circuits. *See Handy*, 761 F.2d at 1281-82, 1282 n.2; Doug Keller, *Resolving a "Substantial Question,"* 60 Fla. L. Rev. 825, 827-28 (2008) (describing this difference). Under this Circuit's precedent, then, a substantial question need not be a close one—just fairly debatable.

A district court need not agree that there was error: "The question may be 'substantial' even though the judge or justice hearing the application for bail would affirm on the merits of the

---

[3] *See, e.g.*, *United States v. Baras*, No. CR 11-00523-YGR, 2014 WL 4728992, at *4 n.3 (N.D. Cal. Sept. 18, 2014) ("[B]ecause there is nothing in the record suggesting that Defendant filed an appeal for purposes of delay, there is no basis to deny Defendant's motion on this ground."); *United States v. Ohayon*, No. CR 10-00105 CRB, 2014 WL 2159256, at *2 n.1 (N.D. Cal. May 23, 2014) ("Although Defendant no doubt wishes to postpone his incarceration, the Court cannot say that it is this desire, rather than a sincere (although, in the Court's view, misguided) view of the merits of his appeal, that motivated his filing.").

[4] Although the bail rules and statutes have changed over the years, the Ninth Circuit in *Handy* adopted the longstanding interpretation of "substantial question" described by Justice Douglas. 761 F.2d at 1282 (adopting the "historic meaning" even though historical cases "involve[d] earlier rules or statutes or arose in different contexts").

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-32

appeal." *D'Aquino v. United States*, 180 F.2d 271, 272 (Douglas, Circuit Justice, 9th Cir. 1950), *quoted in Handy*, 761 F.2d at 1281; *accord Herzog*, 75 S. Ct. at 351 (finding a substantial question even though the Justice "reach[ed] the conclusion that on the merits there is no appellate judge who would likely reverse the judgment"). Even in cases where district judges are confident in their rulings, appellate courts may disagree where questions are fairly debatable.[5] Nor must a district court agree that a defendant is innocent in order to grant release: "The question of the guilt or innocence of an appellant is not an issue on application for bail." *D'Aquino*, 180 F.2d at 272. So long as the defendant raises at least one fairly debatable question, this prong is satisfied.[6]

### 1. The Constructive Amendment Of The Indictment Is A Substantial Question.

Mr. Balwani moved in limine to exclude evidence concerning the accuracy and reliability of traditional, commercial blood-testing technology used by Theranos. Dkt. 1156, at 1-11. The Court denied the motion. Dkt. 1326, at 7-8. The Court's ruling, and the subsequent admission of that evidence, constructively amended the indictment and allowed Mr. Balwani to be convicted on allegations never approved by the grand jury. *See Stirone v. United States*, 361 U.S. 212, 213-17 (1960). Questions of constructive amendment are reviewed de novo. *United States v. Bhagat*, 436 F.3d 1140, 1145 (9th Cir. 2006).

There are two distinct categories of factual issues that could have been put to the grand jury. First, when Theranos conducted testing using proprietary Theranos technology, did it produce accurate and reliable results when compared to commercially available devices, and did

---

[5] *See, e.g., United States v. Geringer*, No. 5:12-cr-00888-EJD, 2016 WL 4791815 (N.D. Cal. Sept. 14, 2016) (finding no substantial question as to loss calculation), *sentence vacated and remanded*, 672 F. App'x 651 (9th Cir. 2016) (vacating based on erroneous loss calculation); *United States v. Abad*, No. CR 12-54 4 JSW, 2014 WL 12708710, at *2 (N.D. Cal. Aug. 6, 2014) (granting release pending appeal in healthcare fraud case even though the district court had "considered and rejected" all of the arguments raised in the motion for release).

[6] *See United States v. Martin*, No. 1:13-cr-00065-BLW, 2014 WL 2155187, at *2 (D. Idaho May 22, 2014) (finding that "the vast majority of the issues [raised in the motion] do not present a substantial question, … [b]ut one or two do, and this is all [the defendant] needs to be eligible for release pending appeal"); *see also United States v. Pollock*, No. 3:14-cr-00186-BR, 2016 WL 8730144, at *2 (D. Or. Sept. 16, 2016) (granting release pending appeal where the defendant raised a substantial question about the loss amount and whether it could be reliably calculated for sentencing purposes); *United States v. Fisher*, No. SACR 14-00110-JLS-2, 2015 WL 13122782, at *2 (C.D. Cal. Aug. 17, 2015) (granting release pending appeal in fraud case where the defendant raised a substantial question about the district court's admission of a non-testifying co-defendant's statements through a testifying witness).

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-33

defendants make misrepresentations on this topic? Or second, when Theranos conducted testing on the same unmodified commercial devices used by other labs, did it produce less accurate and reliable results than traditional labs, and did defendants make misrepresentations on this topic?

The Third Superseding Indictment ("TSI," Dkt. 469) invokes only the first of those categories. But, over Mr. Balwani's protest, the government introduced evidence about and argued for conviction based on the second category, too. In other words, the government's case and the Court's rulings constructively amended the TSI by "alter[ing], either literally or in effect" its "charging terms … after the grand jury has last passed upon them." *United States v. Adamson*, 291 F.3d 606, 614 (9th Cir. 2002) (quoting *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984)). It is at least fairly debatable whether the Court's expansion of the case to reach that distinct second category literally or effectively altered the TSI's terms.

One hallmark of a constructive amendment is a trial that includes a "complex of facts" that is "distinctly different from those set forth in the charging instrument." *Id.* at 615. Here, the indictment alleged one complex of facts (Theranos technology), but at trial the government presented another (unmodified commercial devices). And this distinct difference cut across multiple aspects of the case—from the testimony of CMS Inspector Sarah Bennett, who was allowed to testify about regulatory deficiencies related to Theranos' use of ordinary commercial devices, to the CMS report that set forth alleged regulatory violations (including an immediate jeopardy finding) corresponding mainly to non-Theranos devices, and to the testimony of two patients (each counts in the TSI), who were allowed to describe allegedly erroneous or unexpected test results they received without any connection to Theranos' proprietary technology.

When assessing a constructive amendment claim, courts start with the indictment's text, reading it "according to common sense with an appreciation of existing realities." *United States v. Anderson*, 532 F.2d 1218, 1222 (9th Cir. 1976). With respect to both the patient counts and the investor counts, the TSI alleges schemes to defraud concerning the systemic reliability of Theranos' proprietary fingerstick testing technology. It repeatedly refers to whether the defendants "knew … that *Theranos's technology* was, in fact, not capable of consistently

FER-34

producing accurate and reliable results." Dkt. 469 ("TSI"), ¶ 16 (emphasis added).[7] It nowhere alleges fraud concerning inaccurate results from commercially available tests.

Until the Court's written order on Mr. Balwani's motions in limine, years after the grand jury returned the operative indictment, the parties and the Court appeared to agree on this common-sense reading of the allegations. The government put it simply and correctly in one of its motions in limine: Tests not "run on [a] Theranos proprietary blood analyzer [but rather] a regular FDA-approved machine" are irrelevant and "should be precluded under Rules 401 and 403." Dkt. 1155, at 20. Indeed, at the hearing, the Court agreed: "I understand that he's not … charged with doing anything with commercial machines. He's certainly not charged with that.… I would probably grant [a directed verdict] if they didn't put anything in about the company's machines *like they said in the indictment.*" Feb. 4, 2022 Hr'g Tr. 32 (emphasis added).

In its written order that followed, however, the Court took the polar opposite view, concluding that the TSI "puts Balwani on notice that the scheme to defraud patients includes Theranos' use of unmodified conventional analyzers." Dkt. 1326, at 8. The Court acknowledged that "the TSI does at times focus exclusively on 'Theranos technology.'" *Id.* But it stretched supposed ambiguities in the indictment to reach the accuracy of unmodified commercial devices. It parsed phrases in a highly technical manner, reasoning that "Theranos test results" referred to results from Theranos *as a company*, even though the parties and the Court for years had understood that phrase to refer to results generated by Theranos *technology. Id.* (citing TSI ¶ 18). That reading defies the indictment's plain meaning, which uses "Theranos" as a modifier to indicate Theranos' proprietary technology.

An indictment can be read only to reach facts "necessarily implied by the allegations," and nothing in this indictment *necessarily* implies the broader interpretation ultimately adopted by the

---

[7] *See also id.* ¶ 5 ("Theranos pursued the development of proprietary technology…."); *id.* ¶ 6 ("Theranos claimed that its proprietary technology and methods would minimize the risk of human error and generate results with the highest accuracy."); *id.* ¶ 8 ("[M]ade statements to the media advertising the capabilities of Theranos's technology."); *id.* ¶ 12(E) ("[R]epresented to investors … that Theranos's technology had deployed to the battlefield…."); *id.* ¶ 12(H) ("[R]epresented to investors that Theranos's technology had been examined, used, and validated…."); *id.* ¶ 17(C) ("[K]new that the tests performed on Theranos technology contained or were likely to contain: (1) inaccurate and unreliable results…."); *id.* ¶ 22 ("[T]he false and fraudulent pretense that Theranos technology produced reliable and accurate blood test results.").

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

Court in its motion in limine ruling. *Id.* at 7 (quoting *Anderson*, 532 F.2d at 1222).[8]

The erroneous expansion of the indictment requires reversal. The Fifth Amendment grants defendants "a substantial right to be tried only on the charges set forth in an indictment by a grand jury," *United States v. Shipsey*, 190 F.3d 1081, 1085 (9th Cir. 1999) (vacating conviction), and even more important, the grand jury "serv[es] as a kind of buffer or referee between the government and the people," *United States v. William*, 504 U.S. 36 (1992). For these reasons, a constructive amendment "always requires reversal." *Adamson*, 291 F.3d at 615; *see also United States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001) (acknowledging that a constructive amendment may "always require[] reversal," but not reaching the issue because "the defendants were prejudiced" regardless). Since *Stirone*, the Supreme Court, the Ninth Circuit, and other circuits have often reversed convictions where the jury may have convicted based on a charge that the grand jury did not make.[9]

Moreover, the erroneous expansion of the indictment caused significant prejudice by allowing the government to introduce substantial—and highly incendiary—evidence that was relevant only to an uncharged allegation (i.e., that Theranos was unable to produce accurate and reliable results using commercially available technology and that Mr. Balwani knew it). For example, CMS surveyor Sarah Bennett was allowed to testify about CMS's findings of regulatory deficiencies, the overwhelming majority of which concerned tests run on commercial devices,

[8] References in the indictment to HIV testing do not show that the grand jury indicted on a theory of fraud grounded in the accuracy of standard commercial testing. The record shows that the government was mistaken about which tests were run on which devices and thought at the time that Theranos had conducted HIV testing on Theranos devices. *See* Dkt. 265, at 3 (contending that "Theranos's analyzer" "was not capable of consistently producing accurate and reliable results for … HIV"); Dkt. 267, at 2 (similar).

[9] *See e.g. Russell v. United States*, 369 U.S. 749, 770 (1962) ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure."); *United States v. Shipsey*, 190 F.3d 1081, 1086 (9th Cir. 1999) (charge of theft by false pretenses, jury could have convicted on wrongful taking; conviction reversed); *United States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001) (charge of leaving asbestos-containing debris on floor to dry, jury could have convicted for knowingly failing to comply with workplace standard; conviction reversed); *United States v. Davis*, 854 F.3d 601, 605 (9th Cir. 2017) (sex trafficking charge included knowing disregard of age of victim, sex trafficking based on reasonable opportunity to observe victim; conviction reversed); *United States v. Floresca*, 38 F.3d 706 (4th Cir. 1994) (en banc) (reversing conviction for witness tampering where could have been convicted for tampering with investigation).

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-36

including the PT/INR test that gave rise to an inflammatory finding that Theranos' practices posed "immediate jeopardy" to patient health. *See* Tr. 4621, 4660-64, 4965-66, 5030-31. The Court also erroneously admitted portions of CMS's official report that documented regulatory violations relating to only commercial technology. And the Court's ruling ushered in evidence about patient Erin Tompkin's HIV tests, which were run exclusively on unmodified commercial devices, and patient Brent Bingham's platelet-count tests, which the government did not show were performed on Theranos technology. *See* Tr. 5953-56, 5977-91. Nor is there evidence that the government ever informed the grand jury that Ms. Tompkins was tested on FDA-cleared technology and that it could not show that Mr. Bingham was tested on Theranos' proprietary technology. *See* Davies Decl. Ex. 1 (7/14/2020 C. McCollow Grand Jury Testimony), at 135-39.

These errors infected all the counts of conviction, each of which concerned, at its core, the accuracy and reliability of Theranos' blood tests. In its closing argument, the government framed both the investor counts and patient counts in terms of Theranos' ability to run accurate blood tests.[10] But the government did not clarify that, in accord with the indictment, Theranos' ability to test accurately had to be based solely on evidence related to Theranos' proprietary technology.

The government thus invited the jury to conclude that because of problems related to ordinary commercial technology, Theranos could not test accurately, as the defendants had represented to both investors and patients. *See, e.g.*, Tr. 7670 (inviting the jury to "think about the CMS findings based on a holistic look at the Theranos lab"); Tr. 7681-84 (inviting the jury to "ask how would Mr. Balwani's actions and choices have been different … if he was not a participant in these two schemes…?" and answering in part: "When the CMS inspection found serious problems in the Theranos lab, Mr. Balwani would have focused on solutions rather than trying to persuade Sarah Bennett not to call it what she saw it."). It was error to allow the petit jury to convict on a theory that appears nowhere in the indictment.

---

[10] *See, e.g.*, Tr. 7061 (arguing to the jury that "investors thought they were investing in a company that could test accurately" and "patients thought they were getting their blood tested in a company that could test accurately"); Tr. 7037 ("Just like an article in the media would talk about Theranos's accuracy, and that would be useful for an investor to hear, a patient would read in the media that Theranos's testing was accurate and also make a decision to use Theranos as a lab or blood testing service…."); Tr. 7038 (similar).

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-37

To be clear, this Court need not conclude that there was error in order to grant this motion. Release pending appeal is warranted if reasonable judges, faced with an indictment that at least "at times focus[es] exclusively" on Theranos technology, could conclude on de novo review that the grand jury's charges indeed had that exclusive focus. Dkt. 1326, at 8. Because that question is at least fairly debatable, Mr. Balwani's appeal raises a substantial question.

> ### 2. The Admissibility Of Specialized Testimony By Non-Experts Is A Substantial Question.

Throughout trial, over Mr. Balwani's objections, the Court allowed lay witnesses to present scientific, technical, and specialized testimony without first qualifying them as experts. Those admissibility rulings directly contravened Federal Rule of Evidence 701(c), which constrains lay witnesses from offering testimony that is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Consistent with that constraint, Rule 702 permits witnesses to convey "scientific, technical, or other specialized knowledge" only if that witness "is qualified as an expert" and if the testimony otherwise conforms to that rule's four requirements of usefulness, factual basis, reliable methods, and reliable application.

Recognizing that courts had allowed the lay-expert line to blur, the advisory committee reinforced Rule 701 by adding the just-quoted subsection (c) in order "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee note to 2000 amendment (citing *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)).

The Court of Appeals will review de novo this Court's interpretation of these rules and its determination whether the testimony in question falls within their scope. *United States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018). Mr. Balwani respectfully submits that it is fairly debatable whether the Court erred in applying Rules 701 and 702 to the testimony of three key government witnesses: Erika Cheung, Mark Pandori, and Adam Rosendorff. Each of these critical witnesses repeatedly crossed the line between lay and specialized testimony:

- Ms. Cheung testified about why dilution is necessary in blood testing, Tr. 1132-33; the capacities of Theranos devices, Tr. 1135-38; the purpose of and concerns arising from Theranos' quality-control testing, Tr. 1202-03, 1245-48; comparisons between

- 11 -

Theranos' data-analysis procedures and an industry-standards manual she had never seen before, Tr. 1552-54; and the purpose of government regulations governing blood testing, Tr. 1557-58.

- Dr. Pandori testified about whether Theranos' technology was groundbreaking in light of the state of the art and industry knowledge, Tr. 1608, 1733; concerns arising from quality-control and proficiency testing, Tr. 1634, 2274-75; and a critical issue, i.e., whether "Theranos testing was more accurate" than competitors', Tr. 1734.

- Dr. Rosendorff testified about the effects of laboratory bias, dilution, and hemolysis on the accuracy and reliability of Theranos' technology, Tr. 3265-66, 3729-31; concerns arising from Theranos' use of testing reference ranges specific to its fingerstick technology, Tr. 3266-67; and whether purported errors in individual patients' results could indicate systemic accuracy problems, Tr. 3268-69.

The Court allowed this specialized testimony, notwithstanding Rule 702's unsatisfied safeguards, because the witnesses testified "based on [their] training and experience" at Theranos. Tr. 1137. But that is precisely what Ninth Circuit precedent forbids. Questions framed "based upon your training and experience" are a hallmark of Rule 702 expert testimony. *Figueroa-Lopez*, 125 F.3d at 1246; *see also United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002). The testimony described above was "beyond the understanding of an average juror" and, therefore, specialized. *United States v. Wilson*, 605 F.3d 985, 1026 (D.C. Cir. 2010) (per curiam). In allowing lay testimony based on specialized knowledge obtained through training and experience, the Court committed the very error described in *Figueroa-Lopez*.

It does not matter that the testimony was based on a witness's own perception: "The mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702." *Figueroa-Lopez*, 125 F.3d at 1246. Nor does it matter that a witness gained her specialized knowledge on the job—it is still specialized. Indeed, where knowledge is developed by learning on the job, it is by nature expert testimony. *See Rodriguez v. Gen. Dynamics Armament & Tech. Prods.*, 510 F. App'x 675, 676 (9th Cir. 2013).

This was, in short, testimony "that an untrained layman could not make if perceiving the same acts or events." *United States v. Peoples*, 250 F.3d 630, 341 (8th Cir. 2001) (citing *Figureoa-Lopez*); *accord Conn*, 297 F.3d at 554. For example, an untrained layman would not be familiar with the term "hemolysis," much less be able to explain that there is "a large amount of

- 12 -

hemoglobin in red blood cells" that can "interfere[] with the ability of the [blood-testing] readers to read what is in the sample" and therefore "have an[] effect on the accuracy and reliability of certain [Theranos] tests." Tr. 3731 (Rosendorff). At the very least, reasonable judges could fairly debate whether untrained laymen have such a sophisticated understanding of hemolysis.

If the Court of Appeals sees error, it will likewise find prejudice. The government offered no expert testimony on blood-testing technology in this case. Instead, it relied exclusively on this specialized testimony from witnesses never qualified to give it. Worse still, these witnesses repeatedly testified—in a specialized manner—about an ultimate issue: the accuracy and reliability of Theranos technology. *See* Tr. 1203-03, 1245-48 (Cheung); Tr. 1634, 1734, 2274-75 (Pandori); Tr. 3265-69, 3729-31 (Rosendorff). Indeed, it was precisely these three witnesses who undergirded the denial of Mr. Balwani's motion for judgment of acquittal. *See* Dkt. 1635, at 5-7. And it was precisely these three witnesses the government named when arguing to the jury about "the accuracy and reliability of [Theranos] blood testing." Tr. 6939; *accord* Tr. 7054-55, 7084-86; Tr. 7576 ("The simplest evidence on [accuracy and reliability] was testimony from at least three individuals who worked within Theranos working in the lab. That was, of course, Erika Cheung and then Drs. Mark Pandori and Adam Rosendorff.").

