No. 22-10338

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAMESH "SUNNY" BALWANI,

*Defendant-Appellant*.

On Appeal from United States District Court
for the Northern District of California
No. 5:18-cr-00258-EJD-2, Hon. Edward J. Davila

## REPLY BRIEF OF
## APPELLANT RAMESH "SUNNY" BALWANI

Jeffrey B. Coopersmith
CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA  98101

Amy Walsh
Stephen A. Cazares
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

Mark S. Davies
James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

*Counsel for Appellant*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

ARGUMENT ..................................................................................... 3

    I.    The District Court Violated the Fifth Amendment by Constructively Amending the Grand Jury's Charges. ................. 3

        A.    The indictment charged fraud related to the accuracy and reliability only of Theranos' proprietary technology ........................................................................... 3

            1.    The indictment's text compels Balwani's interpretation. ........................................................ 3

            2.    The evidence before the grand jury tracks Balwani's interpretation. ........................................ 7

        B.    The evidence on conventional technology's accuracy and reliability constructively amended the indictment. ...... 8

        C.    The constructive amendment requires vacating all counts. ................................................................. 10

        D.    Balwani preserved his constructive-amendment argument and regardless has shown plain error. .............. 11

    II.    The District Court Violated Rules 701 and 702 by Admitting Specialized Testimony from Non-Experts. ............................. 13

        A.    The Cheung, Rosendorff, and Pandori testimony about accuracy and reliability was "specialized." ............ 13

        B.    By addressing the wrong legal question, the government effectively concedes the district court violated Rules 701 and 702. ............................................. 16

        C.    Balwani did not invite the district court to violate Rules 701 and 702. ........................................................ 18

        D.    The error requires vacating all counts. ........................... 20

1.      The government's inaccurate overlap and expertise arguments do not render the error harmless. ................................................ 20

2.      Contested evidence of other alleged misrepresentations does not render the error harmless. ................................................ 21

III.    The Government Violated Due Process by Failing to Correct False Testimony. ............................................................... 24

A.    Tolbert and Lucas gave false and misleading testimony. ................................................................ 25

B.    The prosecutors knew the testimony was false and failed to correct it. ................................................ 29

C.    The false testimony warrants vacating all investor counts. ................................................................ 30

D.    Balwani preserved his due-process argument and regardless has shown plain error. .................................. 36

IV.    The District Court Applied the Wrong Standard for Proving Loss at Sentencing. ............................................................ 38

CONCLUSION ............................................................................ 39

CERTIFICATE OF COMPLIANCE

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dickey v. Davis*,
69 F.4th 624 (9th Cir. 2023) ...................................................26, 28, 30, 32

*Dow v. Virga*,
729 F.3d 1041 (9th Cir. 2013)................................................................ 30

*Giglio v. United States*,
405 U.S. 150 (1972) ............................................................................... 33

*Greenwood v. F.A.A.*,
28 F.3d 971 (9th Cir. 1994) .................................................................... 36

*Hayes v. Brown*,
399 F.3d 972 (9th Cir. 2005) .......................................26, 27, 28, 29, 32, 34

*Henry v. Ryan*,
720 F.3d 1073 (9th Cir. 2013)...........................................................27, 28

*Jackson v. Brown*,
513 F.3d 1057 (9th Cir. 2008)...........................................................30, 33

*Kotteakos v. United States*,
328 U.S. 750 (1946) ............................................................................... 22

*Luna v. Luna*,
474 P.3d 966 (Utah 2020) ...................................................................... 33

*Microsoft Corp. v. Motorola, Inc.*,
795 F.3d 1024 (9th Cir. 2015)................................................................ 18

*N. Mariana Islands v. Bowie*,
243 F.3d 1109 (9th Cir. 2001)................................................................ 30

*Napue v. Illinois*,
360 U.S. 264 (1959) ............................................................................2, 24

*Sivak v. Hardison*,
658 F.3d 898 (9th Cir. 2011) ................................................................. 38

*Stirone v. United States*,
361 U.S. 212 (1960) .................................................................. 4, 8, 11

*United States v. Adamson*,
291 F.3d 606 (9th Cir. 2002) ............................................................. 8, 9

*United States v. Alahmedalabdaloklah*,
76 F.4th 1183 (9th Cir. 2023) ............................................................. 32

*United States v. Alli*,
344 F.3d 1002 (9th Cir. 2003) ................................................ 35, 37, 38

*United States v. Barham*,
595 F.2d 231 (5th Cir. 1979) ............................................................. 26

*United States v. Castillo*,
181 F.3d 1129 (9th Cir. 1999) ............................................................ 34

*United States v. Dipentino*,
242 F.3d 1090 ........................................................................... 12, 13

*United States v. Feldman*,
931 F.3d 1245 (11th Cir. 2019) ........................................................... 9

*United States v. Figueroa-Lopez*,
125 F.3d 1241 (9th Cir. 1997) ..................................................... 2, 16, 17

*United States v. Gadson*,
763 F.3d 1189 (9th Cir. 2014) ........................................................... 16

*United States v. Garrido*,
596 F.3d 613 (9th Cir. 2010) ............................................................. 13

*United States v. Hoover*,
467 F.3d 496 (5th Cir. 2006) ............................................................ 3, 4

*United States v. Houston*,
648 F.3d 806 (9th Cir. 2011) ............................................................. 28

iv

*United States v. Hymas,*
  780 F.3d 1285 (9th Cir. 2015)..................................................................... 39

*United States v. Kabov,*
  No. 19-50083, 2023 WL 4585957 (9th Cir. July 18, 2023) ....................... 28

*United States v. Kakkar,*
  719 F. App'x 659 (9th Cir. 2018) ............................................................. 9

*United States v. Kohring,*
  637 F.3d 895 (9th Cir. 2011) ..................................................................... 33

*United States v. LaPage,*
  231 F.3d 488 (9th Cir. 2000) ................................ 28, 29, 30, 32, 34, 35, 37

*United States v. Lonich,*
  23 F.4th 881 (9th Cir. 2022) ..................................................................... 38

*United States v. Magdaleno,*
  43 F.4th 1215 (9th Cir. 2022) ................................................................... 18

*United States v. McDill,*
  871 F.3d 628 (8th Cir. 2017) ..................................................................... 10

*United States v. Palmer,*
  3 F.3d 300 (9th Cir. 1993)....................................................................36, 37

*United States v. Renzi,*
  769 F.3d 731 (9th Cir. 2014) ..................................................................... 27

*United States v. Robinson,*
  68 F.4th 1340 (D.C. Cir. 2023)................................................................. 32

*United States v. Shipsey,*
  190 F.3d 1081 (9th Cir. 1999).................................................................. 12

*United States v. Stirone,*
  262 F.2d 571 (3d Cir. 1958)....................................................................... 4

*United States v. Varela-Rivera,*
  279 F.3d 1174 (9th Cir. 2002).................................................... 12, 36, 37

*United States v. Wellington*,
  754 F.2d 1457 (9th Cir. 1985)...................................................................... 34

*United States v. Wells*,
  879 F.3d 900 (9th Cir. 2019) ..................................................................... 13

**Other Authorities**

Fed. R. Crim. P. 16 ...................................................................................... 20

Fed. R. Evid. 701 ......................................... 1, 2, 13, 14, 15, 16, 17, 18, 21, 24

Fed. R. Evid. 702 .................................................1, 13, 15, 16, 17, 18, 21, 24

## INTRODUCTION

In this closely contested case, evidence admitted in violation of the Constitution and bedrock evidentiary rules made the difference. The jury deliberated five days over two weeks under the false impressions these game-changing errors created. The government's brief centers on repeating its side of the Theranos story, reciting its own factual views not found by the jury. But it does not answer the fundamental questions raised by Mr. Balwani warranting a new trial.