As with the constructive-amendment question, the Rule 701 violations here undermine all counts, both patient and investor. As explained above (at 7-8 & n.7), allegations of misrepresentations about the accuracy and reliability of Theranos' technology were at the core of each count. And as just noted, these three witnesses testified about exactly that. Without that extensive specialized testimony, a jury could easily have concluded that the government failed in its burden to prove the accuracy and reliability allegations underlying the investor counts, TSI ¶ 12(A), and the patient counts, TSI ¶ 17(C).

In sum, at the very least, Mr. Balwani's appeal will present a fairly debatable question about the Court's application of Rules 701 and 702 in light of *Figueroa-Lopez*. Some judges might agree with this Court's ruling, but on de novo review, some reasonable judges surely would take the other view. *Figueroa-Lopez*, 125 F.3d at 1246. Accordingly, this evidentiary issue presents a substantial question warranting release pending appeal.

- 13 -

### 3. The Prosecutor's Solicitation Of And Failure To Correct Mr. Tolbert's False Testimony Raises A Substantial Question.

The Supreme Court has "long emphasized 'the special role played by the American prosecutor in the search for truth in criminal trials.'" *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). "Deliberate deception" of a jury is "inconsistent with the rudimentary demands of justice." *Hayes*, 399 F.3d at 983 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). A conviction "obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The "same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* And where "credibility" of a witness is "an important issue in the case," deception by the prosecutor that protects the witness's credibility violates "the due process requirements enunciated in *Napue* and other cases." *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Prosecutorial misconduct of this kind requires reversal of a conviction if the government knowingly relies on false testimony and that testimony was material, i.e., "there is a reasonable likelihood that the false testimony could have affected the judgment." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).

Due to the government's deceptive handling of Mr. Tolbert's testimony, Mr. Balwani did not receive even rudimentary justice. At Ms. Holmes' trial, the prosecution played several clips of a tape recording made by Mr. Tolbert of an investor call led by Ms. Holmes in December 2013. Holmes Trial Tr. 4471. As a result, while Mr. Tolbert testified as to his "understanding" of what Ms. Holmes told investors on that call on issues ranging from Theranos devices on medevacs to pharmaceutical partnerships, *e.g.*, *id.* at 4513, 4514, the jury heard exactly what Ms. Holmes said during the call. Although the government expected the tape recording to make Mr. Tolbert's testimony more powerful for the jury, the tape undermined it. He was forced to admit the tape showed Ms. Holmes never made certain statements that allegedly informed his view of the company; she did not claim "there were thousands of tests that could be run" on Theranos devices, *id.* at 4540, or that its pharmaceutical business "was still, in December of 2013, a significant focus," *id.* at 4495; *compare id.* at 4533-37. And when the government made her

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-41

alleged statements about Theranos devices on military medevacs a centerpiece of its closing argument, *e.g.*, *id.* at 8910, 8922, 8968, defense counsel was able to direct the jury to "compare [the tape] to what was actually going on with Theranos's military programs," *id.* at 9157—a comparison that showed Ms. Holmes did not in fact tell investors that Theranos devices were being used on medevacs as "many of the witnesses" had suggested, *id.* at 9162; *see also id.* at 4504. After listening to the relevant portion of the tape three different times (on Tolbert's direct and cross examinations, and again at the jury's request during deliberations), the jury did not convict Ms. Holmes on the counts most directly tied to the December 2013 call.

More focused on conviction than truth, in Mr. Balwani's trial the government decided not to introduce the tape of the December 2013 investor call. Tr. 4435-39. Instead, the government successfully opposed the defense's efforts to introduce it, yet the government still elicited inaccurate testimony from Mr. Tolbert, including that Holmes claimed "that Theranos devices were employed on the medevac helicopters and being used to kind of improve survival rates of military personnel who had been injured in combat." Tr. 4435. While this was not apparent to the jury, the government knew all too well from its experience at the Holmes trial that Mr. Tolbert's testimony did not match the truth reflected on the tape. But this time, there was no tape for the jury to use to evaluate Tolbert's incorrect testimony, nor did the government do anything to address what it knew to be inaccuracies. The government "knowingly elicited and then failed to correct false testimony" that was central to making its case. *Dow*, 729 F.3d at 1048.

Over two decades ago, the Ninth Circuit, sitting en banc, directed prosecutors to stop engaging in "schemes to place false or distorted evidence before a jury." *Hayes*, 399 F.3d at 988. "Our criminal justice system depends on the integrity of the attorneys who present their cases to the jury." *Id*. Despite *Hayes*, here is yet another case where a prosecutor obtained a conviction through "deceptive means," thereby "weaken[ing]" "the entire foundation of our system of justice." *Id.* A court's remedial powers in the face of such misconduct is broad, *see United States v. Kojayan*, 8 F.3d 1315, 1323-24 (9th Cir. 1993), and here, a sanction of reversal on all counts would likely be appropriate. As in *Hayes*, there is a substantial question whether acquittal is warranted in light of this error, and the Court should grant release pending the Ninth Circuit's

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-42

resolution of that substantial question.

### 4. The Denial Of The Motion To Suppress And An Instruction On Missing Evidence Poses A Substantial Question.

The government's failure to preserve the LIS violated *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979) (en banc), and *Arizona v. Youngblood*, 488 U.S. 51 (1988). Indeed, evidence the government itself offered in Mr. Balwani's trial showed that, in response to an IT specialist identifying potential ways to preserve that critical evidence, the same prosecutors who tried this case elected to ignore two approaches that unrebutted defense expert testimony at trial showed would have worked to obtain the LIS data. Tr. 6788-89, 6819-21; TX 5943; TX 20832. According to the unrebutted expert testimony of Richard Sonnier, the same approaches the government chose not to pursue would have led to access to the LIS data. *E.g.*, Tr. 6821. The Court thus erred in denying Mr. Balwani's motion to suppress[11] evidence supporting alleged deficiencies with Theranos' clinical testing—which Mr. Balwani could not adequately rebut without the LIS data. *See* Dkt. 1326 at 30-37.[12]

At a minimum, the Court erred in denying Mr. Balwani's requested instruction on missing evidence. *See* Tr. 6887. The Ninth Circuit has squarely held that bad faith is not required for a remedial instruction based on missing evidence. *See, e.g.*, *United States v. Sivilla*, 714 F.3d 1168, 1170 (9th Cir. 2013). Nor is it dispositive under the Ninth Circuit's multi-factor test whether "the evidence was lost or destroyed while in the government's custody." *United States v. Robertson*, 895 F.3d 1206, 1213 (9th Cir. 2018). Had either of these motions been resolved in Mr. Balwani's favor, the jury would likely have acquitted on all counts. With almost all the government's evidence of deficiencies with Theranos' clinical testing suppressed, the government would have been unable to prove the core allegation underlying both the investor counts and patient counts— that Theranos' technology did not work.[13] The same would have been true had the jury been

---

[11] The Court also erred in denying Mr. Balwani's request for an evidentiary hearing.

[12] In briefing before and during trial, the government repeatedly insinuated that Mr. Balwani was somehow involved in, and responsible for, the decision to disassemble the LIS system. *See, e.g.*, Dkts. 682 at 3-9, 1181 at 29, 1440 at 12-13. But when given the chance to substantiate its claims at trial, the government elected not to do so.

[13] The unavailability of the LIS data also eliminated any chance to independently corroborate key evidence of Mr. Balwani's intent: that his own family members relied on Theranos' technology

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-43

instructed, as Mr. Balwani asked, that a finding of government negligence or recklessness in preserving LIS could justify an inference that the data would be unfavorable to the government.

### 5. The Admissibility Of Evidence On Dr. Rosendorff's Bias Is a Substantial Question.

The right to cross-examine a government witness about potential bias is at the core of the Confrontation Clause's guarantee. *See United States v. Alvarez-Lopez*, 559 F.2d 1155, 1160 (9th Cir. 1977). There is a substantial question whether the Court denied that right when it prohibited the defense from questioning Dr. Rosendorff about his bias to paint himself in a positive light and disassociate himself from Theranos due to regulatory issues at each of his three post-Theranos employers. *See* Tr. 3216; Dkts. 1401, 1407. The Ninth Circuit has found it impossible to "overemphasize the importance of allowing full and fair cross-examination of government witnesses" when their bias is at issue, and "[f]ull disclosure of all relevant information concerning their past record and activities through cross-examination … is indisputably in the interests of justice." *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir. 1993). Yet the Court barred Mr. Balwani from any inquiry—an even sharper limitation than it imposed on Ms. Holmes.

Resolving this substantial question in Mr. Balwani's favor would likely lead to a new trial on all counts. The government referred to him by name more than 100 times during closing arguments—more than any other witness. *See* Tr. 6938-7086, 7576-7685. Dr. Rosendorff's testimony was crucial to determining the accuracy of Theranos' technology, Mr. Balwani's knowledge of alleged deficiencies in that technology, and his attitude toward regulatory compliance—issues that were core to all counts. It is fairly debatable whether the Court erred when it denied Mr. Balwani the opportunity to confront fully a key government witness.

### 6. The Denial Of A New Trial Or Evidentiary Hearing Based On Dr. Rosendorff's Post-Trial Conduct Poses A Substantial Question.

Dr. Rosendorff's centrality to Mr. Balwani's trial also underscores the significance of the Court's denying Mr. Balwani's motion for a new trial—or even the same chance that Ms. Holmes had to participate in an evidentiary hearing about Dr. Rosendorff's unprecedented post-trial

---

and testing services for diagnostic purposes. While one of Mr. Balwani's family members has stated, for instance, that she saw Mr. Balwani's mother receive a fingerstick test, Dkt. 1668-3, at 54, any corroboration of that would have been housed in the LIS data.

- 17 -

conduct in visiting Ms. Holmes and expressing concerns about his testimony to her partner, Billy Evans. *See* Dkt. 1599. The Court's reasoning turned on distinguishing between Ms. Holmes (who was granted a hearing) and Mr. Balwani (who was not). But there was no basis—in Dr. Rosendorff's trial testimony or his statements to Mr. Evans—to distinguish between the co-defendants for purposes of evaluating Dr. Rosendorff's post-trial conduct. *Compare* Dkt. 1599 at 2, *with* Dkt. 1587-1.

Dr. Rosendorff's testimony at the Holmes evidentiary hearing did not undermine any of Mr. Evans' statements, thus warranting a new trial. *See United States v. Mendez*, 619 F. App'x 644, 646 (9th Cir. 2015). At the least, reasonable judges could fairly debate whether Mr. Balwani should have been denied the hearing that Ms. Holmes was afforded. The denial thus raises a substantial question that, resolved favorably, would likely lead to a new trial on all counts.

**7. The Admissibility Of Evidence On Alleged Misrepresentations To The Department Of Defense Is A Substantial Question.**

The indictment nowhere charges Mr. Balwani with defrauding the military. And the government nowhere provided written notice under Federal Rule of Evidence 404(b)(3) of its intention to offer evidence that Mr. Balwani or Ms. Holmes misrepresented facts to the military. *See* Dkt. 1396 at 6-10. The Court, however, admitted evidence of alleged misrepresentations in materials Theranos provided to the military. *See* Tr. 2489. That was classic propensity evidence aimed at showing that the defendants were liars: they misrepresented facts to the military, so they must have misrepresented facts to investors. Indeed, that is precisely how the government framed the evidence in closing. Tr. 7026-27. This is a textbook example of a "crime, wrong, or act" that "is not admissible to prove a person's character." Fed. R. Evid. 404(b)(1). The Court's ruling transgressed Rule 404(b), as well as *United States v. Hill*, 953 F.2d 452, 456 (9th Cir. 1991) and *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995). Had this issue been resolved in Mr. Balwani's favor, Mr. Balwani likely would have been acquitted of the investor counts. And acquittal on those counts would likely have led to either a sentence of no incarceration or one of shorter duration than the appeal process.

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

FER-45

**8.    The Standard Of Proof For Proving Loss At Sentencing, And Whether The Government Met That Burden, Is A Substantial Question.**

In imposing a Guidelines sentence on Mr. Balwani, the Court relied on a range driven largely by the $121-million fraud loss that it calculated. *See* U.S.S.G. § 2B1.1(b) (24-point enhancement). But there is a substantial question whether the Court applied an erroneous standard of proof in calculating loss. Under *United States v. Lonich*, 23 F.4th 881, 915 (9th Cir. 2022), a conspiracy conviction alone does not justify the preponderance-of-the-evidence standard when "[t]he jury's guilty verdicts do not compel the conclusion—or even plausibly demonstrate—that the defendants through their criminal conduct were responsible for" the losses. In those circumstances, and when loss would have a dramatic effect on the Guidelines range, the government instead must present clear and convincing evidence. *See id.* at 910-16. Here, the government did not carry its burden under either standard. And without the loss amount, the resulting Guidelines range would have been 4-10 months. With that range, it is likely the Court would have imposed either probation or a sentence shorter than the anticipated time for appeal.

**D.    The Substantial Questions Would Result In A New Trial Or A Substantially Reduced Sentence.**

The fourth prong in the § 3143(b)(1) analysis asks whether, assuming the substantial questions Mr. Balwani raises are resolved in his favor, that determination would lead to reversal, a new trial, or a substantially reduced sentence. *Handy*, 761 F.2d at 1280-81 (holding that this prong is about the type of error asserted, not about the likelihood of success). For the reasons described above, each of the first six errors undermined the verdict on all of the counts for which imprisonment was imposed. *Supra* at §§ III.C.1-6. The last two undermined the investor counts, *supra* at §§ III.C.7-8, and for the reasons just described, vacatur of those counts of conviction would likely result in a sentence shorter than the anticipated time for appeal, *supra* at 18-19. Taken individually or in combination, then, these errors satisfy § 3143(b)(1)'s fourth prong because they are likely to result in one of the enumerated statutory remedies (a new trial, a non-custodial sentence, or a sentence shorter than the expected time for appeal).

FER-46

**E.    The Court Should Stay Surrender Pending Resolution Of This Motion And Any Appellate Motion, If Necessary.**

At sentencing, the Court set Mr. Balwani's surrender for March 15, 2023. In light of this pending motion, Mr. Balwani respectfully requests that the Court stay his surrender at least until it is able to resolve this motion. Should the Court deny this motion, Mr. Balwani intends immediately to move the Ninth Circuit for release pending appeal. *See* Fed. R. App. P. 9(b). The filing of a motion in the Court of Appeals stays a defendant's surrender until that Court can resolve his appellate motion. 9th Cir. R. 9-1(e) ("If the appellant is on bail at the time the motion is filed in this Court, that bail will remain in effect until the Court rules on the motion."). Although this stay is imposed automatically by operation of law, Mr. Balwani requests that the Court acknowledge and impose the stay for the avoidance of any doubt. *See, e.g.*, *United States v. Fuentes*, 946 F.2d 621, 622 (9th Cir. 1991); *United States v. Kakkar*, No. 5:13-cr-00736-EJD, 2017 WL 4163291, at *1 (N.D. Cal. Sept. 20, 2017).

## IV.    CONCLUSION

Mr. Balwani respectfully requests that the Court grant this motion.

DATED: January 9, 2023

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:    */s/ Mark S. Davies*
     Mark S. Davies

Attorney for Defendant
RAMESH "SUNNY" BALWANI

FER-47

JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**MR. BALWANI'S SUPPLEMENTAL PROPOSAL RE: JURY INSTRUCTIONS AND VERDICT FORM**<br><br>**Hon. Edward J. Davila** |

## MR. BALWANI'S SUPPLEMENTAL PROPOSAL RE:
## JURY INSTRUCTIONS AND VERDICT FORM

Mr. Balwani previously adopted the proposed preliminary and final jury instructions submitted by Ms. Holmes, her objections to the jury instructions proposed by the government, and the arguments of Ms. Holmes' counsel regarding the same. *See* Dkt. 1210 at 1. Now that the government has concluded its case-in-chief in his case, Mr. Balwani reaffirms his adoption of Ms. Holmes' proposals and arguments, including her objections at Docket 1174.

In addition, based on the evidence introduced at his trial so far, Mr. Balwani hereby supplements these prior filings with the additional proposed jury instructions below. Because the Court has already considered and resolved many of the disagreements between Ms. Holmes' and the government's proposals, Mr. Balwani has used the final jury instructions given in Ms. Holmes' trial (at Dkt. 1206) (the "Holmes final instructions") as the baseline for the changes he has proposed below. For convenience, the Holmes final instructions are set forth below in a chart, which indicates (1) the Holmes final instructions for which Mr. Balwani is not seeking further argument, or (2) the Holmes final instructions for which Mr. Balwani has proposed redlined changes *infra* and will address during the charging conference. Mr. Balwani does not waive any objections or arguments already lodged to these or other instructions. Mr. Balwani also reserves the right to modify or seek additional instructions and to lodge additional objections at a later time.

| # | Holmes Final Instructions (Dkt. 1206) | |
|---|---|---|
| 1 | Duties of Jury to Find Facts and Follow Law | No further argument requested |
| 2 | Charge Against Defendant— Presumption of Innocence— Burden of Proof | No further argument requested |
| 3 | Absence of Co-Defendant | See *infra* at page 4 |
| 4 | Defendant's Decision to Testify | See *infra* at page 5 |
| 5 | Reasonable Doubt—Defined | No further argument requested |
| 6 | What Is Evidence | See *infra* at page 6 |

| 7 | What Is Not Evidence | No further argument requested |
|---|---|---|
| 8 | Direct and Circumstantial Evidence | No further argument requested |
| 9 | Credibility of Witnesses | See *infra* at page 7 |
| 10 | Activities Not Charged | See *infra* at page 8 |
| 11 | Separate Consideration of Multiple Counts—Single Defendant | No further argument requested |
| 12 | On or About—Defined | See *infra* at page 9 |
| 13 | Dual Role Testimony | See *infra* at page 10 |
| 14 | Charts and Summaries Not Admitted Into Evidence | No further argument requested |
| 15 | Charts and Summaries Admitted Into Evidence | See *infra* at page 11 |
| 16 | Conspiracy—Elements | See *infra* at page 12 |
| 17 | Definition of "Willfully" | No further argument requested |
| 18 | Conspiracy—Knowledge of and Association with Other Conspirators | No further argument requested |
| 19 | Conspiracy—Liability for Substantive Offense Committed by Co-Conspirator | See *infra* at page 14 |
| 20 | Wire Fraud (18 U.S.C. § 1343) | See *infra* at page 16 |
| 21 | Intent to Defraud—Defined | No further argument requested |
| 22 | Good Faith | No further argument requested |
| 23 | Knowingly—Defined | See *infra* at page 19 |
| 24 | Aiding and Abetting | See *infra* at page 20 |
| 25 | Scheme to Defraud—Vicarious Liability (18 U.S.C. § 1343) | See *infra* at page 21 |
| 26 | Wire Fraud—Alleged Victim's Conduct | No further argument requested |
| 27 | Success of a Wire Fraud Scheme | See *infra* at page 23 |
| 28 | Alleged Violations of Regulations and Industry Standards | No further argument requested |
| 29 | Duty to Deliberate | No further argument requested |

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-50

| 30 | Consideration of Evidence—Conduct of the Jury | No further argument requested |
|----|-----------------------------------------------|-------------------------------|
| 31 | Use of Notes | No further argument requested |
| 32 | Jury Consideration of Punishment | No further argument requested |
| 33 | Verdict Form | See *infra* at Ex. 1 |
| 34 | Communication with Court | No further argument requested |
| | **Balwani Proposed Instructions** | |
| | Government Agency Witness | See *infra* at page 24 |
| | Adverse Inference for Missing Evidence | See *infra* at page 25 |

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-51

### 3. ABSENCE OF CO-DEFENDANT

For reasons that do not concern you, the case against Mr. Balwani's[1] codefendant, Ms. Elizabeth Holmes, is not before you. Do not speculate why. This fact should not influence your verdict with reference to Mr. Balwani, nor should anything you know about the outcome of the case against Ms. Holmes affect your verdict as to Mr. Balwani and you. You must base your verdict solely on the evidence introduced during this trial. against Mr. Balwani.