The indictment charged Balwani with defrauding patients and investors about the accuracy and reliability of proprietary blood-testing technology. But over Balwani's objections, the district court admitted a different complex of facts—inflammatory evidence claiming that conventional blood-testing technology used by Theranos endangered patients. As a result, the jury could have decided Balwani made no misrepresentations about the Theranos technology—yet still convicted him based on the evidence about unreliable results on conventional machines. Because the indictment did not charge that latter crime, the convictions must be reversed.

The district court committed reversible error in connection with Theranos' proprietary technology too. In violation of Rules 701 and 702, it allowed the government's three most crucial witnesses—not one of them

qualified as expert—to opine on the scientific and technical aspects of that technology, including its accuracy and reliability. The government argues that the challenged testimony was admissible because it purportedly derived from knowledge obtained on the job and witnesses' rational perceptions. But the government does not dispute that the testimony was indeed specialized under the governing legal test, and Rule 701(c) prohibits specialized testimony by lay witnesses regardless of job training or rational perception. *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997).

To gain still more unfair edge, the government relied on false testimony to appeal to the inherent deep respect for the United States military. It had two witnesses testify falsely that Elizabeth Holmes told investors Theranos was actively using its technology to treat soldiers on battlefields. The government knew this testimony was false because it had a recording of the conversation, where Holmes refers only to the "potential" of such technology. The government successfully fought to hide the truth from the jury and repeatedly used the false testimony in closing. These actions violated *Napue v. Illinois*, 360 U.S. 264 (1959), and basic principles of fairness.

These errors, individually or together, mandate vacating the verdict on all counts.

2

## ARGUMENT

**I.    The District Court Violated the Fifth Amendment by Constructively Amending the Grand Jury's Charges.**

**A.    The indictment charged fraud related to the accuracy and reliability only of Theranos' proprietary technology.**

**1.    The indictment's text compels Balwani's interpretation.**

**a.** The indictment's language describes two different concepts. First, "Theranos's blood testing services" (or "blood tests") encompasses conventional and proprietary technology. Second, "Theranos's technology" (or "Theranos's proprietary analyzer") exclusively describes proprietary technology. OB27-28; AB27-29; 25-ER-6890-93.

In describing Theranos' statements touting its blood tests, the grand jury referred to both technologies. But when it alleged the falsity of those statements, it referred to problems only with Theranos' proprietary technology. OB27-28.

When the grand jury specifically "charge[s] the *manner* in which the defendant's statement is false, the government should be required to prove that it is untruthful *for that reason*." *United States v. Hoover*, 467 F.3d 496, 502 (5th Cir. 2006) (emphases added).

The government tallies the indictment's references to conventional technology divorced from the specific fraud alleged. AB27 (citing indictment

paragraphs 14, 17, 18). From these references, the government concludes that the alleged accuracy-and-reliability fraud covered conventional technology. AB27-28. That is wrong. The indictment in *United States v. Stirone* also explicitly referred to steel, 262 F.2d 571, 574 (3d Cir. 1958), *rev'd*, 361 U.S. 212, but because it *alleged a crime* only regarding sand, the steel evidence constructively amended the charges, *Stirone v. United States*, 361 U.S. 212, 218-19 (1960).

**b.** The correct approach, as in *Hoover*, is to ask in what "manner" the indictment alleges Balwani's "statement [wa]s false." 467 F.3d at 502. That requires looking at the indictment's text "in its entirety," as the government recognizes despite its cherry-picking. AB27. Looking at the whole indictment and its terminology, the question is: As to which technology were the accuracy-and-reliability statements allegedly false?

With the investor counts, there is only one accuracy-related allegation: "that Theranos's proprietary analyzer had accuracy and reliability problems." 25-ER-6890 (Paragraph 12(A)). Nothing about problems with conventional technology.

As for the patient-fraud scheme, the indictment's core charging language—describing the alleged conspiracy—refers to the "fraudulent

4

pretense that Theranos technology produced reliable and accurate blood test results." 25-ER-6894 (Paragraph 22). Again, no conventional technology.

The background paragraphs mention both technologies, reflecting the grand jury's use of the "testing services" term to describe the defendants' statements touting Theranos' tests. But the indictment uses only "Theranos's technology" to describe which tests had problems that rendered fraudulent the representations about accuracy and reliability. The indictment repeatedly reinforces this distinction.

For example, Paragraph 15 describes marketing "claims concerning Theranos's ability to provide accurate, fast, reliable, and cheap blood tests." 25-ER-6892. But in alleging the manner in which those claims were false, it identified "omissions" only "concerning the limits of and problems with Theranos's technologies." *Id.*

Paragraph 16 confirms this distinction, alleging claims about accurate "blood tests and test results" despite alleged "knowledge … that Theranos's technology"—only that technology—was "not capable of consistently producing accurate and reliable results." *Id.*

As an example of those problems, Paragraph 16 lists "certain blood tests" that allegedly did not "consistently produc[e] accurate and reliable results." 25-ER-6893. The government says this list shows an intent to include

conventional technology. AB27-28. It shows the opposite: All but one of the tests ran on proprietary technology at some point. The lone exception (HIV) was one the government, and by extension the grand jury, incorrectly believed *was* tested on proprietary technology. OB29-30 & n.9.

Paragraph 17 demonstrates the grand jury's deliberate use of the two terms to identify two categories. It alleges that "Holmes and Balwani held *Theranos's blood tests* out … as accurate and reliable," but when alleging what made that conduct fraudulent, it states that "Holmes and Balwani knew that the tests performed on *Theranos technology*" were inaccurate and unreliable. 25-ER-6893 (emphasis added); *see also* 25-ER-6892-93 (Paragraphs 14 & 18).

Despite avoiding all but fragments of the text, the government claims that *Balwani's* argument "hinges on a distorted reading" of the indictment. AB27. But in the district court, the government did not just agree with Balwani's interpretation: it championed it. Balwani had his mother's blood tested by Theranos—evidence of his good faith the government wanted to exclude. So the government argued that this evidence lacked "foundational relevance" because Balwani had not established that her sample was tested on proprietary technology. 22-ER-6167. The government contends that its endorsement of this interpretation "*predate*[*d*]" the operative indictment or was "in opposition to Balwani's argument" to admit his mother's results. AB28-29.