---

[1] Throughout these supplemental proposals, Mr. Balwani has replaced "Ms. Holmes" with "Mr. Balwani," "her" with "his," and substituted Ms. Holmes' name for his name where the instructions refer to a co-defendant. He has not redlined those alterations.

## 4. MR. BALWANI'S DECISION NOT TO TESTIFY

Mr. Balwani did not testify in this case. ~~has not testified. You should treat this testimony just as you would the testimony of any other witness.~~ A defendant in a criminal case has an absolute right under the United States Constitution not to testify. In arriving at your verdict, the law prohibits you from considering in any manner that Mr. Balwani did not testify.

*Authority: See* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 6.3 & cmt. (Defendant's Decision Not to Testify) (2022 ed., last updated 3/2022) ("If this instruction is requested by the defendant, it must be given." (citing *Carter v. Kentucky*, 450 U.S. 288, 305 (1981))).

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-53

## 6. WHAT IS EVIDENCE

The evidence you are to consider in deciding what the facts are consists of:

(1) the sworn testimony of any witness;

(2) the exhibits received in evidence; and

(3) any facts to which the parties have agreed.

*Authority*: Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 6.6 (What is Evidence) (2022 ed., last updated 3/2022); *United States v. Houston*, 547 F.2d 104, 107 (9th Cir. 1976) (When the parties have entered into stipulations as to material facts, those facts will be deemed to have been conclusively established."); *see also United States v. Mikaelian*, 168 F.3d 380, 389 (9th Cir. 1999).

## 9. CREDIBILITY

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account: (1) the witness's opportunity and ability to see or hear or know the things testified to; (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case, if any; (5) the witness's bias or prejudice, if any; (6) whether other evidence contradicted the witness's testimony; (7) the reasonableness of the witness's testimony in light of all the evidence; and (8) any other factors that bear on believability.

~~Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.~~

~~However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.~~

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it. What is important is how believable the witnesses are, and how much weight you think their testimony deserves.

FER-55

## 10. ACTIVITIES NOT CHARGED

You are here only to determine whether Mr. Balwani is guilty or not guilty of the charges in the indictment. Mr. Balwani is not on trial for any conduct or offense not charged in the indictment. Mr. Balwani is not on trial for any conduct that took place before the time periods of the alleged offenses, including any conduct by Ms. Holmes before those time periods. The government has alleged a conspiracy to commit wire fraud against Theranos investors during the period 2010 to 2015, and a conspiracy to commit wire fraud against patients who paid for Theranos' blood testing services during the period 2013 to 2016.

*Authority*: *See* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 6.10 cmt. (Activities Not Charged) (2022 ed., last updated 3/2022) ("When conduct necessary to satisfy an element of the offense is charged in the indictment and the government's proof at trial includes uncharged conduct that would satisfy the same element, the court should instruct the jury that it must find the conduct charged in the indictment before it may convict. *See United States v. Ward*, 747 F.3d 1184, 1191 (9th Cir. 2014) (reversible error to permit jury to convict on counts of aggravated identity theft against two victims named in indictment based on evidence presented at trial of uncharged conduct against identity-theft victims not named in indictment).").

## 12.  ON OR ABOUT—DEFINED

The indictment charges that the offenses alleged in Counts One through ~~Eight and Ten through~~ Twelve[2] were committed "on or about" a certain date.

Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove that the offenses were committed precisely on the date charged.

---

[2] Mr. Balwani has incorporated Count Nine where appropriate throughout his proposed instructions and has redlined those alterations. Count Nine was absent from the final Holmes instructions because the government dismissed that count from her case.

## 13. DUAL ROLE TESTIMONY

You have heard testimony from Dr. Audra Zachman, and Dr. Mark Burnes, and Richard Sonnier III, who testified to both facts and opinions and the reasons for their opinions.

Fact testimony is based on what the witness saw, heard, or did. Opinion testimony is based on the education or experience of the witness.

As to the testimony about facts, it is your job to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. You may take into account the factors discussed earlier in these instructions that were provided to assist you in weighing the credibility of witnesses.

As to the testimony about the witness's opinions, this opinion testimony is allowed because of the education or experience of this witness. Opinion testimony should be judged like any other testimony. You may accept all of it, part of it, or none of it. You should give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-58

**15.  CHARTS AND SUMMARIES ADMITTED INTO EVIDENCE**

Certain charts and summaries have been admitted into evidence. Charts and summaries are only as good as the underlying supporting material. You should, therefore, give them only such weight as you think the underlying material deserves.

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-59

## 16.  CONSPIRACY—ELEMENTS

Mr. Balwani is charged in Counts One and Two of the indictment with conspiring to commit wire fraud in violation of Section 1349 of Title 18 of the United States Code.

Mr. Balwani is charged in Count One of the indictment with conspiring to commit wire fraud against investors in Theranos during the period 2010 to 2015.

Mr. Balwani is charged in Count Two of the indictment with conspiring to commit wire fraud against patients who paid for Theranos' blood testing services during the period 2013 to 2016.

I will define wire fraud later in these instructions.

In order for Mr. Balwani to be found guilty of either count, you must all unanimously agree with respect to each Count that the government has proved each of the following elements beyond a reasonable doubt:

First, that there was an agreement between two or more persons to commit wire fraud as charged in the indictment; and

Second, that Mr. Balwani became a member of the alleged conspiracy knowing of at least one of its objects and intending to help accomplish it.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. Nor is it enough, standing alone, that they had a business or romantic relationship. You must find that there was a plan to commit wire fraud as alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the

- 12 -

person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy between two or more other people is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

*Authority*: *United States v. Hussain*, No. 16-cr-00462-CRB-1, WL 4865562, at *5 (N.D. Cal. Oct. 27, 2017) (section 1349 conspiracy requires an agreement "among two or more persons that would satisfy the elements of the substantive offense").

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-61

**19. CONSPIRACY—LIABILITY FOR SUBSTANTIVE OFFENSE COMMITTED BY CO-CONSPIRATOR**

Each member of a conspiracy is responsible for the reasonably foreseeable actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find Mr. Balwani guilty of wire fraud against investors in Theranos as charged in Counts Three through Eight of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a co-conspirator committed the crime of wire fraud as alleged in that count;

Second, the co-conspirator was a member of the conspiracy charged in Count One of the indictment;

Third, the co-conspirator committed the crime of wire fraud in furtherance of the conspiracy;

Fourth, Mr. Balwani was a member of the same conspiracy at the time the offense charged in Counts Three through Eight was committed by the co-conspirator; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen by Mr. Balwani to be a necessary or natural consequence of the unlawful agreement.

You may find Mr. Balwani guilty of wire fraud against patients who paid for Theranos' blood testing services as charged in Counts ~~Ten~~ Nine through Twelve of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a co-conspirator committed the crime of wire fraud as alleged in that count;

Second, the co-conspirator was a member of the conspiracy charged in Count Two of the indictment;

Third, the co-conspirator committed the crime of wire fraud in furtherance of the conspiracy;

- 14 -

FER-62

Fourth, Mr. Balwani was a member of the same conspiracy at the time the offense charged in Counts ~~Ten~~ Nine through Twelve was committed by the co-conspirator; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen by Mr. Balwani to be a necessary or natural consequence of the unlawful agreement.

- 15 -

## 20.  WIRE FRAUD (18 U.S.C. §1343)

Mr. Balwani is charged in Counts Three through ~~, Four, Five, Six, Seven, Eight, Ten, Eleven, and~~ Twelve of the indictment with wire fraud in violation of Section 1343 of Title 18 of the United States Code.

Mr. Balwani is charged in Counts Three through Eight of the indictment with wire fraud against investors in Theranos. In particular:

Mr. Balwani is charged in Count Three with wire fraud in connection with a wire transfer of $99,990 on or about December 30, 2013.

Mr. Balwani is charged in Count Four with wire fraud in connection with a wire transfer of $5,349,900 on or about December 31, 2013.

Mr. Balwani is charged in Count Five with wire fraud in connection with a wire transfer of $4,875,000 on or about December 31, 2013.

Mr. Balwani is charged in Count Six with wire fraud in connection with a wire transfer of $38,336,632 on or about February 6, 2014.

Mr. Balwani is charged in Count Seven with wire fraud in connection with a wire transfer of $99,999,984 on or about October 31, 2014.

Mr. Balwani is charged in Count Eight with wire fraud in connection with a wire transfer of $5,999,997 on or about October 31, 2014.

Mr. Balwani is charged in Counts Nine ~~Ten~~ through Twelve of the indictment with wire fraud against patients who paid for Theranos' blood testing services. The government has alleged that Mr. Balwani engaged in a scheme to defraud patients out of their money through representations about Theranos' blood tests, and that those representations were false because Theranos was not capable of consistently producing accurate and reliable blood test results.[3] In particular:

---

[3] In proposing this amendment to the Holmes final instruction, Mr. Balwani does not waive the argument from his first motion in limine that the Third Superseding Indictment alleges fraud in connection with Theranos' proprietary technology, not in connection with non-Theranos technology (i.e., unmodified commercially available blood testing devices) or the general practices of Theranos' clinical laboratories. Dkt. 1156 at 1–11.

FER-64

Mr. Balwani is charged in Count Nine with wire fraud in connection with a wire transmission regarding Patient B.B.'s laboratory blood test results on or about October 12, 2015.

Mr. Balwani is charged in Count Ten with wire fraud in connection with a wire transmission of Patient E.T.'s laboratory blood test results on or about May 11, 2015.

Mr. Balwani is charged in Count Eleven with wire fraud in connection with a wire transmission of Patient M.E.'s laboratory blood test results on or about May 16, 2015.

Mr. Balwani is charged in Count Twelve with wire fraud in connection with a wire transfer of $1,126,661 on or about August 3, 2015.

In order for Mr. Balwani to be found guilty of each count of wire fraud, you must all unanimously agree with respect to each count that the government has proved each of the following elements beyond a reasonable doubt:

First, Mr. Balwani knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. To find that Mr. Balwani did so knowingly, you must find that he himself had actual knowledge of the fraudulent nature of the scheme or plan. A scheme to defraud is a deceptive scheme to deprive a person of money or property. Deceitful statements of half-truths may constitute false or fraudulent representations;

Second, the statements made as part of the scheme were material. Statements are material if they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, Mr. Balwani acted with the intent to defraud, that is, the intent to deceive and cheat. The intent to deceive and cheat is the intent to deprive someone of money or property by means of deception; and

Fourth, Mr. Balwani used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme. The wire itself need not be false or misleading.

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-65

In determining whether a scheme to defraud exists, you may consider not only Mr. Balwani's words and statements, but also the circumstances in which they are used as a whole.

A wiring is caused when one knows that a wire will be used in the ordinary course of business or when one can reasonably foresee such use.

It need not have been reasonably foreseeable to Mr. Balwani that the wire communication would be interstate in nature. Rather, it must have been reasonably foreseeable to Mr. Balwani that some wire communication would occur in furtherance of the scheme, and an interstate wire communication must have actually occurred in furtherance of the scheme.

*Authority*: *See* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 6.10 & cmt. (Activities Not Charged) (noting risk that jury could convict for conduct not charged in the indictment—and corresponding need for jury instruction to mitigate such risk—when "the government's proof at trial includes uncharged conduct that would satisfy" an element of the charged offense); *see United States v. Wellington*, 754 F.2d 1457, 1463 (9th Cir. 1985), *abrogated on other grounds by United States v. Miller*, 471 U.S. 130 (1985) (when there could be a discrepancy between the evidence and the scheme alleged in the indictment, the jury should be instructed that: "(1) it must unanimously find the existence of a single scheme to defraud, and (2) the single scheme to defraud must not be substantially different from the scheme charged in the indictment"); *United States v. Rude*, 88 F.3d 1538, 1547 (9th Cir. 1996) (approving lower court's instruction that required "a specific finding that the scheme found matched that charged in the [operative] Indictment"); 2 Sand, Modern Federal Jury Instructions-Criminal ¶ 44.01 (Mail Fraud and Wire Fraud) (Matthew Bender ed. 2021) ("When there is the potential for variance based upon proof of … a scheme other than that charged in the indictment, the jury must be instructed that it must unanimously find that the defendant participated in a single scheme and that it is the scheme alleged in the indictment."); *id.* ("The Fifth Circuit has also approved the following similar language: '[W]hat must be proved beyond a reasonable doubt is that the Defendant knowingly and willfully devised … a scheme to defraud substantially the same as the one alleged in the indictment,' accompanied by an admonition that 'Defendant is not on trial for any act or conduct not alleged in the indictment.'"); *Phillips v. United States*, 356 F.2d 297 (9th Cir. 1965) (rejecting "constructive notice" theory imputing a co-conspirator's actual knowledge to another co-conspirator) .

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-66

## 23.  KNOWINGLY—DEFINED

An act is done knowingly if Mr. Balwani is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove that Mr. Balwani knew that his acts were unlawful. You may consider evidence of Mr. Balwani's words, or acts, ~~or omissions,~~ along with all the other evidence, in deciding whether Mr. Balwani acted knowingly.

To find that Mr. Balwani acted knowingly, you must find that he himself had knowledge of the fact at issue. Knowledge by Ms. Holmes or Theranos agents or employees does not prove Mr. Balwani's personal knowledge.

*Authority*: *Phillips v. United States*, 356 F.2d 297 (9th Cir. 1965) (rejecting "constructive notice" theory imputing a co-conspirator's actual knowledge of customer complaints to another co-conspirator).

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-67

## 24.  AIDING AND ABETTING

Mr. Balwani may be found guilty of wire fraud as charged in Counts Three through ~~Eight and Ten through~~ Twelve of the indictment, even if Mr. Balwani personally did not commit the act or acts constituting the crime but aided and abetted in its commission. To "aid and abet" means intentionally to help someone else commit a crime. To prove Mr. Balwani guilty of wire fraud by aiding and abetting, the government must prove each of the following beyond a reasonable doubt:

First, someone else committed the conduct charged in Counts Three through ~~Eight and Ten through~~ Twelve of the indictment;

Second, Mr. Balwani aided, counseled, commanded, induced, or procured that person with respect to at least one element of wire fraud as charged in Counts Three through ~~Eight and Ten through~~ Twelve of the indictment;

Third, Mr. Balwani acted with the intent to facilitate wire fraud as charged in Counts Three through ~~Eight and Ten through~~ Twelve of the indictment; and

Fourth, Mr. Balwani acted before the crime was completed.

It is not enough that Mr. Balwani merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime. The evidence must show beyond a reasonable doubt that Mr. Balwani acted with the knowledge and intention of helping that person commit wire fraud as charged in Counts Three through ~~Eight and Ten through~~ Twelve of the indictment.

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime.

The government is not required to prove precisely which person actually committed the crime and which person aided and abetted.

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-68

**25. SCHEME TO DEFRAUD—VICARIOUS LIABILITY (18 U.S.C. § 1343)**

If you find that Mr. Balwani was a member of the scheme to defraud investors in Theranos charged in Counts Three through Eight and that Mr. Balwani had the intent to defraud investors in Theranos, Mr. Balwani may be responsible for other co-schemers' actions during the course of and in furtherance of the alleged scheme, even if Mr. Balwani did not know what they said or did.

For Mr. Balwani to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the government must prove each of the following elements beyond a reasonable doubt:

First, the co-schemer was a member of the scheme to defraud investors charged in Counts Three through Eight of the indictment;

Second, the co-schemer committed the offense in furtherance of the scheme to defraud Theranos investors;

Third, Mr. Balwani was a member of the same scheme to defraud, and possessed the intent to defraud Theranos investors; and

Fourth, the offense committed by the co-schemer fell within the scope of the scheme to defraud and was one that Mr. Balwani could reasonably foresee as a necessary and natural consequence of the scheme to defraud.

If you find that Mr. Balwani was a member of the scheme to defraud patients who paid for Theranos' blood testing services charged in Counts Nine ~~Ten~~ through Twelve and that Mr. Balwani had the intent to defraud Theranos paying patients, Mr. Balwani may be responsible for other co-schemers' actions during the course of and in furtherance of the alleged scheme, even if Mr. Balwani did not know what they said or did.

For Mr. Balwani to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the government must prove each of the following elements beyond a reasonable doubt:

First, the co-schemer was a member of the scheme to defraud patients who paid for Theranos' blood testing services charged in Counts Nine ~~Ten~~ through Twelve of the indictment;

- 21 -

Second, the co-schemer committed the offense in furtherance of the scheme to defraud Theranos paying patients;

Third, Mr. Balwani was a member of the same scheme to defraud, and possessed the intent to defraud Theranos paying patients; and

Fourth, the offense committed by the co-schemer fell within the scope of the scheme to defraud and was one that Mr. Balwani could reasonably foresee as a necessary and natural consequence of the scheme to defraud.

FER-70

## 27. SUCCESS OF A WIRE FRAUD SCHEME

Success of a scheme to defraud is not necessary for purposes of determining whether wire fraud occurred. For Counts Three ~~through Eight and Ten~~ through Twelve, it is not necessary that Mr. Balwani made a profit or that anyone actually suffered a loss.

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-71

## GOVERNMENT AGENCY WITNESS

You have heard testimony from a witness who works for a government agency. The fact that a witness may be employed by the federal or state government as an official does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

*Authority:* 1 Sand, Modern Federal Jury Instructions-Criminal ¶ 7-16 (Law Enforcement Witness) (Matthew Bender ed. 2020); Third Circuit Model Criminal Jury Instructions 4.18; *United States v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995) ("[T]he government witnesses' testimony was not entitled to any greater consideration because of their federal employment."); *Bush v. United States*, 375 F.2d 602, 605 n.6 (D.C. Cir. 1967) (affirming lower court's instruction "to give an officer's testimony no weight different from that given any other witness simply because he was an officer."); *United States v. Powell*, 932 F.2d 1337, 1341 & n.3 (9th Cir. 1991) (approving lower court's instruction: "You're required to use the same standard in judging the credibility of every witness, regardless of what his occupation or background may be.").

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-72

**ADVERSE INFERENCE FOR MISSING EVIDENCE**

If you find that the government negligently or recklessly failed to preserve the Theranos Laboratory Information System that the government knew or should have known would be evidence in this case, you may infer, but are not required to infer, that this evidence was unfavorable to the government.

Negligence is the failure to use reasonable care. Reasonable care is the degree of care that reasonably prudent persons would use under like circumstances to avoid injury to themselves or others. Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under like circumstances.

"Reckless" means highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of allowing evidence to be destroyed, which is either known to the government or so obvious that the government must have been aware of it.

*Authority:* *See* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 3.19 & cmt. (Lost or Destroyed Evidence) ("An instruction concerning evidence lost or destroyed by the government is appropriate when the balance 'between the quality of the Government's conduct and the degree of prejudice to the accused' weighs in favor of the defendant." (quoting *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring), *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008))); *id.* ("While a showing of bad faith on the part of the government is required to warrant the dismissal of a case based on lost or destroyed evidence, it is not required for a remedial jury instruction." (citing *United States v. Sivilla*, 714 F.3d 1168, 1170 (9th Cir. 2013))); *United States v. Robertson*, 895 F.3d 1206, 1213 (9th Cir. 2018) ("In assessing the quality, or 'culpability,' of the government's conduct, we consider whether the evidence was lost or destroyed while in the government's custody, whether the government acted in disregard of the defendant's interests, whether the government was negligent, whether the prosecuting attorneys were involved, and, if the acts were deliberate, whether they were taking in good faith or with reasonable justification."); *United States v. Burns*, 790 F. App'x 93, 95 (9th Cir. 2020) (reaffirming that the *Loud Hawk* test "has no bad faith requirement" and holding that lower court "abused its discretion by refusing to give an adverse-inference instruction absent a showing of bad faith by the government"); *see also* Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit 6.3 (Federal Employer's Liability Act—Negligence Defined); Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit 7.3 (Jones Act Negligence Claim—Negligence Defined); Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 9.9 (Securities Fraud) (defining "reckless").