6

This is false: The argument was in *the government's* motion just before trial—over a year after the operative indictment. OB14-15 (citing 22-ER-6167).

### 2. The evidence before the grand jury tracks Balwani's interpretation.

To support its interpretation, the government points to evidence it showed the grand jury that supposedly concerned only conventional technology. AB29-30.

But the government never told the grand jury that the evidence related to conventional technology, so the grand jury had no reason to believe it was indicting based on conventional technology's accuracy-and-reliability problems. In particular, the government nowhere explained that CMS's immediate-jeopardy and Condition-level findings are unrelated to Theranos' technology's performance. 2-SER-328-31; OB30-31. Nor did it explain the same as to Tompkins and Bingham's test results—and the indictment nowhere alleges whether their test results were false. 2-SER-341-45, 25-ER-6896; OB31. Thus, nothing before the grand jury bolsters the government's interpretation.

The government points to grand-jury testimony about PT/INR testing on a "third-party device." AB30. But the cited passage includes 14 pages of testimony summarizing concerns about *proprietary* testing, including "modified Siemens machines" and the modified "ADVIA." 2-SER-314-27. Minutes later, the grand jury heard the lone mention of PT/INR testing "on the

ADVIA," with no indication the government had shifted to discussing an *unmodified* Advia—conventional technology. 2-SER-331.

### B. The evidence on conventional technology's accuracy and reliability constructively amended the indictment.

Introducing a "'complex of facts' … 'distinctly different'" from those in the indictment constitutes a constructive amendment. *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002). Here, admitting testimony and a 100-page report highlighting CMS's "immediate jeopardy" and "Condition-level" deficiency findings—all unrelated to proprietary technology's accuracy—surpasses that standard. OB11-12 & n.3, 15-16, 30-31. So too the testimony of two patients about the accuracy of test results from conventional methods. OB31. The government nowhere disputes that this evidence, which it highlighted in closing, turned on conventional technology's accuracy.

The government ignores Balwani's authorities establishing a constructive amendment when a court admits a complex of facts different from those charged. OB32-33. In *Stirone*, for example, the Supreme Court held that admitting evidence of obstructing steel exports (not charged), alongside evidence of obstructing sand imports (expressly charged), was a constructive amendment. *See* 361 U.S. at 213-17. Although the circumstances here match *Stirone*, the government fails to distinguish the case.

Instead, the government invokes cases where the disparity between the charges and the evidence was only a variance. AB31. But none of these cases involves charging a defendant with conduct different from prejudicial evidence that the defendant allegedly risked patient death; they merely concern minor differences in tactics or in the content of the misrepresentation. *United States v. Feldman* involved "slight[]" differences between the alleged fraudulent tactics (forging signatures) and those shown at trial (guiding intoxicated persons' signatures). 931 F.3d 1245, 1261 (11th Cir. 2019). *Adamson* addressed the difference between charges of misrepresenting *whether* hardware servers had been upgraded and evidence of misrepresenting *how* they had been upgraded. 291 F.3d at 616. *United States v. Kakkar* found no discrepancy between the charges and the evidence in the first place. *See* 719 F. App'x 659, 660 (9th Cir. 2018).

Here, the evidence allowed the jury to convict Balwani for conduct different from that charged: running a poor lab and producing allegedly inaccurate results with the same conventional technology used daily by virtually all blood-testing labs. That was a different case from what the grand jury charged and constitutes a constructive amendment.

9

**C.      The constructive amendment requires vacating all counts.**

Because the jury could have based every count of conviction on the uncharged allegations about conventional technology's accuracy and reliability, no count can survive.  The government stated below that "misrepresentations about the accuracy and reliability of Theranos' testing would be sufficient to support a verdict on all counts."  3-ER-408; AB33.  But because the jury made no special findings, the Court cannot know which basis the jury accepted for any count.  *See* OB34-35; *United States v. McDill*, 871 F.3d 628, 630-33 (8th Cir. 2017).

The jury instructions do not defeat this Court's rule that reversal is "always" required.  OB34.  The government falsely contends the district court cautioned that regulatory violations "could not form the basis of the jury's verdict."  AB30-31.  The instruction's text proves otherwise: It told the jury that regulatory violations could not be the *exclusive* basis for their verdict ("merely because"), but—contrary to the government's representation—the jury *could* "consider" that evidence in arriving at a verdict.  1-SER-34.  Nor did the instruction address impermissible testimony about the accuracy of Tompkins and Bingham's test results.

The same holds true for instructing that Balwani was "not on trial for any conduct … not charged in the indictment."  1-SER-17; *contra* AB31.  A

10

jury can understand the charges only based on the evidence admitted at trial, so admitting and arguing improper evidence of uncharged conduct signaled that this conduct was within the indictment's scope. Nothing informed the jury that conventional technology's accuracy and reliability fell outside the indictment.

The government suggests that a single count (Count 11) could still survive. *See* AB35. But while Count 11 involved a proprietary test result, it still required the government to prove the charged falsity of the accuracy-and-reliability representations without the inflammatory evidence that conventional testing endangered patients. The government could not have proven the inaccuracy or unreliability of Theranos' technology, as required by the indictment, with just one inaccurate result among millions of Theranos test results, so that count also must fall.

**D.    Balwani preserved his constructive-amendment argument and regardless has shown plain error.**

The government claims Balwani did not raise constructive amendment below. *See* AB25. But Balwani argued pre-trial that evidence "that non-Theranos technology was inaccurate and unreliable … was not put before a grand jury, and … cannot be put before this petit jury." 22-ER-6159. Just as the defendant in *Stirone* objected to the "materiality and relevancy" of evidence outside the charges, 361 U.S. at 214, Balwani identified the conflict between

11

what the indictment charged and what the challenged evidence showed, 22-ER-6151-61. And the district court's pre-trial ruling refusing to exclude the challenged evidence expressly rested on interpreting the indictment's scope. *See* 2-ER-373.

In proposing jury instructions, Balwani again preserved the argument that the indictment does not allege fraud "in connection with non-Theranos technology" or "the general practices of Theranos' clinical laboratories." FER-64 n.3. And in ruling on Balwani's post-trial bail motion, the district court did not accept the government's waiver argument, noting that it had already rejected "Balwani's interpretation" of the indictment. 3-ER-380; *see* 3-ER-413.

The parties thus "'thoroughly explored'" whether the indictment reaches the accuracy of conventional testing, and the district court's denial of Balwani's pre-trial motion was "'explicit and definitive.'" *United States v. Varela-Rivera*, 279 F.3d 1174, 1177 (9th Cir. 2002).