Defendant's Supplemental Proposal re Jury Instructions & Verdict Form
Case No. CR-18-00258-EJD

FER-73

DATED: June 7, 2022                    Respectfully submitted,

                                       ORRICK HERRINGTON & SUTCLIFFE LLP


                                       By:   /s/ Jeffrey B. Coopersmith
                                             Jeffrey B. Coopersmith

                                             Attorney for Defendant
                                             RAMESH "SUNNY" BALWANI

DEFENDANT'S SUPPLEMENTAL PROPOSAL RE JURY
INSTRUCTIONS & VERDICT FORM
CASE NO. CR-18-00258-EJD

FER-74

JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com; scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**MOTION TO EXCLUDE EVIDENCE AND ARGUMENT THAT PHARMACEUTICAL REPORTS WERE IMPROPERLY ALTERED**<br><br>**Date:  March 14, 2022<br>Time:  9:00 a.m.<br>CTRM.: 4, 5th Floor**<br><br>**Hon. Edward J. Davila** |

FER-75

**NOTICE OF MOTION AND MOTION TO EXCLUDE EVIDENCE AND ARGUMENT THAT PHARMACEUTICAL REPORTS WERE IMPROPERLY ALTERED**

PLEASE TAKE NOTICE that on March 14, 2022, at 9:00 a.m., or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, located at 280 South First Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Ramesh "Sunny" Balwani will and hereby does move the Court to exclude evidence and argument that pharmaceutical reports were improperly altered, whether through the admission of exhibits or testimony or through statements in opening or argument at closing. The Motion is based on the below Memorandum of Points and Authorities, the concurrently filed Declaration of Amy Walsh, the record in this case, and any other matters that the Court deems appropriate.

DATED: February 28, 2022

Respectfully submitted,

ORRICK HERRINGTON & SUTCLIFFE LLP

By: */s/ Jeffrey B. Coopersmith*
Jeffrey B. Coopersmith

Attorney for Defendant
RAMESH "SUNNY" BALWANI

FER-76

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

At a meet and confer conference on February 17, 2022, the government informed undersigned counsel that it intends to offer evidence of alleged improper alteration of certain pharmaceutical reports, including the unauthorized addition of pharmaceutical company logos. Declaration of Amy Walsh ¶ 3.[1] Mr. Balwani was unconnected to these actions, and the Court should exclude the government's evidence, as well as preclude the government from referencing such evidence in its opening statement or raising it in closing arguments.

The only conceivable theory the government could use to offer against Mr. Balwani evidence of altering of pharmaceutical reports is vicarious liability, such as conspiracy or co-schemer liability. *See United States v. Lothian*, 976 F.2d 1257, 1262–63 (9th Cir. 1992). The reason this theory fails is that the government cannot show that Mr. Balwani was participating in a conspiracy or scheme to defraud when the reports were altered by Elizabeth Holmes or others at Theranos unbeknownst to Mr. Balwani. Unless the government makes this showing at a Rule 104(b) hearing, the Court should exclude any evidence or argument that pharmaceutical reports were improperly altered. *See* Fed. R. Evid. 104(b).

Even if the government could prove the elements needed to admit this evidence, the evidence should be excluded under Rule 403. *See* Fed. R. Evid. 403. The sole witness who explained how pharmaceutical logos were placed on reports was Elizabeth Holmes, who confirmed on the witness stand that *she* was the one who altered the reports. Unless the government announces that it is calling Ms. Holmes as a witness, allowing it to present evidence in Mr. Balwani's case that the reports were altered creates a high risk that the jury will think Mr. Balwani altered the reports. Leaving the jury with such a powerful misimpression would undermine the truth-seeking function of the trial and should not be permitted.

---

[1] On February 28, 2022, the government indicated that the witnesses who testified on this issue in the Holmes trial would be called in the first half of the government's case-in-chief against Mr. Balwani.

## II.    FACTUAL BACKGROUND

Before Mr. Balwani joined Theranos, the company partnered with GlaxoSmithKline (GSK), Pfizer, and Schering-Plough to conduct studies using Theranos' technology. Three reports resulted from this work: (1) Theranos' Angiogenesis Study Report resulting from its work with Pfizer ("Pfizer report"), (2) Theranos' Assay Development Report resulting from its work with Schering-Plough ("Schering-Plough report"), and (3) Excerpts from GSK's Metabolic Study Report ("GSK report"). Ex. 2.[2] These reports were later shared with retail partners and Theranos investors.

During the Holmes trial, the government repeatedly argued that Ms. Holmes improperly altered these reports by adding the Pfizer, Schering-Plough, and GSK logos without the companies' permission and adjusting or omitting some findings in the Schering-Plough and GSK reports. When Ms. Holmes took the stand, she testified that she did in fact add the logos and alter those findings before sending the reports to Walgreens. Ex. 1 (11/23/21 Tr. 7478–79; 11/30/21 Tr. 8154, 8157–60). The government argued that Ms. Holmes made these alterations to mislead investors into thinking that the pharmaceutical companies authored all the reports and comprehensively validated Theranos' technology. Critically, however, no evidence connects Mr. Balwani to these actions, as none exists.

### A.    The Government's Case Against Ms. Holmes

In its opening statement in the Holmes trial, the government told the jury that Ms. Holmes "misled investors into believing that pharmaceutical companies endorsed and approved the miniature blood analyzer." Ex. 1 (9/8/21 Tr. 542). It used the Pfizer report as an example. Prosecutors showed the jury two versions of the Pfizer Report: one version that Theranos sent to Pfizer at the close of its study, and another version that Theranos sent to potential retail partners and investors. Ex. 1 (9/8/21 Tr. at 543). The first version included only Theranos' logo, but the second version also included Pfizer's logo. *Id.* According to the government, Ms. Holmes "held

---

[2] Unless otherwise noted, exhibits cited are attached to the Declaration of Amy Walsh.

MOTION TO EXCLUDE EVIDENCE OF ALTERING
PHARMACEUTICAL REPORTS
CASE NO. CR-18-00258-EJD

FER-78

this [second report] out as demonstrating that Pfizer concluded that the analyzer had superior performance, good correlations, and robust functionality," when really "Pfizer did not write this," "did not put its logo on," "did not give its permission to put its logo on," and "did not make the conclusions in this report." Ex. 1 (9/8/21 Tr. 543–544).

During its case-in-chief, the government called two pharmaceutical witnesses to testify on logos: a former Pfizer employee, Shane Weber, and a former Schering-Plough employee, Constance Cullen.[3] While questioning Mr. Weber, the government introduced an October 2008 email from Ms. Holmes to Pfizer, attaching the Pfizer report with only Theranos' logo. Ex. 1 (10/22/21 Tr. 4362–4365); Ex. 3. The government then displayed the second version of the Pfizer report with Pfizer's logo added. Ex.2 at 8. It established elsewhere during the trial that Ms. Holmes emailed this second version of the Pfizer report, along with reports about work with Schering-Plough and GSK, to potential investors and described them as "independent due diligence reports on Theranos systems" and "exemplary reports from pharmaceutical partners." Ex. 1 (10/12/21 Tr. 3186–3187) (Miquelon testimony); Ex. 2 at 1; Ex. 1 (10/26/21 Tr. 4681) (Peterson testimony). Mr. Weber testified that, to his knowledge, Theranos authored the report, Pfizer did not endorse its conclusions, and Pfizer did not approve the use of its logo. Ex. 1 (10/22/21 Tr. 4397–4402). Using a split screen, the government displayed the two versions of the report side-by-side so the jury could compare them. The inference was clear: Ms. Holmes added the Pfizer logo without permission to mislead investors.

The government repeated this strategy for Schering-Plough. While questioning Ms. Cullen, it introduced a December 2009 email from a Theranos employee to Schering-Plough, attaching the Schering-Plough report with only Theranos' logo. Ex. 1 (11/02/21 Tr. at 5039–5041); Ex. 4 at 3. That version of the report included the conclusion that "[t]he Theranos [assay multiplex] has been shown to give accurate and precise results for three independently calibrated cartridge lots and all the many instruments used." Ex. 4 at 19. The government then introduced a

---

[3] The government did not call any witnesses from GSK.

MOTION TO EXCLUDE EVIDENCE OF ALTERING
PHARMACEUTICAL REPORTS
CASE NO. CR-18-00258-EJD

FER-79

different version of the Schering-Plough report, which, like the altered Pfizer report, had been sent to Walgreens and potential investors. Ex. 2 at 34. This version included the Schering-Plough logo and altered the above conclusion to read: "The Theranos [assay multiplex] has been shown to give *more accurate* and precise results for three independently calibrated cartridge lots and all the many instruments used *than current 'gold standard' reference methods*." *Id.* at 18. Ms. Cullen testified that to her knowledge Theranos authored the report and Schering-Plough did not endorse its conclusions or approve the use of its logo. Ex. 1 (11/02/21 Tr. 5041–42, 5045–48). Again, the government used a split screen to display the two versions of the report to the jury.

Ms. Holmes was asked on the stand who added the logos to the Pfizer, Schering-Plough, and GSK reports. She responded, "I did." Ex. 1 (11/23/21 Tr. 7477–78). When asked when she did that, she said, "just before sending them to Walgreens [on April 14, 2010]." Ex. 1 (11/23/21 Tr. 7478). Ms. Holmes also testified that she enhanced the conclusion in the Schering-Plough report. Ex. 1 (11/30/21 Tr. 8154 (Question: "Did you add those words [to the conclusion in the Schering-Plough Report]?" Answer: "I think so.")). As for the GSK report, Ms. Holmes could not remember whether she made any alterations, but she assumed that she added the GSK logo, and she acknowledged that one finding was not in the version of the report sent to Walgreens: "Finger prick/blood draw procedure was difficult (needed larger lancet and better syringe system)." Ex. 1 (11/30/21 Tr. 8157–60). Ms. Holmes explained that she added the logos "because the work was done in partnership with those companies" and that she did not intend to convey any misimpression. Ex. 1 (11/23/21 Tr. 7478–79). The change to the conclusion of the Schering-Plough report, so Ms. Holmes testified, "accurately reflect[ed] the data in the document." Ex. 1 (11/30/21 Tr. 8155).

In closing, the government reiterated that Ms. Holmes altered the pharmaceutical reports. It again used a split screen to display the Pfizer and Schering-Plough reports both with and without their logos added. Ex. 1 (12/16/21 Tr. 8989). According to the government, the altered reports showed that Ms. Holmes "wants Walgreens, and … [investors], to conclude that they are independent due diligence reports, that the pharma companies prepared the reports after their own technical validation." *Id.* 8990.

MOTION TO EXCLUDE EVIDENCE OF ALTERING
PHARMACEUTICAL REPORTS
CASE NO. CR-18-00258-EJD

This evidence was critical to the jury's decision to convict Ms. Holmes on four counts of wire fraud. According to reporting, jurors considered Ms. Holmes' apparent doctoring of the Pfizer report a "smoking gun."[4]

### B. Mr. Balwani Played No Role in Adding Logos or Otherwise Altering Pharmaceutical Reports

None of the evidence introduced at the Holmes trial suggests that Mr. Balwani knew the reports shared with investors had been altered without the pharmaceutical companies' permission, as the government alleged during the Holmes trial. Mr. Balwani was not working for Theranos in October 2008, when Ms. Holmes emailed the Pfizer report to Pfizer without the Pfizer logo affixed. Ex. 3. Indeed, Mr. Balwani was not involved in Theranos' relationships with the pharmaceutical companies generally, other than occasionally being copied on emails from Ms. Holmes.

Mr. Balwani joined Theranos in September 2009, later becoming President and COO of the company. Before joining, he did his own due diligence on the company. As part of that process, in August 2009 the company emailed Mr. Balwani a report stating that "Theranos' technology has been *robustly validated* over the last four years," and that Theranos' clients "include AstraZeneca, BMS, Celgene, *GSK*, J&J Centocor, Mayo Clinic, *Merck* [which acquired Schering-Plough], *Pfizer*, and others." Ex. 5 at 1 (emphases added); Ex. 6.

And a few months after he joined, Mr. Balwani was copied on an email from Ms. Holmes to GSK with the GSK report attached *in the same form* later shared with investors, including the affixed GSK logo. Ex. 7 at 40.

And while Mr. Balwani did work for Theranos in December 2009, when the Schering-Plough Report was emailed to that company without the Schering-Plough logo affixed,

---

[4] Sara Randazzo & Meghan Bobrowsky, *Jury in Elizabeth Holmes Trial Seized on Two 'Smoking Guns' to Convict Theranos Founder, Juror Says*, WALL ST. J. (Jan. 6, 2022), https://www.wsj.com/articles/jury-in-elizabeth-holmes-trial-seized-on-two-smoking-guns-to-convict-theranos-founder-juror-says-11641503502.

FER-81

Mr. Balwani was not copied. Ex. 4.[5]

Although Mr. Balwani was involved in Theranos' communications with Walgreens in spring 2010—and was copied on the April 14, 2010, email containing the pharmaceutical reports that Ms. Holmes edited just before sending—nothing suggests that he knew those reports had been altered or were not approved by the pharmaceutical companies.

Mr. Balwani is not tied to any of the evidence from the Holmes trial related to the altering of the pharmaceutical reports. Nor is there evidence that Mr. Balwani was involved in a scheme or conspiracy when the reports were altered.

## III. ARGUMENT

### A. Evidence that Pharmaceutical Companies' Logos Were Added Without Permission Should Not Be Admitted Against Mr. Balwani

This Court should exclude any evidence or argument that the pharmaceutical reports were improperly altered unless the government establishes that he can be held vicariously liable for Ms. Holmes's actions when the reports were altered (March–April 2010). "It is well settled that 'guilt' is an 'individual and personal' matter," and thus vicarious liability is only permissible in "limited circumstances, such as conspiracy," *United States v. Holmes*, Case No. 5:18-cr-00258-EJD-1, 2021 WL 2044470, at *37 (N.D. Cal. May 22, 2021) (citation omitted), or where two or more people engage in scheme to defraud, *Lothian*, 976 F.2d at 1262–63 (9th Cir. 1992). It is just as well settled that mere association cannot establish vicarious liability. *See United States v. Dunn*, 640 F.2d 987, 989 (9th Cir. 1981). Nor is it enough to act in a way that furthers some objective of a fraudulent scheme or conspiracy even with knowledge of the unlawful plan. *See United States v. Reed*, 575 F.3d 900, 927 (9th Cir. 2009). The law aims to "prevent[] the persecution of the innocent for the beliefs and actions of others." *Bridges v. Wixon*, 326 U.S. 135,

---

[5] A March 19, 2010, email from Ms. Holmes to Walmart, with Mr. Balwani copied, attaches the Schering-Plough report in its original form—i.e., without the Schering-Plough logo or the altered conclusion. Ex.8. This exhibit was not admitted at the Holmes trial.

MOTION TO EXCLUDE EVIDENCE OF ALTERING
PHARMACEUTICAL REPORTS
CASE NO. CR-18-00258-EJD

163 (1945) (Murphy, J., concurring).

There is no evidence that Mr. Balwani knew that the logos were added or that the pharmaceutical reports were altered without authorization. The only evidence that could possibly, even if implausibly, suggest otherwise is a March 19, 2010, email from Ms. Holmes to Walmart, copying Mr. Balwani, with the Schering-Plough report attached with only Theranos' logo. *See* Ex.8. Yet nothing suggests that Mr. Balwani knew anything about whether Schering-Plough had given permission to affix its logo or change eight words of text when he later received a copy of Ms. Holmes April 14, 2010, email to Walgreens (Ex. 2). The Schering-Plough report appears at page 34 of Ex. 2, and no evidence suggests that he reviewed the logos on that attachment, let alone that he noticed that *eight* words were different on page 51 of Ex. 2. Being copied on an email with an attachment more than 30 pages in is far too tenuous to support the inference that Mr. Balwani knew the Schering-Plough report, let alone the Pfizer and GSK reports, had been altered without authorization.

The only conceivable way the government could tie this evidence to Mr. Balwani is through vicarious liability.[6] To hold Mr. Balwani liable for the actions of an alleged co-conspirator, the government must prove that he entered into an agreement to intentionally carry out a fraudulent scheme and had the specific intent to defraud. *See, e.g.*, *United States v. Freeman*, 498 F.3d 893, 907 (9th Cir. 2007) (conspiracy requires "an agreement to accomplish an illegal objective, … coupled with one or more acts in furtherance of the illegal purpose, and … intent necessary to commit the underlying substantive offense"). Only then can Mr. Balwani be held vicariously liable for the reasonably foreseeable actions of co-conspirators made during the course and in furtherance of the conspiracy. *United States v. Chong*, 419 F.3d 1076, 1081 (9th Cir. 2005) (defining *Pinkerton* liability). The same rules apply to co-schemer liability. *Lothian*, 976 F.2d at 1262–63 ("a scheme to defraud, … when more than one person is involved, is

---

[6] *See Phillips v. United States*, 356 F.2d 297, 303 (9th Cir. 1965) ("[S]o-called 'constructive' notice or knowledge of a circumstance, based upon the actual knowledge of a co-conspirator … has no tendency, circumstantially or otherwise, to prove criminal intent."); *United States v. Engelmann*, 720 F.3d 1005, 1008 (8th Cir. 2013) ("Fraudulent intent is not presumed or assumed; it is personal and not imputed. One is chargeable with his own personal intent, not the intent of some other person.").

analogous to a conspiracy").

Here, however, the government cannot show that Mr. Balwani knowingly entered into any such unlawful agreement when the pharmaceutical reports were altered—on or shortly before April 14, 2010. To the contrary, the documents shared with him before that time conveyed that Theranos' technology had been "robustly validated" well before he joined the company, Exs. 5–6; that Theranos had successful relationships with multiple pharmaceutical clients, including Pfizer, Merck (which acquired Schering-Plough in 2009), and GSK, *id.*; and that Theranos was sharing reports affixed with pharmaceutical company logos with those very companies, Ex. 7 (email sending GSK report to GSK with company's logo, and copying Mr. Balwani).

Based on Rule 104 and the Due Process clause, the government should not be permitted to introduce evidence that an alleged co-conspirator (or co-schemer) altered the pharmaceutical reports without first showing that a conspiracy or scheme to defraud existed at that time. *See* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."); *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (in the context of Fed. R. Evid. 801(d)(2)(E) "the existence of a conspiracy and [the defendant's] involvement in it are preliminary questions of fact that, under Rule 401, must be resolved by the court" and shown by a "preponderance of the evidence"). As this Court ruled on an analogous issue in the Holmes trial, the government should proffer in advance—and outside the presence of the jury—the evidence that it believes will connect Mr. Balwani to the altering of the pharmaceutical reports either directly or through vicarious liability. *See Holmes*, 2021 WL 2044470, at *39 (requiring Rule 104 hearing "out of the presence of the jury to consider whether the Government has presented sufficient evidence of a connection to justify admissibility" of evidence that is otherwise unconnected to the defendant). "This approach will insure that the jury will not be tainted by hearing prejudicial evidence—or learning of its existence—until the Government has demonstrated that it will be able to provide an adequate foundation for admission." *Id.* (internal quotation marks and alterations omitted).