Regardless, Balwani would prevail on plain-error review. This Court has repeatedly found constructive amendments prejudicial on plain-error review. *E.g.*, *United States v. Dipentino*, 242 F.3d 1090, 1095-96 (9th Cir. 2001); *United States v. Shipsey*, 190 F.3d 1081, 1087-88 (9th Cir. 1999). Here, as in *Dipentino*, an official testified about regulatory violations disconnected from the charged conduct, and the government amplified the prejudice in closing. *See*

*Dipentino*, 242 F.3d at 1095-96; OB30-32. Thus, as in *Dipentino*, "the jury *could*

have" convicted on uncharged conduct. 242 F.3d at 1095 (emphasis added).

## II. The District Court Violated Rules 701 and 702 by Admitting Specialized Testimony from Non-Experts.[1]

### A. The Cheung, Rosendorff, and Pandori testimony about accuracy and reliability was "specialized."

A glaring omission in the government's brief exemplifies why the

challenged testimony was specialized—and therefore inadmissible—under

Rules 701(c) and 702: Hemolysis.

Hemolysis, a complex scientific phenomenon, was the core of

Rosendorff's criticism of Theranos' technology as the government's star

witness. Balwani emphasized this prototypical violation of Rules 701(c)

and 702: namely, Rosendorff's lesson to the jury about the meaning of

hemolysis and how it "interfere[d]" with Theranos' proprietary testing,

including the "accuracy and reliability of certain [Theranos] tests." OB38-39

(quoting 11-ER-2735-36).

---

[1] The government acknowledges *United States v. Wells*, AB36 n.7, requiring the Court review "de novo the 'construction or interpretation of … the Federal Rules of Evidence, including whether particular evidence falls within the scope of a given rule,'" 879 F.3d 900, 914 (9th Cir. 2019) (alteration in original); *accord United States v. Garrido*, 596 F.3d 613, 616 (9th Cir. 2010), *cited at* AB46.

The government does not address hemolysis because it faces a conundrum. To argue the admissibility of the hemolysis testimony, the government would have to start by explaining hemolysis and its effect on testing accuracy. And it cannot explain hemolysis without proving Balwani's point—that Rosendorff's testimony requires explanation that far exceeds "the common knowledge of the average layman." OB40.

Indeed, the government does not explain why any of the challenged passages fall within the knowledge of the "average layperson" as opposed to the specialized knowledge of an expert. It fails to rebut that specialized knowledge was the foundation of, for example, Cheung's testimony about extrapolation analysis, OB38, Rosendorff's testimony about testing reference ranges, OB19, and Pandori's opinion about whether Theranos' technology was groundbreaking given the state of the art, OB39-40. Even when acknowledging some of this testimony, the government contends that it was "grounded in [a witness's] observations," AB43, which does not address specialization or the layperson standard—and, for the reasons explained below (16-18), is the test for the wrong prong of Rule 701.

The government also misrepresents the record. For example, the government denies that "Pandori relied on literature and industry knowledge." AB43. False: he was comparing "the failure rate of the controls on the

14

[Theranos] Edisons" to the rate on conventional "assay equipment"—and, critically, explained he had "familiarity" with that conventional technology through the "literature" and pre-Theranos "industry" experience. 5-ER-998-99. The government expressly elicited this specialized knowledge. *Id.* (asking about "general knowledge," "state of the art," and "knowledge of the industry," in addition to observations).

The government never addresses the many cases that confirm it violated Rules 701(c) and 702. *See* OB41, 46-49. Although some of the government's cases come out the other way, they did not involve specialized testimony. *See* AB46-47 (describing a gun's appearance or marijuana's smell); OB41-42 (*Chen*). The government also observes that law-enforcement officers can testify about the identity of narcotics. AB46. But it ignores the caveat that "[i]f, however, that witness were to describe how a narcotic was manufactured, … then the witness would have to qualify as an expert under Rule 702." Fed. R. Evid. 701 notes to 2000 amendment. Like narcotics manufacturing, testimony about the risks of hemolysis or statistical extrapolation is fundamentally specialized; it is not comparable to the everyday opinion that toasters cannot cook spaghetti, OB47-48, or marijuana smells like marijuana, AB46.

15

**B.    By addressing the wrong legal question, the government effectively concedes the district court violated Rules 701 and 702.**

The government attempts to avoid the issue by arguing that the testimony was based on rational perceptions and therefore was admissible under Rule 701 without violating Rule 702.  *E.g.*, AB38.

But "[t]he mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702."  OB46 (quoting *Figueroa-Lopez*, 125 F.3d at 1246).  Regardless of rational perception under Rule 701(a), if the testimony is "based on scientific, technical, or other specialized knowledge," it flunks the third, *independent* prong at Rule 701(c).  The government never addresses that third prong.  Instead, under its interpretation, Rule 701(c) is surplusage.

*United States v. Gadson* gets the government nowhere.  AB37 (citing 763 F.3d 1189, 1206-08 (9th Cir. 2014)).  *Gadson* decided only the Rule 701(a) rational-perception question; it did not address Rule 701(c) and did not even mention Rule 702 (except as to other issues).  *Id.* at 1205-11.  The government is litigating the wrong issue, effectively conceding Rule 701(c)'s violation here.

The government also confesses—indeed, emphasizes—that the challenged testimony was based on the witnesses' training and professional

experience.  AB41, 42, 47.  But it ignores Balwani's argument that this is precisely the problem.  *See* OB44-45.

Contrary to the government's policy argument, the "average layperson" test does not result in an absurd system of subjecting "every witness who worked in a technical or specialized field" to Rule 702.  AB47; *see also* Holmes Reply 5.  When a scientist testifies that she led a meeting about hemolysis, for example, Rule 702 is inapplicable, because that testimony is based on common knowledge.  But when she opines about the effects of hemolysis on accuracy, she is deploying specialized knowledge.

To hold otherwise would allow the evil Rule 701 seeks to prevent: "the simple expedient of proffering an expert in lay witness clothing."  Fed. R. Evid. 701 notes to 2000 amendment.  The government disregards *Figueroa-Lopez*'s warnings (1) that the government's theory "blurs the distinction" between Rules 701 and 702, (2) that "mere percipience … does not trump Rule 702," and (3) that "holding to the contrary would encourage the Government to offer all kinds of specialized opinions" without satisfying Rule 702.  125 F.3d at 1246, *quoted at* OB46, 52.

Here, the government did just that, including by urging the jury to reject the defense's arguments and instead believe a witness "who is a medical

17

doctor, who is a clinical pathologist and a lab director." OB45-46; 19-ER-5246.

### C. Balwani did not invite the district court to violate Rules 701 and 702.

The government fails to establish invited error. That doctrine applies only when a party "induc[ed] or caus[ed]" the district court to commit the very error challenged on appeal—by persuading the court, e.g., to admit testimony he *himself* "elicited … that he later argue[s] should have been excluded." *United States v. Magdaleno*, 43 F.4th 1215, 1220 (9th Cir. 2022), *cited at* AB44-45.