MOTION TO EXCLUDE EVIDENCE OF ALTERING
PHARMACEUTICAL REPORTS
CASE NO. CR-18-00258-EJD

FER-84

### B. Admitting This Evidence Without Explaining Ms. Holmes' Responsibility for Altering the Reports Is Highly Prejudicial and Invites the Jury to Speculate

Even if this evidence could be introduced under a theory of vicarious liability, it should still be excluded under Rule 403 because it would invite the jury to engage in highly prejudicial speculation that Mr. Balwani played a role in altering the reports.

As this Court knows from the Holmes trial, Ms. Holmes personally added the pharmaceutical logos to the Pfizer, Schering-Plough, and GSK reports, and altered language in the Schering-Plough and GSK reports. Ex. 1 (11/23/21 Tr. 7478–79; 11/30/21 Tr. 8154, 8157–60). But the jury in Mr. Balwani's trial will not hear that testimony, which is pure hearsay and would violate Mr. Balwani's Confrontation Clause rights. *See* Fed. R. Evid. 801(c), 802. Instead, Mr. Balwani's jury would hear that pharmaceutical companies received copies of the reports with only Theranos' logo, and that Mr. Balwani was copied on later emails sent to retail partners and investors attaching different versions of the reports—with the pharmaceutical logos added and certain conclusions altered. The implication would be clear but contrary to the truth: that Mr. Balwani altered the reports or at least knew and approved of someone else at Theranos altering them.

The government should not be permitted to introduce misleading evidence that tells only part of the story and impliedly points the finger at Mr. Balwani. This Court plays a crucial role in protecting the truth-seeking function of the trial. Thus, under Rule 403, it may exclude relevant evidence if its "probative value is substantially outweighed by a danger of … misleading the jury." Fed. R. Evid. 403. We know how prejudicial this evidence can be given its impact on the jury in the Holmes trial. *See* Randazzo & Bobrowsky, *supra* n.4 (jury viewed alterations to Pfizer report as a "smoking gun"). Evidence that pharmaceutical reports were improperly altered would no doubt invite the jury to speculate that Mr. Balwani was involved. Because the risk of misleading the jury is high, the Court should exclude the evidence under Rule 403.

FER-85

## IV.    CONCLUSION

The Court should grant Mr. Balwani's motion and exclude any evidence and argument that the pharmaceutical reports were improperly altered, as well as prohibit the government from mentioning this evidence in its opening statement.

DATED: February 28, 2022                    Respectfully submitted,

                                            ORRICK HERRINGTON & SUTCLIFFE LLP

                                            By:    /s/ Jeffrey B. Coopersmith
                                                   Jeffrey B. Coopersmith

                                                   Attorney for Defendant
                                                   RAMESH "SUNNY" BALWANI

MOTION TO EXCLUDE EVIDENCE OF ALTERING
PHARMACEUTICAL REPORTS
CASE NO. CR-18-00258-EJD

FER-86

JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:     (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258-EJD |
| Plaintiff, | **DECLARATION OF AMY WALSH RE: DEFENDANT RAMESH BALWANI'S MOTION TO EXCLUDE EVIDENCE AND ARGUMENT THAT PHARMACEUTICAL REPORTS WERE ALTERED** |
| v. | |
| RAMESH "SUNNY" BALWANI, | |
| Defendant. | |
| | Judge:  Honorable Edward J. Davila |

**DECLARATION OF AMY WALSH**

I, Amy Walsh, declare as follows:

1. I am counsel for defendant Ramesh "Sunny" Balwani, an attorney admitted to practice *pro hac vice* in the above-captioned matter, and a partner at the law firm of Orrick, Herrington & Sutcliffe LLP.

2. On February 17, 2022, counsel for Mr. Balwani and the government met and conferred regarding pretrial matters. The following people attended: Jeffrey Coopersmith, Amy Walsh, Molly McCafferty, as attorneys for Mr. Balwani; and Assistant United States Attorneys Jeffrey Schenk, Robert Leach, and John Bostic.

3. During that conference, I asked the government attorneys, among other things, whether the government intended to introduce evidence related to pharmaceutical report logos at Mr. Balwani's trial. The government responded in the affirmative.

4. Attached as **Exhibit 1** is a copy of transcript excerpts from the trial of Mr. Balwani's co-defendant Elizabeth Holmes.

5. Attached as **Exhibit 2** is a copy of an April 14, 2010, email from Elizabeth Holmes to Alex Jung (Jay Rosan and Sunny Balwani copied) attaching excerpts from GlaxoSmithKline's Metabolic Study Report ("GSK report"), Theranos' Angiogenesis Study Report resulting from its work with Pfizer ("Pfizer report"), and Theranos' Assay Development Report resulting from its work with Schering-Plough ("Schering-Plough report"), and listed as Exhibit 291 on the government's February 17, 2022 exhibit list.

6. Attached as **Exhibit 3** is a copy of an October 11, 2008, email from Elizabeth Holmes to Aidan Power and Craig Lipset (Marc Thibonnier copied) attaching the Pfizer report, listed as Exhibit 143 on the government's February 17, 2022, exhibit list.

7. Attached as **Exhibit 4** is a copy of an email chain, including a December 3, 2009, email from Gary Frenzel to Constance Cullen, attaching the Schering-Plough report, listed as Exhibit 259 on the government's February 17, 2022, exhibit list.

8. Attached as **Exhibit 5** is a copy of a report on Theranos Systems, Bates-stamped Balwani-1529 through Balwani-1532.

WALSH DECL. ISO MOTION TO EXCLUDE ALTERING OF
PHARMACEUTICAL REPORTS
18-CR-00258-EJD

FER-88

9.    Attached as **Exhibit 6** is a copy of an August 12, 2009 email from Elizabeth Holmes to Sunny Balwani titled "FW: STRICTLY CONFIDENTIAL - Pharmaceutical documents," Bates-stamped Balwani-1409, redacted to conceal personally identifiable information.

10.    Attached as **Exhibit 7** is a copy of a December 15, 2009 email from Elizabeth Holmes to Thomas Breuer (Sunny Balwani copied) attaching the GSK report, listed as Exhibit 15058 on the January 3, 2022 final admitted exhibit list from the Holmes trial (Dkt. 1324).

11.    Attached as **Exhibit 8** is a copy of a March 19, 2010 email from Elizabeth Holmes to Bruce Shepard (Sunny Balwani copied) attaching the Schering-Plough report, listed as Exhibit 277 on the government's February 17, 2022 exhibit list.

I declare under penalty of perjury that the foregoing is true and correct.

Executed February 28, 2022 at San Jose, California.

*s/ Amy Walsh*
AMY WALSH

WALSH DECL. ISO MOTION TO EXCLUDE ALTERING OF
PHARMACEUTICAL REPORTS
18-CR-00258-EJD

FER-89

# Exhibit 5

FER-90



## Theranos Systems

### Introduction
Theranos is transforming patient management, individual wellness, and the economics of health care delivery.

In doing so, Theranos has showcased a new economic model for pharmaceutical companies, exponentially increasing sales and rate of growth while cutting development expenses.

As the Theranos infrastructure begins to transform the way payors and physicians approach blood testing and reimbursement, the adoption of Theranos Systems in pharmaceutical companies is powering a radical new growth model for the pharmaceutical and biotech industry.

### Return on Investment for Pharmaceutical Clients
Theranos' technology has been robustly validated over the last four years. Existing clients include AstraZeneca, BMS, Celgene, GSK, J&J Centocor, Mayo Clinic, Merck, Pfizer, and others. Theranos' direct-to-consumer home monitoring systems are currently being launched. In pharmaceutical clinical studies/programs, Theranos Systems have:

**Accelerated trial timelines** by an average of 18 months.
- Demonstrating meaningful dose-response and efficacy dynamics profiles in ~6 months where conventional infrastructure took two years and was still not able to generate equally predictive correlations.
- Existing customers value a six-month gain in time-to-market at $180 million to $540 million[1].

**Reduced clinical operations costs** by 50%.
- In addition to saving time, point-of-care ambulatory monitoring reduces the number of sites, as well as shipping, sample processing and clinical operations costs.
- Higher integrity field data and predictive models reduce the number of patients required in each clinical study by 25%.

**Enabled realization of target product profiles** that customers had not been able to achieve using the conventional testing and analytical infrastructure.
- Improved visibility into pathway dynamics
- Early reads on efficacy and safety dynamics
    - Established comprehensive longitudinal PK/PD profiles.
    - Characterized trends in the rate of change of key markers. (Conventional infrastructure obscures trends Theranos Systems elucidate.)
- Optimized development in ways previously not possible because of the biology complexities.
    - Enabled adaptive studies and development.
    - Salvaged assets that were about to be written off.
    - Rapidly enabled label expansion into key new patient populations and multiple indications.
    - Powered mechanistically driven cross-comparison studies for compound differentiation and reimbursement.

**Enabled approval, reimbursement, and maximized use of key assets** through drug-systems combinations now going onto the market together to optimize the benefit/risk profile of a drug on an *individual* patient basis. The individualized selection, treatment, monitoring and wellness counseling of subjects made possible through Theranos Systems is the foundation of a radical new growth model for pharmaceutical companies following the drug-device approach recommended by the Critical Path Initiative. The ability to comprehensively monitor blood-proteins and behavior in an at-home system enables pharmaceutical companies to overcome the clinical and economic limitations of what's currently known as 'personalized' – population-based medicine.

---

[1]Most recent estimates by an existing Theranos client value each day gained at 1-3 million dollars per day.

FOIA Confidential Treatment Requested by R. Balwani                          Balwani-1529

FER-91



## The Theranos System

Theranos Systems are Theranos' proprietary, patented technology. The systems are becoming the center of healthcare in the home, making healthcare a home necessity in the same way that personalized computers made computing a home necessity.

For point-of-care technology to develop into a true individualized medical system (IMS) and make it a staple of patient care at the individualized level, significant breakthroughs were needed over the current state-of-the-art tools in the following domains:
- Greater sensitivity, specificity, precision and accuracy of simultaneous assays
- Home protein analysis for time profiling
- Home drug analysis for exposure-response characterization
- Integration of data coming from various sources into electronic health records (EHR)
- Data modeling using Bayesian and other approaches
- Systematic, prompt feedback to the health care provider (HCP) and the patient
- Enabling early, adaptive and rapid decision making about healthcare utilization

The Theranos System was developed to address the aforementioned issues. Theranos Systems allow HCPs to monitor drugs, their metabolites, and relevant biomarkers from fresh whole blood samples in real-time at any testing frequency in a clinic, hospital setting or any point of care, including the home.

Theranos Systems process finger-stick blood samples at the point of care, wirelessly transmit data to relevant health care providers/clinicians, and can provide individualized and integrated content back to consumers to assist them in modifying behavior and establishing/achieving health and wellness goals. The user interface on the device is a graphical touch-screen, which links with an individual's mobile phone in real-time, providing each user with 'smart,' customized information.

 

Theranos' proprietary blood-analysis technology has made it possible to measure multiplexed combinations of drugs, proteins and other analytes in the home, and in doing so, characterize trends in disease progression and regression that were previously not seen. The ability to capture more comprehensive longitudinal time-series measurements is fundamental to better characterizing a patient's response to therapy.

 

When deployed, the information system allows for the integration and exploitation of information in a way previously not feasible. The home healthcare systems combined with the models in the information system enable accelerated clinical studies and realization of the target profiles of key assets.

In order to increase the value and coverage of marketed assets, compound-specific information characterized in clinical studies is being leveraged in the consumer environment. The information system allows for customized content to be deployed to device touch-screens and the associated mobile applications to enhance the value of a therapy.

The social networks which are rising around the mobile and home systems are proving to be powerful viral marketing channels.

CONFIDENTIAL

FOIA Confidential Treatment Requested by R. Balwani

Balwani-1530

FER-92



**Theranos Systems are comprised of three integrated technologies and services.**

**1. Data infrastructure (for use across an entire pharmaceutical pipeline)**
An information integration and exploitation infrastructure which permits:
- Data acquisition and storage of point-of-care results in real time.
- The integration of blood parameters and patient diary data with all other physiologically relevant information into the EHR.
- A central mathematical software program to:
  - Graphically visualize, help to interpret, and analyze all data in one place
  - Link any new information into a disease management system that then maps the information onto a probability space of clinical outcomes.
- The graphical display of clinically relevant and actionable information back to the HCP and/or the patient.

A customer-specific data integration and self-learning prediction and simulation engine to:
- Centralize all information in one repository.
- Automatically import data that exist in different formats (historical data, clinical studies, literature, patient records, etc.).
- Power models of patient response and disease pathophysiologies on integrated data sets.
- Constantly evolve and become increasingly predictive as learning algorithms process data from the field and literature without requiring human intervention.

**2. Predictive and dynamic, multivariate, multi-dimensional models (customized for program-specific objectives) that map disease progression and regression**
Algorithms
- Built-in pattern recognition tools characterize 'responder classes' and clinical outcomes.
- Probability analysis tools systematically account for uncertainty.
- Integrate physiological models with statistical analysis tools based on Theranos' proprietary time-series analysis.

Models
- Account for all relevant pathophysiologies and compounds' mechanisms of action
- Can identify relevant circulating parameters for patient monitoring and classification
- Are increasingly predictive to power future studies and decision making
- Simulate scenarios that answer 'what-if' questions and allow users to run queries themselves
  - Patient profiles
  - Trial protocols

**3. Home Healthcare Systems (integrated point-of-care home and mobile monitoring systems that work for any combination of assays, including drug and protein analysis)**
Devices – remote, portable patient care systems
- On-site, real-time, automatic processing of cartridges for blood analysis
- User interface designed for non-computer-literate subjects, allowing the patient to initiate the assays and to graphically enter a variety of relevant environmental information, such as comprehensive patient diary, behavioral, and psychological information, through touch-screens embedded in the device
- Two-way communication system from the instruments to HCP/clinicians, mobile phones, and back to patients with relevant content, messages, and health information
- Blood and environmental data is automatically (wirelessly) transmitted into models in real time.
  - Fully exploit all data (every IIT or pivotal trial increases the predictive value of the models).
  - Characterize dose-response, efficacy and safety dynamics faster and more accurately.

FOIA Confidential Treatment Requested by R. Balwani                         Balwani-1531

FER-93



Cartridges – disposable cartridges pre-loaded with chemistries to simultaneously measure multiplexes of proteins and other analytes from ~20µL whole blood finger-stick

- Cartridges can be customized to measure any combination of drugs and biomarkers together to map indicators/trends through comprehensive longitudinal PK/PD profiles of subject status.
- Rapid characterization of rate-of-change in key markers and trends (through more frequent monitoring than possible using central labs) yields predictive insight into clinical outcomes far earlier than more traditional radiologic and clinical end-points, resulting in earlier go/no-go decisions across multiple indications.
- Assay precision and trend generation capabilities reduce required patient numbers.
- Standardized analytical platform can be used across all sites.
    - Reduce variability of data between sites.
    - Improve quality of data by avoiding issues with analyte decay rates and sample processing.
- Drug-specific cartridges complement wellness/disease-specific cartridges that are being launched by Theranos direct to consumers and physicians.

Mobile Applications – transmission of individualized content to 'smart,' automated 'counselors' on device touch-screens and users' mobile phones to assist with behavior modification and increase compliance with therapy

- Theranos' proprietary algorithms enable the correlation of blood data to efficacy dynamics profiles, behavior, lifestyle, diet, and side-effects.
- Truly individualized content is selected to help people change their lifestyles in a sustained way, through the integrated use of the back-end algorithms, models, and data in the data infrastructure.
- Content is based on data for patient 'classes,' which recognize physiological and psychological pre-dispositions as well as local socio-environmental influences.
- Applications link users through social networks, where success stories compound through the combination of each tailored home health system with a given therapy.

**Theranos' Client Services include:**

Customization
- Devices
- Cartridges
- Informatics Systems
- Web portals
- Mobile applications for specific assets

Study Planning
- Biomarker selection

Support
- 24x7 live international call center
- New Information System features for in-person training of all site and where applicable, at-home device installations and training for patients
- Maintenance of information systems and all web and mobile applications

Regulatory Filings
- Compound-specific cartridges

Distribution of the systems to consumers, physician's offices, and pharmacies
- Sale and distribution of devices and cartridges
- Reimbursement for devices and cartridges

Marketing through the creation of Theranos' product-specific mobile, device and web-based wellness social networks

CONFIDENTIAL                                                                                              Page 4

FOIA Confidential Treatment Requested by R. Balwani                    Balwani-1532

FER-94

JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**DEFENDANT RAMESH "SUNNY" BALWANI'S REPLIES IN SUPPORT OF HIS MOTIONS IN LIMINE**<br><br>**Date:  January 6, 2022**<br>**Time:  9:00 a.m.**<br>**CTRM.: 4, 5th Floor**<br><br>**Hon. Edward J. Davila** |

FER-95

**REPLY IN SUPPORT OF MOTION IN LIMINE NO. 2: DR. DAS**

No matter what the government calls him, Dr. Kingshuk Das is an expert witness presenting expert testimony under Federal Rules of Evidence 701 and 702. As Mr. Balwani's motion explained, the government may not offer that testimony where it cannot provide the data underlying Dr. Das' opinions and conclusions. Dkt. 1156 at 16–19. The government does not dispute this point. In its opposition, the government abandons any effort to call Dr. Das as an expert witness and instead argues only that it can classify and call Dr. Das strictly as a lay witness and thereby avoid providing the data. Dkt. 1181 at 11. Then, after engaging in this relabeling exercise, the government says that it can ask Dr. Das to give exactly the same opinions and conclusions without disclosing the data he relied on. This form-over-substance argument is deeply misguided and should be rejected.

### A. An Expert Witness Cannot Testify Without Disclosure of the Data Underlying His Opinions and Conclusions

To begin, the government does not dispute the central legal plank of Mr. Balwani's motion: An expert must disclose his or her data.[8] That is precisely what both parties have done for their other potential experts. *See* Ex. 52 (Master Report) at 43–50 (App'x B); Dkt. 1158 at 24–26 (Mr. Sonnier); Dkt. 1179-2 at 19–42 (Mr. Oustalniol); *id.* at 44–48 (Mr. Weingust). Because the data Dr. Das analyzed to reach his opinions and conclusions has never been disclosed, all testimony from Dr. Das that crosses the line into expert territory must be excluded.

### B. The Government Makes No Effort to Provide the Data Because It Cannot

The government has no meaningful response about the missing data. To the extent the data came from Theranos' LIS, the government does not have it, because remarkably it failed to take the necessary steps to obtain the central scientific evidence in a case alleging scientific fraud. In fact, the government's own support staff advised the prosecution team to encourage Theranos "to consider handing over its physical SQL server and [to] set[] it up in a workroom" in *October*

---

[8] *See* Dkt. 1156 at 17 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002); *United States v. Sheppard*, No. 5:17-CR-00026, 2021 WL 1700356, at *5 (W.D. Ky. Apr. 29, 2021); *Kriedler v. Pixler*, No. C06-0697RSL, 2010 WL 1507888, at *1–2 (W.D. Wash. Apr. 14, 2010)).

- 11 -

FER-96

*2018*—in other words, precisely what Richard Sonnier's unrebutted expert testimony explained should have been done. Ex. 56 (Oct. 29, 2020 *Brady* letter) at 22; Dkt. 1158. [9] The government now tries to sidestep the issue by claiming that some data may have been sourced elsewhere or that Dr. Das may not have relied "directly" on LIS data. Dkt. 1181 at 11. That is extremely doubtful given that the LIS was the central repository of Theranos' laboratory data, including "all patient test results and all QC data," as the government has conceded. Dkt. 669 at 1. But even if the data came from outside LIS, the point remains: The government still has not identified or disclosed the data that Dr. Das relied on. *See* Dkt. 1181 at 11. Even the government seems to acknowledge that it cannot present an expert witness to testify about the ultimate issue of falsity in a wire fraud case based on secret data and ask the Court, jury, and defense to just take his word for it. *See* Dkt. 1156 at 17.