The error here was testimony *the government* elicited and a misconstruction of the rules that *the government* urged. At every turn, Balwani opposed this testimony and erroneous construction. OB18-20 (collecting citations).[2]

---

[2] The government appears to conflate invited error with the distinct doctrine of "curative admissibility," also called "opening the door," which provides that "the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression." *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1055 n.23 (9th Cir. 2015). None of that doctrine's elements is satisfied. *See id.*

Further, even assuming invited error could apply to testimony Balwani opposed rather than invited, the defense-elicited testimony cited by the government was not specialized or otherwise inadmissible. *See* AB44-45.

None of the passages cited by the government contained inadmissible testimony, because each of them (1) was not based on specialized knowledge or (2) postdated the challenged testimony and therefore could not have invited error as a matter of sheer chronology. For example, as to Rosendorff's cross-examination testimony about dilution, the government offers two citations. AB44. One passage postdated the challenged government-elicited testimony, so it could not have invited any error. 11-ER-2780-81. In the other, defense counsel asked Rosendorff to confirm that "dilution" means "adding some other liquid … to make the volume larger," followed by the identification of several documents. 10-ER-2560-64. Unlike the government's inquiry into dilution, neither cross-examination task required specialized knowledge.

The same goes for Cheung's testimony. Of the government's four citations to Cheung's cross-examination, AB45, one postdated the challenged government-elicited testimony, 4-ER-969-72, and the others required mundane tasks that required no specialized knowledge, such as reading documents and recalling her job duties, 4-ER-867-68; 4-ER-749-53; 4-ER-873-81.

19

**D.     The error requires vacating all counts.**

The central question facing the jury was whether the defendants misrepresented that Theranos' technology was accurate and reliable.  The jury could not have resolved that fundamentally scientific question in the government's favor without the considerable, inadmissible specialized testimony.  The error was not harmless.

> **1.     The government's inaccurate overlap and expertise arguments do not render the error harmless.**

The government erroneously asserts that the challenged testimony overlapped with unchallenged passages.  AB48-49.  But that supposed overlap depends on mischaracterizing the record.  For example, Balwani challenged Cheung's explanation of why dilution was necessary, OB18, and Rosendorff's explanation of why dilution caused purported problems, OB19.  That challenged testimony does not overlap with the government's two citations, one that merely defined dilution, 5-ER-1055, and one that did not even mention it, 10-ER-2436-37.

The government also argues in a conclusory footnote that Rosendorff and Pandori (but not Cheung) "would have qualified as experts."  AB49 n.12.  But, perhaps because the government knew it could not produce the data underlying Rosendorff and Pandori's testimony as required or for other tactical reasons, the government decided not to call them as experts.  *See* Fed. R. Crim.

20

P. 16(a)(1)(G)(iii); Fed. R. Evid. 702(b); OB16-17, 35. It should not now be allowed to reverse course. Moreover, there is serious doubt as to Rosendorff's expertise and reliability given his post-Theranos career—plagued by testing errors and healthcare fraud—and his post-trial misconduct and recantation. *See* OB19 n.7; OB22 n.8; Holmes OB53-67; Holmes Reply 19-22.

### 2. Contested evidence of other alleged misrepresentations does not render the error harmless.

The government contends this pervasive evidentiary error is harmless given evidence of other alleged misrepresentations. AB48-49. Yet it never even mentions (1) that the Court's review "begins with a presumption of prejudice," (2) that the government bears the "burden to show the harmlessness of the error," and (3) that when evidence admitted in contravention of Rules 701 and 702 "addresse[s] the central issue of [the] case," as it did here, "it is hard for [the Court] to see how [that] testimony … was harmless." OB49-51 (quotations omitted).

The government agrees that the accuracy and reliability of Theranos' proprietary technology was the central issue here. OB51; 3-ER-408. But it ignores that the case law therefore requires reversal. Instead, the government depends on mistaken, hollow descriptions of the law. Its point seems to be that, even assuming an error as to the accuracy-and-reliability allegations, (1) there were other alleged misrepresentations, (2) the jury *could have*

21

convicted based on those, so (3) the Court should ignore this glaring error going to the heart of the case. But the government's burden—with which it never reckons—is not to show that the jurors *could have* been unaffected but rather that they *likely were* unaffected. AB48; *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)*.*

The government could not make that showing even if it had tried. The facts underlying the other categories of alleged misrepresentations were hotly contested at trial. For example:

> **Walgreens Demonstration & Null Protocol:** The government states that "Balwani gave misleading technology demonstrations to Walgreens executives." AB34. Not true. During the August 2013 technology demonstration the government highlights, Walgreens executives did not believe "their blood was being tested on Theranos's device displayed to them," AB10—they understood "those machines weren't operational in the room, but [instead were] simply to show [them] what these machines would look like." 8-ER-2089. And fingerstick samples *were* tested on proprietary technology—a conventional device with proprietary modifications. *See* 8-ER-1875-76; 13-ER-3612-13.
>
> The government's own witness agreed that the demonstrations aimed "to present an honest picture of how well the Theranos technology worked" and that, far from hiding test failures, the "null protocol" *never* ran when actual blood samples were inserted. 8-ER-1851-55; 8-ER-2020.
>
> **Walgreens Expansion:** The government states that Theranos' inability to reduce the percentage of venous tests caused Walgreens, in August 2014, to reduce its planned expansion of Theranos offerings— supposedly contrary to Balwani's representations. AB15-16; AB34. The contemporaneous documents contradict that story: Walgreens told Balwani the same month: "We are going to touch 2000 stores in 2015."

22

20-ER-5451. Indeed, the August 2014 meeting minutes show a planned expansion of Theranos offerings into new markets and hundreds of new stores throughout 2015—not a reduction. 20-ER-5403-04.

The government ignores testimony too: Its own witness—a Walgreens executive—conceded that "in addition to" the 200-store expansion, Walgreens planned to launch testing for sexually transmitted diseases in "430 existing, plus 50 new" stores. 9-ER-2305-06; *see also* OB10. The government also points to a text message from November 2014 ("we can't scale with [Walgreens]") to suggest that representations made a month earlier were fraudulent, while ignoring that the message itself related to software integration—not testing. *See* AB16; 9-SER-1938.

**Pharma Logos:** The government, relying in part on testimony from a different trial, asserts that "Holmes *and Balwani*" emailed doctored reports and that "*they*" claimed that pharmaceutical companies had "comprehensively validated" Theranos' technology. AB4 (emphases added); AB34. The record shows no instance in which Balwani sent such a report or made such a claim, nor any evidence he knew there was anything improper about these reports. In fact, Balwani heard the same representation—that pharmaceutical companies had "robustly validated" the technology—when Theranos recruited him. FER-91.

The government's other attempts to distort contested issues are similarly meritless. Theranos did not hide its reliance on third-party equipment (OB8-9); it had a robust relationship with the military (OB6-7); it received tens of millions in revenue from Walgreens in 2014, recorded as deferred revenue (6-ER-1459-66); and Balwani had every reason to trust Theranos scientists' and third parties' (like Johns Hopkins) assessments that the proprietary technology was "fully equivalent" to that of conventional labs and "novel and sound," including the development and validation of scores of laboratory tests,

23

alongside Rosendorff's approval of every clinical test (OB6-7, 9).[3]  The

government has not carried its never-mentioned harmlessness burden.