### C. The Vast Bulk of Dr. Das' Testimony Is Expert Testimony

Most of Dr. Das' testimony is expert testimony, but the government ignores this in its opposition. *See* Dkt. 1156 at 13; Dkt. 1181 at 9–10. Rather than address Dr. Das' actual testimony at Ms. Holmes' trial, the government instead goes back to 302s and other materials before the testimony. *See* Dkt. 1181 at 9–11. But looking at Dr. Das' trial testimony, the government fails to answer how Dr. Das could explain to the jury the statistical concept of standard deviation and the "two standard deviation" rule he applied without employing specialized knowledge. *See* Ex. 51 (11/9/21 Trial Tr. 5817:2–16, 5820:2–24, 5831:11–18, 5847:7–5848:12). So too with explanations of quality control standards, analysis of the clinical suitability of the Edison device, and use of technical expertise to explain Levey-Jennings charts and reach conclusions about the

---

[9] Repeating the same thing again like a mantra does not make it true: The government asserts again that it "was led to believe that it had a viable copy of all the information stored in the LIS, obviating any need to obtain the original copy of the database or seek additional hardware." Dkt. 1181 at 13. As a result, the government asserts, it need not "have taken additional steps to obtain the LIS database." *Id.* This argument ignores advice the government received from both Theranos' counsel and the government's own technology experts that a copy of the LIS database would be insufficient and that more needed to be done to obtain the data. *See* Ex. 55 (May 23, 2018 email, Romeo to Taylor et al.); Ex. 56 (Oct. 29, 2020 *Brady* letter) at 22. Had the government secured the servers or hard drives before or long after August 31, 2018, it would have obtained the LIS with no need for an encryption key. Dkt. 1158 at 7–9 (Sonnier Decl.). The government's opposition does not even mention, much less rebut, the expert opinion on the loss of the LIS data offered with Mr. Balwani's motion. *See* Dkt. 1156 at 15–16

DEFENDANT BALWANI'S REPLIES IN SUPPORT OF HIS
MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

validity of CMS's findings. In an exhibit filed alongside this reply, Mr. Balwani catalogs many instances when Dr. Das crossed the line from lay to expert testimony. *See* Ex. 57. Taken as a whole, Dr. Das' trial testimony was permeated with specialized knowledge and expert opinion. The issues the government wants Dr. Das to speak to in Mr. Balwani's case are the same.

### 1. These Issues Have Not Already Been Decided

The government is wrong that whether all of Dr. Das' testimony is expert or percipient has already been decided. Dkt. 1181 at 9–10. The government also presents an inaccurate recitation of what occurred at Ms. Holmes' trial and the Court's ruling about Dr. Das before that trial started.

The government claims that Dr. Das' testimony was "admitted either without objection or over objection" at Ms. Holmes' trial. Dkt. 1181 at 10. Contrary to the government's assertions, there were no objections over the examples described in Mr. Balwani's motion, as shown in the chart accompanying this motion. There were only a handful of objections during Dr. Das' direct examination in any event. *See* Ex. 51 (11/9/21 Trial Tr. 5818:16–20, 5819:14–18, 5821:8–10, 5854:2-5, 5855:17–20, 5856:3–4, 5856:20–21).[10] As a result, the Court did not have a chance to rule on the vast majority of Dr. Das' expert testimony. One defendant's decision not to object does not determine anything for a future defendant; it just means that the issue has not yet been addressed.[11]

The government is also wrong to suggest that the Court has already decided all these issues in the context of the Holmes trial. *See* Dkt. 1181 at 9–10. First, contrary to the government's representation, the Court did not deny Ms. Holmes' pretrial motion on Dr. Das. *See* Dkt. 1181 at 8. Instead, the Court deferred any decision until Dr. Das testified. Dkt. 989 at 4. The Court's ruling specifically put the "parties … on notice" that Dr. Das' testimony "would move …

---

[10] A number of those objections were sustained. *Id.* (11/9/21 Trial Tr. 5818:16–20, 5819:14–18, 5854:2–5, 5855:17–20). Some of the testimony that was allowed over defense objection is inadmissible for other reasons Mr. Balwani has put forward: For example, testimony about issues with the PT/INR assay is inadmissible because it does not go to accuracy and reliability of Theranos technology as charged in the Third Superseding Indictment. *See* Dkt. 1156 at 1–11; *supra* at 1–10.

[11] Mr. Balwani is not criticizing Ms. Holmes' counsel, who are entitled to make their own trial decisions.

DEFENDANT BALWANI'S REPLIES IN SUPPORT OF HIS
MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-98

from percipient to expert" if it involved scientific matters "that would require specialized knowledge to understand and interpret." Dkt. 989 at 4. Although the Court noted that such expert topics "include[ed]" Dr. Das' Six Sigma analysis, the Court cited this merely as an example and did not rule that the Six Sigma analysis was the only area that crossed the expert line. On the contrary, the Court instructed that, should other expert topics arise at trial, the defense "may object at that time." *Id.* As the Court predicted, the government sought to veer into expert territory at trial. *E.g.*, Ex. 51 (11/9/21 Trial Tr. 5819:17–18) ("I think you're asking for an opinion that falls under 702 the way the question is formed, so I'll sustain the objection."). Through this motion, Mr. Balwani now squarely presents the expert-testimony issue not ultimately adjudicated in the Holmes trial. Moreover, unlike in Ms. Holmes' case where the parties and the Court were looking pre-trial at the expert testimony issues based only on anticipated testimony, now Dr. Das' testimony is already in the record, so there is no need to defer. All the testimony identified in Exhibit 57 crosses into the realm of expert testimony and must be excluded as a result.

### 2. The Government Misunderstands the Line Dividing Lay and Expert Testimony

The difference between lay and expert testimony is whether it relies on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c); *accord* Fed. R. Evid. 702(a). Each of the examples above and in the attached Exhibit 57 does. That is presumably why the government disclosed Dr. Das as potentially offering expert testimony within the scope of Rule 702, although it now apparently disclaims that characterization. *See* Dkt. 1179-2 at 66–67 (Ex. 48). Even Dr. Das conceded that his analyses of the Theranos data were "pretty sophisticated," "pretty technical," and "not something that in [Dr. Das'] view someone without knowledge and training would be in a position to do." Ex. 51 (11/10/21 Trial Tr. 5937:14, 21–22, 5953:2–3). That is plainly expert testimony under Rule 702.[12]

---

[12] The government's example about a hypothetical Chief Financial Officer is misplaced. Dkt. 1181 at 11. Adding numbers together is hardly the same as reviewing reams of QC and patient data and expressing an opinion based on experience and training as a clinical pathologist about what the data may mean. *See also infra* at 22 (discussing *United States v. Chen*).

DEFENDANT BALWANI'S REPLIES IN SUPPORT OF HIS
MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-99

As explained in Mr. Balwani's motion on lay and expert testimony, the government should not be permitted to avoid this conclusion by arguing that Dr. Das is merely a percipient witness. *See* Dkt. 1156 at 36–39; *infra* at 21–23. Testimony describing conclusions reached through expert means *is* expert testimony. Here, Dr. Das conducted a backward-looking analysis of Theranos data using technical and scientific methods. He applied those methods and reached conclusions—methods and conclusions he now intends to present to the jury, based on data that is no longer available for the Court to assess under Rule 702(b) and (d) and for defense counsel to use during cross-examination. If there were still any doubt on this score, the government dispelled it the day before this filing by confirming again that Dr. Das had applied specialized knowledge to draw conclusions from data it has never identified:

> [D]r. Das did his own independent analysis, reviewed a broader universe of data than had been provided to CMS, and concluded that the deficiencies identified in the CMS report were only a "representative" sample of the actual deficiencies within Theranos' Newark laboratory. Indeed, Dr. Das found in his internal review that there were multiple instances where Theranos reported patient results in 2014 and 2015 *after* Theranos' proprietary blood analyzer (the Edison) had failed quality control. Dr. Das reviewed Theranos' own quality control data from 2014 and 2015 [and] found "a possible patient impact for every test reported" that was performed on the Edison and thus urged Defendant to void all tests run on Theranos' proprietary blood analyzer and for a few other assays. Dr. Das testified that he "found these [Theranos proprietary] instruments to be unsuitable for clinical use."

Dkt. 1192 at 4–5 (second set of brackets in original) (citations omitted). If that is not expert testimony, then nothing is.

Having to take an expert's word for it is not our criminal-justice system. The government appears to concede that, without disclosing all the underlying data to defense counsel, the government cannot call Dr. Das as an expert. But the government cannot now circumvent Rule 702 and elicit those expert opinions by simply relabeling him as a percipient witness.

**D.      Conclusion**

For these reasons, the Court should exclude any and all expert testimony that the government offers from Dr. Das. The line between expert and percipient witness must be drawn based on the substance and not on the label the government attaches to evade the rules.

- 15 -

when Mr. Balwani was not "associated with Theranos," Dkt. 1155 at 6, it describes his motion to exclude Rule 801(d)(2)(E) statements before and after his tenure at Theranos as "premature," and urges the Court to deny or defer it because any alleged coconspirator statements "will be admissible under alternative theories as in the *Holmes* case." Dkt. 1181 at 18–19. That is no reason to disregard Mr. Balwani's motion. The government has invoked Rule 801(d)(2)(E) in Ms. Holmes' trial several times. *See* Ex 51 (9/22/21 Trial Tr. 1511:02–03; 10/13/21 Trial Tr. 3406:22; 11/02/21 Trial Tr. 5001:21). And even if the government might rely on other theories of admissibility, the point of a motion in limine is "to resolve issues which would otherwise clutter up the trial." Dkt. 798 at 4 (quotation omitted). Granting Mr. Balwani's motion would clarify that the government cannot rely on Rule 801(d)(2)(E) to introduce coconspirator statements made outside the relevant period.

Since the government does not contend that either alleged conspiracy began before September 2009 or continued after mid-2016, the Court should grant Mr. Balwani's motion to exclude any statement made outside that period offered under Rule 801(d)(2)(E).

**REPLY IN SUPPORT OF MOTION IN LIMINE NO. 5: IMPROPER EXPERT OPINION**

Mr. Balwani asks the Court to police the line between permissible lay opinion and testimony that a jury may hear only from an expert. In Ms. Holmes' trial, the testimony of entry-level Theranos lab employee Erika Cheung often transgressed this line. In opposing the motion, the government defends the admissibility of a host of statements that Mr. Balwani's motion does not challenge—largely ignoring the ones he does. The government also fails to cite—much less distinguish—a single authority offered by Mr. Balwani. And the government tries to defend Ms. Cheung's over-the-line testimony by analogizing to percipient testimony from Adam Rosendorff, while ignoring the testimony from Dr. Rosendorff that could be admissible only if he is qualified as an expert at Mr. Balwani's trial. These arguments lack merit, and the Court should grant Mr. Balwani's motion.

To begin, Mr. Balwani challenges the admissibility of testimony that rests on the specialized knowledge that requires qualification as an expert for admission. Ms. Cheung testified, for instance, that a "normal lab" would see "less than [a] 1 percent" test failure rate and

DEFENDANT BALWANI'S REPLIES IN SUPPORT OF HIS
MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-101

that the purported failure rate in Theranos' lab was therefore concerning. *See* Dkt. 1156-2 at 19. (Ex. 1). She next explained the medical significance of an out-of-range Vitamin D test. *Id.* at 18. She also opined on the cause of quality control failures—that the Edison device was not working. *Id.* at 17. These opinions about industry standards, medical interpretations, and guesses about the causes of purported technological failures are classic expert testimony impermissible for a witness who cannot be qualified as an expert. *See, e.g.*, *United States v. Urena*, 659 F.3d 903, 908 (9th Cir. 2011); *Jerden v. Amstutz*, 430 F.3d 1231, 1239–40 (9th Cir. 2005). Even the government disclaims any intent to elicit testimony from Ms. Cheung on "industry standards or the performance of labs other than Theranos." Dkt. 1181 at 22. And it nowhere tries to distinguish the case law cited by Mr. Balwani.

The only authority the government cites is *United States v. Chen*, which, the government claims, rejected a contention "similar" to Mr. Balwani's. *See id.* at 22 (citing Case No. 17-cr-00603-BLF-1, 2021 WL 2662116, at *9–10 (N.D. Cal. June 29, 2021)). But the challenge in *Chen* in no way resembles Mr. Balwani's objection. There, the court allowed testimony from employees about "whether certain technical information was treated as confidential; how [the company] stored CAD drawings and bills of material … in a secure, confidential database; and how [the company] required employees not to share CAD drawings with third parties without a non-disclosure agreement." *Chen*, 2021 WL 2662116, at *9. Simply describing firsthand experiences with company security policies or describing one's experience "extract[ing] emails … from Defendants' work computers" is different from telling the jury the typical error rate in other labs or that quality controls failed because a technology was flawed. *See United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002) ("Lay opinion testimony most often takes the form of a summary of first-hand sensory observations.").

Nor can the government salvage Ms. Cheung's impermissible expert opinion by relying on the Court's narrow pretrial rulings on Dr. Rosendorff's testimony in the Holmes case. First, the Court never blessed lay opinion about the ultimate cause of purported testing failures or industry standards. *See* Dkt. 798 at 75–78. In fact, the Court observed that because Dr. Rosendorff's testimony "will not be introduced to argue that Theranos' [practices] were

DEFENDANT BALWANI'S REPLIES IN SUPPORT OF HIS MOTIONS IN LIMINE CASE NO. CR-18-00258-EJD

FER-102

violating industry standards, the introduction of a scientific basis and methodology pursuant to Rule 702 is not needed." *Id.* at 77. Instead, the Court ruled only that it would not "issue a blanket exclusion of evidence relating to" Theranos' reference ranges, multiplexing method, or information withheld from doctors and patients. *Id.* at 76–78. The Court delineated potential evidence that would not require expert testimony—for example, what suggestions Dr. Rosendorff made to the defendants and their reactions, what information was disclosed to doctors and patients, and "what multiplexing entailed." Those require no specialized knowledge, unlike Ms. Cheung's challenged statements here. Second, the objection to Ms. Cheung's testimony cannot be cured by offering her as an expert—she does not have sufficient education or experience to be qualified as an expert in this area. For Dr. Rosendorff, by contrast, the government has identified him as a potential expert and may offer him as one at trial. If the government does not do so, Mr. Balwani may raise any specific objections to improper expert opinion if the government tries to elicit it.

Because the government neither addresses Mr. Balwani's arguments nor counters his proffered authorities, the Court should exclude the challenged testimony of Ms. Cheung.

### REPLY IN SUPPORT OF MOTION IN LIMINE NO. 6: TEXT MESSAGES

Mr. Balwani has argued that the October 16, 2015 text string containing the inflammatory terms "the death and sex thing," "murder," and "filth" should be excluded under Rules 401–403. Dkt. 1156 at 40–44. In opposition, the government asks the Court to deny or defer ruling on Mr. Balwani's motion because, it claims, the texts are relevant, not unfairly prejudicial, and can be selectively redacted to avoid any prejudice. It is wrong on all fronts.

First, the government refers to the evidence Mr. Balwani seeks to exclude as "a string of text messages in which Defendant Balwani and co-Defendant Holmes discuss their plan to discourage the *Wall Street Journal* from publishing a negative story about Theranos." Dkt. 1181 at 23. The government's theory of relevance turns on speculation and mischaracterizes the text string at issue. To start, the text string occurs *after* the publication of the *Wall Street Journal* article. *See* Dkt. 1179-2 at 187 (Ex. 50) (noting that *Wall Street Journal* article "is out" on October 15, 2015). To show that the text string is relevant to Mr. Balwani's knowledge and

DEFENDANT BALWANI'S REPLIES IN SUPPORT OF HIS
MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-103

DATED: December 13, 2021

Respectfully submitted,

ORRICK HERRINGTON & SUTCLIFFE LLP

By: */s/ Jeffrey B. Coopersmith*
Jeffrey B. Coopersmith

Attorney for Defendant
RAMESH "SUNNY" BALWANI

DEFENDANT BALWANI'S REPLIES IN SUPPORT OF HIS
MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-104

# Exhibit 57

**Excerpts of Trial Testimony of Dr. Kingshuk Das**

| Tr. | Expert Subject | Excerpt |
|---|---|---|
| 5817 | Statistical analysis | Q: And what is a standard deviation?<br>A: Would you like the more technical definition?<br>Q: I'd like the less technical definition if you could.<br>A: It's, in general, an estimate of the spread of a data set, how widely the values vary. … In laboratory parlance, we use it to estimate precision. |
| 5818 | CMS response | Q: And did you and your team also review the data that is listed here on this form?<br>A: Yes.<br>Q: And did you review an even broader universe of QC data in order to respond to the CMS report?<br>A: We did.<br>Q: And is this—is the finding listed here consistent with what you reviewed in your review of data?<br>**MR. WADE: Your Honor, 702 on this issue, particularly given the purpose that this evidence has been offered.**<br>**THE COURT: Mr. Leach, I think you're on the margins of a 702 area, so let me ask you to rephrase your question.** |
| 5819 | CMS response | Q: At any point did you tell CMS that the company disagreed with this particular finding?<br>A: No, I don't believe we did.<br>Q: Okay. And why not?<br>A: These findings—<br>**MR. WADE: Your Honor, again, 702. We're just using reverse instead of forward.**<br>**THE COURT: I understand. I think you're asking for an opinion that falls under 702 the way the question is formed, so I'll sustain the objection.**<br>Q: But you never said to anybody at CMS, "I disagree with this finding"?<br>A: I don't recall saying that or writing that. |
| 5820 | Statistical analysis | Q: And as lab director, is it desirable or undesirable to have a CV of greater than 15 percent? |

1

FER-106

A: That would be undesirable.

Q: This says, "Overall 29 percent of QC samples on all tests on all devices had values greater than 2 SD's." … And what did you understand that to mean?