\* \* \*

As amici observe, the erroneous admission of specialized testimony was

not some "minor procedural foot [fault]"; rather, a court's policing the border

between Rules 701 and 702 "goes to the core of the accused's fundamental

right to mount a defense."  Amicus Br. Nat'l Ass'n Crim. Def. Lawyers 9, 12.

Here, the pseudo-expert testimony was the heart of the government's case on

accuracy and reliability, and its admission requires vacating the verdicts on all

counts.

## III.  The Government Violated Due Process by Failing to Correct False Testimony.

In response to Balwani's due-process challenge under *Napue v.*

*Illinois*, 360 U.S. 264 (1959), the government mischaracterizes the issue as

"[w]hether excluding a recording of Holmes speaking to select investors

violated due process."  AB3.  In fact, Balwani's argument concerns the

government's "failing to correct material false testimony" about what Holmes

said on that recorded call.  OB4.  The government has not rebutted the opening

---

[3] As described in Holmes' opening brief (at 29-30), the decision to void
Theranos test results—after the alleged conspiracy period—was made "out of
an extreme abundance of caution."

brief's showing that: (1) the relevant testimony was false; (2) the government knew it was false and failed to correct it; and (3) the government made that false testimony material to all investor counts, featuring it at least ten times in closing and rebuttal. OB53-66. Balwani preserved this argument and has shown plain error regardless.

### A. Tolbert and Lucas gave false and misleading testimony.

**1.** The government does not contest that Balwani has met the "misleading" standard for falsity. *See* AB55-58; OB54-55. On whether the testimony was also actually false, the government sidesteps the relevant testimony. Tolbert and Lucas testified that on a December 2013 investor call, Holmes told them that Theranos devices were "being used"—in the present tense—on medevacs and in the battlefield. 12-ER-3239; 15-ER-4205; OB54-55. But the recording of that call reveals that Holmes stated "the ability to take a technology like this and put it in flight, specifically on a medevac, has the *potential* to change survival rates." 23-ER-6247 (emphasis added). She spoke prospectively, in terms similar to Theranos' indisputably prospective scope of work for the military. *See* 19-ER-5345; OB55.[4]

---

[4] Holmes also described a "pause" in the military programs. 23-ER-6247. Tolbert falsely testified that she characterized these programs as a "*broadening* of [Theranos'] business *opportunities*," i.e., as currently progressing. 12-ER-3242 (emphases added). *Contra* AB57.

The government contends that based on "present tense" statements Holmes made about other aspects of the military partnership, Tolbert and Lucas "in the moment" interpreted the medevac-and-battlefield points to be similarly present tense. AB55-56. But that's not what the witnesses said, and prosecutors argued to the jury that investors "were left with the impression[,] *because they were told*[,] that the Theranos devices were being used clinically by the military." 19-ER-5261 (emphasis added). Even under the government's view, Tolbert and Lucas created a "false impression" that Holmes definitively stated the military was currently using Theranos devices on the battlefield. *Dickey v. Davis*, 69 F.4th 624, 636 (9th Cir. 2023). Balwani was "entitled to a jury that [wa]s not laboring under a Government-sanctioned false impression of material evidence." *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979). The government was not free to knowingly rest on false or even misleading accounts.

**2.** Ninth Circuit precedent forecloses the government's invented "honestly mistaken recollections" exception for false testimony. AB55-57. This Court has called it "reprehensible for the [government] to seek refuge in the claim that a witness did not commit perjury" but rather "unknowingly present[ed] false testimony." *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005) (en banc). "There is nothing in *Napue*, its predecessors, or its progeny, to

26

suggest that the Constitution protects defendants only against the knowing use of perjured testimony." *Id.* A *Napue* violation is made "more dangerous, not less so" when a witness "is not complicit in the falsehood." *Id.* That "gives the false testimony the ring of truth[] and makes it all the more likely to affect the judgment of the jury." *Id.*

Despite this clear en banc precedent, the government relies (AB55-57) on two Ninth Circuit decisions it claims state that testimony is not false if it is "mistaken, inaccurate or rebuttable," *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013), or composed of "[m]ere inconsistencies or honestly mistaken witness recollections," *United States v. Renzi*, 769 F.3d 731, 752 (9th Cir. 2014). But both these cases recognize that *Napue*'s first prong is satisfied where the testimony is "actually false," without any requirement that the witness intentionally lied. *Renzi*, 769 F.3d at 751; *accord Henry*, 720 F.3d at 1084. The *Renzi* Court "d[id] not decide" whether the defendant there had satisfied *Napue*'s first two prongs (including falsity), "as he ha[d] not met the third prong." 769 F.3d at 752. And *Henry* addressed only *Napue*'s second prong, regarding the government's knowledge. Because the defendant conceded the prosecution was unaware of the false testimony, his *Napue* claim depended on showing that the detective witness' "knowledge must be imputed to the prosecution." *Henry*, 720 F.3d at 1084. The Court "agree[d] with the district

27

court that Henry ha[d] not established that [the detective] knowingly provided false testimony during trial," so he could not prove his theory of imputed knowledge—not at issue here. *Id.*

By contrast, courts that *have* addressed *Napue*'s first prong have faithfully applied *Hayes*' principles to false testimony that was arguably "mistaken, inaccurate, or rebuttable." *E.g.*, *Hayes*, 399 F.3d at 979-80, 988 (testimony denying a prosecution deal made without witness' knowledge); *Dickey*, 69 F.4th at 637-38, 644-45 (testimony that government had not "bought" witness anything where it negotiated for him to secure housing). And while Balwani's *Napue* claim is not based on mere "inconsistencies" with witnesses' prior statements, making *United States v. Houston* inapposite, *see* 648 F.3d 806, 814 (9th Cir. 2011); *contra* AB58, so too have those formed the basis of *Napue* claims, *see, e.g.*, *United States v. LaPage*, 231 F.3d 488, 490 (9th Cir. 2000). Nor does this case involve "opinion" testimony as in *United States v. Kabov*, No. 19-50083, 2023 WL 4585957, at *4 (9th Cir. July 18, 2023), *cited at* AB58: Tolbert and Lucas never qualified their testimony as mere "opinions," *see* 12-ER-3239; 15-ER-4205.

28

**B.** **The prosecutors knew the testimony was false and failed to correct it.**

*Napue*'s second prong is satisfied because Holmes' purported statements about the military's current use of Theranos devices "w[ere] important and the same prosecutor tried the case both times," against Holmes then against Balwani. *LaPage*, 231 F.3d at 490; OB56-59.