A: That—I understand that to mean that 15 percent of the values were violating the 2 SD rule, which is a common quality control rule.

| 5821 | CMS response | Q: Do you see where it says, "In February of 2015, the data"— oh, before I leave G, did you ever tell CMS that you disagreed with this finding in F?<br><br>**MR. WADE: Your Honor, I'm going to object on 702 grounds to this as well.**<br>**THE COURT: Overruled. You can answer the question.**<br>A: No, I do not recall that. |
|------|--------------|--------|
| 5822 | CMS response | Q: And then i[t] says, "In April the data revealed the following tests, showed percentage of QC samples with more than 15 percent of values greater than 2 SD, SHBG," and then there's a list of assays continuing on to page 57. … At any point in time did you tell CMS that you disagreed with this finding?<br>A: No, I don't recall doing so. |
| 5823 | Assay results | Q: And did you give Ms. Holmes a particular reason why you thought the Edison was prone to erroneous results?<br>A: Yes. In reviewing the data, [the PSA test] ended up being an easily digestible example of the Edison's errors [in] that I recall quite a few female patients returning PSA results, which would be highly unlikely.<br>Q: Why was that a red flag to you?<br>A: Because females should generally not have PSA detectable. It should only be detected in males. |
| 5825 | CMS response | Q: And in the course of… preparing these patient impact assessments, were you—did you view yourself as fulfilling your obligations as the CLIA lab director?<br>A: Yes, I did.<br>Q: And why did you feel that was part of your obligations as the CLIA lab director? |

2

A: That's not only a regulatory obligation but a professional one and an ethical one as well.

| | | |
|---|---|---|
| 5826 | CMS response | Q: In the course of responding to the CMS 2567, did you, as the laboratory, detect errors in the patient reported results? <br> A: We did. <br> Q: And did you feel that you were required to take certain action pursuant to this CLIA regulation and your professional responsibilities? <br> A: Yes, that's correct. |
| 5829 | CMS response | Q: [The response] then reads, "Upon review of that [prior] response, including the entirety of the prior analysis of TPS 3.5 QC data and patient test result distributions for all analytes during the time period examined, the laboratory made note of poor QC performance throughout." Is that an accurate statement? <br> A: That is an accurate statement. |
| 5830 | CMS response | Q: It then says, "Therefore, laboratory conducted an expanded retrospective analysis for 2014 and 2015 QC data." What does that mean? <br> A: In general that means we expand the range of the QC data that we looked at because we identified issues with the original data, meaning we wanted to see how far the poor performance extended. |
| 5830–31 | Quality control | Q: It then says, "The laboratory noted multiple and recurrent time periods (across all analytes tested) of abrupt shifts in QC target means." What does that mean? … <br> A: So that first part means that the average values of quality control, the targets that we were trying to reach, or that the laboratory was targeting, were being shifted unexplainedly. <br> Q: "High rates of 1-2S QC rule failures." What is meant by "1-2S"? <br> A: So this 1-2S actually refers to the same QC failures that the CMS inspectors were noting in that D tag. … So the 2S refers to 2 SD analogous to what is being referred to in the D tag. <br> Q: And "QC CV's far exceeding limits for a stable testing process." What did that mean? |

3

A: To simplify that one a bit, it just means that there was a lot of imprecision noted.
Q: And is imprecision desirable or undesirable?
A: Undesirable.

5832    CMS response

Q: And "the laboratory has concluded that there is a possible patient impact for every test reported from the laboratory's TPS 3.5 instruments." Is that what you communicated to CMS?
A: Yes, I believe so.
Q: And was that your view at the time?
A: Yes, it was.

5833    Voiding results

Q: In corrective action it reads, "The fraction of patient results truly impacted, and the nature and magnitude of any effect are unknown. Out of an abundance of caution, the laboratory has voided all patient test results reported from the TPS 3.5 instruments." … And did you, in fact, void all of the test results from the Edison device from the 2014, 2015 time period?
A: Yes, we did so.

5833–34 Voiding results

Q: Describe the substance of what was said [to Ms. Holmes]?
A: I described our rationale for voiding these tests which relied on some of the things that we discussed earlier, which was the validation data as well as the QC data that is referenced here, and it was—I can't remember all of the constituents at that meeting, but I tried to present it in a more understandable format. So I described the issue in terms of the validation data in describing that these instruments apparently were not performing from the very beginning. …
Q: And did you think it was a complete explanation to describe it as just a quality control issue?
A: No, sir.
Q: How come?
A: Because the validation data had no bearing on the quality control or quality assurance program.

5835    Voiding results

Q: Did you ever recommend that testing be resumed in the CLIA lab?
A: No.

4

FER-109

Q: And why was that?

A: I found these instruments to be unsuitable for clinical use.

5847–48 Quality control

Q: And the QC level 1 and level 3, what did you understand those to refer to?

A: Those are different levels of the respective test QC, in this case vitamin B12.

Q: And can you—and what is the purpose of different levels?

A: A laboratory is required to run multiple levels for every quantitative test, so—

Q: So a high level, a low level, something in between?

A: Correct.

Q: Okay. And this says the QC level 1 and 3 were 34.3 and 48.5 percent. What was—what did you understand that to mean?

A: It appears they're referencing those particular levels for those QC.

Q: And are these desirable levels of QC or undesirable levels of QC?

A: Those would be undesirable.

5849      CMS response

Q: Dr. Das, did you understand these to be additional examples of high CV in QC testing on devices within the CLIA lab?

A: Yes.

Q: And similar to what we looked at before, are these issues that you investigated as part of your work?

A: Yes.

Q: And at any point in time, did you disagree with what CMS was finding here?

A: No.

5851      Voiding results

Q: And did Theranos ultimately void all of the tests on the Edison device?

A: Yes.

5853–54 CMS response

Q: And did—in response to the 2567, did you ultimately determine to—that there were errors in the PT INR test?

A: Yes.

Q: And describe those for us, please.

A: Yes. There were actually a variety of findings. One of them

5

was errors in the calculation of the values that has to do with each lot that is used for this assay on the Siemens instrument. There were also deviations in the patient test result distributions, as well as quality control issues.

Q: And did—

**MR. WADE: Your Honor, pardon me. Just move to strike on 702 grounds.**

**THE COURT: I'm going to sustain the objection. And that last portion is stricken, ladies and gentlemen.**

Q: Did you—in communicating to CMS, did you describe the bases—did you tell CMS that Theranos was voiding PT INR tests?

A: Yes.

Q: And did you explain to them why Theranos was doing that?

A: Yes.

Q: What did you tell CMS?

A: I do not recall the exact language, but it reflected the inaccurate calculations, as well as quality control issues and inaccuracies reflected in the patient test result distributions.

| | |
|---|---|
| 5855–57 Quality control | Q: So if you run quality control and you fail quality control for whatever reason, you shouldn't be reporting a test?<br>A: That's right.<br>Q: And is this listing examples of where it appeared that Theranos was running tests after not passing quality control?<br>A: Yes.<br>**MR. WADE: Your Honor, move to strike. It's beyond the scope of what the evidence is offered for.**<br>**THE COURT: You can ask that in a different way. I'll sustain the objection and strike that answer.**<br>Q: As part of your work, Dr. Das, did you investigate whether there were instances where Theranos reported patient results after not passing quality control?<br>A: Yes.<br>Q: And did you find examples of that relating to PT INR?<br>A: Yes.<br>**MR. WADE: 702, your Honor.**<br>**THE COURT: Overruled.**<br>Q: You found examples of that? |

6

A: Yes.

Q: Did you also—looking down at paragraph 2, do you see that the finding here is based on a review of the quality control procedure, QC records, and raw data from patient test runs and interview and the general supervisor, the laboratory failed to ensure that the QC was acceptable for the TPS system, or Theranos proprietary system, prior to reporting patient test results. Do you see that?

A: Yes.

Q: In your mind, was this raising a similar issue with the Edisons that was raised with respect to PT INR?

A: Yes.

**MR. WADE: 702, your Honor.**

**THE COURT: Overruled.**

Q: And did you investigate whether there were instances where Theranos reported patient results from the Edison device after failing quality control?

A: Yes.

Q: And did you find instances of that?

A: Yes.

Q: More than one?

A: Yes.

Q: And was that an issue?

A: Yes.

Q: Why is that?

A: For the reasons I delineated earlier. It's required to do quality control on every day that patient test results are run.

5857–58 Quality control

Q: Do you see where it says in D, "QC records for sex hormone binding globulin, showed that on device E 1025, QC level 2'S, 24 expiration was on 8/14/14 at 18:54 and was not run again until 8/15/14. Patient data showed that patient session," and there's a number, "was run on 8/14/14 at 19:09." …

Q: And in your mind, did you understand this—was this CMS raising the issue of Theranos reporting patient results for this particular assay after failing quality control?

A: Yes.

Q: And that's an issue that you investigated as well?

7

A: Yes.
Q: And you found instances where that happened?
A: Yes.

| 5858 | Quality control | Q: And what is a 10X warning message?<br>A: That is referring to a quality control failure where the quality control results lie on one side of the mean either above or below ten times consecutively.<br>Q: And in the course of your work, did you see instances where Theranos continued to report patient results after this 10X warning had come up?<br>A: Yes. |
|------|-----------------|-----------|
| 5859 | Quality control | Q: And it's been a while since we've heard that term, but what is a Levey-Jennings chart?<br>A: It's also known as a control chart. It's just a way to chart quality control values over time with respect to the expected mean and standard deviations.<br>Q: And at any point in time did you communicate to CMS that you disagreed with this finding?<br>A: No.<br>Q: That would be true of the findings in P and Q related to the Lev[e]y-Jennings charts?<br>A: Yes. |
| 6023 | CMS response | Q: And in response to the 2567, you reviewed not just the quality control data that was listed in the CMS report, but a broader universe of data. Is that fair?<br>A: Yes.<br>Q: And what was the reason for doing that?<br>A: That was to identify the extent of the deficiency.<br>Q: Okay. And after that broader review, did you view the instances that were listed by CMS as representative samples?<br>A: Yes.<br>Q: Those didn't seem out of—unusual in the sense of being one offs or out of the ordinary?<br>A: Outliers? Is that correct?<br>Q: We've used that term in some other contexts. I just want to make sure if what was reported in CMS was representative of |

8

what you saw in your broader review.
A: Yes.

6024–25 Quality control

Q: And is quality control, like, the alarm bell to assess whether a particular assay is working or not working as it's supposed to?
A: Yes.
Q: Okay. And based on your review of the broader universe of QC data, were alarm bells going off?
A: Yes.

6026–27 Quality control

Q: You wrote, "I had a chance to touch base with Tina and Daniel the other day to get details on the updated patient impact assessments, and I've decided to take a more conservative approach." Is that in the context of these assays run on the Siemens Advia?
A: Yes.
Q: And just explain for us what you meant by that.
A: Regarding the prior email, there was an approach outlined that I disagreed with.
Q: And what was the approach you disagreed with?
A: If I remember correctly, they were proposing a more liberal approach that would require multiple analytes to be, quote-unquote, abnormal in order to trigger voiding or corrections, and I disagreed with that assertion.
Q: And you wanted to look at it analyte by analyte; is that fair?
A: Yes, that would be the correct way to do it.
Q: And when you voided tests on the Edison 3.5 device, were you being conservative?
A: Can you clarify, please.
Q: Did you feel like you were being conservative?
A: I was just following the data.

6028 Quality control

Q: And I think you were then shown some questions or asked some questions about some additional assays that had been run on the modified Siemens machine, and you were asked were you comfortable with the data, and your answer was at that point in time. Do you recall that testimony?
A: Yes.

9

Q: And what did you mean by "at that point in time"?

A: We subsequently turned over more rocks and stones.

6029   Voiding results   Q: Did you get pushback from Ms. Holmes about how to characterize the voiding of the tests?

A: Yes.

Q: Describe that pushback for us, please?

A: There was a characterization for why the voiding was done, to which I disagreed.

Q: And that characterization was what?

A: That characterization was that the problems were due to issues with quality control and quality assurance rather than the instrument itself.

Q: And that was communicated—the idea that this was just a quality systems issue was communicated to CMS; is that correct?

A: Yes.

Q: And you disagreed with that?

A: Yes.

10

JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:      (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**DEFENDANT RAMESH "SUNNY" BALWANI'S RESPONSES TO THE GOVERNMENT'S MOTIONS IN LIMINE**<br><br>**Date:  January 6, 2022**<br>**Time:  9:00 a.m.**<br>**CTRM.: 4, 5th Floor**<br><br>**Hon. Edward J. Davila** |

FER-116

government's motion should be deferred to trial.

## RESPONSE TO GOVERNMENT'S MOTION IN LIMINE NO. 12: DEFENDANT'S MOTHER'S BLOOD TEST

The government moves in limine to exclude evidence of a particular blood test result because "foundational evidence demonstrating whether [the blood test] from Theranos would tend to prove the accuracy or reliability of Theranos's proprietary blood analyzer" and a demonstration of its "foundational relevance to the charged conduct in the Third Superseding Indictment" is lacking. Dkt. 1155 at 19–20. Mr. Balwani agrees. Where foundation cannot be laid to show that Mr. Balwani's mother—or any patient—"received a fingerstick test rather than a venous draw blood test, and/or whether the test was run on Theranos proprietary blood analyzer or a regular FDA-approved machine" the evidence should be excluded. Dkt. 1155 at 20; *see also* Dkt. 1156 at 1–11. The same applies to any evidence going to accuracy and reliability of non-Theranos technology.

Still, it would be improper and untimely to preclude Mr. Balwani from offering any piece of evidence before his trial has even begun—before he has seen the government's case against him and before he has had the chance to lay necessary foundation. *United States v. Mixon*, No. CR-14-00631-001-TUC-JGZ, 2015 WL 13849035, at *1 (D. Ariz. Oct. 16, 2015) ("A district court also has discretion to defer evidentiary rulings until trial" and "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." (quoting *United States v. Bensimon*, 172 F.3d 1121, 1127 (9th Cir. 1999) and *Hawthorne Partners v. AT&T Tech., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993) respectively)). The same cannot be said for the government's intention to call Patients E.T. and B.B. and to present excerpts of the 2016 CMS Report—the government cannot lay foundation to admit this evidence because there can be no reasonable dispute that these evidentiary offerings, among others, are irrelevant to the accuracy and reliability of Theranos' technology. *See* Dkt. 1156 at 1–11.

The defense agrees that evidence going to the accuracy and reliability of patient tests is not relevant unless it goes to the accuracy and reliability of Theranos' technology, not unmodified

- 12 -

FER-117

commercial technology. Mr. Balwani acknowledges that whether he will be able to admit evidence of his mother's blood tests in a potential defense case will depend on whether he can lay that foundation at the appropriate time.

## RESPONSE TO GOVERNMENT'S MOTION IN LIMINE NO. 13: TESTIMONY FROM "NON-PAYING" PATIENTS

As it did in the Holmes trial, the government seeks to admit testimony from non-paying patients. As Mr. Balwani has argued in his own motion, any anecdotal evidence about patients' experiences—including non-paying patients—is irrelevant to the charges brought here concerning systemic inaccuracy or unreliability. *See* Dkt. 1156 at 56. Testimony from non-paying patients would be especially irrelevant to and misleading in this fraud case, and it should be excluded under Rules 401–403 as described in Mr. Balwani's motion. *Id.* Testimony from any non-paying patient is also excludable if the government cannot lay a foundation that the patient test at issue was run on Theranos technology. *See id.* at 1–11.

If the Court is inclined to admit anecdotal patient testimony, it should do so with at least the same restriction it adopted in the Holmes trial: "Patients, physicians, and other witnesses who may testify about receiving results will not be permitted to testify about any physical, financial, or emotional harm they may have experienced beyond simply paying for the test." Dkt. 798 at 99.

## RESPONSE TO GOVERNMENT'S MOTION IN LIMINE NO. 14: REVERSE *JENCKS* AND RULE 16

Mr. Balwani understands his obligations under Federal Rules of Criminal Procedure 16(b) and 26.2 and will comply with them. But the government's motion requests—or seems to request—other relief not required by any statute, Rule, or case.

To start, the parties' respective disclosure obligations are not identical. The government must produce documents that are "material to preparing the defense" *or* which "the government intends to use … in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(E) (emphasis added). The government also has constitutional obligations to disclose other material, like *Brady* and *Giglio* information, to the defense. Mr. Balwani's reciprocal obligation, by contrast, extends only to those items within his possession, custody, or control that he intends to use in his case-in-chief.

- 13 -

FER-118

government has provided in its expert disclosures, for example for Dr. Kingshuk Das.[4]

Thus, the government's motion should be denied.

DATED: December 6, 2021    Respectfully submitted,

         ORRICK HERRINGTON & SUTCLIFFE LLP

         By: */s/ Jeffrey B. Coopersmith*
           Jeffrey B. Coopersmith

         Attorney for Defendant
         RAMESH "SUNNY" BALWANI

---

[4] The government has failed to list the materials Dr. Das reviewed in forming his opinion. *See* Ex. 48.

- 17 -

FER-119

JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
|---|---|
| Plaintiff, | **DEFENDANT RAMESH "SUNNY" BALWANI'S OMNIBUS MOTIONS IN LIMINE** |
| v. | |
| RAMESH "SUNNY" BALWANI, | **Date: December 16, 2021** |
| Defendant. | **Time: 9:00 a.m.** |
| | **CTRM.: 4, 5th Floor** |
| | **Hon. Edward J. Davila** |

FER-120

**MOTION IN LIMINE NO. 2 TO EXCLUDE EXPERT TESTIMONY OF DR. DAS**

Mr. Balwani moves to exclude the testimony of Dr. Kingshuk Das because his expected testimony is based on his review of unidentified data that was stored in Theranos' LIS. Regardless of whether the government formally qualifies him as an expert, Dr. Das is in fact an expert medical doctor specializing in clinical pathology, presents to the jury as such, and the defense anticipates that the government plans to elicit expert scientific conclusions based on his analysis of data about the accuracy and reliability of the technology used in Theranos' clinical lab. This testimony is inadmissible under the Due Process and Confrontation Clauses of the United States Constitution and Federal Rule of Evidence 702. Dr. Das' opinions and conclusions rely heavily on his review of data from Theranos that the government has never identified. The LIS was of course the central repository of data relating to Theranos' laboratory operations, but that data is no longer available for the defense to assess Dr. Das' views or challenge him in any way. Without identification of and access to the data Dr. Das reviewed relating to the accuracy and reliability of Theranos technology, the defense—and the jury—will be left in the position of just having to take Dr. Das' word for it. The defense and jury are in this position because of the government's failure to obtain the LIS data. The government's claims in Ms. Holmes' case—that it could not have obtained this data because it was missing an encryption key, *see, e.g.*, Dkt. 846 at 6-7—are completely false, as demonstrated by the declaration of Richard Sonnier accompanying this motion.[6] Allowing Dr. Das to testify under these circumstances violates the law and would infect Mr. Balwani's trial with error going directly to the falsity element of the wire fraud charges.

---

[6] At this time, Mr. Balwani presents the Sonnier Declaration in support of motions in limine. Mr. Balwani has also moved for the same ruling this Court made in Ms. Holmes' case—that the government may not present evidence of who is at fault for failing to secure the LIS, and a defense argument that the government failed to meet its burden of proof does not open the door to fault evidence. *See* Dkt. 798 at 57-58. If Mr. Balwani introduces evidence at trial that the government is at fault, the defense acknowledges there would then be a question regarding what, if any, evidence of fault the government could introduce in rebuttal.

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-121

## I. ARGUMENT

### A. Dr. Das Is an Expert Witness Regardless of the Government's Label

At the Holmes trial, the government engaged in the fiction that Dr. Das was a lay witness. The government may try this again at Mr. Balwani's trial, or it may seek to qualify him as an expert without identifying the data he relied on. Either way, we anticipate the government will try to elicit expert testimony from Dr. Das going to the heart of the element of falsity in the wire fraud charges at issue, i.e., that Theranos technology was allegedly not capable of consistently producing accurate and reliable results as alleged in paragraph 16 and other portions of the Third Superseding Indictment.

The government presented Dr. Das exactly as a party would present an expert witness. Its approach followed the expert script, including his education, his board certification, and his academic appointments. Ex. 1 (11/9/21 Trial Tr. 5781–84). The government did everything but the final—and crucial—step of asking the Court to rule on Dr. Das' expert qualifications. In doing so, the government secured for its witness the perception of credibility and authority conferred on experts without first carrying its burden under Rule 702 or being subject to that rule.

In his testimony, Dr. Das repeatedly explained technical and scientific concepts to the jury. *E.g.*, *id.* at 5817 (standard deviation); *id.* at 5820 (opining on "desirable or undesirable" quality-control values and the two-standard-deviation rule); *id.* at 5831, 5847-48 (same); *id.* at 5845 (explaining a "term of art in the CLIA regulations"); *id.* at 5846 (explaining a laboratory term of art); *id.* at 5859 (describing Levey-Jennings charts); *id.* (11/10/21 Trial Tr. 5936-37) (describing the patient-distribution analysis and its goals). And as Dr. Das expressly recognized, the analysis he presented on Theranos' data was "pretty sophisticated" and "not something that in [his] view someone without knowledge and training would be in a position to do." *Id.* (11/9/21 Trial Tr. 5837); *accord id.* (11/10/21 Trial Tr. 5953) (agreeing that "many of the analyses that you were doing were pretty technical in nature").