In response, the government summarily asserts "[t]here is no evidence that … [it] knowingly elicited false testimony," AB55, or "that the government believed Balwani's nuanced alternative interpretation" of the recording, AB58. This misstates *Napue*'s second prong, which requires the government to correct testimony it knows to be false no matter whether the government elicited it. *Hayes*, 399 F.3d at 981-82. And the government fully understood that the testimony deviated from Holmes' statements *because it had prominently featured those statements* in the Holmes trial through Tolbert's recording. OB20-21, 56-58. The Holmes jury even asked to rehear the recording during deliberations. 22-ER-6135. It proved the government's witnesses wrong, moving Holmes' jury to return a mixed verdict. 22-ER-6132-34. The government cannot now claim amnesia about the destructive effect of the tape on its own case. Its subsequent tactics preventing Balwani's jury from hearing the recording also demonstrate knowledge—it knew the truth did not play well. OB56-59; Amicus Br. Am. Bd. Crim. Lawyers ("ABCL Br.") 5-10.

Even accepting the government's claim of ignorance, it fails to address its "'duty' … to act when put on notice of the real possibility of false testimony." *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001); *see also Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008); OB58-59.

## C. The false testimony warrants vacating all investor counts.

The *Napue* materiality standard is "considerably less demanding than the standard for *Brady* claims," *Dickey*, 69 F.4th at 637, requiring "'harmless[ness] beyond a reasonable doubt'" to affirm, *LaPage*, 231 F.3d at 491; *see also* OB59, 65-66; ABCL Br. 18-20. Thus, Balwani need only show, and has shown, "the error *could* have affected the judgment of the jury." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013); *accord* OB59. The government fails to demonstrate otherwise.

First, Holmes' reported statements about military use of Theranos devices were far from "minimal … point[s]" at trial, *contra* AB60—they were a centerpiece of the government's closing on all investor counts, OB60-63. It told the jury that "Holmes fulfill[ed] her role in the conspiracy" by "brag[ging] about … military work" on "the Tolbert phone call." 18-ER-5107 (closing). And the government hammered the false testimony:

- "If Mr. Balwani was honest with investors, you know that he would have told them … that Theranos's technology had not been

30

deployed by the military in the battlefield ….”  18-ER-5071 (closing).

- “Elizabeth Holmes told Bryan Tolbert that the Theranos device had been deployed by the military and was being used in the treatment of soldiers.”  18-ER-5087 (closing).

- “[Defendants] would have told you that … the technology was being used on the battlefield, and that it was actually saving the lives of soldiers fighting for this country.”  19-ER-5228 (rebuttal closing).

- “They borrowed the credibility of the U.S. military by claiming that organization was relying on the company’s technology ….” 19-ER-5335 (rebuttal closing); *see also* 19-ER-5125, 5131, 5164-66 (closing); 19-ER-5261-65, 5271 (rebuttal closing).

While the government now points to other military representations to defend the verdict (AB61), it relied on *this* alleged misrepresentation more than ten times, to the virtual exclusion of all others concerning the military.  Using this testimony in closing and rebuttal—the latter providing no opportunity for Balwani to respond—amplified its prejudicial impact.

Nor were the inaccuracies in Tolbert and Lucas’ testimony merely “slight.”  *Contra* AB59.  They went to the heart of a fraud case built on what Holmes and Balwani did and did not say.  ABCL Br. 17-18.  The government thought them significant enough to keep Holmes’ actual words from Balwani’s jury.  *Above* 29.  And the Holmes jury evidently thought them serious enough to hang on some counts.  OB20-21.

That the Holmes jury convicted on *some* investor counts does not undermine this testimony’s materiality across the investor case.  *Contra* AB62.

31

That would set an improperly strict test for *Napue* materiality, which does not require showing that removing the false testimony *did* affect the Holmes outcome—only that "correcting [the] false testimony *could* … have changed [Balwani's] jury's decision." *Dickey*, 69 F.4th at 629 (emphasis added). Under the proper standard, Holmes' mixed verdict illustrates that "it is not beyond reason that a juror might harbor doubt as to one count or another, which could have resulted in a hung jury rather than a verdict of guilty." *United States v. Robinson*, 68 F.4th 1340, 1348 (D.C. Cir. 2023). "[E]xamin[ing] … the effect of the prosecutor's hypothetical correction of the false testimony in front of the jury," *United States v. Alahmedalabdaloklah*, 76 F.4th 1183, 1231 (9th Cir. 2023), reveals that Balwani's jury would have been differently positioned than the Holmes jury absent the due-process violation, *see Hayes*, 399 F.3d at 988; OB64-65. Had the government confessed the falsity, *LaPage*, 231 F.3d at 492, a juror could have questioned the integrity of other investor claims and harbored reasonable doubt about the alleged fraud.

Second, Tolbert and Lucas' demonstrably false memories were relevant to all investors' credibility, even on supposed "unrelated false statements that investors heard." *Contra* AB61. The government told the jury it could trust investor-witnesses' recollections "because they all say consistently the same thing." 19-ER-5265; *see also* OB61-64. But "human memory is very slippery."

32

*Luna v. Luna*, 474 P.3d 966, 974 n.7 (Utah 2020).  There can be "hundreds of people who believe" a non-existent event took place and who "would testify that they have a clear recollection" of it, despite proof of the event's non-existence.  *Id.*  "[T]he jury was entitled to know" the government was aware that two investors were flat-out wrong as to a common memory.  *Giglio v. United States*, 405 U.S. 150, 155 (1972).

Third, the government's case was not "overwhelming."  *Contra* AB62.  Other alleged misrepresentations were hotly disputed, altogether undermined, or infected by additional errors.  *Above* 22-24; *see also above* §§ I, II.  In any event, sufficiency of the evidence does not undermine materiality.  *See Jackson*, 513 F.3d at 1071.  Furthermore, unlike with other alleged representations whose truth was vigorously litigated, Balwani never argued at trial that Theranos devices were being used on the battlefield.  So had this alleged misrepresentation been made, it was an easier (and more emotional) route to conviction.  Because the general verdict left "no way to determine wh[at] the jury based [its] convictions on," what matters is that the jury "might have" accepted the government's invitation to rely on this misrepresentation.  *United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011); *see also* OB65-66.

Fourth, the government bafflingly criticizes Balwani for failing to "attempt to impeach [Tolbert or Lucas] … with the transcript or recording."

33

AB60.  Yet the government opposed precisely that move in the colloquies it cites.  *E.g.*, AB52 (citing 2-ER-325-41, 352-59).  Balwani sought to "us[e] the recording" to "cross-examine" Tolbert on "the actual words [Holmes] said," 2-ER-326-27, a classic form of impeachment, *see, e.g.*, *United States v. Castillo*, 181 F.3d 1129, 1132-34 (9th Cir. 1999).  The government called this "an end run around the hearsay rules."  2-ER-328.  But Balwani sought to introduce the statements to prove precisely what was said, not as proof of those underlying statements' truth.  "[R]epresentations that were made to potential investors" in an investor-fraud case "are not hearsay because their probative value is independent of their truth."  *United States v. Wellington*, 754 F.2d 1457, 1464 (9th Cir. 1985); *see also* OB57 & n.18.  The court nevertheless sustained the government's objection and excluded the tape for all purposes, including impeachment.  2-ER-359; *below* 36-37.