Regardless of whether the government formally calls Dr. Das as an expert witness, he is an expert witness, and that is the way his testimony will be viewed by any rational jury. As explained in more depth in Mr. Balwani's motion on expert testimony from lay witnesses, when

- 13 -

"'observations' require demonstrable expertise," as Dr. Das' concededly do, that is expert testimony. *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997). It is not enough that Dr. Das made these observations or analyses in his job at Theranos: "The mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702." *Id.* Because lay witnesses may not offer opinions "based on scientific, technical, or other specialized knowledge," the Court must treat Dr. Das as the expert witness he is and apply the rules and the law accordingly regardless of whether the government moves to qualify him. Fed. R. Evid. 701(c).

**B.** **Dr. Das' Expert Testimony Relied Heavily on His Review and Analysis of Unidentified Data Stored in LIS**

Dr. Das' testimony does not just rely on specialized knowledge; it also relies on data never identified by the government. Dr. Das has expressly conceded that he reviewed "LIS . . . data dumps on his computer," Ex. 22 (US-REPORTS-0024149) at 3, as well as other data related to Theranos' Edison device, Ex. 23 (US-REPORTS-0024246), none of which the government has ever identified, Ex. 22 (US-REPORTS-0024149) at 3. And Dr. Das has repeatedly conceded that he formed his views in reliance on Theranos' patient test results and quality-control data. Ex. 1 (11/10/21 Trial Tr. 5931–32); *see also id.* at 6023; *id.* (11/9/21 Trial Tr. 5818–19, 5829, 5833–34). That data was kept in Theranos' LIS. *See, e.g.*, Ex. 24 (THPFM0003355246) at 36, 55-57 (LIS App User Guide); Ex 25 (Fosque Tr. 56-75, 83, 109); Ex. 26 (Variam Tr. 48–54). The government had the clear opportunity but failed to obtain this data as discussed in Section C below.

Virtually every aspect of Dr. Das' testimony about Theranos testing and technology derived from his review and analysis of data never identified by the government. His opinion that the quality-control data for vitamin B12 and vitamin D was undesirable—that data was in LIS. *See* 11/9/21 Trial Tr. 5846-48. The same goes for his opinion that the prostate-specific antigen test was yielding anomalous results for female patients, *id.* at 5823–24, his determination that patient prothrombin-time tests were run after quality-control failures, *id.* at 5855–56, and his observation that patient results were reported despite "10x" quality-control errors, *id.* at 5858.

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-123

These are just a few examples. In responding to CMS, Dr. Das' conclusions pervasively and by necessity relied on data that was in LIS. Most glaringly, as discussed further below, Dr. Das' bottom-line conclusion—that patient test results should be voided given his concerns—was the direct result of his review and analysis of data stored in LIS that the government has never identified.

### C. The Government Has Presented Inaccurate Information to the Court Regarding Its Failure to Obtain LIS Data

In pretrial litigation with Ms. Holmes, the government claimed that the LIS data was not accessible because Theranos failed to provide a private encryption key when it produced a copy of the LIS data to the government in August 2018. Decl. of Richard L. Sonnier III ("Sonnier Decl.") ¶ 10 (citing Dkt. No. 887). And based on the government's representations, the Court concluded that when Theranos disassembled its LIS in winding down its operations, it "destroy[ed] the key and render[ed] the original database unusable." Dkt. No. 887 at 12.

The government's representations are untrue. Had the government obtained possession of the servers and other hardware that housed and ran the LIS system, or even the disk drives containing the LIS database, the "private encryption key *would not* have been necessary" to access the data. Sonnier Decl. ¶ 11. This was true both before and long after Theranos disassembled its LIS servers at the end of August 2018. The government had a straightforward means to access LIS data either before the Theranos shutdown or long afterward; it simply needed to obtain the server or disk drives that had been operating at Theranos and that were placed in storage after August 2018. *Id.* ¶ 17. It failed to do so. Had the government obtained these items, "[n]o private encryption keys would have been needed," and the defense would now have the data to test Dr. Das' opinions, among other uses of the information. *Id.*

The government is wrong that it could not have accessed the data after Theranos disassembled the system at the end of August 2018. Although the Court accepted the government's claim that the Theranos shutdown rendered the data permanently inaccessible, the government's claim is false. The LIS hardware was kept in Theranos storage after it was disassembled. *Id.* ¶ 20. The disk drives were also stored. There was nothing stopping the

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-124

government from obtaining either or both of these items from the storage locations. Had the government bothered to do so at any time before or long after Theranos disassembled the system, "it would have been a straightforward technical task to reassemble the LIS system, and no password for the private encryption key would have been needed." *Id.* With the LIS servers or disk drives in hand, "[a] technical specialist could have readily reassembled the LIS system" and recovered the data as if the system's architecture had never been disassembled. *Id.* ¶ 19. The government had the ability to obtain the data. It can no longer hide behind its false claim that Theranos destroyed the system or that the government was helpless without the encryption key. As discussed in the previous motion practice, *see* Dkt. 810 at 5–7; Dkt. 850 at 6–11, it is inexplicable and inexcusable that the government brought a laboratory fraud case without obtaining the central repository of laboratory data.

Exposure of the government's false claim that it could have done nothing to obtain the LIS is only the latest revelation in the history of the government's decision to bring a scientific fraud case without even first trying to review and analyze the central repository of scientific evidence. On May 23, 2018, about a year and a half after it learned of LIS, the government was specifically warned by WilmerHale attorneys that "it was not feasible to simply provide a copy of the LIS database, because they would not have the experience with the system to understand how to compile the data they wanted." Ex. 27 (WH000002070). The government ignored that warning and, rather than seek the assistance of experts, sought a copy of LIS with a grand jury subpoena to Theranos issued on June 4, 2018. It then charged ahead and indicted this case on June 14, 2018 before it received the LIS copy or even knew whether it would receive it. *See* Dkt. 469. In October 2018, a government Automated Litigation Support supervisor advised the prosecution team that it should marshal more resources to work on access to the LIS. Ex. 28 (10/29/20 letter ¶ 46). As demonstrated by Mr. Sonnier's declaration, the government's decision to ignore that advice led directly to the loss of the evidence. Sonnier Decl. ¶¶ 11-13, 17–21; *see also* Dkt. 850 at 7-8.

**D.      Without the LIS Data, Dr. Das' Testimony Should Be Excluded**

The Court's role as evidentiary gatekeeper requires it to exclude Dr. Das' testimony going

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

to the accuracy and reliability of Theranos technology. The Court can admit that testimony only if it concludes that it "is based on sufficient facts or data," Fed. R. Evid. 702(b), and that "the expert has reliably applied [reliable] principles and methods to the facts of the case," Fed. R. Evid. 702(d). The Court must conduct the Rule 702 assessment; it cannot rely on a witness's own assurances. *See, e.g.*, Fed. R. Evid. 702 advisory committee's notes on 2000 amendment (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)) ("[A] trial court 'may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'").

Without access to the LIS data that Dr. Das reviewed to formulate his opinions, the Court simply cannot make these required findings and find Rule 702 satisfied. For that reason, trial courts refuse to permit expert testimony based on absent data. *E.g.*, *United States v. Sheppard*, No. 5:17-CR-00026, 2021 WL 1700356, at *5 (W.D. Ky. Apr. 29, 2021) ("Absent the data supporting the claimed results, the results are not reliable."); *Kriedler v. Pixler*, No. C06-0697RSL, 2010 WL 1507888, at *1–2 (W.D. Wash. Apr. 14, 2010); *see also Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("[A]n expert is free to give a bottom line, provided that the underlying data and reasoning are available on demand."); *Gen. Elec.*, 522 U.S. at 146 ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Rules 703 and 705 are not to the contrary. The former permits an expert to opine on inadmissible evidence, and the latter explains that the expert is not required to explain the underlying facts or data before offering the opinion. These rules concern what may and must be presented to the factfinder *at trial*; they do not absolve a trial court of its *preliminary* responsibility to assess the facts and the reliable application of expert methods to those facts. *See* Fed. R. Evid. 104; *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993). Moreover, Rule 705 provides that "the expert may be required to disclose those facts or data on cross-examination." Fed. R. Evid. 705. An expert like Dr. Das who cannot satisfy that disclosure requirement on cross-examination should be excluded. *E.g.*, *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) ("[O]f course, an expert who plans to testify to an opinion must make the basis of that opinion available for evaluation by the court and opposing parties."); *accord* Fed. R.

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-126

Evid. 705 advisory committee's note (explaining that the rule "assumes that the cross-examiner has the advance knowledge which is essential for effective cross-examination").

The same result is required by the Constitution's Due Process and Confrontation Clauses. A criminal defendant must be permitted to evaluate the data underlying an expert's testimony and then cross-examine the expert about it. "[C]ross-examination is necessary not only to test the witness's knowledge and competence in the field to which his testimony relates by also to elicit the facts on which he relied in forming his opinions." *Proffitt v. Wainwright*, 685 F.2d 1227, 1254 (11th Cir. 1982). Permitting an expert to offer testimony based on absent data insulates his opinions from meaningful cross-examination by the defendant as required by the Constitution. *See, e.g.*, *Howard v. Walker*, 406 F.3d 114, 127 (2d Cir. 2005); *United States v. Love*, 482 F.2d 213, 218–19 (5th Cir. 1973).

As an example, Dr. Das testified that he reviewed the Theranos data including the absent LIS data and concluded that the patient test results were undermined by what in his view were poor results from validation and quality control, as well as his mathematical analysis of the aggregate patient results. *See, e.g.*, Ex. 1 (11/9/21 Trial Tr. 5826, 5830–34; *id.* (11/10/21 Trial Tr. 6023). For instance, Dr. Das explained that upon reviewing the quality-control data, "the average values of quality control, the targets that we were trying to reach, or that the laboratory was targeting, were being shifted unexplainedly." *Id.* (11/9/21 Trial Tr. 5831). Dr. Das further explained that "there was a lot of imprecision noted" in the quality-control data, and that this imprecision was "undesirable" in his view. *Id.* at 5831.

Yet Dr. Das never identified a single error in any patient test result. As the Theranos response to CMS acknowledged, "the fraction of patient results truly impacted, and the nature and magnitude of any effects are unknown." *Id.* at 5833. There was merely a "*possible* patient impact." *Id.* at 5832 (emphasis added). This speculation, based on Dr. Das' review of the LIS data, became the "rationale for voiding the[] tests" performed on Theranos devices. *Id.* at 5833. As explained more fully below in Mr. Balwani's motion in limine concerning Theranos' voiding of patient test results, testimony about that decision to void should be excluded for a number of reasons, including because the decision was based, at least in part, on the absent LIS data. *Id.*

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-127

at 5833–34; 11/10/21 Trial Tr. 6023.

Dr. Das' testimony on this matter encapsulates why the jury must not hear his opinions without the defense having access to the underlying data. His vague assertions about errors in patient testing results—"possible" and "unknown"—are cloaked in the authority of an expert and cannot be tested on cross-examination by way of the actual test results and data. Instead, the jury must accept the ipse dixit of the expert. As the gatekeeper, the Court must prohibit such testimony from reaching the jury in the first place.

## II. CONCLUSION

For these reasons, the Court must exclude the testimony of Dr. Das that goes to the accuracy and reliability of Theranos technology. Labeling Dr. Das as anything other than an expert would be pure fiction. The law prohibits this testimony in the absence of identification and access to all the data underlying Dr. Das' opinions and views about Theranos technology.

## MOTION IN LIMINE NO. 5 TO EXCLUDE EXPERT TESTIMONY OFFERED BY LAY WITNESSES

Acting in its role as an evidentiary gatekeeper, the Court is tasked with policing the line between lay and expert testimony. That exercise is guided by Federal Rule of Evidence 701, which permits lay witnesses to offer opinion testimony only in strictly limited circumstances. When a lay witness strays from opinions based on her own perceptions and begins applying scientific, technical, or other specialized knowledge, the Federal Rules require disclosure and qualification as an expert.

In the trial of co-defendant Elizabeth Holmes, lay testimony has sometimes crossed this line into the realm of expert opinion. Because this may recur in Mr. Balwani's trial, he moves in limine to alert the Court to this issue and to exclude lay-opinion testimony requiring specialized knowledge. The Court should grant this motion to cabin the scope of the testimony by government witnesses in compliance with Rule 701.

## I. ARGUMENT

### A. Lay Witnesses Cannot Offer Opinions Requiring Specialized Knowledge

To comply with Rule 701, an opinion from a lay witness must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The distinction "incorporate[d]" into Rule 701 "is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *Id.* advisory committee's note to 2000 amendment (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)).

In a case like this one, involving complex scientific and technological issues, adherence to Rule 701 is essential. Some witnesses will have personally observed scientific methods, such as blood testing, in action. Others will have observed and worked with complicated technology. But those observations alone are not enough to permit opinion testimony if that opinion is derived—even in part—from specialized knowledge: "The mere percipience of a witness to the facts on

FER-129

which he wishes to tender an opinion does not trump Rule 702." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997).

Take a canonical example: DEA agents can offer lay testimony about the actions of an individual they have investigated on suspicion of drug trafficking. But to opine that those actions "were consistent with an experienced drug trafficker" would have required them to draw on specialized knowledge about drug-trafficking practices more generally. *Id.* (*cited with approval in* Fed. R. Evid. 701 advisory committee's note to 2000 amendment). Accordingly, the Ninth Circuit found it was error to allow such testimony without qualifying the agent as an expert.

Similarly, even a treating medical provider cannot apply specialized knowledge without qualification as an expert. He could, for instance, "testify that a substance appeared to be blood." Fed. R. Evid. 701 advisory committee's note to 2000 amendment. But he could not "testify that bruising around the eyes is indicative of trauma," *id.*, nor could he interpret a medical-imaging report to opine that it shows a brain tumor, *Jerden v. Amstutz*, 430 F.3d 1231, 1239–40 (9th Cir. 2005). This type of testimony is limited to expert witnesses.

### B. The Court Should Exclude Lay-Opinion Testimony Requiring Specialized Knowledge

The Court should apply Rule 701 to exclude the opinions of lay witnesses that require specialized knowledge. This Court has already faced this evidentiary issue in the lead-up to Ms. Holmes' trial. In deciding Ms. Holmes' motions in limine, the Court explained that Theranos employees may testify as percipient witnesses, but they move "from . . . percipient to expert" when they discuss "specific details of particular scientific procedures or analyses that would require specialized knowledge to understand and interpret." Dkt. 989 at 4.

At Ms. Holmes's trial there have been occasions when the testimony of lay witnesses migrated from percipient to expert testimony without objection from the defense. Although the Court did not have an opportunity to rule on the propriety of this testimony in all instances, Mr. Balwani objects to expert testimony from unqualified lay witnesses and moves to exclude it. A key example of this line-crossing is Erika Cheung, who was the government's first witness to testify about the Theranos technology at Ms. Holmes' trial and who worked at Theranos for a

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-130

total of six months in an entry-level position right out of college. Ex. 1 (9/14/21 Trial Tr. 790:4–7, 790:21–791:4). Ms. Cheung was qualified in the lab only for "very low complexity" work like "the basic operations of running lab tests." *Id.* (9/15/21 Trial Tr. 1011:4–9). Accordingly, she categorically lacks the "scientific, technical, or other specialized knowledge" required to qualify as an expert. Fed. R. Evid. 702(a). Yet she repeatedly opined on complex scientific matters and industry standards without any relevant expertise or knowledge.

For instance, in describing purported testing failures in a Theranos laboratory, Ms. Cheung explained to the jury that "it was immensely concerning to see this degree of failures because it's just not typical for a normal lab. Like, in a normal lab you would want to see less than 1 percent, right?" Ex. 1 (9/15/21 Trial Tr. 966:22–25). That is classic expert opinion from a witness unqualified to give it. It stretches well beyond Ms. Cheung's own personal observations at Theranos. It describes industry standards and expectations, which Ms. Cheung was not qualified to opine on. *Id.* (9/14/21 Trial Tr. 790:4–7, 790:21–791:4). And it provides a specific numerical comparison between what is "normal" and what she observed at Theranos—wholly inappropriate testimony for an entry-level lab technician whose only job to that point was at Theranos. "These 'observations' require demonstrable expertise" in the field of laboratory testing, but Ms. Cheung lacks any such expertise. *Figueroa-Lopez*, 125 F.3d at 1246. Rule 701 bars testimony like this from a lay witness.

In addition, when asked about the results of proficiency testing at Theranos, Ms. Cheung switched hats and functioned as a medical expert: "The reason this [test result] is important is because this could be two very different diagnoses of a particular patient. . . . [I]f this is a patient, this [test result] could be the difference between having a [vitamin D] deficiency versus being in the normal range." Ex. 1 (9/15/21 Trial Tr. 950:16–23). Ms. Cheung has no relevant medical training or experience, and as a lay witness, she had no basis for testifying about how a doctor would interpret the results of a vitamin D assay.

Asked about purported failures in quality-control checks, Ms. Cheung opined on the "obvious explanation of why the QCs were failing"—because, in her lay opinion, "the Edison devices didn't work" and weren't "performing reliably or effectively to the standards that you

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-131

would typically see for any other type of medical diagnostic." *Id.* at 923. The Ninth Circuit has explained that comparisons like this, to industry standards, cross the line between Rules 701 and 702. *United States v. Aubrey*, 800 F.3d 1115, 1129 (9th Cir. 2015) (forensic auditor could describe the accounting steps actually performed in his job but not the merits of particular accounting methods). Similarly, when opinion testimony addresses causation—like Ms. Cheung's "obvious explanation" for a complex technological problem—it is particularly inappropriate coming from a lay witness. *See United States v. Urena*, 659 F.3d 903, 908 (9th Cir. 2011).

Finally, Mr. Balwani incorporates the arguments presented by Ms. Holmes' motion in limine concerning expert testimony by treating physicians. *See* Dkt. 561. As Ms. Holmes argued, some physician testimony is inadmissible because the physicians do not meet Rule 702's standards for expert testimony on the overall accuracy and reliability of Theranos' tests. *Id.* at 12–14. Mr. Balwani agrees that this testimony should be excluded and requests that, at a minimum, the Court apply its ruling in Ms. Holmes' case to Mr. Balwani and prohibit physicians from (1) "attributing an inaccurate result to 'lab error,'" and (2) "testify[ing] about accuracy or reliability of testing overall or about any flaw in the Theranos technology." Dkt. 798 at 53.

## II. CONCLUSION

For the foregoing reasons, the Court should rule in limine that the government's lay witnesses called in Mr. Balwani's trial—Ms. Cheung included—may not give opinions or testimony derived from specialized knowledge.

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-132

¶¶ 10–13, 17–19; *cf.* Dkt. 887 at 13–14.

This new evidence justifies considering the motion to suppress anew, or at least granting an evidentiary hearing.

## III. CONCLUSION

This Court should adopt in some cases and reconsider in others its evidentiary rulings from Ms. Holmes' trial in determining the admissibility of evidence in Mr. Balwani's trial.

DATED: November 19, 2021                    Respectfully submitted,

ORRICK HERRINGTON & SUTCLIFFE LLP

By:  */s/ Jeffrey B. Coopersmith*
       Jeffrey B. Coopersmith

Attorney for Defendant
RAMESH "SUNNY" BALWANI

DEFENDANT BALWANI'S OMNIBUS MOTIONS IN LIMINE
CASE NO. CR-18-00258-EJD

FER-133