Further, impeachment would be no cure for this *Napue* error.  The introduction of false testimony obligates the government, for example, to unequivocally "interrupt [its] own questioning … [and] inform the jury immediately that the testimony is false," *LaPage*, 231 F.3d at 492, and "correct the record to reflect the true facts," *Hayes*, 399 F.3d at 984.  Because this violation concerned testimony used as substantive evidence of Balwani's guilt, correction here would mean, for example, allowing the jury to consider the

recording as substantive evidence of what Holmes said in assessing the fraud charges—which the government emphatically opposed. OB21, 56-57 & n.18; *above* 29, 33-34.

For these reasons, *United States v. Alli*, 344 F.3d 1002 (9th Cir. 2003) clarifies, rather than undermines, that the false testimony here affected Balwani's substantial rights even under plain-error review. OB57 n.17, 60 & n.19. *Contra* AB60. *Alli* faced a "rare" instance where a *Napue* error did not violate the defendant's substantial rights because the defense attorney was permitted to use the plea agreements that proved the witness wrong "to cross-examine the witnesses; decided not to introduce them into evidence; and neglected to object to the misstatements of the witnesses." 344 F.3d at 1008. And unlike here, "the prosecutor never sought to capitalize on the false testimony." *Id.* This case is worse than *Alli* at every turn.

All false testimony "pollutes a trial," and "[a] prosecutor has a special duty commensurate with a prosecutor's unique power[] to assure that defendants receive fair trials" and to "refrain from improper methods." *LaPage*, 231 F.3d at 492; *see also* ABCL Br. 20. The government's actions, calculated to hide inconvenient truths, require vacating the investor counts.

> **D.** **Balwani preserved his due-process argument and regardless has shown plain error.**

The government pushes for plain-error review of its *Napue* violation. AB54. But Balwani preserved his due-process argument. *See Varela-Rivera*, 279 F.3d at 1177.

Balwani put the district court "on notice," *United States v. Palmer*, 3 F.3d 300, 304 (9th Cir. 1993), of what the government agrees is the essence of a *Napue* claim: "that the government was eliciting false testimony," AB53. To prove Tolbert's anticipated testimony was false, the defense wanted to use "the recording in cross-examination with Mr. Tolbert … relating to the actual words [Holmes] said." 2-ER-326-27. This was not about "hearsay" purposes (i.e., to prove the truth of Holmes' statements) but rather to establish the fact of her actual statements. 2-ER-357 (counsel incorporating earlier "not for the truth" purposes); *see also* 2-ER-326-37; OB57 & n.18. *Contra* AB52-53. The court ruled that it "[did]n't see grounds to allow the defense at this time to put the[]" tape in. 2-ER-359. The district court's ruling was definitive: When the district court suspected defense counsel might raise the issue again, it sternly warned counsel not to "talk about my decision that I just made." 2-ER-359. Balwani also indisputably raised *Napue* post-trial and in his opening brief here, *see, e.g.*, FER-41-42; OB53-66; AB54, distinguishing this case from *Greenwood v.*

36

*F.A.A.*, 28 F.3d 971 (9th Cir. 1994), *cited at* AB54.[5]  The government's other cases (AB54) do not address what counts as a sufficient objection.

Balwani need not have lodged a "futile and formalistic" renewal of his objection during the testimony.  *Varela-Rivera*, 279 F.3d at 1178.  *Contra* AB54.  The district court had all pertinent facts when it ruled, *see* 2-ER-359, and nothing changed before the false testimony an hour later, 12-ER-3239.  "[R]equiring a contemporaneous objection," "immediately after the district court ha[d] denied" Balwani's request, "would have the perverse result of making form the master of substance."  *Palmer*, 3 F.3d at 304.  And the district court did not consider the issue forfeited when it denied bail pending appeal.  3-ER-389-90.

In any event, the plain-error standard would not change the outcome because Balwani has shown "(1) there was error; (2) the error was 'plain'"; "(3) the error affected 'substantial rights'"; and (4) "the error 'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.'"  *Alli*, 344 F.3d at 1007.  First, it has long been clear that the government must correct false testimony even where "defense counsel knows, and the jury may figure out, that the testimony is false," *LaPage*, 231 F.3d at 492, so neglecting that

---

[5] Balwani's bail briefing cited both Tolbert and Lucas' testimony.  FER-17.  *Contra* AB54.

duty in those circumstances is "plain" error, *see Sivak v. Hardison*, 658 F.3d 898, 909 (9th Cir. 2011) ("It is 'irrelevant' whether the defense knew about the false testimony and failed to object or cross-examine the witness …."); *Alli*, 344 F.3d at 1007 (false testimony satisfied three of four plain-error prongs). Next, only in a "rare case" does a *Napue* error not affect a defendant's substantial rights, *Alli*, 344 F.3d at 1008, and Balwani has shown that the government's capitalization on the false testimony did so here, *above* § III.C; *see also* OB57 n.17; OB60 n.19. Finally, the government does not dispute that, as *Alli* held, such error "impact[s] … the 'public reputation of judicial proceedings.'" 344 F.3d at 1007; *see also Sivak*, 658 F.3d at 909.

\*    \*    \*

As for cumulative error, contrary to the government's view (AB62), if the Court identifies two or more errors but concludes they were individually harmless, it should nonetheless vacate because these errors go to the heart of Balwani's defense.

## IV. The District Court Applied the Wrong Standard for Proving Loss at Sentencing.

The government's authorities (AB63-64) predate *United States v. Lonich*, 23 F.4th 881 (9th Cir. 2022), which clarifies the rule: When neither the trial evidence nor the "verdicts … compel the conclusion" that the charged

conduct caused the losses, the clear-and-convincing standard applies, *id.* at 915.

The government opines that the evidence at sentencing met the clear-and-convincing standard.  AB64.  But this Court does not engage in "guesswork."  *United States v. Hymas*, 780 F.3d 1285, 1292 (9th Cir. 2015).

## CONCLUSION

The Court should vacate the judgment and sentence.

January 5, 2024                                  Respectfully submitted,

                                                 */s/ Mark S. Davies*

Jeffrey B. Coopersmith                           Mark S. Davies
CORR CRONIN LLP                                  James Anglin Flynn
1015 Second Avenue, 10th Floor                   ORRICK, HERRINGTON &
Seattle, WA  98101                                 SUTCLIFFE LLP
                                                 1152 15th Street, NW
Amy Walsh                                        Washington, DC  20005
Stephen A. Cazares                               (202) 339-8400
Aaron P. Brecher
Sachi Schuricht
Amari L. Hammonds
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

*Counsel for Appellant*

39

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-10338 _____

I am the attorney or self-represented party.

**This brief contains 8,000 words,** including 0 words manually counted in any

visual images, and excluding the items exempted by FRAP 32(f). The brief's type

size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[X] complies with the length limit designated by court order dated December 22, 2023.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Mark S. Davies _____ **Date** January 5, 2024 _____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                  *Rev. 12/01/22*